CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Jane VanLare
One Liberty Plaza
New York, New York 10006
Telephone:  212-225-2000
Facsimile:  212-225-3999

*Proposed Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (__) |
| Debtors. | Joint Administration Pending |

**DECLARATION OF MICHAEL LETO**
**IN SUPPORT OF FIRST DAY MOTIONS AND**
**APPLICATIONS IN COMPLIANCE WITH LOCAL RULE 1007-2**

I, Michael Leto, hereby declare under penalty of perjury, pursuant to section 1746

of title 28 of the United States Code, as follows:

1.       I am a Managing Director with Alvarez & Marsal North America, LLC ("A&M"),

a restructuring advisory services firm specializing in interim management, crisis management,

turnaround consulting, operational due diligence, creditor advisory services and financial and

operational restructuring, and a restructuring advisor to the above-captioned debtors and

debtors-in-possession:  Genesis Global Holdco, LLC ("Holdco"), Genesis Global Capital, LLC

---

[1]       The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

("GGC"), and Genesis Asia Pacific Pte. Ltd. ("GAP," and together with Holdco, GGC, and Holdco's subsidiaries the "Company").

2.      Since the Debtors engaged A&M in November of 2022, I have worked closely with the Company and other advisors.  I have over 15 years of distressed company advisory experience. Through roles in both senior management and as a restructuring advisor, I have substantial experience helping financially distressed companies stabilize their financial condition, analyze their operations, and develop business plans to accomplish the necessary restructuring of their operations and finances.  I have advised clients in numerous major bankruptcy cases, including Lehman Brothers Holdings Inc, a large financial bankruptcy (for 7 years, of which I served 3 years as Interim Chief Financial Officer), Bristow Group, aviation transportation company, Gibson Brands, a large international consumer products company, and have served as the interim Chief Financial Officer of other private companies.  I received my bachelor's degree in Accounting and Business Administration from Hofstra University and an MBA from Fordham University in Management Systems and International Business.  This declaration sets forth the relevant facts in support of each of the Debtors' chapter 11 petitions and first day motions.

3.      I am generally familiar with the operations and affairs of the Debtors that have filed voluntary petitions for relief under chapter 11, title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Court"). Concurrently herewith, the Debtors have filed a motion seeking joint administration of their chapter 11 cases (the "Chapter 11 Cases") pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").

4.      To minimize the adverse effects on their businesses, creditors and employees of filing for bankruptcy protection, the Debtors have filed motions requesting various types of "first

day" relief (collectively, the "First Day Motions").[2]  The First Day Motions seek relief intended to allow the Debtors to perform and meet the obligations necessary to continue ordinary course activities and fulfill their duties as debtors-in-possession.  I am familiar with the contents of each First Day Motion (including the exhibits thereto) and, based on my knowledge and experience, believe that each First Day Motion (i) is necessary to enable the Debtors to operate in chapter 11 with minimum disruption or loss of productivity or value; (ii) constitutes a critical element of the Debtors' restructuring efforts; and (iii) best serves the interests of the Debtors' estates and creditors.

5.      I submit this declaration (this "First Day Declaration") in support of the First Day Motions and pursuant to 28 U.S.C. § 1746, as well as Rule 1007 of the Bankruptcy Rules and Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"). Except as otherwise indicated herein, all facts set forth in this First Day Declaration are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, information supplied to me by members of the Debtors' management, other personnel and professional advisors or my opinion based on my experience, knowledge and information concerning the Debtors' operations and financial condition and the digital asset industry as a whole.  To the extent that the Debtors learn that any information provided herein is materially inaccurate, the Debtors will act promptly to notify the Court and other parties; however, I believe all information herein to be true to the best of my knowledge, information and belief.  I am authorized to submit this First Day Declaration on behalf of the Debtors and, if called upon to testify, I could and would testify competently to the facts set forth herein.

---

[2]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in each of the First Day Motions.

6.     Section I provides an overview of the Debtors' prepetition capital structure and indebtedness.  Section II summarizes the relief requested in each First Day Motion and the facts supporting those requests.  Section III includes certain additional information required by Local Rule 1007-2 related to the Debtors.

## I.     THE DEBTORS' PREPETITION CAPITAL STRUCTURE

### A.     Debtors' Cash, Digital Assets and Shares Held in Brokerage Accounts

7.     As of the Petition Date, the Debtors have more than $150 million in cash, approximately $500 million in digital assets, and approximately $385 million in shares in brokerage accounts respectively.  As of November 30, 2022, the Debtors had approximately $505 million in outstanding loans to Third Parties.  In connection with the outstanding loans, the Debtors have received approximately $553 million in collateral against those loans in both U.S. dollars and/or digital assets.

### B.     Institutional Creditors

8.     According to information made available by the Company's management, as of November 30, 2022, GGC and GAP had outstanding borrowings in U.S. dollars and digital assets totaling approximately $2.6 billion with approximately 595 non-affiliated institutional lenders.[3] These borrowings are generally documented under master digital asset loan agreements ("MLAs") individually negotiated with each lender as well as associated term sheets.  In connection with such borrowings, GGC and GAP have posted approximately $351 million in collateral denominated in U.S. dollars and/or digital assets.

---

[3]     According to the same information, GGH did not have any outstanding borrowings with third parties as of November 30, 2022.

### i.    Gemini Lenders

9.      GGC also has outstanding borrowings of digital assets with customers of Gemini Trust Company, LLC ("Gemini") (such borrowings, the "Gemini Borrowings").  As with the Debtors' other borrowings, these transactions are documented under MLAs. However, GGC did not interact with Gemini's customers ("Gemini Lenders") directly.  Rather, the Gemini Lenders appointed Gemini to act as their agent in connection with the Gemini Borrowings.

10.      In addition, the Gemini Borrowings with Gemini Lenders are not documented under term sheets.  Rather, pursuant to the MLAs, GGC provided Gemini with the terms of the loans it was willing to enter into.  Gemini then was required to provide such terms to the Gemini Lenders who chose to enter into loans subject to those terms.  GGC does not have information about the number or identity of the Gemini Lenders, and understands that Gemini is privy to that information.

11.      On August 15, 2022, GGC entered into a security agreement with Gemini as agent for the Gemini Lenders pursuant to which GGC pledged 30,905,782 shares of the Grayscale Bitcoin Trust ("GBTC") to Gemini for the benefit of the Gemini Lenders to secure GGC's obligations under the Gemini Borrowings.  On November 7, 2022, GGC and Gemini entered into an amendment to the security agreement, which extended its term until GGC paid what it owed under the Gemini Borrowings in full.  On November 10, 2022, GGC, Gemini and DCG entered into a second amendment to the security agreement pursuant to which DCG agreed to deliver an additional 31,180,804 shares of GBTC to GGC.  GGC, in turn, agreed to transfer such shares to Gemini for the benefit of the Gemini Lenders and, upon such transfer, pledge those shares to Gemini to secure GGC's obligations under the Gemini Borrowings.  However, no shares were transferred (or therefore pledged) pursuant to this second amendment.

12.     On November 16, 2022 Gemini informed GGC that it had foreclosed on 30,905,782 of shares pledged under the security agreement through a private sale at the market price as of 4:00 p.m. EST of $9.20 per share.  On that date, Gemini further informed GGC that the proceeds of such sale, $284,333,194.40, less costs and expenses of foreclosure, were applied to GGC's outstanding obligations under the Gemini Borrowings.  I understand that GGC disputes whether Gemini's foreclosure satisfied applicable law, including whether such sale was completed in a commercially reasonable manner and in accordance with the notice requirements set forth in the Uniform Commercial Code.

## II.     TRANSACTIONS WITH DCG AND DCG INTERNATIONAL INVESTMENTS LTD.

### A.     DCG Loans

13.     According to information made available by the Company's management, as of November 30, 2022, GGC has outstanding loans to DCG amounting to approximately $500,000,000.  The loans consist of:

- A $100,000,000 loan, which was executed on January 24, 2022 with an original maturity date of July 24, 2022, which was later extended to May 11, 2023 (the "January Loan");

- A $100,000,000 loan, which was executed on February 23, 2022 with an original maturity date of August 23, 2022, which was later extended to May 11, 2023 (the "February Loan");

- A $200,000,000 loan, which was executed on May 9, 2022 with a maturity date of May 9, 2023 (the "May 9 Loan");

- A $100,000,000 loan, which was executed on May 10, 2022 with a maturity date of May 10, 2023 (the "May 10 Loan" and together with the May 9 Loan, the "May Loans" and collectively with the January Loan and February Loan, the "GGC-DCG Loans").

14.     On November 10, 2022, in connection with various transactions, including an equity injection from DCG into GGC International Ltd. ("GGCI"), a non-debtor affiliate, of a total value of approximately $140 million, including contributions of $50 million in cash, various digital currency and GBTC shares, GGC and DCG entered into an amended and restated Master Digital Asset Loan Agreement (the "A&R DCG Loan Agreement") to memorialize the terms governing the GGC-DCG Loans.  On the same date, the parties also extended the maturity of the January Loan and February Loan to May 11, 2023.  On the same date, GGC also repaid $50,000,000 it had borrowed from DCG on June 15, 2022.

### B.    DCG Note

15.     On June 30, 2022, DCG assumed a $1.1 billion payable GAP owed to GGC and evidenced the assumed payable with a $1.1 billion promissory note in favor of GGC that had a 10 year maturity and fixed interest rate of 1% that may, at DCG's option, be paid in kind.

### C.    Luno Set Off

16.     On August 30, 2022, GGC entered into a master loan agreement with Luno Pte. Ltd. ("Luno"), a subsidiary of DCG (the "Luno MLA").  On November 11, 2022, DCG purportedly issued to Luno a guarantee, to which GGC was not a party, of GGC's obligations to Luno under the Luno MLA.  As of November 17, 2022, GGC had owed Luno digital assets which were valued at approximately $52.5 million under loans governed by the Luno MLA.  On that date, Luno purportedly demanded the transfer of such digital assets from DCG under the guarantee and DCG purportedly transferred such digital assets promptly after receiving the demand.

17.     DCG purportedly set off GGC's obligation to reimburse DCG for the $52.5 million transfer to Luno against DCG's obligations under the January Loan.  If this setoff is valid, the $500,000,000 owed to GGC by DCG would be reduced by the $52.5 million setoff amount.

However, I understand that the Special Committee of the Board of Holdco is continuing to investigate this matter.

**D.     DCGI Loans**

18.     Based on information made available by the Company's management as of November 30, 2022, GGC has outstanding loans to DCG International Investments Ltd. ("DCGI"), a subsidiary of DCG, of 14,048 BCH (approximately $1.7 million USD as of the Petition Date) and 4,550.45 BTC (approximately $94 million USD as of the Petition Date).  The outstanding 4,550.45 BTC is owed under a loan from GGC to DCGI of 18,297 BTC that the parties entered into on June 18, 2022 pursuant to a term sheet and MLA.  The original maturity date is not specified in the loan term sheet.  On November 10, 2022, DCGI partially paid off the BTC Loan by delivering 25,999,457 GBTC shares to GGC (approximately $250 million USD as of the date of payment), which resulted in the remaining obligation of 4,550.45 BTC.  On the same date, the maturity date for DCGI's obligation to return the remaining 4,550.45 BTC was specified as May 11, 2023.

19.     GGC also owes DCGI 78,539.01 ETHW (approximately $296,000 USD as of the Petition Date) under a loan between the parties dated November 15, 2022.

**III.    FIRST DAY PLEADINGS**

20.     To minimize the adverse effects on their business during the Chapter 11 Cases, and to ensure continued ordinary course operations post-petition, the Debtors have requested various types of customary relief in the following First Day Motions, all of which are being filed concurrently with this declaration.  For the reasons discussed below, I believe that the relief requested in each of the First Day Motions is necessary and appropriate and is in the best interest of the Debtors' estates, creditors and other parties-in-interest.

A.    **Procedural Motions**

*Debtors' Motion for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases* (the "Joint Administration Motion")

21.    The Debtors have sought entry of an order directing the joint administration of the Chapter 11 Cases for Genesis Global Holdco, LLC, Genesis Global Capital, LLC and Genesis Asia Pacific Pte. Ltd.

22.    Joint administration will eliminate the need for duplicative notices, applications, motions, hearings and orders, which will permit the Debtors to avoid the time and expense that would otherwise be necessary to administer individual cases separately.  Because the Joint Administration Motion requests only administrative, and not substantive, consolidation of the Debtors' cases, creditors' rights will not be adversely affected.  In fact, all creditors will benefit from the reduced burdens and expenses that will result from the joint administration of these cases. Finally, joint administration will simplify the supervision of the administrative aspects of these Chapter 11 Cases by this Court and the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee").

*Debtors' Motion for Entry of an Order Extending The Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs* (the "Schedules Extension Motion")

23.    By the Schedules Extension Motion, the Debtors seeks entry of an order extending the time within which the Debtors must file their schedules and statements required by Bankruptcy Rule 1007(a)(3) through and including thirty-five (35) days after the date required under Bankruptcy Rule 1007(c).  The Debtors are also seeking an order extending the time by which the Debtors must file the 2015.3 Financial Reports or otherwise file a motion with this Court seeking a modification of such reporting requirements for cause by sixty (60) days from the Petition Date.

24.    I believe that "cause" exists to extend the Debtors' time to file their Schedules and Statements and 2015.3 Financial Reports.  The Debtors operate a large, complex business and there is a significant amount of information that must be collected, reviewed and analyzed to prepare the Schedules and Statements and ensure their accuracy.  There also are three separate Debtor entities and the Debtors must prepare and review the detailed information for each of them.

25.    After the commencement of these Chapter 11 Cases, the Debtors will spend a significant amount of time and resources making administrative and business decisions related to employees, creditors and vendors that are essential to stabilizing their operations and affairs in the wake of their bankruptcy petition to assure the continued vitality of the Debtors' business operations.  The Debtors have made progress in identifying and assembling the data necessary for the Schedules and Statements; however, I am concerned that the Debtors will not be able to complete this undertaking prior to the original deadline, which renders this extension, , without prejudice to the Debtors' right to seek further extensions, necessary.

*Debtors' Motion for an Order (I) Waiving the Requirement That Debtors File a List of Creditors and Authorizing Preparation of a Consolidated List of Creditors in Lieu of Submitting a Formatted Mailing Matrix, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Fifty (50) Largest Unsecured Creditors, and (III) Authorizing the Debtors to Redact Certain Personally Identifiable Information and (IV) Granting Related Relief* (the "Consolidated Creditors List Motion")

26.    By the Consolidated Creditors List Motion, the Debtors seek entry of an order (i) waiving the requirement that the Debtors file a list of creditors and authorizing the Debtors to file a consolidated list of creditors in lieu of submitting a formatted matrix, (ii) authorizing the Debtors to file a single, consolidated list of the Debtors' fifty (50) largest unsecured creditors, and (iii) authorizing the debtors to redact certain personally identifiable information.

27.     The Debtors presently maintain various computerized lists of the names and addresses of their creditors.  I believe that such information will be utilized more efficiently if it is taken as maintained in the various computer files and then consolidated.  In addition, filing the lists in the format or formats currently maintained in the ordinary course of business will be sufficient to permit the claims and noticing agent to notice promptly all applicable parties.

28.     Furthermore, I believe that filing a consolidated list of the fifty (50) largest unsecured creditors will be both efficient for the Debtors and sufficient to reflect the body of unsecured creditors that have the greatest stake in these cases.  Indeed, the consolidated list of the top fifty (50) creditors captures creditors with outstanding amounts as low as approximately $10.2 million.

29.     The Creditor Matrix and Schedules and Statements may contain the names and home addresses of individuals; such information should be redacted because it can be used to perpetrate identity theft or locate survivors of domestic violence, harassment, or stalking.  The Debtors also wish to comply with data privacy laws in various jurisdictions where their creditors reside that require redaction of the creditors' names.  The Debtors therefore, propose to provide an unredacted version of the Creditor Matrix, Schedules and Statements, and any other applicable filings redacted to the proposed order to (a) the Court, the U.S. Trustee, counsel to the official committee of unsecured creditors appointed in these Chapter 11 Cases (if any), and (b) any party-in-interest upon a request to the Debtors or to the Court that is reasonably related to these Chapter 11 Cases.

30.     Finally, I believe that allowing the Debtors or their claims and noticing agent to complete the mailings to creditors in lieu of effecting service through the Office of the Clerk of

this Court will save both the Debtors and this Court's staff and personnel significant time, cost and

expense.

*Debtors' Application for Appointment of Kroll Restructuring Administration LLC as Claims and Noticing Agent* (the "Kroll Claims and Noticing Agent Application")

31.     I have been informed that the numerous creditors and other parties in interest

involved in these Chapter 11 Cases may impose heavy administrative and other burdens on the

Court and the Clerk's Office.    Therefore, the Debtors seek to appoint Kroll Restructuring

Administration LLC ("Kroll") as their notice, claims and balloting agent.    Among other things,

Kroll will (i) prepare and serve required notices in these Chapter 11 Cases; (ii) maintain the

Debtors Schedules, creditors' list, and other information relating to or concerning these cases, (iii)

maintain the Debtors' Claims Register and provide procedures for the filing and of proofs of claims

in these Chapter 11 Cases; and (iv) act as a balloting agent.    The Debtors selected Kroll because it

is one of the nation's leading bankruptcy administrators and has extensive experience performing

these tasks before this Court in cases of this size.    I believe that Kroll is well-qualified to perform

the services contemplated in its retention application.

*Debtors' Motion for Entry of an Order Implementing Certain Notice and Case Management Procedures* (the "Case Management Motion")

32.     Pursuant to the Case Management Motion, the Debtors seek entry of an order

approving and implementing certain notice, case management and administrative procedures set

forth therein (collectively, the "Case Management Procedures").

33.     Given the size and scope of these cases, the Case Management Procedures will

facilitate service of notices, motions, applications, declarations, objections, responses,

memoranda, briefs, supporting documents and other papers filed in these Chapter 11 Cases that

will be less burdensome and costly than serving such documents on every potentially interested

party.  This will maximize the efficiency and orderly administration of these Chapter 11 Cases, while also ensuring that appropriate notice is provided.

      **B.**      **Motions Related to the Debtors' Operations in Chapter 11**

*Debtors' Motion for an Order Authorizing the Debtors to Operate their Business in the Ordinary Course and Ordering Implementation of the Automatic Stay* (the "Automatic Stay Motion")

34.      By the Automatic Stay Motion, the Debtors seek a clarifying order from this Court enforcing the automatic stay existent pursuant to section 362 of the Bankruptcy Code and the *ipso facto* and anti-discrimination provisions of the Bankruptcy Code (the "Automatic Stay") and confirming the Debtors' authority to continue to operate their business post-petition, pursuant to sections 363, 1107 and 1108 of the Bankruptcy Code.

35.      This order is necessary to inform affected parties of the existence of the Automatic Stay, especially as to the protections that it provides to the Debtors, particularly with respect to foreign creditors who may be unfamiliar with the impact of the Automatic Stay.  It is also necessary to inform affected parties of the Debtors' right to continue business operations under the Bankruptcy Code as well as the authority of Non-Debtor Subsidiaries to continue business operations outside of the jurisdiction of this Court.

36.      The very nature of the Debtors' operations means that the Debtors and their valuable property are subject to dealings with multiple counterparties, including foreign ones, on a daily basis.  To continue to serve their customers, it is critical that vendors, customers and other counterparties understand the nature of the Debtors' reorganization proceedings, their scope and the protections that are afforded to the Debtors under the Bankruptcy Code.  If the Debtors' operations are disrupted, or creditors fail to understand the Debtors' authority to continue their operations, the Debtors' business operations will experience significant negative impacts.  In turn,

customers will be dissatisfied with the Debtors' performance, which may have an effect on the prospects of a successful reorganization.

37.    If a creditor takes action against the Debtors' assets in violation of the Automatic Stay, or refuses to perform its existing contractual obligations, the negative impact on the Debtors will be significant and the risk of damage to their overall business enormous.

38.    Accordingly, the Debtors request that this Court enter an order that will, in simple terms and without the need for extensive explanation, apprise all parties in interest of the rights and obligations of section 362 of the Bankruptcy Code and, particularly, the Debtors' rights under the Automatic Stay.  Without such relief, the Debtors will be exposed to the possibility of significant hardship in the form of (i) unintentional violations of the Automatic Stay that could hamper their ability to successfully reorganize, or (ii) at minimum, numerous and burdensome discussions to educate creditors on the relevant Bankruptcy Code provisions under which the petitions themselves constitute an order for relief.

39.    I am also concerned that the Debtors' creditors and counterparties may be unaware that the Bankruptcy Code allows the Debtors to continue operating their business operations under current management in the ordinary course after the commencement of these Chapter 11 Cases.

40.    Accordingly, the Debtors request an order memorializing the relevant provisions of the Bankruptcy Code to, *inter alia*, inform the Debtors' creditors and counterparties that the Debtors now qualify as debtors-in-possession and are allowed to operate their business in the ordinary course, including, but not limited to, negotiating and entering into ordinary course business transactions, performing obligations, incurring liabilities and paying amounts in respect of such transactions on and after the Petition Date as they become due and payable.

*Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to Pay Certain Prepetition Claims of Critical Vendors and Foreign Vendors, (II) Authorizing and Directing Financial Institutions to Honor and Process Checks and Transfers Related to Such Claims and (III) Granting Related Relief* (the "Critical Vendor Motion")

41.     By the Critical Vendors Motion, the Debtors seek the entry of interim and final orders authorizing, but not directing, the Debtors to pay, in the ordinary course of business, certain prepetition claims of critical and foreign vendors and service providers (the "Critical Vendors" whose claims shall be collectively identified as the "Critical Vendor Claims").

42.     The Debtors have determined, in an exercise of their business judgment, that the continued receipt of certain goods and services is necessary to ensure that there are no unexpected or inopportune interruptions in the Debtors' business operations, and to preserve and maximize the value of the Debtors' estates.  Accordingly, without the relief requested in the Critical Vendor Motion, many of the Critical Vendors may cease providing goods and services to the Debtors, which could be detrimental to the success of the Chapter 11 Cases.

43.     The Critical Vendors supply the Debtors with essential, hyperspecialized goods and services, including information technology platforms, cybersecurity infrastructure, custodial storage, and resources for the Debtors' lending and borrowing operations.  These goods and services support the successful operation of the Debtors' businesses, and if access to these goods and services were cut off or disrupted, even for a limited amount of time, the Debtors and all parties in interest would suffer irreparable harm.  Some of the Debtors' Critical Vendors are foreign vendors.  These vendors may lack minimum contacts with the United States and, thus, may assert that they are not subject to the jurisdiction of the Court or the provisions of the Bankruptcy Code that otherwise protect the Debtors' assets and business operations—particularly the Automatic Stay.  Given the importance the Critical Vendors play in the Debtors' day-to-day operations, even

a temporary disruption in the goods and services provided would have a devastating effect on the operation of the Debtors' businesses. Accordingly, the Debtors need the ability to pay the Critical Vendor Claims on an uninterrupted basis.

> *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Payment of Certain Taxes and Fees* (the "Taxes Motion")

44.     By the Taxes Motion, the Debtors seek the entry of interim and final orders authorizing, but not directing, the Debtors to remit and pay certain prepetition taxes and fees that will become payable during the pendency of these Chapter 11 Cases in the ordinary course of business.

45.     In the ordinary course of business, the Debtors collect, withhold, or incur a variety of taxes, including, without limitation, sales, use, income, foreign, and various other similar taxes, fees, charges and assessments (collectively, the "Taxes and Fees"). The Debtors remit the Taxes and Fees to various federal, state and local governments, including taxing and licensing authorities (collectively, the "Authorities") in accordance with applicable law. Taxes and Fees are remitted and paid by the Debtors through checks and electronic funds transfers that are processed through their banks and other financial institutions. The Debtors pay the Taxes and Fees to the Authorities on a periodic basis, remitting them monthly, quarterly, semiannually and annually, depending on the nature and incurrence of the particular Tax or Fee. Out of an abundance of caution, the Debtors seek authority pursuant to the Taxes Motion to make such payments where: (a) Taxes and Fees accrue or are incurred post-petition; (b) Taxes and Fees accrued or were incurred prepetition but were not paid prepetition, or were paid in an amount less than actually owed; or (c) Taxes and Fees paid prepetition by the Debtors were lost or otherwise not received in full by any of the Authorities.

46.     Failing to pay the Taxes and Fees would materially disrupt the Debtors' business operations in several ways.  First, the Authorities could initiate investigations or audits, suspend operations, file liens, or seek to lift the automatic stay, which would unnecessarily divert the Debtors' attention from their reorganization process.  Second, failing to pay the Taxes and Fees could subject certain of the Debtors' directors and officers to claims of personal liability, which likely would distract those key employees from their duties related to the Debtors' restructuring. Third, failing to pay certain of the Taxes and Fees may cause the Debtors to lose their ability to conduct business in certain jurisdictions.  Fourth, unpaid Taxes and Fees may result in penalties, the accrual of interest, or both, which could negatively impact the Debtors' businesses. Accordingly, the Debtors' ability to pay the Taxes and Fees is critical to their continued and uninterrupted operations.

> *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Debtors to Continue to Operate the Existing Cash Management System, Including Existing Bank Accounts, Honor Certain Prepetition Obligations Related Thereto, and Maintain Existing Business Forms; (II) Permitting Continued Intercompany Transactions and Granting Certain Administrative Claims; (III) Extending the Time to Comply with the Requirements of Section 345 of the Bankruptcy Code; and (IV) Granting Related Relief* (the "Cash Management Motion")

47.     In the ordinary course of business, the Debtors utilize an integrated, centralized cash and cryptocurrency management system (the "Cash Management System"), which includes all activities necessary and pertinent to the collection, disbursing and investing of the Debtors' cash and cryptocurrency assets.  The Cash Management System allows the Debtors to efficiently identify the Debtors' cash and digital asset requirements and transfer cash and digital assets as needed to respond to these requirements in a cost-effective, efficient manner.   The Cash Management System involves approximately 19 bank accounts and five brokerage accounts at ten banking institutions (the "Bank Accounts") in the United States, Singapore and Denmark.  The

complexity of the Debtors' Cash Management System is similar to that of other enterprises in the same industry. Through their Cash Management System, the Debtors are able to efficiently identify and report the Debtors cash and digital asset requirements and transfer assets as needed to respond to these requirements in a cost-effective, efficient manner. Their Cash Management System also allows the Debtors to meet the Debtors' operating needs, enabling them to centrally facilitate, monitor and control the collection and disbursement of funds and digital assets, enable efficient forecasting and reporting on a daily basis, ensure asset availability and liquidity, invest excess assets, and reduce administrative expenses by facilitating the movement of assets and enhancing the development of accurate account balances. Any disruption of the Cash Management System would be extremely detrimental to the Debtors' operations, as their business requires prompt access to cash and digital assets to operate.

48.     So as to minimize disruption to the Cash Management System, which would be costly to the Debtors' operations and divert precious time and resources from the Debtors' focus on their restructuring efforts, the Debtors have sought entry of an order authorizing them to continue the use of the Cash Management System, including the continued maintenance, servicing and administration of their Bank Accounts (as defined in the Cash Management Motion) and Wallets (as defined in the Cash Management Motion). Absent such an order, the Debtors' ability to pay taxes to government entities, pay vendors and employees and successfully administer the Chapter 11 Cases will be severely compromised. The delays that would result from the Debtors being required to establish a new system of accounts and cash and digital asset management would place an undue burden and put unnecessary pressure on the Debtors and their employees while they work to stabilize the business and meet the obligations imposed by chapter 11 of the Bankruptcy Code, among other expected significant and detrimental effects.

49.     Relatedly, the Debtors also seek through the Cash Management Motion the entry of an order authorizing the Debtors to continue certain intercompany transactions, grant administrative priority status to post-petition intercompany claims, extend the time for the Debtors to comply with the investment and deposit restrictions imposed by section 345 of the Bankruptcy Code for forty-five (45) days, authorize the Debtors' to continue using prepetition bank accounts, to continue to maintain and service their cryptocurrency wallets, continue using ordinary course payment methods and existing Business Forms (as defined in the Cash Management Motion) and to schedule a final hearing on the Cash Management Motion.  These requests are intended and necessary to ensure that the Debtors can best serve the interests of not only their businesses but also of all parties in interest during the Chapter 11 Cases.

> *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Certain Employee Wages and Other Compensation and Related Obligations and (B) Maintain and Continue Employee Benefits and Programs in the Ordinary Course, and (II) Authorizing and Directing Applicable Banks to Honor Transfers Related to Such Obligations* (the "<u>Employee Wages Motion</u>")

50.     Pursuant to the Employee Wages Motion, the Debtors request the entry of an order pursuant to sections 105(a), 363, 507 and 541 of the Bankruptcy Code authorizing, but not directing, the Debtors to pay and honor certain prepetition employment-related claims, including (i) wages and salaries, (ii) reimbursable expenses, (iii) health, pension and insurance benefits, (iv) severance benefits, (v) paid time-off and other leave, and (vi) all other benefits that the Debtors have historically provided to Employees in the ordinary course of business (collectively, and together with attendant costs and expenses, the "<u>Wages and Benefits</u>").  In addition, the Debtors intend to continue to exercise their rights to modify or discontinue any of the Wages and Benefits, or to implement new Wages and Benefits in the ordinary course of business, during the Chapter 11 Cases without the need for further Court approval.

51.     The Employees perform a variety of critical functions for the Debtors' business as the Employees' skills, their specialized knowledge of the Debtors' business model, industry and operations, as well as their relationships with vendors, customers and other third parties, are essential to the value of the Debtors' assets and business.  Without the support and dedication of the Employees to ensure the continued operation of the business, the Debtors would be unable to effectively reorganize.

52.     The Employees provide the Debtors with services necessary to conduct the Debtors' business, and absent the payment of the compensation and benefits owed to the Employees, the Debtors may experience workforce turnover and instability at this critical time in these Chapter 11 Cases.  Without these payments, the Debtors' workforce may become demoralized and unproductive because of the potential significant financial strain and other hardships the Employees may face.

53.     Payment of the prepetition obligations with respect to the Employee Compensation and Benefits is a necessary and critical element of the Debtors' efforts to preserve value and will give the Debtors the greatest likelihood of retention of their workforce as the Debtors seek to operate their business in these Chapter 11 Cases.  Accordingly, the relief requested in the Employee Wages Motion should be approved by the Bankruptcy Court.

*Debtors' Motion Pursuant to Section 1505 of the Bankruptcy Code for Authorization of Genesis Asia Pacific Pte. Ltd. to Act as the Foreign Representative of the Debtors* (the "Foreign Representative Appointment Motion")

54.     By this motion, the Debtors seek to appoint GAP as the Debtors' foreign representative pursuant to section 1505 of the Bankruptcy Code so that GAP may seek recognition of the Chapter 11 proceedings and other orders of this Court in the relevant Singaporean courts.

55.    It is my understanding that in order for the Debtors to receive certain benefits of the Chapter 11 process, including enforcing the Automatic Stay in foreign countries, it is necessary for a duly appointed foreign representative to seek recognition in certain foreign courts. The relief sought in the Foreign Representative Appointment Motion will facilitate the Debtors' efforts to have the Chapter 11 Cases recognized in Singapore, where local creditors otherwise may attempt to foreclose on assets or take other measures contrary to the Automatic Stay and to the detriment of the Debtors' estates and their stakeholders generally.

## IV.    INFORMATION REQUIRED BY LOCAL RULE 1007-2

56.    Attached as **Schedule 1** is a chart summarizing the Company's corporate structure and the Debtors' places in that structure.

57.    Local Rule 1007-2 requires certain additional information related to the Debtors, which is set forth below and in the schedules attached hereto.

58.    Pursuant to Local Rule 1007-2(a)(3), **Schedule 2** provides information about committees formed to participate in the Debtors' ongoing restructuring efforts prior to the Petition Date, to the best of the Debtors' knowledge.

59.    Pursuant to Local Rule 1007-2(a)(4), **Schedule 3** lists, for each of the holders of the fifty (50) largest unsecured claims on a consolidated basis, the name, the address, the telephone number, e-mail address, the name(s) of person(s) familiar with the Debtors' account, the amount of the claim and an indication of whether the claim is contingent, unliquidated, disputed or partially secured.

60.    Pursuant to Local Rule 1007-2(a)(5), **Schedule 4** lists, for each of the holders of the five largest secured claims on a consolidated basis, the name, the address, the telephone number, e-mail address, the name(s) of person(s) familiar with the Debtors' account, the amount

of the claim, a brief description and an estimate of the value of the collateral securing the claim and whether the claim or lien is disputed.

61.    Pursuant to Local Rule 1007-2(a)(6), **Schedule 5** provides a summary of the consolidated assets and liabilities for the Debtors and their Non-Debtor Subsidiaries.

62.    Pursuant to Local Rule 1007-2(a)(5), **Schedule 6** provides the following information:  the number and classes of shares of stock, debentures and other securities of the Debtors that is publicly held and the number of record holders thereof; and the number and classes of shares of stock, debentures and other securities of the Debtors that is held by the Debtors' directors and officers, and the amounts so held.

63.    Pursuant to Local Rule 1007-2(a)(8), **Schedule 7** lists all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity, giving the name, address and telephone number of each such entity and the court in which any proceeding relating thereto is pending.

64.    Pursuant to Local Rule 1007-2(a)(9), **Schedule 8** lists all of the premises owned, leased or held under other arrangements from which the Debtors' operate their business.

65.    Pursuant to Local Rule 1007-2(a)(10), **Schedule 9** provides the location of the Debtors' substantial assets, the location of their books and records and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

66.    Pursuant to Local Rule 1007-2(a)(11), **Schedule 10** provides the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their property where a judgment against the Debtors or a seizure of their property may be imminent.

67.    Pursuant to Local Rule 1007-2(a)(12), **Schedule 11** provides the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors and a brief summary of their relevant responsibilities and experience.

68.    Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 12** provides (i) the estimated amount of the weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the thirty (30) day period following the filing of the Chapter 11 Cases; (ii) the amount paid and proposed to be paid for services for the thirty (30) day period following the filing of the Chapter 11 Cases (A) to officers, stockholders and directors; and (B) to the Debtors' financial or business consultants.

69.    Pursuant to Local Rule 1007-2(b)(3), **Schedule 13** provides, for the thirty (30) day period following the filing of the Chapter 11 Cases, estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of

the United States of America that the foregoing is true and correct.

Dated: January 20, 2023
      New York, New York

*/s/ Michael Leto*
Michael Leto
Managing Director
Alvarez & Marsal North America, LLC

**<u>SCHEDULES</u>**

## __Schedule 1__

**Organizational Chart**



© 2023 Genesis | CONFIDENTIAL DO NOT DISTRIBUTE OR COPY

**Schedule 2**

**Committees Organized Prepetition**

Pursuant to Local Bankruptcy Rule 1007-2(a)(3), to the best of the Debtors' knowledge, prior to the Petition Date, the following committees have been formed to participate in the Debtors' ongoing restructuring efforts.

| Committee Members | Counsel for Committee |
|---|---|
| Ad Hoc Group of GGC Lenders | Proskauer Rose LLP, Houlihan Lokey, Inc. |
| Ad Hoc Group of GGC Lenders | Kirkland & Ellis LLP, Houlihan Lokey, Inc. |

## **Schedule 3**

**Fifty Largest Unsecured Creditors**

Fill in this information to identify the case:

Debtor name  Genesis Global Holdco, LLC, et al.

United States Bankruptcy Court for the: Southern District of New York

Case number (If known) _____

☐ Check if this is an
amended filing

Official Form 204

# Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 50 Largest Unsecured Claims and Are Not Insiders

12/15

**A list of creditors holding the 50 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an insider, as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 50 largest unsecured claims.**

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | Various Lenders as defined in certain Master Digital Asset Loan Agreements entered into with Gemini Trust Company, LLC, as agent for the Lenders | On File | Loan Payable | Unliquidated Disputed* | | | $ 765,900,135 |
| 2 | On File | On File | Loan Payable/Collateral Payable | Unliquidated | | | $ 462,209,125 |
| 3 | On File | On File | Loan Payable | Unliquidated | $ 446,863,828 | Undetermined | Undetermined |
| 4 | On File | On File | Collateral Payable | Unliquidated | | | $ 230,023,000 |
| 5 | Mirana Corp. Level 30 Six Battery Road Singapore, 049909 Singapore | Attn: Jonathan Allen Title: Managing Partner Phone: 916-337-8516 Email: jonathanallen@mirana.xyz | Loan Payable | Unliquidated | | | $ 151,568,100 |
| 6 | Moonalpha Financial Services Limited Amtel Building 148 Des Voeux Road Central 9th Floor Central Hong Kong, Hong Kong | Attn: Del Wang Title: CEO Email: del@babel.finance.com | Loan Payable | Unliquidated | | | $ 150,015,000 |
| 7 | On File | On File | Loan Payable | Unliquidated | | | $ 114,507,650 |
| 8 | Coincident Capital International, Ltd. C/O Forbes Hare Trust Company Cassia Court 716 10 Market Street Camana Bay, Grand Cayman, KY1-9006 Cayman Islands | Attn: Wen Hou Title: Chief Investment Officer Phone: 312-588-6891 Email: wen@coincidentcapital.com | Loan Payable/Collateral Payable | Unliquidated | | | $ 112,272,921 |
| 9 | On File | On File | Loan Payable | Unliquidated | | | $ 90,000,000 |
| 10 | Donut, Inc. | c/o Proskauer Rose LLP Attn: Brian S. Rosen Phone: 212-969-3000 Email:brosen@proskauer.com | Loan Payable | Unliquidated | | | $ 78,037,054 |
| 11 | On File | On File | Loan Payable | Unliquidated | | | $ 75,451,600 |
| 12 | On File | On File | Loan Payable | Unliquidated | | | $ 64,912,001 |
| 13 | Altcoinomy SA Place des Florentins 1 1204 Geneva, Switzerland | Attn: Konstantinos Lanaras Title: CEO Phone: +41 22 707 73 99 Email: konstantinos@altcoinomy.com | Loan Payable | Unliquidated | | | $ 61,801,095 |
| 14 | Streami Inc. 18th floor, 42 Olympic-ro 35da-gil Songpa-gu Seoul, Republic of Korea | Attn: Junhaeng Lee Title: CEO Phone: +82 4328700120 Email: junhaeng.lee@streami.co | Loan Payable | Unliquidated | | | $ 56,766,174 |

*Claim amount is estimated and is net of proceeds from foreclosure on certain collateral.  GGC disputes whether the foreclosure satisfied applicable law.

Debtor Genesis Global Holdco, LLC, et al.                                                                      Case number (if known)_____

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim. If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 15 | Heliva International Corp<br>MMG Tower<br>23rd Floor<br>Ave. Paseo Del Mar, Costa Del Este<br>Panama City,<br>Panama | Attn: Santiago Esponda<br>Phone: 598-972-21410<br>Email: santiago@decentraland.org | Loan Payable | Unliquidated | | | $ 55,005,190 |
| 16 | VanEck New Finance Income Fund, LP<br>666 Third Avenue<br>New York, NY 10017<br>United States | Attn: Jan van Eck<br>Title: CEO<br>Phone: 914-960-9809<br>Email: jvane@vaneck.com | Loan Payable | Unliquidated | | | $ 53,101,676 |
| 17 | On File | On File | Loan Payable | Unliquidated | | | $ 51,785,259 |
| 18 | On File | On File | Loan Payable | Unliquidated | | | $ 47,202,205 |
| 19 | Claure Group LLC<br>200 South Biscayne Blvd.<br>Suite 4420<br>Miami, FL 33131<br>United States | Attn: Joan Papadakis<br>Title: CFO<br>Phone: 954-306-2489<br>Email: joan5825@aol.com | Loan Payable | Unliquidated | | | $ 45,857,828 |
| 20 | On File | On File | Loan Payable | Unliquidated | | | $ 40,822,287 |
| 21 | On File | On File | Loan Payable/Collateral Payable | Unliquidated | | | $ 40,266,984 |
| 22 | On File | On File | Collateral Payable | Unliquidated | | | $ 39,787,136 |
| 23 | On File | On File | Collateral Payable | Unliquidated | | | $ 38,532,747 |
| 24 | Digital Finance Group<br>111 Ellis Street<br>Floor 2 & 3<br>San Francisco, CA 94102<br>United States | Attn: Terry Culver<br>Title: Executive Director<br>Phone: 212-998-5700<br>Email: terry.culver@dfg.group.com | Loan Payable | Unliquidated | | | $ 37,907,447 |
| 25 | On File | On File | Loan Payable | Unliquidated | | | $ 35,214,334 |
| 26 | On File | On File | Loan Payable | Unliquidated | | | $ 32,557,600 |
| 27 | Plutus Lending LLC<br>958 California Street<br>Mountain View, CA 94041<br>United States | Attn: Bill Barhydt<br>Title: CEO<br>Phone: 650-723-6961<br>Email: bill@abra.com | Loan Payable | Unliquidated | | | $ 30,003,000 |
| 28 | Ripio International<br>Willow House<br>Floor 4<br>Cricket Square<br>Grand Cayman, KY01-9010<br>Cayman Islands | Attn: Sebastián Serrano<br>Title: CEO<br>Phone: 650-390-3966<br>Email: sebastian@ripio.com | Loan Payable | Unliquidated | | | $ 27,552,174 |
| 29 | Winah Securities S.A.<br>Avenida Del Pacifico Y Avenida Paseo Del Mar<br>Costa Del Este MMG Tower<br>Piso 23, Ciudad De Panama, 0801<br>Panama | Attn: Esteban Ordano<br>Title: Attorney in Fact<br>Phone: 415-316-3327<br>Email: eordano@winah.dev | Loan Payable | Unliquidated | | | $ 26,896,243 |
| 30 | On File | On File | Loan Payable | Unliquidated | | | $ 26,176,466 |
| 31 | Levity & Love, LLC<br>1622 West James Place<br>#2F07<br>Kent, WA 98032<br>United States | Attn: Jon Collins-Black<br>Title: Owner<br>Phone: 323-573-2825<br>Email: levitylovellc@gmail.com | Loan Payable | Unliquidated | | | $ 25,534,533 |
| 32 | On File | On File | Loan Payable | Unliquidated | | | $ 21,622,568 |
| 33 | Caramila Capital Management LLC<br>157 Columbus Ave<br>Fl 4<br>New York, NY 10023<br>United States | Attn: Marko Simovic<br>Phone: 1-631-334-0396<br>Email: markobarko@gmail.com | Loan Payable | Unliquidated | | | $ 21,561,663 |
| 34 | On File | On File | Loan Payable | Unliquidated | | | $ 20,645,334 |
| 35 | On File | On File | Loan Payable | Unliquidated | | | $ 20,152,817 |

Debtor Genesis Global Holdco, LLC, et al.                                                      Case number (if known)_____

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim If the claim is fully unsecured, fill in only unsecured claim amount. If the claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 36 | Big Time Studios Ltd. Cayman Fiduciary Limited 64 Earth Close 3rd Floor, Landmark Square Grand Cayman, KY1-9006 Cayman Islands | Attn: Ari Meilich Title: CEO Phone: 917-257-4219 Email: arimeilich@gmail.com | Loan Payable | Unliquidated | | | $ 20,000,000 |
| 37 | Cumberland DRW LLC 540 W. Madison Street Suite 2500 Chicago, IL 60661 United States | Attn: Chris Zeuhlke Title: Global Head Phone: 847-891-9583 Email: czeuhlke@drw.com | Collateral Payable | Unliquidated | | | $ 18,720,061 |
| 38 | On File | On File | Loan Payable | Unliquidated | | | $ 17,463,057 |
| 39 | On File | On File | Loan Payable | Unliquidated | | | $ 17,246,080 |
| 40 | On File | On File | Loan Payable | Unliquidated | | | $ 15,445,729 |
| 41 | Coinhouse 14 Avenue De L'Opera Paris, 75002 France | Attn: Nicolas Louvet Title: CEO Phone: +330-153009260 Email: nicolas@coinhouse.com | Loan Payable | Unliquidated | | | $ 14,857,000 |
| 42 | Stellar Development Foundation 292 Ivy Street Unit e San Francisco, CA 94102 United States | Attn: Denelle Dixon Title: CEO Phone: 408-431-6919 Email: denelle@stellar.org | Loan Payable | Unliquidated | | | $ 13,187,008 |
| 43 | On File | On File | Loan Payable | Unliquidated | | | $ 13,127,878 |
| 44 | Bayhawk Fund LLC One Penn Plaza Suite 5320 New York, NY 10119 United States | Attn: Gregory Racz Title: President Phone: 1-212-356-6102 Email: gracz@mgginv.com | Loan Payable | Unliquidated | | | $ 12,562,500 |
| 45 | On File | On File | Loan Payable | Unliquidated | | | $ 11,292,345 |
| 46 | On File | On File | Loan Payable | Unliquidated | | | $ 10,905,742 |
| 47 | On File | On File | Loan Payable | Unliquidated | | | $ 10,369,828 |
| 48 | The Badger Technology Company Holdings, Limited Campbells Corporate Services Limited Willow House Floor 4 Cricket Square Grand Cayman, KY19010 Cayman Islands | Attn: Sonia Garica Phone: +52 556382 8572 Email: banking_gibraltar@bitso.com | Loan Payable | Unliquidated | | | $ 10,245,821 |
| 49 | Valour, Inc. 65 Queen Street W Toronto, ON M5H 2M5 Canada | Attn: Olivier Roussy Newton Title: CEO Phone: +114168612269 Email: olivier@btq.li | Collateral Payable | Unliquidated | | | $ 10,239,290 |
| 50 | Schnutz Investments LP Rua Marcos Lopes 233 Apto 162 Vila Nova Conceicao Sao Paulo, 04513-080 Brazil | Attn: Maria Teresa Felix Title: Analyst Phone: 1-917-672-3311 Email: maria.felix@sierracap.com | Loan Payable | Unliquidated | | | $ 10,148,492 |

U.S. Dollar balances based off of market prices as of 01/18/2023

## Schedule 4

### Five Largest Secured Claims

Consistent with Local Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101(31).

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  Any amounts listed herein are estimated, on a preliminary basis, and subject to verification.  The Debtors reserve any and all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| | Name of Creditor and Complete Mailing Address | Claim Amount | Collateral Description | Estimated Value of Collateral |
|---|---|---|---|---|
| 1 | Parafi Digital Credit Fund LP 500 West Putnam Ave., Suite 400 Greenwich, CT, 06830 | $ 5,625,000.00 | USD Receivable | $5,625,000.00 |
| 2 | On file | Undetermined | Digital Asset Receivable | Undetermined |

**Schedule 5**

**Summary of Assets and Liabilities of the Debtors as of November 30, 2022**

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities.  The following financial data is the latest available information and reflects the Debtors' financial condition, as combined among the Debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount or status of any such claim or debt.

As of November 30, 2022, the total value of the Debtors' assets was approximately $5.3 billion, and liabilities were approximately $5.1 billion on a combined basis, including intercompany balances.

## Schedule 6

**Publicly Held Securities**

Pursuant to Local Rule 1007-2(a)(7), the Debtors do not hold any publicly held classes of shares of stock, debentures or other securities.

## **Schedule 7**

### **Debtors' Property Not in the Debtors' Possession**

Pursuant to Local Bankruptcy Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor or agent for any such entity.

Certain property of the Debtors may be in the possession of various other persons, including third-party cryptocurrency custodians and self-custody custodians, exchanges and collateral held by various lenders.  Through these arrangements, the Debtors' ownership interest is not affected.  In light of the movement of this property, providing a comprehensive list of the persons or entities in possession of the property, their addresses and telephone numbers, and the location of any court proceeding affecting such property would be impractical.

## Schedule 8

**Premises from Which Debtors Operate Their Business**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of real property owned or leased from which the Debtors operate their businesses as of the Petition Date.

| Property Address | State | Country | Owned or Leased |
|---|---|---|---|
| 250 Park Avenue S 3rd and 5th Floor, New York, NY 10003 | New York | USA | Leased |
| 111 Town Square Place 12th Floor, Jersey City, New Jersey 07310 | New Jersey | USA | Leased |
| 1 Raffles Quay #45-03, Singapore 048583 | - | Singapore | Leased |

## Schedule 9

**Location of the Debtors' Substantial Assets, Books, Records and Nature and Location of Debtors' Assets, Books, Records and Nature and Local of Debtors' Assets Outside the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

### Location of Debtors' Substantial Assets

A substantial portion of the Debtors' assets as of November 30, 2022 (valued at approximately $5.0 billion) were in the form of loan receivables, including intercompany balances, assets held digitally and securely by cloud computing service providers, cryptocurrency investments that are either held with custodians, exchanges, crypto wallets securely held in cold storage, self custody, collateral pledged to external parties, cash in banks, and brokerage accounts located in the United States. Within the United States, the Debtors had digital assets as of the Petition Date valued at approximately $500 million primarily located on a in a cloud-based self-custody storage.

### Books and Records

The Debtors' books and records are primarily maintained as electronic records on cloud-based storage.

### Debtors' Assets Outside the United States

The Debtors have significant assets in Singapore of more than approximately $235 million chiefly in the form of collateral receivable from third party customers, and receivables from affiliates.

## <u>Schedule 10[1]</u>

**Nature and Status of Actions or Proceedings Against the Debtors Where a Judgment or Seizure of Their Property May Be Imminent**

   Pursuant to Local Rule 1007-2(a)(11), there are no actions or proceedings, pending or threatened, in which a judgment against the Debtors or a seizure of their property is imminent. Any creditor that asserts a claim against any Debtor in respect of a pending action will be included in the Debtors' list of creditors.

---

[1]  The Debtors reserve the right to supplement this exhibit if additional property is identified.

## Schedule 11

### Debtors' Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name | Position | Responsibilities' and Experience |
|------|----------|----------------------------------|
| A. Derar Islim | Interim Chief Executive Officer and Chief Operating Officer | A. Derar Islim, PhD. is the Interim Chief Executive Officer and Chief Operating Officer of Genesis Global Holdco, LLC, as of August 17, 2022. As the Interim CEO and COO, he is responsible for managing strategic initiatives, integrating new services, coordinating daily business operations, and executing on Genesis's global vision to build the world's preeminent prime brokerage in the digital currency ecosystem.

Prior to joining Genesis, Dr. Islim served as Head of Risk at Hard Yaka, a San Francisco based venture capital firm, and previously served as Vice President at Bank of America Merrill Lynch where he co-managed the company's funding valuation adjustment trading desk.

Dr. Islim earned his PhD. in Financial Mathematics with a focus on the pricing and hedging of financial derivatives from Florida State University and is a Fulbright Scholar. |
| Alice Chan | Chief Financial Officer | Alice Chan is the Chief Financial Officer of Genesis, responsible for all Finance functions at the firm. Prior to joining Genesis, Ms. Chan was the Chief Financial Officer of Cantor Fitzgerald SPACs Franchise and served as a member of the board of directors. Ms. Chan also served as the Global Controller at Cantor Fitzgerald, where she was responsible for managing a range of financial functions, most notably financial reporting, consolidations, new accounting standard implementation, corporate accounting, and process enhancements.

Prior to these appointments, Ms. Chan served as Vice President at Goldman Sachs, focusing on broker dealers financial and regulatory reporting, and bank financial reporting. Ms. Chan earned her bachelor's degree in |

| | | |
|---|---|---|
| | | Finance from Pace University and master's degree in Accounting from St. John's University. |
| Arianna Pretto-Sakmann | Chief Legal Officer | Arianna Pretto-Sakmann is the Chief Legal Officer of Genesis. Before joining Genesis, she worked as a lawyer at Freshfields Bruckhaus Deringer LLP in New York and London from 2011-2019 and with Sullivan & Cromwell LLP from 2007-2011. She was previously an academic and taught law at the University of Oxford and Columbia Law School. She holds an MSt and a DPhil from Oxford University and an LLM from Columbia Law School. |
| Andrew Sullivan | General Counsel, Lending | Andrew Sullivan is the General Counsel for Genesis, responsible for advising Genesis's executive team on legal matters. |

## Schedule 12

**Estimated Payroll for the 30-Day Period Following the Petition Date**

Pursuant to Local Bankruptcy Rules 1007-2(b)(1)-(2)(A) and (C), the following provides, for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders and directors, and the estimated amount paid or proposed to be paid to financial and business consultants retained by Debtors.

| | |
|---|---|
| Estimated amount of payroll for employees (exclusive of officers, directors and equity holders) | $0 |
| Estimated payments to officers, directors and equity Holders (Non-Employees) | $115,000 |
| Estimated payments to financial and business consultants | $0 |

**Schedule 13**

**Cash Receipts and Disbursements, Net Cash Gain or Loss, Unpaid Obligations and Receivables**

Pursuant to Local Bankruptcy Rule 1007-2(b)(3), the following schedule provides an estimate of, for the 30-day period following the Petition Date, cash receipts and disbursements, net gain or loss and obligations and receivables expected to accrue but remain unpaid, other than professional fees:

| | |
|---|---|
| Cash Receipts | $4,200,000 |
| Cash Disbursements | $750,000 |
| Net Cash (Gain or Loss) | $3,250,000 |
| Unpaid Obligations | $815,000 |
| Uncollected Receivables | $3,000,000 |