Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 23-10063-shl

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    GENESIS GLOBAL HOLDCO, LLC,

8

9          Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    January 23, 2023

17                    2:00 PM

18

19

20

21   B E F O R E :

22   HON SEAN H. LANE

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   UNKNOWN

Page 2

1    HEARING re FIRST DAY HEARING

2

3    HEARING re Doc. #29 Notice Of First Day Hearing

4

5    HEARING re Doc. #2 (Joint Administration) Motion For Joint

6    Administration

7

8    HEARING re Doc. #14 (Consolidated Creditors List) Motion to

9    Authorize /Debtors' Motion for Entry of Interim and Final

10   Orders Waiving the Requirement that Each Debtor File a List

11   of Creditors and Authorizing Preparation of a Consolidated

12   List of Creditors, in Lieu of Submitting a Formatted Mailing

13   Matrix, (II) Authorizing the Debtors to File a Consolidated

14   List of the Debtors' Fifty (50) Largest Unsecured Creditors,

15   (III) Authorizing the Debtors to Redact Certain Personally

16   Identifiable Information, and (IV) Granting Related Relief

17

18   HEARING re Doc. #3 (Schedules Extension/Waiver) Motion To

19   Extend Deadline To File Schedules Or Provide Required

20   Information / Debtors' Motion For An Order Extending Time To

21   File Schedules Of Assets And Liabilities, Schedules Of

22   Executory Contracts And Unexpired Leases, Statements Of

23   Financial Affairs, And Rule 2015.3 Financial Reports

24

25

Page 3

1    HEARING re Doc. #13 (Automatic Stay) Motion To Authorize

2    Debtors To Operate Their Business In The Ordinary Course,

3    And, Motion To Impose Automatic Stay

4

5    HEARING re Doc. #15 (Cash Management) Motion To Authorize /

6    Debtors' Motion For Entry Of Interim And Final Order (I)

7    Authorizing Debtors To Continue To Operate The Existing Cash

8    Management System, Including Existing Bank Accounts, Honor

9    Certain Prepetition Obligations Related Thereto, and

10   Maintain Existing Business Forms; (II) Permitting Continued

11   Intercompany Transactions and Granting Certain

12   Administrative Claims; (III) Extending the Time to Comply

13   with the Requirements of Section 345 of the Bankruptcy Code

14   and (IV) Granting Related Relief

15

16   HEARING re Doc. #9 (Taxes And Fees) Motion To Pay Taxes

17   /Debtors' Motion For Entry Of Interim And Final Orders

18   Authorizing The Payment Of Certain Taxes And Fees

19

20

21

22

23

24

25

Page 4

1   HEARING re Doc. #11 (Critical Vendor) Motion To Authorize /

2   Debtors' Motion For Entry Of Interim And Final Orders (I)

3   Authorizing, But Not Directing, The Debtors To Pay Certain

4   Prepetition Claims Of Critical Vendors And Foreign Vendors,

5   (II) Authorizing And Directing Financial Institutions To

6   Honor and Process Checks And Transfers Related To Such

7   Claims And (III) Granting Related Relief

8

9   HEARING re Doc. #16 (Employee Wages) Motion To Authorize /

10  Motion Of Genesis Asia Pacific PTE. LTD. For Entry of

11  Interim and Final Orders (I) Authorizing Genesis Asia

12  Pacific PTE. LTD. To (A) Pay Certain Employee Wages and

13  Other Compensation and Related Obligations and (B) Maintain

14  and Continue Employee Benefits and Programs in the Ordinary

15  Course, and (II) Authorizing and Directing Applicable Banks

16  to Honor All Transfers Related to Such Obligations

17

18  HEARING re Doc. #4 (Foreign Representative Appointment)

19  Motion To Appoint / Debtors' Motion Pursuant To Section 1505

20  Of The Bankruptcy Code For Authorization Of Genesis Asia

21  Pacific Pte. Ltd. To Act As The Foreign Representative Of

22  The Debtors

23

24

25

Page 5

1    HEARING re Doc. #10 (Case Management) Motion To Approve /

2    Debtors' Motion For Entry Of An Order Implementing Certain

3    Notice And Case Management Procedures

4

5    HEARING re Doc. #12 (Kroll Claims An Noticing Agent) Motion

6    To Appoint Kroll Restructuring Administration LLC As Claims

7    And Noticing Agent

8

9    HEARING re Doc. #17 (Islim Declaration) Declaration Of A.

10   Derar Islim In Support Of First Day Motions And In

11   Compliance With Local Rule 1007-2

12

13   HEARING re Doc. #28 (Leto Declaration) Declaration Of

14   Michael Leto Support Of First Day Motions And Applications

15   In Compliance With Local Rule 1007-2

16

17   HEARING re Doc. #19 (Aronzon Declaration) Declaration Of

18   Paul Aronzon In Support Of First Day Motions And

19   Applications In Compliance With Local Rule 1007-2

20

21   HEARING re Doc. #20 (Plan) Joint Chapter 11 Plan

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 6

1    A P P E A R A N C E S :

2

3    CLEARY GOTTLIEB STEEN & HAMILTON LLP

4         Attorneys for the Debtor

5         One Liberty Plaza

6         New York, NY 10006

7

8    BY:  SEAN O'NEAL

9         JANE VANLARE

10        HOORI KIM

11        CHRISTIAN RIBEIRO

12        RICHARD C. MINOTT

13

14   WEIL, GOTSHAL & MANGES LLP

15        Attorneys for Digital Currency Group, Inc.

16        767 Fifth Avenue

17        New York, NY 10153

18

19   BY:  JEFFREY SAFERSTEIN

20

21

22

23

24

25

Page 7

```
 1   KIRKLAND & ELLIS LLP

 2        Attorneys for Ad Hoc Group of Creditors

 3        601 Lexington Avenue

 4        New York, NY 10022

 5

 6   BY:  CHRISTOPHER MARCUS

 7        ROSS J. FIEDLER

 8

 9   HUGHES HUBBARD & REED LLP

10        Attorneys for Gemini Trust Company, LLC,

11        Acting as Agent

12        One Battery Park Plaza

13        New York, NY 10004

14

15   BY:  ANSON B. FRELINGHUYSEN

16        DUSTIN P. SMITH

17        JEFFREY S. MARGOLIN

18

19   PROSKAUER ROSE LLP

20        Attorneys for Ad Hoc Group of Genesis Customers

21        11 Times Square

22        New York, NY 10036

23

24   BY:  BRIAN ROSEN

25        JORDAN SAZANT
```

1   UNITED STATES DEPARTMENT OF JUSTICE

2        Attorneys for the U.S. Trustee

3        201 Varick Street, Suite 1006

4        New York, NY 10014

5

6   BY:  GREG ZIPES

7        MARK BRUH

8

9   WHITE CASE LLP

10       Attorneys for Kimchi Fund

11       111 South Wacker Drive, Suite 5100

12       Chicago, IL 60606

13

14  BY:  GREGORY F. PESCE

15       J. CHRISTOPHER SHORE

16       PHILIP ABELSON

17

18  NORTON ROSE FULBRIGHT US LLP

19       Attorneys for Mirana Corp.

20       1301 Avenue of the Americas

21       New York, NY 10019

22

23  BY:  ERIC D. DAUCHER

24

25  PAUL ARONZON, Declarant

Page 9

1    ALSO PRESENT TELEPHONICALLY:

2

3    NATHANIEL ALLARD

4    ALISON R. AMBEAULT

5    ASHLAND BERNARD

6    MICHAEL BLACKMON

7    SABRINA BREMER

8    JESSI BROOKS

9    BRIAN BULTHIUS

10   DONALD BURKE

11   TOM CONHEENEY

12   JARED DERMOT

13   ROMA N. DESAI

14   MICHAEL DIYANNI

15   DANIEL EGGEMANN

16   GABRIEL EISENBERGER

17   DONALD FACKINA

18   MATTHEW ALLEN FELDMAN

19   DANIEL ISAAC FORMAN

20   ADAM J. GOLDBERG

21   DEBRA I. GRASSGREEN

22   BRANDON HAMMER

23   MIRANDA HATCH

24   AUTUMN HIGHSMITH

25   VICKY HUANG

1   VINCENT INDELICATO

2   DERAR ISLIM

3   ZUL JAMAL

4   ALEXANDER JANGHORBANI

5   BARAK KLEIN

6   KONRAD LESSER

7   MICHAEL LETO

8   SAMUEL LEVANDER

9   CHEYENNE LIGON

10   DAVID LOOPEZ

11   ALEXANDRA LOTTY

12   CHRISTOPHER MARCUS

13   JEFFREY S. MARGOLIN

14   LAYLA MILLIGAN

15   DAN T. MOSS

16   OLIVER H.F. PARE

17   JOHN PATOUHAS

18   AMELIA POLLARD

19   ARIANNA PRETTO-SAKMANN

20   MOHIT RATHI

21   JASON ROSELL

22   BRIAN SANDLOW ROSEN

23   ANDRES SAENZ

24   JACK SCHICKLER

25   JOE SCIAMETTA

Page 11

1   MARK STANCIL

2   BENJAMIN JOSEPH STEELE

3   ANDREW SULLIVAN

4   JOSHUA SUSSBERG

5   ANDREW SWIFT

6   NACIF TAOUSSE

7   BENJAMIN TAYLOR

8   TARA TIANTIAN

9   BRIAN TICHENOR

10   DAVID TURETSKY

11   FRANCISCO VAZQUEZ

12   VALENTINA VLASOVA

13   MEGAN VOLIN

14   WANKUN WANG

15   CHRISTOPHER WARD

16   MICHAEL WEINBERG

17   KATHRYN WITCHGER

18   VICTOR P. ABRIANO

19   OLGA ALLEN

20   RACHEL B. ANDERSON RYNDERS

21   NEGISA BALLUKU

22   HUGH BELLAMY

23   BRIANNA B. BILTER

24   SOMA BISWAS

25   THOMAS R. BRAZIEL

Page 12

1    PHILLIP BRENDEL

2    ROBERT DOUGLAS BROWN

3    GABRIEL BRUNSWICK

4    GRANT CARROLL

5    AMY CASTOR

6    BIANCA CASTRO

7    RYAN CHEN

8    CATHERINE CHOE

9    STEVEN CHURCH

10   MIA COOPER

11   CHARLES GOOCH COWDEN

12   RUSSELL CRUMPLER

13   JASON DIBATTISTA

14   JAMES V. DREW

15   CHRISTOPHER FARMER

16   LISA FAUCHER

17   MICHAEL FAY

18   RYAN FINK

19   JULIA FOSTER

20   ERIC FRIEL

21   ELLA GASPAR

22   KIMBERLY GIANIS

23   CINDI GIGLIO

24   UDAY GORREPATI

25   ROHAN GOSWAMI

1    BENJAMIN GRAHAM

2    ROBERT P. GRATTAN

3    LOREN HARMAN

4    TAYLOR HARRISON

5    MIRANDA HATCH

6    JEREMY C. HILL

7    DAVID HOLLERITH

8    PATRICK HOLOHAN

9    CHRISTIANA JOHNSON

10   ROB JORDAN

11   WENDY KANE

12   CRYSTAL KIM

13   MICHAEL KIM

14   DIETRICH KNAUTH

15   RYAN LAWLER

16   CHRISTINE LEE

17   MIKE LEGGE

18   AMANDA LINDNER

19   JONATHAN L. LOZANO

20   KEN LUKASZEWSKI

21   JOHN ANDREW MARCIN

22   AKIKO MATSUDA

23   KEITH MCCORMACK

24   KYLE MCKUHEN

25   ARJUN MEHRA

1    MICHELE MEISES

2    DANIEL MITCHELL

3    DAVID MOHAMED

4    JAMES MURPHY

5    PAUL MUSSER

6    JAMES J. NANI

7    DENNIS C. O'DONNELL

8    TYLER OKADA

9    LUKE PORCARI

10   LINDA RIFKIN

11   SHAYA ROCHESTER

12   ABIGAIL RYAN

13   MATT SEDIGH

14   PETER SABA

15   CAROLINE SALLS

16   WILLIAM SCHATZ

17   THERESE SCHEUER

18   ANDREW SCURRIA

19   THOMAS SHORT

20   IAN SILVERBRAND

21   RYAN STOUT

22   VINCE SULLIVAN

23   MITCHELL SUSSMAN

24   ADAM SWINGLE

25   WES TW

1   BRENDAN TELZROW

2   KATE THOMAS

3   KRISZTIAN TOTH

4   ETHAN TROTZ

5   MARIANNA UDEM

6   WILLIAM UPTEGROVE

7   MADELEINE VESCOVACCI

8   LAUREN WALKER

9   CHRISTOPHER A. WARD

10   MOLLY WHITE

11   STEVEN WHITE

12   BRANDON J. WILLIAMS

13   CHAD RYAN WOLFE

14   ROBERT A. YACAVONIS

15   LILY YARBOROUGH

16   BENJAMIN HIRSCH

17   JEAN-FRANCOIS ZAKY

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  United States Bankruptcy Court for the

3    Southern District of New York and we're here this afternoon

4    for a so-called first day hearing in Genesis Global HoldCo

5    LLC, a Chapter 11 case that was filed last week.  And thank

6    you for everybody's patience to start the hearing.  I'd

7    understood that there were people still logging in at a

8    fairly substantial rate at one o'clock, so we gave it

9    another ten minutes, but out of courtesy for everybody who's

10   here for a one o'clock hearing, I didn't want to wait much

11   past an extra ten minutes.

12             So we'll begin this hearing as we do all hearings,

13   by getting appearances.  I realize that there are quite a

14   few people who are on Zoom for the hearing.  The -- so my

15   guidance would be if you know you're going to speak at

16   today's hearing or you expect that you might have to speak,

17   then those -- what we need appearances for.  And if for some

18   reason you don't make an appearance and you end up speaking,

19   we can get your appearance later.

20             But, so with that, let me start by getting

21   appearances from the counsel for the Debtors.

22             MR. O'NEAL:  Good afternoon.  Sorry, we're having

23   a technical issue.  Just one second.

24             THE COURT:  All right.  It's one of the joys of

25   the pandemic on technical challenges, but we'll get there.

1          MR. O'NEAL:  Okay.  Hopefully, Your Honor, you can

2     hear me now.  It's --

3          THE COURT:  Hear you just fine without the Wizard

4     of Oz --

5          MR. O'NEAL:  -- making an appearance again --

6          THE COURT:  So --

7          MR. O'NEAL:  I'm here with my colleague Jane

8     VanLare.

9          THE COURT:  All right.  Any other folks on the

10    Debtors' team to be introduced?

11         MS. KIM:  Yes, Your Honor.  This is Hoori Kim from

12    Cleary Gottlieb, also here with my colleagues Christian

13    Ribeiro and Richard Minott.

14         THE COURT:  Good afternoon.  Any other folks from

15    the Debtors in capacity?

16         MR. O'NEAL:  Your Honor, we're just testing our

17    audio here.  I apologize.  Can you hear us?

18         THE COURT:  We can hear you just fine.

19         MR. O'NEAL:  I can't hear you.

20         THE COURT:  And I will say, for anybody who might

21    be having any challenges because again these things

22    occasionally happen in this a world in which we live, the

23    most important things that we can hear you.  I confess I'm

24    nothing particularly exciting to look at it.  It's always

25    nice when we have Zoom working appropriately, but I know

1    people have -- will have technical challenges.  So if for

2    some reason everything goes completely wrong for anyone,

3    they should feel free to hang up and then grab a phone and

4    dial the number that Zoom provides and that will work.  And

5    I just mentioned because I know we have quite a few people

6    on the phone.

7              All right.  Any other appearances from anybody?

8              MR. O'NEAL:  Thank you very much, Your Honor.

9              THE COURT: Sure.

10             MR. SAFERSTEIN:  Your Honor --

11             MR. ARONZON:  This is Paul Aronzon.  I'm one of

12   the declarants.  I'm a special committee member and the

13   director.  I'm not sure if you want my appearance, but I

14   thought I would mention I'm on.

15             THE COURT:  Well I did see you.  Happy to have

16   your appearance.  Thank you very much.  And I think there

17   was someone else who was going to chime in.

18             MR. SAFERSTEIN:  Yes, good afternoon, Your Honor.

19   Jeffrey Saferstein from Weil Gotshal and Manges on behalf of

20   Digital Currency Group, which is the ultimate parent company

21   to the Debtors.

22             THE COURT:  All right.  Anyone else from --

23   associated with Digital Currency Group?  All right.  In the

24   list of appearances, I did see some folks associated with

25   one or more of the Gemini entities.  Let me get those

1   appearances, if necessary.

2           MR. MARCUS:  Your Honor, this is Christopher

3   Marcus from Kirkland and Ellis on behalf of Ad Hoc Group of

4   Creditors, one of which is Gemini.  I'm here with my

5   colleague Ross Fiedler as well.

6           THE COURT:  All right.  Good to have you.

7           MR. FRELINGHUYSEN:  Good afternoon, Your Honor.

8   This is Anson Frelinghuysen from Hughes Hubbard and Reed.

9   I'm here with my colleagues Dusty Smith and Jeff Margolin

10  and we're representing Gemini as agent for the Earn users.

11          THE COURT:  All right.  Good to have you as well.

12  Anyone else associated with Gemini?  All right with that,

13  we'll move on to any other ad hoc groups.  I know there are

14  a few in this case.  Any other appearances on that score?

15          MR. ROSEN:  Yes, Your Honor.  This is Brian Rosen

16  from Proskauer Rose.  I'm here with my colleague Jordan

17  Sazant.  We represent an Ad Hoc Group of lenders in excess

18  of $1.5 billion of claims against GGC.

19          THE COURT:  All right.  And Mr. Rosen, I can hear

20  you, you're a little bit faint, so you might want to get

21  closer to whatever microphone there is, just to be on the

22  safe side.  All right.  Any other appearances from any other

23  ad hoc group?

24          Let me get appearances from the United States

25  Trustee's Office.

Page 20

```
 1              MR. ZIPES:  Good afternoon, Your Honor.  Greg

 2     Zipes with the U.S. Trustee's Office.  I'm here with various

 3     colleagues including Mark Bruh, my co-counsel in this

 4     matter.

 5              THE COURT:  All right, good afternoon.

 6              MR. ZIPES:  Good afternoon.

 7              THE COURT:  And there are numerous folks who have

 8     registered on Zoom representing "an interested party."  I

 9     suspect most of those folks don't need to make an

10     appearance, but is there any other party who does need to

11     make an appearance at this point?

12              MR. PESCE:  Your Honor, it's Gregory Pesce from

13     White and Case on behalf of the Kimchi Fund.  I'm joined

14     today by my partners Chris Shore and Phil Abelson.

15              THE COURT:  All right.  Good afternoon.  Any other

16     folks?

17              MR. DAUCHER:  Yes, Your Honor.  Eric Daucher from

18     Norton Rose Fulbright on behalf of Mirana Corp.

19              THE COURT:  Good afternoon.  Anyone else?  All

20     right, waiting sort of a Zoom appropriate amount of time for

21     anyone else to chime in.  I think we appear to be set, and

22     again if somebody does need to chime in who hasn't make an

23     appearance, we'll get appearance at that time.

24              So I do have a binder of everything that was filed

25     that was sent to me.  Thank you very much for that.  And I
```

Page 21

1   do also have a copy of some filings that took place

2   afterwards.  That is Docket 28, the declaration of Michael

3   Leto as well as a revised case management order.  So I have

4   all that in front of me, and with that I will turn it over

5   to Debtors' counsel to start to walk us through what we need

6   to address here today.

7           MR. O'NEAL:  Sure.  Thank you, Your Honor.  Sean

8   O'Neal again, Cleary Gottlieb Steen and Hamilton on behalf

9   of the Genesis Debtors.  Just want to make sure you can hear

10  me okay.

11          THE COURT:  I can hear you just fine.

12          MR. O'NEAL:  Super.  Okay.  Appreciate your

13  scheduling the hearing this afternoon and we look forward to

14  answering any questions you may have.  We'd like to begin

15  with a road map for today's proceedings which will

16  eventually lead us to a road map for the cases.

17          First, I just -- I'll make a few remarks and then

18  I'll turn it over to my colleague Jane VanLare to kind of go

19  through a PowerPoint presentation about Genesis' business

20  and then as part of that -- as part of that presentation

21  you'll learn that we're only dealing with part of the

22  Genesis business in these Chapter 11 proceedings.  The only

23  Debtors here are three Debtors, Holding Company and GGC and

24  Gap.

25          That's really part of our borrowing and lending

1    business.  And that's the only part of the business that's

2    actually in these Chapter 11 proceedings.  And you'll hear

3    more about that.  In addition to -- during today's

4    presentation, you'll hear that really in the wake of

5    tremendous dislocation in the crypto market including the

6    bankruptcy filings of FTX which happened in early November,

7    Genesis paused all of its lending withdrawals.  That

8    occurred on November 16th.

9          The purpose of this pause -- and sometimes you

10   might hear us call it, you know, putting up the gates.  As

11   part of that pause of withdrawals, our goal was to treat

12   creditors fairly, to treat them equitably, and to maximize

13   recoveries for all stakeholders.  And in particular, we

14   really wanted to create a framework for discussions with

15   creditors so we could somehow reach a consensual resolution.

16         And since that time we have been operating really

17   around the clock trying to reach a resolution with our

18   creditors.  We're fortunate that we have two ad hoc groups

19   that represent a very large portion of the debt, roughly

20   $2.4 billion if not more.

21         Secondly, after going through the presentation,

22   we're going to through the first day motions.  Jane VanLare

23   and some of our associates will lead that process.  We've

24   been working with the U.S. Trustee over the past few days,

25   and I'm pleased to report that I believe we've resolved all

Page 23

1    material issues with the first day motions with the U.S.

2    Trustee.  More on that later, but I believe that we've done

3    that.

4              And importantly, as I'm sure you've already

5    observed, we don't have a DIP motion or cash collateral

6    motion here.  We don't have encumbered cash and we don't

7    need DIP financing.  We've got more than $150 million in

8    unencumbered cash.  And of course we're available to answer

9    any questions that you may have as we go through the

10   hearing, but really before we kind -- I kick it over to Ms.

11   VanLare, I'd like to just say just a few words to kind of

12   set up the context, with your permission.

13             THE COURT:  Certainly.

14             MR. O'NEAL:  So really what I -- today we'd like

15   to talk less about where we've been but where we're going,

16   because this is not a case without a plan.  This is a case

17   with a plan.  We have a clear roadmap for this Chapter 11

18   case.  We've filed a plan and that plan is confirmable on

19   its face.  We have outlined in terms of that plan in the

20   Aronzon declaration and we have a timeline and an approach

21   to get through this case as quickly as possible.

22             We really want to avoid getting involved in kind

23   of a prolonged case with litigation that effectively

24   destroys value that would otherwise be available for the

25   creditors.  That is our goal.  Our number one goal here is

Page 24

1    to reach a consensual resolution with the creditors.  That's

2    the framework that we built with our plan and our roadmap.

3            In terms of the parties, on the one hand, we

4    obviously have the Debtors, the Genesis Debtors.  On the

5    other hand, we have our corporate parent, Digital Currency

6    Group.  You'll hear it called DCG.  That is not part of

7    these proceedings.  They have separate counsel and they have

8    separate advisors and it's a separate governance structure.

9    DCG is our largest borrower.  DCG currently owes us roughly

10   $1.65 billion.  You'll see that in the first day papers,

11   including a $1.1 billion note that's due in 2032.

12           And in addition, we have a variety of our lenders

13   who are owed more than, you know, roughly speaking $3.5

14   billion or so.  And then another key player in this case is

15   our Special Committee.  The Special Committee was appointed

16   on November 18th, 2022.  You'll notice that that's a few

17   days after the pause.  It's comprised of two independent

18   directors, Paul Aronzon whose declaration you saw and really

19   needs no introduction given his 40 years of experience in

20   the restructuring world, and then Tom -- Thomas Conheeney.

21   He's a highly respected and thoughtful leader in the

22   financial sector, having dealt with many complex situations

23   over the course of his professional career.

24           The Special Committee in this case has been fully

25   delegated, all responsibilities related to the

Page 25

1    restructuring.  That includes the decision to file

2    bankruptcy, the decision to investigate potential claims,

3    any kind of plan of reorganization.  That is all within the

4    purview of the of the Special Committee.  And we did that

5    because you know, DCG, our corporate parent actually owes

6    the Debtors a substantial sum of money, $1.65 billion.

7            And so we wanted to be sure that we had proper

8    governance in place.  So all of the company's advisors

9    including Cleary and Moelis and A&M report to the Special

10   Committee, and that's who directs our activities.

11           Since we paused the withdrawals, we've been

12   engaged as I said in 'round the clock negotiations with our

13   lenders and DCG.  I've kind of lost count, but we've

14   exchanged at least 15 iterations of various term sheets

15   including some, you know, not very long ago today, and we're

16   continuing to have those discussions.  They've been

17   incredibly productive and constructive, but to date, just

18   sitting here right now, we don't have a deal with our with

19   our creditors but we are quite close.

20           And the substantial progress that we've made to

21   date is really no accident.  It's really the result of a lot

22   of hard work, not only by the Debtors' advisors, but really

23   by the ad hoc group advisors.  Here we're dealing with

24   Houlihan and Proskauer and Kirkland, all of whom have come

25   to the table in a very reasonable fashion to try to help us

Page 26

1   solve this issue and to really provide for the maximized

2   recoveries to the creditors to the highest extent possible.

3           Now we're going to continue these discussions and

4   while we do have some measure of confidence that we will

5   succeed, you know, this is -- it is a challenging situation.

6   And if we don't reach a resolution within the next few days,

7   I think we called it imminently in our first day pleadings,

8   we will be coming to Your Honor with a request to appoint a

9   mediator.  We've been at this for two months.  We've made

10  substantial progress, but it may be at some point in time we

11  will need the help of a facilitator to bring it over the

12  line.

13          As we continue the discussions with the creditors

14  and attempts to reach a resolution, we're going to be

15  pursuing our plan.  The plan we have on file was filed

16  actually on the petition date, and so that's very important

17  to us to pursue that plan.  It's an imminently confirmable

18  plan that provides recoveries to the creditors.

19          In addition, as we're pursuing this plan, we have

20  been asked by the Special Committee to continue an

21  investigation into various transactions occurring before the

22  bankruptcy petition date.  That is ongoing and that is led

23  by one of our partners at Cleary under the direction of the

24  Special Committee and we are accelerating that that

25  investigation at a rapid pace even as we are having our

Page 27

1    negotiations.

2             In addition, as part of this process and as part

3    of this plan, we are going to start implementing a marketing

4    and sales process.  That will be, you know, really in

5    pursuit of a possible sale or capital raise or an

6    equitization, but we are going to continue those efforts as

7    well.  And so there's a whole lot to do here, but we're

8    fortunate that we have an engaged creditor body and an

9    engaged creditor group.

10            And with that, Your Honor, I'm happy to answer any

11   questions or we can just turn it over to Ms. VanLare for the

12   first day presentation.

13            THE COURT:  I'm happy to turn it over to Ms.

14   VanLare at this point.  Please proceed, Counsel.

15            MR. O'NEAL:  Thank you, Your Honor.

16            MS. VANLARE:  Good afternoon, Your Honor.  Jane

17   VanLare, Cleary Gottlieb Steen and Hamilton, proposed

18   counsel to the Debtors.  It's a pleasure to be before you

19   again, Your Honor.

20            As for my part of the presentation, what I'd like

21   to do is give you an overview, as Mr. O'Neal has said.  We

22   have a presentation prepared.  And then we'll go into the

23   presentation of the first day motions.  Before we do that

24   though, Your Honor, I'd just like to briefly introduce some

25   members of our team who will be presenting some of the first

1    motions.  So with us in the virtual courtroom here today are

2    my colleagues, Mr. Minott, Mr. Christian Ribeiro, and Ms.

3    Hoori Kim.  In addition --

4            THE COURT:  All right.  I can see them all here.

5    Thank you for the introduction.

6            MS. VANLARE:  Thank you, Your Honor.  IN addition,

7    we also do have here our first day declarants.  We do have

8    three.  Mr. Aronzon already introduced himself.  In

9    addition, Your Honor, we have Mr. Derar Islim who is an

10   interim CEO for the company.  We also have Mr. Michael Leto

11   who is the managing director with Alvarez and Marsal,

12   proposed financial advisor to the company, and all three

13   submitted first day declarations.

14           And actually before I move into my presentation,

15   I'd like to move their declarations into evidence, Your

16   Honor.

17           THE COURT:  All right.  Anybody wish to be heard

18   as to the request to move the three declarations into

19   evidence for purposes of today's first day hearing,

20   including consideration of the first day motions.

21           MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

22   Trustee's Office.  No objection, but we may have questions

23   for the declarants, depending on what happens.  We're not

24   anticipating that necessarily, but we reserve our rights.

25           THE COURT:  All right, that's fine.  Anyone else

Page 29

1    wish to be heard?  All right.  Hearing no further responses,

2    I'm happy to accept those declarations and by -- in

3    accepting them, I'm going to accept the declaration of Mr.

4    Leto that's at Docket No. 28 as opposed to the one that was

5    filed earlier.  I think there were some technical things

6    that need to be addressed and that led to the filing and

7    that's why it's not a -- it's in substance the same, is

8    understanding, which is why it's not listed as an amended or

9    corrected declaration.  The declaration is the same.  I

10   think it's just a matter of what information was blacked

11   out.  Is that right, Counsel?

12           MS. VANLARE:  That's exactly right, Your Honor.

13   Nothing in the declaration itself was changed in any way.

14   The only difference was that certain information in the

15   creditor list was redacted, and I will explain more as to

16   why we did what we did as part of the presentation of the

17   first day motions.

18           THE COURT:  All right.  Yeah, no, I just wanted to

19   mention that just in case somebody was confused by the fact

20   that they clicked on, I think it's Docket 18 and they were

21   directed to Docket 28.  It's the same document.  It's just a

22   matter of sort of the up-to-date redactions.  So, great.

23   Yeah, I think that'll come up in connection with one of the

24   motions.  All right.  Please --

25           MS. VANLARE:  Yes, Your Honor.  Okay.  With that,

Page 30

1     I will ask my colleague Mr. Minott to share the

2     presentation.

3              THE COURT:  All right.  I have it up on my screen

4     which I assume -- which I assume means that everybody else

5     does as well, so proceed.

6              MS. VANLARE:  Excellent.  Thank you, Your Honor.

7     So Richard, if we could scroll to the to the org chart.

8     We'll start, Your Honor, with giving you a brief overview of

9     the corporate structure and then we'll proceed to describe

10    the operations and tell you about why we're here in Chapter

11    11 and what we hope to achieve.

12             First just to set the stage, we did want to have

13    the org chart in front of you.  As Mr. O'Neal has already

14    previewed, at the top, you can see there digital currency

15    group.  That's the parent.  We refer to them as DCG.  Below

16    that entity is Genesis Global HoldCo.  That is one of the

17    three Debtors.  That's a holding company.  And on this org

18    chart, Your Honor, the Debtor entities are shaded in gray.

19    That way you can see which entities are in Chapter 11 and

20    which are not.

21             And you can see that a number of our affiliates

22    are not in bankruptcy.  So briefly, I mentioned Genesis

23    Global HoldCo is the holding company.  To the left, bottom

24    and left, is Genesis Global Capital LLC.  That is another

25    Debtor.  That entity is primarily engaged in the business of

Page 31

1    borrowing and lending digital assets.  As you may have seen

2    from our first day presentation, the lending business was

3    paused on November 16th, so it's currently not engaging in

4    that business, but that is its core business.

5              Then we also have on the right Genesis Asia

6    Pacific, that's a Singapore entity.  We -- the deviation for

7    that entity is GAP.  That entity is also involved in the

8    lending business.  Similarly, that business was paused on

9    November 16th.  GAP is also involved in some limited

10   trading, which I'll describe later on in the presentation.

11             In addition, under Genesis HoldCo, there are a

12   number of other entities.  I'll describe the other parts of

13   the business later on, but just to point out the other

14   entities on the left.  There's a custody entity.  There's a

15   custody business.  There is also kind of in the center on

16   the bottom there's GGC International.  That's an entity that

17   is engaged in derivative services and also has some trading.

18   Those entities are not part of the Chapter 11 proceeding.

19   There are number of other entities here as well that don't

20   have significant, if any, business operations.

21             Also I'd like to point out there's a non-Debtor

22   affiliate that's a sister company to Genesis HoldCo.  That's

23   Genesis Global Trading.  That's directly underneath DCG to

24   the right of HoldCo.  We refer to that as GGT.  That entity

25   is a broker dealer.  It is not part of the Chapter 11

Page 32

1    proceedings.  It is of course an affiliate.  So with that,

2    if we could move on to the next slide.

3              Okay.  So as I previewed just now, there are four

4    principal types of services that are offered.  There's a

5    trading business, a yield and borrowing or lending business,

6    a derivatives business, and a custody business.  So briefly,

7    I'll just spend a little bit of time describing each of

8    these.

9              With trading, these are primarily spot trading

10   services for institutional investors.  Just to give Your

11   Honor sense of the magnitude of the business, through third

12   quarter of 2022, the spot trading volume was over $38

13   billion.  This entity -- excuse me -- this business is

14   carried on primarily by GGT, the entity that I mentioned a

15   few minutes ago that is a sister company to HoldCo.  There's

16   also some limited trading activity at the Singapore entity

17   which is a Debtor.

18             And on that, just like to describe the type of

19   trading that is continuing.  Unlike the lending business

20   which has been paused as I mentioned, the Singapore entity

21   is continuing some limited trading, the spot trading.

22   Essentially, clients pre-fund to -- and the Singapore entity

23   GAP undertakes trades on behalf of those clients.  There is

24   -- GAP takes minimal risk in executing those trades because

25   as I mentioned they are pre-funded, and we think it's

1    important, Your Honor, for the business as a whole to

2    preserve that activity.

3              Next we've got the lending business.  That's the

4    second column.  This is really the bulk of what the Debtors

5    were doing prior to the pause.  That's GGC, the Genesis

6    capital entity.  That's its primary business.  And again, to

7    give you a sense of the magnitude here through third quarter

8    of 2022, GGC and CAP originated loans totaling over $93

9    billion.  As I mentioned, this is GGC which is a Debtor, and

10   GAP which is one of the other Debtors.

11             Next, we have a derivatives business.  That is

12   carried on by non-Debtor affiliates, primarily GGCI, and the

13   volume there through third quarter was over $73 billion.

14             Last, there is a custody business.  I pointed out

15   the entity when we were looking at the org chart.  There is

16   a custody business as well and that -- just again to give

17   some sense of the magnitude, approximately 90 customers as

18   of year end.  With that, if we can go on to the next slide,

19   please.

20             So the events leading up.  Why are we here?  As

21   I'm sure you know, Your Honor, the digital assets industry

22   has been experiencing a lot of difficulties over the course

23   of the last six months.  It all -- there are a number of key

24   events that lead to the so-called crypto winter.  First, you

25   had the Terra Luna collapse in May of '22.  That was

Page 34

1    promptly followed by the liquidation of Three Arrows Capital

2    in June.  After that, Voyager and Celsius filed for

3    bankruptcy in July of 2022.  And then in November -- and

4    this is really important to our Debtors -- FTX bankruptcy

5    occurred on November 11th and 14th of 2022.

6           Each of these events led to a decrease in investor

7    confidence in digital assets and the market really hadn't

8    fully recovered from the Terra Luna collapse that I

9    mentioned from May and the liquidation of Three Arrows

10   Capital, and so what happened in the fall of 2022 and

11   particularly precipitated by the FTX bankruptcy is that

12   Genesis received an extremely high number and volume of

13   calls on its loans and essentially faced a run on the bank.

14   We could have the next slide please.

15          So what did we do in response?  Fairly quickly, we

16   instituted a pause on November 16th.  Genesis paused all

17   withdrawals and this was done to preserve and maximize the

18   value of the Debtors to ensure fair distribution to the

19   creditors and to stop the run on the bank.  So all lending

20   and borrowing business was paused and that remains today --

21   it remains true today.

22          We also undertook some governance initiatives that

23   Mr. O'Neal described.  We formed a Special Committee for

24   Genesis Global HoldCo on November 18th.  That Special

25   Committee is comprised of two independent directors, Paul

1    Aronzon and Thomas Conheeney.  The board fully delegated all

2    matters relating to the restructuring to the Special

3    Committee, including the decision to file for Chapter 11

4    proceedings.

5              The company also hired advisers -- Cleary

6    Gottlieb, Moelis and Company, Alvarez and Marsal -- that

7    report directly to the Special Committee.  The Special

8    Committee has met frequently, Your Honor, to discuss and

9    evaluate various matters within its purview relating to the

10   Debtors.  And as part of that, and as my colleague

11   described, Mr. O'Neal, the Special Committee also commenced

12   an investigation into certain prepetition transactions in

13   accordance with its fiduciary duties.

14             We've all -- we've had a tremendous, tremendous

15   level of stakeholder engagement since mid-November.  Under

16   the direction of the Special Committee, we've been engaged

17   with around the clock discussions with various creditors,

18   creditor groups, representing more than $2 billion in

19   outstanding loans.  We've provided a substantial amount of

20   information to advisors to the creditors who've conducted

21   diligence.

22             We facilitated discussions and in-person meetings.

23   We've exchanged more than 12 iterations of a term sheet.  We

24   believe we're close, as Mr. O'Neal had mentioned,; and will

25   continue working extremely hard to achieve a resolution.

Page 36

1      We've also been engaged with DCG and its advisors.

2             Few words about the capital structure, the assets.

3      So as of the petition date, the Debtors have more than 150

4      million in cash, approximately 500 million in digital

5      assets, approximately 385 million in shares and brokerage

6      accounts.  We also have approximately 505 million in

7      outstanding loans where GGC is the lender on those loans to

8      third parties.  We note in that -- in connection with those

9      loans, GC received approximately 553 million in collateral.

10            We also, as we mentioned, have substantial claims

11     against the DCG entities including loans in the amount of

12     approximately 575 million maturing in May of 2023 and a $1.1

13     billion promissory that matures in 2032.

14            Now a few words about our outstanding obligations.

15     So we have institutional and high net worth lenders.  As of

16     November 30th, GGC and GAP had outstanding borrowings of

17     approximately 2.6 billion with a almost 600 nonaffiliated

18     lenders.  And we've posted approximately 351 million in

19     collateral.  We also have the Gemini lenders, so Gemini

20     Trust Company acts as an agent in connection with GGC's

21     borrowing of digital assets from Gemini's customers.

22     Genesis does not deal directly with any of them.  We don't

23     know their identity or the loan amounts or repayment

24     schedules.

25            On November 16th, 2022, Gemini foreclosed on the

Page 37

1    collateral.  And the proceeds from the sale of that

2    collateral amounted to almost 284 -- for approximately $284

3    million.  We do dispute that that foreclosure was done in

4    accordance with applicable law.

5            A few words on the restructuring to date and our

6    next steps.  So just as a brief introduction to the

7    advisors, we've got Cleary Gottlieb, proposed counsel;

8    Moelis & Company, proposed investment banker; Kroll as our

9    proposed notice and claims agent; and we've got Alvarez and

10   Marsal, proposed financial advisor to the Debtors.  All of

11   the advisors have been working very, very hard over the last

12   two months to get to today and will continue doing so if we

13   are retained to bring this case to a close.

14           The plan.  As Mr. O'Neal has already previewed, we

15   do intend to conduct a marketing and sales process and/or

16   raise additional capital.  If the process does not result in

17   the sale of a business, the equity interests in GGH which is

18   the HoldCo entity will be distributed to the Debtors'

19   creditors.

20           We filed a plan, as Your Honor saw, as Mr. O'Neal

21   described, and under that plan and -- general unsecured

22   claims would receive a combination of cash and other assets,

23   equity interests in HoldCo, and then general unsecured

24   creditor trust units, entitling them to receive pro rata

25   shares proceeds from certain claims.

1          Next steps, Your Honor.  We intend to continue

2     working very hard.  Continue engaging in discussions with

3     creditors and make revisions to the plan, if those

4     agreements are reached.  If they're not reached, as Mr.

5     O'Neal has mentioned, we do intend to request the

6     appointment of a mediator.  Our hope is to facilitate a

7     global resolution and do so as quickly and efficiently as we

8     can so we can return value and distribute value to our

9     creditors.

10         Thank you, Your Honor.  That concludes our

11    overview presentation.  We'd like to move into the first day

12    motions, but before I do that I'd like to give an

13    opportunity, with your permission Your Honor, to counsel to

14    some of the other advisers to the ad hoc groups to say a few

15    words if they wish before moving on to the first day relief.

16         THE COURT:  All right, I'm happy to do that.  I

17    did have one question based on your presentation, what the

18    word imminently meant in this context.  I realize that

19    there's no precise date, I would imagine, but I wasn't sure

20    of what your general timeline is.  Had a case filed this

21    summer, for example, what was in a similar circumstance.  So

22    I'm just curious what you envision --

23         MR. O'NEAL:  Sure.

24         THE COURT:  -- imminently looking like in this --

25         MR. O'NEAL:  Sure, and I -- Your Honor, Sean

Page 39

1    O'Neal again.  And I think you're referring to our

2    suggestion that if we don't reach a deal imminently, we will

3    ask Your Honor to appoint a mediator.  Is that correct?

4              THE COURT:  Right.  Correct.

5              MR. O'NEAL:  Yes.  I would say imminently is

6    really end of this week.  And if we don't reach a conclusion

7    by the end of this week, at least to a deal in principle, we

8    will seek the appointment of a mediator.  It has been two

9    months.  Actually sitting here right now, I think we can --

10   I don't think we're going to need a mediator.  I think we're

11   going to be able to get to a deal.  We've got very engaged

12   in productive discussions going on.

13             THE COURT:  All right.  We can talk about that in

14   the context of further proceedings at the end of the

15   hearing, but it sounds like that would fall between today

16   and a second day hearing if that's necessary.  So I'll make

17   sure to get you whatever time you need, to the extent it

18   might be something like a status conference or whatever it

19   is, to touch base on that.  And so we'll get there, but it

20   sounds like let's go through the motions first and then we

21   can talk about scheduling towards the end.

22             MR. O'NEAL:  We appreciate it, and also Your

23   Honor, I'm very much an optimist.  So --

24             THE COURT:  Well, I don't want to rain on any

25   parades at this point --

Page 40

1              MR. O'NEAL:  Right.  So don't --

2              THE COURT:  -- certainly that's fine.

3              MR. O'NEAL:  Yeah.  Yes.  Thank you.

4              MR. ROSEN:  Your Honor, this is Brian Rosen.  Are

5    you able to hear me a little bit getter now?

6              THE COURT:  Yeah, I can hear you just fine.  Thank

7    you.

8              MR. ROSEN:  Thank you, Your Honor.  And thank you,

9    Ms. VanLare for passing the baton over this way.  Your

10   Honor, as I said before, we represent a group of creditors

11   holding in excess of $1.5 billion worth of claims and we

12   have been working very collaboratively with Mr. Marcus'

13   group from Kirkland and Ellis who holds a considerable

14   amount of claims as well to create essentially a unified

15   creditor body to have conversations with the Debtor and with

16   DCG.

17             We did bring along Houlihan Lokey to serve as our

18   financial advisor to assist in those conversations.  And as

19   Mr. O'Neal has said, we've been negotiating for the better

20   part or at least gathering information and then negotiating

21   for the better part of approximately two months.  And I

22   loved his positive attitude about imminent.  We all thought

23   imminent might have been over the weekend, but unfortunately

24   we were unable to get there.  But we are hopeful as we inch

25   little bit by bit closer and closer to trying to reach an

Page 41

1   accord by the end of this week.

2           Only time will tell.  There are some economic

3   issues that remain between the parties and our principles do

4   engage in direct communications, both by text and phone and

5   whatever other means they do in this pandemic world, as you

6   indicated before.  But we are getting closer and we're

7   hopeful that we will reach an accord.

8           As Mr. O'Neal said, in the event that we're

9   unsuccessful though, I believe that the unsecured creditors

10  would be supportive of the mediation process and working

11  side by side with Cleary Gottlieb and the Debtors in that

12  regard to try and reach an understanding with respect to the

13  claims and cause of action that the Debtors believe are

14  outstanding and in connection with the overall

15  restructuring.

16          Unless Your Honor has any questions, I would pass

17  the podium to someone else.

18          THE COURT:  All right.  I do not.  Thank you very

19  much for that information.  Any other party wish to be heard

20  as to the status of the case?

21          MR. MARCUS:  Your Honor, this is Chris Marcus from

22  Kirkland and Ellis.  Can you hear me okay?

23          THE COURT:  Can hear you just fine.

24          MR. MARCUS:  Thanks, Your Honor.  So one

25  additional point that I wanted to make, you know, to add on

Page 42

1    what everybody is saying.  You know, we do represent a group

2    of GDC creditors that hold approximately a billion and a

3    half in claim amounts.  Those are comprised of both domestic

4    and foreign institutions.  Also one of those is, as I

5    mentioned before, Gemini Trust Company.

6              So it's really not just institutions we're talking

7    about.  It's traditional type of trade creditors that we see

8    in a lot of these Chapter 11 cases.  In these crypto cases,

9    you know, we have individuals and in this case there's

10   literally hundreds of thousands of individuals whose money

11   is at stake.  And we have been focused -- I agree with Mr.

12   Rosen.

13             I agree with Mr. O'Neal about the work that

14   everybody's putting in, the ad hoc group, Kirkland,

15   Proskauer, Houlihan, the folks representing DCG as well have

16   been working around the clock, and the Debtors'

17   professionals, to get to a value maximizing recovery for all

18   creditors, but not just value maximizing, value maximizing

19   as quickly as possible so we can get recovery back into the

20   hands of the individuals that we're looking out for here.

21             So there is some more work to do.  I'm going to be

22   cautiously optimistic as well, but I can confirm what

23   everybody said already, Your Honor, about the hard work

24   that's gone into getting us to the point where we are.

25   Hopefully, we can get there before mediation is required.

Page 43

1    Thank you, Your Honor.

2              THE COURT:  All right, thank you.  Any other party

3    that wishes to be heard as to status before we turn to the

4    first day motions?

5              MR. SAFERSTEIN:  Your Honor, if I may, Jeffrey

6    Saferstein from Weil Gotshal and Manges on behalf of Digital

7    Currency Group.

8              THE COURT:  Certainly.

9              MR. SAFERSTEIN:  Your Honor, I just want to echo

10   everybody's comments here on behalf of DCG, the parent

11   company.  We want nothing more than to see a successful

12   restructuring here and to do it quickly.  And as everybody

13   has said, we've been working around the clock to try to come

14   to a deal.  I do think we are very close from our

15   perspective as well.  We will continue to work hard to come

16   to an agreement and we hope to be able to report back to the

17   Court shortly that we're there and we can resolve this case,

18   you know, in a quick manner and one that's acceptable to all

19   parties.  Thank you.

20             THE COURT:  Thank you.  Any other party that

21   wishes to be heard on status?

22             MR. DAUCHER:  Good afternoon, Your Honor.  Eric

23   Daucher from Norton Rose Fulbright on behalf of Mirana Corp.

24   I just wanted to address the Court briefly this afternoon.

25   Mirana Corp. is one of the major creditors of Debtor Genesis

Page 44

1   Asia Pacific, which to my knowledge sets it apart a little

2   bit from the ad hoc group with which the Debtors have been

3   engaging, which again to my knowledge are comprised of

4   creditors of the Debtor Genesis Global Capital.

5           We haven't participated in the discussions that

6   all the parties have mentioned, which sound promising.  Very

7   much interested in seeing how much progress is being made

8   and whether that stands to benefit all of the creditors or

9   just the creditors of one or two of the Debtors.  And we

10  note that the first day declaration mentioned at a very high

11  level a number of pre-bankruptcy transactions between and

12  among the Debtors and certain of their affiliates and

13  controlling parties.

14          At least as an initial matter, Mirana has some

15  serious concerns about some of those transactions.  And so

16  we look forward to a full explanation of them and hopefully

17  a deal that resolves them in a way that is acceptable to

18  creditors of all Debtors.  So with that, I'll cede the

19  virtual podium.  Thank you.

20          THE COURT:  Thank you.  Any other party that

21  wishes to be heard?

22          MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

23  Trustee's Office.  I wanted to point out, first of all that

24  my office is soliciting for a Creditors Committee in this

25  case and it's -- the deadline is January 30th.  We are --

Page 45

1    the notice is posted on the Kroll website as well as U.S.

2    Trustee website as well and we had sent out emails to the

3    Debtors' list of top 50 creditors.  So that's number one.

4            We also wanted to acknowledge the professionalism

5    of everybody involved.  My office has been involved with

6    this case at least in the last week and Debtors counsels at

7    all time (indiscernible) professional and responsive to us.

8    That said, Your Honor, my office does have concerns which

9    may not be a first day issue concern, but it deals with some

10   questions that need to be answered.

11           Among other things is the corporate structure as

12   was described, the debt under the Debtors' narrative, DCG is

13   sort of separate at the top there, but DCG did appoint

14   directors to the company's board of directors and they now

15   have the structure of a Special Committee which my office

16   has further questions on, the investigations that are taking

17   place of transactions, that are being conducted by the

18   Special Committee and at its directing Cleary Gottlieb,

19   which is Debtors' counsel.

20           And again, Your Honor, these are not necessarily

21   first day issues.  We're just flagging a few general points.

22   On the sealing issue, my -- which the Court will get to, we

23   just note that these sophisticated creditors on the top 50

24   list and there's obviously been some litigation in the

25   Southern District and with the U.S. Trustee's Office on the

1    extent of the sealing motions.  That again, we don't think

2    is a today issue.

3            We've come to temporary resolutions with the

4    Debtor on that.  We have questions about the cryptocurrency

5    aspect of the Debtors' assets and their safety generally.

6    We have -- and I'm not in any way implying there's an issue

7    that we're aware of but FTX, there was a hack within the

8    first days of the bankruptcy case and under the 345 motion

9    and various motions, the Debtors are going to have to

10   explain these more fulsomely how they intend to protect

11   these assets.

12           The Debtors describe themselves as lending

13   entities and the trading has -- the lending has been frozen,

14   but we do have this GAP entity in Singapore which is doing

15   spot trading.  And the Court (indiscernible) $38 billion

16   approximately for that.  The Debtors are seeking even today

17   for an interim order that will allow that trading to

18   continue, and at least today they are going to have to

19   explain why that's important, we believe.  The SEC has filed

20   a complaint and I do understand that Debtors contest that,

21   but nevertheless there is that complaint that has been filed

22   very recently.

23           And finally Your Honor, just generally the

24   intercompany loans and transactions.  You saw the corporate

25   chart and the GGT entity which is not in bankruptcy.  It

Page 47

1    handles a lot of the transactions between the Debtors and

2    there are a lot of -- and it handles Debtors' and non-Debtor

3    transactions.  And there are questions relating to that

4    again, probably tying into the cash management motion.  But

5    Your Honor, I should also note --

6              THE COURT:  Well, I think some of those are very

7    specifically directed to certain motions.  So we'll go

8    through them and see where --

9              MR. ZIPES:  Yep.

10             THE COURT:  -- see where we are.

11             MR. ZIPES:  Very well, Your Honor.

12             THE COURT:  All right.  Thank you very much, Mr.

13   Zipes.  Any other party that wishes to be heard as to status

14   before we turn to the motions themselves?

15             All right.  I'll turn it back over to Debtors'

16   counsel to kick off the motions, no doubt with the Joint

17   Administration.

18             MS. VANLARE:  Indeed, Your Honor.  Thank you very

19   much.  Jane VanLare here from Cleary Gottlieb.  So Your

20   Honor, if you'll permit us, we'll go mostly in order but

21   slightly out of order just to group motion by the individual

22   presenting that motion.  So we'll start --

23             THE COURT:  That's fine.

24             MS. VANLARE:  We appreciate that very much, Your

25   Honor.  We'll start with my colleague Mr. Ribeiro.  We'll

Page 48

1    then go to Mr. Minott, then Ms. Hoori Kim, and then I will

2    present the remaining few motions.  So with that, I will

3    pass the virtual podium to Mr. Ribeiro to begin with the

4    joint administration motion.

5              THE COURT:  All right.  Thank you very much.  Mr.

6    Ribeiro?

7              MR. RIBEIRO:  Good morning, Your Honor.  Christian

8    Ribeiro, Cleary Gottlieb Steen and Hamilton, proposed

9    counsel to the Debtor.  So the first motion I'll be

10   presenting today is the joint administration motion which is

11   filed at Docket No. 2 and should be Binder Tab No. 4 in the

12   binder we provided to Your Honor.

13             So by this motion, Debtors seek the entry of a

14   proposed order which is attached to the motion as Exhibit A

15   and the proposed order would direct the joint administration

16   of the Chapter 11 cases for procedural purposes only and

17   would allow them to maintain one file, one docket, and one

18   service list for all of the Chapter 11 cases under the case

19   of general -- Genesis Global HoldCo LLC and that the Chapter

20   11 cases be administered under the caption which is provided

21   in Paragraph 9 of the motion and also Paragraph 3 of the

22   proposed order which lists Genesis Global HoldCo LLC as the

23   caption, is administered under Case No. 23-163.

24             The Debtors also request that the Court order that

25   the foregoing caption -- the caption listed in Paragraph 9 -

Page 49

1    - satisfy the requirements set forth in Section 342(c)(1) of

2    the Bankruptcy Code.  The basis for the relief requested in

3    the motion is Bankruptcy Rule 1015(b) which allows -- which

4    provides that if two or more petitions are pending in the

5    same Court by a Debtor and affiliate, the Court may order

6    joint administration of the cases, and here all affiliates -

7    - all of the Debtors are affiliates as that term is defined

8    under Section 1012 of the bankruptcy code.

9            We believe that joint administration will ease the

10   administrative burden for the Court and the parties in

11   interest and will reduce by parties' fees and costs of

12   avoiding duplicative fillings and they will also allow the

13   U.S. Trustee and other parties in interest to monitor

14   Chapter 11 cases with greater ease and efficiency.

15           So the Debtors submit the joint administration of

16   the Chapter 11 cases is in the best interests of their

17   estates, their creditors, and all parties in interests and

18   we additionally note that this is ordinary relief that is

19   typically granted in other related cases, including in cases

20   before Your Honor.

21           With that, unless you have any questions, we

22   respectfully request the entry of the proposed order in the

23   form of Exhibit A.

24           THE COURT:  All right, thank you very much, and I

25   assume obviously based on what's in Paragraph 8 of the

Page 50

1    proposed order, this doesn't constitute in any way, shape,

2    or form, substantive consolidation?

3            MR. RIBEIRO:  Correct.  Yes.  Thank you, Your

4    Honor.

5            THE COURT:  Thank you.  All right.  Any party wish

6    to be heard in connection with the motion for a joint

7    administration of these related Chapter 11 cases?  Hearing

8    no response, I'm happy to grant the motion as entirely

9    appropriate.  For those who are not familiar with the

10   bankruptcy process, it really is -- this motion is granted

11   so that the case proceeds in an organized way and we have

12   one hearing rather than have three separate hearings to

13   accomplish very similar things.

14           So it's really a matter of managing the docket

15   efficiently and hearings efficiently and the case

16   efficiently.  So there's no substantive consolidation

17   meaning it doesn't affect the merits of anybody's rights,

18   its creditor, Debtor in connection with the actual substance

19   of how things should happen under the Bankruptcy Code.

20           All right, I'm happy to grant that motion is

21   entirely appropriate for all the reasons set forth in the

22   motion explained here today.  So that motion is granted.

23   Next up.

24           MR. RIBEIRO:  Thank you, Your Honor.  We

25   appreciate that and we'll submit the proposed order to

Page 51

1    chambers.

2             THE COURT:  All right, and just about that, what

3    would be great is -- there's no doubt a few tweaks here or

4    there, is if you could send around one or two orders,

5    depending on things just -- even an order like this one, I

6    don't think has any changes, it's always good to make sure

7    we have the most up to date order.  So just when you send it

8    along, you can send them along in tranches and just say here

9    are all the orders we're going to send another email with a

10   few more.  That would be much appreciated.

11            MR. RIBEIRO:  Okay.  Sounds good, Your Honor.

12   Thank you.  So again Christian Ribeiro, Cleary Steen and

13   Hamilton, proposed counsel for the Debtors, presenting the

14   next motion which is the Debtors' schedule extension motion

15   and that's at Docket No. 3 and should be Binder Tab No. 5.

16            So by this motion, the Debtors request authority

17   pursuant to section 105(a) of the Bankruptcy Code and

18   Bankruptcy Rule 1007(c) to extend the 14-day period to file

19   their schedules of assets and liabilities, their schedules

20   of executive contracts and unexpired leases, and also their

21   statements of financial affairs by an additional 35 days for

22   a total of 49-day extension from the petition date which

23   would result in a deadline of March 8th, 2023.

24            And the Debtors also request an extension of their

25   time under Rule 2015.3 to file their reports of financial

Page 52

1      information with respect to entities in which the Debtors

2      hold controlling or substantial interests.  They seek an

3      extension of that deadline of 35 days.

4               And with respect to both of these extensions, they

5      are without prejudice to the Debtors rights to request

6      additional time under an agreement with the U.S. Trustee

7      which would not require additional Court approval, should

8      further extension be required.

9               So we seek this extension of the deadlines for

10     filing the schedules and statements under Rule 1007(c) which

11     allows for an extension of the time to file schedules and

12     statements on a motion for cause shown and on notice to the

13     U.S. Trustee.  We believe that extension here would be

14     appropriate given the size, the geographical spread, and the

15     complexity of the Debtors' operations.

16               Debtors anticipate they will not be able to

17     complete their schedules and statements in the 14-day period

18     required under the Bankruptcy Code.  There's a vast amount

19     of information that must be compiled, assembled, and

20     collecting that information requires a significant

21     expenditure of time and effort on the part of the Debtors,

22     their employees, and their professionals.

23               We believe that there will be no prejudice to the

24     Court granting the request for an extension including the

25     deadline and the Debtors anticipate that they will require

Page 53

1     at least 35 days -- 35 additional days to complete

2     schedules.

3              THE COURT:  All right, thank you very much.  Any

4     party wish to be heard in connection with this motion?

5              MR. ZIPES:  Your Honor, my office has no objection

6     to that.  Your Honor, I do note -- and perhaps I missed it

7     in the order, that the Court doesn't need to sign off on any

8     extension of time.  It wouldn't be our intention to make

9     that difficult, but we do think the Court should be signing

10    off on any extension of time.

11             THE COURT:  Well, the other thing is there at

12    least should be notice to relevant parties, so if you all

13    work out an additional extension and you want to put a

14    notice on the Docket, that may be one way to make it

15    efficient but to keep all interested parties fully apprised.

16    That work for you, Mr. Zipes?

17             MR. ZIPES:  That works, Your Honor.  Thank you.

18             THE COURT:  All right.  So yeah, so if you would

19    just tweak -- if Debtors' counsel would just tweak that last

20    sentence of Paragraph 2 to say it's without prejudice, right

21    to seek additional time from the U.S. Trustee without

22    additional Court approval should it become necessary -- and

23    if the additional time become necessary, provided that any

24    additional extensions of time agreed upon shall be set forth

25    in a notice on the docket or something.  I'm sure you can

1    clean that up in a more eloquent way, but just that concept

2    would be great.

3              MR. RIBEIRO:  Will do, Your Honor.  We'll make

4    that change to Paragraph 2.  There's also the request to

5    extend the period in 2015.3.  In the motion, we actually had

6    initially requested an extension of that period by 60 days,

7    but we'll actually be requesting an extension of 35 days.

8              THE COURT:  Yeah, I was going to ask you about

9    that because I heard you say 35 and I saw the order says 60,

10   so --

11             MR. RIBEIRO:  Right.

12             THE COURT:  It's going to be 35 so they run

13   together, which makes a lot of sense.

14             MR. RIBEIRO:  Correct.  Actually, the deadline

15   under 2015.3 is pegged to the 341 meeting at seven days for

16   --

17             THE COURT:  All right.

18             MR. RIBEIRO:  -- the first state set.  But just to

19   have a consistent 35-day request and so that's what we'll be

20   doing.

21             THE COURT:  All right.

22             MR. RIBEIRO:  We'll make the revised order and

23   submit that to your --

24             THE COURT:  All right.

25             MR. RIBEIRO:  Your chambers.

1              THE COURT:  That's fine.  Anyone else wish to be

2     heard on this motion?  All right, hearing no response --

3     further response, I'm happy to grant this motion as it's

4     been amended here on the record this afternoon as

5     appropriate under the facts and circumstances of the case

6     and applicable law, recognizing that this information is

7     challenging to put together in these cases, given the

8     timeline of the case here as set forth in the various

9     papers, this timeframe discussed here is entirely

10    appropriate.  So I'm happy to approve it.

11             MR. RIBEIRO:  Thank you, Your Honor.

12             THE COURT:  Next up.

13             MR. RIBEIRO:  And again, last -- one last time,

14    Christian Ribeiro, Cleary Steen and Hamilton for the --

15    proposed counsel for the Debtors.  The third first day

16    motion I'll be presenting is the Kroll claims and notice

17    agent application and that's at Docket No. 12 and should be

18    Binder Tab No. 7.

19             THE COURT:  All right, I have it.  Thank you.

20             MR. RIBEIRO:  So this is the application for the

21    appointment of Kroll Restructuring Administration LLC as

22    claims and noticing agent, pursuant to Section 156(c) of the

23    Bankruptcy Code.  We seek an order in the form of the order

24    -- proposed order attached as Exhibit A and in support of

25    this motion we rely on the declaration from the managing

1      director of Kroll, Mr. Benjamin Steele, who is also on the

2      line should Your Honor have any questions for him on this.

3             Now, the Debtors request entry of an order

4      appointing coal as the claims and noticing agent for the

5      Debtors in the Chapter 11 cases to assume full

6      responsibility for the distribution of notices and the

7      maintenance, processing, and docketing of proof of claims

8      filed in the Chapter 11 cases.

9             The Debtors' selection of Kroll to act as the

10     claims and noticing agent satisfies the Court's protocol for

11     the employment of claims and noticing agents under 28 U.S.C.

12     Section 156(c) and in that the Debtors have obtained and

13     reviewed engagement proposal from at least two other Court-

14     approved claims and noticing agents to ensure selection

15     through a competitive process.

16            The Debtors have determined based on these

17     proposals obtained that Kroll's rates are competitive and

18     reasonable given Kroll's quality of services and expertise.

19     And also a copy of the engagement agreement is included with

20     the motion attached as Exhibit C.  The Debtors believe that

21     or anticipate that there will be over 600 entities that will

22     need to be noticed and Local Rule 5075-1(b)(1) provides that

23     in a case in which the number of creditors and equity

24     security holders in the aggregate is 250 or more, the estate

25     shall retain, subject to approval of the Court, a claims and

Page 57

1    noticing agent in accordance with the claims agent protocol.

2              And so in light of the number of anticipated

3    claimants and the complexity of the Debtors' businesses, the

4    Debtors submit that the appointment of the claims and

5    noticing agents is actually required by Local Rule 5075-1(b)

6    and is in the best interest of the Debtors' estates and

7    their creditors, so we believe Kroll is to act, claims and

8    administrative agent and if Your Honor, agrees, I would

9    request entry of the proposed order today.

10             THE COURT:  All right, thank you very much.  Any

11   party wish to be heard in connection with the motion to

12   retain Kroll Restructuring Administration LLC as claims and

13   noticing agent?  All right, hearing no response, I'm happy

14   to approve the request as entirely appropriate under the

15   facts and circumstance, for all the reasons set forth in the

16   motion and explained on the record here this afternoon.

17             I do appreciate the inclusion of Paragraph 16 in

18   the proposed order to address the issue that's percolated in

19   some other cases dealing with providing of information to

20   third parties who are involved in claims trading and with

21   that, that motion is granted.  I don't have any changes to

22   the proposed order.  So next up.

23             MR. RIBEIRO:  Thank you, Your Honor.

24             THE COURT:  Thank you.

25             MR. RIBEIRO:  I'll now pass the podium to my

Page 58

1    colleague Mr. Minott.

2              MR. MINOTT:  Good afternoon, Your Honor.  For the

3    record, Richard Minott of Cleary Gottlieb Steen and

4    Hamilton, proposed counsel to the Debtors.  I'll be

5    presenting the next three items on the agenda, starting with

6    the Debtor's motion for entry of interim and final orders

7    authorizing the payment of certain taxes and fees, which is

8    about which is found --

9              THE COURT:  All right.

10             MR. MINOTT:  -- at docket -- which is found at

11   Docket No. 9 and is at Tab 11 of Your Honor's binder.

12             THE COURT:  All right, I have it before me.

13   Proceed.

14             MR. MINOTT:  By virtue of the Debtors' operations

15   in Singapore, Debtor entity Genesis Asia Pacific which I'll

16   refer to as GAP, incurs certain tax obligations from time to

17   time and is required to pay certain mandatory licensing

18   imposed by the money authority of Singapore.  By the taxes

19   and fees motion, the Debtors seek authority to pay an

20   aggregate amount of up to $110,000 on account of certain

21   goods and services taxes and licensing fees incurred by GAP

22   through its operations in Singapore.

23             Your Honor, the Debtors seek authority pursuant to

24   the motion to make such payments for certain taxes and fees

25   accrued prepetition and are unpaid or may be incurred post-

Page 59

1    petition.  Unless Your Honor has any questions, then I

2    respectfully request that Your Honor approve the motion and

3    enter an order substantially in the form attached to the

4    motion as Exhibit A.

5               THE COURT:  All right, thank you very much.  Any

6    party wish to be heard in connection with the request for an

7    interim order authorizing payment of certain taxes and fees?

8               MR. ZIPES:  No, Your Honor.  As stated, this is an

9    interim order.

10              THE COURT:  All right, thank you very much.

11   Anyone else?  All right, hearing no responses, my only

12   question for you is whether you wanted to include in the

13   interim order that information about the taxes and fees will

14   be shared with any Official Committee appointed and whether

15   you wanted to include the ad hocs or not.  I'll leave to you

16   all, pursuant to your discussions.  You obviously have been

17   discussing things.  So I think you have your relationship

18   well in hand.

19              But I often see that kind of language just in

20   connection with any Committee that's appointed, so any

21   thoughts?

22              MR. MINOTT:  We can discuss that with the various

23   parties, Your Honor, and take that into consideration and

24   propose a revised order if needed.

25              THE COURT:  All right, thank you very much.  All

Page 60

1    right.  Anyone else wish to be heard?  All right.  I'm happy

2    to grant this request for an interim order on the payment of

3    certain taxes and fees for all the reasons set forth in the

4    motion and summarized on the record here this afternoon.

5    Thank you very much.  Next up, Counsel?

6             MR. MINOTT:  Thank you, Your Honor.  Up next is

7    the Debtors' critical vendor motion which was filed at

8    Docket No 11 and is Tab 10 of Your Honor's binder.

9             THE COURT:  All right.  Give me one second to just

10   find my appropriate sticky note.  Voila.  All right.   I'm

11   there.  Thank you very much, Counsel.  Proceed.

12            MR. MINOTT:  Your Honor, by the critical vendor

13   motion, the Debtors seek to pay the prepetition claims of

14   various vendors whose goods and services are essential to

15   the Debtors' day to day operations.  The critical vendor

16   motion largely pertains to certain foreign vendors who

17   provide goods and services to the Singapore Debtor entity

18   GAP or Genesis Asia Pacific, and they consider themselves to

19   be outside of the jurisdiction of this Court.

20            These critical vendors provide essential

21   specialized goods and services including information

22   technology platforms, cybersecurity, infrastructure,

23   maintenance, and other resources for the Debtors'

24   operations.  If access to these goods and services are cut

25   off or disrupted even for a limited amount of time, the

Page 61

1    Debtors and all parties in interest would suffer irreparable

2    harm.  Your Honor, based on their books and records, the

3    Debtors estimate that as of the petition date they owe

4    approximately $100,000 in outstanding prepetition vendor

5    claims and the interim relief sought by the Debtors today is

6    $70,000.

7              Your Honor, I'd like to note the U.S. Trustee has

8    requested a list of the vendors which will provide promptly

9    after this hearing, and we'll make that list available to

10   the Court and any Official Committee appointed upon request.

11             So unless Your Honor has any questions at this

12   time, the Debtors respectfully request that Your Honor

13   approve the motion and enter an order substantially in the

14   form attached to the motion as Exhibit A.

15             THE COURT:  All right.  So I did have couple of

16   questions that you would help me with.  I think you just

17   answered one, but in critical vendors, the question is

18   always numerator and denominator, right, what's the total

19   number of the pool versus what's being asked to be paid

20   here?  I recognize the amount is a fairly modest amount in a

21   case of the size and that's, I think, a bit of an

22   understatement even.  But am I right in understanding that

23   the numerator and denominator really are both $100,000 for

24   purposes of a final order, that it's a request to pay all of

25   the outstanding amounts?  Is that right?

Page 62

1              MR. MINOTT:  That's correct, Your Honor.

2              THE COURT:  All right.  And in connection with

3     that, I certainly, as you explain in your motion and Courts

4     here are certainly well aware of the challenges dealing with

5     foreign vendors and how those are sort of in a dramatically

6     different position, or lots of reasons that you explain.  It

7     sounds like the majority of the creditors here, the critical

8     vendors are foreign.  Do you have any sense of what

9     percentage we're talking about?

10             MR. MINOTT:  That's exactly right, Your Honor.  So

11    I would say that the list of about 15, a little more than 15

12    vendors, all but four are foreign vendors.

13             THE COURT:  All right, thank you.  And as -- of

14    the total request for today and on a final basis, I'm

15    assuming that the number of critical vendors who are

16    foreign, does that follow form for the percentage of the

17    obligations?

18             MR. MINOTT:  That's correct, yes, Your Honor.

19    We're happy to provide --

20             THE COURT:  I mean, it's -- I understand it's

21    rough.  It won't be precise but just to get --

22             MR. MINOTT:  Right.  Yes, it's proportional to the

23    to the amount of vendors and kind of which are critical

24    which are foreign.  And we'll provide that list to the

25    Trustee in case they have any questions, but it is.  It is

Page 63

1   proportional.

2           THE COURT:   All right.   And so for foreign

3   vendors, obviously there's a sort of a separate set of

4   issues that lead to request for critical vendors, all

5   foreign vendors to be paid.   For the domestic folks, is

6   there any more meat on the bones that you can give me in

7   terms of the kinds of services?

8           Certainly Paragraph 14 in the motion explains

9   generally and I recognize that there wasn't an extensive

10  discussion of what these critical vendors are doing, and

11  that's probably a reflection of the fact that the amounts

12  sought here is $70,000.   That's understandable and I don't

13  quibble with that but anything else -- so with foreign

14  vendors, I get it.   And I don't think I have any concerns.

15  Anything else you can tell me about domestic vendors?

16          MR. MINOTT:   Sure, Your Honor.   So for the

17  domestic vendors, they really again provide -- they're

18  critical because they serve as the backbone to the business.

19  One of the Debtor is really the communication hub, how the

20  Debtors communicates to its clients and creditors.   We have

21  a cybersecurity infrastructure that the Debtor utilizes,

22  actually two of them, and the other is involved with, from

23  my understanding, just information technology and

24  maintenance of the, really the Debtors' systems that keeps

25  it keeps it running.

Page 64

1              THE COURT: All right.  That's helpful.  Thank you.

2    And I assume -- one last question on this is I assume then

3    that these folks are not easy to replace in terms of

4    domestic vendors.  I ask because I know what you told me in

5    the papers here in terms of this particular industry and

6    I've followed Judge Glenn and Judge Wiles in the other

7    cases, but I don't profess to be an expert on what kind of

8    vendors and how the business is organized, notwithstanding

9    having a child who is a programming -- a software engineer.

10              But so perhaps you can just put on the record the

11    explanation as to how unique the services are the

12    difficulties of replacing them for the domestic folks.

13              MR. MINOTT:  Certainly, Your Honor.  So as is made

14    aware, this is, you know, a Debtor operations that are

15    individual asset space, which is -- it's been around but

16    it's emerging industry where the goods and services that

17    these Debtors provide our hyperspecialized.  There are

18    certain, you know, requirements and restrictions and holding

19    that really is far behind my level of comprehension that

20    these vendors provide to manage the company's day to day

21    operations.  So, you know, it would be tremendous costs and

22    a really significant burden to the Debtor entities to

23    replace these critical vendors at this time.

24              THE COURT:  All right, thank you very much for all

25    that additional detail.  And so let me ask if there's any

1    party that wishes to be heard on the critical vendor motion.

2    All right.  Hearing no response, I'm happy to grant the

3    requests for critical vendors here.  That is the interim

4    order.  I did have one or two questions about including one

5    or two things.

6           I guess the first would be some language

7    consistent with what we talked about before in terms of

8    providing information to any Official Committee that's

9    appointed.  Obviously, that's one of the things that they

10   do.  And certainly to the extent -- I'll leave it to you and

11   the folks who are the Ad Hoc Committees, whether that would

12   extend to them as well.

13          And the other question was, I did see that there's

14   a discussion about customary terms and then Paragraph 4 of

15   the proposed order, that's all fine.  I have seen different

16   degrees of details on customary terms, and this just has a

17   very general statement about customary terms.  That may be a

18   reflection of this particular industry, but to the extent

19   that the Debtors wanted to provide anything else more

20   specific in the order, I don't know if you have any

21   thoughts.

22          What are -- sometimes I've even seen attached

23   forms.  Again, I think those ones that have a lot of details

24   tend to be in fairly traditional industries, so it may not

25   be a fit here, but I don't know if you have any thoughts on

Page 66

1    those two issues.  One is consultation and the other is more

2    details as to customary terms.

3            MR. MINOTT:  Your Honor, on the first issue about

4    providing notice to the Committees, we're happy to take that

5    under advisement and again speak to the various stakeholders

6    and, you know, if need be, proposed a revised order to the

7    Court.  On the customary terms, again as Your Honor alluded

8    to, there's not really uniformity, given that the industry

9    is -- it's really a moving target at times.  But again, we

10   will consider what changes can be made if any to add to the

11   customary terms and again propose a revised order as needed.

12           THE COURT:  All right.  If you think there's

13   something that would be beneficial that is not -- wouldn't

14   overly complicate everybody's life, fine.  And if it proves

15   to be a bridge too far, then you can consider my suggestion

16   shelved.  So I'll leave it to your discretion on that

17   subject.

18           All right.  But those are my only two comments.

19   Thank you very much, Counsel, for all the additional detail.

20   It's much appreciated.  Next up.

21           MR. MINOTT:  Sorry, I just wanted to confirm that

22   the motion is approved, Your Honor?

23           THE COURT:  Yes.  Oh, yes, the motion is granted

24   and the request for an interim order for critical vendors in

25   this case for $70,000 is granted as appropriate under the

Page 67

1    facts and circumstances of the case for all the reasons that

2    you set forth in your motion and summarized here today, and

3    also given the additional information that you very

4    helpfully provided.

5           MR. MINOTT:  Thank you, Your Honor.  Last on my

6    list, Your Honor, is the Debtor's case management procedures

7    motion, which was initially filed at Docket 10.  And the

8    original order should be at Tab 8 of your binder.  As Your

9    Honor noted at the outset, we (indiscernible) revised

10   procedures to align with Your Honor's standard form case

11   management procedures, which we filed earlier today at

12   Docket 32.  I am happy to walk through the redline if it

13   would be helpful to Your Honor.

14          THE COURT:  Well, I actually think it's fine.

15   One, I appreciate you all.  We wanted to call in chambers

16   with some advance notice because a lot of these things are

17   very specific and detailed.  And they aren't necessarily the

18   same kind of questions.  It's more a matter of how you want

19   to organize things and procedures for the case going

20   forward.  So I appreciate your revising the order.  I don't

21   need you to go through the changes.  You all very helpfully

22   provided to us with enough notice that I've been going

23   through it in chambers.

24          The only thing I think I would do -- well, two

25   things that I would suggest.  Is that we will come up with a

Page 68

1   proposed revised order based on a couple of other small

2   changes that we have and send you all a proposed redline so

3   you can see what we have in mind.  I don't think any of

4   these are substantive.  And the other thing is to just point

5   out a couple of big picture points that might be of use for

6   anybody who is listening in.  One is that we'll get rid of

7   all the Court Call paragraphs, because we do everything by

8   Zoom.  And then that way everybody knows who is on the line

9   if they were looking, following along at home, that they

10   might be confused about how they might have to dial in in

11   the future.  But we'll use Zoom not only for video, again,

12   for audio.  And the second is that for purposes of replies

13   and the agenda, I would suggest two days out.  We'll just

14   move back 24 hours.  I think that's consistent with I think

15   how most of the judges in our courthouse do it as well in

16   Delaware.  And that's great.  I recognize for purposes of

17   the agenda -- that means that sometimes there are changes to

18   the agenda.  So it's a mixed blessing.  You get a little bit

19   earlier, but it might change.  That's all fine.  I will

20   never blame anybody for giving us the best information you

21   have at the time, and you can all just contact chambers and

22   let us know if there are any changes.  But particularly for

23   the replies, it's particularly important to make sure I have

24   enough time to give them appropriate studies so that I've

25   got my act together for these hearings and you all get the

Page 69

1   best that I have to offer in terms of comments on

2   substantive law.

3          So those are the only things I think that are

4   worth noting.  The rest are much more in the minutiae

5   category.  So rather than belabor that for the many folks

6   who are on the phone, who I suspect don't have any

7   passionate interest in this particular motion, we will make

8   the changes, send it along to you.  And obviously if there's

9   anybody who does have particular interest in it, they can

10  reach out.  But otherwise, I think we can handle it

11  efficiently that way.

12         With that said, and in an abundance of caution, I

13  will ask whether there is anybody who wishes to be heard on

14  the request for a case management order.  All right.

15  Hearing no response.  So we will be in touch in chambers.

16  Either get something to you either later today or tomorrow.

17         MR. MINOTT:  Thank you, Your Honor.  Much

18  appreciated.  I will now turn the podium over to my

19  colleague, Ms. Hoori Kim.

20         THE COURT:  All right.  Thank you very much.

21         Ms. Kim?

22         MS. KIM:  Good afternoon, Your Honor.

23         THE COURT:  Good afternoon.

24         MS. KIM:  Can you hear me well?

25         THE COURT:  I can hear you just fine, thank you.

Page 70

1              MS. KIM:   Great.   Your Honor, I will be presenting

2       the wages motion and the motion to appoint GAP as the

3       Debtor's foreign representative.

4              For the record, Hoori Kim, Cleary Gottlieb Steen

5       and Hamilton, proposed counsel for the Debtors.   Under the

6       wages motion, Your Honor, which is at Binder Tab 13, the

7       Debtors are seeking authority to pay and honor certain

8       prepetition employment-related claims and continue to

9       exercise their rights to continue these programs, modify,

10      discontinue, or implement any new programs in the ordinary

11      course of business.

12             GAP's employees have the knowledge and skills that

13      are very important to the company's operations, and it's

14      very critical for them to be continued to be paid and to be

15      provided these benefits going forward.

16             Your Honor, we'll note that GAP is seeking relief

17      for this motion for its 15 or so employees.   And as

18      described in a footnote in the motion, employees who perform

19      services for the other debtor entities have contracts with

20      HoldCo, and the details about the reimbursement for their

21      payroll and payroll expenses are further described in the

22      cash management motion.

23             So here, we requested a number of relief.   That's

24      very typical in Chapter 11 cases, to continue to pay the

25      employees and provide benefits in the ordinary course.

Page 71

1    These include wages, deductions, reimbursable expenses,

2    health insurance payments, pension contributions, and

3    worker's compensation contributions.

4            I will note that the Debtors have processed

5    payroll last on January 19th, so there are no outstanding

6    prepetition wages claims.  But we anticipate paying wages

7    going forward in the ordinary course, which amount to around

8    $245,000 a month.

9            THE COURT:  All right.

10           MS. KIM:  I will also note that the Debtors do not

11   have any outstanding prepetition severance obligations, but

12   we're seeking authority to pay any prepetition obligations

13   that arise post-petition.  We are of course not seeking

14   under this motion to pay severance to insiders, as we've

15   noted in the motions.

16           We've been discussing the interim order with the

17   U.S. Trustee's office.  And as of this morning, we

18   understand they anticipate sending us one comment to the

19   order about the representation about no employees having a

20   claim that exceeds a priority cap, which we've included in

21   the motion, but we're happy to include in the order as well.

22           THE COURT:  All right.

23           MS. KIM:  So unless Your Honor has any questions,

24   we would ask the Court to enter the proposed interim order.

25           THE COURT:  All right.  Thank you very much.

1            Mr. Zipes, I think that was a segue to you.

2    Anything to add?

3            MR. ZIPES:  Your Honor, my office has nothing to

4    add.  We've been working cooperatively with Debtor's counsel

5    on these letters.

6            THE COURT:  All right.  Thank you very much.

7    Anyone else wish to be heard in connection with this request

8    for an interim order as to wages?

9            Hearing no -- I'm sorry, go ahead, Ms. VanLare.

10           MS. VANLARE:  Your Honor, I just wanted to correct

11   something.  I think Ms. Kim just misspoke.  The Debtor's

12   employees are employed by GGT rather than Holdco.  I just

13   wanted to make that clear on the record.

14           THE COURT:  All right.  Thank you very much.  All

15   right.  Yeah.  I recognize you all are getting a lot of

16   things done simultaneously.  So it does take a village to

17   get these cases where they need to be.  So thank you.  All

18   right.  With that, I am happy to grant the request for an

19   interim order on wages and related relief as appropriate

20   under the facts and circumstances of the case for the

21   reasons set forth in the motion and have been supplemented

22   here by Ms. Kim's very helpful presentation.  I just had I

23   guess three notes.  One is in Paragraph 2 of the proposed

24   order -- I think I saw this in one other place too, and this

25   comment would equally apply there.  It says if no objection

1    is filed to the final order, the Court may enter the final

2    order without further notice or hearing.

3           My expectation is we will have a second day

4    hearing.  And so I would probably just take that out.  It

5    may be a remnant from somewhere else.  And certainly there

6    are times when that's appropriate.  But if we're going to

7    have a hearing anyway, I would say we can probably take that

8    line out from this order.  And I think it's in one other

9    order in the binder.  But since we're just going to have a

10   second day hearing.

11          I would I guess make the same comment about sort

12   of consultation or essentially keeping the committee -- any

13   official committee and any other ad hocs that you want to

14   include in terms of implementing any new programs, policies,

15   and benefits to the extent that they're significant enough

16   to be of interest to the committee.  So that might be

17   something worth including.

18          And I think including the information about the

19   statutory cap makes sense.  I think I more often than not

20   see that in those proposed orders.  So that makes sense as

21   well.  But with those exceedingly minor comments, I'm happy

22   to approve the motion.  Thank you, Ms. Kim.

23          MS. KIM:  Thank you very much, Your Honor.

24          THE COURT:  All right, next up.

25          MS. KIM:  Moving on to the next item, is the

Page 74

1   foreign representative motion at Binder 14, Docket 4.

2           So under this motion, the Debtors request

3   authority for GAP, so the same debtor entity that's based in

4   Singapore, to act as the Debtor's foreign representative

5   pursuant to Section 1505 of the Bankruptcy Code.

6           We are anticipating that GAP will seek recognition

7   of these Chapter 11 proceedings and any other relevant

8   orders in the relevant Singaporean courts.  To that end, the

9   Debtors are working with local counsel in Singapore to seek

10  recognition of these proceedings.  And we understand that an

11  order from this Court or other evidence that show that GAP

12  has been recognized as the foreign representative is

13  required to commence the proceedings in Singapore.

14          Appointing GAP as the foreign representative will

15  be very helpful for the Debtors to receive certain benefits

16  of the Chapter 11 process, especially to prevent any local

17  creditors based in Singapore otherwise from attempting to

18  foreclose on any assets or take any other measures contrary

19  to the automatic stay that's been granted by this Court.

20          The proposed order will facilitate the Debtor's

21  ability to do this and to effectively reorganize and obtain

22  the benefits of this proceeding in Singapore where the

23  Debtors have operations.

24          The U.S. Trustee has reviewed this motion and

25  understand that they have no objections.

1          So unless Your Honor has any questions, we would

2     ask the Court to enter the proposed order.

3          THE COURT:  All right.  Thank you very much.  Any

4     party wish to be heard in connection with the foreign

5     representative motion?  All right.  I'm happy to grant the

6     motion as appropriate under the facts and circumstances here

7     for all the reasons you set forth.  That is that you need

8     appropriate actions to take place here such that you can

9     take advantage of that country's GAP -- Singapore's version

10    of Chapter 15, in particular here the appointment of a

11    foreign representative.

12          And so having presided over a number of Chapter

13    15s -- you'll forgive me if I geek out for just a minute

14    here, the question about the order.

15          So I looked at the Voyager order, the one entered

16    in the Voyager Digital case as well.  And they seem to

17    track.  I think there's some immaterial differences.  But I

18    guess I was -- the paragraph that I was sort of puzzling

19    over -- and this may be more of an academic interest than

20    anything else, I will confess in advance, is Paragraph 4.  I

21    am wondering if you don't have everything you need in

22    Paragraph 3, Paragraph 4 talks about requesting the foreign

23    court to take certain actions.  And I guess it depends on --

24    that may be perhaps a reflection of what counsel who would

25    bring that kind of proceeding say this is the kind of

Page 76

1    language that the Singapore court would expect or would make

2    this process work best.  But that was my question about

3    Paragraph 4 in particular.  It wasn't in Voyager.  There

4    were a few things in Voyager that I'll flag in a second to

5    ask if you wanted to include them here.  But my question was

6    about the language in particular about requesting the

7    foreign court to take certain specific actions as opposed to

8    simply essentially appointing a foreign representative here.

9             Any thoughts?

10            MS. KIM:  So, Your Honor, if you are referring to

11   language in that paragraph, including the citation to the

12   applicable laws of Singapore and such, we just believe that

13   it's helpful.  We did get some guidance from local counsel

14   there as to some language here.  I believe that it's helpful

15   for them to really institute the proceedings.  And we are

16   really seeking to appoint the foreign representative, but

17   just wanted to kind of specify what our --

18            THE COURT:  No, that background is helpful.  I

19   don't want to make it -- if this language is a result of an

20   informed process where a foreign counsel has told you this

21   would be particularly helpful, we want to institute these

22   proceedings, that's why I asked.  And so that's fine.

23            I did see in the Voyager order; they have a

24   paragraph saying the Debtors are authorized to pay the

25   costs.  In that case, it was a Canadian proceeding.  They

1    took the costs of the information off certain counsel

2    consistent with orders of the Canadian court.  Obviously

3    that would be a different kind of official.  I don't know if

4    you want something in here as to that.  I'll leave it to

5    you.  It's Paragraph 4 of the order in Voyager.  And

6    Voyager, the order is at Docket 52.  So you can take a look

7    at that.  I'll leave it to you as to whether that's helpful

8    or not.

9            And then the other paragraph -- so that's

10   Paragraph 4.  And Paragraph 5 talks about as soon as

11   practical following court action taken by the foreign

12   representative in another jurisdiction, the Debtors will

13   file notice of the same on the docket of these Chapter 11

14   cases.

15           I will leave that to you as well as to whether you

16   think that might be helpful or appropriate in these cases.

17           And the only other language that I see,

18   I will leave that to you as well as to whether you think

19   that might be helpful or appropriate in these cases.

20           And the only other language that I see in Voyager

21   is at the end of Paragraph 3, and it just talks about for

22   avoidance of doubt, this Court has not made any decision

23   with respect to the status of the Debtor's Chapter 11 cases

24   as a foreign main proceeding.  I don't think that needs to

25   be included because I think it's pretty obvious that we're

```
 1    not doing that here.  But I just mention that, again, just

 2    to canvass the things that were in this other order to the

 3    extent they are of any use at all to you.

 4              So I will leave it to the Debtors in consultation

 5    with their counsel who would handle that kind of matter as

 6    to whether the language in Paragraph 4 and 5 of the Voyager

 7    order might be helpful or not.  And I will wait to see what

 8    order you send me.  And given your explanation, I am happy

 9    to continue to include Paragraph 4 given all the

10    circumstances.  So thank you very much, Counsel, for your

11    input on that.  Any other question or comment or anything

12    else we should discuss in connection with the order?

13              MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

14    Trustee's Office.  We would just ask that the order be

15    (indiscernible) before it's submitted to the Court.

16              THE COURT:  All right.

17              Ms. Kim, anything else?

18              MS. KIM:  No, that's it, Your Honor.  Thank you so

19    much for your comments.

20              THE COURT:  All right.  Thank you.  All right.  I

21    think that leaves one or two matters left to discuss.

22              MS. KIM:  That's right, Your Honor.  I will turn

23    it over to Ms. VanLare to present the remaining motions.

24              THE COURT:  All right.  Thank you.

25              MS. VANLARE:  Thank you, Your Honor.  I have three
```

1    motions left, Your Honor.

2            The first one that I would like to address is the

3    consolidated creditor's list motion.  Your Honor, this

4    motion seeks really two primary types of relief.  One is to

5    waive the requirement that each of the Debtor file a

6    separate list of creditors and to authorize the preparation

7    of a consolidated list of creditors and to authorize the

8    Debtors to file that list for the top 50 unsecured

9    creditors.

10            And then the second type of relief is the

11   redactions.  In terms of the first, we believe that a filing

12   of consolidated creditor list is efficient and appropriate

13   in this type of case, and we think that top 50 list is

14   sufficient.  It does capture creditors with claims of

15   approximately $10 million which we think relative to the

16   overall size of the claims in this case as well as

17   individual particular claims, we think it's low enough such

18   that 50 creditors is sufficient.  I will note that we

19   originally had 30, but we've expanded that to 50 following

20   comments from the Office of the U.S. Trustee, which we were

21   happy to accommodate.

22            The second part of the type of relief we're

23   seeking is the request to redact certain information.  And

24   here I would just like to spend a little bit of time to

25   describe the relief that we're seeking in the motion as well

Page 80

1    as what's happened since we filed that motion and where we

2    are today.

3              And I know Mr. Zipes may want to add as well, but

4    hopefully I'll describe accurately our discussions with the

5    Office of the U.S. Trustee.

6              This issue, as I'm sure you know, Your Honor, has

7    gained a lot of attention in the crypto cases.  And so this

8    is in part why we're spending some time on this.

9              So our motion is seeking to redact the names and

10   contact information for individual creditors.  We believe

11   that this is important due to risk of identity theft and to

12   protect our individual creditors from certain other threats

13   that they may face.

14             In addition to the privacy concerns, Your Honor,

15   as we've mentioned, we do have a large number of our

16   creditors in other jurisdictions.  A number of these

17   jurisdictions have more stringent privacy regimes such as

18   the U.K. and E.U. and others.  And we want to be mindful of

19   those regimes and would not want to incur fines if we were

20   to run astray from those regimes.

21             So that's on the individual creditors.  Our motion

22   seeks to maintain as unredacted information relating to

23   institutional creditors.  And so as Your Honor pointed out,

24   we did file the petitions originally with the individual

25   creditor information redacted with institutional creditor

Page 81

1    information as unredacted.  Following this, we received a

2    large number of requests.  I would say we were bombarded

3    with requests from creditors, a number of them noting safety

4    concerns.  And we want to make sure that we are taking all

5    of those very seriously, which we are.

6            And so given the request that we received from our

7    creditors and the fact that these are complicated cases with

8    creditors in different jurisdictions, what we did was we

9    went ahead and we filed a redacted version of the petition.

10   This affected the declaration of Mr. Leto because it also

11   included the creditor list.

12           We redacted contact information.  Not the names,

13   but the contact information.  Although we may have redacted

14   -- so it's a more redacted list of creditors.  This was

15   meant to be an interim measure.  And when I say interim, I

16   don't even mean interim as in until the second day hearing,

17   but really just a temporary measure to make sure that we

18   were in contact with those creditors and to understand their

19   individual concerns.  And our intent is to file a revised

20   creditor list that has more information.  We intend to

21   coordinate with the Office of the U.S. Trustee.  And our

22   goal is to not have any sort of hearing, sort of disputed

23   hearing with respect to the U.S. Trustee's Office on this

24   point.  Again, we hope to work cooperatively.  We only ask

25   that we are allowed just a little bit of time to sort

Page 82

1    through these issues, to make sure that the information we

2    are providing is accurate and appropriate and does not pose

3    any undue risks.

4           We also do want to give parties an opportunity if

5    they wish to come before Your Honor and express particular

6    concerns, that they have an opportunity to do so.  So that's

7    another reason why we would appreciate some time.

8           We have discussed this with Mr. Zipes.  We

9    understand that he is -- he doesn't object to us having some

10   time before we can provide a more -- a revised list with

11   more information.  Again, we do intend to work with his

12   office to work out a list to which we hope the U.S.

13   Trustee's Office won't have an objection, and then we'll

14   present that to Your Honor.

15          And I understand from Mr. Zipes that he would like

16   a hearing sooner than the second day hearing.  Obviously we

17   have not scheduled that yet, but we are certainly open to

18   doing that subject to Your Honor's request as to -- Your

19   Honor's schedule.

20          THE COURT:  If that makes it easier for folks,

21   sometimes having a hearing or a status conference allows

22   people to not have to file a lot of papers and spend a lot

23   of money and you can touch base and have a conversation.

24   And given that we might want to schedule something between

25   now and the second day hearing for purposes of touching base

Page 83

1    on mediation, maybe we put something about a week or ten

2    days out and use it for whatever purposes would be

3    beneficial to the case.

4              MS. VANLARE:  That works for us, Your Honor.  So I

5    will just conclude.

6              And I think we would like to just tweak the

7    interim order to allow us this sort of interim-interim of

8    relief of allowing us to maintain the redactions while we

9    sort through these issues as quickly as possible.

10             THE COURT:  Yeah, no.  I think that's appropriate.

11   It's sort of like a Freedom of Information Act case.  Once

12   the information is out there, it's out there.  Now more than

13   ever given the internet.  So I think that makes sense.

14             So, Mr. Zipes, anything you wanted to add?

15             MR. ZIPES:  Your Honor, I very much appreciate

16   that summary, which is accurate.  And, Your Honor, we have

17   no objection, as stated, to entering the order today.

18             I would note that although, as I said before, that

19   this is a serious issue for not just us, but all the parties

20   here.  And would also note the unusual nature that some of

21   this information that's redacted was part of the public --

22   was disclosed to the public for at least some period, and

23   we're just reserving all our rights in that regard.

24             THE COURT:  That's fine.  I appreciate it.

25             MR. ROSEN:  Your Honor?

1           THE COURT:  Certainly.

2           MR. ROSEN:  Your Honor, I apologize.  Brian Rosen,

3    Proskauer Rose, on behalf of an ad hoc group of creditors.

4           Your Honor, I appreciate all the comments made by

5    Mr. VanLare and Mr. Zipes.  I just want to say that the

6    issue as far as we are concerned -- and as I may have

7    indicated, we represent over 60 people within our group

8    itself.  Many of them are institutional type of lenders to

9    the Debtors.  And they suffer the same threats that have

10   been discussed already.  And I brought this up with Mr.

11   Zipes earlier today.  So we echo the concern, but we want to

12   say that we believe that if there is something that needs to

13   be filed, I would truly like it -- in the future that is of

14   course, we would truly like it to be just with an

15   institutional name perhaps, but not even the name of the

16   contact person.  And I'm happy to discuss that further with

17   Mr. Zipes and Ms. VanLare.  But we just want the Court to be

18   aware that the threats extend well beyond individuals, but

19   to institutional people as well.

20           THE COURT:  All right.  That's a fair point.

21   Thank you very much for that comment.  Any other party wish

22   to comment on this request?  All right.

23           So I appreciate that the parties are talking about

24   this.  It is a very serious issue.  In preparation for

25   today's hearing, I read Judge Glenn's decision in Celsius

Page 85

1    Network at 644 B.R. 276, which was in September, which seals

2    -- allowed to be redacted certain information such as

3    addresses.  He didn't allow names to be redacted.  And then

4    there was Judge Garrity's decision in Endo International,

5    which is from November, early November, where he allowed

6    names and addresses.  And I also looked at Judge Wiles'

7    decision in Voyager, which tracked Judge Garrity's in terms

8    of allowing names and addresses, that is identifying

9    information, to be redacted.

10            But there's one other thing that -- so I will

11    confess that for an instance like the actual applicable rule

12    is a bit sort of out of date in the sense that there's no

13    notion of weighing the need for disclosure of the

14    information versus the potential harm.  It's a much

15    different kind of way of looking at it.  And so there are

16    instances -- I've had in a Chapter 15 case where a party

17    didn't want to provide discovery, citing certain privacy

18    rules overseas.  But it was necessary for the case to

19    proceed.  And that's sort of a different situation than an

20    instance where I think if Judge Wiles said if somebody needs

21    it, somebody can come back to the court and request it.

22    Which is what we do as just a general matter for sealing.

23    Sealing anything never prevents somebody from coming back to

24    the court to request the information based on a showing of

25    need.

Page 86

1          So one other piece of the puzzle I think is worth

2     just identifying here as the parties continue the

3     discussion.  In Celsius, after Judge Glenn's decision, there

4     was a notice of phishing attempt that's on the docket,

5     docket 1527, which talks about the Debtor's becoming aware

6     that phishing emails were sent to certain debtors' customers

7     reporting to be restructuring associates at the applicable

8     law firm of Kirkland and Associates requesting customers

9     submit their addresses or their account information to

10    receive their claims distribution.

11         And so it goes on to say please take note that

12    these are not authorized and are likely a phishing scam and

13    that none of the debtors or their advisors will ever contact

14    you by email, telephone call, or otherwise requesting

15    account information or other personal information absent an

16    order of the court.

17         And so I mention that because it may be that

18    including some kind of language from this notice of phishing

19    attempt as to what a customer should be highly suspicious of

20    if they ever get it, it might be helpful, right?  Because

21    this is happening in Celsius even though the email -- any

22    email addresses were allowed to be redacted by the Court.

23    Right?  So they're getting that information from somewhere

24    else and then hitting people who are customers in the

25    Celsius case.  So I think this order may be a good

Page 87

1    opportunity to include language about that.  If you get

2    something that looks like this, that's not from us.  If you

3    get something and you have a question, you can reach out to

4    this person to verify the accuracy, that it's an actual -- a

5    legitimate request.  So that's why I mention it.  So if

6    you're going to be having these discussions anyway.

7            And also, I think that for purposes of the case

8    and findings where the standard is, that there's a concern

9    about information being out there and about disclosure

10   information creating an undue risk of unlawful injury, this

11   notice of phishing attempt certainly puts a fairly fine

12   point on the kind of worry that we all have in cases.  So

13   whether it's a case involving -- in Endo, you're talking

14   about people in an opioid circumstance, and here you're

15   talking about people who are owed money as creditors in

16   connection with the Debtors.  People don't want to be --

17   shouldn't be victimized twice.

18           So I throw that all out there.  I will stop there

19   unless I interfere with your discussions.  But I did want to

20   mention those things on the record.  Because I certainly am

21   very concerned about it.  And I guess the only other comment

22   I would make is I would agree with Judge Glenn's comment

23   that certainly E.U. or U.K. schemes about privacy don't

24   trump American law.  On the other hand, I do find them to be

25   somewhat informative as to when we're talking about

Page 88

1    something that violates law.  You do have regimes where

2    there's been a determination that this kind of information

3    should not be publicly available.  So I do think it's not

4    binding on a U.S. bankruptcy proceeding, but it is

5    informative in trying to sort out the competing interests

6    here.

7              So, sorry to go on a little bit.  I just thought I

8    would throw this information out to the extent it's helpful

9    in your discussions.  We can pick a date in the next week or

10   ten days to get together again and see where we are.  And

11   certainly nobody needs to file anything between now and then

12   unless you've reached some sort of conclusion and a

13   resolution that you all are on board with.  But I did want

14   to put that all on the record because it's a very -- it's a

15   very difficult, challenging issue.  And I guess that's where

16   we are.

17             So anything else, Ms. VanLare, on this particular

18   motion?

19             MS. VANLARE:  No, nothing else on this motion.

20   And we do very much appreciate Your Honor's comments and

21   your very helpful and excellent suggestions in terms of

22   other things we could add and consider.  So we appreciate

23   that.

24             THE COURT:  All right.  My pleasure.  Anything

25   from any other party in connection with this particular

1    motion?  All right.  Thank you very much.

2                So, Ms. VanLare, I think we have something else to

3    chat about?

4                MS. VANLARE:  We do, Your Honor.  Two more.  The

5    next one is the automatic stay motion.  It's Docket 13 and

6    it's Binder Tab 9.

7                THE COURT:  All right, proceed.

8                MS. VANLARE:  Your Honor, this is the Debtor's

9    motion for an order authorizing the Debtors to operate their

10   business in the ordinary course and ordering the

11   implementation of the automatic stay.  In this motion, the

12   Debtors are seeking a clarifying order enforcing the

13   automatic stay pursuant to Section 362 of the Bankruptcy

14   Code.  As we've noted, we do have foreign creditors.  One of

15   the debtors of course, the Singapore entity, is a foreign

16   entity.  And we do think that this order is necessary to

17   inform affected parties of the existence of the automatic

18   stay, protections that are provided to the Debtor by virtue

19   of Section 362, and we think it's particularly important for

20   a case like this where we have foreign creditors that may be

21   unfamiliar with the automatic stay and the protections that

22   it provides.  We do think that it's critical that vendors

23   and customers and counterparties understand the nature of

24   these proceedings and the protections that are afforded to

25   the Debtors under the Bankruptcy Code.

1              Finally, I'll note we're not seeking any relief

2      beyond the provisions of the Bankruptcy Code.

3              And with that, unless Your Honor has any

4      questions, we ask that you enter an order approving this

5      motion.

6              THE COURT:  All right.  Thank you very much.  Any

7      party wish to be heard in connection with this motion?

8              MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

9      Trustee's Office.  And my office did have an opportunity to

10     review this motion and order as well.  And we have had

11     discussions with the Cleary team.

12             This is slightly unusual.  Not unprecedented, but

13     it's unusual in that the Debtors are asking for -- to

14     operate in the ordinary course, which is something they have

15     a right to do regardless.  And returning to the point about

16     GAP and the spot trading, we would appreciate it if

17     something is put on the record relating to what the

18     intentions are, because they are getting a court order now

19     in connection with the spot trading and whether that will

20     take place in the next week to two weeks.  And

21     (indiscernible) that if at all possible.

22             THE COURT:  All right.  Ms. VanLare, I don't know

23     if you had anything to say.  I understood this to be aimed

24     at really informing foreign creditors and essentially track

25     the code.  But I understand your point I guess is that the

1    title says order authorizing Debtors to operate their

2    business in the ordinary course.  So I don't know, Ms.

3    VanLare, if you have anything worth discussing in connection

4    with the spot trading issue.

5              MS. VANLARE:  Your Honor, I am happy to.  I tried

6    to give a brief description of that as part of my first day

7    presentation, but I'm happy to add more.

8              I will just note that it's of course a cornerstone

9    of the Chapter 11 proceedings that the Debtor is permitted

10   to operate in the ordinary course.  And in some ways, our

11   case is unusual because we have voluntarily paused a large

12   portion of our ordinary course activities, namely the

13   lending business, in order to protect the assets.  And we

14   thought that was the decision that was most conducive to a

15   fair and appropriate distribution of creditor assets, or of

16   assets of the debtor to the creditors.

17             So I will just note that it is of course in any

18   other case would be completely typical for us to continue

19   all of our operations.  In this case, we are not doing that.

20   We have paused the lending, but we are continuing on a

21   limited basis.  And I say limited because the volume is

22   substantially less than what was happening prior to the

23   pause.  Some limited spot trading activity at GAP.  We do

24   think that it is important to preserve that business and

25   preserve that activity for the preservation of the business

Page 92

1    as a whole, which we think is value-maximizing.

2           As I mentioned as part of my presentation, what

3    happens in these situations is that a client would typically

4    prefund.  So, for example, if a client wishes to purchase

5    bitcoin, they would first prefund the amount that's required

6    to GAP.  GAP would then proceed to engage in back-to-back

7    trades to obtain that bitcoin, and then sell it to the

8    client.  But again, the funds are prefunded.

9           So given the limited nature of this activity and

10   given the importance to the business in terms of preserving

11   our relationships with Asian clients, we think that it's

12   appropriate to continue doing so.  And again, we -- we're

13   happy to tweak the wording in the automatic stay order.

14   Again, the purpose of that order was really just to make it

15   clear that the automatic stay is applicable to creditors.

16   But of course happy to clarify the activities that the

17   Debtors are currently engaged in.

18           THE COURT:  All right.  And it may be that simply

19   trading -- changing the caption of the order might be the

20   thing that makes the intent of the order clear in the sense

21   of order providing for the limitation of automatic stay and

22   -- I'll leave it to you all to figure that out.  But that

23   may -- you're right, there's been a cessation of certain

24   activities voluntarily that sort of might give a misleading

25   impression as to what's a result of the Bankruptcy Code per

Page 93

1    se and what's not.

2            So, Mr. Zipes, any further thoughts in light of

3    Ms. VanLare's comment?

4            MR. ZIPES:  We appreciate those comments.  And it

5    may -- the questions may be better directed in the next

6    motion to be heard.  But I think the question basically that

7    we asked earlier before the hearing as well was just if we

8    can get some parameters of what they expect that trading to

9    be over the next couple weeks and what is considered

10   ordinary course in that regard.  Because there is --

11           THE COURT:  So I think I understand where you are.

12   So anybody else wish to be heard in connection with this

13   automatic stay motion?

14           MR. ROSEN:  Your Honor, it's Brian Rosen again.

15   And this may be just a title issue in the ordinary course,

16   and it may be for the next motion as well.  But one of the

17   things we did contact Ms. VanLare about and we were unable

18   to touch base was intercompany transactions.  And I don't

19   know, Jane, if you're going to take it up in the next item.

20           She is.  Okay, Your Honor.

21           MS. VANLARE:  Yes, I will.

22           THE COURT:  No, that's fair.  So I think my

23   suggestion would be -- but I'm open to other better

24   suggestions, is to change the order of the -- the title, I'm

25   sorry, of the order to make it clear what it's about, which

1    is notifying folks about the application of the United

2    States Bankruptcy Code to the Debtor's operations.  And so

3    whether it's order, you know, providing for implementation

4    or providing notice of existence of the automatic stay,

5    something to that effect.  Because I think that that's what

6    the rest of the order actually does.  And I think the issues

7    we're talking about really are -- relate to the next motion

8    and are properly sort of housed there.

9            So I think this -- I have entered this kind of

10   order before in Republic Airways, which is cited, and even

11   as far back as I think 2011 or 2012 in Arcapita, which is a

12   Bahraini investment bank.  And they asked for it because

13   they needed to explain to folks that they did business with

14   who are not familiar with the U.S. Bankruptcy what the

15   impact was of the filing.

16           So I will leave it to you and Ms. VanLare to tweak

17   the title of the order.  I think that would resolve any

18   issues because I think the order itself, as I think is

19   entirely appropriate, essentially goes through what the Code

20   provides.  And so I don't think there's any daylight between

21   the provisions of the order and the provisions of the Code.

22   So I think it's an entirely appropriate request under the

23   facts and circumstances here.  And I think the text of the

24   order is -- I find no fault with it at all.  So just tweak

25   the title and I think it will be fine.

1           And with that, I think that leaves this one other

2     matter to talk about.

3           MS. VANLARE:  That's right, Your Honor.  Thank you

4     very much.  We will make that tweak to the order.

5           So next and last as far as the first day relief is

6     the Debtor's cash management motion.

7           In this motion, the debtors are seeking

8     authorization to continue to operate the debtor's existing

9     cash management system, including the existing bank

10    accounts, on our certain prepetition obligations relating

11    thereto, and to maintain our existing business forms.  We're

12    also seeking permission to continue intercompany

13    transactions and granting certain administrative claims,

14    seeking to extend the time to comply with the requirements

15    of Section 345 of the Bankruptcy Code and certain related

16    relief.

17          So in terms of those requests, Your Honor, we

18    describe in our cash management motion the existing cash

19    management system.  We provide the bank accounts and we

20    describe the flow of funds.  We have been in discussions

21    with the Office of the U.S. Trustee regarding the accounts

22    and the applicability of Section 345 of the Bankruptcy Code.

23    We are seeking a 45-day extension with the ability to seek

24    further extensions.  But we think that we'll be able to work

25    cooperatively with the U.S. Trustee's office regarding

Page 96

1    accounts.  We do note a lot of our accounts actually are at

2    conforming institutions, but we do have some accounts that

3    are not.  And so we will be proceeding to close those

4    accounts and/or relocate the funds at those accounts.  The

5    amounts in those accounts are relatively small already with

6    the exception of the brokerage accounts.  The brokerage

7    accounts are at a non-conforming institution.  They -- and

8    we will be working with the Office of the U.S. Trustee to

9    come up with a resolution.  There are, to be honest, not

10   that many options for certain types of digital asset related

11   shares.  But we'll be working with the office to come up

12   with a resolution that's satisfactory.

13          In addition, we are seeking to maintain our

14   cryptocurrency wallets on third-party platforms that store

15   substantially all of the Debtor's digital assets.  We have

16   been -- we have communicated again with the Office of the

17   U.S. Trustee regarding where those assets are.  We obviously

18   are extremely focused on maintaining the security of those

19   assets, and we are seeking authority to maintain those

20   wallets.

21          We are also seeking authority to pay all

22   outstanding bank fees.  This is fairly typical, Your Honor,

23   of course.  We think that those fees are fairly minimal in

24   the context of this case, and we don't expect them to exceed

25   $3,000 a month.

1           Lastly, I will note the intercompany transactions,

2    which Mr. Rosen brought up.  The Debtors do maintain

3    business relationships with each other that gives rise to

4    claims among the Debtors and certain of their non-debtor

5    affiliates, as well as each other.  We are seeking authority

6    to continue to enter into intercompany transactions, and we

7    are seeking to accord the intercompany claims,

8    administrative claim priority.  I will note that the Debtors

9    are not intending to make any transfers to non-debtor

10   affiliates.  And during the interim period and to the extent

11   there are any, we will make sure that they are appropriately

12   recorded, and that information will be provided to the

13   Office of the U.S. Trustee and the Committee once it's

14   appointed.

15           THE COURT:  All right.  And let me just ask you

16   about the intercompany transfers in light of the fact that

17   the lending business is -- there's a pause on that and there

18   will be notice before that resumes.  What impact does that

19   have on intercompany transfers as opposed supposed to say

20   the spot trading business?

21           MS. VANLARE:  Yes, Your Honor, of course.  That

22   has meant that the volume of intercompany transactions has

23   decreased substantially.  And really what remains are

24   largely reimbursement type expenses for administrative

25   expenses for the Debtors.  So they are relative to typical

Page 98

1    operations substantially smaller.

2            THE COURT:  All right.  All right.  So let me

3    circle the virtual room on this, starting with Mr. Zipes.

4            MR. ZIPES:  Yes, Your Honor.  Greg Zipes with the

5    U.S. Trustee's Office.  Again, we've been in discussion.

6    These are not easy cases.  And, Your Honor, we have the

7    crypto assets that are being held on the cloud through third

8    party companies.  We did want to confirm with the Debtors

9    the security protocols and maybe place a little bit of that

10   on the record, Your Honor.  It's not the place to go into it

11   in detail, but just to outline in general terms how the

12   cryptocurrency is being protected.  We did agree to this on

13   an interim basis, and we would hope to work out all cash

14   management issues.  In a more traditional case, most of the

15   banks and the accounts are in authorized depositories and we

16   would no doubt be able to work out that aspect of it with

17   the Debtors in the interim.  But we are focused on the

18   cryptocurrency and the protection of that because of the

19   significant dollars.

20           THE COURT:  All right.  Thank you.

21           Mr. Rosen?

22           MR. ROSEN:  Yes, Your Honor.  I thought Ms.

23   VanLare was going to go a little bit further with respect to

24   the intercompany transactions.  But really what we are most

25   concerned about is anything outside the ordinary course.

Page 99

1    And by ordinary course what I focus on, and I think some of

2    the other people on the call would focus on, if in fact

3    there is a shared services type of agreement, then they need

4    to pay for those services or wages and things like that that

5    someone else is fronting for them.  I would understand that

6    type of payment, that intercompany transaction.  What we're

7    most concerned about is anything lending related or the

8    passage of assets among the entities other than through the

9    payment of those types of goods and services.

10            So if we could get a representation in that regard

11   that none of that will occur, that would actually take care

12   of it for me, Your Honor.

13            THE COURT:  All right.  Ms. VanLare, any thoughts?

14            MS. VANLARE:  Yes, Your Honor.  With respect to

15   that, we're not -- I can represent that we are not intending

16   to engage in those types of transactions in the interim, and

17   we can -- Mr. Rosen, we're happy to discuss those issues

18   offline as well to provide that information.

19            MR. ROSEN:  Thank you very much.

20            THE COURT:  Thank you.  And I suspect that also is

21   a helpful bit of information for the U.S. Trustee's Office

22   as well.

23            Mr. Marcus, it looked like you wanted to weigh in.

24            MR. MARCUS:  I did.  Thank you, Your Honor.  We

25   had the same concern that Mr. Rosen raised.  We had some

Page 100

1    conversations with Ms. VanLare. I thought it was going to

2    be a representation that they weren't going to happen during

3    the interim period. It sounds like they have no intent, but

4    it may happen. And if that's the case, obviously we would

5    like to receive the same information that everyone else is

6    getting just to make sure we are kept in the loop, Your

7    Honor.

8            THE COURT: All right. Any other party wish to be

9    heard as to this motion?

10           MR. ZIPES: Your Honor, Greg Zipes with the U.S.

11   Trustee's Office. Could you give me one second, please?

12           THE COURT: Sure.

13           MR. ZIPES: Your Honor, I think that everything is

14   clear and there won't be transfers to non-debtors from the

15   debtors during the interim period except as was outlined by

16   Ms. VanLare. We also just wanted to confirm that the crypto

17   is not being transferred to the books or the accounts of

18   non-debtors as well. And I think it's clear that that's not

19   going to happen, but we just wanted clarification on that.

20           MS. VANLARE: I can confirm that the crypto assets

21   are not being transferred to non-debtor entities.

22           THE COURT: All right. Thank you for that.

23           So I don't know how these kinds of issues have

24   been sorted through in other cases, Celsius, FTX, in terms

25   of if you get back to sort of first principles, the notion

1    of making sure that none of the assets are at some undue

2    level of risk or unnecessary risk.  And that sounds like

3    that's something that's going to be discussed among the

4    stakeholders, particularly with the brokerage accounts,

5    which is if you look at the chart, which is very helpful by

6    the way, in the motion starting at Page 7 and going through

7    Page 10.  That's really where the assets are.

8            And so I did note that there was a reference to

9    investment practices, but there wasn't really much of an

10   explanation about that.  That might get some of the way

11   there.  It might be a helpful bit of information to have

12   some understanding as to what those brokerage accounts --

13   what the practices are in detail to understand what

14   protections there are and what level of risk there is to

15   that -- to those assets which is, you know, you look at

16   Continental Stock Transfer and Trust, $358 million.  So

17   those numbers and that particular point of the chart jump

18   off the page.

19           So I would think that's part of it.  I'm happy if

20   folks want to work out -- I understood there were questions

21   and representations, and that's great and that's helpful.

22   And I appreciate both the thought in terms of my folks to

23   ask those kinds of specific questions and as well as the

24   Debtor's obvious preparation to be able to answer those

25   kinds of questions that Ms. VanLare fielded.

Page 102

```
 1              To the extent that anybody wants to put something

 2     in the order, obviously the Debtors would circulate language

 3     to the extent anybody wants to memorialize some of that kind

 4     of language for purposes of intercompany transfers,

 5     transfers in general, the kinds of things we were talking

 6     about here today.  But the brokerage accounts are really --

 7     and the investment practices that would include protections

 8     are things that obviously were more of a concern to me.

 9     There are a couple of other ways to sort of think about

10     this.

11              When I was looking at the accounts, obviously

12     Signature Bank is an authorized depository.  There are other

13     ones that are not.  Some of these accounts that are zero, as

14     an outsider who is not familiar with the way the debtor's

15     business works in the kind of detail that you folks are,

16     questions are -- how much money goes into those accounts,

17     what kind of balances they can end up with, and are there

18     sweep accounts.  If so, when is the money swept from

19     accounts into a master account.  All those kinds of things

20     might be helpful to know in terms of understanding that if

21     accounts generally have a balance of zero, that maybe they

22     are the kinds of accounts that nobody would be having

23     particular concerns about, say for example the ones at

24     Silvergate Bank.  And so I suspect some of those things can

25     be dealt with without too much difficulty in terms of
```

1    additional information.  But I think the brokerage accounts

2    are -- and intercompany transfers are probably where the

3    rubber most hits the road.

4            So those are the sort of things -- I don't know if

5    there's anything else worth putting on the record in

6    connection with those issues that hasn't already been

7    addressed.

8            Ms. VanLare?

9            MS. VANLARE:  Yes.  I just want to add, Your

10   Honor, something about the investment practices that you

11   noted and then the brokerage accounts.  Those are really

12   separate in the sense that investment -- we try to clarify

13   this as well in the motion.  It refers to accounts

14   maintained at Signature Bank.  Really they are unlike kind

15   of what one would typically think of as investment accounts.

16   They're actually bank deposit -- they're savings accounts.

17   So I did want to make that clear.

18           THE COURT:  All right.

19           MS. VANLARE:  I know the defined term refers to

20   investments, but they're really bank deposits and savings

21   accounts that are at Signature, which is an approved

22   institution.

23           I think that's separate from the other issue you

24   noted, which are the brokerage accounts that do have over

25   $350 million worth of certain shares.  And that's -- I

Page 104

1    understand that that's something that we are discussing with

2    the Office of the U.S. Trustee as to what to do with that.

3    As I mentioned, given the nature of those shares and the

4    digital asset industry, it's extremely difficult to find an

5    alternative that would be an appropriate approved

6    institution.  But we are, again, open to trying to find a

7    resolution that's satisfactory to the U.S. Trustee as well

8    as Your Honor.

9              THE COURT:  All right.  Thank you very much.  Yes,

10   so I guess then my question, if the investment practices

11   that are referenced in Paragraph 18 of the motion really to

12   go the Signature Bank accounts, then I guess the question is

13   how the brokerage accounts are handled in terms of what

14   level of risk.  There's obviously reference to collateral

15   being held in the form of shares for certain or other

16   things.  I don't know if that's implicated by these

17   particular accounts or not.  So any -- and again, this may

18   all be information that you all are much further along on

19   and have a much better handle on than I do.  But that kind

20   of thing would be helpful to have a sense, because I think

21   it just -- thinking about this as you think about any case,

22   the level of risk, what's the expectation.  And I guess that

23   has to do with both the kind of account and what the

24   institution is where the asset is being held, but also what

25   is the expectation as to, you know, potential withdrawals of

1   those kinds of assets from those accounts and under what

2   circumstances, how are those accounts used.

3           So I will leave it to you all to have those

4   discussions.  I know they are challenging.  And I very much

5   appreciate that you all have already had discussions.  We

6   all know that these cases -- all cases work so much better

7   with counsel and doing exactly what you all are doing here.

8   So I very much appreciate that you are well on your way to

9   having these kinds of discussions.  So thank you for that.

10          And so to the extent it would be useful, we could

11  include that as part of any status conference that we had,

12  if that makes life easier.  At the same time, if it's -- I

13  don't want to bog you all down with having a to-do list

14  that's unnecessary if you're making progress, then we'll

15  deal with it at the second day hearing.  But you'll let me

16  know after talking to each other whether that would be

17  helpful or just an albatross for purposes of including on

18  the agenda sort of an intermediate hearing/status

19  conference.

20          Anybody have anything else to add in connection

21  with this motion?

22          MS. VANLARE:  Your Honor, I'm sorry.  I do have

23  one other change that I wanted to note.  We'll submit a

24  revised form of order to Your Honor's chambers.  But we did

25  receive a comment from the SEC.  I think this is fairly

Page 106

1   typical language that they've asked to be included.  It's

2   really kind of a preservation for the avoidance of doubt

3   that nothing affects their rights.  So I did just want to

4   flag that we'll be including that language in the revised

5   form of the cash management order that we sent to Your

6   Honor.

7           THE COURT:  All right.  That's fine.  That's

8   understandable.  I had a couple of more minor comments on

9   the order.  So looking at Page 3, Paragraph 2, there is an

10  address for the U.S. Trustee's office, and I know the U.S.

11  Trustee's office has been moving.  So I don't know if you

12  currently still are at Barrack Street or you now should be

13  sent things somewhere else.

14          MS. VANLARE:  Yes, we -- oh, I'm sorry.  I was

15  going to say that's another revision that you will see.

16  Yes, we have made that change.

17          THE COURT:  I always like to mention the revisions

18  and the issues that are nice and easy to resolve.  So it's a

19  nice layup.  So we can end on a high note.

20          So I think the only other thing I had that hasn't

21  already been discussed is -- one second here to just read my

22  notes.  Oh, I think for purposes of new accounts, which is

23  in Paragraph 12, again, the same notion of keeping the

24  Committee and any other ad hoc committees that you think are

25  appropriate to include sort of in the loop on that, that

1    would be helpful.  And I think we already talked about the

2    spot trading transactions in Paragraph 6.  We talked about

3    the fees that are being charged on the accounts.  Also I

4    think all ordinary fees.  That's in Paragraph 10.

5            And so I'll end on an exceedingly mundane note

6    given what we've already talked about, which is whether to

7    include Debtor statutes, Debtor-in-possession on any new

8    business forms.  It seems to be somewhat an antiquated

9    question to ask since we're talking about sort of

10   traditional business forms and we're talking about a

11   cryptocurrency case where -- it's like talking about faxes.

12   So I don't know if there would be business forms that would

13   be generated after the case starts and whether putting that

14   on for dealing with your foreign counterparties would be

15   counterproductive or not.  So I just wanted to raise it as a

16   more mundane kind of issue that we often discuss.

17           MS. VANLARE:  Your Honor, we will confirm that and

18   add it if it's needed.

19           THE COURT:  All right.  With that, any other

20   question or comment from any other party on this motion?

21   All right.

22           I am happy to grant this motion on an interim

23   basis for all the reasons set forth in the motion and given

24   that the motion sort of is supplemented by the additional

25   information and discussions and representations on the

1      record here this afternoon.  And again, I will leave it to

2      you all as to whether we should have a further discussion

3      about this when we get together for a status dealing with

4      redaction and mediation, although it sounds like various

5      parties are confident that we won't need to be talking about

6      mediation.

7              So with that, I think Ms. VanLare and Mr. O'Neal,

8      unless you have anything else to discuss, I think we could

9      turn to scheduling.  Is that right?

10             MR. O'NEAL:  Yes, Your Honor.  Thank you.

11             THE COURT:  All right.  So I'm happy to get you an

12     intermediate date maybe sometime next week if that would be

13     of use.  I do have one complicating factor, and I apologize

14     for this.  I am actually going to be overseas the week of

15     February 13th, which I suspect would be the week we would

16     normally schedule a second day hearing.  It doesn't mean

17     that it's impossible for me to do a hearing from where I am,

18     but it might mean that perhaps if we can pick a date earlier

19     in the following week if that doesn't present a problem.

20     Otherwise, I can see what I can figure out.  But I did want

21     to let you know that week of the 13th is -- I am overseas.

22             And so let me ask Debtors what they have in mind

23     for scheduling with that given all that.

24             MS. VANLARE:  Your Honor, I have to admit, I was

25     envisioning the week of February 13th.  I don't think it

1    should be a problem to do the early (indiscernible) week.

2    If it's all right with Your Honor, I would like to confer

3    some of the other parties and my colleagues and perhaps be

4    in touch with chambers as far as setting up a specific date.

5              THE COURT:  That would be fine.  That would be

6    fine.  And I'm happy to get you in any date that you would

7    want the following week.  The 21st, 22nd, 23rd, whatever

8    works for you.  And we'll wait to hear from you as to what

9    would work best after your consultation with other

10   interested parties.

11             Do you want to pick a date now for essentially --

12   to put a placeholder in for a status conference next week?

13   Or whenever you think would be helpful.  I don't want to

14   schedule it prematurely.  Again, the idea of it is to be

15   helpful, not to have it be an additional burden.

16             MR. O'NEAL:  Your Honor, we do believe that a

17   status conference would be helpful to our process.  What I

18   would suggest is, kind of consistent with the way we've been

19   approaching this case, would want to confer with some of the

20   key stakeholders and come up with a date that works.  I know

21   that there are some significant travel schedules next week

22   for some of the parties.  And we'll come up with a proposal

23   if that's okay with you.

24             THE COURT:  That would be fine.  That would be

25   fine.

```
 1              MR. O'NEAL:  Perfect.

 2              THE COURT:  So I will throw it out that certainly

 3    the dates I was going to throw out were the 1st and the 2nd

 4    of February to begin with.  So -- but also the 30th, which

 5    is the Monday, if that's helpful.  I could sneak you in the

 6    31st, although that's looking to be a fairly long calendar

 7    as it is, and I don't want to have all you people waiting as

 8    I get through another calendar.  So I throw it out there,

 9    those dates.  But obviously you'll reach out to Ms. Ebanks

10    about scheduling and, frankly, talking to her you're in

11    better hands than chatting with me, to be quite candid.

12              MR. O'NEAL:  Certainly.  And my guess is probably

13    the right date is the 30th.

14              THE COURT:  All right.

15              MR. O'NEAL:  If that works.

16              THE COURT:  So with that, let me ask Debtor's

17    counsel of there's anything else that we need to address

18    here this afternoon.

19              MS. VANLARE:  Nothing else, Your Honor.

20              THE COURT:  All right.  Anything from any other

21    party to address?  All right.  So I'll just leave -- before

22    we leave, I will do one thing, which is to so order the

23    record for purposes of the relief that's been granted.

24    Obviously you'll be getting me revised orders.  And again,

25    make sure to get me orders for each motion.  I think most of
```

Page 111

1   them have a little tweak somewhere or another.  But even if

2   for, like, joint administration has no tweak, just send it

3   along so we make sure to do that and that we have the most

4   up-to-date version of the order.  But I will so order the

5   record so folks know that they have the relief and can act

6   accordingly.

7              And with that, unless there's anything else, thank

8   you all very much for everybody's assistance in a productive

9   and efficient hearing.  Have yourselves a good evening and

10  look forward to seeing you soon.

11             MR. O'NEAL:  Thank you, Your Honor.

12             THE COURT:  Thank you.

13             MS. VANLARE:  Thank you very much.

14             (Whereupon these proceedings were concluded at

15  4:34 PM)

16

17

18

19

20

21

22

23

24

25

```
 1                        I N D E X

 2

 3                         RULINGS

 4                                      Page     Line

 5
```

```
 6    Motion for Joint Administration Granted    50       22

 7    Schedules Motion Granted                   55       3

 8    Amended Motion for Automatic Stay Granted  94       25

 9    Cash Management Motion                     107      22

10    Taxes & Fees Motion Granted                60       2

11    Critical Vendors Motion Granted            65       2

12    Employee Wage Motion Granted               72       18

13    Genesis Asia Pacific Pte. Ltd. Motion

14    Granted                                    75       5

15    Case Management Motion                     107      22

16    Kroll Motion Granted                       57       14

17    Islim Declaration Accepted                 29       2

18    Leto Declaration                           29       2

19    Aronzon Declaration                        29       2
```

```
20

21

22

23

24

25
```

Page 113

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  January 24, 2023