Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 23-10063-SHL

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    GENESIS GLOBAL HOLDCO, LLC,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                   United States Bankruptcy Court

13                   300 Quarropas Street, Room 248

14                   White Plains, NY 10601

15

16                   February 6, 2023

17                   4:38 PM

18

19

20

21   B E F O R E :

22   HON SEAN H. LANE

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  ART

1    HEARING re Status Conference

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    KIRKLAND & ELLIS LLP

 4         Attorneys for the Ad Hoc Group of Creditors

 5         601 Lexington Avenue

 6         New York, NY 10022

 7

 8    BY:  ROSS FIEDLER

 9

10    CLEARY GOTTLIEB STEEN & HAMILTON LLP

11         Attorneys for the Debtors

12         One Liberty Plaza

13         New York, NY 10006

14

15    BY:  SEAN A. O'NEAL

16         JANE VANLARE

17

18    WEIL, GOTSHAL & MANGES LLP

19         Attorneys for Digital Currency Group, Inc.

20         767 Fifth Avenue

21         New York, NY 10153

22

23    BY:  JEFFREY SAFERSTEIN

24

25
```

```
1   HUGHES HUBBARD & REED LLP

2        Attorneys for Gemini Trust Company, LLC, as Agent

3        One Battery Park Plaza

4        New York, NY 10004

5

6   BY:  ANSON B. FRELINGHUYSEN

7

8   UNITED STATES DEPARTMENT OF JUSTICE

9        Attorneys for the U.S. Trustee

10       201 Varick Street, Suite 1006

11       New York, NY 10014

12

13  BY:  GREG ZIPES

14

15  PROSKAUER ROSE LLP

16       Attorneys for Ad Hoc group of Genesis Customers

17       Eleven Times Square

18       New York, NY 10036

19

20  BY:  BRIAN ROSEN

21

22   ALSO PRESENT TELEPHONICALLY:

23   PHILIP ABELSON

24   RICHARD ARCHER

25   PAUL ARONZON
```

Page 5

1   SABRINA BREMER

2   JESSI BROOKS

3   CHRISTINE CALDERWOOD

4   BIANCA CASTRO

5   CINDI GIGLIO

6   ADAM J. GOLDBERG

7   EDUARDO GUTARRA

8   AUTUMN HIGHSMITH

9   GREG HILL

10   DAVID HOLLERITH

11   DERAR ISLIM

12   HOO RI KIM

13   XX LIU

14   KEN LUKASZEWSKI

15   CHRISTOPHER MARCUS

16   JEFFREY S. MARGOLIN

17   KYLE MCKUHEN

18   MARCY J. MCLAUGHLIN SMITH

19   RICHARD CHESTER MINOTT

20   GREGORY F. PESCE

21   ISABEL PINHO

22   AMELIA POLLARD

23   STEVEN J. REISMAN

24   CHRISTIAN RIBEIRO

25   SHAYA ROCHESTER

1   JASON H. ROSELL

2   J. CHRISTOPHER SHORE

3   DUSTIN P. SMITH

4   GORDON SUN

5   JOSHUA SUSSBERG

6   BENJAMIN TAYLOR

7   DAVID TURETSKY

8   FRANCISCO VAZQUEZ

9   CHRISTOPHER WARD

10  MICHAEL WEINBERG

11  ALISON R. AMBEAULT

12  ERIC ASQUITH

13  NEGISA BALLUKU

14  BRENDON BARNWELL

15  BRIANNA B. BILTER

16  BRIAN BULTHUIS

17  DONALD BURKE

18  DAVID CHAN

19  AARON CHANDLER

20  RYAN CHEN

21  AARON CHANDLER

22  CATHERINE CHOE

23  TOM CONHEENEY

24  COURTENAY CULLEN

25  BRANDON CURLEY

```
 1   YANN RICHARD DESCHAMPS

 2   NIKHILESH DE

 3   JARED DERMONT

 4   JASON DIBATTISTA

 5   MICHAEL DIYANNI

 6   THOMAS DIRCKS

 7   LEIA DORAN

 8   JAMES V. DREW

 9   MATTHEW ALLEN FELDMAN

10   SCOTT FLAHERTY

11   DANIEL ISAAC FORMAN

12   JULIA FOSTER

13   KIMBERLY GIANIS

14   UDAY GORREPATI

15   JASON GOTTLIEB

16   BRANDON HAMMER

17   CHRIS HAND

18   SANDALI HANDAGAMA

19   LOREN HARMAN

20   MIRANDA HATCH

21   JEREMY C. HILL

22   BART HOYNG

23   ERIN HUDSON

24   ZUL JAMAL

25   ALEXANDER JANHORBANI
```

1    KEEFE JOHNSON

2    OLGA KHARIF

3    PAUL KINEALY

4    BARAK KLEIN

5    DIETRICH KNAUTH

6    GLEN KRATOCHVIL

7    KONRAD LAESSER

8    HANNAH LANG

9    MICHAEL LETO

10   SAMUEL LAVANDER

11   DAVID LOPEZ

12   ALEXANDRA LOTTY

13   JOHN ANDREW MARCIN

14   KYLE MASON

15   AKIKO MATSUDA

16   MICHELE MEISES

17   PABLO MIELGO

18   PAUL MUSSER

19   JOHN NGUYEN

20   DENNIS C. O'DONNELL

21   DAVID OSOJNIK

22   KENNETH L. PERKINS

23   ARIANNA PRETTO-SAKMANN

24   GREGORY RAAB

25   CRAIG V. RASILE

1    MOHIT RATHI

2    PHILIP RIES

3    ANDRES FELIPE SAENZ

4    BILL SCHATZ

5    THERESE SCHEUER

6    JOE SCIAMETTA

7    IAN SILVERBRAND

8    KUNALKUMAR SOMANI

9    MARK STANCIL

10   DAVID STAUFFER

11   BENJAMIN STEELE

12   GREGG STEINMAN

13   ANDREW SULLIVAN

14   VINCE SULLIVAN

15   ANDREW SWIFT

16   BRENDAN TELZROW

17   DUSTIN THAYER

18   KATE THOMAS

19   BRIAN TICHENOR

20   MARIANNA UDEM

21   WILLIAM MATTHEW UPTEGROVE

22   MEGHANA VUNNAMADALA

23   RICHARD RONALD WESTON

24   CHARLES WANG

25   JACK WESTNER

1   BRANDON WILLIAMS

2   PAUL WIRTZ

3   KATHRYN WITCHGER

4   JESSICA WOOL

5   SARAH WYNN

6   LILY YARBOROUGH

7   DOMINIK ZYNIS

8   BENJAMIN HIRSCH

9   OXANA KOZLOV

10  GEORGE LANDEGGER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2           THE COURT:  In the United States District Court

3    for the Southern District of New York and we're here this

4    afternoon for Genesis Global Holdco, LLC, et al, Debtors in

5    this jointly administered Chapter 11 case and we're here for

6    a status conference on a few issues that came up at the

7    first day hearing.

8                This is not the second day hearing, just for those

9    of you joining at home.  The second day hearing is when you

10   revisit all of the motions that were addressed in the first

11   day hearing and follow up to seek final orders and discuss

12   other things.

13               This I think was a status conference to allow us

14   to have discussions on a few issues that we thought it would

15   be productive to sort of almost have an interim discussion

16   between the first day and the second day hearings.

17               And so, with that, let me get appearances starting

18   with the Debtors.

19           MR. O'NEAL:  Good afternoon, Your Honor.  It's

20   Sean O'Neal, Cleary Gottlieb Steen & Hamilton, on behalf of

21   the Debtors, and I'm here with my colleague, Jane VanLare.

22           THE COURT:  All right, good afternoon.  And let me

23   get any appearances from any other parties.

24           MR. ROSEN:  Your Honor, this is Brian Rosen,

25   Proskauer Rose.  I'm here with my partner, Vincent

Page 12

1    Indelicato.  We're representing an ad hoc group of lenders

2    to GGC.

3              THE COURT:  All right, good afternoon.

4              MR. ROSEN:  Good afternoon.

5              THE COURT:  Other appearances?

6              MR. SAFERSTEIN:  Good afternoon.  Can you hear me

7    okay?

8              THE COURT:  Yeah.

9              MR. SAFERSTEIN:  Jeffrey Saferstein from Weil,

10   Gotshal & Manges, on behalf of Digital Currency Group.

11             THE COURT:  All right, good afternoon.

12             MR. FIEDLER:  Your Honor, Rob Fiedler of Kirkland

13   & Ellis, on behalf of an ad hoc group of creditors of GGC.

14   I'm also joined by my partner, Chris Marcus.

15             THE COURT:  All right, good afternoon.  Next up?

16             MR. FRELINGHUYSEN:  Good afternoon, Your Honor.

17   Anson B. Frelinghuysen, Hughes Hubbard Reed, for Gemini

18   Trust Company, LLC, acting capacity as agent on behalf of

19   the Gemini lenders.

20             THE COURT:  All right, good afternoon.

21             MR. FRELINGHUYSEN:  I'm also joined by some of my

22   colleagues.

23             THE COURT:  All right.  Any other appearances?

24             MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

25   Trustee's Office.  I'm on the phone with some colleagues.

1          THE COURT:  All right.  Good afternoon to you as

2     well.  Anyone else?  All right.

3          So I think we had a couple of things we were going

4     to discuss.  I think we were going to chat about cash

5     management and also chat about the redaction issue that came

6     up the first time we got together.

7          Before we get to all those, I did have one thing

8     that I wanted to mention on my own.  We'd gotten a couple of

9     calls about people who had some difficulty getting on Zoom

10    where they had registered, I guess a week ago, and they

11    didn't get a link.  We all know the challenges that

12    technology can provide to us in this COVID era and that all

13    the wonderful things like Zoom that when they work are

14    almost like magic, but when they don't work feel a lot less

15    magical.

16         So, first of all, anybody who's on the Zoom one

17    way or another who's had this kind of issues and persevered,

18    thank you very much for your patience and good humor.

19         The reason why I mention this all is just to say

20    we're looking into it to see what may -- because we got a

21    number of calls, which made me think that this is not a one

22    off for one individual.  So we're going to look to see what

23    may have not worked.

24         But the other thing is, I did know that in

25    something like the Purdue case, that oftentimes -- that what

Page 14

1    the debtors have done is include a phone number with notices

2    as well that allows people to essentially always use that

3    phone number to dial in if for some reason something else

4    happens and they have trouble, and it might be worth

5    adopting that here just because I think at last check, I

6    think we had 156 participants for today's hearing and I

7    think we had more than that for the last hearing.

8              So I throw that as a possible suggestion for the

9    sanity of all people who may want to dial in and don't want

10   to have to spend their life trying to overcome any technical

11   challenges.  Again, we hope that there are no technical

12   challenges, but optionality is not a bad thing.  So I'd ask

13   if the Debtors could take a look at that and see what you

14   can come up with.  And just, again, we're always trying to

15   build a better widget, so to speak, here in the courthouse.

16             So with that, I will turn it over to Debtor's

17   counsel to start us off.

18             MR. O'NEAL:  Thank you, Your Honor.  And I believe

19   we're actually going to kick the cash management and

20   redaction issues over to the second day hearing.  And so, I

21   think today's status conference is more about -- you'll

22   recall that at the first day hearing that we had mentioned

23   that we may be requesting a mediator.

24             THE COURT:  Right.

25             MR. O'NEAL:  And we were having productive

1    discussions with respect to a consensual resolution.  And

2    with Your Honor's permission, I'd like to focus on that at

3    today's status conference.

4            THE COURT:  That will be perfectly fine.  Again,

5    the whole point of the conference is to help parties make

6    progress in the case, so take it away.

7            MR. O'NEAL:  Thank you.  Well, to that end, it

8    certainly helps, so thank you for doing that, Your Honor.

9    We appreciate your scheduling this status conference.  It

10   was originally scheduled for last week and then we moved it

11   to this week in light of the ongoing discussions.

12           And so, what I'd like to do with Your Honor's

13   permission is to give you an update on the kind of

14   discussions we've been having with our ad hoc group of

15   creditors and there are two ad hoc groups of creditors, so

16   I'd like to talk to you a little bit about that, and also

17   our discussion with DCG, who is our corporate parent and

18   also our largest borrower that owes us approximately $1.7

19   billion.

20           And so, I think I'll just start by saying I'm

21   pleased to report that we've used our time extremely well

22   over the past two weeks.  I told Your Honor during the first

23   hearing that I was optimistic that we could reach a deal,

24   and I'm pleased to say today that have reached an agreement

25   in principle, subject to definitive documentation.

1           That agreement in principle involves ad hoc groups

2    representing over $2 billion in claims against GGC; that's

3    one of the debtors.

4           There's somebody just -- maybe just to pause a

5    moment here, Your Honor.  I think somebody might be typing

6    loudly and it's not me and it may be distracting for folks.

7           THE COURT:  All right, we'll take care of that

8    problem.

9           MR. O'NEAL:  Okay, thank you.  So continuing, we

10   have an agreement in principle.  The parties to that

11   agreement in principle are DCG, our corporate parent and

12   largest borrower, an ad hoc group or two ad hoc groups,

13   including those representing approximately or more than $2

14   billion in claims against GGC.  And then also, Gemini Trust

15   Company, which is the agent for various Gemini lenders under

16   the Gemini concern program.

17          We are working to finalize the term sheet.  We've

18   made significant progress and I hope that we're able to file

19   that term sheet with the court in short order, perhaps as

20   early as tomorrow or even tonight.

21          The proposed settlement or the proposed term sheet

22   really sets out a framework of a plan of reorganization, as

23   well as the sale and marketing process, much like the plan

24   that we had proposed on the first day of the case.  What we

25   will hope to do is we will continue to negotiate that and we

Page 17

1    will actually sign a plan support agreement among all of the

2    constituencies.  We'll run a sales and marketing process,

3    just as we had contemplated, and then we'll also have a

4    backup or alternative in equitization in the event that's

5    where we choose to go.

6              Importantly, I'd like to describe a few of the

7    salient terms of the framework.

8              THE COURT:  So let me ask you, obviously, I'm not

9    opposed to getting that kind of information so long as it

10   doesn't trample on any Rule 408 issues.  And for those who

11   don't have their Federal Rules of Evidence handy, that's the

12   rule that talks about keeping settlement conversations

13   confidential.

14             And so, that's -- it sounds like you have an

15   agreement in principle subject to documentation, so I'll

16   leave it to you as to whether you have any 408 issues or not

17   or whether you want to take, even if you don't think you do,

18   whether you want to take the cautious route or not.  So

19   what's your thinking about that?

20             MR. O'NEAL:  Sure, Your Honor.  I do have

21   authority to describe the principle terms of the deal in

22   principle among the parties to the deal in principle.

23             THE COURT:  All right.

24             MR. O'NEAL:  So I believe that I can continue, but

25   I will pause for a moment to see if anybody objects to my

Page 18

```
1    continuing.
2              MR. ROSEN:  Your Honor, this is Brian Rosen from
3    Proskauer Rose.  We actually would appreciate if Mr. O'Neal
4    did continue with the salient terms as members of the group
5    would like it to be publicly known what is being discussed.
6              THE COURT:  All right, that's fair enough.  If it
7    can serve that benefit, that's great; that's the other part
8    of the equation.
9              MR. ROSEN:  Thank you, sir.
10             THE COURT:  All right.  Anybody else wish to be
11   heard in just an abundance of caution?  All right.  Hearing
12   no other party, Mr. O'Neal, please continue.
13             MR. O'NEAL:  Sure, and thank you for asking that
14   question, Your Honor.  We appreciate it and certainly want
15   to follow the right process.
16             And one of the things that we've been doing, and
17   really a hallmark of our case, is not only trying to reach
18   kind of an agreement and to approach this as a consensual
19   matter, but also to be transparent and to let the parties
20   know exactly where we stand, and that's part of what we're
21   doing today.
22             Under the plan, DCG is going to -- and you'll
23   note, Your Honor, that I'm actually reading a summary
24   because the summary has been approved.
25             THE COURT:  Yeah, no, that's entirely appropriate
```

1    and fitting under these circumstances, yes.

2            MR. O'NEAL:   Perfect.   So under this plan, DCG is

3    going to contribute to Genesis Global Holdco, that's the

4    parent and the lead debtor in this case, on the effective

5    date of our plan, all of the equity interest in Genesis

6    Global Trading, Inc., that's called GGT.   GGT, as you may

7    remember from our first day hearing, is a sister company to

8    GGH.   So like GGH, GGT is owned by DCG.   So under the

9    settlement, DCG would contribute that entity, GGT, to GGH.

10   That will allow us -- and that will happen on the effective

11   date of the plan.

12           In the meantime during these cases, we will

13   actually be marketing and trying to sell not only the

14   Debtor's assets, but also GGTs because they formed a nice

15   package and we believe that by packaging them together, we

16   can maximize the recoveries to the estate.

17           The proposed settlement, importantly, the

18   restructure of the debt that DCG (indiscernible), both the

19   $600 million prepetition loans that are due in May 2023 --

20   we call those the DCG loans -- and then also the $1.1

21   billion principal -- well, $1 billion in principal under a

22   promissory note that is actually due in 2032; we call that

23   the DCG note.

24           In satisfactions under the DCG loans, DCG will

25   issue a new second lien term loan facility.   That facility

1    will mature in June of 2024.  There will be two tranches

2    under this term loan: tranche one will be denominated in

3    U.S. dollars and pay 11.5 percent interest, and tranche two

4    will be denominated in Bitcoin and pay a 5 percent interest.

5            DCG will receive a credit in the form of a

6    reduction in the principal amount of tranche one based on

7    the value of stock to GGT and other non-debtor

8    (indiscernible) to the extent those are sold as part of the

9    process.  Those term loans will be roughly equal to around

10   $500 million.

11           In addition, in satisfaction of its obligations

12   under the DCG note, DCG has agreed to issue a class of

13   convertible preferred stock, so convertible preferred stock,

14   and that's going to convert into common equity in DCG or a

15   subsidiary of DCG if it's mutually agreed by the parties.

16           In connection with the issuance -- and this is

17   where it gets a little complicated and we're still working

18   on the details of this, Your Honor.  But in connection with

19   the issuance of the preferred stock, DCG will use mutually

20   reasonable efforts to list the equity of DCG or an agreed

21   upon subsidiary by no later than February 15th,

22   (indiscernible).  The parties are continuing to negotiate in

23   good faith exactly which exchange would be used for that

24   listing, and that'll be the subject of ongoing discussions.

25               The value of the preferred stock for purchase of

Page 21

1    conversion will trade at a rate of 10 percent from September

2    30th, 2023.  If DCG fails to meet the listing requirement by

3    the June 30th, (indiscernible) deadline, holders of the

4    proposed stock will also be entitled to cash dividends at a

5    rate of 10.5 percent per annum, and that rate will increase

6    by an additional 1 percent every six months after December

7    31st, 2027 until the listing (indiscernible) met or the

8    preferred stock has been repurchased or the (indiscernible)

9    by DCG.

10         DCG reserves the right to redeem the preferred

11   stock with cash, subject to certain agreed upon blackout

12   periods, and the preferred stock will mandatorily convert on

13   December 31st, 2027.  To the extent that DCG has listed,

14   they are satisfied the listing was brought.

15         Now we're still working on some of the mechanics

16   and the timing with respect to the redemption and with

17   respect to the conversion and those will be points that are

18   going to be more clearly addressed in the (indiscernible).

19         I should also note that in addition, DCG will be

20   contributing additional value.  DCG will contribute the

21   first $25 million in recoveries from the Three Arrows

22   Capital proceeding that are going on right now in the BVI,

23   as well as certain NEAR and AVAX tokens that are currently

24   part of the collateral for the gap loan to the Three Arrows

25   Capital.  And DCG will also contribute any tax recoveries,

1    that is Three Arrows capital recoveries, in excess of 25

2    million, provided that DCG will receive credit for such

3    access recoveries in the form of a dollar-for-dollar

4    reduction in the amount of the outstanding preferred stock.

5              With respect to Gemini -- and we're heading down

6    the home stretch here, Your Honor.  With respect to Gemini,

7    in consideration for approving the release under the

8    debtor's amended plan, Gemini has agreed to the following in

9    contributions.

10             Number one, Gemini will make a cash contribution

11   in the amount of up to $100 million for the pro rata benefit

12   of Gemini lenders that opt into a third-party release of

13   their direct claim.

14             And Gemini will also distribute the value of

15   certain collateral that was purportedly foreclosed upon

16   prior to the petition date, and that collateral that is

17   currently held by Gemini will be distributed to the Gemini

18   lenders and the value of that collateral, as of the petition

19   date, will be applied to reduce the amount of the Gemini

20   members' claims against GGC as of the petition date.

21             And Gemini will also agree to provide releases and

22   other -- to all the released parties, including the debtors

23   in DCG under the amended plan.

24             And Gemini is also going to help with the

25   distributions.  Under the plan, Gemini is the agent, so they

1    will serve in that role as well.

2            There are customary releases as part of the

3    settlement in principle.  However, there will be some

4    limitations with respect to the release of avoidance actions

5    and similar actions, other than those against DCG.  The DCG

6    avoidance actions will be released as part of the plan.  And

7    a creditor can obtain a release from the debtors in respect

8    of avoidance actions or similar actions if that creditor

9    elects to opt into consensual third-party releases of its

10   direct claim against the released parties and if each class

11   of unsecured claims against GGC votes to accept the plan.

12           So there is a release of avoidance claims in

13   certain circumstances, including if the class of unsecured

14   creditors vote to accept the plan.  The released parties

15   include the Debtors, DCG, Gemini, and Debtor's subsidiaries

16   of GGH.

17           And importantly, just in case Mr. Zipes is

18   listening closely, there are no non-consensual third-party

19   releases under this plan.

20           The special committee will continue its

21   investigation as part of its exercise of fiduciary duties,

22   as Your Honor will recall from the first day hearing, that

23   the special committee is leading an investigation into

24   certain prepetition transactions.  And to the leases that

25   are contemplated under the plan that I just described,

Page 24

```
1    they're going to be subject to the completion of that

2    investigation.  And the Debtors obviously maintain their

3    flexibility to exercise its fiduciary help as necessary.

4              At this point, the settlement does not address gap

5    creditor claims.  That will be something that we work on

6    over the next few weeks.  We will be addressing gap creditor

7    claims, but we were not able to do that in the time that we

8    have.

9              And as I noted, we're still working on a few of

10   the mechanical issues, but we have reached an agreement in

11   principle on the terms that I have just described, and we do

12   hope, Your Honor, that we will be in position to file a term

13   sheet that describes this dealing in short order.  And then

14   we'll work immediately to pull to get their plan support

15   agreement and to continue to work, pulling together amended

16   plan documents and proceeding through what we hope is a

17   rather accelerated and efficient Chapter 11 process.

18             THE COURT:  All right.  Thank you very much for

19   the update.  It's comprehensive and it does serve the

20   purpose of getting the word out to folks who are

21   participating in today's hearing.

22             So let me ask if there's any party that wishes to

23   augment/correct/amend any of what Mr. O'Neal has set forth.

24   It seems unlikely given that he's reading from a very

25   carefully drafted document, but I want to give folks the
```

Page 25

1    opportunity.  Anybody who wishes to be heard?

2            MR. ROSEN:  Your Honor, again, this is Brian Rosen

3    from Proskauer Rose, if I may have a moment.

4            THE COURT:  Sure.

5            MR. ROSEN:  Thank you, sir.  Yes, Your Honor, as I

6    mentioned at the first day hearing, we represent a group of

7    creditors holding approximately $1.6 billion worth of claims

8    against GGC.  It is not just a single type of claim, it's a

9    cross-section, many of whom are parties to something called

10   master loan agreements and there are a few other different

11   types in there, Your Honor.

12           We have been actively engaged in this process,

13   along with the other ad hoc group, to essentially represent

14   the interests of all unsecured creditors at GGC, and we

15   believe that the understanding that has been discussed by

16   Mr. O'Neal really provides a significant recovery and

17   something hopefully that we'll be able to achieve in a

18   timely manner because that is what is most important for the

19   unsecured creditors: to get back whatever they can as soon

20   as they can in whatever currency we're able to do that,

21   whether it is in cash or whether it is in kind, which is

22   something that has been the focal point of many of the

23   conversations.

24           I would like to point out, Your Honor, that unlike

25   many other agreements that might be reached on an either

Page 26

1   prepetition or immediately post-petition basis that would

2   give rise to a plan support agreement, the parties that have

3   been negotiating this process, and it would be signatories

4   to a plan support agreement, are not going to be getting any

5   additional benefits for parties other than meaning with

6   respect to those who do not execute something.  There are no

7   consummation costs, there are no fees.

8           This is something that is being done solely for

9   the benefit of all creditors and we're looking to do this

10  and bring this forward as soon as possible, as I said, Your

11  Honor, in the form of a plan support agreement.

12          So I have nothing more to augment because I

13  believe Mr. O'Neal has been very complete and, as you noted,

14  he read from the script that has been approved by all

15  parties, but we just wanted you to know that no one else is

16  getting any additional benefits out of this process.  It's

17  for the benefit of all parties.

18          THE COURT:  All right.  That's very good to know.

19  I appreciate that kind of information because that's

20  significant and thank you for that.

21          Any other party that wishes to be heard?

22          MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

23  Trustee's Office.  We have not been involved with the

24  negotiations obviously, but I did want to let the Court know

25  that we appointed an official committee of unsecured

Page 27

1    creditors on Friday, and it's my understanding that they are

2    still in the selection phase for selecting professionals.

3    They obviously will have an interest in the settlement here,

4    and I'm sure the parties will work with them.

5           I'll note that some of the creditors put on the

6    committee are part of the ad hoc groups as well, so there's

7    an overlap in that regard, but the official committee will

8    certainly have entrust them and reviewing everything.

9           THE COURT:  All right.  Thank you for that.  I did

10   see on the docket the notice of the appointment of a

11   committee, so it's good to know.  And while our date for a

12   second day hearing is a little different than it might have

13   otherwise been, perhaps it's actually useful given the

14   developments and given the very recent appointment of the

15   committee, so that actually might not work out too badly.

16          Any other party that wishes to be heard?

17          MR. FRELINGHUYSEN:  Good afternoon.  This is Anson

18   B. Frelinghuysen, Hughes Hubbard Reed, counsel for Gemini

19   Trust Company, LLC, also on behalf of Gemini Lenders.

20          Just a minute to express our gratitude to the

21   Debtors and the other parties in the negotiations over the

22   past several weeks.  The nearly agreed term sheet proposed

23   to the plan of reorganization that benefits all Gemini's

24   players, in addition to the path for substantial recovery

25   for the over 340,000 Gemini Earn users, whose assets have

Page 28

1    been stuck since November 16, 2022.

2              Gemini views this as a critical step towards

3    undoing the harm to Gemini users suffered over the past few

4    months, and Gemini recognizes it is not the end of the road

5    and remains committed to doing everything possible to bring

6    the Earn users as high a recovery as possible.

7              To that end, as Mr. O'Neal mentioned, Gemini is

8    committed to contributing $100 million to the proposed plan

9    for distribution to Gemini Earn users.  Gemini founders,

10   Cameron and Tyler Winklevoss, agree and it's because they

11   believe in the Debtor's reorganization and the Gemini

12   platform and they want to do the right thing for their

13   users.

14             Like everybody else on the line, we have been

15   working around the clock with the Debtor's principals and

16   with the professionals to get this through and it could not

17   have been done without the cooperation and professionalism

18   of all the other parties to the agreement.  And, of course,

19   there's much more work to be done.  Gemini's confident that

20   with the Court supervision, the real path presented today

21   will get us prompt exit from Chapter 11.

22             Gemini also would like to thank all of its Earn

23   users who put their trust in the Gemini team during this

24   challenging time and it will commit to keeping their best

25   interest in mind and at the center of everything we do.

1    Thank you.

2              THE COURT:  All right.  Thank you very much for

3    that.  Let me ask if there's another party, any other party

4    who wishes to be heard?

5              MR. FIEDLER:  Your Honor, again for the record,

6    Ross Fiedler of Kirkland & Ellis on behalf of an ad hoc

7    group of creditors of GGC.

8              As my colleague, Mr. Marcus, mentioned at the

9    first day hearing, we represent over $1.5 billion of claims

10   at GCC, and I'll simply confirm what Mr. O'Neal outlined and

11   what Mr. Rosen iterated, which is our group is largely

12   supportive of the commercial deal.  Obviously, that remains

13   subject to definitive documentation and our members internal

14   approvals.

15             But we do believe that the terms laid out by Mr.

16   O'Neal establish a framework for a consensual structuring

17   that will benefit all unsecured creditors, and we look

18   forward to pushing full steam ahead on memorializing the

19   terms through a revised plan and plan support agreement as

20   expeditiously as possible.

21             And lastly, I'd just like to thank and commend Mr.

22   O'Neal and his team and the other advisors and principals on

23   the call for getting us to the point we are at today.  There

24   is obviously a lot of work left on the documentation side,

25   but substantial progress has been made and we look forward

1      to continuing momentum.  Thank you.

2              THE COURT:  All right.  Thank you for those

3      comments.  Any other party that wishes to be heard?

4              MR. O'NEAL:  Your Honor, Sean O'Neal again.  If

5      you don't mind, just a few words.

6              THE COURT:  Certainly, go ahead.  I didn't hear

7      from any other party, so I think we may have heard from

8      everybody in the virtual room that wishes to be heard on

9      this, so it's appropriate to go back to you.

10             MR. O'NEAL:  Certainly.  Thank you, Your Honor.  I

11     do want to acknowledge the very hard work that all of the

12     professionals for the ad hoc group and for Gemini and DCG

13     have been engaged with over the past three and a half

14     months.  We've only been in this case for two weeks, but

15     this has been quite a long time coming in terms of the work,

16     intensely collaborative and greatly appreciated and we'll

17     continue that collaborative approach and that transparent

18     approach and we thank the creditors for their support.

19             I did want to note, and I'm glad that Mr. Zipes

20     mentioned, that the creditors' committee has been appointed.

21     We very much look forward to working with the creditors'

22     committee.  In the term sheet that we have that we hope to

23     be finetuned, we've already included all sorts of

24     consultation and other rights with the creditors' committee.

25     We'll be working hand in hand with the creditors' committee

Page 31

```
 1    and we look forward to meeting with them as soon as they're

 2    ready.

 3              Other than that, Your Honor, we have nothing

 4    further to say and just thank you again for your time in

 5    giving us this platform to have the opportunity to inform

 6    the Court and all parties in interest of the deal in

 7    principal that has been reached, so we can further our goal

 8    of transparency and having a consensual restructure, so

 9    thank you, Your Honor.

10              THE COURT:  All right.  Well, it's my pleasure.  I

11    appreciate what is a very positive update that reflects a

12    tremendous amount of hard work, time and effort and goodwill

13    among parties, which you all know, these cases bankruptcy

14    works much better when people communicate and save the

15    fights for issues that have to be fought over, and so, this

16    represents a tremendous step forward obviously.  I

17    appreciate the update.

18              So let me just end by asking, I know we have a

19    date for a second day hearing with all the traditional

20    issues that'll come along with that.  Is there anything else

21    that you can think of that you might need today, whether

22    it's a date beyond the second day hearing or anything else

23    for that matter in terms of moving the case forward?

24              MR. O'NEAL:  I think I will defer to my colleague,

25    Miss VanLare, to see if there's anything that she would
```

1    (sound drops).

2            MS. VANLARE:  Good afternoon, Your Honor.  Jane

3    VanLare of Clearly Gottlieb Steen & Hamilton.  I don't

4    believe there's anything right now, but we will be reaching

5    out to your chambers to discuss scheduling subsequent

6    hearings into March, but I think for now, we are all set.

7            THE COURT:  All right.  Obviously, I see banks is

8    happy to hear from folks and you're in very competent hands

9    when you talk to her about scheduling and so, we'll wait for

10   those calls.

11           And in the meantime, let me ask if anybody else

12   needs to be heard on any other issues today before we

13   adjourn?

14           MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

15   Trustee's Office on scheduling.  There may be issues, and

16   I'll label them as discreet issues at my office sometimes

17   weighs in on, and we'll work it out with Cleary to the

18   extent matters need to be put before the Court.  They may or

19   may not track the second day hearing.  There may be a need

20   to put them on for the second day, but it may be possible to

21   put them on separately as well to the extent we can't work

22   them out, so I just wanted to let the Court know that.

23           And also just in connection with the RSA that's

24   being discussed, my office would like some notice if the

25   parties do intend to file that.  We typically would want to

1   see RSAs folded into plans and not separately approved and I

2   don't know if that's the parties' intention at the moment.

3   It actually doesn't need to be addressed at the moment, but

4   we're just flagging that as an issue right now.

5         MR. O'NEAL:  Mr. Zipes --

6         THE COURT:  Go ahead, Mr. O'Neal.

7         MR. O'NEAL:  I'm sorry, Your Honor.  Yeah, I'm

8   happy to respond to that, Mr. Zipes and Your Honor.  We do

9   not have any intentions to seek approval of the RSA, that'll

10   be part and parcel of a plan, but we will file the RSA so

11   there is transparency.

12         THE COURT:  All right.  Yeah, that's consistent

13   with what my understanding was, but that's fine.  And

14   obviously, we'll get together and see where we are on the

15   second day hearing and whether there's detail to that in

16   terms of other issues that we need to address in the

17   fullness of time.

18         And again, I'll just ask the Debtors to take a

19   look at this notion of having a call-in number just for

20   folks for ease of access.

21         But with that, I don't have anything else, and

22   again, I appreciate all the hard work.  Thank you for the

23   update and I'll wish you all a very good evening and see you

24   all soon.

25         MR. O'NEAL:  Thank you, Your Honor.

1            THE COURT:   Thank you.

2            (Whereupon these proceedings were concluded at

3     5:13 PM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 35

```
 1                C E R T I F I C A T I O N

 2

 3       I, Sonya Ledanski Hyde, certified that the foregoing

 4    transcript is a true and accurate record of the proceedings.

 5

 6

 7

 8    Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:
```