**Hearing Date: April 26, 2023 at 2:00 p.m. (Prevailing Eastern Time)**
**Objection Deadline: April 19, 2023 at 4:00 p.m. (Prevailing Eastern Time)**

Benjamin Mintz
Marcus Asner
Justin Imperato
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York,  New York 10019
Tel: (212) 836-8000
Facsimile: (212) 836-8689
Email: benjamin.mintz@arnoldporter.com
Email: marcus.asner@arnoldporter.com
Email: justin.imperato@arnoldporter.com

*Counsel to Soichiro "Michael" Moro*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Genesis Global Holdco, LLC, *et al.*,[1] | ) | Case No. 23-10063 (SHL) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**NOTICE OF MOTION FOR ENTRY OF AN ORDER MODIFYING**
**THE AUTOMATIC STAY, TO THE EXTENT APPLICABLE, TO ALLOW FOR**
**ADVANCEMENTS AND PAYMENTS UNDER D&O INSURANCE POLICY**

**PLEASE TAKE NOTICE** that on January 19, 2023 (the "Petition Date"), Genesis Global Holdco, LLC ("Holdco") and its debtor affiliates (collectively, the "Debtors"), as debtors and debtors-in-possession in the above-captioned chapter 11 cases (the "Chapter 11 Cases"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

**PLEASE TAKE FURTHER NOTICE** that on March 27, 2023, Soichiro "Michael" Moro (the "Insured"), filed the annexed *Motion for Entry of an Order Modifying the Automatic Stay, to the Extent Applicable, to Allow for Advancements and Payments Under D&O Insurance*

---

[1] The Debtors in these Chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

*Policy* (the "Motion"). A hearing (the "Hearing") on the Motion will be held via zoom before the Honorable Judge Sean H. Lane, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, NY 10601 at 2:00 p.m. on April 26, 2023, prevailing Eastern Time.

**PLEASE TAKE FURTHER NOTICE** that responses or objections, if any, to the Motion or the relief requested therein shall be made in writing and (a) filed with the Bankruptcy Court by 4:00 p.m. on April 19, 2023, prevailing Eastern Time (the "Objection Deadline") and (b) served as required by the *Order Implementing Certain Notice and Case Management Procedures*, ECF No. 44.

**PLEASE TAKE FURTHER NOTICE** that if no written objections are timely filed and served with respect to the Motion, on or after the Objection Deadline, the Insured may submit to the Bankruptcy Court an order substantially in the form annexed as Exhibit A to the Motion, which order the Bankruptcy Court may enter without further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that copies of the Motion can be viewed and/or obtained by: (i) accessing the Court's website at www.nysb.uscourts.gov (PACER password required) or (ii) from the Debtors' notice and claims agent, Kroll Restructuring Administration LLC, which maintains a website at https://restructuring.ra.kroll.com/genesis or by calling +1 888 524 2017.

**PLEASE TAKE FURTHER NOTICE** that if you oppose the relief requested in the Motion, or if you want the Court to hear your position on the Motion, then you or your attorney must attend the Hearing. If you or your attorney do not follow the foregoing steps, the Court may decide that you do not oppose the relief requested in the Motion and may enter orders granting the relief requested by the Insured.

Dated: March 27, 2023
    New York, New York

                ARNOLD & PORTER KAYE SCHOLER LLP

                */s/ Benjamin Mintz*
                Benjamin Mintz
                Marcus Asner
                Justin Imperato
                ARNOLD & PORTER KAYE SCHOLER LLP
                250 West 55th Street
                New York,  New York 10019
                Tel: (212) 836-8000
                Facsimile: (212) 836-8689
                Email: benjamin.mintz@arnoldporter.com
                Email: marcus.asner@arnoldporter.com
                Email: justin.imperato@arnoldporter.com

Benjamin Mintz
Marcus Asner
Justin Imperato
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York,  New York 10019
Tel: (212) 836-8000
Facsimile: (212) 836-8689
Email: benjamin.mintz@arnoldporter.com
Email: marcus.asner@arnoldporter.com
Email: justin.imperato@arnoldporter.com

*Counsel to Soichiro "Michael" Moro*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No. 23-10063 (SHL) |
| Debtors. | (Jointly Administered) |

## MOTION FOR ENTRY OF AN ORDER MODIFYING THE AUTOMATIC STAY, TO THE EXTENT APPLICABLE, TO ALLOW FOR ADVANCEMENTS AND PAYMENTS UNDER D&O INSURANCE POLICY

Soichiro "Michael" Moro (the "Insured") moves (the "Motion") this Court for entry of an order, substantially in the form attached to this Motion as Exhibit A, pursuant to section 362 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"), modifying the automatic stay, to the extent applicable, to allow the Insured to enforce his rights

---

[1] The Debtors in these Chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

and demand and receive proceeds payable under the D&O Policy[2] and authorize AXIS Insurance Company (the "Insurer") to advance such proceeds to the Insured for his defense costs.  In support of the Motion, the Insured respectfully states as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the Southern District of New York dated January 31, 2012 (Preska, C.J.).

2.      The Insured confirms his consent to this Court entering a final order in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

3.      Venue of these Chapter 11 Cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief requested herein are Bankruptcy Code section 362, Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-1.

## PROCEDURAL BACKGROUND

5.      On January 19, 2023 (the "Petition Date"), Genesis Global Holdco, LLC ("Genesis Holdco"), Genesis Global Capital, LLC ("Genesis Capital"), and Genesis Asia Pacific Pte. Ltd. ("Genesis Pacific," together with Genesis Holdco and Genesis Capital, the "Debtors") each filed a voluntary petition for relief in this Court under Chapter 11 of the Bankruptcy Code.  The Debtors

---

[2]  The D&O Policy means the AXIS Management & Entity Liability Insurance Policy AXIS 1011101 0618, Policy Number P-001-000658817-02, issued by AXIS Insurance Company.  The D&O Policy is attached to this Motion as Exhibit B.

continue to operate their businesses and manage their properties as debtors in possession under sections 1107(a) and 1108 of the Bankruptcy Code.

6.      No trustee or examiner has been appointed in these Chapter 11 Cases.  These Chapter 11 Cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the Court's *Order Directing Joint Administration of Related Chapter 11 Cases*, entered on January 26, 2023 [ECF No. 37].  An official committee of unsecured creditors (the "Committee") was appointed on February 3, 2023 [ECF No. 55].

## FACTUAL BACKGROUND[3]

7.      Genesis Global Trading, Inc. ("GGT") was the first "Genesis" entity and has traded digital assets since 2013.  Genesis Holdco is a sister company of GGT and 100% owned by Digital Currency Group, Inc.  Since their inception, Genesis Holdco (together with the other Debtors and Genesis Holdco's Non-Debtor Subsidiaries,[4] the "Company") and its non-debtor affiliate GGT have grown into a number of entities that handle different aspects of the digital asset services offered.  The Company's and GGT's operations are divided into four categories: (i) the trading service, which facilitates spot trading in digital assets; (ii) the lending and borrowing service, whereby the Company lends and borrows digital assets in consideration for the payment of interest; (iii) the derivatives service, which allows customers to enter into a variety of derivatives on digital asset underliers; and (iv) the custodial service, which permits customers to securely store digital assets.

---

[3] The factual background recited in paragraphs 7 through and including 9 is stated upon information and belief.

[4] The Non-Debtor Subsidiaries include, without limitation: Genesis UK Holdco Limited, Genesis Global Assets, LLC, Genesis Asia (Hong Kong) Limited, Genesis Bermuda Holdco Limited, Genesis Custody Limited, GGC International Limited, GGA International Limited, Genesis Global Markets Limited, GSB 2022 II LLC, GSB 2022 III LLC and GSB 2022 I LLC.

8.     In the months leading up to the Petition Date, the digital asset industry experienced tremendous dislocation.  In particular, in May 2022, LUNA ("Luna") and TerraUSD ("UST") collapsed, causing widespread market turmoil.  Shortly thereafter, the digital asset hedge fund Three Arrows Capital Ltd. ("3AC") commenced liquidation proceedings.  The collapse of Luna and UST and subsequent liquidation of 3AC signaled the onset of a new "crypto winter" and a growing industry-wide reluctance to do business with digital asset companies.

9.     As market conditions worsened, other companies faced financial difficulties.  In July 2022, Celsius Network LLC and certain affiliates and Voyager Digital Holdings, Inc. and certain affiliates filed for bankruptcy.  Most recently, FTX Trading Ltd. ("FTX"), Alameda Research Ltd. ("Alameda") and certain affiliates (together with FTX and Alameda, the "FTX Entities") filed for Chapter 11 bankruptcy on November 11, 2022.  These drastic market shifts decreased investor confidence in the digital asset markets in which the Company operates and severely and adversely impacted the Company's business.  As the FTX Entities' situation unfolded, the Company experienced unprecedented withdrawals, which impacted the Debtors' available liquidity and, along with other factors, led to the commencement of these Chapter 11 Cases.

10.     The Insured served as Genesis Capital's Chief Executive Officer during the period February 2018 through and including August 2022; GGT's Chief Executive Officer during the period March 2016 through and including August 2022; and GGT's Chief Operating Officer during the period April 2015 through and including March 2016.

## CIVIL CASES AND INVESTIGATIONS

11.     The Insured, as a result of his roles with the Company, has to date incurred several hundred thousand dollars in defense costs in connection with pending lawsuits, investigations, and

disputes, and likely will incur additional defense costs for similar matters which may arise in the future (collectively, the "Civil Cases and Investigations").

12.     For example, on January 12, 2023, the U.S. Securities and Exchange Commission (the "SEC") filed a complaint (the "Complaint") against Genesis Capital and Gemini Trust Company, LLC ("Gemini") in the District Court for the Southern District of New York.  The Complaint alleges, among other things, that between February 2021 and November 2022, Genesis Capital and Gemini engaged in an unregistered offer and sale of securities to U.S. retail investors, in violation of the federal securities laws.

13.     The Complaint further alleges that through an investment opportunity termed the "Gemini Earn" program, investors tendered crypto assets to Genesis Capital (with Gemini acting as the agent) in exchange for future interest payments.  Genesis Capital then pooled the crypto assets from Gemini Earn investors with assets from other investors and deployed the crypto assets—primarily by lending the crypto assets to institutional counterparties—in order to generate revenue for its business, including the revenue necessary to pay interest to Gemini Earn investors. Genesis Capital allegedly earned revenue by lending the crypto assets at a higher rate than it paid to Gemini Earn and other investors and Gemini earned revenue by deducting an "agent fee" from interest payments made to Gemini Earn investors.

14.     In addition, the Company's advisors have requested documents and other information from the Insured.  The Insured and his counsel have cooperated in good faith with those requests.  The Company's advisors have also requested the opportunity to undertake a formal interview of the Insured for the purpose of obtaining information concerning, among other things, the Company's business dealings with 3AC in previous years.   The Insured is amenable to

cooperating with the Company provided that he is represented by counsel at the interview and such costs are reimbursed.

15.     The Insured has incurred and will likely incur additional **Defense Costs**[5] in connection with the Complaint and other related matters now and in the near future. Pursuant to the terms of the D&O Policy, the Insured is entitled to be reimbursed for **Defense Costs** already expended and for any future **Defense Costs** expended in connection with any Civil Cases and Investigations.

## THE D&O POLICY

16.     Prior to the Petition Date, Axis issued the D&O Policy for the period June 28, 2022 to June 28, 2023.  Subject to all of its terms and conditions, the D&O Policy potentially affords coverage up to a maximum aggregate limit of liability of $2.5 million, inclusive of **Defense Costs**.[6]

17.     The D&O Policy contains three insuring agreements. First, Insuring Agreement A or Side-A (Directors & Officers Liability Coverage) provides coverage for **Loss**[7] incurred by an

---

[5] Words appearing in bold shall have the meanings ascribed to such terms in the D&O Policy.

[6] The D&O Policy defines **Defense Costs** to mean: "reasonable expenses incurred by the **Insureds** in investigating, opposing, defending, settling, or appealing covered **Claims**, including attorney and expert fees, **Event Study Costs**, court costs, alternative dispute resolution proceeding costs, the cost of appeal or release attachment bonds for amounts within the applicable Limit of Insurance, but the Insurer does not have to furnish these bonds, and expenses incurred by the **Insured Individual** at the Insurer's request, excluding normal operating costs of the **Insured Entity**, loss of earnings, salaries, benefits, and other compensation paid to any **Insured**."

[7] The D&O Policy defines **Loss** to mean: "1. monetary judgments, awards, or settlements, including attorney's fees, costs, exemplary, multiplied, or punitive damages, pre-judgment interest, and post-judgment interest included as part of a covered judgment or award, and **Defense Costs**; 2. fines or penalties, insurable under the law applicable to this Policy, imposed on the **Insured** for any unintentional and non-willful violation of law, including such penalties imposed under 15 U.S.C. §§ 78dd-2(g)(2)(B) or 78ff(c)(2)(B) of the Foreign Corrupt Practices Act or Section 11(1)(a) of Chapter 23 of the U.K. Bribery Act 2010; and 3. solely with respect to the **Directors & Officers Liability Coverage**, taxes for which the **Insured Individuals** are legally obligated to pay solely by reason of the **Financial Impairment** of the **Insured Entity**."

**Insured Individual**[8] for **Claims**[9] made against them for a **Wrongful Act**[10] if such **Loss** is not indemnified by the **Insured Entity**.[11]  Second, Insuring Agreement B or Side-B (Insured Entity Indemnification Coverage) provides coverage to the **Insured Entity** to the extent  it indemnifies an **Insured Individual** for covered **Loss** in connection with **Claims** made against the **Insured Individual** for a **Wrongful Act**. Third, Insuring Agreement C or Side-C (Insured Entity Liability Coverage) provides coverage to the **Insured Entity** for **Loss** resulting from **Securities Claims** made against it for a **Wrongful Act**.

18.    Thus, Side-A provides coverage to the Insured for, among other things, the reimbursement of his **Defense Costs** in connection with any Civil Cases and Investigations.  More specifically, the Insured is an **Insured Individual** under the D&O Policy, and is entitled to

---

[8] The D&O Policy defines **Insured Individual** to mean: "any natural person who was or is: 1. a duly elected or appointed director (including a de facto or shadow director), officer, or trustee (other than a bankruptcy or insolvency trustee) of an **Insured Entity** that is a corporation; a manager or managing member of an **Insured Entity** that is a limited liability company; or a general partner or managing partner of an **Insured Entity** that is a partnership or joint venture; 2. the in-house general counsel, comptroller, risk manager, head of investor relations, or head of human resources of the **Insured Entity**, or a member of any duly constituted advisory board or committee of the **Insured Entity**; 3. an employee of the **Insured Entity** who is named as a defendant in a **Securities Claim**, or in any other **Claim** brought and maintained against both the employee and an **Insured Individual**, as defined in item 1 or 2 above; or 4. the functional equivalents of any of the foregoing."

[9] The D&O Policy defines **Claim** to mean: "1. with respect to the **Directors & Officers Liability Coverage** and the **Insured Entity Indemnification Coverage**: a. a written demand for monetary relief or non monetary or injunctive relief, including a written request to toll or waive a statute of limitations or engage in any alternative dispute resolution process; b. a civil, criminal, administrative or regulatory, or arbitration proceeding or any appeal therefrom; c. a subpoena, written order of investigation, or written notice of charges by a **Government Authority**, including a Wells Notice or similar target letter, identifying the **Insured Individual** as a person against whom a civil, criminal, or administrative or regulatory proceeding may be commenced; or d. a request for the extradition of the **Insured Individual** or the arrest or confinement of the **Insured Individual** by a **Government Authority**; or 2. with respect to the **Insured Entity Liability Coverage**, only a **Securities Claim**; provided, however, that **Claim** does not mean any routine or compliance audit by a **Government Authority**.

[10] The D&O Policy defines **Wrongful Acts** to mean: "1. any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by: a. the **Insured Individual** in his or her capacity as such or in an **Outside Position** or b. the **Insured Entity**, with respect to the **Insured Entity Liability Coverage**; or 2. any matter claimed against the **Insured Individual** solely by reason of his or her status as such or in an **Outside Position**."

[11] The D&O Policy defines **Insured Entity** to mean, "individually and collectively, the **Named Insured** [Genesis Holdco] or any **Subsidiary** . . . ."

coverage for **Loss**, which includes, without limitation, his **Defense Costs**, for **Claims** made against

him for **Wrongful Acts**.

19.    The D&O Policy contains a priority of payment provision (the "Payment

Provision"), which states that the coverage potentially afforded to an **Insured Individual** under

Side-A must be paid prior to the payment of any **Loss** on behalf of the Debtors under Sides-B and

-C for amounts they might pay as indemnification to the **Insured Individuals** for **Claims** made

against them for **Wrongful Acts**.  Specifically, the D&O Policy provides: "[t]he Insurer will be

entitled to pay **Loss** and other covered amounts as they become due and payable under this Policy

without consideration of other future payment obligations. However, if **Loss** exceeds the

remaining applicable Limit of Insurance, the Insurer will first pay **Loss** covered under the

**Directors and Officers Liability Coverage** before paying any other covered amounts under this

Policy."  D&O Policy § "Payments" at 13-14.

## RELIEF REQUESTED

20.    By this Motion, the Insured seeks entry of an order modifying the automatic stay,

to the extent applicable, to allow the Insured to enforce his rights and demand and receive proceeds

payable under the D&O Policy and authorize the Insurer to advance such proceeds to the Insured

for his defense costs.

## ARGUMENT

21.    It is not clear whether the automatic stay applies to a request by the Insured to be

reimbursed by the Insurer or to the Insurer's payment of proceeds to the Insured.  As discussed

below, courts are divided on that question.  Out of an abundance of caution, the Insured accordingly requests relief from the stay, to the extent it applies, for cause as described below. [12]

22.     Section 362(a)(3) stays "any act to obtain possession of property of the estate . . . or to exercise control over property of the estate."  11 U.S.C. § 362(a)(3).  Thus, for Section 362(a)(3) to apply, the asset in question must be property of the debtor's estate.  *See* 11 U.S.C. § 541(a) (defining property of the estate to include, among other things, "all legal or equitable interests of the debtor in property as of the commencement of the case.").

23.     Generally, a debtor's liability insurance policy is property of the bankruptcy estate. *See In re MF Global Holdings Ltd*., 469 B.R. 177, 190 (Bankr. S.D.N.Y. 2012).  Courts disagree though "'over whether the proceeds of a liability insurance policy are property of the estate.'" *Id.* (quoting *In re Downey Fin. Corp*., 428 B.R. 595, 603 (Bankr. D. Del. 2010)).  "Courts that have addressed whether the proceeds of a liability insurance policy are property of the estate are guided by the language and scope of the specific policies at issue."  *In re MF Global Holdings*, 469 B.R. at 190 (citing *Downey*, 428 B.R. at 603; *In re Medex Reg'l Labs., LLC*, 314 B.R. 716, 720 (Bankr. E.D. Tenn. 2004) ("In making its determination, the court must analyze the facts of each particular case, focusing primarily upon the terms of the actual policy itself.") (internal quotation marks omitted); *In re CyberMedica, Inc.*, 280 B.R. 12, 16 (Bankr. D. Mass. 2002) ("Whether the proceeds of a D & O liability insurance policy is [sic] property of the estate must be analyzed in light of the facts of each case.")).

24.     "[W]hen an insurance policy only provides direct coverage to a debtor, courts generally rule that the proceeds are property of the estate."  *MF Global Holdings*, 469 B.R. at 190

---

[12] Prior to filing this Motion, the Insured conferred with Debtors' counsel to reach a consensual stipulation regarding the Insured's access to and use of proceeds from the D&O Policy for his **Defense Costs**.  After conferring with the Committee, the Debtors were unwilling to stipulate to that relief.

(citing *In re Allied Digital Techs. Corp.*, 306 B.R. 505, 512 (Bankr. D. Del. 2004)). But when a policy covers the directors and officers exclusively, "courts have generally held that the proceeds are not property of the estate." *MF Global Holdings*, 469 B.R. at 190 (citing *Allied Digital*, 306 B.R. at 510; *see La. World Exposition, Inc. v. Fed. Ins. Co., (In re La. World Exposition, Inc.)*, 832 F.2d 1391, 1399 (5th Cir.1987) (holding that the debtor has no ownership interest in proceeds of an insurance policy where the obligation of the insurance company is only to the directors and officers); *In re Daisy Sys. Sec. Litig.*, 132 B.R. 752, 755 (N.D. Cal. 1991) (finding that when a D & O insurance policy only provides direct coverage to the directors and officers the proceeds are not property of the estate)).

25.     The D&O Policy here provide direct coverage to both the Insured and the Debtors. In these instances, "courts have held that 'the proceeds will be property of the estate if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution.'" *MF Global Holdings*, 469 B.R. at 190–91 (quoting *Downey*, 428 B.R. at 603).

26.     Section 362(d)(1) provides that the Court may grant relief from the automatic stay on request from a party in interest "for cause." 11 U.S.C. § 362(d).  Whether "cause" exists for purposes of this section is determined on a case-by-case basis and is left to the court's discretion. *See In re Adelphia Commc'ns Corp.*, 285 B.R. 580, 593 (Bankr. S.D.N.Y. 2002), v*acated and remanded on other grounds*, 298 B.R. 49 (S.D.N.Y. 2003).  Among other things, courts should consider the relative harms to interested parties if the stay is not lifted.  *See Adelphia*, 285 B.R. at 594 (considering multiple factors, including the impact of the stay on the parties and the balance of harms).

27.    Courts in this Circuit and other jurisdictions have permitted the advancement of defense costs to a debtor's directors or officers even though the insurance policies provided direct coverage to the debtor.  *See, e.g.*, *MF Global Holdings*, 469 B.R. at 191 ("cause exists to the lift the automatic stay to permit advancement or reimbursement of the Individual Insureds' defense costs pursuant to the Policies."); *Adelphia*, 285 B.R. at 598 (granting relief from stay in order to permit primary insurer to advance defense costs).[13]  The District Court for the Southern District of New York has also held that where insurance proceeds are available to both a debtor and individual insureds, "the individual insureds have a right to use the policies' proceeds to cover their defense and settlement costs in litigation." *In re Global Crossing Sec. & ERISA Litig.*, 225 F.R.D. 436, 463 (S.D.N.Y. 2004).  Indeed, as Judge Gerber explained in *In re Adelphia*, "bankruptcy courts should be wary of impairing the contractual rights of directors and officers even in cases where the policies provide entity coverage." 285 B.R. at 598.

28.    Here,  "cause" exists in not less than four (4) respects for granting relief from the stay to permit the Insurer to advance and pay **Defense Costs** to or on behalf of the Insured under the D&O Policy.  First, the Insured is contractually entitled to coverage of his defense costs under the D&O Policy.  Second, he and other directors and officers relied on that coverage in the D&O Policy in electing to serve as officers and directors of certain of the Debtors and other non-Debtor subsidiaries and affiliates.  To deny the Insured access to the very same policy he relied upon in electing to serve would be inequitable.

---

[13] *See also In re Nat'l Fish & Seafood, Inc.*, Case No. 19-11824-FJB, ECF No. 155 (Bankr. D. Mass. Feb. 26, 2021) (lifting the stay for cause to permit directors and officers to receive proceeds from their A-side coverage for attorneys' fees); *In re Downey Fin. Corp.*, 428 B.R. at 603 (granting relief from stay for cause in order to permit use of D & O policy proceeds for payment of defense costs); *In re Enron Corp.*, No. 01–16034, 2002 WL 1008240 (Bankr. S.D.N.Y. May 17, 2002) (granting relief from stay, to the extent applicable, for payment of defense costs); *In re CyberMedica, Inc.*, 280 B.R. at 18–19 (granting relief from stay for cause because directors and officers would suffer irreparable harm if prevented from exercising their rights to defense payments under D & O policy).

29.    Third, given the Civil Cases and Investigations, the Insured has a real need for the coverage right now and has and would continue to suffer material monetary harm—out of pocket attorneys' fees and costs—if he were denied access to proceeds of the D&O Policy to cover his defense costs.

30.    Finally, the Insured's Side-A coverage in the D&O Policy includes the rights contained in the Payment Provision, which specifies that when covered claims exceed the limit of coverage, payment of Side-A coverage takes precedence over any right of payment for Side-B or Side-C coverage.  Thus, continuation of the stay would not protect the estates' right to coverage under the D&O Policy and would only delay the distribution of Side-A coverage that would in any event have priority over the estates' rights to coverage.  Indeed, "D&O policies are obtained for the protection of individual directors and officers. . . . In essence and at its core, a D&O policy remains a safeguard of officer and director interests and not a vehicle for corporate protection." *Ochs v. Lipson (In re First Central Fin. Corp.)*, 238 B.R. 9, 16 (Bankr. E.D.N.Y. 1999), *aff'd in an unreported decision*, No. 99-CV-6730 (TCP), 2000 U.S. Dist. LEXIS 22005 (E.D.N.Y. Mar. 2, 2000); *see In re Nat'l Fish & Seafood, Inc.*, Case No. 19-11824-FJB, ECF No. 155, 7-8 (Bankr. D. Mass. Feb. 26, 2021) ("As the Movants' have need of their A-side coverage now and in any event enjoy contractual priority over B- and C- side coverage, regardless of timing, the Trustee's concern for protection of potential B- and C-side Coverage is not a basis for denying the relief the Movants seek."); *MF Global Holding*, 469 B.R. at 192 ("the Specialty Policies provide coverage to the Individual Insureds who have a present need for payment of their defense costs.  At this time, the Individual Insureds' need far outweighs the Debtors' hypothetical or speculative need for coverage.").

31.    Based on the foregoing, "cause" under 11 U.S.C. § 362(d) exists to warrant relief from the stay to allow the Insured to enforce his rights and demand and receive proceeds payable under the D&O Policy and authorize the Insurer to advance such proceeds to the Insured for the Insured's **Defense Costs**.

## RESERVATION OF RIGHTS

32.    Prior to the Petition Date, and in addition to the D&O Policy, Genesis Holdco purchased the following insurance policies: (i) AXIS Bankers Professional Liability Insurance Policy AXIS 1011801 0818, Policy Number P-001-000658826-02 (the "E&O Policy"), issued by Insurer; (iii) Excess Bankers Professional Liability, Lender Liability, Securities Broker/Dealer Services, Directors & Officers Liability, Insured Entity Indemnification, and Insured Entity Liability Insurance, Unique Market Reference Number B0146ERUSA2201352 (the "First Excess Policy"), issued by Paragon International Insurance Brokers Ltd.; (iv) Starr Secure Excess Liability Policy, Policy Number 1000624040221 (the "Second Excess Policy"), issued by Starr Indemnity & Liability Company; and (v) Excess Bankers Professional Liability, Lender Liability, Securities Broker/Dealer Services, Directors & Officers Liability, Insured Entity Indemnification, and Insured Entity Liability Insurance, Unique Market Reference Number B0146ERUSA2201455 (the "Third Excess Policy," and together with the First Excess Policy and the Second Excess Policy, the "Excess Policies").  The Insured does not seek to enforce his rights and demand and receive proceeds payable under the E&O Policy and Excess Policies in this Motion, but reserves his right to do so at a later date should the need arise.

## NOTICE

33.    In accordance with paragraph eight (8) of the Court's *Order Implementing Certain Notice and Case Management Procedures* [ECF No. 44] (the "Case Management Order"),

Bankruptcy Rule 2002, and Local Bankruptcy Rule 2002-1, the following parties shall be served with the Motion and exhibits thereto by email (except where otherwise indicated): (a) the Chambers of the Honorable Sean H. Lane, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004 (via U.S. Mail); (b) the Debtors, c/o Genesis Global Holdco, LLC, 250 Park Avenue South, 5th Floor, New York, NY 10003 (Attn: Arianna Pretto-Sakmann); (c) Cleary Gottlieb Steen & Hamilton LLP, 1 Liberty Plaza, New York, NY 10006 (Attn: Sean A. O'Neal and Jane Van), counsel for the Debtors; (d) William K. Harrington, U.S. Department of Justice, Office of the U.S. Trustee, Alexander Hamilton U.S. Custom House, One Bowling Green, Suite 515, New York, NY 10004 (Attn: Greg Zipes); (e)White & Case LLP, 1221 Avenue of the Americas, New York, NY 10020 (Attn: J. Christopher Shore), counsel for the Committee; (f) Axis Insurance Company, 10000 Avalon Blvd., Suite 200, Alpharetta, GA 30009; (g) Paragon International Insurance Brokers Ltd., 140, Leadenhall Street, London, United Kingdom, EC3V 4QT (via FedEx); (h) Starr Indemnity & Liability Company, 399 Park Avenue, 8th Floor, New York, NY 10022 (Attn: Financial Lines Department) (via U.S. Mail); and (i) all other parties that have appeared in these Chapter 11 Cases and must be served pursuant to the Case Management Order (via U.S. Mail where no email address has been provided).

## NO PRIOR REQUEST

34.     No prior request for the relief requested herein has been made to this or any other Court.


[*Remainder of the Page Intentionally Left Blank*]

## CONCLUSION

WHEREFORE, for the reasons set forth in this Motion, the Insured respectfully requests

that this Court (a) enter an order, substantially in the form attached hereto as Exhibit A and

(b) grant such other and further relief as is just and proper.

Dated: March 27, 2023
      New York, New York

                     ARNOLD & PORTER KAYE SCHOLER LLP

                     */s/ Benjamin Mintz*
                     Benjamin Mintz
                     Marcus Asner
                     Justin Imperato
                     ARNOLD & PORTER KAYE SCHOLER LLP
                     250 West 55th Street
                     New York,  New York 10019
                     Tel: (212) 836-8000
                     Facsimile: (212) 836-8689
                     Email: benjamin.mintz@arnoldporter.com
                     Email: marcus.asner@arnoldporter.com
                     Email: justin.imperato@arnoldporter.com

<u>Exhibit A</u>

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No. 23-10063 (SHL) |
| Debtors. | (Jointly Administered) |

### ORDER GRANTING MOTION FOR ENTRY OF AN ORDER MODIFYING THE AUTOMATIC STAY, TO THE EXTENT APPLICABLE, TO ALLOW FOR ADVANCEMENTS AND PAYMENTS UNDER D&O INSURANCE POLICY

Upon the motion (the "Motion")[2] of the Insured for entry of an order pursuant to section 362 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and rule 4001-1 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Bankruptcy Rules"), modifying the automatic stay, to the extent applicable, to allow the Insured to enforce his rights and demand and receive proceeds payable under the D&O Policy and authorize the Insurer to advance such proceeds to the Insured; and the Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and due and sufficient notice of the Motion having been given; and it appearing that no other or further notice need be provided; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby:

---

[1] The Debtors in these Chapter 11 cases and the last four digits of each Debtor's taxpayer identification number are as follows: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

[2] Capitalized terms used but not otherwise defined in this Order shall have the meanings given to those terms in the Motion.

**ORDERED, ADJUDGED, AND DECREED that:**

1.      The Motion is GRANTED as set forth herein.

2.      To the extent applicable, the automatic stay imposed by 11 U.S.C. § 362(a) is hereby modified to the extent necessary to allow the Insured to enforce his rights and demand and receive proceeds payable under the D&O Policy and authorize the Insurer to advance such proceeds to the Insured for his defense costs incurred in connection with pending lawsuits, investigations, and disputes, as well as any additional matters that may arise in the future.

3.      Nothing herein shall constitute a finding by the Court that the proceeds of the D&O Policy is or is not property of the Debtors' estates, and the Court makes no finding as to the applicability of the automatic stay imposed by 11 U.S.C. § 362(a) to the D&O Policy's proceeds.

4.      Upon the advancement and/or payment of any defense costs pursuant to the D&O Policy, but no more frequently than on a three month basis beginning one month following entry of this Order, the Insurer shall provide written notice to (a) counsel to the Debtors and (b) counsel to the Committee reporting (i) the total amount that has been advanced or paid by the Insurer under the D&O Policy during that reporting period; and (ii) the total amount advanced or paid to date under the D&O Policy. No further disclosure relating to advances or payments under the D&O Policy shall be required without further order of the Court, with respect to which all parties reserve their rights.

5.      Nothing in this Order shall constitute (1) a waiver, modification or limitation of the Debtors', the Insurer's, or the Insured's reservation of all of their rights, remedies and defenses under the D&O Policy or applicable law, (2) a waiver, modification or limitation of any of the terms or conditions of the D&O Policy or (3) a finding that such sums are due and owing,

or in what amount, under the D&O Policy.

6.      Nothing contained in the Motion or this Order shall constitute a waiver of the Insured's rights to demand and receive proceeds payable under the E&O Policy and Excess Policies and such rights are expressly reserved.

7.      The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

8.      This Order is immediately valid and fully effected upon its entry and the 14 day stay pursuant to Fed. R. Bankr. Proc. 4001(a) is hereby waived.

Dated: April __, 2023
       New York, NY

_____
Honorable Sean H. Lane

Exhibit B

D&O Policy

AXIS MANAGEMENT & ENTITY LIABILITY

**STATE FRAUD STATEMENT**

**NEW YORK**

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

AXIS MANAGEMENT & ENTITY LIABILITY

**POLICYHOLDER NOTICE**

**ECONOMIC AND TRADE SANCTIONS**

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by the Office of Foreign Assets Control (OFAC).

**THE OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") OF THE US DEPARTMENT OF THE TREASURY ADMINISTERS AND ENFORCES ECONOMIC AND TRADE SANCTIONS BASED ON US FOREIGN POLICY AND NATIONAL SECURITY GOALS AGAINST TARGETED FOREIGN COUNTRIES AND REGIMES, TERRORISTS, INTERNATIONAL NARCOTICS TRAFFICKERS, THOSE ENGAGED IN ACTIVITIES RELATED TO THE PROLIFERATION OF WEAPONS OF MASS DESTRUCTION, AND OTHER THREATS TO THE NATIONAL SECURITY, FOREIGN POLICY OR ECONOMY OF THE UNITED STATES.**

**WHENEVER COVERAGE PROVIDED BY THIS POLICY WOULD BE IN VIOLATION OF ANY U.S. ECONOMIC OR TRADE SANCTIONS, SUCH COVERAGE SHALL BE NULL AND VOID.**

**FOR MORE INFORMATION, PLEASE REFER TO:**

***HTTPS://WWW.TREASURY.GOV/RESOURCE-CENTER/SANCTIONS/PAGES/DEFAULT.ASPX***



**POLICYHOLDER DISCLOSURE**

**NOTICE OF TERRORISM INSURANCE COVERAGE**

The Terrorism Risk Insurance Act established a program (Terrorism Risk Insurance Program) within the Department of the Treasury, under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks.  You are hereby notified that an "act of terrorism", as defined in Section 102(1) of the Terrorism Risk Insurance Act , as amended  (the "Act"), means any act that is certified by the Secretary of the Treasury—in consultation with the Secretary of Homeland Security, and the Attorney General of the United States—to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; and to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from certified acts of terrorism may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act, as amended. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

Please note that your policy includes the terrorism coverage required to be offered by the Act, and that no separate additional premium charge has been made for such terrorism coverage.  The policy premium does not include any charges for the portion of losses covered by the United States government under the Act.

**NOTICE TO BROKER**

**MANDATORY POLICYHOLDER DISCLOSURE**

**RE: TERRORISM INSURANCE COVERAGE**

We are required by the Terrorism Risk Insurance Act, as amended (the "Act"), to provide policyholders with clear and conspicuous disclosures. This notice must be provided at the time of offer and renewal of the policy.

*Includes copyrighted material 2015 National Association of Insurance Commissioners*

 AXIS MANAGEMENT & ENTITY LIABILITY

**DECLARATIONS**

NOTICE: THESE POLICY FORMS AND THE APPLICABLE RATES ARE EXEMPT FROM THE FILING REQUIREMENTS OF THE NEW YORK STATE INSURANCE DEPARTMENT. HOWEVER, SUCH FORMS AND RATES MUST MEET THE MINIMUM STANDARDS OF THE NEW YORK INSURANCE LAW AND REGULATIONS.

THE LIMITS OF INSURANCE UNDER THIS POLICY MAY BE COMPLETELY EXHAUSTED BY LEGAL DEFENSE COSTS. THE INSURER SHALL NOT BE LIABLE FOR LEGAL DEFENSE COSTS, JUDGMENTS, SETTLEMENTS, OR ANY OTHER AMOUNTS AFTER EXHAUSTION OF THE APPLICABLE LIMIT OF INSURANCE.

SOLELY AS RESPECTS THE CLAIMS-MADE LIABILITY COVERAGES UNDER THIS POLICY:

THIS POLICY:

1.  IS WRITTEN ON A CLAIMS-MADE BASIS;

2.  PROVIDES NO COVERAGE FOR CLAIMS ARISING OUT OF INCIDENTS, OCCURRENCES OR ALLEGED WRONGFUL ACTS WHICH TOOK PLACE PRIOR TO THE RETROACTIVE DATE, IF ANY, STATED IN THE POLICY; AND

3.  COVERS ONLY CLAIMS ACTUALLY MADE AGAINST THE INSURED WHILE THE POLICY REMAINS IN EFFECT (OR INCIDENTS REPORTED IF THE INSURER UTILIZES WRITTEN NOTICE OF INCIDENT AS THE TRIGGER OF COVERAGE UNDER THE POLICY) AND ALL COVERAGE UNDER THE POLICY CEASES UPON THE TERMINATION OF THE POLICY, EXCEPT FOR ANY AUTOMATIC EXTENDED REPORTING PERIOD COVERAGE, UNLESS THE INSURED PURCHASES ADDITIONAL EXTENDED REPORTING PERIOD COVERAGE.

UPON TERMINATION OF COVERAGE FOR ANY REASON, AN AUTOMATIC EXTENDED REPORTING PERIOD OF AT LEAST 60 DAYS WILL BE GRANTED AT NO ADDITIONAL CHARGE. THE NAMED INSURED WILL BE ABLE TO PURCHASE AN OPTIONAL EXTENDED REPORTING PERIOD STATED IN THE POLICY UNLESS, DURING THE FIRST YEAR OF COVERAGE, THIS POLICY IS TERMINATED FOR NON-PAYMENT OF PREMIUM. TO AVOID A GAP IN COVERAGE AFTER THE EXPIRATION OF THE OPTIONAL EXTENDED REPORTING PERIOD, THE RETROACTIVE DATE IN ANY REPLACEMENT POLICY SHOULD EXTEND AT LEAST AS FAR BACK AS ANY RETROACTIVE DATE IN THIS POLICY.

DURING THE FIRST SEVERAL YEARS OF THE CLAIMS-MADE RELATIONSHIP, CLAIMS-MADE RATES ARE COMPARATIVELY LOWER THAN OCCURRENCE RATES, AND INSUREDS CAN EXPECT SUBSTANTIAL ANNUAL PREMIUM INCREASES, INDEPENDENT OF OVERALL RATE LEVEL INCREASES, UNTIL THE CLAIMS-MADE RELATIONSHIP REACHES MATURITY.

| NAMED INSURED AND ADDRESS | Genesis Global Holdco, LLC<br>250 Park Ave S<br>New York, NY 10003 |
|---|---|
| BROKER OF RECORD | Woodruff-Sawyer & Co [San Francisco]<br>50 California Street, 12th Floor<br>San Francisco, CA 94111 |

Class Code: 2-14177



AXIS MANAGEMENT & ENTITY LIABILITY

| | |
|---|---|
| **INSURER** | AXIS Insurance Company (Admitted)<br><br>111 South Wacker Drive, Suite 3500<br>Chicago, IL 60606<br>(866) 259-5435<br><br>***A Stock Insurer*** |
| **POLICY FORM** | AXIS MANAGEMENT & ENTITY LIABILITY INSURANCE POLICY AXIS 1011101 0618 |
| **POLICY NUMBER** | P-001-000658817-02<br>*Renewal of: P-001-000658817-01* |
| **POLICY PERIOD** | Effective Date: 06/28/2022<br>Expiration Date: 06/28/2023<br>*Both dates at 12:01 a.m. at the Named Insured's address stated herein.* |

| | |
|---|---|
| **TOTAL POLICY PREMIUM** | **$153,300.00** |
| **MINIMUM EARNED PREMIUM**<br>***(percentage of Total Policy Premium)*** | N/A |

| | |
|---|---|
| **TERRORISM PREMIUM**<br>**FOR CERTIFIED ACTS OF TERRORISM**<br>***(included in Total Policy Premium)*** | Included for no additional premium |
| **SURCHARGE / TAX**<br>***(included in Total Policy Premium)*** | N/A |

***All Limits of Insurance below are aggregate amounts for the respective coverages unless otherwise noted.***

| POLICY LIMIT OF INSURANCE | |
|---|---|
| **Policy Limit**<br>***(applicable to all coverages unless otherwise noted)*** | **$2,500,000**<br>**Aggregate** |

Class Code: 2-14177

AXIS MANAGEMENT & ENTITY LIABILITY

| Claims-Made Coverages | Pending or Prior Date | Coverage Limit | Coverage Retention |
|---|---|---|---|
| Directors & Officers Liability | 06/28/2021 | $2,500,000 | |
| Insured Entity Indemnification | 06/28/2021 | $2,500,000 | $1,000,000 Each Claim other than a Securities Claim<br><br>$1,000,000 Each Securities Claim |
| Insured Entity Liability | 06/28/2021 | $2,500,000 | $1,000,000 Each Securities Claim |
| If the Insured Entity is subject to the Business Corporation Law or Banking Law and its assets (in millions) are: | Retention for Non-Indemnifiable Loss per Insured Individual for each Claim | Aggregate Retention for Non-Indemnifiable Loss for all Insured Individuals for each Claim | Coinsurance of Non-Indemnifiable Loss per Insured Individual |
| Greater than $20 | $5,000 | $50,000 | .5% |
| Greater than $10 up to $20 | $4,000 | $40,000 | .4% |
| Greater than $5 up to $10 | $3,000 | $30,000 | .3% |
| Less than or equal to $5 | $2,000 | $20,000 | .2% |
| Expense Coverages | Pending or Prior Date | Coverage Limit | Coverage Retention |
| Claw Back Expense | 06/28/2021 | $2,500,000 | $1,000,000 Each Claw Back Event |
| Insured Inquiry Expense | 06/28/2021 | $2,500,000 | $1,000,000 Each Insured Inquiry Event |
| Securityholder Demand Expense | 06/28/2021 | $250,000 | $0 Each Securityholder Demand Event |

Class Code: 2-14177



AXIS MANAGEMENT & ENTITY LIABILITY

| EXTENDED REPORTING PERIOD OPTIONS *(applicable to claims made coverages)* | |
|---|---|
| Year | Percentage of Annualized Claims Made Premium |
| 1 Year | 150% |

| NOTICES TO INSURER | |
|---|---|
| *Send Notice of Claims To:* | *Send All Other Notices And Inquiries To:* |
| AXIS Insurance<br>Claims Department<br>P.O. Box 4470<br>Alpharetta, GA 30023-4470<br><br>Email: USFNOL@axiscapital.com<br>Phone (Toll-Free): (866) 259-5435<br>Phone: (678) 746- 9000<br>Fax: (866) 770-5629 | AXIS Insurance<br>10000 Avalon Blvd.<br>Suite 200<br>Alpharetta, GA 30009<br><br>Email: notices@axiscapital.com<br>Phone (Toll-Free): (866) 259-5435<br>Phone: (678) 746- 9000<br>Fax: (678) 746-9444 |

Class Code: 2-14177

**AXIS**

| SCHEDULE OF FORMS & ENDORSEMENTS | |
|---|---|
| **Policyholder Notices and Policy Forms** | **Form Number and Edition Date** |
| State Fraud Statement | AXIS 104 0415 |
| Policyholder Notice - Economic And Trade Sanctions | AXIS 906 0316 |
| Policyholder Disclosure - Notice Of Terrorism Insurance Coverage | TRIA DISCLOSURE 0115 |
| AXIS Management & Entity Liability Insurance Policy | AXIS 1011101 0618 |
| Signature Page | AXIS 102AIC 0615 |
| **Endorsements** | **Form Number and Edition Date** |
| 1 | Absolute Prior Knowledge Exclusion Endorsement | AXIS 1010510 0919 |
| 2 | Illegal Profit or Conduct Exclusion Imputation Amended Endorsement | AXIS 1010536 0817 |
| 3 | Shared Limit Endorsement | AXIS 1010607 0919 |
| 4 | Specified Services Exclusion Endorsement | AXIS 1010618 0619 |
| 5 | Cap on Losses from Certified Acts of Terrorism Endorsement | AXIS 1011040 0817 |
| 6 | Amend Insured Executive Provision Endorsement | AXIS 1011076 0118 |
| 7 | Amend Application Endorsement | AXIS 1011122 0420 |
| 8 | Specific Entity or Individual Exclusion Endorsement | AXIS 1011305 1117 |
| 9 | New Entity Added Endorsement | AXIS 1011313 1117 |
| 10 | Consent Provision Amended Endorsement | AXIS 1011698 0618 |
| 11 | Add Side-A Exception to Bodily Injury and Property Damage Exclusion Endorsement | AXIS 1011709 0618 |
| 12 | Application Reliance Endorsement | AXIS 140 0815 |
| 13 | New York Amendatory Endorsement | AXIS 1011104 1219 |
| 14 | Employment-Related Claims Exclusion Endorsement | AXIS 1011120 0220 |
| 15 | Loss Does Not Include Excess Consideration For Any Transaction Endorsement | AXIS 1013073 1021 |
| | GENESIS GLOBAL HOLDCO, LLC AMEND EXCLUSIONS SECTION ENDORSEMENT | MANU 1013455  1121 |

Class Code: 2-14177

**AXIS MANAGEMENT & ENTITY LIABILITY**

Except for section and paragraph headings, all terms in bold have a special meaning as set forth in the **DEFINITIONS** section and paragraph headings are provided for informational purposes only and do not have special meaning.

In consideration of payment of the premium, and subject to all provisions of this Policy and the DECLARATIONS and endorsements attached to this Policy, all of which are made a part of this Policy, the Insurer designated in the DECLARATIONS will provide the Coverages included in this Policy for which a Limit of Insurance is stated in the DECLARATIONS.

## CLAIMS-MADE LIABILITY COVERAGES

A. **Directors & Officers Liability Coverage**

The Insurer will pay **Loss** not indemnified by the **Insured Entity** that the **Insured Individual** becomes legally obligated to pay arising from a **Claim** first made against such **Insured Individual** during the **Policy Period** or the **Extended Reporting Period**, if applicable, for a **Wrongful Act**.

B. **Insured Entity Indemnification Coverage**

The Insurer will pay **Loss** for which the **Insured Entity** is permitted or required to indemnify an **Insured Individual** arising from a **Claim** first made against such **Insured Individual** during the **Policy Period** or the **Extended Reporting Period**, if applicable, for a **Wrongful Act**.

C. **Insured Entity Liability Coverage**

The Insurer will pay **Loss** that the **Insured Entity** becomes legally obligated to pay arising from a **Securities Claim** first made against the **Insured Entity** during the **Policy Period** or the **Extended Reporting Period**, if applicable, for a **Wrongful Act**.

It is a condition precedent to the **Claims-Made Liability Coverages** that:

1. the **Wrongful Acts** take place prior to the end of the **Policy Period**; and

2. all **Claims** are reported to the Insurer accordance with the **REPORTING OF CLAIMS AND EVENTS** section.

## EXPENSE COVERAGES

If the **Insureds** elect in their sole discretion to notify the Insurer in writing of an **Event** in accordance with the **REPORTING OF CLAIMS AND EVENTS** section, coverage with respect to such **Event** shall apply as follows:

A. **Claw Back Expense Coverage**

The Insurer will pay **Claw Back Expense** arising from a **Claw Back Event** that first occurs during the **Policy Period**, provided such **Claw Back Expense** is incurred after the date notice of such **Claw Back Event** is given to the Insurer.

B. **Insured Inquiry Expense Coverage**

The Insurer will pay **Insured Inquiry Expense** arising from an **Insured Inquiry Event** that first occurs during the **Policy Period**, provided such **Insured Inquiry Expense** is incurred after the date notice of such **Insured Inquiry Event** is given to the Insurer.

C. **Securityholder Demand Expense Coverage**

The Insurer will pay **Securityholder Demand Expense** arising from a **Securityholder Demand Event** that first occurs during the **Policy Period**, provided such **Securityholder Demand Expense** is incurred after the date notice of such **Securityholder Demand Event** is given to the Insurer.

## DEFINITIONS

Whether expressed in the singular or the plural, whenever appearing in bold in this Policy, the following terms have the meanings set forth below.

**Application** means the written application for this Policy, if any, and all written information and material attached thereto, incorporated therein, or submitted by or on behalf of the **Insured** to the Insurer in connection with the underwriting of this Policy.

**Books and Records Demand** means a written demand by one or more securityholders of the **Insured Entity**, pursuant to Section 220 of the Delaware General Corporation Law or any similar statute in any other jurisdiction, to inspect the **Insured Entity's** books and records.

**Claim** means:

1.      with respect to the **Directors & Officers Liability Coverage** and the **Insured Entity Indemnification Coverage**:

   a.   a written demand for monetary relief or non-monetary or injunctive relief, including a written request to toll or waive a statute of limitations or engage in any alternative dispute resolution process;

   b.   a civil, criminal, administrative or regulatory, or arbitration proceeding or any appeal therefrom;

   c.   a subpoena, written order of investigation, or written notice of charges by a **Government Authority**, including a Wells Notice or similar target letter, identifying the **Insured Individual** as a person against whom a civil, criminal, or administrative or regulatory proceeding may be commenced; or

   d.   a request for the extradition of the **Insured Individual** or the arrest or confinement of the **Insured Individual** by a **Government Authority**; or

2.   with respect to the **Insured Entity Liability Coverage**, only a **Securities Claim**;

provided, however, that **Claim** does not mean any routine or compliance audit by a **Government Authority**.

**Claims-Made Liability Coverage** means any Coverage designated as such in the Policy.

**Claw Back Event** means a written demand by the **Insured Entity**, pursuant to its written compensation recoupment policy or Section 304(a) of the Sarbanes-Oxley Act of 2002 or Section 954 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010, against an **Insured Individual** seeking recovery of compensation or other amounts paid to such **Insured Individual**.

**Claw Back Event Expense** means reasonable costs incurred by the **Insured Individual** with the prior written approval of the Insurer to defend or investigate a **Claw Back Event**, or to facilitate payment by the **Insured Individual** of amounts owed pursuant to a **Claw Back Event**, including the premium or origination fee for a bond or loan, and fees of any attorney or other professional hired to assist the **Insured Individual** in obtaining such bond or loan or other financing; provided, however, that **Claw Back Expense** does not mean or include any amounts for which the **Insured Individual** is or becomes liable under any compensation recoupment law or policy.

**Defense Costs** means reasonable expenses incurred by the **Insureds** in investigating, opposing, defending, settling, or appealing covered **Claims**, including attorney and expert fees, **Event Study Costs**, court costs, alternative dispute resolution proceeding costs, the cost of appeal or release attachment bonds for amounts within the applicable Limit of Insurance, but the Insurer does not have to furnish these bonds, and expenses incurred by the **Insured Individual** at the Insurer's request, excluding normal operating costs of the **Insured Entity**, loss of earnings, salaries, benefits, and other compensation paid to any **Insured**.

**Employee Benefit Plan Law** means any law that regulates employee welfare, benefit, or pension plans, including the Employee Retirement Income Security Act of 1974, as amended, ("ERISA"), the United Kingdom's Employee Pension Scheme Act 1993 or Pensions Act 2004, Canada's Pension Benefit Standards Act, 1985, or any **Similar Law**.

**Event** means a **Claw Back Event**, **Insured Inquiry Event**, or **Securityholder Demand Event**.

**Event Study Costs** means reasonable fees charged by an expert to provide an event study of the price impact on the **Insured Entity's** securities by particular events, which is submitted as evidence in a **Securities Claim** to oppose class certification thereof.

**Expense Coverage** means any Coverage designated as such in this Policy.

**Extended Reporting Period** means a designated period of time after the cancellation or nonrenewal of the **Policy Period** for reporting **Claims** to the Insurer that are made against the **Insureds** during such period of time, provided that such **Claims** arise out of **Wrongful Acts** that take place before the end of the **Policy Period**.

**Financial Impairment** means the status of an organization resulting from:

1. the appointment by a **Government Authority** of any receiver, trustee, examiner, conservator, liquidator, rehabilitator, or similar official to take control of, supervise, manage, or liquidate the organization; or

2. the organization becoming a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law.

**Government Authority** means any federal, state, local, or foreign government official or authority, including any court, regulator, administrator, or similar body.

**Insured** means the **Insured Entity** and any **Insured Individual**.

**Insured Entity** means, individually and collectively, the **Named Insured** or any **Subsidiary**, including any such entity as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law.

**Insured Executive** means any **Insured Individual** while serving as the **Insured Entity's** chief executive officer, chief financial officer, or in-house general counsel or their functional equivalents.

**Insured Individual** means any natural person who was or is:

1. a duly elected or appointed director (including a de facto or shadow director), officer, or trustee (other than a bankruptcy or insolvency trustee) of an **Insured Entity** that is a corporation; a manager or managing member of an **Insured Entity** that is a limited liability company; or a general partner or managing partner of an **Insured Entity** that is a partnership or joint venture;

2. the in-house general counsel, comptroller, risk manager, head of investor relations, or head of human resources of the **Insured Entity**, or a member of any duly constituted advisory board or committee of the **Insured Entity**;

3. an employee of the **Insured Entity** who is named as a defendant in a **Securities Claim**, or in any other **Claim** brought and maintained against both the employee and an **Insured Individual**, as defined in item 1 or 2 above; or

4. the functional equivalents of any of the foregoing.

**Insured Inquiry Event** means a written demand, subpoena, or other verifiable request to appear for an interview or meeting, provide testimony, or produce the **Insured's Individual's** documents in connection with:

1. the **Insured Entity's** business or the **Insured Individual's** capacity as such, if such demand, subpoena, or other verifiable request is made by a **Government Authority**, including any such request pursuant to the United Kingdom's Corporate Manslaughter and Corporate Homicide Act, 2007; or

**AXIS MANAGEMENT & ENTITY LIABILITY**

2. the **Insured Entity's** investigation of a **Securityholder Derivative Event**, if such demand, subpoena, or other verifiable request is made by the **Insured Entity** (including the **Insured's Entity's** Board of Directors or committee thereof) or its legal counsel;

provided such demand, subpoena, or other verifiable request is not part of a routine or regularly scheduled audit, inspection, or general oversight or compliance activity.

**Insured Inquiry Expense** means reasonable expenses incurred by the **Insured Individual** with the prior written approval of the Insurer to respond to an **Insured Inquiry Event**.

**Loss** means:

1. monetary judgments, awards, or settlements, including attorney's fees, costs, exemplary, multiplied, or punitive damages, pre-judgment interest, and post-judgment interest included as part of a covered judgment or award, and **Defense Costs**;

2. fines or penalties, insurable under the law applicable to this Policy, imposed on the **Insured** for any unintentional and non-willful violation of law, including such penalties imposed under 15 U.S.C. §§ 78dd-2(g)(2)(B) or 78ff(c)(2)(B) of the Foreign Corrupt Practices Act or Section 11(1)(a) of Chapter 23 of the U.K. Bribery Act 2010; and

3. solely with respect to the **Directors & Officers Liability Coverage**, taxes for which the **Insured Individuals** are legally obligated to pay solely by reason of the **Financial Impairment** of the **Insured Entity**.

In determining the insurability of exemplary, multiplied, or punitive damages or any other **Loss** defined above, the law of the jurisdiction most favorable to the insurability of such amounts will apply; provided that such jurisdiction is (i) where such amounts were awarded or imposed; (ii) where the **Wrongful Act** underlying the **Claim** took place; or (iii) where either the Insurer or the **Insured** is incorporated, has its principal place of business, or resides.

**Loss**, however, does not include:

a. amounts for which the **Insured** is legally or financially absolved from payment;

b. fines, penalties, or taxes, except as otherwise set forth in items 2 and 3 above;

c. amounts incurred to test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize **Pollutants**;

d. solely with respect to **Insured Entity Indemnification Coverage** and **Insured Entity Liability Coverage**, amounts that represent or are substantially equivalent to an increase in the consideration paid or proposed to be paid in connection with the purchase of any securities, assets, or entity;

e. amounts, other than **Defense Costs**, for which the **Insured** becomes liable pursuant to an order or agreement granting non-monetary or injunctive relief;

f. amounts that are uninsurable under the law applicable to this Policy; provided the Insurer shall not assert that **Loss** is uninsurable due to an actual or alleged violation of Section 11, 12, or 15 of the Securities Act of 1933, as amended.

**Management Control** means the **Named Insured** directly or indirectly owns more than 50% of the issued and outstanding voting equity securities of an entity or controls voting rights representing the present right to elect or appoint more than 50% of the directors or trustees of an entity.

**Named Insured** means the entity designated as such in the DECLARATIONS.

**Outside Entity** means a not-for-profit entity that is not an **Insured Entity**.

**Outside Position** means the position of director, officer, trustee, or other equivalent executive position in an **Outside Entity** held by an **Insured Individual**, as defined in item 1 or 2 in the definition of **Insured Individual** above, if service in such position is with the express consent and knowledge of the **Insured Entity**.

**Policy Period** means the period designated as such in the DECLARATIONS, subject to earlier termination, as set forth in the Policy.

**Pollutant** means any substance located anywhere in the world exhibiting any hazardous characteristics, as defined by or identified on a list of hazardous substances issued by any **Government Authority**. **Pollutant** also includes any other air or water emission, odor, waste water, oil or oil product, infectious or medical waste, asbestos or asbestos-containing material, lead or lead-containing material, noise, electric, magnetic, or electromagnetic field, fungi, mycotoxins, viruses, bacteria, or microbes or any other biological contaminant released into the atmosphere. **Pollutants** may take any form including, but not limited to, solids, liquids, gases, thermal or radiological irritants or contaminants, smoke, vapor, soot, fumes, acids, alkalis, silica, chemicals, or waste materials.

**Related Claim** means all **Claims** arising out of a single **Wrongful Act** or **Related Wrongful Acts**.

**Related Claw Back Event** means all **Claw Back Events** that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of causally or logically connected facts, circumstances, situations, events, transactions, or causes.

**Related Event** means all **Events** arising out of a single **Event** or **Related Claw Back Events**, **Related Insured Inquiry Events**, or **Related Securityholder Demand Events**.

**Related Insured Inquiry Events** means all **Insured Inquiry Events** that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of causally or logically connected facts, circumstances, situations, events, transactions, or causes.

**Related Securityholder Demand Event** means all **Securityholder Demand Events** that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of causally or logically connected facts, circumstances, situations, events, transactions, or causes.

**Related Wrongful Act** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause, or series of causally or logically connected facts, circumstances, situations, events, transactions, or causes.

**Securities Claim** means any **Claim**, as defined in item 1.a or 1.b in the definition of **Claim** above:

1.  brought and maintained by one or more securityholders of the **Insured Entity**, in their capacity as such; or

2.  based upon or arising out of the purchase or sale of or offer or solicitation of an offer to purchase or sell any securities issued by the **Insured Entity**.

**Securityholder Demand Event** means a **Books and Records Demand** or **Securityholder Derivative Demand**.

**Securityholder Derivative Demand** means:

1.  a written demand by one or more securityholders of the **Insured Entity** upon the board of directors or equivalent governing body of the **Insured Entity** to bring a civil proceeding in a court of law against one or more **Insured Individuals** for a **Wrongful Act**; or

2.  a lawsuit by a securityholder of the **Insured Entity** brought derivatively on behalf of the **Insured Entity** against an **Insured Individual** for a **Wrongful Act** without first making a demand as described in item 1 above.

**Securityholder Demand Expense** means reasonable expenses incurred by the **Insured Entity** in excess of the **Insured Entity's** normal operating costs and with the prior written approval of the Insurer to investigate and evaluate a **Securityholder Demand Event**.



**Similar Law** means any amendment to or rule, regulation, or order promulgated under such law, or any similar federal, state, local, or foreign common law or statutory law that regulates or governs the same subject, including any amendment to or rule, regulation, or order promulgated thereunder.

**Subsidiary** means an entity that is or was under **Management Control**, as of the effective date of this Policy, or after the effective date of this Policy, subject to the **New and Former Entities** condition below.

**Wrongful Act** means:

1.  any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by:

    a.  the **Insured Individual** in his or her capacity as such or in an **Outside Position** or

    b.  the **Insured Entity**, with respect to the **Insured Entity Liability Coverage**; or

2.  any matter claimed against the **Insured Individual** solely by reason of his or her status as such or in an **Outside Position**.

## EXCLUSIONS

This Policy does not apply to **Claims**:

**Bodily Injury and Property Damage**

for any actual or alleged:

1.  bodily injury, mental anguish, emotional distress, sickness, disease, or death of any person; except this does not apply to an employment-related **Claim** for mental anguish or emotional distress against an **Insured Individual**; or

2.  damage to or destruction of any tangible property or electronic data, including loss of use of any such property or data whether or not it is damaged or destroyed.

**Illegal Profit or Conduct**

based upon or arising out of:

1.  any financial personal profit, remuneration, or financial advantage to which the **Insured** was not legally entitled; or

2.  any willful violation of any statute or regulation or any deliberately fraudulent or criminal act, error, or omission committed by the **Insured**;

provided that such conduct is evidenced by a final and non-appealable adjudication adverse to the **Insured** in an underlying action other than an action brought for a violation of Section 11, 12, or 15 of the Securities Act of 1933.

For the purpose of applying this exclusion:

a.  the acts, errors, or omissions of any **Insured Individual** will not be imputed to any other **Insured Individual**; and

b.  the acts, errors, or omissions of any **Insured Executive** will be imputed to the **Insured Entity**.

**Insured Entity versus Insured**

brought or maintained by or on behalf of an **Insured Entity**; except this exclusion does not apply:

1.  to **Defense Cost** for a **Claim** covered under the **Directors & Officers Liability Coverage**; or



2.  to a **Claim** against an **Insured Individual**:

    a.  brought and maintained as a derivative action on behalf of the **Insured Entity** without the active assistance or participation of the **Insured Entity** or any director, officer, or equivalent executive of the **Insured Entity** unless such assistance or participation is (i) solely pursuant to, or in compliance with, a subpoena or similar legal process or, (ii) protected pursuant to Section 806 of the Sarbanes-Oxley Act of 2002 or any similar whistleblower statute;

    b.  brought and maintained by a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator, creditors' committee, or rehabilitator of the **Insured Entity** or any assignee of any of the foregoing;

    c.  brought and maintained outside the United States, Canada, or any other common law jurisdiction; or

    d.  if such **Insured Individual** has not served in the capacity as an **Insured Individual** within 24 months immediately preceding the date the **Claim** is first made.

**Outside Entity versus Insured Individual**

by or on behalf of an **Outside Entity** against the **Insured Individual** for a **Wrongful Act** by such **Insured Individual** in his or her service in an **Outside Position** in such **Outside Entity**; except this exclusion does not apply a **Claim** brought and maintained:

1.  as a derivative action on behalf of the **Outside Entity** without the active assistance or participation of the **Outside Entity**, the **Insured Entity**, or any director, officer, or equivalent executive of the **Outside Entity** or the **Insured Entity**, unless such assistance or participation is solely pursuant to or in compliance with a subpoena or similar legal process or is protected pursuant to Section 806 of the Sarbanes-Oxley Act of 2002 or any similar whistleblower statute;

2.  by a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator, creditors' committee, or rehabilitator of the **Outside Entity** or any assignee of any of the foregoing;

3.  outside the United States, Canada, or any other common law jurisdiction; or

4.  against an **Insured Individual** who has not served in an **Outside Position** in such **Outside Entity** within 24 months immediately preceding the date the **Claim** is first made.

**Pending or Prior Matters**

based upon or arising out of essentially the same act, error, omission, fact, or circumstance underlying or alleged in any litigation, any administrative or regulatory proceeding or investigation, or any alternative dispute resolution proceeding that was pending or order, decree, or judgment that was entered on or prior to the applicable Pending or Prior Date set forth in the DECLARATIONS.

**Prior Notice**

based upon or arising out of any act, error, omission, fact, or circumstance that was the subject of any notice given under any directors and officers liability insurance policy or similar insurance policy of which this Policy is a direct or indirect renewal or replacement.

**Violation of Employee Benefit Plan Law**

for any actual or alleged violation of any responsibilities, duties, or obligations imposed under **Employee Benefit Plan Law**; provided this exclusion shall only apply with respect to employee welfare, benefit, or pension plans established or maintained in whole or in part for the benefit of employees or **Insured Individuals** of the **Insured Entity**.



## LIMITS OF INSURANCE, RETENTIONS, AND REIMBURSEMENT

A.  **Limits of Insurance**

The Insurer's liability under this Policy will not exceed the Limits of Insurance stated in the DECLARATIONS no matter how many **Insureds** are covered, **Claims** are made against the **Insureds**, or **Wrongful Acts** or **Events** occur.

1.  **Policy Limit of Insurance**

Except as otherwise set forth in this Policy, the Policy Limit of Insurance stated in the DECLARATIONS ("Policy Limit") is the most the Insurer will pay under this Policy.

2.  **Aggregate Limit of Insurance**

Subject to the Policy Limit, any Aggregate Limit of Insurance stated in the DECLARATIONS ("Aggregate Limit") shall be the most the Insurer will pay under this Policy for all **Loss** or other amounts that are subject to such Aggregate Limit.

3.  **Coverage Limits of Insurance**

Subject to the Policy Limit and any applicable Aggregate Limit, the Limit of Insurance for each Coverage stated in the DECLARATIONS ("Limit of Insurance" or "Coverage Limit") is the most the Insurer will pay under each respective **Claims-Made Liability Coverage** or **Expense Coverage**.

If multiple **Claims-Made Liability Coverages** apply to the same **Claim** or multiple **Expense Coverages** apply to the same **Event**, the Coverage Limit that applies to such **Claim** or **Event** will not exceed the highest Coverage Limit available under any one **Claims-Made Liability Coverage** or **Expense Coverage** that applies.

Any Sublimit of Insurance stated in the DECLARATIONS ("Sublimit") shall be part of, not in addition to, any applicable Coverage Limit and shall be the most the Insurer will pay under each respective **Claims-Made Liability Coverage** or **Expense Coverage** for all **Loss** or other amounts that are subject to such Sublimit.

**Defense Costs** are part of, not in addition to, the Coverage Limits for the **Claims-Made Liability Coverages** and payment of **Defense Costs** by the Insurer reduces and may totally exhaust such Coverage Limits.

If a Coinsurance is stated in the DECLARATIONS, the **Insureds** shall be a coinsurer of any **Loss** or other covered amount that is subject to such Coinsurance, in the amount or proportion stated therein, for that part of such **Loss** or other covered amount exceeding any applicable Retention.

B.  **Retentions**

If a Retention is stated in the DECLARATIONS, the **Insureds** are responsible for payment of the Retention for each **Claim** or **Event** to which such Retention applies. The Retentions will be borne by the **Insureds** uninsured and at their own risk. The Insurer's obligation to pay under this Policy is excess of the applicable Retention. The Limits of Insurance will not be reduced by payment of any Retention. Notwithstanding the foregoing, if the **Insured Entity** is permitted or required by law to indemnify the **Insured Individuals** for any **Loss** or covered expense or to advance covered **Defense Costs** on their behalf but either refuses in writing, or fails, within 60 days of the **Insured Individual's** request, to do so for any reason other than its **Financial Impairment**, the Insurer shall pay such **Loss** or advance such **Defense Costs** within the applicable Retention on behalf of the **Insured Individuals**, but the **Insured Entity** shall have a direct and immediate obligation to pay to the Insurer the amount of such **Loss** paid, and the amount of such **Defense Costs** or expenses advanced by the Insurer up to the applicable Retention.

If multiple **Claims-Made Liability Coverages** apply to the same **Claim** or multiple **Expense Coverages** apply to the same **Event**, the Retention that applies to such **Claim** or **Event** will not exceed the highest Retention that applies to such **Claim** or **Event**.

**AXIS**

## DEFENSE AND SETTLEMENT OF CLAIMS

The Insurer has no duty to defend any **Claims** made against the **Insureds**.

The **Insureds** will not settle or offer to settle any **Claim**, pay any **Loss**, incur any **Defense Costs**, admit or assume any liability, stipulate to any judgment or award, or otherwise assume any contractual obligation with respect to a **Claim**, without the Insurer's prior written consent, which shall not be unreasonably withheld. Notwithstanding the foregoing, if all applicable **Insureds** are able to fully and finally dispose of, with prejudice, a **Claim** for an amount, including **Defense Costs**, within the remaining applicable Retention, then the Insurer's consent will not be required for such disposition.

The Insurer will have the right and will be given the opportunity to effectively associate with the **Insured** in the investigation, defense, and settlement of any **Claim**.

The Insurer will advance **Defense Costs** on a current basis, but no later than 60 days after the Insurer receives itemized invoices for such **Defense Costs**; provided that to the extent it is finally established that any such **Defense Costs** are not covered under this Policy, the **Insureds**, severally according to their interests, shall repay such **Defense Costs** to the Insurer.

## REPORTING OF CLAIMS AND EVENTS

A. **When a Claim is Made or an Event Occurs**

1. With respect to any **Claims-Made Liability Coverage**, a **Claim** will be deemed to be first made on the earlier of:

   a. the date of any **Insured's** receipt of notice of such written demand, if such **Claim** is a written demand for monetary relief or non-monetary or injunctive relief or written request to toll or waive a statute of limitations or engage in any alternative dispute resolution process;

   b. the date of service upon or other receipt by any **Insured** of a summons or complaint, indictment or information, warrant, or similar pleading or charging document in any such proceeding, if such **Claim** is a civil, criminal, extradition, administrative or regulatory, or arbitration proceeding,,or appeal therefrom; or

   c. the date of any **Insured's** receipt of notice of such subpoena, written order of investigation, written notice of charges, or Wells Notice or other target letter, if such **Claim** is an investigation or notice of charges by a **Government Authority** or Wells Notice or other target letter from a **Government Authority** identifying an **Insured Individual** as one against whom a criminal, civil, or administrative or regulatory proceeding may be commenced.

   All **Related Claims**, whenever made, will be considered a single **Claim** and such **Claim** will be deemed to have been made on the date the first of those **Related Claims** was made against any **Insured**.

2. With respect to the **Expense Coverages**, an **Event** will be deemed to occur when the **Event** becomes known to any **Insured**.

   All **Related Events**, whenever occurring, will be considered a single **Event** and such **Event** will be deemed to have occurred on the date the first of those **Related Events** occurred.

B. **Reporting of Claims or Events**

It is a condition precedent to coverage under:

1. all **Claims-Made Liability Coverages** that as soon as any **Insured Executive** becomes aware of any **Claim** the **Insured** must notify the Insurer in writing as soon as practicable, but in no event later than 60 days after the end of the **Policy Period** or, with respect to a **Claim** made during the **Extended Reporting Period**, if applicable, no later than the expiration thereof.

AXIS

2.  the **Expense Coverages** that the **Insured** must notify the Insurer in writing of an **Event** no later than 60 days after the end of the **Policy Period**. Such notice shall include full details of the **Event**.

Even if a **Claim** arises out of the same actual or alleged **Wrongful Act**, act, error, omission, fact, or circumstance in any **Event** previously reported to the Insurer, it is a condition precedent to coverage for such **Claim** that it be separately reported to the Insurer as set forth in item 1 above.

C.  **Reporting of Circumstances under Claims-Made Liability Coverages**

If during the **Policy Period** or the **Extended Reporting Period**, if applicable, an **Insured** gives the Insurer written notice of any **Wrongful Act**, **Event**, act, error, omission, fact, or circumstance that occurred before the end of the **Policy Period** and is reasonably likely to give rise to a **Claim** with full details of:

1.  such **Wrongful Act**, **Event**, act, error, omission, fact, or circumstance including any available information on persons or entities involved;

2.  the nature and extent of the potential damages and the names of the potential claimants; and

3.  the manner in which the **Insured** first became aware of such **Wrongful Act**, **Event**, act, error, omission, fact, or circumstance;

then any such **Claim** subsequently arising out of such **Wrongful Act**, **Event**, act, error, omission, fact, or circumstance will be deemed to have been made during the policy period in which such notice was given. In order for coverage to apply to any such **Claim**, the **Insured** must provide notice to the Insurer of such **Claim** in accordance with paragraph B above. No coverage will be provided for any **Loss** incurred prior to the time such **Claim** is made unless otherwise authorized in writing by the Insurer.

Notwithstanding the foregoing, notice to the Insurer of any **Books & Records Demand** or **Insured Inquiry Event** shall not constitute notice under this paragraph C.

## EXTENDED REPORTING PERIODS

If the **Named Insured** cancels or nonrenews this Policy or the Insurer nonrenews this Policy, the **Named Insured** or the **Insured Individuals** will have the right to purchase an optional **Extended Reporting Period** to immediately follow the effective date of cancellation or nonrenewal.

The optional **Extended Reporting Periods** and their respective additional premiums are stated in the DECLARATIONS. The Insurer must receive written notice of the optional **Extended Reporting Period** elected together with payment of the applicable additional premium, within 60 days after the end of the **Policy Period**. If the Insurer does not receive payment within such period, the Insurer will not be required to provide any optional **Extended Reporting Period**.

Premium for the optional **Extended Reporting Period** will be fully earned on the effective date thereof. Once in effect, the optional **Extended Reporting Period** may not be canceled.

No **Extended Reporting Period** will be construed to be a new policy and any **Claim** submitted during an **Extended Reporting Period** will be subject to the Policy's terms and conditions, except as specifically set forth below. All **Claims** made during an **Extended Reporting Period** must be reported in accordance with the **REPORTING OF CLAIMS AND EVENTS** section.

A **Claim** reported in writing to the Insurer during the **Extended Reporting Period** will be deemed to have been made on the last day of this **Policy Period**.

No **Extended Reporting Period** reinstates or increases the Limits of Insurance.

**AXIS MANAGEMENT & ENTITY LIABILITY**

## CONDITIONS

**Action Against the Insurer**

No action may be taken against the Insurer unless, as a condition precedent thereto, there has been full compliance with all of the terms of this Policy by all **Insureds**, nor until the amount of the **Insured's** obligation to pay has been fully determined either by judgment or award against the **Insured** after trial or arbitration or by written agreement among the **Insureds**, the claimant and the Insurer.

No person or organization will have any right under this Policy to join the Insurer as a party to any action against the **Insured** to determine the **Insured's** liability, nor will the Insurer be impleaded by the **Insured** or the **Insured's** legal representative.

**Allocation**

If in any **Claim**, the **Insureds** who are afforded coverage for such **Claim** incur **Loss** jointly with others (including other **Insureds**) who are not covered for such **Claim** or incur an amount consisting of both covered **Loss** and loss not covered by this Policy because such **Claim** includes both covered and uncovered matters, the **Insureds** and the Insurer agree to use their best efforts to determine a fair and reasonable allocation of covered **Loss** and uncovered loss. Such allocation shall take into account the relative legal and financial exposures of the parties to covered and uncovered matters. If the **Insured** and the Insurer cannot agree on an allocation of **Defense Costs**, the Insurer will pay **Defense Costs** that the Insurer believes to be covered until a different allocation is negotiated, arbitrated, or judicially determined. Any such allocation will be applied retroactively to all **Defense Costs** on account of such **Claim**, but will not apply to or create any presumption with respect to the allocation of other amounts arising from such **Claim** or any other **Claim**.

**Assignment**

Assignment of any right or interest under this Policy will not bind the Insurer unless and until the Insurer's written consent is endorsed hereon.

**Assistance and Cooperation**

The **Insureds** will provide the Insurer with all information, assistance, and cooperation that the Insurer reasonably requests and will do nothing that in any way increases the Insurer's exposure under this Policy or in any way prejudices the Insurer's potential or actual rights of recovery. No **Insured** will, except at the **Insured's** own cost, voluntarily make a payment, admit liability, assume any obligation, or incur any expense without the Insurer's prior written consent (such consent not to be unreasonably withheld).

For the purpose of applying this condition:

1.    the failure of the **Insured Entity** or an **Insured Individual** to comply with this condition will not be imputed to another **Insured Individual**; and

2.    the failure of any **Insured Executive** to comply with this condition will be imputed to the **Insured Entity**.

**Authorization of Named Insured**

The **Named Insured** is responsible for payment of all premiums and will have exclusive authority to act on behalf of all other **Insureds** with respect to accepting endorsements to this Policy, giving and receiving notices of cancellation or nonrenewal, and receiving any return premium.

**Bankruptcy**

The bankruptcy or insolvency of any **Insured** or of any **Insured Individual's** estate will not relieve the Insurer of the Insurer's obligation under this insurance. In the event of bankruptcy or insolvency of the **Insured Entity**, the **Insureds** shall waive and release any automatic stay or injunction in such proceeding that may apply to this Policy or its proceeds,



and agree not to oppose or object to any efforts by the Insurer or any **Insured** to obtain relief from any such stay or injunction.

**Cancellation and Nonrenewal**

1.  **Cancellation**

    The **Named Insured** may cancel this Policy by mailing or delivering written notice of cancellation to the Insurer at its address stated in the DECLARATIONS. Such notice will state the effective date of cancellation or, if no effective date is stated, the effective date of cancellation will be 10 days after the Insurer's receipt of notice. The **Policy Period** will end on that date.

    The Insurer may cancel this Policy only for non-payment of premium. In such event, the Insurer will mail or deliver written notice of cancellation for non-payment of premium to the **Named Insured** at its address stated in the DECLARATIONS, at least 20 days before the effective date of cancellation.

    If this Policy is canceled, the Insurer will return to the **Named Insured** any unearned premium, calculated pro rata, but the return of premium to the **Named Insured** is not a condition precedent to cancellation.

2.  **Nonrenewal**

    The Insurer may elect not to renew this policy by mailing or delivering written notice of nonrenewal to the **Named Insured** at its address stated in the DECLARATIONS, at least 60 days before the end of the **Policy Period**. If notice of nonrenewal is mailed, proof of mailing will be sufficient proof of notice. Delivery of the notice will be the same as mailing.

**Change in Control**

If during the **Policy Period** any person, entity, or group of persons or entities acting in concert acquires (i) majority voting control of or the right to elect, appoint, or designate at least 50% of the directors or equivalent executives of the **Named Insured**; (ii) securities which result in such person, entity or group owning more than 50% of the issued and outstanding voting securities of the **Named Insured**; or (iii) all or substantially all of the assets of the **Named Insured**; (individually, a "Change in Control") coverage under this Policy will apply as follows:

1.  Coverage will continue under the **Claims-Made Liability Coverages** to the end of the **Policy Period**, but only with respect to **Wrongful Acts** that occurred prior to the effective date of the Change in Control.

2.  Coverage will cease under the **Expense Coverages** as of the effective date of the Change in Control with respect to **Events** first occurring on or after the effective date of the Change in Control.

The **Financial Impairment** of the **Named Insured** will not be deemed a Change in Control under this condition.

**Changes to the Policy**

Notice or knowledge possessed by any person will not effect a waiver or a change in any part of this Policy or estop the Insurer from asserting any rights under the terms of this Policy, nor will the terms of this Policy be waived or changed except by written endorsement issued to form a part of this Policy.

**Legal Representatives, Spouses or Domestic Partners, or Family Trusts**

The legal representatives, estate, heirs, spouse or domestic partner, or family trusts of an **Insured Individual** will be considered to be an **Insured** under this Policy, but only for **Claims** against such persons or entities arising solely out of their status as such and, with respect to a spouse or domestic partner or a family trust, only where such **Claim** seeks amounts from marital community or jointly held property, or property transferred from such **Insured Individual** to such spouse or domestic partner or family trust. No coverage is provided for any act, error, or omission committed by any such person or entity. The term "domestic partner" as used in this condition means any natural person recognized by law or by the **Insured Entity** as a domestic partner or partner in a civil union.



AXIS MANAGEMENT & ENTITY LIABILITY

**New and Former Entities**

1.  If during the **Policy Period** the **Named Insured** creates, acquires, or merges with an entity or obtains **Management Control** of an entity, then this Policy will provide coverage for such entity and its subsidiaries, directors, officers, trustees, and employees who would otherwise become **Insureds** pursuant to the provisions of this Policy, but only for **Wrongful Acts** or **Events** occurring on or after the effective date of such transaction; provided that if, as of the date immediately preceding the effective date of such transaction, such entity's total consolidated assets exceed 25% of the **Named Insured's** total consolidated assets, as set forth in the **Named Insured's** most recent audited consolidated financial statements, then such coverage will not extend beyond the earlier the end of the **Policy Period** or 90 days following such date unless the **Named Insured** gives the Insurer written notice of the transaction within such earlier period, and pays any additional premium required by the Insurer, which will be computed pro rata from such date based on the Insurer's current rates. In all events, the effective date of such transaction will be deemed to be inception date of the **Policy Period** with respect to such coverage.

2.  If before or during the **Policy Period** an **Insured Entity**, other than the **Named Insured**, ceases to be an **Insured Entity**, the coverage afforded by this Policy will continue to the end of the **Policy Period** with respect to such former **Insured Entity** and its subsidiaries, directors, officers, trustees, and employees who were **Insureds** pursuant to the provisions of this Policy, but only for **Wrongful Acts** or **Events** occurring before the date such entity ceased to be an **Insured Entity**.

3.  In all events, there is no coverage under this Policy:

    a.  for any **Wrongful Act** or **Related Wrongful Act** of or **Event**, **Related Claw Back Event**, **Related Insured Inquiry Event**, or **Related Securityholder Demand Event** involving any entity or its subsidiaries, directors, officers, trustees, or employees that occurred before the date the entity became an **Insured Entity**;

    b.  for any **Wrongful Act** of or **Event** involving any entity or its subsidiaries, directors, officers, trustees, or employees that occurred after the date the entity ceases to be an **Insured Entity**.

**Notices**

Except as otherwise provided in this Policy, all notices under this Policy must be in writing and delivered by prepaid express courier or certified mail, facsimile, or electronic mail to the appropriate party at the street address, fax number, or email address, as applicable, designated in the DECLARATIONS. Notices to the **Insureds** will be given to the **Named Insured**. Notice will be deemed to be received and effective upon actual receipt by the addressee or one day following the date such notice is sent, whichever is earlier.

**Other Insurance**

If there is any other valid and collectible insurance available to the **Insured** that applies to **Loss** or other covered amounts under this Policy, this insurance shall be excess over such other insurance, except when the other insurance is specifically written excess of this Policy; provided this Policy shall apply on a primary basis with respect to any personal liability insurance purchased by an **Insured Individual**.

**Outside Positions**

The coverage afforded under this Policy for **Claims** against the **Insured Individual** for **Wrongful Acts** committed by such **Insured Individual** in his or her service in an **Outside Position** is written specifically excess of any valid and collectible indemnification and insurance available to the **Insured Individual** from the **Outside Entity**. Payment by the Insurer or any affiliate of the Insurer under another policy as a result of such **Claim** will reduce the Limits of Insurance of this Policy applicable to such **Claim**.

**Payments**

The Insurer will be entitled to pay **Loss** and other covered amounts as they become due and payable under this Policy without consideration of other future payment obligations. However, if **Loss** exceeds the remaining applicable Limit of



AXIS MANAGEMENT & ENTITY LIABILITY

Insurance, the Insurer will first pay **Loss** covered under the **Directors and Officers Liability Coverage** before paying any other covered amounts under this Policy.

**Premium**

The **Named Insured** will pay the Premium stated in the DECLARATIONS. As may be agreed upon by the **Named Insured** and the Insurer or as otherwise provided in this Policy, the Premium may be adjusted at any time during the **Policy Period** or any extensions of the **Policy Period** based upon changes in the provisions of this Policy.

**Presumptive Indemnification**

The **Insured Entity** agrees to indemnify the **Insured Individuals** to the fullest extent permitted by law.

**Representations and Severability**

The Insurer has relied on the statements made and information in the **Application** and the accuracy and completeness of such statements and information. Such statements and information are the basis for the Insurer's issuance of this Policy, are incorporated in and constitute a part of this Policy, and have induced the Insurer to issue this policy.

If the **Application** contains any misrepresentation that either was made with the intent to deceive or materially affected either the acceptance of the risk or the hazard assumed by the Insurer, then no coverage will be provided under this Policy for any **Claims** or **Events** based upon or arising out of the facts that were misrepresented to with respect to:

1.  any **Insured Individual** who knew, as of the inception of the **Policy Period**, of such facts, whether or not such **Insured Individual** knew the **Application** contained the misrepresentation; or

2.  the **Insured Entity**, to the extent it indemnifies an **Insured Individual** described in item 1 above; or

3.  the **Insured Entity**, if any **Insured Executive** of such **Insured Entity** knew, as of the inception of the **Policy Period**, of such facts, whether or not such **Insured Executive** knew the **Application** contained the misrepresentation.

For purposes of applying this condition, the knowledge of the **Insured Entity** or an **Insured Individual** will not be imputed to any other **Insured Individual**.

**Subrogation and Recovery**

In the event of any payment under this Policy, the Insurer will be subrogated to the extent of such payment to all the **Insured's** rights of recovery thereof, and the **Insureds** will execute and deliver all instruments and papers required and do whatever else is necessary to secure, and will do nothing to prejudice, such rights. The Insurer, however, will not exercise its right of subrogation against any **Insured Individual** unless the **Illegal Profit or Conduct** exclusion applies to such **Insured Individual**.

If the Insurer recovers any amount it paid under this Policy, the Insurer shall reinstate the applicable Limit of Insurance to the extent of such recovery, less the Insurer's costs incurred in obtaining such recovery. The Insurer assumes no duty to seek a recovery of any amounts paid under this Policy.

**Territory, Valuation and Currency**

The coverage afforded under this Policy applies anywhere in the world, where legally permissible.

If a judgment is rendered, settlement is denominated or another element of loss under this Policy is stated in a currency other than United States dollars, payment under this Policy will be made in United States dollars at the rate of exchange published in *The Wall Street Journal* on the date the judgment becomes final or payment of the settlement or other element of loss is due, unless otherwise set forth in this Policy.

All monetary amounts under this Policy are expressed and payable in the currency of the United States.

AXIS MANAGEMENT & ENTITY LIABILITY

*SIGNATURE PAGE FOLLOWS.*

AXIS

## SIGNATURE PAGE

IN WITNESS WHEREOF, the Insurer has caused this policy to be issued by affixing hereto the facsimile signatures of its President and Secretary.

Secretary

President

Andrew Weissert, Secretary

Carlton W. Maner, President

**AXIS MANAGEMENT & ENTITY LIABILITY**

| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| 1 | 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

### ABSOLUTE PRIOR KNOWLEDGE EXCLUSION ENDORSEMENT

It is agreed that solely with respect to the following **Coverage Parts** or coverages:

All Claims Made Liability and Expense coverages

The following is added to the **EXCLUSIONS** section:

**Prior Knowledge**

This Policy does not apply to **Claims** based upon or arising out of any act, error, omission, fact, circumstance, or **Wrongful Act**, of which, as of 06/28/2021, any **Insured** or **Insured Individual** had knowledge, and which reasonably could give rise to a **Claim**.

All other provisions of the Policy remain unchanged.

AXIS MANAGEMENT & ENTITY LIABILITY

| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| 2 | 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

**ILLEGAL PROFIT OR CONDUCT EXCLUSION IMPUTATION AMENDED ENDORSEMENT**

It is agreed that :

Item b in the **Illegal Profit or Conduct** exclusion is replaced with the following:

   b.   the acts, errors, or omissions of Insured Executive will be imputed to the **Insured Entity**.

All other provisions of the Policy remain unchanged.

 <span style="color:blue">AXIS MANAGEMENT & ENTITY LIABILITY</span>

| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| 3 | 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

### SHARED LIMIT ENDORSEMENT

| SCHEDULE OF OTHER POLICIES | | |
|---|---|---|
| **Named Insured** | **Policy No.** | **Policy Aggregate Limit of Insurance** |
| Genesis Global Holdco, LLC | P-001-000658826-02 | $2,500,000 |

It is agreed that:

Notwithstanding anything in the Policy to the contrary, this Policy and the policies set forth in the above Schedule (collectively, the "AXIS Policies") are subject to a single aggregate limit of insurance that shall not exceed the highest Policy Aggregate Limit of Insurance available under any one AXIS Policy. Accordingly, all payments under any one AXIS Policy shall reduce and may possibly exhaust the Limits of Insurance available under all AXIS Policies.

If this Policy and any one or more other AXIS Policies apply to the same claim or loss, the Retention that applies to such claim or loss will not exceed the highest retention or deductible that applies to such claim or loss, if any.

No Limit of Insurance under this Policy shall be increased by operation of this endorsement. When the total amount paid under all AXIS Policies, combined, equals the Policy Limit of insurance set forth in the DECLARATIONS, the Insurer's obligation to pay any other covered amounts under this Policy shall be completely fulfilled and extinguished.

All other provisions of the Policy remain unchanged.

**AXIS MANAGEMENT & ENTITY LIABILITY**

| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| 4 | 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

**SPECIFIED SERVICES EXCLUSION ENDORSEMENT**

It is agreed that:

1.  The following Schedule of Excluded Services is added to the DECLARATIONS:

| SCHEDULE OF EXCLUDED SERVICES |
|---|
| **Financial Services** |

2.  For purposes of this endorsement, the following definitions are added to the **DEFINITIONS** section:

- **Credit Card Services** means the issuance and regulation of the use of credit cards.

- **Deposit Services** means the establishment and regulation of the use of checking, savings, money market, and other similar accounts in connection with the transfer of funds (including e-payments through online banking or debit cards) and automated teller machine services.

- **Financial Services** means **Credit Card Services, Deposit Services, Insurance Services, Investment Banking Services, Lending Services, Loan Servicing, Miscellaneous Services,** and all activities that are ancillary or incidental to, or associated with, the performance of any such services.

- **Healthcare Services** means medical, surgical, dental, or psychiatric services for the prevention, diagnosis, and treatment of disease, disorder, or injury in humans or non-humans, whether performed by physicians or others, and activities and services related to any of the foregoing services, including testing or imaging; dispensing drugs, food, beverages, supplies, or appliances; post-mortem examinations; or medical accreditation or peer review.

- **Insurance Services** means service as an insurance company, insurance agent, or insurance or reinsurance broker, including the underwriting, offer, issuance, renewal, or cancellation of any product issued by an insurance company or the adjustment of claims under any insurance product.

- **Investment Banking Services** means investment banking services and services in connection with mergers, acquisitions, divestitures, restructurings, issuance of securities, syndication, or similar services.

- **Lending Services** means the purchase, sale, grant or extension, restructuring, termination, or repossession of; the participation or syndication in; the foreclosure on; or the commitment to; any loan, lease, or extension of credit (whether consumer, commercial, mortgage banking, or otherwise).

- **Loan Servicing** means administrative services in connection with any Lending Services or Real Estate Services including record keeping, billing, disbursing principal or interest, receiving or paying insurance premiums or taxes, credit reporting or issuing statements of creditworthiness, determining depreciation amount of property, and similar services.

- **Miscellaneous Services** means accounting services, appraisal services, architectural or construction management services, data processing services, escrow services, **Healthcare Services**, **Insurance Services**, investment, financial, or economic advisory services, trustee services, the practice of law or legal services, **Real Estate Services**, securities broker or dealer services, or any professional certification or accreditation of any of the foregoing services.

- **Real Estate Services** means property management or development services, construction management services, Loan Servicing, real estate appraisal services, escrow or leasing agent services, or real estate broker services, but does not mean the selection or oversight of a third party to perform any of the foregoing such services.



AXIS MANAGEMENT & ENTITY LIABILITY

3.  The following exclusion is added to the **EXCLUSIONS** section:

**Excluded Services**

This Policy does not apply to **Claims** based upon or arising out of any actual or alleged act, error, or omission in the performance of or the failure to perform any services set forth in the Schedule of Excluded Services in the DECLARATIONS ("Excluded Services") to a customer or client of any **Insured**, whether or not in exchange for a fee, and all activities that are ancillary or incidental to or associated with the performance of any Excluded Services or **Claims** for the return or waiver of fees associated with the performance of any Excluded Services.

All other provisions of the Policy remain unchanged.



| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| 5 | 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

**CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM ENDORSEMENT**

It is agreed that:

I.  The following definition is added:

**Certified act of terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act.  The criteria contained in the Terrorism Risk Insurance Act for a **certified act of terrorism** include the following:

1.  The act resulted in Insured losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

2.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion. Under your coverage, any losses resulting from a **certified act of terrorism** may be partially reimbursed by the United States Government under a formula established by the Terrorism Risk Insurance Act.   Under the formula, the United States Government generally reimburses 85% through 2015; 84% beginning on January 1, 2016; 83% beginning on January 1, 2017; 82% beginning on January 1, 2018; 81% beginning on January 1, 2019 and 80% beginning on January 1, 2020, of covered terrorism losses exceeding the statutorily established deductible paid by the insurance company providing the coverage. The Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits U.S. Government reimbursement as well as insurers' liability for losses resulting from certified acts of terrorism when the amount of such losses exceeds $100 billion in any one calendar year.

If aggregate Insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case Insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

II.  The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss or damage which would otherwise be excluded under this policy.

All other provisions of the policy remain unchanged.



| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| 6 | 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

**AMEND INSURED EXECUTIVE PROVISION ENDORSEMENT**

| SCHEDULE OF AMENDED POLICY PROVISIONS |
|---|
| **Representations and Severability** condition |
| **Illegal Profit or Conduct** exclusion |
| **Assistance and Cooperation** condition |
| Paragraph B. **Reporting of Claims or Events** in the **REPORTING OF CLAIMS AND EVENTS** section |

It is agreed that:

Solely with respect to the Policy provisions set forth in the above Schedule, the definition of **Insured Executive** is replaced with the following:

**Insured Executive** means any **Insured Individual** while serving as the **Insured Entity's** chief executive officer, chief financial officer, general counsel or head of human resources or while serving in any position anywhere in the world that is functionally equivalent to any one of the foregoing positions.

All other provisions of the Policy remain unchanged.

 <span style="color:blue">AXIS MANAGEMENT & ENTITY LIABILITY</span>

| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| 7 | 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

### AMEND APPLICATION ENDORSEMENT

It is agreed that the **DEFINITIONS** section is amended by adding the following to the definition of **Application**:

   **Application** also means any publicly available documents filed by or on behalf of the Named Insured within 12 months prior to the inception of the **Policy Period** with the Securities and Exchange Commission or any other federal, state, local, or foreign regulatory agency that regulates the Named Insured.

All other provisions of the Policy remain unchanged.



AXIS MANAGEMENT & ENTITY LIABILITY

| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| 8 | 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

### SPECIFIC ENTITY OR INDIVIDUAL EXCLUSION ENDORSEMENT

It is agreed that:

The following Exclusion is added:

This Policy does not apply to any **Claim** brought by or on behalf of the person or entity listed below:

Digital Currency Group, Inc. including any subsidiary, director, or officer of any of the foregoing

All other provisions of the Policy remain unchanged.

AXIS MANAGEMENT & ENTITY LIABILITY

| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| 9 | 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

### NEW ENTITY ADDED ENDORSEMENT

It is agreed that :

The following is added to the definition of **Insured Entity**:

**Insured Entity** also means each entity shown in the SCHEDULE OF INSURED ENTITIES below, including any such entity as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law, as of the respective Effective Date set forth therein; provided that the coverage afforded by this Policy to each such **Insured Entity** and its **Insured Individuals** is subject to any respective Limit, Retention, or Pending or Prior Date set forth in the Schedule.

| SCHEDULE OF INSURED ENTITIES | | | | |
|---|---|---|---|---|
| **Insured Entity** | **Effective Date** | **Pending or Prior Date** | **Limits** | **Retentions** |
| Genesis Global Trading, Inc. | 06/28/2021 | 06/28/2021 | Please refer to the Declarations. | Please refer to the Declarations. |

All other provisions of the Policy remain unchanged.

AXIS MANAGEMENT & ENTITY LIABILITY

| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| 10 | 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

## CONSENT PROVISION AMENDED ENDORSEMENT

It is agreed that:

The phrase "prior written consent of the Insurer" is replaced with the phrase "prior consent of the Insurer," wherever it appears in the **DEFENSE AND SETTLEMENT** section.

All other provisions of the Policy remain unchanged.

AXIS MANAGEMENT & ENTITY LIABILITY

| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| 11 | 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

**ADD SIDE-A EXCEPTION TO BODILY INJURY AND PROPERTY DAMAGE EXCLUSION ENDORSEMENT**

It is agreed that the **Bodily Injury and Property Damage** exclusion is amended by the addition of the following:

Provided, however, that this exclusion does not apply to any **Claim** that is otherwise covered under the **Directors & Officers Liability Coverage**.

All other provisions of the Policy remain unchanged.

AXIS MANAGEMENT & ENTITY LIABILITY

| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| 12 | 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

**APPLICATION RELIANCE ENDORSEMENT**

It is agreed that this policy shall be deemed to include any materials and application forms submitted by or on behalf of the **Insured** to another insurance carrier, if subsequently also submitted to the Insurer in connection with the underwriting of this policy.  Representations contained in such materials and applications shall be deemed to be made directly to the Insurer with the intent that the Insurer rely upon the accuracy and completeness of such information in its decision to issue this policy.

All other provisions of the policy remain unchanged.

AXIS MANAGEMENT & ENTITY LIABILITY

| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| 13 | 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

**NEW YORK AMENDATORY ENDORSEMENT**

It is agreed that:

A.  The **DEFINITIONS** section is amended by:

1.  amending the definition of **Claim** by inserting "(where legally permissible)" after the word "criminal" in item 2.

2.  replacing the definition of **Extended Reporting Period** with the following:

    **Extended Reporting Period** means a designated period immediately following **Termination of Coverage**, during which **Claims** first made against the **Insureds** will be deemed made during the **Policy Period**, but only for **Wrongful Acts** that take place prior to the effective date of **Termination of Coverage**.

3.  adding the following to the definition of **Loss**: "Notwithstanding the foregoing, New York public policy precludes insurance indemnification for punitive damages awards or intentional wrongdoing."

4.  amending the definition of **Pollutant** by deleting "asbestos or asbestos-containing material, lead or lead-containing material, noise, electric, magnetic or electromagnetic field."

5.  adding the following definitions:

    - **Non-Indemnifiable Loss** means **Loss** covered under the **Directors & Officers Liability Coverage** for which the directors or officers of a corporation may not be indemnified by the corporation pursuant to the New York Business Corporations Law ("BCL"), Banking Law ("BL") or Not-for-Profit Corporation Law.

    - **Termination of Coverage** means, whether made by the Insurer or the **Named Insured** at any time, the cancellation or nonrenewal of this Policy, or a decrease in limits, reduction of coverage, increased Retention, new exclusion, or any other change in coverage less favorable to the **Insureds**.

B.  The **LIMITS OF INSURANCE, RETENTIONS, AND REIMBURSEMENT** section is amended by:

1.  adding the following to subparagraph A.3. **Coverage Limits of Insurance**:

    With respect to any **Claim** for which this Policy may provide payment of defense-only costs, as described in 11 NYCRR 262.4(b), however, no more than 25% of such Coverage Limits may be reduced by such payment.

2.  adding the following to paragraph B. **Retentions**:

    The Retention for the **Directors & Officers Liability Coverage** set forth in the DECLARATIONS shall apply separately to each **Insured Individual**, subject to the respective Aggregate Retention for all **Insured Individuals** set forth therein. In the event that the Aggregate Retention for all **Insured Individuals** applies, it shall be prorated among the **Insured Individuals** in proportion to their respective **Non-Indemnifiable Loss**, but in no event shall the Retention per **Insured Individual** be reduced below 75% of the per **Insured Individual** Retention.

C.  The **REPORTING OF CLAIMS AND EVENTS** section is amended by replacing item 1 in paragraph B. **Reporting of Claims or Events** with the following:

1.  It is a condition precedent to coverage under all **Claims-Made Liability Coverages** that as soon as any **Insured Executive** becomes aware of any **Claim**, the **Insured** must notify the Insurer thereof in writing as soon as reasonably practicable, but in no event later than the expiration of the **Policy Period**, any subsequent renewal, or any applicable **Extended Reporting Period**. Failure to give notice as soon as reasonably practicable, however, shall not invalidate any **Claim**, unless the failure to provide timely notice has prejudiced the Insurer or unless the notice is provided after the time prescribed. Failure to give notice within the time prescribed, however, shall not invalidate any **Claim** if it shall be shown not to have been reasonably possible to do so and that notice was given as soon as was reasonably possible thereafter. Notice given by or on behalf of the **Insured** to the Insurer's agent shall be considered notice to the Insurer.

D.  The **EXTENDED REPORTING PERIODS** section is replaced with the following.

   **EXTENDED REPORTING PERIODS**

   A.  **Automatic Extended Reporting Period**

      In the event of **Termination of Coverage**, the **Insureds** will have an automatic, non-cancelable 60-day **Extended Reporting Period** at no charge; provided, however, that if this Policy is issued pursuant to 11 NYCRR 73.2(d)(1), no automatic **Extended Reporting Period** shall be available for any decrease in limits, reduction of coverage, increased deductible or self-insured retention, new exclusion, or any other change in coverage less favorable to the **Named Insured** The automatic **Extended Reporting Period** will be included in the optional **Extended Reporting Period**, if purchased.

   B.  **Optional Extended Reporting Period**

      1.  In the event of **Termination of Coverage**, the Insurer will notify the **Named Insured** within 30 days thereof of the automatic **Extended Reporting Period** and the availability of, the premium for, and the importance of purchasing an optional **Extended Reporting Period**; provided, however:

         a.  If the Policy is issued pursuant to 11 NYCRR 73.2(d)(1), the Insurer will not provide such notice.

         b.  If the claims-made relationship between the Insurer and the **Named Insured** has been in effect for less than one year and the Policy is cancelled for non-payment of premium, the Insurer will not provide such notice and no optional **Extended Reporting Period** is available.

         c.  If the claims-made relationship between the Insurer and the **Named Insured** has been in effect for one year or more and this Policy is cancelled for non-payment of premium, the Insurer will not offer an optional **Extended Reporting Period** unless requested by the **Named Insured**.

         d.  If this Policy is issued pursuant to 11 NYCRR 73.2(d)(1), then no optional **Extended Reporting Period** shall be available for any decrease in limits, reduction of coverage, increased deductible or self-insured retention, new exclusion, or any other change in coverage less favorable to the **Insured**.

AXIS MANAGEMENT & ENTITY LIABILITY

2. The optional **Extended Reporting Periods** available and their respective additional premiums are stated in the DECLARATIONS. Subject to paragraph 1 above, the Insurer shall offer an optional **Extended Reporting Period** of at least one year. The additional premium will be adjusted for any return premium owed because of cancellation or any premium owed to the Insurer for this Policy. Once purchased, the optional **Extended Reporting Period** shall not be cancelable and the entire premium therefor shall be deemed earned.

3. It is a condition precedent to the **Named Insured's** right to elect the optional **Extended Reporting Period** that:

   a. All amounts due under this Policy must be been paid in full.

   b. The **Named Insured** must notify the Insurer in writing of the optional **Extended Reporting Period** elected and pay the additional premium due no later than 60 days after **Termination of Coverage** or 30 days after the notice described in paragraph 1 above is sent by the Insurer, whichever is later.

   If such conditions are not satisfied, the **Named Insured** shall not at a later date be able to exercise such right.

4. If the **Named Insured** has been placed in receivership, liquidation, or bankruptcy, or permanently ceases operations and neither the **Named Insured** nor its agent has purchased an optional **Extended Reporting Period**, then any person covered under this Policy will have the right to request an optional **Extended Reporting Period** for the benefit of all **Insureds**. This right shall lapse unless such person notifies the insurer in writing of the optional **Extended Reporting Period** elected and pays the additional premium due within 120 days of the **Termination of Coverage**. This paragraph 3, however, shall not apply if the Policy is issued pursuant to 11 NYCRR 73.2(d)(1).

C. **Extended Reporting Periods**

1. All **Claims** made during an **Extended Reporting Period** must be reported to the Insurer in accordance with the **REPORTING OF CLAIMS AND EVENTS** section. All such **Claims** will be subject to the Policy's terms and conditions, including any applicable Retention, except as specifically set forth below.

2. In the event similar insurance to that provided by this Policy is in force during any **Extended Reporting Period**, the coverage afforded during such **Extended Reporting Period** shall be excess over any such valid and collectible insurance.

3. If **Termination of Coverage** is pursuant to a decrease in limits, reduction of coverage, increased Retention, new exclusion, or any other change in coverage less favorable to the **Insureds**, any applicable **Extended Reporting Period** shall apply only in regard to that Coverage terminated.

4 The Limits of Insurance applicable to **Claims** made during the **Extended Reporting Period** shall be equal to the remaining Limits of Insurance set forth in the DECLARATIONS.

E. The **CONDITIONS** section is amended by:

1. adding the following to the **Action Against the Insurer** condition:

   If the Insurer does not pay a judgment covered by the terms of this Policy within 30 days from the service of notice of the judgment upon the **Insured** or the Insured's attorney and the Insurer, then an action may be brought against the Insurer under the terms of the Policy for the amount of the judgment not exceeding the applicable Limit of Insurance, except during a stay or limited stay of execution against the **Insured** on such judgment.

With respect to **Claims** arising out of death or personal injury of any person, if the Insurer disclaims liability or denies coverage based upon the failure to provide timely notice, then the injured person or other claimant may maintain an action directly against the Insurer, in which the sole question is the Insurer's disclaimer or denial based on the failure to provide timely notice, unless within 60 days following such disclaimer or denial, the Insurer or the **Insured** initiates an action to declare the rights of the parties under the insurance policy and names the injured person or other claimant as a party to the action.

2.  adding the following is added to the **Other Insurance** condition: "This Policy will be excess over such other insurance in order to avoid duplication of payment."

All other provisions of the Policy remain unchanged.

AXIS MANAGEMENT & ENTITY LIABILITY

| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| 14 | 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

### EMPLOYMENT-RELATED CLAIMS EXCLUSION ENDORSEMENT

It is agreed that the **EXCLUSIONS** section is amended as follows:

1.  Item 1 in the **Bodily Injury and Property Damage** exclusion is replaced with the following:

    1.  bodily injury (excluding mental anguish or emotional distress), sickness, disease, or death of any person.

2.  The following exclusion is added:

    **Employment-Related Claims**

    brought or maintained by or on behalf of any **Insured** or employee of any **Insured** based upon or arising out of the employment or prospective employment of any individual or any employment practice, including, but not limited to, any actual or alleged breach of employment contract, employment-related tortious conduct, violation of any law or public policy concerning employment or any **Similar Law**, or any other employment-related **Wrongful Act.**

All other provisions of the Policy remain unchanged.



| Endorsement Number | Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|---|
| 15 | 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

**LOSS DOES NOT INCLUDE EXCESS CONSIDERATION FOR ANY TRANSACTION ENDORSEMENT**

It is agreed that the **DEFINITIONS** section is amended by inserting the following phrase after the word "entity" in item d in the definition of **Loss**: "or any merger, acquisition, combination, capital stock exchange, asset acquisition, stock purchase, reorganization, recapitalization, or similar business transaction, including, but not limited to, any transaction described in the **Change in Control** or **New and Former Entities** condition in the **CONDITIONS** section."

All other provisions of the Policy remain unchanged.



AXIS MANAGEMENT & ENTITY LIABILITY

| Effective Date of Endorsement | Policy Number | Premium |
|---|---|---|
| 12:01 a.m. on 06/28/2022 | P-001-000658817-02 | N/A |

**GENESIS GLOBAL HOLDCO, LLC AMEND EXCLUSIONS SECTION ENDORSEMENT**

It is agreed that the Section entitled **EXCLUSIONS** is amended as follows:

A.  The preamble is replaced with the following:

This Policy does not apply to **Claims** or **Insured Inquiry Events**:

B.   The following exclusions are added:

This Policy does not apply to **Claims** or **Insured Inquiry Events**:

**Coin Offerings**

based upon or arising out of any Coin Offering, including but not limited to:

1.  any allegation that any whitepaper relating to the Coin Offering:

   a.     contains an untrue or misleading statement of material fact; or

   b.   omits a material fact which should have been stated in the whitepaper or was necessary to make the statements contained in the whitepaper not misleading;

2.  the pre-sale of any virtual or digital tokens or coins attached to any Coin Offering; or

3.  any allegation made by or on behalf of a **Government Authority** that a Coin Offering:

   a.     is an initial or secondary coin offering;

   b.     involves the sale of securities; or

   c.     violates any federal, state, or foreign equivalent securities law, rule, or regulation.

As used in this exclusion, the term "Coin Offering" means any offer of virtual or digital tokens, coins, or currency made by or on behalf of the **Insured Entity** to the public in exchange for consideration.

**Publicly Traded Securities**

based upon or arising out of any public offering of securities issued by the **Insured Entity** or by an **Outside Entity**, or the purchase or sale of any publicly traded securities subject to the Securities Exchange Act of 1934; except this exclusion does not apply to any **Claim** for a **Wrongful Act** in connection with:

1.  any offer, sale, or purchase of securities in a transaction or series of transactions that are exempt from registration under the Securities Act of 1933, as amended, and any amendments thereto or any rules and regulations promulgated thereunder;

2.  the failure of the **Insured Entity** to undertake or complete the initial public offering or sale of securities of the **Insured Entity**; or

3.  the **Insured Entity's** preparation for a public offering of its securities, including any **Wrongful Act** occurring in the course of the "road show" presentation to potential investors, if the offering does not occur.

All other provisions of the Policy remain unchanged.