Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 23-10063-shl

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    GENESIS GLOBAL HOLDCO, LLC,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                    United States Bankruptcy Court

12                    300 Quarropas Street, Room 248

13                    White Plains, NY 10601

14

15                    March 30, 2023

16                    11:04 AM

17

18

19

20

21   B E F O R E :

22   HON SEAN LANE

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   UNKNOWN

1   HEARING re Omnibus Hearing

2

3   HEARING re Doc. #124 Notice Of Agenda

4

5   HEARING re Doc. #135 Motion To Set Last Day To File Proofs

6   Of Claim / Debtors' Application For An Order (I)

7   Establishing Bar Dates For Filing Proofs Of Claim; (II)

8   Approving Proof Of Claim Forms, Bar Date Notices, And

9   Mailing And Publication Procedures; (III) Implementing

10  Uniform Procedures Regarding 503(b)(9) Claims; And (IV)

11  Providing Certain Supplemental Relief

12

13  HEARING re Doc. #130 Application To Employ Houlihan Lokey

14  Capital, Inc. As Investment Banker To The Official Committee

15  Of Unsecured Creditors Nunc Pro Tune To February 3, 2023

16

17  HEARING re Doc. #131 Application To Employ Berkeley Research

18  Group, LLC As Financial Advisor To The Official Committee Of

19  Unsecured Creditors Effective As Of February 14, 2023

20

21  HEARING re Doc. #132 Application To Employ Kroll

22  restructuring Administration LLC As Noticing And Information

23  Agent Effective As Of February 22, 2023

24

25

Page 3

1    HEARING re Doc. #136 Application For Entry Of An Order

2    Authorizing The Employment And Retention Of White & Case LLP

3    As Counsel Effective As Of February 10, 2023

4

5    HEARING re Doc. #158 (Cash Management: 345 Compliance)

6    Statement Of The United States Trustee To The Cash

7    Management Motion

8

9    HEARING re Doc. #133 (Bidding Procedures) Motion To Approve

10   / Debtors' Motion Seeking Entry Of An Order (I) Approving

11   The Bidding Procedures And Related Deadlines, (II)

12   Scheduling Eiearings And Objection Deadlines With Respect To

13   The Debtors' Sale, And (III) Granting Related Relief

14

15   HEARING re Doc. #14 Motion to Authorize /Debtors' Motion for

16   Entry of Interim and Final Orders Waiving the Requirement

17   that Each Debtor File a List of Creditors and Authorizing

18   Preparation of a Consolidated List of Creditors, in Lieu of

19   Submitting a Formatted Mailing Matrix, (II) Authorizing the

20   Debtors to File a Consolidated List of the Debtors' Fifty

21   (50) Largest Unsecured Creditors, (III) Authorizing the

22   Debtors to Redact Certain Personally Identifiable

23   Information, and (IV) Granting Related Relief

24

25

Page 4

1    HEARING re Doc. #137 The Official Committee Of Unsecured

2    Creditors Motion For Entry Of Order Requiring The Redaction

3    Of Certain Personally Identifiable Information

4

5    HEARING re Doc. #67 Motion To File Under Seal / Debtors

6    Motion Pursuant to 11 U.S.C. 107(b),107(c) And 105(a) For

7    Entry Of An Order Authorizing The Debtors To Redact And File

8    Under Seal Certain Information About The Confidential

9    Parties Listed In The Debtors Professional Retention

10   Applications And Schedules

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    WHITE CASE

 4         Attorneys for the Official Committee of Unsecured

 5         Creditors

 6         1221 Avenue of the Americas

 7         New York, NY 10020

 8

 9    BY:  PHILIP ABELSON

10         MICHELE MEISES

11         AMANDA PARRA CRISTE

12         GREGORY F. PESCE

13         J. CHRISTOPHER SHORE

14         COLIN WEST

15

16    LAW OFFICE OF PAUL ARONZON

17         Attorneys for the Debtor

18         250 Park Ave S, 5th Floor

19         New York, NY 10003

20

21    BY:  PAUL ARONZON

22

23

24

25
```

1    CARRINGTON COLEMAN SLOMAN BLUMENTHAL LLP

2         Attorneys for Ross D. Blankenship and Dr. D. Winslow

3         Blankenship

4         901 Main Street, Suite 5500

5         Dallas, TX 75202

6

7    BY:  STEPHANIE ASSI

8

9    MCELROY DEUTSCH MULVANEY CARPENTER LLP

10        Attorneys for New Jersey Bureau of Securities

11        570 Broad Street

12        Newark, NJ 07102

13

14   BY:  JEFFREY BERNSTEIN

15        NICOLE A. LEONARD

16        VIRGINIA T. SHEA

17

18   NORTON ROSE FULBRIGHT US LLP

19        Attorneys for Mirana Corp.

20        1301 Avenue of the Americas

21        New York, NY 10019

22

23   BY:  ERIC C. DAUCHER

24

25

```
 1   CLEARY GOTTLIEB STEEN HAMILTON LLP

 2        Attorneys for the Debtors

 3        One Liberty Plaza

 4        New York, NY 10006

 5

 6   BY:  SABRINA BREMER

 7        JACK MASSEY

 8        RICHARD CHESTER MINOTT

 9        SEAN A. O'NEAL

10        CHRISTIAN RIBEIRO

11        JANE VANLARE

12        MICHAEL WEINBERG

13

14   HUGHES HUBBARD REED LLP

15        Attorneys for Gemini Trust Company, LLC, as Agent

16        One Battery Park Plaza

17        New York, NY 10004

18

19   BY:  ANSON B. FRELINGHUYSEN

20        JEFFREY S. MARGOLIN

21        DUSTIN P. SMITH

22

23

24

25
```

Page 8

1   SULLIVAN CROMWELL LLP

2       Attorneys for FTX Trading and Affiliated Debtors

3       125 Broad Street

4       New York, NY 10004

5

6   BY:  BRIAN D. GLUECKSTEIN

7

8   LATHAM WATKINS

9       Attorneys for Interested Party

10      1271 Avenue of the Americas

11      New York, NY 10020

12

13  BY:  ADAM J. GOLDBERG

14       NACIF TAOUSSE

15

16  TEXAS ATTORNEY GENERAL

17      Attorneys for Texas State Securities Board

18      12221 Merit Dr., Ste. 650

19      Dallas, TX 75251

20

21  BY:  AUTUMN D. HIGHSMITH

22

23

24

25

Page 9

1  PROSKAUER ROSE LLP

2       Attorneys for Ad Hoc Group of Genesis Customers

3       Eleven Times Square

4       New York, NY 10304

5

6  BY:  VINCENT INDELICATO

7       BRIAN ROSEN

8       JORDAN SAZANT

9       MEGAN VOLIN

10

11  WEIL GOTSHAL MANGES LLP

12       Attorneys for Digital Currency Group, Inc.

13       767 Fifth Avenue

14       New York, NY 10153

15

16  BY:  JESSICA LIOU

17       JEFFREY SAFERSTEIN

18

19  TROUTMAN PEPPER

20       Attorneys for Interested Party

21       Hercules Plaza

22       1313 Market Street

23       Wilmington, DE 19899-1709

24

25  BY:  MARCY J. MCLAUGHLIN SMITH

Page 10

1   UNITED STATES DEPARTMENT OF JUSTICE

2         Attorneys for the U.S. Trustee

3         Alexander Hamilton Custom House

4         One Bowling Green, Room 534

5         New York, NY 10004

6

7   BY:  TARA TIANTIAN

8         VALENTINA VLASOVA

9         GREG ZIPES

10

11  NORTON ROSE FULBRIGHT US LLP

12         Attorneys for Marina Corp.

13         1301 Avenue of the Americas

14         New York, NY 10019-6022

15

16  BY:  FRANCISCO VAZQUEZ

17

18  ALSO PRESENT:

19  STEVEN CHURCH

20  HOO RI KIM

21  CHEYENNE LIGON

22  XIU LIU

23  KEN LUKASZEWSKI

24  CRAIG RASILE

25  HEATH D. ROSENBLAT

1    JEFFREY SINGER

2    JACK SCHICKLER

3    KUNAL SOMANI

4    GORDON SUN

5    ERIC IAN ASQUITH

6    BRENDON BARNWELL

7    BRIANNA B. BILTER

8    ANDREW BROWN

9    SELA BROWN

10   BRIAN BULTHUIS

11   DONALD BURKE

12   TAT CHAN

13   TOM CONHEENEY

14   COURTENAY CULLEN

15   JARED DERMONT

16   MICHAEL DIYANNI

17   LEIA E. DORAN

18   ILDAR S. FAZULYANOV

19   DANIEL FORMAN

20   SHUBHANKAR GAHLOT

21   ASHLYN GALLAGHER

22   ELLA GASPAR

23   UDAY GORREPATI

24   JASON GOTTLIEB

25   BRANDON HAMMER

 1   MIRA HAQQANI

 2   TAYLOR HARRISON

 3   MIRANDA HATCH

 4   ETHAN HESELSCHWERDT

 5   DERAR ISLIM

 6   ZUL JAMAL

 7   BARRY JASON

 8   KEEFE JOHNSON

 9   JANE JONES

10   PAUL KINEALY

11   BARAK KLEIN

12   OXANA KOZLOV

13   GLEN KRATOCHVIL

14   KONRAD LAESSER

15   GREGORY LANDEGGER

16   MIKE LEGGE

17   MICHAEL LETO

18   SAMUEL LEVANDER

19   DAVID LOPEZ

20   ALEXANDRA LOTTY

21   PETER MAERKL

22   AKIKO MATSUDA

23   DAVID MAYO

24   KYLE MCKUHEN

25   LAYLA MILLIGAN

Page 13

1    ANAIS MITRA

2    DANIEL NAHON

3    JOHN NGUYEN

4    TYLER OKADA

5    KENNETH L. PERKINS

6    ARIANNA PRETTO-SAKMANN

7    GREGORY RAAB

8    CHRISTIAN RANDLE

9    MOHIT RATHI

10   VERONICA ANNE REYNOLDS

11   LINDA RIFFKIN

12   ANDRES FELIPE SAENZ

13   SAMIRA SARAN

14   THERESE SCHEUER

15   JOE SCIAMETTA

16   ANDREW SCURRIA

17   PETER J. SPROFERA

18   MARK STANCIL

19   BENJAMIN STEELE

20   ANDREW SULLIVAN

21   VINCE SULLIVAN

22   ANDREW SWIFT

23   SECELEY SWINSON

24   BRIAN TICHENOR

25   ANDREW TSANG

1  WILLIAM MATTHEW UPTEGROVE

2  RICHARD R. WESTON

3  LAUREN WALKER

4  JACK WESTNER

5  PAUL WIRTZ

6  SARAH WYNN

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 15

1                    P R O C E E D I N G S

2            THE COURT:  Good morning.  This is Judge Sean Lane

3    in the United States Bankruptcy Court for the Southern

4    District of New York and we're here for an 11:00 o'clock

5    hearing in the Chapter 11 case of Genesis Global Holdco LLC.

6    So, we'll start, as we always do, by getting appearances, so

7    let me find out who's here on behalf of the debtor.

8            MS. VANLARE:  Good morning, Your Honor.  Jane

9    VanLare, Cleary, Gotlebb, Steen and Hamilton, on behalf of

10   the debtors, and I see my partner Sean O'Neal is on as well.

11           THE COURT:  All right, good morning.  And on

12   behalf of the Official Committee of Unsecured Creditors?

13           MR. PESCE:  Good morning, Your Honor.  It's

14   Gregory Pesce, White Case, proposed counsel to the

15   Committee.  In addition to myself, speaking at the hearing

16   today will be Amanda Parra Criste and Michelle Meises.  My

17   partners Christopher Shore and Phil Abelson are also on the

18   line today.  Thank you.

19           THE COURT:  All right.

20           MR. WESTON:  And I'm Richard Weston, co-Chair of

21   the UCC.

22           THE COURT:  All right.  Good morning to you all.

23   And on behalf of the ad hoc group of Genesis customers?

24           MR. SAZANT:  Good morning, Judge Lane.  Jordan

25   Sazant on behalf of the ad hoc group of Genesis lenders,

Page 16

1    Proskauer Rose.

2              THE COURT:  All right, and on behalf of the United

3    States Trustee's Office?

4              MR. ZIPES:  Good morning, Your Honor.  Greg Zipes

5    with the U.S. Trustee's Office.

6              THE COURT:  All right, good morning.  And so,

7    there are obviously quite a few appearances listed on my

8    sheet here and I realize that many of these folks are on for

9    listen-only, so rather than potentially call a long roll

10   call of names for which a lot of folks don't respond, I will

11   simply ask at this point who else needs to make an

12   appearance; that is, folks who expect to be -- to

13   participate actively in the hearing this morning.

14             MR. SAFERSTEIN:  Good morning, Your Honor.

15   Jeffrey Saferstein from Weil, and Gotshal Manges on behalf

16   of Digital Currency Group.

17             THE COURT:  All right, good morning.  Anyone else?

18             MR. MARGOLIN:  Good morning, Your Honor.  Jeffrey

19   Margolin, Hughes, Hubbard and Reed, on behalf -- with my

20   colleague, Anson Frelinghuysen, on behalf of Gemini Trust

21   Company as agents.

22             THE COURT:  All right, good morning.  Anyone else?

23             MS. ASSI:  Good morning, Your Honor.  Stephanie

24   Assi on behalf of Ross D. Blankenship and Dr. Williams (sic)

25   Blankenship.

1           THE COURT:  All right, good morning.  Anyone else?

2    all right.  So, with that, I will turn it over to the

3    debtors to walk us through the agenda that was filed with

4    the docket, Docket Number 168, and I'm open to suggestions

5    as to what order and which way you want to proceed.

6    Counsel?

7           MS. VANLARE:  Yes.  Thank you, Your Honor.  We

8    have a full agenda for this morning's hearing, so I'll just

9    kind of give you an overview of where I think we are and

10   suggest an order.

11          We have a number of retention applications, which

12   I believe are uncontested.  I would suggest we start with

13   those, and then we'll proceed to the substantive motions.

14   We have the Section 345 issue.  I'd like to start with that,

15   following the retention applications.  The U.S. Trustee

16   filed a statement; we filed a reply and we have some

17   additional remarks on that.  I'm hopeful we can resolve that

18   issue.  We also have the bar date motion.  On that, Your

19   Honor, we'll get into the substance.  I believe we're

20   resolved on all issues in principle.  We are working on some

21   language for the orders, so -- and I'll speak more to this

22   when we get there, but I can sort of lay out what I think is

23   an agreement in principle as to the limited objection that

24   had been filed yesterday, and understand that the parties

25   may need a little extra time after the hearing to review the

Page 18

1      order and make sure everybody signs off on the language.

2              Then we have the bidding procedures, and that one,

3      too, Your Honor -- as of right now, we were down to two

4      issues and I think we're very, very close and I in fact am

5      hopeful that perhaps in the next twenty minutes we will get

6      to a fully consensual order, and we're also filing

7      momentarily a blackline of that order, so I can walk Your

8      Honor through the changes we've made.  Again, we're very

9      close.  I'm cautiously optimistic on that one.

10             And then, I thought we would leave for last but

11     not least the issues related to the redactions and the

12     sealing motions, since that includes a number of motions and

13     I believe that may be the lengthiest part of the hearing, so

14     I would propose we leave that for last.

15             THE COURT:  All right.  That all sounds fine.

16     Obviously, when folks are here in the courtroom, we have a

17     little more flexibility in terms of -- or it's easier to

18     sort of say, "Judge, we'd like a moment.  Can we take

19     fifteen minutes?  Can we talk in the hallway?" and I

20     certainly am amenable to taking a break at an appropriate

21     spot to allow you to do virtually what you would otherwise

22     do in person.  And so, I also will say to the extent that we

23     have future hearings where you say, "Gee, Judge.  It would

24     actually be helpful to come in, because we think we're going

25     to have one of those kinds of hearings where it would be

1   helpful to have folks together to have those conversations,"

2   please let me know, because we can always have a hybrid

3   hearing that allows the folks who think it would be

4   beneficial to be in person in person, other folks to

5   participate remotely.  But I'll be guided by the parties in

6   terms of letting me know if you think there's a point in

7   time when it would make sense to take a break.

8        Obviously, it's ten after 11:00.  We may be here

9   for a little while, so that maybe we can take advantage of a

10  lunch break, but again, you all know where you are much more

11  than I do and what would be beneficial.  So, you'll give me

12  your thoughts as we go forward.  So, with that, Ms. VanLare,

13  take it away in terms of teeing up the matters.

14        MS. VANLARE:  Appreciate that, Your Honor.  I'm

15  actually going to pass the virtual podium to the Committee.

16  They have a number of retention applications I believe

17  they'd like to present.

18        THE COURT:  All right, please.  Let me hear from

19  the Committee.

20        MS. CRISTE:  Good morning, Your Honor.  Can you

21  hear me okay?

22        THE COURT:  I can hear you just fine.  Thank you.

23        MS. CRISTE:  Great, Your Honor.  For the record,

24  Amanda Parra Criste of White and Case, proposed counsel to

25  the Committee.  I'll be presenting a number of the

Page 20

1    Committee's retention applications.  I'm going to start with

2    Houlihan Lokey.  The application for Houlihan Lokey to be

3    retained as investment banker can be found at Docket Number

4    130.  By the application, the Committee requests approval to

5    retain Houlihan Lokey as the Committee's investment banker

6    in order to enable the Committee to fulfill its statutory

7    duties.

8            The general deadline, Your Honor, to object to all

9    of the Committee's retention applications was March 23rd.

10   we extended that deadline for the U.S. Trustee only.  We had

11   some great informal discussions with the U.S. Trustee and

12   there were no objections or comments to the form of order.

13   We actually filed a CNO yesterday at Docket Number 175 that

14   attaches the same form of order that was attached to the

15   retention application.  So, unless Your Honor has any

16   questions, we respectfully request that Your Honor approve

17   Houlihan Lokey's retention as investment banker to the

18   Committee and enter the form of order that's attached to the

19   CNO.

20           THE COURT:  All right, thank you very much.

21           MS. CRISTE:  For Number 175, yeah.

22           THE COURT:  All right.  Let me ask if there's

23   anything from the United States Trustee's Office in

24   connection with this application.

25           MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

Page 21

1    Trustee's Office and we have no objection to that retention

2    or any of the other retention applications to short circuit

3    that, Your Honor.  But as with the debtor's counsel, there

4    are certain confidential clients, clients that are involved

5    with litigation that is maybe responding to government

6    investigations or that were maybe on a list of companies in

7    trouble that may be a debtor in the future and other types

8    of clients of those types that are being redacted from the

9    public record and that are being shared with U.S. Trustee's

10   Office and others involved, and I just wanted to make clear

11   that there are -- we're consenting to some redactions in

12   that context, and that applies for all the professionals.

13            THE COURT:  All right, thank you very much.  That

14   sounds eminently sensible and fair under the circumstances.

15   Any other party that wishes to be heard in connection with

16   this application?

17            All right, hearing no responses and in light of

18   the CNO and the record, I'm happy to grant this application

19   on the terms set forth in the motion and consistent with the

20   professional compensation outlined fee and expense structure

21   that's explained in the motion as appropriate under the

22   facts and circumstances of the case and applicable law.

23   Next up.

24            MS. CRISTE:  Thank you, Your Honor.  Next up is

25   the Committee's application to retain Berkeley Research

Page 22

1    Group as financial advisor to the Committee.  The

2    application can be found at Docket Number 131.  By the

3    application, the Committee requests approval pursuant to

4    Section 328 and 1103 of the Bankruptcy Code to retain BRG as

5    financial advisor effective February 14, 2023.

6            Like the other retention applications, the

7    objection deadline was March 23rd.  We extended it for the

8    U.S. Trustee, but we didn't receive any comments or

9    objections, so we also filed a certificate of no objection

10   yesterday at Docket Number 176.  And unless Your Honor has

11   any questions, we would respectfully request that Your Honor

12   approve the retention of Berkeley Research Group as

13   financial advisor to the Committee.

14           THE COURT:  All right, thank you very much.  Let

15   me ask if there's any party that wishes to be heard in

16   connection with this application.

17           All right.  Hearing no responses other than the

18   one that Mr. Zipes has already put on the record -- the only

19   thing I would ask, counsel, is if you would explain for

20   folks who may be less familiar with how large bankruptcy

21   cases work the difference between having Houlihan Lokey as

22   an investment banker and Berkeley Research Group as a

23   financial advisor, just because I think for folks who may be

24   -- customers who may be listening in, that may not be quite

25   as obvious a point as it is for professionals who

Page 23

1    participate in these cases on a regular basis.

2              MS. CRISTE:  Sure, Your Honor.  So, BRG as

3    financial advisor to the Committee is really going to help

4    assist with developing periodic reports, monitoring the

5    debtor's financial performance, reviewing the schedules and

6    statements that the debtor has recently filed, monitoring

7    things like liquidity, cash flow, scrutinizing cash

8    disbursements that the debtors might be making, reviewing

9    monthly operating reports, working with White and Case to

10   analyze the relief (indiscernible) that the debtors might be

11   seeking, monitoring and reviewing intercompany transactions.

12   So, those are things that are BRG's goal as financial

13   advisors.

14             Houlihan Lokey as investment banker is going to be

15   helping the Committee analyze potential restructuring

16   transactions, whether through a Chapter 11 plan or

17   otherwise.  They're going to also be helping us monitor the

18   sale process that the debtor is actually seeking approval to

19   launch today, including, you know, working with the debtor's

20   advisors to analyze potential bids and consult with the

21   debtors on that process.  So, those are kind of the

22   differences between the two.  They are pretty significant.

23             THE COURT:  All right.  Thank you very much for

24   that explanation.  I'm happy to grant the motion and

25   application for the employment retention of Berkeley

Page 24

1    Research Group as financial advisor to the Official

2    Committee.  I find it to be appropriate under the facts and

3    circumstances of the case and consistent with applicable

4    law.  So, next up?

5              MS. CRISTE:  Next up is the Committee's

6    application to retain Kroll Restructuring Administration as

7    noticing and information agent.  As we reported at the last

8    hearing, Your Honor, the Committee is very active in its

9    communication and outreach.  We launched a website with

10   Kroll, and so this application is just an extension of the

11   relief that we received under our information protocol

12   motion to retain Kroll as the Committee's noticing and

13   information agency in these cases.

14              Like the other retention applications, the

15   deadline was March 23rd.  We didn't receive any comments or

16   objections.  We also filed a certificate of notice for

17   Kroll's application, and that's at Docket Number 177.  The

18   proposed order is attached to that certificate.  So, unless

19   Your Honor has any questions, we would respectfully request

20   that the Court entered the order approving Kroll's retention

21   as information agent to the Committee.

22              THE COURT:  All right, thank you very much.

23   Anyone who wishes to be heard on this application?

24              All right, hearing no responses other than Mr.

25   Zipes's earlier, more global comment, I'm happy to approve

Page 25

1    this application as well as appropriate under the facts and

2    circumstances of the case and consistent with applicable

3    law, and I think next up, then, is the application dealing

4    with the Committee's counsel.

5            MS. CRISTE:  Yes, Your Honor.  That's the last

6    one.  The application to retain White and Case as legal

7    counsel to the Committee is that Docket Number 136.  By the

8    application, the Committee is requesting approval to retain

9    White and Case as counsel effective February 10th pursuant

10   to Section 382 and 1103 of the Bankruptcy Code.

11           Like the others, the objection deadline was March

12   23rd.  We didn't receive any comments, Your Honor, or

13   objections.  The same comment that Mr. Zipes made applies to

14   White and Case as well, but we went ahead and filed a

15   certificate of no objection yesterday as well for the White

16   and Case application and that's at Docket Number 178.  So,

17   Your Honor, unless you have any further questions, we would

18   respectfully request that the Court approve the retention of

19   White and Case as counsel to the Committee.

20           THE COURT:  Thank you very much.  Any party wish

21   to be heard in connection with this application?

22           All right, hearing no response other than Mr.

23   Zipes's earlier global comment about all these retentions,

24   I'm happy to grant this retention application as well as

25   appropriate under the facts and circumstances of the case

Page 26

1    and applicable law.  And we will await electronic versions

2    of the proposed order from counsel and get those entered.

3    Thank you.

4              MS. CRISTE:  Thank you very much, Your Honor.

5              THE COURT:  All right.  So, next up, I imagine

6    that debtor's counsel will be taking the laboring oar in

7    terms of the next matter.

8              MS. VANLARE:  Yes, Your Honor.  Thank you very

9    much.  So, would like to proceed to the Section 345 issue.

10   As you may recall, Your Honor, this was expressly carved out

11   of the final cash management order, so we are here before

12   you to resolve that on a final basis.

13             As I mentioned, U.S. Trustee had filed a statement

14   on this issue -- and I should note, we have been in

15   discussion with the U.S. Trustee's Office on Section 345

16   issues really since we filed, and probably before we filed,

17   so this is really the culmination of a lot of discussions

18   and we have made a lot of efforts over the past couple

19   months to make -- to be in compliance with Section 345 to

20   the extent possible.  So, Your Honor, we did file a

21   statement in reply to some of the issues raised by the

22   United States Trustee.  I'll just briefly summarize I think

23   the -- our response on the various points.

24             So, first, with respect to the cash assets, as we

25   noted, we have moved all of the debtor's cash assets out of

Page 27

1    noncompliant accounts.  I know we've spoken in previous

2    hearings about all of our efforts, which have been very

3    successful given the recent turmoil in the banking industry,

4    to safeguard the debtor's assets.  So, we have moved

5    everything out of noncompliant accounts.  There is one

6    account maintained by Merricks Capital Markets that we are

7    in the process of closing.  It has just over $3 million in

8    it.  We expect that to be closed in the next few weeks and

9    we've discussed this with the Office of the U.S. Trustee,

10   and we ask for an extension of our time to complete that

11   closure until April 14th, and I believe that Mr. Zipes has

12   no issues with that.

13           Next, the U.S. Trustee raised issues with respect

14   to our digital assets.  I will note that this has been a

15   topic of significant discussions with the Committee.  It's

16   also outlined in Paragraph 6 of the final cash management

17   order; namely, that the debtors are authorized to maintain

18   and manage their digital assets subject to a set of

19   limitations and significant disclosure obligations which we

20   have undertaken, again, to share information both with the

21   Committee on a regular basis as well as to file reports on a

22   regular basis on the public docket so that everyone can see

23   them.  So, I believe we've more than satisfied our

24   obligations in terms of ensuring that our assets are

25   safeguarded and that parties in interest have visibility

Page 28

1    into the processes of safeguarding them.

2              In addition, based on the request of the United

3    States Trustee, I also wanted to share some of the security

4    measures that the debtors have undertaken to ensure the

5    safety of the digital assets, and so I'd just like to

6    describe some of those to Your Honor on the record.

7              THE COURT:  Please.

8              MS. VANLARE:  Most of the digital assets of the

9    debtors are stored within Fireblocks, which is a trusted and

10   leading custody software provider with numerous industry-

11   leading security certifications.  All transactions within

12   Fireblocks require multi factor authentication and a forum

13   to execute.  Since January 20th, 2023, the Fireblocks

14   workspaces containing the debtor's assets other than those

15   used in spot trading by Gap were frozen such that

16   transactions are not currently possible unless following a

17   very specific security protocol, including a video

18   verification process and a forum to execute.

19             With respect to the spot training at Gap, which is

20   the Singapore entity, the pre-petition Fireblocks policies

21   all remain in effect.  Among other things, these policies

22   limit who is authorized to initiate or approve transactions

23   and require the approval of multiple parties for any

24   significant transactions to an external address.  On a daily

25   basis, the company sends out reporting to identify any

1    changes across all companies, including GGC and Gap, to

2    management of the debtors and the debtor's financial

3    advisors.  Finally, the company has provided the Fireblock

4    and Ledger wallets to the UCC advisors and provides weekly

5    detailed reporting to the UCC advisors on both the quantity

6    and the market changes on a digital asset basis.

7             So, with that, Your Honor, I will turn to the

8    third sort of category of issues raised by the U.S. Trustee,

9    and that has to do with the so-called trust assets.  These

10   are shares of certain trusts sponsored by Grayscale

11   Investments.  We -- the debtors have held these shares since

12   the petition date.  We have not changed our holdings of

13   those shares.  We've not acquired new shares; we've not

14   liquidated shares.  We don't think that they are subject to

15   Section 345.  To the extent they are, we would request a

16   waiver with respect to these assets.  Your Honor, we've had

17   a number of discussions with the U.S. Trustee on this issue.

18   The U.S. Trustee hasn't articulated any alternative to what

19   we are doing with those assets; namely, holding them for the

20   time being.  We've also discussed this with the Committee

21   and the Committee agrees that no action with respect to the

22   trust shares should be taken at this time.

23            So, given all that, Your Honor, we would ask that

24   you approve the relief we've requested with respect to the

25   issues.  That includes, again, a limited waiver of Section

1    345 that to the extent needed, an extension of really just a

2    few weeks to close that final account, and I believe we've

3    resolved or addressed, at least addressed, all of the issues

4    raised by the U.S. Trustee.  But I'll stop there and let Mr.

5    Zipes chime in.

6              THE COURT:  All right.  Mr. Zipes?

7              MR. ZIPES:  Your Honor, thank you, and thank you

8    to Ms. VanLare as well for that detailed explanation, which

9    I think is -- accurately reflects our discussions.

10             Your Honor, the easiest one just to take first is

11   the cash assets, and as stated, my office has no objection

12   to an extension of time to close out that last account and

13   move it into an authorized depository.  And Your Honor, you

14   may have noted our statement that we filed.  It wasn't an

15   objection; it was more of a request for further explanation

16   in connection with the digital assets and the trust assets.

17   These crypto cases are somewhat unique and my office is used

18   to dealing with 345 issues in the more traditional sense,

19   making sure there's collateral associated with that so the

20   debtors don't suffer the insult to injury that they are

21   already in bankruptcy and they lose major assets.

22             We look for insurance to be in place as well, to

23   the extent 345 doesn't apply, and here we have significant

24   assets that are in crypto or other types of investments that

25   can't be insured in traditional ways.  In the Celsius case

1    and other cases, this came up, and there was in Celsius, for

2    example, further representations on the record on what

3    protections and safeguards are in place.  And Your Honor, my

4    office is again not objecting to this, but we thought it was

5    appropriate to make a more fulsome record.  There's

6    literally hundreds of millions of dollars in these assets,

7    tied up to these assets, and we think it's important that a

8    fulsome record be made and the Court specifically find that

9    these are actually being protected in the bankruptcy case,

10   because we don't want a scenario where large dollar amounts

11   disappear in a bankruptcy case.  That wouldn't happen

12   possibly in more traditional cases where everything is

13   sitting in an authorized depository and protected.  So --

14           THE COURT:  All right.  Thank you very much.  And

15   let me hear from the Committee, who obviously has been

16   involved in these discussions as well.

17           MR. PESCE:  Thank you, Your Honor.  It's Gregory

18   Pesce, White and Case, again, on behalf of the Committee.

19   We've had a lot of discussions with the debtor and the U.S.

20   Trustee on this, and Mr. Zipes mentioned the Celsius

21   bankruptcy, which I'm very familiar with, because I

22   represent the Committee in that case as well.  In looking at

23   what was done in that situation and what has been done here,

24   the Committee standing here today is comfortable with the

25   protocol that exists.  In the Celsius case, which Mr. Zipes

Page 32

1    mentioned, at the time cash management was being dealt with

2    there was a little bit more unsettled question about the

3    treatment of the crypto assets as cash management assets.

4    There was also significant allegations of fraud against the

5    founders and the management team at the time, and all of

6    them held foreign passports and many of them were residents

7    outside of the United States in non-extradition countries.

8           As a result of that unique mix, in that case

9    unique circumstances -- unique protocols were imposed to

10   require people be in the United States and hold back foreign

11   passports to make sure that the keys wouldn't be distributed

12   and people could flee the country.  Suffice it to say, those

13   circumstances and other kinds of concerns don't exist here

14   today.  The Committee, though, is mindful that the $1.1

15   billion in liquid crypto is a very significant form of

16   consideration that the creditors are going to get at the end

17   of the bankruptcy.  We are very closely monitoring.  We

18   appreciate the debtor's professionals working with our

19   professionals at BRG on this in particular.

20          We're going to monitor the situation, and if it is

21   necessary or prudent in the future, the Committee won't shy

22   away from seeking additional relief or speaking with Mr.

23   Zipes or Ms. VanLare and their respective clients to ensure

24   that crypto is protected.  But on the record today, we have

25   no issue with cash management continuing on the terms that

Page 33

1    we've negotiated and agreed to with the debtor.

2         THE COURT:  All right.  Thank you very much.  And

3    so, let me open it up to any other party who might briefly

4    wish to be heard.  I'm not sure there is a party who's been

5    involved in these kinds of discussions with the estate other

6    than the folks that we've already heard from, but in the

7    interest of the record, anyone else?

8         All right.  Hearing no other response -- so, I

9    think it's important for purposes of this to understand what

10   we are looking at and what bucket it goes in.  So, 345 deals

11   with money of the estate.  It's actually in the title of the

12   section, and of course, this is one of these cases where the

13   reality of the modern day has sort of left the categories of

14   the code perhaps in the dust.  And so, I think as to the

15   first category, which is US dollar-denominated assets as

16   described in I guess the debtor's statement in reply, we

17   have an agreement that the Merricks Capital Markets account,

18   which is $3 million, is going to be closed in the next few

19   weeks.  There is an extension of time to mid April to do

20   that. I think we're all in good shape, and that really is

21   the true 345 issue.

22        As to the other accounts, the digital assets and

23   the trust shares, I haven't received any argument and no

24   one's made the argument that these are money in the

25   traditional sense of 345.  Of course, that's a very

Page 34

1    complicated question to wade into and I don't know as a

2    matter of sort of existential certainty that we need to

3    solve that problem here today, because really, what 345 is

4    addressing is security of assets, and so that's what cash

5    management motion is designed to address, and so we can

6    address it in that context and I think that's what the

7    parties have done and I find that to be entirely

8    appropriate.

9              And so, I am very happy to have gotten the

10   additional explanation by Ms. VanLare talking about

11   Fireblocks and the other -- in the way that promotes

12   security for the digital assets.  That's very helpful.  I

13   was going to ask for some additional information on that

14   score, knowing full well that the debtors and the Committee

15   and the U.S. Trustee had had those conversations, but I

16   thought it would be useful to have it on the record here and

17   in fact now it is on the record.  So, one of -- I appreciate

18   everybody having these conversations and the level of

19   communication that's involved.  I appreciate essentially the

20   additional proffer provided by the debtors about the

21   security measures; that is, what is referred to as the

22   safeguard and protocols in Paragraph 6 of the final

23   statement and reply in Docket 180 and the additional

24   explanation.

25              So, I am -- I also appreciate the fact that the

Page 35

1    Committee of the creditors, the Official Committee here, is

2    uniquely close to the business of the debtors here and is --

3    one of the values that the Committee serves is for things

4    exactly like this, and so I appreciate their involvement,

5    and given all of the facts and circumstances here, I am

6    satisfied with the security safeguards and protocols that

7    have been discussed for the digital assets.  And similarly,

8    I reached the same conclusion for the trust shares.  It

9    sounds like you folks have decided that the best way to go

10   here is the status quo, and to leave them exactly where they

11   are to not increase the debtor's holdings of these trust

12   shares but do not diminish them either.

13           In reaching that conclusion about the

14   appropriateness of the handling of the trust shares as well

15   as the digital assets, I recognize that we are always

16   walking a fine line between allowing the debtor to run its

17   business and also protecting the assets, so the debtor is in

18   the business that it's in and therefore it has digital

19   assets, so the notion that the debtor would divulge itself

20   in digital assets or other assets that are not held in a

21   more traditional ways that would be subject to 345 might

22   require the debtor to essentially shutter its doors, thus

23   destroying value and wreaking havoc that no one thinks is

24   appropriate here.

25           So, I think for the purposes of today I'm not

Page 36

1    concluding that the two categories of digital assets or

2    trust shares fall under 345, but I do think they are

3    entitled to appropriate security.  I think I'm satisfied

4    that appropriate steps have been taken as a result of

5    substantial discussions with the Committee and the U.S.

6    Trustee's Office, and I also note that no one has

7    articulated any preferred alternative to what's been

8    proffered by the debtors and what's been reached as a result

9    of those conversations.

10          So, in light of all that, I'm satisfied at the

11   moment, and in light of the record that I have in front of

12   me, that we are in a good place and that the requirements of

13   345 have been satisfied and that the cash management is

14   appropriate.  And obviously, folks will continue to keep a

15   close eye on things.  That's made very clear, the need to do

16   that in light of the banking situation where certainly

17   that's an industry that folks think of as a more traditional

18   industry and has lately had quite a bit of economic

19   upheaval.  So, I will trust all parties to keep their eyes

20   open and continue to monitor as is consistent with their

21   fiduciary obligations under the Bankruptcy Code, and again,

22   I've been provided with no reason to doubt the exercise of

23   their fiduciary duties on anything that happened in this

24   case.

25          So, I think for purposes of today, I'm happy to

Page 37

1    grant the limited waiver of Section 345 for that one

2    account, and I'm satisfied with the other assets of the

3    debtors that have been under discussion in the context of

4    this particular issue.  So, with that, I think we can move

5    on to the next matter.

6              MS. VANLARE:  Excellent.  Thank you very much,

7    Your Honor.  Next we'd like to address the bar date motion.

8    Your Honor, apologies for filing it this late, but we've

9    been working very hard to iron out the remaining issues.  We

10   did file a revised bar date order and forms at Docket Number

11   190 just -- I think just before this hearing started.

12             So, we -- what I'd like to propose is -- I'm happy

13   to walk through the blackline and address some of the

14   changes that we've made in consultation with various parties

15   in interest, and then I'd like to address the limited

16   objection that was filed.  As I mentioned at the beginning

17   of the hearing, I believe we've reached an agreement in

18   principle that resolves the objection, but I understand that

19   people want to have a chance to have a final look at the

20   order, which we're fine with doing.  So, what I'd propose to

21   do there is just again describe to Your Honor what the

22   arrangement is in principle, and people can reserve rights

23   to review the order.

24             THE COURT:  All right.  I think that sounds

25   eminently sensible, so please proceed.

1          MS. VANLARE:  Thank you, Your Honor.  And just so

2     I know, are you able to pull up the blackline that we just

3     filed?  Again, I realize --

4          THE COURT:  I think I had the state of the art

5     orders up through Docket 186, which was the orders on the

6     sealing motions, and then 185, which was the revised order

7     on the creditor list, but I don't believe I have 190.

8          MS. VANLARE:  Okay.

9          THE COURT:  I think probably -- am I right in

10    saying I think you could probably make yourself understood

11    just by walking through it here today from the podium?

12         MS. VANLARE:  Absolutely, Your Honor.  Absolutely,

13    and --

14         THE COURT:  We'll do that rather than wait for me

15    to kill some trees and follow along, so I trust your

16    advocacy skills are more than up to the task, so take it

17    away.

18         MS. VANLARE:  I appreciate that, Your Honor.

19    Okay.  And if anybody else is following along, I am going to

20    start going through -- the blackline starts at about PDF

21    Page 64.  So, first we have the proof of claim.  We made

22    certain clarifying changes to the proof of claim form.

23    Because we are dealing with crypto currency, we just made

24    clear that if the claim is based on a crypto currency

25    holding, that a creditor should list those crypto currency

Page 39

1    holdings and they should only provide a value in US dollars

2    if their claim is actually denominated in US dollars, and

3    that'll just make the process of reconciliation and claim

4    resolution run a lot more smoothly.  So, these are -- this

5    is all in the nature of cleanup and just ensuring that the

6    claim form is as clear as possible for our creditors.

7             THE COURT:  All right, and I assume with that

8    allows you to do is match sort of like with like.  You're

9    tracking the value as it is in essentially the debtor's

10   books and records, which is not in US dollars but in a

11   different denomination.

12            MS. VANLARE:  That's exactly right, Your Honor.

13            THE COURT:  All right.

14            MS. VANLARE:  Next is the bar date notice.

15   Really, these are largely cleanup changes.  I did want to

16   highlight some changes that we've made with respect to the

17   Gemini lender master proof of claim.  The bar date order

18   provides that Gemini as agent under the Gemini Earn program

19   is authorized to file a master proof of claim on behalf of

20   the Gemini lenders for the repayment of any amounts pursuant

21   to the relevant master loan agreements.  The term we use in

22   the bar date motion is "Gemini MLAs" between GGC, which is

23   debtor entity Genesis Global Capital, Gemini, and each

24   Gemini lender.  The changes make clear that any Gemini

25   lender wanting to assert a pre-petition claim for an amount

Page 40

1    greater than the Gemini lenders' Gemini borrowings in the

2    Gemini Earn program or any pre-petition claims other than

3    that for the repayment of the Gemini borrowings shall be

4    required to submit a proof of claim; that is, a separate

5    individual proof of claim, with respect to such pre-petition

6    claims on or before the bar date unless there is another

7    exception.  We also based on the request of --

8             THE COURT:  Can I back up for a second?  I guess

9    I'm just wondering -- it's a little unusual, so I'm

10   wondering what the motivation is behind sort of making that

11   explicit.  I'm all for explicit, but just curious what the

12   window is into the thinking there.

13            MS. VANLARE:  Absolutely, Your Honor.  So, as

14   we've I think described in our papers and perhaps at earlier

15   hearings, Genesis Global Capital, Gemini, and the Gemini

16   lenders entered into a series of master loan agreements.

17   This was done under the auspices of the Gemini Earn program

18   that's administered by Gemini as agent under those master

19   loan agreements.  The debtors do not know the identity or

20   the holdings of the Gemini lenders, and so the idea is to

21   facilitate and make it easier for folks to submit their

22   proof of claim by enabling Gemini as agent to submit a

23   master proof of claim based on the amounts that the Gemini

24   lenders see as part of the Gemini Earn program portal.

25   However, we want to make clear that the master proof of

Page 41

1    claim will include claims for the repayment of borrowings,

2    but if an individual Gemini lender -- they believe that the

3    debtors owe -- Genesis Global Capital owes more than what is

4    stated by Gemini in their portal or if they have -- if they

5    wish to assert a claim other than that for repayment of the

6    borrowings, they should file -- have the right to and should

7    file an individual proof of claim before the bar date.

8            THE COURT:  All right.  Thank you for that.

9            MS. VANLARE:  Your Honor, as I was saying, the ad

10   hoc group has requested really for administrative ease for

11   both their client as well as the debtors to file a master

12   proof of claim, listing each of their holders -- they have a

13   large group of holders, and rather than basically putting

14   together what I presume would be very similar, if not

15   identical, proofs of claim, they are going to list the

16   claims of their clients and provide that to the debtors.

17   And so, the bar date order outlines that procedure again as

18   a way to make the process more efficient for both the ad hoc

19   group as well as the debtors.

20           THE COURT:  All right.

21           MS. VANLARE:  We have -- in the list of the

22   categories of claimants that do not need to file a proof of

23   claim, we've deleted intercompany claims by a Holdco

24   subsidiary or Genesis Global Trading.  The idea is that

25   intercompany claims of course are disclosed in the

1     schedules, and so if the debtors don't have an issue with

2     the claims disclosed in the schedules, intercompany claims

3     do not need to be filed.  Based on comments from the

4     Committee, they wanted to be clear that if we disagreed with

5     the schedules, that intercompany claimants should have to

6     file a proof of claim.

7             THE COURT:  All right.

8             MS. VANLARE:  We've also deleted former officers

9     and directors and employees of the debtors from the list.

10    In other words, former -- so, current officers, directors,

11    and employees of the debtors do not need to file a proof of

12    claim based on indemnification, contribution, or

13    reimbursement, but former officers, directors, or employees

14    do have to file a proof of claim if they wish to assert one

15    based on indemnification, contribution, or reimbursement.

16            THE COURT:  All right.

17            MS. VANLARE:  I believe other changes are

18    conforming changes in line with the procedure that I've

19    outlined with respect to the Gemini lenders and the ad hoc

20    group lenders.  We do -- we did add some language that if

21    you are a Gemini lender and you rely on your individual

22    account page, that may be accessed through that Gemini Earn

23    program's website and the mobile app, and is your

24    responsibility to determine that the claim is accurately

25    listed in such website and mobile app as that is the amount

Page 43

1    that will be listed for the pre-petition claim and the

2    Gemini master claim.  And the idea there, again, is that

3    claimants should verify the amount and see if they agree

4    with the amount that Gemini has on its records as the amount

5    owing to that particular lender, and of course as I've

6    outlined earlier, to the extent that they believe that the

7    amount should be greater, they have their right to file an

8    individual proof of claim and we will -- against the

9    debtors, and we will of course review that.

10                  Next we have the --

11                  THE COURT:  All right -- go ahead.

12                  MS. VANLARE:  Thank you, Your Honor.  Next we have

13   the publication notice.  I believe that just has clarifying

14   changes, and again, changes consistent with those that I've

15   outlined already, so I'm not going to repeat them.

16                  As part of the exhibits to the order, Your Honor,

17   we've also included a Gemini bar date notice.  So, Gemini

18   will be sending a notice to the Gemini lenders and

19   distributing it.  Again, Gemini has as part of the program

20   been the party that the lenders have dealt with and they've

21   received information that way, so we're staying consistent

22   with that and so Gemini will be distributing the bar date

23   notice to get the information out to the Gemini lenders so

24   that they may protect their rights and pursue their rights

25   under the bar date order.  I believe all of the changes to

1    that notice, again, have been consistent with what I've

2    described.

3              THE COURT:  All right.

4              MS. VANLARE:  It will also include the general bar

5    date notice, and that was a comment from the Committee, I

6    believe, and again, we are trying to make sure that

7    everybody has all the information.

8              I believe the remaining changes, Your Honor, are

9    again consistent.  I'm just scrolling to make sure the order

10   also reflects some of these changes that I've described.

11   Okay.  I believe I've highlighted all of the substantive

12   changes.  So, I'm happy to now proceed with just addressing

13   what I believe to be a resolution in principle of the

14   limited objection that was filed by the Blankenships, who

15   are Gemini lenders, and what we have been discussing with

16   our counsel prior to the hearing.

17             I understand that their concern is they want to

18   make clear that nothing in the bar date order is a

19   determination of the Blankenship's voting rights on any

20   Chapter 11 plan presented in the cases, the nature or scope

21   of any releases of the Blankenships in a plan, or a waiver

22   of their right to object to any bankruptcy plan.  We would

23   also say that the proposed bar date order does not waive

24   their right to challenge Gemini's authority to act as their

25   agent outside -- other than filing the Gemini master proof

1    of claim, as I've described.  And furthermore, inclusion of

2    their clients claims in the Gemini master claim does not

3    bestow any authority on Gemini to grant any third-party

4    releases on behalf of the Blankenships, including that of

5    Gemini and any releases of its directors or officers under

6    any plan.

7            So, I think that again articulates in principle

8    what we've discussed.  I know that -- I'm sure parties will

9    probably want to tweak the language, but with that, I will

10   let other parties in interest weigh in.  I believe, again,

11   we have resolved all the issues in principle, so with that,

12   I will stop and let other parties weigh in.

13           THE COURT:  All right.  Let me ask if there's

14   anyone from the Blankenships who wish to be heard who filed

15   a limited objection, and before I hear from them, I will

16   note that I have gotten some papers that were filed after

17   deadlines in this case.  I know we got something filed at

18   4:45 yesterday, and this objection was I think some five

19   days after the deadline.  The reason the deadline exists is

20   to make sure that I have sufficient time to actually read

21   and consider everything that you file, so it's very much a

22   "help me to help you" kind of circumstance, and so that's

23   why we always ask that people reach out to Chambers if

24   you're going to get extensions, just so that I know to allot

25   time, and if for some reason because of other customers here

1    of the Court I don't have the time, I can then warn you off

2    and say, "I really won't have a chance to read it."

3         So, I just mention that.  I'm not trying to scold

4    anybody.  I'm just trying to get the word out so that you

5    all know.  So, for example, some things were filed this

6    morning.  I had a calendar at 10:00 and that's a perfect

7    example of just -- if something happens after 10:00, between

8    10:00 and 11:00, I just don't have the opportunity.  So,

9    again, if you have any questions about extensions of time,

10   I'm always happy to give people as much time as possible,

11   particularly because that often reflects in negotiations to

12   try to resolve issues and that is crucial to the bankruptcy

13   process and consistent with the bankruptcy process.  So,

14   just -- but always just keep us in the loop.  So, with that,

15   I'll get off my soapbox and ask if the Blankenships wish to

16   be heard in connection with the bar date.

17         MS. ASSI:  Yes, Your Honor.  Thank you.  Stephanie

18   Assi on behalf of the Blankenships.  And Your Honor, I

19   apologize.  You know, the individual --

20         THE COURT:  No, I don't need an apology.  It's

21   really -- I just want to keep people in the loop as to why

22   we do what we do and how it operates to getting the business

23   of the Court done and all of your needs addressed.  So, I

24   took your objection -- a lot of things in the objection

25   really to be about the substance of things that aren't in

1    front of the Court today.  So, for example, there's a

2    discussion later on talking about what the plan says, and

3    obviously none of this affects the plan as any -- everyone

4    has all their rights.  So, I think Ms. VanLare's comments

5    really are a more precise way of sketching that out in a

6    variety of different contexts that the bar date order is

7    simply that, the bar date order.  But more to the point, let

8    me ask you if Ms. VanLare's explanation of things on the

9    record does resolve your objection.

10           MS. ASSI:  Thank you, Your Honor.  Not fully.  I

11   think that we are close, but there's a couple things that I

12   would just like to address that I don't feel were in the

13   revised proposed order.

14           THE COURT:  Again, remember that this is the bar

15   date order and we are not -- I don't want to hear about

16   people's substantive legal rights, which were all preserved.

17   Nothing in the bar date order affects those legal rights,

18   and so I don't normally see objections like this for that

19   reason, but go ahead.

20           MS. ASSI:  Yes, Your Honor.  Thank you.  I

21   understand.  My issue is with really the definition of what

22   Gemini's authority is and with Gemini filing the master --

23           THE COURT:  Why is that an issue for today?

24   Nothing in the bar date order affects what Gemini's

25   authority is or isn't.  I think Ms. VanLare actually also

```
1    just made explicit what was -- what I think was already

2    implicit from the notion of a bar date order as compared to

3    an adjudication of anyone's rights.

4           MS. ASSI:  I understand, Your Honor.  The master

5    claim -- if Gemini were to file the master claim as defined,

6    it would encompass more than just the claims against the

7    debtors and just for the repayment of claims.  We had

8    discussed a revised definition of that.  The issue is that

9    Gemini is a counterparty as well and is liable, and so if

10   Gemini files this claim on behalf of all of the Gemini

11   lenders and then when it comes time to -- to the plan,

12   Gemini is acting on behalf of the claimants and access agent

13   and (indiscernible) later and so --

14          THE COURT:  Well, no.  If you're talking about

15   claims and the filing of claims and who is filing what

16   claims on behalf of who, you had me at "Hello."  If you are

17   talking about somehow it being imputed about what Gemini's

18   authority is to bind or not bind parties when it comes to a

19   planet process, that is a totally separate issue.  That is

20   not what a claims bar date does.  So, again, I don't know

21   how I could be any more clear that this is not an

22   adjudication of anybody's rights vis-à-vis anybody else.

23   What the -- what I understand, that the changes that were

24   discussed are consistent with the notion of a bar date order

25   where what you're trying to do is give notice -- that's the
```

Page 49

1    most important thing -- to people that they need to file a

2    claim.  And two, to provide for inappropriately efficient

3    and administratively easy process so that people -- it's not

4    too difficult for people to preserve their rights to be

5    creditors in the case.  That's what it really does.  It's

6    not here to adjudicate the implicit or explicit

7    ramifications of Gemini, who was acting as agent for whom.

8    That's not what it's doing.  It's not an adjudication of

9    claims.

10          So, again, I'm happy to hear things about notice

11   and clarity as to who needs to file proof of claim, but

12   again, before we start segueing into people's substantive

13   rights, we are not there yet.  We are not even remotely

14   there yet.  That's not what a bar date does and I --

15   frankly, in my twelve-plus years on the bench, I've never

16   had somebody argue that somehow a bar date notice acted to

17   lock folks into their substantive legal rights, because

18   that's not what it does.  So, with that understanding, is

19   there anything that you want to address in terms of your

20   remaining objections as to notice and clarity of notice and

21   ease and efficiency?

22          MS. ASSI:  Thank you, Your Honor.  Yes.  Just as

23   far as it's the authority of Gemini to file this proof of

24   claim and what the scope of Gemini's authority is to file

25   claims on behalf of the lenders.  So, as long as it can be

Page 50

1    limited to --

2             THE COURT:  Well, why don't we just carve your

3    clients out?  We'll carve your clients out.  Your clients

4    will do -- with the exception of your clients, who can do

5    whatever they want to do.  Everybody else will be -- who

6    would be covered by the other provisions.  Let me ask Ms.

7    VanLare if that's one possible solution to having an

8    extended conversation about Gemini's role and vis-à-vis all

9    the lenders.

10            MS. VANLARE:  That would be fine with the debtors,

11   Your Honor.

12            THE COURT:  All right.  So, we can do that.

13   Anything else that you wanted to address?

14            MS. ASSI:  No, Your Honor.  The rest of what Ms.

15   VanLare represented reflects our agreement.

16            THE COURT:  All right.  Thank you very much, and

17   again, everybody has their "day in court" on their rights,

18   their substantive legal rights and their rights as to a

19   plan, so nothing today and particularly nothing in

20   connection with today's request for a bar date order impacts

21   that.  So, your clients can rest easy on that.

22            All right.  So, Ms. VanLare, what I will do is I

23   will wait to get a revised version, and if for some reason

24   there is a need to have a further conversation to address

25   any outstanding issues after you reach out to any other

1    parties who were part of that conversation, just to let

2    Chambers know and we are happy to schedule something, but

3    I'm pretty confident you'll be able to get over the finish

4    line on this.  Thank you very much.

5             MS. VANLARE:  Thank you, Your Honor.  That sounds

6    fine.  Okay.  Next, I'd like to move to the bidding

7    procedures, and Your Honor, I'm pleased to report we do have

8    a consensual form of order.  Again, I think we filed -- we

9    did file a revised order in Docket 191, which I know that

10   you don't have in front of you --

11            THE COURT:  I think I do now have that in front of

12   me, so give me one second.  I have a lot of things in front

13   of me, so give me one second to locate that particular item.

14   All right.  Could you just hand me that -- 191.  Thank you.

15            All right.  I think I have 190.  I just got that

16   as you were talking earlier.  And I think the other ones

17   that I have are -- as I said before are 186, 185.  And I

18   just want to make sure that I don't have the others.  If you

19   can give me one more minute?

20            MS. VANLARE:  Of course, Your Honor.

21            THE COURT:  Oh, actually I do.  191.  Sorry.

22   Blackline to proposed order.  I have it front of me.  So,

23   thank you for your indulgence as I scoured my desk for it.

24   But having it located will make life a little easier.  So,

25   take it away.

1          MS. VANLARE:  Thank you very much, Your Honor.

2    And we did finish and finalize all the negotiations, I

3    believe, during the hearing.  So, I will try to present what

4    I think is the final agreed form.  I think we had gotten, as

5    I said, a resolution on almost everything right before.  So,

6    I will walk through the black line and explain some of the

7    changes that were made and then, of course, if anybody has

8    any issues with what I've said, I'm sure they'll make them

9    known.

10         THE COURT:  All right.  And I would assume that

11   you'll go through the ones that you just made and any

12   earlier ones leading right up to the hearing to the extent

13   you want to publicize those to the larger group.

14         MS. VANLARE:   Yes.  We filed a cumulative black

15   line.

16         THE COURT:  Oh, all right.  Great.

17         MS. VANLARE:   I'll go through all of the changes.

18   And the black line, Your Honor, and for anyone else who's

19   following electronically, starts on page 45 of the pdf.  So

20   Your Honor, it's roughly half way through if you have a

21   printed version.

22         THE COURT:  Yeah, I have Exhibit B right in front

23   of me, so I have -- I'll use the page numbers staring with,

24   I guess -- I guess the first page of the ones at the bottom

25   center.  So the order itself has page number 2, the Exhibit

Page 53

1    B is obviously page number 1 in that.  But you can also

2    refer to paragraphs, obviously, as well.

3              MS. VANLARE:   Okay.  Perfect.  Perfect.  So the

4    first substantive changes are on page 5.  So we've added a

5    proviso, this is a comment from the Committee.  That the

6    Committee reserves the right to object to any modification

7    of the sale schedule that's set forth below.  And to any

8    modification to the order dates or the deadlines.  So that's

9    with respect to the timeline that we've laid out that

10   immediately follows that's in the chart.

11             We've also made some tweaks to the timeline,

12   namely -- and this also reflected comments from the

13   Committee.  We have put the stalking horse designation

14   deadline as proceeding the bid deadline, but we do retain

15   the right to designate a stalking horse bidder at a later

16   time.  And extending that deadline in consultation with the

17   consultation parties provided that we provide notice of any

18   such extensions on the docket.  The idea here, I think,

19   we're all similarly situated in that we want to maximum

20   value for the creditors and so this -- again, is what we

21   think is a minor change while preserving flexibility to the

22   extent we believe that having extra time for stalking horse

23   may be appropriate to maximize value.

24             We've also built in some times here to provide a

25   stalking horse designation and then, we've -- this is

Page 54

1    actually in -- prior to the changes.  We had provided for an

2    opportunity for parties to object to a stalking horse

3    designation.  And if someone objects there, we would ask for

4    a hearing.  But if no one objects then there's no need for a

5    hearing.  And so, there is a built-in time here for that.

6    The bid deadline is June 19th as we had previously outlined.

7    And I think that the other dates remain the same.

8            The other change that we made, and it really kind

9    of permeates a lot of the order and the various exhibit, is

10   a deadline for DCG and that's June 19th to identify whether

11   it or any of its insiders or controlled affiliates will

12   submit a bid or whether any newly created entity that's

13   wholly owned or directly or indirectly controlled by DCGs

14   insiders or controlled affiliates, other than by virtue of

15   its existing equity ownership in the Debtors intents to

16   submit a bid.  And the basic idea here, Your Honor, is that

17   if DCG or any of its -- and I'll use the term loosely,

18   related parties -- obviously, we've very explicitly

19   outlined, you know, affiliates and insiders and that's all

20   in here.  But the idea is if anybody, DCG or its insiders or

21   controlled affiliates want to bid on any of the assets, they

22   do identify that and at that point, they will not have the

23   consent rights with the respect to the sale of GDT or along

24   the way other than the final consent to sell the asset

25   because it is DCG's asset.

1            THE COURT:  Thank you, that's helpful.  Let --

2    what's next?

3            MS. VANLARE:  Next page, that's page 6.  We've

4    added a footnote here clarifying that any reference to the

5    Debtors in the bidding procedures order or the bidding

6    procedures means that the Debtor's acting the sole and

7    exclusive direction of the special Committee of the board of

8    directors of Genesis Global Holdco.  The special Committee,

9    as we've noted, consists of two independent directors.

10           THE COURT:  All right.  Next?

11           MS. VANLARE:  Next, Your Honor, page 7 of the

12   black line -- well, of the black line of the order.  New

13   paragraph 5, that same idea that if these that I've

14   mentioned earlier, that if DCGs -- that if DCG or any of its

15   controlled affiliates or insiders or related parties wishes

16   to bid on an asset that their consultation consent rights

17   terminate, other than with the ultimate consent right to

18   approve the winning bidder and sell the asset.

19           We have paragraph 6 here.  This was added based on

20   a request by the Committee.  The idea here is that the

21   Debtors and their professionals will make reasonable efforts

22   to provide the Committee's professional with reasonably

23   timely updates regarding the sale process.  This has

24   certainly always been our intent and consistent with how we

25   would run things.  But I know that the Committee wanted this

Page 56

1        in the order as well.

2                THE COURT:  Fine.

3                MS. VANLARE:  Next, the stalking horse and the big

4        protections.  So, this I believe was actually an oversight

5        and that I think we had it in the e-motion but didn't have

6        this language in the order.  And again, it's just laying out

7        that procedure that I described earlier where the Debtors,

8        after designating a stalking horse, have -- we've

9        purposefully created time in the timeline for parties to

10       object if they wish to do so.  The other change here,

11       though, is that with respect to the big protections -- and

12       I'm just looking to see if it's here or it may be later on.

13       I believe this is all just, again, restating what we had in

14       the motion and we're just putting it into the order.

15       Paragraph --

16               THE COURT:  Right.

17               MS. VANLARE:  -- 8, that has the new language that

18       I was about to explain, which is that to the extent that

19       there is a stalking horse bidder with respect to a sale of

20       GGT, which is the entity that is owned by DCG, that's a

21       sister company to Genesis Global Holdco, which is the Debtor

22       entity.  That any portion of the breakup fee that's on

23       account of GGT, that's payable to any such stalking horse

24       bidder will be deducted from the value escribed to GGT

25       pursuant to the plan.  So basically, the idea here is that

Page 57

1    GGT is not an asset of the Debtors.  So, for example, if

2    there was a bid and a breakup fee that's owed on account of

3    the sale of all of the assets, both Debtor and non-debtor,

4    the estate should not be responsible for the portion of the

5    breakup fee on account of the value of GGT, which is a non-

6    debtor asset.

7              THE COURT:  All right.  And let me just ask you,

8    to the extent we're talking about a stalking horse bidder

9    and the bid protections.  I certainly understand that the

10   notion of having this flexible process on notice, giving

11   people a chance to object.  If there's no objections, sort

12   of having a streamlined process.  Obviously, it is

13   appropriate for the Court to sort of look at what the bid

14   protections are to make sure they're consistent with sort of

15   the normal protections that one receives in these

16   circumstances.  I suspect if there's no objection, then

17   there probably will be a very little likelihood that that's

18   an issue.  But is there a way to have that put essentially

19   on notice of presentment or some other vehicle that I get a

20   chance to put my eyes on it, procedurally on essentially the

21   same schedule?

22             Once I know there's no objections, I have no

23   desire to slow the schedule down.  But I'm open to

24   suggestions on how to do that in most efficient way

25   possible.  I've sometimes seen that there are guardrails

Page 58

1  around what bid protections might be and then that way, the

2  Court can say, well, with that guardrails, I'm fine with

3  whatever you come up with.  But this is -- there's a lot

4  going on here in such kind of predicting what appropriate

5  guardrails might look like might be a little more

6  problematic in a case like this.  So I'm open to suggestions

7  on how you want to handle that.

8          MS. VANLARE:  So, Your Honor, I will note, I think

9  the guardrails, we've already included.  And you'll see

10  that, actually, at the top of this paragraph.  Paragraph 8.

11  We've said the breakup fee shall not exceed three percent of

12  the cash portion of the proposed purchase price.  And the

13  expense reimbursement.  And I believe in the motion, it made

14  sense, we broke even at $50,000.  So those -- so we kind of

15  --

16          THE COURT:  All right.  So you have the guardrails

17  in already.  All right.  I -- thank you.  I had seem that in

18  the blizzard of other things.  I had forgotten it was in

19  there, so that solves any concerns I have.  All right.  Next

20  up?

21          MS. VANLARE:  Next, next is paragraph 16.

22  Paragraph 16, so this - in the -- this provides that in the

23  event that the sales hearing and the confirmation hearing

24  are held separately, and we have the sale including that of

25  GGT occurring prior to the confirmation hearing, the

Page 59

1    proceeds of the sale in GGT shall be agreed upon among the

2    Debtors, the Committee, and the Ad Hoc Group of Genesis

3    Lenders and DCG.  And in the event no agreement is reached

4    as determined by independent accounting firm to be selected

5    by agreement among such parties.  So the -- and this was in

6    -- this reflects -- the Debtors had filed a restructuring

7    term sheet that the parties had agreed to in principle, a

8    non-binding term sheet earlier.  And this reflects a term in

9    that term sheet.  So essentially, if the sale occurs prior

10   to confirmation, then the parties agree to the allocable

11   value of GDT.  And they have the -- kind of a dispute

12   mechanism in here of an accounting firm that's selected

13   among the parties.

14          The proceeds of the sale of DGT shall thereafter

15   be distributed in accordance with the plan or to the extent

16   that a plan is not confirmed within 60 days following the

17   sale of GDT or as otherwise provided in a plan supported to

18   be entered into by the parties, the proceeds will revert to

19   DCG.

20          THE COURT:  All right.

21          MS. VANLARE:  And the parties, the Debtors, the

22   Committee reserve the right to file a motion to extend that

23   60 day period.  And I believe the parties agreed that DCG

24   also reserves its rights to file a motion with respect to

25   the time period.  So I do want to make that clear.

1              THE COURT:  All right.  Thank you very much.  Any

2      other changes to highlight?

3              MS. VANLARE:  If you give me one moment --

4              THE COURT:  Sure.

5              MS. VANLARE:  -- Your Honor, I just want to make

6      sure.  I think I hit of all of the substantive changes.  One

7      other change on -- that's in the bidding procedures.  Page

8      3.  We'd just note that the assets are being sold -- it's a

9      very broad term and so they include everything including

10     claims unless those claims have been waived or released

11     pursuant to plan support agreement entered into by the

12     parties.  We just want to make clear that obviously, we're

13     not going to be selling if we agree to waive or release

14     claims.

15             THE COURT:  All right.

16             MS. VANLARE:  I think the remaining changes are

17     all consistent with what I've outlined under the order or

18     are in the nature of cleanup changes.  Oh, I'm sorry, one

19     other change I should note.  This is at page 9 of the

20     bidding procedures.  This is a list of information that

21     parties have to provide -- potential bidders have to provide

22     when they submit an indication of interest to the Debtors.

23     We've asked that they include a statement specifying whether

24     the potential bidder proposes to acquire claims and causes

25     of action.  As well as a description of the bidders

Page 61

1    intention with respect to any relevant members of the

2    Debtor's GGT and hold subsidiaries management team or other

3    employees and a description of any contemplated incentive

4    plan to the extent applicable.  As well as the extent known

5    of statement detailing whether the potential bidder is an

6    affiliate or insider of DCG or any of its insiders.

7              THE COURT:  All right.  I see all those.

8              MS. VANLARE:  I believe --

9              THE COURT:  Anything else?  I do see that there's

10   some discussion about the involvement of the Committee in

11   the process and due diligence and communications with

12   restricted parties that are on 11 and 12.

13             MS. VANLARE:  Yes.  And I believe -- let me just.

14   I think that that is consistent with what I described to

15   Your Honor earlier that the Committee wanted language that

16   we will provide information to the Committee on a regular

17   basis about the sale process.

18             THE COURT:  All right.

19             MS. VANLARE:  And so this -- this is the same

20   language that I described in the order.  And I believe

21   that's all of the substantive changes.  In the order, the

22   rest is cleanup or reflects the same types of changes that

23   I've already outlined.

24             THE COURT:  All right.  Thank you very much.

25   Anything else asl to this particular motion before I circle

Page 62

```
 1   the virtual room?

 2          MS. VANLARE:  I don't have anything else, Your

 3   Honor.  Thank you.

 4          THE COURT:  All right.  Thank you very much.  So,

 5   let me ask the Official Committee, anything that they wish

 6   to be heard on in connection with this motion?

 7          MS. PARR:  Yes, Your Honor.  Just a few remarks.

 8   And for the record, Amanda Parra with White Case on behalf

 9   of the Committee.  I just wanted to note, Your Honor, that

10   the Committee did file a limited objection and reservation

11   of rights outlining several issues and comments that we had

12   for the same procedures.  And that was in the event that

13   weren't able to resolve them prior to this hearing.

14          The issues we outlined in our objection were, in

15   fact, really only a subset of the Committee's comments to

16   the bidding procedures.  We had many that we had actually

17   worked very hard to adjust prior to filing our limited

18   objection.  And those were reflect in the revised order that

19   Ms. Vanlare just walked us through.  The remaining points

20   that weren't reflected in our limited objection were largely

21   related to ensuring proper controls and information rights

22   for the Committee given DCG's involvement in this process.

23   Those have also, for the record, been addressed and resolved

24   in the revised order that we just walked through together.

25          I just wanted to state that we appreciate the
```

Page 63

1    Debtors working with us and it felt like every settlement

2    they were asked to accept, we wished had been better.  So

3    while we are agreed for purposes of today, we will need to

4    continue to assess how the process is run and the further

5    development in the case in our support for the motion and

6    revised order is without prejudice to the rights of the

7    Committee to seek further relief with respect to the sale

8    and other issues in the case should that be necessary.  I

9    just wanted to provide that context for Your Honor.  Thank

10   you.

11              THE COURT:  All right.  Thank you very much.  Any

12   other party that wishes to be heard on this bid procedures

13   motion?

14              MR. SAFERSTEIN:  Your Honor if I may?  Jeffrey

15   Saferstein from  Weil Gotshal Manges on behalf of Digital

16   Currency Group.

17              THE COURT:  Certainly.  Please proceed.

18              MR. SAFERSTEIN:  Your Honor, we've worked hard

19   over the last several days to reach agreement with the

20   Debtors and the Committee regarding the bid procedures as

21   was outlined.  This is a bit of an unusual sale given that

22   the Debtors will be selling our moles on the behalf of the

23   Debtors selling a non-debtor entity, which is an entity

24   owned by my client, Digital Currency Group, and that's

25   Genesis Global Trading.

1        So Your Honor, we're happy with the compromise

2    that has been made and with the changes that were outlined

3    by Ms. Vanlare in the agreement.  We would like an

4    opportunity though to view the order.  These -- a lot of

5    these changes were made during the hearing, so we would like

6    to review.  I don't expect there to be any issues as

7    outlined, we're in full agreement as it was described.  But

8    we want to see the words on the page.  And subject to that,

9    we're fine.

10        THE COURT:  All right.  Thank you very much.

11    That's a very fair request and I'm sure that's what Ms.

12    Vanlare contemplates.  Thank you for your comments.  Any

13    other party that wish to be heard?

14        MR. SAZANT:  Yes.  Thank you, Your Honor.  Jordan

15    Sazant on behalf of the Ad Hoc Group of Genesis Lenders from

16    Proskauer Rose.  I'd just like to echo the statements made

17    by the Committee and you know, thank the Debtors, and GCD,

18    and the Committee for working hard to resolve these issues.

19    We've been working collectively as a group to try and come

20    to a consensual order over the past few days and up to the

21    minutes before this hearing.  And I think Ms. Vanlare walked

22    through what we agree is an acceptable order.

23        THE COURT:  All right.  Thank you very much.  Any

24    other party that wishes to be heard.

25        MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

Page 65

1    Trustee's Office.  Obviously, the changes reflect a lot of

2    work by various parties in interest.  My office did have

3    some issues we believe were addressed on the immediate

4    basis.  But one issue that we raised with the Debtor is the

5    question of whether there needs to be a consumer privacy

6    ombudsman that's been here based on the privacy policies of

7    the Debtor.  And that would have to be resolved one way or

8    the other before any sale.  There are deadlines for that as

9    well.

10         I believe that we saw a policy that was provided

11   to us. I don't know that we've seen all of the policies.

12   We're leaving it to the Debtor's burden, which we're happy

13   to review more policies as appropriate.  But it -- we're

14   just reserving our right in that regard if there was a need

15   for privacy ombudsman and hopefully, we'll get that

16   resolved.  In the meantime, takes an accessory.  In Celsius,

17   a provision was put in the order directing the appointment

18   of an ombudsman, but obviously if it's not appropriate here,

19   it's not necessary.

20         THE COURT:  What's your understanding of the

21   relevant timing?

22         MR. ZIPES:  Well, it has to be done before any

23   sale.  The privacy ombudsman has to be appointed and has to

24   file a report.  And there are various requirements under 332

25   of the Bankruptcy Code.  And it deals with whether the

Page 66

1  Debtor has privacy policy.  So, for example, if the

2  understanding of the customers is that their information

3  would not be sold to a third party, and that was the privacy

4  policy, then a consumer privacy ombudsman would have to be

5  appointed in that instance to advise the Court.  And here, I

6  -- at least from what we've reviewed, there no such policy

7  in place and the consumer, the customers who signed on are

8  not necessarily -- they didn't restrict their personal

9  information in that regard.  So, Your Honor, I know we're

10  coming up on other objections and -- but I'm just noting

11  that as an issue that my office is observing its rights on.

12          THE COURT:  All right.  That's fine.  I don't know

13  if Ms. Vanlare wants to comment on that issue.

14          MS. VANLARE:  Yes, Your Honor.  I -- yes, we did

15  have some discussions with Mr. Zipes on that issue.  We're

16  still reviewing whether or not it's applicable.  You know,

17  it somewhat of a different situation with us than with some

18  of the other cryptocurrency cases because we have -- we have

19  -- our creditors are lenders pursuant to individual master

20  loan agreements.  So, we're still reviewing as to whether

21  and what extent the privacy policy is applicable and which

22  policy may or may not be applicable.  And how that --

23  whether or not any of that is implicated in the sale

24  process.  And there's obviously also an interaction with the

25  next issue on the agenda, which is the redaction issue.

Page 67

1           So I would posit, Your Honor, that we don't need

2    to solve that today.  I think we have plenty of time and I

3    think that it will be more fruitful to have further

4    discussion on this issue to the extent necessary at a later

5    hearing.

6           THE COURT:  All right.  I will leave the parties

7    to have discussions about what the agreements actually

8    provide and whether they implicate the Bankruptcy Code in

9    the way of requiring a privacy ombudsman.  And we'll discuss

10   it as necessary at the hearing.  And obviously, if I can be

11   of any assistance in that you'll let me know and we'll --

12   but I appreciate the issue being raised and the timing being

13   framed so we sort of know we're all on the same page, so.

14   All right.  Mr. Zipes, anything else from your office?

15          MR. ZIPES:  Your Honor, just in that regard as a

16   suggestion.  The motion is ministerial in nature and if the

17   party -- sometimes the parties come to an agreement, and I

18   would just note that for the Court. I know the Court is very

19   flexible in terms of entering orders as -- if parties are in

20   agreement.

21          THE COURT:  Yeah.  No, I have certainly seen those

22   done essentially presented as a consented to approach in

23   terms of an order.  And so, if you find yourself there, I'm

24   obviously open to suggestions on the most efficient way to

25   get that done and we'll see.  You'll let me know if we do

Page 68

1    find ourselves there.  All right.

2           MR. ZIPES:  And Your Honor, just --

3           THE COURT:  All right.

4           MR. ZIPES:  -- just one other things to raise and

5    I apologize, Your Honor, and very briefly.  The bidding

6    procedures obviously involve non-debtor in the sale of

7    non-debtor assets and this -- these are just bidding

8    procedures, so we're just -- as everybody else is, reserving

9    our rights to see the stalking horse and to see what the

10   final arrangement is.  And we -- and the parties have been

11   very cooperative in getting us the information that we

12   request.  So we would expect that to continue, Your Honor.

13          THE COURT:  All right.  Fair enough.  Thank you

14   very much.  Any other party that wishes to be heard on the

15   bidding procedures motion?  All right, hearing no other

16   responses, although I think Ms. Vanlare, you were getting

17   ready to chime in?

18          MS. VANLARE:  Yes, Your Honor.  Just one

19   administrative matter which is Your Honor, we are anxious to

20   embark on the sale process and we think that timing is of

21   the essence.  We will work to submit a proposed revised

22   order to Your Honor later today.  And if there's any way, we

23   would request, Your Honor, to have that entered.  It would

24   greatly help us in making sure that we launch.

25          THE COURT:  Fair enough.  I'm happy to get to it

1    as soon as I can, and I also will so order the record that

2    you have the ability to move forward consistent with the

3    relief you've requested today.  And in consistent of the

4    grant of the motion, which I'm just about to do provided the

5    motion is appropriate in the facts and circumstances of the

6    case and consistent with applicable law and makes good sense

7    given all the facts and circumstances here.

8             I know there's some very unusual aspects of this

9    in terms of the sale of a non-debtor and I appreciate the

10   parties working together to navigate the ins and outs of all

11   that in a way that allows the process to go forward while

12   reserving folks rights to see what actually comes to pass.

13   And -- but I'm happy to grant the motion.  And so, my so

14   ordering on the record, allow the Debtors and the other

15   constituencies here to start moving forward consistent with

16   the grant of relief.

17            MS. VANLARE:  We appreciate that very much Your

18   Honor.

19            THE COURT:  All right.  What's next?

20            MS. VANLARE:  Last on the agenda is a series of

21   motions that have been filed by the Debtors and by the

22   Committee.  Your Honor, seeking to redact and seal

23   information relating -- specifically relating to creditors

24   and other parties in interest.  Your Honor, I'll make some

25   brief remarks and I'm sure that the Committee will have

1    remarks as well on this issue.  As we've noted earlier,

2    confidentiality is critically important here.  Your Honor,

3    we've certainly heard requests when we -- before we

4    commenced these Chapter 11 cases and during these Chapter 11

5    cases that the preservation to confidentiality with respect

6    to parties identities and personal information is of upmost

7    importance to creditors.  And certainly as the Debtors, we

8    are receptive to those concerns and wish to protect, you

9    know, that information to the extent that it is commercially

10   sensitive and/or protects our creditors both from financial

11   risks as well as physical harm that we've heard that that is

12   also an issue.

13          And as I'm sure Your Honor is aware, and we

14   obviously had these discussions earlier at prior hearing, it

15   is of particular import in cryptocurrency cases where

16   parties have been subject to financial and phishing schemes

17   and have been subject to threats of physical harm.  And to a

18   certain extent, we also -- you know, when we filed the case,

19   we wanted to preserve rights based on the feedback we had

20   received from the creditors.  But in particular, wanted to

21   see where the Committee stood on this issue.  We're

22   obviously very mindful of where the Committee stands as a

23   representative of the unsecured creditors in this case.  And

24   we understand the Committee does feel very strongly --

25   because I'm sure you saw and I'm sure they will explain

Page 71

1    themselves about these issues.

2           So, with that introduction -- and again, just

3    underlining how important we believe as the Debtors these

4    issues are to our stakeholders.  I just wanted to note that

5    the types of parties that are subject to our motion -- and

6    then the Committee, I'm sure, will want to go into the

7    relief that the Committee is seeking in its motion.

8           With respect to the motions we've filed -- and

9    it's really relates to a number of filings and pleadings and

10   papers in this case, you know, including the creditor list,

11   the schedules, the notice lists, any other pleadings.  We

12   would like to redact many potential counterparties.

13   Obviously, Your Honor, we're embarking on a sale process.

14   It's critically important that to the extent there's

15   information about potential bidders.  We view that as

16   commercially sensitive and we would ask --

17           THE COURT:  So, let me ask you about that.

18           MS. VANLARE:  Yes.

19           THE COURT:  The word potential in front of

20   counterparties.  Obviously, it's very easy for us to --

21   there's certain things in your motion that are very clearly

22   anchored in this -- in the sense it's very easy to figure

23   out what it covers and what it doesn't cover.  And so the

24   idea, for example, there was a discussion about litigation

25   -- future involving litigation might be covered by some sort

Page 72

1    of NDAs or some other rule that required those proceedings

2    to stay confidential.  I get that's definable.  It's

3    identifiable.  And certainly, there are times when folks

4    say, well, we ventured into negotiations with these folks

5    and their identity is not appropriate to be on the public

6    record.  The word potential is the thing I'm just trying to

7    figure out for purposes of commercial information what to do

8    with that because obviously, if you're having negotiations

9    with folks, aware those would be interrupted by

10   identification of the parties.  I think you would be very

11   hard to argue that isn't commercially sensitive.

12          No one came in the American Airlines case and

13   started sharing information about who they might want to

14   merge with whatever the newspapers said.  So -- but I guess

15   the question is how are we supposed to understand the

16   universe here when you say potential counterparties what

17   that means for the context of the specific relief.

18          MS. VANLARE:  Yes, Your Honor.  So, what we're

19   trying to get at are parties that may be potential bidders

20   for the Debtor's assets.  So, for instance, as is typical,

21   there are a number of parties that the Debtor's advisors are

22   proactively reaching out to solicit interest.  There are

23   parties that expressed interest in participating in the

24   process and that's the universe of parties that we want to

25   keep confidential because, again, for the reasons I

1    described.  And I think you identified just now there is

2    sensitivity around who they might be.

3         THE COURT:  So, I guess, would the notion be a bit

4    in the drafting that -- to draft something that would, in

5    your view, reflect what you just said.  That is parties who

6    have actively reached out to the Debtors to ask to be

7    involved in the process or parties that the Debtors and

8    their professionals have reached out to as appropriate

9    parties that might want to be involved in the process.  In

10   other words, it doesn't cover everyone.  There's somebody --

11   but somebody's made a reasoned, professional judgment that

12   these are the folks who are appropriate to include.  Is that

13   the kind of thing you have in mind?

14        MS. VANLARE:  Exactly.  And the only tweak that I

15   would make to what you just said, Your Honor, is parties to

16   whom we have reached out or may reach out.

17        THE COURT:  Yeah.

18        MS. VANLARE:  So somebody who's --

19        THE COURT:  Yeah, absolutely.  Absolutely.  And

20   you can certainly dress that up much nicer than what I just

21   said, but it would be after consultation with constituencies

22   including the Committee, including your financial advisors,

23   et cetera, et cetera.  So I think my sense for U.S.

24   Trustee's Office, who obviously can speak for itself in a

25   moment, but what I think they're most concerned about is

Page 74

1    sort of a blank check.  Meaning that somebody can

2    essentially say, well, that now means everybody, or it

3    doesn't mean everybody or it's cover.  But I didn't get the

4    sense that what you're asking, frankly, and that there are

5    easy ways -- I think it's fairly easy to put some language

6    around that to flesh out the contours of that.

7            MS. VANLARE:  Yes, Your Honor.  And thank you for

8    the opportunity to clarify.  I think that's exactly right in

9    terms of what we're seeking.

10           THE COURT:  All right.  So potential

11   counterparties I get, and then I think I jumped the gun a

12   little bit by discussing litigation counterparties.

13           MS. VANLARE:  Yes. And why don't we talk about

14   that one because it's also fair enlaced or a cabined

15   category.  So there it's a litigation parties as well as any

16   regulatory agencies.  So -- and these may be proceedings or

17   inquiries that are expressly confidential.  You know, either

18   filed under seal or we've received, you know, instruction to

19   keep them confidential.  We would seek that we are permitted

20   to redact those parties.

21           THE COURT:  All right.  I think I understand where

22   you're coming from.  And again, I guess that's also

23   potentially subject to a verification in the sense of here's

24   the particular party.  Here's the particular proceeding

25   and/or order agreement, et cetera that makes this

Page 75

1  confidential.

2          MS. VANLARE:  Yes, Your Honor.

3          THE COURT:  All right.  And so, so -- thinking

4  about those folks or any other folks that are -- that we

5  should -- folks or categories we should discuss in the --

6  that are institutional creditors/lenders in this case.  So

7  we've identified two that -- counterparties in litigation,

8  counterparties -- is there anybody else who's on your list?

9          MS. VANLARE:  So I would say in terms of the

10  institutional creditors, you know, our motions had asked to

11  redact information, addresses, of institutional creditors to

12  the extent the institutional address is, in fact, a home

13  address.  We were made aware that there's a number of

14  creditors who are institutions but whose business address is

15  their home.  And they really share the same concerns

16  relating to, you know, threats of kidnapping and personal

17  safety as individuals who -- you know, whose information of

18  that type would be protected.  So that was what we had

19  sought in our motion.  I know that the Committee would like

20  to expand that relief to cover the names of institutional

21  creditors as well.  So, perhaps we can table that until they

22  present their motion.

23          THE COURT:  Yeah.  My thought is -- well, for

24  purposes of how to proceed here is that we'll address the

25  Debtor's requests here from the U.S. Trustee's Office then

1    we can get to the Committee's more expanded request, which I

2    think seeks to treat institutional creditors the same way

3    we're treating individual creditors for a variety of

4    reasons.  But I understand the -- your request dealing with

5    addresses is essentially a recognition, in your view, of

6    that some folks are almost in hybrid situation.  So they're

7    institutional creditors for some purposes, but when you

8    start naming home addresses that it takes them out of that

9    realm for purposes of 107.

10            MS. VANLARE:  That's exactly right, Your Honor.

11            THE COURT:  All right.  Any other comments as to

12    the particular categories of institutional creditors that we

13    should talk about and then we can move back to the

14    individuals in a minute?

15            MS. VANLARE:  Not from us, Your Honor.

16            THE COURT:  All right.  And so as to the

17    individuals, it sounds like there's essentially an

18    agreement, nobody's opposing the notion of protecting home

19    addresses and email addresses that the sticking point seems

20    to be two things.  One is the names and the second may or

21    may not be a sticking point, I couldn't tell when I read the

22    U.S. Trustee's comment if they were talking about, well,

23    we're okay with all this if people express a concern or if

24    they're fine with essentially -- well, all -- you know, if

25    we talk about home addresses, it's all home addresses.  But

1    -- so I understand those to be the two flashpoints.

2              So I guess my first question is whether I'm

3    missing anything. If you there's -- you think there's

4    anything else where there's a dispute dealing with

5    individuals.

6              MS. VANLARE:  I think you've correctly addressed

7    it as far as -- as far as I understand it.  Yeah, we've

8    asked to redact all contact information and names of

9    individuals, again, based on the feedback we've received.

10   And I believe the U.S. Trustee has objected to that and I'll

11   let Me. Zipes express for himself --

12             THE COURT:  Right.

13             MS. VANLARE:  -- to the extent which he agrees

14   with what we've asked for.

15             THE COURT:  All right.  Fair enough.  All right.

16   Mr. Zipes?

17             MR. ZIPES:  Thank you.  Your Honor -- and I do

18   appreciate the discussion you had with Ms. Vanlare about the

19   institutional creditors in connection with the retention

20   applications and I -- my office generally has no issues in

21   that regard with redactions.  Turning to the Debtor's

22   request, I don't want to bring up the Committees at this

23   time and I want to keep this as brief as possible.  The --

24   Your Honor, in this case, the United States Trustee has

25   agreed to redaction of the individual addresses as stated.

Page 78

1    We've attached the notice of the unsecured creditors

2    Committee appointment and that reflects really the agreement

3    for individuals and institutions.

4              And I don't want to put anybody on the spot, but

5    there was really no issue or debate among the Committee

6    members at that time about any of this.  So we put it on

7    and, in fact, we're the ones that suggested separate emails

8    for the purposes of this case because there is -- there are

9    these legitimate concerns about phishing and various other

10   issues.  Your Honor --

11             THE COURT:  Yeah, I was -- I was rather alarmed to

12   see there's a footnote in one of the papers.  I think the

13   last time we talked about this, we -- I think I mentioned a

14   notice of phishing attempt.  And then, I think by the time

15   this paper was filed, there was, I think, a fourth

16   supplemental notice of phishing attempts and it just goes to

17   show that, you know, we're not in Kansas anymore as they say

18   in the Wizard of Oz.  It is a brave new world in terms of

19   trying to protect information.  And 107 may be slightly

20   behind the times in terms of the way it thinks of it because

21   everyone is profoundly concerned about that.

22             I do appreciate the Committee's supplemental

23   declaration not only in the context of its application, but

24   just in terms of the general context at large.  And so --

25   and I just wanted to get sort of this speech out, Mr. Zipes,

```
 1    just for purposes of the way I think about the public

 2    interest involved.

 3             MR. ZIPES:  Mm-hmm.

 4             THE COURT:  Obviously, there's a great interest in

 5    transparency in bankruptcy proceedings.  Right?  And so that

 6    bankruptcy cases can function efficiently and appropriately

 7    and for the interests of all the stakeholders.  But

 8    transparency is not necessarily sort of in a vacuum.  And I

 9    think, certainly looking at the comments of State Judge Wild

10    or the judge in Delaware who dealt with this, there seems to

11    be a concern about trying to have the value of transparency,

12    so the cases work effectively while at the same time, not

13    having creditors who after all didn't file a case be

14    potentially victims.  Right?

15             They're not here voluntarily.  It's a little

16    different in terms of parties coming for a court voluntarily

17    or, you know, creditors are not here necessarily of their

18    own volition.  And so, to not add essentially insult to

19    injury by putting in the crossfire on this.  Obviously, the

20    Code and what 107 says is what it says.  But I just wanted

21    to give you my mindset about how I'm trying to think about

22    this from a very practical -- people here in the bankruptcy

23    court but as a multi-party endeavor, the -- some of these

24    issues get a little harder to manage.  And I just wanted to

25    give you sort of my -- the kind of values I'm trying to
```

Page 80

1    promote.

2              So, let me start with the institutional creditors

3    with your office.  Ms. Vanlare gave some helpful, I think,

4    additional comments about the potential counterparties and

5    litigation counterparties to sort of put anchors around that

6    to address any concerns your office might have about it

7    being not anchored to a specific circumstance.  So maybe we

8    could start -- as we started with her -- start there with

9    your office's -- your current thinking on those -- on say,

10   potential counterparties as modified by Ms. Vanlare's

11   comments.

12             MR. ZIPES:  Your Honor, thank you for focusing on

13   perhaps the easiest question first, which I don't think my

14   office has an issue with any of that.  And --

15             THE COURT:  All right.  Thank you.  And so, I

16   guess, for litigation counterparties, is that -- would you

17   reach the same conclusion again?  The trust, but verify that

18   -- what's -- it's anchored to something specific?

19             MR. ZIPES:  Yes.  Yes, Your Honor.  We're okay.

20             THE COURT:  All right.  And I guess, going right

21   down the list.  There's the -- I guess, the third category.

22   The third of three that was identified by the Debtors is the

23   institutional creditor where there's a home address.  And

24   what's your office's thinking on that?

25             MR. ZIPES:  Okay.  So, Your Honor, I should give a

Page 81

```
 1    little bit of background.  I -- a lot of smart people are --
 2    have been thinking about these issues and my office is --
 3    has a certain viewpoint, obviously, on it.  And the Court
 4    did mention the Delaware court.  One of them is having it is
 5    what it is, and we have to deal with it as it is as opposed
 6    to what we might want it to be.  And so, as to the facts of
 7    this particular case, we have what are termed sophisticated
 8    creditors and the word institutional -- accredited creditors
 9    has been used as well, which has an SEC definition.  I'm not
10    sure if that's the context that's being used, but parties in
11    this case generally are deemed sophisticated, and we're just
12    bringing that out as a fact here.
13              We are concerned about threats, legitimate threats
14    to people.  We take those very seriously as does everybody
15    here.  But my office did reach out and ask for specific
16    people to contact us if there were specific threats and we
17    would deal with them.
18              THE COURT:  Well, the problem -- I saw that
19    reference in your papers.  I will say, just to get it out
20    there.  I'm going to reject the notion that I have to tie
21    this finding based on specific threats.  I think that turns
22    the inquiry sort of upside down.  And obviously, we're
23    talking about threats.  We're talking about 107(c) and we're
24    talking about cause, risk of identity theft or unlawful
25    injury.  Frankly, any injury that's inappropriate.
```

Page 82

1          So, I don't think -- if you think about the way

2     addresses and emails have been handled in the all the cases

3     for everybody I think is on the same page.  Nobody's asked

4     somebody to come forward and say, are you worried about your

5     address?  And I think it's, frankly, unworkable on the sense

6     that individual creditors are not going to do that.  That

7     imposes a hurdle on them in a bankruptcy case that's higher

8     than it should have to be.

9          And the other thing I will say, in a way they have

10    come forward because the Committee represents them.  So

11    we'll get to the Committee's motion in a second. Right?

12    They represent the unsecured creditors.  So they are in --

13    they are there to protect those folks and that's why they

14    filed the motion.  So, I don't -- I think at a certain point

15    where somebody says I've gotten a threat, it's already too

16    late.  Right?  You can't put the genie back in the bottle.

17    And again, I think between the declaration that the

18    Committee supplied, the record that we've already had in the

19    prior -- in our prior hearings, things like the notice of

20    phishing attempt, I think it's pretty clear that this is not

21    a theoretical problem.

22          And I also would note, while I did see one case

23    made a reference to imminent harm, I don't think that's the

24    standard.  The standard is that they're -- the Court may

25    protect a person -- one second here.  I don't -- imminent

1     harm is not the standard is that it's -- I think you have to

2     have a risk.  And I think Judge Garrity talks about it in

3     Endo that way.  So, I'm afraid that the imminent risk of

4     harm is too high a standard.  And I think it's not the

5     standard here for a good reason.  So I'm uncomfortable with

6     requiring individual creditors to come forward and have to

7     be heard as to their concerns.  Because I think if we do

8     that, then I don't know how we do it for some creditors in

9     some buckets and then not do it for all creditors.  Right?

10             I don't know how we would distinguish to say,

11    well, your -- the burden for you is less and we'll

12    essentially in local parentis, look at your concerns.  But

13    for you, you've got to be heard from.  Now, I could see --

14    again, I'm trying sort of predict what your office might

15    think about it, and I may be woefully off.  But I can see

16    that you might say, well, I want to have some verification

17    that this is for this home address for an institution that

18    this is exactly how it is or whatever.  I have no problem

19    with verification of that.  I just don't want to put the

20    burden on the creditor to have to come forward and make

21    itself be known that way.  But I have no problem consistent

22    with what we talked about for counterparties in the

23    litigation to get verification that that is, in fact, the

24    case.  I don't think I want some sort of general rule that

25    allows us to say, well, it might be.

Page 84

1               So I'm not saying that.  I think we'd have to

2       verify it the way we'd verify any other creditor --

3       institutional creditor that we're discussing in the other

4       categories.  Does that help your office at all, Mr. Zipes?

5               MR. ZIPES:  Your Honor, so my understanding is,

6       based on what you're saying, if institutional creditors come

7       forward and it's in fact their home address, then that might

8       fall under the exception that we're -- that you're referring

9       to?

10              THE COURT:  Right.  Yeah, that we'd have to verify

11      that.  And we can talk about how to verify that whether

12      that's -- I would image that would be in the context of

13      discussions with the Committee.  I would image the Committee

14      would be happy to give it its statutory role to take on that

15      and to work with your office as to how to verify that.

16              MR. HIGGINS:  Your Honor -- oh, I'm sorry.  Ben

17      Higgins, United States Trustee.

18              THE COURT:  Oh --

19              MR. HIGGINS:  Just for the record.

20              THE COURT:  Go ahead, I'm not sure how you all are

21      handling this.  If you need a moment to chat, I'm always

22      happy to give it to you.

23              MR. HIGGINS:  That's -- no -- I didn't mean to cut

24      off Mr. Zipes.  But Your Honor, I was just asking about the

25      standard or discussing the standard.  The standard is clean

1    --

2            THE COURT:  Well, I don't want -- I'm not going to

3    have you cut off Mr. Zipes to tell me the standard.  I have

4    the book in front of me.  So, I'll hear from Mr. Zipes.  If

5    there's something where your office is chiming in because --

6    by virtue of the sort of way decision are made, that's

7    another thing.  But Mr. Zipes does an excellent job in this

8    Court and I'm more than happy to hear from him.  And again,

9    if you need a minute to chat, I'm fine with doing that.  But

10   I -- so, Mr. Zipes, if you need a moment and you want to

11   talk about that, we are rapidly approaching lunch.  And

12   certainly, it may be that a break at lunch to sort of think

13   about things makes sense.

14           MR. ZIPES:  Your Honor, I don't have a problem

15   taking lunch right now.  But I think the point is under the

16   standard, it's an undue risk of identity theft.

17           THE COURT:  Right.

18           MR. ZIPES:  And it's not the stand -- it's not

19   imminent threat or whatever that wording was.  Your Honor,

20   I'm happy to go forward for a little while longer if people

21   want a break, we (indiscernible).

22           THE COURT:  Yeah, I'd like to go forward, but my

23   thought would be -- I realize that in a changing landscape

24   to ask your office's view on the fly is not necessarily

25   something that you can necessarily pull that rabbit out of

1    your hat immediately.  So my thought is that at some point,

2    we'll take -- we can take a break once we get through

3    things.  I think my thought would be we'd at least have a

4    discussion of all the issues.  And then maybe take a break

5    then and then come back at lunch to sort of wrap things up.

6    That would be what I had in mind so we can get all of the

7    issues out on the table and think about it.  And take it

8    from there.

9              So, with that, Mr. Zipes, anything else about

10   institutional creditors from the point of view of the

11   Debtor's motion?

12             MR. ZIPES:  Yeah, Your Honor, I just -- in

13   addressing that, I would just note that in Celsius,

14   notwithstanding these notices that are filed, Chief Judge

15   Glenn has not taken any further action in that regard.  He

16   made his ruling and it -- and the names are out there.  And

17   he hasn't taken any further action.  I'm not sure how

18   relevant that --

19             THE COURT:  Well, I --

20             MR. ZIPES:  -- that is or not to the discussion,

21   but --

22             THE COURT:  -- well, I -- is the notion that

23   actual notices of phishing attempts isn't relevant when

24   considering the potential harm to creditors whose

25   identification is out there?  I mean, I -- obviously Judge

Page 87

1    Glenn is more than capable of handling this case.  And I am

2    sure that it is being handled with the highest degree of

3    professionalism.  I'm just saying in terms of understanding

4    things and not relying on speculation.  Right?  That's what

5    I understand the -- one of the concerns in the government

6    circumstances like this tends to be that something is

7    speculative, it's not rooted in actual events happening.

8    Excuse me.  And so, that's a common theme in sealing cases.

9    I -- as an AUSA, I once submitted a declaration from the

10   Chairman of the Joint Chiefs of Staff, and we had a

11   discussion about whether the harms identified in connection

12   with the sealing motion were real harms.

13            And so, that's the inquiry, you know, are they

14   concerns?  Are they specular or are they not?  So, I

15   understand that, but I guess my thought is I'm talking

16   notice of those -- notices of phishing attempts just as some

17   tangible evidence that that kind of a concern is not

18   hypothetical.

19            MR. ZIPES:  No.  And Your Honor, I very much

20   appreciate that, and I appreciate your desire to reach the

21   right results here.  But I will note that phishing is a new

22   -- it's relatively a new phenomenon.  And this argument can

23   be used in any case, in any large mega case that is --

24            THE COURT:  Well, that's a -- that's a fair point.

25   That's a fair point.  And I think the Code may need to be --

Page 88

1    some of these issues may need to be rethought in the context

2    of that so that folks who are creditors aren't victimized

3    for appearing in proceedings in which they didn't volunteer.

4    But I -- yeah, I get it.  You're right.  There are

5    definitely the universality of some of these concerns is an

6    issue.  Although, I think Mr. Renzi's declaration identifies

7    some of the unique aspects of cryptocurrency that makes some

8    of these concerns a bit more acute in these circumstances

9    based on -- at least with FBI and other government agencies

10   have identified.  But you're -- it's a fair point, Mr.

11   Zipes.  Anything else on institutional creditors before we

12   go to the more limited issue associated with individuals?

13             MR. ZIPES:  Yeah --

14             MR. PESCE:  Yeah, Your Honor, it's Gregory Pesce

15   just --

16             MR. ZIPES:  -- oh, I'm sorry, Your Honor.

17             MR. PESCE:  -- for the Committee.  It's just on

18   the institutional creditors -- we're --

19             THE COURT:  Well, no but -- we're going to handle

20   your motion separately.

21             MR. PESCE:  -- yeah, we motion every couple days.

22             THE COURT:  Yeah.  No, I know you do.  But I want

23   to deal with each motion sort of separately.

24             MR. PESCE:  I'd accept --

25             THE COURT:  And so, so we can cabin off the issues

1    because they -- I know they do bleed into one another.  So,

2    Mr. Zipes, as to any other issues with institutional

3    creditors that are the subject of the Debtor's request?

4           MR. ZIPES:  Only that I'll make the observation,

5    Your Honor, that the Debtor in its initial motion did not

6    argue under 107(b).  And the Debtors are well equipped to

7    make that argument if they thought it was important.  At the

8    beginning of the case I know that 107(b) is an argument

9    raised after the fact, but it wasn't at the beginning of the

10   case.  And again, Your Honor, I appreciate all your points

11   and efforts here.  There is -- so I'll move on, Your Honor.

12          THE COURT:  All right.  So, so I will consider for

13   purposes of wrapping up this part of it that there's really

14   no dispute about potential counter parties and litigation

15   related issues, subject to the discussions we've already had

16   about, sort of verifying and identifying the -- that

17   universe based on specific things.  And that as to the

18   institutional creditors and the homme addresses, that that's

19   sort of an open issue that you can -- your office can mull

20   at a break, as to where you end up in light of the

21   discussion.  And so, as for individual creditors in the

22   Debtor's motion, I think the only thing that's an issue is

23   the names.

24          And to just sort of set the stage, I know that

25   Judge Glenn in Celsius did not permit the names to be

1    sealed.  Whereas in Judge Garrity in Indo did and that there

2    are other judges, Judge Wiles and the Judge in Delaware, I

3    think Tred is the name of the case, have similarly followed

4    suit.  So, I'm certainly aware there's different results out

5    there with different theories.  So, as to the names, Mr.

6    Zipes, where's your -- of individual creditors, where does

7    your office currently fall?

8              MR. ZIPES:  So, Your Honor, as stated, we -- we're

9    okay with not having the addresses.  And I'll just note this

10   about Indo, which was an opioid case, and we can go further,

11   Your Honor, with Diocese cases, which I don't think anybody

12   has mentioned.  The survivors -- there are legitimate

13   redaction concerns in those regards.  But -- and the Court

14   did talk about creditors being involuntarily brought into

15   the bankruptcy case, I mean, that unfortunately is the case

16   for every bankruptcy case.  And I believe parties, at one

17   point, were concerned about opioid and survivors of in the

18   Diocese case, the Boy Scout cases, and we're dealing here

19   with sort of commercial -- commercial parties, and I'm

20   picking Your Honor's point.  I understand that you don't

21   look at it, necessarily, that same way.  But I'm --

22             THE COURT:  Well, I would --

23             MR. ZIPES:  -- trying to be (indiscernible).

24             THE COURT:  -- I would agree with your notion that

25   I think the value of sealing and the importance of sealing

1    is heightened in cases where you're talking about victims of

2    either opioid abuse or of sexual abuse.  And so I would

3    agree with you on that notion.

4            MR. ZIPES:  And Your Honor, I would just as well

5    state that the FBI warnings and what not in the crypto

6    space, I mean, everybody shares those concerns.  The Court

7    routinely seals motions that have PII -- personally

8    identifiable information, which is -- which is defined in

9    the Bankruptcy Code and so -- and for that matter, my office

10   is often contacted by creditors, debtors, executives, when

11   there are specialized threats and the FBI does get involved

12   and that's traditionally how it's handled if someone has a

13   specific concern, they bring it to people's attention and we

14   deal with it accordingly.

15           I think a blanket restriction here is problematic

16   because really is not based on anything more than looking at

17   other cases and you know, not looking at the facts of this

18   case, which include no privacy policy that -- that these

19   parties, apparently, were okay with their information being

20   sold, maybe to third parties with no accountability and here

21   they're arguing the point.  So, I'm not --

22           THE COURT:  So, well, that raises an interesting

23   question to segway to, which is there's a thought about and

24   it's raised in the context of institutional creditors, but

25   it's the thought about these folks being customers whose

Page 92

1     information can be sold, can be monetized and therefore, if

2     the information is made available here, that that cuts out a

3     source -- cuts and reduces and damages an asset that the

4     Debtor's have that might be included in a sale that could be

5     monetized.

6             I don't know that I have that -- a record here

7     now, but if a record -- but you might imagine that an

8     appropriate professional might be able to bring in somebody

9     who says being familiar with the crypto space, this is the

10    kind of information that is sold, this is what it's worth.

11    This is what it might be worth here.  Is that something that

12    might provide protection under the different rubric of 107?

13            MR. ZIPES:  Your Honor, I don't want to be unfair

14    to Mr. Pesce, who has these arguments and the Debtor's, I

15    noted, didn't think that this was a relevant argument with

16    all of the professionals at the beginning of the case.  I

17    understand that sometimes, you know, that evaluation can

18    change and I would just note that, again, if we're talking

19    about -- in every large Chapter 11 case, creditor lists are

20    listed; there are attempts with critical vendors to keep

21    that list private.

22            But there are -- there is general disclosure about

23    creditors in large cases, and again, we -- it has to be a --

24    an undue risk of identity theft or some other damage and

25    it's -- every large Chapter 11 case is going to be presented

1    with this particular issue.  So I'm not necessarily talking

2    --

3         THE COURT:  Well, I'm talking about B where you're

4    talking about protecting commercial information, but I

5    realize I have jumped into Mr. Pesce's sort of area without

6    -- without, even though I promised I wasn't going to.  So,

7    the lines can get blurry.  So, let me ask you one other

8    question about the individuals and the names, at least for

9    folks who might be subject to the different privacy schemes

10   in the UK and the EU or in Singapore.

11        I know that -- I've seen it framed in the various

12   papers to say, well that -- the economic damage to the

13   Debtor's is not cognizable under 107.  But I was thinking of

14   it in a different way. I'm sorry, let me be clear.  The

15   economic damage that might happen to the debtors under these

16   privacy schemes, that is fines and the like, is not

17   cognizable under 107.

18        But my concern is a different one, which is -- it

19   talks about unlawful injury.  Right?  And certainly, these

20   privacy schemes over which the Debtor's have zero control,

21   right?  So, they -- they can't reach out and say why don't

22   you get pulled into this privacy scheme.  Unlike -- unlike

23   other circumstances where the Debtor's have some control

24   over who the population -- who's covered by a particular

25   category.  They have no control.  The EU, the UK, and

Page 94

1    Singapore have enacted these schemes and you have people

2    like privacy ombudsman in the EU that take these issues very

3    seriously and have a different approach that the US.

4            But certainly, those schemes reflect a -- while

5    they do not control, foreign law doesn't control and trump

6    the Bankruptcy Code. On the other hand, if we're here

7    thinking about injury, those countries have decided that

8    their citizens are entitled to this privacy protection.  And

9    so if you violate those schemes in the view of those

10   countries, you've created an unlawful injury.  And so,

11   because they've said this is the value entitled to

12   protection.

13           Again, I think there's -- I have a view of trust

14   but verify for these things.  And that's even putting aside

15   the economic damage that I -- to the Debtor's that I don't

16   think is cognizable under 107 but might be cognizable under

17   a different aspect of the Code because I think the idea that

18   the estate would be -- would lose out on -- people would

19   lose out on recovery because they would have to pay fines

20   under these regulatory schemes in the millions of dollars.

21           I don't know what the likelihood of that is and I

22   don't think I have the evidentiary record, again, something

23   like a counsel list, expertise, and privacy issues in these

24   various regimes.  But what you are -- what's your general

25   view, Mr. Zipes about the notion that these statutes in

Page 95

1   other countries are identifying for their citizens what they

2   consider unlawful injury?

3           MR. ZIPES:  Your Honor, I'm appearing from my

4   colleague's desk now because my computer seems to have shut

5   off.  So, I'm --

6           THE COURT:  Oh, I'm very sorry to hear that.

7           MR. ZIPES:  I --

8           THE COURT:  That's what you always want to have

9   happen in the middle of an argument.

10          MR. ZIPES:  I was -- so, Your Honor, I apologize

11  because I -- I believe that you were addressing foreign

12  jurisdictions and their privacy --

13          THE COURT:  Well, that's okay.  I was more wordy

14  than I needed to be.  So, I'll say it shorter this time.

15  Which is, what about the question that these privacy schemes

16  in these three jurisdictions reflect their -- or reflect a

17  notion that the loss of privacy is an unlawful injury?  I

18  mean, again, we're not -- that law doesn't trump the

19  Bankruptcy Code, but the question is whether, essentially,

20  those laws are a reflection of those bodies saying our

21  citizens are entitled to this privacy and if -- and so if

22  you violate what we think is their privacy under these

23  regulations, that's an injury.  It's an unlawful injury.

24          MR. ZIPES:  Your Honor, I don't know.  I read the

25  Committee's response, and again, I don't -- I don't want to

Page 96

```
1    be unfair to the Committee.  I don't know that this is an

2    issue in this case, but I would just state that Judge Glenn

3    considered this issue in Celsius and if there is some

4    specific privacy issue --

5              THE COURT:  Well, he considered it -- the line

6    from the opinion, that's what struck me, is the line from

7    the opinion, obviously, we always address what arguments are

8    made to us.  The line in the opinion is, the Debtor's failed

9    to show the public disclosure of UK or EU citizens personal

10   data violation of these regimes, and I'm summarizing, would

11   constitute an unlawful injury to those individuals because

12   the financial penalties (indiscernible) would be imposed

13   against the Debtor's under those laws.

14             So, it's framed as the financial injury to the

15   Debtor's implicate 107, and I don't think it does.  So, I

16   would agree with Judge Glenn that way, but -- but the idea

17   is whether -- and certainly in Indo, I think what Judge

18   Garrity said is there's certainly a -- it's relevant to the

19   notion of what is sensitive information for purposes of

20   making that determination.  It's not dispositive, it doesn't

21   trump the Bankruptcy Code, but that it is informative.

22             MR. ZIPES:  Yes, Your Honor, I think there would

23   have to be some presentation by the Debtor on whether there

24   are notes in connection with these privacy regimes if this

25   Court enters an order, and Your Honor, that, again is not an
```

Page 97

1    easy issue.  But I don't know that we're in a position to

2    make that argument for the Committee if they or the Debtor's

3    if they believe that that's appropriate.  I --

4            THE COURT:  All right. And so, and Judge -- well,

5    one other legal question, Judge Glenn sort of extended

6    comity, he used comity as a -- as a sort of way of looking

7    at this.  I don't know if your office has a view about that

8    or not.  Because comity is discretionary.  It's saying one

9    law trumps another law, you're saying I'm going to give

10   respect to that particular law in these proceedings, given

11   the analysis that can be made under comity.

12           MR. ZIPES:  Your Honor, just in this context,

13   unless someone can come forward with really power arguments,

14   this is the Bankruptcy Code and this is where we are at.

15           THE COURT:  All right. Well, I got it.

16           MR. ZIPES:  Okay.

17           THE COURT:  But you realize you lost that issue in

18   front of Judge Garrity, where you won it in front of Judge

19   Glenn, so I'm just trying to sort of give you a chance to

20   respond to the things that Judge Garrity relied upon when

21   dealing with names. But that's fine.  So, I think -- I think

22   it probably makes sense to segway to the Committee's motion

23   and what it seeks.  I think I jumped the que a little bit in

24   getting there and Mr. Zipes is trying to -- trying to be

25   fair, procedurally, and caution me from getting too far down

Page 98

1    that road correctly.  So, with that, let me turn to the

2    committee to T up what additional issues its raised and

3    additional requests it wants to make.

4              MR. SAZANT:  Briefly, Your Honor, if I may, really

5    quickly, the Ad Hoc Group of Genesis Lenders filed a joinder

6    to the Debtor's motion.

7              THE COURT:  Yes.

8              MR. SAZANT:  Not a joinder to the Committee's

9    motion, but our arguments and our positions are much

10   stronger -- much more aligned with the Committee's

11   positions.  We took essentially the same position.  If it's

12   appropriate, we would submit that the Committee can go first

13   and we would join our argument to the committee's after

14   that.

15             THE COURT:  Okay.  All right.  So, let me hear

16   from the Committee.

17             MR. SAZANT:  Thank you.

18             MR. PESCE:  Thank you, Your Honor.  So, Gregory

19   Pesce, White and Case, counsel to the Committee. The

20   Committee filed its motion at Docket 137 and we have a reply

21   at Docket 182.  Before proceeding, I would just ask if

22   there's any issue with admitting the declarations of Mark

23   Renzi from Berkley Research Group, they're at Docket 156 and

24   184.  He's on the line and available for cross-examination,

25   if anyone would wish to do so.

1           THE COURT:  All right.  Mr. Zipes, any objection

2     to receiving his declaration?

3           MR. ZIPES:  No, Your Honor.  I may have a few

4     questions later on, but I hope that I won't have any

5     questions, but I want to reserve my right.

6           THE COURT:  So, I will say the normal rule is the

7     first hearing isn't evidentiary, so we'll have to figure out

8     where we go from here.

9           MR. ZIPES:  Sure.

10          THE COURT:  But we'll cross that bridge when we

11    come to it.  So, Mr. Pesce, please.

12          MR. PESCE:  No problem.  So the Committee supports

13    the Debtor's motion to redact the institutional lenders,

14    personally identifiable information, which I'll call PII

15    during my presentation.  But with respect -- it -- in the

16    Committee's view, it doesn't go far enough.  Now, I can't

17    speak for why the Debtor's did or did not try to seal all of

18    the PII, but the Committee here is the fiduciary for

19    unsecured creditors, which are the entire creditor body.

20    There's no bank lenders, there's no bond holders.  It's just

21    the lenders that Genesis did business with prior to the

22    bankruptcy case.  And the Committee takes seriously the risk

23    of dissipation of the assets, which are largely comprised of

24    cause of action, some technology, some employment agreements

25    and then the crypto and the good will of the lenders that

Page 100

1    provided that crypto.

2              THE COURT:  But I don't understand the goodwill of

3    the lenders.  That -- I mean I understand it, but is it --

4    in the context of 107, I have trouble getting any traction

5    with that.  It feels like a very slippery way of looking at

6    it.  So, I -- the goodwill of the lenders, I mean, if you

7    ask any creditor at any bankruptcy, do you want to have your

8    information out there, they'll say no, and often times their

9    counterparties are people still doing business.  And so,

10   that argument would seem to apply in every case and we'd

11   have to rewrite 107 and since I don't have that particular

12   authority, it would be a problem.  So, what -- what do you

13   want me to do with the goodwill of the lenders?

14             MR. PESCE:  Well, the way we're looking at it is

15   this.  Genesis is basically in the business of making and

16   receiving loans from crypto investors.  The names,

17   addresses, and email addresses to those individuals are

18   equivalent to a customer list.  The value of that customer

19   list is in the people's names, the net worth, the addresses

20   associated with it, but it's also the value of that list, in

21   essence is also tied to the fact that a buyer or if there's

22   a reorganization, the creditors will realize the value of

23   that.

24             Now, I don't need to tell you how differently, you

25   know, for example like an American Airlines type case would

Page 101

1    have been if not only did you have the -- this great

2    frequent flyer program list, but if the value of that list

3    would have been dissipated if it was released, and moreover,

4    the good feelings that the passengers or the concierge key

5    members, or what have you, would have been dissipated if

6    they knew that their information was released by, you know,

7    an airline (indiscernible) --

8               THE COURT:  But if they were creditors -- if they

9    were creditors, their information was released.  So, how is

10   it any different than a bank -- a list of bank customers or

11   even a list of plumbing supply customers?  I mean, I -- in

12   terms of goodwill, if there's something specific to crypto,

13   and certainly Mr. Renzi's declaration goes to that, but I --

14   the goodwill aspect just seems exceedingly slippery to me,

15   and I just don't know how I can rely on that without

16   essentially rewriting 107 to mean that --

17              MR. PESCE:  Yeah.

18              THE COURT:  -- it just we're going to seal

19   everything.  Now --

20              MR. PESCE:  We don't (indiscernible) --

21              THE COURT:  -- you can make the argument from a

22   policy point of view that 107 is outdated and the you can

23   accomplish the goals that it should be -- there should be a

24   much more recognition about people being dragged into the

25   bankruptcy, who they didn't file the case; and that their

Page 102

1    information in this -- in this century is much more in play

2    and at risk.  And that's, unfortunately, something that

3    we'll have to wait for Congress to act on.

4              MR. PESCE:  Yeah.

5              THE COURT:  As opposed to having me act on it.

6              MR. PESCE:  I think the -- so we won't -- contrary

7    to what's been said at the hearing, we don't think you need

8    to look to amending 107 and we don't think you need to look

9    to foreign law or other things.  107 says that you can

10   protect -- 107B says you can protect commercially sensitive

11   information. Our view is that the names, addresses and email

12   addresses of the lenders, especially when coupled with the

13   claim amounts, which would be out there, is commercially

14   sensitive information.

15             That in itself warrants protection.  That goodwill

16   argument is really just sort of a enhancing that.  That

17   commercially sensitive information is valuable in its own

18   right.  It will become even more valuable or retain its

19   value if the, you know, the lenders know it is being kept

20   confidential.  But the primary reason we're here is we think

21   that the commercial -- that the lender names, addresses, and

22   email addresses is, itself, sensitive commercial information

23   that warrants --

24             THE COURT:  But what --

25             MR. PESCE:  -- protection.

Page 103

1           THE COURT:  -- what sort of showing then do I need

2      for that?  Do I need somebody who's a financial advisor?

3      Somebody can say this sort of information's been sold

4      before. Somebody who can give me something specific.  I

5      understand Mr. Renzi provided a lot of information about the

6      threats from having the information out there.  And but

7      obviously, institutions, the statute is written the way it's

8      written, talking about entities in one spot and individuals

9      in another. Which may be, again, somewhat outmoded, but what

10     kind of showing do I need for that?  What do I have here and

11     what else might I need to rely on that commercially

12     sensitive information?

13          MR. PESCE:  Sure.  I think -- so when we filed two

14     declarations for Mr. Renzi, the first one, I think hits on

15     the issue that you're talking about right now.  Mr. Renzi's

16     declaration states that the creditors -- you know, as the

17     financial advisor to the creditor's committee, he believes

18     that the lender names and their PII is effectively going to

19     be monetized through the sale process, or the value of that

20     commercially sensitive information is going to vest with the

21     lenders in a reorganization.  And it's equivalent to a

22     customer list.  And as such in the, you know, in the first

23     declaration, he says that's what warrants its protection.

24     Because it's sensitive and the disclosure will impede the

25     value of that that could be realized during the marketing

Page 104

1      process or reorganization.

2              THE COURT:  Do you have any authority for customer

3      lists in cases being protected under 107?

4              MR. PESCE:  You now, I think it's -- it's, you

5      know, you never -- you never see a retailer listing all of

6      like their gift card users.  You don't, as far as I'm aware,

7      see, you know, hotels listing all of their, you know, VIP

8      guests.  You don't see, you know, rail or airlines listing

9      like all of their frequent flyer members in the schedules

10     and statements.  You have kind of true external -- or you

11     keep that information confidential because if you release

12     it, it just becomes worthless, because anyone can go on the

13     internet and fine out here are the people that I should go

14     poach for my own competitor business.

15              THE COURT:  No, why I understand that, but I

16     guess, sometimes you don't see it because it just doesn't

17     come up, meaning they aren't on a list of creditors.  But

18     certainly, I can imagine that such customers are in some

19     industries, end up on creditor lists, and so that's why I'm

20     asking whether this is --

21              MR. PESCE:  Yeah, I think -- yeah, honestly, the

22     issue has become more acute in the crypto space, because

23     these companies are not as complicated as other operating

24     businesses.  Whereas, you know, a just to use the airline

25     example, airlines have frequent fliers, but they also have

Page 105

1    hundreds or thousands of other vendors, bond holders,

2    lenders, employees, and whatnot, that get listed.  Here, you

3    know, I appreciate --

4            THE COURT:  But -- but wouldn't that open the door

5    to people trying to partially redact the creditor lists,

6    right?  And you just say well, I've got some folks, you

7    know, I have counter parties who don't want to be mentioned

8    in a bankruptcy.  I have -- so I'm just concerned about the

9    limiting principle in what you're advocating here.

10           MR. PESCE:  Yeah.  I think the limiting principle

11   here is that unlike a -- take for example if you had a

12   service provider, right?  And you were engaging that service

13   provider to provide services to the Debtor. That's separate

14   and apart from the Debtor trying to keep confidential the

15   name of a list of commercial counterparties, it is

16   cultivating to provide basically all of its revenue.  You

17   know, you don't -- all of your revenue doesn't depend on you

18   having a plumbing contract or some other vendor doing

19   business with you.  Here Genesis' business, literally,

20   entirely depends on the names of the people it has found to

21   lend and exchange crypto with in its lending business.

22           THE COURT:  But -- but if it is so, Mr. Zipes had

23   said earlier that he noted that the lack of a privacy

24   provision in the agreement that would bar their information

25   from being sold and saying well, people are sophisticated

Page 106

1    investors and so the idea that they're sophisticated

2    investors -- not particularly institutional investors, when

3    he's in favor of the fact that they know that they're doing

4    and they know what they're getting themselves into. And if

5    it was a pre-existing agreement that required their

6    identities not to be disclosed, then so be it.  But we don't

7    -- that it's inappropriate to impose that restriction after

8    the fact.

9              MR. PESCE:  Yeah, I don't know if I agree with

10   that.  I think it's really reflected in the Renzi

11   declaration the company did have, at least with the subset

12   of agreements that we've been able to put our hands on, did

13   have agreements that said it would keep the information

14   confidential.  Those agreements did not -- did not, you

15   know, I guess, they might not have contemplated like the

16   public dissemination of that broadly, but you know, that's

17   kind of, I think, not really the point.  You have this group

18   of customers, they're going to -- if they do a sale, it's to

19   transfer the customers over to a competitor that is going to

20   want to monetize and keep the confidences of those customers

21   so that they have value at the new platform.

22             THE COURT:  All right.

23             MR. PESCE:  So, and I think this was a -- I mean,

24   this might be -- this is a factual issue, I mean, we're

25   happy to provide some more, but we did attach, at least, one

1   or more of the privacy agreements that were in the lending

2   agreements that were with Genesis and some of the customers.

3            THE COURT:  All right.  Any -- anything else,

4   counsel, that you wanted to set forth on your specific

5   application before we get to hearing from the US Trustee?

6            MR. PESCE:  Yeah, I would just make two quick

7   points.  First, in terms of the suggestions earlier about,

8   you know, using home addresses or business addresses and

9   things like that; candidly that's just going to put a

10  massive burden on the estate or the committee or whoever is

11  vested with doing it.  I think the benefit -- and the

12  benefit of that, would -- I think it'd be pretty nominal if

13  not negative.

14           THE COURT:  I know, but I don't think I have an

15  ability, under the statute, to use that as a cognizable

16  basis, right?  So, if the notion is that it's -- what I hear

17  the Debtor saying is that because it's a home address,

18  they're sort of a hybrid situation that they are somewhat

19  individualized as opposed to institutions, and that's why

20  you can use the other section of the statute.  But I don't

21  know that I can sit here and talk about administrative

22  burden on the estate, because frankly, if I were doing that,

23  you know, the thread of lawsuits in the EU and the UK, and

24  Singapore might be a more prominent part of this discussion.

25           MR. PESCE:  Yeah.  I think my point here is just

Page 108

1    that in terms of -- there is a balancing here.  The risk of

2    the information getting out there is -- or the costs to the

3    estate are huge, and then in terms of balancing what the

4    appropriate remedy I or how surgical we can be.  I --

5              THE COURT:  But where in the statute, where in the

6    case law do I get to balance that?  That, I think is where

7    the US Trustee's office is, is the statute is the statute--

8    and if we start talking about balancing things, I don't -- I

9    mean, I think I have to look to see if the contemplated

10   injury is -- exists, and then do follow the blueprint of the

11   statute, I don't think it allows me to weigh that.

12             MR. PESCE:  Now (indiscernible) --

13             THE COURT:  And, you know, again, that may be a

14   revised 107, but I don't think it's the current 107.

15             MR. PESCE:  I -- yeah, I think we might be, I

16   think the US Trustee and the Committee might be just talking

17   past each other.  I mean, there's not -- there's no inherent

18   balancing here, but in terms of the appropriate remedy to

19   limit the amount of redaction, you know, we should find a

20   remedy that's not going to, in itself, cause a further cost

21   to the estate.  Which is jut my suggestion.

22             And finally, the second point I just wanted to

23   make really quickly is just on in terms of the individuals,

24   our point there is there was some commentary in the US

25   Trustee's response or its objection. We don't take -- we

1    don't believe that institutional creditors are individuals

2    that are subject to 107.  We want -- we think it's

3    appropriate though, for the Court to redact the PII of the

4    individual creditors, one, and then two, individuals who --

5    we think it's -- we think it's implicitly necessary to do

6    something on the institutions, because if you -- if the --

7    because of the extent to which employee names and

8    information is out there; if you release the institution's

9    names, you can then kind of triangulate to find where they

10   are, how they operate, where they're located.

11              THE COURT:  But I'm not -- I'm not -- that I'm not

12   following that.  So, I don't know that I had a specific

13   request or that anyone specifically identified employees and

14   I know that employees are specifically identified in at

15   least one of the decisions that I read.  So, I don't know

16   that I have -- and if we got to employees, somebody would

17   have to identify for me, sort of the step how we get to

18   employees.  Is it -- is it -- why -- like in other words,

19   just because somebody's an employee doesn't mean that a

20   proof of claim filed by them, would necessarily be covered

21   on that basis if you can't tell from the proof of claim that

22   they're an employee.  Right?

23              So, in other words, people have to self-identify.

24   So, I -- so that's one of the reasons I asked Ms. VanLare

25   about the counterparties, right?  So, if you have a sea of

Page 110

1     names, you know, we -- none of those names by themselves

2     tell you that anybody's a potential counterparty.  And so

3     how can we protect the whole set of names --

4                MR. PESCE:  Yeah.

5                THE COURT:  -- because there's nothing about the

6     set of names where it largely identifies you as a counter

7     party.  She has a solution, which is to say no, we have --

8     we have independent source of information where we can come

9     up with a list and then we can -- we can work with that

10    list.  But here, I don't know how identify -- so, how does

11    the employee issue come up in the context of what you're

12    seeking?

13               MR. PESCE:  Yeah, so say for example, if you

14    released the name of creditor X, as one of the Debtor's

15    creditors, and you released the name and the contact

16    information of creditor X as an institution.  It, you know,

17    it would then, because it is possible to find information

18    about people who work for creditor X --

19               THE COURT:  Yeah.

20               MR. PESCE:  -- you know, their employee's names

21    are listed on, you know, Linked In, on other kind of social

22    media, et cetera.  You could in turn, by disclosing creditor

23    X's name, expose their employees or people affiliated with

24    them to harm.

25               THE COURT:  Well, but I think you just said

Page 111

1    somebody could do that anyway, if properly motivated under

2    the wonderful tool of the internet.  And so if the cow has

3    left the barn by virtue of the internet, there's not a whole

4    lot I can do about fixing that.  So, I mean it may be

5    republishing it. I think cases tend to not be as concerned

6    about republishing information that's already out there for

7    purposes of a sealing requests.

8             MR. PESCE:  Yeah, I mean, look I think a lot of

9    this comes down to just minimizing the harm and minimizing

10   the risk here.  I mean, if for example, one of the members

11   of the committee, an institutional creditor came to me and

12   said they were very concerned about their name, the

13   institutions name getting out there because then, you know,

14   while the institution is a business, it can't, you know,

15   experience, bodily harm, you know, they had a concern that

16   people would track down individuals who worked there as a

17   way to exerting pressure on the institutional creditor.

18   That's the very risk that we're worried about here.

19             THE COURT:  All right.

20             MR. PESCE:  I mean, it's minimize risk --

21             THE COURT:  That I understand -- I understand that

22   argument.  All right.  Anything else, counsel, before I hear

23   from the UST?

24             MR. PESCE:  You know, Mr. Zipes just emailed me

25   and said (indiscernible) --

1                    THE COURT:  (Indiscernible).

2                    MR. PESCE:  -- maybe are you on now?  Okay.

3                    MR. ZIPES:  Gregory, I appreciate that.  I'm on

4        again.

5                    MR. PESCE:  Okay.  Good.

6                    MR. ZIPES:  Your Honor, I -- we're apparently

7        having failures throughout the country because my colleague,

8        Ben, was also disconnected from Seattle.  So, --

9                    THE COURT:  Oh.  Well, that's --

10                   MR. ZIPES:  -- I apologize.

11                   THE COURT:  -- been there done that.  And if this

12       is a current problem, it is now 20 to 2. If it -- if it

13       would be of any assistance, we could resume after lunch, if

14       that would be helpful so you don't have to worry about his

15       particular problem.   I'm open to suggestions.

16                   MR. ZIPES:  Your Honor, I haven't had this problem

17       before and I'm not sure what it is, so I think we're

18       basically done here.  I had one suggestion, because there's

19       a lot to digest here.  And one factual issue which I think

20       we don't need to have an evidentiary hearing on, but if the

21       expert witness, here, can just state on the record, as part

22       of the sale -- maybe he's not prepared to do this, but as

23       part of the sale, what pieces of information would be a part

24       of the sale?  Because I think it would -- just having a name

25       is not the same as all the information that would be

1   transferred as part of the sale.  I think that would be

2   irrelevant.

3           THE COURT:  You want to further connect the dots

4   for purposes of the 107 invocation dealing with commercial

5   information?

6           MS. CRISTE:  If --

7           MR. ZIPES:  Correct, and I don't want to put

8   anybody on the spot here, but and I want to reserve my

9   rights as well, but I think that would be helpful and

10  (indiscernible) --

11          THE COURT:  Here's what I would propose to do.

12  And I'll hear from everybody before we actually take a

13  break.  Is to take a break now, which would allow you, Mr.

14  Zipes, to have a conversation with the committee and it's --

15  and Mr. Renzi about exactly what it is, the contours of

16  which you would like on the record.  And so that we don't

17  have to do this on the fly, it's a little difficult to do on

18  the fly.  And it's even worse in a virtual courtroom, and I

19  keep reminding myself that when I have evidence, I should

20  just drag everybody in because there's no substitute for

21  that.  We could just sit in the back, and you could figure

22  it out.

23          But since it is almost lunchtime, we can do what -

24  - we would probably do -- if you were all here in person,

25  which is to take a break and allow you to have that

Page 114

1    discussion and then come back this afternoon, say about 2:30

2    or 3:00 even, to give you a chance to chat and figure things

3    out, and then we can sort of wrap up where we are.  And I'll

4    show a little bit of my hand.  My thought would be to make a

5    ruling dealing with the things that are uncontested and to

6    make it clear that those can be protected.  For the other

7    things, I then would have a discussion about whether the

8    record is closed or not.  Where there's a need for an

9    evidentiary hearing because there is a certain sense that

10   this is sort of evolving as we talk about it.

11           And this is not supposed to be trial by ambush, so

12   -- so folks should -- that's why I would also encourage the

13   UST and White and Case to have a discussion because you can

14   all figure out what else is out there?  What you can agree

15   upon in terms of the record, or not.  And then we can have a

16   conversation and figure out where we are.  So, that would be

17   my suggestion.  So, since it -- it probably most directly

18   implicates the UST and the Committee, I'll hear from them in

19   a second and then I'll hear from Ms. VanLare if she has any

20   thoughts as Debtor.  So, Mr. Zipes, what do you think of

21   that approach?

22           MR. ZIPES:  Your Honor, that's fine and I think

23   you have tipped your hand a little bit in some, in the way

24   you asked some of the questions.  And it -- so it's fine to

25   take a lunch break.  I can't -- I don't have authority right

Page 115

```
 1    now to agree or not agree to anything other than what's in

 2    our objection, so --

 3              THE COURT:  No, that's fair.

 4              MR. ZIPES:  -- and if the Court wants to reconvene

 5    at three, that's fine.

 6              THE COURT:  All right.  Mr. Pesce, any thoughts

 7    about taking a break until three?

 8              MR. PESCE:  That's fine with me.  Thank you, Your

 9    Honor.

10              THE COURT:  All right.  And Ms. VanLare, last but

11    not least.

12              MS. VANLARE:  Thank you, Your Honor. I would just

13    say that, you know, we are supportive of the Committee's

14    motion and we would like to be included in the discussions,

15    particularly if we're talking about any evidentiary issues.

16    I mean, we agree that -- that this information, the lender

17    information is an asset of the estate, and we just want to

18    make sure we're included in the discussions, obviously,

19    particularly as it concerns the sale process and really the

20    rest of it, so I just want to make sure that the Debtors are

21    a part of any discussions.

22              THE COURT:  All right.  That's a very fair point.

23    Mr. Zipes?

24              MR. SAZANT:  Sorry, Your Honor,

25              THE COURT:  Oh.
```

```
 1              MR. SAZANT:  Jordan Sazant again, on behalf of
 2   Prokauer Rose, counsel for the Ad Hoc Group of Genesis
 3   Lenders.  We represent over $2 billion in petition date
 4   dollar value of claims and over two thirds of the top 50
 5   creditors. You know, respectfully, the Committee certainly
 6   represents and has a fiduciary duty to all creditors, but
 7   this issue is very important to our clients and we would ask
 8   that we be included in these discussions. I do have some
 9   supplemental arguments on top of what Mr. Pesce has proposed
10   -- put forth, but if it's best to reserve those for after
11   the lunch break, I'm happy to do so.
12              THE COURT:  Yeah, I would say, I think now is as
13   good a time to break as any to figure out what we -- how do
14   we get from where we are to the conclusion on the record on
15   this issue and so, that would be my thought.  So, I would
16   say, it's a quarter to two, I would say 3:00, assuming
17   that's enough time, but I don't want to jam people
18   artificially, because there's no magic between 3 and 3:30.
19   So, would it be better to set it later?  I also am happy if
20   you want to sort of start having conversations to reach out
21   to chambers and do what you would do otherwise in person,
22   which is say Judge, we need a few more minutes.  So,
23   whatever works for you all.
24              MR. PESCE:  If it's okay with the parties and the
25   Court, I might suggest that maybe like if you're still
```

Page 117

1    around this afternoon, maybe like four, just to briefly

2    check in?  Just to make sure we have enough time to it once

3    and right.  But otherwise, we can do three, but I'm just

4    trying to short circuit coming back.

5              MS. VANLARE:  Yes, and that's -- a later time is

6    fine with us, Your Honor.

7              MR. ZIPES:  I would keep to the 3:00, but myself,

8    Your Honor, I don't know, but I'm happy to adjourn it out to

9    four if we're making progress, I think --

10             THE COURT:  So, -- so here's what we'll do.  We'll

11   make it 3:30, just because that way we know we have enough

12   time to finish by the end of the day and that should give us

13   -- give you all enough time to hopefully get sort of closure

14   at least on what we're trying to do. And so -- so I will

15   just leave you with one thought. I don't have the authority

16   to write -- rewrite 107.  I have my own personal views, but

17   they're entirely irrelevant.

18             And so, my -- as you can see by the start of the

19   questions with Ms. Vanlare, right from the beginning, my

20   question is how is it -- like what is it that's particular

21   to quote Hamlet, why is it so particular with you in this

22   case that 107's implicated?  And that's -- that's I think

23   something that's important because it's -- and that's what

24   Judges have done and that's what Judge Garrity did in, you

25   know, in the context of his case.  So, that's really what I

Page 118

1   -- the focus for example on commercial information, customer

2   lists, and all that stuff, is probably the most pressing

3   question.  So, with that, let me ask if there's anything

4   else that we need to discuss before we adjourn until 3:30?

5              MR. ZIPES:  Your Honor, I appreciate your

6   attention to this and I understand that everybody -- all the

7   parties want this resolved and not turn this into a sideshow

8   of sorts.  So, we will try to get this resolved.

9              THE COURT:  Yeah, well, listen your lips to God's

10  ears.  If not, I'll do what I have to do at my day job,

11  which is make a decision.  But appreciate everybody's

12  arguments and observations and certainly I'll hear from the

13  Ad Hoc Group after lunch, and I'll see you all at 3:30.

14  Thank you very much.

15             MR. SAZANT:  Thank you very much, Your Honor.

16             MS. VANLARE:  Thank you, Your Honor.

17             (Recess)

18             THE COURT:  Good afternoon, once again, this is

19  Judge Sean Lane, in the United States Bankruptcy Court for

20  the Southern District of New York, and we're here for our

21  continued hearing in Genesis Global Holdco, LLC.  We started

22  at 11:00 and to say continued hearing may be a bit of an

23  overstatement given what you're about to tell me.  We had

24  gotten some communications before coming out here that there

25  was an intent to adjourn things out, which I obviously have

1    no problems with.  I just wanted to do it on the record so

2    that folks who may not be privy to the goings on and who

3    might have logged in to listen to the hearing would know and

4    they wouldn't be sitting on the call at 3:30 until the end

5    of the day wondering what happened.  So, with that, I'm not

6    sure who wants to take the -- grab the podium, virtual

7    podium to sort of T up where we are.

8              MS. VANLARE:  Your Honor --

9              MS. CRISTE:  Amanda -- go ahead Jane.

10             MS. VANLARE:  Go ahead --  I was going to say,

11   Your Honor, I think you've correctly related.  We did reach

12   out separately to your chambers to adjourn and find a

13   hearing date the Week of April 10th on the redaction issue.

14   So, I don't know if the Committee has anything to add to

15   that.

16             THE COURT:  Anything from the Committee?

17             MS. CRISTE:  Your Honor, yes, this is Amanda Parra

18   Criste of White and Case on behalf of the Committee, that's

19   -- that's correct.  That reflects the discussions that

20   occurred during the break.  I wanted to thank, Your Honor,

21   for your time and patience as well.  The only other think I

22   would add is that I think the idea is that during at

23   adjournment hearing and I just want to make this clear for

24   the record, the Debtors and the Committee will either

25   present witnesses to address certain issues that have been

1    raised by the United States Trustee that we believe are not

2    resolved.  Or alternatively the Debtors and the Committee

3    will file supplemental declarations for submission at that

4    hearing.  The parties will also plan to present closing

5    remarks, and I think what we are requesting is about two

6    hours for that hearing.  So, we'll coordinate that with

7    chambers.

8            THE COURT:  All right.  Yeah, Ms. Eve banks will

9    get you squared away.  I guess, my one question is that I

10   have been making sure to try to bring people back for

11   evidentiary matters, just because there's really no -- it's

12   just a much better way to handle evidence, we're much --

13   everybody's much more nimbly address anything that comes up

14   whether it's having exhibits, which it's cross-examination,

15   and not to bore you, with an anecdote, but I recently had a

16   case that turned the tide for me on this issue and when

17   someone said well.

18           We don't need an evidentiary hearing.  Se just

19   have a few questions, Judge, it'll take five minutes.  And

20   then two hours later, we were still at it and we had

21   everything from people not having exhibits in front of them,

22   all sorts of stuff, and again, it's just -- it's just better

23   to do it in person.  So, my thought would be to -- and when

24   I say in person, what I would do is set up essentially, a

25   hybrid hearing, meaning the people who need to be here are

Page 121

1    here, who are handling the evidence, and other people are

2    more than -- more than able to -- I'm more than happy to

3    have the participate remotely.

4                So, I don't want to drag everybody in and -- for

5    no reason, but that would be my thought here for this

6    evidentiary hearing.  That we can sort of nimbly address

7    whatever situation we have.  And I suppose if the parties

8    reach a conclusion that there's no cross-examination, no

9    possibility or need for cross-examination, that the

10   evidentiary record is what it is.

11               We just -- I just -- and therefore we don't need

12   to come in person, then I'd ask that people really button

13   that up and maybe submit something on the docket or

14   something that makes that very, very clear, just so we all

15   know the state of the record.  And so, I guess, the other

16   think I would ask is what the time frame is to file any

17   additional declarations, just so people know when they might

18   arrive.

19               MS. CRISTE:  Your Honor, would it be possible to

20   get some guidance, since we don't know the date of the

21   hearing, could we get some guidance from you as to maybe how

22   we would work back from that hearing?

23               THE COURT:  Sure.  So, I think -- I'm not going to

24   get in the way here because for scheduling, I can only mess

25   this up. But I think a date that's being discussed is April

Page 122

1    12th.  And I would imagine that would be in the afternoon, I

2    think.  So, without setting that as a date, because I'll let

3    you work that out with Ms. Eve Banks, you're much better

4    hands with her.  But I would say the idea would be -- I

5    would think maybe a week before, so that people then can

6    take a look at them and figure out if they do need cross-

7    examination and if people need to make travel plans and

8    things of that sort.  So, is that -- is that what people had

9    in mind?  I'm open to other suggestions, obviously.

10            MR. SAZANT:  Your Honor --

11            MS. CRISTE:  Your Honor --

12            MR. SAZANT:  Go ahead, Amanda.

13            MS. CRISTE:  I think that would be okay with the

14   Committee.  A week from today to submit supplemental

15   declarations if that's what we decide to do.

16            THE COURT:  All right.  All right.  Anything else

17   from the Committee before I hear from the UST?

18            MS. CRISTE:  No, Your Honor, nothing further from

19   us.  Thank you.

20            THE COURT:  All right.  And anything from the UST?

21            MR. ZIPES:  Your Honor, Greg Zipes, with the

22   United States Trustee's Office. We'll attempt to get pointed

23   questions or specific question and see if we can get them

24   answered in the form of declarations and that may or may not

25   be sufficient.

Page 123

1            THE COURT:  All right.  Fair enough.  You won't

2    know until you see it.  That's fine.  And what I'm going to

3    do is I'm going to assume that the evidentiary portion will

4    be handled in person, subject to hearing otherwise after

5    everybody consults with each other and that you're all in

6    agreement.  But -- so we'll make that the default.  So,

7    it'll be like the old days.  And so we'll have that here in

8    court, again, just the part that's evidentiary and

9    obviously, other people are -- can listen in and we'll have

10   the capacity in the hybrid hearing.  All right.  So, with

11   that, any other questions, or concerns that anybody might

12   want to raise at this time?

13           MR. PESCE:  That's White Plains, Your Honor,

14   correct?  You're not coming (indiscernible) --

15           THE COURT:  Yes, that is White Plains, correct.

16           MR. PESCE:  Okay.  Thanks.

17           THE COURT:  I am stepping into Judge Drain, not

18   replacing him, because I wouldn't want to make such a bold

19   claim as to replace Bob Drain.  Yes, White Plains, and one

20   thing apropos of nothing, I suppose, Mr. Zipes, I didn't

21   mean to drive the other person from your office off the call

22   earlier today.  But I had -- to the extent that it was

23   perceived to be a defending your honor, I'm very happy it be

24   seen in that way.

25           MR. ZIPES:  Your Honor, I appreciate that and

Page 124

1    these misunderstandings happen every once in a while and I -

2    -

3            THE COURT:  No, it's fine.

4            MR. ZIPES:  -- I apologize for that.  And I

5    understand --

6            THE COURT:  No, no, no.  No apology necessary.

7    All those things are little easier to deal with in person

8    and in video it just seems a bit more abrupt, so I wasn't

9    trying to be rude to the individual in question.  So, you

10   can please pass that along.  I think it came off as a little

11   more abrupt than perhaps I intended.  But (indiscernible)

12           MR. ZIPES:  Your Honor, sometimes you rule against

13   us, but you're never rude.  I can say that.

14           THE COURT:  All right.  Well, that's good to know.

15   That's good.  All right.  Anything from any other party?

16           MR. SAZANT:  Nothing from Ad Hoc's.

17           THE COURT:  All right. Great.  Thank you.  I

18   wanted to make sure to hear from the Ad Hoc's as well.  All

19   right.  Well, let me just end by saying, I appreciate

20   everybody's efforts to talk to each other and to make sure

21   the record is what it should be and that may lead to a

22   resolution, it may not, and that's okay, but the process by

23   which people are going about this is laudable, and I

24   appreciate it and we'll see here we end up in April.  Thank

25   you very much.  In the meantime, be well.

Page 125

1              MR. ZIPES:  Thank you, Your Honor.

2              MS. CRISTE:  Thank you, Your Honor

3              MS. VANLARE:  Thank you.

4              (Whereupon these proceedings were concluded at

5     3:44 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 126

1                    I N D E X

2

3                    RULINGS

4                                        Page        Line

5    Application to Retain Houlihan Lokey,

6    GRANTED                              21          18

7    Application to Retain Berkeley Research

8    Group, GRANTED                       23          25

9    Application to Retain White and Case,

10   GRANTED                              25          24

11   Limited Waiver of Section 345, GRANTED   37       1

12   Motion for Relief, GRANTED           69          13

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 127

1                  C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6     *[signature: Sonya M. Ledanski Hyde]*

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  April 3, 2023