CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Jane VanLare
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al*.,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |

## CERTIFICATE OF PUBLICATION

I, Jane VanLare, an attorney admitted to practice before this court and an employee of the firm of Cleary Gottlieb Steen & Hamilton LLP, hereby certify that the *Notice of Bidding Procedures, Potential Auction, and Sale Hearing*, which is substantially similar to the form of notice attached as Exhibit 2 to the above-captioned debtors' filing at ECF No. 191, was published in *The New York Times* on Monday, April 10, 2023, as more fully set forth in the Proof of Publication of Larnyce Tabron (attached hereto as Exhibit A).

Dated:   April 12, 2023           /s/ Jane VanLare
         New York, New York       Jane VanLare

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

# EXHIBIT A

**Proof of Publication**



**The New York Times Company**

620 8th Avenue
New York, NY 10018
nytimes.com

# PROOF OF PUBLICATION

April 10, 2023

I, Larnyce Tabron, in my capacity as a Principal Clerk of the Publisher of The New York Times, a daily newspaper of general circulation printed and published in the City, County, and State of New York, hereby certify that the advertisement annexed hereto was published in the editions of The New York Times on the following date or dates, to wit on.

4/10/2023, NY & NATL, pg B2

*Larnyce Tabron*



JOHN MCGILL
Electronic Notary Public
Commonwealth of Virginia
Registration No. 8038092
My Commission Expires Dec 31, 2027

Digitally signed by John McGill
Date: 2023.04.10 10:00:48 -04'00'

---

CLEARY GOTTLIEB STEEN & HAMILTON LLP, Sean A. O'Neal, Jane VanLare, One Liberty Plaza, New York, New York 10006, Telephone: 212-225-2000, Facsimile: 212-225-3999, *Counsel to the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re: | Chapter 11 |
|---|---|
| Genesis Global Holdco, LLC, *et al.*,[1] Debtors.[2] | Case No.: 23-10063 (SHL) Jointly Administered |

**NOTICE OF BIDDING PROCEDURES, POTENTIAL AUCTION, AND SALE HEARING**

**PLEASE TAKE NOTICE** that, on January 19, 2023 (the "Petition Date"), Genesis Global Holdco, LLC and its affiliates Genesis Global Capital, LLC and Genesis Asia Pacific Pte. Ltd., as debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" and the cases, the "Chapter 11 Cases"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") with the Bankruptcy Court for the Southern District of New York (the "Court").[2]

**PLEASE TAKE FURTHER NOTICE** that on March 16, 2023, the Debtors filed a motion [Docket No. 133] (the "Motion") seeking, among other things, the entry of an order approving (a) bidding procedures (the "Bidding Procedures") in connection with the proposed auction (the "Auction") and sale (the "Sale") of the Debtors', Genesis Global Trading, Inc.'s and non-Debtor subsidiaries' equity or some or all of their assets (the "Assets") to one or more Successful Bidders, (b) the selection of a Stalking Horse Bidder and the payment of Bid Protections in certain instances as set forth in the Bidding Procedures, and (c) scheduling dates and deadlines in connection with approval of the Sale (the "Sale Schedule").

PLEASE TAKE FURTHER NOTICE that on March 31, 2023, the Bankruptcy Court entered an order [Docket No. 192] (the "Bidding Procedures Order") granting the relief sought in the Motion, including, among other things, approving the Bidding Procedures and the Sale Schedule.

**Contact Parties for Parties Interested in Submitting a Bid.** **(i) Investment Banker to the Debtors:** Moelis & Company LLC, 399 Park Avenue, 4th Floor, New York, NY 10022, Attn.: Zul Jamal (zul.jamal@moelis.com), Barak Klein (barak.klein@moelis.com); and **(ii) Counsel to the Debtors:** Cleary Gottlieb, Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attn: Sean A. O'Neal, Esq. (soneal@cgsh.com), Jane VanLare, Esq. (jvanlare@cgsh.com).

**Obtaining Information.** Copies of the Bidding Procedures Order, the Bidding Procedures, and any other related documents can be viewed and/or obtained: by (i) accessing the Court's website at www.nysb.uscourts.gov or (ii) from the Debtors' notice and claims agent, Kroll Restructuring Administration LLC, located at 55 East 52nd Street, 17th Floor, New York, NY 10055, at https://restructuring.ra.kroll.com/genesis/ or by calling +1 888-524-2017. Note that a PACER password is needed to access documents on the Court's website.

**The Sale Schedule     Action** (Description): Deadline
• **Bidding Procedures Hearing** (The hearing before the Court to consider this Motion): March 30, 2023
• **Indications of Interest Deadline** (The deadline by which all indications of interest must be actually received): May 5, 2023
• **Stalking Horse Designation Deadline** (The date by which the Debtors may designate one or more Qualified Bidders as the Stalking Horse Bidder(s), if any; provided however that the Debtors may designate a Stalking Horse Bidder at any time prior to the Stalking Horse Designation Deadline; and provided further that the Debtors, in consultation with the Consultation Parties, may extend the Stalking Horse Designation Deadline provided that a notice of any such extension is filed on the docket): June 12, 2023

• **Bid Deadline** (The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures, as well as the deadline by which DCG must identify whether or not it or any of its insiders or controlled affiliates will submit a Bid or whether any newly created entity wholly-owned or directly or indirectly controlled by DCG's insiders or controlled affiliates (other than by virtue of its existing equity ownership in the Debtors) intends to submit a Bid): June 19, 2023
• **Auction** (The date and time of the Auction, if one is needed, which will be held at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, 38th Floor, New York, NY 10006 and/or via Zoom): June 27, 2023
• **Deadline to file the Designation of Successful Bid** (The deadline to file a notice designating the Successful Bid and Successful Bidder, as well as the Back-up Bid and Back-up Bidder): One business day following the conclusion of the Auction
• **Sale Objection Deadline** (The deadline by which objections to the entry of an order by the Court approving the Sale must be filed with the Court and served so as to be actually received by the appropriate notice parties (the "Sale Objection Deadline"): July 7, 2023, or as otherwise determined in accordance with a motion seeking entry of an order approving the adequacy of a disclosure statement and setting forth the timeline for confirmation of a plan
• **Sale Hearing (subject to the Court's availability)** (The Sale will be implemented under the Plan and shall be approved at the Confirmation Hearing): July 14, 2023, or as otherwise determined in accordance with a motion seeking entry of an order approving the adequacy of a disclosure statement and setting forth the timeline for confirmation of a plan

**Filing Objections to the Sale.** The Debtors request that the Court require that objections to the Sale (a) be in writing; (b) comply with the Bankruptcy Rules, the Local Rules and other case management rules and orders of this Court; (c) state the name and address of the objecting party and the amount and nature of the claim or interest asserted by the objecting party against the estate or property of the Debtors; (d) state with particularity the legal and factual basis for such objections, and, if applicable, a proposed modification to the Sale that would resolve such objection; and (e) be filed with the Court with proof of service thereof and served upon, so as to be actually received by the Sale Objection Deadline, the following parties: (i) the Office of the United States Trustee for Region 2; (ii) counsel to the Debtors, Cleary Gottlieb, Steen and Hamilton LLP, One Liberty Plaza, NY, NY 10006 Attn: Sean O'Neal (soneal@cgsh.com) and Jane VanLare (jvanlare@cgsh.com); (iii) the investment banker to the Debtors, Moelis & Company LLC, 399 Park Avenue, 4th Floor, New York, New York 10022, Attn: Zul Jamal and Barak Klein, and; (iv) counsel to the Committee, White & Case LLP, 111 South Wacker Drive Suite 5100, Chicago, Illinois 60606, Attn: Gregory F. Pesce (gregory.pesce@whitecase.com) and 1221 Avenue of the Americas, New York, New York 10020, Attn: Philip Abelson (philip.abelson@whitecase.com).

**Consequences of Failing to Timely File an Objection.** Any party or entity who fails to timely file an objection to the Sale on or before the Sale Objection Deadline, in accordance with the Bidding Procedures, shall be forever barred from asserting any objection to the Sale.

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

[2] Capitalized terms used in this notice and not defined herein shall have the meanings given to them in the Bidding Procedures (as defined herein).

---

## INTERNATIONAL | WORKPLACE

---

# Xi Loyalist Leading Chinese Economy

FROM FIRST BUSINESS PAGE

thing from industrial policy to trade negotiations. He spent the past five years as the leading central planner of China's economy, and will now have even more influence to make sure those plans and the edicts of Xi Jinping, China's top leader, are followed.

The big question among economists now is which Mr. He will the world see as vice premier. Will he take his cues from the entrepreneurial energy he saw early in his career in Xiamen? Or will he follow his more recent experiences as a taciturn Communist Party boss who avoids contact with foreign executives and works closely with state-owned enterprises?

Victor Shih, a political scientist at the University of California, San Diego, said Mr. He's recent experience suggested that he favored state-led initiatives. Such policies meet short-term needs, like the swift economic stimulus that arises from building highways and skyscrapers, but then bring difficulties, like ever-rising debt to pay for the construction.

Mr. He "has a track record of doing things immediately, in accord with his boss's wishes, but may sacrifice some of these medium-term issues," Mr. Shih said.

China's new premier, Li Qiang, promised at his inaugural news conference last month that his country would treat private companies equally with state-owned enterprises, in an attempt to signal that China wanted to revive entrepreneurship. Four people who know Mr. He, speaking on the condition of anonymity to talk openly, said Mr. He was influenced by his work in Xiamen and appreciated the power of free markets in fostering economic growth.

They also said, however, that they expected he would closely follow every decision by Mr. Xi, who has handed down statist measures that in many cases have suppressed business growth.

Mr. He is one of the closest allies of Mr. Xi, who was confirmed last month to a third five-year term. Practically no one in China's political life has been closer to Mr. Xi

over the years. The two met as young officials in Xiamen, months after Mr. He finished his master's degree at Xiamen University. When Mr. Xi ventures out in public, Mr. He consistently appears in official photos several steps behind him.

In Xiamen in the 1980s, they worked together to set up industrial parks for factories and then wined and dined potential investors from other regions of China, as well as Taiwan and Hong Kong.

Mr. He left Xiamen in 2009 and followed Mr. Xi, who by then was China's vice president, to northeastern China. Mr. He played a senior municipal government role in Tianjin and five years later became a senior economic planner in nearby Beijing.

Since 2017, Mr. He has played a powerful role in the economy's shift toward state-led development. He served as the chairman and Communist Party secretary of the country's top central planning agency, the powerful National Development and Reform Commission. He shifted the commission's focus away from foreign investment and curtailed meetings with foreign executives, emphasizing close coordination with state-owned enterprises instead.

Mr. He's economic policy evolution has closely paralleled his longtime boss's declining trust in markets. Mr. He gave a speech in 2008 at his alma mater that reflected an early faith in capitalism. He extolled the decision by Mr. Deng, who dominated political life in China for two decades starting in 1978, to pursue free markets, saying he and other early graduates had "benefited from the great cause" of opening the economy.

In August, Mr. He took a very different tone in a column for the state-run Economic Daily: "Strengthening the Party's overall leadership over economic work is the fundamental guarantee for our country's economic development. Practice has proved that the key to running China's affairs well lies in the Party."

A stark example of how far Mr. He has traveled in his policymak-

ing can be seen in his role as a senior leader in Tianjin before moving to Beijing to run the national development commission.

Tianjin, a large metropolis only 70 miles southeast of Beijing, is a model of government intervention — in many ways the opposite of Xiamen, where Mr. He got his start. State-owned enterprises predominate. Extensive borrowing has left Tianjin facing one of China's worst local government debt crises.

Mr. He oversaw the construction of a vast new city of skyscrapers on the city's oceanfront. It was intended to become a "new Manhattan," but has failed to attract many businesses.

Today, rows of apartment buildings stand vacant at the port in Tianjin. A 103-story skyscraper opened only its bottom 40 floors for business. Even four McDonald's franchises were mostly empty on a recent workday.

### A key post in the shift to state-owned initiatives.

David Xing, a 29-year-old office worker, sat in the food court of a mostly empty mall at lunchtime on a recent weekday. Friends had moved to Tianjin but stayed only a couple of years before concluding there were better job opportunities elsewhere.

"I feel like this place can't keep people," he said.

Cities across China are struggling with overwhelming debt burdens, and an analysis by Fitch Ratings found that Tianjin was in bigger trouble than practically anywhere else. Although Tianjin is a longtime center of heavy industry with a broad tax base, the

city's borrowing affiliates are so indebted that they pay among the highest interest rates in China. Nearly three-fifths of Tianjin's debt falls due this year, and investors have been leery of extending long-term loans to the city.

Unlike Tianjin, Xiamen has fairly little debt. An analysis released last month by S&P Global found that Xiamen was the least indebted city in Fujian Province, which in turn had one of the best provincial credit profiles in China. Xiamen also remains a hub of small-business activity. Sun Hao, 40, moved to Xiamen 15 years ago when he grew tired of working for others in his home province, Henan, in central China. He opened his one-man welding workshop, where he makes steel mountings for a nearby circuit board factory.

"I used to work for others, but here I can do it on my own, which

feels better," he said.

But China today is much more like Tianjin than Xiamen. Nationwide, government investment in road, bridges and other infrastructure grew nearly three times as fast in the first two months of this year as did retail, a sector that is among the most dominated by entrepreneurs in China.

Mr. He himself may never have absorbed Xiamen's small-business ethos. Even before he moved to Tianjin, he spent his last years in Xiamen ordering the flattening of neighborhoods and villages on the outskirts of Xiamen's historic core to make way for modern buildings, said Alfred Wu, a politics professor at the National University of Singapore who used to work as a local journalist near Xiamen.

Mr. He finished his years in Xiamen, Mr. Wu added, with a new nickname: He Dachai, or He the Big Demolisher.



He Lifeng was a top local leader in Xiamen, China, a coastal city freed by Deng Xiaoping in the 1980s from central planning dictates to test free markets.
QILAI SHEN FOR THE NEW YORK TIMES

---

# Work a Few Days From the Office, Then Head Home to Be Laid Off

By Sarah Kessler, Lauren Hirsch and Michael J. de la Merced

Last week, McDonald's asked corporate employees, who usually work from the office at least three days a week, to do the job from home. The plan was to lay off hundreds of employees, DealBook hears, and the company preferred to deliver its news virtually.

McDonald's isn't the only company to tweak the layoff playbook. In January, Google laid off thousands via email. And Mark Zuckerberg, the C.E.O. of Meta, last month announced plans for a year of big cuts in a 2,000-word memo, explaining that Meta staff "wanted more transparency sooner into any restructuring plans."

Like many work norms, how to fire people is being rewritten in the wake of the pandemic, when downsizing companies often had little choice but to make layoffs via Slack, Zoom and email, and often did so sloppily. With offices open again, and remote work more common, companies now have options — and it's not necessarily clear what is best for workers.

"If we had this conversation three years ago, I would have said this is cruel and unusual punishment," said Bob Sutton, a professor at Stanford and the author of "The No Asshole Rule," about remote firing. "But it's changed so dramatically since the pandemic that I'm confused."

**The case for virtual layoffs.** Cynthia Huang, a senior marketing manager, was laid off from a consumer goods company with a hybrid work policy in February. Because she was working remotely that day, she got the news via a video call; others were let go at the office.

Huang said she preferred getting the call at home. "It felt more comfortable than if I had to physically walk out of the office, have everyone watch me, get all my stuff," she said.

Laying off people at home may sometimes be more compassionate in the hybrid-work era, Sutton said. "If you call people into the office who don't go into the office very much to lay them off, it's kind of weird," he said.

**The case for face-to-face firing.** When layoffs are done remotely, managers may not fully feel the human cost of their

**DealBook/**

DealBook helps you make sense of the day's most important business and policy headlines. Sign up for the newsletter at
**nytimes.com/dealbook**

decisions, Sutton said: It's "a little bit easy come, easy go." And with an in-person notice, workers have a chance to say goodbye to co-workers.

Kim Scott, a former Google executive and the author of "Radical Candor," suggested that awkwardness or embarrassment could be avoided by planning ahead — for instance, having an extra conference room for people to collect themselves and an option to collect belongings after hours.

**The medium matters.** A video call with your manager beats the impersonal email. "It's very hard to care personally over email," Scott said.

And experts question the wisdom of Zuckerberg's pre-layoff announcement.

"You have to be prepared at the same time to talk to people about both the process that you're going to go through and what people will get offered if it turns out that their jobs are at risk," said Sandra Sucher, a professor at Harvard Business School. "Because if you don't do all the pieces of that at the same time, you're just introducing a ton of uncertainty into your organization."

Scott advises a tight window between announcing and executing layoffs. "That makes everybody feel nervous," she said of

the Zuckerberg approach.

But even the most considerate version of letting someone go is still painful. "It just felt very like there wasn't that, like, human touch," Huang said about her experience. "But I don't think that was necessarily because it was virtual versus in person. I think it's just the nature of a layoff." — *Sarah Kessler*

### IN CASE YOU MISSED IT

**Donald Trump pleaded not guilty to 34 low-level felonies.** The charges of falsifying business records are all related to hush-money payments to the porn star Stormy Daniels in 2016. Even if convicted, Trump would not automatically be barred from running for president.

**Job growth slowed in March.** Employers added 236,000 jobs, the Labor Department reported on Friday, down from an average of 334,000 added over the prior six months. The gradual slowing appears to reflect the impact of rising interest rates, which is good news for President Biden.

**Jamie Dimon discussed the banking crisis.** In an interview with CNN, the JPMorgan Chase C.E.O. said turmoil caused by the collapse of Silicon Valley Bank and Signature Bank would make a recession more likely. "We are seeing people reduce lending a little bit, cut back a little bit and pull back a little bit," he said.

**Credit Suisse's leaders mourned the end of their bank.** At the Swiss bank's annual meeting on Tuesday, top officials acknowledged that it would be the last as the firm prepared to be absorbed by its archrival,

UBS. Axel Lehmann, Credit Suisse's chairman, also apologized for the scandals and missteps that had led to the bank's demise — but shareholder after shareholder bitterly attacked company leaders: "You can almost taste the feelings of distaste and betrayal here today," one investor said.

### What if the Twitter board had said 'no' to Elon Musk?

A year ago this week, Elon Musk revealed himself to be Twitter's largest shareholder. Shortly afterward, he signed a deal to acquire the company for $54.20 per share, kicking off months of drama and legal challenges that ended with Musk as the owner.

Since then, he has laid off thousands of workers, made changes that have caused some advertisers to flee and confused users by tinkering with the app, most recently by adding the Dogecoin logo to the site's home page and blocking the liking or sharing of tweets that contain links to Substack.

But what if the board had rejected the offer? It's impossible to know for sure, but let's play it out.

**Twitter would have slashed costs anyway.** Had his offer been rejected, Musk could have launched a hostile bid. But he also could have simply moved on to other things, cratering Twitter's stock by selling his shares. In either situation, the board would have been left with one clear task: Get Twitter's share price to $54.20 — up from roughly $40 on the day before Musk revealed his stake. JPMorgan Chase had already done the math on the board's behalf, and wasn't confident that it was possible. Twitter would have had to streamline spending, and years of overhiring was a clear place to start. If the board hadn't accepted Musk's offer, it planned to announce significant layoffs at Twitter's quarterly results in April, a person familiar with the company's strategy told DealBook.

**Ad revenue would have continued to decline.** Major advertisers, facing economic uncertainty, have pulled back their spending on digital advertising, which constitutes 90 percent of Twitter's revenue. Even without Musk at the helm, Twitter's advertising "would have been decimated," said Rich Greenfield, an analyst who covered Twitter as a public company — though, he added, "obviously not as bad

as what has happened under Elon." Greenfield estimated that Twitter's shares would be worth $10 to $20 today.

**Other activists may have pounced.** If Twitter's share price dwindled drastically below Musk's offer price, it would have left Twitter vulnerable to activists pushing for a board shakeup, or for the ouster of Twitter's recently installed C.E.O., Parag Agrawal. (Musk fired him shortly after acquiring the company.) And they could have pushed for a sale. No real bidders stepped forward to challenge Musk's $54.20 offer, but if the stock price had halved over the next year, would a deal have emerged with Disney? Comcast's NBCUniversal? Apollo?

Any of those options would have most likely left shareholders shortchanged compared with Musk's offer. Society, some have argued, would have benefited. But that's not whom the board thought its reported to.

### The Newsmaker: Ari Emanuel keeps doing deals

Within Hollywood, there are talent agents, and there are entertainment moguls. And then there is Ari Emanuel, the C.E.O. of Endeavor.

On Monday, Endeavor announced an agreement to buy World Wrestling Entertainment at a $9.3 billion valuation, the latest landmark deal in a decades-long career that has elevated Emanuel from a star agent to the chief gatekeeper for a broad array of content and talent.

**Emanuel co-founded Endeavor in 1995.** He has steadily built up Endeavor with a series of deals for talent and sports agencies Just as consequentially, Endeavor bought both Professional Bull Riders and Ultimate Fighting Championship, the latter of which brought mixed martial arts to the masses.

**Behind all that deal making is a bet on scale.** Endeavor represents talent across books, movies, music, sports, television and theater; distributes and licenses content; and owns live events like M.M.A. matches.

Combining W.W.E. with U.F.C. is meant to create a live-event colossus, with viewing platforms paying handsomely to show the bouts. It will also make Emanuel the C.E.O. of not one but two publicly traded companies: Endeavor, valued at $7 billion, and the united U.F.C.-W.W.E., which is valued at $21 billion and will be spun out.

---

CLEARY GOTTLIEB STEEN & HAMILTON LLP, Sean A. O'Neal, Jane VanLare, One Liberty Plaza, New York, New York 10006, Telephone: 212-225-2000, Facsimile: 212-225-3999, *Counsel to the Debtors and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

In re:     Chapter 11
Genesis Global Holdco, LLC, *et al.*,[1]   Case No.: 23-10063 (SHL)
       Debtors.    Jointly Administered

**NOTICE OF BIDDING PROCEDURES, POTENTIAL
AUCTION, AND SALE HEARING**

PLEASE TAKE NOTICE that, on January 19, 2023 (the "Petition Date"), Genesis Global Holdco, LLC and its affiliates Genesis Global Capital, LLC and Genesis Asia Pacific Pte. Ltd., as debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors" and the cases, the "Chapter 11 Cases"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") with the Bankruptcy Court for the Southern District of New York (the "Court").[2]

PLEASE TAKE FURTHER NOTICE that on March 16, 2023, the Debtors filed a motion [Docket No. 133] (the "Motion") seeking, among other things, the entry of an order approving (a) bidding procedures (the "Bidding Procedures") in connection with the proposed auction (the "Auction") and sale (the "Sale") of the Debtors; Genesis Global Trading, Inc.'s and non-Debtor subsidiaries' equity or some or all of their assets (the "Assets") to one or more Successful Bidders, (b) the selection of a Stalking Horse Bidder and the payment of Bid Protections in certain instances as set forth in the Bidding Procedures, and (c) scheduling dates and deadlines in connection with approval of the Sale (the "Sale Schedule").

PLEASE TAKE FURTHER NOTICE that on March 21, 2023, the Bankruptcy Court entered an order [Docket No. 192] (the "Bidding Procedures Order") granting the relief sought in the Motion, including, among other things, approving the Bidding Procedures and the Sale Schedule.

**Contact Parties for Parties Interested in Submitting a Bid:**
**(i) Investment Banker to the Debtors:** Moelis & Company LLC, 399 Park Avenue, 4th Floor, New York, NY 10022, Attn: Zul Jamaid (zul.jamaid@moelis.com), Barak Klein (barak.klein@moelis.com); and **(ii) Counsel to the Debtors:** Cleary Gottlieb, Steen & Hamilton LLP, One Liberty Plaza, New York, NY 10006, Attn: Sean A. O'Neal, Esq. (soneal@cgsh.com), Jane VanLare, Esq. (jvanlare@cgsh.com).

**Obtaining Information.** Copies of the Bidding Procedures Order, the Bidding Procedures, and any other related documents can be viewed and/ or obtained by (i) accessing the Court's website at www.nysb.uscourts.gov or (ii) from the Debtors' notice and claims agent, Kroll Restructuring Administration LLC, located at 55 East 52nd Street, 17th Floor, New York, NY 10055, at https://restructuring.ra.kroll.com/genesis/ or by calling +1 888-524-2017. Note that a PACER password is needed to access documents on the Court's website.

**The Sale Schedule** **Action** (Description): Deadline
• **Bidding Procedures Hearing** (The hearing before the Court to consider this Motion): March 30, 2023
• **Indications of Interest Deadline** (The deadline by which all indications of interest must be actually received): May 5, 2023
• **Stalking Horse Deadline** (The date by which the Debtors may designate one or more Qualified Bidders as the Stalking Horse Bidder(s), if any; provided however that the Debtors may designate a Stalking Horse Bidder at any time prior to the Stalking Horse Designation Deadline; and provided further that the Debtors, in consultation with the Consultation Parties, may extend the Stalking Horse Designation Deadline provided that a notice of any such extension is filed on the docket): June 12, 2023

• **Bid Deadline** (The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures, as well as the deadline by which DCG must identify whether or not it or any of its insiders or controlled affiliates will submit a Bid or whether any newly created entity wholly-owned or directly or indirectly controlled by DCG's insiders or controlled affiliates (other than by virtue of its existing equity ownership in the Debtors) intends to submit a Bid): June 19, 2023
• **Auction** (The date and time of the Auction, if one is needed, which will be held at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, 38th Floor, New York, NY 10006 and/or via Zoom): June 27, 2023
• **Deadline to file the Designation of Successful Bid** (The deadline to file a notice designating the Successful Bid and Successful Bidder, as well as the Back-up Bid and Back-up Bidder): One business day following the conclusion of the Auction
• **Sale Objection Deadline** (The deadline by which objections to the entry of an order by the Court approving the Sale must be filed with the Court and served so as to be actually received by the appropriate notice parties (the "Sale Objection Deadline")): July 7, 2023, or as otherwise determined in accordance with a motion seeking entry of an order approving the adequacy of a disclosure statement and setting forth the timeline for confirmation of a plan
• **Sale Hearing (subject to availability)** (The Sale will be implemented under the Plan and shall be approved at the Confirmation Hearing): July 14, 2023, or as otherwise determined in accordance with a motion seeking entry of an order approving the adequacy of a disclosure statement and setting forth the timeline for confirmation of a plan
**Filing Objections to the Sale.** The Debtors request that the Court require that objections to the Sale (a) be in writing; (b) comply with the Bankruptcy Rules, the Local Rules and other case management rules and orders of this Court; (c) state the name and address of the objecting party and the amount and nature of the claim or interest asserted by the objecting party against the estate or property of the Debtors; (d) state with particularity the legal and factual basis for such objections, and, if applicable, a proposed modification to the Sale that would resolve such objection; and (e) be filed with the Court with proof of service thereof and served upon, so as to be actually received by the Sale Objection Deadline, the following parties: (i) the Office of the United States Trustee for Region 2; (ii) counsel to the Debtors, Cleary Gottlieb, Steen and Hamilton LLP, One Liberty Plaza, NY, NY 10006, Attn: Sean O'Neal (soneal@cgsh.com) and Jane VanLare (jvanlare@cgsh.com); (iii) the investment banker to the Debtors, Moelis & Company LLC, 399 Park Avenue, 4th Floor, New York, NY 10022, Attn: Zul Jamaid and Barak Klein, and; (iv) counsel to the Committee, White & Case LLP, 111 South Wacker Drive Suite 5100, Chicago, Illinois 60606, Attn: Gregory F. Pesce (gregory.pesce@whitecase.com) and 1221 Avenue of the Americas, New York, New York 10020, Attn: Philip Abelson (philip.abelson@whitecase.com).

The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purposes of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

[2] Capitalized terms used in this notice and not defined herein shall have the meanings given to them in the Bidding Procedures (as defined herein).

**NOTICE OF SECURED PARTY PUBLIC SALE OF PERSONAL PROPERTY**

Notice is hereby given by ASSEMBLED BRANDS CAPITAL FUNDING LLC (the "Secured Party"), that pursuant to Section 9-610 of the Uniform Commercial Code, a secured party public sale to the highest and/or best bidder for cash, with reserve, will be conducted by the Secured Party on Monday, April 17, 2023 at 1:00 p.m. Eastern Time (the "Public Sale"). The Public Sale shall be held at the offices of Cohen Tauber Spievack & Wagner P.C., 420 Lexington Avenue, Suite 2400, New York, NY 10170, and telephonically; and, "qualified bidders" may attend in person or telephonically. The Secured Party has a first priority perfected lien and security interest in and to all of the personal property assets of FELIX GRAY, INC., a Delaware corporation (the "Borrower"). The Secured Party is conducting the Public Sale to foreclose the lien and security interest held by the Secured Party in and to Borrower's personal property assets, including, inventory, accounts, fixtures, furniture, equipment, trademarks and general intangibles (collectively, the "Collateral"). At the Public Sale, all of Borrower's right, title and interest in and to the Collateral will be sold "as is" and "where is" and the Secured Party shall make no representation or warranty, either express or implied, relating to title, use, quiet enjoyment, possession, merchantability or fitness for a particular purpose, completeness, condition or the like, all of which are hereby disclaimed, in the sale of the Collateral. In addition, the Collateral is being sold without recourse to Secured Party, its attorneys and representatives. At the conclusion of the Public Sale, the successful bidder(s) must pay the final bid amount in full by a wire transfer of funds to the Secured Party. The Secured Party reserves the right to credit bid any amount of the indebtedness due by Borrower at the Public Sale. The Secured Party reserves the right to adjourn, continue or cancel the Public Sale without further notice. Secured Party reserves the right to establish other reasonable bidding procedures and to require potential bidders to reasonably demonstrate their financial ability to perform and close on the acquisition of the Collateral to the satisfaction of the Secured Party. Any parties interested in further information regarding the Collateral, becoming a "qualified bidder", and/or the terms of the Public Sale should contact Cohen Tauber Spievack & Wagner P.C., 420 Lexington Avenue, Suite 2400, New York, NY 10170 Attn: Robert A. Boghosian, Esq., or by email at rboghosian@ctswlaw.com or by telephone at (212) 381-8726.