Hearing Date: April 24, 2023 at 11:00 a.m. (Prevailing Eastern Time)

**WHITE & CASE LLP**
J. Christopher Shore
Philip Abelson
David Turetsky
Michele J. Meises
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113

– and –

Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606-4302
Telephone: (312) 881-5400
Facsimile: (305) 881-5450

*Counsel to Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al*.,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |
| | **Re: Docket No. 137, 156, 157, 179, 182, 184** |

**SECOND SUPPLEMENTAL DECLARATION OF MARK RENZI IN SUPPORT
OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS' MOTION
FOR ENTRY OF AN ORDER REQUIRING THE REDACTION
OF CERTAIN PERSONALLY IDENTIFIABLE INFORMATION**

I, Mark Renzi, declare pursuant to 28 U.S.C. § 1746 as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these chapter 11 cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

1.  I am a Managing Director and Head of the Corporate Finance Financial Institutions Group for Berkeley Research Group, LLC ("**BRG**"). BRG is the financial advisor to the Official Committee of Unsecured Creditors (the "**Committee**") appointed in the cases of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**").

2.  I respectfully submit this second supplemental declaration (the "**Declaration**") in further support of *The Official Committee of Unsecured Creditors' Motion for an Order Requiring the Redaction of Certain Personally Identifiable Information* [Docket No. 137] (the "**Motion**"), and in further response to the *Omnibus Objection of the United States Trustee to: (A) the Debtors' Motion Seeking the Redaction or Sealing of Certain Information [and] (B) the Unsecured Creditors' Committee's Request to Seal Certain Information* [Docket No. 157] (the "**U.S. Trustee Objection**") filed by the Office of the United States Trustee (the "**U.S. Trustee**") and the statements made on the record at the hearing to consider the Motion on March 30, 2023 (the "**Hearing**"). This Declaration supplements my initial declaration in support of the Motion [Docket No. 156] (the "**Initial Declaration**") and my supplemental declaration [Docket No. 184] (the "**First Supplemental Declaration**," and together with the Initial Declaration, the "**Prior Declarations**").[2]

3.  I have considerable experience in providing restructuring advisory and restructuring management services in other cryptocurrency bankruptcy engagements, including through BRG's engagement as the financial advisor to the debtors in the chapter 11 cases of *In re Voyager Digital Holdings, Inc., et al.* (Case No. 22-10943 (MEW) (Bankr. S.D.N.Y.) ("*Voyager*") and as the Chief Restructuring Officer to the debtors in the chapter 11 cases of *In re BlockFi, Inc.*

---

[2] The Prior Declarations are incorporated fully herein by reference. Capitalized terms used but not otherwise herein defined shall have the meanings ascribed to such terms in the Motion, the Initial Declaration, or the First Supplemental Declaration, as applicable.

2

*et al.* (Case No. 22-19361 (MBK) (Bankr. D.N.J.) ("**BlockFi**")). My experience in Voyager and BlockFi is of particular relevance to the issues the Committee and its constituencies are concerned about in the Debtors' chapter 11 cases as it has provided me with first-hand knowledge of, among other things, the potential physical and monetary harm that would result from disclosing Confidential Information.

4. The statements made in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by other professionals in these cases and/or employees working under my supervision, or my opinion based upon my experience, knowledge, and information concerning the Debtors' operations.

5. I declare the following statements are true to the best of my knowledge, information, and belief formed after a reasonable inquiry under the circumstances. I am over the age of 18 and authorized to submit this Declaration on behalf of the Committee. If called as a witness, I would testify truthfully to the matters stated in this Declaration.

**I.     There Is a Pervasive Sense of Fear and Anxiety Among the Debtors' Lenders of a Potential Disclosure of Their Confidential Information**

6. Immediately following the Hearing, members of the Committee alerted BRG about the heightened concern amongst themselves and other lenders with whom they had spoken that the Court would ultimately deny the Motion and order the disclosure of their Confidential Information. As a result, on April 4, 2023, the Committee hosted a virtual town hall meeting (the "**Town Hall Meeting**"). I attended the Town Hall Meeting with a member of the White & Case team. The Town Hall Meeting provided a forum for dozens of the Debtors' lenders to voice their concerns regarding the dire consequences that the lenders expected would result if the Court were to decline to grant the relief requested in the Motion.

3

7. As a result of the Town Hall Meeting, I believe that the Debtors' lenders have significant fear and anxiety regarding the potential release of the Confidential Information, including that such disclosure would place the Debtors' lenders and their loved ones in physical danger.

8. I believe that those concerns are heightened by the unique characteristics of the cryptocurrency industry—including the irreversibility of cryptocurrency transactions, the documented instances of attempts to exploit this irreversibility by torturing and extorting known holders of crypto assets, and official government pronouncements and reports highlighting the elevated risk that holders of crypto assets will continue to be targeted by bad actors—demonstrate that these concerns are based in fact. This fact alone sets these chapter 11 cases apart from most chapter 11 cases.

9. Furthermore, as a result of the Town Hall Meeting, I believe that the potential harm to creditors in these chapter 11 cases is even greater than in other cryptocurrency chapter 11 cases. That belief is based on my understanding that it is well known that many of the Debtors' lenders are high-net worth investors, and a substantial number of whom are "accredited investors," which necessarily puts them at a heightened risk of financial or physical harm at the hands of hackers and criminals because of their perceived wealth. I understand that the Securities Exchange Commission ("**SEC**") defines "accredited investor" in Regulation D, and that definition is not limited to institutions. I understand that an accredited investor can include "any natural person" having an individual net worth exceeding $1 million (excluding the person's primary residence) or an annual individual income in excess of $200,000 ($300,000 if married) in each of the prior two years. I understand that accredited investors do not need to file documents publicly revealing

4

their status as "accredited investors." I understand that there is no requirement for an accredited investor to register with the SEC or any other regulatory agency.

10. I believe that solely redacting the addresses of the lenders is insufficient because the mere disclosure of the names of the lenders would enable criminals to utilize online search engines to find physical addresses, particularly with respect to those lenders with uncommon names. I believe that releasing e-mail addresses for the Genesis account would create risk because many lenders use the same e-mail address for other cryptocurrency exchanges. I believe that releasing the lenders' e-mail addresses would likely result in flooding the lenders' e-mail inboxes with sophisticated phishing attacks and malware attacks which could be made to appear as if they came from legitimate sources, as occurred in the Celsius case, as described in the first report filed by the Consumer Privacy Ombudsman appointed in that case. *See In re Celsius Network LLC*, 22-10964-MG (Bankr. S.D.N.Y. Feb. 15, 2023) [Docket No. 1948], attached as **Exhibit A.**

II. **Individuals Employed by or Associated with Institutional Lenders Face the Same Risks as Individual Lenders**

11. As a result of the Town Hall Meeting, I believe that Genesis's institutional lenders have the same concerns as those of individual lenders because many of the institutional lenders are comprised of only one or two individuals. I believe that individuals employed by, or associated with, institutional lenders are equally at risk of being targeted by bad actors because of the ease with which online search engines can be employed to locate such individuals.

12. Subsequent to the Hearing, members of the Committee as well as other institutional lenders reached out to BRG to emphasize that the individuals employed by or associated with institutional lenders face substantially the same danger as individuals. As a result of the Town Hall Meeting and my experience as an advisor to the Committee, I believe that some institutional lenders work out of their home, while others are located in office buildings, and that these

employees are fearful that their anonymity and safety will be jeopardized were the names and addresses of the institutions disclosed.

13. I believe that many individuals employed by institutional lenders may face risks of physical threats. My belief is based on the fact that there have been many instances in which individuals working at cryptocurrency companies were targeted *at their place of work*, briefly summarized below:

- The managing director of a cryptocurrency exchange in Kiev, Ukraine was kidnapped while he was leaving his office in the center of town. See **Exhibit B**.

- A gang of nine assailants assaulted the owner of a bitcoin trading company at his workplace in Dubai, stealing well over $1 million USD worth of assets. See **Exhibit C**.

- Three robbers held up the employees of a Bitcoin financial institution at gunpoint in Ottawa, Canada, gaining control over four employees and striking one on the head with a gun. See **Exhibit D**.

- Five men who were armed with stun guns and zip ties posed as potential clients having an appointment in order to gain access to a cryptocurrency company in Barcelona, Spain. See **Exhibit E**.

- Three masked men raided a bitcoin exchange store in West Midlands, England. See **Exhibit F**.

14. As evidenced by these examples of attacks on employees of cryptocurrency companies *at their workplace*, I believe that the risk of harm to individuals employed by the institutional lenders in the Debtors' chapter 11 cases is legitimate and concrete. My concerns in this regard are heightened by the fact that a business's address is generally available through the public records of the jurisdiction where it is incorporated and that business addresses that are not publicly registered are very often accessible for free online. I believe that disclosing only the name of the business would enable a motivated bad actor to locate the premises with a plan to

6

steal cryptocurrency assets or otherwise do harm to the business or its representatives—whether through physical violence against its employees or otherwise.

15. Moreover, I understand that professional social media networks such as LinkedIn provide a wealth of information about a company's employees. I believe that, as is the case with individual lenders, disclosing just the name of an institution is enough information for someone to compile information about the entity's workforce and use this information to target the employees or otherwise engineer a way to attempt to steal the company's assets. I understand that, in addition to LinkedIn, other sites such as Indeed, Glassdoor, ZipRecruiter, and Monster may provide criminals with sufficient employee information to plan and carry out an attack on a cryptocurrency company, motivated by malicious intent. I also believe that, as is the case with individual lenders, the risk of being located and targeted is increased for anyone that does not have a very common name, as it is easier to link this information to that person's location.

### III. Disclosing the Confidential Information Would Be Value Destructive

16. I believe that the Confidential Information of the Debtors' lenders is a key asset of the estates and is critical to the proposed sale and reorganization processes.

17. I understand that the identities of both individual and institutional holders of cryptocurrency assets, and the quantum of their cryptocurrency holdings, are typically not publicly available, making it difficult for cryptocurrency exchange companies to identify and solicit specific individuals or entities as potential customers. I believe that publicly disclosing the list of the Debtors' lenders, which are akin to customer lists, would allow competitors to save significantly on customer acquisition costs, reducing the value of the Confidential Information in any future sale of assets.

18.  I believe that, if the Debtors were to lose customers to competitor trading platforms because their customer list was publicized, as the U.S. Trustee insists, any intrinsic value that could be captured during a sale process would be destroyed, placing any emerging entity at a severe competitive disadvantage.  I believe that additional customer acquisition costs would need to be incurred on top of the losses on the capital that had been expended to initially acquire the lost customers, while competitors achieve a windfall.

19.  I understand that the Financial Accounting Standards Board ("**FASB**") acknowledges that customer-related intangible assets acquired in a business combination can be recognized as separate assets.  I understand that, per Accounting Standard Codification ("**ASC**") 805-20-25-31, "[c]ustomer-related intangible assets that would meet that criterion for recognition under this accounting alternative are those that are capable of being sold or licensed independently from the other assets of a business. . . . Customer-related intangible assets that may meet that criterion for recognition include but are not limited to: . . . *Customer information (for example, names and contact information)*."[3]

20.  I understand that the FASB also recognizes that customer information loses value when disclosed.  Valuation expert Jeffrey Cohen states:

> Trade secrets are types of assets that result from a proprietary technology or way of doing business. Generally speaking, they exist because they provide some competitive advantage.  They are not merely one-time secrets . . . , but rather something that is used in the ongoing business. . . .  A customer list . . . might qualify as trade secrets, *provided that there is value in the fact they remain unknown to the competition*—that is, that they provide independent economic value, and that there is some evidence that their owners actually try to keep them secret.[4]

---

[3]  FASB ASC 805-20-25-31, available at https://asc.fasb.org/1943274/2147480013/805-20-25-31 (emphasis added).

[4]  Jeffrey A. Cohen, Intangible Assets:  Valuation and Economic Benefit 17 (2005) (emphasis added).

21. I understand that the Debtors have sought to keep their customer lists private, and I believe that continuing to do so is critical to preserving their value. I understand that Genesis customers only agreed to share their personal information with certain third parties, including service providers, entities that the Debtors "plan to merge, combine or consolidate with or be acquired by," and entities "that may purchase assets, liabilities, and/or whole or part of a business of Genesis, including pursuant to a court-approved sale under U.S. Bankruptcy law." I understand that the Genesis Privacy Policy requires that "the new combined and/or surviving entity . . . follow [the Genesis] Privacy [Policy] substantially with respect to . . . personal information."

22. In sum, I believe that Genesis's lenders are focused on the privacy of their personal information and are more likely to cut ties with the Debtors because of a violation of their privacy than the average consumer.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: April 18, 2023

/s/ Mark Renzi
Mark Renzi
Managing Director, Berkeley Research Group, LLC

*Financial Advisor to the Committee*