**WHITE & CASE LLP**
J. Christopher Shore
Philip Abelson
David Turetsky
Michele J. Meises
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile: (212) 354-8113

– and –

Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606-4302
Telephone: (312) 881-5400
Facsimile: (305) 881-5450

*Counsel to Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |
| | **Re: Docket No. 165** |

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS**
**TO THE MOTION FOR ENTRY OF AN ORDER MODIFYING**
**THE AUTOMATIC STAY, TO THE EXTENT APPLICABLE, TO ALLOW**
**FOR ADVANCEMENTS AND PAYMENTS UNDER D&O INSURANCE POLICY**

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the cases

of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") respectfully

---

[1] The Debtors in these chapter 11 cases along with the last four digits of each Debtor's tax identification number (as applicable) are as follows: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these chapter 11 cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

states as follows in support of this objection to the *Motion for Entry of an Order Modifying the Automatic Stay, to the Extent Applicable, to Allow for Advancements and Payments Under D&O Insurance Policy* [Docket No. 165] (the "**Motion**") filed by Soichiro "Michael" Moro ("**Mr. Moro**"):

## PRELIMINARY STATEMENT

1.      The request for relief from the automatic stay to pursue insurance proceeds, which are valuable assets of the Debtors' estates, should be denied for three reasons.  ***First***, the Insurance Policy (defined below) at issue is a "wasting" policy that covers both the Debtors and Mr. Moro. This means that any Claim (defined below) paid out to Mr. Moro under the Insurance Policy will reduce what is available to the Debtors under the same Insurance Policy on a dollar-for-dollar basis.  Once the Insurance Policy is exhausted, AXIS Insurance Company (the "**Insurer**") is off the hook, leaving the Debtors without redress for covered Claims against the Insurance Policy.

2.      ***Second***, the proceeds of the Insurance Policy have significant value for unsecured creditors.  The Committee, with the assistance of its advisors, has been engaged in a robust investigation of potential claims, including against current and/or former officers and directors, associated with the Debtors' prepetition activities and communications, transactions with affiliates and other third parties, and corporate governance issues.  The ability to recover on such claims would be prejudiced to the extent the Insurance Policy is depleted by Mr. Moro's defense costs.

3.      ***Third***, Mr. Moro has failed to carry his burden of proving by a preponderance of the evidence that cause exists to modify the automatic stay—nor could he under the facts and circumstances of these chapter 11 cases.  The Debtors will suffer material prejudice if the stay is modified.  Genesis Global Capital, LLC ("**GGC**") is subject to ongoing regulatory investigations and is a defendant in the Securities and Exchange Commission (the "**SEC**") litigation (the "**SEC Action**") for which  Mr. Moro  seeks  to  recover  defense  costs,  and  it  is  the  Committee's

understanding that the Debtors have submitted claims against the Insurance Policy that remain unpaid. In contrast, the Motion does not identify any litigation in which Mr. Moro is a defendant. Nor does the Motion set forth the specific causes of action related to the "pending lawsuits, investigations, and disputes" (besides the SEC Action) for which Mr. Moro seeks to recover his defense costs, let alone the "similar matters which may arise in the future." These vague assertions are insufficient to determine whether any of Mr. Moro's defense costs are covered by the Insurance Policy or fall within an exclusion.

4.    On balance, the harm to the Debtors (and the Committee) if the Motion is granted significantly outweighs any purported harm to Mr. Moro if the Motion is denied.

## **BACKGROUND**

5.    On January 19, 2023 (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief in this Court under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors continue to operate their businesses and manage their properties as debtors in possession under sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in these chapter 11 cases. These chapter 11 cases are being jointly administered pursuant to Bankruptcy Rule 1015(b) and the Court's *Order Directing Joint Administration of Related Chapter 11 Cases* [Docket No. 37], entered on January 26, 2023. On February 3, 2023, the Office of the United States Trustee for the Southern District of New York appointed seven of the Debtors' unsecured creditors to serve as members of the Committee. [Docket No. 55].

6.    On March 27, 2023, Mr. Moro filed the Motion seeking to modify the automatic stay to allow him to "enforce his rights and demand and receive proceeds payable under the D&O Policy and authorize [the Insurer] to advance such proceeds" to him. Motion at 1-2. The Motion

states that Mr. Moro served as GGC's chief executive officer between February 2018 and August 2022, Genesis Global Trading, Inc.'s ("**GGT**") chief executive officer between March 2016 and August 2022, and GGT's chief operating officer between April 2015 and March 2016. *Id.* ¶ 10.

The Insurance Policy

7.    The Insurance Policy that Mr. Moro seeks to proceed against is effective for one year from the June 28, 2022 effective date and has a $2.5 million aggregate limit for coverage under side A for directors and officers ("**Side A**" or "**Directors and Officers Liability Coverage**"), sides B and C for the Debtors ("**Side B**" or "**Insured Entity Indemnification Coverage**" and "**Side C**" or "**Insured Entity Liability Coverage**," respectively), and expense coverage ("**Claw Back Expense**," "**Insured Inquiry Expense**," and "**Securityholder Demand Expense**," and collectively with Side A, Side B, and Side C, the "**Insurance Policy**"), a copy of which is annexed to the Motion as Exhibit B.    With respect to Side A (Directors & Officers Liability Coverage), the Insurer "will pay **Loss**[2] not indemnified by the **Insured Entity**[3] that the **Insured Individual**[4] becomes legally obligated to pay arising from a Claim first made against

---

[2]    "**Loss**" means "(1) monetary judgments, awards, or settlements, including attorney's fees, costs, exemplary, multiplied, or punitive damages, pre-judgment interest, and post-judgment interest included as part of a covered judgment or award, and Defense Costs; (2) fines or penalties, insurable under the law applicable to this Policy, imposed on the Insured for any unintentional and non-willful violation of law, including such penalties imposed under 15 U.S.C. §§ 78dd-2(g)(2)(B) or 78ff(c)(2)(B) of the Foreign Corrupt Practices Act or Section 11(1)(a) of Chapter 23 of the U.K. Bribery Act 2010; and (3) solely with respect to the Directors & Officers Liability Coverage, taxes for which the Insured Individuals are legally obligated to pay solely by reason of the Financial Impairment of the Insured Entity."  Insurance Policy at 4 (emphasis omitted).

[3]    "**Insured Entity**" means, "individually and collectively, the Named Insured or any Subsidiary, including any such entity as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law." *Id.* at 3 (emphasis omitted).

[4]    "**Insured Individual**" means "any natural person who was or is (1) a duly elected or appointed director (including a de facto or shadow director), officer, or trustee (other than a bankruptcy or insolvency trustee) of an Insured Entity that is a corporation; a manager or managing member of an Insured Entity that is a limited liability company; or a general partner or managing partner of an Insured Entity that is a partnership or joint venture; (2) the in-house general counsel, comptroller, risk manager, head of investor relations, or head of human resources of the Insured Entity, or a member of any duly constituted advisory board or committee of the Insured Entity; (3) an employee of the Insured Entity who is named as a defendant in a Securities Claim, or in any other Claim brought and maintained against both the employee and an Insured Individual, as defined in item 1 or 2 above; or (4) the functional equivalents of any of the foregoing." *Id.* at 3 (emphasis omitted).

4

such Insured Individual during the Policy Period or the Extended Reporting Period, if applicable,

for a **Wrongful Act**."[5]  Insurance Policy at 1 (emphasis omitted).  With respect to Side B (Insured

Entity Indemnification Coverage), the Insurer "will pay Loss for which the Insured Entity is

permitted or required to indemnify an Insured Individual arising from a Claim first made against

such Insured Individual during the Policy Period or the Extended Reporting Period, if applicable,

for a Wrongful Act."  *Id.* (emphasis omitted).  With respect to Side C (Insured Entity Liability

Coverage), the Insurer "will pay Loss that the Insured Entity becomes legally obligated to pay

arising from a Securities Claim first made against the Insured Entity during the Policy Period or

the Extended Reporting Period, if applicable, for a Wrongful Act."  *Id.* (emphasis omitted).

       8.     The Insurance Policy "is written on a claims-made basis."  *Id.* at 1.  This means that

coverage is triggered and limited as measured by whether a claim is made against the insured

during the applicable policy period.  A "**Claim**" under Sides A and B means as follows:

     (a)    a written demand for monetary relief or non-monetary or injunctive relief, including a written request to toll or waive a statute of limitations or engage in any alternative dispute resolution process;

     (b)    a civil, criminal, administrative or regulatory, or arbitration proceeding or any appeal therefrom;

     (c)    a subpoena, written order of investigation, or written notice of charges by a Government Authority, including a Wells Notice or similar target letter, identifying the Insured Individual as a person against whom a civil, criminal, or administrative or regulatory proceeding may be commenced; or

     (d)    a request for the extradition of the Insured Individual or the arrest or confinement of the Insured Individual by a Government Authority.

---

[5]  "**Wrongful Act**" means "(1) any actual or alleged error, misstatement, misleading statement, act, omission, neglect, or breach of duty by:  (a) the Insured Individual in his or her capacity as such or in an Outside Position or (b) the Insured Entity, with respect to the Insured Entity Liability Coverage; or (2) any matter claimed against the Insured Individual solely by reason of his or her status as such or in an Outside Position."  *Id.* at 6 (emphasis omitted).

*Id.* at 2.  Side C, however, only covers "**Securities Claims**," which means any Claim as defined in (a) or (b) above "(1) brought and maintained by one or more securityholders of the Insured Entity, in their capacity as such; or (2) based upon or arising out of the purchase or sale of or offer or solicitation of an offer to purchase or sell any securities issued by the Insured Entity." *Id.* at 5.

9.     The Insurance Policy does not apply to Claims based upon or arising out of any **Coin Offering**, which means "any offer of virtual or digital tokens, coins, or currency made by or on behalf of the Insured Entity to the public in exchange for consideration." *Id.* (Genesis Global Holdco, LLC Amended Exclusions Section Endorsement, dated June 28, 2022).  This includes, but is not limited to the following:

(a)     any allegation that any whitepaper relating to the Coin Offering:

  i.     contains an untrue or misleading statement of material fact; or

  ii.    omits a material fact which should have been stated in the whitepaper or was necessary to make the statements contained in the whitepaper not misleading;

(b)     the pre-sale of any virtual or digital tokens or coins attached to any Coin Offering; or

(c)     any allegation made by or on behalf of a **Government Authority**[6] that a Coin Offering

  i.     is an initial or secondary coin offering;

  ii.    involves the sale of securities; or

  iii.   violates any federal, state, or foreign equivalent securities law, rule, or regulation.

10.    The Insurance Policy also does not apply to Claims based on illegal profit or conduct, i.e., Claims "based upon or arising out of (1) any financial personal profit, remuneration,

---

[6]  "**Government Authority**" means "any federal, state, local, or foreign government official or authority, including any court, regulator, administrator, or similar body." *Id.* at 3.

or financial advantage to which the Insured was not legally entitled or (2) any willful violation of any statute or regulation or any deliberately fraudulent or criminal act, error, or omission committed by the Insured; provided that such conduct is evidenced by a final and non-appealable adjudication adverse to the Insured in an underlying action other than an action brought for a violation of Section 11, 12, or 15 of the Securities Act of 1933." *Id.* at 6.

11.     The Insurance Policies are "wasting" policies, which means that each Side shares equally in the $2.5 million policy limit.  Although the Insurance Policy contains a $2.5 million coverage limit for Side A, Side B, Side C, and Expenses (subject to certain exceptions), respectively, the $2.5 million is a "single aggregate limit of insurance." *Id.* (Shared Limit Endorsement, dated June 28, 2022).  As a result, "all payments under any one [Insurance] Policy shall reduce and may possibly exhaust the Limits of Insurance available under all [Insurance] Policies." *Id.*   "When the total amount paid under all [the Insurance] Policies combined, equals the Policy Limit [(i.e., $2.5 million)], the Insurer's obligation to pay any other covered amounts under this Policy shall be completely fulfilled and extinguished."  Shared Limit Endorsement. Legal defense costs alone can exhaust the policy limit.  *See* Declarations at 1.

12.     The default rule with respect to payments under the Insurance Policy is that "[t]he Insurer will be entitled to pay Loss and other covered amounts as they become due and payable under this Policy without consideration of other future payment obligations."  Insurance Policy at 13.  But "if Loss exceeds the remaining applicable Limit of Insurance, the Insurer will first pay Loss covered under the Directors and Officers Liability Coverage before paying any other covered amounts under this Policy." *Id.* at 13-14.  It is the Committee's understanding that the Debtors have submitted Claims under the Insurance Policy, but that no amounts have been paid out under

the Insurance Policy to date.  In other words, the entire $2.5 million remains available under the Insurance Policy.

<u>The Ongoing Litigation</u>

13.    Mr. Moro asserts that, as a result of his roles with Genesis he has incurred "several hundred thousand dollars in defense costs in connection with pending lawsuits, investigations, and disputes, and likely will incur additional defense costs for similar matters which may arise in the future."  Motion ¶ 11.  The Motion only describes one action brought against the Debtors, not Mr. Moro—the SEC Action against GGC and Gemini Trust Company, LLC ("**Gemini**").  The SEC Action was commenced on January 12, 2023, when the SEC filed a complaint (the "**Complaint**") against GGC and Gemini in the District Court for the Southern District of New York.  The Complaint alleges, among other things, that between February 2021 and November 2022, GGC and Gemini engaged in an unregistered offer and sale of securities to U.S. retail investors, in violation of the federal securities laws.  The Motion does not list any other pending litigation in which Mr. Moro is involved or provide any specific information about any other investigation or dispute.  Nor does the Motion set forth the exact amount for which Mr. Moro is seeking payment under the Insurance Policy.

## **OBJECTION**

14.    The Motion should be denied because the proceeds of the Insurance Policy are property of the Debtors' estates, and therefore, the automatic stay bars Mr. Moro from receiving such proceeds absent a showing of cause, which Mr. Moro has failed to establish.

## I.    The Proceeds of the Insurance Policy Are Estate Property

15.    The automatic stay protects property of the debtor's estate.  11 U.S.C. § 362(a). Section 362(a)(3) of the Bankruptcy Code stays "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  *Id.* §

362(a)(3).  The Bankruptcy Code defines property of the estate to include "all legal or equitable interests of the debtor in property as of the commencement of the case."  *Id.* § 541(a)(1).  The law is clear that a debtor's liability insurance is property of the estate.  *See In re MF Glob. Holdings Ltd.,* 469 B.R. 177, 190 (Bankr. S.D.N.Y. 2012) ("[I]t is well settled that a debtor's liability insurance is considered property of the estate.").  But whether the ***proceeds*** of an insurance policy are property of the estate depends on "the language and scope of the specific policies at issue." *Id.* (citing *In re Downey Fin. Corp.*, 428 B.R. 595, 603 (Bankr. D. Del 2010)).

16.     Proceeds from an insurance policy that only provides "direct coverage to a debtor" are generally considered property of the estate.  *Id.* (citing *In re Allied Digit. Techs. Corp.,* 306 B.R. 505, 512 (Bankr. D. Del. 2004)).  This is because the "proceeds are payable to the debtor." *Allied Digital*, 306 B.R. at 512.   Conversely, "when an insurance policy provides exclusive coverage to directors and officers, courts generally have held that the proceeds are not property of the estate." *MF Global*, 469 B.R. at 190 (citing *Allied Digital,* 306 B.R. at 510).  This is because "the proceeds are payable to the directors and officers not the estate." *Allied Digital*, 306 B.R. at 510.  However, where insurance policies "provide direct coverage to both directors and officers and debtors," the proceeds will be property of the estate "'if depletion of the proceeds would have an adverse effect on the estate to the extent the policy actually protects the estate's other assets from diminution.'" *MF Global*, 469 B.R. at 190-91 (quoting *Downey,* 428 B.R. at 603); *see also In re Boy Scouts of Am. & Del. BSA, LLC,* 642 B.R. 504, 572-73 (Bankr. D. Del. 2022) (discussing *Allied Digital* and concluding that depletion of insurance proceeds would have adverse impact on estate).  In this scenario, the "debtor's interest in the proceeds ***requires protection from depletion and overrides the interest of the directors and officers***." *Allied Digital*, 306 B.R. at 511 (emphasis added).

17.     Here, the Insurance Policy, which provides direct coverage to the Debtors as well as directors and officers, and the proceeds thereof constitute property of the Debtors' estates.  The Debtors have an independent right to coverage for Losses related to their indemnification obligations under Side B and for Losses arising from Securities Claims under Side C.  If proceeds of the Insurance Policy are used to pay Mr. Moro's defense costs or other Losses under Side A, then the Debtors' insurance coverage under Sides B and C will be depleted correspondingly.  In other words, every dollar of proceeds that is paid to Mr. Moro under Side A of the Insurance Policy is a dollar less for the Debtors' estates.  This is because the Insurance Policy is a "wasting" or "burning candle" policy, and courts have found that the proceeds of these types of policies are property of the estate.  *See, e.g.*, *SN Liquidation, Inc. v. Icon Int'l, Inc. (In re SN Liquidation, Inc.)*, 388 B.R. 579, 584 (Bankr. D. Del. 2008) (holding that proceeds of insurance policy providing coverage for directors and officers as well as debtors are property of estate because "[d]epletion of insurance proceeds which results from indemnification for defense costs would adversely affect the [d]ebtors' estate."); *In re Sacred Heart Hosp.*, 182 B.R. 413, 419-20 (Bankr. E.D. Pa. 1995) ("More important, however, is the fact that the [d]ebtor's own liability exposure is also covered by the D&O Policy. Proceeds available for the [d]ebtor's liability exposure are not segregated from the [p]roceeds available to the directors and officers. Thus, the [d]ebtor is indeed an insured and has a sufficient interest in the [p]roceeds as a whole to bring them into the estate.").

18.     Depletion of the proceeds of the Insurance Policy to pay Mr. Moro's defense costs will have an adverse effect on the Debtors' estates.  As an initial matter, the aggregate policy limit under the Insurance Policy is $2.5 million, which is "the most the Insurer will pay under this Policy."  Insurance Policy at 8; *see also* Shared Limit Endorsement, dated June 28, 2022 ("[T]his Policy and the policies set forth in the above Schedule (collectively, the "AXIS Policies") are

subject to a single aggregate limit of insurance that shall not exceed the highest Policy Aggregate Limit of Insurance available under any one AXIS Policy. Accordingly, ***all payments under any one AXIS Policy shall reduce and may possibly exhaust the Limits of Insurance available under all AXIS Policies***.") (emphasis added); *id.* ("When the total amount paid under all AXIS Policies, combined, equals the Policy Limit of insurance set forth in the DECLARATIONS, the Insurer's obligation to pay any other covered amounts under this Policy is completely fulfilled and extinguished.").

19.    The Court should not lift the automatic stay to permit the depletion of the proceeds of the Insurance Policy as Mr. Moro requests because the proceeds need to be available to cover Losses for Securities Claims against the Debtors as well as any Losses the Debtors incur in respect indemnification obligations.  The circumstances of the Debtors' chapter 11 cases are unlike other decisions cited in the Motion, such as *Allied* and *Downey*, where there was no chance that those debtors would be liable on account of securities claims or seek indemnification coverage.  In *Allied*, the court found that there was "no credible showing that the direct coverage of [the debtor] for securities claims has any continuing vitality" where "all securities claims have already been adjudicated and/or barred by the applicable statute of limitations" and the debtor had "neither indemnified nor intend[ed] to indemnify the directors and officers."  306 B.R. at 508, 511, 513.  Similarly, in *Downey*, the securities class actions against the debtor had been dismissed with prejudice, and the debtor was only a nominal defendant in the shareholder derivative action.  As a result, the court concluded that, "because there are no longer any covered Securities Claims pending against the [d]ebtor, the [d]ebtor no longer enjoys any direct entity coverage [and t]herefore, . . . the [p]olicy's entity coverage is no longer protecting the estate's other assets from diminution."  428 B.R. at 605.  Here, in contrast, not only is the SEC Complaint against the Debtors

currently pending, but there also are other ongoing regulatory investigations as well as private actions that are currently in arbitration related to the Debtors' crypto operations. Therefore, diminution of the proceeds under the Insurance Policies to pay Mr. Moro under Side A will have a direct and adverse effect on the estates.

20.    Additionally, the proceeds of the Insurance Policy need to be available to cover Losses for claims that the Committee could bring against the Debtors' current and/or former officers and directors. The Committee, in furtherance of its fiduciary duty to unsecured creditors, is investigating all relevant prepetition conduct that could give rise to potential claims against non-Debtors, including but not limited to current and/or former officers and directors, which may be a valuable source for enhancing creditor recoveries. The Debtors filed a Restructuring Term Sheet on February 10, 2023 that does not contemplate payment in full to general unsecured creditors [Docket No. 80]. Although the Committee views the Restructuring Term Sheet as a useful framework and positive step to resolving these cases, the Committee does not expect the Restructuring Term Sheet would represent a realistic path toward a successful restructuring process. While negotiations on a proposed restructuring transaction remain ongoing, in the event an agreement cannot be reached, the proceeds of the Insurance Policies may be a source of additional recoveries for general unsecured creditors.

21.    Mr. Moro's argument that "continuation of the stay would not protect the estates' right to coverage under the [Insurance Policy] and would only delay the distribution of Side-A coverage that would in any event have priority over the estates' rights to coverage," Motion ¶ 30, is untenable. The Insurance Policy includes a payment provision which provides: "The Insurer will be entitled to pay Loss and other covered amounts as they become due and payable under this Policy without consideration of other future payment obligations." Insurance Policy at 13. Side-

A payments are prioritized only under the following condition: "*if Loss exceeds* the remaining applicable Limit of Insurance, the Insurer will first pay Loss covered under the Directors and Officers Liability Coverage before paying any other covered amounts under this Policy." *Id.* at 13-14 (emphasis added). Mr. Moro has failed to establish that this condition has been met. The Motion merely states that Mr. Moro has incurred several hundred thousand in defense costs. The Motion does not state (i) the precise amount of Mr. Moro's defense costs, (ii) the amount of the remaining applicable Limit of Insurance, or (iii) that the quantifiable amount of Mr. Moro's defense costs exceeds the remaining applicable Limit of Insurance. Consequently, Losses are to be paid as they become due and payable.

22.     The three cases Mr. Moro cites in support of his argument that payment of Side A coverage "takes precedence over any right of payment" for Side B or Side C coverage are distinguishable or not relevant. Motion ¶ 30.   The first decision, *Ochs v. Lipson (In re First Central Financial Corp.)*, does not state that director and officer claims against the insurance policy are prioritized over entity claims. 238 B.R. 9 (Bankr. E.D.N.Y. 1999). Rather, the court's ruling that the proceeds were not estate property turned on the fact that "entity coverage is hypothetical," as there was no indication of any claims that would implicate either indemnification claims or direct entity claims. *Id.* at 17-18 ("no one has stepped forward to express any interest in suing the [d]ebtor for a violation of securities laws"). The second decision, *In re National Fish & Seafood, Inc.*, involved a motion by former directors and officers to lift the automatic stay for defense costs in connection with an adversary proceeding brought against the directors and officers, where the debtor was "not a defendant in the [adversary proceeding], so that litigation gives rise to no C-side Coverage, and there has been no claim asserted by the movants against the [d]ebtor for indemnification, so the litigation has given rise to no B-side Coverage." Case No. 19-

11824-FJB at 1-3 (Bankr. D Mass. Feb. 26, 2021), ECF No. 155.   The court found that "the likelihood of the [d]ebtor (or the estate's) acquiring a B- or C-side loss for which it might be entitled to coverage at this juncture is very small."   *Id*. at 4.   The third decision, *MF Global*, involved a D&O policy containing a priority in payment provision that was different from the Insurance Policy here.   469  B.R. at 185 (describing the "Specialty D&O Policy," which provided that "if the Insurer concludes that the amount of all Loss, including Defense Costs, is likely to exceed the Insurer's Limit of Liability," the insurer is entitled to withhold loss payable under side B(1) or (2)).   Moreover, the MF Global debtor was not named as a defendant in the underlying actions in which the directors and officers were named.   *Id*. at 192.

23.     Given that a finite amount of insurance proceeds is available to the Debtors as well as current or former officers and directors, the proceeds of the Insurance Policy constitute property of the Debtors' estates.   Mr. Moro should not be entitled to gain any advantage over the Debtors (or any other entity) covered by the Insurance Policy.   Where, as here, the Debtors' own liability exposure is covered by the Insurance Policy, the Debtors have a sufficient interest in the Insurance Policy proceeds as a whole to constitute property of their estates.   As demonstrated below, Mr. Moro has failed to establish that the automatic stay should be lifted to give him priority in payment of the proceeds of the Insurance Policy.

## II.     Mr. Moro Failed to Establish Cause to Modify the Automatic Stay

24.     Section 362(d)(1) of the Bankruptcy Code provides that relief from the automatic stay can be granted only "for cause."   11 U.S.C. § 362(d)(1).   A movant seeking relief from the automatic stay "must initially produce evidence establishing 'cause' for the relief."   *In re Project Orange Assocs., LLC*, 432 B.R. 89, 103 (Bankr. S.D.N.Y. 2010).   The determination on whether to lift the automatic stay "is committed to the discretion of the bankruptcy judge."   *Sonnax Indus., Inc. v. TRI Component Prods. Corp. (In re Sonnax Indus., Inc.)*, 907 F.2d 1280, 1286 (2d Cir.

1990).

25.     To determine whether cause exists to lift the automatic stay for cause, courts in this

Circuit analyze the following factors (the "***Sonnax* Factors**"):

1.      whether relief would result in a partial or complete resolution of the issues;

2.      lack of any connection with or interference with the bankruptcy case;

3.      whether the other proceeding involves the debtor as a fiduciary;

4.      whether a specialized tribunal with the necessary expertise has been established to hear the cause of action;

5.      whether the debtor's insurer has assumed full responsibility for defending it;

6.      whether the action primarily involves third parties;

7.      whether litigation in another forum would prejudice the interests of other creditors;

8.      whether the judgment claim arising from the other action is subject to equitable subordination;

9.      whether movant's success in the other proceeding would result in a judicial lien avoidable by the debtor;

10.     the interests of judicial economy and the expeditious and economical resolution of litigation;

11.     whether the parties are ready for trial in the other proceeding; and

12.     impact of the stay on the parties and the balance of harms.

*Id.*

26.     However, "[n]ot all of the *Sonnax* Factors are relevant in every case, and 'cause' is

a broad and flexible concept that must be determined on a case-by-case basis." *In re Residential*

*Cap., LLC*, 501 B.R. 624, 643 (Bankr. S.D.N.Y. 2013).   Some courts engage in "fact-intensive

inquiries which appear to be loosely based on the *Sonnax* Factors," while others "utilize a hybrid

approach, combining these two analyses." *Project Orange*, 432 B.R. at 103.

27.     Here, only two *Sonnax* Factors are relevant:  (i) impact of the stay on the parties and the balance of harms and (ii) lack of any connection with or interference with the bankruptcy case.  These factors weigh in favor of keeping the automatic stay intact.

**A.     The Harm to the Debtors' Estates by Lifting the Automatic Stay Outweighs the Purported Harm to Mr. Moro by Keeping the Stay in Place.**

28.     The impact of the automatic stay on the parties and the balance of harms tips decidedly against Mr. Moro.

29.     ***First***, the impact of the automatic stay on the Debtors and their estates is that the stay must remain in place because they will suffer significant harm if the stay is lifted so that Mr. Moro can proceed against the Insurance Policy.  As articulated above, relief from the automatic stay would deplete available insurance proceeds for the Debtors and would limit the ability of unsecured creditors to recover any judgment against the Debtors' former or current officers and directors from the insurance proceeds in the event the Committee were to commence and prevail on litigation against them.  Moreover, granting the Motion likely would have the effect of opening the floodgates for other former and current officers and directors of the Debtors to seek similar relief.  *See, e.g., Lawrence v. Motors Liquidation Co. (In re Motors Liquidation Co.)*, No. 10 Civ. 36 (RJH), 2010 U.S. Dist. LEXIS 125182, at \*15 (S.D.N.Y. Nov. 17, 2010) (affirming bankruptcy court's denial of motion to lift stay where bankruptcy court found that proceeding with action "would open the 'floodgates' . . . [, which] would usher in the very state of affairs the automatic stay was enacted to prevent"); *In re Residential Cap., LLC*, Case No. 12-12020 (MG), 2012 Bankr. LEXIS 3777, at \*7 (Bankr. S.D.N.Y. Aug. 16, 2012) ("Lifting the stay . . . could open the floodgates for other movants who also seek stay relief . . . .").

30.     Mr. Moro essentially is asking the Court to overlook the obvious drain on valuable estate assets (i.e., the insurance proceeds) that would result from granting his Motion because some

16

courts have permitted the advancement of defense costs to a debtor's directors or officers, relying

primarily on *MF Global Holdings* and *Adelphia Communications*. *See* Motion ¶ 27. However,

those cases are distinguishable because the debtors' need for insurance coverage was

"hypothetical" and "speculative." *MF Global*, 469 B.R. at 192. In *MF Global*, the debtors had

"not been named as defendants" in any of the underlying actions in which the directors and officers

were named. *See id.* ("At this time, the Individual Insureds' need far outweighs the Debtors'

*hypothetical* or *speculative need* for coverage.") (emphasis added). Similarly, in *Adelphia*

*Communications*, the bankruptcy court was "loath to allow the estates' claims" for coverage

because "such coverage may or may not ever be drawn upon." *Adelphia Commc'ns Corp. v. Assoc.*

*Elec. & Gas Ins. Servs., Ltd. In re Adelphia Commc'ns Corp.)*, 285 B.R. 580, 600 (Bankr. S.D.N.Y.

2002), *vacated and remanded on other grounds*, 298 B.R. 49 (S.D.N.Y. 2003). And even in those

cases, the courts did not allow the directors and officers unfettered access to the insurance

proceeds, as the Motion seeks here. *See MF Global*, 469 B.R. at 197 (finding that a "soft cap" for

defense costs was appropriate); *Adelphia*, 285 B.R. at 600 (authorizing $300,000 cap for defense

costs, which would "preserve the bulk of the policies' proceeds"). The remainder of the cases

cited by Mr. Moro fare no better.[7]

31.    The facts and circumstances of the Debtors' chapter 11 cases are in stark contrast.

**GGC is the named defendant in the SEC Complaint**. It is the Committee's understanding that

**GGC already has submitted claims against the Insurance Policy** on account of the SEC

Complaint. Unlike the cases on which Mr. Moro relies, the Debtors' need to access the proceeds

under the Insurance Policies is neither "speculative" nor "hypothetical." *See, e.g., In re*

---

[7]    In *In re Global Crossing Securities & ERISA Litigation.*, 225 F.R.D. 436, 464 (S.D.N.Y. 2004), the debtors "expressly consented to the use of the insurance proceeds to fund the proposed settlement." *In re Enron Corp.*, Case No. 01-16034, 2002 Bankr. LEXIS 544 (Bankr. S.D.N.Y. May 17, 2002) is not a written opinion. It is an order of the bankruptcy court which does not set forth all of the relevant facts or rationale behind the decision.

*CyberMedica, Inc.*, 280 B.R. 12, 18 (Bankr. D. Mass. 2002) ("the harm to the Debtor if relief from stay is granted is speculative given the fact that there are presently no claims for indemnification nor entity coverage").

32.    ***Second***, Mr. Moro has failed to offer any concrete evidence related to the impact that the automatic stay has on him if the stay remained intact.  The Motion is bereft of any attempt to address any of the *Sonnax* Factors, let alone any citation of the seminal decision in this Circuit. Other than a few generalized statements, the Motion fails to provide any evidence of, among other things, (i) the harm that would occur to Mr. Moro if the Motion were denied, (ii) other assets to which Mr. Moro has access, (iii) the exact amount of Mr. Moro's defense costs to date, (iv) the specific proceedings or investigations for which Mr. Moro seeks defense costs, and (v) the nature of the causes of action asserted against Mr. Moro.  This information is relevant, not only for purposes of establishing that cause exists to lift the automatic stay, but also because the Insurance Policies contain exclusions for certain Claims.  Without evidence of each of the causes of action for which Mr. Moro seeks to cover defense costs, the Court cannot determine whether Mr. Moro is entitled to coverage in the first place.  If the causes of action are not covered by the Insurance Policy, then maintaining the automatic stay has no impact on Mr. Moro.

33.    In a similar recent situation, the bankruptcy court in the FTX bankruptcy denied the motion of a former officer of the debtors for relief from the automatic stay to permit insurers to advance or reimburse the officer's defense costs under the D&O policies.  *See In re FTX Trading Ltd.*, Case No. 22-11068. April 12, 2023, Hr'g Tr. at 53:7-8 (Bankr. D. Del. 2023).  There, the court made clear that "the burden is on the Movant to prove cause" and that the Court had "zero evidence to establish cause" because the officer "did not put on any evidence whatsoever as to . . . what harm is going to occur to him . . . , what other insurance policies he has access to . . . , what

other assets he has access to privately that would allow him to cover these costs and then recover them later under this policy." *Id.* 52:16-24. The court found that there was "nothing to show that there was any cause" to lift the automatic stay and that the officer failed to meet his burden "to prove that there would be no harm to the bankruptcy estate." *Id.* 52:24-53:03. As a result, the court determined that it had "no choice, but to deny the motion for lack of evidence." *Id.* 53:7-8. The Court should do the same here on similar grounds.

34.     While Mr. Moro makes a conclusory statement about relying on the Insurance Policy, that generalized statement, without more, is insufficient to establish cause to lift the stay. In fact, the evidence before the Court shows that the Insurance Policy at issue was implemented in 2021—several years before Mr. Moro began serving as chief operating officer of GGT (March 2016) and chief executive officer of GGC (February 2018). While courts recognize the importance of D&O policies to directors and officers, they also recognize that there are "conflicting needs that also must be taken into account," including the interests that debtors have in "ensuring that the entirety of the proceeds of policies in which [a debtor] claims an interest will not be depleted." *Adelphia*, 285 B.R. at 598 ("wholly uncontrolled access to the D&O Policies could impair [the debtor's] interests by depriving it of entity coverage").

35.     Examining the impact of the Motion on each of the parties, it is clear that the balance of harms tips decidedly against Mr. Moro. As discussed above, the Debtors' need to access the proceeds of the Insurance Policies is neither speculative nor hypothetical. The Debtors already have asserted claims against the Insurance Policies. The likelihood of depletion of the proceeds rises if the Motion is granted, because it will incentivize other officers and directors to seek similar relief. The mere filing of these motions will be detrimental to the estates because of the time and expense associated with responding to same. Therefore, the Court should find that this *Sonnax*

Factor weighs against modifying the automatic stay as requested in the Motion.

**B.      Lifting the Automatic Stay Would Interfere with the Chapter 11 Cases**

36.      As explained above, granting the Motion would have the likely effect of motivating other former and current officers and directors of the Debtors to file motions seeking to modify the automatic stay so that they can access the Insurance Policy.  Such an outcome would interfere with the restructuring process that is underway as it will require the Committee (whose fees are funded by the estates) to conduct its due diligence with respect to the relief requested and oppose such motions if appropriate.  Although the Debtors have advised the Committee that they are taking the position that they cannot object to motions to modify the stay to access the proceeds of the Insurance Policy pursuant to the terms thereof, the Debtors nevertheless were required to expend time and resources to respond to Mr. Moro's request and would need to do so with respect to similar motions.

**III.    The Court Should Not Modify the Automatic Stay with Respect to Relief Not Requested in the Motion**

37.      The Motion states that Mr. Moro "does not seek to enforce his rights and demand and receive proceeds payable under the E&O Policy and Excess Policies" (both as defined in the Motion), but "reserves his right to do so at a later date should the need arise."  Motion ¶ 32.  In addition, the Debtors have advised the Committee that they are filing a response to the Motion that requests that, in the event the Court grants the Motion, the automatic stay should be lifted (i) for the benefit of all the Insureds under the Insurance Policy, rather than solely with respect to Mr. Moro, subject to a full reservation of rights, and (ii) for the Excess Policies in addition to the Insurance Policy.  The Committee objects to the Debtors' request, which expands upon the relief requested in the Motion.

38.      The Federal Rules of Bankruptcy Procedure are clear:  Requests to modify the

automatic stay must be made pursuant to a duly noticed motion. *See* Fed. Bankr. R. 4001(a) (providing that a request for relief from the automatic stay shall be made pursuant to a motion and served on the official creditors' committee); *see also* L. Bankr. R. 4001-1 (stating that Bankruptcy Rule 4001(a) requires motions for relief from the stay). The Court should not enter an order modifying the automatic stay beyond what was requested in the Motion.

## RESERVATION OF RIGHTS

39. The Committee reserves the right to further amend, modify, or supplement this Objection and present evidence at the hearing on the Motion.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court deny the Motion and grant the Committee such other and further relief as is just, proper, and equitable.

Dated: April 19, 2023
New York, New York

Respectfully submitted,

By:  */s/ Gregory F. Pesce*
**WHITE & CASE LLP**
J. Christopher Shore
Philip Abelson
David Turetsky
Michele J. Meises
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
E-mail: cshore@whitecase.com
        philip.abelson@whitecase.com
        david.turetsky@whitecase.com
        michele.meises@whitecase.com

– and –

Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606-4302
Telephone: (312) 881-5400
Facsimile: (305) 881-5450
E-mail:  gregory.pesce@whitecase.com

*Counsel to Official Committee of
Unsecured Creditors*