Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 23-10063-shl

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   GENESIS GLOBAL HOLDCO, LLC,

8

9          Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  April 24, 2023

17                  11:01 AM

18

19

20

21  B E F O R E :

22  HON SEAN H. LANE

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:   UNKNOWN

Page 2

1    HEARING re ***HYBRID EVIDENTIARY HEARING***

2

3    HEARING re Doc. #236 Amended Notice Of Agenda

4

5    HEARING re Doc. #14 Motion to Authorize /Debtors' Motion for

6    Entry of Interim and Final Orders Waiving the Requirement

7    that Each Debtor File a List of Creditors and Authorizing

8    Preparation of a Consolidated List of Creditors, in Lieu of

9    Submitting a Formatted Mailing Matrix, (II) Authorizing the

10   Debtors to File a Consolidated List of the Debtors'

11   Fifty (50) Largest Unsecured Creditors, (III) Authorizing

12   the Debtors to Redact Certain Personally Identifiable

13   Information, and (IV) Granting Related Relief

14

15   HEARING re Doc. #67 Motion To File Under Seal / Debtors

16   Motion Pursuant to 11 U.S.C. 107(b),107(c) And 105(a) For

17   Entry Of An Order Authorizing The Debtors To Redact

18   And File Under Seal Certain Information About The

19   Confidential Parties Listed In The Debtors Professional

20   Retention Applications And Schedules

21

22

23

24

25

Page 3

1    HEARING re Doc. #115 Motion To Join / Ad Hoc Group of

2    Genesis Lenders Joinder to Debtors Motion for Entry of

3    Interim and Final Orders Waiving the Requirements that Each

4    Debtor File a List of Creditors and Authorizing Preparation

5    of a Consolidated List of Creditors, in Lieu of Submitting a

6    Formatted Mailing Matrix, (II) Authorizing the Debtors to

7    File a Consolidated List of the Debtors Fifty (50) Largest

8    Unsecured Creditors, (III) Authorizing the Debtors to Redact

9    Certain Personally Identifiable Information, and (IV)

10   Granting Related Relief

11

12   HEARING re Doc. #137 The Official Committee Of Unsecured

13   Creditors Motion For Entry Of Order Requiring The Redaction

14   Of Certain Personally Identifiable Information

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 4

1    A P P E A R A N C E S :

2

3    WHITE & CASE LLP

4         Attorneys for the Official Creditors' Committee

5         1221 Avenue of the Americas

6         New York, NY 10020

7

8    BY:  GREGORY PESCE

9         COLIN WEST

10        J. CHRISTOPHER SHORE

11        PETE STROM

12        KATIE WICK

13        MICHELE J. MEISES

14        BARRETT LINGLE

15

16   PROSKAUER ROSE LLP

17        Attorneys for the Ad Hoc Group

18        Eleven Times Square

19        New York, NY 10036

20

21   BY:  BRIAN ROSEN

22

23

24

25

1    UNITED STATES DEPARTMENT OF JUSTICE

2          Attorneys for the U.S. Trustee

3          201 Varick Street, Suite 1006

4          New York, NY 10014

5

6    BY:  GREG ZIPES

7          DANIEL RUDEWICZ

8

9    CLEARY GOTTLIEB STEEN & HAMILTON LLP

10          Attorneys for the Debtor

11          One Liberty Plaza

12          New York, NY 10006

13

14   BY:  SEAN O'NEAL

15          JANE VANLARE

16          HOORI KIM

17

18   ALSO PRESENT TELEPHONICALLY:

19   PHILIP ABELSON

20   PAUL ARONZON

21   ERIC C. DAUCHER

22   ANSON B. FRELINGHUYSEN

23   ELLA GASPAR

24   VINCENT INDELICATO

25   HOO RI KIM

Page 6

1   JESSICA LIOU

2   KEN LUKASZEWSKI

3   JEFFREY S. MARGOLIN

4   KYLE MCKUHEN

5   MARCY J. MCLAUGHLIN SMITH

6   MICHELE MEISES

7   AMANDA PARRA CRISTE

8   JEFFREY SAFTERSTEIN

9   JORDAN SAZANT

10  GORDON SUN

11  NACIF TAOUSSE

12  MEGAN VOLIN

13  ARIAM ASMEROM

14  LUKE A. BAREFOOT

15  BRENDON BARNWELL

16  BRIANNA B. BILTER

17  SABRINA BREMER

18  BRIAN BULTHUIS

19  DONALD BURKE

20  BRIAN CHANCEY

21  TOM CONHEENEY

22  COURTENAY CULLEN

23  JARED DERMONT

24  MICHAEL DIYANNI

25  DAN FORMAN

Page 7

1    ASHLYN GALLAGHER

2    SHAWN GILHOOLEY

3    UDAY GORREPATI

4    JASON GOTTLIEB

5    BRANDON M. HAMMER

6    MIRA HAQQANI

7    TAYLOR HARRISON

8    MIRANDA HATCH

9    DERAR ISLIM

10   ZUL JAMAL

11   PAUL KINEALY

12   BARK KLEIN

13   OXANA KOZLOIV

14   KONRAD LAESSER

15   CHRISTINE LEE

16   MIKE LEGGE

17   MICHAEL LETO

18   SAMUEL LEVANDER

19   DAVID LOPEZ

20   ALEXANDRA LOTTY

21   PETER MAERKL

22   MICHAEL MAGZAMEN

23   KYLE MASON

24   JACK MASSEY

25   AKIKO MATSUDA

Page 8

1   RICHARD CHESTER MINOTT

2   ANAIS MITRA

3   JOHN NGUYEN

4   ARIANNA PRETTO-SAKMANN

5   MOHIT RATHI

6   CHRISTIAN RIBEIRO

7   KATIE ROSS

8   ANDRES FELIPE SAENZ

9   SAMIRA SARAN

10  THERESE SCHEUER

11  JOE SCIAMETTA

12  ANDREW SCURRIA

13  MARK STANCIL

14  BENJAMIN STEELE

15  ANDREW SULLIVAN

16  VINCE SULLIVAN

17  ANDREW SWOFT

18  ANDREW TSGANG

19  WILLIAM MATTHEW UPTEGROVE

20  LAUREN WALKER

21  ROBB WARE

22  MICHAEL WEINBERG

23  JACK WESTNER

24  PAUL WIRTZ

25

1                    I N D E X

2

3   WITNESS:              DIRECT:   CROSS:    REDIRECT: RECROSS:

4

5   MARK ANTHONY RENZI   18        34        47        50

6   BRIAN TICHENOR                 53/61

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              THE COURT:  So we are here for a hybrid hearing

3       this morning.  It's good to see folks in person.  I hope you

4       all are well.

5              So a couple of things for those folks who are on

6       hybrid, I'm Judge Sean Lane of the United States Bankruptcy

7       Court, and just a couple of preliminary announcements.  One

8       is because COVID keeps on giving, we have a little technical

9       thing I want you to be aware of, that the microphones, some

10      of these are for purposes of us capturing sound here in the

11      courtroom and some of them are for purposes of Zoom.

12              So in order to make sure that everyone is heard

13      well, not only here in the courtroom, but for Zoom, I would

14      encourage people to use the podium, which I normally don't

15      do.  I normally tell people just do it where you're sitting,

16      but it probably makes -- that's closer to the Zoom

17      microphone so that all of the folks who are out there can

18      hear you.

19              And another note, again because we're here in

20      person, various folks asked to bring in electronic devices,

21      that's all great.  We signed a bunch of orders, that's all

22      great.  Two notes on that: one is that's for here in this

23      courtroom.  If you wander around in the building, you may

24      have someone who is a court security officer stop you if you

25      ware using a device and you're not here.  So it's a little

Page 11

```
 1    different down in Bowling Green, so I just wanted people to

 2    be very mindful of that, and so you don't run into some

 3    unintentional difficulty.

 4             So with that, let me get appearances starting with

 5    Debtors' counsel.

 6             WOMAN:  Good morning, Your Honor.

 7             THE COURT:  Well, for appearances, I think we can

 8    probably use the microphones there.

 9             MS. VANLARE:  Jane VanLare, Cleary Gottlieb Steen

10    & Hamilton, on behalf of the Debtors.

11             THE COURT:  All right.  And what I would say is

12    when getting appearances from the tables that you're at,

13    counsel table, just make sure to project so our Zoom

14    microphone does as well.  And on behalf of the Committee?

15             MR. PESCE:  On behalf of the Official Creditors'

16    Committee, Gregory Pesce, White & Case.  I'm joined in the

17    courtroom today with my partners, Colin West and Chris

18    Shore.

19             THE COURT:  All right, good morning.  And on

20    behalf of the ad hoc group?

21             MR. ROSEN:  Good morning, Your Honor.  Brian

22    Rosen, Proskauer Rose, on behalf of the Ad Hoc Group.

23             THE COURT:  All right, good morning.  And on

24    behalf of the United States Trustee's Office?

25             MR. ZIPES:  Good morning, Your Honor.  Greg Zipes
```

Page 12

```
 1    with the U.S. Trustee's Office.  I am here with my

 2    colleague, Daniel Rudewicz.

 3            THE COURT:  All right, good morning to you both.

 4    And let me get any other appearances from any other party

 5    who's here in the courtroom this morning.  All right.  I

 6    don't anticipate that there's going to be anyone who's going

 7    to wish to be heard and make a presentation who's on Zoom,

 8    but in an abundance of caution, let me get any other Zoom

 9    appearances that are appropriate.

10            Counsel, you are on mute.

11            MR. O'NEAL:  Thank you, Your Honor.  Sean O'Neal,

12    Cleary Gottlieb, on behalf of the Debtors.  I don't

13    anticipate making an appearance today; that's why I'm not in

14    the courtroom, but just in case, I'm here, Your Honor.

15            THE COURT:  Perfectly fine.  Good to see you.

16    Anyone else who'd like to make an appearance who is on Zoom?

17    All right, all quiet.  Just for anybody who is on Zoom, you

18    notice I'm probably looking in various different directions;

19    that's a function of where the monitors are in the

20    courtroom.  Again, another joy of the virtual or semi-

21    virtual world.

22            So just to set the stage for this morning, I know

23    we have witnesses.  I have the various declarations.  Former

24    trial lawyer that I am, I just wanted to make sure

25    everybody's on the same page about the witnesses being in
```

Page 13

1   the courtroom or not when another witness might be

2   testifying.  The folks here are sort of a hybrid between

3   fact witnesses and expert witnesses.  Expert witnesses,

4   nobody ever cares about such things; fact witnesses, people

5   sometimes do care very much.  So I don't know if the parties

6   have had a chance to chat about that.

7             MS. VANLARE:  We have, Your Honor, and we have no

8   issues with the witnesses being in the courtroom.

9             THE COURT:  All right.  Let me just confirm that

10  from the U.S. Trustee's Office.

11            MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

12  Trustee's Office, and we have no objection with the

13  witnesses being at the courthouse.  We're assuming they're

14  representatives of the Debtor and under Federal Rule 615,

15  they're entitled to be here.

16            THE COURT:  All right.  Thank you very much.  And

17  so, with that, I think I'll turn it over to the Debtors to

18  sort of set the stage for what's in dispute and the state of

19  the evidentiary record.

20            MS. VANLARE:  Good morning again, Your Honor.

21  Jane VanLare, Cleary Gottlieb Steen & Hamilton, on behalf of

22  the Debtors.

23            We're here, Your Honor, to discuss the redaction

24  issue.  It's an issue that spans a number of motions; some

25  of those motions were filed by the Debtors.  The Committee

1   subsequently filed another motion seeking further redaction

2   of information.  As you may recall, Your Honor, we had

3   discussed this at a prior hearing and then Your Honor

4   adjourned the evidentiary portion to today's hearing.

5        So what we'd like to do, we've discussed it prior

6   to the hearing with the Committee counsel, and I hope Mr.

7   Zipes would agree with this order.  We did have some

8   discussions prior to today.  We'd like to proceed with the

9   evidentiary portion and then follow that with closing

10  arguments.  We did file -- when I say we, the Debtors filed

11  the declaration by Mr. Brian Tichenor from Moelis & Company.

12  He is in the courtroom today.  We would like to ask that

13  Your Honor admit his declaration into evidence in lieu of

14  direct testimony.

15       We do understand that the U.S. Trustee may have

16  objections to certain portions of the testimony, so we want

17  to be clear about that.  But per our prior discussions, our

18  understanding is the U.S. Trustee is fine with having the

19  declaration admitted and foregoing direct testimony this

20  morning.

21       THE COURT:  All right.  Thank you very much.  So I

22  guess the idea is to admit it as the direct testimony

23  subject to cross-examination, so let me hear from the U.S.

24  Trustee's Office on that.  Any objection to receiving that

25  declaration, which is again at Docket 231.

1           MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

2    Trustee's Office.  No objection subject to the right of

3    cross-examination.

4           THE COURT:  All right.

5           MR. ZIPES:  And I can say that for the other

6    declarant as well.

7           THE COURT:  All right.  And all three of those

8    declarations of that other declarant?

9           MR. ZIPES:  Yes, Your Honor.

10           THE COURT:  Okay, thank you very much.  All right,

11    so I'm happy to receive into evidence the declaration of

12    Brian Tichenor as his direct testimony for this particular

13    set of motions, subject to cross-examination.  Counsel?

14           MR. WEST:  Good morning, Your Honor.  Colin West

15    of White & Case.  Nice to see you in person.  We are going

16    to -- on behalf of the Official Committee of Unsecured

17    Creditors, we're going to be proceeding in much the same

18    way, except we are going to be calling Mr. Renzi for a very

19    brief direct.  I understand Mr. Zipes has no objection to

20    the admission of Mr. Renzi's declarations, but it will be

21    supplemented by a brief direct.

22           THE COURT:  All right.  You want to identify those

23    three declarations for the record?  I referred to them as

24    sort of the initial, I guess, the supplement and then the

25    second supplement.

1           MR. WEST:  Right, and those are --

2           THE COURT:  You can do that more precisely that I

3   just did.

4           MR. WEST:  I will.  I believe the initial

5   declaration at Docket 156 was admitted at the last hearing.

6   The next declarations are the supplemental, which is Docket

7   No. 184, and the second supplemental declaration of Mark

8   Renzi at Docket No. 232.

9           THE COURT:  All right.  And given Mr. Zipes'

10  comments, I will receive those all into evidence as the

11  direct testimony of Mr. Renzi, subject to being supplemented

12  when we get there for whatever comments and, again, subject

13  to cross-examination by any party.

14          All right, so Miss VanLare, anything else from the

15  Debtors are the evidentiary portion?

16          MS. VANLARE:  I don't think so, Your Honor.  I

17  think we're ready to proceed and then, as I mentioned, I

18  think we'd like time at the end to present closing

19  arguments.

20          THE COURT:  All right, thank you very much.

21          MS. VANLARE:  Thank you.

22          THE COURT:  All right.  With that, turn it over to

23  the Committee to I guess supplement the written declarations

24  of your witness.  Counsel, proceed.

25          MR. WEST:  Thank you, sir.  The Committee calls

Page 17

1    Mark Renzi.

2              THE COURT:  All right.

3              MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

4    Trustee's Office.  Just while the witness is approaching, I

5    just want to clarification.  Is this new information that's

6    being presented or is this just clarifying points in the

7    declarations.

8              MR. WEST:  I think we are largely operating within

9    the scope of the declarations.  I can make that

10   representation, but I think the witness is here live to

11   supplement to some extent, but I don't think we're outside

12   the subject matter of the declaration.

13             THE COURT:  All right.  So I'm going to receive it

14   subject to your right to object, Mr. Zipes, on behalf of the

15   U.S. Trustee's Office, and we'll see where we end up.

16             Mr. Renzi, if you would please make your way to

17   the witness box and if you would raise your right hand.  Can

18   you swear the witness?  Do you swear or affirm to tell the

19   whole truth and nothing but the truth so help you god?

20             MR. RENZI:  I do.

21             THE COURT:  All right.  Please have a seat and

22   make yourself comfortable.  I assume that any documents that

23   counsel wants you to see, counsel will send your way.  All

24   right, counsel, proceed.

25             MR. WEST:  All right.

1                DIRECT EXAMINATION OF MARK RENZI

2     BY MR. WEST:

3     Q    Good morning, Mr. Renzi.  Could you please state your

4     full name for the Court.

5     A    Mark Anthony Renzi.

6     Q    And could you please briefly summarize your educational

7     background.

8     A    I attended Washington College and Boston College.

9     Q    And could you please briefly summarize your employment

10    history since you graduated from college.

11    A    I started off as a derivatives trader in Manhattan, and

12    I subsequently have approximately 20 years of restructuring

13    experience.

14    Q    And where are you currently employed?

15    A    I'm at BRG.

16    Q    And has BRG been retained to act as the financial

17    advisor to the Official Committee of Unsecured Creditors or

18    UCC?

19    A    Yes.

20    Q    And have you become familiar with the facts of this

21    case as part of your role as advisor to the Committee?

22    A    Yes.

23    Q    All right.  Do you have prior experience advising in

24    connection with cryptocurrency Chapter 11 cases?

25    A    Yes, I do.  We're involved in BlockFi and Voyager and a

1   few other non-public, you know, mandates.

2   Q    Is it fair to say that you personally have been

3   involved in every single cryptocurrency case in the United

4   States with the exception of Celsius?

5   A    I would say that's generally correct in terms of major

6   cryptocurrency cases, yes.

7   Q    Are you familiar with the motion that was filed by the

8   UCC to redact the names, physical addresses, and email

9   addresses of the Debtors' lenders?

10  A    Yes.

11  Q    Okay.  I'm going to refer to that information -- the

12  names, addresses, and email addresses -- as personal

13  identifiable information or PII.  Will you understand what I

14  mean by that?

15  A    I understand.

16  Q    Okay.  Have you prepared and signed declarations in

17  connection with the redaction motion?

18  A    Yes, three.

19  Q    And just for the record, are those the March 22, 2023

20  declaration, the March 29, 2023 declaration, and the April

21  18, 2023 declaration?

22  A    Yes, that's correct.

23  Q    Okay.  Are the facts set forth in those declarations

24  true and correct to the best of your knowledge?

25  A    Yes.

1    Q    Are the opinions set forth on those declarations your

2    opinions?

3    A    Yes, they are.

4    Q    And have you read the objection to the UCC's motion

5    filed by the United States Trustee?

6    A    Yes.

7    Q    And did you attend the Zoom hearing before the Court to

8    consider the UCC's motion on March 30, 2023?

9    A    I did.

10    Q    Okay.  Do you have a general opinion about whether

11    public disclosure of certain PII of the Genesis' lenders

12    would give rise to a risk of harm to those lenders?

13    A    Yes.  I believe that is true.

14    Q    Okay.  Can you summarize your opinion in that regard?

15    A    Yes.  I think the confidential information, you know,

16    is definitely important to remain confidential in this case

17    because there's a chance for physical threats, physical

18    harm, there's a chance for phishing and there's a chance for

19    psychological harm.

20    Q    All right, let's then take those one at a time.  Can

21    you just explain briefly how phishing works?

22    A    Yeah.  Phishing is an attempt of bad actors to obtain,

23    you know, confidential information from, you know, people

24    generally via the internet where they're attempting to coax,

25    you know, people on the internet to provide passwords or

1   confidential information, and it's generally just a scam.

2   Q    Okay.  Do criminals sometimes, through phishing

3   attempts, try to get victims to install malware on their

4   computer?

5   A    Yes, they do.  Malware is also another way of coaxing

6   people to provide passwords or confidential information so

7   that they can, you know, obtain or steal peoples' property,

8   including cryptocurrencies.

9   Q    Notwithstanding that you've not personally advised on

10   the matter, are you familiar generally with the pending

11   cryptocurrency Chapter 11 case In re. Celsius Network, LLC?

12   A    I am.

13   Q    And based on what you know about that case, can you

14   describe what happened when Celsius' retail customers

15   Celsius' retail customers PII was publicly disclosed?

16          MR. ZIPES:  Your Honor, I object to this question

17   to the extent that this witness is the financial advisor for

18   this Committee and not involved with Celsius.  Your Honor,

19   it's not clear that he has personal knowledge in connection

20   with this.  He has a general knowledge, Your Honor, and this

21   Court I believe can evaluate generally his statements, but I

22   object on the basis that he doesn't have personal knowledge.

23          THE COURT:  Well, so counsel can help me out here.

24   In what I've read, I've seen reference to the notice of

25   phishing attempt, a second and third notice of phishing

Page 22

1    attempts, and various other things in Celsius.  I don't,

2    sitting here now without going through all of my various

3    stickers that I have here, although actually I can, it was

4    provided to me in the context of the pleadings.  And I

5    think, if remember right, some of it was certainly within

6    the Renzi first declaration, right, so it's part and parcel

7    of that if I'm right.  Or was it just something that was

8    attached as an exhibit to one of the Committee's papers?

9              MR. WEST:  It was attached to the Renzi

10   declaration.  It was briefly summarized in the Renzi

11   declaration.  I don't intend to go into this much beyond

12   what's already in the declarations.

13             But I'll also note as the Court observed at the

14   beginning of the hearing, Mr. Renzi is here in part as an

15   expert and he is entitled, I believe, to testify as to the

16   information he reviewed that formed the basis for his

17   opinions, whether or not he has personal knowledge, right,

18   as opposed to testifying in his capacity as a percipient

19   fact witness, so we think it can come in on that basis.

20   Frankly, I think it already is in by virtue of the

21   declarations being admitted.

22             THE COURT:  Yeah.  I was going to say I'm looking

23   at Paragraph 19 of the first Renzi declaration, which says

24   these risks are playing out in real time in the pending

25   cryptocurrency case, Celsius -- and I'm just summarizing

1   here -- and it cites to Exhibit C, which is I think the

2   notices that are provided in the Celsius case.  So I don't

3   know that I've heard anything that goes beyond what's

4   already in the declaration thus far, so I'm going to

5   overrule the objection for the moment.  And if there's

6   something that's strikingly new, we can chat about it, but

7   next question.

8   BY MR. WEST:

9   Q    All right, let me just repeat the question.  Mr. Renzi,

10   can you describe what happened in the Celsius case when

11   Celsius' retail customers' PII was publicly disclosed?

12   A    Sure.  So I believe it was on or about October 5 in

13   2022, 600,000 records were published in the statements and

14   schedules, and they were provided for broad public.  I think

15   subsequently, some actors, you know, out in the internet

16   took that information, created a database that was easily

17   searchable.  That subsequently led to some phishing

18   attempts, you know, of those customers.  And I think that's,

19   you know, greatly concerning in that case and I hope that's

20   something that helps guide us here.

21   Q    And to your knowledge, were some of those phishing

22   attacks successful?

23   A    My understanding is yes, but that's my understanding.

24   Q    Okay.  Do you believe the risk of phishing attacks

25   resulting from publishing creditors' PII is higher in

1    cryptocurrency bankruptcy cases than in other bankruptcy

2    cases?

3    A    I think the question really comes to, in terms of this

4    case; is that correct?

5    Q    Well, first, let's just take crypto versus non-crypto.

6    Do you think there's a higher risk in crypto cases as

7    opposed to non-crypto cases?

8    A    Yes, I do.  I think there is -- you know, it's hard to

9    reverse these transactions.  It is, you know, the activity

10   out on the internet in terms of this case and the access to

11   peoples' information and the portability of it.  And

12   effectively here, these assets are bearer assets, so I think

13   that those are all components that make it particularly, you

14   know, problematic.

15   Q    Okay.  Just to make the record clear, did you say

16   bearer assets?

17   A    Bearer assets.  So, Your Honor, in terms of -- if you

18   have somebody's keys to these assets, then you control the

19   assets; that's essentially what I'm getting at.

20   Q    And is there a documented history, to your knowledge,

21   of criminals seeking to obtain peoples' cryptocurrency keys

22   via phishing or other manners?

23   A    Yes, it's well documented.

24   Q    Okay.  And based on your experience, do you believe

25   that similar phishing attempts could occur here if the

Page 25

1    confidential information of the Genesis lenders were to be

2    disclosed?

3    A    Yes, I do.

4    Q    Do you perceive a higher risk here than in the Celsius

5    case?

6    A    I do.  I mean, you have high net worth investors,

7    accredited investors, institutional investors; they

8    generally have a higher net worth by definition and I think

9    it's particularly heightened here.

10   Q    I think you also testified that lenders could face a

11   risk of threats of violence or actual violence if their PII

12   were to be publicly disclosed.  What's the basis for that

13   opinion?

14   A    Yes.  I think that's stated in my declaration and I've

15   provided examples.  I also believe that there's some

16   examples from the FBI that provide, you know, issues that

17   have come up in the past, so definitely concerning in terms

18   of physical harm, you know, threats, psychological harm, et

19   cetera.

20   Q    Did the Committee host a virtual town hall meeting on

21   April 4, 2023?

22   A    Yes.

23   Q    And did you attend that meeting?

24   A    I did.

25   Q    And what was the purpose of that meeting as you

1   understood it?

2   A     Well, number one, I think it's a very effective form of

3   communication in these cases.  And, number two, to express

4   concern -- some of the Committee members and a number of

5   other participants, you know, creditors of the case,

6   expressed concern about physical harm, physical threats, you

7   know, psychological harm, stealing cryptocurrency vis-à-vis

8   phishing, et cetera, so they wanted to express those issues

9   and concerns.

10  Q     And was that meeting attended by a large number of

11  creditors?

12  A     It was.

13  Q     Apart from statements made by lenders -- addressed this

14  a little earlier, but apart from statements made by lenders

15  at the town hall meeting, what other information have you

16  reviewed in coming to the conclusion that lenders would face

17  threats or physical violence if their PII were disclosed?

18  A     Well, I mean, it's very well documented.  I think I

19  have that as exhibits, you know, in my declaration, you

20  know, about there's been physical threats, stealing

21  cryptocurrency, a number of other things have been cited

22  there.

23  Q     Have there been kidnappings?

24  A     There have been kidnappings.

25  Q     Have there been physical assaults?

Page 27

1   A     There have been physical assaults.

2   Q     Do you believe that redacting only the lenders'

3   addresses but not their names or email addresses would

4   eliminate the risks that you just testified about?

5   A     Look, I think the internet is, you know, very

6   pervasive.  If you just have a person's name, you can

7   generally obtain a significant amount of information.  And

8   so, I think you need to redact not only their addresses but

9   also their name.

10  Q     Is there a possibility that through internet searches,

11  people could identify, just based on names, could identify

12  peoples' home or business addresses?

13  A     Yes.

14  Q     What about email address; what's the risk of publishing

15  email addresses?

16  A     I think the same is true; there's phishing attacks.

17  And I also believe, as Mr. Tichenor was likely to testify

18  to, you know, there's a lot of value to having peoples'

19  email addresses and customer lists, so I think that that's

20  also something to take into consideration.

21  Q     Do you believe that disclosing the identities of

22  Genesis' institutional creditors could also give rise to a

23  risk of harm to individuals?

24  A     Yes.  I mean, I think when you think about

25  cryptocurrency companies and firms, a number of them are

Page 28

1   small and there's one, two, you know, a handful of

2   employees.  Those employees in those type of firms generally

3   have access to keys; I think it has the same -- it's the

4   same impact.  So if you're highlighting an institution, you

5   know, generally, there's been a limited amount of employees

6   and you can find those employees quickly and then you still

7   have the same risk of phishing, et cetera and access to

8   keys.

9   Q    Okay, let's switch now to a different topic.  Mr.

10  Renzi, is it also your opinion that publicly disclosing the

11  confidential information including the names of lenders

12  could diminish the value of the Debtors' estate?

13  A    Yes.  I have firsthand knowledge in the Voyager and

14  BlockFi cases that these are valuable assets.  And then

15  secondly, in reviewing the business plans of these

16  businesses, they specifically ascribe, you know, a certain

17  amount of value to each customer.  So, yes, these assets are

18  valuable; they're part of a marketing process that's ongoing

19  in multiple cryptocurrency cases, and I believe it's a

20  valuable assets.

21  Q    Is the list of lenders akin to a company's customer

22  list?

23  A    I would even say it's even more heightened than that.

24  I think there's a lot of value to these lists even more so

25  and having access to high net worth individuals, yeah, so it

1   is akin to that and I think it's particularly valuable here.

2   Q    And is there a risk in your opinion that publishing the

3   list of Genesis' lenders would allow competitors to solicit

4   their customers?

5   A    Yes.

6   Q    Are you familiar with the Genesis privacy policy, which

7   is attached as Exhibit A to your initial declaration?

8   A    I am.

9   Q    Okay.  And what, if anything, did that policy say with

10  respect to disclosing information that Genesis collects in

11  connection with lender accounts?

12  A    Sure.  In regards to my testimony here, I think, and

13  also discussions with the creditors, they realize that the

14  list can be bought and sold and that there's a limited

15  amount of access to third parties; however, the policy

16  highlights that it's not available just for broad public

17  consumption.

18  Q    So if you were reviewing that privacy policy that's

19  attached as Exhibit A to your initial declaration, would

20  that create an expectation that your personal information

21  would not be publicly disclosed?

22          MR. ZIPES:  Your Honor, I object.  This calls for

23  speculation.

24          THE COURT:  Well, I think that's a conclusion I'll

25  draw, so next question.

```
 1              MR. WEST:  Well, that's the last question, so no

 2     more questions.

 3              THE COURT:  All right.

 4              MR. WEST:  I'll pass the witness.

 5              THE COURT:  I'm going to ask a question and I

 6     always say this and people give me a strange look, but

 7     judges will ask questions, but they are subject to objection

 8     by any party if folks believe that there's a problem with

 9     the question.

10              So with that caveat, for purposes of the record,

11     there's been a lot of discussion at various hearings about

12     the term lender and a lender being akin to a customer here.

13     Can you just explain on the record the relationship here

14     between the Debtor and the lenders such that you would

15     describe them as customers, why you make that analogy.

16              THE WITNESS:  I mean, sure.  In terms of many

17     cryptocurrency, you know, companies, customers or lenders

18     are involved where, very simply put, let's just say you love

19     Bitcoin and if you want to lend your -- you want to lend

20     Bitcoin to a company and you get dollars back; that could be

21     an example of a lending arrangement.

22              So that, in this case, I would view it

23     synonymously with the customer, and this is something that

24     frequently happens in many cryptocurrency exchanges and

25     companies.
```

```
 1                THE COURT:  Thank you.  Anything else?

 2                MR. WEST:  That's all, subject to redirect, and

 3      I'll pass the witness.

 4                THE COURT:  All right.  So Mr. Zipes, I think

 5      since we have this witness on the stand sworn under oath, it

 6      makes sense to finish this witness and then we can go back

 7      to any examination you might want to conduct as to the

 8      Debtors' witness, unless you have a better idea.

 9                MR. ZIPES:  No, Your Honor, that makes sense.

10      Your Honor, I didn't have a chance to address the Court

11      before and I know we have a witness on the stand.  I just

12      wanted to state that we do appreciate Debtor and the

13      Committee working productively to try to limit the issues

14      involved actually and we believe for the purpose of this

15      hearing and we just weren't able to reach a resolution.

16                THE COURT:  Well, since we're here -- with Mr.

17      Renzi's indulgence -- the understanding I have is governed

18      by the last time we got together when -- I don't remember

19      there being -- well, rather than say what was an issue, let

20      me see what I remember as still an issue.

21                One was the protection of the names of individual

22      creditors, as opposed to the other information.  I don't

23      remember there being any objection by the U.S. Trustee as to

24      addresses and emails and things of that sort, but it was the

25      names that the U.S. Trustee for individuals creditors and
```

1    customers, lenders, whatever term you'd like to use, that

2    the U.S. Trustee had an objection to but not the other

3    information.  Am I remembering that right?

4              MR. ZIPES:  Yes, Your Honor, although I hope that

5    I didn't get it reversed or that you didn't get it reversed.

6    But the names, just as with the notice of appointment of

7    creditors' committee, the name is disclosed, the dollar

8    amount is disclosed, but the addresses are not disclosed.

9    And in addition, with respect to the institutional

10   creditors, that --

11             THE COURT:  Oh yeah, I'm going to get to them in a

12   second.  But there was no objection, for example, to keeping

13   confidential the email addresses.

14             MR. ZIPES:  Correct.

15             THE COURT:  All right, of individuals, say it that

16   way.  And as to institutional folks, I think your view, if I

17   remember right, was that for subsection (c) that your view

18   was that -- because that talks about the risk to

19   individuals, that you didn't think that covered

20   institutional creditors' customers as opposed to

21   individuals.

22             MR. ZIPES:  Correct.

23             THE COURT:  All right.  So we've got names and

24   we've got the institutional issue.  Was there anything else

25   that was the subject of a live debate and dispute between

Page 33

1    the U.S. Trustee's Office and other folks who were seeking

2    to seal information?

3              MR. ZIPES:  Well, Your Honor, I would add one

4    other item of agreement, which is that with institutional

5    creditors to the extent that they fall under a threat

6    category, however that's defined by this Court, you know, we

7    would have no objection to their name but not their address

8    being disclosed as well.  But we don't think there's been

9    any showing in that regard, but we would, in concept, be

10   okay with that as well.

11             THE COURT:  All right.  So with that, your witness

12   for cross-examination.

13             MR. ZIPES:  Yes.

14                 CROSS-EXAMINATION OF MARK RENZI

15   BY MR. FINESTONE:

16   Q    Mr. Renzi, good morning.

17   A    Good morning.

18   Q    And this should hopefully be brief.  You're familiar

19   that the Debtor and its professionals have filed a motion

20   seeking to redact certain information as well in this case,

21   correct?

22   A    I am.

23   Q    And you're also aware that their request does not go as

24   far as the Committee requests in terms of what it's seeking

25   to redact?

Page 34

```
 1    A    Yes.

 2    Q    And specifically that the institutional creditors would

 3    be subject to disclosure; is that correct?

 4    A    Yes.

 5    Q    And so you disagree with the Debtor in that regard.

 6    A    I think for both the lenders and the institutional

 7    investors, the names and addresses and emails should be

 8    redacted.

 9    Q    Okay.  And, in fact, in the privacy policy which we're

10    referring to, could you describe your understanding of

11    whether that privacy policy is in effect?

12    A    I believe the privacy policy is in effect and that

13    there's an expectation, you know, from lenders and

14    institutional investors that there are third parties that

15    are deemed, you know, part of the Genesis umbrella, you

16    know, have access to their information; however, the broad

17    public does not.

18         MR. ZIPES:  And just so we're clear, let me just

19    refer to the Court.  I don't know if the Court has the

20    exhibit book with the tabs.

21         THE COURT:  I have the privacy policy.

22         MR. ZIPES:  Okay.

23    BY MR. ZIPES:

24    Q    So the privacy policy that we're referring to is

25    Exhibit A to your declaration dated March 22, 2023; is that
```

1   your understanding of the policy in place?

2   A    Yes.

3   Q    And you referred to the fact that information should

4   not be shared in terms of this privacy policy.

5   A    In terms of public dissemination, yes.

6   Q    Okay.  And are you -- but this privacy policy is not

7   clear in that regard, is it?

8   A    My understanding and my read of it is -- and subsequent

9   discussions is that there's an expectation that their

10  information was not going to be made publicly available.

11  Q    Well, let's look at this privacy policy.  First of all,

12  as we sit here today, are you certain that this is even the

13  privacy policy of the Debtor?

14  A    I believe it is.  I don't have any expectation that it

15  isn't, but if there's a newer one, you know, please provide

16  it.

17  Q    And what is your understanding that that's the privacy

18  policy in place?

19  A    I believe it is the privacy policy in place unless

20  there's a newer one.

21  Q    What did you do to confirm that this is the privacy

22  policy?

23  A    We had discussions with counsel to confirm that it was

24  the latest that we had and that's what we were able to

25  produce.

1    Q    Well, you're using the word latest.  Are you aware that

2    this policy was even ever in effect?

3    A    I believe that -- I have nothing that says that it

4    wasn't in effect, and also from discussions with, you know,

5    the UCC members, they believe it was in effect.

6    Q    Okay, so your basis is in discussions with other

7    people.

8    A    Yes.

9    Q    Okay.  So let's look at the privacy policy that you --

10            THE COURT:  All right, let's get the witness a

11   copy of any documents he's going to be cross-examined on.

12            MR. WEST:  Okay.

13            THE COURT:  I have a set of exhibits.  I marked up

14   one binder that I have and the other one is unmarked, if

15   that's helpful.

16            MR. WEST:  I think we'll have one for him in a

17   moment.  Your Honor, I was set up to refer to tabs and

18   numbers, but I understand.

19            THE COURT:  That's fine, but just we might --

20   whatever tab in whatever binder it is, if we're going to ask

21   him about specific language, it makes sense to have it in

22   front of him.

23            MR. WEST:  I have a large binder.

24            THE COURT:  All right, just show it to Mr. Zipes

25   just so he sees what you're handing up and also sees what

Page 37

1    the tabbing nomenclature is for purposes of referencing the

2    exhibit.   Thank you, counsel.

3              Mr. Zipes.

4    BY MR. ZIPES:

5    Q    So, Mr. Renzi, well, let me just ask some questions

6    about your understanding.   In the event of a sale of assets

7    of this Debtor, are customer datapoints being sold?

8    A    I believe so, yes.

9    Q    And so, just looking at the individuals, the datapoints

10   that would be sold would include all the information that

11   Genesis has with respect to each customer?

12   A    I believe so, but I would like to -- what paragraph are

13   you referring to?

14   Q    I'm not referring; I'm just talking generally right

15   now.

16   A    Yes, I believe so.

17   Q    And that might include the birthdate of the customer?

18   I don't want you to discuss any specific customer --

19   birthdate of customer.

20   A    I can't speak of is it the birthdate.

21   Q    Are you involved with the sale?

22   A    I am involved in reviewing what the Debtors' investment

23   banker is providing in terms of how they're going to market

24   the assets.

25   Q    And are you generally familiar with the assets that are

1    being marketed?

2    A    Yes.

3    Q    And again, the assets include customer information,

4    correct?

5    A    Yes.

6    Q    And to your understanding, that would be all customer

7    information?

8    A    That's my understanding.  However, you know, in other

9    cases, judges have ruled where somebody has a specific

10   request not to have information provided, that's been

11   granted under certain conditions, so that's why I'm

12   answering it a certain way because that's actually what

13   happened in other cases.

14   Q    So it's your understanding that specific creditors can

15   come in and make specific requests with respect to

16   withholding their information?

17   A    I think what the objective for the Debtors, and I agree

18   with it, is to maximize value, and also the portability of

19   customers, lenders, institutional investors, that's

20   incredibly important.  So to make sure that they're

21   comfortable when the information is transported over, that's

22   something that, you know, we had to do in a couple of other

23   cases.

24   Q    Okay.  So again, just focus on my questions and I'm

25   just trying to figure out your understanding of what is

1      being sold for each customer.

2            THE COURT:  Well, can I interject here?  I don't

3      have a sale motion in front of me, so we have the regular

4      rules of the road.  One of the exhibits I have is actually a

5      privacy ombudsman report in connection with the sale in

6      Celsius.  So I don't know what a sale is going to look like,

7      if somebody wants to lay a foundation for questions to

8      identify particular things; otherwise, we're going to spend

9      a lot of time speculating as a group.

10     BY MR. ZIPES:

11     Q    Okay.  So, Mr. Renzi, can you turn to point seven of

12     the privacy policy that you have in front of you?

13     A    Point seven?

14     Q    Sorry, Page 8 of 22, which is...

15     A    Data security; is that correct?

16     Q    How we share our personal information with other

17     parties.

18     A    It starts with -- no, oh sorry, got it.  Yes, I'm

19     there.

20     Q    Okay.  And you see there that we may share your

21     personal information with our affiliates in circumstances

22     described below; do you see that?

23     A    Yes, I do.

24     Q    Okay.  And if you go two paragraphs down, we may also

25     share your personal information with; do you see that

Page 40

1    sentence?

2    A    Yes, I do.

3    Q    Okay.  And if you look on the next page, there's a long

4    list of parties that information can be shared with.  But if

5    you look at the second bullet point, companies or other

6    entities that may purchase assets, liabilities and/or whole

7    or part of the business of Genesis, including pursuant to a

8    court-ordered sale under U.S. bankruptcy law; do you see

9    that?

10   A    Yes, I do.

11   Q    Isn't this an exception under the reading of the

12   privacy policy to release of information?

13   A    No.  This says that they can sell these assets, but

14   that doesn't say that they can publicly disseminate their

15   personal information.

16   Q    Okay, so let's drill down on that a little bit.  They

17   can sell the information to a third party, correct?

18   A    An approved third party, yes.

19   Q    Well, the party that is purchasing the assets, and that

20   party can be any party that this Court approves, correct?

21         MS. VANLARE:  Objection, Your Honor.  I think this

22   line of questioning is calling for speculation.

23         THE COURT:  Well, I mean, I get it.  I can read

24   it.  I understand what it says, so let's...

25         MR. ZIPES:  Okay.

1           THE COURT:  Is says what it says, includes make

2    sure your information is certain as described below; that

3    includes sharing personal information with, and then it's

4    got the two bullet points you referenced on top of Page 9 of

5    22, companies with who we plan to merge, combine,

6    consolidate, et cetera, et cetera.  And the second one is

7    companies or other entities that may purchase assets,

8    liabilities in whole or in part, including pursuant to a

9    court-approved sale under the bankruptcy law.  Got it.

10           MR. ZIPES:  So, Your Honor, I don't think I need

11    to go through each of these points.  I could save that for

12    argument as appropriate.

13           THE COURT:  Yes.

14           MR. ZIPES:  And we can move on.

15    BY MR. ZIPES:

16    Q    You mentioned this town hall and general as to your  --

17    by creditors that their information won't be misused in

18    various ways, right?

19    A    Yes.

20    Q    Are you aware that there are creditors and/or

21    customers, however we're calling them, who have filed public

22    documents on this docket, including their names and, in some

23    cases, their addresses?

24           MS. VANLARE:  Objection, Your Honor.  I would ask

25    that Mr. Zipes clarify his questions.

```
 1            THE COURT:  So, Mr. Zipes, I think the question is
 2    fine.  It would probably be even better than fine if you
 3    could make a reference to a particular filing just so that
 4    everybody's on the same page.
 5            MR. ZIPES:  Yeah.
 6    BY MR. ZIPES:
 7    Q    So are you generally familiar with the docket in this
 8    case?
 9    A    Yes.
10    Q    Okay.  And I wouldn't expect you to have mastered every
11    last document on the docket.
12            MR. ZIPES:  But can I mark as UST 1 a notice of
13    transfer of claim and also hand it to the Court?
14            THE COURT:  Sure.
15            MR. ZIPES:  Just give me one second, Your Honor.
16    Your Honor, I did not bring enough copies with me today.
17            THE COURT:  All right.  Give me one second, I'll
18    look at it, and I'm happy for people to read this copy.  So
19    let me ask a preliminary question before we identify this on
20    the record, whether we want to identify this on the record.
21    So as long as it's been shared with counsel and shared with
22    the witness so they know specifically what you're referring
23    to.
24            But since we have a live discussion about these
25    very issues, and I will say I will take judicial notice that
```

1    people will file things here in the Bankruptcy Court that we

2    will redact because they have provided us with information

3    that they shouldn't have, so a filing may or may not be

4    dispositive of something.  So I'd ask if you could, with

5    reference to U.S. Trustee 1, just keep it general, but it's

6    helpful to have the actual document in front of the

7    witnesses.

8            MR. ZIPES:  And, Your Honor, and I agree with

9    that, Your Honor, and I was going to suggest.  There's no

10   need to identify this specific document, except to note for

11   the record that it is filed on my --

12           THE COURT:  Well, it was my question that led to

13   this, but I wanted to be specific, but I think we can

14   navigate this appropriately and you can do what you need to

15   do without necessarily disseminating or highlighting this

16   particular individual's information.

17           MR. ZIPES:  And, Your Honor, I'd like to mark as

18   UST No. 2 another similar document but that doesn't have all

19   the information of this one admitted, so I'm being cryptic

20   right now.

21           THE COURT:  No, that's fine.  And I assume you

22   want me to hand this to the witness just in terms of having

23   a copy in front of his; is that correct?

24           MR. ZIPES:  Yes, thank you.

25           THE COURT:  All right.

Page 44

```
 1    BY MR. ZIPES:

 2    Q    And, Mr. Renzi, we've all heard the admonishment of the

 3    Court to not be too specific here.  But is it your

 4    understanding that creditors have filed documents with their

 5    name and address in this case?

 6    A    I have two examples in front of me, so yes.

 7    Q    And this case involves customers who voluntarily signed

 8    up with Genesis; is that correct?

 9    A    Yes.

10    Q    Have you been involved with any of the opioid cases?

11    A    I have not.

12    Q    Have you been involved with any of the Archdiocese

13    abuse cases?

14    A    I have not.

15    Q    Okay.  Well, are you generally familiar with those

16    cases?

17    A    Generally, yes.

18    Q    And you're aware that the creditor body in those cases

19    is generally involuntary in the sense that they were opioid

20    users or sexual abuse survivors?

21    A    Yes.

22    Q    And would you say that that's a meaningful distinction

23    between this case and those cases in terms of redacting or

24    deeming certain information of customers confidential?

25    A    I think the proper --
```

1              MR. WEST:  I'm going to object.

2              THE COURT:  Hold on.

3              MR. WEST:  Objection.  Do you want me to go to the

4     podium?

5              THE COURT:  Yeah, please.

6              MR. WEST:  I think the question was, is it a

7     meaningful distinction in terms of the redaction.  I think

8     we're into a pure question of law there and I'm not sure Mr.

9     Renzi needs to be here opining as to that particular

10    question.

11             THE COURT:  So, Mr. Zipes, your response?

12             MR. ZIPES:  Your Honor, he was designated as an

13    expert of some kind.  I'm not sure exactly what that expert

14    is, but if he's --

15             THE COURT:  Well, I understood him to be an expert

16    in connection with being a financial advisor, particularly

17    in cryptocurrency industry.  And so, I'm not taking him to

18    be an expert on the opioid cases or the Diocesan cases.  I

19    guess my thought is that -- let me hear what -- so your

20    question is, is it a meaningful distinction?  I mean, it's a

21    distinction.  I guess the question is I think how meaningful

22    or not is something that the parties are asking me to

23    determine in the context of this proceeding, and so it's

24    sort of the ultimate issues in some ways.

25             I mean, I'll allow him to answer.  I'm not sure

Page 46

1    how probative it is at the end of the day.  Let me just for

2    interest of a clear record, I'll ask that the question be

3    restated.

4              MR. ZIPES:  Your Honor, I think that's -- I can

5    leave that for argument.

6              THE COURT:  All right.

7    BY MR. ZIPES:

8    Q    Mr. Renzi, you do agree that these customers are

9    sophisticated?

10   A    I do.

11   Q    Okay.  And the word accredited has been used in

12   describing them.  Can you describe what the word accredited

13   means?

14   A    They're accredited investors that have a certain level

15   of income that's higher than most that provides them that

16   distinction.

17   Q    And could an accredited investor also be -- could an

18   investor be accredited as a Series 7 holder?

19   A    It doesn't.  You can be an accredited investor, I

20   believe, and hold a Series 7, but I don't know that -- I

21   don't know more specifically than that.

22   Q    So is accredited a term of art defined by the SEC or

23   some other government regulator?

24   A    I'm not sure.

25   Q    Okay.  So your definition of accredited is just someone

Page 47

```
 1   who's a high net worth generally?

 2   A    It's a high net worth and a higher income than most.

 3              MR. ZIPES:  Your Honor, just give me one second.

 4              THE COURT:  Sure.

 5              MR. ZIPES:  Your Honor, I think I'm done with this

 6   witness.  I have questions about what's being sold, but I

 7   think he's not the right witness for this.

 8              THE COURT:  All right, thank you very much.  And

 9   so, with that, any redirect for this witness?

10              MR. WEST:  Very briefly, Your Honor.

11              THE COURT:  Mr. Zipes, I'm assuming that your

12   exhibits were for purposes of -- I don't know if you want to

13   introduce them more sufficient to basically say they helped

14   established the testimony and that that's all you needed

15   them for.

16              MR. ZIPES:  Well, Your Honor, I've asked that they

17   be admitted, but, Your Honor, we can work out with Committee

18   and Debtors' counsel on exactly how that looks.

19              THE COURT:  All right, thank you.

20                  REDIRECT EXAMINATION OF MARK RENZI

21   BY MR. WEST:

22   Q    So, Mr. Renzi, could you turn back to the privacy

23   policy, which was attached as Exhibit A to your initial

24   declaration.

25   A    Sure.  I'm there.
```

1    Q    Okay.  So we're in Section 7, which is how we share

2    personal information with other parties.  There's a list of

3    bullet points under No. 7, right, there's eight bullet

4    points, right?

5    A    Okay.

6    Q    Do any of those bullet points allow Genesis to share

7    information generally with the public?

8    A    Not that I can tell.

9    Q    Okay.  If you look at the, I think it's the fifth

10   bullet point beginning companies or other entities that we

11   plan to merge; do you see that bullet point?

12   A    Yes.

13   Q    Look at the second sentence, you see, should a merger

14   combination or consolidation occur, we will require that the

15   new combined and/or surviving entity, as the case may be,

16   follow this privacy notice substantially with respect to

17   your personal information?

18   A    Yes, I see that.

19   Q    What do you understand that to mean?

20   A    It's asking for the privacy of information to be

21   consistent relative with this document here.

22   Q    And again, this document as you can tell doesn't allow

23   Genesis to share the information with the public, right?

24   A    That's right.

25   Q    Okay.  And then with respect to a potential sale, I'm

1    going to speak generally.  I think you testified earlier

2    that Genesis has an interest in keepings its customer list

3    private and unavailable to competitors, right?

4    A    Yes.

5    Q    Okay.  Would a potential buyer of Genesis, including

6    potentially its customer list, also have an incentive to

7    keep that customer list private?

8    A    Yes.

9    Q    Why would that be?

10   A    I mean, if they're going to bid on an asset such as

11   this, they're going to pay money for it and they really

12   don't want that information out in the public.  They want to

13   retain that information obviously, you know, create

14   hopefully a good sound platform for the customers here to

15   move to that platform.

16   Q    You can put that one away.  Just with reference,

17   general reference to U.S. Trustee Exhibits 1 and 2, Mr.

18   Zipes gave you a couple of samples where creditors

19   apparently filed documents on the docket publicly disclosing

20   their names and some identifiable information.  Do these two

21   examples change your opinion that you gave earlier about the

22   general sentiment that you've heard from the creditor body

23   as it relates to the disclosure of their personal

24   information?

25   A    No, it does not change my opinion.

Page 50

1          MR. WEST:  No further questions, Your Honor.

2          MR. ZIPES:  Your Honor, I just have one more

3    question.

4               RECROSS-EXAMINATION OF MARK RENZI

5    BY MR. ZIPES:

6    Q    Mr. Renzi, you were pointed to language in the privacy

7    policy relating to the sale of assets.  And I guess the

8    point was that they need to abide by this privacy policy to

9    the extent it's coherent, correct?

10   A    Yes.

11   Q    Okay.  So I just ask you to look at the bullet point at

12   the bottom of Page 8 of 22 and that bullet point is

13   financial institutions with which we partner.

14   A    Yes, I see that.

15   Q    And you'll see that that does not have the qualifying

16   language that's contained with respect to a sale of assets,

17   correct?

18          MS. VANLARE:  Objection.

19          THE COURT:  Basis?

20          MS. VANLARE:  Again, I'm not sure when Mr. Zipes

21   refers to clarifying language, what is the clarifying

22   language that is or is not up for debate?

23          THE COURT:  I'm going to overrule that.  I

24   understood him to say it doesn't have the same kind of

25   language about requiring those entities to follow the

1    privacy policy.  Is that right, Mr. Zipes?

2              MR. ZIPES:  That's correct.

3              THE COURT:  All right.  Could you file that, Mr.

4    Renzi, so that you can answer it or should he restate it?

5              THE WITNESS:  Yes, Your Honor.  So I think simply

6    put when I read this and with my experience in this industry

7    and the fact that Voyager and BlockFi did redact

8    information, all of the public that's confidential

9    information, I read these two bullets together, so I don't

10   think they exist without each other.  So I think the most

11   important thing is that there's nothing here that says that

12   public information -- this information can be publicly

13   disseminated.

14   BY MR. ZIPES:

15   Q    Are you familiar with the financial institutions with

16   which the Debtor has partners?

17   A    Some.

18   Q    And unless you're going to tell me that that's -- are

19   there any publicly noted?  I don't want you to reveal

20   financial institutions that are not publicly disclosed.

21             MR. WEST:  I would strictly just jump in here just

22   to guide the witness and I think consistent with Mr. Zipes'

23   guidance that probably Mr. Renzi should err on the side of

24   caution in sitting there right now without knowing what's...

25             THE COURT:  So let me see if can cut to this.

1    What's your ultimate goal, Mr. Zipes; is it to find out

2    whether any of these entities have publicly disclosed the

3    customer information?

4              MR. ZIPES:  No.  Your Honor, the point is and I

5    guess this goes into argument as well -- but that these

6    financial institutions aren't restricted in the same way

7    under this policy by its claim (indiscernible).

8              THE COURT:  Well, I think we -- you can just ask

9    that question.  Does he know one way or the other whether

10   the financial institutions in the bullet point at the bottom

11   of page 8 of 22 are governed by any requirements as use of

12   PII customers/lenders.  Does that work for you?

13             MR. ZIPES:  Well, certainly, Your Honor.

14             THE WITNESS:  Your Honor, I mean, as I read the --

15   one, two, three, four, five, six -- six words here, it

16   doesn't say that if I give information to them that they in

17   turn can go publicly disseminate the information.  And I

18   think that would -- I'm not a lawyer, but it doesn't seem --

19             MR. ZIPES:  Okay.

20             THE WITNESS:  -- like that's what it's giving

21   anybody authority to do.

22             THE COURT:  Any other questions, Mr. Zipes?

23             MR. ZIPES:  No other questions, Your Honor.

24             THE COURT:  All right.  Any other questions of

25   this witness?

Page 53

1          MR. WEST:  No, Your Honor.  Not from me.

2          THE COURT:  All right.  Hearing no other

3  questions, Mr. Renzi, you are excused.  Thank you for your

4  testimony.

5          THE WITNESS:  Thank you.

6          THE COURT:  And with that, I think we will go to

7  the Debtor's witness, who is cross -- sorry, whose direct

8  testimony has been admitted without elaboration -- further

9  elaboration in person, and Mr. Zipes, I assume that you have

10  questions of this witness.

11          MR. ZIPES:  Yes, I do, Your Honor.

12          THE COURT:  All right.  So I'd ask that the

13  Debtor's witness take the stand.  And mister -- is it

14  Tichenor?  Am I saying that correctly?

15          MR. TICHENOR:  Tichenor.

16          THE COURT:  Tichenor.  All right.  Thank you.  Mr.

17  Tichenor, if you'd raise your right ahead and repeat after

18  me.  Do you solemnly swear or affirm to tell the whole truth

19  and nothing but the truth in these proceedings?

20          MR. TICHENOR:  I do.

21          THE COURT:  All right then.  The witness is sworn.

22  Mr. Zipes, your witness for cross examinations.

23               CROSS-EXAMINATION OF BRIAN TICHENOR

24  BY MR. ZIPES:

25  Q    Good afternoon.  It's officially afternoon.  I have a

Page 54

1    few questions for you as well, Mr. Tichenor, and I just

2    botched that name.

3    A    Oh, no.  It's okay.  People do it all the time, so

4    don't worry.  Yeah.

5    Q    So all right.  Can you explain what the term accredited

6    investor means?

7    A    I believe accredited investor as we reference it refers

8    to the SEC definition under Reg D of what defines an

9    accredited investor under the '33 Act.

10   Q    Okay.  And all right.  Is it your understanding that an

11   investor could be a Series 7 holder?

12   A    My understanding is among other factors, I believe a

13   Series 7 is included in that.

14   Q    And for the high worth net -- but you don't have to be

15   a Series 7; is that correct?

16   A    I believe -- and I don't recall the exact specifics of

17   the numerous items that would allow for a party to be an

18   accredited investor, but my recollection is that among

19   those, one of those is a Series 7 holder.

20   Q    Okay.  And for -- you could also be a high-net-worth

21   individual; is that correct?

22   A    Yeah.  I believe the dollar amounts are specified in

23   Regulation D.

24   Q    And as part of that, are there any requirements put on

25   you as the investor?  Do you have to sign paperwork, or

1      review paperwork, or review your status with anybody?  Can

2      you just describe the process for an individual?

3      A     I don't actually recall the exact specifics of what

4      declarations an individual or institution need to make in

5      connection with being an accredited investor specifically.

6           I know in a lot of scenarios -- for example, you may

7      qualify by clicking a button that you are in fact an

8      accredited investor to the extent that it's a form that's

9      presented to you --

10     Q     Would you say it's --

11     A     -- in connection with signing up on a platform, for

12     example.

13     Q     I'm sorry.  Go ahead.  I'm sorry.

14     A     Oh, no.  I was saying I know, for example, like if you

15     sign up with a (indiscernible), sometimes they'll ask you

16     whether or not you're an accredited investor, and it's an

17     election that you can chose to click on.

18     Q     And what is -- what is your purpose of this -- clicking

19     the box or whatever?  Is that -- is it to put on notice that

20     you have some sophistication?  Is that fair?

21     A     I believe it defines a number of activities that you

22     may or may not be able to do, even legally speaking, in

23     connection with being an accredited investor, so the types

24     of -- for example, if it is a broker-dealer in that context,

25     the nature of certain types of investments that you may be

1   able to make that you may be otherwise restricted to be able

2   to do to the extent that you're not an accredited investor.

3   Q    Okay.  And turning to the sale and the sale assets, are

4   you generally familiar with the sale?

5   A    I am.

6   Q    Of Genesis?

7   A    I am.

8   Q    Okay.

9   A    I'm the investment banker to the company, so we are

10   currently involved in operating and managing a sale process

11   for the business.

12   Q    Okay.  So hopefully I have the right witness here.  And

13   you're aware that customer lists are part of the sale

14   process; is that correct?

15   A    That's correct.

16   Q    And that's actually a large part of the sale of this --

17   of these Debtors?

18   A    Yeah.  We believe that the sale of the customer list

19   and that information is one of the primary assets of the

20   business.

21   Q    And Genesis has collected certain information about the

22   customers; is that correct?

23   A    That's my understanding.

24   Q    Okay.  And does that -- does that include their name?

25   A    I believe so, yes.

1    Q    Is it -- well --

2    A    Yeah.  My -- yes.

3    Q    Doesn't Genesis have a vetting process?  They want to

4    make sure the individual is who he or she says?

5    A    Yes.  They have KYC and AML procedures that they follow

6    related to the onboarding of customers.

7    Q    Okay.  And does that include getting, for individuals,

8    their date of birth, and address, and bank accounts, and

9    that sort of information?

10   A    That's correct.

11   Q    And to your knowledge, is that information being sold

12   as part of -- part of the sale process?

13   A    Yes.  My understanding is that to the extent that it's

14   allowed under a sale process relating to what assets can or

15   cannot be sold in connection with the terms of use, we would

16   seek to sell that information, which would, you know,

17   include among other things the name of a creditor, e-mail

18   address, and other information that would allow for a buyer

19   to potentially market to those customers, among other

20   things.

21   Q    And that would include Social Security number as well?

22   A    I can't speak specifically to whether or not that's a

23   piece that would be included or excluded.  Hasn't been

24   addressed in the context of the sale yet.

25   Q    Okay.  And you're aware of this controversy between my

1    office, and the Debtors, and everybody else in this case I

2    guess relating to redaction of information.  We're -- you're

3    familiar with schedules that are filed in bankruptcy cases,

4    correct?

5    A    Broadly speaking, yes.

6    Q    And that information generally does include the name

7    and address of the creditor?

8    A    I -- generally speaking, that's my understanding.  I'm

9    not specifically a restructuring expert.  I work on

10   restructurings among other things, but within our financial

11   institutions group, I focus on M&A restructuring, capital

12   markets activities, and among other things, investment

13   banking, advisory, broadly speaking, which does not include,

14   for example, the preparation of statements and schedules in

15   connection with restructuring transactions.

16   Q    Okay.  All right.  Are you aware that Genesis has a

17   privacy policy in place right now?

18   A    I'm aware that they have a privacy policy.  Yes.

19   Q    And is that privacy policy the one that was -- that we

20   -- that was identified by Committee Counsel?

21   A    I can't speak to the specifics of it.  I haven't read

22   Mr. Renzi's testimony specifically or the privacy policy or

23   had an opportunity to review whether or not that is in fact

24   the privacy policy of the company.

25   Q    Okay.  So is it your understanding that the privacy

1    policy is posted on the internet?

2    A    I believe it is.

3    Q    Okay.  Well, I don't want -- I don't want you to guess.

4    Have you -- have you reviewed the privacy policy?

5    A    I've reviewed it at a high level.  I wouldn't say that

6    I've reviewed in detail.

7           MS. VANLARE:  Objection, Your Honor.  I will just

8    note that this goes outside the scope of Mr. Tichenor's

9    declaration.

10          THE COURT:  All right.  I do see, Mr. Zipes, the

11   privacy policy is not mentioned in here.  Actually, for that

12   matter, I don't -- I don't think the discussion about

13   accredited investors is either, but -- so I think --

14          MR. ZIPES:  Okay.

15          THE COURT:  What would you like to do?

16          MR. ZIPES:  Let me -- let me just move on.

17   BY MR. ZIPES:

18   Q    You're familiar with the Debtor's attempts to redact

19   certain information on these schedules, correct?

20   A    I am.

21   Q    And you're also familiar with the specific requests

22   that individual's names and addresses be redacted?

23   A    I am.

24   Q    And as to institutions, the names can be disclosed.

25   I'm just trying to get an understanding of what the Debtor's

Page 60

1   position is.

2   A     My understanding is the Debtor's position would be to

3   not disclose that information to the extent that it was

4   possible, so we would seek to redact all information

5   relating to the names, address, and otherwise of creditors.

6   Q     In Genesis, is there any ability of customers to

7   withdraw assets at the moment?

8   A     Not at the moment.

9   Q     Is there any immediate plan within the next couple of

10  weeks to allow customers to withdraw assets?

11          MS. VANLARE:  Objection, Your Honor.  Again, I

12  think this goes beyond the scope of the declaration and

13  foundation.

14          THE COURT:  Well, I guess I'm -- my question is

15  I'm -- what's the relevance to this particular hearing?

16          MR. ZIPES:  There's arguments -- I could save it

17  for argument, again, Your Honor, but there are arguments

18  that parties can be coerced into withdrawing assets in this

19  case.

20          THE COURT:  Well, unless somebody has a crystal

21  ball that I don't possess, I don't think we know how the

22  case will progress, just like we don't know how any of these

23  cases will progress.  So right now, certainly customers

24  can't withdraw assets, but I guess I'll take it as -- the

25  rest of it as unknown to various degrees.  So next question.

Page 61

```
 1              MR. ZIPES:  Okay.  Your Honor, just give me one

 2    second.

 3              THE COURT:  Sure.

 4              MR. ZIPES:  Your Honor, I have no further

 5    questions for the witness.  Thank you.

 6              THE COURT:  All right.  Thank you very much.  Any

 7    redirect?

 8              MS. VANLARE:  No, Your Honor.

 9              THE COURT:  All right.  Redirect?

10              MR. ROSEN:  Your Honor, may I ask a question of

11    the witness?

12              THE COURT:  Any objection to the Ad Hoc Committee

13    asking a question of this witness?

14              MR. WEST:  As long as it's within the scope of the

15    declaration, Your Honor.

16              MS. VANLARE:  No objection.

17              THE COURT:  All right.  So given the no objection

18    subject to all usual rules about what your question is, fire

19    away, Counsel.

20              MR. ROSEN:  Thank you very much, Your Honor.

21                 CROSS-EXAMINATION OF BRIAN TICHENOR

22    BY MR. ROSEN:

23    Q    Mr. Tichenor, there were a lot of questions asked of

24    you about the same process and the efforts being undertaken

25    by you in connection with the sale of the Genesis assets.
```

1    Are the parties to -- with whom you are speaking, are they -

2    - have they executed nondisclosure agreements with respect

3    to the information that they are getting from Genesis?

4    A    They do.  It's required.

5    Q    So the names and information associated with the client

6    list then would be subject to the same nondisclosure

7    obligations that Genesis currently has?

8    A    So while that information would be subject to the same

9    nondisclosure obligations, during a sale process, we would

10   not plan to provide information relating to the name of

11   creditors, for example, or customers to parties in

12   connection with the sale process.

13       And this is consistent with two other cases, for

14   example, that I'm investment banker to the debtor on, the

15   first being Voyager and the other being BlockFi.  And given

16   the value of the information relating to the creditor list,

17   we do not provide that information to parties until a sale

18   transaction has been consummated.

19       And that's actually consistent with even broadly how we

20   would run a sale process for any financial institution where

21   a creditor list is inherently one of the most valuable

22   assets because it provides for a source of funding.  So in a

23   lot of scenarios, financial institutions are highly unique

24   in the sense that the assets in a lot of ways are actually

25   your liabilities.  It's customers.  They're your source of

Page 63

1   funding, and there's even a concept in banks called a core

2   deposit premium where you actually capitalize good will

3   relating to the value of those liabilities and customers.

4        So in this context, while parties would be subject to

5   NDA, we would not provide them information relating to those

6   customers up until the transaction has even been

7   consummated.

8              MR. ROSEN:  Thank you very much.  Thank you, Your

9   Honor.

10             THE COURT:  All right.  Thank you.  Any other

11  questions of this witness?

12             All right.  Hearing no further requests for

13  questioning, Mr. Tichenor, you are excused.  Thank you for

14  your testimony.

15             THE WITNESS:  Thank you.

16             THE COURT:  All right.  Unless I'm missing

17  something, I think that concludes the evidentiary portion of

18  this hearing, although I just want to make sure -- maybe

19  I'll ask this question.  I don't know that this is subject

20  to debate, so I didn't ask a witness.

21        I have the privacy policy, which is entitled Privacy

22  Notice.  It's Exhibit A to mister -- one of Mr. Renzi's

23  declarations.  And then later, there is also a -- also

24  attached as Exhibit B, the Master Digital Asset Laon

25  Agreement, and I just had a question as to how those two

1    overlapped, worked together, differed, who they covered,

2    didn't cover.  And just before we finally close the

3    evidentiary portion, again, I think it is what it is, but I

4    just want -- I thought it was an appropriate factual

5    question to ask now.

6            MS. VANLARE:  Your Honor, so the privacy policy

7    was posted on the website of the company.  The -- I believe

8    you asked about the Master Loan Agreement.

9            THE COURT:  Right.

10            MS. VANLARE:  That was a document that individual

11    lenders would enter into with, for example, GGC in

12    connection with entering into transactions, into loans with

13    GGC.

14            THE COURT:  All right.  So the first one is the

15    fairly common kind of click agreement that happens in a lot

16    of industries that when you access things on the internet,

17    this is what you agree to.  And the other -- so would folks

18    -- if they were going to be customers, do they always enter

19    into the master digital loan -- asset loan agreement, or is

20    this for a particular kind of transaction, a particular kind

21    of customer?

22            MS. VANLARE:  So lenders to GGC would enter into

23    an MLA if they were going to undertake a loan transaction.

24    The Debtors do have non-debtor affiliates that may enter

25    into other types of agreements, but the MLA was primarily

Page 65

1    the document that was entered into by GGC and its lender/

2    customers.

3            THE COURT:  All right.  So if you're a

4    lender/customer, you're entering into a Master Loan

5    Agreement for purposes of this case?

6            MS. VANLARE:  Typically yes.

7            THE COURT:  All right.  So would it be correct

8    then to understand these as belt and suspenders in terms of

9    understanding one's more general and one's more specific

10   when you actually cross the Rubicon to enter into a specific

11   arrangements?

12           MS. VANLARE:  I think that's fair, Your Honor, as

13   to confidentiality, but also I think they are different in

14   the sense that the policy was -- excuse me -- available

15   online, and it was broad in nature.  The MLA, of course, had

16   additional terms and was a contract --

17           THE COURT:  Right.

18           MS. VANLARE:  -- that people entered into with the

19   company.

20           THE COURT:  I mean, I just ask because there's a

21   confidentiality provision on page 11, paragraph XI, about

22   the agreement.  And I think if the agreement -- if I'm right

23   -- that that makes a creditor/lender -- that makes that

24   relationship happen, right?  So you could click and be

25   subject to the privacy policy but not yet be a creditor or a

1    lender.  But once you -- once you execute this, you are, and

2    then you've got that separate confidentiality agreement.

3              MS. VANLARE:  That's exactly right, Your Honor.

4              THE COURT:  All right.  All right.  I just wanted

5    to understand how those work together.

6              All right.  So with that, my thought would be to

7    hear any closing argument unless there's something else we

8    need to do before we jump into that.

9              MR. ZIPES:  Your Honor, I just want to be heard

10   briefly on the privacy policy discussion.  And I think I

11   could save this for argument, but -- I'll save it for

12   argument.  I'm reserving all my rights.

13             THE COURT:  Yeah.  No, that's fine.  I was just

14   trying to clarify a fact, and I wanted to do it before any

15   witnesses would leave the building in case there was a need

16   for a witness to clarify it back, and I didn't want anyone

17   to be surprised and save that for the argument portion, but

18   I also didn't want to interrupt anybody's examination.

19             MR. ZIPES:  So Your Honor, here's my concern about

20   this fact.  I asked the question whether the one witness who

21   submitted an affidavit in this regard has knowledge that

22   this is the actual privacy policy, and he said he assumed it

23   is the proper policy.  And Your Honor, I just want to

24   reserve my rights in that regard.  I don' t--

25             THE COURT:  That's why -- so here's what I don't

Page 67

1  want to have happen.  I don't want confusion about what the

2  facts are to be -- to be an issue in deciding this.  So what

3  I'd like to do is give the parties a second to talk and

4  clarify because, for example, I was going to suggest this

5  with your exhibits is to put on the record essentially some

6  kind of stipulation as to what is relevant for these

7  purposes so you can rest easy, but I think parties can work

8  that out.  And to me, this is a similar thing.  It's not

9  uncommon for people to have click agreements, and that's

10  what's on the website because you need something on the

11  website.

12       But I wanted to just clarify, and this was in the

13  -- in the -- it was an exhibit, and so that's how I

14  understood it, but I just wanted to make sure there was no

15  lack of clarity, so why don't I give you all a few minutes

16  to chat so you can then figure out what should go on the

17  record and what shouldn't.  And if there's a question that

18  needs to be asked of a witness in that regard, we can do

19  that.  That's why I wanted to raise it now.

20       MR. ZIPES:  Okay, Your Honor.

21       THE COURT:  All right.  So --

22       MS. VANLARE:  Thank you.

23       THE COURT:  I'll give you like 10 minutes, or just

24  let us know in chambers when you're ready.  I don't think

25  it'll take too long.  But again, I can't think of any other

Page 68

1    factual clarification that I just wanted to have.  Is there

2    any other facts in which it's worth having a discussion to

3    erase any doubt as to what is actually going on as a factual

4    matter?

5            MR. ZIPES:  Your Honor, I just state this.  It is

6    the Debtor's and the Committee's burden, and to the extent

7    they're talking about a privacy policy and referring to a

8    privacy policy, that --

9            THE COURT:  Do you have reason to believe this is

10    a -- there's a different privacy policy?

11            MR. ZIPES:  Your Honor, I believe that there is a

12    more recent privacy policy.  My office has --

13            THE COURT:  Well, then discuss that with the

14    Debtors, right?  This is not trial by ambush, so I

15    understand whose burden it is, but judges don't like to

16    decide something based on erroneous facts, so you'll get me

17    the right facts, and then I'll make a ruling.  So why don't

18    you have that discussion now, and just knock on chambers

19    when you're ready.

20            (Recess)

21            THE COURT:  Please be seated.  I want to make sure

22    that our crack court staff has a chance to get everything up

23    and running.  Are we good to go?  All right.  Thank you very

24    much.

25            All right.  So as to the factual record, there

1    were one or two issues that were sort of floating in the air

2    before I left the bench, and so obviously we're all trying

3    to get it right.  People may agree or disagree in the

4    result, but we never want to do something based on

5    inaccurate facts if we can avoid it.

6            So with that, let me hear from the Debtors as to -

7    - as to where things stand.

8            MS. VANLARE:  Yes, Your Honor.  So I just want to

9    clarify on the privacy policy, and I think we discussed

10   among the parties during the break.  Thank you very much.

11           So Mr. Renzi's declaration attaches a privacy

12   policy.  That privacy policy is the most recent one.  That's

13   the one that's on the website.  In fact, that's how Counsel

14   to the Committee obtained it is by downloading it from the

15   website.

16           We do want to clarify that as of the petition

17   date, there was also a privacy policy.  It differed slightly

18   from the one that is currently on the website that's

19   attached to Mr. Renzi's declaration.  We don't believe any

20   of the changes were implicated in the -- sort of the

21   provisions that Mr. Zipes questioned the witnesses about.

22   However, we would like to admit the policy as of the

23   petition date into the record as well.  And that way, Your

24   Honor will have a complete record of not only the most

25   recent policy that's on the website but also the policy as

Page 70

1   it existed as of the petition date.

2          THE COURT:  All right.  Any objection from the

3   U.S. Trustee's Office?

4          MR. ZIPES:  No objection, Your Honor.  And to be

5   helpful with react to the privacy policies, one paragraph

6   was added, so when there are going to be references to the

7   privacy policy, if you look at one privacy policy, it might

8   be the paragraph before that we're referring to.

9          THE COURT:  All right.  Thank you very much.  So

10  if you could hand that up, I'll throw it in my binder.

11  Thank you very much.

12         MS. VANLARE:  Thank you.

13         THE COURT:  And just to put a finer point on it,

14  what paragraph was added, just so I know how the numbers

15  line up because I see now six says "how we share personal

16  information with other parties," which is what was seven in

17  the discussion we just had.

18         MS. VANLARE:  That's exactly right, Your Honor.

19  That's the paragraph that the questioning related to, and it

20  is seven in the newer version.  It's six in the --

21         THE COURT:  Older version.

22         MS. VANLARE:  In the original.  I believe -- I

23  think the new paragraph is paragraph 4, but --

24         THE COURT:  Four.

25         MS. VANLARE:  I'm going to confirm that.

1              THE COURT:  Or the numbered paragraph 4 in the

2    exhibit that we already have is new compared with the old

3    one, how we collect data.

4              MR. ZIPES:  I would have no objection to using the

5    redline as an exhibit as well (indiscernible).

6              THE COURT:  So let me make it simple though.  Was

7    there any change to the paragraph we were discussing?

8              MS. VANLARE:  There is -- I think the word --

9    instead of privacy policy, it says privacy notice.

10             THE COURT:  So well then let me ask it a different

11   way.  Is there any -- any party want to make an argument

12   that there's some change to the policy that impacts any of

13   the arguments that have been made so far today or are going

14   to be made in connection with the motions pending in front

15   of me?

16             MR. ZIPES:  No, Your Honor.

17             THE COURT:  All right.  So we have a distinction

18   without a difference in this -- for purposes of our

19   proceeding today.  So I'm not going to then ask that this be

20   introduced as an exhibit except to the extent that the

21   Debtors think that might be useful for other purposes down

22   the road because I don't know that it matters for purpose of

23   today.

24             MR. ZIPES:  Your Honor, I was just -- and I don't

25   want to interrupt, but I think it is relevant in that it

```
 1   shows that parties that are reviewing the privacy policy

 2   often have confusion on what they're actually reviewing, so

 3   that --

 4              THE COURT:  I'll admit it.  What do you want me to

 5   call it?

 6              MS. VANLARE:  Joint Exhibit 18, Your Honor.

 7              THE COURT:  Joint Exhibit 18.  All right.  I'm not

 8   sure how probative it is, I confess, but it's in for

 9   whatever purposes, as often famously said in bench trials by

10   judges all across the globe.

11              All right.  So with that, anything else before we

12   turn to oral argument?

13              All right.  With that, I would just say for

14   purposes of argument, maybe folks use the podium.  And it is

15   the Debtor and the Committee and the Ad Hoc's motion, so I

16   assume that I should hear from them first unless you all

17   have agreed on a different presentation where it makes sense

18   for Mr. Zipes to set the stage as to what's still a live

19   objection and why.

20              Mr. Zipes, do you have a -- does anybody have a

21   preference?

22              MS. VANLARE:  Your Honor, I think that's exactly

23   what we had in mind.  I think we were thinking Debtors,

24   Committee, anyone else, mister -- then Mr. Zipes, and then

25   we would reserve the right for a brief reply or rebuttal.
```

Page 73

```
 1              THE COURT:  All right.  That's fine.  Please

 2     proceed.

 3              MS. VANLARE:  Okay.

 4              THE COURT:  And I will start, as I always -- I

 5     usually do in these circumstances.  I've read everybody's

 6     papers, so I will not take the fact that you don't slavishly

 7     include every point that you raise to be in any way a

 8     concession or that you're not pursuing that point but just

 9     you're going to -- I take this to be  highlighting the

10     important stuff and particularly addressing any of the

11     testimony, so all your papers will be considered.

12              And with that, Counsel, take it away.

13              MS. VANLARE:  Thank you, Your Honor.  Jane

14     VanLare, Cleary Gottlieb Steen & Hamilton on behalf of the

15     Debtors, and I will be brief, Your Honor.

16              So first, I just want to clarify the Debtor's

17     position because there's been a number of remarks that have

18     been made today.

19              We did in our original set of redaction motions --

20     there are a number of them -- we did initially seek to

21     redact individual names and contact information and

22     institutional contact information.  We subsequently, after

23     discussions with the Unsecured Creditor's Committee as well

24     as the Ad Hoc Group and other creditors, we have sought to

25     redact all institutional and creditor names and contact
```

Page 74

1     information.

2              And today here -- today, Your Honor, we do join,

3     and we are supportive of the motion that the Committee filed

4     seeking broad redactions for both names and contact

5     information for all the reasons that articulated in their

6     motion and in the declarations as well as during today's

7     hearing.

8              THE COURT:  Let me just ask you about that, and

9     maybe the Committee is the right party, but I'll just tee it

10    up now.

11             There's a lot of talk about individual concerns in

12    connection with the institutional investors, customers,

13    lenders, be that as it may.  So my understanding is that --

14    am I right in saying it's not as if there's going to be any

15    individual information submitted with the bankruptcy court

16    here for these individuals.  It's just that those

17    individuals can be identified once you identify the

18    institutions.  Is that right?

19             I ask because sometimes you just say here's an

20    institutional creditor contact person, so I wasn't sure if

21    it was directed to -- well, even, "Judge, even if you leave

22    the institutional name of the lender/customer, just redact

23    the name of the individual listed as the point of contact,"

24    which is a common thing for, say, you know, proof of claim.

25    So what -- I just want to understand the position.

1          MS. VANLARE:  Yes.  Thank you, Your Honor, because

2     that is an important point.  I mean, of course -- again, I

3     think the Committee has sought to redact the institutional

4     name as well as individual names.  We are supportive of that

5     request.  If Your Honor were not inclined to permit the

6     redaction of institutional names, we would absolutely seek

7     to -- seek permission to redact the individual contact

8     person or at the very least allow some alternative to be

9     noted, for example, in the schedules or creditor list

10    because, again, we were contacted by counsel and by

11    creditors that this was an issue that was of great concern

12    to individuals.  In other words, even those who were part of

13    an institution --

14          THE COURT:  Right.

15          MS. VANLARE:  -- but just having their name as

16    somebody associated with that institution was problematic.

17          THE COURT:  All right.  And again, I'm just trying

18    to make sure I understand the different positions and

19    arguments.  Am I also right in saying that if for purposes

20    of ruling I decide that this is confidential business

21    information for purposes of essentially being a customer

22    list, something that's valuable in a sale, ongoing business,

23    that I don't even need to reach 107(c), which is the privacy

24    issue and some of the more distinct nuances between investor

25    names and individuals?

Page 76

1          MS. VANLARE:  I think that's right, Your Honor.  I

2     was actually going to get to that as well, that you have

3     basically two bases to make this ruling.

4          THE COURT:  All right.  With that, I'll get out of

5     your way and let you -- let you give your presentation.  I

6     just wanted to make sure I had those issues nailed down.

7          MS. VANLARE:  Thank you.  I also just wanted to go

8     back to some of the issues that we talked about at the last

9     hearing and, just so the record's clear and Your Honor's

10    rulings are clear, we did discuss certain categories of

11    parties -- before we even get to sort of institutions and

12    individuals more broadly, we talked about M&A counterparties

13    and litigation or regulatory counterparties, and I believe

14    Your Honor had indicated at the last hearing that so long as

15    there was a reasonable basis for redacting those types of

16    parties that it would be -- that it was permissible to

17    redact them for the reasons that we articulated at the last

18    hearing.

19          THE COURT:  Yeah.  I had understood for potential

20    counterparties as for litigation parties in proceedings,

21    inquiries that were expressly confidential, filed under

22    seal, or received instruction to keep confidential, that

23    those or things not disputed by the U.S. Trustee's Office

24    subject to verification, right.  It wasn't a blank check.

25    It was, "Gee, could you give us some information about that

1    particular proceeding?" for example, but that we didn't --

2    those were essentially removed from the dispute here.

3            And so I think that that's right because I have

4    for my notes for both of those, it's just stated that those

5    conditions that the U.S. Trustee's Office didn't believe

6    there was an issue with that.

7            But let me ask Mr. Zipes just in an abundance of

8    caution if he would be kind enough to pop up and just

9    confirm the that's the case.

10           MR. ZIPES:  Confirmed.

11           THE COURT:  All right.  Thank you.  All right.

12           MS. VANLARE:  Okay.  Thank you, Your Honor.

13           We also discussed at the last hearing our

14   argument, and I won't -- I'll take Your Honor's instruction.

15   I won't reargue the things that we raised in our papers, but

16   foreign creditors, there is sort of an additional

17   consideration for foreign creditors who are subject to

18   privacy regimes that could potentially subject the Debtors

19   just --

20           THE COURT:  So I was going to ask you about that.

21   There's -- it's kind of an interesting issue that seems to

22   be dealt with in different ways.

23           So I think it's pretty clear that there are no

24   courts -- U.S. courts that are going to say that we're bound

25   by whatever privacy regime may exist in the foreign

1    countries.  But if I remember right, Judge Garrity

2    essentially used comity as a way of essentially looking at

3    that issue.

4             And I'd be curious to get your take -- and this is

5    opening a bit of a can of worms -- on the Celsius privacy

6    ombudsman's report that's contained as an exhibit because it

7    goes through a whole host of things for purposes of the

8    sale, including looking at where the customers are, and

9    therefore what the majority or a substantial portion of the

10   customers and creditors are -- what regimes they're subject

11   to.  So in other words, you don't have, "Well, we've got,

12   you know, 10,000 customers.  We've got one in the EU, but

13   we're spending a lot of time talking about the EU."  On the

14   other hand, if you have 90 percent of them are in the EU,

15   shouldn't we be talking about the EU privacy regime?

16            So I guess I had -- I'd be interested in your

17   comments about what the ombudsman was doing and how that

18   sort of fits into the analysis here, which is much more of a

19   threshold issue, but part of me was wondering if, as a

20   threshold matter, there's a ruling that resolves some issues

21   that the privacy -- is there going to be a privacy ombudsman

22   here?  And if so, are some of these issues things that

23   should be considered in the context of a privacy ombudsman

24   would seem to be a much sort of nuanced analysis.

25            MS. VANLARE:  Mh hmm.

1          THE COURT:  So I was curious how to take that, and

2     there's a whole bunch of ways you could frame that question.

3     But that's something I really would appreciate your insight

4     into.

5          MS. VANLARE:  So Your Honor, I think we have had

6     some discussions about a privacy ombudsman with the Office

7     of the U.S. Trustee.  I think to date, we've said that some

8     of that is premature because we -- we're not that far along

9     in the sale process.

10          I think in terms of the foreign creditors, you

11    mentioned comity.  Of course that's, I think, one important

12    consideration.  I think another consideration that sort of

13    is separate and apart from foreign law and foreign courts

14    and respect that you might give to those foreign laws and

15    foreign courts.  It's just the issue of the impact on the

16    Debtor's estate.

17          And so one of the things we argued in our papers

18    is that violation of certain foreign regimes may result in

19    fines and additional costs for the Debtors and I don't -- I

20    think for that, I don't think you need to necessarily

21    consider issues of foreign --

22          THE COURT:  I agree that that's a concern.  I was

23    struggling I think last time and haven't gotten any further

24    in terms of where that fits for today's purposes, right?  It

25    certainly seems to fit when the privacy ombudsman is

Page 80

1    considering the sale because they're saying what's best to

2    maximize value, and so you can consider a lot of different

3    things.   It seems to be the parameters of that inquiry are

4    much broader, but we have essentially the 107 straitjacket

5    here, so I'm try -- it's a legitimate concern.

6           I don't know the range of penalties that folks

7    could be subject to, so the analogy I was teasing my way

8    through is HIPAA, right?  And if you -- if you violate HIPAA

9    for healthcare information, you have a serious problem.  And

10   you have substantial economic exposure, and I know Europe

11   has a very different example -- paradigm for privacy, and I

12   know they have a privacy ombudsman, I believe is the title.

13          And so what thoughts do you have about where that

14   fits into the mix for today?

15          MS. VANLARE:  Well, Your Honor, I think I would

16   say that we don't need to get to any of those issues if Your

17   Honor finds that there's been a sufficient showing that

18   names can be redacted for all the reasons that have been

19   articulated.  We don't need to get into this issue of

20   foreign regimes.  We don't need to make this distinction.  I

21   mention it merely to say that it's out there, and we

22   certainly want to preserve those arguments.

23          THE COURT:  Right.  No, that's a fair -- that's a

24   fair point.  It does seem to highlight the interaction with

25   statutes passed at different times and the -- how these

Page 81

1    issues were manifest or not at the time of the passage of

2    those statutes.

3              So all right.  Thank you for your comments on

4    that.

5              MS. VANLARE:  So Your Honor, now moving into I

6    think what you had mentioned earlier, which is the two

7    bases, I think -- at least two bases that Your Honor has to

8    approve the redactions that have been sought here.  One is

9    the sort of business justification, the fact that as has

10   been shown through the declarations as well as the testimony

11   of Mr. Tichenor and Mr. Renzi that the information, the

12   names, and the contact information is a valuable asset for

13   the Debtors, particularly important in the context of these

14   cases where that asset is for sale, among other things.  We

15   are in the middle of a sale process trying to maximize value

16   for the estates for our creditors, and I think that there's

17   been ample evidence presented in the record that this is an

18   important asset that should be preserved.

19             The second basis that really goes to 107(c) is the

20   threat that disclosure of this information presents to the

21   individuals, and I know -- and we've talked about this at

22   the last hearing -- that 107(c) is worded in terms of

23   individuals.  But I think as we also discussed at the last

24   hearing, and I'll note again, it doesn't limit the

25   protection to only -- to instances where the individuals are

1   themselves the creditor.  It simply says that where there's

2   a threat of two individuals that 107(c) permits the Court to

3   protect that information.  We think that exists today for

4   this case.

5           And again, if you look at the declarations that

6   were submitted, Mr. Renzi and Mr. Tichenor -- Mr. Renzi in

7   particular, and the testimony goes in detail as to many of

8   the threats that are posed by this information, of course

9   for individual creditors but also for those individuals who

10  are the individuals that are part of the institutions who

11  are themselves creditors.

12          And you know, there've been many types of threats

13  that have been highlighted, obviously physical threats,

14  threats of kidnapping, threats of injury as well as

15  financial risks and other types of risks through fishing

16  attempts and the like.  And the record is quite full of

17  examples where this has occurred to people in these types of

18  cases.

19          And just -- I think we made this distinction

20  before, but again, when we talk about institutional

21  creditors, particularly in the crypto industry, there are

22  many institutional creditors where the -- there may only be

23  a few individuals where the home address is used as the

24  business address, so there's also this sort of hybrid --

25  what I would call a hybrid type of creditor where even in

Page 83

1    the sort of most conservative definition of institution

2    versus individual, those concerns are highlighted.

3            But again, I think you don't need to -- I think

4    107(c) permits Your Honor to protect -- again, to allow the

5    redaction of institutional information because in fact of

6    the dangers to individuals who are part of those

7    institutions.

8            Now, Mr. Zipes had brought up during the

9    questioning examples of two filings where folks identified

10   themselves.  And of occurs Your Honor, people are free to

11   identify themselves.  They're free to file things on the

12   docket.  There free to show up at the hearing, but I think

13   that what we're talking about here is involuntarily

14   disclosure and again, in particular given the threats that

15   people face.

16           Finally, I thought it was very instructive what

17   Mr. Zipes said.  You know, and he was talking about contact

18   information of individuals, and he said that he has no

19   objection to names of individuals if they -- if they fall

20   under a threat category, and that really -- the issue is

21   that of showing.

22           And I think that's really important because I

23   think there is actually agreement in that.  We too agree

24   that individuals who fall under a threat should be

25   protected.  It's just that we think that there has been

1    sufficient showing that in this case -- as in many crypto

2    cases but in this case in particular -- that group is very

3    large, and it should not be limited to -- and the burden

4    should not be placed on individuals to contact the Office of

5    the U.S. Trustee to identify themes about a threat which

6    they may be aware of or simply are mindful of, but I think -

7    -

8           THE COURT:  Well, to put -- to put the bankruptcy

9    point on it, isn't what -- that what the Committee is here

10   for, right, to represent the interest of unsecured creditors

11   to -- I mean, that's their -- I mean, that's probably best

12   address to the Committee, but that's the point, that they

13   don't have to come forward because the Committee represents

14   their interests.

15           MS. VANLARE:  That's exactly right, Your Honor.

16   And I think the Committee has certainly said -- and I'm sure

17   their counsel will underline after I finish -- that they've

18   heard from many, many creditors.

19           But again, I just go back to this issue.  I don't

20   actually think that there is a disagreement in terms of if

21   there's a threat, this should be protected.  And we would

22   ask Your Honor to take note that the record is replete with

23   examples and that the showing has been made that parties who

24   are involuntarily subject to these proceedings, be it in

25   their individual capacity or as part of institutions, are in

1    fact subject to these types of threats.

2           And again, it's been said but I'll just note

3    because a lot of people say, "How is crypto different?"

4    Right?  Isn't any large case -- don't we have these issues

5    in any large case where you have creditors, and nobody ever

6    wants their name out there?

7           I do think -- and I think Mr. Renzi said today

8    during his testimony, you know, the fact that these

9    transactions, they're quick, they are -- contain and relate

10   to very large asset transfers that are -- that are virtually

11   instantaneous unlike other types of assets that may take a

12   long time.  And they are very difficult, if not impossible

13   to reverse.  There's not a financial intermediary when you

14   look at crypto assets, so there are very specific

15   differences in the crypto industry that I think do

16   distinguish this, and the reason it's relevant is because it

17   really amplifies the threat that people experience, again,

18   who are involuntarily part of these proceedings.

19           Thank you, Your Honor.

20           THE COURT:  All right.  Let me just check my list

21   here as to any questions.

22           So just to follow up on the conversation before,

23   so I understand the folks that -- who are -- who are

24   entering into agreements here that fall into the

25   customer/lender category, which is the folks we're talking

1    about are the folks who would've entered into the master

2    agreements of the type that were included as an exhibit.

3              MS. VANLARE:   That's exactly right, Your Honor.

4              THE COURT:   All right.   And so I assume then that

5    essentially distinguishes the clickthrough privacy policy,

6    which means that allows you to interface with the website

7    and doesn't necessarily commit you to anything in terms of

8    an actual -- of being a counterparty to any agreement, but

9    so you might have a lot more -- I assume you'd have to have

10   a lot more people who are subject to that, but they may

11   never show up on a list in anything in this case.

12             MS. VANLARE:   That's right.   The privacy policy

13   was more broadly applicable than the lenders -- the specific

14   lenders who entered into MLAs and who are now the creditors

15   in these cases, or some of the creditors in these cases.

16             THE COURT:   All right.   And so that leads me to a

17   more general question is are there any different tiers of

18   creditors that I should be aware of in terms of teasing my

19   way through this?

20             We've been talking about the lender/customers,

21   right?   So I get that.   Are there -- is -- are there other

22   creditors that -- who wouldn't be subject to this kind of a

23   concern that -- for which you're not seeking protection or

24   have an alternative basis for seeking protection?

25             So in other words, we're talking about -- I know

Page 87

1   we've been talking about all individuals, all this, all, but

2   is it all -- is the real category all folks who are

3   lenders/customers, and that may not include everyone who's a

4   creditor?  I mean, I assume someone somewhere has an office

5   and bought a copy machine from, you know, Xerox.  And if

6   Xerox submits a proof of claim that you're not seeking

7   protection for those folks.

8           MS. VANLARE:  That's exactly right, Your Honor.

9   And I think in our schedules, somebody can correct me, but I

10  don't believe we actually redacted vendors.  So we think of

11  those folks as vendors because we don't think the same kinds

12  of issues apply as they do to the lenders.

13          THE COURT:  Right.  So really, the category here

14  is lenders/customers.

15          MS. VANLARE:  Yes.  Yes.

16          THE COURT:  All right.  All right.

17          MS. VANLARE:  And just to -- you know, in terms of

18  -- it's -- they're institutional lenders, they're individual

19  lenders.  Of the individual lenders, some are accredited.

20  Some are not.  And I'm not sure -- I'm actually not sure

21  which -- you know, whether somebody is a creditor or not.  I

22  would say these risks, for different reasons, are just as

23  important whether or not you're accredited or not.

24          THE COURT:  All right.

25          MS. VANLARE:  But just to clarify the full scope

1      of the lenders.

2                  THE COURT:  All right.  Thank you very much.

3      Anything else, Counsel?

4                  MS. VANLARE:  No, Your Honor.  Thank you.

5                  THE COURT:  All right.  So anyone else who wants

6      to speak in support of the requested relief?

7                  MR. PESCE:  Thank you, Your Honor.  Gregory Pesce,

8      White & Case, on behalf of the official Committee.

9                  We've candidly probably killed a lot of trees or

10     computer memory sticks with this issue today, so I will try

11     to keep this very brief.

12                 When -- as has been noted, when the Debtor filed

13     the motion originally, the Committee hadn't yet been formed.

14     After the Committee was formed and after counsel was hired,

15     this amidst all of the very difficult issues that we had in

16     the case was identified to us by the Committee and the

17     broader community of Genesis users as an issue of paramount

18     concern that needed to be addressed.

19                 And as you heard from Mr. Renzi today, there was

20     an outflowing of commentary and concern from the user base

21     when we filed our motion, and then we had a town hall where

22     it really was just overflowing with fear and concern from

23     these aren't Voyager users, these aren't Celsius users,

24     these aren't FTX users, these are Genesis users.

25                 So these are people that actually use the platform

1   and the other Genesis-affiliated platforms and felt a

2   significant concern.  In light of all of that, we spoke to

3   the Debtors, and we were pleased that they have adopted our

4   concerns in this regard, and that there was a course

5   correction of sorts to get us to where we are today.

6           Just briefly on the merits, the -- first and

7   foremost, Section 107(b) covers confidential, sensitive

8   commercial information.  There's been a lot of talk today

9   about 107(c) and who's an individual that's covered, and

10  when does it apply in other circumstances.  First and

11  foremost, though, under 107(b), you heard from Mr. Renzi who

12  is running the sale process in the two competitor crypto

13  businesses about the importance of keeping this information

14  confidential.  You heard from the Debtor's witness about the

15  need to keep the information confidential so that we don't

16  dissipate the value of this in part of the sale process, or

17  as what the Creditors get in a reorganization scenario.

18  There was no question that this has -- this is very

19  important information and is needed to preserve this

20  important asset for those processes.

21          Focusing just on account holder recoveries and the

22  value of the platform, though, would obscure what is also a

23  very important issue of the personal circumstances of

24  Genesis' users, and particularly the individual users.  You

25  heard from Mr. Renzi today recounting the true fear and

Page 90

1   concern that members of our Committee have and have been

2   related to them by others, as well as it was relayed during

3   this town hall meeting that we had to explain this concept

4   to people -- to all of the users, both here and abroad what

5   was happening.

6           There is a real demonstrated risk to the

7   individual users.  And then as to the institutions,

8   institutional Creditors, of course, are not specifically

9   covered by 107(c).  However, at bottom institutions, like

10  any entity created by law, act through individuals.  And the

11  individuals associated with the institutional Creditors are

12  readily available as Mr. Renzi testified today to being

13  found.  And those are the individuals that control the keys,

14  that control the crypto, that control the relationships

15  between those institutional Creditors and Genesis.

16          THE COURT:  So let me ask you a question about

17  that.  Obviously if you have a business model and you're an

18  institution, you are often -- maybe perhaps not uniformly,

19  but you're certainly often in the business of letting the

20  world know you're out there --

21          MR. PESCE:  Mm-hmm.

22          THE COURT:  -- so that you can conduct business.

23  And so how do I understand that vis-a-vis the institutional

24  Creditors?  So I get the individuals.  Individuals don't

25  necessarily put themselves out there.  When they invest,

Page 91

 1    they want to keep their portfolios separate from what's out

 2    there in the world, but these are companies.  And what am I

 3    -- how do I understand that intersection for purposes of

 4    107(c)?

 5              MR. PESCE:  Right.  So as you noted, 107(c) has

 6    its own issues.  I'll just, you know, reamplify that under

 7    -- we don't have to get to 107(c) given the 107(b) angle.

 8              THE COURT:  No, I --

 9              MR. PESCE:  Yeah.

10              THE COURT:  You had me --

11              MR. PESCE:  Yeah.

12              THE COURT:  -- at hello, and then we're going to

13    look at 107(b) as well.  And secondly, I don't think that

14    the statute in the current world we live in is ideal.

15              MR. PESCE:  Sure.

16              THE COURT:  I'll leave it that way.

17              MR. PESCE:  So it -- institutional Creditors in

18    this case are -- some are true businesses like large

19    investing enterprises that, through one reason or another,

20    found themselves involved with Genesis.  Many of the so-

21    called institutional Creditors, though, are really just

22    single-member or two-person LLCs or similar types of legal

23    entities that exist outside of the United States that were

24    formed for purposes of structuring personal investments.

25              So why they're an institution, it's kind of an

1    institution in name only.  They're really an individual or a

2    family just sort of structuring their investments that way.

3    As to -- you know, but whether you're a small institution or

4    a big institution, and we have a few big institutions, you

5    know, on our Committee that have spoken to us quite a bit

6    about their concerns in this regard, they -- you know, the

7    big institutions of course put their names out there to get

8    investors and to get customers, and then those investments

9    were sort of, you know, reinvested in a way in Genesis.

10           You know, the concern that their employees would

11   be threatened or harmed or held hostage or, you know, held

12   up to get access to the keys or to the crypto that those

13   organizations may control really didn't exist when, you

14   know, it was business as usual.  And Genesis was able to

15   satisfy its debts and its business relationships with those

16   institutional Creditors.  To say nothing of now when, you

17   know, as a matter of law, they literally cannot do business

18   with them due to the pendency of the automatic stay.

19           So that in turn has led to -- that in turn I think

20   helps illustrate the need for this as to the institutional

21   creditors as well, which is they're dealing with a situation

22   where their personnel are at risk due to their own

23   distraught or disappointed customers looking for a way to

24   get their money out of those institutional Creditors, but

25   they can't because Genesis is holding their assets.

Page 93

1                    THE COURT:  But those customers know who they are

2      already, don't they?  I mean, right?  So I don't know that

3      we're -- we'd be heightening the risk there.  I guess I'm a

4      little confused.  Certainly Mr. Zipes' questions had the --

5      one or two of them had the implication that was different

6      than yours, which is because they can't do business, there's

7      no real risk now of anybody getting any access of any

8      trades, and you can't -- your accounts are frozen.

9                    So I guess I'm just struggling if -- why not being

10     able to conduct business as usual makes this worse than it

11     would be otherwise.  Because the sense I got from the

12     various information about threats --

13                   MR. PESCE:  Yeah.

14                   THE COURT:  -- seem to basically be targeted to,

15     well, we know it's a -- it's like diamonds in the sense of

16     it's untraceable --

17                   MR. PESCE:  Yeah.

18                   THE COURT:  -- it's an asset that can be

19     converted.  And then once you get it --

20                   MR. PESCE:  Yeah.

21                   THE COURT:  -- you get it, and so once you know

22     that the individuals -- for the individuals that these folks

23     are investing in this --

24                   MR. PESCE:  Right.

25                   THE COURT:  -- that makes you a target.  But for

1    the -- I don't know why the current status quo as opposed to

2    six months ago or eight months ago --

3              MR. PESCE:  Yeah.

4              THE COURT:  -- would be any different.  So am I --

5    what am I missing?

6              MR. PESCE:  Yeah.  Let me -- I'll just give you an

7    example from a member of, you know, the Creditors Committee

8    that was shared with me, and I won't share the specific

9    name.  But you know, they have their own customers, and

10   those customers were effectively unable to withdraw their

11   funds from that organization and -- because the money was

12   tied up there.  And they, you know, said to me, look, we're

13   really concerned that when we tell them the organization

14   can't give it, that people might find people associated with

15   the institution and say -- and try to use that as a back

16   door way to coerce them to get it.

17             THE COURT:  But they already know that

18   information, right?  In that example, those folks -- there

19   may be a --

20             MR. PESCE:  Sure.

21             THE COURT:  -- serious threat, right?

22             MR. PESCE:  Yeah.

23             THE COURT:  Again, I'm not -- there certainly

24   seems to be a lot of literature about all this from

25   institutions in the executive branch, but -- and I don't --

1    I'm just trying to figure out whether we're exacerbating a

2    problem.  And --

3              MR. PESCE:  Yeah.

4              THE COURT:  -- again, it seems to be a problem,

5    but I don't know that for the institutions that are in that

6    category that we're making it any worse.

7              MR. PESCE:  Yeah.

8              THE COURT:  I might be making it worse by being

9    the bankruptcy judge writing -- presiding over a case where

10   there's an automatic stay, but I don't know that the --

11             MR. PESCE:  Yeah.

12             THE COURT:  -- release of the name would change

13   the calculus.

14             MR. PESCE:  I think the predominant issue with the

15   institutional Creditors has to be the 107(b) angle.  I think

16   that as to the 107(c), we want to ensure that a bad

17   situation does not get worse and that we try to mitigate the

18   access to the institutional Creditor information so that it

19   doesn't lead to people taking matters into their own hands

20   and to individuals or to employees associated with those

21   institutional Creditors.

22             THE COURT:  All right.

23             MR. PESCE:  So Mr. Renzi, like I said, you know,

24   is running these processes for two competitors.  He's

25   overseeing -- or he's working to -- in collaboration with

Page 96

1    Moelis on this in this case and has been involved with

2    basically every one of these and presented very competent

3    testimony in that regard.  We think that on the merits we

4    are already there.

5            Let me speak briefly, though, on a couple of what

6    I think are the major issues that have come out in the

7    questioning and in the briefing here.  I think Your Honor

8    and then the U.S. Trustee definitely hit on an important

9    question, which is if the relief granted here or if the

10   relief requested here is granted, well, where does it end?

11   Is this just a slippery slope?

12           And you know, I think you have to look at the

13   nature of this business, which is in itself unique.  Nine

14   months ago there wasn't a cryptocurrency bankruptcy, and

15   today literally almost the entire industry has been

16   subjected to filing for bankruptcy or being large Creditors

17   in this bankruptcy.  But taking a step back here, the assets

18   that are subject to these bankruptcy proceedings are very

19   unique.

20           As Mr. Renzi noted, we have your -- the motto is

21   when you have the keys, you have the coins.  Crypto is

22   fundamentally a bearer asset.  So when you hold the key or

23   the account information to get the crypto, you effectively

24   can get the crypto.  This isn't like some of the privacy

25   issues that have come up in the district recently involving,

1    you know, supermarket coupons or airline tickets or other

2    kinds of goods, which could either be canceled through

3    computer systems or are of, you know, kind of trivial

4    liquidation value.

5            These are bearer assets that in and of themselves

6    have value as bearer assets.  If you steal someone's, you

7    know, bearer bonds back in the day, it wasn't really the

8    face value of the bond that was, you know, important, it was

9    what you could present it for redemption.  This is in the

10   same way.

11           Second, because it is a bearer asset, the crypto

12   ecosystem, for better or worse, has been susceptible to bad

13   acts by criminal elements, you know, organized crime, and

14   confidence schemes.  On a personal note, my entire family

15   inundated me this morning with the clips from John Oliver's

16   show last night highlighting just the -- one of the defining

17   aspects of the crypto industry is just the overlap and the

18   extensive intersection between fraud, misconduct, and

19   criminality that affects the ecosystem.  And that goes to

20   people using it as a way to perpetrate crimes.

21           And then third, you know, you have a bearer asset.

22   You have an industry that's susceptible to this type of

23   criminal manipulation.  And third, you have not speculation,

24   but just literally in other bankruptcy cases in this

25   district extensive evidence of when the names get out there,

Page 98

1      people start to have bad things happen to them.

2              So you know, I'm involved in the Celsius

3      bankruptcy as counsel for the Creditors Committee.  There we

4      respectfully disagree with Judge Glenn's decision in that

5      case, but it's a useful test case for what you have here.

6      There are no notices of phishing attempts in BlockFi and in

7      Voyager, but in Celsius you have rampant notices of

8      phishing, involvement by the FBI and other law enforcement

9      as a result of the disclosure of the customer names.  And

10     that's, we don't think, a coincidence.  It is an obvious

11     risk of what happens when this relief is not granted.

12             So what is the limit?  There is a clear limit that

13     could be applied here.  When you have a bearer asset that's

14     industry susceptible to this type of -- these types of

15     issues, I'm not sure of one outside of crypto, but in crypto

16     itself that is sort of the example that you have.

17             The -- next, there was much made of the accredited

18     investors.  I think as Ms. VanLare said, you -- the --

19     whether you're an accredited investor or a non-accredited

20     investor, you know, that's -- you were signing a form

21     document effectively to make a loan or get property from

22     Genesis.  But whether someone is an accredited investor or

23     identifies with an accredited investor, that doesn't mean

24     that the person is not entitled to be free from physical or

25     financial harm at the hands of criminals that are trying to

Page 99

1    take over and abuse this type of technology.

2            The privacy policy, you know, I think we did a lot

3    of discussion about that, but just suffice it to say the

4    privacy policy had exceptions for selling assets or

5    transferring to other entities within the Genesis complex.

6    But because there is one exception to -- for a particular

7    use, that doesn't mean it's a back door to just releasing

8    the information for any reason.

9            In fact, as it came out in the testimony, that is

10   not -- that is actually what it says is not the case.  The

11   information's not being released just for any purpose, just

12   for those specific purposes.

13           And then finally, you know, just building on sort

14   of a comment you made a couple of minutes ago and that kind

15   of goes throughout the U.S. Trustee's objection, you know,

16   is an amendment needed to 107?  Is an amendment prudent?

17   And then what is the overlay of foreign law?  It may be

18   prudent for a lot of reasons to clarify 107 given the nature

19   of society and the economy we live in, but we don't think

20   that what we're asking for today is outside the bounds of

21   it.

22           Like I said, under 107(b), sensitive commercial

23   information that should be redacted just like other

24   competitive information, whether it's DIP fees or customer

25   names or other things like that, these lenders are the

1    business of Genesis, and their names and information are

2    particularly important.  So we don't think an amendment is

3    necessary despite what has been suggested.

4             And then as to foreign law, like was talked about

5    a few minutes ago, we don't think that is dispositive on the

6    issue.  I think it is a useful data point to understand some

7    of the issues, but you know, we are, to be clear, not

8    hanging our hat that what a bureaucrat in Brussels said

9    applies in the EU dictates the outcome here.  We think the

10   outcome here is dictated by the U.S. Bankruptcy Code and not

11   what happened over in -- whether it's in Brussels or some

12   other foreign capital.

13            So with that, we urge the Court to grant our

14   motions, and I thank you for your time today.

15            THE COURT:  All right.  Thank you very much.

16   Anything from the Ad Hoc Group?

17            MR. ROSEN:  Thank you very much, Your Honor.

18   Brian Rosen, Proskauer Rosen on behalf of the Ad Hoc Group.

19   Your Honor, as you are aware, the Ad Hoc Group represents

20   over 75 Creditors holding over $2.1 billion of pre-petition

21   date value claims against the Debtors, and this comprises

22   over two-thirds of the top 50 Creditors in the case.  And

23   Your Honor, there's been a lot of discussion about the

24   master loan agreements.

25            And just for the record, all of our parties are

Page 101

1    parties to those respective master loan agreements.  They

2    all executed them.  And while there are term sheets that are

3    attached to those master loan agreements, which go through

4    the details of their respective loans to GGC, they are all

5    parties to the master loan agreement, which have the

6    confidentiality provisions that you had been alluding to

7    before.

8            And Your Honor, as part of that in the discussion

9    about accredited investors, it is our understanding that to

10   qualify as one of the Genesis exclusive lenders, Creditors

11   had to provide proof of over $10 million in investible

12   assets and make a minimum loans of either 100 BTC, 1,000

13   Ethereum, or 2 million in USD or stable coin loans to

14   Genesis.  So Your Honor, these are significantly high net

15   worth individuals or, using what everyone has been talking

16   already, institutions.

17           But in that regard, Your Honor, and I do agree

18   with both counsel to the UCC and to the Debtors,

19   institutions in this instance are maybe not the institutions

20   that one would normally think about as institutional

21   lenders.  Rather, as Mr. Pesce went through, Your Honor,

22   they are constructs done for the purposes of making loans,

23   but they are really very, very small entities.  Sometimes

24   only person, sometimes a family office, Your Honor, but the

25   disclosure of that information of the institutional name is

1    tantamount to disclosure of the individuals themselves.

2              I have always prided myself on not repeating what

3    a lot of people have said before me, Your Honor, so I'm

4    going to keep to my own mandate here.  But it is our point

5    that 107(c) does apply to both the institutional people as

6    well as the individual Creditors.

7              Your Honor made a comment both just today and at a

8    previous hearing, and I want to make sure I state it

9    accurately, about 107(c), and I think your words were at the

10   first-day hearing that the reading of the rule is "be a bit

11   sort out of date", and that is our perspective here, Your

12   Honor.  We believe that all of the parties here should be

13   entitled to protection.  Their names, their addresses, their

14   information should not be disclosed.

15             There have been some discussions already, Your

16   Honor, about what has happened to people, the risks of

17   random acts of violence against them, seizures, kidnappings,

18   etcetera.  We will tell you, Your Honor, that one of our

19   clients had his house stoned as a result of the disclosure

20   initially of information associated with this case.  Windows

21   broken and things of that sort, Your Honor.

22             We believe that, lastly, there was one comment

23   made or an effort made by Mr. Zipes to talk about the non-

24   ability to withdraw from the GGC estate.  Your Honor, just

25   by the fact of what I noted earlier about the size of the

1    people who are available or capable of being lenders to GGC,

2    they do have financial worth that might not be solely on the

3    Genesis platform.  It might be elsewhere, Your Honor.

4            And the disclosure of those names, those -- that

5    information would make them susceptible to the risk that may

6    not be available in the Genesis case, but might be available

7    to them as a whole; the taking of the keys, the extracting

8    from their wallets if you will, Your Honor.  So Your Honor,

9    we think the importance or the -- it is irrelevant.  Let me

10   put it that way, Your Honor, specifically whether or not

11   people can take assets out of Genesis.  It doesn't really go

12   to the fact that they could -- their other assets could be

13   gone to through the disclosure of the information about

14   them.

15           With that, Your Honor, we would support, as we did

16   in our joinder, the motions of the Debtor and the UCC, Your

17   Honor.  Thank you.

18           THE COURT:  All right.  Thank you very much.  Let

19   me hear from the United States Trustee's Office.

20           MR. ZIPES:  Your Honor, it's been a long day.

21   It's an important issue, and I know how much care this Court

22   gives on important issues.  And I'll just state upfront that

23   I don't think you would consider anything other 107 as it's

24   written, notwithstanding personal comments on it, and I'm --

25           THE COURT:  No, I do not -- that is not my job

1   description to write laws, and we apply what Congress has

2   given us as does your office.  So I realize that your

3   office's arguments are shaped by the law you have in front

4   of you.  And you, like me, do not get to choose the terms of

5   debate in that way.

6         MR. ZIPES:  And Your Honor, again, in that regard,

7   I -- 107(a), Federal Rules of Bankruptcy Procedure 1007, and

8   the General Rule M399 all point in the direction of full

9   disclosure absent exceptions, which I think the parties are

10  struggling with today.  But Your Honor, I just want to go

11  over the facts because I think the facts will dictate this

12  Court's analysis.

13        And the facts are that -- I think we can state

14  there's a generalized fear by customers and Creditors that

15  their information will be misused, but there's nothing

16  specific on the record in this case about --

17        THE COURT:  Well, I think you have to be careful

18  with that.  I know that your office said early on we haven't

19  heard from Creditors, and we don't really know how they feel

20  about it.  I think it's pretty clear we know how they feel

21  about it.  That doesn't decide the issue, though, right?

22  But I think there certainly is evidence.  I feel like I'm

23  back arguing an immigration appeal in front of the Second

24  Circuit in a prior life where you're looking at Country

25  Reports about what does and doesn't happen.

Page 105

1          Because we have -- I mean, FTX, there was just a

2     declaration filed by somebody who I think was formerly in

3     the Secret Service talking about that person's take on the

4     security concerns relating to it.  And certainly, there's a

5     whole marshaling of all of those kinds of issues in the

6     ombudsman's report in the Celsius case about what to protect

7     or not to protect.  So I think we certainly -- the question

8     is what to do with it.

9          MR. ZIPES:  Well, so, Your Honor, I just wanted to

10    just complete my thought in that regard and acknowledge that

11    there is a generalized fear out there, but also just to

12    point out that the record does reflect that there are

13    Creditors in this case that have allowed their names and

14    addresses to be disclosed.  And although you wouldn't hear

15    that -- we're focusing on evidence in this matter, and there

16    -- I guess that generalized fear is actual disclosures with

17    respect to --

18          THE COURT:  Well, so we'll have a handful of folks

19    who've done that, but your office hasn't, and there are lots

20    of good reasons.  Maybe you haven't responded to two of the

21    central bits of evidence.  One is the declarations from the

22    financial advisors by the -- of the Debtors and the

23    Committee saying that this is valuable commercial

24    information, so putting aside the privacy issues.

25          And two saying that attaching all the specific

1    evidence of various things from the FBI and instances in

2    light of the bearer instruments.  I mean, it does pose the

3    question, right?  We're not here at the bankruptcy court to

4    tell people how they're supposed to run their business,

5    right?  So you could look at this and say that this is not

6    you've subjected yourself to these risks, you've done this,

7    that, and the other thing by buying crypto, and you're doing

8    -- that's not what we're here for, right?

9           I'm not here to judge that.  We take the business

10   as the business is.  And so considering crypto as an

11   industry, there certainly is a lot out there.  And your

12   office doesn't really grapple with that.  There may be

13   nothing for your office to grapple with or to say on that,

14   but it's not -- I mean, it's not just the Creditors saying

15   it.  It's the FBI.  It's all the things in the Ombudsman

16   Report that go through a whole host of concerns that clearly

17   are real.  Not everything that is a real concern is

18   cognizable for getting relief from this court.

19           I recognize that's a different argument, though.

20   So to the extent you're saying, well, it's just the

21   customers, it's not. I don't know what to do with it yet.

22           MR. ZIPES:  Okay.

23           THE COURT:  But so what do you want me to do with

24   it is my question.

25           MR. ZIPES:  So Your Honor, again, we're dealing

1    within the statutory -- the statutes here.  And we work out

2    it in part by Celsius in that decision.  I know the other

3    parties in this case don't necessarily like that decision.

4            And I'll note with respect to the phishing

5    notices, which are being put on in that case, that the

6    record does reflect in that case Judge Glenn, Chief Judge

7    Glenn has not changed his analysis in that regard or parties

8    --

9            THE COURT:  So do you think I ignore that, that

10   those don't constitute a risk of identity theft for unlawful

11   injury?

12           MR. ZIPES:  Well, Your Honor, I think there's

13   always a risk of -- it's -- as a generalized statement,

14   there's always a risk of fraud in all cases.  I could think

15   of completely different industries that have filed for

16   bankruptcy with completely different risks to individuals,

17   not high-worth individuals.  There's cases involving

18   mortgages, Debtors that have sold mortgages to impoverished

19   people who didn't necessarily fill out the paperwork

20   properly and have been -- they've been subjected to

21   disclosures in their bankruptcy cases as well.  So we're

22   focusing --

23           THE COURT:  So your view is that if there is a

24   risk out there, based on the record here, you think it's an

25   acceptable risk?

Page 108

1          MR. ZIPES:  I -- I'm not sure if I'm -- I'm sorry,

2     Your Honor.

3          THE COURT:  Well, so the idea that the statute

4     says risk of identity theft or unlawful injury, we only

5     considered the applications that are made to us.  And you

6     saying that the statute should be interpreted is a way of

7     saying it's an acceptable risk of injury.

8          MR. ZIPES:  No, it's -- the statute has the word

9     "undue" in it, so --

10          THE COURT:  Well, but that's -- so you want to say

11     undue, I say acceptable.  It's the same thing as a qualifier

12     to say that there's a certain amount of risk in walking

13     around the planet.  There's a certain amount of risk in this

14     industry, and therefore it's not an undue risk in your view.

15          MR. ZIPES:  Well, Your Honor, I don't know exactly

16     how to respond to a statement that people are in fear of

17     their name coming up.

18          THE COURT:  But again, you keep saying a statement

19     by people that they're in fear.  So I'm -- I -- listen, I

20     really think --

21          MR. ZIPES:  Okay.

22          THE COURT:  -- at this point I have an unrebutted

23     evidentiary record as to the commercial information.

24     There's nothing from your office nor was there anything in

25     cross-examination that rebutted the evidence presented by

1    two credible witnesses that this is -- these are customer

2    lists that are property of the Debtor, when they're made

3    public they will lose their value, whether it's in a going

4    concern sale or in an ongoing business.  So I --

5              MR. ZIPES:  I don't -- Your Honor, I'm sorry.

6              THE COURT:  Go ahead.

7              MR. ZIPES:  I don't think --

8              THE COURT:  I'm trying not to go down a particular

9    rabbit hole --

10             MR. ZIPES:  No.

11             THE COURT:  -- I guess is the question.

12             MR. ZIPES:  And Your Honor, I'm trying not to do

13   that as well, but -- and I might not have been clear on what

14   I'm saying.  So every -- just backing up, every bankruptcy

15   case has a Creditor list.  Those Creditors could be

16   suppliers.  Those suppliers could give valuable information

17   to third parties, and I think that's a generic statement

18   that could be made about every large Chapter 11 case.

19             THE COURT:  But what evidence did you provide?

20   You didn't even cross-examine them on that question.

21             MR. ZIPES:  Well, Your Honor, the -- I don't know

22   that there's anything controversial about saying that a

23   customer list is --

24             THE COURT:  But if it's true that it can be sold

25   in bankruptcy, doesn't it fit squarely within (b)?

Page 110

1               MR. ZIPES:  Not -- Your Honor, that would mean

2      that any information in the Chapter 11 case --

3               THE COURT:  No, it would mean any --

4               MR. ZIPES:  -- falls under Chapter --

5               THE COURT:  -- information that can be monetized,

6      which is different than any information.  If it's not

7      valuable -- and again, your office had no cross-examination

8      on that point in terms of whether that view is speculative,

9      how it compared with other cases, but it -- the testimony is

10     that that information's valuable.  The testimony is that

11     that information has been treated as valuable in other

12     crypto cases because essentially it's the client list, and

13     that these were people who have a relationship with this

14     Debtor, that if you're going to sell the Debtor, that you've

15     essentially, through time and effort, culled down a list of

16     individuals and institutions who want to do this kind of

17     business who have significant net worth, and that that's a

18     very valuable thing.

19               That's not a -- that's a very traditional answer

20     to, you know, what is probably not a traditional problem

21     when viewed at from other ways.  We use a privacy lens, but

22     that's sort of a traditional bankruptcy question.  If they

23     couldn't sell it and nobody was trying to monetize it, or it

24     wasn't monetized in other cases, then -- you know, but

25     again, I don't have a single bit of evidence or questions

Page 111

1    directed to that to undermine the testimony and conclusions

2    made by these witnesses.  So it's essentially unrebutted

3    testimony.

4            MR. ZIPES:  Your Honor, so the cases including

5    Food Management citing to Orion require extraordinary

6    circumstances in telling me to obtain the protection.  I

7    don't think it's controversial in this case or any other

8    case that customer lists, or supplier lists for that matter

9    generally are -- if they're disclosed --

10           THE COURT:  But I don't know that my answer would

11   be any different if we came in with Home Depot, Lowes, some

12   other company that did tangible goods and services who said

13   I have -- we have cultivated over time our lead contractors

14   program of large construction firms across the country for

15   whom we are the exclusive supplier.  And we don't want our

16   customer lists posted.  We're going to sell it when we sell

17   the name.  I don't -- why would it be any different than

18   that?  And would your office be objecting in that context?

19           MR. ZIPES:  Well, if they're on the Creditor list,

20   then yes, I think we would be.

21           THE COURT:  All right.

22           MR. ZIPES:  But Your Honor, I take your point.  I

23   understand the tenor of your comments.  I would just -- one

24   of the reasons why you didn't hear cross-examination, Your

25   Honor, I think is it's pretty obvious that when a Debtor is

1    making an argument that a list is publicized, it could --

2    the -- it could deplete the value or reduce the value of the

3    Debtor.  That -- that's kind of an unrebuttable statement at

4    that point, and it's --

5              THE COURT:  I disagree.  There is cross-

6    examination to be had on that to ask people about their

7    prior cases, the prior instances, what exactly do you think

8    it would sell for.  I think there's a whole host of cross-

9    examination.  Whether it's successful or not depends on the

10   facts and circumstances.

11             MR. ZIPES:  So --

12             THE COURT:  But I didn't get any questions about

13   it, so it's unrebutted.

14             MR. ZIPES:  Well, Your Honor, we have on the

15   records the Celsius, which is part of the amended -- we're

16   referring to Celsius as part of it.  When it's convenient,

17   it -- we're talking about Celsius under the 107(c) context,

18   but the Celsius case is a crypto case.  And those names are

19   out there, and there's no allegations by the --

20             THE COURT:  I know, but there are other judges

21   who've done the opposite, so --

22             MR. ZIPES:  No, Your Honor.  I understand.

23             THE COURT:  -- I have to decide --

24             MR. ZIPES:  I understand.

25             THE COURT:  -- under the facts and circumstances.

Page 113

1    And again, I'm a trial judge, so I look at the evidence I

2    have.  There could be -- I understand your office's concern

3    that this is a case that will set a precedent that will then

4    be widely invoked because people don't like their

5    information shared.  I have two responses to that.  One is I

6    think that reflects the changing facts on the ground dealing

7    with the internet and people's information that gets out

8    there and how it's used.  That is not really reflected in

9    the statute, that I've got the statute that I have.

10            But the second is that I just look at the evidence

11   in the case that I have.  And if somebody can say this is a

12   valuable asset, then it's -- or it can be used to poach

13   customers, strike different deals, undermine the Debtors'

14   economic position, it's no different than an aircraft lease

15   in American Airlines when you settle an aircraft lease issue

16   and you don't want the terms out because it's going to be

17   damaging to your business.

18            MR. ZIPES:  Well, but, Your Honor, that's actually

19   -- if we're talking about other cases, that is a good

20   example where all the information is out there except for

21   the bottom line settlement.  And to my knowledge, we -- when

22   those settlements come through, they're -- the only thing

23   that's missing in those settlements that no one has an issue

24   with is the underlying dollar amount.  They -- the names of

25   the parties and everything else is not a part of those

Page 114

1    redactions.

2         Your Honor, I hear you, and I'm -- and I -- if

3    your focus is on 107(b), I mean, I can only state that the

4    evidence in this particular case is that there's statements

5    that this could devalue the estate.  But --

6         THE COURT:  Well, I think there's also statements

7    to say that this asset is being marketed, that it's part of

8    the marketing.  There's statements that say that this asset,

9    they're worried that if the information is disclosed,

10   there's no reason that competitors wouldn't try to poach

11   those customers leaving any business to be conveyed to be

12   less valuable.

13        MR. ZIPES:  So --

14        THE COURT:  There's statements from the witness

15   box here today saying that when you compare -- that somebody

16   who's dealt with other crypto cases, that this is

17   information that is being essentially marketed as an asset

18   in those cases.  So this is not a one off in a crypto

19   circumstance.  So there are a couple of things there that,

20   again, are not rebutted.

21        MR. ZIPES:  And let me -- I respectfully disagree

22   with that statement.  And I'll point to a specific example,

23   Your Honor, of -- the Debtor came in, and I think this is

24   evidence and it's not rebutted.  The Debtor initially came

25   in with papers prepared by sophisticated counsel and

1    professionals aware that there was a sale process.  And this

2    was not a request of the Debtor at the beginning of this

3    case.

4          These are parties that are running the sale

5    process, and they made a decision at the beginning.  They

6    could've come in with a motion that asked for the sealing of

7    all this if they thought it was going to be a devastating

8    part of it.  I'm talking about 107(b), Your Honor, because

9    this is the --

10          THE COURT:  So you're telling me that for not

11   teeing up that issue on the first day that I should penalize

12   a Debtor who is no doubt going to hear on a first day what

13   do we absolutely, positively have to do.  And you know your

14   office would object and say that is not a first-day issue,

15   Your Honor.  I am 1,000 percent positive as are you that

16   your office would make that position and say that we've got

17   to have a discussion.  And you have had a discussion, and I

18   appreciate you've had a discussion.  And I can't in my job

19   -- it would be a terrible idea to penalize people for having

20   discussions.

21          MR. ZIPES:  Your Honor, I'm not making that point

22   about the first day at all.  I'm saying that the Debtor

23   could've -- schedules were not due on the first day, so it

24   wasn't a first-day issue.  But what the Debtor was asking

25   for in the first day was a redaction of certain aspects of

Page 116

1    the Creditors' information, but not all this information.

2    So it -- and you're right, Your Honor.  That would've been a

3    discussion to be had with the Creditor's Committee and other

4    parties.  But the point here is that you're looking for

5    evidence within this case, and --

6            THE COURT:  Well, but it is true as night follows

7    day that debtors come in, they have various views on the

8    first day.  They talk to a committee, and the committee has

9    different views.

10           MR. ZIPES:  Yeah, but --

11           THE COURT:  And then the Committee and the debtors

12   have a conversation.  And we all know this is how this

13   works.  That doesn't mean that I agree with the Committee.

14   And when we had discussions about institutions in the

15   context of 107(c), as you can tell I have real concerns that

16   that's a bridge too far.  But I'm not surprised that the

17   Debtors and the Committee would have a discussion.  And the

18   Committee is -- after all the people talking to the

19   customers, that's who they represent.

20           And so that doesn't surprise me.  It doesn't

21   offend me.  It doesn't create any collateral estoppel issue,

22   preclusion, res judicata, judicial estoppel position for

23   purposes of today.  It's just an evolving case, which is

24   what we all deal with.

25           Now, again, speaking of what we deal with, I

1    understand your office is dealing with 107 as written.  I

2    get it.  That's what I'm dealing with, but again, I'm -- so

3    107(b) though seems to present a traditional -- it's a

4    traditional statute 107.  It seems to present the

5    traditional response to this particular problem given the

6    evidence that I have.

7            MR. ZIPES:  Okay.  And Your Honor, I'll move on.

8    I just wanted to make the point that, dealing with the facts

9    in this particular case, and yes, the parties should not

10   necessarily be held to positions that as facts come in and

11   they learn about the case.  But I will note that there was

12   that motion filed, and the original request being asked of

13   the Debtor was not what is being asked for today.

14           THE COURT:  Right.

15           MR. ZIPES:  It's been expanded in that.  And --

16           THE COURT:  Well, I understand the additional ask

17   is -- was really to invoke 107, not particularly (c) for

18   purposes of the institutional investors.  And I think that's

19   probably the hardest argument for anyone to make.  I think

20   your papers point out challenges with that argument.  I

21   pointed out some challenges with that argument.  And what

22   the policy should be is not my job in terms of writing or

23   rewriting the laws of congress, but looking at the statute

24   at (c) doesn't -- I have trouble ping-ponging from the

25   institution will protect the individual, and that the

Page 118

1    individuals at risk simply will be identifying the

2    institution.  It's a hard argument to make based on the way

3    the statute's written.

4          MR. ZIPES:  So Your Honor, I know we're focusing

5    on two separate arguments in (b) and (c).  And I do think

6    there's, reading between the lines, there is an effort to

7    just try to find a way to block this information, whether it

8    comes under (b) or (c).  I think that that is -- there is an

9    effort being done to do that.

10         Your Honor, I just want to just very briefly if I

11   could go through the evidence.  And I know I've heard the

12   Court.  I'm not going to spend a lot of time on some of

13   these.  I just wanted to give the other evidence in this

14   case that the Creditors Committee Notice of Appointment did

15   have names, and it did have email addresses.  And my office

16   had asked for email addresses that could be created for this

17   case as a -- as an alternative.  That was something that my

18   office has thought about, and we thought it was appropriate.

19         As to the institutions, Your Honor, the

20   institutions are -- they typically have addresses and

21   they're typically part of the public record.  So Your Honor,

22   let me move onto other points as well.

23         THE COURT:  Well, but let me back up for that.

24         MR. ZIPES:  Yep.

25         THE COURT:  You're saying -- are you saying that

1    the argument is waived or merely that it's persuasive that

2    this isn't really a problem, the fact that these Creditors,

3    in signing up to be part of the Creditors' Committee, made

4    this information available?  Because certainly other people

5    have filed things, and nothing prevents parties from coming

6    forward and saying this might otherwise be entitled to

7    protection, but I'm -- I -- because I've agreed, for

8    example, to do this, I'm making -- I have to make myself

9    available.

10            MR. ZIPES:  And --

11            THE COURT:  So what is -- I just want to know your

12   precise legal argument.  Is it waiver or is it essentially

13   just a persuasive fact that this information in your view

14   isn't that really important?

15            MR. ZIPES:  I think it's, Your Honor, that parties

16   have agreed to release this information.  So it's not that

17   important if I'm understanding you correctly.  It's

18   important, but it's not important to the purposes of this

19   argument.  And also the claims, the other documents that

20   were filed, Your Honor, the transfer documents that were

21   filed by parties.

22            So you have a certain narrative that there's a

23   great deal of fear, Your Honor, and that's generalized, and

24   parties are saying that.  But there's also evidence.  We're

25   looking at evidence.  There's evidence that parties have in

1      this very case allowed their information to be used.

2                THE COURT:  So is there some source of authority

3      that you want me to rely upon for the level of risk involved

4      here?  So I ask because the evidence that I have from your

5      side on this issue is what you just stated that various

6      people have essentially allowed their information to be out

7      there?

8                On the other side, I have what's been submitted,

9      which includes even the Omnibus Report of Celsius, which

10     goes through a whole host of issues.  Putting aside privacy

11     law and considering privacy law in other jurisdictions in

12     California and overseas, but it has a section called U.S.

13     Assessment of Opportunities and Risk Through Digital Assets

14     that cites an Executive Report 14067 on ensuring responsible

15     development of digital assets.  And it goes on in various

16     detail to talk about issues, and I have similar things that

17     are admittedly, I wouldn't say anecdotal, but they're sort

18     of in this case this happened, in that case that happened,

19     or this person had this happen to them, all of which is bad,

20     but it's hard to quantify.

21               And so your view is that this is not an undue

22     risk.  But for purposes of assessing what is an undue risk

23     and how frequent -- I guess the question is how frequently

24     these things happen, what is it that you're citing to other

25     than these claims transfer notices and folks who allow their

1    information to be used for the UCC Notice of Appointment?

2              MR. ZIPES:  So Your Honor, I'm -- if we're talking

3    about 107(b) and the --

4              THE COURT:  No, I think we segued when we started

5    talking about --

6              MR. ZIPES:  Okay.

7              THE COURT:  -- risk and fear.

8              MR. ZIPES:  So Your Honor, I just -- just I have

9    to state part of your analysis mentions Celsius and other

10   cases.  And I don't know that that's a relevant part of the

11   analysis here, but --

12             THE COURT:  All right.  Then I'll just --

13             MR. ZIPES:  -- I understand because of --

14             THE COURT:  Mr. Zipes --

15             MR. ZIPES:  Yeah.

16             THE COURT:  -- I'm supposed to look at evidence.

17             MR. ZIPES:  Yeah.

18             THE COURT:  So you've drawn a conclusion --

19             MR. ZIPES:  Yeah.

20             THE COURT:  -- that this is not an undue risk.

21   And you've cited two things to me, folks who put stuff on

22   the docket.  I guess it's really one thing, two different

23   instances of it.  On the other hand, I have citations to

24   government reports.  I have citations to declarations about

25   the risks that have stemmed from owning crypto and being

Page 122

 1    identified as owning crypto because of the unique bearer

 2    nature of crypto, and also being identified as essentially a

 3    high-net-worth individual.  So I have evidence --

 4              MR. ZIPES:  So --

 5              THE COURT:  -- on that.  And the nature thing for

 6    a judge in my position to do I think is to say, well, how

 7    frequent is this problem?

 8              MR. ZIPES:  Right.

 9              THE COURT:  It's terrible.  We never want to say

10    we should --

11              MR. ZIPES:  Right.

12              THE COURT:  -- never be concerned about these

13    kinds of issues.  We also should be concerned.  But for

14    purposes of looking at (c), the question is about undue, and

15    that's what I don't think I have any citations.  But your

16    office --

17              MR. ZIPES:  So --

18              THE COURT:  -- is asking me to reach a conclusion

19    essentially this isn't a big enough problem.  But what have

20    you given me to allow me to make that conclusion?

21              MR. ZIPES:  So Your Honor, I believe the record is

22    clear in this case that notwithstanding these generalized

23    allegations that this -- that no one -- this Court hasn't

24    been approached.  There's been nothing on file that this has

25    actually happened in this case.  So --

1       THE COURT:  So that's the -- so your argument is a

2   legal standard that until something happens to an investor

3   or a customer in this case, I should not consider it --

4       MR. ZIPES:  No, Your Honor.

5       THE COURT:  -- a problem regardless of what law

6   enforcement officials or others who are testifying about

7   this.  So then what is it you want?  Again, I'm sorry to

8   give you a hard time --

9       MR. ZIPES:  No, I understand, Your Honor.  It's --

10      THE COURT:  -- about this, but I -- again, I know

11  you're interpreting -- you're applying the statute as

12  written, but so am I.  So what does undue risk constitute in

13  this case given the evidence I've been submitted?  Because

14  I've been submitted this on one hand, and I've been

15  submitted on the other hand essentially instances of people

16  making their identity known.  And that's what I have.  So

17  I'm -- I want to be very clear about what I have --

18      MR. ZIPES:  Okay.  So --

19      THE COURT:  -- or don't have in terms of the

20  evidentiary record.  And if you want to take a minute to

21  think about it, that's fine, but I want to be crystal clear

22  what my record is and what you're relying on.

23      MR. ZIPES:  So Your Honor, I'm not going to try to

24  dissuade you from your statements that there's evidence of

25  generalized fear in this case.  And that on my side I -- we

1   haven't produced something specifically in this case other

2   than the examples I gave, but Your Honor, I'll note that

3   this is just not the way 107 is normally done in bankruptcy

4   cases, and --

5           THE COURT:  But how are you supposed to --

6           MR. ZIPES:  But --

7           THE COURT:  -- do it in an instance like this?

8           MR. ZIPES:  So Your Honor, as I think we stated, I

9   allowed Debtors' counsel to state this, if there's a

10  specific instance of someone who is in legitimate fear of

11  their life or that that's something that should be brought

12  to the parties' attention, my office did receive letters,

13  which we forwarded onto the Committee and the Debtor, again

14  generalized people who are uncomfortable in this situation.

15  And there are various things the Debtor could do short of

16  redacting Creditor lists completely.  They can -- in Celsius

17  and other cases, they can have an email address where

18  parties in fear can write to this email address and get a

19  response.

20          My office takes these matters very seriously, as I

21  think Mr. Pesce would state in other cases where he has,

22  unfortunately, faced threats that my office is heavily

23  involved.  But Your Honor, I know that Your Honor is maybe

24  not struggling with this so much, but it is an issue that

25  will arise in other cases.  The evidence might not be two

Page 125

1    financial advisors getting on the stand, but it will be --

2    it'll be a group of people saying we feel that --

3            THE COURT:  Well, but --

4            MR. ZIPES:  -- our name is out there.

5            THE COURT:  -- I'll tell you if somebody comes in

6    with a generalized "I fear for my life", they're going to be

7    asked why.  And I --

8            MR. ZIPES:  Exactly, Your Honor.

9            THE COURT:  They're going to be asked for --

10           MR. ZIPES:  Exactly, Your Honor.

11           THE COURT:  -- documented instances of why that

12   situation --

13           MR. ZIPES:  Yeah.

14           THE COURT:  -- put somebody at risk.

15           MR. ZIPES:  So --

16           THE COURT:  But in response to that --

17           MR. ZIPES:  Yeah.

18           THE COURT:  -- comment at the last hearing,

19   parties came forward with some declarations that did that.

20   And again, I don't know how to assess the level of risk.

21   Everything in life is a risk.  Walking outside crossing a

22   crosswalk is a risk.  There are acceptable risks and undue

23   risks, and so that's my question to you is how to determine

24   that here.  And what I think I'm hearing you say is you're

25   not asking me to go down that road because you don't have a

Page 126

1    suggestion on that front, but you're talking about you think

2    in these cases that there should be other workarounds that

3    should be resorted to first when someone can identify it,

4    and this is a potential issue.

5           MR. ZIPES:  And Your Honor, I think you know that

6    my office does try to work out these issues.  This is the

7    first case to my knowledge in -- well, leaving aside Celsius

8    maybe, where this sort of blanket request is being made.

9    And there were a lot of discussions, and I think at a

10   certain point the parties just agreed that we need to get it

11   before the Court to make a final determination here.

12   Because we couldn't come up with that appropriate line.  But

13   I -- you can see --

14          THE COURT:  Well, what does someone creating an

15   email address where they can be contacted do for you if the

16   name or the address or something else is still attached to

17   that where someone can be identified?  Because certainly as

18   somebody who was the victim of many hacks in various

19   security checks that I went through in the government over

20   time, I have gotten one of those emails --

21          MR. ZIPES:  Yep.

22          THE COURT:  -- no doubt from a hack.  I don't

23   believe any of my SF50s or whatever forms I submitted

24   contain my email address.  It was found nonetheless, and

25   that doesn't seem to be a particularly difficult thing to do

Page 127

1    on the internet to connect data.  So if the -- if there's a

2    name attached with a new email address, it's going to be the

3    name that carries the day for purposes of connecting the

4    dots, isn't it?

5              MR. ZIPES:  Well, Your Honor, so we're moving --

6    and it's appropriate to move and discuss 107(b) and (c) at

7    the same time, but if this is a 107(b) issue --

8              THE COURT:  No, (b) is all about whether this

9    information is valuable to the --

10             MR. ZIPES:  No, no, and I --

11             THE COURT:  -- estate and the sale.

12             MR. ZIPES:  -- understand that, but I --

13             THE COURT:  Yep.

14             MR. ZIPES:  -- I -- we were talking about 107(b)

15   and --

16             THE COURT:  Well, let me ask you then.

17             MR. ZIPES:  -- so let --

18             THE COURT:  We'll close the door on that.

19   Anything else on (b) that you wanted to address?

20             MR. ZIPES:  Yes.  The one thing that I would say

21   about (b) is that the testimony today that was elicited

22   showed that what's being sold is not the mere name here.  So

23   there is a commercial value being sold that can't be

24   accessed by just looking at a name on a creditor's list.

25   There's a whole range of information, which by the way the

1    parties --

2              THE COURT:  Well, is that really right?  What's to

3    prevent somebody from looking on the internet to connect

4    that name?  And since emails don't cost anything, to send

5    out a blast email for everybody whose name is whatever it is

6    who fits the criteria that your AI search engine has

7    determined is appropriate to get a list of 100 of those

8    names -- email addresses and send something to them.  Which

9    is clearly what happened in Celsius.

10             MR. ZIPES:  But that's -- again, that's not a

11   commercial argument.  That's a --

12             THE COURT:  Well, it is if it means that you can

13   contact those folks to essentially poach those customers.

14             MR. ZIPES:  I'm just telling you, Your Honor, the

15   evidence here shows that what's being sold goes far beyond

16   the name of -- and that the value of that is not -- the name

17   is limited.

18             THE COURT:  So the fact that it's not just the

19   name, it's the other information means that the name is not

20   something worthy of protection for purposes of being in your

21   view.

22             MR. ZIPES:  Yes.  Yes, Your Honor.

23             THE COURT:  All right.

24             MR. ZIPES:  That's right.  So Your Honor, I don't

25   think I have a lot more, but I just wanted to review.  And

Page 129

1    Your Honor, I know that you're very familiar with Celsius

2    and the law, but 107 -- the analysis under Celsius was

3    107(c) regarding public disclosure of UK and citizens.  I --

4    Your Honor, at least it was probably under 107(c).  And

5    Judge Glenn found that you couldn't supersede bankruptcy law

6    with the --

7              THE COURT:  Well, I don't think anybody would

8    dispute that position.  I think Judge Garrity considered it

9    as a matter of international comedy in terms of considering

10   things.  And certainly, the Celsius privacy examiner, when

11   it's coming to determine what should and shouldn't be sold,

12   is looking at those, looking at, if I understand correctly,

13   the location of the Creditors and essentially what the nexus

14   of law is in terms of the population of Creditors and what

15   those laws say.

16             MR. ZIPES:  And Your Honor, I guess just my final

17   point again is looking at the Creditor body here, which I

18   think is also not disputed, these are parties that knowingly

19   went in.  They're sophisticated.  They went in knowing

20   risks.  And frankly, although you can't map out every single

21   risk, one risk when you're involved with -- in a -- as a

22   sophisticated Claimant in cases that -- or with a financial

23   institution is that that institution going into bankruptcy

24   or that information might be taken outside of your control.

25             And that does distinguish this case from some of

Page 130

```
 1    the other cases that were sort of blanket redactions were

 2    made in opioid and sex abuse type cases.  But that -- and

 3    these are no unsophisticated parties.  And Your Honor, you

 4    can actually say the opposite about them.  The reason we're

 5    here today and maybe not in some other cases is exactly

 6    because they know how to get these matters before this

 7    Court, and they're arguing generalized fear, Your Honor.

 8            That -- there was nothing on the record, and I'm

 9    acknowledging generalized fear, and it should be taken

10    seriously, Your Honor.  I'm not -- I don't think there's

11    anything -- any part of the record where it's not, but there

12    is 107.  And Your Honor, we try to apply -- be practical,

13    which I'm hearing a little frustration in your voice about

14    that as well.  But it's --

15            THE COURT:  Well, when I look at the Ombudsman

16    Report in Celsius, it takes a whole host of things into

17    consideration.  Location of the folks whose information

18    might be sold, what law applies, executive orders talking

19    about the protection of this information, and a whole host

20    of things that make me think we're doing a similar kind of

21    analysis, but we're doing it in a very sort of flat two-

22    dimensional way.  Whether it fits in the 107 box or not.

23            And so I think that highlights the tension between

24    different parts of the case and what people should be

25    thinking about and what -- again, 107 is not a particularly
```

Page 131

```
 1    nuanced statute that way, but it's frustrating because I

 2    don't have an Ombudsman's Report because I don't have a

 3    sale.  And we can't make it sort of a nuanced analysis of

 4    what should happen with these people's information in terms

 5    of being sold to a third party, which certainly seems

 6    relevant when we're thinking about what information should

 7    be just let out into the world.

 8            And so I don't -- I mention that -- I don't expect

 9    you to have an answer to that.  I don't have an answer to

10    that, but it does highlight the conundrum we're in, in terms

11    of the procedure and the posture we're in today versus where

12    we may be a few months from now.

13            MR. ZIPES:  And Your Honor, I completely agree

14    with you that it's -- you know, it's a difficult issue to

15    attack.  And the -- Your Honor, I want to just make two more

16    points about the privacy policy and whatever form it is.

17    One is that we heard testimony today that -- about the

18    parties understandings and what not.  The Court can just

19    read the language itself.

20            And I will note that if you were concerned about

21    your name getting out there, Your Honor, and you read this

22    privacy policy, you might have some follow-up questions.

23    There's no testimony about that.  And let me -- what I mean

24    by that is if we are relying on this privacy policy to sort

25    of get -- peg parties' expectations, you do have on Page 8
```

Page 132

1    of 22 -- and we heard Mr. Renzi explain -- give his

2    explanation for that.  I would leave it for the Court to

3    look at the language and the difference in the language

4    between the sale and the sharing of financial institutions.

5            I think the whole point here is parties were

6    expecting to benefit from the crypto ecosystem, and they

7    didn't want their names to get out there.  But Your Honor,

8    that's -- you could focus on the privacy policy and --

9            THE COURT:  But let me ask you about that.  I'm

10   not sure that that's even the relevant policy for purposes

11   of today --

12           MR. ZIPES:  Well --

13           THE COURT:  -- because that's essentially the

14   click-through agreement for accessing the website where,

15   when you become a customer, lender, whatever term we want to

16   use, that you end up exercising -- you enter into an

17   agreement, and it's then the subsequent agreement, the

18   Master Digital Asset Loan Agreement in Exhibit B, which has

19   its own privacy confidentiality provision at XI on Page 11

20   that talks about each party's agreement shall hold in

21   confidence all information obtained.

22           It does have exceptions, right?  It has the

23   exception you'd expect for -- to the extent required by any

24   law, regulation, or direction by a court of competent

25   jurisdiction or government agency regulatory authority with

1    jurisdiction.  And so it does have exceptions, but it would

2    seem that that's the policy I should be looking at.

3              MR. ZIPES:  Your Honor, I -- so to the extent

4    relevant, I think you should be looking at both of these

5    policies, but I -- to the extent there's any testimony that

6    anybody focused on this privacy policy at all when they were

7    giving their money or coins to the Debtor, I don't think

8    there's any testimony on that.

9              THE COURT:  Well, is there a dispute about the

10   fact that this Master -- let me make sure I have the name

11   properly identified here -- that this Master Digital Asset

12   Loan Agreement that's at Docket 156-2 that's Exhibit B to

13   the same declaration where the policy privacy notice that's

14   on the internet as Exhibit A, the representation, which I'm

15   taking as a proffer, is that that's what all these customers

16   and investors -- customers and lenders would enter into.

17             And that that therefore I have one of those for

18   everybody whose information is sought to be protected, and

19   that that, since that's a contract, would seem to supersede

20   the click-through agreement that somebody interacting with

21   the website, which is -- I mean, I've had those in other

22   trials, and they are what they are.  And if you buy software

23   that way, for example, and you hit the click-through

24   agreement, and there's no separate agreement, then it is

25   what it is.  But if you have a separate agreement like this

Page 134

1   as a lender/customer, that this would seem to be the

2   operative agreement.

3          MR. ZIPES:  Your Honor, I think there's a

4   subcategory that this does apply to.  A subcategory of

5   customers.  And I might have to defer to the Debtor in --

6          THE COURT:  Well, I asked the question whether

7   this applies to all the folks whose information is sought to

8   be protected, whether everybody would enter into one of

9   these agreements in Exhibit B, and I was told yes.  So I

10  don't consider there to be any factual dispute based on the

11  evidence I've been presented.  But --

12         MR. ZIPES:  Okay.

13         MR. PESCE:  Your Honor --

14         THE COURT:  -- if there is, I don't want to -- I

15  want to get it right.  So --

16         MR. ZIPES:  Well, I have something to say, but go

17  ahead.

18         MR. PESCE:  I don't mean to interrupt, but --

19         MR. ZIPES:  No, go ahead.  Go.

20         MR. PESCE:  -- just in the interest of making --

21         MR. ZIPES:  Yeah, go.

22         MR. PESCE:  -- sure that we have it right,

23  frankly, I'm just now realizing this.  Exhibit B applies to

24  Gemini lenders.

25         THE COURT:  Okay.

Page 135

1    MR. PESCE:  So Exhibit B applies to the subset of

2    lenders who signed up through the Gemini Earn Program.  I

3    just wanted to clarify that.

4    THE COURT:  All right.  So it's not everybody

5    whose information is sought to be protected here.

6    MR. ZIPES:  Subject to clarification from the

7    Debtors on that point, that's just how I'm reading the

8    document.

9    MR. PESCE:  Well, that was my understanding, but I

10   -- and that's why I turned to the Debtor, but they're --

11   THE COURT:  All right.  No, that's a fair -- it's

12   a fair point.  I want to understand when we're talking about

13   whose information is sought to be protected, whether each

14   one of them has signed a Master Digital Asset Loan Agreement

15   or whether some of them have signed the other agreement.

16   Because I have to figure out the significance of the

17   agreements and who they apply to.

18   MS. VANLARE:  So Your Honor, my understanding is

19   that -- so it's helpful to know this is for Gemini lenders,

20   but my understanding is that other -- basically anybody who

21   was a lender signed something very similar.  In other words,

22   signed a master loan agreement with confidentiality

23   provisions.

24   THE COURT:  All right.  So here's what I'm going

25   to do on that front.  I'm going to ask the Debtors to make a

1    submission, so I know what -- if it's the same as this

2    Master Digital Asset Loan Agreement, then it's the same.

3    It's much like the conversation we had about the policies

4    that are Exhibit A.  If it's different, then I suppose it is

5    what it is.  I'm not sure at the end of the day it'll be

6    relevant, but I just need to know what the facts are for the

7    purposes -- besides it's a fair point to know when it

8    actually would control or not.

9               MR. ZIPES:  Your Honor, I won't stand on ceremony.

10   If it's similar and they can confirm that, I don't -- they

11   don't need to submit extensive documents on it.  But that's

12   --

13              THE COURT:  All right.  Maybe someone can

14   enlighten me.

15              MR. PESCE:  Your Honor, just as I indicated when I

16   was at the podium, all of our clients have signed the Master

17   Digital Loan Agreement.  We're happy to confirm that with

18   Mr. Zipes, though, to show that that is the one that is

19   controlling.

20              THE COURT:  All right.  So here's what I'm going

21   to do.  I'm going to consider that anybody who's information

22   is sought to be protected is governed by this master

23   agreement.  If after conversations among the parties people

24   discover that that's not right within, you know, five

25   business days you will submit something to let me know that

Page 137

1    that's -- there's something different factually.

2            Again, I'm not sure how it's all going to work out

3    in the wash, but it's just -- I want to make sure to get my

4    facts straight, and it's a reasonable -- and they're

5    different, right?  They are different.  You're citing to the

6    internet policy for a reason, and I think the agreement has

7    a little less wiggle room frankly.  So that would be just

8    helpful to know.

9            MR. ZIPES:  And Your Honor, just to -- and I

10   accept the representations if that's what they're saying.  I

11   understand they want to double check, but I -- and that's

12   sufficient for my purposes.  I do want to point out in this

13   privacy policy as well that this is a point that they

14   highlighted, Your Honor.  And I know you're focusing on the

15   master agreement, but this is information that they

16   themselves are highlighting.

17           And there's on Page 19 of 22, Paragraph 13 it's

18   highlighted Genesis does not sell your personal information.

19   And then right below that is something a little bit

20   inconsistent, which says that you can submit a request

21   through Access Correct or deleted your personal information;

22   or two, opt out of the selling or sharing of your personal

23   information.

24           So just someone reading this who is concerned

25   about privacy and not getting their name out, Your Honor, is

Page 138

1  -- alarm -- presumably alarm bells are going off at that

2  point.  And I'm just noting that we're talking about

3  evidence here, how concerned parties were at the time in

4  their name getting out.  So I -- I'm just noting that for

5  the record.  And Your Honor, I'll see if I have any other...

6          Your Honor, in large cases, financial cases that

7  are not crypto, you're going to see large individual

8  investors buying notes or being Creditors in those cases.

9  Hundreds of millions of dollars that we'd all want to be

10  that lucky, I guess, to have that money to invest, but not

11  crypto cases.  I think they would logically look at any

12  statement in this case and say, well, that applies to me as

13  well.  I'm high net worth.  I went into this with my eyes

14  open, but I want the protections of 107(b) or (c) to apply

15  to me.

16          And I think that that argument can be made by a

17  lot of -- in a lot of other contexts.  And I think the

18  phishing and all these harms that come from the internet

19  based on information being released in bankruptcy, they

20  apply just as much to retail creditors and --

21          THE COURT:  Well, that's why I was --

22          MR. ZIPES:  -- and others.

23          THE COURT:  I was not giving you a hard time

24  without -- for no reason.  I was trying to figure out how to

25  quantify the risk here.  So --

Page 139

1          MR. ZIPES:  Yeah.

2          THE COURT:  -- because the argument is that

3    crypto, because of its bearer nature, is a different kind of

4    risk.  I'm not a crypto expert.

5          MR. ZIPES:  Yep.

6          THE COURT:  And I don't know.

7          MR. ZIPES:  Yep.

8          THE COURT:  And you're right.  They're -- unless

9    you identify the facts and circumstances that make relief

10   appropriate in one circumstance as distinguished from

11   another, you're -- you run the risk of setting precedent

12   that is -- has no limitations, which is not my intent.

13          On the other hand, I do have to look at evidence

14   in each individual case.  So -- but I understand your point.

15   And I think that's what the U.S. Trustee's -- it's pretty

16   clear that's what the U.S. Trustee's motivation here is, is

17   precedent in cases generally for information of this type.

18   I got it.

19          MR. ZIPES:  And Your Honor, I would just again

20   state, although the record is entirely clear, and I'll sit

21   down after this, but I -- what's being proposed here is just

22   a blanket redaction of information.  And that just is not

23   consistent with 107 and your extraordinary remedies.  There

24   are ways of dealing with these issues without the -- with

25   the total redaction of all names and addresses.  And we --

Page 140

```
 1    there is a need for transparency and disclosure in

 2    bankruptcy as well.  So Your Honor, with that, I'll sit

 3    down.

 4             THE COURT:  All right.  Well, I just want to

 5    confirm for purposes of whenever we do anything that's

 6    redacted is going to be shared with the U.S. Trustee's

 7    Office as well as with the Committee.  And I assume probably

 8    the Ad Hocs as well.  Is that correct?

 9             MR. ROSEN:  That's correct, Your Honor.

10             MS. VANLARE:  I'm not sure -- I'm sorry.  I'm not

11    sure we've shared information about Creditors with the Ad

12    Hoc Committee.

13             THE COURT:  All right.

14             MS. VANLARE:  I just want to be clear about that.

15             THE COURT:  All right.

16             MS. VANLARE:  I think, but yes absolutely --

17             THE COURT:  But with the --

18             MS. VANLARE:  -- with the --

19             THE COURT:  -- official Committee and with the

20    U.S. Trustee's Office.

21             MS. VANLARE:  Yes.  Yes.

22             MR. ZIPES:  I think 107 requires it for us, but

23    Your Honor, they were doing it regardless.

24             THE COURT:  What's that?  Say that again?

25             MR. ZIPES:  I think 107 requires my office to
```

1   receive that information, but they -- I don't think that's

2   controversial regardless.

3          THE COURT:  No, I don't think it is.  But for

4   purposes of just making clear what the state of play is

5   here.  All right.

6          MS. VANLARE:  Your Honor, just a few points.

7   First, I think -- and I'll identify myself.  Sorry.  Jane

8   VanLare, Cleary Gottlieb Steen and Hamilton for purposes of

9   the record on behalf of the Debtors.  So first, I think it's

10  inappropriate to make any kind of evidentiary inferences

11  from the fact that the Debtor's position has evolved on this

12  issue.  I think Your Honor had said that, but I do think

13  it's worth underlining that the Debtors' position evolved as

14  -- you know, includes a consideration of different factors

15  and certainly discussions with the Creditors' Committee was

16  very important.

17         I'll also note that the -- we didn't file the --

18  our Motion for Bidding Procedures until several months into

19  the case.  Secondly, the privacy policy -- and as Your Honor

20  noted, you know, and I'll say I'm not aware of anybody who

21  didn't -- who is a lender who didn't enter into an MLA, but

22  it is something we can confirm.

23         But the privacy policy that Mr. Zipes focused on,

24  and in particular this provision that, you know, Creditors

25  could've let -- had the opportunity by virtue of the

Page 142

1    language of the privacy policy to opt out of their names

2    being disclosed.  Well, Your Honor, that's exactly what

3    they've done.  They have -- as soon as sort of -- as soon as

4    the cases were filed and these issues became known, that's

5    exactly what they did, which is to contact their lawyers,

6    contact the Debtors, and contact the counsel to the

7    Creditors' Committee to avail themselves of that.

8            Third, Mr. Zipes said at several points in his

9    presentation that this is a blanket request, and I don't

10   think it's a blanket request.  And we did confirm that we

11   did not redact vendor information.  This is limited to

12   lenders who are customers of the Debtors.  So I think that

13   it's unfair and inaccurate to call it a blanket request.

14   It's tailored to the circumstances of these cases.

15           THE COURT:  Well, I think his concern is the next

16   case.  His concern is what about somebody comes in and says

17   we're the bond holders, we have an ad hoc bond holder group,

18   we don't our information out there.  There were -- we have

19   high-net individuals and institutions, and we don't want the

20   information out there so that we could be contacted or

21   phished or any of that.  So what's your thoughts on that?

22           MS. VANLARE:  And I appreciate all of that, Your

23   Honor, which is why I think there is a showing, an

24   evidentiary showing, as well as arguments.  We've a number

25   of points we've made, and that the testimony and the

1   declarations support as to what distinguishes this case,

2   crypto industry, and in particular this case from, you know,

3   any other large case where you have Creditors with large

4   claim amounts.  I do think that the record is very full in

5   terms of why it is that this is different.  And I think Your

6   Honor can and should rely on that.

7           And lastly, in terms of the name, I think Mr.

8   Zipes had said, you know, it's not just the name that's

9   being sold, but other things as well.  And therefore, I

10  guess you should infer that the name is not valuable and the

11  name and contact information.  And I would just say that

12  that's contradicted by the declarations and by the

13  testimony, which is unrebutted.  And furthermore, I'll note

14  that it's --

15          THE COURT:  Well, what in particular are you

16  referring to when you're citing a response to that notion of

17  -- and saying if you'd spit out the name by itself it

18  doesn't have the same value?

19          MS. VANLARE:  So two points on that.  One is that

20  it's actually not just the name and the contact information.

21  It would be the connection of the name and contact

22  information with a specific claim amount.  So that actually

23  -- that combination provides information to others as to not

24  only the identity of the Creditors, but also the size of

25  their claim from which obviously lots of inferences can be

1    made.

2            But the second point is that, you know, Mr.

3    Tichenor's declaration says, and again there was testimony

4    here, that the names and contact information by themselves

5    without all the other stuff, just that information as I

6    mentioned with the claim amounts, it's sort of bonus, the

7    evidence is unrefuted that that in and of itself is a

8    valuable asset.

9            THE COURT:  All right.

10           MS. VANLARE:  Nothing further.  Thank you.

11           THE COURT:  All right.  Thank you very much.  I'll

12   hear from the Committee.

13           MR. PESCE:  For the record, Gregory Pesce, White

14   and Case on behalf of the Official Committee.  Thank you

15   again, Your Honor, for your time.  Just a couple of quick

16   points I just wanted to highlight from the Committee's

17   perspective.  First, the various statements that Creditors

18   haven't been reaching out and what not, you know, we

19   disagree with that.  They've reached out to both of us.

20   They're reached out to the Committee, and the Committee

21   ultimately is here for this very reason so that they have a

22   fiduciary to look out for their interests even if they don't

23   -- each and every one of them doesn't come forward.

24           And the second point, and this goes to the blanket

25   kind of comments and then just the nature of the relief, my

1    understanding is this all started over the Creditor Matrix

2    Motion and then the schedules and statements.  And as to the

3    lenders of Genesis, it's among those two different sets of

4    documents.  It's their name, their email address, their home

5    physical address, and/or their claim amount.

6         So we are not seeking to seal every type of

7    information.  It's just the ones that are before the Court

8    today, which I think is a testament to how narrow the relief

9    is.  And then in a similar vein, you know, I can't speak for

10   what will happen in a future case, but I think the reference

11   to, you know, these cases of like offshore hedge funds

12   liquidating in the district or something like that, you

13   know, I'm not familiar with the facts there.

14        But the unrefuted testimony today is that this

15   information being monetized in this case for these

16   Creditors, I don't know if that's necessarily true for the

17   investors or note holders or bond holders or whatever for a

18   fund that might liquidate in bankruptcy.  So thank you for

19   your time and consideration today.

20        THE COURT:  All right.  Thank you.  And anything

21   from the Ad Hoc Group?

22        MR. ROSEN:  Nothing further, Your Honor.

23        THE COURT:  All right.  Anything from any other

24   party?  All right.  So I'm going to do a couple of things.

25   I'm going to wait for some confirmation that we have our

Page 146

```
 1    facts straight on the master agreements, and just so I know

 2    what's the operative document for purposes of considering

 3    the parameters of the privacy here and the expectations of

 4    privacy.  And I will I think, given the U.S. Trustee's

 5    Office's profound interest in this, I'll likely issue a

 6    written decision.  But if I don't, I'll do a fairly

 7    extensive bench ruling.

 8              In the meantime, the information will remain

 9    confidential pending that ruling.  I'll let you know when

10    that's -- that decision is ready to be issued.  I will tell

11    you my inclination is to grant relief under Section (b)

12    given the confidential -- that this confidential -- this

13    information, if kept confidential, is marketable, that there

14    -- the evidence, which is unrebutted, is that it has value

15    in this case consistent -- and that's consistent with other

16    cases as well.  I think the privacy issue, as our

17    conversation's made clear, is much harder to get a grasp on

18    given the statute.

19              The statute puts an important -- places the

20    paramount value as one of transparency.  Obviously,

21    transparency in public proceedings is enormously important.

22    It's not absolute, but we'll say that the statute probably

23    is not the most nimble grappling with the modern world of

24    the internet and things we read about all the time in terms

25    of what large-scale fraud looks like these days.
```

1          And so -- but that's not something that we have an

2     ability or anyone has an ability here to fix in terms of the

3     more nuanced approach to that situation.  But I appreciate

4     everybody's briefing and argument.  The whole idea behind

5     oral argument is to have a spirited discussion about the

6     issues that we're debating such that we leave no stone

7     unturned.  That only works when people are willing to set

8     aside what I'm sure were no doubt beautiful presentations

9     and speeches that could've been given.

10          And -- but it does do violence to what you all are

11     doing, and I appreciate everybody's willingness to just jump

12     in and answer difficult questions so that I can make sure

13     that I know where you stand, and I know what the record is

14     and what I have to address.  So thank you very much.  So

15     with all that said, is there anything else that we need to

16     address here this afternoon?

17          MR. SHORE:  Yeah, very briefly, Your Honor.  Chris

18     Shore from White and Case on behalf of the Committee.

19     There's been some talk in this case about the Debtors filing

20     a non-operational motion and having it expedited for a

21     hearing as early as this Wednesday.  For a host of reasons

22     from the Committee's perspective, this week's going to be

23     very tough to do that for a motion we haven't seen yet.

24          But what I'd like to do is if the Debtors do file

25     it, we'll have an opportunity to talk, see if we can't agree

1   on an expedited hearing date that works for all the

2   interested parties.  And to that end, if we can't reach an

3   agreement, have a conference with Your Honor as contemplated

4   in your rules about when to set.  Because the Debtors are

5   still, as I understand it, reserved the right to try to go

6   forward at Wednesday's omnibus, if Your Honor has some time

7   tomorrow afternoon, or at least a block that you can let us

8   know that we can reach you --

9           THE COURT:  Yeah.  I'm around.  I know I have

10  hearings tomorrow.  I confess --

11          MR. SHORE:  I think Purdue's going to be a short

12  one.  It's at 11 and it's uncontested.

13          THE COURT:  All right.  So it sounds like the

14  afternoon would be fine.

15          MR. SHORE:  Very good.

16          THE COURT:  I'm also around today and have the

17  benefit of having folks here if anybody wanted to have a --

18  sort of a chambers conference.  My rule for chambers

19  conferences is always that any party who has skin in the

20  game needs to be there so nobody feels like they've been

21  excluded.

22          MR. SHORE:  Yeah.

23          THE COURT:  But there are sometimes when a

24  chambers conference can be helpful in navigating things

25  efficiently.  And so I'm happy to do that as long as nobody

Page 149

1    feels like they're going to make the song from Hamilton that

2    they're not in the room where it happens.  That's what -- we

3    don't want to ever have that problem.

4         MR. SHORE:  No.

5         THE COURT:  So -- but I'll leave it to you all if

6    that might be productive.  I mention it because you actually

7    happen to be here, which is not an everyday occurrence

8    anymore.  So I'm here.  And so if that's something you want

9    to do, just knock on chambers' door and let me know and we

10   can do it in the courtroom.  So -- off the record.  But I'll

11   leave it to you all in your considered professional judgment

12   on what's the best way --

13        MR. SHORE:  Practically --

14        MR. O'NEAL:  Your Honor, Sean O'Neal, Cleary

15   Gottlieb on behalf of the Debtors.  I hadn't anticipated

16   that this would come up today, so I'm not in the hearing

17   today.  So I apologize for that.  I think this sounds like

18   it's a bit of a scheduling issue, but probably more than

19   that as well.  I think there are underlying merits that will

20   probably be raised in addition to scheduling.

21        I would suggest that, you know, we wait until this

22   motion is filed.  It may or may not be filed.  Wait until

23   the motion is filed and then we'll have something to

24   discuss.  I would not -- I would prefer not to have a

25   chambers conference today simply because I'm not there and

1    hadn't arranged --

2           THE COURT:  That's fine.  I'll let you all chat.

3    I just wanted to make myself available to the extent that

4    everybody agrees that it would be a good idea.  If everyone

5    doesn't agree, that's usually a sign that it's not --

6           MR. SHORE:  Sure.

7           THE COURT:  -- a good idea.  So that's fine.  I

8    will be guided by the parties, and you'll obviously talk and

9    figure out what you think makes the most sense.

10          MR. SHORE:  Great.

11          THE COURT:  All right.

12          MR. SHORE:  Thank you, Your Honor.

13          THE COURT:  With that, anything else here this

14   afternoon?  All right.  I know we blew right past lunch.

15   Thank you very much for your accommodation on that.  And

16   with that, court is adjourned.

17          (Whereupon these proceedings were concluded at

18   2:28 PM)

19

20

21

22

23

24

25

Page 151

1                        C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  April 27, 2023