Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 23-10063-SHL

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   GENESIS GLOBAL HOLDCO, LLC,

8

9        Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  April 26, 2023

17                  2:10 PM

18

19

20

21  B E F O R E :

22  HON SEAN H. LANE

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  ART

1   HEARING re Omnibus Hearing

2

3   HEARING re Doc. #248 Notice of Agenda

4

5   HEARING re Doc. #218 Motion To Extend Time To File Notices

6   Of Removal Of Related Proceedings

7

8   HEARING re Doc. $165 Motion For Relief From The Automatic

9   Stay To The Extent Applicable, To Allow For Advancements And

10   Payments Under D&O Insurance Policy

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

Page 3

```
 1   A P P E A R A N C E S :

 2

 3   CLEARY GOTTLIEB STEEN & HAMILTON LLP

 4        Attorneys for the Debtor

 5        One Liberty Plaza

 6        New York, NY 10006

 7

 8   BY:  JANE VANLARE

 9        RICHARD CHESTER MINOTT

10        LUKE A. BAREFOOT

11

12   WHITE & CASE LLP

13        Attorneys Official Committee of Unsecured Creditors

14        1221 Avenue of the Americas

15        New York, NY 10020

16

17   BY:  PHILIP ABELSON

18

19   ARNOLD PORTER KAYE SCHOLER LLP

20        Attorneys for Soichiro "Michael" Moro

21        250 West 55th Street

22        New York, NY 10019

23

24   BY:  BENJAMIN MINTZ

25
```

1   PROSKAUER ROSE LLP

2        Attorneys for Ad Hoc Group of Genesis Customers

3        Eleven Times Square

4        New York, NY 10036

5

6   BY:  JORDAN SAZANT

7

8   ALSO PRESENT TELEPHONICALLY:

9   PAUL ARONZON

10   MARCUS ASNER

11   ERIC IAN ASQUITH

12   SABRINA BREMER

13   BIANCA CASTRO

14   ERIC C. DAUCHER

15   MICHAEL S. ETKIN

16   ANSON B. FRELINGHUYSEN

17   ELLA GASPAR

18   BRIAN D. GLUECKSTEIN

19   AUTUMN HIGHSMITH

20   JUSTIN IMPERATO

21   VINCENT INDELICATO

22   HOO RI KIM

23   TUKISHA KNOX

24   JESSICA LIOU

25   XIU LIU

1   MI LIU

2   LEAN LIU

3   KEN LUKASZEWSKI

4   JEFFREY S. MARGOLIN

5   JACK MASSEY

6   KYLE MCKUHEN

7   MARCY J. MCLAUGHLIN SMITH

8   MICHELE J. MEISES

9   LAYLA MILLIGAN

10  SEAN A. O'NEAL

11  AMANDA PARRA CRISTE

12  GREGORY F. PESCE

13  CHRISTIAN RIBEIRO

14  BRIAN ROSEN

15  JEFFREY SAFERSTEIN

16  JORDAN SAZANT

17  J. CHRISTOPHER SHORE

18  GORDON SUN

19  NACIF TAOUSSE

20  FRANCISCO VAZQUEZ

21  MEGAN VOLIN

22  MICHAEL WEINBERG

23  COLIN WEST

24  ARIAM ASMEROM

25  ERIC IAN ASQUITH

Page 6

1   BRENDON BARNWELL

2   BRIANNA B. BILTER

3   KEVIN EDWARD BROWN

4   BRIAN BULTHUIS

5   DONALD BURKE

6   BRIAN CHANCEY

7   STEVEN CHURCH

8   TOM CONHEENEY

9   COURTENAY CULLEN

10   JARED DERMONT

11   MICHAEL DIYANNI

12   JUSTIN J. DICLEMENTE

13   LEIA DORAN

14   LISA FAUCHER

15   DAN FORMAN

16   SHUBHANKAR GAHLOT

17   ASHLYN GALLAGHER

18   SHAWN GILHOOLEY

19   UDAY GORREPATI

20   JASON GOTTLIEB

21   BRANDON HAMMER

22   MIRA HAQQANI

23   TAYLOR HARRISON

24   MIRANDA HATCH

25   DENNIS HILKENS

1    DERAR ISLIM

2    ZUL JAMAL

3    BARRY JASON

4    KEEFE JOHNSON

5    PAUL KINEALY

6    BARAK KLEIN

7    DIETRICH KNAUTH

8    OXANA KOZLOIV

9    GLEN KRATOCHVIL

10   KONRAD LAESSER

11   CHRISTINE LEE

12   MIKE LEGGE

13   MICHAEL LETO

14   SAMUEL LEVANDER

15   DAVID LOPEZ

16   ALEXANDRA LOTTY

17   PETER MAERKL

18   AKIKOK MATSUDA

19   JOHN MAYO

20   ANAIS MITRA

21   JOHN NGUYEN

22   TYLER OKADA

23   REBEKAH PRESLEY

24   ARIANNA PRETTO-SAKMANN

25   GREGORY RAAB

1    CHRISTIAN RANDLE

2    MOHIT RATHI

3    ANDRES FELIPE SAENZ

4    SAMIRA SARAN

5    THERESE SCHEUER

6    JOE SCIAMETTA

7    MARK STANCIL

8    BENJAMIN STEEL

9    ANDREW SULLIVAN

10   VINCE SULLIVAN

11   ANDREW SWIFT

12   NICHOLAS TALIAN

13   BRIAN TICHENOR

14   ANDREW TSANG

15   WILLIAM MATTHEW UPTEGROVE

16   ROBB WARE

17   JACK WESTNER

18   PAUL WIRTZ

19   CHAD R. WOLFE

20   SARAH WYNN

21   SELA BROWN

22   JASON GOTTLIEB

23

24

25

1                P R O C E E D I N G S

2              THE COURT:  All right, good afternoon.  Can you

3    hear me now?

4              MS. VANLARE:  Yes, we can.

5              THE COURT:  All right, great.  Thank you.  So this

6    is Judge Sean Lane in the United States Bankruptcy Court for

7    the Southern District of New York.  And we're here for a two

8    o'clock hearing in Genesis Global Holdco LLC, a jointly

9    administered Chapter 11.  There's an agenda that was filed

10   on the docket.  And so we'll start, as you always do, with

11   appearances.  So, starting with the debtors.

12             MS. VANLARE:  Good afternoon, Your Honor, Jane

13   Vanlare, Cleary Gottlieb Steen and Hamilton.  I'm joined

14   today by my partner, Luke Barefoot.  He'll be handling the

15   D&O Insurance motion and our colleague, Richard Minott.

16             THE COURT:  All right.  Good afternoon.  And on

17   behalf of the official committee?

18             MR. ABELSON:  Good afternoon, Your Honor, Phil

19   Abelson, White and Case on behalf of the unsecure creditors

20   committee.  I'm joined by my colleague, Michele Meises.

21             THE COURT:  All right.  Good afternoon.  I think I

22   do see the declarant in support of motion who's here, Marcus

23   Asner.  So let me get that appearance.

24             MR. MINTZ:  Good afternoon, Your Honor.  This is

25   Benjamin Mintz from Arnold and Porter.  I'm here with Marcus

Page 10

1    Asner From Arnold and Porter as well on behalf of the

2    movant.

3              THE COURT:  All right.  Good to have you here.

4    Any other appearances for today's proceeding?

5              MR. SAZANT:  Good afternoon, Your Honor.  This is

6    Jordan Sazant, Proskauer Rose, on behalf of the ad hoc group

7    of Genesis creditors.

8              THE COURT:  All right.  Good afternoon to you.

9    Anyone else?  All right.  So let's, in the first instance,

10   turn it over to the debtors to walk through the uncontested

11   matter in the agenda -- on the agenda and any other status

12   matters before we turn to the contested matter.

13             MS. VANLARE:  Thank you very much, Your Honor.

14   I'm going to turn it over to my colleague Richard Minott who

15   will be presenting the removal extension motion.

16             THE COURT:  All right, happy to hear from him.

17   Counsel.

18             MR. MINOTT:  Good afternoon, Your Honor.  For the

19   record, Richard Minott of Cleary Gottlieb, counsel for the

20   debtors.  The first item on the agenda is the debtor's

21   motion for an order extending the time within which to file

22   notices of removal of civil actions and proceedings.  The

23   motion was filed at Docket Number 218.  And is at Tab 1 of

24   Your Honor's binder.

25             THE COURT:  I have it.

Page 11

1              MR. MINOTT:   Great.  Your Honor, pursuant to

2    Bankruptcy Rule 9027, the deadline for the debtors to file

3    notices of removal for civil actions and proceedings that

4    have been pending as of the petition date was April 19th

5    with such deadline being automatically extended pursuant to

6    the bridge order provisions of the local rules by the filing

7    of the removal extension motion.  Your Honor, by this

8    motion, the debtors seek to extend the removal deadline for

9    all debtors until the date and order is entered confirming a

10   Chapter 11 plan in these cases.

11              As set forth in the motion, the debtors

12   respectfully submit that cause exists to extend the removal

13   period.  During the first 90 days of these cases, the

14   debtors and their professionals have devoted significant

15   resources and efforts to preserve and maximize the value of

16   the debtors' estates.  As a result, and given the debtors

17   focus on laying the initial groundwork for these cases, the

18   debtors require additional time to fully examine pending

19   civil actions to determine the feasibility or benefit of

20   removing each case, which efforts are underway.

21              Your Honor, no responses or objections were filed

22   by the response deadline.  As such, the motion is moving

23   forward in an uncontested basis.  So unless Your Honor has

24   any questions, we respectfully request the order attached to

25   the motion as Exhibit A be entered.

Page 12

1          THE COURT:  All right.  Thank you very much.  Any

2    party that wishes to be heard on the debtors' motion?

3          All right, hearing no response and seeing no

4    objection on the record, I'm happy to grant the request of

5    relief for all the reasons that you set forth in your motion

6    as appropriate under the facts and circumstances of the case

7    and applicable law.  Thank you very much.

8          MR. MINOTT:  Thank you, Your Honor.  I'll now turn

9    the podium over to Mr. Barefoot.

10          THE COURT:  All right.  Mr. Barefoot.

11          MR. BAREFOOT:  Your Honor, Luke Barefoot for the

12    debtors.  It's Mr. Mintz' motion.

13          THE COURT:  All right, we'll turn it over to Mr.

14    Mintz.

15          MR. MINTZ:  Thank you, Your Honor.  I want to

16    start just with a brief procedural background and then I'll

17    get into the facts and the argument underlying our motion.

18          By way of background, we filed the motion for stay

19    relief on behalf of Michael Moro on March 27th, 2023.

20    That's at Docket Number 165.  Pursuant to that motion, we

21    seek stay relief to allow Mr. Moro to enforce his rights

22    under the D&O policy and demand and receive proceeds under

23    the policy and allow the insurer to advance such amounts to

24    Mr. Moro.

25          The debtors filed a response at Docket Number 234.

Page 13

1    The debtors do not oppose the motion and, instead, take the

2    position that if the Court were to grant the motion, the

3    motion should be modified to extend to all insureds, all

4    individual insureds and to extend to all insurance policies

5    including the excess policies.

6           On behalf of the movant, we don't have an issue

7    with those modifications in connection with our own motion.

8           The creditors committee filed an objection to the

9    motion.  That's at Docket Number 235.  And on behalf of Mr.

10   Moro, we filed a reply in support of the motion at Docket

11   Number 249 and we also filed the supporting declaration from

12   my partner Marcus Asner, who's on the line here today, at

13   Docket Number 250.  No other objections or responses were

14   filed in respect to the motion.

15          MR. ABELSON:  Your Honor -- my apologies, Mr.

16   Mintz.  Can we take up the issue of the declaration or do

17   you want to wait for that because we do have some

18   objections?

19          THE COURT:  All right.  I'm going to let Mr. Mintz

20   present and then we'll get to the objections, both to the

21   motion and the declaration.  Thank you.

22          MR. ABELSON:  Fair enough.  Thank you.

23          MR. MINTZ:  I think, I mean I'm prepared to deal

24   with the declaration, but I'll start with the fact as

25   follows, which is, I think the principal relevant facts

Page 14

1    relating to the motion are not in dispute and they're not

2    controverted and there are no material issues of dispute in

3    that regard.  It's not disputed that Mr. Moro was the former

4    chief executive officer of the debtor, Genesis Capital, from

5    2018 to 2022.  And prior to that, he was the chief operating

6    officer and then chief executive officer of Genesis Global

7    Trading.  That's not a disputed fact.  It's also not

8    disputed that the debtors maintain a D&O policy, the subject

9    of the motion, an E&O policy, an excess policy.  And each of

10   those policies have limits that are specified therein, most

11   particularly the D&O policy has a $2.5 million coverage

12   limit.

13          The terms of the policy are not in dispute either.

14   They're pretty clear and there isn't really any ambiguity or

15   anything that people are arguing about as to the provisions

16   of the policy.  The D&O policy provides for three buckets of

17   coverage.  There's a Side A, which covers losses of the

18   insured individuals.  That's the directors and officers to

19   the extent that they're not indemnified by the company.  And

20   as an aside, and this is not disputed either, Mr. Moro has

21   requested indemnification from the company and the debtors

22   have declined that request.  Side B of the policy covers

23   losses of the insured company in respect of the company's

24   payment of indemnification claims on behalf of insured

25   individuals.  And Side C covers losses of the insured

Page 15

1      company in respect of a securities claim.

2              It's also not disputed that the policy includes a

3      payment priority provision and that provision is in favor of

4      the Side A coverage and it provides that if total loss

5      exceeds the applicable coverage limit, the insurer will

6      first pay loss covered under Side A before any other covered

7      amounts under the policy.

8              And it's also not disputed that the debtors are

9      the subject of several governmental investigations at a

10     federal and state level.  The committee made some objection

11     to the fact that we didn't detail out those investigations.

12     I don't think it's appropriate to disclose the details of

13     those investigations.  And I imagine the debtors are not

14     interested in getting into those details on the record.  I

15     think if it, if it's really an issue, we would be prepared

16     to describe the details of those investigations in-camera

17     and not on the public record.  But I really don't think

18     there's any serious dispute that there are multiple

19     governmental investigations that are ongoing involving the

20     debtor.

21             Mr. Moro, this is also not disputed, Mr. Moro has

22     been cooperating with information requests from the debtors

23     relating to those governmental investigations.  And he's

24     also been responding and cooperating with the governmental

25     entities as well.  He's incurred legal expenses,

Page 16

1    particularly the fees of expenses of Arnold and Porter in

2    connection with those investigations and his efforts to

3    cooperate.  And those expenses are covered under Side A the

4    policy.

5            So let me focus on our argument.  Courts in this

6    district faced with these types of requests have generally

7    afforded the directors and officers relief of the type

8    requested here.  We cite several examples of that.  There's

9    MF Global, Adelphia and Enron.  And the relief is usually

10   noncontroversial and is often stipulated to by the debtors

11   and the insureds.

12           In Republic Airways, which Your Honor presided

13   over, the debtor made a motion for stay relief to permit the

14   insured directors and officers to seek reimbursement under

15   the policies.  That motion was not contested.  And Your

16   Honor entered an order granting that relief in that case.

17           As a threshold matter, we believe the committee is

18   not permitted to oppose the motion.  The policy itself

19   includes a waiver of the automatic stay by the debtors and

20   it restricts the debtors from opposing any request for stay

21   relief.  The debtors abided by that provision.  They did not

22   oppose our request.

23           The committee, as a representative of the estates,

24   is likewise bound to that provision and it cannot end run

25   around that limitation.  If it wants to avail the estate of

Page 17

1    the benefits of the policy, as a representative of the

2    estate, it must accept the limitations as well.  It can't

3    have its cake and eat it too.

4            On the merits, we don't think the stay is

5    applicable here because the estate's interest in the

6    proceeds are specifically and expressly contractually

7    subordinate to the insurance priority rights under the

8    policy.  Based on that, and through the lens as to how

9    courts evaluate whether the proceeds should be considered

10   property of the estate, the requested relief does not

11   otherwise impair the estate's rights as the estate is only

12   entitled to be paid if there are excess proceeds after

13   paying the claims of the insureds under Side A.

14           To the extent the stay applies, there is ample

15   cause for stay relief.  In its objection, the committee does

16   not disguise its ambition.  It's expressed goal in enforcing

17   the stay is to enable the estates to exhaust the policy

18   limits and prevent the insureds from ever enforcing their

19   rights under the policies.  For one, this is plainly an

20   improper use of the automatic stay.  The automatic stay does

21   not expand and cannot be used to expand the debtor's

22   property interests.  And that is exactly what the committee

23   is seeking to do here.

24           The debtor's property interests and the policy

25   proceeds are contractually subordinated in right of payment

Page 18

1    to the D&O's rights.  The committee seeks to use the

2    automatic stay to enhance that property right and eliminate

3    the subordination through the proverbial race to the

4    proceeds, which the insureds will necessarily lose if the

5    stay is not lifted.

6              Second, and of critical importance, the committee

7    is not offering to provide any adequate protection to the

8    insured of its own property interest in the policy proceeds.

9    Indisputably, the insured's interests would not be

10   adequately protected if the committee and the estates are

11   allowed to drain the policy proceeds while the automatic

12   stay is in place.  This utter lack of protection, of

13   adequate protection is in and of itself ample cause for

14   relief and by the very terms of the statute.

15             The significant harm to the insured is also self-

16   evident.  The insured has incurred legal expenses and will

17   continue to incur expenses as the governmental

18   investigations continue and he continues to cooperate with

19   the debtors.  The company has turned down his request for

20   indemnification.  The policies were clearly intended and

21   designed to provide for payment of these very claims and the

22   insured and the other directors and officers relied on these

23   policies.

24             Continuing to stay and preventing such payment

25   imposes a financial hardship on the insured and harms him.

Page 19

```
1    To make matters worse, if the committee has its way, the

2    policy proceeds will be used exclusively for the estates and

3    the insured will not be able to recover anything under the

4    policies.  As such, is not just an issue of timing but will

5    cause permanent irreparable harm.

6              In contrast, the estates are not harmed.  Either

7    the policy proceeds are more than sufficient to cover both

8    the insured and the estate's claims and everyone can be paid

9    in full.  In that circumstance, stay relief should be

10   readily granted and shouldn't be controversial.  If on the

11   other hand, the policy proceeds are not sufficient to cover

12   all claims, then the estate's interests stand behind the

13   insured's in right of payment.  In that respect, the

14   estate's rights are not being prejudiced by the stay relief

15   as their rights are effectively limited by the policy terms

16   themselves.  There's not an impact from the relief from the

17   stay.  It's the contract that limits that.

18             As harm, the committee points to the creditors'

19   ability to recover under the policy on account of a future

20   potential judgment against the directors and officers.  In

21   our papers, we cited the National Fish and Seafood decision

22   which rejected this exact argument finding that the estates

23   do not have a property right to control the apportionment of

24   A side coverages between defense costs and a judgment.

25             I would also cite to Allied Digital Technologies,
```

1   306 B.R. 505, from the Bankruptcy District of Delaware 2004,

2   which reached the same result, authorizing payment of

3   defense costs over a trustee's objection who sought to

4   preserve policy proceeds to satisfy his own claims against

5   the target insured.

6          MF Global, too, supports this conclusion,

7   recognizing that the contrary result would be inequitable to

8   the insured.  And that's at 469 B.R. at 196 to 97.

9          One final note on harm, the debtors may also be

10  harmed here if stay relief is not granted because that

11  result may very well lead to Mr. Moro being unable to

12  cooperate with the debtors continuing requests for

13  information and documents on a go-forward basis.

14         In conclusion, to the extent the stay applies,

15  cause exists for stay relief, including as evidenced by the

16  lack of adequate protection afforded to the insured, the

17  harm the insured is facing, and the lack of harm to the

18  estate.  Thank you, Your Honor.

19         THE COURT:  All right.  Thank you very much.  So I

20  assume before you leave the virtual podium that we should

21  address the question about the declaration.  So I assume you

22  want to move it into evidence?

23         MR. MINTZ:  I'm prepared to do that, Your Honor.

24  It wasn't clear to me under your rules whether today was

25  intended to be an evidentiary hearing, but I am prepared to

Page 21

1   move it into evidence.

2           THE COURT:  All right.  So let's see where we end

3   up or if we're going to start cross-examining witnesses,

4   we're going to do it here in court in person.  But I'm not

5   quite sure what the objection is.  So what's the objection

6   by the committee?

7           MR. ABELSON:  Yes, Your Honor.  Again, for the

8   record, Phil Abelson White and Case on behalf of the

9   committee.  Your Honor, it's broadly, the objection is

10  broadly addressed to the declaration itself, which is from a

11  lawyer in which the lawyer testifies as to the client's

12  situation, which seems both odd and getting to the second

13  point, more specifically, just pure hearsay.  If you look at

14  in particular --

15          MR. MINTZ:  So, all right, I mean I love a good

16  hearsay discussion as much as the next person.  But is any

17  of this disputed?  I mean we try to be practical here in

18  terms of expending people's time and money on evidentiary

19  hearings.  And if none of the facts here are in dispute, I

20  could take a proffer and then I would ask people if they had

21  a, you know, an issue with the facts here.

22          So I understand the hearsay objection, but I'm

23  just not quite sure that at the end of the day, it's a

24  meaningful discussion.  So does anybody dispute, for

25  example, that he's currently paying for these defense costs

Page 22

```
1    out of pocket, and he's got a family of five, he's the sole

2    source of income, and all these details about his own

3    situation?  So really, it's everything, I guess, from

4    Paragraph 4 through Paragraph 13.  So is there any dispute

5    about these things or questions about these facts?

6              MR. ABELSON:  Yes, Your Honor.  I think there are

7    questions.  I mean, look, there are certain things we can,

8    we can take and say, ok, well, just presume those are true.

9    They don't really move the needle.  But this, this whole

10   question comes down to the equities, right?  Whether the

11   movant can establish that you should lift this day and treat

12   Mr. Moro differently than every other creditor.  We're going

13   to talk about that when I get to my argument.  And

14   ultimately, that's going to come down to Mr. Moro's

15   situation.

16              Frankly, I don't know that Mr. Moro's situation

17   actually changes the analysis, but it's certainly the

18   centerpiece of their motion because if Mr. Moro is a

19   billionaire, the 300,000 on an equal basis, doesn't move the

20   needle.  Your Honor, I presume you're not speaking to me.

21   There you go.

22              THE COURT:  Yeah, I know.  There was an alarming

23   message about being muted by the host and I have no idea

24   what that means other than the fact that I wouldn't be able

25   to talk to you.  But happily that's -- that message is gone
```

1    and all as well.  So I think we got to pump the brakes a

2    little bit here.  I'm not -- there's a, there's bit of the

3    sky is falling aspect of the argument you're making, which

4    is who knows what's going on with Mr. Moro?  Well, I imagine

5    people do know.  It's not unknowable.  And so, I'm, I'm not

6    -- that's just not a very productive way to look at this

7    particular situation and to say he's a creditor, well he's a

8    creditor who has, as we look at any creditor, has

9    circumstances and circumstances dictate whether creditors

10   are priority creditors, administrative creditors, or

11   somebody who has a D&O policy for which he's the insured.

12   And so we look at those circumstances.  So I'm not, that's

13   not really going to get me anywhere.  So do you have a -- so

14   is there something in the paragraphs here that you

15   understand to be in dispute?  I mean particularly as to

16   whether he's getting coverage, whether he's expending money

17   and has had to pay it out of his own pocket, which is what

18   Paragraph 8 says, which I think is really the relevant

19   thing.  I don't know that he's somehow ineligible to be an

20   insured if he's a billionaire.  I don't think anybody thinks

21   he is a billionaire, but I don't know that that's neither

22   here nor there for purposes of the insurance policy.

23             MR. ABELSON:  Your Honor, respectfully, that's not

24   really the question.  The question is, should you lift the

25   stay?  Whether you should have access to the policy --

1              THE COURT:  Well, no, but I have to figure out

2       what everybody's rights are under the policy first.  Right?

3       So and that's what this declaration is about.

4              MR. ABELSON:  Fair enough, Your Honor.  And that

5       goes to whether this declaration should be admitted at all.

6       And what I'm saying is it's --

7              THE COURT:  Counsel, we're not going to get very

8       far with this.  We could spend more money on some of these

9       debates then frankly, we'll just burn estate cash talking

10      about some of these things for both the committee and the

11      debtors.  I'm not, I'm not going to deal with platitudes and

12      sort of general statements by the committee about

13      generalized equities.  The declaration I take to be about

14      his status is insured under the policy, that he is expending

15      money to respond to requests that deal with the company.

16      And therefore, he has a basis to draw on the insurance

17      policy.  So that's what I take to be the relevant facts for

18      purposes of today.  Are any of those disputed?

19              MR. ABELSON:  Those facts that you just listed are

20      not disputed, Your Honor, but that's not what Paragraphs 8

21      and 9 say at least in full.

22              THE COURT:  Well, that's what I care about for the

23      moment.  So the facts about his coverage and that he's

24      spending money is what I care about.  So, all right.  But

25      again, you know, my thought is that I would think very, very

1    long and hard about whether you want to start to get into

2    his personal situation in terms of an evidentiary matter

3    when you could pick up the phone and ask Mr. Mintz some

4    questions about it.  It doesn't seem -- it seems to be like

5    we're burning money unnecessarily on something like that

6    when people can talk to each other.  So if you want to have

7    an evidentiary hearing on that, I'm going to be very mindful

8    of the costs of such an endeavor for anything that can be

9    solved by a simple phone call between counsels.  So, all

10   right.  I'm not, I'm not going to go any further with this

11   particular thing right now.  I see why Mr. Mintz maybe

12   didn't move it into evidence, because it's a bit of a

13   hornet's nest.  So the question is whether it makes sense to

14   hear from the committee now on its legal argument or whether

15   it makes sense to hear from other, other folks?  I guess my

16   thought is since I'm already talked to Mr. Abelson, now, I'm

17   inclined to just go ahead and, and segue right to the

18   merits.  So Mr. Abelson, unless you have a different

19   suggestion, why don't you, why don't you address the merits?

20          MR. ABELSON:  Yes, Your Honor.  To be clear, Your

21   Honor, I was not suggesting that we hold an evidentiary

22   hearing.

23          THE COURT:  Well you kind of were, I mean, whether

24   you, whether you were devoutly, you know, committed to that

25   result is another question.  But when you have an objection

Page 26

1      to the admissibility of evidence, you're sort of asking for

2      an evident or hearing, that's kind of the way that goes at

3      least as far as trial lawyers.

4              MR. ABELSON:  Well, Your Honor, I had a different

5      suggestion.

6              THE COURT:  Let's move on.  Let's just, let's skip

7      to the merit of this.  So he's an insured under the policy,

8      right?  And as I understand New York law, the insurance

9      company has a duty of treating everybody who's an insured

10     under a policy appropriately.  And if there are multiple

11     folks who are under a policy, then you sort of -- I recently

12     had this come up two weeks ago, then sometimes an insurance

13     company will insist on siloing out different proceeds to

14     make them available for people that have defense costs.  But

15     here I think -- so that would seem to set the floor for

16     this.  But what Mr. Mintz is saying is that the policy

17     itself has a priority clause and it says that the insureds,

18     the individual insureds, the Side A come, come first.  And

19     so that seems to be the crux of what he's saying that we

20     don't have to sort out.  And therefore, I don't have the

21     active participation of the insurance company here I suspect

22     for that reason, that they're not coming in concerned that

23     paying out money to one insured will somehow compromise them

24     or lead to them being sued in another context because of

25     this priority provision.  So what's your view about all of

1    that?

2            MR. ABELSON:  Yeah.  Your Honor, I would contest

3    what Mr. Mintz said because I think the premise is wrong.

4    What we're trying to do is preserve the asset like we do

5    with assets.

6            THE COURT:  No, no, I have a very specific

7    question about the policy and the priorities under the

8    policy.  And I need you to answer to that question.

9            MR. ABELSON:  The policy says --

10           THE COURT:  I don't have a magic equity wand.  I

11   look at what people's rights are under applicable law, which

12   here includes this insurance policy.

13           MR. ABELSON:  Right.  The policy says what it

14   says, Your Honor.  And there is a priority provision that

15   says that if you get to the point where you're going to

16   exhaust the policy, the insurer will then pay Side A claims

17   first.

18           THE COURT:  All right.  So if there are Side A

19   claims that need to be paid then, how does it make any

20   logical sense then to object to paying those, if those would

21   come before anything else that the estate would get?

22           MR. ABELSON:  Because, Your Honor, Mr. Moro is not

23   the only party who can make claim to that policy.  There are

24   other for -- there are former officers and directors.  There

25   are the current officers and directors.  This is one policy.

Page 28

1    This is all we have.  So if you --

2              THE COURT: But isn't that the insurance company's

3    problem in the sense of once it's exhausted for any

4    individual insureds in Side A, you know, there's that

5    question about is it a loss, the first incurred loss that

6    sort of pay as you go or that you need to set aside money?

7    But it doesn't seem to -- that doesn't seem to inure to the

8    benefit of the estate, does it?  I mean, how does that, how

9    does that work?

10             MR. ABELSON:  Well, again, let me start, let me

11   take a step back because the estate has actually filed

12   claims under the policy already.  They're just being held

13   because they haven't hit the retention amount, which is a

14   million dollars.

15             THE COURT:  But wouldn't those have to, by

16   definition, have to come after Mr. Moro's request for

17   reimbursement given the way the priority works in the

18   policy?

19             MR. ABELSON:  Not until you hit the point at which

20   the policy is exhausted, Your Honor.  So but, look, I would

21   go back even further and say --

22             THE COURT:  So what you want is that everybody has

23   enough bills that exhaust the policy and then to pay Mr.

24   Moro first?

25             MR. ABELSON:  No, that's not exactly what we want.

1    What we would like is for the estate to apply as it does to

2    make sure that before assets are dissipated, that we make

3    sure that they are equitably distributed and that includes

4    to the current D&Os.  Once this policy is exhausted, Your

5    Honor, there is no D&O policy for this estate.  Now, the

6    debtor can't -- the debtor, for whatever reason --

7              THE COURT:  What I'm trying to figure out is how

8    Mr. Moro wouldn't end up getting covered one way or the

9    other under the operation of this policy?  It would seem to

10   be a violation of the policy for the estate to get payment

11   out of it and Mr. Moro not to get paid out of it, that that

12   would seem to violate the priority provision.

13             MR. ABELSON:  Well, again, only if we've

14   exhausted.  That's actually the point, Your Honor.  I'm not

15   saying he can never access it.  What I'm saying is at the

16   moment, lifting the stay to allow only Mr. Moro -- and let

17   me get to the point of what the debtor said, which I think

18   is just equally as bad -- but to allow Mr. Moro to go and

19   access and potentially exhaust the policy while everybody

20   else is waiting and we're waiting to see what happens in

21   this case -- this case is very complicated.  There are,

22   there are admittedly lots of investigations, Mr. Moro is

23   right or Mr. Mintz was right.  There are investigations.  We

24   are doing one ourselves before we decide --

25             THE COURT:  But I don't normally see this in this

Page 30

1    context.  I don't have people come in and say, Judge,

2    everything has to be exhausted for anybody to come in and

3    seek to have themselves covered under the policy.  That's

4    not, that's not my experience of how this works.  I've seen

5    pay as you go.  A couple of weeks ago, as I said, I saw an

6    instance where a Chapter 11 trustee said, we think we're

7    settling with these folks.  They're entitled to money under

8    the policy.  That's what's going to fund the settlement.  We

9    think the insurance company can just pay all the policy over

10   to us.  The insurance company says we have an equal duty to

11   all the insureds and they're not willing to do that.  And so

12   we're going to apportion it among the insureds, the folks

13   who are entitled to coverage under the policy.  So I've seen

14   that.  But that didn't purport to say you have to wait till

15   everything's exhausted to sort things out.  The insurance

16   company was essentially insisting on something to say, we

17   don't want to get sued at the end of the day.  But here, but

18   that case didn't have a priority provision.  So with the

19   priority provision, I'm having trouble imagining how Mr.

20   Moro having submitted -- well who wants to submit requests

21   and is entitled to submit requests, would end up behind

22   everybody else, would end up behind the estate.  And I think

23   the committee probably only has an interest in this to the

24   extent we're talking about assets of the estate and them

25   inuring to the benefit of the estate.  I know you've invoked

1    other insureds, but that's not really who you're here about.

2    You're here about -- and I think there was a mention about

3    the committee and the policies being available for any

4    claims that the committee might have.  So I just have

5    trouble imagining a circumstance where Mr. Moro ends up out

6    in the cold, given the way the policy works, the fact that

7    he already has incurred expenses.  So I mean -- because I

8    don't, I don't see how it would be appropriate to game the

9    system in terms of the automatic stay so that somehow the

10   things that he incurs now somehow get put at the back of the

11   line later.  So even if we haven't technically exhausted the

12   coverage for that to be triggered, that seems a foregone

13   conclusion.  So am I missing something about how this is

14   actually going to work?

15            MR. ABELSON:  Well a couple of things, Your Honor.

16   One is it is actually a pay as you go.  It's only when you

17   get to the point where there are competing claims and it

18   exceeds the policy that then they would say pay Side A

19   versus Side B or C.  So the debtors claims are in line, they

20   are going, you know, they are in line to be paid.  And so

21   again, we just want to preserve the asset for the debtors

22   because we don't know where this is going to go.

23            THE COURT:  But if the debtors are entitled to be

24   paid, wouldn't Mr. Moro be entitled to be paid?  I mean

25   wouldn't the insurance company be put in an inappropriate

Page 32

1      position under applicable insurance law in terms of

2      violating their duty to treat insureds appropriately under

3      the policy?

4             MR. ABELSON:  Well, yes, although what is likely

5      to happen now is that we're going to have -- and I don't, I

6      mean, I wouldn't blame them -- the other former D&Os, the

7      current D&Os file claims to try to get themselves in the

8      line.  The whole point of the stay is to make sure that

9      estate assets are preserved, so we can figure out how they

10     can be equitably distributed, and distributed according to

11     the policy because ultimately, we're not distributing them.

12     It's not the estate, it's the insurer.

13            THE COURT:  But doesn't that argue for language in

14     the order about essentially that the insurance companies

15     should -- I mean, they're the folks who are sort of on the

16     hook, aren't they, right, if they pay out the proceeds

17     incorrectly and they favor one insured over another, another

18     officer? But even if I want to get into that, wouldn't we,

19     as we did, as they did a couple of weeks ago, then put in

20     provisions that talk about them, their obligation to treat

21     insureds equally?  I mean you could set aside money.  I

22     don't know exactly how many insureds there are.  But I don't

23     know that it counsels for your result of saying we're

24     keeping this all for the estate and nobody else is entitled

25     to anything.  That doesn't seem to be consistent with the

1      whole reason behind the existence of this policy.

2              MR. ABELSON:  No, I understand, Your Honor.  I was

3      -- to the extent that I was suggested, that's not what I'm

4      arguing.  What I'm arguing is that the timing is such that

5      it doesn't make sense to allow the door to be open for

6      people to start to dissipate this policy because once this

7      policy is gone, that is it, that's our D&O for the debtor.

8              THE COURT:  But that's the way it works, right?  I

9      mean I'm having trouble understanding -- also as the

10     committee, you would care about preserving assets of the

11     estate.  But if it's gone, because all of these folks who

12     are entitled to coverages, individual insureds have made

13     claims, then that's what happens.  So that's not a, that's

14     not something that the committee really has any skin in that

15     game if that's what the result is.

16             MR. ABELSON:  But that's only, Your Honor, if you

17     lift the stay.  That's the point.  The stay does protect and

18     we can talk about whether it applies --

19             THE COURT:  I think you're elevating form over

20     substance here, right?  I mean sometimes the policies are

21     written in ways that you have trouble figuring out what --

22     how to treat various parties under it vis-a-vis the

23     bankruptcy.  But this priority provision seems to make it

24     very clear that if individual insureds under Side A have

25     claims, they have claims.  And those that -- there's not a

Page 34

1    circumstance, or there shouldn't be a circumstance where the

2    policy gets exhausted and those folks' claims don't get paid

3    and somehow the debtors, as the estate, as the entity

4    insured or -- I'm sorry, I'm getting the -- the company

5    insured ends up making out better than they do.  That would

6    seem to be inconsistent with the policy.  That's the way I

7    read your papers is that this should be preserved for the

8    estate, meaning the debtors, as the company insured to be

9    able to use as opposed to these individual insureds.  And I

10   have trouble reaching that conclusion based on what I know

11   of the policies, policy.

12          MR. ABELSON:  Yeah, fair enough, Your Honor.  I

13   mean, look, we looked at this situation and said, does it

14   make sense right now where we are in the case -- and it's

15   not a large policy as you probably noted -- to allow a

16   former CEO, who's part of the investigation, to go and start

17   to take assets out of the estate and leave the estate

18   exposed without potentially D&O insurance.  That was the way

19   we looked at it.  I mean, again, my point is this isn't

20   forever.  It's for now to figure out the timing.  What's

21   going to happen?  Who might make claims at it?  Does the

22   estate have claims?  Might there be another exclusion?

23          THE COURT:  But again, you keep getting back to

24   the estate and you keep getting back to trying to pay any

25   claims that the committee contemplates bringing against

1    folks and I don't, that's still the company insured and

2    given the way the insurance policy is written, your desired

3    outcome seems to not be in the cards, for lack of a more

4    precisely parsed legal way of saying that.  I just have

5    trouble seeing that to be the end game here.  So I

6    certainly, if there are guard rails about how to treat this

7    insured individual versus other insured individuals,

8    frankly, I think that that's really something the insurance

9    company would have a stake in as to how that goes.  But at a

10   certain point, they would probably say, Judge, you know,

11   keep out of it.  We have an insurance policy.  This is what

12   we do for a living.  We know who to pay and how to pay them

13   based on the policy.  And if the company makes claims,

14   they'll be processed consistent -- I mean I can see the

15   point of saying anybody, if you're going to allow this

16   insured to make a claim, this individual insured, then

17   anybody else who's on the policy should be able to make a

18   claim.  And if I'm understanding the dialogue, it sounds

19   like that was something that was suggested by the debtors

20   and that the movant doesn't have a problem with.  And that

21   that essentially gives everybody equal treatment and allows

22   the insurance company to do what it would do.  And if

23   there's money left, then there's money left.  But it doesn't

24   sound like that's going to be how it ends up.  So I just

25   have - so I could see if you flip the facts here and the

Page 36

1    individual insureds came after the company insured, and you

2    said they want to lift the stay, but we're first in -- the

3    debtors are first in line, Judge, these folks will end up

4    using up the available insurance funds and they aren't first

5    in line.  And we can end up, the debtor can end up in a

6    worse situation.  I would understand that concern because it

7    would essentially could effectively mean that whatever

8    priority the debtor had, as the company insured being first

9    in line, would effectively be erased.  But I have trouble

10   seeing the problem the other way around.  Again I don't

11   profess to be an insurance expert, but we do end up dealing

12   with these things in bankruptcy court.  And again, just the

13   other day, I had one of these and the insurance company was,

14   was the party coming in to sort of craft the terms of how

15   they wanted the stay relief to look so that they did not

16   feel like they would be legally compromised in any way in

17   taking actions under the policy.

18          So what else do you want to tell me, counsel?  I

19   appreciate the back and forth discussion and I'm sure I've

20   done violence to what's a very nice presentation.  So sorry

21   about that.  But what else do you like to tell me?

22          MR. ABELSON:  Yeah, I mean, Your Honor, I

23   previewed and you seemed to reject what was going to be the

24   thrust of the argument, which essentially is that this is an

25   estate asset.  The stay applies.  And like all assets of the

1   estate where the stay applies, you don't lift it lightly.

2   And there is a burden.  And the burden is one where you look

3   to see -- and you look at the Sonnax factors and the one

4   that seems most appropriate here is the balance, which is

5   really just saying where do the equities lie?  And so I

6   wasn't referencing equity in terms of equitable relief.  I

7   was saying, Your Honor, the test is really where do the

8   equities lie, whether the stay should be lifted.  And, you

9   know, frankly, it's a little incongruous to me that the

10  former CEO of a company that is under a number of

11  investigations, is able to access the policy when 340,000

12  unsecured creditors are sitting and have to wait to access

13  their dollars and their crypto and all the stuff they're

14  waiting for.  And I'm sure within those 340,000, we could

15  find plenty who could talk about financial hardship.

16          THE COURT:  I know, but my concern with that is

17  that seems to elevate the optics of this above the actual

18  law and parsing through what we have.  These are problems

19  that come up in cases. We deal with them as they come up.

20  We're not making value judgments about the moral worth of

21  anybody or anybody's claims.  We are just determining what

22  makes sense  given, given the law.  And so let me -- I do

23  want to hear from debtors because I haven't done that yet.

24  So let me ask you, Mr. Abelson, if there are any other

25  points that you wanted to make before I do that?

 1              MR. ABELSON:  No, Your Honor.  I think that's

 2      fine.  Thank you.

 3              THE COURT:  All right.  So let me hear from the

 4      debtors.

 5              MR. BAREFOOT:  Good afternoon, Your Honor.  For

 6      the record, Luke Barefoot for the debtors.  Your Honor, as

 7      we set forth in our papers, we don't take a position --

 8              THE COURT:  All right, Mr. Barefoot, you're,

 9      you're very choppy at the moment.  Looking at the video and

10      hearing the audio, you might just have a poor connection.

11      So if you want to hop on a phone line, as long as we can

12      hear you, that's fine.

13              MR. BAREFOOT:  Is this any better if I move a

14      little closer?

15              THE COURT:  Yeah, it is.  It's vagaries of what,

16      what works from a technology standpoint, and however you can

17      make it work, God bless you.  All right.  Go ahead.  We'll

18      see if we can make it work this way.

19              MR. BAREFOOT:  Thank you.  So the debtors, as we

20      set forth in our papers, don't take a position on whether

21      Mr. Moro has carried his burden to lift this stay or

22      otherwise, whether the relief should be granted.  There are

23      just a few points that I wanted to address.

24              First off, I did want to -- for the avoidance of

25      any doubt on --

Page 39

```
 1              THE COURT:  All right.  Mr. Barefoot, you are

 2    breaking up.  There is a number to call on Zoom, the Zoom

 3    platform.  So if I were you, I would just hop off the video

 4    and just call that number and I'm happy to wait.

 5              MR. BAREFOOT:  I apologize, Your Honor.  And I'll

 6    do that.

 7              THE COURT:  So, the apology is rejected.  We never

 8    all quite know how these things happen and when they do and

 9    when they don't.  No worries, just hop. I won't talk

10    substance while he's gone, but I will say I did have a

11    daughter whose room I ended up using during the beginning

12    days of the pandemic for hearings.  And she had always

13    complained that the internet was terrible in her room.  And

14    her mother and I shrugged as most parents would like, oh,

15    it's terrible.  You can't get on the internet in your room.

16    What a pity.  And we did nothing.  And then when I was using

17    the room, I said, you know, she's really right.  It is

18    really terrible.  So I fixed it and she came home.  She was

19    suitably outraged.  But anyhow, it's hard to know how one of

20    these things work, why they work and why they don't.  So are

21    you all back in the offices in substantial part or some

22    part?  How's that been working for folks?

23              MR. MINTZ:  We're back in most days.  It seems

24    like there's probably half or so of people that actually do

25    it.
```

1              MR. BAREFOOT:  Your Honor, Luke Barefoot from

2    Cleary Gottlieb.  I've rejoined via audio.  Can you hear me

3    all right?

4              THE COURT:  Yes, I can hear you just fine.  And

5    we've been talking about the internet and whether people are

6    coming to work and technology problems, so nothing of

7    substance.  So we can pick up where we left off.  So you

8    said you had a couple of points you wanted to make, so take

9    it away.

10             MR. BAREFOOT:  Yes, thank you very much, Your

11   Honor.  As we set forth in our papers, we don't take a

12   position on whether Mr. Moro has carried his burden to lift

13   the stay or otherwise whether relief should be granted.  I

14   did want to note for the avoidance of a misimpression on the

15   record, our disagreement with Mr. Mintz's argument that the

16   committee is some now acting here as a representative of the

17   debtors.  This is not a case where there's been derivative

18   standing granted or any similar circumstances.  So the

19   committee, in taking its position, is not speaking for or

20   acting as a representative of the debtors as Mr. Mintz had

21   suggested.

22             Beyond that, Your Honor, the only points that we

23   wanted to make are the ones set out in our papers, which is

24   that if the Court is inclined to grant the motion, the

25   debtors would observe that the current scope of the proposed

Page 41

1    relief in the motion is in equal parts inequitable and

2    inefficient.

3           First, there are many other former directors and

4    officers in Mr. Moro's position and it would be inequitable

5    at best to lift the stay as to him to allow him to make

6    claims and draw down the policy while preserving the stay

7    for many other similarly situated directors or officers.

8           Second, while we're not clear on why the original

9    motion only referenced the primary policy, the argument to

10   the extent the Court finds that they have merit, would apply

11   with equal force to the excess policies.  And so in the

12   interest of judicial economy, it would make sense to include

13   in the scope of any order the excess policies as well.

14          THE COURT:  All right.  So let me ask the debtor,

15   on behalf of the debtors, this, your take for what I would

16   loosely say is sort of the thrust of the committee's

17   objections is that somehow the estate will end up in a worse

18   place here.  I've been grappling with understanding how that

19   could be given the way the policies operate and the language

20   quoted by Mr. Mintz.  Am I -- from the debtor's point of

21   view, am I, am I missing something?  Is there some concern

22   that somehow the debtors, in terms of the property of the

23   estate, will miss out on something by allowing individuals -

24   - individual insureds to draw on the policy?

25          MR. BAREFOOT:  Your Honor.  First, I do want to be

Page 42

1     mindful to the extent it would ever be found enforceable,

2     mindful of the provisions and the policies that purport to

3     prohibit the debtors from taking a position with respect to

4     an automatic stay motion.  And the last thing I would want

5     is to somehow give an insured an argument that --

6                 THE COURT:  No, no.  That's fair.  I don't know if

7     Mr. Mintz has an objection to you answering that question.

8     I'm just trying to figure out the practicalities of drawing

9     on the policy.  I'm not asking you to take a position on the

10    motion, the relief requested, but just as a practicality,

11    what it means to lift the stay for purposes of what's

12    available for the debtor versus what it would mean to not

13    lift the stay in terms of whether the debtor is somehow

14    disadvantaged compared to the other folks who are insureds

15    under the policy.

16                MR. BAREFOOT:  I appreciate that clarification,

17    Your Honor.  I think in many, if not most, factual

18    scenarios, the practical point that Your Honor made is

19    correct.  And in many, many scenarios, it may not

20    necessarily be a difference.  I think given that in this

21    case, unlike in many other policies that we've all seen, the

22    priority of payments provision is not absolute and only

23    comes into effect when there are aggregate claims that

24    threaten to exhaust the policy.  There could be a scenario

25    where if the stay remains in place as to individual

1    insureds, but obviously doesn't prevent the debtors from

2    making claims under the policy, there is a window in which

3    not lifting the stay could have the effect of prejudicing

4    the estate.  But I also take the point that Your Honor made

5    that the policy was written that way for a reason.

6              THE COURT:  All right.  Yeah, I'm trying not to

7    improve anybody's position by virtue of either denying this

8    motion or granting this motion.  I recognize that that can

9    be a little more complicated than you might think.

10             So and again, I do take Mr. Abelson's comment

11   that, you know, that these things kick in with exhaustion

12   and exactly how that would work itself out is an open

13   question.  But, , all right.  Anything else from the

14   debtors?

15             MR. BAREFOOT:  No, Your Honor.

16             THE COURT:  All right.  Thank you very much.  So

17   let me ask, I think the ad hoc group is also here.  I don't

18   know if they wish to be heard in connection with the motion.

19   All right, I'm not hearing anything.  Anyone else who wishes

20   to be heard.  So I think, I heard from the committee.  I

21   don't know if the movant wants to wrap things up in terms of

22   any responses.

23             MR. MINTZ:  Your Honor, the only thing, I'll just

24   confirm, which I stated before, is we do not have any

25   objection to the modifications that the debtor has proposed

1   and we would be prepared to modify the proposed form of

2   order to reflect those two modifications.

3           THE COURT:  All right.  And I just, I want to be

4   very clear.  I know I have them in my stack of papers, but

5   if you could just run the particulars by me of those two

6   modifications just in light of our recent discussion?

7           MR. MINTZ:  As I understand it, I think number one

8   is that the relief that would be granted would extend to all

9   current and former officers and directors.  And number two,

10  that the applicable relief would extend not only to the D&O

11  policy, but the E&O policy, and the excess policies as well.

12          THE COURT:  All right.  All right.  Anything else,

13  Mr. Mintz?

14          MR. MINTZ:  No, Your Honor.

15          THE COURT:  All right.  So I'll turn back to you,

16  Mr. Abelson, on two fronts.  One is if you had any reaction

17  to those two proposed changes?  And second, in light of the

18  concerns you've raised, but also in light of the discussion

19  we've had, is there any other thing that you might request

20  in the order that essentially ensures that the parties are

21  treated in a way consistent with the policy rights and so

22  that there's no  undue windfall to anyone and the insurance

23  company can essentially handle these things the way,

24  consistent with the way the policy is written?  So as to the

25  first, any addendum or changes or objection to the two

1   proposed amendments that the debtors have provided to Mr.

2   Mintz?

3           MR. ABELSON:  So as to that -- as to those

4   changes, Your Honor, I was originally going to oppose those

5   changes that were suggested by the debtors because I think

6   it creates the same issue, but given Your Honor's ruling, I

7   think Mr. Barefoot is correct that judicial efficiency would

8   make sense to not have to force everybody to come in

9   individually and ask to lift the stay.  So if the idea is

10  that people can draw on under the policy as insured, and

11  then rather than have us do this many times and have them

12  incur the cost, I think that's fine to just have, have it be

13  blanket for all the insureds.

14          As to your second question, Your Honor, as to

15  whether there are any changes to the order, I can't really

16  think of any necessarily other than maybe just making sure

17  that it's clear that Your Honor's order doesn't impact the

18  actual terms of the policy, because it is a pay as you go.

19  As claims become payable, they should be paid until

20  exhaustion and only again, when there's competing claims at

21  exhaustion, would you give priority to Side A.  And that

22  could again, because the debtors have submitted claims, that

23  could mean that the debtors actually get some benefit from

24  it.

25          MR. MINTZ:  Yeah, I'll read you some language.

Page 46

1    And maybe this addresses the point.  There is a provision

2    that says nothing in this order shall constitute a waiver,

3    modification, or limitation of any of the terms or

4    conditions of the D&N policy.

5              MR. ABELSON:  That, that sounds fine from my

6    perspective, Your Honor.  I could add a few words but I

7    don't know that they're needed.

8              THE COURT:  Yeah, I think it would also then

9    include the excess policy as well.  Right?

10             MR. MINTZ:  Right.  That's right.  There would

11   have to be revisions throughout to change the references to

12   the D&O policy to the policies and we'll have to define

13   those.

14             THE COURT:  All right.  And just in terms of the

15   first modification, as I understand it, the duty of good

16   faith and fair dealing under New York case law requires that

17   insurer protect the interest of its insureds and that the

18   insurer is prevented from taking actions that prefer one

19   insured over another.  And so I would imagine -- now again,

20   the order of a bankruptcy court that essentially lifts the

21   stay for one party and not for another is an order of the

22   court, then people can come in.  But it does seem that

23   that's an appropriate amendment for purposes of being

24   consistent with New York law.  And so if the insurance

25   company was engaged, they might, they might actually suggest

1    that as I've seen suggested in other cases.

2            And again, I had an insurer take a position that,

3    you know, even in a first come first served policy, that

4    they want to make sure to not have a circumstance where they

5    have a problem from the good faith and fair dealing

6    standpoint.  So, all right.  Anything else from any other

7    party?

8            So I'm going to overrule the objection for a

9    couple of reasons.  One is I do think the debtors have not

10   objected, given the language of the policy, and I'm not sure

11   how the committee, in a case like this, isn't bound by that

12   same language.

13           Secondly, I do think, well, bankruptcy courts get

14   these kinds of requests all the time.  I don't think this

15   strikes me as a particularly offensive request.  It's a

16   request because somebody's cooperating with investigations

17   and those investigations relate to the debtor.  And if

18   somebody, if these folks didn't cooperate, then somebody

19   else would have to.  And so, I think there is some benefit

20   to the estate for somebody to be in a position to respond.

21   But being as it may, I think there are people who are in

22   these circumstances, who are running up expenses, the

23   debtor's (indiscernible) as well.  And I understand that

24   this priority provision is not absolute.  Given the way it's

25   written, I do have trouble imagining that if folks are

Page 48

1    allowed to -- that if the automatic state is used in a

2    particular way, we essentially can rewrite the policy so

3    that folks who are entitled to have provision when push

4    comes to shove and exhaustion, end up at the back of the

5    line, which does seem to be inconsistent with the way the

6    policy is drafted.

7              So it seems most equitable to allow the debtors

8    and other folks in these circumstances to make claims and

9    for the insurance company to process them consistent with

10   the policy on a first come first serve basis with provisions

11   to be triggered as appropriate, including the exhaustion

12   provision until the, until the policy limits are exhausted.

13   So that seems to be the appropriate result here.  I do think

14   the two changes proposed by the debtors are appropriate so

15   that one insured is not favored over another.  And the other

16   folks that we're talking about are other individuals who

17   would be indistinguishable for policy purposes from the

18   movant.  And I would expect that we would see quite a few

19   motions quite quickly to do that.  And it makes sense to

20   address that problem now, which again, seems to be the fair

21   and equitable way to handle it.

22             And I also agree that dealing with the excess

23   policy as well as the primary policy at this point makes

24   sense so that we can deal with this in one fell swoop.  I do

25   appreciate the committee's, you know, you're thinking about

1    if you don't lift the stay and preserving assets of the

2    estate.  And I think that under other circumstances, I think

3    that argument might have more traction.  I am concerned

4    about rewriting a policy though as a practical effect of

5    that in a way that I don't think that's what the automatic

6    stay is intended to do.  It's intended to recognize the

7    legal rights that parties have that preexist the bankruptcy.

8    And I think that  the result reached today is most

9    consistent with that.  It's not perfect, but it seems to be

10   the fairest that we can do under the circumstances.

11          So for all those reasons, I will grant the motion

12   as that relief has been amended in our discussions here

13   today and through the debtor's comments and overrule the

14   objection.  I certainly encourage the circulation of an

15   order before it's submitted here as well as conveying in

16   that email submission to my orders inbox whether all folks

17   are on board with the order, even if I understand that the

18   committee does not consent to this request, they objected to

19   it, but in terms of the order, I just want to make sure that

20   you've seen it and think it comports with our discussions

21   here today and the ruling.

22          So, with that, that's my ruling and I appreciate

23   everybody's arguments and the papers and your attendance

24   here today, as well as persevering through technical issues.

25          MR. ABELSON:  Yeah, apologies, Your Honor.  Can I

Page 50

```
1    -- and I'm not, I'm not questioning the ruling.  I

2    understood where Your Honor stands.  But there was one thing

3    that was said that I think needs to be clarified, which is

4    the first point in your ruling, which was that the provision

5    would bind the debtor and the committee, the provision that

6    limited the ability of the debtor to object to lifting the

7    stay.  I would think that we want to add a qualifier in

8    there for future cases that said if that is enforceable

9    because if it's enforceable, I don't know why it's not in

10   every contract that says when I go to lift the stay, you're

11   not going to oppose it.  And if you do, essentially --

12           THE COURT:  Well, I'm not going to make an

13   advisory ruling as to future cases.  All I will say for

14   purposes of clarifying remarks is that it's been cited as a

15   basis for the debtors not filing an objection.  The

16   committee is acting as fiduciaries on behalf of creditors to

17   the estate.   And so to the extent that the committee is

18   acting to preserve assets of the estate, much like the

19   debtors, there's an argument to be made that that provision

20   would also, might also bar it from opposing a lift stay

21   motion.  But frankly, I think there's other grounds based on

22   the Sonnax factors -- the application of those factors is

23   discussed in the papers -- that make this an appropriate

24   request for relief from the automatic stay in any event.

25           MR. ABELSON:  I'll let Mr. Barefoot speak to this,
```

Page 51

1    Your Honor, but I think they did it out of abundance of

2    caution.  My, my concern, Your Honor, is I don't think they

3    conceded the point that they're bound.

4            THE COURT:  Well, I'm not asking you to concede

5    it.  It was, it was argued and it wasn't specifically

6    opposed.  So I'm not, I'm not here to reargue the motion at

7    this point.

8            MR. BAREFOOT:  Your Honor, Luke Barefoot from

9    Cleary.  Just very briefly, while we would take issue if we

10   were forced to with the enforceability of this as to the

11   debtors and their estate, I think perhaps what Mr. Abelson

12   is concerned with is that if you find, which I don't think

13   Your Honor needs to or has to, finds that the policy

14   prohibition applies to the committee, there perhaps has been

15   -- the existence of the objection could be raised as a

16   coverage issue, which I don't think is anyone's intention.

17           MR. ABELSON:  Well, that -- apologies.  That, Your

18   Honor and, and just bankruptcy policy if the provision in a

19   contract says that the debtor can't object to --

20           THE COURT:  No, I'm not -- I think I just said an

21   argument can be made, which is an attempt to soften the

22   blow.  And so that will be my observation on that point for

23   purposes of the particular facts in this case, dealing with

24   this particular insurance policy.

25           MR. ABELSON:  Fair enough.

1            THE COURT:  It is not meant to be a general

2     statement about how the committee's standing overlaps or

3     doesn't overlap with the debtor's standing in raising any

4     issues.  The committee has its own statutory authority and

5     concerns.  And so I'm not trying to make some sort of broad

6     statement on that.  It was essentially a throwaway point in

7     the papers, but one that I think was made in the sense of

8     saying, if the debtors aren't opposing, we're not sure why

9     the committee is.  So I take it in that vein and so I'll

10    make it as an observation rather than hold it.

11            MR. ABELSON:  Fair enough.  Thank you, Your Honor.

12            MR. MINTZ:  Thank you, Your Honor.

13            THE COURT:  All right.   And so let me ask for

14    purposes of proceeding for the committee, I'm happy to go

15    through and make more specific Sonnax factor findings if

16    that's helpful for you or necessary for purposes of any

17    future proceedings.  I don't like to leave my judicial

18    colleagues shorted on the joys of applying the Sonnax

19    factors in individual cases, but sometimes I don't do it in

20    extensive detail so as to save you all from -- preserve 10

21    or 15 minutes of your life to do other things.  So I'll

22    leave it to you, Mr. Abelson, whether you would like me to

23    do that in this particular circumstance?

24            THE COURT:  There is no need, Your Honor, and I

25    appreciate your time.  Thank you.

Page 53

1              THE COURT:  All right.  All right.  Thank you very

2      much.  All right with that, anything else from any other

3      party to address you this afternoon?  All right.  Thank you

4      very much for your time today.  Be well and I'm sure I'll

5      see you all in the not too distant future.

6              MR. ABELSON:  Thank you, Your Honor.

7              MR. BAREFOOT:  Thank you, Your Honor.

8              (Whereupon these proceedings were concluded at

9      3:19 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         **I N D E X**

2

3                          **RULINGS**

4                                                    Page         Line

5    **Motion to Lift Stay, GRANTED**                49           11

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 55

1                    C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6   *[signature: Sonya M. Ledanski Hyde]*

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  May 2, 2023