CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, et al.,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

**DISCLOSURE STATEMENT WITH RESPECT TO**
**THE AMENDED JOINT PLAN OF GENESIS GLOBAL**
**HOLDCO, LLC *ET AL*., UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Dated: June 13, 2023

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. PLAN SUMMARIES AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, EXHIBITS ANNEXED TO THE PLAN, THE PLAN SUPPLEMENT, AND ALL EXHIBITS TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE. ALL CREDITORS SHOULD CAREFULLY READ THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SEE <u>SECTION IX</u> BELOW, "RISK FACTORS."

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT, THE PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS SHOULD EVALUATE THIS DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON, PARTY, OR ENTITY FOR ANY OTHER PURPOSE EXCEPT AS PERMITTED BY APPLICABLE LAW.

THE TERMS OF THE PLAN, EXHIBITS ANNEXED TO THE PLAN, AND THE PLAN SUPPLEMENT (WHICH SHALL BE FILED WITH THE BANKRUPTCY COURT NO LATER THAN FIVE DAYS BEFORE THE VOTING DEADLINE) GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THIS DISCLOSURE STATEMENT. ALL EXHIBITS TO THIS DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

UNLESS OTHERWISE INDICATED, ALL CAPITALIZED TERMS USED BUT NOT DEFINED HEREIN SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE PLAN. IN THE EVENT OF AN INCONSISTENCY BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN SHALL CONTROL IN ALL RESPECTS. IN THE EVENT OF AN INCONSISTENCY BETWEEN THE PLAN AND THE PLAN SUPPLEMENT, THE TERMS OF THE RELEVANT DOCUMENT IN THE PLAN SUPPLEMENT SHALL CONTROL (UNLESS STATED OTHERWISE IN SUCH PLAN SUPPLEMENT DOCUMENT OR IN THE CONFIRMATION ORDER).

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR FUTURE LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTORS OR SUBSIDIARIES OF THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER BY ANY PERSON, PARTY, OR ENTITY, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY, OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL, OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS OR ANY OTHER PARTY IN INTEREST.

SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

NEITHER THIS DISCLOSURE STATEMENT NOR THE PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY. THE PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS DISCLOSURE STATEMENT OR THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

ANY OFFER, ISSUANCE OR DISTRIBUTION OF SECURITIES CONTEMPLATED TO BE OFFERED, ISSUED OR DISTRIBUTED UNDER THE PLAN, INCLUDING THE POST-EFFECTIVE DATE GGH INTERESTS WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT") OR ANY SIMILAR STATE OR FOREIGN SECURITIES OR "BLUE SKY" LAWS. ANY OFFERS, ISSUANCES OR DISTRIBUTIONS UNDER THE PLAN WILL BE MADE IN RELIANCE ON EXEMPTIONS FROM REGISTRATION SPECIFIED IN SECTION 1145 OF THE BANKRUPTCY CODE OR OTHER EXEMPTIONS FROM REGISTRATION SPECIFIED IN THE SECURITIES ACT, INCLUDING SECTION 4(A)(2) OF THE SECURITIES ACT, RULE 506 OF REGULATION D AND/OR RULE 701 PROMULGATED THEREUNDER OR OTHER EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT OR APPLICABLE FOREIGN SECURITIES LAWS, SUBJECT TO CERTAIN LIMITATIONS DESCRIBED HEREIN AND IN THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- THE DEBTORS' BUSINESS AND FINANCIAL STRATEGIES, BUDGETS, AND PROJECTIONS;
- THE OVERALL HEALTH OF THE CRYPTOCURRENCY INDUSTRY;
- POPULARITY AND RATE OF ADOPTION OF CRYPTOCURRENCIES;
- THE REGULATORY LICENSES HELD BY THE DEBTORS OR THE WIND-DOWN DEBTORS;
- THE EVOLVING REGULATORY LANDSCAPE AND POTENTIAL ADOPTION AND IMPACT OF NEW GOVERNMENTAL REGULATIONS;
- TAXATION APPLICABLE TO THE DEBTORS AND ANY CHANGES THERETO;
- THE DEBTORS' TECHNOLOGY AND ABILITY TO ADAPT TO RAPID TECHNOLOGICAL CHANGE;
- THE RELIABILITY, STABILITY, PERFORMANCE, AND SCALABILITY OF THE DEBTORS' INFRASTRUCTURE AND TECHNOLOGY;
- THE AMOUNT, NATURE, AND TIMING OF THE DEBTORS' CAPITAL EXPENDITURES;
- THE DEBTORS' FINANCIAL CONDITION, REVENUES, CASH FLOWS, AND EXPENSES;
- THE ADEQUACY OF THE DEBTORS' CAPITAL RESOURCES AND LIQUIDITY TO SATISFY BOTH SHORT AND LONG-TERM LIQUIDITY NEEDS;
- THE INTEGRATION AND BENEFITS OF ASSET AND PROPERTY ACQUISITIONS OR THE EFFECTS OF ASSET AND PROPERTY ACQUISITIONS OR DISPOSITIONS ON THE DEBTORS' CASH POSITION AND LEVELS OF INDEBTEDNESS;
- GENERAL ECONOMIC AND BUSINESS CONDITIONS;
- BANK VOLATILITY;
- THE INABILITY TO MAINTAIN RELATIONSHIPS WITH EMPLOYEES AND OTHER THIRD PARTIES AS A RESULT OF THESE CHAPTER 11 CASES OR OTHER FAILURE OF SUCH PARTIES TO COMPLY WITH THEIR CONTRACTUAL OBLIGATIONS;
- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT ACTIVITIES;
- COUNTERPARTY CREDIT RISK;
- THE OUTCOME OF PENDING AND FUTURE LITIGATION;
- EXCHANGE RATE FLUCTUATIONS AND CRYPTOCURRENCY PRICE FLUCTUATIONS;
- RISKS IN CONNECTION WITH DISPOSITIONS; AND
- PLANS, OBJECTIVES, AND EXPECTATIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF ANY FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY

PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE
PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW.
THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:

- THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11
  CASES;
- THE DEBTORS' ABILITY TO PURSUE THEIR BUSINESS STRATEGIES DURING
  THE CHAPTER 11 CASES;
- THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND
  REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS
  THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS'
  BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;
- CHANGES TO A PARTICULAR CRYPTOCURRENCY'S OR PRODUCT
  OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION
  UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY
  INTERPRETATION THEREOF;
- LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS OR
  FINANCIAL LOSSES IN EXCESS OF FDIC INSURED COVERED AMOUNTS
  CAUSED BY THE FAILURE OF CRITICAL BANKING RELATIONSHIPS;
- THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE
  CHAPTER 11 CASES;
- INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE
  CHAPTER 11 CASES;
- CLIENT RESPONSES TO THE CHAPTER 11 CASES;
- THE IMPACT OF A PROTRACTED RESTRUCTURING ON THE DEBTORS'
  BUSINESS;
- THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE PLAN;
- THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN
  ALTERNATIVE TRANSACTION IF THE PLAN IS NOT CONFIRMED OR IF AN
  ALTERNATIVE PLAN WOULD PROVIDE MORE VALUE TO STAKEHOLDERS
  THAN THE PLAN;
- THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING
  THESE CHAPTER 11 CASES;
- THE DEBTORS' INABILITY TO PREDICT THEIR LONG-TERM LIQUIDITY
  REQUIREMENTS AND THE ADEQUACY OF THEIR CAPITAL RESOURCES;
- THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS
  AND FUND WIND-DOWN EXPENSES;
- LIMITED ACCESS TO CAPITAL RESOURCES;
- RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC
  CONDITIONS AND THEIR IMPACT ON DEMAND FOR CRYPTOCURRENCY;

- OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES AND INTERNATIONALLY, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;
- INDUSTRY CONDITIONS, INCLUDING COMPETITION AND TECHNOLOGICAL INNOVATION;
- RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS;
- CHANGES IN LABOR RELATIONS;
- FLUCTUATIONS IN OPERATING COSTS;
- SHIFTS IN POPULATION AND OTHER DEMOGRAPHICS;
- LEGISLATIVE OR REGULATORY REQUIREMENTS;
- ADVERSE TAX CHANGES;
- POSSIBLE RESTRICTIONS ON THE ABILITY TO OPERATE; AND
- FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, CRYPTOCURRENCY VALUES, AND CURRENCY VALUES.

YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS ARE OFTEN CHARACTERIZED BY THE USE OF WORDS SUCH AS "BELIEVES," "ESTIMATES," "EXPECTS," "PROJECTS," "MAY," "INTENDS," "PLANS" OR "ANTICIPATES" OR BY DISCUSSIONS OF STRATEGY, PLANS, OR INTENTIONS. THE LIQUIDATION ANALYSIS, AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE. ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS SPEAK ONLY AS OF THE DATE THEY WERE MADE AND THE DEBTORS DO NOT UNDERTAKE TO PUBLICLY UPDATE OR REVISE ANY SUCH FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED HEREIN OR THEREIN WILL NOT BE REALIZED. EXCEPT AS OTHERWISE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES OR INTERNATIONAL FINANCIAL REPORTING STANDARDS.

**THE DISCLOSURE STATEMENT REFLECTS MANY
BUT NOT ALL OF THE COMMENTS FROM THE COMMITTEE
AND AD HOC GROUP OF GENESIS LENDERS, HOWEVER,
DISCUSSIONS AMONG SUCH PARTIES REMAIN ONGOING
WITH RESPECT TO KEY ASPECTS OF THE DISCLOSURE STATEMENT.**

**FOR THE AVOIDANCE OF DOUBT, AS OF THE DATE HEREOF,
EACH OF THE DEBTORS, THE COMMITTEE, AND THE AD HOC GROUP
RESERVE ALL RIGHTS WITH RESPECT TO THE DISCLOSURE STATEMENT.**

**THE DEBTORS RESERVE THE RIGHT TO AMEND OR SUPPLEMENT THIS
DISCLOSURE STATEMENT AT OR BEFORE THE CONFIRMATION HEARING.**

# TABLE OF CONTENTS

Page

I.      INTRODUCTION ................................................................................................................1

        A.      General ...............................................................................................................1

        B.      Treatment and Classification of Claims and Interests; Impairment ...............................2

II.     IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT .....................................3

III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND
        THE AMENDED PLAN .........................................................................................................4

        A.      What is chapter 11? .............................................................................................4

        B.      Why are the Debtors sending me this Disclosure Statement? ...................................4

        C.      Am I entitled to vote on the Amended Plan? ..........................................................4

                (i)      Classification of Claims Against and Interests in GGH .........................5
                (ii)     Classification of Claims Against and Interests in GGC .........................6
                (iii)    Classification of Claims Against and Interests in GAP .........................7

        D.      What will I receive from the Wind-Down Debtors or Reorganized GGH (as applicable) if
                the Amended Plan is consummated? .......................................................................8

        E.      How do I vote on the Amended Plan? .....................................................................2

        F.      What happens to my recovery if the Amended Plan is not confirmed, or does not go
                effective? ...........................................................................................................2

        G.      Are any regulatory approvals required to consummate the Amended Plan? ..................2

        H.      If the Amended Plan provides that I am entitled to a distribution, do I receive it upon
                Confirmation or when the Amended Plan goes effective, and what do you mean when
                you refer to "Confirmation," "Plan Effective Date," and "Consummation?" ...................2

        I.      Is there potential litigation related to the Amended Plan? .........................................3

        J.      What are the sources of consideration used to make Distributions under the Amended
                Plan? ..................................................................................................................3

        K.      Does the Amended Plan provide for the subordination of any Claims? .........................3

        L.      Will the Wind-Down Debtors and Reorganized GGH be obligated to continue to pay
                statutory fees as part of the bankruptcy process after the Plan Effective Date? .............4

        M.      When will the Plan Supplement be filed and what will it include? ................................4

        N.      What are the Debtors' Intercompany Claims and Interests? .......................................4

        O.      Will Claims asserted with respect to damages resulting from the Debtors' rejection of
                certain executory contracts or unexpired leases of nonresidential real property affect my
                recovery under the Amended Plan? ........................................................................4

        P.      Will there be releases granted to parties in interest as part of the Amended Plan? ..........5

        Q.      What is the deadline to vote on the Plan? ...............................................................5

        R.      What is a Confirmation Hearing and will the Bankruptcy Court hold a Confirmation
                Hearing? ............................................................................................................5

        S.      What is the effect of the Amended Plan on the Debtors' ongoing businesses? ...............6

i

T.    Do the Debtors recommend voting in favor of the Amended Plan? ..................................6

IV.    **THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW** ............7

A.    The Debtors' Prepetition Organizational Structure ........................................................7

B.    Summary of the Debtors' Businesses and Corporate History ........................................7

C.    Summary of the Company's Prepetition Capital Structure ............................................9

V.    **EVENTS LEADING TO CHAPTER 11 AND PREPETITION RESTRUCTURING INITIATIVES** ...............................................................................................................12

A.    Impact of the 3AC Liquidation .....................................................................................12

B.    FTX Collapse ................................................................................................................12

C.    Impact on Customer Confidence ...................................................................................12

D.    Debtors' Decision to File for Chapter 11 ......................................................................13

VI.    **EVENTS OF THE CHAPTER 11 CASES** ............................................................................14

A.    Voluntary Petitions .......................................................................................................14

B.    First and Second Day Relief .........................................................................................14

C.    The Restructuring Term Sheet ......................................................................................15

D.    DCG Special Committee Investigation .........................................................................15

E.    The Committee's Investigation .....................................................................................16

F.    Redaction ......................................................................................................................17

G.    Cash Cloud Proceedings ...............................................................................................17

    (i)    Emergency Lien Priming .................................................................................17
    (ii)    Cash Cloud Sale Process ..................................................................................17

H.    3AC Liquidation Proceedings .......................................................................................17

I.    Recognition of the Chapter 11 Cases in Singapore .......................................................18

J.    Appointment of Official Committee of Unsecured Creditors ........................................18

K.    Ad Hoc Groups in the Chapter 11 Cases ......................................................................18

L.    Schedules and Statements .............................................................................................18

M.    Claims ...........................................................................................................................19

N.    Mediation with DCG and Key Stakeholders .................................................................21

O.    Employee Payments ......................................................................................................21

P.    Director & Officer Insurance ........................................................................................21

Q.    Motion to Extend Exclusivity .......................................................................................22

R.    DCG Loans and Forbearance ........................................................................................22

S.    Litigation Matters .........................................................................................................22

    (i)    Certain Non-Bankruptcy Litigation Matters ....................................................22
    (ii)    FTX Preference Litigation ...............................................................................22

VII.    **SUMMARY OF THE PLAN** .............................................................................................24

A.    General Basis for the Plan .............................................................................................24

B.       Governing Law ...................................................................................................24

C.       Treatment of Unclassified Claims .....................................................................24

    (i)       Administrative Expense Claims .........................................................25
    (ii)      Professional Fee Claims.....................................................................25
    (iii)     Priority Tax Claims.............................................................................25
    (iv)      Statutory Fees .....................................................................................25
    (v)       Ad Hoc Group Restructuring Expenses ..............................................25

D.       Classification and Treatment of Claims and Interests .......................................26

    (i)       Classification of Claims and Interests................................................26
    (ii)      Treatment of Classes of Claims and Interests ...................................26
    (iii)     Intercompany Interests .......................................................................33
    (iv)      Subordinated Claims ...........................................................................33

E.       Means for Implementation of the Plan ..............................................................33

    (i)       Wind-Down Debtors............................................................................33
    (ii)      Means for Implementation ..................................................................37

F.       Treatment of Executory Contracts and Unexpired Leases .................................44

    (i)       Assumption of Executory Contracts and Unexpired Leases ...............44
    (i)       Rejection Damages Claims and Objections to Rejections ..................44
    (ii)      Cure of Defaults for Assumed Executory Contracts and Unexpired Leases...................45
    (iii)     Indemnification Obligations ...............................................................46
    (iv)      Insurance Policies ...............................................................................46
    (v)       Reservation of Rights .........................................................................46

G.       Provisions Governing Distributions ..................................................................46

    (i)       Distributions on Account of Claims Allowed as of the Plan Effective Date ...................46
    (ii)      Disbursing Agent and Gemini Distribution Agent.............................47
    (iii)     Delivery of Distributions and Undeliverable or Unclaimed Distribution .......................47
    (iv)      Manner of Payment.............................................................................49
    (v)       Compliance with Tax Requirements....................................................49
    (vi)      Foreign Currency Exchange Rate .......................................................49
    (vii)     Digital Asset Exchange Rate ...............................................................49
    (viii)    Surrender of Cancelled Instruments or Securities...............................49
    (ix)      Allocations..........................................................................................50
    (x)       No Postpetition Interest on Claims .....................................................50
    (xi)      Setoffs and Recoupment ....................................................................50
    (xii)     Claims Paid or Payable by Third Parties ............................................50

H.       Procedures for Resolving Contingent, Unliquidated, and Disputed Claims ......51

    (i)       Allowance of Claims ..........................................................................51
    (ii)      Claims and Interests Administration Responsibilities .......................51
    (iii)     Estimation of Claims ..........................................................................51
    (iv)      Adjustment to Claims or Interests Without Objection........................52
    (v)       Time to File Objections to Claims ......................................................52
    (vi)      Disallowance of Claims ......................................................................52
    (vii)     Amendments to Claims .......................................................................52
    (viii)    No Distributions Pending Allowance .................................................53
    (ix)      Single Satisfaction of Claims .............................................................53

I.       Effect of Confirmation of the Plan ....................................................................53

    (i)       Compromise and Settlement of Claims, Interests, and Controversies ...................53
    (ii)      Discharge of Claims and Termination of Interests .............................53
    (iii)     Term of Injunctions or Stays ..............................................................54

(iv)    Release of Liens..................................................................54
(v)    Releases by the Debtors........................................................54
(vi)    Releases by Releasing Parties ..............................................55
(vii)    Exculpation ..........................................................................56
(viii)    Injunction .............................................................................57
(ix)    Protection Against Discriminatory Treatment .....................57
(x)    Recoupment ..........................................................................58
(xi)    Subordination Rights ...........................................................58
(xii)    Reimbursement or Contribution ..........................................58
(xiii)    Document Retention ............................................................58

J.    Conditions Precedent to Confirmation and Consummation of the Plan.........................58

(i)    Conditions Precedent to the Plan Effective Date .................58
(ii)    Waiver of Conditions Precedent ..........................................59
(iii)    Substantial Consummation ...................................................59
(iv)    Effect of Non-Occurrence of Conditions to Consummation .........60

K.    Modification, Revocation or Withdrawal of the Plan .......................................60

(i)    Modification of Plan ............................................................60
(ii)    Effect of Confirmation of the Plan on Modifications ..........60
(iii)    Revocation or Withdrawal of Plan .......................................60

VIII.    **PROJECTED FINANCIAL INFORMATION**.................................................61

IX.    **RISK FACTORS** ...........................................................................64

A.    Risks Relating to the Plan, Solicitation and Confirmation ................................64

The Debtors may seek to amend, waive, modify or withdraw the Plan at any time prior to Confirmation.......................................................................66

B.    Risks Related to Reorganized GGH's Business and the Wind-Down Debtors..............................68

If a Standalone Reorganization occurs, Reorganized GGH's operations are subject to governmental laws and regulations. ...............................................................68

The Debtors' insurance does not fully cover all of the Debtors' operational risks, and changes in the cost of insurance or the availability of insurance could materially increase the Debtors' insurance costs or result in a decrease in insurance coverage. ..................................................................................69

The assumptions and estimates contained in the financial projections may prove to be inaccurate. ..................................................................................70

Disruptions or volatility in global financial markets could limit sources of liquidity for Reorganized GGH or its customers and the Wind-Down Debtors. ...............70

The Debtors' businesses may be adversely affected by current and potential litigation, including litigation in connection with the Chapter 11 Cases, as well as ongoing governmental investigations. ...............................................................70

There are certain risks and contingencies that may affect the value of the Retained Causes of Action. ...................................................................................71

Litigation with respect to claims filed in these Chapter 11 Cases, including the FTX Claims and the 3AC Claims, may reduce recoveries available to other creditors of the Debtors. ..........................................................................71

There may be litigation relating to DCG, its obligations owed to the Debtors and claims it filed against the Debtors. ...............................................................71

The sales process may not result in a sale of the Genesis Platform, or the closing conditions of the Sale Transaction may not be satisfied, which would impact recoveries under the Plan. ...............................................................71

**X.    CONFIRMATION OF THE PLAN** .................................................................................**72**

    A.    Requirements for Confirmation of the Plan ...................................................72

    B.    Best Interests of Creditors/Liquidation Analysis .........................................72

    C.    Feasibility.........................................................................................................72

    D.    Acceptance by Impaired Class ........................................................................72

    E.    Confirmation without Acceptance by All Impaired Classes. ........................73

        (i)    No Unfair Discrimination. ......................................................73
        (ii)   Fair and Equitable Test. ...........................................................73

**XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN**.....................**75**

    A.    Liquidation Under Chapter 7 ..........................................................................75

    B.    Alternative Plan(s) of Reorganization ...........................................................75

    C.    Dismissal of the Debtors' Chapter 11 Cases ..................................................75

**XII.    CERTAIN SECURITIES LAW MATTERS** ................................................................**76**

    A.    Plan Securities...................................................................................................76

**XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**.......................................................................................................**76**

**XIV.    SOLICITATION AND VOTING PROCEDURES** ....................................................**77**

    A.    Voting Deadline ...............................................................................................77

    B.    Voting Instructions..........................................................................................78

        (i)    Note to Holders of Claims in Classes Eligible to Vote ....................78

    C.    Voting Tabulation ...........................................................................................79

**XV.    RECOMMENDATION** ...............................................................................................**81**

## EXHIBITS

EXHIBIT A    Debtors' Amended Joint Chapter 11 Plan

EXHIBIT B    Organizational Chart

EXHIBIT C    Liquidation Analysis

EXHIBIT D    Financial Projections

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH
EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT
BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

I.        INTRODUCTION

Genesis Global Holdco, LLC ("Holdco" or "GGH") and its debtor affiliates, as debtors and debtors-in-possession in the above captioned chapter 11 cases (collectively, the "Debtors" and these cases, the "Chapter 11 Cases") submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Debtors' Amended Joint Chapter 11 Plan* (ECF No. 427) (as supplemented or amended from time to time, the "Amended Plan" or the "Plan"). A copy of the Amended Plan is attached hereto as **Exhibit A** and is incorporated herein by reference. The Amended Plan constitutes a separate chapter 11 plan for each of the Debtors.

The Amended Plan is the product of extensive and ongoing negotiation among the Debtors, the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "Committee"), and the Ad Hoc Group, and reflects substantial agreement on certain key issues. The Debtors and their advisors engaged in extensive, arm's-length negotiations with the Committee, the Ad Hoc Group, and each of their advisors to reach a solution that the parties believe is in the best interest of the Debtors, their estates, and stakeholders. However, discussions among such parties remain ongoing. As of the date hereof, each of the Debtors, the Committee and the Ad Hoc Group reserve all rights with respect to the Amended Plan.

**THE DEBTORS BELIEVE THAT THE COMPROMISE CONTEMPLATED UNDER THE AMENDED PLAN IS FAIR AND EQUITABLE, WILL MAXIMIZE THE VALUE OF THE DEBTORS' ESTATES AND PROVIDES THE BEST RECOVERY AVAILBLE UNDER THE CIRCUMSTANCES TO HOLDERS OF ALLOWED CLAIMS. AT THIS TIME, THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THESE CHAPTER 11 CASES.**

A.        General

The Amended Plan is the product of months of effort by the Debtors, their management, directors, and employees, and the Debtors' advisors to stabilize the Debtors' business, preserve the Debtors' estates, and chart a path to a transparent, efficient, and consensual restructuring. These efforts began months prior to the filing of these Chapter 11 Cases, as the Debtors took measures to respond to significant turmoil in the digital asset industry as a whole. Since November 2022, following the shockwave caused by the sudden collapse of FTX Trading Ltd. and certain of its affiliates, the Debtors have engaged in extensive discussions with the Debtors' creditors and stakeholders, including the Committee, an ad hoc group of lenders of Genesis Global Capital, LLC (the "Ad Hoc Group"), Gemini Trust Company, LLC ("Gemini"), and Digital Currency Group, Inc. ("DCG"), Holdco's corporate parent and the Debtors' largest borrower, in an effort to reach a value-maximizing consensual resolution of the Debtors' financial situation, including by participating in an ongoing Bankruptcy Court-approved mediation process. At the outset of these Chapter 11 Cases, on January 23, 2023 the Debtors filed a standalone *Debtors' Joint Chapter 11 Plan*, ECF No. 20 (the "Initial Plan") to provide a framework for a confirmable chapter 11 plan even in the absence of a global settlement.

The Debtors continue to work towards a global settlement with the Committee, the Ad Hoc Group, Gemini, and DCG. However, given that the Debtors have not yet been able to reach a global resolution with all of their key stakeholders, and so as to defray some of the risks and costs of further delay, the Debtors are proposing the Amended Plan, while still working on a global settlement in parallel. The Amended Plan incorporates a structure that is supported by the Committee and the Ad Hoc Group. Throughout these Chapter 11 Cases, the Debtors have remained steadfastly committed to providing a transparent process that would produce a value-maximizing restructuring for their creditors on an expedited timeline. The Debtors, in consultation with their legal and financial advisors, have concluded that the Amended Plan achieves that objective. In addition, the Debtors are continuing to engage with their key stakeholders and, to the extent the Debtors achieve a settlement that would provide more value to their stakeholders than the Amended Plan, the Amended Plan will be further amended to reflect such settlement.

As discussed further below, the Amended Plan provides for the Debtors to continue the ongoing marketing and sale process to sell any or all of the assets of the Debtors, the Genesis Platform, or the Genesis Platform along with GGT, with the goal of achieving the highest recoveries possible for all stakeholders. If the sale process does not result in a Sale Transaction with respect to all of the Genesis Platform, the Amended Plan provides for the option (subject to the consent rights of the Committee and the Ad Hoc Group as described under the Amended Plan) to have

any unsold portion of the Genesis Platform be reorganized as a going concern for the benefit of the Holders of Allowed Claims. In that scenario, Reorganized GGH will retain, for the benefit of the Holders of Allowed Claims, one hundred percent (100%) of the Equity Securities in Genesis Bermuda Holdco Limited ("GBHL") (or, if GBHL is sold in the Sale Transaction, in any unsold subsidiaries of GBHL).

The Amended Plan contemplates that Holders of Allowed General Unsecured Claims against the Debtors will receive a combination of, among other things, (i) the Debtors' available Cash and Digital Assets, which shall include any sales proceeds resulting from the Debtors' sales process, (ii) recoveries from the DCG Loans and the DCG Note, (iii) recoveries from preserved Estate claims and Causes of Action, including Avoidance Actions and any claims and Causes of Action against DCG, and (iv) equity interests in Reorganized GGH or Wind-Down GGH, as applicable, to the extent Holders affirmatively elect to receive them, subject to the conditions set forth in the Plan.

Additional key components of the Plan include:[2]

• Payment in full of all Allowed Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and Professional Fee Claims;

• The funding of a Litigation Reserve that allocates a fixed amount to litigation of any Retained Causes of Action, including Avoidance Actions against the DCG Parties;

• Customary releases of all claims by the Releasing Parties against the Released Parties related in any way to the Debtors; *provided*, that the Amended Plan shall not release any DCG Parties or any former officers and directors of the Debtors as of the Effective Date; *provided further*, that current officers and directors of the Debtors (solely in its capacity as such) shall be released only with the written consent of the Special Committee prior to the Effective Date, with the exception of (x) the members of the Special Committee, who shall be Released Parties without the need for such consent, and (y) any current officers and directors of the Debtors that are also DCG Parties, who shall not be Released Parties;

• Subject to applicable law and certain conditions set forth in the Plan, Holders of Allowed Claims denominated in Digital Assets will receive in-kind distributions in the form of the Digital Asset in which such respective Claims are denominated;

• For purposes of distributions to be made under the Amended Plan, Gemini shall be deemed to be the Holder of all Gemini Lender Claims, and all distributions on account of Allowed Gemini Lender Claims shall be made to the Gemini Distribution Agent and held in trust in a segregated account for the benefit of the Holders of Allowed Gemini Lender Claims. As soon as practicable following delivery of any distribution to the Gemini Distribution Agent under the Plan on account of Allowed Gemini Lender Claims, the Gemini Distribution Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Gemini Lender Claims.

**B.      Treatment and Classification of Claims and Interests; Impairment**

A table showing the classification of Claims and Interests for all purposes, including voting on the Amended Plan and distributions under the Amended Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code is provided in Section III.C further below. The table is qualified in its entirety by reference to the full text of the Amended Plan. A more detailed summary of the treatment of each Class of Claims and Interests is provided below in Section VII.

The Debtors have prepared the Disclosure Statement using the best information regarding their assets, liabilities, and affairs available to them as of the date hereof. To the extent that updated books and records impact the estimates regarding creditor recoveries, the Debtors shall promptly prepare and file an amended version of the

---

[2]      The following is only a summary of key components of the Amended Plan and is qualified in its entirety by reference to the full text of the Amended Plan.

Disclosure Statement with the Bankruptcy Court. If necessary, the Debtors will also promptly prepare and file an amended version of the Amended Plan. Any amended versions of the Disclosure Statement and Amended Plan will be served in the same manner and on the same parties as the original versions of the Disclosure Statement and Amended Plan.

## II.    IMPORTANT INFORMATION ABOUT THIS DISCLOSURE STATEMENT

This Disclosure Statement provides information regarding the Plan. The Debtors believe that the Plan is in the best interests of all creditors and urge all Holders of Claims entitled to vote to vote in favor of the Plan.

Unless the context requires otherwise, reference to "*we*," "*our*," and "*us*" are to the Debtors.

The confirmation of the Plan and effectiveness of the Plan are subject to certain material conditions precedent described herein and in the Plan. There is no assurance that the Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied (or waived).

You are encouraged to read this Disclosure Statement in its entirety, including without limitation, the Plan, which is annexed as **Exhibit A** hereto, and the section entitled "Risk Factors," before submitting your ballot to vote on the Plan.

Summaries of the Plan and statements made in this Disclosure Statement are qualified in their entirety by reference to the Plan, this Disclosure Statement and the Plan Supplement, as applicable, and the summaries of the financial information and the documents annexed to this Disclosure Statement are qualified in their entirety by reference to those documents. The statements contained in this Disclosure Statement are made only as of the date of this Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement.

The information contained in this Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Plan and may not be relied on for any other purpose. The Debtors believe that the summary of certain provisions of the Plan and certain other documents and financial information contained or referenced in this Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Disclosure Statement, including, but not limited to, the Plan are qualified in their entirety by reference to those documents.

This Disclosure Statement has not been approved or disapproved by the SEC, or any federal, state, local or foreign regulatory agency, nor has the SEC nor any other such agency passed upon the accuracy or adequacy of the statements contained in this Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Disclosure Statement, but the financial information contained in this Disclosure Statement has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly stated herein.

Upon the Plan Effective Date, if a Standalone Reorganization occurs, the issuance of Post-Effective Date GGH Interests shall be effected without registration under section 5 of the Securities Act, and without registration under any applicable state securities or "blue sky" law, in reliance upon available exemptions from such registration requirements afforded by section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, Rule 506 of Regulation D and/or Rule 701 promulgated thereunder. See Section XIII, "Certain Securities Law Matters."

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements. In addition to statements which explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be

uncertain and forward-looking. There can be no assurance that the restructuring transaction described herein will be consummated. Creditors and other interested parties should see the section entitled "Risk Factors" of this Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Wind-Down Debtors and Reorganized GGH (as applicable).

## III.    QUESTIONS AND ANSWERS REGARDING THIS DISCLOSURE STATEMENT AND THE AMENDED PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Plan Effective Date, a bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

### B.    Why are the Debtors sending me this Disclosure Statement?

The Debtors are seeking to obtain Bankruptcy Court approval of the Amended Plan. Before soliciting acceptances of the Amended Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding whether to accept or reject the Amended Plan. This Disclosure Statement is being submitted in accordance with such requirements.

### C.    Am I entitled to vote on the Amended Plan?

Your ability to vote on, and your distribution under, the Amended Plan, if any, depends on what type of Claim you hold. In general, a Holder of a Claim or an Interest may vote to accept or reject a chapter 11 plan if (i) no party in interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes), (ii) the Claim or Interest is Impaired by the Plan, and (iii) the Holder of such Claim or Interest will receive or retain property under the Plan on account of such Claim or Interest.

In general, if a Claim or an Interest is Unimpaired under a chapter 11 plan, section 1126(f) of the Bankruptcy Code deems the Holder of such Claim or Interest to have accepted such plan, and thus the Holders of Claims in such Unimpaired Classes are not entitled to vote on such plan. Because the following Classes are Unimpaired under the Amended Plan, the Holders of Claims in these Classes are not entitled to vote:

- Classes 1, 2, and 9 against GGH;

- Classes 1, 2, 10 and 11 against GGC; and

- Classes 1, 2, 9 and 10 against GAP.

In general, if the Holder of an Impaired Claim or Impaired Interest will not receive any distribution under a chapter 11 plan in respect of such Claim or Interest, section 1126(g) of the Bankruptcy Code deems the Holder of such Claim or Interest to have rejected such plan, and thus the Holders of Claims in such Classes are not entitled to vote on such plan. Holders in the following Classes are conclusively presumed to have rejected the Amended Plan pursuant to section 1126(g) and are not entitled to vote:

- Classes 4, 5, 6 ,7, 8 and 10 against GGH;

- Classes 5, 6, 7, 8 and 9 against GGC; and

- Classes 4, 5, 6, 7, 8, 9 and 10 against GAP.

A summary of the classes of Claims (each category of Holders of Claims or Interests, as set forth in Article III of the Amended Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class") and their respective status and entitlement to vote is set forth below. The Amended Plan shall apply as a separate Plan for each of the Debtors, and the classification of Claims and Interests set forth in the Amended Plan shall apply separately to each of the Debtors. All of the potential Classes for the Debtors are set forth herein and in the Amended Plan. Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Section 12.4 of the Plan:

(i)     *Classification of Claims Against and Interests in GGH*

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | DCG Claims | Impaired | Deemed to Reject |
| 5 | 3AC Claims | Impaired | Deemed to Reject |
| 6 | Alameda/FTX Claims | Impaired | Deemed to Reject |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Government Penalty Claims | Impaired | Deemed to Reject |
| 9 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |
| 10 | Interests | Impaired | Deemed to Reject |

*(ii)*    ***Classification of Claims Against and Interests in GGC***

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Other Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Gemini Lender Claims | Impaired | Entitled to Vote |
| 5 | DCG Claims | Impaired | Deemed to Reject |
| 6 | 3AC Claims | Impaired | Deemed to Reject |
| 7 | Alameda/FTX Claims | Impaired | Deemed to Reject |
| 8 | Subordinated Claims | Impaired | Deemed to Reject |
| 9 | Government Penalty Claims | Impaired | Deemed to Reject |
| 10 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |
| 11 | Intercompany Interests | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |

(iii)    *Classification of Claims Against and Interests in GAP*

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | DCG Claims | Impaired | Deemed to Reject |
| 5 | 3AC Claims | Impaired | Deemed to Reject |
| 6 | Alameda/FTX Claims | Impaired | Deemed to Reject |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Government Penalty Claims | Impaired | Deemed to Reject |
| 9 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |
| 10 | Intercompany Interests | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |

Under the Amended Plan, the only Classes of Claims that meet the requirements to vote with respect to each Debtor are:

- Holders of Claims in Class 3 against GGH.  A Holder of a Class 3 Claim against GGH is entitled to vote to accept or reject the Amended Plan if such Holder held such Claim as of [July 5, 2023] (the "Voting Record Date")[3], which date is subject to the Bankruptcy Court's approval of the Debtors' forthcoming solicitation and voting procedures motion.  Holders of the Class 3 Claims against GGH will be entitled to vote their Class 3 Claims; their votes will be used to evaluate satisfaction with the Bankruptcy Code's requirements for confirmation of the Amended Plan.

- Holders of Claims in Class 3 or 4 against GGC.  A Holder of a Claim in Class 3 or 4 against GGC is entitled to vote to accept or reject the Amended Plan if such Holder held such Claim as of the Voting Record Date.  Holders of such Claims will be entitled to vote their respective Claims; their votes will be used to evaluate satisfaction with the Bankruptcy Code's requirements for confirmation of the Plan.

- Holders of Claims in Class 3 against GAP.  A Holder of a Claim in Class 3 against GAP is entitled to vote to accept or reject the Amended Plan if such Holder held such Claim as of the Voting Record Date.  Holders of the Class 3 Claims against GAP will be entitled to vote their Class 3 Claims; their votes will be used to evaluate satisfaction with the Bankruptcy Code's requirements for confirmation of the Amended Plan.

---

[3]    The Voting Record Date is subject to approval by the Bankruptcy Court.

D.    **What will I receive from the Wind-Down Debtors or Reorganized GGH (as applicable) if the Amended Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under the Amended Plan. Any estimates of Claims and Interests in this Disclosure Statement may vary from the final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Amended Plan depends on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Amended Plan. Any Claims referenced as being *pari passu* will receive equal treatment between the Classes of Claims.

The Wind-Down Debtors or Reorganized GGH (as applicable), will use commercially reasonable efforts, subject to applicable law, to provide recoveries in respect of Claims denominated in Digital Assets in kind in the form of Digital Asset in which such Claims are denominated; *provided* that no distribution in the form of Digital Assets shall be made to any Holder that has not responded to all requests by the Debtors, the Wind-Down Debtors, Reorganized GGH, or the Disbursing Agent, or the Gemini Distribution Agent, as applicable, for information necessary to facilitate a particular distribution to such Holder.

The projected recoveries set forth in the table below are estimates only and are based on certain assumptions described herein. Recoveries actually received by Holders of Allowed Claims and Allowed Interests in a liquidation scenario may differ materially from the projected liquidation recoveries listed in the table below.

THE PROJECTED RECOVERIES SET FORTH IN THE TABLE BELOW ARE ESTIMATES ONLY AND, THEREFORE, ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, MARKET VOLATILITY, THE ULTIMATE TREATMENT OF SUBORDINATED CLAIMS, INCLUDING THE ALAMEDA/FTX CLAIMS AND THE 3AC CLAIMS, THE RESOLUTION OF LITIGATION, INCLUDING THE SEC ACTION AGAINST GENESIS AND GEMINI, AND THE RESOLUTION OF DISPUTED CLAIMS. FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE AMENDED PLAN.

| GENESIS GLOBAL HOLDCO LLC | | |
|---|---|---|
| **Class** | **Claim/Equity Interest** | **Projected Recovery Under the Plan** |
| 1 | Other Priority Claims | [•] |
| 2 | Secured Claims | [•] |
| 3 | General Unsecured Claims | [•] |
| 4 | DCG Claims | [•] |
| 5 | 3AC Claims | [•] |
| 6 | Alameda/FTX Claims | [•] |
| 7 | Subordinated Claims | [•] |
| 8 | Government Penalty Claims | [•] |
| 9 | Intercompany Claims | [•] |

| | | |
|---|---|---|
| 10 | Interests | [•] |

| GENESIS GLOBAL CAPITAL LLC | | |
|---|---|---|
| Class | Claim/Equity Interest | Projected Recovery Under the Plan |
| 1 | Other Priority Claims | [•] |
| 2 | Secured Claims | [•] |
| 3 | Other Unsecured Claims | [•] |
| 4 | Gemini Lender Claims | [•] |
| 5 | DCG Claims | [•] |
| 6 | 3AC Claims | [•] |
| 7 | Alameda/FTX Claims | [•] |
| 8 | Subordinated Claims | [•] |
| 9 | Government Penalty Claims | [•] |
| 10 | Intercompany Claims | [•] |
| 11 | Intercompany Interests | [•] |

| GENESIS ASIA PACIFIC PTE LTD. | | |
|---|---|---|
| Class | Claim/Equity Interest | Projected Recovery Under the Plan |
| 1 | Other Priority Claims | [•] |
| 2 | Secured Claims | [•] |
| 3 | General Unsecured Claims | [•] |
| 4 | DCG Claims | [•] |

| 5 | 3AC Claims | [•] |
|---|---|---|
| 6 | Alameda/FTX Claims | [•] |
| 7 | Subordinated Claims | [•] |
| 8 | Government Penalty Claims | [•] |
| 9 | Intercompany Claims | [•] |
| 10 | Intercompany Interests | [•] |

E.      **How do I vote on the Amended Plan?[4]**

The following materials will be included with the Disclosure Statement and the Amended Plan in the solicitation package (the "Solicitation Package"):

- the appropriate Ballot and applicable voting instructions (the "Voting Instructions");

- this Disclosure Statement with all exhibits, including the Amended Plan, and any other supplements or amendments to these documents;

- the notice of the Confirmation Hearing approved by the Bankruptcy Court for transmission to Holders of Claims and other parties in interest (the "Confirmation Hearing Notice"); and

- such other documents as the Debtors may seek to include or the Bankruptcy Court may direct.

**Holders of Claims entitled to vote to accept or reject the Amended Plan shall be served (or were caused to be served) the Solicitation Package (including the appropriate Ballot) providing solicitation and other voting-related information to such Holders. Each and all Gemini Lenders entitled to vote as a Holder of a Claim in Class 4 against GGC as of the Voting Record Date shall receive the Solicitation Package (including the appropriate Ballot) in accordance with the forthcoming solicitation and voting procedures motion to be approved by the Bankruptcy Court.**

**Additional paper copies of these documents may be requested, free of charge from the Solicitation Agent by (i) writing to Genesis Global Holdco, LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232; (ii) calling U.S. Toll Free: (888) 524-2017 or International Toll: (646) 440-4183; or (iii) by e-mailing genesisinfo@ra.kroll.com (with "Genesis Solicitation" in the subject line).**

The Debtors have engaged Kroll Restructuring Administration LLC as the solicitation agent ("Kroll" or the "Solicitation Agent") to assist in the balloting and tabulation process. The Solicitation Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.

---

4      Details regarding voting procedures will be provided in the Solicitation Package to be approved by the Bankruptcy Court pursuant to a separate motion for an order authorizing, among other things, solicitation procedures.

**Unless otherwise permitted by the Debtors, in their discretion, to be counted, all votes must be received by the Solicitation Agent by [August 14, 2023 at 4:00 p.m. (prevailing Eastern Time)] (the "Voting Deadline").**[5]

**VOTING INSTRUCTIONS ARE ATTACHED TO EACH BALLOT. PLEASE SEE SECTION XV BELOW ENTITLED "SOLICITATION AND VOTING PROCEDURES" FOR ADDITIONAL INFORMATION.**

Unless the Debtors, in their sole discretion decide otherwise, any Ballot received after the Voting Deadline shall not be counted. The Solicitation Agent will process and tabulate the Ballots for the Classes entitled to vote to accept or reject the Plan and will file a voting report (the "Voting Report") as soon as practicable after the Voting Deadline, which Voting Report will be supplemented as soon as practicable, if necessary.

Holders of Claims or Interests may contact the Solicitation Agent directly, at U.S. Toll Free: (888) 524-2017 or International Toll: (646) 440-4183, with any questions related to the solicitation procedures applicable to their Claims and Interests.

**Any Ballot that is properly executed, but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Amended Plan, shall not be counted.**

**All Ballots are accompanied by Voting Instructions. It is important to follow the specific instructions provided with each Ballot.**

F.      **What happens to my recovery if the Amended Plan is not confirmed, or does not go effective?**

In the event that the Amended Plan is not confirmed, the Debtors may propose revisions to the Plan (with the necessary consents, including the consent of the Committee) or, if the Debtors' exclusive period has lapsed, other parties in interest may propose an alternative plan. It is possible that any amended or alternative plan may provide Holders of Claims and Interests with less than they would have received pursuant to the Amended Plan. For a more detailed description of the consequences of an extended chapter 11 proceeding, or of a liquidation scenario, *see* "Confirmation of the Plan – Best Interests of Creditors/Liquidation Analysis" in Section IX below and the Liquidation Analysis attached as **Exhibit C** to this Disclosure Statement.

G.      **Are any regulatory approvals required to consummate the Amended Plan?**

While the Debtors are not aware of any regulatory approvals required to consummate the Amended Plan, regulatory and licensing approvals may be required in connection with any potential sale of the Debtors' businesses, which the Debtors discuss further below, *see* "Reorganized GGH's operations are subject to governmental laws and regulations."

H.      **If the Amended Plan provides that I am entitled to a distribution, do I receive it upon Confirmation or when the Amended Plan goes effective, and what do you mean when you refer to "Confirmation," "Plan Effective Date," and "Consummation?"**

"Confirmation" of the Plan refers to approval of the Plan by the Bankruptcy Court. "Confirmation" of the Plan does not guarantee that you will receive the distribution indicated under the Plan. After Confirmation of the Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Plan can be consummated and go effective. Initial distributions to Holders of Allowed Claims may be made on the Plan Effective Date or as soon as practicable thereafter in accordance with the terms and conditions established by the Amended Plan. *See* "Conditions Precedent to Confirmation and Consummation of the Plan," in Section VII.J below, for a discussion of the conditions to Consummation of the Plan.

---

[5]      The Voting Deadline is subject to approval by the Bankruptcy Court.

### I.    Is there potential litigation related to the Amended Plan?

Parties in interest may object to the approval of this Disclosure Statement and may object to Confirmation of the Plan, which could potentially lead to litigation.  See Section IX of this Disclosure Statement titled "The Debtors' Businesses May Be Adversely Affected by Active Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations" for further discussion on this issue.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business and could become parties to additional litigation in the future.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to creditors entitled to receive distributions under the Plan could change, and such changes could be material.

Finally, the Debtors may object to certain Proofs of Claim, which may be subject to a resolution by the Bankruptcy Court after the Plan becomes effective, and ultimately could cause the total amount of claims to change.

### J.    What are the sources of consideration used to make Distributions under the Amended Plan?

Distributions under the Plan shall be funded by Effective Date Available Assets, Post-Effective Date Available Assets, the proceeds of any Monetization Transactions of the Wind-Down Debtors' Assets or Reorganized GGH (if applicable) and any applicable reserves, *provided, however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance.  Such sources include Cash, proceeds from the DCG Loans, the DCG Note, the DCG Tax Receivables, and any and all Causes of Actions or other claims against the DCG Parties, including the proceeds from any settlements thereof, proceeds from Avoidance Actions, and, if applicable, Digital Assets available for distribution, to be determined by the Debtors in consultation with the Committee after considering legal, financial, tax, and other factors in good faith.

### K.    Does the Amended Plan provide for the subordination of any Claims?

Yes.  While the Amended Plan classified the 3AC Claims as Disputed Claims, if the 3AC Claims are Allowed, the Amended Plan provides for their subordination.  The Debtors believe subordination of the 3AC Claims is appropriate based on its founders' actions both before and during its liquidation and chapter 15 proceedings. Among other things, 3AC is alleged to have been a fraud from inception, and 3AC's founders Kyle Livingstone Davies and Su Zhu have fled the jurisdiction, failed to cooperate with 3AC's foreign representatives, and have taken steps to undermine asset recovery efforts by the foreign representatives in favor of creditors, such as Genesis, including by failing to provide information necessary for the foreign representatives to take control of certain of 3AC's assets and accounts.[6]

The Amended Plan also provides for the subordination of Alameda/FTX Claims if they are ultimately Allowed.  Currently FTX and its former CEO Sam Bankman-Fried, along with other executives, are at the center of the subject of a multitude of civil and criminal investigations and proceedings, including federal congressional hearings investigating their involvement in an alleged years-long fraud in an effort to grow its own crypto empire at the expense of its very customers and lenders, as well as all other players in the cryptocurrency space, hastening a decline that started around 3AC's failure.  Multiple FTX and Alameda executives have been charged with, and some have pleaded guilty to, various crimes, including wire fraud, conspiracy to commit wire fraud, and securities and derivatives fraud.  FTX's actions caused countless parties, including the Debtors and their creditors, irreparable harm.

The Debtors also reserve their right to seek to subordinate the DCG claims.

Finally, the Debtors believe that the Government Penalty Claims are penalties within the meaning of section 726(a)(4) of the Bankruptcy Code, applicable in chapter 11 cases through section 1129(a)(7) of the Bankruptcy Code,

---

6    Foreign Representatives of Three Arrows Capital, Ltd.'s Motion for an Order Compelling Compliance with Subpoena, In re Three Arrows Capital, Ltd., No. 22-10920 (MG), ECF No. 81.

pursuant to which they are subordinated to General Unsecured Claims. If any of the Holders of Governmental Penalty Claims disputes these points, the Debtors will further demonstrate the legal and factual bases for subordinating the Government Penalty Claims prior to or at Confirmation. Although the Debtors have classified the Government Penalty Claims as subordinated claims, the Bankruptcy Court may rule that subordination of the Government Penalty Claims is improper. If the Bankruptcy Court denies subordination of the Government Penalty Claims, then such Government Penalty Claims shall be *pari passu* with the General Unsecured Claims.

**L.      Will the Wind-Down Debtors and Reorganized GGH be obligated to continue to pay statutory fees as part of the bankruptcy process after the Plan Effective Date?**

Yes. On the Plan Effective Date the Wind-Down Debtors and Reorganized GGH (as applicable) will be required to pay in Cash any fees due and owing to the U.S. Trustee at the time of Confirmation. Additionally, on and after the Confirmation Date, the Debtors, the Wind-Down Debtors and Reorganized GGH (as applicable) must pay all statutory fees due and payable under 28 U.S.C. § 1930(a)(6) until the entry of a final decree, dismissal or conversion of the cases to chapter 7 of the Bankruptcy Code. The Debtors, the Wind-Down Debtors and Reorganized GGH (as applicable) will also be required to comply with reporting requirements, such as filing quarterly post-Confirmation reports and schedule quarterly post-Confirmation status conferences until the entry of a final decree, dismissal, or conversion of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code.

**M.      When will the Plan Supplement be filed and what will it include?**

The Plan Supplement will be filed on or before five (5) days prior to the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, on notice to parties in interest, and additional documents may be filed before the Plan Effective Date as supplements or amendments to the Plan Supplement, all such documents being in form and substance in accordance with the terms of the Amended Plan, including, without limitation, the following: the New Governance Documents, the Plan Administration Agreement, the Wind-Down Budget, a list of Retained Causes of Action (if any), an exhibit disclosing the identity and affiliations of the PA Officer and any Person proposed to serve on the New Board or proposed to serve as an officer of any of the Wind-Down Debtors or Reorganized GGH (if applicable), an exhibit disclosing the identity of the Related Parties of the Debtors that shall constitute DCG Parties, an exhibit identifying the members of the Wind-Down Oversight Committee (if appointed), the Secured Claims Schedule, the Schedule of Assumed Executory Contracts and Leases, and the Digital Assets Conversion Table. When filed, the Plan Supplement will be available in both electronic and hard copy form, although the Debtors will not serve paper or flash drive copies.

**N.      What are the Debtors' Intercompany Claims and Interests?**

In the ordinary course of business and as a result of their corporate structure, certain of the Debtor entities hold equity of other Debtor entities and maintain business relationships with each other, resulting in Intercompany Claims and Interests. The Intercompany Claims reflect costs and revenues, which are allocated among the appropriate Debtor entities, resulting in Intercompany Claims. Further, the Intercompany Claims include Claims arising from intercompany receivables by and between certain Debtors.

The Amended Plan's treatment of Intercompany Claims and Interests represents a common component of a chapter 11 plan involving multiple debtors in which the value of the going concern enterprise may be replicated upon emergence for the benefit of creditor constituents receiving distributions under a plan.

**O.      Will Claims asserted with respect to damages resulting from the Debtors' rejection of certain executory contracts or unexpired leases of nonresidential real property affect my recovery under the Amended Plan?**

Because the Debtors do not anticipate a significant amount of claims arising from the rejection of executory contracts and unexpired leases, any such Claims are unlikely to have any significant impact on recoveries under the Amended Plan.

**P.      Will there be releases granted to parties in interest as part of the Amended Plan?**

The Amended Plan proposes to release the "Released Parties", consisting only of the following: (i) the Debtors, (ii) the Other Genesis Entities, (iii) the Committee and its members (solely in their capacities as such), (iv) if the Ad Hoc Group RSA has been executed, the members of the Ad Hoc Group SteerCo (solely in their capacities as such), (v) the PA Officer (solely in its capacity as such), and (vi) each Related Party of each Entity described in the foregoing clauses (i)–(v) (in each case, solely in its capacity as such).

The Amended Plan currently does not propose to release the following: the DCG Parties and the former officers and directors of the Debtors as of the Effective Date; *provided* that any of the current officers and directors (solely in its capacity as such) of the Debtors shall be a Released Party only with the written consent of the Special Committee prior to the Effective Date, with the exception of (x) the members of the Special Committee, who shall be Released Parties without the need for such consent, and (y) any current officers and directors of the Debtors that are also DCG Parties, who shall not be Released Parties).  Please consult the Amended Plan to understand the full nature and scope of the releases to be provided under the Amended Plan.

The Debtors believe that the releases and exculpations in the Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit.

**PURSUANT TO THE AMENDED PLAN, IF YOU ARE A HOLDER OF A CLAIM IN A CLASS ELIGIBLE TO VOTE AND RETURN A BALLOT ACCEPTING THE AMENDED PLAN, YOU WILL BE SUBJECT TO THE RELEASE PROVISIONS IN ARTICLE VIII OF THE AMENDED PLAN AND SHALL BE DEEMED, AS OF THE PLAN EFFECTIVE DATE, TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND ALL CAUSES OF ACTION (EXCEPT AS OTHERWISE SET FORTH IN THE AMENDED PLAN) AGAINST THE RELEASED PARTIES (AS DEFINED IN THE AMENDED PLAN)**.

For more detail see "Effect of Confirmation of the Plan," in Section VII.I below

**Q.      What is the deadline to vote on the Plan?**

[August 14, 2023 at 4:00 p.m. (prevailing Eastern Time)].

**R.      What is a Confirmation Hearing and will the Bankruptcy Court hold a Confirmation Hearing?**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a chapter 11 plan.  On June 7, 2023, the Debtors notified all parties in interest that a Confirmation Hearing would be held before the Bankruptcy Court on August 24, 2023 at 11:00 a.m. (prevailing Eastern Time), ECF No. 401.[7]  The Confirmation Hearing may be continued from time to time, without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Amended Plan, if any, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code, the Amended Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  The Debtors have also notified parties in interest of the deadline by which objections to the Amended Plan must be received, which, upon approval by the Bankruptcy Court, will be August 17, 2023 at 4:00 p.m. (prevailing Eastern Time).  All objections to the Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received on or before the deadline to file such objections.

---

[7]    Upon approval by the Bankruptcy Court, the Debtors shall also file a separate Confirmation Hearing Notice.

**S.    What is the effect of the Amended Plan on the Debtors' ongoing businesses?**

The Amended Plan contemplates that if the Sales Process does not result in a Sale Transaction with respect to all of the Genesis Platform, the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent, shall determine whether to pursue a Standalone Reorganization on or prior to the Effective Date of the Plan.  If a Standalone Reorganization occurs, Reorganized GGH will retain, for the benefit of the Holders of Allowed Claims, one hundred percent (100%) of the Equity Securities in GBHL (or, if GBHL is sold in the Sale Transaction, in any unsold subsidiaries of GBHL).  Any proceeds in respect of such Equity Securities in GBHL shall be allocated pro rata by the Disbursing Agent of Reorganized GGH.  However, if an Oversubscription Event does not occur, on the Effective Date, all Interests in GGH will be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of Interests in GGH will not receive any distribution on account of such Interests in GGH.

**T.    Do the Debtors recommend voting in favor of the Amended Plan?**

Yes.  The Debtors believe the Amended Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other alternative that is available at this time.  Therefore, the Debtors believe the Amended Plan is in the best interest of all creditors.

.

## IV.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    The Debtors' Prepetition Organizational Structure

The Debtors' organizational chart is attached to this Disclosure Statement as **Exhibit B**.

### B.    Summary of the Debtors' Businesses and Corporate History

Genesis Global Trading, Inc. ("GGT") was the first Genesis entity and has been trading digital assets since 2013.  Since its inception, the Debtors, their non-Debtor subsidiaries (together with the Debtors, the "Company") and GGT have grown into a number of entities that handle different aspects of the digital asset services offered.

Holdco is a sister company of GGT and 100% owned by DCG, a corporation organized under the laws of Delaware.  GGC and Genesis Asia Pacific Pte. Ltd. ("GAP") are in turn 100% owned by Holdco.  *See* **Exhibit B**.

GGC is a private limited liability company organized under the laws of Delaware that provides lending and borrowing services for digital assets and fiat currency primarily to and from institutional and high net worth individual customers.  It is registered as a Money Services Business with the Financial Crimes Enforcement Network ("FinCEN").  GGC does not have a separate board of directors.

GAP is a Singapore-based digital payment token service provider which carries out digital asset trading and lending activities.  As of July 2022, GAP has received an In-principle Approval for a Major Payment Institution license under the Payment Services Act 2019 by the Monetary Authority of Singapore and is operational under the pre-licensing regime until September 30, 2023.

Other than GGC and GAP, Holdco's subsidiaries and its sister company GGT have not filed petitions for relief and are not a part of these Chapter 11 Cases (collectively, the "Non-Debtor Subsidiaries").  The Non-Debtor Subsidiaries include, without limitation, Genesis UK Holdco Limited, Genesis Global Assets, LLC, Genesis Asia (Hong Kong) Limited, Genesis Bermuda Holdco Limited, Genesis Custody Limited ("GCL"), GGC International Limited ("GGCI"), GGA International Limited, Genesis Global Markets Limited ("GGM"), GSB 2022 II LLC, GSB 2022 III LLC, and GSB 2022 I LLC.

The Board of Directors at Holdco (the "Board") is comprised of Paul Aronzon, Thomas Conheeney, Mark Murphy, and A. Derar Islim.  Holdco is a holding company and does not operate any business separate from GGC and its other operating subsidiaries.  On November 18, 2022, the Board formed the Special Committee and elected Paul Aronzon and Thomas Conheeney, its two independent directors, to serve on the Special Committee.

The purposes of the Special Committee are, among other things, to (i) evaluate on behalf of Holdco or its subsidiaries various strategic alternatives or transactions involving Holdco and its subsidiaries that affect the liquidity or balance sheet of Holdco or its subsidiaries, including, without limitation, the commencement of any financing, sale, restructuring, reorganization, liquidation, or other strategic alternatives or any transaction involving DCG, Holdco's corporate parent and its largest borrower; (ii) address issues of real or potential conflicts; (iii) conduct investigations; and (iv) act on behalf of, and bind, the Company with respect to such matters.  Since its formation, the Special Committee has met frequently to discuss and evaluate matters within its purview, including the commencement of these Chapter 11 Cases.

### *The Company and GGT's Business Operations*

Historically, the Company and GGT's operations were divided into four main categories: (i) the trading service, which facilitated spot trading in digital assets; (ii) the lending and borrowing service, whereby the Company lent and borrowed digital assets and fiat currency in consideration for the payment of interest; (iii) the derivatives service, which allowed customers to enter into a variety of derivatives on digital asset underliers; and (iv) the custodial service, which permitted customers to securely store digital assets.  Traditionally, the Debtors engaged in lending, borrowing and certain trading services, while the derivatives, custodial and most of the trading services were operated by Non-Debtor Subsidiaries and GGT.

*Trading Service*

Non-Debtor GGT launched its first over the counter ("OTC") bitcoin trading desk in 2013.  Since then, the Company and GGT have offered spot trading services to a wide variety of institutional investors seeking exposure to the digital asset market.  The trading service historically operated 24 hours a day, seven days a week. Other than GAP, none of the trading business entities have commenced Chapter 11 Cases.

As part of its trading service, the Company and GGT make markets in digital assets by offering liquidity to buyers and sellers.  This service functions similarly to a traditional brokerage in some respects, in that the Company and GGT, respectively, receive requests for quotes or buy/sell orders from their respective customers on a variety of accepted digital assets.  The Company and GGT, respectively, then gather the quotes from, or execute the orders with, a variety of digital asset exchanges, institutional service providers and counterparties worldwide, endeavoring to achieve optimal price and point-in-time execution.

The Company and GGT's trading brokerage service is offered through three entities: GGT, GGCI, and GAP. GGT is a New York-based non-custodial, OTC market-maker in digital assets and brokerage, has a virtual currency BitLicense issued by the New York State Department of Financial Services ("NYDFS"), and is registered as a broker-dealer with the SEC and the Financial Industry Regulatory Authority ("FINRA").  As noted above, GGT is a sister company to Holdco and is not a Debtor in these Chapter 11 Cases; Holdco has no ownership interests in GGT, and GGT has no ownership interests in any of the Debtors.  GGT provides services and employees to the Debtors and Holdco's various subsidiaries pursuant to various contractual arrangements.  GGCI is a BVI company that carries out spot and derivatives trading activity.  GGCI is not a Debtor in these Chapter 11 Cases.  GAP, which is one of the Debtors in these Chapter 11 Cases, is the entity that provides similar trading services primarily to Singapore residents and is operated from Singapore.

*Lending and Borrowing Service*

The Company's lending and borrowing service permitted customers to loan and borrow digital assets and fiat currency to and from, as applicable, the Company and provided institutional funds and market makers with access to liquidity designed to meet their needs.

Prior to November 16, 2022, when the lending and borrowing service was paused, the service generally permitted customers to enter into bespoke loan terms and structures specifically designed to meet their needs.  These loans were often open-term loans (i.e., callable on demand), but could also be fixed-term loans with maturity dates of up to 12 months.  Loans were made across a variety of digital assets, including stablecoins, BTC, ETH and more than 20 other assets.  In connection with this service, the Company provided its customers with access to additional tools, such as custody services offered by third-party custodians for loan collateral (including by tri-party custodians), real-time and historical analytics, instant collateral transfer and a platform for ease of portfolio management.

The Company's lending and borrowing service was offered primarily through two entities serving different geographies: GGC and GAP.

*Derivatives Service*

The Company also offers a derivatives service through its sell-side dealing desk and acts as a liquidity provider that operates across all major crypto option markets.  In connection with this service, Non-Debtor Subsidiaries offer customers customized derivatives solutions to express nuanced market views, manage volatility and hedge risk.

The derivatives service provides customers exposure to digital assets through a variety of derivative transactions, including options and forwards.  The service accepts a broad range of assets as collateral (although some transactions are required to have U.S. dollar collateral consistent with CFTC variation margin requirements).

The Company's derivatives service is currently offered through GGCI, which carries out spot and derivatives trading activity. GGCI also provides the Company with access to digital asset platforms and exchanges through its membership on such venues.

### Custody Service

One of Holdco's Non-Debtor Subsidiaries, GCL, has historically provided an institutional-grade custody service to manage, move and store digital assets. GCL is not a Debtor in these Chapter 11 Cases. The custody service was intended as an integrated offering for sophisticated investors that incorporates best practices used by government agencies to protect digital assets. These measures include multiple layers of cryptographic security, including multi-party computation technology and private keys that are stored in hardware security modules in bunkers. The service also permitted customers to earn liquidity on assets stored in cold storage by leveraging the trading desk.

GCL has been a UK-based provider of non-fiduciary digital asset storage services to institutional clients and high net worth individuals in permitted jurisdictions. GCL is registered as a cryptoasset business with the Financial Conduct Authority ("FCA") under the Money Laundering Regulations 2017 ("MLRs") as of December 2021 and as a Money Services Business with FinCEN.

### C.    Summary of the Company's Prepetition Capital Structure

### Debtors' Cash, Digital Assets and Shares Held in Brokerage Accounts

As of the Petition Date, the Debtors had more than $180 million in cash, approximately $495 million in digital assets, and approximately $442 million in shares in brokerage accounts. As of the same date, the Debtors had approximately $539 million in outstanding loans to third parties. In connection with the outstanding loans, the Debtors have received approximately $584 million in collateral against those loans in both U.S. dollars and/or digital assets.

### Institutional Creditors

According to information made available by the Company's management, as of January 19, 2023, GGC and GAP had outstanding borrowings in U.S. dollars and digital assets totaling approximately $1.7 billion with approximately 173 non-affiliated institutional lenders and $1.8 billion with non-affiliated individual lenders. These borrowings are generally documented under master digital asset loan agreements ("MLAs") individually negotiated with each lender as well as associated term sheets. In connection with such borrowings, GGC and GAP have posted approximately $436 million in collateral denominated in U.S. dollars and/or digital assets as of April 30, 2023.

### Gemini Lenders

GGC also has outstanding borrowings of digital assets with customers of Gemini (such customers, the "Gemini Lenders") and such borrowings, the "Gemini Borrowings"). As with the Debtors' other borrowings, these transactions are documented under MLAs. However, GGC did not interact with the Gemini Lenders directly. Rather, the Gemini Lenders appointed Gemini to act as their agent in connection with the Gemini Borrowings.

In addition, the Gemini Borrowings with Gemini Lenders are not documented under term sheets. Rather, pursuant to the MLAs, GGC provided Gemini with the terms of the loans it was willing to enter into. Gemini then was required to provide such terms to the Gemini Lenders who chose to enter into loans subject to those terms. GGC does not have information about the number or identity of the Gemini Lenders, and understands that Gemini is privy to that information.

On August 15, 2022, GGC entered into a security agreement with Gemini as agent for the Gemini Lenders pursuant to which GGC pledged 30,905,782 shares of the Grayscale Bitcoin Trust ("GBTC") to Gemini for the benefit of the Gemini Lenders to secure GGC's obligations under the MLAs. On November 7, 2022, GGC and Gemini entered into an amendment to the security agreement, which extended its term until GGC paid what it owed under the MLAs in full. On November 10, 2022, GGC, Gemini and DCG entered into a second amendment to the security agreement pursuant to which DCG agreed to deliver an additional 31,180,804 shares of GBTC to GGC. GGC, in turn, agreed to transfer such shares to Gemini for the benefit of the Gemini Lenders and, upon such transfer, pledge those

shares to Gemini to secure GGC's obligations under the MLAs. However, no shares were pledged or transferred to Gemini by GGC pursuant to this second amendment.

On November 16, 2022 Gemini informed GGC that it had foreclosed on 30,905,782 of shares pledged under the security agreement through a private sale at the market price as of 4:00 p.m. (prevailing Eastern Time) of $9.20 per share. On that date, Gemini further informed GGC that the proceeds of such sale, $284,333,194.40, less costs and expenses of foreclosure, were applied to GGC's outstanding obligations under the MLAs. GGC disputes whether Gemini's foreclosure satisfied applicable law, including whether there was any foreclosure of the collateral, including for the benefit of the Gemini Lenders, and whether such sale was completed in a commercially reasonable manner and in accordance with the notice requirements set forth in the Uniform Commercial Code.

### Intercompany Loans

#### (i)    DCG Loans

According to information made available by the Company's management, as of April 30, 2023, GGC had outstanding loans to DCG in the aggregate principal amount of approximately $500,000,000. The loans consist of:

- A $100,000,000 USD loan, which was executed on January 24, 2022 with an original maturity date of July 24, 2022, which was later extended to May 11, 2023 (the "January Loan");

- A $100,000,000 USD loan, which was executed on February 23, 2022 with an original maturity date of August 23, 2022, which was later extended to May 11, 2023 (the "February Loan");

- A $200,000,000 USD loan, which was executed on May 9, 2022 with a maturity date of May 9, 2023 (the "May 9 Loan");

- A $100,000,000 USD loan, which was executed on May 10, 2022 with a maturity date of May 10, 2023 (the "May 10 Loan" and together with the May 9 Loan, the "May Loans" and collectively with the January Loan and February Loan, the "GGC-DCG Loans").

On November 10, 2022, in connection with various transactions, including an equity injection from DCG into GGCI, a Non-Debtor Subsidiary, of a total value of approximately $140 million, including contributions of $50 million in cash, various digital currency and GBTC shares, GGC and DCG entered into an amended and restated Master Digital Asset Loan Agreement (the "A&R DCG Loan Agreement") to memorialize the terms governing the GGC-DCG Loans. On the same date, the parties also extended the maturity of the January Loan and the February Loan each to May 11, 2023. On November 15, 2022, GGC repaid $50,000,000 it had borrowed from DCG on June 15, 2022.

#### (ii)    DCGI Loans

GGC has outstanding loans to DCG International Investments Ltd. ("DCGI"), a subsidiary of DCG, of 14,048 BCH (approximately $1.7 million USD as of the Petition Date and $1.7 million as of April 30, 2023) and 4,550.45 BTC (approximately $96 million USD as of the Petition Date and $132.9 million as of April 30, 2023). The outstanding 4,550.45 BTC is owed under an open term loan from GGC to DCGI of 18,297 BTC that the parties entered into on June 18, 2022 pursuant to a term sheet and MLA. The original maturity date is not specified in the loan term sheet. On November 10, 2022, DCGI partially paid off the BTC Loan by delivering 25,999,457 GBTC shares to GGC (approximately $250 million USD on of the date of transfer), which resulted in the remaining obligation of 4,550.45 BTC. On the same date, the parties memorialized DCGI's obligation to return the remaining 4,550.45 BTC pursuant to a revised term sheet, which specified the maturity date for the outstanding balance as May 11, 2023.

GGC also owes DCGI 78,539.01 ETHW (approximately $301,589.81 USD as of April 30, 2023) under a loan between the parties dated November 15, 2022.

#### (iii)    May 2023 Maturities

In May 2023, the GGC-DCG Loans, in the aggregate principal amounts of $500,000,000 USD, and the BTC loan to DCGI in the principal amount of 4,550.45173345 BTC (described above) matured and became due and payable to GGC.  On May 12, 2023, following the maturity date of each of these loans, GGC sent to DCG and DCGI a notice of default and reservation of rights with respect to the amounts outstanding under the loans, including default interest. Based on the A&R DCG Loan Agreement (as defined above), it is the Debtors' view that, as of the date of maturity of each of the GGC-DCG Loans, default interest began accruing at a rate of 10% annually on the dollar-denominated loans to DCG, and 5% annually on the BTC loan to DCGI, DCG disputes that default interest is owed or accruing. Additionally, pursuant to the terms of the relevant master lending agreements, costs relating to enforcement of GGC's rights under these loans continue to accrue and will be charged to DCG and DCGI.  Further details about the maturity and potential exercise of remedies relating to these loans is discussed below in Section VI.R.

   (iii)  *DCG Note*

On June 30, 2022, DCG assumed a $1.1 billion payable GAP owed to GGC and evidenced the assumed payable with a $1.1 billion promissory note (the "DCG Note") in favor of GGC that had a 10 year maturity and fixed interest rate of 1% that may, at DCG's option, be paid in kind.  The $1.1 billion payable GAP owed to GGC related to amounts that GGC had provided to GAP in connection with loans made to 3AC.  On July 14, 2022, DCG assumed all of GAP's rights, burdens, obligations, and liabilities in connection with its lending and pledge agreements with 3AC, including any outstanding loans and collateral.  Under the assignment, DCG also agrees to observe and perform all of GAP's duties, obligations, terms, provisions and covenants, and to pay and discharge all of the liabilities in connection with GAP's lending and pledge agreements with 3AC, including any outstanding loans and collateral.  The Debtors understand that the joint liquidators overseeing the liquidation of 3AC intend to challenge the 3AC claims assumed by DCG and GAP's liquidation of collateral that 3AC posted in favor of GAP prior to the commencement of 3AC's liquidation proceedings.   The Debtors believe that the 3AC liquidators' purported claims against GAP, GGC, and Holdco have no merit and that, in any event, pursuant to the assumption and assignment agreement between DCG and GAP, DCG is liable for any such claims and obligations.  DCG disputes that it has any liability to GAP in the event that the joint liquidators' claims are successful.  In addition, the circumstances of the DCG Note are currently a subject of the Investigation being conducted by the Special Committee and the Committee, discussed further below in Sections VI.D and E.

   (iii)  *Luno Setoff*

On August 30, 2022, GGC entered into a master loan agreement with Luno Pte. Ltd. ("Luno"), a subsidiary of DCG (the "Luno MLA").  On November 11, 2022, DCG purportedly issued to Luno a guarantee, to which GGC was not a party, of GGC's obligations to Luno under the Luno MLA.  As of November 17, 2022, GGC had owed Luno digital assets which were valued at approximately $52.5 million under loans governed by the Luno MLA with maturity dates in the future.  On that date, Luno purportedly demanded the transfer of such digital assets from DCG under the guarantee and DCG purportedly transferred such digital assets promptly after receiving the demand.

DCG purportedly set off GGC's obligation to reimburse DCG for the $52.5 million transfer to Luno against DCG's obligations under the January Loan (the "Luno Transaction").  If this setoff is valid, the $500,000,000 owed to GGC by DCG would be reduced by the $52.5 million setoff amount.  The Debtors dispute DCG's purported exercise of set off rights, which is one of the transactions the Special Committee has been investigating.

## V.    EVENTS LEADING TO CHAPTER 11 AND PREPETITION RESTRUCTURING INITIATIVES

The Debtors have commenced these Chapter 11 Cases to maximize value for creditors and restructure their balance sheets, including approximately $4.6 billion of total liabilities outstanding (including intercompany balances) as of April 30, 2023.

Over the past year, the digital asset industry has experienced tremendous dislocation.  In particular, in May 2022, LUNA ("Luna") and TerraUSD ("UST") collapsed, causing widespread market turmoil.  Shortly thereafter, the British Virgin Islands digital asset hedge fund Three Arrows Capital, Ltd. ("3AC") commenced liquidation proceedings.  The collapse of Luna and UST and subsequent liquidation of 3AC signaled the onset of a new "crypto winter" and a growing industry-wide reluctance to do business with digital asset companies.

As market conditions worsened, other companies faced financial difficulties.  In July 2022, Celsius Network LLC and certain affiliates and Voyager Digital Holdings, Inc. and certain affiliates filed for bankruptcy.  Most recently, FTX Trading Ltd. ("FTX"), Alameda Research Ltd. ("Alameda") and certain affiliates (together with FTX and Alameda, the "FTX Entities") filed for chapter 11 bankruptcy on November 11, 2022.

These drastic market shifts have decreased investor confidence in the digital asset markets in which the Company operates and severely and adversely impacted the Company's business.  As the FTX Entities' situation unfolded, the Company experienced unprecedented withdrawals, leading GGC and GAP to pause all lending and borrowing on November 16, 2022.

### A.    Impact of the 3AC Liquidation

In 2020, GAP established a lending relationship with 3AC.  In June 2022, the various loans extended to 3AC by GAP amounted to approximately $2.4 billion in cash and digital assets. After it became clear that 3AC would not be in a position to pay back its loans, GAP foreclosed on collateral pledged by 3AC in connection with those loans. But by the time GAP foreclosed on the collateral, the value of that collateral was approximately $1.2 billion.

In light of these events, DCG assumed the remaining payable GAP owed to GGC in connection with the 3AC lending relationship.  On June 30, 2022, DCG evidenced the assumed payable with a $1.1 billion promissory note in favor of GGC that had a 10 year maturity and fixed interest rate of 1% that may, at DCG's option, be paid in kind.

### B.    FTX Collapse

In early November 2022, the digital asset market plummeted further as the FTX Entities, including what was previously one of the world's largest and most respected digital asset exchanges, collapsed.  Starting November 6, 2022, FTT, a cryptocurrency issued by the FTX Entities, lost over 80% of its worth in the span of 72 hours.  The contagion effect from the FTX Entities' collapse spread throughout the digital asset market.  Because a large bulk of the Debtors' business was with the FTX Entities, the collapse of the FTX entities adversely affected the Debtors, precipitating the Debtors' own bankruptcy filings.

### C.    Impact on Customer Confidence

Consistent with industry practice, many of the loans offered by the Company were open term loans, meaning that the Company could repay a loan in full or in part at any point in time and lenders could "call" (demand repayment) under the loans in whole or in part at any point in time.

As the FTX Entities began to experience their collapse, the Company received calls on its loans amounting to approximately $827 million.  This "run on the bank" following the FTX Entities' collapse was outsized and severely impacted the Company's available liquidity.

At the same time, Holdco's corporate parent, DCG, and its various subsidiaries, including DCGI, were also impacted by the market turmoil and did not have the liquidity to pay back the Company on certain loans, adding pressure to the Debtors' balance sheets.

As a result of the unprecedented number and size of the loan calls, on November 16, 2022, GGC and GAP paused all lending and borrowing to preserve the Debtors' estates, ensure fair distribution and begin discussions with their stakeholders.

**D.      Debtors' Decision to File for Chapter 11**

In close consultation with their advisors, the Debtors ultimately decided to commence the Chapter 11 Cases and move expeditiously to seek to achieve a consensual resolution that avoids the costs and uncertainty of litigation.

## VI.    EVENTS OF THE CHAPTER 11 CASES

As noted above, the Debtors filed for relief under chapter 11 of the Bankruptcy Code on January 19, 2023. Since the Petition Date the Debtors have continued to operate as debtors-in-possession subject to the supervision of the Bankruptcy Court in accordance with the Bankruptcy Code.  An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under section 362(a) of the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors and the continuation of litigation against the Debtors.

### A.    Voluntary Petitions

The following entities filed chapter 11 bankruptcy petitions on the Petition Date commencing the Chapter 11 Cases: (i) Genesis Global Holdco, LLC, (ii) Genesis Global Capital, LLC, (iii) Genesis Asia Pacific Pte. Ltd.

### B.    First and Second Day Relief

Upon the commencement of the Chapter 11 Cases, the Debtors filed numerous motions seeking the relief provided by certain first day orders (the "First Day Orders").  First Day Orders are intended to ensure a seamless transition between a debtor's prepetition and postpetition business operations by approving certain normal business conduct that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.

On January 23, 2023, the Bankruptcy Court held a hearing to consider the relief requested in the motions and granted the relief requested, which was designed to stabilize the Debtors' business operations and business relationships with customers, vendors, employees, and others.  The First Day Orders in the Chapter 11 Cases authorized the Debtors to, among other things:

- procedurally consolidate each of the Chapter 11 Cases for ease of administration, ECF No. 37;

- appoint GAP to act as a foreign representative of the Debtors in Singapore to seek recognition of the Chapter 11 Cases, ECF Nos. 38, 100;

- appoint Kroll Restructuring administration as claims agent, ECF Nos. 39;

- enforce the automatic stay, ECF Nos. 40;

- extend the deadline to file Schedules and Statements, ECF No. 42;

- continue to pay certain taxes and fees, ECF Nos. 43, 97;

- set guidelines and requirements for the administration of the Chapter 11 Cases, ECF No. 44;

- continue to pay critical and foreign vendors and service providers, ECF Nos. 45, 98;

- file a consolidated list of the 50 largest creditors and redact certain personal identification information, ECF No. 46;

- continue to use the Debtors' cash management system and make and receive intercompany loans and extend the deadline to comply with section 345 of the Bankruptcy Code, ECF Nos. 47, 99; and

- pay certain prepetition employee wages, reimbursable expenses, and benefits, ECF No. 48;

Certain of the First Day Orders were entered on an interim basis and subsequently approved on a final basis.

Shortly following the commencement of the Chapter 11 Cases, the Debtors filed motions seeking additional relief (the "Second Day Orders"). The Second Day Orders included seeking permission to pay professionals in the interim, ECF No. 101, and a motion to redact and seal certain information, ECF No. 67. The Second Day Orders also authorized the Debtors to retain, as of the Petition Date, various professionals and advisors to assist the Debtors during the Chapter 11 Cases, including:

- Cleary Gottlieb Steen & Hamilton LLP ("Cleary") as counsel, ECF No. 103;

- Alvarez & Marsal North America, LLC as financial advisor, ECF No. 108;

- Moelis & Company LLC as investment banker, ECF No. 151;

- Kobre & Kim LLP as special counsel, ECF No. 104;

- Morrison Cohen LLP as special counsel, ECF No. 106;

- Kroll Restructuring Administration LLC as administrative advisor, ECF No. 107;[8]

- Grant Thornton LLP as tax services provider, ECF No. 228;

- M3 Advisory Partners, LP as financial advisor, ECF No. 268; and

- other professionals relied upon in the Debtors' ordinary course of business, ECF No. 102.

### C.    The Restructuring Term Sheet

On February 10, 2023, a non-binding agreement in principle among the Debtors and key parties interest was memorialized in the Restructuring Term Sheet (the "Restructuring Term Sheet") attached as Exhibit A to the *Notice of Filing of the Restructuring Term Sheet*, ECF. No. 80. While the term sheet was executed by certain parties (including the Debtors, DCG, Gemini, and certain members of the Ad Hoc Group) it was not executed by a number of Ad Hoc Group members that had been part of the negotiation. The parties, however, have continued to engage in discussions toward a possible consensual settlement of the issues addressed in the Restructuring Term Sheet. At this time, because no resolution has been achieved, the Debtors have proposed the Amended Plan which does not incorporate the Restructuring Term Sheet. The Committee was not a party to and was not involved in the negotiation of the Restructuring Term Sheet, which was filed shortly after its appointment.

### D.    DCG Special Committee Investigation

On November 18, 2022, the Holdco Board of Directors established the Special Committee, comprised of Paul Aronzon and Tom Conheeney, with responsibility for making all decisions relating to the liquidity and restructuring of Holdco and its subsidiaries. As part of its mandate, the Special Committee was charged with evaluating and approving transactions with affiliates including DCG Entities and investigating the Debtors' relationships and transactions with DCG Entities. One of the primary purposes of this investigation has been to assess whether the Debtors have potentially viable claims against the DCG Entities and to assist the Special Committee in the exercise of its fiduciary duties.

In accordance with this mandate, at the request of the Special Committee, Cleary commenced an investigation (the "Investigation") into the relationships and transactions between or among the Debtors and various DCG Entities, (i) corporate governance and corporate separateness between the Debtors and DCG Entities, (ii) the entry into the DCG Loans and the DCG Notes, (iii) the restructuring of the DCG Loans at various points in time, including in November 2022; (iv) DCG's purported exercise of setoff rights in connection with DCG's $52.5 million payment to

---

[8]    Kroll Restructuring Administration was also retained as claims and noticing agent pursuant to the First Day Orders.

Luno ; (v) communications relating to the DCG Loans and DCG Note; and (vi) other transactions with DCG Entities during the applicable avoidance periods under applicable law.

As of June 1, 2023, in connection with the Investigation, Cleary has reviewed over 280,000 documents and communications collected from 20 current and former employees allocated to the Debtors from January 1, 2021 to December 31, 2022. These documents and communications include corporate documents, financial statements, lending agreements and term sheets, and internal and external communications including emails, Microsoft Teams messages, Telegram messages, and social media posts. The document review process, which remains ongoing, serves the purpose of aiding (i) the Investigation, (ii) the Company's responses to requests from authorities, and (iii) document requests from the UCC and DCG Entities, discussed in further detail below. These documents and communications (other than privileged documents and communications) were shared with counsel to the Committee as part of its investigation.

As part of the Investigation, Cleary has also conducted almost 30 interviews with approximately twelve current and former employees allocated to the Company. Between December 4, 2022 and January 24, 2023, Cleary conducted 10 preliminary interviews with current employees on topics including lending processes and procedures, bookkeeping and loan management, compliance and risk policies, and intercompany lending. Following these preliminary interviews, from March 9, 2023 through June 1, 2023, Cleary conducted 18 more substantive interviews with both current and former employees regarding a variety of topics, including but not limited to client communications, risk management, accounting, and the relationship between GGC and DCG.

Additionally, on March 9, 2023, Cleary on behalf of the Special Committee requested from DCG various documents and communications related to, among other things, borrowing, lending, or financing arrangements between or among the Debtors, the DCG Entities and any other subsidiaries and affiliates, including those related to the transactions described above. As of the date of this filing, Cleary has received over 10,000 documents from DCG.

Cleary has shared the findings from the Investigation with the Special Committee and counsel to the UCC and the Ad Hoc Group. While the Internal Investigation remains ongoing, after consultation with legal counsel, the Special Committee has concluded that there are colorable claims[9] against certain DCG Entities for various causes of action, including potential claims based on alter ego theories, preference law, and other legally cognizable rights. The Special Committee recognizes, however, that the law governing such claims, particularly alter ego claims, creates significant challenges to a successful prosecution, and that the DCG Entities would vigorously defend against such claims. Moreover, any litigation against the DCG Entities with respect to these claims would be costly and subject to significant uncertainties, in terms of the ultimate likelihood of success, the ability to recover from responsible parties and the timing of any such recoveries. The Special Committee believes that any litigation over these claims would likely take years to complete, particularly in light of the time it could take to resolve potential appeals. The significant costs, uncertainty and time associated with pursuing these claims would not only significantly reduce recoveries by the Debtors' creditors, but it would also delay distributions to creditors. Therefore, the Special Committee continues to seek a reasonable settlement of the Debtors' potential claims against the DCG Entities.

E.    The Committee's Investigation

The Committee, in furtherance of its fiduciary duty to unsecured creditors, is investigating all prepetition conduct that may give rise to potential claims or causes of action against third parties. Such claims may be a valuable source for improving creditor recoveries. To date, the Committee has received and reviewed nearly 90,000 documents from the Debtors, DCG and Gemini.

The Committee's investigation remains ongoing and is not yet complete. There remain outstanding requests for information and documents directed to the Debtors, DCG, and Gemini. The Committee is continuously evaluating

---

[9]    Generally speaking, a colorable claim is one that is "plausible or not without some merit." *In re Sabine Oil & Gas Corporation*, 547 B.R. 503, 516 (Bankr. S.D.N.Y. 2016). *See also In re KDI Holdings, Inc.*, 277 B.R. 493, 508 (Bankr S.D.N.Y. 1999) ("In determining whether there is a colorable claim, the Court must engage in an inquiry that is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim.").

whether and when to employ any and all available discovery tools and other litigation strategies. Thus far, the Committee has focused on reviewing the production of written documents. It is the Committee's position that the Debtors' bankruptcy estates hold significant potential claims and causes of action against DCG and its affiliates, officers and directors. The Committee will continue to share as much information as possible regarding the status of its investigation without compromising confidentiality obligations, its ongoing negotiations, or the investigation process.

### F.    Redaction

On April 24, 2023, the Court heard arguments related to the requested redaction by the Debtors and the Committee of all individual and institutional creditor names and personally identifiable information in all filings, including Schedules and Statements. At the conclusion of that hearing, the Bankruptcy Court took the matter under advisement. As of the date of filing this Disclosure Statement, the Bankruptcy Court has not issued an opinion in the matter.

### G.    Cash Cloud Proceedings

Holdco is the lender with respect to (i) an unsecured loan facility in the aggregate principal amount of approximately $100 million to Cash Cloud Inc. ("Cash Cloud", such facility, the "Cash Cloud Facility") and (ii) a secured promissory note in the aggregate principal amount of $7.5 million, secured by substantially all of the assets of Cash Cloud, (such lien, the "Lien"), and such note, the "Cash Cloud Note"). This Cash Cloud Facility was originally between GGC and Cash Cloud pursuant to that certain Master Loan Agreement dated July 27, 2020. On October 29, 2022, GGC assigned to Holdco all of its rights and obligations in and to the Cash Cloud Facility. DCG disputes this transfer.

On February 8, 2023, Cash Cloud filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada (the "Nevada Bankruptcy Court").

#### (i)    *Emergency Lien Priming*

The Debtors filed a motion with the Bankruptcy Court to authorize Holdco to consent to the priming of the Lien by a new superpriority lien to secure Cash Cloud's obligations under a contemplated debtor-in-possession loan facility, in exchange for payment of adequate protection by Cash Cloud to Holdco against any diminution in the value of the collateral securing the Lien. *See* ECF No. 59. The Bankruptcy Court entered an order granting the Debtors authority to consent to the priming of the Lien on February 10, 2023. *See* ECF No. 77. On March 20, 2023, the Nevada Bankruptcy Court entered a final order approving the Cash Cloud debtor-in-possession facility and the adequate protection package. Order, *In re Cash Cloud Inc., dba Coin Cloud*, No. 23-10424 (MKN) (Bankr. D.N.V. Mar. 20, 2023), ECF No. 133.

#### (ii)    *Cash Cloud Sale Process*

Cash Cloud is conducting a sale process of substantially all of its assets as of the date hereof. In April, the Nevada Bankruptcy Court approved Cash Cloud's proposed bidding procedures. *See* Order, In re Cash Cloud Inc., dba Coin Cloud, No. 23-10424 (MKN) (Bankr. D.N.V. Apr. 27, 2023), ECF No. 483. On June 2, 2023 Cash Cloud held an auction for the sale of substantially all of its assets and announced winning bids on June 5, 2023. See Notice of Auction Results Regarding Sale of Substantially All of the Debtors' Assets, In re Cash Cloud Inc., dba Coin Cloud, No. 23-10424 (MKN) (Bankr. D.N.V. June 5, 2023), ECF No. 618. Heller Capital, LLC, Genesis Coin, Inc. and Christopher McAlary submitted the winning bids, totaling $6,350,000.00 for substantially all of Cash Cloud's assets.

### H.    3AC Liquidation Proceedings

On June 27, 2022, 3AC commenced a liquidation proceeding (the "3AC Liquidation Proceeding") before the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division) (the "BVI Court"). Following the commencement of the 3AC Liquidation Proceeding and the appointment of Russell Crumpler and Christopher Farmer as joint liquidators of 3AC (the "Joint Liquidators"), the Joint Liquidators made a request for

adequate protection with respect to certain Grayscale Bitcoin Cash Trust Shares, Grayscale Litecoin Trust Shares, Bitcoin, and Ether that the Foreign Representatives asserted may be in the possession of the Debtors. While the Debtors dispute that 3AC has any interest in any property or assets in the Debtors' possession, on February 22, 2023, the Debtors and the Joint Liquidators entered into a stipulation pursuant to which the Debtors agreed not to transfer or encumber any Grayscale Bitcoin Cash Trust Shares, Grayscale Litecoin Trust Shares, Bitcoin or Ether in their possession without providing 14 calendar days' prior written notice to the Joint Liquidators, except for certain transactions. *See Stipulation and Agreed Order By and Among the Debtors and the Foreign Representatives of Three Arrows Capital, Ltd. Regarding Certain Disputed Assets*, ECF No. 96 (the "3AC Stipulation"). On March 21, 2023, the Bankruptcy Court so ordered the 3AC Stipulation.

> ### I.    Recognition of the Chapter 11 Cases in Singapore

Due to the global nature of the Debtors' business operations, the ability of creditors to seize collateral in foreign jurisdictions, and the possibility that creditors and courts in foreign jurisdictions may not respect the automatic stay, the Debtors conducted an analysis of jurisdictions where it would be sensible to obtain recognition of these Chapter 11 Cases and enforcement of the automatic stay, or to commence parallel proceedings where remedies were then available under local law.

Therefore, the Debtors sought recognition of the Chapter 11 Cases by commencing parallel proceedings in Singapore. The Debtors' recognition applications are pending before the High Court of the Republic of Singapore (the "Singapore Court") and are set to be heard on July 6, 2023.

> ### J.    Appointment of Official Committee of Unsecured Creditors

On February 3, 2023, the U.S. Trustee appointed the Committee in the Chapter 11 Cases. The Committee comprises (1) SOF International, LLC, (2) Teddy Andre Amadeo Gorisse, (3) Digital Finance Group Co., (4) Richard R. Weston, (5) Mirana Corp., (6) Amelia Alvarez, and (7) Bitvavo Custody B.V. *See* ECF No. 53.

On or around February 10, 2023, the Committee retained White & Case LLP as counsel, Houlihan Lokey, Inc as investment banker, and Berkeley Research Group, LLC as financial advisor. The Committee subsequently retained Seward & Kissel LLP as conflicts counsel.

> ### K.    Ad Hoc Groups in the Chapter 11 Cases

In November 2022, before the Petition Date, the Ad Hoc Groups were formed. The Ad Hoc Groups consisted of two separate groups of creditors. One group of creditors initially retained Kirkland & Ellis LLP as counsel, and the other group of creditors retained Proskauer Rose LLP as counsel. As time progressed, the group represented by Proskauer Rose LLP has become the predominant Ad Hoc Group.

On March 3, 2023, the Ad Hoc Group represented by Proskauer Rose LLP filed a Verified Statement pursuant to Bankruptcy Rule 2019. *See* ECF No. 114. This Statement represents that there are 78 members of the Ad Hoc Group with a dollarized claim amount of $1,535,158,736.57. The Ad Hoc Group has since grown to include ninety members.

> ### L.    Schedules and Statements

On January 27, 2023, the Bankruptcy Court entered the *Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports*, ECF No. 42 extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by an additional thirty-five (35) days for a total of forty-nine (49) days after the Petition Date. On March 6, 2023, the Debtors filed a notice that they had agreed with the U.S. Trustee to further extend the deadline to file the Schedules and Statements to March 20, 2023, *see* ECF No. 119.

On March 21, 2023, the Debtors filed their Schedules and Statements. *See* ECF Nos. 141, 142, 143, 144, 145, 146, 147.

### M.      Claims

#### (i)        *Bar Date Motion*

On March 16, 2023, the Debtors filed the *Debtors' Application for an Order (I) Establishing Bar Dates for Filing Proofs of Claim; (II) Approving Proof of Claim Forms, Bar Date Notices, and Mailing and Publication Procedures; (III) Implementing Uniform Procedures Regarding 503(B)(9) Claims; and (IV) Providing Certain Supplemental Relief*, ECF No. 135.  On April 4, 2023, the Bankruptcy Court entered an order (the "Bar Date Order"), ECF No. 200, establishing May 22, 2023 at 4:00 p.m. (prevailing Eastern Time) as the last date and time for each person or entity to file proofs of claim based on prepetition Claims or on section 503(b)(9) of the Bankruptcy Code and July 18, 2023 at 4:00 p.m. (prevailing Eastern Time) as the last day for governmental units to file proofs of claim in the Debtors' Chapter 11 Cases.  Additionally, the Bar Date Order establishes separate Bar Dates for Claims arising from Debtors' rejection of executory contracts and unexpired leases and Claims that the Debtors have amended in the Debtors' Schedules (collectively, the "Bar Dates").

On April 7, 2023, the Debtors mailed a notice of the Bar Dates to the U.S. Trustee, the Committee, and other parties as required by the Bar Date Order.  Additionally, in compliance with the Bar Date Order, the Debtors caused a notice to be published in the New York Times and USA Today.

The Bar Date Order authorized and directed Gemini to file a single proof of claim (the "Gemini Master Claim") against the Debtors on behalf of all creditors that loaned assets to the Debtors through the Gemini Earn program with Gemini acting as agent.  Additionally, the Bar Date Order authorized and directed the Ad Hoc Group to file a single proof of claim, together with a schedule of amounts asserted by each such member, on or before the general bar date (May 22, 2023 at 4:00 p.m. (prevailing Eastern Time)), on account of claims held by members of the Ad Hoc Group pursuant to relevant prepetition master loan agreements and loan term sheets.

#### (ii)        *Bidding Procedures Motion*

On March 16, 2023, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Deadlines, (II) Scheduling Hearings and Objection Deadline with Respect to the Debtors' Sale, and (IV) Granting Related Relief*, ECF No. 133 (the "Bidding Procedures Motion").  The Bidding Procedures Motion was approved by the Bankruptcy Court on March 30, 2023, ECF No. 191.

The Bidding Procedures (as defined in the Bidding Procedures Motion) established a process for solicitation, receipt, and evaluation of bids on an efficient timeline for equity in, or assets of, the Debtors and certain of their non-Debtor subsidiaries (the "GGH Assets"), as well as non-Debtor affiliate GGT (together with the GGH Assets, the "Assets").  The Debtors have determined, in their business judgment and in consultation with the Required Consenting GGC Creditors (as defined in the Bidding Procedures Motion), the Committee, and the Ad Hoc Group (collectively, the "Consultation Parties") and with the consent of DCG, as it relates to GGT, that the Bidding Procedures represent the best path forward to effectuate an efficient sale process that maximizes recoveries to creditors.  The Bidding Procedures and Sale Schedule (as defined in the Bidding Procedures Motion) are designed to allow potential bidders adequate time to review the data room and submit bids, as well as adequate time for the Debtors, in consultation with the Consulting Parties and the consent of DCG, as it relates to GGT, to evaluate the bids, hold an Auction, if needed, and seek Bankruptcy Court approval of the sale pursuant to a chapter 11 plan.

The Bidding Procedures set forth the following Sale Schedule, which was amended by the Notice of Amended Sale Schedule, ECF No. 295, in consultation with the Consultation Parties and consent of DCG, as it relates to GGT:

| Action | Description | Deadline |
|---|---|---|
| Bidding Procedures Hearing | The hearing before the Bankruptcy Court to consider the Bidding Procedures Motion | March 30, 2023 |

| Indications of Interest Deadline | The deadline by which all indications of interest must be actually received | May 19, 2023 |
|---|---|---|
| Stalking Horse Designation Deadline | The deadline to designate one or more Qualified Bidders as the Stalking Horse Bidder(s), if any | June 19, 2023 |
| Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures | June 29, 2023 |
| Auction | The date and time of the Auction, if one is needed, which will be held at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, 38th Floor, New York, NY 10006 and/or via Zoom | July 11, 2023 |
| Deadline to file the Designation of Successful Bid | The deadline to file a notice designating the Successful Bid and Successful Bidder, as well as the Back-up Bid and Back-up Bidder | One business day following the conclusion of the Auction |
| Sale Objection Deadline | The deadline by which objections to the entry of an order by the Bankruptcy Court approving the Sale must be filed with the Bankruptcy Court and served so as to be actually received by the appropriate notice parties (the "Sale Objection Deadline") | July 21, 2023, or as otherwise determined in accordance with a motion seeking entry of an order approving the adequacy of a disclosure statement and setting forth the timeline for confirmation of a plan |
| Sale Hearing (subject to the Bankruptcy Court's availability) | The Sale will be implemented under the Plan and shall be approved at the Confirmation Hearing | July 28, 2023, or as otherwise determined in accordance with a motion seeking entry of an order approving the adequacy of a disclosure statement and setting forth the timeline for confirmation of a plan |

Moelis officially launched the sale process on March 31, 2023. The deadline to receive initial indications of interest was May 19, 2023. The Debtors received multiple indications of interest and have continued to work with potential bidders to provide diligence information about the Assets. The final binding bid deadline is June 29, 2023.

### (iii)    *Claims Reconciliation Process*

#### (a)    Three Arrows Capital

On May 22, 2023, 3AC filed proofs of claim numbered 523, 526 and 527 against Holdco, GGC and GAP, respectively, ECF No. 291. The Joint Liquidators have represented that these claims, including avoidance actions, arise from transfers to the Debtors with a value in excess of $1 billion. *Id.* The Debtors intend to vigorously defend its rights and remedies, to contest such claims and to seek their disallowance.

#### (b)    Gemini Lender Master Proof of Claim

On May 22, 2023, Gemini asserted a $1.122 billion claim (the "Gemini Master Claim") against each of GGC, GGH and GAP based on the Gemini Borrowings. The Debtors believe the claims are duplicative. In its annex to the Gemini Master Claim, Gemini states that its claims are secured to the extent of certain collateral pursuant to a security agreement between GGC and Gemini and any subsequent amendments thereto. Whether the Gemini Master Claim is secured is subject to dispute.

More specifically as stated above, GGC pledged 30,905,782 shares of GBTC to Gemini pursuant to the security agreement, on which Gemini purported to foreclose on November 16, 2022. The Debtors dispute whether a foreclosure of the GBTC shares occurred and, if a foreclosure were found to have occurred, whether Gemini's foreclosure satisfies applicable law, including and whether such sale was completed in a commercially reasonable manner and in accordance with the notice requirements set forth in the Uniform Commercial Code. Specifically, there is no evidence that Gemini bought in the GBTC shares and either distributed those GBTC shares to the Gemini Lenders

or distributed the cash from purchasing the collateral to the Gemini Lenders. In addition, the Debtors did not receive any notice of the purported foreclosure sale, and the Debtors do not believe the shares were marketed publicly or privately; rather, the GBTC shares were transferred to an affiliate of Gemini, who continues to hold the GBTC shares. In addition, Gemini claims to have an interest in approximately 31,180,804 GBTC Shares which were never pledged or transferred to Gemini.  The Debtors dispute that Gemini has any interest in such GBTC shares.

(c)        DCG Proofs of Claim

On May 22, 2023, DCG filed proofs of claim nos. 464, 487, 511 against Holdco, GGC and GAP preserving its rights in connection with, among other things, the DCG Loans and the DCGI Loans.

The Debtors vigorously reject these assertions and intend to file objections to the claims.

**N.        Mediation with DCG and Key Stakeholders**

After unsuccessful attempts at reaching a resolution of certain issues involving potential claims against DCG on April 24, 2023, the Debtors filed the *Motion for Appointment of a Mediator,* ECF No. 252.  On May 1, 2023, the Bankruptcy Court entered the *Order Appointing Mediator*, ECF No. 279, which provided for the Debtors, DCG, the Committee, the Ad Hoc Group, and Gemini (collectively, the "Mediation Parties") to engage in mediation through May 31, 2023, which could be extended by agreement among the Mediation Parties.  The Mediation Parties, along with their respective counsel, selected Randall J. Newsome, a former bankruptcy judge in the Northern District of California, as their mediator.

An initial mediation session was held on May 4 and May 5, 2023 with the Mediation Parties and their respective counsel and financial advisors.  On May 31, 2023, the Mediation Parties agreed to extend the mediation period through and including June 16, 2023.  On June 2, 2023, the Bankruptcy Court entered a modified mediation order reflecting the extension.  The Mediation Parties continue to engage in productive discussions concerning a potential resolution of the estates' claims against DCG.

**O.        Employee Payments**

On May 15, 2023, the Debtors filed a *Motion to Authorize Genesis Asia Pacific Pte. Ltd. to Pay Certain Employee Severance Obligations*, ECF No. 312.  The Debtors asked for authorization to pay severance to four employees totaling approximately $21,850.62 USD.  On June 5, 2023, the Court heard this motion and is expected to grant the order shortly.

**P.        Director & Officer Insurance**

On March 27, 2023 Soichiro "Michael" Moro, a former Genesis director, filed a *Motion for Relief from Stay,* ECF No. 165, to allow him to enforce his rights and demand and receive proceeds payable under the Debtors' D&O Insurance Policy.  The policies at issue cover claims made both by the Debtors and their directors and officers.  The Committee objected to the motion, and while the Debtors refrained from objecting to the motion, they filed a response requesting that, should the Bankruptcy Court grant the motion, it lift the stay to permit all covered directors and officers to file claims under the insurance policies.  On May 9, 2023, the Bankruptcy Court issued an order granting the motion and ordering that, to the extent applicable, the automatic stay is modified to the extent necessary to allow any of the Debtors' current and former directors and officers insured under the policies to enforce their rights and demand and receive proceeds payable under the D&O Insurance Policy to the extent of their coverage thereunder, incorporating the Debtors' request.  *See* ECF No. 300.  The order did not constitute a finding that the proceeds of the D&O Insurance Policies are or are not property of the Debtors' estates, and the Bankruptcy Court made no finding as to the applicability of the automatic stay to the proceeds of the D&O Insurance Policy.

On May 15, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Extend the Coverage Period of Certain Insurance Policies and (II) Granting Related Relief*, ECF No. 311 (the "Insurance Extension Motion") seeking authorization, to the extent required, to extend their directors and officers

liability insurance policies by a period of six months to December 28, 2023.  The requested relief would enable the Debtors and covered directors and officers, who are currently navigating multiple actions and investigations, to continue discharging their duties without fear that they will not have insurance coverage.  On June 5, 2023, the Court heard and granted the Insurance Extension Motion and is expected to enter the order shortly.

### Q.    Motion to Extend Exclusivity

On May 19, 2023, the Debtors filed the *Motion to Extend the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereof*, ECF No. 329 (the "Exclusivity Motion") to extend their exclusive period to file a chapter 11 plan and obtain acceptances thereof by 100 days (to August 27, 2023 and October 3, 2023, respectively.  Subsequent to the filing of this motion, the Debtors, the Committee and the Ad Hoc Group agreed to a reduced 75-day extension of  the exclusive periods.  On June 5, 2023, the Bankruptcy Court granted the Exclusivity Motion extending their exclusive period to file a chapter 11 plan and obtain acceptances thereof through and including August 27, 2023 and solicit acceptances thereof through and including October 26, 2023.

### R.    DCG Loans and Forbearance

On May 12, 2023, the Debtors delivered a notice of default for non-payment of approximately $627 million in DCG Loans that were due on May 9, 10 and 11, 2023.  On May 19, 2023, the Debtors received a forbearance proposal from DCG related to its nonpayment of such loans.  The Debtors have been in ongoing discussions with the UCC and the AHG to address DCG's nonpayment, including potential forbearance options and exercising rights and remedies under the loan agreements.

### S.    Litigation Matters

#### (i)    *Certain Non-Bankruptcy Litigation Matters*

 The Debtors are party to certain lawsuits and proceedings.  The Debtors cannot predict with certainty the outcome of these lawsuits or proceedings.  Upon the filing of the Chapter 11 Cases, the automatic stay acts as a pause with respect to the commencement or continuation of litigation by private plaintiffs against the Debtors.  The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate.  Pursuant to section 362(b)(4) of the Bankruptcy Code, however, the filing of the Chapter 11 Cases does not operate as a stay of any action or proceeding by a governmental unit seeking to enforce such unit's police or regulatory power.

#### (ii)    *FTX Preference Litigation*

On May 3, 2023, FTX Trading Ltd. and its affiliated debtors, including Alameda Research, Ltd. (the "FTX Debtors"), filed a *Motion for Relief from Stay*, ECF No. 289 (the "Lift Stay Motion") requesting the Debtors' automatic stay be lifted in order for the FTX Debtors to bring preference actions against Debtor GGC in connection with approximately $3.673 billion in alleged transfers made to the Debtors in the 90 days before the FTX Debtors' chapter 11 petition date.  Specifically, the FTX Debtors seek to bring preference actions with respect to (i) the alleged repayment of loans to GGC by Alameda in the aggregate amount of approximately $1.8 billion; (ii) the alleged pledge of collateral by Alameda to GGC in the aggregate amount of approximately $273 million; and (iii) the alleged withdrawal of assets from the FTX.com exchange in the aggregate amount of approximately $1.6 billion in the United States Bankruptcy Court for the District of Delaware, where FTX's bankruptcy case is pending.  In the Lift Stay Motion, FTX also alleged claims against non-Debtor GGCI.

On June 8, 2023, the Debtors filed an objection to the Lift Stay Motion.  Both the UCC and the Ad Hoc Group filed joinders to the objection.  ECF Nos. 407, 412.  In the Lift Stay Motion objection, the Debtors explain that the FTX Debtors are seeking to litigate claims that are central to these Chapter 11 Cases in a different forum and on an uncertain timeline that threatens the Debtors' timeline for confirming the Amended Plan.  On this basis, the Debtors do not believe that there is cause to modify the automatic stay.  The Bankruptcy Court will hear the Lift Stay Motion on June 15, 2023.

On June 1, 2023, the Debtors filed a *Motion to Establish Procedures and a Schedule for Estimating the Amount of the FTX Debtors' Claims Against the Debtors Under Bankruptcy Code Sections 105(a) and 502(c) and Bankruptcy Rule 3018*, ECF No. 373 (the "Estimation Motion") requesting that the Claims asserted by FTX/Alameda be estimated for purposes of voting, allowance, and distribution at $0.00.  Given the magnitude of the asserted FTX Debtors' Claims, which the Debtors dispute, estimation for the purposes of voting, allowance, and distribution is needed in order to avoid undue delay in the timing and amount of creditor distributions, and to ensure the timely confirmation of the Plan.

Because the fixing of the amounts of the FTX Debtors' Claims through the traditional litigation process would cause undue delay to the administration of the Chapter 11 Cases, the Debtors have proposed the following timeline for the estimation process:

| Action | Deadline |
| --- | --- |
| Deadline to identify experts | July 5, 2023 |
| Deadline to conclude fact discovery, including depositions | July 12, 2023 |
| Deadline to complete and exchange expert discovery including submission of expert reports and rebuttal reports (if any) and expert depositions | July 21, 2023 |
| Deadline to file Debtors' brief in support of estimation | July 24, 2023 |
| Response deadline | August 7, 2023 |
| Reply deadline | August 10, 2023 |
| Evidentiary Hearing | August 15, 2023 at 11:00 a.m. (ET) |

The FTX Debtors filed an objection to the Estimation Motion on June 8, 2023, ECF No. 406.  The Bankruptcy Court will hear the Estimation Motion on June 15, 2023.

## VII.    SUMMARY OF THE PLAN[10]

### A.    General Basis for the Plan

The Plan represents the product of extensive and ongoing arm's-length negotiation among the Debtors, the Committee, and the Ad Hoc Group and their advisors, in an effort to reach a solution that the parties believe is in the best interest of the Debtors, their estates, and stakeholders.  The Debtors believe that prolonged Chapter 11 Cases would be detrimental to the Debtors' reorganization efforts, threaten the viability of Reorganized GGH (if applicable) and reduce recoveries to Holders of Allowed Claims.

Under the Plan, the Debtors will continue their ongoing marketing and sale process to sell any or all of the assets of the Debtors, the Genesis Platform, or the Genesis Platform along with GGT, with the goal of achieving the highest recoveries for all stakeholders.  If the sale process does not result in a Sale Transaction with respect to all of the Genesis Platform, the Plan provides for the option (subject to the Committee and Ad Hoc Group's consent rights as described under the Plan) to have any unsold portion of the Genesis Platform be reorganized as a going concern for the benefit of the Holders of Allowed Claims.  In that scenario, Reorganized GGH will retain, for the benefit of the Holders of Allowed Claims, one hundred percent (100%) of the Equity Securities in GBHL (or, if GBHL is sold in the Sale Transaction, in any unsold subsidiaries of GBHL)

The Plan provides that Holders of Allowed General Unsecured Claims against the Debtors will receive a combination of, among other things, (i) the Debtors' available Cash and Digital Assets, which shall include any sales proceeds resulting from the Debtors' sales process, (ii) recoveries from the DCG Loans and the DCG Note, (iii) recoveries from preserved Estate claims and Causes of Action, including Avoidance Actions and any claims and Causes of Action against DCG, and (iv) equity interests in Reorganized GGH or Wind-Down GGH, as applicable, to the extent Holders affirmatively elect to receive them, subject to the conditions set forth in the Plan.

### B.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated in the Plan, the laws of the State of New York without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that the corporate or limited liability company governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Wind-Down Debtor.

### C.    Treatment of Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, and Priority Tax Claims and statutory fees under section 1930 of title 28 of the U.S. Code (the "Judicial Code") have not been classified and, thus, are excluded from the Classes of Claims set forth in Article III of the Plan.

---

[10]    This Section **Error! Reference source not found.** is intended only to provide a summary of the key terms, s tructure, classification, treatment, and implementation of the Plan, and is qualified in its entirety by reference to the entire Plan and exhibits thereto.  Although the statements contained in this Disclosure Statement include summaries of the provisions contained in the Plan and in documents referred to the Plan, this Disclosure Statement does not purport to be a precise or complete statement of all such terms and provisions, and should not be relied on for a comprehensive discussion of the Plan.  Instead, reference is made to the Plan and all such documents for the full and complete statements of such terms and provisions.  The Plan itself (including attachments) will control the treatment of creditors and equity holders under the Plan.  To the extent there are any inconsistencies between this Section **Error! R eference source not found.** and the Plan (including attachments thereto), the latter shall govern.

*(i)*        ***Administrative Expense Claims***

Except with respect to Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of the Judicial Code, and except to the extent that an Administrative Expense Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Expense Claim and the applicable Debtor(s) or, from and after the Effective Date, the applicable Wind-Down Debtor or Reorganized GGH (as applicable) agrees to less favorable treatment, each Holder of an Allowed Administrative Expense Claim shall be paid in full in Cash on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Expense Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed, but in any event no later than ninety (90) days after the date on which an order allowing such Administrative Claim becomes a Final Order; (c) the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is reasonably practicable; (d) such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Wind-Down Debtors, as applicable; and (e) such time and upon such terms as set forth in a Final Order of the Bankruptcy Court

*(ii)*       ***Professional Fee Claims***

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through and including the Effective Date, shall be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors and Reorganized GGH (as applicable) no later than sixty (60) days after the Effective Date. Each such final request will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, and once approved by the Bankruptcy Court, such Allowed Professional Fee Claims shall be promptly paid in Cash from the Professional Fee Escrow Account up to their full Allowed amount.

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtors and Reorganized GGH (as applicable) may employ and pay any Professional for fees and expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

*(iii)*      ***Priority Tax Claims***

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, release, and discharge of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date or as soon as practicable thereafter or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

*(iv)*       ***Statutory Fees***

On or before the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors in Cash.

After the Effective Date, each Wind-Down Debtor or Reorganized GGH (as applicable) will pay any and all such fees owed by it for each quarter (including any fraction thereof), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, until its Chapter 11 Case is converted, dismissed, or a Final Decree is issued, whichever occurs first. The Wind-Down Debtors and Reorganized GGH (as applicable) shall continue to file quarterly, post-confirmation operating reports in accordance with the U.S. Trustee's guidelines.

*(v)*        ***Ad Hoc Group Restructuring Expenses***

The Ad Hoc Group Restructuring Expenses, if any, payable by the Debtors shall constitute Allowed Administrative Expense Claims and shall be paid in full in Cash pursuant to (and subject to) the Ad Hoc Group RSA, without the need to file a proof of such Claim and without further order of the Court.

D.        **Classification and Treatment of Claims and Interests**

(i)        *Classification of Claims and Interests*

The Plan constitutes a separate Plan proposed by each Debtor. Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code. A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Class(es) to the extent that any portion of the Claim or Interest fits within the description of such other Class(es). A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

(ii)        *Treatment of Classes of Claims and Interests*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors', the Wind-Down Debtors', or the Reorganized GGH's (as applicable) claims, Causes of Action, rights, or defenses in respect of any Unimpaired Claims or Reinstated Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims or Reinstated Claims.

To the extent a Class contains Allowed Claims or Interests with respect to a particular Debtor, the treatment provided to each Class for distribution purposes is specified below:

| SUMMARY OF PLAN TREATMENT AND EXPECTED RECOVERIES | | | |
|---|---|---|---|
| **GENESIS GLOBAL HOLDCO, LLC** | | | |
| Class | Claim/Equity Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
| 1 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim against GGH agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim against GGH will, at the option of GGH, Wind-Down GGH, or Reorganized GGH, as applicable, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim against GGH, in each case, or as soon as reasonably practicable thereafter. | [•] |
| 2 | Secured Claims | Except to the extent that a Holder of an Allowed Secured Claim against GGH agrees to less favorable treatment, in full and final satisfaction of such Allowed Secured Claim, at the option of GGH, Wind-Down GGH, or Reorganized GGH, as applicable, such Holder will receive (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Secured Claim becomes an Allowed Secured Claim against GGH, in each case, or as soon as reasonably practicable thereafter, (ii) the return of the collateral securing such Allowed Secured Claim, or (iii) such other treatment so as to render such | [•] |

| | | Holder's Allowed Secured Claim against GGH Unimpaired pursuant to section 1124 of the Bankruptcy Code. | |
|---|---|---|---|
| 3 | General Unsecured Claims | Allowed General Unsecured Claims against GGH shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII of the Plan), remain obligations of Reorganized GGH or Wind-Down GGH, as applicable, on and after the Effective Date. Each Holder of an Allowed General Unsecured Claim against GGH shall receive its Pro Rata share of (i) the Effective Date Available Assets of GGH, (ii) subject to the prior payment of the Capital Reserves Funding, if applicable, the Post-Effective Date Available Assets allocated to Reorganized GGH or Wind-Down GGH, as applicable and (iii) the Post-Effective Date GGH Interests solely to the extent that (A) such Holder is a Qualified Holder and affirmatively makes the Plan Election and (B) an Oversubscription Event does not occur. Notwithstanding anything to the contrary in the Plan, the Holders of Allowed General Unsecured Claims against GGH shall have no rights or remedies with respect to their Allowed General Unsecured Claims other than the right to receive distributions pursuant to the Plan. | [•] |
| 4 | DCG Claims | The DCG Claims are Disputed Claims. Solely to the extent any DCG Claims against GGH are Allowed and are not deemed equitably subordinated or otherwise found to be Subordinated Claims, such Claims shall be *pari passu* with Class 3 General Unsecured Claims against GGH, except that no Holder shall be entitled to receive, in respect of its DCG Claims, (i) any DCG Recoveries or (ii) any Avoidance Recoveries arising from Avoidance Actions against any of the DCG Parties. | [•] |
| 5 | 3AC Claims | The 3AC Claims are Disputed Claims. Solely to the extent any 3AC Claims against GGH are Allowed and are not deemed equitably subordinated or otherwise found to be Subordinated Claims, such Claims shall be *pari passu* with Class 3 General Unsecured Claims against GGH, except that no Holder shall be entitled to receive, in respect of its 3AC Claims, any Avoidance Recoveries arising from Avoidance Actions against 3AC. | [•] |
| 6 | Alameda/FTX Claims | The Alameda/FTX Claims are Disputed Claims. Solely to the extent any Alameda/FTX Claims against GGH are Allowed and are not deemed equitably subordinated or otherwise found to be Subordinated Claims, such Claims shall be pari passu with Class 3 General Unsecured Claims against GGH, except that no Holder shall be entitled to receive, in respect of its Alameda/FTX Claims, any Avoidance Recoveries arising from Avoidance Actions against Alameda or FTX. | [•] |

| 7 | Subordinated Claims | Holders of Subordinated Claims against GGH shall not receive any distribution on account of such Subordinated Claims. On the Effective Date, all such Subordinated Claims shall be discharged, cancelled, released, and extinguished. | [•] |
|---|---|---|---|
| 8 | Government Penalty Claims | The Government Penalty Claims against GGH shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to the General Unsecured Claims and Intercompany Claims against GGH, and the Government Penalty Claims against GGH will not receive any distribution on account of such Government Penalty Claims until all Allowed General Unsecured Claims and Allowed Intercompany Claims against GGH are paid in full; *provided, however*, that, if the Bankruptcy Court determines that the Government Penalty Claims against GGH should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then such Government Penalty Claims shall be *pari passu* with Class 3 General Unsecured Claims against GGH. | [•] |
| 9 | Intercompany Claims | All Intercompany Claims against GGH will be adjusted, Reinstated, compromised, or discharged on the Effective Date in the Debtors' discretion, with the Committee's Consent. | [•] |
| 10 | Interests | Treatment if an Oversubscription Event does not occur:  If an Oversubscription Event does not occur, on the Effective Date, all Interests in GGH will be cancelled, released, and extinguished, and will be of no further force or effect, and Holders of Interests in GGH will not receive any distribution on account of such Interests in GGH.<br><br>Treatment if an Oversubscription Event occurs: [If an Oversubscription Event occurs, (i) Holders of Interests in GGH shall not receive any distribution on account of such Interests unless all Claims against GGH are paid in full or otherwise treated as Unimpaired and (ii) all Interests in GGH shall, solely for Plan administrative purposes, continue to be held by the Holders of such Interests on and after the Effective Date; provided, however, that, for the avoidance of doubt and in accordance with the New Governance Documents, the Holders of Interests in GGH shall not be entitled to exercise any rights or remedies appurtenant thereto, including any voting rights.] | [•] |

| **GENESIS GLOBAL CAPITAL, LLC** | | | |
|---|---|---|---|
| **Class** | **Claim/Equity Interest** | **Treatment of Claim/Interest** | **Projected Recovery Under the Plan** |
| 1 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim against GGC agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim against GGC will, at the option of the GGC or Wind-Down GGC, as applicable, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective | [•] |

| | | | |
|---|---|---|---|
| | | Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim against GGC, in each case, or as soon as reasonably practicable thereafter. | |
| 2 | Secured Claims | Except to the extent that a Holder of an Allowed Secured Claim against GGC agrees to less favorable treatment, in full and final satisfaction of such Allowed Secured Claim, at the option of GGC or Wind-Down GGC, as applicable, such Holder will receive (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Secured Claim becomes an Allowed Secured Claim against GGC, in each case, or as soon as reasonably practicable thereafter, (ii) the return of the collateral securing such Allowed Secured Claim, or (iii) such other treatment so as to render such Holder's Allowed Secured Claim against GGC Unimpaired pursuant to section 1124 of the Bankruptcy Code. | [•] |
| 3 | Other Unsecured Claims | Allowed Other Unsecured Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII of the Plan), remain obligations of Wind-Down GGC after the Effective Date. Each Holder of an Allowed Other Unsecured Claim shall receive its Pro Rata share of (i) the Effective Date Available Assets of GGC, (ii) subject to the prior payment of the Capital Reserves Funding, if applicable, the Post-Effective Date Available Assets of Wind-Down GGC, and (iii) the Post-Effective Date GGH Interests solely to the extent that (A) such Holder is a Qualified Holder and affirmatively makes the Plan Election and (B) an Oversubscription Event does not occur. Notwithstanding anything to the contrary in the Plan, the Holders of Allowed Other Unsecured Claims shall have no rights or remedies with respect to their Allowed Other Unsecured Claims other than the right to receive distributions pursuant to the Plan. | [•] |
| 4 | Gemini Lender Claims | Allowed Gemini Lender Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII of the Plan), remain obligations of Wind-Down GGC after the Effective Date. Each Holder of an Allowed Gemini Lender Claim shall receive its Pro Rata share of (i) the Effective Date Available Assets of GGC, (ii) subject to the prior payment of the Capital Reserves Funding, if applicable, the Post-Effective Date Available Assets of Wind-Down GGC, and (iii) the Post-Effective Date GGH Interests solely to the extent that (A) such Holder is a Qualified Holder and affirmatively makes the Plan Election and (B) an Oversubscription Event does not occur. | [•] |

| | | Notwithstanding anything to the contrary in the Plan, the Holders of Allowed Gemini Lender Claims shall have no rights or remedies with respect to their Allowed Gemini Lender Claims other than the right to receive distributions pursuant to the Plan. | |
|---|---|---|---|
| 5 | DCG Claims | The DCG Claims are Disputed Claims.  Solely to the extent any DCG Claims are Allowed and are not deemed equitably subordinated or otherwise deemed Subordinated Claims, such Claims shall be *pari passu* with Class 3 Other Unsecured Claims against GGC, except that no Holder shall be entitled to receive, in respect of its DCG Claims, (i) any DCG Recoveries or (ii) any Avoidance Recoveries arising from Avoidance Actions against any of the DCG Parties. | [•] |
| 6 | 3AC Claims | The 3AC Claims are Disputed Claims.  Solely to the extent any 3AC Claims against GGH are Allowed and are not deemed equitably subordinated or otherwise found to be Subordinated Claims, such Claims shall be pari passu with Class 3 General Unsecured Claims against GGC, except that no Holder shall be entitled to receive, in respect of its 3AC Claims, any Avoidance Recoveries arising from Avoidance Actions against 3AC. | [•] |
| 7 | Alameda/FTX Claims | The Alameda/FTX Claims are Disputed Claims.  Solely to the extent any Alameda/FTX Claims against GGC are Allowed and are not deemed equitably subordinated or otherwise found to be Subordinated Claims, such Claims shall be *pari passu* with Class 3 General Unsecured Claims against GGC and Class 4 Gemini Lender Claims against GGC, except that no Holder shall be entitled to receive, in respect of its Alameda/FTX Claims, any Avoidance Recoveries arising from Avoidance Actions against Alameda or FTX. | [•] |
| 8 | Subordinated Claims | Holders of Subordinated Claims against GGC shall not receive any distribution on account of such Subordinated Claims. On the Effective Date, all Subordinated Claims against GGC shall be discharged, cancelled, released, and extinguished. | [•] |
| 9 | Government Penalty Claims | The Government Penalty Claims against GGC shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to the Other Unsecured Claims, Gemini Lender Claims, and Intercompany Claims against GGC, and the Government Penalty Claims against GGC will not receive any distribution on account of such Government Penalty Claims until all Allowed Other Unsecured Claims, Allowed Gemini Lender Claims, and Allowed Intercompany Claims against GGC are paid in full; provided, however, that, if the Bankruptcy Court determines that the Government Penalty Claims against GGC should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then such Government Penalty Claims shall be pari passu with Class 3 General Unsecured Claims against GGC and Class 4 Gemini Lender Claims against GGC. | [•] |

| 10 | Intercompany Claims | All Intercompany Claims against GGC will be adjusted, Reinstated, compromised, or discharged on the Effective Date in the Debtors' discretion, with the Committee's Consent.[11] | [•] |
|----|---------------------|------------------------------------------------------------------------------------------------------------------|-----|
| 11 | Intercompany Interests | Holders of Intercompany Interests in GGC shall not receive any distribution on account of such Intercompany Interests unless all senior Claims against GGC are paid in full or otherwise treated as Unimpaired. [All Intercompany Interests in GGC shall, solely for Plan administrative purposes, continue to be held by the Holders of such Intercompany Interests on and after the Effective Date; *provided*, *however*, that, for the avoidance of doubt and in accordance with the New Governance Documents, the Holders of Intercompany Interests in GGC shall not be entitled to exercise any rights or remedies appurtenant thereto, including any voting rights.] | [•] |

<strong>GENESIS ASIA PACIFIC PTE LTD.</strong>

| Class | Claim/Equity Interest | Treatment of Claim/Interest | Projected Recovery Under the Plan |
|-------|-----------------------|------------------------------|-----------------------------------|
| 1 | Other Priority Claims | Except to the extent that a Holder of an Allowed Other Priority Claim against GAP agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim against GAP will, at the option of GAP or Wind-Down GAP, as applicable, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim against GAP, in each case, or as soon as reasonably practicable thereafter | [•] |
| 2 | Secured Claims | Except to the extent that a Holder of an Allowed Secured Claim against GAP agrees to less favorable treatment, in full and final satisfaction of such Allowed Secured Claim, at the option of GAP or Wind-Down GAP, as applicable, such Holder will receive (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Secured Claim becomes an Allowed Secured Claim against GAP, in each case, or as soon as reasonably practicable thereafter, (ii) the return of the collateral securing such Allowed Secured Claim, or (iii) such other treatment so as to render such Holder's Allowed Secured Claim against GAP Unimpaired pursuant to section 1124 of the Bankruptcy Code. | [•] |
| 3 | General Unsecured Claims | Allowed General Unsecured Claims against GAP shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the | [•] |

---

[11] A settlement of intercompany disputes between GGC and GAP remains under discussion.

| | | provisions of the Plan (including the release and injunction provisions set forth in Article VIII of the Plan), remain obligations of Wind-Down GAP after the Effective Date. Each Holder of an Allowed General Unsecured Claim against GAP shall receive its Pro Rata share of (i) the Effective Date Available Assets of GAP, (ii) subject to the prior payment of the Capital Reserves Funding, if applicable, the Post-Effective Date Available Assets allocated to Wind-Down GAP, and (iii) the Post-Effective Date GGH Interests solely to the extent that (A) such Holder is a Qualified Holder and affirmatively makes the Plan Election and (B) an Oversubscription Event does not occur. Notwithstanding anything to the contrary in the Plan, the Holders of Allowed General Unsecured Claims against GAP shall have no rights or remedies with respect to their Allowed General Unsecured Claims other than the right to receive distributions pursuant to the Plan. | |
|---|---|---|---|
| 4 | DCG Claims | The DCG Claims are Disputed Claims. Solely to the extent any DCG Claims against GAP are Allowed and are not deemed equitably subordinated or otherwise deemed Subordinated Claims, such Claims shall be *pari passu* with Class 3 General Unsecured Claims against GAP, except that no Holder shall be entitled to receive, in respect of its DCG Claims, (i) any DCG Recoveries or (ii) any Avoidance Recoveries arising from Avoidance Actions against any of the DCG Parties. | [•] |
| 5 | 3AC Claims | The 3AC Claims are Disputed Claims. Solely to the extent any 3AC Claims against GAP are Allowed and are not deemed equitably subordinated or otherwise found to be Subordinated Claims, such Claims shall be *pari passu* with Class 3 General Unsecured Claims against GAP, except that no Holder shall be entitled to receive, in respect of its 3AC Claims, any Avoidance Recoveries arising from Avoidance Actions against 3AC. | [•] |
| 6 | Alameda/FTX Claims | The Alameda/FTX Claims are Disputed Claims. Solely to the extent any Alameda/FTX Claims against GAP are Allowed and are not deemed equitably subordinated or otherwise found to be Subordinated Claims, such Claims shall be *pari passu* with Class 3 General Unsecured Claims against GAP and Class 4 Gemini Lender Claims against GAP, except that no Holder shall be entitled to receive, in respect of its Alameda/FTX Claims, any Avoidance Recoveries arising from Avoidance Actions against Alameda or FTX. | [•] |
| 7 | Subordinated Claims | Holders of Subordinated Claims against GAP shall not receive any distribution on account of such Subordinated Claims. On the Effective Date, all Subordinated Claims against GAP shall be discharged, cancelled, released, and extinguished. | [•] |
| 8 | Government Penalty Claims | The Government Penalty Claims against GAP shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to the General Unsecured Claims and Intercompany Claims against GAP, and the Government Penalty Claims against GAP will not receive any | [•] |

| | | distribution on account of such Government Penalty Claims until all Allowed General Unsecured Claims and Allowed Intercompany Claims against GAP are paid in full; *provided*, *however*, that, if the Bankruptcy Court determines that the Government Penalty Claims against GAP should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then such Government Penalty Claims shall be *pari passu* with Class 3 General Unsecured Claims against GAP. | |
| 9 | Intercompany Claims | All Intercompany Claims against GAP will be adjusted, Reinstated, compromised, or discharged on the Effective Date in the Debtors' discretion, with the Committee's Consent. | [•] |
| 10 | Intercompany Interests | Holders of Intercompany Interests in GAP shall not receive any distribution on account of such Intercompany Interests unless all senior Claims against GAP are paid in full or otherwise treated as Unimpaired. [All Intercompany Interests in GAP shall, solely for Plan administrative purposes, continue to be held by the Holders of such Intercompany Interests on and after the Effective Date; provided, however, that, for the avoidance of doubt and in accordance with the New Governance Documents, the Holders of Intercompany Interests in GAP shall not be entitled to exercise any rights or remedies appurtenant thereto, including any voting rights.] | [•] |

### (iii)    *Intercompany Interests*

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being recovered by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors', the Wind-Down Debtors', and Reorganized GGH's (as applicable) agreement under the Plan to make certain distributions to Holders of Allowed Claims.

### (iv)    *Subordinated Claims*

Except as expressly provided the Plan, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors, the Wind-Down Debtors, or Reorganized GGH (as applicable) reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

### E.    Means for Implementation of the Plan

### (i)    *Wind-Down Debtors*

#### (a)    The Wind-Down Debtors Activities

The Wind-Down Debtors shall be successors to the Debtors' rights, title, and interests to the Wind-Down Debtors' Assets. The Wind-Down Debtors will not conduct business operations and will be charged with winding down the Debtors' Estates for the benefit of the Wind-Down Beneficiaries. Each Wind-Down Debtor shall be managed by the PA Officer and the New Board in accordance with the Plan Administration Agreement and the applicable New Governance Documents and shall be subject to the Wind-Down Budget and the Wind-Down Oversight Committee (if appointed).

On the Effective Date, the Wind-Down Debtors and the PA Officer shall execute the Plan Administration Agreement. In the event of any conflict between the terms of Article IV.A of the Plan and the terms of the Plan Administration Agreement, the terms of the Plan Administration Agreement shall control.

(b)  PA Officer

The PA Officer shall be selected by the Committee, with the Ad Hoc Group's Consent and in consultation with the Debtors, and shall be identified in the Plan Supplement. The appointment of the PA Officer shall be approved in the Confirmation Order, and the PA Officer's duties shall commence as of the Effective Date. The PA Officer shall administer the distributions to the Wind-Down Debtors' Beneficiaries and shall serve as the successor to and representative of the Estates (other than, if a Standalone Reorganization occurs, the Estate of GGH) under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Retained Causes of Action belonging to such Estates that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan.

The powers, rights, and responsibilities of the PA Officer shall be specified in the Plan Administration Agreement and shall include the authority and responsibility to fulfill the items identified in the Plan. Other rights and duties of the PA Officer and the Wind-Down Debtors' Beneficiaries shall be as set forth in the Plan Administration Agreement. Pursuant hereto and the Plan Administration Agreement, the PA Officer shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests (other than, if a Standalone Reorganization occurs, Holders in respect of their Claims and Interests against GGH) that are entitled to receive distributions pursuant to the Plan.

In accordance with the Plan Administration Agreement, the PA Officer shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtors are dissolved in accordance with the Plan Administration Agreement, and (ii) the date on which a PA Officer resigns, is terminated (in accordance with the Plan Administration Agreement), or is otherwise unable to serve; *provided*, *however*, that, in the event that a PA Officer resigns, is terminated, or is otherwise unable to serve, the New Board, or the Wind-Down Oversight Committee (if appointed) shall appoint a successor to serve as a PA Officer in accordance with the Plan Administration Agreement. If the New Board or the Wind-Down Oversight Committee (if appointed) does not appoint a successor within the time periods specified in the Plan Administration Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtors, shall approve a successor to serve as a PA Officer.

(c)  The Wind-Down Oversight Committee

If the Standalone Reorganization does not occur, the Committee, with the Ad Hoc Group's Consent and in consultation with the Debtors, shall appoint a committee of [___] members identified in the Plan Supplement to oversee the PA Officer and the Wind-Down Debtors' wind-down activities.

The Wind-Down Oversight Committee shall have the responsibility to (i) review, and advise the PA Officer with respect to, the distribution of the Wind-Down Debtor Assets transferred to each Wind-Down Debtor in accordance herewith and the Plan Administration Agreement, (ii) approve settlements, and (iii) maximize the value of the Retained Causes of Action. For the avoidance of doubt, in advising the PA Officer, the Wind-Down Oversight Committee shall maintain the same fiduciary responsibilities as the PA Officer. Vacancies on the Wind-Down Oversight Committee shall be filled by a Person designated by the PA Officer, subject to the unanimous consent of the remaining member or members of the Wind-Down Oversight Committee. The PA Officer shall have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Oversight Committee for cause.

(d)  Plan Administration Agreement

The Plan Administration Agreement generally will provide for, among other things: (i) the payment of reasonable and documented compensation to the PA Officer; (ii) the payment of other expenses of the Wind-Down Debtors; (iii) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their compensation; (iv) the investment of Cash by the PA Officer within certain limitations; (v) the preparation and filing of appropriate tax returns and other reports on behalf of the Wind-Down Debtors and the Debtors (other than, if a

Standalone Reorganization occurs, GGH) and the payment of taxes or other obligations owed by the Wind-Down Debtors and the Debtors (other than, if a Standalone Reorganization occurs, GGH); (vi) the maintenance (if appropriate) of any going concern vested in the Wind-Down Debtors (subject to the limitations described the Plan and the Plan); (vii) the orderly liquidation of the Wind-Down Debtors' Assets; and (viii) the litigation, settlement, abandonment, or dismissal of the Retained Causes of Action and any other claims, rights, or causes of action assigned to the Wind-Down Debtors.

(e)        Reports to Be Filed by the PA Officer

The PA Officer, on behalf of the Wind-Down Debtors, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Plan Administration Agreement, including the New Board and the Wind-Down Oversight Committee, if appointed), no later than thirty-one (31) days after June 30 and December 31 of each calendar year, a semi-annual report (in a form reasonably acceptable to the New Board and the Wind-Down Oversight Committee, if appointed) regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it, and other matters relating to the implementation of the Plan.

(f)        Fees and Expenses of the Wind-Down Debtors

The Wind-Down Debtors' Expenses shall be paid from the Wind-Down Reserve, subject to the Wind-Down Budget.  The fees and expenses of the PA Officer (including those incurred prior to the Effective Date in connection with the preparation of the Plan Administration Agreement) shall be paid after the Effective Date pursuant to the terms and conditions of the Plan Administration Agreement.  The PA Officer, on behalf of the Wind-Down Debtors, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously employed by the Debtors) to assist in carrying out its duties under the Plan Administration Agreement and may compensate and reimburse the expenses of these professionals based upon the nature of the work performed by such professional, without further order of the Bankruptcy Court, subject to any limitations and procedures established by the Plan Administration Agreement.

(g)        Liability of the Wind-Down Debtors; Indemnification

The Plan Administration Agreement may include reasonable and customary indemnification provisions for the benefit of the PA Officer, the New Board, and/or other parties.  Any such indemnification shall be the sole responsibility of the Wind-Down Debtors and payable solely from the Wind-Down Debtors' Assets.

Neither the Wind-Down Debtors, the PA Officer, or the New Board, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives (each, a "Wind-Down Debtors Party" and collectively, the "Wind-Down Debtors Parties") shall be liable for losses, claims, damages, liabilities or expenses in connection with the affairs of the Wind-Down Debtors or for the act or omission of any other Wind-Down Debtors Party, nor shall the Wind-Down Debtors Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers and authority conferred, or in good faith believed to be conferred by the PA Officer Agreement or the Plan other than for specific acts or omissions  resulting from such Wind-Down Debtors Party's willful misconduct, gross negligence, or actual fraud.  Subject to the Plan Administration Agreement, the PA Officer shall be entitled to enjoy all of the rights, powers, immunities, and privileges applicable to a chapter 7 trustee, and the New Board shall be entitled to enjoy all of the rights, powers, immunities, and privileges of the Committee. The PA Officer or the New Board, as applicable, may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing.  Notwithstanding such authority, neither the PA Officer nor the New Board shall be under any obligation to consult with its attorneys, accountants, financial advisors or agents, and their  determination not to do so shall not result in the imposition of liability on the PA Officer, the New Board, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud.  The PA Officer and/or the New Board shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth the Plan, and no implied covenants or obligations shall be read into the Plan Administration Agreement against any of them.  The Wind-Down Debtors shall promptly pay expenses reasonably incurred by any Wind-Down Debtors Party in defending, participating in, or settling any action, proceeding, or investigation in which such Wind-Down Debtors

Party is a party or is threatened to be made a party or the duties, acts, or omissions of the PA Officer or otherwise in connection with the affairs of the Wind-Down Debtors, upon submission of invoices therefor, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise.

(h)    Tax Treatment

[To Come.]

(i)    Insurance; Bond

The PA Officer may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the PA Officer under the Plan Administration Agreement. Unless otherwise agreed to by the New Board, the PA Officer shall serve with a bond, the terms of which shall be agreed to by the New Board, and the cost and expense of which shall be paid by the Wind-Down Debtors.

(j)    Settlement of Claims

Except as otherwise provided in the Plan or the Plan Administration Agreement, on and after the Effective Date, the PA Officer may compromise or settle any Claims related to the Wind-Down Debtors' Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Wind-Down Debtors' Expenses, professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court; *provided, however*, approval by the New Board (or the Wind-Down Oversight Committee, if appointed) shall be required for any settlement of Retained Causes of Action as provided the Plan and in the Plan Administration Agreement.

(k)    Sales of Assets by the Wind-Down Debtors

The PA Officer may conduct any Monetization Transactions of non-Cash Wind-Down Debtors' Assets on any terms it deems reasonable, without further order of the Bankruptcy Court. Upon the sale, liquidation, transfer, or other disposition of the Wind-Down Debtors' Assets by the PA Officer, the PA Officer shall deposit the proceeds of all such sales, liquidations, transfers, or dispositions into one or more of the Wind-Down Accounts.

(l)    Abandonment of Assets by the Wind-Down Debtors

The PA Officer may abandon any Wind-Down Debtors' Assets that the PA Officer determines in his, her, or its reasonable discretion to be of de minimis value or burdensome to the Wind-Down Debtors, including any pending adversary proceeding or other legal action commenced or commenceable by the Debtors prior to the Effective Date.

(m)    Dissolution of the Wind-Down Debtors

On and after the Effective Date, the Wind-Down Debtors will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Debtors shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates (other than, if a Standalone Reorganization occurs, the Estate of GGH). As soon as practicable after the Effective Date, the Wind-Down Debtors shall take such actions as the Wind-Down Debtors may determine to be necessary or desirable to carry out the purposes of the Plan.

On and after the Effective Date, the Wind-Down Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the applicable Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) except as otherwise provided in the Plan, shall be deemed to have cancelled all Interests pursuant to the Plan, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. [Pursuant to the terms of the Plan, any Money Transmitter Licenses (other than any Money Transmitter Licenses used by the unsold

portion of the Genesis Platform) that have not been terminated shall be deemed withdrawn and no further action is required to be taken by the Debtors or the Wind-Down Debtors to effectuate such withdrawal; *provided* that, following the Effective Date, the Wind-Down Debtors shall use commercially reasonable efforts to comply with all state banking department requirements for the surrender of a Money Transmitter License. Nothing in the Plan shall be construed to limit the rights of creditors, the Debtors, the Wind-Down Debtors, or regulators to pursue recoveries against surety bonds maintained by the Debtors in connection with Money Transmitter Licenses.]

The Wind-Down Debtors will dissolve on the earlier of the date on which: (a) (i) the Wind-Down Debtors have made the final liquidation, administration, and distribution of the Wind-Down Debtors' Assets in accordance with the terms of the Plan Administration Agreement and the Plan, and the PA Officer has fully performed all other duties and functions as set forth the Plan or in the Plan Administration Agreement and (ii) the Chapter 11 Cases of the Debtors have been closed; or (b) the PA Officer determines in his, her, or its reasonable judgment that the Wind-Down Debtors lack sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him, her, or it under the Plan, the Confirmation Order, and/or the Plan Administration Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Debtors of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the PA Officer, the Wind-Down Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The PA Officer, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states. Any certificate of dissolution or equivalent document may be executed by the PA Officer on behalf of any Wind-Down Debtor without the need for any action or approval by the shareholders or board of directors or managers of such Wind-Down Debtor.

### *(ii)* ***Means for Implementation***

#### (a)     Restructuring

On the Effective Date, or as soon as reasonably practicable thereafter, Reorganized GGH and each of the Wind-Down Debtors shall undertake the Restructuring, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, sale transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Entities agree; (3) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) the issuance of securities, including the Post-Effective Date GGH Interests, which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule; (6) the execution and delivery of Definitive Documents not otherwise included in the foregoing, if any; and (7) all other actions that the Debtors, Reorganized GGH (if applicable), or the Wind-Down Debtors, as applicable, determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. The Confirmation Order shall and shall be deemed, pursuant to sections 363, 365, 1123, and 1145 of the Bankruptcy Code, to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Restructuring.

#### (b)     Segregated Accounts for Plan Distributions

##### (i)     Claims Reserve

The Claims Reserve for each Debtor shall be held in trust in a segregated account by the applicable Wind-Down Debtor (or Reorganized GGH, as applicable) for distributions and/or payment in accordance with the terms of Articles II and III of the Plan. Each Wind-Down Debtor (or Reorganized GGH, as applicable) shall be entitled to (i) any Cash or Digital Assets held in the applicable Claims Reserve after all applicable distributions are made to Holders of Allowed Claims entitled to the Cash or Digital Assets in such applicable Claims Reserve under the Plan and (ii) any surplus Cash or Digital Assets in the applicable Claims Reserve, which surplus shall be determined by the PA

Officer (or, with respect to Reorganized GGH if a Standalone Reorganization occurs, the New Board) based on the potential amount of Administrative Expense Claims, Other Priority Claims, and Secured Claims that remain unpaid as of such date of determination and any such Cash or Digital Assets shall constitute Post-Effective Date Available Assets to be distributed pursuant to the Plan.

(ii)    Professional Fee Escrow Account

The Professional Fee Reserve Amount shall be held in trust in a segregated Professional Fee Escrow Account by the Wind-Down Debtors or Reorganized GGH (as applicable) for distributions or payment in accordance with the terms of Article II of the Plan. Each Wind-Down Debtor and Reorganized GGH (as applicable) shall be entitled to its pro rata share (based on the percentage of the Professional Fee Reserve Amount funded by such Entity or the applicable Debtor) of any Cash held in the Professional Fee Escrow Account after all Allowed Professional Fee Claims are satisfied in full in Cash and any remaining such Cash shall constitute Post-Effective Date Available Assets to be distributed pursuant to the Plan.

(iii)    Litigation Reserve

The Litigation Reserve shall be held in the same segregated account as the Wind-Down Reserve and used by the Wind-Down Debtors to pay the Wind-Down Debtors' Expenses incurred in connection with the Wind-Down Debtors' pursuit of any claims or Causes of Action, including the Retained Causes of Action; *provided* that the Litigation Reserves shall not be used to pay the Wind-Down Debtors' Expenses incurred in connection with the Wind-Down Debtors' other wind down efforts, which expenses shall be paid from the Wind-Down Reserve. The Wind-Down Debtors and Reorganized GGH (as applicable) shall be entitled to any (i) Cash held in the Litigation Reserve after all Retained Causes of Action have been settled or determined by a Final Order and (ii) surplus Cash in the Litigation Reserve, which surplus shall be determined by the PA Officer and/or the New Board in accordance with the New Governance Documents, in each case, which Cash shall constitute Post-Effective Date Available Assets to be distributed pursuant to the Plan.

(iv)    Wind-Down Reserve

The Wind-Down Reserve for each Wind-Down Debtor shall be held in trust in a segregated account by such Wind-Down Debtor to pay the applicable Wind-Down Debtors' Expenses; provided that the Wind-Down Reserves shall not be used to pay the Wind-Down Debtors' Expenses incurred in connection with the Wind-Down Debtors' pursuit of any claims or Causes of Action, including the Retained Causes of Action, which Wind-Down Debtors' Expenses shall be paid out of the Litigation Reserve. Each Wind-Down Debtor shall be entitled to any (i) Cash held in the applicable Wind-Down Reserve after all Wind-Down Debtors' Expenses of such Wind-Down Debtor have been paid and (ii) surplus Cash in the applicable Wind-Down Reserve, which surplus shall be determined by the PA Officer, in each case, which Cash shall constitute Post-Effective Date Available Assets to be distributed pursuant to the Plan.

(c)    Sources of Consideration for Plan Distributions; Digital Asset Rebalancing

The Wind-Down Debtors shall make distributions under the Plan from Effective Date Available Assets, Post-Effective Date Available Assets, the proceeds of any Monetization Transactions of the Wind-Down Debtors' Assets or Reorganized GGH (if applicable) and any applicable reserves; *provided*, *however*, that Allowed Professional Fee Claims shall be paid from the Professional Fee Escrow Account in the first instance.

The Wind-Down Debtors or Reorganized GGH (as applicable) shall, to the maximum extent permitted by law, be authorized to rebalance their Digital Assets to enable the Wind-Down Debtors or Reorganized GGH (as applicable) to make distributions in respect of Claims denominated in Digital Assets in the like kind form of Digital Asset in which such Claims are denominated. The Wind-Down Debtors or Reorganized GGH (as applicable), to the maximum extent permitted by law, are authorized to effectuate such rebalancing by buying and selling Digital Assets or otherwise exchanging any type of Digital Asset into any other type of Digital Asset.

The Wind-Down Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Wind-Down Debtors to satisfy their obligations under the Plan. Except

as set forth the Plan, any changes in intercompany account balances resulting from such transfers may be accounted for and/or settled in accordance with the Debtors' historical intercompany account settlement practices and any such action will not violate the terms of the Plan.

(d)    Corporate Existence

Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the New Governance Documents.

(e)    Vesting of Assets

Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated the Plan or the Plan, on the Effective Date: all Assets in each Estate, including all Retained Causes of Action, and any Assets acquired by any of the Debtors, shall vest in each applicable Wind-Down Debtor or Reorganized GGH (as applicable) free and clear of all Liens, Claims, charges, or other encumbrances (other than, for the avoidance of doubt, any Allowed General Unsecured Claims); *provided* that the foregoing vesting of Assets shall not apply to (a) any Assets sold pursuant to a Sale Transaction prior to the Effective Date, which Assets will vest in the applicable Successful Bidder(s), (b) if a Standalone Reorganization occurs, the Capital Reserves and any Money Transmitter Licenses used by the unsold portion of the Genesis Platform will vest in Reorganized GGH or, in GGH's discretion, one or more of its subsidiaries.  The vesting of Assets pursuant to the Plan shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Wind-Down Debtors or Reorganized GGH (as applicable) as if the asset or right was still held by the Debtors.  On and after the Effective Date, except as otherwise provided in the Plan, the New Governance Documents, or the Plan Administration Agreement, Reorganized GGH (as applicable) may operate its business and each Wind-Down Debtor and Reorganized GGH (as applicable) may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

Notwithstanding any prohibition on assignability under applicable non-bankruptcy law, on and after the Effective Date, if additional Assets become available, such additional Assets shall be treated as if they were transferred to (as applicable) and vested in the applicable Wind-Down Debtor or Reorganized GGH (as applicable) as a successor to the Debtors with all attendant rights, title, and interests in and to all such Assets, in accordance with section 1141 of the Bankruptcy Code.  All such Assets shall automatically vest in the Wind-Down Debtors or Reorganized GGH (as applicable) free and clear of all Liens, Claims, charges, or other encumbrances (other than, for the avoidance of doubt, any Allowed General Unsecured Claims).

Except as otherwise provided for in the Plan, to the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors, the Wind-Down Debtors, or Reorganized GGH (as applicable) that are necessary to cancel and/or extinguish such Liens and/or security interests.

On and after the Effective Date, the Wind-Down Debtors or Reorganized GGH, as applicable, may present Bankruptcy Court order(s) or assignment(s) suitable for filing in the records of every county or governmental agency where the property vested in accordance with the foregoing paragraph is or was located, which provide that such property is conveyed to and vested in the Wind-Down Debtors or Reorganized GGH, as applicable.  The Bankruptcy Court order(s) or assignment(s) may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred, assigned, and/or vested free and clear of. The Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished and no notice, other than by the Plan, shall be given prior to the presentation of such Bankruptcy Court order(s) or assignment(s). Any Person having a Lien, Claim, encumbrance, or other interest against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer,

assignment, and vesting of such property to or in the Wind-Down Debtors or Reorganized GGH, as applicable, free and clear of all Liens, Claims, charges, or other encumbrances by failing to object to confirmation of the Plan, except as otherwise provided in the Plan.

(f)    Cancellation of Existing Securities and Agreements

Except as otherwise provided in the Plan, on the Effective Date: (a) all Interests, and each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be cancelled or extinguished and the Debtors, the Wind-Down Debtors, and Reorganized GGH (as applicable) shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or Claims against or Interests in, the Debtors shall be released and discharged; *provided* that, notwithstanding the releases set forth in Article VIII of the Plan, Confirmation, or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided the Plan; *provided*, *further*, absent the consent of the Debtors and the Committee's Consent, nothing in this section shall effectuate a cancellation of any Post-Effective Date GGH Interests, Intercompany Interests, or Intercompany Claims.

Notwithstanding anything to the contrary in Article IV.B.6 of the Plan, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, a Debtor or its Interests, as a result of the cancellations, terminations, satisfaction, releases, or discharges provided for in Article IV.B.6 of the Plan shall be deemed null and void and shall be of no force and effect. Nothing contained the Plan shall be deemed to cancel, terminate, release, or discharge the obligation of a Debtor or any of its counterparties under any Executory Contract or Unexpired Lease to the extent such executory contract or unexpired lease has been assumed by such Debtor or Wind-Down Debtor, as applicable, pursuant to the Plan or a Final Order of the Bankruptcy Court.

(g)    Corporate Action

Upon the Effective Date, all actions (whether to occur before, on, or after the Effective Date) contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the appointment of the New Board and other directors and officers for the Wind-Down Debtors; (2) the implementation of the Restructuring, including the re-vesting and distribution of the Wind-Down Debtors' Assets in the Wind-Down Debtors and the appointment of the PA Officer; (3) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the issuance of the Post-Effective Date GGH Interests; and (5) all other actions contemplated by the Plan and the Definitive Documents. Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Wind-Down Debtors or Reorganized GGH (as applicable), and any corporate action required by the Debtors, the Wind-Down Debtors, or Reorganized GGH, as applicable, in connection with the Plan (including any items listed in the first sentence of this paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, managers, or officers of the Debtors, the Wind-Down Debtors, or Reorganized GGH, as applicable. On or (as applicable) before the Effective Date, the appropriate directors, managers, officers, or other authorized persons of the Debtors, the Wind-Down Debtors, or Reorganized GGH, as applicable, shall be authorized and empowered to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the transactions contemplated by the Plan) in the name of and on behalf of the Wind-Down Debtors or Reorganized GGH, as applicable, to the extent not previously authorized by the Bankruptcy Court. The authorizations and approvals contemplated by Article IV.B.7 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

(h)    New Governance Documents

To the extent required under the Plan or applicable non-bankruptcy law, the Wind-Down Debtors will, on or as soon as practicable after the Effective Date, file their respective New Governance Documents with the applicable

Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. To the extent required by section 1123(a)(6) of the Bankruptcy Code, the New Governance Documents of the Wind-Down Debtors will prohibit the issuance of non-voting equity securities. After the Effective Date, the Wind-Down Debtors may amend and restate their respective New Governance Documents and other constituent documents, as permitted by the laws of their respective states, provinces, or countries of organization and their respective New Governance Documents.

On the Effective Date, the New Governance Documents, substantially in the forms set forth in the Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with their terms and provisions.

(i)        Directors and Officers of the Wind-Down Debtors

As of the Effective Date, the term of the current members of the board of directors, board of managers, or other governing body of the Debtors shall expire automatically and each person serving as a director or manager of a Debtor shall be removed and shall be deemed to have resigned and cease to serve automatically, and the New Board and the officers of Reorganized GGH (if applicable) shall be appointed by the Committee, with the Ad Hoc Group's Consent and in consultation with the Debtors, in accordance with the Plan, New Governance Documents, and other constituent documents of each Wind-Down Debtor and Reorganized GGH (as applicable).  The New Board shall govern each of the Wind-Down Debtors and Reorganized GGH (as applicable).

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent known, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Board, as well as those Persons that will serve as an officer of any of the Wind-Down Debtors. If any such director or officer is an "insider" as defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed to the extent required under the Bankruptcy Code. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Governance Documents and other constituent documents of each of the Wind-Down Debtors and Reorganized GGH (as applicable).

(j)        Effectuating Documents; Further Transactions

On and after the Effective Date, the Wind-Down Debtors, Reorganized GGH (as applicable), their respective officers, the PA Officer, and the members of the New Board are, subject to the New Governance Documents and the Plan Administration Agreement, authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan, including the Post-Effective Date GGH Interests, in the name of and on behalf of the Wind-Down Debtors or Reorganized GGH (as applicable), without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

(k)        Issuance and Distribution of Post-Effective Date GGH Interests

On the Effective Date, if an Oversubscription Event does not occur, Wind-Down GGH or Reorganized GGH (as applicable) shall be authorized to and shall issue the Post-Effective Date GGH Interests offered, issued, or distributed in accordance with the terms of the Plan without the need for any further corporate action and without the need for any further action by Qualified Holders that affirmatively make the Plan Election. All of the Post-Effective Date GGH Interests, when so issued, shall be duly authorized, validly issued, fully paid, and nonassessable. Each distribution and issuance of the Post-Effective Date GGH Interests under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

(l)        Management Incentive Plan

On the Effective Date, if a Standalone Reorganization occurs and the MIP is implemented with the Committee's Consent, the Ad Hoc Group's Consent, and approval of the Bankruptcy Court, upon notice and hearing, a portion of the Post-Effective Date GGH Interests shall be reserved for the issuance by the New Board of Reorganized GGH of stock, warrants, options, or other Equity Securities in connection with the MIP, and issuances of the Post-Effective Date GGH Interests in respect thereof will dilute the Post-Effective Date GGH Interests issued on the Effective Date pursuant to the Plan.  The remaining terms of the MIP shall be determined by the New Board.

If a Standalone Reorganization occurs, the offer and sale of Post-Effective Date GGH Interests to directors, officers, and employees of Reorganized GGH or its subsidiaries pursuant to the MIP shall be effected without registration under section 5 of the Securities Act, and without registration under any applicable state securities or "blue sky" law, in reliance upon available exemptions from such registration requirements afforded by section 4(a)(2) of the Securities Act and Rule 506 of Regulation D and/or Rule 701 promulgated thereunder.

Notwithstanding anything to the contrary in the Plan, no Person shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the Post-Effective Date GGH Interests are exempt from registration and/or eligible for book-entry delivery, settlement, and depository services.

(m)     Exemption from Certain Taxes and Fees

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, (a) any issuance, transfer, or exchange of a Security (including of the Post-Effective Date GGH Interests), (b) any creation of any Lien, mortgage, deed of trust, or other security interest, or (c) any transfer of property, in each case, pursuant to, in contemplation of, or in connection with, the Plan, including the transfer of any Assets to the Wind-Down Debtors or Reorganized GGH (as applicable), shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments of transfer or other relevant documents without the payment of any such tax, recordation fee, or governmental assessment.

(n)     Exemption from Registration Requirements

The Securities offered, issued, or distributed pursuant to the Plan will be so offered, issued, or distributed pursuant to section 1145 of the Bankruptcy Code or an exemption from registration under the Securities Act and all rules and regulations promulgated thereunder.

The offering, issuance, and distribution of the Post-Effective Date GGH Interests under the Plan shall be exempt, pursuant to section 1145 of the Bankruptcy Code, without any further act or action by any Entity, from registration under (a) the Securities Act and all rules and regulations promulgated thereunder and (b) any applicable U.S. state or local law requiring registration for the offer, issuance, or distribution of securities.

The Post-Effective Date GGH Interests offered, issued, or distributed pursuant to section 1145 of the Bankruptcy Code (a) are not "restricted securities" as defined in Rule 144(a)(3) under the Securities Act, and (b) are freely tradable and transferable by any Holder thereof that (i) is not an "affiliate" of Wind-Down GGH or Reorganized GGH (as applicable) as defined in Rule 144(a)(1) under the Securities Act, (ii) has not been such an "affiliate" within 90 days of such transfer, (iii) has not acquired the Post-Effective Date GGH Interests from an "affiliate" within one year of such transfer, and (iv) is not an entity that is an "underwriter" as defined in subsection (b) of section 1145 of the Bankruptcy Code; *provided* that the foregoing clause (b) is subject to (x) compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the United States Securities and Exchange Commission, if any, applicable at the time of any future transfer of such Securities or instruments; (y) the restrictions, if any, on the transferability of such securities or instruments, including any restrictions on the transferability under the terms of the New Governance Documents; and (z) any other applicable regulatory approval. Under Rule 144(a)(1), an "affiliate" of Wind-Down GGH or Reorganized GGH (as applicable) is a person that directly or indirectly controls, or is controlled by, or is under common control with Wind-Down GGH or Reorganized GGH (as applicable). If any recipients of Post-Effective Date GGH Interests are Affiliates of Wind-Down GGH or Reorganized GGH (as

applicable), such recipients will receive restricted Post-Effective Date GGH Interests that are subject to the non-holding period requirements of Rule 144, including volume limitations, current public information requirement, manner of sale requirements, and filing requirements.

Notwithstanding anything to the contrary in the Plan, no Person shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether the Post-Effective Date GGH Interests are exempt from registration and/or eligible for book-entry delivery, settlement, and depository services.

(o)    Preservation of Causes of Action

In accordance with section 1123(b)(3) of the Bankruptcy Code, but subject in all respects to Article VIII, the Wind-Down Debtors or Reorganized GGH (as applicable) shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Wind-Down Debtors and Reorganized GGH (as applicable) shall be vested with all rights, powers, and privileges of the Debtors (including the rights and powers of the Debtors under chapter 5 of the Bankruptcy Code) and may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors or Reorganized GGH (as applicable). Notwithstanding the foregoing or anything to the contrary the Plan, all rights in any Retained Causes of Action shall vest in the Wind-Down Debtors and Reorganized GGH (as applicable) as of the Effective Date. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors, the Wind-Down Debtors, or Reorganized GGH, as applicable, will not pursue any and all available Causes of Action against it. The Debtors, the Wind-Down Debtors, or Reorganized GGH, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, including pursuant to Article VIII of the Plan, the Debtors, the Wind-Down Debtors, and Reorganized GGH, as applicable, expressly reserve all Causes of Action for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.B.15 of the Plan include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided the Plan, any Causes of Action that a Debtor may hold against any Entity shall vest in the applicable Wind-Down Debtor or Reorganized GGH (as applicable). The applicable Wind-Down Debtors or Reorganized GGH (as applicable), through their authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtors or Reorganized GGH (as applicable) shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court. The Wind-Down Debtors and/or Reorganized GGH (as applicable) shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the applicable Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtors' Asset or an Asset vesting in Reorganized GGH (as applicable) without the need for filing any motion for such relief.

(p)    Director and Officer Liability Insurance

Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Wind-Down Debtors or Reorganized GGH (as applicable) shall be deemed to have assumed all D&O Liability Insurance Policies (including tail coverage liability insurance) pursuant to section 365(a) of the Bankruptcy Code, to the extent they are Executory Contracts. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Wind-Down Debtors' (or Reorganized GGH's, as applicable) assumption of each of the D&O Liability Insurance Policies, to the extent they are Executory Contracts. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed

and treated as an Executory Contract that has been assumed by the Wind-Down Debtors or Reorganized GGH (as applicable) under the Plan as to which no Proof of Claim need be Filed, and shall survive the Effective Date.

(q)     Transfer of Control of Money Transmitter Licenses and Other Related Approvals

The Plan and the Confirmation Order shall provide the Debtors, the Wind-Down Debtors, or Reorganized GGH, as applicable, with the requisite authority to proceed with any Transfer of Control required under the Money Transmitter Licenses and any other requirements for similarly situated state and/or federal regulatory approvals.

(r)     Offsetting of Collateral

The Debtors, Wind-Down Debtors, and Reorganized GGH (if a Standalone Reorganization occurs) are authorized, but shall not be required to, for purposes of calculating the Allowed amount of any Claim entitled to receive distributions under the Plan, set off any Claim against the Debtors with (i) the value of any Loan Collateral that the applicable Debtor delivered to the Holder of such Claim or (ii) the value of any debt owed by the Holder of such Claim to the applicable Debtor.

**F.      Treatment of Executory Contracts and Unexpired Leases**

*(i)      Assumption of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume, assume and assign, or reject Executory Contracts and Unexpired Leases, and all Executory Contracts or Unexpired Leases shall be deemed rejected as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is designated on a schedule of assumed contracts by a Successful Bidder; (ii) is designated on the Schedule of Assumed Executory Contracts and Unexpired Leases in the Plan Supplement; (iii) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court; (iv) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (v) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date; or (vi) is the subject of a motion to reject pursuant to which the requested effective date of such rejection is after the Effective Date.

Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date (or as soon as reasonably practicable thereafter) by a Final Order.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

*(i)      Rejection Damages Claims and Objections to Rejections*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court in accordance with the Bar Date Order.  Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically disallowed, forever barred from assertion, and shall not be enforceable against

the Debtors, the Wind-Down Debtors, Reorganized GGH, the Estates, or their property (as applicable), without the need for any objection by the Debtors, the Wind-Down Debtors, or Reorganized GGH (as applicable), or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, and be subject to the permanent injunction set forth in Article VIII of the Plan,  notwithstanding anything in the Proof of Claim to the contrary.  All Allowed Claims arising from the rejection by any Debtor of any Executory Contracts or Unexpired Leases pursuant to section 365 of the Bankruptcy Code shall be treated as General Unsecured Claims in accordance with Article III.B–D of the Plan and may be objected to in accordance with the provisions of Article VII of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

### (ii)        Cure of Defaults for Assumed Executory Contracts and Unexpired Leases

Any monetary defaults under an Executory Contract or Unexpired Lease assumed by the Debtors and not assigned to a Successful Bidder, as reflected on the applicable Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the proposed cure amount (if any) in Cash by the Debtors or the Wind-Down Debtors, as applicable, on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree; provided that, if a Standalone Reorganization occurs, any cure amount paid in respect of an assumed Executory Contract or Unexpired Lease related to the unsold portion of the Genesis Platform shall be paid out of, and credited against, the Capital Reserves.  At least fourteen (14) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed cure amounts to the applicable third parties.  Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount paid or proposed to be paid by the Debtors or the Wind-Down Debtors to such counterparty must be filed with the Bankruptcy Court and served on and actually received by the Debtors at least seven (7) days before the Confirmation Hearing.  Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or proposed cure amount shall be deemed to have assented to such assumption and cure amount, and any such objection shall be Disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Wind-Down Debtor or Reorganized GGH (as applicable), without the need for any objection by the Wind-Down Debtors, Reorganized GGH (as applicable), or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.  For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and there is no listed Cure amount, such Cure amount shall be considered to be zero.

Any Cure Claim shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Wind-Down Debtors of the amount set forth in the applicable Cure Notice or, if the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is determined by a Final Order to be greater than the applicable amount set forth in the Cure Notice, the amount of such Allowed Cure Claim; provided, however, that following entry of a Final Order resolving any such dispute, the applicable Debtor or Wind-Down Debtor shall have the right to reject any Executory Contract or Unexpired Lease within thirty (30) days of such resolution; provided further, however, that nothing in the Plan shall prevent the Wind-Down Debtors from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim.  The Wind-Down Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

If there is any dispute regarding any Cure Claim, the ability of the Wind-Down Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Wind-Down Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease.  Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Claims, the applicable Debtor may assume the Executory Contract or Unexpired Lease prior to the resolution of any such dispute; provided, however, that the Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Claim by the contract counterparty; provided further, however, that following entry of a Final Order resolving any such dispute, the applicable Debtor or Wind-Down Debtor shall have the right to reject any Executory Contract or Unexpired Lease within thirty (30) days of such resolution.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy or insolvency-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease.  Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### *(iii)* *Indemnification Obligations*

The Indemnification Obligations shall not be discharged or Impaired by Confirmation of the Plan, and the Indemnification Obligations shall be deemed and treated as Executory Contracts assumed by the Debtors under the Plan, and shall continue as obligations of the Wind-Down Debtors; provided, however, that the Wind-Down Debtors or Reorganized GGH, as applicable, shall not indemnify directors or officers of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission that constitutes knowing and intentional fraud, gross negligence, or willful misconduct.

### *(iv)* *Insurance Policies*

To the extent that any of the Debtors' insurance policies constitute Executory Contracts and are not assumed and assigned to the Successful Bidder(s) in connection with the Successful Bid, such insurance policies (including all D&O Liability Insurance Policies) and any agreements, documents, or instruments relating thereto are treated as and deemed to be Executory Contracts under the Plan and shall be assumed by the Wind-Down Debtors (or Reorganized GGH, as applicable) on the Effective Date, and all other insurance policies shall vest in the Wind-Down Debtors (or Reorganized GGH, as applicable).

### *(v)* *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Rejected Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors, the Wind-Down Debtors, or Reorganized GGH (as applicable) that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Wind-Down Debtor or Reorganized GGH (as applicable) has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors, or, after the Effective Date, the Wind-Down Debtors or Reorganized GGH (as applicable) shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

### G.    Provisions Governing Distributions

### *(i)* *Distributions on Account of Claims Allowed as of the Plan Effective Date*

Unless otherwise provided in the Plan, on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim, including any portion of a Claim that is an Allowed Claim notwithstanding that other portions of such Claim are a Disputed Claim or a Disallowed Claim, shall, with respect to the portion of the Claim that is an Allowed Claim, receive the full amount of the distributions that the Plan provides for Allowed Claims in each applicable Class and in the manner provided in the Plan.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

*(ii)*    ***Disbursing Agent and Gemini Distribution Agent***

All distributions under the Plan shall be made by the Disbursing Agent and, in the case of distributions on Allowed Gemini Lender Claims, the Gemini Distribution Agent.  The Disbursing Agent and the Gemini Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent or the Gemini Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind-Down Debtors or Reorganized GGH (as applicable).

(a)    Powers of the Disbursing Agent and the Gemini Distribution Agent

The Disbursing Agent and the Gemini Distribution Agent, as applicable, shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent or the Gemini Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent or the Gemini Distribution Agent to be necessary and proper to implement the provisions of the Plan.

(b)    Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent or the Gemini Distribution Agent (each solely in its capacity as such) on or after the Effective Date, and any reasonable and documented compensation and expense reimbursement claims (including reasonable and documented attorney fees and expenses) made by the Disbursing Agent or the Gemini Distribution Agent (each solely in its capacity as such), shall be paid in Cash by the Wind-Down Debtors or Reorganized GGH (as applicable) from the Wind-Down Reserve or Capital Reserves, respectively; provided that the fees and expenses incurred by the Gemini Distribution Agent shall be subject to the Wind-Down Budget and the Gemini Distribution Agent shall not incur any fees and expenses in excess of the Wind-Down Budget without the prior written consent of the PA Officer.

(c)    No Liability

Except on account of gross negligence, fraud, or willful misconduct, each of the Disbursing Agent and the Gemini Distribution Agent shall have no (a) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (b) obligation or liability to any party who does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a distribution is made or who does not otherwise comply with the terms of the Plan.

*(iii)*    ***Delivery of Distributions and Undeliverable or Unclaimed Distribution***

(a)    Delivery of Distributions

(i)    Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Interests maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims and Interests. The Disbursing Agent and the Gemini Distribution Agent shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

(ii)    Delivery of Distributions in General

Except as otherwise provided in the Plan (including in the next paragraph), the Disbursing Agent shall make distributions to Holders of Allowed Claims and Allowed Interests (if any) as of the Distribution Record Date at the address (physical or digital wallet, as applicable) for each such Holder as indicated on the applicable register or in the

47

Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Debtors, the Wind-Down Debtors, or Reorganized GGH (as applicable).  Holders of Claims may notify the Disbursing Agent by email of any changes to their address for receipt of distributions.

> (iii)     Delivery of Distributions on Claims Denominated in Digital Assets

The Wind-Down Debtors or Reorganized GGH (as applicable) will use commercially reasonable efforts, subject to applicable law, to provide recoveries in respect of Claims denominated in Digital Assets in kind in the form of Digital Asset in which such Claims are denominated, including by buying and selling Digital Assets or otherwise exchanging any type of Digital Asset into any other type of Digital Asset; *provided* that no distribution in the form of Digital Assets shall be made to any Holder that has not responded to all requests by the Debtors, the Wind-Down Debtors, Reorganized GGH, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, for information necessary to facilitate a particular distribution to such Holder.  Any distribution in the form of a Digital Asset will be valued in U.S. dollars based on the TWAP of the applicable Digital Asset.

> (iv)     Delivery of Distributions on Gemini Lender Claims.

For purposes of distributions and treatment under the Plan, Gemini shall be deemed to be the Holder of all Gemini Lender Claims and all distributions on account of Allowed Gemini Lender Claims shall be made to the Gemini Distribution Agent and held in trust in a segregated account for the benefit of the Holders of Allowed Gemini Lender Claims.  As soon as practicable following delivery of any distribution to the Gemini Distribution Agent under the Plan on account of Allowed Gemini Lender Claims, the Gemini Distribution Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Gemini Lender Claims.  Any distributions made to Gemini on account of the Allowed Gemini Lender Claims shall reduce the Gemini Lender Claims on a dollar-for-dollar basis and release the Wind-Down Debtors from any further responsibility related to such distributions.

> (v)     Minimum Distributions

No distribution shall be made by the Disbursing Agent or the Gemini Distribution Agent on account of an Allowed Claim if the amount to be distributed to the Holder of such Claim on the applicable Distribution Date has an economic value of less than $250.

No fractional shares of Post-Effective Date GGH Interests shall be distributed, no Cash shall be distributed in lieu of such fractional amounts, and such fractional amounts shall be deemed to be zero. When any distribution pursuant to the Plan on account of an Allowed Claim would otherwise result in the issuance of a number of Post-Effective Date GGH Interests that is not a whole number, the actual distribution of Post-Effective Date GGH Interests shall be rounded as follows: (a) fractions of greater than one-half shall be rounded to the next higher whole number and (b) fractions of one half or less shall be rounded to the next lower whole number with no further payment thereto. The total number of authorized Post-Effective Date GGH Interests to be distributed to Holders may (at the Debtors' discretion) be adjusted as necessary to account for the foregoing rounding.

> (b)     Undeliverable Distributions and Unclaimed Property

In the event that (a) any distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Interest does not respond to a request by the Debtors, the Wind-Down Debtors, Reorganized GGH, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Debtors, the Wind-Down Debtors, Reorganized GGH, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, shall have determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided* that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall be redistributed Pro Rata (it being understood that, for purposes of this provision, "Pro Rata" shall be determined as if the Claim underlying such unclaimed distribution had been Disallowed) without need for a further order by the

Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be discharged and forever barred and shall not be entitled to any distributions under the Plan.

### (iv)      *Manner of Payment*

At the option of the Disbursing Agent or the Gemini Distribution Agent, as applicable, any Cash payment to be made under the Plan may be made by check, wire transfer, or ACH as otherwise required or provided in applicable agreements.

### (v)      *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtors, Reorganized GGH (as applicable), the PA Officer, the Disbursing Agent, the Gemini Distribution Agent, and any applicable withholding agent shall comply with all applicable tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions until receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. All Persons holding Claims against any Debtor shall be required to provide any additional information reasonably necessary for the Debtors, the Wind-Down Debtors, Reorganized GGH (as applicable), the PA Officer, the Disbursing Agent, the Gemini Distribution Agent, and any applicable withholding agent to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, including an IRS Form W-8 or W-9, as applicable, and any other applicable tax forms. The Debtors, the Wind-Down Debtors, Reorganized GGH (as applicable), the PA Officer, the Disbursing Agent, the Gemini Distribution Agent, and any applicable withholding agent reserve the right to allocate all distributions made under the Plan in a manner that complies with all other legal requirements, such as applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim or Allowed Interest shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

### (vi)      *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in government-issued currency (for the avoidance of doubt, not including any Digital Assets) other than U.S. dollars shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable currency as published in The Wall Street Journal, National Edition, on the Petition Date.

### (vii)      *Digital Asset Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in a Digital Asset shall be automatically deemed converted to the equivalent U.S. dollar value using the price of such Digital Asset as of 11:11 p.m. (prevailing Eastern time) on the [Petition Date, as set forth in the Digital Assets Conversion Table].

### (viii)      *Surrender of Cancelled Instruments or Securities*

As a condition precedent to receiving any distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall be deemed to be cancelled pursuant to Article IV of the Plan, except to the extent otherwise provided in the Plan.

49

### (ix)    *Allocations*

The aggregate consideration to be distributed to each Holder of an Allowed Claim will be allocated first to the principal amount of such Allowed Claim, with any excess allocated to unpaid interest that accrued on such Allowed Claims, if any.

### (x)    *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan, or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

### (xi)    *Setoffs and Recoupment*

The Debtors, the Wind-Down Debtors, or Reorganized GGH (as applicable) may, but shall not be required to, set off against, or recoup from, any Allowed Claim against a Debtor of any nature whatsoever that the applicable Debtor or Wind-Down Debtor or Reorganized GGH (as applicable) may have against the Holder of such Claim, to the extent such Claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, the failure to do so nor the allowance of any Claim against a Debtor hereunder shall constitute a waiver or release by the applicable Debtor or Wind-Down Debtor or Reorganized GGH (as applicable) of any such Claim it may have against the Holder of such Allowed Claim.

### (xii)    *Claims Paid or Payable by Third Parties*

#### (a)    Claims Paid by Third Parties

The Debtors, the Wind-Down Debtors, or Reorganized GGH (as applicable) shall reduce in full an Allowed Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor, a Wind-Down Debtor, or Reorganized GGH (as applicable); *provided* that the Debtors, the Wind-Down Debtors, or Reorganized GGH (as applicable) shall provide 21 days' notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court. Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor, a Wind-Down Debtor, or Reorganized GGH (as applicable) on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Debtors, the Wind-Down Debtors, or Reorganized GGH (as applicable), to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Petition Date. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Debtors, the Wind-Down Debtors, or Reorganized GGH (as applicable) annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

#### (b)    Claims Payable by Insurers

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged to the extent of any agreed upon satisfaction without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

#### (c)    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any insurers under any policies of insurance, nor shall anything contained in the Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

### H.    Procedures for Resolving Contingent, Unliquidated, and Disputed Claims

#### (i)    *Allowance of Claims*

On or after the Effective Date, the Wind-Down Debtors or Reorganized GGH (as applicable) shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim immediately prior to the Effective Date. Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.  Any setoff exercised pursuant to Article IV.B.18 of the Plan shall be taken into account when calculating the extent to which any Claim is Allowed for any purpose hereunder.  All settlements of Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019, or otherwise shall be binding on all parties.

Unless relating to a Claim that is expressly Allowed pursuant to the Plan, all Proofs of Claim filed in these Chapter 11 Cases shall be considered objected to and Disputed on the Effective Date without further action by the Debtors.  Upon the Effective Date, all Proofs of Claim filed against the Debtors, regardless of the time of filing, and including Proofs of Claim filed after the Effective Date, shall be deemed withdrawn and expunged, other than as provided below. Notwithstanding anything in the Plan to the contrary, (1) Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease, (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code, and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

#### (ii)    *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Wind-Down Debtors or Reorganized GGH (as applicable), by order of the Bankruptcy Court, shall together have the sole authority to: (1) File, withdraw, or litigate to judgment objections to Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, *provided* that any settlement or compromise shall require approval of the New Board (or the Wind-Down Oversight Committee, if appointed) to the extent set forth in the Plan Administration Agreement; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  In any action or proceeding to determine the existence, validity, or amount of any Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such Claim are preserved as if the Chapter 11 Cases had not been commenced.

#### (iii)    *Estimation of Claims*

Before or after the Effective Date, the Debtors, the Wind-Down Debtors, or Reorganized GGH (as applicable) may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during any appeal relating to such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that

51

has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### (iv)    *Adjustment to Claims or Interests Without Objection*

Any duplicate Claim or Interest, any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded may be adjusted or expunged on the Claims Register at the direction of the Debtors, the Wind-Down Debtors, Reorganized GGH, or the PA Officer, as applicable, without the Debtors, the Wind-Down Debtors, Reorganized GGH, or the PA Officer, as applicable, having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

### (v)    *Time to File Objections to Claims*

Any objections to Claims, which, prior to the Effective Date, may be Filed by any party, shall be Filed on or before the Claims Objection Deadline.

### (vi)    *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors, the Wind-Down Debtors, or Reorganized GGH (as applicable).

**ANY CLAIM THAT HAS BEEN LISTED IN THE SCHEDULES AS DISPUTED, CONTINGENT, OR UNLIQUIDATED, AND FOR WHICH NO PROOF OF CLAIM HAS BEEN TIMELY FILED, SHALL BE DEEMED DISALLOWED AND SHALL BE EXPUNGED WITHOUT FURTHER ACTION AND WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**EXCEPT AS PROVIDED THE PLAN, IN AN ORDER OF THE BANKRUPTCY COURT, OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS AT OR PRIOR TO THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN DEEMED TIMELY FILED BY A FINAL ORDER.**

### (vii)    *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court and any such new or amended Claim Filed shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

*(viii)*    ***No Distributions Pending Allowance***

Notwithstanding any other provision of the Plan to the contrary, no payment or distribution of any kind or nature provided under the Plan shall be made on account of any Claim to the extent that all or any portion of such Claim is a Disputed Claim, including if an objection to such Claim or portion thereof is Filed as set forth in Article VII of the Plan, unless and until such Disputed Claim becomes an Allowed Claim; *provided* that any portion of a Claim that is an Allowed Claim shall receive the payment or distribution provided under the Plan thereon notwithstanding that any other portion of such Claim is a Disputed Claim.

*(ix)*    ***Single Satisfaction of Claims***

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of such Allowed Claim.

**I.    Effect of Confirmation of the Plan**

*(i)*    ***Compromise and Settlement of Claims, Interests, and Controversies***

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, which distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions, releases, and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Wind-Down Debtors or Reorganized GGH (as applicable) may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities, in each case subject to the approval of the New Board (or the Wind-Down Oversight Committee, if appointed) to the extent set forth in the Plan Administration Agreement.

*(ii)*    ***Discharge of Claims and Termination of Interests***

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Plan and the Plan Supplement, or in any contract, instrument, or other agreement or document created pursuant to the Plan and the Plan Supplement, the distributions, rights, and treatment that are provided in the Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims (including any Intercompany Claims resolved or compromised after the Effective Date by the Wind-Down Debtors and any Discharged Deficiency GUC Claim), Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their assets or properties, regardless of whether any property shall have been distributed or retained pursuant to the Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not: (a) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (b) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (c) the Holder of such a Claim or Interest has accepted the Plan. Any default or "event of default" by the Debtors or Affiliates with respect to any Claim or Interest that existed immediately before or on account of the Filing of the Chapter 11

Cases shall be deemed cured (and no longer continuing) as of the Effective Date. Except as otherwise specifically provided in the Plan (including with respect to any Allowed General Unsecured Claims that is not a Discharged Deficiency GUC Claim or any Intercompany Interests that are Reinstated), the Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

      *(iii)*        ***Term of Injunctions or Stays***

Unless otherwise provided the Plan, the Confirmation Order, or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

      *(iv)*        ***Release of Liens***

**Except as otherwise specifically provided in the Plan, the Plan Supplement, or in any other contract, instrument, agreement, or document created pursuant to the Plan or Plan Supplement, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Wind-Down Debtors, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Wind-Down Debtors or the PA Officer.**

From and after the Effective Date, any Holder of a Secured Claim (and the applicable agents for such Holder) secured by Liens or security interests which are to be released under the Plan shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested to give effect to the Plan by the Wind-Down Debtors or Reorganized GGH (as applicable) and to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases. The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens. To the extent that any Holder of a Secured Claim that has been satisfied or discharged in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Wind-Down Debtors or Reorganized GGH (as applicable) that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests in accordance with the Plan, and the Wind-Down Debtors or Reorganized GGH (as applicable) shall be entitled to make any such filings or recordings on such Holder's behalf.

      *(v)*        ***Releases by the Debtors***

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged by the Debtors, their Estates, Reorganized GGH (if a Standalone Reorganization occurs), and the Wind-Down Debtors (as applicable), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Wind-Down Debtors, Reorganized GGH (if a Standalone Reorganization occurs), or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or the Plan after arising, in law, equity, contract, tort, or otherwise, that such Person or its estate, Affiliates, heirs, executors,**

administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Wind-Down Debtors, Reorganized GGH (if a Standalone Reorganization occurs), their Estates, the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the Wind-Down Debtors, or Reorganized GGH (if a Standalone Reorganization occurs), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the MIP, any Monetization Transaction, the related agreements, instruments, and other documents (including the Definitive Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan and the Sales Process, including the issuance or distribution of any property pursuant to the Plan and the Sales Process, the Definitive Documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth in Article VIII.E of the Plan do not release any post-Effective Date obligations of any party or Entity under the Plan, including any such obligations created in connection with the Restructuring; (ii) nothing in Article VIII.E of the Plan shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct; (iii) nothing in Article VIII.E of the Plan shall, nor shall it be deemed to, release any claims or Causes of Action against any of the Other Genesis Entities; and (iv) nothing in Article VIII.E of the Plan shall, nor shall it be deemed to, release any Retained Causes of Action or any claims or Causes of Action against the DCG Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in Article VIII.E of the Plan, which includes by reference each of the related provisions and definitions contained the Plan, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, Reorganized GGH (if a Standalone Reorganization occurs), or their Estates asserting any Claim or Cause of Action released pursuant to such releases.

(vi)    *Releases by Releasing Parties*

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, to the fullest extent allowed by applicable law, each Releasing Party hereby conclusively, absolutely, unconditionally, irrevocably, and forever releases and discharges each Debtor, Estate, Wind-Down Debtor, Reorganized GGH (if a Standalone Reorganization occurs), and Released Party from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Wind-Down Debtors, Reorganized GGH (if a Standalone Reorganization occurs), or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or the Plan after arising, in law, equity, contract, tort, or otherwise, that such Releasing Party or its estate, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own

right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Wind-Down Debtors, Reorganized GGH (if a Standalone Reorganization occurs), their Estates, the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors, the Wind-Down Debtors, or Reorganized GGH (if a Standalone Reorganization occurs), the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the MIP, any Monetization Transaction, the related agreements, instruments, and other documents (including the Definitive Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan and the Sales Process, including the issuance or distribution of any property pursuant to the Plan and the Sales Process, the Definitive Documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; *provided*, *however*, that except as expressly provided under the Plan, the foregoing releases shall not release obligations of the Debtors, the Wind-Down Debtors, or Reorganized GGH (if applicable) on account of any Allowed Claims that are treated under the Plan or obligations otherwise arising under any contract, agreement, or other business arrangement between any non-Debtor Releasing Party and any non-Debtor Released Party.  Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth in Article VIII.F of the Plan do not release any post-Effective Date obligations of any party or Entity under the Plan, including any such obligations created in connection with the Restructuring; (ii) nothing in Article VIII.F of the Plan shall, nor shall it be deemed to, release any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct; (iii) nothing in Article VIII.F of the Plan shall, nor shall it be deemed to, release any claims or Causes of Action by the Debtors, the Wind-Down Debtors, or Reorganized GGH (as applicable) against any of the Other Genesis Entities, and (iv) nothing in Article VIII.F of the Plan shall, nor shall it be deemed to, release any Retained Causes of Action or any claims or Causes of Action against the DCG Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by Holders of Claims and Interests set forth in Article VIII.F of the Plan, which includes by reference each of the related provisions and definitions contained the Plan, and, further, shall constitute the Bankruptcy Court's finding that such releases are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases.

    *(vii)*    **Exculpation**

Except as otherwise specifically provided in the Plan or Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from, any Claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan, the Plan Supplement, the MIP, any Monetization Transaction, or the related agreements, instruments, and other documents (including the Definitive Documents), the solicitation of votes with respect to the Plan, or the Restructuring, or any related contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal

opinion) created or entered into in connection with the Debtors' in or out-of-court restructuring efforts, the Disclosure Statement, the Plan, the MIP, the related agreements, instruments, and other documents (including the Definitive Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan and the Sales Process, including the issuance of or distribution of any property pursuant to the Plan and the Sales Process, the related agreements, instruments, and other documents (including the Definitive Documents), or upon any other act or omission, the transaction, agreement, event, or other occurrence taking place on or before the Effective Date related to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Confirmation Order shall provide that the Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  For the avoidance of doubt, nothing in Article VIII.G of the Plan shall, nor shall it be deemed to, provide any exculpation or release to any of the DCG Parties.

   (viii)   *Injunction*

   Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims or Interests that have been released pursuant to Article VIII.E or Article VIII.F of the Plan (including any Discharged Deficiency GUC Claim), discharged pursuant to Article VIII.B of the Plan, or are subject to exculpation pursuant to Article VIII.G of the Plan, are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, Reorganized GGH (if a Standalone Reorganization occurs), the Released Parties, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released or settled pursuant to the Plan.  Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.  Further, to the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any Causes of Action released pursuant to the Plan, including the Causes of Action discharged, released or exculpated in the Plan.

   (ix)   *Protection Against Discriminatory Treatment*

   Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Entity, including Governmental Units, shall discriminate against the Wind-Down Debtors or Reorganized GGH (as applicable), deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to the Wind-Down Debtors or Reorganized GGH (as applicable), or condition such a grant to, or discriminate with respect to such a grant against, the Wind-Down Debtors, Reorganized GGH (as applicable), or another Entity with whom the Wind-Down Debtors or Reorganized GGH (as applicable) have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the

Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

(x)    *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors, the Wind-Down Debtors, or Reorganized GGH (as applicable), unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

(xi)    *Subordination Rights*

Any distributions under the Plan shall be received and retained free from any obligations to hold or transfer the same to any other Holder and shall not be subject to levy, garnishment, attachment, or other legal process by any Holder by reason of claimed contractual subordination rights. Any such subordination rights shall be waived, and the Confirmation Order shall constitute an injunction enjoining any Entity from enforcing or attempting to enforce any contractual, legal, or equitable subordination rights to property distributed under the Plan, in each case other than as provided in the Plan.

(xii)    *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of disallowance, such Claim shall be forever disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

(xiii)    *Document Retention*

On and after the Effective Date, the Wind-Down Debtors, the PA Officer, or Reorganized GGH (as applicable) may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by the Wind-Down Debtors, the PA Officer, or Reorganized GGH (as applicable); *provided*, *however*, that neither the Wind-Down Debtors nor Reorganized GGH (as applicable) shall destroy or otherwise abandon any such books, records, electronically stored information, or other documents without the permission of the PA Officer or authorization from the Bankruptcy Court.

**J.    Conditions Precedent to Confirmation and Consummation of the Plan**

(i)    *Conditions Precedent to the Plan Effective Date*

It shall be a condition to the occurrence of the Plan Effective Date that the following conditions, as determined by the Debtors, with the Committee's Consent, shall have been satisfied (or waived pursuant to the provisions of Article IX.B of the Plan):

(a)    the Confirmation Order, with respect to which the Debtors shall have obtained the Committee's Consent, shall have been entered, and the Confirmation Order shall not have been stayed, modified, or vacated on appeal;

(b)    with respect to any Sale Transaction(s) resulting from the Sale Process (if any shall have been approved by the Bankruptcy Court), there shall be no material conditions to closing such transactions other than necessary regulatory approvals in accordance with the terms of the applicable purchase agreements;

(c)     the New Governance Documents, the effectiveness of which requires filing with the Secretary of State of any jurisdiction, shall have been duly filed with the applicable authorities in the relevant jurisdictions;

(d)     all other Definitive Documents shall have been effected or be executed and delivered in accordance with the terms of the Plan;

(e)     if an Oversubscription Event does not occur, all conditions precedent to the issuance of the Post-Effective Date GGH Interests, other than any conditions related to the occurrence of the Effective Date, shall have occurred;

(f)     all required governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan shall have been obtained, shall not be subject to unfulfilled conditions, and shall be in full force and effect, and all applicable waiting periods shall have expired without any action having been taken by any competent authority that would restrain or prevent such transactions;

(g)     all documents and agreements necessary to implement the Plan and the Restructuring shall have been (a) tendered for delivery and (b) effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements;

(h)     to the extent the Alameda/FTX Claims have not been otherwise resolved, the Bankruptcy Court shall have entered an order, in form and substance acceptable to the Debtors, in consultation with the Committee and the Ad Hoc Group SteerCo, estimating such Claims in accordance with Article VII.C of the Plan;

(i)     each Claims Reserve shall have been funded in an amount equal to the applicable Claims Reserve Amount;

(j)     each Wind-Down Reserve and the Litigation Reserve shall have been funded in the amounts set forth in the Wind-Down Budget;

(k)     the Professional Fee Escrow Account shall have been funded with Cash in an amount equal to the Professional Fee Reserve Amount; and

(l)     the Debtors and the Committee shall have agreed on the Effective Date Available Assets to be distributed on the Effective Date or as soon as practicable thereafter (or as otherwise determined by the Bankruptcy Court) and such Effective Date Available Assets are ready for distribution as provided for in the Plan.

### *(ii)     Waiver of Conditions Precedent*

The Debtors, with the Committee's Consent, may waive any of the conditions precedent to the Effective Date of the Plan set forth in Article IX.A of the Plan at any time, without any notice to any other parties in interest (except the Committee and the Ad Hoc Group SteerCo), any further notice, leave, or order of the Bankruptcy Court, or any formal action other than proceedings to confirm or consummate the Plan.

### *(iii)     Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

### (iv)    Effect of Non-Occurrence of Conditions to Consummation

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; or (4) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

## K.    Modification, Revocation or Withdrawal of the Plan

### (i)    Modification of Plan

Subject to the limitations contained in the Plan, the Debtors, with the Committee's Consent or in the exercise of the Debtors' Fiduciary Duty Action, reserve the right to alter, amend, or modify the Plan prior to Confirmation (including any exhibit or Plan Supplement) and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the restrictions on modifications set forth in the Plan, the Debtors, with the Committee's Consent or in the exercise of the Debtors' Fiduciary Duty Action, expressly reserve their rights to alter, amend, or modify the Plan (including any exhibit or Plan Supplement), one or more times, after Confirmation, and, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan (including any exhibit or Plan Supplement), or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.

### (ii)    Effect of Confirmation of the Plan on Modifications

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan in accordance with Article X.A of the Plan occurring after the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and shall constitute a finding that such modifications or amendments to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### (iii)    Revocation or Withdrawal of Plan

The Debtors, with the Committee's Consent or in the exercise of the Debtors' Fiduciary Duty Action, reserve the right to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date and to File subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan, or if Confirmation and Consummation do not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity; or (iv) be used by the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

## VIII.    PROJECTED FINANCIAL INFORMATION

The Debtors have attached their projected financial information as **Exhibit D** to this Disclosure Statement.  The Debtors believe that the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code.  In connection with the development of the Plan and for the purposes of determining whether the Plan satisfies this feasibility standard, the Debtors' management analyzed the Debtors' ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources.  The Debtors' management prepared financial projections (the "Projections") for the period ending August 31, 2023 to August 31, 2025 (the "Projection Period").

After the date of the Disclosure Statement, the Debtors do not intend to update or otherwise revise the Projections to reflect circumstances existing since their preparation or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error.  Furthermore, the Debtors do not intend to update or revise the Projections to reflect changes in general economic or industry conditions or otherwise.

In connection with the planning and development of the Plan, the Projections were prepared by the Debtors' management to present the anticipated impact of the Plan.  The Projections assume that the Plan will be implemented in accordance with its stated terms.  The Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in the Plan and the Disclosure Statement.  Accordingly, the estimates and assumptions underlying the Projections are inherently uncertain and are subject to significant business, economic and competitive uncertainties.  Therefore, such Projections, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Projections should be read in conjunction with the significant assumptions, qualifications and notes set forth below and in **Exhibit D.**

**THE DEBTORS' MANAGEMENT DID NOT PREPARE SUCH PROJECTIONS TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS THAT ACCOMPANY THE DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS.  EXCEPT FOR PURPOSES OF THE DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THE DEBTORS' ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.**

**MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995.  THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN, THE CONTINUING AVAILABILITY OF SUFFICIENT BORROWING CAPACITY OR OTHER FINANCING TO FUND OPERATIONS, CURRENCY EXCHANGE RATE FLUCTUATIONS, MAINTAINING GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN SECTION IX OF THE DISCLOSURE STATEMENT ENTITLED "RISK FACTORS"), AND OTHER MARKET AND COMPETITIVE CONDITIONS.  HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE.  ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.**

**THE PROJECTIONS, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, COMPETITIVE, INDUSTRY, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE REORGANIZED DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR TO THE REORGANIZED DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE PLAN OR DISCLOSURE STATEMENT, THE DEBTORS AND REORGANIZED DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS AND SHOULD CONSULT WITH THEIR OWN ADVISORS.**

The Debtors make statements in this Disclosure Statement that are considered forward-looking statements under the federal securities laws. Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements. In addition to statements which explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be uncertain and forward-looking. There can be no assurance that the restructuring transaction described herein will be consummated. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;

- the Debtors' expected future financial position, liquidity, results of operations, profitability, and cash flows;

- competitive position;

- business strategy;

- budgets;

- projected cost reductions;

- projected and estimated liability costs;

- disruption of operations;

- plans and objectives of management for future operations;

- contractual obligations;

- projected price increases;

- projected general market conditions;

- benefits from new technology; and

- effect of changes in accounting due to recently issued accounting standards.

The Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and the Plan.

Creditors and other interested parties should read the following section of this Disclosure Statement entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Debtors.

## IX.    RISK FACTORS

There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project and the Debtors undertake no obligation to update any such statement.  These risks, uncertainties and factors include:

- the Debtors' ability to develop, confirm and consummate the Plan;

- the potential adverse impact of the Chapter 11 Cases on the Debtors' operations, management, and employees, and the risks associated with operating businesses in the Chapter 11 Cases;

- customer, counterparty and employee response to the Chapter 11 Cases;

- general economic, business, and market conditions, with particular regard to cryptocurrency as an asset class;

- dependence upon key personnel;

- the Debtors' financial condition, ability to generate sufficient revenues or cash flow to meet their operating needs or other obligations;

- the Debtors' technology and ability to adapt to rapid technological change;

- the reliability, stability, performance, and scalability of the Debtors' infrastructure and technology;

- the amount, nature, and timing of the Debtors' capital expenditures;

- the integration and benefits of asset and property acquisitions, risks in connection with dispositions or the effects of acquisitions or dispositions on the Debtors' cash position and levels of indebtedness;

- financial conditions of the Debtors' customers;

- taxation applicable to the Debtors and any adverse tax changes;

- limited access to capital resources;

- bank volatility;

- changes in laws and regulations, uncertainty in the regulatory landscape, and regulatory burden on the Debtors ensuing from the application of overlapping regulatory regimes to the cryptocurrency space, and resulting in increased cost of compliance;

- other challenges facing the cryptocurrency space, such as the difficulty of securing banking arrangements and adoption rate and popularity of cryptocurrencies;

- inability to implement business plan;

- significant existing and future competition; and

- the outcome of pending and future litigation.

**PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.**

**ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.**

### A.    Risks Relating to the Plan, Solicitation and Confirmation

*The Debtors may fail to satisfy vote requirements to confirm the Plan.*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation.  If the Plan does not receive the required support from eligible voting Classes, the Debtors may elect to seek Confirmation regardless of the rejection by amending the Plan or seeking to confirm an alternative chapter 11 plan or other restructuring alternative.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Plan.

***The Debtors may fail to satisfy solicitation requirements.***

The solicitation of votes by the Debtors to accept the Plan is subject to several requirements under applicable bankruptcy law.  If the Bankruptcy Court does not find that the Debtors' solicitation complied with such requirements, confirmation of the Plan could be denied.

Section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- the chapter 11 plan is transmitted to substantially all creditors and other interest holders entitled to vote;

- the time prescribed for voting is not unreasonably short; and

- the solicitation of votes is in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in such solicitation or, if no such law, rule or regulation exists, votes be solicited only after the disclosure of "adequate information".

Section 1125(a)(1) of the Bankruptcy Code describes adequate information as information of a kind and in sufficient detail as would enable a hypothetical reasonable investor typical of holders of claims and interests to make an informed judgment about the plan.

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Debtors intend to deliver this Disclosure Statement to all Holders of Claims in Classes eligible to vote as of the Voting Record Date.  In that regard, the Debtors believe that the solicitation of votes to accept or reject the Plan is proper under applicable non-bankruptcy law, rules and regulations.  The Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court.  If such approval is not obtained, the confirmation of the Plan could be denied.  *See* "The Bankruptcy Court may not confirm the Plan".

***If the original solicitation by the Debtors is not successful, the Debtors may opt to resolicit.***

If the Bankruptcy Court were to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to resolicit votes to accept or reject the Plan or to solicit votes to accept or reject the Plan from one or more Classes that were not previously solicited.  Typically, this process involves a 60- to 90-day period and includes a bankruptcy court hearing for the required approval of the disclosure statement, followed by another solicitation of claim and interest holder votes for the chapter 11 plan, followed by a confirmation hearing where the bankruptcy court will determine whether the requirements for confirmation have been satisfied, including the requisite claim and interest holder acceptances.  The Debtors cannot provide any assurances that such a resolicitation would be successful.  In addition, confirmation of the Plan could be delayed and possibly jeopardized as a result.  Furthermore, the need to undertake a resolicitation or any other delay in the Confirmation Date or Plan Effective Date may also result in a deterioration in the Debtors' relationships with its clients and regulators which could adversely affect the Debtors' ability to retain key employees, the Debtors' liquidity, the Debtors' assets, and the Debtors' ability to continue operations.  *See* "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of liquidation proceedings."

Moreover, there may be complications related to the solicitation of Holders of Claims in Class 4 against GGC.  Gemini is responsible for sending the Solicitation Package, including the Disclosure Statement, Plan and appropriate Ballots to such Holders.  While the Debtors do not anticipate any issues with the solicitation of such Holders, nor with their ability to cast their Ballots, any complications with respect to their solicitation and vote may delay the solicitation process, requiring their resolicitation.

***Holders of Claims or Interests may object to, and the Bankruptcy Court may disagree with, the Plan's classification of Claims and Interests.***

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of the Claims and Interests under the Plan complies with the requirements set forth in

the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. However, a Holder of a Claim or Interest could challenge the Debtors' classification. In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification. If the Bankruptcy Court determines that the Plan's classification of Claims and Interests is improper, the Debtors may be required to modify the Plan, which could require resolicitation of votes on the Plan, or the Bankruptcy Court may determine that the Plan may not be confirmed. *See* "The Bankruptcy Court may not confirm the Plan."

### The Bankruptcy Court may not confirm the Plan.

In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors intend to seek Confirmation of the Plan by the Bankruptcy Court. However, even if the requisite votes are received, the Bankruptcy Court is not obligated to confirm the Plan as proposed. In addition, a dissenting Holder of a Claim against the Debtors could challenge the balloting procedures as not being in compliance with the Bankruptcy Code, which could mean that the balloting results may be invalid. Even if the Bankruptcy Court determines that the balloting procedures are appropriate and the results are valid, the Bankruptcy Court could still decline to confirm the Plan, if the Bankruptcy Court finds that any of the statutory requirements for confirmation have not been met. Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan, requires, among other things, a finding by the Bankruptcy Court that the chapter 11 plan is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the chapter 11 plan, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the chapter 11 plan becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code. There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of sections 1122, 1123, 1129, and the other applicable provisions of the Bankruptcy Code have been met with respect to the Plan. In addition, the Bankruptcy Court may decline to accept the Debtors' petition based on jurisdictional or venue grounds, which would also result in the Debtors' not being able to obtain Confirmation of the Plan. *See* "The Debtors may fail to satisfy solicitation requirements" and "Holders of Claims or Interests may object to, and the Bankruptcy Court may disagree with, the Plan's classification of Claims and Interests."

If the Plan is not confirmed by the Bankruptcy Court, (a) the Debtors may not be able to reorganize their businesses, (b) the distributions that Holders of Claims ultimately would receive, if any, with respect to their Claims is uncertain, (c) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims, and (d) there can be no assurance that any Chapter 11 Cases would continue rather than be converted into liquidation cases under chapter 7 of the Bankruptcy Code. In the opinion of the Debtors, the recovery that would be received by creditors in a liquidation scenario would very likely be materially less than they would receive under the Plan. *See* the Liquidation Analysis attached as **Exhibit C** to this Disclosure Statement. It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only the Debtors may propose and solicit votes to accept a chapter 11 plan. If a liquidation or protracted reorganization of the Debtors' Estates were to occur under the Bankruptcy Code, there is a substantial risk that the distributions currently contemplated by the Plan would be substantially eroded to the detriment of all stakeholders. *See* "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of liquidation proceedings."

### The Debtors may seek to amend, waive, modify or withdraw the Plan at any time prior to Confirmation.

The Debtors reserve the right, prior to the Confirmation of the Plan or substantial Consummation thereof, subject to the provisions of section 1127 of the Bankruptcy Code and applicable law, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. Holders of Claims and Interests will receive notice of such amendments or waivers as required by applicable law and the Bankruptcy Court. If, after receiving sufficient

acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan the previously solicited acceptances will be valid only if (a) all classes of adversely affected creditors and interest holders accept the modification in writing, or (b) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

> ***Other parties in interest might be permitted to propose alternative plans of reorganization that may be less favorable to certain of the Debtors' constituencies than the Plan.***

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative chapter 11 plan. Under the Bankruptcy Code, a debtor-in-possession initially has the exclusive right to propose and solicit acceptances of a chapter 11 plan for a period of 120 days from filing, or for such further extended period as may be approved by the Bankruptcy Court. However, such exclusivity period can be reduced or terminated upon a showing of cause pursuant to an order of the Bankruptcy Court. If such an order were to be entered, other parties in interest would then have the opportunity to propose alternative plans of reorganization.

If other parties in interest were to propose an alternative chapter 11 plan following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing Holders of Claims and Interests and may seek to exclude these holders from retaining any equity under their plan. Alternative plans of reorganization also may treat less favorably the Claims of a number of other constituencies, including but not limited to Holders of General Unsecured Claims. The Debtors consider maintaining relationships with their creditors and employees as critical to maintaining the value of Reorganized GGH and the Wind-Down Debtors following the Plan Effective Date, and have sought to treat those constituencies accordingly. However, proponents of alternative plans of reorganization may not share the Debtors' assessments and may seek to impair the Claims of such constituencies to a greater degree. If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated and much more expensive. *See* "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of liquidation proceedings".

> ***Reorganized GGH and the Wind-Down Debtors are subject to the volatility of cryptocurrency.***

The price of digital assets and associated demand for buying, selling, and trading digital assets have historically been subject to significant volatility. Under the Plan, certain Classes will receive distributions cryptocurrency, subjecting those creditors to risks with respect to any diminution of value of the cryptocurrency to be distributed in satisfaction of Allowed Claims. The business operations of Reorganized GGH may also be adversely affected by the volatility of cryptocurrency. This could result in lower recoveries for creditors than the Debtors' current estimates.

> ***Distributions under the Plan will not be made prior to Consummation and may be delayed or changed if the Confirmation Order is appealed.***

The Debtors estimate that the process of obtaining Confirmation will last approximately 75 days from the date hereof, plus an additional period of time of at least 14 days until Consummation. However, this period could be significantly longer due to appeal or regulatory uncertainty, as has been the case in other cases involving businesses involved in the cryptocurrency space.

> ***The conditions precedent to the Effective Date of the Plan may not occur.***

As more fully set forth in the Plan, the Plan Effective Date is subject to a number of conditions precedent. If such conditions precedent are not met or waived, the Plan Effective Date will not take place. If the Plan Effective Date does not take place, the Debtors may not be able to restructure their operations and may be required to liquidate their operations. *See* "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of liquidation proceedings".

***Reorganized GGH's emergence from chapter 11 is not assured.***

While, in the event of a Standalone Reorganization, Reorganized GGH is expected to emerge from chapter 11, there can be no assurance that Reorganized GGH will successfully reorganize or when this reorganization will occur, irrespective of the Debtors' obtaining Confirmation of the Plan. The Plan requires Reorganized GGH to maintain or obtain existing or new licenses and registrations necessary for the continued operation of its businesses, which will entail the filing of additional applications and approval from various regulatory authorities, which may delay or jeopardize consummation of the Plan. *See* "Reorganized GGH's operations are subject to governmental laws and regulations." Any significant delay in emerging from chapter 11 or in the Consummation of the reorganization will increase the risk that Reorganized GGH will nonetheless be unable to continue operations. *See* "If the solicitation is not successful, the Plan is not confirmed or the restructuring is not consummated, the Debtors face a substantial risk of liquidation proceedings."

### B.    Risks Related to Reorganized GGH's Business and the Wind-Down Debtors

***If a Standalone Reorganization occurs, Reorganized GGH's operations are subject to governmental laws and regulations.***

If a Standalone Reorganization occurs, Reorganized GGH's operations will be subject to various generally applicable national, state and local laws and regulations, and may also be subject to national, state and local laws and regulations targeted specifically at the cryptocurrency industry, financial institutions and financial instruments including those governing money transmission, financial services, securities, broker-dealers and alternative trading systems, commodities and commodities interests such as derivatives, credit, cryptocurrency asset custody, exchange and transfer, cross-border and domestic money and cryptocurrency asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counterterrorist financing, among others. Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, cryptocurrency assets, and related technologies. Therefore, the regulatory framework applicable to entities operating in the cryptocurrency industry is highly evolving and subject to considerable uncertainty, with little guidance in this area. Violation by Reorganized GGH of any of these laws and regulations could subject it to lawsuits, governmental investigations, potentially significant fines, and adverse publicity, in addition to administrative, civil, or criminal sanctions, which could include cease and desist orders against Reorganized GGH's operations or even revocation or suspension of its license to operate, as well as significant fines and penalties.

Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, cryptocurrency assets, and related technologies. As a result, some applicable laws and regulations do not contemplate or address unique issues associated with the cryptocurrency economy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another.

Moreover, the complexity and evolving nature of the Debtors' business and the significant uncertainty surrounding the regulation of the cryptocurrency economy require the Debtors to exercise their judgment as to whether certain laws, rules, and regulations apply to the Debtors, and it is possible that governmental bodies and regulators may disagree with their conclusions. To the extent the Debtors have not complied with such laws, rules, and regulations, the Debtors could be subject to significant fines, revocation of licenses, limitations on their products and services, cease and desist orders in one or more states, reputational harm, and other regulatory consequences, each of which may be significant and could adversely affect their business, and financial condition. Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Debtors' business from engaging in transactions in or relating to certain countries, individuals, and entities. The imposition of sanctions and related restrictions by different jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact on global economic and commercial activity as well the financial condition and performance of the Debtors' business and assets is difficult to predict.

Additionally, various governmental and regulatory bodies, including legislative and executive bodies, in the United States and in other countries may adopt new laws and regulations, the direction and timing of which may be influenced by changes in the governing administrations and major events in the cryptoeconomy. In the near future, various governmental and regulatory bodies, including in the United States, may introduce new policies, laws, and regulations relating to crypto assets and the cryptoeconomy generally, and crypto asset platforms in particular. Furthermore, new interpretations of existing laws and regulations may be issued by such bodies or the judiciary, which may adversely impact the development of the cryptoeconomy as a whole.

Therefore, the regulatory framework applicable to entities operating in the cryptocurrency industry is highly evolving and subject to considerable uncertainty, with little guidance in this area. Violation by Reorganized GGH of any of these laws and regulations could subject it to lawsuits, governmental investigations, potentially significant fines, and adverse publicity, in addition to administrative, civil, or criminal sanctions, which could include cease and desist orders against Reorganized GGH's operations or even revocation or suspension of its license to operate, as well as significant fines and penalties.

In the event Reorganized GGH continues to operate, it will require various licenses or registrations. Non-Debtor GGML, a Bermuda company, is awaiting approval of its registration as a foreign swap dealer with the CFTC and the National Futures Association ("NFA") and approval of its license application to operate as a provider of digital asset trading services from the Bermuda Monetary Authority. Non-Debtor GGCI, a British Virgin Islands company, maintains access to liquidity through exchange connectivity, including on several platforms and exchanges around the world. GGCI is not regulated in the United States and contemplates applying to obtain licensed status in Bermuda in the near future. If GGCI is not permitted to operate in Bermuda, it may have to become licensed under the new BVI regime for virtual asset service providers, which recently came into force and the implementation of which is untested. Continuation of Reorganized GGH's businesses, including the businesses of its subsidiaries, will require maintaining their regulatory licenses and registrations. The regulatory obligations inherent in the licensing regimes of the DFS, SEC, FINRA (for GGT), MAS (for GAP), and FCA (for GCL) will not cease upon acquisition or Standalone Reorganization and some compliance remediation aspects may even survive liquidation. The inability of Reorganized GGH to maintain these licenses and registrations will threaten recoveries to be received by Holders of Allowed Claims under the Plan, which depend, among other things, on the continued operations of Reorganized GGH if a Standalone Reorganization occurs.

Moreover, Reorganized GGH's existing compliance processes and internal control systems may not be sufficient to prevent or detect all inappropriate practices, fraud or violations of law by it, its subsidiaries, directors, officers, employees or other persons acting on its behalf, especially in light of the unclear and patchy regulatory framework. Reorganized GGH may in the future discover instances in which it has failed to comply with applicable laws and regulations or internal controls. If its subsidiaries, directors, officers, employees or other persons acting on its behalf engage in fraudulent, corrupt or other unfair business practices or otherwise violate applicable laws, regulations or internal controls, it could become subject to one or more enforcement actions or otherwise be found to be in violation of such laws, which may result in penalties, fines and sanctions and in turn adversely affect its reputation, business, financial condition and results of operations.

***The Debtors' insurance does not fully cover all of the Debtors' operational risks, and changes in the cost of insurance or the availability of insurance could materially increase the Debtors' insurance costs or result in a decrease in insurance coverage.***

The Debtors are subject to a broad variety of risks. While the Debtors have property, liability and business interruption insurance, the Debtors are self-insured for a portion of their potential liabilities. In certain instances, the Debtors' insurance may not fully cover an insured loss depending on the magnitude and nature of the claim. Additionally, changes in the cost of insurance or the availability of insurance in the future could substantially increase the Debtors' costs to maintain their current level of coverage or could cause the Debtors to reduce their insurance coverage and increase the portion of the risks that the Debtors self-insure.

***The assumptions and estimates contained in the financial projections may prove to be inaccurate.***

The Debtors continue to operate in an unstable and uncertain political, economic, and regulatory environment. The factors that have already materially and adversely affected the Debtors' results of operations and financial condition may continue to place significant strains on the Debtors' results of operations and liquidity.

In developing the Projections set forth in **Exhibit D**, the Debtors have made certain assumptions and determinations based on current information and estimates with respect to these and other factors. However, the assumptions and estimates underlying these projections are inherently uncertain and are subject to significant business, economic, and competitive risks and uncertainties, many of which are beyond the Debtors' control. As a result, Reorganized GGH's actual financial results may differ significantly from the Projections. The Projections should not be regarded as a representation by the Debtors' management, their advisors or any other person that the Projections will be achieved. Holders of Claims and Interests are cautioned not to place undue reliance on the Projections.

Due to a number of significant uncertainties relating to the viability of the Debtors' businesses, there can be no assurance that, if a Standalone Reorganization occurs, Reorganized GGH will be able to continue as a going concern.

If the Debtors do not achieve their projected financial results, the Debtors may lack sufficient liquidity to continue operating after the Plan Effective Date. Moreover, if a Standalone Reorganization occurs, the financial condition and results of Reorganized GGH's operations from and after the Plan Effective Date may not be comparable to the financial condition or results.

***Disruptions or volatility in global financial markets could limit sources of liquidity for Reorganized GGH or its customers and the Wind-Down Debtors.***

Global economic conditions may cause volatility and disruption in the capital and credit markets. As the Federal Reserve has raised interest rates several times throughout 2022 and into 2023, there likely will be less available liquidity, credit and credit capacity. If a Standalone Reorganization occurs, there can be no assurance regarding Reorganized GGH's ability to access capital and credit markets. Reorganized GGH's inability to access capital and credit markets may have an adverse effect on its business, results of operations, financial conditions and competitive position.

***The Debtors' businesses may be adversely affected by current and potential litigation, including litigation in connection with the Chapter 11 Cases, as well as ongoing governmental investigations.***

The nature of the Debtors' business exposes the Debtors to litigation, including regulatory, tax and administrative proceedings and enforcement actions, as well as governmental investigations. It is difficult to estimate the impact of such litigation and governmental investigations, as it is inherently costly and unpredictable. Although the Debtors may establish reserves as they deem necessary, the amounts that the Debtors reserve could vary significantly from any amounts the Debtors ultimately pay due to the inherent uncertainties in the estimation process.

The Debtors continue to be subject to ongoing proceedings, as well as investigations of potential claims, and it is possible that parties may commence additional litigation with respect to treatment of their Claims or Interests under the Plan.

It is possible that current or potential litigation or legal proceedings may materially affect the Debtors' businesses. The Debtors have also received various regulatory requests over the course of the last twelve months, and are cooperating with investigations by various governmental authorities, which may impact Reorganized GGH's ability to continue as a going concern if a Standalone Reorganization occurs.

Each of these proceedings and investigations presents risks to the Reorganized GGH's ability to engage in the same or similar businesses and generate revenue in the same fashion as the Debtors did prior to the filing of the Chapter 11 Cases. The course of these investigations and litigations is unpredictable and their outcome is uncertain. Moreover, the lack of a comprehensive, consistent and coordinated regulatory framework with respect to cryptocurrency, digital assets and entities involved in the cryptocurrency space introduces further risk to Reorganized

GGH's ability to conduct business going forward, and presents risks to businesses engaged in the cryptocurrency industry generally.

There remains uncertainty about whether cryptocurrency and digital assets are property, securities, commodities, currencies or some other type of asset. Moreover, there is the potential that certain types of cryptocurrencies, such as bitcoin or stablecoins, will be classified and regulated differently from other types of cryptocurrencies.

### *There are certain risks and contingencies that may affect the value of the Retained Causes of Action.*

There is no guarantee that the Wind-Down Debtors, the PA Officer, or Reorganized GGH (as applicable) will choose to prosecute any of the Retained Causes of Action. Furthermore, to the extent the Wind-Down Debtors or PA Officer determines to prosecute any potential Retained Causes of Action, there is no guarantee as to their success in pursuing the Retained Causes of Action. The success of the Wind-Down Debtors, PA Officer, or Reorganized GGH (as applicable) in pursuing any of the Retained Causes of Action, as well as the expenses incurred in investigating and prosecuting the Retained Causes of Action, may materially affect the recoveries of Holders of Allowed Claims.

### *Litigation with respect to claims filed in these Chapter 11 Cases, including the FTX Claims and the 3AC Claims, may reduce recoveries available to other creditors of the Debtors.*

It is possible that litigation concerning disputed and unliquidated claims filed in these Chapter 11 Cases, including the proofs of claim filed by the FTX Debtors, 3AC and DCG, could affect the Amended Plan. A condition precedent to the effectiveness of the Amended Plan is that, to the extent the Alameda/FTX Claims have not been otherwise resolved, the Bankruptcy Court shall have entered an order estimating such Claims in accordance with Articles VII.C and IX.A.8 of the Plan.

Although the Debtors dispute the Alameda/FTX Claims and the 3AC Claims, the Bankruptcy Court may allow the Alameda/FTX Claims and the 3AC Claims. If the Bankruptcy Court allows the Alameda/FTX and the 3AC Claims and such Claims are not deemed equitably subordinated or otherwise found to be Subordinated Claims, then the Alameda/FTX Claims and 3AC Claims (if any) would be *pari passu* with the Class 3 General Unsecured Claims against GGH, Class 3 Other Unsecured Claims against GGC, or Class 3 General Unsecured Claims against GAP, as applicable.

### *There may be litigation relating to DCG, its obligations owed to the Debtors and claims it filed against the Debtors.*

The Plan contemplates the possible prosecution of claims against DCG, the Debtors' ultimate parent. As discussed in Section VI.D and E above, the Special Committee has investigated these claims and believes that the estates have colorable claims against certain DCG Entities for various causes of action, including potential claims based on alter ego theories, preference law, and other legally recognizable rights. The Debtors understand that the DCG Entities intend to vigorously defend against any such claims and may raise a variety of counterclaims including claims relating to the DCG's entry into an agreement following 3AC's default to assume liabilities in connection with the GAP's loans to 3AC. On May 22, 2023, DCG filed proofs of claim against the Debtors asserting certain rights and/or defenses in connection with such assumption. The Debtors strongly contest DCG's asserted defenses. Any litigation against DCG Entities would involve significant costs, time and uncertainty.

### *The sales process may not result in a sale of the Genesis Platform, or the closing conditions of the Sale Transaction may not be satisfied, which would impact recoveries under the Plan.*

While the Debtors have sought to provide a projected range of recoveries that takes into account the possibility that a sale of the Genesis Platform does not occur, resulting in a Standalone Reorganization and continuation of Reorganized GGH and certain of its subsidiaries as a going concern, the outcome of the sales process remains uncertain and may impact recoveries in ways the Debtors may not anticipate or be capable of estimating. In the event the sales process is successful, resulting in a Sale Transaction, it is possible that the Debtors may not satisfy the closing conditions of the Sale Transaction, which could prevent the Sale Transaction from being consummated.

## X.    CONFIRMATION OF THE PLAN

### A.    Requirements for Confirmation of the Plan

Among the requirements for the Confirmation of the Plan are that the Plan (i) is accepted by all impaired Classes of Claims and Interests, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code.  The Debtors believe that: (i) the Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Plan has been proposed in good faith.

### B.    Best Interests of Creditors/Liquidation Analysis

Often called the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that the Plan provides, with respect to each Class, that each Holder of a Claim or Interest in such Class either (i) has accepted the Plan or (ii) will receive or retain under the Plan property of a value that is not less than the amount that such Holder would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Plan satisfies the "best interests of creditors" test, the Debtors have attached hereto as **Exhibit C**, a Liquidation Analysis prepared by the Debtors' management with the assistance of their advisors, including Alvarez & Marsal North America LLP, the Debtors' financial advisor.  The Liquidation Analysis presents recovery available assuming a hypothetical liquidation based on certain assumptions discussed in this Disclosure Statement and in the accompanying notes to the Liquidation Analysis.

### C.    Feasibility

Section 1129(a)(11) of the Bankruptcy Code requires that Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors, or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan).

The Plan provides for the liquidations of GGC, GAP and, in the event of a Standalone Reorganization, GGH and distribution of their assets to Holders of Allowed Claims and Interests.  Accordingly, the Debtors believe that all Plan obligations with respect to the Debtors will be satisfied, following by their winding down, pursuant to the Amended Plan.  To the extent a Standalone Reorganization occurs, and to determine whether the Plan meets this feasibility requirement, the Debtors have analyzed the ability of the Wind-Down Debtors and Reorganized GGH (as applicable) to meet their respective obligations under the Plan.  As part of this analysis, the Debtors prepared the Projections, as set forth on **Exhibit D** attached hereto.

### D.    Acceptance by Impaired Class

The Bankruptcy Code requires, as a condition to Confirmation, that, except in certain circumstances, each Class of Claims or Equity Interests that is Impaired under the Plan, accept the Plan.  A Class that is not "impaired" under the Plan is deemed to have accepted the Plan and, therefore, solicitation of acceptances with respect to such Class is not required.[12]

---

[12]    A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of allowed claims in that class, counting only those claims that _actually_ voted to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds (2/3) in dollar amount of allowed interests in that class, counting only those interests that _actually_ voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Plan only if two-thirds (2/3) in amount actually voting cast their Ballots in favor of acceptance.

Section 506(a) of the Bankruptcy Code provides that holders of allowed claims secured by liens on property of a debtor shall have an allowed secured claim to the extent of the value of such holder's interest in the debtors' estates' property and shall have an unsecured claim to the extent the value of such holder's interest is less than the allowed amount of such claim. Under the Plan, holders of Secured Claims shall be receiving such treatment rendering their claims Unimpaired pursuant to section 1124(1) or (2) of the Bankruptcy Code, as applicable. For purposes of Voting, to the extent the value of the interest of a Holder of a Secured Claim in property of the Estates exceeds the Allowed amount of such Secured Claim, such Holder shall not have any General Unsecured Claim nor be permitted to Vote in Classes with other General Unsecured Claims.

### E.      Confirmation without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, provided that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Plan, including Classes of Claims or Interests deemed to reject the Plan, the Debtors will request Confirmation of the Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Plan as to such Debtor. The Debtors believe that the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the requirements for cramdown and the Debtors will be prepared to meet their burden to establish that the Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Plan.

### (i)      _No Unfair Discrimination._

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### (ii)      _Fair and Equitable Test._

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Plan satisfies the "fair and

equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a Distribution under the Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Plan.

(a)      Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

(b)      Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

If the Plan is not consummated, the Debtors' financial obligations will exceed their ability to pay them. Accordingly, if the Plan is not confirmed and consummated, the alternatives include:

### A.    Liquidation Under Chapter 7

If the Plan is not confirmed, the Debtors may choose to file a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code.  A discussion of the effects that a liquidation would have on the recoveries of Holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit C**.  For the reasons articulated in Section VIII above, the Debtors believe that a liquidation would result in lower aggregate distributions being made to Holders of Allowed Claims than those provided in the Plan.

### B.    Alternative Plan(s) of Reorganization

The Debtors believe that failure to confirm the Plan will likely lead to expensive and protracted Chapter 11 Cases.  In formulating and developing the Plan, the Debtors have explored numerous other alternatives and engaged in an extensive negotiating process.

The Debtors believe that not only does the Plan fairly adjust the rights of Holders of Allowed Claims receiving distributions under the Plan and enable the Holders of all Claims to maximize their returns, but also that rejection of the Plan in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS, AND ANY ALTERNATIVE TO CONFIRMATION OF THE PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES.  THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE PLAN VOTE TO ACCEPT THE PLAN.

### C.    Dismissal of the Debtors' Chapter 11 Cases

Dismissal of the Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the status quo ante.  Upon dismissal of the Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with their creditors, possibly resulting in costly and protracted litigation in various jurisdictions.  Dismissal would also permit unpaid secured and unsecured creditors to obtain and enforce judgments against the Debtors.  The Debtors believe that these actions would seriously undermine their ability to continue operations.  Therefore, the Debtors believe that dismissal of the Chapter 11 Cases is not a viable reorganizational alternative to the Plan.

## XII.    CERTAIN SECURITIES LAW MATTERS

### A.    Plan Securities

The issuance and distribution under the Plan of any securities (including the Post-Effective Date GGH Interests) shall be exempt from registration under the Securities Act and any other applicable securities laws in reliance on the exemption from registration afforded by section 1145 of the Bankruptcy Code, in addition to any other available exemptions from registration under the Securities Act and all rules and regulations promulgated thereunder, including Section 4(a)(2), Rule 506 of Regulation D and Rule 701.

Section 1145 of the Bankruptcy Code generally exempts from registration under the Securities Act the offer or sale pursuant to a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.

## XIII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

[To come.]

XIV.    **SOLICITATION AND VOTING PROCEDURES**[13]

The following materials constitute the solicitation package (the "Solicitation Package") distributed to Holders of Claims entitled to vote to accept or reject the Plan:

- the appropriate Ballots and applicable Voting Instructions;

- this Disclosure Statement with all exhibits, including the Plan, and any other supplements or amendments to these documents;

- the Confirmation Hearing Notice; and

- such other documents as the Debtors may seek to include or the Bankruptcy Court may direct.

**Holders of Claims entitled to vote to accept or reject the Plan, shall be served (or were caused to be served) the Solicitation Package (including the appropriate ballot) providing solicitation and other voting-related information to such Holders. Each and all Gemini Lenders shall receive the Solicitation Package (including the appropriate Ballot) in accordance with the forthcoming solicitation and voting procedures motion to be approved by the Bankruptcy Court.**

**Any party who desires additional or paper copies of these documents may request copies, free of charge, from the Solicitation Agent by (i) by writing to Genesis Global Holdco, LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232; (ii) by calling U.S. Toll Free: 888-524-2017 or International Toll: 646-440-4183; or (iii) by emailing: genesisinfo@ra.kroll.com (with "Genesis Solicitation" in the subject line).**

On or before five (5) days before the Voting Deadline, the Debtors intend to file the Plan Supplement. As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the electronic ECF or the Debtors' restructuring website. The Debtors will not serve paper or electronic copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Solicitation Agent by: (i) writing to Genesis Global Holdco, LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232; (ii) by calling U.S. Toll Free: 888-524-2017 or International Toll: 646-440-4183; or (iii) by emailing: genesisinfo@ra.kroll.com (with "Genesis Solicitation" in the subject line).

A.    **Voting Deadline**

The period during which Ballots with respect to the Plan will be accepted by the Debtors will terminate on [August 14, 2023 at 4:00 p.m. (Prevailing Eastern Time)]**.**

Except to the extent the Debtors so determine, or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline may not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).

The Debtors reserve the right at any time or from time to time, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline. The Debtors will give notice of any such extension in a manner deemed reasonable to the Debtors in their discretion. There can be no assurance that the Debtors will exercise their right to extend the Voting Deadline.

---

[13]    The Debtors will file a motion to approve certain solicitation procedures in short order. The procedures detailed herein may not reflect the procedures ultimately presented in such motion or approved by the Bankruptcy Court. The Debtors will amend this Disclosure Statement prior to solicitation to reflect the final, approved, solicitation procedures if different from those described herein.

**B.      Voting Instructions**

Only the Holders of Claims in Class 3 against GGH, Classes 3 and 4 against GGC; and Class 3 against GAP as of the Voting Record Date are entitled to vote to accept or reject the Plan.  Holders of Claims in Class 4 against GGC will receive Ballots from Gemini in accordance with the solicitation and voting procedures motion to be approved by the Bankruptcy Court.  It is important to follow the specific instructions provided on each Ballot, which may provide different instructions based on the Class you belong to.  Ballots should be sent to the Solicitation Agent on or before the Voting Deadline as indicated below.

The Debtors have engaged Kroll Restructuring Administration LLC as the Solicitation Agent to assist in the balloting and tabulation process.  The Solicitation Agent will process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan and will file the Voting Report as soon as practicable after the Voting Deadline, which Voting Report may be supplemented after being filed.

**The deadline by which the Solicitation Agent must receive the Ballot is on
[August 14, 2023 at 4:00 p.m. (prevailing Eastern Time)].**

**Any Ballot or that is properly executed, but which does not clearly indicate an acceptance or rejection of the Plan or which indicates both an acceptance and a rejection of the Plan, shall not be counted.**

**It is important to follow the specific instructions provided on each Ballot.  All Ballots must be properly executed, completed and delivered to the Solicitation Agent, <u>so as to be actually received on or before the Voting Deadline</u> by using the envelope provided, or by delivery as follows:**

| BALLOTS |
| --- |
| **If sent in the envelope provided or otherwise by**<br>**First Class Mail, Overnight Courier or Hand Delivery:**<br><br>**Genesis Global Holdco, LLC Ballot Processing,**<br>**c/o Kroll Restructuring Administration LLC,**<br>**850 3rd Avenue, Suite 412,**<br>**Brooklyn, NY 11232**<br><br><br>**If you plan to hand-deliver your Ballot to Kroll Restructuring Administration LLC's office, please e-mail genesisinfo@ra.kroll.com (with "Genesis Solicitation Ballot Submission" in the subject line) at least twenty-four (24) hours in advance of arrival at the Kroll address above and provide the anticipated date and time of delivery.**<br><br>**As outlined in the voting instructions, all Gemini Lenders entitled to vote as Holder of Claims in Classes 4 against GGC may only return their Ballot through Kroll Restructuring Administration LLC's online ballot portal.** |

If you have any questions regarding the voting process please direct them to contact the Solicitation Agent (i) by  (i) writing to Genesis Global Holdco, LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232; (ii) calling U.S. Toll Free: 888-524-2017 or International Toll: 646-440-4183; or (iii) by e-mailing genesisinfo@ra.kroll.com (with "Genesis Solicitation" in the subject line).

*(i)      Note to Holders of Claims in Classes Eligible to Vote*

(a)      Certification.

By signing and returning a Ballot, each Holder of a Claim in a Class eligible to vote (Holders of Claims in Class 3 against GGH, Classes 3 and 4 against GGC, and Class 3 against GAP) will be certifying to the Bankruptcy Court and the Debtors that, among other things:

- the Holder has received and reviewed a copy of the Disclosure Statement and Solicitation Package and acknowledges that the solicitation is being made pursuant to the terms and conditions set forth therein;

- the Holder has not relied on any statement made or other information received from any person with respect to the Plan other than the information contained in the Solicitation Package or other publicly available materials;

- the Holder has cast the same vote with respect to all Claims in the same Class; and

- no other Ballots with respect to the same Claim have been cast, or, if any other Ballots have been cast with respect to such Claim, then any such Ballots are thereby revoked, in accordance with the procedures set forth herein.

(b)    Releases.

Each Ballot provides that if the Holder returns a Ballot and votes to accept the Plan for any Class of Claims for which such Holder is eligible to vote they will be deemed as of the Plan Effective Date, to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Released Parties (as defined in the Plan) from any and all Claims and Causes of Action (as set forth in the Plan), except as otherwise provided in the Plan.

**Holders of Claims in Classes eligible to vote on the Plan are urged to consult the Plan to understand the nature and scope of the releases they will be deemed to have granted upon an affirmative vote in favor of the Plan.**

(c)    Gemini

Each and all Gemini Lenders entitled to vote as Holder of Claims in Class 4 against GGC as of the Voting Record Date shall receive the Solicitation Package (including the appropriate Ballot) in accordance with the solicitation and voting procedures motion to be approved by the Bankruptcy Court. Except as may otherwise be described in the Debtors' solicitation procedures approved by the Bankruptcy Court, Gemini Lenders must return their Ballots directly to the Solicitation Agent or may utilize Solicitation Agent's online ballot portal. Further instructions will be provided in the Ballot provided to Gemini Lenders.

## C.    Voting Tabulation

Any single Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim or Interest. Only Holders of Claims in the voting Classes shall be entitled to vote with regard to such Claims.

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. Except as otherwise provided in the solicitation procedures, a Ballot will be deemed delivered only when the Solicitation Agent actually receives the executed Ballot as instructed in the Voting Instructions. No Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent) or the Debtors' financial or legal advisors. The Debtors expressly reserve the right to amend from time to time the terms of the Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Plan regarding modifications). The Bankruptcy Code may require the Debtors to disseminate additional Solicitation Packages if the Debtors make material changes to the terms of the Plan or if the Debtors waive a material condition to Plan Confirmation. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court. To the extent there are multiple Claims within Classes, the Debtors may, in their discretion, and to the extent possible, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Plan cast with respect to that Claim will be counted for purposes of determining whether the Plan has been accepted and/or rejected.

The Solicitation Agent will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the Voting Report prepared by the Solicitation Agent. The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each, an "Irregular Ballot"), including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information or damaged. The Solicitation Agent will attempt to reconcile the amount of any Claim reported on a Ballot with the Debtors' records, but in the event such amount cannot be timely reconciled without undue effort on the part of the Solicitation Agent, the amount shown in the Debtors' records shall govern. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

## XV.    RECOMMENDATION

The Debtors believe the Plan is in the best interest of all creditors and urge the Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots so they will be received by the Solicitation Agent no later than [August 14, 2023 at 4:00 p.m. (prevailing Eastern Time)].

Dated:  June 13, 2023.

Respectfully submitted,

Genesis Global Holdco LLC
(on behalf of itself and its Debtor Affiliates)

By:/s/ *A. Derar Islim*
    Name: A. Derar Islim
    Title: Interim Chief Executive Officer

Prepared by:

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
1 Liberty Plaza
New York, New York 10006

Telephone:      (212) 225-2000
Facsimile:      (212) 225-3999

*Counsel for the Debtors and Debtors-in-Possession*