Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 23-10063-shl

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   GENESIS GLOBAL HOLDCO, LLC,

8

9        Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11                United States Bankruptcy Court

12                300 Quarropas Street, Room 248

13                White Plains, NY 10601

14

15                July 6, 2023

16                12:14 PM

17

18

19

20

21  B E F O R E :

22  HON SEAN LANE

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  ALIANNA PERSAUD

Page 2

1    HEARING re Omnibus Hearing

2

3    HEARING re Doc. #467 Notice of Agenda

4

5    HEARING re Doc. #449 Motion to Authorize/Debtor's Motion for

6    an Order (I) Establishing Claims Objection and Notice

7    Procedures (II) Establishing Claim Hearing Procedures and

8    (III) Granting Related Relief

9

10   HEARING re Doc. #289 Motion for Relief from the Automatic

11   Stay Re:  FTX Trading

12

13   HEARING re Doc. #373 Motion to Authorize/Motion to Establish

14   Procedures and a Schedule for Estimating the Amount of the

15   FTX Debtors Claims Against the Debtors Under Bankruptcy Code

16   Sections 105(a) and 502(c) and Bankruptcy Rule 3018

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

 1   A P P E A R A N C E S :

 2

 3   SULLIVAN CROMWELL LLP

 4       Attorneys for FTX Trading Ltd. and its Affiliated

 5       Debtors

 6       125 Broad Street

 7       New York, NY 10004

 8

 9   BY:  ANDREW G. DIETDERICH

10       CHRISTIAN T. HODGES

11

12   WHITE CASE

13       Attorneys for the Official Committee of Unsecured

14       Creditors

15       1221 Avenue of the Americas

16       New York, NY 10020

17

18   BY:  PHILIP ABELSON

19       J. CHRISTOPHER SHORE

20       AMANDA PARRA CRISTE

21

22

23

24

25

Page 4

1   LATHAM WATKINS

2        Attorneys for Interested Party

3        1271 Avenue of the Americas

4        New York, NY 10020

5

6   BY:  ADAM J. GOLDBERG

7

8   HUGHES HUBBARD REED

9        Attorneys for Gemini Trust Company, as Agent

10       1 Battery Park Plaza

11       New York, NY 10004

12

13  BY:  JEFFREY S. MARGOLIN

14       ANSON B. FRELINGHUYSEN

15

16  CLEARY GOTTLIEB STEEN HAMILTON LLP

17       Attorneys for the Debtors

18       One Liberty Plaza

19       New York, NY 10006

20

21  BY:  LUKE A. BAREFOOT

22       JANE VANLARE

23

24

25

Page 5

1    PROSKAUER ROSE LLP

2         Attorneys for the Ad Hoc Group of Genesis Customers

3         11 Times Square

4         New York, NY 10036

5

6    BY:  JORDAN SAZANT

7

8    UNITED STATES DEPARTMENT OF JUSTICE

9         Attorneys for the U.S. Trustee

10        Alexander Hamilton Custom House

11        One Bowling Green, Room 534

12        New York, NY 10004

13

14   BY:  GREG ZIPES

15

16   PAUL HASTINGS

17        Attorneys for the Official Committee of Unsecured

18        Creditors of FTX

19        200 Park Avenue

20        New York, NY 10016

21

22   BY:  KENNETH PASQUALE

23        LEONIE KOCH

24         ISAAC SASSON

25

Page 6

1   WEIL GOTSHAL MANGES LLP

2      Attorneys for Digital Currency Group, Inc.

3      767 Fifth Avenue

4      New York, NY 10153

5

6   BY:  FURQAAN SIDDIQUI

7

8   NORTON ROSE FULBRIGHT US LLP

9      Attorneys for Mirana Corp.

10      1301 Avenue of the Americas

11      New York, NY 10019

12

13   BY:  ERIC C. DAUCHER

14

15   TROUTMAN PEPPER

16      Attorneys for the Interested Party

17      Hercules Plaza

18      1313 Market Street

19      Wilmington, DE 19899

20

21   BY:  MARCY J. MCLAUGHLIN SMITH

22

23   ERIC IAN ASQUITH, Pro Se

24

25

Page 7

1   ALSO PRESENT:

2   ALEKSANDRA ABRAMOVA

3   PAUL ARONZON

4   BRENDON BARNWELL

5   ANDREW BEHLMANN

6   BENJAMIN S. BELLER

7   SABRINA BREMER

8   BRIAN BULTHUIS

9   DONALD BURKE

10  STEVEN CHURCH

11  TOM CONHEENEY

12  COURTENAY CULLEN

13  JARED DERMONT

14  MICHAEL DIYANNI

15  DEANDRA FIKE

16  SCOTT FLAHERTY

17  DAN FORMAN

18  ELLA GASPAR

19  BRIAN D. GLUECKSTEIN

20  UDAY GORREPATI

21  JASON GOTTLIEB

22  BRANDON HAMMER

23  KRIS HANSEN

24  MIRA HAQQANI

25  MIRANDA HATCH

Page 8

1    AUTUMN HIGHSMIT

2    JEREMY HILL

3    GAVIN E. HOLMES

4    DERAR ISLIM

5    ZUL JAMAL

6    BARRY JONES

7    HOO RI KIM

8    PAUL KINEALY

9    BARAK KLEIN

10   DIETRICH KNAUTH

11   MIKE KOWIAK

12   OXANA MARIA KOZLOV

13   GLEN KRATOCHVIL

14   KONRAD LAESSER

15   BRADLEY LENOX

16   MICHAEL LETO

17   SAMUEL LEVANDER

18   JESSICA LIOU

19   DAVID LOPEZ

20   ALEXANDRA LOTTY

21   KEN LUKASZEWSKI

22   PETER MAERKL

23   NICHOLAS MAISEL

24   JACK MASSEY

25   AKIKO MATSUDA

Page 9

1   KYLE MCKUHEN

2   RICHARD CHESTER MINOTT

3   SAMUEL NADEL

4   BRETT MATTHEW NEVE

5   JOHN NGUYEN

6   SEAN A. O'NEAL

7   MASON PALISSERY

8   GREGORY F. PESCE

9   REBEKAH PRESLEY

10   ARIANNA PRETTO-SAKMANN

11   PHILIP RIES

12   CRAIG V. RASILE

13   MOHIT RATHI

14   CHRISIAN RIBEIRO

15   BRIAN ROSEN

16   KATIE ROSS

17   JEFFREY S. SABIN

18   ANDRES FELIPE SAENZ

19   JEFFREY SAFERSTEIN

20   THERESE SCHEUER

21   JACK SCHICKLER

22   DAVID Z. SCHWARTZ

23   JOE SCIAMETTA

24   CATHY SHU

25   PETER J. SPROFERA

1    MARK STANCIL

2    BENJAMIN STEELE

3    BRIAN STOUT

4    ANDREW SULLIVAN

5    VINCE SULLIVAN

6    ANDREW SWIFT

7    NACIF TAOUSSE

8    CHRISTINE THAIN

9    BRIAN TICHENOR

10    ETHAN TROTZ

11    ANDRWE TSANG

12    FRANCISCO VAZQUEZ

13    LAUREN WALKER

14    MICHAEL WEINBERG

15    COLIN WEST

16    JACK WESTNER

17    PAUL WIRTZ

18

19

20

21

22

23

24

25

1                  P R O C E E D I N G S

2              THE COURT:  All right, that concludes the 10

3     o'clock calendar.  And now we will proceed belatedly to the

4     11 o'clock calendar and Genesis Global Holdco LLC and we

5     will start by getting appearances in that case.  So let me

6     find out who's here on behalf of the debtors.

7              MS. VANLARE:  Good afternoon, Your Honor, Jane

8     VanLare, Cleary Gottlieb Seen and Hamilton.

9              THE COURT:  All right.  Good morning.  And on

10    behalf of the Official Committee of Unsecured Creditors?

11             MS. VANLARE:  I'm so sorry, Your Honor.  And with

12    me also is my partner, Luke Barefoot as well.

13             THE COURT:  All right.  Good morning to you both.

14    All right.  On behalf of the Unsecured Committee?  Anyone

15    here for the Committee of Unsecured Creditors?

16             MR. ABELSON:  Yes, Your Honor.  It's Phil Abelson

17    White and Case on behalf of the UCC.  My colleague,

18    Christopher Shore, should be joining me in a moment.  I

19    presume he just walked away while the other hearing was

20    going on.  I will make sure he rejoins.  Thank you, Your

21    Honor.

22             THE COURT:  All right.  That's fine.  I can

23    completely understand.  And so on behalf of Gemini Trust

24    Company?

25             MR. MARGOLIN:  Good morning, Your Honor.  Jeffrey

1    Margolin, Hughes Hubbard and Reed.  I'm joined by my

2    colleague, Anson Frelinghuysen.

3              THE COURT:  All right.  On behalf of the Ad Hoc

4    Group of Genesis customers?

5              MR. SAZANT:  Good afternoon, Your Honor, Jordan

6    Sazant, Proskauer Rose, LLP, on behalf of the Ad Hoc Group.

7              THE COURT:  On behalf of the Digital Currency

8    Group?

9              MR. SIDDIQUI:  Good morning, Your Honor.  It's

10   Furqaan Siddiqui of Weil Gotshal and Manges on behalf of the

11   Digital Currency Group.

12             THE COURT:  All right.  On behalf of FTX Trading

13   Limited and its affiliated debtors.

14             MR. DIETDERICH:  Hello, Your Honor, Andy

15   Dietderich, Brian Gluckstein and Ben Beller, Sullivan and

16   Cromwell with the FTX debtors.

17             THE COURT:  All right, I believe.  Good morning.

18   I think we also have the committee from that case here.

19             MR. PASQUALE:  Yes, Your Honor.  Ken Pasquale from

20   Paul Hastings for the Creditors Committee in the FTX cases.

21             THE COURT:  All right.  And there are a number of

22   other appearances from folks, but at this point, again, no

23   slight intended, I will cut to the chase and ask if there's

24   anybody else who needs to make an appearance in this case,

25   who has not yet done so?

1          MR. SHORE:  Your Honor, it's Chris Shore from

2     White and Case.  I was just slow on the trigger.  I'll be

3     appearing on behalf of the Official Committee.

4          THE COURT:  All right, good to have you here.

5     Anyone else?

6          MR. ZIPES:  Your Honor, Greg Zipes with the US

7     Trustee's Office.  I may have some comments at the end at

8     the end of the case.

9          THE COURT:  All right.  Thank you very much.

10     Anyone else?

11          All right.  So first let me thank you all for your

12     patience.  You never know in this job, no matter how many

13     years you've been on the bench, exactly how long something

14     is going to take.  And this morning is a perfect example of

15     that.  I appreciate everybody's patience.  And so I do have

16     the amended agenda for the hearing at Docket 481 and

17     identifies three items that are on for today, two of which

18     are sort of a sequel of earlier events in the case.  And so

19     with that, I'll turn it over to debtor's counsel if there's

20     any sort of initial status issues to discuss on the case and

21     then to walk us through the agenda.

22          MS. VANLARE:  Thank you, Your Honor.  I think we'd

23     like to proceed in the order of the amended agenda.  So

24     start with the claims procedures motion and then proceed to

25     the motion to lift stay and the estimation motion with

Page 14

1    respect to the FTX claims.

2              THE COURT:  All right.

3              MS. VANLARE:  With that (indiscernible) for the

4    claims objection motion.

5              THE COURT:  All right.  Mr. Barefoot.

6              MR. BAREFOOT:  Good morning, Your Honor.  For the

7    record, Luke Barefoot from Cleary Gottlieb Steen and

8    Hamilton for the Genesis debtors in possession.  Your Honor,

9    turning to the first agenda item, Agenda Item Number 1,

10   fortunately, the only uncontested matter we have today, I'm

11   pleased to report, that's Docket Number 499, the debtors

12   motion to establish omnibus procedures for claims

13   objections.  There was a revised proposed order that was

14   filed on Friday at Docket Item 465.  Does Your Honor have

15   that order in front of you?

16             THE COURT:  I do, I do.

17             MR. BAREFOOT:  Very good.  So I will turn to walk

18   through some of the changes on that order, but just by way

19   of brief background, you know, it's been just over

20   approximately a month since the debtor's bar date has

21   passed.  The results of that bar date were approximately 750

22   claims asserted with an aggregate asserted value of nearly

23   $9 billion.  The debtors with their financial advisor at

24   Alvarez and Marsal, since that time, have turned in earnest

25   to right sizing and analyzing the debtor's claims base, not

Page 15

1    only ultimately to ensure that they're not duplicative or

2    inappropriate recoveries, but with the debtor solicitation

3    processes about to come up in the approaching weeks to

4    ensure that there's no unnecessary noise in the voting pool,

5    particularly from duplicate claims.

6           Your Honor may recall that as part of the bar date

7    motion, there was a very elaborate process with respect to

8    Gemini and Gemini-earned users.  Gemini did, pursuant to the

9    bar date order, file a master proof of claim on behalf of

10   the Gemini-earned claimants, but nonetheless, the debtors

11   and their professionals' preliminary analysis indicates

12   nonetheless that hundreds of individual Gemini-earned

13   participants filed claims that appear to be duplicate in

14   whole or in part.

15          And so to that end, the motion attaches not only

16   kind of the standard form of notice that claimants who were

17   subject to a claims objection would receive but customized

18   forms of notice for Gemini-earned claimants whose claims are

19   either in whole or in part duplicative of the Gemini master

20   group of claims.

21          There were no objections filed to the motion, Your

22   Honor.  We did have a number of productive discussions and

23   informal comments both from Gemini, from the UCC, and

24   counsel for the joint liquidators for Three Arrows Capital.

25          So with that background and context, unless Your

Page 16

1    Honor has any specific questions, I would just propose to

2    walk through the blackline that was filed as Exhibit 2 to

3    Docket Item 465.

4               THE COURT:  All right.  Let's walk through the

5    changes, please.

6               MR. BAREFOOT:  Terrific.  Thank you, Your Honor.

7    So the first change appears in Paragraph 1-F.  And this is

8    really a clarification that nothing in this order revises

9    the burden of proof.  Three Arrows and its liquidators

10   obviously have one of the largest asserted claims.  So the

11   parties here are really building in and channeling a mutual

12   ability to consult, to modify on notice to the committee the

13   potential procedures set forth in these objections -- in

14   these objections procedures, and in the event that we're

15   unable to agree to do so, to take the issue up with Your

16   Honor.

17              THE COURT:  All right.  And I did have a sort of a

18   related comment when you're talking about the burden of

19   proof.  I did see there's language talking about the legal

20   standard for a non-evidentiary hearing as the equivalence of

21   a standard motion to dismiss and all that's fine.  I totally

22   understand why you have that in there in terms of it being

23   informative.  Nonetheless, I would, I would urge that it

24   come out just because the applicable legal standard is the

25   applicable legal standard.  I appreciate why you have it in

1    there because I think it's, it's helpful in terms of people

2    understanding what you're trying to accomplish.  But at the

3    same time, I think it goes to your point of saying the

4    applicable, applicable -- the rules of the road that apply,

5    apply.  And so -- and I don't think there's any intent to

6    change those.  So I think you always, people always get a

7    little bit nervous if some particular thing is called out

8    and something else isn't called out or does this change what

9    the standard of review is?  And so I, again, I understand

10   exactly why it's in there because it's helpful in terms of

11   explaining what the intentions are and what those kinds of

12   non-evidentiary hearings would look like.  So I'm taking it

13   for that purpose, but I think for purposes of the order, I

14   would just take that out because the applicable legal

15   standard is the applicable legal standard.

16              MR. BAREFOOT:  Understood, Your Honor.  Do you

17   have, just in terms of implementing what Your Honor just

18   said, do you have an issue with proceeding kind of in two

19   tracks with a sufficiency hearing which we think, you know,

20   it's sort of in accordance with the local rules where the

21   first hearing, unless ordered otherwise, is not an

22   evidentiary.

23              THE COURT:  No, that's correct.

24              MR. BAREFOOT:  Do you?

25              THE COURT:  No, I think you have it right.  I

Page 18

1    don't have a problem with the way you've set it up, which is

2    that the, an evidentiary hearing will be -- the rules and

3    procedures for that will be set forth in the scheduling

4    order.   That is, we'll make sure that anybody, we're going

5    to have an evidential hearing, everybody is on notice.   The

6    rules and procedures will be in there.   And that for claims

7    objections, generally, the first hearing is non-evidentiary.

8    And again, I took your comment to be helpful in the sense of

9    giving me a window into how you're thinking of the process

10   and what can be accomplished and I appreciate that because

11   one of the things that always I think comes to the minds of

12   judges when they get these kinds of motions is we understand

13   what you, what you, why we get these motions.   And the

14   answer is how do we give you what you want without giving

15   you a blank check or totally rewriting the rule that

16   Congress in its wisdom has decided to provide us with?

17          So it is a very helpful comment and I took it in

18   that in that vein so that I understand what it is, how you

19   see the process working.

20          MR. BAREFOOT:   And we obviously did cite in our

21   motion, Your Honor, support for various courts that have

22   applied effectively a 12(b)(6) standard to certain very bare

23   bones proofs of claim.   But just in terms of understanding

24   how to implement Your Honor's point, if we can preserve the

25   distinction between the sufficiency hearing and the merits,

1    evidentiary hearing --

2              THE COURT:  We can do that.  I think, I think my

3    comment is fairly narrow.  So if you go to -- and I happen

4    to have a tabbed on the original proposed order, so my

5    apologies.  If would you go to Paragraph 2 --

6              MR. BAREFOOT:  2-A?

7              THE COURT:  2-A and you just take out that last

8    sentence.  So everything else should remain about the non-

9    evidentiary hearing and pursuant to Bankruptcy Rule 7012.

10   And it just again, I understand why it's included.  And I

11   think it's helpful to give me an idea of, of what you want

12   to do.  But I think to the extent one might argue that it's

13   a legal determination, we just don't want to have to go down

14   that road.  So if you just take out that last sentence and

15   leave everything else in, I think it functions the same way

16   as you intend.

17             MR. BAREFOOT:  Understood, Your Honor.  And the

18   debtors, just for the avoidance of doubt would, would

19   reserve the right to argue that Rule 7012 should,

20   nonetheless, apply to any particular claim.

21             THE COURT:  Yes, absolutely, absolutely.

22             MR. BAREFOOT:  Okay, very good.  That's, that

23   was, that was very helpful colloquy, Your Honor.  If I could

24   then just carry back where we were?

25             THE COURT:  Please.

1          MR. BAREFOOT:  Okay.  So the next change is in

2     Paragraph 1, I'm sorry, these nested, nested objections.  I

3     think it's 1-F romanette II, the language that begins "With

4     respect to each omnibus objection service of the omnibus

5     objection."

6          THE COURT:  Yes, got it.

7          MR. BAREFOOT:  So there's just a parenthetical

8     there that clarifies that the omnibus objections may be

9     filed without exhibits where necessary to comply with

10    sealing requirements.

11         THE COURT:  That seems entirely appropriate.

12         MR. BAREFOOT:  Okay.  And then in that same page,

13    Paragraph J, this is really again in the nature of a

14    clarification because the forms of exhibits that we very

15    carefully crafted, with the assistance of Mr. Margolin at

16    Hughes Hubbard, really are for Gemini lenders' claims that

17    relate to Gemini borrowings.  In the event that there are

18    other types of Gemini lender claims, obviously, those

19    customized notices don't make sense.  So just a

20    clarification that, that we will serve those omnibus

21    notices, not only when the objection is to a Gemini lender's

22    claim, but when that claim is based on Gemini borrowings.

23         THE COURT:  All right.  I'm fine with that.  On a

24    related thing when we're looking at J, there is a reference

25    here about the debtors are authorized to extend any response

1    period in sole discretion without notice to the Court.

2    Please do it on notice to the Court because otherwise, we

3    just have no idea how to most effectively run the railroad.

4    So what I would say is just follow what you have normally

5    done, which is reach out to chambers and say this is fine.

6    Pretty much the inevitable answer will be yes and that's

7    perfectly fine.  But it allows us to keep track of what's

8    moving forward and what isn't and what it looks like,

9    especially with larger claims objections when that kind of

10   stop, go, traffic cop role becomes more important.  So I

11   would actually just tweak that to just say, you know, the

12   court -- a request is made to the Court.  And you can do it

13   informally as you've done in the past with other extensions

14   of deadlines.  That's fine.  I'll leave it to you to craft

15   appropriate language to memorialize that.  And I think

16   frankly, the only time I think I've ever pushed back on

17   extensions of time, because we don't normally do so because

18   we understand people are often trying to resolve issues and,

19   and want to give the max amount of time, is if for some

20   reason I feel like I'm not going to get enough chance to

21   look at the final, completed briefing.  So that's often just

22   the very tail end of things.  But again, as long as you keep

23   us in the loop, it's fine.

24            MR. BAREFOOT:  And, Your Honor, just as a point of

25   clarification.  I think that's Paragraph K in the blackline,

Page 22

```
1    not J, right?

2              THE COURT:  Oh, yeah, I'm sorry, I'm going, I made

3    my notes on the original one.

4              MR. BAREFOOT:  No problem.  We just wanted to make

5    sure we were on the same page.

6              THE COURT:  Yes, you're entirely right.

7              MR. BAREFOOT:  Okay.  So it's just that last

8    sentence --

9              THE COURT:  Correct.

10             MR. BAREFOOT:  Okay.  I've got it.  And then last,

11   but not least, this is not a modification to the form of

12   order but rather a representation that we have agreed to

13   make on the record, in order to reflect discussions we've

14   had with Mr. Abelson on behalf of the UCC, you'll see that

15   in Paragraph 4, the second sentence reads "That the debtors

16   may, in their discretion and in accordance with other orders

17   of this Court or provisions of the code and the rules,

18   settle the amount, priority, and validity of such contested

19   claims without any further notice to, or action order, or

20   approval of the Court.  Obviously, it was not ever our

21   intention to use this for extremely material claims where we

22   believe we would -- it would behoove us and behoove the

23   creditor body to likely seek approval of any such settlement

24   under Rule 9019.  But if by contrast, we filed an objection

25   and said we want to reduce and allow the claim to $5000, it
```

1    turned out after reconciliation, it was $525, you know, the

2    cost of doing a revised proposed order or a 9019 motion just

3    doesn't make sense there.

4           THE COURT:  All right, that's fine.  And I assume

5    that there would no doubt be consultation with the committee

6    on things that were material.

7           MR. BAREFOOT:  And let me just, just let me read

8    into the, into the record, the representation that we've

9    made that will resolve the UCC concern on this.  On that

10   point, the debtors represent on the record that the debtors

11   will provide advanced notice to counsel to the committee for

12   any such claims that they would seek to settle pursuant to

13   the authority in this Paragraph 4.  And that in any event,

14   they would not seek to use the authority for any claims

15   asserted at or proposed to be settled in excess of $10

16   million.

17          THE COURT:  All right.  Thank you very much.  Any

18   other changes to the order that we should walk through?

19          MR. BAREFOOT:  No.  Mr. Abelson, maybe you can

20   just confirm that resolves our concern on this front?

21          MR. ABELSON:  It does, along with your other

22   statements on the record.  I do appreciate it, Mr. Barefoot.

23   Thank you.

24          MR. BAREFOOT:  Very good.  So, Your Honor, it

25   sounds like we have just a handful of changes to make.  We

Page 24

1     will do that expeditiously.  And unless Your Honor has any

2     other questions, we will submit a proposed order.

3              THE COURT:  All right.  Any party wish to be heard

4     on this motion, establishing claims objection notice

5     procedures?

6              All right.  I'm happy to grant the motion.  My

7     only other comments are sort of rather than put them in an

8     order, I would also just state them on the record with the

9     flexibility that entails, is obviously by getting its

10    discretion, I would ask you to use it wisely in the sense of

11    having -- this is often,  this kind of relief is often

12    requested so that people can list a larger number of claims

13    where you're asserting a particular ground and there are

14    many different claimants.  And it obviously works less well

15    when it becomes a very disparate, here's 12 different

16    grounds and many different claims, because it becomes

17    confusing to claimants, many of whom may be pro se, but it

18    also becomes very unmanageable from a traffic cop where

19    we're on Objection Number 37, Omnibus Objection 37.

20             So I'd ask to just exercise your best discretion

21    to, to make it as efficient as possible.  This is designed

22    to be efficient.  So if it's, if it's done properly, it can

23    be more efficient and appropriate, but just to not make

24    claims objections too unwieldy by either, particularly with

25    multiple grounds.  And again, a good test is whether you

Page 25

1    really think somebody who is not represented by a lawyer,

2    who's looking at it, can follow what's going on.  If we all

3    do that, that that tends to end up with a good result for

4    all involved.  But again, I've seen this used very

5    effectively and I think by your firm, in fact.  And so I

6    have no doubt that it'll be beneficial and efficient here.

7            MR. BAREFOOT:  We appreciate that, Your Honor.

8    And partly for that reason, we did not seek to vary the 100

9    maximum omnibus standard rule in 3007 because we do intend

10   to try to keep, as you said, like with like to avoid

11   unnecessary confusion.

12           THE COURT:  All right.  Thank you.  That's helpful

13   to know.  And so that's my only comment and with that, I'm

14   happy to approve the motion as has been amended here on the

15   record and over time in the revised proposed order as

16   appropriate under the facts and circumstances of the case

17   and applicable law.  And I appreciate everybody's comments

18   and thoughts on the subject.  And it looks like a good

19   outcome.  So thank you, Mr. Barefoot.  And with that, I

20   think we can move on to the next matter.

21           MR. BAREFOOT:  Thank you, Your Honor.

22           MS. VANLARE:  Thank you, Your Honor.  Next, we

23   have the two FTX-related motions.  We have the FTX motion to

24   lift the automatic stay and the debtor's motion to estimate

25   the FTX estimation claims.  As, as you call, Your Honor, we

1   did have a hearing on these two motions a few weeks ago.  At

2   the conclusion of that hearing, Your Honor ordered us to

3   commence discovery and engage in meet and confers.  We've

4   done that.  So what I'd like to do is begin with some

5   context again for these two motions and then really focus on

6   telling Your Honor what we've done to date and how we

7   propose to go forward.

8              THE COURT:  All right.  I will say based on what

9   I've seen, I still see a significant amount of parties

10  talking past each other a bit on this.  And let me, so let

11  me start by sharing a couple of thoughts.  I think two of

12  the themes, if you want to characterize it that way, that I

13  have in terms of my concerns is one, I think for estimation,

14  there's a certain amount of devil in the details.  I do see

15  the revised schedule and I did see some of the sort of --

16  there was an attachment to the letter that was filed by FTX

17  counsel that sort of sets forth some of the thinking about

18  what people were -- what issues were going to go forward.

19  And that's all helpful.  But again, to assess the benefits

20  of estimation, which I think is part and parcel of an

21  approval of estimation, is somewhat of a comparative notion,

22  right?  So we think about one, Why is it necessary?  And

23  two, Is it actually of benefit?  What's the alternative?

24  And so having a sense of what the procedure actually looks

25  like is, is an important part of me approving a procedure.

Page 27

1            And so I see there's additional deadlines which,

2      which lay out some of that.  And again, I'm sure you've been

3      talking about what does it look like.  And so -- but another

4      way to think about it, I guess, is to what kind of procedure

5      are we having?  Is it, is it, is it after the, after

6      briefing?  Is it, is it a, is it an evident hearing that

7      lasts one day, two days, three days, a week?  I remember a

8      number of years ago, probably a decade ago, there was a

9      standing to sue hearing that wasn't on the merits of the

10     actual claim but was on standing and I think it lasted, one

11     judge had it, and I think it lasted a week or two.

12            And so the devil is in the details in terms of

13     what it looks like.  So that's one, one thing that I'm sure

14     you've made progress.  I can see some evidence of the

15     progress in terms of the procedures.  But I think there's

16     probably a little more ways to go.  And the second is that

17     when we talk about issues to estimate -- and that's where

18     the FTX motion to lift the day is grounded.  And again, I

19     think as I said before, my concern, it's always a

20     challenging to rule on the abstract and that means ruling in

21     advance as we don't know how cases unfold, can be difficult,

22     whether it's what are the actual deadlines in the case as

23     opposed to what are the deadlines on paper versus, in this

24     case, what's going on in the FTX bankruptcy?

25            But that's a prelude to the notion that there are

1    specific issues that I think are going to be discussed.  And

2    when I saw the revised order, it essentially, I took it as

3    a, as a gigantic reservation of rights in terms of the new,

4    new paragraph, I guess it's 3 that lays out, here are the

5    things that we might, we might include.  And it says, "may

6    assert any and all defenses including," and so, so I guess

7    I'm just trying to get a little more understanding.

8                So to whether the parties have an agreement on

9    this, whether this is something that's being floated by the

10   debtors, because this talks about the debtors may assert any

11   all defenses availed to them in the estimation schedules

12   that were shared except the value of FTT and the insolvency

13   of the FTX debtors.  And I understand that to be addressing

14   Mr. Dietderich's question.  So I guess my question for you

15   is, Is this something that's been agreed to in the sense of

16   it either can be, I don't understand that the parties have

17   reached an entire agreement, but it may be you've reached an

18   agreement on this limited, albeit very important, issue in

19   the sense of that constitutes progress.

20               So I wasn't quite sure how to read that, Ms.

21   VanLare.  Maybe, maybe that's worth diving into from the

22   get-go, how I'm supposed to understand the language of the

23   revised order?

24               MS. VANLARE:  Yes, Your Honor.  Thank you.  That's

25   very helpful and I'm happy to address all of those issues.

Page 29

1    So the proposed revised order, it has not been agreed to by

2    the FTX debtors.  I do want to be clear about that.  I do

3    think we've made substantial progress and I'd like to tell

4    you about some of that.  But, but I do think that the, what

5    the revised order does is it does, I think, further

6    streamline the estimation proceeding.  And I'd like to

7    describe to you how we believe that it does that.

8              So I'll just begin, and let me know if I haven't,

9    I haven't addressed all of your questions.  So in terms of

10   the estimation, we have had multiple meet and confers since

11   the last hearing with the FTX debtors.  We think they've

12   been very productive.  We have exchanged discovery requests.

13   The debtors have either made already or will shortly make

14   today a substantial production relating to ordinary course

15   of business issues, which was, which is responsive to some

16   of the discovery that have been served.

17             In terms of where we are, I think we are very,

18   we're quite close to an agreement as to the -- what I would

19   call sort of the basic facts of the transfers at issue,

20   which include the parties, the amounts, the dates.  I can't

21   say we're, we're there, but I think what we've heard from,

22   from the FTX debtors is I think we're close.  And again, I

23   think we've been proceeding very productively on that front

24   and I do think we can get there relatively quickly.

25             I think where that leaves us then is, to Your

Page 30

1    Honor, one of Your Honor's questions -- is what are the

2    issues?  And what we proposed and what we've sought to do in

3    the revised order is to say that the estimation proceeding

4    will be conducted in a -- on account of the defenses and the

5    arguments that we can make on the basis of that sort of the,

6    the basic transfer information, the transfers themselves, as

7    well as some of the defenses that do require factual

8    testimony, but it's rather limited.  It's the ordinary

9    course of business defense which, you know, I think we've

10   talked about last, at the last hearing, and which we've told

11   the FTX debtors, as part of our meet and confers, that we

12   intend to assert.  That does require factual and expert

13   discovery.  As I mentioned, I think we're well underway with

14   respect to that discovery.

15        And the safe harbor defense, which we said will

16   require expert testimony, beyond that, Your Honor, the

17   remaining issues are really legal in nature or they rely on

18   facts that we think we will be in a position to stipulate to

19   with the FTX debtors.  What we have said, we have told the

20   FTX debtors, and based in part on what they said at the

21   prior hearing, is that there are certain issues that they

22   find particularly involved and difficult and time intensive,

23   which we don't disagree with.  They include the issue of

24   whether FTX was insolvent at the time of the transfers.

25   They had mentioned the, the valuation of FTT tokens and

1    whether or not withdrawals from FTX dot com constituted

2    property of the estate.

3            So what we've done is essentially, taken those

4    three issues and I'll explain how, out of the estimation

5    proceeding on this current timeline.  We do fully reserve

6    our rights to pursue them, but what we've said is Your Honor

7    can estimate and can reach a reasonable basis to estimate

8    without considering those issues on the timeline that we've

9    asserted, which is consistent with our confirmation

10   timeline.  And again, I underline the reason for the

11   timeline that we've proposed is we would like, and we need

12   these claims to be estimated in advance of confirmation.

13           So in terms of the, what this issue, whether or

14   not deposits of customer property where, where

15   (indiscernible).  During the meet and confers and as to the

16   letter that FTX filed yesterday, what they've indicated to

17   us and I believe, you know, on the record, is that they are

18   planning to withdraw the portion of their claim asserted

19   against the debtors that relate to the relationship between

20   GGCI, which is a non-debtor, and FTX dot com.

21           So, Your Honor here, basically, we have two sets

22   of transactions.  We have transactions between GGC and

23   Alameda.  Those are -- those constitute a portion of the FTX

24   claims that have been asserted against GGC and other

25   debtors.  And there are, there are some portion of their

Page 32

1    claims that relates to transactions with FTX dot com.  GGCI

2    was the entity that transacted with FTX dot com, rather than

3    GGC.  So to the extent the FTX debtors withdraw the claims -

4    - again, they've, they've indicated they will do so -- that

5    basically takes the issue of property of the estate out of

6    the estimation proceeding because those will be claims that

7    may or may not be asserted against GGCI.

8              In terms of the issue of valuation of FTT, we have

9    said in the proposed order -- and proposed that -- again,

10   this goes part and parcel with the fact that we anticipate

11   that the FTX debtors will withdraw FTX dot com related

12   claims from the claims they have asserted against the

13   debtors.  The debtors will not be asserting, again, as part

14   of the estimation proceeding, a defense that essentially the

15   value FTT withdrawn was lower than the market value.  We

16   reserved all our rights on that issue, but that is not going

17   to be part of the estimation proceeding.

18             And then finally, as I mentioned earlier, the

19   issue of FTX's insolvency, which is obviously one that is

20   complicated, will take a long time to litigate.  We've also

21   said we think that there is enough here for Your Honor to

22   reach a reasoned basis to estimate these claims without

23   getting to that issue.  We have a number of defenses.  And,

24   in fact, we may never need to reach that issue.

25             So what we're trying to do is to streamline, to

Page 33

1    further focus on what we think will be the issues that may

2    be determinative, frankly and that can be dealt with on the

3    timeline for estimation that we've proposed.

4            THE COURT:  All right.  So let me ask, with that

5    backdrop, what does that mean from the debtor's point of

6    view as to the stay relief motion?  Because obviously,

7    there's an intent, or as a practical matter, the results of

8    identifying things that are going to be litigated here and

9    things that aren't going to be litigated here, some of which

10   were obviously prominently mentioned by Mr. Dietderich the

11   last time we got together as things of particular concern.

12   So where would that leave the debtors in terms of their

13   views about the lift stay motion?

14           MS. VANLARE:  Yes.  Your Honor, We think that

15   they, they have not met their burden to lift the stay.  I'm

16   happy to go through the legal basis, but I think we went

17   through it last time.  I think the Sonnax factors are very

18   clear.  I think that if you look at the great majority of

19   them weigh against lifting the stay.  The only one the FTX

20   debtors have really mentioned and relied on is sort of

21   balance of the harms which, you know, at best is, you know,

22   again, could argue that they have harms, we have harms, but

23   that's one factor.  So I think as a legal matter, they have

24   not met their burden under the law and under the standard

25   that's been articulated in the Second Circuit.

Page 34

1              But again, I think -- so what we would propose to

2     do is we would ask Your Honor to proceed with estimation

3     that's consistent with the confirmation timeline.  We think

4     that not doing so will cause undue delay.  For the reasons

5     we articulated at the last hearing, it'll cause a delay,

6     undue delay in distributions and it will, as Your Honor

7     knows, we have a mediation process that's ongoing.  We're

8     still trying to get to a consensual resolution.  We're not

9     there yet.  We think -- and our credits have made it clear

10    that not estimating these claims will not allow for a

11    consensual resolution of these cases.  So in order --

12             THE COURT:  So let me ask.  The letter that I

13    received yesterday lays out some of the progress that the

14    parties have made, particularly as to the size of a claim,

15    the size of the claim, as well as proportional share in

16    terms of what kind of reserve we're looking at, that it's an

17    unsecured reserve.  It's not -- it doesn't stand in the way

18    of a priority reserve, I guess is the way to say it,  and

19    that things like stipulating that no more than 30 percent of

20    the unsecured claims pool -- and obviously, I will hear from

21    FTX in a little bit, but as I understand the letter and its

22    bullet points, I think the -- it seems like the intent is to

23    explain how this won't hold up distributions or won't

24    interfere with the plan.  And so towards the end of his --

25    Mr. Gluckstein's letter, he asks that the FTX debtors get an

Page 35

1    opportunity to submit additional briefing in light of these

2    developments.  And so I guess two questions then is, I don't

3    know if you have anything to address the substantive points.

4    And two is what you thought about his request for additional

5    briefing to address the -- what I think FTX would say is the

6    changed facts on the ground?

7              MS. VANLARE:  Your Honor.  I don't think that

8    there are really changed facts on the ground.  I do not

9    think we need additional briefing.  I do think that I'd like

10   to address the 30 percent claims pool.  First, I'll just

11   note that we did find it very troubling that the letter was

12   filed yesterday, attaching a 408 document.  So I'll just

13   note that, that we find that inconsistent with the spirit

14   with which we've engaged in meet and confers.  But putting

15   that aside, we think the 30 percent claims pool is, is

16   extremely large and not workable in the context of a plan.

17   30 percent of the scheduled claims, which are approximately

18   $4 billion, would be essentially virtually all of the

19   debtor's liquid assets if you look at the most recent coin

20   and tax report that we filed.  That would mean that

21   essentially virtually all, if not all depending on

22   administrative and priority claims, of liquid assets would

23   be held up by virtue of this kind of reserve.  That is the

24   definition of undue delay.

25             THE COURT:  And that's because, that's because

Page 36

1    it's based on claims filed as opposed to existing, the

2    assets that actually exist.

3            MS. VANLARE:  That is how we understand the

4    letter, correct, Your Honor.

5            THE COURT:  So, but let me ask -- and this sort of

6    ties into this notion, talking about you've invoked the time

7    frame for the case and confirmation including distribution

8    several times.  But I understand, and I saw the further --

9    the notice of further extension of the mediation period and

10   that's fine and great and mediation is commonly used in

11   cases as a way to try to efficiently resolve issues.  But I

12   guess my thought is that it's always difficult for parties

13   to fight in the abstract.  And so as I understand, the

14   mediation is a significant event in trying to determine the

15   available, available -- the amounts available for

16   distribution.  And therefore, put more specific, a more

17   specific point on all of our much more theoretical

18   discussions.  So I am curious what the parties -- I don't

19   expect you to have a time frame for the mediation.  That's

20   not how those things work.  But in terms of thinking about

21   how to reconcile various competing interests, do you think

22   that if the mediation is successfully concluded that that

23   may make it easier for the parties to reach some sort of

24   practical accommodations as to what, what goes ahead, what

25   case and how and how to essentially have the cases not

1    impact each other?  So you mentioned the claims pool and I

2    get it, but if no one can really talk about the amounts

3    available for distribution while the mediation is pending,

4    and so I'm wondering if the mediation might unlock an

5    ability to -- for the parties to more easily reach some kind

6    of accommodation on these specific issues?

7              MS. VANLARE:  Your Honor, it's hard to predict the

8    outcome of mediation.  But again, I note that again, the

9    (indiscernible) of these claims is extremely high and there

10   are a few other issues I'd just like to note.  One is that,

11   you know, under, under the plan that we filed, we are

12   seeking to make in kind distributions.  So having a

13   significant reserve has other repercussions that are very

14   challenging for us in the context of the plan.  I think --

15             THE COURT:  I understand all that.  So I

16   understand how from the point of view, if you start doing

17   the math from the amount of claims, things tilt.  It just

18   doesn't, it just doesn't work.  But my thought is if there's

19   a -- the things haven't stopped moving yet on what assets

20   may be available for distribution in the plan.  And if

21   there's more clarity on that front, I wonder if it allows

22   parties to have more practical negotiations about what, what

23   something might look like in terms of a reserve because it

24   wouldn't be based on claims.  It would be based on available

25   assets perhaps.  I don't know.  I'm just spit-balling here.

Page 38

1    I'm not in the room where this is all happening.  So I don't

2    know, but I know that it puts people in a very difficult

3    position to argue about their theoretical rights when

4    there's too many variables that could impact what it

5    actually means for folks.  And you have to protect against

6    all possible outcomes.  And so I'm just trying to see if

7    there's anything that may -- other ways to look at this that

8    may unlock some common ground.

9              MS. VANLARE:  So I think, Your Honor, more time

10   obviously is more information.  I think what's important to

11   us is that again, we have a process in place that serves as

12   a backdrop.  We've tried very hard to streamline it.  We've

13   tried to be cognizant of some of the issues the FTX debtors

14   had raised.  You know, some of the -- we're talking about

15   balance of harm, some of the issues that were important to

16   them.  We've tried to do that in the process.  I think

17   again, what's key to us is that we continue, discovery

18   continues, that we have sort of schedule that we can fall

19   back on.  We can obviously continue talking to the FTX

20   debtors and thinking about other resolutions.  But it's very

21   important for us to maintain this timeline so that we can

22   estimate these claims.

23             THE COURT:  I understand the case needs to move

24   forward.  The specific timeline is less clear to me because

25   I think it's just less clear.  But again, cases don't move

1       forward unless you move them forward.  So your point is well

2       taken on that.  But I guess part of it goes to the fact that

3       it sounds like there's been a willingness to break out the

4       issues of the value of FTT and the solvency or insolvency of

5       any or all of the FTX debtors.  But that thinking along that

6       score stops short of any willingness to lift the automatic

7       stay to address those kinds of issues in the FTX bankruptcy.

8       I don't know if they're -- frankly, if they're amenable to

9       be parsed out that way.  And so I'm just sort of probing and

10      trying to look at the Rubik's Cube from different angles to

11      get a sense, a sense of things that if there's anything that

12      would essentially as you wish to move forward your case,

13      whether the debtors and FTX are able to move forward with

14      their case, at least on those issues.  And maybe this is a

15      question better for Mr. Dietderich and his team, including

16      Mr. Gluckstein, but I certainly wanted to get your thoughts

17      on that.

18              MS. VANLARE:  Your Honor if I may make just one

19      more point before you turn it over to Mr. Dietderich and his

20      team?  But in terms of the alternative, because that was one

21      of the things you had raised, the alternative to estimation.

22      We are concerned that the alternative would take

23      substantially longer.  We think, you know, the letter that

24      was filed yesterday proposes a six month litigation.  That

25      obviously is not guaranteed.  We think that, you know, if we

Page 40

1    were to include all of the issues that, again, we tried to

2    streamline or try to take off the table for purposes of the

3    schedule, if you were to include all of that, it is likely

4    to take substantially longer.  So I do think, Your Honor,

5    that there is information in the record as to what the

6    alternative would look like.  And again, it really is

7    untenable given our, our estates and the administration of

8    our claims.

9              THE COURT:  Well, I would appreciate a thought as

10   to what -- so I took the order to be we're carving out these

11   issues.  And then I took the chart attached to the letter to

12   be essentially a rough identification from FTX's point of

13   view, not your point of view necessarily that, that this is,

14   that these are the other issues other than the two that

15   you've carved out, which is the value of FTT and the

16   solvency or insolvency of the FTX debtors.  And so -- and I

17   understand and I'm sorry that this is so much prologue

18   before the question.  And I understand the timeline means

19   that the debtor's brief on estimation comes first.  You

20   propose that to be August 7th.  So that puts the marker down

21   to say here's what it is that frames the proceeding we're

22   going to have.  These are the issues that we are going to

23   essentially object to and we want to address the estimation

24   proceeding.  And so my question is this, Is the thought that

25   it's premature until that brief is filed to talk about what

1    the actual process looks like, whether it's a three-day

2    hearing, a one-day hearing, a two-day hearing, a 10-day

3    hearing, how many witnesses, what witnesses and that you

4    can't do that until you reach that point and you complete

5    discovery?  And so essentially, this is a partial schedule

6    leading through essentially briefing, but not necessarily

7    the actual estimation procedure that would appear in court

8    in front of me.  Is that, is that how I understand it?

9            MS. VANLARE:  I think we'd be open.  I mean, we

10   circulated this order to FTX debtors that are not engaged on

11   the on the schedule.  I think from our perspective, I don't

12   see this as a 10-day hearing.  As I mentioned, the issues

13   that are left just basically involve two expert witnesses

14   and factual discovery.  So whether it's one day or two days,

15   you know, I would, I think we may wait to decide that, but

16   that's the rough timeline.

17           THE COURT:  I guess the problem is I can't see

18   what, so what I have in front of me is sort of -- is an

19   incomplete picture.  So I have what's carved out and that's

20   of value, right?  That's of significance.  And then I have

21   the schedule, but I'm sort of left to kind of guess when you

22   say, oh, it's really only two, two experts and sort of

23   agreed upon facts.  I can't divine that from what I have.

24   And so I guess my thought is it would be helpful to actually

25   see it affirmatively stated that this is the intent is to

Page 42

1    litigate.  So that's why I keep making reference to that

2    chart that sort of says, well, here are some of the, here

3    are some of the issues, a new value, ordinary course,

4    collateralization, safe harbor.  I don't, I don't have

5    something that essentially says for purposes of this, Judge,

6    here's what we think this actually looks like.  That chart

7    wasn't for you.  It was in the context of negotiations.  I

8    get it.  So I don't feel free to divine anything from it

9    because you didn't offer it to me.  And so I guess my

10   thought is it would be helpful to have, from your point of

11   view, what you actually think the estimation hearing would

12   look like in terms of issues and witnesses because it allows

13   me to sort of get a handle on things.  Because what we're

14   doing, as I understand it, is saying, Judge, we think you

15   can estimate some things without some of these other issues.

16   And here are the issues we want you to look at.

17          And so that's fine.  But again, I think the only

18   thing I have really is that the universe of the issues you

19   want me to look at are everything other than the value of

20   FTT and the solvency or insolvency of the debtors.  I

21   suspect the truth is not quite that.  It's something

22   different.  And so I'd be interested in sort of an

23   affirmative statement of what you intend to do or maybe

24   something in the schedule that says here's the date by which

25   the debtors are going to come forward and identify the

1    issues that they wish to address in the estimation hearing

2    and what witnesses they think they would offer on that

3    issue.  So it might be -- that's why I asked before.  I

4    wasn't sure if the schedule was essentially, here's the

5    schedule idea we have thus far.  We know there are other

6    steps along the way.  And so that's why I was wondering

7    whether the submission of the debtor's brief is essentially

8    that kind of we're declaring what it is that the estimation

9    hearing would cover.  So sorry, that's a very long question,

10   but I'm just trying to sketch it out so you could at least

11   see what I'm thinking.

12           MS. VANLARE:  Yes, Your Honor.  And I think I'm

13   happy to do that.  And essentially, the chart that was

14   attached, I mean, that was our attempt in trying to be as

15   constructive as we could with the FTX debtors.  We don't

16   want to surprise anyone and we understand that in trying to,

17   to figure out a schedule that works, people need to know

18   what the issues are.  And so I think I'm happy to articulate

19   those.  I think our intent is to argue the collateralization

20   and under 547(b)(5), as well as the transfers of --

21   transfers that occurred from GGC to Alameda contemporaneous

22   new value under 547(c)(1), ordinary course under 547(c)(2),

23   subsequent new value, 547(c)(4) and the safe harbor defense,

24   546(e).

25           Again, I want to just be clear that that relates

Page 44

1    to the GGC Alameda transactions, but that is -- those are

2    the issues that we've outlined for purposes of the

3    estimation.  The chart that was attached does include

4    additional (indiscernible).  We have tried to streamline the

5    process and taken those out of estimation with the exception

6    of customer property under 541, which again, we think will

7    be taken out to the extent those claims are withdrawn, as I

8    mentioned, by the FTX debtors, which they state that they

9    were going to do.

10            So that leaves essentially the list of issues --

11   and some of them are affirmative elements, others are

12   defenses -- that would be part of the estimation proceeding.

13   As I noted, ordinary course defense is one that requires

14   factual and expert discovery.  We are well under way.

15   546(e), we intend to rely on expert testimony.  The other

16   issues are all legal in nature.  Assuming we have a sort of

17   a basic set of stipulated facts, which I think we can get

18   given our meet and confers.

19            THE COURT:  All right.  So following up with your

20   comments, then I think what it means is that what I'm

21   hearing is that Items 2, collateralization; Item 3,

22   contemporary new value; 4, ordinary course; 5, subsequent

23   new value; and 7, safe harbor are ones you've identified as

24   being part of an estimation procedure.  And that 1, solvency

25   and 8, are ones that are carved out by virtue of the

Page 45

1    language in the revised proposed orders as not being

2    covered.  And I guess that would then leave 6, which you say

3    might be mooted out.  And it would leave 9.  Am I sort of

4    understanding the lay of the land right?

5              MS. VANLARE:  That's right, Your Honor.

6              THE COURT:  All right.  And what would the

7    situation be with nine?  Would that be part of estimation or

8    something that you think may not end up getting there?

9              MS. VANLARE:  No, I don't, I don't think so.  I

10   think that will be something that we can handle through

11   stipulated facts.  I think we're largely there on that

12   issue.

13             THE COURT:  All right.  And so backing up from the

14   granular to ask the bigger question then is for purposes of

15   estimation, how should I think about this intellectually

16   speaking?  Is it an estimation where I am supposed to take

17   into a, I'm supposed to estimate what I think the defenses

18   are worth or the claim is vis-a-vis those defenses?  And

19   that what you're trying to do is say, well, we think that

20   once you consider these defenses, it'll lead to a

21   significantly smaller claim for purposes of -- or in your

22   view, no claim at all -- and so I won't need to reach the

23   other ones?  Like if you were to frame the issue, what is

24   it?  You just say, Judge, we just want you essentially to

25   estimate because we think the discounting of the claim based

Page 46

1   on these five identified bases will be sufficient for our

2   purposes?  Because obviously I'm not estimating the claims

3   per se.  I'm estimating the claims when I evaluate from your

4   point of view, these five defenses.

5             MS. VANLARE:  Well, I do think that the issue of,

6   you know, we could frame it as collateralization.  We can

7   frame it as the transfers that took place between GGC and

8   Alameda.  I wouldn't characterize that as a defense, but I

9   think they do go to the affirmative claims.  But to answer

10  your question, Your Honor, I do think that these defenses

11  and our arguments with respect to the affirmative elements

12  of these purported claims, we think are significant.  Again,

13  we think that these claims should be estimated at zero and

14  we think that there is, in terms of the -- we will present

15  arguments on those issues that may very well, we'd like you

16  to believe, we'll convince you to estimate them at zero or a

17  very small number.  We think that that may obviate the need

18  for us to go on to consider what we think are going to be

19  more lengthy, time consuming, and expensive issues.

20             We do, however, preserve our rights to pursue

21  those issues if the estimation proceeding does not result in

22  a claim amount that that is satisfactory to the debtors.

23             THE COURT:  All right.  I think those were all the

24  questions that I had.  I don't know if you have anything

25  else you wanted to add before, before concluding your

Page 47

1    presentation?

2           MS. VANLARE:  I don't think so, Your Honor.  At

3    this time, I'll just reserve my time to respond to anything

4    that the FTX counsel may say.

5           THE COURT:  All right.  So, so let me, before the

6    FTX folks dive into their presentation, let me ask you.  I

7    look at the clock.  It's, it's almost 1:20.  I don't want to

8    cut anybody off.  I do have a customer at two o'clock in a

9    manner that will be significantly less complicated than this

10   one.  And so, what I might suggest is taking a break and

11   resuming in an hour so that people cannot be cut off and

12   also don't have to survive without lunch.  But I'm, I'm open

13   to suggestions.  I've often powered through hearings and

14   skipped lunch entirely, but I've been told by my wife that

15   that's a terrible thing to do without consulting with

16   everybody else and recognizing that some people actually may

17   have medical conditions that require them to eat less they

18   have medical issues.  I don't want to make any assumptions.

19   So I think that question is really directed to FTX since I

20   think you're next up.

21          MR. DIETDERICH:  in Your Honor, Andy Dietderich

22   for FTX.  We will not contest your wife's position on the

23   issue.

24          THE COURT:  All right.  Well, that's, that's my

25   general rule of thumb.  So, all right, with that, let's take

1    a break to 1:15, I'm sorry, to 2:15.  As again, we have a

2    matter on at 2:00 that should be concluded by 2:15.  And

3    we'll resume with FTX's views.  And anything else before we

4    adjourn?  All right.  Thank you very much.  See you in about

5    an hour.

6            (Recess)

7                THE COURT:  All right.  With that, we will return

8    to Genesis Global Holdco LLC, a Chapter 11 case on for an

9    omnibus hearing and when we last left, we're getting ready

10   to hear from the FTX Trading debtors on the various -- on

11   the two issues, motions that we're discussion which is, one

12   is an estimation motion and the other is the motion to lift

13   stay.

14               So with that, I'll turn it over to counsel for FTX

15   Trading.

16               MR. DIETDERICH:  Thank you, Your Honor.  Good

17   afternoon.  For the record, Andy Dietderich with Brian

18   Gluckstein and Ben Beller for the FTX Debtors.  Thank you,

19   Your Honor.

20               We filed the lift stay motion, as Your Honor

21   knows, on May 3rd.  The hearing initially was delayed at the

22   Debtor request.  We're seeking relief from the stay in order

23   to liquidate our claim as quickly as we can.  We're the

24   plaintiffs.  We have no interest in delaying.  The Genesis

25   Debtors responded by filing an estimation motion.  This

Page 49

1   raises, I think as Your Honor summarized, two threshold

2   questions.  I'll characterize them as follows and hope this

3   is fair.

4           First, has the Debtor carried its evidentiary

5   burden to show our undue delay under 502(c) of the

6   Bankruptcy Code?  And second, if the Debtor has carried that

7   burden, how should this Court balance the harms between

8   using estimation to resolve the issues in dispute and

9   allowing the stay to be lifted to resolve the issues in

10  dispute in Delaware?

11          Now, Your Honor, respectfully, we believe the

12  first issue, the first question is dispositive today.  There

13  is no evidence of undue delay in the record before the

14  Court.  There's no witnesses, no declaration, no documents,

15  no facts.  We've heard some things from counsel about

16  timetable.  Much of this is new to us, constantly changing,

17  and all of it is speculation.  When will distribution

18  starts?  For that matter, when will the plan be confirmed?

19  When will mediation end?

20          THE COURT:  Well, but let me cut to the chase a

21  little bit in that we -- this is our second conversation on

22  this.  So as we all know from large Chapter 11 cases, you

23  can't turn the aircraft carrier quickly.  And so as I

24  understand the request, it's a request because it's made

25  now, because even if it's granted now it's going to take

Page 50

1    essentially months for things to actually get to a

2    conclusion.

3              And so one of the things I understood about FTX's

4    position in connection with this motion, without prejudicing

5    your other arguments, is that it seeks to trod upon issues

6    that were near and dear to the FTX's debtor's heart that you

7    thought were crucial, central, and should be litigated in in

8    the bankruptcy cases filed by FTX Trading in Delaware.  And

9    it seems that there has been a recognition of your concern

10   in seeking to back out.  I know they reserve their rights,

11   but let's put that aside for a second, the issues of the

12   value of FTT and the solvency or insolvency of the FTX

13   debtors and not seek to estimate those or address those in

14   the context of the estimation motion.

15             So I know that that's -- we're not talking about

16   undue -- we're not talking about the undue delay issue you

17   started off with but are there -- I'm just asking you about

18   the carving out of those things, putting aside the

19   reservation of rights.  Does that represent progress from

20   your point of view in the sense that the idea is to not

21   touch those and to touch more traditional issues that are --

22   would have to be addressed in this case, whether it's new

23   value or ordinary course or safe harbor defenses?

24             Does that solve at least partially your concern

25   about trodding in this Court upon issues that really should

1    be decided in the Delaware Court?

2            MR. DIETDERICH:  No, Your Honor.  It doesn't.  In

3    fact, it makes it worse.

4            THE COURT:  Well, that I have --

5            MR. DIETDERICH:  Cherry picking --

6            THE COURT:  I have hard --

7            MR. DIETDERICH:  Well, let me --

8            THE COURT:  Hyperbole aside, I have trouble

9    imagining it makes it worse, but go ahead.

10            MR. DIETDERICH:  Well, it's the -- well, in our

11    view, we should proceed with the adversary proceeding in

12    Delaware and litigate everything as quickly as we can.

13    Proposal from the Genesis Debtors is to effectively cherry

14    pick issues.  So we're denied --

15            THE COURT:  But the cherry picking issues you

16    identified is important to you.  So, and issues that I said,

17    can't you figure out what should be the lead dog here versus

18    the lead dog in Delaware; so I'm not going to blame people

19    for pursuing an intellectual exercise that I thought we were

20    all behind at the last hearing and that certainly I

21    encouraged.

22            MR. DIETDERICH:  Well, there's two.  There's two

23    problems, to be precise, Your Honor.  Right?  The first is

24    that the issues are not neatly divisible.  The FTT was

25    posted as collateral here.  So virtually all of the defenses

Page 52

1    raised relate to the very questionable decision to accept

2    FTT as collateral for a loan to Alameda.  So the valuation

3    of FTT relates to collateralization, relates to subsequent

4    new value, and it relates to really everything on that list.

5              THE COURT:  Well, but that's not the way it's

6    pitched in the list, which is attached to your letter, and

7    the list says for collateralization, anticipate factual

8    evidence that can be satisfied by stipulated facts.  Whereas

9    -- that's number two, whereas number eight FTT valuation

10   defense is one that I understand the Debtors are by virtue

11   of the amended order, agreeing that they don't wish to

12   proceed with in the estimation motion.

13             MR. DIETDERICH:  Your Honor, to be clear, this is

14   the Debtor's list.  It's not our list.  And FTT was posted

15   as list, it's not our list.  And FTT was posted as

16   collateral.  So the question of the value of FTT is the

17   question in whether or not the position was collateralized

18   or not.

19             THE COURT:  But if I take them at their word that

20   they're agreeing to not litigate the value of FTT at this

21   time, or the solvency or insolvency of any of the FTX

22   debtors, my thought is that while you could litigate those

23   issues as to the debtors by lift -- by having the stay

24   lifted here so that you can proceed in Delaware, certainly

25   those issues, no doubt will manifest themselves in other

Page 53

1    ways in that case, which you are free to litigate with or

2    without my lifting the stay because you don't have to ask

3    permission of this Court to do what you need to do in your

4    in your case in Delaware.

5           And that we'll see how those issues go and what's

6    decided here on things that aren't those issues and what's

7    decided in Delaware.  You're free to litigate those issues

8    in any other context in which you want and without fear that

9    this Court will somehow get in front of you on those issues.

10   And that's sort of the way cases that have similar issues

11   are litigated all the time.

12          MR. DIETDERICH:  So Your Honor, maybe -- perhaps I

13   can try to try to better understand the direction of Your

14   Honor's thinking.  The -- is a hypothetical, the stay is

15   lifted and we're proceeding to litigate selected issues in

16   Delaware --

17          THE COURT:  No, no --

18          MR. DIETDERICH:  -- and estimating selected issues

19   in front of Your Honor?

20          THE COURT:  No.  The idea is that the concern was

21   or one of the concerns was that the Debtors would litigate

22   here issues that really in your view should be litigated in

23   Delaware and those included, most prominently, the value of

24   FTT and the solvency or insolvency of any and all of the FTX

25   debtors.  And --

Page 54

1           MR. DIETDERICH:  I see.

2           THE COURT:  And that the Debtors have backed off

3    of that  They've reserved their rights, but frankly, I have

4    trouble imagining that this Court should ever be the lead

5    dog on those particular issues, given the centrality to the

6    FTX bankruptcy case.  But in any event, because it's better

7    to deal with practicalities than theoretical propositions,

8    that -- so the estimation would carve those out.  We

9    wouldn't cover them.  And that there's nothing about this

10   case that prevents you from litigating those issues in the

11   FTX case in Delaware.

12           What the stay would do is prevent you from

13   litigating it as to these Debtors, but I can't imagine that

14   the value of FTT and the solvency or insolvency of the FTX

15   debtors are issues that wouldn't have other vehicles in the

16   Delaware case for addressing those issues.  And that what

17   you're left then with is a much more garden variety problem

18   of what -- of estimation, whether it's appropriate on these

19   issues and we're not worried about the clash between the

20   bankruptcies.

21           So I realize my question sort of jumps to a

22   different issue than you started off with, which is not

23   undue delay, but rather the clash, potential clash between

24   the two bankruptcies and how to stay in our respective lanes

25   so that people can do what they need to do in their own

Page 55

1    bankruptcy cases, so that's sort of where I'm starting off.

2            MR. DIETDERICH:  Understood.  Understood.  I

3    understand now, Your Honor.  Thank you very much for that.

4    So it's really the question of the balance of harms and is

5    there a win-win here, but just to focus for a second on the

6    issues.  So on the Debtors' lists of issues, number two is

7    collateralization.  Virtually all of the collateral was FTT.

8    The issue on the valuation of FTT, if FTT is valued in the

9    way we're going to take the position that the loan is

10   uncollateralized, so the collateralization question is

11   entirely a function of how you value FTT when posted as

12   collateral for a loan to FTX.

13           THE COURT:  Well, I guess what I'm saying is there

14   may be moments that we would need to figure out the exact

15   permutations of what would go ahead in estimation here.  But

16   I understand from the order, the revised order that was

17   submitted, is that it's a statement saying that the Debtors

18   may assert any and all defenses available to them in -- as

19   against claims asserted for the present estimation, except

20   for, absent an order of the Court, those relating to the

21   value of FTT and the solvency or insolvency of any or all of

22   the FTX debtors.  So --

23           MR. DIETDERICH:  So --

24           THE COURT:  So it bumps up -- so my understanding

25   of that is if it bumps up against those issues, then we're

Page 56

1    going to have to have a conversation because those are

2    things that are being carved out.  Now, it may be that for

3    some of these potential defenses that are identified in this

4    chart, that there's a much more clear demarcation line,

5    right, so whether it's new value or ordinary course, and

6    that maybe collateralization does or doesn't.  Maybe the

7    parties as contemplated in this chart can actually reach a

8    set of stipulated facts, meaning I don't have to address the

9    issue and you can nonetheless address the collateralization

10   under 547(b)(5) here.  But if it bumps into it, my

11   understanding is the Debtors are saying we have no intent to

12   move forward with anything that bumps into these two issues,

13   the value of FTT and the solvency or insolvency.

14            MR. DIETDERICH:  Well, Your Honor, so you can take

15   that at face value.  The order, by the way, the order does

16   not say the value of FTT is off limits.  It says the value

17   of FTT is off limits in connection with withdrawals from

18   FTX.com, which is the exchange claim, not the loan claim.

19   The claim against GGC is the loan preference claim.  So

20   that's the claim for loans to Alameda.  There's nothing in

21   this order that makes the value of FTT off limits for the

22   loan claim.  I assume that's intentional because again,

23   virtually all of the collateral for the loan was FTT.

24            If the loan -- if FTT is valued at stock price at

25   the time of the repayment of the loan, the preference is

Page 57

1   very small.  If FTT is valued the way that we would value it

2   on the petition date for FTX, the preference is very large;

3   but I take Your Honor's point that --

4          THE COURT:  Well, let me back up there for a

5   second.  Are there other -- you've identified the

6   collateralization claim as one where you think the language

7   in that Subsection A may not solve your problem.  Are there

8   other ones that would fall into that category or is

9   collateralization sort of uniquely problematic from your

10  point of view?

11         MR. DIETDERICH:  I think collateralization and

12  contemporaneous new value are really different ways to say

13  the same thing, right?  Because there's an argument that --

14  I don't know how deep we should get into the merits, Your

15  Honor -- but there's the argument of contemporaneous new

16  value is we returned collateral to you and that collateral

17  had a value that went to the amount of the repayment.

18         The ordinary course defense has something to do

19  with FTT as well because the collateral for the loan was FTT

20  which of course was equity effectively in FTX.  So we need a

21  position among all of our FTX creditors in the Alameda loan,

22  all the similarly situated Alameda loan creditors, we need a

23  position on how to deal with ordinary course for people that

24  made a lending decision based on collateralization by FTT.

25         Subsequent new value is perhaps one of the few

1    that is independent, but I'm not even sure that's in

2    dispute.  So Your Honor is correct that you could identify a

3    few issues that seem to have more to do with Genesis than

4    with FTX, but on the basis of this list, I don't fully

5    understand what those are, but it goes to the second problem

6    with this, whether it is 0 percent or 50 percent of this,

7    that has to be held in reserve because it relates to these

8    core issues.  And again, we think all of it relates to the

9    core issues.

10           There's a heads I win, tails you lose element to

11   this because in ordinary civil litigation, we would tee all

12   of this up and we would resolve the issues.  What the Debtor

13   is proposing to the cherry pick particular issues and if

14   they win on those issues they win, we lose.  If they lose on

15   those issues, we're back at square one because we've made no

16   progress in our underlying litigation.

17           THE COURT:  Well, except that we've resolved

18   issues that need to be resolved.

19           MR. DIETDERICH:  Only negative to us.  We can only

20   lose in that process.

21           THE COURT:  Well, I don't know if it's negative or

22   positive for anybody until I decide it, so that -- the

23   cherry picking issue, I would offer this observation, and I

24   sort of was trying to get at it in my question before, which

25   is, if the agreement is -- I'm trying to understand the

Page 59

1    scope of the agreement.  But as I understand it now, there's

2    a certain caveat emptor quality to it, which is to say

3    Judge, we recognize we wouldn't be teeing up everything.

4          We would be teeing up these things for purposes of

5    estimating the claims.  We think that doing it that way, we

6    think will result in a number low enough -- their number is

7    zero; obviously, that's not your number -- that we could

8    then move the case forward and not have an issue.  But if it

9    turns out that that's not the case, they want to reserve the

10   right to then talk about the value of FTT or the solvency or

11   insolvency.  I understand those are core, much more core

12   issues to your case.

13         I have trouble wrapping my brain around this

14   being, this particular forum being the appropriate place to

15   be the first place to address that.  But again, my thought

16   is if the Debtors are willing to proceed with other issues,

17   however they work out, they work out and I can't prejudge

18   what the results will be.  But if it doesn't bump into the

19   core concerns in the Delaware case, if we can figure out a

20   way to do that, then it becomes a question of, well, is

21   there undue delay, is this an efficient way to deal with

22   things.

23         But certainly undue delay, the sheer size of the

24   claim when it comes to distribution, I haven't seen anything

25   that seems to resolve that as an issue for purposes of undue

Page 60

1    delay for distributions.  I recognize you need a plan before

2    you have distributions.  So, but at the same time, this

3    can't -- we can't throw together a schedule and say we've

4    just confirmed the plan.  Distributions are supposed to

5    happen.  The effective date is supposed to be in two weeks

6    and now we're going to litigate this in two weeks and that's

7    -- we know that doesn't really work.

8            So my question is whether I can find a way to

9    handle the estimation in an appropriate way that doesn't

10   infringe upon issues that in the first instance should be

11   dealt with in Delaware, and then we're faced with a more

12   traditional question about estimation, undue delay in the

13   context of the case, and then we can start talking about

14   schedule in the sense that these things ultimately will have

15   to be decided and we can start down the road and we can see

16   where we are.

17           Again, I favor trying to resolve these things with

18   practical solutions based on real issues and what's actually

19   going on.  So every day that the FTX case progresses and

20   this case progresses, things will become clearer as to what

21   does constitute undue delay, when undue delay becomes a

22   significant issue, and also what other things are being

23   litigated in your case in FTX that deal with the value of

24   FTT or the solvency or insolvency of the FTX debtors.

25           So, that's why I thought discovery should go ahead

Page 61

1    because discovery is, something's going to have to happen no

2    matter how any of this is parsed.  And that using this list

3    of potential defenses to the claims in conjunction with the

4    statement made in the revised proposed order, the question

5    is whether we can thread that needle.

6           Now, you're telling me it's not nearly as easy a

7    needle to thread as it may appear; that may be right.  I

8    don't -- you all are more familiar with it than I am, but

9    the question is whether we can actually do that so that the

10   issues that are central to the Delaware case are decided in

11   the first instance in Delaware.

12          Now, they may ultimately have to be decided here

13   at some point, all right.  There's -- I don't know, but

14   there seems to be no reason to make those the lead dog of

15   issues to decide in estimation and in fact, the Debtors at

16   least seem to be signaling that that's not their intent,

17   whether Subparagraph A goes far enough in your eyes, that's

18   a very legitimate subject of discussion.  I don't know the

19   answer because you all are far, much further ahead than I am

20   in terms of parsing out the details.

21          MR. DIETDERICH:  Your Honor, maybe I can -- let me

22   focus on the practical side from our perspective for just a

23   second because I agree with you that there should be a

24   practical solution here, one that allows the litigation to

25   proceed in the forum that, you know, seems mostly related to

Page 62

1    the issues.  So maybe as thought exercise, if this was not a

2    question of delay and distribution and it was simply a

3    question of where should an adversary proceeding be in a

4    preference action. that would normally be in the bankrupt

5    estate from which the preference emanates because the

6    preferences are, I think really an intercreditor issue

7    designed to put people in a similar, you know, position.

8           But there is this effect, a real effect on the

9    Genesis bankruptcy.  Our practical solution for that is to

10   do the merits litigation in front of Judge Dorsey in

11   Delaware because of the relationship between this claim and

12   the claim against the sister company GGCI.  GGC on June 30,

13   our bar date, put a claim into FTX's bankruptcy.  Even if we

14   were successful on the preference action, of course, the

15   result of that is a replacement claim that Genesis would

16   have into FTX, so it's kind of inherent in the claims

17   resolution process.

18          But to address the concern to agree or determine a

19   reserve that is a cap on our recovery in Genesis, and when

20   we proposed, and there was some confusion about that again

21   today.  Maybe I should just walk through exactly what it is

22   we propose in terms of a cap.  We propose a 30 percent

23   proportional cap on distributions and the 30 percent, Your

24   Honor, is simply based upon our reduced claim amount and

25   what little we know about the claims group.  That is subject

Page 63

1    to decrease as we learn more about the claims group, but the

2    30 percent is a proportionate reserve.

3            What does that mean?  That means that you can go

4    ahead and proceed, confirm the plan, go effective on the

5    plan.  All secured claims and all priority claims can be

6    paid without delay.  And to the extent there is money to

7    distribute, 70 percent of that money can be immediately

8    distributed without needing to take into account our 30

9    percent reserve.  So if there's a billion dollars to

10   distribute, there's $700 million --

11           THE COURT:  So the 30 percent is on the amount of

12   value left for unsecureds as opposed to the face value of

13   claims?

14           MR. DIETDERICH:  Exactly.  It's a distribution.

15           THE COURT:  All right.  That's not how I --

16           MR. DIETDERICH:  It's a distribution.

17           THE COURT:  That's not how I think Ms. VanLare

18   read it and when she pointed it out, I understood her

19   concern.

20           MR. DIETDERICH:  And so the question is --

21           THE COURT:  That's a very practical way of

22   approaching the problem.  So I don't -- so I think the

23   parties have made have made significant progress in trying

24   to frame different avenues for resolving the friction

25   between the party's interests.  I -- one of the reasons I

1    ask you all to sit down and meet and confer is because some

2    of this is a matter of negotiation, right?  And I have

3    learned in this Court, my time in this Court, that there are

4    certain times when I am not helpful in terms of that and I

5    don't want to look like I'm ganging up on one side or the

6    other.

7           My comments try to -- I try to generate those from

8    the legal problem I have in front of me and what the case

9    law says.  So here, I guess that's a conversation worth

10   having because certainly that's not -- that's a significant

11   difference in how Ms. VanLare understood that statement in

12   the letter, because it does talk about claims rather than

13   amount.  And so I don't know the answer to that and that

14   probably is a question and a conversation to have in the

15   first instance with the Debtors to see if there's a way to

16   thread that needle.

17          What I understand to be is the concern is about

18   the delay in this case that will be -- that will occur by

19   the sheer size of the FTX claims and that seems to be fairly

20   self-evident, not at all sort of subject to spin.  It is

21   what it is.  The claim is what it is size-wise and that will

22   stand in the way of distributions, even if perhaps not in

23   the way of the plan.

24          So I don't know if there's a difference in

25   attitude about reserves being based on the amount of money

Page 65

1    available as opposed to the amount of claims.  I'm happy to

2    give the parties a chance to talk about that.  So I don't

3    know what else I can say or how else I can move the needle

4    forward on that.  I don't want to put Ms. VanLare on the

5    spot necessarily, because I think that's a -- she can

6    confirm for me in the head nod if that's a significantly

7    different way of reading that sentence in the letter than

8    how she understood it.

9            MS. VANLARE:  Your Honor, if I could respond to a

10   few of the points.  So I think it is different than what the

11   letter says.  It nevertheless is a very, very high number

12   that -- so I think that our position as to the undue delay

13   would be the same, but I did want to just clarify --

14           THE COURT:  Well, frankly, it shouldn't be the

15   same though.  I'm not saying it's dispositive of the issue,

16   but it is a significantly different situation.  When you can

17   pay off everything that's priority secured and then you can

18   pay off 70 percent of the money available to unsecureds, in

19   cases you often have distributions over time.  Right?

20   That's a fact of life.

21           So again, I don't want to put you on the spot, but

22   I do think it's a significant difference from how I read the

23   letter.

24           MS. VANLARE:  I agree with that, Your Honor.

25   Obviously, 30 percent is lower than 100 percent.  So that's

Page 66

1    true.  But if it -- my point was that even than 30 percent

2    is very high in this case and it raises, as I mentioned

3    earlier, a host of issues that you don't have in other cases

4    having to do with the type of assets that we have, the fact

5    that we are seeking to make in-kind distributions, the fact

6    that these are dollar claims.  We have different types of

7    digital assets and other types of assets.  So it just, it

8    raises complexities and issues that other cases may not

9    have.  That's --

10            THE COURT:  Well, each case, they're like

11   children.  Each has its own set of concerns and issues and

12   that's fine and we'll work through them.  But again, I see -

13   - the conversations we're having on these motions are

14   distinct but related.  One is about undue delay in this case

15   and the other is about not unnecessarily interfering with

16   each other's bankruptcy cases.  And so I think by trying to

17   identify things that you weren't going to address, I think

18   you were trying to significantly address that and maybe we

19   can reach a resolution on that and maybe estimation works.

20            At the same time, if there's a way to address the

21   undue delay component by reaching an understanding about how

22   a reserve would work because the FTX Debtors care enough

23   about having the Court in Delaware where their case is

24   pending, be the Court that addresses issues like the value

25   of FTT and the insolvency issues.  Then you know, that's a

1    bit of a horse trading conversation that I'll let you all

2    have.

3           So let me do this.  Let me hear anything else that

4    Mr. Dietderich wants to say and then I'll loop back.  I know

5    Mr. Shore hasn't been heard either, so --

6           MS. VANLARE:  Yeah --

7           THE COURT:  I'll loop back to you, Ms. VanLare, as

8    soon as Mr. Dietderich is done.  So Mr. Dietderich.

9           MR. DIETDERICH:  Sure.  To reiterate, Your Honor,

10   is kind of where we started to put it all together, which is

11   to say that where it stands now, what we're proposing is to

12   lift the stay and we pay 30 percent (audio drops) reserve

13   based on the amount distributed.  So set up all secured and

14   priority distribution can be paid immediately; 70 percent of

15   everything else can be done immediately; and the reserve is

16   funded effectively as distributions are made.

17          And that reserve, of course, is no longer

18   necessary to litigate the merits which again, we were

19   committed (audio drops) basis in front of Judge Dorsey.

20          THE COURT:  Well, again, I understand so.  So I'm

21   going to try to push everybody towards the middle here in

22   the sense that that's my job, right?  In the sense that --

23          MR. DIETDERICH:  Of course.

24          THE COURT:  -- if issues about the reserve can be

25   resolved and free up a certain, resolve a certain level of

```
 1    urgency, if not all, but not necessarily all the urgency,

 2    that doesn't necessarily change the fact that the Genesis

 3    Debtors are going to say there are certain things that

 4    should happen here because they are claims adjudication for

 5    -- that should happen here.  And so -- and that's where I

 6    think we get into the issue of trying to, if we can, figure

 7    out what lanes this case should stay in versus some lanes it

 8    shouldn't.  I understand that you don't view the defenses as

 9    cleanly as the Debtors do in terms of the value of FTT and

10    the solvency or insolvency.  At the same time, I don't think

11    we've reached the end of the road on that.

12             There certainly seems to be a more nuanced

13    discussion to be had among the parties as to how we might

14    address those things and we certainly need a process to deal

15    with claims adjudication.  One potential -- and I'll throw

16    something else into the hopper because we don't have enough

17    -- which is, if there is a way to essentially figure out an

18    appropriate lane, you might skip estimation altogether and

19    just resolve certain claims issues.  And -- because if

20    they're more narrow and they're dealt with -- and they're

21    legal issues and they're dealt with unstipulated facts that

22    we might just be able to do them promptly.

23             But again, I don't know because you're more

24    familiar with what the litigation might look like.  So

25    anything else that you can offer in terms of wisdom,
```

1    particularly on the issue of working with the language

2    identified in paragraph -- I think Subparagraph A is the one

3    where the -- where we've got the flash points.  I don't

4    think anybody has really spent a lot of time disagreeing

5    about the solvency or insolvency of the FTX debtors as to

6    where to draw those lines.

7              But for the value of FTT, any other wisdom about

8    the --

9              MR. DIETDERICH:  Yeah --

10             THE COURT:  -- defense as to --

11             MR. DIETDERICH:  Your Honor, we will certainly

12   continue to consider that very carefully, Your Honor.  My

13   initial reaction is we have a lot more flexibility on the

14   amount of the reserve than on separating out particular

15   elements of preference claims from the main FTX case because

16   all the creditors are similarly situated with respect to

17   these same questions.  Even ordinary course is fundamentally

18   a question of what's in the ordinary course where the debtor

19   would have -- GGC would have to show what's in the ordinary

20   course of FTX.

21             THE COURT:  But you know, there -- so let's

22   default, though, to the general rules of the road.  There

23   are lots of cases where similar issues are decided in

24   different Courts.  That happens.  And a certain amount of

25   that is contemplated by the federal system and there are

1   rules of construction and rules about res judicata,

2   collateral estoppel, about what can actually be -- people

3   can be held to and what they can't be held to.

4           And so there very well could be, and it sounds

5   like there likely will be issues that come up in this Court

6   that come up in other cryptocurrency cases where judges are

7   asked to confront similar issues that might have spill-over

8   but won't be dispositive of the issues and judges may come

9   to similar conclusions or different conclusions.  And some

10  of those opinions will then be persuasive or not persuasive,

11  and so I don't know that we can fix that.  I don't think

12  there's necessarily going to be a way to hermetically seal

13  the two cases.  What I --

14          MR. DIETDERICH:  I understand, Your Honor, but I

15  do think there's --

16          THE COURT:  One more thought, though, is that I

17  think there are, in the interest of good judgment and

18  discretion, things that should be issues of prominence in

19  one case versus the other case, and so we've identified to

20  the value of FTT and solvency or insolvency.  And I think

21  the devil's in the details as to how we parse those out.

22          But from what I have seen, those are issues near

23  and dear as they should be to the FTX debtors and that those

24  are issues that if you were to think about it from a purely

25  theoretical point of view, that if you could isolate them,

Page 71

1    they should be in Delaware.  But I can't promise that every

2    aspect of every defense is going to be entirely devoid of

3    interest to people who have other cases.  That rarely is the

4    case anyway.

5            MR. DIETDERICH:  There also are cases, Your Honor,

6    to pick up on the idea, where the reserve is effectively

7    probability weighted, right?  The estimation is used to

8    probability weight a reserve.  That's been done in a couple

9    of cases with appeals, for example.

10           But let me just return to the, I think, the most

11   important point is, you know, from our perspective, which

12   goes back to the question of the Debtors' burden to show

13   undue delay or the estimation power is used, a threshold

14   issue for the use of the estimation power is undue delay.

15           So in our view at a 30 percent proportional

16   reserve, there is no undue delay.  If there needs to be a

17   smaller percentage reserve for there to be no undue delay,

18   we are totally open minded.  But you know, what we I think

19   the next step, of course, is discussions with the Debtor and

20   we'll participate with those, you know, actively and we have

21   flexibility.

22           But if we don't have an understanding, we do think

23   the next step that, you know, subject to Your Honor's view,

24   is probably an evidentiary hearing on the question of undue

25   delay.  So we can test this evidence about the timing of

Page 72

1    their case and distributions and everything.

2           THE COURT:  There are a lot of next steps.  I

3    don't know that that's the next step, but we'll get there

4    when we get there.

5           MR. DIETDERICH:  Thank you very much.

6           THE COURT:  All right, thank you.  So let me hear

7    from Ms. VanLare to respond sort of directly to things and

8    then I'll hear from Mr. Shore to weigh in on behalf of the

9    Committee.

10          MS. VANLARE:  Thank you, Your Honor.  So two

11   points.  First just -- I just want to clarify our thinking

12   of value of FTT.  Some of the things that, that Mr.

13   Dietderich said and I just want to make clear it's in the

14   record.  So first, it's, FTT is a significant portion of the

15   collateral of what was returned to Alameda.  It is not

16   solely FTT.

17          Secondly, our intent was, as you, Your Honor,

18   noted in the order, to limit our ability to raise that as a

19   defense to the FTX.com withdrawals.  I think we intend to

20   reference the value of FTT in the context of our defenses

21   vis-à-vis the GGC Alameda transactions.  But we do not need

22   to have a trial on the "real value" of FTT on any given

23   time.

24          In other words, I think we can reference the value

25   as of a certain transaction without needing to have a full-

Page 73

1    blown evidentiary trial on what the right value is.  And

2    that is the thing that we wanted to take off the table.  And

3    as to --

4              THE COURT:  So let me just -- I'm going to try to

5    address them as you raise them.  The short answer is, I

6    don't know.  I mean, Mr. Dietderich had a very colorful face

7    that he just made when hearing that.  I really don't know,

8    because there are times when folks say for purposes of this

9    exercise, the parties can agree the value isn't below X or

10   isn't above Y or falls into this range and therefore we

11   don't need to go any further.

12             You all are much closer to it than I am, but there

13   are other times where it's the problem of being a little bit

14   pregnant.  You either -- you're either discussing it or

15   you're not.  And I don't know.  You're going to have to

16   inform me and that's conversations that I'll ask you to have

17   using paragraph -- Subparagraph A as a sort of a launching

18   point to see if you can reach some sort of understanding.

19             The other thing I would say in the context of

20   reaching an understanding is in large cases, it is often

21   done, as you know -- again, I'm not telling you anything you

22   don't know -- that people say, Judge, there's a million

23   things we could talk about, but we -- three should be on

24   your radar screen and you should do these three in this

25   order and we might not even get to number three depending on

Page 74

1    what happens with number one, number two and other issues.

2         And so again, I urge people to think about this

3    practically so that we can avoid sort of theoretical fights.

4    And it may be that we say everybody agrees or Judge, this is

5    our suggestion about what should happen in the next two

6    months, three months.  We should tee up these issues,

7    resolve these issues, leave those alone.  We might fight

8    about them later, we might not.  And so if I wouldn't have

9    ordinarily suggested this in the context of an estimation

10   because normally you're estimating a claim.  At the same

11   time, the Debtors have suggested that jeez, we are okay with

12   having you take a look at estimation for purposes of certain

13   issues and not others.

14        So I throw that out there to the extent that the

15   passage of time may moot out, alter, or you know, the issues

16   that we have to get into and what those concerns look like.

17        MS. VANLARE:  My only point, Your Honor, is that

18   spot value of FTT is a fact we can argue and it's a legal

19   question as to the relevant timing of that value, and that

20   can be decided without necessarily going into and having a

21   large evidentiary process.  Again, we can limit it to a

22   legal discussion as to the timing of the spot prices,  they

23   may have a different view and we can address that.

24        THE COURT:  Yeah, but --

25        MS. VANLARE:  But I don't think we -- (audio

Page 75

1   drops) to clarify is that we're not waiving those types of

2   arguments.  But again, I think it's consistent with our

3   general position is that we can make those arguments on this

4   timeline that's consistent with estimation.

5           In terms of some of the other points, I mean, I

6   fundamentally disagree with how the legal standard was

7   proposed.  Again, I think on the stay, they have not met

8   their burden on lifting the stay, so I think the -- under

9   the Second Circuit standard, the stay should not be lifted.

10          I think on undue delay, we have met our burden.  I

11  think we've shown there's enough in the record here that's

12  sufficient for Your Honor to make those findings.  And I

13  think that again, in their own letter and in their own

14  papers, I don't think there's any dispute whatsoever.  To

15  the extent there is, again, it's party admission.  It's all

16  in their filings that allowing this process and the full

17  litigation to unfold will be substantially longer.

18          I think we are not opposed, obviously, as we've

19  always shown.  We're not opposed to continuing discussions

20  and having meet and confers and including on the reserve

21  issue.  I think so far, the letter that was filed yesterday,

22  that does not work for us.  We're happy to continue

23  discussions, but what we are kind of running against the

24  clock of trying to maintain our confirmation timeline and so

25  my concern is that we continue those --

1          THE COURT:  We don't -- yes and no.  We don't

2    quite have a confirmation deadline because we don't have a -

3    - we don't have a significant component yet.  Right?  Again,

4    I'm not trying to rain on your parade, but the further the

5    extension of the mediation period is a significant thing and

6    some issues have to get resolved.  So I understand the need

7    for haste and I'll take it that way and I understand the

8    size of the claim means that unless there are agreements

9    about how to deal with -- that obviate that kind of a

10   concern that it will stand, the claim as filed stands in the

11   way of distributions.  So I get all that.

12          MS. VANLARE:  I think that's right, Your Honor.

13   We do have a plan on file.  We hope to reach a consensual

14   resolution, in which case we'll amend it.  But as it stands,

15   we do have a plan on file.  We have a disclosure statement

16   hearing.

17          THE COURT:  I understand.  Everybody always has a

18   plan on file.  I get it.  I get it, but it's -- there's a

19   mediation going on that is significant as to what funds will

20   be available.  And so that's certainly of significance and I

21   don't know how, you know, what that number is or even the

22   range of that number.  I would think it's relevant to

23   disclose to creditors voting on the plan.

24          So again, I get it.  You're trying to move things

25   and we'll, as always, do our best to do that.  But I -- just

1    like we talk about DIP financing and timeframes that lenders

2    want, I get it, we need to go quickly.  But I'm not signing

3    onto the self-professed deadlines necessarily that are baked

4    into the existing plan because I just don't think I know

5    enough.

6           So again, I understand the need.  I'm not trying

7    to have this case delayed.  But we'll do -- we have to work

8    through these issues.  And you all have starkly different

9    takes on how to do that.  I think there is something in the

10   middle that at a certain point, I'll just order if I -- if

11   people can't get to the middle themselves that sort of

12   resolves some issues of undue delay in several different

13   ways and I think -- and by having people stay in their

14   lanes.

15          But Ms. VanLare, what else would you like to

16   address before I hear from Mr. Shore?

17          MS. VANLARE:  Your Honor, why don't we hear from

18   Mr. Shore.  I have nothing else.

19          THE COURT:  All right.  Mr. Shore.

20          MR. SHORE:  Thank you, Your Honor.  Chris Shore

21   from White & Case on behalf of the Official Committee.  Let

22   me start by this.  It sounds like what's going on is people

23   do have a lot of discussions to have and the Committee is

24   not advocating that the Court resolve the motions today,

25   either the lift stay or the setting of the estimation

Page 78

1    procedures.

2            But I would like to clarify a few points.  With

3    respect to the mediation, there is a plan on file which take

4    -- which distributes all of cash and crypto out on the

5    platform on the effective date and puts any litigation

6    against DCG and the related parties into a liquidating trust

7    to be dealt with after the effective date.  The Committee is

8    supportive of that plan.  That is the plan on file and if it

9    changes, that'd be great.  That would mean that there is a

10   settlement which is supported by the Debtors and the

11   Committee to allow for an increased distribution.

12           But right now, the status quo is we have X amount

13   of cash and crypto to distribute and that's what people are

14   going to get on the effective date.  So reserves have an

15   actual more deleterious effect on distributions in the

16   current status quo.  The mediation would be an improvement

17   upon that and I get it.  It would be something that the

18   parties would need to talk to and see if we can't find a way

19   to resolve it, if we have more value to distribute.

20           The Committee does agree with the Court and has

21   from the beginning about the aircraft carrier analogy.

22   Look, I don't think that FTX can claim that an estimation

23   process is trodding on their due process rights and then

24   advocating that you can't decide estimation procedures until

25   there's only two weeks until distributions.

1          That does not seem workable and there's got to be

2     a way the parties can agree on the processes or FTX is just

3     going to have to waive its arguments that their due process

4     is being violated because they were given an opportunity to

5     get ready for this hearing and decided that they wanted to

6     stake it all on an undue delay trial, it sounds like.

7          More substantively, though, Mr. Dietderich has the

8     -- mastered the art of saying that sounds something

9     reasonable on the surface, but the substance would

10    effectively undermine the entire case and put him in a

11    position where he could dictate when and where the Debtors

12    exit.  He and his army know full well the plan on file and a

13    critical component of the plan on file, which is the same

14    issue facing the FTX debtors, is providing creditors in-kind

15    distribution.

16          Debtors have cash and various crypto coins to

17    distribute.  And we're trying to come up with a plan largely

18    for tax reasons that provides people back an in-kind

19    distribution of what they put on the platform.  What he is

20    proposing, a billion dollars of cash, $800 million of cash

21    being put in the account, would effectively prevent the plan

22    from going effective because people would not be able to get

23    an in-kind distribution or it would disproportionately

24    affect one group of creditors over another.

25          So if it was all to be in cash, for example, the

Page 80

1    crypto creditors could get their in-kind distributions and

2    less of their cash, but people who will have in-kind cash

3    claims can't get their cash back because it's all tied up

4    with FTX.  So his saying, all I want is a $800 million

5    reserve or four, whatever it's going to be, 30 percent of

6    distributable value, is his way of saying I want the keys to

7    the exit, at which point I will have a better platform from

8    which to negotiate.

9          That is why the Committee has been supportive of

10   an estimation process.  We have to have a way in which, in

11   order to get this plan done and to do what the plan is

12   committing to do and what the creditors will be voting on, a

13   way of cordoning off the FTX plan.

14         And that is not just, let's just take the total

15   amount of value that we could get in this process, that is,

16   if our claim were allowed in full, but rather have the Court

17   take the issues that are outstanding.  Look at them, and say

18   my view based on what has been presented to me is the FTX

19   debtors have a X percent likelihood of getting to that

20   number.

21         It is a right under the Bankruptcy Code and we are

22   given statutory authority to do so and it just reflects the

23   fact that sometimes you can't wait around for an extended

24   full-blown claims litigation issue, for example, FTT

25   valuation.  It's not like Mr. Dietderich has promised, that

```
 1    issue is going to be resolved by October.  It's just the

 2    issue is going to be resolved in my case.  So it holds up

 3    all of our distributions until that issue gets resolved.

 4              So we need to have, we are supportive of a process

 5    that allows the Court to look at issues and say, based on my

 6    view of the record before me, this is what I believe an

 7    appropriate reserve is.

 8              THE COURT:  Am I understanding correctly, by

 9    virtue of the appearance of this language in the proposed

10    order, that the Committee stands behind the Debtors' attempt

11    to navigate the line as to what should be here versus what

12    should be in the first instance addressed in Delaware cases.

13              MR. SHORE:  Correct, but with one modification

14    with respect to the procedure.  I don't think it's cherry

15    picking, any more than a summary judgment motion is cherry

16    picking.  The federal rules or in this case, the code,

17    provide a basis for people to cherry pick to say even if

18    everything else is true, all these facts in dispute are

19    viewed in the light most favorable to the nonmoving party,

20    you're still not getting there.

21              THE COURT:  Well --

22              MR. SHORE:  That is that --

23              THE COURT:  Well, my view on that is that it's one

24    thing if it's cherry picking in the sense that it's a sort

25    of dishonest rendering of how something affects another
```

Page 82

1    case.  But -- and that's sort of been my concern.  So that's

2    why we've been focusing on the value of FTT and the solvency

3    issues.  But if we can navigate that, you certainly can

4    cherry pick.  Essentially your -- I should put that in air

5    quotes.  You're certainly giving something up, right?

6              You could say, well, Judge, we really want to be

7    able to assert all of our defenses, but we recognize that

8    there are other things that we have no control over that

9    dictate that really isn't possible or appropriate here, and

10   so we're willing to say, like on summary judgments, if you

11   make the following rulings, we can live with that and if it

12   ends up at the end of the day, whatever the rulings are,

13   they are.  And there are issues that have been put in the

14   rearview mirror for purposes of the case and the parties.

15   So, however it ends up, it's progress.

16             MR. SHORE:  And then once that, from a timing

17   perspective, my -- our view, the Committee's view is that

18   then we address the issue of okay, we have now set the

19   reserve.  It is at X.  It's going to have to be at a number

20   that allows the plan to go forward, but as long as it's X

21   minus in that case, then we can address the issue of where

22   and what issues get resolved where.  We'll have a much

23   better view with respect to the progress of the FTX case,

24   the timing of any of these determinations.

25             Maybe the Debtors will have started procedures.

Page 83

1    The FTX debtors will have started procedures to look at

2    those issues.  We may have rulings on it.  There may be a

3    whole host of factors that would cause the Court to

4    determine that these substantive issues, once the cap is set

5    for distribution purposes, they get solved here in this way

6    and maybe we can work it out.

7            But what we can't do from the Committee's

8    perspective is just say, we're going to have these, we're

9    turn over the cadence of this case to the FTX debtors case.

10   That doesn't work, nor can we have a world in which

11   creditors are prejudiced by the reserve mechanics in a way

12   that that causes it so we can't make distributions at all.

13   Fairly certain that the number that they capped at was

14   designed to make it impossible to get out and we may be able

15   to resolve with them at a later date what that cap is.

16           We're certainly willing to participate in that

17   process, but there are some practical realities behind the

18   central plan mechanic which are causing Committee to support

19   the Debtors wholeheartedly in seeking to set up an

20   estimation process so that, as Your Honor posited, we get

21   to, you know, a confirmation hearing, effective dates

22   projected to be in two weeks, and we got to then come up

23   with a set of procedures that allows us to get that issue

24   determined.

25           THE COURT:  All right.  Thank you very much.  And

1    Ms. VanLare, I think you were letting Mr. Shore go in case

2    you sort of needed to bat cleanup on comments.  Anything

3    else that you wanted to address?

4             MS. VANLARE:  No, Your Honor.  I'd like to just,

5    if I could have an opportunity at the end, but it sounds

6    like Mr. Sazant has something to say as well.

7             MR. SAZANT:  Thank you, Ms. VanLare.  Just real

8    quick, Your Honor.  Unsurprisingly, the Ad Hoc Group stands

9    fully behind the UCC on this and we're complete -- in

10   complete alignment with -- I don't want to belabor the

11   point.  Mr. Shore put it adequately.

12            But one thing I'd also like to emphasize is the

13   detrimental impact that a reserve may have in a situation

14   where we're trying to distribute cryptocurrency assets and

15   digital assets to creditors to repay them in kind and as a

16   reserve is held in most likely in dollars in an inflationary

17   environment where these cryptocurrency assets are increasing

18   in price, we -- the Debtors' estate will be able to purchase

19   and rebalance and acquire less digital assets to distribute

20   to creditors who will ultimately have lower recoveries

21   because of it.

22            And so there, there's a severe detrimental impact

23   to any delay and we just want to emphasize that.  Thank you,

24   Your Honor.

25            THE COURT:  All right, thank you very much.  Any

```
1    other --

2              MR. DIETDERICH:  Your Honor --

3              THE COURT:  Any other party that wishes to be

4    heard who hasn't been heard at this point?  All right.  So I

5    realize there are different motions.  So there's no,

6    everybody sort of -- but we, the issues have sort of melded

7    together.  So I think I have a pretty good idea of

8    everybody's position at this point.

9              Is there anything else that's new that somebody

10   needs to add, again recognizing that I have read and reread

11   your papers a number of times and we've had an extensive

12   discussion here this afternoon.

13             MR. DIETDERICH:  Your Honor, Andy Dietderich.  I

14   would like to just respond very briefly to Mr. Shore on two

15   points, if I may.  Is that okay, Your Honor?

16             THE COURT:  Go ahead.

17             MR. DIETDERICH:  Okay.  So first, just one

18   observation, importantly.  FTX is, if we're correct, a

19   creditor as well.  In fact, if we're correct, we're actually

20   the largest creditor in Mr. Shore's constituency and this

21   shouldn't be us versus him.  But more importantly, the whole

22   idea that we're struggling for and we're struggling in the

23   dark here from outside because we -- a lot of these

24   conversations we haven't been party to.  We're struggling

25   for a way to establish a reserve that doesn't cause undue
```

Page 86

1    delay.

2             There will be claims reserves in this case.  We

3    have no position on exactly how to fund it in kind or in

4    cash or anything else and we're happy to sit down and work

5    through a reserve that allows immediate distributions of

6    substantially all the value in the case and does so in a way

7    that's consistent with any plan structure that the Debtors

8    and the Committee and Ad Hoc Group take it.  I just want to

9    reiterate that.  So thank you, Your Honor.

10            THE COURT:  All right.  Thank you.  All right.

11   Anything else that's new from any party?

12            MS. VANLARE:  Your Honor, I would just, if I may,

13   just reiterate the point that I think again, we are open to

14   continuing discussions.  We're open to continuing, in fact,

15   you know, anticipate doing so, engaging in meet and confers.

16   Our concern is that we want to make sure that we are not

17   left with, you know, a week before confirmation and nothing,

18   no progress has been made.

19            So what is important to us is to be able to

20   maintain the discovery schedule so that we are progressing

21   on that as a backup.  In the meantime, we're more than happy

22   to continue to meet and confer to try to narrow issues and

23   so we're fine with doing that, if it means that we adjourn

24   further, so long as we can continue again with -- in the

25   process of the meet and confers and trying to progress on

Page 87

1    the discovery, that works for us.

2         THE COURT:  All right.  Thank you.  So a couple of

3    parting thoughts.  I'm not going to rule on either motion

4    today, but I will give you some further thoughts to expand

5    on our conversation and where we were last time.  I -- each

6    party talking here whether it's the Genesis Debtors or the

7    FTX debtors, has things that are near and dear to its heart

8    for purposes of its bankruptcy case.

9         The Debtors here do not want to cede control of

10   their case and the schedule to what happens in another Court

11   and another forum.  That's understandable and that's exactly

12   what the stay exists for, right, to protect a Debtor, to

13   allow a Debtor to figure out what's going to happen in its

14   own case without having that all being driven by litigation

15   occurring elsewhere.  And so while there's a lot of unusual

16   things about this case, that's a fairly traditional kind of

17   a concern.

18        On the flip side, FTX is understandably concerned

19   about certain issues being litigated outside of its

20   bankruptcy case in Delaware that seem to be most

21   appropriately determined there, whether it's the value of

22   certain kinds of cryptocurrency, FTT, the insolvency of

23   those debtors, and that seems to be a legitimate concern as

24   well.  So how that plays out in the context of these motions

25   is yet to be decided.  It's clear that the parties have had

Page 88

1    extensive discussions.  I appreciate that.

2            It's clear that there are a lot more -- I can see

3    that by virtue of the amount of additional meat on the bones

4    that is before me today that wasn't before me the last time

5    we got together, whether it's the additional language in the

6    proposed order of the Debtors talking about carving out

7    certain issues to not be determined here; whether it's the

8    Debtors' potential defenses to the claims, their list and

9    exactly how they think that would look in litigation; or

10   whether it's the FTX debtor's list of issues that they have

11   worked through and have thoughts on that goes on for some, I

12   think six pages or so.

13           So for purposes of the estimation motion, I do

14   think there has been progress made.  I think there is a

15   loose framework that was walked through by Ms. VanLare and

16   talking about the potential defenses and what she envisions

17   going forward.  I think it is not inappropriate for a Debtor

18   to say, Judge, we're willing to go ahead with estimation on

19   certain issues and not others.  We recognize that may not be

20   exactly what we want, but we're willing to do that and we'll

21   take the cap that comes out of that.

22           And if regardless of the result there, it would

23   mean that certain things, progress had been made.  So I

24   don't think it only works if the claim is somehow reduced,

25   it just works because issues will have been teed up and

1    decided under an estimation rubric.  I do think there's more

2    work to be done in talking about Subparagraph A and the

3    value of FTT and what that means or doesn't mean for a list

4    of the potential defenses.  You all, I'm not close enough to

5    it to make intelligent determinations or comments.

6           And I can't, as they say, in pool, I can't sort of

7    see the shot.  I can't conceptualize what navigating the two

8    competing concerns on that would look like because I just

9    don't know enough.  But you all do.  And I'm not saying that

10   you can reach a conclusion.  Maybe it's irreconcilable.  I

11   don't think we're there yet, given that the proposed order

12   was filed yesterday, the letter was filed yesterday.  I

13   think there's still discussions to be had about that.

14          I think in the meantime, I think there's no reason

15   to not go ahead with the schedule that's been laid out that

16   gets us up through discovery and talking about the

17   identifying of experts and completing fact discovery.  There

18   may be tweaks that somebody wants to propose to it.  And

19   because I realize it's been sort of a moving target and

20   we've had a lot of conversations and I'm certainly open to

21   that, but my takeaway would be that it -- discovery should

22   move forward.  It should move forward promptly.

23          And as you figure out what needs to be done, you

24   may decide to come up with a tweaked schedule that has

25   additional milestones or deadlines or details on it or that

Page 90

1    tweaks a particular deadline here or there.  But I don't see

2    any reason why that shouldn't move forward because that

3    discovery, whether we do an estimation hearing or hearing on

4    the merits of something, whether it -- litigation is here,

5    Delaware, anywhere, it all -- it has to be done.

6             So there's really -- I can't see that there's any

7    prejudice by any party to proceed with discovery.  If

8    somebody wants to tweak it, you know, you want to talk about

9    it and if there's a discovery dispute, we can have a call

10   and that's fine, but I don't want to micromanage the

11   discovery schedule that I've got.  I have it in front of me.

12   Discovery should move forward, period, and if it looks

13   different than the particular deadlines here, you all can --

14   we can have a conversation and figure out what it should

15   look like.

16             As for these issues, particularly the -- so the

17   other issue we talked about is undue delay, and the reserve

18   issues.  I think that's another area where work can still be

19   done.  The reserve conversations, no doubt, have been going

20   on back and forth.  The letter has a particular way it

21   pitches it.  There's an additional way it's been pitched

22   here today by Mr. Dietderich and the devil's in the details.

23             It certainly affects the issue of delay.  It

24   doesn't resolve the issue of delay.  The issue about in-kind

25   distributions and the effect on the reserve is something

1    that I hadn't -- wasn't on my radar screen until today's

2    conversation, so that's why, although argument is very

3    helpful, I -- and I can see the, that it has an impact on a

4    reserve, whether that is something that can be worked

5    around, I don't know.  You all will tell me, but that also

6    is a conversation that should be had.

7            So, recognizing the different moving pieces here,

8    parties are clearly communicating well.  If there is a point

9    where you think it would be helpful to have somebody who's

10   not involved in the case -- mediate maybe too strong a word,

11   but act as a sounding board for coming up with reasonable

12   paths forward, you can let me know that.  I won't -- I'm not

13   going to require that.  I'm not mandating it.  I'm just

14   throwing it out as yet another option to the extent that I

15   don't know, I'm not in the room where these conversations

16   are happening.  So you are all the best judge of what would

17   be most efficient.

18           So turning to the lift stay motion, the lift stay

19   motion does have a -- as filed, certainly has the effect of

20   taking an issue out of the Debtors' case here and saying

21   that the case has to wait for issues to be resolved

22   elsewhere.  And frankly, I have no authority nor do I have a

23   desire to micromanage another judge's calendar.

24           That judge will handle that case as that judge

25   sees fit, informed by counsel who are in that case, and it's

Page 92

1    a road to ruin, I think, to sort of guess what is going to

2    happen, how it's going to be, how things are going to

3    unfold.  It's hard enough to figure that out in the cases

4    that are in front of me, much less somebody else's case.

5              And so what I am hearing though is that there are

6    certain issues that the FTX debtors want to have resolved in

7    that case.  We've already gone through them and certainly

8    those issues may organically happen, not only with this,

9    with the Genesis Debtors here, but with other parties.

10             I don't have any authority nor has anyone asked me

11   to somehow meddle in the Delaware bankruptcy case on any of

12   that, nor would I.  And so if those issues come up, nothing

13   prevents the FTX debtors from addressing those things in the

14   context of its cases.  And what I see, at least here for

15   purpose of the estimation motion is an intent even, if it is

16   an imperfect one from the FTX debtor's point of view, to try

17   to avoid having this case interfere with those core issues

18   for the FTX case.

19             Certainly, and so that's one way to sort of

20   obviate or work around the issue of a lift stay where the

21   FTX debtors do what they need to do.  They don't have to do

22   it necessarily with these Debtors and Debtors stay away from

23   issues that are near and dear to the heart of the FTX

24   debtors that they may be litigating in other contexts.

25             But right now, unless there's some agreement or

Page 93

1    ruling that addresses the size of the claim vis-à-vis the

2    importance of it in this case for distribution if for

3    nothing else, it's a gating issue in this case.  And so it's

4    hard to lift the stay to allow that to go ahead in the way

5    requested somewhere else and essentially wait here for that

6    to get resolved.

7           So again, I think there's a lot of flexibility

8    that exists here in terms of trying to have each case stay

9    in its own lane and address the issues that need to be

10   addressed.  I expect you'll have further conversations.  So

11   I'm adjourning the hearing to another date and we can talk

12   about what that is in a minute.  And I think that covers

13   everything that I wanted to mention.

14           I'm happy to entertain any questions or comments

15   if anybody has anything they think would be productive at

16   this point.

17           MR. DIETDERICH:  So I do have question for

18   clarification, Your Honor.  As I understand it, Your Honor

19   is not granting the estimation motion today and we will be

20   commencing discovery -- discovery will continue.  Document

21   discovery, I think is proceeding, you know, full speed

22   ahead.  We have not commented on the other elements of the

23   litigation schedule with respect to experts and expert

24   reports.  A lot of that relates to some of the issues that

25   are still pretty ambiguous in terms of the chart of issues.

Page 94

1          The -- we'd like to be able to come back and

2     propose something that is sensible in connection with the

3     expert dates in particular.  It relates, of course, to the

4     process we have underway in our own case to appoint experts,

5     which is, you know, proceeding, you know, proceeding

6     quickly.

7          THE COURT:  All right.  Well, I certainly expect

8     the parties will meet and confer about that.  That's why I

9     did try to go through the potential defenses and get a sense

10    of what will be in, what will be out.  I understand that the

11    concept of what that looked like, there was not an agreement

12    among the parties and that's fine.  However, it was further

13    along as I understand it than we were last time we got

14    together and so you all will talk.

15         That will inform what needs to be done.  And I'm

16    happy to have a conference at any time to talk about

17    discovery.  People can save themselves writing letters.  We

18    can just -- I think you've got me plenty educated on these

19    things and you have other things to do than to write me

20    another letter, so I'm happy to make myself available to

21    work through those issues.

22         I think what I'm hearing, Ms. VanLare say and Mr.

23    Shore say is that the case needs to move forward and it

24    can't wait for events in another case.  And I think it is

25    moving forward and will move forward, but for discovery, the

Page 95

1    devil's in the details so you all can talk, but it's going

2    to be a feedback loop in terms of what you can actually work

3    out in terms of issues that are going to be teed up.

4            And so that's, as you said, there's probably a

5    substantive conversation first about the FTT in particular,

6    that value and how it relates to or doesn't, issues like

7    collateralization and new value.  But I'll leave you to have

8    that conversation in the first instance.  But the short

9    answer -- just gave you a very long answer.  The short

10   answer is yes, I'd be happy to talk to folks about it and we

11   can schedule that now or you can reach out to chambers at an

12   appropriate time.

13           MR. DIETDERICH:  Thank you, Your Honor.

14           THE COURT:  Ms. VanLare, anything from you?

15           MS. VANLARE:  No.  No, Your Honor.  Thank you very

16   much.  Appreciate it.  Happy to work with the FTX debtors on

17   the details regarding the schedule, again so long as the

18   general framework is there.  You know, whether we move a day

19   here or two that's -- we're actually happy to discuss.

20           THE COURT:  All right.  And Mr. Shore, anything

21   from you?

22           MR. SHORE:  Nothing, Your Honor.  Thank you.

23           THE COURT:  All right.  Anything from any other

24   party?

25           MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

Page 96

1    Trustee's Office.  I was waiting until the end of the

2    hearing just to raise some scheduling issues, if possible,

3    with all the parties here.  As of now, July 20th is when the

4    disclosure statement is scheduled to be heard and objections

5    are due a week before.  That's been moved once already.

6           I'm not going to characterize the disclosure

7    statement and the Court has heard a lot about certain

8    disputes among the parties in this case, but my office has

9    some concerns about the disclosure statement.  They're

10   resolvable ultimately, but there's missing information, most

11   obviously, the liquidation analysis and objections and other

12   items in the disclosure statement as well.  And just by way

13   of planning, we're wondering if, that deadline is -- well,

14   the deadline is firm for the 13th to respond to the

15   disclosure statement, but it sounds like everything may be

16   adjourned out based on what I heard today.

17          THE COURT:  All right.  Ms. VanLare, I think

18   that's to you.

19          MS. VANLARE:  I'm sure I would take that away, Mr.

20   Zipes, from today's hearing.  I think our current plan is to

21   move forward with the disclosure statement hearing on the

22   20th and the corresponding objection deadline, as you noted,

23   is July 13th.

24          THE COURT:  So is there more information that's

25   going to be provided, I guess, that would impact objections

Page 97

1    that may or may not be made if there's additional

2    information provided?

3              MS. VANLARE:  Yes.  We will be filing the

4    liquidation analysis and the projections in advance of the

5    disclosure statement objection deadline.  We may be filing

6    an amended disclosure statement as one typically does as we

7    incorporate comments that we receive and we're certainly

8    happy to continue working productively with Mr. Zipes and

9    his office to resolve any and all concerns that he has

10   regarding the adequacy of the information.

11             THE COURT:  All right.  I guess my thought is I'll

12   leave it to you in the first instance to have a

13   conversation, but obviously some of the information that was

14   just mentioned in terms of additional information that's

15   going to be provided and its relationship to the objection

16   deadline so as to obviate the need to file objections.

17             So I understand it may come eventually, but having

18   a slew of objections and then having the information arrive

19   is less ideal than the information, obviate the need to file

20   an objection.  So I'll let you all talk and work that out.

21             Mr. Zipes, anything else?

22             MR. ZIPES:  No, Your Honor.  Thank you.

23             THE COURT:  All right.  All right, so Ms. VanLare,

24   since we are here, I just want to make sure I have an

25   understanding of next dates.  I just wanted to -- give me a

1  second to just pull out my list.  So right now, we do have a

2  disclosure statement hearing scheduled for the 20th.  Is --

3  I assume there's nothing between now and then that we have

4  on the calendar?

5       MS. VANLARE:  That's (audio drops).

6       THE COURT:  All right.  And I'm assuming that if

7  there's a need to talk about discovery, you'll reach out

8  unless you want me to schedule something now.  Any

9  preference?

10      MS. VANLARE:  I think that I'm hopeful that we can

11  avoid the need for an additional status conference on

12  discovery issues.  So my preference would be to wait and see

13  and then reach out to chambers if we need one.

14      THE COURT:  All right.  All right, and so I think

15  the next date we have after that is August 15th, which is

16  listed as the estimation motion and I'm -- or at one point

17  it was and I think that the schedule that is coming out of -

18  - will come out of today's conversations and -- is really

19  what's going to govern all that and so that's -- I'm looking

20  at Docket 479 which was filed on the 5th, Page 15 of 15

21  which is the schedule, so I'm not going to pay too much

22  attention to other dates that may have been identified vis-

23  à-vis the estimation motion.  And I want to make sure that

24  I'm not missing something in understanding it that way.

25      MS. VANLARE:  No, Your Honor, that -- so the

1    confirmation hearing right now is scheduled for August 24th.

2    And so our hope is that the estimation hearing would precede

3    that.  We weren't sure of Your Honor's schedule.  We

4    obviously did shift some of the deadlines, so -- but our

5    hope would be that the estimation hearing precedes

6    confirmation.

7           THE COURT:  Well, right now according to this

8    schedule, we've got a deadline for submissions and replies

9    on August 18th.  And if the idea is to have a resolution of

10   the estimation issues, which I don't even know what they are

11   yet -- I have an idea what they might be and the range.  The

12   24th is looking awfully optimistic.  So -- and also like the

13   15th was originally the date for the estimation and the 15th

14   doesn't sort of work with the revised deadline.

15          So my understanding was that these deadlines were

16   sort of likely to slip, but were sort of a framework, so my

17   sense would be that we probably would be looking at

18   something more likely in the beginning of September and that

19   what -- we'd have to talk sometime maybe July 20th about

20   more details about what an estimation hearing would look

21   like and when it would be.  That was kind of where I was

22   thinking we'd end up.  Is that your thoughts?

23          MS. VANLARE:  I think that is an excellent

24   suggestion, Your Honor.  I think we would like to again

25   preserve the possibility that we would have the estimation

Page 100

1    precede confirmation.  I think as Your Honor noted, I think

2    we'll have more definition of the issues and, you know,

3    we'll have a chance to have additional conversations as to

4    whether estimation is a day, for example, daylong hearing,

5    two days.  I don't think it will be more than that.  And so

6    what I would propose, which is really what you proposed,

7    Your Honor, is that we come back to that issue on July 20th

8    and then we can figure out a date for the estimation

9    hearing.

10             THE COURT:  All right.  All right, that's fine,

11   and my thought would be that we're probably likely to move

12   the confirmation hearing date anyway, because at least, pick

13   a date that holds out the hope that it's decided before

14   confirmation.  And if it's not, it's not, but unless we move

15   that date, I think the handwriting is on the wall in terms

16   of that.  So I just mention that just because I don't want

17   people thinking that the 24th is likely to go forward on

18   that day because I just don't -- I don't think that really

19   fits.

20             Again, my thought would be to schedule something

21   early in September.  And again, we'll have to see what the

22   estimation procedures look like, what the actual hearing

23   would look like, and what the substance is in terms of

24   determining whether it could be done before confirmation.

25   But at the same time, pick a date for confirmation where we

Page 101

1   sort of stagger these things and see how it all goes.

2           But I only mention that now just because I want to

3   make sure to get you the dates that you need so that would

4   be my thought for September.  And if you want to reach out

5   to Ms. Ebanks to do that, that's fine or I can throw some

6   dates out or you could think about what you're looking at

7   and call later and that's fine.  But I just want to make

8   sure that you have dates that seem -- for what you need that

9   seem likely to be the dates.

10          MR. DIETDERICH:  Your Honor, just -- Andy

11  Dietderich for FTX.  Again, it depends wildly on what the

12  subject matter is of the estimation motion.  To the extent

13  it's really the guts of an adversary proceeding, that

14  schedule would be, you know, wholly inappropriate and also

15  kind of inappropriate to delay the case to resolve the

16  merits of that, when there could be a reserve.  To the

17  extent --

18          THE COURT:  Well --

19          MR. DIETDERICH:  -- it's an estimation proceeding

20  --

21          THE COURT:  I --

22          MR. DIETDERICH:  -- narrow the gap of the reserve

23  --

24          THE COURT:  I understand.  We're not there yet.

25  My only reason for mentioning is that I think August 24th is

Page 102

1    unlikely to work.  And so that's -- I'm not advocating for a

2    particular schedule.  There's a lot of conversations that

3    need to happen.  All I'm advocating for is that the work

4    that's been done in discovery continue without delay so that

5    we keep all of our options open and then we'll have another

6    conversation July 20th and see where we are.

7              MR. DIETDERICH:  Understood.  Thank you.

8              THE COURT:  So my intent is not to delve into

9    that.  It's not a today problem other than to say, I think

10   August 24th is probably under any view of the world, yours

11   or Ms. Vanlare's, unlikely to work.  So, but we'll talk

12   about it all on July 20th and with that, unless anybody has

13   anything else to add?

14             So here's what I'm going to do is I'll carry the

15   motions to July 20th, so that they're -- we've had a lot of

16   discussions at this point.  My intent is to not repeat these

17   conversations.  You all got me up to speed.  I've talked

18   quite a bit about my views about it so that you have an idea

19   of where I am and so we'll keep them on the calendar for

20   purposes of processing additional information that we

21   receive and how that affects the -- where we're trying to

22   get to and everybody's rights.

23             But, so I'll put them on the calendar for the

24   20th, understanding that we're not here for a full-blown

25   argument on them and at a certain point, if the parties can

Page 103

1    reach certain agreements, great.  If they can't, at a

2    certain point, I've got to make a ruling, a formal ruling.

3    I'll do that.  But they're -- I'll consider them submitted

4    as of today, subject to folks providing me with additional

5    information about all the issues we talked about today.

6              So, all right.  Thank you very much.

7              MS. VANLARE:  Thank you.

8              (Whereupon these proceedings were concluded at

9    3:39 PM)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3                          RULINGS

4                                              Page      Line

5    Claim objections to notice of procedures    25       14

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                C E R T I F I C A T I O N

2

3       I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature: Sonya M. Ledanski Hyde]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  July 10, 2023