Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |

**NOTICE OF FILING OF REVISIONS TO**
**CERTAIN SECTIONS OF DISCLOSURE STATEMENT WITH**
**RESPECT TO THE AMENDED JOINT PLAN OF GENESIS GLOBAL**
**HOLDCO, LLC ET AL., UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

**PLEASE TAKE NOTICE** that, on June 13, 2023, the debtors and debtors-in-possession (collectively, the "Debtors") filed the *Disclosure Statement with Respect to the Amended Joint Plan of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement"), ECF No. 429 and the *Debtors' Amended Joint Chapter 11 Plan* (the "Plan"), ECF No. 427.

**PLEASE TAKE FURTHER NOTICE** that, on July 10, 2023, the Debtors filed the *Notice of Filing of Exhibits to Disclosure Statement*, ECF No. 488, which included the Liquidation Analysis and the Financial Projections as Exhibit C and Exhibit D, respectively, to the Disclosure Statement.

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

**PLEASE TAKE FURTHER NOTICE** that, although the Debtors, Digital Currency Group, Inc., the Official Committee of Unsecured Creditors, and other major stakeholders are currently engaged in discussions regarding a global resolution of issues arising in the Debtors' Chapter 11 Cases, which resolution, if reached, would result in substantial modifications of the Disclosure Statement and the Plan, and the filing of a further amended Disclosure Statement and Plan, the Debtors hereby revise and supplement the Disclosure Statement as follows:

- Section XII of the Disclosure Statement (Certain Securities Law Matters) shall be replaced in its entirety with the language set forth in **Exhibit A** attached hereto; and

- Section XIII of the Disclosure Statement (Certain United States Federal Income Tax Consequences of the Plan) shall be replaced in its entirety with the language set forth in **Exhibit B** attached hereto.

**PLEASE TAKE FURTHER NOTICE** that copies of the Disclosure Statement can be viewed and/or obtained by: (i) accessing the Court's website at www.nysb.uscourts.gov (PACER password required) or (ii) from the Debtors' claims and noticing agent, Kroll Restructuring Administration LLC, which maintains a website at https://restructuring.ra.kroll.com/genesis.

Dated:   July 31, 2023
         New York, New York

*/s/ Jane VanLare*
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors and Debtors-in-Possession*

## Exhibit A

**Section XII – Certain Securities Law Matters**

## XII.    CERTAIN SECURITIES LAW MATTERS

### A.    Exemption from Registration Requirements of the Securities Act and Blue Sky Laws

#### (i)    *Section 1145(a) of the Bankruptcy Code (Offer and Issuance of Post-Effective Date GGH Interests)*

The Debtors will rely on the exemption provided by section 1145(a)(1) of the Bankruptcy Code from the registration requirements of the Securities Act and applicable blue sky Laws to exempt the offer and issuance of Post-Effective Date GGH Interests on the Effective Date to Qualified Holders that made a Plan Election. Section 1145(a)(1) of the Bankruptcy Code provides that the registration requirements of Section 5 of the Securities Act and any applicable blue sky laws will not apply to the offer or sale of stock, warrants or other securities by a debtor under a plan of reorganization if (i) the offer or sale occurs under a plan of reorganization, (ii) the recipients of securities hold a claim against, an interest in or claim for administrative expense against the debtor and (iii) the securities are issued in exchange for a claim against or interest in a debtor or are issued principally in such exchange and partly for cash and property.

#### (ii)    *Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D, and Rule 701 Under the Securities Act (Offer and Issuance of Post-Effective Date GGH Interests Under the Management Incentive Plan)*

The Debtors will rely on the exemptions provided by Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D and/or Rule 701 promulgated under the Securities Act from the registration requirements of the Securities Act to exempt the offer and issuance of the Post-Effective Date GGH Interests to directors, officers and other key employees of the Debtors pursuant to the MIP (the "MIP Securities"). Section 4(a)(2) of the Securities Act exempts transactions by an issuer not involving any public offering, and Regulation D provides a safe harbor under Section 4(a)(2) for transactions that meet certain requirements, including that directors, officers and other key employees of the Debtors qualify as "accredited investors" within the meaning of U.S. securities laws.

Rule 701 under the Securities Act provides a safe harbor exemption from registration under the Securities Act for equity securities issued as employee compensation. Accordingly, the Debtors believe that the MIP Securities issued to directors, officers and other key employees of the Debtors will be exempt from registration under the Securities Act.

In reliance upon the exemptions provided by section 1145(a) of the Bankruptcy Code, Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D under the Securities Act and/or Rule 701 promulgated under the Securities Act, as discussed in the preceding paragraphs, the Debtors believe that the offer and issuance of the Post-Effective Date GGH Interests (including the MIP Securities) will be exempt from registration under the Securities Act.

### B.    Resales of Post-Effective Date GGH Interests

#### (i)    *Resales of the Post-Effective Date GGH Interests Distributed to Qualified Holders*

As discussed above, the issuance of Post-Effective Date GGH Interests to Qualified Holders is anticipated to be exempt under section 1145(a)(1) of the Bankruptcy Code from registration under the Securities Act and applicable blue sky laws. Section 1145(c) of the Bankruptcy Code provides that securities issued pursuant to a registration exemption under section 1145(a)(1) of the Bankruptcy Code ("Exempt 1145(a)(1) Securities") are deemed to have been issued pursuant to a public offering. Therefore, to the extent the offer and sale of any Post-Effective Date GGH Interests are Exempt 1145(a)(1) Securities, they are not considered "restricted securities" and may generally be resold by any holder thereof without registration under the Securities Act pursuant to the exemption provided by Section 4(a)(1) thereof, unless the holder is an "underwriter" with respect to such securities, as such term is defined in section 1145(b)(1) of the Bankruptcy Code. In addition, Exchange Securities that are Exempt 1145(a)(1) Securities generally may be resold by the recipients thereof without registration under state securities or "blue sky" laws pursuant to various exemptions provided by the respective laws of the individual states. However, the availability of such exemptions cannot be known unless individual states' blue sky laws are examined, and recipients of securities issued under the

Plan are advised to consult with their own counsel as to the availability of any such exemption from registration under federal securities laws and any relevant state securities laws in any given instance and as to any applicable requirements or conditions to the availability thereof.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" for purposes of the Securities Act as one who, subject to certain exceptions, (a) purchases a claim with a view to distribution of any security to be received in exchange for such claim, (b) offers to sell securities offered or sold under the plan for the holders of such securities, (c) offers to buy securities issued under the plan from the holders of such securities, if the offer to buy is made with a view to distribution of such securities, and if such offer is under an agreement made in connection with the plan, with the consummation of the plan or with the offer or sale of securities under the plan, or (d) is an issuer, as used in Section 2(a)(11) of the Securities Act, with respect to such securities, which (as described below) includes "control persons" of the issuer.

The term "issuer," as used in Section 2(a)(11) of the Securities Act, includes any person directly or indirectly controlling or controlled by, an issuer of securities, or any person under direct or indirect common control with such issuer. "Control" (as defined in Rule 405 under the Securities Act) means the possession, direct or indirect, of the power to direct or cause the direction of the policies of a person, whether through the ownership of voting securities, by contract, or otherwise. Accordingly, an officer or director of a reorganized debtor or its successor under a plan of reorganization may be deemed to be "in control" of such debtor or successor, particularly if the management position or directorship is coupled with ownership of a significant percentage of the reorganized debtor's or its successor's voting securities. Moreover, the legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of the voting securities of a reorganized debtor may be presumed to be a "control person."

Notwithstanding the foregoing, "control person" underwriters may be able to sell securities without registration pursuant to the resale limitations for control securities under Rule 144 of the Securities Act which, in effect, permit the resale of securities received by such underwriters pursuant to a chapter 11 plan, subject to applicable volume limitations and current public information, notice and manner of sale requirements. Parties who believe they may be statutory underwriters as defined in section 1145 of the Bankruptcy Code are advised to consult with their own legal advisers as to the availability of the exemption provided by Rule 144 and other exemptions from registration under the Securities Act.

**WHETHER OR NOT ANY PARTICULAR PERSON WOULD BE DEEMED TO BE AN "UNDERWRITER" OF POST-EFFECTIVE DATE GGH INTERESTS TO BE ISSUED PURSUANT TO THE PLAN OR AN "AFFILIATE" OF REORGANIZED GGH WOULD DEPEND UPON VARIOUS FACTS AND CIRCUMSTANCES APPLICABLE TO THAT PERSON. ACCORDINGLY, THE DEBTORS EXPRESS NO VIEW AS TO WHETHER ANY SUCH PERSON WOULD BE SUCH AN "UNDERWRITER" OR AN "AFFILIATE." IN VIEW OF THE COMPLEX, SUBJECTIVE NATURE OF THE QUESTION OF WHETHER A PARTICULAR PERSON MAY BE AN UNDERWRITER OR AN AFFILIATE OF THE REORGANIZED DEBTORS, THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING THE RIGHT OF ANY PERSON TO TRADE IN SECURITIES OF REORGANIZED GGH. ACCORDINGLY, THE DEBTORS RECOMMEND THAT POTENTIAL RECIPIENTS OF ANY POST-EFFECTIVE DATE GGH INTERESTS TO BE ISSUED PURSUANT TO THE PLAN CONSULT THEIR OWN COUNSEL CONCERNING WHETHER THEY MAY FREELY TRADE SUCH SECURITIES.**

(ii)     *Resales of the MIP Securities*

The offer and issuance of the MIP Securities is covered by Section 4(a)(2) of the Securities Act, Rule 506 of Regulation D and/or Rule 701 promulgated under the Securities Act, and will not be exempt under section 1145 of the Bankruptcy Code. Therefore, such Post-Effective Date GGH Interests will be considered "restricted securities" as defined by Rule 144 of the Securities Act and may not be sold except pursuant to an effective registration statement or pursuant to an applicable exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act (as discussed below). The Debtors express no view as to whether any Person or Entity may freely resell the MIP Securities.

The Debtors recommend that potential recipients of the MIP Securities consult their own counsel concerning their ability to freely trade the MIP Securities without registration under applicable federal securities laws and blue sky laws and the availability of Rule 144 for exempt resales.

**The Debtors recommend that potential recipients of MIP Securities under the Plan consult their own counsel concerning their ability to freely trade such securities without registration under applicable federal securities laws and blue sky laws.**

## **Exhibit B**

**Section XIII – Certain United States Federal Income Tax Consequences of the Plan**

I.      **CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

A.      **Introduction.**

The following discussion is a summary of certain U.S. federal income tax consequences of the Consummation of the Plan to the Debtors and to certain Holders of Allowed Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities and published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

Due to the lack of authority addressing the taxation of transactions in Digital Assets, the application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Plan, and to Digital Assets in general, is subject to a high level of uncertainty. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS or any other authorities, as to any of the tax consequences of the Plan discussed below. The discussion below is not binding upon the IRS or the courts in the United States. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances. This summary does not address any tax consequences under the laws of any state, municipality or locality of the United States or the laws of any taxing jurisdiction other than the federal tax laws of the United States. This summary does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, foreign taxpayers, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies and those holding, or who will hold, consideration received pursuant to the Plan, as part of a hedge, straddle, conversion, or other integrated transaction). In addition, this summary does not address the Medicare tax on net investment income or the special timing rules prescribed under Section 451(b) of the IRC. No aspect of state, local, estate, gift, or taxes other than U.S. federal income taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds a Claim as a "capital asset" (within the meaning of Section 1221 of the IRC). Except as stated otherwise, this summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Plan to the Debtors, Wind-Down Debtors (Wind-Down GAP and Wind-Down GGC and, solely to the extent a Standalone Reorganization does not occur, Wind-Down GGH), and Holders of Claims described below also may vary depending on the ultimate nature of any restructuring transactions that the Debtors and/or Wind-Down Debtors engage in. This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Plan, or (b) that are deemed to reject the Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (i) an individual who is a citizen or resident of the United States; (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (iv) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning of section 7701(a)(30) of the IRC). For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither

a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Plan.

The below discussion assumes that the Debtors obtained tax ownership of loaned Digital Assets when lenders transferred such loaned Digital Assets to the Debtors. The Debtors believe that position is the right one based on, among other things, the fact that the Debtors had the right to transfer, rehypothecate, and otherwise deal in loaned Digital Assets. If the Debtors were determined to not have tax ownership of the Digital Assets, the consequences of the Plan to Holders of Claims and the Debtors would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**B.      Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors.**

For U.S. federal income tax purposes, each of the Debtors is (i) a member of an affiliated group of corporations of which DCG is the common parent and which files a single consolidated U.S. federal income tax return (the "Tax Group"), or (ii) a foreign branch or entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the Tax Group. The Debtors expect that the issuance of Post-Effective Date GGH Interests (as defined below) in connection with the Plan would cause the Debtors to no longer be members of the Tax Group. Whether the Debtors' tax attributes (if any) will survive the implementation of the Plan is subject to uncertainty. Accordingly, the application of the rules regarding cancellation of indebtedness and section 382 of the IRC is uncertain at this time.

In connection with the Plan, the Debtors (or Wind-Down Debtors, as applicable) or, if there is a Standalone Reorganization under the Plan, a Reorganized GGH  may, among other things, (i) distribute Digital Assets (including newly purchased Digital Assets) to certain Holders that are substantially identical to the Digital Assets such Holders previously loaned to the Debtor (i.e., to attempt to return to certain Holders some or all of the Digital Assets such Holders previously loaned to the Debtor through a distribution "in kind") ("Like-Kind Distribution"), (ii) sell certain assets to third parties or otherwise monetize assets ("Sale Transaction"), (iii) distribute Cash and otherwise distribute Digital Assets (in a non-"in-kind" fashion, i.e., by distributing Digital Assets to a Holder other than Digital Assets that such Holder previously loaned to the Debtor), and/or (iv) distribute equity securities in Wind-Down GGH or Reorganized GGH, as applicable ("Post-Effective Date GGH Interest"). The consequences of the Plan to the Debtors will depend, in part, on whether there is a Sale Transaction in addition to a Wind-Down and/or Standalone Reorganization.

In a Sale Transaction, the Debtors expect that the Plan would be structured such that there would be taxable sale of certain assets of the Debtors to a purchaser (the "Taxable Transaction") and, potentially, a Like-Kind Distribution to Holders in exchange for Claims related to such Digital Assets. As a result, and in connection therewith, the Debtors would realize gain or loss in an amount equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets. Gain would be reduced by the amount of tax attributes (if any) available for use by the Debtors, and any remaining gain would be recognized by the Debtors and result in a cash tax obligation. Any Like-Kind Distribution may be treated as a non-taxable transaction with respect to the underlying Digital Assets, although the treatment of Like-Kind Distributions is unclear. The Debtors continue to evaluate the amount, timing, and which member of the Tax Group will ultimately be responsible for, any taxes payable on gain resulting from a Sale Transaction.

Thus, the U.S. federal income tax consequences of the Taxable Transaction to the Debtors would in large part be a function of the Debtors' tax basis in the assets that the Debtors transfer or are deemed to have transferred, including the Debtors' Digital Assets. There is generally no direct guidance under Applicable Tax Law on how to treat a Holder's transfer of Digital Assets to a business like the Debtors' (and as a result there is significant uncertainty with respect to the Debtors' tax basis in such Digital Assets) or the transferee's utilization of the transferred Digital Assets (for example, and without limitation, holding, lending, staking, selling, and entering derivatives transactions). Accordingly, there is significant uncertainty with respect to the tax consequences of a Taxable Transaction to the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets, including the Debtors' Digital Assets. Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability from a Taxable Transaction, potentially in a way that would have a materially adverse impact on the Debtors. The Debtors, together with their advisors, continue to study this issue.

As part of a Wind-Down and/or a Standalone Reorganization, as applicable, then, generally, subject to any rebalancing of the Debtors' Digital Assets to facilitate Like-Kind Distributions under the Plan or to otherwise effectuate the Wind-Down, the Debtors would distribute Cash and/or property (including Digital Assets) in satisfaction of Claims. In connection with any rebalancing, the Debtors would realize gain or loss upon the sale of property involved in such rebalancing, with such gain or loss calculated as, and subject to the uncertainty, described above. With respect to the Debtors' distribution of Cash and/or property to Holders of Claims, the Debtors would recognize income or cancellation of indebtedness income related to any difference between the value of what a Holder receives in exchange for its Claim and the amount of such Claim. The Debtors continue to evaluate the amount, timing, and which member of the Tax Group (or DCG or the Debtors, if Debtors are no longer be members of the Tax Group) will ultimately be responsible for, any taxes payable on gain resulting from the satisfaction of Claims.

Because the Bankruptcy Code requires debtors, at least for certain purposes, to calculate creditor claims in USD, i.e., denominate creditor claims in a dollar value as of a specific date as opposed to a digital asset, the Debtors intend to calculate Claims in USD for certain purposes of the Plan. The Debtors continue to evaluate how calculating Claims in USD may modify the above analysis, either with respect to the implementation of the Plan itself or with respect to any administrative tax period more generally.

**C.      Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Allowed Claims.**

Before discussing the consequences to any particular Class of Claims entitled to vote, we discuss certain U.S. federal income tax considerations that are relevant to U.S. Holders who may receive a Like-Kind Distribution of Digital Assets pursuant to the Plan.

The tax treatment of such U.S. Holders under the Plan depends significantly on the tax treatment of their transfer of Digital Assets to the Debtors in the first instance. There is uncertainty with respect to whether loans in which tax ownership of the Digital Assets transferred to the Debtors were taxable when they occurred, but the Debtors generally expect that most U.S. Holders have taken the position that the act of lending Digital Assets to the Debtors is not a taxable event. While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of Digital Assets for a contractual right to the return of such Digital Assets is not a transaction that results in a realization event under section 1001 of the IRC because it does not involve an exchange of property "differing materially either in kind or in extent." Such position relies, among other things, on case law that predates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058 of the IRC.

To the extent an initial loan of Digital Assets was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of the same kind of Digital Asset to U.S. Holders in a Like-Kind Distribution, because the exchange of the contractual right to the return of such Digital Asset for the underlying Digital Asset is itself not an exchange of property "differing materially either in kind or in extent." The Debtors emphasize that, like other aspects of Digital Asset taxation, this position is subject to significant uncertainty, including because of the existence of proposed Treasury Regulation section 1.1058-1(e)(2), which causes a securities lending transaction to become taxable where a borrower fails to return to the lender securities identical to the securities

transferred, or otherwise defaults under the agreement.  While this proposed Treasury Regulation is inapplicable by its terms to Digital Assets, it would very likely cause such a transaction to be taxable to a U.S. Holder (or other person that transferred Digital Assets to the Debtors in a transaction intended to be treated as non-taxable in the first instance) if it is applied to Digital Assets by analogy.  Furthermore, even if the foregoing argument would apply to a recovery that comprises solely Like-Kind Distributions, in the case of a Holder receiving Like-Kind Distributions with other distributions, the argument would need to be supplemented by a general "bifurcation" approach that permitted U.S. Holders to take the position that such U.S. Holders retained their Digital Asset positions in a tax-free manner, even if the receipt of other consideration constituted a taxable exchange.  The Debtors emphasize that these positions are unclear.

As discussed above under "Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors", the Debtors intend to calculate Claims in USD for certain purposes of the Plan and, as a result, the tax consequences of a Like-Kind Distribution are highly uncertain and may differ from the discussion above and each U.S. Holder should consult with their tax advisor as to the particular consequences to them of the calculation with respect to the transactions contemplated by the Plan.

The Debtors emphasize in the strongest possible terms that the law applicable to Digital Asset loan transactions with the Debtors, the calculation of Claims in USD for certain purposes of the Plan, and the Consummation of the Plan is subject to a high level of uncertainty.  Although there are instructive analogous authorities, there is effectively no "controlling" authority on any of these issues.  Accordingly, there is a material risk that the positions described throughout this discussion may not be sustained.  The concept of a non-taxable Like-Kind Distribution referred to above rests in large part on the theory that the property that the Debtors would distribute in kind to a U.S. Holder would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the U.S. Holder deposited property with the Debtors.  Given the structure of the Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a U.S. Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the U.S. Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the U.S. Holder loaned Digital Assets to the Debtors (and thus tax-free in-kind treatment would likely be unavailable).

1.  *The Wind-Down Entities.*

The Plan provides that on the Effective Date, Allowed Claims shall, in the absence of any other treatment under the Plan or the Confirmation Order solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including, without limitation, the release and injunction provisions set forth in Article VIII and the treatment of Gemini Lender Claims), remain obligations of Wind-Down GGC, Wind-Down GAP, or Wind-Down GGH or Reorganized GGH, as applicable, on and after the Effective Date.

2.  *Tax Treatment of the Plan Election.*

Holders of certain Classes of Claims (GGH Class 3, GAP Class 3, GGC Class 3 and GGC Class 4, each Holder thereof a "Qualified Holder") may elect, prior to the Effective Date (subject to certain subscription limitations (an "Oversubscription Event")) to receive its Pro Rata share of Post-Effective Date GGH Interests issued on the Effective Date ("Plan Election").  Qualified Holders that are U.S. Holders who elect to receive Post-Effective Date GGH Interests under the Plan Election likely will be treated for U.S. federal income tax purposes as receiving the Post-Effective Date GGH Interests as additional consideration payable with respect to the U.S. Holder's Allowed Claims and as such, receipt of the Post-Effective Date GGH Interests will be a taxable transaction to the U.S. Holder.

A U.S. Holder's tax basis in any Post-Effective Date GGH Interests received under the Plan Election will equal the fair market value of such interests at the time of receipt, and the U.S. Holder's holding period with respect thereto generally will begin on the day after the Effective Date.

It is uncertain whether a U.S. Holder that is eligible for but does not make a Plan Election should be treated as receiving anything of additional value in respect of its Allowed Claim, as applicable.  If a U.S. Holder is treated as having received a Plan Election of value (despite its subsequent lapse), such that it obtains a tax basis in the Plan

Election, upon such lapse of the Plan Election the Holder generally would recognize a loss to the extent of the U.S. Holder's tax basis in the Plan Election.  In general, such loss would be a capital loss, long-term or short-term, depending upon whether the requisite holding period was satisfied.

**3.    *General Unsecured Claims against GGH ("<u>GGH Class 3</u>").***

Pursuant to the Plan, each Holder of a Allowed General Unsecured Claim against GGH shall, in full and final satisfaction of such Claim, receive its Pro Rata share of (i)  the Effective Date Available Assets of GGH (including the proceeds of any Sale Transaction or Wind-Down that are allocated, in the Debtors' discretion, to GGH), (ii) subject to the prior payment of the Capital Reserves Funding, if applicable, the Post-Effective Date Available Assets allocated to Reorganized GGH or Wind-Down GGH and (b) the DCG Recoveries allocated to Reorganized GGH or Wind-Down GGH, as applicable, and (iii) the Post-Effective Date GGH Interests solely to the extent that (a) such Holder is a Qualified Holder and affirmatively makes the Plan Election and (b) an Oversubscription Event does not occur .

To the extent any Digital Asset distributed to a U.S. Holder of an Allowed General Unsecured Claims against GGH is the same as the type of Digital Asset such U.S. Holder previously loaned to GGH, then such return may be treated as a Like-Kind Distribution to such U.S. Holder, consistent with (and subject to the uncertainties around) the discussion set forth above.

In the case where such tax-free treatment did not apply with respect to such Like-Kind Distribution, and for any consideration that a U.S. Holder of an Allowed General Unsecured Claims against GGH receives in satisfaction of its Claim that is not the same as the type of Digital Asset such U.S. Holder initially transferred to GGH as of the Petition Date, the exchange will be taxable to the U.S. Holder. In such case, such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of such consideration received under the Plan and such U.S. Holder's adjusted tax basis in the Claim (this assumes that all of the consideration is received in a taxable fashion; see immediately below for a discussion of a bifurcated approach).  The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim.  If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  Such U.S. Holder's tax basis in such consideration should equal the fair market value of such property as of the Effective Date, and such U.S. Holder's holding period in such consideration should begin on the day after the Effective Date.

Where a U.S. Holder receives some consideration tax-free and other consideration that is taxable (e.g., some but not all of the consideration that a U.S. Holder of an Allowed General Unsecured Claim against GGH receives in satisfaction of its Claim is a Like-Kind Distribution), such U.S. Holder would recognize gain or loss in an amount equal to the difference between (i) the fair market value of such consideration received under the Plan in a taxable fashion, and (ii) while subject to uncertainty, a proportionate portion of the tax basis in such Claim (possibly based on relative fair market values of the consideration received in a tax-free fashion and the consideration received in a taxable fashion, although other potential ways of calculating gain or loss may exist).  The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim.  If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder held its Claim for more than one year at the time of the exchange.  Such U.S. Holder's tax basis in any consideration received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such U.S. Holder's holding period in any such consideration should begin on the day after the Effective Date.

For a very simplified numerical example of the abovementioned methodology (which, for the avoidance of doubt, may be one among others) for determining gain or loss where a U.S. Holder receives some consideration tax-free and other consideration that is taxable, assume the following: (i) such U.S. Holder has an adjusted tax basis in its Claim of $1,000; (ii) such Claim corresponds entirely to BTC that such U.S. Holder previously loaned to the Debtors; and (iii) such Holder receives, in satisfaction of its Claim, BTC worth $3,000 and ETH worth $2,000.  Pursuant to the above methodology, the U.S. Holder would have gain equal to the difference between (a) $2,000 (the fair market value of the ETH), and (b) $2,000 / ($3,000 + $2,000) x $1,000, i.e., $1,600 of gain.

It is generally expected that a Holder of Allowed General Unsecured Claims against GGH should not be taxed on distributions of Post-Effective Date Available Assets until such distributions are received (if at all).

The treatment to each U.S. Holder of a GGH Class 3 Claim of receiving Post-Effective Date GGH Interests will be as described above under "*Tax Treatment of the Plan Election*".

4.    *General Unsecured Claims against GAP ("__GAP Class 3__").*

Pursuant to the Plan, each Holder of an Allowed General Unsecured Claim against GAP shall, in full and final satisfaction of such Claim, receive its Pro Rata share of (i) the available (a) Effective Date Available Assets of GAP, (ii) subject to the prior payment of the Capital Reserves Funding, if applicable, (a)Post-Effective Date Available Assets of Wind-Down GAP, and (iii) the Post-Effective Date GGH Interests solely to the extent that (A) such Holder is a Qualified Holder and affirmatively makes the Plan Election and (B) an Oversubscription Event does not occur.

The treatment to each U.S. Holder of a GAP Class 3 Claim will be as described above for U.S. Holders of Allowed GGH Class 3 Claims.

5.    *Other Unsecured Claims against GGC ("__GGC Class 3__").*

Pursuant to the Plan, each Holder of an Allowed Other Unsecured Claim against GGC shall, in full and final satisfaction of such Claim, receive its Pro Rata share of (i) the Effective Date Available Assets of GGC , (ii) subject to the prior payment of the Capital Reserves Funding, if applicable, the Post-Effective Date Available Assets of GGC, and (iii) the Post-Effective Date GGH Interests solely to the extent that (a) such Holder is a Qualified Holder and affirmatively makes the Plan Election and (b) an Oversubscription Event does not occur.

The treatment to each U.S. Holder of a GGC Class 3 Claim will be as described above for U.S. Holders of Allowed GGH Class 3 Claims.

6.    *Gemini Lender Claims against GGC ("__GGC Class 4__").*

Pursuant to the Plan, each Holder of an Allowed Gemini Lender Claim against GGC shall, in full and final satisfaction of such Claim, receive its Pro Rata share of (i) Effective Date Available Assets of GGC, (ii) subject to the prior payment of the Capital Reserves Funding, if applicable, the Post-Effective Date Available Assets of GGC, and (iii) the Post-Effective Date GGH Interests solely to the extent that (a) such Holder is a Qualified Holder and affirmatively makes the Plan Election and (b) an Oversubscription Event does not occur.

The treatment to each U.S. Holder of a GGC Class 4 Claim will be as described above for U.S. Holders of Allowed GGH Class 3 Claims.

7.    *Limitations on Losses.*

U.S. Holders who recognize capital losses as a result of the distributions under the Plan will be subject to limits on their use of capital losses.  For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns) or (ii) the excess of the capital losses over the capital gains.  Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years.  For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains.  Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

D.    **Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Digital Assets Received Under the Plan.**

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Digital Assets received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including (i) the U.S. federal income tax characterization of the relationship between such Holder and a third-party exchange (if

any) to which such Holder transfers any such Digital Assets, and (ii) the activities that such Holder and/or such third-party exchange (if applicable) pursue with respect to such Digital Assets.   U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of holding and disposing of Digital Assets.

**E.      Certain U.S. Federal Income Tax Consequences of the Plan to Non-U.S. Holders of Allowed Claims.**

The following discussion includes only certain U.S. federal income tax consequences of the Plan to Non-U.S. Holders.  This discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex.  Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the Consummation of the Plan and the Restructuring Transactions to such Non-U.S. Holder.

**1.      *Gain Recognition***

Gain, if any, recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).  If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  In order to claim an exemption from or reduction of withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.  **The taxation of Digital Assets is subject to a high level of uncertainty, and each Non-U.S. Holder should consult its own tax advisor regarding the possibility of being deemed to be engaged in a trade or business in the United States as a result of its Digital Asset-related activities.**

**2.      *U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Digital Assets Received Under the Plan.***

The U.S. federal income tax consequences to a Non-U.S. Holder of owning and disposing of Digital Assets received under the Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including (i) the U.S. federal income tax characterization of the relationship between such Holder and a third-party exchange (if any) to which such Holder transfers any such Digital Assets, and (ii) the activities that such Holder and/or such third-party exchange (if applicable) pursue with respect to such Digital Assets.   Further, owning and disposing of Digital Assets received under the plan may not qualify for the trading safe harbors described in Code section 864, and therefore, a Non-U.S. Holder may be required to recognize income that is effectively connected with a U.S. trade or business and be subject to U.S. federal income taxation on such effectively connected income. Non-U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of holding and disposing of Digital Assets.

**3.      *FATCA***

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments."   For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.

FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding. FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

F.    **Information Reporting and Back-up Withholding**

The Debtors, the Wind-Down Debtors, Reorganized GGH (as applicable), the PA Officer, the Disbursing Agent, and any applicable withholding agent will withhold all amounts required by law to be withheld from payments of interest and will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a U.S. Holder of a claim. Additionally, backup withholding will generally apply to such payments if a U.S. Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the backup withholding rules will be allowed as a credit against such U.S. Holder's U.S. federal income tax liability and may entitle such U.S. Holder to a refund from the IRS, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. U.S. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the U.S. Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**