**UNITED STATES BANKRUPTCY COURT**        <u>**FOR PUBLICATION**</u>
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------x
In re                                                                  Chapter 11

GENESIS GLOBAL HOLDCO, LLC, *et al.*                Case No. 23-10063 (SHL)

                                    Debtors.              (Jointly Administered)
-----------------------------------------------------------------x


<u>**MEMORANDUM OF DECISION**</u>[1]


**A P P E A R A N C E S :**

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
*Counsel for the Debtors*
One Liberty Plaza
New York, New York 10006
By:    Sean A. O'Neal, Esq.
        Jane VanLare, Esq.
        Hoori Kim, Esq.

**WHITE & CASE LLP**
*Counsel for the Official Committee of Unsecured Creditors*
1221 Avenue of the Americas
New York, New York 10020
By:    J. Christopher Shore, Esq.
        Philip Abelson, Esq.
        David Turetsky, Esq.
        Michele J. Meises, Esq.


        -and-

111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606-4302
By:    Gregory F. Pesce, Esq.

---

[1]        Unless otherwise indicated, references in this Memorandum of Decision to docket entries on the Case Management/Electronic Case Files ("ECF") system are to Case No. 23-10063.

**WILLIAM K. HARRINGTON**
*United States Trustee*
Office of the United States Trustee
Alexander Hamilton Custom House
One Bowling Green, Suite 515
New York, New York 10004
By:    Greg Zipes, Esq.
        Benjamin Teich, Esq.
        Tara Tiantian, Esq.

**PROSKAUER ROSE LLP**
*Counsel for the Ad Hoc Group of Genesis Lenders*
Eleven Times Square
New York, New York 10036
By:    Brian S. Rosen, Esq.
        Vincent Indelicato, Esq.
        Megan R. Volin, Esq.

-and-

70 West Madison, Suite 3800
Chicago, Illinois 60602
By:    Jordan E. Sazant, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court are several motions seeking the redaction of personally identifiable

information from public filings in the Chapter 11 cases of the above-captioned debtors (the

"Debtors").[2]  The motions were filed by the Debtors and the Official Committee of Unsecured

---

[2]      The motions at issue are:

- *Debtors' Motion for Entry of Interim and Final Orders Waiving the Requirement that Each Debtor File a List of Creditors and Authorizing Preparation of a Consolidated List of Creditors, in Lieu of Submitting a Formatted Mailing Matrix, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Fifty (50) Largest Unsecured Creditors, (III) Authorizing the Debtors to Redact Certain Personally Identifiable Information, and (IV) Granting Related Relief* [ECF No. 14] (the "Creditor Matrix Motion");

- *Debtors' Motion Pursuant to 11 U.S.C. §§ 107(b), 107(c), and 105(a) for Entry of an Order Authorizing the Debtors to Redact and File Under Seal Certain Information About the Confidential Parties Listed in the Debtors' Professional Retention Applications and Schedules* [ECF No. 67] (the "Sealing Motion"); and

Creditors that has been appointed in the above-captioned cases (the "Committee"), with these

Motions joined by an *ad hoc* group of the Debtors' lenders (the "Ad Hoc Group," and together

with the Debtors and the Committee, the "Movants").  The Movants argue that the information

here—primarily the personally identifiable information of the Debtors' lenders who are

essentially the Debtors' customers—should be sealed on two grounds: 1) as confidential

commercial information under Section 107(b) of the Bankruptcy Code; and 2) based on an undue

risk of harm to these lenders under Section 107(c).  The Motions are opposed by the Office of

the United States Trustee (the "UST"), which argues that the Movants have failed to make the

necessary showing under either prong of Section 107 to overcome the general policy of public

access to court records.  For the reasons set forth below, the Motions are granted in all respects

except as to business entities whose information is sought to be redacted under Section 107(c).

## **BACKGROUND**

### A.  **The Debtors**

The Debtors and their subsidiaries and affiliates (collectively, the "Company") are in the

business of providing digital asset services, including the trading of digital assets and the

borrowing and lending of digital assets and fiat currency to and from institutional customers (the

"Institutional Lenders") and high net worth individual customers (the "Individual Lenders," and

together with the Institutional Lenders, the "Lenders").  *See Declaration of A. Derar Islim in*

---

- *The Official Committee of Unsecured Creditors' Motion for Entry of an Order Requiring the Redaction of Certain Personally Identifiable Information* [ECF No.  137] (the "Committee Motion," and together with the Creditor Matrix Motion and the Sealing Motion, the "Motions").

A joinder was also filed to the Motions:

- *Ad Hoc Group of Genesis Lenders' Joinder to Debtors' Motion for Enty of Interim and Final Orders Waiving the Requirements that Each Debtor File a List of Creditors and Authorizing Preparation of a Consolidated List of Creditors, in Lieu of Submitting a Formatted Mailing Matrix, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Fifty (50) Largest Unsecured Creditors, (III) Authorizing the Debtors to Redact Certain Personally Identifiable Information, and (IV) Granting Related Relief* [ECF No. 115] (the "Joinder").

3

*Support of First Day Motions and Applications in Compliance with Local Rule 1007-2* ¶¶ 6, 9

[ECF No. 17] (the "Islim First Day Declaration").[3]

The Debtors' lending and borrowing services permitted customers to loan digital assets to

the Company and provide institutional funds and individuals with access to liquidity.  *See id.* ¶

17.  Customers could enter into individualized loan terms and structures, with loans made

through a number of digital assets, including Stablecoins, Bitcoin and Ethereum.  *See id.* ¶ 18.

Through September 30, 2022, Genesis Global Capital, LLC and Genesis Asia Pacific PTE Ltd.

had originated loans of approximately $93.1 billion and had active outstanding loans of

approximately $1.7 billion.  *See id.* ¶ 19.  But over the latter half of 2022, the digital assets

industry began to experience significant disruption, including the collapse of certain key industry

players and the subsequent bankruptcy filing of several others.  *See id.* ¶¶ 28, 29.  This led to a

general decline of investor confidence in digital asset markets that, in turn, had a severe impact

on the Debtors' business operations.  *See id.* ¶ 30.  The Debtors began to experience

unprecedented withdrawals, which led Genesis Global Capital, LLC and Genesis Asia Pacific

PTE Ltd. to pause all lending and borrowing as of November 16, 2022.  *See id.* ¶¶ 30, 36-39.

The Debtors filed these Chapter 11 cases on January 19, 2023, seeking to restructure their

balance sheets and evaluate options to preserve the value of the business.  *See id.* ¶ 4.  These

efforts include a competitive marketing and sale process to monetize Genesis Global Holdco,

LLC ("Holdco"), Holdco's subsidiaries, and non-Debtor Genesis Global Trading, Inc., along

---

[3]      Two of the Debtors—Genesis Global Holdco, LLC and Genesis Global Capital, LLC—are organized under
the laws of Delaware.  *See* Islim First Day Decl. ¶¶ 1, 9.  The third Debtor—Genesis Asia Pacific PTE Ltd.— is a
Singapore-based entity.  *See id.* ¶ 10.  Additionally, a number of non-Debtor subsidiaries of the Debtors are
organized and/or located overseas.  *See id.* ¶ 11.  As a result, the Debtors are subject to foreign data privacy laws of
several jurisdictions, including the United Kingdom Data Protection Act of 2018 and the United Kingdom General
Data Protection Regulation (together, the "UK GDPR"), the European General Data Protection Regulation (the "EU
GDPR") and the Singaporean Personal Data Protection Act 2012 (the "Singapore PDPA").  *See* Sealing Motion ¶
23.

with their respective assets, ultimately comprising the Company's business. *See Declaration of Paul Aronzon in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2* ¶ 13 [ECF No. 19] (the "Aronzon First Day Declaration"); *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Deadlines, (II) Scheduling Hearings and Objection Deadlines With Respect to the Debtors' Sale, and (III) Granting Related Relief* ¶¶ 6-7 [ECF No. 133] (the "Sale Motion"); *Order Authorizing the Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Deadlines, (II) Scheduling Hearings and Objection Deadlines With Respect to the Debtors' Sale, and (III) Granting Related Relief* [ECF No. 192] (the "Bid Procedures Order").

### B.  <u>The Requested Relief</u>

The Debtors filed the Creditor Matrix Motion at the outset of these cases, seeking, among other things, to redact from any filing with the Court—including the Debtors' consolidated list of creditors—the names, home addresses and email addresses of all individual creditors, including the Debtors' employees, former employees, and customers. *See* Creditor Matrix Motion ¶ 17. Citing to Section 107(c)(1) of the Bankruptcy Code, the Debtors argued that the relief was appropriate due to the risk involved in public disclosure of this information, including identity theft, the ability of bad actors to locate survivors of domestic violence, or forms of other harassment or stalking. *See id.* ¶¶ 17, 21.  The Debtors also cited their need to comply with foreign data privacy laws to avoid being subject to fines overseas. *See id.* ¶ 22-23.  The Debtors proposed to provide an unredacted version of the consolidated list of creditors and any other applicable filings to the Court, the UST, the Committee and "any party in interest, upon a request reasonably related to these Chapter 11 Cases directed to the Debtors . . . or the Court." *Id.* ¶ 25.

The Court subsequently entered an interim order authorizing the Debtors to redact the names, home addresses, and e-mail addresses of individual (but not institutional) creditors, and the addresses and e-mail addresses (but not the names) of all other creditors, that were listed on the Debtors' consolidated list of creditors or other documents filed with the Court under Sections 107(c) and 105(a) of the Bankruptcy Code, Bankruptcy Rule 9018, and Local Rule 9018-1. *See Interim Order Waiving the Requirement that Each Debtor File a List of Creditors and Authorizing Preparation of a Consolidated List of Creditors, in Lieu of Submitting a Formatted Mailing Matrix, (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Fifty (50) Largest Unsecured Creditors, (III) Authorizing the Debtors to Redact Certain Personally Identifiable Information, and (IV) Granting Related Relief* [ECF No. 46] (the "Interim Creditor Matrix Order"). The Interim Creditor Matrix Order reserved the rights of the UST and any party in interest to file a motion to unseal the redacted information, noting that if the parties could not reach an agreement on such redactions, any remaining issues would be presented to the Court. *See* Interim Creditor Matrix Order ¶ 9.

The Debtors then filed the Sealing Motion, seeking to redact from the Debtors' Schedules of Assets and Liabilities (the "Schedules"), professional retention applications and other documents filed with the Court the following information: (1) all name and contact information for individual creditors; (2) addresses and contact information for institutional creditors whose addresses are individual home addresses; (3) the names of potential counterparties to mergers and acquisitions (the "Potential Counterparties"); and (4) the names of parties involved in "confidential or sealed litigation or regulatory actions or proceedings." (the "Litigation

Counterparties"). *See* Sealing Motion at preamble; *see also* Proposed Order attached to Sealing

Motion ¶ 2.[4]

In the Sealing Motion, the Debtors cited to Section 107(b)(1) of the Bankruptcy Code,

arguing that the information for the Potential Counterparties was commercially sensitive because

disclosure would impair negotiations and reduce competition for the sale, thereby impacting the

Debtors' ability to maximize value for the benefit of the Debtors' estates and stakeholders. *See*

*id.* ¶ 18. The Debtors also referenced the need to keep the information of the Litigation

Counterparties private because the existence of the litigation itself was confidential and under

seal and disclosure would put the Debtors at risk of violating court orders requiring the

confidentiality of such information. *See id.* ¶ 19. The Debtors also cited to Section 107(c) of the

Bankruptcy Code to support the redaction of information related to institutional and individual

creditors, noting that disclosure of such information could perpetrate identity theft, allow bad

actors to locate survivors of domestic violence, or facilitate other harassment or stalking. *See id.*

¶ 22. Additionally, the Debtors noted the need to comply with data privacy laws, which impose

substantial limitations on the disclosure of information relating to identified or identifiable

individuals, including names and home addresses. *See id.* ¶ 23. The Debtors stated that

violation of these privacy laws could subject them to civil and monetary penalties, which the

Debtors sought to avoid in order to maximize the value of their estate for the benefit of

stakeholders. *See id.* The Debtors stated that they would share unredacted copies of the

Debtors' retention applications, Schedules and any other applicable documents with the UST, the

Committee and any other party that was ordered by the Court or agreed to by the Debtors, under

---

[4]    On the same day that the Sealing Motion was filed, the Debtors also filed several professional retention
applications with redacted disclosure schedules. *See generally* ECF Nos. 68-73.

7

appropriate confidentiality agreements that were reasonably satisfactory to the Debtors. *See id.* ¶ 25.

The Court subsequently entered an order extending the time for the Debtors to file their Schedules and their Statements of Financial Affairs ("SOFAs") to March 9, 2023. *See Order Extending Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports* [ECF No. 42]. Thereafter, the Debtors reached an agreement with the UST for an additional extension of time to March 20, 2023. *See Notice of Extension of Debtors' Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statement of Financial Affairs to March 20, 2023* [ECF No. 119].

On March 13, 2023, the Court approved a *Stipulation and Agreed Order by and Among the Debtors, the Official Committee of Unsecured Creditors, and the Office of the United States Trustee Regarding the Redaction of Certain Personally Identifiable Information in the Debtors' Schedules and Statements* [ECF No. 124] (the "Stipulation and Order"). The Stipulation and Order provided that the Debtors would redact from the Schedules and SOFAs the names, physical addresses, and email addresses of all of the Debtors' creditors—whether individuals or institutions—pending the Court's ruling on the Motions. *See* Stipulation and Order ¶ 1.

The Committee then filed its own Motion, which sought broader relief than was requested by the Debtors. Specifically, the Committee sought to redact from all papers filed by any party in interest the names, physical addresses, and email addresses of all the Debtors' Lenders, whether individual or institutional. *See Committee Motion* ¶¶ 1-2. The Committee relied on Section 107(b)(1) of the Bankruptcy Code, arguing that the Lenders' information is a valuable asset of the Debtors' estates and, therefore, commercially sensitive information. *See*

Committee Motion ¶ 3.  Specifically, the Committee asserted that the value of the Debtor's
cryptocurrency trading and lending platform was tied to the preservation of good will with its
Lenders and that disclosure of the information at issue would impair that relationship, risking the
migration of those Lenders to other platforms.  *See id.* ¶¶ 3, 25.  The Committee argued that
release of the information would also impact the marketing process for the sale of the Debtors'
assets—as the identities of the Lenders are a key asset of the Debtors—and any potential
reorganization.  *See id.* ¶¶ 23-24; Hr'g Tr. 56:13-20, 57:13-20 (Apr. 24, 2023).  Additionally, the
Committed relied on Section 107(c), arguing that the Individual Lenders and the individuals
employed by or associated with the Institutional Lenders must be protected from 'phishing'
attempts, threats, and other improper conduct.[5]  *See* Committee Motion ¶¶ 4, 28-29.

On March 23, 2023, the UST filed an objection to the relief requested in the Motions (the
"Objection") [ECF No. 157], arguing that the Movants had failed to satisfy the grounds to seal
under Section 107 to overcome the general policy of public access to court documents.  *See*
Objection at 6-7.  Specifically, the UST argued that the Movants have not met their burden under
Section 107(b) because the Movants have not shown that the names of litigants constitute
confidential commercial information or that the failure to redact names will suppress the value of
the Debtors' assets.  *See id.* at 13-14.  As to Section 107(c), the UST argued that institutional
creditors do not meet the definition of "individual" in the language of the statute and that the
names of individual creditors should not be redacted because the Debtors have failed to show the
existence of an undue risk of harm.  *See id.* at 10-11.  Additionally, the UST argued that the

---

[5]     Phishing is defined as "the practice of tricking Internet users (as through the use of deceptive email
messages or websites) into revealing personal or confidential information which can then be used illicitly."  *See*
Merriam-Webster.com, https://www.merriam-webster.com/dictionary/phishing [https://perma.cc/8E27-3VJ5] (last
accessed July 10, 2023).

requirements of foreign privacy laws should not prevail over the disclosure requirements of U.S. law. *See id.* at 12-13.

On March 30, 2023, the Court heard oral argument on the Motions and then scheduled a further evidentiary hearing. *See* Hr'g Tr. 121:4-18 (Mar. 30, 2023) [ECF No. 198]. Written declarations were admitted into evidence as the direct testimony from Mark Renzi on behalf of the Committee and from Brian Tichenor on behalf of the Debtors.[6] *See generally* Hr'g Tr. 98:21-99:11 (Mar. 30, 2023); Hr'g Tr. 14:10-16:13 (Apr. 24, 2023) [ECF No. 264]. The Court also heard live testimony from Mr. Renzi and Mr. Tichenor at the evidentiary hearing held on April 24, 2023.

### C. **The Evidentiary Record**

The Debtors are in the process of marketing their assets for sale. *See generally* Sale Motion; Bid Procedures Order. Brian Tichenor, a Managing Director of Moelis & Company, LLC, the Debtors' investment banker, testified that the list of the Lenders, including the Lenders' names and contact information, is being sold as part of the Debtors' business and is contemplated to be a key asset in the sale. *See* Tichenor Decl. ¶ 13; Hr'g Tr. 56:13-20, 57:13-20 (Apr. 24,

---

[6]     The declarations submitted in connection with the Motions are:

- *Declaration of Mark Renzi in Support of the Official Committee of Unsecured Creditors' Motion for Entry of an Order Requiring the Redaction of Certain Personally Identifiable Information* [ECF No. 156] (the "Renzi Declaration");

- *Supplemental Declaration of Mark Renzi in Support of the Official Committee of Unsecured Creditors' Motion for Entry of an Order Requiring the Redaction of Certain Personally Identifiable Information* [ECF No. 184] (the "Renzi Supplemental Declaration");

- *Declaration of Brian Tichenor in Support of Debtors' Redaction and Sealing Motions* [ECF No. 231] (the "Tichenor Declaration"); and

- *Second Supplemental Declaration of Mark Renzi in Support of the Official Committee of Unsecured Creditors' Motion for Entry of an Order Requiring the Redaction of Certain Personally Identifiable Information* [ECF No. 232] (the "Renzi Second Supplemental Declaration," and together with the Renzi Declaration, the Renzi Supplemental Declaration and the Tichenor Declaration, the "Declarations").

2023) (Mr. Tichenor testifying that a list of Lenders was one of the primary assets with respect to the sale of the Debtors' business and that the Debtors will seek to sell the Lender information, including creditor name, email address and other information, that would allow for a buyer to market to those customers).  Mr. Tichenor testified that given the value of this information, it will not be shared with any of the potential bidders and will only be provided to the purchaser upon the consummation of a transaction.  *See* Hr'g Tr. 62:8-63:7 (Apr. 24, 2023).

The conclusion of Mr. Tichenor is consistent with the testimony of Mr. Renzi, who is a Managing Director and Head of the Corporate Finance Financial Institutions Group for Berkeley Research Group, LLC, the Committee's financial advisor.  *See* Renzi Supp. Decl. ¶ 1.  Mr. Renzi has firsthand experience with sales in other cryptocurrency bankruptcy cases.  *See* Renzi Second Supp. Decl. ¶ 3; Hr'g Tr. 28:13-14 (Apr. 24, 2023).  Mr. Renzi testified that the list of Lenders in the Debtors' cases was equivalent to a company's customer list.  *See* Hr'g Tr. 28:13-14, 28:21-29:1, 30:13-25 (Apr. 24, 2023); *see also id.* at 62:23-63:3 (Mr. Tichenor testifying that a financial institution's customers are its source of funding); Renzi Decl. ¶ 12.[7]  He noted that the Debtors have spent a significant amount of time, money and resources to develop their customer base.  *See* Renzi Decl. ¶ 13.  Mr. Renzi further explained that the business plans of cryptocurrency companies specifically ascribe value to each customer and that this information is part of the marketing process in multiple cryptocurrency bankruptcy cases.  *See* Hr'g Tr. 28:9-20 (Apr. 24, 2023).  He warned that publishing a list of the Genesis Lenders would allow competitors to contact those Lenders and solicit business from them, thereby shrinking the

---

[7]    The term "customer" was used interchangeably with the term "lender" throughout the testimony.  *See, e.g.,* Hr'g Tr. 56:13-23 (Apr. 24, 2023) (question and answer referring to customer list being asset in Genesis sale process); *see id.* at 49:5-15 (question and answer discussing desire of potential purchaser to keep customer list private); *see also* Islim First Day Decl. ¶ 9 (describing Debtor Genesis Global Capital, LLC as providing "lending and borrowing services for digital assets and fiat currency primarily to and from institutional and high net worth individual *customers*.") (emphasis added); *id.* ¶¶ 17-18 (referring to loan counterparties as "customers").

11

Debtors' Lender base and market share, while at the same time giving those competitors an advantage over the Debtors. *See id.* at 29:2-5; Renzi Decl. ¶¶ 13, 17. For the same reasons, Mr. Tichenor and Mr. Renzi testified that publication of the information would devalue the Debtors' assets in any marketing process and sale because any bidder for the assets would not want the Lender information to be public as the potential purchaser would want to retain the Lenders and move them to its new platform. *See* Hr'g Tr. 49:5-15 (Apr. 24, 2023); Renzi Decl. ¶¶ 13, 17; Tichenor Decl. ¶ 14. Thus, both Mr. Renzi and Mr. Tichenor noted that the value of the Lender list is directly tied to the Lenders' information not being available to the Debtors' competitors; if the information were made public, it would have minimal, if any, value. *See* Renzi Decl. ¶¶ 12-13, 17; Tichenor Decl. ¶ 14.

The evidence also established that the Individual Lenders are generally understood to be high net worth investors and therefore at heightened risk of financial or physical harm because they are perceived to be wealthy. *See* Renzi Second Supp. Decl. ¶¶ 6, 9; Hr'g Tr. 25:4-9 (Apr. 24, 2023) (Mr. Renzi testifying to risk based on the *Genesis* case involving high net worth investors); *see, e.g.,* Hr'g Tr. 101:8-16 (Apr. 24, 2023) (counsel to the Ad Hoc Group stating that to be a Genesis exclusive lender, a creditor must provide proof of over $10 million in investible assets and make a minimum loan of either 100 Bitcoin, 1,000 Ethereum, or $2 million in USD or Stablecoin loans to Genesis). Additionally, Mr. Renzi testified that cryptocurrency poses an increased risk of criminal theft attempts because of the near instantaneous and almost irreversible nature of cryptocurrency transactions due to their status as bearer assets. *See* Renzi Second Supp. Decl. ¶ 8; Hr'g Tr. 23:23-24:23 (Apr. 24, 2023) (Renzi testifying on specific risks with respect to cryptocurrency). Mr. Renzi testified that because cryptocurrency is a bearer asset, if someone were able to obtain a Lender's cryptocurrency keys, then they would then have control

over that asset.  *See* Hr'g Tr. 24:8-19 (Apr. 24, 2023).  Mr. Renzi further testified that it is well

documented that criminals will seek to obtain cryptocurrency keys through phishing and other

means.  *See id* at 24:20-23.  The record contains numerous examples of past harassment, threats

and attacks against individuals motivated by theft of cryptocurrency,[8] along with multiple

examples of alerts, bulletins and press releases from federal law enforcement and administrative

agencies warning the public of schemes, tactics and incidence of theft or violence against holders

of cryptocurrency.[9]  Many of these alerts and warnings come from the federal government,

including the Department of Justice (of which the UST is a part).

---

[8]     *See* Hr'g Tr. 20:10-27:20 (Apr. 24, 2023) (Renzi testimony regarding risk of physical threats and harm, phishing attacks and psychological harm associated with release of personally identifiable information); *see also* Exh. J to Renzi Supp. Decl., New York Times, *Bitcoin Thieves Threaten Real Violence for Virtual Currencies*, dated Feb. 18, 2018 (describing "startling" number of bitcoin thieves threatening violence to force cryptocurrency holders to transfer assets through irreversible transactions, including an incident in New York City where a man was held captive until he transferred over $1.8 million worth of Ether, and another incident where a man in Phuket, Thailand was attacked in his apartment until he transferred $100,000 worth of bitcoin to a wallet that the attackers controlled); Exh. K to Renzi Supp. Decl., CoinTelegraph, *$5 Wrench Attacks Appear to Be on the Rise in Crypto Community*, dated Feb. 2, 2022 (article from crypto-focused news outlet highlighting that attacks on known holders of significant sums of cryptocurrency appear to be on the rise); Exh. L to Renzi Supp. Decl., *Crypto Blogger Yuri Boytsov Had $284,000 Stolen in Bitcoins*, dated Feb. 27, 2023 (article detailing how in Bali, Indonesia, a group of four men attacked a known cryptocurrency investor in his home, beating him and forcing him to transfer $284,000 in Bitcoin to his assailants); Exh. M to Renzi Supp. Decl., Corriere Della Sera, *Manerba, Threatened With a Knife and Robbed of Bitcoins*, dated August 11, 2022 (article detailing how known owner of cryptocurrency in Manerba, Italy held at knifepoint while robbers forced him to transfer cryptocurrency to their accounts); Exh. N. to Renzi Supp. Decl., *Hooded Men Torture the Founder of Tuenti in his Apartment in Madrid and Steal his Fortune in Bitcoins*, dated Nov. 3, 2021 (article detailing how the president and founder of a social media company in Madrid, Spain, was handcuffed and gagged in his apartment by assailants that extorted him in an effort to obtain the password to his accounts holding Bitcoin worth several million Euros); Exh. O to Renzi Supp. Decl. (article detailing how in Kyoto, Japan, several men confined and beat the son of the former CEO of Mitsubishi Electric who was known to be holding cryptocurrency in an effort to force him to transfer the crypto tokens to the assailants); Exh. P. to Renzi Supp. Decl., South China Morning Post, *Hong Kong Police Rescue Cryptocurrency Trader Kidnapped by Triad Gang Who Demanded HK$30 Million Ransom*, dated Nov. 14, 2021 (detailing how a known cryptocurrency trader in Hong Kong was lured, held against his will and beaten by suspected gang members attempting to force him to pay them HK$30 million in cryptocurrency as ransom); Exh. Q to Renzi Supp. Decl., Obozrevatel, *In Kiev, Bitcoin Worth Almost $50 Thousand Was Knocked Out of the Guy*, dated Sept. 8, 2017 (article detailing how a cryptocurrency investor in Kiev, Ukraine, was beaten and tortured by three men to extort him of his cryptocurrency holdings).

[9]     *See* Exh. A to Renzi Supp. Decl., Federal Bureau of Investigation Public Service Announcement, dated February 8, 2022 (informing public of the "increasing use of Subscriber Identity Module (SIM) swapping by criminals to steal money from fiat and virtual currency accounts" and recommending that individuals take precautions to protect against theft, including to "not advertise information about financial assets, including ownership or investment of cryptocurrency" and to "avoid posting personal information online, such as mobile phone number, address, or other personal identifying information."); Exh. B to Renzi Supp. Decl., U.S. Department of Treasury, *Crypto-Assets: Implications for Consumers, Investors, and Businesses*, dated September 2022

The witnesses also testified that redacting a Lender's contact information (such as their email or their address)—but allowing the publication of their names—would not mitigate the risks at issue. *See* Hr'g Tr. 27:2-9, 27:14-20, 28:9-13 (Apr. 24, 2023). This is because the internet allows someone to gain a significant amount of information about individuals simply through a search of their names, thus allowing third parties to identify the individuals' home and business addresses and email addresses. *See id.* at 27:5-15.

The UST's cross-examination was limited in scope and—importantly—raised no real challenge to the testimony that the Lenders' information was a key asset in the Debtors' sale process, leaving that testimony essentially unrebutted.[10] Rather, the UST cross-examined on a variety of more tangential issues. For example, the UST cross-examined Mr. Renzi and Mr. Tichenor about the Debtors not having originally sought redaction requests for Institutional

---

(discussing risk of cryptocurrency theft, which accounted for $3.2 billion of "crypto-asset-based crime" in 2021 from security breaches such as phishing, key logging, and social engineering); Exh. C. to Renzi Supp. Decl., Federal Trade Commission, *What To Know About Cryptocurrency and Scams*, dated May 2022 (warning of blackmail scams involving "emails or U.S. mail sent to [an individual's] home" that threatens to make information public unless payment made in cryptocurrency); Exh. D to Renzi Supp. Decl., Consumer Financial Protection Bureau, Complaint Bulletin, dated November 2022 (highlighting complaints received related to crypto-assets and warning consumers about SIM-swapping, phishing, and other types of hacking); Exh. E to Renzi Supp. Decl., U.S. Attorney's Office, S.D.N.Y., *Two Men Charged with Plan to Commit Home Invasion Robbery for Tens of Millions of Dollars in Bitcoin*, dated June 24, 2022 (press release detailing unsealed indictment of two defendants charged under a federal conspiracy statute in connection with "a violent plan to break into a family's home in the middle of the night and force its residents to provide the code to what the defendants believed was tens of millions of dollars in Bitcoin currency."); Exh. F to Renzi Suppl. Decl., U.S. Customs and Border Protection, *CBP Warns Against Phone Scams*, dated January 20, 2022 (national media release warning of telephone phishing scams involving criminals impersonating U.S. Border Patrol agents who, among other tactics, request that an individual provide information in exchange for Bitcoin); Exh. G to Renzi Supp. Decl., U.S. Department of Justice, *Two Men Sentenced for Nationwide Scheme to Steal Social Media Accounts and Cryptocurrency*, dated Oct. 19, 2022 (press release detailing arrest and conviction of two defendants who targeted, among others, "executives of cryptocurrency companies and others who likely had significant amounts of cryptocurrency" in a scheme through which approximately $330,000 was stolen through "SIM swapping," computer hacking, and other methods); Exh. H to Renzi Supp. Decl., Federal Bureau of Investigation, *FBI Expects a Rise in Scams Involving Cryptocurrency Related to the COVID-19 Pandemic*, dated April 13, 2020 (press release warning of increase in cryptocurrency fraud schemes related to the COVID-19 pandemic, including blackmail attempts); Exh. I to Renzi Supp. Decl., Federal Trade Commission, *Reported Crypto Scam Losses Since 2021 Top $1 Billion, Says FTC Data Spotlight*, dated June 3, 2022 (business blog post noting that, "since 2021, more than 46,000 people have reported losing over $1.0 billion in crypto to scams.").

[10]    Indeed, the UST's cross-examination of Mr. Tichenor seemed to confirm the type of information that the Debtors' collected from their customers, that the Debtors' customer list is part of the sale process and that this information was one of the Debtors' primary assets. *See* Hr'g Tr. 56:3-58;15 (Apr. 24, 2023).

Lenders and the scope of the Debtors' current request for sealing. *See* Hr'g Tr. 33:18-34:8 (Apr.

24, 2023); *see id.* at 59:18-60:5. The UST also cross-examined Mr. Renzi with respect to the

Debtors' privacy policies, specifically which policies were in place at what time. Mr. Renzi's

testimony established that the Debtors did have policies in place providing privacy protections to

the Lenders. *See* Master Digital Loan Agreement applicable to Gemini Lenders, attached as

Exh. B to Renzi Decl. (the "MLA") at Paragraph XI(a) ("Each Party to this Agreement shall hold

in confidence all information obtained from the other Party in connection with this Agreement. . .

."); MLA, Paragraph X(c) ("Each Party also agrees not to use Confidential Information for any

purpose other than in connection with transactions contemplated by this Agreement."); MLA,

Paragraph XI(b) ("Each Party shall (i) keep such Confidential Information confidential and shall

not, without the prior written consent of the other Party, disclose or allow the disclosure of such

Confidential Information to any third party . . . and (ii) restrict internal access to and

reproduction of the Confidential Information to a Party's Representatives only on a need to know

basis."); Genesis Privacy Notice, attached as Exh. A to the Renzi Decl. (the "Genesis Privacy

Policy") at Section 8 ("We have put in place appropriate security measures to prevent your

personal data from being accidentally lost, used or accessed in an unauthorized way, altered or

disclosed. In addition, we limit access to your personal data to those employees, agents,

contractors and other third parties who have a business need to know."); Genesis Privacy Policy

at Section 7 ("We do not sell customer information to third parties for the purposes of

marketing."); *see also Notice of Filing of Additional Joint Exhibit in Connection With the April*

*24, 2023 Hearing* [ECF No. 284] (attaching version of confidentiality provision applicable to

non-Gemini Lenders). Exceptions exist in the Debtors' privacy policies. But they are limited to

allowing the Lenders' information to be disclosed to third parties in specific circumstances, such

as to its affiliates or to a purchaser in the context of a sale of the Debtors' assets. *See* Hr'g Tr. 34:9-36-8 (Apr. 24, 2023); *see id*. at 37:5-39:1; *see id*. at 39:11-40:25; *see id.* at 50:6-52:21.

The UST cross-examined Mr. Renzi with respect to the fact that certain Lenders had filed public documents on the docket of the Debtors' case that included their names and/or addresses. *See* Hr'g Tr. 41:16-44:6 (Apr. 24, 2023). Additionally, the UST questioned Mr. Rezni about the Lenders having voluntarily signed up to do business with Genesis, noting that in some other cases where sealing has been requested, the creditors did not voluntarily surrender their information, but rather their information was implicated due to their status as opioid users and sexual abuse survivors. *See* Hr'g Tr. 44:7-46:6 (Apr. 24, 2023). Mr. Rezni was also cross-examined by the UST regarding the fact that the Debtors' Lenders were sophisticated and questioned both Mr. Renzi and Mr. Tichenor as to whether the Lenders constituted accredited investors and high net worth individuals. *See* Hr'g Tr. 46:8-47:2 (Apr. 24, 2023); *see id.* at 54:5-56-2 (Apr. 24, 2023). Specifically, the UST questioned Mr. Renzi and Mr. Tichenor extensively on what the qualifications were for an individual to be considered an accredited investor as that term of art might be defined by the SEC or other governmental regulators. Hr'g Tr. 46:11-47:2 (Apr. 24, 2023); *id.* at 54:5-56:2 (Mr. Tichenor testifying that the term accredited investor refers to the SEC definition under Regulation D of the Securities Act of 1933, and that among other factors considered is whether an investor is a Series 7 holder or the dollar amounts of an individual's net worth).[11] The UST cross-examined Mr. Tichenor on the type of information that the Debtors' collected from their customers besides their names and the fact that all this information was being sold as part of the sale process. *See* Hr'g Tr. 56:3-58;15 (Apr. 24, 2023).

---

[11]    The UST did not clarify the significance of its line of questioning relating to the qualifications for becoming an accredited investor under such SEC definition. Indeed, the Court can think of none.

Finally, the UST cross-examined Mr. Tichenor as to the Lenders' inability to currently withdraw their assets.  *See* Hr'g Tr. 60:6-8 (Apr. 24, 2023).

## **DISCUSSION**

### A.  **The Standard for Sealing Generally**

Courts recognize "a strong presumption and public policy in favor of public access to court records."  *In re Food Mgmt. Grp., LLC*, 359 B.R. 543, 553 (Bankr. S.D.N.Y. 2007) (collecting cases).  "This preference for public access is rooted in the public's first amendment right to know about the administration of justice.  It helps safeguard the integrity, quality, and respect in our judicial system. . . ."  *Video Software Dealers Ass'n v. Orion Pictures Corp. (In re Orion Pictures Corp.)*, 21 F.3d 24, 26 (2d Cir. 1994) (internal citation and quotation omitted). The presumption is important in bankruptcy cases, where public access "fosters confidence among creditors regarding the fairness of the bankruptcy system."  *In re Food Mgmt.*, 359 B.R. at 553.  But while "the right of public access to court records is firmly entrenched and well supported by policy and practical considerations, the right is not absolute . . . In limited circumstances, courts must deny access to judicial documents—generally where open inspection may be used as a vehicle for improper purposes."  *In re Orion,* 21 F.3d at 27.

Congress's "strong desire to preserve the public's right of access to judicial records in bankruptcy proceedings" is codified in Section 107 of the Bankruptcy Code.  *Id.* at 26.  Section 107(a) states that, "unless otherwise provided . . . , a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge."  11 U.S.C. § 107(a).  Thus, "[t]he plain meaning of [Section] 107(a) mandates that *all* papers filed with the bankruptcy court are 'public records' unless the bankruptcy court decides to protect the information pursuant to the standards set forth in

17

[Sections] 107(b)" and 107(c) of the Bankruptcy Code. *In re Food Mgmt.*, 359 B.R. at 554

(emphasis in original) (internal citation and quotation omitted).

The party seeking to seal a document has the burden to prove that grounds exist to grant

the requested relief. *See In re Food Mgmt.*, 359 B.R. at 561. "Since the sealing of records runs

contrary to the strong policy of public access, only clear evidence of impropriety can overcome

the presumption and justify protection . . . ." *Togut v. Deutsche Bank AG (In re Anthracite*

*Capital, Inc.)*, 492 B.R. 162, 174 (Bankr. S.D.N.Y. 2013) (internal citations and quotations

omitted). Additionally, "[r]edacting portions of a document containing protectable information

is preferable to wholesale sealing . . . because the policy favoring public access supports making

public as much information as possible while still preserving confidentiality of protectable

information." *Motors Liquidation Co. Avoidance Action Trust v. JP Morgan Chase Bank, N.A.*

*(In re Motors Liquidation Co.)*, 561 B.R. 36, 42 (Bankr. S.D.N.Y. 2016).

The grounds for the sealing of information are provided in Sections 107(b) and (c) of the

Bankruptcy Code, which provide in part that:

> (b) On request of a party in interest, the bankruptcy court shall, and on the
> bankruptcy court's own motion, the bankruptcy court may—
>
> (1) protect an entity with respect to a trade secret or confidential research,
>     development, or commercial information; or
> (2) protect a person with respect to scandalous or defamatory matter contained in
>     a paper filed in a case under this title.
>
> (c) (1) The bankruptcy court, for cause, may protect an individual, with respect to
> the following types of information to the extent the court finds that disclosure of
> such information would create undue risk of identity theft or other unlawful injury
> to the individual or the individual's property:
>
> (A) Any means of identification (as defined in section 1028(d) of title 18)
>     contained in a paper filed, or to be filed, in a case under this title.
> (B) Other information contained in a paper described in subparagraph (A).

11 U.S.C. §§ 107(b), (c).

The Movants invoked both Section 107(b) and 107(c). But the parties' precise positions have evolved during the course of filing the Motions. After consulting with the Committee, the Debtors now fully support the Committee's position that the names and contact information of both Institutional and Individual Lenders should be redacted under both Sections 107(b) and 107(c) of the Bankruptcy Code. *See* Hr'g Tr. 73:19-74:7 (Apr. 24, 2023).[12] The UST has stated that it now does not oppose the sealing of information relating to the Litigation Counterparties and the Potential Counterparties, so long as a reasonable basis exists for the redaction and verification of that basis is provided by the Debtors to the UST. *See* Hr'g Tr. 71:12-75:8, 80:2-19 (Mar. 30, 2023); Hr'g Tr. 76:7-77:10 (Apr. 24, 2023). The UST has also agreed to the redaction of email addresses and mailing addresses of Individual Lenders. *See* Hr'g Tr.76:16-19, 77:24-25 (Mar. 30, 2023); *see also* Objection at 11. But the UST continues to object to the redaction of the names of Individual Lenders and the names and contact information of Institutional Lenders. *See* Hr'g Tr. 31:19-32:22 (Apr. 24, 2023). Given the parties' current positions and consistent the Court's need to make appropriate findings before granting a request to seal, the Court will address each of the categories of information where sealing has been sought. The Court will focus on the names of Individual Lenders and the names and contact information of Institutional Lenders, which appears to be the only information still in dispute.

**B.  <u>Section 107(b)</u>**

Section 107(b)(1) provides that "[o]n request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may . . . protect an entity with respect to a trade secret or confidential research, development, or commercial information .

---

[12]    The Debtors have not sought to redact the names and contact information of their vendors and similar types of creditors, as they do not believe the same concerns are applicable to these parties. *See* Hr'g Tr. 86:21-87:15 (Apr. 24, 2023).

19

. . ." 11 U.S.C. 107(b). Bankruptcy Rule 9018 further provides that "the court may make any

order which justice requires . . . to protect the estate or any entity in respect of a trade secret or

other confidential research, development, or commercial information." Fed. R. Bankr. P. 9018.

"[I]f the information fits any of the specified categories [in Section 107(b)(1)], the court

is *required* to protect a requesting interested party and has no discretion to deny the application."

*In re Orion*, 21 F.3d at 27 (emphasis in original) (internal citation and quotation omitted); *see*

*also In re Anthracite*, 492 B.R. at 174.

To meet the requirements of Section 107(b)(1), the moving party must only show "that

the information it sought to seal [is] 'confidential' and 'commercial' in nature." *In re Orion*, 21

F.3d at 27. But the information need not rise to the level of a trade secret to be protected. *See id.*

at 28 (noting that the "clear and unambiguous usage of 'or' neither equates 'trade secret' with

'commercial information' nor requires the latter to reflect the same level of confidentiality as the

former."). Rather, "[c]ommercial information [under Section 107(b)] has been defined as

information which would cause an unfair advantage to competitors by providing them

information as to the commercial operations of the debtor." *Id.* at 27 (internal citation and

quotation omitted). Commercial information also includes "situations where a bankruptcy court

may reasonably determine that allowing such disclosure would have a chilling effect on

[business] negotiations, ultimately affecting the viability of Debtors." *In re Borders Grp., Inc.*,

462 B.R. 42, 47 (Bankr. S.D.N.Y. 2011) (internal citation and quotation omitted); *see also In re*

*Lomas Financial Corp.*, 1991 WL 21231, at *2 (S.D.N.Y. 1991) (finding that "commercial

information" under Section 107(b)(1) is broader than merely the "information that may give a

debtor's competitors an unfair advantage."). Such information should be "so critical to the

operations of the entity seeking the protective order that its disclosure will unfairly benefit the

entity's competitors." *In re Borders*, 462 B.R. at 47-48.

Several courts have held that customer lists constitute confidential commercial

information. *See In re Cred Inc.*, Hr'g Tr. 113:20–25; 114:1–16 (Bankr. D. Del. Dec. 18, 2020)

[Case No. 20-12836, ECF No. 277] (finding that, based on the evidence, creditor list had

intrinsic value and that disclosure would affect the ability of the debtors to market and sell that

list); *see also In re FTX Trading Ltd.*, Hr'g Tr. 103:1-5 (Bankr. D. Del. Jan. 11, 2023) [Case No.

22-11068, ECF No. 489] (court stating that "it goes without saying that a customer list in any

bankruptcy case is something that is protected by 107(b) as a trade secret.  Companies hold those

things very closely and don't want them disclosed."); *In re Altegrity, Inc.*, 2015 WL 10963572,

at *3-4 (Bankr. D. Del. July 6, 2015) (holding debtor's list of independent contractors was a

"primary asset" that debtor had spent "considerable effort and money to develop" and were

"highly susceptible to solicitation" and that such information was therefore confidential

commercial information subject to sealing pursuant to Section 107(b)); *In re Faucett*, 438 B.R.

564, 568 (Bankr. W.D. Tex. 2010) (holding that computer screen shots revealing identity of

debtor's customers was confidential commercial information because it would give advantage to

debtor's competitors); *In re Nunn*, 49 B.R. 963, 965 (Bankr. E.D. Va. 1985) (holding that

customer list was creditor's only "real asset" and was subject to protection under Section 107(b)

because allowing creditor's competitor access to the list would have adverse effect on that

creditor).

Applying these principles here, the Court finds that the Movants have easily satisfied

their evidentiary burden for sealing all of the information as confidential commercial

information.  In particular, the Debtors have established that the list of Lenders, including the

Lenders' names and contact information, is being sold as part of the Debtors' business and is contemplated to be a key asset in the sale that, given its value, will only be provided to the purchaser upon consummation of a transaction. *See* Tichenor Decl. ¶ 13; Hr'g Tr. 56:13-20, 57:13-20 (Apr. 24, 2023); *see id.* at 62:8-63:7.

The testimony has established that the list of Lenders is akin to a customer list and is a valuable asset that the Debtors have spent significant time, money and resources to develop. *See* Renzi Decl. ¶¶ 12, 13; Renzi Supp. Decl. ¶ 1; Renzi Second Supp. Decl. ¶ 3; Hr'g Tr. 28:13-14 (Apr. 24, 2023); *see id.* at 28:13-14, 28:21-29:1, 30:13-25. Mr. Tichenor explained how investment bankers in a bankruptcy case treat this information as sensitive in any sale process for a financial institution. *See* Hr'g Tr. 62:15-63:7 (Apr. 24, 2023). The testimony also established that the business plans of cryptocurrency companies specifically ascribe value to each customer and that this information is part of the marketing process in multiple cryptocurrency bankruptcy cases. *See* Hr'g Tr. 28:9-20 (Apr. 24, 2023). Moreover, the testimony shows that publishing a list of the Genesis Lenders would provide competitors with an advantage over the Debtors by allowing competitors to directly contact the Debtors' Lenders and solicit business from them, thereby shrinking the Debtors' Lender base and market share. *See id.* at 29:2-5; Renzi Decl. ¶¶ 13, 17. For the same reasons, it is clear that publication of the information in these bankruptcy cases would devalue the Debtors' assets in any marketing process and sale; any bidder for the assets would not want the Lender information to be public because any buyer would want to retain the Lenders and move them to its new platform. *See* Hr'g Tr. 49:5-15 (Apr. 24, 2023); Renzi Decl. ¶¶ 13, 17; Tichenor Decl. ¶ 14. Thus, the value of the Lender list is directly tied to the Lender's information not being available to the Debtors' competitors; if the information were made public, it would have minimal, if any, value. *See* Renzi Decl. ¶¶ 12-13, 17; Tichenor Decl.

¶ 14; *see also In re FTX Trading Ltd.*, Hr'g Tr. 156:15-25 (Bankr. D. Del. June 9, 2023) [Case

No. 22-11068, ECF No. 1612] (court redacting customer names under Section 107(b), noting

that evidence was uncontroverted that "customer identification has value . . . to the debtors'

estates" and that "the customer names constitute a trade secret" and protecting information for a

limited time until the debtors determine if they are going to sell their assets, including the

customer lists).

      The Court notes that the factual predicate for the requested relief here is unchallenged.

The UST did not ask any questions on cross-examination of Mr. Tichenor and Mr. Renzi to

challenge their testimony about the commercial value of this information to the Debtors.  Nor did

the UST offer any witnesses of its own to address whether this information has commercial

value.  During oral argument, the UST argued that their lack of cross-examination on these

issues was because "when a Debtor is making an argument that [if] a list is publicized, . . . it

could deplete the value or reduce the value of the Debtor [is] kind of an unrebuttable statement. .

. ." Hr'g Tr. 111:23-112:4 (Apr. 24, 2023).  But as the Court noted during argument, that is not

the case.  The UST could have questioned the witnesses on a number of issues, including their

experience with this issue in prior cases, prior instances of similar assets being sold, what the

witnesses thought those assets would sell for in the Debtors' cases and whether the Debtor or

Committee evaluated the value of this asset separately from the Debtors' other assets.  *See* Hr'g

Tr. 110:6-18; 112:5-10 (Apr. 24, 2023).  But the UST explored none of these issues, despite

having had ample time to seek discovery from the Debtors and Committee on these issues.  *See*

*id.* at 112:9-13; 113:10-17.

      In arguing against granting relief under Section 107(b), the UST notes that the Debtors

did not base their original redaction request on the commercially sensitive nature of this

information for any sale of the Debtors' assets.  *See* Hr'g Tr. 89:5-10 (Mar. 30, 2023); Hr'g Tr.

114:24-115:9 (Apr. 24, 2023).  In so doing, the UST seems to be implying that the Debtors'

belated invocation of Section 107(b) is suspect.  But the UST has not presented any legal basis

for such a conclusion.  It has not invoked judicial estoppel, waiver or any similar theory.  Indeed,

no reason has been provided to deny the request simply based on the timing of the invocation of

Section 107(b) here.

Moreover, the timing of the invocation of Section 107(b) here is not suspicious to the

Court.  As is often observed, a Chapter 11 case is litigation in "real time," with the focus of a

case shifting as it develops and options change.  At the beginning of this case, the Debtors were

focused on a "[a] restructuring of the Debtors' balance sheets . . . to restore the Debtors'

businesses, to evaluate options to preserve their value and to move their businesses forward as

swiftly as possible."  Islim First Day Decl. ¶ 4.  The Debtors stated their broad intent "to seek

[C]ourt approval to conduct a competitive marketing and sales process to sell their assets or

otherwise raise capital during these Chapter 11 Cases."   Aronzon First Day Decl. ¶ 13.  But at

that time the Debtors were still negotiating with their stakeholders about the path forward.  *See*

*id.* ¶ 15 (noting that the Debtors were continuing with negotiations try and reach an agreement in

principle among their core stakeholders).  The Debtors filed the Creditor Matrix Motion on the

very first day of these cases, seeking to have information redacted in certain filings, and then

followed with the Sealing Motion during the initial first three weeks of the case.  *See* ECF No. 14

(Creditor Matrix Motion filed on January 20, 2023); ECF No. 67 (Sealing Motion filed on

February 8, 2023); ECF No. 80 (term sheet filed outlining overall structure of a sale).  The

Debtors didn't file a full sale motion until March 16, 2023, over a month after the Sealing

Motion was filed.  *See generally* Sale Motion [ECF No. 133].  On that same day, the Committee

filed the Committee Motion setting forth its arguments under Section 107(b). *See* Committee Motion, filed on March 16, 2023. The Debtors responded shortly thereafter, stating that they did not oppose the relief requested by the Committee, but had concerns regarding protracted litigation on the issue. *See Debtors' Omnibus Reply and Statement to (I) the Objection of the United States Trustee, (II) the Statement of the Official Committee of Unsecured Creditors to the Debtors' Motions to Redact and File Under Seal Certain Confidential Information, and (III) the Motion of the Official Committee of Unsecure Creditors' to Redact Certain Confidential Information* ¶ 5 [ECF No. 179] (the "Debtors' Reply"), filed on March 29, 2023.[13] Given this timeline, the Court does not find any delay in asserting Section 107(b) to be problematic. Moreover, no party suffered any prejudice as a result of the timing here; indeed, the UST does not make such a claim.

The UST also suggests that the names of the Lenders do not deserve protection because any sale would contain information beyond just the Lenders' names. *See* Hr'g Tr. 128:20-129:22 (Apr. 24, 2023). While not fully articulated by the UST, the UST's argument presumably is that the precise contact information—such as addresses and emails—is where the value exists, and the names alone are of no worth. But as explained below in more detail, the undisputed evidence is that contact information for the Lenders can be found on the internet simply by doing a search of just their names. *See* Hr'g Tr. 27:2-28:13 (Apr. 24, 2023) (Mr. Renzi testifying that that the internet is "very pervasive" and that "[i]f you just have a person's name, you can generally

---

[13]     In that filing, the Debtors explained:

> The relief requested in the UCC Motion expands the scope of the proposed redactions to the names of the Debtors' institutional lenders. While the Debtors are prepared to support the expanded relief sought in the UCC Motion, the Debtors are concerned to the extent the relief requested may result in extensive additional litigation, which would be costly and burdensome for the Debtors' estates, especially at this critical time in the Debtors' Chapter 11 Cases.

Debtors' Reply ¶ 5. As it turns out, the Debtors' concerns were well founded.

obtain a significant amount of information" including home and business addresses); *see also* discussion of Section 107(c) *infra* at 29-30 (discussing whether release of Lender names would create undue risk of identity theft or unlawful injury). The testimony here on this issue is consistent with a recent ruling in the *FTX* bankruptcy case. *See In re FTX Trading Ltd.*, Hr'g Tr. 157:10-15 (Bankr. D. Del. June 9, 2023) [Case No. 22-11068, ECF No. 1612]. In *FTX*, the Court found that customers could be identified on the internet using only their names. *See id.*[14] The Court sees no reason why the conclusion here would be any different.

Given the evidentiary record here, therefore, the Court finds that the Movants have met their burden under Section 107(b) to redact the names, addresses and contact information of the Lenders.[15] The unrebutted evidence shows that release of this information would allow competitors to determine the identity of the Debtors' Lenders and take steps to poach the Lenders, undermining the value of the Debtors' ongoing business. Indeed, several other courts have granted requests for redaction of customer information in cryptocurrency cases. *See In re Cred Inc.* (Bankr. D. Dec. Dec. 21, 2020) [Case No. 20-12836, ECF Nos. 6, 61, 264] (authorizing debtors to redact names, addresses and e-mail addresses of customers pursuant to motions seeking relief under Sections 107(b) and (c)); *In re Voyager Digital Holdings, Inc.* (Bankr. S.D.N.Y. July 20, 2022) [Case No. 22-10943 ECF Nos. 112, 113] (authorizing debtor to

---

[14]     The *FTX* court based its conclusion on testimony at the hearing of an analysis performed on a subset of the *FTX* debtors' customers (specifically, the top-200 customers) on whether revelation of names would be enough for competitors to locate the customers. *See In re FTX Trading Ltd.*, Hr'g Tr. 149:2-150:3 (Bankr. D. Del. June 8, 2023) [Case No. 22-11068, ECF No. 1611]. The witness testified that by using only Google, LinkedIn and Twitter—and not the so-called dark web—they were able to identify 46% of the customer subset purely on the basis of names. *See id.* at 150:4-20. And on a dollar basis, they were able to identify over $1 billion of claims. *See id.* at 150:21-25.

[15]     The Court also concludes that the information regarding Litigation Counterparties and Potential Counterparties should remain confidential—subject to verification—as agreed to on the record by the Movants and the UST and for the reasons set forth by the Movants. *See* Hr'g Tr. 71:12-75:8, 80:2-19 (Mar. 30, 2023); Hr'g Tr. 76:7-77:10 (Apr. 24, 2023).

redact the names of "Confidential Parties," including customers and potential transaction

counterparties, from professional retention applications pursuant to Sections 107(b) and (c)); *In*

*re FTX Trading Ltd.*, Hr'g Tr. 157:10-15 (Bankr. D. Del. June 9, 2023) [Case No. 22-11068,

ECF No. 1612]. The unrebutted evidence also shows that the information is a valuable asset of

the estate that is currently being marketed for sale and that its release would decrease the amount

that would be realized from the sale process and have a negative impact on the value of the

Debtors' estate.[16]

### C. Section 107(c)

Section 107(c) provides that:

> [t]he bankruptcy court for cause may protect an individual, with respect to the
> following types of information to the extent the court finds that disclosure of such
> information would create undue risk of identity theft or other unlawful injury to
> the individual or the individual's property:
>
> (A) Any means of identification (as defined in [S]ection 1028(d) of title 18)
> contained in a paper filed, or to be filed, in a case under this title,
>
> (B) Other information contained in a paper described in subparagraph (A).

11 U.S.C. § 107(c)(1). Unlike Section 107(b), the language of Section 107(c) is permissive,

stating that the Court "for cause may protect an individual . . . ." 11 U.S.C. § 107(c)(1); *see Halo*

*Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 93 (2016) ("[T]he "word 'may' clearly connotes

discretion.").

Section 107(c) protects individuals from the disclosure of information that would create

an undue risk of identity theft or other unlawful injury to them or their property. This

---

[16] Based on the evidence here, a good argument could be made that the Court lacks the discretion to deny the request. *See In re Orion*, 21 F.3d at 27 ("[I]f the information fits any of the specified categories [in Section 107(b)], the court is *required* to protect a requesting interested party and has no discretion to deny the application.") (emphasis in original); *In re Anthracite*, 492 B.R. at 174 ("If the Court finds that one of the exceptions outlined in [Section] 107 apply, it must seal the documents.").

information includes "any means of identification" as that phrase is defined in 18 U.S.C. §

1028(d).  11 U.S.C. § 107(c)(1)(A).  Section 1028(d) of title 18, in turn, describes "means of

identification" as "any name or number that may be used, alone or in conjunction with any other

information, to identify a specific individual."  18 U.S.C. § 1028(d).[17]  "Home addresses fall

within that category of information, as it is taken as a 'given' that they constitute personally

identifiable information that is vital information to perpetrators of identity theft, stalking and

intimate partner violence alike, and that publishing such information facilitates an identify thief's

search for data and a stalker's or abuser's ability to find his or her target."  *In re Endo Int'l PLC*,

2022 WL 16640880, at \*10 (Bankr. S.D.N.Y. Nov. 2, 2022) (quoting *In re Art Van Furniture,*

*LLC*, Case No. 20-10553, Hr'g Tr. 25:13-16 (Bankr. D. Del. Mar. 10, 2022) ("[A]t this point and

given the risks associated with having any kind of private information out on the internet,

[redaction] has really become routine [and] I think obvious relief."); *In re Forever 21, Inc.*, Case

No. 19-12122, Hr'g Tr. 60:22–25 (Bankr. D. Del. Dec. 19, 2019 ) ("We live in a new age in

which the theft of personal identification is a real risk, as is injury to persons who, for personal

reasons, seek to have their addresses withheld.")).  The same rationale also extends to email

addresses.  *See In re Endo*, 2022 WL 16640880, at \*10 (noting that good reason existed to redact

---

[17]     Section 1028 of title 18 defines the term "means of identification" as:

any name or number that may be used, alone or in conjunction with any other information, to
identify a specific individual, including any—
(A) name, social security number, date of birth, official State or government issued driver's license
or identification number, alien registration number, government passport number, employer or
taxpayer identification number;
(B) unique biometric data, such as fingerprint, voice print, retina or iris image, or other unique
physical representation;
(C) unique electronic identification number, address, or routing code; or
(D) telecommunication identifying information or access device (as defined in section 1029(e)). . .

18 U.S.C. § 1028(d)(7).

both home addresses and email addresses, since debtors demonstrated risk of identity theft,

stalking, and intimate partner violence).

The publication of names alone has been found to heighten the risk of identity theft and

other harm. *See id.* at *11 ("[P]ublishing a list of claimants' names in a searchable format would

further compound the risk of identity theft, since that format would render the claimants'

information more susceptible to data mining." ) (citing Paul G. Stiles & Michael A. Fitts,

*Research and Confidentiality: Legal Issues and Risk Management Strategies*, 17 PSYCH. PUB.

POL. & L. 333, 337, 381 n.81 (2011) (noting that large data sets can be vulnerable "to data

mining efforts for the purpose of identity theft.")); *see also In re FTX Trading Ltd*., Case No. 22-

11068, Hr'g Tr. at 103:24-104:5 (Bankr. D. Del. Jan. 11, 2023) (court stating that "if you look at

[18 U.S.C. § 1028(d)], it says that the information includes *names*, numbers, or any combination

of those two that would allow the identification of an individual. So, certainly, the Criminal Code

recognizes that disclosure of a name could result in the identification of an individual and if that

individual needs protecting, we need to make sure that that is happening.") (emphasis added); *In

re FTX Trading Ltd.*, Hr'g Tr. 157:8-21 (Bankr. D. Del. June 9, 2023) [Case No. 22-11068, ECF

No. 1612] (court redacting customer names under Section 107(c), noting that "given the access

to, not just . . . Google, Twitter, et cetera—but the dark web, where there's all kinds of

information about individuals that can be found with just a name.  And [the witness] testified,

again, very compellingly, that if they have a name and they are an FTX customer, they can be

targeted, and that is what we need to protect here.  It's the customers that are the most important

issue here.  I want to make sure that they are protected and they don't fall victim to any types of

scams that might be happening out there.").

The Movants here invoke Section 107(c) as an alternative basis to Section 107(b) to
protect the information at issue.  The Court agrees that Section 107(c) covers this information.
The evidentiary record demonstrates that an undue risk of identity theft or other unlawful injury
exists to the Individual Lenders should their names, addresses, or other contact information be
released in these bankruptcy cases.  As discussed above, redaction of the Individual Lenders'
names is important, because contact information—including home addresses—could easily be
found on the internet through just use of their names.  *See* Hr'g Tr. 27:2-28:13 (Apr. 24, 2023).
Moreover, the Individual Lenders are generally understood to be high net worth investors and
therefore at heightened risk of financial or physical harm because of their perceived wealth.  *See*
Renzi Second Supp. Decl. ¶¶ 6, 9 (testifying that the risks in the *Genesis* case are greater than in
other crypto bankruptcies because the *Genesis* Lenders are well known to be high net worth
investors); Hr'g Tr. 25:4-9 (Apr. 24, 2023).[18]  In fact, to qualify as a *Genesis* exclusive lender, a
creditor must provide proof of over $10 million in investible assets and make a minimum loan of
either 100 Bitcoin, 1,000 Ethereum, or $2 million in USD or Stablecoin loans to Genesis.  *See*
Hr'g Tr. 101:8-16 (Apr. 24, 2023).  The record here reflects that cryptocurrency inherently poses
an increased risk of criminal theft attempts because of the near instantaneous and almost
irreversible nature of cryptocurrency transactions due to their status as bearer assets.  *See* Renzi
Second Supp. Decl. ¶ 8; Hr'g Tr. 23:23-24:23 (Apr. 24, 2023) (Renzi testifying on specific risks
with respect to cryptocurrency).  More specifically, Mr. Renzi testified that because
cryptocurrency is a bearer asset, someone obtaining a Lender's cryptocurrency keys has control
over that cryptocurrency asset.  *See* Hr'g Tr. 24:8-19 (Apr. 24, 2023).  Mr. Renzi further testified

---

[18]    As noted by Debtors' counsel, the connection of an Individual Lenders' name with the amount of their
claim listed in the Debtors' Schedules would provide evidence of the value of that Lenders' cryptocurrency assets
with *Genesis* as well as some evidence of the individual Lenders' net worth. *See* Hr'g Tr. 143:19-144:1 (Apr. 24,
2023).

that it is well documented that criminals will seek to obtain cryptocurrency keys through phishing and other means.  *See id* at 24:20-23.

The record is replete with examples of past harassment, threats and attacks against individuals motivated by the theft of cryptocurrency, none of which were challenged at the hearings on these Motions.[19]  For instance, an article in the New York Times described as "startling" the number of bitcoin thieves threatening violence to force cryptocurrency holders to transfer assets through irreversible transactions, including an incident in New York City where a man was held captive until he transferred over $1.8 million worth of Ether, and a man in Phuket, Thailand who was attacked in his apartment until he transferred $100,000 worth of bitcoin to a wallet that the attackers controlled.  *See* Exh. J to Renzi Supp. Decl., New York Times, *Bitcoin Thieves Threaten Real Violence for Virtual Currencies*, dated Feb. 18, 2018.  Another news article in the South China Morning Post detailed how a known cryptocurrency trader in Hong Kong was lured, held against his will and beaten by suspected gang members attempting to force him to pay them HK$30 million cryptocurrency as ransom.  *See* Exh. P. to Renzi Supp. Decl., South China Morning Post, *Hong Kong Police Rescue Cryptocurrency Trader Kidnapped by Triad Gang Who Demanded HK$30 Million Ransom*, dated Nov. 14, 2021.

The U.S. government acknowledges the heightened risks involved with cryptocurrency, with numerous federal law enforcement and administrative agencies having issued alerts, bulletins and press releases warning the public of schemes, tactics and incidence of theft or violence against holders of cryptocurrency.[20]  For instance, the F.B.I. issued a public service announcement that informed the public of the "increasing use of Subscriber Identity Module

---

[19]    *See supra* note 8.

[20]    *See supra* note 9.

(SIM) swapping by criminals to steal money from fiat and virtual currency accounts" and

specifically recommended that individuals take precautions to protect against theft, including to

"not advertise information about financial assets, including ownership or investment of

cryptocurrency" and to "avoid posting personal information online, such as mobile phone

number, address, or other personal identifying information." *See* Exh. A to Renzi Supp. Decl.,

Federal Bureau of Investigation Public Service Announcement, dated February 8, 2022.[21]

Other cryptocurrency bankruptcy cases confirm that the risk exists with the disclosure of

information about cryptocurrency owners such as the Individual Lenders.  A recent example is *In

re Celsius Network, LLC*, Case No. 22-10964, where *Celsius* customer names were made public

in the case, leading to multiple phishing attempts against those customers.  *See Notices of

Phishing Attempts, In re Celsius Network LLC*, Case No. 22-10964 (Bankr. S.D.N.Y.) [ECF Nos.

1527, 1681, 1904, 1992, 2082].[22]  As notices filed on the *Celsius* docket make clear, some of

these phishing attempts appeared to customers as seemingly legitimate contacts from the *Celsius*

debtors and their professionals.  Creditors were notified that the *Celsius* debtors "became aware

that phishing emails were being sent to certain of the [d]ebtors' customers purporting to be

restructuring associates at Kirkland & Ellis LLC, requesting that customers submit their wallet

addresses and other account information to receive claim distributions."  *Notice of Phishing*

---

[21]     The Department of Justice recently issued a press release detailing the arrest and conviction of two defendants who targeted, among others, "executives of cryptocurrency companies and others who likely had significant amounts of cryptocurrency" in a scheme through which approximately $330,000 was stolen through "SIM swapping," computer hacking, and other methods.  *See* Exh. G to Renzi Supp. Decl., U.S. Department of Justice, *Two Men Sentenced for Nationwide Scheme to Steal Social Media Accounts and Cryptocurrency*, dated Oct. 19, 2022.

[22]     The UST relies on *Celsius* as support for its argument that the Lenders' names should not be redacted.  *See In re Celsius Network LLC*, 644 B.R. 276 (Bankr. S.D.N.Y 2022).  The *Celsius* decision held that the disclosure of the names of the debtors' individual shareholders and customers did not create an undue risk of unlawful injury for purposes of Section 107(c) of the Bankruptcy Code.  *See id.* at 293-94.  But *Celsius* is a different case, with a different set of facts and evidentiary record.  Indeed, the *Notices of Phishing Attempts* occurred only after the *Celsius* ruling, which was made on a more sparse record than the one presented to this Court.

*Attempts*, *In re Celsius Network LLC* (Bankr. S.D.N.Y.) [Case No. 22-10964, ECF No. 1527],

attached as Exh. C to Renzi Decl.  Customers had to be warned that the emails were "not an

authorized message from the [d]ebtors' legal advisors and are likely a phishing scam."  *Id.*  In

another such attempt, a court order was modified and emailed to *Celsius* customers purporting to

require the customers to submit personal information, including their cryptocurrency wallet

address and contact information, and to pay a "filing fee" and "tax fee."  *See Second*

*Supplemental Notice of Additional Phishing Attempts*, *In re Celsius Network LLC* (Bankr.

S.D.N.Y.) [Case No. 22-10964, ECF No. 1904]; attached as Exh. C to Renzi Decl., *Third*

*Supplemental Notice of Additional Phishing Attempts*, *In re Celsius Network LLC* (Bankr.

S.D.N.Y.) [Case No. 22-10964, ECF No. 1992]; attached as Exh. C to Renzi Decl.

   The Consumer Privacy Ombudsman appointed in connection with the sale of assets in the

*Celsius* case also highlighted the risks associated with the potential exposure of cryptocurrency

account information.  *See generally Consumer Privacy Ombudsman First Report to the Court*, *In*

*re Celsius Network LLC* (Bankr. S.D.N.Y.) [Case No. 22-10964, ECF No. 1948] (the

"Ombudsman Report"), attached as Exh. A to Renzi Second Supp. Decl.  The Ombudsman noted

that in the *Celsius* cases, "the names of 603,497 individual retail customers, along with their

recent *Celsius* account transactions, were published in the Statement of Financial Affairs . . . and

Schedules of Assets and Liabilities. . . ."  Ombudsman Report at 32.  The Ombudsman noted that

the information disclosed in the bankruptcy case was taken and widely disseminated online,

stating that:

> [a]lmost immediately thereafter, according to blogs on the Internet, someone
> created a searchable database of the published names and financial transactions.
> This information could be used to try to determine the identity of particular
> individuals who may have suffered losses in the case. The most publicized
> website where the data was published was celsiusnetworth.com. A screenshot of
> the Celsius Net Worth landing page from the date it was published is available.

> Counsel for the Official Committee of Unsecured Creditors [of *Celsius*] consulted
> their forensic experts and advised the Ombudsman that some Reddit sub-threads
> have links to the raw data of schedules/statements of financial affairs. . . .  This
> raw data is still published online and can be uploaded into Excel spreadsheets.

*Id*. at 33.  The Ombudsman went on to note that privacy and cybersecurity risks are heightened

when dealing with digital assets and that "[c]yber criminals have exploited vulnerabilities in the

crypto infrastructure, as well as compromised individual accounts to steal cryptocurrency assets.

The hacker attacks are both profit-driven, as well as motivated by a desire to disrupt crypto

exchanges.  As well, crypto exchanges have been used to facilitate illegal activities." *Id.* at 35.

The Ombudsman also observed that principal policy objectives of an executive order issued by

the President of the United States "focus on the importance of protecting consumers and

investors in the digital assets ecosystem. . . ." *Id.* (citing The White House, Executive Order on

Ensuring Responsible Development of Digital Assets (March 9, 2022)).  The Ombudsman

recommended that certain steps be taken to protect *Celsius* customers and mitigate the risks of

phishing and internet crimes in connection with the case going forward, including protections

centered on the sale of the Celsius debtors' assets.  *See id*. at 34, 39-43.

In opposing relief under Section 107(c), the UST's first argument relates to the standard.

It appears to contend that only a "generalized" fear of identity theft or unlawful injury has been

established here and there are no specific threats to customers.  *See* Hr'g Tr. 80:25-81:17 (Mar.

30, 2023) (citing the lack of people contacting the UST to report the receipt of "specific

threats"); Hr'g Tr. 104:13-16 (Apr. 24, 2023) (stating there was "generalized fear by customers

and [C]reditors that their information will be misused, but there's nothing specific on the record

in this case. . . .").  In the UST's view, this is not sufficient.  But the Court rejects this reading of

the statute.  Section 107(c) references "risk," which is defined as the "possibility of loss or

injury." *See* Merriam-Webster.com, https://www.merriam-webster.com/dictionary/risk
[https://perma.cc/E4YN-5VTV] (last accessed July 13, 2023) (defining of noun "risk"); *see also id.* (defining verb "risk" as "to expose to hazard or danger").  So while evidence of actual injury
or a specific threat against an individual would certainly meet the standard under Section 107(c),
the statute does not require it.  Instead, it requires an evaluation of the possibility of injury in
each case.  Given the realities of the twenty-first century, numerous courts have already
concluded that release of this kind of information presents such an undue risk, particularly in the
world of cryptocurrency.  *See In re Clover Techs. Grp., LLC,* Case No. 19-12680, Hr'g Tr.
24:21-25 (Bankr. D. Del. Jan. 22, 2020) ("To me it is common sense.  I don't need evidence that
there is, at best, a risk of identity theft and worse a risk of personal injury from listing someone's
name and address on the internet by way of the court's electronic case filing system and, of
course, the claims agent's website."); *In re Anna Holdings*, Case No. 19-12551, Hr'g Tr. 48:20–
22, 49:3-5 (Bankr. D. Del. Dec. 4, 2019) ("[I]t's just plain common sense in 2019—soon to-be
2020—to put as little information out as possible about people's personal lives to present [sic]
scams. . . . [Identity theft is] a real-life issue[.]"); *In re Windstream Holdings, Inc.*, Case No. 19-
22312, Hr'g Tr. 88:6-12, 89:5-8 (Bankr. S.D.N.Y. Feb. 26, 2019) (noting that the consequences
of releasing private information could be "very serious," and "[o]nce [private information is] out
there, it's out there."); *In re Endo*, 2022 WL 16640880, at *10 (quoting *In re Motion Seeking
Access to 2019 Statements*, 585 B.R. 733, 751 (D. Del. 2018)) ("While a specific potential harm
must be identified," courts have found that  "the standard does not require evidence of injury
having occurred in the past or under similar circumstances.").  As the record here demonstrates,
the risks to the Individual Lenders are "real, not theoretical," and the Court finds that protection
is warranted under Section 107(c).  *In re Endo*, 2022 WL 16640880, at *10; *see* Hr'g Tr. 82:1-16

35

(Mar. 30, 2023) (Court stating during argument that "where somebody says I've gotten a threat, it's already too late. . . . You can't put the genie back in the bottle."). In opposing relief under Section 107(c), the UST once again has not presented any evidence of its own on the level of risk here, merely arguing that the Movants have failed to satisfy their burden. But the UST has not challenged any of the extensive evidence on risk that was submitted by the Movants, which includes guidance from the Department of Justice—of which the UST is a part—to "not advertise information about financial assets, including ownership or investment of cryptocurrency" and to "avoid posting personal information online, such as mobile phone number, address, or other personal identifying information." *See* Federal Bureau of Investigation Public Service Announcement, dated February 8, 2022, attached as Exh. A to Renzi Supp. Decl.; *see also* Exh. C, D, E, F and G to Renzi Supp. Decl.

The UST also argues that parties who have experienced threats or concerns about their safety should come forward and then efforts will be taken to protect them. *See* Hr'g Tr. 80:22-81:17 (Mar. 30, 2023). But that is not what the statute requires. While the Court welcomes any efforts to protect individuals from harm, the UST's position contemplates first exposing these creditors to the very same risks against which the statute is supposed to protect. Moreover, the UST's position puts the onus on thousands of individual creditors to come forward and argue for protection. But in fact, the Lenders have already come forward—through the Committee that represents them—to voice their concerns about the risks they would face if their information to be disclosed. *See* Renzi Decl. ¶¶ 10, 12 (noting that the vast majority of unsecured creditors are Lenders that used the Debtors' platform). In its capacity as representative of these unsecured creditors, the Committee filed its Motion to request that these Lenders' information be kept confidential. Indeed, the Committee has acted based on the concerns that have been expressly

raised by their constituency.  *See* Renzi Second Supp. Decl. ¶¶ 6-7; Hr'g Tr. 25:20-36:12 (Apr.

24, 2023) (Renzi testifying to attendance at virtual town hall meeting during which dozens of the

Debtors' Lenders expressed their concerns about the consequences of the Court denying the

Motions); *see also* Renzi Supp. Decl. ¶ 6 (noting communications the Committee has received

from Lenders expressing concerns regarding the release of their personally identifiable

information).

       The UST highlights instances where a small number of Lenders have publicly identified

themselves through emails submitted to the Court, presumably contending that the voluntary

sharing of such information dooms the invocation of Section 107(c) here.  *See, e.g.,* Exhs. UST 1

and UST 2.  The Court disagrees.  Nothing about Section 107(c) prevents creditors from

identifying themselves if they wish to do so.  *See, e.g., In re FTX Trading Ltd.*, Hr'g Tr. 158:22-

159:7 (Bankr. D. Del. June 9, 2023) [Case No. 22-11068, ECF No. 1612] (court noting that

cryptocurrency customers who are members of official and ad hoc committees of creditors must

identify themselves and are not protected under Section 107(b) or (c) from disclosure of their

names "because people have a right to know who they're litigating against."); *see id.* at 159:7-14

(providing that customers currently on the official or ad hoc committees who do not wish to have

their names disclosed should be given a chance to resign from the committee before their

information is made public).  Moreover, the number of Lenders that have publicly identified

themselves in this case—a few dozen—pales in comparison to the hundreds of thousands that

have not.  *See, e.g.,* Hr'g Tr. 42:6-11 (Jan. 23, 2023) [ECF No. 35] (counsel to Ad Hoc Group

noting hundreds of thousands of individuals that are creditors); Hr'g Tr. 34:21-35:4 (June 5,

2023) [ECF No. 402] (counsel to Gemini noting there are 232,000 Earn Users that are Lenders to

the Debtors); Hr'g Tr. 14:11-13 (July 13, 2023) [ECF No. 531] (counsel to the Committee noting

the existence of hundreds of thousands of creditors).  Indeed, it is clear from the testimony of Mr. Renzi and the results of the town hall meeting that the majority of Lenders have significant concerns regarding the risks of disclosing their information.

The UST notes that the Lenders in this case were sophisticated individuals that voluntarily did business with Genesis.  Based on this fact, the UST argues that the Lenders should be distinguished from those involved in other cases where blanket redactions were permitted, such as opioid or sexual abuse victims, whom the UST characterizes as being involuntarily drawn into a bankruptcy proceeding.  *See* Hr'g Tr. 44:10-46:3, 129:16-130:7 (Apr. 24, 2023).  Once again, the Court disagrees.  As a threshold matter, this distinction is not present in the statute.  And while the Lenders voluntarily chose to do business with Genesis, they also entered that relationship having been provided with an expectation of privacy.  More specifically, the loan agreements that the Lenders entered into with Genesis provide for protection of the Lenders' information.  *See, e.g.,* MLA, Paragraph XI(a) ("Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement. . . ."); MLA, Paragraph XI(b) ("Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party . . . and (ii) restrict internal access to and reproduction of the Confidential Information to a Party's Representatives only on a need to know basis."); MLA, Paragraph X(c) ("Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement."); *see also Notice of Filing of Additional Joint Exhibit in*

*Connection With the April 24, 2023 Hearing* [ECF No. 284] (attaching version of confidentiality

provision applicable to non-Gemini Lenders).[23]

      The Court recognizes that the UST's objection is motivated by a sincere concern that the

exceptions invoked by the Movants not swallow the rule in favor of public transparency of court

proceedings.  But today's ruling does no such thing.  Rather, the Court today applies the existing

law to the facts of this case, facts that are essentially undisputed.  The Court is not free to ignore

the evidentiary record established by the Movants in favor of a policy concern about the next

case where Section 107 may be invoked.  The next time such an issue is brought before the

Court, the Court will analyze the facts in that case to reach an appropriate conclusion under the

applicable law.[24]  Moreover, the Court concludes that its decision today is not at odds with the

goal of transparency.  The transparency of court proceedings exists to allow the public to

understand the issues presented to the Court and their resolution.  *See, e.g., In re Food Mgmt.*,

359 B.R. at 553 (noting that public access "fosters confidence among creditors regarding the

fairness of the bankruptcy system.").  This Court has no doubt that the issues presented in this

case—including these Motions—have been presented in a transparent way, such that the public

can understand exactly what is before the Court, the parties' arguments and the Court's

resolution of the issues.  Indeed, it is striking that the UST has not identified anything of intrinsic

public interest in the personal information at issue in these Motions.  Of course, to the extent that

---

[23]      There are some limited exceptions permitting the sharing of Lender information with certain third parties under specified circumstances.  *See, e.g.,* Genesis Privacy Policy, Section 7 (noting that personal information can be shared with other companies or entities that Genesis may merge, combine or consolidate with or be acquired by, and noting that under such circumstances "we will require that the new combined and/or surviving entity (as the case may be) follow this Privacy Notice substantially with respect to your personal information. . . .").  But these exceptions contemplate sharing information necessary for a continuation of the business relationship.  None of the exceptions contemplate public disclosure.

[24]      On a related note, a good argument can be made that Section 107 is outdated in its approach to privacy in our rapidly changing, technologically infused world.  Of course, it is not the province of this Court—or the UST for that matter—to rewrite the statute as we see fit.  Only Congress can do that.

the information at issue in these Motions later becomes relevant to an issue to be decided by the

Court, any party—including the Court—reserves the right to seek to unseal the information.

This is the standard approach by this Court when sealing any information under Rule 107. *See,*

*e.g.,* S.D.N.Y. Local Bankr. R. 9018-1(b)(6) (noting that a motion to seal must include "a

proposed order that contains language indicating the order is without prejudice to the rights of

any party in interest, or the United States Trustee, to seek to unseal the documents, or any part

thereof.").

    For all these reasons, the Court finds that the Movants have met their burden under

Section 107(c) of establishing an undue risk of harm to individuals in these cases and that the

information of the Individual Lenders, including their names, mailing addresses and email

addresses should be redacted.[25]  The Debtors must, however, take all steps necessary to limit the

amount of information that is redacted to the minimum necessary to protect the Individual

Lenders.  Where possible, the Debtors should include placeholder descriptions in substitution of

the redacted information.[26]

    The Court cannot, however, extend the same protections under Section 107(c) for the

information of the Institutional Lenders.  *See* Committee Motion ¶ 4 (requesting redaction of

information for not only Individual Lenders but also Institutional Lenders, stating that risks such

---

[25]    To be clear, the Court holds that the redaction of physical addresses is clearly necessary to protect the Individual Lenders from being located them in their homes.  The redaction of the Individual Lenders' email addresses is necessary to prevent this information from being used in phishing and malware attacks.  *See* Renzi Second Supp. Decl. ¶ 10.  The redaction of the Individual Lenders' names is necessary because the disclosure of their names would enable third parties to use online search tools to locate the physical addresses and email addresses of the Individual Lenders.  *See id.*

[26]    The Debtors cite their need to comply with the UK GDPR, EU GDPR and Singapore PDPA as a basis for redaction under Section 107(c).  *See* Sealing Motion ¶ 23.  Of course, foreign privacy laws do not take precedent over U.S. bankruptcy laws requiring the disclosure of information, *see Celsius*, 644 B.R. at 295, although some courts have recognized that such foreign privacy laws are animated by the same concerns as set forth in Section 107(c).  *See In re Endo*, 2022 WL 16640880, at *12-14.

as phishing, threats, hacking, blackmail, harassment and stalking "is not limited to individual

creditors; it applies equally to individuals who are employed by, or associated with, institutional

creditors."); *see id.* ¶ 30 ("The names, addresses, and other personally identifiable information of

individuals employed by, or associated with, institutional creditors is frequently available online.

Bad actors could easily identify such individuals and engage in impermissible conduct in the

same manner as they would with individual creditors.").  While the record contains evidence

demonstrating that risks do exist for the owners and employees of those businesses, *see* Exhs. B-

F to Renzi Second Supp. Decl., the plain language of Section 107(c) applies only to

"individuals."  11 U.S.C. § 107(c); *see In re Celsius Network LLC*, 644 B.R. at 294 ("The Court

does not interpret 'individual' in [S]ection 107(c) to encompass business entities."); *see also In

re FTX Trading Ltd.*, Hr'g Tr. 157:22-25 (Bankr. D. Del. June 9, 2023) [Case No. 22-11068,

ECF No. 1612] (court declining to grant redaction under Section 107(c) of customer names for

"companies or entities").  Accordingly, the Court has no statutory basis to permit the redaction of

names of individuals employed by the Institutional Lenders under Rule 107(c).  *See* Hr'g Tr.

117:16-118:3 (Apr. 24, 2023).

## CONCLUSION

For the reasons stated above, the Motions are granted in all respects except as to business

entities for purposes of Section 107(c).  The Debtors should settle an order on five days' notice.

The proposed order must be submitted by filing a notice of the proposed order on the Case

Management/Electronic Case Files docket, with a copy of the proposed order attached as an

exhibit to the notice.  A copy of the notice and proposed order shall also be served upon the

UST, the Committee and the Ad Hoc Group.

Dated: White Plains, New York
   August 4, 2023

           **_/s/ Sean H. Lane_**_____
           UNITED STATES BANKRUPTCY JUDGE