**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |

**DECLARATION OF HOO RI KIM IN SUPPORT OF DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO CONSENT TO PRIMING OF THE DEBTORS' LIENS ON CERTAIN PROPERTY AND (II) AUTHORIZING AND APPROVING PROCEDURES FOR THE DEBTORS TO CONSENT TO THE PRIMING OR RELEASE OF LIENS ON OTHER DE MINIMIS ASSETS**

I, Hoo Ri Kim, declare under penalty of perjury as follows:

1.      I am an attorney duly admitted to practice before this Court, I am an associate of the law firm Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), and am counsel for Genesis Global Capital, LLC ("GGC") and its debtor affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases.  I respectfully submit this declaration in connection with the *Debtors' Motion for Entry of an Order (I) Authorizing the Debtors to Consent to the Priming of the Debtors' Liens on Certain Property and (II) Authorizing and Approving Procedures for the Debtors to Consent to the Priming or Release of Liens on Other De Minimis Assets.*[2]

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

[2]      Capitalized terms not otherwise defined herein shall have the meanings given to them in the Motion.

2.      Attached hereto as <u>Exhibit A</u> is a true and correct copy of the petition filed in the matter of *In re File Storage Partners, LLC*, Case No. 23-10877-CTG (Bankr. D. Del. June 30, 2023), ECF No. 1.

3.      Attached hereto as <u>Exhibit B</u> is a true and correct copy of the *Motion of the Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. 105, 361, 362, 363(c), 363(e), 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to 364 of the Bankruptcy Code; (II) Authorizing Use of Cash Collateral Pursuant to 363 of the Bankruptcy Code; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to the Prepetition Secured Party; and (V) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. R. 4001(b) and (c)*, filed in the matter of *In re File Storage Partners, LLC*, Case No. 23-10877(CTG) (Bankr. D. Del. June 30, 2023), ECF No. 5.

4.      Attached hereto as <u>Exhibit C</u> is a true and correct copy of the "*Motion of Debtors for Entry of an Order (A) Approving the Sale of Substantially all Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief*", filed in the matter of *In re File Storage Partners, LLC*, Case No. 23-10877(CTG) (Bankr. D. Del. June 30, 2023), ECF No. 8.

5.      Attached hereto as <u>Exhibit D</u> is a true and correct copy of the "*Declaration of Timothy Furey, Chief Restructuring Officer of the Debtors, In Support of the Debtors' Chapter 11 Petitions and First Day Motions*", filed in the matter of *In re File Storage Partners, LLC*, Case No. 23-10877(CTG) (Bankr. D. Del. July 1, 2023), ECF No. 10.

6.      Attached hereto as <u>Exhibit E</u> is a true and correct copy of the "*Notice of Appointment of Subchapter V Trustee*", filed in the matter of *In re File Storage Partners, LLC*, Case No. 23-10877-CTG (Bankr. D. Del. July 5, 2023), ECF No. 16.

7.      Attached hereto as <u>Exhibit F</u> is a true and correct copy of the "*Final Order Pursuant to 11 U.S.C. 105, 361, 362, 363(c), 363(e), 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to 364 of the Bankruptcy Code; (II) Authorizing Use of Cash Collateral Pursuant to 363 of the Bankruptcy Code; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to the Prepetition Secured Party, Genesis Global Capital, LLC and DIP Facility Lender*", filed in the matter of *In re File Storage Partners, LLC*, Case No. 23-10877-CTG (Bankr. D. Del. Aug. 3, 2023), ECF No. 88.

8.      Attached hereto as <u>Exhibit G</u> is a true and correct copy of the *Notice of No Additional Qualified Bids Received and Cancelation of Auction*, filed in the matter of *In re File Storage Partners, LLC*, Case No. 23-10877-CTG (Bankr. D. Del. Aug. 15, 2023), ECF No. 103.

Executed on August 16, 2023 in New York, New York.

Respectfully submitted,

*/s/ Hoo Ri Kim*
Hoo Ri Kim

# EXHIBIT A

**Fill in this information to identify the case:**

United States Bankruptcy Court for the:

_____ District of __Delaware__
                              (State)

Case number (*If known*): _____ Chapter __11__

☐ Check if this is an
   amended filing

## Official Form 201

# Voluntary Petition for Non-Individuals Filing for Bankruptcy    06/22

If more space is needed, attach a separate sheet to this form. On the top of any additional pages, write the debtor's name and the case number (if known).  For more information, a separate document, *Instructions for Bankruptcy Forms for Non-Individuals,* is available.

| | | | |
|---|---|---|---|
| 1. | **Debtor's name** | File Storage Partners, LLC | |

| | | | |
|---|---|---|---|
| 2. | **All other names debtor used in the last 8 years** | None | |
| | Include any assumed names, trade names, and *doing business as* names | | |

| | | | |
|---|---|---|---|
| 3. | **Debtor's federal Employer Identification Number** (EIN) | 8 6 – 3 7 1 6 9 2 0 | |

4. **Debtor's address**

| Principal place of business | Mailing address, if different from principal place of business |
|---|---|
| 1357 Ashford Avenue, Pmb 373 | |
| Number     Street | Number     Street |
| | P.O. Box |
| San Juan         PR      00907 | |
| City          State    ZIP Code | City          State    ZIP Code |
| | **Location of principal assets, if different from principal place of business** |
| n/a | 1148      American Pkwy |
| County | Number     Street |
| | Papillion       NE      68046 |
| | City          State    ZIP Code |

| | | | |
|---|---|---|---|
| 5. | **Debtor's website** (URL) | None | |

| Debtor | File Storage Partners, LLC | Case number *(if known)* _____ |
|---|---|---|
| | Name | |

**6. Type of debtor**

- ☒ Corporation (including Limited Liability Company (LLC) and Limited Liability Partnership (LLP))
- ☐ Partnership (excluding LLP)
- ☐ Other. Specify: _____

**7. Describe debtor's business**

A. *Check one:*

- ☐ Health Care Business (as defined in 11 U.S.C. § 101(27A))
- ☐ Single Asset Real Estate (as defined in 11 U.S.C. § 101(51B))
- ☐ Railroad (as defined in 11 U.S.C. § 101(44))
- ☐ Stockbroker (as defined in 11 U.S.C. § 101(53A))
- ☐ Commodity Broker (as defined in 11 U.S.C. § 101(6))
- ☐ Clearing Bank (as defined in 11 U.S.C. § 781(3))
- ☒ None of the above

B. *Check all that apply:*

- ☐ Tax-exempt entity (as described in 26 U.S.C. § 501)
- ☐ Investment company, including hedge fund or pooled investment vehicle (as defined in 15 U.S.C. § 80a-3)
- ☐ Investment advisor (as defined in 15 U.S.C. § 80b-2(a)(11))

C. NAICS (North American Industry Classification System) 4-digit code that best describes debtor. See http://www.uscourts.gov/four-digit-national-association-naics-codes .

<u>5</u>   <u>1</u>   <u>8</u>   <u>2</u>

**8. Under which chapter of the Bankruptcy Code is the debtor filing?**

A debtor who is a "small business debtor" must check the first sub-box. A debtor as defined in § 1182(1) who elects to proceed under subchapter V of chapter 11 (whether or not the debtor is a "small business debtor") must check the second sub-box.

*Check one:*

- ☐ Chapter 7
- ☐ Chapter 9
- ☒ Chapter 11. *Check all that apply:*

  - ☐ The debtor is a small business debtor as defined in 11 U.S.C. § 101(51D), and its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $3,024,725. If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

  - ☒ The debtor is a debtor as defined in 11 U.S.C. § 1182(1), its aggregate noncontingent liquidated debts (excluding debts owed to insiders or affiliates) are less than $7,500,000, **and it chooses to proceed under Subchapter V of Chapter 11.** If this sub-box is selected, attach the most recent balance sheet, statement of operations, cash-flow statement, and federal income tax return, or if any of these documents do not exist, follow the procedure in 11 U.S.C. § 1116(1)(B).

  - ☐ A plan is being filed with this petition.

  - ☐ Acceptances of the plan were solicited prepetition from one or more classes of creditors, in accordance with 11 U.S.C. § 1126(b).

  - ☐ The debtor is required to file periodic reports (for example, 10K and 10Q) with the Securities and Exchange Commission according to § 13 or 15(d) of the Securities Exchange Act of 1934. File the *Attachment to Voluntary Petition for Non-Individuals Filing for Bankruptcy under Chapter 11* (Official Form 201A) with this form.

  - ☐ The debtor is a shell company as defined in the Securities Exchange Act of 1934 Rule 12b-2.

- ☐ Chapter 12

| Debtor | File Storage Partners, LLC | Case number (if known) |
|--------|----------------------------|------------------------|
|        | Name |                      |

---

**9. Were prior bankruptcy cases filed by or against the debtor within the last 8 years?**

If more than 2 cases, attach a separate list.

☒ No

☐ Yes.  District _____  When _____  Case number _____
                                          MM / DD / YYYY

         District _____  When _____  Case number _____
                                          MM / DD / YYYY

---

**10. Are any bankruptcy cases pending or being filed by a business partner or an affiliate of the debtor?**

List all cases. If more than 1, attach a separate list.

☐ No

☒ Yes.  Debtor _____ See attached rider _____  Relationship _____

         District _____  When _____
                                             MM / DD / YYYY

         Case number, if known _____

---

**11. Why is the case filed in *this district*?**

*Check all that apply:*

☒ Debtor has had its domicile, principal place of business, or principal assets in this district for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other district.

☒ A bankruptcy case concerning debtor's affiliate, general partner, or partnership is pending in this district.

---

**12. Does the debtor own or have possession of any real property or personal property that needs immediate attention?**

☒ No

☐ Yes. Answer below for each property that needs immediate attention. Attach additional sheets if needed.

**Why does the property need immediate attention?** *(Check all that apply.)*

☐ It poses or is alleged to pose a threat of imminent and identifiable hazard to public health or safety.

What is the hazard? _____

☐ It needs to be physically secured or protected from the weather.

☐ It includes perishable goods or assets that could quickly deteriorate or lose value without attention (for example, livestock, seasonal goods, meat, dairy, produce, or securities-related assets or other options).

☐ Other _____

**Where is the property?** _____
Number        Street

_____

_____
City                              State ZIP Code

**Is the property insured?**

☐ No

☐ Yes. Insurance agency _____

Contact name _____

Phone _____

---

**Statistical and administrative information**

---

| Debtor | File Storage Partners, LLC | Case number (if known) |
|---|---|---|
| | Name | |

**13. Debtor's estimation of available funds**

Check one:

☐ Funds will be available for distribution to unsecured creditors.

☒ After any administrative expenses are paid, no funds will be available for distribution to unsecured creditors.

**14. Estimated number of creditors**

| | | |
|---|---|---|
| ☒ 1-49 | ☐ 1,000-5,000 | ☐ 25,001-50,000 |
| ☐ 50-99 | ☐ 5,001-10,000 | ☐ 50,001-100,000 |
| ☐ 100-199 | ☐ 10,001-25,000 | ☐ More than 100,000 |
| ☐ 200-999 | | |

**15. Estimated assets**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☒ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

**16. Estimated liabilities**

| | | |
|---|---|---|
| ☐ $0-$50,000 | ☐ $1,000,001-$10 million | ☐ $500,000,001-$1 billion |
| ☐ $50,001-$100,000 | ☒ $10,000,001-$50 million | ☐ $1,000,000,001-$10 billion |
| ☐ $100,001-$500,000 | ☐ $50,000,001-$100 million | ☐ $10,000,000,001-$50 billion |
| ☐ $500,001-$1 million | ☐ $100,000,001-$500 million | ☐ More than $50 billion |

## Request for Relief, Declaration, and Signatures

**WARNING --** Bankruptcy fraud is a serious crime.  Making a false statement in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.

**17. Declaration and signature of authorized representative of debtor**

The debtor requests relief in accordance with the chapter of title 11, United States Code, specified in this petition.

I have been authorized to file this petition on behalf of the debtor.

I have examined the information in this petition and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   06/30/2023
MM  / DD / YYYY

✖ /s/ Timothy Furey
Signature of authorized representative of debtor

Timothy Furey
Printed name

Title   Chief Restructuring Officer

Debtor    File Storage Partners, LLC
Name                                                    Case number (if known)_____

---

**18. Signature of attorney**

✖  /s/ Evan T. Miller                        Date    06/30/2023
Signature of attorney for debtor                     MM  / DD / YYYY

Evan T. Miller
Printed name

Bayard, P.A.
Firm name

600        N. King Street, Suite 400
Number        Street

Wilmington                                    DE        19801
City                                          State     ZIP Code

302-429-4227                                  emiller@bayardlaw.com
Contact phone                                 Email address

5364                                          DE
Bar number                                    State

---

## Rider 1

### Pending Bankruptcy Cases Filed by the Debtor and Affiliates of the Debtor

On the date hereof, each of the entities below (collectively, the "Debtors") filed a Petition in the United States Bankruptcy Court for the District of Delaware for relief under chapter 11 of title 11 of the United States Code.  The Debtors have moved for joint administration of these cases under the case number assigned to the chapter 11 case of File Service Partners, LLC.

- File Service Partners, LLC

- Afton Blockchain LLC

- Filtech SPV LLC

- Midwest Blockchain Inc.

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| FILE STORAGE PARTNERS, LLC, | Case No. 23-[_____] ([____]) |
| Debtor. | |

## STATEMENT OF CORPORATE OWNERSHIP

Pursuant to Rules 1007(a)(1) and 7007.1 of the Fed. R. Bankr. P., the following is a list of corporations, other than a governmental unit, that directly or indirectly own 10% or more of any class of the above-captioned debtor's equity interests:

| Shareholder | Percentage of Equity Held |
|---|---|
| File Storage Company 1 Inc. | 51% |
| DSM Tech Enterprises Inc. | 49% |

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| FILE STORAGE PARTNERS, LLC, | Case No. 23-[_____] ([____]) |
| Debtor. | |

**LIST OF EQUITY SECURITY HOLDERS**

Pursuant to 1007(a)(3) of the Fed. R. Bankr. P., the following is a list of entities holding an interest in the above-captioned debtor:

| Name | Mailing Address | Percentage of Equity Held |
|---|---|---|
| File Storage Company 1 Inc. | 1357 Ashford Avenue, Pmb 373, San Juan, PR 00907 | 51% |
| DSM Tech Enterprises Inc. | 1357 Ashford Avenue, Pmb 373, San Juan, PR 00907 | 49% |

| Fill in this information to identify the case: |
|---|

Debtor name    File Storage Partners, LLC

United States Bankruptcy Court for the: _____ District of _Delaware_
                                                    (State)

Case number (If known): _____

☐ Check if this is an amended filing

## Official Form 204

# Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders
              12/15

A list of creditors holding the 20 largest unsecured claims must be filed in a Chapter 11 or Chapter 9 case. Include claims which the debtor disputes. Do not include claims by any person or entity who is an *insider,* as defined in 11 U.S.C. § 101(31). Also, do not include claims by secured creditors, unless the unsecured claim resulting from inadequate collateral value places the creditor among the holders of the 30 largest unsecured claims.

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim | | |
|---|---|---|---|---|---|---|---|
| | | | | | If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
| | | | | | Total claim, partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 1 | **D. LEDGER PARTNERS LLC** <br> 5152 NORTH EDGEWOOD DRIVE SUITE 375 PROVO, UT 84604 | James Harrison (801) 318-2786 db@clarkecp.com jh@clarkecp.com | Loan | Contingent & Disputed | | | **$2,380,951.05** |
| 2 | **GENESIS GLOBAL CAPITAL LLC** <br> 111 TOWN SQUARE PLACE SUITE 1203 JERSEY CITY, NJ 07310 | lending@genesiscap.co | Loan | | **$770,379.98** | **$9,648.00** | **$760,731.98** |
| 3 | **STATE OF DELAWARE** <br> WILMINGTON OFFICE 820 N. FRENCH ST., 10TH FLOOR WILMINGTON, DE 19801 | | Taxes | | | | **$507.50** |
| 4 | | | | | | | |
| 5 | | | | | | | |

| Debtor | File Storage Partners, LLC | | | | Case number (*if known*) | | |
|---|---|---|---|---|---|---|---|
| | Name | | | | | | |

| | Name of creditor and complete mailing address, including zip code | Name, telephone number, and email address of creditor contact | Nature of the claim (for example, trade debts, bank loans, professional services, and government contracts) | Indicate if claim is contingent, unliquidated, or disputed | Amount of unsecured claim<br>If the claim is fully unsecured, fill in only unsecured claim amount. If claim is partially secured, fill in total claim amount and deduction for value of collateral or setoff to calculate unsecured claim. | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total claim, if partially secured | Deduction for value of collateral or setoff | Unsecured claim |
| 6 | | | | | | | |
| 7 | | | | | | | |
| 8 | | | | | | | |
| 9 | | | | | | | |
| 10 | | | | | | | |
| 11 | | | | | | | |
| 12 | | | | | | | |
| 13 | | | | | | | |

DSM Tech Enterprises Inc.
1357 Ashford Avenue, Pmb 373
San Juan, PR 00907


State of Delaware
Wilmington Office
820 N French St 10th Floor
Wilmington, DE 19801


CoinList Lend LLC
c/o Harvard Business Services, Inc.
16192 Coastal Hwy
Lewes, DE 19958


DARMA Capital Master Fund LP
c/o Walker Cayman Limited
Cayman Corporate Centre
27 Hospital Road
George Town KY KY1-9008


Genesis Global Capital LLC
111 Town Square Place Suite 1203
Jersey City, NJ 07310


PalladiumX SPC Limited
Craigmuir Chambers, Road Town
Tortola, VG 1110
British Virgin Islands


Baseline
509 Wilcox Street Suite 107
Castle Rock, CO 80104


File Storage Ops 1 LLC
1357 Ashford Avenue, Pmb 373
San Juan, PR 00907

File Storage Ops 2 Limited
1357 Ashford Avenue, Pmb 373
San Juan, PR 00907


File Store Ops 3 LLC
1357 Ashford Avenue, Pmb 373
San Juan, PR 00907


File Store Ops 4 LLC
1357 Ashford Avenue, Pmb 373
San Juan, PR 00907


Recurring Revenue Generator
1357 Ashford Avenue, Pmb 373
San Juan, PR 00907


D. Ledger Partners LLC
5152 North Edgewood Drive
Suite 375
Provo, UT 84604

---

**Fill in this information to identify the case and this filing:**

Debtor Name  **File Storage Partners, LLC**

United States Bankruptcy Court for the: _____  District of  **Delaware**
                                                                                    (State)

Case number (*If known*):  _____

---

Official Form 202

# Declaration Under Penalty of Perjury for Non-Individual Debtors    12/15

An individual who is authorized to act on behalf of a non-individual debtor, such as a corporation or partnership, must sign and submit this form for the schedules of assets and liabilities, any other document that requires a declaration that is not included in the document, and any amendments of those documents. This form must state the individual's position or relationship to the debtor, the identity of the document, and the date.  Bankruptcy Rules 1008 and 9011.

**WARNING -- Bankruptcy fraud is a serious crime.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $500,000 or imprisonment for up to 20 years, or both.  18 U.S.C. §§ 152, 1341, 1519, and 3571.**

## Declaration and signature

I am the president, another officer, or an authorized agent of the corporation; a member or an authorized agent of the partnership; or another individual serving as a representative of the debtor in this case.

I have examined the information in the documents checked below and I have a reasonable belief that the information is true and correct:

☐  *Schedule A/B: Assets–Real and Personal Property* (Official Form 206A/B)

☐  *Schedule D: Creditors Who Have Claims Secured by Property* (Official Form 206D)

☐  *Schedule E/F: Creditors Who Have Unsecured Claims* (Official Form 206E/F)

☐  *Schedule G: Executory Contracts and Unexpired Leases* (Official Form 206G)

☐  *Schedule H: Codebtors* (Official Form 206H)

☐  *Summary of Assets and Liabilities for Non-Individuals* (Official Form 206Sum)

☐  Amended *Schedule* _____

☑  *Chapter 11 or Chapter 9 Cases: List of Creditors Who Have the 20 Largest Unsecured Claims and Are Not Insiders* (Official Form 204)

☑  Other document that requires a declaration __Corporate Ownership Statement and Lists of Equity Holders and Creditors__

I declare under penalty of perjury that the foregoing is true and correct.

Executed on  __06/30/2023__              ✗ __/s/ Timothy Furey__
                    MM / DD / YYYY                Signature of individual signing on behalf of debtor

                                                 __Timothy Furey__
                                                 Printed name

                                                 __Chief Restructuring Officer__
                                                 Position or relationship to debtor

**ACTION BY WRITTEN CONSENT**
**OF THE MEMBERS AND THE MANAGER OF**
**FILE STORAGE PARTNERS, LLC**

**June 29, 2023**

In accordance with Sections 18-404(d) and 18-302(d), respectively, of the Delaware Limited Liability Company Act, 6 *Del. C.* §§ 18-101 *et. seq.* (the "LLC Act") and the Limited Liability Company Operating Agreement dated as of August 3, 2021, as amended by that certain Amendment to Operating Agreement dated April 7, 2023 (as so amended, the "LLC Agreement") of File Storage Partners, LLC, a Delaware limited liability company (the "Company"), the undersigned, being the sole remaining Manager and all of the Class A Members of the Company, hereby take the following actions and adopt the following resolutions by written consent without a meeting effective for all purposes as of the date set forth in the heading to this consent. Capitalized terms used but not defined in this Consent have the meanings given to them in the LLC Agreement.

WHEREAS, pursuant to Section 7.1(a) of the LLC Agreement, the Manager has the exclusive right to manage and control the business and affairs of the Company, subject to the provisions of Section 7.1(h) and Section 7.1(i); and

WHEREAS, pursuant to Section 7.1(i) of the LLC Agreement, the prior unanimous approval of the Class A Members is required in order for the Manager to cause the Company to take certain actions, which include the filing a bankruptcy petition, incurring a secured or unsecured debt in any amount, or the sale, transfer, or other disposition of all or substantially all of the Company's business or assets; and

WHEREAS, the Manager previously appointed Timothy Furey as the Company's Chief Restructuring Officer (the "CRO"), to explore to the options available to the Company, including without limitation, the possibility of pursuing a bankruptcy proceeding under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") or other types of restructuring or liquidation for the Company and to negotiate with the Company's creditors, explore a possible sale of the Company or its assets, developing a plan to resolve the Company's financial status and make a recommendation to the Manager, which may include the filing of a voluntary petition seeking relief under the provisions of Chapter 11, Title 11, of the United States Code (a "Bankruptcy Petition"); and

WHEREAS, the Manager and the Class A Members have considered the recommendation of the CRO, the information provided by the employees and other representatives of the Company and the advice of the Company's advisors, the Manager has determined in his business judgment that it is desirable and in the best interests of the Company and its creditors, employees, members and other interested parties that a Bankruptcy Petition be filed in the United States Bankruptcy Court for the District of Delaware by the Company seeking relief under the provisions of Chapter 11 of the Bankruptcy Code and the Class A Members are willing to approve such filing; and

WHEREAS, pursuant to the proposed bankruptcy proceeding that would be initiated by the filing of the Bankruptcy Petition (the "Bankruptcy Case"), the Company may engage in one or more of the foregoing actions requiring Class A Members approval; and

WHEREAS, the Class A Members are executing this consent to evidence its prior written approval of the Company filing the Bankruptcy Petition, and entering into debtor in possession financing, agreeing to a sale of all or substantially all of the Company's assets and engaging in any other transaction relating to the proceeding initiated by the filing of the Bankruptcy Petition that would require the consent of the Class A Members under the LLC Agreement or the LLC Act and is in furtherance of the reorganization or liquidation of the Company pursuant to the Bankruptcy Case without further consent from or approval of the Class A Members.

NOW, THEREFORE, BE IT RESOLVED, that the Company is authorized to file a Bankruptcy Petition be filed in the United States Bankruptcy Court for the District of Delaware by the Company seeking relief under the provisions of Chapter 11 of the Bankruptcy Code,

AND BE IT FURTHER RESOLVED, that the CRO and any other officer or Manager of the Company (each such Persons, an "Authorized Person" and together, the "Authorized Persons"), acting alone or with one or more other Authorized Persons, is hereby authorized and empowered on behalf of, and in the name of, the Company (a) to execute, verify and file all documents necessary or appropriate in connection with the filing of the Bankruptcy Petition, including, without limitation, all petitions, affidavits, declarations, schedules, statements of financial affairs, lists, motions, applications, pleadings and other papers or documents in connection with the Bankruptcy Case; (b) take and perform any and all actions deemed necessary and proper to obtain such relief as authorized herein and in connection with the Bankruptcy Case; (c) appear as necessary at all bankruptcy proceedings on behalf of the Company; and (d) pay all such expenses where necessary or appropriate in order to carry out fully the intent and accomplish the purposes of the resolutions as adopted herein.

AND BE IT FURTHER RESOLVED, that the previous retention by the Company's management of the law firm of Bayard, P.A. ("Bayard") as bankruptcy counsel, subject to any requisite bankruptcy court approval, to the Company to represent and assist the Company in connection with its consideration of various insolvency-related obligations and bankruptcy alternatives, and to assist the Company in carrying out its duties under chapter 11 of the Bankruptcy Code, and to take any and all actions to advance the Company's rights in connection therewith, is hereby approved and ratified, and each of the Authorized Persons is hereby authorized and directed to execute and ratify appropriate retention agreements and to cause to be filed an appropriate application for authority to retain the services of Bayard.

AND BE IT FURTHER RESOLVED, that the Class A Members agree to cooperate with any transaction that requires its participation to achieve the objectives of the Bankruptcy Case.

AND BE IT FURTHER RESOLVED, that each of the Authorized Persons be, and each of them hereby is, authorized to cause the Company to incur debtor in possession financing in an amount determined to be necessary or advisable by any of such Authorized Persons to guaranty the obligations of the Company in respect of such indebtedness, and to prepare (or cause to be

prepared), execute and file (or cause to be filed) any motion to incur debtor in possession financing, and, upon authorization by the Manager and/or the CRO, to take and perform any and all further acts and deeds which it deems necessary, proper or desirable in connection with the Bankruptcy Case, with a view to the successful prosecution of the Bankruptcy Case;

AND BE IT FURTHER RESOLVED, that each of the Authorized Persons be, and each of them hereby is, authorized and directed to take any and all actions necessary and appropriate to pursue and further the sale process with respect to the Company's assets including, without limitation, entering into any and all other purchase agreements (if applicable), and other ancillary documents in connection therewith, subject to Bankruptcy Court approval;

AND BE IT FURTHER RESOLVED, that each of the Authorized Persons be, and each of them hereby is, authorized and directed on behalf of the Company to take such actions and to make, sign, execute, acknowledge, deliver and perform (and record in a relevant office of the county clerk, if necessary) any and all such agreements, affidavits, orders, directions, certificates, requests, receipts, financing statements or other instruments, as may be necessary, desirable, or appropriate in the reasonable discretion of any such Authorized Person to give effect to the foregoing resolutions, and to execute and deliver such agreements (including exhibits thereto) and related documents, and to perform fully the terms and provisions thereof;

AND BE IT FURTHER RESOLVED, that the Company be, and hereby is, authorized to pay all fees and expenses incurred by it or for its account in connection with the actions approved in any or all of the foregoing resolutions, and all actions related thereto, and each Authorized Person be, and each of them hereby is, authorized, empowered and directed to cause the Company to make said payments as each such Authorized Person may deem necessary, appropriate, advisable or desirable, such payment to constitute conclusive evidence of such Authorized Person's determination and approval of the necessity, appropriateness, advisability or desirability thereof; and

AND BE IT FURTHER RESOLVED, that to the extent that any of the actions authorized by any of the foregoing resolutions have been taken previously by any Authorized Persons or employees of the Company on its behalf, such actions are hereby ratified, approved and confirmed in their entirety.

[Signatures to Follow on Next Page]

IN WITNESS WHEREOF, the undersigned, being the Sole Manager and all of the Class A Members of the Company, do hereby execute this written consent as of the date first set forth above.

**MANAGER**:

_____
David Johnston

**CLASS A MEMBERS**:

DSM TECH ENTERPRISES, INC.

By: _____
    David Johnston
    Chief Executive Officer

FILE STORAGE COMPANY 1, INC.

By: _____
    David Johnston
    Chief Executive Officer

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| FILE STORAGE PARTNERS, LLC, | Case No. 23-[_____] ([____]) |
| Debtor. | |

## **STATEMENT PURSUANT TO 11 U.S.C. § 1116**

I, Timothy Furey, hereby declare under penalty of perjury:

1.     Debtor File Storage Partners, LLC has not prepared a statement of operations or cash-flow statement.

2.     Debtor File Storage Partners, LLC has prepared a balance sheet and income statement, which have been appended to its voluntary petition for relief.

3.     Debtor File Storage Partners, LLC has not filed a federal tax return.  It was listed as a passthrough entity on its non-Debtor parent File Storage Company 1 Inc.'s tax return.

Dated: June 30, 2023

*/s/ Timothy Furey*
Timothy Furey
Chief Restructuring Officer
File Storage Partners LLC

## Balance Sheet

File Storage Partners LLC 140446
As of June 30, 2023

| Account | Jun 30, 2023 |
|---|---|
| **Assets** | |
| **Current Assets** | |
| DSM loan | 93,330.85 |
| Filcoin - Collateral - Genesis | 9,648.00 * |
| Filecoin - Balance - Mining Pool | 2,410,613.72 * |
| Filecoin - Loan - DCENT | 24,120.00 * |
| Filecoin - Loan - Filtech | 20,100.00 * |
| Filecoin - Wallets - Worker & Owner | 558,430.11 * |
| Filecoin Asset - Anchorage Digital | 14,146.16 |
| Loan - DSM Tech Enterprises | 1,361,404.14 |
| Loan - Relay Services | 80,000.00 |
| **Total Current Assets** | **4,571,792.98** |
| **Fixed Assets** | |
| Accumulated Amortisation (ROU Asse | (826,878.41) |
| Accumulated Amortization | (25,545.90) |
| Accumulated Depreciation | (7,609,595.12) |
| Factory Computer Equipment | 13,035,250.10 |
| Right of Use Assets | 2,880,936.70 |
| Start up Costs - Legal Fees | 204,663.50 |
| **Total Fixed Assets** | **7,658,830.87** |
| **Total Assets** | **12,230,623.85** |
| | |
| **Liabilities and Equity** | |
| **Liabilities** | |
| **Current Liabilities** | |
| Accounts Payable | 4,168,448.30 |
| Accruals | 133,376.00 |
| Filcoin - Interest Payable - Genesis | 61,193.48 * |
| Interest Accrual - Inter Co Loans | 673,812.21 |
| Loan - DLTx ASA | 1,187,659.18 |
| **Total Current Liabilities** | **6,224,489.17** |
| **Long Term Liabilities** | |
| Filcoin - Loan Payable - CoinList | 964,531.27 * |
| Filcoin - Loan Payable - DARMA | 85,802.88 * |
| Filcoin - Loan Payable - Genesis | 709,186.50 * |
| Filcoin - Loan Payable - Palladium | 100,500.00 * |
| Lease - Baseline | 2,652,614.71 |
| Loan - DLTx ASA - Investor Loan | 1,000,000.00 |

| | |
|---|---:|
| Loan - FS01 - Equipment | 5,665,168.26 |
| Loan - FS01 - FIL | 61,728.13 |
| Loan - FS01 - Opex | 38,070.94 |
| Loan - FS02 - Equipment | 6,000,000.00 |
| Loan - FS02 - Genesis Collateral | 500,000.00 |
| Loan - FS02 - Opex | 499,623.59 |
| Loan - FS03 - Equipment | 1,000,000.00 |
| Loan - FS03 - Opex | 1,211,034.58 |
| Loan - FS04 - Equipment | 3,000,000.00 |
| Loan - FS04 - Opex | 750,000.00 |
| Loan - Rec Rev Generator | 500,000.00 |
| **Total Long Term Liabilities** | **24,738,260.86** |
| **Total Liabilities** | **30,962,750.03** |
| **Equity** | |
| Current Year Earnings | (4,819,664.16) |
| DSM Retained Earnings | (444,722.41) |
| File Storage Company 1 Retained Earn | (462,771.37) |
| Retained Earnings | (13,004,968.24) |
| **Total Equity** | **(18,732,126.18)** |
| **Total Liabilities and Equity** | **12,230,623.85** |

\* Revalued as at close of business June 27th 2023

## Income Statement (Profit and Loss)

File Storage Partners LLC 140446
For the 6 months ended June 30, 2023

| Account | Jan-Jun 2023 |
|---|---|
| **Income** | |
| Filecoin Rewards | 725,335.01 * |
| **Total Income** | **725,335.01** |
| | |
| **Cost of Goods Sold** | |
| FIL Burn Fees | 7,234.24 * |
| **Total Cost of Goods Sold** | **7,234.24** |
| | |
| **Gross Profit** | **718,100.77** |
| | |
| **Operating Expenses** | |
| Amortisation - ROU Asset | 480,156.12 |
| Amortization | 6,822.12 |
| Bank Charges & Fees | (5.00) |
| Depreciation | 2,172,374.94 |
| Interest - FilCoin Loans | 136,366.86 * |
| Interest - Inter Co Loans | 197,298.75 |
| Interest - Lease | 69,660.08 |
| Legal & Professional Services | 435.00 |
| Management Fees | 1,080,000.00 |
| Rent & Lease | 1,460,513.94 |
| **Total Operating Expenses** | **5,603,622.81** |
| | |
| **Operating Income** | **(4,885,522.04)** |
| | |
| **Other Income / (Expense)** | |
| Other Comprehensible Income - FileC | 65,857.88 |
| **Total Other Income / (Expense)** | **65,857.88** |
| | |
| **Net Income** | **(4,819,664.16)** |

* Revalued as at close of business June 27th 2023

**<u>EXHIBIT B</u>**

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 (Subchapter V) |
| FILE STORAGE PARTNERS, LLC *et al.*,[1] | Case No. 23-10877 (CTG) |
| Debtors. | (Joint Administration Requested) |

## MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS, PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364 AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO § 364 OF THE BANKRUPTCY CODE; (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO § 363 OF THE BANKRUPTCY CODE; (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS; (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTY; AND (V) SCHEDULING A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(b) AND (c)

File Storage Partners, LLC ("FSP"), Afton Blockchain LLC; FilTech SPV LLC; and Midwest Blockchain Inc., as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), hereby move this Court (the "Motion") for the entry of an order, pursuant to §§ 105, 361, 362, 363, 364, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6003, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1, 4001-1, 4001-2 and 9013-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), providing the following relief on an interim basis substantially in the form attached hereto as **Exhibit 1** (the "Interim Order") and, after notice and hearing, on a final basis (the "Final Order" and, together with the Interim Order, the "Orders"):

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  File Storage Partners, LLC (6920); Afton Blockchain LLC (3951); Filtech SPV LLC (9602); and Midwest Blockchain Inc. (8842).  The Debtors' service address is 1357 Ashford Ave., Pmb 373, San Juan, PR 00907.

(1)     authorizing, pursuant to sections 361(a) and 363(c) of the Bankruptcy Code, the Debtors' use of cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code, the "Cash Collateral") on the terms and conditions set forth in the Interim Order;

(2)     authorizing the Debtors to grant continuing liens and adequate protection liens, claims, and security interests to the Prepetition Secured Party (as defined herein) as provided in the Interim Order;

(3)     authorizing the Debtors to use the Cash Collateral for such uses as are approved under the Interim Order, subject to the terms set forth in the Interim Order and the budget attached as **Exhibit A** to the Interim Order (the "Budget");

(4)     immediately authorizing and approving the Debtors, as borrowers under the DIP Facility (as defined herein), to obtain postpetition financing up to the aggregate principal amount of **$1.5 million** (the "DIP Facility"), from KB Silver Funding, LLC (the "DIP Facility Lender") from time to time;

(5)     authorizing the Debtors to execute, enter into, and borrow under the DIP Facility (as defined below) and to perform such other and further acts as may be required in connection with the DIP Facility;

(6)     approving, pursuant to sections 364(c) and (d) of the Bankruptcy Code, that the claim for repayment of the DIP Obligations (as defined below) shall:

    a.     subject to the Carve-Out (as defined below), have priority over any and all administrative expenses, including, without limitation, the kind specified in sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 726, 1113 and/or 1114 of the Bankruptcy Code and all administrative claims granted pursuant to an order of the Bankruptcy Court, whether or not such expenses or claims may become secured by a judgment lien or other consensual or non-consensual lien, levy or attachment, whether incurred in the cases or any successor case, which allowed super-priority claim of the DIP Facility Lender shall be payable from and have recourse to all prepetition and postpetition property of the Debtors, to the extent provided for herein (the "DIP Facility Superpriority Claim"); and

    b.     be and be deemed, subject to the terms of the Interim Order, immediately secured by valid, binding, continuing, enforceable, fully perfected, and unavoidable first-priority senior priming security interests in and liens (collectively, the "DIP Facility Liens") upon all upon all prepetition and postpetition property of the Debtors, whether now existing or hereafter acquired, and to the extent not otherwise included, all proceeds, commercial tort claims, insurance claims (as to insurance claims, to the extent of the Debtors' interest therein) and other rights to payments not otherwise

2

included in the foregoing assets and all products of the foregoing assets and all accessions to, substitutions and replacements for, and rents and profits of, each of the foregoing assets, *excluding* the Cryptocurrency Collateral (as defined below), but *including* all the Debtors' digital currency assets that are not Cryptocurrency Collateral (collectively, the "<u>Interim DIP Collateral</u>"), as provided for by sections 364(c) and (d) of the Bankruptcy Code, subject only to: (i) the Carve-Out; and (ii) the Prepetition Permitted Liens (as defined in the DIP Term Sheet (defined below)); and upon entry of (i) the Final Order and (ii) an order by the United States Bankruptcy Court for the Southern District of New York authorizing Genesis Global Holdco and its affiliated debtors and debtors-in-possession (collectively, the "<u>Genesis Debtors</u>") to grant liens on digital currency loaned by certain of the Genesis Debtors to the Debtors pursuant to the Master Loan Agreement between Genesis Global Capital, LLC ("<u>Genesis</u>") and FSP dated August 10, 2021 (the "<u>Genesis Collateral</u>"): the Interim DIP Collateral *plus* the Genesis Collateral *plus* the proceeds of Avoidance Actions[2] (collectively, the "<u>DIP Collateral</u>"), subject only to the Carve-out and the Permitted Prepetition Liens.

(7)     scheduling an interim hearing (the "<u>Interim Hearing</u>") on the Motion to consider entry of the Interim Order; and

(8)     scheduling a final hearing (the "<u>Final Hearing</u>") to consider, among other things, entry of a Final Order authorizing the continued use of Cash Collateral and borrowing under the DIP Facility, each on a final basis, and approving notice and the grant of adequate protection and other rights and protections to the Prepetition Secured Party and the DIP Facility Lender as set forth in the Motion and the Final Order.

1.     The relief requested in the Motion is supported by the *Declaration of Timothy Furey, Chief Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First Day Motions* (the "<u>First Day Declaration</u>"), which is contemporaneously filed herewith and are incorporated herein by reference.

## <u>JURISDICTION AND VENUE</u>

2.     The United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended*

---

[2] As used herein, "<u>Avoidance Actions</u>" shall mean the claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code and under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and similar statutes or common law.

*Standing Order of Reference from the United States District Court for the District of Delaware*,

dated February 29, 2012.  The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008

and Local Rule 9013-1(f), to the entry of a final order by the Bankruptcy Court in connection with

this motion to the extent that it is later determined that the Bankruptcy Court, absent consent of

the parties, cannot enter final orders or judgments in connection herewith consistent with

Article III of the United States Constitution.

3.    This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

4.    Venue of the cases is proper in this district pursuant to 28 U.S.C. § 1408, and venue

over this proceeding is proper in this district pursuant to 28 U.S.C. § 1409.

5.    The statutory predicates and applicable rules for the relief sought herein are §§ 105,

361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003 and

9014, and Local Rules 2002-1, 4001-1, 4001-2, and 9013-1.

## **BACKGROUND**

### A.    **The Chapter 11 Cases**

6.    On June 30, 2023 (the "<u>Petition Date</u>"), the Debtors commenced their chapter 11

cases (together, the "<u>Chapter 11 Cases</u>") by filing voluntary petitions for relief under chapter 11

of the Bankruptcy Code with this Court.

7.    The Debtors continue to operate their businesses and manage their properties as

debtors and debtors-in-possession pursuant to sections 1007(a) and 1108 of the Bankruptcy

Code.  To date, no trustee, examiner, or statutory committee has been appointed in the cases by

the United States Trustee (the "<u>U.S. Trustee</u>").

8.    The factual background regarding the Debtors, including their business operations,

their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set

forth in detail in the First Day Declaration, which is fully incorporated herein by reference.

9.      The Debtors have sought procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

**B.      The Debtors' Prepetition Capital Structure**

10.     Prepetition, certain of the Debtors had entered into several loan agreements with lenders which lent certain crypto currencies to the Debtors (collectively, the "Cryptocurrency Loan Agreements"), and then retained liens on those lent cryptocurrencies to secure the loan thereof (collectively, the "Cryptocurrency Collateral").  One of those lenders is a debtor in its own chapter 11 case: Genesis Global Holdco, Inc. (the "Genesis Lender").

11.     In the weeks leading up to the Petition Date, the Debtors began to consider their strategic alternatives, including a potential sale of their assets.

12.     In a culmination of those efforts, on June 8, 2023, Silvermine Capital Advisors, LLC ("Silvermine") made a loan to the Debtors and certain affiliates in the original principal amount of thirty thousand and 00/100 dollars ($30,000), as evidenced by that certain Promissory Note, dated June 8, 2023 by the borrowers thereto in favor of the Prepetition Secured Party (as amended or assigned from time to time, the "Note"), and as secured by that certain Security Agreement, dated June 8, 2023, by the grantors signatory thereto in favor of Silvermine (together with any and all amendments, restatements, supplements, assignments, and other modifications thereto, collectively, the "Security Agreement," and together with the Note, the "Prepetition Debt Documents").  The collateral described in the Security Agreement (as subsequently amended) comprised all assets of the Debtors *other than* the Cryptocurrency Collateral (such collateral, the "Prepetition Collateral").[3]  The security interests evidenced under the Security Agreement (as

---

[3] For the avoidance of doubt, the Prepetition Collateral does not include the cryptocurrency owed to the lenders in connection with the Cryptocurrency Loan Agreements.

amended over time, the "Prepetition Liens") were perfected by the filing of a financing statement against each the borrowers with the appropriate Secretaries of State, including those of Delaware, Nebraska, Missouri and Puerto Rico.

13.    On June 29, 2023, Silvermine assigned the Note (with the consent of the Borrowers thereunder) and its rights under the Security Agreement to KB Silver Funding, LLC (in this capacity, the "Prepetition Secured Party").  The Prepetition Secured Party then filed financing statements evidencing the assignment of the Note and the Security Agreement against each of the borrowers under the Note with the appropriate Secretaries of State, including those of Delaware, Nebraska, Missouri and Puerto Rico.  On the same day, the Debtors amended and restated the Note by executing the First Amended and Restated Promissory Note in the amended principal amount of two hundred thousand and 00/100 dollars ($200,000.00).

14.    As of the Petition Date, the Debtors were absolutely and unconditionally indebted and obligated to Prepetition Secured Party under the Prepetition Debt Documents in a principal amount of approximately **$200,000.00**, plus accrued but unpaid interest, fees, costs and expenses incurred by the Prepetition Secured Party under the Prepetition Debt Documents (all amounts owing or outstanding under the Prepetition Debt Documents, whether or not contingent, the "Prepetition Obligations").[4]

### C.    The Debtors' Immediate Need for Debtor-in-Possession Financing to Maintain Operations and Satisfy Their Obligations as Debtors-in-Possession

15.    The Debtors commenced these Chapter 11 Cases to maximize the value of their estates for the benefit of all parties in interest through a going-concern sale process.  As noted in the First Day Declaration, the Debtors and their non-Debtor affiliates have been faced with

---

[4] The exact amount of the indebtedness under the Prepetition Debt Documents has been recorded on the Debtors' books and records.

significant liquidity issues for many months. This resulted in certain operational changes, including the reduction of a significant portion of the personnel supporting the Debtors' business, but also led the Debtors to explore other ways to leverage their assets (the FIL production and the hardware in particular), to raise the short-term capital needed to meet emergent operational needs. While the Debtors approached numerous institutions and equipment financers in this regard, none were willing to take uncollateralized counterparty risk against the Debtors and NewDLTx and there was no cash or digital assets available to post as security for short-term working capital. In addition, it became clear that without a significant restructuring of operations involving multiple technology challenges and a complex rework of the corporate structure of the Debtors and their affiliates, there would be no going concern.

16.    At this stage, certain principals of the Debtors entered into discussions with Silvermine Capital Advisors, LLC ("Silvermine"), a consulting and investment firm with extensive experience in technology company capitalizations and restructurings, including (significantly) digital asset infrastructure and mining operations. This experience includes investments in companies with operations similar to the Debtors, which positioned Silvermine to be a valuable resource to the Debtors on account Silvermine's familiarity with NewDLTx's business and the unique challenges it faced.

17.    The purpose of Debtors' principals' discussions was to solicit Silvermine's interest in capitalizing or otherwise facilitating a restructuring of the Debtors' operations in conjunction with a restructuring of NewDLTx's operations as a whole. Through its portfolio operations, Silvermine has the technical expertise and personnel to fully support the Debtors' existing operations with limited risk of the downtime that would otherwise result in slashing events, potentially resulting in the total loss of secured lender collateral) over a very short period. The

culmination of these negotiations was the Debtors' agreement to enter into an asset purchase agreement with KB Silver Funding, LLC (in this capacity, the "Buyer") for the sale of substantially all of the Debtors' assets, subject to the Bankruptcy Court's approval.[5]

18.     The DIP Facility Lender agreed to provide postpetition financing to the Debtors upon the terms set forth in the Interim Order and in the *Summary of Proposed Terms and Conditions for Senior Secured, Superpriority Debtor-in-Possession Financing*, which is attached to the Interim Order as **Exhibit B** (the "DIP Term Sheet").

19.     Upon execution and delivery of the DIP Term Sheet and entry of the Interim Order, the Debtors seek immediate authority to borrow (on an interim basis) under the DIP Facility from the DIP Facility Lender up to the principal amount of **$200,000.00**, with up to an additional **$1.3 million** that may be borrowed upon entry of the Final Order (together with interest, fees, charges, and expenses payable under the DIP Term Sheet), pursuant and subject to the terms and conditions of the Interim Order and the DIP Term Sheet (including the conditions to effectiveness thereof and the rights and grants to the DIP Facility Lender therein).  The Debtors also seek authority to use the proceeds of the DIP Facility in accordance with the terms of the DIP Term Sheet and the Interim Order.

20.     All loans made to or for the benefit of the Debtors on or after the Petition Date under the DIP Facility Documents (defined below) (collectively, the "DIP Loans"), which includes, without limitation, principal, interest, fees, costs, expenses, indemnification obligations and other obligations and amounts due from time to time by the Debtors to the DIP Facility Lender under the DIP Facility Documents and the Interim Order, shall hereinafter be referred to as the

---

[5] The Debtors have filed a motion seeking, inter alia, approval of the sale transaction contemporaneously herewith (the "Sale Motion").

"DIP Obligations."  DLTx, LLC, an indirect affiliate of the Debtors, has likewise agreed to

guarantee the DIP Obligations.

21.    The Debtors submit that entry into the DIP Term Sheet and the related postpetition

borrowing will: (a) ensure the continued, uninterrupted operation of their businesses as the Debtors

pursue a value-maximizing chapter 11 sale transaction; (b) assure the Debtors' customers,

employees, counterparties, utilities, and business partners that the Debtors are well-capitalized

during the pendency of the Chapter 11 Cases and will continue to meet their postpetition

obligations; and (c) make available sufficient funding for the Debtors to pay necessary expenses

incurred in connection with administering the Chapter 11 Cases, including professional

compensation and statutory fees.

### D.    Alternative Sources of Financing are Not Readily Available

22.    The DIP Facility was thoroughly evaluated by the Debtors and their advisors and

was the subject of arm's-length and good faith negotiations before the Petition Date.  Further, as a

result of the investability of the Debtors' businesses and assets, the Debtors' debt structure and the

challenges facing the Debtors' businesses, as further detailed in the First Day Declaration, the

Debtors faced significant challenges leading to the commencement of these Chapter 11 Cases.  The

Debtors, with their advisors, ultimately determined to market the Debtors' assets for sale.  The

Debtors, upon determining that the best path forward to maximize the value of their assets was

through a section 363 sale in chapter 11, commenced a process to secure the requisite debtor-in-

possession financing to fund the Debtors' ongoing business operations and the contemplated costs

of the chapter 11 cases until the section 363 sale could be completed.

23.    The DIP Facility Lender was the only viable avenue to provide the Debtors

sufficient postpetition financing on reasonable, market and actionable terms.   Under the

circumstances, the Debtors are unable to obtain sufficient financing from sources other than the

DIP Facility Lender on terms more favorable than under the DIP Facility and all the documents, exhibits, schedules, and instruments delivered pursuant thereto or in connection therewith (inclusive of the DIP Term Sheet (as defined below) and the Budget, the "<u>DIP Facility Documents</u>").

24.    Pursuant to Bankruptcy Rules 4001(b)(1)(B) and 4001(c)(1)(B) and Local Rule 4001-2, the following is a summary of the proposed material terms relating to the DIP Term Sheet, the use of Cash Collateral, and the Interim Order:[6]

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | File Storage Partners, LLC; Afton Blockchain LLC; FilTech SPV LLC; and Midwest Blockchain Inc. |
| **DIP Facility Lender**<br>Bankruptcy Rule 4001(c)(1)(B) | KB Silver Funding, LLC ("**KBS**") |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B); Local Rule 4001-2(a)(ii) | The maturity date ("**Maturity Date**") shall be the earliest to occur of: (i) August 23, 2023 (ii) the closing date following entry of one or more final orders approving the sale of all or substantially all of the assets belonging to the Debtors in the Chapter 11 Cases, (iii) the acceleration of any outstanding DIP Loans following the occurrence of an uncured Event of Default (as defined herein), or (iv) entry of an order by the Bankruptcy Court in the Chapter 11 Cases either (a) dismissing such case or converting such Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or (b) appointing a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of the Debtors (*i.e.*, powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), in each case without the consent of the DIP Facility Lender. All amounts outstanding under the DIP Facility shall be due and payable in full, and the DIP Commitments thereunder shall terminate, on the Maturity Date. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii) | The DIP Facility Lender shall provide a secured, multiple draw term loan credit facility of up to $1,500,000 to fund Post-Petition Funding Obligations, on the terms and subject to the conditions set forth in the DIP Term Sheet and Interim Order, provided that $200,000 shall be available upon entry of the Interim Order and the balance shall be available upon entry of the Final Order. |

---

[6] The summaries contained in this Motion are qualified in their entirety by the Interim Order and documents referred to herein.  To the extent anything in this Motion is inconsistent with such order or documents, the terms of the applicable order or documents shall control.  Capitalized terms used in this chart but not otherwise defined herein have the meanings ascribed to such term elsewhere in this Motion or in the referenced documents.

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| **Conditions of Borrowing** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii) | The obligations of the DIP Facility Lender to consummate the transactions contemplated herein and to make the DIP Facility available to the Debtors on a final basis are subject to the satisfaction, in each case in the sole judgment of the DIP Facility Lender, of the following:<br><br>• Non-debtor affiliate DLTx LLC shall have executed that certain term sheet with KBS pertaining to the overall transaction impacting, among other things, (a) the secured party sale to KBS of its collateral owned by non-debtor affiliate DSM Tech Enterprises, Inc.; (b) the credit bid by the DIP Facility Lender of its claims under the DIP Facility for the Debtors' assets, and (c) the acquisition by KBS of the equity or assets of certain non-Debtor affiliates.<br><br>• Each of the Interim Order or Final Order, as the case may be, shall be in a form that is acceptable to the DIP Facility Lender in its sole discretion.<br><br>• All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Facility and the approval thereof shall comply with the terms of the DIP Credit Agreement and be in form and substance satisfactory to the DIP Facility Lender in its sole discretion.<br><br>• The Interim Order or the Final Order, as the case may be, shall be in full force and effect, and shall not have been appealed, reversed, modified, amended, stayed for a period of five (5) business days or longer, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is or may be materially adverse to the interests of the DIP Facility Lender.<br><br>• The DIP Facility Lender shall have received and approved the Approved Budget.<br><br>• Unless otherwise agreed to by the DIP Facility Lender, as to the funding of the Interim Amount, the Debtors shall have taken steps (to the DIP Facility Lender's satisfaction) towards safeguarding the Debtors' assets in the custody of LightEdge Solutions, Inc. ("LightEdge"),[7] including notifying LightEdge of the automatic stay's applicability to the Debtors' assets in its custody, and/or seeking the entry of an order of the Bankruptcy Court (in form and substance acceptable to the DIP Facility Lender) approving any motion to enforce the stay regarding the same.  As to the |

---

[7] Certain of the Debtors' assets are in the custody of LightEdge pursuant to that certain Master Agreement dated as of 2/15/2021 (together with all agreements executed pursuant thereto, the "LightEdge Agreement").

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
|  | funding of the Final Amount, the Bankruptcy Court shall have entered final orders in form and substance acceptable to the DIP Facility Lender approving the Motion to Enforce the Stay, unless such clause is waived by the DIP Facility Lender or the circumstances giving rise to the Motion to Enforce the Stay are otherwise moot.<br><br>• There shall be no uncured or unwaived Event of Default.<br><br>• The representations and warranties of the Debtors relating hereto shall be true and correct immediately prior to, and after giving effect to, funding, as qualified in "Availability and Draw Procedure." |
| **Interest Rate**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii) | The principal balance of the DIP Facility (the "Principal Balance") shall comprise the aggregate amounts available under the DIP Facility minus any voluntary, mandatory, or other prepayments, other than payments of fees, costs and interest, made to the DIP Facility Lender by or on behalf of the Debtors; *provided* that for that Principal Balance attributable to Filecoin Uses (as defined below), the Principal Balance shall equal the greater of the USD lent under the DIP Facility to acquire Filecoin and the USD equivalent on the Maturity Date of the Filecoin so purchased. Interest shall accrue on the Principal Balance based on the portion of the Principal Balance the Debtors have actually drawn, at a per annum fixed rate of 15.00%; provided that, after the occurrence and during the continuance of an Event of Default, interest shall accrue at the fixed rate of 20.00%. |
| **Use of DIP Facility and Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii); Local Rule 4001-2(a)(ii) | The Debtors will be permitted to use the proceeds of the DIP Facility to fund the operational, employee, and other costs of the Debtors, and payments related to the working capital and other general corporate purposes of the Debtors, as well as to pursue the orderly sale of their assets through these Chapter 11 Cases, including the payment of professional fees and expenses, and, in each case, consistent with, subject to, and within the categories and limitations contained in, the Approved Budget (as defined herein) (the "Permitted Uses") and all applicable orders of the Bankruptcy Court in the Chapter 11 Cases.<br><br>No portion of the proceeds under the DIP Facility shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Debtors owing to the Prepetition Secured Party (collectively, the "Prepetition Indebtedness") or the DIP Facility Lender, or (ii) liens or security interests in the collateral securing such indebtedness, including challenges to the perfection, priority or validity of the liens granted in favor of the Prepetition Secured Party or the DIP Facility Lender with respect thereto. |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| **Repayment Features**<br>Local Rule 4001-2(a)(i)(E) | Except for Mandatory Prepayments (as described below), no payments or prepayments of any Draws under the DIP Facility shall be due until the Maturity Date. Upon the Maturity Date, the unpaid Principal Balance, together with all interest, fees, costs, expenses and any other amounts due under the DIP Facility shall be due and payable immediately in full without demand by the DIP Facility Lender or consent or action by the Bankruptcy Court.<br>Except as otherwise provided in the Approved Budget, mandatory repayments of any Draws under the DIP Facility shall be required in an amount equal to (i) 100% of the net sale proceeds from non-ordinary course asset sales of the Collateral (including, without limitation, a sale of all or substantially all of the Debtors' assets), (ii) 100% of the proceeds of the incurrence of any indebtedness other than in the ordinary course of business, (iii) 100% of insurance proceeds received by the Debtors (only in the event that such receipt is an extraordinary receipt that relates to the DIP Collateral and exceeds $50,000), and (iv) any condemnation proceeds received by the Debtors. |
| **Entities with Interests in Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(i) | KB Silver Funding, LLC[8] |
| **Expenses and Fees**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(ii) | There shall be a three percent (3%) commitment fee, which shall be assessed on the full committed amount and not come due until maturity, and no exit fee for the DIP Facility.<br><br>There shall be a Collateral Management Fee of $20,000 per full or partial calendar month payable to one or more designees of Lender that will oversee the inventory, deployment and operation of data networking infrastructure that serves as the Interim DIP Collateral and DIP Collateral. |
| **Budget**<br>Bankruptcy Rule 4001 (c)(1)(B); Local Rule 4001-2(a)(ii) | A copy of the Budget is attached as **Exhibit A** to the Interim Order. |
| **Reporting Information**<br>Bankruptcy Rule 4001(c)(l)(B) | After entry of the Interim Order, the Debtors shall provide to the DIP Facility Lender, no later than 5:00 p.m. Eastern Time on Thursday of each rolling one-week period, a budget variance and reconciliation report setting forth: (i) a comparative reconciliation, on a line-by-line basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the Approved Budget, and (ii) the percentage variance of the aggregate receipts and aggregate disbursements, for (A) the rolling one-week period ended on (and |

---

[8] In addition to the financing statement filed by the Prepetition Secured Party, a UCC search revealed a UCC financing statement by D Ledger Partners LLC, UCC-1 Financing Statement No. 20233346581, against FSP as debtor, which FSP believes is unauthorized and invalid and is seeking to have terminated pursuant to section 9-513 of the Delaware Uniform Commercial Code.  The Debtors reserve all rights to take such further actions necessary in this Court to effectuate the same.

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | including) the last Saturday of the one-week reporting period and (B) the cumulative period to date and (iii) projections for the following 13 weeks, including a rolling cash receipts and disbursements forecast for such period. |
| **Variance Covenant**<br>Bankruptcy Rule 4001(c)(l)(B); Local Rule 4001-2(a)(ii) | The Debtors shall not make or commit to make any payments other than those identified in the Approved Budget, subject to a cumulative four-week 10% variance from the amount in the "Total Disbursements" line in the Approved Budget.<br><br>Subject to the provisions of the Term Sheet, including the subsection entitled "Availability and Draw Procedure", budgeted expenditures and cash receipts may be paid and received, as applicable, in an earlier or later period in the reasonable discretion of the Debtors, in which event, the Approved Budget shall be deemed so amended for the purpose of calculating variances. |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(ii) | The Debtors shall comply with the following milestones for a sale of substantially all of the Debtors' assets to the Buyer (a "Bankruptcy Sale") in the Chapter 11 Cases (the "Sale Milestones"):<br><br>• Together with their chapter 11 petitions, the Debtors shall have filed a motion seeking approval of the Bankruptcy Sale;<br><br>• On or before 40 days after the Petition Date, the Debtors shall have obtained an order from the Bankruptcy Court approving the Bankruptcy Sale; and<br><br>• On or before 54 days after the Petition Date, or such later date as the DIP Facility Lender shall agree in writing, the Bankruptcy Sale shall be consummated. |
| **Liens and Priorities**<br>Bankruptcy Rule 4001(c)(l)(B)(i); Local Rule 4001-2(a)(i)(D) and (G), 4001-2(a)(ii) | All amounts owing by the Debtors under the DIP Facility shall be joint and several as to each Debtor and subject to the Carve Out and Permitted Prepetition Liens, (a) will be entitled to superpriority claim status pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any or all administrative expense claims of every kind and nature whatsoever, and (b) will be secured by a perfected security interest pursuant to section 364(c)(2), section 364(c)(3) and section 364(d) of the Bankruptcy Code with priority over the security interest securing Debtors' existing secured credit facilities and other indebtedness, including the Debtors' obligations owing to the Prepetition Secured Party and all other parties with liens on the Interim DIP Collateral and the DIP Collateral, pursuant to section 364(d)(1) of the Bankruptcy Code in all of the assets of the Debtors, as further described in the "DIP Collateral" section in the DIP Term Sheet.<br><br>Nothing herein shall be construed as impairing the ability of any party to object to any fees and expenses of a professional in the Chapter 11 Cases. |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | All of the liens described herein shall be effective and perfected as of the entry of the DIP Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. |
| **Carve-Out** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(i)(f) | (a) Subject to the terms and conditions contained in the Interim Order, the DIP Facility Liens, DIP Facility Superpriority Claims, and the adequate protection liens and claims of the Prepetition Secured Party as provided for herein, and the liens and claims held by the Prepetition Secured Party, shall be subject and subordinate only to the following (the "<u>Carve-Out</u>"): (i) unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); (ii) allowed reasonable fees and expenses (the "<u>Professional Fees</u>") of attorneys, financial advisors, and other professionals (including any claims agent) employed by the Debtors in the Chapter 11 Cases pursuant to a Court order under section 327 and 328 of the Bankruptcy Code, including a Subchapter V Trustee (collectively, the "<u>Professionals</u>"), to the extent incurred at any time on or prior to the calendar day on which a Termination Date (defined below) occurs less any retainers held by such Professional as of such date), whether such Professional Fees have been allowed by the Bankruptcy Court before or after the Termination Date; (iii) Professional Fees of Professionals incurred subsequent to the calendar day immediately following the Termination Date in an aggregate amount not to exceed **$10,000.00**.  The foregoing shall not be construed as consent to the allowance of any fees and expenses referred to above and shall not affect the right of the Debtors, DIP Facility Lender, Prepetition Secured Party, the U.S. Trustee, or other parties in interest to object to the allowance and payment of such amounts.  Payment of any portion of the Carve-Out shall not, and shall not be deemed to: (i) reduce any Debtors' obligations owed to any of the DIP Facility Lender or Prepetition Secured Party, or (ii) subordinate, modify, alter or otherwise affect any of the liens and security interests of such parties in the DIP Collateral or Prepetition Collateral (or their respective claims against the Debtors). Notwithstanding anything to the contrary in the Interim Order, the DIP Facility Lender reserves the right to review and object to any fee statement, interim application or monthly application issued or filed by any Professional.  Notwithstanding any provision (including, without limitation, any "variance" or similar provision) of the Interim Order or the DIP Facility Documents to the contrary, aggregate cumulative expenditures from Cash Collateral and from the proceeds of the DIP Facility subject to the Carve-Out for the Professionals shall not exceed 100% of the amount with respect thereto set forth in the Budget, and Professional Fees for any Professional included in the Carve-Out shall not exceed 100% of the amount listed in the line item in the Budget for such Professional.<br><br>(b) No Prepetition Collateral, DIP Collateral, proceeds thereof, or Cash Collateral, or any portion of the Carve-Out or financing provided under the DIP Facility, shall include, apply to, or be available for any fees or |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
|  | expenses incurred by any party, including the Professionals, in connection with: (i) the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Facility Lender or the Prepetition Secured Party, including, without limitation, challenging the amount, validity, extent, perfection, priority, characterization or enforceability of, or asserting any defense, counterclaim or offset to, the DIP Obligations, DIP Facility Liens, the DIP Facility Superpriority Claim, in respect thereof, the Prepetition Debt Documents, or the Prepetition Obligations, (ii) asserting any claims or causes of action (including, without limitation, claims or actions to hinder or delay the DIP Facility Lender's assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Facility Documents or this Interim Order or any Avoidance Actions) against the DIP Facility Lender or Prepetition Secured Party, or (iii) incurring indebtedness other than as expressly permitted by the DIP Facility Documents. |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(l)(B)(x); Local Rule 4001-2(a)(i)(C) | Subject to entry of the Final Order, with the exception of the Carve-Out, neither the Prepetition Collateral nor any Prepetition Secured Party, nor the DIP Collateral, nor the DIP Facility Lender shall be subject to surcharge, pursuant to sections 105, 506(c) or 552 of the Bankruptcy Code or otherwise, by the Debtors or any other party in interest without the prior written consent of the Prepetition Secured Party or DIP Facility Lender (as applicable), and no such consent shall be implied from any other action, inaction or acquiescence by such parties in this proceeding, including but not limited to funding of the Debtors' ongoing operation by the Prepetition Secured Party or the DIP Facility Lender. |
| **Section 552(b) Waiver** Bankruptcy Rule 4001(c)(l)(B); Local Rule 4001-2(a)(i)(h) | Subject to entry of the Final Order, the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code shall be deemed waived as to the Prepetition Secured Party and the DIP Facility Lender. The Prepetition Secured Party and the DIP Facility Lender shall not be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the Prepetition Collateral or the Collateral subject to the DIP Facility Liens. |
| **Stipulations to Prepetition Liens and Claims** Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(i)(Q)[9] | Subject to Paragraph 14 of the Interim Order, each stipulation, admission, and agreement contained in the Interim Order (collectively, the "Debtors' Stipulations") shall be binding upon the Debtors, their estates, and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes. The Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date. The Debtors, on their own behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows: |

---

[9] In accordance with Local Rule 4001-2(a)(i), this was an essential part of the Prepetition Secured Party's agreement to the use of its Cash Collateral.

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | (a) On June 8, 2023, Silvermine made a loan to the Debtors in the original principal amount of thirty thousand and 00/100 dollars ($30,000), as evidenced by that certain Promissory Note, dated June 8, 2023 by the borrowers thereto in favor of the Prepetition Secured Party, and as secured by that certain Security Agreement, dated June 8, 2023, by the grantors signatory thereto in favor of Prepetition Secured Lender. The collateral described in the Security Agreement comprised all assets of the Debtors *other than* their digital currency assets (such collateral, the "Prepetition Collateral"). The security interests evidenced under the Security Agreement (as amended over time, the "Prepetition Liens") were perfected by the filing of a financing statement with the Secretaries of State for Delaware, Nebraska, Missouri and Puerto Rico. |
| | (b) On June 29, 2023, Silvermine assigned the Note (with the consent of the Borrowers thereunder) and its rights under the Security Agreement to the Prepetition Secured Party. The Prepetition Secured Party then filed financing statements evidencing the assignment of the Note and the Security Agreement against each of the borrowers under the Note with the appropriate Secretaries of State, including those of Delaware, Nebraska, Missouri and Puerto Rico. On the same day, the Debtors amended and restated the Note by executing the First Amended and Restated Promissory Note in the amended principal amount of two hundred thousand and 00/100 dollars ($200,000.00). |
| | (c) As of the Petition Date, the Debtors were, absolutely and unconditionally, indebted and obligated to Prepetition Secured Party under the Prepetition Debt Documents in a principal amount of approximately $200,000.00 plus accrued but unpaid interest, fees, costs and expenses incurred by the Prepetition Secured Party under the Prepetition Debt Documents. |
| | (d) As of the Petition Date and immediately prior to giving effect to this Interim Order, the Prepetition Debt Documents are valid and binding agreements and obligations of the Debtors party thereto, and the liens granted pursuant thereto constitute valid, binding, enforceable and perfected security interests and liens, subject only to the liens permitted under such agreements, but only to the extent such permitted liens are valid, enforceable, non-avoidable liens and security interests that are perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), which are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (ii) |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and (b) the obligations arising under the Prepetition Debt Documents constitute the legal, valid and binding obligation of Debtors, enforceable in accordance with the terms thereof, and are not subject to any challenge or defense, including without limitation, avoidance, subordination, recharacterization, recovery, setoff, offset, attach, counterclaim, cross-claim, or claim (as defined in the Bankruptcy Code) of any kind.<br><br>(e) The Debtors have waived, discharged and released any right they may have to challenge or contest any of the Prepetition Obligations, the Prepetition Debt Documents, the DIP Obligations, the DIP Facility Documents (as defined below), and the liens, interests, claims, and security for the Prepetition Obligations and the DIP Obligations, and to assert any offsets, defenses, claims, objections, challenges, and/or causes of action against the Prepetition Secured Party, DIP Facility Lender, and/or any of each of its affiliates, parents, subsidiaries, agents, attorneys, advisors, professionals, officers, directors and employees only to the extent any such offset, defenses, claims, objections, challenges, and/or cause of action against any such parties is related to the Prepetition Obligations or the DIP Obligations, and to assert that any portion of the Prepetition Obligations or the DIP Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.<br><br>(f) No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens, Prepetition Secured Obligations, DIP Facility Liens, or DIP Obligations exist, no facts or occurrence supporting or giving rise to any offset, challenge, objection, defense, claim or counterclaim of any kind or nature to any of the Prepetition Liens, Prepetition Secured Obligations, DIP Facility Liens, or DIP Obligations exist, and no portion of the Prepetition Liens, Prepetition Secured Obligations, DIP Facility Liens, or DIP Obligations are subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law or equity.<br><br>(g) The Debtors, on behalf of themselves and their respective estates (including any successor trustee or other estate representative in the Chapter 11 Cases and any Successor |

18

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | Cases (as defined herein), and any party acting by, through or under the Debtors or their estates), hereby stipulate and agree that they absolutely and unconditionally release and forever and irrevocably discharge and acquit the Prepetition Secured Party, the DIP Facility Lender, and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives and other professionals and the respective successors and assigns thereof, in each case solely in their capacity as such (collectively, the "<u>Released Parties</u>"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Loan Documents, the Prepetition Debt Documents and/or the transactions contemplated hereunder or thereunder including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, any and all claims and causes of action arising under the Bankruptcy Code, and any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the liens or claims of the Prepetition Secured Party and/or the DIP Facility Lender (collectively, the "<u>Released Claims</u>") that exist or may exist prior to the entry of this Final Order by the Court. The Debtors further waive and release any defense, right of counterclaim, right of setoff or deduction to the payment of the Prepetition Secured Obligations and the DIP Obligations which the Debtors now have or may claim to have against the Released Parties arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of this Final Order by the Court.<br><br>(h) The Debtors admit, stipulate, acknowledge, and agree that the DIP Facility Lender and the Prepetition Secured Party shall have the right, subject to section 363(k) of the Bankruptcy Code, to credit bid (independently or together) up to the full |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | amount of the applicable outstanding Prepetition Secured Obligations and/or the DIP Obligations in each case, including, without limitation, any accrued interest and expenses, in a sale of any DIP Collateral (defined below) or Prepetition Collateral, as applicable, and whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.<br><br>(i) All of the Debtors' cash and cash equivalents, including cash on deposit in any account or accounts as of the Petition Date, securities or other property, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Prepetition Secured Party and DIP Facility Lender. |
| **Challenge Period**<br>Bankruptcy Rule 4001(c)(l)(B); Local Rule 4001-2(a)(i)(B) | Upon entry of this Interim Order, the Debtors' Stipulations and releases shall be binding upon the Debtors' estates and each other party-in-interest, including any trustee appointed in these chapter 11 cases (any subchapter V trustee, chapter 11 trustee, or chapter 7 trustee), except to the extent such party in interest *first* obtains standing, by no later than the earlier of (x) the deadline for parties to object to the entry of the Sale Order (as defined in the Sale Motion), provided that the Sale Order is entered in accordance with the Sale Milestones (as may be extended from time to time in accordance with the DIP Term Sheet or this Interim Order), and (y) seventy-five (75) calendar days following the date of entry of this Interim Order (such time period established by the earlier of clauses (x) and (y) shall be referred to as the "Challenge Period," and the date that is the next calendar day after the termination of the Challenge Period in the event that either (i) no Challenge (as defined below) is properly raised during the Challenge Period or (ii) with respect only to those parties who properly file a contested matter, adversary proceeding, or other matter challenging or otherwise objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations (each, a "Challenge"), such Challenge is fully and finally adjudicated, (i) and (ii) shall be referred to as the "Challenge Period Termination Date")) and *second*, obtains a final, non-appealable order in favor of such party-in-interest sustaining any such Challenge in any such timely-filed contested matter, adversary proceeding, or other action (any such Challenge timely brought for which such a final and non-appealable order is so obtained, a "Successful Challenge"). If the Chapter 11 Cases are converted to cases under chapter 7 ("Successor Cases") or if a chapter 11 trustee is appointed, in each case prior to the expiration of the Challenge Period, the Challenge Period for the chapter 7 trustee or such chapter 11 trustee, as applicable, shall be extended until 30 days after the appointment of such chapter 7 trustee or chapter 11 trustee, without prejudice to the right such chapter 7 trustee or chapter 11 |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
|  | trustee to seek a further extension of the Challenge Period from the Court. |
|  | Except as otherwise expressly provided herein, from and after the Challenge Period Termination Date and for all purposes in these Chapter 11 Cases and any Successor Cases (and after the dismissal of these Chapter 11 Cases or any Successor Cases), and without further notice, motion, or application to, order of, or hearing before this Court, (i) any and all payments made to or for the benefit of the Prepetition Secured Party or otherwise authorized by the Interim Order (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or avoidance by any party in interest, (ii) any and all such Challenges by any party-in-interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition Secured Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations shall be binding on all parties in interest in these Chapter 11 Cases or any Successor Cases, including any subchapter V, chapter 11, or chapter 7 trustee. Notwithstanding the foregoing, to the extent any Challenge is timely asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the immediately preceding sentence shall nonetheless remain binding and preclusive on any other party-in-interest from and after the Challenge Period Termination Date, except (and only) to the extent that such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately preceding sentence were expressly challenged in such Challenge and such Challenge becomes a Successful Challenge; provided that all other stipulations (other than those subject to a Successful Challenge) shall remain binding on any other party-in-interest. Notwithstanding any provision to the contrary herein, nothing in this Interim Order shall be construed to grant standing to any party in interest, to bring any Challenge on behalf of the Debtors' estates. The failure of any party-in-interest, to obtain an order of this Court prior to the Challenge Period Termination Date granting standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing to commence a Challenge prior to the Challenge Period Termination Date as required under this paragraph or to require or permit an extension of the Challenge Period Termination Date. |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv) | (a) <u>Adequate Protection Liens</u>. The Prepetition Secured Party shall be granted, as adequate protection, replacement liens on the Prepetition Collateral (the "<u>Adequate Protection Liens</u>") to secure claims for any diminution in the value of the Prepetition Secured Party's interests in the Prepetition Collateral during the pendency of these Cases, whether the reason for such diminution is as a result of, arises from, or is attributable to, the use of Cash Collateral, the physical deterioration, consumption, use, sale, lease, disposition, shrinkage or decline in market value of the Prepetition Collateral, the imposition of the automatic stay, or otherwise. The Adequate Protection Liens shall be |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | junior only to the Carve-Out, the DIP Facility Liens and Prepetition Permitted Liens, and senior to any other liens. The Adequate Protection Liens are valid, binding, enforceable and fully perfected as of the Petition Date without the necessity of the execution, filing or recording by the Debtors or the Prepetition Secured Party of security agreements, pledge agreements, financing statements or other agreements. The Adequate Protection Liens shall cover assets, interests and proceeds of the Debtors that are or would be collateral under the Prepetition Debt Documents if not for section 552(a) of the Bankruptcy Code, all cash and cash equivalents and, upon entry of the Final Order, the DIP Collateral.<br><br>(b) The Prepetition Secured Party shall be granted in each of the Debtors' Chapter 11 Cases an allowed administrative claim (the "Adequate Protection Claim") under section 507(b) of the Bankruptcy Code to the extent that the Adequate Protection Liens do not adequately protect against the diminution in the value of the Prepetition Secured Party's interests in the Prepetition Collateral from and after the Petition Date, subject to the terms of the Carve-Out and Prepetition Permitted Liens. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B); Local Rule 4001-2(a)(ii) | The occurrence of any one or more of the following shall constitute an "Event of Default":<br><br>(i) Failure by the Debtors to pay principal, interest or any other amounts provided by this Term Sheet when due;<br><br>(ii) Breach by any Debtor of any of the Covenants set forth on Schedule B to the Term Sheet;<br><br>(iii) Any representation or warranty made by any Debtor shall prove to have been incorrect in any material respect when made;<br><br>(iv) Any provision of the Term Sheet or the DIP Orders shall cease to be valid and binding on any Debtor, or any Debtor shall so assert in any pleading filed in any court;<br><br>(v) The failure to satisfy any of the Sale Milestones;<br><br>(vi) Without the consent of the DIP Facility Lender, any of the Chapter 11 Cases shall be dismissed or converted to a Chapter 7 case;<br><br>(vii) Unless consented to by the DIP Facility Lender, a Chapter 11 trustee, a responsible officer or an examiner with enlarged powers relating to the operation of the business of the Debtors (*i.e.*, powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases;<br><br>(viii) Any other superpriority claim or lien which is *pari passu* with or senior to the claims or liens of the DIP Facility Lender under the DIP Facility shall be granted in any of the Chapter 11 Cases, other than the Carve- |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | Out; |
| | (ix)     Any Debtor shall make any payment on account of any pre-petition indebtedness or payables of a Debtor except as otherwise permitted under the Approved Budget; |
| | (x)     The Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Debtor which have an aggregate value in excess of $25,000 (other than with respect to those Debtors for which the DIP Facility Lender consents to such relief); |
| | (xi)     An order shall be entered amending, modifying or supplementing the Interim Order or Final Order without the prior written consent of the DIP Facility Lender; |
| | (xii)     Any judgment in excess of $100,000 (to the extent not paid or fully covered (subject to applicable deductibles) by a reputable and solvent insurance company) as to any post-petition obligation shall be rendered against any Debtor and the enforcement thereof shall not be stayed; or there shall be rendered against any Debtor a non-monetary judgment with respect to a post-petition event which is not stayed and causes or would reasonably be expected to have a material adverse effect on the operations, businesses, properties, assets, or conditions (financial or otherwise) of any Debtor, or on the ability of any Debtor to perform its respective obligations herein or under the DIP Orders; |
| | (xiii)     The Debtors revoke the subchapter V designation of the Chapter 11 Cases; |
| | (xiv)     The filing of a motion requesting an order described in subparagraphs (vi) through (xiii) above shall be made and such application is not contested by the Debtors in good faith or the relief requested is not withdrawn, dismissed or denied within ten (10) days after filing or the entity obtains a final order under § 506(c) of the Bankruptcy Code against the Lender or obtains a final order adverse to the Lender or any of its rights and remedies under the DIP Documents or in the Interim DIP Collateral or the DIP Collateral; or |
| | (xv)     The filing of a challenge to the liens or claims of the DIP Facility Lender based upon the DIP Facility Lender's prepetition conduct. |
| | Upon an Event of Default, the DIP Facility Lender shall be entitled to payment of its reasonable attorneys' fees and costs incurred |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | thereafter, which such amounts shall be added to the obligations under the DIP Facility. |
| **Waiver/Modification of the Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | Upon the occurrence and continuance of an Event of Default beyond the applicable grace period set forth below (if any), the DIP Facility Lender shall be entitled to take all or any of the following actions without further order of or application to the Bankruptcy Court: <br><br>     (i)    declare the principal of and accrued interest on the outstanding DIP Loans to be immediately due and payable; <br><br>     (ii)   terminate the DIP Facility; <br><br>     (iii)  implement the default rate of interest on all outstanding DIP Loans; and <br><br>     (iv)  take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Facility Lender) permitted under the applicable loan documents, or by applicable law. <br><br> Any automatic stay otherwise applicable to the DIP Facility Lender shall be modified so that upon the occurrence of an Event of Default and upon five (5) business days' prior written notice of such occurrence (a "Termination Notice"), in each case given to the Debtors, and the U.S. Trustee, the DIP Facility Lender shall be entitled to exercise customary remedies including, without limitation, the right to realize on all the Interim DIP Collateral and DIP Collateral and the right to exercise any remedy available under applicable law, in each case without obtaining any further relief or order of the Bankruptcy Court unless, within such five (5) business day period, the Bankruptcy Court has entered an order to the contrary. Consistent with the foregoing sentence, relief from the stay of section 362 of the Bankruptcy Code in favor of the DIP Facility Lender shall be embodied in any order approving the DIP Facility and the use of cash collateral. |
| **Waiver/Modification of Applicability of Non-bankruptcy Law Relating to Perfection or Enforceability of Liens** Bankruptcy Rule 4001(c)(1)(B)(vii) | Upon entry of the Final Order, the liens granted to the DIP Facility Lender in accordance with the Term Sheet and the Interim Order will at all times be fully perfected liens in and to the Collateral described therein, subject, as to priority, only to liens permitted to have such priority under the Interim Order. |
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The Debtors shall be authorized to indemnify the DIP Facility Lender and certain other parties against any liability arising in connection with the DIP Term Sheet to the extent set forth in and in accordance with the terms of the DIP Term Sheet, to the maximum extent permitted under the Bankruptcy Code and applicable law.  All such unpaid fees, expenses and indemnities of the DIP Facility Lender, to the extent permitted by law, shall constitute DIP Obligations, and the repayment |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | thereof shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Term Sheet. |
| **Liens on Avoidance Actions**<br>Local Rule 4001-2(a)(i)(D) | Subject to entry of the Final Order, the DIP Collateral shall include the proceeds of the Avoidance Actions.<br><br>The Adequate Protection Liens shall cover assets, interests and proceeds of the Debtors that are or would be collateral under the Prepetition Debt Documents if not for section 552(a) of the Bankruptcy Code, and all cash and cash equivalents, and all assets, interests and proceeds of the Debtors that constitute DIP Collateral, including (subject to entry of the Final Order) the proceeds of the Avoidance Actions. |
| **Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(l)(B)(ii) | The Cash Collateral shall be used to fund the operational, employee, and other costs of the Debtors, and payments related to the working capital and other general corporate purposes of the Debtors, as well as to pursue the orderly sale of their assets through these Chapter 11 Cases, including the payment of professional fees and expenses, and, in each case, consistent with, subject to, and within the categories and limitations contained in, the Approved Budget. |
| **Duration of Use of Cash Collateral / Events of Default**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | Authority to use Cash Collateral shall continue on an interim basis pursuant to the Interim Order, then on a Final Basis following a Final Order, until terminated in accordance with the Interim Order or Final Order (as applicable). |
| **Adequate Protection**<br>Bankruptcy Rules 4001(b)(l)(B)(iv); Interim Order at ¶¶ 12 | (a) <u>Adequate Protection Liens</u>.  The Prepetition Secured Party shall be granted, as adequate protection, continuing liens and replacement liens on the Prepetition Collateral and any and all assets of the Debtors as exist on or after the Petition Date (including, without limitation, proceeds of Prepetition Collateral) in the same priority and validity as existed on the Petition Date (the "<u>Adequate Protection Liens</u>") to secure its claims for any diminution in the value of such Prepetition Secured Party's interests in the Prepetition Collateral during the pendency of these Chapter 11 Cases, whether the reason for such diminution is as a result of, arises from, or is attributable to, the use of Cash Collateral, the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Prepetition Collateral, the imposition of the automatic stay, or otherwise (including, without limitation, any diminution in value of such interests in the Prepetition Collateral prior to the Prepetition Secured Party seeking relief from the automatic stay or the Bankruptcy Court granting such relief).  The Adequate Protection Liens shall be junior only to the Carve-Out and Prepetition Permitted Liens, and senior to any other liens.  The Adequate Protection Liens are valid, binding, enforceable, and fully perfected as of the Petition Date without the necessity of the execution, filing, or recording by the Debtors or the Prepetition Secured Party of security agreements, pledge agreements, financing statements, or other agreements.  The Adequate Protection Liens shall cover assets, interests, and proceeds |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | of the Debtors that are or would be collateral under the Prepetition Debt Documents if not for section 552(a) of the Bankruptcy Code, and all cash and cash equivalents, including Cash Collateral.<br><br>(b) _Superpriority Administrative Claim_. The Prepetition Secured Party shall be granted in each of the Debtors' Cases an allowed administrative claim (the "_Adequate Protection Claim_") under section 507(b) of the Bankruptcy Code to the extent that the Adequate Protection Liens do not adequately protect against the diminution in the value of the Prepetition Secured Party's interests in the Prepetition Collateral from and after the Petition Date, subject to the terms of the Carve-Out. |
| **Termination Events**<br>Bankruptcy Rule 4001(b)(l)(B)(iii); Local Rule 4001-2(a)(ii)(M) | Until the payment in full of the DIP Obligations, the occurrence of any of the following events, unless waived by the DIP Facility Lender in writing (which may be by electronic mail) and in accordance with the terms of the DIP Loan Documents, shall constitute an event of default hereunder (collectively, the "_Events of Default_"):<br><br>(a) the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants or obligations under the Interim Order, including, without limitation, failure to make any payment under this Interim Order when due, or the failure to comply with any Sale Milestone;<br><br>(b) the occurrence and continuation of any Events of Default under, and as defined in, the DIP Term Sheet, or any other DIP Loan Documents;<br><br>(c) without the prior written consent of the DIP Lender and the Prepetition Secured Party, as applicable, the entry of an order providing for (a) any modification, stay, vacatur, or amendment to this Final Order, or any other use of Cash Collateral resulting from DIP Collateral or Prepetition Collateral; (b) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases or Successor Cases, equal or superior to the DIP Superpriority Claims or the Adequate Protection Superpriority Claims, other than the Carve-Out and the Prepetition Permitted Liens; (c) any lien on any of the DIP Collateral with priority equal or superior to the DIP Facility Liens, except as specifically permitted by the DIP Loan Documents; (d) without the prior written consent of the |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | Prepetition Secured Party, any lien on any of the Prepetition Collateral with priority equal to or superior to the Prepetition Liens or Adequate Protection Liens;<br><br>(d) the filing by the Debtors, the Debtors supporting, or the failure of the Debtors to timely oppose any motion or application seeking entry of an order of the nature described in section (c) immediately above; or<br><br>(e) the Debtors propose or support any plan of reorganization or liquidation or sale of all or substantially all of the Debtors' assets or equity, or order confirming such plan or approving such sale, that is not conditioned upon the payment in full of the DIP Obligations upon the consummation of such plan or sale. |

### E.    The Debtors' Immediate Need for Authority to Use Cash Collateral in Accordance with the Budget to Avoid Imminent and Irreparable Harm

25.    The Debtors have worked closely with their senior management and outside advisors to evaluate the Debtors' cash requirements for their businesses in chapter 11 until a sale process can be completed.  As set forth in the Budget attached to the Interim Order as **Exhibit A**, the Debtors have an urgent need for additional liquidity to ensure business continuity and operational stability from the Petition Date pending a final hearing on the Motion.  The Debtors have thoroughly reviewed and vetted the Budget with their advisors, and the Debtors believe that the Budget provides an accurate reflection of the Debtors' currently anticipated business revenues and expenses, including administrative costs in Chapter 11 Cases, over the covered period.

26.    As reflected in the Budget, immediate authority to access the DIP Facility is necessary to avoid immediate and irreparable harm that would otherwise result if the Debtors were denied incremental liquidity and unable to maintain operations necessary to execute their going-concern sale strategy.

27.     The Debtors, therefore, believe that authority to use Cash Collateral and access the

DIP Facility on an expedited basis is critical to ensuring that the Debtors are able to successfully

pursue their goals in chapter 11 for the benefit of all parties in interest.  Having committed funding

for the Cases also is vital to sending a clear and important signal to the Debtors' customers,

employees, counterparties, utilities, and business partners that the Debtors' operations can and will

continue on a business-as-usual basis until the Debtors are able to consummate a sale, subject to

this Court's approval.  Accordingly, through this Motion, the Debtors also seek authority to use

Cash Collateral and borrow under the DIP Facility in accordance with the terms set forth in the

Interim Order and the Final Order.

28.     The Interim Order also includes certain terms that may constitute material

provisions requiring explicit disclosure under the Local Rules.  The provisions described in Local

Rule 4001-2(a)(i), to the extent applicable, are set forth at the following sections of the Interim

Order:

(a)     Local Rule 4001-2(a)(i)(B) – Validity, Perfection, and Amount of Prepetition Liens.  The Interim Order stipulates, subject to entry of the Final Order, to the validity and perfection of liens held by the Prepetition Secured Party and the DIP Facility Lender.

(b)     Local Rule 4001-2(a)(i)(C) – Section 506(c) Waiver.  Subject to entry of the Final Order, in consideration of their agreement to permit the use of Cash Collateral and/or to permit priming liens to the DIP Facility Lender, the Debtors have agreed to waive the provisions of section 506(c) of the Bankruptcy Code as to the Prepetition Secured Party and the DIP Facility Lender.

(c)     Local Rule 4001-2(a)(i)(D) – Liens on Avoidance Actions.  Subject to entry of the Final Order, the Final Order grants liens on avoidance actions as a form of adequate protection to the Prepetition Secured Party, and as collateral and a form of adequate protection to the DIP Facility Lender.

(d)     Local Rule 4001-2(a)(i)(E) – Provisions Deeming Prepetition Debt to be Postpetition Debt.  The Interim Order contains no provisions that deem prepetition debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt.

(e)     Local Rule 4001-2(a)(i)(H) – Provisions Affecting the Court's Power to Consider Equities of the Case.  Subject to entry of the Final Order, the Debtors have agreed to waive any "equities of the case" claims under section 552(b) of the Bankruptcy Code as to the Prepetition Secured Party and the DIP Facility Lender.

## BASIS FOR RELIEF

### A.     This Court Should Authorize the Debtors to Obtain Postpetition Financing and Grant Priming Liens and other Rights and Privileges to the DIP Facility Lender

29.     Bankruptcy courts have authority to permit debtors-in-possession to obtain postpetition financing pursuant to section 364 of the Bankruptcy Code.  Specifically, section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that a debtor seeking postpetition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense."  11 U.S.C. § 364(c).  In addition, under section 364(d)(1) of the Bankruptcy Code, courts may, after notice and a hearing, authorize a debtor to obtain postpetition credit secured by a "priming" lien from affected secured parties.  Specifically, section 364(d)(1) of the Bankruptcy Code provides, in relevant part, that a court, after notice and a hearing, may:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
> (A)     the [debtor] is unable to obtain credit otherwise; and
>
> (B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).  In evaluating proposed postpetition financing under sections 364(c) and 364(d)(1) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider various factors, including whether:

> (a)     unencumbered credit or alternative financing without superpriority status is available to the debtor;
>
> (b)     the credit transactions are necessary to preserve assets of the estate;

(c)    the terms of the credit agreement are fair, reasonable, and adequate;

(d)    the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtors' estate and their creditors; and

(e)    the proposed financing agreement adequately protects prepetition secured creditors.

See, e.g., In re Los Angeles Dodgers LLC, 457 B.R. 308, 312 (Bankr. D. Del. 2011); In re Aqua Assoc., 123 B.R. 192 (Bankr. E.D. Pa. 1991).

30.    For the reasons discussed herein, the Debtors submit that they satisfy the standards required to access postpetition financing on a superpriority claim and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

*(a)    The Debtors Cannot Obtain Financing on More Favorable Terms*

31.    In demonstrating that credit is not available without the protections afforded by sections 364(c) or 364(d) of the Bankruptcy Code, a debtor need only make a good faith effort. See, e.g., In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir. 1986) (holding "[t]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"). Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom., Anchor Sav. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).

32.    As set forth above and in the First Day Declaration, given their current financial condition, financing arrangements, and debt and capital structure, the only source of financing reasonably available and actionable is that offered by the DIP Facility Lender on the terms under

the DIP Term Sheet, and the Debtors were not able to obtain unsecured credit allowable as an

administrative expense under section 503(b)(1) of the Bankruptcy Code or as secured by a junior

or parri passu lien on the Debtors' assets.  Accordingly, the Debtors submit that, despite their good

faith efforts, similar credit is not available to the Debtors without the priming sought through the

Interim Order.

**(b)** *The DIP Facility and DIP Term Sheet Are Necessary to Preserve the Value of the Debtors' Estates*

33.     As debtors-in-possession, the Debtors have a fiduciary duty to protect and

maximize the value of their estates.  See In re Mushroom Transp. Co., 382 F.3d 325, 339 (3d Cir.

2004).  The DIP Facility and DIP Term Sheet, if approved, will provide working capital critical to

fund the Debtors' day-to-day operations and the chapter 11 cases, which will provide a path for

the Debtors to sell their assets as a going-concern pursuant to section 363 of the Bankruptcy Code.

Without access to the DIP Facility, the Debtors would be forced to cease operations immediately

after the Petition Date, which would result in immediate and irreparable harm to their businesses,

deplete the going-concern value of such businesses, and upend the going-concern sale process that

the Debtors believe is the best way to maximize value for creditors.  The Debtors also would be

unable to administer their chapter 11 cases without the liquidity provided by the DIP Facility.  The

Debtors' ability to maintain business relationships with their vendors, suppliers, utilities, and

customers, to satisfy other working capital and operational needs, and to otherwise finance their

operations during the chapter 11 cases, is essential to the Debtors' continued viability and to ensure

a value-maximizing sale process.

34.     Because the Debtors' available and projected cash from operations alone is

insufficient to fund their operations, see Budget, the funds to be provided under the DIP Facility

are necessary to preserve the value of the Debtors' estates for the benefit of all stakeholders.

**(c)** ***The Terms of the DIP Term Sheet are Fair, Reasonable, and Adequate under the Circumstances***

35.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the proposed lender.  See In re L.A. Dodgers, 457 B.R. at 312 (approval of debtor-in-possession financing requires terms that are "fair, reasonable and adequate, given the circumstances of the debtor-borrower and the proposed lender"); see also In re Farmland Indus., Inc., 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003) (although many of the terms favored the lenders, "taken in context, and considering the relative circumstances of the parties," the court found them to be reasonable); Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization).

36.     As described in the First Day Declaration and herein, given the urgent need of the Debtors to obtain financial stability for the benefit of all parties in interest and fund a sale process in these Chapter 11 Cases, the Debtors submit that the terms of the DIP Term Sheet are fair, appropriate, reasonable, and in the best interests of the Debtors, their estates, and their creditors. The DIP Term Sheet, moreover, was negotiated by the Debtors and the DIP Facility Lender, in good faith and at arm's-length as required by section 364(e) of the Bankruptcy Code, with all parties represented by experienced counsel.  The Debtors, therefore, believe that this requirement is satisfied.

**(d)** ***Entry into the DIP Term Sheet Reflects the Debtors' Reasonable Business Judgment***

37.     A debtor's decision to enter into a postpetition lending facility under § 364 of the Bankruptcy Code is governed by the business judgment standard.  See In re Trans World Airlines, Inc., 163 B.R. 964, 974 (Bankr. D. Del 1994) (noting that the interim loan, receivable facility, and

asset based facility were approved because they "reflect[ed] sound and prudent business judgment [were] reasonable under the circumstances and in the best interests of TWA and its creditors"); Ames Dep't Stores, Inc., 115 B.R. at 40 ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"). Courts grant a debtor-in-possession considerable deference in acting in accordance with its business judgment in obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code. See, e.g., In re L.A. Dodgers, 457 B.R. at 313 ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender.").

38.     For the reasons set forth above and in the First Day Declaration, the Debtors submit that entry into the DIP Term Sheet is consistent with the exercise of the Debtors' reasonable business judgment.  The Debtors, therefore, request that this Court authorize the Debtors to enter into the DIP Term Sheet and access funds under the DIP Facility, subject to the terms of the Interim Order, and that this Court grant to the DIP Facility Lender all of the rights, privileges, and protections, as set forth herein, in the DIP Term Sheet, and the Interim Order, that are necessary to protect the DIP Facility Lender and secure the DIP Obligations.

## B.     The DIP Facility Lender should be Deemed a Good-Faith Lender under Section 364(e) of the Bankruptcy Code

39.     The Debtors submit that the DIP Facility Lender should be deemed a good-faith lender under the Bankruptcy Code.  Specifically, section 364(e) of the Bankruptcy Code provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this

33

section of a priority or a lien, does not affect the validity of any debt so incurred, or
any priority or lien so granted, to an entity that extended such credit in good faith,
whether or not such entity knew of the pendency of the appeal, unless such
authorization and the incurring of such debt, or the granting of such priority or lien,
were stayed pending appeal.

11 U.S.C. § 364(e).  Section 364(e)of the Bankruptcy Code protects a good-faith lender's right to

collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal.

40.    As explained herein and in the First Day Declaration, the DIP Term Sheet is the

result of: (i) the Debtors' reasonable judgment that under the circumstances the DIP Facility

Lender provided a reasonable, market and actionable postpetition financing proposal; and (ii)

extended arm's-length, good-faith negotiations between the Debtors and the DIP Facility Lender.

The Debtors submit that the terms and conditions of the DIP Term Sheet are reasonable under the

circumstances, and the proceeds of the DIP Facility will be used only for purposes that are

permissible under the Bankruptcy Code, as more particularly set forth in the DIP Term Sheet and

Budget.  Accordingly, the Debtors request that this Court find that the DIP Facility Lender is a

"good faith" lender within the meaning of section 364(e) of the Bankruptcy Code and is entitled

to all of the protections afforded by that section.

### C.    This Court Should Approve the Proposed Adequate Protection for the Debtors' Use of Prepetition Collateral, including Cash Collateral

41.    To the extent a secured creditor's interests in the collateral constitute valid and

perfected security interests and liens as of the Petition Date, section 364(d)(1)(B) of the

Bankruptcy Code requires that adequate protection be provided where the liens of such secured

creditor are being primed to secure the obligations under a debtor in possession financing facility.

Similarly, section 363(c)(2) of the Bankruptcy Code provides that a debtor may use Cash Collateral

as long as: (a) each entity that has an interest in such Cash Collateral consents; or (b) the bankruptcy court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of the section.  See 11 U.S.C. § 363(c)(2).  The concept of adequate protection is designed to shield a secured creditor from diminution in the value of its interest in collateral during the period of a debtor's use after commencement of the bankruptcy case.  See In re Carbone Cos., 395 B.R. 631, 635 (Bankr. N.D. Ohio 2008) ("The test is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral); In re Cont'l Airlines, Inc., 154 B.R. 176, 180-81 (Bankr. D. Del. 1993) (adequate protection for use of collateral under § 363 is limited to use-based decline in value).

42.    Although section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts must decide what constitutes sufficient adequate protection on a case-by-case basis.  See Resolution Trust Corp. v. Swedeland Dev. Grp., Inc. (In re Swedeland Dev. Grp., Inc.), 16 F.3d 552, 564 (3d Cir. 1994) ("[A] determination of whether there is adequate protection is made on a case-by-case basis."); In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("[T]he determination of adequate protection is a fact-specific inquiry . . . left to the vagaries of each case . . . .") (citation and quotation omitted).  The focus of the requirement is to protect a secured creditor from the diminution in the value of its interest in the particular collateral during the period of use.  See Swedeland, 16 F.3d at 564 ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

43.    As set forth above, the Prepetition Secured Party has consented to the use of the Cash Collateral pursuant to section 363(c)(2)(A) of the Bankruptcy Code, in exchange for

provision of the adequate protection described below.  The proposed adequate protection provided to the Prepetition Secured Party—the only party that the Debtors anticipate may assert a lien on both Prepetition Collateral and Cash Collateral—comprises the following:

(a)  **Replacement Liens**.  The Prepetition Secured Party shall be granted, as adequate protection, continuing liens and replacement liens on the Prepetition Collateral and any and all assets of the Debtors as exist on or after the Petition Date (including, without limitation, proceeds of Prepetition Collateral) in the same priority and validity as existed on the Petition Date (the "Adequate Protection Liens") to secure its claims for any diminution in the value of such Prepetition Secured Party's interests in the Prepetition Collateral during the pendency of these Chapter 11 Cases, whether the reason for such diminution is as a result of, arises from, or is attributable to, the use of Cash Collateral, the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of the Prepetition Collateral, the imposition of the automatic stay, or otherwise (including, without limitation, any diminution in value of such interests in the Prepetition Collateral prior to the Prepetition Secured Party seeking relief from the automatic stay or the Bankruptcy Court granting such relief).  The Adequate Protection Liens shall be junior only to the Carve-Out, the DIP Facility Liens and Prepetition Permitted Liens, and senior to any other liens.  The Adequate Protection Liens are valid, binding, enforceable, and fully perfected as of the Petition Date without the necessity of the execution, filing, or recording by the Debtors or the Prepetition Secured Party of security agreements, pledge agreements, financing statements, or other agreements.  The Adequate Protection Liens shall cover assets, interests, and proceeds of the Debtors that are or would be collateral under the Prepetition Debt Documents if not for section 552(a) of the Bankruptcy Code, all cash and cash equivalents, including Cash Collateral, and upon entry of a Final Order, all other DIP Collateral; and

(b)  **Superpriority Administrative Claim**.  The Prepetition Secured Party shall be granted in each of the Debtors' Chapter 11 Cases an allowed administrative claim (the "Adequate Protection Claim") under section 507(b) of the Bankruptcy Code to the extent that the Adequate Protection Liens do not adequately protect against the diminution in the value of the Prepetition Secured Party's interests in the Prepetition Collateral from and after the Petition Date, subject to the terms of the Carve-Out and Prepetition Permitted Liens.

44.    The Debtors believe that the adequate protection proposed herein to protect any diminution in value of the Prepetition Secured Party's interest in the Prepetition Collateral and Cash Collateral is fair and reasonable.  Moreover, the Prepetition Secured Party has consented to the use of Cash Collateral in connection with the Debtors' proposed adequate protection package.

Accordingly, based upon the foregoing, the Debtors respectfully request that the Court authorize the Debtors to provide the adequate protection described above to such parties.

### D.    The Carve-Out is Appropriate

45.    The proposed DIP Facility contemplated herein is subject to the Carve-Out. Carve-outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel. See Ames Dep't Stores, 115 B.R. at 40. The DIP Facility does not directly or indirectly restrict the services for which professionals may be paid in this chapter 11 case beyond that which is standard in DIP facilities, and thus does not deprive the Debtor's estate or other parties in interest of possible rights and powers. See id. at 38 ("[a]bsent such protection [provided via carve-outs], the collective rights and expectations of all parties-in-interest are sorely prejudiced"). Additionally, the Carve-Out protects against administrative insolvency during the course of this chapter 11 case by ensuring that assets remain for the payment of professional fees of the Debtors and any other parties so entitled, notwithstanding the grant of superpriority and administrative liens and claims under the Interim Order and Final DIP Order. Accordingly, the Debtors submit that the proposed Carve Out is appropriate in these circumstances.

### E.    Modification of the Automatic Stay is Warranted and Necessary to Facilitate the Debtors' Postpetition Borrowing through the DIP Facility

46.    The Debtors request that this Court modify the automatic stay provisions of section 362 of the Bankruptcy Code solely to the extent necessary to permit the DIP Facility Lender to exercise, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the DIP Term Sheet (all subject to the default and notice provisions set forth in the Interim Order), and to the extent necessary to grant the adequate protection to the Prepetition Secured Party as set forth herein and in the Interim Order. The Debtors believe that

these modifications to the automatic stay are fair and reasonable and are necessary conditions to effectuate the relief sought in this Motion.

### F.    **Interim Relief is Warranted**

47.    Bankruptcy Rules 4001(b)(2) and 4001(c)(2) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the court may conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit on an interim basis "to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2); (c)(2).

48.    As described herein and in the First Day Declaration, the Debtors have an urgent and immediate need to borrow funds and use Cash Collateral.  During the thirteen days after the Petition Date, the Debtors will incur ordinary course expenses and require cash to satisfy their working capital and operational needs, and to otherwise finance their chapter 11 cases.  Failure to pay those expenses as they come due will result in irreparable harm to the business relationships that the Debtors have worked hard to maintain, and which form the foundation of the going concern value which they plan to maximize by virtue of the proposed sale process.

49.    Given the immediate and irreparable harm to be suffered by the Debtors, their estates, and their creditors absent interim relief, the Debtors request that, pending a final hearing, this Court schedule an interim hearing as soon as practicable after the Petition Date to consider the interim relief requested in the Motion.

### **REQUEST FOR FINAL HEARING**

50.    Pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2), the Debtors also request that this Court set a date for a final hearing on the Motion that is as soon as practicable in

accordance with the Bankruptcy Rules and fix the time and date for parties to file objections to the Motion.

### NOTICE

51.     The Debtors will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the Debtors' twenty (20) largest unsecured creditors or their counsel, (c) counsel to the Prepetition Secured Party and DIP Facility Lender, (d) all known holders of filed liens on the Debtors' assets, (e) the Subchapter V Trustee (upon appointment); and (f) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service. In light of the nature of the relief requested herein, the Debtors submit no other or further notice is required.

### CONCLUSION

WHEREFORE the Debtors respectfully request entry of the Interim Order and, following adequate notice and hearing, the Final Order, granting the relief requested herein and such other and further relief as this Court may deem just and appropriate.

Dated:   June 30, 2023
         Wilmington, Delaware                    BAYARD, P.A.

                                                 */s/ Evan T. Miller*
                                                 Evan T. Miller (No. 5364)
                                                 Steven D. Adler (No. 6257)
                                                 600 North King Street, Suite 400
                                                 Wilmington, Delaware 19801
                                                 Telephone: (302) 655-5000
                                                 Facsimile: (302) 658-6395
                                                 Email: emiller@bayardlaw.com
                                                        sadler@bayardlaw.com

                                                 *Proposed Counsel to the Debtors and*
                                                 *Debtors in Possession*

**EXHIBIT 1**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| FILE STORAGE PARTNERS, LLC, *et al.*,[1] | Case No. 23-10877 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. ___** |

## INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364, AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO § 364 OF THE BANKRUPTCY CODE; (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO § 363 OF THE BANKRUPTCY CODE; (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS; (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTY AND DIP FACILITY LENDER; AND (V) SCHEDULING A FINAL HEARING PURSUANT TO FED. R. BANKR. P. 4001(B) AND (C)

Upon consideration of the *Motion of the Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to § 364 of the Bankruptcy Code; (II) Authorizing Use of Cash Collateral Pursuant to § 363 of the Bankruptcy Code; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to the Prepetition Secured Party; and (V) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. R. 4001(b) and (c)* (the "Motion")[2] filed by the Debtors; and it appearing that due and proper notice of the Motion has been given, and that no other or further notice need be given; and after due deliberation and sufficient cause appearing therefor;

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  File Storage Partners, LLC (6920); Afton Blockchain LLC (3951); Filtech SPV LLC (9602); and Midwest Blockchain Inc. (8842).  The Debtors' service address is 1357 Ashford Ave., Pmb 373, San Juan, PR 00907.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

**THE COURT HEREBY FINDS AND CONCLUDES**:

A.       On June 30, 2023 (the "Petition Date"), the Debtors commenced the Cases in the Bankruptcy Court.  The Debtors are continuing to operate their respective businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in the Cases.  No committee has been appointed or designated in the Cases.

B.       On or about the same date as the filing of the Motion, the Debtors: (i) filed a motion seeking joint administration of the Chapter 11 Cases; and (ii) filed a motion seeking an order approving the sale of substantially all their assets (the "Sale Motion").

C.       The Bankruptcy Court has subject matter jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

D.       Debtors' Stipulations: Subject to Paragraph 14 hereof, each stipulation, admission, and agreement contained in this Interim Order, including, without limitation, the sstipulations set forth below (collectively, the "Debtors' Stipulations"), shall be binding upon the Debtors, their estates, and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes. The Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.  The Debtors, on their own behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows:

(a)       Prepetition, certain of the Debtors had entered into five separate loan agreements with lenders which lent certain crypto currencies to the Debtors (collectively, the "Cryptocurrency Loan Agreements"), and then retained liens on those lent cryptocurrencies to

2

secure the loan thereof (collectively, the "Cryptocurrency Collateral").[3]  One of those lenders is

a debtor in its own chapter 11 case: Genesis Global Holdco, Inc. (the "Genesis Lender").

(b)        On June 8, 2023, Silvermine Capital Advisors, LLC (the "Prepetition

Secured Party") made a loan to the Debtors and certain of their affiliates in the original principal

amount of thirty thousand and 00/100 dollars ($30,000), as evidenced by that certain Promissory

Note, dated June 8, 2023 by the borrowers thereto in favor of the Prepetition Secured Party (as

amended from time to time, the "Note"), and as secured by that certain Security Agreement, dated

June 8, 2023, by the grantors signatory thereto in favor of Prepetition Secured Lender (together

with any and all amendments, restatements, supplements, and other modifications thereto,

collectively, the "Security Agreement," and together with the Note, the "Prepetition Debt

Documents").  The collateral described in the Security Agreement (as subsequently amended)

comprised all assets of the Debtors *other than* the Cryptocurrency Collateral, but including all

other digital currency collateral (such collateral, the "Prepetition Collateral").  The security

interests evidenced under the Security Agreement (as amended over time, the "Prepetition Liens")

were perfected by the filing of a financing statement with the Secretaries of State for Delaware,

Nebraska, Missouri and Puerto Rico.

(c)        On June 29, 2023, Silvermine assigned the Note (with the consent of the

Borrowers thereunder) and its rights under the Security Agreement to KB Silver Funding, LLC

(the "Prepetition Secured Party").  The Prepetition Secured Party then filed financing statements

evidencing the assignment of the Note and the Security Agreement against each of the borrowers

under the Note with the appropriate Secretaries of State, including those of Delaware, Nebraska,

Missouri and Puerto Rico.  On the same day, the Debtors amended and restated the Note by

---

[3] For the avoidance of doubt, the Prepetition Collateral does not include the cryptocurrency owed to the lenders in connection with the Cryptocurrency Loan Agreements.

executing the First Amended and Restated Promissory Note in the amended principal amount of two hundred thousand and 00/100 dollars ($200,000.00).

(d)       As of the Petition Date, the Debtors were, absolutely and unconditionally, indebted and obligated to Prepetition Secured Party under the Prepetition Debt Documents in a principal amount of approximately $200,000.00, plus accrued but unpaid interest, fees, costs and expenses incurred by the Prepetition Secured Party under the Prepetition Debt Documents (all amounts owing or outstanding under the Prepetition Debt Documents, whether or not contingent, the "Prepetition Obligations").

(e)       As of the Petition Date and immediately prior to giving effect to this Interim Order, the Prepetition Credit Documents are valid and binding agreements and obligations of the Debtors party thereto, and the liens granted pursuant thereto constitute valid, binding, enforceable and perfected security interests and liens, subject only to the liens permitted under such agreements, but only to the extent such permitted liens are valid, enforceable, non-avoidable liens and security interests that are perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), which are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; and the obligations arising under the Prepetition Credit Documents constitute the legal, valid and binding obligation of Debtors, enforceable in accordance with the terms thereof, and are not subject to any challenge or defense, including without limitation, avoidance, subordination, recharacterization, recovery, setoff, offset, attach, counterclaim, cross-claim, or claim (as defined in the Bankruptcy Code) of any kind.

(f)     The Debtors have waived, discharged and released any right they may have to (i) challenge or contest any of the Prepetition Obligations, the Prepetition Credit Documents, the DIP Obligations, the DIP Facility Documents (as defined below), and the liens, interests, claims, and security for the Prepetition Obligations and the DIP Obligations, and to (ii) assert any offsets, defenses, claims, objections, challenges, and/or causes of action against the Prepetition Secured Party, DIP Facility Lender, and/or any of each of its affiliates, parents, subsidiaries, agents, attorneys, advisors, professionals, officers, directors and employees only to the extent any such offset, defenses, claims, objections, challenges, and/or cause of action against any such parties is related to the Prepetition Obligations or the DIP Obligations, and to assert that any portion of the Prepetition Obligations or the DIP Obligations (as applicable) is subject to avoidance, disallowance, reduction or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(g)     No offsets, challenges, objections, defenses, claims or counterclaims of any kind or nature to any of the Prepetition Liens, Prepetition Secured Obligations, DIP Facility Liens, or DIP Obligations exist, no facts or occurrence supporting or giving rise to any offset, challenge, objection, defense, claim or counterclaim of any kind or nature to any of the Prepetition Liens, Prepetition Secured Obligations, DIP Facility Liens, or DIP Obligations exist, and no portion of the Prepetition Liens, Prepetition Secured Obligations, DIP Facility Liens, or DIP Obligations are subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (equitable or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law or equity.

(h)     The Debtors, on behalf of themselves and their respective estates (including any successor trustee or other estate representative in the Chapter 11 Cases and any

Successor Cases (as defined herein), and any party acting by, through or under the Debtors or their

estates), hereby stipulate and agree that they absolutely and unconditionally release and forever

and irrevocably discharge and acquit the Prepetition Secured Party, the DIP Facility Lender, and

each of their respective former or current officers, partners, directors, managers, owners, members,

principals, employees, agents, related funds, investors, financing sources, financial advisors,

attorneys, accountants, investment bankers, consultants, representatives and other professionals

and the respective successors and assigns thereof, in each case solely in their capacity as such

(collectively, the "Released Parties"), of and from any and all claims, demands, liabilities,

responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights,

assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries,

attorneys' fees, costs, expenses, or judgments of every type, whether known, unknown, asserted,

unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending or threatened

including, without limitation, all legal and equitable theories of recovery, arising under common

law, statute or regulation or by contract, of every nature and description, arising out of, in

connection with, or relating to the DIP Facility, the DIP Loan Documents, the Prepetition Credit

Documents (as applicable) and/or the transactions contemplated hereunder or thereunder

including, without limitation, any so-called "lender liability" or equitable subordination claims or

defenses, any and all claims and causes of action arising under the Bankruptcy Code, and any and

all claims and causes of action with respect to the validity, priority, perfection or avoidability of

the liens or claims of the Prepetition Secured Party and/or the DIP Facility Lender (collectively,

the "Released Claims") that exist or may exist prior to the entry of this Final Order by the Court.

The Debtors further waive and release any defense, right of counterclaim, right of setoff or

deduction to the payment of the Prepetition Secured Obligations and the DIP Obligations which

the Debtors now have or may claim to have against the Released Parties arising out of, connected with, or relating to any and all acts, omissions or events occurring prior to the entry of this Final Order by the Court.

(i)    The Debtors admit, stipulate, acknowledge, and agree that the DIP Facility Lender and the Prepetition Secured Party shall have the right, subject to section 363(k) of the Bankruptcy Code, to credit bid up to the full amount of the applicable outstanding Prepetition Secured Obligations and/or the DIP Obligations (as applicable), including, without limitation, any accrued interest and expenses, in a sale of any Interim DIP Collateral (defined below) or Prepetition Collateral, as applicable, and whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

(j)    All of the Debtors' cash and cash equivalents, including cash on deposit in any account or accounts as of the Petition Date, securities or other property, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Prepetition Secured Party and DIP Facility Lender.

E.    The Debtors' budget (annexed hereto and incorporated herein as **Exhibit A**, the "Budget") indicates that the Debtors will require the use of Cash Collateral and the DIP Facility to meet the Debtors' expenses in connection with their business operations and to pay certain expenses related to the Debtors' Chapter 11 Cases.

F.    The Prepetition Secured Party is entitled, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, to adequate protection of its interests in the Prepetition Collateral to the extent of any diminution in the value of the Prepetition Collateral occurring from and after the Petition Date.

7

G.      The Debtors' businesses have an immediate need to obtain the DIP Facility and use Cash Collateral in order to have adequate liquidity to provide for, among other things, the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, and to satisfy other working capital, operational, financial and general corporate needs, as well as to pursue the orderly sale of its assets through these Chapter 11 Cases.

H.      Under the circumstances, the Debtors are unable to obtain sufficient financing from sources other than the DIP Facility Lender on terms more favorable than under the DIP Facility and all the documents, exhibits, schedules, and instruments delivered pursuant thereto or in connection therewith (inclusive of the DIP Term Sheet (as defined below) and the Budget, the "DIP Facility Documents").

I.      Each of the DIP Facility Lender and Prepetition Secured Party have acted in good faith in, as applicable, negotiating, consenting to and in agreeing to provide the postpetition financing arrangements and use of Cash Collateral contemplated by this Interim Order and the other DIP Facility Documents, and the reliance of each of the DIP Facility Lender and Prepetition Secured Party on the assurances referred to above is in good faith.

J.      Notice of the Motion and the relief requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rule 4001, upon (a) the Office of the U.S. Trustee for the District of Delaware; (b) the Debtors' thirty (30) largest unsecured creditors or their counsel, (c) counsel to the DIP Facility Lender and the Prepetition Secured Party, (d) all known holders of filed liens on the Debtors' assets, and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service.

K.        Absent entry of this Interim Order, the Debtors' businesses, properties, and estates will be immediately and irreparably harmed.

L.        Based on the record presented by the Debtors to the Bankruptcy Court at the Interim Hearing and in the First Day Declaration and DIP Declaration: (i) the terms of the DIP Facility and use of Cash Collateral are the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration; and (ii) the DIP Facility and use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtors and the DIP Facility Lender and the Prepetition Secured Party, and any credit extended, loans made, credit support provided and other financial accommodations extended to the Debtors by the DIP Facility Lender and use of Cash Collateral by the Debtors shall be deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

**THEREFORE**, it is hereby **ORDERED**, **ADJUDGED**, AND **DECREED** that:

1.        <u>Disposition</u>.  The Motion is granted on an interim basis, as set forth herein.  The Debtors are authorized to use Cash Collateral and borrow under the DIP Facility pursuant to the Budget, the DIP Term Sheet, and this Interim Order pending the Final Hearing.  Any objections to the Motion that have not previously been resolved or withdrawn are hereby overruled.  This Interim Order shall immediately become effective upon its entry.

**B.        <u>Authorization to Borrow and Rights of DIP Facility Lender.</u>**

2.        <u>Authorization to Borrow</u>.  Upon execution and delivery of the Debtor-in-Possession Term Sheet attached hereto as **<u>Exhibit B</u>** (the "<u>DIP Term Sheet</u>") by the Debtors and the DIP Facility Lender, and provided that the Debtors are not in default under the terms of this Interim Order or the DIP Term Sheet, the Debtors are authorized to borrow on an interim basis under the

DIP Facility from the DIP Facility Lender up to the principal amount of **$200,000.00** (together with interest, fees, charges and expenses payable under the DIP Facility Documents), pursuant and subject to the terms and conditions of this Interim Order and the DIP Term Sheet (including the conditions to effectiveness thereof). Upon execution and delivery of the DIP Term Sheet and entry of the Interim Order, the DIP Facility Documents shall constitute legal, valid, and binding obligations of the parties thereto, enforceable against the Debtors in accordance with their terms.

3.    <u>Structure and Amount of DIP Facility</u>. Subject to entry of the Final Order, the DIP Facility in the maximum principal amount of **$1,500,000.00** shall comprise senior secured term loan credit facilities, as set forth in the DIP Term Sheet. The DIP Facility Lender is relying upon the Debtors' compliance with the Budget in accordance with the Interim Order and the DIP Facility Documents in determining to enter into the postpetition financing arrangements provided for herein.

4.    <u>Continuation of Liens Securing DIP Obligations</u>. Until payment in full, in cash (unless otherwise released as part of any credit bid for the assets of the Debtors), of all of the DIP Obligations and termination of the DIP Facility Lender's commitments under the DIP Facility, all liens and security interests of the DIP Facility Lender shall remain valid and enforceable with the same continuing priority as described herein.

5.    <u>DIP Loans</u>. All loans made to or for the benefit of the Debtors on or after the Petition Date under the DIP Facility Documents (collectively, the "<u>DIP Loans</u>"), which includes, without limitation, principal, interest, fees, costs, expenses, indemnification obligations and other obligations and amounts due from time to time by the Debtors to the DIP Facility Lender under the DIP Facility Documents and this Interim Order, shall hereinafter be referred to as the "<u>DIP Obligations</u>."

6.      Interim DIP Collateral. All amounts owing by the Debtors under the DIP Facility in respect thereof, including, without limitation, principal, interest, fees and costs, will be secured by a first priority perfected security interest in and lien on all assets (tangible, intangible, real, personal and mixed) of the Debtors, including, without limitation, any collateral granted in respect of the obligations owed to the Prepetition Secured Party, whether now owned or hereafter acquired, including, without limitation, deposit and other accounts, inventory, equipment, receivables, capital stock or other ownership interest in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, and other general intangibles, and all products and proceeds thereof, ***but excluding*** any and all Bitcoin, Bitcoin Cash, Ether, Ether Classic, Litecoin, Filecoin, or any other digital currency of the Debtors inclusive of the Cryptocurrency Collateral (collectively, the "Interim DIP Collateral"), subject only to the Carve-Out and the Prepetition Permitted Liens (defined below).

7.      DIP Facility Liens. As security for the repayment of the DIP Obligations, pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, the DIP Facility Lender is hereby granted valid, binding, continuing, enforceable, fully perfected, and unavoidable first-priority senior priming security interests and liens (collectively, the "DIP Facility Liens") on and in the Interim DIP Collateral and all proceeds thereof, which liens are valid, binding, enforceable, and fully perfected as of the date hereof, not subject to subordination, impairment, or avoidance, for all purposes in the Chapter 11 Cases and any successor case. The DIP Facility Liens granted herein shall be valid, perfected and non-avoidable, first priority liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors, including, upon entry of the Final Order, the proceeds of Avoidance Actions,[4] and shall be senior to all other liens and claims except

---

[4] "Avoidance Actions" shall mean the claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code and under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent

11

the Carve-Out and the Prepetition Permitted Liens,[5] to the extent such liens and security interests are valid, perfected, enforceable and nonavoidable (provided, that with respect to such excepted liens and security interests, if any, the DIP Facility Lender shall be granted second priority liens).

8.    Indemnification.    The Debtors shall be authorized to indemnify the DIP Facility Lender against any liability arising in connection with the DIP Term Sheet, to the maximum extent permitted under the Bankruptcy Code and applicable law.    All such unpaid fees, expenses and indemnities of the DIP Facility Lender, to the extent permitted by law, shall constitute DIP Obligations, and the repayment thereof shall be secured by the Interim DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Term Sheet.

9.    DIP Facility Superpriority Liens.    For all of the DIP Obligations arising under the DIP Facility and the DIP Facility Documents, the DIP Facility Lender is granted, pursuant to section 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out and the Prepetition Permitted Liens, the allowed DIP Facility Superpriority Claim, which claim shall be payable from and have recourse to the Interim DIP Collateral.    The DIP Facility Superpriority Claim shall be deemed a legal, valid, binding, enforceable and perfected claim, not subject to subordination, impairment or avoidance, for all purposes in the Cases and any successor case.

10.    Carve-Out.

(a)    Subject to the terms and conditions contained in this Interim Order, the DIP Facility Liens, DIP Facility Superpriority Claim, and the adequate protection liens and claims of

---

Transfer Act, Uniform Fraudulent Conveyance Act, and similar statutes and common law.
[5] "Prepetition Permitted Liens" shall mean those certain liens senior by operation of law or otherwise permitted by the Prepetition Credit Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the liens securing the Prepetition Obligations as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code).

the Prepetition Secured Party as provided for herein, and the liens and claims held by the Prepetition Secured Party, shall be subject and subordinate only to the following (the "Carve-Out"): (i) unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a); (ii) allowed reasonable fees and expenses (the "Professional Fees") of attorneys, financial advisors, and other professionals (including any claims agent) employed by the Debtors in the Chapter 11 Cases pursuant to a Court order under section 327 and 328 of the Bankruptcy Code, including a Subchapter V Trustee (collectively, the "Professionals"), to the extent incurred at any time on or prior to the calendar day on which a Termination Date (defined below) occurs less any retainers held by such Professional as of such date), whether such Professional Fees have been allowed by the Bankruptcy Court before or after the Termination Date; and (iii) Professional Fees of Professionals incurred subsequent to the calendar day immediately following the Termination Date in an aggregate amount not to exceed **$10,000**.  The foregoing shall not be construed as consent to the allowance of any fees and expenses referred to above and shall not affect the right of the Debtors, DIP Facility Lender, Prepetition Secured Party, the U.S. Trustee, or other parties in interest to object to the allowance and payment of such amounts.  Payment of any portion of the Carve-Out shall not, and shall not be deemed to: (i) reduce any Debtors' obligations owed to any of the DIP Facility Lender or Prepetition Secured Party, or (ii) subordinate, modify, alter or otherwise affect any of the liens and security interests of such parties in the Interim DIP Collateral or Prepetition Collateral (or their respective claims against the Debtors).  The DIP Facility Lender reserves the right to review and object to any fee statement, interim application or monthly application issued or filed by any Professional.  Notwithstanding any provision (including, without limitation, any "variance" or similar provision) of this Interim Order or the DIP Facility Documents to the contrary, the aggregate cumulative expenditures from

13

Cash Collateral and from the proceeds of the DIP Facility subject to the Carve-Out for the Professionals shall not exceed 100% of the amount with respect thereto set forth in the Budget, and Professional Fees for any Professional included in the Carve-Out shall not exceed 100% of the amount listed in the line item in the Budget for such Professional.

(b)      No Prepetition Collateral, Interim DIP Collateral, proceeds thereof, or Cash Collateral, or any portion of the Carve-Out or financing provided under the DIP Facility, shall include, apply to, or be available for any fees or expenses incurred by any party, including the Professionals, in connection with: (i) the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Facility Lender or the Prepetition Secured Party, including, without limitation, challenging the amount, validity, extent, perfection, priority, characterization or enforceability of, or asserting any defense, counterclaim or offset to, the DIP Obligations, DIP Facility Liens, the DIP Facility Superpriority Claim, in respect thereof, the Prepetition Credit Agreements, or the Prepetition Obligations, (ii) asserting any claims or causes of action (including, without limitation, claims or actions to hinder or delay the DIP Facility Lender's assertion, enforcement or realization on the Interim DIP Collateral in accordance with the DIP Facility Documents or this Interim Order or any Avoidance Actions) against the DIP Facility Lender or Prepetition Secured Party, or (iii) incurring indebtedness other than as expressly permitted by the DIP Facility Documents.

11.    Restrictions on the Debtors.  Other than the Carve-Out or Prepetition Permitted Liens, no claim or lien having a priority superior or pari passu with those granted by this Interim Order to the DIP Facility Lender shall be granted by any Debtor while any portion of the DIP Facility (or refinancing thereof) or any commitment thereunder, including the DIP Obligations, remains outstanding.

14

**C.**     **Authorization to Use Cash Collateral and Rights of Prepetition Secured Party**

12.     Use of Cash Collateral; Adequate Protection.  Subject to the terms and conditions

of this Interim Order, the DIP Facility, the DIP Facility Documents, and subject to the Budget, the

Debtors are authorized to use Cash Collateral.  As additional consideration for their consent to use

of Cash Collateral and the priming of certain of the Prepetition Secured Party's liens, claims, and

interests in the Prepetition Collateral (solely as set forth in this Interim Order), the Prepetition

Secured Party shall receive the following (collectively, the "Adequate Protection"):

(a)     The Prepetition Secured Party shall have and is granted continuing and

enforceable liens in accordance with section 552(b) of the Bankruptcy Code on the Prepetition

Collateral (including, without limitation, proceeds of Prepetition Collateral as exist or arise after

the Petition Date) and as adequate protection, replacement liens on the Prepetition Collateral, the

Interim DIP Collateral, and any and all assets of the Debtors as exist on or after the Petition Date

(including, without limitation, proceeds of Prepetition Collateral as exist or arise after the Petition

Date) in the same priority and validity as existed on the Petition Date (the "Adequate Protection

Liens") to the extent there is any diminution in the value of such Prepetition Secured Party's

interests in the Prepetition Collateral or Cash Collateral during the pendency of these Cases,

whether the reason for such diminution is as a result of, arises from, or is attributable to, any or all

of the DIP Facility, the priming of the liens arising under the Prepetition Credit Documents, the

use of Cash Collateral, the physical deterioration, consumption, use, sale, lease, disposition,

shrinkage or decline in market value of the Prepetition Collateral, the imposition of the automatic

stay, or otherwise (including, without limitation, any diminution in value of such interests in the

Prepetition Collateral prior to the Prepetition Secured Party seeking vacation of the automatic stay

or the Bankruptcy Court granting such relief).  The Adequate Protection Liens shall be junior only

to: (i) the Prepetition Permitted Liens, (ii) the DIP Facility Liens, and (iii) the Carve-Out, and senior to any other liens. The Adequate Protection Liens are valid, binding, enforceable and fully perfected as of the Petition Date without the necessity of the execution, filing or recording by the Debtors, the Prepetition Secured Party of security agreements, pledge agreements, financing statements or other agreements. The Adequate Protection Liens shall cover assets, interests and proceeds of the Debtors that are or would be collateral under the Prepetition Credit Documents, and all cash and cash equivalents, and all assets, interests and proceeds of the Debtors that constitute Interim DIP Collateral.

(b)    <u>Administrative Claim</u>. The Prepetition Secured Party is hereby granted in each of the Debtors' Chapter 11 Cases an allowed administrative claim (the "<u>Adequate Protection Claim</u>") under section 507(b) of the Bankruptcy Code in an amount equal to the diminution in the value of the Prepetition Secured Party's interests in the Prepetition Collateral from and after the Petition Date, and such Adequate Protection Claim shall be junior in priority and subordinate only to: (i) the DIP Superpriority Claims, (ii) the Carve-Out, and (iii) the Prepetition Permitted Liens. The Adequate Protection Claim shall have recourse to and be payable from the Interim DIP Collateral and all proceeds thereof.

(c)    <u>Restrictions on Use of Cash Collateral</u>. Except as set forth in Paragraph 10(b), no Prepetition Collateral, Interim DIP Collateral, proceeds thereof, or Cash Collateral, or any portion of the Carve-Out or financing provided under the DIP Facility shall include, apply to, or be available for any fees or expenses incurred by any party, including the Professionals, in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Prepetition Secured Party or DIP Facility Lender, including, without limitation, challenging the amount, validity, extent, perfection,

16

priority or enforceability of, or asserting any defense, counterclaim or offset to, the Prepetition

Obligations, DIP Obligations, or the Adequate Protection Liens granted herein.

13.      <u>Binding Effect on Debtors</u>. Effective as of the date of entry of the Interim Order,

except as otherwise set forth herein, the Debtors' Stipulations and releases are binding in all

circumstances upon the Debtors effective as of the date of entry of the Interim Order.

14.      <u>Binding Effect on Non-Debtor Third Parties</u>. Upon entry of this Interim Order, the

Debtors' Stipulations and releases herein shall be binding upon the Debtors' estates and subject to

entry of the Final Order, each other party-in-interest, except to the extent such party in interest ***first***

obtains standing, by no later than the earlier of (x) the deadline for parties to object to the entry of

the Sale Order (as defined in the Sale Motion), provided that the Sale Order is entered in

accordance with the Sale Milestones (as may be extended from time to time in accordance with

the DIP Term Sheet or this Interim Order), and (y) seventy-five (75) calendar days following the

date of entry of this Interim Order (such time period established by the earlier of clauses (x) and

(y) shall be referred to as the "<u>Challenge Period</u>," and the date that is the next calendar day after

the termination of the Challenge Period in the event that either (i) no Challenge (as defined below)

is properly raised during the Challenge Period or (ii) with respect only to those parties who

properly file a contested matter, adversary proceeding, or other matter challenging or otherwise

objecting to the admissions, stipulations, findings, or releases included in the Debtors' Stipulations

(each, a "<u>Challenge</u>"), such Challenge is fully and finally adjudicated, (i) and (ii) shall be referred

to as the "<u>Challenge Period Termination Date</u>")) provided, that the timely filing of a motion

seeking standing to file a Challenge consistent with applicable law and rules of procedure before

the expiration of the Challenge Period, which attaches a draft complaint setting forth the legal and

factual bases of the proposed Challenge, shall toll the Challenge Period only as to the party that

timely filed such standing motion, and solely with respect to the Challenge(s) asserted in the draft

complaint, until entry of an order granting the motion for standing to prosecute such Challenge(s)

described in the draft complaint and permitted by the Court, provided, further that if standing is

denied by the Court, the Challenge Period shall be deemed to have immediately expired with

respect to such Challenge(s) and **second**, obtains a final, non-appealable order in favor of such

party-in-interest sustaining any such Challenge in any such timely-filed contested matter,

adversary proceeding, or other action (any such Challenge timely brought for which such a final

and non-appealable order is so obtained, a "Successful Challenge").  If the Chapter 11 Cases are

converted to cases under chapter 7 ("Successor Cases") or if a chapter 11 trustee is appointed, in

each case prior to the expiration of the Challenge Period, the Challenge Period for the chapter 7

trustee or such chapter 11 trustee, as applicable, shall be extended until 30 days after the

appointment of such chapter 7 trustee or chapter 11 trustee, without prejudice to the right such

chapter 7 trustee or chapter 11 trustee to seek a further extension of the Challenge Period from the

Court.

15.    Except as otherwise expressly provided herein, from and after the Challenge Period

Termination Date and for all purposes in these Chapter 11 Cases and any Successor Cases (and

after the dismissal of these Chapter 11 Cases or any Successor Cases), and without further notice,

motion, or application to, order of, or hearing before this Court, (i) any and all payments made to

or for the benefit of the Prepetition Secured Party or otherwise authorized by this Interim Order

(whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to

counterclaim, set-off, subordination, recharacterization, defense, disallowance, recovery or

avoidance by any party in interest, (ii) any and all such Challenges by any party-in-interest shall

be deemed to be forever released, waived, and barred, (iii) all of the Prepetition Secured

18

Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the

Bankruptcy Code, and (iv) the Debtors' Stipulations shall be binding on all parties in interest in

these Chapter 11 Cases or any Successor Cases, including any chapter 11 or chapter 7 trustee,

provided, however, that solely as to binding Successor Cases, the foregoing shall be subject to

entry of the Final Order. Notwithstanding the foregoing, to the extent any Challenge is timely

asserted, the Debtors' Stipulations and the other provisions in clauses (i) through (iv) in the

immediately preceding sentence shall nonetheless remain binding and preclusive on any party-in-

interest from and after the Challenge Period Termination Date, except (and only) to the extent that

such Debtors' Stipulations or the other provisions in clauses (i) through (iv) of the immediately

preceding sentence were expressly challenged in such Challenge and such Challenge becomes a

Successful Challenge; provided that all other stipulations (other than those subject to a Successful

Challenge) shall remain binding on any party-in-interest.  Notwithstanding any provision to the

contrary herein, nothing in this Interim Order shall be construed to grant standing to any party in

interest to bring any Challenge on behalf of the Debtors' estates.  The failure of any party-in-

interest to obtain an order of this Court prior to the Challenge Period Termination Date granting

standing to bring any Challenge on behalf of the Debtors' estates shall not be a defense to failing

to commence a Challenge prior to the Challenge Period Termination Date as required under this

paragraph or to require or permit an extension of the Challenge Period Termination Date.

**D.     Perfection, Relief from Stay, and Additional Terms and Rights as to the DIP
Facility Lender and Prepetition Secured Party**

16.     _Additional Perfection Measures_.  The DIP Facility Lender and the Prepetition

Secured Party shall not be required to file financing statements, mortgages, deeds of trust, security

deeds, notices of lien, or similar instruments in any jurisdiction or effect any other action to attach

or perfect the security interests and liens granted under the DIP Term Sheet and this Interim Order

(including, without limitation, the taking possession of any of the Interim DIP Collateral (in accordance with the terms of the DIP Term Sheet), or the taking of any action to have security interests or liens noted on certificates of title or similar documents).

17.     Budget.  The Debtors shall not make disbursements in excess of those projected in the Budget and shall not otherwise deviate from the terms of the Budget and applicable variances, without the written consent of each of: (i) the DIP Facility Lender and (ii) the Prepetition Secured Party, subject to an allowed cumulative four-week variance not to exceed ten percent (10%), from the amount in the "Total Disbursements" line in the Budget, as set forth in the DIP Term Sheet.

18.     Reporting.  After entry of the Interim Order, the Debtors shall provide reporting to the DIP Facility Lender and Prepetition Secured Party in accordance with the DIP Term Sheet.

19.     Credit Bid.  The DIP Facility Lender and the Prepetition Secured Party shall have the right to credit bid the DIP Obligations and Prepetition Obligations under or pursuant to: (i) section 363 of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of the Bankruptcy Code, or (iii) a sale or disposition by a Chapter 7 trustee for any Debtor under section 725 of the Bankruptcy Code.

20.     Amendment to DIP Facility Documents.  The DIP Facility Lender, with the consent of the Debtors, is authorized to amend and/or modify the DIP Facility Documents without further order of the Court; provided that any such amendments or modifications must be in writing and served upon counsel for the Prepetition Secured Party and the US Trustee; provided, further that any amendments or modifications that would have the effect of increasing the borrowings available, shortening the maturity date of the DIP Facility, increasing the aggregate fees, or the rate or amount of interest payable, or otherwise materially adversely affecting the Debtors' rights or obligations, of the Prepetition Secured Party's rights, under the DIP Facility, shall be done only

pursuant to further order of the Court; provided further that any adjustments to the Budget that do not increase the borrowings available shall not require further order of the Court.

21.    Binding Effect.  The provisions of this Interim Order shall be binding upon and inure to the benefit of all parties-in-interest in these Cases, including, without limitation, the Debtors, the DIP Facility Lender, the Prepetition Secured Party and their respective successors and assigns (including, to the fullest extent permitted by applicable law, any Chapter 7 or Chapter 11 trustee hereinafter appointed or elected for any Debtor's estate, an examiner appointed pursuant to section 1104 of the Bankruptcy Code (subject to entry of a Final Order), or any other fiduciary hereafter appointed as a legal representative of the Debtors or with respect to the property of the Debtors' estates), and shall inure to the benefit of the Debtors, the Prepetition Secured Party, the DIP Facility Lender and their respective successors and assigns; provided, however, that DIP Facility Lender shall have no obligation to extend any financing to any Chapter 7 trustee or similar responsible person appointed for the Debtors' estates, and the Prepetition Secured Party shall have no obligation to consent to the use of Cash Collateral in the event these chapter 11 cases are converted to cases under chapter 7.  Such binding effect is an integral part of this Interim Order.

22.    Milestones.  As a condition to the DIP Facility and the use of Cash Collateral, the Debtors have agreed to, and shall comply with, the following milestones (the "Sale Milestones"):

(a)    On the Petition Date, the Debtors shall have filed a motion seeking approval of the Bankruptcy Sale.

(b)    On or before 40 days after the Petition Date, the Debtors shall have obtained an order from the Bankruptcy Court approving the Bankruptcy Sale.

(c)    On or before 54 days after the Petition Date, or such later date as the DIP Facility Lender shall agree in writing, the Bankruptcy Sale shall be consummated.

23.   <u>Events of Default</u>.  Until the payment in full of the DIP Obligations, the occurrence

of any of the following events, unless waived by the DIP Facility Lender in writing (which may

be by electronic mail) and in accordance with the terms of the DIP Loan Documents, shall

constitute an event of default hereunder (collectively, the "<u>Events of Default</u>"):

(a)   the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants or obligations under the Interim Order, including, without limitation, failure to make any payment under this Interim Order when due, or the failure to comply with any Sale Milestone;

(b)   the occurrence and continuation of any Events of Default under, and as defined in, the DIP Term Sheet, or any other DIP Loan Documents;

(c)   without the prior written consent of the DIP Facility Lender and the Prepetition Secured Party, as applicable, the entry of an order providing for (i) any modification, stay, vacatur, or amendment to this Final Order, or any other use of Cash Collateral resulting from Interim DIP Collateral or Prepetition Collateral; (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expense of the kind specified in sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases or Successor Cases, equal or superior to the DIP Superpriority Claims or the Adequate Protection Superpriority Claims, other than the Carve-Out and the Prepetition Permitted Liens; (iii) any lien on any of the Interim DIP Collateral with priority equal or superior to the DIP Facility Liens, except as specifically permitted by the DIP Loan Documents; (iv) without the prior written consent of the Prepetition Secured Party, any lien on any of the Prepetition Collateral with priority equal to or superior to the Prepetition Liens or Adequate Protection Liens;

(d)   the filing by the Debtors, the Debtors supporting, or the failure of the Debtors to timely oppose any motion or application seeking entry of an order of the nature described in section (c) immediately above; or

(e)   the Debtors' proposal or support for any plan of reorganization or liquidation or sale of all or substantially all of the Debtors' assets or equity, or order confirming such plan or approving such sale, that is not conditioned upon the payment in full of the DIP Obligations upon the consummation of such plan or sale.

24.   Upon the occurrence and during the continuation of an Event of Default,

notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application,

motion or notice to, hearing before, or order from the Court, other than as set forth in this Final

Order: (a) the DIP Facility Lender may send a written notice to the Debtors and the U.S. Trustee

(any such declaration shall be referred to herein as a "Termination Declaration") declaring (1) all

DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (2)

the commitment of the DIP Facility Lender to make DIP Loans to be terminated, whereupon such

commitments and obligation shall be terminated to the extent any such commitment remains under

the DIP Facility, (3) the termination of the DIP Facility and the DIP Loan Documents as to any

future liability or obligation of the DIP Facility Lender, but without affecting any of the DIP Liens

or the DIP Obligations, and (4) the application of the Carve-Out has occurred; (b) interest,

including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Loan

Documents; and (c) the DIP Facility Lender and/or the Prepetition Secured Party, as applicable,

may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash

Collateral, other than to pay expenses set forth in the Budget that are necessary to avoid immediate

and irreparable harm to the Debtors' estates. Notwithstanding anything contained herein, the

earliest date on which a Termination Declaration shall be effective is upon five (5) business days'

prior written notice of such Termination Declaration given to the Debtors and the U.S. Trustee,

referred to herein as the "Termination Date." Following a Termination Date, neither the DIP

Facility Lender nor the Prepetition Secured Party shall be required to consent to the use of any

Cash Collateral or provide any loans or other financial accommodations under the DIP Facility.

The Termination Declaration shall be given by electronic mail (or other electronic means) to

counsel to the Debtors and the U.S. Trustee.

    25.   Survival.  The provisions of this Interim Order and any actions taken pursuant

hereto shall survive the entry of any order: (i) confirming any plan of reorganization in any of the

Cases (and, to the extent not satisfied in full, in cash, the DIP Obligations shall not be discharged by the entry of any such order, or pursuant to section 1141(d)(4) of the Bankruptcy Code, each of the Debtors having hereby waived such discharge); (ii) converting any of the Cases to a chapter 7 case; or (iii) dismissing any of the Chapter 11 Cases unless permitted under the DIP Facility Documents, and the terms and provisions of this Interim Order, as well as the DIP Facility Superpriority Claims, the DIP Facility Liens, the adequate protection granted pursuant to this Interim Order, and/or the DIP Facility Documents, shall continue in full force and effect notwithstanding the entry of any such order, and such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Facility Documents to the maximum extent permitted by law until all of the DIP Obligations are indefeasibly paid in full, in cash, and discharged.

26.  <u>Authorization to Act</u>.  Each of the Debtors is authorized to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of security agreements, mortgages and financing statements), and to pay interest, fees, and all other amounts as provided under and subject to the terms of this Interim Order and the DIP Facility Documents, which may be reasonably required or necessary for the Debtors' full and timely performance under the DIP Facility and this Interim Order.

27.  <u>Insurance Policies</u>.  Upon entry of this Interim Order, each of the Prepetition Secured Party and the DIP Facility Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy with respect to which the Debtors benefit which in any way relates to the Prepetition Collateral or the Interim DIP Collateral.

28. <u>Subsequent Reversal</u>. If any or all of the provisions of this Interim Order or the DIP Facility Documents are hereafter modified, vacated, amended or stayed by subsequent order of the Bankruptcy Court or any other court, the Prepetition Secured Party and the DIP Facility Lender shall be protected to the fullest extent permitted by section 364(e) of the Bankruptcy Code.

29. <u>Effect of Dismissal of Cases</u>. If the Cases are dismissed, converted, or substantively consolidated, then neither the entry of this Interim Order nor the dismissal, conversion or substantive consolidation of these Cases shall affect the rights of the DIP Facility Lender and the Prepetition Secured Party (to the extent of adequate protection provided hereunder) under their respective documents or this Interim Order, and all of the respective rights and remedies thereunder of the DIP Facility Lender and the Prepetition Secured Party (to the extent of adequate protection provided hereunder) shall remain in full force and effect as if the Cases had not been dismissed, converted or substantively consolidated. If an order dismissing any of the cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that: (y) the priming liens, security interests and/or replacement security interests granted to the DIP Facility Lender and, as applicable, the Prepetition Secured Party pursuant to this Interim Order shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations and adequate protection obligations shall have been paid and satisfied in full (and that such priming liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest), and (z) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the liens and security interests referred to in clause (y) above.

30.     <u>Findings of Fact and Conclusions of Law</u>.  This Interim Order constitutes findings of fact and conclusions of law and shall take effect and be fully enforceable effective as of the Petition Date immediately upon the entry thereof.

31.     <u>Controlling Effect of Interim Order</u>.  To the extent any provision of this Interim Order conflicts with any provision of the Motion, any prepetition agreement or any document executed in connection with the DIP Facility, the provisions of this Interim Order shall control.

32.     <u>Final Hearing.</u>    The Final Hearing on the Motion shall be heard before the Bankruptcy Court on **_____, 2023 at _____ (EST)** at the United States Bankruptcy Court for the District of Delaware.

33.     <u>Adequate Notice.</u>  The notice given by the Debtors of the Interim Hearing was given in accordance with Bankruptcy Rule 4001(c)(2).  The Debtors shall promptly e-mail, mail or fax copies of this Interim Order and notice of the Final Hearing to (a) the Office of the U.S. Trustee for the District of Delaware; (b) the Debtors' twenty (20) largest unsecured creditors or their counsel, (c) counsel to the DIP Facility Lender and the Prepetition Secured Party, (d) all known holders of filed liens on the Debtors' assets, and (e) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service.  Any party-in-interest objecting to the relief sought in the Final Order shall submit any such objection in writing and file the same with the Bankruptcy Court (with a courtesy copy to chambers) and serve (so as to be received) such objection no later than **_____, 2023 at 4:00 p.m. (EST)** on the following:  (a) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: John Schanne (John.Schanne@usdoj.gov); (b) counsel to the Debtors, Attn: Evan T. Miller and Steven D. Adler, email: emiller@bayardlaw.com and sadler@bayardlaw.com; and (c) counsel to the DIP Facility Lender and the Prepetition Secured Party, Bernstein, Shur, Sawyer & Nelson, P.A., 100 Middle

Street, West Tower, Portland ME 0410, Attn: Lindsay Zahradka Milne (lmilne@bernsteinshur.com) and Archer & Greiner P.C., Attn: Alan M. Root, Esq., 300 Delaware Avenue, Suite 1100, Wilmington, DE 19801 (aroot@archerlaw.com).

**<u>EXHIBIT A</u>**

**Debtors' 13 Week Cash Projection**
**WE 7/7/23 to 9/29/23**

| | First Day Hrg | Entry of Final DIP Order | | | | | | Sale Closing | POST 363 ANTICIPATED | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Week Ending =======>> | PROJ 7/7/23 | PROJ 7/14/23 | PROJ 7/21/23 | PROJ 7/28/23 | PROJ 8/4/23 | PROJ 8/11/23 | PROJ 8/18/23 | PROJ 8/25/23 | PROJ 9/1/23 | PROJ 9/8/23 | PROJ 9/15/23 | PROJ 9/22/23 | PROJ 9/29/23 | TOTAL |
| **RECEIPTS** | | | | | | | | | | | | | | |
| FIL Rewards | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | - | - | - | - | - | 160,000 |
| FIL Lender Payments | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | - | - | - | - | - | 120,000 |
| **TOTAL NET RECEIPTS** | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | - | - | - | - | - | 40,000 |
| **DEBTOR DISBURSEMENTS -** | | | | | | | | | | | | | | - |
| *Opex* | | | | | | | | | | | | | | |
| LightEdge Datacenter | 50,000 | - | - | - | 50,000 | - | - | - | - | - | - | - | - | 100,000 |
| Personnel Costs | 99,231 | - | - | 94,650 | - | - | - | 94,650 | - | - | - | - | - | 288,531 |
| Tax Obligation (UK) | | | | 10,633 | | | | | | | | | | 10,633 |
| Baseline Lease Lender (Deposit) | 33,000 | - | - | - | - | - | - | - | - | - | | | | 33,000 |
| Micellaneous Computer Expense (AWS) | 3,500 | - | - | - | 3,500 | - | - | 3,500 | - | - | - | - | - | 10,500 |
| Office Lease Costs | 2,000 | - | - | - | - | 2,000 | - | - | - | - | - | - | - | 4,000 |
| Travel | - | 2,500 | - | - | 2,500 | - | - | 2,500 | - | - | - | - | - | 7,500 |
| Miscellaneous | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | - | - | - | - | - | 8,000 |
| | | | | | | | | | | | | | | - |
| *Restructuring* | | | | | | | | | | | | | | |
| Debtor Counsel - Bayard | - | - | - | 20,000 | | | - | 35,000 | | | | | - | 55,000 |
| Subchapter V Trustee | - | - | - | 5,000 | | | 5,000 | - | 5,000 | | | | 5,000 | 20,000 |
| Wind Down | | | | | | | | 30,000 | | | | | | 30,000 |
| *Other Outflows* | | | | | | | | | | | | | | |
| Capital expenditures | - | - | - | - | - | - | - | - | - | | | | | - |
| FIL Purchases | - | - | - | - | - | - | - | - | - | | | | | - |
| **TOTAL CASH DISBURSEMENTS** | 188,731 | 3,500 | 1,000 | 131,283 | 57,000 | 3,000 | 6,000 | 166,650 | 5,000 | - | - | - | 5,000 | 567,164 |
| **OPERATING CASH** | (183,731) | 1,500 | 4,000 | (126,283) | (52,000) | 2,000 | (1,000) | (161,650) | (5,000) | - | - | - | (5,000) | (527,164) |
| | | | | | | | | | | | | | | |
| **RESTRUCTURING RECEIPTS** | | | | | | | | | | | | | | |
| DIP Loan Draw | **200,000** | **-** | **-** | **200,000** | **-** | **-** | **150,000** | **-** | **-** | **-** | **-** | | | **550,000** |
| | | | | | | | | | | | | | | |
| **DEBTOR CASH** | 16,269 | 17,769 | 21,769 | 95,486 | 43,486 | 45,486 | 194,486 | 32,836 | 27,836 | 27,836 | 27,836 | 27,836 | 22,836 | 601,769 |
| | | | | | | | | | | | | | | |
| **LENDER DISBURSEMENTS/EXPENSES** | | | | | | | | | | | | | | |
| Lender Fees | | | | | | | | | | | | | | |
| Commitment Fee | - | - | - | - | - | 45,000 | - | - | - | | | - | - | 45,000 |
| Lender Counsel | - | - | - | 50,000 | - | - | - | 50,000 | - | | | - | - | 100,000 |
| DIP Interest | | | | | 2,317 | | | 6,903 | | | | | | |
| Collateral Monitoring | 20,000 | - | - | - | 20,000 | - | - | - | - | | | | | 40,000 |
| Miscellaneous/Filing Costs | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | - | - | - | - | - | 8,000 |
| **TOTAL LENDER DISBURSEMENTS** | 21,000 | 1,000 | 1,000 | 51,000 | 23,317 | 46,000 | 1,000 | 57,903 | - | - | - | - | - | 193,000 |
| | | | | | | | | | | | | | | |
| **DIP LOAN BALANCE** | 221,000 | 222,000 | 223,000 | 474,000 | 497,317 | 543,317 | 694,317 | 752,220 | 752,220 | 752,220 | 752,220 | 752,220 | 752,220 | 743,000 |

## **EXHIBIT B**

**Summary of Proposed Terms and Conditions for Senior Secured,**

**Superpriority Debtor-in-Possession Financing**

**Date: June 30, 2023**

The following term sheet (the "**Term Sheet**") represents the terms and conditions by which KB Silver Funding, LLC (the "**DIP Facility Lender**") will provide a senior secured, superpriority debtor-in-possession credit facility to the Debtors (as defined below) in connection with the Debtors' anticipated bankruptcy cases to be filed under subchapter V of Chapter 11 of Title 11 of the United States Code (the "**Chapter 11 Cases**").

This Term Sheet is condition upon the satisfaction of the following: (i) all conditions precedent set forth herein, including any modifications or supplements hereinafter requested by the DIP Facility Lender, are satisfied or waived in the sole discretion of the DIP Facility Lender, (ii) the DIP Facility Lender agrees to and executes this Term Sheet in form and substance acceptable to the DIP Facility Lender in its sole discretion, and (iii) a United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**"), in connection with the Chapter 11 Cases, authorizes and approves the DIP Facility on terms and conditions, including any modifications or supplements thereto, which are satisfactory to the DIP Facility Lender in its sole discretion and pursuant to order(s) of the Bankruptcy Court in form and substance acceptable to the DIP Facility Lender in its sole discretion.

| DIP FACILITY TERMS | |
|---|---|
| Borrowers / Debtors | File Storage Partners LLC, Afton Blockchain LLC; FilTech SPV LLC; and Midwest Blockchain Inc. (collectively, the "**Debtors**" and each a "**Debtor**"), as debtors and debtors in possession under title 11 of chapter 11 of the United States Code (the "**Bankruptcy Code**"). |
| DIP Facility Lender | KB Silver Funding, LLC ("**Lender**") |
| DIP Facility | The DIP Facility Lender shall extend to the Debtors, as joint and several obligors, a secured debtor-in-possession credit facility made available to the Debtors in the total principal amount of up to $1,500,000.00 (the "**DIP Facility**"), comprising new term loans made by, and other obligations owed to, the DIP Facility Lender on, and from time to time after, the Closing Date (as defined herein) (such new loans and obligations, the "**DIP Loans**" and commitments with respect to such DIP Loans, the "**DIP Commitments**") to be funded as set forth below under the heading "Availability and Draw Procedure," subject to the entry of an interim order (the "**Interim Order**") and a final order (the "**Final Order**" and, together with the Interim Order, the "**DIP Orders**") by the Bankruptcy Court approving the DIP Facility and the terms herein. All DIP Loans and other obligations outstanding under the DIP Facility shall become due and payable on the Maturity Date (as defined below). |
| | As used herein, the terms Interim Order and Final Order mean, as to each, an unstayed order, in form and substance satisfactory to the DIP Facility Lender in its sole discretion, entered upon an application or motion of the Debtors that is in form and substance satisfactory to the DIP Facility Lender in its sole discretion, which order: (i) authorizes the Debtors to enter into the transactions contemplated by this Term Sheet, including the authorization to borrow under the DIP Facility on the terms set forth herein, (ii) grants the superpriority claim status and senior priming and other liens contemplated in this Term Sheet, (iii) contains, subject to entry of the Final Order, provisions prohibiting claims against the collateral of the DIP Facility Lender pursuant to section 506(c) of the Bankruptcy Code, a waiver of any "equities of the case" exception under section 552(b) of the Bankruptcy Code, and |

| | a waiver of the equitable doctrine of marshalling, (iv) approves payment by the Debtors of all of the fees and expenses provided for herein, and (v) shall not have been stayed, vacated, reversed or rescinded or, without the prior written consent of the DIP Facility Lender in its sole discretion, amended, or modified. |
|---|---|
| Availability and Draw Procedure | The DIP Facility shall be made available for the purposes set forth below under the heading "Use of DIP Loan Proceeds" in the total principal amount of up to $1,500,000.00, with the principal amount of $200,000.00 available on the first (1st) business day after entry of the Interim Order (the "**Interim Amount**") and the remaining **$1,300,000.00** available on the first (1st) business day after entry of the Final Order (the "**Final Amount**"); provided that, any such advance from the DIP Facility (each, a "**Draw**") shall be conditioned upon the following: (a) no Default or Event of Default having occurred and be continuing as of the date of such Draw, (b) the representations and warranties set forth herein shall be true and correct in all material respects as of the date of such Draw, and (c) compliance by the Debtors with the Sale Milestones (as defined herein) as of the date of such Draw. |
| | Subject to the foregoing conditions and such other conditions as set forth in this Term Sheet being met, requests for Draws by the Debtors shall be honored by the DIP Facility Lender in accordance with the following procedures: |
| |    a.  Written Request. The Debtors shall have delivered to the DIP Facility Lender a written request (email being sufficient) for a Draw at least two (2) business days prior to the date that the Draw will be transferred to the Debtors. The request shall (i) specify the amount of the Draw, (ii) state the date that the Draw is requested, (iii) provide wiring instructions for the Draw, (iv) certify the Draw is consistent with the categories, amounts and timing of the Approved Budget, and (v) certify that all conditions set forth above with respect to the Draws are and will be satisfied as of the date of the request and the date of the Draw. |
| |    b.  Amount. All Draws shall be in an amount not less than **$50,000.00**. |
| Documentation | Any documentation in respect of the DIP Facility (collectively, the "**Documentation**") and all motions relating thereto shall be in form and substance acceptable to the DIP Facility Lender in its sole discretion. Any Documentation shall be consistent with the terms and conditions set forth in the Term Sheet (other than to the extent any additional representations and warranties or covenants are contained in ancillary documentation (including collateral agreements and/or guarantees)). |
| Interest Rates | The principal balance of the DIP Facility (the "**Principal Balance**") shall comprise the aggregate amounts available under the DIP Facility minus any voluntary, mandatory, or other prepayments, other than payments of fees, costs and interest, made to the DIP Facility Lender by or on behalf of the Debtors; provided that for that Principal Balance attributable to Filecoin Uses (as defined below), the Principal Balance shall equal the greater of the USD lent under the DIP Facility to acquire Filecoin and the USD equivalent on the Maturity Date of the Filecoin so purchased. Interest shall accrue on the Principal Balance based on the portion of the Principal Balance the Debtors have actually drawn, at a per annum fixed rate of 15.00%; provided that, after the occurrence and during the continuance of an Event of Default, interest shall accrue at the fixed rate of 20.00%. All interest and other fees and costs due hereunder shall be payable on the Maturity Date by wire transfer in the event the Debtors' assets are not sold to the DIP Facility Lender pursuant to a credit bid in a section 363 sale consummated prior to the Maturity Date. All interest |

| | |
|---|---|
| | shall be calculated using a 360-day year and actual days elapsed. |
| Fees | There shall be a three percent (3%) commitment fee, which shall be assessed on the full committed amount and not come due until maturity, and no exit fee for the DIP Facility. |
| | There shall be a Collateral Management Fee of $20,000 per full or partial calendar month payable to one or more designees of Lender that will oversee the inventory, deployment and operation of data networking infrastructure that serves as the Interim DIP Collateral and DIP Collateral (as defined below). |
| Maturity Date | The maturity date ("**Maturity Date**") shall be (unless otherwise extended by the DIP Facility Lender in its sole discretion) the earliest to occur of: (i) August 23, 2023 or such later date as the DIP Facility Lender shall agree in writing in its sole discretion; (ii) the closing date following entry of one or more final orders approving the sale of all or substantially all of the assets belonging to the Debtors in the Chapter 11 Cases, (iii) the acceleration of any outstanding DIP Loans following the occurrence of an uncured Event of Default (as defined herein), or (iv) entry of an order by the Bankruptcy Court in the Chapter 11 Cases either (a) dismissing such case or converting such Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code, or (b) appointing a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business of the Debtors (*i.e.*, powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code), in each case without the consent of the DIP Facility Lender. All amounts outstanding under the DIP Facility shall be due and payable in full, and the DIP Commitments thereunder shall terminate, on the Maturity Date. |
| Closing Date | As used herein, the term "**Closing Date**" shall mean the date on which each of the conditions specified under the heading "Conditions Precedent to the Closing" below shall have been satisfied (or waived by the DIP Facility Lender in its sole discretion). The Closing Date shall occur as promptly as is practical after the entry of the Interim Order by the Bankruptcy Court. |
| Use of DIP Facility Proceeds | The Debtors shall be permitted to use the proceeds of the DIP Facility to fund (a) the operational, contractor/employee, and other costs of the Debtors, and payments related to the working capital and other general corporate purposes of the Debtors, including the payment of professional fees and expenses; and (b) acquisition of Filecoin to facilitate operations (the "Filecoin Use"), in each and every case of (a) and (b), consistent with, subject to, and within the categories and limitations contained in, the Approved Budget (as defined herein) (the "**Permitted Uses**") and all applicable orders of the Bankruptcy Court in the Chapter 11 Cases. |
| | No portion of the proceeds under the DIP Facility shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to (i) the amount, extent, priority, validity, perfection or enforcement of the indebtedness of the Debtors owing to the Prepetition Secured Party[1] (collectively, the "**Prepetition Indebtedness**") or the DIP Facility Lender, or (ii) liens or security interests in the collateral securing such indebtedness, including challenges to the perfection, priority or validity of the liens granted in favor of the Prepetition Secured Party or the DIP Facility Lender with respect thereto. |

---

[1] "**Prepetition Secured Party**" means KB Silver Funding, LLC (or its permitted assignee) in its capacity as the prepetition senior secured lender to the Debtors.

| Approved Budget | "**Approved Budget**" shall mean the rolling consolidated 13-week cash flow and financial projections of the Debtors, and itemizing on a weekly basis all uses, and anticipated uses, of the DIP Facility, cash collateral, revenues or other payments projected to be received, and all expenditures proposed to be made during such period, which shall at all times be in form and substance satisfactory to the DIP Facility Lender in its reasonable discretion, which Approved Budget may be amended only with the consent of the DIP Facility Lender in its reasonable discretion. |
|---|---|
| Permitted Variance | The Debtors shall not make or commit to make any payments other than those identified in the Approved Budget, subject to a cumulative four-week 10% variance from the amount in the "Total Disbursements" line in the Approved Budget.<br><br>Subject to the provisions of this Term Sheet, including the subsection entitled "Availability and Draw Procedure", budgeted expenditures and cash receipts may be paid and received, as applicable, in an earlier or later period in the reasonable discretion of the Debtors, in which event, the Approved Budget shall be deemed so amended for the purpose of calculating variances. |
| Reporting | After entry of the Interim Order, the Debtors shall provide to the DIP Facility Lender, no later than 5:00 p.m. Eastern Time on Thursday of each rolling one-week period, a budget variance and reconciliation report setting forth: (i) a comparative reconciliation, on a line-by-line basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the Approved Budget, and (ii) the percentage variance of the aggregate receipts and aggregate disbursements, for (A) the rolling one-week period ended on (and including) the last Saturday of the one-week reporting period and (B) the cumulative period to date and (iii) projections for the following 13 weeks, including a rolling cash receipts and disbursements forecast for such period. |
| Repayment | Except for Mandatory Prepayments (as described below), no payments or prepayments of any Draws under the DIP Facility shall be due until the Maturity Date. Upon the Maturity Date, the unpaid Principal Balance together with all interest, fees, costs, expenses and any other amounts due under the DIP Facility shall be due and payable immediately in full without demand by the DIP Facility Lender or consent or action by the Bankruptcy Court.<br><br>The DIP Facility may credit bid the Prepetition Indebtedness and the obligations under the DIP Facility in the "Purchase Price" for the Assets. |
| Voluntary Prepayment | The Debtors may voluntarily prepay the Principal Balance at any time without penalty or premium. |
| Mandatory Prepayments | Except as otherwise provided in the Approved Budget, mandatory repayments of any Draws under the DIP Facility shall be required in an amount equal to (i) 100% of the net sale proceeds from non-ordinary course asset sales of the Collateral (including, without limitation, a sale of all or substantially all of the Debtors' assets), (ii) 100% of the proceeds of the incurrence of any indebtedness other than in the ordinary course of business, (iii) 100% of insurance proceeds received by the Debtors (only in the event that such receipt is an extraordinary receipt that relates to Collateral and exceeds $50,000), and (iv) any condemnation proceeds received by the Debtors. |

| | |
|---|---|
| Security / Priority | All amounts owing by the Debtors under the DIP Facility shall be joint and several as to each Debtor and subject to the Carve Out and Permitted Prepetition Liens,[2] (a) will be entitled to superpriority claim status pursuant to section 364(c)(1) of the Bankruptcy Code with priority over any or all administrative expense claims of every kind and nature whatsoever, and (b) will be secured by a perfected security interest pursuant to section 364(c)(2), section 364(c)(3) and section 364(d) of the Bankruptcy Code with priority over the security interest securing Debtors' existing secured credit facilities and other indebtedness, including the Debtors' obligations owing to the Prepetition Secured Party and all other parties with liens on the Interim DIP Collateral and the DIP Collateral (defined below), pursuant to section 364(d)(1) of the Bankruptcy Code in all of the assets of the Debtors, as further described in the "DIP Collateral" section below.<br><br>Nothing herein shall be construed as impairing the ability of any party to object to any fees and expenses of a professional in the Chapter 11 Cases.<br><br>All of the liens described herein shall be effective and perfected as of the entry of the Interim Order and without the necessity of the execution of mortgages, security agreements, pledge agreements, financing statements or other agreements. |
| Separate Cash Accounts | The proceeds of the DIP Facility and all other cash from operation of the Debtors during the period in which the DIP Facility is in place shall be maintained in one or more segregated accounts over which the DIP Facility Lender shall have a lien as described above.<br><br>The Debtors shall also enter into an account control agreement promptly with respect to any account as and when directed by the DIP Facility Lender. |
| Collateral | All amounts owing by the Debtors under the DIP Facility in respect thereof, including, without limitation, principal, interest, fees and costs, will be secured by a first priority perfected security interest in and lien on all assets (tangible, intangible, real, personal and mixed) of the Debtors, including, without limitation, any collateral granted in respect of the obligations owed to the Prepetition Secured Party, whether now owned or hereafter acquired, including, without limitation, deposit and other accounts, inventory, equipment, receivables, capital stock or other ownership interest in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks, other general intangibles, and digital currency, but *excluding* any digital currency lent pursuant to loan agreements with Anchorage Lending CA, LLC; CoinList Lend, LLC; DARMA Capital Master Fund, LP; Genesis Global Capital, LLC; and PALLADIUM-Q SEGREGATED PORTFOLIO (collectively, the "Cryptocurrency Loan Agreements") and the amounts due thereunder (such *excluded* collateral, the "Cryptocurrency Collateral"), and all products and proceeds thereof (unless defined as Cryptocurrency Collateral), and subject to entry of the Final Order any proceeds of Avoidance Actions[3] and other causes of action available to or property of the Debtors' bankruptcy estates (collectively, the "**Interim DIP Collateral**"), subject only to the Carve-Out and the Permitted Prepetition Liens.<br><br>Upon entry of (a) a Final Order and (b) an order by United States Bankruptcy Court |

---

[2]     "**Carve Out**" and "**Permitted Prepetition Liens**" shall have the meaning ascribed to such term in the Interim Order and Final Order.

[3]     "**Avoidance Actions**" means the claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code and under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, and similar statutes or common law.

| | |
|---|---|
| | for the Southern District of the New York authorizing Genesis Global Holdco, LLC and its affiliated debtors and debtors in possession (collectively, the "**Genesis Debtors**") to grant liens on that digital currency loaned by certain of the Genesis Debtors the Debtors pursuant to the Master Loan Agreement between Genesis Global Capital, LLC ("Genesis") and File Storage Partners, LLC dated August 10, 2021 (the "Genesis Collateral"): the Interim DIP Collateral *plus* the Genesis Collateral (collectively with the Avoidance Actions, the "**DIP Collateral**"), subject only to the Carve-Out and the Permitted Prepetition Liens. |
| | The DIP Facility Lender shall have a first priority lien as described in the "Security/Priority" section herein on all Interim DIP Collateral and DIP Collateral, senior to all other liens, and junior only to the Carve-Out and the Permitted Prepetition Liens. |
| | The DIP Facility shall be the joint and several obligation of each Debtor and the DIP Facility Lender may exercise its rights with respect to any asset or grouping of assets, through foreclosure or otherwise. Subject to entry of the Final Order, the Debtors shall waive, and the DIP Orders shall prohibit, marshalling of any of the Collateral or other interest of the DIP Facility Lender or under any similar theory. |
| Guarantee | DLTx, LLC shall guarantee the DIP Facility Obligations |
| Conditions Precedent to Closing | The obligations of the DIP Facility Lender to consummate the transactions contemplated herein and to make the DIP Facility available to the Debtors on a final basis are subject to the satisfaction, in each case in the sole judgment of the DIP Facility Lender, of the following: |
| | &bull; Non-debtor affiliate DLTx LLC shall have executed that certain term sheet with Silvermine or its designee pertaining to the overall transaction impacting, among other things, (a) the secured party sale by Silvermine or its designee of its collateral owned by non-debtor affiliate DSM Tech Enterprises, Inc.; (b) the credit bid by Silvermine or its designee of its claims under the DIP Facility for the Debtors' assets, and (c) the acquisition by Silvermine or its designee of the equity or assets of certain non-Debtor affiliates. |
| | &bull; Each of the Interim Order or Final Order, as the case may be, shall be in a form that is acceptable to the DIP Facility Lender in its sole discretion. |
| | &bull; All motions and other documents to be filed with and submitted to the Bankruptcy Court in connection with the DIP Facility and the approval thereof shall comply with the terms of this Term Sheet and be in form and substance satisfactory to the DIP Facility Lender in its sole discretion. |
| | &bull; The Interim Order or the Final Order, as the case may be, shall be in full force and effect, and shall not have been appealed, reversed, modified, amended, stayed for a period of five (5) business days or longer, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is or may be materially adverse to the interests of the DIP Facility Lender. |
| | &bull; The DIP Facility Lender shall have received and approved the Approved Budget. |
| | &bull; Unless otherwise agreed to by the DIP Facility Lender, as to the funding of the Interim Amount, the Debtors shall have taken steps (to the DIP Facility Lender's satisfaction) towards safeguarding the Debtors' assets in the |

6

<table>
<tr><td></td><td>

custody of LightEdge Solutions, Inc. ("LightEdge"),[4] including notifying LightEdge of the automatic stay's applicability to the Debtors' assets in its custody, and/or seeking the entry of an order of the Bankruptcy Court (in form and substance acceptable to the DIP Facility Lender) approving any Motion to Enforce the Stay regarding the same. As to the funding of the Final Amount, the Bankruptcy Court shall have entered final orders in form and substance acceptable to the DIP Facility Lender approving the Motion to Enforce the Stay, unless such clause is waived by the DIP Facility Lender or the circumstances giving rise to the Motion to Enforce the Stay are otherwise moot.

- There shall be no uncured or unwaived Event of Default.

- The representations and warranties of the Debtors relating hereto shall be true and correct immediately prior to, and after giving effect to, funding, as qualified in "Availability and Draw Procedure."

</td></tr>
</table>

| Representations / Warranties | <u>See</u> Schedule A and any other representations or warranties set forth in the Term Sheet. |
|---|---|
| Affirmative and Negative Covenants | <u>See</u> Schedule B and any other affirmative or negative covenants set forth in the Term Sheet. |
| Milestones | Unless otherwise extended by the DIP Facility Lender in its sole discretion, the Debtors shall comply with the following milestones for a sale of substantially all of the Debtors' assets to the DIP Facility Lender (a "**Bankruptcy Sale**") in the Chapter 11 Cases (the "**Sale Milestones**"):<br><br>• Together with their chapter 11 petitions, the Debtors shall have filed a motion seeking approval of the Bankruptcy Sale;<br><br>• On or before the 40th day after the Petition Date, the Debtors shall have obtained an order from the Bankruptcy Court approving the Bankruptcy Sale; and<br><br>• On or before the 54th day after the Petition Date, or such later date as the DIP Facility Lender shall agree in writing, the Bankruptcy Sale shall have been consummated. |
| Events of Default | The occurrence of any one or more of the following shall constitute an "**Event of Default**":<br><br>(i) Failure by the Debtors to pay principal, interest or any other amounts provided by this Term Sheet when due;<br><br>(ii) Breach by any Debtor of any of the Covenants set forth on Schedule B hereto;<br><br>(iii) Any representation or warranty made by any Debtor shall prove to have been incorrect in any material respect when made;<br><br>(iv) Any provision of this Term Sheet or the DIP Orders shall cease to be valid and binding on any Debtor, or any Debtor shall so assert in any pleading filed in any court;<br><br>(v) The failure to satisfy any of the Sale Milestones; |

---

[4] Certain of the Debtors' assets are in the custody of LightEdge pursuant to that certain Master Agreement dated as of 2/15/2021 (together with all agreements executed pursuant thereto, the "<u>LightEdge Agreement</u>").

(vi)    Without the consent of the DIP Facility Lender, any of the Chapter 11 Cases shall be dismissed or converted to a Chapter 7 case;

(vii)   Unless consented to by the DIP Facility Lender, a Chapter 11 trustee, a responsible officer or an examiner with enlarged powers relating to the operation of the business of the Debtors (*i.e.*, powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) shall be appointed in any of the Chapter 11 Cases;

(viii)  Any other superpriority claim or lien which is *pari passu* with or senior to the claims or liens of the DIP Facility Lender under the DIP Facility shall be granted in any of the Chapter 11 Cases, other than the Carve-Out;

(ix)    Any Debtor shall make any payment on account of any pre-petition indebtedness or payables of a Debtor except as otherwise permitted under the Approved Budget;

(x)     the Bankruptcy Court shall enter an order granting relief from the automatic stay to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any Debtor which have an aggregate value in excess of $25,000 (other than with respect to those Debtors for which the DIP Facility Lender consents to such relief);

(xi)    An order shall be entered amending, modifying or supplementing the Interim Order or Final Order without the prior written consent of the DIP Facility Lender;

(xii)   Any judgment in excess of $100,000 (to the extent not paid or fully covered (subject to applicable deductibles) by a reputable and solvent insurance company) as to any post-petition obligation shall be rendered against any Debtor and the enforcement thereof shall not be stayed; or there shall be rendered against any Debtor a non-monetary judgment with respect to a post-petition event which is not stayed and causes or would reasonably be expected to have a material adverse effect on the operations, businesses, properties, assets, or conditions (financial or otherwise) of any Debtor, or on the ability of any Debtor to perform its respective obligations herein or under the DIP Orders;

(xiii)  The Debtors revoke the subchapter V designation of the Chapter 11 Cases;

(xiv)   An application for any of the orders described in clauses (vi) through (xiii) above shall be made and such application is not contested by the Debtors in good faith or the relief requested is not withdrawn, dismissed or denied within ten (10) days after filing or the entity obtains a final order under § 506(c) of the Bankruptcy Code against the Lender or obtains a final order adverse to the Lender or any of its rights and remedies under the DIP Documents or in the Interim DIP Collateral or the DIP Collateral; or

(xv)    The filing of a challenge to the liens or claims of the DIP Facility Lender based upon the DIP Facility Lender's prepetition conduct.

Upon an Event of Default, the DIP Facility Lender shall be entitled to payment of its reasonable attorneys' fees and costs incurred thereafter, which such amounts shall be added to the obligations under the DIP Facility.

| | |
|---|---|
| Relief from Stay Remedies | Upon the occurrence and continuance of an Event of Default beyond the applicable grace period set forth below (if any), the DIP Facility Lender shall be entitled to take all or any of the following actions without further order of or application to the Bankruptcy Court: |
| | (i) declare the principal of and accrued interest on the outstanding DIP Loans to be immediately due and payable; |
| | (ii) terminate the DIP Facility; |
| | (iii) implement the default rate of interest on all outstanding DIP Loans; and |
| | (iv) take any other action or exercise any other right or remedy (including, without limitation, with respect to the liens in favor of the DIP Facility Lender) permitted under the applicable loan documents, or by applicable law. |
| | Any automatic stay otherwise applicable to the DIP Facility Lender shall be modified so that upon the occurrence of an Event of Default and upon five (5) business days' prior written notice of such occurrence (a "Termination Notice"), in each case given to the Debtors, counsel to the Committee appointed in these proceedings (if any), and the U.S. Trustee, the DIP Facility Lender shall be entitled to exercise customary remedies including, without limitation, the right to realize on all the Interim DIP Collateral and DIP Collateral and the right to exercise any remedy available under applicable law, in each case without obtaining any further relief or order of the Bankruptcy Court unless, within such five (5) business day period, the Bankruptcy Court has entered an order to the contrary. Consistent with the foregoing sentence, relief from the stay of section 362 of the Bankruptcy Code in favor of the DIP Facility Lender shall be embodied in any order approving the DIP Facility and the use of cash collateral. |
| Governing Law | All documentation in connection with the DIP Facility shall be governed by the laws of the State of Delaware, subject to applicable bankruptcy laws. |

[*Signature Page(s) to Follow*]

      IN WITNESS WHEREOF, the parties hereto have executed and agree to be bound by the terms set forth in this Term Sheet or caused the same to be executed by their respective duly authorized officers as of the day and year first above written.

**BORROWERS**:

**FILE STORAGE PARTNERS LLC**

_____

BY:

ITS:

**AFTON BLOCKCHAIN LLC**

_____

BY:

ITS:

**FILTECH SPV LLC**

_____

BY:

ITS:

**MIDWEST BLOCKCHAIN INC.**

_____

BY:

ITS:

**DIP FACILITY LENDER**:

**KB SILVER FUNDING, LLC**

_____

BY:

ITS:

### Schedule A

### Representations and Warranties

In order to induce the DIP Facility Lender to enter into this Term Sheet, to make the DIP Facility available to the Debtors, and to advance the Draws, the Debtors, jointly and severally, represent and warrant as of the date hereof, the Closing Date, and the date of each Draw as follows:

1.     **Due Organization**. Each of the Debtors are duly formed and/or organized, validly existing and in good standing (to the extent such concept exists in the relevant jurisdiction) under the laws of their jurisdictions of incorporation or formation.

2.     **Due Authorization**.

a.     Upon entry of the Interim Order, the execution and delivery of the Term Sheet and the performance by each of the Debtors of such Debtor's obligations under the Term Sheet, any Documentation, or the DIP Orders (i) are within its corporate or limited liability company (or equivalent) powers, (ii) have been duly authorized by all necessary corporate or limited liability company (or equivalent) action of such Debtor, (iii) have received all necessary bankruptcy, insolvency or governmental approvals, (iv) do not contravene or conflict with any provisions of such Debtor's corporate charter or by- laws or limited liability company agreement (or equivalent organizational documents), and (v) do not materially contravene or materially conflict with any provisions of applicable material law or of any material agreements binding upon or applicable to such Debtor or any of its properties;

b.     The Chapter 11 Cases of each Debtor have been duly authorized by all corporate or limited liability company (or equivalent) action of such Debtor.

3.     **Binding Obligations**. Upon entry of the Interim Order, this Term Sheet and other Documentation shall constitute the legal, valid and binding obligations, enforceable against each of the Debtors in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally, including the entry of the Interim Order and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

4.     **Title to Assets**. With respect to its real and personal property, if any, each of the Debtors is the sole owner and has good, valid and marketable title to, or a valid leasehold interest in, all of its respective properties and assets, whether personal or real, subject to no transfer restrictions any kind other.

5.     **Existing Indebtedness; Investments, Guarantees and Certain Contracts**. Except as contemplated by the Term Sheet, the Debtors (i) do not have indebtedness secured by any mortgage, pledge, security, lien or conditional sale or other title retention agreement to which any property or asset owned or held by such Debtor is subject except for such Indebtedness that gives rise to the Permitted Liens, or (ii) have not directly or indirectly guaranteed, endorsed (otherwise than for collection or deposit in the ordinary course of business), discounted or sold with recourse or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire any indebtedness.

6.     **Licenses and Permits; Labor**. Each of the Debtors is in compliance with and has all material Permits and Intellectual Property necessary or required by applicable law or governmental authority for the operation of each of the Debtor's businesses.

7.     **Disclosure**. To the best of each of the Debtors' knowledge, no written statement furnished by any of the Debtors to the DIP Facility Lender in accordance with the terms of this Term Sheet and other Documentation, when taken as a whole, contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements contained herein or therein not materially misleading in light of all of the circumstances under which they were made.

8. **Perfected Liens**. Upon entry of the Interim Order, the liens granted to the DIP Facility Lender in accordance with the Term Sheet, the Documentation and the Interim Order will at all times be fully perfected liens in and to the Collateral described therein, subject, as to priority, only to liens permitted to have such priority under the Interim Order.

9. **Compliance with Laws**. To the best of each of the Debtor's knowledge, without investigation, such Debtor (i) is in compliance with all laws, statutes, rules, regulations, ordinances and tariffs of any Governmental Authority applicable to each Debtor and/or each Debtor's business, assets or operations, including, without limitation, the Worker Adjustment and Retraining Notification Act or similar state law and ERISA, and (ii) is not in violation of any order of any Governmental Authority or other board or tribunal, except where noncompliance or violation could not reasonably be expected to have a material adverse effect.

10. **Payment of Taxes**. The Debtors have filed (or obtained extensions to file) all federal, state and other tax returns and reports required to be filed, and have paid all federal, state and other taxes, assessments, fees and other governmental charges levied or imposed by a governmental authority upon them or their properties, income or assets otherwise due and payable other than those (i) not yet delinquent or are being contested in good faith by appropriate proceedings, (ii) taxes the nonpayment of which is permitted or required by the Bankruptcy Code, or (iii) taxes allocable to the locations operated by the Debtors for which the Debtors have agreed to pay under any master lease pertaining to such locations or any sub-leases related thereto.

11. **Use of Proceeds**. The proceeds of the DIP Facility received by the Debtors have been and shall be used exclusively in accordance with the terms set forth in the Term Sheet under the heading "Use of DIP Proceeds".

## Schedule B

### Affirmative, Negative and Financial Covenants

Each of the Debtors covenants and agrees that, until all borrowings under the DIP Facility are paid in full and the commitments thereunder are terminated:

1.    **Inspection**. Upon reasonable request of the DIP Facility Lender, the Debtors will permit any officer, employee, attorney or accountant or agent of the DIP Facility Lender to audit, review, make extracts from or copy, at the Debtors' expense, any and all corporate and financial and other books and records of the Debtors during ordinary business hours and, in the absence of an Event of Default, upon reasonable advance notice and to discuss the Debtors' affairs with any of their directors, officers, employees, attorneys, or accountants. Upon reasonable request of the DIP Facility Lender, the Debtors will permit the DIP Facility Lender, or any of its officers, employees, accountants, attorneys or agents, to examine and inspect any Interim DIP Collateral or DIP Collateral or any other property of the Debtors at any time during ordinary business hours and, in the absence of an Event of Default, upon reasonable prior notice.

2.    **Maintenance of Properties**. Each the Debtors will keep and maintain the Collateral and all of its other properties necessary or useful in its business in good condition, repair and working order (normal wear and tear excepted) other than to the extent contemplated by the Approved Budget or the DIP Orders.

3.    **Insurance**. The insurance coverage maintained by LightEdge Solutions, Inc. for the benefit of each Debtor in connection with the LightEdge Agreement will remain in place with respect to the Interim DIP Collateral and the DIP Collateral to the extent of the Certificate of Insurance delivered in connection with the LightEdge Agreement.

4.    **Use of Proceeds**. The Debtors shall use the proceeds from the DIP Facility only for the purposes set forth under the heading "Use of Proceeds" in the Term Sheet and in accordance with the Approved Budget.

5.    **Further Assurances; Post Closing**. At the Debtors' cost and expense, each of the Debtors shall take such further actions, obtain such consents and approvals and duly execute and deliver such further agreements, assignments, instructions or documents as DIP Facility Lender may reasonably request with respect to the purposes, terms and conditions of the Term Sheet and the consummation of the transactions contemplated thereby.

6.    **Financial Reporting and Other Information**. Each of the Debtors shall (i) file with the Bankruptcy Court and furnish to DIP Facility Lender all operational and other reports as and when required by the Bankruptcy Code and Bankruptcy Rules, (ii) comply with the reporting requirements set forth under the heading "Reporting" in the Term Sheet, (iii) provide access to the DIP Facility Lender for information (including historical information), including, without limitation, regularly scheduled meetings with the Debtors and their advisors; and (iv) provide such additional information, documents, statements, reports and other materials as DIP Facility Lender may reasonably request from a credit or security perspective or otherwise from time to time.

7.    **Payment of Obligations and Indebtedness**.

a.    The Debtors shall satisfy in full all of their obligations under the Term Sheet, any Documentation, or the DIP Orders by or on by the Maturity Date.

b.    Except as otherwise prescribed in the Term Sheet, or to the extent excused pursuant to the Bankruptcy Code, each of the Debtors shall pay, discharge or otherwise satisfy to the extent provided in the Approved Budget at or before the Maturity Date (subject to applicable grace

periods and, in the case of trade payables, to ordinary course payment practices) all of their material obligations and liabilities, except when the amount or validity thereof is being contested in good faith by appropriate proceedings, and such reserves as DIP Facility Lender may deem proper and necessary in its reasonable discretion shall have been made.

8.   **Compliance with Sale Milestones**. Unless otherwise extended by the DIP Facility Lender in its sole discretion, the Debtors shall comply with Sale Milestones set forth under the heading "Sale Milestones" in the Term Sheet.

9.   **Bankruptcy Pleadings**. The Debtors shall deliver to the DIP Facility Lender as soon as practicable in advance of filing with the Bankruptcy Court the Interim Order and the Final Order (which must be in form and substance reasonably satisfactory to the DIP Facility Lender), all other proposed orders and pleadings related to the DIP Facility (which must be in form and substance reasonably satisfactory to the DIP Facility Lender), the Quantum Meruit Motion(s), all "fist day pleadings" and proposed orders relating thereto, the motion, proposed order and/or pleadings related to the Bankruptcy Sale, any plan of reorganization or liquidation, and/or any disclosure statement related to such plan.

## EXHIBIT C

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 (Subchapter V) |
| FILE STORAGE PARTNERS, LLC, *et al.*,[1] | Case No. 23-10877 (CTG) |
| Debtors. | (Joint Administration Requested) |

## MOTION OF DEBTORS FOR ENTRY OF AN ORDER (A) APPROVING THE SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CONTRACTS AND LEASES, AND (C) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (the "Debtors") hereby move this

Court (this "Motion"), pursuant to sections 105(a), 363 and 365 of title 11 of the United States

Code (the "Bankruptcy Code"); Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules"); and Rules 2002-1 and 6004-1 of the Local Rules

of Bankruptcy Practice and Procedures of the Bankruptcy Court for the District of Delaware (the

"Local Rules"), for the entry of an order, substantially in the form attached hereto as **Exhibit A**

(the "Sale Order"), (a) approving the Sale of the Assets (as defined below) to KB Silver Funding,

LLC (the "Purchaser") free and clear of all liens, claims, encumbrances, and other interests (except

certain assumed liabilities as set forth in the Asset Purchase Agreement (defined below)),

(b) approving the assumption and assignment of certain executory contracts and unexpired leases

related thereto, and (c) granting related relief.

In support of this Motion, the Debtors rely upon the *Declaration of Timothy Furey, Chief*

*Restructuring Officer of the Debtors, in Support of the Debtors' Chapter 11 Petitions and First*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  File Storage Partners, LLC (6920); Afton Blockchain LLC (3951); Filtech SPV LLC (9602); and Midwest Blockchain Inc. (8842).  The Debtors' service address is 1357 Ashford Ave., Pmb 373, San Juan, PR 00907.

*Day Motions* (the "<u>First Day Declaration</u>"), filed contemporaneously herewith and incorporated herein by reference.  In support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  The Debtors confirm their consent, pursuant to Bankruptcy Rule 7008 and Local Rule 9013-1(f), to the entry of a final order by the Bankruptcy Court in connection with this motion to the extent that it is later determined that the Bankruptcy Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      This is a core proceeding under 28 U.S.C. § 157(b).

3.      Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

4.      The statutory predicates for the relief requested in this Motion are sections 105, 363, and 365 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014 and Local Rules 2002-1, 6004-1, and 9013-1(m).

## BACKGROUND

### A.      Chapter 11 Cases

5.      On June 30, 2023 (the "<u>Petition Date</u>"), the Debtors commenced their chapter 11 cases (together, the "<u>Chapter 11 Cases</u>") by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code with this Court.

6.      The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to sections 1007(a) and 1108 of the Bankruptcy

Code.  To date, no trustee, examiner, or statutory committee has been appointed in the cases by the United States Trustee (the "U.S. Trustee").

7.      The factual background regarding the Debtors, including their business operations, their capital and debt structures, and the events leading to the filing of the Chapter 11 Cases, is set forth in detail in the First Day Declaration, which is fully incorporated herein by reference.[2]

8.      The Debtors have sought procedural consolidation and joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

**B.      The Sale and Marketing Process**

9.      As noted in the First Day Declaration, the Debtors and their non-Debtor affiliates have been faced with significant liquidity issues for many months.  This resulted in certain operational changes, including the reduction of a significant portion of the personnel supporting the Debtors' business, but also led the Debtors to explore other ways to leverage their assets (the FIL production and their hardware in particular), to raise the short-term capital needed to meet emergent operational needs.  While the Debtors approached numerous institutions and equipment financers in this regard, none were willing to take uncollateralized counterparty risk against the Debtors and NewDLTx and there was no cash or digital assets available to post as security for short-term working capital.  In addition, it became clear that without a significant restructuring of operations involving multiple technology challenges and a complex rework of the corporate structure of the Debtors and their affiliates, there would be no going concern.

10.      At this stage, certain principals of the Debtors entered into discussions with Silvermine Capital Advisors, LLC ("Silvermine"), a consulting and investment firm with extensive

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the First Day Declaration.

experience in technology company capitalizations and restructurings, including (significantly) digital asset infrastructure and mining operations. This experience includes investments in companies with operations similar to the Debtors, which positioned Silvermine to be a valuable resource to the Debtors on account of Silvermine's familiarity with NewDLTx's business and the unique challenges it faced.

11.     The purpose of Debtors' principals' discussions was to solicit Silvermine's interest in capitalizing or otherwise facilitating a restructuring of the Debtors' operations in conjunction with a restructuring of NewDLTx's operations as a whole. Through its portfolio operations, Silvermine has the technical expertise and personnel to fully support the Debtors' existing operations with limited risk of the downtime that would otherwise result in slashing events, potentially resulting in the total loss of secured lender collateral over a very short period.

12.     Toward that end, Silvermine structured a special purpose vehicle to fund the Debtors' chapter 11 cases and acquire the Debtors' assets via a credit bid of the DIP Facility Obligations in order to ensure continuous operation as a going concern. Given (a) the absence of other viable liquidity, operational or restructuring options, (b) the absence of any other entities showing interest in financing these cases or acquiring the Debtors' assets (in part due to the difficulty in locating parties that understand the Debtors' assets and business model in the first place), and (c) the looming threats being issued by the Debtors' data center providers, the Debtors strongly believe that a sale of its assets to Purchaser is the best possible option for the companies and their estates, especially in the context of a broader restructuring occurring outside of this Court (which Purchaser has likewise agreed to facilitate). As such, this is correspondingly the best chance for the Filecoin Business to realize its full potential.

13.     More specifically, the Purchaser agreed, pursuant to the terms of that certain asset purchase agreement, dated June 30, 2023 (the "Asset Purchase Agreement") attached to the Sale Order as **Exhibit 1**, to acquire substantially all of the Debtors' assets (the "Assets") as a going concern and to support the process by agreeing to the Debtors' use of cash collateral and providing needed debtor-in-possession financing.  The culmination of the foregoing marketing process was the execution of the Asset Purchase Agreement.

14.     As part of these negotiations, the Purchaser insisted on the inclusion of "milestone" dates by which the Debtors would be required to have completed certain aspects of the proposed sale process (the "Milestones").  These Milestones are intended to preserve the going-concern value of the business through a timely, efficient sale process that culminates in a closing by the Purchaser by August 23, 2023.

15.     Again, given the Debtors' lack of liquidity and significant debt burden, the Debtors, in their business judgment, have not found any other transaction that would provide more benefit to the Debtors' estates than the transaction detailed in the Asset Purchase Agreement.

C.     **Summary of the Proposed Transaction**

16.     Under the terms of the Asset Purchase Agreement, the Purchaser will purchase the Assets for an aggregate purchase price consisting of: (i) a credit bid in the amount of any outstanding Prepetition Obligations and the then-outstanding DIP Facility Obligations (each as defined in the DIP Motion[3]) (estimated to be approximately $1,000,000.00 as of the Closing); (ii) assumption of certain assumed liabilities as provided in the Asset Purchase Agreement, including

---

[3] The "DIP Motion" means the *Motion of the Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 351, 361, 363(c), 363(e), 364 and 507 and Fed. R. Civ. P. 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to §364 of the Bankruptcy Code; (II) Authorizing Use of Cash Collateral Pursuant to §363 of the Bankruptcy Code; (III) Granting Liens and Super-priority Claims; (IV) Granting Adequate Protection to the Prepetition Secured Party; and (V) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c).*

the Digital Currency Loan Agreements (as defined below); and (iii) the cure costs associated with

the assumption and assignment of any Assumed Contracts to the Purchaser (each term as defined

in the Asset Purchase Agreement).

17.    The following chart summarizes the terms and conditions of the Purchase

Agreement and discloses certain information pursuant to Local Rule 6004-1(b).[4]

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| **Purchaser** | KB Silver Funding, LLC |
| **Purchase Price** | The Purchase Price consists of:<br>▪ A credit bid of any outstanding First Priority Obligations held by the Purchaser in the amount of two hundred thousand dollars ($200,000.00) plus the full amount of the DIP Obligations funded through the Closing, projected to be about one million dollars ($1,000,000.00);<br>▪ The assumption by Purchaser of the Assumed Liabilities;<br>▪ The assumption and assignment to Purchaser of the Assumed Contracts (if any); and<br>▪ Fifty percent (50%) of the net proceeds, if any of the Tortious Interference Claims.<br>*See* Asset Purchase Agreement § 2.4. |
| **Assets** | Substantially all the assets of the Debtors |
| **Assumed Liabilities** | All obligations of File Storage Partners, LLC ("File Storage") under (collectively, the "Digital Currency Loan Agreements"):<br>▪ The October 3, 2022, Term Sheet by and between File Storage and Anchorage Lending CA, LLC ("Anchorage Lending");<br>▪ The September 12, 2022, Term Sheet by and between File Storage and Anchorage Lending;<br>▪ The February 27, 2023, Term Sheet by and between File Storage and CoinList Lend, LLC ("CoinList");<br>▪ The June 7, 2022, Master Loan and Security Agreement by and between File Storage and CoinList<br>▪ The March 16, 2023, Term Sheet by and between File Storage and CoinList<br>▪ The March 24, 2023, Term Sheet, as amended on March 28, 2023, by and between File Storage and CoinList;<br>▪ The September 7, 2022, Filecoin Asset Use Swap by and between File Storage and DARMA Capital Master Fund, LP; |

---

[4] The summaries contained in this Motion are qualified in their entirety by the Interim Order and documents referred to herein.  To the extent anything in this Motion is inconsistent with such order or documents, the terms of the applicable order or documents shall control.  Capitalized terms used in this chart but not otherwise defined herein have the meanings ascribed to such term in the referenced documents.

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | ▪ The August 10, 2021, Loan Term Sheet, as amended on December 10, 2021, by and between File Storage and Genesis Global Capital, LLC ("Genesis Global")<br>▪ The August 9, 2021, Master Loan Agreement by and between File Storage and Genesis Global; and<br>▪ The January 9, 2023, Digital Storage Services Agreement by and between File Storage and PALLADIUMX SPC LIMITED, acting on behalf of PALLADIUM-Q SEGREGATED PORTFOLIO.<br>*See* Asset Purchase Agreement, Schedule 2.3(a). |
| **Sale to Insider**<br>Del. Bankr. L. R. 6004-1(b)(iv) (A) | Not applicable. |
| **Agreements with Management**<br>Del. Bankr. L. R. 6004-1(b)(iv)(B) | There are no management agreements between the Purchaser and employees/officers of the Debtors. |
| **Releases**<br>Del. Bankr. L.R. 6004-1(b)(iv)(C) | The Asset Purchase Agreement contains no releases. |
| **Private Sale**<br>Del. Bankr. L.R. 6004-1(b)(iv)(D) | The Debtors' Assets will be sold to Purchaser in a private sale. |
| **Closing and Other Deadlines**<br>Del. Bankr. L.R. 6004-1(b)(iv)(E) | The closing will occur on or before August 23, 2023, subject to this Court's entry of the Sale Order. Asset Purchase Agreement § 1.1 (defining "End Date"). |
| **Good Faith Deposit**<br>Del. Bankr. L.R. 6004-1(b)(iv)(F) | Not applicable, given that Purchaser will be credit bidding funds already lent under the DIP Facility.  *See* Asset Purchase Agreement § 2.4(a). |
| **Interim Arrangements with Purchaser**<br>Del. Bankr. L.R. 6004-1(b)(iv)(G) | The Purchaser is currently the proposed DIP Facility Lender, pursuant to a motion contemporaneously filed with this Court. |
| **Use of Proceeds**<br>Del. Bankr. L.R. 6004-1(b)(iv)(H) | No restrictions on use of any proceeds, though there are not contemplated to be any cash proceeds as the purchase price is contemplated to comprise a credit bid. |
| **Books and Records; Record Retention**<br>Del. Bankr. L.R. 6004-1(b)(iv)(J) | The Debtors will retain all books and required as required by law and, after Closing, will make any such documents related to the Assets available to the Purchaser upon the Purchaser's request. *See* Asset Purchase Agreement, Schedule 2.2(f). |
| **Sale of Avoidance Actions**<br>Del. Bankr. L.R. 6004-1(b)(iv)(K) | Avoidance actions are not proposed to be sold to the Purchaser. *See* Asset Purchase Agreement, Schedule 2.2(g). |
| **Requested Findings as to Successor Liability**<br>Del. Bankr. L.R. 6004-1(b)(iv)(L) | The Sale Order provides for the sale of the Debtors' Assets free and clear of claims of successor liability. Sale Order, ¶ 24; *see also* Asset Purchase Agreement § 5.7. |
| **Sale Free and Clear of Unexpired Leases**<br>Del. Bankr. L.R. 6004-1(b)(iv)(M) | Not applicable. |
| **Credit Bid**<br>Del. Bankr. L.R. 6004-1(b)(iv)(N) | The Asset Purchase Agreement provides for a credit bid of any outstanding amount of the First Priority Obligations and the full amount advanced under the DIP Facility as of the closing of the |

| Bankruptcy Code / Local Rule | Summary of Material Terms |
|---|---|
| | sale, which is expected to be $1,000,000.00. Asset Purchase Agreement, § 2.4(a). |
| **Relief from Bankruptcy Rule 6004(h)**<br>Del. Bankr. L.R. 6004-1(b)(iv)(O) | As of the Closing Date, the Sale Order: (i) shall have been entered by the Bankruptcy Court, and (ii) shall not have been appealed or be subject to any pending appeal, and no stay with respect thereto (including any stay under Bankruptcy Rule 6004(h) or 6006(d)) shall be in effect. *See* Asset Purchase Agreement, § 1.1 (defining of "Sale Order"); Asset Purchase Agreement § 2.5. |

18.    Given the prepetition process pursued by the Debtors and results thereto, the Debtors believe that it is critical and warranted that the sale process be consummated on the timeline set forth in this Motion to allow the Debtors to satisfy the Milestones under the Asset Purchase Agreement.  The sale timeline was specifically designed to balance the goals of preserving and maximizing the value of the Assets with the value-deteriorating cost of a protracted Chapter 11 sale process with respect to which the Debtors have no reason to believe there are any additional interested parties.

## RELIEF REQUESTED

19.    By this Motion, the Debtors intend to seek entry of the Sale Order at the Sale Hearing in substantially the form attached hereto as **Exhibit A**, providing the following relief:

(a)    Authorizing and approving the Sale of the Assets to the Purchaser, pursuant to the Asset Purchase Agreement, free and clear of liens, claims, encumbrances, and other interests, other than the Permitted Liens and the Assumed Liabilities;

(b)    authorizing the assumption and assignment of any Assumed Contracts; and

(c)    granting any related relief.

## THE PROPOSED SALE

20.    The Debtors believe that a prompt sale of the Assets represents the best option available under the circumstances, including in light of the Purchaser's available credit bid rights from the Prepetition Obligations and the DIP Facility Obligations.  Moreover, it is critical for the

Debtors to execute on any sale transaction as expeditiously as possible, as the Debtors are utilizing the Purchaser's cash collateral and obtaining debtor-in-possession financing to explore and facilitate this process. Time, therefore, is of the essence.

21.    By this Motion, the Debtors respectfully request that this Court approve the following general timeline.

(a)    ***Sale Objection Deadline***: Objections to the Sale shall be filed and served no later than **July 21, 2023 at 4:00 p.m. (prevailing Eastern Time)**.

(b)    ***Contract Cure Objection Deadline***: Objections to the potential assumption and assignment of any Contract, including proposed cure amounts, shall be filed and served no later than **July 21, 2023 at 4:00 p.m. (prevailing Eastern Time)** (the "Cure or Assignment Objection").

(c)    ***Sale Hearing***: Subject to this Court's availability and schedule, the Sale Hearing shall commence on or before **July 28, 2023 at __:__ _.m. (prevailing Eastern Time)**.

22.    The Debtors believe that this timeline is in the best interests of their estates, while ensuring that the Sale can close no later than August 23, 2023, as is contemplated under the Asset Purchase Agreement.

## SUMMARY OF THE ASSUMPTION PROCEDURES

23.    The Debtors are seeking approval of certain procedures to facilitate the fair and orderly assumption and assignment of the Assumed Contracts in connection with the Sale. Pursuant to the Sale Order, notice of the proposed assumption and assignment of the Assumed Contracts to the Purchaser, the proposed cure amounts related thereto, and the right, procedures, and deadlines for objecting thereto, shall be provided in separate notices, attached to the Sale Order

as **Exhibit 2** (the "Cure and Possible Assumption and Assignment Notice") to be sent to the applicable Assumed Contract Counterparties.

24.     Because the Sale Order sets forth the Assumption Procedures in detail, they are not restated herein.  Generally, however, the Assumption Procedures: (i) outline the process by which the Debtors shall serve notice to all Assumed Contract Counterparties regarding the proposed assumption and assignment and related cure amounts, if any, informing such parties of their right, and the procedures, to object thereto, and (ii) establish objection and other relevant deadlines and the manner for resolving disputes relating to the assumption and assignment of the Assumed Contracts to the extent necessary.

## BASIS FOR RELIEF

A.     **Approval of the Proposed Sale Is Appropriate and in the Best Interests of the Estates**

      1.     **The Sale of the Assets Should Be Authorized Pursuant to Section 363 of the Bankruptcy Code as a Sound Exercise of the Debtors' Business Judgment**

25.     Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  A sale of the debtor's assets should be authorized pursuant to § 363 if a "sound business purpose" exists for the proposed transaction.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the debtor-in-possession can sell property of the estate . . . if he has an 'articulated business justification' . . . .");  In re ICL Holding Co. Inc., 802 F.3d 547, 551 (3d Cir. 2015); Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d Cir. 1983); In re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting the "sound business judgment" test of *Lionel*); In re Del. & Hudson Ry. Co., 124 B.R. 169, 175-76 (D.Del. 1991) (holding that the Third Circuit adopted the "sound business judgment" test in Abbott Dairies); Dai-Ichi Kangyo

Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242

B.R. 147, 153 (D. Del. 1999) (same)

26.    Courts typically consider the following factors in determining whether a proposed

sale satisfies this standard: (i) whether a sound business justification exists for the sale, (ii) whether

adequate and reasonable notice of the sale was given to interested parties, (iii) whether the sale

will produce a fair and reasonable price for the property, and (iv) whether the parties have acted

in good faith.  See Del. & Hudson, 124 B.R. at 176; In re Phoenix Steel Corp., 82 B.R. 334, 335-

36 (Bankr. D. Del. 1987).  A sound business purpose for the sale of a debtor's assets outside the

ordinary course of business may be found where such a sale is necessary to preserve the value of

assets for the estates, creditors, or interest holders.  See, e.g., In re Abbotts Dairies of Pa., Inc., 788

at 143; In re Lionel Corp., 722 F.2d 1063.  "Where the debtor articulates a reasonable basis for its

business decisions (as distinct from a decision made arbitrarily or capriciously), courts will

generally not entertain objections to the debtor's conduct."  Comm. of Asbestos-Related Litigants

and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville Corp.), 60 B.R. 612, 616 (Bankr.

S.D.N.Y. 1986).

27.    Here, the Debtors' decision to sell the Debtors' Assets to the Purchaser pursuant to

a Bankruptcy 363 sale represents a reasonable exercise of their business judgment given the very

limited market for the Debtors' Assets and the Debtors concurrent liquidity crunch.  As such, the

terms contemplated in the APA are the highest and best offer received by the Debtors, and any

transaction entered into is subject to the highest and best offer.  Furthermore, no other party that

the Debtors have communicated with regarding a potential acquisition has expressed interest in

any liquidity-infusing or acquisition-type transaction.  The Debtors have determined, in their

business judgment, that an expensive marketing process would not attract any other potential purchaser that would provide more favorable terms to the Debtors.

28.     Based on the foregoing, the Debtors, in the exercise of their business judgment, have determined that a sale of the Assets to the Purchaser represents the best path forward for maximizing recoveries to stakeholders.  The Debtors submit that ample business justification exists for the consummation of the sale and therefore request that this Court approve the sale to the Purchaser.

**2.      The Sale of the Assets Should Be Free and Clear of Interests Pursuant to Section 363(f) of the Bankruptcy Code.**

29.     The Debtors submit it is appropriate to sell the Assets free and clear of all liens, claims, encumbrances, and other interests (collectively, the "Interests") other than the Assumed Liabilities (as such term is defined in the Asset Purchase Agreement) pursuant to section 363(f) of the Bankruptcy Code, with any such Claims and Interests attaching to the net sale proceeds of the Assets, as and to the extent applicable.

30.     Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of another party's interest in the property if: (i) applicable nonbankruptcy law permits such a free and clear sale, (ii) the holder of the interest consents, (iii) the interest is a lien and the sale price of the property exceeds the value of all liens on the property, (iv) the interest is the subject of a bona fide dispute, or (v) the holder of the interest could be compelled in a legal or equitable proceeding to accept a monetary satisfaction of its interest.  See 11 U.S.C. § 363(f).  Section 363(f) of the Bankruptcy Code is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to permit the Debtors' sale of the Assets free and clear of all interests (i.e., all liens, claims, rights, interests, charges, or encumbrances), except with respect to any interests that may be assumed liabilities under the applicable purchase agreement.  See In re

Kellstrom Indus., Inc., 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of five conditions are

met, the debtor has the authority to conduct the sale free and clear of all liens.").

31.    The Debtors submit that, in order to ensure closing of the sale, it is appropriate to

sell the Debtors' Assets free and clear of all Encumbrances in accordance with section 363(f) of

the Bankruptcy Code because one or more of the tests of 363(f) is, or will be, satisfied with respect

to the Sale.

32.    The Debtors will send notice of the Sale to, among others, all parties who assert

liens or claims against the Assets. Any holder of a claim against or interest in the Assets who does

not object to the applicable Sale will be deemed to have consented to the sale of the Assets free

and clear. See 11 U.S.C. 363(f)(2); see Hargrave v. Twp. of Pemberton, 175 B.R. 855, 858 (Bankr.

D.N.J. 1994). Moreover, the Debtors believe that any parties that do object on the basis that they

hold liens or claims against the Assets will either: (a) be holders of liens or claims that are subject

to a bona fide dispute, or (b) would be compelled to accept cash in satisfaction of their interests.

Cf. 11 U.S.C. §§ 363(f)(3) & 363(f)(5). Any lienholder also will be adequately protected by having

its liens, if any, attach to any proceeds of the applicable Transaction, in the same order of priority,

with the same validity, force, and effect, that such creditor had prior to the sale, subject to any

claims and defenses that the Debtors and their estates may possess with respect thereto. Cf. id. §

363(f)(3). Therefore, pursuant to section 363 of the Bankruptcy Code, the Debtors may sell the

Assets free and clear of all liens, claims, and encumbrances.

**3.    The Assets and the Assumed Contracts Should Be Sold Free and Clear of
       Successor Liability.**

33.    Under the terms of the Asset Purchase Agreement, the Purchaser will not be liable

for any of the Debtors' liabilities as a successor to the Debtors' business or otherwise unless

expressly assumed. Extensive case law exists providing that claims of a debtor's creditors cannot

13

be asserted against a purchaser of a debtor's assets sold in accordance with Bankruptcy Code Section 363, but rather are directed to the proceeds of a sale of property conducted pursuant to section 363 of the Bankruptcy Code.

34.     Although section 363(f) of the Bankruptcy Code provides for the sale of assets "free and clear of any interests," the term "any interest" is not defined anywhere in the Bankruptcy Code. Courts, however, have consistently held a buyer of a debtor's assets pursuant to a section 363 sale takes free from successor liability resulting from pre-existing claims.  See Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.), 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a § 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); see also In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[I]n personam claims, including any potential state successor or transferee liability claims against New Chrysler, as well as in rem interests, are encompassed by section 363(f) and are therefore extinguished by the Sale.").

35.     The purpose and value of an order authorizing the transfer of the Assets would be frustrated if claimants thereafter could use the transfer as a basis to assert claims against the Purchaser.  Under section 363(f) of the Bankruptcy Code, the Purchaser is entitled to know the Assets are not tainted by latent claims that could be asserted against the Purchaser after the proposed transaction is completed.  Absent that ruling, the value of the Assets could be severely compromised.  Accordingly, consistent with the above-cited case law and provisions of the Bankruptcy Code, the order approving the sale of the Assets should state the Purchaser is not liable

as a successor under any theory of successor liability, for Interests that encumber or relate to the

Assets.

### 4. The Sale Should Be Subject to the Protection of Bankruptcy Code § 363(m).

36.     The Debtors request that the Court find the Purchaser is entitled to the benefits and

protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the

Assets.

37.     Section 363(m) of the Bankruptcy Code provides, in pertinent part:

[t]he reversal or modification on appeal of an authorization under subsection (b) or
(c) of this section of a sale or lease of property does not affect the validity of a sale
or lease under such authorization to an entity that purchased or leased such property
in good faith, whether or not such entity knew of the pendency of the appeal, unless
such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

38.     Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold

pursuant to § 363 from the risk it will lose its interest in the purchased assets if the order allowing

the sale is reversed on appeal, as long as such purchaser purchased or leased the assets in "good

faith."  Although the Bankruptcy Code does not define "good faith," courts have held a purchaser

shows its good faith through the integrity of its conduct during the course of the sale proceedings,

finding that, where there is a lack of such integrity, a good-faith finding may not be made.  See,

e.g., Abbotts Dairies of Pa., 788 F.2d at 147 ("Typically, the misconduct that would destroy a

[buyer's] good faith status at a judicial sale involves fraud, collusion between the [proposed buyer]

and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.");

In the Matter of Andy Frain Servs., Inc., 798 F.2d 1113 (7th Cir. 1986) (same); In re Sasson Jeans,

Inc., 90 B.R. 608, 610 (S.D.N.Y. 1988) (same).

39.     The Debtors submit the Purchaser would be a "good faith purchaser" within the

meaning of section 363(m) of the Bankruptcy Code, and the resulting purchase agreement would

be a good-faith agreement on arm's-length terms entitled to the protections of section 363(m) of

the Bankruptcy Code.  First, the Asset Purchase Agreement is the result of extensive arm's-length,

good-faith negotiations, during which all parties were represented by separate, competent counsel,

Second, where—as the Debtors anticipate will be the case here—there is no indication of any

"fraud or collusion between the purchaser and other bidders or the trustee, or an attempt to take

grossly unfair advantage of other bidders" or similar conduct, there is no cause that would permit

the Sale to be avoided pursuant to § 363(n).  Accordingly, the Debtors believe the Purchaser and

the Asset Purchase Agreement should be entitled to the full protections of section 363(m) of the

Bankruptcy Code.

40.     Moreover, because there will be no fraud or improper dealing of any kind, the Sale

does not constitute an avoidable transaction pursuant to section 363(n) of the Bankruptcy Code,

and, as a result, the Purchaser should receive the protections afforded good faith purchasers by

section 363(m) of the Bankruptcy Code.  Accordingly, the Debtors request the Court make a

finding at the Sale Hearing that the Asset Purchase Agreement reached with the Purchaser was at

arm's length and is entitled to the full protections of section 363(m) of the Bankruptcy Code.  The

Debtors will submit evidence at the Sale Hearing to support these conclusions.

**5.     Credit Bidding Should Be Authorized Pursuant to Section 363(k) of the
Bankruptcy Code.**

41.     A secured creditor is allowed to "credit bid" the amount of its claims in a sale of

assets in which it has a security interest.  Section 363(k) of the Bankruptcy Code provides, in

relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by

property that is the subject of the sale "may bid at such sale, and, if the holder of such claim

purchases such property, such holder may offset such claim against the purchase price of such

property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured as determined in

16

accordance with section 506(a) of the Bankruptcy Code, section 363(k) of the Bankruptcy Code allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the creditor's economic value.  See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006) ("It is well settled among district and bankruptcy courts that creditors can bid the full-face value of their secured claims under § 363(k)").

42.    In this District, absent cause for restriction on credit bidding, courts have consistently ruled in favor of reserving a secured creditor's right to credit bid its claim.  See In re Source Home Entm't, LLC, No. 14-115533 (KG) (Bankr. D. Del. July 21, 2014) (order approving Bid Procedures which authorized parties with secured claims to credit bid); In re PTC Alliance Corp., No. 09-13395 (Bankr. D. Del. Nov. 6, 2009) (order authorizing, but not directing, the administrative agent to credit bid); In re Hayes Lemmerz Int'l, Inc., No. 09-11655 (Bankr. D. Del. Sept. 22, 2009) (order authorizing interested party to exercise its right under Bankruptcy Code § 363(k) to make a credit bid); In re Foamex Int'l Inc., 09-10560, (Bankr. D. Del. May 27, 2009) (order authorizing the sale of substantially all of the debtor's assets in a $155 million credit bid over a $151.5 million all-cash bid); see also Cohen v. KB Mezzanine Fund II, LP (In re SubMicron Sys. Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006) (citations omitted).

43.    Thus, pursuant to section 363(k) of the Bankruptcy Code, the Purchaser, in its capacity as the Prepetition Secured Party and the DIP Facility Lender, should be allowed to submit a Credit Bid as set forth in the Asset Purchase Agreement.

## B.    The Assumption and Assignment of the Assumed Contracts Should Be Approved

44.    To facilitate and effectuate the Sale of the Assets, the Debtors are seeking authority to assign the Assumed Contracts to the Purchaser to the extent required by the Purchaser.

45.    Section 365 of the Bankruptcy Code authorizes a debtor to assume and/or assign its executory contracts and unexpired leases, subject to the approval of the court, provided the defaults

under such contracts and leases are cured and adequate assurance of future performance is provided. See 11 U.S.C. § 365(b)(1). The standard applied by the Third Circuit in determining whether an executory contract or unexpired lease should be assumed is the "business judgment" test, which requires a debtor to determine that the requested assumption or rejection would be beneficial to its estate. See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 40 (3d Cir. 1989); see also NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (describing business judgment test as "traditional") (superseded in part by 11 U.S.C. § 1113). Courts generally will not second-guess a debtor's business judgment concerning the assumption of an executory contract. See In re Decora Indus., Inc., 2002 WL 32332749, at *8 (D. Del. 2002); Official Comm. for Unsecured Creditors v. Aust (In re Network Access Solutions, Corp), 330 B.R. 67, 75 (Bankr. D. Del. 2005) ("The standard for approving the assumption of an executory contract is the business judgment rule"); In re Exide Techs., 340 B.R. 222, 239 (Bankr. D. Del. 2006) ("The propriety of a decision to reject an executory contract is governed by the business judgment standard"). A debtor's decision to assume or reject an executory contract or expired lease will not be subject to review unless such decision is clearly an unreasonable exercise of such judgment. See Sharon Steel, 872 F.2d at 40 (describing deference to a debtor's business judgment as "breathing space afforded [to] the debtor to consider whether to reject or assume executory contracts under the Code"); Network Access Solutions, 330 B.R. at 75; Exide Techs., 340 B.R. at 239.

46.     Here, the Court should approve the decision to assume and assign the Assumed Contracts in connection with the Sale as a sound exercise of the Debtors' business judgment. First, the Assumed Contracts are necessary to operate the Assets and, as such, they are essential to inducing the best offer for the Assets. Second, it is unlikely any purchaser would want to acquire the Assets unless a significant number of the contracts needed to manage the day-to-day operations

were included in the transaction. Accordingly, the Debtors submit the assumption and assignment

of the Assumed Contracts, as required by the Purchaser, should be approved as a sound exercise

of the Debtors' business judgment.

47.     A debtor in possession may assign an executory contract or an unexpired lease of

the debtor if it assumes the agreement in accordance with section 365(a) of the Bankruptcy Code

and provides adequate assurance of future performance by the assignee, whether or not there has

been a default under the agreement. See 11 U.S.C. § 365(f)(2). Significantly, among other things,

adequate assurance may be provided by demonstrating the assignee's financial health and

experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc.,

56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (stating adequate assurance of future performance is

present when the prospective assignee of a lease from the debtor has financial resources and has

expressed willingness to devote sufficient funding to the business in order to give it a strong

likelihood of succeeding). The meaning of "adequate assurance of future performance" depends

on the facts and circumstances of each case, but should be given "practical, pragmatic

construction." EBG Midtown South Corp. v. McLaren/Hart Envtl. Eng' g Corp. (In re Sanshoe

Worldwide Corp.), 139 B.R. 585, 592 (S.D.N.Y. 1992) (citations omitted), aff'd, 993 F.2d 300 (2d

Cir. 1993); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr.

D.N.J. 1988).

48.     Counterparties to Assumed Contracts will have the opportunity to object to

adequate assurance of future performance by the Purchaser. Accordingly, the Debtors submit the

assumption and assignment of the Assumed Contracts as set forth herein should be approved.

49.     To assist in the assumption, assignment, and sale of the Assumed Contracts, the

Debtors also request the Sale Order approving the sale of the Assets provide that anti-assignment

provisions in the Assumed Contracts shall not restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts and are deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

50.     Section 365(f)(1) of the Bankruptcy Code permits a debtor to assign unexpired leases and contracts free from such anti-assignment restrictions, providing, in pertinent part, that:

> [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection . . . .

11 U.S.C. § 365(f)(1).

51.     Section 365(f)(1) of the Bankruptcy Code, by operation of law, invalidates provisions that prohibit, restrict, or condition assignment of an executory contract or unexpired lease. See Coleman Oil Co., Inc. v. The Circle K Corp. (In re The Circle K Corp.), 127 F. 3d 904, 910-11 (9th Cir. 1997) ("no principle of bankruptcy or contract law precludes us from permitting the Debtors here to extend their leases in a manner contrary to the leases' terms, when to do so will effectuate the purposes of section 365"), cert. denied, 522 U.S. 1148 (1998). Section 365(f)(3) of the Bankruptcy Code goes beyond the scope of section 365(f)(1) of the Bankruptcy Code by prohibiting enforcement of any clause creating a right to modify or terminate the contract or lease upon a proposed assumption or assignment thereof. See, e.g., In re Jamesway Corp., 201 B.R. 73 (Bankr. S.D.N.Y. 1996) (section 365(f)(3) prohibits enforcement of any lease clause creating right to terminate lease because it is being assumed or assigned, thereby indirectly barring assignment by debtor; all lease provisions, not merely those entitled anti-assignment clauses, are subject to court's scrutiny regarding anti-assignment effect).

52.     Other courts have recognized provisions that have the effect of restricting assignments cannot be enforced. See In re Rickel Home Ctrs., Inc., 240 B.R. 826, 831 (D. Del.

1998). Thus, the Debtors request that any anti-assignment provisions be deemed not to restrict, limit, or prohibit the assumption, assignment, and sale of the Assumed Contracts, and be deemed and found to be unenforceable anti-assignment provisions within the meaning of section 365(f) of the Bankruptcy Code.

53. Orders granting motions to sell property and for the assumption and assignment of executory contracts frequently contain language explicitly stating the counterparty to the assumed contracts are barred from asserting against the debtor any default by reason of the closing, including any breach or right of termination relating to a change in control of the debtor. See, e.g., In re Irish Bank Resolution Corp. Ltd., No. 13-12159 (CSS), 2014 WL 1759609, at *8 (Bankr. D. Del. Feb. 14, 2014) ("[n]o sections or provisions of the Contracts that purport to . . . declare a breach or default as a result of a change in control in respect of the Debtor…shall have any force and effect, and such provisions constitute unenforceable anti-assignment provisions under 11 U.S.C. § 365(f) and/or are otherwise unenforceable under 11 U.S.C. § 365(e)."). The Debtors seeks such similar language here.

## C. Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d) Is Appropriate

54. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Additionally, Bankruptcy Rule 6006(d) provides an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtors request the Sale Order be effective immediately upon its entry by providing the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

55.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for objecting party to appeal before an order can be implemented.  <u>See</u> Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14-day stay periods, the leading treatise on bankruptcy suggests the 14-day stay periods should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to procedure." 10 <u>Collier on Bankruptcy</u> ¶ 6004.10 (15th rev. ed. 2006). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal.  <u>Id.</u>

56.     To maximize the value received from the Assets, the Debtors seek to close the Sale as soon as possible after the Sale Hearing.  Accordingly, the Debtors hereby request that the Court waive the 14-day stay periods under Bankruptcy Rules 6004(h) and 6006(d).

## **NOTICE**

57.     Notice of this Motion will be given to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the twenty (20) largest, non-insider unsecured claims against the Debtors; (c) counsel to the Purchaser, the DIP Facility Lender, and the Prepetition Secured Party; (d) any other parties with known secured claims against the Debtors or their counsel, if known; (e) any parties that have executed an NDA; (f) the Internal Revenue Service; (g) all state and local taxing authorities with an interest in the Assets; (h) all other parties known or reasonably believed to have asserted an interest in the Assets; (i) the Assumed Contract Counterparties; (j) the Subchapter V Trustee (upon appointment); and (k) any party that has requested notice pursuant to Bankruptcy Rule 2002.

WHEREFORE, the Debtors respectfully request this Court enter the Sale Order, the form of which is attached as **Exhibit A** hereto, approve the assumption and assignment of certain executory contracts and unexpired leases related thereto, and grant such other and further relief as is just and proper.

Dated:    June 30, 2023
          Wilmington, Delaware                  BAYARD, P.A.

                                                /s/ Evan T. Miller
                                                Evan T. Miller (No. 5364)
                                                Steven D. Adler (No. 6257)
                                                600 North King Street, Suite 400
                                                Wilmington, Delaware 19801
                                                Telephone: (302) 655-5000
                                                Facsimile: (302) 658-6395
                                                Email:  emiller@bayardlaw.com
                                                        sadler@bayardlaw.com

                                                *Proposed Counsel to the Debtors and
                                                Debtors in Possession*

# EXHIBIT A

## Proposed Sale Order

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| FILE STORAGE PARTNERS, LLC, *et al.*,[1] | Case No. 23-10877 (CTG) |
| Debtors. | (Jointly Administered) |
| | Re: D.I. ___ |

## ORDER (I) AUTHORIZING AND APPROVING (A) THE SALE OF SUBSTANTIALLY ALL ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN CONTRACTS AND LEASES, AND (II) GRANTING RELATED RELIEF

Upon consideration of the *Motion of Debtors for Entry of an Order (A) Approving the Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* (the "Sale Motion") [Docket No. ●] filed by the above-captioned debtors and debtors in possession (the "Debtors"), which requests an order (this "Sale Order") that, among other things, (a) authorizes and approves (i) the sale, assignment, transfer, conveyance and delivery of substantially all of Seller's Assets, as defined in the Asset Purchase Agreement between Seller and KB Silver Funding, LLC (the "Purchaser"), which, including all exhibits and schedules thereto, and as may be amended, modified or supplemented in accordance with its terms, is referred to herein as the "Agreement" (a complete copy of which is attached hereto as **Exhibit 1**) and (ii) the assumption and assignment of certain unexpired leases and executory contracts identified as Assumed Contracts,[2] in each case, effective as of the Closing on the Closing Date, all as more fully

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: File Storage Partners, LLC (6920); Afton Blockchain LLC (3951); Filtech SPV LLC (9602); and Midwest Blockchain Inc. (8842). The Debtors' service address is 1357 Ashford Ave., Pmb 373, San Juan, PR 00907.

[2] Except as otherwise defined herein, or where reference is made to a definition in the Sale Motion, all capitalized terms shall have the meanings ascribed to them in the Agreement.

set forth in the Sale Motion, and (b) granting related relief; and this Court having reviewed and

considered the Sale Motion and any objections thereto; this Court having heard statements of

counsel and the evidence presented in support of the relief requested by the Debtors in the Sale

Motion at a hearing before this Court (the "Sale Hearing"), including the First Day Declaration,

and any other declarations from the Debtors in support of the relief herein; and upon the full record

of these Chapter 11 Cases; and it appearing no other notice need be given; and it further appearing

the legal and factual bases set forth in the Sale Motion and the record made at the Sale Hearing

establish just cause for the relief granted herein; and after due deliberation and sufficient cause

therefor:

**THE COURT FINDS AND DETERMINES THAT:**

**Jurisdiction, Final Order, and Statutory Predicates**

A.    The findings and conclusions set forth herein constitute the Court's findings of fact

and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the

"Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To

the extent any of the following findings of fact constitute conclusions of law, they are adopted as

such.  To the extent any of the following conclusions of law constitute findings of fact, they are

adopted as such.

B.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334

and the *Amended Standing Order of Reference from the United States District Court for the

District of Delaware*, dated February 29, 2012.

C.    This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The

Debtors have confirmed their consent, pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy

Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the

"Local Rules"), to the entry of a final order by this Court in connection with the Sale Motion, to the extent it is later determined the Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

D.    Venue over the Chapter 11 Cases is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

E.    The bases for the relief requested in the Sale Motion are §§ 105(a), 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014, and Local Rules 2002-1, 6004-1, and 9013-1(m).

F.    This Sale Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds there is no just reason for delay in the implementation of this Sale Order and waives any stay and expressly directs entry of judgment as set forth herein.

## Retention of Jurisdiction

G.    It is necessary and appropriate for the Court to retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Sale Order and the Agreement, including its related documents, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are parties or which have been assigned to the Purchaser, and to adjudicate, if necessary, any and all disputes involving the Debtors concerning or relating in any way to, or affecting, the Sale (as defined in the Sale Motion) or the transactions contemplated in the Agreement, and related documents.

3

**Corporate Authority; Consents and Approvals**

H.      The Seller has, to the extent necessary or applicable: (a) the full corporate power and authority to execute and deliver the Agreement and all other documents contemplated thereby; (b) all corporate authority necessary to consummate the transaction contemplated by the Agreement; and (c) taken all corporate action necessary to authorize and approve the Agreement and the consummation of the transactions contemplated thereby.  The Sale has been duly and validly authorized by all necessary corporate action.  No consents or approvals, other than those expressly provided for in the Agreement, are required for Seller or the Debtors to consummate the Sale, the Agreement, or the transactions contemplated thereby.

**Notice of Sale, Sale Hearing,
Agreement, and Assumption and Assignment**

I.      Actual written notice of the Sale Motion, the Sale, the Sale Hearing, and the transactions contemplated thereby, and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein, has been afforded to all known interested entities and parties, including, without limitation, the following entities and parties: (a) the U.S. Trustee, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801, Attn: [●] ([●]@usdoj.gov); (b) the holders of the thirty (30) largest, non-insider unsecured claims against the Debtors; (c) counsel to the Purchaser, the DIP Facility Lender and the Prepetition Secured Party; (d) any other parties with known secured claims against the Debtors or their counsel, if known; (e) any parties that executed an NDA; (f) the United States Attorney's Office for the District of Delaware; (g) the Internal Revenue Service; (h) all state and local taxing authorities with an interest in the Assets; (i) the Attorney General for the State of Delaware; (j) the Securities and Exchange Commission; (k) all other governmental agencies with an interest in the Sale and transactions proposed thereunder; (l) all other parties known or reasonably believed to have

4

asserted an interest in the Assets; (m) the Assumed Contract Counterparties; (n) the Subchapter V Trustee; and (o) any party that has requested notice pursuant to Bankruptcy Rule 2002.

J.     Service of such Cure and Possible Assumption and Assignment Notice, attached hereto as **__Exhibit 2__** was good, sufficient, and appropriate under the circumstances, and no further notice need be given in respect of establishing a Cure Amount for the Contracts.  Each of the Assumed Contract Counterparties has had an adequate opportunity to object to the Cure Amounts set forth in the Cure Notices and to the assumption and assignment to the Purchaser of the applicable Assumed Contracts (including objections related to the adequate assurance of future performance and objections based on whether applicable law excuses the counterparty from accepting performance by, or rendering performance to, the Purchaser (or its designee) for purposes of section 365(c)(1) of the Bankruptcy Code).  All objections, responses, or requests for adequate assurance, if any, have been resolved, overruled, or denied, as applicable.

K.     The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Sale Motion upon the terms set forth herein.

L.     As evidenced by the affidavits of service and affidavits of publication previously filed with the Court at Docket Nos. [●], proper, timely, adequate, and sufficient notice of the Sale Motion, the Sale, the Sale Hearing, and the transactions contemplated thereby, including, without limitation, the assumption and assignment of the Assumed Contracts to the Purchaser, has been provided in accordance with sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, 9008, and 9014.  The notices described herein were good, sufficient, and appropriate under the circumstances, and no other or further notice of the Sale Motion, the Sale, the Sale Hearing, or the assumption and assignment of the Assumed Contracts to the Purchaser is or shall be required.

M.     The disclosures made by the Debtors concerning the Sale Motion, the Agreement, the Sale Hearing, the Sale, and the assumption and assignment of the Assumed Contracts to the Purchaser were good, complete, and adequate.

N.     A reasonable opportunity to object and be heard with respect to the Sale and the Sale Motion, and the relief requested therein (including, without limitation, the assumption and assignment of the Assumed Contracts to the Purchaser and any Cure Amounts relating thereto), has been afforded to all interested persons and entities, including the applicable notice parties.

## **Business Judgment**

O.     The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Sale and the other transactions contemplated by the Agreement and related documents (together with the Agreement, the "Transaction Documents"), including, without limitation, the assumption, assignment, and/or transfer of the Assumed Contracts (collectively, the "Transaction") pursuant to sections 105, 363, and 365 of the Bankruptcy Code, prior to and outside of a plan of reorganization, and such action is an appropriate exercise of the Debtors' business judgment and in the best interests of the Debtors, their estates, and their creditors.  Such business reasons include, but are not limited to, the fact that: (i) there is substantial risk of depreciation of the value of the Assets if the Sale is not consummated promptly; (ii) the Agreement and the Closing present the best opportunity to maximize the value of the Debtors' estates; and (iii)  unless the Sale is concluded expeditiously as provided for in this Sale Order and pursuant to the Agreement, potential creditor recoveries may be substantially diminished.

## Good Faith of the Purchaser; No Collusion

P.     The Purchaser is not an "insider" of the Debtors as that term is defined in section 101(31) of the Bankruptcy Code. The Purchaser is purchasing the Debtors' Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that: (i) all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Sale have been disclosed; (ii) the Purchaser has not violated 363(n) of the Bankruptcy Code by any action or inaction; (iii) no common identity of directors or controlling shareholders exists between the Purchaser and the Debtors; and (iv) the negotiation and execution of the Agreement and any other agreements or instruments related thereto was at arm's-length and in good faith.

## No Fraudulent Transfer or Merger

Q.     The consideration provided by the Purchaser pursuant to the Transaction Documents: (a) is fair and reasonable; (b) is the highest and best offer for the Assets; and (c) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, the laws of the United States, any state, territory, possession, or the District of Columbia, and any other applicable law.

R.     Neither the Purchaser, nor its past and present subsidiaries, parents, divisions, affiliates, agents, representatives, insurers, attorneys, successors and assigns, nor any of its nor their respective directors, managers, officers, employees, shareholders, members, agents, representatives, attorneys, contractors, subcontractors, independent contractors, owners, insurance companies, or partners (collectively, the "Purchaser Parties") is a mere continuation of the Debtors or their estates, and there is no continuity of enterprise between any Purchaser Party and the

7

Debtors.  No Purchaser Party is holding itself out to the public as a continuation of the Debtors or their respective estates.  No Purchaser Party is a successor to the Debtors or their estates, and the Sale does not amount to a consolidation, merger, or de facto merger of the Purchaser (or any other Purchaser Party) and the Debtors.

### **Validity of Transfer**

S.    The Transaction Documents were not entered into for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any of its states, territories, or possessions, or the District of Columbia, or under any other applicable law.  Neither the Seller nor the Purchaser are entering into the transactions contemplated by the Transaction Documents fraudulently, for the purposes of statutory and common law fraudulent conveyance and fraudulent transfer claims.

T.    Seller's right, title, and interest in the Assets constitute property of the estate, which is vested in the Seller's estates within the meaning of section 541(a) of the Bankruptcy Code. Subject to section 363(f) of the Bankruptcy Code (addressed below), the transfer of the Assets to the Purchaser will be, as of the Closing Date, a legal, valid, and effective transfer of the Assets, which transfer vests or will vest the Purchaser with all right, title, and interest in the Assets free and clear of: (i) all liens (including any liens as that term is defined in section 101(37) of the Bankruptcy Code), encumbrances, and rights (including any and all "interests" in the Assets within the meaning of section 363(f) of the Bankruptcy Code) relating to, accruing, or arising any time prior to the Closing Date (collectively, the "Liens"); and (ii) all debts (as that term is defined in section 101(12) of the Bankruptcy Code) and rights (including any and all "interests" in the Assets within the meaning of section 363(f) of the Bankruptcy Code) arising under, relating to, or in connection with any act of the Debtors or claims (as that term is defined in section 101(5) of the

8

Bankruptcy Code), liabilities, obligations, demands, guaranties, options in favor of third parties, rights, contractual commitments, restrictions, interests, mortgages, hypothecations, charges, indentures, loan agreements, instruments, collective bargaining agreements, leases, licenses, deeds of trusts, security interests or similar interests, conditional sale or other title retention agreements and other similar impositions, restrictions on transfer or use, pledges, judgments, claims for reimbursement, contribution, indemnity, exoneration, infringement, products liability, alter ego liability, suits, defenses, credits, allowances, options, limitations, causes of action, choses in action, rights of first refusal or first offer, rebate, chargeback, credit, or return, proxy, voting trust or agreement or transfer restriction under any shareholder or similar agreement or encumbrance, easements, rights of way, encroachments, any Liability (as defined in the Transaction Documents), and matters of any kind and nature, whether arising prior to or subsequent to the Petition Date, whether known or unknown, legal or equitable, mature or unmatured, contingent or noncontingent, liquidated or unliquidated, asserted or unasserted, whether imposed by agreement, understanding, law, equity, or otherwise (including, without limitation, rights with respect to Claims (as defined below) and Liens (A) that purport to give any party a right or option to effect a setoff or recoupment against, or a right or option to effect any forfeiture, modification, profit sharing interest, right of first refusal, purchase or repurchase right or option, or termination of, any of the Debtors' or the Purchaser's interests in the Assets, or any similar rights, if any, or (B) in respect of taxes, restrictions, rights of first refusal, charges of interests of any kind or nature, if any, including without limitation, any restriction of use, voting, transfer, receipt of income, or other exercise of any attribute of ownership) (collectively, as defined in this clause (ii), the "Claims" and, together with the Liens and other interests of any kind or nature whatsoever (the "Interests"), relating to, accruing or arising any time prior to the entry of this Sale Order, with the exception of the

9

Permitted Liens and the Assumed Liabilities (as defined in the Transaction Documents) to the extent set forth in the Transaction Documents, and any covenants set forth in the Transaction Documents, but with all such Claims, Liens, and Interests to attach to the proceeds of the Sale.

U.     For the avoidance of doubt, the Purchaser is expressly assuming responsibility for, and the Assets will be transferred subject to, the Cure Amounts and any obligations arising at or after the Closing Date under the Assumed Contracts, as set forth in the Transaction Documents.

### Section 363(f) Is Satisfied

V.     The conditions of section 363(f) of the Bankruptcy Code have been satisfied in full; therefore, the Debtors may sell the Assets free and clear of any Interests in the Assets other than any Permitted Liens and Assumed Liabilities.

W.     The Purchaser would not have entered into the Transaction Documents, and would not consummate the Transactions, if the Sale of the Assets to the Purchaser and the assumption of any Assumed Liabilities by the Purchaser were not free and clear of all Interests, other than the Permitted Liens and the Assumed Liabilities, or if the Purchaser would, or in the future could, be liable for any of such Interests (other than the Permitted Liens and the Assumed Liabilities). Unless otherwise expressly included in the Assumed Liabilities, the Purchaser shall not be responsible for any Interests against the Debtors, their estates, or any of the Assets, including in respect of the following: (a) any labor or employment agreement; (b) all mortgages, deeds of trust, and other security interests; (c) intercompany loans and receivables among the Debtors and any of their affiliates (as defined in section 101(2)) of the Bankruptcy Code; (d) any other environmental, employee, workers' compensation, occupational disease, or unemployment- or temporary disability-related claim, including, without limitation, claims that might otherwise arise under or pursuant to: (i) the Employee Retirement Income Security Act of 1974, as amended; (ii) the Fair

Labor Standards Act; (iii) Title VII of the Civil Rights Act of 1964; (iv) the Federal Rehabilitation Act of 1973; (v) the National Labor Relations Act; (vi) the Worker Adjustment and Retraining Notification Act of 1988; (vii) the Age Discrimination and Employee Act of 1967 and the Age Discrimination in Employment Act, as amended; (viii) the Americans with Disabilities Act of 1990; (ix) the Consolidated Omnibus Budget Reconciliation Act of 1985; (x) state discrimination laws; (xi) the unemployment compensation laws or any other similar state laws; (xii) any other state or federal benefits or claims relating to any employment with the Debtors or their predecessor, if any; (xiii) Claims or Liens arising under any Environmental Law (as defined in the Transaction Documents) with respect to the Debtors' business, (xiv) any Liability (as defined in the Transaction Documents) other than the Assumed Liabilities, relating to the Assets, the Excluded Assets (as defined in the Transaction Documents), or any other assets owned or operated by the Debtors or any corporate predecessor of the Debtors, at any time prior to the Closing Date; (xv) any bulk sales or similar law; (xvi) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (xvii) any statutory or common-law bases for successor liability.

X.      The Debtors may sell the Assets free and clear of all Interests in such property of any entity, including, without limitation, any Liens and Claims against the Debtors, their estates, or any of the Assets (other than the Permitted Liens and the Assumed Liabilities) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of Interests in the Assets, including, without limitation, holders of Liens and Claims against the Debtors, their estates, or any of the Assets, who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code, and such holders, and all other holders of

Interests (except to the extent such Interests are Assumed Liabilities), are protected by having their

Interests, if any, attach to the net proceeds of the Sale ultimately attributable to the Assets in which

such party alleges an Interest, in the same order of priority, with the same validity, force, and effect

that such Interests had prior to the Sale, subject to any claims and defenses the Debtors and their

estates may possess with respect thereto.

### Credit Bid

Y.      Pursuant to applicable law, including sections 363(b) and 363(k) of the Bankruptcy

Code, the Purchaser was authorized to credit bid the Prepetition Obligations and the then-

outstanding DIP Facility Obligations for the Assets (collectively, the "Credit Bid"). No additional

or further evidence of the Purchaser's ability to include the Credit Bid as consideration within the

Transaction Documents is required. The Credit Bid, plus the assumption of the Assumed

Liabilities, was a valid and proper offer pursuant sections 363(b) and 363(k) of the Bankruptcy

Code. There is no cause to limit the amount of the Credit Bid pursuant to section 363(k) of the

Bankruptcy Code.

### Assumption and Assignment of the Assumed Contracts

Z.      The Debtors have demonstrated: (i) that it is an exercise of their sound business

judgment to assume and assign the Assumed Contracts to the Purchaser in each case in connection

with the consummation of the Transaction; and (ii) that the assumption and assignment of the

Assumed Contracts to the Purchaser is in the best interests of the Debtors, their estates, their

creditors, and other parties in interest. The Assumed Contracts being assigned to the Purchaser

are an integral part of the Assets being purchased by the Purchaser and, accordingly, such

assumption, assignment, and cure of any defaults under the Assumed Contracts are reasonable and

enhance the value of the Debtors' estates. Each and every provision of the documents governing

12

the Assets or applicable nonbankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Assets, if any, have been or will be satisfied or are otherwise unenforceable under section 365 of the Bankruptcy Code.

AA.    Unless otherwise agreed and stated on the record at the Sale Hearing, the respective amounts set forth under the "Cure Amount" on **Exhibit 2** attached hereto reflects the sole amounts necessary under section 365(b) of the Bankruptcy Code to cure all monetary defaults and pay all pecuniary losses under the Assumed Contracts (collectively, the "Cure Amounts"), and no other amounts are or shall be due in connection with the assumption by the Debtors and the assignment to the Purchaser of the Assumed Contracts.

BB.    Pursuant to the terms of the Transaction Documents, the Purchaser shall: (a) to the extent necessary, cure or provide adequate assurance of cure, of any default existing prior to the date hereof with respect to the Assumed Contracts, within the meaning of sections 365(b)(1)(A) and 365(f)(2)(A) of the Bankruptcy Code; and (b) to the extent necessary, provide compensation or adequate assurance of compensation to any Assumed Contract Counterparty for any actual pecuniary loss to such party resulting from a default prior to the date hereof with respect to the Assumed Contracts, within the meaning of sections 365(b)(1)(B) and 365(f)(2)(A) of the Bankruptcy Code.

CC.    As of the Closing Date, subject only to the terms of the preceding paragraph and the payment of the Cure Amounts, as determined in accordance with the procedures identified in the Sale Motion and its accompanying and related documents, each of the Assumed Contracts will be in full force and effect and enforceable by the Purchaser against any Assumed Contract Counterparty thereto in accordance with its terms.

DD.    The Debtors have, to the extent necessary, satisfied the requirements of sections 365(b)(1) and 365(f) of the Bankruptcy Code in connection with the Sale, the assumption and assignment of the Assumed Contracts, and shall upon assignment thereto on the Closing Date, be relieved from any liability for any breach thereof.

EE.    The Purchaser has demonstrated it has the financial wherewithal to fully perform and satisfy the obligations under the Assumed Contracts as required by sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.  Pursuant to sections 365(f)(2)(B) of the Bankruptcy Code, the Purchaser has provided adequate assurance of future performance of the obligations under the Assumed Contracts.

FF.    The Purchaser's promise to pay the Cure Amounts and to perform the obligations under the Assumed Contracts after the Closing Date shall constitute adequate assurance of future performance within the meaning of sections 365(b)(1)(C) and 365(f)(2)(B) of the Bankruptcy Code.

GG.    Any objections to the assumption and assignment of any of the Assumed Contracts to the Purchaser are hereby overruled or withdrawn.  Any objections to the Cure Amounts are hereby overruled or withdrawn.  To the extent any Assumed Contract Counterparty failed to timely object to its Cure Amount or to the assumption and assignment of its Assumed Contracts to the Purchaser, such Assumed Contract Counterparty is deemed to have consented to such Cure Amount and the assignment of its Assumed Contract(s) to the Purchaser.

HH.    To the maximum extent permitted by the Bankruptcy Code, no sections or provisions of the Assumed Contracts that purport to: (a) prohibit, restrict or condition the assignment of the Assumed Contracts, including, but not limited to, the conditioning of such assignment on the consent of the non-debtor parties to such Assumed Contracts; (b) authorize the

14

termination, cancellation or modification of the Assumed Contracts based on the filing of a bankruptcy case, the financial condition of the Debtors or similar circumstances; or (c) declare a breach or default or otherwise give rise to a right of termination as a result of any change in control in respect of the Debtors, shall have any force and effect, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code.

II.     The: (i) transfer of the Assets to the Purchaser; and (ii) assignment to the Purchaser of the Assumed Contracts, will not subject the Purchaser or any other Purchaser Party to any liability whatsoever that arises prior to the Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of antitrust, successor, transferee, derivative, or vicarious liability or any similar theory and/or applicable state or federal law or otherwise.

## Sound Business Purpose for the Sale

JJ.     As discussed above, good and sufficient reasons for approval of the Transaction Documents and the Sale have been articulated. The relief requested in the Sale Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest.

KK.     The Debtors have demonstrated both: (a) good, sufficient, and sound business purposes and justifications for approving the Transaction Documents; and (b) compelling circumstances for the sale outside the ordinary course of business, pursuant to section 363(b) of the Bankruptcy Code before, and outside of, a plan of reorganization, in that, among other things, the immediate consummation of the Sale to the Purchaser is necessary and appropriate to maximize the value of the Debtors' estates.

## **Compelling Circumstances for an Immediate Sale**

LL.     To maximize the value of the Assets and preserve the viability of the business to which the Assets relate, it is essential the Sale of the Assets occur promptly.  Therefore, time is of the essence in effectuating the Transaction Documents and consummating the Sale.  As such, the Debtors and the Purchaser intend to close the Sale of the Assets as soon as reasonably practicable. The Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for immediate approval and consummation of the Transaction Documents.  Accordingly, there is sufficient cause to waive the stay provided in Bankruptcy Rules 6004(h) and 6006(d).

MM.     Given all of the circumstances of these Chapter 11 Cases and the adequacy and fair value of the Purchase Price under the Transaction Documents, the proposed Sale of the Assets to the Purchaser constitutes a reasonable and sound exercise of the Debtors' business judgment and should be approved.

NN.     The consummation of the Sale and the assumption and assignment of the Assumed Contracts is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation sections 105(a), 363(b), 363(f), 363(m), and 365 of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Transaction.

OO.     The Sale does not constitute a sub rosa or de facto chapter 11 plan for which approval has not been sought without the protections a disclosure statement would afford, as it does not and does not propose to: (i) impair or restructure existing debt of, or equity interests in, the Debtors; (ii) impair or circumvent voting rights with respect to any future plan proposed by the Debtors; (iii) circumvent chapter 11 plan safeguards, such as those set forth in sections 1125 and 1129 of the Bankruptcy Code; or (iv) classify claims or equity interests, compromise controversies,

16

or extend debt maturities.  Accordingly, the Sale neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates a liquidating chapter 11 plan for the Debtors.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

### General Provisions.

1.    **Relief Granted.** The relief requested in the Sale Motion and the Transactions contemplated thereby and by the Transaction Documents are approved for the reasons set forth in this Sale Order and on the record of the Sale Hearing, which is incorporated herein as if fully set forth in this Sale Order.

1.    **Objections Overruled.**  All objections, statements, and reservations of rights to the Sale Motion and the relief requested therein that have not been withdrawn, waived, or settled by announcement to the Court during the Sale Hearing or by stipulation filed with the Court, including, without limitation, any and all reservations of rights included in such objections or otherwise, are hereby denied and overruled on the merits, with prejudice.  Those parties who did not object, or withdrew their objections, to the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.

2.    **Sale Order and Transaction Documents Binding on All Parties.**  This Sale Order and the Transaction Documents shall be binding in all respects upon all creditors of and holders of equity interests in the Debtors (whether known or unknown), agents, trustees and collateral trustees, holders of Interests in, against, or on the Assets, or any portion thereof, all Contract Counterparties and any other non-debtor parties to any contracts with the Debtors (whether or not assigned), all successors and assigns of the Debtors, and any subsequent trustees appointed in the Chapter 11 Cases or upon a conversion of the Chapter 11 Cases to one or more cases under chapter 7 of the Bankruptcy Code and shall not be subject to rejection or unwinding.

This Sale Order shall survive and remain in full force and effect in regard to any chapter 11 plan

confirmed in the Chapter 11 Cases, any confirmation order confirming any such chapter 11 plan,

any order approving the wind down or dismissal of the Chapter 11 Cases, or any order entered

upon the conversion of the Chapter 11 Cases to one or more cases under chapter 7 of the

Bankruptcy Code.

<u>**Approval of the Transaction Documents; Binding Nature**</u>

3.      **Transaction Documents Approved.** The Transaction Documents, and all of the

terms and conditions thereof, are hereby approved.

4.      **Fair Value.** The consideration provided by the Purchaser for the Assets under the

Transaction Documents is fair and reasonable and shall be deemed for all purposes to constitute

reasonably equivalent value, fair value, and fair consideration under the Bankruptcy Code, the

Uniform Fraudulent Transfer Act, the Uniform Voidable Transactions Act, the Uniform

Fraudulent Conveyance Act, and any other applicable law, and the Transaction may not be avoided

or rejected by any person, or costs or damages imposed or awarded against the Purchaser or any

Purchaser Party, under section 363(n) of the Bankruptcy Code or any other provision of the

Bankruptcy Code.

5.      **Authorization to Consummate Transaction.**  Pursuant to §§ 105, 363, and 365

of the Bankruptcy Code, the Debtors are authorized and empowered to, and shall, take any and all

actions necessary or appropriate to: (a) consummate the Sale pursuant to and in accordance with

the terms and conditions of the Transaction Documents and otherwise comply with the terms of

this Sale Order; and (b) execute and deliver, perform under, consummate, implement, and take any

and all other acts or actions as may be reasonably necessary or appropriate to the performance of

their obligations as contemplated by the Transaction Documents, in each case without further

18

notice to or order of this Court.  The Purchaser shall not be required to seek or obtain relief from

the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under

any Transaction Document.  The automatic stay imposed by section 362 of the Bankruptcy Code

is modified solely to the extent necessary to implement the preceding sentence and the other

provisions of this Sale Order; provided, however, that this Court shall retain exclusive jurisdiction

over any and all disputes with respect thereto.

6.      **Binding Nature.**  This Sale Order shall be binding in all respects upon the Debtors,

their estates, all creditors, all holders of equity interests in the Debtors, all holders of any Claim(s)

(whether known or unknown) against the Debtors, all holders of Interests (whether known or

unknown) against, in or on all or any portion of the Assets, all non-Debtor parties to the Assumed

Contracts, the Purchaser, and all successors and assigns of the foregoing, including, without

limitation, any trustee, if any, subsequently appointed in these Chapter 11 Cases or upon a

conversion to chapter 7 under the Bankruptcy Code of these Chapter 11 Cases, or other plan

fiduciaries, plan administrators, liquidating trustees, or other estate representatives appointed or

elected in the Chapter 11 Cases.

### Transfer of the Assets Free and Clear of Interests

7.      **Transfer of the Assets Authorized.**  Pursuant to sections 105(a), 363(b), 363(f),

and 365 of the Bankruptcy Code, the Debtors are authorized and directed to: (a) take any and all

actions necessary or appropriate to perform, consummate, implement, and close the Sale in

accordance with the terms and conditions set forth in the Transaction Documents and this Sale

Order; (b) assume and assign any and all Assumed Contracts; and (c) take all further actions and

execute and deliver the Transaction Documents and any and all additional instruments and

documents that may be necessary or appropriate to implement the Transaction Documents and

consummate the Sale in accordance with the terms thereof, all without further order of the Court. At Closing, all of the Debtors' right, title, and interest in and to, and possession of, the Assets shall be immediately vested in the Purchaser (or its designee). Such transfer shall constitute a legal, valid, enforceable, and effective transfer of the Assets.

8.      **Surrender of Assets by Third Parties.**   All persons and entities that are in possession of some or all of the Assets on the Closing Date are directed to surrender possession of such Assets to the Purchaser or its designee at the Closing.   On the Closing Date, each of the Debtors' creditors are authorized and directed to execute such documents and take such other actions as may be reasonably necessary to release their Interests in the Assets, if any, as such Interests may have been recorded or may otherwise exist.   All persons are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with, or which would be inconsistent with, the ability of the Debtors to sell and transfer the Assets to the Purchaser in accordance with the terms of the Transaction Documents and this Sale Order.

9.      **Transfer Free and Clear of Interests.**   Upon the Debtors' receipt of the Purchase Price, and other than the Permitted Liens and the Assumed Liabilities specifically set forth in the Transaction Documents, the transfer of the Assets to the Purchaser shall be free and clear of all Interests of any kind or nature whatsoever, including, without limitation: (a) successor or successor-in-interest liability, (b) Claims in respect of the Excluded Liabilities, and (c) any and all Contracts not assumed and assigned to the Purchaser pursuant to the terms of the Transaction Documents, with all such Interests to attach to the net proceeds received by the Debtors ultimately attributable to the Assets against, or in, which such Interests are asserted, subject to the terms thereof, with the same validity, force, and effect, and in the same order of priority, which such

Interests now have against the Assets, subject to any rights, claims, and defenses that the Debtors or their estates, as applicable, may possess with respect thereto.

10.    **Legal, Valid, and Marketable Transfer with Permanent Injunction.**    The transfer of the Assets to the Purchaser pursuant to the Transaction Documents constitutes a legal, valid, and effective transfer of good and marketable title of the Assets, and vests, or will vest, the Purchaser with all right, title, and interest to the Assets, free and clear of all Interests, except as otherwise expressly stated as obligations of the Purchaser under the Transaction Documents.  All Persons holding Interests or Claims of any kind or nature whatsoever against the Debtors or the Assets, the operation of the Assets prior to the Closing Date or the Sale are hereby and forever barred, estopped, and permanently enjoined from asserting against the Purchaser, its successors or assigns, its property, or the Assets, any Claim, Interest, or liability existing, accrued, or arising prior to the Closing, except a right of setoff exercised prepetition.

11.    **Recording Offices and Releases of Interests.**    On the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete assignment, conveyance, and transfer of the Assets or a bill of sale transferring good and marketable title of the Assets to the Purchaser.  This Sale Order is and shall be effective as a determination that, on the Closing Date, all Interests of any kind or nature whatsoever existing as to the Assets prior to the Closing, other than the Permitted Liens and Assumed Liabilities, or as otherwise provided in this Sale Order, shall have been unconditionally released, discharged, and terminated, and that the conveyances described herein have been affected.  This Sale Order is and shall be binding upon and govern the acts of all Persons, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal

and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Transaction Documents. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Transaction. A certified copy of this Sale Order may be: (a) filed with the appropriate clerk; (b) recorded with the recorder; and/or (c) filed or recorded with any other governmental agency to act to cancel any Interests against the Assets, other than the Permitted Liens and the Assumed Liabilities.

12.    **Cancellation of Third-Party Interests.** If any Person which has filed statements or other documents or agreements evidencing Interests on or in all or any portion of the Assets (other than with respect to the Assumed Liabilities) has not delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all Interests which such person or entity has or may assert with respect to all or a portion of the Assets, the Debtors and the Purchaser are authorized to execute and file such statements, instruments, releases and other documents on behalf of such Person with respect to the Assets. Notwithstanding the foregoing, the provisions of this Sale Order authorizing the transfer of the Assets free and clear of all Interests (except only for the Permitted Liens and the Assumed Liabilities) shall be self-executing, and it shall not be, or be deemed,

necessary for any Person to execute or file releases, termination statements, assignments, consents, or other instruments in order for the provisions of this Sale Order to be implemented.

## Assumption and Assignment of Contracts

13.     **Authorization to Assume and Assign.**     Upon the Closing, the Debtors are authorized and directed, pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, to assume and assign each of the Assumed Contracts to the Purchaser.  The payment of the applicable Cure Amounts (if any) by the Purchaser or the Debtors, as applicable, shall: (a) effect a cure or adequate assurance of cure of all defaults existing thereunder as of the date on which the Debtors filed their voluntary petitions for relief under chapter 11 of the Bankruptcy Code (the "Petition Date"); and (b) compensate for any actual pecuniary loss to such Contract Counterparty resulting from such default.  The Debtor shall then have assumed the Assumed Contracts and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assumed Contracts shall not be a default thereunder.  After the payment of the relevant Cure Amounts, neither the Debtors nor the Purchaser shall have any further liabilities to the Contract Counterparties other than the Purchaser's obligations under the Assumed Contracts that accrue and become due and payable on or after the Closing Date.

14.     **Assignment Requirements Satisfied.**  The Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser, in accordance with their respective terms, notwithstanding: (a) any provision in any such Assumed Contract (including provisions of the type described in sections 365(b)(2), (e)(1) and (f)(1)) of the Bankruptcy Code which prohibits, restricts or conditions such assignment or transfer; or (b) any default by the Debtors prior to Closing under any such Assumed Contract or any disputes between the Debtors and a Contract Counterparty with respect to any Assumed Contract arising prior to Closing.

Additionally, no sections or provisions of the Assumed Contracts that purport to: (a) prohibit, restrict or condition the Debtors' assignment of the Assumed Contracts, including, but not limited to, the conditioning of such assignment on the consent of the non-debtor parties to such Assumed Contracts; (b) authorize the termination, cancellation or modification of the Assumed Contracts based on the filing of a bankruptcy case, the financial condition of the Debtors or similar circumstances; or (c) declare a breach or default or otherwise give rise to a right of termination as a result of any change in control in respect of the Debtors, shall have any force and effect, and such provisions constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code.  All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser of the Assumed Contracts have been satisfied.  Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested with all right, title, and interest of the Debtors under the Assumed Contracts.

15.    **Consent to Assign.**  The Contract Counterparties to each Assumed Contract shall be and hereby are deemed to have consented to such assumption and assignment under section 365(c)(1)(B) of the Bankruptcy Code or this Court has determined that no such consent is required, and the Purchaser shall enjoy all of the rights and benefits under each such Assumed Contract as of the Closing Date without the necessity of obtaining the Contract Counterparty's written consent to the assumption and assignment thereof.

16.    **Section 365(k).**  Upon the Closing and: (a) the payment of the applicable Cure Amount; or (b) in the event of any dispute over the appropriate Cure Amount, the reserve and escrow by the Purchaser of the amount necessary to satisfy the Cure Amount asserted by the

Contract Counterparty pending resolution of the dispute by the Bankruptcy Court, the Purchaser shall be deemed to be substituted for the Debtors as a party to the applicable Assumed Contracts, and the Debtors and their estates shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability for breach under the Assumed Contracts.

17. **No Default.** Subject to the terms hereof with respect to the Cure Amounts, all defaults or other obligations of the Debtors under the Assumed Contracts arising or accruing prior to the Closing Date have been cured or hereby are deemed cured by the Debtors in accordance with the terms hereof such that the Purchaser shall have no liability or obligation with respect to any default or obligation arising or accruing under any Assumed Contract prior to the Closing Date, except to the extent expressly provided in the Transaction Documents and this Sale Order, including the Purchaser's obligation to pay the Cure Amounts. Each party to an Assumed Contract is forever barred, estopped, and permanently enjoined from asserting against the Purchaser, any other Purchaser Party, or their property, affiliates, successors and assigns, any breach or default under any Assumed Contract, any claim of lack of consent relating to the assignment thereof, or any counterclaim, setoff (except to the extent exercised prepetition) or any other matter arising prior to the Closing Date for such Assumed Contract or with regard to the assumption and assignment therefore pursuant to the Transaction Documents or this Sale Order. Upon the payment of the applicable Cure Amount, if any, the Assumed Contracts will remain in full force and effect, and no default shall exist under the Assumed Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

18. **Adequate Assurance Provided.** The requirements of sections 365(b)(1) and 365(f)(2) of the Bankruptcy Code are hereby deemed satisfied with respect to the Assumed Contracts based on the Purchaser's evidence of its financial condition and wherewithal and without

any further action by the Purchaser, including, but not limited to, any other or further deposit. Pursuant to section 365(f) of the Bankruptcy Code, the Purchaser has provided adequate assurance of future performance of the obligations under the Assumed Contracts.

19.      **No Fees.**  There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Purchaser or the Debtors as a result of the assumption and assignment of the Assumed Contracts.

20.      **Injunction.**  Pursuant to sections 105(a), 363, and 365 of the Bankruptcy Code, other than the right to payment of the Cure Amounts, if any, all Contract Counterparties are forever barred and permanently enjoined from raising or asserting against the Debtors or the Purchaser any assignment fee, default, breach or claim, or pecuniary loss arising under or related to the Assumed Contracts existing as of the Petition Date or any assignment fee or condition to assignment arising by reason of the Closing.

21.      **No Further Debtor Liability.**  Except as provided in the Transaction Documents or in this Sale Order, after the Closing, the Debtors and their estates shall have no further liabilities or obligations with respect to any Assumed Liabilities, and all holders of such Claims are forever barred and estopped from asserting such Claims against the Debtors, their successors or assigns, their property, or the Debtors' estates.

22.      **No Waiver of Rights.**  The failure of the Debtors or the Purchaser to enforce, at any time, one or more terms or conditions of any Assumed Contracts shall not be a waiver of any such terms or conditions, or of the Debtors' or the Purchaser's rights to enforce every term and condition of the Assumed Contracts.

**Prohibition of Actions Against the Purchaser**

23. **No Successor Liability.** Except for the Assumed Liabilities set forth in the Transaction Documents, the Purchaser shall not have any liability or other obligation of the Debtors or their estates arising under or related to any of the Assets. Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the Transaction Documents, the Purchaser shall not be liable for any Claims against the Debtors or any of their predecessors or affiliates, and the Purchaser shall have no successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transfer liability, labor law, <u>de facto</u> merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing, or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Assets prior to the Closing.

24. Except as expressly provided in the Transaction Documents or this Sale Order with respect to the Purchaser, no Purchaser Party shall have any liability whatsoever with respect to the Debtors' (or their predecessors' or affiliates') respective businesses or operations or any of the Debtors' (or their predecessors' or affiliates') obligations based, in whole or in part, directly or indirectly, on any theory of successor or vicarious liability of any kind of character, or based upon any theory of antitrust, environmental, successor, or transferee liability, de facto merger or substantial continuity, labor and employment or products liability, whether known or unknown as of the Closing, now existing or hereafter arising, asserted or unasserted, fixed or contingent,

27

liquidated or unliquidated, including, without limitation, liabilities on account of: (a) any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the Assets or the Assumed Liabilities prior to the Closing or in respect of pre-Closing periods; or (b) any plan, agreement, practice, policy, or program, whether written or unwritten, providing for pension, retirement, health, welfare, compensation, or other employee benefits which is or has been sponsored, maintained, or contributed to by any Debtor or with respect to which any Debtor has any liability, whether or not contingent, including, without limitation, any "multiemployer plan" (as defined in Section 3(37) of ERISA) or "pension plan" (as defined in Section 3(2) of ERISA) to which any Debtor has at any time contributed, or had any obligation to contribute. Except to the extent expressly included in the Assumed Liabilities with respect to the Purchaser or as otherwise expressly set forth in the Transaction Documents or this Sale Order, no Purchaser Party shall have any liability or obligation under any applicable law, including, without limitation: (a) the WARN Act, 29 U.S.C. §§ 2101 et seq.; (b) the Comprehensive Environmental Response Compensation and Liability Act; (c) the Age Discrimination and Employment Act of 1967 (as amended); (d) the Federal Rehabilitation Act of 1973 (as amended); (e) the National Labor Relations Act, 29 U.S.C. §§ 151 et seq.; or (f) any foreign, federal, state, or local labor, employment or environmental law, by virtue of the Purchaser's purchase of the Assets, assumption of the Assumed Liabilities, or hiring of certain employees of the Debtors pursuant to the terms of the Transaction Documents. Without limiting the foregoing, no Purchaser Party shall have any liability or obligation with respect to any environmental liabilities of the Debtors or any environmental liabilities associated with the Assets except to the extent they are Assumed Liabilities set forth in the Transaction Documents.

25.    **Actions Against the Purchaser Enjoined.**  Except with respect to the Assumed Liabilities set forth in the Transaction Documents, all Persons, including, without limitation, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, litigation claimants, and other creditors, holding Interests of any kind or nature whatsoever against, or in, all or any portion of the Assets, arising under, out of, in connection with, or in any way relating to, the Debtors, the Assets, the operation of the Debtors' businesses prior to the Closing Date, or the transfer of the Assets to the Purchaser, hereby are forever barred, estopped, and permanently enjoined from asserting against the Purchaser, the Purchaser Parties, or any of their affiliates, successors, or assigns, or their property or the Assets, such persons' or entities' Interests in and to the Assets, including, without limitation, the following actions against the Purchaser or its affiliates, or their successors, assets, or properties: (a) commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or other order; (c) creating, perfecting, or enforcing any Lien or other Claim; (d) asserting any set off (except a set off exercised prepetition) or right of subrogation of any kind; (e) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Sale Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof; or (f) revoking, terminating, or failing or refusing to transfer or renew any license, permit, or authorization to operate any of the Assets or conduct any of the business operated with the Assets.

### Other Provisions

26.    **Licenses**.  To the maximum extent permitted by applicable law, and in accordance with the Transaction Documents, the Purchaser (or its designee) shall be authorized, as of the

Closing, to operate under any license, permit, registration, and governmental authorization or approval (collectively, the "Licenses") of the Debtors with respect to the Assets. To the extent the Purchaser (or its designee) cannot operate under any Licenses in accordance with the previous sentence, such Licenses shall be in effect, to the maximum extent permitted by applicable law, while the Purchaser (or its designee), with commercially reasonable assistance from the Debtors, works promptly and diligently to apply for and secure all necessary government or other approvals for new issuance of Licenses to the Purchaser (or its designee). The Debtors shall, at Purchaser's sole cost, maintain the Licenses in good standing to the fullest extent allowed by applicable law for the Purchaser's benefit until equivalent new Licenses are issued to the Purchaser (or its designee).

27.    **Effective Immediately.**  For cause shown, pursuant to Bankruptcy Rules 6004(h), 6006(d), and 7062(g), this Sale Order shall not be stayed and shall be effective immediately upon entry, and the Debtors and the Purchaser are authorized to close the Sale immediately upon entry of this Sale Order.  The Debtors and the Purchaser may consummate the Transaction Documents at any time after entry of this Sale Order by waiving any and all closing conditions set forth in the Transaction Documents that have not been satisfied and by proceeding to close the Sale without any notice to the Court, any pre-petition or post-petition creditor of the Debtors and/or any other party in interest.

28.    **Access to Books and Records.**  Following the Closing of the Sale, the Debtors shall have, and the Purchaser shall provide, reasonable access to the Debtors' books and records, to the extent they are included in the Assets transferred to the Purchaser as part of the Sale as set forth in the Transaction Documents, provided the Purchaser's cooperation under the terms of this section shall be at no cost to the Purchaser.

30

29.    **Bulk Sales Law.**   No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

30.    **Agreement Approved in Entirety.**   The failure specifically to include any particular provision of the Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Transaction Documents be authorized and approved in their entirety.

31.    **Further Assurances**.   From time to time, as and when requested, all parties shall execute and deliver, or cause to be executed and delivered, all such documents and instruments and shall take, or cause to be taken, all such further or other actions as the requesting party may reasonably deem necessary or desirable to consummate the Sale, including such actions as may be necessary to vest, perfect, or confirm or record or otherwise in the Purchaser its right, title, and interest in and to the Assets.

32.    **Modifications to Transaction Documents.**   The Transaction Documents may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, in a writing signed by such parties, without further order of this Court, provided any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

33.    **Good Standing.**   The transactions authorized herein shall be of full force and effect, regardless of any Debtors' lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

34.    **Authorization to Effect Order.**   The Debtors are authorized to take all actions necessary to effect the relief granted pursuant to this Sale Order in accordance with the Sale Motion.

35.    **Automatic Stay.**  The automatic stay pursuant to Bankruptcy Code § 362 is hereby modified, lifted, and annulled with respect to the Debtors and the Purchaser solely to the extent necessary, without further order of this Court, to: (a) allow the Purchaser to deliver any notice provided for in the Transaction Documents; and (b) allow the Purchaser to take any and all actions permitted under the Transaction Documents in accordance with the terms and conditions thereof. The Purchaser shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Transaction Documents.  The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence, provided, however, that this Court shall retain exclusive jurisdiction over any and all disputes with respect thereto.

36.    **Order to Govern.**  To the extent this Sale Order is inconsistent with any prior order entered or pleading filed in these Chapter 11 Cases, the terms of this Sale Order shall govern.  To the extent there are any inconsistencies between the terms of this Sale Order and the Transaction Documents, the terms of this Sale Order shall govern.

37.    **Standing**.  The Purchaser has standing to seek to enforce the terms of this Sale Order.

38.    **Retention of Jurisdiction**. This Court shall retain jurisdiction with respect to the terms and provisions of this Sale Order and the Transaction Documents.

**<u>Exhibit 1 to Sale Order</u>**

**Asset Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

**by and among**

**FILE STORAGE PARTNERS, LLC,**
**AFTON BLOCKCHAIN LLC,**
**FILTECH SPV LLC, AND**
**MIDWEST BLOCKCHAIN INC.**

**AS SELLERS**

**and**

**KB SILVER FUNDING, LLC,**

**AS BUYER**

**dated as of**

**June 30, 2023**

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "<u>Agreement</u>"), dated as of June 30, 2023 (the "<u>Effective Date</u>"), is entered into by and between File Storage Partners, LLC, a Delaware limited liability company ("<u>FSP</u>"); Afton Blockchain LLC, a Delaware limited liability company ("<u>Afton</u>"); FilTech SPV LLC, a Delaware limited liability company ("<u>FilTech</u>"); and Midwest Blockchain Inc., a Delaware corporation ("Midwest," and together with FSP, Afton and Filtech, "<u>Sellers</u>"), and KB Silver Funding, LLC, a Delaware limited liability company ("<u>Buyer</u>").

# RECITALS

**WHEREAS**, Sellers own certain assets, and holds various rights, relating to operating a blockchain infrastructure project focused on decentralized storage (the "<u>Business</u>") located in Nebraska and Missouri; and

**WHEREAS**, pursuant to, among other things, the Prepetition Secured Note[1], Buyer is the holder of first position Liens on all or substantially all of Sellers' assets; and

**WHEREAS**, Buyer desires to purchase substantially all of the assets of Sellers and to assume or consider assumption of certain contracts, leases and liabilities of Sellers as set forth herein, and Sellers desire to sell such assets to Buyer and to assign such contracts, leases and liabilities to Buyer as Buyer should designate, and to have Buyer assume the same as described herein, all on the terms and conditions set forth in this Agreement and the Sale Order, and in accordance with sections 105, 363, and 365 of the Bankruptcy Code and other applicable provisions of the Bankruptcy Code and applicable Law; and

**WHEREAS**, on June 30, 2023 Sellers sought relief under Chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>") by filing cases (collectively, the "<u>Chapter 11 Cases</u>") in the United States Bankruptcy Court for the District of Delaware (the "<u>Bankruptcy Court</u>");

**WHEREAS**, on June 30, 2023 Sellers filed that certain *Motion of Debtors for Entry of an Order (A) Approving the Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* (the "<u>Sale Motion</u>").

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I
# DEFINITIONS

1.1    <u>Definitions</u>.  As used in this Agreement, the following terms have the following meanings:

---

[1] Capitalized terms used in the recitals but not earlier defined shall have the meanings ascribed in Article I.

"Accounts Receivable" means any and all accounts receivable, credit card receivables, notes receivable and other amounts receivable owed to Sellers (whether current or non-current), together with all security or collateral therefor and any interest or unpaid financing charges accrued thereon, including all actions pertaining to the collection of amounts payable, or that may become payable, to Sellers with respect to products sold or services performed on or prior to the Closing Date.

"Affiliate," when used with reference to another Person, means any Person, directly or indirectly, through one or more intermediaries, Controlling, Controlled by, or under common Control with, such other Person.

"Alternative Transaction" shall mean a transaction or series of related transactions pursuant to which Sellers sell, transfer, lease or otherwise dispose of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Sellers or otherwise), including pursuant to a liquidating plan or plan of reorganization or refinancing, all or substantially all of the Assets (or agrees to do any of the foregoing) in a transaction or series of transactions to a Person or Persons other than Purchaser; provided, that with respect to any series of related transactions described herein, only the first such transaction in such series constitutes an "Alternate Transaction" for purposes of Section 8.2(c).

"Assumed Contracts" shall mean those executory Contracts and Leases being assumed by and assigned to Purchaser by Sellers under the terms of this Agreement (if any), including, without limitation, the Assumed Contracts listed in **Schedule 6.2(c)**. The Assumed Contracts shall be assumed by and assigned to Purchaser pursuant to the terms of the assumption and assignment agreement substantially in the form attached hereto as **Exhibit A** (the "Assumption and Assignment Agreement").

"Assumed Liabilities" shall mean the liabilities and obligations set forth in Section 2.3 of this Agreement.

"Avoidance Actions" means any and all causes of action, claims, and remedies of Sellers or their estates, whether known or unknown, in law, at equity or otherwise, whenever and wherever arising under the laws of any jurisdiction, including, without limitation, under sections 542, 543, 544, 545, 547, 548, 549, 550, 551, 553(b) of the Bankruptcy Code or under similar state Laws, including fraudulent conveyance claims, and all other causes of action of a trustee and debtor-in-possession under the Bankruptcy Code.

"Bankruptcy Code" shall mean Title 11 of the United States Code, as in effect for the Chapter 11 Cases as of the Petition Date, unless otherwise stated.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Delaware.

"Business Day" means any day of the year, other than any Saturday, Sunday or any day on which banks located in New York, New York generally are closed for business.

"Cash" shall mean all cash and cash equivalents held by Sellers, including all petty cash, register cash, restricted cash, undeposited checks, cash in transit and marketable securities (less

cash required to fund post-Petition Date issued but uncleared checks of Sellers in the Ordinary Course of Business as exist at Closing), in each case as of immediately prior to the Closing.

"Casualty Loss" shall mean any loss, damage or destruction of the Assets that occurs during the period between the Effective Date and the Closing Date (or earlier termination of this Agreement) for any reason, including any act of God, fire, explosion, collision, earthquake, windstorm, flood, or other casualty or condemnation taking under the right of eminent domain, but excluding any loss, damage, or destruction as a result of depreciation, ordinary wear and tear, and any change in condition of the Assets for production of goods in the Ordinary Course of Business.

"Chapter 11 Cases" shall mean Sellers' cases under Chapter 11 of the Bankruptcy Code commenced in the Bankruptcy Court, including any jointly administrated case with an Affiliate of Sellers.

"Claim(s)" shall have the meaning set forth in the Bankruptcy Code and jurisprudence interpreting the Bankruptcy Code and shall include, among other things, any and all claims or rights based on successor, tort, and products liability.

"Closing" shall have the meaning set forth in Section 2.6 of this Agreement.

"Closing Date" shall have the meaning set forth in Section 2.6 of this Agreement.

"Contract" shall mean any contract, agreement, indenture, note, bond, loan, instrument, conditional sales contract, purchase order, mortgage, license, franchise, insurance policy, letter of credit, commitment or other binding arrangement or commitment, whether or not in written form, that is binding upon a Person or any of its property (other than any Leases)

"Contract Schedule" shall mean, in accordance with Section 6.2(a), that certain schedule provided by Sellers setting forth: (A) each and every Contract or Lease to which Sellers is a party or by which Sellers is bound, (B) all Cure Amounts (if any) for each such Contract or Lease, (C) the name of each Contract or Lease counterparty, and (D) a general description of each such Contract or Lease.

"Control" shall mean, when used with reference to any Person, the power to direct the management or policies of such Person, directly or indirectly, by or through stock or other equity ownership, agency or otherwise, or pursuant to or in connection with any Contract; and the terms "Controlling" and "Controlled" shall have meanings correlative to the foregoing.

"Credit Bid" shall have the meaning set forth in Section 2.4(a).

"Cure Amount" shall mean the amount payable to cure all defaults (as that concept is contemplated by section 365 of the Bankruptcy Code) under the applicable Assumed Contract to effectuate the assumption by Sellers and the assignment to Purchaser of such Assumed Contract in accordance with section 365 of the Bankruptcy Code, as such Cure Amount shall be determined by a Final Order of the Bankruptcy Court or pursuant to a written agreement between the counterparty to such Assumed Contract and Purchaser.

"Cure Notice" shall have the meaning set forth in Section 6.2(b) of this Agreement.

"DIP Facility Lender" shall mean KB Silver Funding, LLC, in its capacity as the DIP Facility Lender, as such term is used in the DIP Order.

"DIP Obligations" shall mean all outstanding obligations owed by Sellers and/or their Affiliates to Purchaser under the DIP Order, which such amount is estimated to be approximately $[___] as of the Closing.

"DIP Order" shall mean the interim order and Final Order of the Bankruptcy Court authorizing Sellers to use cash collateral and incur certain postpetition obligations to Purchaser, all as set forth in more detail in the DIP Order.

"Dollars" or "$" shall mean United States Dollars.

"Employee Benefit Plan" means any "employee benefit plan" (as such term is defined in section 3(3) of ERISA) and any other benefit or compensation plan, program, agreement or arrangement of any kind, in each case, maintained or contributed to Sellers or in which Sellers participate or participated and that provides benefits to any former employee.

"End Date" shall mean August 23, 2023, provided that if (i) the Sale Order is timely entered in accordance with the Bankruptcy Court Milestones and (ii) the Bankruptcy Court does not waive the 14-day stay under Rule 6004, the End Date shall mean the first Business Day after the Sale Order becomes a Final Order.

"ERISA" shall mean the United States Employee Retirement Income Security Act of 1974.

"Excluded Assets" shall have the meaning set forth in Section 2.2 of this Agreement.

"Excluded Liability" shall have the meaning set forth in Section 2.3(b) of this Agreement.

"Expense Reimbursement" shall mean Purchaser's and its attorneys', accountants', investment bankers' and representatives' actual, reasonable, out-of-pocket documented fees and expenses actually incurred in engaging in due diligence, negotiating and preparing this Agreement, in seeking approval of the Sale Order, and in consummating the Closing; provided, that the Expense Reimbursement shall not exceed $150,000.00.

"Final Order" shall mean an order, judgment, or other decree of the Bankruptcy Court that has not been reversed, vacated or stayed and: (i) as to which the time to appeal, petition for certiorari or move for review or rehearing has expired and as to which no appeal, petition for certiorari or other proceeding for review or rehearing is pending, or (ii) if an appeal, writ of certiorari, reargument or rehearing has been filed or sought, the order, judgment or decree has been affirmed by the highest court to which such order, judgment or decree was appealed or certiorari has been denied, or reargument or rehearing shall have been denied or resulted in no modification of such order and the time to take any further appeal or to seek certiorari or further reargument or rehearing has expired.

"First Priority Obligations" shall mean those certain rights and obligations owed by Sellers to Purchaser, pursuant to the Prepetition Secured Note, including, without limitation, the debt obligations owed by Sellers to Purchaser that are secured by first priority Liens on all or

substantially all of Sellers' assets, the outstanding indebtedness for which, as of the Effective Date, is approximately $200,000.00.

"Governmental Entity" shall mean and include any agency, board, bureau, executive, court, commission, department, tribunal, instrumentality or administration of the United States or any State, and any local or other governmental body in a State, or non-United States governmental or regulatory authority, agency, commission, court, body or other governmental entity.

"Independent Accountant" means a certified public accountant to be selected by Purchaser and reasonably acceptable to Sellers.

"Intellectual Property" shall mean all: (i) trademarks, service marks, trade names, trade dress, logos and corporate names and registrations and applications for registration, together with all of the goodwill associated therewith; (ii) Registered copyrights; (iii) computer software (other than general commercial software), data, databases and documentation thereof; (v) domain names and URLs; (vi) Technology used by Seller; (vii) customer names, customer lists, supplier names, supplier lists, marketing files and marketing materials, pricing information and data, and accounts and login credentials for any URL, domain name, software, or account (Internet or otherwise); and (viii) all formulations, R&D, recipes, pricing, and operating know-hows.  The Intellectual Property of Sellers shall include, without limitation, the Intellectual Property identified on **Schedule 3.8** hereto and made a part hereof.  The Intellectual Property shall be assumed and assigned to Purchaser pursuant to the terms of intellectual property assumption and assignment agreements substantially in the form attached hereto as **Exhibit B** (the "Intellectual Property Assumption and Assignment Agreements").

"Knowledge" or the phrase "to the best of Sellers' knowledge" and similar phrases, means with respect to Sellers, the actual knowledge, after reasonable inquiry, of Timothy Furey, including the facts of which such individual would be aware in the reasonably prudent exercise of his duties.

"Law" means any federal, state, provincial, local, municipal, foreign or other law, statute, legislation, constitution, principle of common law, resolution, ordinance (including with respect to zoning or other land use matters), code, treaty, convention, rule, regulation, requirement, edict, directive, pronouncement, determination, proclamation or decree of any Governmental Entity.

"Liability" means any liability, indebtedness, guaranty, Claim, loss, damage, deficiency, assessment, responsibility or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, whether due or to become due, whether determined or determinable, whether choate or inchoate, whether secured or unsecured, whether matured or not yet matured).

"Leases" shall mean all unexpired leases, subleases, licenses, concessions, options, contracts, extension letters, easements, reciprocal easements, assignments, termination agreements, subordination agreements, nondisturbance agreements, estoppel certificates and other agreements (written or oral), and any amendments or supplements to the foregoing, and recorded memoranda of any of the foregoing, pursuant to which Sellers hold any leasehold or subleasehold estates.

"Liens" shall mean any mortgage, deed of trust, hypothecation, contractual restriction, pledge, lien, encumbrance, interest, charge, security interest, put, call, other option, right of first refusal, right of first offer, servitude, right of way, easement, conditional sale or installment contract, finance lease involving substantially the same effect, security agreement or other encumbrance or restriction on the use, transfer or ownership of any property of any type (including real property, tangible property and intangible property and including any "Lien" as defined in the Bankruptcy Code).

"Litigation" means any action, cause of action, suit, claim, investigation, mediation, audit, grievance, demand, hearing or proceeding, whether civil, criminal, administrative or arbitral, whether at Law or in equity and whether before any Governmental Entity or arbitrator.

"Material Adverse Effect" means any change, event, effect, development, condition, circumstance or occurrence (when taken together with all other changes, events, effects, developments, conditions, circumstances or occurrences), that is materially adverse to the financial condition or results of operations of Sellers' Business (taken as a whole); *provided, however*, that no change, event, effect, development, condition, circumstance or occurrence related to any of the following shall be deemed to constitute a Material Adverse Effect: (i) national or international business, economic, political or social conditions, including the engagement by the United States of America in hostilities, affecting (directly or indirectly) the industry in which the Business operates, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States of America or any of its territories, possessions or diplomatic or consular offices or upon any military installation, equipment or personnel of the United States of America; (ii) financial, banking or securities markets (including any disruption thereof or any decline in the price of securities generally or any market or index); (iii) any change in GAAP or Law; (iv) compliance with this Agreement or any agreement in connection herewith, including the taking of any action required hereby or thereby or the failure to take any action that is not permitted hereby or thereby; (v) any changes directly attributable to the announcement of this Agreement or any agreement in connection herewith; (vi) any act of God or other force majeure event; (vii) seasonal changes in the results of operations; (viii) arising from or relating to any existing event, occurrence, or circumstance with respect to which a director or manager of Purchaser has actual knowledge as of the date hereof, including any matter set forth in the schedules hereto; (ix) in the case of Sellers or the Business, (A) the failure to meet or exceed any projection or forecast or (B) changes in the Business or operations of Sellers or any of their Affiliates (including changes in credit terms offered by suppliers or financing sources) resulting from the announcement, filing or pendency of the Chapter 11 Cases or Sellers' and their Affiliates' status as debtors under Chapter 11 of the Bankruptcy Code; or (x) inaction by Sellers due to Purchaser's unreasonable refusal to consent to a request for consent by Sellers under Section 5.2(d) hereof.

"Ordinary Course" or "Ordinary Course of Business" shall mean the ordinary course of business of Sellers taken as a whole consistent with custom and practice prior to the Petition Date.

"Ordinary Course Trade Payables" shall mean those amounts incurred by or billed to Sellers in the Ordinary Course of Business for goods or services provided to Sellers prior to Closing (including, for avoidance of doubt, those amounts that arose pursuant to operation of the

Business in the Ordinary Course after the Petition Date (including as such post-Petition Date operations may be modified due to the Chapter 11 Cases)).

"<u>Permitted Liens</u>" shall mean those Liens senior by operation of law or otherwise permitted by the Prepetition Credit Documents (as such term is defined in the DIP Order), but solely to the extent any such permitted Liens were (i) valid, properly perfected, non-avoidable and senior in priority to the Liens securing the First Priority Obligations as of the Petition Date, or (ii) valid, non-avoidable, senior priority Liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code.

"<u>Person</u>" shall mean an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization or any other entity, including any Governmental Entity or any group or syndicate of any of the foregoing.

"<u>Personal Information</u>" shall mean any personally identifiable information from any individuals, including any customers, prospective customers, employees or other third parties.

"<u>Personal Property</u>" shall mean any and all personal property of any kind or nature owned by Sellers, and includes, without limitation, Cash, Intellectual Property, digital currency, inventory, equipment, furniture, fixtures, vehicles, books and records of Sellers, customer lists of Sellers, corporate records and minutes of Sellers, and the names of Sellers and all assumed names, including, without limitation, all personal property of Sellers stored or otherwise located at a third-party location. Title to the Personal Property shall be transferred and conveyed to Purchaser at Closing pursuant to the terms of a bill of sale substantially in the form attached hereto as **Exhibit C** (the "Bill of Sale").

"<u>Petition Date</u>" shall mean the day on which the Chapter 11 Cases is commenced, which such date shall be no later than June 30, 2023.

"<u>Prepetition Secured Note</u>" shall mean that certain First Amended and Restated Promissory Note dated June 29, 2023 (the "<u>A&R Note</u>") executed by DSM Tech Enterprises Inc., a Delaware corporation ("<u>DSMT</u>"); Afton; FilTech; Midwest; DSM Tech Enterprises UK Ltd.; an English and Welch private company limited by shares ("<u>DSM UK</u>"); Long Term Data Provision Partners Ltd., an Irish private company limited by shares ("<u>LTDP</u>"); File Storage Ops 2 Ltd., an Irish private company limited by shares ("<u>FS Ops 2</u>"); File Storage Company 1 Inc., a Delaware corporation ("<u>FSC 1</u>"); FSP; File Storage Token Provider LLC, a Delaware limited liability company ("<u>FS Token</u>"); File Storage Ops 1 LLC, a Delaware limited liability company ("<u>FS Ops 1</u>"); File Storage Ops 3 LLC, a Delaware limited liability company ("<u>FS Ops 3</u>"); File Storage Ops 4 LLC, a Delaware limited liability company ("<u>FS Ops 4</u>"); File Storage Ops X LLC, a Delaware limited liability company ("<u>FS Ops X</u>"); Relay Partners LLC, a Delaware limited liability company ("<u>Relay Partners</u>"); Relay Services LLC, a Delaware limited liability company ("<u>Relay Services</u>"); and DLTx, LLC, a Puerto Rico limited liability company ("<u>DLTx</u>"), in favor of KB Silver Funding, LLC.

"<u>Priority Claim</u>" shall mean a Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code.

"<u>Purchase Price</u>" shall have the meaning set forth in <u>Section 2.4</u> of this Agreement.

"<u>Registered</u>" means issued by, registered with, renewed by or the subject of a pending application before any Governmental Entity or domain name registrar.

"<u>Representative</u>" of a Person means such Person's Subsidiaries and the officers, directors, managers, employees, advisors, representatives (including its legal counsel and its accountants) and agents of such Person or its Subsidiaries.

"<u>Sale Hearing</u>" means the hearing held by the Bankruptcy Court for: (a) approval of, among other things, this Agreement and the transactions contemplated herein, and (b) entry of the Sale Order.

"<u>Sale Order</u>" shall mean a Final Order entered by the Bankruptcy Court approving the sale of the Assets pursuant to this Agreement and under the applicable provisions of the Bankruptcy Code, in the form attached hereto as **<u>Exhibit D</u>**, with such changes as may be acceptable to Purchaser in its sole discretion.

"<u>Subsidiary</u>" shall mean, with respect to any Person, any corporation, limited liability company, partnership, association or other business entity of which (a) if a corporation, a majority of the total voting power of shares of stock entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof (or other Persons performing similar functions with respect to such corporation) is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof, or (b) if a limited liability company, partnership, association or other business entity (other than a corporation), a majority of partnership or other similar ownership interest thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more Subsidiaries of that Person or a combination thereof and for this purpose, a Person or Persons owns a majority ownership interest in such a business entity (other than a corporation) if such Person or Persons shall be allocated a majority of such business entity's gains or losses or shall be or control any managing director, managing member, or general partner of such business entity (other than a corporation). The term "Subsidiary" shall include all Subsidiaries of such Subsidiary.

"<u>Tax</u>" or "<u>Taxes</u>" means any United States federal, state or local or non-United States income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under section 59A of the Internal Revenue Code), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, real property, personal property, ad valorem, sales, use, transfer, value added, alternative or add-on minimum, estimated or other tax of any kind whatsoever, whether computed on a separate or consolidated, unitary or combined basis or in any other manner, including any interest, penalty or addition thereto, whether or not disputed.

"<u>Tax Return</u>" means any return, declaration, report, claim for refund or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>Technology</u>" means, collectively, all algorithms, APIs, designs, net lists, data, databases, data collections, diagrams, inventions (whether or not patentable), know-how, methods, processes,

proprietary information, protocols, schematics, specifications, tools, systems, servers, hardware, computers, point of sale equipment, inventory management equipment, software, software code (in any form, including source code and executable or object code), subroutines, techniques, user interfaces, URLs, web sites, works of authorship and other similar materials, including all documentation related to any of the foregoing, including instruction manuals, laboratory notebooks, prototypes, samples, studies and summaries, whether or not embodied in any tangible form and whether or not specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used in connection with the foregoing.

"Tortious Interference Claims" means all claims, causes of action or other means of redress held by any Seller against Dan Tuzzio and any other former officers, directors, members, investors, or managers of the Sellers or any affiliate of the Sellers for actions taken in June of 2023 to tortiously interfere with for, *inter alia,* tortious interference the Sellers' relationships with Canton Cole, Curtis Sikyta and Max Larmon, and/or otherwise wrongfully harm the Business of Sellers.

"Transfer Tax" shall have the meaning set forth in Section 5.6(b) of this Agreement.

"Warranties" shall mean all warranties, guaranties, or indemnities for or regarding the Assets, including, without limitation, manufacturers' warranties.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS

2.1    Subject to the terms and conditions set forth herein, Sellers shall sell, assign, transfer, convey and deliver to Buyer, and Buyer shall purchase from Sellers, all of Sellers' rights, title and interest in all of Sellers' properties, assets, and rights of every nature, kind and description, tangible and intangible (including, without limitation, goodwill) used in the ownership, operation, or conduct of the Business, wherever such properties, assets, and rights are located, whether real, personal, or mixed, whether accrued, fixed, contingent, or otherwise, including without limitation Personal Property and the Tortious Interference Claims (collectively, the "Purchased Assets"), in each case free and clear of any and all encumbrances, Liens, Claims, rights, remedies or interests, existing as of the Closing, except for the Permitted Liens and the Assumed Liabilities. **For all purposes under this Agreement, the Purchased Assets shall not include the Excluded Assets** (as defined in Section 2.2).

2.2    Excluded Assets.  Notwithstanding the foregoing, the Purchased Assets shall not include any asset of Sellers listed on Schedule 2.02 and any proceeds thereof, if any (collectively, the "Excluded Assets"):

2.3    Assumption and Assignment of Liabilities.

(a)    Purchaser shall not assume any Liabilities of Sellers, except for (collectively, the "Assumed Liabilities"):

(i)    those specifically identified on **Schedule 2.3(a)** attached hereto and made a part hereof; and

10

(ii)    the Liabilities assumed in relation to the Assumed Contracts (if any), including, for the avoidance of doubt and without limitation, any Cure Amounts in respect thereof.

(b)    For avoidance of doubt, any Liability that is not an Assumed Liability shall be an "Excluded Liability," which shall include, without limitation, all Liabilities excluded, prohibited, or released by the Sale Order.

2.4    Purchase Price.  In consideration of the sale of the Assets to Purchaser, and upon the terms and subject to the conditions set forth herein, the aggregate consideration for the sale and transfer hereunder (the "Purchase Price") shall consist of:

(a)    A credit bid pursuant to section 363(k) of the Bankruptcy Code (the "Credit Bid") of any outstanding First Priority Obligations held by Purchaser in the amount of _____ ($__,000.00) *plus* the full amount of the DIP Obligations funded through [Closing], which is projected as of the Effective Date to be [_____ U.S. dollars ($_____,000.00)]; and

(b)    The assumption by Purchaser of the Assumed Liabilities;

(c)    The assumption and assignment to Purchaser of the Assumed Contracts (if any); and

(d)    fifty percent (50%) of the net proceeds (gross proceeds of settlement or judgment minus all expenses and costs of litigation, including, without limitation, attorneys' fees incurred by the plaintiffs), if any, of the Tortious Interference Claims.

2.5    Closing.  Unless otherwise agreed to in writing by Purchaser, the closing (the "Closing") shall occur on the day after any stay of effectiveness of the Sale Order expires, but in no event more than fourteen days following the date upon which the Sale Order is entered on the docket of the Chapter 11 Cases by the Bankruptcy Court, and no later than the End Date.  Unless otherwise agreed by the Purchaser, the Closing shall take place remotely via the exchange of documents and signatures, and shall be effective as of 11:59 p.m. New York, time on the date of Closing (the "Closing Date").

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF SELLER

As an inducement to Purchaser to enter into this Agreement and to consummate the transactions contemplated hereby, Sellers hereby represent and warrant to Purchaser as follows:

3.1    Organization and Authority.  Sellers are duly organized and validly existing under the Laws of the jurisdiction of its organization and, subject to any required approval of the Bankruptcy Court, and any required approval of applicable Governmental Entities, have the power and authority to own and lease the Assets, and to enter into the transactions contemplated by this Agreement.

3.2    Good Standing.  Sellers are duly authorized to do business and is in good standing in each jurisdiction where the ownership or operation of the Assets or the conduct of the business requires such qualification.

11

3.3     <u>As Is/Where Is</u>.  Purchaser shall acquire the Assets on an "**AS IS**," "**WHERE IS**" and "**WITH ALL DEFECTS**" basis, free, and clear of any Liens, Claims, rights, and interests, including any and all expenses and express and implied warranties of any kind or nature, in each case, *except* for the Permitted Liens, as specifically provided in this Agreement and as approved for sale, transfer, and assignment pursuant to the Sale Order.

3.4     <u>Authority and Binding Agreement</u>.  Sellers have the power and authority necessary to enter into this Agreement, subject to the Bankruptcy Court's entry of the Sale Order.  The execution and delivery of this Agreement has been duly authorized by all necessary limited liability company or corporate action by the boards of managers or boards of directors (or analogous governing body) of Sellers, and no other proceedings are necessary for the performance by Sellers of their obligations under this Agreement or the consummation by Sellers of the transactions contemplated hereby and thereby.  This Agreement has been duly and validly executed and delivered by Sellers and, subject to the Bankruptcy Court's entry of the Sale Order and assuming due authorization, execution, and delivery by Purchaser, is a valid and binding obligation of Sellers enforceable against Sellers in accordance with its terms.

3.5     <u>Title to and Condition of Assets</u>.  Sellers have good title to, or right by license, Lease, or other agreement to use, the Assets.  Subject to the entry of the Sale Order, at the Closing, Sellers will have the right to transfer the Assets to Purchaser free and clear of all Liens, other than the Permitted Liens.  No Person other than Sellers holds any rights, title, or interest in the Assets, except to the extent or as otherwise set forth in **<u>Schedule 3.5</u>**.  Sellers do not own any fee interest in real property.

3.6     <u>Compliance with Laws</u>.  Except as may result from the Chapter 11 Cases, Sellers (x) have operated the Business in material compliance with all applicable Laws, (y) have not received written notice of any violation of any applicable Laws, and (z) are not in default with respect to any order of a Governmental Entity applicable to the Assets or the Business.

3.7     <u>Contracts</u>.

(a)     Sellers have made available to Purchaser or its Representatives true and complete copies of all Contracts that are material to operating the Business.

(b)     With respect to each Contract subject to <u>Section 3.7(a)</u>: (i) such Contract is in full force and effect and constitutes the valid and legally-binding obligation of Sellers and the counterparty thereto, enforceable against Sellers and the counterparty thereto in accordance with its terms and conditions, subject to applicable bankruptcy, insolvency, moratorium or other similar Laws relating to creditors' rights and general principles of equity; and (ii) except for breaches or defaults caused by or resulting from Sellers' bankruptcy proceedings or breaches or defaults disclosed in **<u>Schedule 3.7(b)</u>**, neither Sellers nor, to the Knowledge of Sellers, the counterparty thereto is in material breach or default thereof that presently would permit or give rise to a right of termination, modification or acceleration thereunder.

3.8     <u>Intellectual Property</u>.

(a)     To the Knowledge of Sellers, **<u>Schedule 3.8</u>** contains a true and complete list of (i) all Registered Intellectual Property that is owned by Sellers and used in or related to the

12

Business, (ii) all material Contracts pursuant to which Sellers obtain the right to use any Intellectual Property, and (iii) all material Contracts pursuant to which Sellers grant to any other Person the right to use any Intellectual Property. Sellers own all such Registered Intellectual Property free and clear of all Liens and Claims (except for Permitted Liens), and all such Registered Intellectual Property is valid, subsisting, and enforceable, and is not subject to any outstanding decree adversely affecting Sellers' use thereof or rights thereto. Immediately after the Closing, Purchaser will own or have the right to, subject to the Sale Order having been entered and still being in effect and not subject to any stay pending appeal at the time of Closing, use all of the Intellectual Property included in the Assets on the same terms and conditions as in effect for Sellers immediately prior to the Closing, to the fullest extent permissible under section 363(f) of the Bankruptcy Code and subject to the rights of licensees under section 365(n) of the Bankruptcy Code, and/or under the decision of the United States Supreme Court in <u>Mission Product Holdings, Inc. v. Technology, LLC</u>, 139 S. Ct. 1652 (2019).

(b)     To the Knowledge of Sellers, none of the uses of the Intellectual Property included in the Assets, the conduct of the Business as currently conducted, nor any of the products sold or services provided by Sellers or any of their Affiliates in connection therewith, infringes upon or otherwise violates the Intellectual Property of any other Person. To the Knowledge of Sellers, no third party is infringing any Intellectual Property owned by Sellers and included in the Assets.

(c)     No Litigation is currently pending or threatened in writing against Sellers that challenges the validity, ownership, registrability, enforceability, infringement, or use of any Intellectual Property.

3.9     <u>Litigation, Generally</u>. Except for the Chapter 11 Cases, there is no action, suit, investigation, or proceeding pending against, or to the Knowledge of Sellers, threatened against or affecting, the Assets (other than the Chapter 11 Cases) before any Governmental Authority that (A) would reasonably be expected to be material to the Assets, taken as a whole, or materially impair Purchaser's rights in and to, or use of, the Assets, taken as a whole, or (B) challenges the validity or enforceability of this Agreement or that seeks to enjoin or prohibit the consummation of the transactions contemplated hereby or thereby.

3.10     <u>Employees and Employment Matters</u>.

(a)     The Sellers have no employees.

(b)     There has been no "mass layoff" or "plant closing" (as defined by the WARN Act), or "collective redundancy" or similar process, with respect to Sellers or any of its Affiliates within the six (6) months prior to Closing.

(c)     Sellers are not a party to, or otherwise bound by or subject to, any collective bargaining or other labor union Contracts and no Employees are represented by any labor organization, trade union, works council, employee representative, employee congress or other form of employee association or representative. No labor organization (or representative thereof) or employee or group of employees has made a pending demand for recognition, and there are no representation proceedings or petitions seeking a representation proceeding presently pending or,

to the Knowledge of Sellers, threatened in writing to be brought or filed, with the National Labor Relations Board or other labor relations tribunal, or Governmental Entity. There is no organizing activity involving Sellers or any of their Affiliates pending or threatened in writing by any labor organization (or representative thereof) or employees. There are no material lockouts, or strikes pending, or threatened in writing between Sellers or any of their Affiliates, on the one hand, and their respective employees, on the other hand.

      (d)      Sellers have no Employee Benefit Plans.

      3.11    <u>Data Privacy</u>. To the best knowledge of Sellers, in connection with their collection, storage, transfer, and/or use of any Personal Information or any loss, theft or unauthorized access thereof, Sellers are and, during the last three (3) years, has been in compliance in all material respects with all applicable Laws.  Neither the execution, delivery, or performance of this Agreement, nor the consummation of the transactions contemplated herein will violate any written privacy policy of Sellers or, to the Knowledge of Sellers, applicable Law.  Sellers have commercially reasonable security measures in place to protect all Personal Information collected by it from and against unauthorized access, use or disclosure in accordance with applicable Law. There has been no unauthorized access, use, or disclosure of Personal Information in the possession or control of Sellers or any of their contractors with regard to any Personal Information from or on behalf of Sellers.

      3.12    <u>No Broker</u>.  Neither Sellers nor any of their members, managers, directors, officers, employees, Representatives, or agents has employed or has any Liability to any investment banker, broker, finder, agent, or similar intermediary in connection with this Agreement or the transactions contemplated hereby, and no broker, finder, agent, or similar intermediary is entitled to any broker's fee, finder's fee, or similar fee or commission in connection therewith based on any agreement, arrangement, or understanding.  Sellers agree to protect, indemnify, save, and keep harmless Purchaser, against and from all Liabilities, Claims, losses, costs, damages, and expenses, including attorneys' fees, arising out of, resulting from, or in connection with its breach of the foregoing warranty and representation.

      3.13    <u>Representations Regarding Office of Foreign Assets Control.</u>

      To the Knowledge of Sellers, each of Sellers and each of their respective agents, officers/managers, directors/members, and employees (collectively, the "<u>Representatives</u>") are in compliance with the Foreign Corrupt Practices Act of 1977 (United States), and any rules and regulations thereunder respectively, similar Laws of other jurisdictions, anti-money laundering obligations, and anti-terrorist financing obligations under the Law of United States, and/or Sellers' jurisdictions, and as otherwise applicable to Sellers, their Representatives, and/or Purchaser;

      (a)      Neither any Seller nor any of their Representatives has been convicted of, or has agreed to enter into a pretrial diversion or similar program in connection with the prosecution of, a criminal offense involving theft, dishonesty, breach of trust, money laundering, the illegal manufacture, sale, distribution of or trafficking in controlled substances, or substantially equivalent activity in a domestic, military, or foreign court;

(b)    Neither any Seller nor any of their Representatives is (i) a Person described or designated in the Specifically Designated Nationals and Blocked Persons List of the U.S. Department of Treasury Office of Foreign Assets Control, Section I of the U.S. Anti-Terrorism Order, the Regulations Establishing a List of Entities under s.83.05(1) of the Criminal Code of Canada, any regulations promulgated under Canada's Special Economic Measures Act, United Nations Act, Justice for Victims of Corrupt Foreign Officials Act, Freezing of Assets of Corrupt Foreign Officials Act, or the United Nations Security Council Consolidated Sanctions List or (ii) engaged in any dealings or transactions with any such Person;

(c)    Without limiting the generality of the foregoing, no Seller is, and no Seller is owned or controlled by, or acting on behalf of, any Person who is, identified on any list of prohibited parties under any Law or by any governmental authorities, such as any lists maintained by the United Nations Security Council, the U.S. government (including the U.S. Treasury Department's Specially Designated Nationals list and Foreign Sanctions Evaders list), the Canadian government, the European Union (EU) or its member states. No Seller, and no Seller is owned or controlled by, or acting on behalf of, any Person who is located, ordinarily resident, organized, established, or domiciled in Cuba, Iran, North Korea, Sudan, Syria, the Crimea region of Ukraine (including Sevastopol) or any other country or jurisdiction against which the U.S. or Canada maintains comprehensive economic sanctions or an arms embargo. The Assets are not derived from, and do not otherwise represent the proceeds of, any activities done in violation or contravention of any Law.

3.14    No Other Representations or Warranties.

EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS ARTICLE III (AS QUALIFIED, AMENDED, SUPPLEMENTED AND MODIFIED BY THE DISCLOSURE SCHEDULE) NEITHER SELLERS NOR ANY OTHER PERSON MAKES (AND PURCHASER IS NOT RELYING UPON) ANY OTHER EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY WITH RESPECT TO SELLERS, THEIR BUSINESS, THE ASSETS (INCLUDING THE VALUE, CONDITION OR USE OF ANY ASSET), THE ASSUMED LIABILITIES OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT, AND SELLERS DISCLAIM ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY SELLERS, ANY AFFILIATE OF SELLERS OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, AGENTS OR REPRESENTATIVES. THE DISCLOSURE OF ANY MATTER OR ITEM IN THE DISCLOSURE SCHEDULE SHALL NOT BE DEEMED TO CONSTITUTE AN ACKNOWLEDGMENT THAT ANY SUCH MATTER IS REQUIRED TO BE DISCLOSED OR IS MATERIAL OR THAT SUCH MATTER WOULD RESULT IN A MATERIAL ADVERSE EFFECT.

THE PROVISIONS OF THIS SECTION 3.14 SHALL SURVIVE THE CLOSING OR EARLIER TERMINATION OF THIS AGREEMENT AND SHALL BE INCORPORATED INTO THE CLOSING DOCUMENTS TO BE DELIVERED AT CLOSING.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers as follows:

4.1     Organization and Authority.  Purchaser is duly organized and validly existing under the Laws of the jurisdiction of its organization and has the power and authority and all necessary approvals of any applicable Governmental Entities to enter into the transactions contemplated by this Agreement.

4.2     Authority and Binding Agreement.  This Agreement has been duly authorized, executed and delivered by Purchaser and, subject to the approval of the Bankruptcy Court, is the valid and binding obligation of Purchaser enforceable against Purchaser in accordance with its terms.

4.3     Consents and Approvals.  No consent, approval or authorization of, or declaration, filing, or registration with, any Governmental Entity is required to be made or obtained by Purchaser in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated herein, except for: (a) consents, approvals, or authorizations of, or declarations or filings with, the Bankruptcy Court; (b) the filing of such deeds, assignments or other conveyance documents as may be required to transfer each of Sellers' interests in any Assets, the title to which is governed by filing in the public records; (c) any necessary approval, authorization or exemption by any Governmental Entity with jurisdiction over and the right to approve the sale; and (d) consents, approvals, authorizations, declarations, filings or registrations which, if not obtained, individually or in the aggregate, would not have a Material Adverse Effect on the transactions contemplated in this Agreement.

4.4     Good Faith Purchaser.  Purchaser is a "good faith" purchaser, as such term as such term is used in the Bankruptcy Code and applicable court decisions thereunder.  Purchaser is entitled to the protections of section 363(m) of the Bankruptcy Code with respect to all of the Assets and has negotiated and entered into this Agreement in good faith and without collusion or fraud of any kind.

4.5     Adequate Assurances Regarding Assumed Contracts.  Purchaser, as of the Closing Date, shall be capable of satisfying the conditions contained in sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to any Assumed Contracts, as shall be determined by the Bankruptcy Court.

4.6     No Outside Reliance.  Purchaser acknowledges and agrees that the representations and warranties made by the Sellers to Purchaser in Article III (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) (the "Express Representations") are the sole and exclusive representations, warranties, and statements of any kind made to Purchaser and on which Purchaser may rely in connection with the transactions contemplated by this Agreement.

## ARTICLE V
## COVENANTS PRIOR TO AND IN FURTHERANCE OF CLOSING

5.1    <u>Affirmative and Negative Covenants</u>.

(a)    <u>Certain Efforts; Cooperation</u>.

(i)    From the Effective Date to the Closing Date (or earlier valid termination of this Agreement), the Parties expressly agree to use commercially reasonable efforts, subject to the orders of the Bankruptcy Court and the terms of this Agreement, to make effective the transactions contemplated by this Agreement on or prior to the End Date (including satisfaction, but not waiver, of the conditions to the obligations of the Parties to consummate the transactions contemplated hereby), and use commercially reasonable efforts not to take any action, or permit any of its Affiliates or Representatives to take any action, to diminish the ability of any other Party to consummate, or delay any other Party's ability to consummate, the transactions contemplated hereby, including taking any action that is intended or would reasonably be expected to result directly or indirectly in a failure to satisfy any of the conditions to any other Party's obligations to consummate the transactions contemplated hereby;

(ii)    On and after the Closing, Sellers, subject to the need for Bankruptcy Court approval where required, and Purchaser shall use commercially reasonable efforts to take, or cause to be taken by themselves or any of their respective Affiliates and/or Representatives, all appropriate action, to do or cause to be done by Sellers and Purchaser or any of their respective Affiliates all things reasonably necessary, reasonably proper or reasonably advisable under applicable Law, and to execute and deliver such documents as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated hereby, including in order to more effectively vest in Purchaser all of Sellers' rights, title and interest to the Assets, free and clear of any encumbrances, Liens, Claims, rights, remedies or interests, existing as of the Closing except as specifically permitted herein; provided, that (x) Sellers shall not be obligated to incur any costs or expenses associated with the obligations hereunder and (y) Sellers' obligations hereunder shall only continue until the Chapter 11 Cases are closed and dismissed.

(iii)    <u>Section 5.1(a)</u> of this Agreement shall survive the Closing.

5.2    <u>Notice, Consents and Further Actions</u>.

(a)    To the extent required by the Bankruptcy Code or the Bankruptcy Court, Sellers shall give any notices to third parties, and Sellers shall use commercially reasonable efforts to obtain any third-party consents or sublicenses in each case necessary to consummate the transactions contemplated by this Agreement.  To the extent that any Intellectual Property licenses held by Sellers cannot be assigned to Purchaser hereunder without obtaining the consent of the licensor or grantor thereof (provided such licensor or grantor is not an Affiliate of Seller), such consent to assignment shall not be deemed a condition of Closing hereunder and the inability of the applicable Seller to obtain such consent to assignment following exercise of its commercially reasonable efforts to obtain the same shall not constitute a breach of this Agreement.

(b)    Sellers and Purchaser shall cooperate with one another (i) in promptly determining whether any filings are required to be or should be made or consents, approvals,

permits or authorizations are required to be or should be obtained under any applicable Law in connection with this Agreement and the transactions contemplated hereby and (ii) in promptly making any such filings, furnishing information required in connection therewith and seeking to obtain timely any such consents, permits, authorizations, approvals or waivers.

(c)     Subject to the terms and conditions set forth in this Agreement and applicable Law, Purchaser and Sellers shall (i) promptly notify the other Party of any communication to that Party from any Governmental Entity in respect of any filing, investigation or inquiry concerning this Agreement or the transactions contemplated by this Agreement, (ii) if practicable, permit the other Party the opportunity to review in advance all the information relating to Sellers or Purchaser and its Affiliates, as the case may be, that appears in any filing made with, or written materials submitted to, any third party and/or any Governmental Entity in connection with the Agreement and the transactions contemplated by this Agreement and to consider incorporation of the other Party's reasonable comments.

(d)     Operation of the Business. Except as may be required by order of the Bankruptcy Court (provided that Sellers have not directly or indirectly petitioned, sought, requested or moved for such order of the Bankruptcy Court or authorized, supported or directed any other Person to petition, seek, request or move for such Order of the Bankruptcy Court) and applicable Law, from the date of this Agreement through the Closing, Sellers shall, except as otherwise required, authorized, or restricted pursuant to this Agreement, the Bankruptcy Code or an order of the Bankruptcy Court, or with the prior written consent of Purchaser, operate the Business in the Ordinary Course.  Sellers shall: (i) except as related to or the result of the filing or pendency of the Chapter 11 Cases, preserve intact its Business organizations, (ii) maintain the Business and the Assets in the Ordinary Course (normal wear and tear excepted), (iii) keep available the services of its officers and employees in the Ordinary Course, (iv) except as related to or the result of the filing or pendency of Chapter 11 Cases, maintain its business relationships with licensors, licensees, suppliers, contractors, distributors, consultants, vendors, landlords, and others having business relationships with Sellers in connection with the operation of the Business in the Ordinary Course (other than payment of pre-petition claims), (v) pay all of its undisputed post-petition obligations, including Ordinary Course Trade Payables, in the Ordinary Course consistent with applicable orders of the Bankruptcy Court, and (vi) continue to operate the Business and Assets in all material respects in compliance with all Laws applicable to the Business and Sellers.

5.3     Notice of Developments.  From the date hereof until the Closing Date, Sellers shall promptly disclose to Purchaser, on the one hand, and Purchaser shall promptly disclose to Sellers, on the other hand, in writing after attaining knowledge (as applicable to each of Sellers and Purchaser) of any material failure of any of Sellers or Purchaser to comply with or satisfy any of their respective covenants, conditions or agreements to be complied with or satisfied by it under this Agreement in any material respect; *provided*, *however*, that the delivery of any notice pursuant to this Section 5.3 shall not limit or otherwise affect the remedies available to the Party receiving such notice under this Agreement.

5.4     Access. Upon written request by Purchaser, Sellers shall permit Purchaser and its Representatives to have reasonable access during normal business hours, and in a manner so as not to interfere unreasonably with the normal Business operations of Sellers, to all premises;

properties; personnel; financial and operational books, records, and files; and Contracts related to the Business, in each case, for the sole purpose of evaluating Sellers' Business; *provided*, *however*, that, for avoidance of doubt, the foregoing shall not require any Party to waive, or take any action with the effect of waiving, its attorney-client privilege or any confidentiality obligation to which it is bound with respect thereto or take any action in violation of applicable Law.

5.5     Information Access. Purchaser and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Assets (including access to books and records) as is reasonably necessary for the preparation and filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax. Sellers and Purchaser shall cooperate with each other in the conduct of any audit or other proceeding relating to Taxes involving the Assets or Sellers' Business as it relates to the Assets.

5.6     Public Announcement. The Parties shall consult with each other before issuing, and provide each other the reasonable opportunity to review and comment upon, any press release or other public statements with respect to this Agreement or the transactions contemplated hereby. Except as may be required by applicable Law or the Bankruptcy Court, the Parties shall not cause or permit the issuance of any such release or any such public statement without the consent of all of the Parties hereto, which consent shall not be unreasonably withheld or delayed; provided, however, that nothing herein shall relieve Debtors or preclude them from providing such information to any Person as the Bankruptcy Court (before or after Closing) shall direct.

5.7     No Successor Liability. Except as otherwise expressly ordered by the Bankruptcy Court, the Parties intend that, to the fullest extent permitted by Law, including under section 363 of the Bankruptcy Code, upon the Closing, Purchaser shall not and shall not be deemed to: (a) be a successor (or other such similarly situated party) to Sellers, including a "successor employer" for purposes of the Internal Revenue Code, ERISA, or other applicable Laws; (b) have any responsibility or Liability for any obligations of Sellers, except as otherwise provided in this Agreement, based on any theory of successor liability or any similar theory; (c) have, de facto or otherwise, merged with or into a Seller; (d) be an alter ego or mere continuation or substantial continuation of Sellers (and there is no continuity of enterprise between Purchaser and Sellers), including, within the meaning of any foreign, federal, state or local revenue, pension, ERISA, COBRA, Tax, labor, employment, environmental, products liability, or other Law, rule, regulation, or doctrine; or (e) be holding itself out to the public as a continuation of Sellers or their estates. Purchaser acknowledges and agrees that this Section 5.7 shall not in any way be deemed to modify or contract Purchaser's obligations with respect to Assumed Liabilities.

## ARTICLE VI
## ADDITIONAL AGREEMENTS

6.1     Bankruptcy Court Milestones; Protections.

(a)     Unless otherwise agreed to by Purchaser in writing, Sellers shall comply with the following timeline relating to the transactions contemplated by this Agreement (collectively, the "Bankruptcy Court Milestones"):

19

(i)     Sellers shall commence the Chapter 11 Cases on or before June 30, 2023.

(ii)     Sellers shall file on the Petition Date with the Bankruptcy Court and shall prosecute the Sale Motion in good faith.

(iii)     No later than forty (40) days after the Petition Date, Sellers shall have obtained entry by the Bankruptcy Court of the Sale Order and such order shall be in full force and effect and not reversed, modified, or stayed.

(b)     <u>Financial Protections</u>.

(i)     As consideration for and as a material inducement to Purchaser conducting its due diligence and entering into this Agreement, only in the event this Agreement is terminated by Sellers in accordance with <u>Section 8.1(c)(i)</u> below, Purchaser shall be entitled to receive the Expense Reimbursement.

(ii)     Purchaser and Sellers acknowledge and agree that (A) they have expressly negotiated the provisions of this <u>Section 6.1(b)</u> and the payment of the Expense Reimbursement is an integral part of this Agreement, (B) in the absence of Sellers' obligations to make the Expense Reimbursement, Purchaser would not have entered into this Agreement, and (C) the Expense Reimbursement (I) is an actual and necessary cost of preserving Sellers' bankruptcy estates, within the meaning of section 503(b) of the Bankruptcy Code, and (II) shall be treated as allowed administrative expense claims against Sellers' bankruptcy estates pursuant to sections 105(a), 503(b) and 507(a)(2) of the Bankruptcy Code.

(iii)     The obligation of Sellers to pay the Expense Reimbursement shall survive termination of this Agreement.  The Expense Reimbursement shall be payable by Sellers upon the closing of any Alternative Transaction from the proceeds from consummation of an Alternative Transaction.

(c)     <u>Notice</u>.  The Parties shall consult with each other regarding pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of the Sale Order.

(d)     <u>Appeals of Orders</u>.  If the Sale Order or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Order, or other such order), subject to rights otherwise arising from this Agreement, Sellers shall use their reasonable best efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

6.2     <u>Contract Assumption and Cure</u>.

(a)     No later than two (2) Business Days after the Effective Date, Sellers shall provide to Purchaser the Contract Schedule (the "<u>Contract Schedule Delivery Date</u>").  Upon written request by Purchaser, Sellers shall provide to Purchaser as promptly as practicable an updated Contract Schedule, setting forth the proposed Cure Amounts as of the date of such request with respect to any Contracts or Leases specifically identified by Purchaser in such written request.

(b)     Within two (2) Business Days of the Contract Schedule Delivery Date, Sellers shall file with the Bankruptcy Court and serve on every Contract or Lease counterparty a notice of the Contract Schedule (the "Cure Notice"), in form and substance acceptable to Purchaser, which shall identify (A) each Contract and Lease that may be assumed and assigned to Purchaser and (B) the proposed Cure Amount with respect to each Contract or Lease that may be assumed and assigned to Purchaser.  In the Cure Notice, Sellers shall (x) set forth the procedures for the assumption and assignment of a Contract or Lease (including, the proposed Cure Amount) and (y) notify counterparties that their Contract or Lease may be assumed by Sellers and assigned to Purchaser or rejected by Sellers.

(c)     Purchaser shall, by delivering written notice to Sellers, designate any Contract or Lease on the Contract Schedule as "assumed."  Each Contract or Lease to be assumed by Sellers and assigned to Purchaser in accordance with section 365 of the Bankruptcy Code will be designated as "assumed" and is referred to herein as an "Assumed Contract."  The Assumed Contracts, subject to the modification rights contained herein, shall be identified in **Schedule 6.2(c)** hereto, which schedule shall be completed at Closing.

(d)     On or prior to the Closing Date, Sellers shall file a notice with the Bankruptcy Court setting forth the Assumed Contracts.  The Sale Order shall provide that each Assumed Contract is assumed by Sellers and assigned to Purchaser in accordance with section 365 of the Bankruptcy Code effective upon Sellers filing a notice with the Bankruptcy Court and the counterparty being paid any Cure Amounts by Purchaser, in accordance with this Agreement, the Sale Order, or a settlement with such counterparty and Purchaser or further order of the Bankruptcy Court if there is an unresolved dispute with respect to such Cure Amount (each, an "Assumption and Assignment Notice").

(e)     Sellers shall take all actions necessary to cause all Assumed Contracts to be assumed by Sellers and assigned to Purchaser in accordance with section 365 of the Bankruptcy Code.

(f)     Nothing herein shall preclude Debtors from exercising their fiduciary or other duty to obtain the most value for the Purchased Assets.

## ARTICLE VII
## CONDITIONS PRECEDENT TO PERFORMANCE BY THE PARTIES

7.1     Conditions to Sellers' Obligation to Close.  Sellers' obligation to consummate the transactions contemplated in this Agreement is subject, at the option of Sellers, to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)     Representations and Warranties; Covenants.

(i)     All representations and warranties made by Purchaser shall be accurate in all material respects on and as of the Closing Date as if again made by Purchaser on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date and (ii) inaccuracies that do not result in a material effect on Purchaser's ability to perform its obligations hereunder.

(ii)    Purchaser shall have performed in all material respects all agreements and covenants required by this Agreement to be performed by it prior to or at the Closing Date.

(b)    No Injunction.  No injunction, stay, or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in this Agreement.

(c)    Sale Order.  The Bankruptcy Court shall have entered the Sale Order.

(d)    Purchaser's Deliveries.  Purchaser shall have duly executed and delivered to Sellers each of the documents, instruments and agreements required to be delivered pursuant to Section 7.3(b) of this Agreement.

7.2    Conditions to Purchaser's Obligation to Close.    Purchaser's obligation to consummate the transactions contemplated in this Agreement is subject, at the option of Purchaser, to the satisfaction or waiver, at or prior to the Closing Date, of each of the following conditions:

(a)    Representations and Warranties; Covenants.

(i)    All representations and warranties made by Sellers shall be accurate in all material respects on and as of the Closing Date as if again made by Sellers on and as of such date, except for (i) those representations and warranties that speak solely as of a specific date and that were true and correct as of such date, and (ii) inaccuracies that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.

(ii)    Sellers shall have performed in all material respects all agreements and covenants required by this Agreement to be performed by Sellers prior to or at the Closing Date.

(b)    Sellers' Deliveries.    Sellers shall have duly executed and delivered to Purchaser each of the documents, instruments, and agreements required to be delivered by Sellers pursuant to this Agreement.

(c)    Material Adverse Effect.  From the date of this Agreement until the Closing Date, there shall not have occurred and be continuing a Material Adverse Effect.

(d)    Sale Order.  The Bankruptcy Court shall have entered the Sale Order in form and substance satisfactory to Purchaser, and such order shall not be stayed, enjoined, restrained, or subject to appeal in any way.

(e)    No Injunction or Challenge.  No injunction, stay or restraining order shall be in effect prohibiting the consummation of the transactions contemplated in this Agreement.  No Law, ordinance or regulation shall have been enacted, and no order, judgment, or decree shall have been enacted or rendered by a Governmental Entity or any other Person (and not subsequently dismissed, settled, withdrawn or terminated, nor shall any petition, complaint, or action have been filed or be pending that seeks such order, judgment or decree) which would prevent the consummation at the Closing of, or restrain or invalidate, the transactions contemplated by this Agreement.

7.3     Deliveries at Closing.

(a)     Deliveries by Sellers.  At the Closing, Sellers shall deliver or cause the delivery of the following to Purchaser:

(i)     An entered copy of the Sale Order;

(ii)     executed Assumption and Assignment Agreement(s) (if any);

(iii)     executed Intellectual Property Assumption and Assignment Agreement(s) (if any);

(iv)     an executed Bill of Sale;

(v)     all other documents, closing statements, affidavits, instruments and writings reasonably required to be delivered by Sellers at or prior to the Closing Date pursuant to this Agreement or otherwise reasonably requested by Purchaser to deliver the Assets free and clear of any Liens, Claims, rights or interests (other than the Permitted Liens), each in form and substance satisfactory to Purchaser;

(vi)     any applicable local, state, or federal transfer tax forms; and

(vii)     Bringdown certificates of Sellers, executed by a duly authorized officer Sellers, in a form satisfactory to Purchaser.

(b)     Deliveries by Purchaser.  At the Closing, Purchaser shall deliver or cause the delivery of the following to each of Seller:

(i)     the Purchase Price; and

(ii)     Bringdown certificates of Purchaser, executed by a duly authorized officer Purchaser, in a form reasonably satisfactory to Seller.

7.4     Possession.  On the Closing Date, title to and/or possession of the Assets shall be delivered to Purchaser.

7.5     Closing Costs.  Purchaser shall pay any applicable recording fees and Transfer Taxes in accordance with Section 5.5 hereof unless otherwise provided by the Sale Order.  Other costs associated with the Closing and transactions contemplated under the Agreement shall be allocated as provided elsewhere in this Agreement.

## ARTICLE VIII
## TERMINATION

8.1     Termination.   This Agreement may be terminated, and the transactions contemplated hereby may be abandoned, and there shall thereafter be no Liability of any Party to the other Party hereunder, as follows:

(a)     Mutual Consent.  Upon the mutual written consent of Sellers and Purchaser.

      (b)    <u>By Purchaser</u>.

      (i)    By Purchaser, in the event of a material violation or material breach by Sellers of Sellers' agreements, covenants, representations or warranties contained in this Agreement; provided that such violation or breach shall not have been (x) remedied by virtue of the Sale Order with the consent of Purchaser, or (y) waived or cured within ten (10) days following receipt by Sellers (as applicable) of written notice of such breach from Purchaser (unless such condition shall become incapable of being satisfied by the Closing Date), and provided further that Purchaser is not then in material breach of the Agreement; or

      (ii)    By Purchaser, if any of the Bankruptcy Court Milestones are not satisfied, unless the timely occurrence of such Bankruptcy Court Milestone is waived by Purchaser in writing; or

      (iii)    By Purchaser, if the Closing does not occur on or before the End Date (or on such other extended date upon which the Parties mutually agree in writing); or

      (iv)    By Purchaser, if the conditions precedent for Closing set forth in <u>Section 7.2</u> have not been satisfied prior to or at Closing, unless such condition precedent is waived in writing by Purchaser; or

      (v)    By Purchaser if, prior to the Closing, a Casualty Loss occurs affecting a material portion of the Assets; *provided*, that Purchaser may elect to close and accept the Assets with no reduction in the Purchase Price and, in that event, any insurance proceeds (or proceeds of such condemnation proceeding) subsequently recovered by Sellers on account of such loss shall be transferred to Purchaser, notwithstanding anything else in this Agreement to the contrary.

      (c)    <u>By Sellers.</u>

      (i)    By Sellers, in the event that Sellers seek Bankruptcy Court approval to pursue an Alternative Transaction;

      (ii)    By Sellers, in the event of a material violation or material breach by Purchaser of its agreements, covenants, representations or warranties contained in this Agreement; provided that such violation or breach shall not have been waived or cured within ten (10) days following receipt by Purchaser of written notice of such breach from Sellers, and provided further that Sellers are not then in material breach of the Agreement;

      (iii)    By Sellers, if the Closing does not occur on or before the End Date (or on such other extended date upon which the Parties mutually agree in writing); or

      (iv)    By Sellers, if the conditions precedent for Closing set forth in <u>Section 7.1</u> have not been satisfied prior to or at Closing, unless such condition precedent is waived in writing by Sellers.

    8.2    <u>Effect of Termination</u>.

      (a)    In the event of termination of this Agreement pursuant to <u>Section 8.1</u>, except for termination pursuant to <u>Section 8.1(c)(i)</u>, written notice thereof shall forthwith be given to the non-terminating Party, and all further obligations of the Parties hereunder (except any provisions of this Agreement which are specifically designated to survive termination) shall immediately and

without further action terminate; *provided*, *however*, that if this Agreement is terminated by a Party because of the other Party's failure to comply with its obligations under this Agreement, the terminating Party's right to pursue all legal remedies for breach of contract or otherwise, including, without limitation, specific performance and damages relating thereto, shall also survive such termination unimpaired.

(b)    If this Agreement is terminated pursuant to Section 8.1(c)(i), then Sellers shall pay to Purchaser an amount in cash equal to the Expense Reimbursement on the date each Alternative Transaction is consummated; *provided* that, for the avoidance of doubt, Purchaser is only entitled to a single recovery of the aggregate amount of the Expense Reimbursement. The amounts set forth in this Section 8.2(b) shall be Purchaser's sole and exclusive recourse in the event this Agreement is terminated pursuant to Section 8.1(c)(i).

(c)    Except as otherwise expressly set forth in this Agreement, nothing herein shall relieve any Party from Liability for any breach of covenant occurring prior to any termination of this Agreement.

## ARTICLE IX
## MISCELLANEOUS

9.1    Entire Agreement.  This Agreement, the schedules and the exhibits hereto and the Sale Order contain the entire agreement among the Parties with respect to the transactions contemplated by this Agreement and supersede all prior agreements or understandings among the Parties.

9.2    Other Governmental Entities.  In the event any Party receives notice from any Governmental Entity that other notices, applications or filings are required with respect to this Agreement or the transactions contemplated hereby, Purchaser and Sellers shall make such notices, applications or filings unless they decide, in good faith, that such compliance is not necessary.

9.3    Descriptive Headings; Certain Interpretations.

(a)    Section headings are descriptive and for convenience only and shall not control or affect the meaning or construction of any provision of this Agreement.

(b)    Except as otherwise expressly provided in this Agreement, the following rules of interpretation apply to this Agreement: (i) the singular includes the plural and the plural includes the singular; (ii) "or" and "either" are not exclusive and "include" and "including" is not limiting; (iii) a reference to any agreement or other contract includes any schedules and exhibits thereto and permitted supplements and amendments thereof; (iv) a reference to a law includes any amendment or modification to such law and any rules or regulations issued thereunder; (v) a reference to a Person includes a natural person or entity and its permitted successors and assigns; and (vi) a reference in this Agreement to an Article, Section, Schedule or Exhibit is to the Article, Section, Schedule or Exhibit of this Agreement.

9.4    Successors and Assigns.  This Agreement is made solely and specifically by and for the benefit of the Parties hereto, and their respective successors and assigns.  Purchaser shall be entitled to assign its rights hereunder to an Affiliate or another entity related to Purchaser.

25

    9.5    <u>Notices</u>.  All notices, requests, and other communications hereunder must be in writing and shall be deemed to have been duly given only if delivered by overnight courier to the Parties at the following addresses:

        If to Sellers, addressed to:

        Dulce Mercado
        1379 Paseo Don Juan
        Apt 5B
        San Juan, PR 00907
        Dulce@DLTx.com (with copy to management@palcapital.com)

        With copies (which shall not constitute notice hereunder) to:

        Evan T. Miller
        Bayard P.A.
        600 North King Street, Suite 400
        Wilmington, DE 19801
        EMiller@bayardlaw.com

        If to Purchaser, addressed to:

        KB Silver Funding, LLC
        10830 SW 69 Ave, Pinecrest, Florida 33156
        Attn: Richard Shorten
        Email: rshorten@silverminecapital.com

        With copies to (which shall not constitute notice hereunder to):

        Lindsay Zahradka Milne, Esq.
        Bernstein Shur
        100 Middle Street
        Portland, ME 04104-5029
        Email:  lmilne@bernsteinshur.com

    All such Notices shall be deemed given upon e-mail transmission, return receipt requested. Any Party from time to time may change its address or other information for the purpose of notices to that Party by giving notice specifying the change to the other Parties.

    9.6    <u>Waiver</u>.  Any term, provision or condition of this Agreement may be waived, or the time for its performance may be extended, at any time by the Party which is entitled to the benefit thereof.  To be effective, each such waiver shall be in writing, shall specifically refer to this Agreement and the term, provision or condition being waived, and shall be executed by an authorized officer of the Party granting such waiver.  The failure of any Party hereto to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor to affect in any way the validity of this Agreement or any part hereof or the right of any Party thereafter to enforce each and every such provision.  No waiver of any breach of this Agreement

26

shall be held to constitute a waiver of any other or subsequent breach. Notwithstanding the foregoing, a waiver hereunder by Sellers of any material term or condition shall not be effective without an order of the Bankruptcy Court in relation to such waiver.

9.7    Amendment.  This Agreement may be modified or amended only in a writing duly executed by or on behalf of all Parties hereto.

9.8    Counterparts; Facsimile Signatures.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  This Agreement may be executed and delivered via PDF.

9.9    Continuing Jurisdiction.  The Parties agree that the Bankruptcy Court shall retain jurisdiction over the enforcement of this Agreement, including the performance of the obligations and transactions contemplated hereunder.

9.10    Choice of Law.  This Agreement shall be construed, interpreted and the rights of the Parties determined in accordance with the Laws of the State of Delaware without regard to conflicts of laws principles thereof, except with respect to matters of law concerning the internal corporate affairs of any corporation, company or limited liability company that is a Party to or the subject of this Agreement, as to which the law of the jurisdiction of incorporation or organization of such entity shall govern, and in all cases subject to the provisions of the U.S. Bankruptcy Code.

9.11    No Partnership or Joint Venture.  Nothing contained in this Agreement shall be deemed to create a partnership, joint venture, or any other relationship other than that of a seller and a purchaser between the Parties hereto.

9.12    No Third-Party Beneficiaries.  Nothing herein expressed or implied is intended or shall be construed to confer upon or give to any Person, other than the Parties hereto and their respective permitted successors and assigns, any rights or remedies under or by reason of this Agreement.  It is the explicit intention of the Parties hereto that no Person other than the Parties hereto and their successors and permitted assigns is or shall be entitled to bring any action to enforce any provision of this Agreement against any Party hereto, and the assumptions, indemnities, covenants, undertakings and agreements set forth in this Agreement shall be solely for the benefit of, and shall be enforceable only by, the Parties hereto or their respective successors and permitted assigns.

9.13    Non-Recourse.  No past, present or future director, manager, officer, employee, incorporator, member, partner or equity holder of Purchaser or Sellers shall have any Liability for any Liabilities of Purchaser or Sellers, respectively, under this Agreement or for any Claim based on, in respect of, or by reason of the transactions completed herein.  This Agreement may only be enforced against, and any Claim, action (including in the Chapter 11 Cases), suit, proceeding or investigation based upon, arising out of or related to this Agreement may only be brought against, the Persons that are expressly named as parties to this Agreement.

9.14    Prevailing Agreement Between the Parties.  In the event of any conflict between the provisions of this Agreement and the provisions of any other transaction document, other than the Sale Order, the provisions of this Agreement shall prevail in the determination of the respective

rights and obligations of the Parties as between themselves. In the event of any conflict between any provision of this Agreement and the Sale Order, the terms of the Sale Order shall govern.

(a)    Each of the Parties acknowledges and agrees that the other Parties (collectively, the "Enforcing Parties") would be damaged irreparably in the event any provision of this Agreement is not performed in accordance with its specific terms or otherwise breached, so that, in addition to any other remedy that each of the Parties may have under Law or equity, each of the Parties shall be entitled to injunctive relief to prevent breaches of the provisions of this Agreement and to enforce specifically this Agreement and the terms and provisions hereof (except as otherwise expressly set forth herein).

(b)    Each of the Parties agrees that it shall not oppose the granting of specific performance or an injunction sought in accordance with this Section 10.14 on the basis that the Enforcing Parties have an adequate remedy at Law or that any award of specific performance is, for any reason, not an appropriate remedy (except as otherwise expressly set forth herein). The Enforcing Parties shall not be required to provide any bond or other security in connection with any such injunction or other equitable remedy. The End Date shall be tolled from the date any of the Enforcing Parties files a petition seeking specific performance or an injunction under this Section 10.14 until a final, non-appealable, decision regarding this matter is obtained from a court of competent jurisdiction.

9.15    Severability. The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision of this Agreement shall not affect the validity or enforceability of any other provisions of this Agreement. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision, and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability, nor shall such invalidity or unenforceability in any one jurisdiction affect the validity or enforceability of such provision, or the application thereof, in any other jurisdiction.

9.16    Computation of Time. In computing any period of time prescribed by or allowed with respect to any provision of this Agreement that relates to Sellers or the Chapter 11 Cases, the provisions of Rule 9006(a) of the Federal Rules of Bankruptcy Procedure shall apply.

9.17    Mutual Drafting. Each of the Parties has participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

9.18    Counterparts; Email Signatures. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument. This Agreement or any counterpart may be executed and delivered by email with scan attachment copies, each of which shall be deemed an original.

28

9.19    <u>Time of Essence</u>. Time is of the essence of this Agreement.

9.20    **<u>WAIVERS OF JURY TRIAL</u>**. EACH OF THE PARTIES IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE AGREEMENTS CONTEMPLATED HEREBY OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

[Signature page follows.]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly authorized, executed and delivered.

**KB SILVER FUNDING, LLC**

By: _____
Name: _____
Its: _____

**FILE STORAGE PARTNERS, LLC**

By: _____
Name: _____
Its: _____

**AFTON BLOCKCHAIN LLC**

By: _____
Name: _____
Its: _____

**FILTECH SPV LLC**

By: _____
Name: _____
Its: _____

**MIDWEST BLOCKCHAIN INC.**

By: _____
Name: _____
Its: _____

*[Signature page to Asset Purchase Agreement]*

**EXHIBIT A**

**ASSUMPTION AND ASSIGNMENT AGREEMENT**

## ASSUMPTION AND ASSIGNMENT AGREEMENT

THIS ASSUMPTION AND ASSIGNMENT AGREEMENT (this "Assignment Agreement") is made as of July [●], 2022 by and between File Storage Partners, LLC, a Delaware limited liability company; Afton Blockchain LLC, a Delaware limited liability company; FilTech SPV LLC, a Delaware limited liability company; and Midwest Blockchain Inc., a Delaware corporation (collectively, "Assignors") and KB Silver Funding, LLC, a Delaware limited liability company ("Assignee").

## RECITALS

WHEREAS, Assignee and Assignor are parties along with to that certain Asset Purchase Agreement, dated as of June 30, 2023 (the "Asset Purchase Agreement"); and

WHEREAS, pursuant to the Asset Purchase Agreement, Assignor has agreed to (a) assign to Assignee, and Assignee has agreed to accept and assume, all of Assignor's right, title and interest in, to and under the Assumed Contracts and (b) to assume the Assumed Liabilities under the Asset Purchase Agreement; and

WHEREAS, capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual representations, warranties, covenants, and agreements set forth in the Asset Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.     **Assignment**.  Assignor hereby sells, assigns, conveys, transfers and grants to Assignee all of Assignor's right, title and interest in, to and under the Assigned Contracts of Assignor, which are listed on **Exhibit A**, attached hereto and made a part hereof.

2.     **Assumption of Assumed Contracts**.  Assignee hereby accepts all of Assignor's right, title and interest in, to and under the Assumed Contracts of Assignor.  Assignee hereby agrees to be bound by the Assumed Contracts of Assignor, and assumes all the duties, obligations and liabilities of Assignor under or with respect to the Assumed Contracts of Assignor.

3.     **Assumption of Assumed Liabilities**.  Assignor hereby assigns to Assignee, and Assignee hereby assumes from Assignor and shall pay, discharge and perform, the Assumed Liabilities of Assignee under the Asset Purchase Agreement.

4.     **General**.  This Assignment is made in accordance with, and is subject to and controlled by, the Asset Purchase Agreement. This agreement does not amend, supersede, limit or expand any of the obligations, agreements, covenants or warranties of any party under the Asset Purchase Agreement. Each party shall execute and deliver from time to time, upon reasonable request of any other party, all such further documents and instruments, and shall do and perform all such acts, as may be necessary or reasonably requested by any other party to give full effect to the intent and meaning of this agreement.

5.    **Binding Effect**.  This Assignment shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns.

6.    **Counterparts**.  This Assignment may be executed in multiple counterparts, each of which shall constitute an original and all of which shall constitute one and the same agreement.

**IN WITNESS WHEREOF**, Assignor and Assignee have executed this Assignment Agreement as of the date first above written.

In the presence of                          ASSIGNORS:

**FILE STORAGE PARTNERS, LLC**

By:      _____
Name:  _____
Its:      _____

**AFTON BLOCKCHAIN LLC**

By:      _____
Name:  _____
Its:      _____

**FILTECH SPV LLC**

By:      _____
Name:  _____
Its:      _____

**MIDWEST BLOCKCHAIN INC.**

By:      _____
Name:  _____
Its:      _____

ASSIGNEE:

**KB SILVER FUNDING, LLC**

By:      _____
Name:  _____
Its:      _____

*[Signature Page to Assumption and Assignment Agreement]*

# EXHIBIT B

# INTELLECTUAL PROPERTY ASSUMPTION AND ASSIGNMENT AGREEMENT

## INTELLECTUAL PROPERTY ASSUMPTION AND ASSIGNMENT AGREEMENT

THIS INTELLECTUAL PROPERTY ASSUMPTION AND ASSIGNMENT AGREEMENT (this "Intellectual Property Assignment Agreement") is made and entered into as of the [●], 2023 by and between File Storage Partners, LLC, a Delaware limited liability company; Afton Blockchain LLC, a Delaware limited liability company; FilTech SPV LLC, a Delaware limited liability company; and Midwest Blockchain Inc., a Delaware corporation (collectively, "Assignors"), and KB Silver Funding, LLC, a Delaware limited liability company ("Assignee"). Capitalized terms appearing but not defined herein shall have the meanings set forth in the Agreement (as such term is defined below).

## RECITALS

WHEREAS, Assignee and Assignor are parties to that certain Asset Purchase Agreement, dated as of June 30, 2023 (the "Asset Purchase Agreement"); and

WHEREAS, the Asset Purchase Agreement provides that on the Closing Date, Assignor shall assign and transfer to Assignee all right, title, and interest of Assignor, in and to the Intellectual Property owned or held by the Assignor in conjunction with the Assets, to the extent Assignor has right, title and interest in the Intellectual Property and to the extent the right, title, and interest in the Intellectual Property is assignable.

NOW THEREFORE, for good and valuable consideration as set forth in the Asset Purchase Agreement, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby assigns, conveys, and sets over to the Assignee all right, title, and interest of Assignor, in and to the Intellectual Property owned or held by the Assignor in conjunction with the Assets, to the extent Assignor has right, title and interest in the Intellectual Property and to the extent the right, title, and interest in the Intellectual Property is assignable. Assignee hereby assumes all obligations of the Assignor under the Intellectual Property arising on or after the Closing Date, and agrees to comply with the terms and conditions thereof.

This Intellectual Property Assignment Agreement is made in accordance with, and is subject to and controlled by, the Asset Purchase Agreement. This Intellectual Property Assignment Agreement does not amend, supersede, limit or expand any of the obligations, agreements, covenants or warranties of any party under the Asset Purchase Agreement. Each party shall execute and deliver from time to time, upon reasonable request of any other party, all such further documents and instruments, and shall do and perform all such acts, as may be necessary or reasonably requested by any other party to give full effect to the intent and meaning of this Intellectual Property Assignment Agreement.

*[Signature on following page]*

    **IN WITNESS WHEREOF**, Assignor and Assignee have executed this Intellectual Property Assignment Agreement as of the date first above written.

In the presence of                  ASSIGNOR:

**FILE STORAGE PARTNERS, LLC**

By: _____
Name: _____
Its: _____

**AFTON BLOCKCHAIN LLC**

By: _____
Name: _____
Its: _____

**FILTECH SPV LLC**

By: _____
Name: _____
Its: _____

**MIDWEST BLOCKCHAIN INC.**

By: _____
Name: _____
Its: _____

ASSIGNEE:

**KB SILVER FUNDING, LLC**

By: _____
Name: _____
Its: _____

*[Signature Page to Intellectual Property Assumption and Assignment Agreement]*

## EXHIBIT C

## QUITCLAIM BILL OF SALE

For good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, File Storage Partners, LLC, a Delaware limited liability company ("FSP"); Afton Blockchain LLC, a Delaware limited liability company ("Afton"); FilTech SPV LLC, a Delaware limited liability company ("FilTech"); and Midwest Blockchain Inc., a Delaware corporation ("Midwest," and together with FSP, Afton an Filtech, "Sellers"), hereby assign, transfer, and convey all of their rights, title, and interest, in, to and under the Assets (as such term is defined in that certain Asset Purchase Agreement, dated as of June 30, 2023 by and between Sellers and Purchaser (the "Asset Purchase Agreement"), of the Sellers to KB Silver Funding, LLC, a Delaware limited liability company ("Purchaser").

EXCEPT AS SET FORTH IN THE ASSET PURCHASE AGREEMENT, SUCH ASSETS ARE CONVEYED "AS IS" WITHOUT ANY WARRANTIES OF ANY KIND, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, PURSUANT TO THE ASSET PURCHASE AGREEMENT.

Dated this [●], 2023

In the presence of                                    ASSIGNORS:

**File Storage Partners, LLC**

By:_____
Name:
Its:

**Afton Blockchain LLC**

By:_____
Name:
Its:

**FilTech SPV LLC**

By:_____
Name:
Its:

**Midwest Blockchain Inc.**

By:_____
Name:
Its:

*[Signature Page to Quitclaim Bill of Sale]*

**Exhibit D**

**Sale Order**

[*Omitted for Asset Purchase Agreement Included with Sale Motion*]

# SCHEDULES

## Schedule 2.2 – Excluded Assets

(a)     Except as identified as an Assumed Contract, any and all: (i) employment, consulting, advisory or service agreements, plans, commitments, arrangements or understandings; (ii) leases or consignment agreements and arrangements; (iii) employee benefit, deferred compensation and/or severance agreements, plans, commitments, arrangements or understandings, including, without limitation, all stock option, stock purchase, bonus, incentive and similar agreements, plans, commitments, arrangements or understandings; (iv) collective bargaining agreements, commitments, arrangements or understandings with employees; and (v) agreements, obligations and liabilities with respect to or relating to any "pension plan" or "welfare plan" (as such terms are defined in ERISA);

(b)     Sellers' rights under this Agreement and all cash and non-cash consideration payable or deliverable to Sellers under this Agreement;

(c)     All Contracts and Leases to which any Sellers is a party (and such Sellers' related rights therein) other than the Assumed Contracts;

(d)     Sellers' bank accounts (provided that Cash in such accounts shall be an Asset);

(e)     Any asset that requires the consent of a third party to be transferred, assumed, or assigned hereunder as to which, by the Closing Date (and after giving effect to the entry of the Sale Order and any other Order of the Bankruptcy Court eliminating any contractual right of third parties to withhold such consent), such consent to transfer, assumption or assignment has not been obtained, effected or excused (for clarity, all liabilities associated with each such asset are excluded from Assumed Liabilities);

(f)     Any minute books, stock ledgers, corporate seals and stock certificates of Sellers, and other similar books and records that Sellers are required by Law to retain and all tax returns, financial statements and corporate or other entity filings; *provided* that, following Closing, and to the extent permitted by applicable Law, Sellers shall make such documents, to the extent relating to the Assets, available to Purchaser upon Purchaser's request;

(g)     Avoidance Actions; and

(a)     All membership interests held by File Storage Partners, LLC, including in the following entities:

(i)     File Storage Ops 1 LLC;

(ii)     File Storage Ops 3 LLC;

(iii)     File Storage Ops 4 LLC; and

(iv)     File Storage Ops X LLC.

## Schedule 2.3(a) – Assumed Liabilities

(a)    All obligations of File Storage Partners, LLC under Term Sheet dated October 3, 2022, by and between File Storage Partners, LLC and Anchorage Lending CA, LLC.

(b)    All obligations of File Storage Partners, LLC under Term Sheet dated September 12, 2022, by and between File Storage Partners, LLC and Anchorage Lending CA, LLC.

(c)    All obligations of File Storage Partners, LLC under Term Sheet dated February 27, 2023, and Master Loan and Security Agreement dated June 7, 2022, both by and between File Storage Partners, LLC and CoinList Lend, LLC.

(d)    All obligations of File Storage Partners, LLC under Term Sheet dated March 16, 2023, and Master Loan and Security Agreement dated June 7, 2022, both by and between File Storage Partners, LLC and CoinList Lend, LLC.

(e)    All obligations of File Storage Partners, LLC under Term Sheet dated March 24, 2023, as amended by Amendment to Term Sheet dated March 28, 2023, and Master Loan and Security Agreement dated June 7, 2022, all by and between File Storage Partners, LLC and CoinList Lend, LLC.

(f)    All obligations of File Storage Partners, LLC under Filecoin Asset Use Swap dated September 7, 2022, by and between DARMA Capital Master Fund, LP and File Storage Partners, LLC.

(g)    All obligations of File Storage Partners, LLC under Loan Term Sheet dated August 10, 2021, as amended by First Amendment to Loan Term Sheet Agreement dated December 10, 2021, and Master Loan Agreement dated August 9, 2021, all by and between Genesis Global Capital, LLC and File Storage Partners, LLC.

(h)    All obligations of File Storage Partners, LLC under Digital Storage Services Agreement dated January 9, 2023, by and between PALLADIUMX SPC LIMITED, acting on behalf of PALLADIUM-Q SEGREGATED PORTFOLIO, and File Storage Partners, LLC.

## Schedule 3.5

## Interests Asserted in the Assets

- D. Ledger Partners LLC asserts a blanket lien on FSP's "now owned or hereafter acquired assets, as well as all accessions, additions and improvements to, and all proceeds and products of such assets."  FSP disputes the lien and is presently seeking termination of the same.

## Schedule 3.7(b)

## Breaches of Material Contracts

*[to be populated]*

**Schedule 3.8**

**Intellectual Property**

*[to be populated]*

## Schedule 6.2(c)

## Assumed Contracts

*[to be populated]*

**<u>Exhibit 2 to Sale Order</u>**

**Cure and Possible Assumption and Assignment Notice**

# UNITED STATES BANKRUPTCY COURT
# THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| FILE STORAGE PARTNERS, LLC, *et al.*,[1] | Case No. 23-10877 (CTG) |
| Debtors. | (Jointly Administered) |

### NOTICE TO COUNTERPARTIES TO POTENTIALLY ASSUMED EXECUTORY CONTRACTS AND UNEXPIRED LEASES REGARDING CURE AMOUNTS AND POSSIBLE ASSIGNMENT TO THE PURCHASER

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR AFFILIATES MAY BE COUNTERPARTY TO ONE OR MORE EXECUTORY CONTRACTS AND/OR UNEXPIRED LEASES WITH THE DEBTORS.[2]**

**PARTIES RECEIVING THIS NOTICE SHOULD (1) READ THIS NOTICE CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED BY THE TRANSACTIONS DESCRIBED HEREIN AND (2) LOCATE THEIR NAME AND CONTRACT AND/OR LEASE ON APPENDIX I HERETO**

**PLEASE TAKE NOTICE** that on **June 30, 2023**, the Debtors (the "Debtors") filed the *Motion of Debtors for Entry of an Order (A) Approving the Sale of Substantially All Assets Free and Clear of All Liens, Claims, Encumbrances, and Interests, (C) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief* (the "Sale Motion") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") in these chapter 11 cases of the Debtors seeking approval of, among other things, the fixing of cure amounts (the "Cure Amounts") related to the Debtors' assumption, assignment and/or transfer of certain executory contracts, unexpired leases, and other agreements (the "Executory Contracts and Unexpired Leases") listed on **Appendix I** annexed hereto in connection with the sale (the "Sale") of certain of the Debtors Assets (the "Debtors' Assets"). The Debtor will assume, assign, and/or transfer the Executory Contracts and Unexpired Leases to KB Silver Funding, LLC or its designee (the "Purchaser") pursuant to the Asset Purchase Agreement (the "APA") attached to the Proposed Order for the Sale Motion as **Exhibit 1**. A hearing to consider approval of the Sale Motion for the sale of the Debtors' Assets free and clear of all liens, claims and encumbrances will be held before the Honorable Craig T. Goldblatt in the United States Bankruptcy Court District of Delaware, 824

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are are: File Storage Partners, LLC (6920); Afton Blockchain LLC (3951); Filtech SPV LLC (9602); and Midwest Blockchain Inc. (8842). The Debtors' service address is 1357 Ashford Ave., Pmb 373, San Juan, PR 00907.

[2] This Notice is being sent to counterparties to executory contracts and unexpired leases. This Notice is not an admission by the Debtors that such contract or lease is executory or unexpired.

N. Market St., Wilmington, DE 19801 on **[date], 2023 at [time] a.m. (prevailing Eastern Time)**, or at such other time thereafter as counsel may be heard (the "Sale Hearing").

      **PLEASE TAKE FURTHER NOTICE** that the Debtors have conducted a review of their books and records and have determined the cure amount for unpaid monetary obligations under such contract or lease is set forth in the right-hand column on Appendix I (the "Cure Amount"). If you object to (a) the proposed assumption or disagree with the proposed Cure Amount or (b) object to the possible assignment of such executory contract(s) or unexpired lease(s) to the Purchaser, **you must file an objection with the Bankruptcy Court no later than [●], at 4:00 p.m. (prevailing Eastern Time) (the "Objection Deadline") and serve such objection on the following parties**:

*Proposed Counsel to the Debtors*

Evan T. Miller, Esq.
Steven D. Adler, Esq.
600 North King Street, Suite 400
Wilmington, Delaware 19801
Email: emiller@bayardlaw.com
       sadler@bayardlaw.com

*Co-Counsel to the Purchaser, Prepetition Secured Party, and DIP Facility Lender*

Lindsay Zahradka Milne, Esq.
Bernstein, Shur. Sawyer & Nelson, P.A.
100 Middle Street
Portland, ME 04101

*Office of the United States Trustee for the District of Delaware*

J. Caleb Boggs Federal Building
844 King Street, Suite 2207 – Lockbox #35
Wilmington, DE  19801
Attn: John Schanne
Telephone: (302) 573-6008
Fax: (302) 573-6497

*Subchapter V Trustee*
[●]

*Clerk of the Bankruptcy Court*
*United States Bankruptcy Court for the District of Delaware*
824 North Market Street, 3rd Floor
Wilmington, DE 19801

      **PLEASE TAKE FURTHER NOTICE** that if no objection to the Cure Amount or the assignment of your Executory Contract(s) or Unexpired Lease(s) to the Purchaser is filed by the Objection Deadline, **you will be (a) forever barred from objecting to the Cure Amount or provision of adequate assurance of future performance and from asserting any additional cure or other amounts with respect to your contract(s) or lease(s), and the Debtors and the Purchaser shall be entitled to rely solely upon the Cure Amount, (b) deemed to have consented to the assumption or assumption and assignment, and (c) forever barred and estopped from asserting or claiming defaults exist, that conditions to assignment must be**

satisfied under such contract(s) and/or lease(s) or that there is any objection or defense to the assumption and assignment of such contract(s) and/or lease(s).

PLEASE TAKE FURTHER NOTICE that if you agree with the Cure Amount indicated on Appendix I and otherwise do not object to the Debtors' assumption or assumption and assignment of your contract(s) and/or lease(s), you need not take any further action.

Dated:    [●], 2023
          Wilmington, Delaware                BAYARD, P.A.

                                              /s/_____
                                              Evan T. Miller (No. 5364)
                                              Steven D. Adler (No. 6257)
                                              600 North King Street, Suite 400
                                              Wilmington, Delaware 19801
                                              Telephone: (302) 655-5000
                                              Facsimile: (302) 658-6395
                                              Email: emiller@bayardlaw.com
                                                     sadler@bayardlaw.com

                                              *Proposed Counsel to the Debtors and Debtors in Possession*

# **APPENDIX I**

| [Counterparty Name] | [Contract/Lease] | [Cure Amount] | [Proposed Assignee (if any)] |
|---|---|---|---|

**<u>EXHIBIT D</u>**

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 (Subchapter V) |
| FILE STORAGE PARTNERS, LLC, *et al.*,[1] | Case No. 23-10877 (CTG) |
| Debtors. | (Joint Administration Requested) |

## DECLARATION OF TIMOTHY FUREY, CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN SUPPORT OF THE DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS

I, Timothy Furey, hereby declare under penalty of perjury:

1.      I am the appointed Chief Restructuring Officer for File Storage Partners LLC ("FSP"), Afton Blockchain LLC ("Afton"), Filtech SPV LLC ("Filtech"), and Midwest Blockchain, Inc. ("Midwest," and together with Afton and Filtech, the "Subsidiary Debtors") and the Subsidiary Debtors together with FSP, the "Debtors").  In my capacity as Chief Restructuring Officer of the Debtors, I am familiar with the Debtors' day-to-day operations, books and records, business, and financial affairs.

2.      I submit this Declaration in support of the Debtors' voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and motions filed on the date hereof seeking various types of "first day" relief and to provide an overview of the Debtors' business and their need for protection under Chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.      Except as otherwise indicated, all facts in this Declaration are based upon my

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  File Storage Partners, LLC (6920); Afton Blockchain LLC (3951); Filtech SPV LLC (9602); and Midwest Blockchain Inc. (8842).  The Debtors' service address is 1357 Ashford Ave., Pmb 373, San Juan, PR 00907.

personal knowledge, my discussions with the Debtors' management team and advisors, including

Bayard P.A., my review of relevant documents and information concerning the Debtors'

operations, financial affairs, and restructuring initiatives, and/or my opinions based upon my

experience and knowledge.  I am over the age of 18 years and duly authorized to submit this

Declaration on behalf of the Debtors.  If called upon to testify, I could and would testify

competently to the facts set forth in this Declaration.

4.       On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for

relief under chapter 11 of the Bankruptcy Code, as well as certain motions and other pleadings

(collectively, the "First Day Motions").  I am authorized by the Debtors to submit this Declaration

on their behalf in support of the First Day Motions.

5.       The First Day Motions are intended to enable the Debtors to operate effectively and

efficiently within these chapter 11 cases, as well as to avoid certain adverse consequences that

might otherwise result from the commencement of these cases.  Among other things, the First Day

Motions are designed to meet the Debtors' goals of: (i) continuing their operations in chapter 11

with as little disruption and loss of productivity and value as possible; (ii) maintaining the

confidence and support of their customers, employees, vendors and service providers; and

(iii) establishing procedures for the smooth and efficient administration of these chapter 11 cases.

I have reviewed the First Day Motions, and it is my belief that the relief sought therein is necessary

to (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operation of, the

Debtors' business, and (b) maximize and preserve the value of the Debtors' chapter 11 estates.  As

set forth in greater detail below, certain affiliates of the Debtors have not commenced bankruptcy

proceedings because it would be inefficient to do so and would result in less recovery to affected

creditors who have any prospect of recovery.

6.    This Declaration provides an overview of the Debtors' business, capital structure, the proposed debtor-in-possession ("DIP") financing, and the circumstances giving rise to the commencement of these chapter 11 cases, and summarizes the relief requested in each of the First Day Motions.

## I.    OVERVIEW

### A.    Background[2]

7.    The Debtors' history began with a non-Debtor entity known as DLTx ASA ("ASA"). ASA was the first publicly-traded company (Oslo Børs: DLTX) to monetize token rewards produced by building out the infrastructure of public, permissionless blockchains (often referred to as "mining"). ASA was the result of the reverse merger of a set of shares in blockchain and Bitcoin mining companies into a publicly-traded company on the Norwegian national stock exchange. ASA expanded by taking in investor funds through special purpose vehicles ("SPVs", with investors in the same hereafter "Subordinated SPV Investors") to fund projects in blockchain-related industries, which funds were then invested in capital goods (primarily computing hardware) and operations (payroll, electricity, general corporate purposes). The profits earned through the utilization of this equipment and expertise were then intended to be split between the Subordinated SPV Investors and ASA.

8.    As part of ASA's expansion, in March 2021, ASA acquired non-Debtor DSM Tech Enterprises Inc. ("DSM", and the acquisition thereof, the "DSM Acquisition"), a technical services provider which allowed ASA to become a fully integrated technology company. Given DSM's experience, ASA began focusing on a blockchain protocol called Filecoin.[3] As part of the DSM

---

[2] The summary of the loan documents and security agreements set forth herein is qualified in its entirety by the documents themselves. To the extent there is a discrepancy between the descriptions set forth herein and the documents, the documents control.

[3] The Filecoin network is described more fully below.

Acquisition, ASA also acquired DSM's existing Filecoin data storage operations maintained by the Subsidiary Debtors, which entities were wholly owned by DSM.

9.      Under the DSM's operations, DSM served as the operating company that held the equipment, the vendor relationships, and actually performed the data storage operations as a service provider to the Subsidiary Debtors, as well as FSP.  The Subsidiary Debtors, as well as FSP, paid DSM for use of a data center and management fees to cover DSM's operating expenses. At the time of DSM's purchase by ASA, the Subsidiary Debtors were wholly owned by DSM.

10.      The Filecoin network itself is a decentralized cloud storage platform, similar to Amazon Web Services, iCloud, and Microsoft Azure.  Companies, governments, and individuals can store data on the Filecoin network as with any other "centralized" cloud platform.  The Filecoin network's competitive advantage is reduced cost and reduced risk of not having to rely on a centralized provider.  Currently, Filecoin has 1% of the global cloud storage market.  Operators in the Filecoin ecosystem are compensated for their services (described in more detail below) by payments from the protocol in the form of Filecoin tokens—a type of cryptocurrency commonly known as "FIL."  These payments are called rewards.

11.      The Filecoin network is "trustless" in that it creates incentives for "good" behavior. In order to participate, participants must deposit or "stake" Filecoin tokens to the network.  These tokens can then be repossessed or "slashed" by the Filecoin network if the miners act inappropriately, thus creating an incentive structure for good behavior.  Such inappropriate behavior may include turning off machines or disconnecting storage.  This protects the network and those who rely on it from hacks, as well as encourages sound operations by storage providers. In return, the Filecoin network rewards miners with FIL tokens for the storage they provide.  The FIL received can then be redeployed back into the network or sold on one of the numerous digital

asset exchanges.  Germane to these cases, the secondary market for FIL has dropped precipitously since ASA's operations commenced, dropping from a high of ~$21/FIL around the time of the DSM Acquisition to ~$3/FIL as of the beginning of 2023.[4]  This significantly deteriorated the financial health of ASA's Filecoin operations.

12.    Despite this decreasing pricing, ASA became one of the largest FIL staking operations in North America.  It achieved this success through efficient technical performance and pioneering new ways to procure the FIL needed to expand storage operations.  Instead of spending cash on the open market to buy FIL, ASA borrowed FIL; in particular, ASA developed low-cost collateral borrowing methods pursuant to which it borrowed the FIL held by institutions and high net worth individuals while providing them comfort that their tokens were safe.  By borrowing and repaying the loans (plus interest) in FIL, ASA sought to insulate itself from market fluctuations in the dollar price of the token.

13.    Notwithstanding, ASA proved unable to weather the combined effect of FIL's collapsing price and the macroeconomic shocks that swept through the cryptocurrency industry in recent years—namely, the fall of industry giants FTX, the Terra network, Three Arrows Capital, and the contagion this created among institutions.  Certain entities that ASA relied on for borrowing FIL, such as Genesis Global, were likewise forced into bankruptcy.

14.    Additionally, ASA suffered from liquidity issues as a result of exorbitant data center costs and a ballooning payroll.  The former cost approximately $2.7 million per year (against a run rate of approximately $1.1 million of annual revenue by the end of 2022).  ASA was also supporting annual payroll of approximately $2.5 million, $1 million of which was dedicated to the FIL operations.  Taken as a whole, ASA's ability to cover operating expenses collapsed by

---

[4] As of the time of this filing, the price of FIL trades at approximately $4 USD.

December 2022.

15.     As financial trouble began to surface in the summer of 2022, ASA entered into a merger with a SPAC, Blockchain Moon Acquisition Corp. ("BMAQ") in September 2022.  The SPAC merger promised $10 million in fresh capital and a listing on the NASDAQ.  Unfortunately, in February 2023, both parties mutually agreed to terminate the SPAC as it became evident that BMAQ was unable to raise the funds for the transaction.  This left ASA in a precarious financial position and without a breakup fee to utilize in the short term.

16.     By the close of 2022, ASA became unable to pay its data center and other costs and began cutting salaries and reducing or deferring expenses.  Senior staff began deferring all compensation as of January 2023 and only operational staff and engineers received salaries.  Compounding these woes, in Q1 2023, Norwegian auditors became concerned at the financial condition of ASA's Filecoin operations based on their perception that ASA owed approximately $25 million to the Filecoin-related SPVs.[5]  While certain management disagreed over whether these were revenue sharing arrangements which could not create a default, by April 8th, 2023, Norwegian management had threatened to shutter ASA's Filecoin division, leaving the non-Norwegian stakeholders in the operations with no apparent path to protecting their rights vis-a-vis ASA.  Accordingly, in pursuit of a better outcome for the non-Norwegian stakeholders of the Filecoin Business (defined below), James Haft, the former non-executive chairman of ASA, and two officers of ASA, David Johnston and Jacob Farber, formed a new entity—later known as DLTx, LLC—which entered into a spinoff transaction by which the new company would assume ownership of the entities (including the Debtors here) associated with ASA's Filecoin operations (collectively, the "Filecoin Business").  Through the spinoff, it was hoped that ASA's previous

---

[5] It was at best unclear whether ASA had any obligation whatever on the SPV debt, and further unclear whether any amounts were owing by even the SPVs due to the specific contractual triggers for repayment of the investments.

Filecoin Business could continue servicing its employees, investors and vendors. An organizational chart of the post-spinoff entities is attached hereto as Exhibit A.

### B.    Events Leading to Bankruptcy

17.    As a result of the spinoff, DLTx LLC ("NewDLTx")[6] became the sole owner of all the operating entities of the Filecoin Business, including (indirectly) the Debtors.[7]  At the time, the divested Filecoin Business was encumbered by $33 million in debt with approximately $16 million in book value book-value assets and $120,000 monthly revenue, with a monthly burn rate of ~$550,000.  Presently, as to the Debtors, their debt structures are as follows:

    a.  *FSP*: more than $13 million in total book value of assets, comprised of loans, Filecoin held as collateral, Filecoin used in ongoing data center operations, and Filecoin stored within Wallets, and most importantly, its data center equipment. The equipment is operated and serviced by DSM pursuant to the service agreement between the two parties, and currently resides on the premises of Lightedge Solutions, Inc. ("Lightedge"),[8] a data center provider.  FSP's liabilities, totaling approximately $31 million[9] are largely comprised of (i) intercompany claims related to a variety of unsecured loans issued by certain of its SPV subsidiaries (the "Non-Debtor SPVs"), (ii) amounts owed under those certain *Master Loan and Security Agreements* with lenders who lent FSP certain digital currencies, and (iii) amounts due under certain equipment agreements.

    b.  *Filtech*: Filtech's assets are comprised of approximately $358,927 in data center equipment (prior to depreciation).  Its liabilities, totaling nearly $300,000, are comprised of accounts payable and certain intercompany loans.

    c.  *Midwest*: Midwest's assets are comprised of approximately $75,000 in data center equipment.  Its liabilities, totaling nearly $200,000, are comprised of accounts payable and certain intercompany loans.

    d.  *Afton*: Afton's assets are comprised of approximately $275,000 in data center equipment and intercompany loans.  Its liabilities, totaling nearly $25,000, are

---

[6] The spinoff transactional documents are in the names of ASA and "NewBuyer LLC"—NewBuyer LLC later changed its name to "DLTx, LLC.".

[7] As reflected in Exhibit A, FSP is the wholly-owned subsidiary of non-Debtor File Storage Company 1, Inc., which in turn is wholly owned by NewDLTx non-Debtor subsidiary, Distributed Ledger Technologies Ireland Limited, an Irish company.

[8] Out of an abundance of caution, the Debtors issued a letter to Lightedge advising them of the automatic stay's applicability with respect to the Debtors' equipment on its premises.

[9] When reduced for insider debts, this amount falls well under the $7.5 million noncontingent liabilities Subchapter V cap.

comprised of certain accounts payable.

18.     FSP intended to solve its financial crisis by restructuring the debt held by the Subordinated SPV Investors by offering the opportunity to exchange their debt obligations for equity in FSP.  The premise of the plan was that by eliminating debt, the Filecoin Business could raise the additional capital needed to continue the business.  Unfortunately, FSP was never able to achieve near the 100% consent that would have been required to equitize the Subordinated SPV Investors' debt.

19.     In light of the failure of the debt-for-equity swap, both the Debtors and their non-Debtor affiliates were forced to make additional efforts to right-size their financials.  Among other things, these efforts lead to a reduced headcount by over 50%, more streamlined operations, and reduced costs while maintaining operations to the best extent possible.

20.     In addition to operational changes, the Debtors, in conjunction with the broader efforts of NewDLTx, explored other ways to leverage FIL production and assets (primarily computer hardware), to raise the short-term capital needed to meet operational needs.  Strategies employed to fund the operations included selling their FIL production forward as derivative instruments, raising equity, issuing debt, and exploring joint venture possibilities with existing and new investors and partners.  As to the Debtors' lender outreach, the approximately five (5) institutions with which the Filecoin Business management team spoke were unwilling to take uncollateralized counterparty risk against the Debtors and there was no other cash or digital assets available to sell or leverage. Similarly, the efforts to sell, lever or otherwise monetize the computing hardware were unsuccessful, as lenders were not interested in collateralized loans where the liquidated market value of the hardware was estimated to be less than $3 million.

21.     A further decline in FIL prices and the bloated legacy vendor contracts left the

Debtors with no option but to further restructure its obligations. Indeed, while the Debtors have had continual dialogue with their vendors, the largest two vendors (the data centers and a hardware vendor) have not shown a willingness to restructure their positions vis-à-vis the company. Thus, the Debtors were forced to cut all salaries (which salaries are paid and handled through non-Debtor affiliate DSM) other than the limited critical staff that presently remains and seek a sale of all their assets in the context of a Subchapter V Chapter 11 case.

22. At this stage, FSP reached out to several investors of last resort and identified Silvermine Capital Advisors' LLC ("Silvermine"), a consulting and investment firm with extensive experience in technology company capitalizations and restructurings, including (significantly) digital asset infrastructure and mining operations. This experience includes investments in companies with operations similar to the Debtors, which positioned Silvermine to be a valuable resource to the Debtors on account of Silvermine's familiarity with the Debtors' business (and NewDLTx as a whole) and the unique challenges it faced.

23. The purpose of Debtors' principals' discussions was to solicit Silvermine's interest in capitalizing or otherwise facilitating a restructuring of the Debtors' operations in conjunction with a restructuring of NewDLTx's operations as a whole. Through its portfolio operations, Silvermine has the technical expertise and personnel to fully support the Debtors' existing operations with limited risk of the downtime that would otherwise result in slashing events, potentially resulting in the total loss of secured lender collateral over a very short period.

24. Toward that end, Silvermine structured a special purpose vehicle to fund the Debtors' chapter 11 cases and acquire the Debtors' assets via a credit bid of the DIP Facility obligations in order to ensure continuous operation as a going concern. Given (a) the absence of other viable liquidity, operational or restructuring options, (b) the absence of any other entities

showing interest in financing these cases or acquiring the Debtors' assets (in part due to the difficulty in locating parties that understand the Debtors' assets and business model in the first place), and (c) the looming threats being issued by the Debtors' data center providers, the Debtors strongly believe that a sale of its assets to Silvermine is the best possible option for the companies and their estates, especially in the context of a broader restructuring occurring outside of this Court (which Silvermine has likewise agreed to facilitate).  As such, this is correspondingly the best chance for the Filecoin Business to realize its full potential.

## II.    FIRST DAY MOTIONS[10]

### A.    Debtors' Motion for Entry of Order (I) Directing Joint Administration of Related Chapter 11 Cases and (II) Granting Related Relief (The "Joint Administration Motion")

25.    Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing joint administration of these chapter 11 cases for procedural purposes only and (b) granting related relief.  Given the integrated nature of the Debtors' operations, I believe joint administration of these chapter 11 cases will provide significant administrative convenience without harming the substantive rights of parties in interest.

26.    I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their business in chapter 11.  Accordingly, I respectfully request that the Joint Administration Motion be approved.

### B.    Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Continue to use Existing Business Forms, and (C) Continue Certain Intercompany Transactions and (II) Granting Limited Relief From The Requirements of Bankruptcy Code Section 345(b) (the "Cash Management

---

[10] Capitalized terms used in this section, but not defined, have the meaning ascribed in the respective First Day Motion.

**Motion")**

27.     By the Cash Management Motion, the Debtors seek entry of interim and final orders (i) authorizing the Debtors, in their discretion, to (a) continue to operate their Cash Management System (as defined below), including the authority to pay routine prepetition banking fees, (b) continue to use existing Business Forms, (c) continue to perform Intercompany Transactions (as defined below) consistent with historical practice and pay certain prepetition obligations related thereto and (ii) granting limited relief from the requirements of Bankruptcy Code section 345(b).

28.     The Debtors operate an integrated system of Accounts (as defined below) to facilitate the collection and disbursement of funds across their Debtor and non-Debtor affiliate entities (the "Cash Management System").  Further, the Cash Management System enables monitoring of collection and disbursement activity and facilitates the Debtors' reporting through the development of timely and accurate information.

29.     The Debtors maintain daily oversight over the Cash Management System and implement cash management control protocols for entering, processing, and releasing funds. Additionally, the Debtors' accounting department reconciles the Debtors' books and records on a monthly basis to ensure that all transfers are accounted for properly.

30.     As of the Petition Date, the Cash Management System includes three ordinary deposit bank accounts held by the Debtors (the "Deposit Accounts"), which have no balances. One of the Deposit Accounts is held by the Debtor File Storage Partners, LLC ("FSP") at PlainsCapital Bank and two of the Deposit Accounts are held by the Debtor Afton Blockchain LLC at Evolve Bank & Trust ("Evolve").

31.     FSP also maintains an account to hold, trade, and convert its FIL cryptocurrency to U.S. dollars (the "FIL Account," and together with the Deposit Accounts, the "Accounts"), which

cash is then remitted on to FSP's Deposit Account. Sequentially, the FIL is generated by FSP's staking equipment and is maintained there prior to being sent to the FIL Account for liquidation. The FIL Account is held at the cryptocurrency platform, Anchorage Digital ("Anchorage," and together with Evolve and PlainsCapital Bank, the "Banks"). While the FIL Account is in the name of the Debtor FSP and will maintain FSP's FIL, it is nested under an account at Anchorage that is held by FSP's non-debtor subsidiary, File Storage Ops 1 LLC. As part of the Debtors' historical practice, at times, the conversion of FSP's FIL to U.S. dollars would occur at the File Storage Ops 1 level, with the resulting liquidated cash remitted to FSP's Deposit Account.[11] As of the Petition Date, the FIL Account had a balance of 3,726 FIL, which is worth approximately $14,500 based on the valuation of the FIL token at the time of this Motion. In addition, the Debtors' affiliates maintain eleven bank accounts. Of those accounts, only an account for the Debtors' affiliate DSM Tech Enterprises, Inc. ("DSM") maintains funds, which amount to approximately $2,500. The Debtors incur certain fees and charges in connection with the ordinary course of operations (collectively, the "Bank Fees"). The process through which the Debtors receive payments, make cash disbursements, and transfer funds between the bank accounts is described in greater detail in the Cash Management Motion and Exhibit C attached to the Cash Management Motion.

32.    I believe that the Debtors' transition into chapter 11 will be significantly less disruptive if the Accounts are maintained following the commencement of these cases with the same account numbers and, where applicable, automated relationships. I further believe that it is imperative for the Debtors to be able to deposit funds or cryptocurrency in and withdraw (or as to cryptocurrency, convert to U.S. dollars) funds from the Accounts, subject to the same access rights and limitations existing prior to the Petition Date, including but not limited to checks, wire

---

[11] For the avoidance of doubt, the Debtors intend that such conversion would occur in the FIL Account going forward.

transfers, automated clearinghouse transfers, electronic funds transfers, and other debits and to treat the Accounts for all purposes as debtor-in-possession accounts. In addition, to maintain the integrity of their Cash Management System, I believe that the Debtors should be allowed pay all prepetition Bank Fees, if any, and to continue to pay Bank Fees in the ordinary course on a postpetition basis.

33.     The Debtors also may have used various pre-printed documents (the "Business Forms"), such as checks, invoices, and letterhead, prior to the Petition Date. To the extent, the Business Forms were used prepetition, they do not reference the Debtors' current status as debtors in possession. Nonetheless, most parties doing business with the Debtors will be aware of the Debtors' status as debtors in possession as a result of the publicity surrounding these chapter 11 cases and the notice of commencement served on parties in interest. Requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expenses on the estates. Thus, I believe that the Debtors should be authorized to use their existing Business Forms, if any, without placing a "Debtor In Possession" legend on each, until their existing stock is depleted.[12] Once the Debtors have exhausted their existing stock of checks or forms, any new check stock or subsequently printed checks or forms will bear the designation "Debtor In Possession" with the joint case number. To the extent that checks or forms are prepared electronically, the debtors will add a "Debtor In Possession" designation to such checks within fourteen (14) days of the Petition Date.

34.     Further, from time to time, in the ordinary course of business, resources are shared between the Debtors and certain affiliated entities. These resources include funds, personnel, and logistics and operational services (collectively, the "Intercompany Transactions"). The

---

[12] The Debtors did not generally use such forms in their businesses, but nonetheless seek the relief to do so.

Intercompany Transactions result in receivables and payables (the "Intercompany Claims").  At any given time, there may be intercompany balances owing by one Debtor or non-Debtor affiliate to another Debtor or non-Debtor affiliate.

35.    For instance, the Debtors and DSM engage in certain Intercompany Transactions. This relationship is detailed in part by certain "Management Services Agreement[s]" (the "MSAs") entered into between the each of the Debtors and DSM.  Pursuant to the MSAs, DSM and its personnel provide the Debtors with critical management and administrative support services which include, without limitation: general management; use of hardware, software, and infrastructure; corporate accounting and internal controls; communication and management information systems; and other management services as deemed necessary.  Under the MSAs, the Debtors are to pay an aggregate of $57,500 per month for such services.  In the ordinary course of business, the Debtors paid additional amounts to DSM as the operational expenses of the Debtors increased and the Debtors took on additional investors.  DSM is also party to a certain "Joint Collaboration Agreement" (together with the MSAs, the "Shared Services Agreements") with the Debtors and DSM's former affiliate, DLT ASA, under which DSM is responsible for the operational management of the storage hardware and software owned or used by FSP and any personal required to operate its Filecoin Network, including payroll and analogous independent contractor payments.  In addition, as part of the Debtors' historical practice, at times, the conversion of FSP's FIL to U.S. dollars would occur at the File Storage Ops 1 level, with the resulting liquidated cash remitted to FSP's Deposit Account, but the Debtors intend that all such conversions would occur in the FIL Account going forward.

36.    Based on the Shared Services Agreements, in the ordinary course of business, the Debtors' operations, including the critical and substantially pared down personnel performing such

operations, are managed and paid by and through DSM. The Debtors utilize their funds (which will include the proposed DIP loan) to pay DSM for the operational expenses associated with the Debtors, including the Debtors' taxes, rent, accounts payable, and compensation of DSM's personnel.[13] These Intercompany Transactions enable the Debtors to fund their operations and thus are integral to the continued operation of the Debtors' businesses. Indeed, as of the Petition Date, the Debtors maintain no direct employees or other personnel and rely entirely on the critical personnel primarily contracted with by DSM, who in turn rely on funding from the Debtors for their salaries.

37. Based on the foregoing, I believe that payment of certain limited outstanding prepetition obligations, in no event exceeding $200,000 (as set forth in the DIP Budget), related to Intercompany Transactions and continuing the Intercompany Transactions post-petition is the most efficient and reasonable approach to obtaining necessary services and addressing the covered business expenses, especially in light of the proposed debtor-in-possession financing. I further believe that disallowing the continued use of Intercompany Transactions would unnecessarily disrupt the Debtors' businesses and the Cash Management System to the detriment of the Debtor and its stakeholders. As a result, I believe that the Debtors should have the ability to pay certain pre-petition and post-petition obligations on Intercompany Transactions, consistent with the Debtors' customary prepetition practices and consistent with the DIP Budget. In addition, I believe that the Intercompany Transactions should be granted administrative expense priority status, which will facilitate the orderly and efficient operation of the Debtors' enterprise on a postpetition basis.

38. Without the relief requested, I believe the Debtors would be unable to effectively and efficiently maintain their financial operations. Such a result would cause significant harm to the

---

[13] As of the Petition Date, there are nine (9) individuals that perform services for the Debtors who are independent contractors of DSM or its English and Welsh affiliate.

Debtors' businesses and the value of their estates.  Accordingly, the relief requested is in the best interest of the Debtors, their estates and creditors, and all parties in interest.

    **C.**    **Motion of the Debtors for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 362, 363(c), 363(e), 364 and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to § 364 of the Bankruptcy Code; (II) Authorizing Use of Cash Collateral Pursuant to § 363 of the Bankruptcy Code; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to the Prepetition Secured Party; and (V) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. P. 4001(b) and (c) (the "<u>DIP Motion</u>")**

    39.    By the DIP Motion, the Debtors respectfully request that the Court enter interim and final orders (a) authorizing the Debtors' Post-Petition financing (the "<u>DIP Financing</u>") with KB Silver Funding, LLC ("<u>DIP Lender</u>") as lender under that certain Superpriority Debtor-in-Possession Term Sheet dated June 30, 2023 ("<u>DIP Term Sheet</u>") and granting security interests and providing super-priority administrative expense status pursuant to 11 U.S.C. section 364(c) and (d); (b) authorizing the use of cash collateral and pay certain related fees and charges; (c) modifying the automatic stay pursuant to 11 U.S.C. §362; (d) scheduling a final hearing with respect to the relief requested herein pursuant to Rule 4001 of the Federal Rules of Bankruptcy Procedure; and (e) granting related relief (the "<u>DIP Motion</u>").  Specifically, by the DIP Motion, the Debtors request interim and final authorization for them to obtain the DIP Financing, which if approved on a final basis would consist of post-petition financing in the Maximum Amount of $1,500,000.00, with $200,000.00 available on an interim basis (the "<u>DIP Financing</u>").

    40.    Unsecured financing is not available to the Debtors.  The Debtors exhausted any realistic paths to obtain any additional unsecured financing or additional investors.  During the last twelve (12) months, the Debtors and their prior owners, ASA, approached or were approached by over a dozen interested parties seeking an acquisition or joint venture and entered into non-disclosure agreements with certain interested parties, however, no transaction came to fruition.

41.     In May 2023, the Debtors were introduced to a capital provider in connection with a forward sale of the future production of FSP in a transaction which was targeted to provide $3 million of non-dilutive funding to the Debtor.  This transaction fell through because the price of FIL fell by 50% during the period when the conversations were proceeding.  Likewise in the second quarter of 2023, the Debtors had discussions with a number of other FIL purchasers and investors, but did not culminate in a transaction.  As noted above, the Debtors ultimately engaged in discussions with Silvermine in spring 2023, initially regarding an investment, and subsequently, regarding the current contemplated financing and sale of the Debtors.

42.     Silvermine (through its affiliate, the DIP Lender) was the only party that expressed interest in providing financing to the Debtors pending court approval of the sale of the Debtors' assets but would do so only if such financing were on a secured basis.  The DIP Lender expressed interest in providing financing in the form of debtor-in-possession financing in the context of a chapter 11 case.

43.     As discussed in detail above, these Chapter 11 Cases follow months of efforts by the Debtors to attract capital or consummate strategic transactions.  Faced with the depletion of liquidity, possibility of losing valuable market position and intellectual property, the potential loss of the staff and management, and the inability to obtain further funding outside of Chapter 11, the Debtors' management took the steps they deemed necessary and exercised their best business judgment in negotiating the DIP Financing.  The Debtors' management ultimately concluded that the DIP Financing will provide immediate access to capital to pay their limited ongoing operating expenses while enabling the Debtors to seek a sale of their assets in these cases.

44.     Without this financing, the Debtors' untapped potential for value would be lost, and the Debtors would most likely have dissolved or liquidated under chapter 7 with no chance for a

recovery to their creditors. The DIP Financing is the Debtors' best and only means of obtaining

the liquidity necessary to avoid a shutdown of their businesses, preserve going concern value

pending a sale of their assets.

45.    The proceeds of the DIP Financing are sized to preserve and promote the viability

of the Debtors' assets and support the Debtors through the anticipated pendency of these chapter

11 cases, but nothing more. Moreover, the financial terms and covenants of the DIP Financing are

standard and reasonable for financing of this kind.

46.    Based on the Debtors' negotiations regarding the DIP Financing, the terms of the

DIP Financing constitute, on the whole, the most favorable terms the Debtors could achieve upon

which the DIP Lender will extend the necessary post-petition financing. Although the Debtors

explored whether the DIP Lender would provide the DIP Financing without certain provisions, in

the course of negotiations, the DIP Lender indicated it would not be willing to provide the DIP

Financing without such terms. In particular, the DIP Lender would not provide financing without

the provisions requiring, in particular, securing the DIP Financing with the appropriate super

priority claims. These are key components of consideration for the DIP Lender without which it

has indicated it is unwilling to provide the DIP Financing.

47.    Accordingly, the Debtors, in consultation with their advisors and in light of the

significant liquidity crush they were facing, determined that the terms of the DIP Financing were

superior to any options reasonably available to the Debtors at this time. Therefore, the DIP

Financing provides the Debtors with the best, most feasible, and value-maximizing financing

option available at this time.

48.    Moreover, the Debtors have concluded that the economic terms of the DIP

Financing are fair and reasonable and are consistent with what can be expected in a debtor-in-

possession financing.  After thorough analysis by the Debtors and advisors have concluded that the terms of the DIP Financing are reasonable and appropriate under the circumstances.

49.     For these reasons, in the Debtors' prudent business judgment, the terms of the DIP Financing are fair and reasonable in the circumstances of these cases and the Debtors could not obtain post-petition financing on such favorable lending terms.  Accordingly, the relief requested in the DIP Motion is in the best interests of the Debtor, its estate and creditors, and all parties in interest.

## CONCLUSION

50.     The Debtors' estates would suffer immediate and irreparable harm absent the immediate ability to obtain financing and make certain critical payments and otherwise continue operating in the ordinary course of business as sought in the First Day Motions.  In my opinion, approval of the relief requested in the First Day Motions will minimize disruptions to the Debtors' operations, thereby preserving and maximizing the value of the Debtors' estates for the benefits of their creditors and customers.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: July 1, 2023                          */s/ Timothy Furey*_____
                                             Timothy Furey
                                             Chief Restructuring Officer for the Debtors

## EXHIBIT E

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| FILE STORAGE PARTNERS, LLC, *et al.,*[1] | Case No. 23-10877 (CTG) |
| Debtors. | |

## NOTICE OF APPOINTMENT OF SUBCHAPTER V TRUSTEE

Pursuant to 11 U.S.C. § 1183(a), the United States Trustee has appointed the following qualified individual as Subchapter V trustee in the above captioned cases.

William A. Homony, CIRA
Miller Coffey Tate LLP
1628 John F. Kennedy Boulevard, Suite 950
Philadelphia, PA 19103
Telephone: (215) 561-0950 ext. 26
Fax: (215) 561-0330
Email: bhomony@mctllp.com

The Subchapter V trustee's verified statement of disinterestedness and anticipated rate of compensation is attached to this notice.

Dated: July 5, 2023

**ANDREW R. VARA**
**UNITED STATES TRUSTEE, REGIONS 3 AND 9**

By:  /s/ Hannah McCollum
Hannah McCollum, Esq.
Trial Attorney
United States Department of Justice
Office of the United States Trustee
J. Caleb Boggs Federal Building
844 N. King Street, Room 2207, Lockbox 35
Wilmington, DE 19801
Telephone: (202) 573-3275
E-Mail: hannah.mccollum@usdoj.gov

---

[1]The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: File Storage Partners, LLC (6920); Afton Blockchain LLC (3951); Filtech SPV LLC (9602); and Midwest Blockchain Inc. (8842). The Debtors' service address is 1357 Ashford Ave., Pmb 373, San Juan, PR 00907.

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| FILE STORAGE PARTNERS, LLC, *et al.,*[1] | Case No. 23-10877 (CTG) |
| Debtors. | |

## <u>VERIFIED STATEMENT OF SUBCHAPTER V TRUSTEE</u>

In connection with the United States Trustee's Notice of Appointment of me as Subchapter V trustee in this proceeding, I hereby verify that I am a "disinterested person" as defined by 11 U.S.C. §101(14) in that I:

    (a)    am not a creditor, equity security holder or insider of the debtor;

    (b)    am not, and was not, within two years before the date of filing of the petition, a director, officer, or employee of the debtor; and

    (c)    do not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason.

Subject to court approval pursuant to 11 U.S.C. § 330, I anticipate seeking compensation for my service in this case at an hourly rate of $400.00, in addition to seeking reimbursement for any actual and necessary expenses I incur.

I hereby accept my appointment as subchapter V trustee in this case pursuant to FRBP 2008.

Date: July 5, 2023

                    /s/ William A. Homony
                    William A. Homony, CIRA
                    Miller Coffey Tate LLP
                    1628 John F. Kennedy Boulevard, Suite 950
                    Philadelphia, PA 19103
                    Telephone: (215) 561-0950 ext. 26
                    Fax: (215) 561-0330
                    Email: bhomony@mctllp.com

---

[1]The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: File Storage Partners, LLC (6920); Afton Blockchain LLC (3951); Filtech SPV LLC (9602); and Midwest Blockchain Inc. (8842). The Debtors' service address is 1357 Ashford Ave., Pmb 373, San Juan, PR 00907.

# EXHIBIT F

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| FILE STORAGE PARTNERS, LLC, *et al.*,[1] | Case No. 23-10877 (CTG) |
| Debtors. | (Jointly Administered) |
| | **Re: D.I. 5, 25, 43, 84** |

**FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364, AND 507 AND FED. R. BANKR. P. 2002, 4001 AND 9014: (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING PURSUANT TO § 364 OF THE BANKRUPTCY CODE; (II) AUTHORIZING USE OF CASH COLLATERAL PURSUANT TO § 363 OF THE BANKRUPTCY CODE; (III) GRANTING LIENS AND SUPER-PRIORITY CLAIMS; AND (IV) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTY, GENESIS GLOBAL CAPITAL, LLC AND <u>DIP FACILITY LENDER</u>**

Upon consideration of the *Motion of the Debtors for Entry of Interim and Final Orders, Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to § 364 of the Bankruptcy Code; (II) Authorizing Use of Cash Collateral Pursuant to § 363 of the Bankruptcy Code; (III) Granting Liens and Super-Priority Claims; (IV) Granting Adequate Protection to the Prepetition Secured Party; and (V) Scheduling a Final Hearing Pursuant to Fed. R. Bankr. R. 4001(b) and (c)* [D.I. 5] (the "<u>Motion</u>")[2] filed by the Debtors; and this Court having entered the *Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364, and 507 and Fed. R. Bankr. P. 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing Pursuant to § 364 of the Bankruptcy Code; (II) Authorizing Use of Cash Collateral Pursuant to §*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are:  File Storage Partners, LLC (6920); Afton Blockchain LLC (3951); Filtech SPV LLC (9602); and Midwest Blockchain Inc. (8842).  The Debtors' service address is 1357 Ashford Ave., Pmb 373, San Juan, PR 00907.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Motion.

*363 of the Bankruptcy Code; (III) Granting Liens and Super-Priority Claims; (IV) Granting*

*Adequate Protection to the Prepetition Secured Party; and (V) Scheduling a Final Hearing*

*Pursuant to Fed. R. Bankr. R. 4001(b) and (c)* [D.I. 25] (the "First Interim Order") and the *Second*

*Interim Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(e), 364, and 507 and Fed. R.*

*Bankr. P. 2002, 4001 and 9014: (I) Authorizing Debtors to Obtain Postpetition Financing*

*Pursuant to § 364 of the Bankruptcy Code; (II) Authorizing Use of Cash Collateral Pursuant to §*

*363 of the Bankruptcy Code; (III) Granting Liens and Super-Priority Claims; and (IV) Granting*

*Adequate Protection to the Prepetition Secured Party* [D.I. 43] (the "Second Interim Order"); and

it appearing that due and proper notice of the Motion has been given, and that no other or further

notice need be given; and after due deliberation and sufficient cause appearing therefor;

**THE COURT HEREBY FINDS AND CONCLUDES**:

A.    On June 30, 2023 (the "Petition Date"), the Debtors commenced the Cases in the

Bankruptcy Court.  The Debtors are continuing to operate their respective businesses and manage

their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the

Bankruptcy Code.  A Subchapter V Trustee was appointed on July 5, 2023.

B.    On or about the same date as the filing of the Motion, the Debtors: (i) filed a motion

seeking joint administration of the Chapter 11 Cases; and (ii) filed a motion seeking an order

approving the sale of substantially all their assets (the "Sale Motion").

C.    The Bankruptcy Court entered the First Interim Order on July 6, 2023 and the

Second Interim Order on July 24, 2023.

D.    The Bankruptcy Court has subject matter jurisdiction to consider this matter

pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue

is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409.

E.       Debtors' Stipulations: Subject to Paragraph 14 hereof, each stipulation, admission, and agreement contained in this Final Order, including, without limitation, the stipulations set forth below (collectively, the "Debtors' Stipulations"), shall be binding upon the Debtors, their estates, and any successors thereto (including, without limitation, any chapter 7 or chapter 11 trustee appointed or elected for any of the Debtors) under all circumstances and for all purposes.  The Debtors are deemed to have irrevocably waived and relinquished all Challenges (as defined below) as of the Petition Date.  The Debtors, on their own behalf and on behalf of their estates, admit, stipulate, acknowledge, and agree as follows:

(a)       Prepetition, certain of the Debtors had entered into five separate loan agreements with lenders that lent certain crypto currencies to the Debtors (collectively, the "Cryptocurrency Loan Agreements"), and then retained liens on those lent cryptocurrencies to secure the loan thereof (collectively, the "Cryptocurrency Collateral").[3]  One of those lenders is a debtor in its own chapter 11 case: Genesis Global Capital, LLC ("Genesis") pending in the United States Bankruptcy Court for the Southern District of New York.

(b)       On August 9, 2021, Genesis and File Storage Partners, LLC ("FSP") entered into that certain Master Loan Agreement dated as of August 9, 2021 (the "Genesis MLA").  On April 10, 2021, Genesis and FSP entered into that certain loan term sheet (the "Genesis Term Sheet"), and the first amendment to the Genesis Term Sheet dated December 10, 2021 (the "Genesis Term Sheet Amendment"), pursuant to which, among other things, Genesis lent FSP native token ("FIL") of the Filecoin Network not to exceed 500,000 FIL (the Genesis MLA, the Genesis Term Sheet, and the Genesis Term Sheet Amendment, the "Genesis Loan Documents").

---

[3] For the avoidance of doubt, the Prepetition Collateral does not include the cryptocurrency owed to the lenders in connection with the Cryptocurrency Loan Agreements.

(c)    As of the Petition Date, the Debtors were, absolutely and unconditionally, indebted and obligated to Genesis under the Genesis Loan Documents in an aggregate principal amount of approximately 176,415 FIL, plus accrued but unpaid interest, fees, costs, and expenses incurred by Genesis under the Genesis Loan Documents (all amounts owing or outstanding under the Genesis Loan Documents, whether or not contingent, the "Genesis Secured Obligations").

(d)    As more fully set forth in the Genesis Loan Documents, the Genesis Secured Obligations are secured by a first priority lien on and security interest in the "Collateral" under and as defined in the Genesis MLA (such liens and security interests, collectively, the "Genesis Liens," and the collateral securing the Genesis Liens, the "Genesis Collateral").

(e)    On June 8, 2023, Silvermine Capital Advisors, LLC (the "Prepetition Secured Party") made a loan to the Debtors and certain of their affiliates in the original principal amount of thirty thousand and 00/100 dollars ($30,000), as evidenced by that certain Promissory Note, dated June 8, 2023 by the borrowers thereto in favor of the Prepetition Secured Party (as amended from time to time, the "Note"), and as secured by that certain Security Agreement, dated June 8, 2023, by the grantors signatory thereto in favor of Prepetition Secured Lender (together with any and all amendments, restatements, supplements, and other modifications thereto, collectively, the "Security Agreement," and together with the Note, the "Prepetition Debt Documents").  The collateral described in the Security Agreement (as subsequently amended) comprised all assets of the Debtors *other than* the Cryptocurrency Collateral, but including all other digital currency collateral (such collateral, the "Prepetition Collateral").  The security interests evidenced under the Security Agreement (as amended over time, the "Prepetition Liens") were perfected by the filing of a financing statement with the Secretaries of State for Delaware, Nebraska, Missouri and Puerto Rico.

4

(f)        On June 29, 2023, Silvermine assigned the Note (with the consent of the Borrowers thereunder) and its rights under the Security Agreement to KB Silver Funding, LLC (the "Prepetition Secured Party"). The Prepetition Secured Party then filed financing statements evidencing the assignment of the Note and the Security Agreement against each of the borrowers under the Note with the appropriate Secretaries of State, including those of Delaware, Nebraska, Missouri and Puerto Rico. On the same day, the Debtors amended and restated the Note by executing the First Amended and Restated Promissory Note in the amended principal amount of two hundred thousand and 00/100 dollars ($200,000.00).

(g)        As of the Petition Date, the Debtors were, absolutely and unconditionally, indebted and obligated to Prepetition Secured Party under the Prepetition Debt Documents in a principal amount of approximately $200,000.00, plus accrued but unpaid interest, fees, costs and expenses incurred by the Prepetition Secured Party under the Prepetition Debt Documents (all amounts owing or outstanding under the Prepetition Debt Documents, whether or not contingent, the "Prepetition Obligations").

(h)        As of the Petition Date and immediately prior to giving effect to the First Interim Order, the Prepetition Credit Documents and the Genesis Loan Documents are valid and binding agreements and obligations of the Debtors, and the liens granted pursuant thereto as to the Debtors constitute valid, binding, enforceable, and perfected security interests and liens, subject only to the liens permitted under such agreements, but only to the extent such permitted liens are valid, enforceable, non-avoidable liens and security interests that are perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), which are not subject to avoidance, reduction, disallowance, impairment, or subordination (whether equitable, contractual, or otherwise) pursuant to the Bankruptcy Code

5

or applicable non-bankruptcy law; and the obligations arising under the Prepetition Credit Documents and the Genesis Loan Documents constitute the legal, valid, and binding obligation of the Debtors, enforceable in accordance with the terms thereof, and are not subject to any challenge or defense, including without limitation, avoidance, subordination (whether equitable, contractual, or otherwise), recharacterization, recovery, setoff, offset, attach, counterclaim, cross-claim, or claim (as defined in the Bankruptcy Code) of any kind.

(i)     The Debtors have waived, discharged, and released any right they may have to (i) challenge or contest any of the Prepetition Obligations, the Prepetition Credit Documents, the Genesis Secured Obligations, the Genesis Loan Documents, the Genesis Liens, the Genesis Collateral, the DIP Obligations, the DIP Facility Documents (as defined below), and the liens, interests, claims, and security for the Prepetition Obligations and the DIP Obligations, and to (ii) assert any offsets, defenses, claims, objections, challenges, and/or causes of action against the Prepetition Secured Party, DIP Facility Lender, Genesis, and/or any of each of its affiliates, parents, subsidiaries, agents, attorneys, advisors, professionals, officers, directors, and employees only to the extent any such offset, defenses, claims, objections, challenges, and/or causes of action against any such parties is related to the Prepetition Obligations, the DIP Obligations, or the Genesis Secured Obligations, and to assert that any portion of the Prepetition Obligations, the DIP Obligations, or the Genesis Secured Obligations (as applicable) is subject to avoidance, disallowance, reduction, or subordination (whether equitable, contractual, or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law.

(j)     No offsets, challenges, objections, defenses, claims, or counterclaims of any kind or nature to any of the Prepetition Liens, the Prepetition Secured Obligations, the Genesis Liens, the Genesis Secured Obligations, the Genesis Loan Documents, the Genesis Collateral, the

DIP Facility Liens, or the DIP Obligations exist, no facts or occurrence supporting or giving rise to any offset, challenge, objection, defense, claim, or counterclaim of any kind or nature to any of the Prepetition Liens, Prepetition Secured Obligations, the Genesis Liens, the Genesis Secured Obligations, the Genesis Loan Documents, the Genesis Collateral, DIP Facility Liens, or DIP Obligations exist, and no portion of the Prepetition Liens, Prepetition Secured Obligations, the Genesis Liens, the Genesis Secured Obligations, the Genesis Loan Documents, the Genesis Collateral, DIP Facility Liens, or DIP Obligations are subject to any challenge or defense including, without limitation, avoidance, disallowance, disgorgement, recharacterization, or subordination (whether equitable, contractual, or otherwise) pursuant to the Bankruptcy Code or applicable non-bankruptcy law or equity.

(k)     The Debtors, on behalf of themselves and their respective estates (including any successor trustee or other estate representative in the Chapter 11 Cases and any Successor Cases (as defined herein), and any party acting by, through, or under the Debtors or their estates), hereby stipulate and agree that they absolutely and unconditionally release and forever and irrevocably discharge and acquit the Prepetition Secured Party, Genesis, the DIP Facility Lender, and each of their respective former or current officers, partners, directors, managers, owners, members, principals, employees, agents, related funds, investors, financing sources, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other professionals and the respective successors and assigns thereof, in each case solely in their capacity as such (collectively, the "Released Parties"), of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, rights, assertions, allegations, actions, suits, controversies, proceedings, losses, damages, injuries, attorneys' fees, costs, expenses, or judgments of every type, whether known,

7

unknown, asserted, unasserted, suspected, unsuspected, accrued, unaccrued, fixed, contingent, pending, or threatened including, without limitation, all legal and equitable theories of recovery, arising under common law, statute, or regulation or by contract, of every nature and description, arising out of, in connection with, or relating to the DIP Facility, the DIP Facility Documents, the Prepetition Credit Documents, the Genesis Loan Documents (as applicable), and/or the transactions contemplated hereunder or thereunder including, without limitation, any so-called "lender liability" or equitable subordination claims or defenses, any and all claims and causes of action arising under the Bankruptcy Code, and any and all claims and causes of action with respect to the validity, priority, perfection, or avoidability of the liens or claims of the Prepetition Secured Party, the Genesis Debtors, and/or the DIP Facility Lender (collectively, the "Released Claims") that exist or may exist prior to the entry of this Final Order by the Court.  The Debtors further waive and release any defense, right of counterclaim, right of setoff, or deduction to the payment of the Prepetition Secured Obligations, the Genesis Secured Obligations, and the DIP Obligations which the Debtors now have or may claim to have against the Released Parties arising out of, connected with, or relating to any and all acts, omissions, or events occurring prior to the entry of this Final Order by the Court.

(l)    The Debtors admit, stipulate, acknowledge, and agree that the DIP Facility Lender and the Prepetition Secured Party shall have the right, subject to section 363(k) of the Bankruptcy Code, to credit bid up to the full amount of the applicable outstanding Prepetition Secured Obligations and/or the DIP Obligations (as applicable), including, without limitation, any accrued interest and expenses, in a sale of any DIP Collateral (defined below) or Prepetition Collateral, as applicable, and whether such sale is effectuated through sections 363 or 1129 of the Bankruptcy Code, by a Chapter 7 trustee under section 725 of the Bankruptcy Code, or otherwise.

8

(m)  All of the Debtors' cash and cash equivalents, including cash on deposit in any account or accounts as of the Petition Date, securities or other property, wherever located, whether as original collateral or proceeds of other Prepetition Collateral, constitutes Cash Collateral of the Prepetition Secured Party and DIP Facility Lender.

F.  The Debtors' budget (annexed to the Second Interim Order as **Exhibit A**, the "Budget") indicates that the Debtors will require the use of Cash Collateral and the DIP Facility to meet the Debtors' expenses in connection with their business operations and to pay certain expenses related to the Debtors' Chapter 11 Cases.

G.  The Prepetition Secured Party is entitled, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, to adequate protection of its interests in the Prepetition Collateral to the extent of any diminution in the value of the Prepetition Collateral occurring from and after the Petition Date.

H.  Genesis is entitled, pursuant to sections 361, 363(e), and 364(d) of the Bankruptcy Code, to adequate protection of its interests in the Genesis Collateral to the extent of any diminution in the value of the Genesis Collateral occurring from and after the Petition Date, whether the reason for such diminution is as a result of, arises from, or is attributable to, any or all of the DIP Facility, the priming of the liens arising under the Genesis Loan Documents, the use of Cash Collateral, the physical deterioration, consumption, use, sale, lease, disposition, or shrinkage, of the Genesis Collateral, the imposition of the automatic stay, or otherwise (including, without limitation, any diminution in value of such interests in the Genesis Collateral prior to Genesis's seeking vacation of the automatic stay or the Bankruptcy Court granting such relief).

I.  The Debtors' businesses have an immediate need to obtain the DIP Facility and use Cash Collateral in order to have adequate liquidity to provide for, among other things, the orderly

continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, and to satisfy other working capital, operational, financial and general corporate needs, as well as to pursue the orderly sale of its assets through these Chapter 11 Cases.

J.      Under the circumstances, the Debtors are unable to obtain sufficient financing from sources other than the DIP Facility Lender on terms more favorable than under the DIP Facility and all the documents, exhibits, schedules, and instruments delivered pursuant thereto or in connection therewith (inclusive of the DIP Term Sheet attached to the First Interim Order as **Exhibit B** and the Budget, the "DIP Facility Documents").

K.      Each of the DIP Facility Lender, Genesis, and the Prepetition Secured Party have acted in good faith in, as applicable, negotiating, consenting to, and agreeing to provide the postpetition financing arrangements and use of Cash Collateral contemplated by this Final Order and the other DIP Facility Documents, and the reliance of each of the DIP Facility Lender, Genesis, and the Prepetition Secured Party on the assurances referred to above is in good faith.

L.      Notice of the Motion and the relief requested thereby and this Final Order has been provided in accordance with Bankruptcy Rule 4001, upon (a) the Office of the U.S. Trustee for the District of Delaware; (b) the Debtors' thirty (30) largest unsecured creditors or their counsel, (c) counsel to the DIP Facility Lender and the Prepetition Secured Party, (d) all known holders of filed liens on the Debtors' assets, (e) the Subchapter V Trustee, (f) counsel to Genesis, and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service.

M.      Absent entry of this Final Order, the Debtors' businesses, properties, and estates will be immediately and irreparably harmed.

N.    Based on the record presented by the Debtors to the Bankruptcy Court at the Interim Hearing and Final Hearing, and in the First Day Declaration, *Supplemental Declaration of Timothy Furey, Chief Restructuring Officer of the Debtors, in Support of the Debtors' First Day Motions* [D.I. 18], and *Supplemental Declaration of Timothy Furey, Chief Restructuring Officer of the Debtors, in Support of the Debtors' DIP Motion and Reply to Objection of Ad Hoc Noteholder Group to Entry of the Final DIP Order* [D.I. 63]: (i) the terms of the DIP Facility and use of Cash Collateral are the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration; and (ii) the DIP Facility and use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtors and the DIP Facility Lender, Genesis, and the Prepetition Secured Party, and any credit extended, loans made, credit support provided and other financial accommodations extended to the Debtors by the DIP Facility Lender and use of Cash Collateral by the Debtors shall be deemed to have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

**THEREFORE**, it is hereby **ORDERED**, **ADJUDGED**, AND **DECREED** that:

1.    <u>Disposition</u>.  The Motion is granted, as set forth herein.  The Debtors are authorized to use Cash Collateral and borrow under the DIP Facility pursuant to the Budget, the DIP Term Sheet, and this Final Order.  Any objections to the Motion that have not previously been resolved or withdrawn are hereby overruled.  This Final Order shall immediately become effective upon its entry.

**B.    <u>Authorization to Borrow and Rights of DIP Facility Lender.</u>**

2.    <u>Authorization to Borrow</u>.  Provided that the Debtors are not in default under the terms of this Final Order or the DIP Term Sheet, the Debtors are authorized to borrow under the

DIP Facility from the DIP Facility Lender up to the principal amount of $1,500,000.00 (together with interest, fees, charges and expenses payable under the DIP Facility Documents), pursuant and subject to the terms and conditions of this Final Order and the DIP Term Sheet (including the conditions to effectiveness thereof). The DIP Facility Documents shall constitute legal, valid, and binding obligations of the parties thereto, enforceable against the Debtors in accordance with their terms.

3.      <u>Structure and Amount of DIP Facility</u>. The DIP Facility in the maximum principal amount of **<u>$1,500,000.00</u>** shall comprise senior secured term loan credit facilities, as set forth in the DIP Term Sheet. The DIP Facility Lender is relying upon the Debtors' compliance with the Budget in accordance with this Final Order and the DIP Facility Documents in determining to enter into the postpetition financing arrangements provided for herein.

4.      <u>Continuation of Liens Securing DIP Obligations</u>. Until payment in full, in cash (unless otherwise released as part of any credit bid for the assets of the Debtors), of all of the DIP Obligations and termination of the DIP Facility Lender's commitments under the DIP Facility, all liens and security interests of the DIP Facility Lender shall remain valid and enforceable with the same continuing priority as described herein.

5.      <u>DIP Loans</u>. All loans made to or for the benefit of the Debtors on or after the Petition Date under the DIP Facility Documents (collectively, the "<u>DIP Loans</u>"), which include, without limitation, principal, interest, fees, costs, expenses, indemnification obligations and other obligations and amounts due from time to time by the Debtors to the DIP Facility Lender under the DIP Facility Documents and this Final Order, shall hereinafter be referred to as the "<u>DIP Obligations</u>."

6.    <u>DIP Collateral</u>.  All amounts owing by the Debtors under the DIP Facility in respect thereof, including, without limitation, principal, interest, fees and costs, will be secured by a first priority perfected security interest in and lien on the Interim DIP Collateral (as defined in the First Interim Order) and, subject to entry of an order in the chapter 11 cases of Genesis Global Holdco, LLC and its affiliated debtors and debtors in possession (collectively, the "<u>Genesis Debtors</u>"), pending in the United States Bankruptcy Court for the Southern District of the New York, Case No. 23-10063 (Jointly Administered) (the "<u>Genesis Chapter 11 Cases</u>") authorizing the priming liens on the Genesis Collateral (collectively with the Avoidance Actions and the Interim DIP Collateral, the "<u>DIP Collateral</u>"), pursuant to and in accordance with this Final Order, subject only to the Carve-Out and the Prepetition Permitted Liens (defined below).  The Debtors waive, and this Final Order prohibits, marshalling of any of the DIP Collateral or other interest of the DIP Facility Lender under any similar theory.

7.    <u>DIP Facility Liens</u>.  As security for the repayment of the DIP Obligations, pursuant to sections 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, the DIP Facility Lender is hereby granted valid, binding, continuing, enforceable, fully perfected, and unavoidable first-priority senior priming security interests and liens (collectively, the "<u>DIP Facility Liens</u>") on and in the DIP Collateral and all proceeds thereof, which liens are valid, binding, enforceable, and fully perfected as of the date hereof, not subject to subordination, impairment, or avoidance, for all purposes in the Chapter 11 Cases and any successor case.  The DIP Facility Liens granted herein shall be valid, perfected and non-avoidable, first priority liens on and security interests in all now owned or hereafter acquired assets and property of the Debtors, including the proceeds of Avoidance Actions,[4] and shall be senior to all other liens and claims except the Carve-Out and the

---

[4] "<u>Avoidance Actions</u>" shall mean the claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, and 550 of the Bankruptcy Code and under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent

Prepetition Permitted Liens,[5] to the extent such liens and security interests are valid, perfected, enforceable and nonavoidable (provided, that with respect to such excepted liens and security interests, if any, the DIP Facility Lender shall be granted second priority liens).

8.    <u>Indemnification</u>.  The Debtors shall be authorized to indemnify the DIP Facility Lender against any liability arising in connection with the DIP Term Sheet, to the maximum extent permitted under the Bankruptcy Code and applicable law.  All such unpaid fees, expenses and indemnities of the DIP Facility Lender, to the extent permitted by law, shall constitute DIP Obligations, and the repayment thereof shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Final Order and the DIP Term Sheet.  For the avoidance of doubt, the Debtors will not provide indemnification for bad faith, breach of fiduciary duty, gross negligence, willful misconduct, or fraud.

9.    <u>DIP Facility Superpriority Liens</u>.  For all of the DIP Obligations arising under the DIP Facility and the DIP Facility Documents, the DIP Facility Lender is granted, pursuant to section 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out and the Prepetition Permitted Liens, the allowed DIP Facility Superpriority Claim, which claim shall be payable from and have recourse to the DIP Collateral.  The DIP Facility Superpriority Claim shall be deemed a legal, valid, binding, enforceable and perfected claim, not subject to subordination, impairment or avoidance, for all purposes in the Chapter 11 Cases and any successor case.

10.    <u>Carve-Out</u>.

---

Transfer Act, Uniform Fraudulent Conveyance Act, and similar statutes or common law.

[5] "<u>Prepetition Permitted Liens</u>" shall mean those certain liens senior by operation of law or otherwise permitted by the Prepetition Credit Documents (solely to the extent any such permitted liens were valid, properly perfected, non-avoidable and senior in priority to the liens securing the Prepetition Obligations as of the Petition Date, or valid, non-avoidable, senior priority liens in existence as of the Petition Date that are perfected after the Petition Date as permitted by section 546(b) of the Bankruptcy Code), including any valid, perfected, unavoidable liens and security interests on any of the Debtors' assets in favor of LightEdge Solutions, Inc. or any affiliate or subsidiary thereof ("<u>LightEdge</u>").

(a)    Subject to the terms and conditions contained in this Final Order, the DIP

Facility Liens, DIP Facility Superpriority Claim, the adequate protection liens and claims of the

Prepetition Secured Party and Genesis as provided for herein, and the liens and claims held by the

Prepetition Secured Party and Genesis, shall be subject and subordinate only to the Prepetition

Permitted Liens and the following (the "Carve-Out"): (i) the statutory fees payable to the U.S.

Trustee pursuant to 28 U.S.C. § 1930(a)(6), together with the statutory rate of interest, which shall

not be limited by any budget; (ii) allowed reasonable fees and expenses (the "Professional Fees")

of attorneys, financial advisors, and other professionals (including any claims agent) employed by

the Debtors in the Chapter 11 Cases pursuant to a Court order under section 327 and 328 of the

Bankruptcy Code, including a Subchapter V Trustee (collectively, the "Professionals"), to the

extent incurred at any time on or prior to the calendar day on which a Termination Date (defined

below) occurs less any retainers held by such Professional as of such date), whether such

Professional Fees have been allowed by the Bankruptcy Court before or after the Termination

Date; and (iii) Professional Fees of Professionals incurred subsequent to the calendar day

immediately following the Termination Date in an aggregate amount not to exceed **$10,000**.  The

foregoing shall not be construed as consent to the allowance of any fees and expenses referred to

above and shall not affect the right of the Debtors, the DIP Facility Lender, Genesis, the Prepetition

Secured Party, the U.S. Trustee, or other parties in interest to object to the allowance and payment

of such amounts.  Payment of any portion of the Carve-Out shall not, and shall not be deemed to:

(i) reduce any Debtors' obligations owed to any of the DIP Facility Lender, Genesis, or the

Prepetition Secured Party, or (ii) subordinate, modify, alter, or otherwise affect any of the liens

and security interests of such parties in the DIP Collateral, the Prepetition Collateral, or the Genesis

Collateral (or their respective claims against the Debtors).  The DIP Facility Lender reserves the

right to review and object to any fee statement, interim application or monthly application issued or filed by any Professional.  Notwithstanding any provision (including, without limitation, any "variance" or similar provision) of this Final Order or the DIP Facility Documents to the contrary, the aggregate cumulative expenditures from Cash Collateral and from the proceeds of the DIP Facility subject to the Carve-Out for the Professionals shall not exceed 100% of the amount with respect thereto set forth in the Budget, and Professional Fees for any Professional included in the Carve-Out shall not exceed 100% of the amount listed in the line item in the Budget for such Professional.  The payments to the Subchapter V Trustee reflected on the Budget will be deemed held in escrow pending the Court's approval of the Subchapter V Trustee's fees and expenses or upon further order of the Court, and any unearned portion of such budgeted amounts shall be remitted to the Debtors' estates to be distributed in accordance with this Order and the DIP Facility Documents or other order of the Court.

(b)    No Prepetition Collateral, Genesis Collateral, DIP Collateral, proceeds thereof, or Cash Collateral, or any portion of the Carve-Out or financing provided under the DIP Facility, shall include, apply to, or be available for any fees or expenses incurred by any party, including the Professionals, in connection with: (i) the investigation, initiation, or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Facility Lender, the Genesis Debtors or the Prepetition Secured Party, including, without limitation, challenging the amount, validity, extent, perfection, priority, characterization or enforceability of, or asserting any defense, counterclaim or offset to, the DIP Obligations, DIP Facility Liens, the DIP Facility Superpriority Claim, in respect thereof, the Prepetition Credit Agreements, the Prepetition Obligations, the Genesis Loan Documents, the Genesis Secured Obligations, the Genesis Liens, or the Genesis Collateral, (ii) asserting any claims or causes of action (including,

16

without limitation, claims or actions to hinder or delay the DIP Facility Lender's assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Facility Documents or this Final Order or any Avoidance Actions) against the DIP Facility Lender, the Genesis Debtors, or Prepetition Secured Party, or (iii) incurring indebtedness other than as expressly permitted by the DIP Facility Documents.

11. <u>Restrictions on the Debtors</u>.  Other than the Carve-Out and Prepetition Permitted Liens, no claim or lien having a priority superior or pari passu with those granted by this Final Order to the DIP Facility Lender shall be granted by any Debtor while any portion of the DIP Facility (or refinancing thereof) or any commitment thereunder, including the DIP Obligations, remains outstanding.

## C. <u>Authorization to Use Cash Collateral and Rights of Prepetition Secured Party and Genesis</u>

12. <u>Use of Cash Collateral; Adequate Protection</u>.  Subject to the terms and conditions of this Final Order, the DIP Facility, the DIP Facility Documents, and the Budget, the Debtors are authorized to use Cash Collateral.  As additional consideration for their consent to use of Cash Collateral and the priming of certain of the Prepetition Secured Party's liens, claims, and interests in the Prepetition Collateral (solely as set forth in this Final Order), the Prepetition Secured Party shall receive the following (collectively, the "<u>Prepetition Adequate Protection</u>"):

(a) The Prepetition Secured Party shall have and is granted continuing and enforceable liens in accordance with section 552(b) of the Bankruptcy Code on the Prepetition Collateral (including, without limitation, proceeds of Prepetition Collateral as exist or arise after the Petition Date) and as adequate protection, replacement liens on the Prepetition Collateral, the DIP Collateral, and any and all assets of the Debtors as exist on or after the Petition Date (including, without limitation, proceeds of Prepetition Collateral as exist or arise after the Petition

Date) in the same priority and validity as existed on the Petition Date (the "Prepetition Secured Party Adequate Protection Liens") to the extent there is any diminution in the value of such Prepetition Secured Party's interests in the Prepetition Collateral or Cash Collateral during the pendency of these Cases, whether the reason for such diminution is as a result of, arises from, or is attributable to, any or all of the DIP Facility, the priming of the liens arising under the Prepetition Credit Documents, the use of Cash Collateral, the physical deterioration, consumption, use, sale, lease, disposition, shrinkage or decline in market value of the Prepetition Collateral, the imposition of the automatic stay, or otherwise (including, without limitation, any diminution in value of such interests in the Prepetition Collateral prior to the Prepetition Secured Party seeking vacation of the automatic stay or the Bankruptcy Court granting such relief).  The Prepetition Secured Party Adequate Protection Liens shall be (x) junior in priority and subordinate only to: (i) the Prepetition Permitted Liens, (ii) the DIP Facility Liens, and (iii) the Carve-Out, and (y) senior to any other liens in the DIP Collateral other than the Genesis Collateral.  The Adequate Protection Liens are valid, binding, enforceable and fully perfected as of the Petition Date without the necessity of the execution, filing or recording by the Debtors, the Prepetition Secured Party of security agreements, pledge agreements, financing statements or other agreements.  The Prepetition Secured Party Adequate Protection Liens shall cover assets, interests and proceeds of the Debtors that are or would be collateral under the Prepetition Credit Documents, and all cash and cash equivalents, and all assets, interests and proceeds of the Debtors that constitute DIP Collateral.

(b)    Prepetition Secured Party Administrative Claim.  The Prepetition Secured Party is hereby granted in each of the Debtors' Chapter 11 Cases an allowed administrative claim (the "Prepetition Secured Party Adequate Protection Claim") under section 507(b) of the Bankruptcy Code in an amount equal to the diminution in the value of the Prepetition Secured

Party's interests in the Prepetition Collateral from and after the Petition Date, and such Adequate Protection Claim shall be junior in priority and subordinate only to: (i) the DIP Superpriority Claims, (ii) the Carve-Out, and (iii) the Prepetition Permitted Liens. The Adequate Protection Claim shall have recourse to and be payable from the DIP Collateral and all proceeds thereof.

(c) <u>Restrictions on Use of Cash Collateral</u>. Except as set forth in Paragraph 10(b), no Prepetition Collateral, DIP Collateral, proceeds thereof, or Cash Collateral, or any portion of the Carve-Out or financing provided under the DIP Facility shall include, apply to, or be available for any fees or expenses incurred by any party, including the Professionals, in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against any of the Prepetition Secured Party or DIP Facility Lender, including, without limitation, challenging the amount, validity, extent, perfection, priority or enforceability of, or asserting any defense, counterclaim or offset to, the Prepetition Obligations, DIP Obligations, or the Adequate Protection Liens granted herein.

(d) <u>Use of Genesis Collateral; Adequate Protection</u>. Genesis shall have and is granted continuing and enforceable liens in accordance with section 552(b) of the Bankruptcy Code on the Genesis Collateral (including, without limitation, proceeds of Genesis Collateral as exist or arise after the Petition Date) and as adequate protection, replacement liens on the Genesis Collateral in the same priority and validity as existed on the Petition Date (the "<u>Genesis Adequate Protection Liens</u>") to the extent there is any diminution in the value of Genesis's interests in the Genesis Collateral during the pendency of these Cases, whether the reason for such diminution is as a result of, arises from, or is attributable to, any or all of the DIP Facility, the priming of the liens arising under the Genesis Loan Documents, the use of Cash Collateral, the physical deterioration, consumption, use, sale, lease, disposition, shrinkage, or decline in market value of

19

the Genesis Collateral, the imposition of the automatic stay, or otherwise (including, without

limitation, any diminution in value of such interests in the Genesis Collateral prior to Genesis's

seeking vacation of the automatic stay or the Bankruptcy Court granting such relief). The Genesis

Adequate Protection Liens shall be junior in priority and subordinate only to: (i) the Prepetition

Permitted Liens, (ii) the DIP Facility Liens, and (iii) the Carve-Out.   The Genesis Adequate

Protection Liens are valid, binding, enforceable, and fully perfected as of the Petition Date without

the necessity of the execution, filing, or recording by the Debtors or Genesis of security

agreements, pledge agreements, financing statements, or other agreements.  The Genesis Adequate

Protection Liens shall cover assets, interests, and proceeds of the Debtors that are or would be

Collateral under the Genesis Loan Documents.

   (e) Genesis Administrative Claim. Genesis is hereby granted in each of the

Debtors' Chapter 11 Cases an allowed administrative claim (the "Genesis Adequate Protection

Claim") under section 507(b) of the Bankruptcy Code in an amount equal to the diminution in the

value of the Genesis's interests in the Prepetition Collateral from and after the Petition Date, and

such Genesis Adequate Protection Claim shall be junior in priority and subordinate only to: (i) the

DIP Superpriority Claims, (ii) the Carve-Out, and (iii) the Prepetition Permitted Liens.   The

Genesis Adequate Protection Claim shall have recourse to and be payable from the DIP Collateral

and all proceeds thereof.

   (f) Genesis Legal Fees and Expenses.  As additional adequate protection, the

Debtors shall pay all reasonable and documented outstanding fees and out-of-pocket expenses (the

"Genesis Adequate Protection Fee Payments"), including, but not limited to, reasonable and

documented fees and out-of-pocket expenses of legal counsel, incurred prior to or after the Petition

Date, provided that the Genesis Adequate Protection Fee Payments shall have been incurred on

20

account of the Genesis Secured Obligations and that the aggregate amount of Genesis Adequate

Protection Fee Payments paid by the Debtors will not exceed $20,000.00 and provided further that

Genesis shall send a summary invoice of such fees and expenses to the Debtors and their counsel,

the U.S. Trustee, and Subchapter V Trustee.  Within seven (7) days after delivery of such invoices

in accordance with this paragraph, the Debtors shall pay such Genesis Adequate Protection Fee

Payments; provided, however, that to the extent an objection has been raised to certain fees and

costs within such seven (7) days, the Debtors shall pay only such fees and costs to which no

objection has been raised.  To the extent there is an objection with respect to any such costs and

fees that is not resolved consensually, the Court may resolve the objection.  No professional to

Genesis shall be required to file an application seeking compensation for services or

reimbursement of expenses with the Court.  Subject to the notice and response provisions set forth

in this paragraph, the Genesis Adequate Protection Fee Payments are hereby approved.

(g)    As additional adequate protection, (i) Genesis shall be entitled to cash

payments on the last day of each month, which payments shall each be in the amount calculated

as (A) the amount of the Genesis Secured Obligations as of the Petition Date multiplied by (B) a

rate of 13% per annum (computed on the basis of a 360-day year of twelve 30-day months); (ii)

an allowed administrative expense claim accruing at a rate of 13% of the outstanding amount of

Genesis Secured Obligations; (iii) the Debtors shall maintain any insurance policies that were

applicable to the Genesis Collateral as of the Petition Date; (iv) following the occurrence of an

Event of Default (as defined below), prior to seeking payment of any DIP Obligations from the

Genesis Collateral, the DIP Lender shall first satisfy the DIP Obligations from DIP Collateral other

than the Genesis Collateral; and (v) Genesis shall be entitled to the additional benefits set forth in

this Final Order, including in paragraphs 14 (Binding Effect on Non-Debtor Third Parties) and 26 (Use of DIP Facility Proceeds) hereof.

(h)    <u>Consent to Genesis's Priming and Adequate Protection</u>. Genesis consents to the priming of the Genesis Liens by the DIP Facility Liens provided for herein; provided, however, that such consent to the priming and the sufficiency of the adequate protection provided for herein is expressly conditioned upon the entry of this Final Order relating to the DIP Facility Documents and DIP Term Sheet set forth herein, and such consent shall not be deemed to extend to any replacement or other debtor-in-possession financing other than under the DIP Facility Documents; provided, further, that such consent shall be of no force and effect in the event this Final Order is not entered and the DIP Facility Documents as set forth herein are not approved; provided, further, that such consent shall be of no force and effect if the United States Bankruptcy Court for the Southern District of New York overseeing the Genesis Chapter 11 Cases denies any motion seeking approval of the priming liens pursuant to and in accordance with this Final Order as they relate to Genesis.

(i)    <u>Limitation on Charging Expenses Against Collateral</u>.    Notwithstanding anything to the contrary contained herein, no costs or expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Facility Lender and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Facility Lender, and nothing contained in this Final Order shall be deemed to be a consent by the DIP Facility Lender to any charge, lien,

assessment or claim against the Collateral under section 506(c) of the Bankruptcy Code or otherwise.

13.    <u>Binding Effect on Debtors</u>. Effective as of the date of entry of the First Interim Order, except as otherwise set forth herein, the Debtors' Stipulations and releases are binding in all circumstances upon the Debtors.

14.    <u>Binding Effect on Non-Debtor Third Parties</u>. The Debtors' Stipulations and releases herein shall be binding upon the Debtors' estates and each party-in-interest, except with respect to any party in interest that (a) *first,* by the seventy-fifth (75th) day after entry of the First Interim Order (the "<u>Challenge Period</u>"), files a motion seeking standing to commence a contested matter or adversary proceeding (a "<u>Motion for Standing</u>") challenging or otherwise objecting to any of the Debtors' Stipulations (each, a "<u>Challenge</u>"), which attaches a draft complaint setting forth the legal and factual bases of the proposed Challenge (a "<u>Draft Complaint</u>"), and (b) *second,* obtains a final, non-appealable order in favor of such party-in-interest sustaining any such Challenge (a "<u>Successful Challenge</u>").  Nothing in this Final Order shall be construed to grant standing to any party in interest to bring any Challenge on behalf of the Debtors' estates.  The Debtors' Stipulations shall be binding upon (x) the Debtors' estates and each party in interest that did not timely filing a Motion for Standing on the day following the termination of the Challenge Period (the "<u>Challenge Period Termination</u>"); and (y) each party that filed a Motion for Standing (i) as to each Debtors' Stipulation not expressly challenged in the Draft Complaint, on the Challenge Period Termination; and (ii) as to each Debtors' Stipulation expressly challenged in the Draft Complaint, on the day after the Motion for Standing is denied, or if the Motion for Standing is granted, on the day after the Challenge is fully and finally adjudicated.  If the Chapter 11 Cases are converted to cases under chapter 7 ("<u>Successor Cases</u>") or if a chapter 11 trustee is appointed,

in each case prior to the Challenge Period Termination, the Challenge Period for the chapter 7 trustee or such chapter 11 trustee, as applicable, shall be extended until 30 days after the appointment of such chapter 7 trustee or chapter 11 trustee.

15.    Upon Challenge Period Termination, unless expressly subject to a timely pending Challenge or a Successful Challenge: (i) any and all payments made to or for the benefit of the Prepetition Secured Party or Genesis or otherwise authorized by this Final Order (whether made prior to, on, or after the Petition Date) shall be indefeasible and not be subject to counterclaim, set-off, subordination (whether equitable, contractual, or otherwise), recharacterization, defense, disallowance, recovery, or avoidance by any party in interest, (ii) any and all Challenges (other than any Successful Challenge) by any party-in-interest shall be deemed to be forever released, waived, and barred, (iii) all of the Prepetition Secured Obligations and the Genesis Secured Obligations shall be deemed to be fully allowed claims within the meaning of section 506 of the Bankruptcy Code, and (iv) the Debtors' Stipulations shall be binding on all parties in interest in these Chapter 11 Cases or any Successor Cases, including any chapter 11 or chapter 7 trustee. And once a timely pending Challenge is fully and finally adjudicated, if that Challenge is not then a Successful Challenge, clauses (i) through (iv) in the immediately preceding sentence shall then become binding upon the party having asserted such Challenge.

**D.    Perfection, Relief from Stay, and Additional Terms and Rights as to the DIP Facility Lender, Genesis, and the Prepetition Secured Party**

16.    Additional Perfection Measures.    The DIP Facility Lender, Genesis, and the Prepetition Secured Party shall not be required to file financing statements, mortgages, deeds of trust, security deeds, notices of lien, or similar instruments in any jurisdiction or effect any other action to attach or perfect the security interests and liens granted under the DIP Term Sheet, the First Interim Order, the Second Interim Order, and this Final Order (including, without limitation,

the taking possession of any of the DIP Collateral (in accordance with the terms of the DIP Term

Sheet), or the taking of any action to have security interests or liens noted on certificates of title or

similar documents).

17.    Budget.  The Debtors shall not make disbursements in excess of those projected in

the Budget and shall not otherwise deviate from the terms of the Budget and applicable variances,

without the written consent of each of: (i) the DIP Facility Lender and (ii) the Prepetition Secured

Party, subject to an allowed cumulative four-week variance not to exceed ten percent (10%), from

the amount in the "Total Disbursements" line in the Budget, as set forth in the DIP Term Sheet.

With respect to those "Other Outflows" titled "Capital Expenditures" and "FIL Purchases," the

Debtors shall procure the written consent of the DIP Facility Lender before expending the

budgeted amounts.

18.    Reporting.  The Debtors shall provide reporting to the DIP Facility Lender and

Prepetition Secured Party in accordance with the DIP Term Sheet, and shall provide any such

reporting to Genesis substantially contemporaneously.

19.    Credit Bid.  Subject to any Prepetition Permitted Liens, the DIP Facility Lender

shall have the right to credit bid the DIP Obligations, and the Prepetition Secured Party shall have

the right to credit bid any outstanding Prepetition Obligations, under or pursuant to: (i) section 363

of the Bankruptcy Code, (ii) a plan of reorganization or plan of liquidation under section 1129 of

the Bankruptcy Code, or (iii) a sale or disposition by a Chapter 7 trustee for any Debtor under

section 725 of the Bankruptcy Code.

20.    Amendment to DIP Facility Documents.  The DIP Facility Lender, with the consent

of the Debtors, is authorized to amend and/or modify the DIP Facility Documents without further

order of the Court; provided that any such amendments or modifications must be in writing and

served upon counsel for the Prepetition Secured Party, Genesis, and the US Trustee; provided, further that any amendments or modifications that would have the effect of increasing the borrowings available, shortening the maturity date of the DIP Facility, increasing the aggregate fees, or the rate or amount of interest payable, or otherwise materially adversely affecting the Debtors' rights or obligations, Genesis's rights or obligations, or the Prepetition Secured Party's rights or obligations, under the DIP Facility, shall be done only pursuant to further order of the Court; provided further that any adjustments to the Budget that do not increase the borrowings available shall not require further order of the Court.

21.    Binding Effect.  The provisions of this Final Order shall be binding upon and inure to the benefit of all parties-in-interest in these Cases, including, without limitation, the Debtors, the DIP Facility Lender, the Genesis Debtors, the Prepetition Secured Party, and their respective successors and assigns (including, to the fullest extent permitted by applicable law, any Chapter 7 or Chapter 11 trustee hereinafter appointed or elected for any Debtor's estate, an examiner appointed pursuant to section 1104 of the Bankruptcy Code, or any other fiduciary hereafter appointed as a legal representative of the Debtors or with respect to the property of the Debtors' estates), and shall inure to the benefit of the Debtors, the Genesis Debtors, the Prepetition Secured Party, the DIP Facility Lender and their respective successors and assigns; provided, however, that DIP Facility Lender shall have no obligation to extend any financing to any Chapter 7 trustee or similar responsible person appointed for the Debtors' estates, and neither Genesis nor the Prepetition Secured Party shall have any obligation to consent to the use of Cash Collateral in the event these chapter 11 cases are converted to cases under chapter 7.  Such binding effect is an integral part of this Final Order.

22.    <u>Milestones</u>.  As a condition to the DIP Facility and the use of Cash Collateral, the Debtors have agreed to, and shall comply with, the following milestones, *provided* that any amendment or other modification of any such milestone shall be subject to the prior written consent of the DIP Facility Lender; *provided* further that any amendment or other modification of any such milestone that has the effect of removing it completely or extending it for more than five (5) days shall be subject to the prior written reasonable consent of Genesis (the "<u>Sale Milestones</u>"):

(a)    On the Petition Date, the Debtors filed a motion seeking approval of the Sale of the Debtors' Assets.

(b)    On or before August 17, 2023 or such later date as the DIP Facility Lender shall agree in writing, the Debtors shall have obtained an order from the Bankruptcy Court approving the Sale of the Debtors' Assets (August 17, 2023 or such earlier date as the Bankruptcy Court enters an order approving the Sale of the Debtors' Assets, the "<u>Sale Order Date</u>").

(c)    Within 14 days of the Sale Order Date, or such later date as the DIP Facility Lender shall agree in writing, the Sale of the Assets shall be consummated.

23.    <u>Events of Default</u>.  Until the payment in full of the DIP Obligations, the occurrence of any of the following events, unless waived by the DIP Facility Lender in writing (which may be by electronic mail) and in accordance with the terms of the DIP Facility Documents, shall constitute an event of default hereunder (collectively, the "<u>Events of Default</u>"):

(a)    the failure of the Debtors to perform, in any material respect, any of the terms, provisions, conditions, covenants or obligations under this Final Order, including, without limitation, failure to make any payment under this Final Order when due, or the failure to comply with any Sale Milestone;

(b)    the occurrence and continuation of any Events of Default under, and as defined in, the DIP Term Sheet, or any other DIP Facility Documents;

(c)    without the prior written consent of the DIP Facility Lender, Genesis, and the Prepetition Secured Party, as applicable, the entry of an order providing for (i) any modification, stay, vacatur, or amendment to this Final Order, or any other use of the DIP Collateral, the Genesis Collateral, or the Prepetition Collateral; (ii) a priority claim for any administrative expense or unsecured claim against the Debtors (now existing or hereafter arising of any kind or nature whatsoever, including without limitation any administrative expense

of the kind specified in sections 503(b), 506(c), 507(a), or 507(b) of the Bankruptcy Code) in any of the Chapter 11 Cases or Successor Cases, equal or superior to the DIP Superpriority Claims, the Genesis Adequate Protection Superpriority Claims, or the Prepetition Secured Party Adequate Protection Superpriority Claims, other than the Carve-Out and the Prepetition Permitted Liens; (iii) any lien on any of the DIP Collateral with priority equal or superior to the DIP Facility Liens, except as specifically permitted by the DIP Facility Documents; (iv) without the prior written consent of the Prepetition Secured Party, any lien on any of the Prepetition Collateral with priority equal to or superior to the Prepetition Liens or Prepetition Secured Party Adequate Protection Liens; (v) without the prior written consent of Genesis, any lien on any of the Genesis Collateral with priority equal to or superior to the Genesis Liens or the Genesis Adequate Protection Liens;

(d)     the filing by the Debtors, the Debtors supporting, or the failure of the Debtors to timely oppose any motion or application seeking entry of an order of the nature described in section (c) immediately above; or

(e)     the Debtors' proposal or support for any plan of reorganization or liquidation or sale of all or substantially all of the Debtors' assets or equity, or order confirming such plan or approving such sale, that is not conditioned upon the payment in full of the DIP Obligations upon the consummation of such plan or sale.

24.     Upon the occurrence and during the continuation of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion, or notice to, hearing before, or order from the Court, other than as set forth in this Final Order: (a) the DIP Facility Lender may send a written notice to the Debtors, Genesis, and the U.S. Trustee (any such declaration shall be referred to herein as a "Termination Declaration") declaring (1) all DIP Obligations owing under the DIP Facility Documents to be immediately due and payable, (2) the commitment of the DIP Facility Lender to make DIP Loans to be terminated, whereupon such commitments and obligation shall be terminated to the extent any such commitment remains under the DIP Facility, (3) the termination of the DIP Facility and the DIP Facility Documents as to any future liability or obligation of the DIP Facility Lender, but without affecting any of the DIP Liens or the DIP Obligations, and (4) the application of the Carve-Out

has occurred; (b) interest, including, where applicable, default interest, shall accrue and be paid as set forth in the DIP Facility Documents; and (c) the DIP Facility Lender, Genesis, and/or the Prepetition Secured Party, as applicable, may declare a termination, reduction, or restriction on the ability of the Debtors to use Cash Collateral, other than to pay expenses set forth in the Budget that are necessary to avoid immediate and irreparable harm to the Debtors' estates. Notwithstanding anything contained herein, the earliest date on which a Termination Declaration shall be effective is upon five (5) business days' prior written notice of such Termination Declaration given to the Debtors and the U.S. Trustee, referred to herein as the "Termination Date."  Following a Termination Date, neither the DIP Facility Lender nor Genesis nor the Prepetition Secured Party shall be required to consent to the use of any Cash Collateral or provide any loans or other financial accommodations under the DIP Facility. The Termination Declaration shall be given by electronic mail (or other electronic means) to counsel to the Debtors, counsel to Genesis, and the U.S. Trustee.

25.    Genesis Debtors' Reservation of Rights.  Nothing in this Final Order shall limit any rights of the Genesis Debtors against the DIP Facility Lender arising out of any foreclosure that adversely affects the value of the Genesis Collateral, as a result of the DIP Facility Lender's failure to act in a commercially reasonable manner in connection with such foreclosure; provided that the Genesis Debtors acknowledge that the language in section 12(g)(iv) was included in this Final Order at their request as additional adequate protection for the Genesis Debtors with respect to the Genesis Collateral.

26.    Hessler Reservation of Rights.  Thomas Hessler (or an entity he controls) shall have seven (7) business days from the date of this order to commit a fully funded debtor-in-possession financing facility on terms that the Debtors, in their business judgment and in consultation with

the Subchapter V Trustee, deem more advantageous to the estates than those of the DIP Facility
(taking into account all factors, including but not limited to proposed economics and a path towards
a successful emergence from chapter 11), which sufficiently fund the Debtors' allowed
administrative expenses (including the complete refinance of the DIP facility). The Debtors shall
consider any such committed financing in good faith, and shall consult with the Subchapter V
Trustee about any such committed financing facility.

27.    <u>Survival</u>.  The provisions of this Final Order and any actions taken pursuant hereto
shall survive the entry of any order: (i) confirming any plan of reorganization in any of the Cases
(and, to the extent not satisfied in full, in cash, the DIP Obligations shall not be discharged by the
entry of any such order, or pursuant to section 1141(d)(4) of the Bankruptcy Code, each of the
Debtors having hereby waived such discharge); (ii) converting any of the Cases to a chapter 7 case;
or (iii) dismissing any of the Chapter 11 Cases unless permitted under the DIP Facility Documents,
and the terms and provisions of this Final Order, as well as the DIP Facility Superpriority Claims,
the DIP Facility Liens, the adequate protection granted pursuant to this Final Order, and/or the DIP
Facility Documents, shall continue in full force and effect notwithstanding the entry of any such
order, and such claims and liens shall maintain their priority as provided by this Final Order and
the DIP Facility Documents to the maximum extent permitted by law until all of the DIP
Obligations are indefeasibly paid in full, in cash, and discharged.

28.    <u>Authorization to Act</u>.  Each of the Debtors is authorized to do and perform all acts,
to make, execute and deliver all instruments and documents (including, without limitation, the
execution of security agreements, mortgages and financing statements), and to pay interest, fees,
and all other amounts as provided under and subject to the terms of this Final Order and the DIP

Facility Documents, which may be reasonably required or necessary for the Debtors' full and timely performance under the DIP Facility and this Final Order.

29. <u>Insurance Policies</u>. Each of the Prepetition Secured Party, Genesis, and the DIP Facility Lender shall be, and shall be deemed to be, without any further action or notice, named as additional insureds and loss payees on each insurance policy with respect to which the Debtors benefit which in any way relates to the Prepetition Collateral, the Genesis Collateral, or the DIP Collateral.

30. <u>Subsequent Reversal</u>. If any or all of the provisions of this Final Order or the DIP Facility Documents are hereafter modified, vacated, amended, or stayed by subsequent order of the Bankruptcy Court or any other court, Genesis, the Prepetition Secured Party, and the DIP Facility Lender shall be protected to the fullest extent permitted by section 364(e) of the Bankruptcy Code.

31. <u>Effect of Dismissal of Cases</u>. If the Cases are dismissed, converted, or substantively consolidated, then such dismissal, conversion, or substantive consolidation of these Cases shall not affect the rights of Genesis, the DIP Facility Lender, and the Prepetition Secured Party (to the extent of adequate protection provided hereunder) under their respective documents or this Final Order, and all of the respective rights and remedies thereunder of the DIP Facility Lender, Genesis (to the extent of adequate protection provided hereunder), and the Prepetition Secured Party (to the extent of adequate protection provided hereunder) shall remain in full force and effect as if the Cases had not been dismissed, converted, or substantively consolidated. If an order dismissing any of the cases under section 1112 of the Bankruptcy Code or otherwise is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that: (y) the priming liens, security interests, and/or replacement security

interests granted to the DIP Facility Lender and, as applicable, Genesis and the Prepetition Secured Party pursuant to this Final Order shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations and adequate protection obligations shall have been paid and satisfied in full (and that such priming liens and replacement security interests, shall, notwithstanding such dismissal, remain binding on all parties in interest), and (z) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the liens and security interests referred to in clause (y) above.

32.     <u>Findings of Fact and Conclusions of Law</u>.  This Final Order constitutes findings of fact and conclusions of law and shall take effect and be fully enforceable effective as of the Petition Date immediately upon the entry thereof.

33.     <u>Controlling Effect of Final Order</u>.  To the extent any provision of this Final Order conflicts with any provision of the Motion, any prepetition agreement or any document executed in connection with the DIP Facility, the provisions of this Final Order shall control.

34.     <u>Adequate Notice</u>.  The notice given by the Debtors of the Final Hearing was given in accordance with Bankruptcy Rule 4001(c)(2).  The Debtors shall promptly e-mail, mail or fax copies of this Final Order to (a) the Office of the U.S. Trustee for the District of Delaware; (b) the Debtors' twenty (20) largest unsecured creditors or their counsel, (c) counsel to the DIP Facility Lender and the Prepetition Secured Party, (d) counsel to Genesis; (e) all known holders of filed liens on the Debtors' assets, (f) the Subchapter V Trustee, and (g) any party that has requested notice pursuant to Bankruptcy Rule 2002 as of the time of service.


Dated: August 3rd, 2023
Wilmington, Delaware

CRAIG T. GOLDBLATT
UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT G**

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 (Subchapter V) |
| FILE STORAGE PARTNERS, LLC, *et al.*,[1] | Case No. 23-10877 (CTG) (Jointly Administered) |
| Debtors. | |
| | <u>**Related D.I.:**</u> 8, 34, 87, 94 |

**NOTICE OF NO ADDITIONAL QUALIFIED BIDS RECEIVED AND**
<u>**CANCELATION OF AUCTION**</u>

     **PLEASE TAKE NOTICE** that on June 30, 2023, the Debtors filed the Sale Motion [D.I. 8] and on July 11, 2023, the Debtors served the Sale Motion on the parties indicated in the *Certification of Service* docketed at D.I. 34.

     **PLEASE TAKE FURTHER NOTICE** that on August 3, 2023, the Debtors filed and served,[2] on all parties previously served with the Sale Motion and all other parties that had signed Non-Disclosure Agreements with the Debtors ("<u>NDAs</u>"), that certain *Notice of Rescheduled Hearing on Motion of Debtors for Entry of an Order (A) Approving the Sale of Substantially all Assets Free and Clear of all Liens, Claims, Encumbrances, and Interests, (B) Authorizing the Assumption and Assignment of Contracts and Leases, and (C) Granting Related Relief ("Sale Motion")* [D.I. 87] ("<u>Sale Notice</u>"). The Sale Notice set forth deadlines, requisite bid information, and the process for parties interested in submitting an offer for the Debtors' Assets (as defined below), including *inter alia*, the scheduling of an auction on August 16, 2023 at 12:00 PM ET (the "<u>Auction</u>"), *assuming* bid packages were received by the Debtors and the Subchapter V Trustee by **August 15, 2023 at 12:00 PM ET** (the "<u>Bid Deadline</u>").

     **PLEASE TAKE FURTHER NOTICE** that on August 11, 2023, the Debtors filed and served,[3] on all parties previously served with the Sale Motion and all other parties that had signed NDAs, an amended version of the Sale Notice (the "<u>Amended Sale Notice</u>")[4] that further supplemented the anticipated procedures associated with the Auction.

     **PLEASE TAKE FURTHER NOTICE** that the Debtors received no Qualified Bids on or after[5] the August 15th Bid Deadline, other than the APA that was submitted by Proposed Buyer in the Sale Motion. Accordingly, no Auction will be held on August 16, 2023. The Debtors intend to seek approval of the sale to Proposed Buyer in accordance with the Sale Motion at the hearing before the Honorable Craig T. Goldblatt, United States Bankruptcy Judge for the District of Delaware, at the

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number are: File Storage Partners, LLC (6920); Afton Blockchain LLC (3951); Filtech SPV LLC (9602); and Midwest Blockchain Inc. (8842). The Debtors' service address is 1357 Ashford Ave., Pmb 373, San Juan, PR 00907.
[2] *See Certification of Service* [D.I. 93].
[3] *See Certification of Service* [D.I. 95].
[4] Terms not otherwise defined herein shall have the meanings ascribed to them in the Amended Sale Notice.
[5] In consultation with the Subchapter V Trustee, the Debtors extended one interested party (the only party to reach out to the Debtors on August 15th) until 8:00 PM ET to submit an offer, but no offer was received by that time.

Bankruptcy Court, 824 North Market Street, 6th Floor, Courtroom 2, Wilmington, Delaware 19081 on **August 17, 2023 at 10:00 a.m. (prevailing Eastern Time)**.

Dated: August 15, 2023
      Wilmington, Delaware

**BAYARD, P.A.**

*/s/ Evan T. Miller*
Evan T. Miller (No. 5364)
Steven D. Adler (No. 6257)
600 N. King Street, Suite 400
Wilmington, Delaware 19801
Telephone: (302) 655-5000
Facsimile: (302) 658-6395
E-mail:  emiller@bayardlaw.com
        sadler@bayardlaw.com

*Counsel to the Debtors and
Debtors in Possession*