CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

# NOTICE OF MEDIATION TERMINATION

**PLEASE TAKE NOTICE** that, on January 19, 2023, Genesis Global Holdco, LLC and its debtor affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"), each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court").

**PLEASE TAKE FURTHER NOTICE** that, on April 23, 2023, the Debtors filed the *Debtors' Motion for Appointment of a Mediator*, ECF No. 252 (the "Mediation Motion"),[2] seeking an order from this Court appointing a mediator and ordering mediation of the Mediation Issues between the Mediation Parties.

**PLEASE TAKE FURTHER NOTICE** that, on May 1, 2023, the Debtors filed the *Notice of Filing of Proposed Consensual Order Appointing Mediator*, ECF No. 278.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

[2] Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Mediation Motion.

**PLEASE TAKE FURTHER NOTICE** that, on May 1, 2023, the Court entered the *Order Appointing Mediator*, ECF No. 279 (the "Mediation Order") granting the Mediation Motion for a period of thirty (30) days, which was subsequently extended on various occasions to August 23, 2023. *See* ECF Nos. 445, 517, 580, 599, 606.

**PLEASE TAKE FURTHER NOTICE** that, the mediation terminated on August 23, 2023, and has resulted in a deal in principle among the Debtors, the Official Committee of Unsecured Creditors and Digital Currency Group, Inc., subject to definitive documentation and continued negotiation over the terms and conditions of an amended chapter 11 plan, as described in the presentation attached hereto as **Exhibit 1**.

Dated: August 28, 2023
New York, New York

*/s/ Sean A. O'Neal*
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors
and Debtors-in-Possession*

**Exhibit 1**

Project Genome

# Public Update on Plan Discussions

August 2023



# Introduction

Pursuant to an Order of the Bankruptcy Court (the "Mediation Order") requested by the Debtors, in May 2023, the Debtors, Official Committee of Unsecured Creditors ("UCC"), the Ad Hoc Group of GGC Lenders (the "Ad Hoc Group"), Gemini Trust N.A. ("Gemini") and Digital Currency Group ("DCG") commenced a mediation to resolve certain issues relating to, among other things, the Debtors' corporate parent DCG's contribution to Genesis' chapter 11 plan.

This presentation summarizes an agreement in principle among the Debtors, UCC and DCG with respect to the satisfaction of potential claims amongst the parties, including the payment of approximately $630 million in unsecured loans due in May 2023 and a $1.1 billion unsecured promissory note due in 2032, as well as certain other potential claims.

The agreement in principle with DCG is reliant on agreement on the terms of a chapter 11 plan between the Debtors and UCC. The Debtors, UCC and DCG are working collaboratively on definitive documentation, including an Amended Plan incorporating the terms of the deal in principle.

Neither the Ad Hoc Group nor Gemini supports the deal in principle described in this presentation. Although the mediation has terminated, constructive discussions with the Ad Hoc Group and Gemini regarding the aforementioned agreed-upon deal in principle are ongoing and the parties remain committed to continuing these discussions with a goal of achieving a fully consensual plan.

The Debtors are publishing these materials, which have been reviewed and approved by the UCC and DCG, in order to comply with the obligations under the Mediation Order and in an effort to be transparent and foster continued discussions among stakeholders.

There can be no assurance that the Debtors, UCC and DCG will reach agreement on the definitive documents or that other parties in interest involved in the Debtors' chapter 11 cases will support the deal in principle.



# Overview of Agreement in Principle

### Estimated Recoveries (subject to market pricing)

- If consummated, the Amended Plan could result in USD equivalent estimated recoveries of ~70-90% for unsecured creditors
  - According to the UCC advisors' estimates, the Amended Plan could result in ~65-90% recovery on an in-kind basis, depending on the denomination of the digital asset[1]

### DCG Contributions

- Debtors, UCC and DCG have reached an agreement in principle, subject to definitive documentation, including the following economic terms:
- In satisfaction of its existing liabilities to the Debtors, including approximately $630 million in unsecured loans due in May 2023 and $1.1 billion under an unsecured promissory note due in 2032, DCG would enter into the following new debt facilities and the Partial Repayment Agreement
  - ~$328.8 million first-lien facility with a 2-year maturity (based on market prices as of 8/15/23)
  - $830.0 million second-lien facility with a 7-year maturity
  - $275.0 million in installment payments prior to the Plan Effective Date pursuant to the Partial Repayment Agreement
- In exchange, DCG and its related parties would be entitled to receive certain releases from the Debtors and their creditors

### Distribution Mechanics

- Distributions would be in kind to the extent possible
- Debtors and UCC are working in good faith on an Amended Plan, which is currently contemplated to include the following provisions:
  - Creditors can elect to receive an early payment exceeding their pro rata initial distribution, in full satisfaction of their claims
    - Early payment option to provide for recoveries of ~60-65% of total claims and would be paid in USD
    - Currently contemplated to be $300 million in claims, but may change based on market pricing
- Debtors would make an initial distribution consisting of all cash and coin on hand except certain reserve amounts and the early-pay distribution
  - Initial distribution would provide ~30-40% recovery (subject to change for market values, disputed claims reserve and restructuring or wind-down costs)
- After initial distribution, creditors would receive proceeds of designated longer-term assets on future distribution dates as assets are monetized or received
  - Estate would seek to match assets with claims to maximize in-kind recoveries

### Other Terms

- Debtors, DCG, and UCC have reserved rights with respect to the 3AC-related liabilities and any potential claims the Debtors or DCG have against the other party with respect to the 3AC liabilities are fully preserved
- GAP claims would recover pro rata with all other claims (though this issue remains in dispute with the Ad Hoc Group)
- In the event that definitive documentation is not reached or DCG breaches any settlement obligations prior to the Effective Date, Debtors intend to file a turnover action in respect of May 2023 maturities to the extent not already filed



Note 1:    Distribution mechanics remain under discussion between the Debtors and UCC. Reaching agreement on the distribution mechanics will be necessary to implement the deal in principle described in this presentation.

2

# DCG Contributions

According to the deal in principle among the Debtors, UCC and DCG, subject to definitive documentation, DCG would provide the below consideration in satisfaction of certain existing liabilities to the Debtors

### New DCG Debt Facilities

|  | Tranche 1 | Tranche 2 |
|---|---|---|
| **Principal Amount** | • Approximately $328.8 million[1] | • $830.0 million |
| **Maturity** | • 2 years | • 7 years |
| **Priority** | • 1L | • 2L (to be elevated to 1L upon repayment of Tranche 1; terms of elevation to be subject to definitive documentation) |
| **Loan Denominations** | • Denominations to be calculated based upon the relative USD/BTC balance of the existing loans due May 2023 (with no fewer than 4,674 BTC on account of the BTC-denominated portion between the down payments and new Tranche 1) | • 55% USD; 45% BTC / ETH |
| **Interest Rates** | • USD: 10%; Crypto: 6% | • USD: 6%; Crypto: 6% |
| **Coin Appreciation** | • Loans denominated in BTC benefit from price appreciation up to $85,000 for BTC[2] | • Loans denominated in BTC and ETH benefit from price appreciation up to $85,000 for BTC and up to $8,500 for ETH |
| **Optional Prepayment** | • Prepayable at DCG's discretion at par at all times | • Prepayable at DCG's discretion at par at all times |

### Partial Repayment Agreement

DCG to pay the following amounts in USD on account of the May 2023 maturities in accordance with the following schedule:
- $75 million within two business days of the Partial Repayment Agreement date;
- $75 million 47 days after the Partial Repayment Agreement date;
- $75 million 92 days after the Partial Repayment Agreement date; and
- $50 million at the earlier of 137 days after the Partial Repayment Agreement date or Plan Effective Date

- Forbearance Fee equal to 0.375% of the aggregate outstanding principal amount of the DCG loans due in May 2023, to be paid within 2 business days of the Partial Repayment Agreement date and credited against the USD portion of the final $50 million
- The full $275 million would be due on the Plan Effective Date to the extent not fully repaid through the Partial Repayment Agreement



Note 1:  Based on market prices as of 8/15/2023. Based on (i) the total amount of May 2023 Loans currently outstanding, less (a) amounts paid or credited under the Partial Repayment Agreement and (b) the Luno settlement, and (ii) applicable token price upon the Plan Effective date
Note 2:  Tranche 1 coin appreciation cap, if any, remains subject to discussion.

3

# Distribution Mechanics

Debtors and UCC have agreed in principle on the below distribution mechanics, subject to ongoing discussions

| | |
|---|---|
| **Early Payment Opt-In Mechanics** | • Opt-In for creditors to receive target distribution in one payment at the initial distribution<br>• Target distribution to be at a set percentage of total Opt-In claims – currently assuming ~60-65%<br>• Distribution to be in cash (in-kind distributions would not be available to Opt-In creditors) |
| **Subscription Mechanics** | • Opt-In currently contemplated to be $300 million in claims (subject to change based on market pricing)<br>• To the extent oversubscribed:<br>   ○ 1st priority to claims holders under $50,000<br>   ○ 2nd priority to claims holders between $50,000 - $5,000,000<br>   ○ 3rd priority to claims holders over $5,000,000 (if oversubscribed, to be allocated pro-rata with residual claim to continue to receive distributions under the Plan with creditors getting a claim for their residual amount) |
| **Initial Distributions** | • Estate to make an initial distribution after payment of Opt-In creditors<br>• Estate to make in-kind distributions to the extent possible<br>• Initial distribution to consist of all cash and coin on hand except for: (i) the opt-In distributions, (ii) a wind-down reserve to fund operations, (iii) litigation reserves (if any under the plan) and (iv) claims reserves<br>• Initial distribution would provide approximately 30-40% recovery (subject to change based on then-existing market values, a disputed claims reserve and restructuring or wind-down costs) |
| **Remaining Distributions/ Asset Matching** | • After the initial distribution, creditors would receive proceeds of designated longer-term assets on future distribution dates as assets are monetized or received<br>• Estate would seek to match assets with the claims base such that coin-denominated creditors bear the upside and downside risk of coin price fluctuations post-settlement date<br>   ○ For example, BTC creditor recoveries would be linked to BTC-denominated assets including BTC portions of DCG debt and a percentage of GBTC |
| **Other Points** | • Amended Plan is likely to include separate plan classes for: (i) USD/Stable Coins; (ii) BTC; (iii) ETH; and (iv) Altcoins<br>• Debtors and DCG would endeavor to structure the Amended Plan to be as tax efficient as possible |



4

# Disclaimer

This presentation has been prepared by Moelis & Company LLC ("Moelis"), Cleary Gottlieb Steen & Hamilton LLP and Alvarez & Marsal North America, LLC (collectively, the "Advisors"), based on information provided by Genesis Global Holdco, LLC, Genesis Global Capital, LLC, Genesis Asia Pacific Pte. Ltd. and their affiliates (together, the "Company") and upon information from third party sources.

The Advisors have not assumed any responsibility for independently verifying the accuracy of such information and disclaim any liability with respect to the information herein. None of the Company, the Advisors and other Company representatives make any representation or warranty, express or implied, or accept any responsibility or liability for the accuracy or completeness of, or the existence or materiality of any information omitted from, this presentation or any other written or oral information that the Company and the Advisors and representatives or any other person make available to any recipient.

This presentation is based on market prices as of 8/15/2023, and the Advisors assume no obligation to update, revise or re-categorize the information provided herein or to notify any third party should the information be updated, modified, revised or re-categorized, except as required by applicable law.

This presentation is for informational purposes only, does not constitute, and shall not be interpreted as a solicitation of a chapter 11 plan or an offer or sale of securities, and should not be construed as financial, legal, tax, accounting, investment or other advice or a recommendation with respect to any vote on a chapter 11 plan or an investment. This presentation shall not be taken as any form of commitment on the part of the Debtors to proceed with any transaction and is not intended to be relied upon as the basis for a voting or investment decision.

Among other things, this presentation does not address all material terms, conditions, covenants and other provisions that would be required in connection with any potential transaction, and any agreement would be subject to the execution of definitive documentation and any necessary approvals of the Bankruptcy Court.

Nothing contained in this presentation shall constitute a waiver or admission by the Debtors in any respect, nor shall this presentation or any information set forth herein waive or release any of the Debtors' rights or admissions with respect to the chapter 11 cases or their estates.

Moelis and its related investment banking entities provide mergers and acquisitions, recapitalization, restructuring, corporate finance and other financial advisory services to clients and affiliates of Moelis provide investment management services to clients. Personnel of Moelis or such affiliates may make statements or provide advice that is contrary to information included in this material. The proprietary interests of Moelis or its affiliates may conflict with your interests. In addition, Moelis and its affiliates and their personnel may from time to time have positions in or effect transactions in securities referred to in this material (or derivatives of such securities) or serve as a director of companies referred to in this presentation. The Advisors and other Company representatives and, if applicable, their affiliates may have advised, may seek to advise and may in the future advise or invest in companies referred to in this presentation.

