**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No. 23-10063 (SHL) |
| Debtors. | Jointly Administered |

## <u>AFFIDAVIT OF SERVICE</u>

I, Nataly Diaz, depose and say that I am employed by Kroll Restructuring Administration LLC ("***Kroll***"), the claims and noticing agent for the Debtors in the above-captioned chapter 11 cases.

On August 9, 2023, at my direction and under my supervision, employees of Kroll caused the following documents to be served (1) by the method set forth on the Master Service List attached hereto as **<u>Exhibit A</u>**; (2) via first class mail on the Master Mailing List attached hereto as **<u>Exhibit B</u>**; and (3) via email on the Master Email Mailing List attached hereto as **<u>Exhibit C</u>**:

- Supplemental Bundle of Authorities, a copy of which is attached hereto as **<u>Exhibit D</u>**

- Order Granting Recognition GGC ORC 3250 - OA 403, a copy of which is attached hereto as **<u>Exhibit E</u>**

- Order Granting Recognition GAP ORC 3364 - OA 400, a copy of which is attached hereto as **<u>Exhibit F</u>**

- Order Granting Recognition - Holdco ORC 3238 - OA 402, a copy of which is attached hereto as **<u>Exhibit G</u>**

- Further Written Submissions, a copy of which is attached hereto as **<u>Exhibit H</u>**

- Bundle of Authorities, a copy of which is attached hereto as **<u>Exhibit I</u>**

- Applicants Joint Written Submissions, a copy of which is attached hereto as **<u>Exhibit J</u>**

- AG Letter to Court, a copy of which is attached hereto as **<u>Exhibit K</u>**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

Dated: August 21, 2023

                                                        */s/ Nataly Diaz*
                                                        Nataly Diaz

State of New York
County of New York

Subscribed and sworn (or affirmed) to me on August 21, 2023, by Nataly Diaz, proved to me on
the bases of satisfactory evidence to be the person who executed this affidavit.

*/s/ HERBERT BAER*
Notary Public, State of New York
No. BA6205563
Qualified in Westchester County
Commission Expires May 11, 2025

**<u>Exhibit A</u>**

Exhibit A

Master Service List

Served as set forth below

| DESCRIPTION | NAME | ADDRESS | EMAIL | METHOD OF SERVICE |
|---|---|---|---|---|
| Counsel to Soichiro "Michael" Moro | Arnold & Porter Kaye Scholer LLP | Attn: Benjamin Mintz, Marcus Asner, Justin Imperato<br>250 West 55th Street<br>New York NY 10019 | benjamin.mintz@arnoldporter.com<br>marcus.asner@arnoldporter.com<br>justin.imperato@arnoldporter.com | Email |
| Counsel to Donut, Inc. | ASK LLP | Attn: Edward E. Neiger, Marianna Udem<br>60 East 42nd Street, 46th Floor<br>New York NY 10165 | eneiger@askllp.com<br>mudem@askllp.com | Email |
| Counsel to Digital Finance Group Co. | Baird Holm LLP | Attn: Jeremy C. Hollembeak<br>1700 Farnam St. Ste. 1500<br>Omaha NE 68102 | jhollembeak@bairdholm.com | Email |
| United States Bankruptcy Court for the Southern District of New York | Chambers of Honorable Sean H. Lane | Genesis Chambers Copy<br>US Bankruptcy Court SDNY<br>300 Quarropas Street, Room 147<br>White Plains NY 10601 | | First Class Mail |
| Counsel to the Debtors and Debtors-in-Possession | Cleary Gottlieb Steen & Hamilton LLP | Attn: Jack Massey<br>2112 Pennsylvania Avenue, N.W.<br>Washington DC 20037 | jamassey@cgsh.com | Email |
| Counsel to the Debtors | Cleary Gottlieb Steen & Hamilton LLP | Attn: Sean O'Neal, Jane VanLare, Hoo Ri Kim, Michael Weinberg, Richard C. Minott , Christian Ribeiro, Luke A. Barefoot, Andrew Weaver, Rishi Zutshi<br>One Liberty Plaza<br>New York NY 10006 | soneal@cgsh.com<br>jvanlare@cgsh.com<br>hokim@cgsh.com<br>mdweinberg@cgsh.com<br>rminott@cgsh.com<br>cribeiro@cgsh.com<br>lbarefoot@cgsh.com<br>aweaver@cgsh.com<br>rzutshi@cgsh.com | Email |
| Debtors | Genesis Global Holdco, LLC | Attn: Derar Islim, Arianna Pretto-Sankman<br>250 Park Avenue South<br>5th Floor<br>New York NY 10003 | arianna@genesistrading.com | Email |
| Counsel to Foundry Digital LLC | Horwood Marcus & Berk Chartered | Attn: Aaron L. Hammer, Nathan E. Delman<br>500 W. Madison St., Ste. 3700<br>Chicago IL 60661 | ahammer@hmblaw.com<br>ndelman@hmblaw.com<br>ecfnotices@hmblaw.com | Email |
| Counsel to Gemini Trust Company, LLC | Hughes Hubbard & Reed LLP | Attn: Anson B. Frelinghuysen, Dustin P. Smith, Jeffrey S. Margolin<br>One Battery Park Plaza<br>New York NY 10004 | anson.frelinghuysen@hugheshubbard.com<br>dustin.smith@hugheshubbard.com<br>jeff.margolin@hugheshubbard.com | Email |
| IRS Insolvency Section | Internal Revenue Service | Centralized Insolvency Operation<br>2970 Market Street<br>Mail Stop 5 Q30 133<br>Philadelphia PA 19104-5016 | mimi.m.wong@irscounsel.treas.gov | Email |
| IRS Insolvency Section | Internal Revenue Service | Centralized Insolvency Operation<br>P.O. Box 7346<br>Philadelphia PA 19101-7346 | mimi.m.wong@irscounsel.treas.gov | Email |
| Bankruptcy Counsel to the Securities Litigation Lead Plaintiff | Kaplan Fox & Kilsheimer LLP | Attn: Jeffrey P. Campisi<br>800 Third Avenue, 38th Floor<br>New York NY 10022 | jcampisi@kaplanfox.com | Email |
| Counsel to Ad Hoc Group of Creditors | Kirkland & Ellis LLP Kirkland & Ellis International LLP | Attn: Joshua A. Sussberg, Christopher Marcus, Ross J. Fiedler<br>601 Lexington Avenue<br>New York NY 10022 | joshua.sussberg@kirkland.com<br>christopher.marcus@kirkland.com<br>ross.fiedler@kirkland.com | Email |
| Special Litigation Counsel to Debtors and Debtors-in-Possession | Kobre & Kim LLP | Attn: Danielle L. Rose, Daniel J. Saval, John G. Conte<br>800 Third Avenue<br>New York NY 10022 | Danielle.Rose@kobrekim.com<br>Daniel.Saval@kobrekim.com<br>John.Conte@kobrekim.com | Email |

Exhibit A
Master Service List
Served as set forth below

| DESCRIPTION | NAME | ADDRESS | EMAIL | METHOD OF SERVICE |
|---|---|---|---|---|
| Counsel to Foreign Representatives of Three Arrows Capital, Ltd. (in liquidation) | Latham & Watkins LLP | Attn: Adam J. Goldberg, Christopher Harris, Brett M. Neve, Nacif Taousse<br>1271 Avenue of the Americas<br>New York NY 10020 | adam.goldberg@lw.com<br>christopher.harris@lw.com<br>brett.neve@lw.com<br>nacif.taousse@lw.com | Email |
| Counsel to Foreign Representatives of Three Arrows Capital, Ltd. (in liquidation) | Latham & Watkins LLP | Attn: Nima H. Mohebbi, Tiffany M. Ikeda<br>355 South Grand Avenue, Suite 100<br>Los Angeles CA 90071 | nima.mohebbi@lw.com<br>tiffany.ikeda@lw.com | Email |
| Counsel to 250 Park LLC | Leech Tishman Robinson Brog, PLLC | Attn: Fred B. Ringel<br>875 Third Avenue, 9th Floor<br>New York NY 10022 | fringel@leechtishman.com | Email |
| Bankruptcy Counsel to the Securities Litigation Lead Plaintiff | Lowenstein Sandler LLP | Attn: Michael S. Etkin, Andrew D. Behlmann, Michael Papandrea<br>One Lowenstein Drive<br>Roseland NJ 7068 | metkin@lowenstein.com<br>abehlmann@lowenstein.com<br>mpapandrea@lowenstein.com | Email |
| Counsel to the New Jersey Bureau of Securities | McElroy, Deutsch, Mulvaney & Carpenter, LLP | Attn: Jeffrey Bernstein<br>570 Broad Street<br>Suite 1401<br>Newark NJ 07102 | jbernstein@mdmc-law.com | Email |
| Counsel to the New Jersey Bureau of Securities | McElroy, Deutsch, Mulvaney & Carpenter, LLP | Attn: Nicole Leonard<br>225 Liberty Street<br>36th Floor<br>New York NY 10281 | nleonard@mdmc-law.com | Email |
| Counsel to the New Jersey Bureau of Securities | McElroy, Deutsch, Mulvaney & Carpenter, LLP | Attn: Virginia T. Shea<br>1300 Mt. Kemble Avenue<br>P.O. Box 2075<br>Morristown NJ 07962-2075 | vshea@mdmc-law.com | Email |
| Special Litigation and Enforcement Counsel to the Debtors | Morrison Cohen LLP | Attn: Heath D. Rosenblat, Jason P. Gottlieb<br>909 Third Avenue<br>27th Floor<br>New York NY 10022 | hrosenblat@morrisoncohen.com | Email |
| Counsel to NYSOAG | New York State Office of the Attorney General | Attn: Gabriel Tapalaga<br>Investor Protection Bureau<br>28 Liberty St., 21st Floor<br>New York NY 10005 | gabriel.tapalaga@ag.ny.gov | Email |
| Counsel to Mirana Corp. | Norton Rose Fulbright US LLP | Attn: Eric Daucher, Victoria V. Corder, Francisco Vazquez<br>1301 Avenue of the Americas<br>New York NY 10019-6022 | eric.daucher@nortonrosefulbright.com<br>victoria.corder@nortonrosefulbright.com<br>victoria.corder@nortonrosefulbright.com | Email |
| Office of The United States Trustee – NY Office | Office of the US Trustee | Attn: Greg Zipes<br>Alexander Hamilton Custom House<br>One Bowling Green, Suite 515<br>New York NY 10014 | ustpregion02.nyecf@usdoj.gov<br>andy.velez-rivera@usdoj.gov<br>tara.tiantian@usdoj.gov<br>greg.zipes@usdoj.gov | Email |
| Counsel to Official Committee of Unsecured Creditors of FTX Trading Ltd., et al. | Paul Hastings LLP | Attn: Kristopher M. Hansen, Kenneth Pasquale, Isaac Sasson<br>200 Park Avenue<br>New York NY 10166 | krishansen@paulhastings.com<br>kenpasquale@paulhastings.com<br>isaacsasson@paulhastings.com | Email |
| Counsel to Caramila Capital Management LLC and Residia Asset Management AG | Polsinelli PC | Attn: Christopher A. Ward<br>222 Delaware Avenue, Suite 1101<br>Wilmington DE 19801 | cward@polsinelli.com | Email |
| Counsel to Caramila Capital Management LLC and Residia Asset Management AG | Polsinelli PC | Attn: Jeremy R. Johnson<br>600 Third Avenue, 42nd Floor<br>New York NY 10016 | jeremy.johnson@polsinelli.com | Email |
| Counsel to Ad Hoc Group of Genesis Lenders | Proskauer Rose LLP | Attn: Brian S. Rosen, Vincent Indelicato, Megan R. Volin<br>Eleven Times Square<br>New York NY 10036 | brosen@proskauer.com<br>vindelicato@proskauer.com<br>mvolin@proskauer.com | Email |
| Counsel to Ad Hoc Group of Genesis Lenders | Proskauer Rose LLP | Attn: Jordan E. Sazant<br>70 West Madison, Suite 3800<br>Chicago IL 60602 | jsazant@proskauer.com | Email |

In re: Genesis Global Holdco, LLC, et al.
Case No. 22-10063 (SHL)

Page 2 of 3

Exhibit A
Master Service List
Served as set forth below

| DESCRIPTION | NAME | ADDRESS | EMAIL | METHOD OF SERVICE |
|---|---|---|---|---|
| Securities and Exchange Commission - Headquarters | Securities & Exchange Commission | Attn: Secretary Of The Treasury<br>100 F Street, NE<br>Washington DC 20549 | secbankruptcy@sec.gov<br>nyrobankruptcy@sec.gov | Email |
| Securities and Exchange Commission - Regional Office | Securities & Exchange Commission - NY Office | Attn: Bankruptcy Department<br>Brookfield Place<br>200 Vesey Street, Suite 400<br>New York NY 10281-1022 | bankruptcynoticeschr@sec.gov | Email |
| Securities and Exchange Commission - Regional Office | Securities & Exchange Commission - Philadelphia Office | Attn: Bankruptcy Department<br>One Penn Center<br>1617 JFK Blvd, Ste 520<br>Philadelphia PA 19103 | secbankruptcy@sec.gov | Email |
| Special Litigation Counsel to the Official Committee of Unsecured Creditors | Seward & Kissel LLP | Attn: John R. Ashmead, Mark D. Kotwick, Catherine V. LoTempio, Andrew J. Matott<br>One Battery Park Plaza<br>New York NY 10004 | ashmead@sewkis.com<br>kotwick@sewkis.com<br>lotempio@sewkis.com<br>matott@sewkis.com | Email |
| Bankruptcy Counsel to the Securities Litigation Lead Plaintiff | Silver Golub & Teitell LLP | Attn: Ian W. Sloss<br>One Landmark Square, 15th Floor<br>Stamford CT 06901 | isloss@sgtlaw.com | Email |
| Attorney for Vivian Farmery | Stuart P. Gelberg | Attn: Stuart P. Gelberg<br>125 Turkey Lane<br>Cold Spring Harbor NY 11724 | | First Class Mail |
| Counsel to FTX Trading Ltd. | Sullivan & Cromwell LLP | Attn: Andrew G. Dietderich, James L. Bromley, Brian D. Glueckstein, Alexa J. Kranzley, Christian P. Jensen<br>125 Broad Street<br>New York NY 10004 | dietdericha@sullcrom.com<br>bromleyj@sullcrom.com<br>gluecksteinb@sullcrom.com<br>kranzleya@sullcrom.com<br>jensenc@sullcrom.com | Email |
| Counsel to TN Dept of Revenue | TN Dept of Revenue | Attn: TN Attorney General's Office<br>Bankruptcy Division<br>PO Box 20207<br>Nashville TN 37202-0207 | | First Class Mail |
| United States Attorney's Office for the Southern District of New York | U.S. Attorney for Southern District Of New York | Attn: Bankruptcy Division<br>86 Chambers Street<br>3rd Floor<br>New York NY 10007 | jeffrey.oestericher@usdoj.gov<br>lawrence.fogelman@usdoj.gov<br>peter.aronoff@usdoj.gov<br>linda.riffkin@usdoj.gov | Email |
| Counsel to Digital Currency Group, Inc. | Weil, Gotshal & Manges LLP | Attn: Jeffrey D. Saferstein, Ronit Berkovich, Jessica Liou, Furqaan Siddiqui<br>767 Fifth Avenue<br>New York NY 10153 | jeffrey.saferstein@weil.com<br>ronit.berkovich@weil.com<br>jessica.liou@weil.com<br>furqaan.siddiqui@weil.com | Email |
| Counsel to Official Committee of Unsecured Creditors | White & Case LLP | Attn: Gregory F. Pesce<br>111 South Wacker Drive<br>Suite 5100<br>Chicago IL 60606 | gregory.pesce@whitecase.com | Email |
| Counsel to Official Committee of Unsecured Creditors | White & Case LLP | Attn: J. Christopher Shore, Philip Abelson, Michele J. Meises<br>1221 Avenue of the Americas<br>New York NY 10020 | cshore@whitecase.com<br>philip.abelson@whitecase.com<br>michele.meises@whitecase.com | Email |
| Counsel to Barry Habib | Windels Marx Lane & Mittendorf, LLP | Attn: James M. Sullivan<br>156 West 56th Street<br>New York NY 10019 | jsullivan@windelsmarx.com | Email |

**<u>Exhibit B</u>**

Exhibit B
Master Mailing List
Served via First Class Mail

| ADDRESS ID | NAME | ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|---|
| 12191554 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885441 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191555 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046221 | 250 PARK LLC | ADDRESS ON FILE | | | | |
| 12047503 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046222 | ACRION GROUP INC/DMITRI GOFSHTEIN | ADDRESS ON FILE | | | | |
| 12875768 | AD HOC GROUP OF GENESIS LENDERS | ADDRESS ON FILE | | | | |
| 12885487 | AD HOC GROUP OF GENESIS LENDERS | ADDRESS ON FILE | | | | |
| 12046223 | ADELINA PANG FENGSHUI CONSULTANCY PTE LTD | ADDRESS ON FILE | | | | |
| 12046224 | ADM DESIGN & BUILD | ADDRESS ON FILE | | | | |
| 12046225 | AETOS INTEGRATED SOLUTIONS PTE. LTD. | ADDRESS ON FILE | | | | |
| 12191560 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191567 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885368 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12105041 | ALLEN & GLEDHILL | ADDRESS ON FILE | | | | |
| 13117491 | ALLEN & GLEDHILL LLP | ONE MARINA BOULEVARD #28-00 | | | 018989 | SINGAPORE |
| 13117492 | ALLEN & GLEDHILL LLP | 1221 AVENUE OF THE AMERICAS | NEW YORK | NY | 10020 | |
| 12171183 | ALLIED UNIVERSAL EXECUTIVE PROTECTION AND INTELLIGENCE SERVICES, INC | ADDRESS ON FILE | | | | |
| 12191568 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047552 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191570 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046228 | ALVAREZ & MARSAL HOLDINGS, LLC | ADDRESS ON FILE | | | | |
| 12191831 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047280 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046229 | AMERICAN ARBITRATION ASSOCIATION | ADDRESS ON FILE | | | | |
| 12191571 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12867484 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191572 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047565 | ANCHORAGE LENDING CA, LLC | ADDRESS ON FILE | | | | |
| 12047531 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191558 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191702 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046232 | AON SINGAPORE PTE. LTD. | ADDRESS ON FILE | | | | |
| 12191578 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191797 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191579 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047579 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191580 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13092110 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885614 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047583 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191581 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047585 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12171204 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047598 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191717 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191584 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12833431 | AXIS INSURANCE COMPANY (ADMITTED) | 111 SOUTH WACKER DRIVE, SUITE 3500 | CHICAGO | IL | 60606 | |
| 12191586 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191587 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047153 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047607 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191700 | NAME ON FILE | ADDRESS ON FILE | | | | |

Exhibit B
Master Mailing List
Served via First Class Mail

| ADDRESS ID | NAME | ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|---|
| 12047619 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191689 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191701 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191815 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191631 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191591 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12171196 | BITGO | ADDRESS ON FILE | | | | |
| 12046235 | BITGO, INC. | ADDRESS ON FILE | | | | |
| 12047628 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191592 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191594 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191593 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047630 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191595 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191596 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046236 | BLOOMBERG FINANCE SINGAPORE L.P. | ADDRESS ON FILE | | | | |
| 12191597 | BLOOMBERG FINANCE SINGAPORE L.P. | ADDRESS ON FILE | | | | |
| 12046237 | BLOOMBERG LP | ADDRESS ON FILE | | | | |
| 12191760 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 15600032 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191874 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12856473 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12856956 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191767 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191575 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046823 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12871910 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191735 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12970201 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191852 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047131 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191606 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191711 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191589 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191590 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191607 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191608 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046238 | CANARY LLC | ADDRESS ON FILE | | | | |
| 12191609 | CAPITEQ PTE LTD | ADDRESS ON FILE | | | | |
| 12191610 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191657 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046397 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046240 | CDW DIRECT LLC | ADDRESS ON FILE | | | | |
| 12046400 | CENTRAL PROVIDENT FUND BOARD | ADDRESS ON FILE | | | | |
| 12046401 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12644099 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191731 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046241 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046243 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13007862 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191703 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046244 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191858 | NAME ON FILE | ADDRESS ON FILE | | | | |

Exhibit B
Master Mailing List
Served via First Class Mail

| ADDRESS ID | NAME | ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|---|
| 12046245 | CHICAGO MERCANTILE EXCHANGE INC NEED PO | ADDRESS ON FILE | | | | |
| 12191573 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046499 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046246 | CJD TECHNOLOGIES | ADDRESS ON FILE | | | | |
| 12191622 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046247 | CLEARY GOTTLIEB STEEN & HAMILTON LLP | ADDRESS ON FILE | | | | |
| 12046248 | CLOUDFLARE, INC. | ADDRESS ON FILE | | | | |
| 12046249 | CMS CAMERON MCKENNA NABARRO OLSWANG LLP | ADDRESS ON FILE | | | | |
| 12191603 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046817 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12246199 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046250 | COINBASE CUSTODY TRUST | ADDRESS ON FILE | | | | |
| 12191623 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046450 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046453 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12171197 | COMPLETE DISCOVERY SOURCE | ADDRESS ON FILE | | | | |
| 12046251 | COMPLIANCY SERVICES | ADDRESS ON FILE | | | | |
| 12046461 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191621 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191840 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047431 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13117497 | CROWELL & MORING LLP | 590 MADISON AVENUE 20TH FLOOR | NEW YORK | NY | 10022 | |
| 12191627 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046253 | CSC ASIA SERVICES (HONG KONG) LIMITED | ADDRESS ON FILE | | | | |
| 12046254 | CYBERFORT LTD | ADDRESS ON FILE | | | | |
| 12191628 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046487 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 16172843 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885595 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046255 | DASHLANE USA INC | ADDRESS ON FILE | | | | |
| 12191632 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12105045 | DAVIS POLK & WARDWELL LLP | ADDRESS ON FILE | | | | |
| 12191636 | DCG INTERNATIONAL INVESTMENTS LTD | ADDRESS ON FILE | | | | |
| 12875868 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046257 | DCG REAL ESTATE MANAGEMENT LLC | ADDRESS ON FILE | | | | |
| 12191739 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191637 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12650622 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12106809 | DEPARTMENT OF TREASURY- INTERNAL REVENUE SERVICE | ADDRESS ON FILE | | | | |
| 12191640 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12875632 | DIGITAL CURRENCY GROUP, INC | ADDRESS ON FILE | | | | |
| 12885475 | DIGITAL CURRENCY GROUP, INC | ADDRESS ON FILE | | | | |
| 12191642 | DIGITAL CURRENCY GROUP, INC. | ADDRESS ON FILE | | | | |
| 12191643 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191708 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191788 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046259 | DRIVEN | ADDRESS ON FILE | | | | |
| 12191862 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046546 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191644 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885541 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13007484 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046550 | NAME ON FILE | ADDRESS ON FILE | | | | |

Exhibit B
Master Mailing List
Served via First Class Mail

| ADDRESS ID | NAME | ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|---|
| 12171224 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191577 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885421 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191649 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13052647 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12105039 | ERNST & YOUNG LLP | ADDRESS ON FILE | | | | |
| 12046261 | ERNST & YOUNG LLP | ADDRESS ON FILE | | | | |
| 12046580 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046582 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046589 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191650 | EXECUTIVE LINK | ADDRESS ON FILE | | | | |
| 12191730 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12093512 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191857 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191742 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191653 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191652 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046262 | FEDERAL EXPRESS (SINGAPORE) PTE LTD | ADDRESS ON FILE | | | | |
| 12191563 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191782 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191802 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191658 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191659 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191660 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046263 | FIREBLOCKS, INC. | ADDRESS ON FILE | | | | |
| 12191661 | FIRSTLIGHT FIBER, INC. | ADDRESS ON FILE | | | | |
| 12191820 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191709 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191662 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046264 | FORGE INSURANCE COMPANY | ADDRESS ON FILE | | | | |
| 12191588 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046615 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191809 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12875403 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046266 | FRIEDMAN LLP | ADDRESS ON FILE | | | | |
| 12191665 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191841 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12105043 | FTI CONSULTING | ADDRESS ON FILE | | | | |
| 12046267 | FUJIFILM BUSINESS INNOVATION SINGAPORE PTE. LTD. | ADDRESS ON FILE | | | | |
| 12171184 | FULLERTON HEALTH GROUP | ADDRESS ON FILE | | | | |
| 12046271 | FULLERTON HEALTHCARE GROUP PTE LTD | ADDRESS ON FILE | | | | |
| 12191666 | FULLERTON HEALTHCARE GROUP PTE. | ADDRESS ON FILE | | | | |
| 12191727 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12171237 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046623 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885462 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191710 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191667 | GATE.IO | ADDRESS ON FILE | | | | |
| 12191844 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047301 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191668 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046630 | GENESIS (ASIA) HONG KONG LIMITED | ADDRESS ON FILE | | | | |
| 12046631 | GENESIS BERMUDA HOLDCO LIMITED | ADDRESS ON FILE | | | | |

Exhibit B
Master Mailing List
Served via First Class Mail

| ADDRESS ID | NAME | ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|---|
| 12191669 | GENESIS CUSTODY LIMITED | ADDRESS ON FILE | | | | |
| 12046632 | GENESIS CUSTODY LIMITED (UK) | ADDRESS ON FILE | | | | |
| 12046633 | GENESIS GLOBAL ASSETS, LLC | ADDRESS ON FILE | | | | |
| 12171254 | GENESIS GLOBAL CAPITAL, LLC | ADDRESS ON FILE | | | | |
| 12191670 | GENESIS GLOBAL HOLDCO, LLC | ADDRESS ON FILE | | | | |
| 12191671 | GENESIS GLOBAL HOLDCO, LLC; GENESIS GLOBAL TRADING, INC.; GENESIS GLOBAL CAPITAL, LLC; GGC INTERNATIONAL LIMITED; GENESIS CUSTODY LIMITED | ADDRESS ON FILE | | | | |
| 12191672 | GENESIS GLOBAL HOLDCO, LLC; GENESIS GLOBAL TRADING, INC.; GGC INTERNATIONAL LIMITED; GENESIS CUSTODY LIMITED; GENESIS ASIA PACIFIC PTE. LTD. | ADDRESS ON FILE | | | | |
| 12046634 | GENESIS GLOBAL LABS, LLC | ADDRESS ON FILE | | | | |
| 12046635 | GENESIS GLOBAL MARKETS LIMITED (BERMUDA) | ADDRESS ON FILE | | | | |
| 12191673 | GENESIS GLOBAL TRADING | ADDRESS ON FILE | | | | |
| 12875553 | GENESIS GLOBAL TRADING, INC. | ADDRESS ON FILE | | | | |
| 12191674 | GENESIS GLOBAL TRADING, INC. | ADDRESS ON FILE | | | | |
| 12191675 | GENESIS GLOBAL TRADING, INC.; GENESIS GLOBAL CAPITAL, LLC; GGC INTERNATIONAL LIMITED; GENESIS CUSTODY LIMITED; GENESIS ASIA PACIFIC PTE. LTD. | ADDRESS ON FILE | | | | |
| 12046637 | GENESIS UK HOLDCO LIMITED | ADDRESS ON FILE | | | | |
| 12191676 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191734 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046644 | GGA INTERNATIONAL LIMITED (BVI) | ADDRESS ON FILE | | | | |
| 12191679 | GGC | ADDRESS ON FILE | | | | |
| 12046645 | GGC INTERNATIONAL LIMITED | ADDRESS ON FILE | | | | |
| 12191566 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191598 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191605 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046272 | GITLAB INC | ADDRESS ON FILE | | | | |
| 12046273 | GLOBAL FUND MEDIA LIMITED | ADDRESS ON FILE | | | | |
| 12191873 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191706 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885544 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885774 | GOODWIN PROCTER LLP | ADDRESS ON FILE | | | | |
| 12046274 | GOODWIN PROCTER LLP | ADDRESS ON FILE | | | | |
| 12191832 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191833 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12970129 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191680 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046276 | GOWLING WLG (CANADA) LLP | ADDRESS ON FILE | | | | |
| 12046655 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046277 | GRAB PTE. LTD. | ADDRESS ON FILE | | | | |
| 12171187 | GRABTAXI PTE. LTD | ADDRESS ON FILE | | | | |
| 12885582 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191681 | GRAYSCALE INVESTMENTS, LLC | ADDRESS ON FILE | | | | |
| 12046278 | GROUP LEVIN PTE. LTD | ADDRESS ON FILE | | | | |
| 12191562 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12105044 | GUNDERSON DETTMER | ADDRESS ON FILE | | | | |
| 12191705 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191618 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12171201 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191845 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047311 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046280 | HALBORN INC. | ADDRESS ON FILE | | | | |
| 12885409 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191683 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191619 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191750 | NAME ON FILE | ADDRESS ON FILE | | | | |

Exhibit B
Master Mailing List
Served via First Class Mail

| ADDRESS ID | NAME | ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|---|
| 12191641 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12654874 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191738 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191647 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191778 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191813 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046681 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13007490 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13046738 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13010320 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191559 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191620 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12760975 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191684 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046695 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046696 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191685 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191655 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885471 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191613 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046281 | IBM CORPORATION | ADDRESS ON FILE | | | | |
| 12046711 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046714 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046282 | INLAND REVENUE AUTHORITY OF SINGAPORE | ADDRESS ON FILE | | | | |
| 12046283 | INTELLIWARE DEVELOPMENT INC | ADDRESS ON FILE | | | | |
| 12047433 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 16879677 | IOWA INSURANCE DIVISION | ADDRESS ON FILE | | | | |
| 16879685 | IOWA INSURANCE DIVISION | ADDRESS ON FILE | | | | |
| 12191687 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885861 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191561 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12171188 | ISS FACILITY SERVICES PRIVATE | ADDRESS ON FILE | | | | |
| 12046284 | ISS FACILITY SERVICES PRIVATE LIMITED | ADDRESS ON FILE | | | | |
| 12191688 | ISS FACILITY SERVICES PTE LTD | ADDRESS ON FILE | | | | |
| 12191718 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191696 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12982279 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12245843 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13117495 | JK MEDORA | 22 MALACCA STREET, RB CAPITAL, BUILDING #03-02 | | | 048980 | SINGAPORE |
| 12191715 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 15668876 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046811 | JPMORGAN CHASE BANK, NA | ADDRESS ON FILE | | | | |
| 12046812 | JPMORGAN CHASE BANK, NA SINGAPORE | ADDRESS ON FILE | | | | |
| 12244702 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046287 | JUSTCO (SINGAPORE) PTE. LTD. | ADDRESS ON FILE | | | | |
| 12191713 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885601 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191775 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191743 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191691 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191614 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191724 | NAME ON FILE | ADDRESS ON FILE | | | | |

Exhibit B
Master Mailing List
Served via First Class Mail

| ADDRESS ID | NAME | ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|---|
| 12046288 | KEPPEL ELECTRIC PTE LTD | ADDRESS ON FILE | | | | |
| 12191846 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191574 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191744 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046430 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885405 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885464 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191851 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12171199 | KJ TECHNOLOGIES | ADDRESS ON FILE | | | | |
| 12046289 | KLEINBERG KAPLAN WOLFF & COHEN P.C. | ADDRESS ON FILE | | | | |
| 12191719 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191564 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191745 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191720 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191721 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191830 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191697 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046291 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12869211 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047610 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191663 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191677 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191692 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13060345 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191633 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191664 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 15600407 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 16290910 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191818 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191864 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191556 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047498 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191808 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12835338 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046294 | LEVIN GROUP LTD | ADDRESS ON FILE | | | | |
| 12047408 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191868 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191746 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191741 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046296 | LIFEWORKS SINGAPORE PTE LTD | ADDRESS ON FILE | | | | |
| 12046297 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191712 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046881 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046299 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191871 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046300 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12855400 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885542 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046301 | LLOYD'S OF LONDON | ADDRESS ON FILE | | | | |
| 12046302 | LOCKTON COMPANIES (SINGAPORE) PTE LTD | ADDRESS ON FILE | | | | |
| 12191634 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046887 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046303 | NAME ON FILE | ADDRESS ON FILE | | | | |

Exhibit B
Master Mailing List
Served via First Class Mail

| ADDRESS ID | NAME | ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|---|
| 12191694 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191740 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191728 | LUNO AUSTRALIA PTY LTD | ADDRESS ON FILE | | | | |
| 12046304 | LYRECO PTE LTD | ADDRESS ON FILE | | | | |
| 12046907 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12655954 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12654914 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12242206 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046305 | MANA HOLDINGS LTD | ADDRESS ON FILE | | | | |
| 12046306 | MANAGED FUNDS ASSOCIATION | ADDRESS ON FILE | | | | |
| 12191824 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13067401 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191725 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191611 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191648 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191817 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046307 | MASSIVE COMPUTING, INC | ADDRESS ON FILE | | | | |
| 12191686 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13060360 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191737 | MAXXTRADER SYSTEMS PTE LTD | ADDRESS ON FILE | | | | |
| 12191693 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191600 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191635 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12970094 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191625 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046231 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191814 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191839 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046308 | MEITAR LAW OFFICES | ADDRESS ON FILE | | | | |
| 12046949 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046955 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046956 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046309 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046311 | MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C. | ADDRESS ON FILE | | | | |
| 12191751 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191753 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13041721 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046312 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191804 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046313 | MITSUBISHI HC CAPITAL ASIA PACIFIC | ADDRESS ON FILE | | | | |
| 13117493 | MJM LIMITED | THISTLE HOUSE, 4 BURNABY STREET | HAMILTON | HM | 11 | BERMUDA |
| 12046314 | MONETARY AUTHORITY OF SINGAPORE | ADDRESS ON FILE | | | | |
| 12885680 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191756 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191757 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046315 | MOORE & VAN ALLEN PLLC | ADDRESS ON FILE | | | | |
| 13117496 | MORGAN LEWIS STAMFORD LLC | 10 COLLYER QUAY, #27-00 OCEAN FINANCIAL CENTER | | | 049315 | SINGAPORE |
| 12885531 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12835372 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191822 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191800 | NAME ON FILE | ADDRESS ON FILE | | | | |

Exhibit B
Master Mailing List
Served via First Class Mail

| ADDRESS ID | NAME | ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|---|
| 12970209 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046317 | MORRISON COHEN LLP | ADDRESS ON FILE | | | | |
| 15600022 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191707 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046318 | MOUNT STUDIO PTE LTD | ADDRESS ON FILE | | | | |
| 12171189 | MSA SECURITY | ADDRESS ON FILE | | | | |
| 12191733 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046322 | MURPHY & MCGONIGLE P.C. | ADDRESS ON FILE | | | | |
| 12191812 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191759 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12991065 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191629 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046325 | NAKUL, VERMA | ADDRESS ON FILE | | | | |
| 12191602 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885339 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191761 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191762 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191763 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046326 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047025 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191764 | NICKL INC. | ADDRESS ON FILE | | | | |
| 12191805 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191766 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191768 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191769 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885428 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046327 | NUMERIX LLC | ADDRESS ON FILE | | | | |
| 12171191 | OFFICE SECRETARIES | ADDRESS ON FILE | | | | |
| 12046328 | OFFICE SECRETARIES PTE LTD. | ADDRESS ON FILE | | | | |
| 12191771 | OFFICE SECRETARIES PTE LTD. | ADDRESS ON FILE | | | | |
| 12191772 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12245138 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046329 | OKTA INC | ADDRESS ON FILE | | | | |
| 12191773 | ONE HEDDON STREET | ADDRESS ON FILE | | | | |
| 12046330 | ONE RAFFLES QUAY PTE LTD | ADDRESS ON FILE | | | | |
| 12191774 | ONE RAFFLES QUAY PTE LTD | ADDRESS ON FILE | | | | |
| 12047051 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046331 | ONE11 RACING LLC | ADDRESS ON FILE | | | | |
| 12046332 | ONSTREAM LLC | ADDRESS ON FILE | | | | |
| 12046333 | OPSWAT | ADDRESS ON FILE | | | | |
| 12046334 | OPUS RECRUITMENT SOLUTIONS LTD | ADDRESS ON FILE | | | | |
| 12046335 | ORRICK, HERRINGTON & SUTCLIFFE, LLP | ADDRESS ON FILE | | | | |
| 12928601 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191776 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191777 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12245529 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191779 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191747 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191723 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046336 | PAPAYA GLOBAL, INC. | ADDRESS ON FILE | | | | |
| 12047063 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191780 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047065 | NAME ON FILE | ADDRESS ON FILE | | | | |

Exhibit B
Master Mailing List
Served via First Class Mail

| ADDRESS ID | NAME | ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|---|
| 12047067 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046337 | PARAGON BROKERS (BERMUDA) LTD. | ADDRESS ON FILE | | | | |
| 12046338 | PARAGON INTERNATIONAL | ADDRESS ON FILE | | | | |
| 12191781 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191754 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191785 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047073 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046339 | PERKINS COIE LLP | ADDRESS ON FILE | | | | |
| 12191615 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191789 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885604 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046340 | PHAIDON INTERNATIONAL INC | ADDRESS ON FILE | | | | |
| 12191714 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046341 | PICO QUANTITATIVE TRADING | ADDRESS ON FILE | | | | |
| 12191861 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885466 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047098 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191565 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047102 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191791 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12648475 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12648440 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047110 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191678 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12891029 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046342 | PRIVATE CHEFS OF ATLANTA | ADDRESS ON FILE | | | | |
| 13117489 | PROLEGIS LLC | 50 RAFFLES PLACE #24-01, SINGAPORE LAND TOWER | | | 048623 | SINGAPORE |
| 12191793 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046343 | PYTHIAN | ADDRESS ON FILE | | | | |
| 12046344 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191794 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12245871 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12171202 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046345 | RAJAH & TANN | ADDRESS ON FILE | | | | |
| 12046346 | RANDSTAD PTE LIMITED | ADDRESS ON FILE | | | | |
| 12191825 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047144 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13117490 | REED SMITH IN ALLIANCE WITH RESOURCE LAW | 10 COLLYER QUAY, #18-01, OCEAN FINANCIAL CENTRE | | | 049315 | SINGAPORE |
| 12105040 | REED SMITH LLP | ADDRESS ON FILE | | | | |
| 12046347 | REED SMITH PTE. LTD | ADDRESS ON FILE | | | | |
| 12046348 | REED SMITH RICHARDS BUTLER LLP | ADDRESS ON FILE | | | | |
| 12191801 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191729 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046349 | RICHARDS LAYTON & FINGER | ADDRESS ON FILE | | | | |
| 12191796 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 18165103 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191690 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191843 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046350 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046252 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191699 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191758 | NAME ON FILE | ADDRESS ON FILE | | | | |

Exhibit B
Master Mailing List
Served via First Class Mail

| ADDRESS ID | NAME | ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|---|
| 12191806 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191807 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191624 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046351 | SALT VENTURE GROUP, LLC | ADDRESS ON FILE | | | | |
| 12191656 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12949624 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191698 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191810 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046352 | SAVILLS (SINGAPORE) PTE LTD | ADDRESS ON FILE | | | | |
| 12191626 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191811 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885458 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191682 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885555 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12243915 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191726 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12171206 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191576 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191582 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 15633251 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191704 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191792 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191798 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885446 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191799 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191795 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046353 | SHEARMAN & STERLING LLP | ADDRESS ON FILE | | | | |
| 12191557 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047222 | SIGNATURE BANK | ADDRESS ON FILE | | | | |
| 12047227 | SILVERGATE BANK | ADDRESS ON FILE | | | | |
| 12046355 | SINGTEL (SINGAPORE TELECOMMUNICATIONS LIMITED) | ADDRESS ON FILE | | | | |
| 12191736 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885470 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191821 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191849 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13117494 | SNELL & WILMER L.L.P | 3883 HOWARD HUGHES PARKWAY, SUITE 1100 | LAS VEGAS | NV | 89169 | |
| 12046356 | SNOWFLAKE INC. | ADDRESS ON FILE | | | | |
| 12171205 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191748 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046357 | SP SERVICES LTD (2180) | ADDRESS ON FILE | | | | |
| 12046358 | SPGROUP | ADDRESS ON FILE | | | | |
| 12046359 | SPIRE SEARCH PARTNERS | ADDRESS ON FILE | | | | |
| 12835917 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046360 | STARHUB LTD | ADDRESS ON FILE | | | | |
| 12046361 | STARR INSURANCE & REINSURANCE LIMITED | ADDRESS ON FILE | | | | |
| 12191823 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046362 | STERLING INFOSYSTEMS, INC | ADDRESS ON FILE | | | | |
| 12191604 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885481 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046363 | STOP PEST CONTROL OF NY, INC. | ADDRESS ON FILE | | | | |
| 12046365 | STORM2 PTE LTD | ADDRESS ON FILE | | | | |
| 12046365 | STOTT AND MAY | ADDRESS ON FILE | | | | |
| 12191847 | NAME ON FILE | ADDRESS ON FILE | | | | |

Exhibit B
Master Mailing List
Served via First Class Mail

| ADDRESS ID | NAME | ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|---|
| 12047260 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047265 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046366 | STRUCTURE WORKS | ADDRESS ON FILE | | | | |
| 12191732 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191826 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12830089 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191827 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191786 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046367 | T2 CONSULTING, LLC | ADDRESS ON FILE | | | | |
| 12191863 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885411 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191828 | TALOS TRADING INC. | ADDRESS ON FILE | | | | |
| 12191829 | TALOS TRADING, INC. | ADDRESS ON FILE | | | | |
| 12191599 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047281 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 13091472 | TEXAS DEPARTMENT OF BANKING | ADDRESS ON FILE | | | | |
| 12191834 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046369 | THE FURNITURE X-CHANGE | ADDRESS ON FILE | | | | |
| 12191835 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191836 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046370 | THE PEST CONTROL COMPANY PTE LTD | ADDRESS ON FILE | | | | |
| 12046371 | THE TIE, INC | ADDRESS ON FILE | | | | |
| 12191837 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191838 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046372 | THOMSON REUTERS CORPORATION PTE LTD | ADDRESS ON FILE | | | | |
| 12047314 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191848 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191616 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12949006 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191850 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12970155 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12970140 | TRANSLUNAR CRYPTO LP | ADDRESS ON FILE | | | | |
| 12047330 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12827060 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191853 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191854 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885468 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 16825530 | U.S. SECURITIES AND EXCHANGE COMMISSION | ADDRESS ON FILE | | | | |
| 12046388 | U.S. SECURITIES AND EXCHANGE COMMISSION (SEC) | ADDRESS ON FILE | | | | |
| 12046374 | UNISPACE OF BOSTON, LLC | ADDRESS ON FILE | | | | |
| 12046375 | UNITED CORPORATE SERVICES INC | ADDRESS ON FILE | | | | |
| 12047340 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046642 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047346 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191855 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191749 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191784 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191783 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191816 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191646 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 17114903 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191765 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191645 | NAME ON FILE | ADDRESS ON FILE | | | | |

Exhibit B
Master Mailing List
Served via First Class Mail

| ADDRESS ID | NAME | ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|---|---|
| 12046376 | VERTICAL GREEN PTE LTD | ADDRESS ON FILE | | | | |
| 12191856 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191752 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046377 | VIP SPORTS MARKETING, INC. | ADDRESS ON FILE | | | | |
| 12191651 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 16172836 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191630 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191601 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047652 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047376 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047377 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191716 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191803 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 15445553 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12171203 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191865 | WIN TAT AIR-CONDITIONING (S) PTE LTD | ADDRESS ON FILE | | | | |
| 12046378 | WIN TAT AIR-CONDITIONING PTE LTD | ADDRESS ON FILE | | | | |
| 12191866 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12047399 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191867 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885600 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046379 | WISE GROUP PTE LTD | ADDRESS ON FILE | | | | |
| 12046380 | WOLTERS KLUWER FINANCIAL SERVICES INC. | ADDRESS ON FILE | | | | |
| 12171253 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046381 | WOODRUFF SAWYER | ADDRESS ON FILE | | | | |
| 12046383 | WOODRUFF SAWYER | ADDRESS ON FILE | | | | |
| 12191869 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191870 | WORKSOCIAL.COM | ADDRESS ON FILE | | | | |
| 12046384 | WORKSOCIAL.COM LLC | ADDRESS ON FILE | | | | |
| 12191819 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191859 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191860 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12885618 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046385 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191872 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191654 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12828476 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 15669949 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191695 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12046387 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191875 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191617 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12644098 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12245678 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191876 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12045387 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191877 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191583 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12191585 | NAME ON FILE | ADDRESS ON FILE | | | | |
| 12855708 | NAME ON FILE | ADDRESS ON FILE | | | | |

**<u>Exhibit C</u>**

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12245185 | Name on File | Email on File |
| 12171209 | Name on File | Email on File |
| 12047489 | Name on File | Email on File |
| 12047489 | Name on File | Email on File |
| 12047490 | Name on File | Email on File |
| 12868362 | Name on File | Email on File |
| 12047430 | Name on File | Email on File |
| 12047491 | Name on File | Email on File |
| 12047492 | Name on File | Email on File |
| 12047493 | Name on File | Email on File |
| 12047494 | Name on File | Email on File |
| 12047494 | Name on File | Email on File |
| 12047494 | Name on File | Email on File |
| 12047494 | Name on File | Email on File |
| 12047495 | Name on File | Email on File |
| 12047495 | Name on File | Email on File |
| 12047496 | Name on File | Email on File |
| 12047496 | Name on File | Email on File |
| 12963480 | Name on File | Email on File |
| 12963480 | Name on File | Email on File |
| 17114878 | Name on File | Email on File |
| 15555194 | Acevedo, Manuel | Email on File |
| 12047036 | Name on File | Email on File |
| 15467658 | Ad Hoc Group of Genesis Lenders | Email on File |
| 16304325 | Ad Hoc Group of Genesis Lenders | Email on File |
| 12647650 | Name on File | Email on File |
| 12242134 | Name on File | Email on File |
| 12242134 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047517 | Name on File | Email on File |
| 12047518 | Name on File | Email on File |
| 12649421 | Name on File | Email on File |
| 16304340 | Name on File | Email on File |
| 12046227 | AIA | Email on File |
| 12046226 | AIA | Email on File |
| 12047521 | Name on File | Email on File |
| 12047521 | Name on File | Email on File |
| 12047522 | Name on File | Email on File |
| 12047522 | Name on File | Email on File |
| 12047522 | Name on File | Email on File |
| 12047524 | Name on File | Email on File |
| 12047525 | Name on File | Email on File |
| 12872454 | Alameda Research LLC on behalf of all FTX Debtors | Email on File |
| 12875849 | Alameda Research LLC on behalf of all FTX Debtors | Email on File |
| 12872416 | Alameda Research LLC on behalf of all FTX Debtors | Email on File |
| 12047526 | Name on File | Email on File |
| 12047527 | Name on File | Email on File |
| 12872559 | Alameda Research Ltd. on behalf of all FTX Debtors | Email on File |
| 12872559 | Alameda Research Ltd. on behalf of all FTX Debtors | Email on File |
| 12872559 | Alameda Research Ltd. on behalf of all FTX Debtors | Email on File |
| 12046710 | Name on File | Email on File |
| 12047033 | Name on File | Email on File |
| 12171228 | Name on File | Email on File |
| 12171228 | Name on File | Email on File |
| 12872497 | Name on File | Email on File |
| 12047542 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047543 | Name on File | Email on File |
| 12966997 | Name on File | Email on File |
| 12242135 | Name on File | Email on File |
| 12242135 | Name on File | Email on File |
| 12879011 | Name on File | Email on File |
| 12047547 | Name on File | Email on File |
| 12104320 | Name on File | Email on File |
| 12047549 | Name on File | Email on File |
| 12946950 | Name on File | Email on File |
| 12046815 | Name on File | Email on File |
| 12242136 | Name on File | Email on File |
| 12242136 | Name on File | Email on File |
| 12871811 | Name on File | Email on File |
| 12871811 | Name on File | Email on File |
| 12047551 | Name on File | Email on File |
| 12047553 | Name on File | Email on File |
| 12191569 | Name on File | Email on File |
| 12191569 | Name on File | Email on File |
| 12047554 | Name on File | Email on File |
| 12047555 | Name on File | Email on File |
| 12047555 | Name on File | Email on File |
| 12047556 | Name on File | Email on File |
| 12047556 | Name on File | Email on File |
| 11841979 | Name on File | Email on File |
| 11841979 | Name on File | Email on File |
| 12047558 | Name on File | Email on File |
| 12242137 | Name on File | Email on File |
| 12242137 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12171250 | Name on File | Email on File |
| 12046491 | Name on File | Email on File |
| 12047559 | Name on File | Email on File |
| 12047559 | Name on File | Email on File |
| 12047560 | Name on File | Email on File |
| 12047560 | Name on File | Email on File |
| 12047560 | Name on File | Email on File |
| 12046230 | Name on File | Email on File |
| 12046230 | Name on File | Email on File |
| 12046230 | Name on File | Email on File |
| 12046230 | Name on File | Email on File |
| 12046230 | Name on File | Email on File |
| 12047563 | Name on File | Email on File |
| 12047565 | ANCHORAGE LENDING CA, LLC | Email on File |
| 12047565 | ANCHORAGE LENDING CA, LLC | Email on File |
| 12047565 | ANCHORAGE LENDING CA, LLC | Email on File |
| 12047565 | ANCHORAGE LENDING CA, LLC | Email on File |
| 12047565 | ANCHORAGE LENDING CA, LLC | Email on File |
| 12047565 | ANCHORAGE LENDING CA, LLC | Email on File |
| 12822483 | Name on File | Email on File |
| 12242138 | Name on File | Email on File |
| 12242138 | Name on File | Email on File |
| 12835426 | Name on File | Email on File |
| 12875024 | Name on File | Email on File |
| 12171211 | Name on File | Email on File |
| 12764482 | Name on File | Email on File |
| 12046731 | Name on File | Email on File |
| 12046828 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047575 | Name on File | Email on File |
| 12047575 | Name on File | Email on File |
| 12047575 | Name on File | Email on File |
| 12047575 | Name on File | Email on File |
| 12047575 | Name on File | Email on File |
| 12047575 | Name on File | Email on File |
| 12891877 | Name on File | Email on File |
| 12892052 | Name on File | Email on File |
| 12047504 | Name on File | Email on File |
| 12046772 | Name on File | Email on File |
| 13041742 | Aon Consulting, Inc. | Email on File |
| 12108373 | Name on File | Email on File |
| 12108373 | Name on File | Email on File |
| 12047577 | Name on File | Email on File |
| 12047137 | Name on File | Email on File |
| 12762898 | Name on File | Email on File |
| 12047578 | Name on File | Email on File |
| 12047579 | Name on File | Email on File |
| 12047579 | Name on File | Email on File |
| 12047579 | Name on File | Email on File |
| 12047579 | Name on File | Email on File |
| 12047579 | Name on File | Email on File |
| 12104292 | Name on File | Email on File |
| 12104292 | Name on File | Email on File |
| 12046554 | Name on File | Email on File |
| 12047580 | Name on File | Email on File |
| 12856670 | Name on File | Email on File |
| 12047197 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12871639 | Name on File | Email on File |
| 12047583 | Name on File | Email on File |
| 13052704 | Arizona Corporation Commission | Email on File |
| 12875807 | ARK Cryptocurrency Master Fund LLC | Email on File |
| 12873437 | ARK Cryptocurrency Master Fund LLC | Email on File |
| 12873437 | ARK Cryptocurrency Master Fund LLC | Email on File |
| 12047584 | Name on File | Email on File |
| 12828327 | Name on File | Email on File |
| 12047586 | Name on File | Email on File |
| 12047586 | Name on File | Email on File |
| 12047587 | Name on File | Email on File |
| 12047587 | Name on File | Email on File |
| 12047588 | Name on File | Email on File |
| 12047589 | Name on File | Email on File |
| 12047568 | Name on File | Email on File |
| 12046911 | Name on File | Email on File |
| 12946761 | Name on File | Email on File |
| 12047591 | Name on File | Email on File |
| 12047593 | Name on File | Email on File |
| 12148643 | Name on File | Email on File |
| 12242139 | Name on File | Email on File |
| 12242139 | Name on File | Email on File |
| 12047596 | Name on File | Email on File |
| 12047596 | Name on File | Email on File |
| 12047598 | Name on File | Email on File |
| 12047598 | Name on File | Email on File |
| 12242140 | Name on File | Email on File |
| 12242140 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046829 | Name on File | Email on File |
| 12047600 | Name on File | Email on File |
| 12047486 | Name on File | Email on File |
| 12047487 | Name on File | Email on File |
| 12046233 | AXIS CAPITAL | Email on File |
| 12046234 | AXIS CAPITAL | Email on File |
| 12047602 | Name on File | Email on File |
| 12046995 | Name on File | Email on File |
| 12047604 | Name on File | Email on File |
| 15419260 | Name on File | Email on File |
| 13069398 | Name on File | Email on File |
| 12965497 | Name on File | Email on File |
| 12046779 | Name on File | Email on File |
| 12873585 | Name on File | Email on File |
| 12856882 | Name on File | Email on File |
| 12762845 | Name on File | Email on File |
| 12046933 | Name on File | Email on File |
| 12047606 | Name on File | Email on File |
| 12872596 | Name on File | Email on File |
| 12047608 | Name on File | Email on File |
| 12242141 | Name on File | Email on File |
| 12242141 | Name on File | Email on File |
| 12890111 | Name on File | Email on File |
| 12242142 | Name on File | Email on File |
| 12242142 | Name on File | Email on File |
| 12047535 | Name on File | Email on File |
| 12046767 | Name on File | Email on File |
| 12825866 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*
Case No. 22-10063 (SHL)

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046879 | Name on File | Email on File |
| 12872273 | Name on File | Email on File |
| 12762888 | Name on File | Email on File |
| 12046727 | Name on File | Email on File |
| 12872584 | Name on File | Email on File |
| 12047305 | Name on File | Email on File |
| 12047214 | Name on File | Email on File |
| 12046858 | Name on File | Email on File |
| 12864505 | Name on File | Email on File |
| 12047612 | Name on File | Email on File |
| 12047613 | Name on File | Email on File |
| 12047613 | Name on File | Email on File |
| 12046934 | Name on File | Email on File |
| 12047309 | Name on File | Email on File |
| 13069382 | Name on File | Email on File |
| 15550172 | Name on File | Email on File |
| 12873446 | Name on File | Email on File |
| 12242143 | Name on File | Email on File |
| 12242143 | Name on File | Email on File |
| 18163865 | Name on File | Email on File |
| 12872602 | Name on File | Email on File |
| 12878699 | Name on File | Email on File |
| 12047533 | Name on File | Email on File |
| 12242144 | Name on File | Email on File |
| 12242144 | Name on File | Email on File |
| 12868296 | Name on File | Email on File |
| 12873492 | Name on File | Email on File |
| 12954947 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12242145 | Name on File | Email on File |
| 12242145 | Name on File | Email on File |
| 12651078 | Name on File | Email on File |
| 12046661 | Name on File | Email on File |
| 12046712 | Name on File | Email on File |
| 18140051 | Name on File | Email on File |
| 15556912 | Name on File | Email on File |
| 15481242 | Name on File | Email on File |
| 12046768 | Name on File | Email on File |
| 12819909 | Name on File | Email on File |
| 12047359 | Name on File | Email on File |
| 12047622 | Name on File | Email on File |
| 12047623 | Name on File | Email on File |
| 12047623 | Name on File | Email on File |
| 12242146 | Name on File | Email on File |
| 12242146 | Name on File | Email on File |
| 12872513 | Name on File | Email on File |
| 12047209 | Name on File | Email on File |
| 12987133 | Name on File | Email on File |
| 12046498 | Name on File | Email on File |
| 13088582 | Name on File | Email on File |
| 12047624 | Name on File | Email on File |
| 12873638 | Name on File | Email on File |
| 12046794 | Name on File | Email on File |
| 12047625 | Name on File | Email on File |
| 12047625 | Name on File | Email on File |
| 12046861 | Name on File | Email on File |
| 12244717 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12242147 | Name on File | Email on File |
| 12242147 | Name on File | Email on File |
| 12171215 | Name on File | Email on File |
| 12171215 | Name on File | Email on File |
| 12047626 | Name on File | Email on File |
| 12047627 | Name on File | Email on File |
| 12047627 | Name on File | Email on File |
| 12047628 | Name on File | Email on File |
| 12047628 | Name on File | Email on File |
| 12171216 | Name on File | Email on File |
| 12047629 | Name on File | Email on File |
| 12047630 | Name on File | Email on File |
| 12047630 | Name on File | Email on File |
| 12047630 | Name on File | Email on File |
| 12047631 | Name on File | Email on File |
| 12047631 | Name on File | Email on File |
| 12047632 | Name on File | Email on File |
| 12047633 | Name on File | Email on File |
| 12047634 | Name on File | Email on File |
| 12979618 | Name on File | Email on File |
| 12890110 | Name on File | Email on File |
| 12873513 | Name on File | Email on File |
| 12873431 | Name on File | Email on File |
| 12872475 | Name on File | Email on File |
| 12243900 | Name on File | Email on File |
| 12047635 | Name on File | Email on File |
| 12047635 | Name on File | Email on File |
| 12047636 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047637 | Name on File | Email on File |
| 12047638 | Name on File | Email on File |
| 12047639 | Name on File | Email on File |
| 12047640 | Name on File | Email on File |
| 12047641 | Name on File | Email on File |
| 12047642 | Name on File | Email on File |
| 12047643 | Name on File | Email on File |
| 12047644 | Name on File | Email on File |
| 12047644 | Name on File | Email on File |
| 12047645 | Name on File | Email on File |
| 12171241 | Name on File | Email on File |
| 12857865 | Name on File | Email on File |
| 13093566 | Name on File | Email on File |
| 12047423 | Name on File | Email on File |
| 12242148 | Name on File | Email on File |
| 12242148 | Name on File | Email on File |
| 12047097 | Name on File | Email on File |
| 12242149 | Name on File | Email on File |
| 12242149 | Name on File | Email on File |
| 12046693 | Name on File | Email on File |
| 12862086 | Name on File | Email on File |
| 12862079 | Name on File | Email on File |
| 12047646 | Name on File | Email on File |
| 12242150 | Name on File | Email on File |
| 12242150 | Name on File | Email on File |
| 12046523 | Name on File | Email on File |
| 17115907 | Name on File | Email on File |
| 12046394 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*
Case No. 22-10063 (SHL)

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047354 | Name on File | Email on File |
| 12047647 | Name on File | Email on File |
| 13119689 | Name on File | Email on File |
| 18140064 | Name on File | Email on File |
| 12046416 | Name on File | Email on File |
| 12047255 | Name on File | Email on File |
| 12760689 | Name on File | Email on File |
| 12827845 | Name on File | Email on File |
| 12868777 | Name on File | Email on File |
| 15468585 | Name on File | Email on File |
| 12171212 | Name on File | Email on File |
| 12046945 | Name on File | Email on File |
| 15535900 | Name on File | Email on File |
| 15535900 | Name on File | Email on File |
| 12047660 | Name on File | Email on File |
| 12873617 | Name on File | Email on File |
| 17114949 | Name on File | Email on File |
| 12242151 | Name on File | Email on File |
| 12242151 | Name on File | Email on File |
| 12872533 | Name on File | Email on File |
| 13052730 | Name on File | Email on File |
| 12115741 | Name on File | Email on File |
| 12873448 | Name on File | Email on File |
| 12898458 | Name on File | Email on File |
| 12047663 | Name on File | Email on File |
| 12946612 | Name on File | Email on File |
| 12967160 | Name on File | Email on File |
| 12047664 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*
Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046440 | Name on File | Email on File |
| 12856968 | Name on File | Email on File |
| 12242152 | Name on File | Email on File |
| 12242152 | Name on File | Email on File |
| 12873635 | Name on File | Email on File |
| 13068783 | Name on File | Email on File |
| 12648513 | Name on File | Email on File |
| 12857193 | Name on File | Email on File |
| 12970198 | Name on File | Email on File |
| 12869636 | Name on File | Email on File |
| 12885565 | Name on File | Email on File |
| 12970198 | Name on File | Email on File |
| 12970198 | Name on File | Email on File |
| 12885565 | Name on File | Email on File |
| 12885565 | Name on File | Email on File |
| 12047331 | Name on File | Email on File |
| 12047403 | Name on File | Email on File |
| 12046962 | Name on File | Email on File |
| 12046808 | Name on File | Email on File |
| 12047621 | Name on File | Email on File |
| 12875864 | Name on File | Email on File |
| 12244603 | Name on File | Email on File |
| 12047665 | Name on File | Email on File |
| 12047666 | Name on File | Email on File |
| 12171217 | Name on File | Email on File |
| 12171217 | Name on File | Email on File |
| 12047669 | Name on File | Email on File |
| 12046392 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046392 | Name on File | Email on File |
| 12245216 | Name on File | Email on File |
| 12244682 | Name on File | Email on File |
| 12251717 | Name on File | Email on File |
| 12644100 | Name on File | Email on File |
| 13087286 | Name on File | Email on File |
| 12046599 | Name on File | Email on File |
| 12873526 | Name on File | Email on File |
| 12047154 | Name on File | Email on File |
| 12046917 | Name on File | Email on File |
| 12047277 | Name on File | Email on File |
| 12046397 | Name on File | Email on File |
| 12046397 | Name on File | Email on File |
| 12046397 | Name on File | Email on File |
| 12046397 | Name on File | Email on File |
| 12829062 | Name on File | Email on File |
| 15466854 | Name on File | Email on File |
| 12047245 | Name on File | Email on File |
| 12872622 | Name on File | Email on File |
| 12046606 | Name on File | Email on File |
| 12046399 | Name on File | Email on File |
| 12047571 | Name on File | Email on File |
| 12046402 | Name on File | Email on File |
| 12244617 | Name on File | Email on File |
| 12046403 | Name on File | Email on File |
| 12244631 | Name on File | Email on File |
| 12191612 | Name on File | Email on File |
| 12872617 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12872617 | Name on File | Email on File |
| 12046405 | Name on File | Email on File |
| 12858521 | Name on File | Email on File |
| 12046504 | Name on File | Email on File |
| 12242153 | Name on File | Email on File |
| 12242153 | Name on File | Email on File |
| 12046910 | Name on File | Email on File |
| 12856348 | Name on File | Email on File |
| 12174026 | Name on File | Email on File |
| 12979612 | Name on File | Email on File |
| 12760962 | Name on File | Email on File |
| 12046411 | Name on File | Email on File |
| 12046411 | Name on File | Email on File |
| 12046412 | Name on File | Email on File |
| 12046412 | Name on File | Email on File |
| 12046412 | Name on File | Email on File |
| 16879083 | Name on File | Email on File |
| 16172822 | Name on File | Email on File |
| 13091783 | Name on File | Email on File |
| 12168471 | Name on File | Email on File |
| 12046774 | Name on File | Email on File |
| 12047529 | Name on File | Email on File |
| 12991255 | Name on File | Email on File |
| 12047141 | Name on File | Email on File |
| 12106832 | Name on File | Email on File |
| 12827079 | Name on File | Email on File |
| 12830153 | Name on File | Email on File |
| 12047367 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 13041813 | Name on File | Email on File |
| 12873643 | Name on File | Email on File |
| 12047566 | Name on File | Email on File |
| 15419048 | Name on File | Email on File |
| 13023712 | Name on File | Email on File |
| 12046744 | Name on File | Email on File |
| 12046882 | Name on File | Email on File |
| 12046425 | Name on File | Email on File |
| 12046745 | Name on File | Email on File |
| 12242154 | Name on File | Email on File |
| 12242154 | Name on File | Email on File |
| 12046435 | CIRCLE INTERNATIONAL BERMUDA LIMITED | Email on File |
| 12046436 | Name on File | Email on File |
| 12046437 | Name on File | Email on File |
| 12046437 | Name on File | Email on File |
| 12046438 | Name on File | Email on File |
| 12246390 | Name on File | Email on File |
| 12242155 | Name on File | Email on File |
| 12242155 | Name on File | Email on File |
| 12046441 | Name on File | Email on File |
| 15600695 | Name on File | Email on File |
| 12046442 | Name on File | Email on File |
| 12242156 | Name on File | Email on File |
| 12242156 | Name on File | Email on File |
| 12046443 | Name on File | Email on File |
| 12046443 | Name on File | Email on File |
| 12046443 | Name on File | Email on File |
| 12046443 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046471 | Name on File | Email on File |
| 12046444 | Name on File | Email on File |
| 12047389 | Name on File | Email on File |
| 12046445 | Name on File | Email on File |
| 12046446 | Name on File | Email on File |
| 12046446 | Name on File | Email on File |
| 12046447 | Name on File | Email on File |
| 12046448 | Name on File | Email on File |
| 12999034 | Name on File | Email on File |
| 12047163 | Name on File | Email on File |
| 12891749 | Name on File | Email on File |
| 12047658 | Name on File | Email on File |
| 12872465 | Name on File | Email on File |
| 12046449 | Name on File | Email on File |
| 12046450 | Name on File | Email on File |
| 12046451 | Name on File | Email on File |
| 12046452 | Name on File | Email on File |
| 12171219 | Name on File | Email on File |
| 12171219 | Name on File | Email on File |
| 12171219 | Name on File | Email on File |
| 12046454 | Name on File | Email on File |
| 12046454 | Name on File | Email on File |
| 12046454 | Name on File | Email on File |
| 12046455 | Name on File | Email on File |
| 12244975 | Name on File | Email on File |
| 12046456 | Name on File | Email on File |
| 12046456 | Name on File | Email on File |
| 12046457 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046426 | Name on File | Email on File |
| 12655081 | Name on File | Email on File |
| 12932060 | Name on File | Email on File |
| 12656264 | Name on File | Email on File |
| 12046791 | Name on File | Email on File |
| 12868825 | Name on File | Email on File |
| 12046763 | Name on File | Email on File |
| 12646670 | Name on File | Email on File |
| 12046460 | Name on File | Email on File |
| 12046460 | Name on File | Email on File |
| 12242157 | Name on File | Email on File |
| 12242157 | Name on File | Email on File |
| 12046439 | Name on File | Email on File |
| 12046462 | Name on File | Email on File |
| 12047138 | Name on File | Email on File |
| 12873848 | Name on File | Email on File |
| 12242158 | Name on File | Email on File |
| 12242158 | Name on File | Email on File |
| 12046795 | Name on File | Email on File |
| 12046463 | Name on File | Email on File |
| 12046463 | Name on File | Email on File |
| 12047015 | Name on File | Email on File |
| 17114865 | Name on File | Email on File |
| 12872255 | Name on File | Email on File |
| 12649861 | Name on File | Email on File |
| 12046467 | Name on File | Email on File |
| 12649445 | Name on File | Email on File |
| 12046433 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046468 | Name on File | Email on File |
| 12046468 | Name on File | Email on File |
| 12046469 | Name on File | Email on File |
| 12046469 | Name on File | Email on File |
| 12046470 | Name on File | Email on File |
| 12046476 | Name on File | Email on File |
| 12046477 | Name on File | Email on File |
| 12649713 | Name on File | Email on File |
| 13023644 | Name on File | Email on File |
| 12046479 | Name on File | Email on File |
| 12047668 | Name on File | Email on File |
| 12046586 | Name on File | Email on File |
| 12246202 | Name on File | Email on File |
| 15600539 | Name on File | Email on File |
| 12928217 | Name on File | Email on File |
| 12046480 | Name on File | Email on File |
| 12046481 | Name on File | Email on File |
| 12046482 | Name on File | Email on File |
| 12833236 | Name on File | Email on File |
| 12823899 | Name on File | Email on File |
| 12046920 | Name on File | Email on File |
| 12242159 | Name on File | Email on File |
| 12242159 | Name on File | Email on File |
| 15559019 | Name on File | Email on File |
| 12046483 | Name on File | Email on File |
| 12242160 | Name on File | Email on File |
| 12242160 | Name on File | Email on File |
| 12242161 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12242161 | Name on File | Email on File |
| 12046486 | Name on File | Email on File |
| 12046486 | Name on File | Email on File |
| 12046487 | Name on File | Email on File |
| 12046487 | Name on File | Email on File |
| 12046487 | Name on File | Email on File |
| 12885479 | Name on File | Email on File |
| 12245822 | Name on File | Email on File |
| 13008177 | Name on File | Email on File |
| 12891958 | Name on File | Email on File |
| 12242162 | Name on File | Email on File |
| 12242162 | Name on File | Email on File |
| 13119809 | Name on File | Email on File |
| 12047173 | Name on File | Email on File |
| 12867662 | Name on File | Email on File |
| 12046964 | Name on File | Email on File |
| 12242163 | Name on File | Email on File |
| 12242163 | Name on File | Email on File |
| 12047616 | Name on File | Email on File |
| 15550308 | Name on File | Email on File |
| 12648123 | Name on File | Email on File |
| 12047074 | Name on File | Email on File |
| 12242164 | Name on File | Email on File |
| 12242164 | Name on File | Email on File |
| 12046515 | Name on File | Email on File |
| 12873692 | Name on File | Email on File |
| 12875266 | Name on File | Email on File |
| 15552735 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046516 | Name on File | Email on File |
| 12046516 | Name on File | Email on File |
| 12046516 | Name on File | Email on File |
| 12046948 | Name on File | Email on File |
| 12925011 | Name on File | Email on File |
| 12047185 | Name on File | Email on File |
| 12946669 | Name on File | Email on File |
| 12046517 | Name on File | Email on File |
| 12046517 | Name on File | Email on File |
| 12046517 | Name on File | Email on File |
| 12046517 | Name on File | Email on File |
| 12046518 | Name on File | Email on File |
| 12046518 | Name on File | Email on File |
| 12046518 | Name on File | Email on File |
| 12763588 | Name on File | Email on File |
| 12046520 | Name on File | Email on File |
| 12872336 | Name on File | Email on File |
| 12875871 | Name on File | Email on File |
| 12872336 | Name on File | Email on File |
| 13083047 | Name on File | Email on File |
| 12872442 | Name on File | Email on File |
| 15470737 | Name on File | Email on File |
| 12047195 | Name on File | Email on File |
| 12046521 | Name on File | Email on File |
| 12650622 | Name on File | Email on File |
| 12046427 | Name on File | Email on File |
| 12107322 | Department of Treasury- Internal Revenue Service | Email on File |
| 12949621 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12856872 | Name on File | Email on File |
| 12871888 | Name on File | Email on File |
| 13119346 | Name on File | Email on File |
| 12191638 | Name on File | Email on File |
| 12191639 | Name on File | Email on File |
| 12868545 | Name on File | Email on File |
| 12046526 | Name on File | Email on File |
| 12046527 | Name on File | Email on File |
| 12046527 | Name on File | Email on File |
| 12046258 | Name on File | Email on File |
| 12242165 | Name on File | Email on File |
| 12242165 | Name on File | Email on File |
| 12046528 | Name on File | Email on File |
| 12047386 | Name on File | Email on File |
| 12046529 | Name on File | Email on File |
| 12046530 | Name on File | Email on File |
| 12046530 | Name on File | Email on File |
| 12046532 | Name on File | Email on File |
| 12046533 | Name on File | Email on File |
| 12046534 | Name on File | Email on File |
| 12046535 | DIGITAL CURRENCY GROUP | Email on File |
| 12885474 | Digital Currency Group, Inc | Email on File |
| 12873718 | Digital Currency Group, Inc | Email on File |
| 12046536 | Name on File | Email on File |
| 12875534 | Digital Currency Group, Inc. | Email on File |
| 12875534 | Digital Currency Group, Inc. | Email on File |
| 12875534 | Digital Currency Group, Inc. | Email on File |
| 12875534 | Digital Currency Group, Inc. | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046537 | Name on File | Email on File |
| 12046537 | Name on File | Email on File |
| 12046537 | Name on File | Email on File |
| 12046537 | Name on File | Email on File |
| 12046537 | Name on File | Email on File |
| 12171222 | Name on File | Email on File |
| 12872073 | Name on File | Email on File |
| 12885744 | Name on File | Email on File |
| 12242166 | Name on File | Email on File |
| 12242166 | Name on File | Email on File |
| 12245187 | Name on File | Email on File |
| 12902300 | Name on File | Email on File |
| 12899990 | Name on File | Email on File |
| 13003621 | Name on File | Email on File |
| 12047174 | Name on File | Email on File |
| 12046539 | Name on File | Email on File |
| 12046539 | Name on File | Email on File |
| 12873750 | Name on File | Email on File |
| 12046784 | Name on File | Email on File |
| 12046540 | Name on File | Email on File |
| 12046541 | Name on File | Email on File |
| 12827065 | Name on File | Email on File |
| 12242167 | Name on File | Email on File |
| 12242167 | Name on File | Email on File |
| 15555217 | Name on File | Email on File |
| 12242168 | Name on File | Email on File |
| 12242168 | Name on File | Email on File |
| 12047083 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046542 | Name on File | Email on File |
| 12046542 | Name on File | Email on File |
| 13060462 | Name on File | Email on File |
| 12046424 | Name on File | Email on File |
| 12872673 | Name on File | Email on File |
| 12875481 | Name on File | Email on File |
| 12046544 | Name on File | Email on File |
| 12046544 | Name on File | Email on File |
| 12046545 | Name on File | Email on File |
| 12171223 | Name on File | Email on File |
| 12171223 | Name on File | Email on File |
| 12171223 | Name on File | Email on File |
| 12242169 | Name on File | Email on File |
| 12242169 | Name on File | Email on File |
| 13003073 | Name on File | Email on File |
| 12046916 | Name on File | Email on File |
| 12046547 | Name on File | Email on File |
| 12835394 | Name on File | Email on File |
| 12046548 | Name on File | Email on File |
| 12046548 | Name on File | Email on File |
| 12046548 | Name on File | Email on File |
| 12046548 | Name on File | Email on File |
| 12046548 | Name on File | Email on File |
| 13020857 | Name on File | Email on File |
| 13060353 | Name on File | Email on File |
| 12046549 | Name on File | Email on File |
| 12046551 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12946902 | Name on File | Email on File |
| 12046552 | Name on File | Email on File |
| 12046552 | Name on File | Email on File |
| 12046553 | Name on File | Email on File |
| 12761076 | Name on File | Email on File |
| 15555314 | Name on File | Email on File |
| 12244664 | Name on File | Email on File |
| 12047601 | Name on File | Email on File |
| 12046804 | Name on File | Email on File |
| 12046686 | Name on File | Email on File |
| 12046559 | Name on File | Email on File |
| 12046560 | Name on File | Email on File |
| 12877955 | Name on File | Email on File |
| 12046472 | Name on File | Email on File |
| 12047266 | Name on File | Email on File |
| 12046566 | Name on File | Email on File |
| 12046570 | Name on File | Email on File |
| 12046570 | Name on File | Email on File |
| 12171224 | Name on File | Email on File |
| 12046571 | Name on File | Email on File |
| 12947271 | Name on File | Email on File |
| 12963629 | Name on File | Email on File |
| 12242170 | Name on File | Email on File |
| 12242170 | Name on File | Email on File |
| 12046572 | Name on File | Email on File |
| 12648438 | Name on File | Email on File |
| 12651068 | Name on File | Email on File |
| 13043991 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046577 | Name on File | Email on File |
| 12046577 | Name on File | Email on File |
| 12046577 | Name on File | Email on File |
| 12046578 | Name on File | Email on File |
| 12046579 | Name on File | Email on File |
| 12046581 | Name on File | Email on File |
| 15551625 | Name on File | Email on File |
| 12244656 | Name on File | Email on File |
| 12046583 | Name on File | Email on File |
| 12046583 | Name on File | Email on File |
| 12046584 | Name on File | Email on File |
| 12873534 | Name on File | Email on File |
| 12046585 | Name on File | Email on File |
| 12046585 | Name on File | Email on File |
| 12046585 | Name on File | Email on File |
| 12046921 | Name on File | Email on File |
| 12947002 | Name on File | Email on File |
| 12896707 | Name on File | Email on File |
| 12047299 | Name on File | Email on File |
| 12047299 | Name on File | Email on File |
| 12046590 | Name on File | Email on File |
| 12873702 | Name on File | Email on File |
| 12873741 | Name on File | Email on File |
| 12046996 | Name on File | Email on File |
| 12046909 | Name on File | Email on File |
| 12108936 | Name on File | Email on File |
| 12047355 | Name on File | Email on File |
| 12046965 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12869394 | Name on File | Email on File |
| 12046459 | Name on File | Email on File |
| 12873795 | Name on File | Email on File |
| 12046592 | Name on File | Email on File |
| 12046592 | Name on File | Email on File |
| 12046593 | Name on File | Email on File |
| 12046594 | Name on File | Email on File |
| 12046594 | Name on File | Email on File |
| 12046594 | Name on File | Email on File |
| 12047256 | Name on File | Email on File |
| 12046596 | Name on File | Email on File |
| 12047534 | Name on File | Email on File |
| 12046922 | Name on File | Email on File |
| 12873633 | Name on File | Email on File |
| 12046783 | Name on File | Email on File |
| 13083022 | Name on File | Email on File |
| 12046395 | Name on File | Email on File |
| 12046719 | Name on File | Email on File |
| 12171227 | Name on File | Email on File |
| 12096011 | Name on File | Email on File |
| 12096069 | Name on File | Email on File |
| 12046600 | Name on File | Email on File |
| 12046600 | Name on File | Email on File |
| 12047155 | Name on File | Email on File |
| 12761361 | Name on File | Email on File |
| 12046505 | Name on File | Email on File |
| 12046601 | Name on File | Email on File |
| 12046601 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046602 | Name on File | Email on File |
| 12046602 | Name on File | Email on File |
| 12647386 | Name on File | Email on File |
| 12046809 | Name on File | Email on File |
| 12046603 | Name on File | Email on File |
| 12046603 | Name on File | Email on File |
| 12046604 | Name on File | Email on File |
| 12046604 | Name on File | Email on File |
| 12046605 | Name on File | Email on File |
| 12046605 | Name on File | Email on File |
| 13052765 | FirstLight Fiber, Inc. | Email on File |
| 12047229 | Name on File | Email on File |
| 12763622 | Name on File | Email on File |
| 12046799 | Name on File | Email on File |
| 12046966 | Name on File | Email on File |
| 12872066 | Name on File | Email on File |
| 15470215 | Name on File | Email on File |
| 12873965 | Name on File | Email on File |
| 12046608 | Name on File | Email on File |
| 12046609 | Name on File | Email on File |
| 12047605 | Name on File | Email on File |
| 17632827 | Name on File | Email on File |
| 12885982 | Name on File | Email on File |
| 12046610 | Name on File | Email on File |
| 12046610 | Name on File | Email on File |
| 12881352 | Name on File | Email on File |
| 12946867 | Name on File | Email on File |
| 12889475 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12126062 | FOREIGN REPRESENTATIVE OF THREE ARROWS CAPITAL | Email on File |
| 12126062 | FOREIGN REPRESENTATIVE OF THREE ARROWS CAPITAL | Email on File |
| 12126062 | FOREIGN REPRESENTATIVE OF THREE ARROWS CAPITAL | Email on File |
| 12126062 | FOREIGN REPRESENTATIVE OF THREE ARROWS CAPITAL | Email on File |
| 12126071 | FOREIGN REPRESENTATIVE OF THREE ARROWS CAPITAL | Email on File |
| 12126062 | FOREIGN REPRESENTATIVE OF THREE ARROWS CAPITAL | Email on File |
| 12126071 | FOREIGN REPRESENTATIVE OF THREE ARROWS CAPITAL | Email on File |
| 12126071 | FOREIGN REPRESENTATIVE OF THREE ARROWS CAPITAL | Email on File |
| 12047617 | Name on File | Email on File |
| 12148631 | Name on File | Email on File |
| 12171198 | FOUNDRY DIGITAL LLC | Email on File |
| 12171198 | FOUNDRY DIGITAL LLC | Email on File |
| 12872434 | Name on File | Email on File |
| 12875386 | Name on File | Email on File |
| 12872434 | Name on File | Email on File |
| 12046612 | Name on File | Email on File |
| 12862068 | Name on File | Email on File |
| 12046612 | Name on File | Email on File |
| 12046612 | Name on File | Email on File |
| 12046612 | Name on File | Email on File |
| 12046612 | Name on File | Email on File |
| 12871864 | Name on File | Email on File |
| 12046612 | Name on File | Email on File |
| 12046613 | Name on File | Email on File |
| 12046614 | Name on File | Email on File |
| 12046615 | Name on File | Email on File |
| 12047186 | Name on File | Email on File |
| 12046830 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046265 | Name on File | Email on File |
| 12875050 | Name on File | Email on File |
| 12649369 | Name on File | Email on File |
| 12648504 | Name on File | Email on File |
| 12046616 | Name on File | Email on File |
| 12046620 | Name on File | Email on File |
| 12046963 | Name on File | Email on File |
| 12046587 | Name on File | Email on File |
| 12047300 | Name on File | Email on File |
| 12872480 | FTX Trading Ltd. on behalf of all FTX Debtors | Email on File |
| 12872409 | FTX Trading Ltd. on behalf of all FTX Debtors | Email on File |
| 12872480 | FTX Trading Ltd. on behalf of all FTX Debtors | Email on File |
| 12872480 | FTX Trading Ltd. on behalf of all FTX Debtors | Email on File |
| 12877969 | Name on File | Email on File |
| 15419498 | Name on File | Email on File |
| 12046268 | FULLERTON HEALTH | Email on File |
| 12046269 | FULLERTON HEALTH | Email on File |
| 12046270 | FULLERTON HEALTH | Email on File |
| 12046776 | Name on File | Email on File |
| 15535941 | Name on File | Email on File |
| 13062659 | Name on File | Email on File |
| 13119379 | Name on File | Email on File |
| 12046621 | Name on File | Email on File |
| 12046622 | Name on File | Email on File |
| 12046622 | Name on File | Email on File |
| 12047516 | Name on File | Email on File |
| 15513729 | Name on File | Email on File |
| 12046914 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*
Case No. 22-10063 (SHL)

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12148623 | Name on File | Email on File |
| 12047269 | Name on File | Email on File |
| 12046624 | Name on File | Email on File |
| 12857201 | Name on File | Email on File |
| 12046929 | Name on File | Email on File |
| 12242171 | Name on File | Email on File |
| 12242171 | Name on File | Email on File |
| 12046928 | Name on File | Email on File |
| 12046928 | Name on File | Email on File |
| 12046928 | Name on File | Email on File |
| 12046928 | Name on File | Email on File |
| 12046625 | Name on File | Email on File |
| 12987053 | Name on File | Email on File |
| 12047310 | Name on File | Email on File |
| 12856714 | Name on File | Email on File |
| 12047301 | Name on File | Email on File |
| 12047301 | Name on File | Email on File |
| 18165090 | Name on File | Email on File |
| 12046628 | Name on File | Email on File |
| 12046677 | Name on File | Email on File |
| 12047432 | GEMINI | Email on File |
| 12046629 | Name on File | Email on File |
| 12872084 | Gemini Trust Company, LLC | Email on File |
| 12873876 | Gemini Trust Company, LLC | Email on File |
| 12871713 | Gemini Trust Company, LLC, on behalf of Gemini Lenders | Email on File |
| 12873490 | Gemini Trust Company, LLC, on behalf of Gemini Lenders | Email on File |
| 12871713 | Gemini Trust Company, LLC, on behalf of Gemini Lenders | Email on File |
| 12875976 | Genesis Global Trading, Inc. | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*
Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12875975 | Genesis Global Trading, Inc. | Email on File |
| 12875975 | Genesis Global Trading, Inc. | Email on File |
| 12875975 | Genesis Global Trading, Inc. | Email on File |
| 12875975 | Genesis Global Trading, Inc. | Email on File |
| 12046636 | GENESIS GLOBAL TRADING, INC. | Email on File |
| 12823459 | Name on File | Email on File |
| 12833230 | Name on File | Email on File |
| 12046638 | Name on File | Email on File |
| 12872645 | Name on File | Email on File |
| 15556782 | Georgia Secretary of State Securities and Charities Division | Email on File |
| 12046643 | Name on File | Email on File |
| 12046923 | Name on File | Email on File |
| 12242172 | Name on File | Email on File |
| 12242172 | Name on File | Email on File |
| 12171186 | GGC INTERNATIONAL LIMITED | Email on File |
| 12046646 | Name on File | Email on File |
| 12046647 | Name on File | Email on File |
| 12046648 | Name on File | Email on File |
| 15550141 | Name on File | Email on File |
| 12858034 | Name on File | Email on File |
| 12047649 | Name on File | Email on File |
| 12648467 | Name on File | Email on File |
| 12046755 | Name on File | Email on File |
| 13062548 | Name on File | Email on File |
| 15551430 | Name on File | Email on File |
| 12047662 | Name on File | Email on File |
| 12047207 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 15559045 | Name on File | Email on File |
| 12242173 | Name on File | Email on File |
| 12242173 | Name on File | Email on File |
| 12047162 | Name on File | Email on File |
| 12046781 | Name on File | Email on File |
| 12991148 | Name on File | Email on File |
| 12828680 | Name on File | Email on File |
| 12047422 | Name on File | Email on File |
| 12046649 | Name on File | Email on File |
| 12046650 | Name on File | Email on File |
| 12046650 | Name on File | Email on File |
| 12046651 | Name on File | Email on File |
| 12046651 | Name on File | Email on File |
| 12242174 | Name on File | Email on File |
| 12242174 | Name on File | Email on File |
| 12046801 | Name on File | Email on File |
| 12245239 | Name on File | Email on File |
| 12046652 | Name on File | Email on File |
| 12046762 | Name on File | Email on File |
| 12762875 | Name on File | Email on File |
| 12872261 | Goodwin Procter LLP | Email on File |
| 12046967 | Name on File | Email on File |
| 12047075 | Name on File | Email on File |
| 12047507 | Name on File | Email on File |
| 12046654 | Name on File | Email on File |
| 12970127 | Name on File | Email on File |
| 12872588 | Name on File | Email on File |
| 12885831 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12970127 | Name on File | Email on File |
| 12970127 | Name on File | Email on File |
| 12885831 | Name on File | Email on File |
| 12885831 | Name on File | Email on File |
| 12171229 | Name on File | Email on File |
| 16295144 | GPD Holdings LLC d/b/a CoinFlip | Email on File |
| 15416687 | GPD Holdings LLC d/b/a CoinFlip | Email on File |
| 12885637 | Name on File | Email on File |
| 12047614 | Name on File | Email on File |
| 12046522 | Name on File | Email on File |
| 12242175 | Name on File | Email on File |
| 12242175 | Name on File | Email on File |
| 12046658 | Name on File | Email on File |
| 12046658 | Name on File | Email on File |
| 12046658 | Name on File | Email on File |
| 12046658 | Name on File | Email on File |
| 12873886 | Name on File | Email on File |
| 12046659 | Name on File | Email on File |
| 12047569 | Name on File | Email on File |
| 12855778 | Name on File | Email on File |
| 12046660 | Name on File | Email on File |
| 12046660 | Name on File | Email on File |
| 12046660 | Name on File | Email on File |
| 12046660 | Name on File | Email on File |
| 12046660 | Name on File | Email on File |
| 15419285 | Name on File | Email on File |
| 12046982 | Name on File | Email on File |
| 12046734 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12648524 | Name on File | Email on File |
| 12954889 | Name on File | Email on File |
| 15416724 | Name on File | Email on File |
| 12242176 | Name on File | Email on File |
| 12242176 | Name on File | Email on File |
| 12648492 | Name on File | Email on File |
| 12046666 | Name on File | Email on File |
| 12046666 | Name on File | Email on File |
| 12046667 | Name on File | Email on File |
| 12046667 | Name on File | Email on File |
| 12047530 | Name on File | Email on File |
| 12047022 | Name on File | Email on File |
| 12914867 | Name on File | Email on File |
| 12873522 | Name on File | Email on File |
| 12046279 | Name on File | Email on File |
| 12884173 | Name on File | Email on File |
| 12046656 | Name on File | Email on File |
| 12885230 | Name on File | Email on File |
| 12242177 | Name on File | Email on File |
| 12242177 | Name on File | Email on File |
| 12872317 | Name on File | Email on File |
| 12872150 | Name on File | Email on File |
| 12046428 | Name on File | Email on File |
| 12933863 | Name on File | Email on File |
| 12171251 | Name on File | Email on File |
| 12171210 | Name on File | Email on File |
| 12868233 | Name on File | Email on File |
| 12047023 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12242178 | Name on File | Email on File |
| 12242178 | Name on File | Email on File |
| 12046746 | Name on File | Email on File |
| 12651058 | Name on File | Email on File |
| 12046668 | Name on File | Email on File |
| 12946934 | Name on File | Email on File |
| 12046984 | Name on File | Email on File |
| 12242179 | Name on File | Email on File |
| 12242179 | Name on File | Email on File |
| 13053121 | Name on File | Email on File |
| 12046673 | Name on File | Email on File |
| 12046674 | Name on File | Email on File |
| 12046674 | Name on File | Email on File |
| 12046674 | Name on File | Email on File |
| 12046531 | Name on File | Email on File |
| 12652290 | Name on File | Email on File |
| 12047156 | Name on File | Email on File |
| 12046947 | Name on File | Email on File |
| 12046675 | Name on File | Email on File |
| 12046675 | Name on File | Email on File |
| 12856639 | Name on File | Email on File |
| 13069180 | Name on File | Email on File |
| 12046785 | Name on File | Email on File |
| 12991296 | Name on File | Email on File |
| 13052752 | Name on File | Email on File |
| 12987178 | Name on File | Email on File |
| 12242180 | Name on File | Email on File |
| 12242180 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 18168776 | Name on File | Email on File |
| 12046567 | Name on File | Email on File |
| 12242181 | Name on File | Email on File |
| 12242181 | Name on File | Email on File |
| 12046968 | Name on File | Email on File |
| 12242182 | Name on File | Email on File |
| 12242182 | Name on File | Email on File |
| 12046679 | Name on File | Email on File |
| 12046680 | Name on File | Email on File |
| 12046680 | Name on File | Email on File |
| 12047201 | Name on File | Email on File |
| 12046681 | Name on File | Email on File |
| 12046682 | Name on File | Email on File |
| 12046682 | Name on File | Email on File |
| 12046683 | Name on File | Email on File |
| 12046683 | Name on File | Email on File |
| 12046492 | Name on File | Email on File |
| 12171230 | Name on File | Email on File |
| 15552606 | Name on File | Email on File |
| 13087210 | Name on File | Email on File |
| 13046755 | Name on File | Email on File |
| 12963438 | Name on File | Email on File |
| 12890038 | Name on File | Email on File |
| 13023693 | Name on File | Email on File |
| 12245696 | Name on File | Email on File |
| 12928795 | Name on File | Email on File |
| 13087309 | Name on File | Email on File |
| 12242183 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12242183 | Name on File | Email on File |
| 12046747 | Name on File | Email on File |
| 12171244 | Name on File | Email on File |
| 12245819 | Name on File | Email on File |
| 12047508 | Name on File | Email on File |
| 12762894 | Name on File | Email on File |
| 12762894 | Name on File | Email on File |
| 12046687 | Name on File | Email on File |
| 12046687 | Name on File | Email on File |
| 12046429 | Name on File | Email on File |
| 12046688 | Name on File | Email on File |
| 12827093 | Name on File | Email on File |
| 12046689 | Name on File | Email on File |
| 12047238 | Name on File | Email on File |
| 12046692 | Name on File | Email on File |
| 12046805 | Name on File | Email on File |
| 12856513 | Name on File | Email on File |
| 12949605 | Name on File | Email on File |
| 12046721 | Name on File | Email on File |
| 12046735 | Name on File | Email on File |
| 12046735 | Name on File | Email on File |
| 12760694 | Name on File | Email on File |
| 11842064 | Name on File | Email on File |
| 12046798 | Name on File | Email on File |
| 12242184 | Name on File | Email on File |
| 12242184 | Name on File | Email on File |
| 12046694 | Name on File | Email on File |
| 13023633 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046696 | Name on File | Email on File |
| 12046696 | Name on File | Email on File |
| 12046696 | Name on File | Email on File |
| 12171231 | Name on File | Email on File |
| 12171232 | Name on File | Email on File |
| 12047385 | Name on File | Email on File |
| 12829975 | Name on File | Email on File |
| 12995418 | Name on File | Email on File |
| 12242185 | Name on File | Email on File |
| 12242185 | Name on File | Email on File |
| 12046697 | Name on File | Email on File |
| 12046697 | Name on File | Email on File |
| 12046697 | Name on File | Email on File |
| 12046697 | Name on File | Email on File |
| 12763559 | Name on File | Email on File |
| 12046698 | Name on File | Email on File |
| 12046698 | Name on File | Email on File |
| 12046699 | Name on File | Email on File |
| 15512840 | Name on File | Email on File |
| 12242186 | Name on File | Email on File |
| 12242186 | Name on File | Email on File |
| 12870348 | Name on File | Email on File |
| 12870348 | Name on File | Email on File |
| 12046946 | Name on File | Email on File |
| 12869922 | Name on File | Email on File |
| 12046597 | Name on File | Email on File |
| 12244555 | Name on File | Email on File |
| 12046835 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046700 | Name on File | Email on File |
| 12046701 | Name on File | Email on File |
| 12046657 | Name on File | Email on File |
| 12047146 | Name on File | Email on File |
| 12046786 | Name on File | Email on File |
| 12650340 | Name on File | Email on File |
| 12046417 | Name on File | Email on File |
| 12046703 | Name on File | Email on File |
| 12046704 | Name on File | Email on File |
| 12046705 | Name on File | Email on File |
| 12171233 | Name on File | Email on File |
| 12046706 | Name on File | Email on File |
| 12046707 | Name on File | Email on File |
| 12171226 | Name on File | Email on File |
| 13093597 | Name on File | Email on File |
| 12046408 | Name on File | Email on File |
| 12046708 | Name on File | Email on File |
| 12046709 | Name on File | Email on File |
| 12648449 | Name on File | Email on File |
| 12648413 | Name on File | Email on File |
| 18140180 | Name on File | Email on File |
| 12171234 | Name on File | Email on File |
| 12857449 | Name on File | Email on File |
| 12885391 | Name on File | Email on File |
| 12885394 | Name on File | Email on File |
| 12047230 | Name on File | Email on File |
| 12991321 | Name on File | Email on File |
| 12046715 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046716 | Name on File | Email on File |
| 12046716 | Name on File | Email on File |
| 12046716 | Name on File | Email on File |
| 12046717 | Name on File | Email on File |
| 12046717 | Name on File | Email on File |
| 12046717 | Name on File | Email on File |
| 12885173 | Name on File | Email on File |
| 15556837 | Iowa Insurance Division | Email on File |
| 13119789 | Name on File | Email on File |
| 12046718 | Name on File | Email on File |
| 12889816 | Name on File | Email on File |
| 12046720 | Name on File | Email on File |
| 12242187 | Name on File | Email on File |
| 12242187 | Name on File | Email on File |
| 12873456 | Name on File | Email on File |
| 12047502 | Name on File | Email on File |
| 12046722 | Name on File | Email on File |
| 12648208 | Name on File | Email on File |
| 12046285 | J K MEDORA CORPORATE ASSISTANCE PTE LTD N | Email on File |
| 12951441 | Name on File | Email on File |
| 12171236 | Name on File | Email on File |
| 12999012 | Name on File | Email on File |
| 12891111 | Name on File | Email on File |
| 12046418 | Name on File | Email on File |
| 12046733 | Name on File | Email on File |
| 12046733 | Name on File | Email on File |
| 15481283 | Name on File | Email on File |
| 15599821 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047332 | Name on File | Email on File |
| 12888557 | Name on File | Email on File |
| 12928758 | Name on File | Email on File |
| 12047157 | Name on File | Email on File |
| 12933851 | Name on File | Email on File |
| 12047611 | Name on File | Email on File |
| 12046753 | Name on File | Email on File |
| 12890129 | Name on File | Email on File |
| 12046754 | Name on File | Email on File |
| 12046756 | Name on File | Email on File |
| 15419410 | Name on File | Email on File |
| 17746608 | Name on File | Email on File |
| 12823945 | Name on File | Email on File |
| 12046653 | Name on File | Email on File |
| 12245163 | Name on File | Email on File |
| 12872386 | Name on File | Email on File |
| 12046769 | Name on File | Email on File |
| 12869453 | Name on File | Email on File |
| 13088450 | Name on File | Email on File |
| 12047117 | Name on File | Email on File |
| 12047509 | Name on File | Email on File |
| 12046576 | Name on File | Email on File |
| 12873678 | Name on File | Email on File |
| 12947084 | Name on File | Email on File |
| 12046826 | Name on File | Email on File |
| 12242188 | Name on File | Email on File |
| 12242188 | Name on File | Email on File |
| 12242189 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12242189 | Name on File | Email on File |
| 12047557 | Name on File | Email on File |
| 13087197 | Name on File | Email on File |
| 12047378 | Name on File | Email on File |
| 15467767 | Name on File | Email on File |
| 12046813 | Name on File | Email on File |
| 12763552 | Name on File | Email on File |
| 12046286 | Name on File | Email on File |
| 12046758 | Name on File | Email on File |
| 12096057 | Name on File | Email on File |
| 12047092 | Name on File | Email on File |
| 12760707 | Name on File | Email on File |
| 12870138 | Name on File | Email on File |
| 13062553 | Name on File | Email on File |
| 13119096 | Name on File | Email on File |
| 13119096 | Name on File | Email on File |
| 12047053 | Name on File | Email on File |
| 12242190 | Name on File | Email on File |
| 12242190 | Name on File | Email on File |
| 12046969 | Name on File | Email on File |
| 12115841 | Name on File | Email on File |
| 12242191 | Name on File | Email on File |
| 12242191 | Name on File | Email on File |
| 12171247 | Name on File | Email on File |
| 12046825 | Name on File | Email on File |
| 12046825 | Name on File | Email on File |
| 12046738 | Name on File | Email on File |
| 12047393 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12819030 | Name on File | Email on File |
| 12652100 | Name on File | Email on File |
| 12046409 | Name on File | Email on File |
| 12046872 | Name on File | Email on File |
| 12046833 | Name on File | Email on File |
| 13087171 | Name on File | Email on File |
| 12046836 | Name on File | Email on File |
| 12046842 | Name on File | Email on File |
| 12242192 | Name on File | Email on File |
| 12242192 | Name on File | Email on File |
| 12046843 | Name on File | Email on File |
| 12046844 | Name on File | Email on File |
| 12823445 | Name on File | Email on File |
| 12046464 | Name on File | Email on File |
| 12046796 | Name on File | Email on File |
| 12047567 | Name on File | Email on File |
| 12047394 | Name on File | Email on File |
| 12242193 | Name on File | Email on File |
| 12242193 | Name on File | Email on File |
| 12242194 | Name on File | Email on File |
| 12242194 | Name on File | Email on File |
| 12244688 | Name on File | Email on File |
| 12046970 | Name on File | Email on File |
| 12046970 | Name on File | Email on File |
| 12047419 | Name on File | Email on File |
| 12047510 | Name on File | Email on File |
| 12047510 | Name on File | Email on File |
| 12046848 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046848 | Name on File | Email on File |
| 12148612 | Name on File | Email on File |
| 12046851 | Name on File | Email on File |
| 12046850 | Name on File | Email on File |
| 12046690 | Name on File | Email on File |
| 12047546 | Name on File | Email on File |
| 12047175 | Name on File | Email on File |
| 12047337 | Name on File | Email on File |
| 12963664 | Name on File | Email on File |
| 12873880 | Name on File | Email on File |
| 12046831 | Name on File | Email on File |
| 18140674 | Name on File | Email on File |
| 12830370 | Name on File | Email on File |
| 12046891 | Name on File | Email on File |
| 12046937 | Name on File | Email on File |
| 12047536 | Name on File | Email on File |
| 12046971 | Name on File | Email on File |
| 15419224 | Name on File | Email on File |
| 12244723 | Name on File | Email on File |
| 12046824 | Name on File | Email on File |
| 12047505 | Name on File | Email on File |
| 12047231 | Name on File | Email on File |
| 12763664 | Name on File | Email on File |
| 12979653 | Name on File | Email on File |
| 12046853 | Name on File | Email on File |
| 12835421 | Name on File | Email on File |
| 12868939 | Name on File | Email on File |
| 12047434 | KRAKEN CUSTODIAL | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12873589 | Name on File | Email on File |
| 12046854 | Name on File | Email on File |
| 12875503 | Name on File | Email on File |
| 12875502 | Name on File | Email on File |
| 12875503 | Name on File | Email on File |
| 12171239 | Name on File | Email on File |
| 12873403 | Name on File | Email on File |
| 12873403 | Name on File | Email on File |
| 12047537 | Name on File | Email on File |
| 12047084 | Name on File | Email on File |
| 12047519 | Name on File | Email on File |
| 12046607 | Name on File | Email on File |
| 12047030 | Name on File | Email on File |
| 12046857 | Name on File | Email on File |
| 12244960 | Name on File | Email on File |
| 12046757 | Name on File | Email on File |
| 12046290 | Name on File | Email on File |
| 12047179 | Name on File | Email on File |
| 12047217 | Name on File | Email on File |
| 12901737 | Name on File | Email on File |
| 12823922 | Name on File | Email on File |
| 12171193 | Name on File | Email on File |
| 12932071 | Name on File | Email on File |
| 12047275 | Name on File | Email on File |
| 12046732 | Name on File | Email on File |
| 15552688 | Name on File | Email on File |
| 12046292 | KYTE BROKING LIMITED | Email on File |
| 13007492 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046852 | Name on File | Email on File |
| 12171213 | Name on File | Email on File |
| 12242195 | Name on File | Email on File |
| 12242195 | Name on File | Email on File |
| 12046639 | Name on File | Email on File |
| 12045385 | Name on File | Email on File |
| 12046561 | Name on File | Email on File |
| 12046739 | Name on File | Email on File |
| 12046871 | Name on File | Email on File |
| 15419193 | Name on File | Email on File |
| 12047366 | Name on File | Email on File |
| 12046856 | Name on File | Email on File |
| 12242196 | Name on File | Email on File |
| 12242196 | Name on File | Email on File |
| 12046508 | Name on File | Email on File |
| 12873697 | Name on File | Email on File |
| 12046618 | Name on File | Email on File |
| 12928696 | Name on File | Email on File |
| 12046866 | Name on File | Email on File |
| 12046866 | Name on File | Email on File |
| 12046866 | Name on File | Email on File |
| 12046866 | Name on File | Email on File |
| 15669023 | Name on File | Email on File |
| 12885477 | Name on File | Email on File |
| 12885477 | Name on File | Email on File |
| 12885477 | Name on File | Email on File |
| 12869374 | Name on File | Email on File |
| 12046867 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046868 | Name on File | Email on File |
| 12046868 | Name on File | Email on File |
| 12046869 | Name on File | Email on File |
| 12046870 | Name on File | Email on File |
| 15555972 | Name on File | Email on File |
| 12855645 | Name on File | Email on File |
| 15600408 | Name on File | Email on File |
| 13119639 | Name on File | Email on File |
| 12830376 | Name on File | Email on File |
| 12242197 | Name on File | Email on File |
| 12933835 | Name on File | Email on File |
| 12242198 | Name on File | Email on File |
| 12242198 | Name on File | Email on File |
| 18140086 | Name on File | Email on File |
| 12047387 | Name on File | Email on File |
| 12046913 | Name on File | Email on File |
| 12047618 | Name on File | Email on File |
| 12046506 | Name on File | Email on File |
| 12046748 | Name on File | Email on File |
| 12873424 | Name on File | Email on File |
| 12046846 | Name on File | Email on File |
| 12046864 | Name on File | Email on File |
| 12047224 | Name on File | Email on File |
| 12047395 | Name on File | Email on File |
| 12875254 | Name on File | Email on File |
| 12869393 | Name on File | Email on File |
| 12242199 | Name on File | Email on File |
| 12242199 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12171246 | Name on File | Email on File |
| 12242200 | Name on File | Email on File |
| 12242200 | Name on File | Email on File |
| 12047183 | Name on File | Email on File |
| 12171208 | Name on File | Email on File |
| 12080687 | Name on File | Email on File |
| 12242201 | Name on File | Email on File |
| 12242201 | Name on File | Email on File |
| 12046973 | Name on File | Email on File |
| 12242202 | Name on File | Email on File |
| 12242202 | Name on File | Email on File |
| 12047511 | Name on File | Email on File |
| 12046876 | Name on File | Email on File |
| 12046759 | Name on File | Email on File |
| 12648500 | Name on File | Email on File |
| 13093678 | Name on File | Email on File |
| 12862094 | Name on File | Email on File |
| 12827343 | Name on File | Email on File |
| 12242203 | Name on File | Email on File |
| 12242204 | Name on File | Email on File |
| 12242204 | Name on File | Email on File |
| 15556814 | Name on File | Email on File |
| 12046877 | Name on File | Email on File |
| 12955094 | Name on File | Email on File |
| 12046878 | Name on File | Email on File |
| 12046878 | Name on File | Email on File |
| 12046878 | Name on File | Email on File |
| 12046295 | LIFEWORKS | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046880 | Name on File | Email on File |
| 12046787 | Name on File | Email on File |
| 15419312 | Name on File | Email on File |
| 12046298 | Name on File | Email on File |
| 12046810 | Name on File | Email on File |
| 15600732 | Name on File | Email on File |
| 13060364 | Name on File | Email on File |
| 12655906 | Name on File | Email on File |
| 12047414 | Name on File | Email on File |
| 12046883 | Name on File | Email on File |
| 12046884 | Name on File | Email on File |
| 12046676 | Name on File | Email on File |
| 12046885 | Name on File | Email on File |
| 13003155 | Name on File | Email on File |
| 12047581 | Name on File | Email on File |
| 12047599 | Name on File | Email on File |
| 12867416 | Name on File | Email on File |
| 12046849 | Name on File | Email on File |
| 16172845 | Name on File | Email on File |
| 12046886 | Name on File | Email on File |
| 12046886 | Name on File | Email on File |
| 12046886 | Name on File | Email on File |
| 12046509 | Name on File | Email on File |
| 12046888 | Name on File | Email on File |
| 12914701 | Name on File | Email on File |
| 12046743 | Name on File | Email on File |
| 12890137 | Name on File | Email on File |
| 12650361 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12242205 | Name on File | Email on File |
| 12242205 | Name on File | Email on File |
| 12762906 | Name on File | Email on File |
| 12046892 | Name on File | Email on File |
| 12046895 | Name on File | Email on File |
| 12046896 | Name on File | Email on File |
| 12046897 | Name on File | Email on File |
| 12171200 | LUNO AUSTRALIA PTY LTD | Email on File |
| 12171200 | LUNO AUSTRALIA PTY LTD | Email on File |
| 12171200 | LUNO AUSTRALIA PTY LTD | Email on File |
| 12046900 | Name on File | Email on File |
| 12046900 | Name on File | Email on File |
| 12046900 | Name on File | Email on File |
| 12046901 | Name on File | Email on File |
| 12046901 | Name on File | Email on File |
| 12046901 | Name on File | Email on File |
| 12120435 | Name on File | Email on File |
| 12046903 | Name on File | Email on File |
| 12898519 | Name on File | Email on File |
| 12046940 | Name on File | Email on File |
| 12822627 | Name on File | Email on File |
| 12885557 | Name on File | Email on File |
| 12830156 | Name on File | Email on File |
| 15556822 | Name on File | Email on File |
| 12830180 | Name on File | Email on File |
| 12046906 | Name on File | Email on File |
| 12046906 | Name on File | Email on File |
| 12046907 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046941 | Name on File | Email on File |
| 12046908 | Name on File | Email on File |
| 12893750 | Name on File | Email on File |
| 12046588 | Name on File | Email on File |
| 12242206 | Name on File | Email on File |
| 12046501 | Name on File | Email on File |
| 12046723 | Name on File | Email on File |
| 12763647 | Name on File | Email on File |
| 12047093 | Name on File | Email on File |
| 12885219 | Name on File | Email on File |
| 12046497 | Name on File | Email on File |
| 12047251 | Name on File | Email on File |
| 13018755 | Name on File | Email on File |
| 17746565 | Name on File | Email on File |
| 12046818 | Name on File | Email on File |
| 12047435 | Name on File | Email on File |
| 12096023 | Name on File | Email on File |
| 12108900 | Name on File | Email on File |
| 18160566 | Name on File | Email on File |
| 12242207 | Name on File | Email on File |
| 12242207 | Name on File | Email on File |
| 12244650 | Name on File | Email on File |
| 12047166 | Name on File | Email on File |
| 12995373 | Name on File | Email on File |
| 12046926 | Name on File | Email on File |
| 12046873 | Name on File | Email on File |
| 12873704 | Name on File | Email on File |
| 18163862 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046396 | Name on File | Email on File |
| 12242064 | Name on File | Email on File |
| 12046930 | Name on File | Email on File |
| 12871969 | Name on File | Email on File |
| 12046822 | Name on File | Email on File |
| 12047512 | Name on File | Email on File |
| 12047302 | Name on File | Email on File |
| 12649717 | Name on File | Email on File |
| 12046931 | Name on File | Email on File |
| 12046974 | Name on File | Email on File |
| 12046932 | Name on File | Email on File |
| 12046932 | Name on File | Email on File |
| 12046932 | Name on File | Email on File |
| 12046932 | Name on File | Email on File |
| 12046932 | Name on File | Email on File |
| 12654953 | Name on File | Email on File |
| 12896589 | Name on File | Email on File |
| 12046493 | Name on File | Email on File |
| 12047538 | Name on File | Email on File |
| 12047024 | Name on File | Email on File |
| 12947157 | Name on File | Email on File |
| 12047189 | Name on File | Email on File |
| 12046944 | Name on File | Email on File |
| 12760930 | Name on File | Email on File |
| 12932049 | Name on File | Email on File |
| 12652094 | Name on File | Email on File |
| 12046740 | Name on File | Email on File |
| 12835374 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12963727 | Name on File | Email on File |
| 12868276 | Name on File | Email on File |
| 13025822 | Name on File | Email on File |
| 13010078 | Name on File | Email on File |
| 12047651 | Name on File | Email on File |
| 12649484 | Name on File | Email on File |
| 12829651 | Name on File | Email on File |
| 12995394 | Name on File | Email on File |
| 12047320 | Name on File | Email on File |
| 12046555 | Name on File | Email on File |
| 13003132 | Name on File | Email on File |
| 12970091 | Name on File | Email on File |
| 12885655 | Name on File | Email on File |
| 12970091 | Name on File | Email on File |
| 12970091 | Name on File | Email on File |
| 12885655 | Name on File | Email on File |
| 12870264 | Name on File | Email on File |
| 12885655 | Name on File | Email on File |
| 12829110 | Name on File | Email on File |
| 12829110 | Name on File | Email on File |
| 12652085 | Name on File | Email on File |
| 12242208 | Name on File | Email on File |
| 12242208 | Name on File | Email on File |
| 12242209 | Name on File | Email on File |
| 12242209 | Name on File | Email on File |
| 12242210 | Name on File | Email on File |
| 12242210 | Name on File | Email on File |
| 12047202 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047253 | Name on File | Email on File |
| 12879724 | Name on File | Email on File |
| 12047297 | Name on File | Email on File |
| 16825504 | Name on File | Email on File |
| 12981618 | Name on File | Email on File |
| 15419461 | Name on File | Email on File |
| 12047582 | Name on File | Email on File |
| 12046950 | Name on File | Email on File |
| 12881498 | Name on File | Email on File |
| 12046952 | Name on File | Email on File |
| 12046954 | Name on File | Email on File |
| 12046955 | Name on File | Email on File |
| 12046955 | Name on File | Email on File |
| 12046955 | Name on File | Email on File |
| 12046955 | Name on File | Email on File |
| 12046956 | Name on File | Email on File |
| 12046956 | Name on File | Email on File |
| 12046958 | Name on File | Email on File |
| 12046959 | Name on File | Email on File |
| 12046959 | Name on File | Email on File |
| 12046959 | Name on File | Email on File |
| 12046961 | METROPOLITAN  COMMERCIAL BANK | Email on File |
| 12046960 | METROPOLITAN  COMMERCIAL BANK | Email on File |
| 13003317 | Name on File | Email on File |
| 12830361 | Name on File | Email on File |
| 12047058 | Name on File | Email on File |
| 12047059 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12251685 | Name on File | Email on File |
| 12245152 | Name on File | Email on File |
| 12947044 | Name on File | Email on File |
| 12896657 | Name on File | Email on File |
| 15479344 | Name on File | Email on File |
| 12046985 | Name on File | Email on File |
| 12046310 | Name on File | Email on File |
| 12242211 | Name on File | Email on File |
| 12242211 | Name on File | Email on File |
| 12862040 | Name on File | Email on File |
| 12046986 | Name on File | Email on File |
| 12046986 | Name on File | Email on File |
| 12046986 | Name on File | Email on File |
| 12046986 | Name on File | Email on File |
| 12046986 | Name on File | Email on File |
| 12242212 | Name on File | Email on File |
| 12242212 | Name on File | Email on File |
| 13003279 | Name on File | Email on File |
| 12242213 | Name on File | Email on File |
| 12242213 | Name on File | Email on File |
| 12047161 | Name on File | Email on File |
| 12829517 | Name on File | Email on File |
| 12046989 | Name on File | Email on File |
| 12046989 | Name on File | Email on File |
| 12046990 | Name on File | Email on File |
| 12245244 | Name on File | Email on File |
| 12245862 | Name on File | Email on File |
| 12046991 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*
Case No. 22-10063 (SHL)

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046991 | Name on File | Email on File |
| 15481307 | Name on File | Email on File |
| 12896431 | Name on File | Email on File |
| 12649379 | Name on File | Email on File |
| 12046893 | Name on File | Email on File |
| 12872118 | Name on File | Email on File |
| 12885703 | Name on File | Email on File |
| 12046992 | Name on File | Email on File |
| 12046993 | Name on File | Email on File |
| 12046993 | Name on File | Email on File |
| 12046994 | Name on File | Email on File |
| 12856832 | Name on File | Email on File |
| 12047539 | Name on File | Email on File |
| 12830380 | Name on File | Email on File |
| 12171240 | Name on File | Email on File |
| 12872209 | Name on File | Email on File |
| 12872209 | Name on File | Email on File |
| 12047147 | Name on File | Email on File |
| 12966126 | Name on File | Email on File |
| 12885743 | Name on File | Email on File |
| 12871899 | Name on File | Email on File |
| 12966126 | Name on File | Email on File |
| 12966126 | Name on File | Email on File |
| 12871687 | Name on File | Email on File |
| 12885743 | Name on File | Email on File |
| 12885743 | Name on File | Email on File |
| 12764630 | Name on File | Email on File |
| 13093376 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046510 | Name on File | Email on File |
| 12869081 | Name on File | Email on File |
| 12046782 | Name on File | Email on File |
| 12046983 | Name on File | Email on File |
| 15559062 | Name on File | Email on File |
| 12967602 | Name on File | Email on File |
| 12869197 | Name on File | Email on File |
| 12869075 | Name on File | Email on File |
| 12046320 | MSIG | Email on File |
| 12046321 | MSIG | Email on File |
| 12046319 | MSIG | Email on File |
| 12047247 | Name on File | Email on File |
| 12046575 | Name on File | Email on File |
| 12867493 | Name on File | Email on File |
| 12242214 | Name on File | Email on File |
| 12242214 | Name on File | Email on File |
| 12046557 | Name on File | Email on File |
| 12046998 | Name on File | Email on File |
| 12046999 | Name on File | Email on File |
| 12046999 | Name on File | Email on File |
| 12047000 | Name on File | Email on File |
| 12047000 | Name on File | Email on File |
| 12047001 | Name on File | Email on File |
| 12047002 | Name on File | Email on File |
| 12047003 | Name on File | Email on File |
| 12868349 | Name on File | Email on File |
| 12868346 | Name on File | Email on File |
| 12047004 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12242215 | Name on File | Email on File |
| 12242215 | Name on File | Email on File |
| 13023662 | Name on File | Email on File |
| 13060379 | Name on File | Email on File |
| 12242216 | Name on File | Email on File |
| 12242216 | Name on File | Email on File |
| 12965800 | Name on File | Email on File |
| 12171238 | Name on File | Email on File |
| 12047198 | Name on File | Email on File |
| 12047076 | Name on File | Email on File |
| 12046323 | Name on File | Email on File |
| 12646352 | Name on File | Email on File |
| 12047009 | Name on File | Email on File |
| 12047009 | Name on File | Email on File |
| 12047005 | Name on File | Email on File |
| 12171220 | Name on File | Email on File |
| 12046324 | Name on File | Email on File |
| 12047010 | Name on File | Email on File |
| 12928568 | Name on File | Email on File |
| 12047013 | Name on File | Email on File |
| 12648596 | Name on File | Email on File |
| 12047014 | Name on File | Email on File |
| 12047014 | Name on File | Email on File |
| 12047014 | Name on File | Email on File |
| 12242217 | Name on File | Email on File |
| 12242217 | Name on File | Email on File |
| 12047027 | Name on File | Email on File |
| 12171221 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046862 | Name on File | Email on File |
| 12242218 | Name on File | Email on File |
| 12242218 | Name on File | Email on File |
| 12869227 | Name on File | Email on File |
| 12242219 | Name on File | Email on File |
| 12242219 | Name on File | Email on File |
| 12868317 | Name on File | Email on File |
| 12872599 | Name on File | Email on File |
| 12885726 | Name on File | Email on File |
| 12046473 | Name on File | Email on File |
| 12047020 | Name on File | Email on File |
| 12047020 | Name on File | Email on File |
| 12171242 | Name on File | Email on File |
| 12047021 | Name on File | Email on File |
| 12650908 | Name on File | Email on File |
| 12871657 | Name on File | Email on File |
| 12047349 | Name on File | Email on File |
| 15469104 | Name on File | Email on File |
| 17116521 | Name on File | Email on File |
| 12046788 | Name on File | Email on File |
| 12819902 | Name on File | Email on File |
| 15419132 | Name on File | Email on File |
| 12047026 | Name on File | Email on File |
| 12047026 | Name on File | Email on File |
| 15512001 | Name on File | Email on File |
| 12046766 | Name on File | Email on File |
| 12047168 | Name on File | Email on File |
| 12991142 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047031 | Name on File | Email on File |
| 12242220 | Name on File | Email on File |
| 12242220 | Name on File | Email on File |
| 12242221 | Name on File | Email on File |
| 12242221 | Name on File | Email on File |
| 12047032 | Name on File | Email on File |
| 12650605 | Name on File | Email on File |
| 12047034 | Name on File | Email on File |
| 12047034 | Name on File | Email on File |
| 12242222 | Name on File | Email on File |
| 12242222 | Name on File | Email on File |
| 12047037 | Name on File | Email on File |
| 12046924 | Name on File | Email on File |
| 12047242 | Name on File | Email on File |
| 12991332 | Name on File | Email on File |
| 15556779 | North Carolina Department of the Secretary of State | Email on File |
| 12047038 | Name on File | Email on File |
| 12047038 | Name on File | Email on File |
| 12047039 | Name on File | Email on File |
| 12047039 | Name on File | Email on File |
| 12047039 | Name on File | Email on File |
| 12047040 | Name on File | Email on File |
| 15481344 | Name on File | Email on File |
| 12047041 | Name on File | Email on File |
| 12857908 | Name on File | Email on File |
| 12047041 | Name on File | Email on File |
| 15554853 | Name on File | Email on File |
| 12047042 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*
Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047042 | Name on File | Email on File |
| 12047042 | Name on File | Email on File |
| 12047043 | Name on File | Email on File |
| 12047044 | Name on File | Email on File |
| 12046925 | Name on File | Email on File |
| 12191770 | Name on File | Email on File |
| 12191770 | Name on File | Email on File |
| 12191770 | Name on File | Email on File |
| 12046431 | Name on File | Email on File |
| 12242223 | Name on File | Email on File |
| 12242223 | Name on File | Email on File |
| 12047046 | Name on File | Email on File |
| 12047047 | Name on File | Email on File |
| 12047047 | Name on File | Email on File |
| 12046741 | Name on File | Email on File |
| 12873844 | Name on File | Email on File |
| 12046484 | Name on File | Email on File |
| 12648464 | Name on File | Email on File |
| 12047049 | Name on File | Email on File |
| 12047049 | Name on File | Email on File |
| 12047049 | Name on File | Email on File |
| 12047050 | Name on File | Email on File |
| 12047051 | Name on File | Email on File |
| 12244646 | Name on File | Email on File |
| 12047052 | Name on File | Email on File |
| 12826988 | Name on File | Email on File |
| 12654868 | Name on File | Email on File |
| 12046511 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047232 | Name on File | Email on File |
| 12047011 | Name on File | Email on File |
| 12047055 | Name on File | Email on File |
| 12651047 | Name on File | Email on File |
| 12873444 | Name on File | Email on File |
| 12873779 | Name on File | Email on File |
| 12047057 | Name on File | Email on File |
| 15555287 | Name on File | Email on File |
| 12047060 | Name on File | Email on File |
| 12047061 | Name on File | Email on File |
| 12873846 | Name on File | Email on File |
| 12873764 | Name on File | Email on File |
| 12047016 | Name on File | Email on File |
| 12046975 | Name on File | Email on File |
| 12046802 | Name on File | Email on File |
| 12046865 | Name on File | Email on File |
| 12047160 | Name on File | Email on File |
| 12047062 | Name on File | Email on File |
| 12047062 | Name on File | Email on File |
| 12047064 | Name on File | Email on File |
| 12047066 | Name on File | Email on File |
| 12047066 | Name on File | Email on File |
| 12047068 | Name on File | Email on File |
| 12047068 | Name on File | Email on File |
| 12047069 | Name on File | Email on File |
| 12047070 | Name on File | Email on File |
| 12047070 | Name on File | Email on File |
| 12649790 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046490 | Name on File | Email on File |
| 12047421 | Name on File | Email on File |
| 15550243 | Name on File | Email on File |
| 13087326 | Name on File | Email on File |
| 18140057 | Name on File | Email on File |
| 12988520 | Name on File | Email on File |
| 12242224 | Name on File | Email on File |
| 12242224 | Name on File | Email on File |
| 12889971 | Name on File | Email on File |
| 12046691 | Name on File | Email on File |
| 12649870 | Name on File | Email on File |
| 12046987 | Name on File | Email on File |
| 12048319 | Name on File | Email on File |
| 12096029 | Name on File | Email on File |
| 12096029 | Name on File | Email on File |
| 12047360 | Name on File | Email on File |
| 12047250 | Name on File | Email on File |
| 12171243 | Name on File | Email on File |
| 12242225 | Name on File | Email on File |
| 12242225 | Name on File | Email on File |
| 12242226 | Name on File | Email on File |
| 12242226 | Name on File | Email on File |
| 12046413 | Name on File | Email on File |
| 13087290 | Name on File | Email on File |
| 12933845 | Name on File | Email on File |
| 12047078 | Name on File | Email on File |
| 12047079 | Name on File | Email on File |
| 12047080 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12171235 | Name on File | Email on File |
| 12191787 | Name on File | Email on File |
| 12191787 | Name on File | Email on File |
| 12864323 | Name on File | Email on File |
| 15550121 | Name on File | Email on File |
| 12047609 | Name on File | Email on File |
| 15555208 | Name on File | Email on File |
| 13062543 | Name on File | Email on File |
| 12047082 | Name on File | Email on File |
| 12047082 | Name on File | Email on File |
| 12046466 | Name on File | Email on File |
| 15550219 | Name on File | Email on File |
| 12047087 | Name on File | Email on File |
| 12046410 | Name on File | Email on File |
| 12885599 | Name on File | Email on File |
| 12963706 | Name on File | Email on File |
| 12242227 | Name on File | Email on File |
| 12242227 | Name on File | Email on File |
| 12762456 | Name on File | Email on File |
| 12764918 | Name on File | Email on File |
| 12047088 | Name on File | Email on File |
| 12165072 | Name on File | Email on File |
| 12161627 | Name on File | Email on File |
| 12047089 | Name on File | Email on File |
| 12047090 | Name on File | Email on File |
| 12047091 | Name on File | Email on File |
| 12047091 | Name on File | Email on File |
| 12047096 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*
Case No. 22-10063 (SHL)

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046820 | Name on File | Email on File |
| 12901655 | Name on File | Email on File |
| 12047388 | Name on File | Email on File |
| 12046778 | Name on File | Email on File |
| 12242228 | Name on File | Email on File |
| 12242228 | Name on File | Email on File |
| 12879744 | Name on File | Email on File |
| 12186116 | Name on File | Email on File |
| 12173893 | Name on File | Email on File |
| 12242229 | Name on File | Email on File |
| 12242229 | Name on File | Email on File |
| 12047028 | Name on File | Email on File |
| 12047099 | Name on File | Email on File |
| 12047099 | Name on File | Email on File |
| 12047100 | Name on File | Email on File |
| 12047540 | Name on File | Email on File |
| 12047418 | Name on File | Email on File |
| 12047101 | Name on File | Email on File |
| 12047101 | Name on File | Email on File |
| 12047102 | Name on File | Email on File |
| 12047102 | Name on File | Email on File |
| 13093493 | Name on File | Email on File |
| 12047103 | Name on File | Email on File |
| 12763275 | Name on File | Email on File |
| 12885584 | Name on File | Email on File |
| 12047105 | Name on File | Email on File |
| 12047106 | Name on File | Email on File |
| 12047107 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047108 | Name on File | Email on File |
| 12047109 | Name on File | Email on File |
| 12047656 | Name on File | Email on File |
| 12242230 | Name on File | Email on File |
| 12242230 | Name on File | Email on File |
| 12885444 | Name on File | Email on File |
| 12885424 | Name on File | Email on File |
| 12047110 | Name on File | Email on File |
| 12047110 | Name on File | Email on File |
| 12047110 | Name on File | Email on File |
| 12047110 | Name on File | Email on File |
| 12047111 | Name on File | Email on File |
| 12047541 | Name on File | Email on File |
| 12046641 | Name on File | Email on File |
| 12928551 | Name on File | Email on File |
| 13119841 | Name on File | Email on File |
| 12047203 | Name on File | Email on File |
| 12047112 | Name on File | Email on File |
| 12932082 | Name on File | Email on File |
| 12891021 | Name on File | Email on File |
| 12047113 | Name on File | Email on File |
| 12046859 | Name on File | Email on File |
| 12047115 | Name on File | Email on File |
| 12873559 | Name on File | Email on File |
| 12047116 | Name on File | Email on File |
| 12890143 | Name on File | Email on File |
| 12046976 | Name on File | Email on File |
| 12046976 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047118 | Name on File | Email on File |
| 12047118 | Name on File | Email on File |
| 12047119 | Name on File | Email on File |
| 13060362 | Name on File | Email on File |
| 13003254 | Name on File | Email on File |
| 12047120 | Name on File | Email on File |
| 12047120 | Name on File | Email on File |
| 12047120 | Name on File | Email on File |
| 12047121 | Name on File | Email on File |
| 12108970 | Name on File | Email on File |
| 12047122 | Name on File | Email on File |
| 12108970 | Name on File | Email on File |
| 13093624 | Name on File | Email on File |
| 12047123 | Name on File | Email on File |
| 12047123 | Name on File | Email on File |
| 12046834 | Name on File | Email on File |
| 12835577 | Name on File | Email on File |
| 12047124 | Name on File | Email on File |
| 12047125 | Name on File | Email on File |
| 12047125 | Name on File | Email on File |
| 12047125 | Name on File | Email on File |
| 12987168 | Name on File | Email on File |
| 12987168 | Name on File | Email on File |
| 15419166 | Name on File | Email on File |
| 12891222 | Name on File | Email on File |
| 12046936 | Name on File | Email on File |
| 12244706 | Name on File | Email on File |
| 12046957 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047129 | Name on File | Email on File |
| 12047130 | Name on File | Email on File |
| 12047133 | Name on File | Email on File |
| 12047133 | Name on File | Email on File |
| 12047133 | Name on File | Email on File |
| 12047133 | Name on File | Email on File |
| 12047133 | Name on File | Email on File |
| 12047133 | Name on File | Email on File |
| 12047133 | Name on File | Email on File |
| 12047133 | Name on File | Email on File |
| 12914648 | Name on File | Email on File |
| 12046855 | Name on File | Email on File |
| 12046855 | Name on File | Email on File |
| 12047523 | Name on File | Email on File |
| 12875404 | Name on File | Email on File |
| 12047204 | Name on File | Email on File |
| 12867463 | Name on File | Email on File |
| 12991036 | Name on File | Email on File |
| 12856692 | Name on File | Email on File |
| 18164689 | Name on File | Email on File |
| 12242232 | Name on File | Email on File |
| 12242232 | Name on File | Email on File |
| 12987064 | Name on File | Email on File |
| 12047271 | Name on File | Email on File |
| 12046494 | Name on File | Email on File |
| 12914819 | Name on File | Email on File |
| 16148844 | Name on File | Email on File |
| 12047142 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047142 | Name on File | Email on File |
| 12047143 | Name on File | Email on File |
| 12047144 | Name on File | Email on File |
| 12047144 | Name on File | Email on File |
| 12047144 | Name on File | Email on File |
| 12047144 | Name on File | Email on File |
| 12047144 | Name on File | Email on File |
| 12867514 | Name on File | Email on File |
| 12047145 | Name on File | Email on File |
| 12047094 | Name on File | Email on File |
| 12987152 | Name on File | Email on File |
| 12873894 | Name on File | Email on File |
| 12046919 | Name on File | Email on File |
| 12047148 | Name on File | Email on File |
| 12047149 | Name on File | Email on File |
| 12933867 | Name on File | Email on File |
| 12047150 | Name on File | Email on File |
| 12251709 | Name on File | Email on File |
| 12651083 | Name on File | Email on File |
| 12902217 | Name on File | Email on File |
| 12047151 | Name on File | Email on File |
| 12047151 | Name on File | Email on File |
| 12047151 | Name on File | Email on File |
| 12047152 | Name on File | Email on File |
| 12868874 | Name on File | Email on File |
| 12242233 | Name on File | Email on File |
| 12242233 | Name on File | Email on File |
| 12868746 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047159 | Name on File | Email on File |
| 12047159 | Name on File | Email on File |
| 12047136 | Name on File | Email on File |
| 13083053 | Name on File | Email on File |
| 12046742 | Name on File | Email on File |
| 12046737 | Name on File | Email on File |
| 15542858 | Name on File | Email on File |
| 12046512 | Name on File | Email on File |
| 12827552 | Name on File | Email on File |
| 12873774 | Name on File | Email on File |
| 12046568 | Name on File | Email on File |
| 12046793 | Name on File | Email on File |
| 12047308 | Name on File | Email on File |
| 12245170 | Name on File | Email on File |
| 13119725 | Name on File | Email on File |
| 12761349 | Name on File | Email on File |
| 12656358 | Name on File | Email on File |
| 12655036 | Name on File | Email on File |
| 12046474 | Name on File | Email on File |
| 12046702 | Name on File | Email on File |
| 12047171 | Name on File | Email on File |
| 12246024 | Name on File | Email on File |
| 12047199 | Name on File | Email on File |
| 12047169 | Name on File | Email on File |
| 12856428 | Name on File | Email on File |
| 12047170 | Name on File | Email on File |
| 12856435 | Name on File | Email on File |
| 12242234 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*
Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12824380 | Name on File | Email on File |
| 15535933 | Name on File | Email on File |
| 12047353 | Name on File | Email on File |
| 12046564 | Name on File | Email on File |
| 12868923 | Name on File | Email on File |
| 12047177 | Name on File | Email on File |
| 12047178 | Name on File | Email on File |
| 12047178 | Name on File | Email on File |
| 12882300 | Name on File | Email on File |
| 12046789 | Name on File | Email on File |
| 13060348 | Name on File | Email on File |
| 12965463 | Name on File | Email on File |
| 12046458 | Name on File | Email on File |
| 12046419 | Name on File | Email on File |
| 12242235 | Name on File | Email on File |
| 12242235 | Name on File | Email on File |
| 12889560 | Name on File | Email on File |
| 12244605 | Name on File | Email on File |
| 12873688 | Name on File | Email on File |
| 12872428 | Name on File | Email on File |
| 12047182 | Name on File | Email on File |
| 12242236 | Name on File | Email on File |
| 12242236 | Name on File | Email on File |
| 12879017 | Name on File | Email on File |
| 12875414 | Name on File | Email on File |
| 12873419 | Name on File | Email on File |
| 12046598 | Name on File | Email on File |
| 12872239 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12881576 | Name on File | Email on File |
| 12170788 | Name on File | Email on File |
| 12245248 | Name on File | Email on File |
| 12047188 | Name on File | Email on File |
| 12047190 | Name on File | Email on File |
| 12889932 | Name on File | Email on File |
| 12047008 | Name on File | Email on File |
| 12855095 | Name on File | Email on File |
| 12047192 | Name on File | Email on File |
| 12047192 | Name on File | Email on File |
| 12047192 | Name on File | Email on File |
| 12047193 | Name on File | Email on File |
| 12046832 | Name on File | Email on File |
| 12946598 | Name on File | Email on File |
| 12047194 | Name on File | Email on File |
| 12877582 | Name on File | Email on File |
| 12047323 | Name on File | Email on File |
| 12047248 | Name on File | Email on File |
| 12928625 | Name on File | Email on File |
| 12046863 | Name on File | Email on File |
| 12047196 | Name on File | Email on File |
| 12047196 | Name on File | Email on File |
| 12047196 | Name on File | Email on File |
| 12047196 | Name on File | Email on File |
| 12047196 | Name on File | Email on File |
| 12047196 | Name on File | Email on File |
| 12047196 | Name on File | Email on File |
| 12046678 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12046420 | Name on File | Email on File |
| 12047257 | Name on File | Email on File |
| 12649456 | Name on File | Email on File |
| 12242237 | Name on File | Email on File |
| 12242237 | Name on File | Email on File |
| 12046664 | Name on File | Email on File |
| 12835396 | Name on File | Email on File |
| 12046495 | Name on File | Email on File |
| 12046806 | Name on File | Email on File |
| 12047132 | Name on File | Email on File |
| 12046874 | Name on File | Email on File |
| 12047572 | Name on File | Email on File |
| 12764389 | Name on File | Email on File |
| 12047205 | Name on File | Email on File |
| 12651049 | Name on File | Email on File |
| 12047205 | Name on File | Email on File |
| 12047573 | Name on File | Email on File |
| 12999068 | Name on File | Email on File |
| 12047206 | Name on File | Email on File |
| 12047206 | Name on File | Email on File |
| 12047206 | Name on File | Email on File |
| 12047592 | Name on File | Email on File |
| 12242238 | Name on File | Email on File |
| 12242238 | Name on File | Email on File |
| 12242239 | Name on File | Email on File |
| 12242239 | Name on File | Email on File |
| 12046669 | Name on File | Email on File |
| 12047085 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047085 | Name on File | Email on File |
| 12823203 | Name on File | Email on File |
| 12823300 | Name on File | Email on File |
| 12830162 | Name on File | Email on File |
| 12047114 | Name on File | Email on File |
| 12873515 | Name on File | Email on File |
| 12047210 | Name on File | Email on File |
| 12047211 | Name on File | Email on File |
| 12047213 | Name on File | Email on File |
| 12857351 | Name on File | Email on File |
| 12047135 | Name on File | Email on File |
| 13083006 | Name on File | Email on File |
| 12047603 | Name on File | Email on File |
| 12046422 | Name on File | Email on File |
| 12046942 | Name on File | Email on File |
| 12047184 | Name on File | Email on File |
| 12046749 | Name on File | Email on File |
| 12047500 | Name on File | Email on File |
| 12242240 | Name on File | Email on File |
| 12242240 | Name on File | Email on File |
| 12047215 | Name on File | Email on File |
| 12046797 | Name on File | Email on File |
| 12873888 | Name on File | Email on File |
| 12877926 | Name on File | Email on File |
| 12242241 | Name on File | Email on File |
| 12242241 | Name on File | Email on File |
| 13082980 | Name on File | Email on File |
| 12047545 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12244967 | Name on File | Email on File |
| 12047220 | SIGNATURE BANK | Email on File |
| 12047219 | SIGNATURE BANK | Email on File |
| 12047221 | Name on File | Email on File |
| 12047221 | Name on File | Email on File |
| 12047223 | Name on File | Email on File |
| 12047223 | Name on File | Email on File |
| 12047528 | Name on File | Email on File |
| 12875398 | Name on File | Email on File |
| 12875399 | Name on File | Email on File |
| 12047225 | SILVERGATE BANK | Email on File |
| 12047225 | SILVERGATE BANK | Email on File |
| 12047226 | SILVERGATE BANK | Email on File |
| 12047225 | SILVERGATE BANK | Email on File |
| 12047225 | SILVERGATE BANK | Email on File |
| 12047225 | SILVERGATE BANK | Email on File |
| 12047225 | SILVERGATE BANK | Email on File |
| 12856746 | Name on File | Email on File |
| 12046730 | Name on File | Email on File |
| 12242242 | Name on File | Email on File |
| 12242242 | Name on File | Email on File |
| 12046894 | Name on File | Email on File |
| 17114942 | Singapore Telecommunications Limited | Email on File |
| 17114942 | Singapore Telecommunications Limited | Email on File |
| 12242243 | Name on File | Email on File |
| 12242243 | Name on File | Email on File |
| 12047597 | Name on File | Email on File |
| 12046354 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047352 | Name on File | Email on File |
| 15600113 | Name on File | Email on File |
| 12047233 | Name on File | Email on File |
| 12046943 | Name on File | Email on File |
| 12047620 | Name on File | Email on File |
| 12857882 | Name on File | Email on File |
| 12047234 | Name on File | Email on File |
| 12047235 | Name on File | Email on File |
| 12963755 | Name on File | Email on File |
| 12046513 | Name on File | Email on File |
| 12928836 | Name on File | Email on File |
| 15416667 | Name on File | Email on File |
| 12046770 | Name on File | Email on File |
| 12047236 | Name on File | Email on File |
| 12047236 | Name on File | Email on File |
| 12047316 | Name on File | Email on File |
| 12648629 | Name on File | Email on File |
| 12047254 | Name on File | Email on File |
| 12046819 | Name on File | Email on File |
| 12047187 | Name on File | Email on File |
| 15600029 | Name on File | Email on File |
| 13093519 | Name on File | Email on File |
| 12862058 | Name on File | Email on File |
| 15556835 | South Dakota Division of Insurance | Email on File |
| 12047240 | Name on File | Email on File |
| 12047241 | Name on File | Email on File |
| 12046565 | Name on File | Email on File |
| 12046485 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12242244 | Name on File | Email on File |
| 12242244 | Name on File | Email on File |
| 12047347 | Name on File | Email on File |
| 12046761 | Name on File | Email on File |
| 12829198 | Name on File | Email on File |
| 12873752 | Name on File | Email on File |
| 12885639 | Name on File | Email on File |
| 12868798 | Name on File | Email on File |
| 12047667 | Name on File | Email on File |
| 12046821 | Name on File | Email on File |
| 12047243 | Name on File | Email on File |
| 12047239 | Name on File | Email on File |
| 12047244 | Name on File | Email on File |
| 12046478 | Name on File | Email on File |
| 12047007 | Name on File | Email on File |
| 13023612 | Name on File | Email on File |
| 17116609 | State of Alaska | Email on File |
| 15555274 | State of Hawaii, Department of Commerce and Consumer Affairs, Securities Enforcement Branch | Email on File |
| 15555065 | State of Hawaii, Department of Commerce and Consumer Affairs, Securities Enforcement Branch | Email on File |
| 15550819 | State of New York Office of the Attorney General, Division of Economic Justice | Email on File |
| 12047246 | Name on File | Email on File |
| 12046790 | Name on File | Email on File |
| 12047615 | Name on File | Email on File |
| 12864544 | Name on File | Email on File |
| 12864544 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047249 | Name on File | Email on File |
| 12864544 | Name on File | Email on File |
| 12047249 | Name on File | Email on File |
| 13083000 | Name on File | Email on File |
| 12824459 | Name on File | Email on File |
| 12648490 | Name on File | Email on File |
| 12047659 | Name on File | Email on File |
| 12245156 | Name on File | Email on File |
| 12047259 | Name on File | Email on File |
| 12856853 | Name on File | Email on File |
| 12829819 | Name on File | Email on File |
| 12046765 | Name on File | Email on File |
| 12171248 | Name on File | Email on File |
| 12171248 | Name on File | Email on File |
| 12171248 | Name on File | Email on File |
| 12171248 | Name on File | Email on File |
| 12047262 | Name on File | Email on File |
| 12047263 | Name on File | Email on File |
| 12047264 | Name on File | Email on File |
| 12047402 | Name on File | Email on File |
| 12171249 | Name on File | Email on File |
| 12171249 | Name on File | Email on File |
| 12242245 | Name on File | Email on File |
| 12242245 | Name on File | Email on File |
| 13041717 | Name on File | Email on File |
| 12047267 | Name on File | Email on File |
| 12047268 | Name on File | Email on File |
| 12885257 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12242246 | Name on File | Email on File |
| 12242246 | Name on File | Email on File |
| 12890061 | Name on File | Email on File |
| 12963534 | Name on File | Email on File |
| 12242247 | Name on File | Email on File |
| 12242247 | Name on File | Email on File |
| 15419362 | Name on File | Email on File |
| 15419362 | Name on File | Email on File |
| 12902249 | Name on File | Email on File |
| 12902184 | Name on File | Email on File |
| 12868354 | Name on File | Email on File |
| 12046915 | Name on File | Email on File |
| 12046890 | Name on File | Email on File |
| 12047272 | Name on File | Email on File |
| 12830071 | Name on File | Email on File |
| 12047273 | Name on File | Email on File |
| 12820000 | Name on File | Email on File |
| 12047012 | Name on File | Email on File |
| 12047396 | Name on File | Email on File |
| 12858515 | Name on File | Email on File |
| 12115795 | Name on File | Email on File |
| 12047274 | Name on File | Email on File |
| 12046773 | Name on File | Email on File |
| 12148777 | Name on File | Email on File |
| 18140071 | Name on File | Email on File |
| 12761398 | Name on File | Email on File |
| 12242248 | Name on File | Email on File |
| 12242248 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12917430 | Name on File | Email on File |
| 12877991 | Name on File | Email on File |
| 12047276 | Name on File | Email on File |
| 12047276 | Name on File | Email on File |
| 13082891 | Name on File | Email on File |
| 12171218 | Name on File | Email on File |
| 12046538 | Name on File | Email on File |
| 18140592 | Name on File | Email on File |
| 12046750 | Name on File | Email on File |
| 12873439 | Name on File | Email on File |
| 12047279 | Name on File | Email on File |
| 12047650 | Name on File | Email on File |
| 12046368 | Name on File | Email on File |
| 12047282 | Name on File | Email on File |
| 12047282 | Name on File | Email on File |
| 13087427 | Texas Department of Banking | Email on File |
| 15514077 | Texas State Securities Board | Email on File |
| 15513798 | Texas State Securities Boared | Email on File |
| 15542769 | Name on File | Email on File |
| 12650336 | Name on File | Email on File |
| 12047284 | Name on File | Email on File |
| 12047285 | Name on File | Email on File |
| 12047286 | Name on File | Email on File |
| 12047287 | Name on File | Email on File |
| 12047287 | Name on File | Email on File |
| 12047288 | Name on File | Email on File |
| 12047288 | Name on File | Email on File |
| 12047289 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 15555264 | The New Jersey Bureau of Securities | Email on File |
| 16825570 | The New Jersey Bureau of Securities | Email on File |
| 12047290 | Name on File | Email on File |
| 12047291 | Name on File | Email on File |
| 12047292 | Name on File | Email on File |
| 12047292 | Name on File | Email on File |
| 12047293 | Name on File | Email on File |
| 12822517 | Name on File | Email on File |
| 12047293 | Name on File | Email on File |
| 12047294 | Name on File | Email on File |
| 12047294 | Name on File | Email on File |
| 15552653 | Name on File | Email on File |
| 12047295 | Name on File | Email on File |
| 12148659 | Name on File | Email on File |
| 12148659 | Name on File | Email on File |
| 12991372 | Name on File | Email on File |
| 13093746 | Name on File | Email on File |
| 12872634 | Name on File | Email on File |
| 12047278 | Name on File | Email on File |
| 12873664 | Name on File | Email on File |
| 12875734 | Name on File | Email on File |
| 12875734 | Name on File | Email on File |
| 12875734 | Name on File | Email on File |
| 12873683 | Name on File | Email on File |
| 12047303 | Name on File | Email on File |
| 12047303 | Name on File | Email on File |
| 12873566 | Name on File | Email on File |
| 12191842 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047304 | Name on File | Email on File |
| 12047306 | Name on File | Email on File |
| 12046665 | Name on File | Email on File |
| 12047307 | Name on File | Email on File |
| 12827091 | Name on File | Email on File |
| 12047172 | Name on File | Email on File |
| 12872463 | Name on File | Email on File |
| 12047314 | Name on File | Email on File |
| 12047315 | Name on File | Email on File |
| 12873757 | Name on File | Email on File |
| 12243930 | Name on File | Email on File |
| 12046415 | Name on File | Email on File |
| 13045488 | Name on File | Email on File |
| 12047139 | Name on File | Email on File |
| 12242249 | Name on File | Email on File |
| 12242249 | Name on File | Email on File |
| 12047317 | Name on File | Email on File |
| 12047317 | Name on File | Email on File |
| 12047317 | Name on File | Email on File |
| 12046373 | Name on File | Email on File |
| 12889214 | Name on File | Email on File |
| 13003176 | Name on File | Email on File |
| 12047318 | Name on File | Email on File |
| 12047424 | Name on File | Email on File |
| 12047319 | Name on File | Email on File |
| 12047054 | Name on File | Email on File |
| 12245669 | Name on File | Email on File |
| 12047321 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12869166 | Name on File | Email on File |
| 12885659 | Translunar Crypto LP | Email on File |
| 12870246 | Translunar Crypto LP | Email on File |
| 12885659 | Translunar Crypto LP | Email on File |
| 12885659 | Translunar Crypto LP | Email on File |
| 12970152 | Name on File | Email on File |
| 12970152 | Name on File | Email on File |
| 12970152 | Name on File | Email on File |
| 12047324 | Name on File | Email on File |
| 12047324 | Name on File | Email on File |
| 12046860 | Name on File | Email on File |
| 12047325 | Name on File | Email on File |
| 12047326 | Name on File | Email on File |
| 12047326 | Name on File | Email on File |
| 12047327 | Name on File | Email on File |
| 12047328 | Name on File | Email on File |
| 12047329 | Name on File | Email on File |
| 12047329 | Name on File | Email on File |
| 12047329 | Name on File | Email on File |
| 12242250 | Name on File | Email on File |
| 12242250 | Name on File | Email on File |
| 12925044 | Name on File | Email on File |
| 12868321 | Name on File | Email on File |
| 12885583 | Name on File | Email on File |
| 12046574 | Name on File | Email on File |
| 12827083 | Name on File | Email on File |
| 12242251 | Name on File | Email on File |
| 12242251 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12244625 | Name on File | Email on File |
| 13059937 | Name on File | Email on File |
| 13041845 | Name on File | Email on File |
| 12047661 | Name on File | Email on File |
| 12046726 | Name on File | Email on File |
| 13023515 | Name on File | Email on File |
| 12047333 | Name on File | Email on File |
| 12047334 | Name on File | Email on File |
| 12047334 | Name on File | Email on File |
| 12047334 | Name on File | Email on File |
| 12047335 | Name on File | Email on File |
| 12047335 | Name on File | Email on File |
| 12047336 | Name on File | Email on File |
| 12047336 | Name on File | Email on File |
| 12652286 | Name on File | Email on File |
| 16825532 | U.S. Securities and Exchange Commission | Email on File |
| 15550505 | U.S. Securities and Exchange Commission | Email on File |
| 12047338 | Name on File | Email on File |
| 12875486 | Name on File | Email on File |
| 12873349 | Name on File | Email on File |
| 12047339 | Name on File | Email on File |
| 12047341 | Name on File | Email on File |
| 13003051 | Name on File | Email on File |
| 12047342 | Name on File | Email on File |
| 12047342 | Name on File | Email on File |
| 17116580 | Name on File | Email on File |
| 17116580 | Name on File | Email on File |
| 12829829 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 13089324 | Name on File | Email on File |
| 12047343 | Name on File | Email on File |
| 12047343 | Name on File | Email on File |
| 12047344 | Name on File | Email on File |
| 12047344 | Name on File | Email on File |
| 12047344 | Name on File | Email on File |
| 12763539 | Name on File | Email on File |
| 12047345 | Name on File | Email on File |
| 12171252 | Name on File | Email on File |
| 12171252 | Name on File | Email on File |
| 12875906 | Name on File | Email on File |
| 12872668 | Name on File | Email on File |
| 12171252 | Name on File | Email on File |
| 12171252 | Name on File | Email on File |
| 12171192 | Name on File | Email on File |
| 12762878 | Name on File | Email on File |
| 12046980 | Name on File | Email on File |
| 12047071 | Name on File | Email on File |
| 12047212 | Name on File | Email on File |
| 12046889 | Name on File | Email on File |
| 12046889 | Name on File | Email on File |
| 12762912 | Name on File | Email on File |
| 12242252 | Name on File | Email on File |
| 12242252 | Name on File | Email on File |
| 15551204 | Name on File | Email on File |
| 12046562 | Name on File | Email on File |
| 12047348 | Name on File | Email on File |
| 12047348 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047348 | Name on File | Email on File |
| 12047348 | Name on File | Email on File |
| 12047350 | Name on File | Email on File |
| 12047350 | Name on File | Email on File |
| 12047350 | Name on File | Email on File |
| 12047350 | Name on File | Email on File |
| 12873464 | Name on File | Email on File |
| 12047351 | Name on File | Email on File |
| 12047379 | Name on File | Email on File |
| 12242253 | Name on File | Email on File |
| 12242253 | Name on File | Email on File |
| 12889759 | Name on File | Email on File |
| 12047029 | Name on File | Email on File |
| 12047164 | Name on File | Email on File |
| 12046556 | Name on File | Email on File |
| 12914670 | Name on File | Email on File |
| 12046981 | Name on File | Email on File |
| 12242254 | Name on File | Email on File |
| 12244551 | Name on File | Email on File |
| 12951059 | Name on File | Email on File |
| 12047356 | Name on File | Email on File |
| 12047298 | Name on File | Email on File |
| 12047357 | Name on File | Email on File |
| 12046465 | Name on File | Email on File |
| 12047358 | Name on File | Email on File |
| 13052819 | Name on File | Email on File |
| 12047361 | Name on File | Email on File |
| 12047361 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12242255 | Name on File | Email on File |
| 12242255 | Name on File | Email on File |
| 12047362 | Name on File | Email on File |
| 12914536 | Name on File | Email on File |
| 12046672 | Name on File | Email on File |
| 12046672 | Name on File | Email on File |
| 12047363 | Name on File | Email on File |
| 12047363 | Name on File | Email on File |
| 12892107 | Name on File | Email on File |
| 12047364 | Name on File | Email on File |
| 12047365 | Name on File | Email on File |
| 12047365 | Name on File | Email on File |
| 12914588 | Name on File | Email on File |
| 12914588 | Name on File | Email on File |
| 12873466 | Name on File | Email on File |
| 12046591 | Name on File | Email on File |
| 12046771 | Name on File | Email on File |
| 12047176 | Name on File | Email on File |
| 10596724 | Name on File | Email on File |
| 12047200 | Name on File | Email on File |
| 12242256 | Name on File | Email on File |
| 12242256 | Name on File | Email on File |
| 15555326 | Name on File | Email on File |
| 12862045 | Name on File | Email on File |
| 13119668 | Name on File | Email on File |
| 12046407 | Name on File | Email on File |
| 12046838 | Name on File | Email on File |
| 12047126 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047127 | Name on File | Email on File |
| 12914746 | Name on File | Email on File |
| 12925061 | Name on File | Email on File |
| 12242257 | Name on File | Email on File |
| 12242257 | Name on File | Email on File |
| 12047368 | Name on File | Email on File |
| 17114933 | Name on File | Email on File |
| 12885491 | Name on File | Email on File |
| 12047017 | Name on File | Email on File |
| 12655047 | Name on File | Email on File |
| 12047371 | Name on File | Email on File |
| 12047371 | Name on File | Email on File |
| 12047372 | Name on File | Email on File |
| 12047373 | Name on File | Email on File |
| 12047374 | Name on File | Email on File |
| 12047375 | Name on File | Email on File |
| 12047376 | Name on File | Email on File |
| 12047377 | Name on File | Email on File |
| 12047380 | Name on File | Email on File |
| 12047381 | Name on File | Email on File |
| 13060389 | Name on File | Email on File |
| 12828032 | Name on File | Email on File |
| 12047383 | Name on File | Email on File |
| 12242258 | Name on File | Email on File |
| 12242258 | Name on File | Email on File |
| 12242259 | Name on File | Email on File |
| 12242259 | Name on File | Email on File |
| 12171245 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 17120550 | Name on File | Email on File |
| 12875743 | West Realm Shires Inc. on behalf of all FTX Debtors | Email on File |
| 12875743 | West Realm Shires Inc. on behalf of all FTX Debtors | Email on File |
| 12873462 | West Realm Shires Inc. on behalf of all FTX Debtors | Email on File |
| 12047390 | Name on File | Email on File |
| 12047158 | Name on File | Email on File |
| 12242260 | Name on File | Email on File |
| 12242260 | Name on File | Email on File |
| 12047514 | Name on File | Email on File |
| 12242261 | Name on File | Email on File |
| 12242261 | Name on File | Email on File |
| 12046563 | Name on File | Email on File |
| 12046736 | Name on File | Email on File |
| 12047252 | Name on File | Email on File |
| 12047391 | Name on File | Email on File |
| 12047392 | Name on File | Email on File |
| 12047392 | Name on File | Email on File |
| 12047392 | Name on File | Email on File |
| 12047648 | Name on File | Email on File |
| 12651053 | Name on File | Email on File |
| 12873407 | Name on File | Email on File |
| 12046514 | Name on File | Email on File |
| 15551380 | Name on File | Email on File |
| 12878735 | Name on File | Email on File |
| 12047398 | Name on File | Email on File |
| 12047399 | Name on File | Email on File |
| 12047400 | Name on File | Email on File |
| 12047400 | Name on File | Email on File |

In re: Genesis Global Holdco, LLC, *et al.*

Case No. 22-10063 (SHL)

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12856442 | Name on File | Email on File |
| 12047401 | Name on File | Email on File |
| 12047401 | Name on File | Email on File |
| 12648727 | Name on File | Email on File |
| 12047404 | Name on File | Email on File |
| 12047405 | Name on File | Email on File |
| 12047405 | Name on File | Email on File |
| 12047405 | Name on File | Email on File |
| 12047406 | Name on File | Email on File |
| 12928858 | Name on File | Email on File |
| 12046904 | Name on File | Email on File |
| 12046978 | Name on File | Email on File |
| 12046979 | Name on File | Email on File |
| 12872159 | Name on File | Email on File |
| 12885695 | Name on File | Email on File |
| 12047590 | Name on File | Email on File |
| 12046558 | Name on File | Email on File |
| 13020836 | Name on File | Email on File |
| 12046724 | Name on File | Email on File |
| 12888607 | Name on File | Email on File |
| 12047283 | Name on File | Email on File |
| 12046777 | Name on File | Email on File |
| 12046777 | Name on File | Email on File |
| 12242262 | Name on File | Email on File |
| 12242262 | Name on File | Email on File |
| 12047407 | Name on File | Email on File |
| 13041808 | Name on File | Email on File |
| 12873541 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12824659 | Name on File | Email on File |
| 12242263 | Name on File | Email on File |
| 12242263 | Name on File | Email on File |
| 12047409 | Name on File | Email on File |
| 12047409 | Name on File | Email on File |
| 12047409 | Name on File | Email on File |
| 12047397 | Name on File | Email on File |
| 12047410 | Name on File | Email on File |
| 12046839 | Name on File | Email on File |
| 12764066 | Name on File | Email on File |
| 12245213 | Name on File | Email on File |
| 12047548 | Name on File | Email on File |
| 12242264 | Name on File | Email on File |
| 12242264 | Name on File | Email on File |
| 12047165 | Name on File | Email on File |
| 12888909 | Name on File | Email on File |
| 12148651 | Name on File | Email on File |
| 12148651 | Name on File | Email on File |
| 12047370 | Name on File | Email on File |
| 12762359 | Name on File | Email on File |
| 12047369 | Name on File | Email on File |
| 12047411 | Name on File | Email on File |
| 12047411 | Name on File | Email on File |
| 12047412 | Name on File | Email on File |
| 12047413 | Name on File | Email on File |
| 12823791 | Name on File | Email on File |
| 12242265 | Name on File | Email on File |
| 12242265 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12242266 | Name on File | Email on File |
| 12242266 | Name on File | Email on File |
| 12047415 | Name on File | Email on File |
| 12242267 | Name on File | Email on File |
| 12046595 | Name on File | Email on File |
| 12242267 | Name on File | Email on File |
| 12046670 | Name on File | Email on File |
| 12047416 | Name on File | Email on File |
| 13003202 | Name on File | Email on File |
| 12047417 | Name on File | Email on File |
| 12047417 | Name on File | Email on File |
| 12046751 | Name on File | Email on File |
| 13083032 | Name on File | Email on File |
| 12991072 | Name on File | Email on File |
| 12046912 | Name on File | Email on File |
| 13087229 | Name on File | Email on File |
| 12893772 | Name on File | Email on File |
| 12047574 | Name on File | Email on File |
| 15419474 | Name on File | Email on File |
| 12046988 | Name on File | Email on File |
| 12651061 | Name on File | Email on File |
| 12046840 | Name on File | Email on File |
| 12046386 | Name on File | Email on File |
| 12046684 | Name on File | Email on File |
| 12115004 | Name on File | Email on File |
| 12046489 | Name on File | Email on File |
| 12047095 | Name on File | Email on File |
| 12242268 | Name on File | Email on File |

Exhibit C

Master Email Mailing List

Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12242268 | Name on File | Email on File |
| 12895391 | Name on File | Email on File |
| 13003347 | Name on File | Email on File |
| 12047561 | Name on File | Email on File |
| 13119403 | Name on File | Email on File |
| 12047420 | Name on File | Email on File |
| 12046619 | Name on File | Email on File |
| 12047134 | Name on File | Email on File |
| 12047594 | Name on File | Email on File |
| 12871957 | Name on File | Email on File |
| 12046421 | Name on File | Email on File |
| 12047425 | Name on File | Email on File |
| 12045387 | Name on File | Email on File |
| 12045387 | Name on File | Email on File |
| 12047427 | Name on File | Email on File |
| 12932065 | Name on File | Email on File |
| 12046752 | Name on File | Email on File |
| 12856974 | Name on File | Email on File |
| 12871831 | Name on File | Email on File |
| 12046997 | Name on File | Email on File |
| 12047428 | Name on File | Email on File |
| 12046725 | Name on File | Email on File |
| 18160300 | Name on File | Email on File |
| 12965511 | Name on File | Email on File |
| 12764546 | Name on File | Email on File |
| 12047595 | Name on File | Email on File |
| 12171194 | Name on File | Email on File |
| 12047488 | Name on File | Email on File |

Exhibit C
Master Email Mailing List
Served via Email

| ADDRESS ID | NAME | EMAIL |
|---|---|---|
| 12047035 | Name on File | Email on File |
| 12047429 | Name on File | Email on File |
| 12047429 | Name on File | Email on File |
| 12046814 | Name on File | Email on File |

**<u>Exhibit D</u>**

## IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE

In the matter of Part 11 of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018)

And

In the matter of Section 252 of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018)

And

In the matter of the Third Schedule of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018)

And

In the matter of Article 15 of the UNCITRAL Model Law on Cross-Border Insolvency

And

In the matter of the Appointment of Foreign Representative in the United States Bankruptcy Court in the Southern District of New York in Case No. 2310063 (Genesis Global Holdco, LLC (EIN 384058219)), jointly administered with Case No. 2310064 (Genesis Global Capital, LLC (EIN 371878564)) and Case No. 2310065 (Genesis Asia Pacific Pte. Ltd. (Singapore UEN No. 202002164R)) on 26 January 2023

And

HC/OA 400/2023

In the matter of **GENESIS ASIA PACIFIC PTE. LTD.** (Singapore UEN No. 202002164R)
**1. GENESIS ASIA PACIFIC PTE. LTD.**
   (Singapore UEN No. 202002164R)
   (in its capacity as foreign representative of Genesis Asia Pacific Pte. Ltd.)

**2. GENESIS ASIA PACIFIC PTE. LTD.**
   (Singapore UEN No. 202002164R)

And

HC/OA 402/2023

In the matter of **GENESIS GLOBAL HOLDCO, LLC** (United States Registration No. 38-4058219)
**1. GENESIS ASIA PACIFIC PTE. LTD.**

(Singapore UEN No. 202002164R)

(in its capacity as foreign representative of Genesis Global Holdco, LLC)

**2. GENESIS GLOBAL HOLDCO, LLC**

(United States Registration No. 38-4058219)

And

HC/OA 403/2023

In the matter of **GENESIS GLOBAL CAPITAL, LLC** (United States Registration No. 37-1878564)

**1. GENESIS ASIA PACIFIC PTE. LTD.**

(Singapore UEN No. 202002164R)

(in its capacity as foreign representative of Genesis Global Capital, LLC)

**2. GENESIS GLOBAL CAPITAL, LLC**

(United States Registration No. 37-1878564)

… Applicant(s)

---

### APPLICANTS' SUPPLEMENTAL BUNDLE OF AUTHORITIES

---

**Alexander Yeo**
**Jo Tay**
**Yeoh Tze Ning**
**Allen & Gledhill LLP**
One Marina Boulevard
#28-00
Singapore 018989
Ref: 1022011034/JOTAY/AYEOHT/YEOHTN
**Solicitors for the Applicants**


Dated this 17 July 2023

**BUNDLE OF AUTHORITIES INDEX**

| TAB | DESCRIPTION |
|---|---|
| **I.** | **STATUTES** |
| | **A. SINGAPORE STATUTES** |
| 1. | **Administration of Justice (Protection) Act 2016, Section 6(2)**<br><br>**Relevance**: Corporations may be held accountable for contempt of court. |
| 2. | **Interpretation Act 1965, Section 2**<br><br>**Relevance**: Defines "person" to include "any company or association or body of persons, corporate or unincorporate". |
| 3. | **Insolvency, Restructuring and Dissolution Act 2018, Section 50 (Eligibility of individual to hold insolvency practitioner's licence)**<br><br>**Relevance**: Example of provision that uses the term "individual". |
| | **B. FOREIGN STATUTES** |
| 4. | **Canadian Companies' Creditors Arrangement Act, R.S.C. , 1985, c. C-36**<br><br>**Relevance**: Part IV, section 45 defines "foreign representative". |
| **II.** | **CASES** |
| | **A. SINGAPORE CASES** |
| 5. | ***Malaysia Marine ABD Heavy Engineering Sdn Bhd v VLK Traders Singapore Pte Ltd [2014] 1 SLR 998***<br><br>**Relevance**: The Reciprocal Enforcement of Commonwealth Judgments Act (Cap 264, 1985 Rev Ed) does not define the term "person", and in such cases regard should be had to the definition under the Interpretation Act (Cap 1, 2002 Rev Ed). |
| | **B. FOREIGN CASES** |
| 6. | ***Re Basis Yield Alpha Fund* 381 BR 37**<br><br>**Relevance**: The court always has the power to make its own determination on qualification under section 1517 of the US Bankruptcy Code, notwithstanding the presence of section 1516 and the absence of an actual objection. |

| | |
|---|---|
| 7. | ***Re Grand Prix Associates*** 2009 Bankr. LEXIS 1239 <br><br> <u>Relevance</u>: A corporate entity had been appointed as foreign representative of the foreign debtors. |
| 8. | ***Re Innua Canada Ltd and the Normandy Group SA*** 2009 WL 1025088 <br><br> <u>Relevance</u>: An application for provisional relief under Chapter 15 (the US enactment of the Model Law) of the US Bankruptcy Code was brought by a corporate entity as the duly authorised foreign representative of the foreign debtors in a Canadian receivership proceeding. |
| 9. | ***Re LATAM Airlines Group S.A.*** (Case No. 20-11254), Order dated 28 May 2020 <br><br> <u>Relevance</u>: The US Bankruptcy Court appointed LATAM Airlines Group S.A. ("**LATAM Parent**") as the Foreign Representative of the debtors (which included LATAM Parent itself), to seek recognition of the Chapter 11 proceedings in Colombia and Chile. |
| 10. | ***Re LATAM Airlines Group S.A./Technical Training LATAM*** (Case No. C-8553-2020), decision dated 4 June 2020 <br><br> <u>Relevance</u>: Recognition and assistance was sought by LATAM Parent in the Civil Court of Santiago (Chile) and granted. |
| 11. | ***Re LATAM Airlines Group S.A.*** (Case No. 2020-01-270364), minutes of hearing on 12 June 2020 (Superintendence of Companies, Columbia) <br><br> <u>Relevance</u>: Recognition and assistance was sought by LATAM Parent and granted. |
| 12. | ***Re Oversight and Control Commission of Avanzit*** 385 BR 525 <br><br> <u>Relevance</u>: An Oversight Commission was a "foreign representative" for the purposes of Chapter 15 of the US Bankruptcy Code. Neither the Bankruptcy Code nor the Model Law defines "body", but the context suggests that it includes an artificial person created by a legal authority. |
| 13. | ***Re Voyager Digital Holdings*** (Case No. 22-10943), Order dated 8 July 2022 <br><br> <u>Relevance</u>: The US Bankruptcy Court authorised Voyager Digital Ltd., a corporate entity, to act as foreign representative on behalf of the debtors' estates in their Canadian proceedings. |
| 14. | ***Re Voyager Digital Ltd*** (Court File No. CV-22-00683820-00CL) <br><br> <u>Relevance</u>: The Canadian court declared that VDL was the "*foreign representative*", as defined in section 45 of the Canadian Companies' Creditors Arrangement Act, of the debtors. |

| III. | SECONDARY MATERIALS |
|---|---|
| 15. | ***Cross-Border Insolvency: A Commentary on the UNCITRAL Model Law* (Look Chan Ho gen ed) Vol 1 (Global Law and Business, 4th Ed, 2017), page 195**<br><br>**Relevance**: Foreign representatives may be debtors in possession. |

# TAB – 1

# ADMINISTRATION OF JUSTICE (PROTECTION) ACT 2016

**2020 REVISED EDITION**

This revised edition incorporates all amendments up to and including 1 December 2021 and comes into operation on 31 December 2021

An Act to state and consolidate the law of contempt of court for the protection of the administration of justice, to define the powers of certain courts in punishing contempt of court and to regulate their procedure in relation thereto.

[1 October 2017]

## PART 1

## PRELIMINARY

**Short title**

**1.** This Act is the Administration of Justice (Protection) Act 2016.

**Interpretation**

**2.**—(1)  In this Act, unless the context otherwise requires —

"court" means —

    (*a*)   the Supreme Court;

    (*b*)   any State Court;

    (*c*)   any Family Court; or

    (*d*)   any Youth Court;

"Employment Claims Tribunal" means an Employment Claims Tribunal constituted under section 4 of the State Courts Act 1970;

"judge" means —

    (*a*)   in the case of the Supreme Court — a Judge and a Registrar as defined in the Supreme Court of Judicature Act 1969;

    (*b*)   in the case of a State Court — a judicial officer as defined in the State Courts Act 1970 and a Coroner as defined in the Coroners Act 2010;

(*c*)  in the case of a Family Court or a Youth Court — a judicial officer as defined in the Family Justice Act 2014;

(*d*)  in the case of the Small Claims Tribunals —  a tribunal magistrate or the Registrar as defined in section 2(1) of the Small Claims Tribunals Act 1984; or

(*e*)  in the case of an Employment Claims Tribunal — a tribunal magistrate as defined in the Employment Claims Act 2016;

"publish" means to disseminate, distribute, exhibit, provide or communicate by oral, visual, written, electronic or other means (for example, by way of newspaper, radio, television or through the use of the Internet, subscription TV or other online communications system) to the public at large or a member of the public, and includes cause to be published, and "publication" is to be construed accordingly;

"Small Claims Tribunal" means a Small Claims Tribunal constituted under section 4 of the State Courts Act 1970;

"State Court" means a State Court constituted under section 4 of the State Courts Act 1970.

*[33/2018; 40/2019]*

(2)  In this Act —

(*a*)  a court proceeding is pending from the time that it commences to the time that it is finally decided, struck out or is discontinued or deemed to be discontinued;

(*b*)  a court proceeding commences —

(i)  in the case of any proceeding against a person in respect of any offence (other than an appellate, revision or reference proceeding referred to in sub-paragraphs (iii) and (iv)) — from the earliest of the following events:

(A)  the issue of a notice to attend court, summons to appear before a court to answer a charge of the offence, or any other process to compel the attendance of the person to answer a charge of the offence;

(B)  the issue of a warrant for the arrest of the person for the offence;

(C)  the arrest of the person for the offence;

(ii)   in the case of any proceeding other than a proceeding against a person in respect of any offence (but not an appellate or revision proceeding referred to in sub-paragraph (iii)) — from the time the originating process, application for permission or other application (including an application made before an originating process is filed) is filed in court;

*[Act 25 of 2021 wef 01/04/2022]*

(iii)   in the case of proceedings on appeal from or for revision of a decision of a court in any proceedings — from —

(A)   the time a notice of appeal is lodged or filed or an application for permission to appeal is made; or

*[Act 25 of 2021 wef 01/04/2022]*

(B)   the time an application for revision is made,

as the case may be;

(iv)   in the case of a reference of a question of law of public interest under section 397 of the Criminal Procedure Code 2010 — from the time an application for permission or a reference by the Public Prosecutor is made; and

*[Act 25 of 2021 wef 01/04/2022]*

(v)   in the case of an inquiry under the Coroners Act 2010 — from the time a Coroner is informed of a death under section 11 of that Act;

(*c*)   a court proceeding is finally decided —

(i)   in a case where there is a pending appeal, reference or revision — when the appeal, reference or revision is heard and finally decided including issues relating to assessment of damages and costs of the proceeding;

(ii)   in a case where no appeal or reference is pending — when the period of limitation prescribed for the appeal or reference has expired and all issues relating to assessment of damages and costs of the proceeding are heard and finally decided; or

(iii)   in the case of an inquiry under the Coroners Act 2010 — when the Coroner decides not to hold an inquiry under section 25(2) of that Act or when the inquiry is concluded unless the Public

10

Prosecutor requires the Coroner to hold an inquiry or reopen the inquiry under section 26(1) or (3) of that Act, as the case may be;

(*d*) a court proceeding that has been heard and finally decided will not be deemed to be pending merely by reason of the fact that proceedings for the execution or enforcement of the decree, order or sentence passed in the proceedings are pending; and

*[Act 25 of 2021 wef 01/04/2022]*

(*e*) a proceeding against a person in respect of any offence is deemed to include any criminal motion, case stated, or any other application made in or for the purposes of or in connection with the proceeding.

**Contempt by corporations**

**6.**—(1) Where, in a proceeding for contempt of court under this Act, it is necessary to prove the state of mind of a corporation in relation to a particular conduct, evidence that —

(*a*) an officer, employee or agent of the corporation engaged in that conduct within the scope of his or her actual or apparent authority; and

(*b*) the officer, employee or agent had that state of mind,

is evidence that the corporation had that state of mind.

(2) Where a corporation commits contempt of court under this Act, a person —

(*a*) who is —

(i) an officer of the corporation, or a member of a corporation whose affairs are managed by its members; or

(ii) an individual who is involved in the management of the corporation and is in a position to influence the conduct of the corporation in relation to the commission of the contempt of court; and

(*b*) who —

(i) consented or connived, or conspired with others, to effect the commission of the contempt of court;

(ii) is in any other way, whether by act or omission, knowingly

concerned in, or is party to, the commission of the contempt of court by the corporation; or

(iii) knew or ought reasonably to have known that the contempt of court by the corporation (or contempt of court of the same type) would be or is being committed, and failed to take all reasonable steps to prevent or stop the commission of that contempt of court,

shall be guilty of the same contempt of court as is the corporation, and shall be liable on being found guilty of contempt of court to be punished accordingly.

(3) A person mentioned in subsection (2) may rely on a defence that would be available to the corporation if it were charged with the contempt of court with which the person is charged and, in doing so, the person bears the same burden of proof that the corporation would bear.

(4) To avoid doubt, this section does not affect the application of —

(*a*) Chapters 5 and 5A of the Penal Code 1871; or

(*b*) the Evidence Act 1893 or any other law or practice regarding the admissibility of evidence.

(5) To avoid doubt, subsection (2) also does not affect the liability of the corporation for contempt of court under this Act, and applies whether or not the corporation is found guilty of contempt of court.

(6) This section applies to an offence under this Act as if it were contempt of court under this Act and to a conviction as if it were a finding of guilt of contempt of court.

(7) In this section —

"corporation" includes a limited liability partnership within the meaning of section 2(1) of the Limited Liability Partnerships Act 2005;

"officer", in relation to a corporation, means any director, partner, chief executive, manager, secretary or other similar officer of the corporation, and includes —

(*a*) any person purporting to act in any such capacity; and

(*b*) for a corporation whose affairs are managed by its members, any of those members as if the member was a director of the corporation;

"state of mind" of a person includes —

(*a*) the knowledge, intention, opinion, belief or purpose of the person;

and

(*b*)    the person's reasons for the intention, opinion, belief or purpose.

TAB – 2

# INTERPRETATION ACT 1965

**2020 REVISED EDITION**

This revised edition incorporates all amendments up to and including 1 December 2021 and comes into operation on 31 December 2021

An Act to define certain terms and expressions used in written law and to make provision for the construction, interpretation and publication of written law and for matters connected therewith.

[28 December 1965]

## Short title

**1.** This Act is the Interpretation Act 1965.

## Interpretation of certain words and expressions

**2.**—(1)  In this Act, and in every written law enacted before, on or after 28 December 1965 (but without affecting anything done before that date) —

"abet", with its grammatical variations and cognate expressions, has the meaning given by the Penal Code 1871;

"Accountant-General" means the Accountant-General of Singapore;

"act", in relation to an offence or civil wrong, includes a series of acts, and words which refer to acts done are to be construed as extending to illegal omissions;

"Act" or "Act of Parliament" means an Act of the Parliament of Singapore and includes any Ordinance or Act of Singapore or Malaysia having the force of law in Singapore; and "Act", when used in any subsidiary legislation, means the Act under the authority of which the subsidiary legislation was made;

"advocate" and "advocate and solicitor" mean an advocate and solicitor of the Supreme Court;

"animal" includes bird, reptile, fish and every kind of vertebrate animal and the young thereof;

"appoint" includes re-appoint;

"Attorney-General" means the Attorney-General of Singapore and in relation to any function, power or duty of the Attorney-General, includes a Deputy Attorney-General so assigned by the Attorney-General to perform that function, power or duty;

"Auditor-General" means the Auditor-General of Singapore;

"Cabinet" means the Cabinet constituted under the Constitution;

"Chief Justice" means the Chief Justice of Singapore;

"citizen of Singapore" means any person who, under the provisions of the Constitution, has the status of a citizen of Singapore;

"civil list" means the provision made under the Constitution for the maintenance of the President;

"commencement", in relation to an Act, means the time at which the Act comes into operation in Singapore;

"common law" means the common law insofar as it is in operation in Singapore and any custom or usage having the force of law in Singapore;

"Commonwealth" means collectively the Commonwealth countries and includes any colony, protectorate or protected state or any other territory administered by any Commonwealth country;

"Commonwealth country" means any country recognised by the President to be a Commonwealth country, and "part of the Commonwealth" means any Commonwealth country, any colony, protectorate or protected state or any other territory administered by the government of any Commonwealth country;

"Consolidated Fund" means the Consolidated Fund established by the Constitution;

"Constitution" means the Constitution of the Republic of Singapore;

"consular officer" means consul-general, consul, vice-consul, consular agent and any person for the time being authorised to discharge the duties of consul-general, consul, vice-consul or consular agent;

"contravene", in relation to a provision of a written law, includes a failure to comply with a requirement or condition in that provision;

"court" means any court of competent jurisdiction in Singapore;

"Criminal Procedure Rules" —

    (*a*)   means the Criminal Procedure Rules made under the Criminal Procedure Code 2010 and any other written law by the Criminal Procedure Rules Committee constituted under section 428A of that Code; and

    (*b*)   includes any subsidiary legislation deemed under section 428A(15)

of that Code to be Criminal Procedure Rules;

"Crown Agents" means the persons for the time being acting as Crown Agents for Overseas Governments and Administrations in the United Kingdom;

"Deputy Attorney-General" means a Deputy Attorney-General appointed under Article 35A of the Constitution;

"Deputy Speaker" means the Deputy Speaker of Parliament elected under the Constitution;

"District Court" means any District Court constituted under any written law for the time being in force relating to the courts;

"District Judge" means a District Judge appointed as such under any written law for the time being in force relating to the courts;

"export", with its grammatical variations and cognate expressions, means to take or cause to be taken out of Singapore by land, sea or air;

"Family Court" means a Family Court constituted under section 5 of the Family Justice Act 2014;

"Family Justice Rules" means the Family Justice Rules made under the Family Justice Act 2014 and any other written law by the Family Justice Rules Committee constituted under section 46(1) of that Act;

"*Gazette*" or "Government *Gazette*" means the *Gazette* published in electronic or other form by order of the Government and includes any supplement thereto and any *Gazette* Extraordinary so published;

"Government" means the Government of Singapore;

"Government Printer" includes any printer purporting to be the printer authorised to print Acts and other documents of the Government;

"High Court" means the High Court established by the Constitution;

"immovable property" includes land, benefits to arise out of land and things attached to the earth or permanently fastened to anything attached to the earth;

"import", with its grammatical variations and cognate expressions, means to bring or cause to be brought into Singapore by land, sea or air;

"Judge" means a Supreme Court Judge, a Judicial Commissioner or a Senior Judge sitting in the General Division of the High Court or Appellate Division of the High Court, or the Court of Appeal, in accordance with the Constitution and the Supreme Court of Judicature Act 1969, or an International Judge

sitting in the Singapore International Commercial Court, the Appellate Division of the High Court, or the Court of Appeal, in accordance with the Constitution and that Act;

"Judicial Service Commission" means the Judicial Service Commission constituted under the provisions of the Constitution;

*[Act 33 of 2021 wef 14/01/2022]*

"Judicial Service Officer" means an officer in the Singapore Judicial Service;

*[Act 33 of 2021 wef 14/01/2022]*

"Legal Service Commission" means the Legal Service Commission constituted under the provisions of the Constitution;

*[Act 33 of 2021 wef 14/01/2022]*

"Legal Service Officer" means an officer in the Singapore Legal Service;

*[Act 33 of 2021 wef 14/01/2022]*

"legislature", in relation to any part of the Commonwealth, means the authority competent to make laws for that part of the Commonwealth;

"Magistrate" means a Magistrate appointed under any written law for the time being in force relating to the courts;

"Malaya" means Singapore and the States of Malaya;

"Malaysia" means the Federation known as Malaysia;

"Malaysian citizen" or "Federal citizen" means any person who is a citizen of Malaysia by virtue of the provisions of any law for the time being in force, or any instrument for the time being having the force of law, in Malaysia;

"master", in relation to a ship, means any person, except a pilot or harbour master, having for the time being control or charge of the ship;

"military", in relation to Singapore's military, includes the digital and intelligence service of the Singapore Armed Forces;

*[Act 24 of 2022 wef 28/10/2022]*

"Minister" means the Minister for the time being charged with the responsibility for the department or subject to which the context refers;

"monogamous marriage" means a marriage which is recognised by the law of the place where it is contracted as a voluntary union of one man and one woman to the exclusion of all others during the continuance of the marriage;

"month" means calendar month;

"movable property" means property of every description except immovable property;

"national language" means the Malay language;

"oath" and "affidavit", in the case of persons for the time being allowed by law to affirm or declare instead of swearing, include affirmation and declaration, and "swear" in the like case includes affirm and declare;

"Ordinance" means any Ordinance of Singapore, and includes any Ordinance of the Colony of the Straits Settlements, any Ordinance of the Colony of Singapore or of the State of Singapore and any Proclamation having the force of law in Singapore; and "Ordinance" when used in any subsidiary legislation means the Ordinance under the authority of which the subsidiary legislation was made;

"Parliament" means the Parliament of Singapore;

"person" and "party" include any company or association or body of persons, corporate or unincorporate;

"police officer" means any member of the Singapore Police Force;

"prescribed" means prescribed by the Act in which the word occurs or by any subsidiary legislation made thereunder and, in relation to forms, includes being set out in electronic form on an electronically accessible server (such as an internet website) that is specified in the Act or subsidiary legislation in which the word occurs;

"President" means the President of Singapore and includes any person for the time being performing the functions of the President under the provisions of the Constitution;

"public holiday" means any day which is declared to be or proclaimed as a public holiday or which under any written law is to be observed as a public holiday in Singapore;

"public officer" means the holder of any office of emolument in the service of the Government;

"public seal" means the public seal of Singapore;

"public service" means service under the Government;

"Public Service Commission" means the Public Service Commission constituted under the provisions of the Constitution;

"registered", in relation to a document, means registered under the provisions of any written law for the time being applicable to the registration of such document;

"repeal" includes rescind, revoke, cancel, delete or replace;

[Act 31 of 2022 wef 01/11/2022]

"Rules of Court" means the Rules of Court made under the Supreme Court of Judicature Act 1969 and any other written law by the Rules Committee constituted under section 80(3) of that Act;

"Secretary to the Cabinet" means the Secretary to the Cabinet appointed in accordance with the provisions of the Constitution;

"ship" includes every description of vessel used in navigation not exclusively propelled by oars or paddles;

"sign", with its grammatical variations and cognate expressions, with reference to a person who is unable to write his or her name, includes "mark" with its grammatical variations and cognate expressions;

"Singapore" means the Republic of Singapore and is deemed to include the Island of Singapore and all islands and places which on 2 June 1959 were administered as part of Singapore and all territorial waters adjacent thereto;

"Solicitor-General" means the Solicitor-General of Singapore;

"Speaker" means the Speaker of Parliament elected in accordance with the provisions of the Constitution;

"States of Malaya" means —

 (a) the States of Johore, Kedah, Kelantan, Malacca, Negri Sembilan, Pahang, Penang, Perak, Perlis, Selangor and Trengganu; and

 (b) every Federal Territory which before its establishment was part of the territory of any State mentioned in paragraph (a),

which constitute part of Malaysia;

"statutory declaration", if made —

 (a) in Singapore, means a declaration made under the Oaths and Declarations Act 2000;

 (b) in the United Kingdom or any part of the Commonwealth other than in Singapore, means a declaration made before a justice of the peace, notary public or other person having authority therein under any law for the time being in force to take or receive a declaration;

 (c) in any other place, means a declaration made before a consul or vice-consul or before any person having authority under any law for the time being in force to take or receive a declaration;

"subsidiary legislation" means any order in council, proclamation, rule, regulation, order, notification, by-law or other instrument made under any Act, Ordinance or other lawful authority and having legislative effect;

"Supreme Court" means the Supreme Court established by the Constitution;

"Supreme Court Judge" means the Chief Justice, a Justice of the Court of Appeal, a Judge of the Appellate Division or a Judge of the High Court;

"United Kingdom" means Great Britain and Northern Ireland;

"value", in relation to a suit, means the value of the subject matter of the suit;

"vessel" includes floating craft of every description;

"will" includes a codicil;

words importing the masculine gender include females;

words in the singular include the plural and words in the plural include the singular;

"writing" and expressions referring to writing include printing, lithography, typewriting, photography and other modes of representing or reproducing words or figures in visible form;

"written law" means the Constitution and all previous Constitutions having application to Singapore and all Acts, Ordinances and enactments by whatever name called and subsidiary legislation made thereunder for the time being in force in Singapore;

"Yang di-Pertuan Agong" means the Yang di-Pertuan Agong or Supreme Head of Malaysia and includes the Deputy Supreme Head of Malaysia or a Ruler of a Malay State, whenever he is lawfully exercising the functions of the Yang di-Pertuan Agong;

"year" means a year reckoned according to the Gregorian calendar;

"Youth Court" means a Youth Court constituted under section 5 of the Family Justice Act 2014.

*[9/2003; 42/2005; 27/2014; 41/2014; 42/2014; 19/2018; 40/2019]*
*[Act 31 of 2022 wef 01/11/2022]*

(2)  Where a word or expression is defined in a written law, then, unless the contrary intention appears, other parts of speech and grammatical forms of that word or expression, and cognate expressions, have corresponding meanings in that law.

(2A)  If a written law provides for a definition to apply, the definition applies unless the context otherwise requires.

*[Act 31 of 2022 wef 01/11/2022]*

(3)  In every written law enacted before 28 December 1965 —

    (*a*)  references to the Colony of the Straits Settlements, the Settlement of Singapore, the Colony of Singapore, the Colony, the State of Singapore or the State, are to be construed as references to Singapore;

    (*b*)  references to the Federated Malay States are, unless the context otherwise requires, to be construed as references to the States of Malaya;

    (*c*)  references to the Governor of the Malayan Union are to be construed as references to the Yang di-Pertuan Agong;

    (*d*)  references to the Malayan Union are to be construed as references to Malaysia or the territories comprised therein, as the case may require;

    (*e*)  references to the Chief Justice or to any court, judge or magistrate of the Malayan Union or of the Federated Malay States or of any of the Malay States are to be construed as references to the Chief Justice or to the corresponding court, judge or magistrate of Malaysia or the territories comprised therein, as the case may require;

    (*f*)  references to any officer of, or authority or body constituted in or for, the Federated Malay States, any Malay State or the Malayan Union are to be construed as references to the corresponding officer of, or authority or body constituted in or for, Malaysia or the territories comprised therein, as the case may require;

    (*g*)  references to the Assembly or the Legislative Assembly are to be construed as references to the Parliament;

    (*h*)  references to the Yang di-Pertuan Negara are to be construed as references to the President;

    (*i*)  references to the Federal Minister are to be construed as references to the appropriate Minister of Singapore;

    (*j*)  references to the State Advocate-General are to be construed as references to the Attorney-General;

    (*k*)  references to the High Court in Singapore are to be construed as references to the High Court of Singapore; and

    (*l*)  references to a Judge of the High Court and the Registrar of the High Court are to be construed as references to a Judge of the Supreme Court and the Registrar of the Supreme Court, respectively.

(4)  [*Deleted by Act 5 of 2014*]

(5)  Where an Act authorises or requires any document to be served by post, whether the word "serve", "give" or "send" or any other word is used, then, unless a contrary intention appears, the service is deemed to be effected by properly addressing, prepaying and posting a letter containing the document, and, unless the contrary is proved, is deemed to have been effected at the time at which the letter would be delivered in the ordinary course of post.

(6)  Where a *Gazette* is published in more than one form, the date of publication of that *Gazette* is deemed to be the date on which that *Gazette* is first published in any form.

# TAB – 3

# INSOLVENCY, RESTRUCTURING AND DISSOLUTION ACT 2018

**2020 REVISED EDITION**

This revised edition incorporates all amendments up to and including 1 December 2021 and comes into operation on 31 December 2021

An Act to amend and consolidate the written laws relating to the making and approval of a compromise or an arrangement with the creditors of a company or an individual, receivership, corporate insolvency and winding up, individual insolvency and bankruptcy, and the public administration of insolvency, to provide for the regulation of insolvency practitioners, to provide for connected matters and to make consequential and related amendments to certain other Acts.

[30 July 2020: Except sections 467, 479, 495(*b*) and 499 ;

15 September 2020: Section 467(*a*) to (*g*) ]

## PART 1

## PRELIMINARY

**Short title and commencement**

**1.**—(1)  This Act is the Insolvency, Restructuring and Dissolution Act 2018.

(2)  Sections 467(*h*) and 479 come into operation on a date that the Minister appoints by notification in the *Gazette*.

**General interpretation**

**2.**—(1)  In this Act, unless the context otherwise requires —

"banking corporation" means a bank that holds a valid licence under section 7 or 79 of the Banking Act 1970;

"bankrupt" means —

   (*a*)  an individual debtor who has been adjudged bankrupt by a bankruptcy order; or

   (*b*)  where a bankruptcy order has been made against a firm, each of the partners in the firm;

"company" has the meaning given by section 4(1) of the Companies Act 1967;

"contributory" has the meaning given by section 4(1) of the Companies Act 1967;

"corporation" has the meaning given by section 4(1) of the Companies Act 1967;

"Court" means the General Division of the High Court;

"creditors' committee", in relation to a bankruptcy, means a committee appointed under section 331;

"foreign company" has the meaning given by section 4(1) of the Companies Act 1967;

"insolvency practitioner's licence" means a licence granted under section 51;

"liability" means a liability to pay money or money's worth, regardless whether such liability is present or future, certain or contingent or of an amount that is fixed or liquidated or that is capable of being ascertained by fixed rules or as a matter of opinion, and includes any such liability arising —

> (*a*)   under any written law;
>
> (*b*)   under contract, tort or bailment;
>
> (*c*)   as a result of a breach of trust by the person liable; or
>
> (*d*)   out of an obligation to make restitution;

"licensed insolvency practitioner" and "licensee" mean the holder of a licence granted under section 51;

"limited liability partnership" has the meaning given by section 4(1) of the Limited Liability Partnerships Act 2005;

"liquidator" includes the Official Receiver when acting as the liquidator of a corporation;

"member", in relation to a company, means a member of a company mentioned in section 19(6) or (6A) of the Companies Act 1967;

"Minister" means —

> (*a*)   except as provided in paragraph (*b*), the Minister charged with the responsibility for administration of affairs of insolvent persons and insolvent companies; and
>
> (*b*)   for the purposes of sections 124(1)(*g*) and (2)(*c*), 125(5), 127(3) and 198, the Minister charged with the responsibility for registration of companies;

"Official Assignee" means the Official Assignee appointed under section 16(1) and includes a Deputy Official Assignee, a Senior Assistant Official Assignee and an Assistant Official Assignee;

"Official Receiver" means the Official Receiver appointed under section 17(1) and includes a Deputy Official Receiver, a Senior Assistant Official Receiver and an Assistant Official Receiver;

"property" includes —

> (a)   money, goods, things in action, land and every description of property, wherever situated; and

> (b)   obligations and every description of interest, whether present or future or vested or contingent, arising out of or incidental to property;

"public accountant" means a person who is registered or deemed to be registered in accordance with the Accountants Act 2004 as a public accountant;

"Registrar" means the Registrar of the Supreme Court and includes a Deputy Registrar or an Assistant Registrar of the Supreme Court;

"Registrar of Companies" means the Registrar of Companies appointed under section 8 of the Companies Act 1967 and includes any Deputy or Assistant Registrar of Companies;

"regulations" means regulations made under section 449;

"Rules" means the Rules of Court made under section 448;

"solicitor" means an advocate and solicitor of the Supreme Court;

"subsidiary" has the meaning given by section 5 of the Companies Act 1967;

"transaction" includes any gift, agreement or arrangement, and any reference to entering into a transaction is to be construed accordingly;

"trustee", in relation to a bankruptcy and a bankrupt, means the trustee of the bankrupt's estate and includes the Official Assignee when acting as trustee of the bankrupt's estate;

"trustee in bankruptcy" means a person appointed under section 36 as trustee of a bankrupt's estate.

*[40/2019]*

(2) For the purposes of Parts 4 to 12 and 23, a person who is not a member of a company, but to whom shares in the company have been transferred, or transmitted by

operation of law, is to be regarded as a member of the company, and references to a member or members are to be read accordingly.

(3) Unless the contrary intention appears, a reference in this Act to a Part or a Division of a Part is to be construed so as to include a reference to any subsidiary legislation made in relation to that Part or that Division.

### Eligibility of individual to hold insolvency practitioner's licence

**50.**—(1)  An individual is not eligible to be granted, or to hold or continue to hold, an insolvency practitioner's licence unless the individual is a qualified person or is for the time being exempted under subsection (2).

*[39/2020]*

(2) The Minister may exempt, for such period as the Minister may specify, any individual from the requirement of being a qualified person in order to be granted, or to hold or continue to hold, an insolvency practitioner's licence.

*[39/2020]*

(3)  In this section, "qualified person" means any person who —

(*a*)  is a solicitor;

(*b*)  is a public accountant;

(*c*)  is a chartered accountant within the meaning given by section 2(1) of the Accounting and Corporate Regulatory Authority Act 2004; or

*[Act 36 of 2022 wef 01/04/2023]*

(*d*)  possesses such other qualifications as the Minister may prescribe by order in the *Gazette*.

### Grant and renewal of licence

**51.**—(1)  An application for the grant or renewal of a licence must be —

(*a*)  made to the licensing officer in such form and manner as may be prescribed;

(*b*)  accompanied by the prescribed fee (if any); and

(*c*)  in the case of an application for the renewal of a licence, made before the start of the renewal period.

(2) An applicant for the grant or renewal of a licence must, at the request of the licensing officer, provide such further information or evidence that the licensing officer may require to decide the application.

(3)  Upon receipt of an application under subsection (1), the licensing officer may —

    (*a*)  grant or renew the licence applied for; or

    (*b*)  refuse the application.

(4)  Subject to the provisions of this Division, a person who makes an application under subsection (1) is eligible for the grant or renewal of the licence if, and only if —

    (*a*)  the person has paid the prescribed fee (if any); and

    (*b*)  the person satisfies such other requirements as may be prescribed for the grant or renewal of the licence.

(5)  Without affecting subsection (4), the licensing officer may refuse to grant a licence to a person, or to renew the licence of a person, if, in the opinion of the licensing officer —

    (*a*)  the person is not a fit and proper person to hold or continue to hold the licence; or

    (*b*)  it is not in the public interest to grant or renew the licence, or the grant or renewal of the licence may pose a threat to national security.

(6)  Where a person submits an application for the renewal of the person's licence before the start of the renewal period, the licence continues in force until the date on which the licence is renewed or the application for its renewal is refused, as the case may be.

(7)  Any person who, in making an application for the grant or renewal of a licence —

    (*a*)  makes any statement or furnishes any particulars, information or document that the person knows to be false or does not believe to be true; or

    (*b*)  furnishes any information that the person knows or has reason to believe is misleading in a material particular,

shall be guilty of an offence and shall be liable on conviction to a fine not exceeding $10,000 or to imprisonment for a term not exceeding 12 months or to both.

(8)  In deciding for the purposes of this section whether an individual is a fit and proper person to hold or continue to hold a licence, the licensing officer may take into account any matter the licensing officer considers relevant, including any of the following:

    (*a*)  whether the individual has been convicted in Singapore or elsewhere of any offence involving fraud, dishonesty or moral turpitude;

    (*b*)  whether the individual has had a judgment entered against the individual in

civil proceedings that involves a finding of fraud, dishonesty or breach of fiduciary duty on the part of the individual;

(*c*)  whether the individual is or was suffering from a mental disorder;

(*d*)  whether the individual is an undischarged bankrupt or has entered into a composition or scheme of arrangement with the creditors of the individual;

(*e*)  whether the individual has had a licence revoked by the licensing officer previously.

(9)  In this section, "renewal period", in relation to an application for the renewal of a licence, means such period, immediately before the date of expiry of the licence, as may be prescribed.

# TAB – 4

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 1

Canada Statutes

**R.S.C. 1985, c. C-36, s. 1**  |  L.R.C. 1985, ch. C-36, art. 1

**Canada Statutes  >  Companies' Creditors Arrangement Act [ss. 1-63]  >  SHORT TITLE [s. 1]**

## Notice

⚑  Current Version: Effective 12-12-1988

## SHORT TITLE

## SECTION 1.

*Short title*

1. This Act may be cited as the Companies' Creditors Arrangement Act.

---

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 2

Canada Statutes

**R.S.C. 1985, c. C-36, s. 2**  |  L.R.C. 1985, ch. C-36, art. 2

**Canada Statutes > Companies' Creditors Arrangement Act [ss. 1-63] > INTERPRETATION [ss. 2-3]**

## Notice

 Current Version: Effective 23-05-2018

## INTERPRETATION

## SECTION 2.

*Definitions*

2. (1) In this Act,

*"aircraft objects"*

"aircraft objects" REPEALED: S.C. 2012, c. 31, s. 419, effective April 1, 2013 (SI/2013-26).

*"bargaining agent"*

"bargaining agent" means any trade union that has entered into a collective agreement on behalf of the employees of a company;

*"bond"*

"bond" includes a debenture, debenture stock or other evidences of indebtedness;

*"cash-flow statement"*

"cash-flow statement", in respect of a company, means the statement referred to in paragraph 10(2)(a) indicating the company's projected cash flow;

*"claim"*

"claim" means any indebtedness, liability or obligation of any kind that would be a claim provable within the meaning of section 2 of the Bankruptcy and Insolvency Act;

*"collective agreement"*

"collective agreement", in relation to a debtor company, means a collective agreement within the meaning of the jurisdiction governing collective bargaining between the debtor company and a bargaining agent;

*"company"*

"company" means any company, corporation or legal person incorporated by or under an Act of Parliament or of the legislature of a province, any incorporated company having assets or doing business in Canada, wherever incorporated, and any income trust, but does not include banks, authorized foreign banks within the meaning of section 2 of the *Bank Act*, telegraph companies, insurance companies and companies to which the *Trust and Loan Companies Act* applies;

*"court"*

"court" means

       (a) in Nova Scotia, British Columbia and Prince Edward Island, the Supreme Court,

       (a.1) in Ontario, the Superior Court of Justice,

       (b) in Quebec, the Superior Court,

       (c) in New Brunswick, Manitoba, Saskatchewan and Alberta, the Court of Queen's Bench,

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 2

(c.1) in Newfoundland and Labrador, the Trial Division of the Supreme Court, and

(d) in Yukon and the Northwest Territories, the Supreme Court, and in Nunavut, the Nunavut Court of Justice;

*"debtor company"*

"debtor company" means any company that

(a) is bankrupt or insolvent,

(b) has committed an act of bankruptcy within the meaning of the Bankruptcy and Insolvency Act or is deemed insolvent within the meaning of the Winding-up and Restructuring Act, whether or not proceedings in respect of the company have been taken under either of those Acts,

(c) has made an authorized assignment or against which a bankruptcy order has been made under the Bankruptcy and Insolvency Act, or

(d) is in the course of being wound up under the Winding-up and Restructuring Act because the company is insolvent;

*"director"*

"director" means, in the case of a company other than an income trust, a person occupying the position of director by whatever name called and, in the case of an income trust, a person occupying the position of trustee by whatever named called;

*"eligible financial contract"*

"eligible financial contract" means an agreement of a prescribed kind;

*"equity claim"*

"equity claim" means a claim that is in respect of an equity interest, including a claim for, among others,

(a) a dividend or similar payment,

(b) a return of capital,

(c) a redemption or retraction obligation,

(d) a monetary loss resulting from the ownership, purchase or sale of an equity interest or from the rescission, or, in Quebec, the annulment, of a purchase or sale of an equity interest, or

(e) contribution or indemnity in respect of a claim referred to in any of paragraphs (a) to (d);

*"equity interest"*

"equity interest" means

(a) in the case of a company other than an income trust, a share in the company - or a warrant or option or another right to acquire a share in the company - other than one that is derived from a convertible debt, and

(b) in the case of an income trust, a unit in the income trust - or a warrant or option or another right to acquire a unit in the income trust - other than one that is derived from a convertible debt;

*"financial collateral"*

"financial collateral" means any of the following that is subject to an interest, or in the Province of Quebec a right, that secures payment or performance of an obligation in respect of an eligible financial contract or that is subject to a title transfer credit support agreement:

(a) cash or cash equivalents, including negotiable instruments and demand deposits,

(b) securities, a securities account, a securities entitlement or a right to acquire securities, or

(c) a futures agreement or a futures account;

*"income trust"*

"income trust" means a trust that has assets in Canada if

Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 2

(a) its units are listed on a prescribed stock exchange on the day on which proceedings commence under this Act, or

(b) the majority of its units are held by a trust whose units are listed on a prescribed stock exchange on the day on which proceedings commence under this Act;

*"initial application"*

"initial application" means the first application made under this Act in respect of a company;

*"monitor"*

"monitor", in respect of a company, means the person appointed under section 11.7 to monitor the business and financial affairs of the company;

*"net termination value"*

"net termination value" means the net amount obtained after netting or setting off or compensating the mutual obligations between the parties to an eligible financial contract in accordance with its provisions;

*"prescribed"*

"prescribed" means prescribed by regulation;

*"secured creditor"*

"secured creditor" means a holder of a mortgage, hypothec, pledge, charge, lien or privilege on or against, or any assignment, cession or transfer of, all or any property of a debtor company as security for indebtedness of the debtor company, or a holder of any bond of a debtor company secured by a mortgage, hypothec, pledge, charge, lien or privilege on or against, or any assignment, cession or transfer of, or a trust in respect of, all or any property of the debtor company, whether the holder or beneficiary is resident or domiciled within or outside Canada, and a trustee under any trust deed or other instrument securing any of those bonds shall be deemed to be a secured creditor for all purposes of this Act except for the purpose of voting at a creditors' meeting in respect of any of those bonds;

*"shareholder"*

"shareholder" includes a member of a company - and, in the case of an income trust, a holder of a unit in an income trust - to which this Act applies;

*"Superintendent of Bankruptcy"*

"Superintendent of Bankruptcy" means the Superintendent of Bankruptcy appointed under subsection 5(1) of the Bankruptcy and Insolvency Act;

*"Superintendent of Financial Institutions"*

"Superintendent of Financial Institutions" means the Superintendent of Financial Institutions appointed under subsection 5(1) of the Office of the Superintendent of Financial Institutions Act;

*"title transfer credit support agreement"*

"title transfer credit support agreement" means an agreement under which a debtor company has provided title to property for the purpose of securing the payment or performance of an obligation of the debtor company in respect of an eligible financial contract;

*"unsecured creditor"*

"unsecured creditor" means any creditor of a company who is not a secured creditor, whether resident or domiciled within or outside Canada, and a trustee for the holders of any unsecured bonds issued under a trust deed or other instrument running in favour of the trustee shall be deemed to be an unsecured creditor for all purposes of this Act except for the purpose of voting at a creditors' meeting in respect of any of those bonds.

*Meaning of "related" and dealing at "arm's length"*

(2) For the purpose of this Act, section 4 of the Bankruptcy and Insolvency Act applies for the purpose of determining whether a person is related to or dealing at arm's length to a debtor company.

---

End of Document

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 3

Canada Statutes

**R.S.C. 1985, c. C-36, s. 3**   |   L.R.C. 1985, ch. C-36, art. 3

**Canada Statutes > Companies' Creditors Arrangement Act [ss. 1-63] > INTERPRETATION [ss. 2-3]**

## Notice

⚑  Current Version: Effective 18-09-2009

## SECTION 3.

*Application*

3. (1) This Act applies in respect of a debtor company or affiliated debtor companies if the total of claims against the debtor company or affiliated debtor companies, determined in accordance with section 20, is more than $5,000,000 or any other amount that is prescribed.

*Affiliated companies*

(2) For the purposes of this Act,

    (a) companies are affiliated companies if one of them is the subsidiary of the other or both are subsidiaries of the same company or each of them is controlled by the same person; and

    (b) two companies affiliated with the same company at the same time are deemed to be affiliated with each other.

*Company controlled*

(3) For the purposes of this Act, a company is controlled by a person or by two or more companies if

    (a) securities of the company to which are attached more than fifty per cent of the votes that may be cast to elect directors of the company are held, other than by way of security only, by or for the benefit of that person or by or for the benefit of those companies; and

    (b) the votes attached to those securities are sufficient, if exercised, to elect a majority of the directors of the company.

*Subsidiary*

(4) For the purposes of this Act, a company is a subsidiary of another company if

    (a) it is controlled by

        (i) that other company,

        (ii) that other company and one or more companies each of which is controlled by that other company, or

        (iii) two or more companies each of which is controlled by that other company; or

    (b) it is a subsidiary of a company that is a subsidiary of that other company.

---

End of Document

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 44

Canada Statutes

**R.S.C. 1985, c. C-36, s. 44**  |  L.R.C. 1985, ch. C-36, art. 44

**Canada Statutes  >  Companies' Creditors Arrangement Act [ss. 1-63]  >  PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61]  >  Purpose [s. 44]**

## Notice

⚑  Current Version: Effective 18-09-2009

**PART IV**

**CROSS-BORDER INSOLVENCIES**

**Purpose**

**SECTION 44.**

*Purpose*

44. The purpose of this Part is to provide mechanisms for dealing with cases of cross-border insolvencies and to promote

> (a) cooperation between the courts and other competent authorities in Canada with those of foreign jurisdictions in cases of cross-border insolvencies;

> (b) greater legal certainty for trade and investment;

> (c) the fair and efficient administration of cross-border insolvencies that protects the interests of creditors and other interested persons, and those of debtor companies;

> (d) the protection and the maximization of the value of debtor company's property; and

> (e) the rescue of financially troubled businesses to protect investment and preserve employment.

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 45

Canada Statutes

**R.S.C. 1985, c. C-36, s. 45** | L.R.C. 1985, ch. C-36, art. 45

Canada Statutes  >  Companies' Creditors Arrangement Act [ss. 1-63]  >  PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61]  >  Interpretation [s. 45]

## Notice

 Current Version: Effective 18-09-2009

**Interpretation**

## SECTION 45.

*Definitions*
45. (1) The following definitions apply in this Part.
*"foreign court"*
"foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding.
*"foreign main proceeding"*
"foreign main proceeding" means a foreign proceeding in a jurisdiction where the debtor company has the centre of its main interests.
*"foreign non-main proceeding"*
"foreign non-main proceeding" means a foreign proceeding, other than a foreign main proceeding.
*"foreign proceeding"*
"foreign proceeding" means a judicial or an administrative proceeding, including an interim proceeding, in a jurisdiction outside Canada dealing with creditors' collective interests generally under any law relating to bankruptcy or insolvency in which a debtor company's business and financial affairs are subject to control or supervision by a foreign court for the purpose of reorganization.
*"foreign representative"*
"foreign representative" means a person or body, including one appointed on an interim basis, who is authorized, in a foreign proceeding respect of a debtor company, to

> (a) monitor the debtor company's business and financial affairs for the purpose of reorganization; or

> (b) act as a representative in respect of the foreign proceeding.

*Centre of debtor company's main interests*
(2) For the purposes of this Part, in the absence of proof to the contrary, a debtor company's registered office is deemed to be the centre of its main interests.

---

End of Document

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 46

Canada Statutes

**R.S.C. 1985, c. C-36, s. 46**  |  L.R.C. 1985, ch. C-36, art. 46

**Canada Statutes  >  Companies' Creditors Arrangement Act [ss. 1-63]  >  PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61]  >  Recognition of Foreign Proceeding [ss. 46-51]**

## Notice

⚑  Current Version: Effective 18-09-2009

### Recognition of Foreign Proceeding

### SECTION 46.

*Application for recognition of a foreign proceeding*
46. (1) A foreign representative may apply to the court for recognition of the foreign proceeding in respect of which he or she is a foreign representative.
*Documents that must accompany application*
(2) Subject to subsection (3), the application must be accompanied by

> (a) a certified copy of the instrument, however designated, that commenced the foreign proceeding or a certificate from the foreign court affirming the existence of the foreign proceeding;

> (b) a certified copy of the instrument, however designated, authorizing the foreign representative to act in that capacity or a certificate from the foreign court affirming the foreign representative's authority to act in that capacity; and

> (c) a statement identifying all foreign proceedings in respect of the debtor company that are known to the foreign representative.

*Documents may be considered as proof*
(3) The court may, without further proof, accept the documents referred to in paragraphs (2)(a) and (b) as evidence that the proceeding to which they relate is a foreign proceeding and that the applicant is a foreign representative in respect of the foreign proceeding.
*Other evidence*
(4) In the absence of the documents referred to in paragraphs (2)(a) and (b), the court may accept any other evidence of the existence of the foreign proceeding and of the foreign representative's authority that it considers appropriate.
*Translation*
(5) The court may require a translation of any document accompanying the application.

End of Document

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 47

Canada Statutes

**R.S.C. 1985, c. C-36, s. 47**  |  L.R.C. 1985, ch. C-36, art. 47

**Canada Statutes  >  Companies' Creditors Arrangement Act [ss. 1-63]  >  PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61]  >  Recognition of Foreign Proceeding [ss. 46-51]**

## Notice

🚩  Current Version: Effective 18-09-2009

## SECTION 47.

*Order recognizing foreign proceeding*

47. (1) If the court is satisfied that the application for the recognition of a foreign proceeding relates to a foreign proceeding and that the applicant is a foreign representative in respect of that foreign proceeding, the court shall make an order recognizing the foreign proceeding.

*Nature of foreign proceeding to be specified*

(2) The court shall specify in the order whether the foreign proceeding is a foreign main proceeding or a foreign non-main proceeding.

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 48

Canada Statutes

**R.S.C. 1985, c. C-36, s. 48**  |  L.R.C. 1985, ch. C-36, art. 48

**Canada Statutes > Companies' Creditors Arrangement Act [ss. 1-63] > PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61] > Recognition of Foreign Proceeding [ss. 46-51]**

## Notice

⚑  Current Version: Effective 18-09-2009

## SECTION 48.

*Order relating to recognition of a foreign main proceeding*

48. (1) Subject to subsections (2) to (4), on the making of an order recognizing a foreign proceeding that is specified to be a foreign main proceeding, the court shall make an order, subject to any terms and conditions it considers appropriate,

> (a) staying, until otherwise ordered by the court, for any period that the court considers necessary, all proceedings taken or that might be taken against the debtor company under the Bankruptcy and Insolvency Act or the Winding-up and Restructuring Act;

> (b) restraining, until otherwise ordered by the court, further proceedings in any action, suit or proceeding against the debtor company;

> (c) prohibiting, until otherwise ordered by the court, the commencement of any action, suit or proceeding against the debtor company; and

> (d) prohibiting the debtor company from selling or otherwise disposing of, outside the ordinary course of its business, any of the debtor company's property in Canada that relates to the business and prohibiting the debtor company from selling or otherwise disposing of any of its other property in Canada.

*Scope of order*

(2) The order made under subsection (1) must be consistent with any order that may be made under this Act.

*When subsection (1) does not apply*

(3) Subsection (1) does not apply if any proceedings under this Act have been commenced in respect of the debtor company at the time the order recognizing the foreign proceeding is made.

*Application of this and other Acts*

(4) Nothing in subsection (1) precludes the debtor company from commencing or continuing proceedings under this Act, the Bankruptcy and Insolvency Act or the Winding-up and Restructuring Act in respect of the debtor company.

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 49

Canada Statutes

**R.S.C. 1985, c. C-36, s. 49**  |  L.R.C. 1985, ch. C-36, art. 49

**Canada Statutes > Companies' Creditors Arrangement Act [ss. 1-63] > PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61] > Recognition of Foreign Proceeding [ss. 46-51]**

## Notice

⚑ Current Version: Effective 18-09-2009

## SECTION 49.

*Other orders*

49. (1) If an order recognizing a foreign proceeding is made, the court may, on application by the foreign representative who applied for the order, if the court is satisfied that it is necessary for the protection of the debtor company's property or the interests of a creditor or creditors, make any order that it considers appropriate, including an order

> (a) if the foreign proceeding is a foreign non-main proceeding, referred to in subsection 48(1);

> (b) respecting the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor company's property, business and financial affairs, debts, liabilities and obligations; and

> (c) authorizing the foreign representative to monitor the debtor company's business and financial affairs in Canada for the purpose of reorganization.

*Restriction*

(2) If any proceedings under this Act have been commenced in respect of the debtor company at the time an order recognizing the foreign proceeding is made, an order made under subsection (1) must be consistent with any order that may be made in any proceedings under this Act.

*Application of this and other Acts*

(3) The making of an order under paragraph (1)(a) does not preclude the commencement or the continuation of proceedings under this Act, the Bankruptcy and Insolvency Act or the Winding-up and Restructuring Act in respect of the debtor company.

---

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 50

Canada Statutes

**R.S.C. 1985, c. C-36, s. 50** | L.R.C. 1985, ch. C-36, art. 50

**Canada Statutes > Companies' Creditors Arrangement Act [ss. 1-63] > PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61] > Recognition of Foreign Proceeding [ss. 46-51]**

## Notice

⚑ Current Version: Effective 18-09-2009

**SECTION 50.**

*Terms and conditions of orders*

50. An order under this Part may be made on any terms and conditions that the court considers appropriate in the circumstances.

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 51

Canada Statutes

**R.S.C. 1985, c. C-36, s. 51**  |  L.R.C. 1985, ch. C-36, art. 51

**Canada Statutes  >  Companies' Creditors Arrangement Act [ss. 1-63]  >  PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61]  >  Recognition of Foreign Proceeding [ss. 46-51]**

## Notice

⚑  Current Version: Effective 18-09-2009

## SECTION 51.

*Commencement or continuation of proceedings*

51. If an order is made recognizing a foreign proceeding, the foreign representative may commence and continue proceedings under this Act in respect of a debtor company as if the foreign representative were a creditor of the debtor company, or the debtor company, as the case may be.

---

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 52

Canada Statutes

**R.S.C. 1985, c. C-36, s. 52**  |  L.R.C. 1985, ch. C-36, art. 52

**Canada Statutes  >  Companies' Creditors Arrangement Act [ss. 1-63]  >  PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61]  >  Obligations [ss. 52-53]**

## Notice

Current Version: Effective 18-09-2009

## Obligations

## SECTION 52.

*Cooperation - court*

52. (1) If an order recognizing a foreign proceeding is made, the court shall cooperate, to the maximum extent possible, with the foreign representative and the foreign court involved in the foreign proceeding.

*Cooperation - other authorities in Canada*

(2) If any proceedings under this Act have been commenced in respect of a debtor company and an order recognizing a foreign proceeding is made in respect of the debtor company, every person who exercises powers or performs duties and functions under the proceedings under this Act shall cooperate, to the maximum extent possible, with the foreign representative and the foreign court involved in the foreign proceeding.

*Forms of cooperation*

(3) For the purpose of this section, cooperation may be provided by any appropriate means, including

    (a) the appointment of a person to act at the direction of the court;

    (b) the communication of information by any means considered appropriate by the court;

    (c) the coordination of the administration and supervision of the debtor company's assets and affairs;

    (d) the approval or implementation by courts of agreements concerning the coordination of proceedings; and

    (e) the coordination of concurrent proceedings regarding the same debtor company.

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 53

Canada Statutes

**R.S.C. 1985, c. C-36, s. 53**    |    L.R.C. 1985, ch. C-36, art. 53

**Canada Statutes  >  Companies' Creditors Arrangement Act [ss. 1-63]  >  PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61]  >  Obligations [ss. 52-53]**

# Notice

🚩  Current Version: Effective 18-09-2009

## SECTION 53.

*Obligations of foreign representative*

53. If an order recognizing a foreign proceeding is made, the foreign representative who applied for the order shall

(a) without delay, inform the court of

(i) any substantial change in the status of the recognized foreign proceeding,

(ii) any substantial change in the status of the foreign representative's authority to act in that capacity, and

(iii) any other foreign proceeding in respect of the same debtor company that becomes known to the foreign representative; and

(b) publish, without delay after the order is made, once a week for two consecutive weeks, or as otherwise directed by the court, in one or more newspapers in Canada specified by the court, a notice containing the prescribed information.

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 54

Canada Statutes

**R.S.C. 1985, c. C-36, s. 54** | L.R.C. 1985, ch. C-36, art. 54

**Canada Statutes > Companies' Creditors Arrangement Act [ss. 1-63] > PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61] > Multiple Proceedings [ss. 54-55]**

## Notice

⚑ Current Version: Effective 18-09-2009

**Multiple Proceedings**

## SECTION 54.

*Concurrent proceedings*

54. If any proceedings under this Act in respect of a debtor company are commenced at any time after an order recognizing the foreign proceeding is made, the court shall review any order made under section 49 and, if it determines that the order is inconsistent with any orders made in the proceedings under this Act, the court shall amend or revoke the order.

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 55

Canada Statutes

**R.S.C. 1985, c. C-36, s. 55**  |  L.R.C. 1985, ch. C-36, art. 55

**Canada Statutes  >  Companies' Creditors Arrangement Act [ss. 1-63]  >  PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61]  >  Multiple Proceedings [ss. 54-55]**

## Notice

⚑  Current Version: Effective 18-09-2009

## SECTION 55.

*Multiple foreign proceedings*

55. (1) If, at any time after an order is made in respect of a foreign non-main proceeding in respect of a debtor company, an order recognizing a foreign main proceeding is made in respect of the debtor company, the court shall review any order made under section 49 in respect of the foreign non-main proceeding and, if it determines that the order is inconsistent with any orders made under that section in respect of the foreign main proceedings, the court shall amend or revoke the order.

*Multiple foreign proceedings*

(2) If, at any time after an order is made in respect of a foreign non-main proceeding in respect of the debtor company, an order recognizing another foreign non-main proceeding is made in respect of the debtor company, the court shall, for the purpose of facilitating the coordination of the foreign non-main proceedings, review any order made under section 49 in respect of the first recognized proceeding and amend or revoke the order if it considers it appropriate.

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 56

Canada Statutes

**R.S.C. 1985, c. C-36, s. 56** | L.R.C. 1985, ch. C-36, art. 56

**Canada Statutes  >  Companies' Creditors Arrangement Act [ss. 1-63]  >  PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61]  >  Miscellaneous Provisions [ss. 56-61]**

## Notice

⚑  Current Version: Effective 18-09-2009

**Miscellaneous Provisions**

## SECTION 56.

*Authorization to act as representative of proceeding under this Act*
56. The court may authorize any person or body to act as a representative in respect of any proceeding under this Act for the purpose of having them recognized in a jurisdiction outside Canada.

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 57

Canada Statutes

**R.S.C. 1985, c. C-36, s. 57**  |  L.R.C. 1985, ch. C-36, art. 57

**Canada Statutes > Companies' Creditors Arrangement Act [ss. 1-63] > PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61] > Miscellaneous Provisions [ss. 56-61]**

## Notice

⚑  Current Version: Effective 18-09-2009

## SECTION 57.

*Foreign representative status*

57. An application by a foreign representative for any order under this Part does not submit the foreign representative to the jurisdiction of the court for any other purpose except with regard to the costs of the proceedings, but the court may make any order under this Part conditional on the compliance by the foreign representative with any other order of the court.

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 58

Canada Statutes

**R.S.C. 1985, c. C-36, s. 58**  |  L.R.C. 1985, ch. C-36, art. 58

**Canada Statutes  >  Companies' Creditors Arrangement Act [ss. 1-63]  >  PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61]  >  Miscellaneous Provisions [ss. 56-61]**

## Notice

⚑  Current Version: Effective 18-09-2009

## SECTION 58.

*Foreign proceeding appeal*
58. A foreign representative is not prevented from making an application to the court under this Part by reason only that proceedings by way of appeal or review have been taken in a foreign proceeding, and the court may, on an application if such proceedings have been taken, grant relief as if the proceedings had not been taken.

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 59

Canada Statutes

**R.S.C. 1985, c. C-36, s. 59** | L.R.C. 1985, ch. C-36, art. 59

**Canada Statutes > Companies' Creditors Arrangement Act [ss. 1-63] > PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61] > Miscellaneous Provisions [ss. 56-61] > SECTION 59. Presumption of insolvency**

## Notice

 Current Version: Effective 18-09-2009

## SECTION 59.

*Presumption of insolvency*

59. For the purposes of this Part, if an insolvency or a reorganization or a similar order has been made in respect of a debtor company in a foreign proceeding, a certified copy of the order is, in the absence of evidence to the contrary, proof that the debtor company is insolvent and proof of the appointment of the foreign representative made by the order.

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 60

Canada Statutes

**R.S.C. 1985, c. C-36, s. 60**  |  L.R.C. 1985, ch. C-36, art. 60

**Canada Statutes  >  Companies' Creditors Arrangement Act [ss. 1-63]  >  PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61]  >  Miscellaneous Provisions [ss. 56-61]**

## Notice

⚐   Current Version: Effective 18-09-2009

## SECTION 60.

*Credit for recovery in other jurisdictions*

60. (1) In making a compromise or an arrangement of a debtor company, the following shall be taken into account in the distribution of dividends to the company's creditors in Canada as if they were a part of that distribution:

> (a) the amount that a creditor receives or is entitled to receive outside Canada by way of a dividend in a foreign proceeding in respect of the company; and

> (b) the value of any property of the company that the creditor acquires outside Canada on account of a provable claim of the creditor or that the creditor acquires outside Canada by way of a transfer that, if it were subject to this Act, would be a preference over other creditors or a transfer at undervalue.

*Restriction*

(2) Despite subsection (1), the creditor is not entitled to receive a dividend from the distribution in Canada until every other creditor who has a claim of equal rank in the order of priority established under this Act has received a dividend whose amount is the same percentage of that other creditor's claim as the aggregate of the amount referred to in paragraph (1)(a) and the value referred to in paragraph (1)(b) is of that creditor's claim.

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, s. 61

Canada Statutes

**R.S.C. 1985, c. C-36, s. 61**   |   L.R.C. 1985, ch. C-36, art. 61

**Canada Statutes  >  Companies' Creditors Arrangement Act [ss. 1-63]  >  PART IV CROSS-BORDER INSOLVENCIES [ss. 44-61]  >  Miscellaneous Provisions [ss. 56-61]**

## Notice

⚑  Current Version: Effective 18-09-2009

## SECTION 61.

*Court not prevented from applying certain rules*
61. (1) Nothing in this Part prevents the court, on the application of a foreign representative or any other interested person, from applying any legal or equitable rules governing the recognition of foreign insolvency orders and assistance to foreign representatives that are not inconsistent with the provisions of this Act.
*Public policy exception*
(2) Nothing in this Part prevents the court from refusing to do something that would be contrary to public policy.

**End of Document**

# Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36, Long Title

Canada Statutes

**R.S.C. 1985, c. C-36, Long Title**  |  L.R.C. 1985, ch. C-36, Titre intégral

**Canada Statutes  >  Companies' Creditors Arrangement Act [ss. 1-63]**

An Act to facilitate compromises and arrangements between companies and their creditors

## Notice

 Current Version:

**End of Document**

# TAB – 5

# Malaysia Marine ABD Heavy Engineering Sdn Bhd
v
# VLK Traders Singapore Pte Ltd

## [2013] SGHC 253

High Court — Originating Summons No 593 of 2013
(Registrar's Appeal No 354 of 2013)
Tan Siong Thye JC
5, 22 November 2013

*Conflict of Laws — Foreign judgments — Recognition — Appeal against setting aside of registration of judgment of High Court of Malaya at Johor Bahru — Whether s 3(2)(b) Reciprocal Enforcement of Commonwealth Judgments Act (Cap 264, 1985 Rev Ed) applied to prevent registration of judgment — Whether s 3(2)(b) applied to corporations — Section 3(2)(b) Reciprocal Enforcement of Commonwealth Judgments Act (Cap 264, 1985 Rev Ed)*

**Facts**

This was the plaintiff's appeal against the setting aside of the registration of a judgment of the High Court of Malaya at Johor Bahru ("the Malaysian Judgment") under which the defendant was liable to pay the plaintiff outstanding sums for the repair of the defendant's ships. The defendant had successfully applied to set aside the registration on the basis that s 3(2)(b) of the Reciprocal Enforcement of Commonwealth Judgments Act (Cap 264, 1985 Rev Ed) ("the RECJA") prohibited the registration on the ground that the defendant, "being a person who was neither carrying on business nor ordinarily resident within the jurisdiction of the original court, did not voluntarily appear or otherwise submit or agree to submit to the jurisdiction of that court". The plaintiff appealed on the basis that s 3(2)(b) was inapplicable, in particular arguing that s 3(2)(b) applied only to natural persons and not to corporations.

**Held, dismissing the appeal:**

(1)     As the RECJA did not specify a definition of "person", it was appropriate to seek guidance from the s 2(1) of the Interpretation Act (Cap 1, 2002 Rev Ed), which provided that "person" and "party" include "any company or association or body of persons, corporate or unincorporated". In the circumstances "judgment debtor" under s 3(2)(b) of the RECJA should be read to refer to the defendant, a body corporate. This approach was implicitly supported by both Singapore and UK case law: at [15] to [17].

(2)     On the present facts, the defendant had not at any time carried on business in Malaysia: at [22].

(3)     An inference of submission to the jurisdiction of the foreign court would be confined to actual agreements between the parties, dealings akin to agreement (*ie*, estoppel) or dealings between the parties in relation to the actual proceedings before the foreign court. An agreement to submit to the jurisdiction of a foreign

court had to be express and would not be implied. Moreover, mere service out of jurisdiction was insufficient: at [24] and [26].

(4)    There was nothing to suggest that the defendant had voluntarily appeared or otherwise submitted or agreed to submit to the jurisdiction of the High Court of Malaya at Johor Bahru. The defendant did not enter an appearance; the Malaysian Judgment was in fact obtained by the plaintiff in default of appearance. Moreover, the contract for the repair of the ships was informally entered into through an exchange of e-mails and written correspondence. Finally, there was also no express jurisdiction clause amounting to an agreement to submit to the jurisdiction of the Malaysian court: at [27].

[Observation: Section 3(2)(*c*) of the RECJA was inapplicable as the defendant had been duly served with the originating process in the Malaysian proceedings. The defendant was moreover not ordinarily resident and not carrying on business within the jurisdiction of the Malaysian court: at [28] and [29].]

## Case(s) referred to

*Adams v Cape Industries plc* [1990] Ch 433; [1991] 1 All ER 929 (refd)

*Burswood Nominees Ltd v Liao Eng Kiat* [2004] 2 SLR(R) 436; [2004] 2 SLR 436 (refd)

*DHL Global Forwarding (Malaysia) Sdn Bhd v Mactus (Malaysia) Sdn Bhd* [2013] 4 SLR 781 (refd)

*Ho Hong Bank Ltd v Ho Kai Neo* [1932] MLJ 76 (refd)

*Sfeir & Co v National Insurance Co of New Zealand Ltd* [1964] 1 Lloyd's Rep 330 (refd)

*Sun-Line (Management) Ltd v Canpotex Shipping Services Ltd* [1985–1986] SLR(R) 695; [1986] SLR 259 (refd)

*United Malayan Banking Corp Bhd v Khoo Boo Hor* [1995] 3 SLR(R) 839; [1996] 1 SLR 359 (refd)

*United Overseas Bank Ltd v Tjong Tjui Njuk* [1987] SLR(R) 275; [1987] SLR 299 (refd)

*Tunku Abaidah v Tan Boon Hoe* [1935] MLJ 214 (refd)

*WSG Nimbus Pte Ltd v Board of Control for Cricket in Sri Lanka* [2002] 1 SLR(R) 1088; [2002] 3 SLR 603 (refd)

## Legislation referred to

Interpretation Act (Cap 1, 2002 Rev Ed) s 2(1)

Reciprocal Enforcement of Commonwealth Judgments Act (Cap 264, 1985 Rev Ed) s 3(2)(*b*) (consd);
ss 2, 3, 3(2)(*c*)

Rules of Court (Cap 322, R 5, 2006 Rev Ed) O 67 r 9

Administration of Justice Act 1920 (c 81) (UK) s 9(2)(b)

*P Suppiah and Elengovan s/o V Krishnan (P Suppiah & Co) for the plaintiff;*
*Tan Boon Yong Thomas (Haridass Ho & Partners) for the defendant.*

22 November 2013                                    Judgment reserved.

**Tan Siong Thye JC:**

## Introduction

1       This is the plaintiff's appeal against the decision of the assistant registrar ("Assistant Registrar") in Summons No 4086 of 2013 ("SUM 4086") setting aside the registration of a judgment of the High Court of Malaya at Johor Bahru.

## Background Facts

2       The defendant ("the Defendant") had entered into an informal agreement with the plaintiff ("the Plaintiff") via exchange of e-mail and written correspondence for the repair of two ships, namely, the White Cattleya 10 and the White Cattleya 12. The Plaintiff duly carried out the requested repairs. The total value of the repair works was S$1,1613,500. The Defendant paid the sum of S$873,074, leaving a balance of S$740,426 unpaid.

3       The Plaintiff sued the Defendant in the High Court of Malaya at Johor Bahru for the outstanding sum of S$740,426. The Defendant alleged that it was merely acting as an agent for the ships' owner and that the outstanding sum had been paid to another company, Koumi, which acted as the Plaintiff's agent.

4       On 11 September 2012, the High Court of Malaya at Johor Bahru granted a judgment in default of appearance in Civil Suit No 22NCvC-277-06/2012 ("the Malaysian Judgment"). The Defendant was accordingly liable under the Malaysian Judgment to pay the Plaintiff the sum of S$740,426 and interest at 4% per annum from 16 July 2012 to the date of settlement as well as costs of RM225.

5       On 18 June 2013, the Plaintiff applied to register the Malaysian Judgment as a judgment of the High Court of Singapore pursuant to s 3 of the Reciprocal Enforcement of Commonwealth Judgments Act (Cap 264, 1985 Rev Ed) ("the RECJA"). On the basis of an affidavit filed by the Plaintiff's acting Senior Manager, Mr Kishore A/L Kannan, the Singapore High Court (by way of an order of court dated 4 July 2013 ("the Registering Order")) ordered that the Malaysian Judgment be so registered.

6       On 6 August 2013, the Defendant filed SUM 4086 to set aside the Registering Order pursuant to O 67 r 9 of the Rules of Court (Cap 322, R 5, 2006 Rev Ed). SUM 4086 was heard by the learned Assistant Registrar on 9 October 2013. After hearing arguments, the Assistant Registrar allowed the application and set aside the registration on the basis that s 3(2)(*b*) of the RECJA prohibited the registration of the Malaysian judgement on the ground that the Defendant, "being a person who was neither carrying on

business nor ordinarily resident within the jurisdiction of the original court, did not voluntarily appear or otherwise submit or agree to submit to the jurisdiction of that court". The Plaintiff was dissatisfied with the Assistant Registrar's decision and filed the present appeal on 21 October 2013.

### The Plaintiff's submissions on appeal

7      The learned counsel for the Plaintiff appealed on the basis that s 3(2)(*b*) of RECJA does not apply to this case. According to the learned counsel, s 3(2)(*b*) of the RECJA does not apply to corporations. He referred me to s 2 of RECJA which defines "judgment debtor" as "the *person* against whom the judgment was given, and includes any *person* whom the judgment is enforceable in the place where it was given". Hence, he submitted that s 3(2)(*b*) of the RECJA is not applicable where the judgment sought to be registered lies against a company as opposed to a natural person. The learned Plaintiff's counsel also referred me to Black's Law Dictionary (9th Ed) which defines person as a "human being – also termed natural person". In the circumstances, he submitted that s 3(2)(*b*) of the RECJA does not apply in the present circumstances. This point was not canvassed before the learned Assistant Registrar.

8      The learned Plaintiff's counsel further submitted that the Defendant cannot invoke s 3(2)(*b*) for the following reasons:-

   (a)   The writ and statement of claim in Civil Suit No 22NCvC-277-06/2012 had been lawfully served on the Defendant out of jurisdiction and the Defendant had failed to enter an appearance to defend the action, resulting in a judgment in default of appearance being entered against the Defendant.

   (b)   The Defendant had agreed to submit to the jurisdiction of the Malaysian court when it brought the two ships to Johor Bahru for repairs. The Defendant must have known that if the repairs were not paid for, the Defendant would be sued in Johor Bahru.

   (c)   The operative subsection the Defendant should have proceeded on was s 3(2)(*c*) and not s 3(2)(*b*) of the RECJA. This was because the former provision refers to "judgment debtor, being a defendant in the proceedings". The reference to "defendant" in s 3(2)(*c*) is a general and wide term that can include a corporate entity like the Defendant. Section 3(2)(*b*) on the other hand refers to "judgment debtor, being a person", which denotes a natural person. However, s 3(2)(*c*) did not in fact apply to restrict registration of the Malaysian Judgment as the writ had been properly and duly served on the Defendant.

### The Defendant's submissions on appeal

9      The learned Defendant's counsel submitted that the Malaysian Judgment cannot be registered as a foreign judgment under the RECJA by

virtue of s 3(2)(*b*). It was submitted that notwithstanding the Defendant being a corporation, s 3(2)(*b*) is applicable in this case for the following reasons:

> (a)   it was not disputed that the Defendant neither carried on business nor had a place of business in Malaysia; and

> (b)   the Defendant did not voluntarily appear or otherwise submit or agree to submit to the jurisdiction of the Malaysian court.

**Decision of this court**

10    Singapore law permits foreign judgments to be registered in accordance with the relevant provisions of the law. I agree with the observations of the Singapore High Court in *DHL Global Forwarding (Malaysia) Sdn Bhd v Mactus (Malaysia) Sdn Bhd* [2013] 4 SLR 781 at [4] that "[t]he court's approach toward registration is a light touch approach. In practice, the default is to permit registration of foreign judgments unless certain formal features are missing". The statutory provisions applicable in this case are the s 3(2) of the RECJA and O 67 r 9 of the Rules of Court. Order 67 r 9 of the Rules of Court provides that:

> Where the Court hearing an application to set aside the registration of a judgment registered under the [RECJA] is satisfied that the ***judgment falls within any of the cases in which a judgment may not be ordered to be registered under section 3 (2) of that Act*** or that it is not just or convenient that the judgment should be enforced in Singapore or that there is some other sufficient reason for setting aside the registration, it may order the registration of the judgment to be set aside on such terms as it thinks fit. [emphasis added in bold italics]

11    The crux of this appeal is whether the present case comes within one of the six instances specified in s 3(2) of the RECJA, which constitute separate (as opposed to cumulative) grounds for resisting registration. If it does, the Malaysian Judgment cannot be registered as a judgment of the High Court of Singapore pursuant to s 3 of the RECJA. Section 3(2) of the RECJA reads as follows:

> **Restrictions on registration**
>
> **3.**    …
>
> (2)    No judgment shall be ordered to be registered under this section if —
>
> > (*a*)    the original court acted without jurisdiction;
> >
> > (*b*)    the judgment debtor, being a person who was neither carrying on business nor ordinarily resident within the jurisdiction of the original court, did not voluntarily appear or otherwise submit or agree to submit to the jurisdiction of that court;
> >
> > (*c*)    the judgment debtor, being the defendant in the proceedings, was not duly served with the process of the original court and did not

appear, notwithstanding that he was ordinarily resident or was carrying on business within the jurisdiction of that court or agreed to submit to the jurisdiction of that court;

(*d*)     the judgment was obtained by fraud;

(*e*)     the judgment debtor satisfies the registering court either that an appeal is pending, or that he is entitled and intends to appeal, against the judgment; or

(*f*)     the judgment was in respect of a cause of action which for reasons of public policy or for some other similar reason could not have been entertained by the registering court.

### *"Person"*

12     Section 3(2)(*b*) of the RECJA is hotly contested. The learned Plaintiff's counsel submitted that s 3(2)(*b*) is not applicable in the instant case as the provision does not apply to a body corporate. In the midst of his submissions, I interrupted the learned counsel and brought his attention to the Interpretation Act (Cap 1, 2002 Rev Ed). He replied that the Interpretation Act, being a general statute, was of little assistance as the interpretation of a specific Act (namely the RECJA) was at issue in this particular instance.

13     I had some difficulty accepting this argument. The RECJA does not define or explain the term "person", and it is clear that the court should look towards the Interpretation Act for assistance in filling this lacuna. The purpose of the Interpretation Act is clearly stated in its preamble, where it is described as:

An Act to define certain terms and expressions used in written law and to make provision for the construction, interpretation and publication of written law and for matters connected therewith[.]

14     Section 2(1) explains the scope of the Interpretation Act, as follows:

In this Act, and in every written law enacted before or after 28th December 1965, the following words and expressions shall, without prejudice to anything done prior to that date, have the meanings respectively assigned to them unless there is something in the subject or context inconsistent with such construction or unless it is therein otherwise expressly provided …

15     If the RECJA specified a definition of "person", I would have to agree with the learned Plaintiff's counsel that the Interpretation Act would not be applicable. However, as the RECJA does not define "person", it is appropriate to seek guidance from the Interpretation Act which provides that "person" and "party" include "any company or association or body of persons, corporate or unincorporated". In the circumstances "judgment debtor" under s 3(2)(*b*) of the RECJA should be read to refer to the Defendant, a body corporate.

16    This approach is supported by the *obiter dicta* of the High Court in *United Malayan Banking Corp Bhd v Khoo Boo Hor* [1995] 3 SLR(R) 839 ("*United Malayan Banking*") at [7], where the word "person" in s 3(2)(*b*) of the RECJA was similarly interpreted in accordance with the definition in s 2(1) of the Interpretation Act.

17    Indeed, a similar view has also been taken by the UK courts in relation to s 9(2)(b) of the UK Administration of Justice Act 1920 ("the UK AJA"), to which s 3(2)(*b*) of the RECJA is identical and in which it finds its roots: see the *Straits Settlement Government Gazette* (30 September 1921) at 1528. In *Sfeir & Co v National Insurance Company of New Zealand Ltd; Aschkar & Co v Same; Aschkar Brothers v Same* [1964] 1 Lloyd's Rep 330, the English Queen's Bench Division held, in relation to s 9(2)(b) of the UK AJA (at 337 to 338):

> It is well established by a long line of authorities going back at least as far as *Carron Iron Company Proprietors v. Maclaren, Dawson and Stainton*, (1855) 5 H.L.C. 416, and *Newby v. Van Oppen and Colt's Patent Firearms Manufacturing Company*, (1872) L.R. 7 Q.B. 293, that a foreign corporation can be treated as being present in England for the purpose of serving a writ upon it when the company carries on business in England and provided that the requirements of Order 67, r. 3 (formerly Order 9, r. 8) as to service upon a head officer with some fixed office in England can be complied with: see Dicey's Conflict of Laws, 7th ed. (1958), at p. 178. *It was admitted that the tests laid down in these authorities as to what constituted carrying on business within this country for the purposes of the common-law rule were applicable to the point I have to determine under Sect. 9 (2) (b) of the [UK AJA] as to whether the [defendant company was] at any material time carrying on business in Ghana.* [emphasis added in bold italics]

18    Therefore, it is implicit in both Singapore and UK case law that s 3(2)(*b*) of the RECJA and s 9(2)(b) of the UK AJA are applicable to companies.

19    Having determined that the Defendant is a "judgment debtor" under s 3(2)(*b*) of the RECJA, the Court has to continue to examine whether the rest of s 3(2)(*b*) has been established, *viz*, that the Defendant "who was neither carrying on business nor ordinarily resident within the jurisdiction of the original court, did not voluntarily appear or otherwise submit or agree to the jurisdiction of that court".

### "[N]either carrying on business nor ordinarily resident within the jurisdiction of the original court"

20    In *United Malayan Banking* ([16] *supra*) at [9], the Singapore High Court held:

> In relation to corporations, residence or presence has little meaning. The equivalent concept is whether a corporation carries on business in the foreign country so as to render itself amenable to the jurisdiction of the foreign court.

> In the enforcement of foreign judgments at common law, the concept of 'carrying on business' is peculiar to corporations.

The court further observed (at [14]) that "for a corporation to be carrying on business within a jurisdiction, the business must be that of the corporation and not that of the agent who acts for it".

21    In relation to the relevant period for the court to make the above determination, a Malaysian court in *Tunku Abaidah v Tan Boon Hoe* [1935] MLJ 214 ("*Tunku Abaidah*") stated that the words "being a person who was neither carrying on business nor ordinarily resident within the jurisdiction of the original Court" "clearly relates to the date on which the proceedings were instituted in the original Court" as opposed to the date that the relevant contract was entered into.

22    On the present facts, the Defendant had not at any time carried on business in Malaysia, whether directly or through an agent acting on its behalf. It did not have any office or place of business in Malaysia, and had never been registered to do business there. On the contrary, the Defendant is incorporated in Singapore with its registered office at 171 Chin Swee Road #10-02, San Centre, Singapore. Indeed, the Plaintiff had accepted in the course of oral arguments before the learned Assistant Registrar that the defendant was "neither carrying on business nor ordinarily resident" in Malaysia.

### *"[D]id not voluntarily appear or otherwise submit or agree to submit to the jurisdiction of that court"*

23    In *WSG Nimbus Pte Ltd v Board of Control for Cricket in Sri Lanka* [2002] 1 SLR(R) 1088, the High Court observed that the question in every case is whether the party contesting jurisdiction of the original court "had taken a step in the proceedings which necessarily involved waiving their objection to the jurisdiction". Actions which amount to submission to the jurisdiction of the foreign court include, *inter alia*:

    (a)    initiating an action as the plaintiff;

    (b)    filing a defence to an action; and

    (c)    making a counterclaim, cross-action or claim for set-off.

24    A party may also submit to the jurisdiction of a foreign court by agreement. Once an agreement to submit to the jurisdiction of a foreign court has been established, it does not matter whether the party *in fact* subsequently enters an appearance: *Burswood Nominees Ltd v Liao Eng Kiat* [2004] 2 SLR(R) 436. However, an agreement to submit to the jurisdiction of a foreign court must be express and will not be implied: see *Sun-Line (Management) Ltd v Canpotex Shipping Services Ltd* [1985–1986] SLR(R) 695 ("*Sun-Line*") and *United Overseas Bank Ltd v Tjong Tjui Njuk* [1987] SLR(R) 275. Hence, in *Sun-Line*, the High Court refused to imply such an

agreement from an agreement that the contract in question was to be governed by the law of the foreign country. The following, without more, do not amount to submissions to the jurisdiction of a foreign court by agreement:

> (a)     the fact that the contract in question is made in the foreign country or involves the conduct of business in that country, or the fact that the cause of action arose there;

> (b)     the existence of a choice of law clause in the contract in question; and

> (c)     an agreement to submit to the jurisdiction of an *arbitral* tribunal in the foreign jurisdiction.

In short, an inference of submission will be confined to actual agreements between the parties, dealings akin to an agreement (*ie*, estoppel) or dealings between the parties in relation to the actual proceedings before the foreign court. This is because what is required is not some vague allegiance to the foreign country but "a clear indication of consent to the exercise by the foreign court of the jurisdiction": *Adams v Cape Industries plc* [1991] 1 All ER 929 at 955.

25     In this case, the Defendant could not be said to have had voluntarily appeared or otherwise submitted or agreed to submit to the jurisdiction of the High Court of Malaya at Johor Bahru. The Plaintiff contended that the Defendant had submitted to the jurisdiction of the Malaysian court as the contracts for the repair of the two ships were voluntarily made in Malaysia and the money debt arose from the said contracts. The two ships were also repaired at Johor Bahru, Malaysia. Finally, the writ was served on the Defendant who was given an opportunity to be heard by the Malaysian Court. Thus, the Plaintiff submitted that the Defendant had submitted to the jurisdiction of the Malaysian court.

26     However, it is trite law that the mere act of service out of jurisdiction on the Defendant is insufficient to conclude that the Defendant had submitted or agreed to submit to the jurisdiction of the Malaysian court. In *Ho Hong Bank Ltd v Ho Kai Neo* [1932] MLJ 76, the court stated (correctly, in my opinion) that "sub-s 3(2)(b) which deals with the case of defendants not ordinarily resident or carrying on business within the jurisdiction, disregards the question [of] service because service by itself does not confer jurisdiction. In such cases jurisdiction is only obtained by the defendant submitting or having agreed to submit thereto". Likewise, in *Tunku Abaidah* ([21] *supra*), the court held that "[t]he mere fact of entering into a contract is not of itself a sufficient agreement to submit [to a jurisdiction] since such an agreement cannot be inferred and must be express".

27     In this instant case, there is nothing to suggest that the Defendant had voluntarily appeared or otherwise submitted or agreed to submit to the

jurisdiction of the High Court of Malaya at Johor Bahru. The Defendant did not enter an appearance; the Malaysian Judgment was in fact obtained by the Plaintiff in default of appearance. Moreover, the contract for the repair of the ships was informally entered into through an exchange of e-mails and written correspondence. Finally, there is also no express jurisdiction clause amounting to an agreement to submit to the jurisdiction of the Malaysian court.

### Relevance of section 3(2)(c) of the RECJA

28      Finally, I think it apposite to deal with one last issue raised by the Plaintiff. It was submitted on behalf of the Plaintiff that s 3(2)(*b*) of the RECJA was not relevant as it referred only to natural persons. According to the Plaintiff, because the Defendant is a corporate entity, the relevant provision is s 3(2)(*c*) which refers to a "judgment debtor, being the defendant in the proceedings". To recapitulate, s 3(2)(*c*) of the RECJA reads as follows:

> [No judgment shall be ordered to be registered under this section if] the judgment debtor, being the defendant in the proceedings, was not duly served with the process of the original court and did not appear, notwithstanding that he was ordinarily resident or was carrying on business within the jurisdiction of that court or agreed to submit to the jurisdiction of that court[.]

29      In the present case, the Defendant was duly served with the originating process in Civil Suit No 22NCvC-277-06/2012. The Defendant was moreover not ordinarily resident and not carrying on business within the jurisdiction of the Malaysian court. Nor did it agree to submit to the jurisdiction of the court. As such, s 3(2)(*c*) of the RECJA is not applicable to the facts of this case.

### Conclusion

30      For the above reasons, I dismissed the appeal. It is clear that s 3(2)(*b*) of the RECJA restricts the registration of the Malaysian Judgment in this case. The parties are to submit on the issue of the costs of these proceedings.

Reported by Cheryl Lim.

TAB – 6

Shepard's® report available
As of: July 17, 2023 6:32 AM Z

# In re Basis Yield Alpha Fund (Master)

United States Bankruptcy Court for the Southern District of New York

January 16, 2008, Decided

Chapter 15, Case No. 07-12762(REG)

**Reporter**

381 B.R. 37 *; 2008 Bankr. LEXIS 67 **; Bankr. L. Rep. (CCH) P81,098; 59 Collier Bankr. Cas. 2d (MB) 20; 49 Bankr. Ct. Dec. 89

In re: Basis Yield Alpha Fund (Master), Debtor in a Foreign Proceeding.

**Subsequent History:** As Corrected January 22, 2008. As Corrected March 19, 2008

**Disposition:** The liquidators' motion for summary judgment was denied.

## Core Terms

main proceedings, registered, exempted, matters, summary judgment, Model Law, courts, parties, failure to object, matter of law, evidentiary, nonmain, witnesses, locale, absence of objection, bankruptcy court, Cayman Companies Law, Proceedings, liquidation, Insolvency, questions, entities, power of the court, circumstances, headquarters, functions, investors, presumed, elected, genuine

## Case Summary

**Procedural Posture**

Petitioner liquidators of a foreign debtor, an exempted limited liability financial company incorporated under the laws of the Cayman Islands, sought U.S. recognition of the debtor's Cayman Islands insolvency proceeding. No objection to recognition was made by any party, and the liquidators moved for summary judgment of recognition of the foreign proceeding as a foreign main proceeding.

**Overview**

The liquidators contended that the debtor had a registered office in the Cayman Islands, that the Cayman Islands was thus presumed to be the debtor's center of main interest (COMI) under 11 U.S.C.S. § 1516 in the absence of evidence to the contrary, and that the debtor was thus entitled to recognition of the Cayman Islands insolvency proceeding as a foreign main proceeding. The court held that, in the absence of any evidence of the nature of the debtor's business, employees, assets, or operations in the Cayman Islands, the presumption of COMI in the Cayman Islands did not by itself require recognition of the foreign proceeding as a foreign main proceeding. The debtor was incorporated as an exempted company and Cayman Islands law appeared to require that operation of an exempted company be conducted mainly outside the Cayman Islands, indicating that the Cayman Islands was not the debtor's COMI. Further, the fact that there was no objection to recognition did not require that recognition be granted, in the absence of evidence that such recognition was appropriate.

**Outcome**

The liquidators' motion for summary judgment was denied.

## LexisNexis® Headnotes

Bankruptcy Law > Ancillary & Other Cross Border Cases

*HN1*[⤓]  **Bankruptcy Law, Ancillary & Other Cross Border Cases**

A bankruptcy court engaging in a determination concerning recognition of foreign insolvency proceedings under 11 U.S.C.S. § 1517 is not bound by parties' failures to object and may, if it is so advised, consider any and all relevant facts (including facts not yet presented).

Civil Procedure > ... > Summary

Judgment > Entitlement as Matter of Law > General Overview

Civil Procedure > ... > Summary Judgment > Burdens of Proof > Movant Persuasion & Proof

### HN2[⬇] Summary Judgment, Entitlement as Matter of Law

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law.

Civil Procedure > Judgments > Summary Judgment > Evidentiary Considerations

### HN3[⬇] Summary Judgment, Evidentiary Considerations

In determining a summary judgment motion, a court should not weigh the evidence or determine the truth of any matter, and must resolve all ambiguities and draw all reasonable inferences against the moving party.

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Genuine Disputes

Civil Procedure > ... > Summary Judgment > Entitlement as Matter of Law > Materiality of Facts

### HN4[⬇] Entitlement as Matter of Law, Genuine Disputes

For summary judgment purposes, a fact is material if it might affect the outcome of the suit under the governing law. An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.

Bankruptcy Law > Ancillary & Other Cross Border Cases

### HN5[⬇] Bankruptcy Law, Ancillary & Other Cross Border Cases

11 U.S.C.S. § 1509 erects a structure in which a foreign representative passes through a bankruptcy court for a recognition decision concerning foreign insolvency proceedings, the specified consequences of which are that the foreign representative gains the capacity to sue and be sued in United States courts and the authority to apply directly to a court in the United States for appropriate relief, and that all courts in the United States must grant comity or cooperation to the foreign representative.

Bankruptcy Law > Ancillary & Other Cross Border Cases

### HN6[⬇] Bankruptcy Law, Ancillary & Other Cross Border Cases

See 11 U.S.C.S. § 1509.

Bankruptcy Law > Ancillary & Other Cross Border Cases

### HN7[⬇] Bankruptcy Law, Ancillary & Other Cross Border Cases

After a grant of recognition of foreign insolvency proceedings by a bankruptcy court (and subject to any limitations that the bankruptcy court may impose consistent with chapter 15 policy), access, comity, and cooperation in other United States courts is mandatory. 11 U.S.C.S. § 1509(b)(3). Conversely, if the bankruptcy court denies recognition, it may issue any appropriate order necessary to prevent the foreign representative from obtaining comity or cooperation from courts in the United States.

Bankruptcy Law > Ancillary & Other Cross Border Cases

### HN8[⬇] Bankruptcy Law, Ancillary & Other Cross Border Cases

See 11 U.S.C.S. § 1502(7).

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 186 of 882
Page 69 of 18

381 B.R. 37, *37; 2008 Bankr. LEXIS 67, **67

Bankruptcy Law > Ancillary & Other Cross Border Cases

***HN9***[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

11 U.S.C.S. § 1517 sets forth the requirements for an order granting recognition of foreign insolvency proceedings, and sets forth a statutory directive that when those requirements have been satisfied, a recognition order shall be entered.

Bankruptcy Law > Ancillary & Other Cross Border Cases

***HN10***[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

See 11 U.S.C.S. § 1517.

Bankruptcy Law > General Overview

***HN11***[⬇] **Bankruptcy Law**

See 11 U.S.C.S. § 101(41).

Bankruptcy Law > Ancillary & Other Cross Border Cases

***HN12***[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

See 11 U.S.C.S. § 101(24).

Bankruptcy Law > Ancillary & Other Cross Border Cases

***HN13***[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

See 11 U.S.C.S. § 1515(b).

Bankruptcy Law > Ancillary & Other Cross Border Cases

***HN14***[⬇] **Bankruptcy Law, Ancillary & Other Cross**

Border Cases

A foreign main proceeding is defined in 11 U.S.C.S. § 1502(4) as a foreign insolvency proceeding pending in the country where a debtor has the center of its main interests.

Bankruptcy Law > Ancillary & Other Cross Border Cases

***HN15***[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

Courts look to an array of factors that can be probative in determining a foreign insolvency debtor's center of main interest (COMI), including: the location of the debtor's headquarters; the location of those who actually manage the debtor (which conceivably can be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law applies in most disputes. While certainly not exhaustive or all necessarily applicable in a case, these objective factors are indicative of the facts a court might find relevant in a COMI determination.

Bankruptcy Law > Ancillary & Other Cross Border Cases

***HN16***[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

See 11 U.S.C.S. § 1516(c).

Business & Corporate Law > Foreign Corporations > Qualifications

***HN17***[⬇] **Foreign Corporations, Qualifications**

See Cayman Companies Law § 193.

Business & Corporate Law > Foreign Corporations > Qualifications

***HN18***[⬇] **Foreign Corporations, Qualifications**

See Cayman Companies Law § 184.

Business & Corporate Law > Foreign
Corporations > Qualifications

*HN19*[⬇]  **Foreign Corporations, Qualifications**

See Cayman Companies Law § 182.

Bankruptcy Law > Ancillary & Other Cross Border
Cases

*HN20*[⬇]  **Bankruptcy Law, Ancillary & Other Cross
Border Cases**

If a foreign insolvency proceeding is in the country of the
debtor's registered office, and if there is evidence that
the center of main interests of the debtor might be
elsewhere, then the foreign representative seeking U.S.
recognition of the proceeding must prove that the center
of main interests is in the same country as the
registered office.

Evidence > ... > Testimony > Examination > Judicial
Interrogation

*HN21*[⬇]  **Examination, Judicial Interrogation**

A court's power to ascertain the facts cannot be
sidestepped by failures to object. Nor can it be
sidestepped by elections not to plead or introduce
inconvenient facts.

Bankruptcy Law > Ancillary & Other Cross Border
Cases

*HN22*[⬇]  **Bankruptcy Law, Ancillary & Other Cross
Border Cases**

Recognition of a foreign insolvency proceeding under 11
U.S.C.S. § 1517 is not to be rubber stamped by a court.
The court must make an independent determination as
to whether the foreign proceeding meets the definitional
requirements of 11 U.S.C.S. §§ 1502, 1517.

Civil Procedure > ... > Summary

Judgment > Burdens of Proof > Movant Persuasion
& Proof

*HN23*[⬇]  **Burdens of Proof, Movant Persuasion &
Proof**

A court may properly deny a motion for summary
judgment, even where no opposing evidentiary matters
are presented, when the movant bears the burden of
proof at trial and fails to establish the absence of
genuine issues of fact.

Bankruptcy Law > Ancillary & Other Cross Border
Cases

*HN24*[⬇]  **Bankruptcy Law, Ancillary & Other Cross
Border Cases**

The 11 U.S.C.S. § 1516 presumption of a foreign
debtor's center of main interest exists for the purposes
of speed and convenience, and to save stakeholders
costs in straightforward cases, but does not tie the
hands of a court to examine the facts more closely in
any instances where the court regards the issues to be
sufficiently material to warrant further inquiry.

Evidence > Inferences &
Presumptions > Presumptions

*HN25*[⬇]  **Inferences & Presumptions, Presumptions**

A presumption imposes on the party against whom it is
directed the burden of going forward with evidence to
rebut or meet the presumption, but does not shift to
such party the burden of proof in the sense of the risk of
nonpersuasion, which remains throughout the trial upon
the party on whom it was originally cast. Fed. R. Evid.
301.

Bankruptcy Law > Ancillary & Other Cross Border
Cases

*HN26*[⬇]  **Bankruptcy Law, Ancillary & Other Cross
Border Cases**

11 U.S.C.S. § 1516(c) creates a rebuttable presumption
of a foreign debtor's center of main interest and does
not shift the burden of proof in supporting a petition for
recognition of foreign insolvency proceedings.

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 188 of 882
Page 5 of 18

381 B.R. 37, *37; 2008 Bankr. LEXIS 67, **67

Evidence > ... > Testimony > Examination > Judicial Interrogation

**HN27**[⬇] **Examination, Judicial Interrogation**

See Fed. R. Evid. 614.

Bankruptcy Law > Ancillary & Other Cross Border Cases

**HN28**[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

While recognition of a foreign insolvency proceeding may be granted under the presumption of the debtor's center of main interest set out in 11 U.S.C.S. § 1516, it cannot be said that it must be granted.

**Counsel:** [**1] For the Joint Provisional Liquidators: Karen Dine, Esq., David Crichlow, Esq. (argued), Robyn Schneider, Esq., Jerry Hall, Esq., PILLSBURY WINTHROP SHAW PITTMAN LLP, New York, NY.

For Citigroup Global Markets Limited: Mitchell Lowenthal, Esq., Lindsee Granfield, Esq., CLEARY GOTTLIEB STEEN & HAMILTON LLP, New York, NY.

**Judges:** Robert E. Gerber, United States Bankruptcy Judge.

**Opinion by:** Robert E. Gerber

# Opinion

[*40] DECISION AND ORDER ON MOTION FOR SUMMARY JUDGMENT SEEKING RECOGNITION AS FOREIGN MAIN PROCEEDING

BEFORE: ROBERT E. GERBER

UNITED STATES BANKRUPTCY JUDGE.

In this case under chapter 15 of the Bankruptcy Code, petitioners Hugh Dickson, Stephen John Akers, and Paul Andrew Billingham--the Joint Provisional Liquidators ("JPLs") of Basis Yield Alpha Fund (Master) (In Provisional Liquidation) ("Basis Yield") in a proceeding in the Cayman Islands--by their petition seek recognition in this Court of Basis Yield's liquidation in

that country as a "foreign main proceeding," under section 1517(b)(1) of the Code, or alternatively as a foreign nonmain proceeding, under section 1517(b)(2). With no objections to recognition having been filed, [1] the JPLs move for summary judgment granting the relief sought under the first prong [**2] of their petition, recognition of the Cayman Islands Proceeding as a foreign main proceeding.

The motion raises the issues as to whether failures to object by stakeholders divest the Court of the power to make its own determination as to whether the requirements of Bankruptcy Code section 1517 have been satisfied, and whether a presumption embodied in section 1516 of the Code, discussed below, precludes the Court from considering the actual facts--under circumstances where the JPLs' showing has been strikingly silent and where the few facts that are known raise issues as to their position and make further inquiry appropriate. For reasons set forth below, the Court concurs with the observations of Judge Lifland that recognition under section 1517 is not a rubber stamp exercise. [2] Rather, consistent with Judge Lifland's determination and the views of the drafters of chapter 15 and the UNCITRAL Model Law on which chapter 15 was based, the Court rules that **HN1**[⬆] ] a court engaging in a recognition determination under section 1517 [**3] is not bound by parties' failures to object; may, if it is so advised, consider any and all relevant facts (including facts not yet presented); and that the circumstances here make further factual inquiry necessary and appropriate.

Accordingly, summary judgment is denied.

[*41]  Facts

Basis Yield was incorporated in the Cayman Islands on September 14, 2005 as an exempted limited liability company pursuant to section 193 of the Companies Law

---

[1] As noted below, one creditor, Citigroup Global Markets Ltd. ("Citigroup"), objected to the form of the proposed recognition order, but did not object to recognition itself.

[2] *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. 122, 130 (Bankr. S.D.N.Y. 2007) ("*Bear Stearns*"). *See also id.* at 126 ("However, recognition under section 1517 is not to be rubber stamped by the courts. This Court must make an independent determination as to whether the foreign proceeding meets the definitional requirements of sections 1502 and 1517 of the Bankruptcy Code.").

381 B.R. 37, *41; 2008 Bankr. LEXIS 67, **3

(2004 Revision) of the Cayman Islands (the "Cayman Companies Law"), [3] and maintains its "registered office" in that country. [4] Prior to the commencement of the Cayman Islands Proceeding, Basis Yield invested in a variety of structured credit securities, including asset-backed securities, mortgage-backed securities, collateralized debt obligations, **[**4]** and collateralized loan obligations.

Following the well-publicized volatility in the global credit markets, and particularly the marked rise in sub-prime lending defaults here in the United States, Basis Yield suffered a significant devaluation of the assets in its portfolio. This devaluation precipitated margin calls from Basis Yield's trade counterparties, which Basis Yield was unable to satisfy. As a result, Basis Yield was issued several default notices and ultimately its trade counterparties exercised their rights under their respective agreements to seize or sell those assets of Basis Yield that had been subject to repurchase agreements or in which they held security interests.

On August 27, 2007, the shareholders of Basis Yield authorized the filing of a petition to liquidate the fund under the provisions of the Cayman Companies Law. The shareholders further resolved to apply for the appointment of the petitioners to serve as JPLs for Basis Yield, subject to the supervision of the Grand Court of the Cayman Islands. On August 28, 2007, that court entered an order appointing the JPLs as Basis Yield's joint provisional liquidators. [4a]

As set forth in the petition, **[**5]** [5] Basis Yield is registered in the Cayman Islands, and maintains its registered office there. Basis Yield is the master fund in

_____

[3] Akers Decl. P 2.

[4] *Id.* P 1.

[4a] The Court has been advised that after the filing of the papers on this motion, the JPLs became "Joint Official Liquidators" by order of the Grand Court of the Cayman Islands. That does not affect the statutory or caselaw analysis set forth below.

[5] In accordance with the Court's Case Management Order # 1, dated Sept. 5, 2007, uncontroverted factual allegations in the petition have been taken as true. The petitioners also submitted an affidavit supporting allegations made in the petition, providing an additional basis for taking those allegations as true. But neither addresses factual matters that this Court requested the parties **[**6]** to address in an order it entered early in this case, and of course neither is conclusive with respect to matters of law.

a master-feeder structure. Its only "investors" are two feeder funds, Basis Yield Alpha Fund (US) ("BYAF (US)") and Basis Yield Alpha Fund ("BYAF"), both domiciled in the Cayman Islands. [6] Fortis Prime Fund Solutions (Cayman) Ltd., a Cayman Islands company, serves as the administrator to both Basis Yield and each of its feeder funds. [7] Pac-Rim Investments, Ltd., also a Cayman Islands company, is Basis Yield's investment manager. [8] Basis Yield's pre-filing **[*42]** attorneys and auditor, Walkers and Ernst & Young, respectively, are similarly Cayman Islands entities. The financial books and records of the fund, including the investor register, are currently located in the Cayman Islands.

However, the petition was strikingly silent as to the nature or extent of any business activity Basis Yield conducts (or in the relevant times conducted) in the Cayman Islands. Likewise, it was silent, *inter alia,* as to whether Basis Yield staffed any employees or managers in the Cayman Islands; whether any of its assets were in the Cayman Islands; and the location from which Basis Yield's funds were in **[**7]** fact managed. The failure to address these matters was commented upon in a submission by creditor Citigroup, [9] and in remarks at a hearing by Citigroup's counsel, [10] but in any event was apparent to any observer--including the Court, which did not need a stakeholder's written submission to note the

_____

[6] Supplement to Verified Petition P 3. "Investors" is not defined or explained, though another document suggests it means shareholders. *See* Verified Petition P 5. The JPLs have failed to provide any meaningful information concerning Basis Yield's "beneficial investors," the term they use to refer to the investors in the feeder funds and the ultimate equity stakeholders of Basis Yield.

[7] What Fortis Prime Fund Solutions does as "administrator" is not described, however, nor do the JPLs say where its employees do whatever they do.

[8] What Pac-Rim Investments does as "investment manager" is not described, however, nor do the JPLs say where its employees do whatever they do.

[9] *See* Citigroup Response to Debtors' Request for Entry of Preliminary Injunction, dated Sept. 5, 2007 (ECF # 10) at 2. Citigroup continued that without such information, neither creditors nor the Court could make any determination as to whether Basis has its "Center Of Main Interests" ("COMI") in the Cayman Islands (as necessary for recognition as a foreign main proceeding), or whether Basis maintains an establishment there (as necessary for recognition as a foreign nonmain proceeding). *See id.* at 3.

[10] *See* Tr. of Hrg. of Sept. 6, 2007, at 13-15.

deficiency. [11]

Following the hearing on the JPLs' request for a preliminary injunction blocking the continuation of litigation and seizure of assets, [12] at which scheduling for the future hearing on recognition was also discussed, the Court issued an order with respect to the factual matters raised by the petition, and the matters that had not been addressed in it. [13] The Factual Matters Order provided, *inter alia,* that the Recognition Hearing **[**9]** would be an evidentiary hearing. It further provided that without being foreclosed from introducing any other evidence that the JPLs might consider relevant or helpful to the Court in making the recognition determination, the JPLs were to use best efforts to introduce evidence sufficient for the Court to make **[*43]** factual findings with respect to a fair number of specified matters--some or all of which would at least arguably be relevant to a determination as to whether the Cayman Islands were Basis Yield's COMI, or whether Basis Yield maintained an establishment there.

---

[11] In supplements to their petition, the JPLs added allegations, which this Court likewise takes as true, that since filing their petition, the JPLs sought and obtained recognition from the High Court of Justice as Basis Yield's Joint Provisional Liquidators in England, where a "substantial amount" of Basis Yield's repurchase agreement **[**8]** counterparties are located, though they did not say that the English Court had recognized the Cayman Islands Proceeding as a foreign main proceeding, and, indeed, clarified at oral argument that the English Court proceeding "is not an UNCITRAL type proceeding," and "did not determine COMI." *See* Tr. of Hrg. of Jan. 15, 2008 at 49. They also added allegations that they had sought and obtained an order in Australia which, while apparently not granting recognition, had granted an application for orders compelling certain parties to turn over, among other things, documents and funds in their possession. By affidavit, they stated that third parties, including creditors, trading counterparties, and/or investors of Basis Yield, had appeared in the proceedings pending in the Cayman Islands and Australia, but that no foreign court or party appearing before a foreign court has challenged the basis for the liquidation proceeding in the Cayman Islands.

[12] Relief of this character was uncontroversial, and the Court granted the requested preliminary injunction (which carved out restrictions on rights parties might assert with respect to settlement payments, under repo agreements, and with respect to similar transactions), without prejudice to parties' litigation rights as to other issues in this case.

[13] *See* Order re Upcoming Hearing on Motion for Recognition, dated Sept. 12, 2007 (ECF # 16) (the "Factual Matters Order"). A copy follows this Decision as Appendix A.

Thereafter, however, the JPLs sought and obtained permission from the Court to file a motion for summary judgment **[**10]** in advance of the recognition hearing. They elected to rely on the limited factual showing they had made, without introducing evidence of the character addressed in the Factual Matters Order. They now argue, in substance, that because Basis Yield's registered office is in the Cayman Islands, the Cayman Islands is presumed to be the COMI, under section 1516 of the Code, discussed below--and that with no objections having been filed, there is no evidence to the contrary. Thus, they argue, this Court *must* recognize the Cayman Islands Proceeding as a foreign main proceeding, as a matter of law.

## Discussion

### I.

### Summary Judgment Standard

*HN2*[⬆]] Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." [14] The moving party bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of law. [15]

*HN3*[⬆]] In determining a summary judgment motion, it is well settled that the court should not weigh the evidence or determine the truth of any matter, and must resolve all ambiguities and draw all reasonable inferences against the moving party. [16] *HN4*[⬆]] A fact is

---

[14] FED. R. CIV. P. 56(c), made applicable here by FED. R. BANKR. P. 9014 and Case Management Order # 1.

[15] *See Rodriguez v. City of New York,* 72 F.3d 1051, 1060-61 (2d Cir. 1995); **[**11]** *Ferrostaal, Inc. v. Union Pacific R.R. Co.,* 109 F. Supp. 2d 146, 148 (S.D.N.Y. 2000) ("The initial burden rests on the moving party to demonstrate the absence of a genuine issue of material fact…").

[16] *See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (holding that summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party"); *Virgin Atlantic Airways Ltd. v. British Airways PLC,* 257 F.3d 256, 262 (2d Cir. 2001); *Lovejoy-*

material if it "might affect the outcome of the suit under the governing law." [17] An issue of fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." [18]

## II.

### Chapter [**12] 15 of the Code

Chapter 15 of the Bankruptcy Code was enacted in 2005 to implement the Model Law on Cross-Border Insolvency (the "Model Law") formulated by the United Nations Commission on International Trade Law ("UNCITRAL") in a process in which the United States was an active participant. The language of chapter 15 tracks the Model Law, with some modifications that are designed to conform the Model Law with existing United States law. [19] [*44] Chapter 15 is fundamentally procedural in nature and does not constitute a change in the basic approach of United States law, which has long been one of honoring principles of comity. [20] Those principles appear, with other purposes of chapter 15, in the first section of that chapter, section 1501. As noted by Judge Drain of this Court:

> Unique to the Bankruptcy Code, [chapter 15] contains a statement of purpose: "[t]he purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency … so as to provide effective mechanisms for dealing with cases of cross-border insolvency," with the express objectives of cooperation between United States courts, trustees, examiners, debtors and debtors in possession and the courts and other competent

---

*Wilson v. NOCO Motor Fuel, Inc.,* 263 F.3d 208, 212 (2d Cir. 2001) ("We…constru[e] the evidence in the light most favorable to the non-moving party.").

[17] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

[18] *Id.*

[19] *In re Iida,* 377 B.R. 243, 256 (B.A.P. 9th Cir. 2007). *See also In re Tri-Cont'l Exch. Ltd.,* 349 B.R. 627, 631-32 (Bankr. E.D. Cal. 2006) ("*Tri-Continental Exchange*"); H.R. REP. No. 109-31, at 105-07 (2005), *as reprinted in* 2005 U.S.C.C.A.N. 88, 167; Jay Lawrence Westbrook, *Chapter 15 at Last,* 79 AM. BANKR. L.J. 713, 720 (2005) ("Westbrook I") (all cited in *Iida*).

[20] *Iida,* 377 B.R. at 256; *Tri-Continental Exchange,* 349 B.R. at 725.

[**13] authorities of foreign countries; greater legal certainty for trade and investment; fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested entities, including the debtor; the protection and maximization of the debtor's assets; and the facilitation of the rescue of financially troubled businesses. [21]

## III.

### Recognition Under Chapter 15

**HN5[↑]** ] Section 1509 of the Code [22] erects a structure in which the foreign representative passes through the

---

[21] *In re SPhinX, Ltd.,* 351 B.R. 103, 112 (Bankr. S.D.N.Y. 2006) (Drain, J.) ("*SPhinX-Bankruptcy*"), *aff'd* 371 B.R. 10 (S.D.N.Y. 2007) (Sweet, J.) ("*SPhinX-District*").

[22] Section 1509 provides, in relevant part:

> **HN6[↑]** ] (a) A foreign representative may commence a case under section 1504 by filing directly with the court a petition for recognition of a foreign proceeding under section 1515.
>
> (b) If the court grants recognition under section 1517, and subject to any limitations that the court may impose consistent with the policy of this chapter--
>
>> (1) the foreign representative has the capacity to sue and be sued in a court in the United States;
>>
>> (2) the foreign representative may apply directly to a court in the United States for appropriate relief in that court; and
>>
>> (3) a court in the United States shall grant comity or cooperation to the foreign representative.
>
> …
>
> (d) If the court denies recognition under this chapter, the court may issue any appropriate order necessary to prevent the foreign representative from obtaining comity or cooperation from courts in the United States.
>
> …
>
> (f) Notwithstanding [**15] any other provision of this section, the failure of a foreign representative to commence a case or to obtain recognition under this chapter does not affect any right the foreign representative may have to sue in a court in the United States to collect or recover a claim which is the property of the debtor.

bankruptcy court for a recognition decision, the specified consequences of which are that the [**14] foreign representative gains the capacity to sue and be sued in United States courts and the authority to apply directly to a court in the United States for appropriate relief, and that all courts in the United States must grant comity or cooperation to the foreign [*45] representative. 23

Congress provided that control of these questions would be concentrated in the bankruptcy court; 24 HN7[⬆] after a grant of recognition by the bankruptcy court (and subject to any limitations that the bankruptcy court may impose consistent with chapter 15 policy), access, comity and cooperation in other United States courts is mandatory. 25 Conversely, if the bankruptcy court denies recognition, it may issue any appropriate order necessary to prevent the foreign representative from obtaining comity or cooperation from courts in the United States. 26 Thus a decision as to recognition is a serious matter.

Section 1502 of the Code sets forth definitions for use under chapter 15. One of them, section 1502(7), defining "recognition," provides that

> HN8[⬆] ] "recognition" means the entry of an order granting recognition of a foreign main proceeding or foreign nonmain proceeding under this chapter….

HN9[⬆] ] Section 1517 of the Code sets forth the requirements for an order granting recognition, and sets forth a statutory directive that (subject to an exception inapplicable here) when those requirements have been satisfied, a recognition order *shall* be entered. Section

---

23 *See Iida,* 377 B.R. at 257; *In re Loy,* 380 B.R. 154, 2007 Bankr. LEXIS 4392, 2007 WL 4532092, at *4 (Bankr. E.D. Va. Dec. 18, 2007) (following *Iida*).

24 *Iida,* 377 B.R. at 257.

25 *See* section 1509(b)(3) (if the bankruptcy court grants recognition under section 1517, and subject to any limitations that the court may impose consistent [**16] with chapter 15, "a court in the United States shall grant comity or cooperation to the foreign representative").

In addition, one of the sections of the Code that addresses the effects of a recognition determination, section 1521, provides that after recognition, the foreign representative may petition the bankruptcy court for a host of relief available to a trustee under the United States Bankruptcy Code. *See Loy,* 2007 Bankr. LEXIS 4392, 2007 WL 4532092, at *4.

26 *See* section 1509(d).

1517 provides, in relevant part:

> HN10[⬆] ] (a) Subject to section 1506, 27 after notice and a hearing, an order recognizing a foreign proceeding shall be entered if--
>
> > (1) such foreign proceeding for which [**17] recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
> > (2) the foreign representative applying for recognition is a person or body; and
> > (3) the petition meets the requirements of section 1515.
>
> (b) Such foreign proceeding shall be recognized--
>
> > [*46] (1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or
> > (2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.

Thus, in contrast to the jurisprudence that developed under section 304 that emphasized discretion and flexibility (and that permitted U.S. judicial assistance for a wide array of judicial insolvency proceedings abroad), the new recognition regime under chapter 15 is procedurally quite rigid. 28 To prevail on a petition for

---

27 Section 1506 of the Bankruptcy Code provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." This provides a safety valve which permits denying recognition in any such instances. But as Judge Drain noted in *SPhinX-Bankruptcy, see* 351 B.R. at 115 n. 15, according to the legislative history, this provision "has been narrowly interpreted on a consistent basis in courts around the world. The word 'manifestly' in international usage restricts the public policy exception [**18] to the most fundamental policies of the United States." *See also In re RSM Richter v. Aguilar (In re Ephedra Prods. Liab. Litigation),* 349 B.R. 333 (S.D.N.Y. 2006) (Rakoff, J.) ("*Ephedra Products Liability Litigation*") (recognizing that principle, and declining to find a section 1506 exception with respect to proceedings in Canada for that reason). There has been no suggestion, or indication, that a section 1506 exception should be found to be applicable here. The Court emphasizes that the issues before the Court on this motion have nothing whatever to do with the fairness of Cayman Islands law, or the fairness of the Cayman Islands courts.

28 *See* Jay Lawrence Westbrook, *Locating the Eye of the*

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 193 of 882

Page 176 18

381 B.R. 37, *46; 2008 Bankr. LEXIS 67, **18

recognition, the JPLs must satisfy each of the three requirements of section 1517(a) of the Code.

## IV.

## Application to the Facts Here

Here there is no question that the JPLs have satisfied two of the three requirements of section 1517(a). The JPLs are "persons" within the meaning of section 101(41) [29] and are "foreign representatives" within the meaning of section 101(24), [30] thus complying with the requirements of section 1517(a)(2). Similarly, the JPLs have fulfilled the application prerequisites set forth in section 1515, [31] thereby comporting with the requirements of 1517(a)(3).

---

*Financial Storm,* 32 BROOKLYN J. INT'L L. 1019, 1024 (2007) ("Westbrook II") **[**19]** ("The Model Law grants great discretion as to specific relief, but imposes a fairly rigid procedural structure for recognition of foreign proceedings."); Daniel Glosband, *SPhinX Chapter 15 Opinion Misses the Mark,* 25 AM. BANKR. INST. J. 44, 45 (December/January 2007) ("Glosband") ("[F]oreign proceedings are eligible for recognition only if they meet the definitional requirements of either a foreign main proceeding or a nonmain proceeding ?."); *Bear Stearns,* 374 B.R. at 126 (quoting Westbrook II and Glosband).

[29] Section 101(41) provides, in relevant part, ***HN11***[⬆] "[t]he term 'person' includes individual . . ." 11 U.S.C. § 101.

[30] Section 101(24) provides, in relevant part, ***HN12***[⬆] "[t]he term 'foreign representative' means **[**20]** a person or body . . . authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." *Id.* at § 101. Paragraph 1(e) of the Joint Provisional Liquidator Order issued in the Grand Court of the Cayman Islands on August 28, 2007 clearly designates the petitioners as representatives of the Cayman Proceeding for the purposes of obtaining relief under Chapter 15.

[31] Section 1515(b) requires that ***HN13***[⬆] "[a] petition for recognition be accompanied by - (1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative; (2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or (3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative." *Id.* at § 1515(b).

The motion then turns on whether the JPLs have complied with the requirements of section 1517(a)(1)--*i.e.,* whether the JPLs have shown that "such foreign **[**21]** proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502." And because the JPLs have sought summary judgment granting recognition as a *main* proceeding, the Court has the related questions as to whether, on the evidence now before the Court, they have shown the propriety of such as a matter of law, and without regard to any other facts--and whether the Court has the right to consider all of the facts when the JPLs elected not to put **[*47]** them forth, and instead elected to rely on a statutory presumption embodied in section 1516 of the Code, discussed below. [32]

## A. Requirements of Sections 1517 and 1502 for a "Main Proceeding"

***HN14***[⬆] A "foreign main proceeding" is defined, in chapter 15's Definitions section, section 1502(4), as a "foreign proceeding pending in the country where the debtor has the center of its main interests" (referred to in fn. 9 above, and elsewhere, as the "COMI"). [33] The Bankruptcy Code does not define COMI, and does not prescribe the type of evidence courts should consider in a COMI analysis.

However, prior ***HN15***[⬆] courts have looked to an array

---

[32] In a conference call with the Court, the JPLs sought and obtained permission to file for summary judgment, and to rely on the presumption in lieu of producing the evidence that had been required under the Factual Matters Order. That excuses them from their earlier obligation to comply with the Factual Matters Order. But it does not excuse them from the *consequences* of having failed to provide additional evidence. Since, as the Court now holds, the JPLs here cannot rely on the presumption as a substitute for real evidence, the JPLs will have to comply **[**22]** with the Factual Matters Order when they continue to seek recognition.

[33] By contrast, a "foreign nonmain proceeding" is defined as any other proceeding "pending in a country where the debtor has an establishment." *Id.* at 1502(5). And "establishment" is defined as "any place of operations where the debtor carries out a nontransitory economic activity." *Id.* at § 1502(2). Though the JPLs seeks recognition of the Cayman Islands Proceeding as a nonmain proceeding as an alternative prayer for relief in their petition, they are not seeking recognition of it as a nonmain proceeding under this motion for summary judgment.

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 194 of 882

Page 17 of 18

381 B.R. 37, *47; 2008 Bankr. LEXIS 67, **22

of factors that could be probative in this regard, including: "the location of **[\*\*23]** the debtor's headquarters; the location of those who actually manage the debtor (which conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply in most disputes." [34] While certainly not exhaustive or all necessarily applicable in this or any other case, these objective factors are indicative of the facts a court might find relevant in a COMI determination. [35]

As importantly or more so, as Judge Lifland, one of the authors of the Model Law and chapter 15, [36] observed:

> [T]he use of the concept "where the debtor has the centre of its main interests" as the determinant that a foreign proceeding is a "main" proceeding was modeled on the use of that concept in the European Union Convention on Insolvency Proceedings ("EU **[\*\*24]** Convention") that was already in the process of being adopted when UNCITRAL drafted the Model Law. [37]
>
> In the regulation adopting the EU Convention, the COMI concept is elaborated upon as "the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." [38]

**[\*48]** This generally equates with the concept of a "principal place of business" in United States law. [39]

In this case, however, and significantly, none of the

---

[34] *SphinX-Bankruptcy,* 351 B.R. at 117. *See also Bear Stearns,* 374 B.R. at 128.

[35] The Court asked for evidence as to these and other matters, see page 42, *supra,* while making it clear that the JPLs would not be limited to evidence of the type the Court requested.

[36] *See Bear Stearns,* 374 B.R. at 127 n.3.

[37] *Id.* at 129.

[38] *Id.* (quoting Council Reg. (EC) No. 1346/2000, P 13). *See also* Case 341/04, *Bondi v. Bank of America, N.A. (In re Eurofood IFSC Ltd.),* 2006 E.C.R. I-3813, p. I8-I9, P 32, 2006 WL 1142304 (E.C.J. May 2, 2006).

[39] *See In re Tri-Continental Exchange,* 349 B.R. at 633-34; *Bear Stearns,* 374 B.R. at 129.

papers filed by the JPLs to date have addressed, in any meaningful way, any of those factors. The silence is deafening. The JPLs' conspicuous failure to try to establish, or even plead, facts supporting the existence of a main proceeding, even after the Citigroup submission and the Court's own questions in this regard, makes any reasonable observer wonder why. As **[\*\*25]** importantly or more so, the failure of Citigroup ultimately to file an objection does not make the issues Citigroup noted go away--and, as noted, the issues were obvious in any event.

Thus, the Court has questions that need to be answered, unless the JPLs are legally excused from answering them.

## B. Use of Section 1516

As a proxy for the submission of evidence, the JPLs rely on section 1516(c) of the Code. That section provides:

> *HN16* [⬆] In the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests.

The JPLs argue that in the absence of any objections or facts in the record that could put in question the location of Basis Yield's COMI, they are entitled to this presumption. Therefore, their argument continues, if the other recognition requirements have been met, summary judgment recognizing the Cayman Islands Proceeding--and, indeed, as a foreign main proceeding--*must* be granted.

But the Court cannot endorse that approach, and find that that there is a section 1517 qualification as a matter of law, for two separate reasons. Here there is evidence to the contrary. And the Court's **[\*\*26]** power to examine the facts underlying a request for recognition under section 1517, and to inquire under Fed. R. Evid. 614, cannot be sidestepped or eliminated by elections to not plead or introduce the relevant facts

## 1. Evidence to the Contrary

First, the Court here sees enough "evidence to the contrary"--organization of the Debtor under a Cayman Islands statute that raises red flags as to whether that jurisdiction could be the Debtor's COMI-- to decline to use a section 1516 presumption as a substitute for actual evidence. Among the few facts that have been put forward here is the fact that Basis Yield was

incorporated as an "exempted company" under section 193 of the Cayman Companies Law. [40] Concerns on the part of the Court arise by reason of what section 193, and other sections of the Cayman Companies Law relating to "exempted companies," provide.

Section 193 of the Cayman Companies Law provides:

> HN17[⬆️] An exempted company shall not trade in the Islands with any person, firm or corporation except in furtherance of the business of the exempted company carried on *outside* the Islands:
>
> Provided that nothing in this section shall be construed so as to prevent the exempted **[**27]** company effecting and concluding contracts in the Islands and exercising in the Islands all of its powers **[*49]** necessary for the carrying on of its business *outside* of the Islands. [41]

As significantly or more so, section 184 of the Cayman Companies Law provides:

> HN18[⬆️] A proposed exempted company applying for registration as an exempted company shall submit to the Registrar a declaration signed by a subscriber to the effect *that the operation of the proposed exempted company will be conducted mainly outside the Islands.* [42]

Without more in the way of facts and explanation, there is at least a question in the Court's mind as to whether this exempted company, organized under section 193, and whose **[**28]** representative at least seemingly was required to sign a declaration of the type required under section 184, would have its COMI in the Cayman Islands. If the "operation of the … exempted company will be conducted mainly outside the … Islands," consistent with the representation required to be made under section 184, is it clear, as a matter of law, in the

absence of any additional facts, that the exempted company's principal place of business [43] nevertheless is in the Islands? The Court does not now rule out circumstances under which Basis Yield could engage in activities in the Cayman Islands sufficient to make a COMI showing and still comply with the requirements applicable to exempted companies. [44] But the facts that would support such have not been shown here. While the Court expresses no view on the relevance of section 193 to recognition of a nonmain proceeding (an issue not presented on this motion), it is hardly surprising to this Court that in *Bear Stearns,* on the facts there presented, Judge Lifland considered recognition as a main proceeding of a Cayman Islands insolvency for an "exempted company" organized under section 193 to be inappropriate. [45]

As Judge Klein observed in *Tri-Continental Exchange:*

> [I]f the HN20[⬆️] foreign proceeding is in the country of the **[**30]** registered office, and if there is evidence that **[*50]** the center of main interests might be elsewhere, then the foreign representative must prove that the center of main interests is in the same country as the registered office. [46]

Thus, unless the Court is bound, by section 1516 of the Code or otherwise, to close its eyes to these issues, the Court needs evidence relevant to the Debtor's COMI,

---

[40] *See* Akers Decl. P 2.

[41] Emphasis added. Although there is also a 2007 Revision to the Cayman Companies Law, it appears that neither section 193 nor sections 184 and 182, discussed below, was amended.

[42] Emphasis added. To the same effect, though less specific and arguably saying something slightly different, is section 182 of the Cayman Companies Law:

> HN19[⬆️] Any proposed company applying for registration under this Law, *the objects of which are to be carried out mainly outside the Islands,* may apply to be registered as an exempted company.

---

[43] Or COMI, to the extent **[**29]** that might be regarded as different.

[44] Likewise, the Court is not now holding that compliance with section 193 and the related provisions of the Cayman Companies Law precludes, in all cases, a judicial determination that the exempted company's COMI is in the Cayman Islands.

[45] *See Bear Stearns,* 374 B.R. at 130-31 & n. 13. Similarly, while Judge Drain in *SPhinX-Bankruptcy* ultimately based the denial of main proceeding recognition on the petitioners' improper purpose, he manifestly did not rule that a showing of a Cayman Islands COMI had been made in that case. To the contrary (albeit with a more extensive factual record), he observed that "important objective factors point[ed] to the Sphinx Funds' COMI being located outside the Cayman Islands." 351 B.R. at 119. *See also* Judge Sweet's analysis in *SPhinX-District,* 371 B.R. at 19 ("Based on the facts found, the Bankruptcy Court rightly concluded that objective factors ascertainable to third parties pointed to the SPhinX Funds' COMI not being located within the Cayman Islands, thereby sufficiently rebutting the statutory presumption.").

[46] 349 B.R. at 635.

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 196 of 882
Page 18 of 18

381 B.R. 37, *50; 2008 Bankr. LEXIS 67, **29

and any main proceeding determination. This is not to say that the JPLs would be unable to make the necessary showing (or the lesser showing required for a nonmain proceeding determination); it is only to say that the Court needs more information. [47]

### 2. Court's Power to Examine

Second, the Court has the power to satisfy itself that the requirements for recognition under section 1517 have been satisfied, and has a right like any other federal court to inquire under Fed. R. Evid. 614. This or any other federal court would **[**31]** have the same power to inquire, if it were so advised, if the JPLs had been even less forthcoming in putting forward relevant facts, and had not stated that Basis Yield is an exempted company under Cayman Islands law. *HN21*[⬆️] The court's power to ascertain the facts cannot be sidestepped by failures to object. Nor can it be sidestepped by elections not to plead or introduce inconvenient facts.

Textual analysis--where the Court normally starts in any matter of statutory interpretation--is not inconsistent with this conclusion, but is inconclusive. Section 1517 sets forth substantive requirements that must be satisfied. But sections 1517 and 1516 are silent as to whether or not the court's power to ascertain the facts incident to a section 1517 determination is revoked by parties' failures to object--though section 1517 plainly does *not* say that consent is a substitute for the substantive requirements of that section, or that parties' failures to object deprive the court of the power federal courts customarily exercise when determining whether the requirements of statutes have been satisfied.

Similarly, section 1516(c) would have been clearer (and truer to its stated purpose, see below) if it **[**32]** provided that in the absence of evidence to the contrary, the court "is entitled to presume" that the debtor's registered office is the COMI--rather than providing that the registered office "is presumed" to be the COMI. But neither does section 1516 say that in the absence of objection, the presumption is irrebuttable, or that the court "shall" presume that the registered office is the COMI--which is the normal way of establishing a statutory directive that is binding on a judge.

---

Significantly, each of sections 1517(a), 1517(b), and 1517(c), describing the underlying recognition process, *do* employ the word "shall." And section 1516 does not say, at least expressly, that it trumps the need even to *set forth in a petition* the facts underlying the prima facie case required under section 1517(a).

But while textual analysis does not resolve the relevant questions, the legislative history, caselaw, and the published views of commentators--several of whom, like Judge Lifland, were drafters of the Model Law and chapter 15--answer those questions clearly and consistently. All make clear that in making a section 1517 determination, the Court is not bound by parties' failures to object, and that **[**33]** the **[*51]** section 1516 presumption need not be blindly followed.

### (a) Do Failures to Object Bind the Court?

That failures to object is not conclusive is established by, at the least, legislative history and caselaw. One of the sources that a United States court at least *may* look to, if it is not also *obliged* to treat as persuasive, [48] is the *Guide to Enactment of the UNCITRAL Model Law on Insolvency* (the "*Guide*"), [49] that was promulgated in connection with the approval of the Model Law. As provided in the *Guide,* in its discussion of Article 16 of the Model Law (which sets forth the presumption implemented in the United States in the form of section 1516):

> Article 16 establishes presumptions that allow the court to expedite the evidentiary process; at the same time they do not prevent, in accordance with the applicable procedural law, calling for or assessing other evidence if the conclusion suggested by the presumption is called into

---

[47] The Court notes that none of *Tri-Continental Exchange, SPhinX-Bankruptcy,* or *Bear Stearns* involved an effort to secure recognition (as a main or nonmain proceeding) on summary judgment, and that each was decided only after extensive factual presentation and analysis.

---

[48] *See Bear Stearns,* 374 B.R. at 129 (a United States court "may look to" the Guide as persuasive); H.R. REP. No. 109-31(I), at 106 n.101, *as reprinted in* 2005 U.S.C.C.A.N. 169 n.101 (the Guide "should be consulted for guidance as to the meaning and purpose of [Chapter 15's] provisions"); *Ephedra Products Liability Litigation,* 349 B.R. at 336 (quoting the House Report, and noting that the House Judiciary Committee, in enacting Chapter 15, specifically indicated that the *Guide* should be consulted); *Tri-Continental Exchange,* 349 B.R. at 633 (the *Guide* is one of the sources that a United States Court is "obliged" to take as persuasive).

[49] U.N. Gen. Ass., UNCITRAL 30th Sess., U.N. Doc. A/CN.9/442 (1997).

question *by the court or* an interested party. [50]

Thus the *Guide* does not require that the presumption be called into question by an interested party. To the contrary, it states, explicitly, that the conclusion suggested by the presumption may likewise be "called **[**34]** into question by the court."

Consistent with that, in *Bear Stearns,* Judge Lifland held that parties' failures to object were not binding upon him in determining that the requirements of section 1517 were satisfied. In connection with the requests for recognition (as main or, alternatively, nonmain, proceedings) in that case, one group of parties filed an ambiguous statement with respect to choice of law issues, and no other party filed a response or objection **[**35]** to the relief requested. Nevertheless, Judge Lifland found that not to be conclusive. After expressly noting the lack of objection, he continued:

> However, *HN22*[⬆] recognition under section 1517 is not to be rubber stamped by the courts. This Court must make an independent determination as to whether the foreign proceeding meets the definitional requirements of sections 1502 and 1517 of the Bankruptcy Code. [51]

Further on in *Bear Stearns,* Judge Lifland expanded on that:

> The Petitioners basically argue *that because no objections have been filed* and the Funds' registered offices are in the Cayman Islands, this Court should recognize the Foreign Proceedings as main proceedings. In other words, the Petitioners contend that this Court should accept the proposition that the Foreign Proceedings are main proceedings because the Petitioners say so and *because no one else says they aren't. This contention must be rejected.* [52]

**[*52]** Though Judge Lifland noted that there was dicta in *SPhinX-Bankruptcy*--relied upon the JPLs here [53]--suggesting that if the parties in interest had not objected to the Cayman Islands proceeding being recognized as

main, recognition would have been granted, Judge Lifland disagreed with **[**36]** it: "[t]o the extent that non objection would make the recognition process a rubber stamp exercise, this Court disagrees with the dicta in the *SPhinX* decision." [54]

Finally, commentators--including members, along with Judge Lifland, of the Model Act and chapter 15 drafting groups--have (so far as this Court can tell, uniformly) endorsed Judge Lifland's analysis, and/or agreed with the view, expressed by the *Guide* and Judge Lifland, that the court always has the power to make its own determination on qualification under section 1517, notwithstanding the presence of section 1516 and the absence of an actual objection. [55]

Moreover, the procedural posture **[**37]** in the instant case is relevant to the determination of whether a lack of objections binds the Court. *HN23*[⬆] A court may properly deny a motion for summary judgment, even where no opposing evidentiary matters are presented, when the movant bears the burden of proof at trial and fails to establish the absence of genuine issues of fact. [56] As discussed in more detail below, both caselaw and legislative history confirm that the burden of proof as to each element of a petition for recognition is on the foreign representative. [57] The absence of objections to recognition here neither obviates the JPLs' evidentiary burden nor prevents the Court from concluding on the current record that genuine issues of material fact exist so as to prevent determination as a matter of law.

*(b) Is the Court Bound by the Section 1516 Presumption?*

Finally, the Court **[**38]** determines that *HN24*[⬆] the

---

[50] *Guide* P 122 (emphasis added).

[51] 374 B.R. at 126.

[52] *Id.* at 129 (footnote omitted; emphasis added).

[53] *See* JPLs Br. at 7, 10.

[54] 374 B.R. at 130. With the benefit of the extensive discussion of this topic that has followed the earliest analysis of it a year and a half ago, this Court concurs with Judge Lifland's analysis, for the reasons stated above and below.

[55] *See* Glosband, *supra* note 28, at 84; Westbrook II, *supra* note 28, at 1033-34; Kathy Yeatter, *Judicial Vagaries and Their Potential Impact on the Valuation of Distressed Debt,* 26 AM. BANKR. INST. J. 50, 52, 53 (Nov. 2007).

[56] *See, e.g., Resolution Trust Corp. v. Gill,* 960 F.2d 336, 340 (3rd Cir. 1992) ("However, where the movant bears the burden of proof at trial and the motion does not establish the absence of a genuine factual issue, the … court should deny summary judgment even if no opposing evidentiary matter is presented.").

[57] *See Tri-Continental Exchange,* 349 B.R. at 635.

section 1516 presumption exists for the purposes of speed and convenience, and to save stakeholders costs in straightforward cases, but does not tie the hands of a court to examine the facts more closely in any instances where the court regards the issues to be sufficiently material to warrant further inquiry.

Judge Lifland expressly so held in *Bear Stearns.* [58] And Judges Drain and Sweet noted the speed and convenience purpose in *SPhinX-Bankruptcy* and *SPhinX-District.* As Judge Sweet stated **[*53]** in *SPhinX-District,* quoting Judge Drain's *SPhinX-Bankruptcy* observations approvingly:

> As recognized by the Bankruptcy Court: "The legislative history [ ] indicates that the statutory presumption of § 1516(c) may be of less weight in the event of a serious dispute: '[t]he presumption that the place of the registered office is also the center of the debtor's main interest is included for speed and convenience of proof where there is no serious controversy.'" [59]

As previously noted, the Guide explains that the Model Act's presumption, embodied in the U.S. Bankruptcy Code's section 1516, does "not prevent, in accordance with applicable procedural law, *calling for* or assessing other evidence if the conclusion suggested by the presumption is called into question *by the court* or an interested party." [60] The court's ability to "call[] for" other evidence is expressly noted in the *Guide.* And as noted by the European Court of Justice, the COMI presumption may be overcome "particular[ly] in the case of a 'letterbox' company not carrying out any business in the territory of the Member State in which its registered office is situated." [61]

_____

[58] *See* 374 B.R. at 129 (noting the *Eurofood* observation that the presumption may be overcome "particular[ly] in the case of a 'letterbox' company not carrying out any business" in the territory of its registered office, and the **[**39]** provisions of the *Guide,* expressly noting that the presumption does not prevent calling for evidence if the conclusion suggested by the presumption is called into question by the court).

[59] *SPhinX-District,* 371 B.R. at 18 (quoting *SPhinX-Bankruptcy,* 351 B.R. at 117, which in turn had quoted the House Report, H.R. REP. NO. 109-31, pt. 1, at 112-13 (2005)).

[60] Emphasis added.

[61] *See Eurofood, supra* note 38, at PP 34, 35; *see also SPhinX-District,* 371 B.R. at 19 (same, citing *Eurofood*).

**HN25**[⬆] A presumption imposes on the party against **[**40]** whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which remains throughout the trial upon the party on whom it was originally cast. [62] **HN26**[⬆] Section 1516(c) merely creates a rebuttable presumption and does not shift the burden of proof in supporting a petition for recognition. [63] As Judge Klein noted in *Tri-Continental Exchange,* the word "proof" in subsection (3) was changed to "evidence" to make it clearer using United States terminology that the ultimate burden is on the foreign representative. [64]

As Judge Klein also noted in *Tri-Continental Exchange,* the House Report for the chapter 15 amendments provided:

> Although sections 1515 and 1516 are designed to make recognition as simple and expedient as possible, the court *may hear* **[**41]** *proof on any element stated.* The ultimate burden as to each element is on the foreign representative, although the court is *entitled to* shift the burden to the extent indicated in section 1516. [65]

Thus the court is "entitled to" shift the burden to the extent indicated in section 1516, but does not need to, if it is uncomfortable that a prima facie case has been shown.

Finally, the Court's right to call for other evidence is confirmed not just by the *Guide,* but also by the Federal Rules of Evidence. Rule 614 **[*54]** provides, in relevant part:

> **HN27**[⬆] ] (a) Calling by court. The court may, on its own motion or at the suggestion of a party, call witnesses, and all parties are entitled to cross-examine witnesses thus called.
>
> (b) Interrogation by court. The court may interrogate

_____

[62] FED. R. EVID. 301.

[63] *See Tri-Continental Exchange,* 349 B.R. at 635 ("The registered office, however, does not otherwise have special evidentiary value and does not shift the risk of nonpersuasion, i.e. the burden of proof, away from the foreign representative seeking recognition as a main proceeding.").

[64] 349 B.R. at 635 n.8.

[65] *Id.* (quoting H.R. REP. NO. 109-31, at 112-13, *as reprinted in* 2005 U.S.C.C.A.N. 88, 175 (emphasis added)).

witnesses, whether called by itself or by a party.

Subsection (a) of Rule 614 is particularly relevant. Just as the *Guide* says that the presumption does not prevent "calling for or assessing other evidence if the conclusion suggested by the presumption is called into question by the court," Rule 614(a) gives the court the right, **[**42]** on its own motion, to *call* witnesses. Granting summary judgment here would deny the Court that right. As the Committee Notes with respect to Rule 614(a) provide, "the authority of the judge to call witnesses is well established." The court's right to call witnesses, on its own motion, ensures that "the judge is not imprisoned within the case as made by the parties." [66]

The showing here can be compared and contrasted to the showings that have been made in all of the other chapter 15 cases that have come up on this Court's watch--in all of which the Court granted the requested recognition, or would in the absence of objection. [67] As

---

[66] FED. R. EVID. 614 Committee Notes for 1972 Proposed Rules.

[67] *See In re Daewoo Corp.,* 06-12242 (REG) (Korean insolvency proceeding for the flagship company of the Daewoo Group, one of the largest industrial conglomerates in Korea, recognized as foreign main proceeding); *In re AXA Insurance UK PLC,* 07-07-12110 (REG); *Eccleasiastical Insurance Office PLC,* 07-12111 (REG); *Global General and Reinsurance Co. Ltd,* 07-12112 (REG); *MMA IARDD Assurance Mutuelles,* 07-12113 (REG) (in jointly administered case, English insolvency proceeding for three UK and one non-UK company, all writing reinsurance business in the London market, recognized as main proceeding for the UK companies, and nonmain proceeding for the non-UK company, where alleged, with respect to the UK companies, that "their principal place of business is the UK," and alleged, for the nonmain proceeding **[**44]** recognition for the non-UK company, that it transacted insurance business in England and maintained an establishment there); *In re Europaische Ruckversicheruns-Gesellschaft in Zurich (European Reinsurance Co. of Zurich),* 06-13061 (REG) (English insolvency proceeding for Swiss reinsurance company doing business in the London market recognized as nonmain proceeding). In one other chapter 15 case before this Court, *In re ING Re (UK) Ltd.,* 08-10018 (REG) ("*ING Re*"), a recently filed case with a petition stating that the debtor is headquartered in London and has written insurance in the London market, the matter of recognition is pending. Parties have not yet been heard on whether there is any dispute as to those allegations, or as to whether there are any facts suggesting that its English insolvency proceeding should not be regarded as a main proceeding.

a prototypical example of the kind of petition that would be satisfactory in the absence of an objection, the petition for *ING Re* states that the company, a reinsurance company, "is headquartered in London, England"; "its assets are primarily located in England"; "[t]he Company began writing business in the London Market in July 1997"; and "[t]he reinsurance contracts that will be affected by the Scheme of Arrangement were written predominantly from the Company's headquarters in London." [68] Simple **[**43]** allegations of this type would normally be more than sufficient to give a court comfort that reliance on the section 1516 presumption is appropriate, in the absence of an objection and/or any other evidence to the contrary. Of course, in light of the allegations that have been typical in the other section 1517 petitions that **[*55]** this Court has seen, the omissions in this case were particularly striking.

Thus, *HN28*[⬆] while recognition *may* be granted under a section 1516 presumption (and often that will be appropriate and in the joint interests of parties and the court), the Court cannot agree that it *must* be granted. The JPLs inappropriately transform a labor saving presumption in instances where the basis **[**45]** for recognition is apparent to one that would tie the hands of a court to inquire into the actual facts, in cases where the circumstances require more scrutiny--making recognition turn not on compliance with the requirements of section 1517, but on the happenstance of whether parties might or might not object. Such a result would be exactly *inconsistent* with one of chapter 15's expressly stated purposes, providing predictability to the financial community. [69]

Conclusion

This Court shares the attitude of hospitality and willingness to grant comity that underlies the great bulk of section 304 and chapter 15 jurisprudence, and feels no differently with recognition requests under section 1517. And plainly section 1516 provides for a time and labor saving process that is useful. In most cases, the fact that a jurisdiction is a debtor's COMI (or a place where it has an establishment) will be obvious, or will

---

[68] *See ING Re* Petition at PP 5, 6, 10.

[69] *See* Bankruptcy Code section 1501 (including, as one of chapter 15's objectives, "greater legal certainty for trade and investment"); Westbrook II, *supra* note 28, at 1019 (noting the importance of predictability in making COMI determinations).

appear from facts set forth in the petition **[\*\*46]** or an accompanying affidavit--especially if members of the bar wishing to invoke section 1516 simply include basic statements, in the petition or an affidavit, of the type that other petitioners have provided to this Court. When facts showing a COMI are already known or have been put forth, and there is no opposition, the Court would hardly suggest that further evidence with respect to recognition would be necessary; it would be in exactly such a circumstance that the section 1516 presumption would be very useful, and would rarely, if ever, be second-guessed. In fact, the Court would be saddened if the pendulum swung too far the other way, depriving parties of the use of the section 1516 presumption when allegations in their petitions or statements in their affidavits foreclose any real controversy.

But the decision necessarily must remain with the court, which may be satisfied with reliance on the presumption or not, consistent with its ultimate responsibility, and power, to determine that the requirements of sections 1502 and 1517 are satisfied.

In this case, genuine issues of material fact exist as to the location of Basis Yield's COMI. While the Court does not in any way rule out **[\*\*47]** the possibility that facts could be adduced at an evidentiary hearing sufficient to make a case for entitlement to recognition, the JPLs are not now entitled to recognition as a matter of law.

Summary judgment is denied. Consistent with the requirements of section 1517(c), the Court will hold the evidentiary hearing on the matter of recognition at the earliest practical time. The JPLs' evidentiary presentations shall be made in accordance with Case Management Order # 1, subject to an adjustment of time with respect to the submission of direct testimony affidavits; they will be submitted early enough to permit the Court to advise the JPLs of any desire to call witnesses whose testimony has not already been set forth by affidavit. Duties under the Factual Matters Order are now reinstated.

SO ORDERED.

Dated: New York, New York

January **16,** 2008

*s/ Robert E. Gerber*

United States Bankruptcy Judge

**[\*56]** APPENDIX A

ORDER RE UPCOMING HEARING ON MOTION FOR RECOGNITION

Confirming and amplifying upon matters addressed at the conference in this case on September 6, 2007, and for the purpose of developing a factual record that may be necessary or helpful in determining the issues on the JPLs' motion for recognition,

It is ORDERED: **[\*\*48]**

1. The hearing on the JPLs' motion for recognition will be an evidentiary hearing. The procedures set forth in Case Management Order #1, dated Sept. 5, 2007 (ECF #7) (as applicable generally and as to Contested Matters) will apply, except as any may hereafter be modified by any further order of the Court.

2. Without being foreclosed from introducing any other evidence that they might consider relevant or helpful to the Court in making the recognition determination (and without prejudice to the rights of the JPLs or any other parties to submit any evidence relevant to the recognition determination), the JPLs shall use best efforts to introduce evidence sufficient for the Court to make factual findings with respect to at least the following matters:

(a) in what jurisdiction or jurisdictions Basis Yield Alpha Fund (Master) ("Basis Yield") is organized and/or registered, and as what kind of business entity (*e.g.*, corporation, limited liability company, general or limited partnership, business trust, etc.);

(b) to what extent Basis Yield is registered or qualified to do business in any jurisdictions other than the jurisdiction in which it was organized (*e.g.*, as a foreign corporation);

(c) where **[\*\*49]** Basis Yield maintains offices, and what functions are performed at each such office;

(d) the number, locations, and functions of any personnel employed by Basis Yield;

(e) the number, locations, and functions of any personnel who are not employed by Basis Yield but who nevertheless perform services on its behalf;

(f) the extent to which other business entities (such as an investment advisor) exercise managerial control over Basis Yield operations, and if so, where any such entities are headquartered and

23-10063-shl   Doc 629   Filed 08/29/23   Entered 08/29/23 12:34:49   Main Document
Pg 201 of 882

Page 18 of 18

381 B.R. 37, *56; 2008 Bankr. LEXIS 67, **49

conduct their business;

(g) the place or places at which investment or portfolio management for Basis Yield is conducted, and the number, locations and functions of persons who are responsible for Basis Yield investment or portfolio management;

(h) the place or places at which any Basis Yield administrative or back-office operations are conducted, and the number, locations and functions of persons who are responsible for any such operations;

(i) the place or places at which assets of the Basis Yield estate are located, and the approximate value of the assets at each locale;

(j) the extent, if any, to which real property is leased or owned by Basis Yield, and, if so, its location;

(k) the extent, **[**50]** if any, to which assets were transferred to or from the Cayman Islands before or after the initiation of the liquidation proceedings in the Grand Court of the Cayman Islands (the "Cayman Islands Proceeding"), and, if applicable, the circumstances surrounding any such transfers;

(l) the identity and location of the members of the Basis Yield governing body before the appointment of the JPLs, and the place or places at which the Basis Yield governing body met personally **[*57]** within the last several years?or, to the extent meetings were in whole or in part conducted telephonically, the place or places from which the members of the governing body called in;

(m) the number and location of Basis Yield creditors;

(n) the number and location of equity investors in Basis Yield (or, if more applicable, in the Basis Yield feeder funds) and the relative percentages of the applicable equity that investors in each locale hold;

(o) the extent to which Basis Yield had or now has contractual agreements with entities that are (i) organized under the laws of the Cayman Islands; (ii) have offices in the Cayman Islands; or (iii) employ residents of the Cayman Islands;

(p) the locale or locales at which Basis Yield **[**51]** maintains its financial records and, if applicable, equity investor registries, and, if different, where

they were maintained before the commencement of the Cayman Islands Proceeding;

(q) the extent, if any, to which Basis Yield is required to keep books or records in the Cayman Islands; the extent to which Basis Yield does so; and the extent to which books or records not required to be kept in the Cayman Islands are nevertheless maintained there;

(r) the locale or locales of obligors with respect to any Basis Yield receivables;

(s) The extent to which Basis Yield is a party to any contractual agreements that set forth the law to be applied in the event of any disputes thereunder;

(t) the nature and extent of nontransitory economic activity carried out by Basis Yield in the Cayman Islands; and

(u) the extent, if any, to which Basis Yield is subject to the prohibitions of Companies Law (2004 Revision) of the Cayman Islands Section 193, and, if applicable, the extent to which Basis Yield's activities, or the locale thereof, are affected by the provisions of Section 193.

3. The JPLs shall submit evidence with respect to these matters whether or not any party in interest ultimately objects. **[**52]**

4 There is no significance to the order in which matters to be addressed have been listed. Northing in this Order is or shall be deemed to be an expression of views on the merits of the underlying motion; on the relevance, if any, of any of the above matters; or the weight to be afforded to any facts (responding to the above or otherwise) in connection with the motion.

Dated: New York, New York

September **12**, 2007

**s/ Robert E. Gerber**

United States Bankruptcy Judge

---

**End of Document**

# TAB – 7

Shepard's® report available
As of: July 17, 2023 2:27 PM Z

# In re Grand Prix Assocs.

United States Bankruptcy Court for the District of New Jersey

May 18, 2009, Decided; May 18, 2009, Filed; May 18, 2009, Entered

Case No.: 09-16545 (DHS)

## Reporter

2009 Bankr. LEXIS 1239 *

IN RE: GRAND PRIX ASSOCIATES INC.., et al., Debtors in Foreign Proceedings.

**Notice:** NOT FOR PUBLICATION

**Subsequent History:** Settled by, Motion granted by In re Grand Prix Assocs., 2009 Bankr. LEXIS 1779 (Bankr. D.N.J., June 26, 2009)

## Core Terms

Parties, proposed settlement, main proceedings, Settlement, partnership, appointed, pledges, courts, funds, insolvency proceedings, cross-border, negotiated, Entities, non-main, Invest

## Case Summary

### Procedural Posture

Before the court was the Amended Verified Joint Petition under Chapter 15 of the Bankruptcy Code filed by the applicant, in its capacity as foreign representative of the foreign debtors, seeking recognition of the foreign debtors' insolvency proceeding pending in the British Virgin Islands (BVI) as a foreign main proceeding pursuant to 11 U.S.C.S. §§ 1502(4), 1517(b)(1).

### Overview

In the instant matter, the applicant bore the burden of demonstrating that it had satisfied the requirements of 11 U.S.C.S. § 1517(a) in order for the court to grant recognition of the foreign proceeding. The foreign representative satisfied that it was a foreign representative based upon the language of the Order entered in the BVI proceeding. Moreover, it was a "person" acting as the foreign representative as the Bankruptcy Code's definition included "individual, partnership, and corporation." It had satisfied the

second requirement of § 1517(a). Additionally, it had established that 11 U.S.C.S. § 1515's requirements had been met. Specifically, the applicant provided a certified copy of the Order in the BVI Proceeding entered by the BVI Court explicitly affirming the existence of a foreign proceeding in the BVI and the appointment of the applicant as the foreign representative. Finally, the court was satisfied that the applicant had met its burden in establishing the BVI proceeding was a foreign main proceeding as to the foreign debtors. A foreign main proceeding was one that was pending in the country where the debtor had the center of its main interests, 11 U.S.C.S. § 1502(4).

### Outcome

The application to recognize the BVI Proceeding as a foreign main proceeding was granted.

## LexisNexis® Headnotes

Bankruptcy Law > Ancillary & Other Cross Border Cases

*HN1*[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

A Chapter 15 proceeding is commenced by the foreign representative's filing of a petition for recognition under 11 U.S.C.S. § 1515. A foreign representative is defined in the Bankruptcy Code as a person or body authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding. 11 U.S.C.S. § 101(24). The Bankruptcy Code defines a foreign proceeding as a collective judicial or administrative proceeding in a foreign country under a law relating to insolvency or adjustment of debt in which

proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation. 11 U.S.C.S. § 101(23).

Bankruptcy Law > Ancillary & Other Cross Border Cases

***HN2***[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

A Chapter 15 petition must be accompanied by the following documentation: (i) a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; (ii) a certificate from the foreign court affirming the existence of the foreign proceeding and the appointed foreign representative; (iii) if the above two are not available, then any other evidence satisfying the court that the foreign proceeding has been commenced and the foreign representative has been appointed; and (iv) a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative. 11 U.S.C.S. § 1515(b), (c). Upon filing a Chapter 15 petition, provisional relief may be granted under 11 U.S.C.S. § 1519.

Bankruptcy Law > Ancillary & Other Cross Border Cases

Evidence > Burdens of Proof > Allocation

***HN3***[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

A foreign representative must satisfy the following and, if so demonstrated, the court must then enter an order recognizing the foreign proceeding: (a) Subject to the public policy exception of 11 U.S.C.S. § 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if--(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of 11 U.S.C.S. § 1502; (2) the foreign representative applying for recognition is a person or body; and (3) the petition meets the requirements of 11 U.S.C.S. § 1515. 11 U.S.C.S. § 1517(a). Simultaneously, the court must also determine whether the recognition of the foreign proceeding is as a foreign main or foreign non-main proceeding, which the foreign

representative bears the burden of proving. A foreign main proceeding is defined as a foreign proceeding pending in the country where the debtor has the center of its main interests. 11 U.S.C.S. §§ 1502(4), 1517(b)(1). A foreign non-main proceeding is defined as a foreign proceeding pending in a country where the debtor has an establishment. 11 U.S.C.S. §§ 1502(5), 1517(b)(2). An establishment is any place of operations where the debtor carries out a nontransitory economic activity. 11 U.S.C.S. § 1502(2).

Bankruptcy Law > Ancillary & Other Cross Border Cases

Civil Procedure > ... > Capacity of Parties > Representative Capacity > Representatives

International Law > ... > Comity Doctrine > Areas of Law > Bankruptcy

***HN4***[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

Upon the court granting recognition under 11 U.S.C.S. § 1517, the foreign representative has the capacity to sue and be sued in the United States and the ability to apply directly to a United States court for appropriate relief. All United States courts must grant comity and cooperation to the foreign representative. 11 U.S.C.S. § 1509. 11 U.S.C.S. § 1520 provides the relief granted to the foreign representative upon the court's entry of an order recognizing the foreign proceeding such as implementing the automatic stay under 11 U.S.C.S. § 362 and the automatic application of 11 U.S.C.S. §§ 363, 549, and 552 to interests of the debtor in property located within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of the estate, which is necessary since 11 U.S.C.S. § 541 is not applicable to Chapter 15 cases.

Bankruptcy Law > Ancillary & Other Cross Border Cases

Evidence > Inferences & Presumptions > Presumptions

***HN5***[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

11 U.S.C.S. § 1516(a) allows a court to presume that the foreign proceeding is such if the foreign court's order states that it is a foreign proceeding and that the appointed person or entity is a foreign representative.

Bankruptcy Law > Ancillary & Other Cross Border Cases

*HN6*[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

Regarding who is a "person" acting as the foreign representative, the Bankruptcy Code's definition includes individual, partnership, and corporation. 11 U.S.C.S. § 101(41). Furthermore, although neither the Model Law nor the Bankruptcy Code define "body," it has been recognized as an artificial person created by a legal authority.

Bankruptcy Law > Ancillary & Other Cross Border Cases

*HN7*[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

A foreign main proceeding is one that is pending in the country where the debtor has the center of its main interests. 11 U.S.C.S. § 1502(4). The Bankruptcy Code does not define center of main interests, referred to as COMI. Courts have found that the Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency (Guide) explained that the COMI was modeled after the European Union Convention on Insolvency Proceedings (EU Convention) which states: the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties. Council Reg. (EC) No. 1346/2000, P 13); This generally equates with the concept of a principal place of business in United States law.

Bankruptcy Law > Ancillary & Other Cross Border Cases

*HN8*[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

In the absence of evidence to the contrary, the debtor's registered office is presumed to be the center of the debtor's main interests. 11 U.S.C.S. § 1516(c).

Bankruptcy Law > Ancillary & Other Cross Border Cases

*HN9*[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

The Chapter 15 petition process should not become a rubber stamp exercise when no objection is filed.

Bankruptcy Law > Ancillary & Other Cross Border Cases

*HN10*[⬇] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

In the context of Chapter 15 of the Bankruptcy Code and making the center of main interests (COMI) determination, the well-considered factors listed in In re Sphinx and utilized by other courts are: the location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

**Counsel:** **[*1]** Cole Schotz, Meisel, Forman & Leonard, P.A., Michael D. Sirota, Esq., Warren A. Usatine, Esq., Hackensack, New Jersey, *Co-Counsel for Petitioner Plaza Management Overseas S.A., in its capacity as the Foreign Representative.*

Moses & Singer LLP, Alan Kolod, Esq., Mark N. Parry, Esq., Declan M. Butvick, Esq., New York, New York, *Co-Counsel for Petitioner Plaza Management Overseas S.A., in its capacity as the Foreign Representative.*

Wollmuth Maher & Deutsch LLP, Paul DeFilippo, Esq., Newark, New Jersey, *Co-Counsel for the CS SP Parties.*

Davis Polk & Wardwell, Lawrence Portnoy, Esq., Thomas Ogden, Esq., Boris Ayala, Esq., Marcelo Blackburn, Esq., New York, New York, *Co-Counsel for the CS SP Parties.*

Connell Foley LLP, Stephen V. Falanga, Esq., Roseland, New Jersey, *Co-Counsel to Hellman &*

2009 Bankr. LEXIS 1239, *1

*Friedman Capital Partners VI, L.P. and Blackstone Managed Investment Partnerships.*

Simpson Thacher & Bartlett LLP, Mark Thompson, Esq., Joseph M. McLaughlin, Esq., New York, New York, ***Co-Counsel to Hellman & Friedman Capital Partners VI, L.P. and Blackstone Managed Investment Partnerships.***

Pashman Stein, Sean Mack, Esq., Hackensack, New Jersey, ***Co-Counsel to Carlyle Entities.***

Debevoise & Plimpton LLP, Maureen **[*2]** Cronin, Esq., New York, New York, ***Co-Counsel to Carlyle Entities.***

Office of the United States Trustee, Donald MacMaster, Esq., Newark, New Jersey.

**Judges:** DONALD H. STECKROTH, UNITED STATES BANKRUPTCY JUDGE.

**Opinion by:** DONALD H. STECKROTH

# Opinion

## THE HONORABLE DONALD H. STECKROTH, BANKRUPTCY JUDGE

Before the Court is the Amended Verified Joint Petition under Chapter 15 ("Amended Chapter 15 Petition") of the United States Bankruptcy Code filed by Plaza Management Overseas S.A. ("Plaza Management"), in its capacity as foreign representative of Grand Prix Associates Inc. and its jointly administered affiliates ("Grand Prix" or "Foreign Debtors") [1], seeking recognition of the Foreign Debtors' insolvency proceeding pending in the British Virgin Islands ("BVI Proceeding") as a foreign main proceeding pursuant to Sections 1502(4) and 1517(b)(1). The Court has reviewed the *Amended Chapter 15 Petition,* the *Joint Memorandum of Law in Support of Recognition of a Foreign Proceeding as a Foreign Main Proceeding* and accompanying exhibits, the *Verified Petition for Recognition of a Foreign Proceeding Pursuant to 11 U.S.C. §§ 1515 and 1517 (dated March 18, 2009),* including the *Declaration of Tom Meganck, as Director*

of the Foreign **[*3]** *Representative of the Petitioner, Pursuant to Section 1515(c) of the Bankruptcy Code and Bankruptcy Rule 1007(a)(4)* ("Meganck Decl."), *Objection of Hellman & Friedman Capital Partners VI, L.P.* ("Hellman"), and the *Statement of CS SP Parties.* [2] In addition, the Court heard the arguments of Counsel. The facts set forth herein are taken from the record before the Court.

The Court has jurisdiction over this matter pursuant to Sections 157 and 1334 of Title 28 and Section 1501 of Title 11. This is a core proceeding pursuant to 28 U.S.C. Section 157(b)(2)(P). **[*4]** Venue in the District of New Jersey is proper under 28 U.S.C. Section 1410(1) and (3) as the principal assets are located in New Jersey.

## Statement of Facts and Procedural History

### I. Events Leading to the Filing of the Amended Chapter 15 Petition

On March 13, 2009, the Foreign Debtors commenced proceedings in the British Virgin Islands ("BVI") in the Eastern Caribbean Supreme Court, High Court of Justice, BVI ("BVI Court"). The Order entered by the BVI Court appointed Plaza Management as foreign representative of the Foreign Debtors "for the purpose of contemplated cross-border insolvency proceedings." *See Meganck Decl., Ex. C.* Plaza Management is a family-owned corporation managing global investment portfolios. Bundora Associates, Inc., Shelby Overseas Invest & Trade Ltd., and Lockhart Overseas Investment Corp. (collectively referred to as "Principal Debtors") began investing in private equity limited partnerships prior to April 2006. Blackthorne Property, Inc. ("Blackthorne") partially funded the investments in exchange for a registered floating charge under BVI law against the assets of the Principal Debtors.

Initially, Plaza Management submitted that the Foreign Debtors had negotiated **[*5]** a settlement with Blackthorne in full satisfaction for the amounts due and owing. The CS SP Parties contend that the transfer of $ 340 million to Blackthorne constituted fraud.

---

[1] The jointly administered affiliates are: Grand Prix Associates Inc., Bundora Associates Inc., Bundora Investments Limited, Bundora Investments N.V., Ruby Investment Sp. z.o.o., Bundora Corp., Lockhart Overseas Investments Corp., Lockhart Limited, Naven Investments Sp. z.o.o., Lockhard Corp. I, and Shelby Overseas Invest & Trade Ltd.

[2] The CS Lenders consist of CS Structured Strategies B, L.P, CS Strategic Partners Holdings IV, L.P., CS Strategic Partners IV Investments, L.P, CS Structured Strategies A, L.P., CS Structured Strategies A (RE), L.P., CS Structured Strategies B (RE), L.P., and CSFB Strategic Partners III RE Holdings, L.P. ("CS SP Parties").

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 207 of 882
2009 Bankr. LEXIS 1239, *5

Page 3 of 9

By way of background, in April 2006, Plaza Management and Credit Suisse Strategic Partners ("CSSP") entered into a joint venture where various funds controlled by CSSP extended funding to the Principal Debtors in the form of loans, which would be used to satisfy capital calls by the limited partnerships in which the Principal Debtors had invested. To date, the Principal Debtors have $ 364,190,000 in unfunded capital calls and CSSP funds have invested approximately $ 751,000,000 in the Principal Debtors.

Plaza Management and the CS SP Parties provide differing facts regarding the formation of their agreements. Plaza Management states that CSSP's counsel erred in the preparation of the credit documents because CSSP was to take pledges of the Foreign Debtors' shares and the Foreign Debtors were to pledge accounts and securities. The pledged accounts and securities are held by Pershing LLC, which has its principal office at One Pershing Place, Jersey City, New Jersey. Also, a net asset value ratio covenant was included, [*6] which would put the Principal Debtors in default if the market value of the private equity funds fell below the loan-to-value ratio. Purportedly, CSSP and its counsel knew that a Financial Accounting Standards Board standard was about to be adopted that would allow CSSP to declare default based upon an appraisal even if no actual loss occurred. However, the Principal Debtors were unaware of this standard. Plaza Management also contended that CSSP encouraged conduct by the Principal Debtors that lacked profitability. The Foreign Debtors believe that the valuations will result in an attempt by the CS SP Parties to foreclosure on the pledges. Plaza Management also contends that the Principal Debtors will be unable to satisfy capital calls and will risk forfeiture of their limited partnership interests. According to Plaza Management, this was the basis for the commencement of the foreign proceeding.

Conversely, the CS SP Parties state that throughout the negotiations of the original agreement as well as the subsequent amendments, the agreements were based upon the Foreign Debtors' representations that they were debt free and would remain so. It is this representation that the CS SP Parties [*7] believe to be the basis of the purported fraudulent Blackthorne settlement. Bundora's audited financial sheets for 2006 and 2007 did not indicate a debt to Blackthorne. Rather, the only debt disclosed is that of Group Plaza Entities, which the CS SP Parties believe to be affiliates of Plaza Management.

The CS SP Parties also allege that they had no indication from the Foreign Debtors that a foreign insolvency proceeding was being commenced and thus they did not issue a notice of default. Moreover, at the time they were so informed by the Foreign Debtors of the proceeding, the Foreign Debtors also requested an advance of approximately $ 4 million. In addition to opposing the provisional relief sought, the CS SP Parties also requested expedited discovery in preparation for a trial on the Chapter 15 Petitions of the Foreign Debtors.

On March 24, 2009, the CS SP Parties commenced an action in the Supreme Court of the State of New York against Plaza Management, Blackthorne, Dickson Invest & Trade Ltd. ("Dickson"), and the principals of the Foreign Debtors. The New York Court entered temporary restraints against the state court defendants prohibiting the transfer of assets. The temporary restraining [*8] order remains in effect until July 16, 2009, with a modification allowing for the implementation of the proposed settlement.

Hellman and Blackstone also have been involved in this case from its inception. Bundora Associates ("Bundora") is a party to a limited partnership agreement pursuant to which Hellman is organized. Bundora subscribed for a $ 20,000,000 capital commitment with approximately $ 7,600,000 remaining to be funded. Hellman's initial objection to the Chapter 15 Petition related to the prohibition to transfer, encumber, or dispose of assets except by the Foreign Debtors as provided by the temporary restraining order. Hellman submitted that its day-to-day operations may not be restricted more than allowed under the Bankruptcy Code. Hellman also requested the posting of a bond in the amount of the unfunded capital commitment to protect its interests. Blackstone-Managed Investment Partnerships ("Blackstone"), [3] joined in Hellman's objection. Bundora and Lockhart Corp. are limited partners with Blackstone. Bundora/Lockhart subscribed to approximately $ 365,000,000 with approximately $ 133,000,000 remaining unfunded.

On April 2, 2009, after conferences regarding discovery and a trial on the Chapter 15 Petitions, the Court entered an Order granting Provisional Relief under Section 1519 imposing the automatic stay pursuant to

_____

[3] The partnerships are: Blackstone Capital Partners V L.P., [*9] BCP V-S L.P., BCP V Co-Investors L.P., Blackstone Real Estate Partners V L.P., Blackstone Real Estate Partners V.F L.P., Blackstone Real Estate Partner VI.F L.P. and each of their respective "alternative investment vehicles."

Section 362 on the Foreign Debtors' assets and further order from the BVI Court.

## II. Amended Chapter 15 Petition Currently Before the Court

The parties engaged in extensive negotiations that has resulted in a proposed Master Settlement Agreement and the filing of the Amended Chapter 15 Petition that are currently before the Court. The Foreign Debtors and CS SP Parties submit that without the Master Settlement Agreement, the CS SP parties would have foreclosed upon the pledges on the shares of Grand Prix and the pledged accounts and securities. The proposed settlement ensures the Foreign Debtors' ability to satisfy capital calls to avoid forfeiture of their limited partnership interests.

The proposed Master Settlement Agreement will be before this Court pursuant **[\*10]** to Rule 9019 and Section 363 seeking its approval at a later date. However, for the sake of completeness, a brief summary of the proposed settlement is provided herein. [4] The proposed Master Settlement Agreement is between the Foreign Debtors, the Defendants in the New York state court action, and the CS SP Parties. The proposed settlement contemplates the transfer of certain limited partnership interests from the Foreign Debtors to the CS SP parties for monetary consideration, mutual releases, and the redemption and cancellation of preferred stock. In addition, Blackthorne and Dickson agree to transfer back the stock and interests to the Foreign Debtors to facilitate the implementation of the proposed settlement. Plaza Management explained at the hearing that the Amended Chapter 15 Petition was filed to disclose the proposed settlement, the corresponding documents, and the transfers back from Dickson to Bundora.

As part of the proposed settlement, the CS SP Parties withdraw their opposition and support the recognition of the **[\*11]** BVI Proceeding as a foreign main proceeding. In the statement filed in support of recognition, the CS SP Parties submit that the proposed settlement restores the positions of the Foreign Debtors prior to their transfer to Blackthorne and provides for mutual releases utilizing Chapter 15 of the Bankruptcy Code. Furthermore, the settlement resolves the New York

state court action. The CS SP parties reserve their rights to answer the Amended Chapter 15 Petitions and proceed with a trial schedule in the event the proposed settlement is not approved by this Court.

In its objection to the recognition of the Amended Chapter 15 Petition, Hellman submits that while it supports the principal resolution, it considers certain relief sought unnecessary to achieve the resolution, particularly recognition of the Chapter 15 Petitions. Prior to the hearing, Plaza and Hellman resolved the objection and Hellman consented to the proposed form of Order presented to the Court. Additionally, the Court was informed the Carlyle Entities, [5] without submission of a formal objection, negotiated with Plaza to resolve its dispute over the proposed form of Order.

## Discussion

## I. Chapter 15 of the Bankruptcy Code

In the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Congress enacted Chapter 15 of the Bankruptcy Code implementing the Model Law on Cross-Border Insolvency ("Model Law") promulgated by the United Nations Commission on International Trade Law ("UNCITRAL"). *See* 11 U.S.C. §1501(a) (2009). The objectives of Chapter 15 are:

> [C]ooperation between United States courts, trustees, examiners, debtors and debtors in possession and the courts and other competent authorities of foreign countries; greater legal certainty for trade and investment; fair **[\*13]** and efficient administration of cross-border insolvencies that protect the interests of all creditors and other interested entities, including the debtor; the protection and maximization of the debtor's assets; and the facilitation of the rescue of financially

---

[4] The discussion of the proposed Master Settlement Agreement does not constitute any finding by this Court with respect to propriety or approval of the settlement.

[5] Carlyle Asia Growth Partners III, L.P., Carlyle Asia **[\*12]** Partners II, L.P.; Carlyle Japan International Partners II, L.P.; CJIP II Co-Invest, L.P.; Carlyle Ensus Partners, L.P.; Carlyle Europe Partners II, L.P.; Carlyle Europe Partners III, L.P.; Carlyle Partners IV, L.P.; Carlyle Partners V, L.P., together with any alternative investment vehicles of the foregoing (collectively "Carlyle"), Clayton, Dubilier & Rice Fund VII, L.P. and any alternative investment vehicles ("Clayton") and Diamond Castle Partners IV, L.P. and any alternative investment vehicles ("Diamond") (the foregoing will be collectively referred to as the "Carlyle Entities.")

troubled businesses.

*In re Oversight & Control Commission of Avanzit, S.A.,* 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008) (citing *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund,* 374 B.R. 122, 126 (Bankr. S.D.N.Y. 2007)); *accord* 11 U.S.C. § 1501(a).

*HN1*[⬆] A Chapter 15 proceeding is commenced by the foreign representative's filing of a petition for recognition under Section 1515. *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,* 389 B.R. 325, 331 (S.D.N.Y. 2008); *accord* 11 U.S.C. §§ 1504 & 1509. A foreign representative is defined in the Bankruptcy Code as a "person or body. . .authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding." 11 U.S.C. § 101(24); *see In re Loy,* 380 B.R. 154, 161 (Bankr. E.D. Va., Newport News Div. 2007). The Bankruptcy Code defines a foreign **[*14]** proceeding as "a collective judicial or administrative proceeding in a foreign country. . .under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation." 11 U.S.C. § 101(23).

*HN2*[⬆] The Chapter 15 Petition must be accompanied by the following documentation: (i) a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; (ii) a certificate from the foreign court affirming the existence of the foreign proceeding and the appointed foreign representative; (iii) if the above two are not available, then any other evidence satisfying the court that the foreign proceeding has been commenced and the foreign representative has been appointed; and (iv) a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative. 11 U.S.C. § 1515(b) & (c). Upon filing a Chapter 15 Petition, provisional relief may be granted under Section 1519, for which this Court entered an Order on April 2, 2009.

*HN3*[⬆] A foreign representative must satisfy the following and, **[*15]** if so demonstrated, the Court must then enter an order recognizing the foreign proceeding:

(a) Subject to [the public policy exception of] [6]

section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if--

(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a); *see In re Oversight & Control Commission of Avanzit, S.A.,* 385 B.R. at 532 (citing *In re Basis Yield Alpha Fund (Master),* 381 B.R. 37, 52 (Bankr. S.D.N.Y. 2008)). Simultaneously, the Court must also determine whether the recognition of the foreign proceeding is as a foreign main or foreign non-main proceeding, which the foreign representative bears the burden of proving. *Id.* A foreign main proceeding is defined as "a foreign proceeding pending in the country where the debtor has the center of its main interests." *See* 11 U.S.C. §§ 1502(4) & 1517(b)(1). A foreign non-main proceeding is defined as "a foreign proceeding. . .pending in a country **[*16]** where the debtor has an establishment." *See* 11 U.S.C. §§ 1502(5) & 1517(b)(2). An establishment is "any place of operations where the debtor carries out a nontransitory economic activity." *See* 11 U.S.C. § 1502(2).

*HN4*[⬆] Upon the Court granting recognition under Section 1517, the foreign representative has the capacity to sue and be sued in the United States and the ability to apply directly to a United States court for appropriate relief. All United States courts must grant comity and cooperation to the foreign representative. 11 U.S.C. § 1509. Section 1520 provides the relief granted to the foreign representative upon the Court's entry of an order recognizing the foreign proceeding such as implementing the automatic stay under Section 362 and the automatic application of Sections 363, 549, and 552 to interests of the debtor in property located within the "territorial jurisdiction of the United States 'to the same extent that the sections would apply to property of **[*17]** the estate,'" which is necessary since Section 541 is not applicable to Chapter 15 cases. 8-1520 COLLIER ON BANKRUPTCY P 1520.01 (15th ed. rev. 2008).

## II. Application of Section 1517(a)

---

[6] Section 1506 states: "Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of

the United States." 11 U.S.C. § 1506.

In the instant matter, Plaza Management bears the burden of demonstrating that it has satisfied the requirements of Section 1517(a) in order for the Court to grant recognition of the foreign proceeding. Plaza Management has satisfied that it is a foreign representative based upon the language of the Order entered in the BVI Proceeding specifically stating "Plaza Management Overseas S.A. is hereby appointed as the foreign representative of each and all of the companies within the Grand Prix Group for the purpose of contemplated cross-border insolvency proceedings." *Decl. of Tom Meganck, as Dir. of the Foreign Representative of the Pet.,* Ex. C. Furthermore, ***HN5***[⬆] Section 1516(a) allows a court to presume that the foreign proceeding is such if the foreign court's order states that it is a foreign proceeding and that the appointed person or entity is a foreign representative. *See* 11 U.S.C. § 1516(a). Here, the Order entered in the BVI Proceeding instituted a Plan of Arrangement under which the Foreign Debtors' **[*18]** assets and affairs are under the control of Plaza Management for the purpose of adjusting Grand Prix's debt with supervision by the BVI Court pursuant to the BVI Business Companies Act. *See Meganck Decl.,* Ex. C. Plaza Management submits that the Master Settlement Agreement, once approved, will replace the Plan of Arrangement consensually resolving the claims asserted against the Foreign Debtors. *See Joint Mem. of Law in Supp. of Recognition of a Foreign Proceeding as a Foreign Main Proceeding,* 13.

Moreover, Plaza Management ***HN6***[⬆] is a "person" acting as the foreign representative as the Bankruptcy Code's definition includes "individual, partnership, and corporation". *See* 11 U.S.C. § 101(41); *In re Oversight & Control Commission of Avanzit, S.A.,* 385 B.R. 525, 540 (Bankr. S.D.N.Y. 2008). Furthermore, although neither the Model Law nor the Bankruptcy Code define "body" but "it has been recognized as 'an artificial person created by a legal authority.'" *Id.* at 540 (citation omitted). Thus, regardless of the presumption, Plaza Management has satisfied the second requirement of Section 1517(a).

Additionally, Plaza Management has established that Section 1515's requirements have been met. Specifically, **[*19]** Plaza Management provided a certified copy of the Order in the BVI Proceeding entered by the BVI Court attached to the *Meganck Declaration* at Exhibit C explicitly affirming the existence of a foreign proceeding in the BVI and the appointment of Plaza Management as the foreign representative. *Meganck Decl.,* Ex. C; *accord* 11 U.S.C. § 1515(b). In accordance with Section 1515(c) and Rule 1007(a)(4), Plaza Management provided a Corporate Ownership Statement and lists indicating the Foreign Debtors' known creditors and that there was no litigation pending with respect to the Foreign Debtors as of the date of the initial Chapter 15 Petition. *See Meganck Decl.,* Exs. A & B. At the time of the hearing, Plaza Management represented to the Court that an Amended List will be filed forthwith to include the pending New York state litigation which will be resolved as part of the proposed settlement. Thus, Section 1515(c) will be satisfied. Finally, the last element that the Receiver must demonstrate is whether the foreign proceeding is a foreign main or foreign non-main proceeding.

### III. Types of Foreign Proceedings under Section 1502

The Court must next determine whether the instant foreign proceeding **[*20]** is main, or in the alternative, non-main.

### A. Foreign Main Proceeding

***HN7***[⬆] A foreign main proceeding is one that is pending in the country where the debtor has the center of its main interests. 11 U.S.C. § 1502(4); *see In re Loy,* 380 B.R. at 162. The Bankruptcy Code does not define center of main interests, referred to as "COMI". *See In re Basis Yield Alpha Fund (Master),* 381 B.R. 37, 47 (Bankr. S.D.N.Y. 2008); *In re Loy,* 380 B.R. at 162. Courts have found that the Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency ("Guide") explained that the COMI was modeled after the European Union Convention on Insolvency Proceedings ("EU Convention") which states: "the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties." *See In re Bear Stearns,* 374 B.R. at 129 (citing Council Reg. (EC) No. 1346/2000, P 13); *see also In re Basis Yield Alpha Fund,* 381 B.R. at 47. "This generally equates with the concept of a principal place of business in United States law." *In re Basis Yield Alpha Fund,* 381 B.R. at 48 (citing *In re Tri-Continental Exchange,* 349 B.R. at 633-34); *In re Bear Stearns,* 374 B.R. at 129 (citing **[*21]** same).

Furthermore, Section 1516(c) explicitly provides: ***HN8***[⬆] "In the absence of evidence to the contrary, the debtor's registered office. . .is presumed to be the center of the debtor's main interests." 11 U.S.C. § 1516(c); *In*

*re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.,* 374 B.R. 122, 127 (Bankr. S.D.N.Y. 2007) (citing *In re Tri-Continental Exchange Ltd.,* 349 B.R. 627, 635 (Bankr. E.D. Cal. 2006)). Here, despite strenuous objections at the outset, the Foreign Debtors, Plaza, the State Court Defendants and CS SP Parties reached a resolution and consent to recognition by this Court.

While Hellman initially put forth an objection as to the utility of the recognition at this time, the proposed settlement pursuant to Section 363 and Rule 9019 cannot properly come before this Court without recognition of the BVI Proceeding. Thus, to effectuate the proposed settlement, recognition is necessary, a finding Plaza Management argues is supported by public policy under Section 1506. As both the Master Settlement Agreement and the Termination Agreement require approval from this Court and the BVI Court, recognition is appropriate and necessary. Plaza Management also points **[*22]** out that recognition to facilitate the approval of the proposed settlement furthers the principles of comity and cooperation integral to Chapter 15. *See In re Oversight & Control Commission of Avanzit, S.A.,* 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008) (citation omitted); *In re Basis Yield Alpha Fund (Master),* 381 B.R. 37, 45 (Bankr. S.D.N.Y. 2008).

In discussing Article 16 of the Model Law, the Guide provides that Section 1516 allows courts to expedite the evidentiary process, but it neither prevents the court nor another interested party from questioning the presumption. In *Bear Stearns,* the Honorable Burton R. Lifland stated that *HN9*[⬆] the Chapter 15 Petition process should not become a "rubber stamp exercise" when no objection is filed. *See In re Bear Stearns,* 374 B.R. at 130. This served as a departure from the decision made by the Honorable Robert D. Drain in *In re Sphinx* where the court enumerated factors that could be useful in making the COMI determination, but then found that the court should defer to the "creditors' acquiescence in or support of a proposed COMI." *See In re Sphinx, Ltd.,* 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006). *HN10*[⬆] The well-considered factors listed in *In re Sphinx* and **[*23]** utilized by other courts are:

> [T]he location of the debtor's headquarters; the location of those who actually manage the debtor (which, conceivably could be the headquarters of a holding company); the location of the debtor's primary assets; the location of the majority of the debtor's creditors or of a majority of the creditors

who would be affected by the case; and/or the jurisdiction whose law would apply to most disputes.

*In re Sphinx,* 351 B.R. at 117; *see In re Bear Stearns,* 374 B.R. at 122; *In re Loy,* 380 B.R. at 163.

In the instant matter, the evidence before the Court demonstrates that BVI is clearly where the Foreign Debtors have their COMI. Plaza Management submits that the Foreign Debtors have had no other place of business outside of the BVI with all business and administrative matters handled in the BVI. The books and records of the Foreign Debtors are located in the BVI, with necessary operating expenses for the entities held in a bank account in the BVI. Furthermore, Plaza Management is the director of each Foreign Debtor and is organized under the laws of the BVI and maintains an office there. Moreover, any party that initially objected has since negotiated and resolved **[*24]** such objections and now supports recognition and entry of the proposed form of Order.

Based on the evidentiary record and the affidavits submitted, the Court is satisfied that Plaza Management has met its burden in establishing the BVI Proceeding is a foreign main proceeding as to the Foreign Debtors.

## Conclusion

For the foregoing reasons, the application to recognize the BVI Proceeding as a foreign main proceeding is hereby granted. An Order has been entered and a copy is attached hereto.

*/s/ Donald H. Steckroth*

DONALD H. STECKROTH

UNITED STATES BANKRUPTCY JUDGE

Dated: May 18, 2009

**End of Document**

95

TAB – 8

Shepard's® report available
As of: July 17, 2023 2:59 PM Z

# In re Innua Can., Ltd.

United States Bankruptcy Court for the District of New Jersey

March 25, 2009, Filed; March 25, 2009, Entered

Case No. 09-16362 (DHS)

**Reporter**
2009 Bankr. LEXIS 994 *; 2009 WL 1025088

Re: Innua Canada Ltd. and The Normandy Group S.A.

**Notice:** NOT FOR PUBLICATION

## Core Terms

Receiver, provisional relief, injunction, inventory, notice

## Case Summary

**Procedural Posture**

Applicant, a receiver appointed by a Canadian court, sought provisional relief per 11 U.S.C.S. § 1519(a) and 11 U.S.C.S. § 105(a) in Chapter 15 proceedings involving foreign debtors. At issue was whether provisional 11 U.S.C.S. § 362 relief was properly authorized to preserve U.S.-based assets during the "gap period" between the date on which the Chapter 15 was filed and a ruling on recognition.

**Overview**

The receiver advised that, inter alia, third parties such as owners of warehouses storing debtors' property were threatening to sell the same in satisfaction of debts. He requested § 362 provisional relief to preserve the assets during the "gap period." No opposition was filed. The court granted relief. Noting the relevant provisions in § 1519 and 11 U.S.C.S. § 1521, the court cited § 105 as empowering the court to grant injunctive relief provided that the four elements under prevailing Third Circuit precedent were satisfied. Assessing the receiver's submission under those criteria, the court concluded that the receiver had shown a high likelihood that the foreign proceeding would be recognized under 11 U.S.C.S. § 1515 and 11 U.S.C.S. § 1517 and that the warehouse owners' threats to sell inventory constituted irreparable harm within the meaning of the Third Circuit criteria. As for the element of harm, the court concluded

that the request for relief would simply preserve the status quo and that the same would benefit creditors in that it would allow for an orderly administration of the assets. Finally, a grant of relief advanced the express purposes detailed in 11 U.S.C.S. § 1525.

**Outcome**

The court granted the application for relief under § 362.

## LexisNexis® Headnotes

Bankruptcy Law > Ancillary & Other Cross Border Cases

Bankruptcy Law > Administrative Powers > Automatic Stay > General Overview

Bankruptcy Law > ... > Automatic Stay > Scope of Stay > Claims Against Debtors

Bankruptcy Law > ... > Claims Against Debtors > Judgments & Rulings > Enforcements

*HN1*[⤓] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

See 11 U.S.C.S. § 1519(a).

Bankruptcy Law > Ancillary & Other Cross Border Cases

Bankruptcy Law > ... > Avoidance > Fraudulent Transfers > General Overview

Bankruptcy Law > ... > Prepetition Transfers > Preferential Transfers > General

Overview

Bankruptcy Law > ... > Prepetition
Transfers > Voidable Transfers > Statutory Liens

Bankruptcy Law > Exemptions > Bankruptcy Code
Exemptions

*HN2*[⬇] **Bankruptcy Law, Ancillary & Other Cross
Border Cases**

Relief that may be authorized under 11 U.S.C.S. §
1521(a) includes orders suspending the right to transfer,
encumber or otherwise dispose of any assets of a
debtor to the extent this right has not been suspended
under 11 U.S.C.S. § 1520(a); providing for the
examination of witnesses, the taking of evidence or the
delivery of information concerning a debtor's assets,
affairs, rights, obligations or liabilities; and granting any
additional relief that may be available to a trustee,
except for relief available under 11 U.S.C.S. § 522, 11
U.S.C.S. § 544, 11 U.S.C.S. § 545, 11 U.S.C.S. § 547,
11 U.S.C.S. § 548, 11 U.S.C.S. § 550 and 11 U.S.C.S.
§ 724(a).

Bankruptcy Law > Ancillary & Other Cross Border
Cases

Governments > Legislation > Interpretation

*HN3*[⬇] **Bankruptcy Law, Ancillary & Other Cross
Border Cases**

11 U.S.C.S. § 1519(a)'s use of the word "including"
means that the list that follows is not exhaustive.

Bankruptcy Law > Ancillary & Other Cross Border
Cases

*HN4*[⬇] **Bankruptcy Law, Ancillary & Other Cross
Border Cases**

11 U.S.C.S. § 1519(b) provides that the provisional
relief, if granted, terminates upon the recognition of the
Chapter 15 petition unless extended under 11 U.S.C.S.
§ 1521(a)(6). 11 U.S.C.S. § 1519(b).

Bankruptcy Law > ... > Bankruptcy > Case
Administration > Bankruptcy Court Powers

Civil Procedure > Remedies > Injunctions > General
Overview

*HN5*[⬇] **Case Administration, Bankruptcy Court
Powers**

11 U.S.C.S. § 105(a) allows a bankruptcy court to issue
any order, process, or judgment that is necessary or
appropriate to carry out the provisions of the Bankruptcy
Code. Included in this provision is the power to issue
injunctions under appropriate circumstances.

Bankruptcy Law > Ancillary & Other Cross Border
Cases

Civil Procedure > ... > Injunctions > Grounds for
Injunctions > Balance of Hardships

Civil Procedure > ... > Injunctions > Grounds for
Injunctions > Irreparable Harm

Civil Procedure > ... > Injunctions > Grounds for
Injunctions > Likelihood of Success

Civil
Procedure > Remedies > Injunctions > Preliminary
& Temporary Injunctions

*HN6*[⬇] **Bankruptcy Law, Ancillary & Other Cross
Border Cases**

Provisional relief under 11 U.S.C.S. § 1519 requires
satisfaction of the injunctive relief standard by the
foreign representative. 11 U.S.C.S. § 1519(e). Pursuant
to Third Circuit precedent, a party seeking a preliminary
injunction must show that: (1) it has a likelihood of
success on the merits; (2) it will suffer irreparable harm
if the injunction is denied; (3) granting preliminary relief
will not result in even greater harm to the non-moving
party; and (4) the public interest favors such relief. The
first two factors are mandatory and must be present for
the court to issue a preliminary injunction. The moving
party must establish the first two factors before the court
may consider the remaining two.

Bankruptcy Law > Ancillary & Other Cross Border
Cases

Bankruptcy Law > ... > Automatic Stay > Scope of
Stay > General Overview

*HN7*[⬆️] **Bankruptcy Law, Ancillary & Other Cross Border Cases**

11 U.S.C.S. § 1525 promotes cooperation between a U.S. bankruptcy court and the foreign court where a foreign proceeding is located, and imposition of the automatic stay under 11 U.S.C.S. § 362 furthers such cooperation and policy.

**Counsel:** [*1] **Lowenstein Sandier PC,** Michael S. Etkin, Esq., Eric H. Horm, Esq., Thomas Livolsi, Esq., Roseland, New Jersey, ***Counsel for the Receiver, RSM Richter Inc.***

**Judges:** DONALD H. STECKROTH, UNITED STATES BANKRUPTCY JUDGE.

**Opinion by:** DONALD H. STECKROTH

# Opinion

### LETTER OPINION ORIGINAL FILED WITH THE CLERK OF THE COURT

Dear Counsel:

Before the Court is an application for provisional relief under Section 1519(a) and Section 105(a) of the Bankruptcy Code in the Chapter 15 proceedings of Innua Canada Ltd. ("Innua Canada") and The Normandy Group S.A. ("Normandy") (collectively referred to as "Foreign Debtors"). The Court has reviewed the *Motion for Provisional Relief Pursuant to 11 U.S.C. § 1519,* the *Declaration of Michael S. Etkin in Support of Order to Show Cause and Notice Fixing Hearing to Consider the Motion of the Debtors in a Foreign Proceeding for Provisional Relief Pursuant to 11 U.S.C. § 1519,* the *First Report of RSM Richter Inc., as Interim Receiver and Receiver and Manager of Innua Canada Ltd. and The Normandy Group S.A,* the *Declaration of Mitchell Vinisky in Support of Verified Petitions for Recognition of Foreign Proceeding and Related Relief,* and heard the arguments of Counsel. No opposition to the relief sought [*2] has been filed or heard. The facts set forth herein are taken from the record before the Court.

The Court has jurisdiction over this matter pursuant to Sections 157 and 1334 of Title 28 and Section 1501 of Title 11. This is a core proceeding pursuant to 28 U.S.C. Section 157(b)(2)(P). Venue in the District of New Jersey is proper under 28 U.S.C. Section 1410(1) and (3) because the principal assets are located in New Jersey.

On March 13, 2009, the Ontario Superior Court of Justice ("Ontario Court") appointed RSM Richter Inc. ("RSM") as receiver and duly-authorized foreign representative ("Receiver") of Innua Canada and Normandy in a Canadian receivership proceeding ("Canadian Proceeding"). [1] The Foreign Debtors include Normandy, the parent company, and Innua Canada, a wholly-owned subsidiary. Normandy purchases plasticizers and polyvinyl chloride ("PVC") from producers mainly in Asia and sells those products through its subsidiaries. David and Gail Harris are the principals ("Principals") holding 100% of Normandy's common shares. The Principals reside in Tortola in the British Virgin Islands.

Normandy's registered office is located in Grand Turk in the Turks and Caicos Islands and operates in Canada from an office in Burlington, Ontario. Innua Canada is a Canadian federally incorporated company which operates throughout North America with its registered office also in Burlington, Ontario. Innua Canada's principal assets consist of: (a) accounts receivable of approximately $ 2.2 million and (b) an inventory of approximately 3,155 metric tons of di-sononyl phthalate (DINP), a liquid petroleum based plasticizer, presently stored in tank farms in Bayonne, New Jersey and Houston, Texas as well as railcars in various other locations. These plasticizers are valued up to $ 4.2 million according to the Receiver's First Report filed with the Ontario Court.

Between July 2000 and January 2007, Fortis Bank (Nederland) N.V. and Normandy entered into lending agreements under which Fortis financed Normandy's trading activities by providing $ 6.5 million in 2000 up to $ 40 million in 2007. Upon reviewing Normandy's 2008 Financial Statements for the year ending September 30, 2008, Fortis realized that Normandy was in default of certain covenants in their [*4] agreements such as the solvency test, the maximum inventory amount and the minimum earnings before tax. After issuing several notices of default resulting in no response regarding the provision of additional collateral to cover the shortfalls, Fortis allegedly lost confidence in the Foreign Debtors. Fortis contends that the Foreign Debtors failed to

---

[1] During oral argument, Counsel for the Receiver notified the Court that Normandy alone has taken [*3] an appeal of the Receivership Order.

provide confirmation of inventory purchases and that they also directed their account debtors to make payments of accounts receivable to accounts other than that of Fortis. Additionally, the storage facilities for the DINP have outstanding invoices of approximately $ 750,000 and the warehousers have threatened to sell the inventory in their possession.

Due to these events and the Foreign Debtors' realization that the business could no longer operate as a going concern, Fortis issued a formal demand letter upon the Foreign Debtors on March 11, 2009 for repayment of the full amounts due and owing accompanied by notices of intention to enforce security in accordance with Canadian insolvency laws. On March 12, 2009, after receiving notice of the Canadian Proceeding, the Principals allegedly transferred $ 30,000 to a personal account and made **[*5]** a $ 45,000 severance payment to former employees. As stated above, the Ontario Court appointed RSM as the receiver on March 13, 2009.

On March 16, 2009, pursuant to the Receivership Order issued by the Ontario Court, the Receiver commenced proceedings in the District of New Jersey under Chapter 15 of the United States Bankruptcy Code by filing Verified Petitions for Recognition of Foreign Proceedings ("Chapter 15 Petitions"). In conjunction with the Chapter 15 Petitions, the Receiver filed an Order to Show Cause which the Court entered on March 17, 2009 temporarily imposing the automatic stay under 11 U.S.C. Section 362 on any and all actions, pending a hearing and determination on the Receiver's Motion for Provisional Relief under Section 1519(a) and Section 105(a) of the Bankruptcy Code. The Court set a hearing date of March 25, 2009 for the motion seeking provisional relief and April 13, 2009 for the hearing on recognition of the Chapter 15 Petitions ("Recognition Hearing") to **[*6]** determine whether the Canadian Proceeding is a foreign main proceeding or in the alternative, a foreign non-main proceeding. Service of the Order to Show Cause has been made and notice thereunder has been given.

At this juncture, the Court will focus on the provisional relief sought by RSM under Section 1519 and Section 105 of the Bankruptcy Code. In the motion, the Receiver seeks an order making Section 362 applicable to protect the Foreign Debtors' assets located in the United States during the "gap period," which is the time between the filing of the Chapter 15 petition and the court's ruling on recognition. *See In re Pro-Fit Holdings Ltd.,* 391 B.R. 850, 858 (Bankr. C.D. Cal. 2008). Section 1519(a)

provides:

**HN1**[⬆] From the time of filing a petition for recognition until the court rules on the petition, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including--

(1) staying execution against the debtor's assets;

(2) entrusting the administration or realization of all or part of the debtor's assets located in the United States to the foreign **[*7]** representative or another person authorized by the court, including an examiner, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy; and

(3) any relief referred to in paragraph (3), (4), or (7) of section 1521(a).

11 U.S.C. § 1519(a) (2009). The relevant subsections of Section 1521(a) state:

**HN2**[⬆] (3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

(4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;. . .and

(7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550 and 724(a).

11 U.S.C. § 1521(a)(3), (4), & (7) (2009). In *In re Daewoo Corporation,* the Honorable Robert E. Gerber, United States Bankruptcy Judge for the Southern District of New York, interpreted **HN3**[⬆] Section 1519(a)'s use of "including" to mean that the list that follows is not exhaustive. *See In re Daewoo Corp.,* 06-12242 (REG), *Hrg. on Prelim. Inj.,* 80 (Oct. 4, 2006) **[*8]** . Furthermore, **HN4**[⬆] Section 1519(b) provides that the provisional relief, if granted, terminates upon the recognition of the Chapter 15 Petition unless extended under Section 1521(a)(6). 11 U.S.C. § 1519(b) (2009). Finally, **HN5**[⬆] Section 105(a) allows the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 217 of 882
2009 Bankr. LEXIS 994, *8

Page 3 of 6

this title." 11 U.S.C. § 105(a) (2009). Included in this provision is the power to issue injunctions under appropriate circumstances. *In re Otero Mills, Inc.,* 21 B.R. 777, 778 (Bankr. D.N.M. 1982) *aff'd* 25 B.R. 1018 (D.N.M. 1982).

*HN6*[↑] Provisional relief under Section 1519 of the Bankruptcy Code requires satisfaction of the injunctive relief standard by the foreign representative, in this case, RSM, the Receiver. 11 U.S.C. § 1519(e) (2009). Pursuant to Third Circuit precedent, a party seeking a preliminary injunction must show that: (1) it has a likelihood of success on the merits; (2) it will suffer irreparable harm if the injunction is denied; (3) granting preliminary relief will not result in even greater harm to the non-moving party; and (4) the public interest **[*9]** favors such relief. *Rogers v. Corbett,* 468 F.3d 188, 192 (3d Cir. 2006) (citations omitted); *Kos Pharmaceuticals, Inc. v. Andrx Corp.,* 369 F.3d 700, 708 (3d Cir. 2004) (citations omitted). The first two factors are mandatory and must be present for the Court to issue a preliminary injunction. *Medical Marketing Consultants, LLC v. Cardiac Telecom Corp.,* 2007 U.S. Dist. LEXIS 48406, at *18 (W.D. Pa. May 31, 2007) (citing *Adams v. Freedom Forge Corp.* 204 F.3d 475, 484 (3d Cir. 2000)). The moving party must establish the first two factors before the Court may consider the remaining two. *See id.* at *18-19; *see also Tenafly Eruv Assoc. Inc. v. Borough of Tenafly,* 309 F.3d 144, 157 (3d Cir. 2002) (citing *Adams,* 204 F.3d at 484.).

In the instant matter, as to the first factor, the Receiver contends that there is a high likelihood that the Canadian Proceeding will be recognized as a foreign main proceeding pursuant to Sections 1515 and 1517. The Receiver argues that the Canadian Proceeding is pending in a country where Innua Canada has its center of main interest evidenced by a registered office in Burlington, Ontario containing books, records, computers, and employees. The Receiver also submits **[*10]** that Normandy operates in Canada out of the same offices and utilizes the Burlington, Ontario address on principal loan documents. Furthermore, the Receiver maintains a foreign representative filed the Chapter 15 Petitions including the required documentation such as the Receivership Order and a statement listing all foreign proceedings with respect to the Foreign Debtors.

As to the second factor, the Receiver contends that the Foreign Debtors and their creditors face irreparable harm absent the provisional relief because of potential loss or damage to the value of the assets. Specifically,

the Receiver is concerned about the warehousers' threats to sell the inventory in their possession due to unpaid invoices and potential additional transfers by the Principals of estate assets. The Receiver argues that immediate imposition of the automatic stay is necessary to prevent any further dissipation of assets. This becomes clear in light of the two lawsuits recently commenced in the United States District Court for the Southern District of Texas, Houston Division: (i) *Stolt Tank Containers B. V. v. Normandy Group S.A., Innua Canada Ltd., and Innua Petrochem Ltd., in personam,* No. 09-00779; **[*11]** and (ii) *Stolt Tankers B.V. v. Normandy Group S.A., Innua Canada Ltd., Innua Petrochem Ltd., in personam, and 3,844,360 Pounds of Disononyl Phtalate, in rem,* No. 09-00763. Based upon this showing, the Receiver has met its burden as to the first two factors, that is, likelihood of success on the merits and irreparable harm to the Receiver and the bankruptcy estate.

The third factor, whether preliminary relief will result in even greater harm to the non-moving party, weighs in favor of the Receiver. Essentially, the Receiver requests that the status quo be maintained pending recognition of the Chapter 15 Petitions, which will actually serve to benefit the estates' creditors by allowing for an orderly administration of the Foreign Debtors' financial affairs under the Canadian Proceeding. Moreover, as the Receiver contends, creditors or interested parties will not suffer significant harm or hardship because the provisional relief is temporary, pending the hearing on recognition.

As to the last factor, whether the relief sought is in conjunction with United States' foreign policy, the Receiver submits that the provisional relief advances the express purposes of Chapter 15 found at Section 1501 of the Bankruptcy Code. **[*12]** The Receiver argues that the Foreign Debtors' assets located in the United States are in danger without the provisional relief, which is precisely the harm Chapter 15 is designed to prevent. Clearly, *HN7*[↑] Section 1525 promotes cooperation between the United States Bankruptcy Court and the foreign court where the foreign proceeding is located and imposition of the automatic stay furthers such cooperation and policy.

Based upon the above, the Court is satisfied that the Receiver has met its burden under Section 1519, Section 105 and the injunctive relief standard of the Third Circuit. The Court will grant the Receiver's Motion for Provisional Relief applying Section 362 to the Foreign Debtors' Chapter 15 cases. An Order in

2009 Bankr. LEXIS 994, *12

conformance with this Opinion has been entered by the
Court and a copy is attached.

Very truly yours,

*/s/ Donald H. Steckroth*

DONALD H. STECKROTH

UNITED STATES BANKRUPTCY JUDGE

---

**End of Document**

# TAB – 9

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| LATAM Airlines Group S.A., *et al.*, | Case No.: 20-11254 (JLG) |
| Debtors.[1] | Jointly Administered |
| | **Reference Docket No. 22** |

**ORDER AUTHORIZING DEBTOR LATAM AIRLINES**
**GROUP S.A. TO ACT AS FOREIGN REPRESENATIVE OF THE DEBTORS**

Upon the Motion (the "Motion")[2] of LATAM Airlines Group S.A. ("LATAM

Parent"), and its affiliated debtors and debtors-in-possession in the above-captioned cases

(collectively, the "Debtors"), for entry of an order (this "Order") pursuant to section 1505 of title

11 of the United States Code (the "Bankruptcy Code"), for authorization for LATAM Parent to

act as the foreign representative of the Debtors in Colombia and Chile in order to seek

recognition of the Chapter 11 Cases on behalf of the Debtors, and to request that the

Superintendencia de Sociedades in Colombia (the "Superintendence of Companies" or the

"Colombian Court") and (B) the competent civil court of the city of Santiago in Chile (the

"Chilean Civil Court" and, together with the Colombian Court, the "Foreign Courts") lend

---

[1]     The Debtors in these chapter 11 cases (as defined herein), and each Debtor's federal tax identification number (as applicable), are as follows: LATAM Airlines Group S.A. (59-2605885); Lan Cargo S.A. (98-0058786); Transporte Aéreo S.A. (96-9512807); Inversiones Lan S.A. (96-5758100); Technical Training LATAM S.A. (96-847880K); LATAM Travel Chile II S.A. (76-2628945); Lan Pax Group S.A. (96-9696800); Fast Air Almacenes de Carga  S.A. (96-6315202); Línea Aérea Carguera de Colombia S.A. (26-4065780); Aerovías de Integración Regional S.A. (98-0640393); LATAM Finance Ltd. (N/A); LATAM Airlines Ecuador S.A. (98-0383677); Professional Airline Cargo Services, LLC (35-2639894); Cargo Handling Airport Services, LLC (30-1133972); Maintenance Service Experts, LLC (30-1130248); Lan Cargo Repair Station LLC (83-0460010); Prime Airport Services Inc. (59-1934486); Professional Airline Maintenance Services LLC (37-1910216); Connecta Corporation (20-5157324); Peuco Finance Ltd. (N/A); Latam Airlines Perú S.A. (52-2195500); Inversiones Aéreas S.A. (N/A); Holdco Colombia II SpA (76-9310053); Holdco Colombia I SpA (76-9336885); Holdco Ecuador S.A. (76-3884082); Lan Cargo Inversiones S.A. (96-9696908); Lan Cargo Overseas Ltd. (85-7752959); Mas Investment Ltd. (85-7753009); Professional Airlines Services Inc. (65-0623014).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is: 6500 NW 22nd Street Miami, FL 33131.

[2]     All capitalized terms used and not defined herein shall have the meanings ascribed to them in the Motion.

assistance to this Court in protecting the Debtors' property, and to seek any other appropriate

relief from the Foreign Court that the Foreign Court deems just and proper, all as more fully

described in the Motion; and the Court having jurisdiction to consider the Motion and the relief

requested therein in accordance with 28 U.S.C. §§ 157 and 1334; and consideration of the

Motion and the relief requested therein being a core proceeding pursuant to 28 U. S. C. § 157(b);

and venue being proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and

proper notice of the Motion having been provided to the parties listed therein, and it appearing

that no other or further notice need be provided; and the Court having determined that the legal

and factual bases set forth in the Motion establish just cause for the relief granted herein; and

upon all of the proceedings had before the Court and after due deliberation and sufficient cause

appearing therefor,

### IT IS HEREBY ORDERED THAT:

1.        The Motion is GRANTED to the extent set forth herein.

2.        The Debtors' filing of voluntary petitions for relief under chapter 11 of the

Bankruptcy Code (the "Chapter 11 Cases"), constitute "foreign proceedings" as that term is used

in Article II(a) of the Model Law on Cross-Border Insolvency adopted by the United Nations

Commission on International Trade Law.  The Chapter 11 Cases have been commenced by the

filing of the Debtors' petitions for relief with this Court.

3.        LATAM Parent is authorized and empowered (i) to act as the "foreign

representative" of the Debtors in Colombia, as such term is defined in the Colombian Law, (ii) to

seek recognition by the Colombian Court of the Chapter 11 Cases and of certain orders made by

the Court in the Chapter 11 Cases from time to time, (iii) to request that the Colombian Court

lend assistance to this Court and (iv) to seek any other appropriate relief from the Colombian

Court or any other court, tribunal, regulatory body or administrative body having its jurisdiction
in Colombia as the Debtors deem just and proper.

4.      The Colombian Court and any other court, tribunal, regulatory body or
administrative body having its jurisdiction in Colombia are hereby respectfully requested (i) to
grant representative status to LATAM Parent in any foreign proceeding, (ii) to make such orders
and to provide such assistance to LATAM Parent as the foreign representative and an officer of
this Court, as may be necessary or desirable to give effect to this Order and all applicable
provisions of the Bankruptcy Code and (iii) to assist the Debtors, LATAM Parent, in its capacity
as the foreign representative, and their respective agents in carrying out the terms of (x) this
Order, (y) any other order of this Court and (z) the provisions of the Bankruptcy Code, including,
for the avoidance of doubt, the automatic stay pursuant to Section 362 of the Bankruptcy Code.

5.      LATAM Parent is authorized and empowered (i) to act as the "foreign
representative" of each Debtor in respect of the Chapter 11 Cases in Chile, as such term is
defined in the Chilean Law, (ii) to seek recognition by the Chilean Civil Court of the Chapter 11
Cases and of certain orders made by the Court in the Chapter 11 Cases from time to time, (iii) to
request that the Chilean Civil Court lend assistance to this Court and (iv) to seek any other
appropriate relief from the Chilean Civil Court or any other court, tribunal, regulatory body or
administrative body having its jurisdiction in Chile as the Debtors deem just and proper.

6.      The Chilean Civil Court any other court, tribunal, regulatory body or
administrative body having its jurisdiction in Chile are hereby respectfully requested (i) to grant
representative status to LATAM Parent in any foreign proceeding, (ii) to make such orders and
to provide such assistance to LATAM Parent as the foreign representative and an officer of this
Court, as may be necessary or desirable to give effect to this Order and all applicable provisions

3

of the Bankruptcy Code and (iii) to assist the Debtors, LATAM Parent, in its capacity as the foreign representative, and their respective agents in carrying out the terms of (x) this Order, (y) any other order of this Court and (z) the provisions of the Bankruptcy Code, including, for the avoidance of doubt, the automatic stay pursuant to Section 362 of the Bankruptcy Code.

7.    LATAM Parent is authorized and empowered (i) to act as the "foreign representative" of the Debtors in any other court as it deems necessary or beneficial ("Additional Courts"), (ii) to seek recognition by any Additional Courts of the Chapter 11 Cases and of certain orders made by the Court in the Chapter 11 Cases from time to time, (iii) to request that any Additional Courts lend assistance to this Court and (iv) to seek any other appropriate relief from any Additional Courts or any other court, tribunal, regulatory body or administrative body having its jurisdiction as the Debtors deem just and proper.

8.    All other courts, tribunals, regulatory and administrative bodies, including any Additional Courts, are hereby respectfully requested (i) to grant representative status to LATAM Parent in any foreign proceeding, (ii) to make such orders and to provide such assistance to LATAM Parent as the foreign representative and an officer of this Court, as may be necessary or desirable to give effect to this Order and all applicable provisions of the Bankruptcy Code, and (iii) to assist the Debtors, LATAM Parent, in its capacity as the foreign representative, and their respective agents in carrying out the terms of (x) this Order, (y) any other order of this Court and (z) the provisions of the Bankruptcy Code, including, for the avoidance of doubt, the automatic stay pursuant to Section 362 of the Bankruptcy Code.

9.    The terms and conditions of this Order shall be immediately effective and enforceable upon its entry

4

10.     This Court shall retain jurisdiction with respect to any matters, claims, rights or

disputes arising from or related to the Motion or the interpretation, implementation or

enforcement of this Order.


Dated: May 28, 2020
     New York, New York

                              /s/ *James L. Garrity, Jr.*
                              HONORABLE JAMES L. GARRITY, JR.
                              UNITED STATES BANKRUPTCY JUDGE

108

TAB – 10

**MATTER:    1. [800] Decision on the Recognition under Section 316**
**COURT      : 2nd. Civil Court of Santiago**
**CASE- DOCKET      : C-8553-2020**
**IN RE:        LATAM AIRLINES GROUP S.A./TECHNICAL TRAINING LATAM**
**S.A.**

**In Santiago, on June 4, 2020**

<u>**Ruling rendered on the motion filed on June 1, 2020**</u>

With regard to the main claim and first addendum: they have been decided herein.
With regard to the second addendum: the annexed documents are considered duly enclosed to the record of the case.
The third Addendum: is to be taken into account
With regard to the fourth Addendum: the invoked legal capacity is taken into consideration, and the document evidencing it is considered duly annexed.
With regard to the Fifth Addendum: The legal counseling and power of attorney are taken into account.
The sixth addendum: has been taken into consideration according to the provisions set forth in section 6 of Law No. 20.720.

**This Court having examined the petition filed herein from which it arises:**

**First**: The appearance entered in this court by the attorneys-at-law José María Eyzaguirre Baeza, Cristóbal Eyzaguirre Baeza, Nicolás Luco Illanes and José Miguel Huerta Molina, acting in the name and on behalf of LATAM Airlines Group S.A., doing business as an aeronautical company, all of them domiciled at Presidente Riesco 5711, 20th floor, Las Condes, in Santiago who requested the recognition by the Chilean court of the core reorganization proceeding under Chapter 11, Title 11 of the US Bankruptcy Code, pending in the US Bankruptcy Court for the Southern District of New York, docket N ° 20-11254, and which was brought on May 28, 2020.

**Second**: That section 314 of Law No. 20.720 sets forth that the motion for recognition in Chile of the core foreign reorganization proceeding shall meet the following requirements:

1.      Be filed by the foreign representative who has been empowered in a foreign proceeding to administer the reorganization or liquidation of the debtor's assets or businesses or to act as representative of the foreign proceeding.

2.      Be submitted together with an authorized copy of the resolution declaring the commencement of the foreign proceeding together with the appointment of the foreign representative; or a certificate issued by the foreign court attesting to the existence of the foreign proceeding and the appointment of the foreign representative; or any other document issued by an authority of the foreign State in whose territory the aforementioned proceeding has been brought, and which allows the competent court to be fully convinced of both the existence thereof and the appointment of the foreign representative.

1

3.      Be submitted together with a declaration duly stating the details of all the foreign proceedings brought regarding the debtor known to the foreign representative.

4.      That all the documents supporting the motion be submitted duly translated into Spanish.

5.      That all the public documents issued abroad referred to in Chapter VIII of Law No. 20.720 be submitted duly legalized in accordance with section 345 of the Chilean Code of Civil Procedure

**Third**: That the first two requirements stated above are met in this case by the documents annexed to the motion and singled out as "*Order authorizing the debtors to operate their businesses in the ordinary course and ordering the implementation of the automatic stay of the proceedings brought against them*" and "*Order authorizing the debtor Latam Airlines Group S.A. to act as foreign representative of the debtors*", both of them corresponding to copies of the resolutions issued by the United States Federal Bankruptcy Judge for the Southern District of New York, dated May 28, 2020.  The first of them sustain the motion for reorganization under Chapter 11 of Title 11 of the US Code, filed by LATAM Airlines Group S.A. (the "Parent Company of LATAM"), and its related debtors and debtors in possession of its assets; while the second one authorizes the Parent Company of LATAM to act as a foreign representative and seek in Chile, in the name and on behalf of the debtors, the recognition of the reorganization proceeding brought under Chapter 11 of Title 11 of the US Code.

With regard to the third requirement mentioned above, a declaration signed by Nicolás Luco Illanes, representing LATAM Airlines Group SA, was attached to the motion referred to above, stating that the only foreign proceeding brought in the terms of Law No. 20.720, affecting the debtors in respect of whom the foreign recognition has been requested, is the one pending in the United States Bankruptcy Court for the Southern District of New York, *in re*: "*LATAM Airlines Group and other Debtors*" under N° 20-11254.

With regard to the last two requirements specified above, it should be noted that the documents annexed to the motion have been duly translated into Spanish, and those corresponding to public instruments executed in the United States - a member of The Hague Convention Abolishing the Requirement of Legalization for Foreign Public Documents- have been duly legalized, notarized and apostilled as provided for in sections 345 and 345 bis of the Chilean Code of Civil Procedure.

**Fourth**: That, having fulfilled the formal requirements set forth in section 314 of Law No. 20.720, it is now relevant to address the substantive provisions to be complied with under section 316 of such Law in order to sustain the motion for recognition of a main foreign proceeding, to wit:

1.- That the specific measures ordered by the foreign court do not infringe the internal public policy.

2

2.- That the foreign proceeding is a proceeding within the meaning of paragraph a) of section 301 of Law No. 20.720;

3.- That the foreign representative seeking the recognition is an individual or a corporation within the meaning of paragraph d) of section 301 of Law No. 20.720;

4.- That the motion meets the requirements set forth in paragraph 2) of section 314, of Law No. 20.720.

5.- That the motion has been filed with the competent court pursuant to section 303 of Law No. 20.720.

6.- That the main foreign proceeding is being heard and tried in the State where the debtor's main center of his interests is located.

**Fifth**: That the rulings rendered by the United States Federal Bankruptcy Judge for the Southern District of New York, dated May 28, 2020, basically order: (i) to sustain the reorganization motion; (ii) to stay all executions, foreclosures, proceedings and collections against the debtors; (iii) to appoint a LATAM Airlines Group S.A. as foreign representative; and (iv) to respectfully request the courts and regulatory or administrative bodies having jurisdiction in Chile to recognize the capacity as foreign representative of the Parent Company of Latam, assisting it in that capacity as well as its debtors. The foregoing does not in any way disturb or threat the internal public policy; and that is the reason for which the first requirements mentioned above are considered as met.

The second requirement set forth in section 316 of the Chilean Law No. 20.720 has also been met because the proceeding brought in the United States, evidenced by the documents referred to above, is recognized as a reorganization proceeding handled and processed under the US Bankruptcy Law, and in which the debtor's assets and businesses have been subject to the control or supervision of the court or foreign representative.

Finally, the third and fourth requirements referred to above are deemed met as discussed in the first paragraph of the third recital hereof.

With regard to the fifth requirement set forth in section 316 of Law No. 20.720, it should be pointed out that this court has jurisdiction over the matter at issue in such proceeding because the petitioner's place of business/registered office is located in Chile, specifically at Avenida Presidente Riesco No. 5711, floor 20, in Las Condes, Metropolitan Region.

With regard to the last requirement set forth in section 316 of Law No. 20.720, the annual report for the year 2019 annexed to the motion filed in this proceeding, evidences that the Latam Group develops a relevant part of its business in the United States, listing its shares on the stock exchange of New York, issuing bonds in the international market to obtain

financing in accordance with the US securities laws, and it is also the place where its reorganization is currently being processed. Therefore, it is worth considering that the United States is the State where the debtor has the center of his main interests, thus verifying the fulfillment of the last of the analyzed requirements.

**Sixth**: That, given that the motion meets all the formal and substantive requirements, the motion is to be sustained, as stated below.

**Therefore, and based on** the provisions set forth in sections 299, 300, 301, 305, 308, 313, 315 and 319 of Law No. 20.720, **I do hereby order:**

I.-To recognize in Chile, the foreign reorganization proceeding brought by LATAM Airlines Group S.A. in the United States Bankruptcy Court for the Southern District of New York under No. 20-11254.

II.- To stay and suspend, effective from the date hereof and during the period of time in which said proceeding is handled and processed:

> a)      the initiation or continuation of all the individual actions or proceedings brought with respect to the debtor's assets, rights, obligations or responsibilities.
> b)      any individual enforcement measure against the debtor's assets.
> c)      all rights to transfer or encumber the debtor's assets, as well as to otherwise dispose of those assets.

III.- That the scope, modification and termination of the stay or suspension referred to above shall be subject to the provisions set forth in Law No. 20.720 and shall exclusively refer to those assets that are located in the Chilean territory.

IV.- That the provisions set forth in sub-paragraph a) of paragraph II above, shall not affect the right to bring individual actions or proceedings provided that it is necessary to preserve a credit against the debtor.

V.- That the provisions set forth in paragraph II shall not affect the right to file for reorganization in accordance with Law No. 20.720 or to proof or verify any claims in the respective proceeding.

It is also hereby ordered to publish notice hereof in the *Boletín Concursal* (Chilean Insolvency Bulletin) in accordance with the provisions set forth in section 6 of Law No. 20.720.

Ruling rendered by Gustavo Cerón Seguel, *Pro Tempore* Judge.

**Notice hereof has been served in the City of Santiago, on June 4, 2020**

**GUSTAVO DAVID CERÓN SEGUEL**
**Date: 6/4/2020 07:57:53 PM**

This document has been electronically signed and its original can be validated at
http://verificadoc.pjud.cl or during the course of the proceedings.

As from April 05, 2020, the time displayed corresponds to the winter time established in
Continental Chile. For the Magallanes and Chilean Antarctic Region add one hour, while for
Western Insular Chile, Easter Island and Salas y Gómez Island subtract two hours. For further
information, consult http://www.horaoficial.cl

# TAB – 11

CERTIFIED TRANSLATION No. 0496-20 TO ENGLISH OF A DOCUMENT WRITTEN IN SPANISH

## SUPERINTENDENCE OF COMPANIES

[BAR CODE]
When responding cite No. 2020-01-270364
Type: Exit                                Date: 06/17/2020 05:06:57 pm
Process: 16017 – HEARINGS IN REORGANIZATION PROCESSES
Company: 830019189 – LAN AIRLINES S.A. SUC File: 20641
Sender: 400 – OFFICE FOR INS. PROCEDURES
Destination: 4151 – LEGAL SUPPORT FILE
Pages: 10                    Annexes: YES
Documentary Type: MINUTES          Consecutive: 400-000588

## MINUTES
## HEARING TO RULE ON THE FOREIGN PROCEEDING RECOGNITION REQUEST

| DATE | June 12th, 2020 |
|---|---|
| TIME | 9:00 am |
| NOTICE | 2020-01-229848 of June 5th, 2020 |
| PLACE | Superintendence of Companies – Technology tools |
| SUBJECTS OF THE PROCEEDING | Latam Airlines Group S.A. and others |
| PROCEEDING | Cross-border insolvency |
| FILE | 20641 |

## MATTER OF THE HEARING

Analysis of the request of foreign proceeding as a main proceeding pursuant to Title III, which adopted the cross-border insolvency regime.

## STRUCTURE OF THE HEARING

(I)      INSTALLATION
(II)     DEVELOPMENT
(III)    CLOSING

## (I) INSTALLATION

At 9:10 am the hearing to study the foreign proceeding recognition request of Latam Airlines Group S.A. and other commenced.

The official delegate with judicial powers, Guillermo León Ramírez Torres, appointed through Resolution 2020-01-212546 of May 29, 2020, presided the hearing.

The attendants were told that, pursuant to article 107 of the C.G.P., the minutes only contains the participants and, in this case, the issued decision. The data message with all the development of the hearing and other filed documents will be attached to the minutes of the hearing.

MARIA CRISTINA HOLGUÍN
TRADUCCIONES
TRADUCTORA OFICIAL
Certificado de Idoneidad N 0273 de 2009

1

Afterwards, the hearing through technologic mechanisms protocol was explained, pursuant to Resolution 100-001101 of March 31st, 2020 of the Superintendence of Companies, according to the measures adopted by the National Government to face the current health emergency and the attendants were given the opportunity to speak, identify themselves, and record their attendance.

| Attorneys / Participants | Client / Company |
| --- | --- |
| Carlos Lázaro Umaña Trujillo, Paola Guerrero Yemail, Jaime Elías Robledo Vásquez | Latam Airlines Group S.A. |
| Miguel Fernando Mesa Venegas | Latam Airlines Group S.A. Financial Director |
| Adriana Paola Rincón Palacios | Dian – Large Contributors |
| Lina María Perdomo | Organización Terpel S.A. |

### (II) DEVELOPMENT

The foreign representative, Latam Airlines Group S.A., was given the opportunity to speak to set forth the requests made through brief 2020-01-225456 of June 4th, 2020.

The Judge asked the foreign representative to clarify certain matters and gave the participants the opportunity to say if they had any opposition to the recognition of the foreign proceeding.

Intervened:

| |
| --- |
| Latam Airlines Group S.A. |
| Latam Airlines Group S.A. Financial Director |
| Dian – Large Contributors |
| Organización Terpel S.A. |

The Office gave a 15-minute break.

At 10:55 am the hearing continued.

The Official Delegate with Judicial Powers proceeded to issue the decision that resolved the foreign proceeding recognition request, which is transcribed in its literal content:

### "I. BACKGROUND

1. Through brief of June 4th, 2020, filing number 2020-01-225456, Latam Airlines Group S.A., a company incorporated pursuant to the laws of Chile; acting as foreign representative of the reorganization proceeding of Latam Airlines Group S.A., and others, proceeding subject to Chapter 11 of Title 11 of the United States of America Code, requested the recognition of the foreign proceeding pursuant to Title III of Law 1116/2006, and the enforcement of measures involving the debtors in Colombia.



2. Through Writ 2020-01-229848 of June 5th, 2020, this Office summoned a hearing to be held on June 12th, 2020, at 9:00 am; it published the brief of the request; ordered the foreign representative to file evidence of the good standing and legal representation of the debtors that had permanent establishments in Colombia and denied the injunctions requested in the foreign proceeding recognition request.

3. Through brief 2020-01-240670 of June 10th, 2020, Latam Airlines Group S.A., complying with June 5th, 2020 Writ's order, filed certificates of good standing and legal representation of the debtors that have permanent establishments in Colombia, which are:

    • Latam Airlines Group S.A. Sucursal Colombia.
    • Aerovías De Integración Regional S.A.
    • Línea Aérea Carguera De Colombia S.A.
    • Latam Airlines Perú S.A. Sucursal Colombia.

4. During the hearing, the foreign representative intervened, explaining the details of its request, and answered the Office's and other creditors' requirements.

## II. OFFICE'S CONSIDERATIONS

### Regarding the request for recognition of the foreign proceeding before the United States Bankruptcy Court for the Southern District of New York as a main proceeding

1. Law 1116/2006, in its Title III, adopted the cross-border insolvency regime, based on UNCITRAL (United Nations Commission on International Trade Law) Model Law published in 1997.

2. The cross-border insolvency regime seeks to (i) regulate the cooperation between competent Colombian authorities and the authorities of foreign jurisdictions, (ii) increase legal certainty for trade and investment, (iii) fair and efficient administration of cross-border insolvency, always seeking the protection of the interests of the creditors and the debtor, and (iv) assure the protection of the debtor's assets and the maximization of their value.

3. Particularly, the cross-border insolvency regime allows the foreign representative to request the recognition of the foreign proceeding to obtain from the local tribunal the necessary protective measures to proceed with its insolvency.

4. For the Superintendence of Companies, as the competent authority, to be able to recognize the proceeding, pursuant to articles 103 of Law 1116/2006, the proceeding (i) must be a foreign proceeding according to the definition in section 87.1; (ii) the foreign representative must be a person or body in the sense of articles 87.4 of the same law; (iii) the request must comply with the requirements established by article 100; and (iv) the request must have been filed upon the Colombian competent authority.

5. Article 87.1 of the insolvency law defines the foreign proceeding as a collective, judicial, or administrative proceeding, initiated in a State different from the Colombian State, under an insolvency related law, and pursuant to which the assets and business of the debtor are subject to the control or surveillance of the foreign tribunal.

3

MARIA CRISTINA HOLGUIN
TRADUCCIONES
TRADUCTORA OFICIAL
Certificado de Idoneidad N° 0274 de 2009

6. The Superintendence of Companies, as competent authority, may decide not to recognize the foreign proceeding if doing so is contrary to the public order of the Republic of Colombia, which must be evident and beyond any doubt.

7. In this case, a duly legalized copy of the Order issued on May 28th, 2020 by the United States Bankruptcy Court for the Southern District of New York, translated to the Spanish language , was filed with the brief of June 4th, 2020, in which the Court communicates the beginning of the relief proceeding of the Bankruptcy Code's Chapter 11 by the debtors, stating also that this proceeding falls under the scope of the "foreign proceeding" definition pursuant to article II of the United Nations Commission on International Trade Law Model Law on Cross-Border Insolvency.

8. In that same order, Latam Airlines Group S.A. was appointed, as requested, as "foreign representative" of the Debtors in Colombia, "*(ii) to seek recognition by the Colombian Court of the Chapter 11 Cases and of certain orders made by the Court in the Chapter 11 Cases from time to time, (iii) to request that the Colombian Court lend assistance to this Court and (iv) to seek any other appropriate relief from the Colombian Court or any other court, tribunal, regulatory body or administrative body having its jurisdiction in Colombia as the Debtors deem just and proper.*"

9. According to the above and under article 87.1 of Law 1116/2006, having fulfilled the requirements, this Office will recognize the foreign proceeding and will have as Latam Airlines Group S.A. as foreign representative, pursuant to articles 96 and 97 of Title III of Law 1116/2006.

## Regarding the type of foreign proceeding

10. That said, Law 1116/2006 distinguishes two types of foreign proceedings that can be recognized: (i) the main proceeding, undertaken in the State where the debtor has the center of its main interests, and (ii) the non-main proceeding, undertaken in a country where the debtor only has an establishment or branch. The measures that can be granted with the recognition of a foreign proceeding depend on said distinction.

11. In this case, concerning the debtors, according to the considerations explained in the June 4th, 2020, brief and during this hearing, and according to the documents filed by the foreign representative, the debtors are part of a group of enterprises incorporated in different jurisdictions, which develop a common business and manage together the resources of the group to provide a passenger and cargo transportation service through an international routes network; their suppliers are located in each of the jurisdictions in which they carry out their business; most of their income and expenses are accrued in American dollars, most of its financing has been obtained pursuant to the laws of different States of the United States of America, and many of their contracts are subject to the laws and courts of that jurisdiction.

12. Based on the above, this Office does not find any objection and therefore considers possible the recognition of the proceeding initiated before the United States Bankruptcy Court for the Southern District of New York, pursuant to the chapter 11 of the Federal Bankruptcy Code, as a foreign main proceeding.



MARIA CRISTINA HOLGUIN
TRADUCCIONES
TRADUCTORA OFICIAL
Certificado de Idoneidad N. 0274 de 2059

**Regarding the request to recognize Latam Airlines Group S.A. as foreign representative of the Group's foreign proceeding**

13. As a necessary consequence of what was just said, Latam Airlines Group S.A. will be recognized as representative of the foreign proceeding, with all the prerogatives established by articles 96 and 97 of Law 1116/2006.

**Regarding the request to grant the measures contemplated in articles 105 of Law 1116/2006, conditionally**

14. Pursuant to article 105 of Law 1116/2006, if the proceeding is recognized as a main proceeding, as it occurs in this case, the automatic measure established in that article apply.

15. Number 1 of said article sets forth that no collection proceeding against the debtor can be initiated, and collection proceedings already initiated are suspended, being the foreign representative and the debtor legally empowered to request, individually or collectively, the suspension of the collection proceeding and to argue the nullity of the proceeding or of action occurred after the recognition of the foreign main proceeding.

16. On the other hand, number 2 establishes that all right to transfer or encumber the debtor's assets is suspended, as well as the right to in any way dispose of those assets, unless it is an operation under the ordinary course of business of the enterprise or unless there is an explicit authorization from this Office. Accordingly, it is warned that any operation executed or performed against what this rule establishes will be null and void *ipso iure* and will give place to successive fines until the operation is reversed.

17. Regarding this matter it is warned that, although it is a power of the foreign main proceeding court to authorize the operations on the debtor's assets and the assets of the group, that are outside their ordinary course of business that does not mean that the decisions entered by that Tribunal will have automatic application in the Colombian jurisdiction.

18. Accordingly, whenever an authorization from the court of the main domicile refer to assets located in Colombia, said authorization must be reviewed by this Office in order to comply with article 91 of Law 1116/2006, otherwise the sanctions established by numeral 2 of articles 105 of Law 1116/2006 will apply.

**Regarding the request to grant the measures contemplated in article 106 of Law 1116/2006**

19. Within brief June 4th, 2020, the foreign representative also requested:

    19.1.   To declare that, pursuant to number 5 of article 106 of Law 1116/2006, the continuity of performing contracts will be granted, in order to ensure that the ordinary operation of the Debtors in Colombia will not be interrupted.

    19.2.   To declare that, pursuant to number 5 of article 106 of Law 1116/2006, all administrative authorities shall refrain from imposing any restrictions or to issue any measures that have negative consequences on the operations of the debtors

5

or that restrict the operations within the ordinary course of business of the Debtors, based on default to pay any fees, tariffs, taxes, accrued before the Chapter 11, and in general, in connection to any service rendered before the petition date.

20. In connection with the first request, this Office considers that it consistent with article 21 of Law 1116/2006, and therefore, it is a measure that may be granted pursuant to articles 106 and 107 of Law 1116/2006. It is warned that such prohibition is limited to the fact that no agreement may be unilaterally terminated based on the initiation of the bankruptcy proceeding.

21. In this sense, the measure aimed to restrict authorities from imposing restrictions or issuing any measures based on the lack of payment of debts accrued before the admission of the main bankruptcy proceeding will be thus granted, as it is in conformity with the provisions in article 16 of Law 1116/2006.

## Regarding the request to administer the recognition of the foreign proceeding as a single proceeding

22. As the proceeding refers to the request involving all of the entities of the Latam Group, and in particular in connection to the branches and subsidiaries in Colombia, and as there is no provision to the contrary, this Office grants the request to administer the recognition as a single proceeding.

## Additional measures to protect the creditors' interests and the debtors' assets in Colombia

23. As previously stated, article 107 of the insolvency statute expressly sets forth that when granting or denying an injunction, the Colombian authority must be certain that the interests of the creditors are duly protected.

24. In this respect, aiming to achieve the purpose of the law, this Office will order that notice is given to the creditors on the recognition decision, pursuant to number 5 and 11 of article 19 of Law 1116/2006. In connection with article 19.5, the measure will be limited to the debtors that are part of the group and have permanent establishments in Colombia.

25. In addition, the debtor is ordered to file, within the next 10 days, the following information regarding the members of the group who have a permanent establishment in Colombia:

    25.1.    (i) Individual, separate and consolidated statements of financial position, according to the regulatory framework applicable to the branch in accordance with the provisions of the International Financial Reporting Standards, (ii) consolidated income financial statements, (iii) financial cash flows statement and (iv) notes to the financial statements as of December 31, 2019, certified and executed by the statutory auditor.

    25.2.    Inventory of assets and liabilities as of May 31, 2020 of the branch, certified and executed by the statutory auditor. The inventory of assets and liabilities must be


MARIA CRISTINA HOLGUIN
TRADUCCIONES
TRADUCTOR OFICIAL
Certificado de Idoneidad N° 0274 de 2009

prepared by verifying in detail the existence of each of the items of the balance sheet. The inventory of liabilities must indicate the due dates of the obligations

25.3.    Certify the status of the pension liabilities.

26. Finally, the Office warns that the foreign representative must comply with the duties set forth in article 107 of Law 1116/2006 and, particularly, the foreign representative must inform to this Court their inability to continue paying post-petition obligations within their ordinary course of business, as soon as this situation is known.

27. In the same sense, the Office will require that, as soon as the Creditors Committee within the main proceeding appoints its representatives in Colombia, this update must be informed to the Office.

In light of the above, the Official Delegate with Judicial Powers,

## RESOLVES

**First**. To recognize in Colombia, as main proceeding, the insolvency proceeding initiated pursuant to Chapter 11 of the United States Bankruptcy Code, before the United States Bankruptcy Court for the Southern District of New York by Latam Airlines Group S.A. and other debtors, as detailed in the document with filing number 2020-01-225456.

**Second**. To recognize Latam Airlines Group S.A. as foreign representative, which will have the powers set forth in articles 96 and 97 of Law 1116/2006.

**Third**. To recognize the effectiveness of the automatic measures provided for in article 105 of Law 1116/2006. It is hereby noted that any act carried out or executed in contravention of the provisions in number 2 of article 105 of Law 1116/2006, will be ineffective and will give rise to the imposition of successive fines of up to two hundred (200) current legal minimum wages by the competent Colombian authority, until the respective operation is reversed.

**Fourth**. To grant the requested measures on the continuity of ongoing contracts, in such way that no contract can be unilaterally terminated due to the initiation of the foreign insolvency process, in accordance with the provisions of articles 21, 106 and 107 of Law 1116/2006,

**Fifth**. To grant, in accordance with the provisions of articles 16, 106 and 107 of Law 1116/2006, the measures on the ineffectiveness of the contractual provisions aiming to prevent or directly or indirectly hinder the beginning of a reorganization proceeding, by an early termination of contracts, an acceleration of obligations, the imposition of restrictions and, in general, by means of any kind of prohibitions, as well as the request for authorizations or imposition of unfavorable effects for the debtor admitted to the recognition of foreign proceedings ordered in this decision. Likewise, any stipulation that prevents or hinders the debtor's participation in public or private tenders, at arm's length, will be ineffective.

**Sixth**. To grant the request to process the recognition of foreign proceeding of Latam Airlines Group S.A. and other debtors, as detailed in the brief filed under number 2020-01-225456, as a single proceeding.



**Seventh**. To warn that the orders of the foreign Court relating to the disposition of assets located in the Colombian jurisdiction, must be previously reviewed by this Office, in order to verify compliance with the provisions of article 91 of Law 1116/2006.

**Eighth**. To warn the foreign representative to comply with the duties imposed in article 107 of law 1116/2006, and in particular, giving notice to this Office of their inability to continue paying post-petition obligations within their ordinary course of business, as soon as the representative acknowledges this situation.

**Nineth**. To order the legal representatives of Latam Airlines Group S.A. Colombia Branch, Aerovías de Integración Regional S.A., Línea Aérea Carguera de Colombia S.A. and Latam Airlines Perú S.A. Colombia Branch, to file, together with their accountants and statutory auditors, within the term of 10 days following the hearing, the following information:

1. (i) Individual, separate and consolidated statements of financial position, according to the regulatory framework applicable to the branch in accordance with the provisions of the International Financial Reporting Standards, (ii) consolidated income financial statements, (iii) financial cash flows statement and (iv) notes to the financial statements as of December 31, 2019, certified and executed by the statutory auditor.

2. Inventory of assets and liabilities as of May 31, 2020 of the branch, certified and executed by the statutory auditor. The inventory of assets and liabilities must be prepared by verifying in detail the existence of each of the items in the statement of financial position. The inventory of liabilities must indicate the due dates of the obligations.

3. Certify the status of the pension liabilities.

**Tenth**. To order the judicial Support Group to publish, for a term of five (5) days, a notice informing about the recognition of the main foreign proceeding.

**Eleventh**. To order the legal representative of the debtors to post the notice prepared by the Judicial Support Group in a visible place in their main headquarters and branches, during the entire term of the proceeding.

**Twelfth**. To order the registration of this ruling in the commercial register of the main domicile of Latam Airlines Group S.A. Colombia Branch, Aerovías de Integración Regional S.A., Airline Carguera de Colombia and Latam Airlines Perú S.A. Colombia branch, in its commercial establishments, and in such places where the center of its main interests or operations is located and where it permanently carries out an economic activity, in accordance with the provisions of article 8 of Decree 2785/2008.

**To be published and complied with."**

At this point, the representative of the Colombian Tax Authority (DIAN), representing the Large Taxpayers Section, filed an appeal for reconsideration.

The appeal was transferred.

The foreign representative intervened.

8

123

Then, after the pertinent considerations, the Office decided to dismiss the appeal for reconsideration.

Finally, the Office warned that, under Colombian law, pension obligations and the corresponding rights cannot be affected by the insolvency proceeding.

The decision is final.

## II. Closing

At 11:40 a.m., the session is adjourned.

## III. Exhibits

Audio of the hearing.

The person who presided the hearing signs the minutes for the record,

[signed]
GUILLERMO LEON RAMIREZ TORRES
Official Delegate with Judicial Powers

THIS IS A TRUE AND CORRECT TRANSLATION TO ENGLISH OF A DOCUMENT WRITTEN IN SPANISH, MADE ON JUNE 30, 2020.

MARIA CRISTINA HOLGUIN
OFFICIAL TRANSLATOR AND INTERPRETER
PROFESSIONAL CERTIFICATE No. 0274
UNIVERSIDAD NACIONAL   - February 19, 2009
ID No. 52.862.623 issued in Bogota
Phone: (571) 755 2341
Email: mch@mchtraducciones.com

MARIA CRISTINA HOLGUIN
TRADUCCIONES
TRADUCTORA OFICIAL
Certificado de Idoneidad N° 0274 de 2009



NOTARÍA 22 DEL CÍRCULO DE
BOGOTÁ D.C.
DILIGENCIA DE AUTENTICACIÓN
FIRMA REGISTRADA

El Suscrito Notario Veintidos del Circulo de Bogotá D.C.
CERTIFICA: Que la Firma que aparece en el presente
documento coincide con la Registrada en esta Notaria por:

HOLGUIN BORRERO MARIA CRISTINA
con C.C. 52862623

según confrontación que le ha hecho de ella.

Bogotá D.C. 2020-06-30 10:53:39

CLAUDIA UMAÑA GUERRERO
NOTARIA (E) 22 DEL CIRCULO DE BOGOTA D.C.

# TAB – 12

IN RE OVERSIGHT AND CONTROL COM'N OF AVANZIT, S.A.     **525**
Cite as 385 B.R. 525 (Bkrtcy.S.D.N.Y. 2008)

F.Supp. 288, 300 (S.D.N.Y.1993) ("[W]hen no agreement exists, either in principle or in fact, there is no duty to negotiate in good faith that can be enforced against a party to the negotiations"). A good faith duty only exists in a party's performance or enforcement of a contract. See *In re 50 Pine Co., LLC v. CapitalSource Finance LLC,* 317 B.R. 276, 283 (Bankr.S.D.N.Y. 2004) ("While a covenant of good faith is implied in every contract, the existence of an underlying contractual obligation is presupposed.").

[23] With respect to the Expenses Claim, Madison fairs no better in its attempt to recover this amount from the Debtor because the Expenses Claim lacks a legal underpinning. The Last Look Language was contained in a letter that explicitly stated that Condren was negotiating with others. Madison knew it was not the only bidder on the horizon for the Property. There was no way that Madison could make a bid for the Property without assessing its development prospects in order to determine whether it even wanted to bid and at what price. The Debtor never agreed with Madison to pay or reimburse Madison for any of its expenses in pursuing a deal for the Property. Nor could the Debtor have agreed to do so without court approval since any such contract would not have been in the ordinary course of business. Naming the expenses the "Madison Equities Enhancement" does not convert what was a business expenditure made by Madison into an obligation of the Debtor.

Numerous paragraphs in the Request detail the discussions between the Debtor, Madison and its specialists, such as attorneys and architects, about a proposed development plan for the Property. The worst that can be said is that the Debtor through Condren simply took advantage of Madison's willingness to proceed to incur expenses and to disclose its plans without there being any binding commitment, preliminary or otherwise, or agreement for expense reimbursement. Even though Madison would like this Court to believe that it is unusual, there is nothing unusual about a potential buyer engaging in due diligence and formulating a plan of development when they look to acquire a piece of real estate. Madison appears to be stating that the fact that they made a higher bid for the Property than another bidder in some way shows that they enhanced the value of the Property. However, Madison had no contractual rights to the Property or to the value of any supposed enhancement to the value of the Property that might have come about as a result of its own voluntarily made expenditures and disclosure of its development concepts.

*Conclusion*

For the foregoing reasons, this Court grants the Motion to Dismiss as to both the Debtor and Condren.

The Court is signing separate orders dismissing the Adversary Proceeding and the Request of Payment of Administrative Expenses.



In re OVERSIGHT AND CONTROL
COMMISSION OF AVÁNZIT,
S.A., Debtor.

No. 07–13765 (SMB).

United States Bankruptcy Court,
S.D. New York.

April 18, 2008.

**Background:** Oversight commission that was established in suspension proceeding,

**526**                    **385 BANKRUPTCY REPORTER**

a suspensión de pagos, brought by foreign debtor pursuant to Spanish law petitioned for recognition of these suspension proceedings.

**Holdings:** The Bankruptcy Court, Stuart M. Bernstein, Chief Judge, held that:

(1) suspension proceeding qualified as "foreign proceeding," of kind which bankruptcy court could recognize;

(2) proceeding qualified as "foreign main proceeding"; and

(3) oversight commission that was established in suspension proceeding qualified as "foreign representative," with authority to petition for recognition of this foreign proceeding.

Petition granted; motion for summary judgment dismissing petition denied.

---

**1. Bankruptcy** ⇔2341

Burden of proof is on purported foreign representative petitioning for recognition of alleged foreign proceeding, as either a foreign main or foreign nonmain proceeding, to establish prerequisites for recognition.  11 U.S.C.A. § 1515.

**2. Bankruptcy** ⇔2341

While decision or certificate of foreign court indicating that a proceeding pending against debtor in foreign court qualifies as "foreign proceeding," and that petitioner is "foreign representative," is presumptively correct, bankruptcy court, in deciding whether to grant purported foreign representative's petition for recognition of this alleged foreign proceeding, is not bound by this presumption, but may conduct an examination into the facts.  11 U.S.C.A. § 1516(a).

**3. Bankruptcy** ⇔2341

Suspension proceeding, a suspensión de pagos, that was commenced by telecommunications service provider in Spanish court, pursuant to which creditor collection

activity against service provider was stayed while service provider attempted to work out repayment agreement, a convenio, with its creditors, qualified as "foreign proceeding," of kind which bankruptcy court could recognize under Chapter 15 of the Bankruptcy Code, even after this convenio was approved by Spanish court, after control over service provider's assets was returned to service provider, and after service provider began to perform under convenio; under Spanish law, while court's control and supervision over service provider was reduced after convenio was approved, it did not cease, and if service provider failed to perform in accordance with convenio, it faced prospect of liquidation in Spanish Insolvency Court.  11 U.S.C.A. §§ 101(23), 1515.

See publication Words and Phrases for other judicial constructions and definitions.

**4. Bankruptcy** ⇔2341

Purpose of Chapter 15 of the Bankruptcy Code, the chapter incorporating Model Law on Cross-Border Insolvency promulgated by the United Nations, is to encourage cooperation between domestic and foreign courts, to increase legal certainty, to promote fairness and efficiency, to protect and maximize value, and to facilitate rescue of financially troubled businesses.  11 U.S.C.A. § 1501(a).

**5. Bankruptcy** ⇔3570

While bankruptcy court's jurisdiction shrinks once Chapter 11 plan is confirmed, it does not disappear; bankruptcy court retains jurisdiction to direct debtor or any necessary party to execute acts necessary for consummation of plan, and has continuing responsibilities to satisfy itself that plan is being properly implemented.

**6. Bankruptcy** ⇔2341

Term "pending," as used in provision of chapter 15 authorizing court to recog-

nize foreign proceeding as either a foreign main or foreign nonmain proceeding depending on whether it is pending in country where debtor has its center of interests or only in country where debtor maintains an establishment, refers to country where proceeding is taking place, i.e., its situs, and not to stage of proceeding, i.e., its status.  11 U.S.C.A. § 1502(4, 5).

> See publication Words and Phrases for other judicial constructions and definitions.

### 7. Bankruptcy ⬤2341

Without regard to how one interpreted the term "pending," as used in provision of chapter 15 authorizing court to recognize foreign proceeding as either a foreign main or foreign nonmain proceeding depending on whether it was pending in country where debtor had its center of interests or only in country where debtor maintained an establishment, foreign suspension proceedings that debtor had commenced in Spain remained "pending" even after Spanish court had approved a repayment agreement, a convenio, between debtor and its creditors, until such time as suspension proceedings were dismissed or closed upon debtor's successful performance of its obligations under convenio.  11 U.S.C.A. § 1502(4, 5).

### 8. Bankruptcy ⬤3441

Bankruptcy case in general, and Chapter 11 case in particular, remains pending until it is closed.

### 9. Bankruptcy ⬤2341

Foreign suspension proceeding, a suspensión de pagos, that was pending against financially troubled telecommunications service provider, a sociedad anónima, in Spanish court qualified as "foreign main proceeding" and would be recognized as such, where service provider's registered address was in Spain, and Spain was also country in which service provider had

leased large office building for its management offices.  11 U.S.C.A. §§ 1502(4), 1517.

> See publication Words and Phrases for other judicial constructions and definitions.

### 10. Bankruptcy ⬤2341

Oversight commission that was established in suspension proceeding, a suspensión de pagos, brought by foreign debtor pursuant to Spanish law, for stated purpose of protecting interests of creditors and of assuring debtor's compliance with its payment obligations under court-approved repayment agreement with creditors, qualified as "foreign representative," with authority to petition for recognition of this foreign proceeding.  11 U.S.C.A. §§ 101(24), 1515.

> See publication Words and Phrases for other judicial constructions and definitions.

———————

Fulbright & Jaworski LLP, Zack A. Clement, Esq., David A. Rosenzweig, Esq., C. Mark Baker, Esq., Anibal Sabater, Esq., Johnathan C. Bolton, Esq. of Counsel, New York, NY, Jay L. Westbrook, Esq., University of Texas at Austin School of Law, Austin, Texas, Attorney for Foreign Representative.

Davis Polk & Wardwell, Karen E. Wagner, Esq., James L. Kerr, Esq., John D. Couriel, Esq., Alicia Llosa, Esq. of Counsel, New York, NY, Attorneys for BNP Paribas Andes, S.A.

## MEMORANDUM DECISION DENYING MOTION TO DISMISS AND GRANTING RECOGNITION

STUART M. BERNSTEIN, Chief Judge.

The Oversight and Control Commission of Avánzit, S.A. (the "Oversight Commission") filed a petition for recognition under

chapter 15 of the United States Bankruptcy Code. (*Verified Petition under Chapter 15 for Recognition of a Foreign Main Proceeding and Application for Provisional Injunctive Relief,* dated Nov. 29, 2007) ("*Petition*")(ECF Doc. # 2.) Banque Nationale de Paris Paribas Andes, S.A. ("BNPP Andes" or the "Bank"), a Peruvian bank, opposed the petition, and filed a motion for summary judgment to dismiss it. The Bank contends that once Avánzit approved its repayment plan in its Spanish bankruptcy, the latter was no longer a "foreign proceeding" capable of recognition. For the reasons that follow, the Court denies the motion to dismiss and grants recognition.

## BACKGROUND

The material facts are not in dispute although the application of the Bankruptcy Code to those facts is. At all relevant times, Avánzit has been engaged in the telecommunications business. It and its subsidiaries provide infrastructure and engineering services, technology solutions and services, audiovisual facilities services, and content and location-based services in 25 countries around the world. (*[Oversight Commission's] Statement of Material Facts on Recognition as to Which There is No Genuine Issue to be Tried,* dated Jan. 23, 2008 ("*Rule 7056–1(b) Statement*"), at ¶ 3)(ECF Doc. # 35.) [1]

On May 31, 2002, Avánzit filed a petition seeking a *suspensión de pagos,* or suspension of payments (the "Suspension Proceeding"), before the Madrid Court of First Instance No. 26 (the "Spanish Insol-

vency Court") under Spain's 1922 Suspension of Payments Act (the "SOPA").[2] (*Id.* at ¶ 8.) In general, a *suspensión de pagos* is commenced when the debtor files a petition with a Spanish insolvency court, and the court issues a commencement order. (*Expert Report* at ¶ 6.) Among other things, the commencement order triggers an automatic stay against litigation and collection, and appoints trustees, or *interventores,* who control the debtor's activities jointly with the debtor's management. (*See id.* at ¶ 6.) In addition, notice of commencement of the proceeding is publicized through appropriate entries made in the Commercial, Real Estate and Civil Registries. (*Id.* at ¶ 10.)

The main purpose of a *suspensión de pagos* is to allow the debtor to reach a *convenio,* or repayment plan, with its creditors. (*Id.* at ¶ 5.) The *convenio* must be approved by a majority of creditors and ratified by the court. (*Id.* at ¶ 7.) The approval is also publicized, *inter alia,* through appropriate entries made in the Commercial, Real Estate and Civil Registries. (*Id.*) Once the *convenio* is approved by the court, the limitations imposed by the commencement order are lifted, and replaced by the limitations provided in the *convenio.* (*Id.*) The creditors whose claims are dealt with under the *convenio* are barred from pursuing their claims except in accordance with the *convenio.* (Transcript of hearing held Jan. 29, 2008 ("1/29 Tr.") at 48–49)(ECF Doc. # 54.)

The proceeding does not terminate until the payment plan is fully consummated.

---

1.  BNPP Andes filed its own statement of material facts pursuant to Rule 7056–1(b), *Statement of Material Facts as to Which There is No Genuine Issue to be Tried,* dated Jan. 16, 2008 (ECF Doc. # 25). Unless otherwise indicated, this opinion refers only to the undisputed paragraphs in the Oversight Commission's statement.

2.  The Insolvency Act of 2003 repealed the SOPA, but Avánzit's case is still governed by the former law. (*Amended Expert Report of Jose M. Delgado, Prof. Juana Pulgar and Prof. Calvo–Caravaca,* dated Jan. 23, 2008 ("*Expert Report*"), at ¶ 4)(ECF Doc. # 48.)

IN RE OVERSIGHT AND CONTROL COM'N OF AVANZIT, S.A.    529
Cite as 385 B.R. 525 (Bkrtcy.S.D.N.Y. 2008)

Until then, the Public Prosecutor remains a party to the case. (*Expert Report* at ¶ 19(3).) When the *convenio* has been fully consummated, the insolvency court issues a closing order. (*See Expert Report* at ¶ 8; 1/29 Tr. at 18.) Upon issuance of the closing order, the entries made in the Registries are cancelled. (*Expert Report* at ¶ 8; *see* ¶ 19(4).) In the case of a breach or failure to fulfill a *convenio*, the *convenio* may be converted into a liquidation agreement or proceeding—a *quiebra consecutive*. (*Id.* at ¶ 5.)

**A.  Avánzit's Suspension Proceeding**

As stated, Avánzit filed its *suspensión de pagos* petition on May 31, 2002. On June 4, 2002, the Spanish Insolvency Court acknowledged Avánzit's *suspensión de pagos* petition, and ordered the commencement of the proceeding. (*Rule 7056–1(b) Statement*, at ¶ 14; *Expert Report* at ¶ 9.) Three judicial intervenors, Rafael Figueroa, Jose Antonio Tortosa, and Banco Santander Central Hispano, were nominated to oversee Avánzit's assets and affairs. (*Rule 7056–1(b) Statement* at ¶ 14.) The judicial intervenors rendered a report of Avánzit's assets and liabilities that included a $25 million deposit,[3] discussed below, as one of the assets. (*Id.*, at ¶ 16.)

On January 7, 2004, the Spanish Insolvency Court approved Avánzit's *convenio* (the "Convenio").[4] (*Id.* at ¶ 24.) The Convenio provided for payments to creditors over six years, or until February 19, 2010. (*Id.* at ¶ 39; *see Convenio* at Art. 3, § 1(c).) The judicial intervenors were dis-

charged when the Convenio was approved, (*Rule 7056–1(b) Statement* at ¶ 29), but the Convenio established the Oversight Commission, which consisted of five members, including a non-voting member representing Avánzit.[5] (*Convenio* at Art. 5.) The Oversight Commission was authorized to act as representatives of the creditors. (*Convenio* at Art. 5.) It was charged with the task of supervising and controlling strict compliance with the Convenio, (*id.* at Art. 6), and its existence terminated "as soon as [the Convenio] has been fulfilled in its entirety." (*Id.* at Art. 7, § 8; *accord Rule 7056–1(b) Statement* at ¶¶ 27–29.) The Oversight Commission was not, however, authorized to interfere in Avánzit's operations, which were returned to the company. (*Convenio* at Art. 5.)

Finally, article 12 set forth the scope of the Spanish Insolvency Court's post-Convenio jurisdiction. It provided:

> To settle any disagreement or dispute that may derive from the interpretation, enforcement and/or performance of this Agreement between Avánzit . . . and its creditors, they all submit to the jurisdiction and competence of [the Spanish Insolvency Court], as ordered by current Bankruptcy Reorganization Law.

**B.  The Dispute with BNPP Andes**

The current litigation is driven by a dispute between Avánzit and BNPP Andes that goes back several years.[6] On December 28, 2001, BNPP Andes and Avánzit entered into a Credit Transfer Agreement (the "CCC") under which BNPP Andes

---

3.  "$" refers to United States dollars.

4.  An English translation of the Convenio is annexed as Exhibit C(2) to the *Declaration of Juan Miguel Goenechea*, dated Jan. 11, 2008 (*"Goenechea Declaration"*)(ECF Doc. # 27).

5.  The Chairman of the Oversight Commission is Rafael Figueroa, one of the former judicial

intervenors. (*Rule 7056–1(b) Statement* at ¶ 28.)

6.  The Court makes no findings of fact or conclusions of law regarding the issues between the parties, and includes this part of the discussion for informational purposes only.

**530**                       **385 BANKRUPTCY REPORTER**

acquired contractual credits from Avánzit for a purchase price of $25 million. (*Petition* at ¶¶ 23–24.) The credits arose under three agreements between Avánzit and Teleconsorcio, two of which were the subject of pending arbitrations. (*See id.* at ¶¶ 20–22.) BNPP Andes could terminate the CCC upon the insolvency of Avánzit in Spain. (*Id.* at ¶ 24.)

On the same day, the Bank and Avánzit entered into a Time Deposit Account Opening Agreement (the "TDA"), which was governed by New York law. (*Id.* at ¶ 25.) Avánzit deposited the $25 million paid under the CCC into the TDA. (*Id.*) Avánzit intended to use the TDA to fund lending and investment activities in the United States. (*Id.*)

Avánzit filed the Suspension Proceeding five months later. In August 2002, the tribunal in one of the arbitrations entered a $14 million award *against* Avánzit.[7] (*Id.* at ¶ 27.) On September 30, 2002, the Bank terminated the CCC, and set off the $25 million in the TDA against the amounts allegedly owed under the CCC (the "Setoff"). (*See id.* at ¶ 28.) While Avánzit did not (and the Oversight Commission does not) contest the Bank's right to terminate the CCC, they contend that the Setoff violated Spanish insolvency law.

The Setoff triggered litigation in multiple venues. In March 2003, Avánzit sued BNPP Andes in a civil court in Madrid seeking a declaration that the Setoff was invalid under Spanish law. (*Id.* at ¶ 34.) On March 30, 2004, the Madrid court issued a judgment granting the Bank's motion to dismiss for lack of jurisdiction, and indicated that the courts of Peru were the appropriate forum (the "Madrid Judgment"). (*See Goenechea Declaration* at Ex. D(2).) The Bank had already commenced an action in Peru four days earlier seeking a declaration that the Setoff was valid. (*Petition* at ¶ 37.) Avánzit asserted a counterclaim, seeking a declaration that the Setoff was invalid and unenforceable, (*Declaration of Julio Cesar Perez Vargas,* dated Jan. 14, 2008, at ¶ 3)(ECF Doc. # 29), and BNPP Andes filed its reply. (*Id.* at ¶ 4.) The Peruvian civil court closed the record as to further evidence, and the matter is still pending. (*See id.* at ¶ 9.)

**C. The September 27, 2007 Order**

While Avánzit and the Bank were engaged in litigation in Peru, the Oversight Commission opened a third front. On or about June 11, 2007, it filed a motion in the Spanish Insolvency Court. (*Goenechea Declaration* at Ex. H(2).) The motion recounted some of the history of the dispute between the parties, and emphasized that the $25 million at issue had been considered an asset of the Avánzit estate. Moreover, without the $25 million, Avánzit was insolvent, and the Oversight Commission implied that the consummation of the Convenio was in jeopardy. Among other things, the Oversight Commission sought authority to file a chapter 15 to investigate the facts relevant to the $25 million, and recover it for distribution according to Spanish law. To facilitate these actions, the Oversight Commission asked the Spanish Insolvency Court to declare that Avánzit remained in a state of legal suspension of payments and provisional insolvency, and that the Oversight Commission represented the creditors and was the foreign representative authorized to commence the chapter 15 case in New York.

The Spanish Insolvency Court granted the motion by order dated September 27,

---

**7.** In July 2003, the other arbitration resulted in an award of $6 million against Avánzit.

(*Petition* at ¶ 27.)

2007 (the "September Order").  (*Petition at Ex. A.*)  It declared that Avánzit remained in a legal state of suspension of payments, stated that the Oversight Commission was the foreign representative, and authorized the Oversight Commission to file a chapter 15 in this Court for the ultimate purpose of recovering the $25 million so that the Spanish Insolvency Court could decide the correct distribution in conformity with Spanish law.  It appears that the September Order was issued without prior notice to BNPP Andes.

### D.  The Chapter 15 Proceedings

On November 29, 2007, the Oversight Commission filed the Petition, seeking recognition of the Suspension Proceeding as a foreign main proceeding pursuant to sections 1504 and 1515 of the Bankruptcy Code.  The Oversight Commission simultaneously sought *ex parte* injunctive relief (1) suspending the right to transfer, encumber or otherwise dispose of any assets of Avánzit;  (2) staying execution against Avánzit's assets;  (3) entrusting the administration or realization of all of Avánzit's assets located in the United States to the Oversight Commission;  and (4) providing for the examination of witnesses, the taking of evidence and the delivery of information concerning Avánzit's assets, affairs, rights and obligations.  (*Memorandum of Law in Support of (1) Verified Petition Under Chapter 15 for Recognition of a Foreign Main Proceeding and (2) Application for Order to Show Cause with Temporary Restraining Order and Preliminary Injunction,* dated Nov. 29, 2007, at 2)(ECF Doc. # 6.)  The Court denied the motion for *ex parte* injunctive relief.  After the Bank appeared, the parties entered into a consensual injunction that essentially stayed any further collection activities by the Bank pending the resolution of the Petition, but excepted the Peru litigation from its scope.  (*Stipulation and Order*

*Adjourning Hearing on Motion for Preliminary Injunction and Setting Hearing on Verified Petition,* dated Dec. 6, 2007)(ECF Doc. # 18.)

The Bank opposed recognition and moved to dismiss the Petition.  The Bank essentially contends that once the Convenio was approved, the Spanish Insolvency Court no longer exercised control and supervision of Avánzit's assets and affairs for the purpose of reorganization.  For the same reason, the Bank asserts that the Suspension Proceeding was no longer a "pending" foreign proceeding.  For support, the Bank quoted the Oversight Commission's own expert, who summarized the effect of the Convenio on Avánzit's operations:

The fact that a Convenio is approved and the interventores cease in their office upon confirmation of a Convenio does not mean that the proceeding is ended or that the debtor does not remain subject (although generally to a different kind of) limitations which depending on the Convenio may be more or less strict or broad.  Nor has the effect of the bankruptcy court remaining having ultimate jurisdiction to control the fulfillment of the Convenio and, ultimately, declaring its fulfillment and the closing of the proceeding.  Therefore, while it is true that in practice it is common to refer to such moment as a moment in which the suspension of payment is lifted, this must be properly understood as referring to the lifting of the "status" and limitations initially imposed on the debtor by the Commencement Order and the Order that declared it in suspension of payments upon commencement.  But this does not mean that the debtor, while recovering substantial control over day to day affairs in the normal course of business does not remain subject to (generally less strin-

gent) limitations or that the proceeding becomes closed, since, as above mentioned, the closing can only be made upon fulfillment of the Convenio and the issuance of a specific order by the court to such effect.

(*Expert Report* at ¶ 17.)

While both sides have supplied expert affidavits that opine on whether the Spanish Insolvency Court still maintains supervision and control over Avánzit for the purpose of reorganization, the issue separating the parties ultimately involves the interpretation of the Bankruptcy Code to which I turn.

## DISCUSSION

### A. Introduction

Congress adopted chapter 15 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005. Chapter 15 incorporates the Model Law on Cross–Border Insolvency (the "Model Law") promulgated by the United Nations Commission on International Trade Law ("UNCITRAL"). 11 U.S.C. § 1501(a). It is intended to promote "cooperation between United States courts, trustees, examiners, debtors and debtors in possession and the courts and other competent authorities of foreign countries; greater legal certainty for trade and investment; fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested entities, including the debtor; the protection and maximization of the debtor's assets; and the facilitation of the rescue of financially troubled businesses." *In re Bear Stearns High–Grade Structured Credit Strategies Master Fund,* 374 B.R. 122, 126 (Bankr.S.D.N.Y.2007); *accord* 11 U.S.C. § 1501(a).

A chapter 15 case is commenced when a foreign representative files a petition for recognition of a foreign proceeding under 11 U.S.C. § 1515. *Bear Stearns,* 374 B.R. at 127. The petition must be accompanied by certain documentary evidence, 11 U.S.C. § 1515(b), which the court is entitled to presume is authentic. 11 U.S.C. § 1516(b). Subject to section 1506 (regarding public policy exceptions), the court must grant recognition, if it finds, after notice and a hearing, that

> (1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;
>
> (2) the foreign representative applying for recognition is a person or body; and
>
> (3)the petition meets the requirements of section 1515.

11 U.S.C. § 1517(a).

**[1, 2]** The burden of establishing recognition rests on the foreign representative. *In re Basis Yield Alpha Fund (Master),* 381 B.R. 37, 52 (Bankr.S.D.N.Y.2008). A decision or certificate of a foreign court indicating that the foreign proceeding is a "foreign proceeding" and that the petitioner is a "foreign representative" is presumptively correct. *See* 11 U.S.C. § 1516(a). The presumption does not, however, prevent the Court from examining into the facts. *Basis Yield Alpha Fund,* 381 B.R. at 52 ("[T]he court always has the power to make its own determination on qualification under section 1517, notwithstanding the presence of section 1516 and the absence of an actual objection.").

### B. Is the Suspension Proceeding a "Foreign Proceeding"?

**[3]** A chapter 15 case is ancillary to a "foreign proceeding." Section 101(23) now defines a "foreign proceeding" as

> a collective judicial or administrative proceeding in a foreign country, includ-

ing an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

Although the definition, which is taken from the Model Law, incorporates several requirements, including "control and supervision" and "for the purpose of reorganization or liquidation," the Bankruptcy Code does not explain what they mean. In resolving these ambiguities "the court shall consider [chapter 15's] international origin, and the need to promote an application of this chapter that is consistent with the application of similar statutes adopted by foreign jurisdictions." 11 U.S.C. § 1508. In addition, the Court may look to the *Guide to Enactment of the UNCITRAL Model Law on Cross–Border Insolvency* (the "Guide"), U.N. Gen. Ass., UNCITRAL 30th Sess., U.N. Doc. A/CN.9/442 (1997), promulgated in connection with the approval of the Model Law. *RSM Richter Inc. v. Aguilar (In re Ephedra Prods. Liab. Litig.)*, 349 B.R. 333, 336 (S.D.N.Y. 2006); *Bear Stearns,* 374 B.R. at 129; H.R.Rep. No. 109–31(I) at 106 n. 101, *reprinted in* 2005 U.S.C.C.A.N. 169 n. 101.

As a general matter, a *suspensión de pagos* fits squarely within the definition of a "foreign proceeding."[8] The SOPA concerns insolvency and the adjustment of debt. The proceeding is a collective judicial proceeding in which the debtor reaches a payment agreement with its creditors subject to the approval of the insolvency court. Trustees are appointed, and the assets and affairs of the debtor are subject to control or supervision by the Spanish

court for the purpose of reorganization or liquidation.

BNPP Andes appears to concede that the Suspension Proceeding qualified as a "foreign proceeding" up to the point that the Convenio received final approval. (*Corrected Memorandum of Law in Opposition to Application for Recognition and in Support of Motion to Dismiss Chapter 15 Petition or for Summary Judgment Dismissing the Petition,* dated Jan. 16, 2008 ("*Bank's Memo*"), at 20)(ECF Doc. # 33.) It contends, however, that it lost its status as a "foreign proceeding" at that point because the restrictions imposed on Avánzit were lifted, the trustees were discharged, and Avánzit was free to manage its own business.

Chapter 15 recognizes that the status of the foreign proceeding can change, and the change can affect the right to recognition before or after it is granted. Section 1517(d) allows the court to modify or terminate recognition if the grounds for granting it "have ceased to exist." In addition, section 1518(1) requires the foreign representative to file a notice of any substantial change of status of the foreign proceeding or the foreign representative's appointment. Thus, whether embedded in the definition of "foreign proceeding" or contained elsewhere, a "foreign proceeding" can lose its status.

It does not follow, however, that the approval of the Convenio, and the return of management and daily control to Avánzit, produced the change in status that the Bank assumes. The Model Law does not define "reorganization," but under United States law, a bankruptcy reorganization commonly means a financial restructuring "esp[ecially] in the repayment of debts, under a plan created by a trustee and

---

**8.** The Guide refers to a suspension of payments as an example of the type of proceed-

ing eligible for recognition. (*Guide* at ¶ 24.)

approved by a court." BLACK'S LAW DICTIONARY 1324 (8th ed.2004). The Bank's argument focuses on the approval of the plan and the discharge of the trustees, but ignores the repayment of debts, a critical component of any reorganization.

Avánzit will continue to make payments to its creditors under the Convenio during the next two years; if it fails, it faces liquidation in the Spanish Insolvency Court. Although the Spanish Insolvency Court's control and supervision was reduced once the Convenio was approved, it did not surrender all supervision and control. The Spanish Insolvency Court continues to oversee the payment of claims, and more generally, to settle any disagreement concerning the "interpretation, enforcement and/or performance of [the Convenio] between Avánzit ... and its creditors." (*Convenio* at Art. 12.) The closing order will not be issued until the payments are completed.

The Oversight Commission's motion and the September Order plainly demonstrate that the Spanish Insolvency Court maintains control of Avánzit's assets and affairs to the extent they concern the payments to creditors under the Convenio. The motion alleged that without the $25 million, which the trustees had reported as an asset of the estate, Avánzit would be insolvent. In addition, it implied that the consummation of the Convenio would be in jeopardy. The Oversight Commission sought authority from the Spanish Insolvency Court to recover the Setoff for distribution to creditors in accordance with Spanish law, and the court granted the motion.

The Bank argues that it did not receive notice of that application, and is not bound by the findings and conclusions of the Spanish Insolvency Court. The Bank also contends that the September Order is inconsistent with the Madrid Judgment, which ruled that the Spanish courts lacked jurisdiction over the dispute between Avánzit and the Bank.[9] (*See Bank's Memo,* at 32–33; *Reply Declaration of Luis Diez–Picazo y Ponce de Leon,* dated Jan. 25, 2008, at ¶ 11 (ECF Doc. # 42); *Declaration of Luis Diez–Picazo y Ponce de Leon,* dated Jan. 14, 2008, at ¶¶ 22–27 (ECF Doc. # 28).) The Bank does not contend and has not shown, however, that the Spanish Insolvency Court lacked jurisdiction under the Convenio to appoint a foreign representative for the purpose of commencing this chapter 15 case. Indeed, the power to do so flowed directly from the Convenio; the recovery of the Setoff is closely connected to the Convenio payments and Avánzit's ability to consummate its plan.

[4] Furthermore, the bright line the Bank wants to draw runs counter to the goals of chapter 15. The purpose of chapter 15 is to encourage cooperation between domestic and foreign courts, increase legal certainty, promote fairness and efficiency, protect and maximize value and facilitate the rescue of financially troubled businesses. 11 U.S.C. § 1501(a). Substantial litigation and other liquidation activities may take place under the supervision and control of the bankruptcy court after the plan, or its equivalent, has been confirmed or approved. The exercise of jurisdiction is the *sine qua non* of supervision and control to the extent that a matter falls

9. Although it is unnecessary to decide the issue today, the "inconsistency" argument is a perplexing one. The Spanish court did not rule that the United States Bankruptcy Court lacked jurisdiction over Avánzit's dispute with the Bank, nor could it. The authorization to file a chapter 15 in the United States is not,

therefore, inconsistent with the Madrid Judgment. In fact, if the Spanish courts lack jurisdiction, it seems perfectly appropriate for the Spanish Insolvency Court to authorize a foreign representative to litigate the dispute in a court that may have it.

within the bankruptcy court's jurisdiction. These goals would be frustrated if "foreign proceeding" was interpreted in a manner that cut off assistance at a time when cooperation, certainty, fairness, asset values and financial relief were most needed, simply because the debtor successfully prosecuted its reorganization case. *Cf. In re Bd. of Dirs. of Hopewell Int'l Ins. Ltd.,* 238 B.R. 25, 50 (Bankr.S.D.N.Y.1999)(if sanctioning a scheme cut off eligibility for assistance under former section 304, "we would grant ancillary petitions in advance of the sanctioning of schemes of arrangement, but refuse such relief once the schemes had received court approval. This result would stand the notion of comity on its head by our refusal to grant assistance for the very reason that the foreign court had acted.").

Our own experience with chapter 11 provides a stark example of how a bankruptcy court continues to exercise control and supervision over a confirmed case. Both sides agree, in this regard, that Avánzit's status is similar to a chapter 11 debtor after confirmation. Under the Bankruptcy Code, and unless the confirmation order or the plan states otherwise, confirmation revests the property of the estate in the debtor, free and clear of all claims and interests, 11 U.S.C. § 1141(b), (c), and discharges the debtor. 11 U.S.C. § 1141(d). The reorganized debtor goes about its business, free of the constraints placed on trustees under the Bankruptcy Code. When the case has been fully administered, a final decree is entered closing the case. FED. R. BANKR.P. 3022; *see* 11 U.S.C. § 350(a).[10]

[5] Between confirmation and the final decree, the bankruptcy court continues to exercise jurisdiction over the case, albeit in a more limited fashion. Thus, although the jurisdiction "shrinks," *Penthouse Media Group v. Guccione (In re Gen. Media, Inc.),* 335 B.R. 66, 73 (Bankr.S.D.N.Y. 2005), it does not end. The bankruptcy court retains jurisdiction under 11 U.S.C. § 1142(b) to direct the debtor or any necessary party to execute an act necessary for the consummation of the plan and it has "continuing responsibilities to satisfy itself that the [p]lan is being properly implemented." *Findley v. Blinken (In re Joint E. & S. Dist. Asbestos Litig.),* 982 F.2d 721, 750 (2d Cir.1992).

In fact, the court may be called upon to resolve more issues and disputes post-confirmation than pre-confirmation. Chapter 11 plans, particularly liquidation plans, often create liquidation trusts to pursue causes of action for the benefit of the unsecured creditors. *E.g., In re Teligent, Inc.,* 306 B.R. 752, 755–56 (Bankr.S.D.N.Y. 2004), *aff'd,* 326 B.R. 219 (S.D.N.Y.2005). Post-confirmation, a liquidation trust may initiate hundreds of litigations in the bankruptcy court. *E.g., Global Crossing Estate Representative v. Alta Partners Holdings LDC (In re Global Crossing, Ltd.),* A.P. No. 04–01731, 385 B.R. 52, 58, 2008 WL 934012, *3 (Bankr.S.D.N.Y. Apr.8, 2008)(stating that the estate representative had filed over 1,000 avoidance actions post-confirmation, seeking an aggregate of ap-

---

**10.** "Factors that the court should consider in determining whether the estate has been fully administered include (1) whether the order confirming the plan has become final, (2) whether deposits required by the plan have been distributed, (3) whether the property proposed by the plan to be transferred has been transferred, (4) whether the debtor or the successor of the debtor under the plan has assumed the business or the management of the property dealt with by the plan, (5) whether payments under the plan have commenced, and (6) whether all motions, contested matters, and adversary proceedings have been finally resolved."

FED. R. BANKR.P. 3022 advisory committee's note.

proximately $340 million); *In re Teligent, Inc.,* No. 01–12974, 2005 WL 267956, at *1 (Bankr.S.D.N.Y. Feb.3, 2005)(noting that the estate representative had commenced over 1,000 adversary proceedings and filed 1,000 claims objections in the bankruptcy court after the case was confirmed). In addition, debtors (or trustees) may continue to liquidate assets post-confirmation, through sales or otherwise, for the benefit of the creditors. *E.g., Woods v. Kenan (In re Woods),* 173 F.3d 770 (10th Cir.1999), *cert. denied,* 528 U.S. 878, 120 S.Ct. 187, 145 L.Ed.2d 157 (1999).

Bankruptcy courts exercise post-confirmation jurisdiction over these matters.[11] Under the Bank's formulation, a foreign court applying the same Model Law would be forced to deny assistance to any debtor or post-confirmation trustee seeking to recover property in the foreign state simply because the debtor had confirmed a plan. Moreover, a chapter 7 trustee seeking similar assistance would not be barred from seeking help under the Model Law because plans are not confirmed under chapter 7. The Model Law establishes a "golden rule," and the extension of the Bank's argument would be inimical to the interests of our own bankruptcy stakeholders and to the goals that chapter 15 advances. In the absence of a clearer indication that chapter 15 requires this result, I conclude that it does not.

Accordingly, the Suspension Proceeding is still a "foreign proceeding." It continues to be a collective proceeding under Spanish insolvency law, and remains in a state of reorganization while Avánzit at-

tempts to consummate the Convenio. Finally, as evidenced by the September Order, the Spanish Insolvency Court still exercises control and supervision over Avánzit's assets and affairs to the extent necessary to ensure compliance with and consummation of the Convenio.

C. Is the Suspension Proceeding "Pending"?

The Bank makes a variation of the same argument when it contends that the Suspension Proceeding is not "pending." The Court must recognize the foreign proceeding as either "main" or "nonmain." 11 U.S.C. § 1517(b). A "'foreign main proceeding' means a foreign proceeding *pending* in the country where the debtor has the center of its main interests." 11 U.S.C. § 1502(4)(emphasis added). A "nonmain" proceeding is one (other than a main proceeding) that is *pending* in a country where the debtor maintains an establishment. 11 U.S.C. § 1502(5). The Bank argues that the Suspension Proceeding was no longer "pending" after the Convenio was approved.

[6] I disagree. First, "pending," as used in 11 U.S.C. § 1502(4) and 1502(5), refers to the location of the foreign case, not the stage of the proceeding. Article 2(b) of the Model Law, the counterpart of section 1502(4), states that "'foreign main proceeding' means a foreign proceeding *taking place* in the State where the debtor has the centre of its main interests." (Emphasis added). Chapter 15 uses "pending" rather than "taking place," but

---

**11.** Enron Corp., a chapter 11 debtor reorganized in this Court, offers another glaring example of how bankruptcy courts continue to exercise jurisdiction over confirmed debtors and their cases. Enron confirmed its plan by order dated July 15, 2004. (*Order Confirming Supplemental Modified Fifth Amended Joint Plan of Affiliated Debtors Pursuant to*

*Chapter 11 of the United States Bankruptcy Code, and Related Relief,* dated July 15, 2004, Case No. 01–16034)(ECF Doc. # 19,759.) Since the confirmation date, approximately 12,000 additional entries have appeared on the Enron case docket. This does not include docket entries in adversary proceedings.

138

IN RE OVERSIGHT AND CONTROL COM'N OF AVANZIT, S.A.    537
Cite as 385 B.R. 525 (Bkrtcy.S.D.N.Y. 2008)

the same meaning is presumably intended. In either case, the definition focuses on the relationship between the venue of the proceeding and the location of the debtor's center of main interests. If they match, the proceeding is a foreign main proceeding. If they don't match, but the debtor maintains an establishment in the country where the foreign proceeding is venued, it is a nonmain proceeding. In short, the phrase "pending" refers to situs, not status.

[7, 8] Second, a bankruptcy case in general, and a chapter 11 case in particular, is "pending" until it is closed. *In re Emerson Radio Corp.*, 52 F.3d 50 (3d Cir. 1995) addressed an identical question construing Federal Bankruptcy Rule 1014, and its reasoning is instructive. There, Emerson Radio Corp. ("Emerson") filed a chapter 11 case in the New Jersey bankruptcy court. Under an agreement in principle, an affiliate (FIL) would provide debtor in possession and exit financing, and in exchange, receive 90% of the new common stock issued under the plan and a $45 million note. *Id.* at 51.

FIL provided the debtor in possession financing, but reneged on the exit financing. As a result, Emerson's chief executive officer (Jurick), who was also an indirect owner of FIL, arranged for the exit financing. Emerson confirmed its plan, and issued the new common stock to Jurick, his affiliates, and other entities that apparently provided the exit financing. *Id.* at 51–52. FIL did not receive any stock under the plan.

FIL was subsequently placed in insolvency proceedings in the Bahamas, and the Bahamian court appointed a provisional liquidator (Aranha). The Bahamian liquidator filed an ancillary case under former section 304 in the Southern District of New York for the purpose of administering the new Emerson shares and enjoining

Jurick and the other recipients from disposing of the shares. *Id.* at 52. On motion made to the New Jersey bankruptcy court, Jurick moved to transfer the New York ancillary case to New Jersey under Rule 1014(b). Rule 1014(b) provided, in relevant part, that if two or more petitions were filed in different districts against a debtor and an affiliate,

> "on motion filed in the district in which the petition filed first is *pending* . . . the court may determine . . . the district or districts in which the case or cases should proceed."

FED. R. BANKR.P. 1014(b)(emphasis added). The New Jersey district court withdrew the reference, ordered the ancillary case transferred, and dismissed the ancillary case. *Emerson Radio*, 52 F.3d at 52.

On appeal, the Bahamian liquidator argued, as BNPP Andes does here, that "a bankruptcy proceeding ends upon confirmation of the reorganization plan or when the plan is consummated." *Id.* at 54. The ancillary case was instituted after Emerson confirmed its plan, and most of the plan had already been consummated. Aranha argued that as a result, Emerson was no longer a "debtor" when the New Jersey court ordered the transfer. *Id.*

Affirming the transfer order, the Third Circuit Court of Appeals rejected the contention, and ruled that the case was still open and "pending" despite plan confirmation:

> Aranha also cites various bankruptcy court cases for the proposition that substantial consummation of the reorganization plan effectively closes the debtor's estate and creates a new entity. None of the cases is persuasive as none addressed the issue before us. Instead, we follow the plain language of 11 U.S.C. § 350, which provides that "[a]fter an estate is fully administered and

**538**          **385 BANKRUPTCY REPORTER**

the court has discharged the trustee, the court shall close the case." Thus, as the case is still open, Emerson is a debtor within Rule 1014(b) and the case is still pending within the rule.

*Id.* at 54 (footnote omitted); *accord In re Malden Mills Indus., Inc.,* 361 B.R. 1, 9 (Bankr.D.Mass.2007). This conclusion is consistent with the substantial body of case law arising in various contexts that a bankruptcy case remains open or "pending" until the court enters an order dismissing or closing it. *See e.g., In re Tannen Towers Acquisition Corp.,* 235 B.R. 748, 754 (D.N.J.1999)("It is uncontested that Tannen's bankruptcy plan has been confirmed but remains open pending a final decree."); *Krystal Cadillac–Oldsmobile–GMC Truck, Inc. v. Gen. Motors Corp,* 232 B.R. 622, 626 (E.D.Pa.1999)("[A] bankruptcy case is considered to still be pending until such time as the estate has been fully administered, the court has discharged the trustee and closed the case."); *In re Lundquist,* 371 B.R. 183, 186 (Bankr. N.D.Tex.2007)("[C]ourts have construed the meaning of the term pending for the purposes of section 362(c) when deciding whether a case is pending until closing or until dismissal."); *In re Williams,* 363 B.R. 786, 788 (Bankr.E.D.Va.2006)("Courts have routinely equated pending with not dismissed.' "); *In re Moore,* 337 B.R. 79, 81 (Bankr.E.D.N.C.2005)(same); *In re Island Helicopters,* 211 B.R. 453, 457 (Bankr.E.D.N.Y.1997)(debtor's prior case remains open where "[a] previously confirmed plan of reorganization has not been consummated and no final decree has been entered"); *In re Wilson,* 154 B.R. 769, 771 n. 3 (Bankr.M.D.Ala.1993)("A case under chapter 11 is 'pending' from its inception until the final decree enters and the case is closed.")

In reaching its conclusion, the *Emerson* court also rejected Aranha's contention, the same one that the Bank essentially directs at the Suspension Proceeding, that the Court should ignore the ministerial nature of the final decree in favor of the reality of chapter 11:

We do not ignore Aranha's argument that an order closing the bankruptcy case is ministerial and that "the scheme of Chapter 11 is premised upon the corporate and economic realities of reorganization, not upon the mechanics of the clerk's office." Appellant br. at 14–15. Whatever the abstract merit of this argument, it would not be a basis for departing from the plain language of section 350 and Rule 1014(b). Courts and parties in a bankruptcy proceeding should know with a fair degree of certainty the court which can entertain an application. Applying Rule 1014(b) and section 350 as written supplies that certainty. Thus, we reiterate that a bankruptcy case is pending under Rule 1014(b) unless it has been closed under 11 U.S.C. § 350.

*Id.* at 54–55 (footnotes omitted).

Although the instant dispute concerns the Suspension Proceeding, not a chapter 11, the same rationale applies. A chapter 11 case remains "pending" after confirmation but before it is closed by the entry of a final decree. This conclusion reflects "the practical reality that in most cases the bankruptcy court still has jurisdiction over the case and oversees implementation of the plan." *Emerson Radio,* 52 F.3d at 55 n. 7. Similarly, the Spanish Insolvency Court exercises jurisdiction after the Convenio is approved for the same purpose, and the Suspension Proceeding remains open until an order is entered that formally closes the case and directs the cancellation of the entries in the Registries.

**D.  Avánzit's Public Disclosures**

The Bank also argues that Avánzit has acknowledged in its own public disclosures

## IN RE OVERSIGHT AND CONTROL COM'N OF AVÁNZIT, S.A.    539
Cite as 385 B.R. 525 (Bkrtcy.S.D.N.Y. 2008)

that its insolvency proceeding ended in 2004 when the Convenio was approved. For example, Avánzit's legal counsel wrote to the Spanish National Securities and Exchange Commission on January 29, 2004, reporting the "lifting of the bankruptcy reorganization that affected the company," and the discharge of the trustees. (*Goenechea Declaration* at Ex. F(2).) In the same vein, Avánzit reported in a July 2007 prospectus that Avánzit and its subsidiaries obtained the "final court decisions lifting the bankruptcy reorganizations" in 2004. (*Id.* at Ex. E(2).)

Statements like these prove nothing,[12] and do not stifle this Court's inquiry. In the United States, a company that confirms a plan is apt to declare that it has "emerged" from bankruptcy despite the fact that it continues to consummate the plan and appear in matters before the bankruptcy court.[13] Regardless of how it represents its status, it remains a debtor in a pending case. Once again, *Emerson* illustrates the point. The Bahamian liquidator argued that Emerson was not a "debtor" because Emerson's reorganization plan referred to the new Emerson as something other than "debtor." Rejecting the argument, the Court pointed to the "obvious" fact that "the choice of terms settled upon by the drafters of the reorganization plan cannot be dispositive of the statutory issue before us." *Emerson Radio*, 52 F.3d at 55 n. 6.

Moreover, even Avánzit's Spanish accountants see the reorganization as an on-going work in progress. According to Deloitte's audit report for the year ending December 31, 2005, "during the 2005 fiscal year, the [Avánzit] Group continues with the planned reorganization," and "have created provisions to cover the estimated costs of the planned reorganization processes." (*Goenechea Declaration*, Ex. G(2) at ¶ 5.) The audit report also referred to "the lifting of the [Avánzit] Group companies' bankruptcy reorganizations and the success of the reorganization measures in progress." (*Id.* at ¶ 7.) In short, the Avánzit reorganization is still open and "pending."

## E. Recognition

[9] Based on the foregoing, the Court concludes that the Suspension Proceeding is a "foreign proceeding" within the meaning of the Bankruptcy Code. In addition, the Suspension Proceeding is a "foreign main proceeding." *See* 11 U.S.C. §§ 1502(4), 1517(a)(1), 1517(b)(1). Avánzit is a *sociedad anónima* organized under the laws of Spain. (*Rule 7056–1(b) Statement* at ¶ 1.) Its registered address is Alcalá, 518 28027 Madrid, (*id.* at ¶ 2), which is presumed to be the center of Avánzit's main interests. *See* 11 U.S.C. § 1516(c). In addition, it leases a large office building in downtown Madrid for its management offices. (*Rule 7056–1(b) Statement* at ¶ 5.) Accordingly, the Oversight Commission has satisfied its burden of proof under 11 U.S.C. § 1517(a)(1) and (b)(1).

---

**12.** The Bank has not demonstrated the elements of estoppel.

**13.** For example, Delta Air Lines, a debtor in this Court, confirmed its Plan by order dated April 25, 2007. (*Order Confirming Debtors' Joint Plan of Reorganization under Chapter 11 of the Bankruptcy Code,* dated Apr. 25, 2007, Case No. 05–17923)(ECF Doc. # 5998.) Since then, it has consistently reported in SEC filings and quarterly post-confirmation

status reports that it has "emerged" from bankruptcy. Yet Delta continues to object to claims and reject leases in the bankruptcy court, and since confirmation, over 1,000 new entries have appeared on the ECF docket. According to the Bank's counsel, the Delta Air Lines case is no longer "pending." (1/29 Tr. at 8.) The Delta bankruptcy court and the litigants might disagree.

[10]  I also conclude that the Oversight Commission is a "foreign representative" and a person or body within the meaning of 11 U.S.C. § 1517(a)(2).  Section 101(24) defines a "foreign representative" to mean: a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).  The Bankruptcy Code says, in relevant part, that "[t]he term 'person' includes individual, partnership and corporation."    11 U.S.C. § 101(41).  The use of "includes" is not limiting, 11 U.S.C. § 102(3), and encompasses "persons" that do not fit squarely within the examples.  Neither the Bankruptcy Code nor the Model Law defines "body," but the context suggests that it includes "[a]n artificial person created by a legal authority."  *See* BLACK'S LAW DICTIONARY 185.

The Oversight Commission meets the definition of a "foreign representative," and hence, of a "person or body."  It was created under the Convenio approved by the Spanish Insolvency Court for the stated purpose of protecting the interests of the creditors and assuring Avánzit's compliance with its payment obligations.  Furthermore, the Spanish Insolvency Court expressly authorized the Oversight Commission to pursue and recover the $25 million for the benefit of Avánzit's creditors and distribution under Spanish law.

Lastly, the Petition meets the requirements of 11 U.S.C. § 1515.[14]  *See* 11 U.S.C. § 1517(a)(3).  The Petition annexed, as Exhibit A, a certified copy (in English and Spanish) of the September Order.  The September Order declared, in substance, that the Suspension Proceeding is a pending foreign proceeding and that the Oversight Commission is the foreign representative with the specific authority to recover the Setoff.  Although the Bank argues that it is not bound by these declarations, they are presumed to be correct.  11 U.S.C. § 1516(a).  In any event, for the reasons stated, I independently reach the same conclusions under the United States Bankruptcy Code.

**F.  Postscript**

Although the Oversight Commission has overcome the hurdle of recognition, its quest to recover the Setoff still faces obstacles.  Avánzit is currently litigating its entitlement to the Setoff in Peru, and the Oversight Commission apparently intends to pursue the same claim through this chapter 15.  The Bank contends that the Madrid Judgment collaterally estops the

---

**14.**  Section 1515 states:

(a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.
(b) A petition for recognition shall be accompanied by-
    (1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;
    (2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative;  or

(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.
(c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.
(d) The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English.  The court may require a translation into English of additional documents.

Oversight Commission from pursuing its claim here, and the Bank has raised the question of the Oversight Commission's standing to recover the Setoff in light of Avánzit's counterclaim in Peru. The recognition order does not resolve these issues or the merits of the Setoff dispute.

In conclusion, the application for recognition as a foreign main proceeding is granted, and the motion for summary judgment dismissing the Petition is denied. The foregoing constitutes the Court's findings of fact and conclusions of law. The Court has considered the other arguments made by the parties and concludes that they lack merit.

Settle order on notice.



**In re Margaret MOON, Debtor.**

**Angela Tese–Milner, as Chapter 7 Trustee of Margaret Moon, Plaintiff,**

**v.**

**Margaret Moon, Kenneth Paul, and Specialty Claims Management, Defendants.**

**Bankruptcy No. 04–10881 (REG).**

**Adversary No. 05–01135 (REG).**

United States Bankruptcy Court, S.D. New York.

April 23, 2008.

**Background:** Chapter 7 trustee brought adversary proceeding to recover proceeds of postpetition settlement of debtor's prepetition personal injury claim or to hold debtor's personal injury attorney or claims agent for insurer personally liable there-

for, as well as to revoke debtor's discharge on fraud theory. Parties moved for summary judgment.

**Holdings:** The Bankruptcy Court, Robert E. Gerber, J., held that:

(1) payment of contingency fee to attorney who had represented Chapter 7 debtor in negotiating postpetition settlement of her prepetition personal injury claim was in nature of unauthorized postpetition transfer of property of the estate, which trustee could recover from attorney;

(2) mere fact that, following attorney's postpetition settlement of his Chapter 7 debtor-client's prepetition personal injury claim, settlement proceeds were deposited directly into attorney's trust account did not make attorney "initial transferee" as to entirety of settlement proceeds, but only as to portion that he received as contingency fee;

(3) personal injury attorney, in accepting payment into client trust account of proceeds that were paid in connection with settlement of debtor's slip-and-fall claim, and in later disbursing proceeds to debtor after first deducting his contingency fee, did not exercise control over portion of proceeds paid to debtor, as required under New York law for attorney to be liable for conversion;

(4) claims agent did not have status of "custodian" of estate property; and

(5) genuine issues of material fact precluded entry of summary judgment on revocation-of-discharge claim.

Motions granted in part and denied in part.

## 1. Bankruptcy ⬤2588, 2701, 3172.1

Payment of contingency fee to attorney who had represented Chapter 7 debtor in negotiating postpetition settlement of

TAB – 13

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|                                                      |     |                        |
| ---------------------------------------------------- | --- | ---------------------- |
| In re:                                               | )   | Chapter 11             |
|                                                      | )   |                        |
| VOYAGER DIGITAL HOLDINGS, INC., *et al.*,[1]         | )   | Case No. 22-10943 (MEW) |
|                                                      | )   |                        |
| Debtors.                                             | )   | (Jointly Administered) |
|                                                      | )   |                        |

**ORDER (I) AUTHORIZING VOYAGER DIGITAL LTD.
TO ACT AS FOREIGN REPRESENTATIVE AND (II) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") for entry of an order (this "Order"):  (a) authorizing Voyager Digital Ltd. ("Voyager") to act as foreign representative on behalf of the Debtors' estates (the "Foreign Representative") in the Canadian Proceeding; and (b) granting related relief, all as more fully set forth in the Motion; and upon the First Day Declaration; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, entered February 1, 2012; and that this Court having the power to enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested in the Motion is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and this Court having found that the Debtors' notice of the Motion and opportunity for a hearing on the Motion

---

[1]     The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Voyager Digital Holdings, Inc. (7687); Voyager Digital Ltd. (N/A); and Voyager Digital, LLC (8013).  The location of the Debtors' principal place of business is 33 Irving Place, Suite 3060, New York, NY 10003.

[2]     Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Motion.

were appropriate under the circumstances and no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor, it is HEREBY ORDERED THAT:

1.      The Motion is granted as set forth herein.

2.      Voyager is hereby authorized to:  (a) act as the Foreign Representative of the Debtors; (b) seek recognition of these chapter 11 cases in the Canadian Proceeding; (c) request that the Canadian Court lend assistance to this Court in protecting the property of the estates; and (d) seek any other appropriate relief from the Canadian Court that Voyager deems just and proper in the furtherance of the protection of the Debtors' estates.

3.      The Debtors or any other appropriate party are hereby authorized to request the aid and assistance of the Canadian Court to recognize the Debtors' chapter 11 cases as a "foreign main proceeding" and Voyager as a "foreign representative" pursuant to the CCAA, and to recognize and give full force and effect in all provinces and territories of Canada to this Order. For the avoidance of doubt, this Court has not made any decision with respect to the status of the Debtors' chapter 11 cases as a "foreign main proceeding."

4.      The Debtors are authorized to pay the costs of the Information Officer and its counsel, consistent with any orders of the Canadian Court.

5.      As soon as practical following court action taken by the Foreign Representative in another jurisdiction, the Debtors will file notice of the same on the docket of these chapter 11 cases.

6.      The Debtors are authorized to take all actions necessary to effectuate the relief

granted in this Order in accordance with the Motion.

7.      This Court retains exclusive jurisdiction with respect to all matters arising from or

related to the implementation, interpretation, and enforcement of this Order.

Dated: New York, New York
       July 8, 2022

                                        /s/ **Michael E. Wiles**
                                        THE HONORABLE MICHAEL E. WILES
                                        UNITED STATES BANKRUPTCY JUDGE

# TAB – 14

148

Court File No. CV-22-00683820-00CL

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

| | | |
|---|---|---|
| THE HONOURABLE | ) | TUESDAY, THE 12TH |
| | ) | |
| JUSTICE KIMMEL | ) | DAY OF JULY, 2022 |

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

## INITIAL RECOGNITION ORDER

THIS APPLICATION, made by Voyager Digital Ltd. ("**VDL**") in its capacity as the foreign representative (the "**Foreign Representative**") of VDL in respect of the proceedings (the "**Foreign Proceeding**") commenced on July 5, 2022, in the United States Bankruptcy Court for the Southern District of New York (the "**U.S. Bankruptcy Court**") for an Order substantially in the form enclosed in the Application Record, was heard this day by video conference.

ON READING the Notice of Application, the affidavit of Stephen Ehrlich sworn July 10, 2022, the affidavit of Mitchell Stephenson sworn July 11, 2022 and the affidavit of Service of Daniel Richer sworn July 11, 2022, each filed,

AND UPON BEING ADVISED by counsel for the Foreign Representative that in addition to this Initial Recognition Order, a Supplemental Order is being sought,

AND UPON HEARING the submissions of counsel for the Foreign Representative, counsel for Alvarez & Marsal Canada Inc., in its capacity as proposed information officer (the "**Proposed Information Officer**"), and such other counsel that appeared on the application, and upon being provided with copies of the documents required by section 46 of the *Companies' Creditors Arrangement Act*, RSC 1985, c C-36 (the "**CCAA**");

AND UPON HEARING submissions from counsel for Francine De Sousa and counsel making submissions on behalf of the interests of certain retail investors seeking an adjournment of the determination as to whether the Foreign Proceeding is a "foreign main proceeding":

**SERVICE**

1.      THIS COURT ORDERS that the time for service of the Notice of Application and the Application Record is hereby abridged and validated so that this Application is properly returnable today and hereby dispenses with further service thereof.

**FOREIGN REPRESENTATIVE**

2.      THIS COURT ORDERS AND DECLARES that the Foreign Representative is the "foreign representative" as defined in section 45 of the CCAA of VDL in respect of the Foreign Proceeding.

**RECOGNITION OF FOREIGN PROCEEDING**

3.      THIS COURT ORDERS that the Foreign Proceeding is a "foreign proceeding" for the purposes of Part IV of the CCAA. This Court shall determine at a hearing scheduled for 2:00 p.m. Toronto time on Tuesday, July 19, 2022 whether the Foreign Proceeding is a "foreign main proceeding" or a "foreign non-main proceeding". Such determination, when made, shall be effective *nunc pro tunc* as if made at the effective time of this Order.

-3-

**STAY OF PROCEEDINGS**

4.      THIS COURT ORDERS that until otherwise ordered by this Court:

    (a)      all proceedings taken or that might be taken against VDL under the *Bankruptcy and Insolvency Act*, R.S.C., 1985, c. B-3, as amended, *or the Winding-up and Restructuring Act*, R.S.C., 1985, c. W-11, as amended, are stayed;

    (b)      further proceedings in any action, suit or proceeding against VDL are restrained; and

    (c)      the commencement of any action, suit or proceeding against VDL is prohibited.

5.      THIS COURT ORDERS that, except with leave of this Court, VDL is prohibited from selling or otherwise disposing of:

    (a)      outside the ordinary course of its business, any of its property in Canada that relates to the business; and

    (b)      any of its other property in Canada.

**GENERAL**

6.      THIS COURT ORDERS that without delay after this Order is made, the Foreign Representative shall cause to be published a notice substantially in the form attached to this Order as **Schedule "A"**, once a week for two consecutive weeks, in the Globe and Mail (National Edition).

7.      THIS COURT HEREBY REQUESTS the aid and recognition of any court, tribunal, regulatory or administrative body having jurisdiction in Canada, to give effect to this Order and to assist VDL and the Foreign Representative and its respective counsel and agents in carrying out the terms of this Order.

-4-

8.      THIS COURT ORDERS AND DECLARES that this Order shall be effective as of 12:01

a.m. Toronto time on the date of this Order, and this Order is not required to be entered.


9.      THIS COURT ORDERS that any interested party may apply to this Court to vary or amend

this Order or seek other relief on not less than seven (7) days' notice to VDL, the Foreign

Representative, the Proposed Information Officer and their respective counsel, and to any other

party or parties likely to be affected by the order sought, or upon such other notice, if any, as this

Court may order.


_____

Court File No. CV-22-00683820-00CL

***ONTARIO***
**SUPERIOR COURT OF JUSTICE**
**(COMMERCIAL LIST)**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

## NOTICE OF INITIAL RECOGNITION ORDER

PLEASE BE ADVISED that this Notice is being published pursuant to an order of the Ontario Superior Court of Justice (Commercial List) (the "**Canadian Court**"), granted on July 12, 2022 (the "**Initial Recognition Order**").

TAKE NOTICE that on July 5, 2022, Voyager Digital Ltd. ("**VDL**") filed a voluntary petition for relief under Chapter 11, title 11 of the United States Code (the "**Chapter 11 Proceeding**") in the United States Bankruptcy Court for the Southern District of New York (the "**U.S. Bankruptcy Court**"). In connection with the Chapter 11 Proceeding, VDL has been appointed as the foreign representative of its estate (the "**Foreign Representative**"). The Foreign Representative's address is 33 Irving Place, Suite 3060, New York, NY 10003.

AND TAKE NOTICE that the Initial Recognition Order and the supplemental order granted by the Canadian Court on July 12, 2022 (together with the Initial Recognition Order, the "**Recognition Orders**"), which were both issued by the Canadian Court under Part IV of the *Companies' Creditors Arrangement Act*, R.S.C. 1985, c. C-36 (the "**CCAA Recognition Proceeding**"), among other things:

  (i)    ordered that the Chapter 11 Proceeding is recognized as a foreign proceeding;

  (ii)   granted a stay of proceedings against VDL and its former, current and future directors and officers;

  (iii)  recognized certain orders granted by the U.S. Bankruptcy Court in the Chapter 11 Proceeding; and

  (iv)  appointed Alvarez & Marsal Canada Inc. as the information officer (in such capacity, the "**Information Officer**") with respect to the CCAA Recognition Proceeding.

153
-2-

AND TAKE NOTICE that motions, orders and notices filed with the U.S. Bankruptcy Court in the Chapter 11 Proceeding are available at https://cases.stretto.com/Voyager and that the Recognition Orders and any other orders that may be granted by the Canadian Court in the CCAA Recognition Proceeding are available at http://www.alvarezandmarsal.com/VoyagerDigital.

AND TAKE NOTICE that counsel for the Foreign Representative is:

> **Fasken Martineau DuMoulin LLP**
> Bay Adelaide Centre, 333 Bay Street, Suite 2400, Toronto ON M5H 2T6
> Email:        VoyagerCCAACounsel@fasken.com

FINALLY TAKE NOTICE that if you wish to receive copies of the Recognition Orders or obtain further information in respect of the matters set forth in this Notice, you may contact the Information Officer:

> **Alvarez & Marsal Canada Inc.**
> Royal Bank Plaza, South Tower, 200 Bay Street, Suite 2900, Toronto ON M5J 2J1
> Phone:        [●]
> Email:        [●]

DATED AT TORONTO, ONTARIO this [●]th day of July, 2022.

**Voyager Digital Ltd.**

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

AND IN THE MATTER OF VOYAGER DIGITAL LTD.

APPLICATION OF VOYAGER DIGITAL LTD. UNDER SECTION 46 OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED

Court File No. CV-22-00683820-00CL

| | |
|---|---|
| | **ONTARIO<br>SUPERIOR COURT OF JUSTICE<br>(COMMERCIAL LIST)**<br><br>**Proceeding commenced at<br>Toronto** |
| | **INITIAL RECOGNITION ORDER** |
| | **FASKEN MARTINEAU DuMOULIN LLP**<br>Barristers and Solicitors<br>333 Bay Street, Suite 2400<br>Bay Adelaide Centre, Box 20<br>Toronto ON   M5H 2T6<br><br>**Stuart Brotman (LSO:  43430D)**<br>sbrotman@fasken.com<br>Tel:  416 865 5419<br>**Aubrey Kauffman (LSO:  18829N)**<br>akauffman@fasken.com<br>Tel:  416 868 3538<br>**Daniel Richer (LSO:  75225G)**<br>dricher@fasken.com<br>Tel:  416 865 4445<br>**Mitch Stephenson (LSO:  73064H)**<br>mstephenson@fasken.com<br>Tel:  416 868 3502<br><br>Lawyers for the Applicant |

TAB – 15

156

# Cross-Border Insolvency

A Commentary on the UNCITRAL Model Law,
Fourth Edition, Volume I

General Editor **Look Chan Ho**

**General editor**
Look Chan Ho

**Managing director**
Sian O'Neill

*Cross-Border Insolvency: A Commentary on the UNCITRAL Model Law, Fourth Edition, Volume I*
is published by

Globe Law and Business Ltd
3 Mylor Close
Horsell
Woking
Surrey GU21 4DD
Tel: +44 20 3745 4770
www.globelawandbusiness.com

Printed and bound by Gomer Press

*Cross-Border Insolvency: A Commentary on the UNCITRAL Model Law, Fourth Edition, Volume I*

ISBN 9781911078210
EPUB ISBN 9781787421042
Adobe PDF ISBN 9781787421059
Mobi ISBN 9781787421066

© 2017 Globe Law and Business Ltd, except where otherwise stated.

All rights reserved. No part of this publication may be reproduced in any material form (including
photocopying, storing in any medium by electronic means or transmitting) without the written
permission of the copyright owner, except in accordance with the provisions of the Copyright,
Designs and Patents Act 1988 or under terms of a licence issued by the Copyright Licensing Agency
Ltd, 6-10 Kirby Street, London EC1N 8TS, United Kingdom (www.cla.co.uk, email: licence@cla.co.uk).
Applications for the copyright owner's written permission to reproduce any part of this publication
should be addressed to the publisher.

DISCLAIMER
This publication is intended as a general guide only. The information and opinions which it contains
are not intended to be a comprehensive study, nor to provide legal advice, and should not be treated
as a substitute for legal advice concerning particular situations. Legal advice should always be sought
before taking any action based on the information provided. The publishers bear no responsibility
for any errors or omissions contained herein.



Furthermore, the effect of provisional liquidation has been described thus (which is almost identical to the effect of an equity receivership):

> The appointment of a provisional liquidator is, as the phrase suggests, an interim remedy. It takes place before the facts have been found. Not only is it an interim remedy, it is one of the most intrusive interim remedies in the court's armoury …
>
> [O]nce a provisional liquidator has been appointed the company's books and records will pass into his control; and will no longer be accessible, as of right, to the company's directors.[151]

**Foreign representative:** The various functions of a foreign representative set out in the definition are disjunctive.[152] In the equivalent context under Chapter 15, it has been said:

> This definition of a foreign representative is somewhat circular in that a foreign representative must have been appointed in a foreign proceeding but a Bankruptcy Court does not recognize a foreign proceeding without a petition being filed by a foreign representative. Courts agree, however, it is the person or entity appointed by a foreign tribunal who is the appropriate petitioner.[153]

Thus someone authorised by the US bankruptcy court to act as a foreign representative of the debtor's Chapter 11 estate in any judicial or other proceedings in any foreign country would qualify as a foreign representative under the British Model Law.[154]

But foreign representatives do not require official court appointment[155] and may be debtors in possession,[156] including those that do not meet the US Chapter 11's definition of debtors in possession.[157]

A foreign representative does not need to have day-to-day management of the debtor's operations. It is sufficient that he has the power to conduct the debtor's business and manage its property.[158]

A foreign representative can be a legal person:

> Neither the Bankruptcy Code nor the Model Law defines "body," but the context suggests that it includes an artificial person created by a legal authority.[159]

---

151  *Revenue and Customs v Rochdale Drinks Distributors* [2011] EWCA Civ 1116; [2013] BCC 419 at [109]–[110].
152  *In re OAS SA*, 533 BR 83 (Bankr SDNY 2015).
153  *In re Tradex Swiss AG*, 384 BR 34, 41 (Bankr D Mass 2008).
154  *Whittman v UCI Holdings* [2016] NZHC 1754. See also *In re Inversora Eléctrica de Buenos Aires SA*, 560 BR 650 (Bankr SDNY 2016).
155  *Hayes, in the matter of Pumpkin Patch Originals v Pumpkin Patch Originals* [2016] FCA 1353 (administrators appointed by directors out of court).
156  *Moore, as Debtor-in-Possession of Australian Equity Investors v Australian Equity Investors* [2012] FCA 1002; *Re 19 Entertainment* [2016] EWHC 1545 (Ch); *Re Peabody Holdings (Gibraltar)* (Gibraltar Supreme Court, 31 May 2016); *Board of Directors of Rizzo-Bottiglieri-De Carlini Armatori v Rizzo-Bottiglieri-De Carlini Armatori* [2017] FCA 331.
157  *Ad Hoc Group of Vitro Noteholders v Vitro SAB De CV (In re Vitro SAB De CV)*, 701 F3d 1031, 1042 (5th Cir Tex 2012); *In re OAS SA*, 533 BR 83 (Bankr SDNY 2015).
158  *Asafuji v The Sanko Steamship Co Ltd (No 2)* [2012] FCA 1314 at [10].
159  *In re Oversight and Control Commission of Avanzit SA*, 385 BR 525, 540 (Bankr SDNY 2008) (internal citation omitted). See also *Awal Bank BSC v Al-Sanea* [2011] EWHC 1354 (Comm) at [1] ("Awal Bank BSC, is a company (now in administration since 31 July 2009) incorporated in Bahrain. The appointment of Messrs Charles Russell as external administrator on 6 August 2009 was recognised under the Cross-Border Insolvency Regulations 2006 by order of Mr Registrar Jaques on 23 September 2009"); *In re Grand Prix Associates*, 2009 Bankr LEXIS 1239 (Bankr DNJ 18 May 2009) (the foreign representative being Plaza Management Overseas SA); *In re Innua Canada Ltd*, 2009 Bankr LEXIS 995 (Bankr DNJ 15 April 2009) (the foreign representative being RSM Richter Inc).

In concluding that an oversight commission was a foreign representative, the US bankruptcy court took into account the following factors:

> It was created under the [repayment plan] approved by the Spanish Insolvency Court for the stated purpose of protecting the interests of the creditors and assuring [the debtor's] compliance with its payment obligations. Furthermore, the Spanish Insolvency Court expressly authorized the Oversight Commission to pursue and recover the $25 million for the benefit of [the debtor's] creditors and distribution under Spanish law.[160]

In the case of an Australian voluntary winding-up, the liquidators qualified as foreign representatives under Chapter 15 because "the liquidators are officially authorized by statute to liquidate the debtor's assets" and the debtor's "member vote authorizing the winding up specifically gave the liquidators control over the debtor's assets and allowed them to liquidate those assets".[161]

In recognising the liquidators of an Antiguan winding-up as foreign representatives, the Court of Appeal took into account the following matters stated in the Antiguan winding-up order:

> [The order] directed the liquidators to collect all the assets of [the debtor], wherever situate and provided for them to vest in the Antiguan Liquidators … [It] required the Antiguan Liquidators to hold all such assets for the benefit of depositors, creditors and investors in accordance with their interests under the laws of Antigua and Barbuda and in the priority indicated. The Antiguan Liquidators were constituted as foreign representatives … and authorised to apply for recognition in other jurisdictions …[162]

However, the Court of Appeal in Stanford also upheld the first instance judgment that the US equity receiver was not a foreign representative:

> [S]ince the Receiver has not yet been authorised to administer the liquidation or reorganisation of SIB he is not yet a "foreign representative" as defined, even if the receivership is a "foreign proceeding".[163]

This categorisation of the US receivership appears mistaken. If the US receivership was a foreign proceeding, the receiver must be a foreign representative in that he was authorised to act as a representative of the US receivership. The US receivership order specifically authorised the receiver to collect assets of the receivership estate, "wherever located", and to commence or become party to "such actions or proceedings in state, federal, or foreign courts that the [r]eceiver deems necessary and advisable" to preserve the receivership estate or carry out the receiver's mandate.[164] Here the receiver was seeking recognition in order to collect assets located in the United Kingdom.

Interim judicial managers appointed under Singapore insolvency law have also been recognised as foreign representatives.[165]

---

160   *In re Oversight and Control Commission of Avanzit SA*, 385 BR 525, 540 (Bankr SDNY 2008).
161   *In re Betcorp Limited*, 400 BR 266, 294 (Bankr D Nev 2009). See also *Raithatha v Ariel Industries* [2012] FCA 1526; (2012) 212 FCR 139 (concerning creditors' voluntary liquidation in England).
162   *Re Stanford International Bank* [2010] EWCA Civ 137; [2011] Ch 33 at [28].
163   *Re Stanford International Bank* [2009] EWHC 1441 (Ch); [2009] BPIR 1157 at [85], aff'd [2010] EWCA Civ 137; [2011] Ch 33 at [29].
164   See the US receivership order dated 12 March 2009.
165   *United Drug (UK) Holdings v Bilcare Singapore* [2013] EWHC 4335 (Ch).

196

**Exhibit E**

**IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

Case No.: HC/OA 403/2023

Doc No.: HC/ORC 3250/2023

Filed: 20-July-2023 12:02 PM



In the matter of Part 11 of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018)

And

In the matter of Section 252 of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018)

And

In the matter of the Third Schedule of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018)

And

In the matter of of Article 15 of the UNCITRAL Model Law on Cross-Border Insolvency

And

In the matter of the Appointment of Foreign Representative in the United States Bankruptcy Court in the Southern District of New York in Case No. 23-10063 (Genesis Global Holdco, LLC (EIN 38-4058219)), jointly administered with Case No. 23-10064 (Genesis Global Capital, LLC (EIN 37-1878564) and Case No. 23-10065 (Genesis Asia Pacific Pte. Ltd. (Singapore UEN No. 202002164R)) on 26 January 2023

And

In the matter of GENESIS GLOBAL CAPITAL, LLC (United States Registration No. 37-1878564)

1. GENESIS ASIA PACIFIC PTE. LTD.
   (Singapore UEN No. 202002164R)
   (in its capacity as foreign representative of Genesis Global Capital, LLC)

2. GENESIS GLOBAL CAPITAL, LLC
   (United States Registration No. 37-1878564)

...Applicant(s)

**ORDER OF COURT**

Case No:         HC/OA 403/2023

Before:          The Honourable Justice Aedit Abdullah

Venue:           Supreme Court, Chamber 3C

Hearing date/Time:  06 July 2023 at 10:00AM

The Court made the following orders in the above application:

**UPON THE APPLICATION** of the Applicants made by way of HC/OA 403/2023 coming on for hearing on 6 July 2023, and **UPON READING** the 1st Affidavit of Ahmed Derar Islim dated 8 May 2023 and filed on 9 May 2023 and the 2nd Affidavit of Ahmed Derar Islim dated 31 May 2023 and filed on 1 June 2023, and **UPON HEARING** counsel for the Applicants,

It is ordered:

1. That the proceedings of Genesis Global Capital, LLC (EIN 37-1878564) ("**GGC**") in Case No. 23-10064, consolidated for procedural purposes only by the Order Directing Joint Administration of Related Chapter 11 Cases (ECF No. 37) dated 26 January 2023 under Case No. 23-10063 in relation to GGC, Genesis Global Holdco, LLC (EIN 38-4058219) and Genesis Asia Pacific Pte. Ltd. (Singapore UEN No. 202002164R) filed under Chapter 11, Title 11 of the United States Bankruptcy Code with the Bankruptcy Court for the Southern District of New York  (these cases collectively, the "**Chapter 11 Proceedings**") be recognised by the Singapore Courts and in Singapore as a foreign main proceeding within the meaning of Article 2(f) of the UNCITRAL Model Law on Cross Border Insolvency as adopted in Singapore by way of Section 252 and the Third Schedule of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018) (the "**Model Law**"), and that GGC be immediately entitled to relief pursuant to Article 20 of the Model Law.



2. That so long as the Chapter 11 Proceedings with respect to GGC, including any extensions thereto are in force, except with leave of the Court:

(i) The commencement or continuation of individual actions or individual proceedings concerning GGC's property, rights, obligations or liabilities, and all orders made thereunder, be stayed in accordance with Article 21(1)(a) of the Model Law;

(ii) Execution, distress or other legal process against GGC's property be stayed in accordance with Article 21(1)(b) of the Model Law and section 96(4)(d) / section 64(8)(d) of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018) (the "**IRDA**");

(iii) The right to transfer, encumber or otherwise dispose of any property of GGC (save for any such right by GGC to so transfer, encumber or otherwise dispose its own property) be suspended in accordance with Article 21(1)(c) of the Model Law;

(iv) No order may be made, and no resolution may be passed, for the winding up of GGC in Singapore in accordance with Article 21(1)(g) of the Model Law and section 96(4)(a) / section 64(8)(a) of the IRDA;

(v) No receiver or manager may be appointed over any property or undertaking of GGC in Singapore in accordance with Article 21(1)(g) of the Model Law and section 96(4)(b) / section 64(8)(b) of the IRDA;

(vi) No other proceedings may be commenced or continued against GGC in accordance with Article 21(1) (g) of the Model Law and section 96(4)(c) / section 64(8)(c) of the IRDA;

(vii) No step may be taken to enforce any security over any property of GGC in Singapore, or to repossess any goods under any chattels leasing agreement, hire-purchase agreement or retention of title agreement in Singapore in accordance with Article 21(1)(g) of the Model Law and section 96(4)(e) / section 64(8)(e) of the IRDA;

(viii) Despite sections 18 and 18A of the Conveyancing and Law of Property Act 1886, no right of re-

entry or forfeiture under any lease in respect of any premises occupied by GGC may be enforced in Singapore in accordance with Article 21(1)(g) of the Model Law and section 96(4)(f) / section 64(8)(f) of the IRDA;

(ix)  No person may, in relation to any agreement, claim or asset located in Singapore or governed by the laws of Singapore without the prior written consent of GGC or permission of this Court:

    i.  terminate or amend, or claim an accelerated payment or forfeiture of the term under, any agreement (including a security agreement) with GGC, or

    ii.  terminate or modify any right or obligation under any agreement (including a security agreement) with GGC,



by reason only that the proceedings herein and in the Chapter 11 Proceedings with respect to GGC are commenced or that GGC is insolvent, save that nothing in this paragraph (ix) is to be construed as:

(1) prohibiting a person from requiring payments to be made in cash for goods, services, use of leased property or other valuable consideration provided after the commencement of the proceedings; or

(2) requiring the further advance of money or credit.

(x)  That GGC is authorised to transfer, encumber or otherwise dispose of any property of GGC, and any suspension of such rights under Article 20(1)(c) of the Model Law be disapplied.

3.  Liberty for the Applicants to apply, including in relation to any urgent application required in the event that the appointment of a foreign representative of GGC is required on an urgent basis.

4.  Costs of and incidental to this Originating Application to be paid out of GGC's assets.

Date of Order: 6 July 2023

Notes:
1. The person or entity served with this judgment/order and who/which has been ordered to pay money, to do or not to do any act must comply immediately or within the time specified in the judgment/order, if any.

2. Failure to comply may result in enforcement of judgment/order proceedings, including contempt of Court proceedings, against the said person or entity.





HC/OA403/2023:HC/ORC3230/2023:HC/OA403/2023:HC/ORC3230/2023:HC/OA403/202

TAN BOON HENG

REGISTRAR

SUPREME COURT

SINGAPORE

*https://www.courtorders.gov.sg*
*Access code: 8hf6bka0i*

Getting this document from the Authentic Court Orders
Portal verifies:
(a) that it was issued by the Courts of the Republic of
Singapore or, in the case of a Schedule of Assets, that it was
filed with the Courts in relation to an application for a Grant
of Probate/Letter of Administration; and (b) the text of the
document was issued on 06 Jul 2023



## Exhibit F

**IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

Case No.: HC/OA 400/2023

Doc No.: HC/ORC 3364/2023

Filed: 25-July-2023 03:16 PM

In the matter of Part 11 of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018)

And

In the matter of Section 252 of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018)

And

In the matter of the Third Schedule of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018)

And

In the matter of Article 15 of the UNCITRAL Model Law on Cross-Border Insolvency



And

In the matter of the Appointment of Foreign Representative in the United States Bankruptcy Court in the Southern District of New York in Case No. 23-10063 (Genesis Global Holdco, LLC (EIN 38-4058219)), jointly administered with Case No. 23-10064 (Genesis Global Capital, LLC (EIN 37-1878564) and Case No. 23-10065 (Genesis Asia Pacific Pte. Ltd. (Singapore UEN No. 202002164R)) on 26 January 2023

And

In the matter of GENESIS ASIA PACIFIC PTE. LTD. (Singapore UEN No. 202002164R)

1.  GENESIS ASIA PACIFIC PTE. LTD.
    (Singapore UEN No. 202002164R)
    (in its capacity as foreign representative of Genesis Asia Pacific Pte. Ltd.)

2.  GENESIS ASIA PACIFIC PTE. LTD.
    (Singapore UEN No. 202002164R)

...Applicant(s)

**ORDER OF COURT**

Case No:         HC/OA 400/2023

Before:          The Honourable Justice Aedit Abdullah

Venue:           Supreme Court, Chamber 3C

Hearing date/Time:  6 July 2023 at 10:00AM

The Court made the following orders in the above application:

**UPON THE APPLICATION** of the Applicants made by way of HC/OA 400/2023 coming on for hearing on 6 July 2023, and **UPON READING** the 1st Affidavit of Ahmed Derar Islim dated 8 May 2023 and filed on 9 May 2023 and the 2nd Affidavit of Ahmed Derar Islim dated 31 May 2023 and filed on 1 June 2023, and **UPON HEARING** counsel for the Applicants,

It is ordered:

1.  That the proceedings of Genesis Asia Pacific Pte. Ltd. (Singapore UEN No. 202002164R) ("**GAP**") in Case No. 2310065, consolidated for procedural purposes only by the Order Directing Joint Administration of Related Chapter 11 Cases (ECF No. 37) dated 26 January 2023 under Case No. 2310063 in relation to Genesis Global Holdco, LLC (EIN 38-4058219), Genesis Global Capital, LLC (EIN 37-1878564) and GAP filed under Chapter 11, Title 11 of the United States Bankruptcy Code with the Bankruptcy Court for the Southern District of New York (these cases collectively, the "**Chapter 11 Proceedings**") with respect to GAP be recognised by the Singapore High Court and in Singapore as a foreign non-main proceeding within the meaning of Article 2(g) of the UNCITRAL Model Law on Cross Border Insolvency as adopted in Singapore by way of Section 252 and the Third Schedule of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018) (the "**Model Law**").



2.  That so long as the Chapter 11 Proceedings with respect to GAP, including any extensions thereto are in force, except with leave of the Court:

   (i)  The commencement or continuation of individual actions or individual proceedings concerning GAP's property, rights, obligations or liabilities, and all orders made thereunder, be stayed in accordance with Article 21(1)(a) of the Model Law;

   (ii)  Execution, distress or other legal process against GAP's property be stayed in accordance with Article 21(1)(b) of the Model Law and section 96(4)(d) / section 64(8)(d) of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018) (the "**IRDA**");

   (iii)  The right to transfer, encumber or otherwise dispose of any property of GAP (save for any such right by GAP to so transfer, encumber or otherwise dispose its own property) be suspended in accordance with Article 21(1)(c) of the Model Law;

   (iv)  No order may be made, and no resolution may be passed, for the winding up of GAP in Singapore in accordance with Article 21(1)(g) of the Model Law and section 96(4)(a) / section 64(8)(a) of the IRDA;

   (v)  No receiver or manager may be appointed over any property or undertaking of GAP in Singapore in accordance with Article 21(1)(g) of the Model Law and section 96(4)(b) / section 64(8)(b) of the IRDA;

   (vi)  No other proceedings may be commenced or continued against GAP in accordance with Article 21(1)(g) of the Model Law and section 96(4)(c) / section 64(8)(c) of the IRDA;

   (vii)  No step may be taken to enforce any security over any property of GAP in Singapore, or to repossess any goods held by GAP in Singapore under any chattels leasing agreement, hire-purchase agreement or retention of title agreement in Singapore in accordance with Article 21(1)(g) of the Model Law and section 96(4)(e) / section 64(8)(e) of the IRDA;

   (viii)  Despite sections 18 and 18A of the Conveyancing and Law of Property Act 1886, no right of re-

entry or forfeiture under any lease in respect of any premises occupied by GAP may be enforced in Singapore in accordance with Article 21(1)(g) of the Model Law and section 96(4)(f) / section 64(8)(f) of the IRDA;

(ix)  No person may, in relation to any agreement, claim or asset located in Singapore or governed by the laws of Singapore without the prior written consent of GAP or permission of this Court:

    i.  terminate or amend, or claim an accelerated payment or forfeiture of the term under, any agreement (including a security agreement) with GAP, or

    ii.  terminate or modify any right or obligation under any agreement (including a security agreement) with GAP,

by reason only that the proceedings herein and in the Chapter 11 Proceedings with respect to GAP are commenced or that GAP is insolvent, save that nothing in this paragraph (ix) is to be construed as:



    (1) prohibiting a person from requiring payments to be made in cash for goods, services, use of leased property or other valuable consideration provided after the commencement of the proceedings; or

    (2) requiring the further advance of money or credit.

3.  Liberty for the Applicants to apply, including in relation to any urgent application required in the event that the appointment of a foreign representative of GAP is required on an urgent basis.

4.  Costs of and incidental to this Originating Application to be paid out of GAP's assets.

Date of Order: 06 July 2023

Notes:
1. The person or entity served with this judgment/order and who/which has been ordered to pay money, to do or not to do any act must comply immediately or within the time specified in the judgment/order, if any.

2. Failure to comply may result in enforcement of judgment/order proceedings, including contempt of Court proceedings, against the said person or entity.



*https://www.courtorders.gov.sg*
*Access code: 8hf6hmwh0*

Getting this document from the Authentic Court Orders
Portal verifies:
(a) that it was issued by the Courts of the Republic of
Singapore or, in the case of a Schedule of Assets, that it was
filed with the Courts in relation to an application for a Grant
of Probate/Letter of Administration; and (b) the text of the
document was issued on 06 Jul 2023



HC/OA400/2023 HC/ORC3364/2023 HC/OA400/2023 HC/ORC3364/2023 HC/OA400/202

TAN BOON HENG

REGISTRAR

SUPREME COURT

SINGAPORE



**Exhibit G**

**IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

Case No.: HC/OA 402/2023

Doc No.: HC/ORC 3238/2023

Filed: 17-July-2023 06:01 PM



In the matter of Part 11 of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018)

And

In the matter of Section 252 of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018)

And

In the matter of the Third Schedule of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018)

And

In the matter of Article 15 of the UNCITRAL Model Law on Cross-Border Insolvency

And

In the matter of the Appointment of Foreign Representative in the United States Bankruptcy Court in the Southern District of New York in Case No. 23-10063 (Genesis Global Holdco, LLC (EIN 38-4058219)), jointly administered with Case No. 23-10064 (Genesis Global Capital, LLC (EIN 37-1878564) and Case No. 23-10065 (Genesis Asia Pacific Pte. Ltd. (Singapore UEN No. 202002164R)) on 26 January 2023

And

In the matter of GENESIS GLOBAL HOLDCO, LLC (United States Registration No. 38-4058219)

1.  GENESIS ASIA PACIFIC PTE. LTD.
    (Singapore UEN No. 202002164R)
    (in its capacity as foreign representative of Genesis Global Holdco, LLC)

2.  GENESIS GLOBAL HOLDCO, LLC
    (United States Registration No. 38-4058219)

...Applicant(s)

**ORDER OF COURT**

Case No:              HC/OA 402/2023

Before:               The Honourable Justice Aedit Abdullah

Venue:                Supreme Court, Chamber 3C

Hearing date/Time:    6 July 2023 at 10:00AM

The Court made the following orders in the above application:

**UPON THE APPLICATION** of the Applicants made by way of HC/OA 402/2023 coming on for hearing on 6 July 2023, and **UPON READING** the 1st Affidavit of Ahmed Derar Islim dated 8 May 2023 and filed on 9 May 2023 and the 2nd Affidavit of Ahmed Derar Islim dated 31 May 2023 and filed on 1 June 2023, and **UPON HEARING** counsel for the Applicants,

It is ordered:

1. That the proceedings of Genesis Global Holdco, LLC (EIN 38-4058219) ("**Holdco**") in Case No. 23-10063, consolidated for procedural purposes only by the Order Directing Joint Administration of Related Chapter 11 Cases (ECF No. 37) dated 26 January 2023 under Case No. 23-10063 in relation to Holdco, Genesis Global Capital, LLC (EIN 37-1878564) and Genesis Asia Pacific Pte. Ltd. (Singapore UEN No. 202002164R) filed under Chapter 11, Title 11 of the United States Bankruptcy Code with the Bankruptcy Court for the Southern District of New York  (these cases collectively, the "**Chapter 11 Proceedings**") be recognised by the Singapore Courts and in Singapore as a foreign main proceeding within the meaning of Article 2(f) of the UNCITRAL Model Law on Cross Border Insolvency as adopted in Singapore by way of Section 252 and the Third Schedule of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018) (the "**Model Law**"), and that Holdco be immediately entitled to relief pursuant to Article 20 of the Model Law.



2. That so long as the Chapter 11 Proceedings with respect to Holdco, including any extensions thereto are in force, except with leave of the Court:

(i) The commencement or continuation of individual actions or individual proceedings concerning Holdco's property, rights, obligations or liabilities, and all orders made thereunder, be stayed in accordance with Article 21(1)(a) of the Model Law;

(ii) Execution, distress or other legal process against Holdco's property be stayed in accordance with Article 21(1)(b) of the Model Law and section 96(4)(d) / section 64(8)(d) of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018) (the "**IRDA**");

(iii) The right to transfer, encumber or otherwise dispose of any property of Holdco (save for any such right by Holdco to so transfer, encumber or otherwise dispose its own property) be suspended in accordance with Article 21(1)(c) of the Model Law;

(iv) No order may be made, and no resolution may be passed, for the winding up of Holdco in Singapore in accordance with Article 21(1)(g) of the Model Law and section 96(4)(a) / section 64(8)(a) of the IRDA;

(v) No receiver or manager may be appointed over any property or undertaking of Holdco in Singapore in accordance with Article 21(1)(g) of the Model Law and section 96(4)(b) / section 64(8)(b) of the IRDA;

(vi) No other proceedings may be commenced or continued against Holdco in accordance with Article 21 (1)(g) of the Model Law and section 96(4)(c) / section 64(8)(c) of the IRDA;

(vii) No step may be taken to enforce any security over any property of Holdco in Singapore, or to

repossess any goods under any chattels leasing agreement, hire-purchase agreement or retention of title agreement in Singapore in accordance with Article 21(1)(g) of the Model Law and section 96(4)(e) / section 64(8)(e) of the IRDA;

(viii)  Despite sections 18 and 18A of the Conveyancing and Law of Property Act 1886, no right of re-entry or forfeiture under any lease in respect of any premises occupied by Holdco may be enforced in Singapore in accordance with Article 21(1)(g) of the Model Law and section 96(4)(f) / section 64(8)(f) of the IRDA;

(ix)  No person may, in relation to any agreement, claim or asset located in Singapore or governed by the laws of Singapore without the prior written consent of Holdco or permission of this Court:



    i.  terminate or amend, or claim an accelerated payment or forfeiture of the term under, any agreement (including a security agreement) with Holdco, or

    ii.  terminate or modify any right or obligation under any agreement (including a security agreement) with Holdco,

by reason only that the proceedings herein and in the Chapter 11 Proceedings with respect to Holdco are commenced or that Holdco is insolvent, save that nothing in this paragraph (ix) is to be construed as:

    (1)  prohibiting a person from requiring payments to be made in cash for goods, services, use of leased property or other valuable consideration provided after the commencement of the proceedings; or

    (2)  requiring the further advance of money or credit.

(x)  That Holdco is authorised to transfer, encumber or otherwise dispose of any property of Holdco, and any suspension of such rights under Article 20(1)(c) of the Model Law be disapplied.

3.  Liberty for the Applicants to apply, including in relation to any urgent application required in the event that the appointment of a foreign representative of Holdco is required on an urgent basis.

4.  Costs of and incidental to this Originating Application to be paid out of Holdco's assets.

Date of Order: 6 July 2023

Notes:

1. The person or entity served with this judgment/order and who/which has been ordered to pay money, to do or not to do any act must comply immediately or within the time

specified in the judgment/order, if any.

2. Failure to comply may result in enforcement of judgment/order proceedings, including contempt of Court proceedings, against the said person or entity.





HC/OA 602/2023 HC/ORC 3238/2023 HC/OA 602/2023 HC/ORC3238/2023 HC/OA 602/202

TAN BOON HENG

REGISTRAR

SUPREME COURT

SINGAPORE

*https://www.courtorders.gov.sg*
*Access code: 8hf7ssfhi*

Getting this document from the Authentic Court Orders Portal verifies:
(a) that it was issued by the Courts of the Republic of Singapore or, in the case of a Schedule of Assets, that it was filed with the Courts in relation to an application for a Grant of Probate/Letter of Administration; and (b) the text of the document was issued on 06 Jul 2023



**Exhibit H**

<u>**IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**</u>

|  | In the matter of Part 11 of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018) |
|---|---|
|  | And |
|  | In the matter of Section 252 of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018) |
|  | And |
|  | In the matter of the Third Schedule of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018) |
|  | And |
|  | In the matter of Article 15 of the UNCITRAL Model Law on Cross-Border Insolvency |
|  | And |
|  | In the matter of the Appointment of Foreign Representative in the United States Bankruptcy Court in the Southern District of New York in Case No. 2310063 (Genesis Global Holdco, LLC (EIN 384058219)), jointly administered with Case No. 2310064 (Genesis Global Capital, LLC (EIN 371878564)) and Case No. 2310065 (Genesis Asia Pacific Pte. Ltd. (Singapore UEN No. 202002164R)) on 26 January 2023 |
|  | And |
| HC/OA 400/2023 | In the matter of **GENESIS ASIA PACIFIC PTE. LTD.** (Singapore UEN No. 202002164R) |
|  | **1. GENESIS ASIA PACIFIC PTE. LTD.** (Singapore UEN No. 202002164R) (in its capacity as foreign representative of Genesis Asia Pacific Pte. Ltd.) |
|  | **2. GENESIS ASIA PACIFIC PTE. LTD.** (Singapore UEN No. 202002164R) |

And

HC/OA 402/2023                    In the matter of **GENESIS GLOBAL HOLDCO, LLC**
(United States Registration No. 38-4058219)
**1. GENESIS ASIA PACIFIC PTE. LTD.**
(Singapore UEN No. 202002164R)
(in its capacity as foreign representative of Genesis
Global Holdco, LLC)

**2. GENESIS GLOBAL HOLDCO, LLC**
(United States Registration No. 38-4058219)

And

HC/OA 403/2023                    In the matter of **GENESIS GLOBAL CAPITAL, LLC**
(United States Registration No. 37-1878564)
**1. GENESIS ASIA PACIFIC PTE. LTD.**
(Singapore UEN No. 202002164R)
(in its capacity as foreign representative of Genesis
Global Capital, LLC)

**2. GENESIS GLOBAL CAPITAL, LLC**
(United States Registration No. 37-1878564)

… Applicant(s)

---

### APPLICANTS' FURTHER WRITTEN SUBMISSIONS

---

**Alexander Yeo**
**Jo Tay**
**Yeoh Tze Ning**
**Allen & Gledhill LLP**
One Marina Boulevard
#28-00
Singapore 018989
Ref: 1022011034/JOTAY/AYEOHT/YEOHTN
**Solicitors for the Applicants**

Dated this 17 July 2023

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................... 4

II.     CORPORATE ENTITIES (SUCH AS GAP) CAN BE RECOGNISED AS
        'FOREIGN REPRESENTATIVES' UNDER THE SINGAPORE MODEL LAW
        ............................................................................................................. 5

III.    A DEBTOR CAN BE ITS OWN FOREIGN REPRESENTATIVE, I.E. GAP
        CAN BE ITS OWN FOREIGN REPRESENTATIVE ................................13

IV.     CONCLUSION........................................................................................15

## I.   **INTRODUCTION**

1.   These are the written submissions of Genesis Asia Pacific Pte. Ltd. ("**GAP**"), Genesis Global Holdco ("**Holdco**") and Genesis Global Capital, LLC ("**GGC**") (including GAP in its capacity as foreign representative of Holdco, GGC and GAP) (collectively, the "**Applicants**", and with Holdco, GGC and GAP referred to collectively as "**Debtors**") in the following applications:

   (1)   HC/OA 400/2023 ("**OA 400**") by GAP;

   (2)   HC/OA 402/2023 ("**OA 402**") by Holdco;

   (3)   HC/OA 403/2023 ("**OA 403**") by GGC;

   (collectively, the "**Recognition Applications**").

2.   Terms not otherwise defined in this set of submissions shall have the same meanings attributed to them in the submissions dated 30 June 2023.

3.   On 6 July 2023, this Honourable Court granted orders recognising the Chapter 11 Proceedings of the Debtors, and certain assistance in relation to such proceedings, under the UNCITRAL Model Law on Cross-Border Insolvency as enacted in Singapore, under the Third Schedule of the IRDA (i.e. the **Model Law**).[1]

4.   However, this Honourable Court had certain reservations regarding the appointment of GAP as the foreign representative of each Debtor (including of itself). As such, no orders were made regarding (a) the determination that GAP is the 'foreign representative' of each Debtor for the purposes of Article 2(i) of the Model Law, and (b) entrusting GAP as foreign representative with the administration, realisation, and

---

[1] Singapore Model Law, Bundle of Authorities dated 30 June 2023 ("**30 June BOA**") Tab 2.

distribution of all or any part of the property and assets (and any proceeds thereof) of each Debtor located in Singapore.

5.   We were directed to address this Honourable Court on the following issues relating to the appointment and recognition of a "*foreign representative*" under the Model Law:

(1)   Whether a corporate entity (such as GAP) can be recognised as a "foreign representative" under the Singapore Model Law; and

(2)   Whether a debtor such as GAP can be its own "foreign representative" for the purposes of the Singapore Model Law.

6.   We submit that:

(1)   A corporate entity such as GAP can be a "*foreign representative*" for the purposes of the Singapore Model Law and, in this case, there would be good reasons for recognising GAP as the "*foreign representative*" of the Debtors; and

(2)   A debtor can be its own "*foreign representative*", i.e. GAP can be its own "*foreign representative*" in respect of the Recognition Applications under the Singapore Model Law.

## II.   <u>CORPORATE ENTITIES (SUCH AS GAP) CAN BE RECOGNISED AS 'FOREIGN REPRESENTATIVES' UNDER THE SINGAPORE MODEL LAW</u>

7.   Under Article 2(i) of the Singapore Model Law, "*foreign representative*" is defined as:

"*…<u>a person or body</u>, including one appointed on an interim basis, authorised in a foreign proceeding to administer the reorganisation*

*or the liquidation of the debtor's property or affairs or to act as a representative of the foreign proceeding*".[2]

8.    At the outset, we make two observations:

(1)    In ***Re Rooftop Group International Pte Ltd and another* [2020] 4 SLR 680** ("***Re Rooftop***"), this Honourable Court noted that:

(a)    Under Article 2(i) of the Model Law, "*the appointment of a particular person as the foreign representative **is a matter which falls to be determined by the foreign proceeding itself***".[3]

(b)    The wording of Art 21(1)(e) of the Model Law "*suggests that **the foreign representative cannot be displaced**, even if the court is of the view that the interests of local creditors might be better served by having some other person administer or realise the locally-based assets*".[4]

We suggest that a certain degree of deference should be paid to the decision of the foreign court appointing the foreign representative.

(2)    That said, it should ultimately be for the Singapore court to determine whether the entity applying for recognition of the foreign proceeding qualifies as a "*foreign representative*" under Article 2(i) of the Singapore Model Law.

(a)    Under Article 17, a proceeding must be recognised if "*…(b) the person or body applying for recognition is a foreign representative within the meaning of Article 2(i)*".[5]

---

[2] 30 June BOA Tab 2.
[3] *Re Rooftop*, at [49]: see 30 June BOA Tab **4**.
[4] *Re Rooftop*, at [50]: 30 June BOA Tab 4.
[5] 30 June BOA Tab 2.

(b)      Article 16[6] provides that the Court is entitled to presume that the person or body making that application is a foreign representative within the meaning of Article 2(i), if the certificate from the foreign court indicates so. However we note that this is only a presumption, and can be displaced if there is proof to the contrary.

(c)      In *Re Basis Yield Alpha Fund* **381 BR 37**,[7] the US Bankruptcy Court endorsed the view that the court "*always has the power to make its own determination on qualification under section 1517, notwithstanding the presence of section 1516 and the absence of an actual objection*".

Properly viewed, even though the *appointment* of the foreign representative is a matter to be determined by the foreign proceeding, it would be for the Singapore Court to consider if the foreign representative so appointed falls within the scope of a "*foreign representative*" under the Singapore Model Law.

9.      The appointment by the US Bankruptcy Court of GAP as the foreign representative of the Debtors is not in issue.[8] The only remaining issue is whether GAP, a corporate entity, properly falls within the definition of "*foreign representative*" under Article 2(i) of the Singapore Model Law. We submit that the definition of "*foreign representative*" should include corporate entities such as GAP.

10.      **First**, a "*foreign representative*" can be a "*person*", which includes a corporate entity.

(1)      While the term "*person*" is not specifically defined in the IRDA, it is defined in the Interpretation Act 1965:[9]

---

[6] 30 June BOA at Tab 2.
[7] Supplemental Bundle of Authorities ("**SBOA**"), at Tab 6.
[8] See the *Order Authorizing Debtor Genesis Asia Pacific Pte Ltd to Act as Foreign Representative of the Debtors* dated 26 January 2023  appointing GAP as the foreign representative of all three Debtors ("**Foreign Representative Appointment Order**"), exhibited in the 1st Affidavit of Ahmed Derar Islim dated 8 May 2023 and filed on 9 May 2023 in the Recognition Applications ("**1st ADI**") at ADI-1, Tab 9 (page 458).
[9] SBOA, at Tab 2.

> *"**Interpretation of certain words and expressions***
> *2.—(1)  In this Act, and <u>in every written law enacted</u> before, on or <u>after 28 December 1965</u> (but without affecting anything done before that date) —*
>
> *"person" and "party" <u>include any company</u> or association <u>or body of persons, corporate</u> or unincorporate;"*

(2)    It is submitted that where a statute such as the IRDA does not define or explain the term "*person*", it is open to the Court to adopt the definition of "*person*" in the Interpretation Act. In ***Malaysia Marine ABD Heavy Engineering Sdn Bhd v VLK Traders Singapore Pte Ltd* [2014] 1 SLR 998**,[10] the Singapore High Court noted that the Reciprocal Enforcement of Commonwealth Judgments Act ("**RECJA**") does not define the term "*person*", and in such cases regard should be had to the definition under the Interpretation Act:

> *"[13] … The RECJA does not define or explain the term "person", and it is clear that the court should look towards the Interpretation Act for assistance in filling this lacuna. The purpose of the Interpretation Act is clearly stated in its preamble, where it is described as:*
>
> > *An Act to define certain terms and expressions used in written law and to make provision for the construction, interpretation and publication of written law and for matters connected therewith[.]*
>
> *[14] Section 2(1) explains the scope of the Interpretation Act, as follows:*
>
> > *In this Act, and in every written law enacted before or after 28th December 1965, the following words and expressions shall, without prejudice to anything done prior to that date, have the meanings respectively assigned to them unless there is something in the subject or context inconsistent with such construction or unless it is therein otherwise expressly provided …*
>
> *[15] If the RECJA specified a definition of "person", I would have to agree with the learned Plaintiff's counsel that the*

---

[10] SBOA, Tab 5, at [13]-[15].

8

> *Interpretation Act would not be applicable. <u>However, as the RECJA does not define "person", it is appropriate to seek guidance from the Interpretation Act which provides that "person" and "party"</u>* **<u>include "any company or association or body of persons, corporate or unincorporated"</u>***. In the circumstances "judgment debtor" under s 3(2)(b) of the RECJA should be read to refer to the Defendant, <u>a body corporate</u>.*"

(3)   While the pre-amble to section 2 of the Interpretation Act has been amended, it is submitted that a similar approach should nevertheless be adopted here. That is, given that the IRDA is silent on the definition of "*person*", the definition of "*person*" from the Interpretation Act should be adopted. If so, the term "*foreign representative*" should be read to include a body corporate (e.g. GAP).

11.   **<u>Second</u>**, this is consistent with the use of "*person*" elsewhere in the Singapore Model Law.[11] For example:

(1)   Paragraph (c) of the Preamble states that the purpose of the Singapore Model Law is *"…to provide effective mechanisms for dealing with cases of cross-border insolvency so as to promote the objectives of — … (c) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and <u>other interested persons, including the debtor</u>"*. Given that "*debtor*" is specifically defined at Article 2(c) to mean "*a corporation*", this suggests that "*persons*" was meant to include corporations.

(2)   Article 1(d) provides that the Singapore Model Law applies where "*(d) <u>creditors or other interested persons</u> in a foreign State have an interest in requesting the commencement of, or participating in, a proceeding under Singapore insolvency law*". In this context, it would make more sense for "persons" to include corporate entities (and not be limited to individuals).

---

[11] 30 June BOA Tab 2.

(3)     Article 22 provides that "*In granting or denying relief under Article 19 or 21, …the Court must be satisfied that the interests of <u>the creditors</u> … <u>and other interested persons, including if appropriate the debtor</u>, are adequately protected.*" Likewise, the context here suggests that "*persons*" is meant to include non-individuals, including the debtor which is a corporation.

12.     <u>**Third**</u>, and in the same vein, if Parliament had intended for the foreign representative to only be an individual, in the enactment of the Singapore Model Law, the definition of "*foreign representative*" could have been modified to refer to an "*individual*" (instead of "*person*"). The term "*individual*" is specifically used elsewhere in the IRDA, e.g. section 50 (*Eligibility of individual to hold insolvency practitioner's licence*).[12]

13.     <u>**Fourth**</u>, this approach is in line with other Model Law jurisdictions, which have recognised foreign proceedings brought by "*foreign representatives*" that are corporate entities:

(1)     In ***Re Grand Prix Associates* 2009 Bankr LEXIS 1239**,[13] the US Courts granted an order approving a settlement and sale in respect of certain foreign debtors. The application was <u>brought by a corporate entity known as Plaza Management Overseas, S.A. ("**Plaza Management**"), in its capacity as foreign representative</u> of the foreign debtors. Plaza Management had been appointed as the foreign representative of the debtors by the Eastern Caribbean Supreme Court, High Court of Justice, British Virgin Islands, i.e. the BVI Court.

(2)     In ***Re Innua Canada Ltd and the Normandy Group SA* 2009 WL 1025088**,[14] the US Courts granted, to certain foreign debtors, provisional relief under Chapter 15 (the US enactment of the Model Law) of the US Bankruptcy Code. The application for such relief was <u>brought by a corporate entity known as RSM</u>

---

[12] SBOA, Tab 3.
[13] SBOA, Tab 7.
[14] SBOA, Tab 8.

10

<u>Richter Inc. as the duly-authorised foreign representative</u> of the foreign debtors
in a Canadian receivership proceeding.

(3)     In ***Re Oversight and Control Commission of Avanzit* 385 BR 525**,[15] the US
Courts concluded that an Oversight Commission was a "foreign representative"
for the purposes of Chapter 15. The Oversight Commission, which consisted
five members, was established by a Convenio (repayment plan) which had
been approved by the Spanish Insolvency Court. In doing so, the US Court
noted:

> *"[10] I also conclude that the Oversight Commission is a
> "foreign representative" and a person or body within the
> meaning of 11 U.S.C. § 1517(a)(2). Section 101(24) defines
> a "foreign representative" to mean:*
>
>> *a person or body, including a person or body
>> appointed on an interim basis, authorized in
>> a foreign proceeding to administer the
>> reorganization or the liquidation of the
>> debtor's assets or affairs or to act as a
>> representative of such foreign proceeding.*
>
> *11 U.S.C. § 101(24). The Bankruptcy Code says, in relevant
> part, that "[t]he term 'person' includes individual, partnership
> and corporation." 11 U.S.C. § 101(41). The use of
> "includes" is not limiting, 11 U.S.C. § 102(3), and
> encompasses "persons" that do not fit squarely within the
> examples. **Neither the Bankruptcy Code nor the Model
> Law defines "body," but the context suggests that it
> includes "[a]n artificial person created by a legal
> authority."** See BLACK'S LAW DICTIONARY 185."*

(4)     In the Chapter 11 Proceedings of Voyager Digital Ltd ("**VDL**") and its related
entities, the US Bankruptcy Court <u>authorised VDL, a corporate entity, to act as
foreign representative on behalf of the debtors' estates</u> in their Canadian
proceedings.[16] In ***Re Voyager Digital Ltd*** (Court File No. CV-22-00683820-
00CL), [17]  the Canadian court declared that VDL was the "*foreign*

---

[15] SBOA, Tab 12.
[16] *Re Voyager Digital Holdings* (Case No. 22-10943), Order dated 8 July 2022: SBOA, Tab 13.
[17] SBOA, at Tab 14.

*representative*", as defined in section 45 of the Canadian Companies' Creditors Arrangement Act (CCAA),[18] of the debtors. It should be further noted that <u>VDL was both the foreign representative and a debtor in this case</u>.

(5)    In the Chapter 11 Proceedings of the LATAM Airlines Group, the US Bankruptcy Court <u>appointed LATAM Airlines Group S.A. ("**LATAM Parent**") as the Foreign Representative of the debtors</u> (which included LATAM Parent itself), to seek recognition of the Chapter 11 proceedings in Colombia and Chile.[19] Recognition and assistance was sought by LATAM Parent in both the Columbian court[20] and the Chilean court,[21] and granted. It should be further noted that LATAM Parent <u>was both the foreign representative and a debtor in this case</u>.

14.    <u>**Fifth**</u>, while questions may arise about the accountability of corporate entities (as opposed to individuals), it is submitted that corporate entities may nevertheless be held accountable to this Honourable Court should they be in breach of certain orders. For example, under section 6(2) of the Administration of Justice (Protection) Act 2016:[22]

> *"(2)  Where a corporation commits contempt of court under this Act, a person —*
> *(a)    who is —*
>
> > *(i)     an officer of the corporation, or a member of a corporation whose affairs are managed by its members; or*
> >
> > *(ii)    an individual who is involved in the management of the corporation and is in a position to influence the conduct of the corporation in relation to the commission of the contempt of court; and*
>
> *(b)    who —*
>
> > *(i)     consented or connived, or conspired with others, to effect the commission of the contempt of court;*

---

[18] SBOA, at Tab 4.
[19] SBOA, at Tab 9.
[20] SBOA, at Tab 11.
[21] SBOA, at Tab 10.
[22] SBOA, at Tab 1.

> *(ii)      is in any other way, whether by act or omission, knowingly concerned in, or is party to, the commission of the contempt of court by the corporation; or*
>
> *(iii)      knew or ought reasonably to have known that the contempt of court by the corporation (or contempt of court of the same type) would be or is being committed, and failed to take all reasonable steps to prevent or stop the commission of that contempt of court,*
>
> *shall be guilty of the same contempt of court as is the corporation, and shall be liable on being found guilty of contempt of court to be punished accordingly."*

15.   Further, the concern about a corporation's accountability should feature less here, given that <u>GAP, the appointed foreign representative, is a Singapore-incorporated entity, with two (2) local officers (one director and one company secretary).</u>[23] These parties would fall within the reach of the Singapore court.

16.   We therefore humbly submit that a corporate entity such as GAP should qualify as a "*foreign representative*" for the purposes of Article 2(i) of the Singapore Model Law.

## III.   <u>A DEBTOR CAN BE ITS OWN FOREIGN REPRESENTATIVE, I.E. GAP CAN BE ITS OWN FOREIGN REPRESENTATIVE</u>

17.   It is submitted that the "foreign representative" can also be a debtor in the foreign proceedings sought to be recognised under the Singapore Model Law.

18.   <u>**First**</u>, on a plain reading of Article 2(i), there is nothing contained therein that prevents a debtor from being its own foreign representative.

19.   <u>**Second**</u>, as discussed at paragraphs 13(4) and 13(5) above, other Model Law jurisdictions have granted recognition and assistance to foreign proceedings where the

---

[23] See 1st ADI at [10], and GAP's business profile obtained from ACRA on 8 May 2023 at ADI-1, Tab 4.

foreign representative was also the debtor: see discussion at paragraphs 13(4) and (5) above on VDL and LATAM Parent.[24]

20.    **Third**, there are other advantages that flow from this approach:

(1)    It would bring greater consistency and certainty to the way the Model Law is applied in multi-jurisdictional restructurings. Given that other jurisdictions have accepted applications by foreign representatives that are also debtors, it would assist coordination of international proceedings if the Singapore Court, too, is open to the accepting the appointment of such a foreign representative. Otherwise, the debtors would potentially have to incur additional time and costs in appointing a separate foreign representative (e.g. an individual) to commence recognition and assistance proceedings in Singapore. This would be inefficient and time-consuming.

(2)    Where the foreign proceedings are debtor-in-possession proceedings, it is likely that the debtor itself has the most information and control in respect of the foreign proceeding. In such cases the debtor may be the most suitable entity to take certain actions required of the foreign representative under the Singapore Model Law.[25] For example:

(a)    Under Article 18, the foreign representative "*must inform the Court promptly of any substantial change in the status of the recognised foreign proceeding*". A debtor-in-possession is quite likely to have immediate and first-hand information about such a change.

---

[24] See also *Cross-Border Insolvency: A Commentary on the UNCITRAL Model Law* (Look Chan Ho gen ed) Vol 1 (Global Law and Business, 4th Ed, 2017), page 195: "…*But foreign representatives do not require official court appointment and **may be debtors in possession**, including those that do not meet the US Chapter 11's definition of debtors in possession.*" (emphasis added); SBOA, at Tab 15.
[25] 30 June BOA Tab 2.

(b)      Under Article 21(1)(e), the Court may "*[entrust] the administration or realisation of all or part of the debtor's property located in Singapore to the foreign representative…*".  Where a corporate debtor-in-possession is concerned, it may be more efficient for such a debtor to administer the assets itself so that it can maximise the value of the assets. In contrast, where a third party is appointed as a foreign representative, such a party may be less familiar with the assets and operations of the company, or may require a further fee for taking on certain professional services.

21.    **Fourth**, in the present case, the US Bankruptcy Court granted an order appointing GAP as foreign representative.[26] If the Singapore Court rejects the appointment of GAP as the foreign representative, the Applicants would be required to return to the US Court to seek an order for the appointment of a new foreign representative, which may entail further costs, delay and potentially uncertainty.

## IV.    CONCLUSION

22.    In the circumstances, the Applicants respectfully seek orders in terms of prayers 1(c) and 1(d)(xi) of each Originating Application in respect of the Recognition Applications.



Solicitors for the Applicants
Allen & Gledhill LLP

---

[26] Foreign Representative Appointment Order, exhibited in 1st ADI at ADI-1, Tab 9 (page 458).

**<u>Exhibit I</u>**

**IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

|  |  |
|---|---|
|  | In the matter of Part 11 of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018) |
|  | And |
|  | In the matter of Section 252 of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018) |
|  | And |
|  | In the matter of the Third Schedule of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018) |
|  | And |
|  | In the matter of Article 15 of the UNCITRAL Model Law on Cross-Border Insolvency |
|  | And |
|  | In the matter of the Appointment of Foreign Representative in the United States Bankruptcy Court in the Southern District of New York in Case No. 2310063 (Genesis Global Holdco, LLC (EIN 384058219)), jointly administered with Case No. 2310064 (Genesis Global Capital, LLC (EIN 371878564)) and Case No. 2310065 (Genesis Asia Pacific Pte. Ltd. (Singapore UEN No. 202002164R)) on 26 January 2023 |
|  | And |
| HC/OA 400/2023 | In the matter of **GENESIS ASIA PACIFIC PTE. LTD.** (Singapore UEN No. 202002164R) **1. GENESIS ASIA PACIFIC PTE. LTD.** (Singapore UEN No. 202002164R) (in its capacity as foreign representative of Genesis Asia Pacific Pte. Ltd.) **2. GENESIS ASIA PACIFIC PTE. LTD.** (Singapore UEN No. 202002164R) |
|  | And |
| HC/OA 402/2023 | In the matter of **GENESIS GLOBAL HOLDCO, LLC** (United States Registration No. 38-4058219) **1. GENESIS ASIA PACIFIC PTE. LTD.** |

(Singapore UEN No. 202002164R)

(in its capacity as foreign representative of Genesis Global Holdco, LLC)

**2. GENESIS GLOBAL HOLDCO, LLC**
   (United States Registration No. 38-4058219)


And

HC/OA 403/2023              In the matter of **GENESIS GLOBAL CAPITAL, LLC**
(United States Registration No. 37-1878564)
**1. GENESIS ASIA PACIFIC PTE. LTD.**
   (Singapore UEN No. 202002164R)
   (in its capacity as foreign representative of Genesis Global Capital, LLC)

**2. GENESIS GLOBAL CAPITAL, LLC**
   (United States Registration No. 37-1878564)

… Applicant(s)

---

## APPLICANTS' BUNDLE OF AUTHORITIES

---

**Alexander Yeo**
**Jo Tay**
**Yeoh Tze Ning**
**Allen & Gledhill LLP**
One Marina Boulevard
#28-00
Singapore 018989
Ref: 1022011034/JOTAY/AYEOHT/YEOHTN
**Solicitors for the Applicants**


Dated this 30 June 2023

**BUNDLE OF AUTHORITIES INDEX**

| TAB | DESCRIPTION |
|---|---|
| **I.** | **STATUTES** |
| | **A. SINGAPORE STATUTES** |
| 1. | **Section 366 of the Companies Act 1967**<br><br>__Relevance__: Definition of debtor company carrying on business in Singapore. |
| 2. | **Sections 88, 96 and 252, Articles 2, 4, 15, 16, 17, 20, 21, 22 of the Third Schedule of the Insolvency, Restructuring and Dissolution Act 2018 ("IRDA")**<br><br>__Relevance__: Sets out the relief that is available to a Singapore insolvency holder and also the adoption of the UNCITRAL Model Law ("**Model Law**"). The Third Schedule sets out the definition for a variety of terms related to the UNCITRAL Model Law on Cross-Border Insolvency, as well as the requirements for an application for recognition of foreign proceedings and the accompanying reliefs. |
| | **B. FOREIGN STATUTES** |
| 3. | **Sections 362 and 1522 of Title 11 of the United States Bankruptcy Code**<br><br>__Relevance__: Section 362 provides for the automatic stay that arises from the US Bankruptcy Code. Section 1522 provides guidance on how Article 22 of the Model La should be interpreted. |
| **II.** | **CASES** |
| | **A. SINGAPORE CASES** |
| 4. | ***Re Rooftop Group International Pte Ltd and another (Triumphant Gold Ltd and another, non-parties)*** **[2020] 4 SLR 680**<br><br>__Relevance__:<br><br>(1) Most recognition of foreign corporate insolvency proceedings would have to be made under the Model Law and the Singapore Court will be slow to allow common law recognition in the first instance. Common law recognition is only relevant in situations where the recognition is not catered for by the Model Law.<br>(2) Assistance of a particular form may not be granted under the Model Law if in the same circumstances it may be denied or is not available to a local representative. |

| 5. | ***Re Tantleff, Alan** [2023] 3 SLR 250* |
|----|----|
|  | <u>Relevance</u>: |
|  | (1) Most recognition of foreign corporate insolvency proceedings would have to be made under the Model Law and the Singapore Court will be slow to allow common law recognition in the first instance. Common law recognition is only relevant in situations where the recognition is not catered for by the Model Law. |
|  | (2) The court may, in appropriate circumstances, apply foreign insolvency law when granting discretionary relief under Article 21(1)(g) of the Model Law. |
|  | (3) Singapore court must carefully scrutinise the circumstances in which the foreign order was granted and ensure that adequate protection is afforded to interested parties. |
| 6. | ***Re Zetta Jett Pte Ltd and others** [2018] 4 SLR 801 ("**Zetta (No. 1)**")* |
|  | <u>Relevance</u>: Chapter 11 proceedings in the US may be described as a form of protected restructuring or reorganisation, accompanied by an automatic moratorium or stay upon application. Such moratorium or stay operates, at least from the perspective of the US, on a worldwide basis. |
| 7. | ***Zetta Jet Pte Ltd and others (Asia Aviation Holdings Pte Ltd, intervener)** [2019] 4 SLR 1343 ("**Zetta (No. 2)**")* |
|  | <u>Relevance</u>: |
|  | (1) A US Chapter 11 proceeding is "clearly a 'foreign proceeding' within the meaning of Art 2(h) of the Singapore Model Law". |
|  | (2) Factors that would be helpful in determining a debtor's COMI. |
|  | (3) A debtor's COMI is determined at the date a recognition application is filed. |
|  | (4) Where the UNCITRAL Guide 1997 is silent, the court may consider the UNCITRAL Guide 2013 in its interpretation of the Model Law, but the UNCITRAL Guide 1997 prevails in the event of conflict between the two guides |
| 8. | ***United Securities Sdn Bhd (in receivership and liquidation) and another v United Overseas Bank Ltd** [2021] 2 SLR 950* |
|  | <u>Relevance</u>: Explains that Article 20(2) of the Model Law essentially delineates the ambit or stay or suspension arising under Article 20(1) by making such stay or suspension the same as what would have been available under Singapore law had the debtor been wound up in Singapore. |
|  | **B.   FOREIGN CASES** |
| 9. | ***Cosco Bulk Carrier Co Ltd v Armada Shipping SA and another** [2011] EWHC 216 (Ch)* |

| | |
|---|---|
| | **Relevance**: Legal principles applicable to the exercise of discretion in relation to applications for, or to discharge, a stay under the Model Law. |
| 10. | ***Jaffe v Samsung Electronics Company*** **737 F.3d 14 (2013)**<br><br>**Relevance**: Describes the test in section 1522 of the US Bankruptcy Code as being one of a balancing of respective interests. |
| 11. | ***Re OGX Petróleo e Gás SA Nordic Trustee A.S.A. and another v Ogx Petroleo E Gas S.A. (Em Recuperação Judicial) and others*** [2016] EWHC 25 (Ch)<br><br>**Relevance**: The consequences of recognition should be stated in the order. |
| 12. | ***Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another*** [2014] **EWHC 2124 (Ch)**<br><br>**Relevance**: An example where courts have held that the words "any appropriate relief" do not allow the court to grant relief that would not have been available when dealing with a domestic insolvency. |
| 13. | ***Ronelp Marine Ltd and other companies v STX Offshore & Shipbuilding Co Ltd*** [2016] **EWHC 2228 (Ch)**<br><br>**Relevance**: Where the foreign main proceeding is in the nature of a restructuring rather than liquidation it has become the practice of the English Courts as a matter of discretion to grant the whole of the relief available under Article 21 of the Model Law. |
| **III.** | **SECONDARY MATERIALS** |
| 14. | ***Cross-Border Insolvency: A Commentary on the UNCITRAL Model Law*** **(Look Chan Ho gen ed) Vol 1 (Global Law and Business, 4ᵗʰ Ed, 2017)**<br><br>**Relevance**: The courts should grant a moratorium under Article 21(1)(g) of the Model Law as a matter of course where the foreign proceeding is a rescue process. |
| 15. | ***Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency*** **(UN document A/CN.9/442) ("UNCITRAL Guide 1997")**<br><br>**Relevance**: Relevant document for the purposes of interpreting articles of the Model Law. |
| 16. | **Response to Feedback Received from Public Consultation of the Report of the Insolvency Law Review Committee (2013)**<br><br>**Relevance**: Local courts may refuse to turn over assets to the foreign representative where the rules of that foreign jurisdiction purport to discriminate or prejudice the local creditors vis-à-vis creditors in a similar class in that foreign jurisdiction. |

| 17. | **UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation (2013) ("UNCITRAL Guide 2013")** |
| | **Relevance**: Relevant document for the purposes of interpreting articles of the Model Law. |

H56˙%

# COMPANIES ACT 1967

**2020 REVISED EDITION**

This revised edition incorporates all amendments up to and including 1 December 2021 and comes into operation on 31 December 2021

An Act relating to companies.

[29 December 1967]

## Interpretation of this Division

**366.**—(1)  In this Division, unless the contrary intention appears —

"authorised representative", in relation to a foreign company, means —

   (*a*)   in the case of a foreign company registered before 3 January 2016 — the agent of the foreign company as defined by this section in force immediately before that date; and

   (*b*)   in the case of a foreign company registered on or after 3 January 2016 — the person named in a notice lodged under section 368(1)(*e*);

"carrying on business"  —

   (*a*)   includes the administration, management or otherwise dealing with property situated in Singapore as an agent, a legal personal representative, or a trustee, whether by employees or agents or otherwise; and

   (*b*)   does not exclude activities carried on without a view to any profit.

*[36/2014]*

   (2)  Despite subsection (1), a foreign company is not to be regarded as carrying on business in Singapore for the reason only that in Singapore it —

   (*a*)   is or becomes a party to any action or suit or any administrative or arbitration proceeding or effects settlement of an action, suit or proceeding or of any claim or dispute;

   (*b*)   holds meetings of its directors or shareholders or carries on other activities concerning its internal affairs;

   (*c*)   maintains any bank account;

   (*d*)   effects any sale through an independent contractor;

(*e*)  solicits or procures any order which becomes a binding contract only if such order is accepted outside Singapore;

(*f*)  creates evidence of any debt or creates a charge on movable or immovable property;

(*g*)  secures or collects any of its debts or enforces its rights in regard to any securities relating to such debts;

(*h*)  conducts an isolated transaction that is completed within a period of 31 days, but not being one of a number of similar transactions repeated from time to time;

(*i*)  invests any of its funds or holds any property;

(*j*)  establishes a share transfer or share registration office in Singapore;

(*k*)  effects any transaction through its related corporation licensed or approved under any written law by the Monetary Authority of Singapore, established under the Monetary Authority of Singapore Act 1970, under an arrangement approved by the Monetary Authority of Singapore; or

(*l*)  carries on such other activity as the Minister may prescribe.

*[36/2014]*

H5 6 ˙2

# INSOLVENCY, RESTRUCTURING AND DISSOLUTION ACT 2018

**2020 REVISED EDITION**

This revised edition incorporates all amendments up to and including 1 December 2021 and comes into operation on 31 December 2021

An Act to amend and consolidate the written laws relating to the making and approval of a compromise or an arrangement with the creditors of a company or an individual, receivership, corporate insolvency and winding up, individual insolvency and bankruptcy, and the public administration of insolvency, to provide for the regulation of insolvency practitioners, to provide for connected matters and to make consequential and related amendments to certain other Acts.

[30 July 2020: Except sections 467, 479, 495(*b*) and 499 ;

15 September 2020: Section 467(*a*) to (*g*) ]

**Interpretation of this Part**

**88.**—(1)  In this Part —

"chattels leasing agreement" means an agreement, which is capable of subsisting for more than 3 months, for the bailment of goods;

"company" means any corporation liable to be wound up under this Act;

"hire-purchase agreement" has the meaning given by section 2(1) of the Hire-Purchase Act 1969;

"judicial manager", in relation to a company, means a person appointed under this Part to manage the company and its affairs, business and property, but does not, unless a contrary intention appears, include an interim judicial manager;

"property", in relation to a company, includes money, goods, things in action and every description of property, whether real or personal, and whether in Singapore or elsewhere, and also obligations and every description of interest whether present or future or vested or contingent arising out of, or incidental to, property;

"retention of title agreement" means an agreement for the sale of goods to a company, being an agreement —

(*a*)  that does not constitute a charge on the goods; but

(*b*)  under which, if the seller is not paid and the company is wound up,

the seller will have priority over all other creditors of the company as respects the goods or any property representing the goods.

(2) For the purposes of this Part —

    (*a*)  a company is "in judicial management" while the appointment of a judicial manager of the company has effect;

    (*b*)  a company "enters judicial management" when the appointment of a judicial manager takes effect;

    (*c*)  a company ceases to be in judicial management when the company is discharged from judicial management in accordance with this Part;

    (*d*)  a company does not cease to be in judicial management merely because a judicial manager vacates office (by reason of resignation, death or otherwise) or is removed from office;

    (*e*)  where successive persons are appointed as judicial manager of a company, the company is deemed to "enter judicial management" as at the time the first appointment of a judicial manager takes effect, unless the Court orders otherwise; and

    (*f*)  a company is deemed to be unable to pay its debts if any of the paragraphs in section 125(2) is satisfied.

(3) A person may be appointed as judicial manager of a company —

    (*a*)  by a judicial management order made by the Court under section 91; or

    (*b*)  by the creditors of the company under section 94(11)(*e*).

### Effect of company entering judicial management

**96.**—(1)  When a company enters judicial management —

    (*a*)  any receiver, or receiver and manager, must vacate office; and

    (*b*)  any application for the winding up of the company must be dismissed.

(2) Where any receiver, or receiver and manager, has vacated office under subsection (1)(*a*), the following must be charged on and, subject to subsection (4), paid out of any property which was in the custody or under the control of the receiver, or receiver and manager, at the time the company enters judicial management, in priority to any security held by the person by or on whose behalf the receiver, or receiver and manager, was appointed:

    (*a*)  the remuneration of, and any expenses properly incurred by, the receiver,

or receiver and manager;

(*b*) any indemnity to which the receiver, or receiver and manager, is entitled out of the assets or property of the company.

(3) A receiver, or receiver and manager, of a company who vacates office under subsection (1)(*a*) is not required, on or after so vacating office, to take steps to comply with any duty imposed on the receiver, or receiver and manager, by section 86.

(4) During the period in which a company is in judicial management —

(*a*) no order may be made, and no resolution may be passed, for the winding up of the company;

(*b*) no receiver or manager may be appointed over any property or undertaking of the company;

(*c*) no other proceedings may be commenced or continued against the company, except —

(i) with the consent of the judicial manager; or

(ii) with the permission of the Court and subject to such terms as the Court may impose;

*[Act 25 of 2021 wef 01/04/2022]*

(*d*) no enforcement order or other legal process may be issued, continued or executed, and no distress may be levied, against the company or its property except —

(i) with the consent of the judicial manager; or

(ii) with the permission of the Court and subject to such terms as the Court may impose;

*[Act 25 of 2021 wef 01/04/2022]*

(*e*) no step may be taken to enforce any security over any property of the company, or to repossess any goods under any hire-purchase agreement, chattels leasing agreement or retention of title agreement, except —

(i) with the consent of the judicial manager; or

(ii) with the permission of the Court and subject to such terms as the Court may impose; and

*[Act 25 of 2021 wef 01/04/2022]*

(*f*) despite sections 18 and 18A of the Conveyancing and Law of Property Act 1886, no right of re-entry or forfeiture under any lease in respect of

any premises occupied by the company may be enforced, except —

    (i)    with the consent of the judicial manager; or

    (ii)   with the permission of the Court and subject to such terms as the Court may impose.

*[Act 25 of 2021 wef 01/04/2022]*

  (5)  Subsection (4) does not affect any of the following:

    (*a*)   the exercise of any legal right under any arrangement (including a set-off arrangement or a netting arrangement) that may be prescribed by regulations;

    (*b*)   the commencement or continuation of any proceedings that may be prescribed by regulations.

## Model Law to have force of law

  **252.**—(1) The Model Law (with certain modifications to adapt it for application in Singapore) as set out in the Third Schedule has the force of law in Singapore.

  (2) In the interpretation of any provision of the Third Schedule, the following documents are relevant documents for the purposes of section 9A(3)(*f*) of the Interpretation Act 1965:

    (*a*)   any document relating to the Model Law that is issued by, or that forms part of the record on the preparation of the Model Law maintained by, the United Nations Commission on International Trade Law and its working group for the preparation of the Model Law;

    (*b*)   the Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency (UN document A/CN.9/442).

## THIRD SCHEDULE

Sections 252, 253 and 447

## UNCITRAL MODEL LAW ON CROSS-BORDER INSOLVENCY

## PREAMBLE

  The purpose of this Law is to provide effective mechanisms for dealing with cases of cross-border insolvency so as to promote the objectives of —

    (*a*)   cooperation between the courts and other competent authorities of Singapore and foreign

States involved in cases of cross-border insolvency;

(b) greater legal certainty for trade and investment;

(c) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested persons, including the debtor;

(d) protection and maximisation of the value of the debtor's property; and

(e) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

CHAPTER 1

GENERAL PROVISIONS

**Article 1. Scope of Application**

1. This Law applies where —

(a) assistance is sought in Singapore by a foreign court or a foreign representative in connection with a foreign proceeding;

(b) assistance is sought in a foreign State in connection with a proceeding under Singapore insolvency law;

(c) a foreign proceeding and a proceeding under Singapore insolvency law in respect of the same debtor are taking place concurrently; or

(d) creditors or other interested persons in a foreign State have an interest in requesting the commencement of, or participating in, a proceeding under Singapore insolvency law.

2. This Law does not apply to any proceedings concerning such entities or classes of entities which the Minister may, by order in the *Gazette*, prescribe.

3. The Court must not grant any relief, or modify any relief already granted, or provide any cooperation or coordination, under or by virtue of any of the provisions of this Law if and to the extent that such relief or modified relief or cooperation or coordination would, in the case of a proceeding under Singapore insolvency law, be prohibited under or by virtue of —

(a) this Act;

(b) Part 7 or section 61, 62 or 76A of the Banking Act 1970;

(c) section 27(2) or 52(2) of the Deposit Insurance and Policy Owners' Protection Schemes Act 2011;

(d) Part 3AA of the Insurance Act 1966;

(e) the International Interests in Aircraft Equipment Act 2009;

(f) Part 4A or 4B or section 178 of the Monetary Authority of Singapore Act 1970;

(g) the Payment and Settlement Systems (Finality and Netting) Act 2002;

(h) Division 4 of Part 3, or Part 3AA, of the Securities and Futures Act 2001; or

(*i*)    any other written law that the Minister may, by order in the *Gazette*, prescribe.

4. Where a foreign proceeding regarding a debtor, who is an insured under the provisions of a relevant Act (being the Third Parties (Rights against Insurers) Act 1930 or the Motor Vehicles (Third-Party Risks and Compensation) Act 1960), is recognised under this Law, any stay and suspension mentioned in Article 20(1) and any relief granted by the Court under Article 19 or 21 does not apply to or affect —

(*a*)    any transfer of rights of the debtor under that relevant Act; or

(*b*)    any claim, action, cause or proceeding by a third party against an insurer under or in respect of rights of the debtor transferred under that relevant Act.

5. Any suspension under this Law of the right to transfer, encumber or otherwise dispose of any of the debtor's property —

(*a*)    is subject to sections 46 and 47 of the Land Titles Act 1993 in relation to any estate or interest in land under the provisions of that Act; and

(*b*)    in any other case, does not bind a purchaser of any estate or interest in land in good faith for money or money's worth unless the purchaser has express notice of the suspension.

6. In paragraph 5, "land" has the same meaning as in section 4(1) of the Land Titles Act 1993.

### Article 2. Definitions

For the purposes of this Law —

(*a*)    "the Court", except as otherwise provided in Articles 14(4) and 23(6)(*b*), means the Court mentioned in Article 4(1);

(*b*)    "chattel agreement" includes a conditional sale agreement, a chattels leasing agreement (as defined in section 88(1) of this Act) and a retention of title agreement (as defined in section 88(1) of this Act);

(*c*)    "debtor" means a corporation;

(*d*)    "establishment" means any place where the debtor has property, or any place of operations where the debtor carries out a non-transitory economic activity with human means and property or services;

(*e*)    "foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding;

(*f*)    "foreign main proceeding" means a foreign proceeding taking place in the State where the debtor has its centre of main interests;

(*g*)    "foreign non-main proceeding" means a foreign proceeding, other than a foreign main proceeding, taking place in a State where the debtor has an establishment;

(*h*)    "foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the property and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation or liquidation;

(*i*)    "foreign representative" means a person or body, including one appointed on an interim

basis, authorised in a foreign proceeding to administer the reorganisation or the liquidation of the debtor's property or affairs or to act as a representative of the foreign proceeding;

(j)    "security" means any mortgage, charge, pledge, lien or other security recognised by law;

(k)    "Singapore insolvency law" means any of the following:

    (i)    sections 210 to 212 of the Companies Act 1967;

    (ii)    Parts 5, 7, 8, 9, 10, 11 and 22 of this Act;

    (iii)    any subsidiary legislation made under any section of the Companies Act 1967 mentioned in sub-paragraph (i);

    (iv)    any subsidiary legislation made in relation to any Part of this Act mentioned in sub-paragraph (ii);

    (v)    the common law of Singapore relating to or in connection with the subject matter of any section of the Companies Act 1967 mentioned in sub-paragraph (i) or any Part of this Act mentioned in sub-paragraph (ii), or the subject matter of any subsidiary legislation mentioned in sub-paragraph (iii) or (iv);

(l)    "Singapore insolvency officeholder" means —

    (i)    the Official Receiver, when acting as a liquidator, a provisional liquidator or a scheme manager of a scheme of arrangement under Part 5 of this Act or Part 7 of the Companies Act 1967; or

    (ii)    a person acting as a liquidator, a provisional liquidator, a judicial manager, an interim judicial manager or a scheme manager of a scheme of arrangement under Part 5 of this Act or Part 7 of the Companies Act 1967;

(m)    "State" means Singapore and any country other than Singapore;

(n)    any reference to the law of Singapore includes a reference to the rules of private international law applicable in Singapore.

## Article 3. International obligations of Singapore

To the extent that this Law conflicts with an obligation of Singapore arising out of any treaty or other form of agreement to which it is a party with one or more other States, the requirements of the treaty or agreement prevail.

## Article 4. Competent Court

1. The functions mentioned in this Law relating to recognition of foreign proceedings and cooperation with foreign courts are to be performed by the General Division of the High Court in Singapore.

2. Subject to paragraph 1 of this Article, the Court has jurisdiction in relation to the functions mentioned in that paragraph if —

    (*a*)   the debtor —

        (i)    is or has been carrying on business within the meaning of section 366 of the Companies Act 1967 in Singapore; or

        (ii)    has property situated in Singapore; or

    (*b*)   the Court considers for any other reason that it is the appropriate forum to consider the question or provide the assistance requested.

### Article 5. Authorisation of Singapore insolvency officeholders to act in a foreign State

1. A Singapore insolvency officeholder is authorised to act in a foreign State on behalf of a proceeding under Singapore insolvency law, as permitted by the applicable foreign law.

2. The Court has the power to appoint any other person or persons to act in a foreign State on behalf of a proceeding under Singapore insolvency law, as permitted by the applicable foreign law.

### Article 6. Public policy exception

Nothing in this Law prevents the Court from refusing to take an action governed by this Law, if the action would be contrary to the public policy of Singapore.

### Article 7. Additional assistance under other laws

Nothing in this Law limits the power of a Court or a Singapore insolvency officeholder to provide additional assistance to a foreign representative under other laws of Singapore.

### Article 8. Interpretation

In the interpretation of this Law, regard is to be had to its international origin and to the need to promote uniformity in its application and the observance of good faith.

CHAPTER 2

ACCESS OF FOREIGN REPRESENTATIVES AND
CREDITORS TO COURTS IN SINGAPORE

### Article 9. Right of direct access

A foreign representative is entitled to apply directly to the Court in Singapore.

### Article 10. Limited jurisdiction

The sole fact that an application under this Law is made to the Court in Singapore by a foreign representative does not subject the foreign representative or the foreign property and affairs of the debtor to the jurisdiction of the courts of Singapore for any purpose other than the application.

### Article 11. Application by a foreign representative to commence a proceeding under Singapore insolvency law

A foreign representative appointed in a foreign main proceeding or foreign non-main proceeding is

entitled to apply to commence a proceeding under Singapore insolvency law if the conditions for commencing such a proceeding are otherwise met.

### Article 12. Participation of a foreign representative in a proceeding under Singapore insolvency law

Upon recognition of a foreign proceeding, the foreign representative is entitled to participate in a proceeding regarding the debtor under Singapore insolvency law.

### Article 13. Access of foreign creditors to a proceeding under Singapore insolvency law

1. Subject to paragraph 2 of this Article, foreign creditors have the same rights regarding the commencement of, and participation in, a proceeding under Singapore insolvency law as creditors in Singapore.

2. Paragraph 1 of this Article does not affect the ranking of claims in a proceeding under Singapore insolvency law, or the exclusion of foreign tax claims, social security claims or claims for employees' superannuation or provident funds or under any scheme of superannuation (collectively, "tax and social security obligations") from such a proceeding. Nevertheless, the claims of foreign creditors other than those concerning tax and social security obligations are not to be given a lower priority than that of general unsecured claims solely because the holder of such a claim is a foreign creditor.

### Article 14. Notification to foreign creditors of a proceeding under Singapore insolvency law

1. Whenever under Singapore insolvency law notification is to be given to creditors in Singapore, such notification must also be given to the known creditors who do not have addresses in Singapore. The Court may order that appropriate steps be taken with a view to notifying any creditor whose address is not yet known.

2. The notification under paragraph 1 of this Article must be made to the foreign creditors individually, unless —

   (*a*)  the Court considers that under the circumstances some other form of notification would be more appropriate; or

   (*b*)  the notification to creditors in Singapore is to be by advertisement only, in which case the notification to the known foreign creditors may be by advertisement in such foreign newspapers as the Singapore insolvency officeholder considers most appropriate for ensuring that the content of the notification comes to the notice of the known foreign creditors.

3. When notification of a right to file a claim is to be given to foreign creditors, the notification must —

   (*a*)  indicate a reasonable time period for filing claims and specify the place for their filing;

   (*b*)  indicate whether secured creditors need to file their secured claims; and

   (*c*)  contain any other information required to be included in such a notification to creditors under the law of Singapore and the orders of the Court.

4. In this Article, "the Court" means the Court which has jurisdiction in relation to the particular proceeding under Singapore insolvency law under which notification is to be given to creditors.

CHAPTER 3

RECOGNITION OF A FOREIGN PROCEEDING AND RELIEF

**Article 15. Application for recognition of a foreign proceeding**

1.  A foreign representative may apply to the Court for recognition of the foreign proceeding in which the foreign representative has been appointed.

2.  An application for recognition must be accompanied by —

   (*a*)   a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative;

   (*b*)   a certificate from the foreign court affirming the existence of the foreign proceeding and of the appointment of the foreign representative; or

   (*c*)   in the absence of evidence mentioned in sub-paragraphs (*a*) and (*b*), any other evidence acceptable to the Court of the existence of the foreign proceeding and of the appointment of the foreign representative.

3.  An application for recognition must also be accompanied by a statement identifying all foreign proceedings and proceedings under Singapore insolvency law in respect of the debtor that are known to the foreign representative.

4.  The foreign representative must provide the Court with a translation into English of documents supplied in support of the application for recognition.

**Article 16. Presumptions concerning recognition**

1.  If the decision or certificate mentioned in Article 15(2) indicates that the proceeding in respect of which an application for recognition is made is a foreign proceeding within the meaning of Article 2(*h*) and that the person or body making that application is a foreign representative within the meaning of Article 2(*i*), the Court is entitled to so presume.

2.  The Court is entitled to presume that documents submitted in support of the application for recognition are authentic, whether or not they have been legalised.

3.  In the absence of proof to the contrary, the debtor's registered office is presumed to be the debtor's centre of main interests.

**Article 17. Decision to recognise a foreign proceeding**

1.  Subject to Article 6, a proceeding must be recognised if —

   (*a*)   it is a foreign proceeding within the meaning of Article 2(*h*);

   (*b*)   the person or body applying for recognition is a foreign representative within the meaning of Article 2(*i*);

   (*c*)   the application meets the requirements of Article 15(2) and (3); and

   (*d*)   the application has been submitted to the Court mentioned in Article 4.

2.  The foreign proceeding must be recognised —

    (*a*)   as a foreign main proceeding if it is taking place in the State where the debtor has its centre of main interests; or

    (*b*)   as a foreign non-main proceeding, if the debtor has an establishment within the meaning of Article 2(*d*) in the foreign State.

3. An application for recognition of a foreign proceeding must be decided upon at the earliest possible time.

4. The provisions of Articles 15 to 16, this Article and Article 18 do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have fully or partially ceased to exist; and in such a case, the Court may, on the application of the foreign representative or a person affected by the recognition, or of its own motion, modify or terminate recognition, either altogether or for a limited time, on such terms and conditions as the Court thinks fit.

## Article 18. Subsequent information

From the time of filing the application for recognition of the foreign proceeding, the foreign representative must inform the Court promptly of —

    (*a*)   any substantial change in the status of the recognised foreign proceeding or the status of the foreign representative's appointment; and

    (*b*)   any other foreign proceeding or proceeding under Singapore insolvency law regarding the same debtor that becomes known to the foreign representative.

## Article 19. Relief that may be granted upon application for recognition of a foreign proceeding

1. From the time of filing an application for recognition until the application is decided upon, the Court may, at the request of the foreign representative, where relief is urgently needed to protect the property of the debtor or the interests of the creditors, grant relief of a provisional nature, including —

    (*a*)   staying execution against the debtor's property;

    (*b*)   entrusting the administration or realisation of all or part of the debtor's property located in Singapore to the foreign representative or another person designated by the Court, in order to protect and preserve the value of property that, by its nature or because of other circumstances, is perishable, susceptible to devaluation or otherwise in jeopardy; and

    (*c*)   any relief mentioned in Article 21(1)(*c*), (*d*) or (*g*).

2. Unless extended under Article 21(1)(*f*), the relief granted under this Article terminates when the application for recognition is decided upon.

3. The Court may refuse to grant relief under this Article if such relief would interfere with the administration of a foreign main proceeding.

## Article 20. Effects of recognition of a foreign main proceeding

1. Upon recognition of a foreign proceeding that is a foreign main proceeding, subject to paragraph 2 of this Article —

    (*a*)   commencement or continuation of individual actions or individual proceedings concerning the debtor's property, rights, obligations or liabilities is stayed;

(b)  execution against the debtor's property is stayed; and

(c)  the right to transfer, encumber or otherwise dispose of any property of the debtor is suspended.

2.  The stay and suspension mentioned in paragraph 1 of this Article are —

(a)  the same in scope and effect as if the debtor had been made the subject of a winding up order under this Act; and

(b)  subject to the same powers of the Court and the same prohibitions, limitations, exceptions and conditions as would apply under the law of Singapore in such a case,

and the provisions of paragraph 1 of this Article are to be interpreted accordingly.

3.  Without prejudice to paragraph 2 of this Article, the stay and suspension mentioned in paragraph 1 of this Article do not affect any right —

(a)  to take any steps to enforce security over the debtor's property;

(b)  to take any steps to repossess goods in the debtor's possession under a hire-purchase agreement (as defined in section 88(1) of this Act);

(c)  exercisable under or by virtue of or in connection with any written law mentioned in Article 1(3)(a) to (i); or

(d)  of a creditor to set off its claim against a claim of the debtor,

being a right which would have been exercisable if the debtor had been made the subject of a winding up order under this Act.

4.  Paragraph 1(a) of this Article does not affect the right to —

(a)  commence individual actions or proceedings to the extent necessary to preserve a claim against the debtor; or

(b)  commence or continue any criminal proceedings or any action or proceedings by a person or body having regulatory, supervisory or investigative functions of a public nature, being an action or proceedings brought in the exercise of those functions.

5. Paragraph 1 of this Article does not affect the right to request or otherwise initiate the commencement of a proceeding under Singapore insolvency law or the right to file claims in such a proceeding.

6.  In addition to and without prejudice to any powers of the Court under or by virtue of paragraph 2 of this Article, the Court may, on the application of the foreign representative or a person affected by the stay and suspension mentioned in paragraph 1 of this Article, or of its own motion, modify or terminate such stay and suspension or any part of it, either altogether or for a limited time, on such terms and conditions as the Court thinks fit.

### Article 21. Relief that may be granted upon recognition of a foreign proceeding

1.  Upon recognition of a foreign proceeding, whether a foreign main proceeding or a foreign non-main proceeding, where necessary to protect the property of the debtor or the interests of the creditors, the Court may, at the request of the foreign representative, grant any appropriate relief, including —

(a)   staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's property, rights, obligations or liabilities, to the extent they have not been stayed under Article 20(1)(a);

(b)   staying execution against the debtor's property to the extent it has not been stayed under Article 20(1)(b);

(c)   suspending the right to transfer, encumber or otherwise dispose of any property of the debtor to the extent this right has not been suspended under Article 20(1)(c);

(d)   providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's property, affairs, rights, obligations or liabilities;

(e)   entrusting the administration or realisation of all or part of the debtor's property located in Singapore to the foreign representative or another person designated by the Court;

(f)   extending relief granted under Article 19(1); and

(g)   granting any additional relief that may be available to a Singapore insolvency officeholder, including any relief provided under section 96(4) of this Act.

2. Upon recognition of a foreign proceeding, whether a foreign main proceeding or a foreign non-main proceeding, the Court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's property located in Singapore to the foreign representative or another person designated by the Court, provided that the Court is satisfied that the interests of creditors in Singapore are adequately protected.

3. In granting relief under this Article to a representative of a foreign non-main proceeding, the Court must be satisfied that the relief relates to property that, under the law of Singapore, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

4. No stay under paragraph 1(a) of this Article affects the right to commence or continue any criminal proceedings or any action or proceedings by a person or body having regulatory, supervisory or investigative functions of a public nature, being an action or proceedings brought in the exercise of those functions.

### Article 22. Protection of creditors and other interested persons

1. In granting or denying relief under Article 19 or 21, or in modifying or terminating relief under paragraph 3 of this Article or Article 20(6), the Court must be satisfied that the interests of the creditors (including any secured creditors or parties to hire-purchase agreements (as defined in section 88(1) of this Act)) and other interested persons, including if appropriate the debtor, are adequately protected.

2. The Court may subject relief granted under Article 19 or 21 to conditions it considers appropriate, including the provision by the foreign representative of security or caution for the proper performance of his, her or its functions.

3. The Court may, at the request of the foreign representative or a person affected by relief granted under Article 19 or 21, or of its own motion, modify or terminate such relief.

### Article 23. Actions to avoid acts detrimental to creditors

1. Subject to paragraphs 6 and 9 of this Article, upon recognition of a foreign proceeding, the foreign representative has standing to make an application to the Court for an order under or in connection with

sections 130, 205, 224, 225, 228, 229, 238, 239, 240 and 438 of this Act and section 131(1) of the Companies Act 1967.

2. Where the foreign representative makes such an application under paragraph 1 of this Article ("an Article 23 application"), the provisions of this Act and the Companies Act 1967 mentioned in paragraph 1 of this Article apply —

    (*a*)   whether or not the debtor is being wound up or is in judicial management or undergoing a scheme of arrangement, under Singapore insolvency law; and

    (*b*)   with the modifications set out in paragraph 3 of this Article.

3. The modifications mentioned in paragraph 2 of this Article are as follows:

    (*a*)   for the purposes of section 130 of this Act, the date which corresponds with the commencement of the winding up is the date of the opening of the relevant foreign proceeding;

    (*b*)   for the purposes of section 224 or 225 read with section 226(1) and (4) of this Act —

        (i)   the date which corresponds with the commencement of the judicial management or winding up is the date of the opening of the relevant foreign proceeding;

        (ii)   the date which corresponds with the date the company enters judicial management is the date of the appointment of the equivalent of a judicial manager in the relevant foreign proceeding; and

        (iii)   section 226(5) and (6) of this Act does not apply;

    (*c*)   for the purposes of section 224 or 225 read with section 227(4) of this Act, a person has notice of the relevant proceedings if the person has notice of the opening of the relevant foreign proceeding;

    (*d*)   for the purposes of section 228 or 240 of this Act, the date which corresponds with the commencement of the judicial management or winding up is the date of the opening of the relevant foreign proceeding;

    (*e*)   for the purposes of section 229 of this Act —

        (i)   the date which corresponds with the commencement of the judicial management or winding up is the date of the opening of the relevant foreign proceeding;

        (ii)   the date which corresponds with the date the company enters judicial management is the date of the appointment of the equivalent of a judicial manager in the relevant foreign proceeding; and

        (iii)   section 229(5) and (6) of this Act does not apply.

4. For the purposes of paragraph 3 of this Article, the date of the opening of the foreign proceeding is to be determined in accordance with the law of the State in which the foreign proceeding is taking place, including any rule of law by virtue of which the foreign proceeding is deemed to have opened at an earlier time.

5.  When the foreign proceeding is a foreign non-main proceeding, the Court must be satisfied that the Article 23 application relates to property that, under the law of Singapore, should be administered in the foreign non-main proceeding.

6.  At any time when a proceeding under Singapore insolvency law is taking place regarding the debtor —

>   (*a*)  the foreign representative must not make an Article 23 application except with the permission of the Court; and

>   (*b*)  references to "the Court" in paragraphs 1, 5 and 7 of this Article are references to the Court in which that proceeding is taking place.

7.  On making an order on an Article 23 application, the Court may give such directions regarding the distribution of any proceeds of the claim by the foreign representative, as it thinks fit to ensure that the interests of creditors in Singapore are adequately protected.

8.  Nothing in this Article affects the right of a Singapore insolvency officeholder to make an application under or in connection with any of the provisions mentioned in paragraph 1 of this Article.

9.  Nothing in paragraph 1 of this Article applies in respect of any preference given, floating charge created, alienation, assignment made or other transaction entered into before the date on which this Law comes into force.

### Article 24. Intervention by a foreign representative in proceedings in Singapore

Upon recognition of a foreign proceeding, the foreign representative may, provided the requirements of the law of Singapore are met, intervene in any proceedings in which the debtor is a party.

CHAPTER 4

COOPERATION WITH FOREIGN COURTS AND
FOREIGN REPRESENTATIVES

### Article 25. Cooperation and direct communication between a Court of Singapore and foreign courts or foreign representatives

1.  In matters mentioned in Article 1(1), the Court may cooperate to the maximum extent possible with foreign courts or foreign representatives, either directly or through a Singapore insolvency officeholder.

2.  The Court is entitled to communicate directly with, or to request information or assistance directly from, foreign courts or foreign representatives.

### Article 26. Cooperation and direct communication between the Singapore insolvency officeholder and foreign courts or foreign representatives

1.  In matters mentioned in Article 1(1), a Singapore insolvency officeholder must to the extent consistent with the Singapore insolvency officeholder's other duties under the law of Singapore, in the exercise of the Singapore insolvency officeholder's functions and subject to the supervision of the Court, cooperate to the maximum extent possible with foreign courts or foreign representatives.

2.  The Singapore insolvency officeholder is entitled, in the exercise of the Singapore insolvency officeholder's functions and subject to the supervision of the Court, to communicate directly with foreign

courts or foreign representatives.

**Article 27. Forms of cooperation**

Cooperation mentioned in Articles 25 and 26 may be implemented by any appropriate means, including —

(*a*)   appointment of a person to act at the direction of the Court;

(*b*)   communication of information by any means considered appropriate by the Court;

(*c*)   coordination of the administration and supervision of the debtor's property and affairs;

(*d*)   approval or implementation by courts of agreements concerning the coordination of proceedings; and

(*e*)   coordination of concurrent proceedings regarding the same debtor.

CHAPTER 5

CONCURRENT PROCEEDINGS

**Article 28. Commencement or continuation of a proceeding under Singapore insolvency law after recognition of a foreign main proceeding**

After recognition of a foreign main proceeding, the effects of a proceeding under Singapore insolvency law in relation to the same debtor are to, insofar as the property of that debtor is concerned, be restricted to property that is located in Singapore and, to the extent necessary to implement cooperation and coordination under Articles 25, 26 and 27, to other property of the debtor that, under the law of Singapore, should be administered in that proceeding.

**Article 29. Coordination of a proceeding under Singapore insolvency law and a foreign proceeding**

Where a foreign proceeding and a proceeding under Singapore insolvency law are taking place concurrently regarding the same debtor, the Court may seek cooperation and coordination under Articles 25, 26 and 27, and the following apply:

(*a*)   when the proceeding in Singapore is taking place at the time the application for recognition of the foreign proceeding is filed —

    (i)   any relief granted under Article 19 or 21 must be consistent with the proceeding in Singapore; and

    (ii)   if the foreign proceeding is recognised in Singapore as a foreign main proceeding, Article 20 does not apply;

(*b*)   when the proceeding in Singapore commences after the filing of the application for recognition of the foreign proceeding —

    (i)   any relief in effect under Article 19 or 21 must be reviewed by the Court and must be modified or terminated if inconsistent with the proceeding in Singapore;

      (ii)    if the foreign proceeding is a foreign main proceeding, the stay and suspension mentioned in Article 20(1) must be modified or terminated under Article 20(6), if inconsistent with the proceeding in Singapore; and

      (iii)   any proceedings brought by the foreign representative by virtue of Article 23(1) before the proceeding in Singapore commenced must be reviewed by the Court and the Court may give such directions as it thinks fit regarding the continuance of those proceedings; and

  (*c*)   in granting, extending or modifying relief granted to a foreign representative of a foreign non-main proceeding, the Court must be satisfied that the relief relates to property that, under the law of Singapore, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

## Article 30. Coordination of more than one foreign proceeding

In matters mentioned in Article 1(1), in respect of more than one foreign proceeding regarding the same debtor, the Court may seek cooperation and coordination under Articles 25, 26 and 27, and the following are to apply:

  (*a*)   any relief granted under Article 19 or 21 to a representative of a foreign non-main proceeding after recognition of a foreign main proceeding must be consistent with the foreign main proceeding;

  (*b*)   if a foreign main proceeding is recognised after the filing of an application for recognition of a foreign non-main proceeding, any relief in effect under Article 19 or 21 must be reviewed by the Court and must be modified or terminated if inconsistent with the foreign main proceeding; and

  (*c*)   if, after recognition of a foreign non-main proceeding, another foreign non-main proceeding is recognised, the Court is to grant, modify or terminate relief for the purpose of facilitating coordination of the proceedings.

## Article 31. Presumption of insolvency based on recognition of a foreign main proceeding

In the absence of evidence to the contrary, recognition of a foreign main proceeding is, for the purpose of commencing a proceeding under Singapore insolvency law, proof that the debtor is unable to pay its debts within the meaning given to the expression under Singapore insolvency law.

## Article 32. Rule of payment in concurrent proceedings

Without prejudice to secured claims or rights in rem, a creditor who has received part payment in respect of its claim in a proceeding under a law relating to insolvency in a foreign State may not receive a payment for the same claim in a proceeding under Singapore insolvency law regarding the same debtor, so long as the payment to the other creditors of the same class is proportionately less than the payment the creditor has already received.

*[40/2019]*

H5 6 ˙3

# TITLE 11—BANKRUPTCY

*This title was enacted by Pub. L. 95–598, title I, §101, Nov. 6, 1978, 92 Stat. 2549*

| Chap. | | Sec. |
|---|---|---|
| 1. | General Provisions ........................... | 101 |
| 3. | Case Administration ......................... | 301 |
| 5. | Creditors, the Debtor, and the Estate ........................................ | 501 |
| 7. | Liquidation ..................................... | 701 |
| 9. | Adjustment of Debts of a Municipality ..................................... | 901 |
| 11. | Reorganization ................................ | 1101 |
| 12. | Adjustments of Debts of a Family Farmer or Family Fisherman with Regular Annual Income [1] ..... | 1201 |
| 13. | Adjustment of Debts of an Individual With Regular Income ........ | 1301 |
| 15. | Ancillary and Other Cross-Border Cases ....................................... | 1501 |

## Editorial Notes

### Amendments

2005—Pub. L. 109–8, title VIII, §801(b), title X, §1007(d), Apr. 20, 2005, 119 Stat. 145, 188, substituted ''Adjustments of Debts of a Family Farmer or Family Fisherman with Regular Annual Income'' for ''Adjustment of Debts of Family Farmers with Regular Annual Income'' in item for chapter 12 and added item for chapter 15.

1994—Pub. L. 103–394, title V, §501(d)(39), Oct. 22, 1994, 108 Stat. 4147, struck out item for chapter 15, ''United States Trustees''.

1986—Pub. L. 99–554, title II, §257(a), Oct. 27, 1986, 100 Stat. 3114, added item for chapter 12.

## TABLE I

This Table lists the sections of former Title 11, Bankruptcy, and indicates the sections of Title 11, as revised by Pub. L. 95–598 which cover similar and related subject matter.

| Title 11<br>Former Sections | Title 11<br>New Sections |
|---|---|
| 1(1)–(3) ..................................... | Rep. |
| 1(4) .......................................... | 101(12) |
| 1(5)–(7) ................................... | Rep. |
| 1(8) .......................................... | 101(8) |
| 1(9), (10) ................................. | Rep. |
| 1(11) ........................................ | 101(9) |
| 1(12), (13) ............................... | Rep. |
| 1(14) ........................................ | 101(11) |
| 1(15), (16) ............................... | Rep. |
| 1(17) ........................................ | 101(17), (18) |
| 1(18) ........................................ | Rep. |
| 1(19) ........................................ | 101(26) |
| 1(20)–(22) ............................... | Rep. |
| 1(23) ........................................ | 101(30) |
| 1(24) ........................................ | 101(31) |
| 1(25), (26) ............................... | Rep. |
| 1(27) ........................................ | 101(34) |
| 1(28), (29) ............................... | Rep. |
| 1(29a) ...................................... | 101(38) |
| 1(30) ........................................ | 101(40) |
| 1(31) ........................................ | Rep. |
| 1(32) ........................................ | 101(24) |
| 1(33), (34) ............................... | Rep. |
| 1(35) ........................................ | 102(7) |

[1] So in original. Does not conform to chapter heading.

### Table I—Continued

| Title 11<br>Former Sections | Title 11<br>New Sections |
|---|---|
| 11(a)(1) .................................... | 109(a) |
| 11(a)(2) .................................... | 502(j) |
| 11(a)(2A) .................................. | 505(a), (b) |
| 11(a)(3), (4) .............................. | Rep. |
| 11(a)(5) .................................... | 721 |
| 11(a)(6) .................................... | Rep. |
| 11(a)(7) .................................... | 363 |
| 11(a)(8) .................................... | 350 |
| 11(a)(9)–(14) ............................ | Rep. |
| 11(a)(15) .................................. | 105 |
| 11(a)(16) .................................. | Rep. |
| 11(a)(17) .................................. | 324 |
| 11(a)(18) .................................. | 303(i) |
| 11(a)(19), (20) .......................... | Rep. |
| 11(a)(21) .................................. | 543(b), (c) |
| 11(a)(22) .................................. | 305(a)(2) |
| 11(b) ........................................ | Rep. |
| 21 ............................................. | 303(h) |
| 22 ............................................. | 109(b) |
| 22(a) ........................................ | 301 |
| 22(b) ........................................ | 303(a) |
| 23(a) ........................................ | Rep. |
| 23(b) ........................................ | 303(b) |
| 23(c)–(f) ................................... | Rep. |
| 23(g) ........................................ | 723 |
| 23(h)–(k) .................................. | Rep. |
| 24 ............................................. | 522 |
| 25(a)(1) .................................... | 348, 521(4) |
| 25(a)(2) .................................... | Rep. |
| 25(a)(3) .................................... | 521(2) |
| 25(a)(4) .................................... | 521(3) |
| 25(a)(5) .................................... | 521(3) |
| 25(a)(6) .................................... | 521(2) |
| 25(a)(7) .................................... | 521(2) |
| 25(a)(8), (9) ............................. | 521(1) |
| 25(a)(10) .................................. | 343, 344 |
| 25(a)(11) .................................. | 521(3) |
| 25(b) ........................................ | Rep. |
| 26 ............................................. | 541(a) |
| 27, 28 ....................................... | Rep. |
| 29(a) ........................................ | 362 |
| 29(b)–(d) .................................. | Rep. |
| 29(e) ........................................ | 108(a), (b) |
| 29(f) ........................................ | 108(c) |
| 30, 31 ....................................... | (See former 501–1103) |
| 32(a) ........................................ | 727(a)(10), 1141(d)(4) |
| 32(b) ........................................ | 727(c) |
| 32(c)(1) .................................... | 727(a)(2), (4) |
| 32(c)(2) .................................... | 727(a)(3) |
| 32(c)(3) .................................... | 727(a)(4) |
| 32(c)(4) .................................... | 727(a)(2) |
| 32(c)(5) .................................... | 727(a)(8), (9) |
| 32(c)(6) .................................... | 727(a)(6) |
| 32(c)(7) .................................... | 727(a)(5) |
| 32(c)(8) .................................... | Rep. |
| 32(d), (e) .................................. | Rep. |
| 32(f) ........................................ | 524(a) |
| 32(g), (h) .................................. | Rep. |
| 33 ............................................. | 727(d), (e), 1328(e) |
| 34 ............................................. | 524(e) |
| 35(a)(1) .................................... | 523(a)(1) |
| 35(a)(2) .................................... | 523(a)(2) |
| 35(a)(3) .................................... | 523(a)(3) |
| 35(a)(4) .................................... | 523(a)(4) |
| 35(a)(5), (6) ............................. | Rep. |
| 35(a)(7) .................................... | 523(a)(5) |
| 35(a)(8) .................................... | 523(a)(6) |
| 35(b) ........................................ | 523(b), 349(a) |
| 35(c) ........................................ | 523(c) |
| 35(c)(4) .................................... | 362 |
| 41(a) ........................................ | Rep. |
| 41(b) ........................................ | 303(d) |
| 41(c)–(e) ................................... | Rep. |
| 41(f) ........................................ | 301 |
| 42 ............................................. | T. 28 §1480 |
| 43 ............................................. | Rep. |
| 44(a) ........................................ | 343 |
| 44(b)–(f) ................................... | Rep. |
| 44(g) ........................................ | 549(c) |
| 44(h)–(l) ................................... | Rep. |

TITLE 11—BANKRUPTCY

TABLE I—CONTINUED

| Title 11 Former Sections | Title 11 New Sections |
|---|---|
| 45–51 | Rep. |
| 52, 53 | Rep. |
| 54 | Rep. |
| 55 | T. 28 §1475 |
| 61–71 | Rep. |
| 72(a) | 702 |
| 72(b) | 705 |
| 72(c) | 327(c) |
| 73 | 321 |
| 74 | 325, 703(a) |
| 75(a)(1) | 704(1) |
| 75(a)(2) | 345 |
| 75(a)(3) | 704(2) |
| 75(a)(4) | Rep. |
| 75(a)(5) | 704(2) |
| 75(a)(6) | Rep. |
| 75(a)(7) | 704(3) |
| 75(a)(8) | 704(4) |
| 75(a)(9) | 704(5) |
| 75(a)(10) | 704(6) |
| 75(a)(11), (12) | Rep. |
| 75(a)(13) | 704(8) |
| 75(a)(14) | Rep. |
| 75(b), (c) | Rep. |
| 76(a), (b) | Rep. |
| 76(c) | 326(a), 330 |
| 76(d) | Rep. |
| 76(e) | 326(d) |
| 76(f), (g) | Rep. |
| 76a | 330 |
| 77 | 107 |
| 78(a) | Rep. |
| 78(b) | 322(a) |
| 78(c) | 322(b)(1) |
| 78(d) | 322(b)(2) |
| 78(e) | Rep. |
| 78(f), (g) | 322(b)(2) |
| 78(h) | Rep. |
| 78(i) | 322(c) |
| 78(j)–(l) | Rep. |
| 78(m) | 322(d) |
| 78(n) | Rep. |
| 79–82 | Rep. |
| 91, 92 | 341 |
| 93(a)–(c) | Rep. |
| 93(d) | 502(a), (c) |
| 93(e) | Rep. |
| 93(f) | 502(b) |
| 93(g) | 502(d) |
| 93(h) | 506(a), (b) |
| 93(i) | 501(b), 509 |
| 93(j) | 724(a) |
| 93(k) | 502(j) |
| 93(l), (m) | Rep. |
| 93(n) | 501(a), 726(a)(3) |
| 93a | 342 |
| 94 | 342 |
| 95(a) | 301 |
| 95(b) | 303(b) |
| 95(c), (d) | 303(b) |
| 95(e) | 303(b) |
| 95(f) | 303(c) |
| 95(g) | 303(j), 707 |
| 95(h) | Rep. |
| 96 | 547 |
| 96(a)(4) | 547(e)(1)(B) |
| 96(b) | 550, 551 |
| 96(c) | 547(c)(4), 553 |
| 96(d) | 329 |
| 96(e)(1) | 741 |
| 96(e)(2) | 745, 751, 752 |
| 96(e)(3) | 753 |
| 96(e)(5) | 749 |
| 101 | 345 |
| 101a | Rep. |
| 102(a)(1) | 503(b)(2) |
| 102(a)(2)–(4) | Rep. |
| 102(b) | Rep. |
| 102(c) | 504 |
| 102(d) | Rep. |
| 103 | 101(4) |
| 103(a)(9) | 502(b)(7) |
| 103(c) | 365 |
| 103a | Rep. |
| 104(a) | 507 |
| 104(a)(1) | 503(b) |
| 104(a)(2) | 507(a)(3) |
| 104(a)(4) | 502(b)(4), 505(a), (b) |
| 104(b) | Rep. |
| 105(a)–(c) | Rep. |
| 105(d) | 508 |
| 105(e) | Rep. |
| 106(a) | 347(a) |
| 106(b) | Rep. |
| 107(a) | 349(b), 547(b), (d), 551 |
| 107(b), (c) | 545 |
| 107(c)(1)(A) | 545(1) |
| 107(c)(1)(B) | 545(2), 546(b) |
| 107(c)(1)(C) | 545(3), (4) |
| 107(c)(2) | 551 |

TABLE I—CONTINUED

| Title 11 Former Sections | Title 11 New Sections |
|---|---|
| 107(c)(3) | 724(b) |
| 107(d)(1)(a)–(c) | Rep. |
| 107(d)(1)(d) | 101(26) |
| 107(d)(1)(e) | Rep. |
| 107(d)(2) | 548(a) |
| 107(d)(3) | 550 |
| 107(d)(4) | 548(b) |
| 107(d)(5) | 548(d)(1) |
| 107(d)(6) | 548(c), 550, 551 |
| 107(d)(7) | Rep. |
| 107(e), (f) | Rep. |
| 108 | 502(b)(3), 553 |
| 109(a) | 303(e) |
| 109(b) | 303(i) |
| 109(c) | Rep. |
| 109(d) | 303(g), 543(b), (c) |
| 110(a) | 541(a) |
| 110(a)(3) | 541(b) |
| 110(a)(5) | 522(d)(7), (8) |
| 110(b) | 365 |
| 110(c) | 541(e), 544(a) |
| 110(d)(1) | 549(a) |
| 110(d)(2), (3) | 542(c) |
| 110(d)(4), (5) | Rep. |
| 110(e) | 544(b) |
| 110(f) | 363 |
| 110(g)–(i) | Rep. |
| 111, 112 | Rep. |
| 201, 202 | (See former 501–1103) |
| 202a–204 | Rep. |
| 205(a) | Rep. |
| 205(b) | 1171(b), 1172 |
| 205(c)(1) | 1163 |
| 205(c)(2) | 1166 |
| 205(c)(3)–(5) | Rep. |
| 205(c)(6) | 1169 |
| 205(c)(7)–(13) | Rep. |
| 205(d) | 1173 |
| 205(f)–(i) | Rep. |
| 205(j) | 1168 |
| 205(k), (l) | Rep. |
| 205(m) | 101(33) |
| 205(n) | 1167, 1171(a) |
| 205(o) | 1170 |
| 205(p)–(s) | Rep. |
| 205a | Rep. |
| 206, 207 | (See former 501–1103) |
| 208 | Rep. |
| 301–303 | Rep. |
| 401(1) | 101(4) |
| 401(2) | Rep. |
| 401(3) | 101(9) |
| 401(4) | Rep. |
| 401(5) | 101(11) |
| 401(6) | 101(28) |
| 401(7) | 101(30) |
| 401(8) | 101(12) |
| 401(9) | Rep. |
| 401(10) | 902(2) |
| 401(11) | 903(3) |
| 402(a) | Rep. |
| 402(b)(1), (2) | 901 |
| 402(b)(3) | Rep. |
| 402(c) | 904 |
| 402(d) | 921(b) |
| 403 | 903 |
| 404 | 101(29), 109(c) |
| 405(a) | 921(a), (c)–(f) |
| 405(b) | 901, 924 |
| 405(c) | 923 |
| 405(d) | Rep. |
| 405(e) | 901 |
| 405(e)(1) | 922(a) |
| 405(f), (g) | Rep. |
| 405(h) | 901, 926 |
| 406, 407 | 925 |
| 408(a) | Rep. |
| 408(b) | 901 |
| 408(c) | Rep. |
| 409 | 901 |
| 410(a) | 941, 942 |
| 410(b) | 942 |
| 411, 412 | 901 |
| 413 | 901, 943(a) |
| 414(a) | 901 |
| 414(b)(1) | 943(b)(5), (6) |
| 414(b)(2) | 943(b)(2) |
| 414(b)(3) | Rep. |
| 414(b)(4) | 943(b)(3) |
| 414(b)(5) | Rep. |
| 414(b)(6) | 943(b)(4) |
| 415(a) | 944(a) |
| 415(b)(1) | 944(b) |
| 415(b)(2) | 944(c) |
| 416(a) | Rep. |
| 416(b) | 901 |
| 416(c) | Rep. |
| 416(d) | 347(b), 901 |
| 416(e) | 945(a) |

TABLE I—CONTINUED

TABLE I—CONTINUED

| Title 11 Former Sections | Title 11 New Sections | Title 11 Former Sections | Title 11 New Sections |
|---|---|---|---|
| 416(f) | Rep. | 627 | 1142(b) |
| 417 | 946 | 628(1) | 1141(d)(1)–(3) |
| 418 | 927 | 628(2)–(4) | Rep. |
| 501, 502 | Rep. | 629(a) | 1101(2) |
| 506(1) | 101(4) | 629(b) | Rep. |
| 506(2), (3) | Rep. | 629(c) | 1127(b) |
| 506(4) | 101(9) | 636 | 1112(b) |
| 506(5) | 101(12) | 637 | Rep. |
| 506(6) | 101(11) | 638 | 348 |
| 506(7) | Rep. | 641(1), (2) | Rep. |
| 506(8) | 101(28) | 641(3), (4) | 330 |
| 506(9) | 101(31) | 641(5) | 503(b)(4) |
| 506(10) | Rep. | 642(1) | 503(b)(3), (5) |
| 506(11) | 101(35) | 642(2) | Rep. |
| 506(12), (13) | Rep. | 642(3) | 503(b)(4) |
| 507 | 1124 | 643 | 503(b)(3), (4) |
| 511, 512 | Rep. | 644(1) | 330 |
| 513 | 362 | 644(2) | 503(b)(4) |
| 514, 515 | Rep. | 644(3) | 330 |
| 516(1) | 365 | 644(4) | 503(b)(3), (4) |
| 516(2) | 364 | 645–650 | Rep. |
| 516(3) | 363 | 656–659 | Rep. |
| 516(4) | 362 | 661 | 108(c) |
| 516(5), (6) | 1110 | 662 | Rep. |
| 517–521 | Rep. | 663 | 362 |
| 526 | 303(b) | 664(a) | 1145(a) |
| 527 | Rep. | 664(b) | 1145(b) |
| 528 | T. 28 §1472 | 665, 666 | Rep. |
| 529–533 | Rep. | 667 | 1146(c) |
| 536, 537 | 303(d) | 668 | 346(j)(1) |
| 541–549 | Rep. | 669 | 1129(d) |
| 556 | 1104(a) | 670 | 346(j)(5) |
| 557 | 327 | 671, 672 | Rep. |
| 558 | 101(13) | 676 | Rep. |
| 559 | 1105 | 701, 702 | Rep. |
| 560 | 324, 1104(c) | 706(1), (2) | Rep. |
| 561, 562 | Rep. | 706(3) | 101(12), 109(d) |
| 563 | 1107(a) | 706(4) | Rep. |
| 564 | 1106(a)(2) | 706(5) | 101(31) |
| 565 | Rep. | 707(1) | 101(9) |
| 566 | 107 | 707(2) | 101(4), (11) |
| 567(1) | 1106(a)(3) | 708 | 1124 |
| 567(2) | Rep. | 711, 712 | Rep. |
| 567(3) | 1106(a)(4)(A) | 713(1) | 365 |
| 567(4) | Rep. | 713(2) | 363 |
| 567(5) | 1106(a)(4) | 713(3) | Rep. |
| 567(6) | Rep. | 714 | 362 |
| 568 | 1104(b), 1106(b) | 715, 716 | Rep. |
| 569 | 1106(a)(5) | 721–728 | Rep. |
| 570 | 1121 | 731–733 | Rep. |
| 571–574 | Rep. | 734 | 341 |
| 575 | 1125(d) | 735 | 341 |
| 576 | 1125(b) | 736(3) | 1128(a) |
| 577, 578 | Rep. | 736 | 341 |
| 579 | 1126, 1128(a) | 736(2) | 501(a) |
| 580 | 1128(b) | 736(3) | 343 |
| 586 | 541(a) | 737(1) | Rep. |
| 587 | 1106 | 737(2) | 1129(a)(9) |
| 588 | 1107(a) | 737(3) | 1128(a) |
| 589 | 1108 | 738 | 1102 |
| 590 | Rep. | 739(1)(a) | 1103(c)(2) |
| 591 | 327 | 739(1)(b)–(e) | 1103(c)(3) |
| 596 | 501(a), 1111 | 739(1)(f) | 1104(c)(5) |
| 597 | 1122 | 739(2) | 503(b)(4), 1103(a) |
| 598 | 501(a) | 741 | Rep. |
| 599 | 1126(a) | 742 | 1107(a) |
| 600, 601 | Rep. | 743 | 364 |
| 602 | 502(b)(7) | 744 | 1122 |
| 603 | 1126(e) | 751 | 1122 |
| 604 | 1143 | 752 | Rep. |
| 605 | 347(5) | 753 | 502(b)(7) |
| 606 | 1109(b) | 754, 755 | Rep. |
| 607 | 1109 | 755a | 501(a) |
| 608 | 1109(a) | 756 | Rep. |
| 609–613 | Rep. | 757(1) | Rep. |
| 616(1) | 1123(b)(1) | 757(2) | 1123(b)(2) |
| 616(2) | 1123(a)(5), (b)(4) | 757(3)–(7) | Rep. |
| 616(3) | Rep. | 757(8) | 1123(b)(5) |
| 616(4) | 1123(b)(2) | 761 | 1129(a)(3) |
| 616(5) | 1123(a)(3) | 762 | Rep. |
| 616(6) | 1123(a)(2) | 763 | 1127 |
| 616(7)–(9) | Rep. | 764 | 1127(d) |
| 616(10) | 1123(a)(5) | 765 | 1127(c) |
| 616(11) | 1123(a)(7) | 766(1) | 1129(a)(1) |
| 616(12)(a) | 1123(a)(6) | 766(2) | 1129(a)(7), (11) |
| 616(12)(b) | Rep. | 766(3) | 1129(a)(2) |
| 616(13) | 1123(b)(3) | 766(4) | 1129(a)(3) |
| 616(14) | 1123(b)(5) | 767(1) | 1141(a) |
| 621(1) | 1129(a)(1) | 767(2)–(4) | Rep. |
| 621(2) | 1129(a)(7), (11) | 768–770 | Rep. |
| 621(3) | 1129(a)(3) | 771 | 1141(d)(1)–(3) |
| 621(4) | 1129(a)(4) | 772 | Rep. |
| 621(5) | 1129(a)(5) | 776, 777 | 1112(b) |
| 622 | 1127 | 778 | 348 |
| 623 | 1127(d) | 779–781 | Rep. |
| 624(1) | 1141(a) | 786 | 1144 |
| 624(2) | 1129(a)(6), 1142(a) | 787(1) | 1127(b) |
| 624(3), (4) | Rep. | 787(2) | 1127(c) |
| 625 | Rep. | 787(3) | 1127(d) |
| 626 | 1141(c) | 787(4) | Rep. |

TITLE 11—BANKRUPTCY                                      Page 4

## TABLE I—CONTINUED

| Title 11 Former Sections | Title 11 New Sections |
|---|---|
| 791 | 108(c) |
| 792 | Rep. |
| 793(a) | 1145(a) |
| 793(b) | 1145(b) |
| 794 | Rep. |
| 795 | 346(j)(1) |
| 796 | 346(j)(5) |
| 797 | Rep. |
| 799 | Rep. |
| 801, 802 | Rep. |
| 806(1) | 101(4) |
| 806(2) | Rep. |
| 806(3), (4) | Rep. |
| 806(5) | 101(9) |
| 806(6) | 101(12), 109(d) |
| 806(7) | 101(11) |
| 806(8) | 101(23) |
| 806(9) | 101(31) |
| 807 | 1124 |
| 811, 812 | Rep. |
| 813(1) | 365 |
| 813(2) | 363 |
| 813(3) | Rep. |
| 814 | 362 |
| 815, 816 | Rep. |
| 821–827 | Rep. |
| 828 | 362 |
| 831 | Rep. |
| 832 | 1104(a) |
| 833 | Rep. |
| 834 | 341 |
| 835 | 341, 1128(a) |
| 836 | 341 |
| 836(2) | 501(a) |
| 836(3) | 343 |
| 837(1) | 1104(a) |
| 837(2) | Rep. |
| 837(3) | 1128(a) |
| 841 | Rep. |
| 842 | 1106 |
| 843 | 348 |
| 844 | 1107(a) |
| 845 | 1108 |
| 846 | 364 |
| 851 | 501(a), 1111 |
| 852 | 1122 |
| 853 | Rep. |
| 854 | 501(a) |
| 855–857 | Rep. |
| 858 | 502(b)(7) |
| 859 | Rep. |
| 861(1)–(3) | Rep. |
| 861(4) | 1123(b)(2) |
| 861(5), (6) | Rep. |
| 861(7) | 1123(b)(4) |
| 861(8) | Rep. |
| 861(9) | 1123(a)(3) |
| 861(10) | 1123(a)(2) |
| 861(11) | Rep. |
| 861(12) | 1123(a)(5) |
| 861(13) | 1123(b)(5) |
| 866 | Rep. |
| 867 | 1129(a)(3) |
| 868 | Rep. |
| 869 | 1127(a), (b) |
| 870 | 1127(d) |
| 871 | 1127(c) |
| 872(1) | 1129(a)(7), (11) |
| 872(2) | 1129(a)(2) |
| 872(3) | 1129(a)(3) |
| 872(4) | 1129(a)(5) |
| 872(5) | 1129(a)(6) |
| 873(1) | 1141(a) |
| 873(2) | 1142(a) |
| 873(3) | Rep. |
| 874 | 1141(c) |
| 875 | 1142(b) |
| 876 | 1141(d)(1)–(3) |
| 877 | Rep. |
| 881, 882 | 1112(b) |
| 883 | 348 |
| 884–886 | Rep. |
| 891(1) | Rep. |
| 891(2), (3) | 330 |
| 892(1) | 503(b)(3) |
| 892(2) | Rep. |
| 892(3) | 503(b)(4) |
| 893(1) | Rep. |
| 893(2) | 503(b)(4) |
| 893(3) | 330 |
| 893(4) | 503(b)(4) |
| 894–898 | Rep. |
| 906–909 | Rep. |
| 911 | 1144 |
| 916 | 108(c) |
| 917 | 362 |
| 918(a) | 1145(a) |
| 918(b) | 1145(b) |
| 919 | Rep. |
| 920 | 346(j)(1) |

## TABLE I—CONTINUED

| Title 11 Former Sections | Title 11 New Sections |
|---|---|
| 921 | 1129(d) |
| 922 | 346(j)(5) |
| 923 | Rep. |
| 926 | Rep. |
| 1001, 1002 | Rep. |
| 1006(1) | 101(4) |
| 1006(2) | 101(9) |
| 1006(2) | 101(12), 109(e) |
| 1006(3) | 101(11) |
| 1006(4) | Rep. |
| 1006(5) | 101(31) |
| 1006(6) | Rep. |
| 1006(7) | Rep. |
| 1006(8) | 101(24), 109(e) |
| 1007 | Rep. |
| 1011, 1012 | Rep. |
| 1013(1) | 365 |
| 1013(2) | Rep. |
| 1014 | 362 |
| 1015, 1016 | Rep. |
| 1021–1026 | Rep. |
| 1031 | 341 |
| 1032, 1033 | Rep. |
| 1033(1) | 343, 501(a) |
| 1033(2) | 1321 |
| 1033(5) | 1324 |
| 1036 | 1303 |
| 1037 | Rep. |
| 1041–1044 | Rep. |
| 1046(1) | 1322(b)(1) |
| 1046(2) | 1322(b)(2) |
| 1046(3) | 1322(a)(2) |
| 1046(4) | 1322(a)(1) |
| 1046(5) | 1329(a) |
| 1046(6) | 1322(b)(7) |
| 1046(7) | 1322(b)(10) |
| 1051 | 1325(a)(3) |
| 1052 | Rep. |
| 1053 | 1323(a) |
| 1054 | 1323(c) |
| 1055 | Rep. |
| 1056(a)(1) | 1325(a)(1) |
| 1056(a)(2) | 1325(a)(6) |
| 1056(a)(3) | Rep. |
| 1056(a)(4) | 1325(a)(3) |
| 1056(b) | 502(b) |
| 1057 | 1327(a) |
| 1058 | Rep. |
| 1059 | 1326(a) |
| 1060 | 1328(a), (c), (d) |
| 1061 | 1328(b) |
| 1062 | Rep. |
| 1066 | 348, 1307 |
| 1067 | 348 |
| 1068, 1069 | Rep. |
| 1071 | 1330 |
| 1076 | 108(c) |
| 1077–1079 | Rep. |
| 1080 | 1305(a)(1) |
| 1086 | Rep. |
| 1101–1103 | Rep. |
| 1200–1255 | Rep. |

## TABLE II

This Table lists the sections of revised Title 11, Bankruptcy, and indicates the sections of former Title 11, which covered similar and related subject matter.

| Title 11 New Sections | Title 11 Former Sections |
|---|---|
| 101(1)–(3) | |
| 101(4) | 103, 401(1), 506(1), 707(2), 806(2), 1006(1) |
| 101(5)–(7) | |
| 101(8) | 1(8) |
| 101(9) | 1(11), 401(3), 506(4), 707(1), 806(5), 1062(2) |
| 101(10) | |
| 101(11) | 1(14), 401(5), 506(6), 707(2), 806(7), 1006(4) |
| 101(12) | 1(4), 401(8), 506(5), 706(3), 806(6), 1006(3) |
| 101(13) | 558 |
| 101(14)–(16) | 1(17) |
| 101(17), (18) | |
| 101(19)–(21) | |
| 101(22) | T. 15 §77ccc(7) |
| 101(23) | 506(8), 806(8) |
| 101(24) | 1(32), 1006(8) |
| 101(25) | |
| 101(26) | |
| 101(27) | 1(19), 107(d)(1)(d) |
| 101(28) | 401(6) |
| 101(29) | 404 |
| 101(30) | 1(23), 401(7) |
| 101(31) | 1(24), 506(9), 706(5), 806(9), 1006(6) |

TITLE 11—BANKRUPTCY

TABLE II—CONTINUED

| Title 11 New Sections | Title 11 Former Sections |
|---|---|
| 101(32) | |
| 101(33) | 205(m) |
| 101(34) | 1(27) |
| 101(35) | 506(11) |
| 101(36), (37) | |
| 101(38) | 1(29a) |
| 101(39) | T. 15 §78c(a)(4), (5) |
| 101(40) | 1(30) |
| 102(1)–(6) | |
| 102(7) | 1(35) |
| 102(8) | |
| 103, 104 | 11(a)(15) |
| 105 | |
| 106 | |
| 107 | 77, 566 |
| 108(a), (b) | 29(e) |
| 108(c) | 29(f), 661, 791, 1076 |
| 109(a) | 11(a)(1) |
| 109(b) | 22 |
| 109(c) | 404 |
| 109(d) | 706(3), 806(6) |
| 109(e) | 1006(3), (8) |
| 301 | 22(a), 41(f), 95(a) |
| 302 | |
| 303(a) | 22(b) |
| 303(b) | 23(b), 95(b), (e), 526 |
| 303(c) | 95(f) |
| 303(d) | 41(b), 536, 537 |
| 303(e) | 109(a) |
| 303(f) | |
| 303(g) | 109(d) |
| 303(h) | 21 |
| 303(i) | 11(a)(18), 19(b) |
| 303(j) | 95(g) |
| 303(k) | |
| 304 | |
| 305(a)(1) | |
| 305(a)(2) | 11(a)(22) |
| 305(b), (c) | |
| 306 | |
| 321 | 73 |
| 322(a) | 78(b) |
| 322(b)(1) | 78(c) |
| 322(b)(2) | 78(d), (f), (g) |
| 322(c) | 78(1) |
| 322(d) | 78(m) |
| 323 | |
| 324 | 11(a)(17), 560 |
| 325 | 74 |
| 326(a) | 76(c) |
| 326(b), (c) | |
| 326(d) | 76(e) |
| 327 | 557, 691 |
| 327(c) | 72(c) |
| 328 | |
| 329 | 96(d) |
| 330 | 76(c), 76a, 641(3), (4), 644(1), (3), 891(2), (3), 893(3) |
| 331 | |
| 341 | 91, 92, 734–736, 834–836, 1032, 1033 |
| 342 | 94 |
| 343 | 44(a), 25(a)(1), (10), 736(3), 836(3), 1033(1) |
| 344 | 25(a)(10) |
| 345 | 101, 75(a)(2) |
| 346(a)–(i) | |
| 346(j)(1) | 668, 795, 920 |
| 346(j)(2)–(4) | |
| 346(j)(5) | 670, 796, 922 |
| 346(j)(6), (7) | |
| 347(a) | 106(a) |
| 347(b) | 416(d), 605 |
| 348 | 638, 778, 843, 1066, 1067 |
| 349(a) | 35(b) |
| 349(b) | 107(a) |
| 350 | 11(a)(8) |
| 361 | |
| 362 | 29(a), 35(c)(4), 513, 516(4), 663, 714, 814, 828, 917, 1014 |
| 363 | 11(a)(7), 110(f), 516(3), 713(2), 813(2) |
| 364 | 516(2), 744, 846 |
| 365 | 103(c), 110(b), 516(1), 713(1), 813(1), 1013(1) |
| 366 | |
| 501(a) | 93(n), 596, 598, 736(2), 755a, 836(2), 851, 854, 1033(1) |
| 501(b) | 93(i) |
| 501(c), (d) | |
| 502(a) | 93(d) |
| 502(b) | 93(f), 1056(b) |
| 502(b)(3) | 108 |
| 502(b)(4) | 104(a)(4) |
| 502(b)(7) | 103(a)(9), 602, 753, 858 |
| 502(c) | 93(d) |
| 502(d) | 93(g) |
| 502(e)–(i) | |
| 502(j) | 93(k), 11(a)(2) |
| 503(a) | |
| 503(b) | 104(a)(1) |

TABLE II—CONTINUED

| Title 11 New Sections | Title 11 Former Sections |
|---|---|
| 503(b)(2) | 102(a)(1) |
| 503(b)(3) | 642(1), 643, 644(4), 892(1) |
| 503(b)(4) | 641(5), 642(3), 643, 644(2), (4), 739(2), 892(3), 893(2), (4) |
| 503(b)(5) | 642(1) |
| 504 | 102(c) |
| 505(a), (b) | 11(a)(2A), 104(a)(4) |
| 505(c) | |
| 506(a), (b) | 93(h) |
| 506(c), (d) | |
| 507 | 104(a) |
| 507(a)(3) | 104(a)(2) |
| 508 | 105(d) |
| 509 | 93(i) |
| 510 | |
| 521(1) | 25(a)(8), (9) |
| 521(2) | 25(a)(3), (6), (7) |
| 521(3) | 25(a)(4), (5), (11) |
| 521(4) | 25(a)(1) |
| 522 | 24 |
| 523(a)(1) | 35(a)(1) |
| 523(a)(2) | 35(a)(2) |
| 523(a)(3) | 35(a)(3) |
| 523(a)(4) | 35(a)(4) |
| 523(a)(5) | 35(a)(7) |
| 523(a)(6) | 35(a)(8) |
| 523(a)(7)–(9) | |
| 523(b) | 35(b) |
| 523(c) | 35(c) |
| 523(d) | |
| 524(a) | 32(f) |
| 524(b)–(d) | |
| 524(e) | 34 |
| 525 | |
| 541(a) | 26, 110(a), 586 |
| 541(b) | 110(a)(3) |
| 541(c), (d) | |
| 541(e) | 110(c) |
| 542(a), (b) | |
| 542(c) | 110(d)(2), (3) |
| 542(d), (e) | |
| 543(a) | |
| 543(b), (c) | 11(a)(21), 109(d) |
| 543(d) | |
| 544(a) | 110(c) |
| 544(b) | 110(e) |
| 545 | 107(b), (c) |
| 545(1) | 107(c)(1)(A) |
| 545(2) | 107(c)(1)(B) |
| 545(3), (4) | 107(c)(1)(C) |
| 546(a) | |
| 546(b) | 107(c)(1)(B) |
| 546(c) | |
| 547 | 96 |
| 547(a) | 107(a) |
| 547(c)(4) | 96(c) |
| 547(d) | 107(a) |
| 547(e)(1)(B) | 96(a)(4) |
| 548(a) | 107(d)(2) |
| 548(b) | 107(d)(4) |
| 548(c) | 107(d)(6) |
| 548(d)(1) | 107(d)(5) |
| 548(d)(2) | |
| 549(a) | 110(d)(1) |
| 549(b) | |
| 549(c) | 44(g) |
| 549(d) | |
| 551 | 96(b), 107(d)(3), (6) |
| | 96(b), 107(d)(3), (c)(2), (d)(6), 110(e)(2) |
| 552 | |
| 553 | 96(c), 108 |
| 554 | |
| 701 | |
| 702 | 72(a) |
| 703(a) | 74 |
| 703(b), (c) | |
| 704(1) | 75(a)(1) |
| 704(2) | 75(a)(3), (5) |
| 704(3) | 75(a)(7) |
| 704(4) | 75(a)(8) |
| 704(5) | 75(a)(9) |
| 704(6) | 75(a)(10) |
| 704(7) | |
| 704(8) | 75(a)(13) |
| 705 | 72(b) |
| 706 | |
| 707 | 95(g) |
| 721 | 11(a)(5) |
| 722 | |
| 723 | 23(g) |
| 724(a) | 93(j) |
| 724(b) | 107(c)(3) |
| 724(c), (d) | |
| 725 | |
| 726(a)(1), (2) | |
| 726(a)(3) | 93(n) |
| 726(a)(4)–(6), (b), (c) | |
| 727(a)(1) | |
| 727(a)(2) | 32(c)(1), (4) |

TITLE 11—BANKRUPTCY

TABLE II—CONTINUED

| Title 11 New Sections | Title 11 Former Sections |
|---|---|
| 727(a)(3) | 32(c)(2) |
| 727(a)(4) | 32(c)(1), (3) |
| 727(a)(5) | 32(c)(7) |
| 727(a)(6) | 32(c)(6) |
| 727(a)(7) | |
| 727(a)(8), (9) | 32(c)(5) |
| 727(a)(10) | 32(a) |
| 727(b) | |
| 727(c) | 32(b) |
| 727(d), (e) | 33 |
| 728 | |
| 741 | 96(e)(1) |
| 742–744 | |
| 745 | 96(e)(2) |
| 746–748 | |
| 749 | 96(e)(5) |
| 750 | |
| 751 | 96(e)(2) |
| 752 | 96(e)(2), (3) |
| 761–766 | |
| 901 | 402(b)(1), (2), 405(b), (e), (h), 408(b), 409, 411, 412, 413, 414(a), 416(b), (d) |
| 902(1) | |
| 902(2) | 401(10) |
| 902(3) | 401(11) |
| 902(4) | |
| 903 | 403 |
| 904 | 402(c) |
| 921(a) | 405(a) |
| 921(b) | 402(d) |
| 921(c)–(f) | 405(a) |
| 922(a) | 405(e)(1) |
| 922(b) | |
| 923 | 405(d) |
| 924 | 405(b) |
| 925 | 408(a) |
| 926 | 405(h) |
| 927 | 418 |
| 941 | 410(a) |
| 942 | 410(a), (b) |
| 943(a) | 413 |
| 943(b)(1) | |
| 943(b)(2) | 414(b)(2) |
| 943(b)(3) | 414(b)(4) |
| 943(b)(4) | 414(b)(6) |
| 943(b)(5), (6) | 414(b)(1) |
| 944(a) | 415(a) |
| 944(b) | 415(b)(1) |
| 944(c) | 415(b)(2) |
| 945(a) | 416(e) |
| 945(b) | |
| 946 | 417 |
| 1101(1) | |
| 1101(2) | 629(a) |
| 1102 | 738 |
| 1103(a) | 739(2) |
| 1103(b), (c)(1) | |
| 1103(c)(2) | 739(1)(a) |
| 1103(c)(3) | 739(1)(b)–(e) |
| 1103(c)(4) | |
| 1103(c)(5) | 739(1)(f) |
| 1103(d) | |
| 1104(a) | 556, 832, 837(1) |
| 1104(b) | 568 |
| 1104(c) | 560 |
| 1105 | 559 |
| 1106 | 587, 842 |
| 1106(a)(2) | 564 |
| 1106(a)(3) | 567(1) |
| 1106(a)(4) | 567(5) |
| 1106(a)(4)(A) | 567(3) |
| 1106(a)(5) | 569 |
| 1106(b) | 568 |
| 1107(a) | 563, 588, 742, 844 |
| 1107(b) | |
| 1108 | 589, 743, 845 |
| 1109 | 607 |
| 1109(a) | 608 |
| 1109(b) | 606 |
| 1110 | 516(5), (6) |
| 1111 | 596, 851 |
| 1112(a) | |
| 1112(b) | 636, 776, 777, 881, 882 |
| 1112(c)–(e) | 570 |
| 1121 | |
| 1122 | 597, 751, 852 |
| 1123(a)(1) | |
| 1123(a)(2) | 616(6), 861(10) |
| 1123(a)(3) | 616(5), 861(9) |
| 1123(a)(4) | |
| 1123(a)(5) | 616(2), (10), 861(12) |
| 1123(a)(6) | 616(12)(a) |
| 1123(a)(7) | 616(11) |
| 1123(b)(1) | 616(1) |
| 1123(b)(2) | 616(4), 757(2), 861(4) |
| 1123(b)(3) | 616(13) |
| 1123(b)(4) | 616(2), 861(7) |
| 1123(b)(5) | 616(14), 757(8), 861(13) |
| 1123(c) | |

TABLE II—CONTINUED

| Title 11 New Sections | Title 11 Former Sections |
|---|---|
| 1124 | 507, 708, 807 |
| 1125(a) | |
| 1125(b) | 576 |
| 1125(c) | |
| 1125(d) | 575 |
| 1125(e) | |
| 1126 | 579 |
| 1126(a) | 599 |
| 1126(e) | 603 |
| 1127 | 622, 763 |
| 1127(a) | 869 |
| 1127(b) | 629(c), 787(1), 869 |
| 1127(c) | 765, 787(2), (3), 871 |
| 1127(d) | 623, 764, 870 |
| 1128(a) | 579, 735(3), 737(3), 835, 837(3) |
| 1128(b) | 580 |
| 1129(a)(1) | 621(1), 766(1), 872(1) |
| 1129(a)(2) | 766(3), 872(3) |
| 1129(a)(3) | 621(3), 761, 766(4), 867, 872(4) |
| 1129(a)(4) | 621(4), 872(5) |
| 1129(a)(5) | 621(5) |
| 1129(a)(6) | 624(2) |
| 1129(a)(7) | 621(2), 766(2), 872(2) |
| 1129(a)(9) | |
| 1129(a)(8) | 737(2) |
| 1129(a)(10) | |
| 1129(a)(11) | 621(2), 766(2), 872(2) |
| 1129(b), (c) | |
| 1129(d) | 669, 921 |
| 1141(a) | 624(1), 767(1), 873(1) |
| 1141(c) | |
| 1141(d)(1)–(3) | 628(1), 771, 876 |
| 1141(d)(4) | 32(a) |
| 1142(a) | 624(2), 873(2) |
| 1142(b) | 627, 875 |
| 1143 | 604 |
| 1144 | 786, 911 |
| 1145(a) | 664(a), 793(a), 918(a) |
| 1145(b) | 664(b), 793(b), 918(b) |
| 1145(c), (d) | |
| 1146(a), (b) | |
| 1146(c) | 667 |
| 1146(d) | |
| 1161, 1162 | |
| 1163 | 205(c)(1) |
| 1164, 1165 | |
| 1166 | 205(c)(2) |
| 1167 | 205(n) |
| 1168 | 205(j) |
| 1169 | 205(c)(6) |
| 1170 | 205(o) |
| 1171(a) | 205(n) |
| 1171(b) | 205(b) |
| 1172 | 205(b) |
| 1173 | 205(e) |
| 1174 | |
| 1301, 1302 | |
| 1303 | 1036 |
| 1304 | |
| 1305(a)(1) | 1080 |
| 1305(a)(2), (b), (c) | |
| 1306 | |
| 1307 | 1066 |
| 1321 | 1033(2) |
| 1322(a)(1) | 1046(4) |
| 1322(a)(2) | 1046(3) |
| 1322(a)(3) | |
| 1322(b)(1) | 1046(1) |
| 1322(b)(2) | 1046(2) |
| 1322(b)(3)–(6) | |
| 1322(b)(8), (9) | 1046(6) |
| 1322(b)(10) | 1046(7) |
| 1322(c) | |
| 1323(a) | 1053 |
| 1323(b) | |
| 1323(c) | 1054 |
| 1324 | 1033(5) |
| 1325(a)(1) | 1056(a)(1) |
| 1325(a)(2) | |
| 1325(a)(3) | 1051, 1056(a)(4) |
| 1325(a)(4), (5) | |
| 1325(a)(6) | 1056(a)(2) |
| 1325(b) | |
| 1326(a) | 1059 |
| 1326(b) | |
| 1327(a) | 1057 |
| 1327(b), (c) | 1060 |
| 1328(a) | 1061 |
| 1328(b) | 1060 |
| 1328(c), (d) | |
| 1328(e) | 33 |
| 1329(a) | 1046(5) |
| 1329(b), (c) | |
| 1330 | 1071 |
| 1501–151326 | |

Page 7                                    TITLE 11—BANKRUPTCY

## Statutory Notes and Related Subsidiaries

### ENACTING CLAUSE

Pub. L. 95–598, title I, §101, Nov. 6, 1978, 92 Stat. 2549, provided in part: "The law relating to bankruptcy is codified and enacted as title 11 of the United States Code, entitled 'Bankruptcy', and may be cited as 11 U.S.C. §—."

### REPEALS

Pub. L. 95–598, title IV, §401(a), Nov. 6, 1978, 92 Stat. 2682, provided that: "The Bankruptcy Act [act July 1, 1898, ch. 541, 30 Stat. 544, as amended] is repealed."

### EFFECTIVE DATE

Pub. L. 95–598, title IV, §402, Nov. 6, 1978, 92 Stat. 2682, as amended by Pub. L. 98–249, §1(a), Mar. 31, 1984, 98 Stat. 116; Pub. L. 98–271, §1(a), Apr. 30, 1984, 98 Stat. 163; Pub. L. 98–299, §1(a), May 25, 1984, 98 Stat. 214; Pub. L. 98–325, §1(a), June 20, 1984, 98 Stat. 268; Pub. L. 98–353, title I, §§113, 121(a), July 10, 1984, 98 Stat. 343, 345; Pub. L. 98–454, title X, §1001, Oct. 5, 1984, 98 Stat. 1745, provided that:

"(a) Except as otherwise provided in this title [sections 401 to 411], this Act [for classification of title, see Tables] shall take effect on October 1, 1979.

"(b) Except as provided in subsections (c) and (d) of this section, the amendments made by title II [sections 201 to 252] of this Act shall not be effective.

"(c) The amendments made by sections 210, 214, 219, 220, 222, 224, 225, 228, 229, 235, 244, 245, 246, 249, and 251 of this Act shall take effect on October 1, 1979.

"(d) The amendments made by sections 217, 218, 230, 247, 302, 314(j), 317, 327, 328, 338, and 411 of this Act shall take effect on the date of enactment of this Act [Nov. 6, 1978].

"(e) [Repealed. Pub. L. 98–454, title X, §1001, Oct. 5, 1984, 98 Stat. 1745]."

[Amendment of section 402(b) of Pub. L. 95–598, set out above, by section 113 of Pub. L. 98–353 effective June 27, 1984, see section 122(c) of Pub. L. 98–353, set out as an Effective Date note under section 151 of Title 28, Judiciary and Judicial Procedure.]

### SAVINGS PROVISION

Pub. L. 95–598, title IV, §403, Nov. 6, 1978, 92 Stat. 2683, as amended by Pub. L. 98–353, title III, §382, July 10, 1984, 98 Stat. 364, provided that:

"(a) A case commenced under the Bankruptcy Act, [act July 1, 1898, ch. 541, 30 Stat. 544, as amended], and all matters and proceedings in or relating to any such case, shall be conducted and determined under such Act as if this Act had not been enacted, and the substantive rights of parties in connection with any such bankruptcy case, matter, or proceeding shall continue to be governed by the law applicable to such case, matter, or proceeding as if the [this] Act had not been enacted.

"(b) Notwithstanding subsection (a) of this section, sections 1165, 1167, 1168, 1169, and 1171 of title 11 of the United States Code, as enacted by section 101 of this Act, apply to cases pending under section 77 of the Bankruptcy Act ([former] 11 U.S.C. 205) on the date of enactment of this Act [Nov. 6, 1978] in which the trustee has not filed a plan of reorganization.

"(c) The repeal [of the Bankruptcy Act] made by section 401(a) of this Act does not affect any right of a referee in bankruptcy, United States bankruptcy judge, or survivor of a referee in bankruptcy or United States bankruptcy judge to receive any annuity or other payment under the civil service retirement laws.

"(d) The amendments made by section 314 of this Act [for classification to the Code, see Tables] do not affect the application of chapter 9, chapter 96, section 2516, section 3057, or section 3284 of title 18 of the United States Code to any act of any person—

"(1) committed before October 1, 1979; or

"(2) committed after October 1, 1979, in connection with a case commenced before such date.

"(e) Notwithstanding subsection (a) of this section—

"(1) a fee may not be charged under section 40c(2)(a) of the Bankruptcy Act [former 11 U.S.C. 68(c)(2)(a)] in a case pending under such Act after September 30, 1979, to the extent that such fee exceeds $200,000;

"(2) a fee may not be charged under section 40c(2)(b) of the Bankruptcy Act in a case in which the plan is confirmed after September 30, 1978, or in which the final determination as to the amount of such fee is made after September 30, 1979, notwithstanding an earlier confirmation date, to the extent that such fee exceeds $100,000;

"(3) after September 30, 1979, all moneys collected for payment into the referees' salary and expense fund in cases filed under the Bankruptcy Act shall be collected and paid into the general fund of the Treasury; and

"(4) any balance in the referees' salary and expense fund in the Treasury on October 1, 1979, shall be transferred to the general fund of the Treasury and the referees' salary and expense fund account shall be closed."

Pub. L. 98–353, title III, §381, July 10, 1984, 98 Stat. 364, provided that: "This subtitle [(§§381, 382) amending section 403(e) of Pub. L. 95–598, set out above] may be cited as the 'Referees Salary and Expense Fund Act of 1984'."

### HISTORY OF BANKRUPTCY ACTS

The bankruptcy laws were revised generally and enacted as Title 11, Bankruptcy, by Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2549.

Earlier bankruptcy laws included the following acts:

Apr. 4, 1800, ch. 19, 2 Stat. 19, repealed Dec. 19, 1803, ch. 6, 2 Stat. 248.

Aug. 19, 1841, ch. 9, 5 Stat. 440, repealed Mar. 3, 1843, ch. 82, 5 Stat. 614.

Mar. 2, 1867, ch. 176, 14 Stat. 517, the provisions of which were incorporated in Rev. Stat. Title LXI, §§4972 to 5132, were materially amended June 22, 1874, ch. 390, 18 Stat. 178, and were repealed June 7, 1878, ch. 160, 20 Stat. 99.

The Bankruptcy Act of July 1, 1898, ch. 541, 30 Stat. 544, as amended, sometimes called the Nelson Act, repealed by Pub. L. 95–598.

The Chandler Act of July 22, 1938, ch. 575, 52 Stat. 883, which revised the Bankruptcy Act generally and materially amended the provisions covering corporate reorganizations, repealed by Pub. L. 95–598.

### NATIONAL BANKRUPTCY REVIEW COMMISSION

Pub. L. 103–394, title VI, Oct. 22, 1994, 108 Stat. 4147, established the National Bankruptcy Review Commission to (1) investigate and study issues and problems relating to title 11, United States Code, (2) evaluate the advisability of proposals and current arrangements with respect to such issues and problems, (3) solicit divergent views of all parties concerned with the operation of the bankruptcy system, and (4) prepare and submit to the Congress, the Chief Justice, and the President a report not later than 2 years after the date of its first meeting, and provided for termination of the Commission 30 days after submission of the report which was submitted on Oct. 20, 1997.

### COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES

Pub. L. 91–354, §§1–6, July 24, 1970, 84 Stat. 468, as amended by Pub. L. 92–251, Mar. 17, 1972, 86 Stat. 63; Pub. L. 93–56, §1, July 1, 1973, 87 Stat. 140, established the Commission on the Bankruptcy Laws of the United States, to study and recommend changes to this title, which ceased to exist 30 days after the date of submission of its final report which was required prior to July 31, 1973.

## CHAPTER 1—GENERAL PROVISIONS

Sec.
101.       Definitions.

### Editorial Notes

#### AMENDMENTS

2010—Pub. L. 111–327, § 2(a)(49), Dec. 22, 2010, 124 Stat. 3562, inserted "patient care" before "ombudsman" in item 333.

2005—Pub. L. 109–8, title II, § 232(c), title IV, § 434(a)(2), title VII, § 719(a)(2), title VIII, § 802(d)(4), title XI, §§ 1102(b), 1104(a)(2), Apr. 20, 2005, 119 Stat. 74, 111, 133, 146, 190, 192, added items 308, 332, 333, and 351, substituted "Special provisions related to the treatment of State and local taxes" for "Special tax provisions" in item 346, and struck out item 304 "Cases ancillary to foreign proceedings".

1986—Pub. L. 99–554, title II, § 205(b), Oct. 27, 1986, 100 Stat. 3098, added item 307.

### SUBCHAPTER I—COMMENCEMENT OF A CASE

### § 301. Voluntary cases

(a) A voluntary case under a chapter of this title is commenced by the filing with the bankruptcy court of a petition under such chapter by an entity that may be a debtor under such chapter.

(b) The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2558; Pub. L. 109–8, title V, § 501(b), Apr. 20, 2005, 119 Stat. 118.)

#### HISTORICAL AND REVISION NOTES

##### LEGISLATIVE STATEMENTS

Sections 301, 302, 303, and 304 are all modified in the House amendment to adopt an idea contained in sections 301 and 303 of the Senate amendment requiring a petition commencing a case to be filed with the bankruptcy court. The exception contained in section 301 of the Senate bill relating to cases filed under chapter 9 is deleted. Chapter 9 cases will be handled by a bankruptcy court as are other title 11 cases.

##### SENATE REPORT NO. 95–989

Section 301 specifies the manner in which a voluntary bankruptcy case is commenced. The debtor files a petition under this section under the particular operative chapter of the bankruptcy code under which he wishes to proceed. The filing of the petition constitutes an order for relief in the case under that chapter. The section contains no change from current law, except for the use of the phrase "order for relief" instead of "adjudication." The term adjudication is replaced by a less pejorative phrase in light of the clear power of Congress to permit voluntary bankruptcy without the necessity for an adjudication, as under the 1898 act [former title 11], which was adopted when voluntary bankruptcy was a concept not thoroughly tested.

### Editorial Notes

#### AMENDMENTS

2005—Pub. L. 109–8 designated existing provisions as subsec. (a), struck out "The commencement of a voluntary case under a chapter of this title constitutes an order for relief under such chapter." at end, and added subsec. (b).

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE OF 2005 AMENDMENT

Amendment by Pub. L. 109–8 effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as a note under section 101 of this title.

### § 302. Joint cases

(a) A joint case under a chapter of this title is commenced by the filing with the bankruptcy court of a single petition under such chapter by an individual that may be a debtor under such chapter and such individual's spouse. The commencement of a joint case under a chapter of this title constitutes an order for relief under such chapter.

(b) After the commencement of a joint case, the court shall determine the extent, if any, to which the debtors' estates shall be consolidated.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2558.)

#### HISTORICAL AND REVISION NOTES

##### SENATE REPORT NO. 95–989

A joint case is a voluntary bankruptcy case concerning a wife and husband. Under current law, there is no explicit provision for joint cases. Very often, however, in the consumer debtor context, a husband and wife are jointly liable on their debts, and jointly hold most of their property. A joint case will facilitate consolidation of their estates, to the benefit of both the debtors and their creditors, because the cost of administration will be reduced, and there will be only one filing fee.

Section 302 specifies that a joint case is commenced by the filing of a petition under an appropriate chapter by an individual and that individual's spouse. Thus, one spouse cannot take the other into bankruptcy without the other's knowledge or consent. The filing of the petition constitutes an order for relief under the chapter selected.

Subsection (b) requires the court to determine the extent, if any, to which the estates of the two debtors will be consolidated; that is, assets and liabilities combined in a single pool to pay creditors. Factors that will be relevant in the court's determination include the extent of jointly held property and the amount of jointly-owned debts. The section, of course, is not license to consolidate in order to avoid other provisions of the title to the detriment of either the debtors or their creditors. It is designed mainly for ease of administration.

### § 303. Involuntary cases

(a) An involuntary case may be commenced only under chapter 7 or 11 of this title, and only against a person, except a farmer, family farmer, or a corporation that is not a moneyed, business, or commercial corporation, that may be a debtor under the chapter under which such case is commenced.

(b) An involuntary case against a person is commenced by the filing with the bankruptcy court of a petition under chapter 7 or 11 of this title—

(1) by three or more entities, each of which is either a holder of a claim against such person that is not contingent as to liability or the subject of a bona fide dispute as to liability or amount, or an indenture trustee representing such a holder, if such noncontingent, undisputed claims aggregate at least $10,000 [1] more than the value of any lien on property of the debtor securing such claims held by the holders of such claims;

(2) if there are fewer than 12 such holders, excluding any employee or insider of such person and any transferee of a transfer that is

---

[1] See Adjustment of Dollar Amounts notes below.

there is a question over the scope of the subsection, the court will make the appropriate orders to protect rights acquired in reliance on the bankruptcy case.

### Editorial Notes

#### AMENDMENTS

1994—Subsec. (a). Pub. L. 103–394 substituted ''109(g)'' for ''109(f)''.

1984—Subsec. (a). Pub. L. 98–353 inserted ''; nor does the dismissal of a case under this title prejudice the debtor with regard to the filing of a subsequent petition under this title, except as provided in section 109(f) of this title''.

#### Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–394 effective Oct. 22, 1994, and not applicable with respect to cases commenced under this title before Oct. 22, 1994, see section 702 of Pub. L. 103–394, set out as a note under section 101 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

### § 350. Closing and reopening cases

(a) After an estate is fully administered and the court has discharged the trustee, the court shall close the case.

(b) A case may be reopened in the court in which such case was closed to administer assets, to accord relief to the debtor, or for other cause.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2569; Pub. L. 98–353, title III, §439, July 10, 1984, 98 Stat. 370.)

#### HISTORICAL AND REVISION NOTES

SENATE REPORT NO. 95–989

Subsection (a) requires the court to close a bankruptcy case after the estate is fully administered and the trustee discharged. The Rules of Bankruptcy Procedure will provide the procedure for case closing. Subsection (b) permits reopening of the case to administer assets, to accord relief to the debtor, or for other cause. Though the court may permit reopening of a case so that the trustee may exercise an avoiding power, laches may constitute a bar to an action that has been delayed too long. The case may be reopened in the court in which it was closed. The rules will prescribe the procedure by which a case is reopened and how it will be conducted after reopening.

### Editorial Notes

#### AMENDMENTS

1984—Subsec. (b). Pub. L. 98–353 substituted ''A'' for ''a''.

#### Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

### § 351. Disposal of patient records

If a health care business commences a case under chapter 7, 9, or 11, and the trustee does not have a sufficient amount of funds to pay for the storage of patient records in the manner required under applicable Federal or State law, the following requirements shall apply:

(1) The trustee shall—

(A) promptly publish notice, in 1 or more appropriate newspapers, that if patient records are not claimed by the patient or an insurance provider (if applicable law permits the insurance provider to make that claim) by the date that is 365 days after the date of that notification, the trustee will destroy the patient records; and

(B) during the first 180 days of the 365-day period described in subparagraph (A), promptly attempt to notify directly each patient that is the subject of the patient records and appropriate insurance carrier concerning the patient records by mailing to the most recent known address of that patient, or a family member or contact person for that patient, and to the appropriate insurance carrier an appropriate notice regarding the claiming or disposing of patient records.

(2) If, after providing the notification under paragraph (1), patient records are not claimed during the 365-day period described under that paragraph, the trustee shall mail, by certified mail, at the end of such 365-day period a written request to each appropriate Federal agency to request permission from that agency to deposit the patient records with that agency, except that no Federal agency is required to accept patient records under this paragraph.

(3) If, following the 365-day period described in paragraph (2) and after providing the notification under paragraph (1), patient records are not claimed by a patient or insurance provider, or request is not granted by a Federal agency to deposit such records with that agency, the trustee shall destroy those records by—

(A) if the records are written, shredding or burning the records; or

(B) if the records are magnetic, optical, or other electronic records, by otherwise destroying those records so that those records cannot be retrieved.

(Added Pub. L. 109–8, title XI, §1102(a), Apr. 20, 2005, 119 Stat. 189.)

#### Statutory Notes and Related Subsidiaries

EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

### SUBCHAPTER IV—ADMINISTRATIVE POWERS

### § 361. Adequate protection

When adequate protection is required under section 362, 363, or 364 of this title of an interest of an entity in property, such adequate protection may be provided by—

(1) requiring the trustee to make a cash payment or periodic cash payments to such enti-

ty, to the extent that the stay under section
362 of this title, use, sale, or lease under sec-
tion 363 of this title, or any grant of a lien
under section 364 of this title results in a de-
crease in the value of such entity's interest in
such property;

(2) providing to such entity an additional or
replacement lien to the extent that such stay,
use, sale, lease, or grant results in a decrease
in the value of such entity's interest in such
property; or

(3) granting such other relief, other than en-
titling such entity to compensation allowable
under section 503(b)(1) of this title as an ad-
ministrative expense, as will result in the re-
alization by such entity of the indubitable
equivalent of such entity's interest in such
property.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2569; Pub. L.
98–353, title III, §440, July 10, 1984, 98 Stat. 370.)

HISTORICAL AND REVISION NOTES

LEGISLATIVE STATEMENTS

Section 361 of the House amendment represents a
compromise between H.R. 8200 as passed by the House
and the Senate amendment regarding the issue of ''ade-
quate protection'' of a secured party. The House
amendment deletes the provision found in section 361(3)
of H.R. 8200 as passed by the House. It would have per-
mitted adequate protection to be provided by giving
the secured party an administrative expense regarding
any decrease in the value of such party's collateral. In
every case there is the uncertainty that the estate will
have sufficient property to pay administrative expenses
in full.

Section 361(4) of H.R. 8200 as passed by the House is
modified in section 361(3) of the House amendment to
indicate that the court may grant other forms of ade-
quate protection, other than an administrative ex-
pense, which will result in the realization by the se-
cured creditor of the indubitable equivalent of the
creditor's interest in property. In the special instance
where there is a reserve fund maintained under the se-
curity agreement, such as in the typical bondholder
case, indubitable equivalent means that the bond-
holders would be entitled to be protected as to the re-
serve fund, in addition to the regular payments needed
to service the debt. Adequate protection of an interest
of an entity in property is intended to protect a credi-
tor's allowed secured claim. To the extent the protec-
tion proves to be inadequate after the fact, the creditor
is entitled to a first priority administrative expense
under section 503(b).

In the special case of a creditor who has elected ap-
plication of creditor making an election under section
1111(b)(2), that creditor is entitled to adequate protec-
tion of the creditor's interest in property to the extent
of the value of the collateral not to the extent of the
creditor's allowed secured claim, which is inflated to
cover a deficiency as a result of such election.

SENATE REPORT NO. 95–989

Sections 362, 363, and 364 require, in certain cir-
cumstances, that the court determine in noticed hear-
ings whether the interest of a secured creditor or co-
owner of property with the debtor is adequately pro-
tected in connection with the sale or use of property.
The interests of which the court may provide protec-
tion in the ways described in this section include equi-
table as well as legal interests. For example, a right to
enforce a pledge and a right to recover property deliv-
ered to a debtor under a consignment agreement or an
agreement of sale or return are interests that may be
entitled to protection. This section specifies means by
which adequate protection may be provided but, to
avoid placing the court in an administrative role, does

not require the court to provide it. Instead, the trustee
or debtor in possession or the creditor will provide or
propose a protection method. If the party that is af-
fected by the proposed action objects, the court will de-
termine whether the protection provided is adequate.
The purpose of this section is to illustrate means by
which it may be provided and to define the limits of the
concept.

The concept of adequate protection is derived from
the fifth amendment protection of property interests as
enunciated by the Supreme Court. See *Wright v. Union
Central Life Ins. Co.*, 311 U.S. 273 (1940); *Louisville Joint
Stock Land Bank v. Radford*, 295 U.S. 555 (1935).

The automatic stay also provides creditor protection.
Without it, certain creditors would be able to pursue
their own remedies against the debtor's property.
Those who acted first would obtain payment of the
claims in preference to and to the detriment of other
creditors. Bankruptcy is designed to provide an orderly
liquidation procedure under which all creditors are
treated equally. A race of diligence by creditors for the
debtor's assets prevents that.

Subsection (a) defines the scope of the automatic
stay, by listing the acts that are stayed by the com-
mencement of the case. The commencement or con-
tinuation, including the issuance of process, of a judi-
cial, administrative or other proceeding against the
debtor that was or could have been commenced before
the commencement of the bankruptcy case is stayed
under paragraph (1). The scope of this paragraph is
broad. All proceedings are stayed, including arbitra-
tion, administrative, and judicial proceedings. Pro-
ceeding in this sense encompasses civil actions and all
proceedings even if they are not before governmental
tribunals.

The stay is not permanent. There is adequate provi-
sion for relief from the stay elsewhere in the section.
However, it is important that the trustee have an op-
portunity to inventory the debtor's position before pro-
ceeding with the administration of the case. Undoubt-
edly the court will lift the stay for proceedings before
specialized or nongovernmental tribunals to allow
those proceedings to come to a conclusion. Any party
desiring to enforce an order in such a proceeding would
thereafter have to come before the bankruptcy court to
collect assets. Nevertheless, it will often be more ap-
propriate to permit proceedings to continue in their
place of origin, when no great prejudice to the bank-
ruptcy estate would result, in order to leave the parties
to their chosen forum and to relieve the bankruptcy
court from many duties that may be handled elsewhere.

Paragraph (2) stays the enforcement, against the
debtor or against property of the estate, of a judgment
obtained before the commencement of the bankruptcy
case. Thus, execution and levy against the debtors'
prepetition property are stayed, and attempts to col-
lect a judgment from the debtor personally are stayed.

Paragraph (3) stays any act to obtain possession of
property of the estate (that is, property of the debtor
as of the date of the filing of the petition) or property
from the estate (property over which the estate has
control or possession). The purpose of this provision is
to prevent dismemberment of the estate. Liquidation
must proceed in an orderly fashion. Any distribution of
property must be by the trustee after he has had an op-
portunity to familiarize himself with the various rights
and interests involved and with the property available
for distribution.

Paragraph (4) stays lien creation against property of
the estate. Thus, taking possession to perfect a lien or
obtaining court process is prohibited. To permit lien
creation after bankruptcy would give certain creditors
preferential treatment by making them secured instead
of unsecured.

Paragraph (5) stays any act to create or enforce a lien
against property of the debtor, that is, most property
that is acquired after the date of the filing of the peti-
tion, property that is exempted, or property that does
not pass to the estate, to the extent that the lien se-
cures a prepetition claim. Again, to permit

postbankruptcy lien creation or enforcement would permit certain creditors to receive preferential treatment. It may also circumvent the debtors' discharge.

Paragraph (6) prevents creditors from attempting in any way to collect a prepetition debt. Creditors in consumer cases occasionally telephone debtors to encourage repayment in spite of bankruptcy. Inexperienced, frightened, or ill-counseled debtors may succumb to suggestions to repay notwithstanding their bankruptcy. This provision prevents evasion of the purpose of the bankruptcy laws by sophisticated creditors.

Paragraph (7) stays setoffs of mutual debts and credits between the debtor and creditors. As with all other paragraphs of subsection (a), this paragraph does not affect the right of creditors. It simply stays its enforcement pending an orderly examination of the debtor's and creditors' rights.

Subsection (b) lists seven exceptions to the automatic stay. The effect of an exception is not to make the action immune from injunction.

The court has ample other powers to stay actions not covered by the automatic stay. Section 105, of proposed title 11, derived from Bankruptcy Act §2a(15) [section 11(a)(15) of former title 11], grants the power to issue orders necessary or appropriate to carry out the provisions of title 11. The district court and the bankruptcy court as its adjunct have all the traditional injunctive powers of a court of equity, 28 U.S.C. §§151 and 164 as proposed in S. 2266, §201, and 28 U.S.C. §1334, as proposed in S. 2266, §216. Stays or injunctions issued under these other sections will not be automatic upon the commencement of the case, but will be granted or issued under the usual rules for the issuance of injunctions. By excepting an act or action from the automatic stay, the bill simply requires that the trustee move the court into action, rather than requiring the stayed party to request relief from the stay. There are some actions, enumerated in the exceptions, that generally should not be stayed automatically upon the commencement of the case, for reasons of either policy or practicality. Thus, the court will have to determine on a case-by-case basis whether a particular action which may be harming the estate should be stayed.

With respect to stays issued under other powers, or the application of the automatic stay, to governmental actions, this section and the other sections mentioned are intended to be an express waiver of sovereign immunity of the Federal Government, and an assertion of the bankruptcy power over State governments under the supremacy clause notwithstanding a State's sovereign immunity.

The first exception is of criminal proceedings against the debtor. The bankruptcy laws are not a haven for criminal offenders, but are designed to give relief from financial overextension. Thus, criminal actions and proceedings may proceed in spite of bankruptcy.

Paragraph (2) excepts from the stay the collection of alimony, maintenance or support from property that is not property of the estate. This will include property acquired after the commencement of the case, exempted property, and property that does not pass to the estate. The automatic stay is one means of protecting the debtor's discharge. Alimony, maintenance and support obligations are excepted from discharge. Staying collection of them, when not to the detriment of other creditors (because the collection effort is against property that is not property of the estate) does not further that goal. Moreover, it could lead to hardship on the part of the protected spouse or children.

Paragraph (3) excepts any act to perfect an interest in property to the extent that the trustee's rights and powers are limited under section 546(a) of the bankruptcy code. That section permits postpetition perfection of certain liens to be effective against the trustee. If the act of perfection, such as filing, were stayed, the section would be nullified.

Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.

Paragraph (5) makes clear that the exception extends to permit an injunction and enforcement of an injunction, and to permit the entry of a money judgment, but does not extend to permit enforcement of a money judgment. Since the assets of the debtor are in the possession and control of the bankruptcy court, and since they constitute a fund out of which all creditors are entitled to share, enforcement by a governmental unit of a money judgment would give it preferential treatment to the detriment of all other creditors.

Paragraph (6) excepts the setoff of any mutual debt and claim for commodity transactions.

Paragraph (7) excepts actions by the Secretary of Housing and Urban Development to foreclose or take possession in a case of a loan insured under the National Housing Act [12 U.S.C. 1701 et seq.]. A general exception for such loans is found in current sections 263 and 517 [sections 663 and 917 of former title 11], the exception allowed by this paragraph is much more limited.

Subsection (c) of section 362 specifies the duration of the automatic stay. Paragraph (1) terminates a stay of an act against property of the estate when the property ceases to be property of the estate, such as by sale, abandonment, or exemption. It does not terminate the stay against property of the debtor if the property leaves the estate and goes to the debtor. Paragraph (2) terminates the stay of any other act on the earliest of the time the case is closed, the time the case is dismissed, or the time a discharge is granted or denied (unless the debtor is a corporation or partnership in a chapter 7 case).

Subsection (c) governs automatic termination of the stay. Subsections (d) through (g) govern termination of the stay by the court on the request of a party in interest.

Subsection (d) requires the court, upon motion of a party in interest, to grant relief from the stay for cause, such as by terminating, annulling, modifying, or conditioning the stay. The lack of adequate protection of an interest in property is one cause for relief, but is not the only cause. Other causes might include the lack of any connection with or interference with the pending bankruptcy case. Generally, proceedings in which the debtor is a fiduciary, or involving postpetition activities of the debtor, need not be stayed because they bear no relationship to the purpose of the automatic stay, which is protection of the debtor and his creditors from his creditors.

Upon the court's finding that the debtor has no equity in the property subject to the stay and that the property is not necessary to an effective reorganization of the debtor, the subsection requires the court grant relief from the stay. To aid in this determination, guidelines are established where the property subject to the stay is real property. An exception to "the necessary to an effective reorganization" requirement is made for real property on which no business is being conducted other than operating the real property and activities incident thereto. The intent of this exception is to reach the single-asset apartment type cases which involve primarily tax-shelter investments and for which the bankruptcy laws have provided a too facile method to relay conditions, but not the operating shopping center and hotel cases where attempts at reorganization should be permitted. Property in which the debtor has equity but which is not necessary to an effective reorganization of the debtor should be sold under section 363. Hearings under this subsection are given calendar priority to ensure that court congestion will not unduly prejudice the rights of creditors who may be obviously entitled to relief from the operation of the automatic stay.

Subsection (e) provides protection that is not always available under present law. The subsection sets a time

certain within which the bankruptcy court must rule on the adequacy of protection provided for the secured creditor's interest. If the court does not rule within 30 days from a request by motion for relief from the stay, the stay is automatically terminated with respect to the property in question. To accommodate more complex cases, the subsection permits the court to make a preliminary ruling after a preliminary hearing. After a preliminary hearing, the court may continue the stay only if there is a reasonable likelihood that the party opposing relief from the stay will prevail at the final hearing. Because the stay is essentially an injunction, the three stages of the stay may be analogized to the three stages of an injunction. The filing of the petition which gives rise to the automatic stay is similar to a temporary restraining order. The preliminary hearing is similar to the hearing on a preliminary injunction, and the final hearing and order are similar to the hearing and issuance or denial of a permanent injunction. The main difference lies in which party must bring the issue before the court. While in the injunction setting, the party seeking the injunction must prosecute the action, in proceeding for relief from the automatic stay, the enjoined party must move. The difference does not, however, shift the burden of proof. Subsection (g) leaves that burden on the party opposing relief from the stay (that is, on the party seeking continuance of the injunction) on the issue of adequate protection and existence of an equity. It is not, however, intended to be confined strictly to the constitutional requirement. This section and the concept of adequate protection are based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the policy of the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interest where such steps are a necessary part of the rehabilitative process. Though the creditor might not be able to retain his lien upon the specific collateral held at the time of filing, the purpose of the section is to insure that the secured creditor receives the value for which he bargained.

The section specifies two exclusive means of providing adequate protection, both of which may require an approximate determination of the value of the protected entity's interest in the property involved. The section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development. In light of the restrictive approach of the section to the availability of means of providing adequate protection, this flexibility is important to permit the courts to adapt to varying circumstances and changing modes of financing.

Neither is it expected that the courts will construe the term value to mean, in every case, forced sale liquidation value or full going concern value. There is wide latitude between those two extremes although forced sale liquidation value will be a minimum.

In any particular case, especially a reorganization case, the determination of which entity should be entitled to the difference between the going concern value and the liquidation value must be based on equitable considerations arising from the facts of the case. Finally, the determination of value is binding only for the purposes of the specific hearing and is not to have a res judicata effect.

The first method of adequate protection outlined is the making of cash payments to compensate for the expected decrease in value of the opposing entity's interest. This provision is derived from *In re Bermec Corporation*, 445 F.2d 367 (2d Cir. 1971), though in that case it is not clear whether the payments offered were adequate to compensate the secured creditors for their loss. The use of periodic payments may be appropriate where, for example, the property in question is depreciating at a relatively fixed rate. The periodic payments would be

to compensate for the depreciation and might, but need not necessarily, be in the same amount as payments due on the secured obligation.

The second method is the fixing of an additional or replacement lien on other property of the debtor to the extent of the decrease in value or actual consumption of the property involved. The purpose of this method is to provide the protected entity with an alternative means of realizing the value of the original property, if it should decline during the case, by granting an interest in additional property from whose value the entity may realize its loss. This is consistent with the view expressed in *Wright v. Union Central Life Ins. Co.*, 311 U.S. 273 (1940), where the Court suggested that it was the value of the secured creditor's collateral, and not necessarily his rights in specific collateral, that was entitled to protection.

The section makes no provision for the granting of an administrative priority as a method of providing adequate protection to an entity as was suggested in *In re Yale Express System, Inc.*, 384 F.2d 990 (2d Cir. 1967), because such protection is too uncertain to be meaningful.

HOUSE REPORT NO. 95–595

The section specifies four means of providing adequate protection. They are neither exclusive nor exhaustive. They all rely, however, on the value of the protected entity's interest in the property involved. The section does not specify how value is to be determined, nor does it specify when it is to be determined. These matters are left to case-by-case interpretation and development. It is expected that the courts will apply the concept in light of facts of each case and general equitable principles. It is not intended that the courts will develop a hard and fast rule that will apply in every case. The time and method of valuation is not specified precisely, in order to avoid that result. There are an infinite number of variations possible in dealings between debtors and creditors, the law is continually developing, and new ideas are continually being implemented in this field. The flexibility is important to permit the courts to adapt to varying circumstances and changing modes of financing.

Neither is it expected that the courts will construe the term value to mean, in every case, forced sale liquidation value or full going concern value. There is wide latitude between those two extremes. In any particular case, especially a reorganization case, the determination of which entity should be entitled to the difference between the going concern value and the liquidation value must be based on equitable considerations based on the facts of the case. It will frequently be based on negotiation between the parties. Only if they cannot agree will the court become involved.

The first method of adequate protection specified is periodic cash payments by the estate, to the extent of a decrease in value of the opposing entity's interest in the property involved. This provision is derived from *In re Yale Express, Inc.*, 384 F.2d 990 (2d Cir. 1967) (though in that case it is not clear whether the payments required were adequate to compensate the secured creditors for their loss). The use of periodic payments may be appropriate, where for example, the property in question is depreciating at a relatively fixed rate. The periodic payments would be to compensate for the depreciation.

The second method is the provision of an additional or replacement lien on other property to the extent of the decrease in value of the property involved. The purpose of this method is to provide the protected entity with a means of realizing the value of the original property, if it should decline during the case, by granting an interest in additional property from whose value the entity may realize its loss.

The third method is the granting of an administrative expense priority to the protected entity to the extent of his loss. This method, more than the others, requires a prediction as to whether the unencumbered assets that will remain if the case if converted from reor-

ganization to liquidation will be sufficient to pay the protected entity in full. It is clearly the most risky, from the entity's perspective, and should be used only when there is relative certainty that administrative expenses will be able to be paid in full in the event of liquidation.

The fourth [enacted as third] method gives the parties and the courts flexibility by allowing such other relief as will result in the realization by the protected entity of the value of its interest in the property involved. Under this provision, the courts will be able to adapt to new methods of financing and to formulate protection that is appropriate to the circumstances of the case if none of the other methods would accomplish the desired result. For example, another form of adequate protection might be the guarantee by a third party outside the judicial process of compensation for any loss incurred in the case. Adequate protection might also, in some circumstances, be provided by permitting a secured creditor to bid in his claim at the sale of the property and to offset the claim against the price bid in.

The paragraph also defines, more clearly than the others, the general concept of adequate protection, by requiring such relief as will result in the realization of value. It is the general category, and as such, is defined by the concept involved rather than any particular method of adequate protection.

#### Editorial Notes

##### AMENDMENTS

1984—Par. (1). Pub. L. 98–353 inserted ''a cash payment or'' after ''make''.

#### Statutory Notes and Related Subsidiaries

##### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

## § 362. Automatic stay

(a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning a tax liability of a debtor that is a corporation for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title.

(b) The filing of a petition under section 301, 302, or 303 of this title, or of an application under section 5(a)(3) of the Securities Investor Protection Act of 1970, does not operate as a stay—

(1) under subsection (a) of this section, of the commencement or continuation of a criminal action or proceeding against the debtor;

(2) under subsection (a)—

(A) of the commencement or continuation of a civil action or proceeding—

(i) for the establishment of paternity;

(ii) for the establishment or modification of an order for domestic support obligations;

(iii) concerning child custody or visitation;

(iv) for the dissolution of a marriage, except to the extent that such proceeding seeks to determine the division of property that is property of the estate; or

(v) regarding domestic violence;

(B) of the collection of a domestic support obligation from property that is not property of the estate;

(C) with respect to the withholding of income that is property of the estate or property of the debtor for payment of a domestic support obligation under a judicial or administrative order or a statute;

(D) of the withholding, suspension, or restriction of a driver's license, a professional or occupational license, or a recreational license, under State law, as specified in section 466(a)(16) of the Social Security Act;

(E) of the reporting of overdue support owed by a parent to any consumer reporting agency as specified in section 466(a)(7) of the Social Security Act;

(F) of the interception of a tax refund, as specified in sections 464 and 466(a)(3) of the Social Security Act or under an analogous State law; or

(G) of the enforcement of a medical obligation, as specified under title IV of the Social Security Act;

(3) under subsection (a) of this section, of any act to perfect, or to maintain or continue the perfection of, an interest in property to the extent that the trustee's rights and powers are subject to such perfection under section 546(b) of this title or to the extent that such act is accomplished within the period provided under section 547(e)(2)(A) of this title;

(4) under paragraph (1), (2), (3), or (6) of subsection (a) of this section, of the commencement or continuation of an action or proceeding by a governmental unit or any organi-

zation exercising authority under the Convention on the Prohibition of the Development, Production, Stockpiling and Use of Chemical Weapons and on Their Destruction, opened for signature on January 13, 1993, to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power;

[(5) Repealed. Pub. L. 105–277, div. I, title VI, §603(1), Oct. 21, 1998, 112 Stat. 2681–866;]

(6) under subsection (a) of this section, of the exercise by a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency of any contractual right (as defined in section 555 or 556) under any security agreement or arrangement or other credit enhancement forming a part of or related to any commodity contract, forward contract or securities contract, or of any contractual right (as defined in section 555 or 556) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such contracts, including any master agreement for such contracts;

(7) under subsection (a) of this section, of the exercise by a repo participant or financial participant of any contractual right (as defined in section 559) under any security agreement or arrangement or other credit enhancement forming a part of or related to any repurchase agreement, or of any contractual right (as defined in section 559) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements;

(8) under subsection (a) of this section, of the commencement of any action by the Secretary of Housing and Urban Development to foreclose a mortgage or deed of trust in any case in which the mortgage or deed of trust held by the Secretary is insured or was formerly insured under the National Housing Act and covers property, or combinations of property, consisting of five or more living units;

(9) under subsection (a), of—

(A) an audit by a governmental unit to determine tax liability;

(B) the issuance to the debtor by a governmental unit of a notice of tax deficiency;

(C) a demand for tax returns; or

(D) the making of an assessment for any tax and issuance of a notice and demand for payment of such an assessment (but any tax lien that would otherwise attach to property of the estate by reason of such an assessment shall not take effect unless such tax is a debt of the debtor that will not be discharged in the case and such property or its proceeds are transferred out of the estate to, or otherwise revested in, the debtor).

(10) under subsection (a) of this section, of any act by a lessor to the debtor under a lease of nonresidential real property that has termi-

nated by the expiration of the stated term of the lease before the commencement of or during a case under this title to obtain possession of such property;

(11) under subsection (a) of this section, of the presentment of a negotiable instrument and the giving of notice of and protesting dishonor of such an instrument;

(12) under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Transportation under section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage, or a security interest in or relating to a vessel or vessel under construction, held by the Secretary of Transportation under chapter 537 of title 46 or section 109(h) of title 49, or under applicable State law;

(13) under subsection (a) of this section, after the date which is 90 days after the filing of such petition, of the commencement or continuation, and conclusion to the entry of final judgment, of an action which involves a debtor subject to reorganization pursuant to chapter 11 of this title and which was brought by the Secretary of Commerce under section 31325 of title 46 (including distribution of any proceeds of sale) to foreclose a preferred ship or fleet mortgage in a vessel or a mortgage, deed of trust, or other security interest in a fishing facility held by the Secretary of Commerce under chapter 537 of title 46;

(14) under subsection (a) of this section, of any action by an accrediting agency regarding the accreditation status of the debtor as an educational institution;

(15) under subsection (a) of this section, of any action by a State licensing body regarding the licensure of the debtor as an educational institution;

(16) under subsection (a) of this section, of any action by a guaranty agency, as defined in section 435(j) of the Higher Education Act of 1965 or the Secretary of Education regarding the eligibility of the debtor to participate in programs authorized under such Act;

(17) under subsection (a) of this section, of the exercise by a swap participant or financial participant of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement, or of any contractual right (as defined in section 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements;

(18) under subsection (a) of this section, of the creation or perfection of a statutory lien for an ad valorem property tax, or a special tax or special assessment on real property whether or not ad valorem, imposed by a governmental unit, if such tax or assessment comes due after the date of the filing of the petition;

(19) under subsection (a), of withholding of income from a debtor's wages and collection of amounts withheld, under the debtor's agreement authorizing that withholding and collection for the benefit of a pension, profit-sharing, stock bonus, or other plan established under section 401, 403, 408, 408A, 414, 457, or 501(c) of the Internal Revenue Code of 1986, that is sponsored by the employer of the debtor, or an affiliate, successor, or predecessor of such employer—

(A) to the extent that the amounts withheld and collected are used solely for payments relating to a loan from a plan under section 408(b)(1) of the Employee Retirement Income Security Act of 1974 or is subject to section 72(p) of the Internal Revenue Code of 1986; or

(B) a loan from a thrift savings plan permitted under subchapter III of chapter 84 of title 5, that satisfies the requirements of section 8433(g) of such title;

but nothing in this paragraph may be construed to provide that any loan made under a governmental plan under section 414(d), or a contract or account under section 403(b), of the Internal Revenue Code of 1986 constitutes a claim or a debt under this title;

(20) under subsection (a), of any act to enforce any lien against or security interest in real property following entry of the order under subsection (d)(4) as to such real property in any prior case under this title, for a period of 2 years after the date of the entry of such an order, except that the debtor, in a subsequent case under this title, may move for relief from such order based upon changed circumstances or for other good cause shown, after notice and a hearing;

(21) under subsection (a), of any act to enforce any lien against or security interest in real property—

(A) if the debtor is ineligible under section 109(g) to be a debtor in a case under this title; or

(B) if the case under this title was filed in violation of a bankruptcy court order in a prior case under this title prohibiting the debtor from being a debtor in another case under this title;

(22) subject to subsection (l), under subsection (a)(3), of the continuation of any eviction, unlawful detainer action, or similar proceeding by a lessor against a debtor involving residential property in which the debtor resides as a tenant under a lease or rental agreement and with respect to which the lessor has obtained before the date of the filing of the bankruptcy petition, a judgment for possession of such property against the debtor;

(23) subject to subsection (m), under subsection (a)(3), of an eviction action that seeks possession of the residential property in which the debtor resides as a tenant under a lease or rental agreement based on endangerment of such property or the illegal use of controlled substances on such property, but only if the lessor files with the court, and serves upon the debtor, a certification under penalty of perjury that such an eviction action has been filed, or that the debtor, during the 30-day period preceding the date of the filing of the certification, has endangered property or illegally used or allowed to be used a controlled substance on the property;

(24) under subsection (a), of any transfer that is not avoidable under section 544 and that is not avoidable under section 549;

(25) under subsection (a), of—

(A) the commencement or continuation of an investigation or action by a securities self regulatory organization to enforce such organization's regulatory power;

(B) the enforcement of an order or decision, other than for monetary sanctions, obtained in an action by such securities self regulatory organization to enforce such organization's regulatory power; or

(C) any act taken by such securities self regulatory organization to delist, delete, or refuse to permit quotation of any stock that does not meet applicable regulatory requirements;

(26) under subsection (a), of the setoff under applicable nonbankruptcy law of an income tax refund, by a governmental unit, with respect to a taxable period that ended before the date of the order for relief against an income tax liability for a taxable period that also ended before the date of the order for relief, except that in any case in which the setoff of an income tax refund is not permitted under applicable nonbankruptcy law because of a pending action to determine the amount or legality of a tax liability, the governmental unit may hold the refund pending the resolution of the action, unless the court, on the motion of the trustee and after notice and a hearing, grants the taxing authority adequate protection (within the meaning of section 361) for the secured claim of such authority in the setoff under section 506(a);

(27) under subsection (a) of this section, of the exercise by a master netting agreement participant of any contractual right (as defined in section 555, 556, 559, or 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any master netting agreement, or of any contractual right (as defined in section 555, 556, 559, or 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such master netting agreements to the extent that such participant is eligible to exercise such rights under paragraph (6), (7), or (17) for each individual contract covered by the master netting agreement in issue;

(28) under subsection (a), of the exclusion by the Secretary of Health and Human Services of the debtor from participation in the medicare program or any other Federal health care program (as defined in section 1128B(f) of the Social Security Act pursuant to title XI or XVIII of such Act); and

(29) under subsection (a)(1) of this section, of any action by—

(A) an amateur sports organization, as defined in section 220501(b) of title 36, to replace a national governing body, as defined

in that section, under section 220528 of that title; or

(B) the corporation, as defined in section 220501(b) of title 36, to revoke the certification of a national governing body, as defined in that section, under section 220521 of that title.

The provisions of paragraphs (12) and (13) of this subsection shall apply with respect to any such petition filed on or before December 31, 1989.

(c) Except as provided in subsections (d), (e), (f), and (h) of this section—

(1) the stay of an act against property of the estate under subsection (a) of this section continues until such property is no longer property of the estate;

(2) the stay of any other act under subsection (a) of this section continues until the earliest of—

(A) the time the case is closed;

(B) the time the case is dismissed; or

(C) if the case is a case under chapter 7 of this title concerning an individual or a case under chapter 9, 11, 12, or 13 of this title, the time a discharge is granted or denied;

(3) if a single or joint case is filed by or against a debtor who is an individual in a case under chapter 7, 11, or 13, and if a single or joint case of the debtor was pending within the preceding 1-year period but was dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under section 707(b)—

(A) the stay under subsection (a) with respect to any action taken with respect to a debt or property securing such debt or with respect to any lease shall terminate with respect to the debtor on the 30th day after the filing of the later case;

(B) on the motion of a party in interest for continuation of the automatic stay and upon notice and a hearing, the court may extend the stay in particular cases as to any or all creditors (subject to such conditions or limitations as the court may then impose) after notice and a hearing completed before the expiration of the 30-day period only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed; and

(C) for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such presumption may be rebutted by clear and convincing evidence to the contrary)—

(i) as to all creditors, if—

(I) more than 1 previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was pending within the preceding 1-year period;

(II) a previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was dismissed within such 1-year period, after the debtor failed to—

(aa) file or amend the petition or other documents as required by this title or the court without substantial excuse (but mere inadvertence or negligence shall not be a substantial excuse unless the dismissal was caused by the negligence of the debtor's attorney);

(bb) provide adequate protection as ordered by the court; or

(cc) perform the terms of a plan confirmed by the court; or

(III) there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under chapter 7, 11, or 13 or any other reason to conclude that the later case will be concluded—

(aa) if a case under chapter 7, with a discharge; or

(bb) if a case under chapter 11 or 13, with a confirmed plan that will be fully performed; and

(ii) as to any creditor that commenced an action under subsection (d) in a previous case in which the individual was a debtor if, as of the date of dismissal of such case, that action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to actions of such creditor; and

(4)(A)(i) if a single or joint case is filed by or against a debtor who is an individual under this title, and if 2 or more single or joint cases of the debtor were pending within the previous year but were dismissed, other than a case refiled under a chapter other than chapter 7 after dismissal under section 707(b), the stay under subsection (a) shall not go into effect upon the filing of the later case; and

(ii) on request of a party in interest, the court shall promptly enter an order confirming that no stay is in effect;

(B) if, within 30 days after the filing of the later case, a party in interest requests the court may order the stay to take effect in the case as to any or all creditors (subject to such conditions or limitations as the court may impose), after notice and a hearing, only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed;

(C) a stay imposed under subparagraph (B) shall be effective on the date of the entry of the order allowing the stay to go into effect; and

(D) for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such presumption may be rebutted by clear and convincing evidence to the contrary)—

(i) as to all creditors if—

(I) 2 or more previous cases under this title in which the individual was a debtor were pending within the 1-year period;

(II) a previous case under this title in which the individual was a debtor was dismissed within the time period stated in this paragraph after the debtor failed to file or amend the petition or other documents as required by this title or the court without substantial excuse (but mere inadvertence or negligence shall not be substantial excuse unless the dismissal was caused by the negligence of the debtor's attorney), failed to provide adequate protection as ordered by the court, or failed to perform the terms of a plan confirmed by the court; or

(III) there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under this title, or any other reason to conclude that the later case will not be concluded, if a case under chapter 7, with a discharge, and if a case under chapter 11 or 13, with a confirmed plan that will be fully performed; or

(ii) as to any creditor that commenced an action under subsection (d) in a previous case in which the individual was a debtor if, as of the date of dismissal of such case, such action was still pending or had been resolved by terminating, conditioning, or limiting the stay as to such action of such creditor.

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization;

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

(B) the debtor has commenced monthly payments that—

(i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

(ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate; or

(4) with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either—

(A) transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or

(B) multiple bankruptcy filings affecting such real property.

If recorded in compliance with applicable State laws governing notices of interests or liens in real property, an order entered under paragraph (4) shall be binding in any other case under this title purporting to affect such real property filed not later than 2 years after the date of the entry of such order by the court, except that a debtor in a subsequent case under this title may move for relief from such order based upon changed circumstances or for good cause shown, after notice and a hearing. Any Federal, State, or local governmental unit that accepts notices of interests or liens in real property shall accept any certified copy of an order described in this subsection for indexing and recording.

(e)(1) Thirty days after a request under subsection (d) of this section for relief from the stay of any act against property of the estate under subsection (a) of this section, such stay is terminated with respect to the party in interest making such request, unless the court, after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination under subsection (d) of this section. A hearing under this subsection may be a preliminary hearing, or may be consolidated with the final hearing under subsection (d) of this section. The court shall order such stay continued in effect pending the conclusion of the final hearing under subsection (d) of this section if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing. If the hearing under this subsection is a preliminary hearing, then such final hearing shall be concluded not later than thirty days after the conclusion of such preliminary hearing, unless the 30-day period is extended with the consent of the parties in interest or for a specific time which the court finds is required by compelling circumstances.

(2) Notwithstanding paragraph (1), in a case under chapter 7, 11, or 13 in which the debtor is an individual, the stay under subsection (a) shall terminate on the date that is 60 days after a request is made by a party in interest under subsection (d), unless—

(A) a final decision is rendered by the court during the 60-day period beginning on the date of the request; or

(B) such 60-day period is extended—

(i) by agreement of all parties in interest; or

(ii) by the court for such specific period of time as the court finds is required for good cause, as described in findings made by the court.

(f) Upon request of a party in interest, the court, with or without a hearing, shall grant such relief from the stay provided under subsection (a) of this section as is necessary to prevent irreparable damage to the interest of an entity in property, if such interest will suffer such damage before there is an opportunity for notice and a hearing under subsection (d) or (e) of this section.

(g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section—

(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues.

(h)(1) In a case in which the debtor is an individual, the stay provided by subsection (a) is terminated with respect to personal property of the estate or of the debtor securing in whole or in part a claim, or subject to an unexpired lease, and such personal property shall no longer be property of the estate if the debtor fails within the applicable time set by section 521(a)(2)—

(A) to file timely any statement of intention required under section 521(a)(2) with respect to such personal property or to indicate in such statement that the debtor will either surrender such personal property or retain it and, if retaining such personal property, either redeem such personal property pursuant to section 722, enter into an agreement of the kind specified in section 524(c) applicable to the debt secured by such personal property, or assume such unexpired lease pursuant to section 365(p) if the trustee does not do so, as applicable; and

(B) to take timely the action specified in such statement, as it may be amended before expiration of the period for taking action, unless such statement specifies the debtor's intention to reaffirm such debt on the original contract terms and the creditor refuses to agree to the reaffirmation on such terms.

(2) Paragraph (1) does not apply if the court determines, on the motion of the trustee filed before the expiration of the applicable time set by section 521(a)(2), after notice and a hearing, that such personal property is of consequential value or benefit to the estate, and orders appropriate adequate protection of the creditor's interest, and orders the debtor to deliver any collateral in the debtor's possession to the trustee. If the court does not so determine, the stay provided by subsection (a) shall terminate upon the conclusion of the hearing on the motion.

(i) If a case commenced under chapter 7, 11, or 13 is dismissed due to the creation of a debt repayment plan, for purposes of subsection (c)(3), any subsequent case commenced by the debtor under any such chapter shall not be presumed to be filed not in good faith.

(j) On request of a party in interest, the court shall issue an order under subsection (c) confirming that the automatic stay has been terminated.

(k)(1) Except as provided in paragraph (2), an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages.

(2) If such violation is based on an action taken by an entity in the good faith belief that subsection (h) applies to the debtor, the recovery under paragraph (1) of this subsection against such entity shall be limited to actual damages.

(l)(1) Except as otherwise provided in this subsection, subsection (b)(22) shall apply on the date that is 30 days after the date on which the bankruptcy petition is filed, if the debtor files with the petition and serves upon the lessor a certification under penalty of perjury that—

(A) under nonbankruptcy law applicable in the jurisdiction, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after that judgment for possession was entered; and

(B) the debtor (or an adult dependent of the debtor) has deposited with the clerk of the court, any rent that would become due during the 30-day period after the filing of the bankruptcy petition.

(2) If, within the 30-day period after the filing of the bankruptcy petition, the debtor (or an adult dependent of the debtor) complies with paragraph (1) and files with the court and serves upon the lessor a further certification under penalty of perjury that the debtor (or an adult dependent of the debtor) has cured, under nonbankruptcy law applicable in the jurisdiction, the entire monetary default that gave rise to the judgment under which possession is sought by the lessor, subsection (b)(22) shall not apply, unless ordered to apply by the court under paragraph (3).

(3)(A) If the lessor files an objection to any certification filed by the debtor under paragraph (1) or (2), and serves such objection upon the debtor, the court shall hold a hearing within 10 days after the filing and service of such objection to determine if the certification filed by the debtor under paragraph (1) or (2) is true.

(B) If the court upholds the objection of the lessor filed under subparagraph (A)—

(i) subsection (b)(22) shall apply immediately and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and

(ii) the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the court's order upholding the lessor's objection.

(4) If a debtor, in accordance with paragraph (5), indicates on the petition that there was a judgment for possession of the residential rental property in which the debtor resides and does not file a certification under paragraph (1) or (2)—

(A) subsection (b)(22) shall apply immediately upon failure to file such certification, and relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to complete the process to recover full possession of the property; and

(B) the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the docket indicating the absence of a filed certification and the applicability of the exception to the stay under subsection (b)(22).

(5)(A) Where a judgment for possession of residential property in which the debtor resides as a tenant under a lease or rental agreement has been obtained by the lessor, the debtor shall so

indicate on the bankruptcy petition and shall provide the name and address of the lessor that obtained that pre-petition judgment on the petition and on any certification filed under this subsection.

(B) The form of certification filed with the petition, as specified in this subsection, shall provide for the debtor to certify, and the debtor shall certify—

(i) whether a judgment for possession of residential rental housing in which the debtor resides has been obtained against the debtor before the date of the filing of the petition; and

(ii) whether the debtor is claiming under paragraph (1) that under nonbankruptcy law applicable in the jurisdiction, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after that judgment of possession was entered, and has made the appropriate deposit with the court.

(C) The standard forms (electronic and otherwise) used in a bankruptcy proceeding shall be amended to reflect the requirements of this subsection.

(D) The clerk of the court shall arrange for the prompt transmittal of the rent deposited in accordance with paragraph (1)(B) to the lessor.

(m)(1) Except as otherwise provided in this subsection, subsection (b)(23) shall apply on the date that is 15 days after the date on which the lessor files and serves a certification described in subsection (b)(23).

(2)(A) If the debtor files with the court an objection to the truth or legal sufficiency of the certification described in subsection (b)(23) and serves such objection upon the lessor, subsection (b)(23) shall not apply, unless ordered to apply by the court under this subsection.

(B) If the debtor files and serves the objection under subparagraph (A), the court shall hold a hearing within 10 days after the filing and service of such objection to determine if the situation giving rise to the lessor's certification under paragraph (1) existed or has been remedied.

(C) If the debtor can demonstrate to the satisfaction of the court that the situation giving rise to the lessor's certification under paragraph (1) did not exist or has been remedied, the stay provided under subsection (a)(3) shall remain in effect until the termination of the stay under this section.

(D) If the debtor cannot demonstrate to the satisfaction of the court that the situation giving rise to the lessor's certification under paragraph (1) did not exist or has been remedied—

(i) relief from the stay provided under subsection (a)(3) shall not be required to enable the lessor to proceed with the eviction; and

(ii) the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the court's order upholding the lessor's certification.

(3) If the debtor fails to file, within 15 days, an objection under paragraph (2)(A)—

(A) subsection (b)(23) shall apply immediately upon such failure and relief from the stay provided under subsection (a)(3) shall not

be required to enable the lessor to complete the process to recover full possession of the property; and

(B) the clerk of the court shall immediately serve upon the lessor and the debtor a certified copy of the docket indicating such failure.

(n)(1) Except as provided in paragraph (2), subsection (a) does not apply in a case in which the debtor—

(A) is a debtor in a small business case pending at the time the petition is filed;

(B) was a debtor in a small business case that was dismissed for any reason by an order that became final in the 2-year period ending on the date of the order for relief entered with respect to the petition;

(C) was a debtor in a small business case in which a plan was confirmed in the 2-year period ending on the date of the order for relief entered with respect to the petition; or

(D) is an entity that has acquired substantially all of the assets or business of a small business debtor described in subparagraph (A), (B), or (C), unless such entity establishes by a preponderance of the evidence that such entity acquired substantially all of the assets or business of such small business debtor in good faith and not for the purpose of evading this paragraph.

(2) Paragraph (1) does not apply—

(A) to an involuntary case involving no collusion by the debtor with creditors; or

(B) to the filing of a petition if—

(i) the debtor proves by a preponderance of the evidence that the filing of the petition resulted from circumstances beyond the control of the debtor not foreseeable at the time the case then pending was filed; and

(ii) it is more likely than not that the court will confirm a feasible plan, but not a liquidating plan, within a reasonable period of time.

(o) The exercise of rights not subject to the stay arising under subsection (a) pursuant to paragraph (6), (7), (17), or (27) of subsection (b) shall not be stayed by any order of a court or administrative agency in any proceeding under this title.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2570; Pub. L. 97–222, §3, July 27, 1982, 96 Stat. 235; Pub. L. 98–353, title III, §§304, 363(b), 392, 441, July 10, 1984, 98 Stat. 352, 363, 365, 371; Pub. L. 99–509, title V, §5001(a), Oct. 21, 1986, 100 Stat. 1911; Pub. L. 99–554, title II, §§257(j), 283(d), Oct. 27, 1986, 100 Stat. 3115, 3116; Pub. L. 101–311, title I, §102, title II, §202, June 25, 1990, 104 Stat. 267, 269; Pub. L. 101–508, title III, §3007(a)(1), Nov. 5, 1990, 104 Stat. 1388–28; Pub. L. 103–394, title I, §§101, 116, title II, §§204(a), 218(b), title III, §304(b), title IV, §401, title V, §501(b)(2), (d)(7), Oct. 22, 1994, 108 Stat. 4107, 4119, 4122, 4128, 4132, 4141, 4142, 4144; Pub. L. 105–277, div. I, title VI, §603, Oct. 21, 1998, 112 Stat. 2681–886; Pub. L. 109–8, title I, §106(f), title II, §§214, 224(b), title III, §§302, 303, 305(1), 311, 320, title IV, §§401(b), 441, 444, title VII, §§709, 718, title IX, §907(d), (o)(1), (2), title XI, §1106, title XII, §1225, Apr. 20, 2005, 119 Stat. 41, 54, 64, 75, 77, 79, 84, 94, 104, 114, 117, 127, 131, 176,

181, 182, 192, 199; Pub. L. 109–304, § 17(b)(1), Oct. 6, 2006, 120 Stat. 1706; Pub. L. 109–390, § 5(a)(2), Dec. 12, 2006, 120 Stat. 2696; Pub. L. 111–327, § 2(a)(12), Dec. 22, 2010, 124 Stat. 3558; Pub. L. 116–189, § 9, Oct. 30, 2020, 134 Stat. 970.)

### HISTORICAL AND REVISION NOTES

#### LEGISLATIVE STATEMENTS

Section 362(a)(1) of the House amendment adopts the provision contained in the Senate amendment enjoining the commencement or continuation of a judicial, administrative, or other proceeding to recover a claim against the debtor that arose before the commencement of the case. The provision is beneficial and interacts with section 362(a)(6), which also covers assessment, to prevent harassment of the debtor with respect to pre-petition claims.

Section 362(a)(7) contains a provision contained in H.R. 8200 as passed by the House. The differing provision in the Senate amendment was rejected. It is not possible that a debt owing to the debtor may be offset against an interest in the debtor.

Section 362(a)(8) is new. The provision stays the commencement or continuation of any proceeding concerning the debtor before the U.S. Tax Court.

Section 362(b)(4) indicates that the stay under section 362(a)(1) does not apply to affect the commencement or continuation of an action or proceeding by a governmental unit to enforce the governmental unit's police or regulatory power. This section is intended to be given a narrow construction in order to permit governmental units to pursue actions to protect the public health and safety and not to apply to actions by a governmental unit to protect a pecuniary interest in property of the debtor or property of the estate.

Section 362(b)(6) of the House amendment adopts a provision contained in the Senate amendment restricting the exception to the automatic stay with respect to setoffs to permit only the setoff of mutual debts and claims. Traditionally, the right of setoff has been limited to mutual debts and claims and the lack of the clarifying term "mutual" in H.R. 8200 as passed by the House created an unintentional ambiguity. Section 362(b)(7) of the House amendment permits the issuance of a notice of tax deficiency. The House amendment rejects section 362(b)(7) in the Senate amendment. It would have permitted a particular governmental unit to obtain a pecuniary advantage without a hearing on the merits contrary to the exceptions contained in sections 362(b)(4) and (5).

Section 362(d) of the House amendment represents a compromise between comparable provisions in the House bill and Senate amendment. Under section 362(d)(1) of the House amendment, the court may terminate, annul, modify, or condition the automatic stay for cause, including lack of adequate protection of an interest in property of a secured party. It is anticipated that the Rules of Bankruptcy Procedure will provide that those hearings will receive priority on the calendar. Under section 362(d)(2) the court may alternatively terminate, annul, modify, or condition the automatic stay for cause including inadequate protection for the creditor. The court shall grant relief from the stay if there is no equity and it is not necessary to an effective reorganization of the debtor.

The latter requirement is contained in section 362(d)(2). This section is intended to solve the problem of real property mortgage foreclosures of property where the bankruptcy petition is filed on the eve of foreclosure. The section is not intended to apply if the business of the debtor is managing or leasing real property, such as a hotel operation, even though the debtor has no equity if the property is necessary to an effective reorganization of the debtor. Similarly, if the debtor does have an equity in the property, there is no requirement that the property be sold under section 363 of title 11 as would have been required by the Senate amendment.

Section 362(e) of the House amendment represents a modification of provisions in H.R. 8200 as passed by the House and the Senate amendment to make clear that a final hearing must be commenced within 30 days after a preliminary hearing is held to determine whether a creditor will be entitled to relief from the automatic stay. In order to insure that those hearings will in fact occur within such 30-day period, it is anticipated that the rules of bankruptcy procedure provide that such final hearings receive priority on the court calendar.

Section 362(g) places the burden of proof on the issue of the debtor's equity in collateral on the party requesting relief from the automatic stay and the burden on other issues on the debtor.

An amendment has been made to section 362(b) to permit the Secretary of the Department of Housing and Urban Development to commence an action to foreclose a mortgage or deed of trust. The commencement of such an action is necessary for tax purposes. The section is not intended to permit the continuation of such an action after it is commenced nor is the section to be construed to entitle the Secretary to take possession in lieu of foreclosure.

Automatic stay: Sections 362(b)(8) and (9) contained in the Senate amendment are largely deleted in the House amendment. Those provisions add to the list of actions not stayed (a) jeopardy assessments, (b) other assessments, and (c) the issuance of deficiency notices. In the House amendment, jeopardy assessments against property which ceases to be property of the estate is already authorized by section 362(c)(1). Other assessments are specifically stayed under section 362(a)(6), while the issuance of a deficiency notice is specifically permitted. Stay of the assessment and the permission to issue a statutory notice of a tax deficiency will permit the debtor to take his personal tax case to the Tax Court, if the bankruptcy judge authorizes him to do so (as explained more fully in the discussion of section 505).

#### SENATE REPORT NO. 95–989

The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

The action commenced by the party seeking relief from the stay is referred to as a motion to make it clear that at the expedited hearing under subsection (e), and at hearings on relief from the stay, the only issue will be the lack of adequate protection, the debtor's equity in the property, and the necessity of the property to an effective reorganization of the debtor, or the existence of other cause for relief from the stay. This hearing will not be the appropriate time at which to bring in other issues, such as counterclaims against the creditor, which, although relevant to the question of the amount of the debt, concern largely collateral or unrelated matters. This approach is consistent with that taken in cases such as *In re Essex Properties, Ltd.*, 430 F.Supp. 1112 (N.D.Cal.1977), that an action seeking relief from the stay is not the assertion of a claim which would give rise to the right or obligation to assert counterclaims. Those counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be. Rather, they will be the subject of more complete proceedings by the trustee to recover property of the estate or to object to the allowance of a claim. However, this would not preclude the party seeking continuance of the stay from presenting evidence on the existence of claims which the court may consider in exercising its discretion. What is precluded is a determination of such collateral claims on the merits at the hearing.

#### HOUSE REPORT NO. 95–595

Paragraph (7) [of subsec. (a)] stays setoffs of mutual debts and credits between the debtor and creditors. As

with all other paragraphs of subsection (a), this paragraph does not affect the right of creditors. It simply stays its enforcement pending an orderly examination of the debtor's and creditors' rights.

Subsection (c) governs automatic termination of the stay. Subsections (d) through (g) govern termination of the stay by the court on the request of a party in interest. Subsection (d) requires the court, on request of a party in interest, to grant relief from the stay, such as by terminating, annulling, modifying, or conditioning the stay, for cause. The lack of adequate protection of an interest in property of the party requesting relief from the stay is one cause for relief, but is not the only cause. As noted above, a desire to permit an action to proceed to completion in another tribunal may provide another cause. Other causes might include the lack of any connection with or interference with the pending bankruptcy case. For example, a divorce or child custody proceeding involving the debtor may bear no relation to the bankruptcy case. In that case, it should not be stayed. A probate proceeding in which the debtor is the executor or administrator of another's estate usually will not be related to the bankruptcy case, and should not be stayed. Generally, proceedings in which the debtor is a fiduciary, or involving postpetition activities of the debtor, need not be stayed because they bear no relationship to the purpose of the automatic stay, which is debtor protection from his creditors. The facts of each request will determine whether relief is appropriate under the circumstances.

Subsection (e) provides a protection for secured creditors that is not available under present law. The subsection sets a time certain within which the bankruptcy court must rule on the adequacy of protection provided of the secured creditor's interest. If the court does not rule within 30 days from a request for relief from the stay, the stay is automatically terminated with respect to the property in question. In order to accommodate more complex cases, the subsection permits the court to make a preliminary ruling after a preliminary hearing. After a preliminary hearing, the court may continue the stay only if there is a reasonable likelihood that the party opposing relief from the stay will prevail at the final hearing. Because the stay is essentially an injunction, the three stages of the stay may be analogized to the three stages of an injunction. The filing of the petition which gives rise to the automatic stay is similar to a temporary restraining order. The preliminary hearing is similar to the hearing on a preliminary injunction, and the final hearing and order is similar to a permanent injunction. The main difference lies in which party must bring the issue before the court. While in the injunction setting, the party seeking the injunction must prosecute the action, in proceedings for relief from the automatic stay, the enjoined party must move. The difference does not, however, shift the burden of proof. Subsection (g) leaves that burden on the party opposing relief from the stay (that is, on the party seeking continuance of the injunction) on the issue of adequate protection.

At the expedited hearing under subsection (e), and at all hearings on relief from the stay, the only issue will be the claim of the creditor and the lack of adequate protection or existence of other cause for relief from the stay. This hearing will not be the appropriate time at which to bring in other issues, such as counterclaims against the creditor on largely unrelated matters. Those counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be. Rather, they will be the subject of more complete proceedings by the trustees to recover property of the estate or to object to the allowance of a claim.

## Editorial Notes

### REFERENCES IN TEXT

Section 5(a)(3) of the Securities Investor Protection Act of 1970, referred to in subsecs. (a) and (b), is classified to section 78eee(a)(3) of Title 15, Commerce and Trade.

The Social Security Act, referred to in subsec. (b)(2)(D) to (G), (28), is act Aug. 14, 1935, ch. 531, 49 Stat. 620. Titles IV, XI, and XVIII of the Act are classified generally to subchapters IV (§601 et seq.), XI (§1301 et seq.), and XVIII (§1395 et seq.), respectively, of chapter 7 of Title 42. The Public Health and Welfare. Sections 464, 466, and 1128B of the Act are classified to sections 664, 666, and 1320a–7b, respectively, of Title 42. For complete classification of this Act to the Code, see section 1305 of Title 42 and Tables.

The National Housing Act, referred to in subsec. (b)(8), is act June 27, 1934, ch. 847, 48 Stat. 1246, which is classified principally to chapter 13 (§1701 et seq.) of Title 12, Banks and Banking. For complete classification of this Act to the Code, see section 1701 of Title 12 and Tables.

The Higher Education Act of 1965, referred to in subsec. (b)(16), is Pub. L. 89–329, Nov. 8, 1965, 79 Stat. 1219, which is classified generally to chapter 28 (§1001 et seq.) of Title 20, Education. Section 435(j) of the Act is classified to section 1085(j) of Title 20. For complete classification of this Act to the Code, see Short Title note set out under section 1001 of Title 20 and Tables.

The Internal Revenue Code of 1986, referred to in subsec. (b)(19), is classified generally to Title 26, Internal Revenue Code.

Section 408(b)(1) of the Employee Retirement Income Security Act of 1974, referred to in subsec. (b)(19)(A), is classified to section 1108(b)(1) of Title 29, Labor.

### AMENDMENTS

2020—Subsec. (b)(29). Pub. L. 116–189 added par. (29).

2010—Subsec. (a)(8). Pub. L. 111–327, §2(a)(12)(A), substituted ''tax liability of a debtor that is a corporation'' for ''corporate debtor's tax liability''.

Subsec. (c)(3). Pub. L. 111–327, §2(a)(12)(B)(i), inserted ''a'' after ''against'' in introductory provisions.

Subsec. (c)(4)(A)(i). Pub. L. 111–327, §2(a)(12)(B)(ii), inserted ''under a chapter other than chapter 7 after dismissal'' after ''refiled''.

Subsec. (d)(4). Pub. L. 111–327, §2(a)(12)(C), substituted ''hinder, or'' for ''hinder, and'' in introductory provisions.

Subsec. (l)(2). Pub. L. 111–327, §2(a)(12)(D), substituted ''nonbankruptcy'' for ''nonbankruptcy''.

2006—Subsec. (b)(6), (7). Pub. L. 109–390, §5(a)(2)(A), added pars. (6) and (7) and struck out former pars. (6) and (7) which read as follows:

''(6) under subsection (a) of this section, of the setoff by a commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency of any mutual debt and claim under or in connection with commodity contracts, as defined in section 761 of this title, forward contracts, or securities contracts, as defined in section 741 of this title, that constitutes the setoff of a claim against the debtor for a margin payment, as defined in section 101, 741, or 761 of this title, or settlement payment, as defined in section 101 or 741 of this title, arising out of commodity contracts, forward contracts, or securities contracts against cash, securities, or other property held by, pledged to, under the control of, or due from such commodity broker, forward contract merchant, stockbroker, financial institution, financial participant, or securities clearing agency to margin, guarantee, secure, or settle commodity contracts, forward contracts, or securities contracts;

''(7) under subsection (a) of this section, of the setoff by a repo participant or financial participant, of any mutual debt and claim under or in connection with repurchase agreements that constitutes the setoff of a claim against the debtor for a margin payment, as defined in section 741 or 761 of this title, or settlement payment, as defined in section 741 of this title, arising out of repurchase agreements against cash, securities, or other property held by, pledged to, under the control of, or due from such repo participant or financial participant to margin, guarantee, secure or settle repurchase agreements;''.

Subsec. (b)(12). Pub. L. 109–304, § 17(b)(1)(A), substituted "chapter 537 of title 46 or section 109(h) of title 49" for "section 207 or title XI of the Merchant Marine Act, 1936".

Subsec. (b)(13). Pub. L. 109–304, § 17(b)(1)(B), substituted "chapter 537 of title 46" for "section 207 or title XI of the Merchant Marine Act, 1936".

Subsec. (b)(17). Pub. L. 109–390, § 5(a)(2)(B), added par. (17) and struck out former par. (17) which read as follows: "under subsection (a), of the setoff by a swap participant or financial participant of a mutual debt and claim under or in connection with one or more swap agreements that constitutes the setoff of a claim against the debtor for any payment or other transfer of property due from the debtor under or in connection with any swap agreement against any payment due to the debtor from the swap participant or financial participant under or in connection with any swap agreement or against cash, securities, or other property held by, pledged to, under the control of, or due from such swap participant or financial participant to margin, guarantee, secure, or settle any swap agreement;".

Subsec. (b)(27). Pub. L. 109–390, § 5(a)(2)(C), added par. (27) and struck out former par. (27) which read as follows: "under subsection (a), of the setoff by a master netting agreement participant of a mutual debt and claim under or in connection with one or more master netting agreements or any contract or agreement subject to such agreements that constitutes the setoff of a claim against the debtor for any payment or other transfer of property due from the debtor under or in connection with such agreements or any contract or agreement subject to such agreements against any payment due to the debtor from such master netting agreement participant under or in connection with such agreements or any contract or agreement subject to such agreements or against cash, securities, or other property held by, pledged to, under the control of, or due from such master netting agreement participant to margin, guarantee, secure, or settle such agreements or any contract or agreement subject to such agreements, to the extent that such participant is eligible to exercise such offset rights under paragraph (6), (7), or (17) for each individual contract covered by the master netting agreement in issue; and".

2005—Subsec. (a)(8). Pub. L. 109–8, § 709, substituted "a corporate debtor's tax liability for a taxable period the bankruptcy court may determine or concerning the tax liability of a debtor who is an individual for a taxable period ending before the date of the order for relief under this title" for "the debtor".

Subsec. (b)(2). Pub. L. 109–8, § 214, added par. (2) and struck out former par. (2) which read as follows: "under subsection (a) of this section—

    "(A) of the commencement or continuation of an action or proceeding for—

        "(i) the establishment of paternity; or

        "(ii) the establishment or modification of an order for alimony, maintenance, or support; or

    "(B) of the collection of alimony, maintenance, or support from property that is not property of the estate;".

Subsec. (b)(6). Pub. L. 109–8, § 907(d)(1)(A), (*o*)(1), substituted "financial institution, financial participant," for "financial institutions," in two places and inserted ", pledged to, under the control of," after "held by".

Subsec. (b)(7). Pub. L. 109–8, § 907(d)(1)(B), (*o*)(2), inserted "or financial participant" after "repo participant" in two places and ", pledged to, under the control of," after "held by".

Subsec. (b)(17). Pub. L. 109–8, § 907(d)(1)(C), added par. (17) and struck out former par. (17) which read as follows: "under subsection (a) of this section, of the setoff by a swap participant, of any mutual debt and claim under or in connection with any swap agreement that constitutes the setoff of a claim against the debtor for any payment due from the debtor under or in connection with any swap agreement against any payment due to the debtor from the swap participant under or in connection with any swap agreement or against cash,

securities, or other property held by or due from such swap participant to guarantee, secure or settle any swap agreement;".

Subsec. (b)(18). Pub. L. 109–8, § 1225, amended par. (18) generally. Prior to amendment, par. (18) read as follows: "under subsection (a) of the creation or perfection of a statutory lien for an ad valorem property tax imposed by the District of Columbia, or a political subdivision of a State, if such tax comes due after the filing of the petition;".

Subsec. (b)(19). Pub. L. 109–8, § 224(b), added par. (19).

Subsec. (b)(20), (21). Pub. L. 109–8, § 303(b), added pars. (20) and (21).

Subsec. (b)(22) to (24). Pub. L. 109–8, § 311(a), added pars. (22) to (24).

Subsec. (b)(25). Pub. L. 109–8, § 401(b), added par. (25).

Subsec. (b)(26). Pub. L. 109–8, § 718, added par. (26).

Subsec. (b)(27). Pub. L. 109–8, § 907(d)(1)(D), added par. (27).

Subsec. (b)(28). Pub. L. 109–8, § 1106, added par. (28).

Subsec. (c). Pub. L. 109–8, § 305(1)(A), substituted "(e), (f), and (h)" for "(e), and (f)" in introductory provisions.

Subsec. (c)(3), (4). Pub. L. 109–8, § 302, added pars. (3) and (4).

Subsec. (d). Pub. L. 109–8, § 303(a), added par. (4) and concluding provisions.

Subsec. (d)(3). Pub. L. 109–8, § 444(1), inserted "or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later" after "90-day period)" in introductory provisions.

Subsec. (d)(3)(B). Pub. L. 109–8, § 444(2), added subpar. (B) and struck out former subpar. (B) which read as follows: "the debtor has commenced monthly payments to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien), which payments are in an amount equal to interest at a current fair market rate on the value of the creditor's interest in the real estate; or".

Subsec. (e). Pub. L. 109–8, § 320, designated existing provisions as par. (1) and added par. (2).

Subsec. (h). Pub. L. 109–8, § 305(1)(C), added subsec. (h). Former subsec. (h) redesignated (k).

Subsecs. (i), (j). Pub. L. 109–8, § 106(f), added subsecs. (i) and (j).

Subsec. (k). Pub. L. 109–8, § 441(1), designated existing provisions as par. (1), substituted "Except as provided in paragraph (2), an" for "An", and added par. (2).

Pub. L. 109–8, § 305(1)(B), redesignated subsec. (h) as (k).

Subsecs. (*l*), (m). Pub. L. 109–8, § 311(b), added subsecs. (*l*) and (m).

Subsec. (n). Pub. L. 109–8, § 441(2), added subsec. (n).

Subsec. (*o*). Pub. L. 109–8, § 907(d)(2), added subsec. (*o*).

1998—Subsec. (b)(4), (5). Pub. L. 105–277 added par. (4) and struck out former pars. (4) and (5) which read as follows:

    "(4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

    "(5) under subsection (a)(2) of this section, of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;".

1994—Subsecs. (a), (b). Pub. L. 103–394, § 501(d)(7)(A), (B)(i), struck out "(15 U.S.C. 78eee(a)(3))" after "Act of 1970" in introductory provisions.

Subsec. (b)(2). Pub. L. 103–394, § 304(b), amended par. (2) generally. Prior to amendment, par. (2) read as follows: "under subsection (a) of this section, of the collection of alimony, maintenance, or support from property that is not property of the estate;".

Subsec. (b)(3). Pub. L. 103–394, § 204(a), inserted ", or to maintain or continue the perfection of," after "to perfect".

Subsec. (b)(6). Pub. L. 103–394, § 501(b)(2)(A), substituted "section 761" for "section 761(4)", "section 741

for "section 741(7)", "section 101, 741, or 761" for "section 101(34), 741(5), or 761(15)", and "section 101 or 741" for "section 101(35) or 741(8)".

Subsec. (b)(7). Pub. L. 103–394, §501(b)(2)(B), substituted "section 741 or 761" for "section 741(5) or 761(15)" and "section 741" for "section 741(8)".

Subsec. (b)(9). Pub. L. 103–394, §116, amended par. (9) generally. Prior to amendment, par. (9) read as follows: "under subsection (a) of this section, of the issuance to the debtor by a governmental unit of a notice of tax deficiency;".

Subsec. (b)(10). Pub. L. 103–394, §501(d)(7)(B)(ii), struck out "or" at end.

Subsec. (b)(12). Pub. L. 103–394, §501(d)(7)(B)(iii), substituted "section 31325 of title 46" for "the Ship Mortgage Act, 1920 (46 App. U.S.C. 911 et seq.)" and struck out "(46 App. U.S.C. 1117 and 1271 et seq., respectively)" after "Act, 1936".

Subsec. (b)(13). Pub. L. 103–394, §501(d)(7)(B)(iv), substituted "section 31325 of title 46" for "the Ship Mortgage Act, 1920 (46 App. U.S.C. 911 et seq.)" and struck out "(46 App. U.S.C. 1117 and 1271 et seq., respectively)" after "Act, 1936" and "or" at end.

Subsec. (b)(14). Pub. L. 103–394, §501(d)(7)(B)(vii), amended par. (14) relating to the setoff by a swap participant of any mutual debt and claim under or in connection with a swap agreement by substituting "; or" for period at end, redesignating par. (14) as (17), and inserting it after par. (16).

Subsec. (b)(15). Pub. L. 103–394, §501(d)(7)(B)(v), struck out "or" at end.

Subsec. (b)(16). Pub. L. 103–394, §501(d)(7)(B)(vi), struck out "(20 U.S.C. 1001 et seq.)" after "Act of 1965" and substituted semicolon for period at end.

Subsec. (b)(17). Pub. L. 103–394, §501(d)(7)(B)(vii)(I), (III), redesignated par. (14) relating to the setoff by a swap participant of any mutual debt and claim under or in connection with a swap agreement as (17) and inserted it after par. (16).

Subsec. (b)(18). Pub. L. 103–394, §401, added par. (18).

Subsec. (d)(3). Pub. L. 103–394, §218(b), added par. (3).

Subsec. (e). Pub. L. 103–394, §101, in last sentence substituted "concluded" for "commenced" and inserted before period at end ", unless the 30-day period is extended with the consent of the parties in interest or for a specific time which the court finds is required by compelling circumstances".

1990—Subsec. (b)(6). Pub. L. 101–311, §202, inserted reference to sections 101(34) and 101(35) of this title.

Subsec. (b)(12). Pub. L. 101–508, §3007(a)(1)(A), which directed the striking of "or" after "State law;", could not be executed because of a prior amendment by Pub. L. 101–311. See below.

Pub. L. 101–311, §102(1), struck out "or" after "State law;".

Subsec. (b)(13). Pub. L. 101–508, §3007(a)(1)(B), which directed the substitution of a semicolon for period at end, could not be executed because of a prior amendment by Pub. L. 101–311. See below.

Pub. L. 101–311, §102(2), substituted "; or" for period at end.

Subsec. (b)(14) to (16). Pub. L. 101–508, §3007(a)(1)(C), added pars. (14) to (16). Notwithstanding directory language adding pars. (14) to (16) immediately following par. (13), pars. (14) to (16) were added after par. (14), as added by Pub. L. 101–311, to reflect the probable intent of Congress.

Pub. L. 101–311, §102(3), added par. (14) relating to the setoff by a swap participant of any mutual debt and claim under or in connection with a swap agreement. Notwithstanding directory language adding par. (14) at end of subsec. (b), par. (14) was added after par. (13) to reflect the probable intent of Congress.

1986—Subsec. (b). Pub. L. 99–509 inserted sentence at end.

Subsec. (b)(6). Pub. L. 99–554, §283(d)(1), substituted ", financial institutions" for "financial institution," in two places.

Subsec. (b)(9). Pub. L. 99–554, §283(d)(2), (3), struck out "or" at end of first par. (9) and redesignated as par. (10)

the second par. (9) relating to leases of nonresidential property, which was added by section 363(b) of Pub. L. 98–353.

Subsec. (b)(10). Pub. L. 99–554, §283(d)(3), (4), redesignated as par. (10) the second par. (9) relating to leases of nonresidential property, added by section 363(b) of Pub. L. 99–353, and substituted "property; or" for "property.". Former par. (10) redesignated (11).

Subsec. (b)(11). Pub. L. 99–554, §283(d)(3), redesignated former par. (10) as (11).

Subsec. (b)(12), (13). Pub. L. 99–509 added pars. (12) and (13).

Subsec. (c)(2)(C). Pub. L. 99–554, §257(j), inserted reference to chapter 12 of this title.

1984—Subsec. (a)(1). Pub. L. 98–353, §441(a)(1), inserted "action or" after "other".

Subsec. (a)(3). Pub. L. 98–353, §441(a)(2), inserted "or to exercise control over property of the estate".

Subsec. (b)(1). Pub. L. 98–353, §441(b)(1), inserted "or to the extent that such act is accomplished within the period provided under section 547(e)(2)(A) of this title".

Subsec. (b)(6). Pub. L. 98–353, §441(b)(2), inserted "or due from" after "held by" and "financial institution," after "stockbroker" in two places, and substituted "secure, or settle commodity contracts" for "or secure commodity contracts".

Subsec. (b)(7) to (9). Pub. L. 98–353, §441(b)(3), (4), in par. (8) as redesignated by Pub. L. 98–353, §392, substituted "the" for "said" and struck out "or" the last place it appeared which probably meant "or" after "units;" that was struck out by Pub. L. 98–353, §363(b)(1); and, in par. (9), relating to notices of deficiencies, as redesignated by Pub. L. 98–353, §392, substituted a semicolon for the period.

Pub. L. 98–353, §392, added par. (7) and redesignated former pars. (7) and (8) as (8) and (9), respectively.

Pub. L. 98–353, §363(b), struck out "or" at end of par. (7), substituted "; or" for the period at end of par. (8), and added par. (9) relating to leases of nonresidential property.

Subsec. (b)(10). Pub. L. 98–353, §441(b)(5), added par. (10).

Subsec. (c)(2)(B). Pub. L. 98–353, §441(c), substituted "or" for "and".

Subsec. (d)(2). Pub. L. 98–353, §441(d), inserted "under subsection (a) of this section" after "property".

Subsec. (e). Pub. L. 98–353, §441(e), inserted "the conclusion of" after "pending" and substituted "The court shall order such stay continued in effect pending the conclusion of the final hearing under subsection (d) of this section if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing. If the hearing under this subsection is a preliminary hearing, then such final hearing shall be commenced not later than thirty days after the conclusion of such preliminary hearing." for "If the hearing under this subsection is a preliminary hearing—

"(1) the court shall order such stay so continued if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the final hearing under subsection (d) of this section; and

"(2) such final hearing shall be commenced within thirty days after such preliminary hearing."

Subsec. (f). Pub. L. 98–353, §441(f), substituted "Upon request of a party in interest, the court, with or" for "The court,".

Subsec. (h). Pub. L. 98–353, §304, added subsec. (h).

1982—Subsec. (a). Pub. L. 97–222, §3(a), inserted ", or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3))," after "this title" in provisions preceding par. (1).

Subsec. (b). Pub. L. 97–222, §3(b), inserted ", or an application under section 5(a)(3) of the Securities Investor Protection Act of 1970 (15 U.S.C. 78eee(a)(3))," after "this title" in provisions preceding par. (1).

Subsec. (b)(6). Pub. L. 97–222, §3(c), substituted provisions that the filing of a bankruptcy petition would not operate as a stay, under subsec. (a) of this section, of

the setoff by a commodity broker, forward contract merchant, stockbroker, or securities clearing agency of any mutual debt and claim under or in connection with commodity, forward, or securities contracts that constitutes the setoff of a claim against the debtor for a margin or settlement payment arising out of commodity, forward, or securities contracts against cash, securities, or other property held by any of the above agents to margin, guarantee, or secure commodity, forward, or securities contracts, for provisions that such filing would not operate as a stay under subsection (a)(7) of this section, of the setoff of any mutual debt and claim that are commodity futures contracts, forward commodity contracts, leverage transactions, options, warrants, rights to purchase or sell commodity futures contracts or securities, or options to purchase or sell commodities or securities.

## Statutory Notes and Related Subsidiaries

### Effective Date of 2006 Amendment

Amendment by Pub. L. 109–390 not applicable to any cases commenced under this title or to appointments made under any Federal or State law, before Dec. 12, 2006, see section 7 of Pub. L. 109–390, set out as a note under section 101 of this title.

### Effective Date of 2005 Amendment

Amendment by Pub. L. 109–8 effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as a note under section 101 of this title.

### Effective Date of 1994 Amendment

Amendment by Pub. L. 103–394 effective Oct. 22, 1994, and not applicable with respect to cases commenced under this title before Oct. 22, 1994, see section 702 of Pub. L. 103–394, set out as a note under section 101 of this title.

### Effective Date of 1990 Amendment

Pub. L. 101–508, title III, § 3007(a)(3), Nov. 5, 1990, 104 Stat. 1388–28, provided that: ''The amendments made by this subsection [amending this section and section 541 of this title] shall be effective upon date of enactment of this Act [Nov. 5, 1990].''

Pub. L. 101–508, title III, § 3008, Nov. 5, 1990, 104 Stat. 1388–29, provided that the amendments made by subtitle A (§§ 3001–3008) of title III of Pub. L. 101–508, amending this section, sections 541 and 1328 of this title, and sections 1078, 1078–1, 1078–7, 1085, 1088, and 1091 of Title 20, Education, and provisions set out as a note under section 1078–1 of Title 20, were to cease to be effective Oct. 1, 1996, prior to repeal by Pub. L. 102–325, title XV, § 1558, July 23, 1992, 106 Stat. 841.

### Effective Date of 1986 Amendment

Amendment by section 257 of Pub. L. 99–554 effective 30 days after Oct. 27, 1986, but not applicable to cases commenced under this title before that date, see section 302(a), (c)(1) of Pub. L. 99–554, set out as a note under section 581 of Title 28, Judiciary and Judicial Procedure.

Amendment by section 283 of Pub. L. 99–554 effective 30 days after Oct. 27, 1986, see section 302(a) of Pub. L. 99–554.

Pub. L. 99–509, title V, § 5001(b), Oct. 21, 1986, 100 Stat. 1912, provided that: ''The amendments made by subsection (a) of this section [amending this section] shall apply only to petitions filed under section 362 of title 11, United States Code, which are made after August 1, 1986.''

### Effective Date of 1984 Amendment

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

### Report to Congressional Committees

Pub. L. 99–509, title V, § 5001(a), Oct. 21, 1986, 100 Stat. 1911, directed Secretary of Transportation and Secretary of Commerce, before July 1, 1989, to submit reports to Congress on the effects of amendments to 11 U.S.C. 362 by this subsection.

## § 363. Use, sale, or lease of property

(a) In this section, ''cash collateral'' means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title.

(b)(1) The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate, except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—

(A) such sale or such lease is consistent with such policy; or

(B) after appointment of a consumer privacy ombudsman in accordance with section 332, and after notice and a hearing, the court approves such sale or such lease—

(i) giving due consideration to the facts, circumstances, and conditions of such sale or such lease; and

(ii) finding that no showing was made that such sale or such lease would violate applicable nonbankruptcy law.

(2) If notification is required under subsection (a) of section 7A of the Clayton Act in the case of a transaction under this subsection, then—

(A) notwithstanding subsection (a) of such section, the notification required by such subsection to be given by the debtor shall be given by the trustee; and

(B) notwithstanding subsection (b) of such section, the required waiting period shall end on the 15th day after the date of the receipt, by the Federal Trade Commission and the Assistant Attorney General in charge of the Antitrust Division of the Department of Justice, of the notification required under such subsection (a), unless such waiting period is extended—

(i) pursuant to subsection (e)(2) of such section, in the same manner as such subsection (e)(2) applies to a cash tender offer;

(ii) pursuant to subsection (g)(2) of such section; or

(iii) by the court after notice and a hearing.

(c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, 1183,

1184, 1203, 1204, or 1304 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

(2) The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—

(A) each entity that has an interest in such cash collateral consents; or

(B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

(3) Any hearing under paragraph (2)(B) of this subsection may be a preliminary hearing or may be consolidated with a hearing under subsection (e) of this section, but shall be scheduled in accordance with the needs of the debtor. If the hearing under paragraph (2)(B) of this subsection is a preliminary hearing, the court may authorize such use, sale, or lease only if there is a reasonable likelihood that the trustee will prevail at the final hearing under subsection (e) of this section. The court shall act promptly on any request for authorization under paragraph (2)(B) of this subsection.

(4) Except as provided in paragraph (2) of this subsection, the trustee shall segregate and account for any cash collateral in the trustee's possession, custody, or control.

(d) The trustee may use, sell, or lease property under subsection (b) or (c) of this section—

(1) in the case of a debtor that is a corporation or trust that is not a moneyed business, commercial corporation, or trust, only in accordance with nonbankruptcy law applicable to the transfer of property by a debtor that is such a corporation or trust; and

(2) only to the extent not inconsistent with any relief granted under subsection (c), (d), (e), or (f) of section 362.

(e) Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest. This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).

(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

(1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(2) such entity consents;

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute; or

(5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

(g) Notwithstanding subsection (f) of this section, the trustee may sell property under subsection (b) or (c) of this section free and clear of any vested or contingent right in the nature of dower or curtesy.

(h) Notwithstanding subsection (f) of this section, the trustee may sell both the estate's interest, under subsection (b) or (c) of this section, and the interest of any co-owner in property in which the debtor had, at the time of the commencement of the case, an undivided interest as a tenant in common, joint tenant, or tenant by the entirety, only if—

(1) partition in kind of such property among the estate and such co-owners is impracticable;

(2) sale of the estate's undivided interest in such property would realize significantly less for the estate than sale of such property free of the interests of such co-owners;

(3) the benefit to the estate of a sale of such property free of the interests of co-owners outweighs the detriment, if any, to such co-owners; and

(4) such property is not used in the production, transmission, or distribution, for sale, of electric energy or of natural or synthetic gas for heat, light, or power.

(i) Before the consummation of a sale of property to which subsection (g) or (h) of this section applies, or of property of the estate that was community property of the debtor and the debtor's spouse immediately before the commencement of the case, the debtor's spouse, or a co-owner of such property, as the case may be, may purchase such property at the price at which such sale is to be consummated.

(j) After a sale of property to which subsection (g) or (h) of this section applies, the trustee shall distribute to the debtor's spouse or the co-owners of such property, as the case may be, and to the estate, the proceeds of such sale, less the costs and expenses, not including any compensation of the trustee, of such sale, according to the interests of such spouse or co-owners, and of the estate.

(k) At a sale under subsection (b) of this section of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.

(l) Subject to the provisions of section 365, the trustee may use, sell, or lease property under subsection (b) or (c) of this section, or a plan under chapter 11, 12, or 13 of this title may provide for the use, sale, or lease of property, notwithstanding any provision in a contract, a lease, or applicable law that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title concerning the debtor, or on the appointment of or the taking possession by a trustee in a case under this title or a custodian, and that effects, or gives an option to effect, a forfeiture, modification, or termination of the debtor's interest in such property.

(m) The reversal or modification on appeal of an authorization under subsection (b) or (c) of

this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

(n) The trustee may avoid a sale under this section if the sale price was controlled by an agreement among potential bidders at such sale, or may recover from a party to such agreement any amount by which the value of the property sold exceeds the price at which such sale was consummated, and may recover any costs, attorneys' fees, or expenses incurred in avoiding such sale or recovering such amount. In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection.

(o) Notwithstanding subsection (f), if a person purchases any interest in a consumer credit transaction that is subject to the Truth in Lending Act or any interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations (January 1, 2004), as amended from time to time), and if such interest is purchased through a sale under this section, then such person shall remain subject to all claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as such person would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under this section.

(p) In any hearing under this section—

(1) the trustee has the burden of proof on the issue of adequate protection; and

(2) the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2572; Pub. L. 98–353, title III, §442, July 10, 1984, 98 Stat. 371; Pub. L. 99–554, title II, §257(k), Oct. 27, 1986, 100 Stat. 3115; Pub. L. 103–394, title I, §109, title II, §§214(b), 219(c), title V, §501(d)(8), Oct. 22, 1994, 108 Stat. 4113, 4126, 4129, 4144; Pub. L. 109–8, title II, §§204, 231(a), title XII, §1221(a), Apr. 20, 2005, 119 Stat. 49, 72, 195; Pub. L. 111–327, §2(a)(13), Dec. 22, 2010, 124 Stat. 3559; Pub. L. 116–54, §4(a)(6), Aug. 23, 2019, 133 Stat. 1086.)

HISTORICAL AND REVISION NOTES

LEGISLATIVE STATEMENTS

Section 363(a) of the House amendment defines "cash collateral" as defined in the Senate amendment. The broader definition of "soft collateral" contained in H.R. 8200 as passed by the House is deleted to remove limitations that were placed on the use, lease, or sale of inventory, accounts, contract rights, general intangibles, and chattel paper by the trustee or debtor in possession.

Section 363(c)(2) of the House amendment is derived from the Senate amendment. Similarly, sections 363(c)(3) and (4) are derived from comparable provisions in the Senate amendment in lieu of the contrary procedure contained in section 363(c) as passed by the House. The policy of the House amendment will generally require the court to schedule a preliminary hearing in accordance with the needs of the debtor to authorize the trustee or debtor in possession to use, sell, or lease

cash collateral. The trustee or debtor in possession may use, sell, or lease cash collateral in the ordinary course of business only "after notice and a hearing."

Section 363(f) of the House amendment adopts an identical provision contained in the House bill, as opposed to an alternative provision contained in the Senate amendment.

Section 363(h) of the House amendment adopts a new paragraph (4) representing a compromise between the House bill and Senate amendment. The provision adds a limitation indicating that a trustee or debtor in possession sell jointly owned property only if the property is not used in the production, transmission, or distribution for sale, of electric energy or of natural or synthetic gas for heat, light, or power. This limitation is intended to protect public utilities from being deprived of power sources because of the bankruptcy of a joint owner.

Section 363(k) of the House amendment is derived from the third sentence of section 363(e) of the Senate amendment. The provision indicates that a secured creditor may bid in the full amount of the creditor's allowed claim, including the secured portion and any unsecured portion thereof in the event the creditor is undersecured, with respect to property that is subject to a lien that secures the allowed claim of the sale of the property.

SENATE REPORT NO. 95–989

This section defines the right and powers of the trustee with respect to the use, sale or lease of property and the rights of other parties that have interests in the property involved. It applies in both liquidation and reorganization cases.

Subsection (a) defines "cash collateral" as cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents in which the estate and an entity other than the estate have an interest, such as a lien or a co-ownership interest. The definition is not restricted to property of the estate that is cash collateral on the date of the filing of the petition. Thus, if "non-cash" collateral is disposed of and the proceeds come within the definition of "cash collateral" as set forth in this subsection, the proceeds would be cash collateral as long as they remain subject to the original lien on the "non-cash" collateral under section 552(b). To illustrate, rents received from real property before or after the commencement of the case would be cash collateral to the extent that they are subject to a lien.

Subsection (b) permits the trustees to use, sell, or lease, other than in the ordinary course of business, property of the estate upon notice and opportunity for objections and hearing thereon.

Subsection (c) governs use, sale, or lease in the ordinary course of business. If the business of the debtor is authorized to be operated under §721, 1108, or 1304 of the bankruptcy code, then the trustee may use, sell, or lease property in the ordinary course of business or enter into ordinary course transactions without need for notice and hearing. This power is subject to several limitations. First, the court may restrict the trustee's powers in the order authorizing operation of the business. Second, with respect to cash collateral, the trustee may not use, sell, or lease cash collateral except upon court authorization after notice and a hearing, or with the consent of each entity that has an interest in such cash collateral. The same preliminary hearing procedure in the automatic stay section applies to a hearing under this subsection. In addition, the trustee is required to segregate and account for any cash collateral in the trustee's possession, custody, or control.

Under subsections (d) and (e), the use, sale, or lease of property is further limited by the concept of adequate protection. Sale, use, or lease of property in which an entity other than the estate has an interest may be effected only to the extent not inconsistent with any relief from the stay granted to that interest's holder. Moreover, the court may prohibit or condition the use, sale, or lease as is necessary to provide ade-

quate protection of that interest. Again, the trustee has the burden of proof on the issue of adequate protection. Subsection (e) also provides that where a sale of the property is proposed, an entity that has an interest in such property may bid at the sale thereof and set off against the purchase price up to the amount of such entity's claim. No prior valuation under section 506(a) would limit this bidding right, since the bid at the sale would be determinative of value.

Subsection (f) permits sale of property free and clear of any interest in the property of an entity other than the estate. The trustee may sell free and clear if applicable nonbankruptcy law permits it, if the other entity consents, if the interest is a lien and the sale price of the property is greater than the amount secured by the lien, if the interest is in bona fide dispute, or if the other entity could be compelled to accept a money satisfaction of the interest in a legal or equitable proceeding. Sale under this subsection is subject to the adequate protection requirement. Most often, adequate protection in connection with a sale free and clear of other interests will be to have those interests attach to the proceeds of the sale.

At a sale free and clear of other interests, any holder of any interest in the property being sold will be permitted to bid. If that holder is the high bidder, he will be permitted to offset the value of his interest against the purchase price of the property. Thus, in the most common situation, a holder of a lien on property being sold may bid at the sale and, if successful, may offset the amount owed to him that is secured by the lien on the property (but may not offset other amounts owed to him) against the purchase price, and be liable to the trustee for the balance of the sale price, if any.

Subsection (g) permits the trustee to sell free and clear of any vested or contingent right in the nature of dower or curtesy.

Subsection (h) permits sale of a co-owner's interest in property in which the debtor had an undivided ownership interest such as a joint tenancy, a tenancy in common, or a tenancy by the entirety. Such a sale is permissible only if partition is impracticable, if sale of the estate's interest would realize significantly less for the estate than sale of the property free of the interests of the co-owners, and if the benefit to the estate of such a sale outweighs any detriment to the co-owners. This subsection does not apply to a co-owner's interest in a public utility when a disruption of the utilities services could result.

Subsection (i) provides protections for co-owners and spouses with dower, curtesy, or community property rights. It gives a right of first refusal to the co-owner or spouse at the price at which the sale is to be consummated.

Subsection (j) requires the trustee to distribute to the spouse or co-owner the appropriate portion of the proceeds of the sale, less certain administrative expenses.

Subsection (k) [enacted as (l)] permits the trustee to use, sell, or lease property notwithstanding certain bankruptcy or ipso facto clauses that terminate the debtor's interest in the property or that work a forfeiture or modification of that interest. This subsection is not as broad as the anti-ipso facto provision in proposed 11 U.S.C. 541(c)(1).

Subsection (l) [enacted as (m)] protects good faith purchasers of property sold under this section from a reversal on appeal of the sale authorization, unless the authorization for the sale and the sale itself were stayed pending appeal. The purchaser's knowledge of the appeal is irrelevant to the issue of good faith.

Subsection (m) [enacted as (n)] is directed at collusive bidding on property sold under this section. It permits the trustee to void a sale if the price of the sale was controlled by an agreement among potential bidders. The trustees may also recover the excess of the value of the property over the purchase price, and may recover any costs, attorney's fees, or expenses incurred in voiding the sale or recovering the difference. In addition, the court is authorized to grant judgment in favor of the estate and against the collusive bidder if the agreement controlling the sale price was entered into in willful disregard of this subsection. The subsection does not specify the precise measure of damages, but simply provides for punitive damages, to be fixed in light of the circumstances.

### Editorial Notes

#### References in Text

Section 7A of the Clayton Act, referred to in subsec. (b)(2), is classified to section 18a of Title 15, Commerce and Trade.

The Truth in Lending Act, referred to in subsec. (o), is title I of Pub. L. 90–321, May 29, 1968, 82 Stat. 146, as amended, which is classified generally to subchapter I (§1601 et seq.) of chapter 41 of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see Short Title note set out under section 1601 of Title 15 and Tables.

#### Amendments

2019—Subsec. (c)(1). Pub. L. 116–54 inserted ''1183, 1184,'' after ''1108,''.

2010—Subsec. (d). Pub. L. 111–327, §2(a)(13)(A), struck out ''only'' before dash at end of introductory provisions.

Subsec. (d)(1). Pub. L. 111–327, §2(a)(13)(B), amended par. (1) generally. Prior to amendment, par. (1) read as follows: ''in accordance with applicable nonbankruptcy law that governs the transfer of property by a corporation or trust that is not a moneyed, business, or commercial corporation or trust; and''.

Subsec. (d)(2). Pub. L. 111–327, §2(a)(13)(C), inserted ''only'' before ''to the extent''.

2005—Subsec. (b)(1). Pub. L. 109–8, §231(a), substituted '', except that if the debtor in connection with offering a product or a service discloses to an individual a policy prohibiting the transfer of personally identifiable information about individuals to persons that are not affiliated with the debtor and if such policy is in effect on the date of the commencement of the case, then the trustee may not sell or lease personally identifiable information to any person unless—'' and subpars. (A) and (B) for period at end.

Subsec. (d). Pub. L. 109–8, §1221(a), substituted ''only—'' and pars. (1) and (2) for ''only to the extent not inconsistent with any relief granted under section 362(c), 362(d), 362(e), or 362(f) of this title.''

Subsecs. (o), (p). Pub. L. 109–8, §204, added subsec. (o) and redesignated former subsec. (o) as (p).

1994—Subsec. (a). Pub. L. 103–394, §214(b), inserted ''and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties'' after ''property''.

Subsec. (b)(2). Pub. L. 103–394, §§109, 501(d)(8)(A), struck out ''(15 U.S.C. 18a)'' after ''Clayton Act'' and amended subpars. (A) and (B) generally. Prior to amendment, subpars. (A) and (B) read as follows:

''(A) notwithstanding subsection (a) of such section, such notification shall be given by the trustee; and

''(B) notwithstanding subsection (b) of such section, the required waiting period shall end on the tenth day after the date of the receipt of such notification, unless the court, after notice and hearing, orders otherwise.''

Subsec. (c)(1). Pub. L. 103–394, §501(d)(8)(B), substituted ''1203, 1204, or 1304'' for ''1304, 1203, or 1204''.

Subsec. (e). Pub. L. 103–394, §219(c), inserted at end ''This subsection also applies to property that is subject to any unexpired lease of personal property (to the exclusion of such property being subject to an order to grant relief from the stay under section 362).''

1986—Subsec. (c)(1). Pub. L. 99–554, §257(k)(1), inserted reference to sections 1203 and 1204 of this title.

Subsec. (l). Pub. L. 99–554, §257(k)(2), inserted reference to chapter 12.

1984—Subsec. (a). Pub. L. 98–353, §442(a), inserted ''whenever acquired'' after ''equivalents'' and ''and in-

cludes the proceeds, products, offspring, rents, or profits of property subject to a security interest as provided in section 552(b) of this title, whether existing before or after the commencement of a case under this title'' after ''interest''.

Subsec. (b). Pub. L. 98–353, §442(b), designated existing provisions as par. (1) and added par. (2).

Subsec. (e). Pub. L. 98–353, §442(c), inserted '', with or without a hearing,'' after ''court'' and struck out ''In any hearing under this section, the trustee has the burden of proof on the issue of adequate protection''.

Subsec. (f)(3). Pub. L. 98–353, §442(d), substituted ''all liens on such property'' for ''such interest''.

Subsec. (h). Pub. L. 98–353, §442(e), substituted ''at the time of'' for ''immediately before''.

Subsec. (j). Pub. L. 98–353, §442(f), substituted ''compensation'' for ''compensation''.

Subsec. (k). Pub. L. 98–353, §442(g), substituted ''unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder'' for ''if the holder''.

Subsec. (l). Pub. L. 98–353, §442(h), substituted ''Subject to the provisions of section 365, the trustee'' for ''The trustee'', ''condition'' for ''conditions'', ''or the taking'' for ''a taking'', and ''interest'' for ''interests''.

Subsec. (n). Pub. L. 98–353, §442(i), substituted ''avoid'' for ''void'', ''avoiding'' for ''voiding'', and ''In addition to any recovery under the preceding sentence, the court may grant judgment for punitive damages in favor of the estate and against any such party that entered into such an agreement in willful disregard of this subsection'' for ''The court may grant judgment in favor of the estate and against any such party that entered into such agreement in willful disregard of this subsection for punitive damages in addition to any recovery under the preceding sentence''.

Subsec. (o). Pub. L. 98–353, §442(j), added subsec. (o).

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE OF 2019 AMENDMENT

Amendment by Pub. L. 116–54 effective 180 days after Aug. 23, 2019, see section 5 of Pub. L. 116–54, set out as a note under section 101 of this title.

EFFECTIVE DATE OF 2005 AMENDMENT

Pub. L. 109–8, title XII, §1221(d), Apr. 20, 2005, 119 Stat. 196, provided that: ''The amendments made by this section [amending this section and sections 541 and 1129 of this title and enacting provisions set out as a note under this section] shall apply to a case pending under title 11, United States Code, on the date of enactment of this Act [Apr. 20, 2005], or filed under that title on or after that date of enactment, except that the court shall not confirm a plan under chapter 11 of title 11, United States Code, without considering whether this section would substantially affect the rights of a party in interest who first acquired rights with respect to the debtor after the date of the filing of the petition. The parties who may appear and be heard in a proceeding under this section include the attorney general of the State in which the debtor is incorporated, was formed, or does business.''

Amendment by sections 204 and 231(a) of Pub. L. 109–8 effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as a note under section 101 of this title.

EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–394 effective Oct. 22, 1994, and not applicable with respect to cases commenced under this title before Oct. 22, 1994, see section 702 of Pub. L. 103–394, set out as a note under section 101 of this title.

EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by Pub. L. 99–554 effective 30 days after Oct. 27, 1986, but not applicable to cases commenced

under this title before that date, see section 302(a), (c)(1) of Pub. L. 99–554, set out as a note under section 581 of Title 28, Judiciary and Judicial Procedure.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

CONSTRUCTION OF SECTION 1221 OF PUB. L. 109–8

Pub. L. 109–8, title XII, §1221(e), Apr. 20, 2005, 119 Stat. 196, provided that: ''Nothing in this section [see Effective Date of 2005 Amendment note above] shall be construed to require the court in which a case under chapter 11 of title 11, United States Code, is pending to remand or refer any proceeding, issue, or controversy to any other court or to require the approval of any other court for the transfer of property.''

**§ 364. Obtaining credit**

(a) If the trustee is authorized to operate the business of the debtor under section 721, 1108, 1183, 1184, 1203, 1204, or 1304 of this title, unless the court orders otherwise, the trustee may obtain unsecured credit and incur unsecured debt in the ordinary course of business allowable under section 503(b)(1) of this title as an administrative expense.

(b) The court, after notice and a hearing, may authorize the trustee to obtain unsecured credit or to incur unsecured debt other than under subsection (a) of this section, allowable under section 503(b)(1) of this title as an administrative expense.

(c) If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

(e) The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

(f) Except with respect to an entity that is an underwriter as defined in section 1145(b) of this title, section 5 of the Securities Act of 1933, the Trust Indenture Act of 1939, and any State or local law requiring registration for offer or sale of a security or registration or licensing of an issuer of, underwriter of, or broker or dealer in, a security does not apply to the offer or sale under this section of a security that is not an equity security.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2574; Pub. L. 99–554, title II, §257(*l*), Oct. 27, 1986, 100 Stat. 3115; Pub. L. 103–394, title V, §501(d)(9), Oct. 22, 1994, 108 Stat. 4144; Pub. L. 116–54, §4(a)(7), Aug. 23, 2019, 133 Stat. 1086; Pub. L. 116–260, div. N, title III, §320(a), (f)(2)(A)(i), Dec. 27, 2020, 134 Stat. 2015, 2016.)

AMENDMENT OF SECTION AND TERMINATION OF AMENDMENT

*Pub. L. 116–260, div. N, title III, §320(a), (f)(1), Dec. 27, 2020, 134 Stat. 2015, 2016, provided that, effective on the date on which the Administrator of the Small Business Administration submits to the Director of the Executive Office for United States Trustees a written determination that, subject to satisfying any other eligibility requirements, any debtor in possession or trustee that is authorized to operate the business of the debtor under section 1183, 1184, 1203, 1204, or 1304 of this title would be eligible for a loan under paragraphs (36) and (37) of section 636(a) of Title 15, Commerce and Trade, and applicable to any case pending on or commenced on or after such effective date, this section is amended by adding at the end the following:*

*(g)(1) The court, after notice and a hearing, may authorize a debtor in possession or a trustee that is authorized to operate the business of the debtor under section 1183, 1184, 1203, 1204, or 1304 of this title to obtain a loan under paragraph (36) or (37) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), and such loan shall be treated as a debt to the extent the loan is not forgiven in accordance with section 7A of the Small Business Act or subparagraph (J) of such paragraph (37), as applicable, with priority equal to a claim of the kind specified in subsection (c)(1) of this section.*

*(2) The trustee may incur debt described in paragraph (1) notwithstanding any provision in a contract, prior order authorizing the trustee to incur debt under this section, prior order authorizing the trustee to use cash collateral under section 363, or applicable law that prohibits the debtor from incurring additional debt.*

*(3) The court shall hold a hearing within 7 days after the filing and service of the motion to obtain a loan described in paragraph (1). Notwithstanding the Federal Rules of Bankruptcy Procedure, at such hearing, the court may grant relief on a final basis.*

*Pub. L. 116–260, div. N, title III, §320(f)(2), Dec. 27, 2020, 134 Stat. 2016, provided that, if the amendment made to this section by Pub. L. 116–260, §320(a), takes effect, effective on the date that is 2 years after Dec. 27, 2020, with provisions relating to applicability to cases commenced before such date, this section is amended by striking subsection (g).*

*See 2020 Amendment notes below.*

HISTORICAL AND REVISION NOTES
LEGISLATIVE STATEMENTS

Section 364(f) of the House amendment is new. This provision continues the exemption found in section 3(a)(7) of the Securities Act of 1933 [15 U.S.C. 77c(a)(7)] for certificates of indebtedness issued by a trustee in bankruptcy. The exemption applies to any debt security issued under section 364 of title 11. The section does not intend to change present law which exempts such securities from the Trust Indenture Act, 15 U.S.C. 77aaa, et seq. (1976).

SENATE REPORT NO. 95–989

This section is derived from provisions in current law governing certificates of indebtedness, but is much broader. It governs all obtaining of credit and incurring of debt by the estate.

Subsection (a) authorizes the incurring of unsecured credit and the incurring of unsecured debt in the ordinary course of business if the business of the debtor is authorized to be operated under section 721, 1108, or 1304. The debts so incurred are allowable as administrative expenses under section 503(b)(1). The court may limit the estate's ability to incur debt under this subsection.

Subsection (b) permits the court to authorize the trustee to obtain unsecured credit and incur unsecured debts other than in the ordinary course of business, such as in order to wind up a liquidation case, or to obtain a substantial loan in an operating case. Debt incurred under this subsection is allowable as an administrative expense under section 503(b)(1).

Subsection (c) is closer to the concept of certificates of indebtedness in current law. It authorizes the obtaining of credit and the incurring of debt with some special priority, if the trustee is unable to obtain unsecured credit under subsection (a) or (b). The various priorities are (1) with priority over any or all administrative expenses; (2) secured by a lien on unencumbered property of the estate; or (3) secured by a junior lien on encumbered property. The priorities granted under this subsection do not interfere with existing property rights.

Subsection (d) grants the court the authority to authorize the obtaining of credit and the incurring of debt with a superiority, that is a lien on encumbered property that is senior or equal to the existing lien on the property. The court may authorize such a superpriority only if the trustee is otherwise unable to obtain credit, and if there is adequate protection of the original lien holder's interest. Again, the trustee has the burden of proof on the issue of adequate protection.

Subsection (e) provides the same protection for credit extenders pending an appeal of an authorization to incur debt as is provided under section 363(*l*) for purchasers: the credit is not affected on appeal by reversal of the authorization and the incurring of the debt were stayed pending appeal. The protection runs to a good faith lender, whether or not he knew of the pendency of the appeal.

A claim arising as a result of lending or borrowing under this section will be a priority claim, as defined in proposed section 507(a)(1), even if the claim is granted a super-priority over administrative expenses and is to be paid in advance of other first priority claims.

**Editorial Notes**
REFERENCES IN TEXT

Section 5 of the Securities Act of 1933, referred to in subsec. (f), is classified to section 77e of Title 15, Commerce and Trade.

The Trust Indenture Act of 1939, referred to in subsec. (f), is title III of act May 27, 1933, ch. 38, as added Aug. 3, 1939, ch. 411, 53 Stat. 1149, as amended, which is classified generally to subchapter III (§77aaa et seq.) of chapter 2A of Title 15. For complete classification of this Act to the Code, see section 77aaa of Title 15 and Tables.

TITLE 11—BANKRUPTCY

## AMENDMENTS

2020—Subsec. (g). Pub. L. 116–260, § 320(f)(2)(A)(i), contingent on its addition by Pub. L. 116–260, § 320(a), struck out subsec. (g) which read as follows:

"(g)(1) The court, after notice and a hearing, may authorize a debtor in possession or a trustee that is authorized to operate the business of the debtor under section 1183, 1184, 1203, 1204, or 1304 of this title to obtain a loan under paragraph (36) or (37) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)), and such loan shall be treated as a debt to the extent the loan is not forgiven in accordance with section 7A of the Small Business Act or subparagraph (J) of such paragraph (37), as applicable, with priority equal to a claim of the kind specified in subsection (c)(1) of this section.

"(2) The trustee may incur debt described in paragraph (1) notwithstanding any provision in a contract, prior order authorizing the trustee to incur debt under this section, prior order authorizing the trustee to use cash collateral under section 363, or applicable law that prohibits the debtor from incurring additional debt.

"(3) The court shall hold a hearing within 7 days after the filing and service of the motion to obtain a loan described in paragraph (1). Notwithstanding the Federal Rules of Bankruptcy Procedure, at such hearing, the court may grant relief on a final basis."

Pub. L. 116–260, § 320(a), added subsec. (g).

2019—Subsec. (a). Pub. L. 116–54 inserted "1183, 1184," after "1108,".

1994—Subsec. (a). Pub. L. 103–394, § 501(d)(9)(A), substituted "1203, 1204, or 1304" for "1304, 1203, or 1204".

Subsec. (f). Pub. L. 103–394, § 501(d)(9)(B), struck out "(15 U.S.C. 77e)" after "Act of 1933" and "(15 U.S.C. 77aaa et seq.)" after "Act of 1939".

1986—Subsec. (a). Pub. L. 99–554 inserted reference to sections 1203 and 1204 of this title.

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE AND TERMINATION DATES OF 2020 AMENDMENT

Pub. L. 116–260, div. N, title III, § 320(f), Dec. 27, 2020, 134 Stat. 2016, provided that:

"(1) EFFECTIVE DATE.—The amendments made by subsections (a) through (e) [amending this section and sections 503, 1191, 1225, and 1325 of this title] shall—

"(A) take effect on the date on which the Administrator [of the Small Business Administration] submits to the Director of the Executive Office for United States Trustees a written determination that, subject to satisfying any other eligibility requirements, any debtor in possession or trustee that is authorized to operate the business of the debtor under section 1183, 1184, 1203, 1204, or 1304 of title 11, United States Code, would be eligible for a loan under paragraphs (36) and (37) of section 7(a) of the Small Business Act (15 U.S.C. 636(a)); and

"(B) apply to any case pending on or commenced on or after the date described in subparagraph (A).

"(2) SUNSET.—

"(A) IN GENERAL.—If the amendments made by subsections (a) through (e) take effect under paragraph (1), effective on the date that is 2 years after the date of enactment of this Act [Dec. 27, 2020]—

"(i) section 364 of title 11, United States Code, is amended by striking subsection (g);

"(ii) section 503(b) of title 11, United States Code, is amended—

"(I) in paragraph (8)(B), by adding 'and' at the end;

"(II) in paragraph (9), by striking '; and' at the end and inserting a period; and

"(III) by striking paragraph (10);

"(iii) section 1191 of title 11, United States Code, is amended by striking subsection (f);

"(iv) section 1225 of title 11, United States Code, is amended by striking subsection (d); and

"(v) section 1325 of title 11, United States Code, is amended by striking subsection (d).

"(B) APPLICABILITY.—Notwithstanding the amendments made by subparagraph (A) of this paragraph, if the amendments made by subsections (a) through (e) take effect under paragraph (1) of this subsection, such amendments shall apply to any case under title 11, United States Code, commenced before the date that is 2 years after the date of enactment of this Act [Dec. 27, 2020]."

#### EFFECTIVE DATE OF 2019 AMENDMENT

Amendment by Pub. L. 116–54 effective 180 days after Aug. 23, 2019, see section 5 of Pub. L. 116–54, set out as a note under section 101 of this title.

#### EFFECTIVE DATE OF 1994 AMENDMENT

Amendment by Pub. L. 103–394 effective Oct. 22, 1994, and not applicable with respect to cases commenced under this title before Oct. 22, 1994, see section 702 of Pub. L. 103–394, set out as a note under section 101 of this title.

#### EFFECTIVE DATE OF 1986 AMENDMENT

Amendment by Pub. L. 99–554 effective 30 days after Oct. 27, 1986, but not applicable to cases commenced under this title before that date, see section 302(a), (c)(1) of Pub. L. 99–554, set out as a note under section 581 of Title 28, Judiciary and Judicial Procedure.

## § 365. Executory contracts and unexpired leases

(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or lease.

(2) Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title;

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement; or

(D) the satisfaction of any penalty rate or penalty provision relating to a default arising from any failure by the debtor to perform nonmonetary obligations under the executory contract or unexpired lease.

(3) For the purposes of paragraph (1) of this subsection and paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

(A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

(B) that any percentage rent due under such lease will not decline substantially;

(C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

(4) Notwithstanding any other provision of this section, if there has been a default in an unexpired lease of the debtor, other than a default of a kind specified in paragraph (2) of this subsection, the trustee may not require a lessor to provide services or supplies incidental to such lease before assumption of such lease unless the lessor is compensated under the terms of such lease for any services and supplies provided under such lease before assumption of such lease.

(c) The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(1)(A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(B) such party does not consent to such assumption or assignment; or

(2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor; or

(3) such lease is of nonresidential real property and has been terminated under applicable nonbankruptcy law prior to the order for relief.

(d)(1) In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected.

(2) In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease.

(3)(A) The trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected, notwithstanding section 503(b)(1) of this title. The court may extend, for cause, the time for performance of any such obligation that arises within 60 days after the date of the order for relief, but the time for performance shall not be extended beyond such 60-day period, except as provided in subparagraph (B). This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f) of this section. Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

(B) In a case under subchapter V of chapter 11, the time for performance of an obligation described in subparagraph (A) arising under any unexpired lease of nonresidential real property may be extended by the court if the debtor is experiencing or has experienced a material financial hardship due, directly or indirectly, to the coronavirus disease 2019 (COVID–19) pandemic until the earlier of—

(i) the date that is 60 days after the date of the order for relief, which may be extended by the court for an additional period of 60 days if the court determines that the debtor is continuing to experience a material financial hardship due, directly or indirectly, to the coronavirus disease 2019 (COVID–19) pandemic; or

(ii) the date on which the lease is assumed or rejected under this section.

(C) An obligation described in subparagraph (A) for which an extension is granted under subparagraph (B) shall be treated as an administrative expense described in section 507(a)(2) for the purpose of section 1191(e).

(4)(A) Subject to subparagraph (B), an unexpired lease of nonresidential real property under which the debtor is the lessee shall be deemed rejected, and the trustee shall immediately surrender that nonresidential real property to the lessor, if the trustee does not assume or reject the unexpired lease by the earlier of—

(i) the date that is 210 days after the date of the order for relief; or

(ii) the date of the entry of an order confirming a plan.

(B)(i) The court may extend the period determined under subparagraph (A), prior to the expi-

ration of the 210-day period, for 90 days on the motion of the trustee or lessor for cause.

(ii) If the court grants an extension under clause (i), the court may grant a subsequent extension only upon prior written consent of the lessor in each instance.

(5) The trustee shall timely perform all of the obligations of the debtor, except those specified in section 365(b)(2), first arising from or after 60 days after the order for relief in a case under chapter 11 of this title under an unexpired lease of personal property (other than personal property leased to an individual primarily for personal, family, or household purposes), until such lease is assumed or rejected notwithstanding section 503(b)(1) of this title, unless the court, after notice and a hearing and based on the equities of the case, orders otherwise with respect to the obligations or timely performance thereof. This subsection shall not be deemed to affect the trustee's obligations under the provisions of subsection (b) or (f). Acceptance of any such performance does not constitute waiver or relinquishment of the lessor's rights under such lease or under this title.

(e)(1) Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

(2) Paragraph (1) of this subsection does not apply to an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—

(A)(i) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and

(ii) such party does not consent to such assumption or assignment; or

(B) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor.

(f)(1) Except as provided in subsections (b) and (c) of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

(2) The trustee may assign an executory contract or unexpired lease of the debtor only if—

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

(3) Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee.

(g) Except as provided in subsections (h)(2) and (i)(2) of this section, the rejection of an executory contract or unexpired lease of the debtor constitutes a breach of such contract or lease—

(1) if such contract or lease has not been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title, immediately before the date of the filing of the petition; or

(2) if such contract or lease has been assumed under this section or under a plan confirmed under chapter 9, 11, 12, or 13 of this title—

(A) if before such rejection the case has not been converted under section 1112, 1208, or 1307 of this title, at the time of such rejection; or

(B) if before such rejection the case has been converted under section 1112, 1208, or 1307 of this title—

(i) immediately before the date of such conversion, if such contract or lease was assumed before such conversion; or

(ii) at the time of such rejection, if such contract or lease was assumed after such conversion.

(h)(1)(A) If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and—

(i) if the rejection by the trustee amounts to such a breach as would entitle the lessee to treat such lease as terminated by virtue of its terms, applicable nonbankruptcy law, or any agreement made by the lessee, then the lessee under such lease may treat such lease as terminated by the rejection; or

(ii) if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

(B) If the lessee retains its rights under subparagraph (A)(ii), the lessee may offset against the rent reserved under such lease for the balance of the term after the date of the rejection

of such lease and for the term of any renewal or extension of such lease, the value of any damage caused by the nonperformance after the date of such rejection, of any obligation of the debtor under such lease, but the lessee shall not have any other right against the estate or the debtor on account of any damage occurring after such date caused by such nonperformance.

(C) The rejection of a lease of real property in a shopping center with respect to which the lessee elects to retain its rights under subparagraph (A)(ii) does not affect the enforceability under applicable nonbankruptcy law of any provision in the lease pertaining to radius, location, use, exclusivity, or tenant mix or balance.

(D) In this paragraph, "lessee" includes any successor, assign, or mortgagee permitted under the terms of such lease.

(2)(A) If the trustee rejects a timeshare interest under a timeshare plan under which the debtor is the timeshare interest seller and—

(i) if the rejection amounts to such a breach as would entitle the timeshare interest purchaser to treat the timeshare plan as terminated under its terms, applicable nonbankruptcy law, or any agreement made by timeshare interest purchaser, the timeshare interest purchaser under the timeshare plan may treat the timeshare plan as terminated by such rejection; or

(ii) if the term of such timeshare interest has commenced, then the timeshare interest purchaser may retain its rights in such timeshare interest for the balance of such term and for any term of renewal or extension of such timeshare interest to the extent that such rights are enforceable under applicable nonbankruptcy law.

(B) If the timeshare interest purchaser retains its rights under subparagraph (A), such timeshare interest purchaser may offset against the moneys due for such timeshare interest for the balance of the term after the date of the rejection of such timeshare interest, and the term of any renewal or extension of such timeshare interest, the value of any damage caused by the nonperformance after the date of such rejection, of any obligation of the debtor under such timeshare plan, but the timeshare interest purchaser shall not have any right against the estate or the debtor on account of any damage occurring after such date caused by such nonperformance.

(i)(1) If the trustee rejects an executory contract of the debtor for the sale of real property or for the sale of a timeshare interest under a timeshare plan, under which the purchaser is in possession, such purchaser may treat such contract as terminated, or, in the alternative, may remain in possession of such real property or timeshare interest.

(2) If such purchaser remains in possession—

(A) such purchaser shall continue to make all payments due under such contract, but may, offset against such payments any damages occurring after the date of the rejection of such contract caused by the nonperformance of any obligation of the debtor after such date, but such purchaser does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset; and

(B) the trustee shall deliver title to such purchaser in accordance with the provisions of such contract, but is relieved of all other obligations to perform under such contract.

(j) A purchaser that treats an executory contract as terminated under subsection (i) of this section, or a party whose executory contract to purchase real property from the debtor is rejected and under which such party is not in possession, has a lien on the interest of the debtor in such property for the recovery of any portion of the purchase price that such purchaser or party has paid.

(k) Assignment by the trustee to an entity of a contract or lease assumed under this section relieves the trustee and the estate from any liability for any breach of such contract or lease occurring after such assignment.

(l) If an unexpired lease under which the debtor is the lessee is assigned pursuant to this section, the lessor of the property may require a deposit or other security for the performance of the debtor's obligations under the lease substantially the same as would have been required by the landlord upon the initial leasing to a similar tenant.

(m) For purposes of this section 365 and sections 541(b)(2) and 362(b)(10), leases of real property shall include any rental agreement to use real property.

(n)(1) If the trustee rejects an executory contract under which the debtor is a licensor of a right to intellectual property, the licensee under such contract may elect—

(A) to treat such contract as terminated by such rejection if such rejection by the trustee amounts to such a breach as would entitle the licensee to treat such contract as terminated by virtue of its own terms, applicable nonbankruptcy law, or an agreement made by the licensee with another entity; or

(B) to retain its rights (including a right to enforce any exclusivity provision of such contract, but excluding any other right under applicable nonbankruptcy law to specific performance of such contract) under such contract and under any agreement supplementary to such contract, to such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law), as such rights existed immediately before the case commenced, for—

(i) the duration of such contract; and

(ii) any period for which such contract may be extended by the licensee as of right under applicable nonbankruptcy law.

(2) If the licensee elects to retain its rights, as described in paragraph (1)(B) of this subsection, under such contract—

(A) the trustee shall allow the licensee to exercise such rights;

(B) the licensee shall make all royalty payments due under such contract for the duration of such contract and for any period described in paragraph (1)(B) of this subsection for which the licensee extends such contract; and

(C) the licensee shall be deemed to waive—

(i) any right of setoff it may have with respect to such contract under this title or applicable nonbankruptcy law; and

(ii) any claim allowable under section 503(b) of this title arising from the performance of such contract.

(3) If the licensee elects to retain its rights, as described in paragraph (1)(B) of this subsection, then on the written request of the licensee the trustee shall—

(A) to the extent provided in such contract, or any agreement supplementary to such contract, provide to the licensee any intellectual property (including such embodiment) held by the trustee; and

(B) not interfere with the rights of the licensee as provided in such contract, or any agreement supplementary to such contract, to such intellectual property (including such embodiment) including any right to obtain such intellectual property (or such embodiment) from another entity.

(4) Unless and until the trustee rejects such contract, on the written request of the licensee the trustee shall—

(A) to the extent provided in such contract or any agreement supplementary to such contract—

(i) perform such contract; or

(ii) provide to the licensee such intellectual property (including any embodiment of such intellectual property to the extent protected by applicable nonbankruptcy law) held by the trustee; and

(B) not interfere with the rights of the licensee as provided in such contract, or any agreement supplementary to such contract, to such intellectual property (including such embodiment), including any right to obtain such intellectual property (or such embodiment) from another entity.

(o) In a case under chapter 11 of this title, the trustee shall be deemed to have assumed (consistent with the debtor's other obligations under section 507), and shall immediately cure any deficit under, any commitment by the debtor to a Federal depository institutions regulatory agency (or predecessor to such agency) to maintain the capital of an insured depository institution, and any claim for a subsequent breach of the obligations thereunder shall be entitled to priority under section 507. This subsection shall not extend any commitment that would otherwise be terminated by any act of such an agency.

(p)(1) If a lease of personal property is rejected or not timely assumed by the trustee under subsection (d), the leased property is no longer property of the estate and the stay under section 362(a) is automatically terminated.

(2)(A) If the debtor in a case under chapter 7 is an individual, the debtor may notify the creditor in writing that the debtor desires to assume the lease. Upon being so notified, the creditor may, at its option, notify the debtor that it is willing to have the lease assumed by the debtor and may condition such assumption on cure of any outstanding default on terms set by the contract.

(B) If, not later than 30 days after notice is provided under subparagraph (A), the debtor notifies the lessor in writing that the lease is assumed, the liability under the lease will be assumed by the debtor and not by the estate.

(C) The stay under section 362 and the injunction under section 524(a)(2) shall not be violated by notification of the debtor and negotiation of cure under this subsection.

(3) In a case under chapter 11 in which the debtor is an individual and in a case under chapter 13, if the debtor is the lessee with respect to personal property and the lease is not assumed in the plan confirmed by the court, the lease is deemed rejected as of the conclusion of the hearing on confirmation. If the lease is rejected, the stay under section 362 and any stay under section 1301 is automatically terminated with respect to the property subject to the lease.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2574; Pub. L. 98–353, title III, §§362, 402–404, July 10, 1984, 98 Stat. 361, 367; Pub. L. 99–554, title II, §§257(j), (m), 283(e), Oct. 27, 1986, 100 Stat. 3115, 3117; Pub. L. 100–506, §1(b), Oct. 18, 1988, 102 Stat. 2538; Pub. L. 101–647, title XXV, §2522(c), Nov. 29, 1990, 104 Stat. 4866; Pub. L. 102–365, §19(b)–(e), Sept. 3, 1992, 106 Stat. 982–984; Pub. L. 103–394, title II, §§205(a), 219(a), (b), title V, §501(d)(10), Oct. 22, 1994, 108 Stat. 4122, 4128, 4145; Pub. L. 103–429, §1, Oct. 31, 1994, 108 Stat. 4377; Pub. L. 109–8, title III, §§309(b), 328(a), title IV, §404, Apr. 20, 2005, 119 Stat. 82, 100, 104; Pub. L. 116–260, div. FF, title X, §1001(f)(1), (2)(A), Dec. 27, 2020, 134 Stat. 3219.)

AMENDMENT OF SUBSECTION (d)

*Pub. L. 116–260, div. FF, title X, §1001(f)(2)(A), Dec. 27, 2020, 134 Stat. 3219, provided that, effective on the date that is 2 years after Dec. 27, 2020, subsection (d) of this section is amended:*

*(1) in paragraph (3)—*

*(A) by striking ''(A)'' after ''(3)'';*

*(B) by striking '', except as provided in subparagraph (B)'' after ''such 60-day period''; and*

*(C) by striking subparagraphs (B) and (C); and*

*(2) in paragraph (4), by striking ''210'' each place it appears and inserting ''120''.*

*See 2020 Amendment notes below.*

HISTORICAL AND REVISION NOTES

LEGISLATIVE STATEMENTS

Section 365(b)(3) represents a compromise between H.R. 8200 as passed by the House and the Senate amendment. The provision adopts standards contained in section 365(b)(5) of the Senate amendment to define adequate assurance of future performance of a lease of real property in a shopping center.

Section 365(b)(4) of the House amendment indicates that after default the trustee may not require a lessor to supply services or materials without assumption unless the lessor is compensated as provided in the lease.

Section 365(c)(2) and (3) likewise represent a compromise between H.R. 8200 as passed by the House and the Senate amendment. Section 365(c)(2) is derived from section 365(b)(4) of the Senate amendment but does not apply to a contract to deliver equipment as provided in the Senate amendment. As contained in the House amendment, the provision prohibits a trustee or debtor in possession from assuming or assigning an executory contract of the debtor to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or the issuance of a security of the debtor.

Section 365(e) is a refinement of comparable provisions contained in the House bill and Senate amend-

ment. Sections 365(e)(1) and (2)(A) restate section 365(e) of H.R. 8200 as passed by the House. Sections 365(e)(2)(B) expands the section to permit termination of an executory contract or unexpired lease of the debtor if such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or for the issuance of a security of the debtor.

Characterization of contracts to make a loan, or extend other debt financing or financial accommodations, is limited to the extension of cash or a line of credit and is not intended to embrace ordinary leases or contracts to provide goods or services with payments to be made over time.

Section 365(f) is derived from H.R. 8200 as passed by the House. Deletion of language in section 365(f)(3) of the Senate amendment is done as a matter of style. Restrictions with respect to assignment of an executory contract or unexpired lease are superfluous since the debtor may assign an executory contract or unexpired lease of the debtor only if such contract is first assumed under section 364(f)(2)(A) of the House amendment.

Section 363(h) of the House amendment represents a modification of section 365(h) of the Senate amendment. The House amendment makes clear that in the case of a bankrupt lessor, a lessee may remain in possession for the balance of the term of a lease and any renewal or extension of the term only to the extent that such renewal or extension may be obtained by the lessee without the permission of the landlord or some third party under applicable non-bankruptcy law.

SENATE REPORT NO. 95–989

Subsection (a) of this section authorizes the trustee, subject to the court's approval, to assume or reject an executory contract or unexpired lease. Though there is no precise definition of what contracts are executory, it generally includes contracts on which performance remains due to some extent on both sides. A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of the contract would have been completed and the contract is no longer executory.

Because of the volatile nature of the commodities markets and the special provisions governing commodity broker liquidations in subchapter IV of chapter 7, the provisions governing distribution in section 765(a) will govern if any conflict between those provisions and the provisions of this section arise.

Subsections (b), (c), and (d) provide limitations on the trustee's powers. Subsection (b) requires the trustee to cure any default in the contract or lease and to provide adequate assurance of future performance if there has been a default, before he may assume. This provision does not apply to defaults under ipso facto or bankruptcy clauses, which is a significant departure from present law.

Subsection (b)(3) permits termination of leases entered into prior to the effective date of this title in liquidation cases if certain other conditions are met.

Subsection (b)(4) [enacted as (c)(2)] prohibits the trustee's assumption of an executory contract requiring the other party to make a loan or deliver equipment to or to issue a security of the debtor. The purpose of this subsection is to make it clear that a party to a transaction which is based upon the financial strength of a debtor should not be required to extend new credit to the debtor whether in the form of loans, lease financing, or the purchase or discount of notes.

Subsection (b)(5) provides that in lease situations common to shopping centers, protections must be provided for the lessor if the trustee assumes the lease, including protection against decline in percentage rents, breach of agreements with other tenants, and preservation of the tenant mix. Protection for tenant mix will not be required in the office building situation.

Subsection (c) prohibits the trustee from assuming or assigning a contract or lease if applicable nonbankruptcy law excuses the other party from performance

to someone other than the debtor, unless the other party consents. This prohibition applies only in the situation in which applicable law excuses the other party from performance independent of any restrictive language in the contract or lease itself.

Subsection (d) places time limits on assumption and rejection. In a liquidation case, the trustee must assume within 60 days (or within an additional 60 days, if the court, for cause, extends the time). If not assumed, the contract or lease is deemed rejected. In a rehabilitation case, the time limit is not fixed in the bill. However, if the other party to the contract or lease requests the court to fix a time, the court may specify a time within which the trustee must act. This provision will prevent parties in contractual or lease relationships with the debtor from being left in doubt concerning their status vis-a-vis the estate.

Subsection (e) invalidates ipso facto or bankruptcy clauses. These clauses, protected under present law, automatically terminate the contract or lease, or permit the other contracting party to terminate the contract or lease, in the event of bankruptcy. This frequently hampers rehabilitation efforts. If the trustee may assume or assign the contract under the limitations imposed by the remainder of the section, the contract or lease may be utilized to assist in the debtor's rehabilitation or liquidation.

The unenforcibility [sic] of ipso facto or bankruptcy clauses proposed under this section will require the courts to be sensitive to the rights of the nondebtor party to executory contracts and unexpired leases. If the trustee is to assume a contract or lease, the court will have to insure that the trustee's performance under the contract or lease gives the other contracting party the full benefit of his bargain.

This subsection does not limit the application of an ipso facto or bankruptcy clause if a new insolvency or receivership occurs after the bankruptcy case is closed. That is, the clause is not invalidated in toto, but merely made inapplicable during the case for the purposes of disposition of the executory contract or unexpired lease.

Subsection (f) partially invalidates restrictions on assignment of contracts or leases by the trustee to a third party. The subsection imposes two restrictions on the trustee: he must first assume the contract or lease, subject to all the restrictions on assumption found in the section, and adequate assurance of future performance must be provided to the other contracting party. Paragraph (3) of the subsection invalidates contractual provisions that permit termination or modification in the event of an assignment, as contrary to the policy of this subsection.

Subsection (g) defines the time as of which a rejection of an executory contract or unexpired lease constitutes a breach of the contract or lease. Generally, the breach is as of the date immediately preceding the date of the petition. The purpose is to treat rejection claims as prepetition claims. The remainder of the subsection specifies different times for cases that are converted from one chapter to another. The provisions of this subsection are not a substantive authorization to breach or reject an assumed contract. Rather, they prescribe the rules for the allowance of claims in case an assumed contract is breached, or if a case under chapter 11 in which a contract has been assumed is converted to a case under chapter 7 in which the contract is rejected.

Subsection (h) protects real property lessees of the debtor if the trustee rejects an unexpired lease under which the debtor is the lessor (or sublessor). The subsection permits the lessee to remain in possession of the leased property or to treat the lease as terminated by the rejection. The balance of the term of the lease referred to in paragraph (1) will include any renewal terms that are enforceable by the tenant, but not renewal terms if the landlord had an option to terminate. Thus, the tenant will not be deprived of his estate for the term for which he bargained. If the lessee remains in possession, he may offset the rent reserved under the

lease against damages caused by the rejection, but does not have any affirmative rights against the estate for any damages after the rejection that result from the rejection.

Subsection (i) gives a purchaser of real property under a land installment sales contract similar protection. The purchaser, if the contract is rejected, may remain in possession or may treat the contract as terminated. If the purchaser remains in possession, he is required to continue to make the payments due, but may offset damages that occur after rejection. The trustee is required to deliver title, but is relieved of all other obligations to perform.

A purchaser that treats the contract as terminated is granted a lien on the property to the extent of the purchase price paid. A party with a contract to purchase land from the debtor has a lien on the property to secure the price already paid, if the contract is rejected and the purchaser is not yet in possession.

Subsection (k) relieves the trustee and the estate of liability for a breach of an assigned contract or lease that occurs after the assignment.

HOUSE REPORT NO. 95–595

Subsection (c) prohibits the trustee from assuming or assigning a contract or lease if applicable nonbankruptcy law excuses the other party from performance to someone other than the debtor, unless the other party consents. This prohibition applies only in the situation in which applicable law excuses the other party from performance independent of any restrictive language in the contract or lease itself. The purpose of this subsection, at least in part, is to prevent the trustee from requiring new advances of money or other property. The section permits the trustee to continue to use and pay for property already advanced, but is not designed to permit the trustee to demand new leases or additional transfers of property under lease commitments.

Thus, under this provision, contracts such as loan commitments and letters of credit are nonassignable, and may not be assumed by the trustee.

Subsection (e) invalidates ipso facto or bankruptcy clauses. These clauses, protected under present law, automatically terminate the contract or lease, or permit the other contracting party to terminate the contract or lease, in the event of bankruptcy. This frequently hampers rehabilitation efforts. If the trustee may assume or assign the contract under the limitations imposed by the remainder of the section, then the contract or lease may be utilized to assist in the debtor's rehabilitation or liquidation.

The unenforceability of ipso facto or bankruptcy clauses proposed under this section will require the courts to be sensitive to the rights of the nondebtor party to executory contracts and unexpired leases. If the trustee is to assume a contract or lease, the courts will have to insure that the trustee's performance under the contract or lease gives the other contracting party the full benefit of his bargain. An example of the complexity that may arise in these situations and the need for a determination of all aspects of a particular executory contract or unexpired lease is the shopping center lease under which the debtor is a tenant in a shopping center.

A shopping center is often a carefully planned enterprise, and though it consists of numerous individual tenants, the center is planned as a single unit, often subject to a master lease or financing agreement. Under these agreements, the tenant mix in a shopping center may be as important to the lessor as the actual promised rental payments, because certain mixes will attract higher patronage of the stores in the center, and thus a higher rental for the landlord from those stores that are subject to a percentage of gross receipts rental agreement. Thus, in order to assure a landlord of his bargained for exchange, the court would have to consider such factors as the nature of the business to be conducted by the trustee or his assignee, whether that business complies with the requirements of any

master agreement, whether the kind of business proposed will generate gross sales in an amount such that the percentage rent specified in the lease is substantially the same as what would have been provided by the debtor, and whether the business proposed to be conducted would result in a breach of other clauses in master agreements relating, for example, to tenant mix and location.

This subsection does not limit the application of an ipso facto or bankruptcy clause to a new insolvency or receivership after the bankruptcy case is closed. That is, the clause is not invalidated in toto, but merely made inapplicable during the case for the purpose of disposition of the executory contract or unexpired lease.

### Editorial Notes

AMENDMENTS

2020—Subsec. (d)(3). Pub. L. 116–260, §1001(f)(2)(A)(i), struck out subpar. (A) designation before "The trustee", '', except as provided in subparagraph (B)'' after "such 60-day period" and subpars. (B) and (C). Prior to amendment, subpars. (B) and (C) related to extension of time for performance in case under subchapter V of chapter 11 where there was financial hardship due, directly or indirectly, to the coronavirus disease 2019 (COVID–19) pandemic and treatment of obligation as certain administrative expense, respectively.

Pub. L. 116–260, §1001(f)(1)(A), designated existing provisions as subpar. (A), inserted '', except as provided in subparagraph (B)'' after "such 60-day period" and added subpars. (B) and (C).

Subsec. (d)(4). Pub. L. 116–260, §1001(f)(2)(A)(ii), substituted "120" for "210" in two places.

Pub. L. 116–260, §1001(f)(1)(B), substituted "210" for "120" in two places.

2005—Subsec. (b)(1)(A). Pub. L. 109–8, §328(a)(1)(A), inserted before semicolon at end "other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph".

Subsec. (b)(2)(D). Pub. L. 109–8, §328(a)(1)(B), substituted "penalty rate or penalty provision" for "penalty rate or provision".

Subsec. (c)(4). Pub. L. 109–8, §328(a)(2), struck out par. (4) which read as follows: "such lease is of nonresidential real property under which the debtor is the lessee of an aircraft terminal or aircraft gate at an airport at which the debtor is the lessee under one or more additional nonresidential leases of an aircraft terminal or aircraft gate and the trustee, in connection with such assumption or assignment, does not assume all such leases or does not assume and assign all of such leases to the same person, except that the trustee may assume or assign less than all of such leases with the airport operator's written consent."

Subsec. (d)(4). Pub. L. 109–8, §404(a), amended par. (4) generally. Prior to amendment, par. (4) read as follows: "Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor."

Subsec. (d)(5) to (10). Pub. L. 109–8, §328(a)(3), redesignated par. (10) as (5) and struck out former pars. (5) to (9) which related to rejection of leases under which the debtor is an affected air carrier that is the lessee of an aircraft terminal or aircraft gate.

Subsec. (f)(1). Pub. L. 109–8, §404(b), substituted "provided in subsections (b) and" for "provided in subsection".

Pub. L. 109–8, §328(a)(4), struck out "; except that the trustee may not assign an unexpired lease of nonresidential real property under which the debtor is an affected air carrier that is the lessee of an aircraft terminal or aircraft gate if there has occurred a termination event" before period at end.

Subsec. (p). Pub. L. 109–8, §309(b), added subsec. (p).

1994—Subsec. (b)(2)(D). Pub. L. 103–394, §219(a), added subpar. (D).

Subsec. (d)(6)(C). Pub. L. 103–429, §1(1), substituted "section 40102(a) of title 49" for "section 101 of the Federal Aviation Act of 1958 (49 App. U.S.C. 1301)".

Pub. L. 103–394, §501(d)(10)(A), which directed the substitution of "section 40102 of title 49" for "the Federal Aviation Act of 1958 (49 U.S.C. 1301)", could not be executed because the phrase "(49 U.S.C. 1301)" did not appear in text.

Subsec. (d)(10). Pub. L. 103–394, §219(b), added par. (10).

Subsec. (g)(2)(A). Pub. L. 103–394, §501(d)(10)(B), substituted "1208, or 1307" for "1307, or 1208".

Subsec. (h). Pub. L. 103–394, §205(a), amended subsec. (h) generally. Prior to amendment, subsec. (h) read as follows:

"(h)(1) If the trustee rejects an unexpired lease of real property of the debtor under which the debtor is the lessor, or a timeshare interest under a timeshare plan under which the debtor is the timeshare interest seller, the lessee or timeshare interest purchaser under such lease or timeshare plan may treat such lease or timeshare plan as terminated by such rejection, where the disaffirmance by the trustee amounts to such a breach as would entitle the lessee or timeshare interest purchaser to treat such lease or timeshare plan as terminated by virtue of its own terms, applicable nonbankruptcy law, or other agreements the lessee or timeshare interest purchaser has made with other parties; or, in the alternative, the lessee or timeshare interest purchaser may remain in possession of the leasehold or timeshare interest under any lease or timeshare plan the term of which has commenced for the balance of such term and for any renewal or extension of such term that is enforceable by such lessee or timeshare interest purchaser under applicable nonbankruptcy law.

"(2) If such lessee or timeshare interest purchaser remains in possession as provided in paragraph (1) of this subsection, such lessee or timeshare interest purchaser may offset against the rent reserved under such lease or moneys due for such timeshare interest for the balance of the term after the date of the rejection of such lease or timeshare interest, and any such renewal or extension thereof, any damages occurring after such date caused by the nonperformance of any obligation of the debtor under such lease or timeshare plan after such date, but such lessee or timeshare interest purchaser does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset."

Subsec. (n)(1)(B). Pub. L. 103–394, §501(d)(10)(C), substituted "a right to" for "a right to to".

Subsec. (o). Pub. L. 103–394, §501(d)(10)(D), substituted "a Federal depository institutions regulatory agency (or predecessor to such agency)" for "the Federal Deposit Insurance Corporation, the Resolution Trust Corporation, the Director of the Office of Thrift Supervision, the Comptroller of the Currency, or the Board of Governors of the Federal Reserve System, or its predecessors or successors".

Subsec. (p). Pub. L. 103–429, §1(2), which directed the amendment of subsec. (p) by substituting "section 40102(a) of title 49" for "section 101(3) of the Federal Aviation Act of 1958", could not be executed because subsec. (p) was repealed by Pub. L. 103–394, §501(d)(10)(E). See below.

Pub. L. 103–394, §501(d)(10)(E), struck out subsec. (p), which read as follows: "In this section, 'affected air carrier' means an air carrier, as defined in section 101(3) of the Federal Aviation Act of 1958, that holds 65 percent or more in number of the aircraft gates at an airport—

"(1) which is a Large Air Traffic Hub as defined by the Federal Aviation Administration in Report FAA–AP 92–1, February 1992; and

"(2) all of whose remaining aircraft gates are leased or under contract on the date of enactment of this subsection."

1992—Subsec. (c)(4). Pub. L. 102–365, §19(c), added par. (4).

Subsec. (d)(5) to (9). Pub. L. 102–365, §19(b), added pars. (5) to (9).

Subsec. (f)(1). Pub. L. 102–365, §19(d), substituted for period at end "; except that the trustee may not assign an unexpired lease of nonresidential real property under which the debtor is an affected air carrier that is the lessee of an aircraft terminal or aircraft gate if there has occurred a termination event."

Subsec. (p). Pub. L. 102–365, §19(e), added subsec. (p).

1990—Subsec. (o). Pub. L. 101–647 added subsec. (o).

1988—Subsec. (n). Pub. L. 100–506 added subsec. (n).

1986—Subsec. (c)(1)(A). Pub. L. 99–554, §283(e)(1), struck out "or an assignee of such contract or lease" after "debtor in possession".

Subsec. (c)(3). Pub. L. 99–554, §283(e)(2), inserted "is" after "lease" and "and" after "property".

Subsecs. (d)(2), (g)(1). Pub. L. 99–554, §257(j), (m)(1), inserted reference to chapter 12.

Subsec. (g)(2). Pub. L. 99–554, §257(m)(2), inserted references to chapter 12 and section 1208 of this title.

Subsec. (h)(1). Pub. L. 99–554, §283(e)(2), inserted "or timeshare plan" after "to treat such lease".

Subsec. (m). Pub. L. 99–554, §283(e)(3), substituted "362(b)(10)" for "362(b)(9)".

1984—Subsec. (a). Pub. L. 98–353, §362(a), amended subsec. (a) generally, making minor changes.

Subsec. (b). Pub. L. 98–353, §362(a), amended subsec. (b) generally, inserting in par. (3) reference to par. (2)(B) of subsec. (f) of this section, in par. (3)(A) inserting provisions relating to financial condition and operating performance in the case of an assignment, and in par. (3)(C) substituting "that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center" for "that assumption or assignment of such lease will not breach substantially any provision, such as a radius, location, use, or exclusivity provision, in any other lease, financing agreement, or master agreement relating to such shopping center".

Subsec. (c). Pub. L. 98–353, §362(a), amended subsec. (c) generally, substituting in par. (1)(A) "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession or an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties" for "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties" and adding par. (3).

Subsec. (d). Pub. L. 98–353, §362(a), amended subsec. (d) generally, inserting in par. (1) reference to residential real property or personal property of the debtor, inserting in par. (2) reference to residential real property or personal property of the debtor, and adding pars. (3) and (4).

Subsec. (h)(1). Pub. L. 98–353, §402, amended par. (1) generally. Prior to amendment, par. (1) read as follows: "If the trustee rejects an unexpired lease of real prop-

erty of the debtor under which the debtor is the lessor, the lessee under such lease may treat the lease as terminated by such rejection, or, in the alternative, may remain in possession for the balance of the term of such lease and any renewal or extension of such term that is enforceable by such lessee under applicable nonbankruptcy law."

Subsec. (h)(2). Pub. L. 98–353, §403, amended par. (2) generally. Prior to amendment, par. (2) read as follows: "If such lessee remains in possession, such lessee may offset against the rent reserved under such lease for the balance of the term after the date of the rejection of such lease, and any such renewal or extension, any damages occurring after such date caused by the nonperformance of any obligation of the debtor after such date, but such lessee does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset."

Subsec. (i)(1). Pub. L. 98–353, §404, amended par. (1) generally, inserting provisions relating to timeshare interests under timeshare plans.

Subsecs. (l), (m). Pub. L. 98–353, §362(b), added subsecs. (l) and (m).

#### Statutory Notes and Related Subsidiaries

##### Effective Date of 2020 Amendment

Pub. L. 116–260, div. FF, title X, §1001(f)(2)(A), Dec. 27, 2020, 134 Stat. 3219, provided that the amendment made by section 1001(f)(2)(A) is effective on the date that is 2 years after Dec. 27, 2020.

Pub. L. 116–260, div. FF, title X, §1001(f)(2)(B), Dec. 27, 2020, 134 Stat. 3219, provided that: "Notwithstanding the amendments made by subparagraph (A) [amending this section], the amendments made by paragraph (1) [amending this section] shall apply in any case commenced under subchapter V of chapter 11 of title 11, United States Code, before the date that is 2 years after the date of enactment of this Act [Dec. 27, 2020]."

##### Effective Date of 2005 Amendment

Amendment by Pub. L. 109–8 effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as a note under section 101 of this title.

##### Effective Date of 1994 Amendment

Amendment by Pub. L. 103–394 effective Oct. 22, 1994, and not applicable with respect to cases commenced under this title before Oct. 22, 1994, see section 702 of Pub. L. 103–394, set out as a note under section 101 of this title.

##### Effective Date of 1992 Amendment

Pub. L. 102–365, §19(f), Sept. 2, 1992, 106 Stat. 984, provided that: "The amendments made by this section [amending this section] shall be in effect for the 12-month period that begins on the date of enactment of this Act [Sept. 3, 1992] and shall apply in all proceedings involving an affected air carrier (as defined in section 365(p) of title 11, United States Code, as amended by this section) that are pending during such 12-month period. Not later than 9 months after the date of enactment, the Administrator of the Federal Aviation Administration shall report to the Committee on Commerce, Science, and Transportation and Committee on the Judiciary of the Senate and the Committee on the Judiciary and Committee on Public Works and Transportation of the House of Representatives on whether this section shall apply to proceedings that are commenced after such 12-month period."

##### Effective Date of 1988 Amendment

Amendment by Pub. L. 100–506 effective Oct. 18, 1988, but not applicable to any case commenced under this title before such date, see section 2 of Pub. L. 100–506, set out as a note under section 101 of this title.

##### Effective Date of 1986 Amendment

Amendment by section 257 of Pub. L. 99–554 effective 30 days after Oct. 27, 1986, but not applicable to cases commenced under this title before that date, see section 302(a), (c)(1) of Pub. L. 99–554, set out as a note under section 581 of Title 28, Judiciary and Judicial Procedure.

Amendment by section 283 of Pub. L. 99–554 effective 30 days after Oct. 27, 1986, see section 302(a) of Pub. L. 99–554.

##### Effective Date of 1984 Amendment

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

##### Airport Leases

Pub. L. 102–365, §19(a), Sept. 2, 1992, 106 Stat. 982, provided that: "Congress finds that—

"(1) there are major airports served by an air carrier that has leased a substantial majority of the airport's gates;

"(2) the commerce in the region served by such a major airport can be disrupted if the air carrier that leases most of its gates enters bankruptcy and either discontinues or materially reduces service; and

"(3) it is important that such airports be empowered to continue service in the event of such a disruption."

### §366. Utility service

(a) Except as provided in subsections (b) and (c) of this section, a utility may not alter, refuse, or discontinue service to, or discriminate against, the trustee or the debtor solely on the basis of the commencement of a case under this title or that a debt owed by the debtor to such utility for service rendered before the order for relief was not paid when due.

(b) Such utility may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date. On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

(c)(1)(A) For purposes of this subsection, the term "assurance of payment" means—

(i) a cash deposit;

(ii) a letter of credit;

(iii) a certificate of deposit;

(iv) a surety bond;

(v) a prepayment of utility consumption; or

(vi) another form of security that is mutually agreed on between the utility and the debtor or the trustee.

(B) For purposes of this subsection an administrative expense priority shall not constitute an assurance of payment.

(2) Subject to paragraphs (3) and (4), with respect to a case filed under chapter 11, a utility referred to in subsection (a) may alter, refuse, or discontinue utility service, if during the 30-day period beginning on the date of the filing of the petition, the utility does not receive from the debtor or the trustee adequate assurance of payment for utility service that is satisfactory to the utility.

(3)(A) On request of a party in interest and after notice and a hearing, the court may order modification of the amount of an assurance of payment under paragraph (2).

(B) In making a determination under this paragraph whether an assurance of payment is adequate, the court may not consider—

(i) the absence of security before the date of the filing of the petition;

(ii) the payment by the debtor of charges for utility service in a timely manner before the date of the filing of the petition; or

(iii) the availability of an administrative expense priority.

(4) Notwithstanding any other provision of law, with respect to a case subject to this subsection, a utility may recover or set off against a security deposit provided to the utility by the debtor before the date of the filing of the petition without notice or order of the court.

(Pub. L. 95–598, Nov. 6, 1978, 92 Stat. 2578; Pub. L. 98–353, title III, § 443, July 10, 1984, 98 Stat. 373; Pub. L. 109–8, title IV, § 417, Apr. 20, 2005, 119 Stat. 108; Pub. L. 116–260, div. FF, title X, § 1001(h), Dec. 27, 2020, 134 Stat. 3221.)

HISTORICAL AND REVISION NOTES

LEGISLATIVE STATEMENTS

Section 366 of the House amendment represents a compromise between comparable provisions contained in H.R. 8200 as passed by the House and the Senate amendment. Subsection (a) is modified so that the applicable date is the date of the order for relief rather than the date of the filing of the petition. Subsection (b) contains a similar change but is otherwise derived from section 366(b) of the Senate amendment, with the exception that a time period for continued service of 20 days rather than 10 days is adopted.

SENATE REPORT NO. 95–989

This section gives debtors protection from a cut-off of service by a utility because of the filing of a bankruptcy case. This section is intended to cover utilities that have some special position with respect to the debtor, such as an electric company, gas supplier, or telephone company that is a monopoly in the area so that the debtor cannot easily obtain comparable service from another utility. The utility may not alter, refuse, or discontinue service because of the nonpayment of a bill that would be discharged in the bankruptcy case. Subsection (b) protects the utility company by requiring the trustee or the debtor to provide, within ten days, adequate assurance of payment for service provided after the date of the petition.

Editorial Notes

AMENDMENTS

2020—Subsec. (d). Pub. L. 116–260, § 1001(h)(2), struck out subsec. (d) which read as follows: "Notwithstanding any other provision of this section, a utility may not alter, refuse, or discontinue service to a debtor who does not furnish adequate assurance of payment under this section if the debtor—

"(1) is an individual;

"(2) makes a payment to the utility for any debt owed to the utility for service provided during the 20-day period beginning on the date of the order for relief; and

"(3) after the date on which the 20-day period beginning on the date of the order for relief ends, makes a payment to the utility for services provided during the pendency of case when such a payment becomes due."

Pub. L. 116–260, § 1001(h)(1), added subsec. (d).

2005—Subsec. (a). Pub. L. 109–8, § 417(1), substituted "subsections (b) and (c)" for "subsection (b)".

Subsec. (c). Pub. L. 109–8, § 417(2), added subsec. (c).

1984—Subsec. (a). Pub. L. 98–353 inserted "of the commencement of a case under this title or" after "basis".

Statutory Notes and Related Subsidiaries

EFFECTIVE DATE OF 2020 AMENDMENT

Pub. L. 116–260, div. FF, title X, § 1001(h)(2), Dec. 27, 2020, 134 Stat. 3221, provided that the amendment made by section 1001(h)(2) is effective on the date that is 1 year after Dec. 27, 2020.

EFFECTIVE DATE OF 2005 AMENDMENT

Amendment by Pub. L. 109–8 effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as a note under section 101 of this title.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–353 effective with respect to cases filed 90 days after July 10, 1984, see section 552(a) of Pub. L. 98–353, set out as a note under section 101 of this title.

# CHAPTER 5—CREDITORS, THE DEBTOR, AND THE ESTATE

SUBCHAPTER I—CREDITORS AND CLAIMS

Sec.
501.    Filing of proofs of claims or interests.
502.    Allowance of claims or interests.
503.    Allowance of administrative expenses.
504.    Sharing of compensation.
505.    Determination of tax liability.
506.    Determination of secured status.
507.    Priorities.
508.    Effect of distribution other than under this title.
509.    Claims of codebtors.
510.    Subordination.
511.    Rate of interest on tax claims.

SUBCHAPTER II—DEBTOR'S DUTIES AND BENEFITS

521.    Debtor's duties.
522.    Exemptions.
523.    Exceptions to discharge.
524.    Effect of discharge.
525.    Protection against discriminatory treatment.
526.    Restrictions on debt relief agencies.
527.    Disclosures.
528.    Requirements for debt relief agencies.

SUBCHAPTER III—THE ESTATE

541.    Property of the estate.
542.    Turnover of property to the estate.
543.    Turnover of property by a custodian.
544.    Trustee as lien creditor and as successor to certain creditors and purchasers.
545.    Statutory liens.
546.    Limitations on avoiding powers.
547.    Preferences.
548.    Fraudulent transfers and obligations.
549.    Postpetition transactions.
550.    Liability of transferee of avoided transfer.
551.    Automatic preservation of avoided transfer.
552.    Postpetition effect of security interest.
553.    Setoff.
554.    Abandonment of property of the estate.
555.    Contractual right to liquidate, terminate, or accelerate a securities contract.
556.    Contractual right to liquidate, terminate, or accelerate a commodities contract or forward contract.

Special tax provision: Section 1331 of title 11 of the House bill and the comparable provisions in sections 1322 and 1327(d) of the Senate amendment, pertaining to assessment and collection of taxes in wage earner plans, are deleted, and the governing rule is placed in section 505(c) of the House amendment. The provisions of both bills allowing assessment and collection of taxes after confirmation of the wage-earner plan are modified to allow assessment and collection after the court fixes the fact and amount of a tax liability, including administrative period taxes, regardless of whether this occurs before or after confirmation of the plan. The provision of the House bill limiting the collection of taxes to those assessed before one year after the filing of the petition is eliminated, thereby leaving the period of limitations on assessment of these nondischargeable tax liabilities the usual period provided by the Internal Revenue Code [Title 26].

SENATE REPORT NO. 95–989

The court may revoke an order of confirmation procured by fraud, after notice and hearing, on application of a party in interest filed within 180 days after the entry of the order. Thereafter, unless a modified plan is confirmed, the court is to convert or dismiss the chapter 13 case as provided in section 1307.

CHAPTER 15—ANCILLARY AND OTHER
CROSS-BORDER CASES

Sec.
1501.       Purpose and scope of application.
       SUBCHAPTER I—GENERAL PROVISIONS
1502.       Definitions.
1503.       International obligations of the United States.
1504.       Commencement of ancillary case.
1505.       Authorization to act in a foreign country.
1506.       Public policy exception.
1507.       Additional assistance.
1508.       Interpretation.
SUBCHAPTER II—ACCESS OF FOREIGN REPRESENTATIVES AND CREDITORS TO THE COURT
1509.       Right of direct access.
1510.       Limited jurisdiction.
1511.       Commencement of case under section 301 or 303.[1]
1512.       Participation of a foreign representative in a case under this title.
1513.       Access of foreign creditors to a case under this title.
1514.       Notification to foreign creditors concerning a case under this title.
       SUBCHAPTER III—RECOGNITION OF A FOREIGN PROCEEDING AND RELIEF
1515.       Application for recognition.
1516.       Presumptions concerning recognition.
1517.       Order granting recognition.
1518.       Subsequent information.
1519.       Relief that may be granted upon filing petition for recognition.
1520.       Effects of recognition of a foreign main proceeding.
1521.       Relief that may be granted upon recognition.
1522.       Protection of creditors and other interested persons.
1523.       Actions to avoid acts detrimental to creditors.
1524.       Intervention by a foreign representative.
       SUBCHAPTER IV—COOPERATION WITH FOREIGN COURTS AND FOREIGN REPRESENTATIVES
1525.       Cooperation and direct communication between the court and foreign courts or foreign representatives.

Sec.
1526.       Cooperation and direct communication between the trustee and foreign courts or foreign representatives.
1527.       Forms of cooperation.
       SUBCHAPTER V—CONCURRENT PROCEEDINGS
1528.       Commencement of a case under this title after recognition of a foreign main proceeding.
1529.       Coordination of a case under this title and a foreign proceeding.
1530.       Coordination of more than 1 foreign proceeding.
1531.       Presumption of insolvency based on recognition of a foreign main proceeding.
1532.       Rule of payment in concurrent proceedings.

**Editorial Notes**

PRIOR PROVISIONS

A prior chapter 15, consisting of sections 1501 to 151326, related to a pilot program for a United States trustee system, prior to repeal by Pub. L. 99–554, title II, § 231, Oct. 27, 1986, 100 Stat. 3103.

## § 1501. Purpose and scope of application

(a) The purpose of this chapter is to incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of—

(1) cooperation between—

(A) courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and

(B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;

(2) greater legal certainty for trade and investment;

(3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;

(4) protection and maximization of the value of the debtor's assets; and

(5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

(b) This chapter applies where—

(1) assistance is sought in the United States by a foreign court or a foreign representative in connection with a foreign proceeding;

(2) assistance is sought in a foreign country in connection with a case under this title;

(3) a foreign proceeding and a case under this title with respect to the same debtor are pending concurrently; or

(4) creditors or other interested persons in a foreign country have an interest in requesting the commencement of, or participating in, a case or proceeding under this title.

(c) This chapter does not apply to—

(1) a proceeding concerning an entity, other than a foreign insurance company, identified by exclusion in section 109(b);

(2) an individual, or to an individual and such individual's spouse, who have debts within the limits specified in section 109(e) and who are citizens of the United States or aliens lawfully admitted for permanent residence in the United States; or

_____
[1] So in original. Section catchline amended by Pub. L. 111–327 without corresponding amendment of chapter analysis.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## SUBCHAPTER III—RECOGNITION OF A FOREIGN PROCEEDING AND RELIEF

### § 1515. Application for recognition

(a) A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

(b) A petition for recognition shall be accompanied by—

(1) a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2) a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

(3) in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

(c) A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

(d) The documents referred to in paragraphs (1) and (2) of subsection (b) shall be translated into English. The court may require a translation into English of additional documents.

(Added Pub. L. 109–8, title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 139.)

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

### § 1516. Presumptions concerning recognition

(a) If the decision or certificate referred to in section 1515(b) indicates that the foreign proceeding is a foreign proceeding and that the person or body is a foreign representative, the court is entitled to so presume.

(b) The court is entitled to presume that documents submitted in support of the petition for recognition are authentic, whether or not they have been legalized.

(c) In the absence of evidence to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the center of the debtor's main interests.

(Added Pub. L. 109–8, title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 139.)

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

### § 1517. Order granting recognition

(a) Subject to section 1506, after notice and a hearing, an order recognizing a foreign proceeding shall be entered if—

(1) such foreign proceeding for which recognition is sought is a foreign main proceeding or foreign nonmain proceeding within the meaning of section 1502;

(2) the foreign representative applying for recognition is a person or body; and

(3) the petition meets the requirements of section 1515.

(b) Such foreign proceeding shall be recognized—

(1) as a foreign main proceeding if it is pending in the country where the debtor has the center of its main interests; or

(2) as a foreign nonmain proceeding if the debtor has an establishment within the meaning of section 1502 in the foreign country where the proceeding is pending.

(c) A petition for recognition of a foreign proceeding shall be decided upon at the earliest possible time. Entry of an order recognizing a foreign proceeding constitutes recognition under this chapter.

(d) The provisions of this subchapter do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist, but in considering such action the court shall give due weight to possible prejudice to parties that have relied upon the order granting recognition. A case under this chapter may be closed in the manner prescribed under section 350.

(Added Pub. L. 109–8, title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 139.)

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

### § 1518. Subsequent information

From the time of filing the petition for recognition of a foreign proceeding, the foreign representative shall file with the court promptly a notice of change of status concerning—

(1) any substantial change in the status of such foreign proceeding or the status of the foreign representative's appointment; and

(2) any other foreign proceeding regarding the debtor that becomes known to the foreign representative.

(Added Pub. L. 109–8, title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 140.)

**Statutory Notes and Related Subsidiaries**

Effective Date

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## § 1519. Relief that may be granted upon filing petition for recognition

(a) From the time of filing a petition for recognition until the court rules on the petition, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including—

(1) staying execution against the debtor's assets;

(2) entrusting the administration or realization of all or part of the debtor's assets located in the United States to the foreign representative or another person authorized by the court, including an examiner, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy; and

(3) any relief referred to in paragraph (3), (4), or (7) of section 1521(a).

(b) Unless extended under section 1521(a)(6), the relief granted under this section terminates when the petition for recognition is granted.

(c) It is a ground for denial of relief under this section that such relief would interfere with the administration of a foreign main proceeding.

(d) The court may not enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding, under this section.

(e) The standards, procedures, and limitations applicable to an injunction shall apply to relief under this section.

(f) The exercise of rights not subject to the stay arising under section 362(a) pursuant to paragraph (6), (7), (17), or (27) of section 362(b) or pursuant to section 362(o) shall not be stayed by any order of a court or administrative agency in any proceeding under this chapter.

(Added Pub. L. 109–8, title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 140; amended Pub. L. 111–327, § 2(a)(46), Dec. 22, 2010, 124 Stat. 3562.)

**Editorial Notes**

Amendments

2010—Subsec. (f). Pub. L. 111–327 substituted ''362(o)'' for ''362(n)''.

**Statutory Notes and Related Subsidiaries**

Effective Date

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## § 1520. Effects of recognition of a foreign main proceeding

(a) Upon recognition of a foreign proceeding that is a foreign main proceeding—

(1) sections 361 and 362 apply with respect to the debtor and the property of the debtor that is within the territorial jurisdiction of the United States;

(2) sections 363, 549, and 552 apply to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of an estate;

(3) unless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by sections 363 and 552; and

(4) section 552 applies to property of the debtor that is within the territorial jurisdiction of the United States.

(b) Subsection (a) does not affect the right to commence an individual action or proceeding in a foreign country to the extent necessary to preserve a claim against the debtor.

(c) Subsection (a) does not affect the right of a foreign representative or an entity to file a petition commencing a case under this title or the right of any party to file claims or take other proper actions in such a case.

(Added Pub. L. 109–8, title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 141.)

**Statutory Notes and Related Subsidiaries**

Effective Date

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## § 1521. Relief that may be granted upon recognition

(a) Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—

(1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

(2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

(3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);

(4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

(6) extending relief granted under section 1519(a); and

(7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

(b) Upon recognition of a foreign proceeding, whether main or nonmain, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative or another person, including an examiner, authorized by the court, provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected.

(c) In granting relief under this section to a representative of a foreign nonmain proceeding, the court must be satisfied that the relief relates to assets that, under the law of the United States, should be administered in the foreign nonmain proceeding or concerns information required in that proceeding.

(d) The court may not enjoin a police or regulatory act of a governmental unit, including a criminal action or proceeding, under this section.

(e) The standards, procedures, and limitations applicable to an injunction shall apply to relief under paragraphs (1), (2), (3), and (6) of subsection (a).

(f) The exercise of rights not subject to the stay arising under section 362(a) pursuant to paragraph (6), (7), (17), or (27) of section 362(b) or pursuant to section 362(o) shall not be stayed by any order of a court or administrative agency in any proceeding under this chapter.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 141; amended Pub. L. 111–327, §2(a)(47), Dec. 22, 2010, 124 Stat. 3562.)

**Editorial Notes**

AMENDMENTS

2010—Subsec. (f). Pub. L. 111–327 substituted ''362(o)'' for ''362(n)''.

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

§ 1522. Protection of creditors and other interested persons

(a) The court may grant relief under section 1519 or 1521, or may modify or terminate relief under subsection (c), only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected.

(b) The court may subject relief granted under section 1519 or 1521, or the operation of the debt-

or's business under section 1520(a)(3), to conditions it considers appropriate, including the giving of security or the filing of a bond.

(c) The court may, at the request of the foreign representative or an entity affected by relief granted under section 1519 or 1521, or at its own motion, modify or terminate such relief.

(d) Section 1104(d) shall apply to the appointment of an examiner under this chapter. Any examiner shall comply with the qualification requirements imposed on a trustee by section 322.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 142.)

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

§ 1523. Actions to avoid acts detrimental to creditors

(a) Upon recognition of a foreign proceeding, the foreign representative has standing in a case concerning the debtor pending under another chapter of this title to initiate actions under sections 522, 544, 545, 547, 548, 550, 553, and 724(a).

(b) When a foreign proceeding is a foreign nonmain proceeding, the court must be satisfied that an action under subsection (a) relates to assets that, under United States law, should be administered in the foreign nonmain proceeding.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 142.)

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

§ 1524. Intervention by a foreign representative

Upon recognition of a foreign proceeding, the foreign representative may intervene in any proceedings in a State or Federal court in the United States in which the debtor is a party.

(Added Pub. L. 109–8, title VIII, §801(a), Apr. 20, 2005, 119 Stat. 142.)

**Statutory Notes and Related Subsidiaries**

EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

SUBCHAPTER IV—COOPERATION WITH FOREIGN COURTS AND FOREIGN REPRESENTATIVES

## § 1525. Cooperation and direct communication between the court and foreign courts or foreign representatives

(a) Consistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee.

(b) The court is entitled to communicate directly with, or to request information or assistance directly from, a foreign court or a foreign representative, subject to the rights of a party in interest to notice and participation.

(Added Pub. L. 109–8, title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 143.)

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## § 1526. Cooperation and direct communication between the trustee and foreign courts or foreign representatives

(a) Consistent with section 1501, the trustee or other person, including an examiner, authorized by the court, shall, subject to the supervision of the court, cooperate to the maximum extent possible with a foreign court or a foreign representative.

(b) The trustee or other person, including an examiner, authorized by the court is entitled, subject to the supervision of the court, to communicate directly with a foreign court or a foreign representative.

(Added Pub. L. 109–8, title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 143.)

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## § 1527. Forms of cooperation

Cooperation referred to in sections 1525 and 1526 may be implemented by any appropriate means, including—

(1) appointment of a person or body, including an examiner, to act at the direction of the court;

(2) communication of information by any means considered appropriate by the court;

(3) coordination of the administration and supervision of the debtor's assets and affairs;

(4) approval or implementation of agreements concerning the coordination of proceedings; and

(5) coordination of concurrent proceedings regarding the same debtor.

(Added Pub. L. 109–8, title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 143.)

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

SUBCHAPTER V—CONCURRENT PROCEEDINGS

## § 1528. Commencement of a case under this title after recognition of a foreign main proceeding

After recognition of a foreign main proceeding, a case under another chapter of this title may be commenced only if the debtor has assets in the United States. The effects of such case shall be restricted to the assets of the debtor or that are within the territorial jurisdiction of the United States and, to the extent necessary to implement cooperation and coordination under sections 1525, 1526, and 1527, to other assets of the debtor that are within the jurisdiction of the court under sections 541(a) of this title, and 1334(e) of title 28, to the extent that such other assets are not subject to the jurisdiction and control of a foreign proceeding that has been recognized under this chapter.

(Added Pub. L. 109–8, title VIII, § 801(a), Apr. 20, 2005, 119 Stat. 143.)

### Statutory Notes and Related Subsidiaries

#### EFFECTIVE DATE

Section effective 180 days after Apr. 20, 2005, and not applicable with respect to cases commenced under this title before such effective date, except as otherwise provided, see section 1501 of Pub. L. 109–8, set out as an Effective Date of 2005 Amendment note under section 101 of this title.

## § 1529. Coordination of a case under this title and a foreign proceeding

If a foreign proceeding and a case under another chapter of this title are pending concurrently regarding the same debtor, the court shall seek cooperation and coordination under sections 1525, 1526, and 1527, and the following shall apply:

(1) If the case in the United States is pending at the time the petition for recognition of such foreign proceeding is filed—

(A) any relief granted under section 1519 or 1521 must be consistent with the relief granted in the case in the United States; and

(B) section 1520 does not apply even if such foreign proceeding is recognized as a foreign main proceeding.

(2) If a case in the United States under this title commences after recognition, or after the date of the filing of the petition for recognition, of such foreign proceeding—

(A) any relief in effect under section 1519 or 1521 shall be reviewed by the court and

# H5 6 ˙4

# *Re* Rooftop Group International Pte Ltd and another
# (Triumphant Gold Ltd and another, non-parties)

## [2019] SGHC 280

High Court — Originating Summons No 773 of 2019
Aedit Abdullah J
15 August 2019; 3 December 2019

*Insolvency Law — Cross-border insolvency — Coordination of cross-border insolvency proceedings — Appointment of foreign representative of foreign proceeding — Whether court had authority to appoint different person as foreign representative of foreign proceeding — Articles 2(i) and 21(1)(e) of Tenth Schedule, Companies Act (Cap 50, 2006 Rev Ed)*

*Insolvency Law — Cross-border insolvency — Coordination of cross-border insolvency proceedings — Debtor company seeking stay of local proceedings to enforce share charge over its shares — Whether court should stay local proceeding potentially affecting conduct of foreign proceeding*

*Insolvency Law — Cross-border insolvency — Recognition of foreign insolvency proceedings — Location of applicant company's centre of main interests — Operative date of ascertainment of centre of main interests — Whether presumption in favour of place of debtor's registered office should be rebutted and factors to be considered — Articles 16(3) and 17 of Tenth Schedule, Companies Act (Cap 50, 2006 Rev Ed)*

## Facts

Rooftop Group International Pte Ltd ("the first applicant"), a Singapore-incorporated company, was in the business of manufacturing and selling toys and hobby-grade drones. After encountering liquidity problems, it applied for Chapter 11 proceedings in the US Bankruptcy Court for the Northern District of Texas ("the US Chapter 11 Proceedings"), following which an automatic moratorium came into effect. This was followed by the present application by the first applicant and its putative foreign representative, Mr Darren Scott Matloff ("the second applicant"), for recognition of the US Chapter 11 proceedings as a foreign main proceeding and assistance under the United Nations Commission on International Trade Law (UNCITRAL) Model Law on Cross-Border Insolvency (30 May 1997) ("the Model Law") as enacted in the Tenth Schedule of the Companies Act (Cap 50, 2006 Rev Ed) ("CA").

The assistance requested by the applicants included a moratorium against: (a) the winding up of the first applicant; (b) the commencement or continuation of legal proceedings against the first applicant;(c) the commencement, continuation or levy of any execution, distress or other legal process against any property of the first applicant; and (d) the right to transfer, encumber or otherwise dispose of any property of the first applicant. The applicants also specifically sought a stay of proceedings in Originating Summons No 544 of 2018 ("OS 544/2019") and Suit No 252 of 2019 ("S 252/2019"). OS 544/2019 was an application by Triumphant Gold Limited ("TGL"), a creditor of the first applicant, to enforce a share charge it held over 44 shares in the first applicant

held by Gandiva Investments Limited ("GIL"), which might lead to a change of control in the first applicant. S 252/2019 was an action by TGL against the first applicant, Asian Express Holdings Ltd ("AE") and GIL for sums loaned to the first applicant and guaranteed by the latter two entities.

The application was opposed by two of the first applicant's creditors, TGL and Polar Venture Overseas Limited, the non-parties in the proceedings. The non-parties did not oppose the recognition of the US Chapter 11 proceedings as a foreign non-main proceeding but opposed the recognition of the second applicant as the first applicant's foreign representative. The non-parties also did not oppose a stay of enforcement proceedings in S 252/2019 against the first applicant, but took the position that any assistance granted should not include a stay of legal proceedings in OS 544/2019.

**Held, granting the application in part:**

(1)    Applying the approach laid down in *Re Zetta Jet* [2019] 4 SLR 1343, the US Chapter 11 Proceedings would be recognised as a foreign non-main proceeding as Singapore was the first applicant's centre of main interests ("COMI") as of the date of application for recognition. The fact that the first applicant was incorporated in Singapore led to a presumption that its COMI was located in Singapore. The fact that the location of the majority of the first applicant's sales, and the location of the majority of its assets consisting of intellectual property rights, was the US did not definitively point to its COMI being located in the US. The fact that the primary decision maker of the first applicant, the second applicant, was located in the US similarly did not do so as there was little evidence available to third parties demonstrating that the first applicant's operational decisions were being made in the US. Taken together with the other factors pointing away from the US as the first applicant's COMI, the applicants failed to rebut the presumption that the first applicant's COMI was in Singapore, and the US Chapter 11 Proceedings would be recognised as a foreign non-main proceeding: at [14] and [18] to [22].

(2)    The primary difference in respect of assistance granted to foreign main and foreign non-main proceedings was that in respect of the latter, stays and other orders would be discretionary. The general inclination would be to grant such orders to assist the foreign representative to the same degree and extent as would be granted to a local insolvency representative to serve the objectives of modified universalism. Such an inclination would be displaced where factors point to the need to address any overriding interests within the jurisdiction, such as possible societal concerns or employee rights: at [26] and [27].

(3)    The fact that the enforcement of the share charge in OS 544/2019 might result in a change of control in the first applicant was not a reason to grant a moratorium affecting the proceeding. Assistance under the Model Law was to ensure the orderly and equitable distribution of assets and facilitate the process of restructuring where possible. It was not intended to protect or preserve a party's position within the company in the case of a dispute between shareholders, or prevent a different view being taken subsequently in the foreign proceedings about the direction of the restructuring. There was nothing in s 259 of the CA which assisted the applicants in this regard: at [35].

(4)     Common law recognition would not be available to assist the applicants as a basis on which OS 544/2019 could be stayed. The detailed recognition regime created by the Model Law displaced the need for common law doctrine to apply. Recognition in most, if not all, foreign corporate insolvency proceedings would have to be made under the Model Law: at [58].

(5)     It was irrelevant that the US Chapter 11 Proceedings might be negated because of the change of control of the first applicant that would follow from the enforcement of the share charge in OS 544/2019. There was nothing in the Model Law requiring a recognising court to preserve and protect the foreign proceedings: at [38].

(6)     The fact that the non-parties had not complied with the US worldwide moratorium imposed following the commencement of the US Chapter 11 Proceedings was a matter solely for US courts, and was immaterial and irrelevant in Singapore: at [24].

(7)     The following assistance would be ordered in the present case: (a) a moratorium on the commencement of proceedings against the first applicant save that the moratorium would not affect the proceedings in OS 544/2019; (b) an order that no resolution may be passed for the winding up of the first applicant; and (c) an order that no execution, distress or other legal process may be commenced, continued or levied against any property of the first applicant: at [29].

(8)     While there were concerns about the fitness of the second applicant to serve as foreign representative, the Model Law did not empower a court to displace the appointment of a foreign representative: at [48] to [50].

(9)     While it would be preferable to have another person appointed to oversee any assets of the first applicant in Singapore, the first applicant did not appear to have any assets in Singapore. The second applicant would thus be recognised as the first applicant's foreign representative, with a requirement that a specific application for leave be made before the taking of any steps to oversee such assets: at [56].

[Observation: The interests and authority of a representative of a foreign non-main proceeding would typically be narrower than those of the representative of a foreign main proceeding. Care should be taken to avoid giving unnecessarily broad powers to the foreign representative of a foreign non-main proceeding which may interfere with the administration of another insolvency proceeding, particularly a main proceeding, elsewhere: at [28].]

**Case(s) referred to**

   *Beluga Chartering GmbH v Beluga Projects (Singapore) Pte Ltd* [2014] 2 SLR 815
     (refd)
   *Fibria Celulose S/A v Pan Ocean Co Ltd* [2014] Bus LR 1041 (refd)
   *Zetta Jet Pte Ltd,* Re [2018] 4 SLR 801, HC (refd)
   *Zetta Jet Pte Ltd,* Re [2019] 4 SLR 1343, HC (folld)

**Legislation referred to**

   Companies Act (Cap 50, 2006 Rev Ed) Tenth Schedule Art 2(*i*), Tenth Schedule
     Art 16(3), Tenth Schedule Art 17, Tenth Schedule Art 21(1)(*e*) (consd);

ss 148(1), 148(2), 259, Tenth Schedule Art 17(2), Tenth Schedule Art 20(1), Tenth Schedule Art 21(1), Tenth Schedule Art 22(1)

*Tay Kang-Rui Darius, Lee Lieyong Sean and Loh Yu Chin, Deborah (Blackoak LLC) for the applicants;*
*Mohamed Nawaz Kamil and Lau Hui Ming Kenny (Providence Law Asia LLC) for the non-parties.*

3 December 2019                                         Judgment reserved.

**Aedit Abdullah J:**

**Introduction**

1      In these proceedings, Rooftop Group International Pte Ltd ("the first applicant"), a Singapore-incorporated company, and its putative foreign representative, Mr Darren Scott Matloff ("the second applicant") seek recognition of ongoing US Chapter 11 proceedings, and assistance under the United Nations Commission on International Trade Law (UNCITRAL) Model Law on Cross-Border Insolvency (30 May 1997) ("the Model Law") as enacted in the Tenth Schedule of the Companies Act (Cap 50, 2006 Rev Ed) ("CA"). Triumphant Gold Limited ("TGL") and Polar Venture Overseas Limited, the non-parties in these proceedings and creditors of the first applicant, do not oppose recognition of the US Chapter 11 proceedings as a foreign non-main proceeding, but disagree on the scope of the assistance to be afforded. The non-parties also oppose the recognition of the second applicant as the first applicant's foreign representative.

**Background**

2      The first applicant manufactured and sold toys and hobby-grade drones, using the trade name "Propel RC®". It claims to have had some success in the United States ("US") market. As it was, the first applicant obtained a licence to produce "Star Wars" drones for the 2016 holiday season. "Star Wars" is, of course, a science fiction franchise of some contemporary popularity, presently owned by Disney, an entertainment conglomerate. Sales would have been promising. However, the launch of the drones was postponed to 2017 despite production being underway. This caused the first applicant, which had taken loans from external lenders, including the non-parties, to encounter liquidity problems. The maturity dates of these loans were extended, with additional financing obtained, although at increased interest rates. In the end, the "Star Wars" drones did not perform as hoped.

3      Litigation was pursued by TGL, which eventually culminated in the first applicant filing for Chapter 11 in the US Bankruptcy Court for the Northern District of Texas ("the US Chapter 11 Proceedings"). The US worldwide moratorium granted was, as is customary in these things, not

complied with by TGL, which continued proceedings in Singapore. These were then followed by the present application to seek the assistance of the Singapore courts.

**Summary of the applicants' case**

4      The applicants seek:

(a)     recognition of the US Chapter 11 Proceedings as a foreign main proceeding, or alternatively, as a foreign non-main proceeding;

(b)     the recognition of the second applicant as the foreign representative of the first applicant; and

(c)     a moratorium against:

(i)     the winding up of the first applicant;

(ii)     the commencement or continuation of legal proceedings against the first applicant;

(iii)     the commencement, continuation or levy of any execution, distress or other legal process against any property of the first applicant; and

(iv)     the right to transfer, encumber or otherwise dispose of any property of the first applicant.

5      Specific to [4(c)(ii)] above, the applicants originally sought that the proceedings in Originating Summons No 544 of 2018 ("OS 544/2019") and Suit No 252 of 2019 ("S 252/2019") be stayed. By way of background, OS 544/2019 is an application by TGL to enforce a share charge it holds over 44 shares in the first applicant which are presently held in the name of Gandiva Investments Limited ("GIL"). S 252/2019 is an action by TGL against the first applicant, Asian Express Holdings Ltd ("AE") and GIL for sums loaned to the first applicant and guaranteed by the other two defendants. Summary judgment has already been obtained by TGL against the first applicant. AE and GIL have filed Summons No 4022 of 2019 in S 252/2019 for a stay pending the disposal of these proceedings. At the hearing before me, the applicants clarified that they only sought a stay of enforcement of the summary judgment obtained against the first applicant; they did not oppose the proceedings in S 252/2019 continuing against AE and GIL.

6      It was argued that the US Chapter 11 Proceedings are a foreign main proceeding as the first applicant's centre of main interest ("COMI") was in the US.

**The non-parties' case**

7      The non-parties do not contest recognition of the US Chapter 11 Proceedings as a foreign non-main proceeding. They do, however, contend

that the US Chapter 11 Proceedings are not a foreign main proceeding as the first applicant's COMI was in Singapore or that the presumption in favour of the place of incorporation, *ie*, Singapore, applies. The non-parties also object to the recognition of the second applicant as the first applicant's foreign representative as he will not act impartially, and will favour the shareholders' and his own interests.

8      The non-parties further contend that any assistance granted to the US Chapter 11 Proceedings should not include a stay of legal proceedings in OS 544/2019 and S 252/2019.

**Decision**

9      The first applicant's COMI is situated in Singapore, by virtue of the presumption in favour of the place of incorporation. Recognition is thus granted to the US Chapter 11 Proceedings as a foreign non-main proceeding under Art 17 of the Model Law. Although there are serious concerns about the second applicant's fitness to serve as the first applicant's foreign representative, the Model Law does not allow the Singapore court to appoint another person in the second applicant's stead. Stays are not granted against the proceedings for the enforcement of the share charge against GIL in OS 544/2019, as well as the continuation of the suit against GIL and AE in S 252/2019.

**Analysis**

10      The analysis will proceed as follows:

(a)      whether the US Chapter 11 Proceedings are foreign main or non-main proceedings;

(b)      what assistance is to be granted to the US Chapter 11 Proceedings; and

(c)      whether the second applicant should be recognised as the first applicant's foreign representative.

***Whether the US Chapter 11 Proceedings are foreign main or non-main proceedings***

11      The determination of whether the US Chapter 11 Proceedings are foreign main or non-main proceedings turns on whether the first applicant's COMI lies in the US or in Singapore.

***COMI***

*The law*

12      I examined the law on this area in *Re Zetta Jet Pte Ltd and others (Asia Aviation Holdings Pte Ltd, intervener)* [2019] 4 SLR 1343 ("*Zetta Jet (No 2)*"). In brief:

(a)    The relevant date for ascertaining the COMI of a company is the date on which the application for recognition is filed (at [61]).

(b)    The presumption under Art 16(3) of the Model Law operates such that the place of the debtor company's registered office is presumed to be its COMI. This presumption may be displaced if various factors which are ascertainable by third parties, particularly creditors and potential creditors of the debtor company, point to a different location as being its COMI (at [76]).

(c)    It is material, in determining which factors to take into consideration in a COMI determination, to consider how likely it is that a creditor would weigh a particular factor in mind when deciding whether to afford credit to the debtor company (at [78]).

(d)    There should be an element of settled permanence or intended permanence in the factors considered (at [79]).

(e)    The focus is on determining the centre of gravity of the objectively ascertainable factors. Such determination will be based on a robust and entirely qualitative analysis (at [80]).

(f)    Where there are disputed facts, the court will have to make the best conclusions it can in the circumstances. Where the factors considered do not clearly tip in favour of a particular location, the presumption would operate, and the location of the registered office will be taken to be the debtor company's COMI (at [81]).

(g)    In undertaking an analysis on where a debtor company's COMI is located, the court's focus is on actual facts on the ground rather than on legal structures (at [82]).

As presently advised, I do not see any reason to depart from this approach, though I do note that there has been some criticism of my adopting the US approach in fixing the date of the COMI determination as that of the recognition application. This, however, is not the appropriate case to reconsider the issue as the date for the COMI determination of the first applicant is not material. Indeed, none of the parties sought to raise arguments on this point.

*Arguments on COMI*

13    The applicants argue that the first applicant's COMI was in the US. No operations were conducted out of Singapore; no employees were based here. The business of the first applicant was in the US: it was originally organised and operated through a US company in California, but was restructured to take advantage of the tax regime in Singapore. The primary asset of the first applicant, the Propel RC brand, is widely recognised in the US, and derives most of its goodwill there, with a presence in many major retailers. The US accounted for 90% of the yearly sales of Propel products.

Presently, the Rooftop group has ceased its manufacturing, sales and distribution business. The first applicant instead engages in the licensing of its intellectual property ("IP") rights, which are its only assets and are governed by Californian law. The IP rights are overwhelmingly registered in the US. The place of central administration of the first applicant is in the US, particularly as the second applicant was and continues to be the sole decision maker: he is a US citizen and has been operating the first applicant from the US. His status as the primary person in charge of the first applicant's administration is readily ascertainable by the creditors. Importantly, the second applicant is recognised as a significant person within the first applicant by the non-parties, as he is insured as a key man under the loan agreements with the non-parties. The fact that investor presentations and creditors meetings were in Singapore; that negotiations on the loan agreements took place in Hong Kong; and that the loan agreements provided for Singapore law as the governing law with provisions for disputes to be settled in the Singapore courts or Singapore-seated arbitration, do not point to Singapore as the COMI.

14    The non-parties argue, citing *Zetta Jet (No 2)*, that the relevant factors are those objectively ascertainable by third parties, particularly creditors and potential creditors. That the second applicant is the sole decision maker, that he is a US citizen and that he has been living in and operating the first applicant from the US since 2014 are outweighed by the fact that as far as the majority of the creditors are concerned, meetings with the second applicant took place in Singapore and Hong Kong. There was no representation that the first applicant was a US based entity, unlike in *Zetta Jet (No 2)*. Letters of support by the first applicant's creditors were all addressed to its registered address in Singapore. Most of the first applicant's creditors are also not based in the US. All of the loan agreements entered into by the first applicant provide for either Singapore or Hong Kong as the governing law and jurisdiction, with the majority pointing to Singapore. In fact, an arbitration was commenced by the first applicant in the Singapore International Arbitration Centre over the validity of the loan agreements entered into with TGL which was heard and determined. The IP rights were licenced to a Hong Kong company with a place of business in China; the registration of these rights in the US do not point to a US COMI. No evidence was given that the majority of the first applicant's employees prior to 2019 were based in the US. In contrast, an investor presentation made in April 2018 stated that the majority of the employees were employed in and operated out of Asia. Thus, the applicants have not rebutted the presumption of the first applicant's COMI being in the place of incorporation.

*Consideration of the factors*

15    The following factors do point to the US as the first applicant's COMI:

(a)    the second applicant, the primary decision maker for the first applicant, being a US citizen;

(b)    the first applicant's sales being primarily concentrated in the US; and

(c)    the first applicant's main assets, its IP rights, being substantially registered in the US.

16    The factors pointing away from the US as the first applicant's COMI are:

(a)    the first applicant not making any representation online, or elsewhere, that it was a US based entity;

(b)    the first applicant's creditors were not generally located in the US; and

(c)    the first applicant entering into loan agreements specifying that either Singapore or Hong Kong law was to apply.

17    The factors specifically pointing to Singapore as the first applicant's COMI are:

(a)    the first applicant's creditor meetings being held in Singapore, though I would note that some were also held in Hong Kong; and

(b)    the first applicant being incorporated in Singapore, which under Art 16(3) of the Model Law leads to a presumption that its COMI is in Singapore.

18    The factors relied upon by the applicants to establish that the COMI of the first applicant was in the US were not, on examination, sufficient to displace the presumption in favour of Singapore. The fact that sales were in the US would not have signalled on its own a US COMI: sales may occur in an entirely different country from where the creditors and other third party observers would expect the centre of gravity to be. Similarly, that the primary assets of the first applicant at present (*ie*, its IP rights) may be registered in the US is not a significant determinant: assets may be held in various countries, and the place of registration would not preclude dealings in those assets in other countries. I do not think that any creditor would have been influenced by the location of the registration of such rights. Similarly, the fact that the second applicant is a US citizen, or may have been largely present in the US, would not also point definitively to the US as the first applicant's COMI. In this regard, there was little evidence that would have been available to third parties demonstrating that operational decisions of the first applicant were being made in the US. I could not see

that any creditor would regard the US as the centre of gravity of the first applicant simply because of the second applicant.

19      On the other hand, the fact that creditor meetings were held in Singapore or Hong Kong would not seem to help either. These may have been entirely fortuitous or arranged for the convenience of some of the first applicant's creditors. Furthermore, it would appear that funds were raised by the first applicant from creditors in a number of jurisdictions including Singapore, the US, Hong Kong, China and the United Kingdom, to name a few. Seen in this light, the nationality, residence or origin of the creditors would not be a material factor in determining the first applicant's COMI.

20      Taking all these factors together, I cannot conclude that the first applicant's COMI was in the US as of the date of application for recognition: while a substantial part of the applicant's activities are or were US-centric, they were not such as to outweigh the presumption in favour of the place of registration. These factors were not to my mind the sort of factors that would weigh heavily in a creditor's mind; a different conclusion might have been reached had there been stronger evidence of corporate direction and management being centred in the US.

21      While it is correct that the time for assessment of a debtor company's COMI, as I laid down in *Zetta Jet (No 2)* ([12] *supra*), is at the point of application, it does not follow that all possible factors extant at that point would go towards determining the COMI. The focus is on factors which are *objectively ascertainable* by third parties (see *Zetta Jet (No 2)* at [76]). Thus, the fact that the second applicant may have been in sole control at this point, would not be determinative.

22      Overall, the factors in support of the US being the first applicant's COMI do not tip the balance sufficiently. In the circumstances, the presumption under Art 16(3) of the Model Law operates to lead to the answer that Singapore is the first applicant's COMI. The consequence of this conclusion is that the proceedings in the US are not foreign main proceedings for the purposes of the Model Law. Recognition and assistance can however be granted to the US Chapter 11 Proceedings as foreign non-main proceedings, with the scope of assistance governed by Art 21 of the Model Law.

### Public policy

23      The applicants argue that there was no lack of *bona fides* on their part in commencing the US Chapter 11 Proceedings and the present application. This appears to be raised primarily to deal with the arguments against the appointment of the second applicant as the foreign representative of the first applicant, and is considered in detail below (at [47]). In any event, I do not see anything in this case that would raise

a public policy issue of the sort considered in *Re Zetta Jet Pte Ltd and others* [2018] 4 SLR 801.

### Non-compliance with the US worldwide moratorium

24    The applicants referred to the non-compliance by TGL of the US moratorium, which under the Bankruptcy Code 11 USC (US) § 362 (1978), has worldwide effect, at least from the perspective of the US. Any alleged non-compliance is a matter solely for the US courts, and is immaterial and irrelevant in Singapore under present law. The Singapore courts do not compel compliance with foreign injunctions; neither do the Singapore courts expect foreign courts to enforce its injunctions or moratoria. What assistance can be rendered to the US Chapter 11 Proceedings is another matter.

### Assistance under the Model Law

25    From the findings above, assistance would be available on the basis that the US Chapter 11 Proceedings are recognised as a foreign non-main proceeding. The scope of such assistance is not necessarily narrower than that for foreign main proceedings. Under Art 20 of the Model Law, a moratorium automatically operates upon recognition of a foreign main proceeding. In comparison, under Art 21 of the Model Law, the court may in respect of a foreign proceeding, whether main or non-main, grant any appropriate relief where necessary to protect the property of the debtor company or the interests of its creditors, including:

(a)    staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's property, rights, obligations or liabilities, to the extent they have not been stayed under Article 20(1)(*a*);

(b)    staying execution against the debtor's property to the extent it has not been stayed under Article 20(1)(*b*);

(c)    suspending the right to transfer, encumber or otherwise dispose of any property of the debtor to the extent this right has not been suspended under Article 20(1)(*c*);

(d)    providing for examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's property, affairs, rights, obligations or liabilities;

(e)    entrusting the administration or realisation of all or part of the debtor's property located in Singapore to the foreign representative or another person designated by the Court;

(f)    extending relief granted under Article 19(1); and

(g)    granting any additional relief that may be available to a Singapore insolvency officeholder, including any relief provided under section 227D(4) of this Act [in respect of a Judicial Management order].

26     The primary difference is thus that in respect of foreign non-main proceedings, stays and other orders are granted at the discretion of the court. In exercising such discretion, the court will be mindful of a number of considerations. The general inclination would be to grant such orders to assist the foreign representative in the performance of her functions to the same degree and extent as would be granted to a local insolvency representative. This would serve the objectives of modified universalism as endorsed in *Beluga Chartering GmbH (in liquidation) and others v Beluga Projects (Singapore) Pte Ltd (in liquidation) and another (deugro (Singapore) Pte Ltd, non-party)* [2014] 2 SLR 815. That inclination would be displaced where factors point to the need to address any overriding interests within the jurisdiction, such as possible societal concerns or employee rights, for instance.

27     Assistance of a particular form may not be granted if in the same circumstances it may be denied or is not available to a local representative. This issue was considered by the English High Court in *Fibria Celulose S/A v Pan Ocean Co Ltd and another* [2014] Bus LR 1041. The court found that the phrase "any appropriate relief" in Art 21(1) of the Model Law did not extend to the granting of relief which would not have been available when dealing with a domestic insolvency (at [108]). Such a reading is also supported by the UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation (2013) <http://www.uncitral.org/pdf/english/texts/insolven/1997-Model-Law-Insol-2013-Guide-Enactment-e.pdf> (accessed 19 November 2019) ("the 2013 Guide"), where para 189 states that "the court is not restricted unnecessarily in its ability to grant any type of relief that is available *under the law of the enacting State …*" [emphasis added].

28     Further, as is noted in the Cross-Border Insolvency: Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency, UNCITRAL, 30th Sess, UN Doc A/CN.9/442 (1997) at para 158, the interests and authority of a representative of a foreign non-main proceeding are typically narrower than those of a representative of a foreign main proceeding; care should be taken to avoid giving unnecessarily broad powers to the foreign representative of a foreign non-main proceeding which may interfere with the administration of another insolvency proceeding, particularly a main proceeding elsewhere. But these are questions for another day, as the parties here do not contest these points.

29     The following may be ordered in the present case:

      (a)     a moratorium on the commencement of proceedings against the first applicant, save for the qualifications to be dealt with below (at [31]–[40]);

      (b)     an order that no resolution may be passed for the winding up of the first applicant; and

(c)    an order that no execution, distress or other legal process may be commenced, continued or levied against any property of the first applicant.

30    The primary difficulty relates to the orders sought concerning the barring of the transfer of shares in the first applicant.

*Barring the transfer of shares in the first applicant in OS 544/2019*

31    The applicants point to s 259 of the CA as showing that a moratorium can be granted to prevent the transfer of shares in the first applicant. This is raised in the context of the applicants' arguments that OS 544/2019 should be stayed, with the result that TGL is prevented from enforcing the share charge over shares in the second applicant held by GIL (see [5] above).

32    The non-parties argue that OS 544/2019 should not be stayed as the express wording of Art 20 and Art 21 of the Model Law provide that any stay ordered is to protect the debtor's property and assets. OS 544/2019 does not concern any of the first applicant's assets as the relief sought is the rectification of the register of the first applicant's members. The same view was taken by the US court overseeing the US Chapter 11 Proceedings, which decided that none of the pending actions in Singapore courts in fact constituted direct claims against the first applicant or its assets.

33    Section 259 of the CA reads:

> **Avoidance of dispositions of property, etc.**
>
> **259**.  Any disposition of the property of the company, including things in action, and any transfer of shares or alteration in the status of the members of the company made after the commencement of the winding up by the Court shall unless the Court otherwise orders be void.

34    Section 259 of the CA is, in its marginal note, clearly targeted at avoiding the disposition of the company's property and is part of Div 2 in PPt X of the CA, which is concerned with the consequences of the presentation of a winding-up petition. Where winding up has commenced, any change of the membership of the company or transfer of its shares would go against the freezing of the position of the company as at the point of winding up by the court. The primary objective appears to be to maintain the status quo: see Ian Fletcher, *The Law of Insolvency* (Sweet & Maxwell, 5th Ed, 2017) at para 26-004.

35    As s 259 of the CA is concerned with winding up by the court, and is intended to preserve the position on liquidation, it does not provide any indication or guidance as to whether any similar prohibition should be part of the assistance given to a foreign insolvency representative under the Model Law. Here, the moratorium sought against the share transfer is clearly intended to head off any change in control of the first applicant, and hence the restructuring effort. There is no apparent reason why the

Singapore courts should step in to prevent such an event. It may be that any such share transfer would be contrary to the stay imposed in the US Chapter 11 Proceedings (though the non-parties argue that it is not), but that in itself does not require that the Singapore courts similarly bar that transfer. The point of the assistance in the Model Law is to ensure the orderly and equitable distribution of assets and to facilitate the process of restructuring wherever possible. It is not intended to protect or preserve a party's position within the company in the case of a dispute between shareholders, or to prevent a different view being taken subsequently in the foreign proceedings about the direction of the restructuring, or whether restructuring efforts should even be maintained. Thus, the assistance in Singapore cannot be directed to prevent the transfer of shares in the first applicant.

36    In addition, the fact that the parties have subjected the debts in respect of which the share charge over the first applicant's shares was given by GIL to TGL to dispute resolution, with a determination having been made, would be a factor pointing against any stay or moratorium by the court, especially where no assets or property of the first applicant that would otherwise be available to the general pool of creditors is at stake.

37    In this context therefore, the possibility of the second applicant being displaced from control over the first applicant is a *non sequitur* to the protection of and consolidation of assets that would be at the core of the assistance rendered under the Model Law.

38    It can be argued that the US Chapter 11 Proceedings would be effectively negated because of the change of control of the first applicant that would follow from the displacement of the second applicant. This may indeed be a possible consequence, but I do not understand the Model Law to require that a recognising court preserve and protect the foreign proceedings.

39    It follows from the above discussion that a stay is not imposed on the proceedings in OS 544/2019.

*Enforcement of S 252/2019*

40    Both the applicants and the non-parties took the position in the hearing before me that the proceedings in S 252/2019 should be allowed to proceed against AE and GIL, while enforcement of the summary judgment obtained against the first applicant in those proceedings should be stayed (see [5] above). It is therefore unnecessary for me to consider whether S 252/2019 should be carved out of any moratorium imposed on the commencement or continuation of legal proceedings against the first applicant.

*Recognition of the foreign representative*

41    The non-parties argue that the second applicant should not be recognised as the foreign representative. It is said that the court has a discretion to designate another person to administer the property, taking into account the interests of the creditors as required by Art 21(1) and Art 22(1) of the Model Law. Recognition of a foreign proceeding does not automatically lead to the recognition of the appointed foreign representative. In support of this proposition, the non-parties relied on:

(a)    paras 192 and 196 of the 2013 Guide;

(b)    the Report of the Working Group on Insolvency Law on the Work of its Twentieth Session, UNCITRAL, 30th Sess, UN Doc A/CN 9/433 (1996); and

(c)    the Report of the Working Group on Insolvency Law on the Work of its Twenty-First Session, UNCITRAL, 30th Sess, UN Doc A/CN 9/435 (1997).

42    The non-parties raise a number of arguments to show that the second applicant should not be recognised as the first applicant's foreign representative.

43    First, the second applicant is an undischarged bankrupt, having filed for voluntary bankruptcy under Chapter 7 of the US Bankruptcy Code 11 USC (US) § 362 (1978) just a day after the present application was made. This sequence of events leads to the conclusion that they were deliberately timed by the second applicant such that his personal bankruptcy would not affect his recognition as the first applicant's foreign representative.

44    Second, the second applicant has acted in a manner prejudicial to the first applicant's creditors by giving priority to its shareholders. He caused the first applicant to file a frivolous arbitration claim disputing its debts to TGL as a delaying tactic to protect his shareholding. The arbitration was so unmeritorious that it caused the first applicant to incur legal fees of about $360,000, in addition to being ordered to pay indemnity costs of about $400,000 to TGL. The second applicant might also have engaged in fraudulent transfers of the first applicant's assets in order to stifle recovery by its creditors.

45    Third, the second applicant has not been truthful in disclosing the financial position of the first applicant. In the arbitration proceedings commenced against TGL, he falsely represented that the first applicant was in a stable financial position in order to avoid having to give security for costs. The second applicant also understated the debts owed by the first applicant to TGL in the US Chapter 11 Proceedings.

46    Fourth, the second applicant has disregarded Singapore court orders. After summary judgment was obtained against him in Suit No 450 of 2018,

a related proceeding to enforce a personal guarantee, contempt of court proceedings were commenced against the second applicant for breaches of examination of judgment debtor orders which he chose not to dispute on the issue of liability.

47    The applicants argue that there was no lack of *bona fides* on their part. The purpose of commencing the US Chapter 11 Proceedings was to ensure that the first applicant's creditors would reap the greatest possible recovery. In this regard, the proposed sale of its assets is being supervised by the US courts. The non-parties' allegations of dissipation of the first applicant's assets are unsubstantiated. The US court overseeing the US Chapter 11 Proceedings had already heard and dismissed TGL's objections to their continuation.

48    Having considered the authorities relied upon by the non-parties, I do not think that it is open to me to appoint a different person as the foreign representative of the first applicant.

49    The definition of the term "foreign representative" is set out in Art 2(*i*) of the Model Law:

> 'foreign representative' means a person or body, including one appointed on an interim basis, *authorised in a foreign proceeding* to administer the reorganisation or the liquidation of the debtor's property or affairs or to act as a representative of the foreign proceeding … [emphasis added]

It would appear from a plain reading of the provision that the appointment of a particular person as the foreign representative is a matter which falls to be determined by the foreign proceeding itself.

50    On the other hand, Art 21(1)(*e*), which the non-parties argue entitles the Singapore court to appoint a different person to act as the foreign representative of the US Chapter 11 Proceedings, states:

> 1.    Upon recognition of a foreign proceeding, whether a foreign main proceeding or a foreign non-main proceeding, where necessary to protect the property of the debtor or the interests of the creditors, the Court may, *at the request of the foreign representative*, grant any appropriate relief, including —
>
>    …
>
>    (*e*)    entrusting the administration or realisation of all or party of the debtor's property located in Singapore to the foreign representative or another person designated by the Court;
>
>    …
>
> [emphasis added]

Two observations can be made about the wording of the provision. First, the application for relief is to be made by the foreign representative. Second, the provision entitles the court to entrust the administration or realisation of the debtor's property to a person other than the foreign representative.

Nothing in the provision suggests that the court may, of its own accord, decide to appoint a different person as the foreign representative of a foreign proceeding. In contrast, I find that the wording of Art 21(1)(*e*) of the Model Law actually suggests that the foreign representative cannot be displaced, even if the court is of the view that the interests of local creditors might be better served by having some other person administer or realise the locally-based assets.

51    That being said, I should state that I have some concerns that the second applicant, in acting as the first applicant's foreign representative, may not discharge his duties even-handedly.

52    Here, the dispute between the parties appears to have gone beyond the background level of litigation that is often a part of modern business life. The actions taken by the second applicant on behalf of the first applicant have brought him into direct conflict with its creditors. The second applicant's actions in causing the first applicant to bring an arbitration disputing the debts owed to TGL caused the latter to incur significant costs (see [44] above). It appears that there was little evidence in support of the first applicant's claims in the arbitration, with the final award noting that the claim was "largely without merit".

53    There is also the fact that the second applicant has been adjudged bankrupt in the US, which would bar him from acting as a director of the first applicant here. Such disqualification is provided for by s 148 of the CA, which states:

> **Restrictions on undischarged bankrupt**
>
> **148.**—(1) Every person who, being an undischarged bankrupt (whether he was adjudged bankrupt by a Singapore Court or a foreign court having jurisdiction in bankruptcy), acts as director of, or directly or indirectly takes part in or is concerned in the management of any corporation, except with the leave of the Court or the written permission of the Official Assignee, shall be guilty of an offence and shall be liable on conviction to a fine not exceeding $10,000 or to imprisonment for a term not exceeding 2 years or to both.

The prohibition against bankrupts acting as insolvency officers here is founded on local policy considerations. A person who is an undischarged bankrupt is *prima facie* not fit to take part in the management of a company, especially one with limited liability: see *Walter Woon on Company Law* (Tan Cheng Han gen ed) (Sweet & Maxwell Asia, 3rd Ed, 2009) at para 7.39. There is no evidence before the court that the second applicant had made such an application to the court or the Official Assignee under s 148(2) of the CA to allow him to continue acting as a director of the first applicant despite his disqualification.

54    Finally, there is the issue of the second applicant's wilful disobedience of Singapore court orders. Following the hearing of the present application,

the second applicant was, on 11 November 2019, found guilty on three charges of contempt by disobedience and sentenced to a fine of $20,000 by Pang Khang Chau J.

55    To my mind, these factors taken together demonstrate that the second applicant is ill-suited to adequately protect the interests of the first applicant's creditors.

56    In the circumstances, given the limitations of the Model Law, the second applicant will continue to act as the foreign representative recognised by the US Chapter 11 Proceedings. Though I am minded to appoint a different person to oversee any assets of the first applicant located in Singapore, there is no evidence that any such assets exist. For the avoidance of doubt, however, I would require a specific application for leave from the applicants before any steps are taken to oversee any such assets. I also note that court to court communications with the court overseeing the US Chapter 11 Proceedings to explore how the interests of overseas and local creditors can be protected may be explored, if needed.

**Common law recognition**

57    The applicants alternatively invoke common law recognition as a basis on which OS 544/2019 can be stayed.

58    I do not consider that common law recognition is available in the present case. In general, where the Model Law is applicable to the subject matter, the court would be slow to allow common law recognition to be invoked as an alternative. The existence of a detailed recognition regime created by legislation displaces the need for common law doctrine to apply. Thus, in most, if not all, foreign corporate insolvency proceedings, recognition should be made under the Model Law. The invocation of the common law should only be for situations where recognition is not catered for by the Model Law, which would appear to be highly unlikely given its structure. I would thus see the scope for common law recognition to be limited to foreign personal bankruptcy proceedings, and little else besides.

**Conclusion**

59    Recognition is granted to the US Chapter 11 Proceedings as foreign non-main proceedings, with assistance granted as follows:

    (a)    a moratorium on the commencement of proceedings against the first applicant;

    (b)    an order that no resolution may be passed for the winding up of the first applicant; and

    (c)    an order that no execution, distress or other legal process may be commenced, continued or levied against any property of the first applicant.

For the avoidance of doubt, the moratorium in (a) does not apply to TGL's application in OS 544/2019 against GIL to enforce its share charge over the first applicant's shares. The stay of proceedings similarly does not apply to proceedings brought by TGL in S 252/2019 to enforce guarantees given to it by AE and GIL for the first applicant's debts.

60    Cost directions will be given separately, and time for any appeal or other application is extended in the meantime.

Reported by Theodore Tan.

# H565

## *Re* Tantleff, Alan

## [2022] SGHC 147

General Division of the High Court — Originating Summons No 203 of 2022
Aedit Abdullah J
25 April 2022; 24 June 2022

*Insolvency Law — Cross-border insolvency — Recognition of foreign insolvency proceedings — Application made by foreign representative of real estate investment trust undergoing Chapter 11 proceedings in US without presence of trustee of unitholders — Application to recognise and enforce Chapter 11 plan and confirmation order as appropriate additional relief — Whether collective investment scheme authorised under Securities and Futures Act (Cap 289, 2006 Rev Ed) came within scope of UNCITRAL Model Law on Cross-Border Insolvency — Whether relief could be granted under UNCITRAL Model Law on Cross-Border Insolvency for recognition and enforcement of foreign insolvency judgments and orders — Article 21(1)(g) UNCITRAL Model Law on Cross-Border Insolvency — Securities and Futures Act (Cap 289, 2006 Rev Ed)*

**Facts**

The application concerned three entities consisting of Eagle Hospitality Real Estate Investment Trust ("EH-REIT"), Eagle Hospitality Trust S1 Pte Ltd ("S1") and Eagle Hospitality Trust S2 Pte Ltd ("S2") (collectively, the "Singapore Chapter 11 Entities"). EH-REIT was a publicly held real estate investment trust in Singapore with DBS Trustee Ltd as its trustee, and the EH-REIT was part of a stapled trust, Eagle Hospitality Trust ("EHT"). Securities of EHT were issued in Singapore to the public through an initial public offering on the mainboard of Singapore Exchange Securities Trading Ltd.

Both S1 and S2 were Singapore-incorporated companies that were wholly owned by EH-REIT. S1 and S2 served as important links between the ultimate controllers and owners of the Eagle Hospitality Group (consisting of EH-REIT and other subsidiaries) and the revenue-generating arm of the group. Through directly and indirectly wholly-owned companies, the Eagle Hospitality Group owned a portfolio comprising of 18 full-service hotel properties (collectively, the "Hotels"), all of which were located in the US. The Eagle Hospitality Group faced serious financial difficulties over the course of 2020 and it eventually voluntarily filed for Chapter 11 reorganisation in 2021.

The Applicant, in his capacity as foreign representative, sought recognition of the foreign proceedings and court orders in the US pursuant to the UNCITRAL Model Law on Cross-Border Insolvency (30 May 1997) (the "Model Law"). The foreign proceedings concerned the Singapore Chapter 11 Entities in Cases No 21-10120-CSS, No 21-10037-CSS and No 21-10038-CSS under Chapter 11 of the United States Bankruptcy Code 11 USC (US) (1978) (the "US Bankruptcy Code") in the US Bankruptcy Court (the "Singapore Entities' Chapter 11 Proceedings"). In addition to this, recognition was sought for the Chapter 11 plan of liquidation in the US (the "Chapter 11 Plan") and the US Bankruptcy Court's confirmation of the Chapter 11 Plan (the "Confirmation Order").

The Applicant also sought the following additional reliefs: (a) the Applicant to be recognised as the foreign representative of the Singapore Chapter 11 Entities; (b) the Applicant to be entrusted with the administration and realisation of property and assets of the Singapore Chapter 11 Entities and to implement the Chapter 11 Plan; and (c) DBS Trustee Ltd, in its capacity as trustee of EH-REIT, to be authorised to take all appropriate steps to wind down the Singapore Chapter 11 Entities in accordance with Singapore law and perform obligations under the Chapter 11 Plan.

**Held, granting the application in part:**

(1)  The EH-REIT did not come within the scope of the Model Law as implemented in Singapore. Part 11 of the Insolvency, Restructuring and Dissolution Act 2018 (2020 Rev Ed) ("IRDA") implemented the Model Law, but Pt 11 was within that segment of the IRDA (Pts 4 to 12) that dealt with corporate entities. EH-REIT was not a corporate entity, but was instead, a collective investment scheme authorised under the Securities and Futures Act (Cap 289, 2006 Rev Ed) ("SFA"). There was nothing in the IRDA or its language that would extend its application to EH-REIT, and there was no mention of business trusts or real estate investment trusts: at [25] and [26].

(2)  The types of entities excluded from the scope of the Model Law, by the Minister's orders under s 252(1) of the IRDA, suggested that the Model Law only applied to corporate entities and that in a similar vein, non-corporate entities governed by the SFA (such as EH-REIT) did not fall within the Model Law. Further, entities which were authorised under the SFA were excluded from the scope of the Model Law, and it was logical to infer that the EH-REIT itself would not come within the Model Law as well. The English position in *Rubin v Eurofinance SA* [2010] 1 All ER (Comm) 81 was not followed. Nothing in the UNCITRAL materials suggested that the Model Law could apply to EH-REIT and further, it seemed that Parliament wanted to exclude entities under the SFA from the Model Law as enacted in Singapore. The restructuring of EH-REIT would probably have to proceed by way of a separate application for common law recognition and would have to involve DBS Trustee Ltd. The analysis for recognition under the Model Law was only proceeded with for S1 and S2: at [27], and [30] to [32].

(3)  The Singapore Entities' Chapter 11 Proceedings under the US Bankruptcy Code were clearly foreign proceedings within the meaning of Art 2(*h*) of the Model Law, as noted in previous cases. The remaining issue was whether the Singapore Entities' Chapter 11 Proceedings should be recognised as foreign main proceedings or foreign non-main proceedings. The starting point was that the centre of main interest ("COMI") of S1 and S2 was presumed to be Singapore pursuant to Art 16(3) of the Model Law as they were both incorporated in and had registered offices in Singapore. However, this presumption could be displaced on the presence of proof to the contrary by other factors which were objectively ascertainable by third parties that pointed the COMI away from the place of registration to some other location: at [33], [34], [36] and [37].

(4)  Both S1 and S2 were not active, operational companies. Rather, they were part of the Eagle Hospitality Group, which had its main business operations and

assets based in the US. The substantial assets consisting of the portfolio of 18 full-service Hotels were all located in the US where the income would be derived as well. Further, the significant creditors of S1 and S2 were based in the US, and the governing law of the various agreements with the creditors was US law. In the circumstances, the presumption under Art 16(3) of the Model Law had been displaced and the COMI for both S1 and S2 was the US: at [39] to [43].

(5)     The fact that the proceedings were ongoing in the US was irrelevant in determining the COMI, as were the activities of the foreign representative. The jurisprudential basis of the COMI requirement was to determine the centre of gravity of the company's commercial activity, that is, where it was centred while it was alive and flourishing. The US authorities which suggested otherwise should not be followed as the US approach appeared to be a form of bootstrapping and would allow the parties to choose their COMI in an artificial manner. It would be better to assess the COMI by looking at the activities of the company before the foreign restructuring took place: at [45] and [50].

(6)     While the Model Law did not explicitly provide for the recognition and enforcement of foreign insolvency orders and judgments, the list of reliefs in Art 21 of the Model law was non-exhaustive in nature and the court was not restricted unnecessarily in its ability to grant any type of relief that was required in the circumstances of the case: at [68].

(7)     It was well established within the US Chapter 15 jurisprudence that foreign insolvency orders and judgments could be recognised and enforced locally, subject to limited exceptions. The US equivalent of Art 21 of the Model Law had been interpreted to extend to the recognition and enforcement of foreign insolvency-related orders and judgments confirming foreign reorganisation plans. In contrast, the position in the UK was much more circumscribed with regard to interpreting the UK equivalent of Art 21 of the Model Law, and the recognition and enforcement of foreign insolvency judgments was not permitted in *Rubin v Eurofinance SA* [2012] 3 WLR 1019 ("*Rubin (UKSC)*"): at [70], [71] and [75].

(8)     The US approach should be preferred over the UK approach in interpreting the scope of Art 21 of the Model Law. The Singapore Ministry of Law had expressed its preference for the US approach and had intentionally amended the language of Art 21(1)(*g*) of the Model Law to align Singapore's position with that of the US. Thus, it was the US jurisprudence that was persuasive in determining the scope of relief to be granted, and the UK approach in *Rubin (UKSC)* was not endorsed in Singapore: at [77] and [78].

(9)     In granting recognition and enforcement of foreign insolvency judgments and orders, the Singapore court was not merely acting as a rubber stamp, but instead, had to carefully scrutinise the circumstances in which the foreign order was granted and ensure that interested parties were adequately protected. This requirement was encapsulated in Art 22(1) of the Model Law. There was adequate protection for the relevant parties here as the Chapter 11 process was supervised by the US Bankruptcy Court, the requisite voting requirements for the confirmation of the Chapter 11 Plan were properly satisfied, and there was opportunity provided for creditors to be heard. The Singapore creditors and the stapled security holders of EHT were also duly notified about the developments.

All creditors were also notified of the present recognition application and no objections were received. Recognition of the Chapter 11 Plan and Confirmation Order was therefore granted as appropriate additional relief under Art 21(1)(*g*) of the Model Law for S1 and S2. The additional relief sought by the Applicant was granted as these were uncontroversial, save that these were limited to S1 and S2 only: at [81] to [83] and [91].

(10)   As regards EH-REIT, some form of common law recognition was required. However, The Applicant did not have the standing to make an application on behalf of DBS Trustee Ltd. Instead, DBS Trustee Ltd should satisfy the Singapore court that the winding down and other steps contemplated were in accordance with Singapore law and the trust deed. The court could not see how any matters affecting the winding down of EH-REIT could be brought in this summons. A separate application should be made in respect of EH-REIT: at [85], [87], [88] and [95].

[Observation: While the court was previously amenable to taking an expanded view of Art 2(*h*) of the Model Law, the better course was to grant recognition of the Chapter 11 Plan and Confirmation Order under Art 21(1)(*g*) of the Model Law instead. Nevertheless, some views in passing regarding Art 2(*h*) of the Model Law were set out and the issue was left open for future determination: at [56].]

## Case(s) referred to

*Ashapura Minechem Ltd,* Re 480 BR 129 (Bankr SDNY, 2012) (refd)

*British American Isle of Venice (BVI) Ltd,* Re 441 BR 713 (Bankr SD Fla, 2010) (not folld)

*CFG Peru Investments Pte Ltd,* Re HC/OS 665/2021 (21 September 2021) (refd)

*CGG SA,* Re 579 BR 716 (Bankr SDNY, 2017) (refd)

*EHT US1, Inc,* Re 630 BR 410 (Bankr D Del, 2021) (refd)

*Energy Coal SPA,* Re 582 BR 619 (Bankr D Del, 2018) (refd)

*Fairfield Sentry Ltd,* Re 714 F 3d 127 (2nd Cir, 2013) (refd)

*Fibria Celulose S/A v Pan Ocean Co Ltd* [2014] Bus LR 1041 (refd)

*Lupatech SA,* Re 611 BR 496 (Bankr SDNY, 2020) (refd)

*Magyar Telecom BV,* Re 2013 Bankr LEXIS 5716 (Bankr SDNY, 11 December 2013) (refd)

*Metcalfe & Mansfield Alternative Investments,* Re 421 BR 685 (Bankr SDNY, 2010) (refd)

*Oi Brasil Holdings Coöperatief UA,* Re 578 BR 169 (Bankr SDNY, 2017) (refd)

*Oi SA,* Re 587 BR 253 (Bankr SDNY, 2018) (folld)

*Opti-Medix Ltd,* Re [2016] 4 SLR 312 (refd)

*Oversight and Control Commission of Avanzit, SA,* Re 385 BR 525 (Bankr SDNY, 2008) (refd)

*Rooftop Group International Pte Ltd,* Re [2020] 4 SLR 680 (refd)

*Rubin v Eurofinance SA* [2010] 1 All ER (Comm) 81, HC (Eng) (not folld)

*Rubin v Eurofinance SA* [2013] 1 AC 236; [2012] 3 WLR 1019, SC (Eng) (not folld)

*Salvati,* Re 2009 Bankr LEXIS 5722 (Bankr SDNY, 7 May 2009) (refd)

*Sino–Forest Corp,* Re 501 BR 655 (Bankr SDNY, 2013) (refd)

*United Securities Sdn Bhd v United Overseas Bank Ltd* [2021] 2 SLR 950 (refd)

*Zetta Jet Pte Ltd,* Re [2019] 4 SLR 1343 (folld)

**Legislation referred to**

Business Trusts Act 2004 (2020 Rev Ed)

Companies Act 1967 (2020 Rev Ed) s 4(1)

Insolvency, Restructuring and Dissolution Act 2018 (2020 Rev Ed) ss 61(1), 96(4), 252(1), 252(2)(*b*), Pts 4–12, Pt 11, Third Schedule

Insolvency, Restructuring and Dissolution (Prescribed Companies and Entities) Order 2020 para 5(1), para 5(1)(*z*), para 5(1)(*zf*)

Securities and Futures Act (Cap 289, 2006 Rev Ed) ss 286, 289

Bankruptcy Code 11 USC (1978) (US) §1521, §1521(a), §1521(a)(7), Ch 11, Ch 15

Companies Act 2006 (c 46) (UK) s 895

Cross-Border Insolvency Regulations 2006 (SI 2006 No 1030) (UK) Sch 1

*Ong Tun Wei Danny, Ng Hui Ping Sheila and Chen Lixin (Rajah & Tann Singapore LLP) for the applicant.*

24 June 2022                          Judgment reserved.

**Aedit Abdullah J:**

1     The present application is brought by Mr Alan Tantleff (the "Applicant"), in his capacity as foreign representative of three entities, for the recognition of foreign proceedings and court orders pursuant to the United Nations Commission on International Trade Law ("UNCITRAL") Model Law on Cross-Border Insolvency (30 May 1997) (the "Model Law"). The Model Law is given the force of law in Singapore under s 252(1) of the Insolvency, Restructuring and Dissolution Act 2018 (2020 Rev Ed) ("IRDA").

2     This application concerns three entities consisting of Eagle Hospitality Real Estate Investment Trust ("EH-REIT"), Eagle Hospitality Trust S1 Pte Ltd ("S1") and Eagle Hospitality Trust S2 Pte Ltd ("S2") (collectively, the "Singapore Chapter 11 Entities"). The Applicant was appointed by the United States Bankruptcy Court for the District of Delaware ("US Bankruptcy Court") to be the foreign representative of the Singapore Chapter 11 Entities. Prior to this, the Applicant was the chief restructuring officer of the Eagle Hospitality Group consisting of EH-REIT and its direct and indirect subsidiaries.

3     The Applicant is seeking for the proceedings concerning the Singapore Chapter 11 Entities in Cases No 21-10120-CSS, No 21-10037-CSS and No 21-10038-CSS under Chapter 11 of the United States Bankruptcy Code 11 USC (US) (1978) (the "US Bankruptcy Code") in the

US Bankruptcy Court (the "Singapore Entities' Chapter 11 Proceedings") to be recognised in Singapore as foreign main proceedings within the meaning of Art 2(*f*) of the Model Law, or as foreign non-main proceedings within the meaning of Art 2(*g*) of the Model Law. In addition to this, the Applicant requests for the recognition of the Chapter 11 plan of liquidation in the US (the "Chapter 11 Plan") and the US Bankruptcy Court's confirmation of the Chapter 11 Plan.

4        Regarding the additional reliefs, the Applicant seeks the following:

(a)    the Applicant to be recognised as the foreign representative of the Singapore Chapter 11 Entities within the meaning of Art 2(*i*) of the Model Law;

(b)    the Applicant to be entrusted with the administration and realisation of all or any part of the property and assets of the Singapore Chapter 11 Entities that are located in Singapore, to effectuate and/or implement the Chapter 11 Plan and its confirmation; and

(c)    for DBS Trustee Ltd, in its capacity as trustee of EH-REIT (the "EH-REIT Trustee"), to be authorised to take all appropriate steps to wind down the Singapore Chapter 11 Entities in accordance with Singapore law and to perform other obligations set out under the Chapter 11 Plan.

## Background

### *The Eagle Hospitality Group*

5        EH-REIT is a publicly held real estate investment trust in Singapore. EH-REIT is part of a stapled trust, Eagle Hospitality Trust ("EHT"), consisting of EH-REIT and Eagle Hospitality Business Trust ("EH-BT"). EH-REIT's trustee is DBS Trustee Ltd, which is incorporated in Singapore. EH-REIT's manager was Eagle Hospitality REIT Management Pte Ltd, which was removed as manager on 30 December 2020 pursuant to a directive issued by the Monetary Authority of Singapore. EH-BT's trustee-manager is Eagle Hospitality Business Trust Management Pte Ltd, which is also incorporated in Singapore.

6        The Eagle Hospitality Group, consisting of EH-REIT and its direct and indirect subsidiaries, was listed on the Singapore Exchange Securities Trading Ltd ("SGX-ST") in May 2019 with the principal strategy of investing in a diversified portfolio of income-producing real estate properties which are used primarily for hospitality and/or hospitality-related purposes. The investments are conducted on a long-term basis and with an initial geographical focus on the US. Through directly and indirectly wholly-owned companies, the Eagle Hospitality Group owned a portfolio comprising of 18 full-service hotel properties (collectively, the

"Hotels" or the "Properties"), all of which are located in the US, and each of which is owned by a separate US-incorporated holding company (save for one Hotel, the Queen Mary) (each, a "Propco").

7      Both S1 and S2 are Singapore-incorporated companies that are wholly owned by EH-REIT. S1 is the indirect 100% holding company of USHIL Holdco Member, LLC and CI Hospitality Investment, LLC, which are in turn, indirect 100% holding companies for each of the Propcos that own the Hotels (other than the Queen Mary) in the Eagle Hospitality Group portfolio. In addition, S1 and S2 are the direct 100% holding companies of EHT US1, Inc ("the US Corp") and EHT Cayman Corp Ltd ("the Cayman Corp"), respectively.

8      As disclosed in EHT's prospectus (the "Prospectus"), EH-REIT had obtained a Tax Ruling (as defined in the Prospectus) in relation to certain Singapore income tax treatment of the distributions received by S1, S2, EH-REIT and the stapled security holders of EHT ("Stapled Security Holders"). The Tax Ruling is subject to certain terms and conditions, which include, *inter alia*, that: (a) S1 and S2 will each be a wholly-owned subsidiary of EH-REIT; and (b) S2 will wholly own the Cayman Corp. The distribution policy of EHT contemplated that each of the Propcos would distribute cash upstream to the US Corp, which would then distribute cash to the Cayman Corp through interest payments and/or repayment of the principal in relation to a loan from the Cayman Corp. In turn, the Cayman Corp would distribute cash to S2, whilst S2 would then distribute dividends up to EH-REIT and the Stapled Security Holders. Thus, S1 and S2 served as important links between the ultimate controllers and owners of the Eagle Hospitality Group and the revenue-generating arm of the group.

9      Securities of EHT were issued in Singapore to the public through an initial public offering on the mainboard of SGX-ST. There were 3,749 Stapled Security Holders as of 31 December 2021.

***The Chapter 11 Proceedings in the US***

10     The Eagle Hospitality Group faced serious financial difficulties over the course of 2020 stemming from: significant defaults on the part of lessees of the Hotels (*eg*, defaulting on rental payment obligations and payment of outgoings), the onset of the global COVID-19 pandemic, and problems relating to the former EH-REIT manager's activities. The defaults by the lessees continued until the termination of the leases by the Propcos in the last quarter of 2020, and this had pushed the Eagle Hospitality Group into a liquidity crisis.

11     On 18 January 2021, due to the liquidity issues and potential impending actions to be taken by the creditors of the Eagle Hospitality Group, a number of EH-REIT's downstream companies (including S1 and S2, but not including EH-REIT) (the "Initial Chapter 11 Entities")

voluntarily filed for Chapter 11 reorganisation and sought a debtor-in-possession financing facility (the "DIP Financing Facility"). These Initial Chapter 11 Entities entered into a commitment letter for the provision of the DIP Financing Facility with a lender to extend a US$100m senior secured super-priority debtor-in-possession term loan facility pursuant to the US Bankruptcy Code. The Initial Chapter 11 Entities were permitted to use the proceeds of the DIP Financing Facility for working capital needs, general corporate needs, and other purposes of the Initial Chapter 11 Entities, including funding the costs of the Chapter 11 cases. At a hearing on 21 January 2021, the US Bankruptcy Court, amongst other things:

(a)    authorised the joint administration, for procedural purposes, of the Initial Chapter 11 Entities' Chapter 11 cases;

(b)    approved the DIP Financing Facility on an interim basis, allowing the Initial Chapter 11 Entities to borrow up to US$9.3m until the next hearing to be held on 11 February 2021;

(c)    authorised, on an interim basis, the Initial Chapter 11 Entities to pay certain critical vendors for the ongoing operations and maintenance of the Hotels in EH-REIT's portfolio post-Chapter 11 filings;

(d)    appointed the Initial Chapter 11 Entities' chief restructuring officer to act as foreign representative in any Singapore proceedings to recognise the Chapter 11 cases as foreign proceedings; and

(e)    confirmed the application of the worldwide automatic stay in respect of any claims against the Initial Chapter 11 Entities.

12    As EH-REIT was not yet a party to the Chapter 11 process or the DIP Financing Facility, the EH-REIT Trustee made an application to the Singapore court (*vide* HC/OS 46/2021) to be granted powers to take immediate action on behalf of EH-REIT to join the Chapter 11 process in the US and have access to the DIP Financing Facility to meet ongoing expenditures of EH-REIT itself. On 22 January 2021, Vinodh Coomaraswamy J granted the EH-REIT Trustee's application by way of HC/ORC 413/2021, which allowed the EH-REIT Trustee to "step into the shoes" of the manager of EH-REIT until such time as a replacement manager was appointed. Following this, on 27 January 2021, in its capacity as trustee and on behalf of EH-REIT, the EH-REIT Trustee filed a voluntary petition for relief under Chapter 11 in the US Bankruptcy Court. In conjunction with EH-REIT's Chapter 11 filing, an application was also made to jointly administer, for procedural purposes, EH-REIT's Chapter 11 case with the Initial Chapter 11 Entities (the Initial Chapter 11 Entities and EH-REIT are collectively known as the "Chapter 11 Entities"), which was granted by the US Bankruptcy Court on the same day.

13    Subsequently, at a hearing on 24 February 2021, the US Bankruptcy Court, amongst others:

(a)    approved the DIP Financing Facility on a final basis, allowing the Chapter 11 Entities (including EH-REIT) to borrow an aggregate amount of up to US$100m (which can be increased up to US$125m under certain circumstances) and the use of such proceeds in accordance with an approved budget and subject to the terms of the order approving the DIP Financing Facility;

(b)    authorised (but did not require), on a final basis, the payment of certain critical vendors for the ongoing operations and maintenance of the Hotels in EH-REIT's portfolio; and

(c)    in connection with the Chapter 11 filing, confirmed the application of the worldwide automatic stay in respect of any claims against EH-REIT.

14    Concurrently, in connection with the Chapter 11 cases, the EH-REIT Trustee instructed Moelis & Company (in its capacity as financial adviser to the Chapter 11 Entities) to commence a process for the restructuring and recapitalisation of EH-REIT and/or the sale of the Properties in the portfolio of EHT that were owned by certain Chapter 11 Entities. Following this, 14 of the Properties were sold off and the lease relating to the Queen Mary Property was rejected.

15    After the completion of the sale process, the Chapter 11 Entities other than Urban Commons Queensway LLC (collectively, the "Liquidating Chapter 11 Entities"), the committee of unsecured creditors of the Chapter 11 Entities appointed in the Chapter 11 cases, and the Bank of America NA (as the administrative agent of a syndicated credit agreement, being EH-REIT's largest debt facility), negotiated and reached an agreement on the terms of a Chapter 11 plan of liquidation (*ie*, the Chapter 11 Plan). On 14 October 2021, the Liquidating Chapter 11 Entities filed with the US Bankruptcy Court: (a) the Chapter 11 Plan in respect of the Liquidating Chapter 11 Entities; and (b) the proposed disclosure statement (the "Disclosure Statement") which contained information on the Chapter 11 Plan for the purpose of providing adequate information to creditors of the Liquidating Chapter 11 Entities to make a reasonably informed decision as to whether to vote to accept or reject the Chapter 11 Plan.

16    Following certain revisions made to the Disclosure Statement due to objections received, a revised Disclosure Statement was made and approved by the US Bankruptcy Court on 4 November 2021. The Liquidating Chapter 11 Entities then proceeded to solicit votes to accept or reject the Chapter 11 Plan from classes of creditors who were entitled to vote on the Chapter 11 Plan. Under the Chapter 11 Plan, the Stapled Security Holders were deemed to have rejected the Chapter 11 Plan, and therefore were not

entitled to vote on the Chapter 11 Plan and did not receive a ballot to vote. Nevertheless, copies of the relevant notices which set out further information about the process and options available were mailed to the Stapled Security Holders. The relevant voting requirements under the US Bankruptcy Code in relation to the Chapter 11 Plan were satisfied, and on 20 December 2021, the US Bankruptcy Court entered an order confirming the Chapter 11 Plan for the Liquidating Chapter 11 Entities (the "Confirmation Order"). Accordingly, the Liquidating Chapter 11 Entities, their creditors and the Stapled Security Holders are bound by the terms of the confirmed Chapter 11 Plan.

17    The Chapter 11 Plan contemplates, *inter alia*, (a) the allocation and distribution of the net sale proceeds from the sale of the properties that were owned by certain Chapter 11 Entities to the Chapter 11 Entities' creditors and other stakeholders; and (b) the resolution of outstanding claims against, and equity interests in, each of the Liquidating Chapter 11 Entities. It is unlikely that claims of all creditors of the Liquidating Chapter 11 Entities will be satisfied in full from the sale proceeds after accounting for various secured claims. In relation to the Stapled Security Holders, they would receive contingent interests in a liquidating trust that would entitle them to a distribution only if there is value available in EH-REIT and only if holders of claims against EH-REIT have been paid in full. Based on current projections, it is not expected that the Stapled Security Holders will receive any distributions.

18    Additionally, under the Chapter 11 Plan, it has also been agreed that the Applicant, as the liquidating trustee, will be authorised to take all actions reasonably necessary to dissolve the Liquidating Chapter 11 Entities (other than the Singapore Chapter 11 Entities), Urban Commons Queensway LLC, and the non-debtor affiliates of the Chapter 11 Entities. Further, and pertinently, the Chapter 11 Plan contemplates that the EH-REIT Trustee shall take all appropriate necessary steps to put into effect the termination, liquidation or dissolution of the Singapore Chapter 11 Entities in accordance with and subject to Singapore law.

19    The Chapter 11 proceedings are still ongoing, and it is anticipated that these Chapter 11 cases will be closed around 31 December 2022. Against this backdrop, the Applicant has filed the present application for the recognition of the foreign proceedings and court orders to implement the Chapter 11 Plan and Confirmation Order (and to dissolve the Singapore Chapter 11 Entities).

**Summary of the Applicant's arguments**

20    The Applicant submits that the requirements for recognition under Art 17(1) of the Model Law are satisfied. First, the Singapore Entities' Chapter 11 Proceedings are "foreign proceeding[s]" within the meaning of Art 2(*h*) as they are a form of protected reorganisation and have been stated

to fall squarely within the provision in previous cases. Second, the Applicant is a "foreign representative" within the meaning of Art 2(*i*) of the Model Law as he was appointed by the US Bankruptcy Court as the foreign representative for S1, S2 and EH-REIT. Third, the requirements under Art 17(1)(*c*) are satisfied as the relevant documents provide sufficient evidence of the existence of the foreign proceedings and the appointment of the foreign representative. The statement identifying all relevant proceedings against the Singapore Chapter 11 Entities has also been produced. Fourth, the requirement under Art 17(1)(*d*) is satisfied as the application was filed in the High Court of Singapore and there is jurisdiction over the Singapore Chapter 11 Entities. S1 and S2 are both incorporated and have registered offices in Singapore, while EHT had issued securities on the mainboard of SGX-ST.

21    Next, the Applicant argues that the Singapore Entities' Chapter 11 Proceedings should be recognised as foreign main proceedings. While S1 and S2 have their registered offices in Singapore and EH-REIT is listed on the SGX-ST, the presumption that Singapore is the centre of main interest ("COMI") is rebutted in this case. The Singapore Chapter 11 Entities are part of the Eagle Hospitality Group, which has its main business operations and assets based in the US. The portfolios of income-producing Hotels are all located in the US, and each of the Hotels is owned by a Propco that was incorporated in the US. All of the larger creditors of the Singapore Chapter 11 Entities are based in the US, with US law being the governing law of the various agreements between the respective Singapore Chapter 11 Entities and their creditors. Further, the Singapore Chapter 11 Entities have been subject to the control and supervision of the US Bankruptcy Court for over one year, and the Applicant, a US-based citizen, has been actively managing the Singapore Chapter 11 Entities. The foreign representative's actions and activities in managing the entities abroad are relevant to the determination of the COMI, following the approach taken in US cases. Alternatively, the Singapore Entities' Chapter 11 Proceedings should be recognised as foreign non-main proceedings.

22    The Applicant also submits that the Chapter 11 Plan and Confirmation Order should be recognised as they fall within the definition of a "foreign proceeding" under Art 2(*h*) of the Model Law. This is consistent with the UNCITRAL guide materials, and the US Bankruptcy Court retains jurisdiction and supervision over the process under the Chapter 11 Plan even after the Confirmation Order has been issued.

23    Further and/or in the alternative, upon recognition in Singapore of the Singapore Entities' Chapter 11 Proceedings as a "foreign proceeding", Art 21(1)(*g*) of the Model Law provides the court with the power to recognise the Chapter 11 Plan and Confirmation Order as part of the additional relief to be granted. The court has the power under that provision to recognise (and enforce) insolvency-related, non-monetary

judgments as this is consistent with the interpretation based on the UNCITRAL materials. The approach of US and Canadian cases which permit the recognition and enforcement of foreign insolvency-related judgments should be preferred over the more restrictive approach taken in the UK as this is consistent with Parliament's intention. As a final alternative, recognition should be granted under common law.

24    In relation to the other additional reliefs stated above at [4], the Applicant argues that these are necessary for the Applicant to implement the Chapter 11 Plan and Confirmation Order.

**Recognition of the Singapore Entities' Chapter 11 Proceedings**

*Whether proceedings or orders concerning the restructuring of a real estate investment trust can be recognised under the IRDA and the Model Law*

25    I am doubtful about EH-REIT coming within the scope of the Model Law as implemented in Singapore. That implementation is by way of Pt 11 of the IRDA, and s 252(1) of the IRDA provides that the Model Law (with certain modifications), as set out in the Third Schedule of the IRDA, has the force of law in Singapore. However, Pt 11 is within that segment of the IRDA (Pts 4 to 12 of the IRDA) that deals with corporate entities. EH-REIT is clearly not a corporate entity. Rather, it is a collective investment scheme authorised under the Securities and Futures Act (Cap 289, 2006 Rev Ed) ("SFA") in which a designated trustee acts for the benefit of the unitholders.

26    I do not see anything in the IRDA or its language that would extend its application to EH-REIT. Part 4 and s 61(1) of the IRDA specify the interpretation of the terms used in Pts 4 to 12 of the IRDA, and it is clear that these are limited to corporate insolvency only – there is no mention of business trusts nor real estate investment trusts ("REITs"). This makes sense, as there is already the enactment of other legislation such as the Business Trusts Act 2004 (2020 Rev Ed) ("BTA") and the SFA that would govern aspects of a business trust or a REIT (such as the winding up of a registered business trust under the BTA by order of court).

27    Additionally, the types of entities excluded from the scope of the Model Law, by the Minister's orders under s 252(1) of the IRDA, suggest that the Model Law only applies to corporate entities and that in a similar vein, non-corporate entities governed by the SFA (such as EH-REIT) do not fall within the scope of the Model Law. Section 252(1) of the IRDA provides that the Model Law has force of law, subject to certain modifications to adapt it for application, in Singapore. In turn, Art 1(2) of the Model Law provides that: "This Law does not apply to any proceedings concerning such entities or classes of entities which the Minister may, by order in the *Gazette*, prescribe." The list of entities which are excluded can be found under para 5(1) of the Insolvency, Restructuring and Dissolution

(Prescribed Companies and Entities) Order 2020 which makes reference to a banking corporation, a finance company, *etc.* Under para 5(1)(*z*), a trustee for a collective investment scheme authorised under s 286 of the SFA (and who is approved under s 289 of the SFA) is excluded from the scope of the Model Law. For completeness, it is also provided under para 5(1)(*zf*) that "any other corporation that is licensed, approved, authorised, designated, recognised or registered under the provisions of … (ii) the Business Trusts Act; … (ix) the Securities and Futures Act …" is also excluded from the scope of the Model Law. Two observations may be made. First, the exclusion of entities relates mostly to corporate entities with a separate legal personality, unlike the present EH-REIT. Second, entities which are authorised under the SFA (or the BTA for that matter) are excluded from the scope of the Model Law, and it is logical to infer that EH-REIT itself would not come within the Model Law as well. One possible reason for the exclusion of entities under the SFA may be the need to cater for the interests of a large number of individual unitholders under the various collective investment schemes. Thus, EH-REIT does not come within the scope of the Model Law as implemented in Singapore.

28    I note that under the US Bankruptcy Code, EH-REIT could be considered as a "corporation" for the purposes of being an eligible debtor under Chapter 11. As noted by Christopher Sontchi CJ in *In re EHT US1, Inc* 630 BR 410 (Bankr D Del, 2021) at 423: "Section 109(d) of the Bankruptcy Code provides that only 'a person … may be a debtor' under Chapter 11. The term 'person' is defined under section 101(14) as including an 'individual, partnership, and corporation …' The term 'corporation,' in turn, is defined in section 101(9) as being limited to certain business entities, including a 'business trust.'" Having determined that Singapore law governed the issue, Sontchi CJ held that EH-REIT was a business trust despite not being registered under the BTA after being persuaded by the expert testimony of Professor Hans Tjio (at 428). Thus, it was an eligible debtor under the US Bankruptcy Code. Given that Art 2(*c*) of the Model Law provides that the reference to a "debtor" means a "corporation", it may be arguable that the Model Law could apply to EH-REIT. However, the difficulty is that under our local legislation, specifically the Companies Act 1967 (2020 Rev Ed), the term "corporation" under s 4(1) is not expressly defined to include business trusts (unlike the position in the US), much less a collective investment scheme authorised under the SFA. Hence, under Singapore law, EH-REIT is not a corporation, and consequently, not a "debtor" within the meaning of Art 2(*c*) of the Model Law. Further, as noted above at [27], entities relating to the BTA are also excluded from the scope of the Model Law as enacted in Singapore.

29    A contrary position has been taken in England. In *Rubin and another v Eurofinance SA and others* [2010] 1 All ER (Comm) 81 ("*Rubin (EWHC)*"), an entity known as The Consumers Trust ("TCT") was brought

into proceedings under Chapter 11 of the US Bankruptcy Code, and the US court approved a plan of liquidation under Chapter 11 (at [13]). The English High Court noted that this entity was considered as a "business trust" and that it was common ground that "bankruptcy proceedings can be brought in New York in relation to a business trust, even though it has no separate legal personality for any other purpose" (at [10]). The foreign representatives of TCT then sought recognition of the Chapter 11 case in England as a foreign main proceeding under the equivalent UK legislation enacting the Model Law. However, it was argued by the respondent that the Model Law could not apply as TCT was not a separate legal entity as a matter of English law (at [36]):

> The first point taken in response to the application for recognition by Mr Staff is that, whilst it is clear that a business trust is treated in US bankruptcy law as a separate legal entity, and can be the subject of insolvency remedies – according to the applicants' United States counsel, Mr Friedman, TCT 'is an insolvent corporate entity' – it is not a separate legal entity as a matter of English law. Articles 15 and 17, read together with the definitions of 'foreign proceeding' and 'foreign representative' in art 2 require the existence of 'a debtor'. Mr Staff submits that the word 'debtor' must be given its ordinary meaning in English law, from which it follows that there is no debtor and that the Model Law cannot be applied in this case, or in any other case in which the insolvent estate in a foreign jurisdiction is not that of an individual or of a corporate entity recognised in English law as an independent legal entity.

The English High Court rejected that submission and found that the Model Law could apply to business trusts. This was on the basis that, *inter alia*, having regard to the international origins of the Model Law and the need to promote uniformity in its application under Art 8, a "parochial interpretation" of the term "debtor" and the following "refus[al] to provide any assistance in relation to a bona fide insolvency proceeding taking place in a foreign jurisdiction" should be eschewed (at [40]). The English court then held that TCT was a "debtor" under the Model Law and recognised the Chapter 11 proceedings as a foreign main proceeding (at [42]).

30    While one can appreciate the need to promote uniformity in the application of the Model Law under Art 8, I do not think that *Rubin (EWHC)* should be followed in Singapore. In interpreting the Model Law as enacted in Singapore, s 252(2)(*b*) of the IRDA allows us to have regard to the "Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency", UNCITRAL, 30th Sess, UN Doc A/CN.9/442 (1997) ("the UNCITRAL 1997 Guide"). Additionally, the revised guide – "UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation" (2013) <https://uncitral.un.org/sites/uncitral.un.org/files/media-documents/uncitral/en/1997-model-law-insol-2013-guide-enactment-e.pdf> (accessed 19 May 2022) ("the UNCITRAL 2013 Guide") – may also be referred to as noted in *Re Zetta Jet Pte Ltd and others*

*(Asia Aviation Holdings Pte Ltd, intervener)* [2019] 4 SLR 1343 ("*Zetta Jet (No 2)*") at [37] (where the UNCITRAL 1997 Guide is silent, the court may consider the UNCITRAL 2013 Guide but the UNCITRAL 1997 Guide prevails in the event of conflict). Neither document contains any mention that the Model Law is intended to apply to business trusts or REITs. Further, within the UNCITRAL 2013 Guide, it is provided that a contracting State to the Model Law still retains the sovereignty to decide which entities to exclude from its scope of application (at para 57):

> Paragraph 2 indicates that the enacting State might decide to exclude the insolvency of entities other than banks and insurance companies; the State might do so where the policy considerations underlying the special insolvency regime for those other types of entity (e.g. public utility companies) call for special solutions in cross-border insolvency cases.

As observed above at [26]–[27], there is nothing in our domestic legislation which suggests that the Model Law could apply to EH-REIT (even if it could be described as a business trust) and on the contrary, it seems that Parliament wanted to exclude entities under the SFA from the Model Law as enacted in Singapore. Hence, I am doubtful that EH-REIT comes within the scope of the Model Law as implemented in Singapore.

31      The restructuring of EH-REIT will probably have to proceed by way of a separate application for common law recognition and would have to involve the EH-REIT Trustee (*ie*, DBS Trustee Ltd), who was not present in this application. As will be explained below at [87], I cannot see how the Applicant can have the standing to make the application on behalf of DBS Trustee Ltd.

32      S1 and S2 do not run into this difficulty of falling outside the scope of the Model Law and I proceed with the analysis for these two corporate entities.

***Whether the Singapore Entities' Chapter 11 Proceedings should be recognised as foreign main proceeding even though the presumptive COMI is in Singapore***

33      I am persuaded by the Applicant's submissions on the requirements of Art 17 (see above at [20]) as these are relatively uncontroversial issues. The Singapore Entities' Chapter 11 Proceedings under the US Bankruptcy Code are clearly "foreign proceeding[s]" within the meaning of Art 2(*h*) as stipulated under Art 17(1)(*a*) of the Model Law, and this was previously recognised in *Re Rooftop Group International Pte Ltd and another (Triumphant Gold Ltd and another, non-parties)* [2020] 4 SLR 680 ("*Re Rooftop*") and noted in *Zetta Jet (No 2)* ([30] *supra*) at [25].

34      Rather, the key issue is whether the Singapore Entities' Chapter 11 Proceedings should be recognised as foreign main proceedings or foreign non-main proceedings. Under Art 17(2)(*a*) of the Model Law, it is provided

that the foreign proceeding must be recognised as a foreign main proceeding (which is defined in Art 2(*f*) of the Model Law) if it takes place in the State where the debtor has its COMI.

35     The requirements for the determination of the COMI were considered in *Zetta Jet (No 2)*. As noted at [80], the focus is on the centre of gravity of the objectively ascertainable factors. Further, in ascertaining the COMI, there is no need to maintain the distinction between different entities within a group strictly and it is possible for the analysis to be made of the activities of an entire group of companies (at [83]).

36     The starting point is the presumption under Art 16(3) of the Model Law, which operates such that the place of the debtor-company's registered office is presumed to be its COMI (*Zetta Jet (No 2)* at [29]). Here, S1 and S2 are both incorporated in and have registered offices in Singapore. Thus, the COMI of both debtor companies is presumed to be Singapore.

37     However, this presumption may be displaced if the place of the company's central administration and various factors which are objectively ascertainable by third parties, particularly creditors and potential creditors of the debtor company, point the COMI away from the place of registration to some other location (*Zetta Jet (No 2)* at [76]; *Re Rooftop* at [12(b)]). The rebuttal of the presumption does not need to be made out on a balance of probabilities, but operates as a starting point that is subject to displacement by other factors on the presence of proof to the contrary (*Zetta Jet (No 2)* at [31]). Some factors which may be considered when determining the COMI are: the location of substantial assets, location of sales (*Re Rooftop* at [15]), the location from which control and direction were administered, the location of clients, the location of creditors, the location of operations, the governing law, *etc* (*Zetta Jet (No 2)* at [85]).

38     Here, what commercial activity there was appeared to be centred in the US, particularly as regards S1, which is the indirect 100% holding company of USHIL Holdco Member, LLC and CI Hospitality Investment, LLC, which are in turn, indirect 100% holding companies for each of the Propcos that own the revenue-generating Hotels in the Eagle Hospitality Group portfolio. I note that S2 is only concerned with a Cayman entity (*ie*, the Cayman Corp) under it. However, it is apparent that S2 plays an important role in facilitating the distribution of dividends up to EH-REIT and the Stapled Security Holders from the income generated by the US-based Propcos (see above at [8]).

39     It is clear that both S1 and S2 are not active, operational companies. Rather, they are part of the Eagle Hospitality Group, which has its main business operations and assets based in the US. The substantial assets in play, consisting of the portfolio of 18 full-service Hotels, are all located in the US where the income would be derived as well. These are immovable fixed properties and provide a good indication of the COMI, in contrast to

the situation in *Zetta Jet (No 2)* (at [106]) where the location of planes was not indicative of the COMI as it was expected that assets in the business of aircraft rental and charter might be dispersed in the location most appropriate. In my view, the location of S1 and S2's operations and substantial assets are therefore relevant indicators of their COMI being the US.

40    Further, S1 and S2 did not have creditors in Singapore as of 18 January 2021 (the date of their respective voluntary petitions for relief under Chapter 11). Their only creditors were in the US (such as the debt incurred under a credit facility with the Bank of America NA) according to their respective "Global Notes and Statement of Limitations, Methodology, and Disclaimers Regarding the Debtors' Schedules of Assets and Liabilities and Statements of Financial Affairs" which were filed in the US Bankruptcy Court on 19 March 2021. S1 and S2 (along with EH-REIT) were joint borrowers under a credit facility with the Bank of America NA and the bank had an unsecured claim of US$357,968,703.28 against them. Another significant creditor was the Bank of the West, a bank headquartered in California, with an unsecured claim of US$18,448,253.94. Thus, the significant creditors of S1 and S2 are all based in the US.

41    After S1 and S2 had filed their voluntary petitions for relief under Chapter 11, there were some invoices billed to S1 and S2 from pre-petition Singapore creditors who had provided corporate secretarial services and incurred nominee director fees, but these were much smaller creditors (all of whom have been paid under the Chapter 11 process) and they do not shift the centre of gravity in determining the COMI.

42    It is also noted that US law is the governing law of the various agreements between the respective Singapore Chapter 11 Entities and their creditors. In particular, both the Bank of America NA credit facility and the secured swap agreement with the Bank of the West are governed by US law.

43    In the circumstances, given that the operations and assets of S1 and S2 are in the US, that the larger creditors are located in the US, and that US law governs the various agreements, I conclude that the presumption under Art 16(3) of the Model Law has been displaced and the COMI for both S1 and S2 is the US.

### *The irrelevance of the ongoing Chapter 11 proceedings in the US and the foreign representative's activities*

44    For completeness, I note that the Applicant also contends that the control and supervision of the US Bankruptcy Court in the Singapore Entities' Chapter 11 Proceedings, and the activities of the Applicant as the chief restructuring officer and subsequently as liquidating trustee, are relevant factors that point to the COMI of S1 and S2 being the US. For the

avoidance of doubt, I do not accept these arguments as reasons for my conclusion above at [43] that the COMI of S1 and S2 is the US.

45     To my mind, the fact that the Singapore Entities' Chapter 11 Proceedings are ongoing in the US is irrelevant in determining the COMI, as are the activities of the foreign representative. The jurisprudential basis of the COMI requirement is to determine the centre of gravity of the company's commercial activity, that is, where it was centred while it was alive and flourishing – in other words, a corporation's real home. A hospital bed, or a crypt, does not count.

46     As for the relevance of a foreign representative's actions to determining the COMI, I previously observed in *Zetta Jet (No 2)* ([30] *supra*) that the foreign representative's actions are irrelevant in the ascertainment of the COMI and rejected the approach taken in the US (at [101]–[103]):

> 101     The applicants point to the fact that the US-based Trustee undertook efforts to restructure Zetta Jet Singapore from the date of his appointment to the cessation of the business of the Zetta Entities, *ie*, from 5 October 2017 to 30 November 2017.

> 102     However, I would not take the foreign representative's actions as being relevant in the ascertainment of COMI. The work being done by the foreign representative would flow from the assumption of jurisdiction by the foreign court on whatever basis it considers appropriate.

> 103     I am mindful that I differ in this regard from the approach of the US courts … which held that 'any relevant activities, including liquidation activities and administrative functions, may be considered in the COMI analysis' … I am not, however, convinced that it is proper to consider such activities in determining COMI.

47     As noted in *Zetta Jet (No 2)* at [103], the US position is that the activities of the foreign representative are relevant. In *In re Fairfield Sentry Ltd* 714 F 3d 127 (2nd Cir, 2013) ("*re Fairfield*"), the United States Court of Appeals for the Second Circuit held that "any relevant activities, including liquidation activities and administrative functions, may be considered in the COMI analysis" and it was observed that the COMI should correspond to the place where the debtor "conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties" (at 137–138).

48     In the subsequent decision of *In re Oi Brasil Holdings Coöperatief UA* 578 BR 169 (Bankr SDNY, 2017), *re Fairfield* was cited for the proposition that the activities of foreign liquidators and administrators could be relevant to a COMI analysis (at 222). However, the activities of a judicial administrator must be of sufficient significance to produce a shift in the COMI (at 222) and provide a meaningful basis for the expectation of third parties (at 223).

49    That was the case in *In re British American Isle of Venice (BVI) Ltd* 441 BR 713 (Bankr SD Fla, 2010), where the work done by the liquidator of the company was significant (reviewing the company's books, taking control of company assets and undertaking the investigation of the investments, *etc*) and the extended passage of time meant that third parties necessarily considered his office in the British Virgin Islands to be the location of the debtor company's COMI (at 723). Where a foreign representative remains in place for an extended period and relocates the primary business of the debtor to his location, thereby causing creditors and other parties to look to the foreign representative, this could lead to the conclusion that the COMI has become lodged with the foreign representative (at 723).

50    Nevertheless, I decline to follow the US authorities. As I have noted previously in *Zetta Jet (No 2)* ([30] *supra*) at [102], the "work being done by the foreign representee would flow from the assumption of jurisdiction by the foreign court". Where the business activities of a company are subsequently managed in the jurisdiction where the foreign proceedings were commenced, I do not think that creditors would necessarily look to the actions of the foreign representative. The US approach appears to be a form of bootstrapping and will allow the parties to choose their COMI (so to speak) in an artificial manner. To my mind, it would be better to assess the COMI by looking at the activities of the company before the foreign restructuring takes place (even though the relevant date for determining the COMI is at the date of application for recognition). The location of the activities of the foreign representative is therefore irrelevant.

51    While I appreciate that the US cases have set a relatively high threshold before the COMI can be shifted in this manner, I remain unconvinced that the foreign representative's actions are relevant in determining the COMI. Looking to other jurisdictions, it appears that the work done and activities of the foreign representative are not usually considered by the courts around the world (in those jurisdictions which have adopted the Model Law) to be "among the most important" five factors in determining the COMI (see UNCITRAL, "Digest of Case Law on the UNCITRAL Model Law on Cross-Border Insolvency" (2021) <https://uncitral.un.org/sites/uncitral.un.org/files/media-documents/uncitral/en/20-06293_uncitral_mlcbi_digest_e.pdf> (accessed 22 May 2022) ("UNCITRAL Digest") at p 41). In fact, it appears to be a largely US-centric phenomenon.

52    I am therefore not persuaded by the Applicant's submission that the fact that the Singapore Entities' Chapter 11 Proceedings are ongoing in the US, or the Applicant's activities in its capacity as foreign representative, are relevant factors pointing to the COMI of S1 and S2 being the US. Nevertheless, in view of the findings above at [38]–[42] regarding the other factors applicable to the present case, the presumption that the COMI is

Singapore is displaced in favour of the US. Accordingly, the Singapore Entities' Chapter 11 Proceedings are recognised as foreign main proceedings within the meaning of Art 2(*f*) and pursuant to Art 17(2)(*a*) of the Model Law.

### Whether the Singapore Entities' Chapter 11 Proceedings should be recognised as Foreign Non-Main Proceedings

53     Having decided that the Singapore Entities' Chapter 11 Proceedings in relation to S1 and S2 should be recognised as foreign main proceedings, the issue of whether they can be recognised as foreign non-main proceedings is now moot and does not arise on the facts. The fallback submission of the Applicant does not need to be considered.

### Recognition of the Chapter 11 Plan and Confirmation Order

54     I turn to the Applicant's prayer that the Chapter 11 Plan and Confirmation Order be recognised as foreign proceedings under the Model Law. The commercial objective of the recognition of the Chapter 11 Plan and Confirmation Order sought by the Applicant is apparently to allow the affairs of the Singapore Chapter 11 Entities to be wound up as efficiently as possible. The Chapter 11 Plan resolves the outstanding liabilities and contemplates the eventual winding down of the Singapore Chapter 11 Entities, including S1 and S2. It is thus necessary for the Confirmation Order, along with the Chapter 11 Plan, to first be recognised by the Singapore courts, before the Singapore Chapter 11 Entities can be properly dissolved in Singapore. Given the presence of Singapore creditors, recognition would also ensure that any creditor action or potential proceedings in Singapore is prevented.

55     The Applicant argues that the liabilities should be resolved in Singapore to efficiently dissolve the relevant entities as opposed to going into a parallel liquidation scenario. Certainty would be achieved, and the Chapter 11 Plan can be implemented in Singapore without any hitch. Thus, to ensure all matters are resolved smoothly, the Chapter 11 Plan and Confirmation Order should be recognised in Singapore.

### Basis of recognition

#### Article 2(h) of the Model Law

56     Having considered the arguments before me, while I was previously amenable to taking an expanded view of Art 2(*h*) of the Model Law, considering the continued supervision and jurisdiction of the US Bankruptcy Court over the Chapter 11 Plan and Confirmation Order, I am of the view that the better course is to grant recognition of the Chapter 11 Plan and Confirmation Order as foreign orders under Art 21(1)(*g*) of the Model Law instead. Nevertheless, I set out some views in passing regarding

Art 2(*h*) of the Model Law and leave the issue open for future determination.

57    The Applicant submits that the court has the ability to recognise and give effect to not only the Singapore Entities' Chapter 11 Proceedings, but also the Chapter 11 Plan and Confirmation Order, as they fall within the scope of the definition of a "foreign proceeding" under Art 2(*h*) of the Model Law.

58    Article 2(*h*) reads:

> (*h*) 'foreign proceeding' means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the property and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation or liquidation …

59    As laid down by the Court of Appeal in *United Securities Sdn Bhd (in receivership and liquidation) and another v United Overseas Bank Ltd* [2021] 2 SLR 950 ("*United Securities*") at [53], there are at least four cumulative attributes (to be considered as a whole) required for a proceeding to constitute a "foreign proceeding" under Art 2(*h*) of the Model Law:

> (a)   The proceeding must involve creditors collectively.
>
> (b)   The proceeding must have its basis in a law relating to insolvency.
>
> (c)   The court must exercise control or supervision of the property and affairs of the debtor in the proceeding.
>
> (d)   The purpose of the proceeding must be the debtor's reorganisation or liquidation.

In the present circumstances, only requirement (c) is in doubt – regarding whether the court exercises control or supervision of the debtor's property and affairs post-confirmation of the Chapter 11 Plan.

60    The question that arises is whether the approval of the Chapter 11 Plan by the Confirmation Order, means that the US Bankruptcy Court no longer retains control or supervision over the matter. For this third attribute to be satisfied, the control or supervision must be "formal in nature", though it "may be potential rather than actual" and may be exercised directly by the court or indirectly through an insolvency representative (*United Securities* at [67]). Thus, it is sufficient for the foreign court to have supervision over the foreign insolvency representative who possesses direct control. One example cited by the Court of Appeal which satisfies this requirement is a proceeding in which the court has exercised control or supervision over the debtor company, but at the time

of application for recognition, is no longer required to do so (*United Securities* at [69]).

61     The Applicant cites a part of the UNCITRAL 2013 Guide (at para 75) which suggests that this court could recognise the Chapter 11 Plan and Confirmation Order:

> Proceedings in which the court has exercised control or supervision, but at the time of the application for recognition is no longer required to do so should also not be excluded. An example of the latter might be cases where a reorganization plan has been approved and although the court has no continuing function with respect to its implementation, the proceedings nevertheless remain open or pending and the court retains jurisdiction until implementation is completed.

One could suggest that the Chapter 11 Plan, which has been approved by the Confirmation Order, is no different from a "reorganization plan" mentioned in the UNCITRAL 2013 Guide. This would mean that post-confirmation of the Chapter 11 Plan, the proceeding would still fall within the definition of a foreign proceeding under Art 2(*h*) of the Model Law.

62     Indeed, other materials support this interpretation. The authors of *Cross-Border Insolvency: A Commentary on the UNCITRAL Model Law* (Look Chan Ho gen ed) (Globe Law & Business, 4th Ed, 2017) ("*A Commentary on the UNCITRAL*") observe at p 178 that a foreign insolvency proceeding will remain as a "foreign proceeding" even after judicial confirmation of a reorganisation plan, until the proceeding is closed and the debtor's affairs are no longer subject to the foreign court's control. In the UNCITRAL Digest, it is suggested (at p 8) that where a reorganisation plan has been approved and although the court has no continuing function with respect to its implementation, the proceeding nevertheless remains open or pending and the court retains jurisdiction (*eg*, to settle any dispute over the interpretation of the plan or to oversee the debtor's performance pursuant to the plan) until implementation is completed.

63     To better understand whether a court will still retain supervision and control, what happens after a Chapter 11 plan of liquidation has been confirmed is relevant. In *In re Oversight and Control Commission of Avanzit, SA* 385 BR 525 (Bankr SDNY, 2008) ("*Oversight & Control*"), this situation was summarised (at 535) as such:

> … Under the Bankruptcy Code, and unless the confirmation order or the plan states otherwise, confirmation revests the property of the estate in the debtor, free and clear of all claims and interests, 11 U.S.C. §1141(b), (c), and discharges the debtor. 11 U.S.C. §1141(d). The reorganized debtor goes about its business, free of the constraints placed on trustees under the Bankruptcy Code. When the case has been fully administered, a final decree is entered closing the case. …

> Between confirmation and the final decree, the bankruptcy court continues to exercise jurisdiction over the case, albeit in a more limited fashion. Thus, although the jurisdiction 'shrinks,' … it does not end. The bankruptcy court retains jurisdiction under 11 U.S.C. § 1142(b) to direct the debtor or any necessary party to execute an act necessary for the consummation of the plan and it has 'continuing responsibilities to satisfy itself that the [p]lan is being properly implemented.' …

Thus, even after confirmation of a Chapter 11 plan of liquidation and up until the final decree closing the case, the US bankruptcy court continues to maintain control or supervision necessary to implement the Chapter 11 plan even if this is in a more limited fashion. Case law under Chapter 15 of the US Bankruptcy Code (which encapsulates the Model Law as enacted in the US) also suggests that a "foreign proceeding" under Art 2(*h*) of the Model Law is not restricted to the approval of a restructuring or repayment plan, but can extend to the implementation of the plan (see Look Chan Ho, *Cross-Border Insolvency: Principles and Practice* (Sweet & Maxwell, 2016) ("*Principles and Practice*") at p 98). Further, leaving a foreign representative in control of the business and operations is not necessarily inconsistent with supervision by a foreign court (see *In re Ashapura Minechem Ltd* 480 BR 129 (Bankr SDNY, 2012) at 138).

64     In *Oversight & Control*, a petition was filed for recognition of Spanish proceedings under Chapter 15 of the US Bankruptcy Code. The equivalent of a Chapter 11 plan or a repayment agreement, known in Spain as a "convenio", had been negotiated with the creditors and the convenio had been approved by the Spanish court. The issue was whether the control and supervision of the Spanish court ceased upon approving the convenio, such that the Spanish proceedings were no longer a "foreign proceeding" capable of recognition. It was undisputed by the parties (at 535) that the debtor company's status was "similar to a chapter 11 debtor after confirmation". The US court held that even though the management and daily control of the debtor company had been returned, the Spanish insolvency court had not surrendered all supervision and control as it continued to oversee the payment of claims to creditors and to settle any disagreement concerning the "interpretation, enforcement and/or performance" of the convenio (at 534). It may have been the case that the Spanish court's level of control or supervision was reduced, but it had not entirely ceased. Hence, even after the "convenio" received final approval, the Spanish insolvency proceedings did not lose their status as a "foreign proceeding" as the Spanish court still exercised control and supervision over the debtor company's assets and affairs, to the extent necessary to ensure compliance with and consummation of the convenio (at 536).

65     Some parallels may be drawn to the present circumstances. While the Chapter 11 Plan has been confirmed, it is provided in para 40 of the Confirmation Order that the US Bankruptcy Court "shall retain and have exclusive jurisdiction of all matters" relating to the Chapter 11 Plan.

Article XIII of the Chapter 11 Plan then sets out a list of matters which the US Bankruptcy Court continues to have jurisdiction over, which includes, *inter alia*, hearing any disputes arising in connection with the "interpretation, implementation or enforcement" of the Chapter 11 Plan and recovering all assets of the debtor companies wherever located. In the circumstances, it would appear that the US Bankruptcy Court still retains some jurisdiction over the process under the Chapter 11 Plan, even after the Confirmation Order has been issued. Thus, the Chapter 11 Plan and Confirmation Order could fall within the scope of "foreign proceeding[s]" as defined in Art 2(*h*) of the Model Law.

66     However, as explained above at [56], my preference would be to give recognition to the Chapter 11 Plan and the Confirmation Order pursuant to Art 21(1)(*g*) of the Model Law instead. At this juncture, it is relevant to point out that *Oversight & Control* is perhaps one of the only few cases in which a post-confirmation repayment plan was recognised under Art 2(*h*) of the Model Law. As will be seen below, it is more orthodox to recognise the Chapter 11 Plan and the Confirmation Order under Art 21(1)(*g*) of the Model Law as a form of additional relief, and the cases in that regard are much more numerous. Hence, I make no pronouncement on whether a Singapore court has the ability to recognise a post-confirmation plan of liquidation (or other foreign insolvency judgments) under Art 2(*h*) of the Model Law, and leave this issue open for future determination.

*Article 21(1)(g) of the Model Law*

67     Article 21(1) of the Model Law provides that upon the recognition of a foreign proceeding, the court may grant any appropriate relief. Specifically, under Art 21(1)(*g*), this includes granting any additional relief that may be available to a Singapore insolvency officeholder, including any relief provided under s 96(4) of the IRDA. The Applicant submits that upon the recognition of the Singapore Entities' Chapter 11 Proceedings as "foreign proceedings", the court is empowered to grant recognition and enforcement of the Chapter 11 Plan and Confirmation Order.

68     It is pertinent to note that the Model Law does not explicitly provide for the recognition and enforcement of foreign insolvency orders and judgments. Nevertheless, as proposed by the UNCITRAL 2013 Guide (at para 189), the list of reliefs in Art 21 should be regarded as non-exhaustive in nature and the court is not restricted unnecessarily in its ability to grant any type of relief that is required in the circumstances of the case. Hence, it is said that "[i]t is in the nature of discretionary relief that the court may tailor it to the case at hand" (the UNCITRAL 2013 Guide at para 191).

69     In some States, it has been suggested that the recognising court can give effect to the position in the foreign main proceeding, which might mean the relief that can be ordered in the recognising State is not limited to

the relief that would be available in a hypothetical domestic insolvency proceeding (*In re Sino–Forest Corporation* 501 BR 655 (Bankr SDNY, 2013) at 665–666). In contrast, in other States, courts have held that the words "any appropriate relief" do not allow the court to grant relief that would not be available when dealing with a domestic insolvency (*Fibria Celulose S/A v Pan Ocean Co Ltd and another* [2014] Bus LR 1041 at [107]–[108]). I had previously commented in *Re Rooftop* ([33] *supra*) at [27]) that assistance of a particular form may not be granted if in the same circumstances it may be denied or is not available to a local representative. However, as explained below at [77]–[78], I am satisfied on the material before me that the court may, in appropriate circumstances, apply foreign insolvency law when granting discretionary relief under Art 21(1)(*g*) of the Model Law as the phrase "under the law of Singapore" has been deliberately omitted. The circumstances and degree of discretion can only be specified incrementally.

70    Looking to the US cases, it is well established in Chapter 15 jurisprudence that foreign insolvency orders and judgments may be recognised and enforced locally, subject to limited exceptions such as public policy considerations (*A Commentary on the UNCITRAL* at p 249; *Principles and Practice* at p 167).

71    The US equivalent of Art 21 of the Model Law is §1521(a) of the US Bankruptcy Code, which reads:

> **§1521. Relief that may be granted upon recognition**
>
> (a)    Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—
>
> > …
> >
> > (7)    granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

§ 1521(a) of the US Bankruptcy Code has been interpreted to extend to the recognition and enforcement of foreign insolvency-related orders and judgments confirming foreign reorganisation plans. For instance, in *In re Lupatech SA* 611 BR 496 (Bankr SDNY, 2020), it was noted (at 502) that "appropriate relief" under §1521 includes "enforcing a foreign order confirming a debtor's plan", but that the relief will only be granted if the interests of the creditors and other interested entities are sufficiently protected.

72    Consistent with this position, the US courts have recognised and enforced foreign insolvency-related court orders from abroad. In *In re Salvati*, 2009 Bankr LEXIS 5722 (Bankr SDNY, 7 May 2009), an English

company had commenced proceedings before the English High Court for a scheme of arrangement pursuant to s 895 of the Companies Act 2006 (c 46) (UK). The scheme was approved at the sanction hearing, and a sanction order was granted. The US court held that the sanction order was entitled to recognition and enforcement in the US. Other English schemes of arrangement and the accompanying sanction orders have also been recognised and enforced in the US (see *In re Magyar Telecom BV* 2013 Bankr LEXIS 5716 (Bankr SDNY, 11 December 2013)).

73     In *In re CGG SA* 579 BR 716 (Bankr SDNY, 2017) ("*re CGG SA*"), the applicant sought the recognition and enforcement of an order entered by a French court sanctioning a French safeguard plan (which restructured the debts of the company). The French court had given a sanctioning order after the safeguard plan had obtained the requisite approval from creditors. The US court held (at 720) that "the recognition and enforcement of the [s]anctioning [o]rder [was] 'appropriate relief' under section 1521(a) of the Bankruptcy Code" and gave the sought-after relief. However, the US court did not do so blindly, but also took notice that (a) the interests of the creditors and shareholders were sufficiently protected under the safeguard plan; (b) the interested parties had been given the opportunity to be heard in the French court; and (c) the safeguard plan might not be fully implemented if relief were not granted, to the detriment of the parties who fully supported it.

74     In addition to the foregoing brief survey of authorities, other authorities demonstrating that the US courts are open to recognising and enforcing foreign insolvency-related orders and judgments from various jurisdictions include: *In re Oi SA* 587 BR 253 (Bankr SDNY, 2018) ("*re Oi SA*") (concerning a Brazilian reorganisation plan); *In re Metcalfe & Mansfield Alternative Investments* 421 BR 685 (Bankr SDNY, 2010) (a Canadian plan of compromise and arrangement); and *In re Energy Coal SPA* 582 BR 619 (Bankr D Del, 2018) (an Italian debt restructuring plan).

75     In contrast, the position in the UK is much more conservative and circumscribed with regard to interpreting the UK equivalent of Art 21 of the Model Law. The relevant provision is found in Schedule 1 to the Cross-Border Insolvency Regulations 2006 (SI 2006 No 1030) (UK), and provides as such:

> *Article 21. Relief that may be granted upon recognition of a foreign proceeding*
>
> 1.     Upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including—
>
> > …
>
> > (g)     granting any additional relief that may be available to a British insolvency officeholder under the law of Great Britain, including any

relief provided under paragraph 43 of Schedule B1 to the Insolvency Act 1986.

Coming back to the case of *Rubin (EWHC)* (mentioned above at [29]), an appeal against the English High Court's decision was subsequently heard by the English Court of Appeal. The English Court of Appeal's decision was then, in turn, appealed against and heard by the UK Supreme Court in *Rubin v Eurofinance SA* [2012] 3 WLR 1019 ("*Rubin (UKSC)*"), though the issue of whether the Model Law as enacted in the UK (the "UK Model Law") could apply to business trusts was no longer in play. In *Rubin (UKSC)*, it was argued by the respondent that the recognition and enforcement of foreign-insolvency judgments was one of the reliefs available under Art 21 of the UK Model Law, and the fact that "recognition and enforcement of foreign judgments is not specifically mentioned in article 21 as one of the forms of relief available, does not mean that such relief cannot be granted" (at [141]). Thus, the foreign representatives of TCT sought enforcement of a judgment by the US bankruptcy court in respect of fraudulent conveyances and transfers against Eurofinance SA and others. However, the UK Supreme Court rejected that submission on the basis that the UK Model Law "say[s] nothing about the enforcement of foreign judgments" and it "would be surprising if the Model Law was intended to deal with judgments in insolvency matters" when no consensus could even be reached regarding the recognition and enforcement of judgments in civil and commercial matters which had been the subject of intense international negotiations at the Hague Conference on Private International Law (at [142]–[143]). It was concluded that "the Model Law is not designed to provide for the reciprocal enforcement of judgments" (at [144]).

76     *Rubin (UKSC)* has not been well received: see, for example, academic critique noting that "the Supreme Court's reasoning in respect of Article 21 is unconvincing" (*A Commentary on the UNCITRAL* at p 248; *Principles and Practice* at p 165). It is also observed that in an attempt to get around the decision of the UK Supreme Court in *Rubin (UKSC)*, the UNCITRAL Working Group V drafted a proposed model law to allow for the recognition of foreign insolvency judgments, especially if the judgment comes from the jurisdiction of the debtor's COMI (Neil Hannan, *Cross-Border Insolvency: The Enactment and Interpretation of the UNCITRAL Model Law* (Springer, 2017) at p 244).

77     In this regard, the Applicant submits that the UK's position should not be adopted. The Singapore Ministry of Law has expressed its preference for the US approach in relation to Art 21(1)(*g*) over the UK approach. In the draft Companies (Amendment) Bill 2017 that the Ministry of Law sought public consultation on, the draft Art 21(1)(*g*) of the Model Law provided that the reliefs available included "any additional relief that may be available to a Singapore insolvency officeholder *under the law of*

*Singapore*" [emphasis added]. However, in the final version of the Model Law, the italicised phrase was deleted. This was intentionally done in order to align the Singapore position with that of the US, rather than the UK, as observed from the Ministry's Response to Feedback from Public Consultation on the Draft Companies (Amendment) Bill 2017 to Strengthen Singapore as an International Centre for Debt Restructuring <https://www.mlaw.gov.sg/files/Annex_A-Goverment_Response_to_Public%20Consult_Feedback_for_Companies_Act_Amendments.pdf/> (accessed 24 May 2022):

> 11.2.1 In respect of Art 21(1)(g), we received a comment that despite similar wording in their respective provisions, the UK and US differ in their approaches on the scope of relief that may be granted. It was therefore suggested that Singapore should signal whether the US or UK approach should be adopted in respect of relief that may be granted under Art 21(1)(g).
>
> 11.2.2 After consideration of this issue, the suggestion has been noted and accepted. Thus, this provision has been amended to align the wording with the US provision in Chapter 15 of the US Bankruptcy Code.

The language of the Model Law as enacted in Singapore (the "Singapore Model Law") is distinct from that of the UK Model Law, as it removes the qualifier that the relief granted must be available "under the laws of [the State]". From the above passage, it is clear that the Ministry of Law was concerned with the "scope of relief that may be granted" under Art 21(1)(*g*) of the Singapore Model Law, and has expressly chosen to align the language of the provision with that under Chapter 15 of the US Bankruptcy Code.

78    In the circumstances, the US approach should be preferred and it is the US jurisprudence which should be persuasive in determining the scope of relief to be granted. The holding in *Rubin (UKSC)* is not endorsed in Singapore and I decline to follow the English authorities that depart from the US position. I accept the Applicant's arguments that the Singapore court is empowered under Art 21(1)(*g*) of the Model Law to grant recognition of the Chapter 11 Plan and Confirmation Order as foreign orders, following the proposition found in the US authorities. I do not consider that the difference in the language of the enacting provisions in the US and Singapore makes a substantial difference. While §1521(a) of the US Bankruptcy Code contains the additional phrase "to effectuate the purpose of this chapter" (see above at [71]), the difference is not material. This is because the purpose of Chapter 15 is *in pari materia* with the objectives stated in the preamble to our Model Law. Additionally, while the version of Art 21(1)(*g*) enacted in Singapore contains the modifier "available to a Singapore insolvency officeholder" after "any additional relief" (see above at [77]), I do not read Art 21(1)(*g*) to be so restricted, in line with the Ministry of Law's comments that the scope of relief that may be granted should follow the US approach and the US provisions contain a similar modifier. This also follows from the fact that the phrase "under the law of

Singapore" was eventually removed, which signifies that an expansive view is to be taken.

79    The section heading of Art 21(1) of the Model Law contains the phrase "any appropriate relief". Invoking the section heading alone would circumvent the issue that the enforcement of a foreign rehabilitation plan is not ordinarily "relief that may be available to a Singapore insolvency officeholder" under Art 21(1)(*g*) of the Model Law. I do note that in the unreported case of *Re CFG Peru Investments Pte Ltd and another* HC/OS 665/2021 (21 September 2021), the Singapore High Court recognised a US Chapter 11 plan and the accompanying confirmation order under the Model Law but did not specify whether the relief was granted under the section heading of Art 21(1) or Art 21(1)(*g*) of the Model Law.

80    Nevertheless, Art 21(1)(*g*) of the Model Law can be read as an extension of Art 21(1) and the principles governing the reliefs available apply equally to both. Little distinction is made by the US courts. In *re Oi SA* ([74] *supra* at 265), the US Bankruptcy Court for the Southern District of New York considered that the reliefs available under §1521(a) of the US Bankruptcy Code (the equivalent of Art 21(1) of the Singapore Model law) encompass the reliefs available under §1521(a)(7) (the equivalent of Art 21(1)(*g*) of the Singapore Model Law):

> Section 1521(a) of the Bankruptcy Code provides that '[u]pon recognition of a foreign proceeding, … where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief….' 11 U.S.C. § 1521(a). Such 'appropriate relief' includes a non-exhaustive list of certain types of relief that is enumerated by the statute, including 'any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).' 11 U.S.C. § 1521(a)(7). …

Hence, in *re Oi SA* (at 266), the recognition of the Brazilian reorganisation plan (known as the "recuperação judicial plan") and the Brazilian court order confirming the plan was granted as "'appropriate relief' under Section 1521(a)(7)", even though the language of "appropriate relief" is found only in the chapeau of §1521(a) of the US Bankruptcy Code. Following the reasoning in that case, the relief in the present application can be granted pursuant to Art 21(1)(*g*) of the Model Law.

81    However, in granting recognition and enforcement of foreign insolvency judgments and orders, the Singapore court is not merely acting as a rubber stamp. Following the guidance laid down in *re CGG SA* (see above at [73]), the Singapore court must carefully scrutinise the circumstances in which the foreign order was granted and ensure that interested parties were given an opportunity to be heard and that the relevant creditors and shareholders are adequately protected. This requirement is encapsulated in Art 22(1) of the Model Law which provides

that in granting relief under Art 21, the court must be satisfied that the interests of the creditors and other interested persons, including if appropriate the debtor, are "adequately protected". As elaborated upon in the UNCITRAL 2013 Guide (at para 196), the "idea underlying article 22 is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief". Adequate protection must be afforded to interested parties.

82      Turning to the present circumstances, I note that the Chapter 11 process, leading up to the approval of the Confirmation Order endorsing the Chapter 11 Plan, was conducted under the supervision of and with the approval of the US Bankruptcy Court. The requisite voting requirements for the confirmation of the Chapter 11 Plan were properly satisfied. There was opportunity provided for creditors to appear and be heard before the US Bankruptcy Court. Further, the Singapore creditors had been duly notified about the developments in the Singapore Entities' Chapter 11 Proceedings and the Chapter 11 Plan via public announcements on SGXNet and the Eagle Hospitality Trust website. In relation to the Stapled Security Holders, they had been informed via announcements and the revised Disclosure Statement that it is not expected that they will receive any distributions. Copies of the relevant notices (including the notice of the hearing on confirmation of the Chapter 11 Plan), which set out further information on the process and the options that the Stapled Security Holders may take in connection with the Chapter 11 Plan, were also mailed out to them.

83      Specifically, in relation to the present recognition application, the Applicant has given notice of the application to all creditors by way of announcement on the SGXNet, the EH-REIT website and the Donlin, Recano & Company, Inc website (the claims and noticing agent engaged in providing public access to the court papers filed in the Singapore Entities' Chapter 11 Proceedings). The Applicant informs that he has not received any notice from any creditor of any objection to this present application. Thus, I find that the interests of relevant parties are adequately protected. The recognition of the Chapter 11 Plan and Confirmation Order is therefore granted as appropriate additional relief under Art 21(1)(*g*) of the Model Law in relation to S1 and S2.

### Common law

84      As has been noted in a number of instances, I am reluctant to invoke common law recognition where it would seem to have been contemplated that the Model Law would govern the proceedings, either by allowing or prohibiting a particular result. Where the Model Law is applicable to the subject matter, the court would be slow to allow common law recognition to be invoked as an alternative basis as the existence of a detailed recognition regime created by legislation displaces the need for the

common law doctrine to apply (*Re Rooftop* ([33] *supra*) at [58]). In the present case, the Applicant's request for recognition of the Chapter 11 Plan and Confirmation, at least in relation to S1 and S2, is governed by the Model Law, as is apparent from my conclusion above at [83]. Thus, in relation to S1 and S2, common law recognition would not be available. I do not deal with the alternate submissions made by the Applicant on this front.

85     As regards EH-REIT, some form of common law recognition would probably be required, given my finding at [30] above that the Model Law does *not* apply to entities such as EH-REIT. However, I am doubtful whether any application for common law recognition can be pursued without the joining of the EH-REIT Trustee, as I elaborate below.

**Relief in respect of the EH-REIT Trustee and common law recognition**

86     What is sought by the Applicant is authorisation for the EH-REIT Trustee (namely, DBS Trustee Ltd) to take steps to wind down the entity. In my judgment, this should be done in a separate application with the relevant supporting affidavit. The recognition of the Applicant as the foreign representative and the recognition of the Singapore Entities' Chapter 11 Proceedings does not absolve DBS Trustee Ltdfrom exercising its duties and responsibilities as the EH-REIT Trustee.

87     I cannot see how the Applicant could also have the standing to make an application on behalf of DBS Trustee Ltd. If obligations are owed under Singapore law, which presumably they are, DBS Trustee Ltdshould satisfy the Singapore court that the winding down and other steps contemplated are in accordance with Singapore law, and that it is satisfied, as the EH-REIT Trustee, that these are appropriate under the terms of the trust deed. DBS Trustee Ltd must also demonstrate to the court that no prejudice will be occasioned to the Stapled Security Holders.

88     Furthermore, I cannot see how any matters affecting the winding down of EH-REIT could be brought in this summons: the winding down of a trust is not covered by the empowering Act, *ie*, the IRDA, and is outside the scope of the Model Law as enacted in Singapore. While there is express provision made for business trusts to be wound up in Singapore under the BTA (*eg*, by order of court), there is no such equivalent provision under the SFA for collective investment schemes, such as EH-REIT, that are authorised under it. The dissolution of EH-REIT would have to be done in accordance with the terms of the trust deed, which would specify details such as the manner in which the assets are to be sold and how the remaining assets (if any) are to be distributed to the various unitholders.

89     It may be that a separate application will add to the complexity of the process of implementing the Chapter 11 Plan and Confirmation Order, but that is what our legal framework requires. I cannot give orders for DBS Trustee Ltd to liquidate EH-REIT in these proceedings.

90    Common law recognition may possibly be available for the recognition of the Singapore Entities' Chapter 11 Proceedings in relation to EH-REIT. The common law test may have to be applied instead (see *Re Opti-Medix Ltd (in liquidation) and another matter* [2016] 4 SLR 312). But no comment is made on whether such an application would succeed under common law recognition, and this issue will be determined at the appropriate juncture.

**Other reliefs sought**

91    In relation to the additional relief sought above at [4(a)]–[4(b)], I do not find that controversial issues are raised and will grant them, save that these are limited to S1 and S2 only (instead of all the Singapore Chapter 11 Entities including EH-REIT).

92    The prayer at [4(a)] is sought so that the Applicant can be properly authorised by the Singapore courts as a "foreign representative" under Art 2(*i*) of the Model Law to perform his duties and obligations set out under the Chapter 11 Plan and Confirmation Order. The UNCITRAL 2013 Guide provides (at para 86) that the "fact of appointment of the foreign representative in the foreign proceeding … is sufficient for the purposes of the Model Law" and the definition of a "foreign representative" is "sufficiently broad to include debtors who remain in possession after the commencement of insolvency proceedings". The Applicant was duly appointed by the US Bankruptcy Court to be the foreign representative of S1 and S2 on 21 January 2021 in relation to the Singapore Entities' Chapter 11 Proceedings. Certified copies of the US Bankruptcy Court orders expressly appointing the Applicant as foreign representative of the respective entities have been provided to the court. Thus, this prayer is granted. The prayer at [4(b)] is also granted to enable the Applicant to administer the assets located in Singapore arising out of any investigations pursuant to the Chapter 11 Plan.

93    However, there should be no expatriation of funds or proceedings to be instituted without obtaining the leave of court.

**Conclusion**

94    For the abovementioned reasons, the court grants recognition for the Singapore Entities' Chapter 11 Proceedings, the Chapter 11 Plan and the Confirmation Order under the Model Law as enacted in Singapore. However, these are only in respect of S1 and S2. Should there be any intention to repatriate the assets of S1 and S2 from Singapore, the Applicant is required to obtain the leave of the court before proceeding to do so.

95    In respect of EH-REIT, a separate application should be made. In principle, I would think that this should be made by the EH-REIT Trustee, DBS Trustee Ltd. However, I will consider arguments if the application can

be made by the Applicant with at least the participation of the EH-REIT Trustee. It would also be fair and appropriate for the Stapled Security Holders to be given an opportunity to come before the court as well.

Reported by Darien The.

H5 6 ˙6

## *Re* Zetta Jet Pte Ltd and others

### [2018] SGHC 16

High Court — Originating Summons No 1391 of 2017
Aedit Abdullah J
16, 24 January 2018

*Insolvency Law — Cross-border insolvency — Recognition of foreign insolvency proceedings — Insolvency representative appointed in US bankruptcy proceedings after High Court of Singapore issued injunction enjoining further steps being taken in US proceedings — Insolvency representative applying for recognition in Singapore — Whether recognition would be contrary to public policy — Article 6 Tenth Schedule Companies Act (Cap 50, 2006 Rev Ed)*

**Facts**

Voluntary Chapter 11 bankruptcy proceedings, a form of protected restructuring, were filed against Zetta Jet Pte Ltd and Zetta Jet USA, Inc ("the Zetta Entities") in the United States Bankruptcy Court. An automatic moratorium came into effect when the US Chapter 11 proceedings were commenced. Such moratorium operated, from the perspective of the US, on a worldwide basis.

Shortly after the US Chapter 11 proceedings were commenced, an injunction order from the High Court of Singapore was sought and obtained by Asia Aviation Holdings Pte Ltd ("AAH"), a shareholder of Zetta Jet Pte Ltd. The injunction enjoined Zetta Jet Pte Ltd and its shareholders from carrying out any further steps in the US bankruptcy proceedings until trial or further order.

The US bankruptcy proceedings continued notwithstanding the injunction. The Chapter 11 proceedings were subsequently converted to Chapter 7 proceedings, the equivalent of liquidation in the US. In the US Chapter 7 proceedings, an insolvency representative was appointed ("the Chapter 7 Trustee").

The Chapter 7 Trustee applied for recognition by the Singapore courts of the US Chapter 7 proceedings, pursuant to the UNCITRAL Model Law on Cross-Border Insolvency (30 May 1997) ("the Model Law"). The Model Law had been enacted with modifications in Singapore under s 354B read with the Tenth Schedule of the Companies Act (Cap 50, 2006 Rev Ed) ("the Singapore Model Law"). AAH opposed the application for recognition on the ground, amongst others, that recognition was contrary to public policy.

**Held, granting the application in part:**

(1)    Under Art 17 of the Singapore Model Law, the court had to grant recognition of the foreign insolvency proceedings if the various requirements had been met. Whether or not the foreign proceeding was properly commenced was not relevant to the granting of recognition. However, under Art 6 of the Singapore Model Law, to which Art 17 was subject, the court could refuse recognition if such recognition was contrary to the public policy of Singapore: at [13] and [14].

(2)     Article 6 of the Singapore Model Law differed from Art 6 of the Model Law in that the word "manifestly" was omitted from the former. Article 6 of the Singapore Model Law thus allowed a Singapore court to refuse recognition where such recognition was contrary to the public policy of Singapore. On the other hand, Art 6 of the Model Law required recognition to be "manifestly contrary" to public policy for it to be refused: at [11] and [21].

(3)     The Tenth Schedule of the Companies Act (Cap 50, 2006 Rev Ed) contained the Model Law Articles with modifications to adapt them for application in Singapore. If it was important enough for UNCITRAL to have included the word "manifestly" in Art 6 of the Model Law, and for other jurisdictions, including the UK, to have chosen to enact the Model Law with the word "manifestly" included, then its omission in Singapore had to be deliberate and conscious: at [22].

(4)     The deliberate omission of the word "manifestly" from Art 6 of the Singapore Model Law meant that that the standard for refusal of recognition on public policy grounds in Singapore was lower than that in jurisdictions where the Model Law had been enacted unmodified. Recognition could be denied in Singapore on public policy grounds even though such recognition was not manifestly contrary to public policy: at [23].

(5)     Non-compliance with an injunction granted by a Singapore court undermined the administration of justice. An application for recognition would therefore be rejected on the public policy ground under Art 6 of the Singapore Model Law if the foreign representative was appointed pursuant to proceedings that had been enjoined by a Singapore court. The same result would follow even if the higher standard under Art 6 of the Model Law was applied: at [25] and [26].

(6)     The fact that the injunction of the High Court of Singapore was issued after the US Chapter 11 proceedings were filed and any automatic moratorium in the US came into effect was irrelevant. The US moratorium did not bind the Singapore courts: at [28].

(7)     The injunction was broadly worded and prohibited further steps from being taken in the US bankruptcy proceedings relating to the Zetta Entities. The conversion from Chapter 11 to Chapter 7 thus did not bring the proceedings in the US out of the ambit of the injunction: at [30].

(8)     There was nothing which showed that any error had been made in the ordering of the injunction. In any event, where an error was alleged to have been made by the court in the granting of an injunction, the proper course was to apply to set the injunction aside or to file an appeal against the injunction order: at [29].

(9)     If recognition was denied to the Chapter 7 Trustee, no one could apply to set the injunction aside as the Zetta Entities were in liquidation in the US. It was not open to the Chapter 7 Trustee to procure by the Zetta Entities themselves the institution of proceedings against the injunction. Such an approach would open the door to covert actions by a foreign insolvency representative, purportedly acting through extant companies in Singapore, while the companies were in the process of being wound up abroad. The inclusion of the Zetta Entities in the title

of the application also could not confer a legal right to pursue the setting aside: at [31] to [33].

(10)   Justice and fairness required that some opportunity was given to the Chapter 7 Trustee to question the granting of the injunction by the High Court of Singapore. A balance had to be struck between protecting the integrity of administration of justice in Singapore on the one hand, with fairness to the Chapter 7 Trustee. This balance could be achieved by granting limited recognition to the Chapter 7 Trustee only for the purposes of applying to set aside or appeal against the injunction order and making any related applications. Only if the Chapter 7 Trustee succeeded that far should the question of general recognition be resurfaced: at [34].

(11)   Article 6 of the Singapore Model Law was broad enough to allow the court the discretion to grant the limited recognition. The limited nature of the recognition conferred could be characterised as either a form of modification of recognition under Art 17.4 or as a manner of relief under Art 21.1 of the Singapore Model Law: at [34].

### Case(s) referred to

Gold and Honey, Ltd, Re 410 BR 357 (2009) (refd)
Hartford Computer Hardware, Inc (Re) 2012 ONSC 964 (refd)

### Legislation referred to

Companies Act (Cap 50, 2006 Rev Ed) Tenth Schedule Arts 2(d), 6, 8, 15, 16, 17, 17.4, 21.1 (consd);
    s 354B
11 US Code (US) § 1506
Cross-Border Insolvency Regulations 2006 (UK) Schedule 1

Tan Mei Yen and Ng Wei Long (Oon & Bazul LLP) for the applicant;
N Sreenivasan SC, Rajaram Muralli Raja, Jerrie Tan Qiu Lin and Kyle Gabriel Peters (Straits Law Practice LLC) for the intervener.

24 January 2018                              Judgment reserved.

**Aedit Abdullah J:**

### Introduction

1      This short form ex tempore judgment conveys my decision on the application for recognition by the interim trustee acting in Chapter 7 proceedings in the United States Bankruptcy Court in the Central District of California – Los Angeles Division (the "US Bankruptcy Court").

### Background

2      Zetta Jet Pte Ltd ("Zetta Jet Singapore"), is a company incorporated in Singapore. Zetta Jet USA, Inc ("Zetta Jet USA"), is a company organised under the laws of the State of California, US and is wholly owned by Zetta

Jet Singapore. Jonathan D King ("King") is the Chapter 7 trustee ("the Chapter 7 Trustee") of Zetta Jet Singapore and Zetta Jet USA ("the Zetta Entities") appointed pursuant to US bankruptcy proceedings, and applying for recognition under s 354B and the Tenth Schedule of the Companies Act (Cap 50, 2006 Rev Ed) ("the Companies Act"). The intervener ("the Intervener") in this application, Asia Aviation Holdings Pte Ltd ("AAH"), is a shareholder of Zetta Jet Singapore. The principal business of the Zetta Entities is in aircraft rental and charter.

3    The shareholders of Zetta Jet Singapore and their respective shareholdings are as follows:

  (a)    AAH – 34%;

  (b)    Truly Great Global Limited ("TGGL") – 30%;

  (c)    Stephen Matthew Walter ("Walter") – 23%;

  (d)    James Noel Halstead Seagrim ("Seagrim") – 13%.

The relationship between the shareholders is governed by the terms of the subscription incorporating shareholders' agreement ("the SHA") dated 26 February 2016.

4    On 15 September 2017, voluntary Chapter 11 bankruptcy proceedings were filed against the Zetta Entities in the US Bankruptcy Court and a worldwide automatic moratorium in the US came into effect.

5    On 18 September 2017, Suit No 864 of 2017 was commenced in the High Court of Singapore by AAH and TGGL against Seagrim, Walter and Zetta Jet Singapore for commencing the Chapter 11 proceedings in alleged breach of the SHA. On 19 September 2017, AAH and TGGL obtained an injunction order from the High Court of Singapore ("the Singapore injunction") which enjoined Zetta Jet Singapore, Seagrim and Walter from carrying out any further steps in and relating to the bankruptcy filings relating to Zetta Jet Singapore and Zetta Jet USA in the US Bankruptcy Court until trial or further order. On 1 November 2017, TGGL discontinued its action, leaving AAH as the sole plaintiff in Suit No 864 of 2017.

6    Subsequent to the issuance of the Singapore injunction, proceedings in the US Bankruptcy Court continued. On 5 October 2017, King was appointed the Chapter 11 trustee of the Zetta Entities in the US bankruptcy proceedings. On 4 December 2017, the Chapter 11 proceedings were converted to Chapter 7 proceedings as financing could not be obtained for the reorganisation plan under Chapter 11. On 5 December 2017, King was appointed the Chapter 7 Trustee in the Chapter 7 proceedings.

7    On 11 December 2017, the US Bankruptcy Court authorised the Chapter 7 Trustee to commence recognition proceedings in Singapore. On 13 December 2017, the Chapter 7 Trustee brought this application.

8    Chapter 11 proceedings in the US may be briefly described as a form of protected restructuring or reorganisation, accompanied by an automatic moratorium or stay upon application. Such moratorium or stay operates, at least from the perspective of the US, on a worldwide basis.

9    Chapter 7 proceedings in the US is essentially liquidation. These may be contrasted with Chapter 13 proceedings, in which there is some attempt at a repayment plan.

10    In either instance, Chapter 11 or Chapter 7 proceedings, an insolvency representative, termed the trustee, is appointed by the Bankruptcy Court.

**The legal framework**

11    The 2017 amendments to the Companies Act introduced s 354B, which in turn brings in, through the Tenth Schedule of the Companies Act, the UNCITRAL Model Law on Cross-Border Insolvency (30 May 1997) ("the Model Law"). Article 6 of the Model Law enacted in Singapore under the Tenth Schedule of the Companies Act ("the Singapore Model Law") differs from Art 6 of the Model Law in that the former omits the word "manifestly". The effect of this omission will be considered below.

12    Under Art 15 of the Singapore Model Law, a foreign insolvency representative may apply to the High Court in Singapore for recognition of the foreign insolvency proceeding in which the foreign representative has been appointed. Recognition essentially allows, among other things, the foreign representative to function as the insolvency representative in Singapore, with accompanying powers.

13    Under Art 17 of the Singapore Model Law, the court must grant recognition if the various requirements are met. A foreign proceeding is recognised as a foreign main proceeding if the foreign proceeding takes place where the debtor has its centre of main interests ("COMI"), or as a foreign non-main proceeding where the debtor has an establishment there, as defined under Art 2(d). Whether or not the foreign proceeding was properly commenced is not relevant to the granting of recognition.

14    However, under Art 6 of the Singapore Model Law, to which Art 17 is subject, a Singapore court may refuse recognition if such recognition would be "contrary" to the public policy of Singapore. Article 6 of the Model Law on the other hand requires recognition to be "manifestly contrary" to public policy for it to be refused.

15    In the present case, a number of issues were raised by both sides. It suffices for the present judgment to consider only two main areas: the determination of the COMI, and whether recognition would be contrary to public policy.

**Determination of COMI**

16    The determination of the COMI will establish whether recognition can be given to the Chapter 7 Trustee as a foreign representative in foreign main proceedings. Under Art 16 of the Singapore Model Law, the presumption is that the debtor's COMI is its place of registration. Zetta Jet Singapore is a Singapore-incorporated company, while Zetta Jet USA is incorporated in the US. In these proceedings, the COMI of Zetta Jet Singapore was in issue.

17    The Intervener argues that in the case of Zetta Jet Singapore, the COMI is in Singapore as the managing director, before he was purportedly removed, was based in Singapore; the employees were generally based out of the US; no offices were maintained in the US, and while it had a flight operation centre in the US, most operations were handled out of the other centre in Singapore. Flight scheduling and operations were conducted in Singapore, and Zetta Jet Singapore carried on business in Singapore and has creditors in Singapore. The Intervener also points to the source of revenue, which it says is largely from outside the US.

18    The applicant argues that various factors point to the US being the COMI of Zetta Jet Singapore. The pointers that the applicant relied on included that the operations were carried out in the US through a maintenance facility, and operational control was at its hanger base, including sales, business operations, scheduling, maintenance and stocking. Substantial assets were, it is claimed, in the US rather than in Singapore. Employees were also largely in the US. Most business was centred on the US. Account books and bank accounts were maintained in the US generally, though there were Singapore links as well.

19    The applicant treats the Zetta Entities as a single whole. I have my concerns about this approach. It is to my mind essential to observe the separate corporate personalities and to treat each entity on its own, unless there is sufficient reason shown to deal with them as one. It may be that in this context we may not apply the full rigour of the common law on piercing the corporate veil, but some basis must be made out for the two entities to be treated as a single entity. The applicant's affidavit in support does contain assertions that the entities were treated as one in practice. Though examples are listed, that is not enough to trigger a disregard for the separate corporate identities. I am not comfortable with the piercing of the veil and the treatment of the entities as a single whole. This I think merits further argument, taking into account both Singapore and English cases on separate corporate identities.

20    I do not wish to hold up the resolution, however, of the main question of the public policy bar, discussed below, particularly as at least, I am satisfied on the evidence adduced by the applicant that Zetta Jet Singapore had an establishment, as defined under Art 2(d) of the Singapore Model

Law, in the US. This is a basis for limited recognition of the US proceedings as a foreign non-main proceeding. There is of course no issue with respect to Zetta Jet USA. In view of my order in this application, the question of the proper approach to COMI and the appropriateness of treating the two companies as one can be relooked at later.

**Public policy**

21    If the US is the COMI of the Zetta Entities or if the Zetta Entities have an establishment in the US, then recognition would have to be granted to the Chapter 7 Trustee under Art 17 of the Singapore Model Law, unless the court concludes it should not do so because recognition is contrary to public policy. As noted above, under the Model Law, the court can only deny recognition on this ground if recognition is "manifestly contrary" to public policy. Singapore's enactment of the Model Law omits the word "manifestly". This would seem to mean that recognition may be denied if recognition is merely contrary to public policy, without being manifestly so.

22    The reason for the omission of this term does not appear in the records of the Parliamentary debates or any preparatory materials, though it is stated generally in the explanatory statement to the Companies (Amendment) Bill 2017 (No 13 of 2017) that the Tenth Schedule contains the Model Law Articles, "with modifications to adapt them for application in Singapore", and also that the Tenth Schedule "is adapted with modifications" from Schedule 1 to the UK Cross-Border Insolvency Regulations 2006. There is apparently no other public statement on the omission of the term "manifestly" either. What can be surmised is that the omission is deliberate. If it was important enough for UNCITRAL to include the word "manifestly" in Art 6 to begin with, and for other jurisdictions, including the UK, to choose to enact the Model Law with it included, then its omission in Singapore had to be deliberate and conscious.

23    What flows from the omission being deliberate is that the standard of exclusion on public policy grounds in Singapore is lower than that in jurisdictions where the Model Law has been enacted unmodified. That is, in Singapore, recognition may be denied on public policy grounds though such recognition may not be manifestly contrary to public policy. Whether this will lead to a significant divergence from other jurisdictions remains to be seen. I have noted that the commentaries to Art 6 of the Model Law suggest that Art 6, as originally worded, would be taken to exclude purely domestic public policy concerns (see *Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency*, UN Doc A/CN.9/442) If this were indeed so, then Singapore's version of Art 6 may not lead to the same conclusion.

24    I do note that there is commentary suggesting that a narrow reading of the public policy exception under Art 6 of the Singapore Model Law should be applied (see *Cross-Border Insolvency: A Commentary on the*

*UNCITRAL Model Law* vol 1 (Look Chan Ho gen ed) (Globe Law and Business, 4th Ed, 2017) at p 521).

25      I cannot on this occasion lay down specifically what would trigger the public policy bar in Singapore. But at the very least, I would interpret it as requiring denial of an application for recognition by foreign insolvency representatives appointed under proceedings enjoined by a Singapore court. Ignoring an injunction granted by a Singapore court undermines the administration of justice. Orders issued by a court are to be complied with. Those who do not comply are rightly subject to penalties. In particular, they cannot generally seek the assistance of the courts unless the non-compliance is rectified or purged. While the court's power to refuse recognition under Art 6 of the Singapore Model Law is discretionary, it would be rare for the court not to refuse recognition where there has been non-compliance with a Singapore court order.

26      But while I have examined this issue in the context of Art 6 of the Singapore Model Law, the same result would seem to follow even under Art 6 of the Model Law, which is in force in various countries including the US. In *In re Gold and Honey, Ltd* 410 BR 357 (2009), the US Bankruptcy Court of the Eastern District of New York denied recognition of an Israeli receiver appointed in the face of a Chapter 11 automatic stay in the US. As cited by counsel for the Intervener, Bankruptcy Judge Alan Trust stated, at pp 371–372:

> A petition for recognition should be denied if recognition would be manifestly contrary to the public policy of the United States. 11 U.S.C. § 1506. Recognition of the Israeli Receivership Proceeding as a foreign proceeding would be manifestly contrary to the public policy of the United States because such recognition would reward and legitimize [*sic*] [the] violation of both the automatic stay and this Court's Orders regarding the stay.

> While the legislative history of Section 1506 demonstrates that this exception should be applied narrowly, it should be invoked when fundamental policies of the United States are at risk.

11 US Code § 1506 contains the US implementation of Art 6 of the Model Law:

> Nothing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States.

27      The Intervener also referred to cases on the recognition of foreign judgments; while these cases would perhaps be instructive if there were any doubt about the position, I do not think in the light of my conclusions here that I need to refer to them.

28      The fact that the Singapore injunction was obtained after the Chapter 11 proceedings were filed and any worldwide automatic

moratorium in the US came into effect is irrelevant. The US moratorium does not bind the Singapore courts any more than any Singapore moratorium or injunction would bind the US courts either. The only thing that matters is that an order was made in Singapore, which was not complied with.

29    Recognising the Chapter 7 Trustee despite the breach by the pursuit of the US proceedings in the face of the Singapore injunction undermines the administration of justice in Singapore. That injunction remains in force and prohibited the pursuit of the very proceedings that were the basis of the Trustee's appointment. It is furthermore an order made by a court of coordinate jurisdiction. There is nothing before me to show any error leading to the ordering of the Singapore injunction, but even if there were, the proper course would be to apply to set it aside or appeal. I cannot ignore or overlook the Singapore injunction. But that would be the effect of granting general recognition of the Chapter 7 Trustee.

30    The applicant argues, not strongly, that the Singapore injunction was not in fact breached as recognition is sought not of a Chapter 11 Trustee but one appointed under Chapter 7. That argument could not fly at all: the Singapore injunction prohibited proceedings from being pursued. It was not limited to Chapter 11 proceedings alone; it would have been surprising and odd if it had been. The Singapore injunction clearly prohibited further steps being taken in and relating to the bankruptcy filings relating to Zetta Jet Singapore and Zetta Jet USA in Case 2:17-bk-21387-BB, and Case 2:17-bk-21386-BB in the US Bankruptcy Court for the Central District of California – Los Angeles Division. That broad wording sufficiently covers the whole of the proceedings upon which recognition is founded. The conversion from Chapter 11 to Chapter 7 did not bring the proceedings in the US out of the ambit of the Singapore injunction.

31    However, my finding that the public policy exception bars recognition does not end the matter. As the applicant has argued, if recognition is denied to the Chapter 7 Trustee, arguably no one else can come in to try to set the Singapore injunction aside. The companies are in liquidation in the US.

32    The Intervener argues that while the Zetta Entities are indeed in liquidation in the US, with the Chapter 7 Trustee stepping into their shoes in the US, the companies are still extant and live in Singapore. It is thus open, according to the Intervener, for the Chapter 7 Trustee to procure by the Zetta Entities themselves the institution of proceedings against the Singapore injunction. The Intervener points in support of his proposition to the inclusion of the companies in the title of this present application.

33    I do not accept that argument. As is argued by the applicant, such an approach would open the door to covert actions by a foreign insolvency representative, purportedly acting through extant companies in Singapore,

while in effect the companies would be in the process of being wound up
abroad. Distinguishing between the status of companies in different
jurisdictions is conceptually odd and to be avoided – such a company is not
Schrodinger's Cat, suspended between life and death, whose fate depends
on who is looking and when. As for the inclusion of the companies in the
title of this application, this could not confer a legal right to pursue the
setting aside. Indeed, properly speaking, the title of this application should
have referred to the Chapter 7 Trustee acting in such capacity on behalf of
these companies, or some similar formula.

34    Justice and fairness entail that some opportunity be given to question
the granting of the injunction. A sufficient balance needs to be struck
between protecting the integrity of administration of justice in Singapore
on the one hand, with fairness to the Trustee. This balance can be achieved
by granting limited recognition to the Chapter 7 Trustee only for the
purposes of applying to set aside or appeal against the Singapore injunction,
or matters directly related to such applications, such as extensions of time.
A form of this was put forward by the applicant and not strenuously
objected to by the Intervener. Only if the Chapter 7 Trustee succeeds that
far should the question of general recognition be resurfaced. This approach
is, I believe, consonant with the philosophy and objective of the statute and
the Singapore Model Law, including the need to have regard to the
international basis of the Model Law and the promotion of uniformity as
required by Art 8. I read Art 6 of the Singapore Model Law as being broad
enough to allow the court the discretion exercised here. The limited nature
of the recognition conferred may be characterised as either a form of
modification of recognition under Art 17.4 or, given that the applicant has
included something similar in its submissions, as a manner of relief under
Art 21.1.

35    Of course this would mean that the Chapter 7 proceedings may be
held up, and probably the Trustee will need to incur additional expense and
time in his work, but that is unavoidable in the circumstances. Whether or
not any application is made in respect of the Singapore injunction is a
matter for the Trustee to weigh. To ensure, however, that any application in
respect of the Singapore injunction is made by the Trustee as promptly as
possible, I will give specific directions.

**Order**

36    In view of my conclusion that the Chapter 7 Trustee should be
granted recognition to set aside or appeal against the Singapore injunction,
or make related applications, in the light of that limited recognition, it is
appropriate to give parties the opportunity to revisit the question of COMI
subsequently, as well as the other matters raised if they so wish. Thus, upon
the conclusion of the proceedings in respect of the Singapore injunction, if
the Trustee has succeeded that far, the applicant may revisit the issue of

wider recognition, on the basis of the US being the foreign main proceeding and perhaps convince the court that it would be appropriate to treat the Zetta Entities as one. But correspondingly, it would be open to the Intervener to revisit the arguments for not granting wider recognition as well. Both parties, in other words, may revisit the various issues as needed.

## Other issues

37    Allegations were made by the Intervener that there has been breach of natural justice and abuse of process because of collateral purposes. I do not think either allegation needs to be addressed here in the light of my conclusion on public policy above. This again is without prejudice to the Intervener raising these issues should general recognition be sought eventually if the Chapter 7 Trustee is able to have the Singapore injunction set aside.

38    There were additionally written submissions on when COMI is to be ascertained. The matter is one of some nicety, and will be left for consideration if need be, to the application for full recognition, should there be one.

39    I had given permission to the applicant to submit any further materials on the interpretation of Art 6 of the Singapore Model Law if any could be uncovered. However, the applicant instead sent in further submissions which went beyond this. The only part of the further submissions that touched on the Art 6 issue was a reference to a Canadian case, *Hartford Computer Hardware, Inc (Re)* 2012 ONSC 964, but that case does not assist in the present context. As the rest of the submissions went beyond the scope of the directions they were not considered: they touched on analogies with other statutes, the approach of the US courts to breaches of their injunctions, distinguishing *re Gold and Honey Ltd* ([26] *supra*), arguments for the setting aside of the Singapore injunction, discussion of COMI and the question of prejudice to AAH. None of these to my mind would, in any event, have made a difference to my determination here.

40    I appreciate the work that was put in and the enthusiasm of counsel. But I would advise that counsel should seek permission from the court for further submissions after an oral hearing if judgment is reserved, or even as in this case, where further submissions were invited on a specific point, to go beyond the bounds of what was directed. This flows from fairness to the other side and respect for the court process. Without the drawing of a line, matters will drag on interminably.

## Costs

41    In the circumstances, especially as recognition is limited, I am not minded to make any order for costs in this application, save perhaps for

anything flowing from the attempt to put in further submissions. I will give directions accordingly.

Reported by See Ying Xiu Alison.

H5 6 ˙7

# *Re* Zetta Jet Pte Ltd and others
# (Asia Aviation Holdings Pte Ltd, intervener)

## [2019] SGHC 53

High Court — Originating Summons No 1391 of 2017
Aedit Abdullah J
19 November 2018; 4 March 2019

*Insolvency Law — Cross-border insolvency — Recognition of foreign insolvency proceedings — Location of applicant company's centre of main interests — Operative date of ascertainment of centre of main interests — Whether presumption in favour of place of debtor's registered office should be rebutted and factors to be considered — Articles 16(3) and 17(2) of Tenth Schedule, Companies Act (Cap 50, 2006 Rev Ed)*

## Facts

This application followed from *Re Zetta Jet Pte Ltd* [2018] 4 SLR 801 ("*Zetta Jet (No 1)*"), where full recognition of US Chapter 7 bankruptcy proceedings was denied as being contrary to public policy, pursuant to Art 6 of the United Nations Commission on International Trade Law (UNCITRAL) Model Law on Cross-Border Insolvency (30 May 1997) ("the Model Law"), as enacted with modifications in Singapore under s 354B read with the Tenth Schedule of the Companies Act (Cap 50, 2006 Rev Ed) ("the Singapore Model Law"). The US proceedings had continued in breach of an injunction granted by the High Court of Singapore ("the Singapore injunction"), thereby undermining the administration of justice in Singapore.

The applicants were Zetta Jet Pte Ltd ("Zetta Jet Singapore"), Zetta Jet USA, Inc (collectively, "the Zetta Entities") and the Chapter 7 trustee appointed in the US Chapter 7 proceedings in relation to the Zetta Entities. The Zetta Entities were in the business of aircraft rental and charter. Asia Aviation Holdings Pte Ltd, a shareholder of Zetta Jet Singapore, was the intervener.

The Singapore injunction had since been discharged by consent. Parties revisited the issue of recognition, focusing on the location of Zetta Jet Singapore's centre of main interests ("COMI"). Zetta Jet Singapore's registered office was in Singapore.

The applicants canvassed the US, English and Australian positions towards COMI ascertainment. They argued that Zetta Jet Singapore's COMI was in the US and that the US proceedings should be recognised as a foreign main proceeding under Art 17(2)(*a*) of the Singapore Model Law. Public policy supported such recognition, so as to ensure the orderly and efficient recovery of assets for the benefit of Zetta Jet Singapore's debtors, and so as to promote the uniform application of the Model Law pursuant to Art 8 of the Singapore Model Law.

The intervener submitted that Zetta Jet Singapore's COMI was in Singapore where its senior management, employees, facilities, operations, business and creditors were located. As Zetta Jet Singapore had no establishment in the US, the US bankruptcy proceedings in relation to it could not be recognised. In any

case, the Chapter 7 trustee's breach of the Singapore injunction amounted to continuing contempt notwithstanding the discharge of the injunction. This precluded recognition.

**Held, granting the application:**

(1)    The proceedings in relation to the Zetta Entities under Chapter 7 of the Bankruptcy Code 11 USC (US) (1978) were a "foreign proceeding" within the meaning of Art 2(*h*) of the Singapore Model Law: at [25].

(2)    In determining COMI, the presumption under Art 16(3) of the Singapore Model Law in favour of the place of the debtor's registered office applied. Article 16(3) was not a legal presumption rebuttable on the balance of probabilities. Rather, it operated as a starting point subject to displacement, with a focus on where the debtor's primary commercial decisions were made. This also reflected the US approach: at [27] and [30] to [33].

(3)    COMI was not defined in the Singapore Model Law. Article 8 of the Singapore Model Law requires regard to be paid to the Singapore Model Law's international origins and the promotion of uniformity in the Model Law's application. The correct interpretative approach was guided by the guides issued by UNICTRAL and case law from other jurisdictions: at [29], [34] to [36] and [38].

(4)    In particular, s 354B(2) of the Companies Act (Cap 50, 2006 Rev Ed) endorsed the Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency (UN document A/CN.9/442). But consistency and comity allowed the court to also consider other UNCITRAL guides: at [37].

(5)    The relevant date for determining COMI was the date the application for recognition was filed, *ie*, the US position. The definitions in Art 2 of the Singapore Model Law used the present tense, indicating that the situation at the time of the application for recognition mattered. Postponing the COMI determination also facilitated COMI shifts to allow for restructuring in an appropriate forum, even where such shifts took place after the date of the foreign application commencing foreign insolvency proceedings (*ie*, the operative date under the English and European positions). The US position was also preferred as the Australian position, which took as operative the date of the recognition hearing, would leave the date of COMI ascertainment uncertain: at [53] to [61].

(6)    It would be preferable to align the common law and Model Law conceptions of COMI. The Art 16(3) presumption would be displaced if it is shown that the place of the debtor's central administration and other factors point to another location. COMI factors should be objectively ascertainable by third parties generally, and creditors and potential creditors in particular. This followed the English, European and Australian positions. It would also be material to consider how likely a creditor would weigh a particular factor in his decision to afford credit to the applicant company. The COMI factors should have an element of settled or intended permanence, with a focus on the facts on the ground rather than on legal structures and corporate identities: at [72] to [83].

(7)    On the facts, Zetta Jet Singapore's COMI was in the US. It was most relevant that the US was where control and direction of Zetta Jet Singapore was

administered. Additionally, at least half of its creditors were in the US and third parties understood the Zetta Entities to be US-based, based on representations made: at [87], [88], [97] to [99], [104] and [107].

(8)    The location of Zetta Jet Singapore's employees, clients and operations were less determinative. The evidence as to the employees' location was insufficient, and the international nature of the Zetta Entities' business meant that dispersal of operations was expected: at [89] to [96], [105] and [106].

(9)    The location where the Chapter 7 trustee operated from was not relevant. This flowed instead from the assumption of jurisdiction by the foreign court on the basis it thought appropriate: at [102].

(10)    The applicants' previous failure to comply with the Singapore injunction was not a ground for refusal of recognition. As the injunction was discharged, recognition no longer undermined the administration of justice in Singapore even if the intervener had grounds to pursue contempt proceedings against the applicants: at [121] and [122].

(11)    There was no countervailing public policy consideration of protecting the interests of Zetta Jet Singapore's creditors. The public policy concern identified in *Zetta Jet (No 1)* of ensuring that recognition of the US proceedings did not undermine the administration of justice in Singapore was overriding: at [123] and [124].

(12)    As Zetta Jet Singapore's COMI was in the US, the US bankruptcy proceedings in relation to it were recognised as a foreign main proceeding within the meaning of Art 2(*f*) of the Singapore Model Law. The Chapter 7 trustee was recognised as a foreign representative within the meaning of Art 2(*i*). Automatic stay reliefs flowed from recognition pursuant to Art 20(1): at [126] to [128].

(13)    Orders were granted to empower the Chapter 7 trustee to properly conduct the Singapore and US insolvency proceedings, to entrust him with the realisation of the Zetta Entities' Singapore assets, to allow him to apply to the court under Art 23(1) of the Singapore Model Law and to grant him powers available to a liquidator under Singapore insolvency law under Art 21(1)(*g*): at [129].

[Observation: Although courts should grant debtors the flexibility and autonomy to make COMI shifts, public policy limits existed. Recognition might be denied if a COMI shift was opportunistically pursued in a wholly unrelated jurisdiction, or to evade employment or criminal laws or to prejudice debtors: at [58].

Where there were disputed facts or where the COMI factors balanced each other out, it may be that the Art 16(3) presumption would be upheld: at [27] and [81].]

## Case(s) referred to

*ABC Learning Centres Ltd,* Re 728 F 3d 301 (3rd Cir, 2013) (refd)
*Betcorp Ltd,* Re 400 BR 266 (Bankr D Nev, 2009) (refd)
*Eurofood IFSC Ltd,* Re (Case C-341/04) [2006] 1 Ch 508 (refd)
*Fairfield Sentry Ltd,* Re 440 BR 60 (Bankr SDNY, 2010) (refd)

*Fairfield Sentry Ltd,* Re 714 F 3d 127 (2nd Cir, 2013), CA (refd)

*Gold & Honey, Ltd,* Re 410 BR 357 (Bankr ED NY, 2009) (refd)

*Interedil Srl v Fallimento Interedil Srl* Case C-369/09 [2011] ECR I-9915 (refd)

*Kapila, Edelsten,* Re [2014] FCA 1112 (refd)

*Legend International Holdings Inc (as debtor in possession of the assets of Legend International Holdings Inc) v Legend International Holdings Inc* [2016] VSC 308 (refd)

*Moore, as Debtor-in-Possession of Australian Equity Investors v Australian Equity Investors* [2012] FCA 1002 (refd)

*Nikkomann Co Pte Ltd v Yulean Trading Pte Ltd* [1992] 2 SLR(R) 328; [1992] 2 SLR 980 (refd)

*Ocean Rig UDW Inc,* Re 570 BR 687 (Bankr SDNY, 2017) (refd)

*Opti-Medix Ltd,* Re [2016] 4 SLR 312 (refd)

*Pertamina Energy Trading Ltd v Karaha Bodas Co LLC* [2007] 2 SLR(R) 518; [2007] 2 SLR 518 (refd)

*Railpower Hybrid Technologies Corp,* Re Case 09-41498-WWB (Bankr WD Pa, 2009) (refd)

*Ran,* Re 607 F 3d 1017 (5th Cir, 2010) (refd)

*SPhinX, Ltd,* Re 351 BR 103 (Bankr SDNY, 2006) (refd)

*Stanford International Bank Ltd,* Re [2010] 3 WLR 941 (refd)

*Susanne Staubitz-Schreiber* (Case C-1/04) [2006] ECR I-701 (refd)

*Taisoo Suk,* Re [2016] 5 SLR 787 (refd)

*Videology Ltd,* Re *v Cross-Border Insolvency Regulations 2006,* Re *the* [2018] EWHC 2186 (Ch) (refd)

*Wood v Astra Resources Ltd (UK Company No 07620218)* [2016] FCA 1192 (refd)

*Young, Jr, Buccaneer Energy Ltd v Buccaneer Energy Ltd,* Re [2014] FCA 711 (refd)

*Zetta Jet Pte Ltd,* Re [2018] 4 SLR 801 (refd)

**Legislation referred to**

Companies Act (Cap 50, 2006 Rev Ed) Tenth Schedule Arts 16(3), 17(2), 23(1) (consd);
ss 354B, 354B(2), Tenth Schedule Arts 2(*d*), 2(*f*), 2(*g*), 2(*h*), 2(*i*), 6, 8, 15, 17(1), 17(2)(*a*), 17(2)(*b*), 20(1), 20(2), 21(1)(*d*), 21(1)(*e*), 21(1)(*g*)

Conveyance and Law of Property Act (Cap 61, 1994 Rev Ed) s 73B

Bankruptcy Code 11 USC (US) § 1502, § 1516(c)

Cross-Border Insolvency Act 2008 (Cth) sch 1

Cross-Border Insolvency Regulations 2006 (SI 2006 No 1030) (UK) Sch 1

Regulation on insolvency proceedings, EC Council Regulation No 1346/2000, [2000] OJ L 160/1

Regulation on insolvency proceedings (recast), EU Parliament and Council Regulation No 2015/848, [2015] OJ L 141/19 Recital (23), Recital (28), Art 3(1)

*Tan Mei Yen, Thenuga Vijakumar, and Oh Teng Chew, Dennis (Hu Tingchao) (Oon & Bazul LLP) for the applicants;*
*Rajaram Muralli Raja, Jerrie Tan Qiu Lin and Kyle Gabriel Peters (Straits Law Practice LLC) for the intervener.*

4 March 2019                                        Judgment reserved.

**Aedit Abdullah J:**

**Introduction**

1       The present case follows on from my earlier decision in *Re Zetta Jet Pte Ltd* [2018] 4 SLR 801 ("*Zetta Jet (No 1)*"), in which I granted only limited recognition on an application by a US bankruptcy trustee for recognition of US bankruptcy proceedings under the United Nations Commission on International Trade Law (UNCITRAL) Model Law on Cross-Border Insolvency (30 May 1997) ("the Model Law"). The Model Law has the force of law in Singapore pursuant to s 354B of the Companies Act (Cap 50, 2006 Rev Ed) ("Companies Act"), as enacted under the Tenth Schedule of the Companies Act ("the Singapore Model Law").

2       In *Zetta Jet (No 1)* at [36], limited recognition was given to allow the US bankruptcy trustee to apply to set aside or otherwise appeal a separate injunction granted by the High Court that enjoined bankruptcy proceedings in the US. I gave parties the liberty to revisit the issue of wider recognition upon the conclusion of the injunction proceedings. As it was, the injunction was discharged by consent. The applicants now seek full recognition of the US bankruptcy proceedings.

**Facts**

3       The background to this application is set out in *Zetta Jet (No 1)* at [2]–[10], and will be briefly recounted here.

***Parties***

4       Zetta Jet Pte Ltd ("Zetta Jet Singapore") is a Singapore-incorporated company that wholly owns Zetta Jet USA, Inc ("Zetta Jet USA"), a company organised under the laws of the State of California. The principal business of Zetta Jet Singapore and Zetta Jet USA (collectively "the Zetta Entities") is in aircraft rental and charter. Jonathan D King ("King", used interchangeably with "the Trustee") is the Chapter 7 Trustee of the Zetta Entities.

5       The Zetta Entities are part of a wider group consisting of 16 other entities organised under the laws of the British Virgin Islands ("BVI"). The wider group will be referred to as "the Zetta Jet Group".

6       The intervener in this application, Asia Aviation Holdings Pte Ltd ("AAH", used interchangeably with "the Intervener"), is a 34% shareholder

of Zetta Jet Singapore. Zetta Jet Singapore's shareholders are AAH, Truly Great Global Limited ("TGGL"), Stephen Matthew Walter ("Walter") and James Noel Halstead Seagrim ("Seagrim"). Their relationship is governed by a shareholders' agreement dated 26 February 2016 ("the SHA").

### *Background to the dispute*

7    In 2017, voluntary Chapter 11 bankruptcy proceedings were filed against the Zetta Entities in the US Bankruptcy Court in the Central District of California – Los Angeles Division. A worldwide automatic moratorium in the US came into effect. Shortly thereafter, AAH and TGGL commenced an action by way of Suit No 864 of 2017 ("Suit 864/2017") in Singapore against Zetta Jet Singapore, Walter and Seagrim for commencing the Chapter 11 proceedings in alleged breach of the SHA.

8    On 19 September 2017, AAH and TGGL obtained an injunction to prevent Zetta Jet Singapore, Seagrim and Walter from taking further steps in relation to the bankruptcy filings in the US Bankruptcy Court ("the Singapore injunction"). On 1 November 2017, TGGL discontinued its action, leaving AAH as the sole plaintiff in Suit 864/2017.

9    Notwithstanding the issuance of the Singapore injunction, the US bankruptcy proceedings continued. On 5 October 2017, King was appointed the Chapter 11 Trustee of the Zetta Entities in the US bankruptcy proceedings. The proceedings were subsequently converted to Chapter 7 proceedings and King was appointed the Chapter 7 Trustee in the proceedings. On 11 December 2017, the US Bankruptcy Court authorised the Trustee to commence recognition proceedings in Singapore. The Trustee did so on 13 December 2017.

10    In *Zetta Jet (No 1)* ([1] *supra*), I found that the flouting of the Singapore injunction undermined the administration of justice in Singapore: at [25] and [29]. I therefore ordered that recognition would be denied under Art 6 of the Singapore Model Law, save for limited recognition only for the purposes of allowing the Trustee to apply to set aside the Singapore injunction: at [34] and [36].

11    On 9 March 2018, Zetta Jet Singapore filed an application to set aside the Singapore injunction. On 12 July 2018, the injunction was discharged by consent of the parties involved. The consequences of such discharge by consent on recognition is disputed in the present application before me.

### The parties' cases

### *The legal framework*

12    The applicants have applied under Art 15 of the Singapore Model Law for recognition of the US bankruptcy proceedings in which King has been appointed as Trustee. Under Art 17 of the Singapore Model Law, the court

must recognise a foreign proceeding if the stipulated conditions under Art 17(1) are met. Article 17(1) of the Singapore Model Law is subject to Art 6, which allows a Singapore court to refuse recognition if such recognition would be "contrary" to the public policy of Singapore.

13     Under Art 17(2) of the Singapore Model Law, the foreign proceeding must be recognised as a foreign *main* proceeding if it is taking place in the State where the debtor has its centre of main interests ("COMI"); the foreign proceeding is recognised as a foreign *non-main* proceeding if the debtor has an establishment within the meaning of Art 2(*d*) in the foreign State.

14     The focus of the parties' cases has been on the location of Zetta Jet Singapore's COMI. No issue arises in respect of Zetta Jet USA, which was incorporated in the US. Unless otherwise specified, any references in this judgment to disputed COMI issues generally should be taken as a reference to Zetta Jet Singapore's COMI only.

### Summary of the applicants' case

15     The applicants note that no issue has arisen in relation to Zetta Jet USA's COMI (see *Zetta Jet (No 1)* ([1] *supra*) at [20]). Zetta Jet USA's COMI is the US. On that basis, the US bankruptcy proceedings in relation to Zetta Jet USA should be granted recognition as a foreign main proceeding under Art 17(1) read with Art 17(2)(*a*) of the Singapore Model Law.

16     The applicants ask the court to revisit the question of where Zetta Jet Singapore's COMI is located. If found that it is also in the US, the US bankruptcy proceedings in relation to Zetta Jet Singapore should also be recognised as a foreign main proceeding under Art 17(1) read with Art 17(2)(*a*) of the Singapore Model Law.

17     The applicants argue that there is no public policy issue which would require the court to refuse to recognise the US bankruptcy proceedings in relation to Zetta Jet Singapore and the Trustee appointed for those proceedings. AAH did not enter any appearance in the US bankruptcy proceedings, despite informing the judge who granted the injunction in Suit 864/2017 that it would take steps to resist the US bankruptcy proceedings in the US Bankruptcy Court. In any event, the most important public policy consideration in this case is to ensure the orderly and efficient recovery of assets for the benefit of Zetta Jet Singapore's creditors: *In re ABC Learning Centres Ltd* 728 F 3d 301 (3rd Cir, 2013). Public policy also requires the court to have regard to the international basis of the Model Law and the promotion of its uniform application, as required under Art 8 of the Singapore Model Law.

18     Next, the applicants submit that whatever test is applied to ascertain Zetta Jet Singapore's COMI and whichever date is taken to be operative in

this determination, Zetta Jet Singapore's COMI would be found to be in the US. That said, the applicants favour the US approach in assessing COMI as at the time of the filing of the recognition application to the recognising court.

19    In the alternative, the applicants submit that even if the US proceedings in relation to Zetta Jet Singapore are not a foreign main proceeding, the court had earlier found that Zetta Jet Singapore had an establishment within the meaning of Art 2(*d*) of the Singapore Model Law in the US (see *Zetta Jet (No 1)* ([1] *supra*) at [20]). Accordingly, the US bankruptcy proceedings in respect of it should be recognised as a foreign non-main proceeding under Art 17(1) read with Art 17(2)(*b*) of the Singapore Model Law.

20    Following from these submissions, in the event that the US bankruptcy proceedings relating to the Zetta Entities are recognised, the applicants submit that the various orders prayed for should also be granted, including orders under the Singapore Model Law for:

(a)    the Trustee's recognition as a foreign representative within the meaning of Art 2(*i*);

(b)    the stay of proceedings under Arts 20(1) and 20(2);

(c)    the Trustee's empowerment to examine witnesses, take evidence and obtain delivery of information under Art 21(1)(*d*);

(d)    the Trustee's entrustment with the administration and realisation of assets of the Zetta Entities;

(e)    the Trustee's empowerment to appoint of a local representative under Art 21(1)(*e*);

(f)    the Trustee's standing to make applications under Art 23(1); and

(g)    the granting of additional reliefs available to a liquidator appointed in Singapore under Art 21(1)(*g*).

### *Summary of the Intervener's case*

21    In respect of the determination of Zetta Jet Singapore's COMI, the Intervener relies on its previous arguments in *Zetta Jet (No 1)*: Zetta Jet Singapore's senior management, employees, facilities, operations, business and creditors were all located in Singapore. These factors also indicate that the company had no establishment in the US. Accordingly, the US bankruptcy proceedings in relation to Zetta Jet Singapore are neither foreign main nor non-main proceedings under Art 17(2) of the Singapore Model Law.

22    As for the question of recognition, the Intervener argues that the Trustee's breach of the Singapore injunction in continuing the US bankruptcy proceedings amounted to contempt, and remained so even after the discharge of the injunction. The Intervener cites *Pertamina Energy Trading Ltd v Karaha Bodas Co LLC* [2007] 2 SLR(R) 518 ("*Pertamina*"), which is to be preferred to contrary authority in *Nikkomann Co Pte Ltd v Yulean Trading Pte Ltd* [1992] 2 SLR(R) 328 ("*Nikkomann*"). The Intervener also notes that it had consented to the discharge of the injunction: (a) on the basis that it was accepted that *Pertamina* was the correct statement of the law; and (b) in view of the implicit concessions that the Trustee had made that showed that he was aware or wilfully blind that he had breached and continued to breach the Singapore injunction.

**My decision**

23    I accept that Zetta Jet Singapore's COMI is to be determined as at the date of the recognition application, following the US position. In any event, the evidence before me indicates that whichever alternative date is considered, its COMI was in the US. No reason remains to deny recognition on the basis of public policy following the consensual discharge of the injunction. Accordingly, the US bankruptcy proceedings in relation to Zetta Jet Singapore are to be recognised as a foreign main proceeding.

24    Aside from the matters examined below, I am satisfied that the other provisions of the Singapore Model Law are met.

**Issue 1: Whether the US proceedings are a "foreign proceeding" under the Singapore Model Law**

25    The US bankruptcy proceedings in relation to the Zetta Entities were originally restructuring proceedings under Chapter 11 of the Bankruptcy Code 11 USC (US) (1978) ("the US Bankruptcy Code"), but were subsequently converted to Chapter 7 proceedings, *ie*, liquidation proceedings. These are clearly a "foreign proceeding" within the meaning of Art 2(*h*) of the Singapore Model Law.

**Issue 2: Zetta Jet Singapore's COMI**

26    There are two issues to be discussed in relation to the determination of Zetta Jet Singapore's COMI:

(a)    The date at which such assessment is to be made, namely, whether the court should assess the location of the debtor's COMI on the date of the foreign application commencing foreign insolvency proceedings; the date when recognition is applied for; or the date the recognising court hears the issue of whether recognition should be granted.

(b)    The approach to be taken in assessing what constitutes the COMI of a particular debtor company.

27    I am of the view that the determination of the debtor's COMI is to be made as at the date of the application to this court for recognition, and that in assessing where the COMI lies, the court's focus would be on where the primary commercial decisions are made for the debtor. This would generally be the place of registration unless otherwise shown in a particular case. The enquiry would be dependent on the circumstances of each case and no general rule can be laid down. In many cases, it may be that the factors relevant in the assessment essentially balance each other out; in such cases, the presumption under Art 16(3) of the Singapore Model Law in favour of the place of the debtor's registered office would have to come into play.

### The interpretative approach to be adopted

28    The concept of the COMI lies at the heart of the regime created by the Model Law, in force in Singapore with certain modifications to adapt it for application in Singapore, as enacted under the Tenth Schedule of the Companies Act pursuant to s 354B of the Companies Act. The location of the debtor's COMI determines whether foreign insolvency proceedings qualify as a "foreign main proceeding" within the meaning of Art 2 of the Singapore Model Law:

> **Article 2. Definitions**
>
> 2.    For the purposes of this Law —
>
>     …
>
>     (*f*)    'foreign main proceeding' means a foreign proceeding taking place in the State where the debtor has its centre of main interests;
>
>     (*g*)    'foreign non-main proceeding' means a foreign proceeding, other than a foreign main proceeding, taking place in a State where the debtor has an establishment;
>
> …

Foreign main proceedings qualify for more extensive reliefs than foreign non-main proceedings: only foreign main proceedings qualify for automatic reliefs under Art 20(1) of the Singapore Model Law.

29    The term "COMI" is not, however, defined in the Model Law or the Singapore Model Law. There is only a presumption under Art 16(3) of the Singapore Model Law that the place of the debtor's registered office is its COMI:

**Article 16. Presumptions concerning recognition**

…

> 3.      In the absence of proof to the contrary, the debtor's registered office is presumed to be the debtor's centre of main interests.

30     While there is reference to a presumption here, I do not read Art 16(3) of the Singapore Model Law to constitute a rebuttable presumption of law in the typical sense, which would require the party rebutting the presumption to prove on the balance of probabilities that the presumption does not apply. I see nothing in the Model Law itself, as enacted in the legislative materials, or in the commentaries to the Model Law which would require such an approach.

31     Considering the text of Art 16 of the Model Law and the Singapore Model Law, the guides to enactment provided by UNCITRAL, and the fact that the Model Law is to operate across jurisdictions, I am of the view that the usual rule generally requiring that rebuttal of a legal presumption is to be made out on the balance of probabilities does not apply here. Instead, I regard the presumption under Art 16 to operate as a starting point subject to displacement by other factors depending on the circumstances of the specific case. Art 16 refers to "the absence of proof to the contrary", which to my mind does not require proof on the balance of probabilities; it allows for the presumption to be rebutted simply on the presence of proof, *ie*, evidence, to the contrary.

32     I do note that the Singapore legislation did not adopt the same language as the US enactment which does refer to "evidence". US Bankruptcy Code § 1516(c), which incorporates Art 16(3) of the Model Law into US law, reads:

> (c)     In the absence of evidence to the contrary, the debtor's registered office … is presumed to be the center [*sic*] of the debtor's main interests.

I do not, however, understand that difference to mean that the Singapore courts adopt a stricter standard in respect of the Art 16(3) presumption.

33     I have noted that there is language in the US cases which may seem to require some weighing of the evidence when considering if the presumption should be rebutted. In so far as these cases establish that there needs to be consideration and assessment of the evidence, I would, with respect, agree. I understand the US cases to require that there be proof of the debtor's COMI, but not that the presumption is rebutted on the preponderance of the evidence as required in Singapore law generally. For example, in *In re Fairfield Sentry Ltd* 440 BR 60 at 63–64 (Bankr SDNY, 2010) ("*Fairfield Sentry (Bankruptcy Court)*"), Judge Burton R Lifland at first instance referred to the applicant's burden in that case to "persuade the Court by a preponderance of the evidence" that the debtor's COMI was in the BVI. Judge Lifland noted that although US Bankruptcy Code § 1516

created a rebuttable presumption in favour of the BVI as the COMI, the court could not "rely solely upon this presumption, but rather must consider all of the relevant evidence": at 64. Judge Lifland's approach did not appear to be disturbed on appeal: see *In re Fairfield Sentry Ltd* 714 F 3d 127 at 137–139 (2nd Cir, 2013) ("*Fairfield Sentry (CA)*").

34     Given the absence of actual statutory guidance under the Model Law beyond the presumption in Art 16(3) as to what constitutes the debtor's COMI, resort has to be had to guidance issued by UNCITRAL as well as case law from other jurisdictions. In respect of the latter, I am mindful that there may be differences in legislative backgrounds, particularly as regards European and English cases. These jurisdictions additionally consider the applicable EU legislative materials:

    (a)     the **Regulation on insolvency proceedings**, EC Council Regulation No 1346/2000, [2000] OJ L 160/1 <https://eur-lex.europa.eu/legal-content/en/ALL/?uri=CELEX%3A32000R1346> (accessed 19 November 2018) ("the EIR"); and

    (b)     the **Regulation on insolvency proceedings (recast)**, EU Parliament and Council Regulation No 2015/848, [2015] OJ L 141/19 <https://eur-lex.europa.eu/legal-content/en/TXT/?uri=CELEX%3A3 2015R0848> (accessed 19 November 2018) ("the Recast EIR"), which replaced and supersedes the EIR, and applies to insolvency proceedings opened after 26 June 2017.

35     I note that the Model Law concept of COMI owes much to the European Union: Convention on Insolvency Proceedings (23 November 1995), 35 ILM 1223 (1996) ("EU Convention on Insolvency Proceedings"), which was subsequently adopted by and reproduced as the EIR: see *Cross-Border Insolvency: A Commentary on the UNCITRAL Model Law* vol 1 (Look Chan Ho consulting ed) (Globe Law and Business, 4th Ed, 2017) ("*Cross-Border Insolvency: A Commentary*") at p 171. That being said, there are differences in the structure of the UNCITRAL and EU regimes, which, on occasion, may lead to different nuances at least. I am also mindful that there are variations in the enactment of the Model Law itself, in various jurisdictions, which may be material.

36     Guidance may also be taken from the guides issued by UNCITRAL:

    (a)     the "Cross-Border Insolvency: Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency", UNCITRAL, 30th Sess, UN Doc A/CN.9/442 (1997) ("the 1997 Guide"); and

    (b)     the "UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation" (2013) <http://www.uncitral.org/pdf/english/texts/insolven/1997-Model-Law-Insol-2013-

# 153

Guide-Enactment-e.pdf> (accessed 19 November 2018) ("the 2013 Guide").

These guides will collectively be referred to as "the Guides".

37     Section 354B(2) of the Companies Act refers to the 1997 Guide as a relevant document in the interpretation of the Singapore Model Law. This is of course a deliberate legislative endorsement of the 1997 Guide; the 2013 Guide which introduced a number of amendments is not given official status in Singapore law. Nonetheless, the 2013 Guide should not be entirely ignored. Consistency and comity should be pursued as far as possible in the interpretation of the provisions of the Model Law. Where there is any conflict between the two Guides, the 1997 Guide trumps. But where the 1997 Guide is silent, the court may consider the 2013 Guide in its interpretation of the Singapore Model Law and in assessing its statutory objectives.

38     Finally, I bear in mind the preamble to the Singapore Model Law, emphasising co-operation and efficiency between the courts of States involved in cross-border insolvency, and Art 8 of the Singapore Model Law, which requires regard to be paid to the Singapore Model Law's international origin and the promotion of uniformity in its application. I am of the view that the Singapore courts should attempt to tack as closely as possible to the general interpretive trends taken in other jurisdictions that apply the Model Law in its various enactments.

### Relevant date for determining the COMI

39     Different approaches exist as to the relevant date for determining COMI. The applicants canvass each approach, arguing that whichever date is chosen, Zetta Jet Singapore's COMI will be found to be in the US. No issue arises as to Zetta Jet USA's COMI.

#### The English (and European) position

40     The English approach is as laid down in cases such as *In the Matter of Videology Limited v In the Matter of the Cross-Border Insolvency Regulations 2006* [2018] EWHC 2186 (Ch) ("*Videology*") and *In re Stanford International Bank Ltd* [2010] 3 WLR 941. Applying the Model Law as incorporated into English law in Cross-Border Insolvency Regulations 2006 (SI 2006 No 1030) (UK) Sch 1 and the Recast EIR, English courts determine the debtor's COMI as at the date of the application to open insolvency proceedings abroad.

41     The applicants argue that this approach is influenced by the fact that the Recast EIR uses the COMI concept to determine (a) if the proceeding is one to which the Recast EIR applies; and (b) which EU Member State the proceeding may be commenced in. This view is supported by Recital (23) of the Preamble to the Recast EIR, which states that the "[Recast EIR] enables

the main insolvency proceedings to be opened in the Member State where the debtor has [its COMI]". Additionally, Art 3(1) of the Recast EIR states:

> *Article 3.* **International jurisdiction**
>
> 1.    The courts of the Member State within the territory of which the centre of the debtor's main interests is situated shall have jurisdiction to open insolvency proceedings ('main insolvency proceedings'). The centre of main interests shall be the place where the debtor conducts the administration of its interests on a regular basis and which is ascertainable by third parties.

42    The applicants thus argue that the COMI concept is used differently in the Recast EIR and in the Model Law. The Model Law uses the COMI concept at a later stage, as a means of determining the relief to be granted to the relevant foreign proceedings if so recognised: see Art 20(1) of the Model Law. Furthermore, citing *Cross-Border Insolvency: A Commentary* at p 172, the use of the present tense in Arts 2(*f*) and 17(2)(*a*) of the Model Law indicates that "COMI is to be determined at the time of the application for recognition".

43    I have considered the reasoning in two cases discussed in the applicants' submissions:

> (a)    In *Videology*, Mr Justice Snowden stated that under the Recast EIR, the date at which the company's COMI must be determined is that at which the request to open insolvency proceedings is made: at [49], citing *Interedil Srl v Fallimento Interedil Srl* Case C-396/09, [2011] ECR I-9915 at [55], [2012] Bus LR 1582, <http://europa.eu.int/eur-lex/en/index.html> (accessed 19 November 2018) ("*Interedil*"), a decision by the European Court of Justice ("ECJ").
>
> (b)    In *Interedil* at [54], the ECJ noted that in light of Art 3(1) of the Recast EIR, the last place in which a debtor's COMI was located is to be regarded as the relevant place for the purpose of determining the court having jurisdiction to open the main insolvency proceedings. The ECJ at [55] then referred to the case of *Susanne Staubitz-Schreiber* Case C-1/04, [2006] ECR I-701 at [29], <http://europa.eu.int/eur-lex/en/index.html> (accessed 19 November 2018) ("*Staubitz*"), which held that the courts of the Member State in which the COMI was situated at the time when the request was launched retains jurisdiction to rule on the proceedings, even where the COMI is transferred after the request to open insolvency proceedings is lodged. This led to the conclusion that it is the location of the debtor's COMI at the time the debtor lodges the request to open insolvency proceedings that is relevant to determine the court having jurisdiction.

44    In view of this analysis of *Interedil* and *Videology*, I am satisfied that the applicants' submissions are correct. The English position regarding the

relevant date flows from the European position, which utilises the COMI concept to determine which EU Member State's courts have jurisdiction to open the main insolvency proceedings. These considerations and requirements do not apply under the Model Law and in Singapore. There is thus no constraint requiring a Singapore court to adopt the English position.

*The Australian position*

45     Australia applies the Model Law as incorporated into Australian law under Cross-Border Insolvency Act 2008 (Cth) sch 1. The debtor's COMI is determined as at the time of the hearing of the recognition application, but regard may be had to historical facts which led to the position at the time: *Moore, as Debtor-in-Possession of Australian Equity Investors v Australian Equity Investors* [2012] FCA 1002 ("*Moore*") at [18]–[19], and applied in *Legend International Holdings Inc (as debtor in possession of the assets of Legend International Holdings Inc) v Legend International Holdings Inc* [2016] VSC 308 ("*Legend*") at [96], and *Wood v Astra Resources Ltd (UK Company No 07620218)* [2016] FCA 1192 at [12].

46     The basis of the Australian position appears to be that the debtor's COMI is to be determined at the point the court is required to give a decision on recognition. I consider the merits of this position in greater detail below.

*The US position*

47     Chapter 15 of the US Bankruptcy Code incorporates the Model Law into US law. The US cases are consistently clear that the debtor's COMI should be determined as at the filing of the application for recognition: *In re Betcorp Ltd* 400 BR 266 at 290–292 (Bankr D Nev, 2009), *In re Ran* 607 F 3d 1017 at 1025–1026 (5th Cir, 2010) ("*Ran*"). This approach considers the language adopted in US Bankruptcy Code § 1502, which defines a "foreign main proceeding" as "a proceeding in the country where the debtor has the center [*sic*] of its main interests". In *Ran*, the US Court of Appeals for the Fifth Circuit noted that Congress's use of the present tense required the courts to view the COMI determination in the present, *ie*, "at the time the petition for recognition was filed".

48     The court in *Ran* put forward an additional reason for adopting this approach: examining a debtor's COMI at the time the petition for recognition is filed allows for the harmonisation of transnational insolvency proceedings. Limiting the inquiry to the time of filing avoids a detailed examination of the operational history of the applicant, which may entail conflicting COMI determinations by different courts.

49     The applicants note that this position has been maintained in subsequent cases including *Fairfield Sentry (CA)* ([33] *supra*) at 137 and *In*

*re Ocean Rig UDW Inc* 570 BR 687 at 704 (Bankr SDNY, 2017). I note that the US position has the advantages of simplicity and adherence to the plain language of the Model Law.

*The 1997 and 2013 Guides*

50    The applicants note that the 1997 Guide, which is silent on the relevant date for the COMI determination, is the guide which the Singapore Parliament considered when enacting the Singapore Model Law. Conversely, the 2013 Guide expressly states at para 31 that a debtor's COMI should be determined as at the date of the commencement of the foreign insolvency proceedings. Taking the date of commencement to determine the COMI provides a test that can be applied with certainty to all insolvency proceedings: see paras 159–160 of the 2013 Guide.

51    At this point, I should note that these Guides can provide such guidance as to promote the uniform and consistent interpretation of the Model Law. However, they must always be subject to the interpretation of the Model Law provisions as enacted in each jurisdiction, and the relevant considerations of policy which may point in favour of one outcome or another. I have reservations about adopting the approach advocated in the 2013 Guide, which is essentially that adopted by Europe and England. Certainty is also well served by the adoption of the US position, though possibly, with respect, not the Australian position.

*The preferred approach*

52    The positions regarding the relevant date to determine COMI are:

(a)    **The English and European position and the position taken in the 2013 Guide**: The date of the commencement of the foreign insolvency proceedings.

(b)    **The Australian position**: The date of the hearing of the recognition application.

(c)    **The US position**: The date the application for recognition is filed.

53    Having considered parties' submissions and the above analyses, I accept that determining the debtor's COMI as at the date the recognition application is filed, *ie*, the US position, provides greater certainty and better accords with commercial realities and the language of the provisions of the Model Law.

54    The applicants point to three reasons for preferring the US position:

(a)    Articles 2(*f*) and 2(*g*) of the Singapore Model Law, which define foreign main and non-main proceedings, refer to proceedings that are "taking place". The use of the present tense contemplates that foreign

proceedings are underway at the time the debtor's COMI is being ascertained. This is in line with the US position.

(b)    The US position would allow the court to account for shifts in the debtor's COMI in the period between the commencement of the foreign insolvency proceeding and the date the recognition application is filed.

(c)    The debtor's operational history should not be considered as part of the COMI determination, so as to avoid a meandering inquiry.

55    Considering the applicants' submissions, I note the following factors that militate in favour of Singapore's adoption of the US position over the English position.

56    First, the definitions in Art 2 of the Singapore Model Law do not expressly specify the date at which COMI is to be ascertained. The definitions do, however, use the present tense, which seems to indicate that what matters is the situation at the point of the application for recognition.

57    Second, postponing the COMI determination until the application for recognition is made accepts that, in contemporary practice, various entirely legitimate measures may be taken to shift a debtor's COMI to another jurisdiction, for instance, to create a jurisdictional nexus for the opening of insolvency proceedings. Such measures may not all be in place by the time of the foreign insolvency application, *ie*, the operative date under the English and European position. It is not objectionable to grant companies the discretion to select the jurisdiction that will offer the best prospects for achieving an effective restructuring solution: see Sundaresh Menon, Chief Justice, Supreme Court of Singapore, "The future of cross-border insolvency: Some thoughts on a framework fit for a flattening world", keynote address at the 18th Annual Conference of the International Insolvency Institute 2018 (25 September 2018) at paras 32–39 <https://www.iiiglobal.org/sites/default/files/media/keynote%20address%20 delivered%20by%20Chief%20Justice%20Sundaresh%20Menon.pdf> (accessed 19 November 2018). Indeed, granting debtors the flexibility to make such COMI shifts is a recognition of their autonomy. An applicant company in ordering its affairs is to be given some leeway in choosing an appropriate forum in which to seek reorganisation. The courts should take a neutral stance as to any purported changes in COMI so as to recognise the applicant's autonomy and to give effect to any preference exercised by the applicant, subject to any public policy concerns.

58    That said, this is not to sanction a free-for-all: limits exist. An applicant company cannot, for instance, seek to evade responsibilities to its employees by seeking reorganisation in a wholly unrelated jurisdiction, and recognition may be denied in such a situation. If, for instance, and subject to considered arguments on this issue, a COMI shift was opportunistically pursued to evade the criminal laws of the recognising court or to cause

prejudice to creditors, then the application for recognition of the foreign proceedings may be denied. It may also be that such denial would not turn on whether the conditions for recognition under Art 17(1) of the Model Law were fulfilled, but rather as being contrary to public policy. We will have to see how the arguments are made in such a case. But short of evasion of criminal or similar laws, and generally provided that there are commercial reasons for choosing one jurisdiction over another, I am doubtful that a Singapore court would be overly exercised by the applicant's choice of a particular court to commence insolvency proceedings in.

59     With that consideration in mind, ascertaining the debtor's COMI as at the date of the hearing for recognition facilitates an applicant's ability to seek restructuring in an appropriate forum. Jurisdiction may be assumed by the restructuring court on a number of grounds, not all of which will necessarily establish that the applicant's COMI is in that jurisdiction. That, however, is a separate analysis; what matters for the recognising court is that the requirements of the Model Law are met at the point of the application for recognition.

60     Having preferred the US position to the English position, I now consider the Australian position *vis-à-vis* the US position. It would seem that the Australian approach is based on the need to give effect to the language of the Model Law. I am, however, unable to find in the language of the Singapore Model Law anything that distinguishes the date of the *application* from the date of the *hearing* as the relevant date for determining the COMI. I am also of the view that the Australian position leaves the date of the ascertainment of the debtor's COMI uncertain: a bright-line rule would be preferable. Finally, although the Australian position gives the recognising court greater leeway in ascertaining the debtor's COMI, I do not think that in practice there would be much difference in result between the Australian and US positions.

61     All things considered, the ascertainment of COMI as at the date of the application has the advantage of greater certainty, given the possible vagaries of hearing diaries in all jurisdictions. I therefore prefer the US position to the Australian position.

### Factors to be considered in determining COMI

62     Having determined the relevant date for the COMI determination, which factors does the court consider in the COMI assessment? A summary of the approaches taken in various jurisdictions follows.

#### The English and European approach

63     English and European cases, particularly *In re Eurofood IFSC Ltd* (Case C-341/04) [2006] 1 Ch 508 ("*Eurofood*") and *Interedil* ([43a] *supra*), provide useful guidance. They highlight the need for objective criteria that

would allow for ascertainment of the COMI by third parties: *Eurofood* at [33], *Interedil* at [49].

64    The English High Court of Justice in *Videology* ([40] *supra*) took the following approach:

> (a)    English courts are to apply the ECJ's tests in determining a company's COMI: at [28]. *Eurofood* and *Interedil* were applied to determine if the presumption of COMI in the place of the debtor's registered office had been displaced: at [32].

> (b)    In view of the Recitals and Art 3(1) of the Recast EIR, the factors relied upon to rebut the presumption had to be both objective and ascertainable by third parties. The fact that a parent company in another state controlled the economic choices of a subsidiary was insufficient to rebut the presumption: at [33], citing *Eurofood* at [33]–[37].

> (c)    On the facts of the case, Mr Justice Snowden concluded that the presumption that the company's COMI was in the place of its registered office had not been displaced. The UK, the place of the debtor company's registered office, was also where the company's trading premises and staff were located; where its customer and creditor relationships were established; where it administered its relations with trade creditors on a day to-day basis; and where its main assets, namely, the receivables and cash at bank, were located. Importantly, representations were made to the company's main finance creditor that the UK was where its COMI was located: at [72]. These were all factors that were visible and immediately ascertainable by customers and trade creditors of the company, and which ultimately displaced the factor that the company's senior management was located in the US: at [73].

65    I note also that Recital (28) of the Preamble to the Recast EIR, which *Videology* considered at [31], states:

> (28)   When determining whether the centre of the debtor's main interests is ascertainable by third parties, special consideration should be given to the creditors and to their perception as to where a debtor conducts the administration of its interests. This may require, in the event of a shift of [COMI], informing creditors of the new location from which the debtor is carrying out its activities in due course, for example by drawing attention to the change of address in commercial correspondence, or by making the new location public through other appropriate means.

66    Although the Recast EIR and its Recitals are not part of Singaporean law, the recognised need for objective criteria ascertainable by third parties and the focus on the debtor company's place of central administration are clearly applicable to the Singaporean context.

*The Australian approach*

67     In *Legend* ([47] *supra*), Randall AsJ of the Supreme Court of Victoria considered various factors in this analysis, including the location of the debtor company's assets; the residence of its directors; its principal place of business, the activities of its wholly owned subsidiary; its operations, including its day-to-day activities; and where the auditing of its accounting was attended to. In the circumstances, it was found that the preponderance of the debtor company's activities was conducted in Australia, and Australia was thus the company's COMI. The presumption of COMI in the place of the company's registered office, *ie*, Delaware, was therefore displaced: at [98]–[123].

68     The Australian approach also entails consideration of where the debtor conducts the administration of its interests on a regular basis: *Moore* ([45] *supra*) at [19]. The COMI should also be ascertainable by third parties, creditors, and potential creditors; for this to be the case, the court must have regard to the need for an element of permanence: *Moore* at [19], *Kapila, in the matter of Edelsten* [2014] FCA 1112 at [53], *Legend* at [91].

69     I also highlight the broad-ranging approach taken in *Young, Jr, in the matter of Buccaneer Energy Limited v Buccaneer Energy Limited* [2014] FCA 711 at [7]–[14]. Jagot J noted that although the company was registered in Australia, its main activities and that of its subsidiaries were in the US. Its COMI was thus the US; ignoring the company's group structure would be to ignore the commercial realities which the Model Law attempts to address.

*The US approach*

70     The US courts have adopted the term "nerve centre", focusing on where the debtor company performs its most important and consequential business decision-making functions: *In re Railpower Hybrid Technologies Corp* Case 09-41498-WWB at 8 (Bankr WD Pa, 2009), *Fairfield Sentry (Bankruptcy Court)* ([33] *supra*) at 64–65. We have not had the occasion to consider the US cases in extensive detail, but I am concerned that the focus on the company's "nerve centre" is perhaps too narrow where the language of the Model Law is concerned, given that the analysis is concerned more broadly with where the company's "centre of main interests" is located.

71     That being said, the US cases do look at a similarly broad range of factors in the COMI determination, as in other jurisdictions, including the location of the debtor's headquarters; the location of its management; the location of its primary assets; the location of the majority of its creditors; and the jurisdiction whose law would apply to most disputes: *Fairfield Sentry (CA)* ([33] *supra*) at 137, *In re SPhinX, Ltd* 351 BR 103 at 117 (Bankr SDNY, 2006).

*The Singaporean approach*

72    We have not had the occasion yet, at least in a written judgment, to consider the interpretation of COMI under the Singapore Model Law. I previously applied a common law COMI test when deciding recognition issues in *Re Opti-Medix Ltd* [2016] 4 SLR 312 ("*Opti-Medix*") and *Re Taisoo Suk* [2016] 5 SLR 787. In particular, I was satisfied in *Opti-Medix* that despite the debtor companies' incorporation in the BVI, their common law COMI was in Japan where the companies carried on business. I thus granted full recognition to the relevant Japanese insolvency orders and the Tokyo District Court-appointed bankruptcy trustee: at [24] and [25].

73    Singapore has since adopted the Model Law. It would be preferable if the common law and Model Law conceptions of COMI were aligned as far as possible.

74    Turning to the Guides for reference, the 1997 Guide is quite laconic; para 72 only states that COMI as used in Art 2(*b*) of the Model Law is used also in the EU Convention on Insolvency Proceedings. No commentary is made regarding Art 16(3) of the Model Law. In comparison, the 2013 Guide describes the COMI concept as fundamental to the operation of the Model Law; proceedings commenced in a company's COMI are accorded deference and automatic relief: para 144. The 2013 Guide then states, at para 145:

> In most cases, the following principal factors, considered as a whole, will tend to indicate whether the location in which the foreign proceeding has commenced is the debtor's centre of main interests. The factors are the location: (*a*) where the central administration of the debtor takes place, and (*b*) which is readily ascertainable by creditors …

This approach echoes the approach taken in the Recast EIR.

75    In addition, the 2013 Guide at para 147 also highlights additional COMI factors which could be considered by the recognising court as applicable:

> … [T]he location of the debtor's books and records; the location where financing was organized or authorized, or from where the cash management system was run; the location in which the debtor's principal assets or operations are found; the location of the debtor's primary bank; the location of employees; the location in which commercial policy was determined; the site of the controlling law or the law governing the main contracts of the company; the location from which purchasing and sales policy, staff, accounts payable and computer systems were managed; the location from which contracts (for supply) were organized; the location from which reorganization of the debtor was being conducted; the jurisdiction whose law would apply to most disputes; the location in which the debtor was subject to supervision or regulation; and the location whose law governed the preparation and audit of accounts and in which they were prepared and audited.

76    I have noted at [30] and [31] that I do not understand the Singapore Model Law to require that the Art 16(3) presumption be rebutted on the balance of probabilities. In determining a debtor's COMI under the Singapore Model Law, the court would first presume that the place of the debtor company's registered office is its COMI. This presumption would be displaced if it is shown that the place of the company's central administration and other factors point the COMI away from the place of registration to some other location. The COMI factors should be those that are objectively ascertainable by third parties generally, with a focus on creditors and potential creditors in particular. This follows the English, European and Australian positions.

77    *Eurofood* ([63] *supra*) at [33] noted that objectivity and the possibility of ascertainment by third parties are necessary to ensure legal certainty and foreseeability concerning the determination of which EU Member State's courts have jurisdiction to open main insolvency proceedings. Although this consideration does not strictly apply in Singapore, there remains a need to ensure that creditors especially can predict when an insolvency proceeding might subsequently be granted recognition as a "foreign main proceeding", given the automatic reliefs that follow under the Model Law.

78    In this respect, I would also consider it material, in determining which factors to take into consideration for the COMI determination, to consider how likely it is that a creditor would weigh a particular factor in his mind. I would focus on those factors that a creditor would take into account in his deliberations as to whether to afford credit to the applicant company. For instance, where a company is clearly involved in cross-border activities, a creditor may not regard the location of assets as being significant if it is expected that the assets in question, *eg*, vessels or planes, would move around as part of the company's operations. It may be in such a situation that the location of the company's fixed assets plays a greater role.

79    I also accept that there should be an element of settled permanence or intended permanence in the factors considered, which would assist creditors in their weighing of the relevant factors and the risks entailed in granting credit. As such, a change in COMI would be tolerated, even just ahead of an insolvency filing, provided that there is a clear ascertainable intention to make such a COMI change lasting, rather than vacillating.

80    The US approach of identifying the company's "nerve centre" is useful, but I would not regard this factor as determinative. It would be one of several factors that need to be weighed in the round. I would focus on the centre of gravity of the objectively ascertainable factors, if that helps the analysis: balancing all the relevant factors, where does the mass settle in the end? It will be a robust, entirely qualitative analysis especially since the proceedings will not involve a full trial of the facts, but that is, I believe, what is intended under the Model Law.

81    Flowing from that, where there are disputed facts, the court will have to make the best conclusions it can in the circumstances. Where the scale does not clearly tip either way, the location of the registered office will be taken to be the COMI by default. And, as is the case here, if there are background disputes between shareholders affecting questions of management and direction, that again may, on the facts, lead to the conclusion that the presumption or default position should be upheld.

82    As the analysis requires a consideration of factors relevant to the creditor's understanding, the court's focus is on actual facts on the ground rather than on legal structures. The court's inquiry in this regard is broad-ranging, looking at the company's activities in and connections to a particular locale. In some situations, it may be that the actual activities on the ground mean that little distinction is drawn in reality between a company and other members in its group. That should be taken into account in determining the company's COMI. This approach may be contrasted to other situations where the concept of separate corporate identity is maintained: the purpose of those legal doctrines is different. COMI determination is not concerned with corporate identity as such, unlike, say, determinations of corporate liability or attribution.

83    Accordingly, I am of the view that in ascertaining a specific company's COMI, there is no need to maintain strictly the distinction between different entities within a group. It is possible for the analysis to be made of the activities of an entire group of companies, rather than of the specific debtor company in question. In this case, some of the COMI factors relate to the activities of the Zetta Entities and the Zetta Jet Group generally, and not Zetta Jet Singapore itself.

84    In any event, I do not think there is a significant difference in the position of the applicants and the Intervener as to the law on the determination of COMI.

### Consideration of factors in the present application

85    I will assess the various factors raised by the parties in the following categories:

  (a)    the location from which control and direction was administered;

  (b)    the location of clients;

  (c)    the location of creditors;

  (d)    the location of employees;

  (e)    the location of operations;

(f)　　dealings with third parties; and

(g)　　the governing law.

I will also deal briefly with the applicants' argument that the location where the foreign insolvency representative, *ie*, the Trustee, operated from should be considered.

86　　The COMI determination takes into account the facts as they were at 13 December 2017, the date of the applicants' recognition application. That said, as noted above at [23], the analysis will be unchanged regardless of the date considered.

*Location from which control and direction was administered*

87　　The applicants contend that control of Zetta Jet Singapore resided in the US, particularly after 17 August 2017 when Geoffrey Owen Cassidy ("Cassidy") and June Tang Kim Choo ("Tang") were removed from their positions in the Zetta Jet Group. Following their removal, the Zetta Entities were managed exclusively from the US; operational decisions were also made in the US. The Intervener relies on the fact that Cassidy was the managing director of Zetta Jet Singapore prior to his "improper removal" before the commencement of the Chapter 11 proceedings.

88　　I accept that at least following Cassidy's ouster, control and direction of Zetta Jet Singapore resided in persons located in the US. I note that there was a dispute about whether Cassidy's removal was proper, but this does not affect my finding. In determining COMI, the court only needs to consider the question of actual control of the debtor company, leaving the resolution of any underlying legal dispute to the appropriate forum and process.

*Location of clients*

89　　The applicants argue that the clients were primarily based in the North America and Europe. The Intervener does not refute this.

90　　The presence of clients in a given location does not by itself establish the debtor's COMI; the relevance of this factor arises primarily through its connection with other factors such as whether these clients are creditors, and the location of funds, assets and management. I would not in the circumstances of this case attach much weight to this factor.

*Location of creditors*

91　　The Intervener contends in submissions that Zetta Jet Singapore has creditors in Singapore. In contrast, the applicants state that its creditors were largely based in the US; ten of its top 20 unsecured creditors were located in the US as at 15 September 2017, the date of the commencement of the US Chapter 11 proceedings.

92    I accept the evidence of the applicants that at least half of the primary unsecured creditors were located in the US. But that by itself would not be sufficient to lean the conclusion regarding the COMI towards the US, as the position with respect to the creditors would appear, on the applicants' own evidence, to be mixed.

*Location of employees*

93    The Intervener argues that Zetta Jet Singapore employed 176 employees who were mostly based out of the US. The applicants refute this, saying that there were only 60 employees based in Singapore, with the remaining employees based elsewhere. Those in Singapore played primarily back-end functions, in low-level administrative roles. The applicants' assertion of the limited roles of the employees in Singapore was not backed up by more than an organisation chart and a page in the Zetta Jet Singapore employee handbook, which directed employees to direct questions and suggestions to Seagrim or to Eric Rastler, the Zetta Jet Group's Chief Pilot.

94    I find that there is insufficient evidence as to the level or responsibility of the employees stationed in Singapore. In the circumstances, this does not play a material role in the ultimate determination.

*Location of operations*

95    The applicants rely on the fact that Zetta Jet Singapore's business was conducted primarily in the US: a large majority of the flights that it and the Zetta Jet Group chartered occurred within the US. These flights could only be operated with US Federal Aviation Authority certification of the planes, which Zetta Jet USA maintained. The Intervener argues that no maintenance facility or offices were in effect maintained in the US: while a flight operation centre was supposedly maintained in the US, most operations were conducted by the Singapore operation centre, which housed most of the operations staff; all flight scheduling and operations were conducted in Singapore.

96    I am of the view that in this specific case, the locus of operations was of less relevance than perhaps in other cases. Where and how the business activities of the Zetta Entities were conducted would not have been of much relevance and not appreciable to a creditor, especially since the company was concerned with flights, at least some of which presumably would be international in nature. Some dispersal of operations would have been expected. The administration would seem to be split in some way between the US and Singapore. I cannot conclude that this points clearly in either direction. I also find that the location of assets would not perhaps be readily apparent to a creditor, nor would a creditor likely consider it significant, given the nature of the business of transporting persons. It would have been otherwise had the business been one of largely domestic inland transport. Accordingly, I give this factor less weight in the analysis.

*Dealings with third parties*

97    The applicants rely on the fact that the Zetta Entities were understood to be US-based by customers and creditors. The Zetta Entities were marketed on their website and social media as operating out of Burbank, California. The applicants refer to communications to key customers, vendors and creditors that their points of contact after 17 August 2017 following the removal of Cassidy and Tang would be Walter, Michael Maher, the newly-appointed Chief Executive Officer of the Zetta Jet Group, and Seagrim, who were all US-based. The applicants also point to the Zetta Jet Group's website which indicated that the US was the location of Zetta Jet Group's business. These factors are significant pointers which were readily perceivable by third parties that indicated that the COMI was in the US.

98    The Intervener alleges that Zetta Jet Singapore conducted sales and marketing for its flights all over the world, implying that it was not US-centred.

99    In so far as dealings with creditors are concerned, I would accept that it is relevant that representations pointed to the Zetta Jet Group as being located in the US, reinforcing the expectations of at least some of the creditors that they were dealing with a company that would have a strong connection to the US.

*The governing law*

100   Neither side invokes the use of a particular law or choice of jurisdiction. In general, I would think that this is of less relevance in most situations given the demise of the rule in *Gibbs* outside England and its associated jurisdictions.

*Location that the foreign representative was operating from*

101   The applicants point to the fact that the US-based Trustee undertook efforts to restructure Zetta Jet Singapore from the date of his appointment to the cessation of the business of the Zetta Entities, *ie*, from 5 October 2017 to 30 November 2017.

102   However, I would not take the foreign representative's actions as being relevant in the ascertainment of COMI. The work being done by the foreign representative would flow from the assumption of jurisdiction by the foreign court on whatever basis it considers appropriate.

103   I am mindful that I differ in this regard from the approach of the US courts in cases such as *Fairfield Sentry Ltd (CA)* ([33] *supra*), which held that "any relevant activities, including liquidation activities and administrative functions, may be considered in the COMI analysis": at 137. I am not, however, convinced that it is proper to consider such activities in determining COMI.

*The final assessment*

104  On an overall assessment, the following significant factors displace the presumption that Singapore, the place of Zetta Jet Singapore's registered office, was its COMI:

(a)  central management and direction of Zetta Jet Singapore were conducted from the US at all relevant times;

(b)  corporate representations indicated it operated from the US; and

(c)  a substantial portion of its creditors were located in the US.

105  The fact that Zetta Jet Singapore's administration and operations were carried out at least to some extent in Singapore is outweighed by the abovementioned factors. I am not sure that any distinction can be drawn between administration and operations. For that reason, I am of the view that in these circumstances, the presence of employees in Singapore will be at best a neutral factor in determining COMI.

106  I am also of the view that the location of Zetta Jet Singapore's assets, namely, the planes, is incidental and not indicative of the location of its COMI. It is to be expected for a business of this nature that its assets may be dispersed in the location most appropriate from time to time. The fact that US air certification was required for Zetta Jet Singapore to operate its flights in the US is also a neutral factor, and ultimately does not assist in the COMI determination.

107  On the facts, the most important factor to my mind is the location of the primary decision-makers. I am therefore satisfied on the evidence that Zetta Jet Singapore's COMI was at the material times located in the US.

**Issue 3: Whether the public policy exception applies**

108  The Intervener argues that there was continued breach of the Singapore injunction on the applicants' part; this breach was still contempt even if the injunction was subsequently discharged: *Pertamina* ([22] *supra*) at [82]. *Pertamina* is to be preferred to *Nikkomann* ([22] *supra*) at [62], which held that the discharge of an order would not leave the putative contemnor with any liability for penalties.

109  The Intervener had consented to the discharge on the basis that the law was set out in *Pertamina*. King had made implicit concessions that he was aware or wilfully blind that he had breached and continued to breach the Singapore injunction. The application to discharge the injunction was only made after King had failed to obtain full recognition in *Zetta Jet (No 1)* ([1] *supra*) and after the Australian courts observed in parallel proceedings that the Singapore injunction enjoined him. King accepted on 12 July 2018, at the hearing where the injunction was set aside, that in the event the

injunction was discharged, any breach or contempt that he committed prior to the discharge would not be excused.

110    The applicants first argue that there is no public policy issue that should lead the court to refuse to recognise the US bankruptcy proceedings and the Trustee. No concessions had been made: King had been advised by US counsel that the injunction "did not bite on him", and thus had not sought to discharge the injunction earlier.

111    Second, the effect of the Intervener's arguments on continued breach would be that the Trustee can never obtain recognition in Singapore. The applicants highlight that the US bankruptcy proceedings are still underway and that the Intervener could have entered an appearance or resisted those proceedings. Moreover, the Singapore injunction had been discharged, and the court discharging the injunction had observed that the basis of the injunction was no longer extant.

112    Third, public policy does not call for recognition to be refused. The first and most important public policy consideration is to protect the general body of Zetta Jet Singapore's creditors and to ensure that the Trustee maximises recovery for all of them, giving priority to creditors over shareholders. The Intervener had cynically sought to prioritise the rights of shareholders over the rights of creditors in procuring the Singapore injunction. The Intervener's public policy arguments ought to be disregarded, or weighed against the overwhelming public policy concerns pointing in favour of allowing the application.

113    Fourth, the applicants highlight the overwhelming evidence of Cassidy's wrongdoing and the Intervener's deliberate deception in its *ex parte* application to procure the Singapore injunction. The applicants call the court to make a finding with regard to the Intervener's wrongful procurement of the Singapore injunction.

114    Finally, the applicants argue that the present case is unlike the US decision in *In re Gold & Honey, Ltd* 410 BR 357 (Bankr ED NY, 2009) ("*Gold & Honey*"), which the Intervener relied upon in *Zetta Jet (No 1)* ([1] *supra*). *Gold & Honey* involved a situation where the recognition of foreign receivers would directly contradict local proceedings that sought to maximise the recovery for the entire pool of creditors. Recognition would have resulted in an irremediable situation. In comparison, Suit 864/2017 is a civil suit brought by one shareholder against two other shareholders of Zetta Jet Singapore, and Zetta Jet Singapore itself. The recognition of the US bankruptcy proceedings and the Trustee will not undermine any claim the Intervener may make in the US proceedings or separately against the other shareholders.

115    Having considered these submissions, I set out my decision as follows.

*The allegedly continuing breach*

116  The fact that the parties had by consent agreed to the discharge of the Singapore injunction would seem to point to the conclusion that there was no continuing breach of the injunction. The Intervener's argument, though, is that the applicants' initial breach of the injunction was not cured by subsequent discharge of the injunction.

117  This is a question that engages domestic public policy considerations. In determining these issues, the court is not primarily concerned with the desires or interests of the body of Zetta Jet Singapore's creditors as a whole or even of those in Singapore, but with the administration of justice in Singapore.

118  Whether or not breach or contempt continues after an order is discharged would be a matter dependent on the facts. I am wary of enunciating a general rule. The Intervener relies on *Pertamina* ([22] *supra*) at [82], which cites Mark S W Hoyle, *Freezing and Search Orders* (Informa, 4th Ed, 2006) ("Hoyle") at paras 9.17:

> The following observations in a leading textbook are also apposite (see *Hoyle* … at para 9.17):
>
>> It is no defence to contempt proceedings to allege that the order should not have been made, or has been discharged. ***An order of the court must be obeyed while it stands, and a breach is still contempt even if, at a later stage, the order is in fact discharged.*** The same principle applies if the original order was wrongly made; the defendant's remedy is to apply for its immediate discharge while keeping to its terms.

> [emphasis added in bold italics]

119  The Intervener contrasts *Pertamina* with *Nikkomann* ([22] *supra*) at [62]:

> … In *Hallmark Cards Inc v Image Arts Ltd* [1977] FSR 150, however, Buckley LJ said:
>
>> While the order stands, the party who refuses access to his premises is in default of the order. But if the party against whom the order is made were to succeed in getting the order discharged, I cannot conceive that that party would be liable to any penalties for any breach of the order of which he may have been guilty while it subsisted, for if the order is discharged upon the footing that it ought not to have been made, then the contempt is in truth no contempt, although technically no doubt there is contempt.

120  I read the extract from *Pertamina* to mean that an order of the court must be obeyed while it stands; a breach of a court order is still contempt even if, at a later stage, the order is in fact discharged. I do not read *Nikkomann* as taking a different position, as the Intervener suggests. Indeed, opprobrium attaches at the point of breach regardless of what happens after.

121   I would, with respect, prefer to weigh the original injunction order, the breach of the order and the circumstances of any purported rectification to consider the consequences that follow for a putative contemnor. But while the applicants' wrong remains a breach of the Singapore injunction after its discharge and may be pursued as contempt, it does not follow that such failure to comply remains a ground for refusal of recognition, whether under the Singapore Model Law or the common law. Recognition was refused in *Zetta Jet (No 1)* ([1] *supra*) because the US Trustee had flouted an express order of court; he breached the Singapore injunction by pursuing US bankruptcy proceedings, which undermined the administration of justice in Singapore: at [29]. However, if the order is discharged and the court issuing the order is content to let the order be discharged, recognition no longer undermines the administration of justice in Singapore. It may be that contempt proceedings may be continued for such breaches in some situations, but that is a separate matter.

122   Thus the fact that the Intervener may have consented to discharge on the basis that contempt may still exist does not determine the question of whether recognition should be granted. The Intervener may indeed pursue contempt proceedings against the applicants if it wishes, but the fact that contempt may have been committed does not in itself give rise to grounds for continued non-recognition of the US bankruptcy proceedings.

### *The general interests of creditors*

123   The other point of public policy raised by the applicants is that there is a countervailing public policy consideration of ensuring that the general interests of creditors are protected. I do not accept the applicant's arguments as regards public policy and do not find this consideration material in the application of Art 6 of the Singapore Model Law.

124   Briefly, the public policy concern identified in *Zetta Jet (No 1)* at [29] was simply that recognition of a foreign insolvency proceeding pursued in breach of an injunction issued by a co-ordinate court would undermine the administration of justice in that co-ordinate jurisdiction. That policy consideration overrides all others, including those raised by the applicants. On the facts, the objectives of facilitating the uniform and orderly distribution of assets cannot override the paramount public policy of upholding the administration of justice in Singapore.

125   Flouting a Singapore order will carry consequences. Those advising in restructuring and insolvency matters abroad would do well to take note of that. Those breaching orders issued by Singaporean courts may not need to come to Singapore and may feel that they can thumb their noses with safety from foreign shores. But should they ever need to look to assets or information in Singapore, they will have to answer for their conduct. In the present case, the consensual discharge resolved the issue for the Trustee. The same result may not arise in other cases.

**Orders made**

126   Prayer 1 in Originating Summons No 1391 of 2017 ("OS 1391/2017") is for the US bankruptcy proceedings to be recognised as a foreign main proceeding within the meaning of Art 2(*f*) of the Singapore Model Law. For the reasons above, Prayer 1 is accordingly granted.

127   Prayer 2 in OS 1391/2017 is for the Trustee to be recognised as a foreign representative within the meaning of Art 2(*i*) of the Singapore Model Law. No issue arises on that score, and Prayer 2 is also granted.

128   Automatic stay reliefs flow from the recognition of the US bankruptcy proceedings as a foreign main proceeding: Art 20(1) of the Singapore Model Law. Prayer 3 in OS 1391/2017, which covers this, is granted. Prayer 4, which deals with the situation in which the US bankruptcy proceedings are recognised as a foreign non-main proceeding, is not in play.

129   Of the other operative prayers in OS 1391/2017, I grant as follows:

(a)   I grant Prayer 5 to allow the Trustee to examine witnesses, take evidence, and obtain delivery of information concerning the Zetta Entities' property. I regard such powers as necessary for the proper conduct of the insolvency proceedings whether here or in the US. If any party takes specific objection to the powers granted to the Trustee in these orders, these objections will be considered separately.

(b)   I also grant Prayer 6 to allow the Trustee to be entrusted with the realisation of the Zetta Entities' assets located in Singapore, save that the Trustee should apply to court for leave to repatriate any assets to locations outside of Singapore. I would also limit realisation of the assets to the extent that powers granted under Prayer 6 shall not be exercised within Singapore to prejudice rights granted by Zetta Jet Singapore to any person in respect of any real property located in Singapore.

(c)   Prayer 7(a) seeks to allow the Trustee to apply to the court under Art 23(1) of the Singapore Model Law for orders under or in connection with avoidance provisions in the Companies Act and s 73B of the Conveyance and Law of Property Act (Cap 61, 1994 Rev Ed). The applicants highlight the need to be granted standing to protect the integrity of Zetta Jet Singapore's assets, and note that there are at present no other insolvency proceedings against Zetta Jet Singapore. I am satisfied that the Trustee should be able to pursue claims under Art 23(1) of the Singapore Model Law in the circumstances. Any potential prejudice faced by Singapore creditors is addressed by the requirement that the Trustee apply for leave before any assets are repatriated.

(d)    Prayer 7(b) seeks relief under Art 21(1)(*g*) of the Singapore Model Law to grant the Trustee powers available to a liquidator under Singapore insolvency law. I am satisfied that such powers should be granted to the Trustee to allow him to pursue an orderly liquidation.

130   Several of the other prayers in OS 1391/2017 are in the circumstances not necessary and accordingly no orders are made on these.

131   I will see parties to settle the scope of the orders and determine their precise wording, and will give directions on cost submissions. In the meantime, time for appeal is extended.

Reported by Wong Mei-Yu Esther.

H5 6 8

# United Securities Sdn Bhd (in receivership and liquidation) and another

## v

# United Overseas Bank Ltd

## [2021] SGCA 78

Court of Appeal — Civil Appeal No 10 of 2021
Judith Prakash JCA, Steven Chong JCA and Chao Hick Tin SJ
7 May 2021; 10 August 2021

*Insolvency Law — Cross-border insolvency — Recognition of foreign insolvency proceedings — Malaysian court making winding-up order against company — Company commencing action in Malaysian court — Whether writ action should be recognised as foreign proceeding — Articles 2(*h*) and 17 UNCITRAL Model Law on Cross-Border Insolvency (30 May 1997)*

*Insolvency Law — Cross-border insolvency — Stay of proceedings — Malaysian court making winding-up order against company — Secured creditor commencing action in Singapore against company — Singapore court recognising Malaysian winding-up proceeding as foreign main proceeding — Whether Singapore action should be stayed — Articles 20 and 21 UNCITRAL Model Law on Cross-Border Insolvency (30 May 1997)*

**Facts**

The first appellant was United Securities Sdn Bhd (in receivership and liquidation) ("USSB"), and the second appellant was its liquidator. The respondent was United Overseas Bank Ltd ("UOB"), a Singapore bank.

USSB entered into a loan agreement ("the Loan Agreement") with Overseas Union Bank Ltd ("OUB") for OUB to provide USSB with credit facilities. OUB and USSB also entered into a deed of debenture ("the Debenture"), which created a fixed charge in OUB's favour over all of USSB's shares in City Centre Sdn Bhd ("CCSB").

USSB defaulted on the loan granted by OUB. Subsequently, UOB took over all of OUB's interest in the Loan Agreement and the Debenture. On 30 January 2007, a winding-up order was made against USSB in Malaysia ("the Malaysian Winding-Up Proceeding"). Prior to that, CCSB had also been wound up. Parcels of land belonging to CCSB were sold as part of its winding up and the remainder of the proceeds of sale after its debts were paid formed its liquidation surplus ("the Surplus Funds").

Parallel proceedings were subsequently commenced in Malaysia and Singapore concerning the issue of UOB's and USSB's rights and obligations under the Loan Agreement and the Debenture, including their entitlement to the Surplus Funds. In Malaysia, this took the form of a writ action commenced in the High Court in Malaya by USSB ("the Malaysian Writ Action"). In Singapore, UOB commenced HC/OS 414/2020 ("OS 414").

Following the commencement of OS 414, UOB applied to the High Court in Malaya for a stay of the Malaysian Writ Action. Meanwhile, in Singapore, the appellants filed, among other applications, HC/OS 780/2020 ("OS 780") seeking the court's recognition of the Malaysian Winding-Up Proceeding and the Malaysian Writ Action under the United Nations Commission on International Trade Law (UNCITRAL) Model Law on Cross-Border Insolvency (30 May 1997) ("the Model Law"), given the force of law in Singapore via s 252 of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018) ("IRDA"). Consequent to such recognition, the appellants further sought a stay of OS 414 pursuant to Arts 20 and/or 21 of the Model Law as enacted in Singapore ("the SG Model Law"). Prior to the hearing of OS 780, UOB's application for a stay of the Malaysian Writ Action was dismissed by the High Court in Malaya which held that Malaysia was the appropriate forum. UOB appealed against this decision to the Malaysian Court of Appeal.

The High Court judge ("the Judge") dismissed OS 780. The Judge held that the Malaysian Winding-Up Proceeding had to be recognised as a "foreign main proceeding" under the SG Model Law, but that the Malaysian Writ Action was not entitled to recognition as such or as a "foreign non-main proceeding". Furthermore, the Judge held that no stay under Art 20 of the SG Model Law operated in respect of OS 414, and declined to grant any discretionary stay under Art 21 of the SG Model Law. Dissatisfied, the appellants appealed against the Judge's decision.

Shortly before the hearing of the appeal against the Judge's decision, the Malaysian Court of Appeal allowed UOB's appeal in respect of the appropriate forum, holding that Singapore was the more appropriate forum. As a result, the Malaysian Writ Action was stayed. The appellants applied for leave to appeal to the Federal Court of Malaysia, which was still pending at the time of the hearing of the appeal.

**Held, dismissing the appeal:**

(1)     It was not feasible to hold over the hearing of the appeal until the Malaysian Federal Court delivered its decision on the appropriate forum issue. The appellants were asking the court to delay the hearing of the appeal, and in turn the hearing of OS 414, for an indeterminate period of time to await an uncertain outcome that was unlikely to affect the appeal in any event. There was no reason to do so: at [27].

(2)     Article 20(1) of the SG Model Law provided that upon recognition of a foreign main proceeding, an automatic stay and suspension arose in respect of certain actions, proceedings and rights. However, Art 20(2) delineated the ambit of any such stay or suspension by making it the same as would have been available under Singapore law had the debtor been wound up in Singapore. Furthermore, Art 20(3) of the SG Model Law provided certain exceptions to the stay and suspension arising under Art 20(1): at [32] and [34] to [36].

(3)     Given the Judge's holding that the Malaysian Winding-Up Proceeding was a foreign main proceeding, the single critical issue on appeal was whether a stay of OS 414 ought to be granted under the SG Model Law: at [30] and [31].

(4)    As OS 414 concerned the determination of UOB's and USSB's respective rights, obligations and liabilities under the Loan Agreement and Debenture, it was an individual action or individual proceeding "concerning the debtor's property, rights, obligations or liabilities". Therefore, it fell within the scope of the automatic stay arising under Art 20(1)(*a*) of the SG Model Law: at [37].

(5)    The next question was what the position would have been if USSB had been wound up under the IRDA. In this regard, it was well established that leave would readily be granted to secured creditors to proceed with enforcing their security, notwithstanding any stay of proceedings. In this case, UOB was *prima facie* a secured creditor and OS 414 was directed at allowing UOB to establish its purported rights as a secured creditor against USSB. Therefore, notwithstanding the recognition of the Malaysian Winding-Up Proceeding and the automatic stay arising therefrom, leave was granted to UOB to proceed with OS 414: at [38], [39] and [44].

(6)    There was no reason to grant a discretionary stay of OS 414 under Art 21 of the Model Law. Given that a secured creditor's security was regarded as standing apart from the pool of assets available for *pari passu* distribution amongst unsecured creditors, the grant of a discretionary stay of proceedings was not necessary to protect the debtor's property or the creditors' interests: at [47].

[Observation: There were at least four cumulative attributes required for a proceeding to constitute a "foreign proceeding" under the SG Model Law: (a) the proceeding had to involve creditors collectively; (b) the proceeding had to have its basis in a law relating to insolvency; (c) the court had to exercise control or supervision of the property and affairs of the debtor in the proceeding; and (d) the purpose of the proceeding had to be the debtor's reorganisation or liquidation: at [53].

The Malaysian Writ Action bore none of the attributes required to constitute a "foreign proceeding". First, it was not a collective proceeding. It did not contemplate the consideration and eventual treatment of the rights, obligations and claims of USSB's creditors generally, and did not concern substantially all of USSB's assets and liabilities. Second, the law on which the Malaysian Writ Action was based did not relate to insolvency. Third, the Malaysian Writ Action did not involve the Malayan High Court's control or supervision of USSB's property and affairs. The court's role was simply to determine the issues disputed between the parties. Finally, the purpose of the Malaysian Writ Action was not USSB's reorganisation or liquidation, but to determine the parties' rights, obligations and liabilities under the Loan Agreement and the Debenture, and consequently, the parties' entitlement to the Surplus Funds: at [54], [62], [66], [70] and [75].]

**Case(s) referred to**

*ABC Learning Centres Ltd,* Re 445 BR 318 (refd)

*Betcorp,* Re 400 BR 266 (refd)

*British American Insurance Co Ltd,* Re 425 BR 884 (refd)

*Gold & Honey, Ltd,* Re 410 BR 357 (refd)

*Kim and Yu v STX Pan Ocean Co Ltd* [2014] NZHC 845 (refd)

*Korea Asset Management Corp v Daewoo Singapore Pte Ltd* [2004] 1 SLR(R) 671;
[2004] 1 SLR 671 (folld)
*Rubin v Eurofinance SA* [2011] Ch 133; [2011] 2 WLR 121, CA (Eng) (distd)
*Rubin v Eurofinance SA* [2013] 1 AC 236; [2012] 3 WLR 1019, SC (Eng) (refd)
*SCK Serijadi Sdn Bhd v Artison Interior Pte Ltd* [2019] 1 SLR 680 (folld)
*Williams v Simpsons (No 5)* [2010] NZHC 1786 (refd)
*Zetta Jet Pte Ltd,* Re [2019] 4 SLR 1343 (folld)

**Legislation referred to**

Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018) s 252
Bankruptcy Code 11 USC (US) Chapter 15
Corporations Act 2001 (Cth)
Cross-Border Insolvency Regulations 2006 (SI 2006 No 1030) (UK)
Insolvency (Cross-border) Act 2006 (NZ)

*Abraham Vergis SC (Providence Law Asia LLC) (instructed), Suresh s/o Damodara,
Ong Ziying Clement, Lim Qiu'en and Ning Jie (Damodara Ong LLC) for the
appellants;
Lee Eng Beng SC and Cheong Tian Ci Torsten (Rajah & Tann Singapore LLP) for the
respondent.*

10 August 2021

**Judith Prakash JCA (delivering the grounds of decision of the court):**

**Introduction**

1      This appeal arose from a set of parallel proceedings in Singapore and
Malaysia which concerned the issue of the respondent's and the first
appellant's respective rights and obligations under a loan agreement and
deed of debenture. Whereas the respondent is seeking to have the issue
determined in Singapore, the appellants seek to have it determined in
Malaysia.

2      As part of the appellants' efforts to halt the Singapore proceedings,
they applied to the Singapore High Court for recognition of certain
Malaysian proceedings under the United Nations Commission on
International Trade Law (UNCITRAL) Model Law on Cross-Border
Insolvency (30 May 1997) ("the Model Law"), given the force of law in
Singapore via s 252 of the Insolvency, Restructuring and Dissolution Act
2018 (Act 40 of 2018) ("IRDA"). For convenience, we shall refer to the
Model Law as enacted in Singapore as "the SG Model Law". The appellants
contended that upon recognition of the Malaysian proceedings as either
a "foreign main proceeding" or a "foreign non-main proceeding" pursuant
to the SG Model Law there should be a stay of the Singapore proceeding. In
his oral grounds of decision rendered on 12 January 2021, the High Court
judge ("the Judge") recognised one of the Malaysian proceedings as being a

"foreign main proceeding" covered by the SG Model Law, but nevertheless declined to grant a stay of the Singapore proceeding. Dissatisfied, the appellants appealed against the Judge's decision.

3 We heard and dismissed the appeal on 7 May 2021. As the principles applicable to recognition of foreign proceedings under the SG Model Law and the effects of such recognition have not been fully explored in local jurisprudence, this appeal afforded us an opportunity to consider such principles, having regard to the UNCITRAL authorities, textbooks, as well as foreign case law.

**The Model Law**

4 Before we go on to discuss the facts and issues in this appeal, it may be helpful to make some brief comments on the Model Law. The account that follows is a paraphrase of the account in *UNCITRAL Model Law on Cross-Border Insolvency: The Judicial Perspective*, UN Doc A/CN.9/732 and Add 1–3 (2014) as updated in 2013 (see *UNCITRAL Model Law on Cross-Border Insolvency: The Judicial Perspective: Note by the Secretariat*, UN Doc A/CN.9/778 (2013)) ("*The Judicial Perspective*").

5 The Model Law was developed by UNCITRAL and endorsed by the General Assembly of the United Nations in 1997. The Model Law does not lay down any substantive principles of insolvency law; those are governed by the domestic laws of the individual jurisdictions. Instead, it provides procedural mechanisms to facilitate more efficient disposition of cases in which the insolvent debtor has assets or debts in more than one jurisdiction. The SG Model Law therefore gives effect to four principles:

(a) the "access principle" which sets out the circumstances in which a "foreign representative" of an insolvent debtor has rights of access to the Singapore courts in order to seek recognition and relief;

(b) the "recognition" principle which deals with the Singapore courts' recognition of foreign insolvency proceedings as either a foreign "main" or "non-main" proceeding;

(c) the "relief" principle which deals with both interim and permanent relief that the Singapore court may provide after it recognises foreign proceedings as "main" or "non-main"; and

(d) the co-operation and coordination principle which obliges courts and insolvency representatives in different jurisdictions to communicate with each other and co-operate to ensure the fair administration of the debtor's estate.

6 Most relevant for present purposes are the recognition principle and the relief principle. These prescribe the circumstances in which insolvency proceedings in a foreign jurisdiction should be recognised by Singapore courts and be given effect to by the imposition of a stay of local proceedings

against the debtor in question. Such recognition is only given to those proceedings which qualify as a "foreign main proceeding" or a "foreign non-main proceeding". The definitions of these terms as set out in Art 2 of the SG Model Law are set out below:

> **Article 2. Definitions**
>
> For the purposes of this Law —
>
> > …
> >
> > (*f*)    'foreign main proceeding' means a foreign proceeding taking place in the State where the debtor has its centre of main interests;
> >
> > (*g*)    'foreign non-main proceeding' means a foreign proceeding, other than a foreign main proceeding, taking place in a State where the debtor has an establishment;
> >
> > (*h*)    'foreign proceeding' means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, under a law relating to insolvency or adjustment or debt in which proceeding the property and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation or liquidation;
> >
> > …

7    Once the court holds that the relevant foreign proceeding meets either of these definitions, then the provisions of Arts 20 and 21 of the SG Model Law come into play. Articles 20 and 21 read:

> **Article 20. Effects of recognition of a foreign main proceeding**
>
> 1.    Upon recognition of a foreign proceeding that is a foreign main proceeding, subject to paragraph 2 of this Article —
>
> > (*a*)    commencement or continuation of individual actions or individual proceedings concerning the debtor's property, rights, obligations or liabilities is stayed;
> >
> > (*b*)    execution against the debtor's property is stayed; and
> >
> > (*c*)    the right to transfer, encumber or otherwise dispose of any property of the debtor is suspended.
>
> 2.    The stay and suspension mentioned in paragraph 1 of this Article are —
>
> > (*a*)    the same in scope and effect as if the debtor had been made the subject of a winding up order under this Act; and
> >
> > (*b*)    subject to the same powers of the Court and the same prohibitions, limitations, exceptions and conditions as would apply under the law of Singapore in such a case,
>
> and the provisions of paragraph 1 of this Article are to be interpreted accordingly.

3.    Without prejudice to paragraph 2 of this Article, the stay and suspension mentioned in paragraph 1 of this Article do not affect any right —

(*a*)    to take any steps to enforce security over the debtor's property;

(*b*)    to take any steps to repossess goods in the debtor's possession under a hire-purchase agreement (as defined in section 88(1) of this Act);

(*c*)    exercisable under or by virtue of or in connection with any written law mentioned in Article 1(3)(*a*) to (*i*); or

(*d*)    of a creditor to set off its claim against a claim of the debtor,

being a right which would have been exercisable if the debtor had been made the subject of a winding up order under this Act.

4.    Paragraph 1(*a*) of this Article does not affect the right to —

(*a*)    commence individual actions or proceedings to the extent necessary to preserve a claim against the debtor; or

(*b*)    commence or continue any criminal proceedings or any action or proceedings by a person or body having regulatory, supervisory or investigative functions of a public nature, being an action or proceedings brought in the exercise of those functions.

5.    Paragraph 1 of this Article does not affect the right to request or otherwise initiate the commencement of a proceeding under Singapore insolvency law or the right to file claims in such a proceeding.

6.    In addition to and without prejudice to any powers of the Court under or by virtue of paragraph 2 of this Article, the Court may, on the application of the foreign representative or a person affected by the stay and suspension mentioned in paragraph 1 of this Article, or of its own motion, modify or terminate such stay and suspension or any part of it, either altogether or for a limited time, on such terms and conditions as the Court thinks fit.

**Article 21. Relief that may be granted upon recognition of a foreign proceeding**

1.    Upon recognition of a foreign proceeding, whether a foreign main proceeding or a foreign non-main proceeding, where necessary to protect the property of the debtor or the interests of the creditors, the Court may, at the request of the foreign representative, grant any appropriate relief, including —

(*a*)    staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's property, rights, obligations or liabilities, to the extent they have not been stayed under Article 20(1)(*a*);

(*b*)    staying execution against the debtor's property to the extent it has not been stayed under Article 20(1)(*b*);

(*c*)    suspending the right to transfer, encumber or otherwise dispose of any property of the debtor to the extent this right has not been suspended under Article 20(1)(*c*);

(*d*)   providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's property, affairs, rights, obligations or liabilities;

(*e*)   entrusting the administration or realisation of all or part of the debtor's property located in Singapore to the foreign representative or another person designated by the Court;

(*f*)   extending relief granted under Article 19(1); and

(*g*)   granting any additional relief that may be available to a Singapore insolvency officeholder, including any relief provided under section 96(4) of this Act.

2.   Upon recognition of a foreign proceeding, whether a foreign main proceeding or a foreign non-main proceeding, the Court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's property located in Singapore to the foreign representative or another person designated by the Court, provided that the Court is satisfied that the interests of creditors in Singapore are adequately protected.

3.   In granting relief under this Article to a representative of a foreign non-main proceeding, the Court must be satisfied that the relief relates to property that, under the law of Singapore, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

4.   No stay under paragraph 1(*a*) of this Article affects the right to commence or continue any criminal proceedings or any action or proceedings by a person or body having regulatory, supervisory or investigative functions of a public nature, being an action or proceedings brought in the exercise of those functions.

8   With that brief introduction to set the scene, we turn to the facts of this case.

## Facts

### *The parties*

9   The first appellant is United Securities Sdn Bhd (in receivership and liquidation) ("USSB"), a Malaysian company which was wound up on 30 January 2007 by the Malaysian court. The second appellant is Robert Teo Keng Tuan, USSB's liquidator. USSB is the beneficial owner of all the issued shares in City Centre Sdn Bhd (in liquidation) ("CCSB"), a wholly-owned subsidiary of USSB which had been wound up by the Malaysian court on 25 April 2000.

10   The respondent is United Overseas Bank Ltd ("UOB"), a Singapore bank. USSB is indebted to UOB and that debt is purportedly secured by a charge over USSB's shares in CCSB ("the CCSB Shares").

*The Loan Agreement and the Debenture*

11     On 17 December 1982, Overseas Union Bank Ltd ("OUB") and USSB entered into a loan agreement ("the Loan Agreement") for OUB to provide USSB with certain credit facilities. On the same date, USSB executed a deed of debenture ("the Debenture") which created a fixed charge ("the Charge") in OUB's favour over all of the CCSB Shares. The following clauses of the Loan Agreement are pertinent.

     (a)     Clause 25.1 provided that the Loan Agreement and the Debenture "shall be governed by and construed in all respects in accordance with the laws of Singapore".

     (b)     Clause 25.2 provided that USSB "irrevocably agrees that any legal action or proceedings against it with respect to [the Loan] Agreement and the Debenture may be brought in the courts of Singapore" and that USSB "irrevocably submits … to the non-exclusive jurisdiction of the [Singapore] courts".

     (c)     Clause 25.6 provided that USSB:

          … irrevocably waives any objection … to the venue of any suit, action or proceeding arising out of or relating to [the Loan] Agreement … selected by [UOB] and … further irrevocably waives any claim that the venue so selected is not a convenient forum for any such suit, action or proceeding.

12     On 27 December 1982, the CCSB Shares which were then registered in the name of USSB were transferred to and registered in the sole name of OUB Nominees (Malaysia) Sdn Bhd pursuant to the Debenture. OUB Nominees (Malaysia) Sdn Bhd subsequently changed its name to UOB Nominees 2006 (Tempatan) Sdn Bhd ("UOB Nominees"). At the time of the appeal before us, UOB Nominees remained the registered holder of the CCSB Shares.

13     On 19 December 1983, USSB defaulted on the loan granted by OUB. In May 1985, pursuant to the Loan Agreement and the Debenture, receivers were appointed over the properties and assets of USSB charged to OUB. In 2002, following OUB's merger with UOB, UOB took over all of OUB's interest in the Loan Agreement and the Debenture.

*The winding up of CCSB and USSB*

14     A winding-up order against CCSB was made in Malaysia on 25 April 2000. Several years later, on 30 January 2007, a similar order was made against USSB in Companies Winding Up No D5286182005 ("the Malaysian Winding-Up Proceeding").

15     On 12 May 2017, 16 parcels of land belonging to CCSB were sold as part of its winding up. After CCSB's debts were paid, a sum of money remained from the proceeds of sale – this formed CCSB's liquidation

surplus ("the Surplus Funds"). For the purposes of distributing the Surplus Funds, CCSB's liquidators filed an application on 18 September 2017 in the High Court in Malaya, seeking directions as to whether UOB Nominees was the sole and rightful contributory of CCSB.

16    On 12 February 2018, the Malayan High Court held that UOB Nominees was the sole and rightful contributory of CCSB and that the Surplus Funds should be distributed to it. However, this decision was set aside by the Malaysian Court of Appeal on 7 August 2019, on the basis that the form of the application had not been appropriate for the determination of the ownership of the CCSB Shares. UOB Nominees' application for leave to appeal against the Malaysian Court of Appeal's decision was subsequently dismissed by the Malaysian Federal Court. The Malaysian Federal Court then imposed an undertaking on CCSB's liquidators not to distribute the Surplus Funds pending the determination of the rights and obligations of the parties. Hence, at the time of the appeal before us, the Surplus Funds remained with CCSB.

### Parallel proceedings in Malaysia and Singapore

17    Subsequently, parallel proceedings were commenced in Malaysia and Singapore concerning the issue of UOB's and USSB's rights and obligations under the Loan Agreement and the Debenture. In Malaysia, this took the form of a writ action commenced in the High Court in Malaya on 9 December 2019 by USSB against UOB, UOB Nominees, CCSB and CCSB's liquidators ("the Malaysian Writ Action"). In the Malaysian Writ Action, USSB sought, among other things, the following relief:

(a)    A declaration that the Surplus Funds and any interest or benefit earned thereon did not form part of the assets or property or undertaking of CCSB subject to the Charge.

(b)    A declaration that UOB and/or UOB Nominees had not established a legal entitlement to the Surplus Funds.

(c)    A declaration that all such interest in the property and assets subject to the Charge as had been vested in UOB by virtue of the Charge had been extinguished, and that UOB and/or UOB Nominees had no interest in the property and assets subject to the Charge.

18    In Singapore, UOB commenced HC/OS 414/2020 ("OS 414") on 21 April 2020. In OS 414, UOB sought, among other things, the following relief:

(a)    A declaration that UOB's rights under the Debenture were valid and exercisable, including UOB's security over all the rights attached to the CCSB Shares and UOB's entitlement to all the benefits derived from those rights to the extent of the outstanding debt owed by USSB to UOB.

(b)    A declaration that UOB's security over all the rights attached to the CCSB Shares pursuant to the Debenture included the right to the Surplus Funds.

(c)    A declaration that UOB was not prevented by time-bar from exercising its rights under the Debenture and taking all necessary steps to realise its security in the CCSB Shares and all the rights attached to the CCSB Shares.

(d)    A declaration as to the quantum of the outstanding debt owed by USSB to UOB under the Loan Agreement.

19    Following the commencement of OS 414, UOB applied to the High Court in Malaya on 27 May 2020 for a stay of the Malaysian Writ Action. UOB argued that having regard to the jurisdiction clause in the Loan Agreement, Malaysia was not the appropriate forum in which to determine the dispute.

20    Meanwhile, back in Singapore, USSB filed HC/SUM 2635/2020 ("SUM 2635") in OS 414 on 3 July 2020. In SUM 2635, USSB sought to challenge the validity of the service of OS 414 on USSB as well as the Singapore court's jurisdiction over USSB. Alternatively, USSB sought a stay of OS 414 on the basis that Singapore was not the appropriate forum.

21    SUM 2635 was dismissed on 12 August 2020 and USSB appealed against this decision in HC/RA 211/2020 ("RA 211"). Immediately thereafter, the appellants commenced HC/OS 780/2020 ("OS 780") seeking the court's recognition of the Malaysian Winding-Up Proceeding and the Malaysian Writ Action as "foreign main proceedings" or "foreign non-main proceedings" under the SG Model Law. Consequent to such recognition, the appellants further sought a stay of OS 414 pursuant to Arts 20 and/or 21 of the SG Model Law.

22    Before the hearing of OS 780 and RA 211 in Singapore, further developments took place in Malaysia. UOB's application for a stay of the Malaysian Writ Action was dismissed on 1 October 2020 by the High Court in Malaya which held that Malaysia was the appropriate forum. UOB appealed against this decision to the Malaysian Court of Appeal on 13 October 2020.

23    In Singapore, on 12 January 2021, the Judge dismissed OS 780 and RA 211. USSB was refused leave to appeal against the decision in RA 211 (the stay application). As such, a notice of appeal was filed only in respect of OS 780.

24    On 26 April 2021, shortly before this appeal was heard by this court, the Malaysian Court of Appeal delivered its decision allowing UOB's appeal in respect of the appropriate forum. The Malaysian Court of Appeal held that Singapore was the more appropriate forum for the dispute. As a result, the Malaysian Writ Action was stayed. On 4 May 2021, the appellants

applied for leave to appeal to the Federal Court of Malaysia against the Malaysian Court of Appeal's decision. This application for leave to appeal was still pending at the time of the hearing before us.

**The decision below**

25    We turn now to the reasons for the Judge's dismissal of OS 780. In the proceedings below, the Judge held that the Malaysian Winding-Up Proceeding had to be recognised as a "foreign main proceeding" under the SG Model Law but that the Malaysian Writ Action was not entitled to recognition as such or even as a "foreign non-main proceeding". The Judge found that the Malaysian Writ Action was not a foreign proceeding within the meaning of the SG Model Law as it "lack[ed] the collective nature required and [was] not sufficiently connected to an insolvency or reorganization". In this regard, the Judge observed that the Malaysian Writ Action was concerned with UOB's rights to the Surplus Funds under the Loan Agreement and the Debenture. It would be determined, if at all, on the contract or agreement between the parties. The Malaysian Writ Action was not a collective proceeding under a law relating to insolvency or adjustment of debt, in which the debtor company was under the control of a foreign court for the purposes of reorganisation or liquidation.

26    Furthermore, in relation to the stay of OS 414 sought by the appellants, the Judge observed that "[w]hether or not UOB has any right in respect of [CCSB] and the related matters should be determined in the ordinary course of civil litigation, and does not impinge on the winding up in Malaysia". The Judge thus held that no stay under Art 20 of the SG Model Law operated in respect of OS 414, and declined to grant any discretionary stay under Art 21 of the SG Model Law.

**Our decision**

*Preliminary issues*

27    Before setting out our decision proper, we make two preliminary points. First, at the hearing before us, the appellants' counsel, Mr Abraham Vergis SC ("Mr Vergis"), requested that the court hold over the hearing of the appeal until the Malaysian Federal Court delivered its decision on the appropriate forum issue. In our view, this was not feasible. Although it appeared that the appellants intended to apply to expedite the proceedings in Malaysia, there was no indication as to when those proceedings would eventually be concluded. Indeed, the appellants had yet to obtain *leave* to pursue the appeal to the Federal Court, much less have the actual appeal heard and then determined. Furthermore, it had already been finally determined in RA 211 that Singapore was the appropriate forum. As such, a stay of OS 414 could only be granted on the basis that the issues therein were properly to be decided by USSB's liquidators rather than by the Singapore court. This inquiry was independent of whether the Malaysian

Writ Action would be stayed or would be allowed to proceed by the Malaysian Federal Court. In other words, the appellants were asking this court to delay the hearing of the appeal, and in turn the hearing of OS 414, for an indeterminate period of time to await an uncertain outcome that was unlikely to affect the appeal in any event. We saw no reason to do so and thus declined to hold over the hearing of the appeal as requested by Mr Vergis.

28      Second, it ought to be observed that in interpreting the various provisions of the SG Model Law, we took into consideration the texts and guides developed by UNCITRAL as well as the case law from other jurisdictions. We were cognisant of Art 8 of the SG Model Law, which provides that "regard is to be had to its international origin and to the need to promote uniformity in its application and the observance of good faith". As the High Court observed in *Re Zetta Jet Pte Ltd and others (Asia Aviation Holdings Pte Ltd, intervener)* [2019] 4 SLR 1343 at [38]:

> … I bear in mind the preamble to the Singapore Model Law, emphasising co-operation and efficiency between the courts of States involved in cross-border insolvency, and Art 8 of the Singapore Model Law, which requires regard to be paid to the Singapore Model Law's international origin and the promotion of uniformity in its application. I am of the view that the Singapore courts should attempt to tack as closely as possible to the general interpretive trends taken in other jurisdictions that apply the Model Law in its various enactments.

29      Having addressed the preliminary issues, we now turn to our decision in the appeal proper.

### Stay of OS 414

30      In our view, the single critical issue on appeal was whether a stay of OS 414 ought to be granted under the SG Model Law in the light of the Judge's holding that the Malaysian Winding-Up Proceeding was a foreign main proceeding. By reason of the decision of the Malaysian Court of Appeal, the Malaysian Writ Action no longer needed to be considered.

31      As UOB had conceded from the beginning that the Malaysian Winding-Up Proceeding was a foreign main proceeding and did not appeal against its recognition as such, the appellants could rely on that recognition to seek a stay of OS 414 under the SG Model Law, regardless of whether the Malaysian Writ Action was also recognised as a foreign proceeding. Accordingly, whether a stay of OS 414 ought to be granted due to the recognition of the Malaysian Winding-Up Proceeding was the dispositive issue and the appeal was decided on this basis.

*Article 20 of the SG Model Law*

32      We turn first to the relevant provisions under Art 20 of the SG Model Law. These have been set out in full at [7] above. The starting point is

Art 20(1), which provides that upon recognition of a foreign main proceeding, the following consequences arise:

> (a)   commencement or continuation of individual actions or individual proceedings concerning the debtor's property, rights, obligations or liabilities is stayed;
>
> (b)   execution against the debtor's property is stayed; and
>
> (c)   the right to transfer, encumber or otherwise dispose of any property of the debtor is suspended.

33     The above effects arise only upon the recognition of foreign *main* proceedings, which may explain their automatic nature and wider scope relative to the relief afforded under other provisions of the SG Model Law. The purpose of the automatic stay and suspension arising under Art 20(1) is explained in *UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation*, UN Doc A/CN.9/442 (1997) as updated in 2013 (see *Revision of the Guide to Enactment of the Model Law on Cross-Border Insolvency and Part Four of the Legislative Guide on Insolvency Law of the United Nations Commission on International Trade Law*, GA Res 68/107, 68th Sess (2013)) (the "*Guide*") at para 37, as follows:

> … Such stay and suspension are 'mandatory' (or 'automatic') in the sense that either they flow automatically from the recognition of a foreign main proceeding or, in the States where a court order is needed for the stay or suspension, the court is bound to issue the appropriate order. The stay of actions or of enforcement proceedings is necessary to provide 'breathing space' until appropriate measures are taken for reorganization or liquidation of the assets of the debtor. The suspension of transfers is necessary because in a modern, globalized economic system it is possible for a multinational debtor to move money and property across boundaries quickly. The mandatory moratorium triggered by the recognition of the foreign main proceeding provides a rapid 'freeze' essential to prevent fraud and to protect the legitimate interests of the parties involved until the court has an opportunity to notify all concerned and to assess the situation.

34     However, the stay and suspension arising under Art 20(1) are subject to Art 20(2) of the SG Model Law, which provides that they are "the same in scope and effect as if the debtor had been made the subject of a winding up order" under the IRDA and "subject to the same powers of the Court and the same prohibitions, limitations, exceptions and conditions as would apply under the law of Singapore in such a case". This qualification is explained in the *Guide* at para 183 as follows:

> Notwithstanding the 'automatic' or 'mandatory' nature of the effects under article 20, it is expressly provided that the scope of those effects depends on exceptions or limitations that may exist in the law of the enacting State. Those exceptions may be, for example, the enforcement of claims by secured creditors, payments by the debtor in the ordinary course of business, initiation of court action for claims that have arisen after the commencement

of the insolvency proceeding (or after recognition of a foreign main proceeding) or completion of open financial-market transactions.

35    Thus, Art 20(2) delineates the ambit of any stay or suspension arising under Art 20(1) by making such stay or suspension the same as what would have been available under Singapore law had the debtor been wound up in Singapore. As observed in *Digest of Case Law on the UNCITRAL Model Law on Cross-Border Insolvency* (2021) at p 16, Art 20(2) "grant[s] protection to those classes of people who would normally receive protection in insolvency proceedings commenced in the enacting State". In this way, recognition of a foreign proceeding "has its own effects rather than importing the consequences of the foreign law into the insolvency system of the enacting State" (see the *Guide* at para 178). This is in line with the basic approach of the Model Law, which is not to "attempt a substantive unification of insolvency law" but to provide a procedural "framework for cooperation between jurisdictions" in order to "facilitate and promote a uniform approach to cross-border insolvency" (see the *Guide* at para 3; *The Judicial Perspective* at paras 9 and 27).

36    In addition to the qualification contained in Art 20(2), Art 20(3) of the SG Model Law provides certain exceptions to the stay and suspension arising under Art 20(1). Specifically, Art 20(3) stipulates that the stay and suspension do not affect the following rights, provided that such rights would have been exercisable if the debtor had been made the subject of a winding-up order under the IRDA:

    (a)    any right to take any steps to enforce security over the debtor's property;

    (b)    any right to take any steps to repossess goods in the debtor's possession under a hire-purchase agreement;

    (c)    any right exercisable under or by virtue of or in connection with the statutes set out in Arts 1(3)(*a*)–1(3)(*i*); and

    (d)    any right of a creditor to set off its claim against a claim of the debtor.

(1)    Article 20(1)

37    Applying the above provisions to the present case, the first question was whether OS 414 fell within the ambit of proceedings stayed or suspended pursuant to Art 20(1). As Arts 20(1)(*b*) and 20(1)(*c*) were clearly inapplicable, the only issue was whether OS 414 was an individual action or individual proceeding "concerning the debtor's property, rights, obligations or liabilities" within the meaning of Art 20(1)(*a*). It was not seriously disputed that it was – OS 414 concerned the determination of UOB's and USSB's respective rights, obligations and liabilities under the Loan

Agreement and Debenture. Therefore, OS 414 fell within the scope of the automatic stay arising under Art 20(1)(*a*) of the SG Model Law.

(2)    Article 20(2)

38    That was not the end of the matter, however. As we observed above, the automatic stay is the same in scope and effect as if the debtor had been wound up in Singapore. It is also subject to the same powers of the court and the same prohibitions, limitations, exceptions and conditions as would apply under Singapore law in such a situation. The next question therefore was what the position would have been if USSB had been wound up under the IRDA.

39    In this regard, it is well established that leave will readily be granted to secured creditors to proceed with enforcing their security, notwithstanding any stay of proceedings that arises upon the winding up of the debtor. This was explained by this court in *SCK Serijadi Sdn Bhd v Artison Interior Pte Ltd* [2019] 1 SLR 680 ("*Artison*") at [11] as follows:

> … [*T*]*here is in some sense an 'exception' carved out for secured creditors … In general, the court will more readily grant leave to secured creditors to proceed with enforcing their security, notwithstanding the stay* … because their security is regarded as standing apart from the pool of assets available for *pari passu* distribution amongst unsecured creditors. Thus, in *Korea Asset Management Corp v Daewoo Singapore Pte Ltd* [2004] 1 SLR(R) 671 ('*Korea Asset Management*') at [49], V K Rajah JC observed that leave to proceed would readily be given to an applicant who was 'merely attempting to claim from the company, property which *prima facie* belongs to the applicant', and this expressed the law's recognition 'that the rights of a secured creditor or *in rem* rights should not be fettered as a matter of course by the initiation of insolvency proceedings' (see also *Power Knight Pte Ltd v Natural Fuel Pte Ltd* [2010] 3 SLR 82 ('*Power Knight*') at [27]). … [emphasis added]

40    Furthermore, as V K Rajah JC (as he then was) observed in *Korea Asset Management Corp v Daewoo Singapore Pte Ltd* [2004] 1 SLR(R) 671 at [41], an applicant purporting to be a creditor and seeking the court's leave to proceed with its action need only show a *prima facie* case. This refers to a case that "is brought *bona fide*, underpinned by credible facts and is, even without a serious investigation of the factual matrix, capable of succeeding if and when heard".

41    The above sets out the principles that would have applied had USSB been wound up in Singapore. In transposing these principles to the SG Model Law context via Art 20(2), we had regard to the decision of the High Court of New Zealand in *Kim and Yu v STX Pan Ocean Co Ltd* [2014] NZHC 845 ("*STX Pan Ocean*"). In that case, the respondent was the subject of an administration proceeding in Korea. The Korean administration proceeding was recognised in New Zealand as a foreign main proceeding pursuant to the Insolvency (Cross-border) Act 2006 (NZ), which enacted

the Model Law. Nevertheless, the claimants sought the leave of the High Court of New Zealand to continue their statutory claims *in rem* against a ship that had been demise chartered by the respondent. Gilbert J held that notwithstanding the automatic stay that arose upon recognition, the court had a discretion under Art 20(2) to allow a person to commence or continue proceedings. Article 20(2) of the Model Law as enacted in New Zealand provided as follows (see *STX Pan Ocean* at [20]):

> Paragraph (1) of this article does not prevent the Court, on the application of any creditor or person, from making an order, subject to such conditions as the Court thinks fit, that the stay or suspension does not apply in respect of any particular action or proceeding, execution, or disposal of assets.

42    In construing this provision, Gilbert J observed at [23] that:

> … The Law Commission considered that each of the consequences that flow from art 20 would occur as a result of most formal insolvency regimes in New Zealand and that the discretion reserved under art 20(2) should enable the High Court to exercise the same type of discretion to override the consequences of stay or suspension as it has under other insolvency provisions. …

43    Gilbert J found on the facts that the claimants had obtained security against the ship immediately upon issue of the admiralty proceedings, which took place prior to the commencement of the Korean administration proceeding. The respondent's rights to the ship were therefore subject to the claimants' "secured claims". Thus, "[c]onsistent with usual practice … where leave would normally be given for secured creditors to commence or continue proceedings to establish their security", the claimants were granted leave to continue their claims against the ship (see *STX Pan Ocean* at [29]–[30], [43]). In other words, the ordinary principles and practice that applied under New Zealand insolvency law applied virtually identically to the stay or suspension arising under Art 20(1) of the Model Law.

44    In this case, it was clear that UOB was *prima facie* a secured creditor. On the face of the evidence, the Debenture created the Charge over the CCSB Shares as security for any sums disbursed under the Loan Agreement. The Malaysian companies' register also reflected UOB as being a registered chargee of USSB, with the charge status stated as "unsatisfied". Furthermore, OS 414 was directed at allowing UOB to establish its purported rights as a secured creditor against USSB. The fact that the appellants were disputing UOB's security interest was insufficient to displace this *prima facie* conclusion. Therefore, notwithstanding the recognition of the Malaysian Winding-Up Proceeding and the automatic stay arising therefrom, we granted leave to UOB to proceed with OS 414.

*Article 21 of the SG Model Law*

45    For completeness, we consider whether, alternatively, a stay of OS 414 ought to have been granted under Art 21 of the SG Model Law. Although

this point was not pursued by the appellants on appeal, it had been argued in the proceedings below and was addressed by the Judge in his oral grounds of decision.

46      The relevant provision was Art 21(1)(*a*) of the SG Model Law:

> 1.      Upon recognition of a foreign proceeding, whether a foreign main proceeding or a foreign non-main proceeding, where necessary to protect the property of the debtor or the interests of the creditors, the Court may, at the request of the foreign representative, grant any appropriate relief, including —
>
> > (*a*)      staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's property, rights, obligations or liabilities, to the extent that they have not been stayed under Article 20(1)(*a*);

47      In our judgment, there was no reason to grant a discretionary stay of OS 414 under Art 21 of the SG Model Law. As we concluded at [44] above, UOB was *prima facie* a secured creditor and OS 414 was directed towards enabling UOB to establish its purported security rights against USSB. Given that a secured creditor's "security is regarded as standing apart from the pool of assets available for *pari passu* distribution amongst unsecured creditors" (see *Artison* ([39] *supra*) at [11], cited at [39] above), the grant of a discretionary stay of proceedings was not necessary to protect the property of the debtor or the interests of the creditors.

48      For these reasons, notwithstanding the recognition of the Malaysian Winding-Up Proceeding as a foreign main proceeding, we did not order a stay of OS 414 either under Art 20 or 21 of the SG Model Law.

### Recognition of the Malaysian Writ Action

49      As we observed at [30] above, the appeal was decided on the basis of whether OS 414 ought to be stayed following the recognition of the Malaysian Winding-Up Proceeding. There was therefore no need for us to determine the issue of recognition of the Malaysian Writ Action. However, given that this was one of the first few cases concerning the requirements for recognition of a "foreign proceeding" under the SG Model Law, we consider it useful to nevertheless provide our views on the issue.

50      The relevant provisions of Art 17 of the SG Model Law read as follows:

> **Article 17. Decision to recognise a foreign proceeding**
>
> 1.      Subject to Article 6, a proceeding must be recognised if —
>
> > (*a*)      it is a foreign proceeding within the meaning of Article 2(*h*);
>
> > (*b*)      the person or body applying for recognition is a foreign representative within the meaning of Article 2(*i*);

(*c*)    the application meets the requirements of Article 15(2) and 15(3); and

(*d*)    the application has been submitted to the Court mentioned in Article 4.

2.    The foreign proceeding must be recognised —

(*a*)    as a foreign main proceeding if it is taking place in the State where the debtor has its centre of main interests; or

(*b*)    as a foreign non-main proceeding, if the debtor has an establishment within the meaning of Article 2(*d*) in the foreign State.

51    The main point of contention between the parties was Art 17(1)(*a*) – whether the Malaysian Writ Action was a *foreign proceeding* within the meaning of Art 2(*h*). Article 2(*h*) defines a "foreign proceeding" as:

(*h*)    … a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, under a law relating to insolvency or adjustment or debt in which proceeding the property and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation or liquidation;

52    This definition is explained in the *Guide* at para 66 as follows:

The attributes required for a foreign proceeding to fall within the scope of the Model Law include the following: basis in insolvency-related law of the originating State; involvement of creditors collectively; control or supervision of the assets and affairs of the debtor by a court or another official body; and reorganization or liquidation of the debtor as the purpose of the proceeding …

53    There are, therefore, at least four attributes required for a proceeding to constitute a "foreign proceeding" under the SG Model Law, which "are cumulative" and "should be considered as a whole" (see the *Guide* at para 68). These attributes are as follows.

(a)    The proceeding must involve creditors collectively.

(b)    The proceeding must have its basis in a law relating to insolvency.

(c)    The court must exercise control or supervision of the property and affairs of the debtor in the proceeding.

(d)    The purpose of the proceeding must be the debtor's reorganisation or liquidation.

54    In our view, the Malaysian Writ Action bore none of these attributes. Accordingly, it was *not* a foreign proceeding within the meaning of Art 2(*h*) of the SG Model Law. We examine each of the attributes in turn.

*Collective proceeding*

55    The first attribute concerns whether the proceeding involves the creditors collectively. The term "collective proceeding" was explained in the *Guide* at paras 69–70 as follows:

> 69.    For a proceeding to qualify for relief under the Model Law, it must be a collective proceeding because *the Model Law is intended to provide a tool for achieving a coordinated, global solution for all stakeholders of an insolvency proceeding*. It is not intended that the Model Law be used merely as a collection device for a particular creditor or group of creditors who might have initiated a collection proceeding in another State. Nor is it intended that the Model Law serve as a tool for gathering up assets in a winding up or conservation proceedings that does not also include provisions for addressing the claims of creditors. …

> 70.    *In evaluating whether a given proceeding is collective for the purpose of the Model Law, a key consideration is whether substantially all of the assets and liabilities of the debtor are dealt with in the proceeding*, subject to local priorities and statutory exceptions, and to local exclusions relating to the rights of secured creditors. … Examples of the manner in which a collective proceeding … might deal with creditors include providing creditors that are adversely affected by the proceeding with a right (though not necessarily the obligation): to submit claims for determination and to receive an equitable distribution or satisfaction of those claims, to participate in the proceedings, and to receive notice of the proceedings in order to facilitate their participation. …

> [emphasis added]

56    *Cross-Border Insolvency: A Commentary on the UNCITRAL Model Law* (Look Chan Ho gen ed) (Globe Law & Business, 3rd Ed, 2012) ("*Look Chan Ho*") observes at p 158 that for a proceeding to be collective, it must concern all creditors of the debtor generally. Richard Fisher and Adam Al-Attar in Richard Fisher & Adam Al-Attar, "The UNCITRAL Model Law" in *Cross-Border Insolvency* (Richard Sheldon gen ed) (Bloomsbury Professional, 4th Ed, 2015) provide examples of proceedings that are collective in nature – winding-up or bankruptcy proceedings, and even certain forms of reorganisation proceedings (see paras 3.39, 3.42 and 3.43). At para 3.36, they explain that:

> The basic notion of a collective proceeding is aimed at identifying those cases where there is a single insolvency representative able to control the realisation or assets for the purpose of *pro rata* distribution among all creditors, as opposed to a proceeding designed to assist a particular creditor to obtain payment or a process designed for some purpose other than to address the insolvency of the debtor.

57    Other jurisdictions have adopted similar positions. In *Williams v Simpsons (No 5)* [2010] NZHC 1786, the High Court of New Zealand held at [5] that:

> … The term 'collective' distinguishes a formal insolvency regime (under which the debtor's assets are realised for the benefit of all creditors) from private proceedings against a debtor, in which a single creditor seeks judgment for its own benefit.

58      Similarly, in *Re Betcorp* 400 BR 266 ("*Betcorp*"), the US Bankruptcy Court observed at 281 that "[a] collective proceeding is one that considers the rights and obligations of all creditors". Applying that principle, the US Bankruptcy Court held that a voluntary liquidation commenced under Australian law was a foreign proceeding falling within the scope of chapter 15 of the US Bankruptcy Code 11 USC (US), which implemented the Model Law (see *Betcorp* at 285).

59      *Betcorp* was cited and applied in *In Re Gold & Honey, Ltd* 410 BR 357 ("*Gold & Honey*"), where the US Bankruptcy Court declined to recognise an Israeli receivership proceeding as a foreign proceeding under chapter 15 of the US Bankruptcy Code. The US Bankruptcy Court held that the Israeli receivership proceeding was not a collective proceeding, observing that the receivership proceeding did not require the receivers to consider the rights and obligations of all creditors. Instead, it was more akin to an individual creditor's replevin or repossession action. It was primarily designed to allow the creditor to collect its debts, rather than a proceeding instituted by a debtor for the purposes of paying off all creditors with court supervision (see *Gold & Honey* at 370). It is notable that although the Israeli receivership proceeding concerned all of the debtor's assets present in Israel (see *Gold & Honey* at 371), this was not sufficient to ground a finding that it was collective in nature. As *Look Chan Ho* observes at p 159, citing *Gold & Honey*, "[r]eceivership in consequence of enforcement of security is naturally not collective, even where the receivership covers most of the debtor's assets".

60      A similar distinction was drawn in *In re ABC Learning Centres Ltd* 445 BR 318 ("*ABC Learning Centres*") between receivership proceedings concerned only with the secured creditors' interests and insolvency proceedings falling within the scope of the Model Law. In *ABC Learning Centres*, the US Bankruptcy Court was faced with an application for recognition of certain Australian liquidation proceedings. At the time, the debtor was also under a set of receivership proceedings commenced by several of the debtor's secured creditors. It was agreed that the receivership proceedings were not collective in nature as they were, by design, for the benefit of the secured creditors. The US Bankruptcy Court commented on the distinction between the liquidation proceedings and the receivership proceedings in *ABC Learning Centres* at 330, as follows:

> … Liquidators and Receivers have clearly delineated roles under the Corporations Act. Liquidators are appointed by the creditors as a whole and are responsible for winding up the affairs of a company and ultimately dissolving it; specific duties include: collecting assets; establishing deadlines

for proving claims; distributing assets per the priorities set forth in the Corporations Act; convening required meetings; maintaining records; creating and distributing required reports to various parties … and conducting investigations into possibly voidable transactions. … Receivers, on the other hand, are appointed by a secured creditor and their primary role is to recover secured assets for the benefit of the secured creditor and return any surplus to the company. …

61     *Betcorp* and *Gold & Honey* were cited with approval in *In Re British American Insurance Company Limited* 425 BR 884, where the US Bankruptcy Court held at 902 that:

> For a proceeding to be collective … *it must be instituted for the benefit of creditors generally rather than for a single creditor or class of creditors.* … The Guide to Enactment suggests that a foreign proceeding must *contemplate the 'involvement of creditors collectively.'* …
>
> From the foregoing, the Court concludes that the word 'collective' … *contemplates both the consideration and eventual treatment of claims of various types of creditors, as well as the possibility that creditors may take part in the foreign action.* Notice to creditors, including general unsecured creditors, may play a role in this analysis.
>
> [emphasis added]

62     Having regard to the above principles, we were of the view that the Malaysian Writ Action was not a collective proceeding. It did not contemplate the consideration and eventual treatment of the rights, obligations and claims of USSB's creditors generally. Nor did it concern substantially all of USSB's assets and liabilities. Instead, it focused on *one particular aspect* of USSB's assets, specifically, USSB's purported entitlement to the Surplus Funds. If determined, it would address USSB's legal rights and obligations *vis-à-vis* only *one* of its creditors, namely, UOB. Furthermore, the Malaysian Writ Action was a civil action between USSB as the plaintiff, and UOB, UOB Nominees, CCSB, and CCSB's liquidators as the defendants. Out of all these parties, only UOB was USSB's creditor. Although UOB's receiver and one of USSB's creditors had been granted leave by the Malayan High Court to intervene in the Malaysian Writ Action, it bears emphasis that these parties had to seek the court's leave to intervene in the first place and had no automatic right to participate in the proceedings. Furthermore, on appeal by UOB, the Malaysian Court of Appeal eventually set aside the Malayan High Court's order allowing USSB's creditor to intervene in the Malaysian Writ Action. All of these points indicated that the Malaysian Writ Action was not collective in nature.

*Basis in a law relating to insolvency*

63     The second attribute concerns whether the proceeding has its basis in a law relating to insolvency. The *Guide* explains this attribute at para 73 as follows:

This formulation is used in the Model Law to acknowledge the fact that liquidation and reorganization might be conducted under law that is not labelled as insolvency law (e.g. company law), but which nevertheless deals with or addresses insolvency or severe financial distress. The purpose was to find a description that was sufficiently broad to encompass a range of insolvency rules irrespective of the type of statute or law in which they might be contained and irrespective of whether the law that contained the rules related exclusively to insolvency. …

64    *Look Chan Ho* opines at pp 162–163 that:

As 'law relating to insolvency' is not a defined term, the … court ought to rely on the plain meaning of the term and its general connotation consistent with ordinary English usage:

> *Insolvency law can be described as the prevention, regulation, or supervision of discontinuity in the legal relations of a person (legal entity) that is in financial difficulties, including the discontinuity of that person itself.*

[emphasis in original]

65    It was apparent that the phrase "under a law relating to insolvency" had been deliberately framed in a broad manner so as to cater to the wide range of laws that were intended to fall within the scope of the Model Law. The *Guide* explains this approach at para 65 as follows:

The definitions of proceedings or persons emanating from foreign jurisdictions avoid the use of expressions that may have different technical meanings in different legal systems and instead describe their purpose or function. This technique is used to avoid inadvertently narrowing the range of possible foreign proceedings that might obtain recognition and to avoid unnecessary conflict with terminology used in the laws of the enacting State. … [T]he expression 'insolvency proceedings' may have a technical meaning in some legal systems, but is intended in subparagraph *(a)* to refer broadly to proceedings involving debtors that are in severe financial distress or insolvent.

66    In light of the above, the court in determining whether a proceeding is conducted "under a law relating to insolvency" should adopt a commonsense approach which focuses on the *substance* of the relevant law. Specifically, whether the relevant law "deals with or addresses insolvency or severe financial distress". Here, although the Malaysian Writ Action, *factually speaking*, concerned insolvent companies and surplus funds arising out of a liquidation, the *law* on which the Malaysian Writ Action was based did not relate to insolvency. Rather, it was an ordinary civil action commenced under the Malayan High Court's civil jurisdiction, to be determined based on a number of different types of law, none of which dealt with insolvency or severe financial distress. We were therefore of the view that the Malaysian Writ Action did not have its basis in a law relating to insolvency.

*Control or supervision by the court of the debtor's property and affairs*

67    The third attribute concerns whether the proceeding involves the court's exercise of control or supervision of the debtor's property and affairs. Such control or supervision must be "formal in nature", although they "may be potential rather than actual" and may be exercised directly by the court or indirectly through an insolvency representative (see the *Guide* at para 74). It is notable that "both assets *and* affairs of the debtor should be subject to control or supervision; it is not sufficient if only one or the other are covered by the foreign proceeding" [emphasis added] (see the *Guide* at para 76).

68    A straightforward example of a proceeding that involves the court's control or supervision of the debtor's property and affairs is a liquidation proceeding. In *Betcorp* ([58] *supra*), the US Bankruptcy Court found that an Australian voluntary liquidation proceeding was subject to the supervision of the Australian court. In reaching this decision, the US Bankruptcy Court considered that the liquidators and creditors could request the Australian court to determine any question arising in the winding up of a company, and that the Australian court had a broad mandate to review the actions of liquidators (see *Betcorp* at 22). Similarly, the US Bankruptcy Court found in *ABC Learning Centres* ([60] *supra*) at 331–332 that the Australian court had control of and played a supervisory role in the Australian liquidation proceedings, as provided for by numerous sections of the Corporations Act 2001 (Cth).

69    Further examples of proceedings that involve the requisite control and supervision by the court are provided in the *Guide* at paras 74–75: a debtor-in-possession; expedited proceedings in which the court exercises control or supervision at a late stage of the insolvency process; and proceedings in which the court has exercised control or supervision, but at the time of the application for recognition is no longer required to do so.

70    In this case, it was clear that the Malaysian Writ Action did not involve the Malayan High Court's control or supervision of USSB's property and affairs. The court's role in the Malaysian Writ Action was simply to determine the issues disputed between the parties, as it would do in any ordinary civil action. Although USSB's property and affairs *were* subject to the control and supervision of the Malaysian courts, this was by virtue of the Malaysian Winding-Up Proceeding, rather than the Malaysian Writ Action.

*Purpose of reorganisation or liquidation*

71    The fourth and final attribute concerns whether the purpose of the proceeding is the reorganisation or liquidation of the debtor. The *Guide* provides several examples of proceedings that *do not* satisfy this requirement at paras 77–78:

(a)    proceedings that are designed to prevent dissipation and waste, rather than to liquidate or reorganise the insolvent estate;

(b)    proceedings designed to prevent detriment to investors rather than to all creditors;

(c)    proceedings in which the powers conferred and the duties imposed upon the foreign representative are more limited than the powers or duties typically associated with liquidation or reorganisation (*eg*, the power to do no more than preserve assets); and

(d)    financial adjustment measures or arrangements undertaken between the debtor and some of its creditors on a purely contractual basis concerning some debt, where the negotiations do not lead to the commencement of an insolvency proceeding conducted under the insolvency law.

72    At this juncture, we address the appellants' reliance on the English Court of Appeal's decision in *Rubin and another v Eurofinance SA and others* [2011] 2 WLR 121 ("*Rubin*"). In *Rubin*, the English Court of Appeal held that adversary proceedings – the equivalent of undervalue transaction and preference claims – formed "part and parcel" of the insolvency proceedings and thus could be given the same recognition under the Model Law as set out in the Cross-Border Insolvency Regulations 2006 (SI 2006 No 1030) (UK). This was because such adversary proceedings were "part of collecting the bankrupt's assets with a view to distributing them to creditors", as well as "part of the plan which the bankruptcy court approved" and "an integral part" of the insolvency proceedings (see *Rubin* at [25] and [60]). By analogy to such adversary proceedings, the appellants sought to argue that the Malaysian Writ Action should similarly be recognised under the SG Model Law.

73    In our view, however, the appellants' reliance on *Rubin* was misplaced. Even if *Rubin* was correct in concluding that adversary proceedings may be recognised as foreign proceedings under the Model Law, the Malaysian Writ Action was clearly distinguishable from adversary proceedings. The proceedings recognised in *Rubin* arose from the use of mechanisms specially available in the insolvency regime to allow the debtor's legal representative to bring actions against third parties for the collective benefit of all creditors. Such proceedings were therefore central to the collective nature of bankruptcy (see *Rubin* at [61]). In contrast, the Malaysian Writ Action was not part of any insolvency plan approved by the Malaysian court nor an integral part of the Malaysian Winding-Up Proceeding. Nor did the Malaysian Writ Action arise from any mechanism specially available in the insolvency regime. In this regard, we agreed with the Judge's observations:

…

(b)    I was referred to the example of adversary proceedings in US cases, but these were, in contrast, quite different. I note most adversary proceedings are similar to unfair preference or clawback proceedings under Commonwealth insolvency law: they are actions by the estate to recover assets or proceeds of the estate which were unlawfully taken away to avoid being caught by the insolvency.

(c)    In contrast, the Malaysian [W]rit [A]ction was the determination of issues of property or ownership rights and obligations that are no different from any that could arise in any civil proceeding. The only thing possibly colouring it with the nature of an insolvency or collective claim was that it involved the foreign insolvency representative. It is true that the determination by the Malaysian courts would affect the size of the estate in the end, but it does so through the operation not of insolvency or reorganization law. Extending the operation of Model Law recognition to this extent could effectively extend recognition to all manner of foreign civil judgments, beyond the ambit of the [IRDA].

…

74    For completeness, we note that *Rubin* was subsequently overturned on appeal by the UK Supreme Court in *Rubin and another v Eurofinance SA and others (Picard and others intervening); In re New Cap Reinsurance Corpn Ltd (in liquidation; New Cap Reinsurance Corpn Ltd and another v Grant and others* [2012] 3 WLR 1019, although on a different point of law. On appeal, as it was no longer disputed that the adversary proceedings should be recognised under the Model Law, the point was not specifically considered by the UK Supreme Court.

75    The purpose of the Malaysian Writ Action was *not* USSB's reorganisation or liquidation. Instead, it was to determine the parties' rights, obligations and liabilities under the Loan Agreement and Debenture, which would in turn affect the parties' entitlement to the Surplus Funds.

76    In light of the above analysis, we took the view that the Malaysian Writ Action did not possess any of the cumulative attributes required for it to constitute a "foreign proceeding" within the meaning of Art 2(*h*) of the SG Model Law. Accordingly, we agreed with the Judge's decision not to recognise the Malaysian Writ Action as a foreign proceeding under Art 17 of the SG Model Law, whether as a foreign main proceeding or a foreign non-main proceeding.

**Conclusion**

77    For all of the above reasons, we dismissed the appeal.

Reported by Cheng Le En Leanne.

H5 6 ˙9

*a*

# Cosco Bulk Carrier Co Ltd v Armada Shipping SA and another

# Re Armada Shipping SA

*b*

## [2011] EWHC 216 (Ch)

CHANCERY DIVISION (COMPANIES COURT)

BRIGGS J

*c*
4, 11 FEBRUARY 2011

*Arbitration – Jurisdiction – Discretion of court – Recognition of Swiss bankruptcy order against charterer – Charterer party to English arbitration proceedings concerning disponent owner's entitlement to sub-hire due under sub-charter – Sub-hire placed in an*
*d*  *escrow account – Whether issue of entitlement to sub-hire to be dealt with by English arbitration or in Swiss bankruptcy proceedings.*

In January 2010 A was made the subject of a bankruptcy order in Switzerland. A recognition order was subsequently made in England under art 17 of the UNCITRAL Model Law on Cross-Border Insolvency. A was, at the time of the
*e*  bankruptcy order, the charterer of a vessel from C as disponent owner under a time charter on substantially the New York Produce Exchange (NYPE) 93 form. A sub-chartered the vessel to S, also on NYPE 93 terms. Both the time charter and the sub-charter contained London arbitration clauses, and provided that any dispute arising thereunder should be governed by English law. The time charter contained an owner's lien over sub-freights and/or sub-hire for
*f*  any amounts due under the time charter. A defaulted in hire payments due to C, and C exercised its lien over sub-hire due by S to A under the sub-charter. A dispute arose, in substance (though not in form) between A and C, as to entitlement to the sub-hire due from S under the sub-charter. C had sought to pursue its claim by commencing a London arbitration against S. Although in substance neutral, S had in order to avoid double jeopardy commenced a
*g*  separate London arbitration against A and, in the meantime, had deposited an amount representing the sub-charter hire which it acknowledged was due either to C or to A in an escrow account. The parties made cross-applications to the court to enable the court to decide whether (as C claimed) its dispute with A should be resolved by London arbitration, or whether (as A's Swiss
*h*  office holder claimed) the dispute should be resolved in Switzerland, before the Swiss court having bankruptcy jurisdiction in relation to A.

**Held** – The matter was to be approached as one of broad discretion, the question being which route for the resolution of the underlying dispute was likely best to serve the interests of justice, being that which was right and fair
*j*  in all the circumstances. The application of that approach led to the conclusion that the underlying dispute should, if possible, be determined in the first arbitration, provided that A, by its office holder, could without delay or significant risk as to its effectiveness, be joined as a party to that arbitration. The true analysis of the underlying dispute was not that it was a claim by C against A, or for that matter by A against C. Rather, there were two competing

proprietary and/or contractual claims by A and C in relation to a single asset,  *a*
namely the chose in action which consisted of S's obligations to make
payments under the sub-charter. The asset in question was not the fund in the
escrow account, the creation of which occurred pursuant to an agreement to
which A was not party, and which the court could not require S and C to
transmit to an account in Switzerland under the control of the office holder as
if it were part of A's assets located in Great Britain within the meaning of the  *b*
model law. Moreover A and C had both agreed, in the time charter, that
disputes about C's lien were to be resolved, pursuant to English law, by
arbitration in London. Furthermore, A's rights in relation to the sub-hire were
also, in the event of dispute, subject to an identical choice of law and
arbitration clause in the sub-charter (see [53]–[61], [63], below).
                                                                                  *c*

**Notes**
For the bankruptcy of a party to an arbitration agreement, see 2 *Halsbury's
Laws* (5th edn) (2008) para 1217.

**Cases referred to in judgment**                                                 *d*
*Agnew v Comr of Inland Revenue* [2001] UKPC 28, [2001] 2 BCLC 188, [2001]
    2 AC 710, [2001] 3 WLR 454.
*Angelakis (G & N) Shipping Co SA v Cie National Algerienne de Navigation, The
    Attika Hope* [1988] 1 Lloyd's Rep 439.
*Annangel Glory Cia Naviera SA v M Golodetz Ltd, The Annangel Glory* [1988] 1
    Lloyd's Rep 45.                                                               *e*
*Aro Co Ltd, Re* [1980] 1 All ER 1067, [1980] Ch 196, [1980] 2 WLR 453, CA.
*Bank of Credit and Commerce International SA (No 4), Re* [1994] 1 BCLC 419.
*Bourne v Charit-Email Technology Partnership LLP* [2009] EWHC 1901 (Ch), [2010]
    1 BCLC 210.
*Buchler v Talbot* [2004] UKHL 9, [2004] 1 All ER 1289, [2004] 2 AC 298, [2004]  *f*
    2 WLR 582, HL.
*Care Shipping Corp v Itex Itagrani Exports SA, The Cebu (No 2)* [1992] 1 All ER 91,
    [1993] QB 1, [1991] 3 WLR 609.
*Federal Commerce and Navigation Ltd v Molena Alpha Inc, The Nanfri, The Benfri,
    The Lorfri* [1979] 1 All ER 307, [1979] AC 757, [1978] 3 WLR 991, HL.
*Grosvenor Metal Co Ltd, Re* [1949] 2 All ER 948, [1950] Ch 63.                   *g*
*Lloyd (David) & Co, Re, Lloyd v David Lloyd & Co* (1877) 6 Ch D 339, CA.
*New Bullas Trading Ltd, Re* [1994] 1 BCLC 485, CA.
*Pyle Works, Re* (1890) 44 Ch D 534, CA.
*Redman (Builders) Ltd, Re* [1964] 1 All ER 851, [1964] 1 WLR 541.
*Samsun Logix Corp v Oceantrade Corp, Deval Denizeilik VE Ticaret AS v Oceantrade
    Corp* [2007] EWHC 2372 (Comm), [2008] 1 All ER (Comm) 673.                    *h*
*Siebe Gorman & Co Ltd v Barclays Bank Ltd* [1979] 2 Lloyd's Rep 142.
*Spectrum Plus Ltd, Re, National Westminster Bank plc v Spectrum Plus Ltd* [2005]
    UKHL 41, [2005] 4 All ER 209, [2005] 2 AC 680, [2005] 3 WLR 58.
*Suidair International Airways Ltd, Re* [1950] 2 All ER 920, [1951] Ch 165.
*Welsh Irish Ferries Ltd, Re* [1985] BCLC 327, [1986] Ch 471, [1985] 3 WLR 610.   *j*

**Applications**
In proceedings between Cosco Bulk Carriers as applicant and Armada Shipping
SA (which had been made the subject of a bankruptcy order in Switzerland)
and STX Pan Ocean as respondents, the parties made cross-applications under

*a*  the Cross-Border Insolvency Regulations 2006, SI 2006/1030 arising from a recognition order made under art 17 of the UNCITRAL Model Law on Cross-Border Insolvency on 19 May 2010 whereby the bankruptcy pronounced by the Civil Court of the District of La Sarine, Switzerland, in respect of Armada on 11 January 2010 was recognised as a foreign main proceeding. The facts are summarised in the judgment.

*b*

*Stephen Robins* (instructed by *Holman Fenwick Willan LLP*) for Cosco.
*Timothy Young QC* and *Christopher Boardman* (instructed by *Squire, Sanders & Dempsey (UK) LLP*) for Armada.
*David Allison* (instructed by *Clyde & Co*) for STX.

*c*
                                                        *Judgment was reserved.*

11 February 2011. The following judgment was delivered.

*d*  **BRIGGS J.**

INTRODUCTION
    [1] There are before the court cross-applications under the Cross-Border Insolvency Regulations 2006, SI 2006/1030 arising from a recognition order made under art 17 of the UNCITRAL Model Law on Cross-Border Insolvency (the Model Law) on 19 May 2010 whereby the bankruptcy order pronounced
*e*  by the Civil Court of the District of La Sarine, Switzerland, in respect of Armada Shipping SA (Armada) on 11 January 2010 was recognised as a foreign main proceeding.
    [2] Armada was, at the time of the bankruptcy order, the charterer of a vessel called the Spar Sirius (the vessel) from Cosco Bulk Carrier Co Ltd (Cosco), as disponent owner under a time charter on substantially the NYPE 93
*f*  form (the time charter). Armada had sub-chartered the vessel to STX Pan Ocean Co Ltd (STX), also on NYPE 93 terms (the sub-charter). Both the time charter and the sub-charter contained London arbitration clauses, and provided that any dispute arising thereunder should be governed by English law.
    [3] The time charter contained an owner's lien upon sub-freights and/or sub-hire for any amounts due under the time charter. Armada defaulted in hire
*g*  payments due to Cosco, and Cosco exercised its lien over sub-hire due by STX to Armada under the sub-charter.
    [4] A dispute has arisen, in substance (albeit not in form) between Cosco and Armada, as to entitlement to the sub-hire due from STX under the sub-charter. Cosco has sought to pursue its claim by commencing a London arbitration
*h*  against STX. Although in substance neutral, STX has in order to avoid double jeopardy commenced a separate London arbitration against Armada and, in the meantime, has deposited an amount representing the sub-charter hire which it acknowledges is due either to Cosco or to Armada into an escrow account.
*j*      [5] The effect of the cross-applications under the Model Law is to enable the court to decide whether (as Cosco claims) its dispute with Armada should be resolved by London arbitration, or whether (as Armada's Swiss office holder claims) the dispute should be resolved in Switzerland, before the Swiss court having bankruptcy jurisdiction in relation to Armada. Certain intermediate solutions between those two were, in addition, canvassed during the hearing.

THE FACTS

[**6**] The primary facts, which are not significantly disputed, may be summarised as follows. Having itself chartered the vessel from Spar Shipping, Cosco chartered her to Armada on 3 September 2009 on NYPE 93 form at a daily hire rate of $US 20,000 (including overtime) less commissions from delivery until 15 January/26 February 2010 (at Armada's option). Hire was payable every 15 days in advance in the net amount of $US 288,750.

[**7**] By cll 7 and 9, the time charter required Armada to provide and pay for all bunkers. Clause 18 permitted Armada to sublet the vessel. Clause 23 provided for a lien on sub-freights and/or sub-hire in the following terms:

'The Owners shall have a lien upon all cargoes and all sub-freights and/or sub-hire for any amounts due under this Charter Party, including general average contributions, and the Charterers shall have a lien on the Vessel for all money paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once …'

Clause 45 provided for London arbitration in the following terms:

'(b) LONDON
All disputes arising out of this contract shall be arbitrated at London and, unless the parties agree forthwith on a single Arbitrator, be referred to the final arbitrament of two Arbitrators carrying on business in London who shall be members of the Baltic Mercantile & Shipping Exchange and engaged in Shipping. One to be appointed by each of the parties, with power to such Arbitrators to appoint an Umpire. No award shall be questioned or invalidated on the ground that any of the Arbitrators is not qualified as above, unless objection to his action be taken before the award is made. Any dispute arising hereunder shall be governed by English Law.'

[**8**] Armada sub-chartered the vessel on 4 December 2009, again in NYPE 93 form, for a 60-day without guarantee trip at a gross daily hire of $US 28,750 (including overtime) less commissions. Hire was, as under the time charter, payable every 15 days in advance, but at the higher net rate of $US 415,078·12.

[**9**] Clause 96 of the sub-charter provided as follows:

'Neither Owners nor Charterers may assign the benefit of this contract or the benefit of any rights arising out of this contract in whole or in part without the prior consent in writing of the other party. The party who is named as Owner and the party who is named as Charterers in this contract shall always remain fully responsible for the due fulfilment of all the terms of this contract.'

The sub-charter contained a London arbitration clause in identical terms to those in the time charter.

[**10**] On 28 December 2009 Armada made a voluntarily filing for liquidation with the court of Fribourg in Switzerland. By then, the vessel had taken on bunkers at Gibraltar and was on passage to Suez where, in due course, either she or the bunkers (the evidence does not make clear which) were arrested for non-payment of bunkers at Gibraltar. Cosco obtained the release of the vessel by paying for the bunkers itself.

[**11**] On 30 December 2009 solicitors for Cosco sought to exercise its lien over sub-hire by fax to STX, referring to the time charter and cl 23 in particular, the sub-charter, and to a sum then alleged to be owing by Armada to Cosco of $US 285,000-odd. The fax (which was copied to Armada) continued:

Ch D      Cosco Bulk Carrier Co v Armada Shipping (Briggs J)      485

*a*
'Kindly take this message as notice, in exercise of Owners' rights under
the said clause 23 of the Time Charter, that all and any sub-hire which is or
will become payable by you pursuant to the Sub-Charter must not be paid
to or as directed by Armada, or its agent or nominee, but to Owners …
This means that Armada or any such other person cannot give you a
good receipt for any payment of hire.'

*b*
[**12**] On 11 January 2010 a bankruptcy order was made by the Civil Court of
the District of La Sarine in Switzerland. It had broadly the same effect in
relation to Armada as an English winding-up order. The Cantonal Bankruptcy
Office in Fribourg was thereby appointed as Armada's office holder, with
powers broadly comparable to those of an English liquidator.

*c*
[**13**] By further notices faxed to STX and copied to Armada on 15, 19, and
28 January 2010 Cosco sought to exercise its lien in relation to increased
amounts alleged to be due from Armada. In particular, the notice on 19 January
included, as a claim against Armada, the amount which Cosco had paid to
release the vessel from arrest at Suez. The final amount claimed by the notice
dated 28 January was $US 1,204,514·89.

*d*
[**14**] On 4 February Cosco and STX made a written escrow agreement
providing for $US 915,119·27 to be placed in an escrow account. The
agreement, expressed to be governed by English law, provided at cl 2 that—

'[t]he sums held in the Escrow Account will be held pending the final
resolution of the Liened Sum Dispute between Cosbulk and STX Pan
Ocean (and as the case may be Armada Shipping if applicable), either by
written agreement or by arbitration in London pursuant to the terms of
the STX Pan Ocean Charter or by judgment of the English High Court of
Justice on appeal therefrom.'

*e*

The escrow agreement contained its own London arbitration clause.

*f*
[**15**] It is apparent from the escrow agreement (and elsewhere) that it was
from the outset common ground as between Cosco and STX that any dispute
between them as to Cosco's claim to the sub-hire due under the sub-charter fell
to be resolved by arbitration under the arbitration clause in the sub-charter.
Cosco's case was that the lien on sub-hire operated as an equitable charge, so
that it could enforce as security assignee Armada's right to sub-hire under the
sub-charter. To that end Cosco appointed its arbitrator Mr Baker-Harber on
10 February 2010. For its part STX appointed its own arbitrator
Mr Tim Marshall in the Cosco v STX arbitration, and then commenced a
separate arbitration against Armada, pursuant to which on 3 March it
appointed the same Mr Baker-Harber as its arbitrator in the STX v Armada
arbitration. I shall refer to them as the first and second arbitrations respectively.

*g*

*h*
[**16**] As appears from its statement of case dated 15 March, Cosco's claim
against STX was for $US 1,178,216·21 plus interest. STX's claim against Armada
in the second arbitration was for a declaration of non-liability. None the less
STX defended Cosco's claim in the first arbitration by advancing for its own
protection all those arguments which it conceived that Armada might assert in
the second arbitration.

*j*
[**17**] Also on 15 March Cosco invited Armada's office holder either to
concede Cosco's claim against STX or to join in the first arbitration. The office
holder's response, two days later, took the form of a letter from its Swiss
lawyers to Mr Baker-Harber and Mr Marshall requesting a stay of the first
arbitration, and an invitation to STX to pay outstanding sub-hire due under the

*a*

sub-charter into a special account opened by the office holder in Fribourg for the purposes of the bankruptcy. The office holder relied in support of its request for a stay upon provisions for the automatic stay of civil proceedings involving a bankrupt provided by art 207 of the Swiss Federal Statute on Debt Enforcement and Bankruptcy.

*b*

[**18**] On the same day Cosco wrote to the arbitrators in the first arbitration asserting that Swiss law was irrelevant to the dispute, and repeating its invitation that Armada's office holder should join in the reference as a second respondent. On 19 March the arbitrators resolved to continue with the first arbitration.

*c*

[**19**] On 24 March STX set out its position in an open e-mail to the arbitrators and the other parties. Its substance was to assert STX's neutrality in the dispute between Cosco and Armada, to invite Armada's office holder to join in the first arbitration, thereby allowing STX to 'drop out of the picture' or alternatively to invite the office holder to obtain an order under the Model Law 'having the effect of staying the arbitration'. Neither choice having in the meantime been adopted by the office holder, STX filed its defence in the first arbitration on 29 April.

*d*

[**20**] The office holder eventually decided to take the second of the courses alternatively proposed by STX, seeking a recognition order on 13 May, and obtaining one on 19 May. None of the types of additional relief, beyond recognition itself, available under art 21(1) of the Model Law, were either sought or obtained. It appears that those advising the office holder took the view that recognition itself would, pursuant to art 20(1)(a), effect an automatic stay of both arbitrations.

*e*

[**21**] It appears (and for good reason) to have been common ground that the recognition order, without more, achieved an automatic stay of the second arbitration. Those advising Armada and STX appear to have taken the same view in relation to the first arbitration, but this view was challenged by Cosco which, on 11 October 2010, applied to this court for an order confirming that the first arbitration had not been stayed, or alternatively for an order lifting the stay in respect of that arbitration.

*f*

[**22**] For its part, the office holder applied to this court on 9 December 2010 for an order confirming that the first arbitration had been stayed by the recognition order, alternatively that a stay of the first arbitration be now imposed.

*g*

THE ISSUES

[**23**] It will be apparent from the foregoing summary of the facts that there are in reality two disputes between the parties. The first is the underlying dispute, essentially between Cosco and Armada, as to which of them is entitled to sub-hire due from STX under the sub-charter and (if it is to be shared) in what proportions. The second dispute, affecting all three parties, is as to the procedure by which the underlying dispute should now be resolved, having regard in particular to Armada's Swiss bankruptcy, and its recognition in this jurisdiction. It is convenient to identify, as far as possible, the parameters of the underlying dispute first. I say as far as possible, because Armada has yet to plead a statement of case of its own in relation to that dispute. None the less, and with the considerable assistance of Mr Timothy Young QC, who appeared for Armada in an unfamiliar forum to make submissions about what he described as 'the shipping aspects' of the matter, it is possible to identify the gist of the underlying dispute with sufficient accuracy for present purposes.

*h*

*j*

*a*  [**24**] The underlying dispute has thrown up the following five issues. (1) The juridical nature and effect of an owner's lien on sub-hire. (2) The effect of the prohibition on assignment in the sub-charter. (3) Whether the lien was exercised for an excessive amount and, if so, with what consequence. (4) Whether Cosco can rely upon the lien in respect of its claim to an indemnity for its payment for bunkers. (5) The consequences in terms of *b*  priority in Armada's bankruptcy.

[**25**] Although the parties appeared to have prepared, ahead of the hearing before me, to argue issues (1) and (5) in full, none of them invited me to determine them there and then. The other three issues were little more than mentioned in the parties' submissions. For reasons which will become clear, I *c*  do not consider it necessary, convenient or appropriate to determine any of the underlying issues at this stage. It is however necessary to say a little more about them.

[**26**] The juridical nature of a lien on sub-hire (or sub-freight) is, at least at the academic level and at all levels above (perhaps) first instance, a well-known and long-unresolved problem. In the present context it is clearly to be determined *d*  in accordance with English law. A series of first instance decisions, following on from an obiter dictum of Lord Russell of Killowen in *Federal Commerce and Navigation Ltd v Molena Alpha Inc, The Nanfri, The Benfri, The Lorfri* [1979] 1 All ER 307 at 318, [1979] AC 757 at 784, have concluded that an owner's lien on sub-freights created by contract in a charterparty operates as an equitable charge on what is due from the shipper to the charterer. The first instance *e*  decisions include *Re Welsh Irish Ferries Ltd* [1985] BCLC 327, [1986] Ch 471, *Annangel Glory Cia Naviera SA v M Golodetz Ltd, The Annangel Glory* [1988] 1 Lloyd's Rep 45, *G & N Angelakis Shipping Co SA v Cie National Algerienne de Navigation, The Attika Hope* [1988] 1 Lloyd's Rep 439 and *Care Shipping Corp v Itex Itagrani Exports SA, The Cebu (No 2)* [1992] 1 All ER 91, [1993] QB 1.

*f*  [**27**] The contrary argument, originally propounded by Dr Fidelis Oditah in his article 'The Juridical Nature of a Lien on Subfreights' [1989] LMCLQ 191, and enthusiastically indorsed by Lord Millett, giving the judgment of the Judicial Committee of the Privy Council in *Agnew v Comr of Inland Revenue* [2001] UKPC 28 at [38]–[41], [2001] 2 BCLC 188 at [38]–[41], [2001] 2 AC 710, is that the owner's lien on sub-freights is a personal contractual right of *g*  interception analogous to an unpaid seller's right of stoppage in transit, and not a charge or proprietary right at all.

[**28**] Despite Mr Robins's valiant attempts to describe the alternative view as no more than a one-off obiter dictum from Lord Millett who had failed, when at the bar, to persuade Nourse J to the same view in *Re Welsh Irish Ferries Ltd*, I *h*  have to bear in mind that Lord Millett's judgment in *Agnew*'s case expressed (albeit obiter) a view of a committee which included Lord Bingham of Cornhill, Lord Nicholls of Birkenhead, Lord Hoffmann and Lord Hobhouse of Woodborough and that the general thrust of the reasoning in *Agnew*'s case (albeit not, at least expressly, the passage about the lien on sub-freights) was central to the later decision of the House of Lords in *Re Spectrum Plus Ltd,* *j*  *National Westminster Bank plc v Spectrum Plus Ltd* [2005] UKHL 41, [2005] 4 All ER 209, [2005] 2 AC 680, when overruling the long-standing authority of *Siebe Gorman & Co Ltd v Barclays Bank Ltd* [1979] 2 Lloyd's Rep 142 and the later decision of *Re New Bullas Trading Ltd* [1994] 1 BCLC 485 on the question whether debenture security over book debts constituted a fixed or floating charge.

[**29**] It is perhaps surprising that this formidable dissent from what had
otherwise been a conventional view has yet to be adjudicated upon in an
English case but, as Gross J concluded in *Samsun Logix Corp v Oceantrade Corp,
Deval Denizeilik VE Ticaret AS v Oceantrade Corp* [2007] EWHC 2372 (Comm)
at [41], [2008] 1 All ER (Comm) 673 at [41], the answer to the question may not
generally make any difference to priority issues arising from the charterer's
insolvency.

[**30**] The second issue, which arises only if the lien operates by way of
security assignment, as a charge rather than a purely personal right, is whether
it is invalidated by the prohibition on assignment in cl 96 of the sub-charter.
Again, it is a question governed by English law. Although largely a matter of
interpretation and application of the sub-charter, it may raise fact-intensive
issues, such as the knowledge or otherwise of STX of the lien on sub-freights in
the time charter. There is likely in addition to be a question whether it is open
to Armada to rely upon it, in circumstances where STX has pleaded it not in its
own interests, but merely in order to avoid the risk that Armada might
successfully make use of it in pursuing its own claim against STX for the
sub-hire.

[**31**] The third and fourth issues are inextricably bound up, and both are again
subject to English law. They are largely matters of interpretation but may have
a possible factual element, both in terms of quantum and on the question
whether the circumstances in which Cosco procured the release of the vessel
from arrest were such as to make a refund of its bunkers payment by Armada
a liability arising under the time charter.

[**32**] The final issue is essentially a question of priority, and is bound up with
the first issue. On any view, and in particular after *Re Spectrum Plus Ltd*, the lien
on sub-hire in the present case can, if a charge at all, only have been a floating
rather than a fixed charge, since it plainly permitted STX to continue to pay,
and Armada to receive, sub-hire pending any exercise of the lien. The sub-hire
was plainly not permanently appropriated by way of security to the discharge
of Armada's liabilities to Cosco under the time charter.

[**33**] If the lien operates as a floating charge, then both English and Swiss
insolvency law provide that it confers less than absolute priority on the
chargee. In England the floating charge holder's rights are subordinated both to
limited claims of preferential creditors, and to the appropriate part of the office
holder's expenses. It appears from limited available evidence that some form of
postponement to the office holder's expenses is also conferred under Swiss law,
in relation to charges generally.

[**34**] There is a large dispute between Cosco and Armada's office holder as to
whether English or Swiss insolvency law, or neither of them, is applicable to
Cosco's lien. Furthermore, questions may arise in relation to the date of
exercise of the lien, when it is borne in mind that all four exercise notices
followed Armada's application for bankruptcy, and three of them followed the
bankruptcy order itself.

THE PROCEDURAL DISPUTE

[**35**] In a nutshell, this dispute is, simply, how and before which tribunal or
tribunals should the issues in the underlying dispute be resolved. More
specifically, Armada maintains, but Cosco denies, that the recognition order
has, of itself, stayed the first arbitration. All the parties acknowledge however
that, whether or not the first arbitration has been automatically stayed, the

*a*  court has a discretion under the Model Law, as incorporated into English law by the 2006 Regulations, either to continue or lift the existing stay, or to impose a stay if the recognition order did not have that effect.

[**36**] Cosco's case is, as I have set out in the introduction, that the underlying dispute should be resolved in the first arbitration, with Armada permitted, and if necessary encouraged, to participate by its office holder. The office holder's
*b*  case is that there is good reason, in terms of saving cost and time, why the underlying dispute should be resolved in Switzerland, in the first instance by the office holder itself and, if necessary, on appeal to the appropriate Swiss bankruptcy court.

[**37**] Mr Christopher Boardman for Armada volunteered two intermediate alternatives, either of which he submitted would be preferable to the first
*c*  arbitration as the vehicle for the determination of the underlying dispute. He suggested that I might decide the first and (if necessary) fifth issues myself, although he did not encourage me to do so. Alternatively, but with more enthusiasm, he submitted that I should give directions for the determination of all or part of the underlying dispute by this court, pursuant to powers
*d*  conferred by art 21(1) of the Model Law. Mr Robins for Cosco showed no interest of any kind in these alternatives and, for his part, Mr David Allison for STX doubted whether the art 21 route would be preferable to the first arbitration.

THE LAW

*e*  [**38**] There being no reported authority on the question, the first stage is to identify what are the legal principles applicable to the exercise of discretion in relation to applications for, or to discharge, a stay under the Model Law. Regulation 2(1) of the 2006 Regulations provides that the Model Law is to have the force of law in Great Britain in the form set out in Sch 1, which consists of an English language version of the Model Law, incorporating certain
*f*  modifications to adapt it for application in Great Britain. Regulation 2(2) of the 2006 Regulations provides that, without prejudice to any practice of the courts as to matters which may be considered apart from that paragraph, the following documents can be considered for the purpose of ascertaining the meaning or effect of any provision of the United Kingdom version of the Model Law in Sch 1 namely: (a) the UNCITRAL Model Law itself (ie the
*g*  international version of the Model Law on Cross-Border Insolvency as adopted by the United Nations Commission on International Trade Law in May 1997); (b) any of the UN Commission's travaux préparatoires; (c) the Guide to Enactment of the UNCITRAL Model Law prepared at the request of the UN Commission, also in May 1997.

*h*  [**39**] The 2006 Regulations provide, by way of Sch 2, a detailed set of procedural rules governing applications made under the Model Law in England and Wales, but it was not suggested that anything in those provisions was material to the matters which I have to decide. My references in the remainder of this judgment to the Model Law are references to the United Kingdom version of the UNCITRAL Model Law set out in Sch 1 to the 2006 Regulations.

*j*  [**40**] The provisions of the Model Law with which I am concerned appear entirely in Ch III, headed 'Recognition of a Foreign Proceeding and Relief'. Article 15(1) provides that a foreign representative may apply to the court for recognition of the foreign proceeding in which the foreign representative has been appointed. For present purposes, and having regard to the definitions in art 2, the Swiss bankruptcy of Armada is a foreign proceeding, and the office

holder of Armada (as I have identified it earlier in this judgment) is the foreign representative. Before leaving the definitions, it is to be noted that 'security' in the articles to which I shall shortly refer means, pursuant to art 2(n):

> '(i) In relation to England and Wales, any mortgage, charge, lien or other security; and
>
> (ii) In relation to Scotland, any security (whether heritable or moveable), any floating charge and any right of lien or preference and any right of retention (other than a right of compensation or set off) …'

I was persuaded by Mr Robins (without opposition from counsel for the other parties) that the express reference to floating charge in the Scottish part of that definition did not mean that floating charges were excluded from the definition of security in relation to England and Wales. For the special position in Scotland in relation to floating charges see per Lord Hope of Craighead in *Re Spectrum Plus Ltd* [2005] 4 All ER 209 at [48]–[51].

[41] Article 20, headed 'Effects of Recognition of a Foreign Main Proceeding', provides, so far as is relevant, as follows:

> '1. Upon recognition of a foreign proceeding that is a foreign main proceeding, subject to paragraph 2 of this article—(a) commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities is stayed; (b) execution against the debtor's assets is stayed; and (c) the right to transfer, encumber or otherwise dispose of any assets of the debtor is suspended.
>
> 2. The stay and suspension referred to in paragraph 1 of this article shall be—(a) the same in scope and effect as if the debtor, in the case of an individual, had been adjudged bankrupt under the Insolvency Act 1986 or had his estate sequestrated under the Bankruptcy (Scotland) Act 1985, or, in the case of a debtor other than an individual, had been made the subject of a winding-up order under the Insolvency Act 1986; and (b) subject to the same powers of the court and the same prohibitions, limitations, exceptions and conditions as would apply under the law of Great Britain in such a case, and the provisions of paragraph 1 of this article shall be interpreted accordingly.
>
> 3. Without prejudice to paragraph 2 of this article, the stay and suspension referred to in paragraph 1 of this article, in particular, does not affect any right—(a) to take any steps to enforce security over the debtor's property; (b) to take any steps to repossess goods in the debtor's possession under a hire-purchase agreement; (c) exercisable under or by virtue of or in connection with the provisions referred to in article 1(4); or (d) of a creditor to set off its claim against a claim of the debtor, being a right which would have been exercisable if the debtor, in the case of an individual, had been adjudged bankrupt under the Insolvency Act 1986 or had his estate sequestrated under the Bankruptcy (Scotland) Act 1985, or, in the case of a debtor other than an individual, had been made the subject of a winding-up order under the Insolvency Act 1986 …
>
> 6. In addition to and without prejudice to any powers of the court under or by virtue of paragraph 2 of this article, the court may, on the application of the foreign representative or a person affected by the stay and suspension referred to in paragraph 1 of this article, or of its own motion, modify or terminate such stay and suspension or any part of it, either altogether or for a limited time, on such terms and conditions as the court thinks fit.'

Ch D        Cosco Bulk Carrier Co v Armada Shipping (Briggs J)        491

*a*    [**42**] Article 21, headed 'Relief that may be Granted upon the Recognition of a Foreign Proceeding', provides, so far as is relevant, as follows:

'1. Upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of the creditor, the court may, at the request of the foreign
*b*    representative, grant any appropriate relief, including—(a) staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities, to the extent they have not been stayed under paragraph 1(a) of article 20; (b) staying execution against the debtor's assets to the extent it has not been stayed under paragraph 1(b) of article 20 … (g) granting any
*c*    additional relief that may be available to a British insolvency officeholder under the law of Great Britain, including any relief provided under paragraph 43 of Schedule B1 to the Insolvency Act 1986.
2. Upon recognition of a foreign proceeding, whether main or non-main, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in Great Britain to
*d*    the foreign representative or another person designated by the court, provided that the court is satisfied that the interests of creditors in Great Britain are adequately protected.
3. In granting relief under this article to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under the law of Great Britain, should be administered in the
*e*    foreign non-main proceeding or concern information required in that proceeding.'

[**43**] Article 22, headed 'Protection of Creditors and other Interested Persons', provides, so far as is relevant, as follows:

*f*    '1. In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph 3 of this article or paragraph 6 of article 20, the court must be satisfied that the interests of the creditors (including any secured creditors or parties to hire-purchase agreements) and other interested persons, including if appropriate the debtor, are adequately protected.
*g*    2. The court may subject relief granted under article 19 or 21 to conditions it considers appropriate, including the provision by the foreign representative of security or caution for the proper performance of his functions.
3. The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or of its own motion,
*h*    modify or terminate such relief.'

[**44**] The Guide to Enactment contains, at para 145, the following commentary upon the relationship between art 20 of the Model Law and arbitration proceedings:

*j*    '145. Subparagraph 1 (*a*), by not distinguishing between various kinds of individual actions, also covers actions before an arbitral tribunal. Thus, article 20 establishes a mandatory limitation to the effectiveness of an arbitration agreement. This limitation is added to other possible limitations restricting the freedom of the parties to agree to arbitration that may exist under national law (e.g. limits as to arbitrability or as to the capacity to

conclude an arbitration agreement). Such limitations are not contrary to *a*
the Convention on the Recognition and Enforcement of Foreign Arbitral
Awards (1958). However, bearing in mind the particularities of
international arbitration, in particular its relative independence from the
legal system of the State where the arbitral proceeding takes place, it might
not always be possible, in practical terms, to implement the automatic stay *b*
of arbitral proceedings. For example, if the arbitration does not take place
in the enacting State and perhaps also not in the State of the main
proceedings, it may be difficult to enforce the stay of the arbitral
proceedings. Apart from that, the interests of the parties may be a reason
for allowing an arbitral proceeding to continue, a possibility that is
envisaged in paragraph 2 and left to the provisions of law of the enacting *c*
State.'

The references to paragraphs in that extract are to the paragraphs of art 20.

[**45**] Paragraph 2 of art 20, which is expressed to prevail over paras 1 and 3,
clearly identifies the British insolvency code as the primary source of an
understanding as to the effect of recognition of a foreign main proceeding both
in terms of its immediate effect, and in terms of the court's powers in relation
to the automatic stay prescribed by para 1. Furthermore, it is to the stay which *d*
occurs on the making of a winding-up order, rather than to the moratorium
which occurs upon the making of an administration order, to which reference
is made, albeit that, in an appropriate case, the English court may impose a
moratorium under para 1(g) of art 21. In the present case, the evidence as to
the applicable Swiss procedure relating to Armada's bankruptcy shows that it is *e*
analogous to a British winding up rather than a British administration. Thus,
the domestic regime for the imposition and management of a stay
incorporated by para 2 of art 20 is that prescribed by s 130(2) of the
Insolvency Act 1986, which provides that—

'[w]hen a winding-up order has been made or a provisional liquidator has *f*
been appointed, no action or proceeding shall be proceeded with or
commenced against the company or its property, except by leave of the
court and subject to such terms as the court may impose.'

There is English authority both as to the meaning of that provision, and as to
the way in which the court should exercise its power to give permission, to *g*
which I shall shortly refer.

[**46**] The only provision of the Model Law framed in a way which might be
thought to override art 20(2) is art 22(1), requiring the court to be satisfied that
the interests of creditors, including secured creditors, and other interested
persons, including if appropriate the debtor, are adequately protected. As will
appear however, I consider that the principles upon which the court acts under *h*
s 130(2) of the 1986 Act are such as fully to implement that objective.

[**47**] There is a long line of English authority, both at first instance and in the
Court of Appeal, that in considering whether to permit proceedings which
would otherwise be stayed by what is now s 130(2) none the less to continue,
the court is given 'a free hand to do what is right and fair according to the
circumstances of each case': see *Re Grosvenor Metal Co Ltd*, [1950] Ch 63 at 65, *j*
[1949] 2 All ER 948 per Vaisey J, *Re Suidair International Airways Ltd* [1950]
2 All ER 920, [1951] Ch 165, *Re Redman (Builders) Ltd* [1964] 1 All ER 851, [1964]
1 WLR 541, *Re Aro Co Ltd* [1980] 1 All ER 1067 at 1076, [1980] Ch 196 at 209
and, most recently, *Bourne v Charit-Email Technology Partnership LLP* [2009]
EWHC 1901 (Ch) at [2], [2010] 1 BCLC 210 at [2].

*a*  [**48**] In the latter case, Proudman J also noted that, in a case where s 130(2) clearly imposed a stay, the starting point was that proceedings were not generally to be permitted against a company in liquidation, so that the court should, subject to the overriding objective, adopt the primary objective of achieving an orderly resolution of all matters arising in the winding up for the benefit of the creditors as a whole. She also noted that previous authorities *b*  recognised that, in general, the resolution of disputed matters within the machinery of a liquidation was likely to be cheaper and quicker than if left to ordinary proceedings, and that the often limited resources of the office holder meant that the court should be cautious before exposing liquidators to the burden of coping with difficult and time-consuming litigation. That was, of course, a purely domestic case. Proudman J also noted that, on the authority of *c*  *Re Bank of Credit and Commerce International SA (No 4)* [1994] 1 BCLC 419 at 426, the Companies Court is not required to investigate the merits of the underlying dispute, beyond satisfying itself that there is a genuine arguable claim, before giving permission for the commencement or continuation of proceedings which would otherwise be stayed by s 130(2).

*d*  [**49**] Section 130(2) imposes an automatic stay only upon proceedings 'against the company or its property'. Article 20(1)(a) is expressed, a little more broadly, in terms of staying proceedings 'concerning the debtor's assets, rights, obligations or liabilities'. None the less it is not to have a wider scope or effect than s 130(2): see art 20(2)(a). Where a company charges its property as security for a debt, then for the purposes of s 130(2) its property is not the *e*  subject matter of the charge, but only its equity of redemption in relation to it: see *Re David Lloyd & Co, Lloyd v David Lloyd & Co* (1877) 6 Ch D 339, *Re Pyle Works* (1890) 44 Ch D 534 and, more recently, *Buchler v Talbot* [2004] UKHL 9, [2004] 2 AC 298 at 308, 313. The result is that, by contrast with an administration, the commencement of a winding up does not in general prevent a secured creditor from realising his security.

*f*  [**50**] In the present case there is of course a sharp dispute as to whether Cosco's enforcement of its lien over the sub-hire due from STX is or is not the enforcement of security by a secured creditor. Sometimes it is convenient for the court to decide that question on an application in relation to an insolvency stay, but since a conclusion that the creditor may not be secured will not of itself necessarily prevent the court granting permission for him to bring *g*  proceedings against the company, it is by no means always necessary or convenient to do so: see generally *Re Aro Co Ltd* [1980] 1 All ER 1067 at 1075–1076, [1980] Ch 196 at 209.

ANALYSIS

*h*  [**51**] In the present case, much time was taken up by the protagonists, in particular in counsel's skeleton arguments, in seeking to persuade me that Cosco either was, or was not, seeking to enforce a security. To answer that question would require me substantially to determine issues (1), (2) and possibly timing questions under issue (5) in relation to the underlying dispute. I consider that it would be inappropriate for me to take that course. The *j*  juridical nature of the lien over sub-hire is plainly ripe for consideration at least by the Court of Appeal. The question whether the creation of an equitable charge by that lien was invalidated by the prohibition on assignment in the sub-charter may be fact-intensive, and the timing questions arising under issue (5) are unsuitable for determination until (or at the same time as) the other issues in the underlying dispute are determined.

[**52**] To extract the first issue as to the juridical nature of the lien from the *a* remainder would be to expose the parties to a possibly lengthy stay of the underlying dispute while a single issue in it was litigated up to, and possibly beyond, the Court of Appeal, and all in relation to a dispute with a present value of less than £1m. I therefore approach the matter upon the basis that it is, at least, arguable that the underlying dispute relates to property of Armada, or at least that it relates to property in relation to which Armada has an arguable *b* claim to a beneficial interest which, pursuant to art 22(1) of the Model Law, I must be satisfied is adequately protected.

[**53**] Since the parties accept that I have a discretion whether or not to stay the first arbitration going forward it is not necessary for me to decide whether thus far there has or has not been an automatic stay of the first arbitration by reason of the recognition order. For the reasons given, it is not convenient to *c* do so either. I shall therefore approach the matter as one of broad discretion, the question being which route for the resolution of the underlying dispute is likely best to serve the interests of justice, being that which is right and fair in all the circumstances.

[**54**] In my judgment the application of that approach clearly leads to the *d* conclusion that the underlying dispute should, if possible, be determined in the first arbitration, provided that Armada by its office holder can without delay or significant risk as to its effectiveness, be joined as a party to that reference. My reasons follow.

[**55**] First, the starting point is that, in my view, the true analysis of the *e* underlying dispute is not that it is a claim by Cosco against Armada, or for that matter by Armada against Cosco. Rather, there are two competing proprietary and/or contractual claims by Armada and Cosco in relation to a single asset, namely the chose in action which consists of STX's obligations to make payments under the sub-charter. Notwithstanding Mr Boardman's submissions to the contrary, the asset in question is not the fund in the escrow account, the *f* creation of which occurred pursuant to an agreement to which Armada was not a party, and which the court could not require STX and Cosco to transmit to an account in Switzerland under the control of the office holder, as if it were part of Armada's 'assets located in Great Britain' within the meaning of art 21(2).

[**56**] Secondly, Armada and Cosco have both agreed, in the time charter, that *g* disputes about Cosco's lien are to be resolved, pursuant to English law, by arbitration in London. Furthermore, Armada's rights in relation to sub-hire are also, in the event of dispute, subject to an identical choice of law and arbitration clause in the sub-charter.

[**57**] The case is therefore very unlike the typical claim against a company in *h* liquidation, in relation to which the starting point may be (as Proudman J held in *Bourne's* case [2010] 1 BCLC 210) that the liquidator should not lightly be deprived of the cost and time advantages of having the matter determined in the liquidation. If Armada had simply been pursuing a claim under the sub-charter for alleged, disputed, arrears of hire, there could I think have been no question but that the court would have required the office holder to pursue *j* that claim by arbitration, as Armada had agreed to do in the sub-charter. Furthermore I ascertained upon inquiry of Mr Young that the office holder of Armada has funds in hand with which to pursue the arbitration, always assuming that such expenditure is considered to be in the best interests of Armada's unsecured creditors.

215

*a*  [**58**] While I acknowledge some force in Mr Young's submission that, viewed purely from a perspective of cost and time, proceedings to resolve the underlying dispute in the Swiss bankruptcy court might be cheaper and possibly even quicker than by London arbitration, I would none the less regard the balance of fairness, convenience and justice as lying strongly in favour of arbitration. All the issues in the underlying dispute, save possibly for certain *b* aspects of issue (5) (and even that is disputed), are issues of English law. They are all, save again for issue (5), questions mainly of the English shipping law, in relation to which London arbitrators of the type required by the arbitration clause in both charters are experienced and well qualified.

[**59**] While acknowledging that, mainly for the benefit of the arbitral process and its participants, routes for appeal are restricted, I consider that issue (1) *c* plainly raises questions of general importance in the context of charterparties, sufficient to make it likely that an appeal against a decision of the arbitrators would readily be entertained by the court. Furthermore, albeit only with the parties' and the arbitrators' consent and the court's approval, s 45 of the Arbitration Act 1996 would enable issue (1) to be determined as a preliminary *d* point of law if, once all the issues had been identified by statements of case, it appeared that taking that course would be likely to produce a substantial saving in costs. As matters stand, and for reasons already given, I am not at present persuaded that any such saving would thereby be achieved.

[**60**] A fair and just resolution of the underlying dispute by arbitration would of course necessitate the joinder of Armada in the first arbitration. There has *e* for nearly a year been an open invitation to the office holder by both Cosco and STX that Armada should join the first arbitration. While I acknowledge that the capacity to deal with multi-party proceedings is, at present, a weakness of the arbitral process, I can conceive of no reason why in the present case the reconstitution of the first arbitration (if necessary with the appointment by Armada of a third arbitrator) should prove impossible, unwieldy, *f* time-consuming or particularly expensive. My clear impression is that, to date, the only reason why that has not occurred is because of the office holder's preference for some other, preferably Swiss, method of dispute resolution.

[**61**] There is in my view an air of unreality in the submission that it would either be fair, just or convenient to visit upon a Swiss bankruptcy court the adjudication of an underlying dispute which is almost entirely governed by *g* English law, concerns shipping matters and which is already the subject of two pending arbitrations before experienced tribunals pursuant to obligations in the contracts out of which the dispute has arisen. The Swiss court would be obliged to rely for the determination of most of the matters in issue upon expert evidence as to English law (whether from a single expert or competing *h* experts) and its own relevant experience would be limited to Swiss insolvency law, as to which, despite having many months to do so, none of the parties have identified any specific issue to be decided.

[**62**] I have considered whether the alternative course proposed by Mr Boardman, namely to direct a stay of the arbitrations and the determination of all or some of the issues in the underlying dispute by this *j* court, would be fairer or more likely to lead to a just and economical determination than by allowing the first arbitration to proceed upon condition that Armada is joined. In its favour is, I suppose, the reduction of the potential stages of appeal (in relation in particular to issue (1)) by starting the matter in the High Court. Apart from that, I can see no other advantage in circumventing an arbitration, still less why it would be fair to do so in the light

of the parties' pre-existing agreement to arbitrate all disputes relating to the    *a*
charters. I bear in mind, although it is not a major factor in the balance, that
the escrow agreement contemplates the determination of the dispute by
arbitration or by the court on appeal from arbitration, rather than by the court
in separately constituted proceedings.

[63] Subject only to two matters, I am satisfied that the arbitration route will    *b*
properly protect the interests of Armada, its creditors and all other interested
persons, within the meaning of art 22(1) of the Model Law. My only
reservations are, first, that there remains a risk, however small, that the arbitral
process called for by the two charters may not be capable of adaptation to
admit all three parties to the underlying dispute in a single arbitration. My
second reservation is that I cannot rule out the possibility of an outcome to
issues (1)–(5) that might give rise to a priority issue as between Cosco and    *c*
Armada's office holder or creditors which the arbitration process would be
ill-suited to resolve.

[64] In order to address those two reservations I am minded in principle to
impose two conditions to the release or as the case may be non-imposition of a
stay under the Model Law so as to permit the underlying dispute to be    *d*
arbitrated. The first is that Armada should have liberty to apply for further
relief under art 22(3) in the event that, for some as yet unexplained reason, it is
unable to be effectively joined into the first arbitration, through no fault of its
own. The second is that there should at this stage be a stay of enforcement or
execution of any arbitral award under art 21(1)(b) until, after such an award has
become final, Armada has had the opportunity to restore the matter to this    *e*
court, in the event that any aspect of the interests of its creditors or office
holder have not been addressed by the arbitrators, or upon appeal.

[65] I indicated at the close of oral argument my provisional view that I
would be likely to give directions enabling the underlying dispute to be
determined by arbitration, and that after handing down judgment I would
invite submissions as to the precise form which they should take. It is for that    *f*
reason that I have identified methods of addressing the two reservations which
I have described only on an 'in-principle' basis at this stage.

*Order accordingly.*

Aaron Turpin    Barrister.    *g*



# Jaffé v. Samsung Elecs. Co.

United States Court of Appeals for the Fourth Circuit

September 17, 2013, Argued; December 3, 2013, Decided

No. 12-1802

**Reporter**

737 F.3d 14 *; 2013 U.S. App. LEXIS 24041 **; 108 U.S.P.Q.2D (BNA) 1942 ***; 58 Bankr. Ct. Dec. 230

MICHAEL JAFFÉ, Insolvency Administrator, Plaintiff - Appellant, v. SAMSUNG ELECTRONICS COMPANY, LIMITED; INFINEON TECHNOLOGIES AG; INTERNATIONAL BUSINESS MACHINES CORPORATION; HYNIX SEMICONDUCTOR, INC.; INTEL CORPORATION; NANYA TECHNOLOGY CORPORATION; MICRON TECHNOLOGY, Defendants - Appellees.UNITED STATES OF AMERICA, Amicus Curiae, VERBAND INSOLVENZVERWALTER DEUTSCHLANDS E.V., Amicus Supporting Appellant, THE FEDERATION OF GERMAN INDUSTRIES, a/k/a Bundesverband der Deutschen Industrie; INTELLECTUAL PROPERTY OWNERS ASSOCIATION; SEMICONDUCTOR INDUSTRY ASSOCIATION; CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; NATIONAL ASSOCIATION OF MANUFACTURERS; BUSINESS SOFTWARE ALLIANCE, Amici Supporting Appellees.

**Subsequent History:** US Supreme Court certiorari denied by Jaffe v. Samsung Elecs. Co., 2014 U.S. LEXIS 6583 (U.S., Oct. 6, 2014)

**Prior History:** [**1] Appeal from the United States Bankruptcy Court for the Eastern District of Virginia, at Alexandria. (09-14766-RGM). Stephen S. Mitchell, Bankruptcy Judge.

In re Qimonda AG, 462 B.R. 165, 2011 Bankr. LEXIS 4191 (Bankr. E.D. Va., 2011)

**Counsel:** ARGUED: Jeffrey A. Lamken, MOLOLAMKEN LLP, Washington, D.C., for Appellant.

William H. Pratt, KIRKLAND & ELLIS LLP, New York, New York, for Appellees.

Mark R. Freeman, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae the United States of America.

ON BRIEF: Robert K. Kry, MOLOLAMKEN LLP, Washington, D.C., for Appellant.

737 F.3d 14, *14; 2013 U.S. App. LEXIS 24041, **1; 108 U.S.P.Q.2D (BNA) 1942, ***1942

Jennifer M. Selendy, John P. Del Monaco, New York, New York, Timothy Muris, Daniel A. Bress, Washington, D.C., William E. Devitt, Dennis J. Abdelnour, KIRKLAND & ELLIS LLP, Chicago, Illinois; Stephen E. Leach, LEACH TRAVELL BRITT, P.C., Tysons Corner, Virginia, for Appellees Infineon Technologies AG, Samsung Electronics Company, Limited, and International Business Machines Corporation.

Lawrence A. Katz, LEACH TRAVELL BRITT, P.C., Tysons Corner, Virginia; Theodore G. Brown, III, KILPATRICK TOWNSEND & STOCKTON LLP, Menlo Park, California, for Appellee Hynix Semiconductor, Inc.

Joseph E. Mais, Timothy J. Franks, Phoenix, Arizona, John K. Roche, Washington, D.C., Alan D. Smith, PERKINS COIE LLP, Seattle,  [**2] Washington, for Appellee Intel Corporation.

Marc Palay, Geneva, Switzerland, Jonathan Cohn, SIDLEY AUSTIN LLP, Washington, D.C., for Appellee Nanya Technology Corporation.

Maurice Horwitz, New York, New York, M. Jarrad Wright, Adam P. Strochak, Washington, D.C., Alfredo R. Perez, Houston, Texas, Jared Bobrow, WEIL, GOTSHAL & MANGES LLP, Redwood Shores, California, for Appellee Micron Technology.

Christopher J. Wright, Timothy J. Simeone, WILTSHIRE & GRANNIS, LLP, Washington, D.C., for Amicus Verband Insolvenzverwalter Deutschlands E.V. Neil H. MacBride, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia; Stuart F. Delery, Acting Assistant Attorney General, Robert M. Loeb, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Amicus Curiae the United States of America.

Richard F. Phillips, Kevin H. Rhodes, INTELLECTUAL PROPERTY OWNERS ASSOCIATION, Washington, D.C.; Jeffrey K. Sherwood, Gary M. Hoffman, Megan S. Woodworth, DICKSTEIN SHAPIRO LLP, Washington, D.C., for Amicus Intellectual Property Owners Association.

Timothy J. Coleman, FRESHFIELDS BRUCKHAUS DERINGER LLP, Washington, D.C., for Amicus Federation of German Industries.

David  [**3] Isaacs, SEMICONDUCTOR INDUSTRY ASSOCIATION, Washington, D.C., for Amicus Semiconductor Industry Association; Paul D. Clement, D. Zachary Hudson, BANCROFT PLLC, Washington, D.C., for Amici Semiconductor Industry Association, Chamber of Commerce of the United States of America, National Association of Manufacturers, and Business Software Alliance; Robin S. Conrad, NATIONAL CHAMBER LITIGATION CENTER, Washington, D.C., for Amicus Chamber of Commerce of the United States of America; Quentin Riegel,

NATIONAL ASSOCIATION OF MANUFACTURERS, Washington, D.C., for Amicus National Association of Manufacturers; Timothy A. Molino, BSA/THE SOFTWARE ALLIANCE, Washington, D.C., for Amicus Business Software Alliance.

**Judges:** Before NIEMEYER, WYNN, and FLOYD, Circuit Judges. Judge Niemeyer wrote the opinion, in which Judge Floyd joined. Judge Wynn wrote a separate opinion concurring in Parts I, II, and III and the judgment. WYNN, Circuit Judge, concurring in the judgment.

**Opinion by:** NIEMEYER

# Opinion

 [***1943]  [*17]   NIEMEYER, Circuit Judge:

This appeal presents the significant question under Chapter 15 of the U.S. Bankruptcy Code of how to mediate between the United States' interests in recognizing and cooperating with a foreign insolvency proceeding  [**4] and its interests in protecting creditors of the foreign [***1944]  debtor with respect to U.S. assets, as provided in 11 U.S.C. §§ 1521 and 1522.

Qimonda AG, a German corporation that manufactured semiconductor devices and was, for a brief time, one of the world's largest manufacturers of dynamic random access memory ("DRAM"), filed for insolvency in Munich, Germany, in January 2009. The principal assets of Qimonda's estate consisted of some 10,000 patents, about 4,000 of which were U.S. patents. These patents were subject to cross-license agreements with Qimonda's competitors, as was common in the semiconductor industry to avoid infringement risks caused by the "patent thicket" resulting from the overlapping patent rights of some 420,000 patents in the semiconductor industry.

Ancillary to the German insolvency proceeding, Dr. Michael Jaffé, the insolvency administrator appointed by the Munich court, filed an application in the Bankruptcy Court for the Eastern District of Virginia under Chapter 15 of the U.S. Bankruptcy Code, petitioning the U.S. court to recognize the German insolvency proceeding as a "foreign main proceeding" in order to obtain an array of privileges available under Chapter  [**5] 15. Among other relief, Jaffé specifically requested that the bankruptcy court entrust to him, pursuant to 11 U.S.C. § 1521(a)(5), the administration of all of Qimonda's assets within the territorial jurisdiction of the United States, which largely consisted of the 4,000 U.S. patents.

Contemporaneously with the Chapter 15 proceeding, Jaffé sent letters to licensees of Qimonda's patents under its cross-license agreements, declaring that, under § 103 of the German Insolvency Code, the licenses granted under Qimonda patents "are no longer enforceable," including the licenses under the company's 4,000 U.S. patents. As Jaffé later indicated to the bankruptcy court, he intended to re-license Qimonda's patents for the benefit of Qimonda's creditors, replacing licenses paid for in-kind with cross-licenses with licenses paid for with cash through royalties.

The bankruptcy court entered an order recognizing the German insolvency proceeding [*18] as a foreign main proceeding and a separate order granting Jaffé the discretionary relief he requested under § 1521(a)(5). But, following a four-day evidentiary hearing, it conditioned the § 1521 relief with the requirement that Jaffé afford the licensees of [**6] Qimonda's U.S. patents the treatment they would have received in the United States under 11 U.S.C. § 365(n), which limits a trustee's ability to reject unilaterally licenses to the debtor's intellectual property by giving licensees the option to retain their rights under the licenses. After balancing the interests of Qimonda's estate with the interests of the licensees of its U.S. patents, the bankruptcy court concluded that the application of § 365(n) was necessary to ensure, as required by § 1522(a), that the licensees were "sufficiently protected," even though it would adversely affect Qimonda's estate. The bankruptcy court also concluded, pursuant to 11 U.S.C. § 1506, that allowing Jaffé to cancel unilaterally Qimonda's licenses of U.S. patents "would be manifestly contrary to the public policy of the United States," recognizing "a fundamental U.S. public policy promoting technological innovation," which would be undermined if it failed to apply § 365(n) to the licenses under Qimonda's U.S. patents.

In this direct appeal from the bankruptcy court, Jaffé challenges both of these conclusions, arguing that the court erred in its construction of Chapter 15 and abused its discretion [**7] in applying it.

We conclude that the bankruptcy court properly recognized that Jaffé's request for discretionary relief under § 1521(a) required it to consider "the interests of the creditors and other interested entities, including the debtor" under § 1522(a) and that it properly construed § 1522(a) as requiring the application of a balancing test. Moreover, relying on the particular facts of this case and the extensive record developed during the four-day evidentiary hearing, we also conclude that the bankruptcy court reasonably exercised its discretion in balancing the interests of the licensees against the interests of the debtor and finding that application of § 365(n) was necessary to ensure the licensees under Qimonda's U.S. patents were sufficiently protected. Accordingly, we affirm.

I

737 F.3d 14, *18; 2013 U.S. App. LEXIS 24041, **7; 108 U.S.P.Q.2D (BNA) 1942, ***1944

The German insolvency proceeding

Qimonda AG filed an application to open a preliminary insolvency proceeding in the Munich Insolvency Court on January 23, 2009, which was converted to a final proceeding on April 1, 2009. Upon converting the proceeding [***1945] to a final one, the court appointed Dr. Michael Jaffé to serve as the estate's insolvency administrator, a position akin to a bankruptcy trustee under [**8] U.S. law. Subsequently, Qimonda ceased all manufacturing operations and began to liquidate its estate. The principal assets of the estate consisted of its approximately 10,000 patents, including about 4,000 U.S. patents. Most of these patents covered products or processes related to DRAM, but some covered other types of semiconductor technology.

The "patent thicket" and the practice of cross-licensing

At the time Qimonda opened its insolvency proceeding, its patents were subject to numerous cross-license agreements with other semiconductor manufacturers, including Infineon Technologies AG (from which Qimonda had spun off in 2006), Samsung Electronics Company, International Business Machines Corporation ("IBM"), Intel Corporation, Hynix Semiconductor, Inc., Nanya Technology Corporation, and Micron Technology, Inc. While some of these cross-license agreements were designed to facilitate specific joint ventures, [*19] most simply reflected the strategy widely adopted in the semiconductor industry in response to infringement risks arising from the industry's "patent thicket" -- a term used to describe "a dense web of overlapping intellectual property rights." Carl Shapiro, Navigating the Patent [**9] Thicket: Cross Licenses, Patent Pools, and Standard Setting, in 1 Innovation Policy and the Economy 119, 120 (Adam B. Jaffe et al. eds., 2001). As the bankruptcy court in this case aptly explained and all parties agreed, there are so many patents implicated by any new semiconductor product that "it would be all but impossible to design around each and every" one. In re Qimonda AG, 462 B.R. 165, 175 (Bankr. E.D. Va. 2011). "Indeed, such is the number of potentially applicable patents that it is not always possible to identify which ones might cover a new product . . . ." Id.

The problem of the patent thicket is exacerbated by the enormous costs incurred to bring a new semiconductor product to market. According to one expert, the price of building a new semiconductor fabrication facility can now exceed $5 billion. These sunk costs could create a classic "holdup" problem if a new product were ultimately found to infringe someone else's patent, with the patent's owner being able to extract a substantially higher royalty after

737 F.3d 14, *19; 2013 U.S. App. LEXIS 24041, **9; 108 U.S.P.Q.2D (BNA) 1942, ***1945

the investment had been made than if a license had been negotiated beforehand. Thus, to avoid this holdup premium and enhance their design freedom, competitors in [**10] the semiconductor industry have routinely entered into broad, non-exclusive cross-license agreements with each other, "sometimes with the addition of equalizing payments (either up-front payments or so-called running royalties) to account for differences in the size and breadth of the respective patent portfolios." In re Qimonda AG, 462 B.R. at 175.

Consistent with this industry practice, Qimonda had patent cross-license agreements with nearly every other major semiconductor manufacturer at the time it opened its insolvency proceeding.


The Chapter 15 proceeding

Jaffé commenced this Chapter 15 proceeding on June 15, 2009, for recognition of the German insolvency proceeding as a "foreign main proceeding" under 11 U.S.C. § 1517. Jaffé's petition identified Qimonda's known assets in the United States as including its "active patents and patent applications filed with the United States Patent and Trademark Office," and it sought relief designed to "give effect to the German Proceedings in the U.S., protect the U.S. Assets, and to prevent creditors in the U.S. from taking actions that [might] frustrate the German Proceedings." Jaffé also sought an order entrusting to him, under § 1521(a)(5), [**11] "[t]he administration or realization of all or part of the assets of [Qimonda] within the territorial jurisdiction of the United States" and further declaring that the "German Proceedings . . . be granted comity and [be] given full force and effect" in the United States.

The bankruptcy court granted the relief Jaffé requested, entering an order granting recognition of the German insolvency proceeding as a "foreign main proceeding" under § 1517. At the same time, it also entered a separate Supplemental Order "grant[ing] further relief under 11 U.S.C. § 1521." The Supplemental Order made Jaffé "the sole and exclusive representative of Qimonda AG in the United States" and, as requested, specifically gave him the power to "administer the assets of Qimonda AG within the territorial jurisdiction of the United States." It authorized Jaffé "to examine witnesses, take evidence, [***1946] seek production of documents, and deliver [*20] information" concerning Qimonda. Finally, it specified that, "in addition to those sections [of the Bankruptcy Code] made applicable pursuant to § 1520," a number of other provisions of the Bankruptcy Code would be "applicable in this proceeding," including 11 U.S.C. § 365. That [**12] provision gives a bankruptcy trustee power to assume or reject any of the debtor's executory contracts. But one subsection, § 365(n), limits the trustee's ability to unilaterally

737 F.3d 14, *20; 2013 U.S. App. LEXIS 24041, **12; 108 U.S.P.Q.2D (BNA) 1942, ***1946

reject licenses <u>to the debtor's intellectual property</u>, reserving to the licensees the option to elect to retain their rights under the licenses.

Shortly after the bankruptcy court entered its Supplemental Order, Jaffé began sending letters to companies that had cross-license agreements with Qimonda, invoking § 103 of the German Insolvency Code and declaring that the licenses under Qimonda's patents were "no longer enforceable." Section 103 of the German Insolvency Code, much like § 365 of the U.S. Bankruptcy Code, permits an insolvency administrator to decide whether to continue to perform the debtor's executory contracts. But, unlike § 365, which includes the § 365(n) exception, § 103 does not specifically address intellectual property licenses. In Jaffé's view, however, the licenses under Qimonda's patents fell within the scope of § 103, and it was his duty, as insolvency administrator, not to recognize them since they provided no useful compensation to Qimonda's estate.

After receiving these letters, Samsung  [**13] and Elpida Memory, Inc., responded with letters, taking the position that 11 U.S.C. § 365(n) protected their licenses under Qimonda's U.S. patents and announcing that they were electing to retain their rights under the licenses.

The letters from Samsung and Elpida prompted Jaffé to move to amend the bankruptcy court's July 22, 2009 Supplemental Order to delete entirely its reference to § 365. Alternatively, Jaffé asked the court to add a proviso to the Supplemental Order specifying that "Section 365(n) applies only if the Foreign Representative rejects an executory contract pursuant to Section 365 (rather than simply exercising the rights granted to the Foreign Representative pursuant to the German Insolvency Code)." Several companies that had licenses under Qimonda's U.S. patents through cross-license agreements -- namely, Infineon, Samsung, Micron, Nanya, IBM, Intel, and Hynix (hereafter, the "Licensees") -- opposed Jaffé's motion to amend the Supplemental Order.[1]

By an opinion dated November 19, 2009, the bankruptcy court granted Jaffé's motion, stating that its inclusion of § 365 was "improvident." The court explained that consistent with Chapter 15's goal of "providing a systematic and consistent resolution to cross-border insolvencies," the fate of the patent cross-license agreements should be decided in the German insolvency proceeding by applying German law. The court accordingly amended its Supplemental Order to include the alternative proviso that Jaffé had requested as an amendment.

---

[1] Infineon, Samsung, Micron, Nanya, and Elpida originally objected to the motion, while IBM, Intel, and Hynix were later allowed to intervene as objectors. Elpida, which also had elected to enforce its licenses from Qimonda  [**14] under § 365(n), subsequently reached a settlement with Jaffé and therefore is not an objecting Licensee.

<u>The appeal to the district court and its remand order</u>

The Licensees appealed the bankruptcy court's amended order to the district court, which thereafter remanded the case back to the bankruptcy court to consider 11 U.S.C. § 1522(a)'s requirement that the [*21] bankruptcy court ensure that "the interests of the creditors and other interested entities, including the debtor, [were] sufficiently protected." The district court explained that § 1522(a) required the bankruptcy court "to balance the relief granted to the foreign representative and the interests of those [**15] affected by such relief, without unduly favoring one group of creditors over another." <u>In re Qimonda AG Bankr. Litig</u>., 433 B.R. 547, 557 (E.D. Va. 2010) (emphasis omitted) (quoting <u>In re Tri-Continental Exch.</u>., 349 B.R. 627, 637 (Bankr. E.D. Cal. 2006)). The court found it "unclear on [the] somewhat anemic record whether the Bankruptcy Court adequately balanced the parties' interests, as required by § 1522," noting that the bankruptcy court had not adequately explained why the application of § 365(n) would unduly prejudice Jaffé or, conversely, fully considered "whether cancellation of licenses for [Qimonda's U.S. patents] would put at risk [the Licensees'] investments in manufacturing or sales facilities in this [***1947] country for products covered by the U.S. patents." <u>Id</u>. at 558.

As a separate basis for remand, the district court also found that the bankruptcy court had failed to consider "whether § 365(n) embodies the fundamental public policy of the United States, such that subordinating § 365(n) to German Insolvency Code § 103 is an action 'manifestly contrary to the public policy of the United States,'" under 11 U.S.C. § 1506. 433 B.R. at 565. The district court concluded that there were [**16] two primary circumstances in which a bankruptcy court should invoke § 1506: <u>first</u>, when "the foreign proceeding was procedurally unfair;" and <u>second</u>, when "the application of foreign law or the recognition of a foreign main proceeding under Chapter 15 would severely impinge the value and import of a U.S. statutory or constitutional right, such that granting comity would severely hinder United States bankruptcy courts' abilities to carry out . . . the most fundamental policies and purposes of these rights." <u>Id</u>. at 568-69 (internal quotation marks omitted). Finding the application of that standard "unclear on [the] record," the court also directed the bankruptcy court on remand to consider "whether conditioning the applicability of § 365(n) was a prohibited action 'manifestly contrary to the public policy of the United States' under § 1506." <u>Id</u>. at 570-71.

<u>On remand to the bankruptcy court</u>

737 F.3d 14, *21; 2013 U.S. App. LEXIS 24041, **16; 108 U.S.P.Q.2D (BNA) 1942, ***1947

On remand, Jaffé filed papers in the bankruptcy court in which he committed to re-license Qimonda's patent portfolio to the Licensees at a reasonable and nondiscriminatory ("RAND") royalty. He stated that he was prepared to "enter into good faith negotiations" with the Licensees to set the royalty rates [**17] and, if necessary, to submit the rate amounts to arbitration before the World Intellectual Property Organization ("WIPO").[2]

 [*22]  In March 2011, the bankruptcy court held a four-day evidentiary hearing, receiving testimony regarding the likely effects  [**18] of applying § 365(n) to licenses under Qimonda's U.S. patents. Jaffé testified at the hearing that a ruling applying § 365(n) would render "the central assets of [Qimonda's] estate, that is [its] U.S. patents . . . largely worthless." He also said that such a ruling would "violate the principle of equal treatment of creditors under German law" by giving the Licensees preferential treatment over Qimonda's other creditors.

Jaffé also presented the expert testimony of Dr. William Kerr, an economist, who concluded that based on his review of existing licenses and licensing practices in the semiconductor industry, Qimonda's estate would receive approximately $47 million per year if Jaffé were allowed to re-license Qimonda's U.S. patents covering DRAM products at RAND terms. Observing that $47 million would represent a small fraction of what the Licensees spend on research and development every year, Kerr gave his opinion that "discontinuance of the cross-licenses at issue [and subsequent re-licensing at a RAND rate] would not unduly impair the function of the semiconductor industry or the [Licensees]."

By contrast, the Licensees' witnesses testified to the harm that would befall the Licensees,  [**19] as well as the semiconductor industry as a whole, if the reference to § 365(n) were removed from the Supplemental Order. For example, Dr. Jerry Hausman, the Licensees' economist, gave his opinion that "[b]y destabilizing the system of licensing that has enabled the extraordinary success of the semiconductor industry and other industries, failure to apply Section 365(n) would reduce investment, innovation, and competition, which would harm U.S. productivity growth and U.S. consumers as well as worldwide productivity and consumers." Hausman also disputed Kerr's calculation of the likely RAND royalty rates, forecasting significantly higher sums and arguing that the holdup threat

_____

[2] RAND royalties are relatively common in high-tech industries because of the role played by standard-setting organizations, which help ensure the interoperability of products, among other functions. To avoid the holdup problem in this context, standard-setting organizations typically require their members to agree in advance to license any patent identified as necessary to a standard at RAND terms. Both Qimonda and the Licensees belong to such an organization. Nonetheless, the Federal Trade Commission has observed that "there is much debate over whether such RAND . . . commitments can effectively prevent patent owners from imposing excessive royalty obligations on licensees," noting complaints by industry representatives that the term RAND is "vague and ill-defined -- particularly with regard to what royalty rate is 'reasonable.'" Fed. Trade Comm'n, The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition 192-93 (2011).

737 F.3d 14, *22; 2013 U.S. App. LEXIS 24041, **19; 108 U.S.P.Q.2D (BNA) 1942, ***1947

could not [***1948] be eliminated. Moreover, in Hausman's view, Jaffé's offer to re-license the U.S. patents at RAND terms could not "provide adequate protection for the interests of the [Licensees]," in part because of the danger that Jaffé would subsequently sell the patent portfolio to an entity that might itself file for bankruptcy, thus "extinguish[ing] the [Licensees'] licenses once again."

The bankruptcy court's decision on remand

At the conclusion of the hearing, the bankruptcy court issued a memorandum opinion denying [**20] Jaffé's motion to amend the Supplemental Order and confirming "that § 365(n) applies with respect to Qimonda's U.S. patents." In re Qimonda AG, 462 B.R. at 185. The court assumed for the purpose of its analysis that Jaffe's interpretation of German law was correct and that § 103 of the German Insolvency Code would authorize him to terminate the Licensees' right to practice Qimonda's patents. With that assumption, the court concluded that "the balancing of debtor and creditor interests required by § 1522(a) . . . weighs in favor of making § 365(n) applicable to Dr. Jaffé's administration of Qimonda's U.S. patents." Id. at 182.

Explaining its balancing analysis, the bankruptcy court recognized that its ruling would "result in less value . . . being realized by the Qimonda estate" but noted that Qimonda's patents would "by no means be rendered worthless." 462 B.R. at 182. On the other hand, the court found that a contrary ruling would create a "very real" "risk to the very substantial investment the [Licensees] . . . [had] collectively made in research and manufacturing facilities in the United States in reliance on the design [*23] freedom provided by the cross-license agreements." Id. at 182-83. [**21] The court acknowledged that Jaffé's offer to re-license Qimonda's patents on RAND terms would lessen the holdup risk, but observed that, because of the Licensees' "sunk costs, [they would] not have the option of avoiding royalties altogether by designing around the patent." Id. at 181-82.

As an independent ground for its decision, the bankruptcy court also concluded, under 11 U.S.C. § 1506, that "deferring to German law, to the extent it allows cancellation of the U.S. patent licenses, would be manifestly contrary to U.S. public policy." 462 B.R. at 185. Referencing the legislative history of Congress's enactment of the Intellectual Property Licenses in Bankruptcy Act, Pub. L. No. 100-506, 102 Stat. 2538 (1988), the court noted that § 365(n) resulted from Congress's determination "that allowing patent licenses to be terminated in bankruptcy would 'impose[] a burden on American technological development.'" In re Qimonda AG, 462 B.R. at 184 (quoting S. Rep. No. 100-505, at 1 (1988), reprinted in 1988 U.S.C.C.A.N. 3200, 3200). Informed by this congressional policy choice,

737 F.3d 14, *23; 2013 U.S. App. LEXIS 24041, **21; 108 U.S.P.Q.2D (BNA) 1942, ***1948

the court reasoned that "[a]lthough innovation would obviously not come to a grinding halt if licenses to U.S. patents [**22] could be cancelled in a foreign insolvency proceeding, the court is persuaded by Professor Hausman's testimony that the resulting uncertainty would nevertheless slow the pace of innovation, to the detriment of the U.S. economy." Id. at 185. On this basis, the court concluded that "failure to apply § 365(n) under the circumstances of this case and this industry would 'severely impinge' an important statutory protection accorded licensees of U.S. patents and thereby undermine a fundamental U.S. public policy promoting technological innovation." Id.

The bankruptcy court thus held that "public policy, as well as the economic harm that would otherwise result to the [L]icensees, require[d] that the protections of § 365(n) apply to Qimonda's U.S. patents." 462 B.R. at 167-68.


The direct appeal to the court of appeals

Jaffé appealed the bankruptcy court's ruling and sought from the district court a certification under 28 U.S.C. § 158(d)(2) for a direct appeal to this court. The district court concluded that the bankruptcy court's order qualified for certification, and, by order dated June 28, 2012, we authorized the direct appeal. See 28 U.S.C. § 158(d)(2).

II

Congress enacted Chapter 15 of the [**23] Bankruptcy Code in 2005 as part of the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, stating that its purpose was "to incorporate the Model Law on Cross-Border Insolvency," which had been developed in 1997 by the United Nations Commission on International Trade Law ("UNCITRAL"), "so as to provide [***1949] effective mechanisms for dealing with cases of cross-border insolvency." 11 U.S.C. § 1501(a); see also H.R. Rep. No. 109-31, pt. 1, at 105 (2005), reprinted in 2005 U.S.C.C.A.N. 88, 169. In this respect, Chapter 15 replaced former 11 U.S.C. § 304, which authorized bankruptcy courts to award appropriate relief in a case ancillary to a foreign proceeding but which was largely discretionary. See 11 U.S.C. § 304(c) (2000). Chapter 15 lists five specific objectives: (1) to encourage cooperation with "the courts and other competent authorities of foreign countries involved in cross-border cases;" (2) to increase "legal certainty for trade and investment;" (3) to promote the "fair and efficient administration of cross-border insolvencies" so as to [*24] "protect[] the interests of all creditors, and other interested entities, including the debtor;" (4) [**24] to protect and maximize "the value of the debtor's assets;" and (5) to facilitate "the rescue of financially troubled businesses." 11 U.S.C. § 1501(a); see also H.R. Rep. No. 109-31, pt. 1, at 105.

To further these stated objectives, Chapter 15 authorizes the representative of a foreign insolvency proceeding to commence a case in a U.S. bankruptcy court by filing a petition for recognition of the foreign proceeding. 11 U.S.C. §§ 1504, 1509(a), 1515. If the petition meets the requirements listed in § 1517, the court must enter an order granting recognition of the foreign proceeding. And if that foreign proceeding "is pending in the country where the debtor has the center of its main interests," it is recognized as a "foreign main proceeding." 11 U.S.C. § 1517(b)(1); see also id. § 1502(4). With the entry of an order recognizing a foreign main proceeding, the foreign representative of the proceeding automatically receives relief as stated in § 1520, including the automatic stay created by § 362 with respect to the debtor and its property within the United States and the ability to operate the debtor's business within the United States under § 363, as well as the right to sue and be sued [**25] and the right to "intervene in any proceedings in a State or Federal court in the United States in which the debtor is a party." Id. §§ 1520(a), 1509(b)(1), 1524. Moreover, the statute provides that following entry of a recognition order, "a court in the United States shall grant comity or cooperation to the foreign representative," thereby implementing a principal purpose of Chapter 15. Id. § 1509(b)(3).

Even before entry of the order granting recognition, § 1519 authorizes the bankruptcy court, on the foreign representative's request, to grant preliminary relief when "urgently needed to protect the assets of the debtor or the interests of the creditors." 11 U.S.C. § 1519.

In addition to the automatic relief that comes with the entry of an order granting recognition of a foreign main proceeding, § 1521 authorizes the bankruptcy court to grant discretionary relief. Specifically, § 1521 provides that "where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief." 11 U.S.C. § 1521(a). This discretionary relief may include "entrusting [**26] the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative," id. § 1521(a)(5), as well as "entrust[ing] the distribution of all or part of the debtor's assets located in the United States to the foreign representative," id. § 1521(b). The bankruptcy court, however, may only grant discretionary relief under § 1521 if it determines that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." Id. § 1522(a). It may also subject the discretionary relief it grants under § 1521 "to conditions it considers appropriate, including the giving of security or the filing of a bond." Id. § 1522(b).

737 F.3d 14, *24; 2013 U.S. App. LEXIS 24041, **26; 108 U.S.P.Q.2D (BNA) 1942, ***1949

Finally, all of the actions authorized in Chapter 15 are subject to § 1506, which provides that "[n]othing in this chapter prevents the court from refusing to take an action governed by this chapter if the action would be manifestly contrary to the public policy of the United States." 11 U.S.C. § 1506.

Chapter 15 thus authorizes an "ancillary" proceeding in a United States bankruptcy court that is largely designed to complement and assist a foreign [**27] insolvency [*25] proceeding by, among other things, "bring[ing] people and property beyond the foreign main proceeding's jurisdiction into the foreign main proceeding through the exercise of the United States' jurisdiction." In re ABC Learning Centres Ltd., 728 F.3d 301, 307 (3d Cir. 2013); see also H.R. Rep. No. 109-31, pt. 1, at 106 [***1950] ("Cases brought under chapter 15 are intended to be ancillary to cases brought in a debtor's home country . . ."). This structure reflects "the United States policy in favor of a general rule that countries other than the home country of the debtor, where a main proceeding would be brought, should usually act through ancillary proceedings in aid of the main proceedings, in preference to a system of full bankruptcies (often called 'secondary' proceedings) in each state where assets are found." H.R. Rep. No. 109-31, pt. 1, at 108. Notwithstanding this general policy, Chapter 15 also expressly contemplates that "[a]fter recognition of a foreign main proceeding, a case under another chapter of [the Bankruptcy Code] may be commenced . . . if the debtor has assets in the United States." 11 U.S.C. § 1528.

Thus, taken as a whole, Chapter 15 -- like the Model Law on [**28] which it was based -- takes "several modest but significant" steps toward implementing "a modern, harmonized and fair framework to address more effectively instances of cross-border insolvency." UNCITRAL, Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency, in Legislative Guide on Insolvency Law 307, 307 (2005) (hereinafter, "Guide to Enactment").

III

Jaffé contends that the bankruptcy court erred by employing § 1522(a)'s sufficient protection requirement to subject his "right to administer [Qimonda's] U.S. patents . . . to the constraints imposed by § 365(n)," thus allowing the Licensees to elect to retain their license rights under Qimonda's U.S. patents, contrary to German law as he understands it. In re Qimonda AG, 462 B.R. at 183. The bankruptcy court limited the authority it conferred on Jaffé under § 1521(a)(5) by balancing the interests of the Licensees with the interests of Qimonda's estate under § 1522(a) and concluding that the Licensees should receive the protection of § 365(n). Id. at 180-83. In support of his challenge, Jaffé makes essentially three arguments: (1) that the district court and the bankruptcy court erred in even considering § 1522(a), because [**29] that section applies only to relief granted under § 1521, that the relief granted under § 1521 may be requested only by the foreign representative, and that he, as the foreign

737 F.3d 14, *25; 2013 U.S. App. LEXIS 24041, **29; 108 U.S.P.Q.2D (BNA) 1942, ***1950

representative, never requested the inclusion of § 365(n) as part of the § 1521 relief; (2) that the bankruptcy court misunderstood the type of protection afforded by § 1522(a) by applying a test that balanced the debtor's interests and the creditors' interests instead of a test that placed all creditors on an equal footing; and (3) that in balancing the competing interests, the bankruptcy court overstated the risks to the Licensees, especially in view of Jaffé's offer to re-license Qimonda's patents to them, and failed to treat all creditors' interests equally. We address these points in order.[3]

 [*26]  A

First, Jaffé argues that both the bankruptcy court and the district court erred  [**31] in even considering § 1522's sufficient protection requirement because § 1522(a) applies to relief that may be granted under § 1521, and § 1521(a), in turn, provides that "the court may, at the request of the foreign representative, grant any appropriate relief." (Emphasis added). He asserts that he "never asked the bankruptcy court to include § 365 in its Supplemental Order or sought other relief relating to § 365(n)" such that the Licensees would have the option to retain their licenses under Qimonda's U.S. patents. Thus, according to Jaffé, because application of § 365 was not specifically requested  [***1951] by him, the bankruptcy court's sua sponte inclusion of § 365 was legal error, the correction of which must precede any consideration of § 1522(a)'s sufficient protection requirement.

We believe that Jaffé's view of the relationship between § 1521(a) and § 1522(a) is too myopic. While it is true that Jaffé "never affirmatively requested rejection authority under § 365," he did request several forms of discretionary relief under § 1521, among which was the privilege, pursuant to § 1521(a)(5), to have the bankruptcy court entrust him with "[t]he administration or realization of all or part  [**32] of the assets of [Qimonda] within the territorial

---

[3] We note as well that the United States has appeared as amicus curiae to express its concern that the bankruptcy court overstepped its authority below. Specifically, it criticizes the bankruptcy court as "approach[ing] this case as though it were empowered to decide whether the Foreign Administrator should be permitted to reject appellees' license agreements" based on an erroneous assumption that it could "superimpose  [**30] Section 365(n) on the operation of German insolvency law in a German proceeding." The United States therefore urges us to "reverse[] on the threshold ground that Section 365(n) cannot constrain the operation of German insolvency law in Germany."

As already made clear, however, we take a different view of the scope of the bankruptcy court's holding. Rather than purporting to "constrain the operation of German insolvency law in Germany," the bankruptcy court conditioned its grant of power to Jaffé to "administer the assets of Qimonda AG within the territorial jurisdiction of the United States" with the limitation that he was taking the company's U.S. patents subject to the preexisting licenses, which he was obliged to treat in a manner consistent with § 365(n). As a result, Jaffé is precluded from rejecting the U.S. patent licenses as a matter of U.S. law. Although this limitation may have indirect effects in the German proceeding, it does not represent an impermissible application of U.S. law extraterritorially, which we understand to be the main concern animating the United States' position in this case.

jurisdiction of the United States," specifically identifying the company's U.S. patents as among the U.S. assets he sought to control. And, as a prerequisite to awarding any § 1521 relief, the court was required to ensure sufficient protection of the creditors and the debtor. Section 1522(a) states this explicitly, providing in relevant part, "The court may grant relief under section . . . 1521 . . . only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a) (emphasis added). Additionally, the court was authorized to "subject" any § 1521 relief "to conditions it considers appropriate." Id. § 1522(b); see also H.R. Rep. No. 109-31, pt. 1, at 116 (describing § 1522 as "giv[ing] the bankruptcy court broad latitude to mold relief to meet specific circumstances, including appropriate responses if it is shown that the foreign proceeding is seriously and unjustifiably injuring United States creditors").

This is precisely what the bankruptcy court did here. It granted discretionary relief under § 1521 and, as mandated, considered the question of sufficient protection [**33] under § 1522(a). Upon such consideration, it conditioned its § 1521 relief on application of § 365(n), finding that such protection was appropriate in the circumstances presented.

To be sure, the bankruptcy court did not frame its initial inclusion of § 365 in the [*27] Supplemental Order as a condition on the authority it was granting Jaffé under § 1521. Indeed, when initially faced with Jaffé's motion to amend, the court described the inclusion of § 365 as "improvident." But on the Licensees' appeal, the district court correctly recognized that it was incumbent on the bankruptcy court, on remand, to consider whether "the interests of the creditors and other interested entities, including the debtor, [would be] sufficiently protected" under § 1522(a) were the court to modify its earlier order so as to grant Jaffé control over the administration of Qimonda's U.S. patents without providing for the application of § 365(n) to the licenses on those patents. See In re Qimonda AG Bankr. Litig., 433 B.R. at 557-58.

The bankruptcy court's consideration of § 1522(a) was thus undoubtedly appropriate when authorizing relief under § 1521.

B

Jaffé next contends that even if the bankruptcy court was correct [**34] to consider § 1522's sufficient protection requirement in granting § 1521 relief, the court nonetheless employed the wrong test in applying § 1522(a). He maintains that the bankruptcy court's "ruling fundamentally misunderst[ood] the 'interests' § 1522(a) protects" by failing to recognize that § 1522(a) is merely a procedural protection "designed to ensure that all creditors [could] participate in the bankruptcy distribution on an equal footing" and thus should not be used to protect parties from

737 F.3d 14, *27; 2013 U.S. App. LEXIS 24041, **34; 108 U.S.P.Q.2D (BNA) 1942, ***1951

the substantive bankruptcy law that would otherwise apply in the foreign main proceeding. (Emphasis added). He asserts that "[d]isregarding foreign law based on an open-ended balancing test under § 1522(a) is contrary to Chapter 15's basic design," which, according to Jaffé, requires U.S. courts to defer to foreign substantive law except only as allowed under § 1506, which provides a narrow exception when the court's action would otherwise violate "the most fundamental policies of the United States." H.R. Rep. No. 109-31, pt. 1, at 109. In sum, he argues (1) that the bankruptcy court erred by interpreting § 1522's sufficient protection requirement as incorporating a balancing test that could  [**35] achieve a result that treated creditors differently and that would therefore be in tension with German law, and (2) that, to the extent § 1522(a) was implicated at all, the bankruptcy court should have limited its analysis to ensuring that the doors of the German insolvency proceeding would be open to the Licensees on equal footing with Qimonda's other creditors.

Jaffé's theory of how the sufficient protection requirement of § 1522(a) operates is not illogical. The text of the statute is broad and somewhat ambiguous regarding the test that  [***1952]  courts should employ to determine "if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a). But we are not convinced that Jaffé's theory can fully be squared with the text or with Congress's intent in enacting the text.

Section 1522(a) requires the bankruptcy court to ensure the protection of both the creditors and the debtor. 11 U.S.C. § 1522(a). The provision thus requires the court to ensure that the relief a foreign representative requests under § 1521 does not impinge excessively on any one entity's interests, implying that each entity must receive at least some protection.  [**36] And because the interests of the creditors and the interests of the debtor are often antagonistic, as they are here, providing protection to one side might well come at some expense to the other. The analysis required by § 1522(a) is therefore logically best done by balancing the respective  [*28]  interests based on the relative harms and benefits in light of the circumstances presented, thus inherently calling for application of a balancing test.

We also find support for this interpretation in the Model Law on Cross-Border Insolvency, on which Chapter 15 was based. In enacting Chapter 15, Congress stated that it intended to codify the Model Law. See 11 U.S.C. § 1501(a). And, in doing so, it also indicated strongly that the Model Law, and the accompanying Guide to Enactment issued by UNCITRAL in conjunction with its adoption of the Model Law, should inform our interpretation of Chapter 15's provisions. Indeed, Chapter 15 provides that "[i]n interpreting this chapter, the court shall consider its international origin, and the need to promote an application of this chapter that is consistent with the application of similar

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 542 of 882
737 F.3d 14, *28; 2013 U.S. App. LEXIS 24041, **36; 108 U.S.P.Q.2D (BNA) 1942, ***1952

234

statutes adopted by foreign jurisdictions." Id. § 1508; see also H.R. [**37] Rep. No. 109-31, pt. 1, at 109-10 ("Interpretation of this chapter on a uniform basis will be aided by reference to the Guide and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well. . . . To the extent that the United States courts rely on these sources, their decisions will more likely be regarded as persuasive elsewhere" (emphasis added)). Thus, the Model Law and its Guide to Enactment also provide relevant guidance in determining the appropriate meaning of Chapter 15's provisions.

The Guide to Enactment contains a number of paragraphs that bear directly on the question of how a court should assess the interests of others and protect them prior to granting the discretionary relief sought by a foreign representative. For example, the Guide acknowledges that the representative of a foreign main proceeding will "normally seek[] to gain control over all assets of the insolvent debtor." Guide to Enactment ¶ 158, at 347. But it stresses that the Model Law makes "[t]he 'turnover' of assets to the foreign representative . . . discretionary," adding that "the Model Law contains several safeguards designed to ensure the protection of [**38] local interests before assets are turned over to the foreign representative." Id. ¶ 157, at 347 (emphasis added). Chief among those "safeguards" is Article 22 of the Model Law, which is largely codified as § 1522.[4] According to the Guide, "The idea underlying [A]rticle 22 is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief. This balance is essential to achieve the objectives of cross-border insolvency legislation." Id. ¶ 161, at 348 (emphasis added). The Guide to Enactment separately indicates that Article 22 is designed to "protect the interests of the [*29] creditors (in particular local creditors), the debtor and other affected persons." Id. ¶ 35, at 314. Finally, the Guide states, "[i]n addition to [Article 22's] specific provisions," Article 6 of the Model Law "in a general way provides [***1953] that the court may refuse to take an action governed by the Model Law if the action would be manifestly contrary to the public policy of the enacting State." Id. ¶ 36, at 314 (emphasis added).

---

[4] Article 22 of the Model Law provides in full:

1. In granting or denying relief under article 19 [**39] or 21, or in modifying or terminating relief under paragraph 3 of this article, the court must be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected.

2. The court may subject relief granted under article 19 or 21 to conditions it considers appropriate.

3. The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or at its own motion, modify or terminate such relief.

Comparing Article 22 and § 1522 reveals that Congress relied heavily on the language of the Model Law. One of the few alterations that Congress made was to change "adequately" in Article 22(1) to "sufficiently" in § 1522(a) -- a modification that the legislative history indicates was made in order "to avoid confusion with . . . 'adequate protection,'" "a very specialized legal term in United States bankruptcy." H.R. Rep. No. 109-31, pt. 1, at 115.

Informed by the Guide to Enactment's description of the relationship between Articles 22 and 6 of the Model Law (§§ 1522 and 1506 in the U.S. Bankruptcy Code), we do not share Jaffé's view that § 1506's public policy exception forecloses use of a [**40] balancing analysis under § 1522. Contrary to Jaffé's position, Chapter 15 does not require a U.S. bankruptcy court, in considering a foreign representative's request for discretionary relief under § 1521, to blind itself to the costs that awarding such relief would impose on others under the rule provided by the substantive law of the State where the foreign insolvency proceeding is pending. Instead, Chapter 15, like the Model Law, anticipates the provision of particularized protection, as stated in § 1522(a).

We therefore conclude, through interpretation of § 1522(a)'s text and consideration of Chapter 15's international origin, that the district court correctly interpreted § 1522(a)'s sufficient protection requirement as requiring a particularized balancing analysis that considers the "interests of the creditors and other interested entities, including the debtor," 11 U.S.C. § 1522(a), and, in this case in particular, a weighing of the interests of the foreign representative (the debtor) in receiving the requested relief against the competing interests of those who would be adversely affected by the grant of such relief (here, the Licensees). And we also agree that § 1506 is an additional, [**41] more general protection of U.S. interests that may be evaluated apart from the particularized analysis of § 1522(a).

In reaching this conclusion, we join the Fifth Circuit, which interpreted § 1522(a) similarly, based largely on the language in the Guide to Enactment. See In re Vitro S.A.B. de C.V., 701 F.3d 1031, 1060, 1067 n.42 (5th Cir. 2012); see also In re Int'l Banking Corp. B.S.C., 439 B.R. 614, 626-27 (Bankr. S.D.N.Y. 2010); In re Tri-Continental Exch., 349 B.R. 627, 637 (Bankr. E.D. Cal. 2006).

C

Finally, Jaffé contends that the bankruptcy court's balancing analysis, even if assumed appropriate, was flawed in implementation. He argues that the court dramatically overstated the risk to the Licensees' investments made in reliance on the cross-license agreements, especially in light of his offer to re-license Qimonda's U.S. patents to the Licensees at a RAND royalty rate. In this regard, he maintains that the court's balancing analysis failed to recognize that "§ 1522(a) requires courts to protect the interests of all 'creditors and other interested entities, including the debtor' -- not just one set of contracting parties."

The Licensees respond, arguing that "the bankruptcy court [**42] properly recognized that Dr. Jaffé's offer to relicense did not change the balance of harms" and that the bankruptcy court correctly "concluded that, without §

365(n) protection, the Licensees would face both the immediate harm of a hold-up and the future . . . destabilization of the licensing regime in the semiconductor industry." They maintain that in light of the bankruptcy court's detailed findings and careful reasoning, Jaffé simply "cannot meet his heavy burden to demonstrate that the bankruptcy [*30] court abused its discretion in its application of § 1522."

It should be noted that after hearing four days of evidence, the bankruptcy court considered the outcome of its balancing analysis to be a close one. But in the end it concluded, reasonably we believe, "that the balancing of debtor and creditor interests required by § 1522(a), Bankruptcy Code, weigh[ed] in favor of making § 365(n) applicable to Dr. Jaffé's administration of Qimonda's U.S. patents." In re Qimonda AG, 462 B.R. at 182. The court recognized Jaffé's claim that the "application of § 365(n) [would] result in less value . . . being realized by the Qimonda estate." Id. But it noted that "Qimonda's patent portfolio [would]  [**43] by no means be rendered worthless" because the "U.S. patents [could] still be licensed to parties that [did] not already have a license, and Dr. Jaffé, to the extent permitted by German law, [would] be able to fully monetize the non-U.S. patents." Id. Additionally, the bankruptcy court found it significant that "[a]pplication of § 365(n) . . . [would impose] no affirmative burden on Dr. Jaffé," id., but instead would merely limit his ability -- and, importantly, the ability of the patents' subsequent owners -- to bring infringement actions against the very entities that Qimonda had previously promised not to sue. See Imation Corp. v. Koninklijke Philips Elecs. N.V., 586 F.3d 980, 987 [***1954]  (Fed. Cir. 2009) (characterizing a patent cross-license agreement as essentially "a promise by the licensor not to sue the licensee" for infringement (citation omitted)).

In considering and weighing the Licensees' interests, the bankruptcy court largely credited their evidence indicating that entrusting Jaffé with the right to administer Qimonda's U.S. patents without making § 365(n) applicable to the preexisting licenses under those patents would have broad-ranging ill effects. It explained that "the risk [**44] to the very substantial investment the [Licensees] -- particularly IBM, Micron, Intel, and Samsung -- [had] collectively made in research and manufacturing facilities in the United States in reliance on the design freedom provided by the cross-license agreements, though not easily quantifiable, [was] nevertheless very real." In re Qimonda AG, 462 B.R. at 182-83. While the bankruptcy court acknowledged that the Licensees had been unable "to identify specific Qimonda patents implicated by the products they manufacture[d] and s[old]," it noted that the lack of such evidence was "not at all surprising, since the whole point of portfolio cross-licenses [was] to eliminate the necessity (and in some cases impossibility) of individually analyzing each and every patent that might possibly apply to determine if a new design infringe[d] on it." Id. at 181. Thus, although the bankruptcy court could not, in the course of its balancing

737 F.3d 14, *30; 2013 U.S. App. LEXIS 24041, **44; 108 U.S.P.Q.2D (BNA) 1942, ***1954

analysis, make "a finding that cancellation of the [Licensees'] right to use Qimonda's U.S. patents would have a specific dollar impact on them," it did find that it "create[d] a substantial risk of harm," adding that "the threat of infringement litigation can be  [**45] as damaging as an actual finding of infringement." Id.

We find the bankruptcy court's thorough examination of the parties' competing interests to have been both comprehensive and eminently reasonable.

Jaffé relies heavily on the mitigation that would result from his commitment to re-license Qimonda's patents to the Licensees on RAND terms, arguing that it would provide sufficient protection for their interests. Of course, his proposal -- first mentioned after the district court's remand -- does weigh in his favor by decreasing the Licensees' holdup risks. But just because the RAND proposal would reduce the Licensees' risks does not mean  [*31] that their interests would be sufficiently protected by Jaffé's promise to re-license. The bankruptcy court expressly recognized this, explaining that "the hold-up risk is lessened by Dr. Jaffé's offer to re-license the patents on RAND terms," but emphasizing that "even if the WIPO expert determination process were to arrive at the same figure that would have been agreed to in an 'ex ante' scenario, the [Licensees], because of their sunk costs, [would] not have the option of avoiding royalties altogether by designing around the patent." In re Qimonda AG, 462 B.R. at 181-82.  [**46] We conclude that the bankruptcy court's findings in this regard are not unreasonable and that the bankruptcy court was justified in its skepticism of Jaffé's claim that the Licensees' interests would now be "sufficiently protected" by his commitment not to charge them an exorbitant rate during their re-licensing negotiations.

Moreover, the bankruptcy court also noted that it remained an "open question" whether any new license issued by Jaffé on RAND terms would itself be secure, expressing its concern that

> Dr. Jaffé could still sell the underlying patents to a purchaser -- whether a practicing entity or a 'troll' -- that might itself file for insolvency under German law or transfer the patent to a special purpose entity for the purpose of having it file for insolvency under German law.

Id. at 181-82 n.13. The court's recognition of this concern was also reasonable, as it is far from clear whether, having once facilitated the termination of license rights in a foreign insolvency proceeding, the genie could ever be put back into the bottle. Rather, as indicated by expert testimony that the bankruptcy court credited, it would seem all too likely that such a result would introduce a dangerous  [**47] degree of uncertainty to a licensing system that plays a critically important role in the semiconductor industry, as well as other high-tech sectors of the global economy.

737 F.3d 14, *31; 2013 U.S. App. LEXIS 24041, **47; 108 U.S.P.Q.2D (BNA) 1942, ***1954

At bottom, we affirm the decision of the bankruptcy court, finding reasonable its exercise of discretion in conducting the balancing analysis under § 1522(a) and concluding that attaching the protection of § 365(n) was necessary when granting Jaffé the power to administer Qimonda's U.S. patents. See In re Vitro S.A.B. de C.V., 701 F.3d at 1069 (noting in the course of affirming a bankruptcy court's decision not to enforce the reorganization plan [***1955] adopted in a foreign main proceeding that "[i]t is not our role to determine whether the above-summarized evidence would lead us to the same conclusion" and adding that "[o]ur only task is to determine whether the bankruptcy court's decision was reasonable" (emphasis added)).

IV

It is important, we think, to recognize, as Jaffé would have us do, the importance of Chapter 15 to a global economy, in which businesses needing bankruptcy protection increasingly have assets in various countries. In mimicking the U.N.'s Model Law on Cross-Border Insolvencies, Chapter 15 furthers a [**48] policy of the United States of cooperating with other countries in providing fair and efficient insolvency proceedings for such international businesses. Consistent with its stated purposes, Chapter 15 provides for the ready recognition of foreign insolvency proceedings, see 11 U.S.C. § 1517, and grants automatic relief to protect U.S. assets upon entry of an order granting recognition, see id. § 1520. It also provides for a broad range of discretionary relief under § 1521. Thus, it represents a full commitment of the United States to cooperate with foreign insolvency proceedings, as called for by the U.N.'s Model Law on [*32] Cross-Border Insolvency. And at bottom, such cooperation will provide greater legal certainty for trade and business to the benefit of the global economy.

But the United States' commitment is not untempered, as is manifested in both Chapter 15 and the Model Law on which it was based. Thus, § 1522(a) requires that a bankruptcy court, when granting the discretionary relief authorized by § 1521, ensure sufficient protection of creditors, as well as the debtor. And at a more general level, § 1506, which covers any action under Chapter 15, authorizes a bankruptcy court to [**49] refuse to take an action that would be manifestly contrary to U.S. public policy.

In this case, it is sufficient for us to affirm the bankruptcy court, based on its application of § 1522(a). But in doing so, we understand that, by affirming the bankruptcy court's application of § 365(n) following its balancing analysis under § 1522(a), we also indirectly further the public policy that underlies § 365(n). The Senate Report accompanying the bill that became § 365(n) explicitly recognized that licensees have a strong interest in maintaining their right to use intellectual property following the licensor's bankruptcy and that to deny them that right would "impose[] a burden on American technological development that was never intended by Congress." S. Rep.

No. 100-505, at 1. The Report added that "[t]he adoption of this bill will immediately remove that burden and its attendant threat to the development of American Technology." Id. at 2.

In this case, the bankruptcy court, in weighing the respective interests of the Licensees and the debtor under § 1522(a), found that without the protection of 365(n), the risk of harm to the Licensees would be very real, impairing the "design freedom provided  [**50] [them] by the cross-license agreements." In re Qimonda AG, 462 B.R. at 183. And as the bankruptcy court otherwise found, this potential harm to the Licensees would, in turn, threaten to "slow the pace of innovation" in the United States, to the detriment of the U.S. economy. Id. at 185. Thus, the court's findings, which were, to be sure, focused on the Licensees' interests, nonetheless necessarily furthered the public policy underlying § 365(n).

We thus recognize that by affirming the bankruptcy court, even though on its § 1522(a) analysis, we too necessarily further the public policy inherent in and manifested by § 365(n).

The judgment of the bankruptcy court is accordingly

AFFIRMED.

**Concur by:** WYNN

## Concur

WYNN, Circuit Judge, concurring in the judgment:

The only question we need to address in this appeal concerns the bankruptcy court's discretion in ensuring that "the interests of the creditors and other interested entities, including the debtor, are sufficiently protected" under Chapter 15 of the Bankruptcy Code, 11 U.S.C. § 1522, and whether the bankruptcy court abused that discretion here. I agree with the majority opinion that in reviewing this issue, we look not to whether the record evidence "would  [**51] lead us to the same conclusion" but that "[o]ur only task is to determine whether the bankruptcy court's decision was reasonable." In re Vitro S.A.B. de C.V., 701 F.3d 1031, 1069 (5th Cir. 2012). Accordingly, I am happy to concur in the language in Parts I, II, and III of the majority opinion that analyzes and addresses only this issue. I do not  [***1956] join in Part IV because it is unnecessary dictum.

---

# H5 6 ˙1%



Neutral Citation Number: [2016] EWHC 25 (Ch)

Case No: 5091 of 2015

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

**IN THE MATTER OF OGX PETRÓLEO E GÁS S.A.**
**AND**
**IN THE MATTER OF THE CROSS-BORDER INSOLVENCY REGULATIONS 2006**

Royal Courts of Justice
Rolls Building, Fetter Lane
London, EC4A 1NL
Date: 12 January 2016

**Before** :

**MR JUSTICE SNOWDEN**

- - - - - - - - - - - - - - - - - - - -

(1)  **NORDIC TRUSTEE A.S.A.**
(2)  **OSX 3 LEASING B.V.**

**Applicants**

**And**

(1)   **OGX PETRÓLEO E GÁS S.A. (EM RECUPERAÇÃO JUDICIAL)**
(2) **PEDRO MORAES BORBA, PAULO NARCELIO AMARAL and**
**JULIO ALFREDO KLEIN JR**

**Respondents**

- - - - - - - - - - - - - - - - - - - -

**Andreas Gledhill QC** and **Andrew Scott** (instructed by **Akin Gump LLP**) for the **Applicants**
**Martin Pascoe QC** and **Richard Fisher** (instructed by **SC Andrews LLP**) for the
**Respondents**

Hearing date: 2 October 2015

- - - - - - - - - - - - - - - - - - - -

# APPROVED JUDGMENT

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this
Judgment and that copies of this version as handed down may be treated as authentic.

**MR JUSTICE SNOWDEN**

**MR JUSTICE SNOWDEN:**

*Introduction*

1.　This case raises important questions about applications for recognition of foreign insolvency proceedings under the UNCITRAL Model Law on Cross-Border Insolvency ("the Model Law") as incorporated into English law by the Cross-Border Insolvency Regulations 2006 (S.I. 2006 No. 1030) ("the CBIR"). The main issue is whether an applicant for recognition of a foreign insolvency proceeding must make full and frank disclosure to the Court in relation to the effect that such recognition might have on third parties.

*The facts*

2.　The First Respondent, OGX Petróleo e Gás SA ("OGX") is an oil and gas company incorporated in Brazil. The Second Respondents are the members of the Board of Directors of OGX.

3.　OSX 3 Leasing BV ("Leasing") is a company which is incorporated in the Netherlands. In July 2011, Leasing contracted with a Japanese shipyard for a floating production, storage and offloading vessel, known as the OSX 3. Construction was part financed by a US$500m secured bond issue in favour of a Norwegian company, Nordic Trustee ASA ("Nordic"), as trustee for the bond holders.

4.　On 6 March 2012, Leasing concluded a bare boat charter agreement in relation to the OSX 3 with OGX as charterer (the "Original Charter"). The charter period was 20 years. On 26 March 2012, Leasing assigned its rights under the Original Charter to Nordic.

5.　In October 2013, OGX ran into financial difficulties. On 30 October 2013, OGX and its parent petitioned for judicial reorganisation under chapter III (Articles 47 et seq.) of the Brazilian bankruptcy law (No. 11,101/05) (the "Brazilian Bankruptcy Law"). Thereafter OGX prepared a reorganisation plan for submission to the Fourth Corporate Court of Rio de Janeiro ("the Bankruptcy Court"). In March 2014, and while OGX's plan was still in gestation, OGX asked Leasing to agree a reduction in the daily charter rates payable under the Original Charter. This led to a renegotiation which proceeded in parallel to the judicial reorganisation.

6.　OGX's reorganisation plan (the "Plan") was approved by its creditors on 3 June 2014, and by the Bankruptcy Court on 13 June 2014. The "Credits" that were affected by the Plan were defined therein as "Credits and obligations, whether materialised or contingent, net or illiquid, existing on the Filing Date". The "Creditors Affected by the Plan" were defined in the Plan as "Creditors whose Credits and rights can be changed by the Plan, as set forth in the Brazilian Bankruptcy Law". In that regard, the relevant provision of the Brazilian Bankruptcy Law is Article 49 which provides,

> "All claims existing on the date of the petition are subject to the judicial reorganization, even if not yet due".

7.    Although claims under the Original Charter might have been subject to the judicial reorganisation, the Plan expressly reflected the fact that a renegotiation of the Original Charter was still continuing between OGX and Leasing and it was envisaged that any new charter entered into as a result of those renegotiations would not be subject to the restructuring to be effected by the Plan.  To that end the Plan expressly ratified any agreements that might be entered into between OGX and Leasing which set out new terms and conditions for the chartering and operation of the OSX 3 vessel. Accordingly, neither Leasing nor Nordic were included on the list of creditors of OGX for the purposes of the Plan and they were not entitled to attend the meeting of creditors on 3 June 2014 or vote on the Plan.

8.    The renegotiation between Leasing and OGX concluded three months after the Plan was approved, with the execution on 12 September 2014 of a Charter Amendment Agreement (the "Charter Amendment Agreement"), and an Amended and Restated Bare Boat Charter Agreement (the "New Charter").  Under the latter, the daily charter rate for the OSX 3 was reduced from the US$410,837 payable under the Original Charter to US$250,000 initially and US$265,000 after 31 January 2015.

9.    Importantly for present purposes, the Charter Amendment Agreement expressly substituted the New Charter for the Original Charter.  It provided that, "with effect on and from ... the Effective Date ... the Original Charter Contract shall cease to have any force or effect".  The New Charter also included detailed representations and warranties by OGX going to the enforceability of the obligations assumed by OGX under it, notwithstanding its bankruptcy proceedings. OGX could not have given those representations and warranties had its obligations under the New Charter been subject to the terms of the Plan.

10.   The obvious and intended consequence of these provisions was that any claims of Leasing against OGX under the New Charter would not be claims "existing on the petition date" in respect of OGX's Plan within the meaning of Article 49 of the Brazilian Bankruptcy Law and would not be subject to the restructuring of debts under the Plan.

11.   Further, the New Charter contained an express provision under which the parties agreed that all disputes between them in relation to the agreement should be finally settled by arbitration in accordance with the rules of the London Court of Arbitration (LCIA), with the seat and place of arbitration being London.  Accordingly, subject to an express right to apply to the Brazilian courts for "provisional and urgent measures", arbitration in London represented the parties' agreed dispute resolution mechanism under the New Charter.

12.   On 12 September 2014 Leasing gave notice to OGX that Leasing's rights under the New Charter had been assigned to Nordic, and OGX acknowledged receipt of that notice.

13.   The first invoice under the New Charter (for US$71.5 million) was paid by OGX on about 17 September 2014.  After that, OGX continued to use the OSX 3 vessel but only made one more payment under the New Charter.  By mid-August 2015 invoices totalling some US$78.73m were outstanding.

14.     On 18 December 2014, and without notice to Nordic or Leasing, OGX sought and obtained a provisional injunction from the Bankruptcy Court in Rio de Janeiro, unilaterally reducing the daily charter payable under the New Charter from US$250,000 to US$130,000 (the "Brazilian Injunction"). The basis for the decision was apparently articles 317 and 478 of the Brazilian Civil Code, which OGX contended empowered the Bankruptcy Court to revise the New Charter on the basis that there had been "an alteration in the objective basis of the business deal". This was said by OGX to have been the result of an unforeseen fall in the price of oil. On 16 January 2015, OGX issued substantive proceedings (the "Substantive Claim"), seeking final injunctive relief pursuant to those provisions of the Brazilian Civil Code.

15.     Nordic and Leasing sought to set aside the Brazilian Injunction, and on 28 May 2015 the Fourteenth Civil Panel of the Court of Appeals of Rio de Janeiro declared the Brazilian Injunction to be null and void on the basis that the Bankruptcy Court had had no jurisdiction to make such an order. The Court of Appeals noted that the New Charter and OGX's obligation to pay charter rates under it were entered into after the filing of OGX's judicial reorganisation, so that by reason of the terms of Article 49 of the Brazilian Bankruptcy Law, those obligations were not subject to the Plan which was approved by the Bankruptcy Court. The Court of Appeals cited with approval an opinion from the State Attorney's office, which stated that the Bankruptcy Court only had jurisdiction in relation to, "claims involving creditors subject to the effects of the judicial recovery plan and the management of the assets in connection to said plan". The Court of Appeals consequently remitted OGX's application for a reduction of the daily charter rate under the New Charter to a different civil court for determination, subject to determination of a further request by OGX for clarification/permission to appeal against the Court of Appeals' decision.

16.     On 22 June 2015, Nordic and Leasing submitted a request for arbitration pursuant to the New Charter and the LCIA rules ("the Arbitration"). Among the relief sought by them "as a preliminary or urgent matter" was an order, "requiring OGX to take all necessary steps to withdraw or discontinue both its request for the Brazilian Injunction and its Substantive Claim; and to cease, desist and refrain until further order from commencing or prosecuting ... proceedings in any court or tribunal in Brazil, or in any other court or tribunal other than arbitration in London …".

17.     Faced with that relief in the Arbitration and the challenge to OGX's attempts to obtain a reduction in the rates payable under the New Charter, the Board of Directors of OGX decided to try to prevent the Arbitration from proceeding. It did this by applying for an order for recognition in England of the Brazilian Plan as a foreign main proceeding with a view to taking advantage of the automatic stay of proceedings that would follow such recognition.

18.     To that end, on 24 July 2015 the Board of Directors of OGX issued an application for recognition of the Plan under Article 15 of the Model law, as incorporated into English law by the CBIR. Article 15 provides,

> "1.     A foreign representative may apply to the court for recognition of the foreign proceeding in which the foreign representative has been appointed.

4

2.      An application for recognition shall be accompanied by—

(a)     a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; or

(b)     a certificate from the foreign court affirming the existence of the foreign proceeding and of the appointment of the foreign representative; or

(c)     in the absence of evidence referred to in sub-paragraphs (a) and (b), any other evidence acceptable to the court of the existence of the foreign proceeding and of the appointment of the foreign representative.

3.      An application for recognition shall also be accompanied by a statement identifying all foreign proceedings, proceedings under British insolvency law and section 426 requests in respect of the debtor that are known to the foreign representative."

19.    The Board of Directors of OGX contended that the Plan was a foreign proceeding as defined in Article 2(i) of the Model Law and that the Board of Directors qualified as a foreign representative of OGX within the meaning of Article 2(j) of the Model Law. Those definitions are as follows,

"(i)    "foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation or liquidation;

(j)     "foreign representative" means a person or body, including one appointed on an interim basis, authorised in a foreign proceeding to administer the reorganisation or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding;"

20.    Article 17 of the Model Law states:

"1.     Subject to article 6, a foreign proceeding shall be recognised if-

(a)      it is a foreign proceeding within the meaning of sub-paragraph (i) of article 2;

(b)      the foreign representative applying for a recognition is a person or body within the meaning of sub-paragraph (j) of article 2;

(c)      the application meets the requirements of paragraphs 2 and 3 of article 15; and

(d)      the application has been submitted to the court referred to in article 4.

2.      The foreign proceeding shall be recognised -

(a)      as a foreign main proceeding if it is taking place in the State where the debtor has the centre of its main interest…"

21.      In addition to an order for recognition, the proposed order included a provision specifically setting out that the consequences of recognition under Article 20(1) of the Model Law would be that the continuation of any proceedings against OGX in Great Britain would be stayed.  As incorporated into English law by the CBIR, and insofar as is relevant, Article 20 provides,

"1.      Upon recognition of a foreign proceeding that is a foreign main proceeding, subject to paragraph 2 of this article —

(a)      commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities is stayed;

(b)      execution against the debtor's assets is stayed; and

(c)      the right to transfer, encumber or otherwise dispose of any assets of the debtor is suspended.

2.      The stay and suspension referred to in paragraph 1 of this article shall be —

(a)      the same in scope and effect as if the debtor … had been made the subject of a winding-up order under the Insolvency Act 1986; and

(b)      subject to the same powers of the court and the same prohibitions, limitations, exceptions and conditions as would apply under the law of Great Britain in such a case,

and the provisions of paragraph 1 of this article shall be interpreted accordingly.

…

6.      In addition to and without prejudice to any powers of the court under or by virtue of paragraph 2 of this article, the court may, on the application of the foreign representative or a person affected by the stay and suspension referred to in paragraph 1 of this article, or of its own motion, modify or terminate such stay and suspension or any part of it, either altogether or for a limited time, on such terms and conditions as the court thinks fit."

*The evidence on the application*

22.   The evidence in support of the Board of Directors' application was provided by the Chief Executive Officer of OGX, Mr. Paulo Amaral.  He stated that it had not previously been thought that recognition in England of OGX's judicial reorganisation would be necessary because the company had not anticipated the need for any protection in England.  He said, however, that the position had changed as the result of the Arbitration commenced in London by Nordic and Leasing.

23.   The evidence also sought to address the requirements of recognition under the Model Law.  In that regard, in seeking to show that the Plan to which OGX was subject under the Brazilian Bankruptcy Law was a foreign proceeding, Mr. Amaral's witness statement stated that,

"Judicial reorganisation in this context contemplates the restructuring, collecting and distributing the debtor's assets to creditors pursuant to an approved and Court endorsed plan, in this instance OGX's Judicial Reorganisation Plan".

24.   Mr. Amaral then continued, "In this regard, the following provisions of the Bankruptcy Law apply."  He then set out, verbatim, the provisions of Articles 47-53 of the Brazilian Bankruptcy Law, except that Article 49 was omitted entirely.  His statement did not, however, draw attention to that omission.  Still less was any explanation provided for it.

25.   The evidence in support of the application then went on to address the question of whether OGX's Board of Directors constituted a "foreign representative" for the purposes of the Model Law, and argued that it did.  Reference was then made to the Original Charter, the 2012 assignment of Leasing's rights under the Original Charter to Nordic, and the Charter Amendment Agreement.  Mr. Amaral asserted that Nordic "consequently became an OGX creditor".  The witness statement then continued,

7

248

> "However, OGX, due to the crisis that afflicted the oil sector, was unable to pay certain instalments under the charter party. [Nordic] then filed for enforcement of an extrajudicial title before the State Court of Rio de Janeiro, requiring the provisional attachment of certain assets of [OGX] in order to secure recovery of the credit.
>
> OGX filed a motion for stay of enforcement in which, amongst other reasons, it stated that the enforceability of the [claims of] creditors arising out of the charter party had been suspended by means of an order granted by the [Bankruptcy Court]. The application for provisional attachment was rejected.
>
> By request dated 22 June 2015 [Nordic and Leasing] commenced an arbitration against OGX pursuant to Article 21.3 of the Bareboat Charter Party Agreement.
>
> Recognition by the English court of the Brazilian judicial proceedings will assist progress in the OGX Group judicial reorganisation, in accordance with article 20 of the UNCITRAL Model Law there will be a stay of enforcement against the company and of rights to encumber any of the Company's assets."

26.   Accordingly, whilst referring to Nordic as "an OGX creditor", the witness statement failed to draw attention to the fact that the New Charter under which Nordic and Leasing had instituted the Arbitration had been entered into after the relevant date for the purposes of the Brazilian judicial reorganisation. Nor did Mr. Amaral's evidence mention that only two months earlier, the Rio de Janeiro Court of Appeals had specifically determined (subject to any clarification or further appeal), as against OGX, that the Bankruptcy Court had no jurisdiction to vary the charter rates under the New Charter, because the obligations under that agreement were not subject to the Plan. Nor did the evidence disclose (still less make it clear) that the Arbitration upon which the automatic stay under Article 20 of the Model Law would bite was an arbitration of claims under the New Charter which were not subject to the Plan for which recognition was sought.

*The hearing of the application*

27.   OGX's recognition application came before Mann J. without notice to Nordic or Leasing in the final week of the Trinity term, on Tuesday 28 July 2015. The Board of Directors of OGX was represented before Mann J. by junior counsel, whose skeleton argument stated that the Board of Directors applied for recognition of the Plan and repeated that it had not been thought necessary to apply for such recognition until Nordic and Leasing commenced the Arbitration in England. Counsel submitted that the Board of Directors of OGX now applied for recognition, "in order to obtain the benefit of the automatic stay under Article 20, which prevents the continuation of actions and proceedings without the Court's permission."

28.   The effect of the automatic stay upon the Arbitration was thus very much at the forefront of Mann J.'s mind when he embarked upon the hearing of the application on 28 July 2015.  That much is evident from the following exchange that took place close to the start of the hearing,

> "MR JUSTICE MANN:   Normally, at the end but I will ask it now, I ask the question that on the footing that you are, as it were, unopposed, and you owe the usual duties to the court--
>
> COUNSEL: Yes
>
> MR JUSTICE MANN:    -- are there any matters to which my attention needs to be drawn which might point away from the making of this application [sic], were there an opponent, for example, the person who wants to initiate the arbitration … which needs to be drawn to my attention which hasn't already been drawn to my attention in the skeleton argument?
>
> COUNSEL:   The one unusual fact of which I am aware, which I have drawn attention to in the skeleton argument, is that there is this judicial administrator or supervisor who's been appointed in reserve of his position as being addressed by [inaudible] on the evidence that, presumably proceedings are in the nature of debtor in possession proceedings rather than [overspeaking] where the existing Board remain in position."

29.   There was a further exchange towards the end of the hearing,

> "MR JUSTICE MANN:   And unless there is anything which you need to draw to my attention – you say there isn't – then I'm minded to make the order.  The only person who's likely to be really affected by this is the counterparty to the arbitration and I don't know whether – do I have the draft order in here?
>
> COUNSEL: The draft order is at tab 4, I've got copies.  Certainly, of course, [several inaudible words] if they consider that there are proper grounds for [the] arbitration to continue but that obviously is something that will have to be dealt with in the usual way.
>
> MR JUSTICE MANN:   Yes, I was wondering whether they should have liberty to apply under this order but they probably don't need it, do they, because they can always apply, in any event, and several [overspeaking].
>
> COUNSEL:   Well, absolutely, it's only if they were – I'm assuming that if they wanted to continue the arbitration, they could apply for permission.   I think if your Lordship is postulating this now, in a way, instead of doing that perhaps as well [overspeaking] sets outs this order.

MR JUSTICE MANN:    I was, yes.

COUNSEL:  There would be nothing to stop them from making that application.

MR JUSTICE MANN:    Because they may take the view that despite the fact that you and I seem to have got to the bottom of the technicalities that, in fact, we haven't and there are other technicalities and for some reason or other Brazilian insolvency shouldn't be recognised, that they would be able to do that, in any event, wouldn't they?  Person affected under rule 7.47?

COUNSEL:  Absolutely.  They [inaudible] rules in that regard apply.

MR JUSTICE MANN:    Yes."


30.    Crucially, at no time during the hearing was Mann J. told that the New Charter pursuant to which the Arbitration was taking place was not subject to the Brazilian judicial reorganisation (the Plan) for which recognition was being sought.

31.    Mann J. then gave a short judgment dealing with the point that had been raised as to whether the Board of Directors qualified as the foreign representative of OGX.  He concluded,

"I am satisfied that all the other requirements and conditions have been fulfilled and, in the circumstances, I shall make the order.  I add the following.  The reason that recognition is sought is that an arbitration has been commenced, or is sought to be commenced in this jurisdiction and the companies wish to have the opportunity of having that arbitration stayed.  The effect of my order is that there will be a stay but the counterparty to the arbitration may apply to have the stay lifted.  Any such application will be heard on its merits.  I also record that, in my view, the counterparty would also have the right to challenge the recognition order that I have made…"


32.    Mann J.'s Order ("the Order") provided for the recognition of the Plan as a foreign main proceeding and then expressly stated that,

"(i)     commencement or continuation of individual actions or individual proceedings concerning the Company's assets, rights, obligations or liabilities is stayed;

(ii)     execution against the Company's assets is stayed;"

The practice of spelling out in the order the consequences of recognition originated in cases such as <u>Samsung Logix Corporation v DEF</u> [2009] EWHC 576 (Ch) and was commended by Norris J. in <u>Pan Oceanic Maritime Inc</u> [2010] EWHC 1734 (Ch).

*Nordic and Leasing apply for the Order to be set aside or modified*

33.    After the Order had been served upon them, Nordic and Leasing immediately protested and made an urgent application pursuant to the inherent jurisdiction of the court and/or Article 20(6) of the Model Law for the Order to be set aside in part or varied so as to permit the Arbitration to proceed.  Nordic and Leasing contended that Mann J. had been misled, or at very least that the Order had been obtained by a material non-disclosure of the fact that the Plan for which recognition was sought did not apply to the claims in the Arbitration under the New Charter.

34.    The application was adjourned on 13 August 2015 on terms that permitted the tribunal to be constituted for the Arbitration in London and for evidence to be filed, including evidence from OGX on the question of whether Mann J had been misled or whether there had been material non-disclosure.

35.    Importantly, when that evidence was filed, OGX's evidence (including its expert evidence) accepted that because the claims of Nordic and Leasing under the New Charter arose post-petition, they were not subject to the Plan by reason of Article 49 of the Brazilian Bankruptcy Law.

36.    However, OGX's evidence maintained that the use of the OSX 3 vessel was of great importance if OGX was to comply with the Plan, but that the charter rate agreed under the New Charter had become "unrealistic and commercially unviable given the drastic and unforeseen fall in the price of oil" since the rate had been agreed.  OGX contended that the Bankruptcy Court had jurisdiction over any assets considered essential to its activities, and hence that it could order a reduction in the amounts payable under the New Charter.  OGX further submitted that this meant that the Arbitration in which Nordic and Leasing were seeking to prevent OGX seeking such relief in Brazil should be stayed.

37.    OGX's evidence as regards the allegations of material non-disclosure to Mann J. was supplied by a witness statement from its solicitor.  He asserted that the evidence filed by OGX had been sufficient for the purposes of complying with Articles 15 and 17 of the Model Law and that when the Article 17 requirements had been met, recognition was required leading to an automatic stay without the exercise of any discretion under Article 20.  The witness statement continued,

> "The evidence filed on behalf of OGX did not therefore address matters potentially relevant to whether or not the automatic stay imposed by virtue of Article 20 should be modified in any way in relation to Nordic's arbitration proceedings.  It did not do so on the basis that such matters were not relevant to the requirements for recognition, and would have to be addressed in due course if an application was made to modify the stay."

38.     The witness statement then addressed the question of what had occurred at the hearing, drawing attention to the latter of the two exchanges between Mann J. and Counsel to which I have referred above, and then asserting that because the requirements for recognition are set out in the Model Law and a stay follows automatically under Article 20(1), "it is not accepted that the matters relied upon by Nordic should have been drawn to the Court's attention."

39.     The witness statement concluded,

> "In the event that the Court concludes that there are matters that ought to have been drawn to the attention of Mann J., and were not, I apologise on behalf of OGX.  Any such failure will be a consequence of a mistaken approach adopted by OGX … as to what was relevant to the application, rather than a deliberate attempt by OGX to keep relevant information from the Court."

40.     When the matter came back before me on 2 October 2015, matters had moved on. OGX's application for permission to appeal the determination of the Brazilian Court of Appeals that the Bankruptcy Court had no jurisdiction to order a reduction of the amounts payable under the New Charter had been dismissed by the Brazilian Superior Court of Justice.  In light of that, and the acceptance on all sides that the claims under the New Charter were not subject to the Plan, the parties had agreed a draft consent order under which the automatic stay was to be lifted to permit the Arbitration to continue.  In addition, OGX had agreed to pay the costs of Nordic and Leasing in relation to the application to modify Mann J.'s Order, with an interim payment on account of costs of £215,000 to be paid within 21 days.  The draft consent order provided that if such payment was made, the costs would be assessed on the standard basis, but that if it was not, then the costs would be assessed on the indemnity basis.

41.     Although I had reservations about making an order by consent that left Mann J.'s order for recognition of the Plan in place for no obvious purpose, and in circumstances in which I had doubts about whether it should have been granted in the first place (see below), in the end I was persuaded that I should abide by the agreement that the parties had reached.

42.     Mr. Andreas Gledhill QC, for Nordic and Leasing, also told me that in light of the draft consent order that had been agreed, his clients had no desire to pursue their allegations of material non-disclosure.  That was doubtless a pragmatic commercial decision taken in light of the fact that Nordic and Leasing had obtained permission to pursue the Arbitration together with an order for payment of their costs and a substantial payment on account.

43.     I was not, however, satisfied by OGX's explanation of its approach to the application for recognition or as to the disclosure to Mann J.  I therefore heard submissions from Mr. Martin Pascoe QC, on behalf of OGX, as to those matters, and I indicated that I would give a judgment concerning them because of the wider importance of these

issues for applications of this type.  I should make it clear that neither Mr. Pascoe QC nor his junior, Mr. Fisher, had appeared before Mann J.


*Analysis*

44.   I accept that, in the ordinary case, recognition of a foreign proceeding within the meaning of that expression in Article 2(i) of the Model Law is intended to follow if the applicant can satisfy the requirements of Articles 15 and 17 of the Model Law. Article 17 provides that if the requirements are satisfied, the foreign proceeding "shall" be recognised.  Further, although Article 17 is subject to Article 6, which provides that the court can refuse to take any action which would be "manifestly contrary to the public policy of Great Britain or any part of it", it is clear that this public policy exception is intended to be restrictively interpreted.

45.   The Guide to Enactment of the Model Law explains this at paragraphs 29-30,

> "29.     One of the key objectives of the Model Law is to establish simplified procedures for recognition of qualifying foreign proceedings that would avoid time-consuming legalization or other processes and provide certainty with respect to the decision to recognize. The Model Law is not intended to accord recognition to all foreign insolvency proceedings. Article 17 provides that, subject to article 6, when the specified requirements of article 2 concerning the nature of the foreign proceeding (i.e. that the foreign proceeding is, as a matter of course, a collective proceeding for the purposes of liquidation or reorganization under the control or supervision of the court) and the foreign representative are met and the evidence required by article 15 has been provided, the court should recognize the foreign proceeding without further requirement. The process of application and recognition is aided by the presumptions provided in article 16 that enable the court in the enacting State to presume the authenticity and validity of the certificates and documents, originating in the foreign State, that are required by article 15.
>
> 30.     Article 6 allows recognition to be refused where it would be "manifestly contrary to the public policy" of the State in which recognition is sought. This may be a preliminary question to be considered on an application for recognition. No definition of what constitutes public policy is attempted as notions vary from State to State. However, the intention is that the exception be interpreted restrictively and that article 6 be used only in exceptional and limited circumstances (see paras. 101-104). Differences in insolvency schemes do not themselves justify a finding that enforcing one State's laws would violate the public policy of another State."

13

46.     I also accept that if a foreign proceeding is recognised as a foreign main proceeding under Article 17, the stay under Article 20(1) operates automatically. However, as is apparent from Article 20(2), the stay only applies to the extent that a stay would apply if a winding up order had been made in relation to the company in England. It is therefore important to understand the scope and purpose of the stay that would apply if the company were being wound up in England.

47.     The stay that comes into force upon the making of a winding up order in England is set out in section 130(2) of the Insolvency Act 1986:

> "When a winding-up order has been made or a provisional liquidator has been appointed, no action or proceeding shall be proceeded with or commenced against the company or its property, except by leave of the court and subject to such terms as the court may impose."

48.     The general scope and purpose of this provision has been well-settled since the nineteenth century. In re David Lloyd & Co. (1877) 6 Ch D 339 at 344, James LJ said,

> "These sections in the Companies Act, and the corresponding legislation with regard to bankrupts, enabling the Court to interfere with actions, were intended, not for the purpose of harassing, or impeding, or injuring third persons, but for the purpose of preserving the limited assets of the company or bankrupt in the best way for distribution among all the persons who have claims upon them. There being only a small fund or a limited fund to be divided among a great number of persons, it would be monstrous that one or more of them should be harassing the company with actions and incurring costs which would increase the claims against the company and diminish the assets which ought to be divided among all the creditors. But that has really nothing to do with the case of a man who for the present purpose is to be considered as entirely outside the company, who is merely seeking to enforce a claim, not against the company, but his own property."

49.     Further, in Re Aro Limited [1980] Ch 196, the Court of Appeal considered section 231 of the Companies Act 1948 which was in the same terms as section 130(2) of the Insolvency 1986 Act. Brightman LJ said, at pages 203-204,

> "This case is directly concerned only with section 231 of the Companies Act 1948, but it will be convenient to consider the statutory provisions in greater breadth. The basic scheme of the companies legislation is that the unsecured creditors of an insolvent company are to rank *pari passu* (subject to statutory provisions as to preferential payments) … In order to achieve

14

this result, there are provisions which restrict the right of a creditor to make use of procedures outside the liquidation…

Section 228 (1) of the Act provides that where a company is being wound up by the court, any attachment, sequestration, distress or execution "put in force" against the estate or effects of the company after the commencement of the winding up shall be void to all intents. "Put in force" means, for example, seizure by the sheriff as distinct from a sale by him. The date of the commencement of the winding up is the date of the presentation of the petition or of a preceding resolution for a voluntary winding up. This section, though absolute in terms, has been held to be subject by implication to the court's dispensing power which is spelt out by section 231. This is the section with which we are primarily concerned. It reads in full:

"When a winding up order has been made or a provisional liquidator has been appointed, no action or proceeding shall be proceeded with or commenced against the company except by leave of the court and subject to such terms as the court may impose."

Sections 228 and 231 apply to secured as well as to unsecured creditors. But a secured creditor is in a position where he can justly claim that he is independent of the liquidation, since he is enforcing a right, not against the company, but to his own property: see In re David Lloyd & Co. (1877) 6 Ch.D. 339, a case under the predecessor of section 231."

50.    It can therefore be seen that the purpose of the automatic stay under section 130(2) is to preserve the *pari passu* ranking of unsecured creditors in a winding up and to prevent any individual unsecured creditor from obtaining an illegitimate advantage over other unsecured creditors in the collective process of winding up. The obvious assumption that underlies the operation of section 130(2) is that the party against whom a stay should operate is a creditor whose claims against the debtor company are subject to the collective insolvency proceeding. So, for example, if the party is a secured creditor, he will be regarded as standing outside the collective process, and the automatic stay under section 130(2) will invariably be lifted to enable him to enforce his security.

51.    That analysis is entirely consistent with the fact that the Model Law applies only to collective proceedings, and of the purpose of the automatic stay under Article 20. In that regard, paragraph 69 of the Guide to Enactment of the Model Law explains the importance of the collective nature of insolvency proceedings,

"For a proceeding to qualify for relief under the Model Law, it must be a collective proceeding because the Model Law is intended to provide a tool for achieving a coordinated, global solution for all stakeholders of an insolvency proceeding. It is

> not intended that the Model Law be used merely as a collection device for a particular creditor or group of creditors who might have initiated a collection proceeding in another State. Nor is it intended that the Model Law serve as a tool for gathering up assets in a winding up or conservation proceeding that does not also include provision for addressing the claims of creditors."

52.     In relation to the stay under Article 20(1), paragraphs 37-38 of the Guide to Enactment emphasise that the stay applies to prevent action by individual creditors, and indicate that exceptions from the stay under national laws are likely to include, in particular, secured claims and the execution of rights *in rem*,

> "37.     Key elements of the relief accorded upon recognition of a foreign "main" proceeding include a stay of actions of individual creditors against the debtor or a stay of enforcement proceedings concerning the assets of the debtor…
>
> 38.     Exceptions and limitations to the scope of the stay and suspension (e.g. exceptions for secured claims, payments by the debtor made in the ordinary course of business, set-off, execution of rights *in rem*) and the possibility of modifying or terminating the stay or suspension are determined by provisions governing comparable stays and suspensions in insolvency proceedings under the laws of the enacting State (article 20, paragraph 2)."

See also per Briggs J in <u>Cosco Bulk Carriers v Armada Shipping SA</u> [2011] EWHC 216 (Ch) at paragraphs 46-49.

53.     Given these considerations, I do not think that the stay which is intended to operate upon recognition of a collective foreign proceeding under the Model Law is intended to prevent persons whose claims are <u>not</u> subject to that collective proceeding from being able to pursue their claims against the company. Such persons stand outside the collective process, and it would not be appropriate to utilise the stay under Article 20(1) to prevent them from pursuing their ordinary remedies against the company.

54.     The case of OGX presents this issue in a more extreme way, because the <u>only</u> purpose for which recognition of the Plan was sought under the Model Law was in order to obtain a stay under Article 20(1) so as to prevent the Arbitration. The application for recognition had nothing to do with protecting the Brazilian reorganisation proceedings from action by an individual creditor who was subject to those collective proceedings. Instead, its sole purpose was to obtain a stay to frustrate an arbitration proceeding under a contract that OGX had freely entered into <u>after</u> approval of the Plan, where the claims in question under the New Charter were not subject to the Plan. That aim was, in my judgment, inconsistent with the structure and purpose of the Model Law, and was an abuse of the process for recognition of a foreign proceeding.

55.     Further, OGX plainly proceeded upon the basis that it was only required to inform the English court of the matters necessary to obtain recognition, and that it could then

simply rely upon the stay coming into effect automatically under Article 20(1), irrespective of whether or not the stay might be upheld if subsequently challenged. This led to Mr. Amaral's evidence being framed so as to avoid any mention of the fact that the obligations under the New Charter were not subject to the Plan; a decision was obviously taken to omit any reference to Article 49 in the extract from the Brazilian Bankruptcy Law that was otherwise set out verbatim in his witness statement; and the section of the witness statement dealing with legal proceedings was drafted so as to omit any mention of the decision of the Brazilian Court of Appeals.

56.    This approach also seems to have followed through into the answers given to Mann J at the hearing on 28 July 2015 when the Judge referred to the "usual duties to the court" owed by a party making a without notice application and asked whether there were any points that Nordic and Leasing might have wished to draw to his attention had they been at the hearing.  The answers given drew attention a point concerning satisfaction of the requirements for recognition, but made no reference to the obvious point that could have been raised by Nordic and Leasing that their claims under the New Charter were not subject to the Plan and that (at very least) the automatic stay should be modified or varied from the outset by the court of its own motion so as to permit the Arbitration to proceed.

57.    In my judgment, quite apart from the fact that the Board of Directors of OGX were seeking recognition under Article 17 and an automatic stay under Article 20 for a purpose for which those provisions of the Model Law were not intended, the approach by OGX to the formulation of the evidence which it placed before the court was wrong, and the disclosure made to Mann J. at the hearing on 28 July 2015 was wholly inadequate.

58.    As indicated above, the court hearing an application for recognition has the discretionary power under Article 20(6) of the Model Law to modify, from the outset, the stay which will come into effect upon the making of its order.  That discretion is often exercised either by limiting the stay, or extending it: see e.g. Pan Oceanic Maritime Inc. [2010] EWHC 1734 at paragraph 7.  Accordingly, it seems to me that a foreign representative who seeks recognition without notice ought to place before the court any material of which he is aware which is relevant to the exercise of that discretion.  If the foreign representative knows that recognition and the automatic stay will affect existing or threatened proceedings, or the enforcement of security by a third party, he should inform the court of that fact and of any matters that would be relevant as to whether the automatic stay should apply or not, or be modified or limited, apply in a modified form, or not apply at all.  The court can then exercise its discretion whether to modify the automatic stay immediately or simply to grant recognition and to place the burden upon the third party to apply subsequently.

59.    In many cases, for example where there are pre-existing court proceedings against the company, it may well be that it would be appropriate for the court simply to grant recognition and to leave it to the other litigant to apply for the automatic stay to be lifted.  In other cases, for example where there are arbitration proceedings already in existence or threatened (see e.g. Cosco Bulk Carriers (supra)), the decision might be more finely balanced.  Where it is known that a secured creditor wishes to enforce its security, it may be obvious that a modification to the automatic stay should be made from the outset because it would be pointless to place the onus upon the secured creditor to spend time and money making an application for the stay to be modified

which would inevitably be granted: see e.g. <u>re David Lloyd & Co</u> (supra) and <u>Cosco Bulk Carriers</u> at para 49.

60.     The instant case falls squarely into the last category.  I have no doubt whatsoever that had Mann J. been alerted to the fact that the claims in the Arbitration under the New Charter were not subject to the Plan that he was being asked to recognise, he would not have followed the course which he in fact took of granting recognition and permitting the automatic stay to halt the Arbitration, thereby placing the burden upon Nordic and Leasing to expend time and money applying for the stay to be lifted.  I have no doubt that, if he had been properly informed, Mann J. would at very least have modified the automatic stay from the outset to permit the Arbitration to proceed.  Further, and notwithstanding the clear intention that the public policy exception in Article 6 should be interpreted restrictively, I consider that it is strongly arguable that the court must have a residual discretion to refuse recognition if satisfied that the applicant is abusing that process for an illegitimate purpose.  On the exceptional facts of this case I think that Mann J. might well have been justified in rejecting the application for recognition altogether.

61.     As it was, a very substantial amount of costs were incurred by Nordic and Leasing in seeking a modification of the stay.  Those costs were caused by OGX's abuse of process.  For my part, had the parties not themselves agreed a modification of the Order that permitted the Arbitration to continue and included a provision that OGX would pay Nordic and Leasing's costs (including a significant sum on account), I would have been inclined to make an indemnity costs order against OGX.

62.     Further, whatever view might have been taken as to the obligation of the Board of Directors of OGX to inform the court of all matters relevant to the exercise of discretion as to whether the automatic stay should be modified or not, it should not be overlooked that at the hearing on 28 July 2015 Mann J. expressly asked to be told of any matters that Nordic and Leasing might have raised if they had been present which might have pointed away from the court granting OGX's application.  It is well understood that the duty of full and frank disclosure to which Mann J. was referring requires disclosure of all matters that <u>might</u> reasonably be raised by an opposing party, whether or not the party who is appearing before the court considers that such arguments would be well-founded.  Given that the question was expressly asked and the Order sought expressly referred to the stay that would come into effect upon recognition, I think that it was plainly incumbent upon those advising and representing OGX to disclose that the claims in the Arbitration under the New Charter were not subject to the Brazilian reorganisation proceedings for which recognition was sought.  They did not do so, and in my judgment it is clear that Mann J. did not receive the disclosure and assistance that he should have been given.

63.     I have been considerably troubled by this aspect of the case, but by a narrow margin I have accepted Mr. Pascoe QC's submission that I should not seek to investigate it or take matters further.  In particular, I cannot make any findings as to where responsibility for the non-disclosure at the hearing on 28 July 2015 lies without seeking to understand which (if any) of the members of the legal team present knew of the matters which had been omitted from the evidence.  Pursuit of these questions would require further disclosure and would doubtless intrude into areas covered by privilege.  Bearing in mind that Nordic and Leasing will be compensated for their

wasted costs and do not wish to pursue such matters, I have eventually come to the conclusion that it would not be proportionate for me to do so on my own initiative.

64.    For the future, however, I think that it must be made clear that foreign representatives and their advisers must ensure that the valuable process for recognition under the Model Law and the CBIR is not misused.  When seeking recognition, full and frank disclosure must be made to the court in relation to the consequences that recognition of the foreign proceeding may have upon third parties who are not before the court. In particular, the court should be told of any points that could be raised in relation to the modification or termination of the automatic stay and suspension which will come into effect upon recognition.

19



# Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

CHANCERY DIVISION, COMPANIES COURT

MORGAN J

2, 3, 4 APRIL, 30 JUNE 2014

30 JUNE 2014

**Contract — Termination — Cancellation of contract — Korean company (the company) being in administration — Brazilian firm (Fibria) seeking to cancel contract with company — Contract being governed by English law — Company submitting Fibria unable to cancel contract — Whether Fibria able to cancel contract — Cross-Border Insolvency Regulations 2006, SI 2006/1030, Sch 1, s 21(1)**

M Collings QC and A Winter for Fibria Celulose S/A

M Phillips QC and S Robins for Pan Ocean Co Ltd and Mr You Sik Kim

Thomas Cooper LLP; DLA Piper UK LLP

**MORGAN J:**

*INTRODUCTION*

**[1]**  This case involves the interpretation and application of the Cross-Border Insolvency Regulations 2006 ("the CBIR"). In particular, it concerns the scope of the relief that may be granted by the Companies Court upon recognition of a foreign insolvency proceeding. For convenience, I have set out the relevant provisions of the CBIR in an appendix to this judgment.

**[2]**  Pan Ocean Co Ltd ("the Company") is a shipping company, incorporated under the laws of the Republic of Korea on 28 May 1996. The Company is undergoing an insolvency process, described as rehabilitation, in Korea. That process has been recognised by the Companies Court under the CBIR as a foreign main proceeding.

**[3]**  The Company has the benefit of a long term shipping contract with Fibria Celulose S/A ("Fibria"). Fibria is a Brazilian company described in the evidence before me as the world's largest producer of wood pulp. The

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

administrator regards that contract as likely to be very profitable for the Company and its continued existence as being important to the rehabilitation of the Company. Conversely, Fibria regards the contract as onerous to it.

[4]  The contract is governed by English law. The express terms of the contract confer on Fibria the right to terminate it by reason of the Korean insolvency process in relation to the Company. Those terms are valid and enforceable in English law. The administrator of the Company contends that those terms are not valid and enforceable under Korean insolvency law. Fibria contends that the administrator is not right about that but, in any event, the position under Korean insolvency law is irrelevant.

[5]  Both the administrator and Fibria have made applications to the Companies Court under the CBIR. The administrator contends that the Companies Court has power to grant him relief which includes an order that Fibria must not exercise its right to terminate the contract. Fibria counters by saying that the Companies Court has no such power, alternatively that it should not exercise any such power.

[6]  Mr Collings QC and Mr Winter appeared on behalf of Fibria and Mr Phillips QC and Mr Robins appeared on behalf of the administrator and the Company.

*THE CONTRACT*

[7]  On 31 August 2011, the Company and Fibria entered into four separate contracts, on similar terms. Prior to the hearing before me, the administrator of the Company elected to terminate three of those contracts and it is accepted that those three contracts have been effectively terminated. The administrator does not wish to terminate the remaining contract which is the relevant contract for present purposes. This contract was described as "Contract of Affreightment No 1" but as it is now the only relevant contract, I will simply refer to it as "the contract".

[8]  The contract was made on 31 August 2011 between Fibria as "the Charterers" and the Company as "the Owners". By cl 2, Fibria undertook to provide for the shipment of, and the Company undertook to carry, the cargoes identified in the contract. The Company was to provide newly constructed vessels to enable it to perform the contract. The period of the contract was defined by reference to the dates on which the vessels were delivered; the contract was a long term contract which was to continue for 25 years from the date on which the last such vessel was delivered from the relevant construction shipyard. The contract identified the intended loading ports as two ports in South America and it identified the intended discharging ports as various ports in the United States of America and in the Far East (one of which was in South Korea). The contract fixed the freight rates payable by Fibria to the Company. Either party could assign the contract in the circumstances therein set out.

[9]  Clause 28 of the contract included the following provisions:
    "28 TERMINATION FOR DEFAULT

    28.1 A Party (the 'non-defaulting Party') shall be entitled to terminate this Contract with immediate effect upon notice in writing to the other Party (the 'defaulting Party') if any of the following events shall occur:

    (a) a defaulting Party is in material breach of its material obligations pursuant to this Contract and that breach has not been remedied by the defaulting party within a period of 60 days after the non-defaulting Party first notified the defaulting Party in writing of that breach; or

    (b) a defaulting Party is in material breach of its material obligations pursuant to this Contract three times (whether consecutively or not), during any period of 6 (six) months; or

    (c) a defaulting party ceases wholly or substantially to carry on its business;

    (d) a defaulting Party becomes unable (or reasonably appears to the non-defaulting Party to become unable) to pay its debts as they fall due;

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

(e) any formal declaration of bankruptcy or any formal statement to the effect that a defaulting Party is insolvent or likely to become insolvent is made by that defaulting Party or by its directors or, in any proceedings, by a lawyer acting for that defaulting Party; or

(f) an administrator is appointed (whether by a court or otherwise) in respect of a defaulting Party otherwise than for the purpose of a reconstruction or amalgamation without insolvency previously approved by the non-defaulting Party (which approval shall not be unreasonably withheld). Whilst any application to appoint an administrator is pending or following the giving or filing of an administration notice the defaulting party must (to the extent that it may lawfully do so and it would not be in breach of any contractual restriction by which it is then bound) continue to carry on its business without disruption; or

(g) a provisional liquidator is appointed in respect of a defaulting Party or a winding up order is made in relation to a defaulting Party; or

(h) a resolution is passed, an administration notice is given or filed, an application or petition to a court is made or presented or any other step is taken by or on behalf of a defaulting Party for or with a view to the winding up of a defaulting Party or for the appointment of a provisional liquidator or administrator in respect of a defaulting party otherwise than for the purpose of a reconstruction or amalgamation without insolvency previously approved by the non-defaulting Party (which approval shall not be unreasonably withheld); or

(i) an administration notice is given or filed, an application or petition to a court is made or presented or any other step is taken by a creditor of a defaulting Party for the winding up of that defaulting Party or the appointment of a provisional liquidator or administrator in respect of that defaulting Party unless the proposed winding up, appointment of a provisional liquidator or an administrator is being contested in good faith with the aim to have any application or petition dismissed or withdrawn within 90 days of being presented or within 90 days of the administration notice being filed or given or other steps or actions being taken to ensure that no administration will take place and (in either such case) the Party carries on its business without disruption; or

(j) an event analogous to any of the events referred to in paragraphs (b) to (i) (inclusive) occurs under the laws of any applicable jurisdiction in relation to the defaulting Party."

**[10]** By cl 32 of the contract it was agreed:

"32 LAW AND ARBITRATION

This Contract and any non-contractual obligations arising out of or in connection with it, shall be governed by and construed in accordance with English law. Any dispute arising out of or in connection with this Contract shall be referred to arbitration in London in accordance with the Arbitration Act 1996 or any statutory modification or re-enactment thereof save to the extent necessary to give effect to the provisions of this Clause.

The arbitration shall be conducted in accordance with the London Maritime Arbitrators Association (LMAA) Terms current at the time when the arbitration proceedings are commenced.

. . ."

*THE EFFECT OF CL 28 IN ENGLISH LAW*

**[11]** Clause 28.1 may be invoked by either party to the contract if the other party is a "defaulting Party". The first three events specified in the clause, in sub-paragraphs (a), (b) or (c), do not turn on the insolvency of the defaulting party. The remaining sub-paragraphs of cl 28.1, to a greater or lesser extent, define the relevant event by reference to the fact of insolvency or to the taking of some step in an insolvency process.

**[12]** In some jurisdictions, a clause which allows a party to a contract to terminate the contract by reason of the insolvency of the counterparty is called an *ipso facto* clause. In certain jurisdictions in the United States, such clauses are automatically invalid. In Canada, the court has power to stay the exercise of rights under such clauses. Later in this judgment, I will consider how such clauses are treated under Korean insolvency law.

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

**[13]**  There was no dispute before me as to the efficacy in English law of the provisions in cl 28.1 of the contract which allow termination by reason of an insolvency event. It was accepted that those provisions are valid in English law. In particular, it was accepted that the rule of insolvency law, known as the anti-deprivation rule, does not strike down those provisions.

**[14]**  Although there was no argument as to the approach of an English court to the insolvency provisions in cl 28.1 of the contract, it is helpful for present purposes to understand why those provisions do not infringe the anti-deprivation rule or any other rule of English insolvency law. The scope of the anti-deprivation rule has been considered recently by the Supreme Court in *Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd* [2011] UKSC 38, [2012] 1 AC 383, [2012] 1 All ER 505. There were some differences in the approach taken by Lord Collins JSC (with whom Lords Walker, Phillips, Hope, Baroness Hale and Lord Clarke JJSC agreed) and Lord Mance JSC but no difference which is relevant for present purposes.

**[15]**  Lord Collins expressed his conclusions as to the anti-deprivation rule at 102 – 106:

"102 It would go well beyond the proper province of the judicial function to discard 200 years of authority, and to attempt to re-write the case law in the light of modern statutory developments. The anti-deprivation rule is too well-established to be discarded despite the detailed provisions set out in modern insolvency legislation, all of which must be taken to have been enacted against the background of the rule.

103 As has been seen, commercial sense and absence of intention to evade insolvency laws have been highly relevant factors in the application of the anti-deprivation rule. Despite statutory inroads, party autonomy is at the heart of English commercial law. Plainly there are limits to party autonomy in the field with which this appeal is concerned, not least because the interests of third party creditors will be involved. But, as Lord Neuberger stressed [2010] Ch 347, para 58, it is desirable that, so far as possible, the courts give effect to contractual terms which parties have agreed. And there is a particularly strong case for autonomy in cases of complex financial instruments such as those involved in this appeal.

104 No doubt that is why, except in the case of a blatant attempt to deprive a party of property in the event of liquidation (*Folgate London Market Ltd v Chaucer Insurance plc* [2011] EWCA Civ 328), the modern tendency has been to uphold commercially justifiable contractual provisions which have been said to offend the anti-deprivation rule: *Money Markets International Stockbrokers Ltd v London Stock Exchange Ltd* [2002] 1 WLR 1150; *Lomas v JFB Firth Rixson Inc* [2010] EWHC 3372 (Ch); and the judgments of Sir Andrew Morritt C and the Court of Appeal in these proceedings. The policy behind the anti-deprivation rule is clear, that the parties cannot, on bankruptcy, deprive the bankrupt of property which would otherwise be available for creditors. It is possible to give that policy a common sense application which prevents its application to bona fide commercial transactions which do not have as their predominant purpose, or one of their main purposes, the deprivation of the property of one of the parties on bankruptcy.

105 Except in the case of well-established categories such as leases and licences, it is the substance rather than the form which should be determinant. Nor does the fact that the provision for divestment has been in the documentation from the beginning give the answer, nor that the rights in property in question terminate on bankruptcy, as opposed to being divested. Nor can the answer be found in categorising or characterising the property as 'property subject to divestment on bankruptcy.'

106 If the anti-deprivation principle is essentially directed to intentional or inevitable evasion of the principle that the debtor's property is part of the insolvent estate, and is applied in a commercially sensitive manner, taking into account the policy of party autonomy and the upholding of proper commercial bargains, these conclusions on the present appeal follow."

**[16]**  Lord Mance said at 177:

"177 However, [counsel] advanced propositions which would mean that any provision for termination on bankruptcy, which would deprive the trustee or liquidator of the opportunity of continuing the contract and so the bankrupt estate of future potential advantage, would infringe the principle. There is in my opinion no basis for any such rule. Where a contract provides for the performance in the future of reciprocal obligations, the performance of each of which is the quid pro quo of the other, I see nothing objectionable or evasive about a provision entitling one party to terminate if the other becomes bankrupt. That is particularly so, having regard to the purpose and character of the present transaction, viewed rather more broadly than the Court of Appeal did in its detailed reasoning."

265

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

[17]*Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd* is of further interest in the present case for the following reason. The contractual provisions which were under review in that case were triggered by the relevant company filing for Ch 11 protection in the US Bankruptcy Court. Judge Peck sitting in the US Bankruptcy Court for the Southern District of New York made a declaration that the contractual provisions in question were ineffective because they were in breach of the US Bankruptcy Code: see *Re Lehman Bros Holdings Inc* 422 BR 407. Nonetheless, the contractual provisions were governed by English law and the English courts held that they were effective under English law although the relief granted was confined to declaratory relief; the position is explained by Lord Collins at 30 – 35 and by Lord Mance at 173-174. The judgments in the English courts did not have to deal with any application under art 21 of the CBIR for an order restraining any party from relying upon the contractual provisions which were effective in English law but ineffective under the US Bankruptcy Code.

*THE ASSIGNMENT*

[18]  On 30 December 2011, the Company assigned absolutely to certain Marshall Islands companies, controlled by the Company, all its rights, title and interest in and to, and all benefits accruing to it under, the contract and on the same day, those Marshall Islands companies assigned to ABN AMRO Bank NV all of their rights, title and interest in and to, and all benefits accruing to it under, the contract (which had just been assigned to them by the Company). Copies of these assignments were not in the evidence before me.

[19]  Also on 30 December 2011, the Company (and the Marshall Islands companies) gave written notice to Fibria of the assignments referred to above. In this notice, the Company was referred to as the "Bareboat Charterer", the Marshall Islands companies were referred to as the "Registered Owners" and ABN AMRO Bank NV was referred to as the "Security Agent". By this notice, the Company and the Registered Owners requested Fibria to acknowledge the assignments. Fibria was asked to note (amongst other things):

(1) until Fibria received notice to the contrary from the Security Agent, it was to pay all sums due under the contract to the Company;

(2) following notice from the Security Agent to do so, Fibria was to pay all sums due under the contract to the Security Agent;

(3) the Company remained liable to perform all present and future obligations assumed by it under the contract.

[20]  The notice of assignment contained the following further provisions (the reference to the "COA" is to the contract):

"Further:

(1) We, the Bareboat Charterer, the Registered Owners and the Security Agent refer to the COA and hereby request, if you intend to exercise any right to cancel, rescind or otherwise terminate the COA, in whole or in part, that you notify the Security Agent in writing at its address above stated . . . and that by such notice you grant the Security Agent the option to either maintain the COA (the 'Step-in Option') or to agree to the cancellation, rescission or termination of the COA in whole or in part (the 'Termination Option'). Following receipt of such notice the Security Agent may elect by notice in writing to you (an 'Election Notice') at your address above . . . within sixty (60) days of receipt of your notice, to either maintain the COA or agree to the cancellation, rescission or termination of the COA in each case in whole or in part and, if in part, with a pro rata reduction in the cargo quantities to be shipped pursuant to the COA and the number of Vessels required to service the same.

(2) If the Security Agent elects to maintain the COA, the Security Agent shall have the right to either remedy the breach by the Bareboat Charterer which gave rise to the aforesaid cancellation, rescission or termination rights within sixty (60) days of the date of the Election Notice or to replace the Bareboat Charterer as the disponent owner of the Vessel and replace the same with a company (the 'Substitute Disponent Owner') to assume the Bareboat Charterer's rights and obligations under the COA and so as to be substituted for the Bareboat Charterer under the COA by way of a transfer or novation of the COA

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

in favour of such Substitute Disponent Owner or by entry into of a new contract of affreightment on materially the same terms and conditions, mutatis mutandis, as the COA. Any such Substitute Disponent Owner shall be subject to your prior written approval but such approval shall not be unreasonably withheld or delayed, provided that your rights and obligations under the COA (as transferred or novated) or under any new contract or affreightment entered into shall be on materially the same terms and conditions, mutatis mutandis, as the COA, except as may be otherwise expressly agreed by you. For the avoidance of doubt, if the proposed Substitute Disponent Owner, or any company that is to provide in your favour a guarantee of the obligations of such Substitute Disponent Owner on terms acceptable to you, is not (in your reasonable opinion) of similar (or better) financial standing, market reputation and of similar (or better) operational, technical, logistical and commercial capabilities as the Bareboat Charterer, any refusal by you to accept it as a Substitute Disponent Owner under this provision shall be deemed reasonable.

(3) If the Security Agent elects to agree to the cancellation, rescission or termination of the COA in part, the COA shall remain otherwise in full force and effect with a pro rata reduction in the cargo quantities to be shipped pursuant to the COA and the number of vessels required to service the same and we request your confirmation of your agreement thereto."

**[21]**  The notice of assignment stated that the assignments of the benefit of the contract (first to the Marshall Islands companies and then to the Security Agent) were by way of security only. The notice further stated that the notice and any acknowledgment of it given by Fibria and any non-contractual obligations arising from or in connection therewith should be governed by and construed in accordance with the law of England and Wales.

**[22]**  On 17 January 2012, Fibria wrote to the Company, and to the Registered Owners and the Security Agent, acknowledging the notice of the assignments, as requested. In particular, by its acknowledgment Fibria undertook and confirmed:

(1) that Fibria agreed to comply with the instructions in the notice of assignment;

(2) that Fibria agreed to the provisions in the notice of assignment which included those relating to the Step-in Option and the Termination Option and further agreed to enter into a transfer or novation agreement in relation to the contract or a new contract of affreightment on materially the same terms and conditions, mutatis mutandis, as the contract to give effect to any election by the Security Agent to exercise the Step-in Option, subject to para 2 of the notice of assignment;

(3) that the assignments were by way of security only.

**[23]**  The parties before me accepted that the terms of the acknowledgement were valid and enforceable in English law.

*FURTHER FACTS*

**[24]**  By June 2013, the Company had become insolvent on a cash-flow basis although it continued to be solvent on a balance sheet basis as a going concern. On 7 June 2013, the Company presented a petition to the Bankruptcy Court (Fifth Division) of the Seoul Central District Court for the commencement of rehabilitation proceedings. The Company did not seek or obtain Fibria's consent to the making of this application.

**[25]**  On 12 June 2013, Fibria wrote to the Security Agent referring to the contract, the assignments, the notice of assignment and the acknowledgment referred to above. Fibria stated in its letter that it was entitled to terminate the contract. It set out the text of sub-clauses (h) and (j) of cl 28.1 of the contract. It wrongly referred to the text of cl 28.1 (j) as being in cl 28.1.(i). By the letter, Fibria gave formal notice to the Security Agent:

(1) of the Company's application on 7 June 2013 to the Seoul Central District Court;

(2) of Fibria's belief that it was entitled to terminate the contract under clauses 28.1(h) and (i) (the letter probably intended to refer to cl 28.1(j)) and/or any other application clause;

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

(3) that Fibria granted to the Security Agent the Step-in Option and the Termination Option;

(4) that Fibria awaited an Election Notice from the Security Agent.

**[26]**  Also on 12 June 2013, Fibria notified the Company of the notice it had sent to the Security Agent.

**[27]**  Shortly after 12 June 2013, the Company replied to Fibria stating that Korean courts did not recognize the validity of the provisions relied upon by Fibria (the Company's letter specified clauses 28.1 (h) and (i)) and that Fibria was not entitled to terminate the contract by reason of the Company's application in the rehabilitation proceedings. The Company further stated that under art 119 of the Debtor Rehabilitation and Bankruptcy Act of Korea ("the DRBA") it was the custodian of the Company who would have the option to elect to terminate or maintain the contract and that the custodian would certainly elect to perform the contract.

**[28]**  On 17 June 2013, the Korean Court made an order commencing rehabilitation proceedings in relation to the Company and appointed joint administrators. (There is now only one administrator, Mr You Sik Kim, who became the sole administrator following the resignation of the former joint administrator on or about 7 November 2013.) Mr Kim has stated that a rehabilitation process in Korea is broadly comparable to an English administration coupled with a scheme of arrangement or company voluntary arrangement. This categorisation was not the subject of any further analysis or dispute at the hearing before me.

**[29]**  On 18 June 2013, the Security Agent responded to Fibria's notice to it of 12 June 2013 and suggested that discussions should take place.

**[30]**  On 21 June 2013, the administrator of the Company applied in the Companies Court in London for the Korean rehabilitation proceedings to be recognised as foreign main proceedings under art 17 of Sch 1 to the CBIR.

**[31]**  On 25 June 2013, the Companies Court (Warren J) made an order under the CBIR recognising the Korean rehabilitation proceedings as foreign main proceedings in respect of the Company. Warren J made further orders pursuant to arts 20(6) and 21(1)(g) of the CBIR. These orders provided that there was to be:

(1) no enforcement of securities;

(2) no repossession of goods;

(3) no legal process against the Company or its property;

(4) no appointment of an administrative receiver; and

(5) no winding up petition.

In some cases, the prohibited matters could proceed with the consent of the administrator or of the Companies Court. At the hearing before me, it was stressed that the orders made by Warren J were not confined to the automatic effects of recognition of a foreign main proceeding which are provided for by art 20 of the CBIR. However, it does not seem to me to matter whether the orders simply gave effect to art 20 or modified it under art 20(6) and added relief under art 21. There was nothing in those orders which prevented the administrator applying subsequently for further relief under art 21, as the administrator has now done. Around the same time as orders were made in the Companies Court, the Company obtained broadly similar recognition orders in a number of other countries.

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

**[32]**  On 2 July 2013, the Company wrote to Fibria. The letter directly concerned another contract of affreightment which has since been terminated. However, what was said in relation to that other contract was also relevant to the contract with which I am concerned. The letter stated that Fibria was not entitled to terminate such a contract. The letter enclosed a letter of advice, dated 1 July 2013, from attorneys in Seoul. The attorneys advised that the contract was, in Korean law, a "bilateral executory contract" and the administrator of the Company was entitled to elect to terminate or to continue the contract. If the administrator elected to continue the contract, the counterparty would be entitled to receive full payment or other benefit under the contract without any impairment of its position by reason of the rehabilitation. The attorneys further advised that cl 28 or parts of it were to be regarded as an *ipso facto* clause and that the Supreme Court of Korea had held that there may be circumstances in which such a clause might be invalidated or, at least, its operation might be restricted until the conclusion of the rehabilitation proceedings. They then advised that it was highly likely that the *ipso facto* clause would be deemed ineffective in Korea. Finally, they said that by reason of the rules as to cross-border insolvency, the clause would also be invalid under Brazilian law.

**[33]**  On 11 July 2013, Fibria wrote again to the Security Agent, without prejudice to its earlier notice of 12 June 2013. In its letter, Fibria referred to the Company's application to the Korean court of 7 June 2013 and the order of the Korean court on 17 June 2013. Fibria stated that the Company was unable (and/or it reasonably appeared to Fibria that the Company was unable) to pay its debts as they fell due and that Fibria intended to terminate the contract pursuant to clauses 28.1 (d), (f), (h) and (j) thereof. Fibria notified the Security Agent that Fibria granted it the Step-in Option and the Termination Option and awaited the Security Agents' Election Notice.

**[34]**  On 16 July 2013, solicitors for Fibria requested permission from the administrator of the Company for Fibria to commence arbitration proceedings against the Company under the contract. Such permission has not since been forthcoming.

**[35]**  On 14 August 2013, the solicitors for the administrator sent to Fibria a copy of the administrator's notice dated 13 August 2013 confirming, pursuant to art 119 of the DRBA, that the Company would continue to perform the contract as an executory contract.

**[36]**  The administrator was not obliged to apply to the Korean court for its approval of his decision to elect to perform the contract but he did so apply and, on 1 October 2013, that court approved that decision.

**[37]**  On 22 November 2013, a rehabilitation plan in relation to the Company was approved by the Company's creditors and by the Korean court. In a witness statement dated 10 February 2014, the administrator has stated that the income and profits generated for the Company under the contract are crucial to the ability of the Company to perform the rehabilitation plan.

*THE APPLICATIONS*

**[38]**  On 15 August 2013, Fibria applied in the Companies Court for permission pursuant to art 20(6) of the CBIR and/or para 2(3) of the order of Warren J of 25 June 2013 to commence and prosecute an arbitration against the Company seeking declaratory relief as to Fibria's entitlement to terminate the contract. The evidence in support of the application drew attention to a statement made by the administrator, in his application for recognition, to the effect that the Company was unable to pay its debts as they fell due and Fibria reserved its right to serve a further notice under cl 28.1 of the contract relying on cl 28.1(e). The administrator's evidence in opposition to this application included evidence that the contract is highly profitable to the Company and that the administrator wishes to preserve the contract and to perform it in the interests of the Company and its creditors. The administrator says that Fibria will not suffer any prejudice as a result of the insolvency process in relation to the Company in that Fibria's rights under the contract will not be affected in any way by that insolvency process.

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

**[39]**  On 10 February 2014, the administrator of the Company applied in the Companies Court for relief under art 21 of the CBIR directing that Fibria is not entitled to exercise any right of termination under clauses 28 of the contract and/or such further or other relief as the court thought fit. The administrator filed evidence in support of its application and that evidence provided detailed information as to the ongoing process of restructuring of the Company.

**[40]**  On 24 March 2014, the administrator of the Company applied in the Companies Court under arts 21, 25 and 27 of the CBIR for relief in the form of the Companies Court issuing a letter of request to the Korean court. An attached draft letter of request asked the Korean court to exercise its powers under art 641 of the DRBA to give its opinion to the English court as to whether cl 28 of the contract was void and unenforceable pursuant to Korean insolvency law.

**[41]**  At the hearing of these applications, the administrator put forward a draft order setting out the relief which he sought. The draft order defined cl 28 of the contract as "the Insolvency Termination Clause". The draft order then sought a declaration as to the position under the Insolvency Termination Clause on the assumption that that clause was void and unenforceable as a matter of Korean insolvency law. The position contended for by the administrator was that the Companies Court had jurisdiction under art 21(1) of the CBIR to make an order restraining Fibria from relying on the Insolvency Termination Clause in England and Wales and that it would be a proper exercise of discretion for the Companies Court of make such an order. The draft order also provided for a letter of request to be issued to the Korean court in accordance with the application made on 24 March 2014. The draft order continued by seeking an order that the application dated 10 February 2014 for relief under art 21 of the CBIR be adjourned to be restored when the Korean court had responded to the letter of request. Finally, the draft order suggested that Fibria's application for permission to commence arbitration proceedings be adjourned.

*THE POSITION OF THE SECURITY AGENT*

**[42]**  The Security Agent has not been made a party to the above applications. I was told that representatives of the Security Agent were present in court during the hearing before me but they took no part in that hearing. I inquired of the parties as to the position of the Security Agent in the light of the relief sought by the applications. As explained earlier, Fibria has given notice to the Security Agent pursuant to the acknowledgement of the notice of assignment. On the face of it, the result of Fibria's notice is that the Security Agent has a right to elect either to maintain the contract or to agree to its termination. If the Security Agent were to elect to maintain the contract, then the Security Agent would be entitled to replace the Company with a Substitute Disponent Owner by way of a transfer or novation of the contract or by the entry into a new contract. In such cases, Fibria would not be entitled to take further steps to terminate the contract with the Company.

**[43]**  I was told by counsel for the administrator and for Fibria that, notwithstanding the position under the acknowledgement of the notice of assignment, it remained relevant to determine the position in relation to Fibria's ability to serve notice of termination under cl 28.1 of the contract. I was told that the Security Agent supported the Company's attempt at restructuring and the Company's stance that Fibria was not entitled to terminate the contract under cl 28.1. The Security Agent therefore wanted to know whether Fibria did have the ability to terminate the contract under cl 28.1. On the assumption that it is held that Fibria did not have the ability to terminate the contract under cl 28.1, then the Security Agent would not feel it necessary to elect to maintain the contract nor would it wish to agree to the termination of the contract but it would simply not respond to the notice served on it by Fibria. If Fibria later attempted to terminate the contract under cl 28.1, the Security Agent would be able to rely on the fact that (on this assumption) that Fibria was not able so to act.

**[44]**  Conversely, if it were held that Fibria was entitled to terminate the contract under cl 28.1, then the Security Agent would have to consider its position further and make its election under the acknowledgement of the notice of assignment. I understand that Fibria has agreed to extend the time within which the Security Agent is to makes its

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

election under the acknowledgment of the notice of assignment so that the time for its election is suspended while the present applications are pending.

[45]  Accordingly, both Fibria and the administrator of the Company ask the court to deal with the applications which have been made to it and, in particular, to decide the scope of the powers of the court to grant relief under art 21 of the CBIR.

KOREAN LAW

[46]  The parties did not agree on the relevant principles of Korean insolvency law. I heard expert evidence as to Korean insolvency law from two Korean lawyers. The administrator called Mr Eunjai Lee and Fibria called Mr Duk-Kyou Hyun. I have concluded that I should not myself decide the dispute between these two experts and so I do not need to describe the witnesses in greater detail nor need I set out the detailed points which divided them. I will however summarise the positions they adopted as to the relevant principles of Korean insolvency law.

[47]  Mr Lee relied on art 119 of the DRBA. He also referred in passing to art 32-2 of that Act because that article was referred to in one of the cases to which he drew my attention. However, his view was essentially based on art 119. Article 119 does not apply to all contracts but only to certain unperformed bilateral contracts. It did not appear to be in dispute that the contract in the present case comes within the type of unperformed bilateral contract which is governed by art 119.

[48]  Under art 119, the custodian of a company undergoing rehabilitation may choose to cancel or terminate an unperformed bilateral contract. Further, art 119 appears to allow the custodian to require the other party to fulfil its obligations under such a contract. It is said that it would be inconsistent with that right for the counterparty to be able to terminate the contract by reason of the fact of the rehabilitation.

[49]  The statutory predecessor of art 119 was considered by the Korean Supreme Court in its decision of 6 September 2007 in *Allied Domecq (Holdings) plc v The trustee of Jinro Co Ltd* Mr Lee accepted that parts of the reasoning in that decision were not wholly clear in relation to the impact of art 119 on an insolvency termination clause. The Supreme Court held that, in a case not governed by art 119, an insolvency termination clause would be valid. The Supreme Court then considered the type of contract which came within art 119 and referred to the nature of the obligations under the particular unperformed bilateral contract in that case. It then held that the contract in that case was not governed by art 119.

[50]  Article 119 was further considered in *Radcliff Corporation v The receiver of Samsun Logix* (decision dated 11 January 2010). In that case, Samsun Logix ("Samsun") chartered a vessel under a time charterparty which was governed by English law. It then entered rehabilitation and the owner of the vessel asserted that Samsun had no intention of performing the charterparty and had repudiated it, giving the owner the right to treat the charterparty as at an end and to claim damages. The court held that the effect of art 119 was that the owner was not entitled to terminate the charterparty on the grounds of Samsum's repudiation of it because that would infringe the receiver's option to terminate, or to continue, the unperformed bilateral contract.

[51]  In *Korea Real Estate Investment & Trust Co Ltd v The receiver of Poonglim Co Ltd* (decision dated 17 July 2013) it was held that art 119 and art 32-2 prevented a counterparty of the debtor company relying upon an insolvency termination clause to terminate a building contract under which the debtor company was to build an apartment building. The court appeared to hold that such was the automatic effect of art 119 in relation to an unperformed bilateral contract.

[52]  The most recent decision as to the operation of art 119 is *Trustee of Tongyang Networks Co Ltd v Standard Chartered Bank Ltd* (a decision of 24 January 2014). That case concerned a contract under which the debtor company was to provide services to the bank. The contract contained an insolvency termination clause and the

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

bank gave, or purported to give, notice to terminate pursuant to that clause. The trustee of the debtor company argued that the bank's right to terminate should be considered null and void by reason of art 119 or, alternatively, the bank should refrain from terminating the contract at least during the period of the rehabilitation. The court considered the earlier decision in *Allied Domecq* and held that to achieve a proper balance between the purpose of rehabilitation and the principle of freedom of contract and the counterparty's need to be able to trust the debtor company, it was necessary to look at all the circumstances, such as the nature of the contract, the necessity to protect the debtor and the counterparty and other relevant factors. The court then conducted a detailed examination of what it regarded as the relevant factors and held that art 119 did not render the insolvency termination clause null and void. I was told that the trustee has appealed that decision to a higher court.

[53]  Mr Lee's view was that the decision in the *Standard Chartered Bank* case was simply wrong and that in the case of an unperformed bilateral contract which is within art 119, an insolvency termination clause is null and void and cannot be exercised by the counterparty of the debtor company. Mr Hyun relied on the decision in the *Standard Chartered Bank* case and said that the effect of art 119 would not be automatic in this case but would require the Korean court to consider all the circumstances. I suggested to Mr Hyun that if one carried out in the present case a similar exercise to that carried out in the *Standard Chartered Bank* case, then the result was likely to be that the Korean court would hold that the insolvency termination provisions in cl 28.1 of the contract were null and void or unenforceable. Mr Hyun suggested that, in the present case, the Korean court would be influenced by the fact that the contract was an international shipping contract governed by English law and that Korean court would not wish to damage Korea's position as a trading nation.

[54]  In the event, I do not think that it is necessary for the purposes of the present applications for me to determine the disputes as to the operation of Korean law. It is sufficient for me to say that there is a good arguable case that the insolvency termination provisions in cl 28.1 of the contract are automatically void by reason of art 119. Further, even if the insolvency termination provisions in cl 28.1 are not automatically void, there is a good arguable case that they would in fact be held to be void after a Korean court considered all of the relevant circumstances.

[55]  Having reached those conclusions, I note that there are potential points of Korean law which were not explained by the experts. The precise operation of art 119 is unclear. Does it make the insolvency termination clause null and void or only render it unenforceable during the rehabilitation? What if the counterparty serves a termination notice before the Korean court gives a ruling on the enforceability of the insolvency termination clause? On my own reading of the Korean decisions, it seems to me to be likely that the counterparty would not be able to rely on that notice as effective if the Korean court were later to hold that the insolvency termination clause was null and void or even just unenforceable.

[56]  I also note that the experts confined themselves to discussing the effect of art 119 on cl 28.1 of the contract without regard to the later arrangements which were brought into existence by the acknowledgment of the notice of assignment. I consider that it might be very relevant indeed, and it might even be determinative, in Korea to assess the position by reference to the later arrangements and not by reference to cl 28.1 alone. I can see how it might be argued that if cl 28.1, or parts of it, were invalid or unenforceable, then the later provisions which were premised on the enforceability of cl 28.1 did not have effect. However, I could also see force in an argument that whatever Korean insolvency law might make of cl 28.1, if it stood alone, it would have to evaluate the later arrangements separately. The position of the company and its creditors is quite different in a case where cl 28.1 is relied on by Fibria to terminate the contract at its option and a case where cl 28.1 is relied on by Fibria and the consequence is either that the Security Agent exercises the Step-in Option so that the contract is transferred or novated or, if the contract is terminated, then it is terminated at the option of the Security Agent rather than at the option of Fibria.

*THE SUBMISSIONS FOR THE PARTIES*

[57]  Mr Phillips' approach, on behalf of the administrator, was to focus on the relief which might be ordered by the court under art 21(1) of the CBIR. He concentrated on the power conferred by art 21(1) to grant "any appropriate

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

relief". He submitted that the court was entitled to grant any relief which it considered to be appropriate in all the circumstances. Mr Phillips addressed me in great detail and relied on an extensive citation of decided cases in various jurisdictions, and many other materials, which he submitted were valuable when considering the meaning of "any appropriate relief" in art 21(1) and when deciding what relief was appropriate in this case. In the alternative to these submissions, he put forward a narrower submission that the court had power pursuant to art 21(1)(a) of CBIR to stay proceedings and that included a power to restrain Fibria from serving a termination notice under cl 28.1 of the contract. I pay tribute to the thoroughness and quality of Mr Phillips' submissions. It is not necessary for me to attempt to summarise everything which was said in the course of these wide-ranging submissions as I consider that I can identify the essential points which were made when I discuss my approach to the issues which arise.

[58]  Mr Collings, for Fibria, submitted that its rights to terminate the contract were governed by English law, as to which there was no dispute. Korean insolvency law was irrelevant, certainly in the Companies Court. He submitted that the power conferred by art 21(1)(a) to grant a stay of proceedings could not be interpreted to extend to an order restraining Fibria from serving a notice pursuant to cl 28.1 of the contract. He further submitted that the power of the court to grant "any appropriate relief" did not permit the court to give relief in accordance with Korean insolvency law and, in any event, the relief sought was not appropriate.

*DISCUSSION: PRELIMINARY REMARKS*

[59]  The administrator's primary object at the hearing of these applications was to obtain the determinations set out in his draft order as to the court's jurisdiction and discretion under art 21 of the CBIR in relation to cl 28.1 of the contract (or, at any rate, those parts of cl 28.1 which deal with various insolvency events). The determinations set out in the draft order are expressly on the assumption that cl 28.1 is void and unenforceable as a matter of Korean insolvency law. I have already described the rival opinions as to the relevant Korean insolvency law and my conclusion that the administrator has a good arguable case that the insolvency termination provisions in cl 28.1 of the contract are automatically void by reason of art 119 or, if not automatically void, he has a good arguable case that they would in fact be held to be void after a Korean court considered all of the relevant circumstances. Accordingly, for the sake of the following analysis, I will assume that a Korean court would regard (at least) those parts of cl 28.1 which provide for termination by notice following an insolvency event in Korea, as being inoperative or (at least) in suspense during the Korean insolvency.

[60]  The administrator relied, principally, on the power of the recognising court, pursuant to art 21(1), to grant "any appropriate relief" and, in the alternative, on the power, pursuant to art 21(1)(a), to order a stay of proceedings. Before dealing with the specific points which arise in relation to these two ways of putting the case, I should comment briefly on other points which are referred to in arts 21 and 22 but which were not examined at the hearing.

[61]  Article 21 allows the court to grant relief "where necessary to protect the assets of the debtor or the interests of the creditors". The meaning of the phrase "the assets of the debtor", and how that phrase might apply to the contract in this case, was not really explored at the hearing before me. It seemed to me that there might have been two issues in that respect. The first was as to whether the benefit of the contract had ceased to be an asset of the debtor because it had been assigned to the Marshall Islands companies and then to the Security Agent. If the point had been raised, it may be that the answer would have been that because the assignments were by way of security only, the Company retained a right to redeem the security and it was that right (rather than the benefit of the contract) which was an asset of the debtor. However, as the point was not raised and the assignments were not put in evidence, I will say no more about that subject. The second possible question might have been whether the relevant asset of the debtor in this case is a contract which is not subject to termination (pursuant to the insolvency termination provisions in cl 28.1) or whether the asset of the debtor was the contract subject to the possibility of such termination. If the asset of the debtor was the latter, then an order of the court which prevented Fibria exercising its contractual rights under cl 28.1 would not merely "protect" the assets of the debtor but would enhance the assets of the debtor. However, as this point was not argued, I will not deal with it further. In any case, I

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

note that art 21 allows relief to be granted to protect "the interests of the creditors", seemingly as an alternative to it being granted to protect the assets of the debtor.

**[62]**  Further, there was no real examination of the possible application of art 22 in this case. Article 22(1) provides that the court must be satisfied, when granting or denying relief under art 21, that the interests of the creditors and other interested persons must be adequately protected. It may be that it could be said that Fibria would be "adequately" protected if it were able to enjoy the benefit of the contract in all other respects even though it was prevented from taking advantage (pursuant to cl 28.1) of the insolvency of the Company to free itself of a contract which was onerous from its point of view.

*ARTICLE 21(1)(A) OF THE CBIR*

**[63]**  Although the administrator relied on art 21(1)(a) as an alternative to his argument based on the words "any appropriate relief" in art 21(1), it is more logical for me first to consider the specific relief which is referred to in art 21(1)(a).

**[64]**  Article 21(1)(a) allows the recognising court to grant a stay on "the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities". The administrator contended that the service by Fibria of a notice to terminate under cl 28.1 would be within this wording in art 21(1)(a). Article 21(1)(a) allows the court to grant such a stay "to the extent that they have not been stayed under para (1)(a) of art 20". The administrator accepted that the service of such a notice had not already been stayed under art 20(1)(a). art 20(1)(a) also refers to the "commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities". However, art 20(2) provides that the stay which is automatically imposed by art 20(1)(a) is to be "the same in scope and effect" as if the debtor (in the case of a company) had been the subject of a winding up order under the Insolvency Act 1986. It is agreed that the scope and extent of a stay, in the case of a company ordered to be wound up, is to be found in s 130(2) of the Insolvency Act 1986. Section 130(2) provides that "no action or proceeding shall be proceeded with or commenced against the company or its property" except with the leave of the court. Accordingly, in order for the administrator in the present case to rely on art 21(1)(a), he has to accept that he cannot rely on art 20(1)(a) and that must be because the scope of art 20(1)(a) is not wider than the scope of s 130(2) of the 1986 Act and, further, that the service of a notice to terminate under cl 28.1 of the contract does not involve an "action or proceeding [being] proceeded with or commenced against the company or its property" within the meaning of s 130(2) of the 1986 Act. Thus, the administrator is in effect submitting that although the service of a notice to terminate pursuant to cl 28.1 of the contract is not "an action or proceeding" within the meaning of s 130(2) of the 1986 Act, it is "an individual action" or "an individual proceeding" within art 21(1)(a) of the Model Law.

**[65]**  I can accept the words "action" and "proceeding" in art 21 need not have the same meaning as those words in s 130(2) of the 1986 Act. I therefore need to look at the Model Law and any matters which assist me in construing it, together with any authorities which might be relevant.

**[66]**  The first thing to note is that art 21(1)(b) refers to "execution against the debtor's assets"; this suggests that the draftsman of the Model Law considered that some forms of execution against the debtor's assets would not involve the commencement or continuation or individual actions or individual proceedings. Further, art 21(1)(g) allows the court to grant any relief of the kind provided under para 43 of sch B1to the Insolvency Act 1986. Paragraph 43 of sch B1 creates a moratorium in relation to different kinds of legal process. In particular, para 43(6) provides that there may be no legal process instituted or continued against the company or the property of the company except with the consent of the administrator or the permission of court. Article 21(1)(g) refers to relief under para 43 of sch B1 as being "additional relief", that is, additional to the relief specified in sub-paragraphs (a) to (f) of art 21(1). However, these textual points on their own do not offer much guidance as to the scope of art 21(1)(a).

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

[67]  I have considered the Guide to Enactment which deals with the relevant wording in arts 20 and 21 at paras 145, 146 and 155. Paragraph 145 indicates that the reference to "an action" will cover "actions before an arbitral tribunal". Paragraph 146 suggests that the word "proceedings" can extend to "enforcement measures initiated by creditors outside the court system". The Guide to Enactment does not further describe the measures it had in mind save to say that, in some states, creditors were allowed to take such "measures".

[68]  The provision formerly contained in s 11 of the Insolvency Act 1986, imposing a moratorium in the case of an administration of a company, referred in s 11(3)(c) to "steps" to enforce a security or to repossess goods and in s 11(3)(d) to "no other proceedings and no execution or other legal process" being "commenced or continued". These provisions were construed by the Court of Appeal in *Bristol Airport plc v Powdrill* [1990] Ch 744, [1990] 2 All ER 493, [1990] BCLC 585 and by Millett J in *Re Olympia & York Canary Wharf Ltd* [1993] BCLC 453, [1993] BCC 154. In the second of these cases, it was held that a notice given by a party to a contract in order to make time of the essence of the other party's contractual obligation and a notice accepting a repudiatory breach as terminating the contract were not "proceedings" or "other legal process" within s 11(3)(d).

[69]  In *Bristol Airport plc v Powdrill*, Sir Nicolas Browne-Wilkinson V-C said at p 765:

"... the natural meaning of the words 'no other proceedings . . . may be commenced or continued' is that the proceedings in question are either legal proceedings or quasi-legal proceedings such as arbitration . . . the reference to the 'commencement' and 'continuation' of proceedings indicates that what Parliament had in mind was legal proceedings. The use of the word 'proceedings' in the plural together with the words 'commence' and 'continue' are far more appropriate to legal proceedings (which are normally so described) than to the doing of some act of a more general nature."

[70]  In *Re Olympia & York Canary Wharf Ltd*, Millett J said at p 157-158:

"It is not necessary in this case to consider where the line is to be drawn between the commencement or continuation of 'proceedings' on the one hand or of 'legal process' on the other. But in my judgment both concepts are well known. Together they embrace all steps in legal proceedings from the issue of initiating process, to their final termination in the process of execution or other means of enforcement of a judgment such as the appointment of a receiver by way of equitable execution or the making of a charging order or other steps for the enforcement of the court's judgment without execution. But the phrase is not apt to describe the taking of non-judicial steps such as the service of a contractual notice in order to crystallise the liability of the party on whom the notice is served.

In my judgment, support for that conclusion can be derived from the use of the words 'commenced or continued' in section 11(3)(d) of the 1986 Act. If the service of a contractual notice is part of a legal process, I am unable to understand what legal process it is supposed to commence or continue. The words 'commence or continue' indicate a process which has an independent existence of its own apart from the step by which it is commenced or continued; a process which either continues after or was in existence before the taking of the relevant step.

Further support for my conclusion, if it were needed, may be derived from a consideration of the legislative purpose for which section 10 and section 11 were enacted. They are intended to impose a moratorium upon the creditors of the company in order to assist the administrator in his attempts to achieve the statutory purpose for which he was appointed. They are couched in procedural terms and are designed to prevent creditors from depriving the administrator of the possession of property which may be required by him for the purpose of the administration."

[71]  Both these cases construed the particular provisions of s 11(3)(d) having regard to the other language used in s 11 and the purpose of that section. The language of art 21 is certainly not the same as the language of s 11. These two decisions of the English courts cannot therefore be determinative of the meaning of art 21 (1)(a). Nonetheless, the discussion in those cases, and particularly in the second case, is helpful in elucidating the general concepts normally involved in the words "actions or proceedings", particularly when coupled with the words "commencement or continuation".

[72]  Mr Phillips did not refer me to any English authority which assisted his argument as to the meaning of art 21(1)(a). However, he referred to Canadian decisions as to s 11(4) of the Companies' Creditors Arrangement Act ("the CCAA"), a Canadian statute. Part IV of the CCAA implemented in Canada, with modifications, the Model Law but s 11(4) is not in Pt IV. Accordingly, the Canadian decisions dealing with s 11(4) do not directly deal with the

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

meaning of art 21 of the Model Law. The position in Canada, pursuant to s 11(4) of the CCAA, became relevant in the English case of *AWB Geneva SA v North America Steamships Ltd, Canada* [2007] 1 CLC 749 (Field J) and [2007] 2 Lloyd's Rep 315 (Court of Appeal). In *AWB*, the Claimants had entered into contracts with a Canadian company which had then entered a process of insolvency governed by the CCAA. The Claimants contended that the Canadian company had committed certain events of default and, pursuant to the express terms of the contract, the Claimants were not obliged to perform certain obligations otherwise imposed on them by the contracts. The office holder in the Canadian insolvency applied to the Canadian court under s 11(4) of the CCAA for an order preventing the Claimants relying on the events of default as producing the result, in accordance with the contractual provisions, that the Claimants did not have to perform the contracts.

**[73]** Section 11(4) of the CCAA gave the court power, in particular, to restrain "proceedings taken or that might be taken in respect of the company" and "the commencement of or proceeding with any other action, suit or proceeding against the company". In *AWB*, Field J heard expert evidence as to Canadian law and he summarised the matter in this way at 11 – 14:

> "11 . . . in broad terms, the CCAA provides a regime that corresponds to the combined effect of the provisions of UK insolvency law relating to administrations (Schedule B1 of the Insolvency Act 1986 ['the 1986 Act']) and compromises or schemes of arrangement (Part 1 of the 1986 Act providing for company voluntary arrangements, and section 425 of the Companies Act 1985 ['the 1985 Act']).
>
> 12 Section 11(4) of the CCAA empowers the court to make an order staying 'proceedings' taken or that might be taken in respect of the company. 'Proceedings' has been construed to include extra-judicial conduct that could impair the ability of the debtor company to continue in business. In *Norcen Energy Resources Ltd v Oakwood Petroleums Ltd* (1988) 72 CBR (NS) 1, the court restrained a joint venture party of a debtor company from relying on the insolvency of the debtor company to replace it as the operator under a petroleum operating agreement. In *Re T Eaton Co* (1997) 46 CBR (3d) 293, the court restrained tenants in shopping centres from terminating leases on the basis of co-tenancy clauses requiring the debtor company's store to stay open. And in *Re Playdium Enterprises Corp* (2001) 31 CBR (4th) 302, the court restrained a party from relying on its contractual right to object to an assignment.
>
> 13 In *Re Doman Industries* (2003) 41 CBR (4th) 29 Tysoe J explained the purpose of such stays in these terms:
>
> 'In my view, there are numerous purposes of stays under s 11 of the CCAA. One of the purposes is to maintain the status quo among creditors while a debtor company endeavours to reorganise or restructure its financial affairs. Another purpose is to prevent creditors and other parties from acting on the insolvency of the debtor company or other contractual breaches caused by the insolvency to terminate contracts or accelerate the repayment of the indebtedness owing by the debtor company when it would interfere with the ability of the debtor company to reorganise or restructure its financial affairs . . . . [A] further purpose is to prevent the frustration of the reorganisation or restructuring plan after its implementation on the basis of events of default or breaches which existed prior to or during the restructuring period.'
>
> 14 It is clear from the evidence of the Trustee's expert on Canadian insolvency law, the Hon James M Farley QC, a former Justice of the Superior Court of Ontario, that stays are commonly granted under section 11 (4) of the CCAA to restrain counterparties to contracts with the debtor company from relying on any pre-CCAA plan breaches of those contracts committed by the debtor company that would allow those counterparties to exercise remedies against the debtor company. Mr Farley gives examples of such orders in his report. In two of these the order provided that no person who is a party to any contract or lease to which the debtor company is a party may accelerate, terminate, rescind, refuse to perform or otherwise repudiate its obligations thereunder by reason of any defaults or events of default arising out of the insolvency of the Applicant."

**[74]** Mr Phillips provided me with copies of *Norcen Energy Resources Ltd v Oakwood Petroleums Ltd* (1988) 72 CBR (NS) 1; *Re T Eaton Co* (1997) 46 CBR (3d) 293; *Re Playdium Enterprises Corp* (2001) 31 CBR (4th) 302 and *Re Doman Industries* (2003) 41 CBR (4th) 29. So far as I could see, the judges in those cases did not discuss the meaning of the word "proceedings", much less did they attempt to define it. Accordingly, I find that any persuasive force which these decisions might otherwise have had is greatly diminished.

**[75]** Having considered the material relied upon by the parties, I conclude that I am considerably assisted by the

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

discussion in *Bristol Airport plc v Powdrill* [1990] Ch 744, [1990] 2 All ER 493, [1990] BCLC 585 and *Re Olympia & York Canary Wharf Ltd* [1993] BCLC 453, [1993] BCC 154 as to the ordinary and well understood meaning of a phrase such as "the commencement or continuation of individual actions or individual proceedings" (the wording used in art 21(1)(a)). Applying that meaning, I consider that the service of a notice to terminate under cl 28.1 of the contract is not the commencement or continuation of an individual action or proceeding within art 21(1)(a). Accordingly, I reject the argument for the administrator that the court has power under art 21(1)(a) to restrain Fibria from serving a termination notice under cl 28.1.

[76]  It was not said that the service of a termination notice under cl 28.1 came within any other sub-paragraph of art 21(1). In particular, it was not said that the claimed jurisdiction was conferred by art 21(1)(g) which refers to additional relief (including relief under para 43 of sch B1 to the Insolvency Act 1986) that might be available to a British insolvency office holder under the law of Great Britain.

*APPROPRIATE RELIEF*

[77]  The principal way in which the administrator put his case in relation to art 21 was to contend that the Companies Court had jurisdiction to make an order restraining Fibria from relying on cl 28.1 pursuant to the court's power to grant "any appropriate relief". It was submitted that the words "any appropriate relief" were not defined and that the words should be given their ordinary meaning. For the order sought to come within those words, the order must be such that it could properly be described as the grant of "relief". If it could be so described, then the court had to decide whether that relief was "appropriate". It was said that these words deliberately gave the court very wide powers to do what it thought fit. If the court thought it was appropriate to order relief which would be available to the administrator in the Korean court applying Korean insolvency law, then the English court could grant that relief. In so doing, the English court was not applying Korean law. Article 21 of CBIR was part of English law and it was English law which was being applied when the English court granted the same sort of relief as would be available in the Korean court under Korean insolvency law.

[78]  It was submitted that the phrase "any appropriate relief" was not cut down by the heads of relief specified in paras (a) to (g) of art 21(1) because art 21(1) stated that any appropriate relief "included" those heads of relief; this showed that "any appropriate relief" was wider than the specified heads and that the specified heads were not intended to be an exhaustive statement of what could be ordered by way of appropriate relief.

[79]  The administrator is right that the words "appropriate relief", taken on their own, are wide words. Although the argument in the present case focussed on the appropriateness of the English court granting the sort of relief which a Korean court would grant, applying Korean insolvency law, it is only right to acknowledge that if the administrator is right in his approach to art 21, then the English court has power to grant any relief which it thinks fit, whether that relief would be available under the law of the state of the foreign proceedings or under English law or, indeed, under some other system of law. On this basis, the English court would have power to reflect the fact that Fibria is a Brazilian company and to apply Brazilian law, if the English court thought that relief under Brazilian law was appropriate. Indeed, the English court could express approval for the insolvency laws which apply in some entirely different jurisdiction and persuade itself that it was appropriate that such laws should be applied in the case before it. Further, if the court has power to do what it thinks is appropriate, it may not be necessary to find that the relief which is sought is relief which is available under any current system of law anywhere. If there were a pending proposal, for example from the Law Commission, to reform English insolvency law, then on the administrator's approach, the English court would have power to anticipate that reform and to hold that granting relief in accordance with the proposed reform would be "appropriate". Whilst some of these examples are more fanciful than others, they do indicate that the administrator's submissions result in the English court having the widest possible power to do whatever it thinks fit, whether its order is in accordance with the law of the foreign insolvency proceedings or not.

[80]  The administrator's argument that the scope of "any appropriate relief" is not cut down by the terms of sub-

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

paragraphs (a) to (g) which are matters "included" in the appropriate relief but not exhaustive of the appropriate relief does reflect the ordinary meaning of the language of art 21. Nonetheless, I consider it somewhat surprising that sub-paragraph (g) is expressed in the way in which it is if it had really been intended that the phrase "any appropriate relief" permitted the recognising court to grant relief which it would not be able to grant in an insolvency conducted in accordance with the laws of the recognising court. A power for the recognising court to grant relief in that way would be a very significant power. It is odd to think that such a power was intended without there being any specific reference to the recognising court's ability to apply the law of a foreign state, or even to do something which no system of law anywhere would allow. This is particularly so in view of the terms of sub-paragraph (g) which deliberately limit relief under that sub-paragraph to relief which would be available to a British insolvency office holder under the law of Great Britain.

[81]  Having made these comments on the possible literal readings of art 21, I ought not to construe art 21 without regard to the other matters which I am able to consider when determining its meaning. In that regard, reg 2 of the CBIR provides that, for the purpose of ascertaining the meaning and effect of the CBIR, the court may consider certain documents, in particular, the UNCITRAL Model Law, the documents of the working group relating to the preparation of the Model Law and the Guide to Enactment of the Model Law.

[82]  As regards the documents of the working group relating to the preparation of the Model Law, I was asked by Mr Phillips to consider the note dated 26 September 1995 which was prepared in advance of a meeting of the working group in October and November 1995. Paragraph 6 of this note stated that it was intended to set out possible solutions that might be adopted in relation to various problems. Paragraphs 42 to 54 of the note are material as background to the present issue. In relation to setting out the effects of recognition of a foreign proceeding, one approach was to provide a detailed and exhaustive list of all the consequences which would follow from recognition: see para 42. A second possible approach was to specify that the effect of recognition would be determined by the application of the law of one of the two countries involved. Here there could be two variants. Variant 1 would involve, essentially, the application of the law of the state in which the foreign proceedings were opened. Variant 2 would involve, essentially, the application of the law of the recognising state. The note identified earlier legislative examples of one or other of these variants being adopted. It was suggested that variant 1 could be justified from a dogmatic point of view whereas variant 2 would be more easily applied in practice. An alternative would be for the two systems of law to be applied in combination: see para 52. It was then stated at para 53 that the choice of law could be left to the recognising state and s 426(5) of the Insolvency Act 1986 was given as an example of this possibility. Finally, at para 54, it was stated that the effects of recognition could be left to judicial discretion and reference was made to s 304 of the United States Bankruptcy Code where the court was empowered to order "other appropriate relief".

[83]  Having met in October and November 1995, the working group reported on 1 December 1995. The possible legislative approaches to the effects of recognition were discussed at paras 46 to 59. The arguments for and against the application of the law of the recognising state or the application of the law of the state in which the foreign proceedings were opened were described, as was a possible approach leaving it to the recognising court to choose between the two systems of law. The report appeared to favour a list of automatic consequences of recognition followed by a power for a judge to specify additional effects of recognition involving factors which would be familiar to judges in different legal systems: see paras 56 and 59. At para 134, the report set out a draft provision dealing with the effects of recognition. By para (1)(e) of that draft, a foreign representative was able to ask the recognising court to grant "other appropriate relief" under the law of the state in which the foreign proceeding was opened (unless forbidden by local law); this draft was subject to a possible further qualification which referred to the law of the jurisdiction in which a limited proceeding has been commenced. This part of the draft was then discussed at paras 154 to 166. The discussion identified competing arguments as to the law which should be available to the recognising court. Paragraph 165 referred to the law of the foreign proceeding but subject to limitations based on the law of the recognising state. However, para 165 ended by saying that the matter needed to be returned to later.

[84]  Although Mr Phillips took me to these reports of the working group, no one at the hearing referred to two

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

further reports of the working group which were dated 24 October 1996 and 19 February 1997. I find that these two later reports are more helpful as regards the final adopted version of the Model Law. The report of 24 October 1996 referred to a draft article (then numbered art 12) which identified the relief which could be granted by the recognising court. Article 12(2)(b) permitted the recognising court to grant "any appropriate relief including" certain specified heads of relief. Article 12(2)(b)(v) referred to "other relief which may be available under the laws of the State of the foreign proceeding or under the laws of the enacting State . . .". This draft provision was discussed at para 133 of the report where it was stated that the provision referring to relief under the laws of the State of the foreign proceeding was widely thought to be unrealistic and so that the reference to foreign law should be deleted, although the wording might be retained as an option which the enacting state might choose to implement.

[85]  The report dated 19 February 1997 referred to a draft article (then numbered art 17) which came very close to the final adopted form of the Model Law. The earlier reference to the relief which was available under the laws of the State of the foreign proceeding had been removed so that the relevant provision referred only to relief available under the laws of the recognising State. At paras 51 and 52 of the report, there was discussion as to whether the draft art 17 should be amended by the addition of words such as "under the conditions of the law of this State" at appropriate places. This suggestion was objected to on the ground that it was implicit by virtue of the discretionary nature of the relief available under art 17 that the court would have regard to its own law. The report also stated that the court should not be prevented from granting relief if that was found to be useful and fair. At para 57, commenting on the provision which became art 21(1)(g), the report stated that the working group accepted the proposal to restrict the relief to that available to the insolvency administrator in the enacting state.

[86]  The Model Law was adopted by the United Nations General Assembly on 15 December 1997. Article 21 of the Model Law, as adopted, referred to "any appropriate relief, including" and sub-paragraph (g) of art 21(1) referred to "(g) Granting any additional relief that may be available to [the office holder] under the laws of this State."

[87]  My reaction to the discussions of the working group is that it seems improbable that the working group, having deleted (from what is now art 21(1)(g)) a power for the recognising court to apply the law of the foreign proceeding, intended to bring back in such a power under the general wording which refers to "any appropriate relief".

[88]  I was referred to two versions of the Guide to Enactment, one published in 1999 and the other in 2014. It was submitted that the 1999 version was the one referred to in reg 2 of CBIR. I will refer to that version but, in any event, the following passages from the 1999 Guide are essentially repeated in the 2014 Guide. Paragraphs 20(b) and 154 of the 1999 Guide state:

> "20 With its scope limited to some procedural aspects of cross-border insolvency cases, the Model Law is intended to operate as an integral part of the existing insolvency law in the enacting State. This is manifested in several ways . . . .
>
> (b) The Model Law presents to enacting States the possibility of aligning the relief resulting from recognition of a foreign proceeding with the relief available in a comparable proceeding in national law . . . .
>
> 154 Post recognition relief under art 21 is discretionary, as is pre-recognition relief under art 19. The types of relief listed in art 21, para 1, are typical or most frequent in insolvency proceedings; however, the list is not exhaustive and the court is not restricted unnecessarily in its ability to grant any type of relief that is available under the law of the enacting state and needed in the circumstances of the case."

[89]  Turning to more general matters, I note that what can be called the common law of recognition proceeds on the basis that the recognising court applies its own law and not the law of the state in which the foreign proceedings were opened: see *Cambridge Corporation v Unsecured Creditors* [2006] UKPC 26, [2007] 1 AC 508, [2006] 3 All ER 829. This is to be contrasted with the position under s 426(5) of the Insolvency Act 1986 and art 4 of the EC Regulation on Insolvency Proceedings 2000. In those two cases, the applicable law is clearly defined so that it is not restricted to (in the case of s 426(5)) or is not (in the case of art 4) the law of the state which is asked to grant relief. The working group referred to s 426(5) and an earlier draft of the EC Regulation but did not adopt language which is comparable to those legislative precedents.

**[90]** The scope of art 21 of the CBIR was one of the issues raised in *Rubin v Eurofinance SA* [2012] UKSC 46, [2013] 1 AC 236, [2013] 1 All ER 521. In that case it was suggested that a judgment of a New York court should be recognised in England pursuant to art 21. I note that counsel who submitted that the judgment could be recognised under art 21 said that under the CBIR the court could grant "appropriate relief including any type of relief which is available under the law of the enacting state". At [28], Lord Collins referred to para 20(b) of the Guide to Enactment and stated that enacting states could make available "the type of relief that would be available in the case of a domestic insolvency". Lord Collins dealt further with the CBIR at 133 – 144 and he said at 141 – 143:

> "141 The Respondents say that (a) the power under Article 21 is to grant any type of relief that is available under the law of the relevant state, and that the fact that recognition and enforcement of foreign judgments is not specifically mentioned in Article 21 as one of the forms of relief available, does not mean that such relief cannot be granted; (b) the recognition and enforcement of the judgments of a foreign court is the paradigm means of co-operation with that court; and (c) the examples of co-operation in Article 27 are merely examples and are not exhaustive.
>
> 142 But the CBIR (and the Model Law) say nothing about the enforcement of foreign judgments against third parties. As Lord Mance pointed out in argument, recognition and enforcement are fundamental in international cases. Recognition and enforcement of judgments in civil and commercial matters (but not in insolvency matters) have been the subject of intense international negotiations at the Hague Conference on Private International Law, which ultimately failed because of inability to agree on recognised international bases of jurisdiction.
>
> 143 It would be surprising if the Model Law was intended to deal with judgments in insolvency matters by implication. Articles 21, 25 and 27 are concerned with procedural matters. No doubt they should be given a purposive interpretation and should be widely construed in the light of the objects of the Model Law, but there is nothing to suggest that they apply to the recognition and enforcement of foreign judgments against third parties."

**[91]** *Re Atlas Bulk Shipping A/S* [2011] EWHC 878 (Ch), [2012] Bus LR 1124, [2012] 1 BCLC 151 is an interesting example of the Companies Court granting relief under art 21(1)(g) but no issue arose in that case of the court granting a type of relief which was not available in the case of a domestic insolvency: see at 1131G.

**[92]** The text books appear to favour a limitation on the relief which might be granted under art 21 to relief which would be available under domestic law in relation to a domestic insolvency: see Fletcher on Insolvency in Private International Law, 2nd ed at para 8.38 and Sheldon on Cross Border Insolvency, 3rd ed at paras 3.91 – 3.100.

**[93]** Mr Phillips cited a number of decisions of courts in the United States and Canada. Mr Collings did not make submissions to me in relation to those cases but I obviously need to consider them. Before doing so, I will refer to the relevant statutory provisions in the United States and in Canada.

**[94]** Before the Model Law was implemented in the United States, cases in that jurisdiction which were ancillary to foreign insolvency proceedings were dealt with under s 304 of the former Bankruptcy Code. Under s 304(b)(3) the court was able to order "other appropriate relief" and s 304(c) set out matters which should guide the court when asked to make an order under s 304(b). The Model Law was implemented in the United States by Ch 15 of Title 11 of the Bankruptcy Code. Sections 1519, 1520 and 1521 are similar to arts 19, 20 and 21 of the CBIR. The Model Law was implemented in Canada by Pt IV (ss 44 – 61) of the CCAA. Section 48 of the CCAA gives the court power to make certain orders on recognition of a foreign proceeding. Further, by s 49(1), the court may make any order "that it considers appropriate" including certain specified orders.

**[95]** In *Re Atlas Shipping A/S* 404 BR 726 (Bankr SD NY, 2009) the New York court held that many of the principles underlying s 304 of the former Bankruptcy Code remained in effect in relation to Ch 15. It was said that the jurisdiction to grant "appropriate relief" was "exceedingly broad".

**[96]** In *Gandi Innovations Holdings LLC* (Bankr WD Texas, 2009) the Texas court recognised a foreign proceeding in Canada. The Canadian court had made an order under the CCAA prohibiting the termination of executory

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

contracts without the leave of the court. The Texas court acting under s 1521 of the Bankruptcy Code made its own order to the same extent as the Canadian order.

**[97]** *Re Condor Insurance Co Ltd* 601 F 3d 319 (Fifth Circuit 2010) is a decision of the United States Court of Appeals. The case concerned a Nevis insurance company which was the subject of a winding up order in Nevis. The United States court recognised the Nevis proceedings as foreign main proceedings. The case raised the question whether there was power under s 1521 of the Bankruptcy Code to apply foreign law (Nevis Law) for the purpose of avoiding fraudulent transfers. The alternative of opening proceedings in the United States under Ch 7 of the Bankruptcy Code was not available because the company was a foreign insurance company. Under Ch 7, the United States court would have had extensive powers to avoid fraudulent transfers. The court held that it had the power to apply Nevis law because it could grant "appropriate relief" under s 1521. The discussion in the case is complicated by a number of provisions in s 1507 and 1521 as to the bringing of avoidance claims in the United States courts but it is not necessary to refer to those matters for present purposes. The court referred to the deliberations of the UNCITRAL working group, as follows:

> "UNCITRAL's Working Group on Insolvency Law examined three potential approaches to the question of which law a recognizing court should apply. The first approach would allow the recognizing court to apply its own law. This was favored by some countries concerned with the potential lack of familiarity with foreign law by recognizing courts. The second approach would apply the law of the main proceeding. This approach was favored by some as it 'would lead to a more consistent, harmonized result, in view of divergences among national insolvency laws' and would help 'avoid abetting debtors seeking to conceal assets behind another law that might provide a haven for those assets.' A third approach was to permit the recognizing court to apply either the law of the main proceeding or its own law – a solution which might 'provide flexibility needed to limit insulation of assets from insolvency proceedings'. However this approach drew concern that it might raise the potential that a foreign representative 'would be enabled to exercise more powers than those that would be available to the representative under the law of the appointing jurisdiction'."

**[98]** In the quoted passage, the United States court referred to the working group report dated 1 December 1995. The court did not specifically refer to the reports dated 24 October 1996 and 19 February 1997. The court then continued:

> "The final provision did not accept any of these three approaches in full. Rather, the Model Law permitted the recognizing court to grant any appropriate relief and granted standing to the foreign representatives to bring avoidance actions under the law of the recognizing state. This purposefully left open the question of which law the court should apply--in deference to the choice of law concerns expressed by the United States."

**[99]** The United States court then explained that the application of foreign avoidance law in a Ch 15 ancillary proceeding raised fewer choice of law concerns as the court was not required to create a separate bankruptcy estate. The court also stated that its decision was supported by earlier decisions as to the scope of s 304 of the former Bankruptcy Code and cited *Re Metzler* 78 BR 674 (Bankr SDNY 1987). The court added that Congress had intended that the case law in relation to s 304 should apply unless contradicted by Ch 15.

**[100]** In *Re Hartford Computer Hardware Inc* (2012) 94 CBR (5th) 20, the Canadian court recognised United States Ch 11 proceedings. Under s 49 of the CCAA, the Canadian court was asked to recognise and make effective in Canada an order made in the United States court. It was pointed out that one part of the United States order could not be made by a Canadian court in relation to a Canadian insolvency under its domestic insolvency provisions: see s 11(2) of the CCAA. The Canadian court held that under s 49 of the CCAA it could make any order which it considered appropriate and it concluded that the order requested was indeed appropriate. It also held that the provisions of the CCAA which gave effect to the public policy restrictions in art 6 of the Model Law should be construed restrictively and that the order sought did not raise any public policy issues.

**[101]** *Re Sino-Forest Corporation* 501 BR 655 (58 Bankr Ct Dec 226 2013) concerned s 1507, rather than s 1521 of the United States Bankruptcy Code: see footnote 3 to the judgment. Section 1507 allows the United States court to provide "additional assistance" to a foreign representative. The court was asked to recognise an order made by the Canadian court in a Canadian insolvency proceeding. It was held, following, *Re Metcalfe & Mansfield Alt Invs* 421 BR 685, that the United States court should apply its ordinary principles as to enforcement of foreign judgments and comity pursuant to Ch 15 and it did not need to ask itself whether it could or would have made the same order if the insolvency had been proceeding before a United States court under its own Ch 11.

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

**[102]**  I was also shown a number of decisions of the American and Canadian courts where the recognising court granted relief which was available under the domestic law of the recognising state in a case of a domestic insolvency. These decisions are not of any assistance as to the present debate about the scope of "appropriate relief" in art 21.

**[103]**  Mr Phillips argued that art 6 of CBIR demonstrated that the reference to "appropriate relief" must include relief that was not available under English law. It was submitted that relief which was available under English law could not be "manifestly contrary to the public policy of Great Britain or any part of it". It was then submitted that if the court held that appropriate relief under art 21(1)(a) was confined to relief which was available under English law, then art 6 could never apply and would be otiose. Therefore to prevent art 6 being otiose, the court should hold that "appropriate relief" could include relief only available under foreign law and in such a case the court could ask itself whether it would be "manifestly contrary to the public policy of Great Britain or any part of it" to give effect to foreign law.

**[104]**  This argument as to the significance of art 6 ignores the fact that art 6 is not restricted to dealing with cases which might involve the grant of "appropriate relief" within art 21(1). Article 6 deals with all of the provisions of the CBIR, which include many specific provisions. It may therefore be the case that an application is made to the court to take action under such a specific provision, where the court may have to consider whether the action in question would be contrary to public policy in English law. The operation of art 6 in this way is illustrated by *Re Jurgen Toft* 453 BR 186 (2011), a decision of a New York Bankruptcy Court. In that case, Dr Toft was the subject of insolvency proceedings in Germany. The German court made an order permitting the administrator in the insolvency to intercept Dr Toft's postal and electronic mail. The English court granted recognition and enforcement of that order. The administrator applied in the United States for a similar order relying on the express power to order the delivery of information contained in s 1521(a)(4) of the Bankruptcy Code. The New York held that the order sought was contrary to United States public policy within s 1506 of the Bankruptcy Code (which implemented art 6 of the Model Law).

*CONCLUSION ON "ANY APPROPRIATE RELIEF"*

**[105]**  The non-exhaustive words "any appropriate relief" are capable of being given a wide literal meaning. However, the very width of their literal meaning, which is illustrated in para 79 above, makes me somewhat cautious about construing the words literally. Those considerations suggest to me that it was not intended that the words should be given such a wide literal meaning.

**[106]**  The decision in *Re Condor Insurance Co Ltd* appears to support an interpretation of those words which would allow the recognising court to give effect to an order of the court of the foreign proceedings even if the recognising court could not itself have made such an order in its own domestic proceedings. I recognise that art 8 of the CBIR directs the Companies Court to have regard to the need to promote uniformity in the application of the Model Law. However, I have concerns about applying the decision in *Re Condor Insurance Co Ltd* to art 21 of the CBIR for two separate reasons. The first is that, with respect to the judges in that case, I do not think that their description of the various reports of the working group on the Model Law was accurate. Secondly, their reasoning relied on the position which pertained under s 304 of the former US Bankruptcy Code before the implementation of the Model Law. I can see that if the position under s 304 of the former Code was that the US court could grant "any appropriate relief" and that it had been established that those words allowed the US court to apply the law of the foreign proceedings, then the same words should have the same effect in s 1521 of the Bankruptcy Code, which implemented the Model Law. However, there is no comparable legislative history in Great Britain and it is open to me to conclude that the United States have implemented the Model Law in a way which is not identical to the way in which it has been implemented in Great Britain.

**[107]**  I am directed by reg 2 of the CBIR to consider the documents relating to the working group on the Model

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

Law. On my reading of the reports of the working group, it was not intended that "any appropriate relief" would allow the recognising court to go beyond the relief it would grant in relation to a domestic insolvency. I do not think that there is sufficient in the discussion in those reports which would allow me to conclude (as the court concluded in *Re Condor Insurance Co Ltd*) that the words "any appropriate relief" were intended to replicate the position under s 304 of the former US Bankruptcy Code. I also note that whenever the legal position under art 21 has been described in an English case or in a textbook on the CBIR, the discussion proceeds on the basis that "any appropriate relief" allows the court to grant the same sort of relief as it would grant in relation to a domestic insolvency.

**[108]** Accordingly, I am not persuaded that that the words "any appropriate relief" allow me to grant relief which would not be available to the court when dealing with a domestic insolvency.

**[109]** I have also considered whether I would be prepared to grant to the administrator the relief which he seeks in this case, even if I held that I had power to do so pursuant to the words "any appropriate relief" in art 21. I have concluded that I would not have been prepared to do so.

**[110]** The contract in this case was made between a Korean company and a Brazilian company. The parties chose the law which was to govern their contract. They chose English law rather than Korean or Brazilian law. Under English law, in the events which have happened, if the Security Agent does not elect to transfer or novate the contract, then the contract can be brought to an end, either by an election to that effect on the part of the Security Agent, or by a termination notice given by Fibria. If the contract is brought to an end, under English law, then Fibria is not committed to the contract for the remainder of the 25 year term. If the Company claims freight from Fibria, then Fibria will not be obliged to pay. Conversely, if Fibria is restrained from terminating the contract, then it will be committed to the contract for the remainder of the 25 year term and will be obliged to pay freight for that period.

**[111]***Rubin v Eurofinance SA* supports the view that the relief available under art 21 is of a procedural nature and that the article should be given a wide interpretation in relation to matters of procedure. There is considerable scope for argument as to whether the relief sought in a particular case is of a procedural or of a substantive nature. I will not attempt to define which matters are procedural and which are substantive. However, having explained the difference between Fibria being entitled to terminate the contract and not being so entitled, it seems to me that this difference goes well beyond matters of procedure and affects the substance of the parties' rights and obligations under the contract.

**[112]** In some cases, it can be argued that anyone who does business with a foreign company which might thereafter enter a process of insolvency, governed by the insolvency law of its country of registration, should expect that the insolvency will be governed by that law. Indeed, statements to that effect have been made in *In re Atlas Shipping S/A*[2011] EWHC 878 (Ch), [2012] 1 BCLC 151, [2012] Bus LR 1124and *AWB Geneva SA v North America Steamships Ltd, Canada* [2007] 1 CLC 749 at 31. However, in the present case, the parties had deliberately chosen English law as the law of the contract. Whereas the parties might have expected that a Korean court would apply Korean insolvency law to the insolvency of the Company, they might have been very surprised to find that an English court would apply Korean insolvency law to the substantive rights of the parties under a contract which they had agreed should be governed by English law.

**[113]** Different jurisdictions adopt different approaches to *ipso facto* clauses. I have referred earlier to the position in the United States, Canada and Korea. As it happens, the position in English law has been recently reviewed by the Supreme Court in *Belmont Park Investments Pty Ltd v BNY Corporate Trustee Services Ltd.* The Supreme Court took full account of the policy considerations behind the choice which is to be made as to the enforceability of such provisions. If Korean law is as the administrator contends, then Korea views these policy questions differently from this jurisdiction. If I have a free hand, as the administrator contends, to do what I consider to be appropriate in this case, I am not tempted to prefer the policy choice which is made in Korean law over the policy choice recently reaffirmed by the Supreme Court in relation to English law. In this case, I consider that it is appropriate for the Companies Court to apply English law and to give effect to the parties' choice of English law.

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

**[114]** Even if the decision in *Re Condor Insurance Co Ltd* were a persuasive authority in this jurisdiction, it is readily distinguishable from the present case. In that case, the US court had extensive powers to set aside avoidance transactions in a domestic insolvency. The issue for the court was much more to do with matters of procedure than of substance. The present case is more to do with matters of substance than of procedure. Further, in that case, the US court was applying its established principles of comity to the order of the foreign court. There is no comparable order of the Korean court in this case.

*THE EFFECT OF MY CONCLUSION ON THE APPLICATIONS*

**[115]** I do not have power under art 21(1)(a) to order a "stay" in relation to Fibria's entitlement to serve a termination notice under cl 28.1 of the contract. I do not have power under art 21(1) to make an order restraining Fibria from serving such a notice; if I had such power, I would not exercise it as I would hold such an order was not "appropriate relief". In any case, if it is said that I should do what a Korean court would do in this case, then I am not persuaded that a Korean court would make an order restraining the service of a termination notice. On my understanding of the expert evidence, what the Korean court would do would be to hold that a termination notice, if served, would be ineffective to determine the contract. Thus, it is not necessary or appropriate to make an order restraining Fibria from serving a termination notice.

**[116]** I have reached the above decisions on the assumptions as to Korean law contended for by the administrator. On those assumptions, I am not prepared to grant the relief sought by the administrator under art 21. Accordingly, I do not need to know the answer to the questions of Korean law that arise and I will not therefore send a request to the Korean court to give me the answers to such questions.

**[117]** As to Fibria's application for permission to commence an arbitration, I raised at the hearing the question whether it was necessary for there to be an arbitration between Fibria and the Company as to the enforceability of cl 28.1 in English law. I understood at the hearing there was no issue about that. It may be any question as to the enforceability of cl 28.1 in English law would also affect the various assignees of the benefit of the contract. Those persons are not parties to the present proceedings but, in any event, as they are not the subject of the Korean insolvency, and are not the subject of Warren J's order of 25 June 2013, Fibria does not need permission to bring any relevant proceedings to determine such an issue (if there is one) between Fibria and those persons.

**[118]** I will hear counsel as to the appropriate orders to make to give effect to this judgment.

Judgment accordingly.

*APPENDIX*

1. The Cross-Border Insolvency Regulations 2006 were made pursuant to s 14 of the Insolvency Act 2000 and came into force on 4 April 2006.

2. By reg 1(2), "the UNCITRAL Model Law" is defined to mean the Model Law on cross-border insolvency as adopted by the United Nations Commission on International Trade Law on 30 May 1997.

3. Rule 2 provides for the UNCITRAL Model Law to have the force of law in the following way:
    "2(1) The UNCITRAL Model Law shall have the force of law in Great Britain in the form set out in Schedule 1 to these Regulations (which contains the UNCITRAL Model Law with certain modifications to adapt it for application in Great Britain).

    (2) Without prejudice to any practice of the courts as to the matters which may be considered apart from this paragraph, the

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

following documents may be considered in ascertaining the meaning or effect of any provision of the UNCITRAL Model Law as set out in Schedule 1 to these Regulations –

(a) the UNCITRAL Model Law;

(b) any documents of the United Nations Commission on International Trade Law and its working group relating to the preparation of the UNCITRAL Model Law; and

(c) the Guide to Enactment of the UNCITRAL Model Law (UNCITRAL document A/CN9/442) prepared at the request of the United Nations Commission on International Trade Law made in May 1997."

4. Rule 3 provides:

"3(1) British insolvency law (as defined in article 2 of the UNCITRAL Model Law as set out in Schedule 1 to these Regulations) and Part 3 of the Insolvency Act 1986 shall apply with such modifications as the context requires for the purpose of giving effect to the provisions of these Regulations.

(2) In the case of any conflict between any provision of British insolvency law or of Part 3 of the Insolvency Act 1986 and the provisions of these Regulations, the latter shall prevail."

5. The form of the Model Law whichias given effect is set out in Schedule 1 to the Regulations.

6. By article 1(1) it is provided that the Model Law applies where assistance is sought in Great Britain by a foreign court or a foreign representative in connection with a foreign proceeding.

7. Article 2 contains relevant definitions, which include the following:

"For the purposes of this Law –

(a) 'British insolvency law' means –

(i) in relation to England and Wales, provision extending to England and Wales and made by or under the Insolvency Act 1986 (with the exception of Part 3 of that Act) or by or under that Act as extended or applied by or under any other enactment (excluding these Regulations);

. . .

. . .

(g) 'foreign main proceeding' means a foreign proceeding taking place in the State where the debtor has the centre of its main interests;

(h) 'foreign non-main proceeding' means a foreign proceeding, other than a foreign main proceeding, taking place in a State where the debtor has an establishment within the meaning of sub-paragraph (e) of this article;

(i) 'foreign proceeding' means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganisation or liquidation;

(j) 'foreign representative' means a person or body, including one appointed on an interim basis, authorised in a foreign proceeding to administer the reorganisation or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding;

. . .

(q) references to the law of Great Britain include a reference to the law of either part of Great Britain (including its rules of private international law)."

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

8. Articles 6, 7 and 8 provide:

"Article 6. Public policy exception

Nothing in this Law prevents the court from refusing to take an action governed by this Law if the action would be manifestly contrary to the public policy of Great Britain or any part of it.

Article 7. Additional assistance under other laws

Nothing in this Law limits the power of a court or a British insolvency officeholder to provide additional assistance to a foreign representative under other laws of Great Britain.

Article 8. Interpretation

In the interpretation of this Law, regard is to be had to its international origin and to the need to promote uniformity in its application and the observance of good faith."

9. Chapter II (arts 9 to 14) provides for foreign representatives and creditors to have access to courts in Great Britain.

10. Chapter III (arts 15 to 24) provides for recognition of a foreign proceeding and relief. Articles 19 to 23 are in the following terms:

"Article 19. Relief that may be granted upon application for recognition of a foreign proceeding

1. From the time of filing an application for recognition until the application is decided upon, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including –

(a) staying execution against the debtor's assets;

(b) entrusting the administration or realisation of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy; and

(c) any relief mentioned in paragraph 1(c), (d) or (g) of Article 21.

2. Unless extended under paragraph 1(f) of article 21, the relief granted under this article terminates when the application for recognition is decided upon.

3. The court may refuse to grant relief under this article if such relief would interfere with the administration of a foreign main proceeding.

Article 20. Effects of recognition of a foreign main proceeding

1. Upon recognition of a foreign proceeding that is a foreign main proceeding, subject to paragraph 2 of this article –

(a) commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities is stayed;

(b) execution against the debtor's assets is stayed; and

(c) the right to transfer, encumber or otherwise dispose of any assets of the debtor is suspended.

2. The stay and suspension referred to in paragraph 1 of this article shall be –

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

(a) the same in scope and effect as if the debtor, in the case of an individual, had been adjudged bankrupt under the Insolvency Act 1986 or had his estate sequestrated under the Bankruptcy (Scotland) Act 1985, or, in the case of a debtor other than an individual, had been made the subject of a winding-up order under the Insolvency Act 1986; and

(b) subject to the same powers of the court and the same prohibitions, limitations, exceptions and conditions as would apply under the law of Great Britain in such a case,

and the provisions of paragraph 1 of this article shall be interpreted accordingly.

3. Without prejudice to paragraph 2 of this article, the stay and suspension referred to in paragraph 1 of this article, in particular, does not affect any right –

(a) to take any steps to enforce security over the debtor's property;

(b) to take any steps to repossess goods in the debtor's possession under a hire-purchase agreement;

(c) exercisable under or by virtue of or in connection with the provisions referred to in article 1(4); or

(d) of a creditor to set off its claim against a claim of the debtor,

being a right which would have been exercisable if the debtor, in the case of an individual, had been adjudged bankrupt under the Insolvency Act 1986 or had his estate sequestrated under the Bankruptcy (Scotland) Act 1985, or, in the case of a debtor other than an individual, had been made the subject of a winding-up order under the Insolvency Act 1986.

4. Paragraph 1(a) of this article does not affect the right to –

(a) commence individual actions or proceedings to the extent necessary to preserve a claim against the debtor; or

(b) commence or continue any criminal proceedings or any action or proceedings by a person or body having regulatory, supervisory or investigative functions of a public nature, being an action or proceedings brought in the exercise of those functions.

5. Paragraph 1 of this article does not affect the right to request or otherwise initiate the commencement of a proceeding under British insolvency law or the right to file claims in such a proceeding.

6. In addition to and without prejudice to any powers of the court under or by virtue of paragraph 2 of this article, the court may, on the application of the foreign representative or a person affected by the stay and suspension referred to in paragraph 1 of this article, or of its own motion, modify or terminate such stay and suspension or any part of it, either altogether or for a limited time, on such terms and conditions as the court thinks fit.

Article 21. Relief that may be granted upon recognition of a foreign proceeding

1. Upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including –

(a) staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities, to the extent they have not been stayed under paragraph 1(a) of article 20;

(b) staying execution against the debtor's assets to the extent it has not been stayed under paragraph 1(b) of article 20;

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

(c) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under paragraph 1(c) of article 20;

(d) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(e) entrusting the administration or realisation of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court;

(f) extending relief granted under paragraph 1 of article 19; and

(g) granting any additional relief that may be available to a British insolvency officeholder under the law of Great Britain, including any relief provided under paragraph 43 of Schedule B1 to the Insolvency Act 1986.

2. Upon recognition of a foreign proceeding, whether main or non-main, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court, provided that the court is satisfied that the interests of creditors in Great Britain are adequately protected.

3. In granting relief under this article to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under the law of Great Britain, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

4. No stay under paragraph 1(a) of this article shall affect the right to commence or continue any criminal proceedings or any action or proceedings by a person or body having regulatory, supervisory or investigative functions of a public nature, being an action or proceedings brought in the exercise of those functions.

Article 22. Protection of creditors and other interested persons

1. In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph 3 of this article or paragraph 6 of article 20, the court must be satisfied that the interests of the creditors (including any secured creditors or parties to hire-purchase agreements) and other interested persons, including if appropriate the debtor, are adequately protected.

2. The court may subject relief granted under article 19 or 21 to conditions it considers appropriate, including the provision by the foreign representative of security or caution for the proper performance of his functions.

3. The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or of its own motion, modify or terminate such relief.

Article 23. Actions to avoid acts detrimental to creditors

1. Subject to paragraphs 6 and 9 of this article, upon recognition of a foreign proceeding, the foreign representative has standing to make an application to the court for an order under or in connection with sections 238, 239, 242, 243, 244, 245, 339, 340, 342A, 343, and 423 of the Insolvency Act 1986 and sections 34, 35, 36, 36A and 61 of the Bankruptcy (Scotland) Act 1985.

2. Where the foreign representative makes such an application ('an article 23 application'), the sections referred to in paragraph 1 of this article and sections 240, 241, 341, 342, 342B to 342F, 424 and 425 of the Insolvency Act 1986 and sections 36B and 36C of the Bankruptcy (Scotland) Act 1985 shall apply –

(a) whether or not the debtor, in the case of an individual, has been adjudged bankrupt or had his estate sequestrated, or, in the case of a debtor other than an individual, is being wound up or is in administration, under British insolvency law; and

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

(b) with the modifications set out in paragraph 3 of this article.

3. The modifications referred to in paragraph 2 of this article are as follows –

(a) for the purposes of sections 241(2A)(a) and 342(2A)(a) of the Insolvency Act 1986, a person has notice of the relevant proceedings if he has notice of the opening of the relevant foreign proceeding;

(b) for the purposes of sections 240(1) and 245(3) of that Act, the onset of insolvency shall be the date of the opening of the relevant foreign proceeding;

(c) the periods referred to in sections 244(2), 341(1)(a) to (c) and 343(2) of that Act shall be periods ending with the date of the opening of the relevant foreign proceeding;

(d) for the purposes of sections 242(3)(a), (3)(b) and 243(1) of that Act, the date on which the winding up of the company commences or it enters administration shall be the date of the opening of the relevant foreign proceeding; and

(e) for the purposes of sections 34(3)(a), (3)(b), 35(1)(c), 36(1)(a) and (1)(b) and 61(2) of the Bankruptcy (Scotland) Act 1985, the date of sequestration or granting of the trust deed shall be the date of the opening of the relevant foreign proceeding.

4. For the purposes of para 3 of this article, the date of the opening of the foreign proceeding shall be determined in accordance with the law of the State in which the foreign proceeding is taking place, including any rule of law by virtue of which the foreign proceeding is deemed to have opened at an earlier time.

5. When the foreign proceeding is a foreign non-main proceeding, the court must be satisfied that the article 23 application relates to assets that, under the law of Great Britain, should be administered in the foreign non-main proceeding.

6. At any time when a proceeding under British insolvency law is taking place regarding the debtor –

(a) the foreign representative shall not make an article 23 application except with the permission of –

(i) in the case of a proceeding under British insolvency law taking place in England and Wales, the High Court; or

(ii) in the case of a proceeding under British insolvency law taking place in Scotland, the Court of Session; and

(b) references to 'the court' in paragraphs 1, 5 and 7 of this article are references to the court in which that proceeding is taking place.

7. On making an order on an Article 23 application, the court may give such directions regarding the distribution of any proceeds of the claim by the foreign representative, as it thinks fit to ensure that the interests of creditors in Great Britain are adequately protected.

8. Nothing in this article affects the right of a British insolvency officeholder to make an application under or in connection with any of the provisions referred to in paragraph 1 of this article.

9. Nothing in paragraph 1 of this article shall apply in respect of any preference given, floating charge created, alienation, assignment or relevant contributions (within the meaning of section 342A(5) of the Insolvency Act 1986) made or other transaction entered into before the date on which this Law comes into force."

11. Chapter IV (articles 25 to 27) provides for cooperation with foreign courts and foreign representatives. Article 25 provided:

"Article 25 Cooperation and direct communication between a court of Great Britain and foreign courts or foreign representatives

Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another [2014] EWHC 2124 (Ch)

1. In matters referred to in paragraph 1 of article 1, the court may cooperate to the maximum extent possible with foreign courts or foreign representatives, either directly or through a British insolvency officeholder.

2. The court is entitled to communicate directly with, or to request information or assistance directly from, foreign courts or foreign representatives."

12. Article 27 provides:

"Article 27. Forms of cooperation

Cooperation referred to in articles 25 and 26 may be implemented by any appropriate means, including –

(a) appointment of a person to act at the direction of the court;

(b) communication of information by any means considered appropriate by the court;

(c) coordination of the administration and supervision of the debtor's assets and affairs;

(d) approval or implementation by courts of agreements concerning the coordination of proceedings;

(e) coordination of concurrent proceedings regarding the same debtor."

**End of Document**

# H5 6 ˙%⁄3



Ronelp Marine Ltd v STX Offshore & Shipbuilding Co Ltd

Overview    |    [2016] EWHC 2228 (Ch),    |    [2017] BPIR 203,    |    [2016] All ER (D) 77 (Oct)

# Ronelp Marine Ltd and other companies v STX Offshore & Shipbuilding Co Ltd [2016] EWHC 2228 (Ch)

Chancery Division

Norris J

7 September 2016Judgment

**Stephen Atherton QC and Charlotte Tan** (instructed by **Holman Fenwick Willan LLP**) for the Applicants

**Robert Amey** (instructed by **MFB Solicitors**) for the Respondents

Hearing dates: 1 September 2016

- - - - - - - - - - - - - - - - - - - - -

**Judgment**

**Mr Justice Norris:**

   1.   STX Offshore & Shipbuilding Co Ltd ("STX") is a Korean shipbuilding company which until very recently had a registered branch office in London. STX has a wholly owned Chinese subsidiary which also undertakes shipbuilding ("Dalian").

   2.  On 27 June 2012 Dalian entered into five shipbuilding contracts ("the Zodiac Contracts"), one with each of the five applicants ("the Buyers"), who are Liberian companies. The Zodiac Contracts provided for the delivery of the five vessels in the period from the end of October 2014 to the end of April 2016 and for payments by instalments over that period. In each case there was a separate side agreement which had the effect of reducing the price by $6 million for each vessel ("the Sideletter"). The Zodiac Contracts are in a standard form and are governed by English law.

   3.  On 4 July 2012 STX entered into performance bonds ("the Guarantee") with the Buyers unconditionally and irrevocably guaranteeing the due and faithful performance by Dalian of the Zodiac Contracts. The Guarantee stated :-

"This Guarantee is governed by the laws of England and any dispute arising out of this guarantee may be referred to the non-exclusive jurisdiction of the Courts of England"

Ronelp Marine Ltd and other companies v STX Offshore & Shipbuilding Co Ltd [2016] EWHC 2228 (Ch)

4.  Turmoil in the global shipbuilding market meant that Dalian entered into a Chinese insolvency process (I deliberately avoid categorizing it as a restructuring or as a liquidation) on 6 June 2014, before the steel had been cut for any of the hulls, and before the Buyers had paid any instalments. It was made clear that the ships would not be built by a notice from the Chinese office holder dated 27 August 2014. This referred to the Enterprise Bankruptcy Law of China and stated that each contract "shall be deemed to be rescinded". The Buyers say that under English law that notice constituted a renunciatory and/or anticipatory repudiatory breach of each of the Zodiac Contracts giving rise to a claim for damages to be assessed by reference to (a) the increased cost of acquiring a replacement vessel and (b) profits lost because of an inability to trade a vessel from the due delivery date under the Zodiac Contracts until such time as a replacement vessel can be delivered. The total claim is of the order of US$90 million.

5.  The Chinese office-holder rejected those claims on 18 November 2014. So the Buyers turned to the Guarantee. But STX did not acknowledge liability. So the Buyers commenced proceedings in the Commercial Court by a claim form dated 30 January 2015. STX filed a Defence on 1 June 2015.

6.  The nature of the Defence was as follows:-

a)  The obvious inference from the Sideletter is that the parties intended to mislead third parties as to the true price payable under the relevant shipbuilding contract, and as a result the Zodiac Contracts are unenforceable on grounds of illegality.  If the Zodiac Contracts are unenforceable then Dalian had no obligations which the Guarantee could support: so there is no claim under the Guarantee. (In their Reply the Buyers say that this arrangement came about at the request of Dalian, and they simply concurred in it).

b)  Since the Enterprise Bankruptcy Law of China enabled the Chinese officeholder to bring the contracts to an end, the exercise by him of that statutory power could not amount to a repudiatory breach of the Zodiac Contracts. The parties are therefore confined to whatever rights the contract gives them.

c)  The terms of the Zodiac Contracts properly construed do not entitle the Buyers to damages but confine them simply to the return of instalments plus interest: since Dalian has received no instalments, it is not in breach of any obligation, and there is no claim under the Guarantee.

d)  The losses claimed are excessive (though STX simply puts the Buyers to proof, rather than advancing any positive case).

e)  Dalian's obligation to start building the vessels had not in fact arisen, because the Zodiac Contracts provided for the Buyers to obtain a performance guarantee from their parent company which they had not in fact done. If the obligation to commence building had not arisen, nor had the obligation to deliver. Accordingly there cannot be any claim for lost profits: so STX is not liable to pay that head of claim. (In their Reply the Buyers say that there was a collateral agreement which varied this requirement, but in the alternative the requirement was waived by Dalian, and in the further alternative Dalian is by conduct estopped from requiring compliance with the article).

7.  On 20 November 2015 the Commercial Court made an Order giving directions for the conduct of this case. It provided for disclosure to be made by 12 February 2016 (and it has taken place although there are outstanding disputes as to the adequacy). Witness statements of fact were to have been exchanged by 8 April 2016. Expert reports were to be exchanged by 13 May 2016. There was to be one expert for each party as to Chinese law,

Ronelp Marine Ltd and other companies v STX Offshore & Shipbuilding Co Ltd [2016] EWHC 2228 (Ch)

whose evidence was to be confined to opinion whether to the Chinese insolvency process amounted to a declaration of bankruptcy proceedings under Chinese law (which is relevant to the definition of "default" under the Zodiac Contracts). There was to be one expert for each side on quantum: the Buyer's expert is German. Neither witness statements nor expert reports have been exchanged. The length of the trial is estimated as four days (plus pre-reading) and is fixed for 12 December 2016. Although there has been slippage in compliance with the Order for Directions neither side had by 22 June 2016 applied to the Commercial Court to the vacate trial and re-fix the date: they were engaged in discussions about a revision of the timetable to achieve that date.

8.   On 27 May 2016 the directors of STX presented a petition to the Seoul Central District Court (Bankruptcy Division) for the commencement of rehabilitation proceedings in respect of STX. That same day the Korean court imposed a moratorium pending the hearing of that petition. On 7 June 2016 the Korean Court made an order commencing rehabilitation proceedings and appointing the CEO of STX, Mr Lee, as its administrator.

9.   As its name implies, a rehabilitation proceeding is a form of "turnaround" or "rescue" proceeding under the Korean Debtor Rehabilitation and Bankruptcy Act ("the DRBA"), similar to Chapter 11 proceedings under the US Bankruptcy Code. The object is to promote the restructuring of the indebtedness of STX according to a plan approved by the creditors and by the Korean Court. In the present case the plan being formulated is for payment of 7.25% of admitted or established claims in cash over three years commencing 2024, and for treatment of the balance of 92.5% as a "debt-for-equity" swap.

10.  To achieve that objective, when the Korean Rehabilitation Court issued its commencement order the effect of the DRBA was that enforcement against STX became prohibited or (if current) suspended; and so did litigation. What then happens under the provisions of the DRBA is that the administrator prepares a list of all claims by creditors. If the creditor does not agree with that list, then that creditor must file a proof of claim within a limited period. This will either be accepted or rejected by the administrator.

11.  If the administrator rejects the claim, then the creditor may commence "a confirmatory action" in the Rehabilitation Court, again within a limited period.

12.  If the creditor is not satisfied with the outcome of the review by the Korean Rehabilitation Court then the creditor may file an "objection" (again within a limited period) and the case is transferred to the Korean civil courts as an "objection proceeding".

13.  Mr Lee applied in England to have effect given to the Korean rehabilitation proceedings. On the 23 June 2016 by Order of Mr Simon Monty QC ("the Recognition Order") the rehabilitation proceedings were recognised as "the foreign main proceeding" under the Cross Border Insolvency Regulations 2006 in accordance with the provisions of Schedule 1 ("the Model Law"). The Model Law is, of course, the enactment in Great Britain of the UNCITRAL Model Law. In interpreting the Model law the English Court must have regard to its international origin and to the need to promote uniformity in its application and the observance of good faith: (see Article 8),

14.  On the making of a recognition order, Article 20.1(a) of the Model Law provides that:-

"…commencement or continuation of individual actions….. concerning the debtor's assets, rights obligations or liabilities is stayed."

This stay is automatic. Article 20.2 describes its nature and definies its scope and effect by drawing on established rules in relation to bankruptcy and liquidation. But Article 20.6 says that

Ronelp Marine Ltd and other companies v STX Offshore & Shipbuilding Co Ltd [2016] EWHC 2228 (Ch)

"the court may… modify…such stay and suspension or any part of it, either altogether or for a limited time, on such terms and conditions as the court thinks fit….."

provided that the Court is satisfied that the interests of creditors and other persons interested are adequately protected.

15.  On the making of a recognition order Article 21 of the Model law enables the Court, where necessary for the protection of the assets of the debtor or the interests of the creditors, to grant certain discretionary relief including

"any additional relief that may be available to a British insolvency officeholder under the law of Great Britain, including any relief provided under paragraph 43 of schedule B1 to the Insolvency Act 1986".

16.  In cases where the foreign main proceeding is in the nature of a restructuring rather than a liquidation it has become the practice of the English Courts as a matter of discretion to grant the whole of the relief available under paragraph 43 of Schedule B1 and to modify the automatic stay to align it with those provisions: Transfield ER Cape Limited [2010] EWHC 2851.

17.  Mr Monty QC followed this course. Paragraph 2 of the Recognition Order begins:-

 "Pursuant to articles 20(6) and 21(1)(b) of the Model Law, the stay and suspension in article 20(1) of the Model Law is modified as follows and additional relief is granted in the following terms …."

18.  Paragraph 3 of the Recognition Order says that save for certain proceedings that are identified in the Schedule (which were permitted to continue to the extent identified) no legal process might be continued against STX except with the consent of the Administrator or the permission of the Court. The excepted proceedings which were permitted to continue were legal proceedings where the argument had concluded, and only judgment or award and consequential matters remained.

19.  The judge knew about the Commercial Court action between the Buyers and STX. That is because as part of his duty of full and frank disclosure (see Re OGX Petroleo [2016] EWHC 25) the administrator, Mr Lee, had informed the judge about it. In the light of what Mr Lee told him, the judge thought it appropriate simply to grant recognition and leave it to the Buyers (from whom he had not heard) to apply for the stay to be lifted: compare OGX (supra) at para. 59.

20.  The assessment of Mr Lee and those advising him as to the state of the Commercial Court action at the date of the recognition application may be summarised as follows. Requests for further information in relation to the statements of case had been answered on 7 June 2016. There were some outstanding disclosure issues: but no applications had been made. The parties having failed to meet the time ordered for exchange of witness statements, they had agreed 15 June 2016 as the date for exchange; but that was disrupted by the recognition application and was replaced by an agreement for exchange on 29 July 2016 (though that itself was overtaken by the Recognition Order). On STX's side, of their three witnesses, the statement of one was almost ready for exchange, and the other two were at a stage where some further questioning would be required before the statements could be finalised. As to the expert evidence, STX had a fairly detailed draft of preliminary reports from each of their experts.

Ronelp Marine Ltd and other companies v STX Offshore & Shipbuilding Co Ltd [2016] EWHC 2228 (Ch)

21.  Although in the recognition application Mr Lee himself described the case as "reasonably well advanced, the evidence filed on this present application by STX has emphasised how much remains to be done, the solicitor for STX expressing the view that "the parties could not possibly be ready for trial as early as December 2016", so that a re-fixing of the trial for June 2017 is necessary, coupled with the expenditure of at least as much again as the costs already incurred (a further £350-£450,000).

22.  Mr Lee has been replaced as administrator of STX. The new administrator has rejected the Buyers' claim under the Guarantee. It has therefore been necessary for the Buyers to commence confirmatory proceedings in the Korean Rehabilitation Court. I received expert evidence as to the nature, timescale and prospective cost of these proceedings and of any objection proceedings in the event that the Korean Rehabilitation Court confirms the administrator's rejection of proof.

23.  STX tendered the opinion of Mr Young Seok Lee, a licensed attorney in the Republic of Korea with almost 30 years' experience handling international or cross-border disputes: he is not a specialist insolvency lawyer. The Buyers tendered the opinion of ChiYong Rim, also a licensed attorney in the Republic of Korea of similar call, but with extensive experience of advising on personal bankruptcy, corporate liquidations, corporate reorganisations and workouts. From 1985 to 2007 he served as a judge in the Korean Courts (between 2005 and 2007 being the Senior Judge of the Bankruptcy Division of the Seoul Central District Court), is an internationally published author on insolvency matters, and was for the period from 2009 to 2013 a member or chair of a specialist subcommittee considering amendments to the DRBA.  Both experts were careful and measured in their evidence: where there is a difference of emphasis between them I have given greater weight to the opinion of Mr Rim.

24.  The Korean Courts are sophisticated independent organs of a democratic state and they and their judges are deserving of the greatest respect. They are rapidly accumulating experience of insolvent shipping and shipbuilding companies trading through contracts governed by English or New York law. This case is not about whether the English Commercial Court (as the domestic court) is "better" than a Korean Rehabilitation Court or the Korean Civil Courts (as the courts of the insolvency). What this case requires is an understanding of the respective processes available for the resolution of a particular dispute, and a consideration of which should be engaged in the light of the principles embodied in the Model Law.

25.  As to the confirmatory proceedings, the experts were agreed that this is essentially a limited summary procedure involving a short hearing (or a series of short hearings at varying intervals) before the Rehabilitation Court to consider written material (including witness statements, opinions from foreign lawyers, and legal submissions). In straightforward claims (for example where only quantum is in issue) the process would take between six months and a year. But in complex claims (for example involving foreign law) the process would generally take over a year and anything up to 3 years (the more complex the issues the longer the time needed to deliberate on the arguments) Mr Rim acknowledged that his upper limit of three years derived from his experience of two other cases involving multiple confirmatory actions where the sheer bulk of claims may have impacted upon the progress of each. But the STX rehabilitation is likewise on a large scale, and will probably involve multiple claims. The costs would be of the order of US$200,000 on each side. In a case concerning a foreign law contract, if the foreign court adjudicated on that dispute, then the Korean court would probably suspend the confirmatory proceedings pending the outcome, and the adjudication of the foreign court would be very powerful evidence in the confirmatory proceedings with the Korean judge likely either to adopt it or to recommend the parties to agree to the disposal of the confirmatory claim on those terms.

26.  If the confirmatory proceedings do not provide an outcome satisfactory to the Buyers they can commence "objection proceedings". As to these, a significant fee (in this case about US$350,000) would be payable and

Ronelp Marine Ltd and other companies v STX Offshore & Shipbuilding Co Ltd [2016] EWHC 2228 (Ch)

further costs incurred. The amount of those further costs is, in the light of the evidence, less than wholly clear: but I think would be of the order of a further US$200,000 (taking into account that this is a conventional trial process but is not restricted to the material produced in the confirmatory action. The objection proceedings would, I am satisfied, take at least a further year.

27.  It is in this context that the Buyers, having had their claim rejected by the new Administrator and having commenced objection proceedings, seek the permission of the Court to the continuation of the Commercial Court proceedings (or, as it was put in argument, a lifting of the stay imposed by the Recognition Order). (The Buyers sought the permission of the administration to that continuation, but their request was rejected without reasons being supplied). The sole object of the continuation is to obtain an adjudication of the claim, with a view to presenting the outcome to the Korean Rehabilitation Court in the current confirmatory proceedings. It is accepted that any judgment obtained from the Commercial Court cannot be enforced against STX: and it is accepted that the conversion of the claim into a judgment cannot alter the priorities within the Korean insolvency. The Buyers will continue to have an unsecured claim: but it will be one verified and quantified by the Commercial Court, which it is up to the Korean Rehabilitation Court to adopt or reject.

28.  The Korean rehabilitation plan is a collective process designed to achieve a coordinated, global solution for all stakeholders in the STX insolvency: it includes addressing the claims of individual creditors through an orderly resolution of claims conducted for the benefit of the creditors as a whole. In making the Recognition Order the English Court acknowledged that collective process under the control of the Korean Court, and extended to the Korean officeholder the assistance it would give to a domestic administrator by granting the "paragraph 43 stay" (subject to the ability of any affected creditor apply for permission to continue proceedings).,

29.  In my judgment, under paragraph 43, an affected creditor applying for permission to continue existing proceedings bears the burden of making out the case for that relief. He must first identify the nature of the interest that he wishes to promote by obtaining that relief. He must secondly address the question whether the grant of such relief is likely to impede the achievement of the purpose of the insolvency proceeding (here, rehabilitation). He must thirdly enable the Court to balance his legitimate interests against the interests of other creditors, having regard to the nature and the probability of occurrence of prejudice on either side. An affected creditor making such an application under a modified stay imposed under the Model Law must in addressing these questions bear in mind that he is seeking to persuade the domestic court to interfere in the processes of the insolvency court. The list of relevant considerations is not exhaustive.

30.  The Buyers are seeking to prosecute (in proceedings already commenced) an unsecured money claim, for the payment of damages, and to do so according to the law and in the domestic court stipulated for in the agreement which established the relationship between them and STX.

31.  Unsecured money claims are, of course, amongst the claims to be addressed in the rehabilitation plan and would inevitably be caught in any liquidation process in the event that the rehabilitation plan is rejected. As Patten J pointed out in AES Barry Ltd v TXU Europe Energy Trading [2004] EWHC 1757 at [24] it will only be in "exceptional" cases that the court gives a creditor, whose claim is simply a monetary one, a right by the taking of proceedings to override and pre-empt the statutory machinery. The term "exceptional" is protean: but in this context I think it means that the applicant creditor must demonstrate a circumstance or combination of circumstances of sufficient weight to overcome the strong imperative to have all the claims dealt with in the same way (and in the instant case by the insolvency court). That said, a domestic court, recognising the general desirability of having one insolvency estate under the management of one insolvency court, should not be too ready to find the factors of "sufficient" weight (but, given the nature of the decision, is unlikely to be assisted by the extensive citation of judgments which simply show the assessments made by other judges).

Ronelp Marine Ltd and other companies v STX Offshore & Shipbuilding Co Ltd [2016] EWHC 2228 (Ch)

32.  In my judgment the following factors are of relevance in the instant case.

33.  First, although the claim is a monetary one it is (and is acknowledged to be) a  particularly complex one: one point in particular requires consideration.

34.  It arises from the issue whether according to English law the underlying Dalian contracts are unenforceable on the ground of illegality.

35.  The fact that English law is involved is not of itself sufficient. As Counsel for  STX pointed out, although the parties have agreed that English law shall apply to the  Guarantee (and to the Zodiac Contracts) and for the English courts to be the non-exclusive venue, that is but a contractual right which (like contractual rights generally) may be subject to interference in an insolvency. The Buyers must be taken to have known that the Guarantee was being provided by a Korean company, that in the ordinary course it would be Korean law that would govern its insolvency, and that something more would be needed if the verification and quantification of the Buyers' claim was to be removed from the ordinary insolvency process. As it was put in one American case (see Gercke below) as regards the normal position, "the intervention of insolvency proceedings requires the mandatory venue clause to yield to considerations of comity and the interests of all creditors… in an equality of distribution".

36.  Counsel for STX argued that once the underlying factual disputes about how the Sideletter came into being had been resolved, the English law on illegality was "clear and well-known". This struck me as a bold submission in the light of the changes in the law even since the point was pleaded in the Commercial Court action. One only has to read the judgments in Patel v Mirza [2016] UKSC 42 to appreciate how accurate was the description by Prof Andrew Burrows in his "Restatement of the English Law Contract" (OUP, 2016) of the law of illegality as being "in a state of flux" (p.221), and the observation of Lord Neuberger (at paragraph [164]) that the different approaches adopted by members of the Supreme Court in recent cases had "left the law on the topic in the some disarray". That state has not been brought to an end by the decision that in the application of the doctrine of illegality regard must be had to the policy factors involved and to the nature and circumstances of the illegal conduct in determining whether the public interest in preserving the integrity of the judicial system should result in denial (on the grounds of illegality) of the relief claimed (see the judgment of Lord Toulson - with whom Baroness Hale, Lord Kerr, Lord Wilson and Lord Hodge agreed - paragraph [120]). Of course Patel v Mirza does render relatively clear and certain the law on illegality where a claimant has paid money to a defendant to carry out an illegal activity, and the illegal activity is not proceeded with. But that is not relevant to the dispute about the Zodiac Contracts: and the Supreme Court was clearly divided as to the extent to which the rule so articulated applied in other scenarios.

37.  I can see why the application of this body of law through the medium of expert evidence and in the course of the summary review procedure should not be visited upon the Korean Rehabilitation Court. I find myself rather in the position in which Briggs J was in Cosco Bulk Carrier: Ltd v Armada Shipping SA [2011] EWHC 216. He was concerned with competing proprietary and/or contractual claims to the receipt of payments due under a sub-charter, made by Armada (a company subject to a Swiss liquidation) on the one hand Cosco (a creditor of Armada):  so the claim was not a money claim typical of claims in insolvency (as the claim on the Guarantee in essence is). The resolution of the dispute involved a consideration of competing views, expressed at first instance (and once in the Court of Appeal) on the one hand and in the Privy Council on the other hand, about the juridical nature of a lien on sub-freights. He said (at para [61]) :-

Ronelp Marine Ltd and other companies v STX Offshore & Shipbuilding Co Ltd [2016] EWHC 2228 (Ch)

" There is in my view an air of unreality in the submission that it will be either fair, just or convenient to visit upon a Swiss bankruptcy court the adjudication of an underlying dispute which is almost entirely governed by English law, concerns shipping matters and which is already the subject of two pending arbitration for experienced tribunal's pursuant to obligations in the contracts out of which the dispute has arisen. The Swiss court would be obliged to rely for the determination of most of the matters in issue on expert evidence as to English law (either from a single expert or competing experts) and its own relevant experience will be limited to Swiss insolvency law as to which… none of the parties have identified any specific issue to be decided".

I take the same view about the applicability of the law of illegality to the underlying Zodiac Contracts. Its application is uncertain to an exceptional degree.

38.  Nor is that the only legal point of real difficulty: an issue arises whether, upon the true construction of the Zodiac Contracts, common law remedies are excluded and the Buyers confined the return of instalments. The interaction of contractual remedies and common law remedies for repudiatory breach (and the associated construction questions) were identified by Hamblen J in TeeKay Tankers Ltd v  STX Offshore & Shipping Co [2014] EWHC 3612 as a matter of intricacy and complexity requiring extensive argument and citation of authority. His observations were made in the context of identifying a convenient forum: whereas for me the question is not one of "convenience" but of whether to depart from the strong imperative to leave matters to the insolvency court. That different context does not affect the analysis of the nature and the assessment of the significance of the issue which has to be resolved.

39.  Second, it is in my judgment a factor of significant weight that there are already proceedings before the Commercial Court which are reasonably well advanced and on which the Buyers and STX have each expended considerable sums in preparation for trial in December 2016. Plainly the mere existence of proceedings is not of itself sufficient, for the automatic stay (modified to accord with paragraph 43) applies to existing proceedings. But the fact that proceedings have been commenced is a factor to be taken into account, and the nearer the outcome of the proceedings the greater the weight to be attached to that factor: note the exceptions made in the Recognition Order itself, and compare American Energy Group Ltd v Hycarbex Asia Ltd[2014] EWHC 1091 (Ch), where permission was granted to continue an existing 2-year old arbitration where the hearing was due to commence the following day.

40.  Counsel for STX relied on Re Gercke and Homan 122 BR 621 (1991), a decision of the Bankruptcy Court for the District of Columbia under what was then section 304 of Chapter 11 of the US Bankruptcy Code. The applicants were the English administrators of Dominion: they applied in the District of Columbia to restrain Yorke from continuing proceedings which it had commenced there, which had a trial date two months hence (though the actual state of preparation is not clear). The US Court nonetheless granted an injunction restraining the Columbia proceedings in order to permit the English Court (as the insolvency court) to decide where the Yorke claim should be litigated. This is an illustration of similar (though not identical) principles being applied, and serves to underline the degree of respect that should be accorded to the insolvency court. But it is not otherwise helpful in this case.

41.  Third, the Buyers want the adjudication and quantification of their claim under the Guarantee to be determined more speedily than is likely under the confirmatory review and objection proceeding process: and they wish to do that in order to be enfranchised when the rehabilitation plan is put to creditors.

42.  So much for the nature of the interests which the Buyers seek to promote by asking the domestic court to permit them to continue the Commercial Court action. I turn to consider whether granting permission for the continuation of the Commercial Court action would impede the achievement of the rehabilitation plan. In my judgment it would not: rather it has the potential greatly to assist. It would enable the Korean Rehabilitation

Ronelp Marine Ltd and other companies v STX Offshore & Shipbuilding Co Ltd [2016] EWHC 2228 (Ch)

Court to suspend the Buyers' confirmatory action, and would then provide (almost certainly more speedily than could be achieved by the insolvency court itself) that court with an adjudication upon the issues which the Korean Rehabilitation Court could adopt or promote (or, if dissatisfied, ignore). There is no suggestion that completing the steps necessary to prepare the Commercial Court action for trial and participating in the trial will interfere in any material way with the formulation and prosecution of the rehabilitation plan or with addressing any of the other confirmatory actions. Given the size of the STX insolvency that is no surprise.

43.   Counsel for STX submitted that it could be inferred from the fact that it gave permission to the administrator to expend insolvency estate funds in opposing the present application that the Korean Rehabilitation Court considered that permitting continuation of the Commercial Court action would interfere with the achievement of the rehabilitation plan. I do not consider that it is an inference properly made. All I can say is that the Korean Rehabilitation Court wanted the matter properly argued and tested before the domestic court.

44.   Since permitting continuation of the Commercial Court action would not interfere with the rehabilitation process, I move to a balancing of the interests of the buyers and of the other creditors of STX. The interest of the Buyers is to obtain a verification and quantification of their claim expeditiously and (from their point of view) economically so that they can play a part in the formulation and adoption of the rehabilitation plan. The interest of the creditors as a whole is to ensure (a) that if possible the same rules and processes apply to all claims; (b) that the rehabilitation process shall proceed in an orderly way and without delay; (c) that so far as possible the administrator is not put to any extra administration expenses which would form the "top slice" of any recoveries and reduce the amounts for distribution. No particular interests were identified in the evidence.

45.   Resolving a genuinely difficult issue of foreign law would assist rather than impede the insolvency process. It does entail treating the Buyers' foreign law claim in a way different from that in which other possible foreign law claims might be treated: but that is justified because of the nature of the dispute (a factor I regard as crucial) and because there are extant proceedings in which the precise issues have been defined, a trial ordered and imminent and preparation undertaken. The Buyers' claim will be adjudicated upon within the same timeframe as it would in the Korean Rehabilitation Court, and faster than would be the case if the confirmatory proceedings were followed by objection proceedings in the Korean civil court. The English timetable is governed by an order of the Commercial Court and I do not accept that it is probable that the parties must abandon that or that the Commercial Court would vacate the trial.  In terms of expense to the administrator (and that is the focus here) there is little to choose between the two processes, though the English costs appear to be slightly higher: however, given the billions of dollars involved in the rehabilitation plan (US$6.7 billion) and the extent of the "haircut" which creditors must take the increase is of no materiality. In whatever forum the Buyers' claim is adjudicated documents will have to be translated and witnesses to travel and interpreters engaged. There is no disorder caused to the administration. There is no basis in the evidence for supposing that if the Buyers' are permitted to continue the Commercial Court action there will be a clamour for other creditors to do likewise: and if there are other creditors with English law claims against STX in respect of which STX has raised an illegality defence, then a ruling by the Commercial Court is likely to be of advantage in those cases also. There is no question of piecemeal realisation or unequal distribution or any undermining of the equal treatment of creditors in any distribution, features that would seriously undermine the object of having a single insolvency estate.

46.   Being satisfied that the Korean Rehabilitation Court would be required to rule on an English law controversy that is more than usually difficult, that there are proceedings on foot to determine that issue which are at an advanced stage, that to permit those proceedings to continue would not impede the administration, and that taking that course does not unduly advance the interests of the Buyers over the interest of the creditors as a whole, I shall grant permission to continue the Commercial Court action.

Ronelp Marine Ltd and other companies v STX Offshore & Shipbuilding Co Ltd [2016] EWHC 2228 (Ch)

47.  There is also adjourned to the hearing before me an application to recognise Mr Jang as the replacement foreign representative for Mr Lee. I have considered that application and grant it.

---

**End of Document**

301

# Cross-Border Insolvency

;9

3

)

A Commentary on the UNCITRAL Model Law,
Fourth Edition, Volume I

General Editor **Look Chan Ho**

permit such set-off would seem proper,[364] but in some circumstances staying bilateral set-off temporarily is necessary to protect the debtor's assets.[365]

Although arbitration proceedings will normally be subject to the automatic stay,[366] the court may allow arbitration to proceed in appropriate circumstances under Article 20(6).[367]

### Article 21: Relief that may be granted upon recognition

1. Upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including –

    (a) staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities, to the extent they have not been stayed under paragraph 1(a) of article 20;

    (b) staying execution against the debtor's assets to the extent it has not been stayed under paragraph 1(b) of article 20;

    (c) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under paragraph 1(c) of article 20;

    (d) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

    (e) entrusting the administration or realisation of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court;

    (f) extending relief granted under paragraph 1 of article 19; and

    (g) granting any additional relief that may be available to a British insolvency officeholder under the law of Great Britain, including any relief provided under paragraph 43 of Schedule B1 to the Insolvency Act 1986.

2. Upon recognition of a foreign proceeding, whether main or non-main, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in Great Britain to the foreign representative or another person designated by the court, provided that the court is satisfied that the interests of creditors in Great Britain are adequately protected.

3. In granting relief under this article to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under the law of Great Britain, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

4. No stay under paragraph 1(a) of this article shall affect the right to commence or continue any criminal proceedings or any action or proceedings by a person or body having regulatory, supervisory or investigative functions of a public nature, being an action or proceedings brought in the exercise of those functions.

---

365    Cf *Tucker v Aero Inventory (UK) Limited*, 2009 CanLII 63138.

366    *Re Samsun Logix Corporation* [2009] EWHC 576 (Ch); [2009] BPIR 1502.

367    *Cosco Bulk Carrier v Armada Shipping* [2011] EWHC 216 (Ch); [2011] 2 All ER (Comm) 481; *United Drug (UK) Holdings v Bilcare Singapore* [2013] EWHC 4335 (Ch); *Re Kombinat Aluminjuma Podgorica* [2015] EWHC 750 (Ch); *Re Pan Ocean Co* [2015] EWHC 1500 (Ch).

Article 21 of the British Model Law implements Article 21 of the Model Law. It sets out the discretionary relief upon recognition of a foreign proceeding. As pointed by the US bankruptcy court in the context of Chapter 15:

> *Section 1521 applies only after recognition of a foreign proceeding. A foreign representative seeks recognition in order to obtain some relief not otherwise available under United States law. It is not necessary that the debtor have any assets in the United States for there to be a chapter 15 case. Sometimes the relief sought by the foreign representative is limited to the ability to conduct discovery under section 1521(a)(4). Or the foreign representative may seek a stay of litigation against the debtor under section 1521(a)(1), to the extent not already stayed under sections 1520(a)(1) and 362. But where the debtor has assets in the United States or may later acquire the right to assets in the United States, such as in executing on a judgment, the foreign representative must seek an order under section 1521(a)(5) to obtain the right to administer and/or realize on such assets, and must seek an order under section 1521(b) to address the distribution of such assets.*[368]
>
> *[S]uch post-recognition assistance is largely discretionary and turns on subjective factors that embody broader principles of comity.*[369]

The examples of relief in Article 21(1) are "non-exclusive"[370] and "[t]he 'any appropriate relief' language is extremely broad"[371] which, for instance, extends to giving effect to a foreign bankruptcy stay.[372] The court must take account of the requirements in Article 22 when exercising its discretion.

Under Chapter 15, a court should first consider the specific relief enumerated under Section 1521(a) and (b). If the relief is not explicitly provided for there, a court should then consider whether the requested relief falls more generally under § 1521's grant of any appropriate relief.[373]

Article 21(1)(a) may be used to stay mediation, quasi-judicial administrative action, proceeding or process whatsoever.[374] But the service of a notice to terminate a contract is not the commencement or continuation of an individual action or proceeding within Article 21(1)(a).[375]

The reference in Article 21(1)(b) to "execution against the debtor's assets" suggests that the draftsman of the Model Law considered that some forms of execution against the debtor's assets would not involve the commencement or continuation or individual actions or individual proceedings.[376]

Under Article 21(1)(c), the court may restrain any person within the jurisdiction

---

368    *British American Insurance Company Limited v Fullerton (In re British American Insurance Company Limited)*, 488 BR 205, 213 (Bankr SD Fla 2013) (footnote omitted).

369    *In re Toft*, 453 BR 186, 190 (Bankr SDNY 2011) (internal citation omitted).

370    *In re Qimonda AG Bankruptcy Litigation*, 433 BR 547, 559 (ED Va 2010).

371    *In re Tien Chiang*, 437 BR 397, 403 (Bankr CD Cal 2010); *Re Chesterfield United* [2012] EWHC 244 (Ch); [2012] BCC 786 at [11] (internal quotation omitted) ("the list of types of relief to be found in Article 21(1) is not exhaustive and the court is not restricted unnecessarily in its ability to grant any type of relief that is available under the law of the enacting State and needed in the circumstances of the case").

372    *In re Daebo International Shipping Co Ltd*, 543 BR 47 (Bankr SDNY 2015).

373    *Ad Hoc Group of Vitro Noteholders v Vitro SAB De CV (In re Vitro SAB De CV)*, 701 F3d 1031, 1054 (5th Cir Tex 2012).

374    *Pink v MF Global UK* [2012] FCA 260.

375    *Fibria Celulose v Pan Ocean* [2014] EWHC 2124 (Ch); [2014] 1 Bus LR 1041 at [75].

376    *Ibid* at [66].

of the court from transferring, encumbering or otherwise disposing of any assets of the debtor.[377] It should also be possible to stay actions against non-debtor parties in order to assist in, and maintain the integrity of, the administration of a debtor's bankruptcy proceedings.[378]

The court has provided some guidance on Article 21(1)(d) as follows:

*Article 21(1)(d) has both a jurisdictional and a discretionary component. The court must be satisfied that the information sought concerns the debtor's assets, affairs, rights, obligations or liabilities. If it is so satisfied then it has a discretion to order the delivery of that information. In exercising that discretion it must have regard to all relevant circumstances and ensure that the interests of the person against whom the order is sought are adequately protected ...*

*[I]t is appropriate for the court to have regard to the principles upon which the court will exercise its powers under section 236 and section 366 of the Insolvency Act 1986. The relevant principles for present purposes are, I think, these.*

*First, the power is conferred to enable the office holder to discover the true facts concerning the affairs of the company so that he may be able as quickly, effectively and with as little expense as possible to complete his duties.*

*Second, even an honest person who finds himself to have been involved in a major fraud which has had a catastrophic effect for thousands of investors must be expected to cooperate with the office holder.*

*Third, nevertheless, the court must avoid making any order which is unnecessary or unreasonable or which is oppressive to the respondent.*

*Fourth, one of the factors which weighs against making an order or limiting its scope in some way is the disruption, stress and expense likely to be caused to the respondent.*

*Fifth, in assessing what order to make the court will attach considerable weight to the views of the office holder.[379]*

The court has also explained the relationship between Article 21(1)(d) and Article 21(1)(g) by reference to Section 236 of the Insolvency Act 1986:

*[T]he relief available to a "British insolvency officeholder" can potentially include an order under section 236 of the Insolvency Act 1986 for the production of books, papers or other records relating to the relevant company or "the promotion, formation, business, dealings, affairs or property of the company" ... Article 21(1)(g) allows foreign representatives to take advantage of section 236 ...*

---

377    See *Lawrence v Northern Crest Investments* [2011] FCA 925, where the Australian court recognised a New Zealand liquidation as a foreign main proceeding pursuant to the Australian enactment of the Model Law and ordered that any person within the jurisdiction of the court be restrained from transferring, encumbering or otherwise disposing of any assets of the debtor.

378    *CT Investment Management Co v Pablo Gonzalez Carbonell & Grupo Costamex*, 2012 US Dist LEXIS 3356 (SDNY 6 January 2012).

379    *Picard v FIM Advisers* [2010] EWHC 1299 (Ch); [2011] 1 BCLC 129 at [23]–[29]. See also *Singularis Holdings v PricewaterhouseCoopers* [2014] UKPC 36; [2015] AC 1675 at [46]; *In re Millenium Global Emerging Credit Master Fund Limited*, 471 BR 342 (Bankr SDNY 2012) and *Lawrence v Northern Crest Investments* [2011] FCA 925 where the Australian court recognised a New Zealand liquidation as a foreign main proceeding pursuant to the Australian enactment of the Model Law and ordered that the foreign representatives may examine witnesses, take evidence and obtain delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities. The Australian court concluded that without the relief, the foreign representatives would be unable to discharge their duties as liquidators of the debtor, resulting in prejudice to many creditors of the debtor.

> *Article 21(1)(d) was intended to set a common minimum standard. A foreign representative is to be able to seek relief under Article 21(1)(d) regardless of whether an officeholder would be entitled to such relief under the local law. If the local law in fact provides for "additional" relief, a foreign representative can seek that under Article 21(1)(g) ...*
>
> *The result is that the precise scope of Article 21(1)(d) is unimportant for present purposes. The liquidators can, via Article 21(1)(g), rely on section 236 of the Insolvency Act. I agree with the liquidators that, if Article 21(1)(d) is narrower than section 236, that is of no consequence ...*
>
> *Article 21(1) provides for the court to have power to grant relief "where necessary to protect the assets of the debtor or the interests of the creditors". I do not think, however, that the words I have quoted significantly curtail the court's ability to grant relief under section 236 in cases such as the present one. A proper case in which to grant relief under section 236 is one where an officeholder "reasonably requires" to see documents to carry out his functions: see* British & Commonwealth Holdings plc v Spicer & Oppenheim *[1993] AC 426 at 439. If a foreign representative "reasonably requires" material with a view to establishing whether a company has a valuable course of action, relief is likely to be "necessary to protect the assets of the debtor or the interests of the creditors".*[380]

Unlike in other jurisdictions (eg, the United States), where there would be an automatic stay on the enforcement of security interests upon the recognition of a foreign main proceeding, the enforcement of security interests in Great Britain may be stayed only by a court order. Any such stay may be imposed under Article 21(1)(g), which imports the administration moratorium. It is suggested that the court will grant such moratorium as a matter of course where the foreign proceeding is a rescue process, as "[t]he British Government has a commitment to the promotion of a rescue culture and supports the Model Law as an appropriate legislative tool to support this objective on the wider international stage".[381] This suggestion has received court approval in *Re TPC Korea Co Limited*.[382] Thus in cases where the foreign main proceeding is in the nature of a restructuring rather than a liquidation, it has become the practice of the English courts as a matter of discretion to grant the whole of the relief available under paragraph 43 of Schedule B1 to the Insolvency Act 1986 and to modify the automatic stay to align it with those provisions.[383]

From a restructuring perspective, another useful relief that may be granted under

---

380    *Re Chesterfield United* [2012] EWHC 244 (Ch); [2012] BCC 786 at [10]–[13]. See also *Crumpler (as liquidator and joint representative) of Global Tradewaves Ltd (a company registered in the British Virgin Islands) v Global Tradewaves (in liquidation), in the matter of Global Tradewaves Ltd (in liquidation)* [2013] FCA 1127; *ANZ National Bank v Sheahan* [2012] NZHC 3037; [2013] 1 NZLR 67; *Re Primeo Fund* [2016] EWHC 2432 (Ch); [2017] Bus LR 726.

381    Explanatory Memorandum to the Cross-Border Insolvency Regulations 2006, para 7.2.

382    *Re TPC Korea Co Limited* (Case No 19984 of 2009) (29 October 2009, unreported), also confirming this commentator's views in Look Chan Ho, "Smoothing Cross-border Insolvency by Synchronising the UNCITRAL Model Law: *In re Samsun Logix Corporation*" (2009) 24(7) JIBFL 395. See also *Re Pan Oceanic Maritime* [2010] EWHC 1734 (Ch); *Cosco Bulk Carrier v Armada Shipping* [2011] EWHC 216 (Ch); [2011] 2 All ER (Comm) 481 at [45]; *Re 19 Entertainment* [2016] EWHC 1545 (Ch) at [20]; *Tai-Soo Suk v Hanjin Shipping* [2016] FCA 1404.

383    *Ronelp Marine v STX Offshore & Shipbuilding* [2016] EWHC 2228 (Ch); [2017] BPIR 203 at [16]; *Re International Bank of Azerbaijan OJSC* (unreported, 6 June 2017).

Article 21(1)(g) is the power available to a British administrator to dispose of assets subject to security pursuant to paragraphs 70 and 71 of Schedule B1 to the Insolvency Act 1986. It is suggested that the protection afforded to secured creditors under paragraphs 70 and 71 of Schedule B1 should not be bypassed by relying on the provisions under Article 21(1)(e) of the British Model Law.

Article 21(1)(g) has been read as permitting the foreign representative to apply for such relief as would have been available to an English officeholder in respect of English insolvency proceedings commenced on the date of the opening of the foreign insolvency proceedings. Thus the English court has power to restrain or to undo the purported exercise of set-off rights after the commencement of the foreign insolvency proceedings.[384]

Note also that "permanent injunctive relief is available under Chapter 15. See 11 U.S.C. § 1521(a)",[385] may provide for discharging obligations held by non-debtor guarantors.[386]

As regards the scope of "any appropriate relief" in Article 21(1), the court has held that these words would not permit the court to grant relief which would not be available to the court when dealing with a domestic insolvency.[387] The decision is misconceived, for the reasons explained below.

**Recognition and enforcement of foreign insolvency judgments:** The English court may conceivably grant relief under Article 21 that takes the form of enforcement of foreign insolvency judgments. For example, as an alternative to requesting the English court to apply foreign avoidance provisions, the foreign representative may seek avoidance in the foreign court and then seek to enforce the foreign judgment in England under Article 21.[388]

However, the Supreme Court in *Rubin v Eurofinance*[389] held that the British Model Law does not permit the recognition and enforcement of foreign judgments, reasoning thus:

> [T]he CBIR (and the Model Law) say nothing about the enforcement of foreign judgments against third parties. As Lord Mance pointed out in argument, recognition and enforcement are fundamental in international cases. Recognition and enforcement of judgments in civil and commercial matters (but not in insolvency matters) have been the subject of intense international negotiations at the Hague Conference on Private International Law, which ultimately failed because of inability to agree on recognised international bases of jurisdiction.
>
> It would be surprising if the Model Law was intended to deal with judgments in insolvency matters by implication. Articles 21, 25 and 27 are concerned with procedural

---

384    *Larsen v Navios International* [2011] EWHC 878 (Ch); [2012] BCC 353 at [18].
385    *In re Lee*, 348 BR 799, 801 (Bankr WD Wash 2006).
386    *In re Metcalfe & Mansfield Alternative Investments*, 421 BR 685 (Bankr SDNY 2010); *In re Sino-Forest Corporation*, 501 BR 655 (Bankr SDNY 2013). Cf *Ad Hoc Group of Vitro Noteholders v Vitro SAB De CV (In re Vitro SAB De CV)*, 701 F3d 1031 (5th Cir Tex 2012).
387    *Fibria Celulose v Pan Ocean* [2014] EWHC 2124 (Ch); [2014] 1 Bus LR 1041.
388    Cf *In re Ephedra Prods Liab Litig*, 349 BR 333 (SDNY 2006). For the parallel position under the Insolvency Regulation, see *Seagon v Deko Marty Belgium* (Case C-339/07) [2009] 1 WLR 2168.
389    *Rubin v Eurofinance* [2012] UKSC 46; [2013] 1 AC 236.

*matters. No doubt they should be given a purposive interpretation and should be widely construed in the light of the objects of the Model Law, but there is nothing to suggest that they apply to the recognition and enforcement of foreign judgments against third parties.*[390]

The Supreme Court must be right in respect of Articles 25 and 27 of the British Model Law. While the concept of cooperation might be wide enough to encapsulate the enforcement of a foreign judgment where there is a letter of request from the foreign court, Articles 25 and 27 are not about granting substantive discretionary relief.

However, the Supreme Court's reasoning in respect of Article 21 is unconvincing. To say Article 21 is solely concerned with procedural matters undermines the British Model Law's purpose and is inconsistent with previous decisions on the British Model Law. Two examples would suffice.

First, Article 21 has been held to permit a foreign representative to apply for such relief as would have been available to an English officeholder in respect of English insolvency proceedings commenced on the date of the opening of the foreign insolvency proceedings. Thus the English court could rely on English insolvency set-off rules to restrain or to undo the purported exercise of set-off rights after the commencement of the foreign insolvency proceedings.[391] English insolvency set-off is a rule about substantive justice, not just a procedural matter.[392] The Supreme Court must have overlooked *Larsen v Navios International* which was not cited in argument.

Secondly, the Supreme Court must have forgotten its own decision in *Belmont Park Investments v BNY Corporate Trustee Services*.[393] As explained at some length below, the High Court, Court of Appeal and Supreme Court proceeded on the basis that, under Article 21 of the British Model, the court could assist a foreign representative by applying the anti-deprivation principle to strike down a substantive contractual right.

Using the anti-deprivation principle to avoid an antecedent transaction is hardly

---

390    *Ibid* at [142]–[143].
391    *Larsen v Navios International* [2011] EWHC 878 (Ch); [2012] BCC 353.
392    *Forster v Wilson* (1843) 12 M & W 191; *Halesowen Presswork & Assemblies v National Westminster Bank* [1972] AC 785 (HL); *Stein v Blake* [1996] 1 AC 243 (HL); *Re Parkside International* [2008] EWHC 3554 (Ch); [2010] BCC 309 at [42]; *Williams v Bateman* [2009] EWHC 1760 (Ch); [2009] BPIR 973 at [13]; *Finnigan v He* [2009] NHC 2156; [2010] 2 NZLR 668 at [39]. See also *Revenue and Customs Commissioners v Xicom Systems* [2008] EWHC 1945 (Ch); [2008] STC 3492 at [18] ("Where one party has no prospect of paying its debts, it would usually run counter to common notions of good sense and justice to require the other party to pay, as opposed to set off, its debt"); *Rolfe v Investec Bank (Australia)* [2014] VSCA 38 at [95] ("the essential purpose of [insolvency set-off] is to protect persons who engage in mutual dealings with a bankrupt and, to that end, the section is to be given the widest possible scope consistent with reasonable notions of mutuality"); *Facade Treatment Engineering v Brookfield Multiplex* [2015] VSC 41 at [60] ("The [insolvency set-off] provision recognises that where a party is in liquidation, it would be unjust to allow the liquidator to insist on receiving 100 cents in the dollar on the one hand whilst at the same time requiring a company's debtor be content with joining the pool of creditors and receiving a lesser amount"); *Re Anglican Development Fund Diocese of Bathurst* [2015] NSWSC 440 at [18]. Indeed, "[i]rritation at the obvious injustice of excluding set-offs against plaintiffs of doubtful financial ability; the waste of time and unnecessary expenditures involved in two or more law suits were all factors in bringing about the eighteenth century changes": William H Lloyd, "The Development of Set-Off", 64 U Pa L Rev 541, 568 (1916).
393    *Belmont Park Investments v BNY Corporate Trustee Services* [2011] UKSC 38; [2012] 1 AC 383. Ironically, Lord Collins, Lord Walker, Lord Mance and Lord Clarke were part of the panels in both *Rubin* and *Belmont*.

procedural. As Morgan J pointed out in *Fibria Celulose v Pan Ocean*,[394] the difference between a party being entitled to rely on a contractual provision and not being so entitled goes well beyond matters of procedure and affects the substance of the parties' rights and obligations under the contract. It follows that using insolvency law to avoid an antecedent transaction is by any standard substantive because it affects a party's substantive rights:

*Words or phrases used in a private international law context (such as substance, procedure, rights and remedies) may have a different meaning when used in other contexts. English common law has drawn a long-standing and a well-established distinction between matters that affect a claimant's cause of action (his rights) and those that affect the way in which those rights are enforced (the remedies available); the former regarded as substantive and the latter as procedural.*[395]

It is unfortunate that Belmont was nowhere mentioned in Rubin.

An equivalent US example is *In re Metcalfe & Mansfield Alternative Investments*[396] where the US bankruptcy court ordered that the Canadian court orders in relation to a plan of compromise and arrangement under the Canadian Companies' Creditors Arrangement Act be "given full force and effect in the United States" pursuant to Sections 1521(a)(7) and 1507 of the Bankruptcy Code. This case demonstrates that the Model Law is not against the enforcement of foreign judgments. "One of the reasons Congress changed so little of the wording in the Model Law was to endorse it wholesale, and encourage wide adoption by other nations."[397]

It is established Chapter 15 jurisprudence that foreign insolvency orders and judgments may be recognised and enforced locally, subject to limited exceptions such as public policy considerations:

*The Sanction Order [in respect of an scheme of arrangement pursuant to section 895 of the Companies Act of 2006] is entitled to recognition and enforcement in the United States.*[398]

*[A]s of the Scheme Effective Date, the [English] Scheme Sanction Order, the Scheme and the Restructuring Documents are recognized, granted comity, and entitled to full force and effect against all entities (as that term is defined in section 101(15) of the Bankruptcy Code) in accordance with their terms, and such terms shall be binding and fully enforceable on the Scheme Creditors and the Related Parties whether or not they actually agreed to be bound by the Scheme or the Restructuring Documents or participated in the UK Proceeding ...*[399]

*[The Mexican Court order approving the prepackaged plan of reorganization*

---

394    *Fibria Celulose v Pan Ocean* [2014] EWHC 2124 (Ch); [2014] 1 Bus LR 1041 at [111]. It seems unfortunate that although Morgan J referred to *Belmont* in connection with the scope of the anti-deprivation principle, his Lordship appears to have overlooked how the court in *Belmont* came to consider the potential application of the anti-deprivation principle to an entity not subject to English insolvency proceedings.

395    *Allen v Depuy International* [2015] EWHC 926 (QB) at [29].

396    *In re Metcalfe & Mansfield Alternative Investments*, 421 BR 685 (Bankr SDNY 2010). See also *In re Sino-Forest Corporation*, 501 BR 655 (Bankr SDNY 2013) which is virtually on all fours with *Metcalfe*; *In re Rede Energia SA*, 515 BR 69 (Bankr SDNY 2014).

397    *In re ABC Learning Centres Ltd*, 728 F3d 301, 306 (3d Cir Del 2013).

398    *In re Salvati*, 2009 Bankr LEXIS 5722 (Bankr SDNY 7 May 2009).

399    *In re Magyar Telecom BV*, 2013 Bankr LEXIS 5716 (Bankr SDNY 11 December 2013).

("*Convenio Order*")] *is worthy of comity and the Convenio should be given effect in the United States because, among other things, the Convenio embodies a consensual arms'-length agreement among the Debtor and its creditors that abides by fundamental standards of procedural fairness and due process, conforms to the distribution priorities generally applicable in cases under the Bankruptcy Code, was confirmed only after all creditors were given the opportunity to object thereto and is consistent with U.S. public policy and all applicable U.S. laws … The Convenio Order shall be and hereby is recognized in the United States and the Convenio shall be and hereby is fully enforceable in the United States and is binding upon creditors located or taking any actions in the United States.*[400]

*While it is well recognized that comity should be extended in most instances, bankruptcy courts should also have the discretion to deny granting comity to foreign laws, court orders and judgments – consistent with over a hundred years of comity precedent – when unique circumstances warrant it, so long as "the interests of the creditors … are sufficiently protected." 11 U.S.C. § 1522(a). Furthermore, courts must deny granting comity in exceptional circumstances of fundamental importance, when doing otherwise would be manifestly contrary to the public policy of the United States.*[401]

*[T]he statutory imperative that the Court shall grant comity or cooperation does not mean that the Court must enforce every order entered into by the Alberta Court, for, under the plain terms of the statute, the Court must also consider any limitations that the court may impose consistent with the policy of chapter 15. More generally, the principle of comity has never meant categorical deference to foreign proceedings. It is implicit in the concept that deference should be withheld where appropriate to avoid the violation of the laws, public policies, or contrary to the public policy of the United States … Accordingly, a foreign judgment should generally be accorded comity if its proceedings are fair and impartial … It is clear that the Canadian proceedings have been fair and impartial, and that the Canadian proceedings have afforded creditors a full and fair opportunity to be heard in a manner that is fully consistent with this country's standards of due process.*

*The stay of proceedings for officers and directors is a standard feature of proceedings under the CCAA and has routinely been enforced in the United States upon recognition of a foreign proceeding under Chapter 15 … The stay against individual directors is a fixture of Canadian bankruptcy proceedings in part because Canadian bankruptcy proceedings typically involve a claims process where claims against the company, officers, and directors are filed and handled together … Although this is not always true in the United States, we are not so provincial as to say that every solution of a problem is wrong because we deal with it otherwise at home …*

*The Court cannot conclude that the enforcement of the Canadian Court's temporary stay of proceedings would be contrary to the most fundamental policies of the United States … If the request for a stay had been presented to this Court in the first instance, the Court might not have granted it. But, the question here is not whether this Court should grant a stay in the first instance, but whether it should accord comity and*

400   *In re Metrofinanciera*, 2010 Bankr LEXIS 6541, 8–10 (Bankr SD Tex 24 September 2010).
401   *CT Investment Management Co LLC v Cozumel Caribe SA de CV (In re Cozumel Caribe)*, 482 BR 96, 113 (Bankr SDNY 2012) (emphasis added).

*deference to the stay orders entered by the Alberta Court. The Court concludes that in light of the comity principles laid out above, the Court must defer to the procedures set forth in the Canadian Proceedings and enforce the stay.*[402]

This is also consistent with the Australian decision in *Re Chow Cho Poon (Private) Limited*[403] concerning the Australian implementation of the Model Law:

*A foreign representative seeking an order of the local court for a purpose such as securing assets in the local jurisdiction or enforcing in the local jurisdiction an order of the foreign court may utilise art 21 after a recognition order has been made in respect of the foreign proceeding or art 19 when an application for such an order has been made but not yet determined. Article 25 does not provide a means of outflanking those provisions. The court does not "cooperate with" a plaintiff by giving a debt judgment or awarding damages or an account of profits or granting an injunction (nor does it "cooperate with" a defendant by refusing such relief). Rather, the court either decides that the plaintiff has a legal entitlement to the particular remedy and fulfils that entitlement by giving the remedy or decides that there is no entitlement and dismisses the claim. To say that the court "cooperates with" litigants by granting the relief they seek or even by hearing and determining cases brought by them is, to my mind, to mischaracterise the judicial process.*

It appears that the English court may under the British Model Law recognise a foreign insolvency court's judgment *in rem*:

*Mr Smith's submission … was that Glencore had a claim in rem in this, different, sense. If and when its secured reorganisation claim is finalised (admitted) in Tokyo it can be enforced against the proceeds of sale of the vessel. The decision of the Tokyo court to that effect will be recognised by this court pursuant to (i) the principles governing the recognition of insolvency proceedings (see* Rubin v Eurofinance SA *[2013] 1 AC 236) or (ii) the provisions of the Cross-Border Insolvency Regulations pursuant to which the reorganisation proceedings have been recognised in this jurisdiction or (iii) the ordinary English rules of private international law, with the result that this court will enable Glencore to satisfy its claim from the proceeds of sale held in this court.*

*I accept that the English court will recognise and give effect to a judgment of the Tokyo court by one or more of the above routes (Mr Henderson did not suggest that it would not) and would therefore permit Glencore's claim to be enforced against the proceeds of sale held in court (to the extent that they were sufficient to allow that to be done taking into account other claims against the proceeds which had a higher priority).*[404]

**Recognition and enforcement of foreign bankruptcy discharge:** The author has argued at length elsewhere that as a matter of common law, the English court may recognise discharge effected by foreign insolvency law and the contrary decision in *Antony Gibbs & Sons v Société Industrielle et Commerciale des Métaux*[405] is no longer good law.[406]

---

402    *Collins v Oilsands Quest*, 484 BR 593, 596–597 (SDNY 2012) (internal quotations omitted).
403    *Re Chow Cho Poon (Private) Limited* [2011] NSWSC 300 at [65].
404    *Bank of Tokyo-Mitsubishi UFJ v MV Sanko Mineral* [2014] EWHC 3927 (Admlty); [2015] 2 All ER (Comm) 979 at [32]–[33].
405    *Antony Gibbs & Sons v Société Industrielle et Commerciale des Métaux* (1890) 25 QBD 399 (CA).
406    Look Chan Ho, *Cross-Border Insolvency: Principles and Practice* (Sweet & Maxwell, 2016), pp214–229. See also *Re Pacific Andes Resources Development* [2016] SGHC 210.

# EXHIBIT 5

**UNITED**
**NATIONS**

**A**



**General Assembly**

Distr.
GENERAL

A/CN.9/442
19 December 1997

ORIGINAL: ENGLISH

UNITED NATIONS COMMISSION ON
  INTERNATIONAL TRADE LAW
Thirtieth session
Vienna, 12-30 May 1997

CROSS-BORDER INSOLVENCY

Guide to Enactment of the UNCITRAL Model Law
on Cross-Border Insolvency

Contents

|  |  | Page |
|---|---|---|
| Introduction | | 4 |
| Annex | | 5 |
| GUIDE TO ENACTMENT OF THE UNCITRAL MODEL LAW ON CROSS-BORDER INSOLVENCY | | 5 |
| I. | PURPOSE OF THE MODEL LAW | 5 |
| II. | PURPOSE OF THE GUIDE | 7 |
| III. | MODEL LAW AS VEHICLE FOR HARMONIZATION OF LAWS | 7 |
| IV. | MAIN FEATURES OF THE MODEL LAW | 8 |
| | A. Background | 8 |
| | B. Model Law fitting into existing national law | 9 |
| | C. Scope of application of Model Law | 10 |
| | D. Types of foreign proceedings covered | 10 |
| | E. Foreign assistance for an insolvency proceeding taking place in the enacting State | 11 |
| | F. Foreign representative's access to courts of the enacting State | 11 |
| | G. Recognition of foreign proceedings | 12 |

Page

H.   Cross-border cooperation ..................................   13
I.    Coordination of concurrent proceedings ...................   14

V.   ARTICLE-BY-ARTICLE REMARKS ........................   15

Preamble ...............................................   16

CHAPTER I. GENERAL PROVISIONS ......................   17

Article 1.  Scope of application ...........................   17
Article 2.  Definitions ...................................   19
Article 3.  International obligations of this State ..............   22
Article 4.  *[Competent court or authority]* ...................   23
Article 5.  Authorization of *[insert the title of the person or body*
             *administering a reorganization or liquidation under the*
             *law of the enacting State]* to act in a foreign State ...   24
Article 6.  Public policy exception ........................   25
Article 7.  Additional assistance under other laws ..............   26
Article 8.  Interpretation ................................   26

CHAPTER II.  ACCESS OF FOREIGN REPRESENTATIVES
             AND CREDITORS TO COURTS IN THIS STATE .   27

Article 9.  Right of direct access ........................   27
Article 10. Limited jurisdiction ..........................   27
Article 11. Application by a foreign representative to commence
             a proceeding under *[identify laws of the enacting State*
             *relating to insolvency]* .........................   28
Article 12. Participation of a foreign representative in a proceeding under
             *[identify laws of the enacting State relating to insolvency]*   29
Article 13. Access of foreign creditors to a proceeding under
             *[identify laws of the enacting State relating to insolvency]*   30
Article 14. Notification to foreign creditors of a proceeding under
             *[identify laws of the enacting State relating to insolvency]*   31

CHAPTER III.  RECOGNITION OF A FOREIGN PROCEEDING
             AND RELIEF ...............................   33

Article 15. Application for recognition of a foreign proceeding ....   33
Article 16. Presumptions concerning recognition ..............   36
Article 17. Decision to recognize a foreign proceeding ...........   37
Article 18. Subsequent information .........................   39
Article 19. Relief that may be granted upon application
             for recognition of a foreign proceeding ............   40
Article 20. Effects of recognition of a foreign main proceeding ....   42

23-10063-shl   Doc 629   Filed 08/29/23   Entered 08/29/23 12:34:49   Main Document
Pg 623 of 882

315
A/CN.9/442
English
Page 3

Page

Article 21. Relief that may be granted upon recognition of a
    foreign proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . .   45
Article 22. Protection of creditors and other interested persons . . . .   47
Article 23. Actions to avoid acts detrimental to creditors . . . . . . . . .   48
Article 24. Intervention by a foreign representative in proceedings
    in this State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   49

CHAPTER IV. COOPERATION WITH FOREIGN COURTS
    AND FOREIGN REPRESENTATIVES . . . . . . . . . .   50

Article 25. Cooperation and direct communication between a court of
    this State and foreign courts or foreign representatives   50
Article 26. Cooperation and direct communication between the *[insert
    the title of a person or body administering a reorganization
    or liquidation under the law of the enacting State]*
    and foreign courts or foreign representatives . . . . .   51
Article 27. Forms of cooperation . . . . . . . . . . . . . . . . . . . . .   51

CHAPTER V. CONCURRENT PROCEEDINGS . . . . . . . . . . .   54

Article 28. Commencement of a proceeding under *[identify laws of the
    enacting State relating to insolvency]* after recognition
    of a foreign main proceeding . . . . . . . . . . . . . . .   54
Article 29. Coordination of a proceeding under *[identify laws of the
    enacting State relating to insolvency]* and a
    foreign proceeding . . . . . . . . . . . . . . . . . . . . . .   55
Article 30. Coordination of more than one foreign proceeding . .   57
Article 31. Presumption of insolvency based on recognition of a
    foreign main proceeding . . . . . . . . . . . . . . . . . .   58
Article 32. Rule of payment in concurrent proceedings . . . . . . .   59

VI.  ASSISTANCE FROM THE UNCITRAL SECRETARIAT . . . . . .   60

Introduction

When the Commission at its thirtieth session (Vienna, 12-30 May 1997) finalized the UNCITRAL Model Law on Cross-Border Insolvency, it did not have time to consider the "draft Guide to Enactment of the UNCITRAL Model Provisions on Cross-Border Insolvency" (A/CN.9/436), as it had been prepared by the Secretariat on the basis of the draft Model Provisions on Cross-Border Insolvency (A/CN.9/435, annex) formulated by the Working Group on Insolvency Law. Since much of the material for the future Guide to Enactment was to be found in the report of the thirtieth session of the Commission (A/52/17, paras. 12-225) and other *travaux préparatoires*, the Commission requested the Secretariat to prepare a final version of the Guide to Enactment, reflecting the deliberations and decisions at the thirtieth session. The Commission mandated the publication of the final version of the Guide together with the text of the Model Law, as a single document (A/52/17, para. 220).

The requested Guide to Enactment as prepared by the Secretariat is set forth in the annex to this document. The Guide and the Model Law will also be published by the United Nations in book form.

A/CN.9/442
English
Page 5

<u>Annex</u>

# Guide to Enactment of the
# UNCITRAL Model Law on Cross-Border Insolvency

## I. PURPOSE AND ORIGIN OF THE MODEL LAW

<u>Purpose</u>

1.      The UNCITRAL Model Law on Cross-Border Insolvency, adopted in 1997, is designed to assist States to equip their insolvency laws with a modern, harmonized and fair framework to address more effectively instances of cross-border insolvency. Those instances include cases where the insolvent debtor has assets in more than one State or where some of the creditors of the debtor are not from the State where the insolvency proceeding is taking place.

2.      The Model Law reflects practices in cross-border insolvency matters that are characteristic of modern, efficient insolvency systems. Thus, the States enacting the Model Law (hereafter "enacting States") would be introducing useful additions and improvements in national insolvency regimes designed to resolve problems arising in cross-border insolvency cases. Not only jurisdictions that currently have to deal with numerous cases of cross-border insolvency but also those that wish to be well prepared for the increasing likelihood of cases of cross-border insolvency will find the Model Law useful.

3.      The Model Law respects the differences among national procedural laws and does not attempt a substantive unification of insolvency law. It offers solutions that help in several modest, but nonetheless significant ways. These include:

-      providing access for the person administering a foreign insolvency proceeding ("foreign representative") to the courts of the enacting State, thereby permitting the foreign representative to seek a temporary "breathing space", and allowing the courts in the enacting State to determine what coordination among the jurisdictions or other relief is warranted for optimal disposition of the insolvency;

-      determining when a foreign insolvency proceeding should be accorded "recognition", and what the consequences of recognition may be;

-      providing a transparent regime for the right of foreign creditors to commence, or participate in, an insolvency proceeding in the enacting State;

-      permitting courts in the enacting State to cooperate more effectively with foreign courts and foreign representatives involved in an insolvency matter;

-      authorizing courts in the enacting State and persons administering insolvency proceedings in the enacting State to seek assistance abroad;

A/CN.9/442
English
Page 6

-   providing for court jurisdiction and establishing rules for coordination where an insolvency proceeding in the enacting State is taking place concurrently with an insolvency proceeding in a foreign State;

-   establishing rules for coordination of relief granted in the enacting State in favour of two or more insolvency proceedings that may take place in foreign States regarding the same debtor.

<u>Preparatory work and adoption</u>

4.    The project was initiated in UNCITRAL in close cooperation with the International Association of Insolvency Practitioners (INSOL) and benefitted from its expert advice during all stages of the preparatory work.  Active consultative assistance during the formulation of the Law was received also from Committee J (Insolvency) of the Section on Business Law of the International Bar Association (IBA).

5.    Prior to the decision by the Commission to undertake work on cross-border insolvency, UNCITRAL and INSOL held two international colloquia of insolvency practitioners, judges, government officials and representatives of other interested sectors.[1]  The suggestion arising from those meetings was that work by the Commission should have the limited but useful goal of facilitating judicial cooperation, court access for foreign insolvency administrators and recognition of foreign insolvency proceedings.

6.    When the Commission decided in 1995 to develop a legal instrument relating to cross-border insolvency, it entrusted the work to the Working Group on Insolvency Law, one of the Commission's three inter-governmental subsidiary bodies.[2]  The Working Group devoted four two-week sessions to the work on the project.[3]

_____

[1]    The first was the UNCITRAL-INSOL Colloquium on Cross-Border Insolvency, Vienna, 17-19 April 1994 (report on the Colloquium: doc. A/CN.9/398, <u>UNCITRAL Yearbook</u>, vol. XXV: 1994, part two, V, B; the proceedings of the Colloquium are published in <u>International Insolvency Review</u>, Special Conference Issue 1995, vol: 4; considerations of the Commission relating to the Colloquium: doc. A/49/17, paras. 215-222, <u>UNCITRAL Yearbook</u>, vol. XXV: 1994, part one, A). Subsequently, an international meeting of judges was held specifically to elicit their views: the UNCITRAL-INSOL Judicial Colloquium on Cross-Border Insolvency, Toronto, 22-23 March 1995 (report on the Judicial Colloquium: doc. A/CN.9/413,  <u>UNCITRAL Yearbook</u>, vol. XXVI: 1995, part two, IV, A; considerations of the Commission relating to the Judicial Colloquium: doc. A/50/17, paras. 382-393,  <u>UNCITRAL Yearbook</u>, vol. XXVI: 1995, part one, A).

[2]    <u>Official Records of the General Assembly, Fiftieth Session, Supplement No. 17</u> (A/50/17) (<u>UNCITRAL Yearbook</u>, vol. XXVI: 1995, part one, A), paras. 392 and 393.

[3]    The eighteenth session (Vienna, 30 October - 10 November 1995), report: document A/CN.9/419 (<u>UNCITRAL Yearbook</u>, vol. XXVII: 1996, part two); nineteenth session (New York, 1-12 April 1996), report: document A/CN.9/422 (<u>UNCITRAL Yearbook</u>, vol. XXVII: 1996, part two); twentieth session (Vienna, 7-18 October 1996), report: document A/CN.9/433 (<u>UNCITRAL Yearbook</u>, vol. XXVIII: 1997, part two); twenty-first session (New York, 20-31 January 1997), report: document A/CN.9/435 (<u>UNCITRAL Yearbook</u>, vol. XXVIII: 1997, part two).

7.     Before the session of the Commission in May 1997, at which the Model Law was adopted, another international meeting of practitioners was held to discuss the draft text as prepared by the Working Group. The participants (mostly judges, judicial administrators and government officials) generally considered that the model legislation, when enacted, would constitute a major improvement in dealing with cross-border insolvency cases.[4]

8.     The final negotiations on the draft text took place during the thirtieth session of the Commission (Vienna, Austria, 12-30 May 1997) and the Model Law was adopted by consensus on 30 May 1997.[5]  In addition to the 36 States members of the Commission, representatives of 40 observer States and 13 international organizations participated in the deliberations in the Commission and the Working Group.

## II.  PURPOSE OF THE GUIDE

9.     The Commission considered that the Model Law would be a more effective tool for legislators if it were accompanied by background and explanatory information.  While such information would primarily be directed to executive branches of Governments and legislators preparing the necessary legislative revisions, it would also provide useful insight to other users of the text such as judges, practitioners and academics.  The Guide might also assist States in considering which, if any, of the provisions should be varied in order to be adapted to the particular national circumstances.

10.     The present Guide has been prepared by the Secretariat pursuant to the request of the Commission made at the close of the thirtieth session of the Commission in 1997.  It is based on the deliberations and decisions at that session of the Commission, when the Model Law was adopted (A/52/17, para. 220), as well as on considerations of the Working Group on Insolvency Law, which conducted the preparatory work.

## III.  MODEL LAW AS VEHICLE FOR HARMONIZATION OF LAWS

11.     A model law is a legislative text that is recommended to States for incorporation into their national law.  Unlike an international convention, a model law does not require the State enacting it to notify the United Nations or other States that may have also enacted it.

---

4/    The Second UNCITRAL-INSOL Multinational Judicial Colloquium on Cross-Border Insolvency was held from 22 to 23 March 1997 in conjunction with the 5th World Congress of INSOL, New Orleans, 23-26 March 1997.  A brief account of the Colloquium appears in doc. A/52/17, paras. 17-22 (UNCITRAL Yearbook, vol. XXVIII: 1997, part one, A).

5/    The Model Law is also published in Official Records of the General Assembly, Fifty-second Session, Supplement No. 17 (A/52/17, annex I) (UNCITRAL Yearbook, vol. XXVIII: 1997, part three).  The discussion at the thirtieth session concerning the Model Law is reproduced in doc. A/52/17, paras. 12-225 (UNCITRAL Yearbook, vol. XXVIII: 1997, part one, A).

12.    In incorporating the text of the model law into its system, the State may modify or leave out some of its provisions. In the case of a convention, the possibility of changes to the uniform text by the States parties (normally referred to as "reservations") is much more restricted; in particular trade law conventions usually either totally prohibit reservations or allow only specified ones. The flexibility inherent in a model law is particularly desirable in those cases when it is likely that the State would wish to make various modifications to the uniform text before it would be ready to enact it as a national law. Some modifications may be expected in particular when the uniform text is closely related to the national court and procedural system (which is the case with the UNCITRAL Model Law on Cross-Border Insolvency). This, however, also means that the degree of, and certainty about, harmonization achieved through a model law is likely to be lower than in the case of a convention. Therefore, in order to achieve a satisfactory degree of harmonization and certainty, it is recommended that the States make as few changes as possible in incorporating the model law into their legal systems.

## IV. MAIN FEATURES OF THE MODEL LAW

### A. Background

13.    The increasing incidence of cross-border insolvencies reflects the continuing global expansion of trade and investment. However, national insolvency laws have by and large not kept pace with the trend, and they are often ill-equipped to deal with cases of a cross-border nature. This frequently results in inadequate and inharmonious legal approaches, which hamper the rescue of financially troubled businesses, are not conducive to a fair and efficient administration of cross-border insolvencies, impede the protection of the assets of the insolvent debtor against dissipation, and hinder maximization of the value of those assets. Moreover, the absence of predictability in the handling of cross-border insolvency cases impedes capital flow and is a disincentive to cross-border investment.

14.    Fraud by insolvent debtors, in particular by concealing assets or transferring them to foreign jurisdictions, is an increasing problem, both in terms of frequency and magnitude. The modern interconnected world makes such fraud easier to conceive and carry out. The cross-border cooperation mechanisms established by the Model Law are designed to confront such international fraud.

15.    Only a limited number of countries have a legislative framework for dealing with cross-border insolvency that is well suited to the needs of international trade and investment. Various techniques and notions are employed in the absence of a specific legislative or treaty framework for dealing with cross-border insolvency. These include: application of the doctrine of comity by courts in common law jurisdictions; issuance for equivalent purposes of enabling orders (*exequatur*) in civil law jurisdictions; enforcement of foreign insolvency orders relying on legislation for enforcement of foreign judgments; techniques such as letters rogatory for transmitting requests for judicial assistance.

16.    Approaches based purely on the doctrine of comity or on the *exequatur* do not provide the same degree of predictability and reliability as can be provided by specific legislation, such as the one contained in the Model Law, on judicial cooperation, recognition of foreign insolvency proceedings and access for foreign representatives to courts. For example, in a given legal system general legislation on reciprocal recognition of judgments, including *exequatur*, might be confined to enforcement of specific money judgments or injunctive orders in two-party disputes, thus excluding decisions opening collective insolvency proceedings. Furthermore, recognition of foreign insolvency proceedings might not be

considered as a matter of recognizing a foreign "judgment", for example, if the foreign bankruptcy order is considered to be merely a declaration of status of the debtor or if the order is considered not to be final.

17.     To the extent that there is a lack of communication and coordination among courts and administrators from concerned jurisdictions, it is more likely that assets would be dissipated or fraudulently concealed, or possibly liquidated without reference to other more advantageous solutions. As a result, not only is the ability of creditors to receive payment diminished, but so is also the possibility of rescuing financially-viable businesses and saving jobs. By contrast, mechanisms in national legislation for coordinated administration of cases of cross-border insolvency make it possible to adopt solutions that are sensible and in the best interest of the creditors and the debtor; the presence of such mechanisms in the law of a State are therefore perceived as advantageous for foreign investment and trade in that State.

18.     The Model Law takes into account the results of other international efforts. Those include the European Union Convention on Insolvency Proceedings, the European Convention on Certain International Aspects of Bankruptcy ("Istanbul Convention", 1990), the Montevideo Private International Law Treaties of 1889 and 1940, the Convention regarding Bankruptcy between Nordic States (1933) as well as the Havana Convention of 1928 ("Bustamante Code"). Proposals from non-governmental organizations that have been taken into account include the Model International Insolvency Cooperation Act (MIICA) as well as the Cross-Border Insolvency Concordat, both developed by Committee J of the Section on Business Law of the International Bar Association (IBA).

19.     When the European Union Convention on Insolvency Proceedings enters into effect, it will establish an intra-Union cross-border insolvency regime for cases where the debtor has the centre of its main interests in a State member of the Union. The Convention does not deal with cross-border insolvency matters extending beyond a State member of the Union into a non-member State. Thus, the Model Law offers to States members of the Union a complementary regime of considerable practical value that addresses the many cases of cross-border cooperation not covered by the Convention.

## B.  Model Law fitting into existing national law

20.     With its scope limited to some procedural aspects of cross-border insolvency cases, the Model Law is intended to operate as an integral part of the existing insolvency law in the enacting State. This is manifested in several ways:

-     The amount of possibly new legal terminology added to existing law by the Model Law is limited. New legal terms are those specific to the cross-border context, such as "foreign proceeding" and "foreign representative". The terms used in the Model Law are unlikely to be in conflict with terminology in existing law. Moreover, where the expression is likely to vary from country to country, the Model Law, instead of using a particular term, indicates the meaning of the term in italics within square brackets and calls upon the drafters of the national law to use the appropriate term;

-     The Model Law presents to enacting States the possibility of aligning the relief resulting from recognition of a foreign proceeding with the relief available in a comparable proceeding in the national law;

-     Recognition of foreign proceedings does not prevent local creditors from initiating or maintaining collective insolvency proceedings in the enacting State (art. 28);

A/CN.9/442
English
Page 10

- Relief available to the foreign representative is subject to the protection of local creditors and other interested persons, including the debtor, against undue prejudice; relief is also subject to compliance with the procedural requirements of the enacting State and to applicable notification requirements (in particular arts. 22 and 19(2));

- The Model Law preserves the possibility of excluding or limiting any action in favour of the foreign proceeding, including recognition of the proceeding, on the basis of overriding public policy considerations, although it is expected that the public policy exception will be rarely used (art. 6);

- The Model Law is in the flexible form of model legislation that takes into account differing approaches in national insolvency laws and the varying propensities of States to cooperate and coordinate in insolvency matters (arts. 25-27).

21.    The flexibility to adapt the Model Law to the legal system of the enacting State should be utilized with due consideration for the need for uniformity in its interpretation and for the benefits to the enacting State in adopting modern, generally acceptable international practices in insolvency matters. Thus it is advisable to limit deviations from the uniform text to the minimum. One advantage of uniformity is that it will make it easier for the enacting States to obtain cooperation from other States in insolvency matters.

### C. Scope of application of Model Law

22.    The Model Law applies in a number of cross-border insolvency situations. These include:  (a) the case of an inward-bound request for recognition of a foreign proceeding; (b) an outward-bound request from a court or administrator in the enacting State for recognition of an insolvency proceeding commenced under the laws of the enacting State; (c) coordination of concurrent proceedings in two or more States; and (d) participation of foreign creditors in insolvency proceedings taking place in the enacting State (art. 1).

### D. Types of foreign proceedings covered

23.    To fall within the scope of the Model Law, a foreign insolvency proceeding needs to possess certain attributes. These include: basis in insolvency-related law of the originating State; involvement of creditors collectively; control or supervision of the assets and affairs of the debtor by a court or another official body; and reorganization or liquidation of the debtor as the purpose of the proceeding (art. 2(a)).

24.    Within those parameters, a variety of collective proceedings would be eligible for recognition, be they compulsory or voluntary, corporate or individual, winding-up or reorganization or those in which the debtor retains some measure of control over its assets, albeit under court supervision (e.g. suspension of payments; "debtor in possession").

25.    An inclusive approach is used also as regards the possible types of debtors covered by the Model Law.  Nevertheless, the Model Law refers to the possibility of excluding from its scope of application certain types of entities, such as banks or insurance companies specially regulated with regard to insolvency under the laws of the enacting State (art. 1(2)).

A/CN.9/442
English
Page 11

### E. Foreign assistance for an insolvency proceeding
### taking place in the enacting State

26.    In addition to equipping the courts of the enacting State to deal with incoming requests for recognition, the Model Law authorizes the courts of the enacting State to seek assistance abroad on behalf of a proceeding taking place in the enacting State (art. 25). Addition of the authorization for the courts of the enacting State to seek cooperation abroad may help to fill a gap in legislation in some States. Without such legislative authorization, the courts, in some legal systems, feel constrained from seeking such assistance abroad, which creates potential obstacles to a coordinated international response in case of cross-border insolvency.

27.    The Model Law may similarly help an enacting State to fill a gap in its legislation as to the "outward" powers of persons appointed to administer insolvency proceedings under the local insolvency law. Article 5 authorizes those persons to seek recognition of, and assistance for, those proceedings from foreign courts.

### F. Foreign representative's access to courts
### of the enacting State

28.    An important objective of the Model Law is to provide expedited and direct access for foreign representatives to the courts of the enacting State. The Law avoids the need to rely on cumbersome and time-consuming letters rogatory or other forms of diplomatic or consular communications, which might otherwise have to be used. This facilitates a coordinated, cooperative approach to cross-border insolvency and enables fast action when needed.

29.    In addition to establishing the principle of direct court access for the foreign representative, the Model Law:

-    establishes simplified proof requirements for seeking recognition and relief for foreign proceedings, which avoid time-consuming "legalization" requirements involving notarial or consular procedures (art. 15);

-    provides that the foreign representative has procedural standing for commencing an insolvency proceeding in the enacting State (under the conditions applicable in the enacting State) and that the foreign representative may participate in an insolvency proceeding in the enacting State (arts. 11 and 12);

-    confirms, subject to other requirements of the enacting State, access of foreign creditors to the courts of the enacting State for the purpose of commencing in the enacting State an insolvency proceeding or participating in such a proceeding (art. 13);

-    gives the foreign representative the right to intervene in proceedings concerning individual actions in the enacting State affecting the debtor or its assets (art. 24);

-    provides that the mere fact of a petition for recognition in the enacting State does not mean that the courts in that State have jurisdiction over all the assets and affairs of the debtor (art. 10).

A/CN.9/442
English
Page 12

## G. Recognition of foreign proceedings

### (a) Decision whether to recognize a foreign proceeding

30.    The Model Law establishes criteria for determining whether a foreign proceeding is to be recognized (arts. 15-17) and provides that, in appropriate cases, the court may grant interim relief pending a decision on recognition (art. 19). The decision includes a determination whether the jurisdictional basis on which the foreign proceeding was commenced was such that it should be recognized as a "main" or instead as a "non-main" foreign insolvency proceeding. Procedural matters related to notice of the filing of an application for recognition or of the decision to grant recognition are not addressed by the Model Law; they remain to be governed by other provisions of law of the enacting State.

31.    A foreign proceeding is deemed to be the "main" proceeding if it has been commenced in the State where "the debtor has the centre of its main interests". This corresponds to the  formulation in the European Union Convention on Insolvency Proceedings (art. 3 of that Convention), thus building on the emerging harmonization as regards the notion of a "main" proceeding. The determination that a foreign proceeding is a "main" proceeding may affect the nature of the relief accorded to the foreign representative.

### (b) Effects of recognition and discretionary relief available to a foreign representative

32.    Key elements of the relief accorded upon recognition of the representative of a foreign "main" proceeding include a stay of actions of individual creditors against the debtor or a stay of enforcement proceedings concerning the assets of the debtor, and a suspension of the debtor's right to transfer or encumber its assets (art. 20(1)). Such stay and suspension are "mandatory" (or "automatic") in the sense that either they flow automatically from the recognition of a foreign main proceeding or, in the States where a court order is needed for the stay or suspension, the court is bound to issue the appropriate order. The stay of actions or of enforcement proceedings is necessary to provide a "breathing space" until appropriate measures are taken for reorganization or fair liquidation of the assets of the debtor. The suspension of transfers is necessary because in the modern, globalized economic system it is possible for multi-national debtors to move money and property across boundaries quickly. The mandatory moratorium triggered by the recognition of the foreign main proceeding provides a rapid "freeze" essential to prevent fraud and to protect the legitimate interests of the parties involved until the court has an opportunity to notify all concerned and to assess the situation.

33.    Exceptions and limitations to the scope of the stay and suspension (e.g. exceptions for secured claims, payments by the debtor made in the ordinary course of business, set-off, execution of rights *in rem*) and the possibility of modifying or terminating the stay or suspension are determined by provisions governing comparable stays and suspensions in insolvency proceedings under the laws of the enacting State (art. 20(2)).

34.    In addition to such mandatory stay and suspension, the Model Law authorizes the court to grant "discretionary" relief for the benefit of any foreign proceeding, whether "main" or not (art. 21). Such discretionary relief may consist of, for example, staying proceedings or suspending the right to encumber assets (to the extent such stay and suspension have not taken effect automatically under art. 20), facilitating access to information concerning the assets of the debtor and its liabilities, appointing a person to administer all or part of those assets, and any other relief that may be available under the laws of the

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 633 of 882

325

A/CN.9/442
English
Page 13

enacting State. Urgently needed relief may be granted already upon filing an application for recognition (art. 21).

(c) Protection of creditors and other interested persons

35.    The Model Law contains provisions, such as the following, which protect the interests of the creditors (in particular local creditors), the debtor and other affected persons: the availability of temporary relief upon application for recognition of a foreign proceeding or upon recognition is subject to the discretion of the court; it is expressly stated that in granting such relief the court must be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected (art. 22(1)); the court may subject the relief it grants to conditions it considers appropriate; and the court may modify or terminate the relief granted, if so requested by a person affected thereby (art. 22(2) and (3)).

36.    In addition to those specific provisions, the Model Law in a general way provides that the court may refuse to take an action governed by the Law if the action would be manifestly contrary to the public policy of the enacting State (art. 6).

37.    Questions of notice to interested persons, while closely related to the protection of their interests, are in general not regulated in the Model Law. Thus, these questions are governed by the procedural rules of the enacting State, some of which may be of a public-order character. For example, the law of the enacting State will determine whether any notice is to be given to the debtor or another person of an application for recognition of a foreign proceeding and the time period for giving the notice.

H. Cross-border cooperation

38.    A widespread limitation on cooperation and coordination between judges from different jurisdictions in cases of cross-border insolvency is derived from the lack of a legislative framework, or from uncertainty regarding the scope of the existing legislative authority, for pursuing cooperation with foreign courts.

39.    Experience has shown that, irrespective of the discretion courts may traditionally enjoy in a State, the passage of a specific legislative framework is useful for promoting international cooperation in cross-border cases. Accordingly, the Model Law fills the gap found in many national laws by expressly empowering courts to extend cooperation in the areas governed by the Model Law (arts. 25-27).

40.    For similar reasons, provisions are included authorizing cooperation between a court in the enacting State and a foreign representative, and between a person administering the insolvency proceeding in the enacting State and a foreign court or a foreign representative (art. 26).

41.    The Model Law lists possible forms of cooperation and leaves the legislator an opportunity to list additional forms (art. 27). It is advisable to keep the list, when enacted, illustrative rather than exhaustive so as not to stymie the ability of courts to fashion remedies in keeping with specific circumstances.

## I. Coordination of concurrent proceedings

### (a) Jurisdiction to commence a local proceeding

42.    The Model Law imposes virtually no limitations on the jurisdiction of the courts in the enacting State to commence or continue insolvency proceedings.  Pursuant to article 28, even after recognition of a foreign "main" proceeding, jurisdiction remains with the courts of the enacting State to institute an insolvency proceeding if the debtor has assets in the enacting State. If the enacting State would wish to restrict its jurisdiction to cases where the debtor has not only assets but an establishment in the enacting State, the adoption of such a restriction would not be contrary to the policy underlying the Model Law.

43.    In addition, the Model Law deems the recognized foreign main proceeding to constitute proof that the debtor is insolvent for the purposes of commencing local proceedings (art. 31). This rule would be helpful in those legal systems in which commencement of an insolvency proceeding requires proof that the debtor is in fact insolvent.  Avoidance of the need for repeated proof of financial failure reduces the likelihood that a debtor may delay the commencement of the proceeding long enough to conceal or carry away assets.

### (b) Coordination of relief when more than one proceeding take place concurrently

44.    The Model Law deals with coordination between a local proceeding and a foreign proceeding concerning the same debtor (art. 29) and facilitates coordination between two or more foreign proceedings concerning the same debtor (art. 30).  The objective of the provisions is to foster coordinated decisions that would best achieve the objectives of both proceedings (e.g. maximization of the value of the debtor's assets or the most advantageous restructuring of the enterprise).  In order to achieve satisfactory coordination and to be able to adapt relief to changing circumstances, the court is in all situations covered by the Model Law, including those which limit the effects of foreign proceedings in the face of local proceedings, directed to cooperate to the maximum extent possible with foreign courts and the foreign representatives (arts. 25 and 30).

45.    When the local insolvency proceeding is already under way at the time that recognition of a foreign proceeding is requested, the Model Law requires that any relief granted for the benefit of the foreign proceeding must be consistent with the local proceeding.  Furthermore, the existence of the local proceeding at the time the foreign main proceeding is recognized prevents the operation of article 20.  When there is no local proceeding pending, article 20 mandates the stay of individual actions or enforcement proceedings against the debtor and a suspension of the debtor's right to transfer or encumber its assets.

46.    When the local proceeding begins subsequent to recognition or application for recognition of the foreign proceeding, the relief that has been granted for the benefit of the foreign proceeding must be reviewed and modified or terminated if inconsistent with the local proceeding.  If the foreign proceeding is a main proceeding, the stay and a suspension, as mandated by article 20, must also be modified or terminated if inconsistent with the local proceeding.

23-10063-shl   Doc 629   Filed 08/29/23   Entered 08/29/23 12:34:49   Main Document
Pg 635 of 882

327

A/CN.9/442
English
Page 15

47.    When the court is faced with more than one foreign proceeding, article 30 calls for
tailoring relief in such a way that will facilitate coordination of the foreign proceedings; if one of
the foreign proceedings is a main proceeding, any relief must be consistent with that main
proceeding.

48.    Another rule designed to enhance coordination of concurrent proceedings is the one on
rate of payment of creditors (art. 32). It provides that a creditor, by claiming in more than one
proceeding, does not receive more than the proportion of payment that is obtained by other
creditors of the same class.

## V.  ARTICLE-BY-ARTICLE REMARKS

### Title: "UNCITRAL Model Law on Cross-Border Insolvency"

"Insolvency"

49.    The term "insolvency", as used in the title of the Model Law, refers to various types of
collective proceedings against insolvent debtors. The reason is that the Model Law (as pointed
out above in paras. 23-24) covers proceedings concerning different types of debtors, and, among
those proceedings, deals with proceedings aimed at reorganizing the debtor as well proceedings
leading to a liquidation of the debtor as a commercial entity.

50.    It should be noted that in some jurisdictions the expression "insolvency" proceedings has a
narrow technical meaning in that it may refer, for example, only to collective proceedings
involving a company or a similar legal person, or only to collective proceedings against a natural
person. No such distinction is intended to be drawn by the use of the term "insolvency" in the
title of the Model Law, since the Law is designed to be applicable to proceedings regardless of
whether they involve a natural or legal person as the debtor. If in the enacting State the word
"insolvency" may be misunderstood as referring to one particular type of collective proceeding,
another term should be used to refer to the proceedings covered by the Law.

51.    However, when referring to foreign insolvency proceedings, it is desirable to utilize the
wording of article 2(a) so as not to exclude recognition of foreign proceedings that, according to
article 2(a), should be covered.

"Model Law"

52.    If the enacting State decides to incorporate the provisions of the Model Law into an
existing national insolvency statute, the title of the enacted provisions would have to be adjusted
accordingly, and the word "Law", which appears at various places in the text, would have to be
replaced by the appropriate expression.

A/CN.9/442
English
Page 16

53.    In enacting the Model Law, it is advisable to adhere as much as possible to the uniform text so as to make the national law as transparent as possible for foreign users of the national law.  (See also above, paras. 11-12 and 21.)

* * *

## Preamble

The purpose of this Law is to provide effective mechanisms for dealing with cases of cross-border insolvency so as to promote the objectives of:

(a)    cooperation between the courts and other competent authorities of this State and foreign States involved in cases of cross-border insolvency;

(b)    greater legal certainty for trade and investment;

(c)    fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested persons, including the debtor;

(d)    protection and maximization of the value of the debtor's assets; and

(e)    facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

54.    The Preamble gives a succinct statement of the basic policy objectives of the Model Law.  It is not intended to create substantive rights, but rather to give a general orientation for users of the Model Law as well as to assist in the interpretation of the Model Law.

55.    In States where it is not customary to set out preambular statements of policy in legislation, consideration might be given to including the statement of objectives either in the body of the statute or in a separate document, so as to preserve a useful tool for the interpretation of the law.

"State"

56.    The expression "State", as used in the preamble and throughout the Model Law, refers to the entity that enacts the Law (the "enacting State" in the Guide).  The term should not be understood as referring, for example, to a state in a country with a federal system.

A/CN.9/442
English
Page 17

Prior discussion in the Commission and the Working Group

A/52/17, paras. 136-139 (Commission, 30th session)
A/CN.9/435, para. 100 (Working Group, 21st session)
A/CN.9/433, paras. 22-28 (Working Group, 20th session)
A/CN.9/422, paras. 19-23 (Working Group, 19th session)

* * *

## CHAPTER I.  GENERAL PROVISIONS

### Article 1.  Scope of application

(1)      **This Law applies where:**

(a)   **assistance is sought in this State by a foreign court or a foreign representative in connection with a foreign proceeding; or**

(b)   **assistance is sought in a foreign State in connection with a proceeding under** *[identify laws of the enacting State relating to insolvency]***; or**

(c)   **a foreign proceeding and a proceeding under** *[identify laws of the enacting State relating to insolvency]* **in respect of the same debtor are taking place concurrently;  or**
(d)   **creditors or other interested persons in a foreign State have an interest in requesting the commencement of, or participating in, a proceeding under** *[identify laws of the enacting State relating to insolvency]***.**

(2)      **This Law does not apply to a proceeding concerning** *[designate any types of entities, such as banks or insurance companies, that are subject to a special insolvency regime in this State and that this State wishes to exclude from this Law]***.**

Paragraph (1)

57.      Article 1(1) outlines the types of issues that may arise in cases of cross-border insolvency and for which the Model Law provides solutions: (a) inward-bound requests for recognition of a foreign proceeding; (b) outward-bound requests from a court or administrator in the enacting State for recognition of an insolvency proceeding commenced under the laws of the enacting State; (c) coordination of proceedings taking place concurrently in two or more States; and (d) participation of foreign creditors in insolvency proceedings taking place in the enacting State.

58.      The expression "this State" is used in the preamble and throughout the Model Law to refer to the State that is enacting the text.  The national statute may use another expression that is customarily used for this purpose.

59.      "Assistance" in paragraph (1)(a) and (b) is meant to cover various situations, dealt with in the Model Law, in which a court or an insolvency administrator in one State may make a

request directed to a court or an insolvency administrator in another State for taking a measure encompassed in the Model Law. Some of those measures the Law specifies (e.g. in art. 19(1)(a) and (b); art. 21(1)(a) to (f) and (2); or art. 27(a) to (e)), while other possible measures are covered by a broader formulation such as the one in article 21(1)(g).

Paragraph (2) (Specially regulated insolvency proceedings)

60.     In principle, the Model Law was formulated to apply to any proceeding that meets the requirements of article 2(a), independently of the nature of the debtor or its particular status under national law. The only possible exceptions contemplated in the text of the Model Law itself are indicated in paragraph (2) (see, however, below, para. 66, for considerations regarding "consumers").

61.     Banks or insurance companies are mentioned as examples of entities that the enacting State might decide to exclude from the scope of the Model Law. The reason for the exclusion would typically be that the insolvency of such entities gives rise to the particular need to protect vital interests of a large number of individuals, or that the insolvency of those entities usually requires particularly prompt and circumspect action (for instance to avoid massive withdrawals of deposits). For those reasons, the insolvency of such types of entities is in many States administered under a special regulatory regime.

62.     Paragraph (2) indicates that the enacting State might decide to exclude the insolvency of entities other than banks and insurance companies; the State might do so where the policy considerations underlying the special insolvency regime for those other types of entities (e.g. public utility companies) call for special solutions in cross-border insolvency cases.

63.     It is not advisable to exclude all cases of insolvency of the entities mentioned in paragraph (2). In particular, the enacting State might wish to treat, for recognition purposes, a foreign insolvency proceeding relating to a bank or an insurance company as an ordinary insolvency proceeding, if the insolvency of the branch or of the assets of the foreign entity in the enacting State do not fall under the national regulatory scheme. The enacting State might also wish not to exclude the possibility of recognition of a foreign proceeding involving one of those entities, if the law of the State of origin does not make that proceeding subject to special regulation.

64.     In enacting paragraph (2), the State may wish to make sure that it would not inadvertently and undesirably limit the right of the insolvency administrator or court to seek assistance or recognition abroad of an insolvency proceeding conducted in the territory of the enacting State, merely because that insolvency is subject to a special regulatory regime. Moreover, even if the particular insolvency is governed by special regulation, it is advisable, before generally excluding those cases from the Model Law, to consider whether it would be useful to leave certain features of the Model Law (e.g. on cooperation and coordination and possibly on certain types of discretionary relief) applicable also to the specially regulated insolvency proceedings.

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 639 of 882

331
A/CN.9/442
English
Page 19

65.    In any case, with a view to making the national insolvency law more transparent (for the benefit of foreign users of the law based on the Model Law), it is advisable that exclusions from the scope of the law be expressly mentioned by the enacting State in paragraph (2).

<u>Non-traders or natural persons</u>

66.    In those jurisdictions that have not made provision for the insolvency of consumers, or whose insolvency law provides special treatment for the insolvency of non-traders, the enacting State might wish to exclude from the scope of application of the Model Law those insolvencies that relate to natural persons residing in the enacting State whose debts have been incurred predominantly for personal or household purposes, rather than for commercial or business purposes, or those insolvencies that relate to non-traders.  The enacting State might also wish to provide that such exclusion would not apply in cases where the total debts exceed a certain monetary ceiling.

<u>Prior discussion in the Commission and the Working Group</u>

A/52/17, paras. 141-150 (Commission, 30th session)
A/CN.9/435, paras. 102-106, 179 (Working Group, 21st session)
A/CN.9/433, paras. 29-32 (Working Group, 20th session)
A/CN.9/422, paras. 24-33 (Working Group, 19th session)

\* \* \*

## Article 2.  <u>Definitions</u>

**For the purposes of this Law:**

**(a)  "foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation;**

**(b)  "foreign main proceeding" means a foreign proceeding taking place in the State where the debtor has the centre of its main interests;**

**(c)  "foreign non-main proceeding" means a foreign proceeding, other than a foreign main proceeding, taking place in a State where the debtor has an establishment within the meaning of subparagraph (f) of this article;**

**(d)  "foreign representative" means a person or body, including one appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding;**

**(e)  "foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding;**

(f)   "establishment" means any place of operations where the debtor carries out a non-transitory economic activity with human means and goods or services.

Subparagraphs (a) to (d)

67.     Since the Model Law will be embedded in the national insolvency law, article 2 only needs to define the terms specific to cross-border scenarios. Thus, the Model Law contains definitions of the terms "foreign proceeding" (subparagraph (a)) and "foreign representative" (subparagraph (d)), but not of the person or body that may be entrusted with the administration of the assets of the debtor in an insolvency proceeding in the enacting State. To the extent that it would be useful to define in the national statute the term used for such a person or body (rather than just using the term commonly employed to refer to such persons), this may be added to the definitions in the law enacting the Model Law.

68.     By specifying required characteristics of the "foreign proceeding" and "foreign representative", the definitions limit the scope of application of the Model Law. For a proceeding to be susceptible to recognition or cooperation under the Model Law and for a foreign representative to be accorded access to local courts under the Model Law, the foreign proceeding and the foreign representative must have the attributes of subparagraphs (a) and (d).

69.     The definitions in subparagraphs (a) and (d) cover also an "interim proceeding" and a representative "appointed on an interim basis". In a State where interim proceedings are either not known or do not meet the requisites of the definition the question may arise whether recognition of a foreign "interim proceeding" creates a risk of allowing potentially disruptive consequences under the Model Law that the situation does not warrant. It is advisable that, irrespective of the way interim proceedings are treated in the enacting State, the reference to "interim proceeding" in subparagraph (a) and to a foreign representative appointed "on an interim basis" in subparagraph (d) be maintained. The reason is that in the practice of many countries insolvency proceedings are often, or even usually, commenced on an "interim" or "provisional" basis. Except for being labelled as interim, those proceedings meet all the other requisites of the definition in article 2(a). Such proceedings are often conducted for weeks or months as "interim" proceedings under the administration of persons appointed on an "interim" basis, and only some time later would the court issue an order confirming the continuation of the proceedings on a non-interim basis. The objectives of the Model Law apply fully to such "interim proceedings" (provided the requisites of subparagraphs (a) and (d) are met); therefore, these proceedings should not be distinguished from other insolvency proceedings merely because they are of an interim nature. The point that an interim proceeding and the foreign representative must meet all the requirements of article 2 is emphasized in article 17 (1), according to which a foreign proceeding may only be recognized if "the foreign proceeding is a proceeding within the meaning of article 2(a)" and "the foreign representative applying for recognition is a person or body within the meaning of article 2(d)".

70.     Article 18 addresses a case where, after the application for recognition or after recognition, the foreign proceeding or foreign representative, whether interim or not, ceases to meet the requirements of article 2(a) and (d). Article 18 obligates the foreign representative to inform the court promptly, after the time of filing the application for recognition of the foreign proceeding, of "any substantial change in the status of the recognized foreign proceeding or the

23-10063-shl   Doc 629   Filed 08/29/23   Entered 08/29/23 12:34:49   Main Document
Pg 641 of 882
333
A/CN.9/442
English
Page 21

status of the foreign representative's appointment". The purpose of the obligation is to allow the court to modify or terminate the consequences of recognition.

71.     The definitions of proceedings or persons emanating from foreign jurisdictions avoid the use of expressions that may have different technical meaning in legal systems and instead describe their purpose or function.  This technique is used to avoid inadvertently narrowing the range of possible foreign proceedings that might obtain recognition, and to avoid unnecessary conflict with terminology used in the laws of the enacting State.  As noted above in paragraph 50, the term "insolvency" is an example of a term that may have a technical meaning in some legal systems, but which is intended in subparagraph (a) to refer broadly to companies in severe financial distress.

72.     The expression "centre of main interests" in subparagraph (b) to define a foreign main proceeding is used also in the European Union Convention on Insolvency Proceedings.

73.     Subparagraph (c) requires that a "foreign non-main proceeding" take place in the State where the debtor has an "establishment".  Thus, a foreign non-main proceeding susceptible to recognition under article 17(2) may be only a proceeding commenced in a State where the debtor has an establishment in the meaning of article 2(f).  This rule does not affect the provision in article 28, namely, that an insolvency proceeding may be commenced in the enacting State if the debtor has assets there.  It should be noted, however, that the effects of an insolvency proceeding commenced on the basis of the presence of assets only are normally restricted to the assets located in that State; if other assets of the debtor located abroad should, under the law of the enacting State, be administered in that insolvency proceeding (as envisaged in article 28), that cross-border issue is to be dealt with as a matter of international cooperation and coordination under articles 25 to 27 of the Model Law.

Subparagraph (e)

74.     A foreign proceeding that meets the requisites of article 2(a) should receive the same treatment irrespective of whether it has been commenced and supervised by a judicial or administrative body.  Therefore, in order to obviate the need to refer to a foreign non-judicial authority whenever reference is made to a foreign court, the definition of "foreign court" in subparagraph (e) includes also non-judicial authorities.  Subparagraph (e) follows a similar definition contained in article 2(d) of the European Union Convention on Insolvency Proceedings.

Subparagraph (f)

75.     The definition of the term "establishment" (subparagraph (f)) has been  inspired by article 2(h) of the European Union Convention on Insolvency Proceedings.  The term is used in the definition of "foreign non-main proceeding" (art. 2(c)) and in the context of article 17(2), according to which, for a foreign non-main proceeding to be recognized, the debtor must have an establishment in the foreign State (see also above, para. 73).

Prior discussion in the Commission and the Working Group

A/52/17, paras. 152-158 (Commission, 30th session)
A/CN.9/435, paras. 108-113 (Working Group, 21st session)
A/CN.9/433, paras. 33-41, 147 (Working Group, 20th session)
A/CN.9/422, paras. 34-65 (Working Group, 19th session)
A/CN.9/419, paras. 95-117 (Working Group, 18th session)

* * *

## Article 3.  International obligations of this State

**To the extent that this Law conflicts with an obligation of this State arising out of any treaty or other form of agreement to which it is a party with one or more other States, the requirements of the treaty or agreement prevail.**

76.    Article 3, expressing the principle of supremacy of international obligations of the enacting State over internal law, has been modelled on similar provisions in other model laws prepared by UNCITRAL.

77.    In enacting the article, the legislator may wish to consider whether it would be desirable to take steps to avoid an unnecessarily broad interpretation of international treaties.  Namely, the article might result in giving precedence to international treaties which, while addressing matters covered also by the Model Law (e.g. access to courts and cooperation between courts or administrative authorities), were aimed at the resolution of problems other than those that the Model Law focuses on.  Some of those treaties, only because of their imprecise or broad formulation, may be misunderstood as dealing also with matters dealt with by the Model Law.  Such a result would compromise the goal of achieving uniformity and facilitating cross-border cooperation in insolvency matters and would reduce certainty and predictability in the application of the Model Law.  The enacting State might wish to provide that, in order for article 3 to displace a provision of the national law, a sufficient link must exist between the international treaty concerned and the issue governed by the provision of the national law in question.  Such a condition would avoid the inadvertent and excessive restriction of the effects of the law which implements the Model Law.  However, such a provision should not go so far as imposing a condition that the treaty concerned has to deal specifically with insolvency matters in order to satisfy that condition.

78.    It is noteworthy that, while in some States binding international treaties are self-executing, in other States those treaties are, with certain exceptions, not self-executing in that they require internal legislation for them to become enforceable law.  With respect to the latter group of States, in view of their normal practice in dealing with international treaties and agreements, it would be inappropriate or unnecessary to include article 3 in their legislation or it might be appropriate to include it in modified form.

23-10063-shl   Doc 629   Filed 08/29/23   Entered 08/29/23 12:34:49   Main Document
Pg 643 of 882

335
A/CN.9/442
English
Page 23

Prior discussion in the Commission and the Working Group

A/52/17, paras. 160-162 (Commission, 30th session)
A/CN.9/435, paras. 114-117 (Working Group, 21st session)
A/CN.9/433, paras. 42-43 (Working Group, 20th session)
A/CN.9/422, paras. 66-67 (Working Group, 19th session)

* * *

## Article 4. *[Competent court or authority]*[a]

The functions referred to in this Law relating to recognition of foreign proceedings and cooperation with foreign courts shall be performed by *[specify the court, courts, authority or authorities competent to perform those functions in the enacting State]*.

---

[a] A State where certain functions relating to insolvency proceedings have been conferred upon government-appointed officials or bodies might wish to include in article 4 or elsewhere in chapter I the following provision:

Nothing in this Law affects the provisions in force in this State governing the authority of *[insert the title of the government-appointed person or body]*.

79.     If in the enacting State any of the functions mentioned in article 4 are performed by an authority other than a court, the State would insert in article 4 and in other appropriate places in the enacting legislation the name of the competent authority.

80.     The competence for the various judicial functions dealt with in the Model Law may lie with different courts in the enacting State, and the enacting State would tailor the text of the article to its own system of court competence. The value of article 4, as enacted in a given State, would be to increase the transparency and ease of use of the insolvency legislation for the benefit of, in particular, foreign representatives and foreign courts.

81.     It is important to note that, in defining jurisdiction in matters mentioned in article 4, the implementing legislation should not unnecessarily limit the jurisdiction of other courts in the enacting State, in particular to entertain requests by foreign representatives for provisional relief.

Footnote

82.     In a number of States, insolvency legislation has entrusted certain tasks relating to the general supervision of the process of dealing with insolvency cases in the country to government-appointed officials who are typically civil servants or judicial officers and who carry out their functions on a permanent basis. The names under which they are known vary and include, for example, "official receiver", "official trustee" or "official assignee". The activities, and the scope and nature of their duties, vary from State to State. The Model Law does not restrict the authority of such officials, a point that some enacting States may wish to clarify in the law, as indicated in the footnote. However, depending on the wording that the enacting State

uses in articles 25 and 26 in referring to the "*title of the person or body administering a reorganization or liquidation under the law of the enacting State*", these officials may be subjected to the duty to cooperate as provided under articles 25 to 27.

83.      In some jurisdictions, officials referred to in the preceding paragraph may also be appointed to act as administrators in individual insolvency cases.  To the extent that that occurs, such officials would be covered by the Model Law.

Prior discussion in the Commission and the Working Group

A/52/17, paras. 163-166 (Commission, 30th session)
A/CN.9/435, paras. 118-122 (Working Group, 21st session)
A/CN.9/433, paras. 44-45 (Working Group, 20th session)
A/CN.9/422, paras. 68-69 (Working Group, 19th session)
A/CN.9/419, para. 69 (Working Group, 18th session)

* * *

**Article 5.  Authorization of *[insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State]* to act in a foreign State**

**A *[insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State]* is authorized to act in a foreign State on behalf of a proceeding under *[identify laws of the enacting State relating to insolvency]*, as permitted by the applicable foreign law.**

84.      The intent of article 5 is to equip administrators or other authorities appointed in insolvency proceedings commenced in the enacting State to act abroad as foreign representatives of those proceedings.  The lack of such authorization in some States has proved to be an obstacle to effective international cooperation in cross-border cases.  An enacting State in which administrators are already equipped to act as foreign representatives may decide to forgo inclusion of article 5, although even such a State might want to keep article 5 so as to provide clear statutory evidence of that authority.

85.      It may be noted that article 5 is formulated to make it clear that the scope of the power exercised abroad by the administrator would depend upon the foreign law and courts.  Actions that the administrator appointed in the enacting State may wish to take in a foreign country will be actions of the type that are dealt with in the Model Law, but the authority to act in a foreign country does not depend on whether that country has enacted legislation based on the Model Law.

Prior discussion in the Commission and the Working Group

A/52/17, paras. 167-169 (Commission, 30th session)
A/CN.9/435, paras. 123-124 (Working Group, 21st session)
A/CN.9/433, paras. 46-49 (Working Group, 20th session)
A/CN.9/422, paras. 70-74 (Working Group, 19th session)
A/CN.9/419, paras. 36-39 (Working Group, 18th session)

* * *

### Article 6.  Public policy exception

**Nothing in this Law prevents the court from refusing to take an action governed by this Law if the action would be manifestly contrary to the public policy of this State.**

86.     As the notion of public policy is grounded in national law and may differ from State to State, no uniform definition of that notion is attempted in article 6.

87.     In some States the expression "public policy" may be given a broad meaning in that it might relate in principle to any mandatory rule of national law.  However, in many States the public policy exception is construed as being restricted to fundamental principles of law, in particular constitutional guarantees; in these States, public policy would only be used to refuse the application of foreign law, or the recognition of a foreign judicial decision or arbitral award, when that would contravene those fundamental principles.

88.     For the applicability of the public policy exception in the context of the Model Law it is important to note that a growing number of jurisdictions recognize a dichotomy between the notion of public policy as it applies to domestic affairs, and the notion of public policy as it is used in matters of international cooperation and the question of recognition of effects of foreign laws.  It is especially in the latter situation that public policy is understood more restrictively than domestic public policy.  This dichotomy reflects the realization that international cooperation would be unduly hampered if public policy would be understood in an extensive manner broadly. [as encompassing essentially the mandatory law of the country.]

89.     The purpose of the expression "manifestly", used also in many other international legal texts as a qualifier of the expression "public policy", is to emphasize that public policy exceptions should be interpreted restrictively and that article 6 is only intended to be invoked under exceptional circumstances concerning matters of fundamental importance for the enacting State.

Prior discussion in the Commission and the Working Group

A/52/17, paras. 170-173 (Commission, 30th session)
A/CN.9/435, paras. 125-128 (Working Group, 21st session)
A/CN.9/433, paras. 156-160 (Working Group, 20th session)
A/CN.9/422, paras. 84-85 (Working Group, 19th session)
A/CN.9/419, para. 40 (Working Group, 18th session)

\* \* \*

## Article 7.  Additional assistance under other laws

**Nothing in this Law limits the power of a court or a *[insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State]* to provide additional assistance to a foreign representative under other laws of this State.**

90.      The purpose of the Model Law is to increase and harmonize cross-border assistance available in the enacting State to foreign representatives.  However, since the law of the enacting State may, at the time of enacting the Law, already have in place various provisions under which a foreign representative could obtain cross-border assistance, and since it is not the purpose of the Law to displace those provisions to the extent they provide assistance that is additional to or different from the type of assistance dealt with in the Model Law, the enacting State may consider whether article 7 is needed to make that point clear.

Prior discussion in the Commission

A/52/17, para. 175 (Commission, 30th session)

\* \* \*

## Article 8.  Interpretation

**In the interpretation of this Law, regard is to be had to its international origin and to the need to promote uniformity in its application and the observance of good faith.**

91.      A provision similar to the one contained in article 8 appears in a number of private-law treaties (e.g. art. 7(1) of the United Nations Convention on Contracts for the International Sale of Goods, Vienna 1980).  More recently, it has been recognized that also in a non-treaty text such as a model law such a provision would be useful in that a State enacting a model law also has an interest in its harmonized interpretation.   Article 8 has been modelled on article 3(1) of the UNCITRAL Model Law on Electronic Commerce (1996).

92.      Harmonized interpretation of the Model Law will be facilitated by the information system CLOUT ("Case Law on UNCITRAL Texts"), a system under which the UNCITRAL secretariat publishes abstracts of judicial decisions (and, where applicable, arbitral awards) that interpret conventions and model laws emanating from the work of the Commission.  (For further information about the system, see below, para. 202.)

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 647 of 882

**339**
A/CN.9/442
English
Page 27

<u>Prior discussion in the Commission</u>

A/52/17, para. 174 (Commission, 30th session)

\* \* \*

## CHAPTER II.  ACCESS OF FOREIGN REPRESENTATIVES AND CREDITORS TO COURTS IN THIS STATE

### Article 9.  <u>Right of direct access</u>

**A foreign representative is entitled to apply directly to a court in this State.**

93.      The article is limited to expressing the principle of direct access by the foreign representative to courts of the enacting State, thus freeing the representative from having to meet formal requirements such as licences or consular actions.  Article 4 deals with court competence in the enacting State for providing relief to the foreign representative.

<u>Prior discussion in the Commission and the Working Group</u>

A/52/17, paras. 176-178 (Commission, 30th session)
A/CN.9/435, paras. 129-133 (Working Group, 21st session)
A/CN.9/433, paras. 50-58 (Working Group, 20th session)
A/CN.9/422, paras. 144-151 (Working Group, 19th session)
A/CN.9/419, paras. 77-79; 172-173 (Working Group, 18th session)

\* \* \*

### Article 10.  <u>Limited jurisdiction</u>

**The sole fact that an application pursuant to this Law is made to a court in this State by a foreign representative does not subject the foreign representative or the foreign assets and affairs of the debtor to the jurisdiction of the courts of this State for any purpose other than the application.**

94.      The provision constitutes a "safe conduct" rule aimed at ensuring that the court in the enacting State would not assume jurisdiction over all the assets of the debtor on the sole ground of the foreign representative having made an application for recognition of a foreign proceeding. The article also makes it clear that the application alone is not sufficient ground for the court of the enacting State to assert jurisdiction over the foreign representative as to matters unrelated to insolvency.  The provision responds to concerns of foreign representatives and creditors about exposure to all-embracing jurisdiction triggered by an application under the (Model) Law.

95.      The limitation on jurisdiction over the foreign representative embodied in article 10 is not absolute.  It is only intended to shield the foreign representative to the extent necessary to make court access a meaningful proposition.  It does so by providing that an appearance in the

courts of the enacting State for the purpose of requesting recognition would not expose the entire estate under the supervision of the foreign representative to the jurisdiction of those courts. Other possible grounds for jurisdiction under the laws of the enacting State over the foreign representative or the assets are not affected. For example, a tort or a misconduct committed by the foreign representative may provide grounds for jurisdiction to deal with the consequences of such an action by the foreign representative. Furthermore, the foreign representative who applies for relief in the enacting State will be subject to conditions which the court may order in connection with relief granted (art. 22(2)).

96.     The article may appear superfluous in States where the rules on jurisdiction do not allow a court to assume jurisdiction over a person making an application to the court on the sole ground of the applicant's appearance. Nevertheless, also in those States it would be useful to enact the article so as to eliminate possible concerns of foreign representatives or creditors over the possibility of jurisdiction based on the sole ground of applying to the court.

Prior discussion in the Commission and the Working Group

A/52/17, paras. 179-182 (Commission, 30th session)
A/CN.9/435, paras. 134-136 (Working Group, 21st session)
A/CN.9/433, paras. 68-70 (Working Group, 20th session)
A/CN.9/422, paras. 160-166 (Working Group, 19th session)

* * *

## Article 11.  Application by a foreign representative to commence a proceeding under [identify laws of the enacting State relating to insolvency]

**A foreign representative is entitled to apply to commence a proceeding under [identify laws of the enacting State relating to insolvency] if the conditions for commencing such a proceeding are otherwise met.**

97.     Many national laws, in enumerating persons who may request the commencement of an insolvency proceeding, do not mention a representative of a foreign insolvency proceeding; under those laws, it might be doubtful whether a foreign representative is among those that may make such a request.

98.     Article 11 is designed to ensure that the foreign representative (of a foreign main or non-main proceeding) has standing (or "procedural legitimation") for requesting the commencement of an insolvency proceeding. However, the article makes it clear (by the words "if the conditions for commencing such a proceeding are otherwise met") that it does not otherwise modify the conditions under which an insolvency proceeding may be commenced in the enacting State.

99.     The foreign representative has this right without prior recognition of the foreign proceeding, because the commencement of an insolvency proceeding might be crucial in cases of urgent need for preserving the assets of the debtor. The article recognizes that not only a representative of a foreign main proceeding but also a representative of a foreign non-main proceeding may have a legitimate interest in the commencement of an insolvency proceeding in the enacting State. Sufficient guarantees against abusive applications are provided by the

requirement that the other conditions for commencing such a proceeding under the law of the enacting State have to be met.

Prior discussion in the Commission and the Working Group

A/52/17, paras. 183-187 (Commission, 30th session)
A/CN.9/435, paras. 137-146 (Working Group, 21st session)
A/CN.9/433, paras. 71-75 (Working Group, 20th session)
A/CN.9/422, paras. 170-177 (Working Group, 19th session)

\* \* \*

**Article 12.  Participation of a foreign representative in a proceeding under *[identify laws of the enacting State relating to insolvency]***

**Upon recognition of a foreign proceeding, the foreign representative is entitled to participate in a proceeding regarding the debtor under *[identify laws of the enacting State relating to insolvency]*.**

100.    The purpose of the provision is to ensure that, when an insolvency proceeding concerning a debtor is taking place in the enacting State, the foreign representative of a proceeding concerning that debtor will be given procedural standing (or "procedural legitimation") to make petitions, requests or submissions concerning issues such as protection, realization or distribution of assets of the debtor or cooperation with the foreign proceeding.

101.    Notably, the article is limited to giving the foreign representative standing and does not vest the foreign representative with any specific powers or rights.  The provision does not specify the kinds of motions the foreign representative might make and does not affect the provisions in the insolvency law of the enacting State that govern the fate of the motions.

102.    If the law of the enacting State uses a term other than "participate" to express the concept, such other term may be used in enacting the provision.  However, if the legislator proposes that the other term should be "intervene", it should be noted that article 24 already uses the term "intervene" to refer to a case where the foreign representative takes part in an individual action by or against the debtor (as opposed to a collective insolvency proceeding).

Prior discussion in the Commission and the Working Group

A/52/17, paras. 188-189 (Commission, 30th session)
A/CN.9/435, paras. 147-150 (Working Group, 21st session)
A/CN.9/433, para. 58 (Working Group, 20th session)
A/CN.9/422, paras. 114-115, 147, 149 (Working Group, 19th session)

\* \* \*

### Article 13.  Access of foreign creditors to a proceeding under *[identify laws of the enacting State relating to insolvency]*

**(1)    Subject to paragraph (2) of this article, foreign creditors have the same rights regarding the commencement of, and participation in, a proceeding under *[identify laws of the enacting State relating to insolvency]* as creditors in this State.**

**(2)    Paragraph (1) of this article does not affect the ranking of claims in a proceeding under *[identify laws of the enacting State relating to insolvency]*, except that the claims of foreign creditors shall not be ranked lower than *[identify the class of general non-preference claims, while providing that a foreign claim is to be ranked lower than the general non-preference claims if an equivalent local claim (e.g. claim for a penalty or deferred-payment claim) has a rank lower than the general non-preference claims].*[b]**

---

[b] **The enacting State may wish to consider the following alternative wording to replace article 13(2):**

> **(2)    Paragraph (1) of this article does not affect the ranking of claims in a proceeding under *[identify laws of the enacting State relating to insolvency]* or the exclusion of foreign tax and social security claims from such a proceeding. Nevertheless, the claims of foreign creditors other than those concerning tax and social security obligations shall not be ranked lower than *[identify the class of general non-preference claims, while providing that a foreign claim is to be ranked lower than the general non-preference claims if an equivalent local claim (e.g. claim for a penalty or deferred-payment claim) has a rank lower than the general non-preference claims].***

103.    With the exception contained in paragraph (2), the article embodies the principle that foreign creditors, when they apply to commence an insolvency proceeding in the enacting State or file claims in such proceeding, should not be treated worse than local creditors.

104.    Paragraph (2) makes it clear that the principle of non-discrimination embodied in paragraph (1) leaves intact the provisions on the ranking of claims in insolvency proceedings, including any provisions that might assign a special ranking to claims of foreign creditors.  It may be noted that few States currently have provisions assigning a special ranking to foreign creditors.  However, lest the non-discrimination principle should be emptied of its meaning by provisions giving the lowest ranking to foreign claims, paragraph (2) establishes the minimum ranking for claims of foreign creditors: the rank of general unsecured claims.  The exception to that minimum ranking is provided for the cases where the claim in question, if it were of a domestic creditor, would be ranked lower than general unsecured claims (such low-rank claims may be, for instance, those of a State authority for financial penalties or fines, claims whose payment is deferred because of a special relationship between the debtor and the creditor, or claims that have been filed after the expiry of the time period for doing so).  Those special claims may rank below the general unsecured claims, for reasons other than the nationality or location of the creditor, as provided in the law of the enacting State.

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 651 of 882

343

A/CN.9/442
English
Page 31

105.    The alternative provision in the footnote differs from the provision in the text only in that it provides wording for States that refuse to recognize foreign tax and social security claims to continue to discriminate against such claims.

Prior discussion in the Commission and the Working Group

A/52/17, paras. 190-192 (Commission, 30th session)
A/CN.9/435, paras. 151-156 (Working Group, 21st session)
A/CN.9/433, paras. 77-85 (Working Group, 20th session)
A/CN.9/422, paras. 179-187 (Working Group, 19th session)

\* \* \*

### Article 14.  Notification to foreign creditors of a proceeding under *[identify laws of the enacting State relating to insolvency]*

**(1)    Whenever under *[identify laws of the enacting State relating to insolvency]* notification is to be given to creditors in this State, such notification shall also be given to the known creditors that do not have addresses in this State. The court may order that appropriate steps be taken with a view to notifying any creditor whose address is not yet known.**

**(2)    Such notification shall be made to the foreign creditors individually, unless the court considers that, under the circumstances, some other form of notification would be more appropriate. No letters rogatory or other, similar formality is required.**

**(3)    When a notification of commencement of a proceeding is to be given to foreign creditors, the notification shall:**

**(a)    indicate a reasonable time period for filing claims and specify the place for their filing;**

**(b)    indicate whether secured creditors need to file their secured claims; and**

**(c)    contain any other information required to be included in such a notification to creditors pursuant to the law of this State and the orders of the court.**

Paragraphs (1) and (2)

106.    The main purpose of notifying foreign creditors as provided in paragraph (1) is to inform them of the commencement of the insolvency proceeding and of the time-limit to file their claims.  Furthermore, as a corollary to the principle of equal treatment established by article 13, article 14 requires that foreign creditors should be notified whenever notification is required for creditors in the enacting State.

107.    States have different provisions or practices regarding the methods for notifying creditors; those may be, for example, publication in the official gazette or in local newspapers, individual notices, affixing notices within the court premises or a combination of such

23-10063-shl   Doc 629   Filed 08/29/23   Entered 08/29/23 12:34:49   Main Document
Pg 652 of 882
344
A/CN.9/442
English
Page 32

procedures. If the form of notification were to be left to national law, foreign creditors would be in a less advantageous situation than local creditors, since they typically do not have direct access to local publications. For that reason, paragraph (2) in principle requires individual notification for foreign creditors, but nevertheless leaves discretion to the court to decide otherwise in a particular case (e.g. if individual notice would entail excessive cost or would not seem feasible under the circumstances).

108.    With regard to the form of individual notification, States may use special procedures for notifications that have to be served in a foreign jurisdiction (e.g. sending of notifications through diplomatic channels). In the context of insolvency proceedings, those procedures would often be too cumbersome and time-consuming and their use would typically not provide foreign creditors timely notice concerning insolvency proceedings. It is therefore advisable for those notifications to be effected by such expeditious means that the court considers adequate. Those considerations are the reason for the provision in paragraph (2) that "no letters rogatory or other, similar formality is required".

109.    Many States are party to bilateral or multilateral treaties on judicial cooperation, which often contain provisions on procedures for communicating judicial or extrajudicial documents to addressees abroad. A multilateral treaty of this kind is the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters (1965), adopted under the auspices of the Hague Conference on Private International Law. While the procedures envisaged by those treaties may constitute a simplification as compared to traditional communication via diplomatic channels, they would often be, for reasons stated in the preceding paragraph, inappropriate for cross-border insolvency cases. The question may arise whether paragraph (2), which allows the use of letters rogatory or similar formalities to be dispensed with, is compatible with these treaties. Each State would have to consider that question in light of its treaty obligations, but generally it may be said that the provision in paragraph (2) would not be in conflict with the international obligations of the enacting State, because the purpose of the treaties alluded to above is typically to facilitate communication and not to preclude use of notification procedures that are even simpler than those established by the treaty; for example, article 10 of the above-mentioned Convention states that

"Provided the State of destination does not object, the present Convention shall not interfere with -

a) the freedom to send judicial documents, by postal channels, directly to persons abroad,

b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,

c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination."

To the extent that there might still exist a conflict between the second sentence of paragraph (2) of this article and a treaty, article 3 of the Model Law provides the solution.

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 653 of 882

345
A/CN.9/442
English
Page 33

110.    While paragraph (2) mentions letters rogatory as a formality that is not required for a notification under article 14, it may be noted that in many States such notifications would never be transmitted in the form of a letter rogatory. A letter rogatory in those States would be used for other purposes, such as to request evidence in a foreign country or to request permission to perform some other judicial act abroad. Such use of letters rogatory is governed, for example, by the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (1970), adopted under the auspices of the Hague Conference on Private International Law.

<u>Paragraph (3)</u>

111.    In some legal systems a secured creditor who files a claim in the insolvency proceeding is deemed to have waived the security or some of the privileges attached to the credit, while in other systems failure to file a claim results in a waiver of such security or privilege. Where such a situation may arise, it would be appropriate for the enacting State to include in paragraph (3)(b) a requirement that the notification should include information regarding the effects of filing, or failing to file, secured claims.

<u>Prior discussion in the Commission and the Working Group</u>

A/52/17, paras. 193-198 (Commission, 30th session)
A/CN.9/435, paras. 157-164 (Working Group, 21st session)
A/CN.9/433, paras. 86-98 (Working Group, 20th session)
A/CN.9/422, paras. 188-191 (Working Group, 19th session)
A/CN.9/419, paras. 84-87 (Working Group, 18th session)

* * *

## CHAPTER III. RECOGNITION OF A FOREIGN PROCEEDING AND RELIEF

### Article 15. <u>Application for recognition of a foreign proceeding</u>

**(1)    A foreign representative may apply to the court for recognition of the foreign proceeding in which the foreign representative has been appointed.**

**(2)    An application for recognition shall be accompanied by:**

**(a)    a certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; or**

**(b)    a certificate from the foreign court affirming the existence of the foreign proceeding and of the appointment of the foreign representative; or**

**(c)    in the absence of evidence referred to in subparagraphs (a) and (b), any other evidence acceptable to the court of the existence of the foreign proceeding and of the appointment of the foreign representative.**

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 654 of 882

346

A/CN.9/442
English
Page 34

**(3)   An application for recognition shall also be accompanied by a statement identifying all foreign proceedings in respect of the debtor that are known to the foreign representative.**

**(4)   The court may require a translation of documents supplied in support of the application for recognition into an official language of this State.**

Article as a whole

112.    The article defines the core procedural requirements for an application by a foreign representative for recognition.  In incorporating the provision into national law, it is desirable not to encumber the process with additional requirements beyond those referred to.  With article 15, in conjunction with article 16, the Model Law provides a simple, expeditious structure for a foreign representative to obtain recognition.

Paragraph (2) and article 16(2)

113.    The Model Law presumes that documents submitted in support of the application for recognition need not be authenticated in any special way, in particular by legalization: according to article 16(2), the court is entitled to presume that those documents are authentic whether or not they have been legalized.  "Legalization" is a term often used for the formality by which a diplomatic or consular agent of the State in which the document is to be produced certifies the authenticity of the signature, the capacity in which the person signing the document has acted and, where appropriate, the identity of the seal or stamp on the document.

114.    It follows from article 16(2) (according to which the court "is entitled to presume" the authenticity of documents accompanying the application for recognition) that the court retains discretion to decline to rely on the presumption of authenticity or to conclude that evidence to the contrary prevails.  This flexible solution takes into account the fact that the court may be able to assure itself that a particular document originates from a particular court even without it being legalized, but that in other cases the court may be unwilling to act on the basis of a foreign document that has not been legalized, particularly when documents emanate from a jurisdiction with which it is not familiar.  The presumption is useful because legalization procedures may be cumbersome and time-consuming (e.g. also because in some States they involve various authorities at different levels).

115.    In respect of the provision relaxing any requirement of legalization, the question may arise whether this is in conflict with the international obligations of the enacting State.  Several States are parties to bilateral or multilateral treaties on mutual recognition and legalization of documents, such as the Convention Abolishing the Requirement of Legalisation for Foreign Documents (1961), adopted under the auspices of the Hague Conference on Private International Law, which provides specific simplified procedures for the legalization of documents originating from signatory States.  However, similarly as noted above with respect to the use of letters rogatory and similar formalities, the treaties on legalization of documents in many instances leave in effect laws and regulations that have abolished or simplified legalization procedures; therefore a conflict is unlikely to arise.  For example, the Hague Convention referred to provides in article 3(2):

"However, [legalisation] mentioned in the preceding paragraph cannot be required when either the laws, regulations, or practice in force in the State where the document is produced or an agreement between two or more contracting States have abolished or simplified it, or exempt the document itself from legalisation."

To the extent there might still exist a conflict between the Model Law and a treaty, according to article 3 of the Model Law, the treaty will prevail.

Paragraph (2)(c)

116.    In order not to prevent recognition because of non-compliance with a mere technicality (e.g. where the applicant is unable to submit documents that in all details meet the requirements of paragraph (2)(a) and (b)), it is allowed by paragraph (2)(c) to take into account evidence other than that specified in subparagraphs (a) and (b); this provision, however, does not compromise the court's power to insist on the presentation of evidence acceptable to it. It is advisable to maintain that flexibility in enacting the Model Law. Article 16(2), which provides that the court "is entitled to presume" the authenticity of documents accompanying the application for recognition, applies also to documents submitted under paragraph (2)(c) (see above, paras. 114-115).

Paragraph (3)

117.    Paragraph (3) requires that an application for recognition must be accompanied by a statement identifying all foreign proceedings in respect of the debtor that are known to the foreign representative. That information is needed by the court not so much for the decision on recognition itself but for any decision granting relief in favour of the foreign proceeding. Namely, in order to tailor such relief appropriately and make sure that relief is consistent with any other insolvency proceeding concerning the same debtor, the court needs to be aware of all foreign proceedings concerning the debtor which may be under way in third States.

118.    An express provision establishing this duty to inform is useful, firstly, because the foreign representative is likely to have more comprehensive information about the debtor's affairs in third States than the court and, secondly, because the foreign representative may be primarily concerned with obtaining relief in favour of his or her foreign proceeding and less concerned about coordination with another foreign proceeding. (The duty to inform the court about a foreign proceeding that becomes known to the foreign representative after the decision on recognition is set out in article 18; as to coordination of more than one foreign proceeding, see article 30.)

Paragraph (4)

119.    Paragraph (4) entitles, but does not compel, the court to require a translation of some or all documents accompanying the application for recognition. If this discretion is compatible with the procedures of the court, it is useful since it allows, when the court understands the documents, to shorten the time needed for a decision on recognition and reduces costs.

Notice

120.    Different solutions exist also as to whether the court is required to issue notice of an
application for recognition.  In a number of jurisdictions, fundamental principles of due process,
in some cases enshrined in the constitution, may be understood as requiring that a decision of the
importance of the recognition of a foreign insolvency proceeding could only be made after
hearing the affected parties.  However, in other States it is considered that applications for
recognition of foreign proceedings require expeditious treatment (as they are often submitted in
circumstances of imminent danger of dissipation or concealment of the assets) and that, because
of this need for expeditiousness, the issuance of notice prior to any court decision on recognition
is not required.  In that vein of thinking, imposing the requirement would cause undue delay and
would be inconsistent with article 17(3), which provides that an application for recognition of a
foreign proceeding should be decided upon at the earliest possible time.

121.    Procedural matters related to such notice are not resolved by the Model Law and are thus
governed by other provisions of law of the enacting State.  The absence of an express reference
to notice of the filing of an application for recognition or of the decision to grant recognition
does not preclude the court from issuing such notice, where legally required, in pursuance of its
own rules on civil or insolvency proceedings.  By the same token, there is nothing in the Model
Law that would mandate the issuance of such notice, where such requirement does not exist.

Prior discussion in the Commission and the Working Group

A/52/17, paras. 199-209 (Commission, 30th session)
A/CN.9/435, paras. 165-173 (Working Group, 21st session)
A/CN.9/433, paras. 59-67, 99-104 (Working Group, 20th session)
A/CN.9/422, paras. 76-93, 152-159 (Working Group, 19th session)
A/CN.9/419, paras. 62-69, 178-189 (Working Group, 18th session)

* * *

## Article 16.  Presumptions concerning recognition

**(1)    If the decision or certificate referred to in article 15(2) indicates that the foreign
proceeding is a proceeding within the meaning of article 2(a) and that the foreign
representative is a person or body within the meaning of article 2(d), the court is entitled to
so presume.**

**(2)    The court is entitled to presume that documents submitted in support of the
application for recognition are authentic, whether or not they have been legalized.**

**(3)    In the absence of proof to the contrary, the debtor's registered office, or habitual
residence in the case of an individual, is presumed to be the centre of the debtor's main
interests.**

122.    The article establishes presumptions that allow the court to expedite the evidentiary
process; at the same time they do not prevent, in accordance with the applicable procedural law,

calling for, or assessing, other evidence if the conclusion suggested by the presumption is called into question by the court or an interested party.

123.     For comments on paragraph (2), which dispenses with the requirement of legalization, see above, paragraphs 113 to 115.

Prior discussion in the Commission and the Working Group

A/52/17, paras. 204-206 (Commission, 30th session)
A/CN.9/435, paras. 170-172 (Working Group, 21st session)

\* \* \*

### Article 17.  Decision to recognize a foreign proceeding

(1)     Subject to article 6, a foreign proceeding shall be recognized if:

(a)   the foreign proceeding is a proceeding within the meaning of article 2(a);

(b)   the foreign representative applying for recognition is a person or body within the meaning of article 2(d);

(c)   the application meets the requirements of article 15(2); and

(d)   the application has been submitted to the court referred to in article 4.

(2)     The foreign proceeding shall be recognized:

(a)   as a foreign main proceeding if it is taking place in the State where the debtor has the centre of its main interests; or

(b)   as a foreign non-main proceeding if the debtor has an establishment within the meaning of article 2(f) in the foreign State.

(3)     An application for recognition of a foreign proceeding shall be decided upon at the earliest possible time.

(4)     The provisions of articles 15, 16, 17 and 18 do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist.

Paragraphs (1) to (3)

124.     The purpose of the article is to indicate that, if recognition is not contrary to the public policy of the enacting State, and if the application meets the requirements set out in the article, recognition will be granted as a matter of course.

125.    It is noteworthy that, apart from the public policy exception (see article 6), the conditions for recognition do not include those that would allow the court considering the application to evaluate the merits of the foreign court's decision by which the proceeding has been commenced or the foreign representative appointed.   The foreign representative's ability to obtain early recognition (and the consequential ability to invoke in particular articles 20, 21, 23 and 24) is often essential for the effective protection of the assets of the debtor from dissipation and concealment.  For that reason, paragraph (3) obligates the court to decide on the application "at the earliest possible time" and the court should in practice be able to conclude the recognition process within such a short period of time.

126.    The article draws in paragraph (2) the basic distinction between foreign proceedings categorized as "main" proceedings and those foreign proceedings that are not so characterized, depending upon the jurisdictional basis of the foreign proceeding (see above, para. 75).  The relief flowing from recognition may depend upon the category into which a foreign proceeding falls.  For example, recognition of a "main" proceeding triggers an automatic stay of individual creditor actions or executions concerning the assets of the debtor (art. 20(1)(a) and (b)) and an automatic "freeze" of those assets (art. 20(1)(c)), subject to certain exceptions referred to in article 20(2).

127.    It is not advisable to include more than one criterion for qualifying a foreign proceeding as a "main" proceeding and provide that on the basis of any of those criteria a proceeding could be deemed a main proceeding.  Such a "multiple criteria" approach would raise the risk of competing claims from foreign proceedings for recognition as the main proceeding.

128.    With regard to paragraph (2)(b), it has been pointed out above, in paragraph 73, that the Model Law does not envisage recognition of a proceeding commenced in a foreign State in which the debtor has assets but no establishment as defined in article 2(c).

Paragraph (4)

129.    A decision to recognize a foreign proceeding would normally be subject to review or rescission, as any other court decision.  Paragraph (4) clarifies that the question of revisiting the decision on recognition, if grounds for granting it were fully or partially lacking or have ceased to exist, is left to the procedural law of the enacting State other than the provisions implementing the Model Law.

130.    Modification or termination of the recognition decision may be a consequence of a change of circumstances after the decision on recognition, for instance, if the recognized foreign proceeding has been terminated or its nature has changed (e.g. a reorganization proceeding might be transformed into a liquidation proceeding).  Also, new facts might arise which require or justify a change of the court's decision, for example, if the foreign representative disregarded the conditions under which the court granted relief.

131.    A decision on recognition may also be subject to review as to whether in the decision-making process the requirements for recognition were observed.  Some appeal procedures under national laws give the appeal court the authority to review the merits of the case in its entirety, including factual aspects.  It would be consistent with the purpose of the Model Law, and with

the nature of the decision granting recognition (which is limited to verifying whether the applicant fulfilled the requirements of article 17), if an appeal of the decision would be limited to the question whether the requirements of articles 15 and 16 were observed in deciding to recognize the foreign proceeding.

## Notice of decision to recognize foreign proceedings

132.    As noted above (paras. 120-121), procedural matters regarding requirements of notice of the decision to grant recognition are not dealt with by the Model Law and are left to other provisions of law of the enacting State.

## Prior discussion in the Commission and the Working Group

A/52/17, paras. 29-33 and 201-202 (Commission, 30th session)
A/CN.9/435, paras. 167 and 173 (Working Group, 21st session)
A/CN.9/433, paras. 99-104 (Working Group, 20th session)
A/CN.9/422, paras. 76-93 (Working Group, 19th session)
A/CN.9/419, paras. 62-69 (Working Group, 18th session)

* * *

## Article 18.  Subsequent information

**From the time of filing the application for recognition of the foreign proceeding, the foreign representative shall inform the court promptly of:**

**(a)  any substantial change in the status of the recognized foreign proceeding or the status of the foreign representative's appointment; and**

**(b)  any other foreign proceeding regarding the same debtor that becomes known to the foreign representative.**

## Subparagraph (a)

133.    It is possible that, after the application for recognition or after recognition, changes occur in the foreign proceeding that would have affected the decision on recognition or the relief granted on the basis of recognition.  For example, the foreign proceeding may be terminated or transformed from a liquidation proceeding into a reorganization proceeding, or the terms of the appointment of the foreign representative may be modified or the appointment itself terminated. Subparagraph (a) takes into account the fact that technical modifications in the status of the proceedings or the terms of the appointment are frequent, but that only some of those modifications are such that they would affect the decision granting relief or the decision recognizing the proceeding; therefore, the provision only calls for information of "substantial" changes.  The court would likely be particularly anxious to be kept so informed when its decision on recognition concerns a foreign "interim proceeding" or a foreign representative has been "appointed on an interim basis" (see art. 2(a) and (d)).

Subparagraph (b)

134.    Article 15(3) requires that an application for recognition be accompanied by a statement identifying all foreign proceedings in respect of the debtor that are known to the foreign representative.  Subparagraph (b) extends that duty to the time after the application for recognition has been filed.  That information will allow the court to consider whether relief already granted should be coordinated with the existence of the insolvency proceedings that have been commenced after the decision on recognition (see article 30).

Prior discussion in the Commission

A/52/17, paras. 113-116, 201-202, 207 (Commission, 30th session)

* * *

### Article 19.   Relief that may be granted upon application for recognition of a foreign proceeding

(1)    From the time of filing an application for recognition until the application is decided upon, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including:

(a)   staying execution against the debtor's assets;

(b)   entrusting the administration or realization of all or part of the debtor's assets located in this State to the foreign representative or another person designated by the court, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy;

(c)   any relief mentioned in article 21(1)(c), (d) and (g).

(2)    *[Insert provisions (or refer to provisions in force in the enacting State) relating to notice.]*

(3)    Unless extended under article 21(1)(f), the relief granted under this article terminates when the application for recognition is decided upon.

(4)    The court may refuse to grant relief under this article if such relief would interfere with the administration of a foreign main proceeding.

Paragraph (1)

135.    Article 19 deals with "urgently needed" relief that may be ordered at the discretion of the court and is available as of the moment of the application for recognition (unlike relief under article 21, which is also discretionary but which is available only upon recognition).

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 661 of 882

353

A/CN.9/442
English
Page 41

136.    Article 19 authorizes the court to grant the type of relief that is usually available only in collective insolvency proceedings (i.e. the same type of relief available under article 21), as opposed to the "individual" type of relief that may be granted before the commencement of insolvency proceedings under rules of civil procedure (i.e. measures covering specific assets identified by a creditor). However, the discretionary "collective" relief under article 19 is somewhat more narrow than the relief under article 21.

137.    The reason for the availability of collective measures, albeit in a restricted form, is that relief of a collective nature may be urgently needed already before the decision on recognition in order to protect the assets of the debtor and the interests of the creditors. Exclusion of collective relief would frustrate those objectives. On the other hand, recognition has not yet been granted and, therefore, the collective relief is restricted to urgent and provisional measures. The urgency of the measures is alluded to in the opening words of paragraph (1), while paragraph (1)(a) restricts the stay to execution proceedings, and the measure referred to in paragraph (1)(b) is restricted to perishable assets and assets susceptible to devaluation or otherwise in jeopardy. Otherwise, the measures available under article 19 are essentially the same as those available under article 21.

Paragraph (2)

138.    Laws of many States contain requirements for notice to be given (either by the insolvency administrator upon the order of the court or by the court itself) when relief of the type mentioned in article 19 is granted. Paragraph (2) is the location where the enacting State should make appropriate provision for such notice.

Paragraph (3)

139.    Relief available under article 19 is provisional in that, as provided in paragraph (3), the relief terminates when the application for recognition is decided upon; however, the court is given the opportunity to extend the measure, as provided in article 21(1)(f). The court might wish to do so, for example, to avoid a hiatus between the provisional measure issued before recognition and the measure issued after recognition.

Paragraph (4)

140.    Paragraph (4) pursues the same objective as the one underlying article 30(a), namely that, if there is a foreign main proceeding pending, any relief granted in favour of a foreign non-main proceeding must be consistent (or should not interfere) with the foreign main proceeding. In order to foster such coordination of pre-recognition relief with any foreign main proceeding, the foreign representative applying for recognition is required, by article 15(3), to attach to the application for recognition a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

Prior discussion in the Commission and the Working Group

A/52/17, paras. 34-46 (Commission, 30th session)
A/CN.9/435, paras. 17-23 (Working Group, 21st session)

A/CN.9/433, paras. 110-114 (Working Group, 20th session)
A/CN.9/422, paras. 116, 119, 122-123 (Working Group, 19th session)
A/CN.9/419, paras. 174-177 (Working Group, 18th session)

* * *

### Article 20.  Effects of recognition of a foreign main proceeding

**(1)    Upon recognition of a foreign proceeding that is a foreign main proceeding,**

**(a)  commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities is stayed;**

**(b)  execution against the debtor's assets is stayed; and**

**(c)  the right to transfer, encumber or otherwise dispose of any assets of the debtor is suspended.**

**(2)    The scope, and the modification or termination, of the stay and suspension referred to in paragraph (1) of this article are subject to *[refer to any provisions of law of the enacting State relating to insolvency that apply to exceptions, limitations, modifications or termination in respect of the stay and suspension referred to in paragraph (1) of this article].***

**(3)    Paragraph (1)(a) of this article does not affect the right to commence individual actions or proceedings to the extent necessary to preserve a claim against the debtor.**

**(4)    Paragraph (1) of this article does not affect the right to request the commencement of a proceeding under *[identify laws of the enacting State relating to insolvency]* or the right to file claims in such a proceeding.**

141.    While relief under articles 19 and 21 is discretionary, the effects provided by article 20 are not, i.e. they flow automatically from recognition of the foreign main proceeding.  Another difference between discretionary relief under articles 19 and 21 and the effects under article 20 is that discretionary relief may be issued in favour of main as well as non-main proceedings, while the automatic effects apply only to main proceedings.

142.    In the States where an appropriate court order is needed for the effects of article 20 to become operative, the enacting State, in order to achieve the purpose of the article, should include (perhaps in the opening words of paragraph (1)) language directing the court to issue an order putting into effect the consequences specified in subparagraphs (a), (b) and (c) of paragraph (1).

143.    The automatic consequences envisaged in article 20 are necessary to allow taking steps for organizing an orderly and fair cross-border insolvency proceeding.  In order to achieve those benefits, it is justified to impose on the insolvent debtor the consequences of article 20 in the enacting State (i.e. the country where it maintains a limited business presence), even if the State where the centre of the debtor's main interests is situated poses different (possibly less stringent) conditions for the commencement of insolvency proceedings or even if the automatic effects of

the insolvency proceeding in the country of origin are different from the effects of article 20 in the enacting State. This approach reflects a basic principle underlying the Model Law according to which recognition of foreign proceedings by the court of the enacting State grants effects that are considered necessary for an orderly and fair conduct of a cross-border insolvency. Recognition, therefore, has its own effects rather than importing the consequences of the foreign law into the insolvency system of the enacting State. If recognition should in a given case produce results that would be contrary to the legitimate interests of an interested party, including the debtor, the law of the enacting State should provide possibilities for protecting those interests, as indicated in article 20(2) (and discussed below, in para. 149).

144.    By virtue of article 2(a), the effects of recognition extend also to foreign "interim proceedings". That solution is necessary since, as explained above in paragraph 69, interim proceedings (provided they meet the requisites of article 2(a)), should not be distinguished from other insolvency proceedings merely because they are of an interim nature. If after recognition the foreign "interim proceeding" ceases to have a sufficient basis for the automatic effects of article 20, the automatic stay could be terminated pursuant to the law of the enacting State, as indicated in article 20(2). (See also article 18, which deals with the obligation of the foreign representative "to inform the court promptly of any substantial change in the status of the recognized foreign proceeding or the status of the foreign representative's appointment").

145.    Paragraph (1)(a), by not distinguishing between various kinds of individual actions, also covers actions before an arbitral tribunal. Thus, article 20 establishes a mandatory limitation to the effectiveness of an arbitration agreement. This limitation is added to other possible limitations restricting the freedom of the parties to agree to arbitration which may exist in a national law (e.g. limits as to arbitrability or as to the capacity to conclude an arbitration agreement). Such limitations are not contrary to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (New York, 1958). However, bearing in mind the particularities of international arbitration, in particular its relative independence from the legal system of the State where the arbitral proceeding takes place, it might not always be possible, in practical terms, to implement the automatic stay of arbitral proceedings. For example, if the arbitration does not take place in the enacting State and perhaps also not in the State of the main proceeding it may be difficult to enforce the stay of the arbitral proceedings. Apart from that, the interests of the parties may be a reason for allowing an arbitral proceeding to continue, a possibility that is envisaged in paragraph (2) and left to the provisions of law of the enacting State.

146.    Paragraph (1)(a) refers not only to "individual actions" but also to "individual proceedings" in order to cover, in addition to "actions" instituted by creditors in a court against the debtor or its assets, also enforcement measures initiated by creditors outside the court system, measures that creditors are allowed to take under certain conditions in some States. Paragraph (1)(b) has been added to make it abundantly clear that executions against the assets of the debtor are covered by the stay.

147.    The Model Law does not deal with sanctions that might apply to acts performed in defiance of the suspension of transfers of assets provided under paragraph 20(1)(c). Those sanctions vary among legal systems, and might include criminal sanctions, penalties and fines, or the acts themselves might be void or capable of being set aside. It should be noted that, from the

viewpoint of creditors, the main purpose of such sanctions is to facilitate recovery for the insolvency proceeding of any assets improperly transferred by the debtor and that, for that purpose, the setting aside of such transactions is preferable to the imposition of criminal or administrative sanctions on the debtor.

## Paragraph (2)

148.     Notwithstanding the "automatic" or "mandatory" nature of the effects under article 20, it is expressly provided that the scope of those effects depends on exceptions or limitations that may exist in the law of the enacting State. Those exceptions may be, for example, the enforcement of claims by secured creditors, payments by the debtor in the ordinary course of business, initiation of court actions for claims that have arisen after the commencement of the insolvency proceeding (or after recognition of a foreign main proceeding), or completion of open financial-market transactions.

149.     Sometimes it may be desirable for the court to modify or terminate the effects of article 20. The rules governing the power of the court to do so vary. In some legal systems the courts are authorized to make individual exceptions upon request by an interested party, under conditions prescribed by local law, while in others the courts do not have that power, in line with the principle that, in general, courts do not have the power to set aside the application of a statutory rule of law. If courts are to be given such a power, some legal systems would normally require setting out grounds on which the court could modify or terminate the mandatory effects of recognition under article 20(1). In view of that situation, article 20(2) provides that the modification or termination of the stay and the suspension provided in the article is subject to the provisions of law of the enacting State relating to insolvency.

150.     Generally, it is useful for persons that are adversely affected by the stay or suspension under article 20(1) to have an opportunity to be heard by the court, which should then be allowed to modify or terminate those effects. It would be consistent with the objectives of the Model Law if the enacting State would spell out, or refer to, the provisions that govern this question.

## Paragraph (3)

151.     The Model Law does not address the question whether the limitation period for a claim ceases to run when the claimant is unable to commence individual proceedings as a result of article 20(1)(a). A harmonized rule on that question would not be feasible. However, since it is necessary to protect creditors from losing their claims because of a stay pursuant to article 20(1)(a), paragraph (3) has been added to authorize the commencement of individual actions to the extent necessary to preserve claims against the debtor. Once the claim has been preserved, the action continues to be covered by the stay.

152.     Paragraph (3) might seem unnecessary in a State where a demand for payment or performance served by the creditor on the debtor causes the cessation of the running of the limitation period or where the stay of the kind envisaged in paragraph (1)(a) triggers such cessation. However, also in such States paragraph (3) may still be useful because the question of the cessation of the running of the limitation period might, pursuant to conflict-of-laws rules, be governed by the law of a State other than the enacting State; furthermore, the paragraph would be

useful as assurance to foreign claimants that their claims would not be prejudiced in the enacting State.

Paragraph (4)

153.    Paragraph (4) merely clarifies that the automatic stay and suspension pursuant to article 20 do not prevent anyone, including the foreign representative or foreign creditors, from requesting the commencement of a local insolvency proceeding and to participate in that proceeding. The right to apply to commence a local insolvency proceeding and to participate in it is in a general way dealt with in articles 11, 12 and 13. If a local proceeding is indeed initiated, article 29 deals with the coordination of the foreign and the local proceedings.

Prior discussion in the Commission and the Working Group

A/52/17, paras. 47-60 (Commission, 30th session)
A/CN.9/435, paras. 24-48 (Working Group, 21st session)
A/CN.9/433, paras. 115-126 (Working Group, 20th session)
A/CN.9/422, paras. 94-110 (Working Group, 19th session)
A/CN.9/419, paras. 137-143 (Working Group, 18th session)

* * *

**Article 21.  Relief that may be granted upon recognition of a foreign proceeding**

**(1)    Upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including:**

**(a)  staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities, to the extent they have not been stayed under article 20(1)(a);**

**(b)  staying execution against the debtor's assets to the extent it has not been stayed under article 20(1)(b);**

**(c)  suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under article 20(1)(c);**

**(d)  providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;**

**(e)  entrusting the administration or realization of all or part of the debtor's assets located in this State to the foreign representative or another person designated by the court;**

**(f)  extending relief granted under article 19(1);**

(g)  granting any additional relief that may be available to *[insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State]* under the laws of this State.

(2)  Upon recognition of a foreign proceeding, whether main or non-main, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in this State to the foreign representative or another person designated by the court, provided that the court is satisfied that the interests of creditors in this State are adequately protected.

(3)  In granting relief under this article to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

154.    Post-recognition relief under article 21 is discretionary, as is pre-recognition relief under article 19.   The types of relief listed in paragraph (1) are those that are typical or most frequent in insolvency proceedings; however, the list is not exhaustive in order not to restrict the court unnecessarily in its ability to grant any type of relief that is available under the law of the enacting State and needed in the circumstances of the case.

155.    The explanation relating to the use of the expressions "individual actions" and "individual proceedings" in article 20(1)(a) and to coverage of execution proceedings (see above, paras. 145-146) applies also to article 21(1)(a).

156.    It is in the nature of discretionary relief that the court may tailor it to the case at hand. This idea is reinforced by article 22(2), according to which the court may subject the relief granted to conditions it considers appropriate.

Paragraph (2)

157.    The "turnover" of assets to the foreign representative (or another person), as envisaged in paragraph (2), is discretionary.   It should be noted that the Model Law contains several safeguards designed to ensure the protection of local interests, before assets are turned over to the foreign representative.   Those safeguards include: the general statement of the principle of protection of local interests in article 22(1); the provision in article 21(2) that the court should not authorize the turnover of assets until it is assured that the local creditors' interests are protected; and article 22(2), according to which the court may subject the relief it grants to conditions it considers appropriate.

Paragraph (3)

158.    One salient factor to be taken into account in tailoring the relief is whether it is for a foreign main or non-main proceeding.   It is necessary to bear in mind that the interests and the authority of a representative of a foreign non-main proceeding are typically narrower than the interests and the authority of a representative of a foreign main proceeding, who normally seeks to gain control over all assets of the insolvent debtor. Paragraph (3) reflects that idea by providing (a) that relief granted to a foreign non-main proceeding should be limited to assets that

are to be administered in that non-main proceeding, and (b) if the foreign representative seeks information concerning the debtor's assets or affairs, the relief must concern information required in that proceeding. The objective is to admonish the court that relief in favour of a foreign non-main proceeding should not give unnecessarily broad powers to the foreign representative and that such relief should not interfere with the administration of another insolvency proceeding, in particular the main proceeding.

159.    The proviso "under the law of this State" reflects the principle underlying the Model Law that recognition of a foreign proceeding does not mean extending the effects of the foreign proceeding as they may be prescribed by the law of the foreign State. Rather, recognition of a foreign proceeding entails attaching to the foreign proceeding consequences envisaged by the law of the enacting State.

160.    The idea underlying article 21(3) has been reflected also in article 19(4) (pre-recognition relief), article 29(c) (coordination of a foreign proceeding with a local proceeding) and article 30 (coordination of more than one foreign proceeding).

Prior discussion in the Commission and the Working Group

A/52/17, paras. 61-73 (Commission, 30th session)
A/CN.9/435, paras. 49-61 (Working Group, 21st session)
A/CN.9/433, paras. 127-134, 138-139 (Working Group, 20th session)
A/CN.9/422, paras. 111-113 (Working Group, 19th session)
A/CN.9/419, paras. 148-152, 154-166 (Working Group, 18th session)

* * *

### Article 22. Protection of creditors and other interested persons

(1)    In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph (3) of this article, the court must be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected.

(2)    The court may subject relief granted under article 19 or 21 to conditions it considers appropriate.

(3)    The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or at its own motion, modify or terminate such relief.

161.    The idea underlying article 22 is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief. This balance is essential to achieve the objectives of cross-border insolvency legislation.

162.    The reference to the interests of creditors, the debtor and other interested parties in paragraph (1) provides useful elements to guide the court in exercising its powers under article 19 or 21. In order to allow the court to tailor better the relief, the court is clearly authorized to

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 668 of 882
360

A/CN.9/442
English
Page 48

subject the relief to conditions (para. (2)) and to modify or terminate the relief granted (para. (3)). An additional feature of paragraph (3) is that it expressly gives standing to the parties who may be affected by the consequences of articles 19 and 21 to petition the court to modify and terminate those consequences. Apart from that, the article is intended to operate in the context of the procedural system of the enacting State.

163.    In many cases the affected creditors will be "local" creditors. Nevertheless, in enacting article 22, it is not advisable to attempt to limit it to local creditors. Any express reference to local creditors in paragraph (1) would require a definition of those creditors. An attempt to draft such a definition (and to establish criteria according to which a particular category of creditors might receive special treatment) would not only show the difficulty of crafting such a definition but would also reveal that there is no justification for discriminating creditors on the basis of criteria such as place of business or nationality.

164.    Protection of all interested persons is linked to provisions in national laws on notification requirements; those may be general publicity requirements, designed to apprise potentially interested persons (e.g. local creditors or local agents of a debtor) that a foreign proceeding has been recognized, or there may be requirements for individual notifications which the court, under its own procedural rules, has to issue to persons that would be directly affected by recognition or relief granted by the court. National laws vary as to the form, time and content of notice required to be given of the recognition of foreign proceedings, and the Model Law does not attempt to modify those laws (see also above, para. 132).

Prior discussion in the Commission and the Working Group

A/52/17, paras. 82-93 (Commission, 30th session)
A/CN.9/435, paras. 72-78 (Working Group, 21st session)
A/CN.9/433, paras. 140-146 (Working Group, 20th session)
A/CN.9/422, para. 113 (Working Group, 19th session)

* * *

### Article 23.  Actions to avoid acts detrimental to creditors

**(1)    Upon recognition of a foreign proceeding, the foreign representative has standing to initiate *[refer to the types of actions to avoid or otherwise render ineffective acts detrimental to creditors that are available in this State to a person or body administering a reorganization or liquidation].***

**(2)    When the foreign proceeding is a foreign non-main proceeding, the court must be satisfied that the action relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding.**

165.    Under many national laws both individual creditors and insolvency administrators have a right to bring actions to avoid or otherwise render ineffective acts detrimental to creditors. Such a right, insofar as it pertains to individual creditors, is often not governed by insolvency law but by general provisions of law (such as the Civil Code); the right is not necessarily tied to the existence of an insolvency proceeding against the debtor so that the action may be instituted

prior to the commencement of such a proceeding. The person having such a right is typically only an affected creditor and not another person such as the insolvency administrator. Furthermore, the conditions for these individual-creditor actions are different from the conditions applicable to similar actions that might be initiated by an insolvency administrator. It should be noted that the procedural standing conferred by article 23 extends only to actions that are available to the local insolvency administrator in the context of an insolvency proceeding, and that the article does not equate the foreign representative with individual creditors who may have similar rights under a different set of conditions. Such actions of individual creditors fall outside the scope of article 23.

166.    The Model Law expressly provides that a foreign representative has "standing" (a concept in some systems referred to as "active procedural legitimation", "active legitimation" or "legitimation") to initiate actions to avoid or otherwise render ineffective legal acts detrimental to creditors. The provision is drafted narrowly in that it does not create any substantive right regarding such actions and also does not provide any conflict-of-laws solution. The effect of the provision is that a foreign representative is not prevented from initiating such actions by the sole fact that the foreign representative is not the insolvency administrator appointed in the enacting State.

167.    Granting procedural standing to the foreign representative to institute such actions is not without difficulty. In particular, such actions might not be looked upon favourably because of their potential for creating uncertainty about concluded or performed transactions. However, since the right to commence such actions is essential to protect the integrity of the assets of the debtor and is often the only realistic way to achieve such protection, it has been considered important to ensure that such right would not be denied to a foreign representative on the sole ground that he or she has not been locally appointed.

Prior discussion in the Commission and the Working Group

A/52/17, paras. 210-216 (Commission, 30th session)
A/CN.9/435, paras. 62-66 (Working Group, 21st session)
A/CN.9/433, para. 134 (Working Group, 20th session)

* * *

### Article 24. Intervention by a foreign representative in proceedings in this State

**Upon recognition of a foreign proceeding, the foreign representative may, provided the requirements of the law of this State are met, intervene in any proceedings in which the debtor is a party.**

168.    The purpose of the article is to avoid the denial of standing to the foreign representative "to intervene" in proceedings merely because the procedural legislation may not have contemplated the foreign representative among those having such standing. The article applies to foreign representatives of both main and non-main proceedings.

169.    The word "intervene" in the context of article 20 is intended to refer to the case where the foreign representative appears in court and makes representations in proceedings, whether those proceedings be individual court actions or other proceedings (including extrajudicial proceedings) instituted by the debtor against a third party, or proceedings instituted by a third party against the debtor.  The proceedings where the foreign representative might intervene could only be those that have not been stayed under articles 20(1)(a) or 21(1)(a).

170.    The article, limited to providing procedural standing, makes it clear (by stating "provided the requirements of the law of this State are met") that all other conditions of the local law for a person to be able to intervene remain intact.

171.    Many if not all national procedural laws contemplate cases where a party (the foreign representative in this article) who demonstrates a legal interest in the outcome of a dispute between two other parties may be permitted by the court to be heard in the proceedings.  Those procedural laws refer to such situations by different expressions, among which the expression "intervention" is frequently used.  If the enacting State uses another expression for that concept, the use of such other expression in enacting article 24 would be appropriate.

172.    It should be noted that the expression "participate" as used in the context of article 12 refers to a case where the foreign representative makes representations in a collective insolvency proceeding (see above, para. 102), whereas the expression "intervene" as used in article 24 covers a case where the foreign representative takes part in proceedings concerning an individual action by or against the debtor.

Prior discussion in the Commission and the Working Group

A/52/17, paras. 117-123  (Commission, 30th session)
A/CN.9/435, paras. 79-84  (Working Group, 21st session)
A/CN.9/433, paras. 51, 58 (Working Group, 20th session)
A/CN.9/422, paras. 148-149 (Working Group, 19th session)

\* \* \*

## CHAPTER IV.  COOPERATION WITH FOREIGN COURTS AND FOREIGN REPRESENTATIVES

### Article 25.  Cooperation and direct communication between a court of this State and foreign courts or foreign representatives

**(1)    In matters referred to in article 1, the court shall cooperate to the maximum extent possible with foreign courts or foreign representatives, either directly or through a *[insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State]*.**

**(2)    The court is entitled to communicate directly with, or to request information or assistance directly from, foreign courts or foreign representatives.**

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 671 of 882

363

A/CN.9/442
English
Page 51

**Article 26.  Cooperation and direct communication between the *[insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State]* and foreign courts or foreign representatives**

(1)    In matters referred to in article 1, a *[insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State]* shall, in the exercise of its functions and subject to the supervision of the court, cooperate to the maximum extent possible with foreign courts or foreign representatives.

(2)    The *[insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State]* is entitled, in the exercise of its functions and subject to the supervision of the court, to communicate directly with foreign courts or foreign representatives.

**Article 27.  Forms of cooperation**

Cooperation referred to in articles 25 and 26 may be implemented by any appropriate means, including:

(a)    appointment of a person or body to act at the direction of the court;

(b)    communication of information by any means considered appropriate by the court;

(c)    coordination of the administration and supervision of the debtor's assets and affairs;

(d)    approval or implementation by courts of agreements concerning the coordination of proceedings;

(e)    coordination of concurrent proceedings regarding the same debtor;

(f)    *[the enacting State may wish to list additional forms or examples of cooperation]*.

Chapter IV as a whole

173.    Chapter IV (arts. 25-27) on cross-border cooperation is a core element of the Model Law.  Its objective is to enable courts and insolvency administrators from two or more countries to be efficient and achieve optimal results.  Cooperation as described in the chapter is often the only realistic way, for example, to prevent dissipation of assets; to maximize the value of assets (e.g. when items of production equipment located in two States are worth more if sold together than if sold separately); or to find the best solutions for the reorganization of the enterprise.

174.    Articles 25 and 26 not only authorize cross-border cooperation, they also mandate it by providing that the court and the insolvency administrator "shall cooperate to the maximum extent possible".  These articles are designed to overcome a widespread lack in national laws of rules providing a legal basis for cooperation by local courts with foreign courts in dealing with

cross-border insolvencies. Enactment of such a legal basis would be particularly helpful in legal systems in which the discretion given to judges to operate outside areas of express statutory authorization is limited. However, even in jurisdictions in which there is a tradition of wider judicial latitude, enactment of a legislative framework for cooperation has proven to be useful.

175.    To the extent that cross-border judicial cooperation in the enacting State is based on principles of comity among nations, the enactment of articles 25 to 27 offers an opportunity for making this principle more concrete and adapted to the particular circumstances of cross-border insolvencies.

176.    In the States in which the proper legal basis for international cooperation in the area of cross-border insolvency is not the principle of "comity", but an international agreement (e.g. a bilateral or multilateral treaty or an exchange of letters between the cooperating authorities) based on the principle of reciprocity, chapter IV of the Model Law may serve as a model for the elaboration of such international cooperation agreements.

177.    The articles leave the decision as to when and how to cooperate to the courts and, subject to the supervision of the courts, to the insolvency administrators. For a court (or a person or body referred to in articles 25 and 26) to cooperate with a foreign court or a foreign representative regarding a foreign proceeding, the Model Law does not require a previous formal decision to recognize that foreign proceeding.

178.    The ability of courts, with appropriate involvement of the parties, to communicate "directly" and to request information and assistance "directly" from foreign courts or foreign representatives is intended to avoid the use of time consuming procedures traditionally in use, such as letters rogatory. This ability is critical when the courts consider that they should act with urgency. In order to emphasize the flexible and potentially urgent character of cooperation, the enacting State may find it useful to include in the enactment of the Model Law  an express provision that would authorize the courts, when they engage in cross-border communications under article 25, to forgo use of the formalities (e.g. communication via higher courts, letters rogatory or other diplomatic or consular channels) that are inconsistent with the policy behind the provision.

179.    The importance of granting the courts flexibility and discretion in cooperating with foreign courts or foreign representatives was emphasized at the Second UNCITRAL-INSOL Multinational Judicial Colloquium on Cross-Border Insolvency. At that Colloquium, reports of a number of cases in which judicial cooperation in fact occurred were given by the judges involved in the cases. From those reports a number of points emerged, which might be summarized as follows: (a) communication between courts is possible, but should be done carefully and with appropriate safeguards for the protection of substantive and procedural rights of the parties; (b) communication should be done openly, with advance notice to the parties involved and in the presence of those parties, except in extreme circumstances; (c) communications that might be exchanged are various and include: exchanges of formal court orders or judgments; supply of informal writings of general information, questions and observations; and transmission of transcripts of court proceedings; (d) means of communication include, for example, telephone, facsimile, electronic-mail facilities and video; and (e) where communication is necessary and is intelligently used, there could be considerable benefits for the persons involved in, and affected

by, the cross-border insolvency.  The Colloquium was held from 22 to 23 March 1997 in conjunction with the 5th World Congress of the International Association of Insolvency Practitioners (INSOL) (New Orleans, 23 to 26 March 1997).  A brief account of the Colloquium appears in document A/52/17, paragraphs 17-22.

Article 26

180.    Inclusion of article 26 on international cooperation between persons who are appointed to administer assets of insolvent debtors reflects the important role that such persons can play in devising and implementing cooperative arrangements, within the parameters of their authority. The provision makes it clear that an insolvency administrator acts under the overall supervision of the competent court (by stating "in the exercise of its functions and subject to the supervision of the court").  The Model Law does not modify the rules already existing in the insolvency law of the enacting State on the supervisory functions of the court over the activities of the insolvency administrator.  Generally, a certain degree of latitude and initiative of administrators, within the broad confines of judicial supervision, are mainstays of cooperation in practical terms; it is therefore advisable that the enacting State does not change that in enacting the Model Law. In particular, there should be no suggestion that ad hoc authorization would be needed for each communication between the administrator and a foreign body.

Article 27

181.    Article 27 is suggested to be used by the enacting State to provide courts with an indicative list of the types of cooperation that are authorized by articles 25 and 26.  Such an indicative listing may be particularly helpful in States with a limited tradition of direct cross-border judicial cooperation, and in States where judicial discretion has traditionally been limited. Any listing of forms of possible cooperation should not purport to be exhaustive, as this might inadvertently preclude certain forms of appropriate cooperation.

182.    The implementation of cooperation would be subject to any mandatory rules applicable in the enacting State; for example, in the case of requests for information, rules restricting the communication of information (e.g. for reasons of protection of privacy) would apply.

183.    Subparagraph (f) of article 27 is a slot where the enacting State may include additional forms of possible cooperation.  Those might include, for example, suspension or termination of existing proceedings in the enacting State.

Prior discussion in the Commission and the Working Group

A/52/17, paras. 124-129  (Commission, 30th session)
A/CN.9/435, paras. 85-94  (Working Group, 21st session)
A/CN.9/433, paras. 164-172 (Working Group, 20th session)
A/CN.9/422, paras 129-143 (Working Group, 19th session)
A/CN.9/419, paras. 75-76, 80-83, 118-133 (Working Group, 18th session)

* * *

## CHAPTER V.  CONCURRENT PROCEEDINGS

**Article 28.  Commencement of a proceeding under [identify laws of the enacting State relating to insolvency] after recognition of a foreign main proceeding**

**After recognition of a foreign main proceeding, a proceeding under [identify laws of the enacting State relating to insolvency] may be commenced only if the debtor has assets in this State; the effects of that proceeding shall be restricted to the assets of the debtor that are located in this State and, to the extent necessary to implement cooperation and coordination under articles 25, 26 and 27, to other assets of the debtor that, under the law of this State, should be administered in that proceeding.**

184.     Article 28, in conjunction with article 29, provides that recognition of a foreign main proceeding will not prevent the commencement of a local insolvency proceeding concerning the same debtor as long as the debtor has assets in the State.

185.     The position taken in article 28 is in substance the same as the position taken in a number of States.  However, in some States for the court to have jurisdiction to commence a local insolvency proceeding, the mere presence of assets in the State is not sufficient.  For such jurisdiction to exist, the debtor must be engaged in an economic activity in the State (to use the terminology of the Model Law, the debtor must have an "establishment" in the State, as defined in article 2(f)).  The Model Law opted in this article for the less restrictive solution in a context where the debtor is already involved in a foreign main proceeding.  While the solution leaves a broad ground for commencing a local proceeding after recognition of a foreign main proceeding, it serves the purpose of indicating that if the debtor has no assets in the State there is no jurisdiction for commencing an insolvency proceeding.

186.     Nevertheless, the enacting State may wish to adopt the more restrictive solution, i.e. allowing the initiation of the local proceeding only if the debtor has an "establishment" in the State.  The rationale may be that, when the assets in the enacting State are not part of an establishment, the commencement of a local proceeding would typically not be the most efficient way to protect the creditors, including local creditors.  By tailoring relief to be granted to the foreign main proceeding and cooperating with the foreign court and foreign representative, the court in the enacting State would have sufficient opportunities to ensure that the assets in the State would be administered in such a way that local interests would be adequately protected.  Therefore, the enacting State would act in line with the philosophy of the Model Law if it enacts the article by replacing the words "only if the debtor has assets in this State", as they currently appear in article 28, with the words "only if the debtor has an establishment in this State".

187.     Ordinarily, the local proceeding of the kind envisaged in the article would be limited to the assets located in the State.  However, in some situations a meaningful administration of the local insolvency proceeding may have to include certain assets abroad, especially when there is no foreign proceeding necessary or available in the State where the assets are situated (for example: where the local establishment would have an operating plant in a foreign jurisdiction; where it would be possible to sell the debtor's assets in the enacting State and the assets abroad as a "going concern"; or where assets were fraudulently transferred abroad from the enacting State).  In order to allow such limited cross-border reach of a local proceeding, the article

includes at the end of paragraph (1) the words "and such other property as may be appropriately administered within the proceedings in this State". Two restrictions have been included in the article concerning the possible extension of effects of a local proceeding to assets located abroad: firstly, the extension is permissible "to the extent necessary to implement cooperation and coordination under articles 25, 26 and 27", and, secondly, those foreign assets must be subject to administration in the enacting State "under the law of [the enacting State]". Those restrictions are useful in order to avoid creating an open-ended faculty to extend the effects of a local proceeding to assets located abroad, a faculty that would generate uncertainty as to the application of the provision and may lead to conflicts of jurisdiction.

Prior discussion in the Commission and the Working Group

A/52/17, paras. 94-101 (Commission, 30th session)
A/CN.9/435, paras. 180-183  (Working Group, 21st session)
A/CN.9/433, paras. 173-181 (Working Group, 20th session)
A/CN.9/422, paras. 192-197 (Working Group, 19th session)

* * *

## Article 29.  Coordination of a proceeding under *[identify laws of the enacting State relating to insolvency]* and a foreign proceeding

**Where a foreign proceeding and a proceeding under *[identify laws of the enacting State relating to insolvency]* are taking place concurrently regarding the same debtor, the court shall seek cooperation and coordination under articles 25, 26 and 27, and the following shall apply:**

**(a)  when the proceeding in this State is taking place at the time the application for recognition of the foreign proceeding is filed,**

> **(I)    any relief granted under article 19 or 21 must be consistent with the proceeding in this State; and**

> **(ii)   if the foreign proceeding is recognized in this State as a foreign main proceeding, article 20 does not apply;**

**(b)  when the proceeding in this State commences after recognition, or after the filing of the application for recognition, of the foreign proceeding,**

> **(I)    any relief in effect under article 19 or 21 shall be reviewed by the court and shall be modified or terminated if inconsistent with the proceeding in this State; and**

> **(ii)   if the foreign proceeding is a foreign main proceeding, the stay and suspension referred to in article 20(1) shall be modified or terminated pursuant to article 20(2) if inconsistent with the proceeding in this State;**

    (c)  **in granting, extending or modifying relief granted to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.**

188.    The article gives guidance to the court that deals with cases where the debtor is subject to a foreign proceeding and a local proceeding at the same time.  The opening words of the provision direct the court that in all such cases it must seek cooperation and coordination pursuant to chapter IV of the Model Law, i.e. articles 25, 26 and 27.

189.    The salient principle embodied in this article is that the commencement of a local proceeding does not prevent or terminate the recognition of a foreign proceeding.  This principle is essential for achieving the objectives of the Model Law in that it allows the court in the enacting State in all circumstances to provide relief in favour of the foreign proceeding.

190.    However, the article maintains a pre-eminence of the local proceeding over the foreign proceeding.  This has been done in the following ways: firstly, any relief to be granted to the foreign proceeding must be consistent with the local proceeding (subpara. (a)(I)); secondly, any relief that has already been granted to the foreign proceeding must be reviewed and modified or terminated to ensure consistency with the local proceeding  (subpara. (b)(I)); thirdly, if the foreign proceeding is a main proceeding, the automatic effects pursuant to article 20 are to be modified and terminated if inconsistent with the local proceeding (those automatic effects do not terminate automatically since they may be beneficial, and the court may wish to maintain them) (subpara. (b)(ii)); fourthly, where a local proceeding is pending at the time a foreign proceeding is recognized as a main proceeding, the foreign proceeding does not enjoy the automatic effects of article 20 (subpara. (a)(ii)).  The article avoids establishing a rigid hierarchy between the proceedings since that would unnecessarily hinder the ability of the court to cooperate and exercise its discretion under articles 19 and 21.  It is desirable not to restrict that latitude of the court when the article is enacted.

191.    Subparagraph (c) incorporates the principle that relief granted to a foreign non-main proceeding should be limited to assets that are to be administered in that non-main proceeding or must concern information required in that proceeding. .This principle is expressed in article 21(3) (which deals in a general way with the type of relief that may be granted to a foreign representative) and is restated in this article (which deals with coordination of local and foreign proceedings).  Article 19(4) (on pre-recognition relief) and article 30 (on coordination of more than one foreign proceeding) are inspired by the same principle.  (See also comments above, para. 140).

Prior discussion in the Commission and the Working Group

A/52/17, paras. 106-110 (Commission, 30th session)
A/CN.9/435, paras. 190-191 (Working Group, 21st session)

* * *

23-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 677 of 882

369

A/CN.9/442
English
Page 57

## Article 30.  <u>Coordination of more than one foreign proceeding</u>

**In matters referred to in article 1, in respect of more than one foreign proceeding regarding the same debtor, the court shall seek cooperation and coordination under articles 25, 26 and 27, and the following shall apply:**

**(a)  any relief granted under article 19 or 21 to a representative of a foreign non-main proceeding after recognition of a foreign main proceeding must be consistent with the foreign main proceeding;**

**(b)  if a foreign main proceeding is recognized after recognition, or after the filing of an application for recognition, of a foreign non-main proceeding, any relief in effect under article 19 or 21 shall be reviewed by the court and shall be modified or terminated if inconsistent with the foreign main proceeding;**

**(c)  if, after recognition of a foreign non-main proceeding, another foreign non-main proceeding is recognized, the court shall grant, modify or terminate relief for the purpose of facilitating coordination of the proceedings.**

192.    The article deals with cases where the debtor is subject to insolvency proceedings in more than one foreign State and foreign representatives of more than one foreign proceeding seek recognition or relief in the enacting State.  The provision applies whether or not an insolvency proceeding is pending in the enacting State.  If in addition to two or more foreign proceedings there is a proceeding in the enacting State, the court will have to act pursuant to both articles 29 and 30.

193.    The objective of article 30 is similar to the objective of article 29 in that the key issue in the case of concurrent proceedings is to promote cooperation, coordination and consistency of relief granted to different proceedings.  Such consistency will be achieved by appropriate tailoring of relief to be granted or by modifying or terminating relief already granted.  Unlike article 29 (which as a matter of principle gives primacy to the local proceeding), article 30 gives preference to the foreign main proceeding if there is one.  In the case of more than one foreign non-main proceeding, the provision does not *a priori* treat any foreign proceeding preferentially.  Priority for the foreign main proceeding is reflected in the requirement that any relief in favour of a foreign non-main proceeding (whether already granted or to be granted) must be consistent with the foreign main proceeding (subparas. (a) and (b)).

<u>Prior discussion in the Commission</u>

A/52/17, paras. 111-112 (Commission, 30th session)

* * *

### Article 31.  Presumption of insolvency based on recognition of a foreign main proceeding

**In the absence of evidence to the contrary, recognition of a foreign main proceeding is, for the purpose of commencing a proceeding under *[identify laws of the enacting State relating to insolvency]*, proof that the debtor is insolvent.**

194.    In some jurisdictions proof that the debtor is insolvent is required for the commencement of insolvency proceedings.  In other jurisdictions insolvency proceedings may be commenced under specific circumstances defined by law which do not necessarily mean that the debtor is in fact insolvent; those circumstances may be, for example, cessation of payments by the debtor or certain actions of the debtor such as a corporate decision, dissipation of its assets or abandonment of its establishment.

195.    In jurisdictions where insolvency is a condition for commencing insolvency proceedings, article 31 establishes, upon recognition of a foreign main proceeding, a rebuttable presumption of insolvency of the debtor for the purposes of commencing an insolvency proceeding in the enacting State.  The presumption does not apply if the foreign proceeding is a non-main proceeding.  The reason is that an insolvency proceeding commenced in a State other than the State where the debtor has the centre of its main interests does not necessarily mean that the debtor is to be subject to laws relating to insolvency in other States.

196.    For the national laws where proof that the debtor is insolvent is not required for the commencement of insolvency proceedings, the presumption established in article 31 may be of little practical significance and the enacting State may decide not to enact it.

197.    The article would have particular significance when proving insolvency as the prerequisite for an insolvency proceeding would be a time-consuming exercise and of little additional benefit bearing in mind that the debtor is already in an insolvency proceeding in the State where it has the centre of its main interests and the commencement of a local proceeding may be urgently needed for the protection of local creditors.  Nonetheless, the court of the enacting State is not bound by the decision of the foreign court, and local criteria for demonstrating insolvency remain operative, as is clarified by the words  "in the absence of evidence to the contrary".

Prior discussion in the Commission and the Working Group

A/52/17, paras. 94, 102-105 (Commission, 30th session)
A/CN.9/435, paras. 180, 184 (Working Group, 21st session)
A/CN.9/433, paras. 173, 180-189 (Working Group, 20th session)
A/CN.9/422, para. 196 (Working Group, 19th session)

* * *

## Article 32.  Rule of payment in concurrent proceedings

**Without prejudice to secured claims or rights *in rem*, a creditor who has received part payment in respect of its claim in a proceeding pursuant to a law relating to insolvency in a foreign State may not receive a payment for the same claim in a proceeding under *[identify laws of the enacting State relating to insolvency]* regarding the same debtor, so long as the payment to the other creditors of the same class is proportionately less than the payment the creditor has already received.**

198.    The rule set forth in article 32 (sometimes referred to as the "hotchpot" rule) is a useful safeguard in a legal regime for coordination and cooperation in the administration of cross-border insolvency proceedings.  It is intended to avoid situations in which a creditor might obtain more favourable treatment than the other creditors of the same class by obtaining payment of the same claim in insolvency proceedings in different jurisdictions.  For example, an unsecured creditor has received 5 percent of its claim in a foreign insolvency proceeding; that creditor also participates in the insolvency proceeding in the enacting State, where the rate of distribution is 15 percent; in order to put the creditor in the equal position as the other creditors in the enacting State, the creditor would receive 10 percent of its claim in the enacting State.

199.    The article does not affect the ranking of claims as established by the law of the enacting State, and is solely intended to establish the equal treatment of creditors of the same class.  To the extent claims of secured creditors or creditors with rights *in rem* are paid in full (a matter that depends on the law of the State where the proceeding is conducted), those claims are not affected by the provision.

200.    The expression "secured claims" is used to refer generally to claims guaranteed by particular assets, while the words "rights *in rem*" are intended to indicate rights relating to a particular property that are enforceable also against third parties.  A given right may fall within the ambit of both expressions, depending on the classification and terminology of the applicable law.  The enacting State may use another term or terms for expressing these concepts.

Prior discussion in the Commission and the Working Group

A/52/17, paras. 130-134 (Commission, 30th session)
A/CN.9/435, paras. 96, 197-198 (Working Group, 21st session)
A/CN.9/433, paras. 182-183 (Working Group, 20th session)
A/CN.9/422, paras. 198-199 (Working Group, 19th session)
A/CN.9/419, paras. 89-93 (Working Group, 18th session)

* * *

# VI.  ASSISTANCE FROM THE UNCITRAL SECRETARIAT

(a)    Assistance in drafting legislation

201.    The UNCITRAL Secretariat may assist States with technical consultations for the preparation of legislation based on the Model Law.  Further information may be obtained from: the UNCITRAL Secretariat, Vienna International Centre, P.O. Box 500, A-1400 Vienna, Austria; telephone (43-1) 21345-4060; fax (43-1) 21345-5813 (but note that some time during 1998 the number 21345 will be changed to 26060); electronic mail: uncitral@unov.un.or.at; Internet home page: http://www.un.or.at/uncitral.

(b)    Information on interpretation of legislation based on the Model Law

202.    Once enacted, the Model Law will be included in the system for collecting and disseminating information on case law relating to the Conventions and Model Laws that have emanated from the work of the Commission (Case Law on UNCITRAL Texts (CLOUT)).  The purpose of the system is to promote international awareness of the legislative texts formulated by the Commission and to facilitate their uniform interpretation and application.  The Secretariat publishes, in the six languages of the United Nations, abstracts of decisions and makes available, against reimbursement of copying expenses, the original decisions on the basis of which the abstracts were prepared.  The system is explained in document A/CN.9/SER.C/GUIDE/1, available from the Secretariat and at the Internet home page indicated in the preceding paragraph.

* * *

# EXHIBIT 373

ANNEX A - SUMMARY OF FEEDBACK FROM THE PUBLIC CONSULTATION ON THE
INSOLVENCY LAW REVIEW COMMITTEE (ILRC) REPORT AND MINLAW'S RESPONSE
Chapter 2: A New Insolvency Act

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| 2.1 | Consolidation of Bankruptcy and Corporate Insolvency Laws into a single piece of omnibus legislation. | <u>Supportive</u><br><br>Agrees with Recommendation. | MinLaw agrees with the Recommendation. |
| 2.3 | Insolvency Act should be general and not industry specific. | <u>Supportive</u><br><br>Entities operating in highly regulated sectors ought to have special regimes designed to address particular industry specific issues. These entities include banks and insurance companies.<br><br><u>Supportive but,</u><br><br>Suggests that it should be possible to bankrupt a foreign individual, but there should be a threshold to prevent frivolous applications. | MinLaw agrees with the Recommendation and the views expressed in the feedback. There is no intention for the new Insolvency Act to have regimes designed to address industry specific issues. Provisions that are applicable for specific industries to address industry specific issues will remain in specialised legislation relating to that industry.<br><br>Singapore courts already have the power to bankrupt a foreign individual, where criteria under section 60(1) of the Bankruptcy Act are satisfied. The requirements prevent foreigners who have no presence or property in Singapore from being made bankrupts, as administration of such estates only depletes resources without any real benefit to creditors. MinLaw does not intend to change this. |
|  |  | <u>Other / Neutral</u><br><br>Query on whether the proposed reforms will impact the Co-operative Societies Act and the Mutual Benefit Organisation Act | The New Insolvency Act will only cover individuals and companies for now, and will not cover particular industries that have specialised legislation (e.g. banks and insurers) as well as non-corporate bodies (e.g. co-operatives, societies and mutual benefit organisations). |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| | | The new Insolvency Act should also address Limited Liability Partnerships. | The New Insolvency Act will, for the time being, apply to the insolvency regimes of natural persons and companies incorporated under the Companies Act. The issue of whether the insolvency regimes for other legal entities and organisations may be brought under the ambit of the New Insolvency Act may be considered at a later time.  Consistent with this, the rules for the receivership and winding up of a limited liability partnership will remain under the Limited Liability Partnerships Act (Cap. 163A).   Where existing provisions of the Bankruptcy Act refer to a limited liability partnership, these will be ported over to the New Insolvency Act as well. |
| 2.4 | (d)  Interest should be provable at the contractual rate up till 3 years prior to the commencement of liquidation, judicial management or bankruptcy and capitalisation allowed if contractually provided for. Interest within the 3 years prior to commencement of bankruptcy or liquidation will be subject to the rule against capitalisation and statutory cap. | <u>Others</u><br><br>This rule should not be applied in judicial management as there is no logical reason why simply because interest ceases to run against the company in liquidation it should also cease to run in judicial management.<br><br>In liquidation, the date of the winding up order or passing of the resolution of winding up should be adopted as the date in respect of which the rule against capitalisation and the cap on interest should be calculated upon. | See below for a combined response. |
| | | <u>Not Supportive</u><br><br>Process seems to be unnecessarily complicated. The exclusion of contractual interest for any period up until 3 years prior to the insolvency seems harsh, where there are mechanisms in | There are reasons for and against the current statutory cap and rule against capitalisation.<br><br>MinLaw notes that in the context of liquidation/bankruptcy, the statutory cap and rule against capitalisation give rise to the difficulty of re-calculating interest for the proof of debt.  It is a source of |

2

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---------|----------------|-------------------|----------------------------|
| | | place to challenge extortionate rates.<br><br>It is strange that creditors who can claim for the full principal outstanding are limited from claiming contractually agreed interest on commercial terms, which may have accrued up to the commencement of liquidation.<br><br>The approach of calculating interest under proofs of debts in the UK does not give rise to any issues in practice.<br><br>There are certain limited circumstances where estates may have sufficient realisations to pay interest. | substantial work, delay and expense.  Most commercial transactions also carry higher interest rates than the statutory cap, and it may not be commercially sensible to force creditors to adopt lower interest rates from those contractually agreed. Other jurisdictions such as UK and Australia do not adopt this practice.<br><br>On the other hand, as noted in the Report, there may be a practice or tendency for governing contracts to allow creditors to charge interest at high contractual or default rates, capitalise interest into the principal and/or charge compound interest.  In the context of bankruptcy, the restrictions also protect consumer debtors who may face high default interest rates if institutional creditors can claim the full interest owed.  While applications may be made to the Court to strike down extortionate rates of interest, that approach may engender some uncertainty, as there will be no useful reference for when a claim for interest is extortionate.  In contrast, a statutory cap and rule against capitalisation provides a "bright line" rule.  The time period of 3 years from the commencement of the liquidation/bankruptcy accords with the relevant time for avoidance provisions to apply in respect of an extortionate credit transaction in a liquidation/bankruptcy.<br><br>MinLaw will continue to consider these arguments before coming to a position on the rule against capitalisation and whether the statutory cap should be retained in bankruptcy and liquidation.<br>However, for the judicial management regime, there is no similar |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| | | | statutory cap and it appears from case law that the rule against the capitalisation of interest should not apply in that regime.[1]  Unlike liquidation, the company is not in a state of insolvency and may be revived, thus limiting contractual rights may prejudice creditors. |
| 2.5 | Rule on realisation of security should apply to both corporate and individual insolvency. In the context of liquidation, default period should be extended to 1 year. Rule on realisation of security should also be extended to judicial management, if leave is granted by the Court or judicial manager. | Supportive but, <br><br>Queried whether period of time should be extended further. Certain assets, which form a significant part of a particular market, may be difficult to dispose of within 12 months. | The recommended default time limit of 1 year may be extended by the Official Receiver or liquidator or upon application to court. |
| 2.7 | Employee vacation leave as a preferential debt should be capped at $7,500. | Supportive but, <br><br>Suggest that this change be made in subsidiary legislation to enable it to be amended in the future. <br><br>The cap on remuneration payable for vacation leave as a preferential debt should be raised to $10,000, to be in line with revisions to the cap for preferential debts in respect of salary in the Proposed Additional Amendments to the Companies Act. | MinLaw intends that the cap on remuneration payable for vacation leave be subject to section 328(2A), which will allow the Minister to make future amendments by way of an order in the Gazette. <br><br>MinLaw intends that the cap on remuneration payable for vacation leave will be the same as the cap for preferential debt in respect of salary. |

---

[1] *Re Boonann Construction Pte Ltd* [2000] 2 SLR(R) 339 states that in contrast to liquidation, contractual interest rates will apply when calculating the proof of debt, and will continue to run after the date of the judicial management order, and there is no reason to deprive creditors of those contractual rights.  Following that logic, the rule against the capitalisation of interest should likewise not apply in a judicial management.

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| N.a. | N.a. | <u>Carve-outs and Safe-harbour provisions</u><br><br>Suggests that there should be provisions which give powers to enable the Minister (or other appropriate body) to make regulations to allow carve outs or safe-harbour provisions either unconditionally or on terms from some or all of the provisions of the New Insolvency Act. | MinLaw is of the view that carve outs or safe-harbour provisions ought to be made through a full legislative process to allow careful consideration of all policy issues and to ensure that views of all stakeholders are obtained.  It would therefore be inappropriate for carve outs or safe-harbour provisions to be made by way of regulation.<br><br>Insofar as the feedback has raised specific examples of financial transactions that may require carve-outs and safe-harbour provisions, MinLaw has forwarded the feedback to the relevant government agencies. |

<u>ANNEX A - SUMMARY OF FEEDBACK FROM THE PUBLIC CONSULTATION ON THE</u>
<u>INSOLVENCY LAW REVIEW COMMITTEE (ILRC) REPORT AND MINLAW'S RESPONSE</u>
<u>Chapter 3: Bankruptcy</u>

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| 3.1 | Individual Voluntary Arrangement and Debt Repayment Scheme ("DRS") regimes should be adopted. | <u>Neutral / Others</u><br><br>Suggests that if it is clear that total unsecured debts of a debtor exceeds S$100,000 there should be no need to refer the case to the Official Assignee for consideration for DRS. | MinLaw accepts that the court should have discretion to not refer a case for consideration for DRS if it is satisfied that the debt or the aggregate of the debts of the debtor exceeds $100,000. |
| 3.2 | Current procedural provisions on proceedings in bankruptcy can be largely adopted. An expedited bankruptcy application procedure should be included. | <u>Supportive</u><br><br>There is a mechanism to obtain an earlier date on an urgent basis, but this should be specifically legislated. | MinLaw agrees with the Recommendation. |
| 3.3 | Non-automatic vesting of property acquired after bankruptcy order but before discharge should not be adopted. | <u>Supportive</u><br>The automatic vesting of property helps clarify the OA has *locus standi* for dealing with creditors. | MinLaw agrees with the Recommendation. |
| 3.7 | Amendments to s. 131 to clarify that OA's sanction is required for bankrupt to defend any action, including those commenced or continued with leave of Court pursuant to s. 76(1)(c). Amendment to s. 131 to clarify that "action" includes arbitration proceedings. Section 131 does not apply to criminal and matrimonial | <u>Supportive</u><br><br>This amendment will provide greater clarity regarding the when OA approval is required for a bankrupt to defend legal proceedings. | MinLaw agrees with the Recommendation. |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| | proceedings but bankrupts need to inform OA of such proceedings promptly. | | |
| N.a. | No recommendation is made on whether to introduce an automatic discharge regime, but the current discharge system should be reviewed and fine-tuned. | <u>Supportive</u><br><br>A system that discharges bankrupts without regard to facts and circumstances is inappropriate.<br><br>Careful assessment of the cause of bankruptcy is needed before discharge is given in order not to encourage careless, irresponsible spending, gambling habits or even cheats and scams.<br><br>A bankrupt should not be discharged based on a rigid set of criteria as the need to clear up the administration of bankruptcies cannot trump the need for justice to be upheld.<br><br>However, there should be sympathy for bankrupts engaged in entrepreneurial activities. | MinLaw is currently reviewing the bankruptcy discharge regime. A separate consultation will be held for these reforms. |
| N.a. | | <u>Not Supportive</u><br>An automatic discharge regime should be introduced.<br><br>It has been suggested for the period of time before automatic discharge is granted was between 3 to 7 years. | |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---------|----------------|-------------------|----------------------------|
|  |  | The reasons given in support of automatic discharge included:<br><br>(a) Automatic discharge would encourage entrepreneurs to engage in entrepreneurial activities;<br>(b) Financial institutions should be made to take greater responsibilities on their loan controls and bear the risk of non-payment;<br>(c) A lack of automatic discharge gave the impression that a bankrupt can remain in bankruptcy forever;<br>(d) Automatic discharge gives bankrupts a second chance and allows bankrupts to think of and plan for a future after bankruptcy;<br>(e) The lack of an automatic discharge hurts poor people who cannot afford lawyers or pay their debts, are likely to stay bankrupt all their lives. |  |
| N.a. |  | <u>Others</u><br><br>Different causes of bankruptcy should be taken into consideration:<br><br>Automatic discharge may be appropriate in cases where there is no fraud and the bankrupt is not recalcitrant and has made genuine attempts to repay the amounts owed by him. |  |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---------|----------------|-------------------|----------------------------|
| | | Automatic discharge may not be appropriate for bankruptcies arising out of (i) personal guarantees given to banks as this would lessen the value that banks place on personal guarantees; and (ii) wilful or negligent incurring of excessive credit, as being too lenient in such cases may cause people to be irresponsible in their financial planning.<br><br>Suggested to have a monetary threshold that the bankrupt would have to repay before being considered for automatic discharge. The threshold should determine based on the quantum of a bankrupt's debts and bankrupt's assets and earning capacity. This threshold should be agreed by creditors.<br><br>A bankrupt who is a primary borrower to a loan should not be discharged if a person who has given personal guarantees on the same loan is still a bankrupt. | |

**ANNEX A - SUMMARY OF FEEDBACK FROM THE PUBLIC CONSULTATION ON THE
INSOLVENCY LAW REVIEW COMMITTEE (ILRC) REPORT AND MINLAW'S RESPONSE**
**Chapter 4: Receivership**

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| N.a. | N.a. | Inconsistency of sections 226(1) and 328(5) CA<br><br>Under section 226(1) CA (and where there is no winding up), it appears that the costs and expenses of receivership enjoy priority over preferential creditors. However, if the company is wound up, section 328(5) CA provides that certain preferential creditors rank ahead of claims of the debenture holder, which could include the costs and expenses of the receiver. Suggests that the priorities should remain the same whether or not there is a winding up. | It is intended that the priority of a receiver's remuneration remains the same whether the company is wound up or not, and this will be taken up in the drafting of the new Insolvency Act. |

ANNEX A - SUMMARY OF FEEDBACK FROM THE PUBLIC CONSULTATION ON THE
INSOLVENCY LAW REVIEW COMMITTEE (ILRC) REPORT AND MINLAW'S RESPONSE
Chapter 5: The Liquidation Regime

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| 5.1 | A summary liquidation regime should be adopted for cases where realisable assets are insufficient to cover expenses of liquidation and affairs of company do not require further investigations. | Supportive<br><br>Objecting creditors should be made to place funds to further the liquidation. This would weed out frivolous actions that impede the finalisation of the liquation and ensure that the funding creditors are committed in assisting the liquidator. | MinLaw is of the view that the summary liquidation provisions should allow an objecting creditor, who disagrees with a liquidator's decision to proceed with summary liquidation, to apply to court for directions. The court hearing the facts of each application would be best-placed to make the appropriate order in each case, which may include ordering the creditor to fund the liquidator. |
| | | There should be a requirement for an advertisement to be placed in Government Gazette when there is an intention to seek early dissolution so it can be communicated to relevant stakeholders. | Under the proposed early dissolution regime, there will be a requirement to serve, on the creditors and contributories, a notice of intention to seek early dissolution. MinLaw is of the view that this will be sufficient to bring the matter to the attention of the relevant stakeholders and a separate advertisement is not necessary. |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| 5.2 | Official Receiver to remain as liquidator of last resort, but be empowered to outsource liquidations to private liquidators. | <u>Supportive</u><br><br>If OR appoints a private liquidator, the normal rules of Court-ordered winding-up should apply. | Where the Official Receiver outsources a liquidation to a private liquidator, the case remains a court-ordered winding-up, such that the normal rules of a court-ordered winding up will apply.<br><br>In respect of the Official Receiver's role as the liquidator of last resort, MinLaw is of the view that the Official Receiver ought to move away from administering liquidations as liquidator, save for cases which are in the public interest or where the Official Receiver consents to be liquidator. |
| 5.3 | Section 328(1)(a) should be amended to confer priority on OR's fees (or expenses and fees of private liquidators, if outsourced) ahead of the other debts in the same section. | <u>Neutral / Other</u><br><br>A receiver's remuneration and expenses should rank equally with the security holder as well as preferential claims. | MinLaw accepts the Recommendation and disagrees with the feedback.  The present rules on priority for receivers' remuneration vis-à-vis the security holder and preferential creditors are well-established and have worked well in practice.  MinLaw does not see any pressing need to change these rules. |
| 5.4 | Actions statutorily vested in a liquidator should not be assignable but remain vested in the liquidator and pursued by him. A liquidator may assign the fruits of the statutory causes of action to third party funders provided appropriate safeguards control the extent to which a third party funder can control conduct of proceedings. | <u>Supportive</u><br><br>Creditors usually have reservations in funding a liquidator due to uncertainty on whether (i) the claims that have been assigned will succeed; and (ii) whether the funding creditor has standing to pursue claims on behalf of a company in liquidation even when the cause of action is assigned to them. It would be helpful if these uncertainties can be clarified in the new Insolvency Act.<br><br>Agrees that statutory claims of the liquidator should not be assignable. | MinLaw accepts the Recommendation.<br><br>MinLaw disagrees with this feedback. The first uncertainty referred to arises out of the unpredictability of litigation and it is not possible to legislatively provide certainty in the outcome of litigation.  Where a creditor funds a claim that is statutorily vested in the liquidator, the claim remains vested in the liquidator and it is for the liquidator to pursue the action for the benefit of all the creditors.  The assignment of the fruits of such an action is not intended to confer on a particular creditor any standing to pursue this action. |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| | | Suggests that liquidators should not be able to assign actions for wrongful or fraudulent trading (which is a reform being considered in the UK).<br><br>Insolvency litigation funding by third party funders should be statutorily codified, and regulated according to a principled framework, the details of which are set out in the paper on Litigation Funding in Insolvency cases by the Sub-Committee (of the Singapore Law Academy Law Reform Committee). | MinLaw agrees that liquidators should not be able to assign actions for wrongful or fraudulent trading.<br><br>The issue of third party funding is currently being examined by MinLaw. |
| 5.6 | A single director should be allowed to apply for a company's winding-up if the director can show a prima facie case that company ought to be wound-up and obtains leave of court. | Supportive<br><br>Supportive of Recommendation. | MinLaw agrees with the Recommendation. |
| N.a. | N.a. | Opening a separate bank account<br><br>The requirement for a liquidator to apply to court to open a separate bank account in compulsory liquidation should be removed as it is generally procedural and administrative in nature and increases the costs of liquidation.<br><br>Suggests that the OR can approve the opening of the bank account if regulatory oversight is needed. | MinLaw has considered the feedback and is of the view that the application to court for a liquidator to open and operate a bank account is not merely procedural as the court does not simply rubber-stamp such applications. The oversight of the court remains a useful safeguard against possible abuses of such bank accounts. |

13

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| N.a. | N.a. | Taxation of professional agent fees<br><br>The Committee of Inspection or the creditors should be allowed to approve the fees to be paid to professionals engaged by the liquidator. | MinLaw agrees with the proposal in the feedback. |
| N.a. | N.a. | Meetings<br><br>Suggests that the quorum for meetings should be standardised. There are different requirements in Section 296, 308(4) of the CA and Rule 123 of the Winding Up Rules.<br><br>Suggests that the notice period for creditor meetings should be standardised. There are different requirements in Section 296(2)(a), 296(b) of the CA and Rule 114 of the Winding Up Rules.<br><br>Suggests that there should be provisions to guide liquidators in their assessment or allocation of voting rights of creditors in a first meeting of creditors.<br><br>Suggests that there should not be a requirement that in order for a creditor to vote, a liquidator has to admit (wholly or in part) or reject a proof before a creditor meeting. | MinLaw disagrees with this feedback. There is no compelling reason to standardise quorum and notice periods between the different types of meetings, as long as the quorum and notice periods are clearly prescribed for each type of meeting.<br><br>The allocation of voting rights to creditors in a first meeting remains a judgment call for the liquidator and he is best placed to make this decision, having all the facts of a given case before him. It would not be appropriate for legislation to prescribe a generic set of rules which may not be flexible enough to deal with unique factual scenarios.<br><br>MinLaw is also of the view that a liquidator ought to admit (wholly or in part) or reject a creditor's proof before the creditor may vote at a meeting. Such a requirement ensures that creditors who have obviously frivolous or illegitimate claims cannot vote at meetings. The standard for admitting or rejecting a proof for the purpose of voting at meetings is not the same as adjudicating proofs of debts for the |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| | | | purpose of declaring a dividend. |
| | | Suggests that there should be statutory provisions that will prevent related-party debts from voting at creditor meetings when there are legitimate concerns over the existence of the related party debt. | There are no compelling reasons to provide statutory provisions to prevent related-party debts from voting when there are legitimate concerns on the existence of the debt.  The liquidator remains best placed to determine whether such concerns exist for any debts (including non-related party debts) and should exercise his discretion to permit or exclude the debt from voting accordingly. |
| N.a. | N.a. | Provisional Liquidator's remuneration<br><br>A provisional liquidator's remuneration should rank in priority to a liquidator's remuneration. | MinLaw disagrees with the feedback. A provisional liquidator's remuneration should not rank in priority to a liquidator's remuneration.  The work done by both office-holders concerns the same subject matter, i.e. the winding up of a company.  There are no compelling reasons to favour provisional liquidators over liquidators when the assets of the company are insufficient to pay the costs and expenses of the winding up. |
| N.a. | N.a. | Taxation of Liquidator's remuneration in voluntary liquidation<br><br>Suggests that the right to allow a liquidator to proceed for taxation of his remuneration in a creditors voluntary liquidation should be statutorily provided.<br><br>Suggests that there should be an independent body to ensure independent decision and assist liquidators who are affected by biased decisions taken by the Committee of Inspection or body of creditors in respect of their fees. | MinLaw accepts that a liquidator in a creditors' voluntary liquidation should be allowed to tax his bill in court. This can be addressed in the drafting of the new Act to provide for a uniform position vis-à-vis court-ordered windings up and voluntary liquidations.<br><br>Where there are any disagreements with the Committee of Inspection or the creditors, the liquidator should proceed to tax his bill in court. |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---------|---------------|-------------------|---------------------------|
| N.a. | N.a. | Committees of Inspection<br><br>Suggests that provisions should provide when a liquidator can override decisions of the Committee of Inspection. | MinLaw is of the view that the situations in which a liquidator may disagree with the Committee of Inspection are likely to be premised on the specific facts of each case.  Thus, it would be more appropriate for the matter to be resolved by the courts, who are better placed to make the appropriate orders. |
| N.a. | N.a. | Transition between Provisional Liquidation to Liquidation<br><br>Suggests that there should be provisions which deal with the cut-off point for the powers of the provisional liquidator upon appointment of the liquidator. | There is already clarity on when a provisional liquidation ends, which is on the making of the winding up order.  The arrangements for a hand over from the provisional liquidator to the liquidator are administrative in nature and it is not appropriate to have statutory provisions govern this process. |
| N.a. | N.a. | Expenses of preparing a Statement of Affairs<br><br>Suggests that there should be provisions that cover claims by a director for expenses incurred in preparation of the Statement of Affairs in creditors' voluntary liquidations. | It is intended that there should be a uniform position in court-ordered windings up and voluntary liquidations on the requirements to provide a Statement of Affairs and for the covering of expenses incurred in preparing a Statement of Affairs.  This will be addressed in the drafting of the new Insolvency Act. |

ANNEX A - SUMMARY OF FEEDBACK FROM THE PUBLIC CONSULTATION ON THE
INSOLVENCY LAW REVIEW COMMITTEE (ILRC) REPORT AND MINLAW'S RESPONSE
Chapter 6: Judicial Management

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| 6.1 | Judicial management regime should be retained but with reform in certain areas. | Neutral/Others<br><br>To extend the present timeframe for the judicial manager to present the statement of proposals once the judicial management order has been made. | The initial 60-day time period to present the statement of proposals appears to be an appropriate starting point, which can be subject to extension by the court.  Increasing the default time period may prolong the overall judicial management timeframe.  Nonetheless, MinLaw recognises that in certain cases, it may be difficult for the judicial manager to present the statement of proposals within that time period, and would incur costs by having to take out a court application for extension.  Therefore, to provide greater flexibility to judicial managers who require more than 60 days to present the statement of proposals, MinLaw is of the view that the 60-day time period should be capable of a single extension for a period of up to 60 days, by a vote of a simple majority in number and value of creditors without needing to apply to court for the same. |
| 6.2 | Court should have overriding discretion to grant a judicial management order despite objection by secured creditors who may appoint a receiver over the whole or substantially the whole of a company's assets. Court should exercise discretion if the prejudice to unsecured creditors if the judicial management order is not made is wholly disproportionate to the prejudice suffered by secured creditors if a judicial management order is made. | Neutral<br><br>Unclear whether judicial management process can be commenced if a receiver has already been appointed.<br><br>Unclear as to who bears the burden of proof as to the prejudice potentially being caused to unsecured creditors. | The Recommendation does not envisage any changes to the present framework, where a judicial management and receivership are not able to co-exist.<br><br>It will be for the parties seeking the judicial management order to satisfy the court that there are circumstances warranting the making of a judicial management order over the wishes of the floating charge holder. |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| | | Not supportive<br><br>Secured creditors who have the right to appoint a receiver over the whole or substantially the whole of a company's assets should have an absolute veto right (subject to public interest). Giving the Courts this discretion to override the veto prejudices the security holders' rights. | Secured creditors should not have absolute veto rights. The Recommendation seeks to strike a better balance between the extensive rights of secured creditors, and general unsecured creditors, particularly where rehabilitation may be possible for the company (which ultimately will also enhance value for secured creditors). It envisages a high threshold to meet. The court will only exercise its discretion where the prejudice caused to unsecured creditors if the judicial management order is *not* made is "wholly disproportionate" to the prejudice caused to secured creditors if the judicial management order is made. The burden to prove that high threshold, moreover, is on the parties seeking the judicial management order, to satisfy the court that there are circumstances warranting the making of a judicial management order over the wishes of the floating charge holder. |
| | | It is unclear how the Court can meaningfully weigh prejudice between the secured and unsecured creditors.<br><br>Suggests that if the recommendation is adopted, the test should not be based solely on the rights of the secured creditors, such as whether the secured creditor is "more than adequately secured". | The proportionality test should enable the court to take into account a number of factors, including the legal and commercial interests of the unsecured creditors, particularly if there is a chance for the company to be rehabilitated through judicial management, or if the secured creditor is over- or under-secured. |
| 6.3 | Right to object to judicial management should only accrue to holder of a floating charge that is valid in the liquidation of a company. | Supportive but,<br><br>The right to object should only be given to holders of floating charges that constitute a substantial proportion of the company's total debts. | MinLaw accepts the Recommendation.<br><br>In response to the feedback, MinLaw notes that section 227B(5)(b) already allows the holder of a floating charge over "the whole or substantially the whole" of the company's property to veto an application for judicial management. |

18

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---------|----------------|-------------------|----------------------------|
| 6.4 | A floating charge holder who consents to judicial management should be granted the right to appoint the judicial manager. | <u>Not supportive</u><br><br>The appointment of a judicial manager should be decided by majority creditors. | MinLaw accepts the Recommendation, which seeks to provide floating charge holders with some incentive to consent to a judicial management order, rather than exercise their right to veto. The judicial manager will ultimately act in the interest of all creditors, and other creditors may object to the nomination on limited grounds (e.g. bias or bad faith). MinLaw thus disagrees with the suggestion in the feedback. |
| 6.5 | A company should be able to put itself into judicial management upon filing requisite documents without formal application to court. | <u>Not supportive</u><br><br>Judicial management should only be initiated through a court application to ensure that all creditors' rights are catered for. | It is intended that dissenting creditors will have the same right of recourse to the court against a company-appointed judicial manager as they presently have against a court-appointed judicial manager (including the right to apply to court under section 227R for an order or interim order to protect their interests, or for an order to discharge the judicial management process).<br><br>Creditors should also have the right to apply to court to set aside the judicial management process where, for example, procedural requirements have not been met. |
| 6.8 | Personal liability for contracts entered into or adopted by judicial managers should not be imposed on judicial managers. | <u>Supportive but,</u><br><br>A judicial manager should still be personally liable in instances of gross negligence or fraud. | Imposing personal liability on judicial managers may discourage judicial managers from adopting contracts which may be beneficial for the company, and also appears at odds with the position taken with liquidators of a company, or directors of a company, who do not assume personal liability for contracts entered into or adopted. The Recommendation does not affect the judicial manager's general liability for acts of negligence, default, misfeasance, breach of trust or breach of fiduciary duties. |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| 6.13 | (a) Any creditor of the company should be allowed to apply for appointment of an interim judicial manager before the judicial management order is made. | <u>Neutral / Others</u><br><br>Concerned about the lack of clarity on the basis / legal requirement to appointing an interim judicial manager.<br><br>Suggests that the threshold requirement for appointment of an interim judicial manager should be that of "good *prima facie* case" (as is the case for appointment of provisional liquidators).<br><br>Suggests that the situations in which an interim judicial manager should be appointed should be specifically set out. | It is appropriate that the threshold requirement for the appointment of an interim judicial manager should be that of a "good *prima facie* case". However, it may not be appropriate to specifically set out the situations that warrant the appointment of an interim judicial manager. Instead, the Court is best placed to decide on the facts of a particular case whether the appointment of an interim judicial manager ought to be made. |
| | (b) Where a company applies for its own judicial management, the directors should give personal undertakings to the court that the company will apply its assets and incur liabilities only in the ordinary course of business. | <u>Supportive but,</u><br><br>Unclear what the consequence of the breach of an undertaking would be and who would be in position monitor this, or be able to enforce or take action against a breach of an undertaking. | Generally, a breach of the terms of the undertaking may result in personal liability of the director. Any creditor should be able to apply to the court to enforce the undertaking. The details of the undertaking and how it may be enforced will be taken up in the drafting of the Act. |
| 6.15 | Provisions should be made to allow grant of super-priority for rescue finance, but should not introduce super-priority liens. | <u>Supportive</u><br><br>Agrees with Recommendation. Introduction of such funding will give companies with sound businesses a real opportunity of survival. | MinLaw agrees with the Recommendation. |

ANNEX A - SUMMARY OF FEEDBACK FROM THE PUBLIC CONSULTATION ON THE
INSOLVENCY LAW REVIEW COMMITTEE (ILRC) REPORT AND MINLAW'S RESPONSE
Chapter 7: Schemes of Arrangement

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| 7.2 | The scope of the moratorium should be no narrower than that in a judicial management, but the court should have discretion to alter it. | Not supportive<br><br>There should not be a moratorium for schemes of arrangement, unless appropriate safeguards are in place or the scope of the moratorium is narrower than the moratorium in judicial management.<br><br>Allowing a moratorium opens the possibility for abuse by the management of the company. | MinLaw accepts the Recommendation and does not agree with the feedback.   Currently, a moratorium (non-automatic) is already available for schemes of arrangement.<br><br>To prevent abuse, the Recommendation to expand the scope of the moratorium also contains the following safeguards:<br>(a) the court is empowered to tailor the scope of the moratorium in each case according to its circumstances; and<br>(b) aggrieved creditors will be entitled to apply to the court for relief if there is abuse. |
| | | Other / Neutral<br><br>Specific carve-outs and exemptions may be needed. | See discussion on carve out and safe harbour provisions in the comments for Chapter 2. |
| 7.4 | (a) Each creditor is entitled to review proofs submitted by other creditors. Notice should first be given, and the company and proving creditor have the right to object to the inspection. An independent assessor shall decide whether there is a legitimate basis for declining to disclose the proof and if he agrees, must review | Supportive but,<br><br>Concerned that allowing each creditor to "review" and object to other creditors claim may lead to uncertainty, higher costs and inevitable delay (even though strict timelines are in place). | MinLaw is of the view that adequate safeguards exist as the independent assessor has a right to determine whether a creditor's request to review another creditor's claim is legitimate or a mere delaying tactic.<br><br>In any case, the resulting increase in uncertainty, costs and delay (which may not be significant) has to be weighed against the fact that the creditor's right to information is an important right (as the claims submitted by creditors and admitted or rejected by the company or the scheme manager would fundamentally affect voting rights and the issue of whether the scheme has been properly approved by the |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| | the proof himself. He may direct that it be partially disclosed and/or that sensitive portions are redacted. | | creditors). |
| | (d) The independent assessor may be appointed when an application relating to a scheme of arrangement is made to court, upon nomination of the company, a creditor or member of the company. The independent assessor may also be appointed once a matter requiring his assessment arises. | <u>Neutral</u><br><br>Suggest that independent assessors be appointed at the outset and that they assess the proofs. | An independent assessor should be appointed at the outset only if the company, a creditor or a member desires such an appointment. Additionally, it would not be efficient and cost-effective to require that an independent assessor assess each and every proof. Instead, the independent assessor's role in respect of assessing proofs ought to be focused on disputes relating to the admission or rejection of a proof. |
| | (e) The independent assessor's decisions may be challenged in court, but only at the sanction hearing. | <u>Neutral</u><br><br>Suggests that each creditor should only have a summary right to appeal the independent assessor's decision on their own claim.<br><br><u>Not Supportive</u><br><br>The challenge should not be restricted to the sanction hearing. A creditor should have the right to proceed to Court immediately. The scheme meeting may still proceed and be voted on with two results declared: | The creditor's right to challenge the independent assessor's decision should not be confined to his claim only.<br><br>The admission or rejection of proofs fundamentally affects voting rights and the issue of whether the scheme has been properly approved by the creditors.<br><br>MinLaw is of the view that there will be time and cost savings in having the court hear and determine all the creditors' challenges at the sanction stage. This is particularly so as some of the creditors' challenges may be inter-related and can be dealt with at the same time, whilst other challenges may become inconsequential because of the voting results of other unchallenged debts. |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| | | (a) The result based on the accepted adjudicated claims and the adjudicated amount of disputed adjudications; and<br>(b) The result based on the accepted adjudicated claims and the disputed amount of the disputed adjudications. | In contrast, requiring that the court deal with challenges as and when they are raised may lead to excessive delays and increased costs. It may also make the scheme of arrangement process overly cumbersome. In addition, there is a concern that some creditors may abuse this process by raising challenges with the objective of delaying and de-railing an otherwise viable scheme of arrangement.<br><br>In any event, the creditor does not suffer prejudice from having the challenge heard only at the sanction stage, as a scheme of arrangement is not effective until it is sanctioned by the court. |
| 7.10 | Provisions should be introduced to allow grant of super-priority for rescue finance. | <u>Supportive</u><br><br>Agrees with Recommendation. | MinLaw agrees with the Recommendation. |
| 7.11 | Where the requisite majorities in number and value of creditors have been obtained, a scheme of arrangement should be passed over the objections of dissenting creditors, subject to the court being satisfied that the dissenting creditors are not prejudiced by such cram-down. | <u>Neutral</u><br><br>Unclear who bears the burden of proof in establishing that the dissenting class is not prejudiced.<br><br><br>Unclear how appointments of court assessors or experts to assist the Court would work in practice. | Under the US Bankruptcy Code, it is for the proponents of the reorganisation plan under Chapter 11 to prove that the plan does not discriminate unfairly against the dissenting, impaired class of creditors. MinLaw is of the view that In Singapore, the company and/or the classes of creditors in favour of the scheme would have the burden of proof in establishing that the dissenting class is not prejudiced.<br><br>The Court ought to be given powers to order how the court assessors or expert should be appointed and assist the Court. This will allow the appropriate order to be made based on the circumstances of a particular case. |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| | | Clear parameters are needed as to how the mechanism is to apply. Noted that a "no worse off than in a liquidation" threshold is used in many jurisdictions. | It is intended for the Court to require a high threshold of proof that the dissenting class is not going to be prejudiced by the cram-down. The MinLaw will consider using "no worse off than in a liquidation" threshold in the drafting of the Act. |
| N.a. | N.a. | **Suspension of Insolvent Trading Rules**<br><br>Suggests that there should be a provision to allow a distressed company to apply to Court for an order that insolvent trading rules applicable to officers do not apply or apply in a modified way, during an interim period between the periods from the first application to the Court to the convening of the first meeting.<br><br>There should be a long stop date to this interim period to prevent abuse. This longstop date should not be statutorily prescribed but be fixed by the Court at the first application, with liberty to apply for extension(s) for good reason. | Stipulating that insolvent trading rules do not apply during the interim period (even if there is a longstop date) could potentially allow abuses during that period.<br><br>One of the Recommendations in the ILRC report is that a defence to insolvent trading arises where the officer acted honestly and having regard to the circumstances of the case, he ought to be fairly excused. MinLaw is of the view that this defence provides sufficient protection to the company's officers. This is because the defence will permit the Court to consider the actions of the officers in light of the fact that a scheme of arrangement is being proposed. Additionally, if an officer has legitimate concerns as to whether a proposed course of action could amount to insolvent trading, it will be possible for an application to be made to court to determine whether such action at and after such application would be wrongful. |
| N.a. | N.a. | **Supervision of Management**<br><br>Suggests that in appropriate certain cases modification of the company's existing management may be required. This could be done by supervision by the court, through a court appointed director who regularly reports to the court. Alternatively, to give creditors the | Appointing a new independent officer to supervise the company's existing management may be undesirable as it would reduce the autonomy and flexibility given to the company to propose a restructuring plan. It may also be difficult to give creditors a right to appoint directors of their choice, and this may result in lobbying by creditors. |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---------|----------------|-------------------|----------------------------|
| | | right to appoint a number of directors to deny existing management control of the board. | Should there be a need for an independent officer to supervise and oversee the management and running of the company, an alternative process such as judicial management should be used.  On balance, this distinguishing feature of the scheme of arrangement, which allows existing management to remain in control of the company, should be preserved. |
| N.a. | N.a. | Longstop Date<br><br>There should be a longstop date between the granting of the moratorium and the first meeting. This longstop date should not be statutorily prescribed but be fixed by the court at the first application, with liberty to apply for extension(s) for good reason. | MinLaw agrees that a longstop date should not be statutorily enacted.  The court is best placed to determine if a longstop date is appropriate in a given case. |
| N.a. | N.a. | Expedited Procedure<br><br>Suggests an additional expedited procedure for obtaining the court's approval for a scheme of arrangement, similar to the US concept of pre-packaged restructuring plans.<br><br>Under this procedure, application to the court for a scheme meeting to be convened will be bypassed. Instead, the company constructs a plan along the existing scheme of arrangement principles. The company can apply for a moratorium without being required to have already proposed a plan to creditors, and can also apply for rulings on classification of | MinLaw is of the view that the proposal in the feedback may not be appropriate for the three reasons set out below.   Nevertheless, MinLaw is of the view that there may be merit in introducing a procedure that allows a court to sanction a scheme of arrangement in a fast and efficient manner, provided the concerns listed below are not present.  MinLaw will consider if such a procedure can be enacted in the drafting of the Act.<br><br>(i)      Adoption of the UK Practice Statement (Companies: Schemes of Arrangement) [2002] 1 WLR 1345<br><br>In England, the practice regarding applications to court for meetings is governed by a Practice Statement (Companies: Schemes of Arrangement). The Court of Appeal in _The Royal Bank of Scotland NV v TT International Ltd_ [2012] 2 SLR 235 [at para 61] approved and |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---------|----------------|-------------------|----------------------------|
| | | creditors. Upon approval of the plan by a majority in number representing three-quarters in value of creditors present and voting in each class, the company applies for approval. | opined that this Practice Statement could serve as guidance for local practitioners.  MinLaw is of the view that the same should be adopted in Singapore.<br><br>The adoption of the Practice Statement in Singapore requires the company's solicitors, when applying for an order to summon the scheme creditors' meeting, to unreservedly disclose all material information to the court to assist it in arriving at a properly considered determination on how the scheme creditors' meeting is to be conducted.  This means that an applicant has a responsibility when bringing the first application to consider *inter alia,* whether there are different classes of creditors which require more than one meeting of creditors to be convened, and to notify persons affected by the scheme of its purpose and the meetings which the applicant considers to be necessary.  The applicant is also required to draw the court's attention to any issues that may arise as to the constitution of meetings of creditors or which otherwise affect the conduct of those meetings.  This allows the court to exercise greater oversight over the scheme process and ensure that the creditors meetings are properly called.  Additionally, by ventilating all these issues at this early stage, the court may also give directions for the calling of scheme creditors' meeting(s) to pre-emptively resolve challenges that may arise at the sanction hearing.<br><br>(ii)      Possibility of Abuse<br><br>There are concerns that the suggested expedited procedure is open to abuse as it allows an applicant to avoid raising issues that ought to be raised at the first application, and only raise them at the sanction hearing, which will lead to significant delays and costs.  Furthermore, |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| | | | in the process outlined in the Practice Statement, it is expressly provided for creditors who consider themselves unfairly treated, to be able to raise objections at the sanction hearing, though the court will expect a good explanation for why such objections were not raised earlier. |
| | | | (iii)    Existing Framework allows pre-negotiated  restructuring plans; no significant savings in time and cost that outweigh possibility of abuse |
| | | | In any case, the existing framework for schemes of arrangement does not prevent a company from pre-negotiating its restructuring plan with its creditors, in similar fashion to a pre-packaged US restructuring plan.  If the company successfully pre-negotiates its restructuring plan with the requisite majority of creditors to pass the plan (as would be the case in a pre-packaged US restructuring plan), there would not be a need for the company to seek a moratorium or apply for rulings on the classification of creditors.  The only savings in cost and time achieved under this expedited procedure is the by-passing of a single court application i.e., the first application for leave to convene a scheme meeting.  As a result, the costs and time savings under the suggested expedited procedure are not significant enough to outweigh the potential for abuse by the company. |

ANNEX A - SUMMARY OF FEEDBACK FROM THE PUBLIC CONSULTATION ON THE
INSOLVENCY LAW REVIEW COMMITTEE (ILRC) REPORT AND MINLAW'S RESPONSE
Chapter 8: Avoidance Provisions

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| 8.3 | The relevant time for transactions at an undervalue should be reduced to 3 years. | <u>Not supportive</u><br><br>No rationale or benefit for the proposed reduction. The relevant time should remain as 5 years. | MinLaw accepts the Recommendation.<br><br>In response to the feedback, MinLaw notes that the current 5-year period creates unnecessary concerns and difficulties in practice for parties seeking to enter into a legitimate commercial transaction.<br><br>In any case, the nexus between a transaction and the prejudice to creditors weakens with the passage of time. The most reprehensible form of undervalued transactions are those entered into close to the time when the party is placed under insolvency/bankruptcy. A period of 3 years should cover such cases, and yet strike a balance for parties to enter into legitimate commercial transactions. |
| 8.9 | The subjective test for unfair preference should be retained, i.e. the person giving the preference was influenced by a "desire to prefer" the recipient. | <u>Not Supportive</u><br><br>In practice there are difficulties gathering evidence to satisfy a subjective test. It is particularly difficult to gather evidence if the former officers are not co-operative and creditors / other stakeholders are unable to provide assistance and information.<br><br>The objective test will give greater clarity on transactions that would amount to an undue preference. | MinLaw accepts the Recommendation.<br><br>The case law and applicable principles on the subjective approach are sufficiently clear as to what is required to satisfy the test.<br><br>Further, while it may be difficult to prove subjective intention, this should be weighed against the potential consequences of the objective test, one of which is that all payments made after insolvency are *prima facie* liable to be set aside. This may pose even more practical problems. MinLaw thus disagrees with the feedback. |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| 8.10 | The provision on registering of charges should be retained in the Companies Act. | Neutral / Others<br><br>Clarification should be made on security which does not fall squarely within section 131(1) of the CA. | MinLaw accepts the Recommendation, and takes the view that clarification is not necessary since section 131(3) of the Companies Act already sets out the types of charges that the section applies to. The question of whether a security falls within section 131(1) is best left to the development of case-law. |
| 8.11 | An unregistered charge shall be void against a judicial manager, and shall remain enforceable against the company in the event that the judicial management is successful. | Neutral / Others<br><br>Does this recommendation simply clarify that a charge will still be enforceable vis-à-vis a company after discharge from judicial management and not have an effect of curing any defects due to a lack of registration. | This Recommendation does not intend to cure any defects in the validity of a charge due to a lack of registration, in the event that the judicial manager is discharged and the company is rehabilitated. |
| 8.13 | (b) Notice of the intended disclaimer should be given to creditors, OR any other relevant parties. | Neutral / Others<br><br>Suggests that the insolvency office-holder also advertise the proposed disclaimer in the appropriate place whether this be the gazette / company registry / land registry in order to protect third party interests. | The relevant third parties should have been given notice of the intended disclaimer. Where the third party cannot be immediately located, under the Recommendation, the insolvency office-holder is required to advertise the proposed disclaimer in a newspaper and/or government gazette. |
| N.a. | N.a. | Defence of Good Faith<br><br>A defence similar to Regulation 6 of the Companies (Application of Bankruptcy Act Provisions) Regulations ('CABAR') should be introduced to promote transactions entered into good faith. | MinLaw intends to introduce a defence similar to regulation 6 of CABAR in the drafting of provisions on undervalued transactions in liquidation and judicial management in the new Act. |

ANNEX A - SUMMARY OF FEEDBACK FROM THE PUBLIC CONSULTATION ON THE
INSOLVENCY LAW REVIEW COMMITTEE (ILRC) REPORT AND MINLAW'S RESPONSE
Chapter 9: Officer Delinquency

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| 9.2 | (a) A criminal conviction should not be a requisite to bringing a civil claim for insolvent trading. | Supportive<br><br>Agrees with Recommendation. | MinLaw agrees with the Recommendation. |
| | (b) It should be expressly provided that a defence to insolvent trading arises where the officer acted honestly and having regard to the circumstances of the case, he ought to be fairly excused. | Neutral<br><br>Civil liability should be imposed so long as certain thresholds are proven such as insolvency of the company, no evidence to support the reasonableness of incurring the debt etc. | Allowing the court to have regard to the circumstances of the case is a flexible approach that strikes a balance between guarding against insolvent trading and ensuring fairness to the officer.<br><br>In any event, MinLaw is of the view that what was proposed in the Recommendation and the suggested thresholds in the feedback will not result in much difference in practice, as there would be few if any cases where it would be fair to excuse the officer when there is no evidence to support the reasonableness of incurring the debt. |

**ANNEX A - SUMMARY OF FEEDBACK FROM THE PUBLIC CONSULTATION ON THE
INSOLVENCY LAW REVIEW COMMITTEE (ILRC) REPORT AND MINLAW'S RESPONSE
Chapter 10: Regulation of Insolvency Practitioners**

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| 10.1 | Official Receiver should take on the registering and renewal of licenses, and the setting of licensing requirements for all insolvency office-holders. | Supportive<br><br>Official Receiver also needs to set ethical standards for the profession and these standards should be no less onerous than the standards in other major jurisdictions. | As it is intended for the Official Receiver to leverage on existing frameworks within the professional bodies for disciplinary matters, licenced insolvency practitioners will be subject to the professional standards and codes of conduct of those professional bodies. MinLaw will consult with the relevant professional bodies to determine if specific and additional ethical standards ought to be issued for insolvency practitioners. |
| 10.2 | The qualification standard for all insolvency office-holders should be the same except for scheme managers and liquidators in members' voluntary winding-ups. | Neutral / Other<br><br>Suggests that section 46(2) of the BA (governing qualifications required of nominees in IVAs) be amended to be standardised with the Recommendation that qualifications of insolvency practitioners be the same in all insolvency regime. | It is intended that the qualification requirements of all insolvency practitioners acting in insolvency regimes be standardised unless expressly excluded. |
| | | Advocates and solicitors should continue to have the right to be appointed as trustees in bankruptcy. | There is no proposal to disallow advocates and solicitors from being appointed as trustees in bankruptcy.  An advocate and solicitor will also be considered a qualified person for the purposes of licensing and appointment as an insolvency practitioner. |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| | | Not supportive<br><br>Liquidators in members' voluntary liquidations should be subject to the same qualification standards as they take on similar work to other liquidators. Issues of adjudication of proofs of debt, set-offs and other insolvency related issues may arise in an members' voluntary liquidation. These liquidators in members' voluntary liquidations also need to be regulated by a government agency. | MinLaw disagrees with the feedback.  Generally, in members' voluntary liquidations, the company is solvent and able to pay its debts in full.  The directors are required to make a declaration to that effect and if this declaration is made without reasonable grounds to believe in the truth of the declaration, the directors would be liable for an offence.<br><br>Where the company is solvent, there would usually not be issues of adjudication or set-off that require professional knowledge.  Where the company turns out to be insolvent, the appointed liquidator in a members' voluntary liquidation is required to call a creditors' meeting, whereupon, the liquidation proceeds as a creditors' voluntary liquidation with a licensed practitioner to be appointed as liquidator.<br><br>Even if the liquidator appointed in a members' voluntary liquidation is not licensed, the liquidator will be subject to the same duties and liabilities imposed by the Act and Rules. |
| 10.3 | Further views should be taken on the issue of whether liquidators in members' voluntary liquidations should be licensed insolvency office-holders before a decision be made. | Supportive of regulation<br><br>Liquidators of members' voluntary liquidations should be regulated to ensure that all insolvency practitioners have basic knowledge and experience of insolvency law.<br><br>In a members' voluntary liquidation, certain compliance procedures have to be carried out and liquidators in a members' voluntary liquidation should be aware of such requirements. | Having considered the feedback, MinLaw is of the view that in a members' voluntary liquidation, the company is solvent and thus, the choice of liquidator is unlikely to have an impact on the creditors.  As such, there is no compelling reason to limit the appointment to a licensed insolvency practitioner or allow unqualified persons to act as insolvency office-holders only in certain limited circumstances.  There is no obstacle to appointing an insolvency practitioner if so desired.<br><br>In respect of feedback that a liquidator ought to be aware of the requirements of a members' voluntary liquidation, MinLaw is of the view that an unqualified person is capable of obtaining advice to ensure he discharges the necessary requirements.  He assumes the risks of non-compliance of such requirements by choosing to act as |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| | | Suggests that the threshold to obtain a licence to be a liquidator of a members' voluntary liquidation should not be as high as a liquidator acting in a creditors' voluntary liquidation and a compulsory liquidation.<br><br>Supportive of Regulation but,<br><br>Liquidators in members' voluntary liquidations should be Approved Liquidators (as defined in the Companies Act), as such persons are better placed to deal with complications in the liquidation, e.g. where it is subsequently determined that the liquidation is an insolvent liquidation.<br><br>Suggests that an unqualified person may act as liquidators in members' voluntary liquidations for companies with no assets and no liabilities (similar to the case of strike-off from the registry). | the liquidator, instead of engaging an insolvency practitioner. |
| N.a. | N.a. | Liquidator's Security Undertaking<br><br>The security undertaking that liquidators have to furnish to the Official Receiver in compulsory liquidation limits the financing facilities available to insolvency practitioners.<br><br>Professional indemnity insurance, which is generally taken up by insolvency practitioners, | One of the purposes of having the security in the form of a banker's guarantee is to ensure that in cases of misfeasance, the Official Receiver can step in and use these funds to begin administering the case.  As such, professional indemnity insurance does not sufficiently fulfil this function.   If liquidators are able to provide alternative security that can serve this purpose, there should be no objection to allowing these other forms of security. |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| | | should be a sufficient safeguard in the event of any misfeasance of the insolvency practitioner.<br><br>Suggests that the requirement of the security undertaking could be replaced by submission of proof of professional indemnity insurance when an insolvency practitioner is applying for a renewal of his licence. | |
| N.a. | N.a. | <u>Prohibition of auditors as officeholders</u><br><br>Suggests that save for a members' voluntary liquidation, a company's auditors or former auditors should not be allowed to act in all forms of insolvent regimes. (Prohibitions are already in place for Receivership and Judicial Management, see section 217(1)(c) and section 227B(3)(a)). | As it is intended that the qualification requirements of all insolvency practitioners be standardised across all insolvency regimes save for members' voluntary liquidation, the prohibition of an auditor of the company from acting as an insolvency office holder will apply to all insolvency regimes, unless expressly excluded. |
| N.a. | N.a. | <u>Distinction between court appointed and out-of-court appointed Judicial Managers</u><br><br>Suggests that provisions be enacting to prescribe that the duties / standards on an out-of-court appointed judicial manager or interim judicial managers are no different from ones appointed by the court. | There is no intention to differentiate between judicial managers who are appointed by the court and judicial managers appointed out-of-court in terms of their duties and obligations as judicial managers of a company. |
| N.a. | N.a. | <u>Prevention of staff from working on a case when an insolvency practitioner is prohibited from acting</u> | MinLaw is of the view that such a prohibition ought to be in professional conduct rules or ethical standards of the professional body that the practitioner belongs to, and should not be enacted in legislation. |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
|  |  | There should be provisions preventing practitioners who cannot be appointed from having another practitioner be appointed, only to have the work done by the staff of the prohibited practitioner. |  |

ANNEX A - SUMMARY OF FEEDBACK FROM THE PUBLIC CONSULTATION ON THE
INSOLVENCY LAW REVIEW COMMITTEE (ILRC) REPORT AND MINLAW'S RESPONSE
Chapter 11: Cross-Border Insolvency

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| 11.1 | The judicial management regime should be extended to cover all foreign companies. | <u>Supportive</u><br><br>Extending Judicial Management to foreign companies establishes consistency in the availability of corporate insolvency regimes to foreign companies. | MinLaw agrees with the Recommendation. |
| | | <u>Neutral / Others</u><br><br>Suggests that there should be provision to introduce regulations containing carve-outs or safe harbour provisions. For example, there might be carve-outs for certain securitisations, where the security provided by a foreign entity may be subjected to a moratorium and disposal by a judicial manager. | See discussion on carve-outs and safe harbour provisions in the comments for Chapter 2. |
| 11.2 | The UNCITRAL Model Law on Cross-Border Insolvency should be adopted with appropriate modification and exclusions. | <u>Supportive</u><br><br>Agrees with Recommendation.<br><br><u>Supportive but,</u><br><br>Model Law should be limited to selected entities, i.e. branches of foreign companies or foreign companies in Singapore not registered with ACRA. | MinLaw agrees with the Recommendation.<br><br><br><br>It is intended that certain regulated industries will be exempted under Article 2 of the Model Law.  However, apart from these exempted industries, it would be inappropriate to limit the Model Law's application to selected entities. |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| | | In the event that Model Law is applied to all entities in Singapore, preferential creditors should rank in priority to the global pool of creditors in the main proceedings in the foreign jurisdiction. | Currently, a foreign company registered under the Companies Act that is in liquidation must comply with requirements under section 377(7) to pay local preferential creditors first, before remitting the balance monies to the foreign representative.<br><br>Provisions in the Model Law also allow a court to make appropriate orders to ensure that the interests of local creditors, including preferential creditors, are adequately protected. Such provisions may provide adequate protection to creditors generally in the event that they may be prejudiced or discriminated against *vis-à-vis* creditors in a similar class in that foreign insolvency proceeding. Therefore, the local court may refuse to turn over assets to the foreign representative where the rules of that foreign jurisdiction purport to discriminate or prejudice the local creditors *vis-à-vis* creditors in a similar class in that foreign jurisdiction.<br><br>In any case, a provision that is enacted in Singapore that provides priority to preferential creditors over the global pool of creditors is unlikely to have any force in the foreign jurisdiction. |
| 11.4 | The Model Law should apply only to corporate insolvency with a review at a later date on whether to extend it to bankruptcy. | <u>Supportive</u><br><br>Agrees with the Recommendation, bearing in mind existing common law principles and sections 43 and 46 of the Evidence Act. However, consideration should be given on whether to expand and develop the provisions in the Evidence Act to not only cover recognition but also assistance. | MinLaw agrees that common law principles will continue to evolve and supplement the statutory framework on cross-border insolvency. |

| Rec No. | Recommendation | Feedback received | Ministry of Law's response |
|---|---|---|---|
| 11.5 | Ring-fencing of assets of foreign companies should, as a general rule, be abolished. | Supportive but,<br><br>The abolishment of ring fencing should not prejudice a bank's local security package in financing transactions. | The abolition of ring-fencing will not affect the promulgation or continued operation of any other ring-fencing legislation which is applicable to any specific type of companies or industries.<br><br>Adequate protection for a local security package (which would be prejudiced in a foreign proceeding) is provided, as the Model Law allows the court to have the discretion not to grant assistance to a foreign proceeding where the interests of local creditors would not be adequately protected. |

**ANNEX A - SUMMARY OF FEEDBACK FROM THE PUBLIC CONSULTATION ON THE
INSOLVENCY LAW REVIEW COMMITTEE (ILRC) REPORT AND MINLAW'S RESPONSE**
**List of Respondents**

1. Institute of Singapore Chartered Accountants
2. Law Society of Singapore
3. Association of Banks in Singapore
4. Ministry of Culture Community and Youth
5. Stamford Law Corporation
6. Clifford Chance
7. Ferrier Hodgson
8. Rae Chan
9. Elango Subramanian
10. Ashok Kumar
11. Brendan Chian

12. Jayram Atmaram Khialani
13. Vashdev Atmaram Khialani
14. Ganshamdas Atmaram Khialani
15. Yaan Lin
16. Ulaganathan Karumanan
17. Kwok Sze Hwee
18. Sonny Yuen
19. Rianne Meurzec
20. Agnes Meurzec
21. Gary Berlandier
22. Suneel Ramchandani

H5 6 ˙%⁄7

# UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation





**UNITED NATIONS**

*Further information may be obtained from:*
UNCITRAL Secretariat, Vienna International Centre
P.O. Box 500, 1400 Vienna, Austria
Telephone: (+43-1) 26060-4060          Telefax: (+43-1) 26060-5813
Internet: www.uncitral.org          E-mail: uncitral@uncitral.org

UNITED NATIONS COMMISSION ON INTERNATIONAL TRADE LAW

# UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation



UNITED NATIONS
New York, 2014

**Note**

Symbols of United Nations documents are composed of letters combined with figures. Mention of such symbols indicates a reference to a United Nations document.

UNITED NATIONS PUBLICATION
Sales No.: E.14.V.2
ISBN 978-92-1-133819-5
e-ISBN 978-92-1-056399-4

© United Nations, January 2014. All rights reserved, worldwide.

The designations employed and the presentation of material in this publication do not imply the expression of any opinion whatsoever on the part of the Secretariat of the United Nations concerning the legal status of any country, territory, city or area, or of its authorities, or concerning the delimitation of its frontiers or boundaries.

Information on uniform resource locators and links to Internet sites contained in the present publication are provided for the convenience of the reader and are correct at the time of issue. The United Nations takes no responsibility for the continued accuracy of that information or for the content of any external website.

This publication has not been formally edited.

Publishing production: English, Publishing and Library Section, United Nations Office at Vienna.

## **Contents**

*Page*

**Part One.   UNCITRAL Model Law On Cross-Border Insolvency**

Preamble . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

Chapter I.   General provisions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

|            | Article 1.   | Scope of application. . . . . . . . . . . . . . . . . . . . . . . . . .   3 |
| Article 2.   | Definitions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4 |
| Article 3.   | International obligations of this State . . . . . . . . . . .   4 |
| Article 4.   | [*Competent court or authority*] . . . . . . . . . . . . . . .   5 |
| Article 5.   | Authorization of [*insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State*] to act in a foreign State . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5 |
| Article 6.   | Public policy exception . . . . . . . . . . . . . . . . . . . . . . .   5 |
| Article 7.   | Additional assistance under other laws. . . . . . . . . .   5 |
| Article 8.   | Interpretation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   5 |

Chapter II.   Access of foreign representatives and creditors to courts in this State. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6

| Article 9.    | Right of direct access. . . . . . . . . . . . . . . . . . . . . . . . .   6 |
| Article 10.   | Limited jurisdiction. . . . . . . . . . . . . . . . . . . . . . . . . . .   6 |
| Article 11.   | Application by a foreign representative to commence a proceeding under [*identify laws of the enacting State relating to insolvency*]. . . . . . . . .   6 |
| Article 12.   | Participation of a foreign representative in a proceeding under [*identify laws of the enacting State relating to insolvency*]. . . . . . . . . . . . . . . . . . . .   6 |
| Article 13.   | Access of foreign creditors to a proceeding under [*identify laws of the enacting State relating to insolvency*]. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   6 |
| Article 14.   | Notification to foreign creditors of a proceeding under [*identify laws of the enacting State relating to insolvency*] . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7 |

Chapter III.   Recognition of a foreign proceeding and relief. . . . . . . . . . . . .   8

| Article 15.   | Application for recognition of a foreign proceeding. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   8 |
| Article 16.   | Presumptions concerning recognition . . . . . . . . . . .   8 |
| Article 17.   | Decision to recognize a foreign proceeding . . . . . .   9 |

*Page*

|  | Article 18. | Subsequent information . . . . . . . . . . . . . . . . . . . . . . | 9 |
|--|-------------|------------------------------------------------------------|---|
|  | Article 19. | Relief that may be granted upon application for recognition of foreign proceeding . . . . . . . . . . . . . | 9 |
|  | Article 20. | Effects of recognition of a foreign main proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 10 |
|  | Article 21. | Relief that may be granted upon recognition of a foreign proceeding . . . . . . . . . . . . . . . . . . . . . . . . . | 11 |
|  | Article 22. | Protection of creditors and other interested persons | 12 |
|  | Article 23. | Actions to avoid acts detrimental to creditors . . . . | 12 |
|  | Article 24. | Intervention by a foreign representative in proceedings in this State . . . . . . . . . . . . . . . . . . . . | 12 |

| Chapter IV. | Cooperation with foreign courts and foreign representatives . . . | 13 |
|-------------|-------------------------------------------------------------------|----|
|  | Article 25. | Cooperation and direct communication between a court of this State and foreign courts or foreign representatives . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 13 |
|  | Article 26. | Cooperation and direct communication between the [*insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State*] and foreign courts or foreign representatives . . . . . . . . . . . . . . | 13 |
|  | Article 27. | Forms of cooperation . . . . . . . . . . . . . . . . . . . . . . . . | 13 |

| Chapter V. | Concurrent proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 14 |
|------------|-------------------------------------------------------------------------------|----|
|  | Article 28. | Commencement of a proceeding under [*identify laws of the enacting State relating to insolvency*] after recognition of a foreign main proceeding . . . | 14 |
|  | Article 29. | Coordination of a proceeding under [*identify laws of the enacting State relating to insolvency*] and a foreign proceeding . . . . . . . . . . . . . . . . . . . . . . . . . | 14 |
|  | Article 30. | Coordination of more than one foreign proceeding | 15 |
|  | Article 31. | Presumption of insolvency based on recognition of a foreign main proceeding . . . . . . . . . . . . . . . . | 15 |
|  | Article 32. | Rule of payment in concurrent proceedings . . . . . . | 15 |

**Part Two.  Guide to Enactment and Interpretation of the UNCITRAL Model Law on Cross-Border Insolvency**

| I. | Purpose and origin of the Model Law . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 |
|----|------------------------------------------------------------------------------|----|
|  | A. | Purpose of the Model Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 19 |
|  | B. | Origin of the Model Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 20 |
|  | C. | Preparatory work and adoption . . . . . . . . . . . . . . . . . . . . . . . . . . . | 22 |

| II. | Purpose of the Guide to Enactment and Interpretation . . . . . . . . . . . . . | 24 |
|-----|------------------------------------------------------------------------------|----|

|      |      |              |                                                                                     | *Page* |
| ---- | ---- | ------------ | ----------------------------------------------------------------------------------- | ------ |
| III. | The model Law as a vehicle for the harmonization of laws |              |                                             | 24     |
|      | A.   | Flexibility of a model law |                                                                       | 25     |
|      | B.   | Fitting the Model Law into existing national law |                                                 | 25     |
|      |      |              |                                                                                     |        |
| IV.  | Main features of the model law |              |                                                             | 26     |
|      | A.   | Access |                                                                                     | 27     |
|      | B.   | Recognition |                                                                                | 28     |
|      | C.   | Relief |                                                                                     | 29     |
|      | D.   | Cooperation and coordination |                                                               | 30     |
|      |      |              |                                                                                     |        |
| V.   | Article-by-article remarks |              |                                                                 | 32     |
|      | A.   | Preamble |                                                                                   | 32     |
|      | B.   | Chapter I.   | General provisions |                                                               | 34     |
|      |      | Article 1.   | Scope of application |                                                             | 34     |
|      |      | Article 2.   | Definitions |                                                                    | 37     |
|      |      | Article 3.   | International obligations of this State |                                          | 48     |
|      |      | Article 4.   | [*Competent court or authority*] |                                                 | 49     |
|      |      | Article 5.   | Authorization of [*insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State*] to act in a foreign State | 51     |
|      |      | Article 6.   | Public policy exception |                                                         | 52     |
|      |      | Article 7.   | Additional assistance under other laws |                                          | 53     |
|      |      | Article 8.   | Interpretation |                                                                 | 54     |
|      | C.   | Chapter II.  | Access of foreign representatives and creditors to courts in this State |          | 55     |
|      |      | Article 9.   | Right of direct access |                                                          | 55     |
|      |      | Article 10.  | Limited jurisdiction |                                                            | 55     |
|      |      | Article 11.  | Application by a foreign representative to commence a proceeding under [*identify laws of the enacting State relating to insolvency*] | 57     |
|      |      | Article 12.  | Participation of a foreign representative in a proceeding under [*identify laws of the enacting State relating to insolvency*] | 58     |
|      |      | Article 13.  | Access of foreign creditors to a proceeding under [*identify laws of the enacting State relating to insolvency*] | 59     |
|      |      | Article 14.  | Notification to foreign creditors of a proceeding under [*identify laws of the enacting State relating to insolvency*] | 60     |
|      | D.   | Chapter III. | Recognition of a foreign proceeding and relief |                                   | 64     |
|      |      | Article 15.  | Application for recognition of a foreign proceeding |                              | 64     |

*Page*

Article 16.   Presumptions concerning recognition . . . . . . . . . . . . . .   68
Article 17.   Decision to recognize a foreign proceeding. . . . . . . . . .   73
Article 18.   Subsequent information . . . . . . . . . . . . . . . . . . . . . . . . .   78
Article 19.   Relief that may be granted upon application for
              recognition of a foreign proceeding . . . . . . . . . . . . . . .   80
Article 20.   Effects of recognition of a foreign main proceeding. .   82
Article 21.   Relief that may be granted upon recognition of a
              foreign proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . .   87
Article 22.   Protection of creditors and other interested persons . .   90
Article 23.   Actions to avoid acts detrimental to creditors . . . . . . .   91
Article 24.   Intervention by a foreign representative in
              proceedings in this State . . . . . . . . . . . . . . . . . . . . . . . .   93

E.   Chapter IV.   Cooperation with foreign courts and foreign
     representatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   94

Article 25.   Cooperation and direct communication between a
              court of this State and foreign courts or foreign
              representatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   97
Article 26.   Cooperation and direct communication between the
              [*insert the title of a person or body administering a
              reorganization or liquidation under the law of the
              enacting State*] and foreign courts or foreign
              representatives. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   97
Article 27.   Forms of cooperation . . . . . . . . . . . . . . . . . . . . . . . . . . .   98

F.   Chapter V.   Concurrent proceedings . . . . . . . . . . . . . . . . . . . . . . . . .   100

Article 28.   Commencement of a proceeding under [*identify laws
              of the enacting State relating to insolvency*] after
              recognition of a foreign main proceeding . . . . . . . . . .   100
Article 29.   Coordination of a proceeding under [*identify laws of
              the enacting State relating to insolvency*] and a
              foreign proceeding . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   102
Article 30.   Coordination of more than one foreign proceeding. . .   104
Article 31.   Presumption of insolvency based on recognition of a
              foreign main proceeding . . . . . . . . . . . . . . . . . . . . . . . .   105
Article 32.   Rule of payment in concurrent proceedings. . . . . . . . .   106

VI.   Assistance from the UNCITRAL secretariat . . . . . . . . . . . . . . . . . . . . . .   108
A.   Assistance in drafting legislation . . . . . . . . . . . . . . . . . . . . . . . . . . .   108
B.   Information on the interpretation of legislation based on the
     Model Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   108

*Annexes*

I.   General Assembly resolution 52/158 of 15 December 1997 . . . . . . . . .   109
II.   Decision of the United Nations Commission on International Trade Law   111

*Part one*

# UNCITRAL MODEL LAW
# ON CROSS-BORDER INSOLVENCY

423

# UNCITRAL Model Law on
# Cross-Border Insolvency

## PREAMBLE

The purpose of this Law is to provide effective mechanisms for dealing with cases of cross-border insolvency so as to promote the objectives of:

*(a)* Cooperation between the courts and other competent authorities of this State and foreign States involved in cases of cross-border insolvency;

*(b)* Greater legal certainty for trade and investment;

*(c)* Fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested persons, including the debtor;

*(d)* Protection and maximization of the value of the debtor's assets; and

*(e)* Facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

## CHAPTER I.  GENERAL PROVISIONS

*Article 1.  Scope of application*

1.  This Law applies where:

*(a)* Assistance is sought in this State by a foreign court or a foreign representative in connection with a foreign proceeding; or

*(b)* Assistance is sought in a foreign State in connection with a proceeding under [*identify laws of the enacting State relating to insolvency*]; or

*(c)* A foreign proceeding and a proceeding under [*identify laws of the enacting State relating to insolvency*] in respect of the same debtor are taking place concurrently; or

*3*

*(d)* Creditors or other interested persons in a foreign State have an interest in requesting the commencement of, or participating in, a proceeding under [*identify laws of the enacting State relating to insolvency*].

2.   This Law does not apply to a proceeding concerning [*designate any types of entities, such as banks or insurance companies, that are subject to a special insolvency regime in this State and that this State wishes to exclude from this Law*].

### *Article 2.   Definitions*

For the purposes of this Law:

*(a)* "Foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation;

*(b)* "Foreign main proceeding" means a foreign proceeding taking place in the State where the debtor has the centre of its main interests;

*(c)* "Foreign non-main proceeding" means a foreign proceeding, other than a foreign main proceeding, taking place in a State where the debtor has an establishment within the meaning of subparagraph *(f)* of this article;

*(d)* "Foreign representative" means a person or body, including one appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding;

*(e)* "Foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding;

*(f)* "Establishment" means any place of operations where the debtor carries out a non-transitory economic activity with human means and goods or services.

### *Article 3.   International obligations of this State*

To the extent that this Law conflicts with an obligation of this State arising out of any treaty or other form of agreement to which it is a party with one or more other States, the requirements of the treaty or agreement prevail.

*Article 4.*  [Competent court or authority]*ª*

The functions referred to in this Law relating to recognition of foreign proceedings and cooperation with foreign courts shall be performed by [*specify the court, courts, authority or authorities competent to perform those functions in the enacting State*].

*Article 5.  Authorization of* [insert the title of the person or body administering reorganization or liquidation under the law of the enacting State] *to act in a foreign State*

A [*insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State*] is authorized to act in a foreign State on behalf of a proceeding under [*identify laws of the enacting State relating to insolvency*], as permitted by the applicable foreign law.

*Article 6.  Public policy exception*

Nothing in this Law prevents the court from refusing to take an action governed by this Law if the action would be manifestly contrary to the public policy of this State.

*Article 7.  Additional assistance under other laws*

Nothing in this Law limits the power of a court or a [*insert the title of the person or body administering a reorganization or liquidation under the law of the enacting State*] to provide additional assistance to a foreign representative under other laws of this State.

*Article 8.  Interpretation*

In the interpretation of this Law, regard is to be had to its international origin and to the need to promote uniformity in its application and the observance of good faith.

_____

*ª*A state where certain functions relating to insolvency proceedings have been conferred upon government-appointed officials of bodies might wish to include in article 4 or elsewhere in chapter I the following provision:

Nothing in this Law affects the provisions in force in the State governing the authority of [*insert the title of the government-appointed person or body*].

## CHAPTER II.   ACCESS OF FOREIGN REPRESENTATIVES AND CREDITORS TO COURTS IN THIS STATE

### *Article 9.   Right of direct access*

A foreign representative is entitled to apply directly to a court in this State.

### *Article 10.   Limited jurisdiction*

The sole fact that an application pursuant to this Law is made to a court in this State by a foreign representative does not subject the foreign representative or the foreign assets and affairs of the debtor to the jurisdiction of the courts of this State for any purpose other than the application.

### *Article 11.   Application by a foreign representative to commence a proceeding under* [identify laws of the enacting State relating to insolvency]

A foreign representative is entitled to apply to commence a proceeding under [*identify laws of the enacting State relating to insolvency*] if the conditions for commencing such a proceeding are otherwise met.

### *Article 12.   Participation of a foreign representative in a proceeding under* [identify laws of the enacting State relating to insolvency]

Upon recognition of a foreign proceeding, the foreign representative is entitled to participate in a proceeding regarding the debtor under [*identify laws of the enacting State relating to insolvency*].

### *Article 13.   Access of foreign creditors to a proceeding under* [identify laws of the enacting State relating to insolvency]

1.   Subject to paragraph 2 of this article, foreign creditors have the same rights regarding the commencement of, and participation in, a proceeding under [*identify laws of the enacting State relating to insolvency*] as creditors in this State.

2.   Paragraph 1 of this article does not affect the ranking of claims in a proceeding under [*identify laws of the enacting State relating to*

*insolvency*], except that the claims of foreign creditors shall not be ranked lower than [*identify the class of general non-preference claims, while providing that a foreign claim is to be ranked lower than the general non-preference claims if an equivalent local claim (e.g. claim for a penalty or deferred-payment claim) has a rank lower than the general non-preference claims*].*b*

*Article 14.    Notification to foreign creditors of a proceeding under*
[identify laws of the enacting State relating to insolvency]

1.    Whenever under [*identify laws of the enacting State relating to insolvency*] notification is to be given to creditors in this State, such notification shall also be given to the known creditors that do not have addresses in this State. The court may order that appropriate steps be taken with a view to notifying any creditor whose address is not yet known.

2.    Such notification shall be made to the foreign creditors individually, unless the court considers that, under the circumstances, some other form of notification would be more appropriate. No letters rogatory or other, similar formality is required.

3.    When a notification of commencement of a proceeding is to be given to foreign creditors, the notification shall:

*(a)*    Indicate a reasonable time period for filing claims and specify the place for their filing;

*(b)*    Indicate whether secured creditors need to file their secured claims; and

*(c)*    Contain any other information required to be included in such a notification to creditors pursuant to the law of this State and the orders of the court.

---

*b* The enacting State may wish to consider the following alternative wording to replace paragraph 2 of article 13:

"2.    Paragraph 1 of this article does not affect the ranking of claims in a proceeding under [*identify laws of the enacting State relating to insolvency*] or the exclusion of foreign tax and social security claims from such a proceeding. Nevertheless, the claims of foreign creditors other than those concerning tax and social security obligations shall not be ranked lower than [*identify the class of general non-preference claims, while providing that a foreign claim is to be ranked lower than the general non-preference claims if an equivalent local claim (e.g. claim for a penalty or deferred-payment claim) has a rank lower than the general non-preference claims*]."

CHAPTER III.   RECOGNITION OF A FOREIGN PROCEEDING
AND RELIEF

*Article 15.   Application for recognition of a foreign proceeding*

1.   A foreign representative may apply to the court for recognition of
the foreign proceeding in which the foreign representative has been
appointed.

2.   An application for recognition shall be accompanied by:

*(a)* A certified copy of the decision commencing the foreign proceed-
ing and appointing the foreign representative; or

*(b)* A certificate from the foreign court affirming the existence of the
foreign proceeding and of the appointment of the foreign representative; or

*(c)* In the absence of evidence referred to in subparagraphs *(a)* and *(b)*,
any other evidence acceptable to the court of the existence of the foreign
proceeding and of the appointment of the foreign representative.

3.   An application for recognition shall also be accompanied by a
statement identifying all foreign proceedings in respect of the debtor that
are known to the foreign representative.

4.   The court may require a translation of documents supplied in sup-
port of the application for recognition into an official language of this State.

*Article 16.   Presumptions concerning recognition*

1.   If the decision or certificate referred to in paragraph 2 of article 15
indicates that the foreign proceeding is a proceeding within the meaning of
subparagraph *(a)* of article 2 and that the foreign representative is a person
or body within the meaning of subparagraph *(d)* of article 2, the court is
entitled to so presume.

2.   The court is entitled to presume that documents submitted in sup-
port of the application for recognition are authentic, whether or not they
have been legalized.

3.   In the absence of proof to the contrary, the debtor's registered
office, or habitual residence in the case of an individual, is presumed to be
the centre of the debtor's main interests.

3-10063-shl   Doc 629   Filed 08/29/23   Entered 08/29/23 12:34:49   Main Documen
Pg 738 of 882   430

*Part one.   UNCITRAL Model Law on Cross-Border Insolvency*                                   *9*

*Article 17.   Decision to recognize a foreign proceeding*

1.   Subject to article 6, a foreign proceeding shall be recognized if:

*(a)*   The foreign proceeding is a proceeding within the meaning of subparagraph *(a)* of article 2;

*(b)*   The foreign representative applying for recognition is a person or body within the meaning of subparagraph *(d)* of article 2;

*(c)*   The application meets the requirements of paragraph 2 of article 15; and

*(d)*   The application has been submitted to the court referred to in article 4.

2.   The foreign proceeding shall be recognized:

*(a)*   As a foreign main proceeding if it is taking place in the State where the debtor has the centre of its main interests; or

*(b)*   As a foreign non-main proceeding if the debtor has an establishment within the meaning of subparagraph *(f)* of article 2 in the foreign State.

3.   An application for recognition of a foreign proceeding shall be decided upon at the earliest possible time.

4.   The provisions of articles 15, 16, 17 and 18 do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist.

*Article 18.   Subsequent information*

From the time of filing the application for recognition of the foreign proceeding, the foreign representative shall inform the court promptly of:

*(a)*   Any substantial change in the status of the recognized foreign proceeding or the status of the foreign representative's appointment; and

*(b)*   Any other foreign proceeding regarding the same debtor that becomes known to the foreign representative.

*Article 19.   Relief that may be granted upon application
for recognition of a foreign proceeding*

1.   From the time of filing an application for recognition until the application is decided upon, the court may, at the request of the foreign

representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including:

*(a)* Staying execution against the debtor's assets;

*(b)* Entrusting the administration or realization of all or part of the debtor's assets located in this State to the foreign representative or another person designated by the court, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy;

*(c)* Any relief mentioned in paragraph 1 *(c)*, *(d)* and *(g)* of article 21.

2.   [*Insert provisions (or refer to provisions in force in the enacting State) relating to notice*.]

3.   Unless extended under paragraph 1 *(f)* of article 21, the relief granted under this article terminates when the application for recognition is decided upon.

4.   The court may refuse to grant relief under this article if such relief would interfere with the administration of a foreign main proceeding.


*Article 20.   Effects of recognition of a foreign main proceeding*

1.   Upon recognition of a foreign proceeding that is a foreign main proceeding:

*(a)* Commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities is stayed;

*(b)* Execution against the debtor's assets is stayed; and

*(c)* The right to transfer, encumber or otherwise dispose of any assets of the debtor is suspended.

2.   The scope, and the modification or termination, of the stay and suspension referred to in paragraph 1 of this article are subject to [*refer to any provisions of law of the enacting State relating to insolvency that apply to exceptions, limitations, modifications or termination in respect of the stay and suspension referred to in paragraph 1 of this article*].

3.   Paragraph 1 *(a)* of this article does not affect the right to commence individual actions or proceedings to the extent necessary to preserve a claim against the debtor.

4. Paragraph 1 of this article does not affect the right to request the commencement of a proceeding under [*identify laws of the enacting State relating to insolvency*] or the right to file claims in such a proceeding.

### *Article 21.   Relief that may be granted upon recognition of a foreign proceeding*

1. Upon recognition of a foreign proceeding, whether main or non-main, where necessary to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including:

*(a)* Staying the commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities, to the extent they have not been stayed under paragraph 1 *(a)* of article 20;

*(b)* Staying execution against the debtor's assets to the extent it has not been stayed under paragraph 1 *(b)* of article 20;

*(c)* Suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under paragraph 1 *(c)* of article 20;

*(d)* Providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

*(e)* Entrusting the administration or realization of all or part of the debtor's assets located in this State to the foreign representative or another person designated by the court;

*(f)* Extending relief granted under paragraph 1 of article 19;

*(g)* Granting any additional relief that may be available to [*insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State*] under the laws of this State.

2. Upon recognition of a foreign proceeding, whether main or non-main, the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in this State to the foreign representative or another person designated by the court, provided that the court is satisfied that the interests of creditors in this State are adequately protected.

3.    In granting relief under this article to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

*Article 22.    Protection of creditors and other interested persons*

1.    In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph 3 of this article, the court must be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected.

2.    The court may subject relief granted under article 19 or 21 to conditions it considers appropriate.

3.    The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or at its own motion, modify or terminate such relief.

*Article 23.    Actions to avoid acts detrimental to creditors*

1.    Upon recognition of a foreign proceeding, the foreign representative has standing to initiate [*refer to the types of actions to avoid or otherwise render ineffective acts detrimental to creditors that are available in this State to a person or body administering a reorganization or liquidation*].

2.    When the foreign proceeding is a foreign non-main proceeding, the court must be satisfied that the action relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding.

*Article 24.    Intervention by a foreign representative
in proceedings in this State*

Upon recognition of a foreign proceeding, the foreign representative may, provided the requirements of the law of this State are met, intervene in any proceedings in which the debtor is a party.

3-10063-shl   Doc 629   Filed 08/29/23   Entered 08/29/23 12:34:49   Main Documer
Pg 742 of 882   434

*Part one.   UNCITRAL Model Law on Cross-Border Insolvency*                    *13*

## CHAPTER IV.   COOPERATION WITH FOREIGN COURTS AND FOREIGN REPRESENTATIVES

*Article 25.   Cooperation and direct communication between a court of this State and foreign courts or foreign representatives*

1.   In matters referred to in article 1, the court shall cooperate to the maximum extent possible with foreign courts or foreign representatives, either directly or through a [*insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State*].

2.   The court is entitled to communicate directly with, or to request information or assistance directly from, foreign courts or foreign representatives.

*Article 26.   Cooperation and direct communication between the* [insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State] *and foreign courts or foreign representatives*

1.   In matters referred to in article 1, a [*insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State*] shall, in the exercise of its functions and subject to the supervision of the court, cooperate to the maximum extent possible with foreign courts or foreign representatives.

2.   The [*insert the title of a person or body administering a reorganization or liquidation under the law of the enacting State*] is entitled, in the exercise of its functions and subject to the supervision of the court, to communicate directly with foreign courts or foreign representatives.

*Article 27.   Forms of cooperation*

Cooperation referred to in articles 25 and 26 may be implemented by any appropriate means, including:

*(a)*   Appointment of a person or body to act at the direction of the court;

*(b)*   Communication of information by any means considered appropriate by the court;

*(c)*   Coordination of the administration and supervision of the debtor's assets and affairs;

*(d)* Approval or implementation by courts of agreements concerning the coordination of proceedings;

*(e)* Coordination of concurrent proceedings regarding the same debtor;

*(f)* [*The enacting State may wish to list additional forms or examples of cooperation*].

## CHAPTER V.   CONCURRENT PROCEEDINGS

### *Article 28.   Commencement of a proceeding under* [identify laws of the enacting State relating to insolvency] *after recognition of a foreign main proceeding*

After recognition of a foreign main proceeding, a proceeding under [*identify laws of the enacting State relating to insolvency*] may be commenced only if the debtor has assets in this State; the effects of that proceeding shall be restricted to the assets of the debtor that are located in this State and, to the extent necessary to implement cooperation and coordination under articles 25, 26 and 27, to other assets of the debtor that, under the law of this State, should be administered in that proceeding.

### *Article 29.   Coordination of a proceeding under* [identify laws of the enacting State relating to insolvency] *and a foreign proceeding*

Where a foreign proceeding and a proceeding under [*identify laws of the enacting State relating to insolvency*] are taking place concurrently regarding the same debtor, the court shall seek cooperation and coordination under articles 25, 26 and 27, and the following shall apply:

*(a)* When the proceeding in this State is taking place at the time the application for recognition of the foreign proceeding is filed,

 (i) Any relief granted under article 19 or 21 must be consistent with the proceeding in this State; and

 (ii) If the foreign proceeding is recognized in this State as a foreign main proceeding, article 20 does not apply;

*(b)* When the proceeding in this State commences after recognition, or after the filing of the application for recognition, of the foreign proceeding,

 (i) Any relief in effect under article 19 or 21 shall be reviewed by the court and shall be modified or terminated if inconsistent with the proceeding in this State; and

(ii)  If the foreign proceeding is a foreign main proceeding, the
stay and suspension referred to in paragraph 1 of article 20
shall be modified or terminated pursuant to paragraph 2 of
article 20 if inconsistent with the proceeding in this State;

*(c)*  In granting, extending or modifying relief granted to a representa-
tive of a foreign non-main proceeding, the court must be satisfied that the
relief relates to assets that, under the law of this State, should be adminis-
tered in the foreign non-main proceeding or concerns information required
in that proceeding.

### *Article 30.   Coordination of more than one foreign proceeding*

In matters referred to in article 1, in respect of more than one foreign
proceeding regarding the same debtor, the court shall seek cooperation and
coordination under articles 25, 26 and 27, and the following shall apply:

*(a)*  Any relief granted under article 19 or 21 to a representative of a
foreign non-main proceeding after recognition of a foreign main proceeding
must be consistent with the foreign main proceeding;

*(b)*  If a foreign main proceeding is recognized after recognition, or
after the filing of an application for recognition, of a foreign non-main
proceeding, any relief in effect under article 19 or 21 shall be reviewed by
the court and shall be modified or terminated if inconsistent with the foreign
main proceeding;

*(c)*  If, after recognition of a foreign non-main proceeding, another
foreign non-main proceeding is recognized, the court shall grant, modify
or terminate relief for the purpose of facilitating coordination of the
proceedings.

### *Article 31.   Presumption of insolvency based on recognition*
### *of a foreign main proceeding*

In the absence of evidence to the contrary, recognition of a foreign
main proceeding is, for the purpose of commencing a proceeding under
[*identify laws of the enacting State relating to insolvency*], proof that the
debtor is insolvent.

### *Article 32.   Rule of payment in concurrent proceedings*

Without prejudice to secured claims or rights *in rem*, a creditor who
has received part payment in respect of its claim in a proceeding pursuant

to a law relating to insolvency in a foreign State may not receive a payment for the same claim in a proceeding under [*identify laws of the enacting State relating to insolvency*] regarding the same debtor, so long as the payment to the other creditors of the same class is proportionately less than the payment the creditor has already received.

*Part two*

# GUIDE TO ENACTMENT AND INTERPRETATION
## OF THE UNCITRAL MODEL LAW
## ON CROSS-BORDER INSOLVENCY

439

# Guide to Enactment and Interpretation
# of the UNCITRAL Model Law
# on Cross-Border Insolvency

## I. Purpose and origin of the Model Law

### A. Purpose of the Model Law

1.  The UNCITRAL Model Law on Cross-Border Insolvency, adopted in
1997, is designed to assist States to equip their insolvency laws with a
modern, harmonized and fair framework to address more effectively instances
of cross-border proceedings concerning debtors experiencing severe financial
distress or insolvency. Those instances include cases where the debtor has
assets in more than one State or where some of the creditors of the debtor
are not from the State where the insolvency proceeding is taking place. In
principle, the proceeding pending in the debtor's centre of main interests is
expected to have principal responsibility for managing the insolvency of the
debtor regardless of the number of States in which the debtor has assets and
creditors, subject to appropriate coordination procedures to accommodate
local needs.

2.  The Model Law reflects practices in cross-border insolvency matters
that are characteristic of modern, efficient insolvency systems. Thus, the
States enacting the Model Law would be introducing useful additions and
improvements in national insolvency regimes designed to resolve problems
arising in cross-border insolvency cases. By adopting legislation based upon
the Model Law, States recognize that certain laws relating to insolvency
may have to be or might have been amended in order to meet internationally
recognized standards.

3.  The Model Law respects the differences among national procedural laws
and does not attempt a substantive unification of insolvency law. Rather, it
provides a framework for cooperation between jurisdictions, offering solu-
tions that help in several modest but significant ways and facilitate and
promote a uniform approach to cross-border insolvency. Those solutions
include the following:

*(a)* Providing the person administering a foreign insolvency proceeding ("foreign representative") with access to the courts of the enacting State,[1] thereby permitting the foreign representative to seek a temporary "breathing space", and allowing the courts in the enacting State to determine what coordination among the jurisdictions or other relief is warranted for optimal disposition of the insolvency;

*(b)* Determining when a foreign insolvency proceeding should be accorded "recognition" and what the consequences of recognition may be;

*(c)* Providing a transparent regime for the right of foreign creditors to commence, or participate in, an insolvency proceeding in the enacting State;

*(d)* Permitting courts in the enacting State to cooperate more effectively with foreign courts and foreign representatives involved in an insolvency matter;

*(e)* Authorizing courts in the enacting State and persons administering insolvency proceedings in the enacting State to seek assistance abroad;

*(f)* Providing for court jurisdiction and establishing rules for coordination where an insolvency proceeding in the enacting State is taking place concurrently with an insolvency proceeding in a foreign State;

*(g)* Establishing rules for coordination of relief granted in the enacting State to assist two or more insolvency proceedings that may take place in foreign States regarding the same debtor.

4.  For jurisdictions that currently have to deal with numerous cases of cross-border insolvency, as well as jurisdictions that wish to be well prepared for the increasing likelihood of cases of cross-border insolvency, the Model Law is an essential reference for developing an effective cross-border cooperation framework.

## B.  *Origin of the Model Law*

5.  The increasing incidence of cross-border insolvencies reflects the continuing global expansion of trade and investment. However, national insolvency laws by and large have not kept pace with the trend, and they are often ill-equipped to deal with cases of a cross-border nature. This frequently results in inadequate and inharmonious legal approaches, which hamper the rescue of financially troubled businesses, are not conducive to a fair and efficient administration of cross-border insolvencies, impede the protection

---

[1] The "enacting State" refers to a State that has enacted legislation based on the Model Law. Unless otherwise provided, that term is used in the *Guide to Enactment and Interpretation* to refer to the State receiving an application under the Model Law.

of the assets of the insolvent debtor against dissipation and hinder maximization of the value of those assets. Moreover, the absence of predictability in the handling of cross-border insolvency cases can impede capital flow and be a disincentive to cross-border investment.

6.   Fraud by insolvent debtors, in particular by concealing assets or transferring them to foreign jurisdictions, is an increasing problem, in terms of both its frequency and its magnitude. The modern, interconnected world makes such fraud easier to conceive and carry out. The cross-border cooperation mechanisms established by the Model Law are designed to confront such international fraud.

7.   Only a limited number of countries have a legislative framework for dealing with cross-border insolvency that is well suited to the needs of international trade and investment. Various techniques and notions are employed in the absence of a specific legislative or treaty framework for dealing with cross-border insolvency. These include the following: application of the doctrine of comity by courts in common-law jurisdictions; issuance for equivalent purposes of enabling orders (exequatur) in civil-law jurisdictions; enforcement of foreign insolvency orders relying on legislation for enforcement of foreign judgements; and techniques such as letters rogatory for transmitting requests for judicial assistance.

8.   Approaches based purely on the doctrine of comity or on exequatur do not provide the same degree of predictability and reliability as can be provided by specific legislation, such as contained in the Model Law, on judicial cooperation, recognition of foreign insolvency proceedings and access for foreign representatives to courts. For example, in a given legal system general legislation on reciprocal recognition of judgements, including exequatur, might be confined to enforcement of specific money judgements or injunctive orders in two-party disputes, thus excluding decisions opening collective insolvency proceedings. Furthermore, recognition of foreign insolvency proceedings might not be considered as a matter of recognizing a foreign "judgement", for example, if the foreign bankruptcy order is considered to be merely a declaration of status of the debtor or if the order is considered not to be final.

9.   To the extent that there is a lack of communication and coordination among courts and administrators from concerned jurisdictions, it is more likely that assets would be dissipated, fraudulently concealed, or possibly liquidated without reference to other more advantageous solutions. As a result, not only is the ability of creditors to receive payment diminished, but so is the possibility of rescuing financially viable businesses and saving jobs. By contrast, mechanisms in national legislation for coordinated

administration of cases of cross-border insolvency make it possible to adopt solutions that are sensible and in the best interest of the creditors and the debtor; the presence of such mechanisms in the law of a State is therefore perceived as advantageous for foreign investment and trade in that State.

10.   The Model Law takes into account the results of other international efforts, including the negotiations leading to the European Council (EC) Regulation No. 1346/2000 of 29 May 2000 on insolvency proceedings (the "EC Regulation"), the European Convention on Certain International Aspects of Bankruptcy (1990),[2] the Montevideo treaties on international commercial law (1889 and 1940), the Convention regarding Bankruptcy between Nordic States (1933) and the Convention on Private International Law (Bustamante Code) (1928).[3] Proposals from non-governmental organizations that have been taken into account include the Model International Insolvency Cooperation Act and the Cross-Border Insolvency Concordat, both developed by the former Committee J (Insolvency) of the Section on Business Law of the International Bar Association.[4]

11.   The EC Regulation establishes a cross-border insolvency regime within the European Union for cases where the debtor has the centre of its main interests in a State member of the Union. The Regulation does not deal with cross-border insolvency matters extending beyond a State member of the European Union into a non-member State. Thus, the Model Law offers to States members of the European Union a complementary regime of considerable practical value that could address the many cases of cross-border cooperation not covered by the EC Regulation.

## C.   *Preparatory work and adoption*

12.   The project was initiated by the United Nations Commission on International Trade Law (UNCITRAL), in close cooperation with INSOL International. The project benefited from the expert advice of INSOL during all stages of the preparatory work. In addition, during the formulation of the Law, consultative assistance was provided by the former Committee J (Insolvency) of the Section on Business Law of the International Bar Association.

13.   Prior to the decision by UNCITRAL to undertake work on cross-border insolvency, the Commission and INSOL held two international colloquiums for insolvency practitioners, judges, government officials and representatives

---

[2] European Treaty Series, No. 136.

[3] League of Nations, Treaty Series, vol. LXXXVI, No. 1950.

[4] Available from http://www.iiiglobal.org/component/jdownloads/finish/396/1522.html (last visited 1 August 2013).

of other interested sectors.[5] The suggestion arising from those colloquiums was that work by UNCITRAL should have the limited but useful goal of facilitating judicial cooperation, court access for foreign insolvency representatives and recognition of foreign insolvency proceedings.

14.    When UNCITRAL decided in 1995 to develop a legal instrument relating to cross-border insolvency, it entrusted the work to the Working Group on Insolvency Law, one of the subsidiary bodies of UNCITRAL.[6] The Working Group devoted four two-week sessions to the work on the project.[7]

15.    In March 1997, another international meeting of practitioners was held to discuss the draft text as prepared by the Working Group. The participants (mostly judges, judicial administrators and government officials) generally considered that the model legislation, when enacted, would constitute a major improvement in dealing with cross-border insolvency cases.[8]

16.    The final negotiations on the draft text took place during the thirtieth session of UNCITRAL, held in Vienna from 12 to 30 May 1997. UNCITRAL adopted the Model Law by consensus on 30 May 1997.[9] In addition to the 36 States members of UNCITRAL, representatives of 40 observer States and 13 international organizations participated in the deliberations of the Commission and the Working Group. Subsequently, the General Assembly adopted resolution 52/158 of 15 December 1997 (see annex), in which it expressed its appreciation to UNCITRAL for completing and adopting the Model Law.

---

[5] The first was the UNCITRAL-INSOL Colloquium on Cross-Border Insolvency (Vienna, 17 to 19 April 1994) (for the report on the Colloquium, see document A/CN.9/398 and http://www.uncitral. org/uncitral/en/commission/colloquia_insolvency.html; for the proceedings of the Colloquium, see International Insolvency Review, Special Conference Issue, vol. 4, 1995; and for the considerations of UNCITRAL relating to the Colloquium, see *Official Records of the General Assembly, Forty-ninth Session, Supplement No. 17* (A/49/17), paras. 215-222). The second colloquium, organized to elicit the views of judges, was the UNCITRAL-INSOL Judicial Colloquium on Cross-Border Insolvency (Toronto, 22 to 23 March 1995) (for the report on the Judicial Colloquium, see document A/CN.9/413 and http://www.uncitral.org/uncitral/en/commission/colloquia_insolvency.html; and for the considerations of UNCITRAL relating to the Judicial Colloquium, see *Official Records of the General Assembly, Fiftieth Session, Supplement No. 17* (A/50/17), paras. 382-393).

[6] *Official Records of the General Assembly, Fiftieth Session, Supplement No. 17* (A/50/17), paras. 392 and 393.

[7] For the reports of the Working Group see: eighteenth session, (Vienna, 30 October to 10 November 1995), document A/CN.9/419 and Corr.1; nineteenth session (New York, 1 to 12 April 1996), document A/CN.9/422; twentieth session (Vienna, 7 to 18 October 1996), document A/CN.9/433; and twenty-first session (New York, 20 to 31 January 1997), document A/CN.9/435; all documents are available from http://www.uncitral.org/uncitral/en/commission/sessions.html.

[8] The Second UNCITRAL-INSOL Multinational Judicial Colloquium on Cross-Border Insolvency was held at New Orleans from 22 to 23 March 1997. A brief account of the Colloquium appears in the report of UNCITRAL on the work of its thirtieth session (Vienna, 12 to 30 May 1997) (*Official Records of the General Assembly, Fifty-second Session, Supplement No. 17* (A/52/17), paras. 17-22) and the report on the Colloquium is available from http://www.uncitral.org/uncitral/en/commission/colloquia_insolvency.html.

[9] For the discussion, see the report of UNCITRAL on the work of its thirtieth session (*Official Records of the General Assembly, Fifty-second Session, Supplement No. 17* (A/52/17), paras. 12-225).

## II.  Purpose of the Guide to Enactment and Interpretation

17.  UNCITRAL considered that the Model Law would be a more effective tool if it were accompanied by background and explanatory information. While such information would primarily be directed to executive branches of Governments and legislators preparing the necessary legislative revisions, it would also provide useful insight to those charged with interpretation and application of the Model Law, such as judges,[10] and other users of the text such as practitioners and academics. Such information might also assist States in considering which, if any, of the provisions should be adapted to address particular national circumstances.

18.  The present Guide was prepared by the Secretariat pursuant to the request of UNCITRAL made at the close of its thirtieth session, in 1997. It is based on the deliberations and decisions of the Commission at that thirtieth session,[11] when the Model Law was adopted, as well as on considerations of the Working Group on Insolvency Law, which conducted the preparatory work. The Guide has been revised in accordance with the request of UNCITRAL at its forty-third session (2010)[12] in order to include additional guidance with respect to the interpretation and application of selected aspects of the Model Law relating to "centre of main interests". The revisions are based on the deliberations of Working Group V (Insolvency Law) at its thirty-ninth (2010), fortieth (2011), forty-first (2012), forty-second (2012) and forty-third (2013) sessions, as well as of the Commission at its forty-sixth session (2013) and were adopted by the Commission as the "Guide to Enactment and Interpretation of the UNCITRAL Model Law on Cross-Border Insolvency" on 18 July 2013.

## III.  The model law as a vehicle for the harmonization of laws

19.  A model law is a legislative text that is recommended to States for incorporation into their national law. Unlike an international convention, a model law does not require the State enacting it to notify the United Nations or other States that may have also enacted it.

---

[10] Where "judges" would include a judicial officer or other person appointed to exercise the powers of the court or other competent authority having jurisdiction under domestic insolvency laws [enacting the Model Law].

[11] *Official Records of the General Assembly, Fifty-second Session, Supplement No. 17* (A/52/17), para. 220.

[12] *Official Records of the General Assembly, Sixty-fifth Session, Supplement No. 17* (A/65/17), para. 259.

### *A.   Flexibility of a model law*

20.   In incorporating the text of a model law into its system, a State may modify or leave out some of its provisions. In the case of a convention, the possibility of changes being made to the uniform text by the States parties (normally referred to as "reservations") is much more restricted; in particular trade law conventions usually either totally prohibit reservations or allow only specified ones. The flexibility inherent in a model law is particularly desirable in those cases when it is likely that the State would wish to make various modifications to the uniform text before it would be ready to enact it as a national law. Some modifications may be expected in particular when the uniform text is closely related to the national court and procedural system (which is the case with the UNCITRAL Model Law on Cross-Border Insolvency). This, however, also means that the degree of, and certainty about, harmonization achieved through a model law is likely to be lower than in the case of a convention. Therefore, in order to achieve a satisfactory degree of harmonization and certainty, it is recommended that States make as few changes as possible in incorporating the Model Law into their legal systems.

### *B.   Fitting the Model Law into existing national law*

21.   With its scope limited to some procedural aspects of cross-border insolvency cases, the Model Law is intended to operate as an integral part of the existing insolvency law in the enacting State. This is manifested in several ways:

   *(a)*   The amount of possibly new legal terminology added to existing law by the Model Law is limited. New legal terms are those specific to the cross-border context, such as "foreign proceeding" and "foreign representative". The terms used in the Model Law are unlikely to be in conflict with terminology in existing law. Moreover, where the expression is likely to vary from country to country, the Model Law, instead of using a particular term, indicates the meaning of the term in italics within square brackets and calls upon the drafters of the national law to use the appropriate term;

   *(b)*   The Model Law presents to enacting States the possibility of aligning the relief resulting from recognition of a foreign proceeding with the relief available in a comparable proceeding under the national law (article 20);

   *(c)*   Recognition of foreign proceedings does not prevent local creditors from initiating or continuing collective insolvency proceedings in the enacting State (article 28);

*(d)* Relief available to the foreign representative is subject to the protection of local creditors and other interested persons, including the debtor, against undue prejudice; relief is also subject to compliance with the procedural requirements of the enacting State and to applicable notification requirements (article 22 and article 19, paragraph 2);

*(e)* The Model Law preserves the possibility of excluding or limiting any action in favour of the foreign proceeding, including recognition of the proceeding, on the basis of overriding public policy considerations, although it is expected that the public policy exception will be rarely used (article 6);

*(f)* The Model Law is in the flexible form of model legislation that takes into account differing approaches in national insolvency laws and the varying propensities of States to cooperate and coordinate in insolvency matters (articles 25-27).

22.  The flexibility to adapt the Model Law to the legal system of the enacting State should be utilized with due consideration for the need for uniformity in its interpretation (see paras. 106-107 below) and for the benefits to the enacting State of adopting modern, generally acceptable international practices in insolvency matters. Thus it is advisable to limit deviations from the uniform text to a minimum. This will assist in making the national law as transparent as possible for foreign users (see also paras. 20 and 21 above). The advantage of uniformity and transparency is that it will make it easier for enacting States to demonstrate the basis of their national law on cross-border insolvency and obtain cooperation from other States in insolvency matters.

23.  If the enacting State decides to incorporate the provisions of the Model Law into an existing national insolvency statute, the title of the enacted provisions would have to be adjusted accordingly and the word "Law", which appears at various places in the title and in the text of the Model Law, would have to be replaced by the appropriate expression.

## IV.  Main features of the model law

24.  The text of the Model Law focuses on four key elements identified, through the studies and consultations conducted in the early 1990s prior to the negotiation of the Model Law, as being the areas upon which international agreement might be possible:

*(a)* Access to local courts for representatives of foreign insolvency proceedings and for creditors and authorization for representatives of local proceedings to seek assistance elsewhere;

*(b)* Recognition of certain orders issued by foreign courts;

*(c)* Relief to assist foreign proceedings; and

*(d)* Cooperation among the courts of States where the debtor's assets are located and coordination of concurrent proceedings.

### *A. Access*

25.  The provisions on access address both inbound and outbound aspects of cross-border insolvency. In terms of outbound aspects, article 5 authorizes the person or body administering a reorganization or liquidation under the law of the enacting State (referred to as the insolvency representative)[13] to act in a foreign State (article 5) on behalf of local proceedings. In terms of inbound requests, a foreign representative applying in the enacting State has the following rights: of direct access to courts in the enacting State (article 9); to apply to commence a local proceeding in the enacting State on the conditions applicable in that State (article 11); and to apply for recognition of the foreign proceedings in which they have been appointed (article 15). Upon recognition, a foreign representative is entitled to participate in insolvency-related proceedings conducted in the enacting State under the law of that State (article 12); to initiate in the enacting State an action to avoid or otherwise render ineffective acts detrimental to creditors (article 23); and to intervene in any local proceedings in which the debtor is a party (article 24).

26.  The fact that a foreign representative has the right to apply to the courts of the enacting State does not subject the foreign representative or the foreign assets and affairs of the debtor to the jurisdiction of the enacting State for any purpose other than that application (article 10).

27.  Importantly, foreign creditors have the same right as local creditors to commence and participate in proceedings in the enacting State (article 13).

28.  Questions of notice to interested persons, while closely related to the protection of their interests, are in general not regulated in the Model Law. Thus, such questions are governed by the procedural rules of the enacting State, some of which may be of a public-order character. For example, the law of the enacting State will determine whether any notice is to be given

───────────────

[13] This terminology reflects the language used in article 5 of the Model Law and is used for consistency with the *UNCITRAL Legislative Guide on Insolvency Law*, which explains that an "insolvency representative" is "a person or body, including one appointed on an interim basis, authorized in insolvency proceedings to administer the reorganization or liquidation of the insolvency estate": Introduction, para. 12 *(v)*.

3-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 757 of 882
*28   UNCITRAL Model Law on Cross-Border Insolvency: Law with Guide to Enactment and Interpretation*

449

to the debtor or another person of an application for recognition of a foreign proceeding and the time period for giving the notice.

## B.   Recognition

29.   One of the key objectives of the Model Law is to establish simplified procedures for recognition of qualifying foreign proceedings that would avoid time-consuming legalization or other processes and provide certainty with respect to the decision to recognize. The Model Law is not intended to accord recognition to all foreign insolvency proceedings. Article 17 provides that, subject to article 6, when the specified requirements of article 2 concerning the nature of the foreign proceeding (i.e. that the foreign proceeding is, as a matter of course, a collective proceeding[14] for the purposes of liquidation or reorganization under the control or supervision of the court) and the foreign representative are met and the evidence required by article 15 has been provided, the court should recognize the foreign proceeding without further requirement. The process of application and recognition is aided by the presumptions provided in article 16 that enable the court in the enacting State to presume the authenticity and validity of the certificates and documents, originating in the foreign State, that are required by article 15.

30.   Article 6 allows recognition to be refused where it would be "manifestly contrary to the public policy" of the State in which recognition is sought. This may be a preliminary question to be considered on an application for recognition. No definition of what constitutes public policy is attempted as notions vary from State to State. However, the intention is that the exception be interpreted restrictively and that article 6 be used only in exceptional and limited circumstances (see paras. 101-104). Differences in insolvency schemes do not themselves justify a finding that enforcing one State's laws would violate the public policy of another State.

31.   A foreign proceeding should be recognized as either a main proceeding or a non-main proceeding (article 17, paragraph 2). A main proceeding is one taking place where the debtor had its centre of main interests (COMI) at the date of commencement of the foreign proceeding (see paras. 157-160 on timing). In principle, a main proceeding is expected to have principal responsibility for managing the insolvency of the debtor regardless of the number of States in which the debtor has assets and creditors, subject to appropriate coordination procedures to accommodate local needs. Centre of main interests is not defined in the Model Law, but is based on a

---

[14]On what constitutes a collective proceeding, see paras. 69-72 below.

presumption that it is the registered office or habitual residence of the debtor (article 16, paragraph 3).

32.   A non-main proceeding is one taking place where the debtor has an establishment. This is defined as "any place of operation where the debtor carries out non-transitory economic activity with human means and goods or services" (article 2, subparagraph *(f)*). Proceedings commenced on a different basis, such as presence of assets without a centre of main interests or establishment, would not qualify for recognition under the Model Law scheme. Main and non-main proceedings are discussed in more detail below at paras. 81-85.

33.   Acknowledging that it might subsequently be discovered that the grounds for granting recognition were lacking at the time of recognition, have changed or ceased to exist, the Model Law provides for modification or termination of the order for recognition (article 17, paragraph 4).

34.   Recognition of foreign proceedings under the Model Law has several effects. Principal amongst them is the relief accorded to assist the foreign proceeding (articles 20 and 21), but additionally, as noted above, the foreign representative is entitled to participate in any local insolvency proceeding regarding the debtor (article 13), has standing to initiate an action for avoidance of antecedent transactions (article 23) and may intervene in any proceeding in which the debtor is a party (article 24).

## C.   Relief

35.   A basic principle of the Model Law is that the relief considered necessary for the orderly and fair conduct of a cross-border insolvency should be available to assist foreign proceedings, whether on an interim basis or as a result of recognition. Accordingly, the Model Law specifies the relief that is available in both of those instances. As such, it neither necessarily imports the consequences of the foreign law into the insolvency system of the enacting State nor applies to the foreign proceeding the relief that would be available under the law of the enacting State. However, it is possible, as noted above, to align the relief resulting from recognition of a foreign proceeding with the relief available in a comparable proceeding commenced under the law of the enacting State (article 20).

36.   Interim relief is available at the discretion of the court between the making of an application for recognition and the decision on that application (article 19); specified forms of relief are available on recognition of main proceedings (article 20); and relief at the discretion of the court is available

for both main and non-main proceedings following recognition (article 21). In the case of main proceedings, that discretionary relief would be in addition to the relief available on recognition. Additional assistance might be available under other laws of the enacting State (see article 7).

37.   Key elements of the relief accorded upon recognition of a foreign "main" proceeding include a stay of actions of individual creditors against the debtor or a stay of enforcement proceedings concerning the assets of the debtor, and a suspension of the debtor's right to transfer or encumber its assets (article 20, paragraph 1). Such stay and suspension are "mandatory" (or "automatic") in the sense that either they flow automatically from the recognition of a foreign main proceeding or, in the States where a court order is needed for the stay or suspension, the court is bound to issue the appropriate order. The stay of actions or of enforcement proceedings is necessary to provide "breathing space" until appropriate measures are taken for reorganization or liquidation of the assets of the debtor. The suspension of transfers is necessary because in a modern, globalized economic system it is possible for a multinational debtor to move money and property across boundaries quickly. The mandatory moratorium triggered by the recognition of the foreign main proceeding provides a rapid "freeze" essential to prevent fraud and to protect the legitimate interests of the parties involved until the court has an opportunity to notify all concerned and to assess the situation.

38.   Exceptions and limitations to the scope of the stay and suspension (e.g. exceptions for secured claims, payments by the debtor made in the ordinary course of business, set-off, execution of rights *in rem*) and the possibility of modifying or terminating the stay or suspension are determined by provisions governing comparable stays and suspensions in insolvency proceedings under the laws of the enacting State (article 20, paragraph 2).

39.   With respect to interim and discretionary relief, the court can impose conditions and modify or terminate the relief to protect the interests of creditors and other interested persons affected by the relief ordered (article 22).

### D.   Cooperation and coordination

*Cooperation*

40.   The Model Law expressly empowers courts to cooperate in the areas governed by the Model Law and to communicate directly with foreign counterparts. Cooperation between courts and foreign representatives and between foreign representatives is also authorized. Cooperation is not dependent upon recognition and may thus occur at an early stage and before

an application for recognition is made. Since the articles of chapter 4 apply to the matters referred to in article 1, cooperation is available not only in respect of applications for assistance made in the enacting State, but also applications from proceedings in the enacting State for assistance elsewhere (see also article 5). Moreover, cooperation is not limited to foreign proceedings within the meaning of article 2, subparagraph *(a)* that would qualify for recognition under article 17 (i.e. that they are either main or non-main), and cooperation may thus be available with respect to proceedings commenced on the basis of presence of assets. Cooperation is discussed in detail in paragraphs 209-223.

41.   Recognizing that the idea of cooperation might be unfamiliar to many judges and insolvency representatives, article 27 sets out some of the possible means of cooperation. These are further discussed and amplified in the *UNCITRAL Practice Guide on Cross-Border Insolvency Cooperation*,[15] which also compiles practice and experience with respect to the use and negotiation of cross-border insolvency agreements.

*Coordination of concurrent proceedings*

42.   Several provisions of the Model Law address coordination of concurrent proceedings and aim to foster decisions that would best achieve the objectives of both proceedings.

43.   The recognition of foreign main proceedings does not prevent commencement of local proceedings in the enacting State (article 28), nor does the commencement of local proceedings in that State terminate recognition already accorded to foreign proceedings or prevent recognition of foreign proceedings.

44.   Article 29 addresses adjustment of the relief available where there are concurrent proceedings. The basic principle is that relief granted to a recognized foreign proceeding should be consistent with the relief granted in local proceedings, irrespective of whether the foreign proceeding was recognized before or after the commencement of the local proceeding. For example, where local proceedings have already commenced at the time the application for recognition is made, relief granted to the foreign proceeding must be consistent with the local proceeding. If the foreign proceeding is recognized as a main proceeding, the automatic relief available on recognition under article 20 will not apply.

---

[15] The *Practice Guide* is available from: http://www.uncitral.org/uncitral/uncitral_texts/insolvency.html

45.    Articles 31 and 32 contain additional means of facilitating coordination. Article 31 establishes a presumption to the effect that recognition of a foreign proceeding is proof that the debtor is insolvent where insolvency is required for commencement of a local proceeding. Article 32 establishes the hotchpot rule to avoid situations in which a creditor might make claims and be paid in multiple insolvency proceedings in different jurisdictions, thereby potentially obtaining more favourable treatment than other creditors.

## V.    Article-by-article remarks

---

### PREAMBLE

The purpose of this Law is to provide effective mechanisms for dealing with cases of cross-border insolvency so as to promote the objectives of:

*(a)*    Cooperation between the courts and other competent authorities of this State and foreign States involved in cases of cross-border insolvency;

*(b)*    Greater legal certainty for trade and investment;

*(c)*    Fair and efficient administration of cross-border insolvencies that protects the interests of all creditors and other interested persons, including the debtor;

*(d)*    Protection and maximization of the value of the debtor's assets; and

*(e)*    Facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

---

46.    The Preamble gives a succinct statement of the basic policy objectives of the Model Law. It is not intended to create substantive rights, but rather to provide general orientation for users of the Model Law and to assist in its interpretation.

47.    In States where it is not customary to set out preambular statements of policy in legislation, consideration might be given to including the statement of objectives either in the body of the statute or in a separate document, in order to preserve a useful tool for the interpretation of the law

*Use of the term "insolvency"*

48.    Acknowledging that different jurisdictions might have different notions of what falls within the term "insolvency proceedings", the Model Law does

not define the term "insolvency".[16] However, as used in the Model Law, the word "insolvency" refers to various types of collective proceedings commenced with respect to debtors that are in severe financial distress or insolvent. The reason is that the Model Law (as pointed out above in paragraphs 23-24) covers proceedings concerning different types of debtors and, among those proceedings, deals with proceedings aimed at liquidating or reorganizing the debtor as a commercial entity. A judicial or administrative proceeding to wind up a solvent entity where the goal is to dissolve the entity and other foreign proceedings not falling within article 2 subparagraph *(a)* are not insolvency proceedings within the scope of the Model Law. Where a proceeding serves several purposes, including the winding up of a solvent entity, it falls under article 2, subparagraph *(a)* of the Model Law only if the debtor is insolvent or in severe financial distress.

49.  Debtors covered by the Model Law would generally fall within the scope of the *UNCITRAL Legislative Guide on Insolvency Law* and would therefore be eligible for commencement of insolvency proceedings in accordance with recommendations 15 and 16 of the *Legislative Guide*,[17] being debtors that are or will be generally unable to pay their debts as they mature or whose liabilities exceed the value of their assets.

50.  It should be noted that in some jurisdictions the expression "insolvency proceedings" has a narrow technical meaning in that it may refer, for example, only to collective proceedings involving a company or a similar legal person or only to collective proceedings against a natural person. No such distinction is intended to be drawn by the use of the term "insolvency" in the Model Law, since the Model Law is designed to be applicable to proceedings regardless of whether they involve a natural or a legal person as the debtor. If, in the enacting State, the word "insolvency" may be misunderstood as referring to one particular type of collective proceeding, another term should be used to refer to the proceedings covered by the Law.

---

[16] The *UNCITRAL Legislative Guide on Insolvency Law* explains insolvency as being "when a debtor is generally unable to pay its debts as they mature or when its liabilities exceed the value of its assets" and insolvency proceedings as being "collective proceedings, subject to court supervision, either for reorganization or liquidation", Introduction, paras. 12 *(s)* and *(u)*.

[17] Recommendations 15 and 16 of the *Legislative Guide* provide:

> 15.  The insolvency law should specify that insolvency proceedings can be commenced on the application of a debtor if the debtor can show either that:
>
> *(a)*  It is or will be generally unable to pay its debts as they mature; or
>
> *(b)*  Its liabilities exceed the value of its assets.
>
> 16.  The insolvency law should specify that insolvency proceedings can be commenced on the application of a creditor if it can be shown that either:
>
> *(a)*  The debtor is generally unable to pay its debts as they mature; or
>
> *(b)*  The debtor's liabilities exceed the value of its assets.

51. However, when referring to foreign insolvency proceedings, it is desirable to utilize the wording of article 2, subparagraph *(a)*, so as not to exclude recognition of foreign proceedings that, according to article 2, subparagraph *(a)*, should be covered.

*"State"*

52. The word "State", as used in the preamble and throughout the Model Law, refers to the entity that enacts the Law (the "enacting State"). The term should not be understood as referring, for example, to a state in a country with a federal system. The national statute may use another expression that is customarily used for this purpose.

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*

A/52/17, paras. 136-139.

A/CN.9/422, paras. 19-23.

A/CN.9/WG.V/WP.46, pp. 4-5.

A/CN.9/433, paras. 22-28.

A/CN.9/WG.V/WP.48, p. 5.

A/CN.9/435, para. 100.

*(b)  Guide to Enactment*

A/CN.9/436, paras. 37-38.

A/CN.9/442, paras. 54-56.

*(c)  Guide to Enactment and Interpretation*

A/CN.9/738, paras. 14-16.

A/CN.9/WG.V/WP.103, paras. 54, 51-52 and 56.

A/CN.9/742, para. 23.

A/CN.9/WG.V/WP.112, paras. 54, 51-51A and 56.

A/CN.9/766, paras. 21-25.

---

CHAPTER I.   GENERAL PROVISIONS

*Article 1.   Scope of application*

1.   This Law applies where:

*(a)*   Assistance is sought in this State by a foreign court or a foreign representative in connection with a foreign proceeding; or

*(b)*   Assistance is sought in a foreign State in connection with a proceeding under [*identify laws of the enacting State relating to insolvency*]; or

*(c)*   A foreign proceeding and a proceeding under [*identify laws of the enacting State relating to insolvency*] in respect of the same debtor are taking place concurrently; or

*(d)* Creditors or other interested persons in a foreign State have an interest in requesting the commencement of, or participating in, a proceeding under [*identify laws of the enacting State relating to insolvency*].

2. This Law does not apply to a proceeding concerning [*designate any types of entities, such as banks or insurance companies, that are subject to a special insolvency regime in this State and that this State wishes to exclude from this Law*].

*Paragraph 1*

53. Article 1, paragraph 1, outlines the types of issue that may arise in cases of cross-border insolvency and for which the Model Law provides solutions: *(a)* inward-bound requests for recognition of a foreign proceeding; *(b)* outward-bound requests from a court or insolvency representative in the enacting State for recognition of an insolvency proceeding commenced under the laws of the enacting State; *(c)* coordination of proceedings taking place concurrently in two or more States; and *(d)* participation of foreign creditors in insolvency proceedings taking place in the enacting State.

54. "Assistance" in paragraph 1, subparagraphs *(a)* and *(b)*, is intended to cover various situations dealt with in the Model Law, in which a court or an insolvency representative in one State may make a request directed to a court or an insolvency representative in another State for assistance within the scope of the Model Law. The Law specifies some of the types of assistance available (e.g. article 19, subparagraphs 1 *(a)* and *(b)*; article 21, subparagraphs 1 *(a)-(f)* and paragraph 2; and article 27, subparagraphs *(a)-(e)*), while other possible types of assistance are covered by a broader formulation (such as the one in article 21, subparagraph 1 *(g)*).

*Paragraph 2 (Specially regulated insolvency proceedings)*

55. In principle, the Model Law was formulated to apply to any proceeding that meets the requirements of article 2, subparagraph *(a)*, independently of the nature of the debtor or its particular status under national law. The only possible exceptions contemplated in the text of the Model Law itself are indicated in paragraph 2 (see, however, para. 61 below, for considerations regarding "consumers").

56. Banks or insurance companies are mentioned as examples of entities that the enacting State might decide to exclude from the scope of the Model Law.

The reason for the exclusion would typically be that the insolvency of such entities gives rise to the particular need to protect vital interests of a large number of individuals or that the insolvency of those entities usually requires particularly prompt and circumspect action (for instance to avoid massive withdrawals of deposits). For those reasons, the insolvency of such types of entity is administered in many States under a special regulatory regime.

57.   Paragraph 2 indicates that the enacting State might decide to exclude the insolvency of entities other than banks and insurance companies; the State might do so where the policy considerations underlying the special insolvency regime for those other types of entity (e.g. public utility companies) call for special solutions in cross-border insolvency cases.

58.   It is not advisable to exclude all cases of insolvency of the entities mentioned in paragraph 2. In particular, the enacting State might wish to treat, for recognition purposes, a foreign insolvency proceeding relating to a bank or an insurance company as an ordinary insolvency proceeding if the insolvency of the branch or of the assets of the foreign entity in the enacting State do not fall under the national regulatory scheme. The enacting State might also wish not to exclude the possibility of recognition of a foreign proceeding involving one of those entities if the law of the State of origin does not make that proceeding subject to special regulation.

59.   In enacting paragraph 2, a State may wish to make sure that it would not inadvertently and undesirably limit the right of the insolvency representative or court to seek assistance or recognition abroad of an insolvency proceeding conducted in the territory of the enacting State, merely because that insolvency is subject to a special regulatory regime. Moreover, even if the particular insolvency is governed by special regulation, it is advisable, before generally excluding those cases from the Model Law, to consider whether it would be useful to leave certain features of the Model Law (e.g. on cooperation and coordination and possibly on certain types of discretionary relief) applicable also to the specially regulated insolvency proceedings.

60.   In any case, with a view to making the national insolvency law more transparent (for the benefit of foreign users of a law based on the Model Law), it is advisable that exclusions from the scope of the law be expressly mentioned by the enacting State in paragraph 2.

*Non-traders or natural persons*

61.   In jurisdictions that have not made provision for the insolvency of consumers or whose insolvency law provides special treatment for the

insolvency of non-traders, the enacting State might wish to exclude from the scope of application of the Model Law insolvencies that relate to natural persons residing in the enacting State whose debts have been incurred predominantly for personal or household purposes, rather than for commercial or business purposes, or insolvencies that relate to non-traders. The enacting State might also wish to provide that such exclusion would not apply in cases where the total debts exceed a certain monetary ceiling.

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*

A/52/17, paras. 141-150.

A/CN.9/WG.V/WP.44, pp. 6-7.

A/CN.9/422, paras. 24-33.

A/CN.9/WG.V/WP.46, p. 5.

A/CN.9/433, paras. 29-32.

A/CN.9/WG.V/WP.48, pp. 6 and 15.

A/CN.9/435, paras. 102-106 and 179.

*(b)   Guide to Enactment*

A/CN.9/436, paras. 39-42.

A/CN.9/442, paras. 57-66.

*(c)   Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.103, paras. 57-59.

A/CN.9/742, para. 24.

A/CN.9/WG.V/WP.107, para. 65.

A/CN.9/763, paras. 22.

A/CN.9/WG.V/WP.112, paras. 58-59 and 65.

A/CN.9/766, para. 26.

---

*Article 2.   Definitions*

For the purposes of this Law:

*(a)*   "Foreign proceeding" means a collective judicial or administrative proceeding in a foreign State, including an interim proceeding, pursuant to a law relating to insolvency in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation;

*(b)*   "Foreign main proceeding" means a foreign proceeding taking place in the State where the debtor has the centre of its main interests;

*(c)*   "Foreign non-main proceeding" means a foreign proceeding, other than a foreign main proceeding, taking place in a State where the debtor has an establishment within the meaning of subparagraph *(f)* of this article;

*(d)*   "Foreign representative" means a person or body, including one appointed on an interim basis, authorized in a foreign proceeding to administer

*Article 2. Definitions* (continued)

the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of the foreign proceeding;

*(e)* "Foreign court" means a judicial or other authority competent to control or supervise a foreign proceeding;

*(f)* "Establishment" means any place of operations where the debtor carries out a non-transitory economic activity with human means and goods or services.

*Subparagraphs* (a)-(d)

62. Since the Model Law will be embedded in the national law, article 2 only needs to define the terms specific to cross-border scenarios. Thus, the Model Law contains definitions of the terms "foreign proceeding" (subparagraph *(a)*) and "foreign representative" (subparagraph *(d)*), but not of the person or body that may be entrusted with the administration of the assets of the debtor in an insolvency proceeding in the enacting State. To the extent that it would be useful to define in the national statute the term used for such a person or body (rather than just using the term commonly employed to refer to such persons), this may be added to the definitions in the law enacting the Model Law.

63. By specifying the required characteristics of a "foreign proceeding" and a "foreign representative", the definitions limit the scope of application of the Model Law. For a proceeding to be susceptible to recognition or cooperation under the Model Law and for a foreign representative to be accorded access to local courts under the Model Law, the foreign proceeding and the foreign representative must have the attributes specified in subparagraphs *(a)* and *(d)*.

64. Proceedings and foreign representatives that do not have those attributes would not be eligible for recognition under the Model Law.

*Subparagraph* (a) – *Foreign proceeding*

65. The definitions of proceedings or persons emanating from foreign jurisdictions avoid the use of expressions that may have different technical meaning in different legal systems and instead describe their purpose or function. This technique is used to avoid inadvertently narrowing the range of possible foreign proceedings that might obtain recognition and to avoid unnecessary conflict with terminology used in the laws of the enacting State. As noted

in paragraph 50 above, the expression "insolvency proceedings" may have a technical meaning in some legal systems, but is intended in subparagraph *(a)* to refer broadly to proceedings involving debtors that are in severe financial distress or insolvent.

66. The attributes required for a foreign proceeding to fall within the scope of the Model Law include the following: basis in insolvency-related law of the originating State; involvement of creditors collectively; control or supervision of the assets and affairs of the debtor by a court or another official body; and reorganization or liquidation of the debtor as the purpose of the proceeding (article 2, subparagraph *(a)*). Whether a foreign proceeding possesses or possessed those elements would be determined at the time the application for recognition is considered.

67. As noted in subparagraph *(e)* of the preamble, the focus of the Model Law is upon severely financially distressed and insolvent debtors and the laws that prevent or address the financial distress of those debtors. As noted above (para. 49), these are debtors that would generally fall within the commencement criteria discussed in the *Legislative Guide*, being debtors that are or will be generally unable to pay their debts as they mature or whose liabilities exceed the value of their assets (recommendations 15 and 16).

68. The following paragraphs discuss the various characteristics required of a "foreign proceeding" under article 2. Although discussed separately, these characteristics are cumulative and article 2, subparagraph *(a)* should be considered as a whole.

### (i)  *Collective proceeding*

69. For a proceeding to qualify for relief under the Model Law, it must be a collective proceeding because the Model Law is intended to provide a tool for achieving a coordinated, global solution for all stakeholders of an insolvency proceeding. It is not intended that the Model Law be used merely as a collection device for a particular creditor or group of creditors who might have initiated a collection proceeding in another State. Nor is it intended that the Model Law serve as a tool for gathering up assets in a winding up[18] or conservation proceeding that does not also include provision for addressing the claims of creditors. The Model Law may be an appropriate tool for certain kinds of actions that serve a regulatory purpose, such as receiverships for such publicly regulated entities as insurance companies or

---

[18] "Winding up" is a procedure in which the existence of a corporation and its business are brought to an end.

brokerage firms, provided the proceeding is collective as that term is used in the Model Law. If a proceeding is collective it must also satisfy the other elements of the definition, including that it be for the purposes of liquidation or reorganization (see paras. 77-78 below).

70.    In evaluating whether a given proceeding is collective for the purpose of the Model Law, a key consideration is whether substantially all of the assets and liabilities of the debtor are dealt with in the proceeding, subject to local priorities and statutory exceptions, and to local exclusions relating to the rights of secured creditors. A proceeding should not be considered to fail the test of collectivity purely because a class of creditors' rights is unaffected by it. An example would be insolvency proceedings that exclude encumbered assets from the insolvency estate, leaving those assets unaffected by the commencement of the proceedings and allowing secured creditors to pursue their rights outside of the insolvency law (see *Legislative Guide on Insolvency Law*, part two, chap. II, paras. 7-9). Examples of the manner in which a collective proceeding for the purposes of article 2 might deal with creditors include providing creditors that are adversely affected by the proceeding with a right (though not necessarily the obligation): to submit claims for determination and to receive an equitable distribution or satisfaction of those claims, to participate in the proceedings, and to receive notice of the proceedings in order to facilitate their participation. The *Legislative Guide* deals extensively with the rights of creditors, including the right to participate in proceedings (part two, chapter III, paras. 75-112).

71.    Within the parameters of the definition of a foreign proceeding, a variety of collective proceedings would be eligible for recognition, be they compulsory or voluntary, corporate or individual, winding-up or reorganization. The definition would also include those proceedings in which the debtor retains some measure of control over its assets, albeit under court supervision (e.g. suspension of payments, "debtor in possession").

72.    The Model Law recognizes that, for certain purposes, insolvency proceedings may be commenced under specific circumstances defined by law that do not necessarily mean the debtor is in fact insolvent. Paragraph 235 below notes that those circumstances might include cessation of payments by the debtor or certain actions of the debtor such as a corporate decision, dissipation of its assets or abandonment of its establishment. Paragraph 236 below notes that for use in jurisdictions where insolvency is a condition for commencing insolvency proceedings, article 31 establishes, upon recognition of foreign main proceedings, a rebuttable presumption of insolvency of the debtor for the purposes of commencing a local insolvency proceeding.

3-10063-shl   Doc 629   Filed 08/29/23   Entered 08/29/23 12:34:49   Main Documen
Pg 770 of 882   462

*Part two.  Guide to Enactment and Interpretation*                        *41*

#### (ii)  *Pursuant to a law relating to insolvency*

73.   This formulation is used in the Model Law to acknowledge the fact that liquidation and reorganization might be conducted under law that is not labelled as insolvency law (e.g. company law), but which nevertheless deals with or addresses insolvency or severe financial distress. The purpose was to find a description that was sufficiently broad to encompass a range of insolvency rules irrespective of the type of statute or law in which they might be contained[19] and irrespective of whether the law that contained the rules related exclusively to insolvency. A simple proceeding for a solvent legal entity that does not seek to restructure the financial affairs of the entity, but rather to dissolve its legal status, is likely not one pursuant to a law relating to insolvency or severe financial distress.

#### (iii)  *Control or supervision by a foreign court*

74.   The Model Law specifies neither the level of control or supervision required to satisfy this aspect of the definition nor the time at which that control or supervision should arise. Although it is intended that the control or supervision required under subparagraph *(a)* should be formal in nature, it may be potential rather than actual. As noted in paragraph 71, a proceeding in which the debtor retains some measure of control over its assets, albeit under court supervision, such as a debtor-in-possession would satisfy this requirement. Control or supervision may be exercised not only directly by the court but also by an insolvency representative where, for example, the insolvency representative is subject to control or supervision by the court. Mere supervision of an insolvency representative by a licensing authority would not be sufficient.

75.   Expedited proceedings of the type referred to in the *Legislative Guide* (see part two, chap IV, paras. 76-94 and recommendations 160-168) should not be excluded. These are proceedings in which the court exercises control or supervision at a late stage of the insolvency process. Proceedings in which the court has exercised control or supervision, but at the time of the application for recognition is no longer required to do so should also not be excluded. An example of the latter might be cases where a reorganization plan has been approved and although the court has no continuing function with respect to its implementation, the proceedings nevertheless remain open or pending and the court retains jurisdiction until implementation is completed.

---

[19] A/CN.9/422, para. 49.

76. Subparagraph *(a)* of article 2 makes it clear that both assets and affairs of the debtor should be subject to control or supervision; it is not sufficient if only one or the other are covered by the foreign proceeding.

### (iv)   *For the purpose of reorganization or liquidation*

77. Some types of proceeding that may satisfy certain elements of the definition of foreign proceeding in article 2, subparagraph *(a)* may nevertheless be ineligible for recognition because they are not for the stated purpose of reorganization or liquidation. They may take various forms, including proceedings that are designed to prevent dissipation and waste, rather than to liquidate or reorganize the insolvency estate; proceedings designed to prevent detriment to investors rather than to all creditors (in which case the proceeding is also likely not to be a collective proceeding); or proceedings in which the powers conferred and the duties imposed upon the foreign representative are more limited than the powers or duties typically associated with liquidation or reorganization, for example, the power to do no more than preserve assets.

78. Types of procedures that might not be eligible for recognition could include financial adjustment measures or arrangements undertaken between the debtor and some of its creditors on a purely contractual basis concerning some debt, where the negotiations do not lead to the commencement of an insolvency proceeding conducted under the insolvency law.[20] Such measures would generally not satisfy the requirement for collectivity nor for control or supervision by the court (see paras. 74-76). Because they could take a potentially large number of forms, those measures would be difficult to address in a general rule on recognition.[21] Other procedures that do not require supervision or control by the court might also be ineligible.

### *Interim proceeding*

79. The definitions in subparagraphs *(a)* and *(d)* cover also an "interim proceeding" and a representative "appointed on an interim basis". In a State where interim proceedings are either not known or do not meet the requisites of the definition, the question may arise whether recognition of a foreign

---

[20] Such contractual arrangements would clearly remain enforceable outside the Model Law without the need for recognition; nothing in the Model Law or *Guide to Enactment and Interpretation* is intended to restrict such enforceability.

[21] A/CN.9/419, paras. 19 and 29.

"interim proceeding" creates a risk of allowing potentially disruptive consequences under the Model Law that the situation does not warrant. It is advisable that, irrespective of the way interim proceedings are treated in the enacting State, the reference to "interim proceeding" in subparagraph *(a)* and to a foreign representative appointed "on an interim basis" in subparagraph *(d)* be maintained. The reason is that in the practice of many countries insolvency proceedings are often, or even usually, commenced on an "interim" or "provisional" basis. Except for being labelled as interim, those proceedings meet all the other requisites of the definition in article 2, subparagraph *(a)*. Such proceedings are often conducted for weeks or months as "interim" proceedings under the administration of persons appointed on an "interim" basis, and only some time later would the court issue an order confirming the continuation of the proceedings on a non-interim basis. The objectives of the Model Law apply fully to such "interim proceedings" (provided the requisites of subparagraphs *(a)* and *(d)* are met); therefore, these proceedings should not be distinguished from other insolvency proceedings merely because they are described as being of an interim nature. The point that an interim proceeding and the foreign representative must meet all the requirements of article 2 is emphasized in article 17, paragraph 1, according to which a foreign proceeding may be recognized only if it is "a proceeding within the meaning of subparagraph *(a)* of article 2" and "the foreign representative applying for recognition is a person or body within the meaning of subparagraph *(d)* of article 2".

80.    Article 18 addresses a case where, after the application for recognition or after recognition, the foreign proceeding or foreign representative, whether interim or not, ceases to meet the requirements of article 2, subparagraphs *(a)* and *(d)* (see paras. 168-169 below).

*Subparagraph* (b) – *foreign main proceeding*

81.    A foreign proceeding is deemed to be the "main" proceeding if it has been commenced in the State where "the debtor has the centre of its main interests". This corresponds to the formulation in article 3 of the EC Regulation (based upon the formulation previously adopted in the European Union Convention on Insolvency Proceedings (the European Convention)), thus building on the emerging harmonization as regards the notion of a "main" proceeding. The determination that a foreign proceeding is a "main" proceeding may affect the nature of the relief accorded to the foreign representative under articles 20 and 21 and coordination of the foreign proceeding with proceedings that may be commenced in the enacting State under chapter IV and with other concurrent proceedings under chapter V.

82. The Model Law does not define the concept "centre of main interests". However, an explanatory report (the Virgos-Schmit Report),[22] prepared with respect to the European Convention, provided guidance on the concept of "main insolvency proceedings" and notwithstanding the subsequent demise of the Convention, the Report has been accepted generally as an aid to interpretation of the term "centre of main interests" in the EC Regulation. Since the formulation "centre of main interests" in the EC Regulation corresponds to that of the Model Law, albeit for different purposes (see para. 141 below), jurisprudence interpreting the EC Regulation may also be relevant to interpretation of the Model Law.

83. Recitals (12) and (13) of the EC Regulation state:

"(12)   This Regulation enables the main insolvency proceedings to be opened in the Member State where the debtor has the centre of his main interests. These proceedings have universal scope and aim at encompassing all the debtor's assets. To protect the diversity of interests, this Regulation permits secondary proceedings[23] to be opened to run in parallel with the main proceedings. Secondary proceedings may be opened in the Member State where the debtor has an establishment. The effects of secondary proceedings are limited to the assets located in that State. Mandatory rules of coordination with the main proceedings satisfy the need for unity in the Community.

"(13)   The 'centre of main interests' should correspond to the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties."

84. The Virgos-Schmit Report explained the concept of "main insolvency proceedings" as follows:

"**73.   Main insolvency proceedings**

"Article 3 (1) enables main insolvency universal proceedings to be opened in the Contracting State where the debtor has his centre of main interests. Main insolvency proceedings have universal scope. They aim at encompassing all the debtor's assets on a world-wide basis and at affecting all creditors, wherever located.

"Only one set of main proceedings may be opened in the territory covered by the Convention.

---

[22] M. Virgos and E. Schmit, *Report on the Convention on Insolvency Proceedings*, Brussels 3 May 1996. The report was published in July 1996 and is available from http://aei.pitt.edu/952 (last visited 1 August 2013).
[23] The EC Regulation refers to "secondary proceedings", while the Model Law uses "non-main proceedings".

...

"75. The concept of 'centre of main interests' must be interpreted as the place where the debtor conducts the administration of his interests on a regular basis and is therefore ascertainable by third parties.

"The rationale of this rule is not difficult to explain. Insolvency is a foreseeable risk. It is therefore important that international jurisdiction (which, as we will see, entails the application of the insolvency laws of that Contracting State) be based on a place known to the debtor's potential creditors. This enables the legal risks which would have to be assumed in the case of insolvency to be calculated.

"By using the term 'interests', the intention was to encompass not only commercial, industrial or professional activities, but also general economic activities, so as to include the activities of private individuals (e.g. consumers). The expression 'main' serves as a criterion for the cases where these interests include activities of different types which are run from different centres.

"In principle, the centre of main interests will in the case of professionals be the place of their professional domicile and for natural persons in general, the place of their habitual residence.

"Where companies and legal persons are concerned, the Convention presumes, unless proved to the contrary, that the debtor's centre of main interests is the place of his registered office. This place normally corresponds to the debtor's head office."

Centre of main interests is discussed further in the remarks on article 16.


*Subparagraph* (c) – *foreign non-main proceeding*

85. Subparagraph *(c)* requires that a "foreign non-main proceeding" take place in the State where the debtor has an "establishment" (see paras. 88-90 below). Thus, a foreign non-main proceeding susceptible to recognition under article 17, paragraph 2 may be only a proceeding commenced in a State where the debtor has an establishment within the meaning of article 2, subparagraph *(f)*. This rule does not affect the provision in article 28, namely, that an insolvency proceeding may be commenced in the enacting State if the debtor has assets there. It should be noted, however, that the effects of an insolvency proceeding commenced on the basis of the presence of assets only are normally restricted to the assets located in that State; if other assets of the debtor located abroad should, under the law of the enacting State, be administered in that insolvency proceeding (as envisaged in article 28), that

cross-border issue is to be dealt with as a matter of international cooperation and coordination under articles 25-27 of the Model Law.

### *Subparagraph* (d) – *foreign representative*

86.   Subparagraph *(d)* recognizes that the foreign representative may be a person authorized in the foreign proceedings to administer those proceedings, which would include seeking recognition, relief and cooperation in another jurisdiction, or they may simply be a person authorized specifically for the purposes of representing those proceedings. The Model Law does not specify that the foreign representative must be authorized by the court (as defined in article 2, subparagraph *(e)*) and the definition is thus sufficiently broad to include appointments that might be made by a special agency other than the court. It also includes appointment made on an interim basis (see paras. 79-80 above). The fact of appointment of the foreign representative in the foreign proceeding to act in either or both of those capacities is sufficient for the purposes of the Model Law; article 15 requires either a certified copy of the decision appointing the representative, a certificate affirming the appointment or other evidence of that appointment that is acceptable to the receiving court. The definition in subparagraph *(d)* is sufficiently broad to include debtors who remain in possession after the commencement of insolvency proceedings.

### *Subparagraph* (e) – *foreign court*

87.   A foreign proceeding that meets the requisites of article 2, subparagraph *(a),* should receive the same treatment irrespective of whether it has been commenced and supervised by a judicial body or an administrative body. Therefore, in order to obviate the need to refer to a foreign non-judicial authority whenever reference is made to a foreign court, the definition of "foreign court" in subparagraph *(e)* includes also non-judicial authorities. Subparagraph *(e)* follows a similar definition contained in article 2, subparagraph *(d)* of the EC Regulation, which is also used in the *Legislative Guide* (Intro., para. 12(i)) and the *UNCITRAL Practice Guide* (Intro., paras. 7-8).

### *Subparagraph* (f) – *establishment*

88.   The definition of the term "establishment" was inspired by article 2, subparagraph *(h)* of the EC Regulation. The term is used in the Model Law in the definition of "foreign non-main proceeding" (article 2, subparagraph *(c)*) and in the context of article 17, paragraph 2, according to which,

3-10063-shl Doc 629 Filed 08/29/23 Entered 08/29/23 12:34:49 Main Document
Pg 776 of 882 468

*Part two. Guide to Enactment and Interpretation* *47*

for a foreign non-main proceeding to be recognized, the debtor must have an establishment in the foreign State (see also para. 85 above).

89. The Virgos-Schmit Report on that Convention provides some further explanation of "establishment":

"Place of operations means a place from which economic activities are exercised on the market (i.e. externally), whether the said activities are commercial, industrial or professional.

"The emphasis on an economic activity having to be carried out using human resources shows the need for a minimum level of organization. A purely occasional place of operations cannot be classified as an 'establishment'. A certain stability is required. The negative formula ('non-transitory') aims to avoid minimum time requirements. The decisive factor is how the activity appears externally, and not the intention of the debtor."[24]

90. Since "establishment" is a defined term, the inquiry to be made by the court as to whether the debtor has an establishment is purely factual in nature. Unlike "foreign main proceeding" there is no presumption with respect to the determination of establishment. There is a legal issue as to whether the term "non-transitory" refers to the duration of a relevant economic activity or to the specific location at which the activity is carried on. The commencement of insolvency proceedings, the existence of debts, and the presence alone of goods in isolation, of bank accounts or of property would not in principle satisfy the definition of establishment.

*Discussion in UNCITRAL and in the Working Group*

| (a) Model Law | (b) Guide to Enactment |
|---|---|
| A/52/17, paras. 152-158. | A/CN.9/436, paras. 43-45. |
| A/CN.9/419, paras. 95-117. | A/CN.9/442, paras. 67-75. |
| A/CN.9/WG.V/WP.44, pp. 7-10. | |
| A/CN.9/422, paras. 34-65. | |
| A/CN.9/WG.V/WP.46, pp. 5-7. | (c) Guide to Enactment and Interpretation |
| A/CN.9/433, paras. 33-41 and 147. | A/CN.9/715, paras. 14-15, 17-22, 32-35 and 46. |
| A/CN.9/WG.V/WP.48, pp. 6-7. | |
| A/CN.9/435, paras. 108-113. | A/CN.9/738, paras. 17-19. |

---

[24] Virgos-Schmit Report (see footnote 22), para. 7.1.

*(c)   Guide to Enactment and Interpretation* (continued)

A/CN.9/WG.V/WP.103, paras. 67-68A, 71-72, 23-23G, 69-70, 31-31C and 73-75B.

A/CN.9/742, paras. 25-36 and 58.

A/CN.9/WG.V/WP.107, paras. 68, 23A-24G, 31 and 73-75B.

A/CN.9/763, paras. 23-25.

A/CN.9/WG.V/WP.112, paras. 68-68A, 71-72, 23-23C, 24-24G, 70, 31-31C and 73-75B.

A/CN.9/766, paras. 27-28.

---

*Article 3.   International obligations of this State*

To the extent that this Law conflicts with an obligation of this State arising out of any treaty or other form of agreement to which it is a party with one or more other States, the requirements of the treaty or agreement prevail.

---

91.   Article 3, expressing the principle of supremacy of international obligations of the enacting State over internal law, has been modelled on similar provisions in other model laws prepared by UNCITRAL.

92.   In enacting the article, the legislator may wish to consider whether it would be desirable to take steps to avoid an unnecessarily broad interpretation of international treaties. For example, the article might result in giving precedence to international treaties that, while dealing with matters covered also by the Model Law (e.g. access to courts and cooperation between courts or administrative authorities), were aimed at the resolution of problems other than those the Model Law focuses on. Some of those treaties, only because of their imprecise or broad formulation, may be misunderstood as dealing also with matters dealt with by the Model Law. Such a result would compromise the goal of achieving uniformity and facilitating cross-border cooperation in insolvency matters and would reduce certainty and predictability in the application of the Model Law. The enacting State might wish to provide that, in order for article 3 to displace a provision of the national law, a sufficient link must exist between the international treaty concerned and the issue governed by the provision of the national law in question. Such a condition would avoid the inadvertent and excessive restriction of the effects of the legislation implementing the Model Law. However, such a provision should not go so far as to impose a condition that the treaty concerned has to deal specifically with insolvency matters in order to satisfy that condition.

93.   While in some States binding international treaties are self-executing, in other States those treaties are, with certain exceptions, not self-executing in that they require internal legislation in order to become enforceable law. With respect to the latter group of States, in view of their normal practice in dealing with international treaties and agreements, it would be inappropriate or unnecessary to include article 3 in their legislation or it might be appropriate to include it in a modified form.

*Discussion in UNCITRAL and in the Working Group*

| | |
|---|---|
| *(a) Model Law* | *(b) Guide to Enactment* |
| A/52/17, paras. 159-162. | A/CN.9/436, para. 46. |
| A/CN.9/WG.V/WP.44, p. 11. | A/CN.9/442, paras. 76-78. |
| A/CN.9/422, paras. 66-67. | *(c)   Guide to Enactment and Interpretation* |
| A/CN.9/WG.V/WP.46, p. 7. | |
| A/CN.9/433, paras. 42-43. | A/CN.9/WG.V/WP.107, para. 78. |
| A/CN.9/WG.V/WP.48, pp. 7-8. | A/CN.9/763, para. 26. |
| A/CN.9/435, paras. 114-117. | A/CN.9/WG.V/WP.112, para. 78. |
| | A/CN.9/766, para. 29. |

---

*Article 4.*   [Competent court or authority][1]

The functions referred to in this Law relating to recognition of foreign proceedings and cooperation with foreign courts shall be performed by [*specify the court, courts, authority or authorities competent to perform those functions in the enacting State*].

————
   [1]A State where certain functions relating to insolvency proceedings have been conferred upon government-appointed officials or bodies might wish to include in article 4 or elsewhere in chapter I the following provision:

Nothing in this Law affects the provisions in force in this State governing the authority of [*insert the title of the government-appointed person or body*].

---

94.   If in the enacting State any of the functions mentioned in article 4 are performed by an authority other than a court, the State would insert in article 4 and in other appropriate places in the enacting legislation the name of the competent authority.

95. The competence for the various judicial functions dealt with in the Model Law may lie with different courts in the enacting State and the enacting State would tailor the text of the article to its own system of court competence. The value of article 4, as enacted in a given State, would be to increase the transparency and ease of use of the insolvency legislation for the benefit of, in particular, foreign representatives and foreign courts.

96. In defining jurisdiction in matters mentioned in article 4, the implementing legislation should not unnecessarily limit the jurisdiction of other courts in the enacting State, in particular to entertain requests by foreign representatives for provisional relief.

*Footnote*

97. In a number of States, insolvency legislation has entrusted certain tasks relating to the general supervision of the process of dealing with insolvency cases in the country to government-appointed officials who are typically civil servants or judicial officers and who carry out their functions on a permanent basis. The names under which they are known vary and include, for example, "official receiver", "official trustee" or "official assignee". The activities and the scope and nature of their duties vary from State to State. The Model Law does not restrict the authority of such officials, a point that some enacting States may wish to clarify in the law, as indicated in the footnote. However, depending on the wording that the enacting State uses in articles 25 and 26 in referring to the "title of the person or body administering a reorganization or liquidation under the law of the enacting State", the officials may be subjected to the duty to cooperate as provided under articles 25-27.

98. In some jurisdictions, officials referred to in the preceding paragraph may also be appointed to act as insolvency representatives in individual insolvency cases. To the extent that occurs, such officials would be covered by the Model Law.

*Discussion in UNCITRAL and in the Working Group*

*(a) Model Law*                          A/CN.9/WG.V/WP.46, p. 8.
A/52/17, paras. 163-166.                 A/CN.9/433, paras. 44-45.
A/CN.9/419, para. 69.                    A/CN.9/WG.V/WP.48, pp. 8-9.
A/CN.9/WG.V/WP.44, p. 11.                A/CN.9/435, paras. 118-122.
A/CN.9/422, paras. 68-69.

*(b)   Guide to Enactment*

A/CN.9/436, paras. 47-50.

A/CN.9/442, paras. 79-83.

> *Article 5.   Authorization of* [insert the title of the person or body
> administering a reorganization or liquidation under the law
> of the enacting State] *to act in a foreign State*
>
> A [*insert the title of the person or body administering a reorganization
> or liquidation under the law of the enacting State]* is authorized to act in a
> foreign State on behalf of a proceeding under *[identify laws of the enacting
> State relating to insolvency*], as permitted by the applicable foreign law.

99.   The intent of article 5 is to equip insolvency representatives or other
authorities appointed in insolvency proceedings commenced in the enacting
State to act abroad as foreign representatives of those proceedings. The lack
of such authorization in some States has proved to be an obstacle to effective
international cooperation in cross-border cases. An enacting State in which
insolvency representatives are already equipped to act as foreign representatives
may decide to forgo inclusion of article 5, although retaining that article
would provide clear statutory evidence of that authority and assist foreign
courts and other users of the law.

100.   Article 5 is formulated to make it clear that the scope of the power
exercised abroad by the insolvency representative would depend upon the
foreign law and courts. Action that the insolvency representative appointed
in the enacting State may wish to take in a foreign country will be action
of the type dealt with in the Model Law, but the authority to act in a foreign
country does not depend on whether that country has enacted legislation
based on the Model Law.

*Discussion in UNCITRAL and in the Working Group*

| *(a)   Model Law* | A/CN.9/WG.V/WP.46, p. 8. |
|---|---|
| A/52/17, paras. 167-169. | A/CN.9/433, paras. 46-49. |
| A/CN.9/419, paras. 36-39. | A/CN.9/WG.V/WP.48, p. 9. |
| A/CN.9/WG.V/WP.44, p. 12. | A/CN.9/435, paras. 123-124. |
| A/CN.9/422, paras. 70-74. | |

| | |
|---|---|
| *(b)   Guide to Enactment*<br>A/CN.9/436, paras. 51-52.<br>A/CN.9/442, paras. 84-85. | *(c)   Guide to Enactment and Interpretation*<br>A/CN.9/WG.V/WP.107, para. 84.<br>A/CN.9/763, para. 26.<br>A/CN.9/WG.V/WP.112, para. 84.<br>A/CN.9/766, para. 30. |

---

*Article 6.   Public policy exception*

Nothing in this Law prevents the court from refusing to take an action governed by this Law if the action would be manifestly contrary to the public policy of this State.

---

101.   As the notion of public policy is grounded in national law and may differ from State to State, no uniform definition of that notion is attempted in article 6.

102.   In some States the expression "public policy" may be given a broad meaning in that it might relate in principle to any mandatory rule of national law. In many States, however, the public policy exception is construed as being restricted to fundamental principles of law, in particular constitutional guarantees; in those States, public policy would only be used to refuse the application of foreign law, or the recognition of a foreign judicial decision or arbitral award, when that would contravene those fundamental principles.

103.   For the applicability of the public policy exception in the context of the Model Law it is important to note that a growing number of jurisdictions recognize a dichotomy between the notion of public policy as it applies to domestic affairs, as well as the notion of public policy as it is used in matters of international cooperation and the question of recognition of effects of foreign laws. It is especially in the latter situation that public policy is understood more restrictively than domestic public policy. This dichotomy reflects the realization that international cooperation would be unduly hampered if "public policy" were to be understood in an extensive manner.

104.   The purpose of the expression "manifestly", used also in many other international legal texts as a qualifier of the expression "public policy", is to emphasize that public policy exceptions should be interpreted restrictively and that article 6 is only intended to be invoked under exceptional circumstances concerning matters of fundamental importance for the enacting State.

3-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 782 of 882

*Part two.  Guide to Enactment and Interpretation*                    *53*

474

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*

A/52/17, paras. 170-173.

A/CN.9/419, para. 40.

A/CN.9/WG.V/WP.44, p. 15.

A/CN.9/422, paras. 84-85.

A/CN.9/WG.V/WP.46, p. 16.

A/CN.9/433, paras. 156-160.

A/CN.9/WG.V/WP.48, p. 9.

A/CN.9/435, paras. 125-128.

*(b)  Guide to Enactment*

A/CN.9/436, para. 53.

A/CN.9/442, paras. 86-89.

*(c)  Guide to Enactment and
      Interpretation*

A/CN.9/715, paras. 26-30.

A/CN.9/738, para. 32.

---

*Article 7.  Additional assistance under other laws*

Nothing in this Law limits the power of a court or a [*insert the title of
the person or body administering a reorganization or liquidation under the
law of the enacting State*] to provide additional assistance to a foreign repre-
sentative under other laws of this State.

---

105.  The purpose of the Model Law is to increase and harmonize cross-
border assistance available in the enacting State to foreign representatives.
However, since the law of the enacting State may, at the time of enacting
the Law, already have in place various provisions under which a foreign
representative could obtain cross-border assistance and since it is not the
purpose of the Law to displace those provisions to the extent that they
provide assistance that is additional to or different from the type of assis-
tance dealt with in the Model Law, the enacting State may consider whether
article 7 is needed to make that point clear.

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*

A/52/17, para. 175.

*(b)  Guide to Enactment*

A/CN.9/442, para. 90.

---

*Article 8.   Interpretation*

In the interpretation of this Law, regard is to be had to its international origin and to the need to promote uniformity in its application and the observance of good faith.

---

106.   A provision similar to the one contained in article 8 appears in a number of private law treaties (e.g. art. 7, para. 1, of the United Nations Convention on Contracts for the International Sale of Goods). More recently, it has been recognized that such a provision would also be useful in a non-treaty text such as a model law on the basis that a State enacting a model law would have an interest in its harmonized interpretation. Article 8 has been modelled on article 3, paragraph 1, of the UNCITRAL Model Law on Electronic Commerce.

107.   Harmonized interpretation of the Model Law is facilitated by the Case Law on UNCITRAL Texts (CLOUT) information system, under which the UNCITRAL secretariat publishes abstracts of judicial decisions (and, where applicable, arbitral awards) that interpret conventions and model laws emanating from UNCITRAL. (For further information about the system, see paragraph 243 below.)

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*
A/52/17, para. 174.

*(b)   Guide to Enactment*
A/CN.9/442, paras. 91-92.

*(c)   Guide to Enactment and Interpretation*
A/CN.9/715, paras. 23-25.
A/CN.9/WG.V/WP.103, para. 92.
A/CN.9/742, paras. 37-38.
A/CN.9/WG.V/WP.107, para. 91.
A/CN.9/763, para. 26.
A/CN.9/WG.V/WP.112, para. 91.
A/CN.9/766, para. 30.

> CHAPTER II.  ACCESS OF FOREIGN REPRESENTATIVES
> AND CREDITORS TO COURTS IN THIS STATE
>
> *Article 9.  Right of direct access*
>
> A foreign representative is entitled to apply directly to a court in this
> State.

108.  An important objective of the Model Law is to provide expedited and
direct access for foreign representatives to the courts of the enacting State.
Article 9 is limited to expressing the principle of direct access by the foreign
representative to courts of the enacting State, thus freeing the representative
from having to meet formal requirements such as licences or consular action.
Article 4 deals with court competence in the enacting State for providing
relief to the foreign representative.

*Discussion in UNCITRAL and in the Working Group*

| | |
|---|---|
| *(a)  Model Law* | *(b)  Guide to Enactment* |
| A/52/17, paras. 176-178. | A/CN.9/436, para. 54. |
| A/CN.9/419, paras. 77-79 and 172-173. | A/CN.9/442, para. 93. |
| A/CN.9/422, paras. 144-151. | |
| A/CN.9/WG.V/WP.46, p. 9. | *(c)  Guide to Enactment and Interpretation* |
| A/CN.9/433, paras. 50-58. | A/CN.9/WG.V/WP.103, para. 93. |
| A/CN.9/WG.V/WP.48, p. 10. | A/CN.9/WG.V/WP.112, para. 93. |
| A/CN.9/435, paras. 129-133. | A/CN.9/766, para. 31. |

> *Article 10.  Limited jurisdiction*
>
> The sole fact that an application pursuant to this Law is made to a court
> in this State by a foreign representative does not subject the foreign repre-
> sentative or the foreign assets and affairs of the debtor to the jurisdiction of
> the courts of this State for any purpose other than the application.

109.  Article 10 constitutes a "safe conduct" rule aimed at ensuring that
the court in the enacting State would not assume jurisdiction over all the
assets of the debtor on the sole ground of the foreign representative having

made an application for recognition of a foreign proceeding. The article also makes it clear that the application alone is not sufficient ground for the court of the enacting State to assert jurisdiction over the foreign representative as to matters unrelated to insolvency. The article responds to concerns of foreign representatives and creditors about exposure to all-embracing jurisdiction triggered by an application under the Model Law.

110.   The limitation on jurisdiction over the foreign representative embodied in article 10 is not absolute. It is only intended to shield the foreign representative to the extent necessary to make court access a meaningful proposition. It does so by providing that an appearance in the courts of the enacting State for the purpose of requesting recognition would not expose the entire estate under the supervision of the foreign representative to the jurisdiction of those courts. Other possible grounds for jurisdiction under the laws of the enacting State over the foreign representative or the assets are not affected. For example, a tort or misconduct committed by the foreign representative may provide grounds for jurisdiction to deal with the consequences of such an action by the foreign representative. Furthermore, a foreign representative who applies for relief in the enacting State will be subject to conditions that the court may order in connection with relief granted (article 22, paragraph 2).

111.   Article 10 may appear superfluous in States where the rules on jurisdiction do not allow a court to assume jurisdiction over a person making an application to the court on the sole ground of the applicant's appearance. Enacting the article in those States would be useful, however, to eliminate possible concerns of foreign representatives or creditors over the possibility of jurisdiction based on the sole ground of applying to the court.

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*
A/52/17, paras. 179-182.
A/CN.9/WG.V/WP.44, p. 24.
A/CN.9/422, paras. 160-166.
A/CN.9/WG.V/WP.46, pp. 10-11.
A/CN.9/433, paras. 68-70.
A/CN.9/WG.V/WP.48, p. 10.
A/CN.9/435, paras. 134-136.

*(b)   Guide to Enactment*
A/CN.9/436, paras. 55-56.
A/CN.9/442, paras. 94-96.

*(c)   Guide to Enactment and
       Interpretation*
A/CN.9/WG.V/WP.107, para. 96.
A/CN.9/763, para. 27.
A/CN.9/WG.V/WP.112, para. 96.
A/CN.9/766, para. 31.

> *Article 11.  Application by a foreign representative to commence*
> *a proceeding under* [identify laws of the enacting State
> relating to insolvency]
>
> A foreign representative is entitled to apply to commence a proceeding
> under [*identify laws of the enacting State relating to insolvency*] if the condi-
> tions for commencing such a proceeding are otherwise met.

112.   Many national laws, in enumerating persons who may request the
commencement of an insolvency proceeding, do not mention a representative
of a foreign insolvency proceeding; under such laws, it might be doubtful
whether a foreign representative might make such a request.

113.   Article 11 is designed to ensure that the foreign representative (of a
foreign main or non-main proceeding) has standing[25] to request the
commencement of an insolvency proceeding. However, the article makes it
clear (by the words "if the conditions for commencing such a proceeding
are otherwise met") that it does not otherwise modify the conditions under
which an insolvency proceeding may be commenced in the enacting State.

114.   A foreign representative has this right without prior recognition of
the foreign proceeding because the commencement of an insolvency
proceeding might be crucial in cases of urgent need for preserving the assets
of the debtor. Article 11 recognizes that not only a representative of a foreign
main proceeding but also a representative of a foreign non-main proceeding
may have a legitimate interest in the commencement of an insolvency
proceeding in the enacting State. Sufficient guarantees against abusive
applications are provided by the requirement that the other conditions for
commencing such a proceeding under the law of the enacting State have to
be met.

*Discussion in UNCITRAL and in the Working Group*

| | |
|---|---|
| *(a)  Model Law* | A/CN.9/WG.V/WP.46, p. 11. |
| A/52/17, paras. 183-187. | A/CN.9/433, paras. 71-75. |
| A/CN.9/WG.V/WP.44, pp. 24-25. | A/CN.9/WG.V/WP.48, p. 11. |
| A/CN.9/422, paras. 170-177. | A/CN.9/435, paras. 137-146. |

---

[25]Also known as "procedural legitimation", "active legitimation" or "legitimation".

*(b)   Guide to Enactment*

A/CN.9/436, para. 57.

A/CN.9/442, paras. 97-99.

*(c)   Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.107, para. 98.

A/CN.9/763, para. 27.

A/CN.9/WG.V/WP.112, para. 98.

A/CN.9/766, para. 31.

---

*Article 12.   Participation of a foreign representative in a proceeding under*
[identify laws of the enacting State relating to insolvency]

Upon recognition of a foreign proceeding, the foreign representative is entitled to participate in a proceeding regarding the debtor under [*identify laws of the enacting State relating to insolvency*].

---

115.   The purpose of article 12 is to ensure that, when an insolvency proceeding concerning a debtor is taking place in the enacting State, the foreign representative of a proceeding concerning that debtor will be given, as an effect of recognition of the foreign proceeding, standing[25] to make petitions, requests or submissions concerning issues such as protection, realization or distribution of assets of the debtor or cooperation with the foreign proceeding.

116.   Article 12 is limited to giving the foreign representative standing and does not vest the foreign representative with any specific powers or rights. The article does not specify the kinds of motions that the foreign representative might make and does not affect the provisions in the insolvency law of the enacting State that govern the fate of any such motions.

117.   If the law of the enacting State uses a term other than "participate" to express the concept, that other term may be used in enacting the provision. It should be noted, however, that article 24 already uses the term "intervene" to refer to a case where the foreign representative takes part in an individual action by or against the debtor (as opposed to a collective insolvency proceeding) (see paras. 205 and 208 below).

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*

A/52/17, paras. 188-189.

A/CN.9/422, paras. 114-115, 147 and 149.

A/CN.9/WG.V/WP.46, p. 9.

A/CN.9/433, para. 58.

A/CN.9/WG.V/WP.48, p. 11.

A/CN.9/435, paras. 147-150.

*(b)  Guide to Enactment*

A/CN.9/436, paras. 58-59.

A/CN.9/442, paras. 100-102.

*(c)  Guide to Enactment and
      Interpretation*

A/CN.9/WG.V/WP.103, para. 100.

A/CN.9/WG.V/WP.107, paras. 100-102.

A/CN.9/763, para. 27.

A/CN.9/WG.V/WP.112, paras. 100-102.

A/CN.9/766, para. 31.

---

*Article 13.    Access of foreign creditors to a proceeding under*
[identify laws of the enacting State relating to insolvency]

1.    Subject to paragraph 2 of this article, foreign creditors have the same rights regarding the commencement of, and participation in, a proceeding under [*identify laws of the enacting State relating to insolvency*] as creditors in this State.

2.    Paragraph 1 of this article does not affect the ranking of claims in a proceeding under [*identify laws of the enacting State relating to insolvency*], except that the claims of foreign creditors shall not be ranked lower than [*identify the class of general non-preference claims, while providing that a foreign claim is to be ranked lower than the general non-preference claims if an equivalent local claim (e.g. claim for a penalty or deferred-payment claim) has a rank lower than the general non-preference claims*].[2]

_____
[2] The enacting State may wish to consider the following alternative wording to replace paragraph 2 of article 13(2):

2.    Paragraph 1 of this article does not affect the ranking of claims in a proceeding under [*identify laws of the enacting State relating to insolvency*] or the exclusion of foreign tax and social security claims from such a proceeding. Nevertheless, the claims of foreign creditors other than those concerning tax and social security obligations shall not be ranked lower than [*identify the class of general non-preference claims, while providing that a foreign claim is to be ranked lower than the general non-preference claims if an equivalent local claim (e.g. claim for a penalty or deferred-payment claim) has a rank lower than the general non-preference claims*].

---

118.    With the exception contained in paragraph 2, article 13 embodies the principle that foreign creditors, when they apply to commence an insolvency proceeding in the enacting State or file claims in such a proceeding, should not be treated worse than local creditors.

119.   Paragraph 2 makes it clear that the principle of non-discrimination
embodied in paragraph 1 leaves intact the provisions on the ranking of
claims in insolvency proceedings, including any provisions that might assign
a special ranking to claims of foreign creditors. Few States currently have
provisions assigning special ranking to foreign creditors. However, lest the
non-discrimination principle should be emptied of its meaning by provisions
giving the lowest ranking to foreign claims, paragraph 2 establishes the
minimum ranking for claims of foreign creditors: the rank of general
unsecured claims. The exception to that minimum ranking is provided for
cases where the claim in question, if it were of a domestic creditor, would
be ranked lower than general unsecured claims (such low-rank claims may
be, for instance, those of a State authority for financial penalties or fines,
claims whose payment is deferred because of a special relationship between
the debtor and the creditor or claims that have been filed after the expiry
of the time period for doing so). Those special claims may rank below the
general unsecured claims, for reasons other than the nationality or location
of the creditor, as provided in the law of the enacting State.

120.   The alternative provision in the footnote differs from the provision
in the text only in that it provides wording for States that refuse to recognize
foreign tax and social security claims to continue to discriminate against
such claims.

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*
A/52/17, paras. 190-192.
A/CN.9/WG.V/WP.44, pp. 25-26.
A/CN.9/422, paras. 179-187.
A/CN.9/WG.V/WP.46, pp. 11-12.
A/CN.9/433, paras. 77-85.
A/CN.9/WG.V/WP.48, pp. 11-12.
A/CN.9/435, paras. 151-156.

*(b)  Guide to Enactment*
A/CN.9/436, paras. 60-61.
A/CN.9/442, paras. 103-105.

---

*Article 14.   Notification to foreign creditors of a proceeding under*
[identify laws of the enacting State relating to insolvency]

1.   Whenever under [*identify laws of the enacting State relating to insolvency*]
notification is to be given to creditors in this State, such notification shall also

be given to the known creditors that do not have addresses in this State. The court may order that appropriate steps be taken with a view to notifying any creditor whose address is not yet known.

2.  Such notification shall be made to the foreign creditors individually, unless the court considers that, under the circumstances, some other form of notification would be more appropriate. No letters rogatory or other, similar formality is required.

3.  When a notification of commencement of a proceeding is to be given to foreign creditors, the notification shall:

    *(a)*  Indicate a reasonable time period for filing claims and specify the place for their filing;

    *(b)*  Indicate whether secured creditors need to file their secured claims; and

    *(c)*  Contain any other information required to be included in such a notification to creditors pursuant to the law of this State and the orders of the court.

121.  The main purpose of notifying foreign creditors as provided in paragraph 1 is to inform them of the commencement of the insolvency proceeding and of the time limit to file their claims. Furthermore, as a corollary to the principle of equal treatment established by article 13, article 14 requires that foreign creditors should be notified whenever notification is required for creditors in the enacting State.

122.  States have different provisions or practices regarding the methods for notifying creditors, for example, publication in the official gazette or in local newspapers, individual notices, and affixing notices within the court premises or a combination of such procedures. If the form of notification were to be left to national law, foreign creditors would be in a less advantageous situation than local creditors, since they typically do not have direct access to local publications. For that reason, paragraph 2 in principle requires individual notification for foreign creditors but leaves discretion to the court to decide otherwise in a particular case (e.g. if individual notice would entail excessive cost or would not seem feasible under the circumstances).

123.  With regard to the form of individual notification, States may use special procedures for notifications that have to be served in a foreign jurisdiction (e.g. sending notifications through diplomatic channels). In the context of insolvency proceedings, those procedures would often be too cumbersome and time-consuming and their use would typically not provide foreign creditors

timely notice concerning insolvency proceedings. It is therefore advisable for those notifications to be effected by such expeditious means that the court considers adequate. Those considerations are the reason for the provision in paragraph 2 that "no letters rogatory or other, similar formality is required".

124.   Many States are party to bilateral or multilateral treaties on judicial cooperation, which often contain provisions on procedures for communicating judicial or extrajudicial documents to addressees abroad. A multilateral treaty of this kind is the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil and Commercial Matters of 1965,[26] adopted under the auspices of the Hague Conference on Private International Law. While the procedures envisaged by those treaties may constitute a simplification as compared with traditional communication via diplomatic channels, they would often be, for reasons stated in the preceding paragraph, inappropriate for cross-border insolvency cases. The question may arise whether paragraph 2, which allows the use of letters rogatory or similar formalities to be dispensed with, is compatible with those treaties. Each State would have to consider that question in the light of its treaty obligations, but generally the provision in paragraph 2 would not be in conflict with the international obligations of the enacting State because the purpose of the treaties alluded to above is typically to facilitate communication and not to preclude use of notification procedures that are even simpler than those established by the treaty; for example, article 10 of the above-mentioned Convention reads as follows:

> "Provided the State of destination does not object, the present Convention shall not interfere with —
>
> "*a)* the freedom to send judicial documents, by postal channels, directly to persons abroad,
>
> "*b)* the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,
>
> "*c)* the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination."[27]

To the extent that there might still be a conflict between the second sentence of paragraph 2 of article 14 and a treaty, article 3 of the Model Law provides the solution.

---

[26] United Nations, *Treaty Series*, vol. 658, No. 9432.
[27] Ibid.

3-10063-shl   Doc 629   Filed 08/29/23   Entered 08/29/23 12:34:49   Main Document
Pg 792 of 882                                   484

*Part two.  Guide to Enactment and Interpretation*                                  *63*

125.   While paragraph 2 mentions letters rogatory as a formality that is not required for a notification under article 14, in many States such notifications would never be transmitted in the form of a letter rogatory. A letter rogatory in those States would be used for other purposes, such as to request evidence in a foreign country or to request permission to perform some other judicial act abroad. Such use of letters rogatory is governed, for example, by the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters of 1970,[28] adopted under the auspices of the Hague Conference on Private International Law.

*Paragraph 3*

126.   In some legal systems a secured creditor who files a claim in an insolvency proceeding is deemed to have waived the security or some of the privileges attached to the credit, while in other systems failure to file a claim results in a waiver of such security or privilege. Where such a situation may arise, it would be appropriate for the enacting State to include in paragraph 3, subparagraph *(b)*, a requirement that the notification include information regarding the effects of filing, or failing to file, secured claims.

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*

A/52/17, paras. 193-198.

A/CN.9/419, paras. 84-87.

A/CN.9/WG.V/WP.44, pp. 19-20.

A/CN.9/422, paras. 188-191.

A/CN.9/WG.V/WP.46, pp. 11-12.

A/CN.9/433, paras. 86-98.

A/CN.9/WG.V/WP.48, pp. 12-13, 16 and 20.

A/CN.9/435, paras. 157-164.

*(b)  Guide to Enactment*

A/CN.9/436, paras. 63-65 and 84.

A/CN.9/442, paras. 106-111 and 120-121.

---

[28] Ibid., vol. 847, No. 12140.

## CHAPTER III.  RECOGNITION OF A FOREIGN PROCEEDING AND RELIEF

*Article 15.  Application for recognition of a foreign proceeding*

1.  A foreign representative may apply to the court for recognition of the foreign proceeding in which the foreign representative has been appointed.

2.  An application for recognition shall be accompanied by:

*(a)*  A certified copy of the decision commencing the foreign proceeding and appointing the foreign representative; or

*(b)*  A certificate from the foreign court affirming the existence of the foreign proceeding and of the appointment of the foreign representative; or

*(c)*  In the absence of evidence referred to in subparagraphs *(a)* and *(b),* any other evidence acceptable to the court of the existence of the foreign proceeding and of the appointment of the foreign representative.

3.  An application for recognition shall also be accompanied by a statement identifying all foreign proceedings in respect of the debtor that are known to the foreign representative.

4.  The court may require a translation of documents supplied in support of the application for recognition into an official language of this State.

*Article 15 as a whole*

127.  The Model Law avoids the need to rely on cumbersome and time-consuming letters rogatory or other forms of diplomatic or consular communications that might otherwise have to be used. This facilitates a coordinated, cooperative approach to cross-border insolvency and makes expedited action possible. Article 15 defines the core procedural requirements for an application by a foreign representative for recognition. In incorporating the provision into national law, it is desirable not to encumber the process with additional procedural requirements beyond those referred to. With article 15, in conjunction with article 16, the Model Law provides a simple, expeditious structure to be used by a foreign representative to obtain recognition.

128.  The Model Law presumes that documents submitted in support of the application for recognition need not be authenticated in any special way, in particular by legalization: according to article 16, paragraph 2, the court is

3-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Documen
Pg 794 of 882
*Part two.  Guide to Enactment and Interpretation*                                              *65*

486

entitled to presume that those documents are authentic whether or not they
have been legalized. "Legalization" is a term often used for the formality
by which a diplomatic or consular agent of the State in which the document
is to be produced certifies the authenticity of the signature, the capacity in
which the person signing the document has acted and, where appropriate,
the identity of the seal or stamp on the document.

129.  It follows from article 16, paragraph 2, (according to which the court
"is entitled to presume" the authenticity of documents accompanying the
application for recognition) that the court retains discretion to decline on
the presumption of authenticity or to conclude that evidence to the
contrary prevails. This flexible solution takes into account the fact that the
court may be able to assure itself that a particular document originates from
a particular court even without it being legalized, but that in other cases the
court may be unwilling to act on the basis of a foreign document that has
not been legalized, in particular when documents emanate from a jurisdiction
with which it is not familiar. The presumption is useful because legalization
procedures may be cumbersome and time-consuming (e.g. also because in
some States they involve various authorities at different levels).

130.  In respect of the provision relaxing any requirement of legalization,
the question may arise whether that is in conflict with the international
obligations of the enacting State. Several States are parties to bilateral or
multilateral treaties on mutual recognition and legalization of documents,
such as the Convention Abolishing the Requirement of Legalisation for
Foreign Documents of 1961[29] adopted under the auspices of the Hague
Conference on Private International Law, which provides specific simplified
procedures for the legalization of documents originating from signatory
States. In many instances, however, the treaties on legalization of documents,
like letters rogatory and similar formalities, leave in effect laws and
regulations that have abolished or simplified legalization procedures;
therefore a conflict is unlikely to arise. For example, as stated in article 3,
paragraph 2, of the above-mentioned convention:[30]

"However, [legalisation] cannot be required when either the laws,
regulations, or practice in force in the State where the document is
produced or an agreement between two or more Contracting States have
abolished or simplified it, or exempt the document itself from legalisation."

According to article 3 of the Model Law, if there is still a conflict between
the Model Law and a treaty, the treaty will prevail.

────────────
[29] Ibid., vol. 527, No. 7625.
[30] Ibid.

*Subparagraph 2* (c)

131.    In order not to prevent recognition because of non-compliance with a mere technicality (e.g. where the applicant is unable to submit documents that in all details meet the requirements of subparas. 2 *(a)* and *(b)*), sub-paragraph 2 *(c)* allows evidence other than that specified in sub-paragraphs 2 *(a)* and *(b)* to be taken into account; that provision, however, does not compromise the court's power to insist on the presentation of evidence acceptable to it. It is advisable to maintain that flexibility in enacting the Model Law. Article 16, paragraph 2, which provides that the court "is entitled to presume" the authenticity of documents accompanying the application for recognition, also applies to documents submitted under subparagraph 2 *(c)* (see paras. 129-130 above).

*Paragraph 3*

132.    Paragraph 3 requires an application for recognition to be accompanied by a statement identifying all foreign proceedings in respect of the debtor that are known to the foreign representative. That information is needed by the court not so much for the decision on recognition itself, but for any decision granting relief in favour of the foreign proceeding. In order to tailor such relief appropriately and ensure the relief is consistent with any other insolvency proceeding concerning the same debtor, the court needs to be aware of all foreign proceedings concerning the debtor that may be under way in third States.

133.    An express provision establishing the duty to inform is useful, firstly, because the foreign representative is likely to have more comprehensive information about the debtor's affairs in third States than the court and, secondly, because the foreign representative may be primarily concerned with obtaining relief in favour of his or her foreign proceeding and less concerned about coordination with another foreign proceeding. (The duty to inform the court about a foreign proceeding that becomes known to the foreign representative after the decision on recognition is set out in article 18; as for coordination of more than one foreign proceeding, see article 30.)

*Paragraph 4*

134.    Paragraph 4 entitles, but does not compel, the court to require a translation of some or all documents accompanying the application for recognition. If that discretion is compatible with the procedures of the court, it may facilitate a decision being made on the application at the earliest possible

time, as contemplated by article 17, paragraph 3, if the court is in a position to consider the application without the need for translation of the documents.

*Notice*

135. Different solutions exist as to whether the court is required to issue notice of an application for recognition. In a number of jurisdictions, fundamental principles of due process, in some cases enshrined in the constitution, may be understood as requiring that a decision on the importance of the recognition of a foreign insolvency proceeding could only be made after hearing the affected parties. In other States, however, it is considered that applications for recognition of foreign proceedings require expeditious treatment (as they are often submitted in circumstances of imminent danger of dissipation or concealment of the assets) and that, accordingly, the issuance of notice prior to any court decision on recognition is not required. In these circumstances, imposing the requirement could cause undue delay and would be inconsistent with article 17, paragraph 3, which provides that an application for recognition of a foreign proceeding should be decided upon at the earliest possible time.

136. Procedural matters related to such notice are not resolved by the Model Law and are thus governed by other provisions of law of the enacting State. The absence of an express reference to notice of the filing of an application for recognition or of the decision to grant recognition does not preclude the court from issuing such notice, where legally required, in pursuance of its own rules on civil or insolvency proceedings. By the same token, there is nothing in the Model Law that would mandate the issuance of such notice, where such a requirement does not exist.

*Discussion in UNCITRAL and in the Working Group*

| *(a)  Model Law* | *(b)  Guide to Enactment* |
|---|---|
| A/52/17, paras. 199-209. | A/CN.9/436, paras. 66-69. |
| A/CN.9/419, paras. 62-69 and 178-189. | A/CN.9/442, paras. 112-121. |
| A/CN.9/WG.V/WP.44, pp. 22-23. | |
| A/CN.9/422, paras. 76-93 and 152-159. | |
| A/CN.9/WG.V/WP.46, pp. 9-10. | |
| A/CN.9/433, paras. 59-67 and 99-104. | |
| A/CN.9/WG.V/WP.48, pp. 13-15. | |
| A/CN.9/435, paras. 165-173. | |

*(c)   Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.103/Add.1, para. 112.

A/CN.9/742, para. 40.

A/CN.9/WG.V/WP.107, paras. 119-120.

A/CN.9/763, para. 28.

A/CN.9/WG.V/WP.112, paras. 112 and 119-120.

A/CN.9/766, para. 32.

---

*Article 16.   Presumptions concerning recognition*

1.   If the decision or certificate referred to in paragraph 2 of article 15 indicates that the foreign proceeding is a proceeding within the meaning of subparagraph *(a)* of article 2 and that the foreign representative is a person or body within the meaning of subparagraph *(d)* of article 2, the court is entitled to so presume.

2.   The court is entitled to presume that documents submitted in support of the application for recognition are authentic, whether or not they have been legalized.

3.   In the absence of proof to the contrary, the debtor's registered office, or habitual residence in the case of an individual, is presumed to be the centre of the debtor's main interests.

---

137.   Article 16 establishes presumptions that permit and encourage fast action in cases where speed may be essential. These presumptions allow the court to expedite the evidentiary process. At the same time, they do not prevent the court, in accordance with the applicable procedural law, from calling for or assessing other evidence if the conclusion suggested by the presumption is called into question.

*Paragraph 1*

138.   Article 16, paragraph 1 creates a presumption with respect to the definitions of "foreign proceeding" and "foreign representative" in article 2. If the decision commencing the foreign proceeding and appointing the foreign representative indicates that the foreign proceeding is a proceeding within the meaning of article 2, subparagraph *(a)* and that the foreign representative is a person or body within the meaning of article 2, subparagraph *(d)*, the receiving court is entitled to so presume. That presumption

has been relied upon in practice by various receiving courts when the court commencing the proceedings has included that information in its orders.[31]

139.   Inclusion of information regarding the nature of the foreign proceeding and the foreign representative, defined in article 2, in the orders made by the court commencing the foreign proceeding can facilitate the task of recognition in relevant cases. Those orders or decisions are not binding on the receiving court in the enacting State, which is required to independently satisfy itself that the requirements of article 2 are met (discussed further at paras. 152-153 below).

*Paragraph 2*

140.   For comments on paragraph 2, which dispenses with the requirement of legalization, see paragraphs 128-130 above.

*Paragraph 3*

141.   Although the presumption contained in article 16, paragraph 3 corresponds to the presumption in the EC Regulation, it serves a different purpose. In the Model Law, the presumption is designed to facilitate the recognition of foreign insolvency proceedings and the provision of assistance to those proceedings. Under the EC Regulation, the presumption relates to the proper place for commencement of insolvency proceedings, thus determining the applicable law, and to the automatic recognition of those proceedings by other European Union member States. Under the Regulation, the decision on centre of main interests is made by the court receiving an application for commencement of insolvency proceedings at the time of consideration of that application. Under the Model Law, a request for recognition of a foreign proceeding may be made at any time after the commencement of that proceeding; in some cases it has been made several years later. Accordingly, the court considering an application for recognition under the Model Law must determine whether the foreign proceeding for which recognition is sought is taking place in a forum that was the debtor's centre of main interests when the proceeding commenced (the issue of timing with respect to the determination of centre of main interests is discussed at paras. 157-160 below). Notwithstanding the different purpose of centre of main interests under the two instruments, the jurisprudence with respect to interpretation of that concept in the EC Regulation may be relevant to its interpretation in the Model Law.

---

[31] For examples, see A/CN.9/WG.V/WP.95, paras. 15-16.

142. The presumption in article 16, paragraph 3 has given rise to considerable discussion, most commonly in the context of corporate rather than individual debtors, with the focus upon the proof required for the presumption to be rebutted. The debtor's centre of main interests may be at the same location as its place of registration and in that situation no issue concerning rebuttal of the presumption will arise.

143. However, when a foreign representative seeks recognition of a foreign proceeding as a main proceeding and there appears to be a separation between the place of the debtor's registered office and its alleged centre of main interests, the party alleging the centre of main interests is not at the place of registration will be required to satisfy the court as to the location of the centre of main interests. The court of the enacting State will be required to consider independently where the debtor's centre of main interests is located.

*Centre of main interests*

144. The concept of a debtor's centre of main interests is fundamental to the operation of the Model Law.[32] The Model Law accords proceedings commenced in that location greater deference and, more immediate, automatic relief. The essential attributes of the debtor's centre of main interests correspond to those attributes that will enable those who deal with the debtor (especially creditors) to ascertain the place where an insolvency proceeding concerning the debtor is likely to commence. As has been noted, the Model Law establishes a presumption that the debtor's place of registration is the place that corresponds to those attributes. However, in reality, the debtor's centre of main interests may not coincide with the place of its registration and the Model Law provides for the rebuttal of the presumption where the centre of main interests is in a different location to the place of registration. In those circumstances, the centre of main interests will be identified by other factors which indicate to those who deal with the debtor (especially creditors) where the centre of main interests is. It is thus important to consider the factors that may independently indicate that a given State is the debtor's centre of main interests.

*Factors relevant to the determination of centre of main interests*

145. In most cases, the following principal factors, considered as a whole, will tend to indicate whether the location in which the foreign proceeding has commenced is the debtor's centre of main interests. The factors are the

---

[32] As noted in paragraph 82, the concept of centre of main interests also underlies the scheme set out in the EC Regulation.

location: *(a)* where the central administration of the debtor takes place, and *(b)* which is readily ascertainable by creditors. The date at which these factors should be analysed in order to determine the location of the debtor's centre of main interests is addressed in paragraphs 157-160 below.

146.    When these principal factors do not yield a ready answer regarding the debtor's centre of main interests, a number of additional factors concerning the debtor's business may be considered. The court may need to give greater or less weight to a given factor, depending on the circumstances of the particular case. In all cases, however, the endeavour is an holistic one, designed to determine that the location of the foreign proceeding in fact corresponds to the actual location of the debtor's centre of main interests, as readily ascertainable by creditors.

147.    The order in which the additional factors are set out below is not intended to indicate the priority or weight to be accorded to them, nor is it intended to be an exhaustive list of relevant factors; other factors might be considered by the court as applicable in a given case. The additional factors may include the following: the location of the debtor's books and records; the location where financing was organized or authorized, or from where the cash management system was run; the location in which the debtor's principal assets or operations are found; the location of the debtor's primary bank; the location of employees; the location in which commercial policy was determined; the site of the controlling law or the law governing the main contracts of the company; the location from which purchasing and sales policy, staff, accounts payable and computer systems were managed; the location from which contracts (for supply) were organized; the location from which reorganization of the debtor was being conducted; the jurisdiction whose law would apply to most disputes; the location in which the debtor was subject to supervision or regulation; and the location whose law governed the preparation and audit of accounts and in which they were prepared and audited.

*Movement of centre of main interests*

148.    A debtor's centre of main interests may move prior to commencement of insolvency proceedings, in some instances in close proximity to commencement and even between the time of the application for commencement and the actual commencement of those proceedings.[33] Whenever there is

---

[33] In some examples, the move was intended to give the debtor access to an insolvency process, such as reorganization, that more closely met its needs than what was available under the law of its former centre of main interests. In other examples, the move of the centre of main interests may have been designed to thwart the legitimate expectations of creditors and third parties.

evidence of such a move in close proximity to the commencement of the foreign proceeding, it may be desirable for the receiving court, in determining whether to recognize those proceedings, to consider the factors identified in paragraphs 145 and 147 above more carefully and to take account of the debtor's circumstances more broadly. In particular, the test that the centre of main interests is readily ascertainable by third parties may be harder to meet if the move of the centre of main interests occurs in close proximity to the opening of proceedings.

149.   It is unlikely that a debtor could move its place of registration (or habitual residence) after the commencement of insolvency proceedings, since many insolvency laws contain specific provisions preventing such a move. In any event, if this were to occur, it should not affect the decision as to centre of main interests for the purposes of the Model Law, since the date relevant to that determination is the date of commencement of the foreign proceeding (see paras. 157-159 below).

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*

A/52/17, paras. 204-206.

A/CN.9/WG.V/WP.46, p. 13.

A/CN.9/435, paras. 170-172.

*(b)   Guide to Enactment*

A/CN.9/442, paras. 122-123.

*(c)   Guide to Enactment and Interpretation*

A/68/17, para. 197.

A/CN.9/715, paras. 14-15, 38-41 and 44-45.

A/CN.9/738, paras. 22-30.

A/CN.9/WG.V/WP.103, Add.1, paras. 122-122A and 123A-K.

A/CN.9/742, paras. 41-56.

A/CN.9/WG.V/WP.107, paras. 122B, 123A-123G, 123I and 123K-M.

A/CN.9/763, paras. 29-48.

A/CN.9/WG.V/WP.112, paras. 122-122B, 123A-D, F-G, I, K and M.

A/CN.9/766, paras. 33-40.

3-10063-shl   Doc 629   Filed 08/29/23   Entered 08/29/23 12:34:49   Main Documen

*Part two. Guide to Enactment and Interpretation* Pg 802 of 882      494      *73*

---

*Article 17. Decision to recognize a foreign proceeding*

1.   Subject to article 6, a foreign proceeding shall be recognized if:

   *(a)*   The foreign proceeding is a proceeding within the meaning of sub-paragraph *(a)* of article 2;

   *(b)*   The foreign representative applying for recognition is a person or body within the meaning of subparagraph *(d)* of article 2;

   *(c)*   The application meets the requirements of paragraph 2 of article 15; and

   *(d)*   The application has been submitted to the court referred to in article 4.

2.   The foreign proceeding shall be recognized:

   *(a)*   As a foreign main proceeding if it is taking place in the State where the debtor has the centre of its main interests; or

   *(b)*   As a foreign non-main proceeding if the debtor has an establishment within the meaning of subparagraph *(f)* of article 2 in the foreign State.

3.   An application for recognition of a foreign proceeding shall be decided upon at the earliest possible time.

4.   The provisions of articles 15, 16, 17 and 18 do not prevent modification or termination of recognition if it is shown that the grounds for granting it were fully or partially lacking or have ceased to exist.

---

*Paragraph 1*

150.   The purpose of article 17 is to establish that, if recognition is not contrary to the public policy of the enacting State (see article 6) and if the application meets the requirements set out in the article, recognition will be granted as a matter of course.

151.   In deciding whether a foreign proceeding should be recognized, the receiving court is limited to the jurisdictional pre-conditions set out in the definition. This requires a determination that the proceedings are foreign proceedings within article 2, subparagraph *(a)*. The Model Law makes no provision for the receiving court to embark on a consideration of whether the foreign proceeding was correctly commenced under applicable law; provided the proceeding satisfies the requirements of article 15 and article 6 is not relevant, recognition should follow in accordance with article 17.

152.    In reaching its decision on recognition, the receiving court may have due regard to any decisions and orders made by the originating court and to any information that may have been presented to the originating court. Those orders or decisions are not binding on the receiving court in the enacting State, which is required to independently satisfy itself that the foreign proceeding meets the requirements of article 2. Nevertheless, the court is entitled to rely, pursuant to the presumptions in article 16, paragraphs 1 and 2 (see para. 138), on the information in the certificates and documents provided in support of an application for recognition. In appropriate circumstances that information would assist the receiving court in its deliberations.

153.    Accordingly, recognition of a foreign proceeding would be assisted if the originating court mentioned in its orders any information that would facilitate a finding by a receiving court that the proceeding is a foreign proceeding within the meaning of article 2. This would be particularly helpful when the originating court was aware of the international character either of the debtor or its business and of the likelihood that recognition of the proceeding would be sought under the Model Law. The same considerations would apply to the appointment and recognition of the foreign representative.

*Paragraph 2*

154.    Article 17, paragraph 2 draws the basic distinction between foreign proceedings categorized as the "main" proceedings and those foreign proceedings that are not so characterized, depending upon the jurisdictional basis of the foreign proceeding (see paragraph 88 above). The relief flowing from recognition may depend upon the category into which a foreign proceeding falls. For example, recognition of a "main" proceeding triggers an automatic stay of individual creditor actions or executions concerning the assets of the debtor (article 20, subparagraphs 1 *(a)* and *(b)*) and an automatic "freeze" of those assets (article 20, subparagraph 1 *(c)*), subject to certain exceptions referred to in article 20, paragraph 2.

155.    It is not advisable to include more than one criterion for qualifying a foreign proceeding as a main proceeding and provide that on the basis of any of those criteria a proceeding could be deemed a main proceeding. An approach involving such "multiple criteria" would raise the risk of competing claims from foreign proceedings for recognition as the main proceeding.

156.    With regard to subparagraph 2 *(b)*, as noted in paragraph 85 above, the Model Law does not envisage recognition of a proceeding commenced in a foreign State in which the debtor has assets but no establishment as defined in article 2, subparagraph *(c)*.

3-10063-shl   Doc 629   Filed 08/29/23   Entered 08/29/23 12:34:49 Main Documer
Pg 804 of 882                 496

*Part two.  Guide to Enactment and Interpretation*                              *75*

*Date at which to determine centre of main interests and establishment*

157.   The Model Law does not expressly indicate the relevant date for determining the centre of main interests of the debtor.

158.   Article 17, subparagraph 2 *(a)* provides that the foreign proceeding is to be recognized as a main proceeding "if it *is* taking place in the State where the debtor *has* the centre of its main interests" [*emphasis added*]. The use of the present tense in article 17 does not address the question of the relevant date, but rather requires the foreign proceeding to be current or pending at the time of the recognition decision; if the proceeding for which recognition is sought is no longer current or pending in the originating State at that time (i.e. it is no longer "taking place" having been terminated or closed), there is no proceeding that would be eligible for recognition under the Model Law.

159.   With respect to the date at which the centre of main interests of the debtor should to be determined, having regard to the evidence required to accompany an application for recognition under article 15 and the relevance accorded the decision commencing the foreign proceeding and appointing the foreign representative, the date of commencement of that proceeding is the appropriate date.[34] Where the business activity of the debtor ceases after the commencement of the foreign proceeding, all that may exist at the time of the application for recognition to indicate the debtor's centre of main interests is that foreign proceeding and the activity of the foreign representative in administering the insolvency estate. In such a case, determination of the centre of the debtor's main interests by reference to the date of the commencement of those proceedings would produce a clear result. The same reasoning may also apply in the case of reorganization where, under some laws, it is not the debtor that continues to have a centre of main interests, but rather the reorganizing entity. In such a case, the requirement for a foreign proceeding that is taking place in accordance with article 17, subparagraph 2 *(a)* is clearly satisfied and the foreign proceeding should be entitled to recognition. Moreover, taking the date of commencement to determine centre of main interests provides a test that can be applied with certainty to all insolvency proceedings.

160.   The same considerations apply to the date at which any determination with respect to the existence of an establishment of the debtor should be

---

[34] Under some insolvency laws, the effects of commencement are backdated to the date of the application for commencement or the date of application becomes the date of commencement by virtue of automatic commencement. In both cases, it is appropriate to refer to the date of commencement for the purposes of the centre of main interests determination, since the Model Law is concerned only with existing foreign proceedings and when they commenced.

made. Accordingly, the date of commencement of the foreign proceeding is the relevant date to be considered in making that determination.

*Abuse of process*

161. One issue that has arisen is whether, on a recognition application, the court should be able to take account of abuse of its processes as a ground to decline recognition. There is nothing in the UNCITRAL Model Law itself which suggests that extraneous circumstances should be taken into account on a recognition application. The Model Law envisages the application being determined by reference to the specific criteria set out in the definitions of "foreign proceeding", "foreign main proceeding" and "foreign non-main proceeding". Since what constitutes abuse of process depends on domestic law or procedural rules, the Model Law does not explicitly prevent receiving courts from applying domestic law or procedural rules to respond to a perceived abuse of process. However, the broader purpose of the Model Law, namely to foster international cooperation as a means of maximizing outcomes for all stakeholders, as set out in article 1, as well as the international origins of the Model Law, and the need to promote uniformity in its application, as set out in article 8, should be borne in mind. Courts considering the application of domestic laws and procedural rules might also recall that the public policy exception in article 6 (see paras. 101-104 above) is intended to be narrowly construed and invoked only when the taking of action under the Model Law would be manifestly contrary to a State's public policy. As a general rule, article 6 should rarely be the basis for refusing an application for recognition, even though it might be a basis for limiting the nature of relief accorded.

162. If the applicant falsely claims the centre of main interests to be in a particular State, the receiving court may determine that there has been a deliberate abuse of the process. The Model Law does not prevent receiving courts from applying domestic law or procedural rules in response to such an abuse of process.

*Paragraph 3*

163. The foreign representative's ability to obtain early recognition (and the consequential ability to invoke in particular articles 20, 21, 23 and 24) is often essential for the effective protection of the assets of the debtor from dissipation and concealment. For that reason, paragraph 3 obligates the court to decide on the application "at the earliest possible time". The phrase "at the earliest possible time" has a degree of elasticity. Some cases may be so

straightforward that the recognition process can be completed within a matter of days. In other cases, particularly if recognition is contested, "the earliest possible time" might be measured in months. Interim relief will be available in the event that some order is necessary while the recognition application is pending.

*Paragraph 4*

164.  A decision to recognize a foreign proceeding would normally be subject to review or rescission, as any other court decision. Paragraph 4 clarifies that the decision on recognition may be revisited if grounds for granting it were fully or partially lacking or have ceased to exist.

165.  Modification or termination of the recognition decision may be a consequence of a change of circumstances after the decision on recognition, for instance, if the recognized foreign proceeding has been terminated or its nature has changed (e.g. a reorganization proceeding might be converted into a liquidation proceeding) or if the status of the foreign representative's appointment has changed or the appointment has been terminated. Also, new facts might arise that require or justify a change of the court's decision, for example, if the foreign representative disregarded the conditions under which the court granted relief. The court's ability to review the recognition decision is assisted by the obligation article 18 imposes on the foreign representative to inform the court of such changed circumstances.

166.  A decision on recognition may also be subject to a review of whether, in the decision-making process, the requirements for recognition were observed. Some appeal procedures give the appeal court the authority to review the merits of the case in its entirety, including factual aspects. It would be consistent with the purpose of the Model Law and with the nature of the decision granting recognition (which is limited to verifying whether the applicant fulfilled the requirements of article 17) if an appeal of the decision would be limited to the question whether the requirements of articles 15 and 16 were observed in deciding to recognize the foreign proceeding.

*Notice of decision to recognize foreign proceedings*

167.  As noted in paragraphs 135 and 136 above, procedural matters regarding requirements of notice of the decision to grant recognition are not dealt with by the Model Law and are left to other provisions of law of the enacting State.

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*

A/52/17, paras. 29-33 and 201-202.

A/CN.9/419, paras. 62-69.

A/CN.9/WG.V/WP.44, pp. 13-15.

A/CN.9/422, paras. 76-93.

A/CN.9/WG.V/WP.46, pp. 12-13.

A/CN.9/433, paras. 99-104.

A/CN.9/WG.V/WP.48, pp. 13-16.

A/CN.9/435, paras. 167 and 173.

*(b)   Guide to Enactment*

A/CN.9/436, paras. 68-69.

A/CN.9/442, paras. 124-131.

*(c)   Guide to Enactment and
       Interpretation*

A/CN.9/715, paras. 14-15 and 32-35.

A/CN.9/738, paras. 33-35.

A/CN.9/WG.V/WP.103/Add.1,
   paras. 124-124C, 126, 128A-E,
   125 and 129-130.

A/CN.9/742, paras. 57-62.

A/CN.9/WG.V/WP.107, paras. 124B-C,
   128A, 128C, 123J, 125 and 130-131.

A/CN.9/763, paras. 49-55.

A/CN.9/WG.V/WP.112, paras. 124-
   124C, 128A-D, 123J and L, 125
   and 129-131.

A/CN.9/766, paras. 41-44.

---

*Article 18.   Subsequent information*

From the time of filing the application for recognition of the foreign proceeding, the foreign representative shall inform the court promptly of:

*(a)*   Any substantial change in the status of the recognized foreign proceeding or the status of the foreign representative's appointment; and

*(b)*   Any other foreign proceeding regarding the same debtor that becomes known to the foreign representative.

---

*Subparagraph* (a)

168.   Article 18 obligates the foreign representative to inform the court promptly, after the time of filing the application for recognition of the foreign proceeding, of "any substantial change in the status of the recognized foreign proceeding or the status of the foreign representative's appointment". The purpose of the obligation is to allow the court to modify or terminate the consequences of recognition. As noted above, it is possible that, after the application for recognition or after recognition, changes occur in the foreign proceeding that would have affected the decision on recognition or the relief

granted on the basis of recognition, such as termination of the foreign proceeding or conversion from one type of proceeding to another. Subparagraph *(a)* takes into account the fact that technical modifications in the status of the proceedings or the foreign representative's appointment are frequent, but that only some of those modifications would affect the decision granting relief or the decision recognizing the proceeding; therefore, the provision only calls for information of "substantial" changes. It is of particular importance that the court be informed of such modifications when its decision on recognition concerns a foreign "interim proceeding" or a foreign representative has been "appointed on an interim basis" (see article 2, subparagraphs *(a)* and *(d)*).

*Subparagraph* (b)

169.   Article 15, paragraph 3, requires an application for recognition to be accompanied by a statement identifying all foreign proceedings in respect of the debtor that are known to the foreign representative. Article 18, subparagraph *(b)*, extends that duty to the time after the application for recognition has been filed. That information will allow the court to consider whether relief already granted should be coordinated with insolvency proceedings commenced after the decision on recognition (see article 30) and to facilitate cooperation under chapter IV.

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*

A/52/17, paras. 113-116, 201-202 and 207.

A/CN.9/WG.V/WP.48, p. 15.

*(b)   Guide to Enactment*

A/CN.9/442, paras. 133-134.

*(c)   Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.103/Add.1, paras. 133-134.

A/CN.9/742, para. 63.

A/CN.9/WG.V/WP.107, paras. 133-134.

A/CN.9/763, para. 56.

A/CN.9/WG.V/WP.112, paras. 133-134.

A/CN.9/766, para. 45.

---

*Article 19.   Relief that may be granted upon application
for recognition of a foreign proceeding*

1.   From the time of filing an application for recognition until the application is decided upon, the court may, at the request of the foreign representative, where relief is urgently needed to protect the assets of the debtor or the interests of the creditors, grant relief of a provisional nature, including:

   *(a)*   Staying execution against the debtor's assets;

   *(b)*   Entrusting the administration or realization of all or part of the debtor's assets located in this State to the foreign representative or another person designated by the court, in order to protect and preserve the value of assets that, by their nature or because of other circumstances, are perishable, susceptible to devaluation or otherwise in jeopardy;

   *(c)*   Any relief mentioned in paragraph 1 *(c), (d)* and *(g)* of article 21.

2.   [*Insert provisions (or refer to provisions in force in the enacting State) relating to notice.*]

3.   Unless extended under paragraph 1 *(f)* of article 21, the relief granted under this article terminates when the application for recognition is decided upon.

4.   The court may refuse to grant relief under this article if such relief would interfere with the administration of a foreign main proceeding.

---

170.   Article 19 deals with "urgently needed" relief that may be ordered at the discretion of the court and is available as of the moment of the application for recognition (unlike relief under article 21, which is also discretionary but available only upon recognition).

171.   Article 19 authorizes the court to grant the type of relief that is usually available only in collective insolvency proceedings (i.e. the same type of relief available under article 21), as opposed to the "individual" type of relief that may be granted before the commencement of insolvency proceedings under rules of civil procedure (i.e. measures covering specific assets identified by a creditor). However, the discretionary "collective" relief under article 19 is somewhat narrower than the relief under article 21.

172.   The reason for the availability of collective measures, albeit in a restricted form, is that relief of a collective nature may be urgently needed before the decision on recognition in order to protect the assets of the debtor and the interests of the creditors. Exclusion of collective relief would

frustrate those objectives. On the other hand, recognition has not yet been granted and, therefore, the collective relief is restricted to urgent and provisional measures. The urgency of the measures is alluded to in the opening words of paragraph 1, while subparagraph *(a)* restricts the stay to execution proceedings and the measure referred to in subparagraph *(b)* is restricted to perishable assets and assets susceptible to devaluation or otherwise in jeopardy. Otherwise, the measures available under article 19 are essentially the same as those available under article 21.

*Paragraph 2*

173.   Laws of many States contain requirements for notice to be given (either by the insolvency representative upon the order of the court or by the court itself) when relief of the type mentioned in article 19 is granted. Paragraph 2 is the appropriate place for the enacting State to make provision for such notice.

*Paragraph 3*

174.   Relief available under article 19 is provisional in that, as provided in paragraph 3, it terminates when the application for recognition is decided upon; however, the court is given the opportunity to extend the measure, as provided in article 21, subparagraph 1 *(f)*. The court might wish to do so, for example, to avoid a hiatus between the provisional measure issued before recognition and the measure issued after recognition.

*Paragraph 4*

175.   Article 19, paragraph 4, pursues the same objective as the one underlying article 30, subparagraph *(a)*, namely that, if a foreign main proceeding is pending, any relief granted in favour of a foreign non-main proceeding must be consistent (or should not interfere) with the foreign main proceeding. In order to foster such coordination of pre-recognition relief with any foreign main proceeding, the foreign representative applying for recognition is required, by article 15, paragraph 3, to attach to the application for recognition a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

*Discussion in UNCITRAL and in the Working Group*

(a)  *Model Law*

A/52/17, paras. 34-46.

A/CN.9/419, paras. 174-177.

A/CN.9/WG.V/WP.44, pp. 22-23.

A/CN.9/422, paras. 116, 119 and 122-123.

A/CN.9/WG.V/WP.46, pp. 9, 13-16.

A/CN.9/433, paras. 110-114.

A/CN.9/435, paras. 17-23.

(b)  *Guide to Enactment*

A/CN.9/436, paras. 71-75.

A/CN.9/442, paras. 135-140.

(c)  *Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.107, paras. 135-140.

A/CN.9/763, para. 57.

A/CN.9/WG.V/WP.48, pp. 16-17.

A/CN.9/WG.V/WP.112, paras. 135-140.

A/CN.9/766, para. 46.

---

*Article 20.  Effects of recognition of a foreign main proceeding*

1.  Upon recognition of a foreign proceeding that is a foreign main proceeding,

   *(a)*  Commencement or continuation of individual actions or individual proceedings concerning the debtor's assets, rights, obligations or liabilities is stayed;

   *(b)*  Execution against the debtor's assets is stayed; and

   *(c)*  The right to transfer, encumber or otherwise dispose of any assets of the debtor is suspended.

2.  The scope, and the modification or termination, of the stay and suspension referred to in paragraph 1 of this article are subject to [*refer to any provisions of law of the enacting State relating to insolvency that apply to exceptions, limitations, modifications or termination in respect of the stay and suspension referred to in paragraph 1 of this article*].

3.  Paragraph 1 *(a)* of this article does not affect the right to commence individual actions or proceedings to the extent necessary to preserve a claim against the debtor.

4.  Paragraph 1 of this article does not affect the right to request the commencement of a proceeding under [*identify laws of the enacting State relating to insolvency*] or the right to file claims in such a proceeding.

3-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Document
Pg 812 of 882    504

*Part two. Guide to Enactment and Interpretation*                                                                83

176. While relief under articles 19 and 21 is discretionary, the effects provided by article 20 are not, for they flow automatically from recognition of the foreign main proceeding. Another difference between discretionary relief under articles 19 and 21 and the effects under article 20 is that discretionary relief may be issued in favour of main and non-main proceedings, while the automatic effects apply only to main proceedings. Additional effects of recognition are contained in articles 14, 23 and 24.

177. In States where an appropriate court order is needed for the effects of article 20 to become operative, the enacting State, in order to achieve the purpose of the article, should include (perhaps in the opening words of paragraph 1) language directing the court to issue an order putting into effect the consequences specified in subparagraphs *(a)-(c)* of that paragraph.

178. The automatic consequences envisaged in article 20 are necessary to allow steps to be taken to organize an orderly and fair cross-border insolvency proceeding. In order to achieve those benefits, the imposition on the insolvent debtor of the consequences of article 20 in the enacting State (i.e. the country where it maintains a limited business presence) is justified, even if the State where the centre of the debtor's main interests is situated poses different (possibly less stringent) conditions for the commencement of insolvency proceedings or even if the automatic effects of the insolvency proceeding in the country of origin are different from the effects of article 20 in the enacting State. This approach reflects a basic principle underlying the Model Law according to which recognition of foreign proceedings by the court of the enacting State produces effects that are considered necessary for an orderly and fair conduct of a cross-border insolvency. Recognition, therefore, has its own effects rather than importing the consequences of the foreign law into the insolvency system of the enacting State. If, in a given case, recognition should produce results that would be contrary to the legitimate interests of a party in interest, including the debtor, the law of the enacting State should include appropriate protections, as indicated in article 20, paragraph 2 (and discussed in paragraph 184 below).

179. By virtue of article 2, subparagraph *(a)*, the effects of recognition extend to foreign "interim proceedings". That solution is necessary since, as explained in paragraph 79 above, interim proceedings (provided they meet the requisites of article 2, subparagraph *(a)*), should not be distinguished from other insolvency proceedings merely because they are of an interim nature. If after recognition the foreign "interim proceeding" ceases to have a sufficient basis for the automatic effects of article 20, the automatic stay could be terminated pursuant to the law of the enacting State, as indicated in article 20, paragraph 2. (See also article 18, which deals with the obligation of the foreign representative "to inform the court promptly of any

substantial change in the status of the recognized foreign proceeding or the status of the foreign representative's appointment".)

180.    Subparagraph 1 *(a)*, by not distinguishing between various kinds of individual action, also covers actions before an arbitral tribunal. Thus, article 20 establishes a mandatory limitation to the effectiveness of an arbitration agreement. This limitation is added to other possible limitations restricting the freedom of the parties to agree to arbitration that may exist under national law (e.g. limits as to arbitrability or as to the capacity to conclude an arbitration agreement). Such limitations are not contrary to the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of 1958.[35] However, bearing in mind the particularities of international arbitration, in particular its relative independence from the legal system of the State where the arbitral proceeding takes place, it might not always be possible, in practical terms, to implement the automatic stay of arbitral proceedings. For example, if the arbitration does not take place in either the enacting State or the State of the main proceeding, it may be difficult to enforce the stay of the arbitral proceedings. Apart from that, the interests of the parties may be a reason for allowing an arbitral proceeding to continue, a possibility that is envisaged in paragraph 2 and left to the law of the enacting State.

181.    Subparagraph 1 *(a)* refers not only to "individual actions" but also to "individual proceedings" in order to cover, in addition to "actions" instituted by creditors in a court against the debtor or its assets, enforcement measures initiated by creditors outside the court system, being measures that creditors are allowed to take under certain conditions in some States. Subparagraph 1 *(b)* has been added to make it abundantly clear that executions against the assets of the debtor are covered by the stay.

182.    The Model Law does not deal with sanctions that might apply to acts performed in defiance of the suspension of transfers of assets provided under article 20, subparagraph 1 *(c)*. Those sanctions vary, depending on the legal system; they might include criminal sanctions, penalties and fines or the acts themselves might be void or capable of being set aside. From the viewpoint of creditors, the main purpose of such sanctions is to facilitate recovery for the insolvency proceeding of any assets improperly transferred by the debtor and, for that purpose, the setting aside of such transactions is preferable to the imposition of criminal or administrative sanctions on the debtor.

---

[35] United Nations, *Treaty Series*, vol. 330, No. 4739.

3-10063-shl   Doc 629   Filed 08/29/23   Entered 08/29/23 12:34:49   Main Documen
Pg 814 of 882                         506

*Part two.   Guide to Enactment and Interpretation*                                    *85*

*Paragraph 2*

183.   Notwithstanding the "automatic" or "mandatory" nature of the effects under article 20, it is expressly provided that the scope of those effects depends on exceptions or limitations that may exist in the law of the enacting State. Those exceptions may be, for example, the enforcement of claims by secured creditors, payments by the debtor in the ordinary course of business, initiation of court action for claims that have arisen after the commencement of the insolvency proceeding (or after recognition of a foreign main proceeding) or completion of open financial-market transactions.

184.   Sometimes it may be desirable for the court to modify or terminate the effects of article 20. The rules governing the power of the court to do so vary. In some legal systems the courts are authorized to make individual exceptions upon request by an interested party, under conditions prescribed by local law, while in others the courts do not have that power, in line with the principle that, in general, courts do not have the power to set aside the application of a statutory rule of law. If courts are to be given such a power, some legal systems would normally require the grounds on which the court could modify or terminate the mandatory effects of recognition under article 20, paragraph 1 to be specified. In view of that situation, article 20, paragraph 2, provides that the modification or termination of the stay and the suspension provided in the article is subject to the provisions of law of the enacting State relating to insolvency.

185.   Generally, it is useful for persons that are adversely affected by the stay or suspension under article 20, paragraph 1, to have an opportunity to be heard by the court, which should then be allowed to modify or terminate those effects. It would be consistent with the objectives of the Model Law if the enacting State were to spell out, or refer to, the provisions that govern this question.

*Paragraph 3*

186.   The Model Law does not cover the question of whether the limitation period for a claim ceases to run when the claimant is unable to commence individual proceedings as a result of the application of article 20, subparagraph 1 *(a)*. A harmonized rule on that question would not be feasible; however, since it is necessary to protect creditors from losing their claims because of a stay pursuant to subparagraph 1 *(a)*, paragraph 3 has been added to authorize the commencement of individual action to the extent necessary to preserve claims against the debtor. Once the claim has been preserved, the action continues to be covered by the stay.

187.   Paragraph 3 might seem unnecessary in a State where a demand for payment or performance served by the creditor on the debtor causes the cessation of the running of the limitation period or where the stay of the kind envisaged in subparagraph 1 *(a)* triggers such cessation. However, paragraph 3 may still be useful in such States because the question of the cessation of the running of the limitation period might be governed, pursuant to rules concerning conflict of laws, by the law of a State other than the enacting State. Furthermore, the paragraph would be useful as an assurance to foreign claimants that their claims would not be prejudiced in the enacting State.

*Paragraph 4*

188.   Paragraph 4 clarifies that the automatic stay and suspension pursuant to article 20 do not prevent anyone, including the foreign representative or foreign creditors, from requesting the commencement of a local insolvency proceeding and from participating in that proceeding. The right to apply to commence a local insolvency proceeding and to participate in it is in a general way dealt with in articles 11-13. If a local proceeding is indeed initiated, article 29 deals with the coordination of the foreign and the local proceedings.

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*

A/52/17, paras. 47-60.

A/CN.9/419, paras. 137-143.

A/CN.9/WG.V/WP.44, pp. 15-19.

A/CN.9/422, paras. 94-110.

A/CN.9/WG.V/WP.46, pp. 13-16.

A/CN.9/433, paras. 115-126.

A/CN.9/WG.V/WP.48, pp. 17-18.

A/CN.9/435, paras. 24-48.

*(b)   Guide to Enactment*

A/CN.9/436, paras. 76-79.

A/CN.9/442, paras. 141-153.

*(c)   Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.103/Add.1, paras. 141 and 143.

A/CN.9/742, para. 64.

A/CN.9/WG.V/WP.107, paras. 144-146, 149 and 151-153.

A/CN.9/763, para. 58.

A/CN.9/WG.V/WP.112, paras. 141, 143, 144-146, 149, 151-153.

A/CN.9/766, para. 47.

---

*Article 21.  Relief that may be granted upon recognition
of a foreign proceeding*

1.  Upon recognition of a foreign proceeding, whether main or non-main,
where necessary to protect the assets of the debtor or the interests of the
creditors, the court may, at the request of the foreign representative, grant any
appropriate relief, including:

*(a)*  Staying the commencement or continuation of individual actions or
individual proceedings concerning the debtor's assets, rights, obligations or
liabilities, to the extent they have not been stayed under paragraph 1 *(a)* of
article 20;

*(b)*  Staying execution against the debtor's assets to the extent it has not
been stayed under paragraph 1 *(b)* of article 20;

*(c)*  Suspending the right to transfer, encumber or otherwise dispose of
any assets of the debtor to the extent this right has not been suspended under
paragraph 1 *(c)* of article 20;

*(d)*  Providing for the examination of witnesses, the taking of evidence
or the delivery of information concerning the debtor's assets, affairs, rights,
obligations or liabilities;

*(e)*  Entrusting the administration or realization of all or part of the
debtor's assets located in this State to the foreign representative or another
person designated by the court;

*(f)*  Extending relief granted under paragraph 1 of article 19;

*(g)*  Granting any additional relief that may be available to [*insert the
title of a person or body administering a reorganization or liquidation under
the law of the enacting State*] under the laws of this State.

2.  Upon recognition of a foreign proceeding, whether main or non-main, the
court may, at the request of the foreign representative, entrust the distribution
of all or part of the debtor's assets located in this State to the foreign repre-
sentative or another person designated by the court, provided that the court is
satisfied that the interests of creditors in this State are adequately protected.

3.  In granting relief under this article to a representative of a foreign non-
main proceeding, the court must be satisfied that the relief relates to assets
that, under the law of this State, should be administered in the foreign non-
main proceeding or concerns information required in that proceeding.

---

189.  In addition to the mandatory stay and suspension under article 20,
the Model Law authorizes the court, following recognition of a foreign
proceeding, to grant relief for the benefit of that proceeding. This post-
recognition relief under article 21 is discretionary, as is pre-recognition relief

under article 19. The types of relief listed in article 21, paragraph 1, are typical of the relief most frequently granted in insolvency proceedings; however, the list is not exhaustive and the court is not restricted unnecessarily in its ability to grant any type of relief that is available under the law of the enacting State and needed in the circumstances of the case.

190.   The explanation relating to the use of the expressions "individual actions" and "individual proceedings" in article 20, subparagraph 1 *(a)*, and to coverage of execution proceedings (see paras. 180-181 above) applies also to article 21, subparagraph 1 *(a)*.

191.   It is in the nature of discretionary relief that the court may tailor it to the case at hand. This idea is reinforced by article 22, paragraph 2, according to which the court may subject the relief granted to any conditions it considers appropriate.

*Paragraph 2*

192.   The "turnover" of assets to the foreign representative (or another person), as envisaged in paragraph 2, is discretionary. It should be noted that the Model Law contains several safeguards designed to ensure the protection of local interests before assets are turned over to the foreign representative. Those safeguards include the following: the general statement of the principle of protection of local interests in article 22, paragraph 1; the provision in article 21, paragraph 2, that the court should not authorize the turnover of assets until it is assured that the local creditors' interests are protected; and article 22, paragraph 2, according to which the court may subject the relief that it grants to conditions it considers appropriate.

*Paragraph 3*

193.   One salient factor to be taken into account in tailoring the relief is whether it is for a foreign main or non-main proceeding. The interests and the authority of a representative of a foreign non-main proceeding are typically narrower than the interests and the authority of a representative of a foreign main proceeding, who normally seeks to gain control over all assets of the insolvent debtor. Paragraph 3 reflects that idea by providing *(a)* that relief granted to a foreign non-main proceeding should be limited to assets that are to be administered in that non-main proceeding, and *(b)* that, if the foreign representative seeks information concerning the debtor's assets or affairs, the relief must concern information required in that non-main proceeding. The objective is to advise the court that relief in favour of a

foreign non-main proceeding should not give unnecessarily broad powers
to the foreign representative and that such relief should not interfere with
the administration of another insolvency proceeding, in particular the main
proceeding.

194.   The proviso "under the law of this State" reflects the principle under-
lying the Model Law that recognition of a foreign proceeding does not mean
extending the effects of the foreign proceeding as they may be prescribed
by the law of the foreign State. Instead, recognition of a foreign proceeding
entails attaching to the foreign proceeding consequences envisaged by the
law of the enacting State.

195.   The idea underlying article 21, paragraph 3, is also reflected in article
19, paragraph 4 (pre-recognition relief), article 29, subparagraph *(c)* (coor-
dination of a foreign proceeding with a local proceeding) and article 30
(coordination of more than one foreign proceeding).


*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*

A/52/17, paras. 61-73.

A/CN.9/419, paras. 148-152 and
   154-166.

A/CN.9/WG.V/WP.44, pp. 15-19.

A/CN.9/422, paras. 111-113.

A/CN.9/WG.V/WP.46, pp. 13-16.

A/CN.9/433, paras. 127-134 and
   138-139.

A/CN.9/435, paras. 49-61.

*(b)   Guide to Enactment*

A/CN.9/436, paras. 80-83.

A/CN.9/442, 154-159.

*(c)   Guide to Enactment and
       Interpretation*

A/CN.9/WG.V/WP.103/Add.1,
   para. 154.

A/CN.9/742, para. 65.

A/CN.9/WG.V/WP.48, pp. 18-19.

A/CN.9/WG.V/WP.107, paras. 154,
   156, 158 and 160.

A/CN.9/763, para. 59.

A/CN.9/WG.V/WP.112, paras. 154,
   156, 158 and 160.

A/CN.9/766, para. 48.

---

*Article 22. Protection of creditors and other interested persons*

1. In granting or denying relief under article 19 or 21, or in modifying or terminating relief under paragraph 3 of this article, the court must be satisfied that the interests of the creditors and other interested persons, including the debtor, are adequately protected.

2. The court may subject relief granted under article 19 or 21 to conditions it considers appropriate.

3. The court may, at the request of the foreign representative or a person affected by relief granted under article 19 or 21, or at its own motion, modify or terminate such relief.

---

196. The idea underlying article 22 is that there should be a balance between relief that may be granted to the foreign representative and the interests of the persons that may be affected by such relief. This balance is essential to achieve the objectives of cross-border insolvency legislation.

197. The reference to the interests of creditors, the debtor and other interested parties in article 22, paragraph 1, provides useful elements to guide the court in exercising its powers under articles 19 and 21. In order to allow the court to tailor the relief appropriately, the court is clearly authorized to subject the relief to conditions (paragraph 2) and to modify or terminate the relief granted (paragraph 3). An additional feature of paragraph 3 is that it expressly gives standing to the parties who may be affected by the consequences of articles 19 and 21 to petition the court to modify and terminate those consequences. Apart from that, article 22 is intended to operate in the context of the procedural system of the enacting State.

198. In many cases the affected creditors will be "local" creditors. Nevertheless, in enacting article 22, it is not advisable to attempt to limit it to local creditors. Any express reference to local creditors in paragraph 1 would require a definition of those creditors. An attempt to draft such a definition (and to establish criteria according to which a particular category of creditors might receive special treatment) would not only show the difficulty of crafting an appropriate text but would also reveal that there is no justification for discriminating against creditors on the basis of criteria such as place of business or nationality.

199. Protection of all interested persons is linked to provisions in national laws on notification requirements; those may be general publicity requirements,

designed to notify potentially interested persons (e.g. local creditors or local agents of a debtor) that a foreign proceeding has been recognized or there may be requirements for individual notifications that the court, under its own procedural rules, has to issue to persons that would be directly affected by recognition or relief granted by the court. National laws vary as to the form, time and content of notice required to be given of the recognition of foreign proceedings and the Model Law does not attempt to modify those laws (see also para. 167 above).

*Discussion in UNCITRAL and in the Working Group*

*(a) Model Law*

A/52/17, paras. 82-93.

A/CN.9/422, para. 113.

A/CN.9/WG.V/WP.46, pp. 15-16.

A/CN.9/433, paras. 140-146.

A/CN.9/WG.V/WP.48, p. 21.

A/CN.9/435, paras. 72-78.

*(b) Guide to Enactment*

A/CN.9/436, para. 85.

A/CN.9/442, paras. 161-164.

*(c) Guide to Enactment and Interpretation*

A/CN.9/715, para. 39.

A/CN.9/WG.V/WP.107, paras. 162-164.

A/CN.9/763, para. 60.

A/CN.9/WG.V/WP.112, paras. 162-164.

A/CN.9/766, para. 49.

---

*Article 23.    Actions to avoid acts detrimental to creditors*

1.    Upon recognition of a foreign proceeding, the foreign representative has standing to initiate [*refer to the types of actions to avoid or otherwise render ineffective acts detrimental to creditors that are available in this State to a person or body administering a reorganization or liquidation*].

2.    When the foreign proceeding is a foreign non-main proceeding, the court must be satisfied that the action relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding.

---

200.    Under many national laws both individual creditors and insolvency representatives have a right to bring actions to avoid or otherwise render ineffective acts detrimental to creditors. Such a right, insofar as it pertains to individual creditors, is often not governed by insolvency law but by general provisions of law (such as the civil code); the right is not necessarily

tied to the existence of an insolvency proceeding against the debtor so that the action may be instituted prior to the commencement of such a proceeding. The person having such a right is typically only an affected creditor and not another person such as the insolvency representative. Furthermore, the conditions for these individual-creditor actions are different from the conditions applicable to similar actions that might be initiated by an insolvency representative. The standing[25] conferred by article 23 extends only to actions that are available to the local insolvency representative in the context of an insolvency proceeding, and the article does not equate the foreign representative with individual creditors who may have similar rights under a different set of conditions. Such actions of individual creditors fall outside the scope of article 23.

201.    Article 23, paragraph 1 expressly provides that, as an effect of recognition of the foreign proceeding under article 17, a foreign representative has standing[25] to initiate actions under the law of the enacting State to avoid or otherwise render ineffective legal acts detrimental to creditors. The provision is drafted narrowly in that it neither creates any substantive right regarding such actions nor provides any solution involving conflict of laws; the Model Law does not address the right of a foreign representative to bring such an action in the enacting State under the law of the State in which the foreign proceeding is taking place. The effect of article 17 is that a foreign representative is not prevented from initiating such actions by the sole fact that the foreign representative is not the insolvency representative appointed in the enacting State.

202.    When the foreign proceeding has been recognized as a "non-main proceeding", it is necessary for the court to consider specifically whether any action to be taken under the article 23 authority relates to assets that "should be administered in the foreign non-main proceeding" (article 23, paragraph 2). Again, this distinguishes the nature of a "main" proceeding from that of a "non-main" proceeding and emphasizes that the relief in a "non-main" proceeding is likely to be more restrictive than for a "main" proceeding.

203.    Granting standing[25] to the foreign representative to institute such actions is not without difficulty. In particular, such actions might not be looked upon favourably because of their potential for creating uncertainty about concluded or performed transactions. However, since the right to commence such actions is essential to protect the integrity of the assets of the debtor and is often the only realistic way to achieve such protection, it has been considered important to ensure that such right would not be denied to a foreign representative on the sole ground that he or she has not been locally appointed.

*Discussion in UNCITRAL and in the Working Group*

<table>
<tr><td>

*(a)   Model Law*

A/52/17, paras. 210-216.

A/CN.9/433, para. 134.

A/CN.9/WG.V/WP.48, p. 19.

A/CN.9/435, paras. 62-66.

*(b)   Guide to Enactment*

A/CN.9/436, paras. 86-88.

A/CN.9/442, paras. 165-167.

</td><td>

*(c)   Guide to Enactment and Interpretation*

A/68/17, para. 197.

A/CN.9/WG.V/WP.103/Add.1, paras. 165-167.

A/CN.9/742, para. 66.

A/CN.9/WG.V/WP.107, paras. 165-167.

A/CN.9/763, para. 61.

A/CN.9/WG.V/WP.112, paras. 165-167.

A/CN.9/766, para. 50.

</td></tr>
</table>

---

*Article 24.   Intervention by a foreign representative in proceedings in this State*

Upon recognition of a foreign proceeding, the foreign representative may, provided the requirements of the law of this State are met, intervene in any proceedings in which the debtor is a party.

---

204.   The purpose of article 24 is to avoid the denial of standing[25] to the foreign representative to intervene in proceedings merely because the procedural legislation may not have contemplated the foreign representative among those having such standing. The article applies to foreign representatives of both main and non-main proceedings.

205.   The word "intervene" in the context of article 20 is intended to refer to cases where the foreign representative appears in court and makes representations in proceedings, whether those proceedings be individual court actions or other proceedings (including extrajudicial proceedings) instituted by the debtor against a third party or proceedings instituted by a third party against the debtor. The proceedings where the foreign representative might intervene could only be those which have not been stayed under article 20, subparagraph 1 *(a)*, or article 21, subparagraph 1 *(a)*.

206.   Article 24, which is limited to providing standing,[25] makes it clear (by stating "provided the requirements of the law of this State are met") that all other conditions of the local law for a person to be able to intervene remain intact.

207.    Many if not all national procedural laws contemplate cases where a party (the foreign representative in this article) who demonstrates a legal interest in the outcome of a dispute between two other parties may be permitted by the court to be heard in the proceedings. Those procedural laws use different expressions to refer to such situations, the expression "intervention" being frequently used. If the enacting State uses another expression for that concept, the use of such other expression in enacting article 24 would be appropriate.

208.    The word "participate" as used in the context of article 12 refers to cases where the foreign representative makes representations in a collective insolvency proceeding (see para. 117 above), whereas the word "intervene" as used in article 24 covers cases where the foreign representative takes part in proceedings concerning an individual action by or against the debtor.

*Discussion in UNCITRAL and in the Working Group*

*(a)    Model Law*

A/52/17, paras. 117-123.

A/CN.9/422, paras. 148-149.

A/CN.9/433, paras. 51 and 58.

A/CN.9/WG.V/WP.48, p. 21.

A/CN.9/435, paras. 79-84.

*(b)    Guide to Enactment*

A/CN.9/436, paras. 89-90.

A/CN.9/442, paras. 168-172.

*(c)    Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.107, para. 170.

A/CN.9/763, para. 62.

A/CN.9/WG.V/WP.112, para. 170.

A/CN.9/766, para. 51.

---

CHAPTER IV.   COOPERATION WITH FOREIGN COURTS
AND FOREIGN REPRESENTATIVES

---

209.    A widespread limitation on cooperation and coordination between judges from different jurisdictions in cases of cross-border insolvency is derived from the lack of a legislative framework, or from uncertainty regarding the scope of the existing legislative authority, for pursuing cooperation with foreign courts.

210.   Experience has shown that, irrespective of the discretion courts may traditionally enjoy in a State, the passage of a specific legislative framework is useful for promoting international cooperation in cross-border cases. Accordingly, the Model Law fills the gap found in many national laws by expressly empowering courts to extend cooperation in the areas covered by the Model Law (articles 25-27).

211.   Chapter IV (articles 25-27), on cross-border cooperation, is thus a core element of the Model Law. Its objective is to enable courts and insolvency representatives from two or more countries to be efficient and achieve optimal results. Cooperation as described in the chapter is often the only realistic way, for example, to prevent dissipation of assets, to maximize the value of assets (e.g. when items of production equipment located in two States are worth more if sold together than if sold separately) or to find the best solutions for the reorganization of the enterprise.

212.   Cooperation is not dependent upon recognition and may thus occur at an early stage and before an application for recognition. Since the articles of chapter 4 apply to the matters referred to in article 1, cooperation is available not only in respect of applications for assistance made in the enacting State, but also applications from proceedings in the enacting State for assistance elsewhere (see also article 5). Cooperation is not limited to foreign proceedings within the meaning of article 2, subparagraph *(a)* that would qualify for recognition under article 17 (i.e. that they are either main or non-main), and cooperation may thus be available with respect to proceedings commenced on the basis of presence of assets. Such a provision may be useful when that proceeding is commenced in the enacting State and assistance is sought elsewhere. That provision may also be relevant when the enacting State, in addition to the Model Law, has other laws facilitating coordination and cooperation with foreign proceedings (see article 7).

213.   Articles 25 and 26 not only authorize cross-border cooperation, they also mandate it by providing that the court and the insolvency representative "shall cooperate to the maximum extent possible". The articles are designed to overcome the widespread problem of national laws lacking rules providing a legal basis for cooperation by local courts with foreign courts in dealing with cross-border insolvencies. Enactment of such a legal basis would be particularly helpful in legal systems in which the discretion given to judges to operate outside areas of express statutory authorization is limited. However, even in jurisdictions in which there is a tradition of wider judicial latitude, enactment of a legislative framework for cooperation has proved to be useful.

214. To the extent that cross-border judicial cooperation in the enacting State is based on the principle of comity among nations, the enactment of articles 25-27 offers an opportunity for making that principle more concrete and adapting it to the particular circumstances of cross-border insolvencies.

215. In the States in which the proper legal basis for international cooperation in the area of cross-border insolvency is not the principle of comity, but an international agreement (e.g. a bilateral or multilateral treaty or an exchange of letters between the cooperating authorities) based on the principle of reciprocity, chapter IV of the Model Law may serve as a model for the development of such international cooperation agreements.

216. The articles in chapter IV leave certain decisions, in particular when and how to cooperate, to the courts and, subject to the supervision of the courts, to the insolvency representatives. For a court (or a person or body referred to in articles 25 and 26) to cooperate with a foreign court or a foreign representative regarding a foreign proceeding, the Model Law does not require a previous formal decision to recognize that foreign proceeding.

217. The importance of granting the courts flexibility and discretion in cooperating with foreign courts or foreign representatives was emphasized at the Second UNCITRAL/INSOL Multinational Judicial Colloquium on Cross-Border Insolvency. At that Colloquium, reports of a number of cases in which judicial cooperation in fact occurred were given by the judges involved in the cases. From those reports a number of points emerged that might be summarized as follows: *(a)* communication between courts is possible but should be done carefully and with appropriate safeguards for the protection of substantive and procedural rights of the parties; *(b)* communication should be done openly, in the presence of the parties involved (except in extreme circumstances), who should be given advance notice; *(c)* communications that might be exchanged are various and include, for example, exchanges of formal court orders or judgements; supply of informal writings of general information, questions and observations; and transmission of transcripts of court proceedings; *(d)* means of communication include, for example, telephone, facsimile, electronic mail facilities and video; and *(e)* where communication is necessary and is intelligently used, there could be considerable benefits for the persons involved in, and affected by, the cross-border insolvency.

---

*Article 25.   Cooperation and direct communication between a court of
this State and foreign courts or foreign representatives*

1.   In matters referred to in article 1, the court shall cooperate to the maxi-
mum extent possible with foreign courts or foreign representatives, either
directly or through a [*insert the title of a person or body administering a
reorganization or liquidation under the law of the enacting State*].

2.   The court is entitled to communicate directly with, or to request informa-
tion or assistance directly from, foreign courts or foreign representatives.

---

218.   The ability of courts, with appropriate involvement of the parties, to
communicate "directly" and to request information and assistance "directly"
from foreign courts or foreign representatives is intended to avoid the use
of time-consuming procedures traditionally in use, such as letters rogatory.
This ability is critical when the courts consider that they should act with
urgency. In order to emphasize the flexible and potentially urgent character
of cooperation, the enacting State may find it useful to include in the enact-
ment of the Model Law an express provision that would authorize the courts,
when they engage in cross-border communications under article 25, to forgo
use of the formalities (e.g. communication via higher courts, letters rogatory
or other diplomatic or consular channels) that are inconsistent with the policy
behind the provision.

---

*Article 26.   Cooperation and direct communication between the* [insert the
title of a person or body administering a reorganization or liquidation under
the law of the enacting State] *and foreign courts
or foreign representatives*

1.   In matters referred to in article 1, a [*insert the title of a person or body
administering a reorganization or liquidation under the law of the enacting
State*] shall, in the exercise of its functions and subject to the supervision of
the court, cooperate to the maximum extent possible with foreign courts or
foreign representatives.

2.   The [*insert the title of a person or body administering a reorganization
or liquidation under the law of the enacting State*] is entitled, in the exercise
of its functions and subject to the supervision of the court, to communicate
directly with foreign courts or foreign representatives.

---

219.    Article 26 on international cooperation between persons who are appointed to administer assets of insolvent debtors reflects the important role that such persons can play in devising and implementing cooperative arrangements, within the parameters of their authority. The provision makes it clear that an insolvency representative acts under the overall supervision of the competent court (by stating "in the exercise of its functions and subject to the supervision of the court"). The Model Law does not modify the rules already existing in the insolvency law of the enacting State on the supervisory functions of the court over the activities of the insolvency representative. Generally, a certain degree of latitude and initiative on the part of insolvency representatives, within the broad confines of judicial supervision, are mainstays of cooperation in practical terms; it is therefore advisable that the enacting State does not change that in enacting the Model Law. In particular, there should be no suggestion that ad hoc authorization would be needed for each communication between the insolvency representative and a foreign body.

---

*Article 27.    Forms of cooperation*

Cooperation referred to in articles 25 and 26 may be implemented by any appropriate means, including:

*(a)*    Appointment of a person or body to act at the direction of the court;

*(b)*    Communication of information by any means considered appropriate by the court;

*(c)*    Coordination of the administration and supervision of the debtor's assets and affairs;

*(d)*    Approval or implementation by courts of agreements concerning the coordination of proceedings;

*(e)*    Coordination of concurrent proceedings regarding the same debtor;

*(f)*    [*The enacting State may wish to list additional forms or examples of cooperation*].

---

220.    Article 27 is suggested for use by the enacting State to provide courts with an indicative list of the types of cooperation that are authorized by articles 25 and 26. Such an indicative listing may be particularly helpful in States with a limited tradition of direct cross-border judicial cooperation and in States where judicial discretion has traditionally been limited and, as an indicative list, leaves the legislator an opportunity to include other forms of cooperation. Any listing of forms of possible cooperation should be illustrative rather than exhaustive, to avoid inadvertently precluding certain forms

of appropriate cooperation and limiting the ability of courts to fashion remedies in keeping with specific circumstances.

221. The implementation of cooperation would be subject to any mandatory rules applicable in the enacting State; for example, in the case of requests for information, rules restricting the communication of information (e.g. for reasons of protection of privacy) would apply.

222. Subparagraph *(f)* of article 27 offers the enacting State the opportunity to include additional forms of possible cooperation. Those might include, for example, suspension or termination of existing proceedings in the enacting State.

223. The *UNCITRAL Practice Guide on Cross-Border Insolvency Cooperation* expands upon the forms of cooperation mentioned in article 27 and, in particular, compiles practice and experience with the use of cross-border insolvency agreements.[36]

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*

A/52/17, paras. 124-129.

A/CN.9/419, paras. 75-76, 80-83 and 118-133.

A/CN.9/WG.V/WP.44, pp. 21-22.

A/CN.9/422, paras. 129-143.

A/CN.9/WG.V/WP.46, p. 17.

A/CN.9/433, paras. 164-172.

A/CN.9/WG.V/WP.48, p. 22.

A/CN.9/435, paras. 85-94.

*(b)  Guide to Enactment*

A/CN.9/436, paras. 91-95.

A/CN.9/442, paras. 173-183.

*(c)  Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.103/Add.1, paras. 173-175, 177, 181 and 183A.

A/CN.9/742, paras. 67-68.

A/CN.9/WG.V/WP.107, paras. 183-183A.

A/CN.9/763, para. 63.

A/CN.9/WG.V/WP.112, paras. 173A, 181 and 183-183A.

A/CN.9/766, para. 52.

---

[36] See footnote 15. The Model Law applies to individual debtors whether corporate or natural. Part three of the *Legislative Guide on Insolvency Law*, however, addresses the treatment of enterprise groups in insolvency and recommendations 240 to 254 focus on cooperation and communication to facilitate the conduct of cross-border insolvency proceedings where they concern members of an enterprise group. Part three of the *Legislative Guide* is available from http://www.uncitral.org/uncitral/uncitral_texts/insolvency.html

## CHAPTER V.   CONCURRENT PROCEEDINGS

*Article 28.   Commencement of a proceeding under* [identify laws of the
enacting State relating to insolvency] *after recognition
of a foreign main proceeding*

After recognition of a foreign main proceeding, a proceeding under [*iden-
tify laws of the enacting State relating to insolvency*] may be commenced
only if the debtor has assets in this State; the effects of that proceeding shall
be restricted to the assets of the debtor that are located in this State and, to
the extent necessary to implement cooperation and coordination under arti-
cles 25, 26 and 27, to other assets of the debtor that, under the law of this
State, should be administered in that proceeding.

224.   The Model Law imposes virtually no limitations on the jurisdiction
of the courts in the enacting State to commence or continue insolvency
proceedings. Article 28, in conjunction with article 29, provides that recogni-
tion of a foreign main proceeding will not prevent the commencement of a
local insolvency proceeding concerning the same debtor as long as the debtor
has assets in the State.

225.   The position taken in article 28 is in substance the same as the posi-
tion taken in a number of States. In some States, however, for the court to
have jurisdiction to commence a local insolvency proceeding, the mere pres-
ence of assets in the State is not sufficient. For such jurisdiction to exist,
the debtor must be engaged in an economic activity in the State (to use the
terminology of the Model Law, the debtor must have an "establishment" in
the State, as defined in article 2, subparagraph *(f)*). In article 28, the less
restrictive solution was chosen in a context where the debtor is already
involved in a foreign main proceeding. While the solution leaves a broad
ground for commencing a local proceeding after recognition of a foreign
main proceeding, it serves the purpose of indicating that, if the debtor has
no assets in the State, there is no jurisdiction for commencing an insolvency
proceeding.

226.   Nevertheless, the enacting State may wish to adopt the more restrictive
solution of allowing the initiation of the local proceeding only if the debtor
has an establishment in the State. The adoption of such a restriction would
not be contrary to the policy underlying the Model Law. The rationale may
be that, when the assets in the enacting State are not part of an establishment,
the commencement of a local proceeding would typically not be the most
efficient way to protect the creditors, including local creditors. By tailoring
the relief to be granted to the foreign main proceeding and cooperating with

the foreign court and foreign representative, the court in the enacting State would have sufficient opportunity to ensure the assets in the State would be administered in such a way that local interests would be adequately protected. Therefore, the enacting State would act in line with the philosophy of the Model Law if it enacted the article by replacing the words "only if the debtor has assets in this State", as they currently appear in article 28, with the words "only if the debtor has an establishment in this State".

227.   Ordinarily, the local proceeding of the kind envisaged in article 28 would be limited to the assets located in the State. In some situations, however, a meaningful administration of the local insolvency proceeding may have to include certain assets abroad, especially when there is no foreign proceeding necessary or available in the State where the assets are situated (for example, where the local establishment would have an operating plant in a foreign jurisdiction, where it would be possible to sell the debtor's assets in the enacting State and the assets abroad as a "going concern", or where assets were fraudulently transferred abroad from the enacting State). In order to allow such limited cross-border reach of a local proceeding, the article includes the words "and ... to other assets of the debtor that ... should be administered in that proceeding". Two restrictions have been included in the article concerning the possible extension of effects of a local proceeding to assets located abroad: firstly, the extension is permissible "to the extent necessary to implement cooperation and coordination under articles 25, 26 and 27"; and, secondly, those foreign assets must be subject to administration in the enacting State "under the law of [the enacting State]". Those restrictions are useful in order to avoid creating an open-ended ability to extend the effects of a local proceeding to assets located abroad, a result that would generate uncertainty as to the application of the provision and that might lead to conflicts of jurisdiction.

228.   Where under the law of the enacting State the debtor must be insolvent to commence an insolvency proceeding, the Model Law establishes a rebuttable presumption that recognition of a foreign main proceeding constitutes the requisite proof of insolvency of the debtor for that purpose (article 31) (see paras. 235-238).

*Discussion in UNCITRAL and in the Working Group*

| | |
|---|---|
| *(a)   Model Law* | A/CN.9/WG.V/WP.46, p. 18. |
| A/52/17, paras. 94-101. | A/CN.9/433, paras. 173-181. |
| A/CN.9/WG.V/WP.44, pp. 26-29. | A/CN.9/WG.V/WP.48, p. 23. |
| A/CN.9/422, paras. 192-197. | A/CN.9/435, paras. 180-183. |

| | |
|---|---|
| *(b)  Guide to Enactment* | *(c)  Guide to Enactment and Interpretation* |
| A/CN.9/436, para. 96. | A/CN.9/WG.V/WP.103/Add.1, paras. 184 and 186-187A. |
| A/CN.9/442, paras. 184-187. | A/CN.9/742, para. 69. |
| | A/CN.9/WG.V/WP.107, paras. 185 and 187A. |
| | A/CN.9/763, para. 64. |
| | A/CN.9/WG.V/WP.112, paras. 184-186 and 187A. |
| | A/CN.9/766, para. 53. |

---

*Article 29.  Coordination of a proceeding under* [*identify laws of the enacting State relating to insolvency*] *and a foreign proceeding*

Where a foreign proceeding and a proceeding under *[identify laws of the enacting State relating to insolvency]* are taking place concurrently regarding the same debtor, the court shall seek cooperation and coordination under articles 25, 26 and 27, and the following shall apply:

*(a)*  When the proceeding in this State is taking place at the time the application for recognition of the foreign proceeding is filed,

- (i)  Any relief granted under article 19 or 21 must be consistent with the proceeding in this State; and

- (ii)  If the foreign proceeding is recognized in this State as a foreign main proceeding, article 20 does not apply;

*(b)*  When the proceeding in this State commences after recognition, or after the filing of the application for recognition, of the foreign proceeding,

- (i)  Any relief in effect under article 19 or 21 shall be reviewed by the court and shall be modified or terminated if inconsistent with the proceeding in this State; and

- (ii)  If the foreign proceeding is a foreign main proceeding, the stay and suspension referred to in paragraph 1 of article 20 shall be modified or terminated pursuant to paragraph 2 of article 20 if inconsistent with the proceeding in this State;

*(c)*  In granting, extending or modifying relief granted to a representative of a foreign non-main proceeding, the court must be satisfied that the relief relates to assets that, under the law of this State, should be administered in the foreign non-main proceeding or concerns information required in that proceeding.

229.    Article 29 gives guidance to the court that deals with cases where the debtor is subject to a foreign proceeding and a local proceeding at the same time. The objective of this article and article 30 is to foster coordinated decisions that would best achieve the objectives of both proceedings (e.g. maximization of the value of the debtor's assets or the most advantageous reorganization of the enterprise). The opening words of article 29 direct the court that in all such cases it must seek cooperation and coordination pursuant to chapter IV (articles 25, 26 and 27) of the Model Law.

230.    The salient principle embodied in article 29 is that the commencement of a local proceeding does not prevent or terminate the recognition of a foreign proceeding. This principle is essential for achieving the objectives of the Model Law in that it allows the court in the enacting State in all circumstances to provide relief in favour of the foreign proceeding.

231.    However, the article maintains a pre-eminence of the local proceeding over the foreign proceeding. This has been done in the following ways: firstly, any relief to be granted to the foreign proceeding must be consistent with the local proceeding (article 29, subparagraph *(a)* (i)); secondly, any relief that has already been granted to the foreign proceeding must be reviewed and modified or terminated to ensure consistency with the local proceeding (article 29, subparagraph *(b)* (i)); thirdly, if the foreign proceeding is a main proceeding, the automatic effects pursuant to article 20 are to be modified and terminated if inconsistent with the local proceeding (those automatic effects do not terminate automatically since they may be beneficial, and the court may wish to maintain them) (article 29, subparagraph *(b)* (ii)); and fourthly, where a local proceeding is pending at the time a foreign proceeding is recognized as a main proceeding, the foreign proceeding does not enjoy the automatic effects of article 20 (article 29, subparagraph *(a)* (ii)). Article 29 avoids establishing a rigid hierarchy between the proceedings since that would unnecessarily hinder the ability of the court to cooperate and exercise its discretion under articles 19 and 21. It is desirable not to restrict that latitude of the court when article 29 is enacted.

232.    Article 29, subparagraph *(c)*, incorporates the principle that relief granted to a foreign non-main proceeding should be limited to assets that are to be administered in that non-main proceeding or must concern information required in that proceeding. That principle is expressed in article 21, paragraph 3, which deals in a general way with the type of relief that may be granted to a foreign representative, and is restated in article 29, which deals with coordination of local and foreign proceedings. Article 19, paragraph 4, on pre-recognition relief, and article 30, on coordination of more than one foreign proceeding, are inspired by the same principle (see also the comments in para. 175 above).

*Discussion in UNCITRAL and in the Working Group*

| | |
|---|---|
| *(a)  Model Law* | *(c)  Guide to Enactment and Interpretation* |
| A/52/17, paras. 106-110. | |
| A/CN.9/435, paras. 190-191. | A/CN.9/WG.V/WP.103/Add.1, para. 188. |
| *(b)  Guide to Enactment* | A/CN.9/742, para. 70. |
| A/CN.9/442, paras. 188-191. | A/CN.9/WG.V/WP.112, para. 188. |
| | A/CN.9/766, para. 53. |

---

*Article 30.   Coordination of more than one foreign proceeding*

In matters referred to in article 1, in respect of more than one foreign proceeding regarding the same debtor, the court shall seek cooperation and coordination under articles 25, 26 and 27, and the following shall apply:

*(a)*  Any relief granted under article 19 or 21 to a representative of a foreign non-main proceeding after recognition of a foreign main proceeding must be consistent with the foreign main proceeding;

*(b)*  If a foreign main proceeding is recognized after recognition, or after the filing of an application for recognition, of a foreign non-main proceeding, any relief in effect under article 19 or 21 shall be reviewed by the court and shall be modified or terminated if inconsistent with the foreign main proceeding;

*(c)*  If, after recognition of a foreign non-main proceeding, another foreign non-main proceeding is recognized, the court shall grant, modify or terminate relief for the purpose of facilitating coordination of the proceedings.

---

233.   Article 30 deals with cases where the debtor is subject to insolvency proceedings in more than one foreign State and foreign representatives of more than one foreign proceeding seek recognition or relief in the enacting State. The provision applies whether or not an insolvency proceeding is pending in the enacting State. If, in addition to two or more foreign proceedings, there is a proceeding in the enacting State, the court will have to act pursuant to both article 29 and article 30.

234.   The objective of article 30 is similar to the objective of article 29 in that the key issue in the case of concurrent proceedings is to promote

3-10063-shl    Doc 629    Filed 08/29/23    Entered 08/29/23 12:34:49    Main Documen
Pg 834 of 882    526

*Part two.   Guide to Enactment and Interpretation*                                    *105*

cooperation, coordination and consistency of the relief granted to different proceedings. Such consistency will be achieved by appropriate tailoring of the relief to be granted or by modifying or terminating relief already granted. Unlike article 29 (which, as a matter of principle, gives primacy to the local proceeding), article 30 gives preference to the foreign main proceeding if there is one. In the case of more than one foreign non-main proceeding, the provision does not a priori treat any foreign proceeding preferentially. Priority for the foreign main proceeding is reflected in the requirement that any relief in favour of a foreign non-main proceeding (whether already granted or to be granted) must be consistent with the foreign main proceeding (article 30, subparagraphs *(a)* and *(b)*).

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*                          *(b)   Guide to Enactment*

A/52/17, paras. 111-112.                   A/CN.9/442, paras. 192-193.

---

*Article 31.   Presumption of insolvency based on recognition
of a foreign main proceeding*

In the absence of evidence to the contrary, recognition of a foreign main proceeding is, for the purpose of commencing a proceeding under [*identify laws of the enacting State relating to insolvency*], proof that the debtor is insolvent.

---

235.    In some jurisdictions, proof that the debtor is insolvent is required for the commencement of insolvency proceedings. In other jurisdictions, insolvency proceedings may be commenced under specific circumstances defined by law that do not necessarily mean that the debtor is in fact insolvent; those circumstances may be, for example, cessation of payments by the debtor or certain actions of the debtor such as a corporate decision, dissipation of its assets or abandonment of its establishment.

236.    In jurisdictions where insolvency is a condition for commencing insolvency proceedings, article 31 establishes, upon recognition of a foreign main proceeding, a rebuttable presumption of insolvency of the debtor for the purposes of commencing an insolvency proceeding in the enacting State. The presumption does not apply if the foreign proceeding is a non-main proceeding. The reason is that an insolvency proceeding commenced in a State other than the State where the debtor has the centre of its main interests does not necessarily mean that the debtor is to be subject to laws relating to insolvency in other States.

237.   For the national laws where proof that the debtor is insolvent is not required for the commencement of insolvency proceedings, the presumption established in article 31 may be of little practical significance and the enacting State may decide not to enact it.

238.   This rule, however, would be helpful in those legal systems in which commencement of an insolvency proceeding requires proof that the debtor is in fact insolvent. Article 31 would have particular significance when proving insolvency as the prerequisite for an insolvency proceeding would be a time-consuming exercise and of little additional benefit bearing in mind that the debtor is already in an insolvency proceeding in the State where it has the centre of its main interests and the commencement of a local proceeding may be urgently needed for the protection of local creditors. Nonetheless, the court of the enacting State is not bound by the decision of the foreign court, and local criteria for demonstrating insolvency remain operative, as is clarified by the words "in the absence of evidence to the contrary".

*Discussion in UNCITRAL and in the Working Group*

*(a)   Model Law*

A/52/17, paras. 94 and 102-105.

A/CN.9/WG.V/WP.44, p. 27.

A/CN.9/422, para. 196.

A/CN.9/WG.V/WP.46, p. 18.

A/CN.9/433, paras. 173 and 180-181.

A/CN.9/WG.V/WP.48, p. 23.

A/CN.9/435, paras. 180 and 184.

*(b)   Guide to Enactment*

A/CN.9/436, para. 97.

A/CN.9/442, paras. 194-197.

*(c)   Guide to Enactment and Interpretation*

A/CN.9/WG.V/WP.103/Add.1, para. 197.

A/CN.9/742, para. 71.

A/CN.9/WG.V/WP.112, para. 197.

A/CN.9/766, para. 53.

---

*Article 32.   Rule of payment in concurrent proceedings*

Without prejudice to secured claims or rights *in rem*, a creditor who has received part payment in respect of its claim in a proceeding pursuant to a law relating to insolvency in a foreign State may not receive a payment for the same claim in a proceeding under [*identify laws of the enacting State relating to insolvency*] regarding the same debtor, so long as the payment to the other creditors of the same class is proportionately less than the payment the creditor has already received.

---

3-10063-shl   Doc 629   Filed 08/29/23   Entered 08/29/23 12:34:49   Main Document
Pg 836 of 882                     528

*Part two.  Guide to Enactment and Interpretation*                           *107*

239.    The rule set forth in article 32 (sometimes referred to as the hotch-potch rule) is a useful safeguard in a legal regime for coordination and cooperation in the administration of cross-border insolvency proceedings. It is intended to avoid situations in which a creditor might obtain more favourable treatment than the other creditors of the same class by obtaining payment of the same claim in insolvency proceedings in different jurisdictions. For example, an unsecured creditor has received 5 per cent of its claim in a foreign insolvency proceeding; that creditor also participates in the insolvency proceeding in the enacting State, where the rate of distribution is 15 per cent; in order to put the creditor in the equal position as the other creditors in the enacting State, the creditor would receive 10 per cent of its claim in the enacting State.

240.    Article 32 does not affect the ranking of claims as established by the law of the enacting State and is solely intended to establish the equal treatment of creditors of the same class. To the extent claims of secured creditors or creditors with rights *in rem* are paid in full (a matter that depends on the law of the State where the proceeding is conducted), those claims are not affected by the provision.

241.    The words "secured claims" are used to refer generally to claims guaranteed by particular assets, while the words "rights *in rem*" are intended to indicate rights relating to a particular property that are enforceable also against third parties. A given right may fall within the ambit of both expressions, depending on the classification and terminology of the applicable law. The enacting State may use another term or terms for expressing those concepts.

*Discussion in UNCITRAL and in the Working Group*

*(a)  Model Law*

A/52/17, paras. 130-134.

A/CN.9/419, paras. 89-93.

A/CN.9/WG.V/WP.44, pp. 29-30.

A/CN.9/422, paras. 198-199.

A/CN.9/WG.V/WP.46, p. 18.

A/CN.9/433, paras. 182-183.

A/CN.9/WG.V/WP.48, p. 23.

A/CN.9/435, paras. 96 and 197-198.

*(b)  Guide to Enactment*

A/CN.9/436, para. 98.

A/CN.9/442, paras. 198-200.

## VI. Assistance from the UNCITRAL Secretariat

*A.   Assistance in drafting legislation*

242.   The UNCITRAL secretariat assists States with technical consultations for the preparation of legislation based on the Model Law. Further information may be obtained from the UNCITRAL secretariat (mailing address: Vienna International Centre, P.O. Box 500, 1400 Vienna, Austria; telephone: (+43-1) 26060-4060; facsimile: (+43-1) 26060-5813; e-mail: uncitral@uncitral. org; Internet home page: http://www.uncitral.org).

*B.   Information on the interpretation of legislation based on the Model Law*

243.   The Model Law is included in the Case Law on UNCITRAL Texts (CLOUT) information system, which is used for collecting and disseminating information on case law relating to the conventions and model laws developed by UNCITRAL. The purpose of the system is to promote international awareness of those legislative texts and to facilitate their uniform interpretation and application. The secretariat publishes abstracts of decisions in the six official languages of the United Nations and the full, original decisions are available, upon request. The system is explained in a user's guide that is available on the above-mentioned Internet home page of UNCITRAL.

## *Annex I*

*General Assembly resolution 52/158 of 15 December 1997*

### 52/158. Model Law on Cross-Border Insolvency of the United Nations Commission on International Trade Law

*The General Assembly*,

*Recalling* its resolution 2205 (XXI) of 17 December 1966, by which it created the United Nations Commission on International Trade Law with a mandate to further the progressive harmonization and unification of the law of international trade and in that respect to bear in mind the interests of all peoples, in particular those of developing countries, in the extensive development of international trade,

*Noting* that increased cross-border trade and investment leads to greater incidence of cases where enterprises and individuals have assets in more than one State,

*Noting also* that when a debtor with assets in more than one State becomes subject to an insolvency proceeding, there often exists an urgent need for cross-border cooperation and coordination in the supervision and administration of the insolvent debtor's assets and affairs,

*Considering* that inadequate coordination and cooperation in cases of cross-border insolvency reduce the possibility of rescuing financially troubled but viable businesses, impede a fair and efficient administration of cross-border insolvencies, make it more likely that the debtor's assets would be concealed or dissipated and hinder reorganizations or liquidations of debtors' assets and affairs that would be the most advantageous for the creditors and other interested persons, including the debtors and the debtors' employees,

*Noting* that many States lack a legislative framework that would make possible or facilitate effective cross-border coordination and cooperation,

*Convinced* that fair and internationally harmonized legislation on cross-border insolvency that respects the national procedural and judicial systems and is acceptable to States with different legal, social and economic systems would contribute to the development of international trade and investment,

*Considering* that a set of internationally harmonized model legislative provisions on cross-border insolvency is needed to assist States in modernizing their legislation governing cross-border insolvency,

1.  *Expresses its appreciation* to the United Nations Commission on International Trade Law for completing and adopting the Model Law on Cross-Border Insolvency contained in the annex to the present resolution;[a]

2.  *Requests* the Secretary-General to transmit the text of the Model Law, together with the Guide to Enactment of the Model Law prepared by the Secretariat, to Governments and interested bodies;

3.  *Recommends* that all States review their legislation on cross-border aspects of insolvency to determine whether the legislation meets the objectives of a modern and efficient insolvency system and, in that review, give favourable consideration to the Model Law, bearing in mind the need for an internationally harmonized legislation governing instances of cross-border insolvency;

4.  *Recommends also* that all efforts be made to ensure that the Model Law, together with the Guide, become generally known and available.

*72nd plenary meeting*
*15 December 1997*

---

[a] The *UNCITRAL Model Law on Cross-Border Insolvency* is presented in part one of the present publication.

## *Annex II*

## **Decision of the United Nations Commission on International Trade Law**

At its 973rd meeting on 18 July 2013, the Commission adopted the following decision:

> *The United Nations Commission on International Trade Law*,

> "*Noting* that legislation based upon the UNCITRAL Model Law on Cross-Border Insolvency[37] has been enacted in some 20 States,

> "*Noting also* the widespread increase in the incidence of cross-border insolvency proceedings and, accordingly, the growing opportunities for use and application of the Model Law in cross-border insolvency proceedings and the development of international jurisprudence interpreting its provisions,

> "*Noting further* that courts frequently have reference to the Guide to Enactment of the Model Law[38] for guidance on the background to the drafting and interpretation of its provisions,

> "*Recognizing* that some uncertainty with respect to the interpretation of certain provisions of the Model Law has emerged in the jurisprudence arising from its application in practice,

> "*Convinced* of the desirability, in interpretation of those provisions, of regard to the international origin of the Model Law and the need to promote uniformity in its application,

> "*Convinced also* of the desirability of providing additional guidance through revision of the Guide to Enactment of the Model Law with respect to the interpretation and application of selected aspects of the Model Law to facilitate that uniform interpretation,

> "*Appreciating* the support for and the participation of international intergovernmental and non-governmental organizations active in the field of insolvency law reform in the revision of the Guide to Enactment of the Model Law,

---

[37] General Assembly resolution 52/158, annex (model law only).
[38] A/CN.9/442, annex.

"*Expressing* its appreciation to Working Group V (Insolvency Law) for its work in revising the Guide to Enactment of the Model Law,

"1.    *Adopts* the *Guide to Enactment and Interpretation of the UNCI-TRAL Model Law on Cross-Border Insolvency* contained in document A/CN.9/WG.V/WP.112, as revised by the Working Group at its forty-third session (set forth in document A/CN.9/766) and by the Commission at its current session,[39] and authorizes the Secretariat to edit and finalize the text of the Guide to Enactment and Interpretation in the light of those revisions;

"2.    *Requests* the Secretary-General to publish, including electronically, the revised text of the Guide to Enactment and Interpretation of the Model Law, together with the text of the Model Law, and to transmit it to Governments and interested bodies, so that it becomes widely known and available;

"3.    *Recommends* also that the *Guide to Enactment and Interpretation of the Model Law* be given due consideration, as appropriate, by legislators, policy makers, judges, insolvency practitioners and other individuals concerned with cross-border insolvency laws and proceedings; and

"4.    *Recommends* that all States continue to consider implementation of the UNCITRAL Model Law on Cross-Border Insolvency and invites States that have enacted legislation based upon the Model Law to advise the Commission accordingly."

---

[39] *Official Records of the General Assembly, Sixty-eighth session, Supplement No. 17* (A/68/17), para. 197.

V.13-86394
ISBN 978-92-1-133879-5



**Exhibit J**

**IN THE GENERAL DIVISION OF THE HIGH COURT OF THE REPUBLIC OF SINGAPORE**

In the matter of Part 11 of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018)

And

In the matter of Section 252 of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018)

And

In the matter of the Third Schedule of the Insolvency, Restructuring and Dissolution Act 2018 (Act 40 of 2018)

And

In the matter of Article 15 of the UNCITRAL Model Law on Cross-Border Insolvency

And

In the matter of the Appointment of Foreign Representative in the United States Bankruptcy Court in the Southern District of New York in Case No. 2310063 (Genesis Global Holdco, LLC (EIN 384058219)), jointly administered with Case No. 2310064 (Genesis Global Capital, LLC (EIN 371878564)) and Case No. 2310065 (Genesis Asia Pacific Pte. Ltd. (Singapore UEN No. 202002164R)) on 26 January 2023

And

HC/OA 400/2023

In the matter of **GENESIS ASIA PACIFIC PTE. LTD.** (Singapore UEN No. 202002164R)

**1. GENESIS ASIA PACIFIC PTE. LTD.**
   (Singapore UEN No. 202002164R)
   (in its capacity as foreign representative of Genesis Asia Pacific Pte. Ltd.)

**2. GENESIS ASIA PACIFIC PTE. LTD.**
   (Singapore UEN No. 202002164R)

1

And

HC/OA 402/2023

In the matter of **GENESIS GLOBAL HOLDCO, LLC**
(United States Registration No. 38-4058219)
**1. GENESIS ASIA PACIFIC PTE. LTD.**
   (Singapore UEN No. 202002164R)
   (in its capacity as foreign representative of Genesis
   Global Holdco, LLC)

**2. GENESIS GLOBAL HOLDCO, LLC**
   (United States Registration No. 38-4058219)

And

HC/OA 403/2023

In the matter of **GENESIS GLOBAL CAPITAL, LLC**
(United States Registration No. 37-1878564)
**1. GENESIS ASIA PACIFIC PTE. LTD.**
   (Singapore UEN No. 202002164R)
   (in its capacity as foreign representative of Genesis
   Global Capital, LLC)

**2. GENESIS GLOBAL CAPITAL, LLC**
   (United States Registration No. 37-1878564)

… Applicant(s)

---

## APPLICANTS' JOINT WRITTEN SUBMISSIONS

---

**Alexander Yeo**
**Jo Tay**
**Yeoh Tze Ning**
**Allen & Gledhill LLP**
One Marina Boulevard
#28-00
Singapore 018989
Ref: 1022011034/JOTAY/AYEOHT/YEOHTN
**Solicitors for the Applicants**

Dated this 30 June 2023

2

## TABLE OF CONTENTS

I.      INTRODUCTION ....................................................................... 4

II.     BACKGROUND........................................................................... 5

III.    APPLICABLE LEGAL PRINCIPLES......................................... 8

A.      *Application for recognition under Article 15 of the Model Law* ........... 8

B.      *Reliefs*...................................................................................... 9

IV.     THE REQUIREMENTS OF ARTICLE 17(1) OF THE MODEL LAW ARE
        SATISFIED ................................................................................12

A.      *Article 17(1)(a) Requirement is satisfied* ..............................................13

B.      *Article 17(1)(b) Requirement is satisfied*...............................................14

C.      *Article 17(1)(c) Requirement is satisfied* ...............................................15

D.      *Article 17(1)(d) Requirement is satisfied*...............................................16

V.      THE CHAPTER 11 CASES SHOULD BE RECOGNISED AS FOREIGN
        MAIN PROCEEDINGS ...............................................................18

A.      *The Debtors' COMI is the United States* ...............................................18

B.      *Application to the facts* ......................................................................21

VI.     ALTERNATIVELY, THE CHAPTER 11 CASES SHOULD BE RECOGNISED
        AS FOREIGN NON-MAIN PROCEEDINGS ...........................................25

VII.    THE RELIEFS SOUGHT IN THE RECOGNITION APPLICATIONS ARE
        NECESSARY .........................................................................................27

A.      *Automatic relief under Article 20 of the Model Law*..............................27

B.      *Relief under Article 21(1) of the Model Law* ........................................28

VIII.   GAP'S APPOINTMENT AS FOREIGN REPRESENTATIVE SHOULD BE
        RECOGNISED.......................................................................................35

IX.     CONCLUSION.......................................................................................35

## I.    **INTRODUCTION**

1.    These are the written submissions of Genesis Asia Pacific Pte. Ltd. ("**GAP**"), Genesis
Global Holdco ("**Holdco**") and Genesis Global Capital, LLC ("**GGC**") (including GAP in
its capacity as foreign representative of Holdco, GGC and GAP) (collectively, the
"**Applicants**", and with Holdco, GGC and GAP referred to collectively as "**Debtors**") in
the following applications:

    (1)    HC/OA 400/2023 ("**OA 400**") by GAP;

    (2)    HC/OA 402/2023 ("**OA 402**") by Holdco;

    (3)    HC/OA 403/2023 ("**OA 403**") by GGC;

(collectively, the "**Recognition Applications**").

2.    The present Recognition Applications were filed concurrently for *inter alia*, the following
orders:

    (1)    the recognition of the Chapter 11 Cases in respect of each Debtor (defined
below) as foreign main proceedings within the meaning of Article 2(f) of the
Third Schedule (the "**Model Law**") of the Insolvency, Restructuring and
Dissolution Act 2018 ("**IRDA**"), and that each Debtor is each immediately entitled
to relief pursuant to Article 20 of the Model Law and that the relief sought at prayer
1(d) of each Debtor's Originating Application subsist for as long as their Chapter
11 Cases, including any extensions thereto, are in force;

    (2)    alternatively, that the Chapter 11 Cases in respect of each  Debtor be recognised
as foreign non-main proceedings within the meaning of Article 2(g) of the Model
Law;

(3)      that the said Debtor be entitled to relief pursuant to <u>Article 21</u> of the Model Law, as specified in the Originating Application for that Debtor, for as long as their Chapter 11 Cases, including any extensions thereto, are in force; and

(4)      that GAP's appointment as the <u>foreign representative</u> of each Debtor (defined below) pursuant to the order granted in respect of the Foreign Representative Appointment Motion (defined below) on 26 January 2023 be recognised by the Singapore Courts and in Singapore as a foreign representative within the meaning of Article 2(i) of the Model Law.

3.      In these submissions, the Applicants will refer to following affidavits filed in the Recognition Applications to date:

(1)      1st Affidavit of Ahmed Derar Islim dated 8 May 2023 and filed on 9 May 2023 in OA 400, OA 402, and 403 ("**1st ADI**").

(2)      2nd Affidavit of Ahmed Derar Islim dated 31 May 2023 and filed on 1 June 2023 in HC OA 400, OA 402, and 403 ("**2nd ADI**").

4.      Unless otherwise defined herein, the capitalised terms used herein shall have the same meanings ascribed to them in 1st ADI and 2nd ADI.

## II.      <u>BACKGROUND</u>

5.      The Debtors' business and financial circumstances leading up to the filing of the Chapter 11 Cases are detailed in 1st ADI.[1] A brief summary is set out below.

6.      The Debtors operate in the cryptocurrency space. Holdco and GGT provide lending and borrowing, spot trading, derivatives and custody services for digital assets and fiat currency. Both Holdco and GGT are wholly owned by Digital Currency Group (i.e.

---

[1] 1st ADI at [5]-[20].

DCG). Holdco is a limited liability company in incorporated in Delaware – its operating subsidiaries include the Debtor entities GAP and GGC which provide lending and borrowing services and certain trading services:

(1)    Genesis Global Capital, LLC (i.e. GGC) is a wholly owned Delaware incorporated subsidiary of Holdco that provides lending and borrowing services for digital assets and fiat currency primarily to and from institutional and high net worth individual customers.

(2)    Genesis Asia Pacific Pte Ltd (i.e. GAP) is a wholly-owned Singapore-incorporated subsidiary of Holdco, and a Singapore-based digital payment token service provider which carries out digital asset trading and lending activities.

7.    The other non-Debtor subsidiaries of Holdco engage in derivatives and custody services, as well as most of the trading services.[2]

8.    The digital asset industry has experienced a series of tumultuous events over the past year, including drastic market shifts which plunged multiple businesses in the industry into financial difficulty and eroded investor confidence in the digital asset market.[3] These events included FTX's collapse which caused the digital asset market to plummet even further, and adversely affected the Debtors' business. As FTX began to collapse in or around November 2022, an unprecedented number and size of loan calls (amounting to approximate US$827 million) was received by the Debtors. On 16 November 2022, GGC and GAP paused all lending and borrowing to preserve the Debtors' estates, ensure fair distribution and begin discussions with stakeholders. All lending and borrowing business of GGC and GAP remains paused. Multiple players in the digital asset industry (including 3AC and Celsius Network LLC) have also filed for

---

[2] 1st ADI at [6].
[3] 1st AD1 at [12]-[16].

6

Chapter 11 proceedings in the US as a result of drastic market conditions, and debt and liquidity issues that arose therefrom. The financial difficulties resulting from the aforementioned events eventually led the Debtors to each file a voluntary petition for their Chapter 11 Cases on 19 January 2023, on the basis that *inter alia*, a restructuring of the Debtors' balance sheet is necessary to restore the Debtors' businesses, to evaluate options to preserve their value and to move their businesses forward as swiftly as possible.[4]

9.    Pursuant to the *Order Authorizing Debtor Genesis Asia Pacific Pte Ltd to Act as Foreign Representative of the Debtors* dated 26 January 2023 ("**Foreign Representative Appointment Order**"),[5] GAP has been authorised by the United States Bankruptcy Court for the Southern District of New York (the "**US Bankruptcy Court**") to act as the foreign representative of the Debtors in Singapore in order to seek recognition of the Chapter 11 Cases on behalf of the Debtors, and to request that the Singapore High Court lend assistance to this Court in protecting the Debtors' property, and to seek any other appropriate relief from the Singapore High Court that the Singapore High Court deems just and proper, as more fully described in the Foreign Representative Appointment Motion.

10.    Accordingly, the Applicants have commenced the present Recognition Applications to seek recognition and assistance from the Singapore High Court, in order to, *inter alia*, protect the Debtors from proceedings or other enforcement steps in Singapore that may derail the Chapter 11 Cases.

---

[4] 1st ADI at [16].
[5] 1st ADI at [21]-[24]; see the Foreign Representative Appointment Motion exhibited at ADI-1, Tab 6 (page 311) and the Foreign Representative Appointment Order exhibited at ADI-1, Tab 9 (page 458).

### III.    APPLICABLE LEGAL PRINCIPLES

11.    The present Recognition Applications are brought pursuant to Article 15 of the Model Law, which has the force of law in Singapore pursuant to Section 252 of the IRDA.[6] The Model Law, as adopted in Singapore (with certain modifications to adapt it for application in Singapore), is set out in the Third Schedule of the IRDA.[7]

### A.    *Application for recognition under Article 15 of the Model Law*

12.    The requirements for an application for recognition of a foreign proceeding are set out in Article 15 of the Model Law.[8]

13.    The Court's ability to recognise foreign proceedings is prescribed by Article 17 of the Model Law.[9]

14.    The language of Articles 17(1) and 17(2) is mandatory. If the foreign proceeding fulfils the requirements of Article 17(1), the Court "*must*" recognise the foreign proceeding as either a foreign main proceeding or foreign non-main proceeding depending on (a) whether the foreign proceeding is taking place in the State where the debtor has its centre of main interest ("**COMI**") (Article 17(2)(a)); or (b) if the debtor has an establishment within the meaning of Article 2(d) of the Model Law in the foreign State (Article 17(2)(b)).[10]

---

[6] ABOA Tab 2.
[7] ABOA Tab 2.
[8] ABOA Tab 2.
[9] ABOA Tab 2.
[10] ABOA Tab 2.

**B.      Reliefs**

15.      In the present Recognition Applications, the Applicants also seek the Singapore
Court's assistance for appropriate reliefs under the Model Law as long as their Chapter
11 Cases, including any extensions thereto, are in force. In particular:

(1)      if this Honourable Court is minded to grant recognition of the Chapter 11 Cases
as foreign main proceedings, that each Applicant be immediately entitled to
relief pursuant to Article 20 of the Model Law for as long as their Chapter 11
Cases, including any extensions thereto, are in force. Each Applicant further
seeks the relief sought at prayer 1(d) of each Originating Application, to the extent
not already granted under Article 20 (in particular, prayer 1(d)(iv), (v), (vii), (viii),
(ix), (x) and (xi) of each Applicant's Originating Application).

(2)      alternatively, if the Court is minded to grant recognition of the Chapter 11 Cases
as foreign non-main proceedings, that each Applicant be entitled to relief
pursuant to Article 21 of the Model Law, as specified in prayer 1(d) the Originating
Application for that Applicant, for as long as the Chapter 11 Cases, including any
extensions thereto, are in force.

16.      Where the foreign proceeding in question is recognised as a foreign main proceeding,
Article 20(1) of the Model Law[11] provides for an automatic stay and suspension in the
following terms:

---

[11] ABOA Tab 2.

9

(1)     commencement or continuation of individual actions or individual proceedings concerning the debtor's property, rights, obligations or liabilities is stayed (Article 20(1)(a));

(2)     execution against the debtor's property is stayed (Article 20(1)(b)); and

(3)     the right to transfer, encumber or otherwise dispose of any property of the debtor is suspended (Article 20(1)(c)).

17.     However, the automatic stay and suspension arising under Article 20(1) of the Model Law is subject to Article 20(2), which provides that such stay and suspension are "*the same in scope and effect as if the debtor had been made the subject of a winding up order*" under the IRDA and "*subject to the same powers of the Court and the same prohibitions, limitations, exceptions and conditions as would apply under the law of Singapore in such a case*". Article 20(2) essentially delineates the ambit of any stay or suspension arising under Article 20(1) by making such stay or suspension the same as what would have been available under Singapore law had the debtor been wound up in Singapore.[12]

18.     Article 21(1) of the Model Law[13] provides that upon the recognition of a foreign proceeding, <u>regardless of whether it is recognised as a foreign main proceeding or foreign non-main proceeding</u>, the Court may grant "*any appropriate relief*" in its discretion where necessary to protect the property of the debtor company or the interests of its creditors, including those set out in Article 21(1). Under Article 21(1)(g) of the Model Law, the Singapore Court may grant any additional relief that may be available to a Singapore insolvency officeholder, including any relief provided under section 96(4) of the IRDA.[14]

---

[12] *United Securities Sdn Bhd (in receivership and liquidation) and another v United Overseas Bank Ltd* [2021] 2 SLR 950 ("***United Securities***") at [34]-[35]; ABOA Tab 8.
[13] ABOA Tab 2.
[14] ABOA Tab 2.

19.     Whilst Article 21 of the Model Law provides examples of the reliefs that the Court may grant upon recognition of a foreign proceeding, the list is not intended to be exhaustive and the Court is not restricted unnecessarily in its ability to "*grant any type of relief that is available under the law of the enacting State and needed in the circumstances of the case*": Guide to Enactment of the UNCITRAL Model Law on Cross-Border Insolvency (UN document A/CN.9/442), ("**UNCITRAL Guide 1997**")[15];  at [189]-[191].[16] Pursuant to Section 252(2) of the IRDA,[17] the UNCITRAL Guide 1997 is a relevant document for the purposes of interpreting the articles of the Model Law.[18] The revised guide  "UNCITRAL Model Law on Cross-Border Insolvency with Guide to Enactment and Interpretation (2013)" ("**UNCITRAL Guide 2013**")[19] may also be referred to, as noted in *Re Zetta Jet Pte Ltd and others (Asia Aviation Holdings Pte Ltd, intervener)* **[2019] 4 SLR 1343** ("*Zetta (No. 2)*") at [37]. Where the UNCITRAL Guide 1997 is silent, the court may consider the UNCITRAL Guide 2013 in its interpretation of the Model Law, but the UNCITRAL Guide 1997 prevails in the event of conflict between the two guides.[20]

20.     The Singapore Court has held that assistance of a particular form may not be granted if in the same circumstances it may be denied or is not available to a local representative.[21] In *Rooftop*, the Singapore Court considered the English authority of *Re Pan Ocean Co Ltd; Fibria Celulose S/A v Pan Ocean Co Ltd and another* **[2014] EWHC 2124 (Ch)**[22] as an example of decisions in certain States where courts have held that the words "any appropriate relief" do not allow the court to grant relief that

---

[15] ABOA Tab 15.
[16] ABOA Tab 15. Also see *Re Rooftop Group International Pte Ltd and another (Triumphant Gold Ltd and another, non-parties*) [2020] 4 SLR 680 ("*Rooftop*") at [27]; ABOA Tab 4; and *Tantleff* at [68]; ABOA Tab 5.
[17] ABOA Tab 2.
[18] ABOA Tab 2.
[19] ABOA Tab 17.
[20] *Zetta (No. 2)* at [37]; ABOA Tab 7. Also see *Tantleff at* [30]; ABOA Tab 5.
[21] *Rooftop* at [27]: ABOA Tab 4.
[22] ABOA Tab 12.

would not have been available when dealing with a domestic insolvency.[23] However this was qualified in **_Tantleff_**,[24] where the Singapore High Court held that the court may, in appropriate circumstances, apply foreign insolvency law when granting discretionary relief under Article 21(1)(g) of the Model Law, as the phrase "*under the law of Singapore*" has been deliberately omitted. The above is set out for the purposes of full and frank disclosure only, as the relief sought in these Applications would also have been available to a local representative.

## IV.    THE REQUIREMENTS OF ARTICLE 17(1) OF THE MODEL LAW ARE SATISFIED

21.    As set out above, a foreign proceeding must be recognised if:

(1)    it is a foreign proceeding within the meaning of Article 2(h) (the "**Art 17(1)(a) Requirement**");

(2)    the person or body applying for recognition is a foreign representative within the meaning of Article 2(i) (the "**Art 17(1)(b) Requirement**");

(3)    the application meets the requirements of Article 15(2) and (3) (the "**Art 17(1)(c) Requirement**"); and

(4)    the application has been submitted to the Court mentioned in Article 4 (the "the "**Art 17(1)(d) Requirement**").

22.    The Applicants submit that the requirements of Article 17(1) of the Model Law are satisfied in respect of the Chapter 11 Cases.

---

[23] *Ibid*. at [108].
[24] *Tantleff* at [69]; ABOA Tab 5.

### A.    Article 17(1)(a) Requirement is satisfied

23.    It is submitted that the Article 17(1)(a) Requirement is satisfied as each Applicant's Chapter 11 Case is a foreign proceeding within the meaning of Article 2(h) of the Model Law.

24.    Article 2(h) of the Model Law defines a "*foreign proceeding*" as "*a collective judicial or administrative proceeding in a* foreign *State, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the property and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.*"[25]

25.    The Singapore Court has accepted that a US Chapter 11 proceeding is "clearly a "foreign proceeding" within the meaning of Art 2(h) of the Singapore Model Law": *Re Zetta (No. 2)*" at [25].[26]

26.    The Singapore Court has noted that Chapter 11 proceedings in the US may be described as a form of protected restructuring or reorganisation, accompanied by an automatic moratorium or stay upon application. Such moratorium or stay operates, at least from the perspective of the US, on a worldwide basis.[27]

27.    This is applicable to the Debtors' Chapter 11 Cases which were commenced under Chapter 11 of title 11 of the US Bankruptcy Code.[28] The Debtors' filings in the Chapter 11 Cases also triggered an automatic stay under section 362 of the US Bankruptcy

---

[25] ABOA Tab 2.
[26] ABOA Tab 7.
[27] *Re Zetta Jett Pte Ltd and others* [2018] 4 SLR 801 ("*Zetta (No. 1)*") at [9]; ABOA Tab 6.
[28] 1st ADI at [16].

Code,[29] pursuant to which the Debtors sought and obtained a global moratorium order from the US Bankruptcy Court.[30]

28.     The Article 17(1)(a) Requirement is satisfied in respect of the Chapter 11 Cases of the Debtors.

**B.      *Article 17(1)(b) Requirement is satisfied***

29.     It is clear that GAP is a "*foreign representative*" within the meaning of Article 2(i) of the Model Law.

30.     Article 2(i) of the Model Law provides that a "foreign representative" means "*a person or body, including one appointed on an interim basis, authorised in a foreign proceeding to administer the reorganisation or the liquidation of the debtor's property or affairs or to act as a representative of the foreign proceeding*".[31]

31.     As referred to at paragraph 9 above, GAP has been expressly authorised by the US Bankruptcy Court to, *inter alia*, "*(i) to act as the "foreign representative" of the Debtors in Singapore, including within the meaning of Article 2(i) of the Third Schedule of the Insolvency, Restructuring and Dissolution Act 2018 of the Republic of Singapore or any other applicable laws of Singapore, (ii) to seek recognition by the Singapore High Court of the Chapter 11 Cases and of certain orders made by the Court in the Chapter 11 Cases from time to time, (iii) to request that the Singapore High Court lend assistance to this Court, including but not limited to granting relief under Articles 19 to 21 of the Third Schedule of the Insolvency, Restructuring and Dissolution Act 2018 of*

---

[29] ABOA Tab 3.
[30] 1st ADI at [25], [28].
[31] ABOA Tab 2.

*the Republic of Singapore or any other applicable laws of Singapore, and (iv) to seek any other appropriate relief from the Singapore High Court or any other court, tribunal, regulatory body or administrative body having its jurisdiction in Singapore as the Debtors deem just and proper.*" This was part of the Foreign Representative Appointment Order granted by the US Bankruptcy Court.[32]

### C.   Article 17(1)(c) Requirement is satisfied

32.   Pursuant to Article 15(2) of the Model Law (see paragraph 21(3) above), the documents disclosed by the Applicants in support of the Recognition Applications include the following:

(1)   Copies of the Notice of Commencement of Chapter 11 Cases and First Day Hearing, the voluntary petitions for Chapter 11 relief filed for each of the Debtors,[33] as well as the Chapter 11 Plan proposed jointly by the Debtors.[34]

(2)   A copy of the Foreign Representative Appointment Order (see paragraph 9 above).

33.   The Applicants submit that the above constitute sufficient evidence of the existence of the foreign proceeding and the appointment of GAP as foreign representative of the Debtors.

34.   In respect of Article 15(3) of the Model Law (see paragraph 21(3) above), the Debtors are only subject to their respective Chapter 11 Cases. There are no other "*foreign*

---

[32] 1st ADI at [21]-[24], [28] and ADI-1, Tab 9 (page 458).
[33] 1st ADI at [16]-[18] and ADI-1, Tab 6 (pages 96 and 101).
[34] 1st ADI at [19] and ADI-1, Tab 6 (page 215).

*proceedings and proceedings under Singapore insolvency law in respect of the debtor*"
that are known to GAP as foreign representative.[35]

35.    In the circumstances, the requirements in Article 15 have been satisfied. There is also
no dispute on the authenticity of the documents referred to above. Further, Article 16(2)
of the Model Law allows this Court to presume that the documents submitted are
authentic regardless of whether they have been legalised.[36]

### D.    Article 17(1)(d) Requirement is satisfied

36.    Article 17(1)(d) of the Model Law provides that the Applications must be submitted to
the court mentioned in Article 4 of the Model Law.[37] Article 4(1) of the Model Law
provides that the functions mentioned in the Model Law relating to recognition of
foreign proceedings and cooperation with foreign Courts are to be performed by the
General Division of the High Court in Singapore.

37.    Article 4(2) of the Model Law also provides that, subject to Article 4(1), such Court has
jurisdiction in relation to such functions if:

(1)    the debtor is or has been carrying on business within the meaning of section
366 of the Companies Act 1967[38] in Singapore or has property situated in
Singapore (Article 4(2)(a)(i)-(ii)); or

---

[35] 1st ADI at [47]-[48], as clarified in 2nd ADI at [6].
[36] ABOA Tab 2.
[37] ABOA Tab 2.
[38] ABOA Tab 1.

(2)      the Court considers for any other reason that it is the appropriate forum to consider the question or provide the assistance requested (Article 4(2)(b)).

38.    The Applicants submit that the requirement under Article 4(2) of the Model Law is met on the facts of this case due to the following:

(1)      The US Bankruptcy Court has expressly granted an order i.e. the Foreign Representative Appointment Order authorising GAP as foreign representative to bring the present Recognition Applications before the Singapore High Court in respect of <u>all three Debtors</u>, and requesting the Singapore High Court to "*make such orders and provide such assistance to GAP as the foreign representative and an officer of this Court, as may be necessary or desirable to give effect to this Order*".

(2)      While the US has been the place where most of the Debtors' business dealings occurred and decisions made, GAP is incorporated in Singapore and has creditors, vendors and contractual parties located in Singapore. We elaborate on this below.

39.    The Applicants submit that the above are sufficient reasons that give the Singapore Court jurisdiction to hear the Recognition Applications and to provide the assistance requested by GAP as foreign representative.

40.    In light of the foregoing, the Applicants respectfully submit that recognition of the Chapter 11 Cases should be granted pursuant to Article 17 of the Model Law.

## V.    THE CHAPTER 11 CASES SHOULD BE RECOGNISED AS FOREIGN MAIN PROCEEDINGS

41.    The next issue is whether the Chapter 11 Cases should be recognised as a foreign main proceeding or foreign non-main proceeding. As referred to above, Article 17(2) of the Model Law provides that the Court *must* recognise a foreign proceeding:[39]

(1)    as a foreign main proceeding if it is taking place in the State where the debtor has its COMI (Article 17(2)(a)); or

(2)    as a foreign non-main proceeding, if the debtor has an establishment within the meaning of Article 2(d) of the Model Law in the foreign State (Article 17(2)(b)).

42.    In the present Recognition Applications, the Applicants submit that the Chapter 11 Cases of all three Debtors should be recognised as foreign main proceedings within the meaning of Article 2(f) of the Model Law and, flowing from such recognition, be entitled to automatic relief under Article 20 of the Model Law.

### A.    The Debtors' COMI is the United States

43.    In order for a foreign proceeding to be recognised as a foreign main proceeding, it has to be shown that the foreign proceedings are taking place in the state where the debtor in question has its COMI.

44.    The general criteria for factors that would help in determining a debtor's COMI include the following:

---

[39] ABOA Tab 2.

18

(1)     COMI factors should be factors that are objectively ascertainable by third parties generally, with a focus on creditors and potential creditors in particular: *Zetta (No. 2)* at [76].[40]

(2)     There remains a need to ensure that creditors especially can predict when an insolvency proceeding might subsequently be granted recognition as a "foreign main proceeding: *Zetta (No. 2)* at [77].[41]

(3)     There should be an element of settled permanence or intended permanence in the COMI factors considered, which would assist creditors in their weighing of the relevant factors and the risks entailed in granting credit: *Zetta (No. 2)* at [78].[42]

(4)     In ascertaining a specific company's COMI, the Court will not maintain strictly the distinction between different entities within a group. It is possible for the analysis to be made of the <u>activities of an entire group of companies</u>, rather than of the specific debtor company in question: *Zetta (No. 2)* at [83]. This is because the analysis requires a consideration of factors relevant to the creditors' understanding, so the Court's focus is on actual facts on the ground rather than on legal structures. If the actual facts on the ground mean that little distinction is drawn in reality between a company and other members in its group, then the Court will also not strictly maintain that distinction in determining the debtor's COMI: *Zetta (No. 2)* at [82].[43]

---

[40] ABOA Tab 7.
[41] ABOA Tab 7.
[42] ABOA Tab 7.
[43] ABOA Tab 7.

45.    A set of non-exhaustive factors are taken into account in determining a company's COMI. The UNCITRAL Guide 2013 highlights additional COMI factors which could be considered by the recognising court:[44]

> *"… [T]he location of the debtor's books and records; the location where financing was organized or authorized, or from where the cash management system was run; the location in which the debtor's principal assets or operations are found; the location of the debtor's primary bank; the location of employees; the location in which commercial policy was determined; the site of the controlling law or the law governing the main contracts of the company; the location from which purchasing and sales policy, staff, accounts payable and computer systems were managed; the location from which contracts (for supply) were organized; the location from which reorganization of the debtor was being conducted; the jurisdiction whose law would apply to most disputes; the location in which the debtor was subject to supervision or regulation; and the location whose law governed the preparation and audit of accounts and in which they were prepared and audited."*

46.    In ***Zetta (No. 2)***, the Court considered various factors in the following categories:[45]

(1)    the location from which control and direction was administered;

(2)    the location of clients;

(3)    the location of creditors;

(4)    the location of employees;

(5)    the location of operations;

---

[44] See UNCITRAL Guide 2013 at [147]; ABOA Tab 17. And *Zetta (No. 2)* at [75]; ABOA Tab 7.
[45] ABOA Tab 7 at [85].

(6)      dealings with third parties; and

(7)      the governing law.

47.    Ultimately, the Court considers on a robust basis, where, on balance, the centre of
gravity of the objectively ascertainable factors is located.[46]

48.    The determination of a debtor's COMI is to be made at the date a recognition
application is filed. This follows the US position: *Zetta (No. 2)* at [53].[47]

49.    Further, Article 16(3) of the Model Law provides for a presumption that the debtor's
registered office is presumed to be the COMI in the absence of proof to the contrary.
Rebuttal of this presumption does not require proof on the balance of probabilities; but
operates as a starting point that is subject to displacement by other factors on the
presence of proof to the contrary.[48]

**B.    *Application to the facts***

50.    The following factors point to US as the 'centre of gravity' in respect of the Debtors:[49]

(1)      Holdco is organized under the laws of Delaware and carries on the majority of
its business from its headquarters in New York.

(2)      GGC is organized under the laws of Delaware and its main place of business
is in New Jersey. GGC is registered with the U.S. Treasury Department's
Financial Crimes Enforcement Network (i.e. FinCEN) as a money services
business. GGC holds the majority of its assets in the US.

(3)      Most of the creditors of GGC and Holdco are located in the US.

---

[46] *Zetta (No. 2)* at [80]; ABOA Tab 7.
[47] ABOA Tab 7.
[48] *Zetta (No. 2)* at [31]; ABOA Tab 7. Also see *Tantleff* at [37]; ABOA Tab 5.
[49] 1st ADI at [32].

(4)    A special committee of the board of Holdco has been established, operating from the US, to direct the restructuring of all three Debtor entities and continuing business operations during the said restructuring.

(5)    Restructuring advisors have been appointed, operating from the US, whose mandate includes advising on the restructuring of the three Debtor entities.

(6)    GAP has also entered into significant transactions with US-based parties.

(a)    First, the bulk of GAP's business is conducted with the US-based entities GGC and GGT, including entering into intercompany loans with GGC.

(b)    GAP's spot trading activity is also closely tied to US-based entities. When GAP enters into spot trading with clients in Singapore and elsewhere in Asia, it also completes a back-to-back trade with GGC International or with GGT.

(c)    Finally, GAP also provides derivative operational support for US-based affiliates.

51.    For completeness, as well as full and frank disclosure, the Applicants highlight the following facts for the Honourable Court's attention:[50]

(1)    GAP is a Singapore-based and -incorporated digital payment token service provider which carries out digital asset trading and lending activities. GAP's registered office is in Singapore.

(2)    GAP provides certain trading and lending services primarily to Singapore residents.

---

[50] 1st ADI at [33].

(3)   GAP's workforce consists of approximately 15 wage earners as of the Petition
Date (i.e. Employees), including executives, managers, professionals, and other
personnel working in finance, trading, operations, technology, compliance, and
other key functions. All of the Employees are based in Singapore, which is the
principal place of business of GAP.

(4)   Many of GAP's other creditors, vendors and contractual parties (besides those
set out in preceding paragraphs) are located in Singapore.

52.   The Applicants submit that insofar as Holdco and GGC are concerned, the factors
above conclusively point to the US being the COMI of the two entities. In respect of
GAP, notwithstanding the facts highlighted at paragraph 51 above, including the
location of GAP's registered office in Singapore, the Applicants submit that on balance,
the COMI of GAP should be the US as well.

53.   **First**, GAP is significantly involved with US-based parties, including how the bulk of
GAP's business is conducted with US-based entities GGC and GGT. As highlighted in
***Zetta (No. 2)***,[51] the Court is not bound to maintain a strict distinction between different
entities within a group; this inquiry can take into account the <u>activities of an entire group
of companies</u>, rather than of the specific debtor company.

54.   **Second**, since the filing of the Chapter 11 Cases, GAP (along with Holdco and GGC)
has been subject to the control and supervision of the US Bankruptcy Court which is
located in New York. The location in which the debtor was subject to supervision or
regulation is also cited as a relevant factor in determining COMI in the UNCITRAL
Guide 2013 (see paragraph 45 above). We note that ***Tantleff*** held that (at [45]) "*the
fact that the Singapore Entities' Chapter 11 Proceedings are ongoing in the US is
irrelevant in determining the COMI, as are the activities of the foreign representative.*

---

[51] *Zetta (No. 2)* at [83]; ABOA Tab 7. Also see *Tantleff* at [35]; ABOA Tab 5.

*The jurisprudential basis of the COMI requirement is to determine the centre of gravity of the company's commercial activity, that is, where it was centred while it was alive and flourishing – in other words, a corporation's real home. A hospital bed, or a crypt, does not count.*"   We nonetheless submit that ***Tantleff*** can be distinguished in our case:

(1)    This holding in ***Tantleff*** arose in the context of a Chapter 11 plan that was effectively a controlled liquidation. The Court noted that "*The commercial objective of the recognition of the Chapter 11 Plan and Confirmation Order sought by the Applicant is apparently to allow the affairs of the Singapore Chapter 11 Entities to be wound up as efficiently as possible. [58] The Chapter 11 Plan resolves the outstanding liabilities and contemplates the eventual winding down of the Singapore Chapter 11 Entities, including S1 and S2*."   In such case, it is entirely accurate to suggest that the Chapter 11 proceedings in ***Tantleff*** were just the "*hospital bed, or a crypt".*

(2)    In contrast, in our case, the Chapter 11 Plans are a genuine attempt at "*restructuring of the Debtors' balance sheet… necessary to restore the Debtors' businesses, to evaluate options to preserve their value and to move their businesses forward as swiftly as possible*"[52].   To this end, a Restructuring Term Sheet has been signed by creditors representing over US$2 billion in claims against the Debtors, and the plan of reorganisation under the Chapter 11 Plan will finalise and effect this restructuring. In other words, the Debtors will continue to be a going concern after the US Chapter 11 Proceedings, as a direct result of the said US proceedings.

(3)    The relevant date for determining the COMI is at the date of application for recognition, not the date of commencement of the foreign insolvency

---

[52] 1st ADI at [16].

24

proceedings[53]. This indicates that the Court can take into account subsequent developments after the commencement of the Chapter 11 Proceedings. We add (in addition to the reasons already set out in ***Zetta (No. 2)*** that Articles 17(4) and 18(1) of the Model Law allows the Court to modify or terminate recognition based on changed circumstances, and require the foreign representative to notify the court of changed circumstances. This shows that the Model Law has a forward-looking policy: that the Court can take into account relevant subsequent developments. We submit that the Chapter 11 Proceedings in *this* case are relevant factors to determining COMI.

55.   Accordingly, while GAP has its registered office in Singapore, the Applicants submit that the presumption under Article 16(3) of the Model Law should be displaced, and GAP's COMI should be the US, along with Holdco and GGC.

56.   Should this Honourable Court recognise the Chapter 11 Cases as foreign main proceedings, the Debtors will benefit from the protection of an automatic stay against commencement or continuation of actions or proceedings concerning the Debtors' assets, rights, obligations and liabilities in Singapore, per Article 20(1) of the Model Law.

## VI.   <u>ALTERNATIVELY, THE CHAPTER 11 CASES SHOULD BE RECOGNISED AS FOREIGN NON-MAIN PROCEEDINGS</u>

57.   <u>**Alternatively**</u>, if this Honourable Court is not minded to recognise each or any of the Debtors' Chapter 11 Cases as foreign main proceedings, it is respectfully submitted that the Chapter 11 Cases should be recognised as "foreign non-main proceedings" within the meaning of Article 2(g) of the Model Law.

---

[53] *Tantleff* at [50]; ABOA Tab 5; *Zetta (No. 2)* at [53]; ABOA Tab 7.

58.     Pursuant to Article 17(2) of the Model Law, the foreign proceeding must be recognised as a foreign non-main proceeding if the debtor has an "establishment" within the meaning of Article 2(d) in the foreign State.

59.     Under Article 2(d), "establishment" means "*any place where the debtor has property, or any place of operations where the debtor carries out a non-transitory economic activity with human means and property or services*".[54]

60.     Each Applicant has an 'establishment' in the US, in that each of them has property in the US, or has places of operations in the US where each of the Debtors carries out a non-transitory economic activity with human means and property or services. In particular:[55]

        (1)     As stated above, Holdco is organized under the laws of Delaware and is qualified to carry on business in New York, and owns property, i.e., equity interests in GGC, located in the US. GGC is organized under the laws of Delaware and its main place of business is in New Jersey.

        (2)     GGC holds the majority of its assets in the US.

        (3)     GAP owns property located in the US, including a bank account with cash in the US and an intercompany receivable from the US-based entity, GGT.

61.     It is submitted that the above is sufficient to qualify the Chapter 11 Cases as foreign non-main proceedings within the definition of the Model Law.

62.     It is further submitted that each of the Applicants should be entitled to the relief sought in their respective Originating Applications even if this Honourable Court does not recognise

---

[54] ABOA Tab 2.
[55] 1st ADI at [34].

the Debtors' Chapter 11 Cases as foreign main proceedings, but as foreign non-main proceedings. We elaborate more on the relief sought in the following section.

## VII.   THE RELIEFS SOUGHT IN THE RECOGNITION APPLICATIONS ARE NECESSARY

63.   The Applicants submit that the reliefs sought in the Recognition Applications are necessary to protect the interests of their creditors.

64.   The assistance sought by the Applicants mainly relate to various moratoriums against enforcement actions. Such relief is sought, in particular, to ensure that the Debtors' Chapter 11 Cases are not disrupted by creditor action in Singapore. As disclosed in 1st ADI, to date, the Applicants are aware of at least one creditor who has sent a default notice in respect of outstanding loans purportedly owed by GGC and GAP and threatened litigation in Singapore.[56]

### A.   *Automatic relief under Article 20 of the Model Law*

65.   As referred to at paragraph 56 above, should this Honourable Court be minded to recognise the Debtors' Chapter 11 Cases as foreign main proceedings, pursuant to Article 20 of the Model Law, the Debtors are immediately entitled to the relief sought in the Debtors' respective Originating Applications, including but not limited to a stay of proceedings against the Debtors, a stay of execution against their property and a suspension of the right to transfer, encumber or dispose property of the Debtors.

66.   Notwithstanding the application of the automatic stay under Article 20(1) of the Model Law, each Debtor seeks a carve-out from the moratorium relief sought – in particular, that so long as the Chapter 11 Cases (including any extensions thereto) are in force, any

---

[56] 1st ADI at [37], ADI-1 at Tab 11.

suspension of each Debtor's "*right to transfer, encumber or otherwise dispose of any property of the debtor*" under Article 20(1)(c) of the Model Law be disapplied (prayer 1(d)(x) of each Originating Application in the Recognition Applications). In respect of the relief sought under Article 21(1)(c) of the Model Law (under prayer 1(d)(iii) of each Originating Application), each Debtor also seeks to preserve its own right to transfer, encumber or otherwise dispose its own property.  In essence, this carve-out is sought for the following reasons:

(1)     GAP is looking to seek an extension of MAS' in-principle approval for a MPI Licence, and should not be precluded from continuing its digital asset trading operations, as its Chapter 11 Case allows the disposal of assets (including the proposed Chapter 11 Plan which involves the disposition of property).

(2)     Holdco and GGC's Chapter 11 Cases allow them to operate in the ordinary course of business, and allow the disposal of assets including through the administration of a sale of assets.

(3)     A moratorium which prevents the Debtors from being able to continue trading or doing business in the ordinary course will defeat the very purpose of the Chapter 11 Plan to effect a restructuring of the Debtors.[57]

## B.     *Relief under Article 21(1) of the Model Law*

67.    Even if the Debtors' Chapter 11 Cases are recognised only as foreign non-main proceedings, the Applicants humbly submit that this Honourable Court nonetheless has discretion, and should exercise such discretion, to grant the reliefs sought in respect of

---

[57] 1st ADI at [44]-[46].

each Debtor (at prayer 1(d) of each Debtor's Originating Application) pursuant to Article 21(1) of the Model Law.

68.   As referred to at paragraphs 18 to 19 above, the Singapore Court may grant any appropriate relief under the laws of Singapore and is not limited to the list of reliefs enumerated in Article 21 of the Model Law. However, the Court's discretion under Article 21(1) of the Model Law is subject to the proviso that the grant of appropriate reliefs is "*where necessary to protect the property of the debtor or the interests of the creditors*".

### *Discretionary stay of proceedings*

69.   English authorities may be referred to for guidance on the guiding principles for determining whether to grant a discretionary stay / moratorium under Article 21(1). In *Cosco Bulk Carrier Co Ltd v Armada Shipping SA and another* **[2011] EWHC 216**,[58] the Court analysed the legal principles applicable to the exercise of discretion in relation to applications for, or to discharge, a stay under the Model Law, which are similar to the principles upon which the court exercises its discretion for a discretionary stay in a domestic insolvency proceeding. The Court held at [57] that in exercising such discretion, the starting point is that there should be a stay of proceedings against the debtor because "*the liquidator should not lightly be deprived of the cost and time advantages of having the matter determined in the liquidation*." In the present case, this should similarly apply to a company in restructuring which should not lightly be deprived of the cost and time advantages of a stay / moratorium on proceedings against that company.

70.   The reasons below apply to the Debtors' need for assistance, in particular, a discretionary stay on proceedings (in the event their Chapter 11 Cases are recognized only as foreign non-main proceedings):[59]

---

[58] ABOA Tab 9.
[59] 1st ADI at [40].

(1)     Holdco wholly owns GAP, an entity located in Singapore, and GGC has an intercompany payable from GAP. Holdco and GGC are seeking further protection of these interests by way of the recognition orders sought in the present Applications from the Singapore High Court (including entrusting GAP as foreign representative of Holdco and GGC with the administration, realisation and distribution of their assets, per prayer 1(d)(xi) of Holdco and GGC's respective Originating Applications). While the automatic stay imposed by the US Bankruptcy Court under the order approving the Automatic Stay Motion has a worldwide reach and bars such actions under the law of the US, for the avoidance of doubt, the Applicants also wish to seek assistance from the Singapore High Court in having these actions barred <u>under Singapore law</u>.

(2)     GAP is an important part of the Debtors' business operations and necessary to the restructuring of the Company. Actions taken by creditors that put GAP at risk would be detrimental to the Debtors' rehabilitation prospects.

### ***<u>Discretionary stay on enforcement of security and other judicial management-like moratoriums, in foreign main proceedings</u>***

71.     Where a foreign main proceeding is in the nature of a restructuring rather than a liquidation, it has become the practice of the English Courts as a matter of discretion to grant the whole of the relief available under Section 236 of the Insolvency Act 1986. See *Cross-Border Insolvency: A Commentary on the UNCITRAL Model Law* (Look Chan Ho gen ed) Vol 1 (Global Law and Business, 4th Ed, 2017), page 246:[60]

> *"Unlike in other jurisdictions (eg, the United States), where there would be an automatic stay on the enforcement of security interests upon the recognition of a foreign main proceeding, the **<u>enforcement of security interests</u>** in Great*

---

[60] ABOA Tab 14.

*Britain may be stayed only by a court order. Any such stay may be imposed under Article 21(1)(g), which imports the administration moratorium. It is suggested that the court __will grant such moratorium as a matter of course where the foreign proceeding is a rescue process__, as "[t]he British Government has a commitment to the promotion of a rescue culture and supports the Model Law as an appropriate legislative tool to support this objective on the wider international stage". This suggestion has received court approval in Re TPC Korea Co Limited. __Thus in cases where the foreign main proceeding is in the nature of a restructuring rather than a liquidation it has become the practice of the English Courts as a matter of discretion to grant the whole of the relief available under paragraph 43 of Schedule B1 and to modify the automatic stay to align it with those provisions__."*

(emphasis added)

72.   We submit that the same should apply to Singapore. In addition, a stay on enforcement of security is available in Singapore judicial management proceedings (section 96(4)(e) of the IRDA).[61]

### *Interests of creditors*

73.   The reliefs that a Court may grant under Article 21 of the Model Law is subject to Article 22, which provides that:[62]

*"1.  In granting or denying relief under Article 19 or 21, or in modifying or terminating relief under paragraph 3 of this Article or Article 20(6), __the Court must be satisfied that the interests of the creditors (including any secured creditors or parties to hire-purchase agreements (as defined in section 88(1) of this Act)) and other interested persons, including if appropriate the debtor, are adequately protected__.*

---

[61] ABOA Tab 2.
[62] ABOA Tab 2.

> *2.  The Court may subject relief granted under Article 19 or 21 to conditions it considers*
>
> *appropriate, including the provision by the foreign representative of security or caution for*
>
> *the proper performance of his, her or its functions.*
>
> *3.  The Court may, at the request of the foreign representative or a person affected by*
>
> *relief granted under Article 19 or 21, or of its own motion, modify or terminate such relief."*

(emphasis added)

74.    The UNCITRAL Guide 1997 provides that "*[t]he idea underlying article 22 is that there*
*should be a <u>balance between relief that may be granted to the foreign representative and</u>*
*<u>the interests of the persons that may be affected by such relief</u>.*"[63] This was cited in the
decision of ***Tantleff*** at [81], which highlighted that the Singapore court must carefully
scrutinize the circumstances in which the foreign order was granted and ensure that
adequate protection is afforded to interested parties (including relevant creditors and
stakeholders).[64] The UNCITRAL Guide 1997 also highlights that the Court must balance
the interests of all creditors, and should not limit this to "local" creditors (i.e. creditors in
the enacting State).[65]

75.    The Singapore Ministry of Law has also provided some guidance on the considerations
in ensuring adequate protection for creditors. Paragraph 11.2 of the Response to
Feedback Received from Public Consultation of the Report of the Insolvency Law Review
Committee (2013) provides that:[66]

> *"Provisions in the Model Law also allow a court to make appropriate orders to*
> *ensure <u>that the interest of local creditors, including preferential creditors, are</u>*
> *<u>adequately protected</u>. Such provisions may provide adequate protection to*
> *creditors generally <u>in the event that they may be prejudiced or discriminated</u>*

---

[63] *UNCITRAL Guide 1997* at [161]; ABOA Tab 15.
[64] *Tantleff* at [81]; ABOA Tab 5.
[65] *UNCITRAL Guide 2013* at [196]-[198]; ABOA Tab 17.
[66] ABOA Tab 16; see further *United Securities* at [47]; ABOA Tab 8.

> *against vis-à-vis creditors in a similar class in that foreign insolvency proceeding.*
> *Therefore, the local court may refuse to turn over assets to the foreign*
> *representative <u>where the rules of that foreign jurisdiction purport to discriminate</u>*
> *<u>or prejudice the local creditors vis-à-vis creditors in a similar class in that foreign</u>*
> *<u>jurisdiction.</u>"* (emphasis added)

76.    US authorities on Section 1522 of the US Bankruptcy Code also provide useful guidance on how Article 22 should be interpreted. Section 1522 of the US Bankruptcy Code is *in pari materia* to Article 22, and provides that:[67]

> *"(a) The court may grant relief under section… 1521* [which provides for relief that may be granted upon recognition of a foreign proceeding, whether main or non-main]*… only if the interests of the creditors and other interested entities, including the debtor, are sufficiently protected.*
>
> *(b) The court may subject relief granted under section… 1521… to conditions it considers appropriate, including the giving of security or the filing of a bond…"*

77.    The US Court of Appeals in ***Jaffe v Samsung Electronics Company* 737 F.3d 14 (2013)** helpfully described the test in Section 1522 of the US Bankruptcy Code as being one of a balancing of respective interests:[68]

> *"The provision… requires the court to ensure that the relief a foreign representative requests under s 1521 does not impinge excessively on any one entity's interests, implying that each entity must receive at least some protection. And because the interests of the creditors and the interests of the debtor are often antagonistic, as they are here, providing protection to one side might well come at some expense to the other. The analysis required by s*

---

[67] ABOA Tab 3.
[68] ABOA Tab 10, para 28.

33

*1522(a) is therefore logically best done by **balancing the respective interests based on the relative harms and benefits** in light of the circumstances presented, thus inherently calling for application of a balancing test."* (emphasis added)

78.   In the present case, adequate notice has been given to the Debtors' creditors about the Recognition Applications and directions issued at the Case Conference of 18 May 2023. A notice dated 25 May 2023 was disseminated by the Debtors' claims agent, Kroll Inc. around 26 May 2023 SGT to the Debtors' creditors. Creditors have had sufficient opportunity to file reply affidavits by 22 June 2023, yet to date, <u>none of the Applicants' creditors has filed reply affidavits and/or raised any objections to the Recognition Applications</u>, including the reliefs sought under the Originating Applications. The Applicants' solicitors have also not been contacted by any creditor indicating their interest to attend the hearing fixed on 6 July 2023, 10AM before the Honourable Justice Aedit Abdullah in respect of the Recognition Applications. The Applicants further submit that there is no prejudice or unfairness suffered by creditors, whether in Singapore or overseas.

79.   Ultimately, the relief sought is necessary to afford the Debtors some breathing space to formulate and implement a restructuring plan in relation to their Chapter 11 Cases, and to ensure that dissenting or other creditors do not take action (whether in Singapore or overseas) to disrupt the Debtors' restructuring efforts. Any enforcement action taken by any creditor which is inconsistent with the terms of the Chapter 11 Plan is likely to jeopardise the plan to the detriment of the general body of the Debtors' creditors. Further, as no countervailing interests have been raised by any creditors in response to the Recognition Applications filed, the balance of interests lies squarely in favour of granting these applications, which would protect the interests of creditors involved by ensuring that the Chapter 11 Plan can be properly implemented.

**VIII.** **GAP'S APPOINTMENT AS FOREIGN REPRESENTATIVE SHOULD BE RECOGNISED**

80. Lastly, each Debtor's Originating Application also seeks an order that GAP's appointment as foreign representative of each Debtor be recognised by the Singapore Court and in Singapore as a foreign representative within the meaning of Article 2(i) of the Model Law.

81. The Applicants submit that this Honourable Court ought to grant recognition of GAP's appointment as foreign representative in respect of all three Debtors to, *inter alia*, provide such assistance to GAP as may be necessary or desirable to give effect to the Foreign Representative Appointment Order, and extend GAP's functions as foreign representative to Singapore (including but not limited to entrusting GAP with the administration, realisation and distribution of the Debtors' assets in Singapore, as sought in each Originating Application).

**IX.** **CONCLUSION**

82. In the circumstances, the Applicants respectfully seek orders in terms of the present Recognition Applications.

_____

Solicitors for the Applicants
Allen & Gledhill LLP

**Exhibit K**

# ALLEN & GLEDHILL

From :  Alexander Yeo / Jo Tay / Yeoh Tze Ning       DID :  +65 6890 7874 / 7470 / 7576

alexander.yeo@allenandgledhill.com                    Fax :  +65 6302 3276 / 3429 / 3479
jo.tay@allenandgledhill.com
yeoh.tzening@allenandgledhill.com

Our reference      : 1022011034/JOTAY/AYEOHT/YEOHTN        20 July 2023

Your reference    : -

**The Registrar**                                          **BY E-LITIGATION ONLY**
Supreme Court of Singapore
1 Supreme Court Lane
Singapore 178879

Dear Sirs

**HC/OA 400/2023 – IN THE MATTER OF GENESIS ASIA PACIFIC PTE. LTD.  ("GAP")**
**HC/OA 402/2023 – IN THE MATTER OF GENESIS GLOBAL HOLDCO, LLC  ("Holdco")**
**HC/OA 403/2023 – IN THE MATTER OF GENESIS GLOBAL CAPITAL, LLC  ("GGC")**

**(the "Proceedings")**

1.      We act for GAP, Holdco and GGC (together, the "**Applicants**"). We also act for GAP in its
        capacity as foreign representative of all three Applicants.

2.      We refer to the Applicants' Further Written Submissions filed on 17 July 2023 ("**Further
        Submissions**"), adopting the terms defined therein unless the contrary intention appears.

3.      As directed by the Honourable Justice Aedit Abdullah's at the hearing on 6 July 2023 in the
        Proceedings, our clients filed the Further Submissions to address the following issues relating
        to the appointment of a "*foreign representative*" under Article 2(i) of the Model Law:

        (1)     Whether a corporate entity (such as GAP) can be recognised as a "*foreign
                representative*" under the Singapore Model Law; and

        (2)     Whether a debtor such as GAP can be its own "*foreign representative*".

4.      It has since come to our attention that there is a further authority of assistance to the
        Honourable Court in relation to the issues at paragraph 3 above – in particular, that a debtor
        can be its own foreign representative.

Allen & Gledhill LLP
One Marina Boulevard #28-00 Singapore 018989
Tel: +65 6890 7188  |  Fax: +65 6327 3800

allenandgledhill.com

Allen & Gledhill LLP (UEN/Registration No. T07LL0925F) is registered in Singapore under the Limited Liability Partnerships Act 2005 with limited
liability. A list of the Partners and their professional qualifications may be inspected at the address specified above.

5.      Further to our Further Submissions at [17]-[21], the UNCITRAL Guide 2013 at [86][1] (also cited in the decision of *Re Tantleff, Alan* [2023] 3 SLR 250 at [92]) expressly provides that a "*foreign representative*" under the Model Law can be the debtor in possession itself: [2]

> "*Subparagraph (d) – foreign representative*
> *86. ...* **The fact of appointment of the foreign representative in the foreign proceeding to act in either or both of those capacities is sufficient for the purposes of the Model Law***; article 15 requires either a certified copy of the decision appointing the representative, a certificate affirming the appointment or other evidence of that appointment that is acceptable to the receiving court.* **The definition in subparagraph (d) is sufficiently broad to include debtors who remain in possession after the commencement of insolvency proceedings**." (emphasis added)

6.      The UNCITRAL Guide 2013 makes clear that the term "*debtor in possession*" refers to the debtor <u>company</u> in question. See for instance, paragraphs 71 and 74 on the interpretation of "foreign proceeding" for the purposes of the Model Law:[3]

> "*71. Within the parameters of the definition of a foreign proceeding, a variety of collective proceedings would be eligible for recognition, be they compulsory or voluntary, corporate or individual, winding-up or reorganization. The definition would also include those* **proceedings in which the debtor retains some measure of control over its assets, albeit under court supervision (e.g. suspension of payments, "debtor in possession")***.*
>
> *74. … As noted in paragraph 71,* **a proceeding in which the debtor retains some measure of control over its assets, albeit under court supervision, such as a debtor-in-possession would satisfy this requirement.** *...*" (emphasis added)

7.      We respectfully submit that the above extracts from the UNCITRAL Guide 2013 reinforce our Further Submissions that (1) a corporate entity can be a "foreign representative",[4] and (2) a debtor such as GAP can be its own "foreign representative" under the Model Law.[5]

8.      We remain grateful to the Honourable Court for its kind attention to this matter, and humbly apologise for not previously including the above matters in our Further Submissions.

Yours faithfully,

*Allen & Gledhill*

Allen & Gledhill LLP
cc. Clients

---

[1] Applicants' Bundle of Authorities filed on 30 June 2023 ("**ABOA**") Tab 17, at [86].
[2] ABOA Tab 5, at [92].
[3] ABOA Tab 17 at [71], [74]; also see the UNCITRAL Guide 1997 at [24]; ABOA Tab 15.
[4] Further Submissions at [7]-[16].
[5] Further Submissions at [17]-[21].

2