PROSKAUER ROSE LLP
Brian S. Rosen
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000

-and-

Jordan E. Sazant
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone: (312) 962-3550

*Counsel to the Ad Hoc Group of Genesis Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*, | Case No. 23-10063 (SHL) |
| Debtors.[1] | Jointly Administered |

**STATEMENT OF AD HOC GROUP OF GENESIS LENDERS
IN RESPECT OF PUBLIC UPDATE ON PLAN DISCUSSIONS**

      The Ad Hoc Group of Genesis Lenders (the "Ad Hoc Group") hereby submits this statement (this "Statement") in respect of the *Public Update on Plan Discussions* [Docket No. 625] (the "Public Update") filed by the debtors (collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases"). This Statement is intended to clarify and set forth the Ad Hoc Group's position as to the Proposed Settlement and Distribution Mechanics (each, as defined in the Public Update) set forth in the Public Update. The Ad Hoc Group respectfully states as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable) are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (9564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

1.      The Ad Hoc Group represents approximately $2.4 billion in claims asserted against Genesis Global Capital, LLC ("GGC"), including majorities in amount of asserted USD, Bitcoin, and Ethereum claims against GGC. Since November 2022, the Ad Hoc Group, through its counsel Proskauer Rose LLP ("Proskauer"), has been engaged with (i) the Debtors, (ii) their parent company, Digital Currency Group ("DCG"), and (iii) Gemini Trust N.A. ("Gemini"), negotiating a potential consensual holistic restructuring of both the claims asserted against the Debtors, as well as the claims and causes of action held by the Debtors' estates against DCG and Gemini (the "Estate Claims"). As a result of such efforts, the parties entered into a non-binding term sheet providing for a proposed compromise and settlement of such Estate Claims (the "Term Sheet").

2.      On January 19, 2023, the Debtors commenced the Chapter 11 Cases and, on February 3, 2023, an official committee of unsecured creditors (the "UCC") was appointed in these Chapter 11 Cases. Shortly thereafter, the Ad Hoc Group, the Debtors, Gemini, and the UCC acknowledged that circumstances had changed and additional information had been acquired that made proceeding with the proposed Term Sheet transaction inconsistent with the interests of the Debtors' creditors.

3.      On May 10 and May 11, 2023, DCG defaulted on its obligations to pay approximately $630 million in loans payable to GGC (collectively, the "DCG Loans"). Since such time, the Debtors have failed to enter into a forbearance agreement with DCG with respect to such default or, despite repeated requests to do so, to require payment of the amounts due and owing.

4.      In May 2023, the Debtors, DCG, the Ad Hoc Group, Gemini, and the UCC commenced a mediation process regarding a consensual chapter 11 plan structured around a potential resolution of the Estate Claims, including the payment of the defaulted amounts, as well

as a $1.1 billion promissory note from DCG payable to the Debtors in 2032, among other causes of action described in greater detail below.

5. Following months of negotiation, mediation terminated, and, on August 29, 2023, the Debtors published the Public Update, disclosing the terms of an agreement in principle tentatively reached among the Debtors, DCG, and the UCC.

6. As disclosed in the Public Update, and as described further herein, the Ad Hoc Group does not support the proposed agreement in principle disclosed in the Public Update because (a) DCG's contribution to the estate in satisfaction of creditor claims is wholly insufficient to satisfy even the uncontested loan amounts due, let alone, the valuable Estate Claims assertable by creditors against DCG and its directors and officers, including Barry Silbert, and (b) DCG should not be entitled to non-consensual third party releases.

**Background**

7. In June 2022, the cryptocurrency industry underwent a period of significant turmoil and upheaval, resulting in the collapse of, among others, Three Arrows Capital, which was indebted to the Debtors in an amount exceeding $2.3 billion. Following the liquidation of collateral held by the Debtors, a $1.2 billion hole remained in the Debtors' consolidated balance sheet, which left the Debtors insolvent by hundreds of millions of dollars. Instead of either acknowledging reality or adequately recapitalizing the Debtors to cure their insolvency, DCG committed its original sin by contributing a $1.1 billion promissory note payable only in 2032 and accruing interest at a rate of 1% per annum and advertising to the world that it had "filled the hole" and absorbed all of the Three Arrows Capital losses, including by causing the Debtors to issue financial statements reflecting the $1.1 billion promissory note as a near-term receivable. In reality, however, the promissory note did not mature for 10 years and was no more than cardboard covering the pothole in the Genesis balance sheets.

8. In addition to the $1.1 billion payable in 2032, DCG also owed the Debtors the DCG Loans, the majority of which were open term loan amounts repayable upon request. As noted above, these amounts went unpaid by DCG when matured and the Debtors have not attempted to enforce their respective rights or to require payment thereof.

9. On the backs of these fraudulent financial and public statements, the Debtors continued their business operations and solicited hundreds of millions in additional loans from creditors, including many members of the Ad Hoc Group who lent millions of dollars to the Debtors for the first time over the Summer and Fall of 2022 in reliance thereon.

10. In November 2022, following the collapse of the FTX cryptocurrency exchange and with the Debtors in critical need of liquidity to satisfy increased customer withdrawal/loan call requests, (a) DCG unilaterally extended the maturity of its then-owing DCG Loans to May 2023, and (b) the Debtors froze their activities and prohibited creditors from calling for repayment of their loans under the terms of their Master Loan Agreements.

11. Since then, Proskauer has been engaged on behalf of the Ad Hoc Group to maximize creditor recoveries on account of their loan claims, the proceeds of which were largely funneled upwards to DCG.

**DCG Contribution**

12. Under the proposed agreement in principle described by the Public Update, DCG will contribute (i) $275 million between the execution of a settlement agreement and the effective date of a confirmed chapter 11 plan, (ii) approximately $328.8 million in first-lien debt payable two years post-effective date, and (iii) approximately $830 million (55% USD, and 45% in Bitcoin and Ethereum), payable seven years post-effective date, with an interest rate of 6%.

13. Simply put, the Ad Hoc Group believes this proposed contribution is wholly insufficient for the Debtors to agree to release the Estate Claims against DCG. On account of

approximately $630 million in DCG Loans already overdue for 3 months, DCG is committing to pay approximately $604 million in two years. On account of the $1.1 billion fraudulent promissory note that led all parties down this path in the first place, currently payable in nine years, DCG is instead paying $830 million in seven years at sub-market interest rates.

14. The Debtors and UCC fail to explain how these amounts approach fair value in a standalone restructuring of the DCG Loans and the promissory note, let alone, simultaneously serving as a settlement of the valuable Estate Claims against DCG and its directors and officers on account of, among other things, (a) preference claims potentially valued in the hundreds of millions of dollars, (b) fraud, (c) alter ego liability for the creditors' claims, and more.

15. Moreover, the terms of the proposed restructured debt instruments themselves are unmarketable and provide for deep additional implied discounts to the principal value of the restructured loans. In connection with prior secured loans, issued in a far more credit-friendly environment, DCG agreed to an 8.75% interest rate for $300 million of debt payable in 5 years with additional protective features such as excess cash sweeps. Now, however, DCG is only agreeing to pay 6% interest on longer-dated maturities with much greater credit risk. It is the understanding of the Ad Hoc Group that this interest rate is far below the market rate and would trade at a significant discount as a result.

### Third Party Releases

16. In exchange for the restructured debt—which not only fails to equal the undisputed amounts owed to the Debtors, but further fails to provide any compensation for the Debtors' release of Estate Claims—the Debtors and UCC have also agreed to improperly cause the release of third party claims against DCG and its related parties.

17. While the Second Circuit affirmed the Bankruptcy Court's statutory authority to grant non-consensual third-party releases,[2] courts are required to consider seven factors prior to approving such releases. The Ad Hoc Group will brief such matters in accordance with any proposed plan confirmation schedule to the extent necessary, but highlights that chief among the factors to be considered are whether the non-debtor contributed substantial assets to the reorganization and whether creditors voted overwhelmingly in support of such releases.

18. It is difficult to argue that DCG has provided any value in exchange for its proposed third-party releases. As mentioned above, the contributions being made by DCG to the proposed plan are lower in amount than even the undisputed loans already committed to be paid by DCG. Indeed, instead of receiving $630 million that matured and should have been paid 3 months ago, DCG will only be paying $275 million now and will pay another $328.8 million in another 2 years. There is no conceivable scenario where these contributions can be considered to be a substantial contribution of assets sufficient to merit releases from the Estate Claims, let alone third-party creditor claims.

19. Moreover, and perhaps most importantly, the Ad Hoc Group represents a majority of each class of claims asserted against GGC, and affirmatively does not support the proposed third-party releases. There is no scenario where a Court may find that creditors voted "overwhelmingly" in support of such releases.

## Conclusion

20. At its essence, the Plan Update demonstrates that the Debtors and UCC are unwilling to comply with their fiduciary obligations to maximize creditor recoveries, and are instead focused on putting this case behind them. However, the Ad Hoc Group, which includes

---

[2] This is, of course, under further review by the Supreme Court in connection with its grant of certiorari in *In re Purdue Pharma L.P.*.

dozens of creditors for whom these assets are critical, does not have such luxury and cannot support the proposed terms of the Plan Update which permit DCG to walk away untouched and, in fact, paying less than already committed.

21. In the event that the proposed agreement is committed to definitive documentation and a proposed chapter 11 plan is pursued, the Ad Hoc Group intends to oppose confirmation thereof.

Dated: August 29, 2023

**PROSKAUER ROSE LLP**

*/s/ Brian S. Rosen*
Brian S. Rosen
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000
Email: brosen@proskauer.com

-and-

Jordan E. Sazant
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone: (312) 962-3550
Email: jsazant@proskauer.com

*Counsel to the Ad Hoc Group of Genesis Lenders*