**BROWN RUDNICK LLP**
Kenneth J. Aulet, Esq.
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: kaulet@brownrudnick.com

-and-

Matthew A. Sawyer, Esq. (*pro hac vice pending*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Email: msawyer@brownrudnick.com

*Counsel to the Fair Deal Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| GENESIS GLOBAL HOLDCO, LLC, et al., | : | Case No. 23-10063 (SHL) |
| Debtors[1]. | : | (Jointly Administered) |

**OBJECTION OF THE FAIR DEAL GROUP**
**TO DEBTORS' SECOND MOTION TO EXTEND EXCLUSIVITY**

Members of that certain ad hoc group of unsecured claimants (the "Fair Deal Group") of the above-captioned affiliated debtors and debtors-in-possession (collectively, "Genesis" or, the "Debtors"), by and through its undersigned counsel, hereby submits this objection (the "Objection") to the *Debtors' Second Motion for Entry of an Order Extending the Debtors'*

---

[1] The Genesis Debtors in the Genesis Bankruptcy Proceedings along with the last four digits of each Genesis Debtor's tax identification number as applicable, are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of the Genesis Bankruptcy Proceedings, the service address for the Genesis Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

*Exclusive Periods in which to File a Chapter 11 Plan and Solicit Acceptances thereof and Granting Related Relief* (the "Second Exclusivity Motion") [Docket No. 574] seeking entry of an order terminating the Debtors' exclusivity period, pursuant to section 1121(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), and allowing the Fair Deal Group to file and prosecute a chapter 11 plan. In support of the Objection, the Fair Deal Group respectfully states as follows:

## PRELIMINARY STATEMENT

1. The Debtors have utterly wasted their exclusivity, spending more than seven months to forward a "deal in principle" that squanders billions of dollars of claims against their parent Digital Currency Group, Inc. (together with its affiliates, "DCG"). This "deal in principle" (the "DCG Term Sheet") [Docket No. 625] amounts to another fraud perpetrated on the Genesis lenders. It purports to give up to "90%" recoveries: these recoveries are a fiction. Fortunately, it is dead on arrival.

2. DCG, today, owes approximately $630 million to the Genesis estates — money that is owed to creditors — which it has refused to pay since it became due in May (the "May Maturities"). The Debtors have steadfastly refused to file a turnover action to demand that DCG pay back these funds. Now, the Debtors make clear they never will. Instead, the Debtors will take a down payment of the May Maturities and *lend more than half of the money back out to DCG at below-market rates* – in other words, the first part of the deal with DCG *is a concession from the creditors to DCG*. The DCG Term Sheet claims it compensates creditors for this delay by charging a forbearance fee. But this claim is a remarkable act of deception by the Debtors against their creditors: the DCG Term Sheet "credits" this fee against a future payment of principal, making it entirely illusory and giving the Genesis estates not one additional cent. The true value of the loan is below par, given the below-market interest rate and the default risk. Money due today:

2

squandered.  Creditors will be lucky to get all of what they are indisputably owed today, *in two years*.

3.   It gets worse.  Much worse.

4.   The remainder of the "consideration" under the DCG Term Sheet is a seven-year promissory note, at 6% interest (the "Second Lien Note").  To be clear – which the Debtors go out of their way not to be – this means that *creditors will receive only token interest payments* until the end of year seven, interest payments that are only minimally higher than the "risk-free" 10-year treasury rate of return.  It would be a bad note if it was what it purports to be – a secured note certain to be repaid.  But it is not.

5.   DCG has committed fraud.  It defrauded Genesis' lenders brazenly and repeatedly, causing this bankruptcy.  It is widely reported to be facing multiple governmental investigations of both a civil and criminal nature.  Its flagship product — Grayscale — faces significant potential market competition.  It is, in every respect, a terrible credit risk.  The interest rate required to entice any rational counterparty, free to make its own decisions, to lend its own money to DCG on a seven-year note would be nearly obscene.

6.   It gets *even worse*.

7.   The DCG Term Sheet should be understood as advertising material.  The "deal" admits it has no meaningful creditor support: it must advertise itself and find some.  Accordingly, it paints the deal in *the best possible light*.  And that best possible light is riddled with loopholes, making clear that the final product will render all of the supposed security for the Second Lien Note completely illusory.

8.   Nowhere in the DCG Term Sheet is there any reference to the usual covenants included to prevent a debtor/obligor (here, DCG) from seeking to defraud its lenders (here,

3

Genesis' creditors).  There are no limitations on dividend payments or other payments to DCG insiders.  No limits on asset transfers away from the DCG entities that guarantee the Second Lien Note.  No limits on "layering" debt ahead of the Second Lien Note – indeed, it is *explicitly contemplated* that the terms of "elevating" the Second Lien Note to a first lien note will be further negotiated – in other words, loopholes will be inserted and elevation will not be automatic and effective.  Nor is there any mention of what actual DCG collateral will secure the Second Lien Note.  No mention of a direct collateral interest in the crown jewels of DCG – the Grayscale trusts.  No mention of a guarantee of the debt by all relevant subsidiaries.

9.  The silence on these critical deal points in an advertisement painting the deal in the best possible light, on a deal cut with a party that has already demonstrated a willingness to defraud Genesis creditors is deafening.  But the message is loud and clear. DCG has no intention of making any real contribution to the Genesis creditors, only hollow gestures.

10.  But it gets *even worse than that*.

11.  The Second Lien Note is illusory.  It will never be paid.  The Second Lien Note would be an insult even if it was compensation solely for *Genesis*'s claims against DCG.  Those claims include preference claims for over $700 million siphoned off by DCG (unmentioned in the DCG Term Sheet), claims related to the fraudulent $1.1 billion promissory note, and a variety of business tort claims based on DCG's intentional mismanagement of the Debtors (again, unmentioned in the DCG Term Sheet).

12.  But the DCG Term Sheet *also* seeks to strip creditors of their individual claims against DCG and presumptively against its founder and CEO, Barry Silbert – claims that hold DCG and Mr. Silbert accountable for their numerous false misrepresentations to Genesis lenders. These claims are held by creditors, not the Debtors, and creditors have the right to pursue these

4

claims to make themselves whole. But the DCG Term Sheet states that in return for the "compensation" in the DCG Term Sheet, DCG will receive "releases from the Debtors *and their creditors*" (emphasis added). In other words: the DCG Term Sheet proposes to involuntarily strip creditors of their individual claims against DCG and Mr. Silbert.

13. Litigation claims do have downsides. They can take years to pay out. They have a significant risk of not paying out. Thus, the strong preference in the Bankruptcy Code and bankruptcy practice is for settlements. But here, the Debtors managed to take their litigation claims and *extend* the timeline to a "litigation worst-case" timeline of seven years. Further, the Debtors managed to take their litigation claims and exchange them for a "note" with even greater risk and higher uncertainty of payment than a litigation claim. This purported "settlement" offers *nothing* for the Genesis estates. It offers no faster payouts. It offers no risk reduction. It even offers no legal fee savings – instead, those legal fees are simply deferred to when DCG begins preparing to not repay the Second Lien Note.

14. But there is one final way in which it gets worse.

15. On August 14, 2023, the Fair Deal Group provided the Debtors with a term sheet memorializing a proposal to replace the expected cut-rate DCG settlement with a structure whereby the Fair Deal Group would put up at least $630 million, with additional amounts subject to confirmatory due diligence, to fund payouts to creditors now while preserving litigation against DCG (the "Fair Deal Proposal"). Under the Fair Deal Proposal, creditors would have a number of options: (1) they could elect to keep their litigation upside against DCG in full; (2) they could elect to take a large cash payout out of a facility backstopped by certain members of the Fair Deal Group (and other electing creditors) and keep part of their litigation upside against DCG; or (3) they could elect to take an even larger cash payout with no litigation exposure or upside against DCG.

5

Further, any creditor of sufficient size would be entitled to participate in the backstop facility up to their *pro rata* share – no economics would be exclusive to the proposing parties. In other words, it offers every creditor the option that is right for them with respect to the balance of future litigation value and cash now – and does so while letting any other creditor participate in the facility with the same economics as the original backstop parties (up to their *pro rata* share).

16. In every respect the Fair Deal Proposal would have been superior to the DCG Term Sheet, for any creditor. Creditors could elect higher interim cash payments in lieu of litigation – cash *now* not cash in 2-7 years. Litigation could be pursued on behalf of the creditors who wanted to maximize returns: litigation that would likely be *faster* and *less risky* than the proposed "settlement" – and the hand of the estate would be strengthened in future settlement negotiations by cashing out creditors unwilling to "go the distance" in litigation.

17. The main condition of the Fair Deal Proposal is that it is subject to appropriate diligence from the Debtors to finalize the proposal and the aggregate size of the contemplated facility. On August 14th, The Fair Deal Group provided a diligence list to the Debtors with the term sheet, along with a request to sign an NDA so diligence could begin immediately, which the Fair Deal Group anticipated would take up to two weeks. In other words: it should have been completed on Monday, August 28. It was not.

18. It was not, because the Debtors ignored the repeated requests for an NDA for *two weeks*. Then, *literally hours before filing the DCG Term Sheet* (and certainly after they had made the decision to do so) the Debtors finally sent the Fair Deal Group an NDA, in the early morning hours of Tuesday, August 29, 2023. The Debtors refused to engage with the Fair Deal Group in an effort to block any alternative to their preferred path of squandering the Genesis estates' claims against DCG – and then to "tick the box" by sending the NDA only when they believed they had

6

run out the clock and could propose the DCG Term Sheet.

19. The Debtors spent more than seven months to deliver a proposal that insults the intelligence of their creditors, that disregarded their duty to maximize value, and that is dead on arrival. It is time to remove the Debtors from blocking a fair deal for Genesis creditors and allow creditors to negotiate the deal they deserve – without the Debtors' involvement. The Debtors exclusivity should come to an end.

## ARGUMENT

### I. Cause Exists To Terminate Exclusivity Because The Debtors' Contemplated Plan Is Unconfirmable.

20. Section 1121 represents a compromise between debtor and creditor interests. A debtor's statutory exclusivity period acknowledges potential benefits to a debtor staying in control of the business and encourages troubled entities to seek relief under the Bankruptcy Code. *See In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 600 (Bankr. S.D.N.Y. 2014) (discussing "the debtor's need to remain in control to some degree [which] thereby encourage[s] debtors to seek chapter 11 before it is too late"). However, Congress also recognized that a debtor may wield exclusivity "as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory." S. Rep. No. 99-764; H.R. Conf. Rep. No. 99-958, reprinted in 1986 U.S. Code Cong. & Adm. News 5227. Therefore, exclusivity under section 1121 is not indefinite, but rather, vests with a debtor for a finite period, and may be extended or terminated for cause. *See* 11 U.S.C. § 1121.

21. The Debtors have had more than seven months to negotiate a resolution with DCG and other parties in interest and propose a plan satisfactory to creditors. They have not done so. As the Committee forewarned nearly three months ago, "at some point one has to recognize that [a comprehensive plan settlement with DCG] may not happen." Committee Exclusivity Statement,

7

¶ 4. The Fair Deal Group agrees. A plan that would embody the terms of the DCG Term Sheet will not achieve requisite creditor support and is, therefore, not confirmable.

22.     However, not all hope is lost. The Debtors have at their fingertips a replacement for a DCG deal – the Fair Deal Proposal – that affords creditors optionality based on risk tolerance (critical where, as here, so many creditors are individuals who are relying on sufficient, expeditious distributions for their livelihoods). But the Debtors thus far, shielded from pressures by the exclusivity forcefield, have declined even to look behind door number two. The Fair Deal Group respectfully submits that the facts and circumstances present provide ample cause to terminate exclusivity, and that the Fair Deal Proposal will provide a swift, equitable resolution to these cases that have been sputtering rudderless for months.

> A.     **Ample Cause Exists To Terminate Exclusivity Under Section 1121(d)(1).**

23.     Section 1121 of the Bankruptcy Code describes who may file a Chapter 11 plan and the period during which that right is reserved for the debtor alone. Although section 1121(b) grants a debtor the exclusive right to file a plan during the first 120 days following the petition date, section 1121(d)(1) further provides that "the court may for cause reduce or increase" the debtor's exclusivity periods. *See* 11 U.S.C. § 1121(d)(1).

24.     Section 1121(d) "represents a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise." *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (9188) (citing H.R. Rep. No. 95-595, at 174 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6191, 6192).

25.     Section 1121(d) is intended to ensure that a debtor does not exploit exclusivity "as a tactical device to put pressure on parties in interest to yield to a plan they consider

unsatisfactory." S. Rep. No. 99-764; H.R. Conf. Rep. No. 99-958, reprinted in 1986 U.S. Code Cong. & Adm. News 5227; *see In re All Seasons Indus.*, 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990) (denying extension of exclusivity when "such an extension would have the result of continuing to hold creditors hostage to the Chapter 11 process and pressuring them to accept a plan they believe to be unsatisfactory"). The statute was "designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." *Timbers of Inwood Forest*, 808 F.2d at 372.

26.  The Bankruptcy Code does not define "cause" for modifying the exclusivity period, leaving the decision to the discretion of the courts on a case-by-case basis. *See In re Geriatrics Nursing Home, Inc.*, 187 B.R. 128, 132 (D.N.J. 1995) (Section 1121(d)(1) "grants great latitude to the Bankruptcy Judge in deciding, on a case-specific basis, whether to modify the exclusivity period on a showing of cause") (citing *In re Kerns*, 111 B.R. 777, 781 (S.D. Ind. 1990)); *see also In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006) ("A decision to extend or terminate exclusivity for cause is within the discretion of the bankruptcy court, and is fact-specific."); *In re Lehigh Valley Prof'l Sports Club, Inc.*, No. 00–11296, 2000 WL 290187, at *2 (Bankr. E.D. Pa. Mar. 14, 2000) (relief under Section 1121(d) is committed to the sound discretion of the bankruptcy judge); *In re Sharon Steel Corp.*, 78 B.R. 762, 763-64 (Bankr. W.D. Pa. 1987) ("Congress has left the meaning of the phrase 'for cause' to be determined by the facts and circumstances in each individual case.").

27.  In determining whether cause exists to terminate exclusivity, courts have identified a variety of factors to consider, including, among others: (1) whether the debtor has had sufficient time to negotiate a plan of reorganization; (2) whether the debtor has made progress in negotiations with stakeholders; (3) whether the debtor is using exclusivity to pressure creditors; and (4) whether

9

or not unresolved contingencies exist. *See, e.g.*, *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); *In re Dow Corning Corp.*, 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997); *In re Express One Int'l*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996). Application of these factors here militates in favor of terminating exclusivity.

### i. The Debtors Have Had Ample Time To Negotiate A Plan, But Have Failed.

28. These cases are more than seven months old. A key remaining issue is how claims against DCG will be treated. For more than seven months, the Debtors have tried to tackle this issue. Yesterday, the Debtors made public the results of those efforts – the results are unsatisfactory and will not garner requisite creditor approval. Given the Fair Deal Group's refusal to agree to a cut-rate settlement, and other parties' similar refusal, there is no meaningful prospect of a deal consistent with the DCG Term Sheet *that can be confirmed*. The Debtors may seek to "cram down" a plan on creditors, but they will fail.

29. After seven months, the best that the Debtors could negotiate is a deal that is dead on arrival. Exclusivity need not be extended to go through the motions relating to an unconfirmable plan, nor to provide the Debtors with yet more time to go back to the drawing board after the DCG Term Sheet is shot down. The Debtors are, of course, free to continue negotiating with any and all parties in interest, notwithstanding whether exclusivity is in place. To that end, the Fair Deal Group hopes that the Debtors will (at this late stage, after wasting weeks) engage in meaningful dialogue with it, particularly concerning the merits of the Fair Deal Proposal. Moreover, maintaining exclusivity only serves to remove any pressure to move quickly (lest risk a competing, less attractive plan be filed), which hinders any prospects of an actionable global resolution.

30. The Debtors also suggest that exclusivity must remain in place so that they may (i)

address objections that may be raised with respect to the Disclosure Statement or the Plan; (ii) to solicit votes on the Plan; (iii) continue reconciling claims and refining their understanding of the claims pool; and (iv) seek approval of the settlement between the Debtors and FTX. None of these items require that exclusivity remain in place. The Plan on file is illusory. Claims reconciliation is untethered to any particular plan or plan proponent – it will continue in parallel as these cases move forward. Finally, the FTX settlement may be memorialized in any plan filed, irrespective of proponent.

31. Put simply, the Debtors have had time; the Debtors do not need more time. What the Debtors and other parties need, and what creditors deserve, is to be incentivized to move quicker. Lifting exclusivity will facilitate that effort.

      ii.      **Terminating Exclusivity Will Move The Case Forward And Benefit The Estate.**

32. A "primary consideration" in determining whether to terminate exclusivity is whether terminating exclusivity will "facilitate moving the case forward." *In re Dow Corning Corp.*, 208 B.R. at 670; *In re Adelphia Commc'ns Corp.*, 352 B.R. at 590 ("[T]he test is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case.").

33. The "threat posed [] by the prospect of a competing plan may stimulate movement towards a consensual plan." *In re Henry Mayo Newhall Mem'l Hosp.*, 282 B.R. 444, 453 (B.A.P. 9th Cir. 2002). Thus, the potential for alternative, confirmable creditor-sponsored plans has been found to satisfy the "cause" requirement for terminating exclusivity. *See*, *e.g.*, *In re Situation Mgmt. Syst.*, 252 B.R. 859, 865 (Bankr. D. Mass. 2000) (terminating exclusivity to give creditors option to choose between competing plans); *In re Dave's Detailing, Inc.*, 2015 Bankr. LEXIS 2528, at *65 (Bankr. D. Ind. July 30, 2015) ("termination of exclusivity provides an open market

11

for competition in the form of competing plans").

34.     The Fair Deal Group is prepared to quickly negotiate and file a competing plan that will provide optionality. Creditor interests in many chapter 11 cases differ, but perhaps particularly so here. Some creditors have an urgent need to access value now, or face knock-on effects that destroy further value that makes them unwilling to hold out for more. Meanwhile, many other creditors are institutional investors with higher appetite for risk and a longer acceptable time horizon. These two groups will almost certainly have different preferences with respect to, among other things, the relative import of quick distributions and desire to pursue claims against DCG. The Fair Deal Proposal allows both groups to go forth on their respective preferred paths. The Fair Deal Group believes that permitting it to file a plan consistent with the Fair Deal Proposal will have broad creditor appeal and will move these cases to a swift conclusion.

35.     Moreover, as discussed above, permitting the Fair Deal Group to file a plan will have the added bonus of incentivizing the Debtors and others to work constructively with creditors to achieve a resolution that has a legitimate chance of success – which the current DCG Term Sheet does not. Competition may be the ingredient missing in the last seven plus months of negotiations.

36.     Finally, permitting the Fair Deal Group to move forward with a plan will provide the Court and all parties in interest with a powerful tool by which to assess the reasonableness of any Debtors proposal. Accordingly, the exclusive period should be terminated. *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94, 102 (3d Cir. 1988) ("[T]he ability of a creditor to compare the debtor's proposals against other possibilities is a powerful tool by which to judge the reasonableness of the proposals."); *In re EUA Power Corp.*, 130 B.R. 118, 119 (Bankr. D.N.H. 1991) ("[I]t is sufficient for [the Court] to recognize and express the judgment that opening up the

process to those alternative approaches in this particular case is desirable. The market will tell us the answer and I think that is appropriate on the facts of this case."); *In re Rook Broadcasting of Idaho, Inc.*, 154 B.R. 970, 976 (Bankr. D. Idaho 1993) ("It is in the interest of creditors that they have a choice between competing plans.").

### iii. The Debtors Have Not Made Meaningful Progress In Negotiations With Stakeholders.

37. The Debtors have been attempting to negotiate a global resolution for months. Those efforts culminated in a proposal that has no chance of being confirmed.

38. Notwithstanding the apparent deadlock on a global resolution, the Debtors have made no progress with the Fair Deal Group (and have, in fact, shunned such progress). Further, they have announced a plan that explicitly lacks the support of their major creditors (and has their active opposition), and cannot thus be approved.

### iv. Unresolved Contingencies Weigh In Favor Of Allowing A Competing Plan.

39. People's livelihoods are at stake in this case. Additional time negotiating a remote settlement does not justify continued separation between everyday people and their assets.

40. While contingencies weigh in favor of terminating exclusivity, there is no contingency that weighs in favor of its extension. The Debtors suggest that (i) ongoing efforts to analyze and reconcile the claims pool, (ii) memorializing the FTX agreement, and (iii) ongoing efforts to resolve the 3AC Claims Objection are "unresolved contingencies" that justify extending exclusivity. They are not. This Court set a general bar date of May 22, 2023, more than three months ago. *See* Docket No. 200. Moreover, reconciling the claims pool is not extraordinary, nor is it so critical as to justify extending exclusivity. The Debtors can reconcile the claims pool, which we suspect is already well underway, without needing exclusivity over plan filing and solicitation. In a similar vein, not only is the FTX agreement "resolved," but the Debtors simply

do not need exclusivity to memorialize the terms thereof. Finally, litigation with creditors, as here with 3AC, does not justify extending exclusivity. *See In re Southwest Oil Co. of Jourdanton, Inc.*, 84 B.R. 448, 452 (Bankr. W.D. Tex. 1987) ("The ordinary Chapter 11 debtor is expected to bring with it litigation, or the potential for it. Litigation with creditors is not an unusual circumstance, and the fact that litigation is pending with creditors is not in itself sufficient cause to justify an extension of the exclusivity period."); *In re Lake in the Woods*, 10 B.R. 338, 342 (E.D. Mich. 1981) (holding that pending litigation was not sufficient cause to extend the exclusivity period). The unresolved contingencies that the Debtors point to as justification to extend exclusivity are routine, unremarkable, and may be resolved without the need to continue exclusivity.

### v.    Terminating Exclusivity Will Not Prejudice The Debtors.

41.    Terminating exclusivity will not prejudice the Debtors. *In re Southwest Oil Co.*, 84 B.R. 448, 454 (Bankr. W.D. Tex. 1987) ("[B]y denying the extension, the Court does not prejudice the debtors' coexistent right, nor dilute the debtors' duty to file a plan."). Rather, it will provide the best mechanism to level the playing field for the principal stakeholders to negotiate and formulate an acceptable case outcome. *See In re Mid-State Raceway, Inc.*, 323 B.R. 63, 70 (Bankr. N.D.N.Y. 2005) ("[E]nding plan exclusivity does not by itself mean that multiple plans *will* be filed, or that the parties may not *still* agree to a consensual debtor plan. It simply returns the parties to a level playing field after the period of debtor control intended by Congress has expired.") (emphasis in original) (quoting *In re Pub. Serv. Co. of New Hampshire*, 88 B.R. at 540); *In re EUA Power Corp.*, 130 B.R. at 119 ("It may well be, as has been the experience in cases not only in this Court but in other courts, that while the process starts out after termination of exclusivity with competing plans, the ongoing progress of the case results in compromises and negotiations whereby one joint plan goes forward.").

42. Solicitation for any Debtor plan and a competing plan, including one sponsored by the Fair Deal Group, can occur simultaneously, and will not prejudice the Debtors. *See In re Grossinger's Assoc.*, 116 B.R. 34, 36 (Bankr. S.D.N.Y. 1990) ("[L]oss of plan exclusivity does not mean that the debtor is foreclosed from promulgating a meaningful plan of reorganization; only that the right to propose a chapter 11 plan will not be exclusively with the debtor."). Genesis lenders are the only parties-in-interest here: if the Debtors believe that their plan is truly in their best interests, then they should not be afraid of a competing plan.

## **CONCLUSION**

**WHEREFORE**, based on the foregoing, the Fair Deal Group respectfully requests that this Court (i) terminate the Debtors' exclusive period to file and solicit votes on a plan of reorganization under Section 1121(d)(1) of the Bankruptcy Code and (ii) grant such other and further relief as the Court deems necessary and appropriate.

[*Remainder of page intentionally left blank.*]

Respectfully submitted,

Dated: August 30, 2023
      New York, New York

                                      **BROWN RUDNICK LLP**

                                      */s/ Kenneth J. Aulet*
                                      Kenneth J. Aulet, Esq.
                                      Seven Times Square
                                      New York, NY 10036
                                      Telephone: (212) 209-4800
                                      Email: kaulet@brownrudnick.com

                                      -and-

                                      Matthew A. Sawyer, Esq. (*pro hac vice pending*)
                                      One Financial Center
                                      Boston, MA 02111
                                      Telephone: (617) 856-8200
                                      Email: msawyer@brownrudnick.com

                                      *Counsel to the Fair Deal Group*