Hearing Date and Time:  September 6, 2023 at 2:00 p.m. (Prevailing Eastern Time)

**WHITE & CASE LLP**
J. Christopher Shore
Philip Abelson
David Turetsky
Michele J. Meises
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113

– and –

Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606-4302
Telephone: (312) 881-5400
Facsimile: (305) 881-5450

*Counsel to Official Committee of Unsecured Creditors*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al*.,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |
| | **Re: Docket No. 574** |

**REPLY, STATEMENT IN SUPPORT, AND RESERVATION OF RIGHTS
OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS
WITH RESPECT TO THE DEBTORS' SECOND MOTION FOR ENTRY
OF AN ORDER EXTENDING THE DEBTORS' EXCLUSIVE PERIODS
IN WHICH TO FILE A CHAPTER 11 PLAN
AND SOLICIT ACCEPTANCES THEREOF AND GRANTING RELATED RELIEF**

---

[1]  The Debtors in these chapter 11 cases along with the last four digits of each Debtor's tax identification number (as applicable) are as follows:  Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these chapter 11 cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

The Official Committee of Unsecured Creditors (the "**Committee**") appointed in the cases of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") files this statement in support and reservation of rights with respect to, and a reply to the objections against, the Debtors' second motion to extend their exclusive periods in which to file and solicit acceptances of a chapter 11 plan:[2]

## STATEMENT

1. The Committee approached these cases with two goals in mind: (i) increase the amount of distributable assets relative to the status quo and the agreement in principle described in the Restructuring Term Sheet, dated February 10, 2023[3] (the "**February Term Sheet**"); and (ii) maximize in-kind recoveries to unsecured creditors in as fair and legally cognizable way as possible. The Committee began by analyzing the February Term Sheet and quickly determined that, in addition to certain significant structural and tax issues, the February Term Sheet failed to account for additional compensation from Digital Currency Group, Inc. ("**DCG**") related to a host of claims, including for potential alter ego and preference liability.[4]

2. Thereafter, the Debtors, the Committee, and the Ad Hoc Group of Genesis Lenders (the "**Ad Hoc Group**"), working cooperatively, set out to negotiate both structural and financial improvements to DCG's contribution and, in May 2023, mediation began. That process was incredibly hard-fought and difficult. At all times, the Committee tried to balance multiple relevant factors – value, time, expense, risk, asset mix, and certainty – while trying to get as much value as

---

[2] Debtors' Second Motion for Entry of an Order Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereof and Granting Related Relief [Docket No. 329] (the "**Motion**").

[3] *See* Notice of Filing of the Restructuring Term Sheet [Docket No. 80].

[4] To be clear, the Committee is not criticizing the parties that negotiated the February Term Sheet, which includes certain members of the Committee. The February Term Sheet was designed and negotiated based on limited information and with a different type of restructuring and form of chapter 11 case (if at all) in mind.

2

possible to maximize the overall size of the asset pool for distribution. Considerable efforts were made to extract the best terms for the estate, including shorter maturities, higher interest rates, and a cash sweep (especially with respect to tranche 2). But like any negotiation, the Committee did not get everything it wanted. Ultimately, the Committee was faced with the choice of the negotiation failing and the parties retreating to their litigation corners or locking in a floor of value that satisfies many of the Committee's goals – increased value, more cryptocurrency for in-kind distributions, secured debt (rather than unsecured or preferred equity), and cash to structure an immediate cash-out for creditors that do not want long-term risk. In other words, the deal in principle between the Debtors, the Committee, and DCG, which was disclosed by the Debtors on August 28,[5] is better than the alternatives.

3.    In making this determination, the Committee conducted an extensive assessment of all available options, including full-blown litigation against DCG. The Committee ultimately decided that the deal in principle not only provides more certain recoveries to creditors, but also reduces DCG bankruptcy risk by providing the Debtors (and ultimately creditors[6]), with a first lien security interest in DCG's assets – something the estates do not currently have, did not have under the February Term Sheet, and would not have in the litigation scenario. The deal in principle also supports in-kind recoveries by denominating portions of the new debt in Bitcoin and Ethereum – again, something the February Term Sheet did not provide, and the litigation path does not

---

[5] *See* Notice of Mediation Termination [Docket No. 625].

[6] To be clear, the plan structure that the Debtors and the Committee are currently considering will not include distributions of the to-be-issued DCG debt. Rather, that debt would have GGC as the lender and all distributions would be made to GGC and then, if possible, out to creditors in the denomination to which their debt was originally issued. In other words, BTC creditors would receive BTC, ETH creditors would receive ETH, USD creditors would receive USD, but no one other than GGC would receive the 1L or 2L debt.

guarantee given the significant uncertainty as to whether litigation damages would capture any appreciation in cryptocurrency.

4.   Moreover, the proposed distribution mechanics, which are in the process of being finalized, are critical to achieving the Committee's number one goal – maximizing in-kind (rather than USD-price measured) recoveries.  They do this by (i) providing distributions in-kind, (ii) creating liquidity options and additional value through an early cash out, and (iii) rebalancing assets on hand to match lender claims to the maximum extent possible.  Such mechanics, however, only work together with a DCG contribution (they do not work in the litigation scenario because the estate cannot map out the assets that will be on hand or when they will be received).

5.   The objectors' criticisms of the DCG deal in principle, though not entirely without merit,[7] are mostly based on a lack of information and clarity on the definitive details of the deal. The specific terms are not finalized or cannot yet be disclosed because the deal in principle with DCG is just that – a deal in principle.  Notwithstanding the termination of the mediation, much work remains to be done to finalize a comprehensive, fully documented agreement.  That is in process, and any suggestion about what might or might not be in those documents is baseless and irresponsible speculation.  The fact is that, like the negotiation itself, the documentation process will be difficult and frustrating, and we will either get to the point where the definitive documentation is agreed, or we will not.  If not, the estate may have no choice but to litigate.

6.   At this point, however, the Committee believes that, among the alternatives available, including full-blown litigation with DCG, the deal in principle is the one that best maximizes returns and the ability of the estate to make in-kind distributions.  **The Committee has**

---

[7] Again, the Committee does not believe the DCG deal in principle is perfect – just better than the alternatives.

*made it clear that its support for the deal in principle is dependent on the ultimate terms of this definitive documentation and the terms of an amended chapter 11 plan and reserves all rights with respect to the deal in principle and exclusivity should such plan not feature the mechanics necessary to drive the estimated in-kind recoveries*. And, to be clear, the timeframe for agreement on that definitive documentation is now and the Committee's support for the Debtors' request for continued exclusivity is based on the idea that we will have a comprehensive, completed agreement imminently.[8] In other words, under the current dynamics of these chapter 11 cases, continued exclusivity should be measured in weeks, not months. If a comprehensive deal is not agreed by October 2, 2023, the Committee expressly reserves the right to oppose further requests to extend exclusivity.

7.  Further, consistent with its fiduciary duties, the Committee is open to any alternative proposals that provide enhanced in-kind recoveries. In fact, the Committee has been actively assessing the plan proposal made by the group of lenders represented by Brown Rudnick (the "**Brown Rudnick Group**"), which was first presented to the Debtors less than three weeks ago. In that time, the Committee members have met with the Brown Rudnick Group and Committee professionals have held several follow up conversations with Brown Rudnick to gather more information to properly assess the proposal. The Committee has also supported the Debtors in getting the Brown Rudnick Group under NDA so that the parties can progress their discussions. Significantly more information is needed, however, to understand whether the Brown Rudnick Group's proposal is in fact a better alternative to the deal in principle with DCG. The Committee will continue to push for that information so that it can form a view on the proposal. Given its

---

[8] The Committee's understanding is that the Debtors share the perspective that the window on completing documentation is narrow and the parties need to know whether we will be able to reach the comprehensive deal sooner than later.

5

nascent state, however, the Committee does not believe the Brown Rudnick Group's proposal should derail efforts to document and propose an amended plan reflecting the deal in principle.

8.  Finally, the Ad Hoc Group, with whom the Committee has worked closely and collaboratively throughout these chapter 11 cases,[9] takes a surprising and unwarranted shot at the Committee (and the Debtors), as being "unwilling to comply with their fiduciary obligations" and instead "focused on putting this case behind them."[10]  The reality is that the Committee, as a fiduciary for *all* unsecured creditors, "does not have the luxury" (to use the Ad Hoc Group's phrase) of gambling away creditor recoveries on a quixotic quest to "get more."  Though the deal in principle with DCG is not perfect, and, like all negotiations, the Committee wanted and pushed hard for more, at the end of the day, the Committee had to make a choice – support an imperfect deal in principle that satisfies many of the Committee's goals (i.e., appropriate mix of assets to make in-kind distributions) or walk into the abyss of years of risky and costly litigation.  The Committee chose the former path, and until someone can demonstrate a better one that appropriately mixes risk and predictable returns, the Committee will stay on that path (consistent with its duties to maximize creditor recoveries), but only so long as the parties work quickly to prepare and finalize definitive documentation that in fact memorializes the terms of the deal in principle.

9.  In sum, the Committee does not believe that terminating exclusivity during the final stages of documenting an amended chapter 11 plan that the Debtors and the Committee support is appropriate at this point in time.  The Committee understands the creditor body needs significantly

---

[9] Indeed, the Committee welcomes continuing the constructive engagement with the SteerCo to the Ad Hoc Group to assess the deal in principle and these chapter 11 cases generally.

[10] Statement of Ad Hoc Group of Genesis Lenders in Respect of Public Update on Plan Discussions ¶ 20 [Docket No. 632].

more information to be able to adequately assess the deal in principle and expects to use this time to finalize the definitive documentation with the Debtors and DCG so that more details can be disclosed.  The Committee looks forward to presenting the complete picture of the deal in principle and the amended plan to unsecured creditors for their consideration.  The Committee reserves all rights with respect to exclusivity as well as its support for the deal in principle should such negotiations not proceed in good faith with all deliberate speed toward a plan that the Committee can support.  The Committee remains ready to continue to engage in discussions with the Debtors, the Ad Hoc Group, and Gemini Trust Company, LLC to attempt to achieve a fully consensual plan.

## RESERVATION OF RIGHTS

10.    The Committee reserves the right to (i) further amend, modify, or supplement this Reply and Reservation of Rights to raise additional issues with the Motion at the hearing and (ii) seek to terminate the Debtors' exclusivity at any time.

[*Remainder of page intentionally left blank.*]

<table>
<tr><td>

Dated: September 1, 2023
New York, New York

</td><td>

Respectfully submitted,

By: */s/ Philip Abelson*

**WHITE & CASE LLP**
J. Christopher Shore
Philip Abelson
David Turetsky
Michele J. Meises
1221 Avenue of the Americas
New York, NY 10020
Telephone: (212) 819-8200
Facsimile:  (212) 354-8113
E-mail: cshore@whitecase.com
       philip.abelson@whitecase.com
       david.turetsky@whitecase.com
       michele.meises@whitecase.com

– and –

Gregory F. Pesce (admitted *pro hac vice*)
111 South Wacker Drive, Suite 5100
Chicago, IL 60606-4302
Telephone: (312) 881-5400
Facsimile: (305) 881-5450
E-mail:  gregory.pesce@whitecase.com

*Counsel to Official Committee of Unsecured Creditors*

</td></tr>
</table>