Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |

**NOTICE OF HEARING ON**
**DEBTORS' SECOND OMNIBUS OBJECTION**
**(SUBSTANTIVE) TO CLAIM NOS. 523, 526, 527, 981, 982 AND 990**
**PURSUANT TO 11 U.S.C. § 502 AND FED. R. BANKR. P. 3007 (NO LIABILITY)**

　　　**PLEASE TAKE NOTICE** that on January 19, 2023 (the "Petition Date"), Genesis Global Holdco, LLC ("Holdco") and its debtor affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors")[2] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Court").

　　　**PLEASE TAKE FURTHER NOTICE** that on July 19, 2023 the Debtors filed the *Debtors' First Omnibus Objection (Substantive) to Claim Nos. 523, 526 and 527 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (the "Objection"). Pursuant to the *Revised Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 3007 (I) Establishing Claims*

---

[1]　　　The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

[2]　　　Holdco, and its Debtor and non-Debtor subsidiaries are collectively referred to as the "Company".

*Objection and Notice Procedures, (II) Establishing Claim Hearing Procedures and (III) Granting Related Relief* [ECF No. 498] (the "Claims Procedures Order"), the Debtors intend to request an evidentiary hearing (the "Evidentiary Hearing") on the objection at the earliest possible date.  Once the date for such Evidentiary Hearing is established, the Debtors will file a supplemental notice detailing the time, place and means of access for the hearing. In that same notice, the Debtors will provide details on the objection deadline and other interim deadlines associated with the Evidentiary Hearing.  Pursuant to the Claims Procedures Order, the Debtors reserve the right to adjourn said Evidentiary Hearing in their sole discretion on further notice.  Claims Procedures Order at 3.

**PLEASE TAKE FURTHER NOTICE** that any objections or responses ("Responses"), if any, to the Objection or the relief requested therein shall be made in writing, filed with the Court on a date to be announced (the "Response Deadline") and served as required by the Case Management Order and Claims Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that if no Responses are timely filed and served with respect to the Objection, the Debtors may, on or after the Response Deadline, submit to the Bankruptcy Court an order substantially in the form annexed as Exhibit BB to the Objection, which order the Court may enter without further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** that copies of the Objection can be viewed and/or obtained by:  (i) accessing the Court's website at www.nysb.uscourts.gov (PACER password required) or (ii) from the Debtors' notice and claims agent, Kroll Restructuring Administration LLC, located at One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, New York 10165, at https://restructuring.ra.kroll.com/genesis or by calling +1 212-257-5450.

**PLEASE TAKE FURTHER NOTICE** that the relief sought in the Objection may affect your rights.  Please read the Objection carefully and if you have one available, discuss it with your attorney.  (If you do not have an attorney, you should consider consulting with one.)

**PLEASE TAKE FURTHER NOTICE** that if you oppose the relief requested in the Objection, or if you want the Court to hear your position on the Objection, then you or your attorney must attend the Evidentiary Hearing.  If you or your attorney do not follow the foregoing steps, the Court may decide that you do not oppose the relief requested in the Objection and may enter orders granting the relief requested by the Debtors.

Dated:  September 1, 2023
        New York, New York

/s/ Luke A. Barefoot
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Andrew Weaver
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219) ("Holdco"); Genesis Global Capital, LLC (8564) ("GGC"); and Genesis Asia Pacific Pte. Ltd. (2164R) ("GAP").  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

# TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................ 1

Procedural Background ............................................................................................... 3

    A.  Procedural History ....................................................................................... 3

    B.  Debtors' Corporate Structure and Business ............................................... 5

    C.  Bar Date, Schedules and Notice ................................................................. 6

    D.  The Claims Resolution Process .................................................................. 7

    E.  The Automatic Stay .................................................................................... 8

    F.  3AC Commences BVI Liquidation and Chapter 15 Proceedings ............... 9

    G.  The Claims ................................................................................................ 10

    H.  The Amended Claims ............................................................................... 12

Jurisdiction ............................................................................................................... 13

Relief Requested ....................................................................................................... 13

Objection To Sufficiency Of Disputed Claims ........................................................ 13

3AC's Amended Claims With Respect To Approximately 9.2m GBTC Do Not Relate Back .... 20

3AC's Amended Claims Lack Any Evidentiary Basis And Fail On The Merits ........................ 23

Factual Background ................................................................................................... 23

Argument .................................................................................................................. 34

    i.  Genesis Has A Valid And Enforceable Security Interest In All Of The Amended
    PoC Assets. ................................................................................................ 34

    a.  The MLAs constitute authenticated security agreements and granted Genesis a valid
    security interest in the assets at issue. ....................................................... 37

    b.  The parties' written communications constitute "Loan Term Sheets" under the
    MLAs. ....................................................................................................... 40

    c.  The parties' written communications constitute authenticated security agreements
    that granted Genesis a valid security interest in the assets. ....................... 42

    ii.  3AC's BVI Turnover Claims Fail On The Merits. ................................... 45

    iii.  3AC's US Law Turnover Claims and New York Law Conversion Claims Fail On
    The Merits. ................................................................................................ 46

Section 546(e) and 546(g) Bar Avoidance of the Challenged Transfers .................... 58

    iv.  Section 546(e) Bars Avoidance of the Challenged Transfers .................... 62

    a.  The non-GBTC Digital Assets That Were the Subject of the Challenged Transfers
    Are Commodities Under Section 761(8). .................................................. 62

    b.  GBTC is a Security Under 11 U.S.C. § 101(49)(A)(viii) .......................... 63

    c.  The Challenged Transfers Were Made in Connection with Forward Contracts ....... 64

1

d.    The Challenged Transfers are also Connected to Forward Contracts, as defined under Section 101(25)(E) ................................................................................... 68

e.    The Challenged Transfers are also Connected to Securities Contracts ................... 69

f.    GAP is a Forward Contract Merchant ...................................................................... 70

g.    GAP and 3AC are Financial Participants................................................................. 71

v.    Section 546(g) Also Bars Avoidance of the Challenged Transfers ........................... 72

vi.    The Challenged Transfers Are Domestic ................................................................... 74

vii.    Even if the Challenged Transfers Were Foreign, the Application of the Safe Harbors is a Domestic Application of Law .............................................................. 76

viii.    Section 561(d) Makes the Safe Harbors Applicable to a Foreign Representative's Foreign Claims Regarding Foreign Transfers, Whether that Application is Characterized as Domestic or Not ...................................................... 78

3AC's Now-Amended Claims Should Be Disallowed And Expunged ....................................... 83

Responses to the Objection ........................................................................................................ 84

Replies to Responses.................................................................................................................. 86

Adjournment of Hearing ............................................................................................................ 87

Reservation of Rights................................................................................................................. 87

Notice ......................................................................................................................................... 88

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Am. Smelting & Ref. Co. v. U.S.*,
  259 U.S. 75 (1922)..................................................................................................41

*AP Servs., LLP v. Silva*,
  483 B.R. 63 (S.D.N.Y. 2012)..................................................................................83

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)..........................................................................................17, 19

*Bennett v. Bascom*,
  788 Fed. Appx. 318 (6th Cir. 2019)..........................................................36, 43, 45

*CFTC v. Eisenberg*,
  Case No. 23-cv-00173 (S.D.N.Y. Jan. 9, 2023), Dkt. 1............................................62

*Commodity Futures Trading Comm'n v. McDonnell*,
  287 F. Supp. 3d 213 (E.D.N.Y. 2018) ....................................................................62

*Deutsche Bank Tr. Co. v. Am. Gen. Life Ins. Co.*,
  2016 WL 5719783 (S.D.N.Y. Sept. 30, 2016).........................................................42

*Force v. Facebook, Inc.*,
  934 F.3d 53 (2d Cir. 2019)......................................................................... 73, 77-78

*In re Adelphia Commc'ns Corp.*,
  359 B.R. 54 (Bankr. S.D.N.Y. 2006)........................................................................15

*In re Alper Holdings USA, Inc.*,
  398 B.R. 736 (S.D.N.Y. 2008)................................................................................16

*In re Ampal-Am. Israel Corp.*,
  562 B.R. 601 (Bankr. S.D.N.Y. 2017).....................................................................57

*In re Arcapita Bank B.S.C.(C)*,
  640 B.R. 604 (S.D.N.Y. 2022) (SHL) ....................................................................64

*In re Asia Glob. Crossing, Ltd.*,
  324 B.R. 503 (Bankr. S.D.N.Y. 2005).....................................................................22

*In re Avaya, Inc.*,
608 B.R. 366 (Bankr. S.D.N.Y. 2019) ............................................................. 13-14

*In re Bernard L. Madoff Inv. Secs. LLC*,
474 B.R. 76 (Bankr. S.D.N.Y. 2012) ...................................................................9

*In re Borden Chems.*,
336 B.R. 214 (Bankr. D. Del. 2006) ............................................................. 67-68

*In re Cardali*,
No. 10-11185 (SHL) 2010 WL 4791801 (Bankr. S.D.N.Y. Nov. 18, 2010) .........................46

*In re CIL Ltd.*,
582 B.R. 46 (Bankr. S.D.N.Y. 2018) .................................................................57

*In re CIS Corp.*,
172 B.R. 748 (S.D.N.Y. 1994) .........................................................................46

*In re Clear Peak Energy, Inc.*,
488 B.R. 647 (Bankr. D. Ariz. 2013) ...........................................................68, 71

*In re Ditech Holding Corp.*,
No. 19-10412 (JLG), 2022 WL 14964188 (Bankr. S.D.N.Y. Oct. 26, 2022) ........................15

*In re Ditech Holding Corp.*,
No. 19-10412 (JLG), 2023 WL 4943734 (Bankr. S.D.N.Y. Aug. 2, 2023) ...........................14

*In re DJK Residential LLC*,
416 B.R. 100 (Bankr. S.D.N.Y. 2009) .................................................................16

*In re Enron Corp.*,
419 F.3d 115 (2d Cir. 2005) ...................................................................... 20-21

*In re Fairfield Sentry Ltd.*,
452 B.R. 52 (2011) ......................................................................................81

*In re Fairfield Sentry Ltd.*,
596 B.R. 275 (Bankr. S.D.N.Y. 2018) .....................................................77, 80, 82

*In re Fairfield Sentry Ltd.*,
630 F. Supp. 3d 463 (S.D.N.Y. 2022) ......................................................74, 80

*In re Fairfield Sentry Ltd. Litig.*,
458 B.R. 665 (S.D.N.Y. 2011) .........................................................................46

*In re Florsheim Group Inc.*,
  336 B.R. 126 (N.D. Ill. 2005) ...............................................................74

*In re Lehman Bros. Holdings Inc.*,
  469 B.R. 415 (Bankr. S.D.N.Y. 2012)....................................................69

*In re Lehman Bros. Inc.*,
  No. 0801420SCCSIPA, 2016 WL 316857 (S.D.N.Y. Jan. 26, 2016) ...................................15

*In re Lyondell Chemical Company*,
  543 B.R. 127 (Bankr. S.D.N.Y. 2016)....................................................74

*In re M. Fabrikant & Sons, Inc*.,
  447 B.R. 170 (Bankr. S.D.N.Y. 2011)....................................................20

*In re Magnesium Corp. of Am.*,
  460 B.R. 360 (Bankr. S.D.N.Y. 2011)....................................................70

*In re MBS Mgmt. Servs., Inc.*,
  690 F.3d 352 (5th Cir. 2012) ...............................................................67

*In re Mirant Corp.*,
  310 B.R. 548 (Bankr. N.D. Tex. 2004)...................................................70

*In re Nat'l Gas Distributors, LLC*,
  556 F.3d 247 (4th Cir. 2009) ........................................................ *passim*

*In re Nine W. LBO Sec. Litig.*,
  482 F. Supp. 3d 187 (S.D.N.Y. 2020)............................................... 82-83

*In re Nortel Networks, Inc*.,
  469 B.R. 478 (Bankr. D. Del. 2012) ......................................................15

*In re Residential Cap., LLC*,
  2015 WL 4654906 (Bankr. S.D.N.Y. Aug. 5, 2015) ..............................22

*In re Residential Cap., LLC*,
  518 B.R. 720 (Bankr. S.D.N.Y. 2014)....................................................16

*In re Roman Cath. Diocese of Rockville Ctr., New York*,
  651 B.R. 146 (Bankr. S.D.N.Y. May 1, 2023) .......................................15

*In re Roman Cath. Diocese of Rockville Ctr.*,
  No. 20-12345, 2023 WL 3158940 (Bankr. S.D.N.Y. May 1, 2023) .........16

*In re Tender Loving Care Health Servs., Inc.*,
   562 F.3d 158 (2d Cir. 2009) ............................................................................. 14

*In re Trib. Co. Fraudulent Conv. Litig.*,
   946 F.3d 66 (2d Cir. 2019) ............................................................... 58, 77, 82-83

*In re Uvino*,
   2012 WL 892501 (Bankr. S.D.N.Y. Mar. 14, 2012) .......................................... 22

*Kiobel v. Royal Dutch Petrol. Co.*,
   621 F.3d 111 (2d Cir. 2010) ............................................................................. 17

*Merit Mgmt. Group, LP v. FTI Consulting, Inc.*,
   138 S. Ct. 883 (2018) ....................................................................................... 58

*Morrison v. Nat'l Aus. Bank Ltd.*,
   561 U.S. 247 (2010) ......................................................................................... 76

*Morse v. Rescap Borrower Claims Tr.*,
   No. 1:14-cv-5800-GHW, 2015 WL 353931 (S.D.N.Y. Jan. 26, 2015), *aff'd sub nom.*
   *In re Residential Cap.*, LLC, 628 F. App'x 63 (2d Cir. 2016) ................................ 16

*Phelan v. Loc. 305 of United Ass'n of Journeymen & Apprentices of Plumbing and
   Pipefitting Indus. of U.S. & Can.*,
   973 F.2d 1050 (2d Cir. 1992) ........................................................................... 83

*RJR Nabisco, Inc. v. Euro. Cmty.*,
   579 U.S. 325 (2016) ..................................................................................... 75-76

*SIPC v. Madoff*,
   594 B. R. 167 (Bankr. S.D.N.Y. 2018) ............................................................... 55

*Slayton v. Am. Express Corp.*,
   460 F.3d 215 (2d Cir. 2006) ............................................................................. 21

*Smith v. Onyx Oil & Chem. Co.*,
   218 F.2d 104 (3d Cir. 1955) ............................................................................. 41

*Spanski Enters., Inc. v. Telewizja Polska, S.A.*,
   883 F.3d 904 (D.C. Cir. 2018) .......................................................................... 76

*Vaughn v. Air Line Pilots Ass'n, Int'l*,
   604 F.3d 703 (2d Cir.2010) ......................................................................... 17, 19

*Western-GECO LLC v. ION Geophysical Corp.*,
    138 S. Ct. 2129 (2018) .................................................................................. 76-77

*Whyte v. Barclays Bank*,
    494 B.R. 196 (S.D.N.Y. 2013) .............................................................................77

*Bocre Leasing Corp. v. Gen. Motors Corp.*,
    84 N.Y.2d 685 (1995) .........................................................................................48

*Broadway Warehouse Co. v. Buffalo Barn Bd., LLC*,
    39 N.Y.S.3d 555 (4th Dep't 2016) ......................................................................47

*Caring Pro., Inc. v. Catholic Health Care Sys. d/b/a Archcare*,
    No. 656248/2016, 2017 WL 5725516 (N.Y. Sup. Ct. Nov. 22, 2017) ...................48

*Colavito v. N.Y. Organ Donor Network, Inc.*,
    8 N.Y.3d 43 (1st Dep't 2006) .............................................................................47

*Komolov v. Segal*,
    144 A.D.3d 487 (1st Dep't 2016) ........................................................................47

*Naldi v. Grunberg*,
    908 N.Y.S.2d 639 (1st Dep't 2010) ...............................................................36, 44

*Newmark & Co. Real Est. Inc. v. 2615 E. 17 St. Realty LLC*,
    80 A.D.3d 476 (1st Dep't 2011) ..........................................................................44

*Prospect Funding Holdings, LLC v. Paiz*,
    183 A.D.3d 486, 124 N.Y.S.3d 685 (1st Dep't 2020) ..........................................48

*Solartech Renewables, LLC v. Vitti*,
    156 A.D.3d 995 (3d Dep't 2017) .........................................................................44

**Statutes**

11 U.S.C. § 101 ............................................................................................ *passim*

7 U.S.C. § 1a(9) ....................................................................................... 62-63

28 U.S.C. § 157 ...........................................................................................2, 13

28 U.S.C. § 1408 .........................................................................................2, 13

28 U.S.C. § 1409 .........................................................................................2, 13

11 USC § 741(7)(A)(iv) ...........................................................................................69

N.Y. Gen. Oblig. Law § 5-701 ................................................................................44

N.Y. State Tech. Law § 304 ....................................................................................44

N.Y. UCC § 9-102(74) ............................................................................................42

UCC § 1-204 ............................................................................................................35

UCC § 9-102(a)(7) .............................................................................................37, 43

UCC § 9-102(a)(70) .................................................................................................43

UCC § 9-102(a)(74) .................................................................................................37

UCC § 9-108(a) ........................................................................................................45

UCC § 9-108(b) ........................................................................................................45

UCC § 9-109(a)(1) ...................................................................................................34

UCC Section 9-203(b) .........................................................................................34-35

**Other Authorities**

Bankruptcy Code Section 105 ....................................................................................9

Bankruptcy Code Section 502 ....................................................................................9

Bankruptcy Rule 1015(b) ...........................................................................................1

Bankruptcy Rule 3007 ...........................................................................................9, 1

Bankruptcy Rule 7012(b) ...........................................................................................6

**DEBTORS' SECOND OMNIBUS OBJECTION**
**(SUBSTANTIVE) TO CLAIM NOS. 523, 526, 527, 981, 982 AND 990**
**PURSUANT TO 11 U.S.C. § 502 AND FED. R. BANKR. P. 3007 (NO LIABILITY)**

The above-captioned debtors and debtors-in-possession (each a "<u>Debtor</u>" and collectively, the "<u>Debtors</u>") hereby submit this objection (the "<u>Objection</u>") to Claim Nos. 523, 526, 527, 981, 982 and 990 (as defined herein), pursuant to section 502(b) of chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), and seek entry of an order, substantially in the form attached hereto as <u>Exhibit BB</u> (the "<u>Proposed Order</u>"), disallowing and expunging Claim Nos. 523, 526, 527, 981, 982 and 990 (as defined herein).  In support of this Objection, the Debtors respectfully state as follows:

**Preliminary Statement**

1.      3AC's amended proofs of claim narrow the scope of 3AC's original threadbare proofs of claim, but they are as equally deficient in terms of both law and facts.  Despite extensive engagement with the Debtors and receiving over 6,000 pages of documents, 3AC's claims suffer from many of the same deficiencies that they did when they were first brought, and 3AC's continued refrain that it does not have access to the relevant documents is not only stale, but cannot salvage the claims.

2.      The amended proofs of claim are replete with mentions of "potential" U.S. bankruptcy law claims, which 3AC has been barred from pursuing by the BVI Court.  And even were 3AC to eventually bring a chapter 11 proceeding following a successful appeal of that decision (which is, at best, a remote possibility), these "potential" claims would fail for multiple other reasons.

3.      On the BVI and U.S. law claims 3AC actually has standing to bring, 3AC falls woefully short.  As to their turnover and conversion claims, 3AC does not allege *any* facts about

1

the origin of the assets subject to these claims, and the Debtors and the Court are left to guess as to which transactions 3AC is targeting.  Apart from these pleading deficiencies, these claims fail on the merits because the Debtors had a valid security interest in all of the assets it foreclosed upon following 3AC's default under the parties' master lending agreements (as well as for other independent reasons).  3AC's argument that the Debtors somehow misappropriated these assets is contrary to the clear factual record in this case—the only relationship between the parties was a lending relationship, and all of the challenged assets were transferred as collateral pursuant to that relationship.  In any event, it is black letter law that a Section 542 claim is an inapt vehicle for litigating competing entitlements to property.

4.    As to 3AC's BVI-law preference claims, 3AC does not meet *its burden* to show that it was insolvent at the time of the relevant transactions or to plead and prove that the transactions did not take place in the ordinary course of business (among other deficiencies). Indeed, 3AC goes to great lengths to avoid taking a firm position as to when 3AC actually became insolvent.  Moreover, the questionable assertion that the Debtors were aware of 3AC's distress and that this fact somehow removes the transactions from the ordinary course, is belied by the factual record and by 3AC's conduct during that time, where the challenged transactions bear striking resemblance not only to the way the parties conducted business for months, if not years, prior to 3AC's liquidation, but also to the way parties in the industry operate during times of market turmoil.

5.    Finally, and perhaps most importantly, *all* of the challenged transactions are protected by the safe harbor provisions of the U.S. Bankruptcy Code.  The digital assets that were exchanged between the Parties under the MLAs and related agreements were either commodities or securities; those same agreements were forward contracts and securities contracts; and given

2

the nature of the Debtors' businesses, Genesis was both a forward contract merchant and a financial participant.

6.       Accordingly, all of 3AC's amended claims should be disallowed.

## **Procedural Background**

### A.    **Procedural History**

7.       On January 19, 2023, each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the date of such filing, the "Petition Date"). The Debtors are operating their businesses as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors' Chapter 11 Cases have been consolidated for procedural purposes only and are jointly administered pursuant to Bankruptcy Rule 1015(b) [ECF No. 37]. No trustee or examiner has been appointed in the Chapter 11 Cases. On February 3, 2023, an official committee of unsecured creditors (the "Committee") was appointed in these cases [ECF No. 55].

8.       On January 20, 2023, the Debtors filed the *Debtors' Joint Chapter 11 Plan* [ECF No. 20] (the "Plan"). In the months following the Petition Date and filing the Plan, the Debtors and their advisors have engaged in extensive negotiations with various advisors to creditor groups and Digital Currency Group, Inc. ("DCG") to explore strategic solutions. On February 10, 2023, the Debtors filed the *Restructuring Term Sheet* [ECF No. 80], which reflected a non-binding agreement in principle among the Debtors, DCG, Gemini Trust Company LLC ("Gemini"), and certain members of an ad hoc group of creditors of GGC holding over $1.5 billion in claims (the "Ad Hoc Group").

9.       On March 31, 2023, the Debtors launched their marketing and sales process, led by the Debtors' investment banker, Moelis & Company LLC ("Moelis"), to garner competitive bids from qualified bidders on an efficient timeline. On March 31, 2023, the Court entered the *Order Authorizing the Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures*

*and Related Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, and (III) Granting Related Relief* [ECF No. 192]. The deadline for submitting bids was July 26, 2023. *Notice of Sixth Amended Sale Schedule* [ECF No. 566]. The Debtors currently remain in discussion with bidders.

10.    After unsuccessful attempts at reaching a resolution of certain issues involving potential claims against DCG, on May 5, 2023, the Court granted the Debtors' request for mediation of certain Plan-related issues with DCG, the Committee, the Ad Hoc Group and Gemini (collectively, the "Mediation Parties"), with an initial period running until May 31, 2023. *See Order Appointing Mediator* [ECF No. 279] (the "Mediation Order"). While further Court approval was unnecessary to extend the mediation period pursuant to paragraph 2 of the Mediation Order, the Debtors submitted a proposed order extending the initial mediation period until June 16, 2023, which was granted by the Court on the record over objections by certain parties-in-interest, including Three Arrows Capital Ltd ("3AC"), at a hearing held on June 5, 2023.

11.    On June 13, 2023, the Debtors filed the *Disclosure Statement with Respect to the Amended Joint Plan of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code* (the "Disclosure Statement") [ECF No. 429]. The hearing on the Debtors' Disclosure Statement is now scheduled for September 26, 2023. *See Seventh Notice of Adjournment and Rescheduling of the Hearing on the Adequacy of Information in the Debtors' Disclosure Statement* [ECF No. 621].

12.    On June 13, 2023, the Debtors filed the *Debtors' Amended Joint Chapter 11 Plan* (the "Amended Plan") [ECF No. 427].

13.    Between June 16, 2023 and August 23, 2023, the Mediation Parties extended the mediation period various times. *See Notice of Further Extension of Mediation Period* [ECF No.

606].   On August 29, 2023, the Debtors filed a notice terminating the mediation period and outlining the terms of a deal in principle among the Debtors, the Official Committee of Unsecured Creditors and Digital Currency Group, Inc.  *See Notice of Mediation Termination* [ECF No. 625]. The deal is subject to subject to definitive documentation and continued negotiation over the terms and conditions of an amended chapter 11 plan.

14.     3AC has represented that it holds claims against the Debtors greater than $1 billion, *see Objection of the Foreign Representatives of Three Arrows Capital, Ltd. (In Liquidation) to the Proposed Mediation Extension Order* [ECF No. 391].   Given the size of 3AC's claims, it is imperative to have a prompt hearing on the Debtors' Objection in light of the Debtors' plan confirmation schedule.  Creditors need to understand their recoveries under the Amended Plan, and the Debtors must ensure appropriate distributions are made promptly pursuant to the Amended Plan without the need for potential requests that could seek extensive reserves on account of 3AC's legally and factually deficient claims.  Moreover, this Objection rests in large part on applying settled law to a relatively discrete set of facts as to which the Debtors do not believe there can be legitimate material factual disputes, making final resolution of the claim on the merits through this Objection the most appropriate path forward.

**B.     Debtors' Corporate Structure and Business**

15.     Holdco (together with the other Debtors and Holdco's Non-Debtor Subsidiaries, the "Company") and its non-Debtor affiliate Genesis Global Trading, Inc. ("GGT") provide lending and borrowing, spot trading, derivatives and custody services for digital assets and fiat currency.  *See Decl. of A. Derar Islim in Support of First Day Mot. and Appl. in Compliance with Local Rule 1007-2* at ¶ 12 [ECF No. 17].  The Debtors engaged in lending, borrowing and certain trading services, while the Non-Debtor Subsidiaries engage in derivatives, custody and most of the Company's trading services.  Holdco is a sister company of GGT and directly and wholly

owned by DCG, the Debtors' ultimate parent.  *See id.* at ¶ 7.  Holdco exists only as a holding company with no business operations or assets aside from its ownership in the Debtors and the Non-Debtor Subsidiaries.  *See* Disclosure Statement at Section IV.B [ECF No. 429].  Accordingly, Holdco did not maintain any contractual or business relationships with third-party counterparties, including 3AC.  Ex. K, *Decl. of A. Derar Islim in Support of Debtors' Second Omnibus Objection (Substantive) to Claim Nos. 523, 526, 527, 981, 982 and 990 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* ("<u>Islim Decl.</u>") at ¶ 11.  Nor does 3AC's proof of claim against Holdco allege any facts, circumstances or basis to independently support any claim against Holdco. Instead, 3AC's proof of claim against Holdco is substantively identical to its proofs of claim against the other Debtors.

16.     Additional information regarding the Debtors' business, capital structure and the circumstances leading to the commencement of the Chapter 11 Cases is set forth in the Disclosure Statement.

**C.     Bar Date, Schedules and Notice**

17.     On March 21, 2023, the Debtors filed their Schedules of Assets and Liabilities [ECF Nos. 145, 146, and 147] and Statements of Financial Affairs [ECF Nos. 142, 143, and 144] (the "<u>Statements</u>"), along with the schedule and statements of the remaining Debtors (collectively, the "<u>Schedules</u>" and "<u>Statements</u>," respectively).

18.     On April 4, 2023, the Court entered the *Order (I) Establishing Bar Dates for Submitting Proofs of Claim, (II) Approving Proof of Claim Form, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Suppl. Relief* (the "<u>Bar Date Order</u>") [ECF No. 200].  Pursuant to the Bar Date Order, the Court set May 22, 2023 at 4:00 pm, Eastern Time (the "<u>General Bar Date</u>") as

the deadline for each person or entity, not including governmental units as defined in section 101(27) of the Bankruptcy Code, to file its proofs of claim in the Chapter 11 Cases.

**D.    The Claims Resolution Process**

19.    In the ordinary course of business, the Debtors maintain books and records (the "Books and Records") that reflect, among other things, the Debtors' liabilities and the amounts owed to their creditors.

20.    The Debtors' claims agent, Kroll Restructuring Administration LLC (the "Claims Agent"), has prepared and maintains a register (the "Claims Register") of proofs of claim (collectively, the "Proofs of Claim") that were filed in these Chapter 11 Cases asserting claims against the Debtors.  As of August 31, 2023, the Claims Register consisted of 1,005 separate Proofs of Claim and 694 Scheduled Claims.  The Debtors and their advisors are comprehensively reviewing and reconciling all claims, including both the claims listed on the Schedules (the "Scheduled Claims") and the claims asserted in the Proofs of Claim (including any supporting documentation) filed in these cases.  The Debtors also are comparing the claims asserted in the Proofs of Claims with their Books and Records to determine the validity of the asserted claims.  Validating and resolving claims that are unsupported by the Debtors' Books and Records is a high priority for the Debtors at this stage in the proceedings.   In light of the confirmation process, Debtors are focused on right-sizing the claims pool both in anticipation of solicitation of votes on the Amended Plan and the Debtors' ability to timely and appropriately make distributions at the earliest possible date to all deserving holders of allowed claims.

21.    This reconciliation process includes identifying particular claims that may be targeted for disallowance.  To reduce the number of claims and to avoid possible double recovery or otherwise improper recovery, including by 3AC, the Debtors will continue to file objections to claims that should not be allowed.

7

22.     In aid of the claims resolution process, the Court has entered the Claims Procedures Order.  Among other things, the Claims Procedures Order authorizes the filing and prosecution of claims on an omnibus basis and contemplates that, absent specific notice from the Debtors to the contrary, the initial hearing on a claims objection will be a Sufficiency Hearing at which the Court will determine whether the relevant Claim should be dismissed pursuant to Bankruptcy Rule 7012(b).  Claims Procedures Order ¶¶ 2(a), 2(b).  Because a substantial portion of the claims and defenses asserted herein require the Court to hear evidence, proceeding first to a sufficiency hearing pursuant to the Claims Procedures Order on a relatively limited and in any event overlapping sub-set of the claims would only delay ultimate adjudication of the bulk of the 3AC Claims.  As such, the Debtors intend to exercise their rights under the Claims Procedures Order to notice the hearing on this Objection as an evidentiary hearing.  Claims Procedures Order ¶2(b).  Simultaneously herewith, as discussions with representatives for 3AC have not to date yielded agreement on scheduling and related matters relevant to the conduct of the Evidentiary Hearing, the Debtors will be seeking the Court's entry of a scheduling order, as the Claims Procedures Order contemplates.  *Id.*[1]

**E.      The Automatic Stay**

23.     Immediately upon the filing of the Debtors' bankruptcy petitions, Section 362 of the Bankruptcy Code imposed an automatic stay (the "Automatic Stay").  The Automatic Stay precludes the commencement or continuation of any judicial, administrative or other action or proceeding against the Debtors that could have been commenced before the commencement of the case under this title, as well as efforts to recover a claim against the Debtors that arose before the commencement of the Chapter 11 Cases.  The Automatic Stay applies to any action affecting the

---

[1]     In accordance with the Claims Procedures Order, the Debtors provided notice of the schedule embodied in their proposed scheduling order on Tuesday, August 29, 2023.

Debtors' estates anywhere in the world.  *See In re Bernard L. Madoff Inv. Secs. LLC*, 474 B.R. 76,

82 (Bankr. S.D.N.Y. 2012).

24.    On January 26, 2023, the same day the Debtors filed for bankruptcy, the Debtors

filed the *Debtors' Mot. for an Order Authorizing Debtors to Operate Their Businesses in the*

*Ordinary Course and Ordering Implementation of the Automatic Stay* [ECF No. 13], restating the

Automatic Stay.  The Court entered the order on January 26, 2023 [ECF No. 40].

**F.    3AC Commences BVI Liquidation and Chapter 15 Proceedings.**

25.    On June 27, 2022, 3AC commenced a liquidation proceeding (the "BVI

Proceeding") before the Eastern Caribbean Supreme Court in the High Court of Justice,

Commercial Division, Virgin Islands (the "BVI Court").  *Verified Pet. Under Chapter 15 For*

*Recognition of a Foreign Main Proceeding and Related Relief* at ¶ 1, *In re Three Arrows Capital,*

*Ltd.*, Case No. 22-10920, ECF No. 2.  On June 29, 2022, Messrs. Russell Crumpler and Christopher

Farmer were appointed as joint liquidators of 3AC (the "Joint Liquidators").  *Id.*

26.    On July 1, 2022, 3AC commenced a chapter 15 proceeding in the U.S. Bankruptcy

Court for the Southern District of New York, captioned *In re Three Arrows Capital, Ltd.*, No. 22-

10920 (MAG).  *Id.*[2] On July 28, 2022, the Court entered the *Order Granting Recognition of*

*Foreign Main Proceeding and Relate Relief, In re Three Arrows Capital, Ltd*, Case No. 22-10920,

ECF No. 47.

---

[2]    The Debtors understand that 3AC had sought sanction from the BVI Court to commence a chapter 11
proceeding in the U.S. Bankruptcy Court for the Southern District of New York.  As discussed *infra*, that request for
sanction was denied by the BVI Court.  While the Joint Liquidators have elected to appeal that decision, not only is
the timing of any such appeal unclear, but the standard of review in pursuing that appeal makes the prospects of a
reversal remote, as the BVI Court has held that the order on the sanction application is committed to the discretion of
the BVI Court.  *See* Parker Decl. at 8.  However, the Debtors reserve all rights, including, without limitation, to amend
or supplement this Objection, including without limitation should 3AC ultimately prevail on appeal in the BVI and
purport to commence chapter 11 proceedings.

27.     In a July 26, 2022 email, counsel to DCG provided the Joint Liquidators with documentation relating to the various assets the Debtors had foreclosed upon. *See* Exs. A, B and C at Ex. E.

28.     In late November 2022, after having this information from DCG in its possession for over four months, and without attempting to contact the DCG or Debtors, 3AC filed an action in the BVI against GGC, GAP and DCG under Sections 186 and 274A of the BVI Insolvency Act (the "BVI Action").   At the time, 3AC's claims had an asserted value of approximately $578,542,142.30. *See* Ex. W at ¶ 15.

29.     In April 2023, the Debtors met with 3AC and provided 346 pages of certain additional documentation related to the transfers at issue in the BVI Action, which demonstrated that 3AC's claims in the BVI Action were meritless.

30.     On May 24, 2023, 3AC filed an application before the BVI Court seeking sanction to commence a Chapter 11 case in the United States on behalf of 3AC.  On July 26, 2023, the BVI Court denied the application. *See In re Three Arrows Capital, Ltd.*, No. 22-10920, ECF No. 109. 3AC has appealed the BVI Court's decision.

## G.     The Claims

31.     On May 22, 2023, 3AC filed substantively identical proofs of claim numbered 523, 526 and 527 against Holdco, GGC and GAP, respectively (collectively, the "3AC PoCs").  *See* Exs. D, E, F.  Without any significant factual detail concerning the relevant transactions or the required factual elements of any of their purported claims, the 3AC PoCs asserted claims (the "Claims"), "under BVI, New York, Delaware, and other applicable law, including without limitation claims in the nature of preference, conversion, and other avoidance actions, arising from the following":

a)      Interest payments by 3AC to GAP totaling $18 million between June 2 and June 3, 2022;

b)      A loan repayment by 3AC to GAP on May 6, 2022 in the amount of 115,000,000 USDC;

c)      GAP's foreclosure on: (i) 13,172,000 GBTC, (ii) approximately 17,500 ETH, and (iii) approximately 33,350 BTC;

d)      Liens granted to GAP on the Foreclosure Assets, as well as on certain AVAX and NEAR tokens; and

e)      3AC's investments and relationship with the Grayscale Bitcoin Trust and the Grayscale Ethereum Trust (and/or other Grayscale trusts). *Id* at ¶ 6.

32.    On July 19, 2023, the Debtors filed an Objection to the 3AC PoCs, after which 3AC proceeded to request permission from the Court to, in the Court's words, file a "free amendment." *In re Genesis Global Capital, LLC*, No. 23-100063, Aug. 2, 2023 Hr'g. Tr. at 33:15-23; 38:22-39:3.  The Court made clear there was no such thing.  *Id*.  The Joint Liquidators indicated that they would likely proceed to amend 3AC's claims.  Notably, in order to guard against the Joint Liquidators' refrain that even more than a year after their appointment they lack any information, the Debtors voluntarily produced to the Joint Liquidators a total of 6,099 pages of documents on August 8 and August 9, 2023 (after having produced an additional several hundred pages of documents several months earlier).

33.    Rather than attempt to defend their threadbare original claims by opposing the Debtors' claims objection, 3AC ultimately filed amended proofs of claim on August 18, 2023, thereby conceding that their original claims were deficient from a pleading perspective.[3]

---

[3]      At the hearing, 3AC agreed to file such amended claims by August 14, 2023.  *Id*. at 42:9.  This date was subsequently extended by agreement of the Debtors.

## H.     The Amended Claims

34.     On August 18, 2023, 3AC filed substantively identical proofs of claim numbered 981, 982 and 990 against GGC, Holdco, and GAP, respectively (collectively, the "Amended PoCs").[4]  *See* Exs. A, B and C.  Notably, several of the most ambiguous and broad categories of claims that 3AC previously indicated an intent to pursue in the original 3AC PoCs have either not been re-asserted, or are now concededly only "potential" claims that they currently lack standing to pursue.  The Amended PoCs narrow 3AC's claims to the following:

a)      Turnover claims under U.S. and BVI law, as well as conversion claims under New York law, with respect to the following assets: (i) approximately 13,780.04 BTC; (ii) approximately 17,455 ETH; (iii) four categories of tokens that were converted into BTC, comprised of 96.2 million ALGO tokens ("ALGO"), 699,000 Solana tokens ("SOL"), 300,000 AVAX tokens ("AVAX"), and 50,000 ETH (collectively, the "Substituted Collateral"); and (iv) approximately 9.2 million GBTC.  *See* Exs. A, B and C at  ¶¶ 37, 50.

b)      Preference claims under BVI law with respect to the following assets: (i) interest payments by 3AC to GAP totaling approximately $18 million between June 2 and June 3, 2022 (the "Interest Payment"); a loan repayment by 3AC to GAP on May 6, 2022 in the amount of 115,000,000 USDC (the "Principal Payment"); (iii) 13,172,000 GBTC; and (iv) the Substituted Collateral.  *See* Exs. A, B and C at  ¶ 45.

c)      "Potential" strong-arm claims under Section 544 of the Bankruptcy Code with respect to the following assets: (i) 27,673.37 BTC; (ii) the Substituted Collateral; and (iii) 17,455 ETH.  *See* Exs. A, B and C at  ¶ 56.[5]

d)      "Potential" preference claims under Section 547 of the Bankruptcy Code with respect to the following assets: (i) 13,172,000 Grayscale Bitcoin Trust shares; (ii) the Substituted Collateral; (iii) the Principal Payment; and (iv) the Interest Payment.[6]  *See* Exs. A, B and C at  ¶ 65.

---

[4]      References to claims brought or actions taken by 3AC include claims brought or actions taken by the Joint Liquidators, and vice versa.

[5]      As discussed below, these claims are at best "potential," as 3AC concedes, because the Joint Liquidators have not commenced a chapter 11 proceeding that would vest them with powers under Section 544 or 547 and in fact their request for sanction to do so was denied by the BVI Court.

[6]      The assets subject to the Amended PoCs shall be referred to as the "Amended PoC Assets" hereinafter.

35.     The Amended PoCs value all of the Amended PoC Assets as of June 27, 2022 (the date of the commencement of the BVI Proceeding), *except* the Substituted Collateral, which is inexplicably valued as of the date of the transfers, specifically May 12 and 13, 2022.  *See* Exs. A, B and C at ¶ 37 n. 11.  Using this helter-skelter valuation methodology, 3AC now estimates that the value of its claims "to be at least $1.15 billion."  Exs. A, B and C at ¶ 25.

### Jurisdiction

36.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the relief requested herein are Bankruptcy Code sections 105 and 502 and Bankruptcy Rule 3007.

### Relief Requested

37.     For the reasons set forth below, the Debtors object to the Claims.  By this Objection, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit BB, disallowing and expunging the Claims.

### Objection To Sufficiency Of Disputed Claims

38.     Section 502(b)(1) of the Bankruptcy Code provides that a claim shall not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured."  11 U.S.C. § 502(b)(1).  When asserting a proof of claim against a bankruptcy estate, a claimant must allege facts that, if true, would support a finding that a debtor is legally liable to a claimant.  *See In re Avaya, Inc.*, 608 B.R. 366, 369-70 (Bankr. S.D.N.Y. 2019).  Where a claimant alleges sufficient facts to support a claim, that claim is afforded *prima facie* validity.  *See id.*  A party wishing to dispute such claim must produce evidence in sufficient force to negate that claim's *prima facie* validity.  *Id.*  Once an objecting party produces such evidence, the burden shifts back

to the claimant to prove the validity of the claim by a preponderance of the evidence. *Id.* The burden of persuasion is always on the claimant. *Id.*

39.    Under the Bankruptcy Rules, this Court has discretion to apply Bankruptcy Rule 7012 in deciding the validity of the Amended PoCs. Given that the Joint Liquidators have asserted claims that are essentially, in form and substance, in the nature of specific statutory and common law causes of action that one would more typically see in an adversary proceeding, the Court should exercise its discretion and apply Bankruptcy Rule 7012 to the claims susceptible to dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure (the "Federal Rules"), as described below (together, the "Dismissal Claims").

40.    *First*, upon filing this Objection to the Amended PoCs, the Debtors initiated a "contested matter" governed by Bankruptcy Rule 9014. *See In re Tender Loving Care Health Servs., Inc.*, 562 F.3d 158, 162 (2d Cir. 2009) ("the filing of an objection to a proof of claim … creates a dispute which is a contested matter"); *see also In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2023 WL 4943734, at n. 11 (Bankr. S.D.N.Y. Aug. 2, 2023) ("Bankruptcy Rule 9014 governs contested matters."). Under Bankruptcy Rule 9014(c), this Court has discretion to apply Bankruptcy Rule 7012, which incorporates the federal pleading standards under Federal Rule 12 of the Federal Rules of Civil Procedure, including the standard for a motion to dismiss for failure to state a claim, when assessing the validity of a claim in the bankruptcy context.[7]

41.    Many courts, both within and outside of the Second Circuit, have exercised their discretion to use this authority to incorporate Bankruptcy Rule 7012 and apply the Rule 12(b)(6)

---

[7]    Indeed, the Court has arguably already done so in entering the Claims Procedures Order. *See* Claims Procedures Order at 2(a) ("For a non-evidentiary hearing to address whether the Contested Claim has failed to state a claim against the Debtors which can be allowed and should be dismissed pursuant to Bankruptcy Rule 7012(b) (a "Sufficiency Hearing"). Unless the Debtor serves the holder of the claim (the "Claimant") with a Notice of Merits Hearing (as defined herein), the Sufficiency Hearing shall go forward at the date set forth in the notice of the claim objection (or such other date as may be scheduled by the Debtor)").

standard for a motion to dismiss for failure to state a claim to claims objection contexts. *See In re Roman Cath. Diocese of Rockville Ctr., New York*, 651 B.R. 146, 159 (Bankr. S.D.N.Y. May 1, 2023) (applying the standard for a motion to dismiss for failure to state a claim to a claims objection); *In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2022 WL 14964188, at *7 (Bankr. S.D.N.Y. Oct. 26, 2022) (same); *In re Lehman Bros. Inc.*, No. 0801420SCCSIPA, 2016 WL 316857, at *1 (S.D.N.Y. Jan. 26, 2016) (same); *In re Adelphia Commc'ns Corp.*, 359 B.R. 54, 56 (Bankr. S.D.N.Y. 2006) (noting that despite Rule 9014 not explicitly incorporating Rule 7012 in the context of contested matters, the judge in his discretion has found "demurrers to be a useful procedural mechanism to decide some kinds of contested matter disputes economically, saving litigation costs for the benefit of creditors and other stakeholders").

42.    The Court should employ Bankruptcy Rule 7012 here with respect to the Dismissal Claims not only because it will aid in efficiently resolving the Claims, but also because the Amended PoCs assert statutory and common law claims in form and substance similar to those found in a complaint filed in an adversary proceeding. As such, 3AC should not be allowed to avoid the pleading standards articulated in Bankruptcy Rule 7012 merely because they have asserted claims in proofs of claim as opposed to through an adversary proceeding— Bankruptcy Rule 9014(a) gives the Court discretion to apply Bankruptcy Rule 7012 for this very reason. *See In re Nortel Networks, Inc.*, 469 B.R. 478, 496–97 (Bankr. D. Del. 2012) (finding "most courts have gone so far as to apply the federal pleading standards to proofs of claim" and applying the Rule 12(b)(6) standard to the amended claims at issue where they were "in the familiar format of a complaint" given they had been amended to include "more definite statements" and included "separate counts and prayers for relief").

43.    *Second*, even were this Court not to exercise its discretion to formally apply Rule 12(b)(6), under established caselaw in this Circuit, federal pleading standards equivalent to the standard under Federal Rule 12(b)(6) for failure to state a claim already apply when assessing the validity of a proof of claim without the specific adoption of Bankruptcy Rule 7012.  *See, e.g., In re Residential Cap., LLC*, 518 B.R. 720, 731 (Bankr. S.D.N.Y. 2014); *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure." (citations omitted)); *Morse v. Rescap Borrower Claims Tr.*, No. 1:14-cv-5800-GHW, 2015 WL 353931, at *4 (S.D.N.Y. Jan. 26, 2015), *aff'd sub nom. In re Residential Cap.*, LLC, 628 F. App'x 63 (2d Cir. 2016) (upholding the bankruptcy court's application of the federal pleading standards to a proof of claim); *In re Roman Cath. Diocese of Rockville Ctr.*, No. 20-12345, 2023 WL 3158940, at *5 (Bankr. S.D.N.Y. May 1, 2023) (holding that applying the 12(b)(6) motion to dismiss standard "is consistent with authorities in this Circuit stating that where a party objects to a claim as facially defective, the analysis of the claim is guided by the familiar standards applicable to a motion to dismiss.") (internal citations and quotations marks omitted); *In re DJK Residential LLC*, 416 B.R. 100, 106 (Bankr. S.D.N.Y. 2009) ("In determining whether a party has met their burden in connection with a proof of claim, bankruptcy courts have looked to the pleading requirements set forth in the Federal Rules of Civil Procedure." (citations omitted)); *In re Alper Holdings USA, Inc.*, 398 B.R. 736, 748 (S.D.N.Y. 2008) (stating the standard for dismissal of a claim pursuant to 11 U.S.C. § 502 is equivalent to dismissing the claim under Rule 12(b)(6) and disallowing claims for failure to meet the federal pleading standard).

44.     Thus, under the established caselaw of this Circuit, to have pleaded valid claims, 3AC must have alleged "enough facts to state a claim for relief that is plausible on its face." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir.2010) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citation and quotation marks omitted). Plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal citation and quotation marks omitted).  The court must accept all factual allegations as true, discounting legal conclusions clothed in factual garb. *See, e.g., id.* at 677-78; *Kiobel v. Royal Dutch Petrol. Co.*, 621 F.3d 111, 124 (2d Cir. 2010) (stating that a court must "assum[e] all well-pleaded, nonconclusory factual allegations in the complaint to be true" (citing *Iqbal*, 556 U.S. at 678)).  The court must then determine if these well-pleaded factual allegations state a "plausible claim for relief." *Iqbal*, 556 U.S. at 679 (citation omitted).  A claim is plausible when the factual allegations permit "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citation omitted).  "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do." *Id.* (internal quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555).

A.     **No Claims Lie Against Holdco.**

45.     Here, the Debtors' cases are not substantively consolidated, and none of 3AC's claims lie against Holdco.  Holdco did not maintain contractual or business relationships with third parties, including 3AC.[8]  Indeed, the fact that 3AC's Amended PoC against Holdco is substantively

---

[8]     For the reasons stated herein, no claims lie against any Genesis entity.  To the extent the Court is inclined to deny this Objection, however, Genesis reserves the right to make further arguments as to whether these claims lie against GAP, GCC, neither or both. *See infra* at ¶ 187.

identical to its Amended PoCs against the other Debtors speaks volumes: 3AC makes no allegations concerning specific transactions with Holdco, and does not cite to or append any agreements or communications with Holdco that governed or evidenced any such relationships— nor could it—because there are none.  It is particularly telling that, even though the Debtors pointed out these blatant deficiencies in their original Objection and produced voluminous documents to the Joint Liquidators before the filing of the Amended PoCs, this did nothing to enable the Joint Liquidators to plead any facts concerning the basis for any claims against Holdco.  Even with a second bite at the apple, the Amended PoCs do not allege any basis for a claim against Holdco, and 3AC's claims against Holdco should be disallowed and expunged.

**B.      3AC Fails To Allege Any Turnover or Conversion Claims.**

46.      The Amended PoCs assert turnover claims under both U.S. and BVI law, as well as conversion claims under New York law, with respect to approximately (i) 13,780.04 BTC, (ii) approximately 17,455 ETH, (iii) the Substituted Collateral, and (iv) approximately 9.2 million GBTC.  Exs. A, B and C at ¶¶ 37, 50.  However, and in contrast with the assets purportedly subject to 3AC's BVI law preference claims, the Amended PoCs do not allege a single fact about the origin or circumstances of the transfers of the assets purportedly subject to their turnover and conversion claims.  The Amended PoCs contain no facts explaining how or why these assets still belong to the 3AC estate such that a turnover or conversion theory can even be a colorable cause of action.  Instead, the Amended PoCs state only that these were among assets that "were purportedly foreclosed upon despite the Debtors lacking a valid and enforceable security interest." Exs. A, B and C at ¶ 27.  Accordingly, the Debtors are left to guess as to which transactions between 3AC and Debtors underlie these assets.[9]  This is not a trifling point.  If the Joint

---

[9]      While Genesis believes that it has been able to identify, even based on the facially deficient Amended PoCs, the transactions that underlie the approximately 17,455 ETH, the Substituted Collateral, and the approximately

Liquidators' theory of why they have a conversion or turnover claim with respect to these assets turns on their assertions that there was not a valid pledge to Genesis by 3AC, the Debtors are left to speculate as to the underlying transactions through which 3AC deliberately chose to post these assets to Genesis, and it is in those transaction documents and communications that the Debtors would be able to identify the relevant agreements containing pledges.  This is particularly the case where the Debtors and 3AC entered into hundreds of individual loan transactions throughout the parties' lending history.  Islim Decl. at ¶ 8.  Without further information regarding these assets and the transactions to which they relate, the Debtors cannot effectively respond to 3AC's claims.  As such, 3AC's turnover and conversion claims should be disallowed and expunged for this reason alone.  *See Vaughn*, 604 F.3d at 709 ("To survive a motion to dismiss, a complaint must set out only enough facts to state a claim for relief that is plausible on its face."); *Iqbal*, 556 U.S. at 679 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.").

47.    Independent of the above, and as detailed further *infra* at ¶¶ 109-113, U.S. law turnover claims can only be brought for assets that are not subject to legitimate dispute.

**C.    3AC's BVI Law Preference Claims Fail Because They Do Not Allege Facts To Show That Any Transfers Were Not In the Ordinary Course.**

48.    Unlike under U.S. law, under BVI law, the burden is on 3AC to plead that a transaction subject to a preference claim did not take place in the ordinary course of business.  *See Declaration of Christopher Parker Pursuant to Fed. R. Bankr. P. 9017 in Support of Debtors' Second Omnibus Objection (Substantive) to Claim Nos. 523, 526, 527, 981, 982 and 990 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)*, attached to the Objection as Exhibit

---

9.2 million GBTC that 3AC claims to be at issue, Genesis has not been able to do the same with respect to the 13,780.04 BTC.  Accordingly, as detailed *infra* at 36, Genesis has been forced to explain why 3AC's turnover and conversion claims fail with respect to all of the BTC that Genesis foreclosed upon following 3AC's default.

G ("Parker Decl.") at ¶ 19.   However, 3AC's attempt to meet its burden amounts to a single

allegation, on information and belief, that the transfers purportedly subject to their preference

claims "were all made subsequent to and in connection with the Debtors' knowledge of 3AC's

distress."  Exs. A, B and C at ¶ 43.  This is plainly insufficient as a matter of law.  Even were

Debtors aware that 3AC was in "distress," this would not equate to an expectation that an

insolvency process was inevitable.  *See* Parker Decl. at ¶ 26.  Moreover, despite knowledge of the

details of the history of the hundreds of loans entered into between 3AC and Genesis, the Claims

tellingly make no allegations whatsoever that any of the challenged transactions are markedly

different from the course of the parties' conduct. Nor does 3AC plead any facts in relation to its

conclusory statement regarding the "Debtors' knowledge of 3AC's distress," despite the fact that

thousands of pages of documents were produced to them before they filed the Amended Claims.

Accordingly, 3AC does not meet its burden to plead BVI law preference claims.

### 3AC's Amended Claims With Respect To Approximately 9.2m GBTC Do Not Relate Back

49.    3AC's claims for turnover and conversion regarding the approximately 9.2 million

GBTC that Genesis foreclosed upon must be dismissed as untimely.  These claims raise post-bar-

date amendments that do not relate back to a timely filed proof of claim.  An amendment to a

timely filed proof of claim will relate back if it: "1) corrects a defect of form in the original claim;

2) describes the original claim with greater particularity; or 3) pleads a new theory of recovery on

the facts set forth in the original claim."  *In re Enron Corp*., 419 F.3d 115, 133 (2d Cir. 2005)

(quoting *In re McLean Indus., Inc.*, 121 B.R. 704, 708 (Bankr. S.D.N.Y. 1990)).  "An amended

complaint will not relate back if it is based on new facts and different transactions."  *In re M.

Fabrikant & Sons, Inc*., 447 B.R. 170, 181 (Bankr. S.D.N.Y. 2011).  "[T]he central inquiry is

whether adequate notice of the matters raised in the amended pleading has been given to the

opposing party within the statute of limitations by the general fact situation alleged in the original

pleading." *See Slayton v. Am. Express Corp.*, 460 F.3d 215, 228 (2d Cir. 2006). "Courts must subject post-bar-date amendments to careful scrutiny to assure that there [is] no attempt to file a new claim under the guise of an amendment." *In re Enron Corp.*, 419 F.3d at 124 (quoting *In re Integrated Res., Inc.*, 157 B.R. 66, 70 (S.D.N.Y. 1993) (internal citations omitted).

50.    3AC's turnover and conversion claims regarding the approximately 9.2 million GBTC that Genesis foreclosed upon are based on entirely new facts that were not pled in the first 3AC PoCs. As discussed above, 3AC's Amended PoCs provide no factual detail as to the transactions surrounding the approximately 9.2 million GBTC, perhaps in an attempt to gloss over the fact that the approximately 9.2 million GBTC on which they now assert turnover and conversion claims bears no relation to and has no overlap with the 13,172,000 GBTC referenced in the original 3AC PoCs.

51.    As detailed further below, the transactions underlying the 9.2 million GBTC raised for the first time in 3AC's Amended PoCs are separate and distinct from *any* transactions that gave rise to the claims in the original 3AC PoCs. The 13,172,000 GBTC that was included as part of the original 3AC PoCs are assets that 3AC transferred to GAP in May 2022 as Additional Collateral in response to a margin call that GAP issued 3AC on May 9, 2022. *See infra* at ¶73(c); Islim Decl. at ¶ 23(c). In contrast, the 9.2 million GBTC that 3AC included for the first time in the Amended PoCs was transferred by 3AC to Genesis pursuant to a combination of the extension of new loans as well as collateral substitutions in 2020 and 2021. *See infra* at ¶ 73(b); Islim Decl. at ¶ 23(b). Any claim regarding the transfer of the approximately 9.2 million GBTC therefore stems from a factual basis entirely distinct from the 13,172,000 GBTC included in the original 3AC PoCs and thus does not relate back. *See In re M. Fabrikant*, 447 B.R. at 181–82 ("In avoidance litigation, each transfer is treated as a separate transaction for purposes of applying the

'relation back' doctrine."). The mere fact that the transfers happen to involve the same type of asset (*i.e.*, GBTC) did not put the Debtors on notice of any claim arising out of *any* GBTC, no matter the origin. *Cf. In re Asia Glob. Crossing, Ltd*., 324 B.R. 503, 508–10 (Bankr. S.D.N.Y. 2005) (finding no relation back where the original claim did "not allege the type of facts" necessary to put the counterparty on notice, in particular where the original claim included a general damage claim, "but did not itemize the damages or attribute a specified amount of damages to a particular allegation" and proving the claim would rely on different evidence).

52.      Accordingly, the Debtors were not on notice of any claim or legal theory arising from these transactions, despite the fact that 3AC had within its possession all of the facts needed to timely raise these claims. *In re Uvino*, 2012 WL 892501, at *4 (Bankr. S.D.N.Y. Mar. 14, 2012) (where a party "knew its purported . . . claims existed but chose to remain silent" a "back-door attempt to escape the Bar Date and must be disallowed."). As the Amended PoCs make clear, the Joint Liquidators have been aware since at least July 26, 2022 that Genesis had foreclosed on the 9.2 million GBTC. *See* Exs. A, B and C at Ex. E (describing Genesis's foreclosure on more than 35 million GBTC, of which the 9.2 million GBTC is a subset). Therefore, 3AC's claim with respect to these assets must be barred. *In re Residential Cap., LLC*, 2015 WL 4654906, at *12 (Bankr. S.D.N.Y. Aug. 5, 2015) (finding no relation back where "the Revised Claim Notice identifies new and/or different loans from those listed in the Initial Claim Notice"). With the knowledge that 3AC intended to assert claims for new transactions in its Amended PoCs, its unprecedented request for a "free amendment," *In re Genesis Global Capital, LLC*, Case No. 23-100063, Aug. 2, 2023 Hr'g. Tr. at 33:15-23; 38:22-39:3, before doing so begins to make more sense.

### 3AC's Amended Claims Lack Any Evidentiary Basis And Fail On The Merits

53.     Apart from the legal insufficiency of the Amended PoCs with respect to the points discussed above, the claims in the Amended PoCs are unsupported by the facts and/or give rise to obvious legal defenses.  To that end, the facts underlying the parties' lending relationship and the origin of the Amended PoC Assets are detailed below.[10]

### Factual Background

**A.      The Lending Relationship Among 3AC, GAP And GGC.**

54.     Beginning in 2019, GGC, GAP (together with GGC, "Genesis") and 3AC entered into various agreements that set out the terms of their lending relationship.  Islim Decl. at ¶ 7.  In January 2019, GGC entered into a Master Loan Agreement and related pledge agreements with 3AC.  *See* Ex. O (Master Loan Agreement between GGC and 3AC dated Jan. 10, 2019).  In January 2020, GAP entered into a Master Loan Agreement and a related pledge agreement with 3AC (together with the 2019 agreements, the "MLAs").  *See* Ex. P (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020).

55.     In July 2020, GGC assigned all of its rights and obligations under the 2019 MLA and related pledge agreements to GAP.  *See* Ex. Q (Assignment and Assumption Agreement dated July 20, 2020).

56.     Pursuant to these agreements, GAP provided loans of USD and digital assets to 3AC.  Islim Decl. at ¶ 8.  At the time of 3AC's default, 3AC had outstanding obligations to GAP in a notional amount of approximately $2,363,105,165.  Islim Decl. at ¶ 8.  In return for the extension of loans, 3AC substantially simultaneously transferred (in the form of pledges and/or

---

[10]      As noted above, the Debtors will notice a Merits Hearing pursuant to paragraph 2(b) of the Claims Procedures Order so that the Court may reach and consider factual matters concerning the transactions between 3AC and certain of the Debtors.

delivery) USD, digital assets, or shares to GAP as collateral.  Islim Decl. at ¶ 8.  Pursuant to these agreements, GAP was entitled to and did rehypothecate or reuse this collateral in the ordinary course of its lending activities, including to extend new loans or to pledge to another counterparty as collateral.  Islim Decl. at ¶ 8.  The parties entered into hundreds of loans during the course of their relationship, and 3AC paid interest on outstanding loans on a monthly basis.  Islim Decl. at ¶ 8.  While only described in cursory terms, if at all, in the Amended PoCs, to the extent the Court requires further factual detail concerning their terms to expunge the Amended PoCs, the terms of the relevant transactions are described below.  *See infra* at ¶¶ 70-74.  3AC was one of Genesis's largest borrowers from 2020 to 2022, up until the time of its collapse.  Islim Decl. at ¶ 8.

## B.    3AC Defaults And Genesis Exercises Remedies.

57.    Under the terms of the MLAs, 3AC was required to post additional collateral if the value of its posted collateral fell below certain agreed-upon thresholds.  Islim Decl. at ¶ 12.  On June 12, 2022, GAP and GGC issued a margin call to 3AC for approximately $189 million, and further updated margin call notices followed.  Ex. U.  After 3AC failed to meet the margin call, Genesis issued a notice of default to 3AC on June 13, 2022, at 6:29 pm.  Ex. V.

58.    As set forth above, at the time of 3AC's default, 3AC owed GAP approximately $2,363,105,165 (in USD and digital assets) under the MLAs and related agreements.  Islim Decl. at ¶ 13.  As collateral for its outstanding loans, 3AC had transferred (in the form of pledges and/or delivery) to GAP the following assets:  (1) 35,585,040 Grayscale Bitcoin Trust Shares ("GBTC"); (2) 33,348.03 Bitcoin ("BTC"); (3) 17,455.73 Ether ("ETH"); (4) 2,739,043.83 AVAX tokens; and (5) 13,583,265 NEAR tokens.  Islim Decl. at ¶ 13.  The facts and circumstances around the posting of this collateral are detailed further below.  *See infra* at 73-74.  As of June 23, 2022, the total value of the GBTC, BTC and ETH collateral was approximately $1,164,807,844.92, and the

total value of the AVAX and NEAR collateral was approximately $93,105,701.40, in each case based on the spot price of the relevant asset at that time.  Islim Decl. at ¶ 13.

59.    By late June 2022, Genesis had exercised remedies against the GBTC, BTC and ETH collateral, which exercise reduced GAP's unsecured deficiency claim against 3AC to approximately $1,198,297,320.  Islim Decl. at ¶ 14.

60.    As to the AVAX and NEAR collateral, Genesis does not have possession or control over such collateral and lacks visibility and definitive information concerning the current status and disposition of such collateral.[11]  Islim Decl. at ¶ 15.

**C.    DCG Assumes GAP's 3AC-Related Liability.**

61.    After 3AC defaulted and Genesis exercised remedies on the pledged collateral, on June 30, 2022, GAP and DCG executed an Assignment & Assumption Agreement pursuant to which GAP assigned DCG, and DCG assumed, all rights and obligations in relation to $1,100,000,000 of intercompany payables owed from GAP to GGC in connection with GGC's provision of working capital to GAP to finance the extension of loans to 3AC.  *See* Ex. R (Assignment and Assumption Agreement between GAP and DCG, dated June 30, 2022).

62.    On July 14, 2022, GAP and DCG executed an Assignment and Assumption of Master Loan Agreement pursuant to which GAP assigned to DCG various interests, including relating to: (1) the Master Loan Agreement between GAP and 3AC dated January 10, 2019 (which had been assigned to GAP by GGC), and the Master Loan Agreement between GAP and 3AC dated January 24, 2020, both as amended, restated, supplemented or otherwise modified and in effect from time to time; (2) the Pledge Agreement between GAP and 3AC dated May 28, 2020,

---

[11]    The Debtors understand that DCG has demanded that the Joint Liquidators return certain of the AVAX tokens that remain.

the Pledge Agreement between GAP and 3AC dated November 16, 2021, and the Pledge

Agreement between GAP and 3AC January 27, 2022, all as amended, restated, amended and

restated, supplemented or otherwise modified and in effect from time to time (the "Pledge

Agreements"); (3) related Collateral under the MLAs and Pledge Agreements; and (4) all of GAP's

outstanding loans with 3AC.[12]  *See* Ex. S  (Assignment and Assumption of Master Loan

Agreement between GAP and DCG dated July 14, 2022).  Pursuant to the same July 14, 2022

Assignment and Assumption Agreement, DCG assumed all obligations in connection with the

foregoing interests.[13]  *See id.*

**D.    Relevant Master Loan Agreement Provisions.**

63.    The MLAs between Genesis and 3AC,[14] which are substantially similar in their

terms, including the terms relevant to this Objection, grant Genesis a security interest in all

collateral transferred from 3AC to Genesis, by providing as follows:

> The Collateral transferred by Borrower to Lender, as adjusted
> herein, shall be security for Borrower's obligations in respect of
> such Loan and for any other obligations of Borrower to Lender
> hereunder. Borrower hereby pledges with, assigns to, and grants
> Lender a continuing first priority security interest in, and a lien upon,
> the Collateral, which shall attach upon the transfer of the Loaned
> Assets by Lender to Borrower and which shall cease upon the return
> of the Loaned Assets by Borrower to Lender.  In addition to the
> rights and remedies given to Lender hereunder, Lender shall have
> all the rights and remedies of a secured party under the UCC.

Ex. P  (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § IV(a)).

---

[12]    The MLAs provide that "Lender may assign this Agreement or any rights or duties hereunder upon notice to
Borrower."  Ex. P (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § XIX)

[13]    While Genesis is not presently seeking to implead DCG, pursuant to these terms, liability for 3AC's claims
(if any) lies with DCG.  The Debtors reserve all rights and claims against DGC in connection therewith.  The Debtors
understand that DCG disputes the Debtors' position that DCG is obligated to indemnify Genesis for any 3AC liabilities
arising out of the Amended PoCs as a result of the July 14, 2022 Assignment and Assumption Agreement.

[14]    Notably, no MLA existed between Holdco and 3AC.

64.     The MLAs define "Collateral" as follows:

> Unless otherwise agreed by the parties, or modified in the Loan
> Term Sheet or as set forth [in the MLA] below, Borrower shall
> provide as collateral an amount of U.S. Dollars or Digital Currency
> (such choice at the sole discretion of the Lender) to be determined
> and agreed upon by the Borrower and Lender ("Collateral") and
> memorialized using the Loan Term Sheet.

Ex. P  (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § IV(a)).

65.     The MLAs provide that Collateral may change over the life of the loans.   For

example, the MLAs contemplate that 3AC could substitute certain assets for existing Collateral.

> Collateral shall always be valued in U.S. Dollars, but Borrower may,
> if mutually agreed by both parties, provide the Collateral (in whole
> or in part) to Lender in Digital Currency in an amount equal to the
> value of the Collateral in U.S. Dollars at a spot rate determined by
> Lender. . . . The Collateral transferred by Borrower to Lender, as
> adjusted herein, shall be security for Borrower's obligations in
> respect of such Loan and for any other obligations of Borrower to
> Lender hereunder.

Ex. P  (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § IV(a))

(emphasis added).

66.     In addition, the MLAs provide that Collateral could change as a result of margin

calls.

> Lender shall have the right to require Borrower to contribute
> additional Collateral so that the Collateral is at least the same
> percentage indicated in Section IV(a) relative to the value of the
> Loaned Assets (the "Additional Collateral").

Ex. P  (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § IV(a)).

67.     The MLAs also provide that 3AC could prepay loans in full or in part:

> For loans in which Borrower has a Prepayment Option (e.g. Open
> Loans, Term Loans with Prepayment Option, etc.), Borrower may
> notify Lender during Business Hours of Borrower's intent to return
> the Loan prior maturity or Lender's exercising of its Call Option
> without being subject to Early Termination Fees as set forth in
> Section III(d).   Borrower shall provide said notice at least two

27

Business Days prior to the date on which the Borrower will repay all or a portion of the Loan Balance (said later date, the "Redelivery Day"). Borrower's exercising of its Prepayment Option shall not relieve it of any of its obligations herein, including without limitation its payment of owed Loan Fees and Late Fees.

In the event of a Prepayment Option where the Borrower repays only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Redelivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date, Recall Delivery Day, or subsequent Redelivery Day.

Ex. P (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § II(c)(iii)).

68.    The MLAs also provide for monthly interest payments from 3AC relating to outstanding loans, which could be payable pursuant to the relevant terms either in USD or in Digital Assets depending on the character of the assets loaned:

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as agreed to herein and annualized in the relevant Loan Term Sheet and subject to change if thereafter agreed by Borrower and Lender. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from and include the date on which the Loaned Digital Currencies are transferred to Borrower to the date on which such Loaned Digital Currencies are repaid in their entirety to Lender. For any Loan, the minimum Loan Fee shall be the Loan Fee that would accrue for one day.

Lender shall calculate any Loan Fees owed on a daily basis and provide Borrower with the calculation upon request. The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies. The Loan Fee is payable monthly by Borrower in arrears.

Ex. P (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § III(a)).[15]

---

[15]    While there are some minor differences between the provisions on interest payments between the two MLAs, they are materially the same for purposes of the arguments herein.

69.     As we will discuss further below, *see infra* at 39–46, while the MLAs reference memorialization in an example form of "Loan Term Sheet" and the parties at times did so memorialize their dealings, the MLAs contemplated that the parties could memorialize loans in other ways as well, and, accordingly, the parties often conducted and memorialized their dealings via Telegram chat.

**E.     The Underlying Transactions.**

70.     3AC transferred the Amended PoC Assets pursuant to the MLAs.  Islim Decl. at ¶ 15.

71.     The Interest Payment was comprised of several payments from 3AC to GAP for interest accrued during the month of May 2022 on outstanding loans, Islim Decl. at ¶ 19:

   a)     On June 2, 2022, 3AC paid GAP approximately 478,767.12 Tether ("USDT"), 4,149.54 Ethereum Classic ("ETC"), and 4,881.44 FTX Token ("FTT") as interest.

   b)     On June 3, 2022, 3AC paid GAP $15,358,034.15 and approximately 1,899,706.52 USDC as interest.

   c)     The approximate USD value of the USDT, ETC, FTT and USDC on the dates they were transferred to GAP, together with the $15,358,034.15, is slightly less than $18 million.

72.     The Principal Payment was a payment made from 3AC to GAP on May 6, 2022 for the purpose of repaying and settling several outstanding open term loans from GAP to 3AC in full or in part, Islim Decl. at ¶ 21:

   a)     The Principal Payment fully repaid and settled a loan for $38,804,954.17 provided by GAP to 3AC on January 11, 2022;

   b)     The Principal Payment fully repaid and settled a loan for $200,000,000 (of which $190,000,000 had previously been repaid) provided by GAP to 3AC on January 11, 2022; and

   c)     The Principal Payment partially repaid 66,195,045.83 USDC of a loan for 225,000,000 USDC provided by GAP to 3AC on January 28, 2022.

73.    The remaining assets at issue, specifically 33,348.03 BTC,[16] 67,455 ETH, 96,200,000 ALGO, 699,000 SOL, 300,000 AVAX, and 22,385,048 GBTC, consist of Collateral that 3AC transferred to GAP in the course of the parties' lending relationship (and that Genesis foreclosed upon following 3AC's default) as a result of the following three types of transfers:

a)    **Contemporaneous exchange of value.**  As detailed below, 23,256.97 BTC was Collateral (as defined under the MLAs) transferred from January 11, 2022 to June 7, 2022 in connection with purchase price loans of USD of equal or greater value (*i.e.,* loans of USD that Genesis made to 3AC for the purpose of allowing 3AC to buy such BTC).  Similarly, 3,296,472 GBTC was Collateral (as defined under the MLAs) transferred from May 28 to May 29, 2020 in connection with loans of BTC and USDT.  Accordingly, this 23,256.97 BTC and 3,296,472 GBTC were transferred in connection with a contemporaneous exchange of value for loans extended by GAP to 3AC.

    i.    Between January 9, 2022 and January 11, 2022, 3AC transferred 8,206.97 BTC to GAP as collateral in connection with three purchase price loans of USD of equal value extended by GAP to 3AC.    These transactions and transfers are memorialized in contemporaneous electronic communications between the parties,[17] and are also memorialized in executed Loan Term Sheets. Islim Decl. at ¶ 23(a); Ex. T (Telegram Agreements).

    ii.    On May 14, 2022, 3AC transferred 3,000 BTC to GAP as collateral in connection with a purchase price loan of USD of equal value extended by GAP to 3AC.  This transaction and transfer is memorialized in contemporaneous electronic communications between the parties and an executed Loan Term Sheet.  Islim Decl. at ¶ 23(a); Ex. T  (Telegram Agreements).

    iii.    On May 17, 2022, 3AC transferred 5,000 BTC to GAP as collateral in connection with a purchase price loan of USD of equal value extended by GAP to 3AC.    This transaction and transfer is

---

[16]    As described *supra* n. 9, due to 3AC's failure to include any factual detail as to the transactions underlying the BTC that 3AC alleges is subject to their turnover and conversion claims, Genesis will explain why 3AC's turnover and conversion claims fail with respect to *all* of the BTC that Genesis foreclosed upon following 3AC's default.

[17]    The main course of dealing between Genesis and 3AC for the lending relationship was via Telegram chat, and all of the transactions discussed herein are memorialized therein, in addition to in other sources.  Islim Decl. at ¶ 17.

memorialized in contemporaneous electronic communications between the parties. Islim Decl. at ¶ 23(a); Ex. T (Telegrams).

iv.   On May 30, 2022, 3AC transferred 3,450 BTC to GAP as collateral in connection with a purchase price loan of USD of equal value extended by GAP to 3AC. This transaction and transfer is memorialized in electronic communications between the parties. Islim Decl. at ¶ 23(a); Ex. T (Telegram Agreements).

v.    Between June 6, 2022 and June 7, 2022, 3AC transferred 3,600 BTC to GAP as collateral for purchase price loans of USD of equal value extended by GAP to 3AC. These transactions and transfers are memorialized in electronic communications between the parties. Islim Decl. at ¶ 23(a); Ex. T (Telegram Agreements).

vi.   On May 28, 2020, 3AC pledged 2,125,794 GBTC pursuant to a Pledge Agreement signed by the parties on May 28, 2020. Islim Decl. at ¶ 23(a). This GBTC was pledged as collateral for a loan of 2,500 BTC on May, 28, 2020. Islim Decl. at ¶ 23(a).

vii.  On May 29, 2020, 1,170,678 GBTC was provided as Collateral for a loan of 10,000,000 USDT. Islim Decl. at ¶ 23(a).

b)  **Collateral substitutions.** 9,131.06 BTC, 17,455.73 ETH and 6,391,199 GBTC were Collateral (as defined in the MLAs) transferred through collateral substitutions requested by 3AC:

i.    Between May 23, 2022 and June 7, 2022, at 3AC's request, 3AC transferred to GAP 9,131.06 BTC to substitute for other Collateral that 3AC had transferred to GAP. These transfers are memorialized in contemporaneous electronic communications between the parties. Islim Decl. at ¶ 23(b); Ex. T (Telegram Agreements). Each transfer involved an exchange of one digital asset for another of equal value. *See* Ex. L (Collateral Substitutions Summary Chart).

ii.   Similarly, on June 12, 2022, at 3AC's request, 3AC transferred to GAP 17,455.73 ETH to substitute for other Collateral that 3AC had transferred to GAP. This transfer is memorialized in contemporaneous electronic communications between the parties. Islim Decl. at ¶ 23(b); Ex. T (Telegram Agreements). This transfer also involved an exchange of one digital asset for another of equal value. *See* Ex. L (Collateral Substitutions Summary Chart).

iii.  As further background, the original Collateral that was substituted through these transfers was comprised of: (1) 71,375 ETH that 3AC transferred to GAP on December 6, 2021 as collateral for a purchase price loan of USD, which was therefore a transfer in connection with a contemporaneous exchange of value for loans extended by GAP

to 3AC; and (2) 96,200,000 ALGO, 699,000 SOL, 300,000 AVAX and 50,000 ETH, all of which 3AC transferred to GAP as Additional Collateral in response to a May 9, 2022 margin call that GAP issued to 3AC. Islim Decl. at ¶ 23(b).[18]

    iv.    Additionally, between September 25, 2020 to January 26, 2021, 3AC transferred to GAP 6,391,199 GBTC to substitute for other Collateral that 3AC had transferred to GAP.[19] These transfers are memorialized in executed loan term sheets and electronic communications between the parties. Islim Decl. at ¶ 23(b).

   c)   **Margin calls.**  960 BTC and 13,172,000 GBTC was transferred as Additional Collateral (as defined in the MLAs), *i.e.*, margin payments, pursuant to margin calls:

    i.    On February 21, 2022 and February 23, 2022, 3AC transferred 610 BTC and 350 BTC, respectively, to GAP as Additional Collateral in response to a margin call that GAP issued 3AC on February 20, 2022. These transfers are memorialized in contemporaneous electronic communications between the parties. Islim Decl. at ¶ 23(c); Ex. T (Telegram Agreements).

    ii.   On May 11, 2022 and May 12, 2022, 3AC transferred 7,720,000 GBTC and 5,400,000 GBTC, respectively, to GAP as Additional Collateral in response to a margin call that GAP issued 3AC on May 9, 2022. These transfers are memorialized in contemporaneous electronic communications between the parties. Islim Decl. at ¶ 23(c); Ex. T (Telegram Agreements).

74.    The AVAX and NEAR tokens also consist of Collateral that 3AC pledged to GAP in the course of the parties' lending relationship.[20] 3AC pledged 2,739,043.83 AVAX tokens and 13,583,265 NEAR tokens to GAP pursuant to a Pledge Agreement between the parties dated

---

[18]    The Amended PoCs may double-count at least some of these assets. That is, the Amended PoC Assets include both the original Collateral that was eventually substituted out (i.e., the 96,200,000 ALGO, 699,000 SOL, 300,000 AVAX and 50,000 ETH), as well as at least some of the Collateral that those assets were substituted for and that the Debtors eventually foreclosed upon.

[19]    This 6,391,199 GBTC, together with the 3,296,472 GBTC that was transferred by 3AC to Debtors in connection with a contemporaneous exchange of value, less 474,623 GBTC that was returned to 3AC on November 21, 2020, constitutes 9,213,048 GBTC, or the "approximately 9.2 million" GBTC subject to the 3AC Amended PoCs. *See* Exs. A, B, and C.

[20]    3AC does not bring claims on this AVAX and NEAR in the Amended PoCs, but reserves rights to bring further claims against DCG with respect to these tokens subject to the commencement of Chapter 11 proceedings. *See* Exs. A, B, and C at ¶ 68.

January 27, 2022.  Islim Decl. at ¶ 24.  These tokens were pledged as Collateral for a loan of 225,000,000 USDC from GAP to 3AC on January 28, 2022.  Islim Decl. at ¶ 24.

**F.      3AC Has Long Been In Possession Of The Documents Underlying Its Claims.**

75.      In addition to the files the Joint Liquidators have been able to review and reconstruct in the more than a year since their appointment, the Debtors have provided to the Joint Liquidators documentation regarding the lending relationship between the Debtors and 3AC, including but not limited to: the various agreements setting out the terms of that lending relationship; the security documents underlying the transfer of the Amended PoC Assets, such as pledge agreements, UCC-1 financing statements, and loan term sheets; documents relating to the Debtors' internal accounting of the Amended PoC Assets; and the written communications between the Debtors and 3AC, such as emails and Telegram communications memorializing the parties' lending activity and collateralization arrangements.  All of these materials and more were provided to the Joint Liquidators in advance of their filing the Amended PoCs:

a)      In a July 26, 2022 email, more than one year before the Amended PoCs were filed, counsel to DCG provided the Joint Liquidators a summary of the assets the Debtors had foreclosed upon and included copies of the agreements setting out the terms of the lending relationship as well as copies of various security documents pertaining to the assets on which Genesis had foreclosed following 3AC's default.  *See* Exs. A, B and C at Ex. E.

b)      On April 27, 2023, the Debtors made a production of approximately 350 pages to the Joint Liquidators, including further highly relevant documents regarding the parties' lending relationship and the assets underlying the Amended PoCs.  *See* Ex. N, *Declaration of Deandra Fike in Support of Debtors' Second Omnibus Objection (Substantive) to Claim Nos. 523, 526, 527, 981, 982 and 990 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)*, ("Fike Decl.") at ¶ [3].

c)      On August 8 and August 9, 2023, the Debtors made additional productions of approximately 6,100 pages to the Joint Liquidators, including further documentation regarding the lending relationship.  *See* Fike Decl. at ¶ [4].

### Argument

**A.    3AC's Purported Turnover and Conversion Claims Lack Any Evidentiary Basis And Fail On The Merits.**

76.    3AC asserts BVI law turnover claims under section 274A of the BVI Insolvency Act, U.S. law turnover claims under section 542 of the Bankruptcy Code, and New York law conversion claims.  These claims are all predicated on Genesis's foreclosure on the following assets: (i) approximately 13,780.04 BTC; (ii) approximately 17,455 ETH; (iii) the Substituted Collateral; and (iv) approximately 9.2 million GBTC.  Additional reasons that each of these claims fail are described further below, but the common basis of all of these claims is that Genesis lacked a valid security interest in the foreclosed upon assets.  This is not the case.

> i.    Genesis Has A Valid And Enforceable Security Interest In All Of The Amended PoC Assets.

77.    3AC transferred all of the Amended PoC Assets pursuant to the MLAs, which specify that they are "governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of law rules."  *See* Ex. P (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § XIII).  Genesis understands that 3AC does not dispute (nor could it) that New York law governs the validity of security interests in the Amended PoC Assets.  This is true not only for claims asserted under U.S. law, but also for purposes of a BVI law analysis.  Parker Decl. at 32.

78.    The New York Uniform Commercial Code ("UCC") applies generally to security interests in personal property, which includes the Amended PoC Assets.  *See* UCC § 9-109(a)(1). A security interest in personal property becomes enforceable against the person creating the security interest under UCC Section 9-203(b) if: "(1) value has been given;[21] (2) the [pledgor]

---

[21]    In this context, a person gives "value" under the UCC for rights that are acquired "in return for a binding commitment to extend credit or for the extension of immediately available credit whether or not drawn upon and

has rights in the collateral or the power to transfer rights in the collateral to a secured party; and

(3) . . . the [pledgor] has authenticated a security agreement that provides a description of the

collateral . . . ."  UCC § 9-203(b).

79.    The first two requirements under UCC Section 9-203(b) are satisfied here, since

there is no dispute that 3AC received value in the form of loan proceeds, and that it had rights in

the Amended PoC Assets as well as the power to transfer the Amended PoC Assets as Collateral

for loans from GAP.[22]  The only remaining question is whether there existed authenticated

security agreements providing a description of the collateral.  The answer is yes.

80.    *First*, Genesis had a valid security interest under New York law in the AVAX

and NEAR tokens, as such assets were pledged pursuant to executed pledge agreements.  *See*

*supra* at ¶ 74.

81.    *Second*, 3AC's pledge of 6,000 BTC to GAP was memorialized in executed Loan

Term Sheets (which, as discussed below, is sufficient to confer a valid security interest).  *See*

*supra* at ¶ 73.

82.    *Third*, Genesis had a valid security interest under New York law in the remainder

of the assets on which Genesis exercised remedies after 3AC's default—specifically,

27,348.03 BTC, 17,455.73 ETH and 13,172,000 GBTC—for at least three independent

reasons:[23]  (1) the MLAs themselves constitute authenticated security agreements and granted

---

whether or not a charge-back is provided for in the event of difficulties in collection[,] . . . as security for or in total or partial satisfaction of a preexisting claim[,] . . . by accepting delivery under a pre-existing contract for purchase [or] in return for any consideration sufficient to support a simple contract."  UCC § 1-204.

[22]    The MLAs also provide that "Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest in said Collateral subject to the terms and conditions hereof."  Ex. P (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § VI(j)).

[23]    There are other ways to create a valid security interest under New York law and other arguments to support that Genesis had such an interest in these assets and the ability to apply such assets to 3AC's obligations, but the arguments detailed herein are dispositive.  However, should the Court be inclined not to grant the Objection, Genesis reserves all rights with respect to these other arguments.

Genesis a valid security interest in all Collateral provided by 3AC to Genesis pursuant to the MLAs (including collateral pledged after entry into the MLA); (2) the parties' written communications memorializing their lending activity and collateralization arrangements constitute "Loan Term Sheets" under the MLAs, and the MLAs make clear that assets described as collateral in Loan Term Sheets constitute Collateral for purposes of the MLAs; and (3) even if the parties' written communications do not follow to the letter the format of the "Loan Term Sheets," those communications memorialize the parties' lending activity and collateralization arrangements and therefore constitute authenticated security agreements under New York law, thereby granting Genesis a valid security interest in all collateral provided by 3AC to Genesis pursuant to those agreements.

83.     Finally, and as discussed further below, to the extent 3AC disputes the validity of the Debtor's security interests based on the form of electronic communication and signature, 3AC is misguided.  The plain terms of the MLA provide the parties flexibility in the form that they memorialize Collateral.  *See infra* at ¶¶ 86-87.  Nor is a "wet ink signature" needed for authentication of security interest as a general matter, *see Bennett v. Bascom*, 788 Fed. Appx. 318, 321 (6th Cir. 2019), or under New York's Electronic Signatures and Records Act ("ERSA"), which provides that contracts memorialized over electronic communications be given the same effect as those "subscribed on paper." *See, e.g.*, *Naldi v. Grunberg*, 908 N.Y.S.2d 639, 646 (1st Dep't 2010).  In any event, to the extent that a signature was required, ESRA addresses this by confirming that an electronic process constitutes a signature.

> a. *The MLAs constitute authenticated security agreements and
> granted Genesis a valid security interest in the assets at issue.*

84.     The MLAs are authenticated security agreements under New York law, which granted Genesis a valid security interest in all Collateral that 3AC transferred to Genesis, including the assets on which Genesis exercised remedies after 3AC's default.

85.     The UCC provides that a "security agreement" is "an agreement that creates or provides for a security interest." UCC § 9-102(a)(74).  It further provides that such an agreement is "authenticated" when it is signed, or when the parties, "with present intent to adopt or accept a record, [] attach to or logically associate with the record an electronic sound, symbol, or process." UCC § 9-102(a)(7).

86.     In the Amended PoCs, 3AC states that the MLAs provided that a security interest in "Collateral" could be granted pursuant to "Loan Term Sheets."  Exs. A, B and C at  ¶ 9.  To the extent this suggests that collateral could *only* be granted pursuant to the example form of Loan Term Sheet attached as an exhibit to the MLAs, this assertion is incorrect and mischaracterizes the clear language in the MLAs.  *See* Ex. P (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § I) (defining Loan Term Sheet to mean "the agreement between Lender and Borrower on the particular terms of an individual Loan, which shall be memorialized in an agreement as set forth in Exhibit B **or in a form approved by Lender comparable therewith**") (emphasis added).

87.     Moreover, the definition of "Collateral" in the MLAs contemplates that the parties *could* memorialize Collateral in Loan Term Sheets, but the MLAs plainly do not *require* the parties to do so.  This is true for several reasons:

> a)     *First,* the definition of Collateral appears before, not after, the memorialization language in the MLAs, meaning that whether assets are "Collateral" does not depend on whether they are memorialized in a Loan Term Sheet.  *See supra* ¶ 69.

37

b)  *Second*, the MLAs contemplate that Collateral would change over the life of the loans without requiring a Loan Term Sheet. *See* Ex. P (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § IV(a)). The definition of Collateral contemplates that the parties could agree to substitute one form of collateral for another at any time without a Loan Term Sheet. Since it is not contemplated in the MLAs that the parties would memorialize such a substitution in a Loan Term Sheet, a Loan Term Sheet is not a requirement for Collateral as a general matter.

c)  *Third,* the MLAs further provide that Genesis had the ability to make margin calls and to require 3AC to pledge "Additional Collateral" to satisfy those calls. *See* Ex. P (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § IV(a)). "Additional Collateral," as defined in the MLAs, does not contemplate memorialization in a Loan Term Sheet. *See* Ex. P (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § IV(c)). To the contrary, the MLAs contemplate that Genesis could require "Additional Collateral" in response to margin calls without creating new Loan Term Sheets. *See id.* Since "Additional Collateral" is defined by reference to "Collateral" and does not reference memorialization in Loan Term Sheets, "Collateral" cannot be reasonably understood to require memorialization in Loan Term Sheets.

d)  *Fourth*, this interpretation is consistent with market practice and the parties' course of dealing. The parties regularly agreed for assets to serve as collateral in connection with new loans, in response to margin calls, or in connection with substitutions of collateral, often without executing the form of Loan Term Sheet attached as exhibits to the MLAs. *See* Islim Decl. at ¶ 23 (description of the transactions).

88.    The MLAs, which were signed by the parties, explicitly granted Genesis a valid security interest in all Collateral transferred from 3AC to Genesis. *See supra* at ¶ 63 (citing Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § IV(a)).[24] The MLAs broadly define "Collateral" to cover "an amount of U.S. Dollars or Digital Currency" transferred

---

[24]    The MLAs also include an additional granting clause, which, among other things, would include assets that secured loans of Digital Currency:

In the event that the purchase price of any replacement Digital Currency pursuant to [Lender's exercise of remedies] exceeds the amount of the Collateral, Borrower shall be liable to Lender for the amount of such excess together with interest thereon in the amount of 10% or as modified in the Term Sheet. As security for Borrower's obligation to pay such excess, Lender shall have, and Borrower hereby grants, a security interest in any property of Borrower then held by or for Lender and a right of setoff with respect to such property and any other amount payable by Lender to Borrower.

Ex. P (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § IX(c)].

by 3AC to Genesis and agreed upon by the parties.  *See supra* at ¶ 64 (Master Loan Agreement

between GAP and 3AC dated Jan. 24, 2020 §IV(a).  Since the assets at issue here are all "Digital

Currency" as defined in the MLAs, they constitute Collateral.  *See* Ex. P (Master Loan

Agreement between GAP and 3AC dated Jan. 24, 2020 § I  ("'Digital Currency' means Bitcoin

(BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), or any digital

currency that the Borrower and Lender agree upon.")).

89.    It is thus unsurprising that the parties routinely referred to these assets being

transferred to GAP as "collateral" or "top up collateral."  Any after-the-fact effort by 3AC to

claim these assets were not validly pledged collateral is at odds with the parties' intent as

expressed in their contemporaneous communications.  *See infra* at ¶ 96 (3AC referring to "1mio

FTT for return & 610 BTC for margin top up via FBN" and later separately referring to a

collateral "top up" of a margin call in BTC); *see also* Ex. T (Telegram Agreements).

90.    Assets that were transferred through each of the three types of transactions

outlined above constitute Collateral under the MLAs:

a)    Collateral transferred in connection with purchase price loans constitutes
       "Collateral" under the MLAs because it was transferred to GAP in
       connection with the parties' agreement that it secure the loan extended by
       Genesis to 3AC substantially simultaneously with the pledge of the
       Collateral.

b)    Collateral transferred pursuant to margin calls constitutes "Additional
       Collateral" under the MLAs, which provide that Collateral could change as
       a result of margin calls.

c)    Collateral transferred through collateral substitutions also constitutes
       "Collateral" under the MLAs, since the definition of "Collateral"
       contemplates that Collateral may be "as adjusted herein" (*see supra* at ¶ 65),
       including that the parties could agree to substitute one form of collateral for
       another at any time.[25]

---

[25]    Substitution of collateral is a widespread market practice.  *See, e.g.*, https://www.sifma.org/wp-
content/uploads/2017/06/MSLA_Master-Securities-Loan-Agreement-2017-Version.pdf  (SIFMA  form  MSLA

91.     The record is therefore clear that the remainder of the assets on which Genesis exercised remedies after 3AC defaulted fall within the broad definition of "Collateral" (and in some cases "Additional Collateral") under the MLAs and that Genesis therefore had a valid security interest in these assets.

92.     Moreover, there is no logical explanation for why these assets were provided by 3AC to Genesis other than that they were to serve as collateral securing the loans to 3AC.  The only contractual relationship that Genesis and 3AC had was a lending relationship whereby 3AC would transfer collateral to Genesis in exchange for the extension of loans, as well as ancillary collateral management services.  *See* Islim Decl. at ¶ 9.  3AC did not have any custodial, gifting or other type of relationship with Genesis that would explain why Genesis was in possession of these assets.  Islim Decl. at ¶ 10.  Nor do the Amended PoCs assert any such relationship that would explain 3AC's transfer of these assets to Genesis as anything other than collateral.  Moreover, the parties' communications demonstrate that the parties' sole intent was that these assets were transferred as Collateral by 3AC to Genesis pursuant to the lending relationship.  *See infra* at ¶ 73.

> b.  *The parties' written communications constitute "Loan Term Sheets" under the MLAs.*

93.     Even if a Loan Term Sheet were required under the MLAs, the parties' written communications constitute "Loan Term Sheets" as defined in the MLAs.

94.     The MLAs define Loan Term Sheet to mean "the agreement between Lender and Borrower on the particular terms of an individual Loan, which shall be memorialized in an agreement as set forth in Exhibit B **or in a form approved by Lender comparable therewith**."

---

Section 4.5, providing for substitution of collateral).  Collateral substitutions are also common in the market for loans collateralized with digital currency assets.  Islim Decl. at ¶ 23(b).

*See* Ex. P (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § I) (emphasis added).

95.     3AC and GAP routinely memorialized their lending activity and collateralization arrangements in written communications that contained the relevant terms, rather than in the precise format found in the example form of Loan Term Sheet attached as exhibits to the MLAs. *See supra* at ¶ 73.  The written communications between the parties contain the same substantive information included in the example form of Loan Term Sheet attached to the MLAs, including the names of the lender (Genesis) and borrower (3AC), borrowed asset type, amount of borrowed asset, borrow fee, and collateral.  *See generally* Ex. T (Telegram Agreements).  The written communications are therefore agreements "comparable" in form to the example form of Loan Term Sheet and constitute Loan Term Sheets under the MLAs.  *See Am. Smelting & Ref. Co. v. U.S.*, 259 U.S. 75, 78 (1922) ("Of course the expressed contemplation of a more formal document did not prevent the letters from having the effect that otherwise they would have had."); *Smith v. Onyx Oil & Chem. Co.*, 218 F.2d 104, 108 (3d Cir. 1955) ("'The courts are quite agreed upon general principles.  The parties have power to contract as they please. They can bind themselves orally or by informal letters or telegrams if they like. . . . The matter is merely one of expressed intention.  If their expressions convince the court that they intended to be bound without a formal document, their contract is consummated, and the expected formal document will be nothing more than a memorial of that contract.'" (citing Corbin on Contracts, § 30 (1950))).

96.     Examples of these written communications are illustrative (emphasis added), *see* Ex. T (Telegrams):

    a)    For Collateral transferred in connection with purchase price loans:  On January 11, 2022, Ningxin Zhang (3AC) messaged the Genesis team, "could u pls do **another $200mio btcusd buy** twap [time-weighted average price] over 72 hours?"  A Genesis employee responded, "**Confirming this**

will be adding to loan balance as well at same terms as yesterday?" Zhang responded, "**Yes confirmed.**" After execution, Zhang messaged "**ok, will book to loan/collateral**." This demonstrates an explicit agreement between the parties that the BTC that was purchased in connection with this loan would be transferred to Genesis as Collateral for that same loan extended by Genesis to 3AC substantially simultaneously with the pledge of the Collateral.

    b)    For collateral substitutions: On May 26, 2022, Ningxin Zhang (3AC) messaged the Genesis team, "**hi team, just checking if we can swap out some ETH collateral with BTC?**" Zhang then requested to substitute "**20k ETH**" for "**1200 BTC back.**" This demonstrates a substitution of collateral in the form of one digital asset for another of equal value. *See* Ex. L (Collateral Substitutions Summary Chart).

    c)    For Collateral transferred pursuant to margin calls: On February 20, 2022, Ningxin Zhang (3AC) messaged the Genesis team, "hi team, sent you 1mio FTT for return & **610 BTC for margin top up via FBN [Fireblocks Network] . . . more will follow to cover the margin call** . . . most probably in BTC or GBTC, will let you know." On February 23, 2022, Zhang messaged a Genesis employee, "**happy to top up the rest in BTC, does 350 BTC work?**" A Genesis employee responded, "**that works.**"

97.    The remaining transactions are memorialized in similar types of communications. Such written communications constitute Loan Term Sheets pursuant to the MLAs, thereby evidencing Genesis's valid security interest in all Collateral provided by 3AC to GAP, including in the remainder of the assets on which Genesis exercised remedies following 3AC's default.

    *c.   The parties' written communications constitute authenticated security agreements that granted Genesis a valid security interest in the assets.*

98.    Finally, and independent of the arguments detailed above, the parties' written communications constitute authenticated security agreements under New York law, granting Genesis a valid security interest in the remainder of the assets on which Genesis exercised remedies following 3AC's default.[26]

---

[26]    *See* N.Y. UCC § 9-102(74) (defining "security agreement" as "an agreement that creates or provides for a security interest.").

99.    Under New York law, agreements are interpreted in accordance with standard contract principles, specifically, in accordance with the manifestation of the parties' intent. *See Deutsche Bank Tr. Co. v. Am. Gen. Life Ins. Co.*, 2016 WL 5719783, at *8 (S.D.N.Y. Sept. 30, 2016). Here, the types of written communications described above are written agreements that identify the parties to the transaction, the specified collateral and the parties' intent to use that collateral to secure obligations under the loans.

a)    With respect to collateral for purchase price loans, the types of written communications discussed above indicate the parties' intent for 3AC to borrow assets (in these cases, USD), use those assets to purchase another asset and transfer the purchased asset to Genesis as collateral for the loan.

b)    With respect to collateral transferred pursuant to margin calls, the communications discussed above make clear that 3AC specifically identified when it was sending assets to satisfy margin calls and thereby for such assets to constitute collateral for 3AC's obligations.

c)    With respect to collateral substitutions, consistent with the parties' ordinary course of dealing, the context and the specific references to 3AC's collateral throughout the communications evidence the parties' intent that 3AC was to transfer the BTC and ETH to Genesis to continue to secure 3AC's obligations under the preexisting loans.

100.    The parties' written communications, *see supra* at ¶ 96, constitute "authenticated security agreements" under the UCC. An authenticated security agreement under the UCC need not be reduced to a tangible written form; Article 9 only requires a "record" of a security agreement, which is defined as both paper documents and information "stored in an electronic or other medium" that is "retrievable in perceivable form." *See* UCC § 9-102(a)(70). And, as noted above, authentication does not require a written signature, and is satisfied when the parties, "with present intent to adopt or accept a record, [] attach to or logically associate with the record an electronic sound, symbol, or process." UCC § 9-102(a)(7). The parties' written communications, which included unique usernames specifically attributable to individual employees of the parties, satisfy this standard.

101.    As discussed above, electronic signatures are sufficient to "authenticate" a security interest under the UCC. *See Bennett v. Bascom*, 788 Fed. Appx. 318, 321 (6th Cir. 2019) (holding that a record was authenticated under a state UCC with a provision identical to NY UCC § 9-102(a)(7) where the sender "typed his name at the end of the email and pressed the 'send' button," thereby showing "he intended to presently authenticate and adopt the content of the email as his own writing.").

102.    Electronic signatures carry the same weight as "wet-ink" signatures for purposes of creating binding contracts under New York law. *See* N.Y. State Tech. Law § 304 (McKinney) (providing that "unless specifically provided otherwise by law, an electronic signature may be used by a person in lieu of a signature affixed by hand. The use of an electronic signature shall have the same validity and effect as the use of a signature affixed by hand."); *see also* N.Y. Gen. Oblig. Law § 5-701 (McKinney) (for purposes of the statute of frauds, "the tangible written text produced by telex, telefacsimile, computer retrieval or other process by which electronic signals are transmitted by telephone or otherwise shall constitute a writing and any symbol executed or adopted by a party with the present intention to authenticate a writing shall constitute a signing.")

103.    Numerous courts have held that an email can constitute an electronically memorialized and subscribed contract under New York Law, and other electronic communications are substantively no different. *See, e.g.*, *Naldi v. Grunberg*, 908 N.Y.S.2d 639, 646 (2010) (holding that under New York's Electronic Signatures and Records Act, "an electronically memorialized and subscribed contract [shall] be given the same effect as a contract memorialized and subscribed on paper."); *Solartech Renewables, LLC v. Vitti*, 156 A.D.3d 995 (3d Dep't 2017); *Newmark & Co. Real Est. Inc. v. 2615 E. 17 St. Realty LLC*, 80 A.D.3d 476,

477 (1st Dep't 2011) ("An e-mail sent by a party, under which the party's name is typed, can constitute a writing for purposes of the statute of frauds.").

104.    Finally, the written communications include a sufficient description of the collateral for purposes of the UCC.  UCC Article 9 provides that a "description of personal or real property is sufficient, whether or not it is specific, if it reasonably identifies what is described."  UCC § 9-108(a).  As discussed above, the written communications between the parties describe both the category and quantity of collateral that is being transferred by 3AC to Genesis, *supra* at ¶ 96, which are examples of reasonable identification under UCC § 9-108(b).  Moreover, the parties' written communications repeatedly make clear that these assets are collateral, which is the only plausible reason 3AC would have provided Genesis with these assets. *Supra* at ¶ 92.

105.    Accordingly, Genesis had a valid and enforceable security interest in all of the Amended PoC Assets. *See Bennett*, 788 Fed. Appx. at 321.  Because 3AC cannot bring claims pursuant to Sections 544 and 547 of the Bankruptcy Code, perfection of the Amended PoC Assets is not at issue, and the only relevant question is whether Genesis had a valid security interest in the Amended PoC Assets.

ii.    3AC's BVI Turnover Claims Fail On The Merits.

106.    3AC states that BVI law turnover claims involve situations "[w]here any person has in his or her possession or control any assets or documents to which the company appears to be entitled."  Exs. A, B and C at ¶ 34.  In such a case, according to 3AC, "the Court may . . . require that person . . . to pay, deliver, convey, surrender or transfer the assets or documents o the office holders." *Id.*

107.    3AC makes no effort to allege facts that would explain how Genesis improperly came to be in possession of the foreclosed upon assets, let alone the nature of 3AC's supposed

possessory right or interest in such assets.  Nor do the Amended PoCs allege any actions the

Debtors took in derogation of 3AC's rights with respect to such assets.  According to the

Amended PoCs, the sole basis for the BVI law turnover claims is that "the Debtors did not have

a valid and enforceable security interest on the Unpledged Seized Assets."  Exs. A, B and C at ¶

35; *see also* Parker Decl. at ¶ 30 (BVI law turnover claims are "dependent on 3AC establishing

that the Debtors did not have a valid and enforceable security interest in the assets").  But, as

described above, this claim fails because, under the relevant agreements governing the lending

arrangements between the parties, Genesis had a valid and enforceable security interest in the

disputed assets.  *See* Parker Decl. at ¶ 34.

108.    Independent of this, much as New York courts have held with respect to U.S. law

turnover claims (as described below), a BVI law turnover claim is likely not an appropriate vehicle

for claims involving the types of disputed legal issues involved here.  *See* Parker Decl. at ¶ 37.

    iii. <u>3AC's US Law Turnover Claims and New York Law Conversion Claims
       Fail On The Merits.</u>

109.    Turnover proceedings under 11 U.S.C. § 542 fall within a bankruptcy court's core

jurisdiction under § 157(b)(2)(e) "only when there is no legitimate dispute over what is owed to

the debtor."  *In re CIS Corp.*, 172 B.R. 748, 759–60 (S.D.N.Y. 1994).  Such an action is core

only "when its purpose is the collection rather than the creation, recognition or liquidation of a

matured debt.  Numerous courts have therefore held that an action is non-core when property

which is the subject of a significant dispute between the parties is sought to be recovered through

a turnover action."  *In re Fairfield Sentry Ltd. Litig.*, 458 B.R. 665, 683 (S.D.N.Y. 2011) (quoting

*In re CIS Corp.*, 172 B.R. at 759).  The court must look beyond the party's label or

characterization as "turnover" claims to consider "whether in substance they constitute turnover

actions."  *In re CIS Corp.*, 172 B.R. at 759.  Here, a turnover action is an improper vehicle since

it is abundantly clear that there exists "a legitimate dispute over ownership of the property." *Id.* at 760. Ownership and entitlement to collection of the assets subject to 3AC's U.S. law turnover claims are clearly disputed, making "reliance on section 542 . . . facially problematic." *In re Cardali*, No. 10-11185 (SHL) 2010 WL 4791801, at *11 (Bankr. S.D.N.Y. Nov. 18, 2010).

110. The U.S. law turnover claims independently fail because, as described above, Genesis had a valid and enforceable security interest in the collateral on which it exercised remedies after 3AC's default.

111. As to 3AC's conversion claims, under New York law, a conversion occurs where "someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49–50, (1st Dep't 2006). Courts typically consider two "key elements" of conversion: "(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights." *Komolov v. Segal*, 144 A.D.3d 487, 488 (1st Dep't 2016).

112. These conversion claims fail as well. The Amended PoCs assert (without any supporting factual allegations) that "the Debtors do not have a valid and enforceable security interest on the Unpledged Seized Assets" and that 3AC had a "legal right to own such assets." Exs. A, B and C at ¶ 48. But the facts described above make clear that, under the relevant agreements governing the lending arrangements between the parties, (i) Genesis had a valid and enforceable security interest in all of the Amended PoC Assets under New York law, (ii) 3AC had transferred these assets to GAP pursuant to the MLAs, and (iii) Genesis had no obligation to return this collateral to 3AC in the event of a default. *See Broadway Warehouse Co. v. Buffalo Barn Bd., LLC*, 39 N.Y.S.3d 555, 559 (4th Dep't 2016) (finding that "'plaintiff's rights would be superior to

47

those of a buyer . . . who purchased [the secured assets] with actual knowledge of plaintiff's security interest'") (*citing Reisdorf Bros. v. Clinton Corn Processing Co.*, 130 A.D.2d 951, 951 (4th Dep't 1987)).

113.    Moreover, and independent of the above, 3AC cannot bring a conversion claim under New York law in respect of the Amended PoC Assets because these claims arise out of the MLAs.  *See Bocre Leasing Corp. v. Gen. Motors Corp.*, 84 N.Y.2d 685, 687 (1995) ("Plaintiff thus has no cause of action in tort . . . for contractually based economic losses . . ."); *Prospect Funding Holdings, LLC v. Paiz*, 183 A.D.3d 486, 124 N.Y.S.3d 685 (1st Dep't 2020) (finding attorneys and law firm were not liable for conversion against holdings company where claim was predicated on breach of purchase agreement and alleged no independent facts sufficient to give rise to tort liability); *Caring Pro., Inc. v. Catholic Health Care Sys. d/b/a Archcare*, No. 656248/2016, 2017 WL 5725516, at *8 (N.Y. Sup. Ct. Nov. 22, 2017) ("[a] cause of action for conversion cannot be predicated on a mere breach of contract and the conversion claim here relies upon no facts other than those underlying the contract claim." (internal quotations omitted)).

### B.    3AC's Purported Preference Claims Under BVI Law Lack Any Evidentiary Basis And Fail On The Merits.

114.    3AC brings preference claims under BVI law with respect to the following assets: (i) the Interest Payment; (ii) the Principal Payment; (iii) 13,172,000 GBTC; and (iv) the Substituted Collateral.  Exs. A, B and C at ¶¶ 38–45.  3AC fails to show that the transfers of these assets were not made in the ordinary course of business, and does not adequately allege that it was insolvent at the time of the challenged transfers.[27]  Accordingly, the preference claims under BVI law should

---

[27]    As the Joint Liquidators have not produced a single document to the Debtors, particularly on matters such as solvency that should be uniquely in their possession and control, the Debtors intend to supplement their submissions following discovery with respect to the Joint Liquidators' burden to show that 3AC was insolvent at the time of each allegedly preferential transfer.

be disallowed, before even reaching the bar to bringing these claims that Section 546(e) imposes as a matter of law.

115.   "Unfair preference" claims under BVI law are governed by s245 of the BVI Insolvency Act 2003.  Parker Decl. at ¶ 12.  In order to plead and prove an unfair preference under BVI law, 3AC must show that the transaction (1) is an "insolvency transaction,"[28] (2) is entered into "within the vulnerability period,"[29] and (3) "has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into."  Parker Decl. at ¶ 12.  BVI law further provides that a transaction is not an unfair preference if it took place in the ordinary course of business.  Parker Decl. at ¶ 16.

116.   Under BVI law, absent a showing that Genesis is a "connected person" under BVI law with respect to 3AC, the burden is on 3AC to plead and show both that the transaction was an insolvency transaction and that the transaction did not take place in the ordinary course of business.  Parker Decl. at ¶ 20.  The Amended PoCs do not allege that Genesis was a "connected person," nor could they.  *See* Parker Decl. at ¶ 19 (detailing definition of a "connected person").  Accordingly, unlike under U.S. law, under BVI preference law it is 3AC's burden to plead and show facts to support the position that any given transaction (1) is an insolvency transaction, and (2) did not take place in the ordinary course of business.  *See* Parker Decl. at ¶ 20.  The Joint Liquidators' attempt to characterize the ordinary course defense as an "affirmative defense" is

---

[28]   "A transaction is an insolvency transaction if (a) it is entered into at a time when the company is insolvent; or (b) it causes the company to become insolvent."  Parker Decl. at ¶ 13.

[29]   The vulnerability period "means, (a) (i) in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing 2 years prior to the onset of insolvency and ending on the appointment of … the liquidator; and (ii) in the case of a transaction entered into with, or a preference to, any other person, the period commencing six months to the onset of insolvency and ending on the appointment of the liquidator."  Parker Decl. at ¶ 14.

more than a bit of a misnomer, as it is black letter law that the burden of pleading and proving insolvency and non-ordinary course status rests at all times here with 3AC.  *See* Parker Decl. at ¶ 20.  Any preference claims under BVI law with respect to the Interest Payment, the Principal Payment, the 13,172,000 GBTC, and the Substituted Collateral fail for several reasons.

117.    *First*, the transfers in connection with collateral substitutions do not independently constitute preferences under BVI law, because each one involved an exchange of one digital asset for another of equal value.  Parker Decl. at ¶ 28; *See* Ex. L (Collateral Substitutions Summary Chart).  Moreover, because the value of the collateral substituted in each case was exactly the same, the collateral substitutions cannot be preferences because Genesis remained in the exact same position as a creditor of 3AC in a hypothetical liquidation that it would have been absent the collateral substitutions.

118.    *Second*, all of the relevant assets were transferred to Debtors in the ordinary course. While there is limited caselaw under BVI law on the meaning of "ordinary course," the purpose of the doctrine is to "enable a company to continue to make payments to ordinary trade creditors so that they can continue to trade as a going concern."  Parker Decl. at ¶ 21.  A BVI court would also look to relevant caselaw in other Commonwealth jurisdictions that have examined the ordinary course defense.  Parker Decl. at ¶ 22.  The High Court of Australia has made reference to the statement that "[g]enuine payments made by the company to reduce a general debit as it stands from day to day and in order to maintain a genuine business relationship that promises advantages to both the company and its creditor are not preferences."  Parker Decl. at ¶ 25.  UK law holds that good faith on the part of the creditor should be considered.  *See* Parker Decl. at ¶ 24 ("Where the creditor receives a payment in good faith, it will almost invariably be the case that the company makes the payment as a normal part of its business or to protect its own interests [], not to favour

the creditor to whom payment is made."). GAP received the transfers (in the form of pledges and/or delivery) of <u>all</u> of the relevant assets in good faith and in connection with the parties' ongoing lending relationship. Accordingly, all of the transactions underlying the Interest Payment, the Principal Payment, the 13,172,000 GBTC, and the Substituted Collateral were ordinary course transactions, and 3AC has not met its burden to plead or prove otherwise.

119.    As to the Interest Payment, GAP typically sent interest invoices to 3AC on a monthly basis. Kamlani Decl. at ¶¶ 21–22; Islim Decl. at ¶ 8. Interest was calculated on the amount of loans outstanding, and 3AC customarily paid interest in a mix of currencies at some point during the first week of every month. Kamlani Decl. at ¶¶ 21–22. The Interest Payment was no different. GAP sent an interest invoice to 3AC on May 31, 2022, calculated on the basis of 3AC's outstanding loans as of that date. Kamlani Decl. at ¶¶ 21–22. 3AC sent GAP the Interest Payment during the first week of June 2022 in response to this invoice, and it was comprised of assets that were typical of previous interest payments. *Id.* Genesis received the Interest Payment in good faith, and nothing in the relevant communications between the parties indicates anything to the contrary.

120.    As to the Principal Payment, 3AC repaid open term loans provided by Genesis on a regular basis over the course of the parties' lending relationship, either of its own accord or to raise collateral levels. Kamlani Decl. at ¶¶ 19–20; Islim Decl. at ¶ 21. The Principal Payment was an example of the latter, and was not different in kind from previous loan repayments used to raise collateral levels (as Genesis calculated collateral requirements for 3AC on a portfolio-wide basis, rather than on the basis of individual loans). Kamlani Decl. at ¶¶ 19-20; Islim Decl. at ¶ 21. Genesis received the Principal Payment in good faith, and nothing in the relevant communications between the parties indicates anything to the contrary. As to the 13,172,000 GBTC and Substituted

Collateral, these were transferred pursuant to a routine margin call on May 9, 2022, in the same manner as with several other prior margin calls between the parties. Kamlani Decl. at ¶¶ 19-20; Islim Decl. at ¶23.

121.    Moreover, the structure of the lending relationship between 3AC and GAP, including its documentation, is consistent with typical secured lending arrangements in both the digital and traditional asset markets. Campbell Decl. at ¶¶ 11-15. Indeed, beyond the use of MLAs, messaging platforms, like Telegram and similar applications, are used in the ordinary course by participants in the secured digital asset lending market to memorialize individualized lending terms. Campbell Decl. at ¶¶ 15-16. The ordinary commercial understanding of secured loans is that, in return for borrowing funds or assets, a borrower will post collateral and pay interest on the terms agreed to between the counterparties, with the borrower required to keep its loans current in response to market moves that impact the value of the posted collateral. Campbell Decl. at ¶ 14. Where a general perception of risk increases due to falling prices and increased volatility (leading to greater credit exposure), tightened lending terms, management of leverage, and adjustment or substitution of collateral are foundational to the effective functioning of secured lending markets. Campbell Decl. at ¶¶ 18-20. The terms of the Agreements and the transfers by 3AC to Genesis, *see infra* ¶ 114, are consistent with the ordinary course behaviors of secured lenders and borrowers in the industry, including during a period of market volatility. Campbell Decl. at ¶¶ 11.

122.    3AC's threadbare allegations that these transactions were not ordinary course because the "Debtors' had knowledge of 3AC's distress" and for "other reasons," Exs. A, B and C at ¶ 43, are not only conclusory and unsupported by any facts in the Amended PoCs; more importantly, they are unsupported by the factual record. While there was general market distress

during the relevant time period due to the collapse of the stablecoins Terra LUNA and Terra USD, and a number of the Debtors' lending counterparties were impacted, there is nothing in the factual record supporting 3AC's contention that Debtors had specific knowledge of 3AC's distress.  In fact, the factual record shows the opposite: when confronted with a margin call of approximately $170 million on May 9, 2022 3AC promptly met the margin call.  The Debtors' internal communications regarding 3AC and communications with 3AC also show they were not aware of 3AC's distress, and indeed, believed 3AC to be solvent.  3AC, in contrast, is, according to public reports, currently being investigated by U.S. regulators for fraud, specifically for *misleading investors about the strength of its balance sheet*.[30]

123.    *Third*, 3AC has not adequately pled that it was insolvent at the time of the relevant transactions.  The stablecoins Terra LUNA and Terra USD collapsed in mid-May 2022, leading to the commencement of the BVI Proceedings.[31]  Any transaction that predated this collapse, including at least the Principal Payment (transferred on May 6, 2022), the 13,172,000 GBTC (transferred on May 11-12, 2022), and the Substituted Collateral (transferred on May 12-13, 2022), was likely not an insolvency transaction.  *See* Ex. M (Defenses to Conversion and Preference Claims by Category of Amended 3AC PoC Assets).[32]

---

[30]    *See* Allyson Versprille, Lydia Beyoud and Olga Kharif, "US Investigating Bankrupt Crypto Hedge Fund Three Arrows Capital" (Oct. 17, 2022), https://www.bloomberg.com/news/articles/2022-10-17/us-investigating-bankrupt-crypto-hedge-fund-three-arrows-capital?in_source=embedded-checkout-banner.

[31]    *See* Jiageng Liu, Igor Makarov & Antoinette Schoar, Anatomy of a Run: The Terra Luna Crash 5 (Nat'l Bureau of Econ. Rsch., Working Paper No. 31160, 2023) ("In the period from May 7 to May 13, users swapped UST worth $4.65 billion. As users swapped UST for LUNA, the price of LUNA precipitously fell leading to increasing dilution which further depressed the price of LUNA, and led to a dramatic 'death spiral.'"); Scott Chipolina & Katie Martin, The week that shook crypto, Financial Times (May 13, 2022), https://www.ft.com/content/3e0a65bb-a953-433a-819e-ff29de847336 ("But this week, luna lost it all. Its value slid to zero after terraUSD, a sister token, collapsed in value, despite being designed to track the value of the US dollar.").

[32]    To the extent the Court is unwilling or unable to dismiss the portion of the claims concerning transfers that took place when 3AC was arguably solvent, the Debtors reserve all rights to file supplemental objections addressing this portion of the claims.

124.    3AC argues that it was insolvent as of May 5, 2022 because it was purportedly in default of certain of its master loan agreements under which 3AC was a borrower as of this date due to "the deterioration of market conditions leading up to May 5, 2022 constitut[ing] a material adverse effect." *See* Exs. A, B, and C at ¶ 40.  3AC further alleges that these events of default "either automatically accelerated the loans thereunder or rendered them immediately callable." *Id.* According to 3AC, "the total amount of loans under these master loan agreements" exceeded the value of 3AC's liquid assets on May 5, 2022.  *Id.*[33]

125.    Notably, however, 3AC does not allege that any of its lenders actually declared an event of default or accelerated loans as of this date.  And, to the extent that 3AC was defrauding its counterparties with respect to its financial situation, it seems unlikely that any lenders would have done so.  Indeed, similar to the Debtors, certain other of 3AC's largest lending counterparties apparently did not declare events of default under their relevant master lending agreements until June 2022.  *See In re Voyager Digit. Holdings, Inc.*, No. 22-10943, ECF No. 863 at 61 (Bankr. S.D.N.Y. Jan. 13, 2023) ("[O]n June 24, 2022, Voyager issued a notice of default and acceleration to 3AC."); *In re: BlockFi Inc.*, No. 22-19361, ECF No. 1375 at ¶ 16 (Bankr. D.N.J. Aug, 21, 2023) ("Three Arrows defaulted on the Loans in June 2022 and BlockFi properly accelerated the Loans and foreclosed on the Collateral with notice to 3AC.").  In addition, with respect to the Debtors, 3AC continued to request extensions of new loans and continued to meet all of its obligations under the MLAs until June 13, 2022.[34]  This course of dealing, as well as 3AC's affirmative

---

[33]    3AC also argues that "because a substantial portion of the loan agreements to which 3AC was party were 'open' loan agreements that may be called at any time, 3AC was in effect insolvent at any point where its liquid assets could not suffice to satisfy its liabilities on such loans, irrespective of the occurrence of an event of default." *See* Exs. A, B, and C at ¶ 40.  But this would mean that any leveraged entity using open term loans would be operating in a constant state of insolvency.

[34]    All indications are that 3AC continued actively borrowing throughout May and June 2022.  3AC claims that, as of May 5, 2022, it had approximately $2.6 billion in loans outstanding.  Exs. A, B and C at ¶ 48.  But, as of 3AC's default on June 13, Debtors alone had more than $2.3 billion of loans outstanding to 3AC, and public sources indicate that Voyager had nearly $700 million of loans outstanding to 3AC at the time that Voyager defaulted 3AC in late

representations to the Debtors, led the Debtors to believe that 3AC was entirely able, for example, to make transfers to meet the May 9, 2022 margin call. *See, e.g.*, Ex. AA (May 12 communication involving Genesis and DCG where Genesis employee states, in the context of the ongoing Terra LUNA and Terra USD collapse, that "3 arrows just met a 200mm margin call to us as well, and I've spoken with them. **They are not insolvent.** Probably took a fat loss though") (emphasis added).

126. The Debtors have not received *any* discovery from 3AC in response to the requests they served on 3AC shortly after filing their July 19, 2023 Objection, much less discovery on solvency.[35] Accordingly, the Debtors reserve the right and intend to supplement this Objection with expert testimony concerning 3AC's insolvency following discovery.

127. Separately, 3AC does not allege insolvency with respect to each transfer. *See SIPC v. Madoff*, 594 B. R. 167, 190 (Bankr. S.D.N.Y. 2018) (finding with respect to preference claims that "[e]ach transfer is a separate claim"). This is a particularly glaring issue in light of 3AC's farfetched insolvency analysis—even were it legally sufficient. Because the underlying transfers were on multiple days, it seems entirely possible that 3AC could have been insolvent at the time of one transaction but then solvent at the time of a subsequent transaction. 3AC assiduously avoids stating the date on which it became insolvent.

128. Accordingly, 3AC does not meet its burden to adequately plead much less put forth the facts to prove that it was insolvent with respect to any of the transactions purportedly subject

---

June. *See, e.g.*, Caitlin Ostroff, *Crypto Hedge Fund Three Arrows Defaulted on Loan, Says Broker Voyager Digital*, Wall Street Journal (June 27, 2022) https://www.wsj.com/articles/crypto-hedge-fund-three-arrows-defaulted-on-loan-says-broker-voyager-digital-11656336534

[35] On August 31, 2023, more than a month after the Debtors served discovery requests on 3AC, 3AC's counsel indicated they would be making a production next week that consisted of 28 pages of documents.

to its preference claims, and especially with respect to the Loan Payment, the 13,172,000 GBTC, and the Substituted Collateral.[36]

## C.    3AC's Contingent Chapter 11 Claims Should be Disallowed.

129.    The Joint Liquidators currently have no ability to bring strong-arm claims under Section 544 of the Bankruptcy Code or preference claims under section 547 of the Bankruptcy Code.  The Joint Liquidators, who are the appointed liquidators for 3AC, a foreign debtor, sought and received recognition under chapter 15 of the Bankruptcy Code.  *Order Granting Recognition of Foreign Main Proceeding and Related Relief, In re Three Arrows Capital, Ltd*, No. 22-10920, ECF No. 47.  Accordingly, pursuant to section 1521(a)(7) of the Bankruptcy Code, the Joint Liquidators are affirmatively barred by the plain text of the Bankruptcy Code from seeking or obtaining any relief under sections 544 and 547.  11 U.S.C. § 1521(a)(7) ("Upon recognition of a foreign proceeding, whether main or nonmain . . . the court may, at the request of the foreign representative, grant any appropriate relief, including granting any additional relief that may be available to a trustee, **except for relief available under sections** 522, **544**, 545, **547**, 548, 550, and 724(a)." (emphasis added)).

130.    As 3AC acknowledges, these claims are only "potential" because they must receive sanction from the BVI Court in order to commence a chapter 11 proceeding in the U.S.  However, this sanction application has already been examined and denied by the BVI Court.  As stated above, on July 26, 2023, the BVI Court denied 3AC's application seeking sanction to commence a chapter

---

[36]    While it is not germane to 3AC's claims, it is worth noting that 3AC values nearly all of the assets on which Genesis foreclosed that are purportedly subject to their claims (as well as to their "potential" claims) as of June 27, 2022, which is the date 3AC entered into liquidation in the BVI.  *See* Exs. A, B, and C at ¶¶ 27, 37, 45, 50, 56, 65. However, with respect to the Substituted Collateral, 3AC uses a valuation as of May 12 and 13, the original transfer date.  *See* Exs. A, B and C at  ¶ 37 n. 11.  This appears to be a transparent attempt to inflate the value of the assets given the directionality of the crypto market generally throughout May and June 2022, and it does not comport with BVI law.  *See* Parker Decl. at ¶ 11.

11 proceeding in the U.S. on behalf of 3AC.  *See supra* at ¶ 30.  Without a chapter 11 proceeding,

3AC simply lacks standing to bring claims under, *inter alia*, Section 544, 547 and 550.  While

3AC has filed an appeal of the BVI Court's decision, the standard of review for this appeal under

BVI law is exacting.  *See* Parker Decl. at ¶¶ 6-8.  3AC is therefore highly unlikely to succeed in

overturning the BVI Court's denial of the application.

131.    Even if the Joint Liquidators were to somehow successfully overcome the

extremely high burden for overturning the BVI Court's decision, for the reasons noted elsewhere

in this Objection, any such purported strong-arm and preference actions would still fail.[37]  As such,

these contingent claims should be expunged both because there is no statutory (or other) basis for

asserting them and because, even if there were, they fail as a matter of law and on the facts.

**D.    3AC's Remaining "Potential" Claims Fail.**

132.    The Amended PoCs include a reservation of rights outlining in vague and

conclusory fashion other "potential" claims that 3AC may bring against the Debtors "arising from

3AC's investments in the Grayscale Trusts and the relationships among 3AC's Founders, the

Debtors, the Debtors' parent DCG, DCG's CEO Barry Silbert, and DCG's subsidiary Grayscale,

among other related parties."  Exs. A, B and C at ¶¶ 66-67.  Despite being given the opportunity

to replead, after the benefit of thousands of documents produced by Genesis, 3AC alleges no facts

---

[37]    Further, even if the Joint Liquidators were to file a chapter 11 petition, their claims would fail for at least four independent reasons.  First, neither Section 547 nor Section 544 applies extraterritorially.  *See, e.g., In re Ampal-Am. Israel Corp.*, 562 B.R. 601, 612 (Bankr. S.D.N.Y. 2017); *In re CIL Ltd.*, 582 B.R. 46, 97 (Bankr. S.D.N.Y. 2018), *am. on reconsideration*, No. 13-11272-JLG, 2018 WL 3031094 (Bankr. S.D.N.Y. June 15, 2018).  Second, none of the transfers at issue will have taken place within 90 days of any potential future chapter 11 filing, meaning there can be no basis for a preference action with respect to transactions with the Debtors.  Section 547(b)(4)(A).  Third, Genesis had already validly taken possession of all of Amended PoC Assets following 3AC's default under the MLAs, and they are therefore not subject to strong-arm claims.  Section 544(a)(1); *see* Amended PoCs at 52-55.  Fourth, as detailed in this Objection, all of the transfers here are protected by safe harbors under Sections 546(e) and 546(g) of the Bankruptcy Code.  The Debtors reserve all of their rights and defenses, including without limitation to amend or supplement this Objection to the extent the Joint Liquidators somehow win the appeal in the BVI Court and commence a chapter 11 case.

to support these claims and simply points to a lawsuit, to which the Debtors are not a party, in the Delaware Court of Chancery.  3AC pleads no facts and no cause of action under which they believe the Debtors can be shown to have any liability on account of these  "potential" claims.  In characterizing these claims as "potential," at best, 3AC effectively concedes that such claims cannot meet the standard for prima facie validity.  Accordingly, these potential Grayscale-related claims should be disallowed.[38]

### Section 546(e) and 546(g) Bar Avoidance of the Challenged Transfers

**A.      Each Element Of the Safe Harbors Is Met.**

133.    3AC's claims are barred by the safe harbors embodied in Sections 546(e) and 546(g) of the Bankruptcy Code (the "Safe Harbors"), which prohibit avoidance of a "transfer made by or to (or for the benefit of)," *inter alia*, a forward contract merchant or a financial participant (each, a "Qualifying Entity") in connection with a forward contract or securities contract, 11 U.S.C. § 546(e), or in connection with a swap agreement made by a swap participant, 11 U.S.C. § 546(g).  These provisions "operate as a limit to the general avoiding powers of a bankruptcy trustee."  *Merit Mgmt. Group, LP v. FTI Consulting, Inc.*, 138 S. Ct. 883, 888 (2018);  *In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 83–84, 97 (2d Cir. 2019) (holding that Section 546(e), and similar provisions such as Section 546(g), also preempt claims brought by creditors).

134.    The Safe Harbors apply by their terms to all of the Challenged Transfers (as defined below).  For purposes of the Safe Harbors, the Challenged Transfers may be broken into five categories:

a)      Transfers of collateral comprising all of the ETH, ALGO, AVAX and SOL claimed under the Amended PoCs ("Digital Asset Transfers"), which were

---

[38]      As noted above, 3AC also reserves its rights to make certain claims against DCG with respect to collateral comprised of 2.7 million AVAX tokens and the 13.6 million NEAR tokens subject to the commencement of Chapter 11 proceedings in the United States. *See* Exs. A, B and C at ¶ 68.  This is not the proper forum for potential claims by a non-debtor against DCG, nor are such claims relevant to the Debtors' claims adjudication process.  In any event, tellingly, 3AC has not alleged any such claims against the Debtors and these claims should be similarly disallowed.

transferred to GAP in connection with margin calls related to loans of U.S. Dollars ("USD Loans") and loans of digital assets ("Digital Asset Loans", and together with the USD Loans, the "Loans"). The Loans are governed by term sheets, *see* Exhibit Y ("Loan Documentation"), and by agreements memorialized in contemporaneous electronic communications between the GAP and 3AC ("the "Parties") over Telegram, *see* Exhibit T (the "Telegram Agreements" and together with the Loan Term Sheets, the "GAP Term Sheets"), entered into by GAP and 3AC (the "Parties") under the MLAs and corresponding Pledge Agreements. The Digital Asset Transfers are protected from avoidance (i) by Section 546(e) because they were made in connection with forward contracts and securities contracts, and GAP is a Qualifying Entity;[39] and (ii) by Section 546(g) because they were made in connection with a swap agreement, and 3AC qualifies as a swap participant.

b)    Transfers of collateral comprising approximately 22.37 million GBTC to GAP (the "GBTC Transfers") as collateral pursuant to Digital Asset Loans, as well as in connection with margin calls related to the Loans. The GBTC Transfers are protected from avoidance (i) by Section 546(e) because they were made in connection with forward contracts and securities contracts, and GAP is a Qualifying Entity; and (ii) by Section 546(g) because they were made in connection with a swap agreement, and 3AC qualifies as a swap participant.

c)    The Principal Payment consisting of 115,000,000 USDC transferred to GAP as repayment in full for two U.S. Dollar loans, and partial repayment of a USDC loan (collectively the "Principal Payment Loan"),[40] which loans are governed by the GAP Term Sheets entered into by the Parties under the MLAs and their corresponding Pledge Agreements. The Principal Payment is protected from avoidance (i) by Section 546(e) because it was made in connection with forward contracts and securities contracts, and GAP is a Qualifying Entity; and (ii) by Section 546(g) because it was made in connection with a swap agreement, and 3AC qualifies as a swap participant.

d)    The Interest Payment (which amounts to slightly less than $18 million and consists of Ethereum Classic ("ETC"), FTX Token ("FTT"), USDC, Tether ("USDT") and U.S. Dollars) transferred to GAP in connection with the Loans. The Interest Payment is protected from avoidance (i) by Section 546(e) because it was made in connection with forward contracts and securities contracts, and GAP is a Qualifying Entity; and (ii) by Section

---

[39]    As explained below, 3AC also qualifies as a financial participant solely on the basis of what the Debtors know about its transactions with Genesis. The Debtors have, however, sought discovery concerning other alternative bases under which 3AC may independently be a Qualifying Entity.

[40]    As noted, *see* ¶ 72 *supra,* 3AC had previously repaid portions of the U.S. Dollar loans comprising the Principal Payment Loan.

546(g) because it was made in connection with a swap agreement, and 3AC qualifies as a swap participant.

e)      Transfers of collateral comprising approximately 13,780.04 BTC corresponding to 3AC's turnover and conversion claims (the "Foreclosed BTC" and collectively with the Digital Asset Transfers, the Interest Payment, the Principal Payment and the GBTC Transfers, the "Challenged Transfers").[41]  The transfers of the Foreclosed BTC are protected from avoidance (i) by Section 546(e) because they were made in connection with forward contracts and securities contracts, and GAP is a Qualifying Entity; and (ii) by Section 546(g) because they were made in connection with a swap agreement, and 3AC qualifies as a swap participant.

135.    Each of the Challenged Transfers was made pursuant to forward contracts (namely the relevant MLAs and the GAP Term Sheets, (collectively, the "Agreements")) as defined in Bankruptcy Code section 101(25), because they were connected with (i) loans of, or collateralized by, commodities, (ii) which matured more than two days after their issuance, (iii) all material terms of the loans were fixed at the time of contracting, and (iv) there was a relationship between the GAP Transfers and the financial markets.  *See* Islim Decl. at ¶¶ 5, 25–27; *see also In re Nat'l Gas Distributors, LLC*, 556 F.3d 247, 255 (4th Cir. 2009) ("*National Gas*") (articulating the test applied by courts in this circuit and elsewhere for identifying forward contracts under section 101(25)); *Decl. in Support of Debtors' Second Omnibus Objection (Substantive) to Claim Nos. 523, 526, 527, 981, 982 and 990 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (the "Brown-Hruska Decl.") at ¶¶ 20–23 (opining that the agreements embodied in the MLAs and Gap Term Sheets bear the same features as forward contracts, as that term is used in the Bankruptcy Code).

---

[41]     In its claim for the Foreclosed BTC, 3AC has not specified which transactions comprised the Foreclosed BTC.  However, every transfer between GAP and 3AC, including the Foreclosed BTC, was governed by the MLAs, Pledge Agreements, and GAP Term Sheets, which as discussed below constitute forward contracts and securities contracts.  *See* ¶¶ 142–152; 156–157 *infra*.  Therefore, the transfer of the Foreclosed BTC was made pursuant to forward contracts and securities contracts for purposes of the Safe Harbors.

136.    In turn, for the purposes of Section 546(e), GAP qualifies (a) as a "forward contract merchant" because a significant proportion of GAP's business involved providing digital asset loans and loans secured by digital assets, in addition to buying and selling digital assets,  Islim Decl. at ¶ 5; Brown-Hruska Decl.at ¶¶ 27–28 (opining that GAP is a forward contract merchant); and (b) as a "financial participant" because during the 15 months preceding the Petition Date GAP was a party to contracts, including the MLAs and GAP Term Sheets, under which it (i) agreed to borrow or take as collateral cryptocurrencies and other digital assets of total gross dollar value not less than $1,000,000,000; and (ii) had positions in cryptocurrencies and other digital assets whose mark to market value exceeded  $100,000,000.  *See* Islim Decl.  ¶ 6 ("Genesis originated approximately  $309,000,000  in  loans  per  day,  $2,000,000,000  in  loans  per  week,  and $8,000,000,000 in loans per month. These loans had an average notional value of approximately $100,000,000,000" between October 21, 2021 and January 19, 2023).  3AC also qualifies as a financial participant for the same reasons: in the 15 months preceding the Petition Date, 3AC was a party to the MLAs and GAP Term Sheets, under which it agreed to borrow cryptocurrencies and other digital assets from GAP of total gross dollar value not less than $1,000,000,000, and had posted to the Debtors positions in cryptocurrencies and other digital assets whose mark to market value exceeded $100,000,000.  *See* Islim Decl. ¶ 6; Exs. O-T (MLAs).

137.    Additionally, each of the Challenged Transfers is protected under Section 546(e) because (i) GBTC is a security, as defined in Section 101(49), and (ii) the Challenged Transfers were made in connection with securities contracts (the Pledge Agreements incorporated in the GAP Term Sheets, and the Second Digital Asset Loan) as defined in Section 101(50).  *See* 11 U.S.C. 546(e) (providing that transfers of securities made in connection with a securities contract are protected from avoidance).

138.    Further, each of the Challenged Transfers is also protected from avoidance by the plain language of the safe harbor provided by Section 546(g), as each of the Challenged Transfers was made in connection with a swap agreement (*see* 11 U.S.C. §§ 101(53B)(A)(i)(I), which provides that a "forward agreement" is a type of "swap agreement") that were made by, to, or for the benefit of 3AC, which is a "a swap participant" under 11 U.S.C. § 101(53C) because it was a party to swap agreements outstanding prior to GAP's chapter 11 filing.

iv.    <u>Section 546(e) Bars Avoidance of the Challenged Transfers</u>

139.    The Challenged Transfers are protected from avoidance because each was made in connection with a forward contract, and GAP is, and was at the time of all of the Challenged Transfers, a Qualifying Entity as defined in 11 U.S.C. 101(26) and 101(22A).  *See* ¶¶ 142–150, 153–154 *infra*.  Here, the digital assets (including GBTC) transferred in the Challenged Transfers are either "commodities" or "securities," *see* ¶¶ 140–142 *infra*, and the Challenged Transfers were made pursuant to forward contracts, *see* ¶¶ 143–152 *infra*, and securities contracts, *see* ¶ 153 *infra*. As a result, all of the Challenged Transfers fall under the ambit of the Section 546(e) safe harbor.

a.    *The non-GBTC Digital Assets That Were the Subject of the
Challenged Transfers Are Commodities Under Section 761(8).*

140.    Bankruptcy Code Section 761 defines "commodity" by reference to the Commodity Exchange Act (the "<u>CEA</u>"), which defines it as "all . . . goods and articles . . . and all services, rights, and interests . . . in which contracts for future delivery are presently or in the future dealt in."  7 U.S.C. § 1a(9).  All virtual currencies—a category that includes the assets transferred as part of all of the Challenged Transfers, except for GBTC—qualify as commodities under the CEA. *See, e.g.*, *CFTC v. Eisenberg*, Case No. 23-cv-00173 (S.D.N.Y. Jan. 9, 2023), Dkt. 1 at 6, 13 (noting that SOL and ETH are commodities under the CEA); *Commodity Futures Trading Comm'n v. McDonnell*, 287 F. Supp. 3d 213, 228–29 (E.D.N.Y. 2018), *adhered to on denial of*

*reconsideration*, 321 F. Supp. 3d 366 (E.D.N.Y. 2018) (holding the category of "commodity" encompasses virtual currency both in economic function and in the language of the statute.") (citing 7 U.S.C. § 1(a)(9)); s*ee In re Matter of BXFNA*, CFTC Dkt. No. 16-19, ECF No. 1, at 2 ("Bitcoin, Ether, Litecoin, and Tether tokens, along with other digital assets are encompassed within the broad definition of 'commodity' under Section 1a(9) of the Act.").

141.    With respect to the non-GBTC digital assets at issue in the Challenged Transfers: both Bitcoin and ETH are subject to futures listed on regulated, designated contract markets, including the Chicago Mercantile Exchange (the "CME"), and therefore are presumptively classified as commodities under Section 761.  Hruska-Brown Decl. ¶ 18.  AVAX, ALGO and SOL are also commodities under Section 761 because they are cryptocurrencies in which futures contracts are dealt, and which are categorically similar to ETH and BTC.  *Id*. at ¶ 18-19.  Furthermore, any asset that is not a security for purposes of U.S. securities laws is a "commodity" subject to regulation under the CEA.  *Id*. at ¶ 16.  As such, all the digital assets transferred in the Challenged Transfers (save for GBTC) are commodities.

### b.  *GBTC is a Security Under 11 U.S.C. § 101(49)(A)(viii)*

142.    GBTC constitutes individual shares in a trust "solely and passively invested in BTC, enabling investors to gain exposure to BTC in the form of a security while avoiding the challenges of buying, storing, and safekeeping BTC, directly."[42]  Shares of GBTC are registered as securities under the Securities Exchange Act of 1934 and are publicly listed on the OTCQX, an over-the-counter market.  *Id*.  As such, they are securities.  *See* 11 U.S.C. § 101(49) (defining a

---

[42]    Grayscale® Bitcoin Trust, Grayscale Bitcoin Trust: Overview, Grayscale Investments, LLC, https://grayscale.com/products/grayscale-bitcoin-trust/ (last visited Sept. 1, 2023).

"security" as a "contract or interest [that] is required to be the subject of a registration filed with the Securities and Exchange Commission under the provisions of the Securities Act of 1933").

> ### c. The Challenged Transfers Were Made in Connection with Forward Contracts

143.    The Bankruptcy Code defines a "forward contract" as "a contract . . . for the purchase, sale, or transfer of a commodity . . . with a maturity date more than two days after the date the contract is entered into . . . ."  11 U.S.C. § 101(25)(A).   Courts within and outside this District have looked to the four-factor test first articulated in *National Gas* to determine whether a contract qualifies as a forward contract under this provision, and by extension to determine whether transfers fall within the section 546(e)'s protection.  *See In re Arcapita Bank B.S.C.(C)*, 640 B.R. 604, 625 (S.D.N.Y. 2022) (SHL).   The *National Gas* test requires that: (1) the subject of the relevant agreement must be a commodity; (2) the delivery must be more than two days after the date of the contract; (3) the price, quantity and time terms must be fixed at the time of contracting; and (4) there must be some "relationship" between the agreement and the financial markets.  *Nat'l Gas*, 556 F.3d at 255.   Under this definition, the GAP Term Sheets are forward contracts.  *See generally* Exs. T, Y.

144.    **First**, the "subjects" of the GAP Term Sheets are commodities because *the GAP Term Sheets required the Parties to exchange commodities*, namely cryptocurrencies and digital assets.  Specifically:

> a)     With respect to the Interest Payment, 3AC sent GAP collateral consisting of ETC, USDC, and USDT, as required under the GAP Term Sheets.[43]  *See* Exs. T, Y.

---

[43]     As noted, ETC, USDC and USDT are commodities under the Bankruptcy Code and the CEA. Further, the GAP Term Sheets which governed the Loans underlying the Interest Payment were collateralized by other digital assets, including but not limited to ETH and BTC, pursuant to the MLAs and the Pledge Agreements.  As noted, ETH and BTC are commodities under the Bankruptcy Code and the CEA.

b)    With respect to the Principal Payment, 3AC repaid to GAP loan principal consisting entirely of USDC which was applied to three separate loans. Two of the loans were issued in USD, and were collateralized by BTC.  The third loan was issued in USDC.[44]  *See* Exs. T, Y.

c)    With respect to the GBTC Transfers, 3AC sent GAP collateral consisting of (i) approximately 9.2 million shares of GBTC in connection with loans of BTC, ETH, USDT, FTT, ZEC, and XLM, as required under the GAP Term Sheets,[45] *see* Exhibits T, Y; and (ii) approximately 13.1 million shares of GBTC pursuant to a margin call connected to the Loans, under which the Parties exchanged digital asset commodities, including BTC, ETC, ETH, USDT, USDC, FTT, ZEC, and XLM.[46]  *See* Exs. T, Y.

d)    With respect to the Digital Asset Transfers, 3AC sent GAP collateral comprising ETH, ALGO, and SOL.  *See* Exhibits T, Y.[47]

145.    Further, the digital asset commodities are properly considered the "subject" of the GAP Term Sheets, and the Agreements more generally because both Parties entered into them in order to trade in cryptocurrencies.  *See* Hruska-Brown Decl. ¶ 23 ("Moreover, the economic purpose of the Agreements was to enable both Parties to trade in cryptocurrencies, and as such, the subject of the Agreements were commodities.").  GAP, for instance, entered the Agreements in order to gain access to the cryptocurrencies and other digital assets which 3AC pledged as collateral (in order to, for example, re-lend those cryptocurrencies).  Islim Decl. at ¶ 25.  In other words, the purpose of the Agreements from GAP's perspective was to acquire commodities for the duration of the relevant loans.  *Id*.  In particular, GAP used the various cryptocurrencies and digital assets it received from 3AC in order to address counterparty risk for the loans themselves, as well as to re-lend in new loans to other parties, before returning the collateral when 3AC paid

---

[44]    As noted, USDC and BTC are a commodities under the Bankruptcy Code and the CEA.

[45]    As noted, BTC, ETH, USDT, FTT, ZEC and XLM are commodities under the Bankruptcy Code and the CEA.

[46]    As noted, BTC, ETC, ETH, USDT, USDC, FTT, ZEC and XLM are commodities under the Bankruptcy Code and the CEA.

[47]    As noted, ETH, ALGO, AVAX and SOL are commodities under the Bankruptcy Code and the CEA.

back the corresponding loan principal. Islim Decl. at ¶ 26. 3AC, for its part, used the loan principal it received from GAP to facilitate its own trading in cryptocurrencies. *See* Amended PoCs ¶ 12 ("3AC's investment strategy involved making large, leveraged cryptocurrency trades using funding from the Debtors and other investors"); *see generally id.* ¶¶ 12–15. Indeed as the Liquidators admit in the Amended PoCs, 3AC's entire business model involved trading in cryptocurrencies. *See* Amended PoCs ¶ 12. It entered into contracts such as the Agreements to facilitate these activities. *Id.*

146.    Moreover, neither of the Parties is an end user or repository of the U.S. Dollars or digital assets exchanged as part of any of the Challenged Transfers (including the Challenged Transfers), and as a result, the Agreements (including the GAP Term Sheets) are not "supply contracts" as that term is used in the Bankruptcy Code. *See* H.R. REP. No. 101–484, at 6, U.S. Code Cong. & Admin. News 1990, pp. 223, 228 ("[T]he exemptions [to the avoidance powers of the Trustee under 11 U.S.C. § 546(e)] do not apply to ordinary supply-of-goods contracts, which are not essentially financial in character."). As such, all of the Challenged Transfers satisfy the first element of the *National Gas* test, insofar as that element was designed to distinguish transfers under forward contracts, where "substantially all of the expected costs of performance [are] attributable to the expected costs of the underlying commodity, determined at the time of contracting," from those governed by supply contracts, "in which costs attributable to other factors, such as packaging, marketing, transportation, service, and similar matters contribute to a greater portion of the costs." *See National Gas*, 556 F.3d at 259.

147.    **Second**, the Challenged Transfers meet the second element of the *National Gas* test, as none were delivered within two days of the origination of the underlying loan, although the GAP Term Sheets did not specify maturity dates. *See Nat'l Gas*, 556 F.3d at 260.

148.     Courts have found that even where no maturity date is explicitly included as part

of an agreement, that agreement can be a "forward contract."  *See In re MBS Mgmt. Servs., Inc.*,

690 F.3d 352, 355–57 (5th Cir. 2012) (holding that the absence of a maturity date from the relevant

agreement did not preclude its classification as a forward contract under the Bankruptcy Code

because no courts have suggested that "contracts that do not *specify* a maturity date do not have

one" and that the contract at issue met the definition for a forward contract because "*no* delivery

of electricity was scheduled to occur less than two days after the Agreement's execution")

(emphasis in original); *see also* Brown-Hruska Decl. at ¶¶ 22-23.  There can be no dispute that the

Parties intended that these loans would be repaid more than two days after origination; and no

Loans were repaid less than two days after origination.  Islim Decl. at ¶ 27.

149.     **Third**, the Challenged Transfers were made pursuant to contracts that specified

fixed price, quantity and time terms at the time of contract.  All of the GAP Term Sheets specify

the "Amount of Borrowed Asset" (*i.e.* the quantity) and an interest rate (*i.e.* the price), and that the

loans were to be "open term" (*i.e.* the time).  *See* Exhibits T, Y.

150.     **Fourth**, the Challenged Transfers were all related to financial markets in that they

were part of GAP's lending and borrowing business.  The *National Gas* court required a transaction

have a relationship with the financial markets to qualify as a forward contract in order "to effect

greater protections of financial markets from the disrupting effects of bankruptcy . . . ."  *Nat'l Gas*,

556 F.3d at 260; *see also In re Borden Chems.*, 336 B.R. 214, 220 (Bankr. D. Del. 2006) (". . .

[T]he primary purpose of a forward contract is to hedge against possible fluctuations in the price

of a commodity.  This purpose is financial and risk-shifting in nature, as opposed to the primary

purpose of an ordinary commodity contract, which is to arrange for the purchase and sale of the

commodity.") (internal quotations omitted).  Courts have held that transactions designed to allow

parties to speculate on the price of commodities satisfy this element. *See In re Clear Peak Energy, Inc.*, 488 B.R. 647, 669-660 (Bankr. D. Ariz. 2013) (holding contracts where the "primary purpose" was to allow a party "to hedge the price that it must pay for power over the long term" had a relationship with the financial markets for purposes of exemption from the provisions of the automatic stay pursuant to Section 362(b)(6)).

151.    As discussed *supra* ¶ 145, from GAP's perspective, the purpose of entering into the Agreements pursuant to which the Challenged Transfers were made was to acquire digital assets from 3AC, which hedged against counterparty risk with respect to 3AC itself, and which GAP could also re-lend.   In this way, GAP used the digital assets to hedge against possible price fluctuations and speculate on the price of digital assets in a manner to that which courts have determined were related to financial markets. *See In re Borden Chems*, 336 B.R. 214; *In re Clear Peak Energy*, 488 B.R. 647.   The GAP Transfers therefore satisfy the fourth element of the *National Gas* test.

### d.  The Challenged Transfers are also Connected to Forward Contracts, as defined under Section 101(25)(E)

152.    The Bankruptcy Code also provides that "security agreement[s]" are "forward contracts" for the purposes of Section 546(e), if they are "related to any agreement or transaction that is referred to in subparagraph (A) [i.e. forward contracts], (B), or (C)."  11 U.S.C. § 101(25). Section 101(50), in turn, defines a "security agreement" as an agreement which "creates or provides for a security interest," 11. U.S.C. § 101(50)., i.e., a "a lien created by an agreement." 11. U.S.C. § 101(51) (defining "security interest").   Under this definition, the MLAs and their incorporated Pledge Agreements, are "security agreements" because (i) they created a security interest in the digital assets pledged as collateral by 3AC in exchange for the Loans, *see* Exs. O-S (MLAs) (incorporating Pledge Agreements); Ex. X (Pledge Agreements) (providing that the Loans

are secured by various digital assets); and (ii) they are related to the GAP Term Sheets, which are forward contracts for the reasons explained above, *see supra* ¶¶ 143-151; *see also* Ex. Y (GAP Term Sheets) (incorporating MLAs and Pledge Agreements).

    *e. The Challenged Transfers are also Connected to Securities Contracts*

  153. Each Challenged Transfer was also made in connection with "securities contracts" as defined under Section 741(7) of the Bankruptcy Code, and is protected from avoidance on that basis. The GAP Term Sheets, which by their terms incorporate the Pledge Agreements through the MLAs, are properly understood as "margin loans" because each of the Pledge Agreements explicitly provides that all of the Loans are collateralized by securities (shares of GBTC) and the Loans were marked to market and margined. *See* 11 USC § 741(7)(A)(iv) (providing that margin loans are securities contracts); H.R. REP. 109-31(I), 119, 2005 U.S.C.C.A.N. 88, 181 ("The inclusion of 'margin loans' in the definition [of 'securities contract' under the Bankruptcy Code] is intended to encompass only those loans commonly known in the securities industry as "margin loans," such as credit permitted in a margin account under the Federal Reserve Board's Regulation T (whether or not effected in that account) or arrangements where a financial intermediary–a stockbroker, financial institution, financial participant, or securities agency–extends credit in connection with the purchase, sale, carrying, or trading of securities."); *In re Lehman Bros. Holdings Inc., 469 B.R. 415, 438* (Bankr. S.D.N.Y. 2012) ("The plain language of section 741(7) is very broad in its application and encompasses virtually any contract for the . . . extension of credit, for the clearance or settlement of securities transactions, and a wide array of related contracts[.]); *see also* Exhibit X (Pledge Agreements) (providing that the Loans are collateralized by shares of GBTC); Exhibits O-T (MLAs) (incorporating Pledge Agreements). As such, the Challenged Transfers fall under the protection of the Section 546(e) safe harbor because they were

made "in connection with a securities contract", the Pledge Agreements, to a forward contract merchant (i.e. GAP).  11 U.S.C. § 546(e); *see infra* 154.[48]

### f.   GAP is a Forward Contract Merchant

154.    Section 101(26) defines "forward contract merchant" as "an entity the business of which consists in whole or in part of entering into forward contracts as or with merchants in a commodity (as defined in Section 761) or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade."  11 U.S.C. § 101(26).  Courts, including those in the Second Circuit, have placed emphasis on the statute's use of the terms "business" and "merchant" in defining the term.  *In re Mirant Corp.*, 310 B.R. 548, 567 (Bankr. N.D. Tex. 2004); *In re Magnesium Corp. of Am.*, 460 B.R. 360, 375 (Bankr. S.D.N.Y. 2011).  Although the Bankruptcy Code does not define either term, courts have held that "merchant" refers to "one that buys, sells or trades in a market" and "business" as "something one engages in to generate a profit."  *Id*.

155.    At the time of the Challenged Transfers, GAP's business was to enter into digital asset loans and loans secured by digital assets, and to borrow and loan digital assets with comparably favorable rates of arbitrage.  Islim Decl. at ¶¶ 5, 26.[49]  As such, GAP is properly classified as a forward contract merchant because, at the time of the Challenged Transfers, its business consisted primarily of buying and selling commodities (namely digital assets) as defined

---

[48]    Additionally, the GBTC Transfers are further protected under Section 546(e) because they were executed in connection with the Digital Asset Loans, which are also securities contracts within the meaning of Section 741(7) of the Bankruptcy Code because, by their terms, they call for the "loan of a security," namely GBTC.  *See* 11 U.S.C. § 741(7); *see* Exhibit X (Pledge Agreements); *see also* Exhibits T, Y.  The GBTC Transfers therefore fall under the protection of the Section 546(e) safe harbor because they were made "in connection with a securities agreement", the Digital Asset Loans, to a forward contract merchant (i.e. GAP).  11 U.S.C. § 546(e); *see supra* ¶ 154.

[49]    Between October 21, 2021 and January 19, 2023, Genesis had a lending and borrowing relationship with approximately 1,065 unaffiliated counterparties with which it engaged in either lending or borrowing of digital assets, or both.  Islim Decl. at ¶ 6.  Genesis originated approximately $309,000,000 in loans per day, $2,000,000,000 in loans per week, and $8,000,000,000 in loans per month.  *Id*.

under Section 761, *see* Brown-Hruska Decl. at ¶¶ 17-19 (stating that cryptocurrencies and other digital assets, including BTC, ETH, SOL, USDC, AVAX and ALGO, are commodities, as that term is defined under the Bankruptcy Code), and using those digital assets to hedge against other investment risk. *See supra* ¶¶ 150-151; Brown-Hruska Decl. at ¶¶ 27-28; *see also In re Clear Peak Energy, Inc.*, 488 B.R. at 661 (finding a utility company that provides power to its customers, and as part of that process enters into forward contracts to hedge against price fluctuations, constitutes a "merchant" whose business was "buying and selling goods for a profit" in the context of a section 362(b) stay exception).

### g.   *GAP and 3AC are Financial Participants*

156.   Section 101(22A) defines "financial participant," in relevant part, as an entity that "at the time of the date of the filing of the petition, has one or more [securities contracts, commodity contracts, forward contracts, repurchase agreements, swap agreements, or master netting agreements] . . . with the debtor or any other entity (other than an affiliate) of a total gross dollar value of not less than $1,000,000,000 in notional or actual principal amount outstanding (aggregated across counterparties) at [the time of the date of the filing of the petition] or any day during the 15-month period preceding the date of the filing of the petition, or has gross mark-to-market positions of not less than $100,000,000 (aggregated across counterparties) in one or more such agreements or transactions."  11 U.S.C. § 101(22A).  Under this definition, both GAP and 3AC qualify as "financial participants."

157.   GAP meets the Bankruptcy Code definition of "financial participant" because, during the 15 months preceding the Petition Date, (i) GAP had numerous contracts outstanding (including the MLAs and the GAP Term Sheets), with 3AC alone, under which it agreed to lend and receive as collateral cryptocurrencies and other digital assets of total gross dollar value in amounts exceeding $1,000,000,000, *see* Islim Decl. at ¶ 6; and (ii) under those same contracts with

3AC, GAP held as collateral, and was the lender on, positions in cryptocurrencies and other digital assets, whose mark-to-market value exceeded $100,000,000.  In particular, at the time of 3AC's default on June 13, 2022, 3AC owed GAP approximately $2,363,105,165 under the MLAs, and GAP held cryptocurrencies and digital assets[50] in comparable amounts as collateral under those same agreements.  *Id.* at ¶ 8.  By the same token, 3AC meets the Bankruptcy Code definition of "financial participant" because during the 15 months preceding the Petition Date, it was a counterparty to the same MLAs and GAP Term Sheets, under which it (i) agreed to receive $2,363,105,165 in loan principal consisting of U.S. Dollars, cryptocurrencies, and other digital assets, and to send collateral consisting of cryptocurrencies and other digital assets with an equivalent actual or notional value; and (ii) had positions in cryptocurrencies and digital assets (namely the collateral which it posted to GAP) whose mark to market value exceeded $100,000,000.

> v.    Section 546(g) Also Bars Avoidance of the Challenged Transfers

158.    Under Section 546(g), transfers "made by or to (or for the benefit of) a swap participant or financial participant, under or in connection with any swap agreement and that is made before the commencement of the case" may not be avoided.  11 U.S.C. § 546(g).  Here, the Challenged Transfers constitute swap agreements, in that they are forward contracts.  *See supra* ¶¶ 142-151*;* 11 U.S.C. § 101(53B) (defining a "swap agreement" as, among other things, a "commodity swap, option, future, or forward agreement."); *see also In re Nat'l Gas Distributors, LLC*, 556 F.3d 247, 260 (4th Cir. 2009) (stating the definition of "swap agreement" also includes "commodity forward agreement," which is understood to encompass "forward contracts.").

---

[50]    As noted, all of the cryptocurrencies and digital assets exchanged under the MLAs were either commodities or securities. *See* ¶¶ 140-142 *supra*.

Because the Challenged Transfers took place prior to GAP's filing of its voluntary chapter 11 petition,[51] 3AC is a "swap participant."  11 U.S.C. § 101(53C) (defining a "swap participant" as "an entity that, at any time before the filing of the petition, has an outstanding swap agreement with the debtor.").

159.    Therefore, for the reasons articulated above, the Challenged Transfers constitute forward contracts, or swap agreements that were made by, to, or for the benefit of 3AC, a swap participant, such that the Joint Liquidators may not avoid such transfers under Section 546(g).

**B.    The Presumption Against Extraterritoriality Does Not Preclude Application Of The Safe Harbors.**

160.    3AC has not alleged facts to indicate that the Challenged Transfers are anything but "domestic" transfers.  As such, application of the Safe Harbors here is "domestic," and this Court may apply them notwithstanding any concerns of extraterritorial application of U.S. law.  Even if the transfers at issue were "foreign," the application of the Safe Harbors to claims brought by the Joint Liquidators before this New York Court is a domestic application of law.  As the Second Circuit has held, the assertion of a statutory defense to liability in a U.S. court, like the Safe Harbors here, is a domestic application of the statute, even if the underlying conduct occurred abroad.  *See Force v. Facebook, Inc.*, 934 F.3d 53, 74 (2d Cir. 2019).  Moreover, even if the application of the Safe Harbors were found to be an extraterritorial application of law, Section 561(d) of the U.S. Bankruptcy Code limits the authority of the Joint Liquidators to avoid the Challenged Transfers by providing that the limitations on the authority of a foreign liquidator under chapter 15 is coextensive with the limitations on the authority of a trustee under chapter 7 or 11.  As such, the presumption against extraterritoriality does not alter the fact that the Challenged Transfers are

---

[51]    The underlying MLAs and GAP Term Sheets pursuant to which the Challenged Transfers were made are all are dated prior to the Petition Date.  *See* Exhibits O-S, T, Y.

subject to the Safe Harbors and may not be avoided.  *See Fairfield Sentry Ltd.*, 630 F. Supp. 3d 463, 488 (S.D.N.Y. 2022) ("§ 561(d) extends the § 546(e) safe harbor to claims raised by a foreign representative . . . .").

vi.   The Challenged Transfers Are Domestic

161.   In determining whether transactions are "domestic" for avoidance purposes, courts "look at the facts of a case to determine whether they have a center of gravity outside the United States." *Maxwell Communication Corp. plc v. Barclays Bank (In re Maxwell Commc'n Corp. plc)*, 170 B.R. 800, 809 (Bankr. S.D.N.Y.1994) ("*Maxwell I*"), aff'd, 186 B.R. 807 (S.D.N.Y.1995) ("*Maxwell II*"), aff'd on other grounds, 93 F.3d 1036 (2d Cir.1996)).  "Such an analysis may include consideration of 'all component events of the transfers,' such as 'whether the participants, acts, targets, and effects involved in the transaction[s] at issue are primarily foreign or primarily domestic.'"  *In re Lyondell Chemical Company*, 543 B.R. 127, 150 (Bankr. S.D.N.Y. 2016) (quoting *Maxwell*, 186 B.R. at 816; *French v. Liebmann (In re French)*, 440 F.3d 145, 150 (4th Cir. 2006)).  Where the "most significant events surrounding the transfers occurred in the United States," those transfers are deemed domestic and the Bankruptcy Court can apply U.S. law directly. *See In re Florsheim Group Inc.*, 336 B.R. 126, 132 (N.D. Ill. 2005).

162.   The "center of gravity" of the Challenged Transfers here is domestic.[52]  For one, the MLA between GAP and 3AC contains forum selection and choice of law provisions providing that the agreement was to be "be construed and enforced under, the laws of [New York]" and that any disputes were to be "resolved by arbitration administered in the New York County."  Ex. P (Master Loan Agreement between GAP and 3AC dated Jan. 24, 2020 § XIII).  Moreover, during

---

[52]   In furtherance of their argument that the transfers here are domestic for purposes of Section 546(e), the Debtors reserve the right to take and produce further discovery.  For instance, the Debtors intend to adduce evidence that many of the assets that were eventually foreclosed upon were custodied in the United States and that the relevant tokens were transferred to crypto wallets within the United States, among other information.

GAP's lending relationship with 3AC, key individuals acting for Genesis were based in, and located in, New York City, New York.  Islim Decl. at ¶ 28.  These included Matthew Ballensweig, Managing Director, Co-Head Trading & Lending and the primary manager of Genesis's lending relationship with 3AC, who was based in, and located in, New York City at all relevant times during the GAP-3AC lending relationship; Greg Guttas and Jake Kaufman, who were both Vice Presidents in spot and derivative cryptocurrency trading, who were based in, and located in, New York City when they negotiated the majority of the key agreements with 3AC; Kristopher Johnson, a Senior Risk Officer and the signatory to the MLAs, who was based in New York City as of the date of execution of the MLAs; Adim Offurum, a Vice President in Credit Risk, who was based in, and located in, New York City when he issued certain margin calls to 3AC pursuant to which certain of the Challenged Transfers were made; Arianna Pretto-Sakmann, Chief Legal Officer, who was based in, and located in, New York City when she issued a notice of default to 3AC on June 13, 2022, at 6:29 pm from New York City; and Andrew Sullivan, General Counsel, who was based in, and located in, New York City when he informed Jacob Hinkle, the managing Director of TradeStation Securities, Inc. ("TradeStation") based in Plantation, Florida, by email on June 16, 2022 at 12:48 pm, that 3AC was in default of its obligations under the MLAs, and instructed TradeStation (pursuant to an attached notice of control) to grant GAP control over 26,371,992 shares of GBTC which 3AC had posted as collateral under the MLAs, and which were held in accounts at TradeStation in the United States.  Islim Decl. ¶ 28; Exhibits T (Telegrams), O-P (MLAs); U (Margin Calls); Z (June 16th email from Andrew Sullivan to Jacob Hinkle).

163.    Only where the conduct underlying a claim or defense took place abroad must courts consider whether a statute was meant to apply extraterritorially.  *RJR Nabisco, Inc. v. Euro. Cmty.*, 579 U.S. 325, 337 (2016).  Here, considerations regarding extraterritorial application of

U.S. statutes are irrelevant because the transfers between GAP and 3AC were domestic, and the Safe Harbors apply by their terms to bar any recovery on the Challenged Transfers.

> vii.  Even if the Challenged Transfers Were Foreign, the Application of the Safe Harbors is a Domestic Application of Law

164.    While the transfers here were domestic, their location is of no relevance to the question of whether the Safe Harbors may or should apply extraterritorially, because the application of Safe Harbors to a foreign liquidator's claims before a New York court is a domestic application of law.

165.    Courts use a two-step test to determine whether a statute should be applied extraterritorially. *RJR Nabisco*, 579 U.S. at 337; *see also Morrison v. Nat'l Aus. Bank Ltd.*, 561 U.S. 247, 262-66 (2010). The court decides: (i) whether there is a "clear, affirmative indication" that the presumption against extraterritoriality has been rebutted; and (ii) whether the case involves a domestic application of the statute. *RJR Nabisco*, 579 U.S. at 337. To answer the second question, courts identify the "conduct relevant to the [statute's] focus," *id.*, "by asking precisely what it is that the [statute] regulates," *Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 914 (D.C. Cir. 2018). If that conduct occurs in the United States, even if other related conduct occurs abroad, the case involves a domestic application. *RJR Nabisco*, 579 U.S. at 337; *Spanski Enters.*, 883 F.3d at 914 (finding focus of statute was "on *policing* [copyright] infringement," which occurred in the United States, not on copyright infringement *itself*, which occurred abroad) (emphasis added).

166.    "[I]n appropriate cases," such as here where it is clear that the Safe Harbors are being applied domestically, courts may "star[t] at step two." *RJR Nabisco*, 579 U.S. at 338 n.5; *Western-GECO LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2136 (2018).

167. Section 546(e)'s "focus"—*i.e.* "the conduct it 'seeks to regulate,'" *Western GECO*,
138 S. Ct. at 2137 (quoting *Morrison.,* 561 U.S. at 267 (2010))—is to limit the avoidance powers
in *U.S. proceedings* of a trustee or claimant (*i.e.*, the act of avoidance, not the transfer to be
avoided). *See, e.g., In re Tribune Co.*, 946 F.3d at 84 (Section 546(e) "expressly prohibits trustees
et al." from using certain avoidance powers); *Whyte v. Barclays Bank*, 494 B.R. 196, 199
(S.D.N.Y. 2013) ("[S]ection 546(g) . . . deprives a bankruptcy trustee of the power to bring
avoidance actions . . ."). The Safe Harbors are defenses to liability asserted, by definition, in the
United States. *See In re Fairfield Sentry Ltd.*, 596 B.R. 275, 307 (Bankr. S.D.N.Y. 2018).

168. The Second Circuit has held that asserting a statutory defense to liability in a U.S.
court is a domestic application of the statutory defense, even if the underlying conduct occurred
abroad. *Force v. Facebook*, 934 F.3d 53 (2d Cir. 2019). In *Force*, Facebook asserted Section
230(c)(1) of the Communications Decency Act (the "CDA"), which safeguards interactive
computer service providers from liability for user-posted content, as an affirmative defense to
claims that employees outside the United States failed to remove content created abroad. *Id.* at 64,
72-73. The Second Circuit found the defendant was permitted to assert such defense to foreign
conduct, as under the second prong of the extraterritoriality analysis, the "primary purpose" of the
statute was "limiting civil liability in American courts." *Id.* at 74. "The regulated conduct—the
litigation of civil claims in federal courts—occur[red] entirely domestically in its application." *Id.*
Like CDA Section 230(c)(1), the Safe Harbors shield defendants from certain claims that a party
may assert in a U.S. court.

169. The Second Circuit's analysis in *Force* regarding its application to the CDA is
equally applicable to the Safe Harbors. Congress' intent behind CDA Section 230(c)(1) was to
"limit[] civil liability in American courts," *Force*, 934 F.3d at 74. This exactly equates with and

the objectives underlying the Safe Harbors. *Compare* 47 U.S.C. § 230(c)(1), *with* 11 U.S.C. § 546(e) (limiting avoidability of certain categories of transfers) *and* 11 U.S.C. § 546(g) (limiting avoidability of swap agreements). Indeed, while the availability of relief in a U.S. court may influence how parties behave abroad, that indirect impact does not make the underlying conduct the "focus" of the claim-limiting language. Where a statute limits the claims that can be brought in a U.S. court, its application "occurs entirely domestically."[53] *Force*, 934 F.3d at 74.

170.    The holding in *Force* is directly applicable to this case. As in *Force,* the focus of the statute here limits liability *in U.S. courts*. The Safe Harbors regulate what Plaintiffs "may not" do in U.S. proceedings—namely, "avoid" covered transactions. 11 U.S.C. §§ 546(e), 546(g). The "litigation of civil claims in federal courts" is the "regulated conduct." *Force,* 934 F.3d at 74. Because that "occurs entirely domestically," *id.*, applying the Safe Harbors to these transfers presents no extraterritoriality concern.[54]

viii.    Section 561(d) Makes the Safe Harbors Applicable to a Foreign Representative's Foreign Claims Regarding Foreign Transfers, Whether that Application is Characterized as Domestic or Not

171.    Even if this Court were to conclude that the focus of the Safe Harbors is on the transfers to be avoided, rather than the act of avoidance, Section 561(d) of the Bankruptcy Code

---

[53]    Indeed, the Second Circuit in *Force* questioned whether a defense could ever implicate the presumption because "it is unclear how an American court could apply such a provision 'extraterritorially.'" *Id.* Moreover, denying defenses under U.S. law in a U.S. court on the basis that the conduct at issue is foreign would "increase the possibility of international friction" by limiting the defenses available in U.S. proceedings only where foreign conduct is at issue—thus selectively subjecting foreign actors to liability while insulating domestic actors from liability with respect to the very same conduct. *Id.* (emphasis added). Since "[s]uch a regime could also give plaintiffs an advantage when they sue over extraterritorial wrongdoing that they would not receive if the defendant's conduct occurred domestically," the Second Circuit concluded that "[i]t is doubtful that Congress ever intends such a result when it writes provisions limiting civil liability." *Id.*

[54]    Counsel for the Joint Liquidators has recently argued as much in the context of another case. *See Consolidated Brief for Defendants-Appellees, In re Fairfield Sentry Limited* at 23, No. 22-2101 (May 5, 2023), Dkt. 661, ("[The] analysis in [*Force*] confirms that asserting a statutory defense to liability in a U.S. court is a domestic application . . . ."). The Debtors struggle to understand how this case is distinguishable on any basis other than the differing interests of counsel's positionally-conflicted clients.

extends the protections afforded by the Safe Harbors to claims concerning foreign transactions brought by a foreign liquidator in a chapter 11 proceeding.  That is, even if the presumption against extraterritoriality were pertinent here, which it is not, it would be rebutted because Section 561(d) expressly makes the limitations of the Safe Harbors applicable to claims to unwind foreign covered transactions in a proceeding under chapter 11.

172.    Section 561(d) of the U.S. Bankruptcy Code provides that provisions of the Code "relating to securities contracts, commodity contracts, forward contracts, [and] swap agreements," which includes the Safe Harbors, apply in a "case under chapter 15 … to the same extent as in a proceeding under chapter 7 or 11 . . . (such enforcement not to be limited based on the presence or absence of assets of the debtor in the United States)."  11 U.S.C. § 561(d).

173.    By its terms, Section 561(d) extends the "provisions of this title relating to securities contracts, commodity contracts, forward contracts, [and] swap agreements" that "limit avoidance powers," such as the Safe Harbors, to any "case under chapter 15."  In a chapter 15 case, the Safe Harbors limit a foreign liquidator's avoidance powers "to the same extent" as it limits those of a trustee in a domestic bankruptcy, with "such enforcement not to be limited based on the presence or absence of assets of the debtor in the United States."  11 U.S.C. § 561(d).  So too does this provision apply in a chapter 11 proceeding where a foreign liquidator is seeking to avoid foreign transfers, as 561(d) applies the protections of the Safe Harbors "to the same extent as in a proceeding under chapter 7 or 11 of this title."  11 U.S.C. § 561(d).

174.    The policy considerations underlying chapters 11 and 15 of the Bankruptcy Code also counsel in favor of the application of Section 561(d) to extend the Safe Harbors to foreign avoidance claims brought by a foreign liquidator in a chapter 11 proceeding.  Were the Joint Liquidators to seek to bring these claims as avoidance actions in their own chapter 15 proceeding,

the Safe Harbors would apply to preclude recovery of the Challenged Transfers. *See In re Fairfield Sentry Ltd.*, 630 F. Supp. 3d 463, 490 (S.D.N.Y. 2022) (holding that "Congress has expressed a clear intent to apply § 546(e) extraterritorially through § 561(d)" in a chapter 15 proceeding); *In re Fairfield Sentry Ltd.*, 596 B.R. 275, 308-309, 308 n. 46 (Bankr. S.D.N.Y 2018) (holding "Section 546(e) was designed to protect against the ripple effect of requiring a transferee to 'repay amounts received in settled securities transactions' and stating "[t]o the extent that the Liquidators are seeking to avoid and recover redemption payments made in connection with swap agreements, the same principles apply") (*quoting Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V. (In re Enron Creditors Recovery Corp.)*, 651 F.3d 329, 334 (2d Cir. 2011)). Reading Section 561(d) to apply the Safe Harbors only in a chapter 15 proceeding would provide a chapter 15 foreign representative broader powers to avoid foreign transfers than a chapter 11 trustee, permitting a sort of end-run around the application of 546(e) to categories of transfers including the Challenged Transfers by applying different (and severely curtailed) safe harbor protection to avoidance actions that happen to target transfers to a chapter 11 debtor, compared to those brought by way of ordinary avoidance action by a chapter 15 liquidator in its own case.

175. 3AC, as a chapter 15 debtor, is also bound by the rules and limitations of its own case such that it cannot bring an action in another debtor's action that it could not bring in its own action. That is, because 3AC's power to avoid foreign transactions by way of avoidance actions in its own chapter 15 case is limited by the Safe Harbors, that power must be limited to the same extent where such avoidance actions have instead been brought in the form of claims filed against a chapter 11 debtor such as GAP. As applied here, in 3AC's own chapter 15 proceeding, the Joint Liquidators obtained approval to pursue "realization of all of the Debtor's assets within the territorial jurisdiction of the United States, as set forth in section 1521(a)(5)." *Order Granting*

*Recognition of Foreign Main Proceeding and Related Relief*, In re: *Three Arrows Capital, Ltd*, No. 22-10920, (July 28, 2022). Dkt. No. 47.   Section 1521(a)(7) of the Bankruptcy Code, meanwhile, provides that "[u]pon recognition of a foreign proceeding, the court may, at the request of the foreign representative, grant . . . any additional relief that may be available to a trustee, *except for [the avoidance powers of a trustee]*." 15 U.S.C. § 1521(a)(7) (emphasis added).  Thus, although the Joint Liquidators opted to file their avoidance actions in the form of claims against GAP in this chapter 11 proceeding, their authority to bring these claims is *pursuant to the powers granted to them under chapter 15*.   Accordingly, Section 561(d) provides that the avoidance powers available to the Joint Liquidators in this proceeding must be limited to the same extent that such powers would be limited in 3AC's own chapter 15, as they are acting "essentially . . . as [a] trustee" in bringing these claims.  *See In re Fairfield Sentry Ltd.*, 452 B.R. 52, 60-64 (2011) (holding a chapter 15 foreign representative could obtain relief available to "trustees" under a Section 108 of the U.S. Bankruptcy Code, reasoning "[w]here entities, such as the Foreign Representatives, 'essentially function[ ] as the trustee,' the Second Circuit has found entitlement to Section 108 relief.") (citation omitted).

176.   The final sentence of Section 561(d), in turn, resolves any doubt as to Congress's intent that Section 561(d) should apply regardless of where the relevant transfers occurred.  Section 561(d) precludes a court from preventing enforcement of "securities contracts, commodity contracts, forward contracts, [and] swap agreements" and prevents the avoidance of such transactions to the extent they have already occurred.  11 U.S.C. § 561.  In both cases, "such enforcement [is] not to be limited based on the presence or absence of assets of the debtor in the United States."  *Id.*   As this Court has previously recognized, this means that foreign representatives cannot enjoin transfers necessary to enforce securities contracts, regardless of

whether the assets to be used to satisfy such contracts are "located within or without the United States." *In re Fairfield Sentry Ltd.*, 596 B.R. 275, 310 (Bankr. S.D.N.Y. 2018) (applying 561(d)). Foreign transfers necessary to enforce contracts delineated under Section 561(d) therefore cannot be enjoined. Likewise, foreign liquidators cannot avoid transfers, even foreign transfers, previously made in connection with such contracts. *Id.* at 311 ("The foreign representative cannot prevent the enforcement of the Close-Out Rights and cannot avoid the transfers that result from the enforcement of Close-Out Rights."). To the extent the Challenged Transfers are found to be foreign, therefore, the Safe Harbors apply extraterritorially through Section 561(d) to bar avoidance of all of the Challenged Transfers.

**C.    The Safe Harbors Bar All of the Joint Liquidators' Claims**

177.    Finally, the Safe Harbors bar not only the preference claims under Section 245 of the British Virgin Islands ("BVI") Insolvency Act ("BVI Law Preference Claims"), but also their turnover claims under Section 274A of the BVI Insolvency Act ("BVI Law Turnover Claims"), their turnover claims under Section 542 of the Bankruptcy Code ("U.S. Law Turnover and Conversion Claims"), their conversion claims, and any related claims they purport to or may seek to plead.[55]  Amended PoCs ¶¶ 33-50.  The Safe Harbors broadly protect settled transactions such as the Challenged Transfers from being unwound, and the Joint Liquidators' alternative pleading does not change this analysis. *See Tribune Co.*, 946 F.3d at 90-91; *In re Nine W. LBO Sec. Litig.*, 482 F. Supp. 3d 187, 207 (S.D.N.Y. 2020) (explaining that matters is the "remedy sought rather than the allegations pled").

---

[55]    Although it is true that the Safe Harbors do not on their face protect transfers from a turnover claim, here the Liquidators' asserted turnover claims are merely preference claims improperly re-cast as turnover claims. *See supra* ¶¶ 46-47.

178.    The Safe Harbors apply with equal force to bar the Joint Liquidators' U.S. Law Turnover and Conversion Claims, which are alternative routes to recover on the same Challenged Transfers.  The Second Circuit has recognized that "[t]he broad language used in Section 546(e) protects transactions" and "[a] lack of protection against the unwinding of securities transactions would create substantial deterrents, limited only by the copious imaginations of able lawyers, to investing in the securities market." *Tribune*, 946 F.3d at 90-91.  Thus, the Safe Harbors must be read broadly to protect the Challenged Transfers from recovery even on creative alternative theories, because "[u]nwinding settled securities transactions by claims such as [the Joint Liquidators'] would seriously undermine—a substantial understatement—markets in which certainty, speed, finality, and stability are necessary to attract capital." *See id.* at 90.

179.    The Joint Liquidators' BVI Law Turnover Claims are also barred by the Safe Harbors for similar reasons.  These claims too are simply alternative statutory means for seeking avoidance of the Challenged Transfers.  Courts reject efforts to accomplish what the Safe Harbors forbid through creative pleading under nonbankruptcy law.  *See, e.g.*, *id.* at 90 (barring non-bankruptcy fraudulent transfer claims); *In re Nine W.*, 482 F. Supp. 3d at 207 (barring unjust enrichment claims); *AP Servs., LLP v. Silva*, 483 B.R. 63, 71 (S.D.N.Y. 2012) (same).  This Court should similarly reject the Joint Liquidators' attempt to circumvent the Safe Harbors by re-casting their avoidance claims as claims as BVI law turnover, just as domestic trustees are barred from doing under state law.

### 3AC's Now-Amended Claims Should Be Disallowed And Expunged

180.    The now-amended 3AC PoCs (Claim Nos. 523, 526 and 527) should be disallowed and expunged for the same reasons described herein.  Moreover, to the extent the Amended PoCs are allowed, the Debtors cannot be required to pay the same claim multiple times.  *See, e.g.*, *Phelan v. Loc. 305 of United Ass'n of Journeymen & Apprentices of Plumbing and Pipefitting Indus. of*

*U.S. & Can.*, 973 F.2d 1050, 1063 (2d Cir. 1992) (articulating the general principal that "[a]
plaintiff may not recover twice for the same injury").  Courts routinely disallow and expunge
claims filed against the same debtor that have been amended and superseded by other claims.  *See,
e.g.*, *In re Voyager Digit. Holdings, Inc.*, No. 22-10943 (MEW) (Bankr. S.D.N.Y. Aug. 10, 2023)
(ECF No. 1559) (disallowing and expunging amended and superseded claims); *In re Celsius
Network LLC*, No. 22-10964 (MG) (Bankr. S.D.N.Y. Mar. 21, 2023) (ECF No. 2288) (same)*.*

181.   The Debtors object to the now-amended 3AC PoCs because the Debtors have
determined that such claims have been amended and superseded by the Amended PoCs, which
were filed by the same Claimant on account of the same liability.  Question number four on the
proof of claim form asks the Claimant to identify whether the claim amends one already filed and,
if it does, to identify the original claim's claim number.  In response to this question, 3AC specified
that these claims amended the 3AC PoCs.  Exs. A, B and C at 1.  It is therefore apparent from the
face of the Amended PoCs that 3AC intended them to amend and supersede the now-amended
3AC PoCs.  Failure to disallow the 3AC PoCs may result in 3AC obtaining a double recovery to
the detriment of other creditors.  Accordingly, the Debtors request that the Court disallow and
expunge the 3AC PoCs from the Claims Register.

### Responses to the Objection

182.   To oppose this Objection, the claimant must file and serve a written response to this
Objection (a "Response") so that it is received no later than such time as is set by the Court in
relation to the *Debtors' Motion for Entry of a Scheduling Order Concerning the Debtors' Second
Omnibus Objection (Substantive) to Claim Nos. 523, 526, 527, 981, 982 and 990 Pursuant to 11
U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (the "Scheduling Motion"), which is being
filed substantially simultaneously herewith (the "Response Deadline").  Pursuant to the *Order
Implementing Certain Notice and Case Management Procedures* [ECF No. 44] (the "Case

Management Procedures"), every Response must be filed electronically with the Court on the

docket of *In re Genesis Global Capital, LLC*, Case No. 23-100063 (the "Docket") with two single-

sided hard copies provided to:

> Chambers of Honorable Sean H. Lane
> United States Bankruptcy Court for the Southern District of New York
> 300 Quarropas Street
> White Plains, NY 10601

and served upon the following entities so that the Response is received no later than the Response

Deadline, at the following addresses:

> Cleary Gottlieb Steen & Hamilton LLP
> One Liberty Plaza
> New York, New York 10006
> Attn:  Sean A. O'Neal, Esq., Luke A. Barefoot, Esq., Jane VanLare, Esq.
> soneal@cgsh.com, lbarefoot@cgsh.com, jvanlare@cgsh.com
>
> -and-
>
> Genesis Global Capital, LLC
> 250 Park Avenue South, 5th Floor
> New York, NY 10003
> Attn: Arianna Pretto-Sakmann, Esq.
> arianna@genesistrading.com
>
> -and-
>
> White & Case LLP
> 1221 Avenue of the Americas
> New York, NY 10020
> Attn: Gregory Pesce, Esq. and Phil Abelson, Esq.
> gregory.pesce@whitecase.com, philip.abelson@whitecase.com
>
> -and-
>
> U.S. Dept. of Justice
> Office of the U.S. Trustee
> Alexander Hamilton U.S. Custom House
> One Bowling Green, Suite 515
> New York, NY 10004
> Attn: Greg Zipes, Esq.
> greg.zipes@usdoj.gov

183.    Every Response to this Objection must contain, at a minimum, the following information:

    a)    A caption setting forth the name of the Court, the name of the Debtors, the case number and the title of this Objection;

    b)    The name of the claimant, the claim number and a description of the basis for the amount of the claim;

    c)    The specific factual basis and supporting legal argument upon which the party will rely in opposing this Objection;

    d)    Any supporting documentation, to the extent that it was not included in the proof of claim previously filed with the clerk or claims agent, upon which the claimant intends to rely to support the basis for and amounts asserted in the proof of claim; and

    e)    The name, address, email, telephone number and fax number of the person(s) (which may be the claimant or the claimant's legal representative) with whom counsel for the Debtors should communicate with respect to the Claim or this Objection and who possesses authority to reconcile, settle or otherwise resolve the objection to the disputed claim on behalf of the claimant.

184.    If 3AC fails to file and serve a timely Response by the Response Deadline, the Debtors may present to the Court an appropriate order disallowing the Claims, without further notice to 3AC or a hearing.

### **Replies to Responses**

185.    The Debtors may, at their option, file and serve a reply to any response so that it is received by the claimant (or claimant's counsel) no later than three days prior to the Hearing.[56]

---

[56]    Upon entry of the *Debtors' Motion for Entry of a Scheduling Order Concerning the Debtors' Second Omnibus Objection (Substantive) to Claim Nos. 523, 526, 527, 981, 982 and 990 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)*, which is being filed substantially simultaneously herewith, the Debtors will file their reply and any other pleadings in accordance with its terms.

**Adjournment of Hearing**

186.    In accordance with the Claims Procedures Order, the Debtors may adjourn the Hearing on any Responses to this Objection.  In the event that the Debtors elect to pursue such an adjournment, it will be noted on the notice of agenda for the Hearing and such agenda will be served in accordance with the *Order Implementing Certain Notice and Case Management Procedures* [ECF No. 44] ("Case Management Procedures").

**Reservation of Rights**

187.    The Debtors expressly reserve the right to amend, modify or supplement this Objection.  Should the grounds of objection stated in this Objection be dismissed or overruled, the Debtors reserve the right to object to the Claims on any other grounds that the Debtors discover or elect to pursue, including, without limitation, equitable subordination or disallowance, *in pari delicto* and other doctrines relating to 3AC's role in the circumstances that led to the commencement of these Chapter 11 cases.  This Objection sets out certain substantive objections to the Claims.  The Debtors reserve their right to assert other substantive objections and/or one or more non-substantive objections to the Claims at a later time.

188.    Notwithstanding anything contained in this Objection or the attached exhibits, nothing herein shall be construed as a waiver of any rights that the Debtors may have to (a) commence avoidance actions under the applicable sections of the Bankruptcy Code, including, but not limited to, sections 547 and 548 of the Bankruptcy Code, against the claimant subject to this Objection, (b) enforce the Debtors' rights of setoff against the claimant relating to such avoidance actions or (c) seek disallowance pursuant to Bankruptcy Code Section 502(d) of each of the claims of the claimant that are subject to such avoidance actions.

**Notice**

189.    Notice of this Objection has been given in accordance with the Case Management Procedures, including to 3AC.  In light of the nature of the relief requested, the Debtors submit that no other or further notice is necessary.

WHEREFORE, the Debtors respectfully request that the Court (i) enter an order substantially in the form attached hereto as Exhibit BB disallowing and expunging Claim Nos. 523, 526, and 527, and (ii) grant such other and further relief as is just and proper.

Dated:  September 1, 2023
      New York, New York

*/s/ Luke A. Barefoot*
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*