# EXHIBIT B
# Proof of Claim

**United States Bankruptcy Court, Southern District of New York**

| Fill in this information to identify the case (Select only one Debtor per claim form): |
|---|
| ☐  Genesis Global Holdco, LLC (Case No. 23-10063) |
| Genesis Global Capital, LLC  (Case No. 23-10064) |
| Genesis Asia Pacific PTE. LTD.  (Case No. 23-10065) |

## Modified Official Form 410

# Proof of Claim
04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed (January 19, 2023). That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☐ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Name | Name |
| Number     Street | Number     Street |
| City          State          ZIP Code | City          State          ZIP Code |
| **Country: British Virgin Islands** | |
| Contact phone _____ | Contact phone _____ |
| Contact email _____ | Contact email _____ |

**4. Does this claim amend one already filed?**

☐ No
☐ Yes.   Claim number on court claims registry (if known)_____

Filed on _____
MM  /  DD  /  YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☐ No
☐ Yes. Who made the earlier filing? _____

**Part 2:**    **Give Information About the Claim as of the Date the Case Was Filed**

6. **Do you have any number you use to identify the debtor?**

☐ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

7. **How much is the claim?** (If your claim is based on cryptocurrency holdings, please provide the number of units associated with your claim. Do not provide a value for your cryptocurrency holding claim in United States Dollars.  Only provide a United States Dollar value for your claim if your claim is based in United States Dollars.)

A.    To the extent you assert a claim that is denominated in US Dollars, list the value of the claim in US Dollars as of the date the case was filed (January 19, 2023): $_____. Does this amount include interest or other charges?

☐ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other  charges required by Bankruptcy Rule 3001(c)(2)(A).

B.    With regard to coins loaned to the Debtors, list the number of each type of coin loaned to the Debtors as of the date the case was filed (January, 19, 2023).

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| 0x (ZRX) | | Livepeer (LPT) | |
| 1inch Network (1INCH) | | Loopring (LRC) | |
| Aave (AAVE) | | Maker (MKR) | |
| Alchemix (ALCX) | | Moonbeam (GLMR) | |
| Algorand (ALGO) | | Multi Collateral Dai (DAI) | |
| Amp (AMP) | | Near (NEAR) | |
| Ankr (ANKR) | | Neo (NEO) | |
| ApeCoin (APE) | | Orchid (OXT) | |
| Axie Infinity (AXS) | | PAX Gold (PAXG) | |
| Balancer (BAL) | | Polkadot (DOT) | |
| Bancor (BNT) | | Polygon (MATIC) | |
| Basic Attention Token (BAT) | | Rally (RLY) | |
| Binance Coin (BNB) | | Ren (REN) | |
| Bitcoin (BTC) | | Ribbon Finance (RBN) | |
| Bitcoin Cash (BCH) | | Serum (SRM) | |
| Bitcoin SV (BSV) | | Shiba Inu (SHIB) | |
| Cardano (ADA) | | SKALE (SKL) | |
| Chainlink (LINK) | | Solana (SOL) | |
| Chiliz (CHZ) | | Stellar (XLM) | |
| Compound (COMP) | | Storj (STORJ) | |
| Cosmos (ATOM) | | SushiSwap (SUSHI) | |
| Curve DAO Token (CRV) | | Synthetix (SNX) | |
| Decentraland (MANA) | | Terra Classic (LUNC) | |
| DogeCoin (DOGE) | | TerraClassicUSD (USTC) | |
| EOS (EOS) | | Tether (USDT) | |

| Coin List | Count | Coin List | Count |
|---|---|---|---|
| Ethereum (ETH) | | Tezos (XTZ) | |
| Ethereum Classic (ETC) | | The Graph (GRT) | |
| EthereumPoW (ETHW) | | The Sandbox (SAND) | |
| Fantom (FTM) | | Tokemak (TOKE) | |
| Fetch.ai (FET) | | Tron (TRX) | |
| Filecoin (FIL) | | UMA (UMA) | |
| Flow (FLOW) | | Uniswap (UNI) | |
| Gemini Dollar (GUSD) | | USD (USD) | |
| Helium (HNT) | | USD Coin (USDC) | |
| Horizen (ZEN) | | Wrapped Bitcoin (WBTC) | |
| Injective (INJ) | | Wrapped Luna (WLUNA) | |
| Kusama (KSM) | | XRP (XRP) | |
| Kyber Network Crystal v2 (KNC) | | Yearn.Finance (YFI) | |
| Litecoin (LTC) | | Zcash (ZEC) | |
| BIT (BitDAO) | | Other (Provide Currency Type & Count) | |

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_____

_____

Are you a current or former Gemini Trust Company, LLC user?   ☐ No  ☐ Yes

If yes, is your claim related to any loans you made through the Gemini Earn Program?   ☐ No  ☐ Yes

**9. Is all or part of the claim secured?**

☐ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____

**Amount of the claim that is secured:**   $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%
☐ Fixed
☐ Variable

| | |
|---|---|
| 10. **Is this claim based on a lease?** | ❏ No<br><br>❏ Yes. **Amount necessary to cure any default as of the date of the petition.**  $_____ |
| 11. **Is this claim subject to a right of setoff?** | ❏ No<br><br>❏ Yes. Identify the property.  (If the property is cryptocurrency, identify each type of cryptocurrency, the respective number of units of each type of cryptocurrency, and whether the property was posted by you or the Debtor):<br><br>_____<br>_____<br>_____<br>_____<br>_____ |

| | | |
|---|---|---|
| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**<br><br>A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ❏ No<br><br>❏ Yes. *Check one:* | **Amount entitled to priority** |
| | ❏ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ❏ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ❏ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ❏ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ❏ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ❏ Other. Specify subsection of 11 U.S.C. § 507(a)(    ) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment. | |

| | | |
|---|---|---|
| 13. **Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?** | ❏ No<br><br>❏ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.** | $_____ |

| Part 3: | Sign Below |
| --- | --- |

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

❑  I am the creditor.

❑  I am the creditor's attorney or authorized agent.

❑  I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

❑  I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date _____
MM / DD / YYYY

_____
Signature

**Name of the person who is completing and signing this claim:**

Name _____
First name                    Middle name                    Last name

Title _____

Company _____
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address _____
Number          Street

_____
City                                        State          ZIP Code

Contact phone _____          Email _____

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| Genesis Global Holdco, LLC, *et al.*,[1] | ) | Case No. 23-10063 (SHL) |
| | ) | |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

## ATTACHMENT TO AMENDED PROOF OF CLAIM FILED BY THE JOINT LIQUIDATORS OF THREE ARROWS CAPITAL LTD

This attachment to the amended proof of claim (the "**Amended Proof of Claim**") is hereby filed by Russell Crumpler and Christopher Farmer, in their capacities as the duly authorized joint liquidators and foreign representatives (the "**Foreign Representatives**") of Three Arrows Capital Ltd. ("**3AC**"), against Debtors Genesis Global Holdco, LLC ("**GGH**"), Genesis Global Capital, LLC ("**GGC**"), and Genesis Asia Pacific, Pte. Ltd., ("**GAP**") (collectively, the "**Debtors**"). This attachment is an integral part of the Amended Proof of Claim, which amends the claims previously filed under Claim Nos. 523, 526, and 527, and is incorporated by reference therein for all purposes.

## I.    Overview of 3AC's Claims

1.    This Amended Proof of Claim arises out of a series of transactions between the Debtors and 3AC—a cryptocurrency hedge fund—in the months leading up to 3AC's well-publicized collapse in 2022 and its liquidation in the British Virgin Islands ("**BVI**"). The Debtors were 3AC's largest lenders. Between 2019 and 2022, the Debtors claim to have provided over $2.36 billion in loans to 3AC. In just the two months prior to the commencement of 3AC's BVI

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

liquidation proceeding on June 27, 2022, the Debtors received transfers worth over $500 million from 3AC. Before filing this Chapter 11 proceeding they then purported to foreclose upon over one billion dollars in 3AC assets, much of which was not subject to valid and enforceable security interests based on documents obtained by the Foreign Representatives to date.

2.      Now, the Foreign Representatives—appointed as joint liquidators by the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division) (the "**BVI Court**") in 3AC's ongoing liquidation proceeding in the British Virgin Island (the "**BVI Proceeding**")—assert claims (1) to avoid, pursuant to BVI law, preferential transfers to the Debtors by 3AC while it was insolvent, and (2) to recover assets that the Debtors purported to foreclose upon in the absence of a valid and enforceable security interest pursuant to New York law, BVI law, and section 542 of title 11 of the U.S. Code(the "**Bankruptcy Code**").

3.      This Amended Proof of Claim also preserves the 3AC estate's claims against the Debtors under the Bankruptcy Code, which they will pursue if a plenary bankruptcy case is commenced in the United States in respect of 3AC.

4.      Further, the Foreign Representatives expressly reserve their rights to bring any other claims against the Debtors that they may uncover based on ongoing discovery. The information available to the Foreign Representatives concerning 3AC's business, assets, and affairs has been limited by 3AC's incomplete books and records and the documented lack of cooperation by 3AC's founders, Kyle Davies and Shu Zu (together, the "**Founders**"). The Foreign Representatives are actively engaged in discovery with the Debtors and their parent company, Digital Currency Group ("**DCG**"), and may further amend their claims based on any new facts uncovered after the completion of such discovery. As just one example, the Debtors are wholly-owned subsidiaries of DCG, and the Founders invested heavily—on behalf of 3AC—in cryptocurrency trusts managed

2

by DCG's subsidiary Grayscale Investments, LLC ("**Grayscale**").  Grayscale and DCG have been involved in at least two lawsuits alleging that they breached their fiduciary and contractual duties by preventing investors from redeeming their shares for cryptocurrency and charging excessive sponsor fees.[2]  The Debtors may be subject to related claims.  The Foreign Representatives expressly reserve their rights to bring such claims—or any other claims (including on the basis of breach of contract and lender liability)—after obtaining and reviewing discovery materials.

## II.    The Relationship Between 3AC and the Debtors

5.    3AC was an investment firm incorporated in the BVI with a focus on trading cryptocurrency and other digital assets.  The Founders founded 3AC in 2013.  3AC initially focused on foreign-exchange arbitrage before shifting to cryptocurrency trading in 2018.

6.    The Debtors describe themselves as "[t]he premier institutional digital asset financial services firm" and have originated over $244 billion in loans of cryptocurrency or U.S. dollars since launching their institutional cryptocurrency lending business in 2018.[3]  The Debtors are wholly-owned subsidiaries of DCG.

7.    The Debtors were 3AC's largest purported lenders and provided it with billions of dollars' worth of purported loans.

8.    3AC initially entered into a Master Loan Agreement with Debtor GGC dated January 19, 2019 (the "**2019 MLA**"), attached hereto as **Exhibit A**, and received purported loans

---

[2]    *See* Complaint, *Fir Tree Value Master Fund L.P. et al., v. Grayscale Investments et al.*, Case No. 2022-1126 (Del. Ct. Ch.); *Alameda Research Ltd. v. Grayscale Investments, LLC. et al.*, No. 2023-0276 (Del. Ct. Ch.).

[3]    Genesis, *About Genesis*, https://genesistrading.com/company/about (last accessed Aug. 16, 2023); Genesis, *Genesis Q1 2022 Market Observations*, https://info.genesistrading.com/hubfs/quarterly-reports/2022/Genesis-Q1-Report-2022.pdf  (last accessed Aug. 16, 2023) ("As of March 31, cumulative originations had reached $195 Billion."); Genesis, *Genesis Q2 2022 Market Observations*, *available at* https://info.genesistrading.com/hubfs/quarterly-reports/2022/Genesis-Q2-Report-2022.pdf (last accessed Aug. 16, 2023) ("The Genesis lending desk originated approximately $40.4 billion in loans" in one quarter alone).

from GGC.  3AC then entered into a Master Loan Agreement with Debtor GAP dated January 24, 2020 (the "**2020 MLA**"), attached hereto as **Exhibit B**, and subsequently received purported loans from GAP.  GGC purported to assign "all of its lending activities" under the 2019 MLA to GAP under an Assignment and Assumption of Master Loan Agreement dated July 20, 2020, attached hereto as **Exhibit C**.

9.    The MLAs state that the "terms" of each loan made by the Debtors to 3AC would be "memorialized" in a "Loan Term Sheet."  Exs. A & B, Section II(b).  Between 2019 and 2022, the Debtors and 3AC entered into various Loan Term Sheets under the MLAs.  By 2022, the Debtors had more than $2 billion in purported loans to 3AC outstanding (not all of which appear to be memorialized in Loan Term Sheets).  The MLAs provided that 3AC may grant the Debtors a security interest in certain "Collateral" pursuant to Loan Term Sheets.  Exs. A & B, Section IV(a).

10.    3AC purportedly granted the Debtors security interests in certain of its assets in connection with loans provided by the Debtors.  This purported collateral included cryptocurrency, such as Bitcoin, AVAX tokens, and NEAR tokens, and other types of assets, such as shares in the Grayscale Bitcoin Trust (the "**Bitcoin Trust**") and the Grayscale Ethereum Trust (the "**Ethereum Trust**," and together with the Bitcoin Trust, the "**Grayscale Trusts**").

11.    Pursuant to that certain Assignment and Assumption of Master Loan Agreement, by and between GAP and its parent company DCG, dated as of July 14, 2022 (the "**DCG Assignment Agreement**") and attached hereto as **Exhibit D**, GAP purported to assign its rights under the 2020 MLA and related pledges to its parent company DCG.  Importantly, the DCG Assignment Agreement did not relieve GAP from any existing claims by or liability to 3AC.

**III.    3AC's Collapse**

4

12.     As discussed above, 3AC's investment strategy involved making large, leveraged cryptocurrency trades using funding from the Debtors and other investors.  Between 2018 and 2021, as the cryptocurrency market grew, 3AC's strategy was successful.  However, by May 2022, the cryptocurrency market crashed, and 3AC failed.  This failure was in part due to the failure of two of 3AC's most significant investments: the Grayscale Trusts and the "Luna" coin.[4]

13.     3AC began focusing on cryptocurrency in 2018, when the global cryptocurrency market's value was estimated at just over $100 billion.  Between 2018 and 2021, the cryptocurrency market grew exponentially, reaching its peak in November 2021 at over $3 trillion in value.

14.     Between November 2021 and May 2022, however, the global cryptocurrency market experienced a historic and momentous decline.  By May 3, 2022, it had fallen over $1 trillion, to $1.9 trillion, and by May 11, 2022, it had reached its low at $1.3 trillion.[5]

15.     As the size of the cryptocurrency market shrank, so did 3AC's net asset value.  For example, between November 12, 2021 and May 3, 2022, the value of 3AC's shares in the Grayscale Bitcoin Trust decreased by over a billion dollars, from approximately $2.9 billion to less than $1.9 billion.  This fall in value occurred despite 3AC increasing its overall holdings of Grayscale Bitcoin Trust shares during this period.  Similarly, 3AC's holdings in Luna coins also collapsed by May 2022.  On May 4 2022, the price of Luna began to fall and, on May 7 2022, "Terra", a token fundamentally associated with LUNA began to lose its U.S. dollar "peg" as its

---

[4]     "Luna" was designed to be a "stablecoin" that maintained a value of one U.S. dollar.

[5]     https://www.coingecko.com/en/global-charts

price crashed to less than $1.[6]  Given the fundamental relationship between the two tokens, the "de-peg" of Terra resulted in LUNA tokens falling to $0 in 13 May 2022.[7]

16.    The Luna crash led to a "meltdown" in cryptocurrency markets, resulting in a crash in the price of Bitcoin and the loss of $300 billion in value in cryptocurrency markets between May 9 and May 12, 2022.[8]  This further devastated 3AC.  By early May 2022, 3AC's balance sheet had collapsed.  3AC's net asset value ("**NAV**") is calculated by subtracting its assets from its liabilities.  3AC's NAV decreased dramatically between May 4 and May 11, 2022.  Ultimately, when taking into account the Bitcoin Trust, Luna, Bitcoin, and its other assets, 3AC lost around $2.7 billion in value between February 28 and May 12, 2022.

17.    The Debtors describe themselves as the "biggest trading desk for professional investors in cryptocurrency markets."[9]  On information and belief, the Debtors were aware of the decline in the cryptocurrency markets, Luna, and the Grayscale Trusts—which is owned by the Debtors' parent company, DCG—from 2021 through 3AC's collapse in 2022.  The Debtors provided billions of dollars of funding to 3AC during this time period and had a close working relationship with the Founders, and on information and belief, the Debtors were aware of 3AC's exposure to cryptocurrency, the Grayscale Trusts, Luna, and Bitcoin.

18.    Subsequent to 3AC's collapse, the Debtors' purported to foreclose upon certain assets in which they asserted a security interest.  In a July 26, 2022 email, which is attached hereto

---

[6]    https://www.coindesk.com/layer2/2022/05/11/the-luna-and-ust-crash-explained-in-5-charts/

[7]    https://www.forbes.com/sites/lawrencewintermeyer/2022/05/25/from-hero-to-zero-how-terra-was-toppled-in-cryptos-darkest-hour/?sh=65244847389e

[8]    https://www.nytimes.com/2022/05/12/technology/cryptocurrencies-crash-bitcoin.html

[9]    https://genesistrading.com/company/about

as **Exhibit E**, counsel to DCG stated that the Debtors had foreclosed on 33,348.3 Bitcoin, 17,455.73 Ether, and 35,585,040 shares of the Grayscale Bitcoin Trust, and that DCG asserts a security interest in 2,739,043.83 AVAX tokens and 13,583,265 NEAR tokens. On information and belief, the value of the assets the Debtors purportedly foreclosed upon exceeded $1 billion at the time of such purported foreclosure.

19.     As discussed below, the Foreign Representatives dispute that the Debtors had a valid and enforceable security interest in many of the assets the Debtors purported to foreclose upon. Specifically, there is no security agreement or other document (or any other method for attachment of a security interest) that granted a valid security interest in many of the assets subject to purported foreclosure, and for other assets where a purported agreement or document exist, many of the transfers that purportedly gave rise to security interests may be avoided as preferential under BVI law.

## IV.    The Foreign Representatives' Authority

20.     3AC's BVI Proceeding is governed by the BVI's Insolvency Act of 2003 (the "**BVI Insolvency Act**"). On June 27, 2022, 3AC commenced the BVI Proceeding, and the BVI Court appointed Foreign Representatives Russell Crumpler and Christopher Farmer as 3AC's joint liquidators. Under BVI law, the Foreign Representatives are fiduciaries of the 3AC estate, with an obligation to conduct an orderly, fair liquidation of 3AC and to maximize the value of its assets for 3AC's creditors. As liquidators, the Foreign Representatives are "office holders" as defined in section 244 of the BVI Insolvency Act, who are authorized to seek relief from a court setting aside voidable transactions.

21.     On July 28, 2022, the Foreign Representatives obtained recognition of the BVI Proceeding as a "foreign main proceeding" under Chapter 15 of the Bankruptcy Code before the Honorable Judge Martin Glenn of the United States Bankruptcy Court for the Southern District of

New York.  *See Order Granting Recognition Of Foreign Main Proceeding and Related Relief*, Case No. 22-10920 (MG), ECF No. 47.  As a result, the Court may grant Foreign Representatives "any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a)." 11 U.S.C § 1521(a)(7).

22.    On May 24, 2023, 3AC filed an application before the BVI Court seeking sanction (i.e., authorization) to commence a Chapter 11 case in the United States on behalf of 3AC.  On July 26, 2023, the BVI Court denied the application.  On August 17, 2023, the Foreign Representatives filed an appeal of the BVI Court's decision.

23.    If a plenary U.S. bankruptcy case is commenced in respect of 3AC, the 3AC estate would have "strong arm" claims to avoid unperfected security interests under 11 U.S.C. § 544 and preference claims under 11 U.S.C. § 547 to avoid transfers of security interests attached or perfected within the 90-day period prior to the July 1, 2022 filing of 3AC's Chapter 15 cases, which period began on April 2, 2022.  *See* 11 U.S.C. § 1523(a); *See In re Awal Bank, BSC*, 455 B.R. 73 (Bankr. S.D.N.Y. 2011).

24.    On January 19, 2023, the Debtors initiated these jointly-administered Chapter 11 cases.  The Foreign Representatives timely filed Proofs of Claims ("**POCs**") on May 22, 2023, and the Debtors objected.  ECF Nos. 523, 526, 527, 530.  The Foreign Representatives are hereby filing an Amended Proof of Claim pursuant to their agreement with the Debtors regarding an adjournment of the Debtors' claim objection.

## V.    The Disputed Assets

25.    The Foreign Representatives bring claims against the Debtors to recover, and avoid certain transfers of, assets and of purported interests therein that are either the property of the 3AC estate, or subject to avoidance under BVI or U.S. law.  Specifically, the Foreign Representatives claims concern transfers of at least $132.9 million in loan repayment and interest payments,

27,673.37 Bitcoin, 67,455 Ether, 96.2 million ALGO tokens, 699,000 Solana tokens, 300,000 AVAX tokens, and 22.3 million Grayscale Bitcoin Trust shares (collectively, the "**Disputed Assets**").[10]  The value of the Disputed Assets is estimated to be at least $1.15 billion.

26.     The Foreign Representatives' claims are in two categories: (1) recovery of assets subject to purported foreclosure where the Debtors had no valid and enforceable security interest over such assets, and (2) avoidance of preferential transfers under BVI law.

      A.    *Unpledged Seized Assets*

27.     The following assets were purportedly foreclosed upon despite the Debtors lacking a valid and enforceable security interest: (i) approximately 13,780.04 BTC (with a value of approximately $286 million as of June 27, 2022), (ii) approximately 17,455 Ether (with a value of approximately $21 million as of June 27, 2022), (iii) four categories of tokens that were converted into Bitcoin comprised of 96.2 million ALGO tokens, 699,000 Solana tokens, 300,000 AVAX tokens, and 50,000 Ether (with a collective value of approximately $183 million as their transfer to Debtors on May 12 and 13, 2022), and (vi) approximately 9.2 million Grayscale Bitcoin Trust shares (with a value of approximately $124 million as June 27, 2022) (collectively, the "**Unpledged Seized Assets**").

      B.    *Preferential Transfers*

28.     On May 6, 2022, 3AC made a principal loan repayment with a value of $115 million to the Debtors (the "**Principal Payment")**.  The Debtors assert that these transfers were made to fully pay $49 million balance of certain January 10 and 11, 2022 loans and make a payment of approximately 66 million USDC toward a certain January 28, 2022 loan.  *See Debtors' First*

---

[10]     Of the Disputed Assets, 50,000 Ether, 96.2 million ALGO tokens, 699,000 Solana tokens, and 300,000 AVAX tokens were ultimately converted into Bitcoin and held by the Debtors as purported collateral.

*Omnibus Objection (Substantive) to Claim Nos. 523, 526 And 527 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)*, Docket No. 530, at ¶ 59.  The Debtors admit that the Principle Repayment was made "to raise margin levels" for 3AC's existing loan, rather than as collateral for any new loan.  *Id.* at ¶ 60.

29.    On May 11 and May 12, 2022, 3AC transferred 13,172,000 Grayscale Bitcoin Trust shares into an account (the "**ACA Account**") subject to an Account Control Agreement dated as of November 15, 2021 with TradeStation Securities, Inc., as a securities intermediary.  No new value was given in exchange for 3AC's transfer of this asset into the controlled account.

30.    On May 12 and May 13, 2022, 3AC transferred the following assets to the Debtors, purportedly pursuant to a margin call: (i) 50,000 Ether, (ii) 96.2 million ALGO tokens, (iii) 699,000 Solana tokens, and (iv) 300,000 AVAX tokens.  No new value was given in exchange for 3AC's transfer of these assets to the Debtors.

31.    On May 31, 2022, the Debtors provided 3AC with an invoice for purported loans of U.S. dollars and cryptocurrency, including Ethereum Classic, FTX Token, USD Coin, and Tether. The invoice identified various digital and other assets as "Accrued Interest."  On June 2 and 3, 2022, 3AC transferred the requested amounts in the invoice of U.S. dollars and cryptocurrency (the "**Interest Payment**"), valued at $17,959,648.47 on the dates they were transferred.

32.    The assets described in the preceding four paragraphs (including, for the avoidance of doubt, the assets transferred to make the Principal Payment and the Interest Payment) shall hereinafter be referred to as the "**Preferential Transfers**."

## VI.    The Foreign Representatives Claims

33.    The Foreign Representatives assert claims based on BVI law, the Bankruptcy Code, and New York law, and reserve the right to assert any other claims based on any other applicable law.

A.    *BVI Law Claims*

a.    *BVI Turnover Claims*

34.    The Foreign Representatives assert claims under BVI law to recover transfers of the Unpledged Seized Assets.  Pursuant to section 274A of the BVI Insolvency Act, "[w]here any person has in his or her possession or control any assets or documents to which the company appears to be entitled, the Court may, on the application of the office holder, require that person forthwith, or within such period as the Court may direct, to pay, deliver, convey, surrender or transfer the assets or documents to the office holder." Insolvency Act 2003 (as amended), S.I. 47/2004,  § 274A.

35.    As explained above, the Debtors did not have a valid and enforceable security interest on the Unpledged Seized Assets.  Accordingly, such assets rightfully belong to 3AC, and the Debtors' purported foreclosure on such assets means that the Debtors took possession or control of assets "to which the company appears to be entitled."

36.    Consequently, the Foreign Representatives assert claims pursuant to section 274(A) of the BVI Insolvency Act to recover the Unpledged Seized Assets for the benefit of 3AC's estate (the "**BVI Turnover Claims**").

37.    The BVI Turnover Claims are valued at least at approximately $614,000,000,[11] comprised of:

- approximately 13,780.04 BTC (with a value of approximately $286 million as of June 27, 2022);

---

[11]    The values of the assets underlying the claims set forth in this Amended Proof of Claim are valued as of June 27, 2022 (*i.e.,* the date on which the BVI Proceeding started), with the exception of the following assets, which are valued as of the date such assets were no longer in 3AC's possession or control: 50,000 Ether; 96.2 million ALGO tokens; 699,000 Solana tokens; 300,000 AVAX tokens, and 13,172,000 Grayscale Bitcoin Trust shares.  The Foreign Representatives reserve the right to assert claim values based on different dates with respect to such assets and/or transfers, including based on the value that should have been available to the estate at the time of any judgment if the transfers had not occurred.

- approximately 17,455 Ether (with a value of approximately $21 million as of June 27, 2022);

- four categories of tokens that were converted into Bitcoin, comprised of 96.2 million ALGO tokens, 699,000 Solana tokens, 300,000 AVAX tokens, and 50,000 Ether (with a collective value of approximately $183 million as their transfer to Debtors on May 12 and 13, 2022); and

- approximately 9.2 million Grayscale Bitcoin Trust shares (with a value of approximately $124 million as June 27, 2022).

    b.    *BVI Preference Claims*

38.    Pursuant to section 245 of the BVI Insolvency Act, a transaction is subject to avoidance as an "unfair preference" if the transaction: (a) "is an insolvency transaction;" (b) is "entered into within the vulnerability period;" and (c) "has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he or she would have been in if the transaction had not been entered into."  Insolvency Act 2003 (as amended), S.I. 47/2004, § 245(1).

39.    Section 245 of the BVI Insolvency Act applies to "insolvency transactions."  Under section 244(2) of the BVI Insolvency Act, an "insolvency transaction" is a transaction "entered into at a time when [a] company is insolvent" or that "causes a company to become insolvent." Insolvency Act 2003 (as amended), S.I. 47/2004, § 244(2).

40.    Among other reasons for insolvency, the deterioration of market conditions leading up to May 5, 2022 constituted a material adverse effect, among other events of default, under certain of the master loan agreements under which 3AC was a borrower.  Depending on the specific terms of each master loan agreement, those events of default either automatically accelerated the loans thereunder or rendered them immediately callable.  The total amount of loans under these master loan agreements totaled $2,608,102,034.90 as of May 5, 2022.  On that date, 3AC    had    only    $2,424,648,388.06    worth    of    liquid    assets,    and    was    therefore

insolvent.  Additionally, because a substantial portion of the loan agreements to which 3AC was party were "open" loan agreements that may be called at any time, 3AC was in effect insolvent at any point where its liquid assets could not suffice to satisfy its liabilities on such loans, irrespective of the occurrence of an event of default.

41.    Specifically, the following factors contributed to the severe deterioration of 3AC's financial condition, which has resulted in events of default on the aforementioned master loan agreements:

- The value of 3AC's holding in Grayscale Bitcoin Trust shares fell from approximately $2.9 billion to approximately $1.9 billion between 12 November 2021 and 3 May 2022, *i.e.*, a decrease of approximately $1 billion.  This fall in value occurred despite 3AC increasing its overall holdings of Grayscale Bitcoin Trust shares during this period.

- On 4 May 2022, the price of LUNA and Terra began to fall and by 12 May 2022 those tokens were valueless.

- Between 28 February 2022 and 12 May 2022, the value of 3AC's holding in LUNA fell by $527,086,042.85.

- Between 4 May 2022 and 11 May 2022, as the price of LUNA and Terra fell, the value of 3AC's holding in GBTC fell by a further $428 million.

42.    Under Section 244 of the BVI Insolvency Act, the "vulnerability period" for a voidable transfer under Section 245 is generally "the period commencing six months prior to the onset of insolvency and ending in the appoint of the administrator or, if the company is in liquidation, the liquidator."    When a company is in liquidation and a BVI court appoints a liquidator, the "onset of insolvency" is generally "the date on which the application for the appointment of the liquidator was filed," which occurred in this case on June 27, 2022.  Therefore, the vulnerability period under BVI law with respect to 3AC is December 27, 2022 to June 27, 2022.

43.    BVI preference law provides for an affirmative defense with respect to transactions entered into in the ordinary course.  Specifically, section 245(2) of the BVI Insolvency Act provides that "[a] transaction is not an unfair preference if the transaction took place in the ordinary course of business." Insolvency Act 2003 (as amended), S.I. 47/2004,  § 245(2).  Based on information (including information produced by the Debtors to the Foreign Representatives through discovery) and belief, the Preferential Transfers were all made subsequent to and in connection with the Debtors' knowledge of 3AC's distress.  For this and other reasons, the Preferential Transfers were not made in "in the ordinary course of business."

44.    Accordingly, the Foreign Representatives assert claims under section 245 of the BVI Insolvency Act to recover the Preferential Transfers (the "**BVI Preference Claims**"), which were all made to the Debtors after May 5, 2023 (i.e., while 3AC was insolvent and within the vulnerability period), and which had the effect of putting the Debtors into a better position than they would have been in if the Preferential Transfers were never made.

45.    The BVI Preference Claims are in an aggregate amount of at least at approximately $563.2 million, comprised of:

- The Principal Payment, with a value of $115 million;

- The Interest Payment, with a value of approximately $18 million;

- 13,172,000 Grayscale Bitcoin Trust shares, with a value of approximately $247 million as of the time such shares were transferred into the ACA Account; and

- four categories of tokens that were converted into Bitcoin, comprised of 96.2 million ALGO tokens, 699,000 Solana tokens, 300,000 AVAX tokens, and 50,000 Ether (with a collective value of approximately $183 million as their transfer to Debtors on May 12 and 13, 2022)

**B.**    *U.S. Law Turnover & Conversion Claims*

46.    Section 542 of the Bankruptcy Code provides, in relevant part, that "an entity . . . in possession, custody, or control, during the case, of property that the trustee may use, sell, or lease

under section 363 of this title, or that the debtor may exempt under section 522 of this title, shall deliver to the trustee, and account for, such property or the value of such property . . . ." 11 U.S.C. § 542(a).

47.    Under New York law, conversion occurs "when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession." *Fam. Health Mgmt., LLC v. Rohan Devs., LLC*, 207 A.D.3d 136, 139, 171 N.Y.S.3d 44, 46 (2022)

48.    As explained above, the Debtors do not have a valid and enforceable security interest on the Unpledged Seized Assets.  Accordingly, seizure of such assets without a valid and enforceable security interest did not alter 3AC's legal right to own such assets.

49.    The Foreign Representatives assert claims pursuant to section 542 of the Bankruptcy Code and New York conversion law to recover the Unpledged Seized Assets for the benefit of 3AC's estate (the "**U.S. Turnover Claims**").

50.    The U.S. Turnover Claims are valued at least at approximately $614,000,000, comprised of:

- Approximately 13,780.04 BTC (with a value of approximately $286 million as of June 27, 2022);

- approximately 17,455 Ether (with a value of approximately $21 million as of June 27, 2022);

- four categories of tokens that were converted into Bitcoin, comprised of 96.2 million ALGO tokens, 699,000 Solana tokens, 300,000 AVAX tokens, and 50,000 Ether (with a collective value of approximately $183 million as their transfer to Debtors on May 12 and 13, 2022); and

- approximately 9.2 million Grayscale Bitcoin Trust shares (with a value of approximately $124 million as June 27, 2022).

    **C.**    *Potential U.S. Avoidance Actions*

51.    The Amended Proof of Claim also seeks to preserve the 3AC estate's claims against the Debtors under the Bankruptcy Code, which the Foreign Representatives may pursue if a plenary U.S. bankruptcy case is commenced in respect of 3AC.  These claims are in an aggregate amount of at least $1.15 billion (the "**Potential US Avoidance Actions**").  The Potential US Avoidance Actions are as follows.

    a.    *Strong-Arm Claims*

52.    Section 544 of the Bankruptcy Code empowers a trustee or debtor-in-possession to avoid certain pre-bankruptcy transfers of a debtor's property that could have been avoided by (1) a hypothetical judgment lien of creditor that extended credit and obtained a lien on the commencement of a bankruptcy case; (2) a hypothetical bona fide purchaser of real property from the debtor that perfected such transfer at the time of the commencement of the case; and (3) a creditor holding an allowed general unsecured claim.  11 U.S.C. § 544.

53.    This "strong arm" power enables the debtor to, *inter alia*, avoid security interests that are unperfected, or not properly perfected, as of the commencement of the bankruptcy case.

54.    No document or other means of perfection exists evidencing the perfection of any purported security interest (to the extent one exists) in the following Disputed Assets, either via the filing of a UCC-1 financing statement, or via an alternative method of perfection acceptable under Article 9 of the New York Uniform Commercial Code (*e.g.*, control by means of an account control agreement): 27,673.37 Bitcoin, 67,455 Ether, 96.2 million ALGO tokens, 699,000 Solana tokens, and 300,000 AVAX tokens (collectively, the "**Unperfected Assets**").

55.    Accordingly, subject to the commencement of plenary U.S. bankruptcy case in respect of 3AC, the Foreign Representatives reserve the rights of the 3AC estate to assert claims to avoid any security interest purportedly granted with respect to the Unperfected Assets that are

subject to avoidance pursuant to section 544 of the Bankruptcy Code (the "**Strong-Arm Claims**"). Such security interests being subject to avoidance, any purported foreclosure thereupon likewise gives rise to claims for turnover pursuant to section 542 of the Bankruptcy Code and for preference pursuant to section 547 of the Bankruptcy Code.

56.    The Chapter 11 Strong-Arm Claims are valued at least at approximately $777.7 million comprised of:

- 27,673.37 Bitcoin (with a value of approximately $573,820,610 as of June 27, 2022);

- four tokens subsequently converted into Bitcoin (*i.e.*, 50,000 Ether , 96.2 million ALGO tokens, 699,000 Solana tokens, and 300,000 AVAX tokens) (with an aggregate value of approximately $183,037,481 as of the transfer of such tokens to the Debtors on May 12 and May 13, 2022, as applicable); and

- 17,455.73 ETH (with a value of approximately $20,836,556 as of June 27, 2022).

b.    *US Preference Claims*

57.    Section 547 of the Bankruptcy Code permits a trustee or debtor-in-possession to avoid certain pre-bankruptcy transfers as "preferences." Section 547(b) sets forth the elements of a preference as follows:

- any transfer of an interest of the debtor in property;

- to or for the benefit of a creditor;

- for or on account of an antecedent debt owed by the debtor before such transfer was made;

- made while the debtor was insolvent;

- made (A) on or within 90 days before the date of the filing of the petition; or (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

- that enables such creditor to receive more than such creditor would receive if – (A) the case were a case under Chapter 7 of the Bankruptcy Code, (B) the transfer had not been made, and (C) such creditor received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

17

11 U.S.C. § 547(b).

58.     For purposes of section 547, a transfer is deemed to have occurred (i) at the time of the transfer if the transfer is perfected within 30 days, (ii) at the time of perfection if the transfer is not perfected within 30 days, or (iii) immediately before the filing of the bankruptcy petition, if the transfer has not been perfected by the later of the petition date and 30 days after the transfer. 11 U.S.C. § 547(e).

59.     There is a rebuttable presumption that the debtor was insolvent during the 90 days immediately preceding the date of the filing of the petition.  11 U.S.C. § 547(f).

60.      The relevant preference period for purposes of the Foreign Representatives' potential preference claims based on section 547 is the 90-day period prior to the July 1, 2022 filing of 3AC's Chapter 15 cases, which preference period therefore began on April 2, 2022. *See In re Awal Bank, BSC*, 455 B.R. 73, 90 (Bankr. S.D.N.Y. 2011) ("Use of the chapter 15 petition date also gives greater effect to § 1523(a) of the Bankruptcy Code, which provides that, 'Upon recognition of a foreign proceeding, the foreign representative has standing in a case concerning the debtor pending under another chapter of this title to initiate actions under sections 522, 544, 545, 547, 548, 550, 553, and 724(a).'") (internal citations omitted).

61.     Of the Disputed Assets, 13,172,000 Grayscale Bitcoin Trust shares (purportedly perfected as a result of deposits on May 11 and May 12, 2022 into the ACA Account) (the "**Late-Perfected Assets**") were perfected within the relevant 90-day preference period applicable under 11 U.S.C. § 547 (as discussed in further detail below).  Such perfection constituted a "transfer of an interest of the debtor in property", "to or for the benefit of a creditor" (*i.e.*, the Debtors), on account of 3AC's loans to the Debtors, made while 3AC was presumptively insolvent, made within

the relevant preference period, and which enabled the Debtors to receive more than they would have had the transfer not been made.

62.     Accordingly, subject to the commencement of a plenary U.S. bankruptcy case in respect of 3AC, the Foreign Representatives reserve the rights of the 3AC estate to assert claims against the Debtors pursuant to section 547 of the Bankruptcy Code to avoid the transfer of the Late-Perfected Assets and avoid any security interest purportedly granted on the Late-Perfected Assets.

63.     Additionally, subject to the commencement of plenary U.S. bankruptcy case in respect of 3AC, the Foreign Representatives reserve the right to assert claims pursuant to section 547 of the Bankruptcy Code to avoid the Principal Payment and the Interest Payment, both of which were made to the Debtors as creditors on account of loans purportedly owed by 3AC to the Debtors and during the relevant preference period while 3AC was presumptively insolvent.

64.     Finally, subject to the commencement of plenary U.S. bankruptcy case in respect of 3AC, the Foreign Representatives reserve the right to assert claims pursuant to section 547 of the Bankruptcy Code to avoid the transfers of (i) 50,000 Ether, (ii) 96.2 million ALGO tokens, (iii) 699,000 Solana tokens, and (iv) 300,000 AVAX tokens, which transfers were made to the Debtors as creditors on account of their loans to 3AC between May 12 and May 13, 2022 (*i.e.*, during the relevant preference period during which 3AC was presumptively insolvent and in exchange for which no new loans or other value was provided).  Such assets, as stated above, were subsequently converted to Bitcoin.

65.     The claims set forth in the preceding three paragraphs shall hereinafter be referred to as the "**US Preference Claims**".  The Chapter 11 Preference Claims are valued at least at approximately $563,238,609, comprised of:

- 13,172,000 Grayscale Bitcoin Trust shares (with a value of approximately $247,241,480 as of the transfer of such shares into the ACA Account on May 11 and May 12, 2022);

- four tokens subsequently converted into Bitcoin (*i.e.*, 50,000 Ether , 96.2 million ALGO tokens, 699,000 Solana tokens, and 300,000 AVAX tokens) (with an aggregate value of approximately $183,037,481 as of the transfer of such tokens to the Debtors on May 12 and May 13, 2022, as applicable);

- the Principal Payment, with a value of $115 million; and

- the Interest Payment, with a value of $17,959,648;

## VII.  **RESERVATION OF RIGHTS**

66.    Following ongoing discovery, the Foreign Representatives may uncover additional causes of action against the Debtors based on conduct, acts, omissions, and transactions between and among 3AC, the Debtors, and the Debtors' affiliates, including, but not limited to, causes of action arising from 3AC's investments in the Grayscale Trusts and the relationships among 3AC's Founders, the Debtors, the Debtors' parent DCG, DCG's CEO Barry Silbert, and DCG's subsidiary Grayscale, among other related parties.  These additional claims may include, but are not limited to, claims for fraudulent misrepresentation, negligent misrepresentation, breach of fiduciary duty, breach of contract, breach of the duty of good faith and fair dealing, tortious interference with contract, or aiding and abetting.  Similar causes of action are currently the subject of ongoing litigation involving Grayscale and Alameda Research Ltd. in the Delaware Court of Chancery, and further discovery from the Debtors, DCG, and the Founders, and further reconstruction of 3AC's records, may reveal that the Debtors were aware of, involved in and complicit in the misconduct alleged in those litigations.

67.    Any such additional claims remain subject to the Foreign Representatives' ongoing evaluation and investigation.  The Foreign Representatives hereby expressly preserve such claims and reserve all rights with respect thereto.  The Foreign Representatives do not yet have access to

all documentation and records relating to possible claims or 3AC's relationship with the Debtors, and thus far have been able to identify the claims raised in this Amended Proof of Claim via the limited information available to them.

68.    Additionally, subject to the commencement of a plenary bankruptcy case in the United States in respect of 3AC, the Foreign Representatives reserve all rights to assert against DCG any claims to avoid purported security interests in certain purported collateral comprised of 2.7 million AVAX tokens and the 13.6 million NEAR tokens, which assets were purportedly perfected via the filing of a UCC-1 financing statement dated as of June 23, 2022 (*i.e.*, within the relevant 90-day preference period for purposes of section 547 of the Bankruptcy Code).

69.    The information available to the Foreign Representatives regarding 3AC's assets, business, affairs—including 3AC's relationships with the Debtors and other third parties—has been severely limited by the Founders' lack of cooperation and 3AC's historically meager books and records.  Specifically, the Founders failed to deliver information and assets to the Foreign Representatives following their appointment.   When the Foreign Representatives flew to Singapore immediately after their appointment, they were unable to gain access to 3AC's offices. When they finally gained access to 3AC's offices on October 21, 2022, most of 3AC's records and hard drives had been removed.   And, the Foreign Representatives have recently discovered that thousands of emails from the Founders are suspiciously missing from 3AC's email accounts.

70.    In light of these informational deficiencies, the Foreign Representatives reserve their rights to assert any additional claims they are subsequently able to uncover by amendment of this Amended Proof of Claim or otherwise.  The Foreign Representatives file this Amended Proof of Claim against the Debtors with the information presently available to them to preserve the claims they are aware of at this time.

71.     This Amended Proof of Claim is without prejudice to claims, if any, that 3AC or its

estate has or may have for payment of any additional administrative expenses allowable under

section 503(b) of the Bankruptcy Code or otherwise with respect to any transaction, whether or

not such amounts are included in this Amended Proof of Claim, and the Foreign Representatives

right to file such claims or any similar claims on behalf of 3AC and its estate at an appropriate

time is expressly reserved.

72.     The Foreign Representatives, on behalf of the 3AC estate, further reserve all of their

rights of setoff, recoupment, bankers' lien, and all similar such rights, as well as any equitable

rights, and nothing herein shall be construed as a waiver thereof.

73.     The Foreign Representatives, on behalf of themselves and the 3AC's estate, reserve

all of their respective procedural and substantive defenses and rights, including a right to a jury

trial, with respect to any claim that may be asserted against them by any of the Debtors, any trustee

for the Debtors' estates, any other party in interest in these chapter 11 cases, or any other person

or entity whatsoever.

74.     The filing of this Amended Proof of Claim and the assertion of the claims herein are

not and shall not be deemed or construed as a consent or admission with respect to the validity or

accuracy of any valuation proposed by the Debtors, any affiliate, or any third party.  The Foreign

Representatives and 3AC do not waive or release any rights with respect thereto.

75.     The execution and filing of this Amended Proof of Claim is not (i) a waiver or

release of any of the Foreign Representatives' or the 3AC's rights against any entity or person

liable for all or part of the claims herein, (ii) a consent by the Foreign Representatives or 3AC to

the jurisdiction of this Court with respect to any proceeding commenced in these chapter 11 cases

against or otherwise involving the Foreign Representatives, (iii) a waiver of the Foreign

22

Representatives' or 3AC's right to have any and all final orders in any and all non-core matters entered after de novo review by a United States District Court judge or their respective right to a trial by jury in any proceeding as to any and all matters so triable, whether designated legal or private rights, or in any case or controversy or proceeding related thereto, notwithstanding the designation of such matters as "core proceedings" pursuant to section 157(b) of the Bankruptcy Code or otherwise, and whether such jury trial is pursuant to statute or the United States Constitution, (iv) a waiver of the right to withdraw the reference with respect to the subject matter of the claims herein, any objection or other proceeding commenced with respect thereto or any other proceeding commenced in this case against or otherwise involving the Foreign Representatives or 3AC, (v) an election of remedy or choice of law that waives or otherwise affects any other remedy or choice of law, (vi) a waiver or release of any of the Foreign Representatives' or 3AC's rights and remedies under applicable law, including BVI law, (vii) a waiver of any right of action that the Foreign Representatives or 3AC have or may have against any of the Debtors or any other person or entity, (viii) a waiver or release of any of the Foreign Representatives' or 3AC's rights against any third party, and/or (ix) a waiver of any right to the subordination, in favor of 3AC and its estate, of indebtedness or liens held by creditors of any of the Debtors.

76.     To the extent that any of the Debtors or any other party takes any action that would give rise to a counterclaim or other rights or claims that 3AC or its estate may have against any of the Debtors, the Foreign Representatives reserve all of their and 3AC's rights.

77.     The Foreign Representatives reserve the right to attach, produce and/or rely upon additional documentation that supports 3AC's and its estate's claims against the Debtors, and any additional documents that may become available after further investigation or discovery, or upon request of any of the Debtors.  Nothing contained in this Amended Proof of Claim shall limit the

rights of the Foreign Representatives to file papers or pleadings, or commence any proceedings,

or take any actions concerning 3AC's and its estate's claims against the Debtors.

## VIII.   Notices

78.    All notices to the Joint Liquidators concerning this Amended Proof of Claim should

be sent to:

> **c/o Teneo (BVI) Limited**
> Banco Popular Building, 3rd Floor
> Road Town, Tortola, VG-1110
> British Virgin Islands
> Attn: Russell Crumpler
> Email: Russell.crumpler@teneo.com and 3acliquidation@teneo.com

Copies of all notices to the Joint Liquidators concerning this Amended Proof of Claim should be
sent to:

> **LATHAM & WATKINS LLP**
> Attn: Adam J. Goldberg, Brett Neve, and Nacif Taousse
> 1271 Avenue of the Americas
> New York, NY 10020
> Emails: adam.goldberg@lw.com, brett.neve@lw.com, and nacif.taousse@lw.com

79.    The request for copies of notices to be sent to Latham & Watkins LLP will not be

deemed authorization of Latham & Watkins LLP to accept service of process on behalf of the Joint

Liquidators.

# EXHIBIT A

# MASTER LOAN AGREEMENT

This Master Loan Agreement ("Agreement") is made on this 10th day of January 2019 ("Effective Date") by and between Genesis Global Capital, LLC ("Genesis" or "Lender"), a corporation organized and existing under the laws of Delaware with its principal place of business at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310 and Three Arrows Capital Ltd ("Three Arrows Capital" or "Borrower") a corporation organized and existing under the laws of British Virgin Islands, with its registered office at 7 Temasek Boulevard #21-04 Singapore, Singapore 038987

## RECITALS

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend U.S. Dollars or Digital Currency to Borrower, and Borrower will return such U.S. Dollars or Digital Currency to Lender upon the termination of the Loan; and

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, the Borrower and the Lender hereby agree as follows:

## I.    Definitions

"*Airdrop*" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "*Applicable Airdrop*" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time.  A "*Non-Applicable Airdrop*" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Currency, or a distribution that depends on a wallet of the relevant Digital Currency meeting a threshold requirement.

"*Authorized Agent*" has the meaning set forth in Exhibit A.

"*Borrower*" means Three Arrows Capital Ltd

"*Borrowed Amount*" refers to the value of the Loaned Assets in U.S. dollars on the Loan Effective Date.

"*Borrower Email*" means kyle@threearrowscap.com

"*Business Day*" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

"*Business Hours*" means between the hours of 9:00 am to 5:00 pm New York time on a Business Day.

1

GENESIS_3AC_BVI_00000010

"*Call Option*" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement.

"*Close of Business*" means 5:00 pm New York time.

"*Collateral*" is defined as set forth in Section IV(a)

"*Demand Loan*" means a Loan without a Maturity Date where the Lender has a Call Option.

"*Digital Currency*" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), or any digital currency that the Borrower and Lender agree upon.

"*Digital Currency Address*" means an identifier of 26-34 alphanumeric characters that represents a digital identity or destination for a transfer of Digital Currency.

"*Fixed Term Loan*" means a Loan with a pre-determined Maturity Date, where Borrower does not have a Prepayment Option and Lender does not have a Call Option.

"*Hard Fork*" means a permanent divergence in the block chain (e.g. when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"*Lender*" means Genesis.

"*Loan*" means a request for a loan or an actual loan of Digital Currency or U.S. Dollars made pursuant to and in accordance with this Agreement and a Loan Term Sheet.

"*Loan Balance* " means the sum of all outstanding amounts of Loaned Asset , Loan Fees, Late Fees, and any Earlier Termination Fee for a particular Loan.

"*Loan Documents*" means this Master Loan Agreement and any and all Loan Term Sheets entered into between Lender and Borrower.

"*Loan Effective Date*" means the date upon which a Loan begins.

"*Loan Fee*" means the fee paid by Borrower to the Lender for the Loan.

"*Loan Term Sheet*" means the agreement between Lender and Borrower on the particular terms of an individual Loan, which shall be memorialized in an agreement as set forth in Exhibit B or in a form approved by Lender comparable therewith.

"*Loaned Assets*" means any Digital Currency or U.S. Dollar amount transferred in a Loan hereunder until such Digital Currency (or identical Digital Currency) or U.S. Dollar amount is transferred back to Lender hereunder. For purposes of return of Loaned Digital Currency by

2

Borrower or purchase or sale of Digital Currencies pursuant to Section IX, such term shall include Digital Currency of the same quantity and type as the Digital Currency.

"*Maturity Date*" means the pre-determined future date upon which a Loan becomes due in full.

"*Open Loan*" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"*Prepayment Option*" means the Borrower has the option to repay or return the Loaned Assets prior to the Maturity Date, subject to this Agreement.

"*Term*" means the period from the Loan Effective Date through Termination Date.

"*Term Loan with Call Option*" means a Loan with a pre-determined Maturity Date where Lender has a Call Option.

"*Term Loan with Prepayment Option*" means a Loan with a pre-determined Maturity Date where Borrower has a Prepayment Option.

"*Term Loan with Call and Prepayment Options*" means a Loan with a pre-determined Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"*Termination Date*" means the date upon which a Loan is terminated.

## II.      General Loan Terms.

(a) <u>Loans of Digital Currency or U.S. Dollars</u>

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request from the Lender a Loan to Borrower of a specified amount of Digital Currency or U.S. Dollars, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan on terms acceptable to Lender and as set forth in a corresponding Loan Term Sheet.

(b) <u>Loan Procedure</u>

From time to time during the Term of this Agreement, during the hours of 9:00 am New York time to 4:00 pm New York time on a Business Day (the "<u>Request Day</u>"), by email directed to <u>lend@genesiscap.co</u> (or such other address as Lender may specify in writing), an Authorized Agent of Borrower may request from Lender a Loan of a specific amount of Digital Currency or U.S. Dollars (a "<u>Lending Request</u>").  Provided Lender receives such Lending Request prior to 3:00 pm New York time, Lender shall by email directed to Borrower Email (or such other address as Lender may specify in writing) to inform Borrower whether Lender agrees to make such a Loan.  If Lender fails to provide Borrower with an acceptance as to a particular Lending Request prior to Close of Business on the Request Day, such Lending Request shall be deemed to have be denied by Lender.

3

As part of its Lending Request, Borrower shall provide the following proposed terms:

    (i)    Whether U.S. Dollars or Digital Currency, and if Digital Currency, the type of Digital Currency;

    (ii)    the amount of Digital Currency or U.S. Dollars;

    (iii)    whether the Loan is to be a Fixed Term Loan, a Term Loan with Prepayment Option, or an Open Loan;

    (iv)    the Loan Effective Date;

    (v)    the Maturity Date (if a Fixed Term Loan or a Term Loan with Prepayment Option).

If Lender agrees to make a Loan, Lender shall commence transmission to either (x) the Borrower's Digital Currency Address the amount of Digital Currency; or (y) Borrower's bank account by bank wire the amount of U.S. Dollars, as applicable, as such Digital Currency Address or bank wire instruction is set forth in the Lending Request on or before Close of Business on the Request Day.

The specific and final terms of a Loan shall be memorialized using the Loan Term Sheet. In the event of a conflict of terms between this Master Loan Agreement and a Loan Term Sheet, the terms in the Loan Term Sheet shall govern.

  (c) Loan Repayment Procedure

    (i) Loan Repayment

Unless otherwise specified in subsections (ii) and (iii) below, upon the earlier of the Maturity Date, the Recall Delivery Day, or the Redelivery Day (as defined below) for a Loan, Borrower shall repay the entirety of the Loan Balance to Lender by Close of Business.

    (ii) Call Option

For Loans in which the Lender has a Call Option (e.g. Open Loans, etc.), Lender may during Business Hours (the "Recall Request Day") demand repayment of a portion or the entirety of the Loan Balance (the "Recall Amount"). Lender will notify Borrower of Lender's exercising of this right by email to Borrower's Email. Borrower will then have until Close of Business on the second Business Day after the Recall Request Day (the "Recall Delivery Day") to deliver the Recall Amount.

In the event of a Call Option where Lender demands only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Recall Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date or the subsequent Recall Delivery Day.

    (iii) Prepayment Option

4

GENESIS_3AC_BVI_00000013

For Loans in which Borrower has a Prepayment Option (e.g. Open Loans, Term Loans with Prepayment Option, etc.), Borrower may notify Lender during Business Hours of Borrower's intent to return the Loan prior maturity or Lender's exercising of its Call Option without being subject to Early Termination Fees as set forth in Section III(d). Borrower shall provide said notice at least two Business Days prior to the date on which the Borrower will repay all or a portion of the Loan Balance (said later date, the "Redelivery Date"). Borrower's exercising of its Prepayment Option shall not relieve it of any of its obligations herein, including without limitation its payment of owed Loan Fees and Late Fees.

In the event of a Prepayment Option where the Borrower repays only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Redelivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date, Recall Day, or subsequent Redelivery Day.

(d) Termination of Loan

Loans will terminate upon the earlier of:

(i)     the Maturity Date;

(ii)    the repayment of the Loan Balance by Borrower prior to the Maturity Date;

(iii)   Upon an Event of Default as defined in Section VII; however, Lender shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan. In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and termination of this Agreement except as specified in Section XXIV.

### III.    Loan Fees and Transaction Fees.

(a) Loan Fee

Unless otherwise agreed, Borrower agrees to pay Lender a Loan Fee on each Loan.
When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as agreed to herein and in the relevant Loan Term Sheet, annualized and subject to change if thereafter agreed by Borrower and Lender. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from and include the date on which the Loaned Assets are transferred to Borrower to the date on which such Loaned Assets are repaid in their entirety to Lender.

Lender shall calculate any Loan Fees owed on a daily basis and provide Borrower with the calculation upon request. The Loan Fee will be calculated off all outstanding portions of the Loaned Assets.

5

                                                                    GENESIS_3AC_BVI_00000014

(b) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with section III(c), Borrower shall incur an additional fee (the "Late Fee") of a 10% (annualized, calculated daily) increase on top of the Loan Fee.

(c) Payment of Loan Fees and Late Fees

Unless otherwise agreed, any Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) five (5) Business Days after receipt of an invoice from Lender or (ii) the termination of all Loans hereunder (the "Payment Due Date"). An invoice for Loan Fees and any Late Fees (the "Invoice Amount") shall be sent out on the first Business Day of the month and shall include any Loan Fees, Late Fees, and Early Termination Fees incurred during the previous month. Borrower shall have up to five Business Days from sending of said Invoice to pay the Invoice Amount . Failure of Lender to timely send an invoice in accordance with the preceding sentence shall not relieve Borrower of its obligation to pay any Loan Fees, Late Fees, and Early Termination Fees owed herein nor negate any Event of Default resulting from Borrower's failure to timely pay such fees. The Loan Fee, Late Fees, and Early Termination Fees shall be payable, unless otherwise agreed by the Borrower and Lender, in the same asset that was Borrowed, whether U.S. Dollars or Digital Currency on the same blockchain and of the same type that was loaned by the Lender during the Loan.

Notwithstanding the foregoing, in all cases, all Loan Fees, Late Fees, and Early Termination Fees shall be payable by Borrower immediately upon the occurrence of an Event of Default hereunder by Borrower.

(d) Early Termination Fees

For Fixed Term Loans and Term Loans with Call Options, if Borrower returns the Loaned Assets prior to the Maturity Date, Borrower shall pay to Lender an "Early Termination Fee" equal to thirty percent (30%) of the Loan Fee that would have accrued from the date of the repayment until the Maturity Date of the Loan. The Early Termination Fee is due with the repayment of the Loaned Assets. The Early Termination Fee shall not apply if Borrower returns the Loaned Assets to Lender in the event of a Hard Fork (as defined in Section IV) for the purposes of allowing Lender to split the tokens in accordance with Section IV (h).

(e) Taxes and Fees

All transfer or other taxes or third party fees payable with respect to the transfer, repayment, and/or return of any Loaned Assets or Collateral hereunder shall be paid by Borrower.

## IV.    **Collateral Requirements**

(a) Collateral

6

GENESIS_3AC_BVI_00000015

Unless otherwise agreed by the parties, or modified as set forth below, Borrower shall provide as collateral an amount of U.S. Dollars, Bitcoin or Ether (such choice at the sole discretion of Lender), to be determined and agreed upon by the Borrower and Lender ("Collateral") and memorialized using the Loan Term Sheet. The Collateral will be calculated as a percentage of the value of the Loaned Assets, such value determined by a spot rate agreed upon in the Loan Term Sheet. Borrower shall, prior to or concurrently with the transfer of the Loaned Assets to Borrower, but in no case later than the Close of Business on the day of such transfer, transfer to Lender the agreed upon Collateral.

Collateral shall always be valued in U.S. Dollars, but Borrower may, if mutually agreed by both parties, provide the Collateral (in whole or in part) to Lender in Bitcoin or Ether in an amount equal to the value of the Collateral in U.S. Dollars at a spot rate determined by Lender. For the avoidance of doubt, upon the repayment of the Loaned Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited, net of any Additional Collateral or Margin Call adjustments (as defined below in paragraph (b)). If a Hard Fork in the Bitcoin or Ether blockchain meeting the criteria in Section V occurs while Lender is holding Bitcoin or Ether as Collateral, Lender shall return the New Tokens (as defined in Section V) to Borrower in addition to the Collateral and Additional Collateral. If a Hard Fork occurs that does not meet the criteria in Section V, Lender shall have no obligation to return any New Tokens to Borrower.

The Collateral transferred by Borrower to Lender, as adjusted herein, shall be security for Borrower's obligations in respect of such Loan and for any other obligations of Borrower to Lender hereunder. Borrower hereby pledges with, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the Loaned Assets by Lender to Borrower and which shall cease upon the transfer of the return of the Loaned Assets by Borrower to Lender. In addition to the rights and remedies given to Lender hereunder, Lender shall have all the rights and remedies of a secured party under the UCC. Lender shall be entitled to use the Collateral to conduct its digital currency lending and borrowing business, including transferring the Collateral to other non-Genesis bank accounts.

(b) Loan and Collateral Transfer

If Lender transfers Loaned Assets to Borrower and Borrower does not transfer Collateral to Lender as provided in Section IV(a), Lender shall have the absolute right to the return of the Loaned Assets; and if Borrower transfers Collateral to Lender, as provided in Section IV(a), and Lender does not transfer the Loaned Assets to Borrower, Borrower shall have the absolute right to the return of the Collateral.

(c) Margin Calls

If during the Term of a Loan the value of the value of the Collateral, using the current spot rate as indicated on GDAX, as a percentage of the "Amount of Asset" specified on the Loan Term Sheet falls below the "Margin Call Level" on the Loan Term Sheet, Lender shall have the right to require

7

Borrower to contribute additional Collateral so that the Collateral value as a percentage of the "Amount of Asset" is equal to the "Collateral Level" as indicated on the Loan Term Sheet (the "Additional Collateral"). In the event the Loaned Assets decreases below the original Borrowed Amount, Lender may, at its sole discretion, return a portion of the Collateral in an amount determined by Lender; however, in such an event, Lender reserves its rights under this Section IV to request Borrower to contribute collateral up to the original amount of Collateral and also Additional Collateral if required.

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "First Notification") to the Borrower at the email address indicated in Section XIV (or such other address as the parties shall agree to in writing) that sets forth: (i) the Margin Call Spot Rate and (ii) the amount of Additional Collateral required based on the Margin Call Spot Rate. Borrower shall have twelve (12) hours from the time Lender sends such First Notification to (x) respond and send payment to Lender in accordance with subsection (c) below, or (y) respond that the spot rate as indicated on GDAX has changed sufficiently such that it is no longer at or above the Margin Call Spot Rate. If Lender agrees by email that Borrower's response according to (y) above is correct, then no other action is required by Borrower. If Lender fails to agree by email with Borrower's response in accordance with (y) by Close of Business that same day, such shall be deemed as Lender's rejection of Borrower's response and a re-statement of Lender's demand for Borrower to contribute Additional Collateral.

If Borrower fails to respond to the First Notification within twelve hours, or Lender rejects Borrower's response pursuant to (y) above, whether affirmatively by email or by non-reply as set forth above, and the spot rate of the Loaned Assets is still at least at the Margin Call Spot Rate, Lender shall send a second email notification (the "Second Notification") repeating the information in (i) and (ii) in the paragraph above. Borrower shall have six (6) hours from the time Lender sends the Second Notification to respond according to (x) or (y) above, and Lender has the right to accept or reject Borrower's response as stated above. Failure by Borrower to respond to either the First Notification or the Second Notification, shall give Lender the option to declare an Event of Default under Section VII below.

(d) Payment of Additional Collateral

Payment of the Additional Collateral shall be made by bank wire to the account specified in the Loan Term Sheet, or to the Digital Currency Address specified in the Loan Term Sheet, as applicable; or by a return of the amount of Loaned Assets necessary to make the USD Collateral percentage indicated in the Loan Term Sheet correct based on the Margin Call Spot Rate. For any return of Loaned Assets made in accordance with this Section, Borrower is still responsible for payment of any Early Termination Fees that apply to the particular Loan.

(e) Return of Collateral

Upon Borrower's repayment of the Loan and acceptance by Lender of the Loaned Assets into Lender's Digital Currency Address or bank account, with such delivery being confirmed on the relevant Digital Currency blockchain ten times (if applicable), Lender shall initiate the return of

8

Collateral within five Business Days to a bank account designated by Borrower or, where Digital Currency is Collateral, into an applicable Digital Currency account on the behalf of Borrower.

### V.    **Hard Fork**

(a) Notification

In the event of a public announcement of a future Hard Fork or an Airdrop in the blockchain for any Loaned Digital Currency, Lender shall provide email notification to Borrower.

(b) No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be immediately terminated. Borrower and Lender may agree, regardless of Loan type, for Lender to manage the Hard Fork on the behalf of Borrower through Borrower returning the Loaned Assets to Lender two business days prior to the scheduled Hard Fork or Airdrop. Lender shall not be obligated to return any Collateral to the Borrower during the period in which Lender manages the Loaned Assets on the behalf of Borrower. Lender shall fork the Loaned Assets, and following the Hard Fork shall return to Borrower the Loaned Assets but not the New Tokens (as defined below). For any whole days in which Lender manages the Loan Digital Currency pursuant to this section, the Loan Fee for those days shall not accrue. Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Currency to Lender and Lender transfers said Digital Currency back to Borrower pursuant to this section.

(c) Lender's Right to New Tokens

Genesis will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Currency protocol or an Applicable Airdrop (the "New Tokens") if any two of the following four conditions are met:

- *Hash Power*: the average hash power mining the New Token on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the hash power mining the Loaned Assets on the day preceding the Hard Fork or Applicable Airdrop (calculated as a 3-day average of the 3 days preceding the Hard Fork).
- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).

9

CONFIDENTIAL

- *Wallet Compatibility*: the New Token is supported by either BitGo wallets or Ledger wallets within 30 days of the Hard Fork or Applicable Airdrop.

For the above calculations, the source for the relevant data on the Digital Currency hash power, market capitalization, and 24-Hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the hash power of the New Token will be bitinfocharts.com (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Genesis.   If sending the New Tokens to Genesis is prohibitively burdensome, upon Lender's agreement with Borrower, Borrower can reimburse Genesis for the value of the New Tokens with any combination of a one-time payment in the same Loan Digital Currency transferred as a part of the Loan reflecting the amount of the New Tokens owed using the agreed upon spot rate at the time of said repayment or returning the borrowed Digital Currency so that Genesis can manage the split of the underlying digital tokens as described in subsection (b) above.. Alternatively, subject to Lender's written agreement, the parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender.  In all cases, Borrower will be solely responsible for payment of additional costs incurred by such transfer methods, including but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment.  For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this Section V shall continue for any New Tokens that meet the criteria in this subsection (c) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement.

## VI.   **Representations and Warranties.**

The parties to this Agreement hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each party hereto represents and warrants that (a) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (b) it has taken all necessary action to authorize such execution, delivery and performance, and (c) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan , any Digital Currency, Collateral, or funds received or provided hereunder.

10

(c) Each party hereto represents and warrants that it is acting for its own account.

(d) Each party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws

(f) Each party represents and warrants there is no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

(g) Each party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h) Lender represents and warrants that it has, or will have at the time of transfer of any Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof, and that it owns the Loaned Assets, free and clear of all liens.

(i) Borrower represents and warrants that it has, or will have at the time of transfer of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof, and, free and clear of all liens and encumbrances other than those arising under this Agreement.

(j) Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest in said Collateral subject to the terms and conditions hereof.

## VII.    Covenants

Promptly upon (and in any event within seven (7) Business Days after) the execution of this Agreement, Borrower shall furnish Lender with Borrower's most recent audited annual and (if applicable) quarterly financial statements and any other financial statements mutually agreed upon by Borrower and Lender.  For each successive year, Borrower shall also furnish Lender with Borrower's future audited annual financial statements by Borrower's fiscal year end or within seven (7) Business Days thereof.

## VIII.   Default

CONFIDENTIAL

It is further understood that any of the following events shall constitute an event of default hereunder, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to return any and all Loaned Assets upon termination of the Loan;

(b) the failure of Borrower to pay any and all Loan Fees, Late Fees, or Early Termination Fees when due hereunder; however, Borrower shall have ten days to cure such default;

(c) the failure of either party to transfer Collateral or Additional Collateral as required by Section IV;

(d) a material default in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by Borrower to abide by its obligations in Section IV or V of this Agreement and Borrower's failure to cure said material default within ten days;

(e) any Event of Default (as such term is defined each applicable Loan Term Sheets) shall occur and shall be continuing beyond any applicable grace periods under such Loan Term Sheets;

(f) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings shall be instituted by or against the Borrower and shall not be dismissed within thirty (30) days of their initiation;

(g) any event or circumstance occurs or exists that is a material adverse effect on the business, operations, prospects, property, assets, liabilities or financial condition of, such party, taken as a whole, or a material adverse effect on the ability of Borrower to perform its obligations under the Loan Documents, including but not limited to the ability to return, transfer, repay, or pay any and all Loaned Assets, Loan Fees, and Late Fees.

(h) Borrower causes or permits any partner, member or other equity interest holder in Borrower to, directly or indirectly, transfer, convey, assign, mortgage, pledge, hypothecate, alienate or lease the partnership interest, membership interest or other equity interest of such partner, member, other equity interest holder in Borrower without Lender's prior written consent. Notwithstanding the foregoing, the Lender shall not unreasonably withhold such consent for transfers of membership interests for purposes of estate planning which do not result in a change of control of the Borrower.

(i) any representation or warranty made in any of the Loan Documents proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof;

(j) either party notifies the other of its inability to or its intention not to perform its obligations hereunder or otherwise disaffirms, rejects, or repudiates any of its obligations hereunder; or

12

GENESIS_3AC_BVI_00000021

## IX.    **Remedies**

(a) Upon the occurrence and during the continuation of any Event of Default, the Lender may, at its option:  (1) declare the entire Loan Balance outstanding for any Loan hereunder immediately due and payable; (2) terminate this Agreement and any Loan upon notice to Borrower; (3) transfer any Collateral from the collateral account to Lender's operating account necessary for the payment of any liability or obligation or indebtedness created by this Agreement, including but not limited to using the Collateral to purchase the relevant Digital Currency to replenish Lender's supply of the relevant Digital Currency or selling any Collateral in a relevant market for such Digital Currency; (4) purchase on Lender's own account a like amount of Loaned Assets in a relevant market for such Digital Currency; (5) exercise its rights under Section XVI herein; and (6) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity; provided, that upon any Event of Default pursuant to Section VIII the Borrowed Amount and the amount of any Borrowing Fee then outstanding hereunder shall automatically become and be immediately due and payable.

(b) On the occurrence of any Event of Default under Sections VIII(e) or (f), this Agreement and all Loans made pursuant to this Agreement shall be terminated immediately and become due and payable.

(c) In the event that the purchase price of any replacement Digital Currency pursuant to subsections (a)(3) & (a)(4) above exceeds the amount of the Collateral, Borrower shall be liable to Lender for the amount of such excess together with interest thereon as specific in the Term Sheet.  As security for Borrower's obligation to pay such excess, Lender shall have, and Borrower hereby grants, a security interest in any property of Borrower then held by or for Lender and a right of setoff with respect to such property and any other amount payable by Lender to Borrower.  The purchase price of replacement Digital Currency purchased under this Section shall include, and the proceeds of any sale of Collateral shall be determined after deduction of, broker's fees and commissions and all other reasonable costs, fees and expense related to such purchase or sale (as the case may be).  In the event Lender exercises its rights under this Section, Lender may elect in its sole discretion, in lieu of purchasing all or a portion of the replacement Digital Currencies or selling all or a portion of the Collateral, to be deemed to have made, respectively, such purchase of replacement Digital Currencies or sale of Collateral for an amount equal to the price therefor on the date of such exercise obtained from a generally recognized source.

(d) To the extent that the Loans are now or hereafter secured by property other than the Collateral, or by the guarantee, endorsement or property of any other person, then Lender shall have the right in its sole discretion to determine which rights, security, liens, security interests or remedies Lender shall at any time pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting any of them or any of Lender's rights hereunder.

CONFIDENTIAL                                                                  GENESIS_3AC_BVI_00000022

(e) In connection with the exercise of its remedies pursuant to this Section IX, Lender may (i) exchange, enforce, waive or release any portion of the Collateral or Loans in favor of the Lender or relating to any other security for the Loans; (ii) apply such Collateral or security and direct the order or manner of sale thereof as the Lender may, from time to time, determine; and (iii) settle, compromise, collect or otherwise liquidate any such Collateral or security in any manner following the occurrence of an Event of Default, without affecting or impairing the Lender's right to take any other further action with respect to any Collateral or security or any part thereof.

(f) In addition to its rights hereunder, the non-defaulting party shall have any rights otherwise available to it under any other agreement or applicable law.

## X.    Rights and Remedies Cumulative.

No delay or omission by the Lender in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of the Lender stated herein are cumulative and in addition to all other rights provided by law, in equity.

## XI.    Survival of Rights and Remedies

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets or Collateral, and termination of this Agreement.

## XII.    Collection Costs.

In the event Borrower fails to pay any amounts due or to return any Digital Currency or upon the occurrence of any Event of Default in Section VIII hereunder, Borrower shall, upon demand, pay to Lender all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs, broker fees, and technology costs incurred by the Lender in connection with the enforcement of its rights hereunder.

## XIII.    Governing Law; Dispute Resolution.

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The parties agree to waive their rights to a jury trial. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

14

GENESIS_3AC_BVI_00000023

### XIV.  Notices.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a party may designate in accordance herewith), or to the respective address set forth below:

Borrower:
Three Arrows Capital Ltd
7 Temasek Boulevard #21-04
Singapore, Singapore 038987
Attn: Kyle Davis
Email: kyle@threearrowscap.com

Lender:
Genesis Global Capital, LLC
111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Attn: Kristopher Johnson, Senior Risk Officer
Email: kristopher@genesiscap.co

Either party may change its address by giving the other party written notice of its new address as herein provided.

### XV.  Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

### XVI.  Single Agreement

Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other.  Accordingly, Borrower and Lender hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.  In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other. Accordingly, Borrower and Lender hereby agree that (a) each shall perform all of its obligations in respect of each Loan hereunder, and that a default in the performance of any such obligation by Borrower or by Lender (the "Defaulting Party") in any Loan hereunder shall constitute a default by the Defaulting Party under all such Loans hereunder, and (b) the non-defaulting party shall be entitled to set off claims and apply property held by it in respect of any Loan hereunder against obligations owing to it in respect of any other Loan with the Defaulting Party.

15

## XVII.  **Entire Agreement.**

This Agreement, each exhibit referenced herein, and all Loan Term Sheets constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.  Nothing in this Section XVII shall be construed to conflict with or negate Section XVI above.

## XVIII. **Successors and Assigns.**

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that Borrower may not assign this Agreement or any rights or duties hereunder without the prior written consent of the other party (such consent to not be unreasonably withheld).  Lender may assign this Agreement or any rights or duties hereunder upon notice to Borrower.  Notwithstanding the foregoing, in the event of a change of control of Lender or Borrower, prior written consent shall not be required so such party provides the other party with written notice prior to the consummation of such change of control.  For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the party shares representing more than fifty percent (50%) of the outstanding voting stock of such party.

## XIX.  **Severability of Provisions.**

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XX.  **Counterpart Execution.**

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XXI.  **Relationship of Parties.**

Nothing contained in this Agreement shall be deemed or construed by the parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

16

### XXII. <u>No Waiver.</u>

The failure of or delay by Genesis to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent Genesis from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

### XXIII. <u>Indemnification.</u>

Borrower shall indemnify and hold harmless Genesis from and against any and all claims, demands, losses, expenses and liabilities of any and every nature (including attorneys' fees of an attorney of Genesis' choosing to defend against any such claims, demands, losses, expenses and liabilities) that Genesis may sustain or incur or that may be asserted against Genesis arising out of Genesis' lending of Digital Currency to Borrower under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to Genesis's bad faith, gross negligence or willful misconduct in the performance of its duties under this Agreement.  This indemnity shall be a continuing obligation of Borrower, its successors and assigns, notwithstanding the termination of this Agreement.

### XXIV. <u>Term and Termination.</u>

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period.   The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VIII or upon 30 days' notice by either party to the other.

In the event of a termination of this Agreement, any Loaned Assets shall be redelivered immediately and any fees owed shall be payable immediately.

### XXV. <u>Miscellaneous.</u>

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate.  This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.  The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement.  The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

17

GENESIS_3AC_BVI_00000026

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

BORROWER:

Three Arrows Capital Ltd

By: *Su Zhu*
    Su Zhu (Jan 10, 2019)

Name: Su Zhu

Title: CEO

LENDER:

GENESIS GLOBAL CAPITAL, LLC

By: *Kristopher Johnson*
    Kristopher Johnson (Jan 10, 2019)

Name: Kristopher Johnson

Title: Senior Risk Officer

18

GENESIS_3AC_BVI_00000027

## EXHIBIT A

Authorized Agents.  The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section II hereof:

Name:
Email:

Name:
Email:

Borrower may change its Authorized Agents by notice given to Lender as provided herein.

19

**EXHIBIT B**

**LOAN TERM SHEET**

This loan agreement dated January 10th, 2019 between Genesis Global Capital, LLC ("Genesis") and Three Arrows Capital Ltd ("Borrower") incorporates all of the terms of the Master Digital Currency Loan Agreement between Genesis and Borrower on January 10th, 2019 and the following specific terms:

| | |
|---|---|
| Lender: | Genesis Global Capital, LLC |
| Borrower: | Three Arrows Capital Ltd |
| Borrowed Asset Type: | TRX |
| Amount of Borrowed Asset: | 5,500,000 TRX |
| Borrow Fee: | 22% |
| Loan Type: | Open Term |
| Loan Term: | Open |
| Collateral: | 80% of Loan Value |
| Margin Call Level: | 70% of Loan Value |
| Genesis BTC Address: | 3HjoAj61BnCsCsrvrkznJ4NCryHwNNjqmb |
| BTC Collateral: | 32 BTC |

GENESIS GLOBAL CAPITAL, LLC          Three Arrows Capital Ltd

By: *Kristopher Johnson*                    By: *Su Zhu*
    Kristopher Johnson (Jan 10, 2019)            Su Zhu (Jan 10, 2019)
Name: Kristopher Johnson                 Name: Su Zhu
Title: Senior Risk Officer               Title: CEO

20

                                    GENESIS_3AC_BVI_00000029

# Master Loan Agreement Three Arrows Capital

**Final Audit Report**                                                    2019-01-10

| | |
|---|---|
| Created: | 2019-01-10 |
| By: | Matthew Ballensweig (matt@genesiscap.co) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAA_q7UokOC9nje1cd-fNJB27UacITBGOMR |

## "Master Loan Agreement Three Arrows Capital" History

📄 Document created by Matthew Ballensweig (matt@genesiscap.co)
2019-01-10 - 2:32:28 PM GMT- IP address: 69.12.27.194

📧 Document emailed to Su Zhu (su.zhu@threearrowscap.com) for signature
2019-01-10 - 2:34:50 PM GMT

📄 Document viewed by Su Zhu (su.zhu@threearrowscap.com)
2019-01-10 - 2:47:56 PM GMT- IP address: 220.255.220.85

✍️ Document e-signed by Su Zhu (su.zhu@threearrowscap.com)
Signature Date: 2019-01-10 - 2:50:13 PM GMT - Time Source: server- IP address: 220.255.220.85

📧 Document emailed to Kristopher Johnson (kristopher@genesiscap.co) for signature
2019-01-10 - 2:50:15 PM GMT

📄 Document viewed by Kristopher Johnson (kristopher@genesiscap.co)
2019-01-10 - 2:54:47 PM GMT- IP address: 69.12.27.194

✍️ Document e-signed by Kristopher Johnson (kristopher@genesiscap.co)
Signature Date: 2019-01-10 - 2:55:48 PM GMT - Time Source: server- IP address: 69.12.27.194

✔️ Signed document emailed to roshun@genesiscap.co, Kristopher Johnson (kristopher@genesiscap.co), Matthew Ballensweig (matt@genesiscap.co), and Su Zhu (su.zhu@threearrowscap.com)
2019-01-10 - 2:55:48 PM GMT

 Adobe Sign

# EXHIBIT B

# MASTER LOAN AGREEMENT

This Master Loan Agreement ("Agreement") is made on this 24th day of January, 2020 ("Effective Date") by and between Genesis Asia Pacific PTE. LTD. ("Genesis" or "Lender"), a private limited company organized and existing under the laws of Singapore with its principal place of business at 3 Fraser Street #05-25 Duo Tower, Singapore 189352 and Arrows Capital Ltd ("Three Arrows Capital" or "Borrower") a limited liability company organized and existing under the laws of British Virgin Islands, with its registered office at 7 Temasek Boulevard #21-04 Singapore, Singapore 038987.

## RECITALS

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend Digital Currency or U.S. Dollars to Borrower, and Borrower will pay a Loan Fee and return such Digital Currency or U.S. Dollars to Lender upon the termination of the Loan; and

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, the Borrower and the Lender hereby agree as follows:

## I.    Definitions

"*Airdrop*" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "*Applicable Airdrop*" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time.  A "*Non-Applicable Airdrop*" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Currency, or a distribution that depends on a wallet of the relevant Digital Currency meeting a threshold requirement.

"*Authorized Agent*" has the meaning set forth in Exhibit A.

"*Borrower*" means Three Arrows Capital.

"*Borrowed Amount*" refers to the value of the Loaned Assets in U.S. dollars on the Loan Effective Date.

"*Borrower Email*" means kyle@threearrowscap.com

"*Business Day*" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

"*Business Hours*" means between the hours of 9:00 am to 5:00 pm New York time on a Business Day.

1

DocuSign Envelope ID: C2A08F14-08F4-4F3B-8DC4-432869F9FED8

"***Call Option***" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement.

"***Close of Business***" means 5:00 pm New York time.

"***Collateral***" is defined as set forth in Section IV(a).

"***Digital Currency***" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), or any digital currency that the Borrower and Lender agree upon.

"***Digital Currency Address***" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Currency.

"***Fixed Term Loan***" means a Loan with a pre-determined Maturity Date, where Borrower does not have a Prepayment Option and Lender does not have a Call Option.

"***Hard Fork***" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"***Lender***" means Genesis.

"***Loan***" means a request for a loan or an actual loan of Digital Currency or U.S. Dollars made pursuant to and in accordance with this Agreement and a Loan Term Sheet.

"***Loan Balance***" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees, Late Fees, and any Earlier Termination Fee or New Token Fee for a particular Loan, as defined in Sections III and V.

"***Loan Documents***" means this Master Loan Agreement and any and all Loan Term Sheets entered into between Lender and Borrower.

"***Loan Effective Date***" means the date upon which a Loan begins.

"***Loan Fee***" means the fee paid by Borrower to the Lender for the Loan.

"***Loan Term Sheet***" means the agreement between Lender and Borrower on the particular terms of an individual Loan, which shall be memorialized in an agreement as set forth in Exhibit B or in a form approved by Lender comparable therewith.

"***Loaned Assets***" means any Digital Currency or U.S. Dollar amount transferred in a Loan hereunder until such Digital Currency (or identical Digital Currency) or U.S. Dollar amount is transferred back to Lender hereunder, except that, if any new or different Digital Currency is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Currency shall be deemed to become Loaned Assets in addition to the former Digital Currency for which

such exchange is made. For purposes of return of Loaned Assets by Borrower or purchase or sale of Digital Currencies pursuant to Section IX, such term shall include Digital Currency of the same quantity and type as the Digital Currency, as adjusted pursuant to the preceding sentence.

"*Maturity Date*" means the pre-determined future date upon which a Loan becomes due in full.

"*Open Loan*" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"*Prepayment Option*" means the Borrower has the option to repay or return the Loaned Assets prior to the Maturity Date, subject to this Agreement.

"*Term*" means the period from the Loan Effective Date through Termination Date.

"*Term Loan with Call Option*" means a Loan with a pre-determined Maturity Date where Lender has a Call Option.

"*Term Loan with Prepayment Option*" means a Loan with a pre-determined Maturity Date where Borrower has a Prepayment Option.

"*Termination Date*" means the date upon which a Loan is terminated.

## II.    **General Loan Terms.**

(a) <u>Loans of Digital Currency or U.S. Dollars</u>

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request from the Lender a Loan to Borrower of a specified amount of Digital Currency or U.S. Dollars, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan on terms acceptable to Lender and as set forth in a corresponding Loan Term Sheet.

(b) <u>Loan Procedure</u>

From time to time during the Term of this Agreement, during the hours of 9:00 am New York time to 4:00 pm New York time on a Business Day (the "<u>Request Day</u>"), by email directed to lend@genesiscap.co (or such other address as Lender may specify in writing), an Authorized Agent of Borrower may request from Lender a Loan of a specific amount of Digital Currency or U.S. Dollars (a "<u>Lending Request</u>"). Provided Lender receives such Lending Request prior to 3:00 pm New York time, Lender shall by email directed to Borrower Email (or such other address as Lender may specify in writing) to inform Borrower whether Lender agrees to make such a Loan. If Lender fails to provide Borrower with an acceptance as to a particular Lending Request prior to Close of Business on the Request Day, such Lending Request shall be deemed to have be denied by Lender.

As part of its Lending Request, Borrower shall provide the following proposed terms:

(i)     Whether U.S. Dollars or Digital Currency, and if Digital Currency, the type of Digital Currency;

(ii)    the amount of Digital Currency or U.S. Dollars;

(iii)   whether the Loan is to be a Fixed Term Loan, a Term Loan with Prepayment Option, or an Open Loan;

(iv)    the Loan Effective Date; and

(v)     the Maturity Date (if a Fixed Term Loan or a Term Loan with Prepayment Option).

If Lender agrees to make a Loan, Lender shall commence transmission to either (x) the Borrower's Digital Currency Address the amount of Digital Currency, or (y) Borrower's bank account by bank wire the amount of U.S. Dollars, as applicable, as such Digital Currency Address or bank wire instruction is set forth in the Lending Request on or before Close of Business on the Request Day.

The specific and final terms of a Loan shall be memorialized using the Loan Term Sheet. In the event of a conflict of terms between this Master Loan Agreement and a Loan Term Sheet, the terms in the Loan Term Sheet shall govern.

(c)  Loan Repayment Procedure

(i)  Loan Repayment

Unless otherwise specified in subsections (ii) and (iii) below, upon the earlier of the Maturity Date, the Recall Delivery Day, or the Redelivery Day (as defined below) for a Loan, Borrower shall repay the entirety of the Loan Balance to Lender by Close of Business.

(ii) Call Option

For Loans in which the Lender has a Call Option (e.g. Open Loans, etc.), Lender may during Business Hours (the "Recall Request Day") demand repayment of a portion or the entirety of the Loan Balance (the "Recall Amount"). Lender will notify Borrower of Lender's exercising of this right by email to Borrower's Email. Borrower will then have until Close of Business on the second Business Day after the Recall Request Day (the "Recall Delivery Day") to deliver the Recall Amount.

In the event of a Call Option where Lender demands only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Recall Delivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date or the subsequent Recall Delivery Day.

(iii) Prepayment Option

For Loans in which Borrower has a Prepayment Option (e.g. Open Loans, Term Loans with Prepayment Option, etc.), Borrower may notify Lender during Business Hours of Borrower's

intent to return the Loan prior maturity or Lender's exercising of its Call Option without being subject to Early Termination Fees as set forth in Section III(d). Borrower shall provide said notice at least two Business Days prior to the date on which the Borrower will repay all or a portion of the Loan Balance (said later date, the "<u>Redelivery Day</u>"). Borrower's exercising of its Prepayment Option shall not relieve it of any of its obligations herein, including without limitation its payment of owed Loan Fees and Late Fees.

In the event of a Prepayment Option where the Borrower repays only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Redelivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date, Recall Delivery Day, or subsequent Redelivery Day.

(d) <u>Termination of Loan</u>

A Loan will terminate upon the earlier of:

(i)     the Maturity Date;

(ii)    the repayment of the Loan Balance by Borrower prior to the Maturity Date;

(iii)   the occurrence of an Event of Default as defined in Section VII; however, Lender shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan. In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

(iv)    in the event any or all of the Loaned Assets becomes in Lender's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization. arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Lender's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and termination of this Agreement except as specified in Section XXIV.

### III.     <u>Loan Fees and Transaction Fees.</u>

(a) <u>Loan Fee</u>

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "<u>Loan Fee</u>"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as agreed to herein and annualized in the relevant Loan Term Sheet and subject to change if thereafter agreed by Borrower and Lender. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from and include the date on which the Loaned Digital Currencies are transferred to Borrower to the date on which such Loaned Digital Currencies are repaid in their

DocuSign Envelope ID: 621D8F14-08F4-4F3B-8DC4-432869F9FED8

entirety to Lender.  For any Loan, the minimum Loan Fee shall be the Loan Fee that would accrue for one day.

Lender shall calculate any Loan Fees owed on a daily basis and provide Borrower with the calculation upon request.  The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies.  The Loan Fee is payable monthly by Borrower in arrears.

(b) Origination Fee

For certain Loans, Lender may charge Borrower a fee (the "Origination Fee") to be paid at the time the Collateral is delivered to Lender.  If an Origination Fee applies to a Loan, the Loan Term Sheet shall set forth the amount of the Origination Fee and whether the Origination Fee is to be paid in U.S. Dollars or in a Digital Currency.

(c) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with section III(c), Borrower shall incur an additional nominal fee (the "Late Fee") of a 10% (annualized, calculated daily) on all outstanding portions of the Loaded Digital Currencies and Loan Fees.  If a Late Fee is imposed under this Section III(b) due to an event that would constitute an Event of Default under Section VIII, the imposition of a Late Fee by the Lender does not constitute a waiver of its right to declare an Event of Default for the same event.

(d) Payment of Loan Fees and Late Fees

Unless otherwise agreed, any Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) five (5) Business Days after receipt of an invoice from Lender or (ii) the termination of all Loans hereunder (the "Payment Due Date").  An invoice for Loan Fees and any Late Fees (the "Invoice Amount") shall be sent out on the first Business Day of the month and shall include any Loan Fees, Late Fees, and Early Termination Fees incurred during the previous month.  Borrower shall have up to five Business Days from the date of said Invoice to pay the Invoice Amount.  Failure of Lender to timely send an invoice in accordance with the preceding sentence shall not be considered a material default under Section VIII(d) nor shall it relieve Borrower of its obligation to pay any Loan Fees, Late Fees, and Early Termination Fees owed herein nor negate any Event of Default resulting from Borrower's failure to timely pay such fees.  The Loan Fee, Late Fees, and Early Termination Fees shall be payable, unless otherwise agreed by the Borrower and Lender in the Loan Term Sheet, whether U.S. Dollars or Digital Currency on the same blockchain and of the same type that was loaned by the Lender during the Loan.

Notwithstanding the foregoing, in all cases, all Loan Fees, Late Fees, and Early Termination Fees shall be payable by Borrower immediately upon the occurrence of an Event of Default hereunder by Borrower.

(e) Early Termination Fees

For Fixed Term Loans and Term Loans with Call Options, if Borrower returns the Loaned Assets prior to the Maturity Date, Borrower shall pay to Lender a fee equal to thirty percent (30%) of the Loan Fee that would have accrued from the date of the repayment until the Maturity Date of the Loan (the "Early Termination Fee"). The Early Termination Fee is due with the repayment of the Loaned Assets. The Early Termination Fee shall not apply if Borrower returns the Loaned Assets to Lender in the event of a Hard Fork (as defined in Section IV) for the purposes of allowing Lender to split the tokens in accordance with Section IV (e).

(f) Taxes and Fees

All transfer or other taxes or third party fees payable with respect to the transfer, repayment, and/or return of any Loaned Assets or Collateral hereunder shall be paid by Borrower.

## IV.    Collateral Requirements

(a) Collateral

Unless otherwise agreed by the parties, or modified in the Loan Term Sheet or as set forth below, Borrower shall provide as collateral an amount of U.S. Dollars or Digital Currency (such choice at the sole discretion of the Lender) to be determined and agreed upon by the Borrower and Lender ("Collateral") and memorialized using the Loan Term Sheet. Unless otherwise agreed by the parties in the Loan Term Sheet, the Collateral shall initially be 120% of the value of the Loaned Assets, such value determined by a spot rate agreed upon in the Loan Term Sheet. Borrower shall, prior to or concurrently with the transfer of the Loaned Assets to Borrower, but in no case later than the Close of Business on the day of such transfer, transfer to Lender the agreed upon Collateral.

Collateral shall always be valued in U.S. Dollars, but Borrower may, if mutually agreed by both parties, provide the Collateral (in whole or in part) to Lender in Digital Currency in an amount equal to the value of the Collateral in U.S. Dollars at a spot rate determined by Lender. For the avoidance of doubt, upon the repayment of the Loaned Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited, net of any Additional Collateral or Margin Call adjustments (as defined below in Section IV(c)). If a Hard Fork in the blockchain of the Digital Currency serving as Collateral meeting the criteria in Section V occurs while Lender is holding Digital Currency as Collateral, Lender shall return the New Tokens (as defined in Section V) to Borrower in addition to the Collateral and Additional Collateral. If such a Hard Fork occurs that does not meet the criteria in Section V, Lender shall have no obligation to return any New Tokens to Borrower.

The Collateral transferred by Borrower to Lender, as adjusted herein, shall be security for Borrower's obligations in respect of such Loan and for any other obligations of Borrower to Lender hereunder. Borrower hereby pledges with, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the Loaned Assets by Lender to Borrower and which shall cease upon the return of

DocuSign Envelope ID: 620D8E14-08F4-4F9B-8DC4-432869F9FED8

the Loaned Assets by Borrower to Lender.  In addition to the rights and remedies given to Lender hereunder, Lender shall have all the rights and remedies of a secured party under the UCC.

During the term of the Loan, Borrower agrees and affirms Lender's entitlement to and use of the Collateral, including but not limited use in lending, investing, transferring to bank and other accounts upon which Lender, or a third party, is the account holder or the beneficiary, or re-pledging as collateral in other transactions involved with Lender's digital currency lending and borrowing business.  Such entitlement and use shall not relieve Borrower or Lender of any of its obligations hereunder.

(b) Loan and Collateral Transfer

If Lender transfers Loaned Assets to Borrower and Borrower does not transfer Collateral to Lender as provided in Section IV(a), Lender shall have the absolute right to the return of the Loaned Assets; and if Borrower transfers Collateral to Lender, as provided in Section IV(a), Lender does not transfer the Loaned Assets to Borrower, Borrower shall have the absolute right to the return of the Collateral.

(c) Margin Calls

If during the Term of a Loan the value of the Loaned Assets increases, or the value of the Collateral decreases, so that the value of the Loaned Assets becomes equal to or greater than the value of the Collateral (the "Margin Call Limit"), Lender shall have the right to require Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in Section IV(a) relative to the value of the Loaned Assets (the "Additional Collateral").  The parties may modify this standard in the Loan Term Sheet by (i) setting a different ratio of the value of the Loaned Assets and Collateral or (ii) the creation of a Margin Call rate to be indicated on the Loan Term Sheet, as measured by the spot rate published on GDAX (such rate, the "Margin Call Spot Rate") over the spot rate indicated in the Loan Term Sheet, or the prior Margin Call Spot Rate, as applicable.  In the event of the creation of a Margin Call Spot Rate, Lender shall have the right to require Borrower to contribute Additional Collateral so that the Collateral is at least the same percentage in the applicable Loan Term Sheet, relative to the value of the Loaned Assets at the Margin Call Spot Rate.

In the event the value of the Loaned Assets decreases below the value of the Collateral, Lender may, at its sole discretion, return a portion of the Collateral in an amount determined by Lender; however, in such an event, Lender reserves its rights under this Section IV to request Borrower to contribute collateral up to the original amount of Collateral and also Additional Collateral if required.

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "First Notification") to the Borrower at the email address indicated in Section XV (or such other address as the parties shall agree to in writing) that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Margin Call Spot Rate, if applicable, and (iv) the amount of Additional Collateral required based on the Margin Call Limit or, if

applicable, the Margin Call Spot Rate.  Borrower shall have six (6) hours from the time Lender sends such First Notification to (x) respond and send payment to Lender in accordance with subsection (d) below, or (y) respond that the value of the Loaned Assets, value of the Collateral, or spot rate as indicated on GDAX, as applicable, has decreased sufficiently such that it is no longer at or above the Margin Call Limit or, if applicable, the Margin Call Spot Rate.  If Lender agrees by email that Borrower's response according to (y) above is correct, then no other action is required by Borrower.  If Lender fails to agree by email with Borrower's response in accordance with (y) by Close of Business that same day, such shall be deemed as Lender's rejection of Borrower's response and a re-statement of Lender's original demand for Borrower to contribute Additional Collateral.

If Borrower fails to respond to the First Notification within six hours, or Lender rejects Borrower's response pursuant to (y) above, whether affirmatively by email or by non-reply as set forth above, Lender shall send a second email notification (the "Second Notification") repeating the information in provisions (i) – (iv) in the preceding paragraph.  Borrower shall have three (3) hours from the time Lender sends the Second Notification to respond according to (x) or (y) in the preceding, and Lender has the right to accept or reject Borrower's response as stated above.  Upon Lender's rejection of Borrower's response to the Second Notification, whether affirmatively by email or by non-reply by the Close of Business that same day, Borrower shall make immediate payment of Additional Collateral as set forth in Section IV(d) below.  Failure to provide Additional Collateral, or failure by Borrower to respond to either the First Notification or the Second Notification, shall give Lender the option to declare an Event of Default under Section VII below.

Borrower acknowledges that its obligations hereunder, including those in this Section IV, continue regardless of Lender's request for Additional Collateral and Borrower's acceptance or rejection of the same.

(d) Payment of Additional Collateral

Payment of the Additional Collateral shall be made by bank wire to the account specified in the Loan Term Sheet or by a return of the amount of Loaned Assets necessary to make the Collateral percentage indicated in the Loan Term Sheet correct based on the Margin Call Limit or, if applicable, the Margin Call Spot Rate.  For any return of Loaned Assets made in accordance with this Section, Borrower is still responsible for payment of any Early Termination Fees that apply to the particular Loan.

(e) Return of Collateral

Upon Borrower's repayment of the Loan and acceptance by Lender of the Loaned Assets into Lender's Digital Currency Address, with such delivery being confirmed on the relevant Digital Currency blockchain ten times, Lender shall initiate the return of Collateral within five Business Days to a bank account designated by Borrower or, where Digital Currency is Collateral, into an applicable Digital Currency Address on the behalf of Borrower.

## V.    **Hard Fork**

DocuSign Envelope ID: 62A08F14-08F4-4F9B-8DC4-4328869F9FE08

(a) <u>Notification</u>

In the event of a public announcement of a future Hard Fork or an Airdrop in the blockchain for any Loaned Assets or Collateral, Lender shall provide email notification to Borrower.

(b) <u>No Immediate Termination of Loans Due to Hard Fork</u>

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated.  Borrower and Lender may agree, regardless of Loan type, either (i) to terminate the Loan without any penalties on an agreed upon date or (ii) for Lender to manage the Hard Fork on the behalf of Borrower.  If the Lender manages the Hard Fork on behalf of Borrower,  Borrower shall return the Loaned Assets to Lender two business days prior to the scheduled Hard Fork or Airdrop.  Lender shall not be obligated to return any Collateral to the Borrower during the period in which Lender manages the Loaned Assets on the behalf of Borrower.  Lender shall fork the Loaned Assets, and following the Hard Fork shall return to Borrower the Loaned Assets but not any New Tokens (as defined below).  For any whole days in which Lender manages the Loan Digital Currency pursuant to this section, the Loan Fee for those days shall not accrue.  Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Currency to Lender and Lender transfers said Digital Currency back to Borrower pursuant to this section.

(c) <u>Lender's Right to New Tokens</u>

Genesis will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Currency protocol or an Applicable Airdrop (the "<u>New Tokens</u>") if any two of the following four conditions are met:

- *Hash Power*: the average hash power mining the New Token on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the hash power mining the Loaned Assets on the day preceding the Hard Fork or Applicable Airdrop (calculated as a 3-day average of the 3 days preceding the Hard Fork).
- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).
- *Wallet Compatibility*: the New Token is supported by either BitGo wallets or Ledger wallets within 30 days of the Hard Fork or Applicable Airdrop.

DocuSign Envelope ID: 62A08F14-08F4-453B-8DC4-432869F9FED8

For the above calculations, the source for the relevant data on the Digital Currency hash power, market capitalization, and 24-Hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the hash power of the New Token will be bitinfocharts.com (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Genesis. If sending the New Tokens to Genesis is burdensome, upon Lender's written agreement with Borrower, Borrower can reimburse Genesis for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount of the New Tokens owed using the spot rate determined by Lender in its reasonable discretion at the time of said repayment, or (ii) returning the borrowed Digital Currency so that Genesis can manage the split of the underlying digital tokens as described in Section IV(b) above. Alternatively, subject to Lender's written agreement, the parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender. In all cases, Borrower will be solely responsible for payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender, including but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment. For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this Section V shall continue for any New Tokens that meet the criteria in this subsection (c) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement. If Borrower fails to transfer the New Tokens to Lender, or provide alternative compensation to Genesis as agreed to in accordance with this subsection, within 60 days from the Hard Fork or Applicable Airdrop, such failure will be considered an Event of Default in accordance with Section VIII(b), and Borrower shall incur an additional fee (the "Hard Fork Fee") equal to 10% (annualized, calculated daily) of all outstanding portions of the Loaded Digital Currencies and Loan Fees. Lender's charging of the Hard Fork Fee does not constitute a waiver of its right to declare an Event of Default for the same event.

## VI.    **Representations and Warranties.**

The parties to this Agreement hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each party hereto (individually, a "Party", collectively the "Parties") represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution, delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Currency, Collateral, or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws

(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h) Lender represents and warrants that it has, or will have at the time of the loan of any Digital Currency, the right to lend such Loaned Assets subject to the terms and conditions hereof.

(i) Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to lend such Loaned Assets subject to the terms and conditions hereof, and, free and clear of all liens and encumbrances other than those arising under this Agreement.

(j) Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest in said Collateral subject to the terms and conditions hereof.

## VII.    **Covenants**

Promptly upon (and in any event within seven (7) Business Days after) the execution of this Agreement, Borrower shall furnish Lender with Borrower's most recent audited annual and (if applicable) quarterly financial statements and any other financial statements mutually agreed upon by Borrower and Lender.  For each successive year, Borrower shall also furnish Lender

with Borrower's future audited annual financial statements by Borrower's fiscal year end or within seven (7) Business Days thereof.

## VIII.  __Default__

It is further understood that any of the following events shall constitute an event of default hereunder, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to return any and all Loaned Assets and any New Tokens as defined by Section V upon termination of any Loan;

(b) the failure of Borrower to pay any and all Loan Fees, Late Fees, or Early Termination Fees when due hereunder, or to remit any New Tokens or pay any New Token Fee in accordance with Section V; however, Borrower shall have ten days to cure such default;

(c) the failure of either Party to transfer Collateral or Additional Collateral, or a failure by Borrower to respond to Lender's First or Second Notifications, as required by Section IV;

(d) a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by Borrower to abide by its obligations in Section IV or V of this Agreement and Borrower's failure to cure said material default within ten days;

(e) any Event of Default (as such term is defined each applicable Loan Term Sheets) caused by Borrower shall occur and shall be continuing beyond any applicable grace periods under such Loan Term Sheets, including but not limited to failure to make any payment due thereunder;

(f) Borrower's default in any other agreement or failure to perform any obligation with Genesis or any of its affiliates;

(g) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against the Borrower and are not be dismissed within thirty (30) days of the initiation of said proceedings;

(h) any event or circumstance occurs or exists that is a material adverse effect on the business, operations, prospects, property, assets, liabilities or financial condition of, such Party, taken as a whole, or a material adverse effect on the ability of Borrower to perform its obligations under the Loan Documents, including but not limited to the ability to return, transfer, repay, or pay any and all Loaned Assets, Loan Fees, and Late Fees;

(i) Borrower causes or permits any partner, member or other equity interest holder in Borrower to, directly or indirectly, transfer, convey, assign, mortgage, pledge, hypothecate, alienate or lease the partnership interest, membership interest or other equity interest of such partner, member, other equity interest holder in Borrower without Lender's prior written consent.  Notwithstanding the foregoing, the Lender shall not

unreasonably withhold such consent for transfers of membership interests for purposes of estate planning which do not result in a change of control of the Borrower;

(j) any representation or warranty made by either Party in any of the Loan Documents that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof; or

(k) either Party notifies the other of its inability to or its intention not to perform its obligations hereunder, or otherwise disaffirms, rejects, or repudiates any of its obligations hereunder.

## IX.    <u>Remedies</u>

(a) Upon the occurrence and during the continuation of any Event of Default by Borrower, the Lender may, at its option:  (1) declare the entire Loan Balance outstanding for any Loan hereunder immediately due and payable; (2) terminate this Agreement and any Loan upon notice to Borrower; (3) transfer any Collateral from the collateral account to Lender's operating account necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by this Agreement or by Genesis in furtherance of its performance hereunder and/or its lending business, including but not limited to using the Collateral to purchase the relevant Digital Currency to replenish Lender's supply of the relevant Digital Currency or selling any Collateral in a relevant market for such Digital Currency; (4) purchase on Lender's own account a like amount of Loaned Assets in a relevant market for such Digital Currency and then collect from Borrower amounts expended by Lender for such purchase ; (5) exercise its rights under Section XII herein; and (6) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity; provided, that upon any Event of Default pursuant to Section VIII as to a particular Loan, the entire Loan Balance then outstanding hereunder shall automatically become and be immediately due and payable.

(b) On the occurrence of any Event of Default under Sections VIII(g) or (h), this Agreement and any and all Loans made pursuant to this Agreement shall be terminated immediately and become due and payable, and Lender shall have immediate right to the Collateral to the fullest extent permitted herein and by law.

(c) In the event that the purchase price of any replacement Digital Currency pursuant to Section IX (a)(3) & (a)(4) above exceeds the amount of the Collateral, Borrower shall be liable to Lender for the amount of such excess together with interest thereon in the amount of 10% or as modified in the Term Sheet.  As security for Borrower's obligation to pay such excess, Lender shall have, and Borrower hereby grants, a security interest in any property of Borrower then held by or for Lender and a right of setoff with respect to such property and any other amount payable by Lender to Borrower.  The purchase price of replacement Digital Currency purchased under this Section shall include, and the proceeds of any sale of Collateral shall be determined after deduction of, broker's fees and commissions and all other reasonable costs, fees and expense related to such purchase or sale (as the case may be).  In the event Lender exercises its rights under this

Section, Lender may elect in its sole discretion, in lieu of purchasing all or a portion of the replacement Digital Currencies or selling all or a portion of the Collateral, to be deemed to have made, respectively, such purchase of replacement Digital Currencies or sale of Collateral for an amount equal to the price therefor on the date of such exercise obtained from a generally recognized source.

(d) To the extent that the Loans are now or hereafter secured by property other than the Collateral, or by the guarantee, endorsement or property of any other person, then upon an Event of Default by Borrower, Lender shall have the right in its sole discretion to determine which rights, security, liens, security interests or remedies Lender shall at any time pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting any of them or any of Lender's rights hereunder.

(e) In connection with the exercise of its remedies pursuant to this Section IX, Lender may (1) exchange, enforce, waive or release any portion of the Collateral or Loans in favor of the Lender or relating to any other security for the Loans; (2) apply such Collateral or security and direct the order or manner of sale thereof as the Lender may, from time to time, determine; and (3) settle, compromise, collect or otherwise liquidate any such Collateral or security in any manner following the occurrence of an Event of Default, without affecting or impairing the Lender's right to take any other further action with respect to any Collateral or security or any part thereof.

(f) In addition to its rights hereunder, the non-defaulting Party shall have any rights otherwise available to it under any other agreement or applicable law.

## X.    Rights and Remedies Cumulative.

No delay or omission by the Lender in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder.  All rights of the Lender stated herein are cumulative and in addition to all other rights provided by law, in equity.

## XI.    Survival of Rights and Remedies

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets or Collateral, and termination of this Agreement.

## XII.    Collection Costs.

In the event Borrower fails to pay any amounts due or to return any Digital Currency or upon the occurrence of any Event of Default in Section VIII hereunder,  Borrower shall, upon demand, pay to Lender all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs, broker fees, and technology costs incurred by the Lender in connection with the enforcement of its rights hereunder.

### XIII.    Governing Law; Dispute Resolution.

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules.  If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.  The parties agree to waive their rights to a jury trial.  If any preceding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

### XIV.    Confidentiality.

(a) Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information").  Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XIV, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii) available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b) Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XIV.

(c) Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

(d) The provisions of this Section XIV will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; *provided* that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such

16

DocuSign Envelope ID: C2106F14-08F4-4F3B-8DC4-432869F9FE28

disclosure.  Notwithstanding the foregoing, Lender may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e) The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement.  Notwithstanding anything in this agreement to the contrary, a Party may retain copies of Confidential Information (the "Retained Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XIV; provided, however, that such Party agrees that  any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and the confidentiality obligations of this Section XIV shall survive with respect to the Retained Confidential Information for so long as such information is retained.

## XV.    Notices.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth below:

Borrower:
Three Arrows Capital Ltd
7 Temasek Boulevard #21-04
Singapore, Singapore 038987
Attn: Kyle Davis
Email: kyle@threearrowscap.com

Lender:
Genesis Asia Pacific PTE. LTD.
3 Fraser Street #05-25
Duo Tower, Singapore 189352
Attn: Soichiro Moro, CEO
Email: michael@genesiscap.co

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

## XVI.    Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

## XVII.  Single Agreement

17

DocuSign Envelope ID: C2A08F14-08F4-4F3B-8DC4-432869F9FED8

Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other. Accordingly, Borrower and Lender hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted. In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other. Accordingly, Borrower and Lender hereby agree that (a) each shall perform all of its obligations in respect of each Loan hereunder, and that a default in the performance of any such obligation by Borrower or by Lender (the "Defaulting Party") in any Loan hereunder shall constitute a default by the Defaulting Party under all such Loans hereunder, and (b) the non-defaulting Party shall be entitled to set off claims and apply property held by it in respect of any Loan hereunder against obligations owing to it in respect of any other Loan with the Defaulting Party.

## XVIII. Entire Agreement.

This Agreement, each exhibit referenced herein, and all Loan Term Sheets constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements. Nothing in this Section XVIII shall be construed to conflict with or negate Section XVII above.

## XIX. Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that Borrower may not assign this Agreement or any rights or duties hereunder without the prior written consent of the other Party (such consent to not be unreasonably withheld). Lender may assign this Agreement or any rights or duties hereunder upon notice to Borrower. Notwithstanding the foregoing, in the event of a change of control of Lender or Borrower, prior written consent shall not be required so such Party provides the other Party with written notice prior to the consummation of such change of control. For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party. Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, or Loan Term Sheet hereunder, shall create any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns. For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc. The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

## XX. Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XXI.    Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any Party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XXII.   Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

## XXIII.  No Waiver.

The failure of or delay by Genesis to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent Genesis from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

## XXIV.   Indemnification.

A Party shall indemnify and hold harmless the other Party, or any of its parents or affiliates, from and against any and all third party claims, demands, losses, expenses and liabilities of any and every nature (including attorneys' fees of an attorney of Genesis' choosing to defend against any such claims, demands, losses, expenses and liabilities) that it may sustain or incur or that may be asserted against it arising out of Genesis' lending of Digital Currency to Borrower under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to that Party's bad faith, gross negligence or willful misconduct in the performance of its duties under this Agreement.  This indemnity shall be a continuing obligation of Borrower, its successors and assigns, notwithstanding the termination of this Agreement.

## XXV.    Term and Termination.

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either Party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period.   The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VIII or upon 30 days' notice by either Party to the other.

In the event of a termination of this Agreement, any Loaned Assets shall be redelivered immediately and any fees owed shall be payable immediately.

### XXVI. **Miscellaneous.**

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate.  This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.  The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement.  The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

BORROWER:

Three Arrows Capital Ltd

By: _____
      040BC485CE864EB...
Name: Kyle Davies

Title:  Kyle Davies, Chairman

LENDER:

GENESIS ASIA PACIFIC PTE. LTD.

By: _____
      E5D870D05A1C4B3...
Name: Kristopher Johnson

Title:  Senior Risk Officer

DocuSign Envelope ID: 62A08F14-08F4-453B-8DC4-432869F9FED8

## EXHIBIT A

Authorized Agents.  The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section II hereof:

Name:
Email:

Name:
Email:

Borrower may change its Authorized Agents by notice given to Lender as provided herein.

# **<u>EXHIBIT C</u>**

DocuSign Envelope ID: A5103D90-7B2F-49D7-9E33-6DA50ABE08CD

## ASSIGNMENT AND ASSUMPTION OF
## MASTER LOAN AGREEMENT

This Assignment and Assumption of Master Loan Agreement (this "Assignment Agreement") is made and entered into as of July 20, 2020 by and among Genesis Global Capital, LLC, a Delaware limited liability company ("Assignor"), Genesis Asia Pacific Pte. Ltd., a corporation organized and existing under the laws of Singapore ("Assignee"), and Three Arrows Capital Ltd., a corporation organized and existing under the laws of Singapore ("Counterparty").

WHEREAS, Assignor and Counterparty are parties to that certain Master Loan Agreement dated the 10th of January, 2019 (the "Agreement"), pursuant to which Assignor makes loans to Counterparty;

WHEREAS, Assignor wishes to assign to Assignee all of its lending activities, including any outstanding loans and related Collateral under the Agreement (such loans, the "Outstanding Loans");

WHEREAS, Assignor and Counterparty are parties to that certain Pledge Agreement, dated as of May 28, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect from time to time, the "Pledge Agreement"); and

WHEREAS, Assignor wishes to assign to Assignee all of its rights and obligations under the Pledge Agreement.

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the parties do hereby agree as follows:

**1. Capitalized Terms.** Capitalized terms used but not defined herein shall have the same meanings that are set forth for such terms in the Agreement.

**2. Assignment and Assumption.** Effective as of the date hereof, Assignor hereby assigns, contributes, transfers and sets over (collectively, the "Assignment") to Assignee all of Assignor's right, title, benefit, privileges and interest in and to, and all of Assignor's burdens, obligations and liabilities in connection with, the Agreement, including any Outstanding Loans and related Collateral, and the Pledge Agreement. Assignee hereby accepts the Assignment and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants, and to pay and discharge all of the liabilities of Assignor to be observed, performed, paid or discharged from and after the date hereof, in connection with the Agreement, including all obligations and Collateral relating to the Outstanding Loans, and the Pledge Agreement. As of the date hereof, Assignor shall have no obligation to and shall receive no benefit from Counterparty with regard to any Outstanding Loans or related Collateral.

DocuSign Envelope ID: A5103D90-7B2F-49D7-9E33-6DA50ABE08CD

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Assignment as of the date first set forth above.

**ASSIGNOR**
**GENESIS GLOBAL CAPITAL, LLC**

By: *Kristopher Johnson*
      E5D870D05A1C483...
    Name: Kristopher Johnson
    Title: Senior Risk Officer

**ASSIGNEE**
**GENESIS ASIA PACIFIC PTE. LTD.**

By: *Reed Werbitt*
      E4525138479E4D9
    Name: Reed Werbitt
    Title: Director

**Acknowledged by:**
**THREE ARROWS CAPITAL LTD.**

By
      15665D32A144445
    Name: Kyle Davies
    Title: Chairman

GENESIS_3AC_BVI_00000009

# **<u>EXHIBIT D</u>**

Execution Version

# ASSIGNMENT AND ASSUMPTION OF
# MASTER LOAN AGREEMENT

This Assignment and Assumption of Master Loan Agreement (this "Assignment Agreement") is made and entered into as of July 14, 2022, by and among Genesis Asia Pacific Pte. Ltd., a corporation organized and existing under the laws of Singapore ("Assignor") and Digital Currency Group, Inc., a Delaware corporation ("Assignee").

WHEREAS, Assignor and Three Arrows Capital Ltd., a corporation organized and existing under the laws of the British Virgin Islands ("Counterparty") are, among others, parties to (i) that certain Master Loan Agreement, dated as of January 10, 2019 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect from time to time, the "2019 Agreement") and (ii) that certain Master Loan Agreement, dated as of January 24, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect from time to time, the "2020 Agreement", and together with the 2019 Agreement, collectively, the "Agreements"), in each case, pursuant to which Assignor has extended loans to Counterparty;

WHEREAS, Assignor and Counterparty are parties to (i) that certain Pledge Agreement, dated as of January 27, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect from time to time, the "2022 Pledge Agreement"), (ii) that certain Pledge Agreement, dated as of May 28, 2020 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect from time to time, the "2020 Pledge Agreement") and (iii) that certain Pledge Agreement, dated as of November 16, 2021 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect from time to time, the "2021 Pledge Agreement", and together with the 2022 Pledge Agreement and the 2020 Pledge Agreement, collectively, the "Pledge Agreements");

WHEREAS, Assignor wishes to assign to Assignee all of its lending activities with Counterparty, including any outstanding loans (such loans, the "Outstanding Loans");

WHEREAS, Assignor wishes to assign to Assignee all of its rights and obligations under the Pledge Agreements and related Collateral under the Agreements and the Pledge Agreements (collectively with the Outstanding Loans, the "Assigned Interests");

WHEREAS, Assignor is an affiliate of Assignee and Assignor and Assignee previously entered into that certain Assignment and Assumption Agreement, dated as of June 30, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect from time to time), and that certain Promissory Note, dated as of June 30, 2022 (as amended, restated, amended and restated, supplemented or otherwise modified and in effect from time to time), which were, in each case, entered into solely for purposes of internal accounting as an accommodation among affiliates without giving effect to any change in beneficial ownership of the loans or other interests purported to be transferred therein; and

NOW, THEREFORE, for and in consideration of the premises and the mutual covenants contained herein, and for other good and valuable consideration, the receipt, adequacy and legal sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

DocuSign Envelope ID: 2612FD59-377E-4688-968C-51823BF9B239

1. **Capitalized Terms.** Capitalized terms used but not defined herein shall have the same meanings that are set forth for such terms in the Agreements.

2. **Assignment and Assumption.** Effective as of the date hereof, Assignor hereby assigns, contributes, transfers and sets over (collectively, the "Assignment") to Assignee all of Assignor's right, title, benefit, privileges and interest in and to, and all of Assignor's burdens, obligations and liabilities in connection with, the Assigned Interests. Assignee hereby accepts the Assignment and assumes and agrees to observe and perform all of the duties, obligations, terms, provisions and covenants, and to pay and discharge all of the liabilities of Assignor to be observed, performed, paid or discharged from and after the date hereof, in connection with the Assigned Interests. As of the date hereof, Assignor shall have no obligation to, and shall receive no benefit from Counterparty with respect to, the Assigned Interests

3. **Miscellaneous**.

   a. This Assignment Agreement shall bind and inure to the benefit of the parties hereto and their respective successors and assigns.

   b. The provisions of this Assignment Agreement are intended to be severable. If any provision of this Assignment Agreement shall be held invalid or unenforceable in whole or in part in any jurisdiction, such provision shall, as to such jurisdiction, be ineffective to the extent of such invalidity or unenforceability without in any manner affecting the validity or enforceability thereof in any other jurisdiction or the remaining provisions hereof in any jurisdiction.

   c. THIS ASSIGNMENT AGREEMENT AND ANY CLAIM, CONTROVERSY OR DISPUTE ARISING UNDER OR RELATED TO THIS ASSIGNMENT AGREEMENT, WHETHER IN TORT, CONTRACT (AT LAW OR IN EQUITY) OR OTHERWISE, SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAW PRINCIPLES THAT WOULD RESULT IN THE APPLICATION OF ANY LAW OTHER THAN THE LAW OF THE STATE OF NEW YORK.

   d. This Assignment Agreement may be executed in any number of counterparts, and by different parties in separate counterparts, each of which when so executed and delivered shall be deemed an original but all of which when taken together shall constitute but one and the same instrument. Any signature delivered by a Party by electronic mail or pdf format shall be deemed to be an original signature hereto.

WEIL:\98719122\6\41531.0003

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Assignment as of the date first set forth above.

**ASSIGNOR:**                                           **ASSIGNEE:**

**Genesis Asia Pacific Pte. Ltd.**                      **Digital Currency Group, Inc.**

By: *Arianna Pretto-Sakmann*                            By: *Michael Katz*
    Name: Arianna Pretto-Sakmann            Name: Michael Katz
    Title: Director                           Title: Director of Legal and Regulatory

[Signature Page to Master Loan Agreement Assignment and Assumption]

# **<u>EXHIBIT E</u>**

| | |
|---|---|
| **From:** | Siddiqui, Furqaan <Furqaan.Siddiqui@weil.com> |
| **Sent:** | Tuesday, July 26, 2022 11:03 PM |
| **To:** | Goldberg, Adam (NY); Rosen, Brian (NY); Neve, Brett (NY); Taousse, Nacif (NY) |
| **Cc:** | Russell.Cumpler@teneo.com; Christopher.Farmer@teneo.com; Mark Forte; Marie Stewart; Saferstein, Jeffrey; Berkovich, Ronit; Viets, Heather; Nichols, Evan; Ham, Arden; Mike Katz; Arianna Pretto-Sakmann; Andrew Sullivan |
| **Subject:** | DCG/Genesis - 3AC Secured Collateral |
| **Attachments:** | DCG - Security Documents.zip |

All,

As discussed, the only outstanding collateral is: (i) 2,739,043.83 AVAX tokens (located at the following wallet address: avax1flenwaa6k5tu68havtarz92qcpfzta6hem4nxg) and (ii) 13,583,265 NEAR tokens (located at the following wallet address: 6dd346cdb8a2c9a6b8ceb2f959d7725e1b62b4778fe77997bfa330f1491d02ba).

These AVAX and NEAR tokens are currently missing and we have been unable to find the location of the cryptocurrency wallets in order to foreclose upon this collateral. We ask for the liquidators' assistance in finding these wallets to avoid any further deterioration of value and request that the liquidators send us any relevant information on the location of these wallets and/or tokens. Attached are true and correct copies of the pledge agreement and UCC-1 financing statements with respect to those AVAX and NEAR tokens, as well as a corresponding UCC-3 assignment for the benefit of DCG. The value of those AVAX and NEAR tokens equals approximately $102,923,293.34 (USD) (calculated as of June 27, 2022), which is the amount noted on our preliminary claim form in section 8.

The collateral already foreclosed upon falls into two categories.

- First, Three Arrows pledged its equity interests in 17,443,644 Grayscale Bitcoin Trust Shares, with an additional increase of 18,141,396 Grayscale Bitcoin Trust Shares in connection with collateral top-up/margin call requirements, equaling a total of 35,585,040 Grayscale Bitcoin Trust Shares. Genesis has taken possession of all 35,585,040 Grayscale Bitcoin Trust Shares.
- Second, Three Arrows pledged BTC and ETH as collateral for certain of its repayment obligations under certain loan term sheets issued under the 2020 Master Loan Agreement (which was provided with DCG's claim submission packet). Pursuant to the 2020 MLA, each term sheet would enumerate an amount of collateral – whether in U.S. Dollars or in cryptocurrency – to be posted by Three Arrows by Genesis for each loan, and the 2020 MLA contains pledge provisions pursuant to which Three Arrows granted a first priority lien in favor of DCG (as successor in interest pursuant to the 2022 MLA Assignment). The collateral enumerated in the 2020 MLA and loan term sheets indicate that it "shall be security for [Three Arrows'] obligations in respect of such Loan and for any other obligations of [Three Arrows] to [Genesis] hereunder." (2020 MLA § IV(a)). Genesis had such collateral in its possession and foreclosed on it upon Three Arrows' default. The 2020 MLA, ancillary documentation, and all of the attached loan term sheets (which cover the foreclosed secured collateral in this bucket, other than as noted in numbers 17 and 18 below) were provided to the liquidators on July 16, 2022 with DCG's claim submission form.
- The value of all collateral that has been foreclosed upon is $1,193,782,456.73, calculated as of June 27, 2022.

The relevant security documents (which, for the second category above, include the 2020 MLA) are appended to this email for reference, as well as described below.

Please let us know of any questions or follow up.

<u>Outstanding Secured Collateral (AVAX and NEAR Tokens)</u>

1. Pledge Agreement by and between Genesis Asia Pacific Pte. Ltd., as Secured Party, and Three Arrows Capital Ltd., as Pledgor, dated as of January 27, 2022
   a. (2,739,043.83 AVAX tokens (digital wallet address provided in pledge agreement))
   b. (13,583,265 NEAR tokens (digital wallet address provided in pledge agreement))

2. UCC-1 Financing Statement, filed June 23, 2022 for Genesis Asia Pacific Pte. Ltd. (Secured Party) and Three Arrows Capital Ltd (Debtor), No. 2022067553
   a. (2,739,043.83 AVAX tokens)
   b. (13,583,265 NEAR tokens)

3. UCC-3 Assignment, filed July 20, 2022 from Genesis Asia Pacific Pte. Ltd. to Digital Currency Group, Inc. (re No. 2022067553) (see above)

Foreclosed Collateral (Shares)

4. Account Control Agreement among Three Arrows Capital, Ltd, as Pledgor, TradeStation Securities, Inc., as Securities Intermediary, and Genesis Asia Pacific Pte. Ltd., as Secured Party, dated as of November 15, 2021 (Three Arrows Capital, Ltd. Account)

5. Pledge Agreement by and between Genesis Global Capital, LLC., as Secured Party, and Three Arrows Capital Ltd., as Pledgor, dated as of May 28, 2020 (Pledged Grayscale Bitcoin Trust Shares: 2,125,794)

6. Pledge Supplement by and between Genesis Global Capital, LLC., as Secured Party, and Three Arrows Capital Ltd., as Pledgor, dated as of June 4, 2020 (Pledged Grayscale Ethereum Trust Shares: 446,928)

7. Pledge Supplement by and between Genesis Global Capital, LLC., as Secured Party, and Three Arrows Capital Ltd., as Pledgor, dated as of June 16, 2020 (Pledged Grayscale Bitcoin Trust Shares: 2,076,238)

8. Pledge Agreement by and between Genesis Asia Pacific Pte. Ltd., as Secured Party, and Three Arrows Capital Ltd., as Pledgor, dated as of November 16, 2021 (Pledged Grayscale Bitcoin Trust Shares: 13,241,612)

9. UCC-1 Financing Statement, filed on June 1, 2020 for Genesis Global Capital, LLC (Secured Party) and Three Arrows Capital Ltd (Debtor), No. 2020063749

10. UCC-1 Financing Statement Amendment, filed September 8, 2021 for Genesis Asia Pacific Pte. Ltd. (Secured Party) and Three Arrows Capital Ltd (Debtor) (re Initial No. 2020063749)
    a. (Grayscale Bitcoin Trust Shares: 9,213,048)
    b. (Grayscale Litecoin Trust Shares: 1,226,480)
    c. (Grayscale Bitcoin Cash Trust Shares: 3,405,442)

11. UCC-3 Assignment, filed July 20, 2022 from Genesis Asia Pacific Pte. Ltd. to Digital Currency Group, Inc. (re Initial No. 2020063749)

Foreclosed Collateral (BTC and ETH)

12. The 2020 MLA

13. The 2022 MLA Assignment

14. Loan Term Sheet entered into by Genesis Asia, as Lender, and Three Arrows, as Borrower, dated May 14, 2022: Assets lent to Three Arrows: $88,789,800 US dollars; Collateral: 3,000 BTC

15. Loan Term Sheet entered into by Genesis Asia, as Lender, and Three Arrows, as Borrower, dated June 6, 2022: Assets lent to Three Arrows: $49,119,034.50 US dollars; Collateral: 1,621.3 BTC

16. Loan Term Sheet entered into by Genesis Asia, as Lender, and Three Arrows, as Borrower, dated June 7, 2022: Assets lent to Three Arrows: $40,798,490.40 US dollars; Collateral: 1,378.7 BTC

17. TAC Missing TS Trades Script – as referenced in the claim submission form, the attached chat room script indicates that Genesis was issues the following loans and Three Arrows posted the following amounts of collateral in connection therewith:
    a. That certain Loan entered into by Genesis Asia, as Lender, and Three Arrows, as Borrower, dated May 17, 2022: Assets lent to Three Arrows: $150,892,500 US dollars; Collateral: 5,000 BTC
    b. That certain Loan entered into by Genesis Asia, as Lender, and Three Arrows, as Borrower, dated May 30, 2022: Assets lent to Three Arrows: $87,863,400 US dollars; Collateral: 3,000 BTC

18. In addition, approximately 19,348.3 BTC were also foreclosed upon, an increase attributable to various margin calls that were made to Three Arrows to top up the collateral to the margin requirement amounts under certain loans made to Three Arrows.

19. In addition, approximately 17,455.73 ETH tokens were also foreclosed upon.  At Three Arrows' request, Genesis had executed a trade to swap out a certain amount of BTC for these ETH tokens. The trade took place on 6/12/22.

Best,

Furqaan



**Furqaan Siddiqui**

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Furqaan.Siddiqui@weil.com
+1 212 310 8756 Direct
+1 347 302 4485 Mobile
+1 212 310 8007 Fax

The information contained in this email message is intended only for use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify us by email, postmaster@weil.com, and destroy the original message. Thank you.