# Exhibit G

Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

**DECLARATION OF CHRISTOPHER PARKER
PURSUANT TO FED. R. BANKR. P. 9017 IN SUPPORT OF DEBTORS'
SECOND OMNIBUS OBJECTION (SUBSTANTIVE) TO
CLAIM NOS. 523, 526, 527, 981, 982 AND 990
PURSUANT TO 11 U.S.C. § 502 AND FED. R. BANKR. P. 3007 (NO LIABILITY)[2]**

I, Christopher Parker KC, make this declaration pursuant to 28 U.S.C. § 1746 and state as follows:

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219) ("Holdco"); Genesis Global Capital, LLC (8564) ("GGC"); and Genesis Asia Pacific Pte. Ltd. (2164R) ("GAP"). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

[2]    Any capitalized terms not defined herein shall be ascribed the same meaning as provided in the Objection.

1

**Background**

1.  I am a barrister practising from Maitland Chambers, 7 Stone Buildings, Lincoln's Inn, London WC2A 3SZ. I am a King's Counsel ("KC"). I was called to the Bar of England and Wales in 1984 and the Bar of the British Virgin Islands ("BVI") in 2006. I became a Queen's Counsel ("QC") in 2008.

2.  I have over 35 years' experience as a practitioner before the Courts of England and Wales. The principles of English common law and equity apply in the BVI (subject to modification by BVI statutes) pursuant to the Common Law (Declaration of Application) Act (Cap 13) and the West Indies Associated States Supreme Court (Virgin Islands) Act (Cap 80), respectively. The procedural rules applicable in the BVI, the Eastern Caribbean Supreme Court Civil Procedure Rules 2000 (as amended), are modelled on the current English Civil Procedure Rules. I also have been instructed on many cases in the BVI of an international nature. I consider myself appropriately qualified to provide this Declaration.

3.  I am authorized to submit this Declaration in support of the *Debtors' Second Omnibus Objection (Substantive) To Claim Nos. 523, 526, 527, 981, 982 And 990 Pursuant to 11 U.S.C. § 502 And Fed. R. Bankr. P. 3007 (No Liability)* (the "Objection").

4.  I understand that Russel Crumpler and Christopher Farmer, in their capacity as Joint Liquidators ("Joint Liquidators") of Three Arrows Capital Ltd. (In Liquidation) ("3AC") filed three substantively identical amended proofs of claim (the "Proofs of Claim") on August 18, 2023 against Holdco, GGC and GAP (collectively referred to as "Genesis" hereafter) asserting the following claims:

    a)  *Turnover claims under both New York and BVI law, and conversion claims under New York law with respect to the following assets: (i) approximately*

2

     *13,780.04 BTC; (ii) approximately 17,455 ETH; (iii) four categories of tokens that were converted into Bitcoin, comprised of 96.2 million ALGO tokens, 699,000 Solana tokens, 300,000 AVAX tokens, and 50,000 Ether (together, the "<u>Substituted Assets</u>"); and (iv) approximately 9.2 million GBTC.*

 b) *Preference claims under BVI law with respect to the following assets: (i) the Interest Payment; (ii) the Principal Payment; (iii) 13,172,000 GBTC; and (iv) the Substituted Assets.*

 c) *Certain "potential" claims (i) under Sections 544 and 547 of the U.S. Bankruptcy Code and (ii) with respect to 3AC's investments in the Grayscale Trusts (which do not specify the nature of the claim or cause of action).* See Objection, Exs. A, B, C ("<u>3AC Proofs of Claim</u>").

5. I have also reviewed various Master Loan Agreements and related pledge agreements, as amended (collectively, the "<u>MLAs</u>") entered into between 3AC, GGC and GAP that set out the terms of their lending relationship. See Objection, Exs. O, P. I understand that 3AC provided the Amended PoC Assets to GAP pursuant to these MLAs.

**Appeal of BVI Sanction Decision**

6. I understand that the "potential" claims under the US Bankruptcy Code are contingent upon 3AC[3] obtaining sanction from the BVI Court to commence a Chapter 11 case in the United States on behalf of 3AC and actually duly commencing such a Chapter 11 case. I understand that

---

[3] References to claims brought or actions taken by 3AC include claims brought or actions taken by the Joint Liquidators, and vice versa.

3

on July 26, 2023, the BVI Court denied the application, and that 3AC has filed an appeal of the BVI Court's decision.

7.  It appears that 3AC presented its application under s186(5) of the BVI Insolvency Act 2003 to obtain sanction to commence a chapter 11 proceeding in the United States on behalf of 3AC as a Type 2 application under BVI law (i.e. on the basis that sanction from the BVI Court was not needed for the power being exercised). See Objection, Ex. W (BVI Court Judgment). An appeal against a Type 2 application generally will succeed only if the judge committed an error of law or principle, or her decision was perverse or wholly unsustainable.[4]

8.  However, in 3AC's case, Mangatal J ruled that 3AC's application was a Type 1 application (meaning that sanction from the BVI Court was required before the power arose or could be exercised). A BVI court's decision on a Type 1 application fundamentally turns on an exercise of the judge's discretion. Under these circumstances, the appellate court will not interfere with the discretion exercised by the judge "*unless satisfied that he applied a wrong principle, took into account matters which he should not have taken into account, disregarded matters of which he should have had regard, or was plainly wrong.*"[5]

**Proper Valuation of Claims Under BVI Law**

9.  The 3AC Proofs of Claim give values for all the Amended PoC Assets as at June 27, 2022 (the date of the liquidation of 3AC and the appointment of the Joint Liquidators), *except* the Substituted Assets, which are asserted to be valued as of the date of the transfers, specifically May 12 and 13, 2022. In this way 3AC estimates the total value of its claims "to be at least $1.15 billion." Exs. A, B and C at para. 25.

---

[4] Phoenix Group Foundation v Carl Stuart Jackson and others BVIHCMAP 2020/0019 at [70].
[5] Re Greenhaven Motors Ltd [1999] 1 BCLC 635 at 641B.

4

10. The values provided for assets that are the subject of the s274A claim (discussed below) are simply historic values and are not relevant to the remedy for a s274A claim. A s274A claim is for delivery up of actual assets rather than for damages amounting to the value that such assets may have had at any time previously.

11. For the value of the preference claims, the general principle is that the Court "*may make such order as it considers fit for restoring the position to what it would have been if the company had not entered into that transaction*": s249(1)(b). It is therefore very unlikely that the Court would, without more, order recovery by reference to the value of the assets at the time of the transfer.

**Unfair Preference**

12. 3AC brings preference claims under s245 of the BVI Insolvency Act 2003 with respect to (i) the Interest Payment; (ii) the Principal Payment; (iii) 13,172,000 GBTC; and (iii) the Substituted Assets. That section is in the following terms:

> *245.(1) Subject to subsection (2), a transaction entered into by a company is an unfair preference given by the company to a creditor if the transaction (a) is an insolvency transaction; (b) is entered into within the vulnerability period; and (c) has the effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.*

13. A transaction is an insolvency transaction if

> "*(a) it is entered into at a time when the company is insolvent; or (b) it causes the company to become insolvent.*": s244(2).

14. The vulnerability period

> *means, (a) (i) in the case of a transaction entered into with, or a preference given to, a connected person, the period commencing 2 years prior to the onset of insolvency and ending on the appointment of ... the liquidator; and (ii) in the case of a transaction entered into with, or a preference to, any other person, the period commencing six months prior to the onset of insolvency and ending on the appointment of the liquidator: s244 (1).*

5

15. 3AC's preference claims under s245 depend, amongst other things, on 3AC being able to show that the transfers had the "effect of putting the creditor into a position which, in the event of the company going into insolvent liquidation, will be better than the position he would have been in if the transaction had not been entered into.": s245(1). That would be the case if the debt obligations of 3AC exceeded the value of the security held.[6]

16. The wording of s245(1)(c) accords with s239(4)(b) of the UK Insolvency Act 1986. However, whilst s239(5) of the UK Insolvency Act 1986 stipulates that no order under s239 shall be made "*unless the company which gave the preference was influenced in deciding to give it by a desire to produce....the effect mentioned in subsection (4)(b),*" s245(2) of the BVI legislation provides that, "*(2) A transaction is not an unfair preference if the transaction took place in the ordinary course of business.*"

17. The BVI legislation thus mirrors s243(2)(a) of the UK legislation dealing with "*Unfair preferences (Scotland)*" by which "*a transaction in the ordinary course of trade or business*" cannot be challenged as an unfair preference.

18. In the UK, the Cork Committee[7] examined the ordinary course defense in its 1982 Report,[8] and debated the merits of departing from the subjective test of an intention or desire to prefer and "*adopting a test similar to that adopted in Australia,*"[9] noting,

> *s122(2) of the [Australian Bankruptcy Act 1963] excludes any payment to a creditor who can prove that the payment was made in good faith and in the ordinary course of business; and section 122(4) of the Act provides that the payment should not be regarded as being made in good faith if the creditor who received the payment knew or had reason to suspect that the debtor was unable to pay his debts as they became due from his own money, and*

---

[6] See Armour & Bennett, Vulnerable Transactions in Corporate Insolvency, para. 4.44.

[7] Appointed on 27 January 1977 "*to carry out a fundamental and exhaustive reappraisal of all aspects of the insolvency laws of England and Wales*" as stated in the introduction to their Report.

[8] Insolvency Law and Practice, Report of the Review Committee, Cmnd. 8558.

[9] Para. 1252.

6

*that the effect of the payment would be to give him a preference, priority or advantage over other creditors.*

19.   The UK legislation for preferences in England and Wales by said s239(5) is expressed as providing for an additional requirement to be met before a transaction can be challenged as a preference. In comparison, for unfair preferences in the BVI, s245(2) is expressed as an exception from what is otherwise an unfair preference. Under the Australian legislation, the burden of showing that the transaction was in the ordinary course of business was expressly placed upon the payee. The NZ legislation placed the burden on the payee to show that the transaction was not at a time when the company was unable to pay its debts or was in the ordinary course of business,[10] but only if it fell within *"the restricted period,"* i.e., a period of 6 months before the liquidation. It obviously followed that if the claim was based on the transaction having occurred within *"the specified period"* (i.e., a period of 2 years before the liquidation) but outside *"the restricted period,"* then the burden of showing that the transaction occurred at a time when the company was unable to pay its debts and otherwise than in the ordinary course of business was on the applicant. Similarly, it is clear from the language of s245(4), below—which, where the alleged preference concerns a connected person, places the burden on the creditor to prove the contrary— that otherwise the burden of proof is on the liquidator to plead and ultimately to show not only that the transaction was an insolvency transaction but also that the transaction did not take place in the ordinary course of business:

> *"245(4) Where a transaction entered into by a company within the vulnerability period has the effect specified in subsection (1)(c) in respect of a creditor who is a connected person, <u>unless the contrary is proved,</u> it is presumed that the transaction <u>was an insolvency transaction and that it did not take place in the ordinary course of business</u>" (emphasis added): s245(4).*

---

[10] New Zealand Companies Act 1955 s266(3).

20. I note that in the Proofs of Claim, the 3AC Liquidators characterize the element of the claim concerning ordinary course as an "affirmative defense." Exs. A, B and C at para. 43. To the extent this is intended to suggest that it is the defendant that bears the burden of proof and persuasion either as to the ordinary course defense or as to the solvency of the plaintiff, then it should be clear from the above that this is not correct. 3AC's reliance on a six-month vulnerability period rather than a two year period, see Exs. A, B and C at para. 42, confirms that it is not being suggested that the Debtors were "a connected person" (see s244(1)), so the burden of proof lies with 3AC to plead and prove that (i) the company was insolvent at the time of the relevant transactions, and (ii) that any challenged transactions were not in the ordinary course.

21. There is limited case law in the BVI courts interpreting the meaning of "ordinary course" under s245(4). In <u>Byers, McDonald and Pioneer Freight Futures Company Limited v Chen Ningning</u> BVIHCVAP 2015/0011, 12 June, 2018, the Eastern Caribbean Court of Appeal held that "*the repayment of a loan during a contractually obligated time does not necessarily engage the conclusion that the repayment was in the ordinary course of business*": at 105. That was because "*the ordinary course of business defence is intended to enable a company to continue to make payments to ordinary trade creditors so that they can continue to trade as a going concern. However, once an insolvency process is inevitable, payments to ordinary creditors can no longer be justified on the basis of continuity of trade*": at 103. In that case there was no suggestion that the inevitability of the insolvency process was not known by those causing the payment to be made. I note that it is not alleged in the Amended Proofs of Claim that 3AC knew that an insolvency process was inevitable nor that the transfers were not made in order that it could continue to trade as a going concern.

8

22. Given the limited BVI caselaw interpreting the meaning of "ordinary course" under s245(4), the BVI Court would derive persuasive guidance from relevant judgments in other Commonwealth jurisdictions that use "an ordinary course of business" test.

23. Indeed, a BVI court would be bound[11] to follow the view of the Privy Council in Countrywide Banking Corporation Ltd v Dean [1998] BCC 105,[12] a case on appeal from the Court of Appeal of New Zealand, where the Privy Council highlighted the significance of a consideration of past practice between the parties, general practices in the industry and an expectation of continuing in business:

> *Their Lordships do not accept...that the test is general in the sense that it would be satisfied so long as it can be said that the transaction is one which might reasonably take place in some business setting...*
>
> *Plainly the transaction must be examined in the actual setting in which it took place. That defines the circumstances in which it is to be determined whether it was in the ordinary course of business. The determination then is to be made objectively by reference to the standard of what amounts to the ordinary course of business. As was said by Fisher J in the Modern Terrazzo Ltd case, the transaction must be such that it would be viewed by an objective observer as having taken place in the ordinary course of business. While there is to be reference to business practices in the commercial world in general, the focus must still be the ordinary operational activities of business as going concerns, not responses to abnormal financial difficulties. Their Lordships respectfully agree with the judge's conclusion by reference to the policy of the section ((1997) 8 NZCLC 261,478 at p.261,490):*
>
>> *Whether a payment should be regarded as commercially routine at a day to day trading and operating level will turn at least in part upon a comparison with the practices of the commercial community in general. But equally, the way in which the particular company has acted in the past, and its dealings with the particular creditor, would seem pertinent. That the payment was simply a repetition of past patterns of behaviour would make it more difficult to argue that it represented special assistance to an insider or the result of special enforcement measures or a situation in which the subject*

---

[11] The binding nature of Privy Council decisions was recently discussed by Jack J in Commercial Bank of Dubai v 18 Elvaston Place Ltd BVIHC(COM) 2020/0070 16 June 2020 and Briefline Assets Ltd v Nikolay Anatolyevich Falin BVIHC(COM) 2020/0223 15 February 2022.

[12] "The approach for ascertaining what constitutes the ordinary course of business is set out by the Privy Council in Countrywide Banking Corporation Ltd v Dean": Emmerson International Corporation v Vekselberg and others BVIHCM 2013/0160 29 October 2018 per Wallbank J at 71.

9

> *creditor ought to have investigated before extending credit. So at a policy level there is something to be said for the view that relevant consideration should extend to the prior practices of the particular company.*
>
> *The section therefore requires examination of the actual transaction in its factual setting (excluding the intent or purpose of the company save as required by subsection 4)[13]. Because the examination is undertaken objectively by reference to the standard of the ordinary course of business, there may be circumstances where a transaction, exceptional to a particular trader, will nonetheless be in the ordinary course of business – as for example its first transaction of a particular type. It may be that transactions undertaken in the past will, because of changed circumstances, no longer be considered as in the ordinary course of business. The payment of some accrued indebtedness may be within the ordinary course of business……The particular circumstances will require assessment in each case: at 113H-114E.*

24. Whilst the test is objective, good faith on the part of the creditor would surely be relevant to a consideration of whether the transaction has taken place in the ordinary course of business, even though, unlike the Australian legislation,[14] it is not mentioned as a requirement of the defence under BVI law separate from that of the transaction being in the ordinary course of business. As noted in Goode on Principles of Corporate Insolvency Law, 5th ed., para. 13-84:

> *Where the creditor receives a payment in good faith, it will almost invariably be the case that the company makes the payment as a normal part of its business or to protect its own interests (for example, for the purpose of ensuring the continuance of supplies), not to favour the creditor to whom payment is made.*

25. The importance of whether the alleged preference was directed to a continuation of trade has been considered in the Australian authorities, as recently discussed by the High Court of

---

[13] The same case states, "*That intention did not cease to be relevant in all circumstances is apparent from subsection(4) which reintroduces it as a factor for consideration of the ordinary course of business exception where the person preferred knew of any intent or purpose of the debtor to prefer*": Countrywide Banking Corporation Ltd v Dean [1998] BCC 105, at 111C. It might be said that the NZ Act assumed that intention would be relevant to the determination of the question. Thus the NZ Companies Act 1955 considered it necessary to provide that "*in determining whether a transaction took place in the ordinary course of business, no account is to be taken of any intent or purpose on the part of a company (a) To enable another person to receive more towards the satisfaction of a debt than the person would otherwise receive or be likely to receive in the liquidation…..unless that person knew that that was the intent or purpose of the company*": s266(4).

[14] See Countrywide Banking Corporation Ltd v Dean [1998] BCC 105 at 112A-E.

10

Australia in Bryant v Badenoch Integrated Logging Pty Ltd [2023] HCA 2. Reference was there made (at 51) to the statement in MacPherson, The Law of Company Liquidation, 3rd ed., at 319:

> *Genuine payments made by the company to reduce a general debit as it stands from day to day and in order to maintain a genuine business relationship that promises advantages to both the company and its creditor are not preferences. This is because there is a mutual assumption by the parties that the business relationship of buyer and seller will continue with the result that the relationship of debtor and creditor will continue in the running account between the parties. There is no attempt to terminate this relationship but rather to ensure its continuance to the mutual benefit of the parties. In these circumstances payments made by the company to its supplier should not be viewed in isolation and attacked as preferences.*

26.  The Proofs of Claim do not allege that the Debtors knew that an insolvency process was inevitable. They do not address the Debtors' expectation with regard to 3AC's continuing in business, but rather simply allege that they knew of 3AC's "distress." Exs. A, B and C at para. 43.

27.  As for the claim that 3AC was insolvent, I note that in computing 3AC's alleged balance sheet insolvency 3AC includes the total amount of the loans under the MLAs at full value on the basis that, "*amongst other events of default,*" the deterioration of market conditions leading up to May 5, 2022 constituted a material adverse effect which "*[d]epending on the specific terms of each master loan agreement . . . either automatically accelerated the loans thereunder or rendered them immediately callable.*" Exs. A, B and C at para. 40. The question of whether 3AC was insolvent as a matter of BVI law appears therefore to turn on the terms of the MLAs, which are governed by New York law.

28.  The grant of a security interest, such as a pledge, to a creditor in respect of existing indebtedness within the vulnerability period, can potentially be an unfair preference. However, Goode on Principles of Corporate Insolvency Law, 5th ed., identifies the following as not involving the giving of a preference, at para. 13-90:

11

*"(3) the exchange of an asset of the company for one of at least equal value"*: that would apply equally to exchanges of collateral. In the event that one form of collateral is substituted for another of equivalent value, there could be no underlying preference claim because the creditor would not by that act alone be in a better position than he would have in the event of a liquidation by virtue of the substitution of collateral of equal value. Any consequential improvement of the position of the creditor on the liquidation will have been accidental and consequent upon market changes in the value of the collateral subsequent to the transaction;

*"(4) the grant of security for a contemporaneous or subsequent advance or other new value"*: in that event, even if the recipient happens to be a creditor already, *"he does not receive the [security] in his capacity as such but derives it from the independent, new transaction concluded for value."* Accordingly, the grant of security for contemporaneous exchange of value, including the extension of new loans, does not constitute a preference.[15]

### Turnover

29.     3AC also brings turnover claims under s274A of the BVI Insolvency Act with respect to (i) approximately 13,780.04 BTC; (ii) approximately 17,455 ETH; (iii) the Substituted Assets; and (iv) approximately 9.2 million GBTC. Exs. A, B and C at para. 27.

30.     3AC's claim under s274A recognizes that claims under s274A do not disturb any existing property rights the Debtors have. It is dependent on 3AC establishing that the Debtors did not have a valid and enforceable security interest in the assets.

---

[15] Goode on Principles of Corporate Insolvency Law, 5th ed., para. 13-79.

31. The validity of Genesis' security interest in these assets as a matter of BVI law would be governed by the choice of law clause in the agreements governing them: see Dicey, Morris & Collins, The Conflict of Laws, 16th ed., 33-005. S161(2) of the BVI Business Companies Act provides that the company may create a mortgage, charge or other encumbrance over any of its assets situated in any part or the world in accordance with the law of any jurisdiction of the company's choice, and the mortgage, charge or other encumbrance shall be binding on the company to the extent, and in accordance with, the requirements of the chosen law.

32. The agreements by which these assets were transferred provided that they were to be *"construed and enforced under the laws of the State of New York."* See Objection, Ex. P (2020 MLA § XIII). Accordingly, the question of the validity of Genesis' security interest in those assets as a matter of BVI law would be governed by New York law.

33. As for the question of perfection[16] of the security as a matter of BVI law, it is not a requirement of BVI law that to be enforceable against a company in liquidation the security must be registered with the BVI Registrar of Corporate Affairs,[17] though if in fact registered with the Registrar, the charge[18] has priority over any subsequently registered charge and any unregistered

---

[16] *"Perfection refers to steps required by statute in various contexts to give publicity to security interests in assets owned by another person to ensure their effectiveness against competing third party claims."*: Law Commission's Digital Assets: Consultation Paper para. 18.14 ftnte 1614. As the Paper notes, the position under the UK legislation (Companies Act 2006, s859H) is that *"Failure to comply with these steps results in the interests being void in the event of the collateral provider becoming subject to insolvency proceedings...."* The BVI legislation makes no such provision.

[17] S175(2) of the BVI Insolvency Act 2003 expressly states that the commencement of the liquidation does not affect the right of a secured creditor to take possession of or otherwise deal with assets of the company over which that creditor has a security interest.

[18] "Charge" means any form of security interest over property, wherever situated, other than an interest arising by operation of law": s160(1) of the Business Companies Act.

13

charge.[19] Therefore, any failure by Genesis to register its security with the BVI Registrar would not affect its validity and enforceability as against 3AC.

34.  Thus, if Genesis' security interests in the assets subject to the s274A claims were enforceable against 3AC under New York law and were lawfully enforced against 3AC under that law, there can be no valid claim under s274A.

35.  In the aforementioned judgment of Mangatal J of July 7, 2023, the s274A application is described at para. 15 as seeking *"declarations as to the beneficial ownership of the Disputed Assets (or their traceable proceeds) and an order . . . requiring a delivery up of the assets/proceeds."* Consequently, the application requires determinations as to whether the assets subject to the 274A claim were, as a matter of New York law, subject to a valid and enforceable security interest and as to whether the Substituted Assets can be traced into identifiable assets. The application is therefore in part for the delivery up of as yet unidentified assets.

36.  In Ezair v Conn [2020] EWCA Civ 687 in his judgment (with which Henderson and Rose LJJ agreed) Patten LJ said of s234 of the UK Insolvency Act 1986 that,

> *"...the provisions of subsections (3) and (4) also confirm that an application under s234 may not (and probably is not intended to) provide a definitive ruling about title nor is the possibility of such a ruling a pre-condition to the exercise of the power. Sections 234 and 236 are designed to assist an office-holder in the carrying out of the relevant insolvency process by placing under his control the property and records to which the company appears to be entitled. Although, as Warner J recognized in Re London Iron and Steel Co. Ltd. [1990] BCLC 372, a determination of whether the company appears to be entitled to the property does not preclude the resolution at the hearing of the grounds upon which the application is resisted, it may not provide an appropriate procedure for determining complex issues about title.....Section 234 creates a summary procedure whereby the office holder in his own name may seek the transfer of company property to him. Although the entitlement to such an order will depend upon the company's apparent rights to the property in question and the judge will have to resolve any dispute about entitlement raised by the respondent in the proceedings, the purpose of the power conferred on the Court is and remains as Lord Hoffman explained in Smith*

---

[19] S166(1) Business Companies Act. There is no equivalent to the UK Companies Act 2006 s859H by which a failure to register a charge (though not a possessory security such as a pledge or a lien) renders it void as against the liquidator or any creditor of the company.

14

*(Administrator of Cosslett (Contractors) Ltd v Bridgend County Borough Council [2001] UKHL 58 at [26]-[28] that of enabling the office holder to carry out his statutory functions by placing the apparent property of the company under his control. This process does not therefore necessarily involve any determination of title and the final resolution of such a dispute may fall to be made in subsequent proceedings*": at [26].

37. As s274A contains materially the same wording as the UK s234, I would expect a BVI Court to take a similar view of s274A and to have serious concerns as to the appropriateness of using s274A for a claim seeking delivery up of unidentified assets which also requires a determination as to whether under New York law security was conferred.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on September 1, 2023.

Christopher Parker KC

Maitland Chambers

15