# Exhibit H

Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

**DECLARATION OF SHARON BROWN-HRUSKA IN**
**SUPPORT OF DEBTORS' SECOND OMNIBUS OBJECTION**
**(SUBSTANTIVE) TO CLAIM NOS. 523, 526, 527, 981, 982 AND 990**
**PURSUANT TO 11 U.S.C. § 502 AND FED. R. BANKR. P. 3007 (NO LIABILITY)**

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219) ("Holdco"); Genesis Global Capital, LLC (8564) ("GGC"); and Genesis Asia Pacific Pte. Ltd. (2164R) ("GAP"). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

# Table of Contents

I.      Qualifications.................................................................................................. 1

II.     Engagement and Materials Reviewed.............................................................. 2

III.    Summary Of Opinions.................................................................................... 4

IV.     The Cryptocurrencies and Other Similar Assets Exchanged Under the Agreements
        Are Commodities............................................................................................ 5

V.      The Agreements and the Loans Made Thereunder Are Forward Contracts...................... 9
   A.   The Agreements Were Forward Contracts Under the Bankruptcy Code.......................... 9
   B.   The Agreements Were Forward Contracts as Understood By the Financial Markets...... 11

VI.     Genesis Operated As a Forward Contract Merchant in Cryptocurrency ........................ 13

VII.    Further Work .................................................................................................. 14

**APPENDIX A: CURRICULUM VITAE**

**APPENDIX B: SOURCES RELIED UPON**

I, Sharon Brown-Hruska, Ph.D., hereby declare under penalty of perjury, pursuant to section 1746 of title 28 of the United States Code, as follows:

# I.    QUALIFICATIONS

1.    I am a Principal of Hruska Economics, LLC and an Affiliated Consultant in the Global Securities and Finance and the White Collar, Investigations, and Enforcement Practices of National Economic Research Associates, Inc. ("NERA").  I am an expert on futures, options, derivatives, and securities markets, and have worked on commodities and securities regulatory matters for more than 30 years.  I have served as an expert and offered expert testimony in various arbitration forums and court proceedings related to my area of expertise and have served as an arbitrator for the National Futures Association.

2.    I have served in various government and private sector roles, including as Chief Economist at the U.S. Department of State (2019-2021), as Managing Director at NERA (2006-2019), and as Staff Economist (1990-1995), Commissioner (2002-2006), and Acting Chairman (2004-2005) of the U.S. Commodity Futures Trading Commission ("CFTC"), the federal regulatory body governing the futures, options, and swaps markets.  In my former positions at the CFTC, I was closely involved in the development and understanding of commodities, including the emerging markets for "crypto" and virtual currency, and the various types of derivatives and financial contracts that are used to facilitate trade in them, as well as their specific purposes in risk management and commerce.

3.    I have held faculty positions in finance at Tulane University's A.B. Freeman School of Business (2012-2015, 1995-1998), George Mason University's School of Business (1998-2005), and Pamplin College of Business at Virginia Polytechnic Institute and State University (1994-1995).  As a professor, I have researched and taught courses on futures and options markets,

risk management and financial innovation, investments, financial market structure, and regulation. As an economist and market practitioner, I specialize in derivatives contracts and their underlying assets and associated regulations governing them, and I have published numerous scholarly and applied, peer-reviewed articles and reports on derivatives, virtual currencies, and risk management.

4.      I currently serve as an Independent Director and the Chairman of the Regulatory Oversight Committee on the FMX Futures, Public Director of Athena Technology Acquisition Co. II, and as a member of the Board of the PRIME Finance Foundation.  I am an experienced Board Member, having served as an Independent Director and Chairman of the ROC on the board of the Electronic Liquidity Exchange, a futures exchange offering U.S. treasury futures and options; a Director on the North American Derivatives Exchange; and as a Trustee for the International Securities Exchange ("ISE") Trust, a regulatory trust that oversaw ISE's governance and compliance with national and international securities laws.  I also served as a Public Director on the Boards of MarketAxess Holdings (2010-2013), an electronic market and broker-dealer in the credit markets, and have had various opportunities to serve on advisory boards and working groups in business and government.

5.      I hold a Ph.D. and M.A. in economics and a B.A. in economics and international studies from Virginia Polytechnic Institute and State University in Blacksburg, Virginia.

6.      My curriculum vitae, attached hereto as Appendix A, more fully sets forth my qualifications and expertise.

## II.    ENGAGEMENT AND MATERIALS REVIEWED

7.      I have been retained by Cleary Gottlieb Steen & Hamilton LLP, counsel to the Debtors in the above-captioned proceedings, to opine based on my professional and academic expertise regarding (1) whether cryptocurrencies and other similar digital assets are commodities;

2

(2) whether various agreements entered into between Genesis Global Capital, LLC ("GGC"), Genesis Asia Pacific Pte. Ltd. ("GAP", and with GGC, each a "Genesis Party", and collectively with GGC, "Genesis") and Three Arrows Capital Ltd. ("3AC", and together with Genesis, the "Parties") are forward contracts for the purchase of commodities, as defined in the Bankruptcy Code; and (3) whether GAP is similar to entities whose business consists of dealing in the forward contract trade.

8.    I have reviewed the following documents:

- *Attachment to Amended Proof of Claim filed by the Joint Liquidators of Three Arrows Capital, Ltd.* filed in support of proofs of claim numbered 981, 982, and 990[2] (collectively, the "POCs") submitted in the above-referenced proceedings;

- *Debtors' First Omnibus Objection (Substantive) To Claim Nos. 523, 526 And 527 Pursuant To 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (the "First Objection") (ECF No. 530), and associated exhibits; the *Declaration filed by Paul Aronzon in Support of First Day Motions and Applications in Compliance with Local Rule 1007-2* (ECF No. 19); and the *Declaration of A. Derar Islim in Support of First Day Motions and Applications in Compliance With Local Rule 1007-2* (ECF No. 17);

- Master Digital Currency Loan Agreement, dated January 10, 2019 between GGC and 3AC; Master Loan Agreement, dated January 10, 2019 between GGC and 3AC; and Master Loan Agreement, dated January 24, 2020 between GAP and 3AC; (collectively, the "MLAs");[3]

- Loan Term Sheets under the MLAs,[4] executed by GAP or GGC on the one hand and 3AC on the other hand (the "Term Sheets"), as well as term sheets between the Parties under the MLAs reflected in Telegram Communications (the "Telegram Agreements" and together with the Term Sheets and the MLAs, the "Agreements"),[5] by which Genesis agreed to send 3AC (i) cryptocurrencies and similar digital assets or (ii) U.S. dollars, in exchange for which 3AC posted collateral to Genesis, consisting of cryptocurrencies and other similar digital assets; and

- The *Declaration of A. Derar Islim in Support of Debtors' Second Omnibus Objection (Substantive) to Claim Nos. 523, 526, 527, 981, 982, and 990 Pursuant*

---

[2]    Proofs of claim numbered 981, 982, and 990 supersede and amend proofs of claim numbered 523, 526, and 527 filed by 3AC in the above-referenced proceedings.

[3]    *See* First Objection, Exs. G, H.

[4]    *See, e.g.*, First Objection, Ex. B of Exhibit G.

[5]    *See, e.g.,* First Objection, Ex. L.

3

*to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (the "Islim Declaration"), attached as Exhibit K to the *Debtors' Second Omnibus Objection (Substantive) to Claim Nos. 523, 526, 527, 981, 982, and 990 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (the "Objection").

9.      I have also considered academic literature, regulatory and legal notices and reports, and practitioner publications generally used and relied upon by persons in my field of occupation. The full list of materials considered in forming my opinions are listed in Appendix B attached hereto.

10.      NERA is being compensated for my work on this matter at my standard hourly rate of $950.  Members of NERA support staff are being billed by NERA at their standard hourly rates and NERA is also being reimbursed for out-of-pocket expenses.  My compensation is based upon hours worked and appropriate related expenses, and is not in any way contingent upon the outcome of this matter.

11.      I am authorized to submit this Declaration in support of the Objection.[6]

## III.    SUMMARY OF OPINIONS

12.      Based on my expertise and experience in the commodities industry, including my various positions at the CFTC, and my analysis and review of case evidence, including the documents listed in Appendix B attached hereto, I conclude that:

- The cryptocurrencies and similar digital assets transferred between the Parties pursuant to the Agreements are commodities[7] within the meaning of the Commodities Exchange Act (the "CEA");

- The Agreements between the Parties, pursuant to which cryptocurrencies and similar digital assets were transferred, are "forward contracts" as that term is used

---

[6]      All capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

[7]      As part of my engagement, Counsel has instructed me to assume, for the purposes of my opinion, that shares in Grayscale Bitcoin Trust ("GBTC") are considered securities as that term is defined in Section 101(49) of the Bankruptcy Code.  Consequently, my opinion does not address whether GBTC is a commodity within the meaning of the CEA.

in section 101(25)(A) of the Bankruptcy Code and as commonly understood by financial market authorities and in the commodities markets; and

- By virtue of its business and the transactions undertaken under the Agreements, pursuant to which cryptocurrencies and similar digital assets were transferred, GAP operated as an intermediary, borrowing and lending cryptocurrency in order to make markets in cryptocurrency. By engaging in dealing activities in borrowing and lending cryptocurrency, GAP acted as a "forward contract merchant" as that term is commonly understood by financial market authorities and in the commodities markets.

## IV.   THE CRYPTOCURRENCIES AND OTHER SIMILAR ASSETS EXCHANGED UNDER THE AGREEMENTS ARE COMMODITIES

13.    In general, commodities are goods, both tangible and intangible, used in commerce that are interchangeable with other goods of the same type.[8] From an economics perspective, commodities are characterized by scarcity, fungibility, and uniformity. Some commodities, like precious metals including gold and silver, have been used as a medium of exchange that facilitated transactions in other commodities.[9] Since Bitcoin and other cryptocurrencies are subject to scarcity, are interchangeable, and have functions consistent with global commodities, scholars and regulators have concluded that they are appropriately considered as commodities.[10] As with other commodities, contracts for their exchange can be physical or financial.

---

[8]      *See, e.g.*, John Black, Nigar Hashimzade, and Gareth Myles, "A Dictionary of Economics (Oxford Quick Reference)," Oxford University Press, 2009 ("A standardized good, which is traded in bulk and whose units are interchangeable.") and "What Is a Commodity and Understanding Its Role in the Stock Market," Investopedia, accessed August 29, 2023 ("A commodity is a basic good used in commerce that is interchangeable with other goods of the same type."

[9]      *See* CFI Team, "Store of Value," Corporate Finance Institute, accessed on August 30, 2023 ("For the better part of history, various commodities played the role of money. Initially, trade agents used assets and commodities, such as gold, as mediums of exchange based on their intrinsic values, durability, and portability.").

[10]      *See Digital Metal: Regulating Bitcoin As A Commodity*, 66 Case W. Res. L. Rev. 609, 626, 632 (2015) ("It would make sense for regulators to treat Bitcoin as a commodity. Commodities are generally defined as 'goods sold in the market with a quality and value uniform throughout the world.' This categorization would be appropriate because it realistically reflects the economic behavior of Bitcoin users and squares with traditional economic conceptions of exchange. [...] Bitcoin likely fits best in the category of exempt commodities. This categorization would make sense primarily because of the similarities between bitcoins and precious metals: each exists in a limited supply, is capable of physical delivery, and is a capital good." (Internal footnotes omitted)); *see also* "CFTC Launches Virtual Currency Resource Web Page," CFTC Press Release, December 15, 2017 ("Bitcoin and other virtual currencies have been determined to be commodities under the Commodity Exchange Act (CEA).").

14.     Under the Bankruptcy Code, "commodity […] ha[s] the meaning assigned to [that] term in the [Commodities Exchange] Act."[11]    The CEA[12] identifies three categories of "commodities": (i) enumerated goods (primarily agricultural products); (ii) goods and articles subject to futures contracts; and (iii) services, interests, or rights, in such goods or articles subject to futures contracts.[13]    The CEA definition of "commodity" is intentionally broad in order to be adapted to new types of commerce in commodities not explicitly enumerated under the statute.

15.     The CEA established the CFTC and empowered it to interpret the scope of the CEA, provided it followed appropriate rule-making procedures as set forth in the Administrative Procedures Act.    The CFTC has consistently found that any service, right, or interest for which a futures contract exists, or could exist in the future, qualifies as a commodity under the CEA.    As a result, the definition of a "commodity" for the purposes of the CEA (and by extension under the Bankruptcy Code) extends far beyond the enumerated list provided in in the text of the statute.

16.     Since 2015, the CFTC has regulated cryptocurrencies and other digital assets as commodities under the CEA based on the fact that (i) such assets are exchanged in commerce for uniform quantity and value and are subject to contracts for future delivery that are dealt in presently or in the future; (ii) they are digital representations of value that function as mediums of exchange; and (iii) their futures and options are traded on regulated designated contract markets ("DCM"), including the Chicago Mercantile Exchange ("CME"), or are categorically similar to assets traded

---

[11]     *See* 11 USC § 761(8).

[12]     *See* 7 USC § 1 *et sq*.

[13]     *See* 17 CFR § 1.3. ("Commodity. This term means and includes wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, millfeeds, butter, eggs, Irish potatoes, wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles […] and all services, rights and interests […] in which contracts for future delivery are presently or in the future dealt in.").

6

on such exchanges.[14]  The CFTC has also asserted regulatory authority more generally with respect to digital assets other than cryptocurrencies on the theory that such assets are categorically similar to goods which are exchanged in commerce and are subject to futures contracts.  Courts have also noted the regulatory authority of the CFTC with respect to virtual currencies.[15]  With respect to financial products, it is generally accepted that assets, which are not otherwise deemed a security for the purposes of U.S. securities law, or are traded on DCMs such as the CME, are treated as commodities.[16]

17.    In my opinion, the cryptocurrencies that are the subject of the claims in the POCs, namely Bitcoin ("BTC"), Ethereum ("ETH"), USD Coin ("USDC"), Tether ("USDT"), Algorand ("ALGO"), Avalanche ("AVAX"), Ethereum Classic ("ETC"), FTX Token ("FTT"), Solana ("SOL"), Stellar ("XLM"), and Zcash ("ZEC") are commodities and have characteristics consistent with commodities within the meaning of the CEA.

---

[14]    *See, e.g. In re Matter of Coinflip, Inc.,* CFTC Dkt. No. 15-29, ECF No. 1, at 2, 3 ("Bitcoin is a 'virtual currency,' defined here as a digital representation of value that functions as a medium of exchange, a unit of account, and/or a store of value, but does not have legal tender status in any jurisdiction" and "Bitcoin and other virtual currencies are encompassed in the definition [of commodities under the CEA] and properly defined as commodities."); *see also* "CFTC/SEC Investor Alert: Funds Trading in Bitcoin Futures", CFTC Advisories and Articles ("Bitcoin is a commodity, and commodity futures trading is required to take place on futures exchanges regulated and supervised by the CFTC.").

[15]    *See CFTC v. McDonnell*, 287 F. Supp. 3d 213, 226 (E.D.N.Y 2018) ("Virtual currencies can be regulated by CFTC as a commodity. Virtual currencies are 'goods' exchanged in a market for a uniform quality and value. [...] They fall well-within the common definition of 'commodity' as well as the CEA's definition of 'commodities' as 'all other goods and articles ... in which contracts for future delivery are presently or in the future dealt in.'").

[16]    *See* 17 CFR § 1.3.

18.    The CFTC has asserted that BTC and ETH, which trade on the CME,[17] are commodities within the meaning of the CEA.[18,19]   Similarly, in statements to Congress,[20] interviews,[21] and in certain enforcement actions,[22] the CFTC has taken the position that stablecoins, such as USDC and USDT, are commodities under the CEA.  As for ALGO, AVAX, ETC, FTT, SOL, XLM, and ZEC, they are cryptocurrencies, which the CFTC has asserted are categorically similar to BTC and ETH and therefore commodities under the CEA.[23]

---

[17]     The CME has listed Bitcoin futures since 2017 and Ether futures since 2021.  *See* "CME Group Self-Certifies Bitcoin Futures to Launch Dec. 18," CME Group Press Release (December 1, 2017) and "CME Group to Launch Ether Futures on February 8, 2021," CME Group press release (December 16, 2020).

[18]     *See, e.g. In re Matter of Coinflip, Inc.,* CFTC Dkt. No. 15-29, ECF No. 1, at 3 ("Bitcoin and other virtual currencies are encompassed in the definition [of commodities under the CEA] and properly defined as commodities."); *In re Matter of iFinex Inc., BFXNA Inc., and BFXWW Inc.,* CFTC Dkt. No. 22-05, ECF No. 1, at 2 ("Bitcoin, ether, litecoin, and tether tokens, along with other digital assets are encompassed within the broad definition of 'commodity' under Section 1a(9) of the Act . . . and are therefore subject to applicable provisions of the Act and Regulations which include Section 6(c)(1) of the Act and Regulation 180.1(a)."); *In re Matter of TeraExchange LLC,* CFTC Dkt. No. 15-33, ECF No. 1 at 5 ("Bitcoin is a commodity under Section 1a of the Act, 7 U.S.C. § 1a (2012), and is therefore subject as a commodity to applicable provisions of the Act and Regulations.")*; see also* "CFTC Launches Virtual Currency Resource Web Page," CFTC Press Release, December 15, 2017 ("Bitcoin and other virtual currencies have been determined to be commodities under the Commodity Exchange Act (CEA).").

[19]     In CFTC Press Release Number 8051-19 dated October 10, 2019, CFTC Chairman Heath P. Tarbert commented on Ether's status as a commodity, noting that "[w]e've been very clear on bitcoin: bitcoin is a commodity under the Commodity Exchange Act. We haven't said anything about ether – until now. It is my view as Chairman of the CFTC that ether is a commodity, and therefore it will be regulated under the CEA. And my guess is that you will see, in the near future, ether-related futures contracts and other derivatives potentially traded … **It's my conclusion as Chairman of the CFTC that ether is a commodity and therefore would fall under our jurisdiction.**" Emphasis in original.

[20]     During a March 8, 2023 Senate Agricultural Hearing, CFTC Chairman Rostin Behnam reiterated the Commission's stance on Ether, stating that "[n]otwithstanding a regulatory framework around stablecoins, they're going to be commodities in my view." *See* "Stablecoins and Ether are 'going to be commodities,' reaffirms CFTC chair," Cointelegraph (March 9, 2023).

[21]     In an interview following the March 8, 2023 Senate Agricultural Hearing, CFTC Chairman Behnam further noted that "[b]ased on the cases we have brought in the past around stablecoins, I think there's a strong legal argument that USDC and other similar stablecoins would be commodities[.]" *See* "Stablecoins like USDC are Commodities, CFTC Chair Says," The Wall Street Journal (March 8, 2023).

[22]     *See CFTC v. Ooki DAO,* Case No. 22-cv-5416 (N.D. Cal. Sept. 22, 2022), Dkt. 1 ("Virtual currencies such as ETH, DAI, and others traded on the Ooki Protocol are 'commodities' under the Act."); *see also CFTC v. Samuel Bankman-Fried,* Case No. 22-cv-10503 (N.D. Cal. Dec. 13, 2022), Dkt. 1, at 5 ("Certain digital assets are 'commodities,' including bitcoin (BTC), ether (ETH), tether (USDT) and others, as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).").

[23]     *See, e.g. In re Matter of Coinflip, Inc.,* CFTC Dkt. No. 15-29, ECF No. 1, at 3 ("Bitcoin and other virtual currencies are encompassed in the definition [of commodities under the CEA] and properly defined as (continued)

8

19.     More fundamentally, each of these digital assets fit the general definition of commodities, including because (i) they are interchangeable assets exchanged in commerce subject to contracts for future delivery,[24] and (ii) they are digital assets that function as mediums of exchange, units of account, and/or stores of value.[25]

## V.    THE AGREEMENTS AND THE LOANS MADE THEREUNDER ARE FORWARD CONTRACTS

### A.  The Agreements Were Forward Contracts Under the Bankruptcy Code

20.     Under Section 101(25)(A) of the Bankruptcy Code, a "forward contract" is a contract for the purchase, sale or transfer of a commodity or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade, with a maturity date more than two days after the contract is entered into.[26] As

---

commodities."); *In re Matter of iFinex Inc., BFXNA Inc., and BFXWW Inc.*, CFTC Dkt. No. 22-05, ECF No. 1, at 2 ("Bitcoin, ether, litecoin, and tether tokens, along with other digital assets, are encompassed within the broad definition of 'commodity' under Section 1a(9) of the Act . . . and are therefore subject to applicable provisions of the Act and Regulations which include Section 6(c)(1) of the Act and Regulation 180.1(a)."); *CFTC v. My Big Coin Pay, Inc.* 334 F. Supp. 3d 492, 497 (D. Mass. 2018) ("Here, the amended complaint alleges that My Big Coin is a virtual currency and it is undisputed that there is a futures trading in virtual currencies [….] That is sufficient, especially at the pleading stage, for plaintiff to allege that My Big Coin is a 'commodity' under the [CEA]."); *CFTC v. Ooki DAO*, Case No. 22-cv-5416 (N.D. Cal. Sept. 22, 2022), Dkt. 1 ("Virtual currencies such as ETH, DAI, and others traded on the Ooki Protocol are 'commodities' under the Act."); *CFTC v. Samuel Bankman-Fried*, Case No. 22-cv-10503 (N.D. Cal. Dec. 13, 2022), Dkt. 1, at 6 ("Certain digital assets are 'commodities,' including bitcoin (BTC), ether (ETH), tether (USDT) and others, as defined under Section 1a(9) of the Act, 7 U.S.C. § 1a(9).").

[24]     *See Digital Metal: Regulating Bitcoin As A Commodity*, 66 Case W. Res. L. Rev. 609, 626 (2015) ("It would make sense for regulators to treat Bitcoin as a commodity. Commodities are generally defined as 'goods sold in the market with a quality and value uniform throughout the world.' This categorization would be appropriate because it realistically reflects the economic behavior of Bitcoin users and squares with traditional economic conceptions of exchange." (Internal footnote omitted)).

[25]     *See CFTC v. Eisenberg*, Case No. 23-cv-00173 (S.D.N.Y Jan. 9, 2023), Dkt. 1, at 5 ("Digital assets include virtual currencies, such as bitcoin (BTC), ether (ETH), and USD Coin (USDC), which are digital representations of value that function as mediums of exchange, units of account, and/or stores of value."); *see also CFTC v. Samuel Bankman-Fried*, Case No. 22-cv-10503 (N.D. Cal. Dec. 13, 2022), Dkt. 1, at 6 ("Digital assets include virtual currencies, such as bitcoin (BTC), ether (ETH), and tether (USDT), which are digital representations of value that function as mediums of exchange, units of account, and/or stores of values."); n.9 *supra*.

[26]     *See* 11 USC § 101 (25)(A).

relevant to this provision, "transfer" includes, among other things, either the creation of a lien or the retention of title as a security interest.[27]

21.    The specific contracts enumerated in 11 USC § 101(25)(A), including "a repurchase or reverse repurchase transaction," "consignment, lease, swap, hedge transaction, deposit, loan, option, allocated transaction, unallocated transaction, or any other similar agreement," all have prices fixed at the time of contracting and are used for financial purposes rather than commercial purposes—for instance, to manage or assume price risk. The quantity of the commodity (e.g., currency or digital assets) to be exchanged is also fixed at the time of contracting in the enumerated contracts. In addition, such contracts obligate (in this case, the borrower) to deliver (to the lender) payments under the terms of the contracts more than two days in the future.

22.    Pursuant to the Agreements, Genesis agreed to extend to 3AC loans of either "digital currency" or U.S. Dollars (in each instance as set forth in the relevant Term Sheet or Telegram Agreement) (each, a "Loan"). For each Loan, 3AC in turn would post collateral (representing an agreed-to percentage of relevant principal amount of the loan) to the relevant Genesis Entity in the form of cryptocurrencies or other digital assets. The Agreements also provide that, if the value of the collateral held by Genesis fell below a certain value, Genesis could demand that 3AC post additional collateral. The Term Sheet or Telegram Agreement governing each Loan set a fixed interest rate and an open-term maturity date. The purpose of the Agreements was to enable 3AC to trade in "cryptocurrency and other digital assets[,]" and "3AC's investment strategy involved making large, leveraged cryptocurrency trades using funding from [Genesis] and other

---

[27]    *See* 11 USC § 101(54).

10

investors."[28]  Genesis also benefitted from the Agreements because it received cryptocurrency and other digital assets which it rehypothecated, pledged, or otherwise disposed of in the ordinary course of its business until 3AC repaid the corresponding loan principal.[29]  In other words, Genesis offered secured borrowing and lending under the Agreements that enabled the purchase, transfer, and/or trade in cryptocurrencies and other similar digital assets.

23.      Each of the Agreements, and the Loans entered into thereunder, were "forward contracts" under the Bankruptcy Code.  Each involved commodities in the form of cryptocurrency or other digital assets (either as principal advanced by Genesis to 3AC or as collateral posted by 3AC to Genesis).[30]  Such commodities posted by 3AC to the Genesis entities as collateral for the Loans were "transferred" (as that meaning is used under the Bankruptcy Code) because Genesis retained both possession and title to such collateral as a security interest under the agreement.  The Agreements provided that the Parties would exchange fixed quantities of commodities (the cryptocurrencies and other digital assets), at a future date, at a price set at the time of contracting.  Moreover, the economic purpose of the Agreements was to enable both Parties to undertake transactions in cryptocurrencies, and as such, the subject of the Agreements were commodities.

## B.  The Agreements Were Forward Contracts as Understood By the Financial Markets

24.      In my experience as Commissioner and Acting Chairman of the CFTC, and as an economist on the staff of the Commission, I have had the opportunity to analyze, examine, and oversee the regulation of trading of a wide array of physical and financial contracts involving a wide range of commodities.  In my roles at the CFTC, I served as the nation's top regulator of

---

[28]      POCs, ¶¶ 5, 12.

[29]      *See* Islim Declaration ¶ 5.

[30]      As noted above, shares in GBTC are assumed to be securities as that term is defined in Section 101(49) of the Bankruptcy Code.

11

derivatives contracts, including derivatives contracts on foreign currencies, commodities, and securities. As an academic, I have written about and taught courses in finance and risk management, analyzing the building blocks of derivatives assets and analyzed commonly understood characteristics of particular commodity contracts, derivative contracts, and markets in those products.

25.    A forward contract is a basic and commonly used derivative contract that consists of an over-the-counter agreement between two counterparties that obligates one party to make delivery, and the other party to take delivery, of a predetermined quantity of an underlying commodity or asset, at a predetermined price or interest rate[31] specified such that the value at the inception of the contract is zero,[32] with an anticipated maturity more than two days in the future, or else the contract is considered a spot contract.[33] In general, forward contracts (1) obligate both parties to make, or take, respectively, delivery of (2) a certain quantity of a specified commodity or currency, (3) at a certain fixed price or interest rate, (4) on a date more than two days in the future. A loan may be considered a forward contract. Loans typically establish a fixed interest rate, which by extension established a fixed price for the capital provided by the loan. Further, a loan has zero value at inception in that the net present value of the future loan repayments (including the final repayment of principal) will equal the amount borrowed. Loans also commonly set dates of repayment much further in the future than two days after inception. Even

---

[31]    Often called the forward price or delivery price.

[32]    Because a forward contract by definition involves no transfer of assets or cash for more than two days after contracting, the predetermined price must be such that "the forward contract has zero value at inception." Varma, Jayanth R. "Derivatives and Risk Management." 2009, p. 3-10. *See also* Sercu, Piet. "International finance: Theory into practice." Princeton University Press, 2009, p. 134.

[33]    *See* 11 U.S.C. § 101(25)(A).

where a contract does not specify a delivery date more than two days in the future, such obligation can be inferred through the course of dealing of the parties to the contract.

26.     The Loans advanced under the Agreements have the characteristics that, in my experience as an economist, are consistent with forward contracts.  The Genesis Entities would agree to deliver, and 3AC agreed to accept, a certain fixed amount of cash or commodities (in the form of cryptocurrencies or similar digital assets) at a fixed interest rate.  In turn, 3AC would agree to repay the principal of such Loans at a date in the future (in all instances further than two days after inception) in addition to any interest accrued.

## VI.    GENESIS OPERATED AS A FORWARD CONTRACT MERCHANT IN CRYPTOCURRENCY

27.     The Bankruptcy Code defines "forward contract merchant" in relevant part as "an entity the business of which consists in whole or in part of entering into forward contracts as or with merchants in a commodity (as defined [under the CEA]) or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade."  The CFTC similarly defines a Futures Commission Merchant as an "individual, association, partnership, corporation, or trust" that engages in "soliciting or in accepting orders" for futures and other derivatives and that "accepts any money, securities, or property […] to margin, guarantee, or secure any trades or contracts[.]"[34]  A Futures Commission Merchant, pursuant to the CFTC definition, is an intermediary who seeks to be a market maker in a given commodity futures or option contract.  Similarly, a "merchant" is commonly used in commodities markets in reference to an individual or firm which acts as an intermediary between buyers and sellers of a given commodity.

---

[34]     7 USC § 1a(28).

13

28.    I understand that GAP's sole business was the provision of loans substantially similar terms to those of the Agreements, which consisted of "forward contracts" as that term is defined in the Bankruptcy Code and as understood by financial markets.[35] GAP is an intermediary, not an end user or repository of digital assets; its business model is to lend digital assets or currency that it borrowed at a higher rate than the rate at which it borrowed those assets.[36] Consequently, in my opinion GAP is a "forward contract merchant" as that term is used in the Bankruptcy Code.

## VII. FURTHER WORK

29.    This report reflects analysis based on documents and data provided to me by counsel. My conclusions are derived from analyses of the data and information available to me, and are subject to change should additional information and data become available.

*[The remainder of this page is left blank intentionally]*

---

[35]    *See* Islim Declaration ¶¶ 5, 25-26.

[36]    *See* Islim Declaration ¶ 5.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  September 1, 2023                           _/s/ Sharon Brown-Hruska__
          Burke, Virginia
                                     Sharon Brown-Hruska, Ph.D.



**Sharon Brown-Hruska**
Affiliated Consultant
NERA Economic Consulting
2112 Pennsylvania Ave, NW, 4th Floor
Washington, DC 20037
sharon.hruska.affiliate@nera.com
www.nera.com

# Appendix A
# Sharon Brown-Hruska, Ph.D.

## Professional Experience

| | |
|---|---|
| 2021- Present | **Principal and Managing Director**, Hruska Economics, LLC |
| | **Affiliated Consultant**, Global Securities and Finance Practice, National Economic Research Associates, Inc., Washington, DC |
| | **Academic Affiliate**, Stoneturn Group, Washington DC |
| 2019–2021 | **Chief Economist**, Office of the Chief Economist, Economic Growth, Energy, and the Environment, U.S. Department of State, Washington, DC |
| 2006–2019 | **Managing Director**, Partner, and Vice President, Global Securities and Finance Practice, National Economic Research Associates, Inc., Washington, DC |
| 2012–2015 | **Visiting Professor of Finance**, A.B. Freeman School of Business, Tulane University, New Orleans, LA |
| 2002–2006 | **Commissioner and Acting Chairman** (2004-2005), U.S. Commodity Futures Trading Commission, Washington, DC |
| 1998–2005 | **Assistant Professor of Finance**, School of Management, **Mercatus Center Research Fellow**, 1999–2002, George Mason University, Fairfax, VA |
| 1995–1998 | **Assistant Professor of Finance**, A.B. Freeman School of Business, **Lilly Endowment Teaching Fellow**, 1997-1998; **Newcomb Fellow**, 1996-1998, Tulane University, New Orleans, LA |
| 1994–1995 | **Adjunct Professor of Finance**, Pamplin College of Business, Investments, **H.B. Earhart Fellow**, Center for the Study of Futures and Options Markets, 1987–1990, Virginia Polytechnic Institute and State University, Falls Church, VA |
| 1990–1995 | **Financial Economist**, Division of Economic Analysis, Commodity Futures Trading Commission, Washington, DC |

**Sharon Brown-Hruska**

## Education

Virginia Polytechnic Institute and State University, Ph.D., Economics, 1994; M.A., Economics, 1988; B.A., Economics and International Studies, 1983.

## Publications in the Last 10 Years

Report on Proposed SEC Rule "Position Reporting of Large Security-Based Swap Positions," [Activist Investing] (with Patrick Conroy and Nadim Siddique), Appendix A, Mar. 21, 2022.

"The Impact of Post-Crisis Regulatory Reforms on Cross-Border Financial Transactions." *Proceedings of the ASIL Annual Meeting, 112*, 41-44. 2018.

"The Virtual Currency Regulatory Framework in Global Context" (with Trevor Wagener), *Capital Markets Law Journal*, Oxford University Press, London, Oct. 2018.

"Ethanol RIN Market Analysis and Potential Reforms" (with Alex Kfoury, Trevor Wagener), Prepared for Valero Services, Inc., at https://www.fuelingusjobs.com/library/public/Study/-2018-10-18-NERA-White-Paper-on-the-RIN-Market-Final.pdf, Oct. 18, 2018.

"Crypto Market Surveillance Has Arrived," (with Jordan Milev and Trevor Wagener), *Law360*, May 25, 2018.

"Recent Trends in Virtual Currency Regulation, Enforcement, and Litigation." (with Trevor Wagener), at https://www.nera.com/publications/archive/2018/recent-trends-in-virtual-currency-regulation--enforcement--and-l.html, NERA Economic Consulting, May 18, 2018.

"Dodd-Frank Wall Street Reform and Consumer Protection Act," (with Julian Hammer, Anna Pinedo, and David Sawyer), *Encyclopedia of Business Ethics and Society*, 2nd ed., Robert W. Kolb, ed., April 2018.

"Deterrence Theory," (with Trevor Wagener and Robert Zwirb), *Encyclopedia of Business Ethics and Society*, 2nd ed., Robert W. Kolb, ed., April 2018.

"Energy Markets," (with James McFarland), *Encyclopedia of Business Ethics and Society*, 2nd ed., Robert W. Kolb, ed., April 2018.

"Excessive Speculation," (with Ryan Cummings and Peter Lissy), *Encyclopedia of Business Ethics and Society*, 2nd ed., Robert W. Kolb, ed., April 2018.

"FINRA," (with Jeffrey Holik), *Encyclopedia of Business Ethics and Society*, 2nd ed., Robert W. Kolb, ed., April 2018.

"Foreign Exchange Markets," (with Georgi Tsvetkov and Trevor Wagener), *Encyclopedia of Business Ethics and Society*, 2nd ed., Robert W. Kolb, ed., April 2018.

"Money Laundering," *Encyclopedia of Business Ethics and Society*, 2nd ed., Robert W. Kolb, ed., April 2018.

"Options Contracts and Markets," (with Georgi Tsvetkov and Trevor Wagener), *Encyclopedia of Business Ethics and Society*, 2nd ed., Robert W. Kolb, ed., April 2018.

**Sharon Brown-Hruska**

Cost-Benefit Analysis of the CFTC's Swap Dealer De Minimis Exception Definition (with Ryan Cummings, Georgi Tsvetkov, and Trevor Wagener), American Bankers Association at [https://comments.cftc.gov/Handlers/PdfHandler.ashx?id=28659](https://comments.cftc.gov/Handlers/PdfHandler.ashx?id=28659), Mar 29, 2018, 16-69.

"BSA/AML Compliance and Enforcement: An Update for the Securities and Derivatives Industry," _Market Solutions_, Financial Markets Association, June 2017.

"New Regulations for Securitizations and Asset-Backed Securities," (with Georgi Tsvetkov and Trevor Wagener), _Handbook of Mortgage-Backed Securities_, 7th ed., Frank J. Fabozzi, ed., Oxford University Press, Oct. 18, 2016.

"Market Manipulation and Spoofing:  From Pit Trading to Big Data," _Risk Desk,_ Scudder Publishing , Sep.16, 2016.

Developments in Bank Secrecy Act and Anti-Money Laundering Enforcement and Litigation, [https://www.nera.com/content/dam/nera/publications/2016/PUB_Developments_BSA_AML_Lit-06.16.pdf](https://www.nera.com/content/dam/nera/publications/2016/PUB_Developments_BSA_AML_Lit-06.16.pdf), June 30, 2016.

"On Retail Forex, Regulators Have Failed To Reach Far Enough," _Forbes_, Capital Flows, Avik Roy, ed., Jan. 12, 2015.

"Cost-Benefit Analysis of the CFTC's Proposed Margin Requirements for Uncleared Swaps," [NERA Publication](), (with Trevor Wagener), December 02, 2014.

## Testimony at Trial and in Depositions in Last 4 Years

None

## Congressional Testimony

Testimony of Acting Chairman Sharon Brown-Hruska before the Agriculture, Nutrition and Forestry Committee, U.S. Senate, Hearing, Washington, DC, Mar. 8, 2005.

Testimony of Acting Chairman Sharon Brown-Hruska, Subcommittee General Farm Commodities and Risk Management, U.S. House of Representatives, Hearing, Washington, DC, Mar. 3, 2005.

Testimony for Senate Confirmation before the Agriculture, Nutrition and Forestry Committee, U.S. Senate, Hearing, Washington, DC, Jun. 25, 2002.

## Public Director and Advisory Boards

| | |
|---|---|
| 2021–Present | Management Board, PRIME Finance Foundation |
| 2021–Present | Board of Directors, Athena Technology Acquisition Corp. II, Audit Committee Chair |
| 2021–Present | Chairman, Regulatory Oversight Committee and Board of Directors, FMX Futures Exchange |
| 2021–Present | Advisory Board Member, Ten12 |
| 2021–Present | Advisory Board Member, Social Capital Campaign |

**Sharon Brown-Hruska**

| | |
|---|---|
| 2017–2018 | Board of Directors, PRIME Finance Dispute Resolution and Education Foundation |
| 2015–2018 | CFTC Energy and Environmental Markets Advisory Committee |
| 2011–2018 | Working Group on Financial Markets, Federal Reserve Bank of Chicago |
| 2010–2013 | Public Director, Corporate Governance Committee, MarketAxess Holdings, Inc. |
| 2009–2016 | Board of Directors, Electronic Liquidity Exchange (ELX), Chairman, Regulatory Oversight Committee |
| 2009–2010 | Board of Directors, North American Derivatives Exchange (Nadex) |
| 2007–2016 | Trustee, International Securities Exchange Holdings, Inc. (ISE Trust) |
| 2007–Present | Pamplin School of Business Finance Advisory Board, Virginia Tech |
| 2006–2007 | Independent Director, Board of Directors, Dillon Read Financial Products Funds, Dillon Read Capital Management |
| 2005–2011 | Women in Leadership and Philanthropy Council, Virginia Tech |
| 2003–2006 | Chairman, CFTC Technology Advisory Committee |
| 2003–2006 | Financial Literacy and Education Commission, Chairman of the Website Development Committee, led the effort to develop and launch *mymoney.gov* |

**Appendix B**
**Genesis Global Holdco, LLC**
**Sources Relied Upon**

### *Academic Literature and Books*

Black, J., Hashimzade, N., & Myles, G., "A Dictionary of Economics (Oxford Quick Reference)," 2009 edition, entry on Commodity.

*Digital Metal: Regulating Bitcoin As A Commodity*, 66 Case W. Res. L. Rev., 2015.

Sercu, Piet., "International Finance: Theory into Practice," *Princeton University Press*, 2009.

Varma, Jayanth R., *Derivatives and Risk Management*, 2009.

### *Case Law*

*CFTC v. Eisenberg*, Case No. 23-cv-00173 (S.D.N.Y Jan. 9, 2023).

*CFTC v. Ooki DAO*, Case No. 22-cv-5416 (N.D. Cal. Sept. 22, 2022).

*CFTC v. McDonnell*, 287 F. Supp. 3d 213, 226 (E.D.N.Y 2018).

*CFTC v. My Big Coin Pay, Inc.* 334 F. Supp. 3d 492, 497 (D. Mass. 2018).

*CFTC v. Samuel Bankman-Fried*, Case No. 22-cv-10503 (N.D. Cal. Dec. 13, 2022).

*In re Matter of Coinflip, Inc.,* CFTC Dkt. No. 15-29, ECF No. 1, September 17, 2015.

*In re Matter of iFinex Inc., BFXNA Inc., and BFXWW Inc.*, CFTC Dkt. No. 22-05, October 15, 2021.

*In re Matter of TeraExchange LLC*, CFTC Dkt. No. 15-33, September 24, 2015.

### *Expert Reports*

Expert Declaration of A. Derar Islim in Support of First Day Motions and Applications in Compliance With Local Rule 1007-2 (ECF No. 17), dated January 20, 2023.

Expert Declaration of Paul Aronzon in Support of First Day Motions and Applications in Compliance With Local Rule 1007-2 (ECF No. 19), dated January 20, 2023.

Expert Declaration of A. Derar Islim in Support of Debtors' Second Omnibus Objection (Substantive) to Claim Nos. 523, 526, 527, 981, 982, and 990 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability), dated August 31, 2023.

### *News Articles*

"CFTC Launches Virtual Currency Resource Web Page," CFTC Press Release, dated December 15, 2017

**Appendix B**
**Genesis Global Holdco, LLC**
**Sources Relied Upon**

### News Articles (cont.)

"IN CASE YOU MISSED IT: Chairmen Tarbert Comments on Cryptocurrency Regulation at Yahoo! Finance All Markets Summit," CFTC Press Release, dated October 10, 2019.

"CME Group Self-Certifies Bitcoin Futures to Launch Dec. 18," CME Group Press Release, dated December 1, 2017.

"CME Group to Launch Ether Futures on February 8, 2021," CME Group Press Release, dated December 16, 2020.

"Stablecoins and Ether are 'going to be commodities', reaffirms CFTC chair," Cointelegraph, dated March 9, 2023.

"Stablecoins like USDC are Commodities, CFTC Chair Says," The Wall Street Journal, dated March 8, 2023.

### Pleadings in This Matter

Debtors' First Omnibus Objection (Statement) To Claim Nos. 523, 526 and 527 Pursuant To 11 U.S.C § 502 and Fed. R. Bankr. P. 3007 (No Liability), dated July 19, 2023.

Attachment to Amended Proof of Claim filed by the Joint Liquidators of Three Arrows Capital, Ltd. Filed in support of Claim Nos. 981, 982, and 990, dated May 22, 2023.

### Other Materials

Code of Federal Regulations: Title 17.

Master Digital Currency Loan Agreement dated January 10, 2019.

Master Loan Agreement, dated January 10, 2019.

Master Loan Agreement, dated January 24, 2020.

"Store of Value," Corporate Finance Institute, entry on Store of Value, available online at: https://corporatefinanceinstitute.com/resources/valuation/store-of-value/.

U.S. Code: Title 7.

U.S. Code: Title 11.

"What Is a Commodity and Understanding Its Role in the Stock Market," Investopedia, available online at: https://www.investopedia.com/terms/c/commodity.asp.