# Exhibit I

Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

**DECLARATION OF KUNAL S. KAMLANI**
**PURSUANT TO FED. R. BANKR. P. 9017 IN SUPPORT OF DEBTORS'**
**FIRST OMNIBUS OBJECTION (SUBSTANTIVE) TO CLAIM NOS. 523, 526 AND 527**
**PURSUANT TO 11 U.S.C. § 502 AND FED. R. BANKR. P. 3007 (NO LIABILITY)[2]**

I, Kunal S. Kamlani, make this declaration pursuant to 28 U.S.C. § 1746 and state as follows:

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219) ("Holdco"); Genesis Global Capital, LLC (8564) ("GGC"); and Genesis Asia Pacific Pte. Ltd. (2164R) ("GAP"). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

[2] Any capitalized terms not defined herein shall be ascribed the same meaning as provided in the Objection.

1

**Background**

1.     I am the Senior Managing Director of M3 Partners ("M3"), a corporate advisory firm located at 1700 Broadway 19th Floor, New York, NY 10019. I have over 25 years of operating experience in a variety of industries, spanning financial services, global leisure & hospitality, retail, real estate, and home services. I have led a number of major corporate transactions, including the purchase and sale of assets in bankruptcy. I specialize in effectuating business transformations to maximize value for all stakeholders and have a strong track record of delivering quantifiable results.

2.     Prior to joining M3, I was the President of ESL Investments, where I led the firm's M&A, divestiture, and financing activities. I have also served as the President and Chief Operating Officer of Prestige Cruise Holdings, as the head of Bank of America Merrill Lynch's Global Investment Solutions business, and as the Chief Operating Officer at Citi Smith Barney. During my tenure at both Bank of America Merrill Lynch and Citi Smith Barney I served as the head or participated in various risk committees. I have also served on several boards, both public and private, and was a member of the audit, finance, related party transaction and compensation committees depending on the board.

3.     I am authorized to submit this Declaration in support of the *Debtors' Second Omnibus Objection (Substantive) To Claim Nos. 523, 526, 527, 981, 982 and 990 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (the "Objection").

4.     I understand that Three Arrows Capital Ltd. ("3AC") has asserted preference claims under BVI law against the Debtors regarding the following transfers:

   a)     Interest payments by 3AC to GAP totaling approximately $18 million between June 2 and June 3, 2022 (the "Interest Payment");

2

    b)    A loan repayment by 3AC to GAP on May 6, 2022 in the amount of 115,000,000 USDC (the "Principal Payment");

    c)    Collateral postings on May 11, May 12 and May 13, 2022 of: (1) 13,172,000 Grayscale Bitcoin Trust shares ("GBTC"); and (2) four categories of tokens that were converted into BTC, comprised of 96.2 million ALGO tokens ("ALGO"), 699,000 Solana tokens ("SOL"), 300,000 AVAX tokens ("AVAX"), and 50,000 ETH (together, the "Substituted Collateral")

5.    I have been asked to evaluate whether the aforementioned transfers from May 6 through June 3, 2022 were reasonably within the ordinary course of the parties' lending relationship.

6.    I have reviewed the following documents:

    a)    Amended Proofs of Claim filed by 3AC on August 18, 2023 against Holdco, GGC, and GAP;

    b)    Various Master Loan Agreements and related pledge agreements, as amended (collectively, the "MLAs") entered into between 3AC, GGC and GAP;

    c)    *Debtors' First Omnibus Objection (Substantive) To Claim Nos. 523, 526 And 527 Pursuant To 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* and associated exhibits;

    d)    Certain email and Telegram communications between the Debtors and 3AC, Loan Term Sheets under the MLAs between the Debtors and 3AC, invoices for interest payments sent by the Debtors to 3AC, and account records; and

    e)    Excerpts from the Debtors' loan database.

**Summary of Opinions**

7.      After examining the course of the lending relationship between the Debtors and 3AC, including interest payments and margin payments both during and prior to the preference period, it is my opinion that the transfers that 3AC seeks to challenge as preferential transfers are in the nature of transfers that were done in the ordinary course of the parties' lending relationship.

**The Parties' Relationship**

8.      I understand that 3AC provided the assets that are purportedly subject to the preference claims to GAP pursuant to various Master Loan Agreements and related pledge agreements, as amended (collectively, the "MLAs") entered into between 3AC, GGC and GAP.  *See* Objection, Exs. O, P.

9.      GAP and 3AC had a lending relationship from 2019 until 3AC's default under the MLAs in June 2022.  Pursuant to the MLAs, GAP provided loans of USD and digital assets to 3AC, and 3AC transferred to GAP USD, digital assets and shares as collateral.  The MLAs provided that GAP could issue a margin call and require additional collateral if 3AC's collateralization levels fell below certain thresholds.  The MLAs also provided GAP with the power to call loans prior to the agreed-upon termination date, or for 3AC to prepay outstanding loans prior to the agreed-upon termination date.  Finally, the MLAs provided for monthly interest payments from 3AC calculated on the basis of outstanding loans.  The parties memorialized these loans and collateralization agreements in executed loan term sheets and electronic communications pursuant to the MLAs.  *See* Objection, Exs. O, P.

4

**Ordinary Course Analysis**

10.  3AC has alleged that the "vulnerability period," *i.e.*, the relevant lookback period for preference claims under BVI law, with respect to 3AC is December 27, 2021 to June 27, 2022. *See* Objection, Exs. A, B and C at ¶ 42.

11.  The transfers that 3AC alleges are subject to their preference claims fall into two categories: (i) transfers pursuant to margin calls or to otherwise increase collateral levels, and (ii) one set of interest payments.

12.  The first category includes the transfers of 13,172,000 GBTC as well as the Substituted Collateral, both of which were transferred to satisfy a May 9, 2022 margin call.

13.  The first category also includes the Principal Payment, which included the repayment in full or in part of several open term loans in order to raise collateralization levels. Specifically, the Principal Payment fully repaid and settled two loans provided by GAP to 3AC on January 11, 2022, as well as part of a loan provided by GAP to 3AC on January 28, 2022.

14.  The second category includes the Interest Payment, which was comprised of a set of payments of interest on outstanding loans. 3AC typically paid interest on outstanding loans on a monthly basis pursuant to the MLAs. In this instance, the Interest Payment comprised payments of USD, USDT, ETC, FTT and USDC totaling approximately $18 million.

15.  In order to compare these challenged transactions with other transactions involving the parties, I reviewed loan returns and collateral posting transactions among GAP and 3AC as well as interest payments made by 3AC from the period starting April 1, 2021 and ending on June 13, 2022, the date of 3AC's default.

16.  My preliminary review identified more than 300 such transactions during this period. Specifically, for the first category I identified and reviewed more than 150 instances of loans being

5

returned by 3AC as well as more than 90 instances of collateral received from 3AC, and for the second category I identified and reviewed more than 70 instances of interest received from 3AC.

17. As a general matter, these transactions were all executed pursuant to the general relationship structure and documentation outlined above. *See supra* at ¶¶ 8–9.

18. With respect to the first category, during the course of the period of my review, GAP issued margin calls or otherwise requested additional collateral when 3AC's collateralization levels fell below a certain threshold. When such margin calls or requests were issued, 3AC satisfied them by (i) posting additional collateral or (ii) repaying loan principal. The Principal Payment was an example of the latter, and the 13,172,000 GBTC and Substituted Collateral were an example of the former.

19. GAP issued at least eight margin calls and/or requests for additional collateral to 3AC during the time period of April 1, 2021 to June 13, 2022. Two of these margin calls took place prior to the vulnerability period, on May 19, 2021 and September 21, 2021, and the remaining six took place during the vulnerability period (though some of these were prior to any of the challenged transfers), from January 21, 2022 to June 13, 2022. In each of these instances, 3AC met the margin call by either repaying loan principal or by posting additional collateral.

20. Consistent with these practices, the Principal Repayment was sent by 3AC to GAP on May 6, 2022 in response to a request for additional collateral from GAP. The 13,172,000 GBTC and Substituted Collateral were posted as additional collateral on May 11, May 12, 2022 and May 13, 2022 to satisfy a margin call issued on May 9, 2022. These transactions were similar in kind to those transactions during the period of my review that are not being challenged.

21. With respect to the second category, the Interest Payment, the Debtors typically sent an interest invoice to 3AC on a monthly basis. Interest was calculated at the individual loan level

6

for outstanding loans, in accordance with each loan's terms, and then aggregated by asset type at the portfolio level. 3AC customarily paid interest in a mix of currencies, as dictated by the terms of the outstanding loans, and typically paid at some point during the first week of every month, though there were instances where payments were made slightly later in the month. During the period from April 1, 2021 through June 13, 2022, 3AC typically made the monthly payments on between one and three different calendar days, and the number of discrete payments per month (corresponding to different types of assets) ranged from four to seven.

22. The challenged Interest Payment was no different. For this payment, GAP sent an interest invoice to 3AC on May 31, 2022, which reflected the interest owed on 3AC's outstanding loans according to the terms of those loans. In line with 3AC's typical practice, the challenged Interest Payment from 3AC comprised five discrete payments (corresponding to five different types of assets) on two different calendar days (June 2, 2022 and June 3, 2022). Moreover, the specific assets comprising the Interest Payment (FTT, USD, USDT, USDC, and ETC) were each common to other interest payments during the April 1, 2021 through June 13, 2022 period.

23. As is clear from the above, the structure and practice of all of the challenged transfers is entirely consistent with the parties' general structure and practice during the period of my review.

**Opinion**

24. Based upon my review of transfers during the period of my review, the challenged transfers are all in the nature of transfers that were done in the ordinary course of the parties' lending relationship.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed on September 1, 2023.

*/s/ Kunal S. Kamlani*

Kunal S. Kamlani