# Exhibit J

Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Andrew Weaver
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Capital, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

**DECLARATION OF J. AUSTIN CAMPBELL IN
SUPPORT OF DEBTORS' SECOND OMNIBUS OBJECTION
(SUBSTANTIVE) TO CLAIM NOS. 523, 526, 527, 981, 982 AND 990
PURSUANT TO 11 U.S.C. § 502 AND FED. R. BANKR. P. 3007 (NO LIABILITY)**

I, J. Austin Campbell, hereby declare under penalty of perjury, pursuant to section

1746 of title 28 of the United States Code, as follows:

**A.      Background & Qualifications[2]**

1.      I have nearly two decades of experience in fixed income and lending markets,

having traded or managed repo transactions and structured loans, fixed income derivatives, and

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific PTE. LTD. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

[2]      A copy of my curriculum vitae is attached hereto as Exhibit A.

1

bonds with a total notional value of over $500 billion.  I am currently an adjunct professor at Columbia Business School, of Columbia University of New York, where I teach on the subject of blockchain markets infrastructure, the function of various centralized entities and decentralized protocols in the digital asset space, the usage of stablecoins and integration with other private money systems for payments, and fintech innovation.  I am also the managing partner and founder of Zero Knowledge Consulting, a firm that provides strategic consulting and risk evaluations for traditional financial and digital asset companies.

2.      Previously, I held multiple positions in both digital asset and traditional financial institutions.  From 2009 until 2012, I was part of the insurance-linked trading team at JP Morgan. From 2012 until 2018, also at JP Morgan, I ran stable value and bank-owned life insurance wrap trading, which included trading of cash stability derivatives covering a broad basket of fixed income instruments, including interest rate swaps, swaptions, total return swaps, bonds, and repo. In this role I also had responsibility for redundant reserve financing agreements with life insurance companies (a type of structured lending trade), catastrophe bonds, mortality swaps, and at times, basic funding trades (letters of credit, repo, etc.) facing insurance entities.

3.      From 2018 until 2020, I was a portfolio manager at Stone Ridge Asset Management, where I was involved with the structuring of lending trades in the digital asset space, specifically cash-secured repo against Bitcoin in a structure substantially similar to the lending agreements in place in the digital asset markets today, cash management across the various investment funds, structuring of derivatives contracts, and the management of the reinsurance portfolios.

4.      From 2020 until 2021, I was the co-head of Citibank's Digital Assets Rates Trading ("DART") group.  In my role as DART co-head, I evaluated market norms, structures, and conduct across the digital asset-related lending market, with a specific focus on secured lending.

5.      Finally, in 2022, I was the head of portfolio management at Paxos across our various legal entities, though primarily for Paxos Trust Company, a New York Limited Purpose Trust company, and the acting Chief Risk Officer of Paxos National Trust, which would have been our federally chartered trust company as we constructed that entity.  In this role I was responsible for establishing policies, procedures, and risk control groups, as well as researching and evaluating market norms for risk control at the time to ensure that our policies were at or beyond the standards of those deployed generally in the market.  Paxos at the time was the third largest issuer of stablecoins in the world, as well as a provider of custody and trading services in the digital asset space.  My job duties consisted of managing the reserves behind these stablecoins (approximately $20 billion in notional value), primarily composed of overnight repurchase agreements, U.S Treasury bills, and cash deposits at various banks.  Additionally, I was tasked with overseeing certain of our trading and financial activities across the firm, especially from the perspective of managing our exposure and financial risk.  In these roles, I had responsibility for managing the risk of Paxos's own lending books to market makers in the digital asset space, in addition to managing the reserves for the stablecoins.

6.      I have spoken at major forums and conferences on the topics of lending and risk management in digital asset markets, stablecoins and risk management of reserves, and digital asset market structure more generally, including at the New York and Chicago Federal Reserve Fintech conferences, Consensus (CoinDesk's digital asset conference), AlleyCon (Columbia

University), and DeFi Con (Fordham University). I have also testified as an expert in front of the House Financial Services Committee in April 2023.

7.     I am authorized to submit this declaration (the "<u>Declaration</u>") in support of the *Debtors' Second Omnibus Objection (Substantive) to Claim Nos. 523, 526, 527, 981, 982, and 990 Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (the "<u>Objection</u>"),[3] which is being filed simultaneously herewith. My compensation for my work on this declaration is based upon hours worked at an hourly rate of $600, as well as reimbursement for out-of-pocket expenses, and is not in any way contingent upon the outcome of this matter.

## B.     Engagement & Materials Received

8.     I have been retained by Cleary Gottlieb Steen & Hamilton LLP, counsel to the Debtors in the above-captioned proceedings, to opine, based on my professional and academic expertise, whether the Challenged Transfers were made within the ordinary course of business for the secured lending industry, and in particular secured lending involving digital assets.

9.     I have reviewed the following documents:

- *Attachment to Amended Proof of Claim filed by the Joint Liquidators of Three Arrows Capital, Ltd.* filed in support of proofs of claim numbered 981, 982, and 990[4] (collectively, the "<u>POCs</u>") submitted in the above-referenced proceedings;

- *Debtors' First Omnibus Objection (Substantive) To Claim Nos. 523, 526 And 527 Pursuant To 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (the "<u>First Objection</u>") (ECF No. 530), and associated exhibits;

- Master Digital Currency Loan Agreement, dated January 10, 2019 between Genesis Global Capital, LLC ("<u>GGC</u>") and Three Arrows Capital Ltd. ("<u>3AC</u>"); Master Loan Agreement, dated January 10, 2019 between GGC and 3AC; and Master Loan Agreement, dated January 24, 2020 between Genesis Asia Pacific Pte. Ltd. ("<u>GAP</u>" and, together with GGC, "<u>Genesis</u>"

---

[3]     Capitalized terms not otherwise defined herein shall have the meanings given to them in the Objection.

[4]     Proofs of claim numbered 981, 982, and 990 supersede and amend proofs of claim numbered 523, 526, and 527 filed by 3AC in the above-referenced proceedings.

and Genesis, with 3AC, the "Parties") and 3AC; (collectively, the "MLAs");[5]

- Loan Term Sheets under the MLAs,[6] executed by GAP or GGC on the one hand and 3AC on the other hand (the "Term Sheets"), as well as term sheets between the Parties under the MLAs reflected in Telegram Communications (the "Telegram Agreements" and together with the Term Sheets and the MLAs, the "Agreements"),[7] by which Genesis agreed to send 3AC (i) cryptocurrencies and similar digital assets or (ii) U.S. dollars, in exchange for which 3AC posted collateral to Genesis, consisting of cryptocurrencies and other similar digital assets; and

- Communications between the Parties related to certain margin calls relevant to the Challenged Transactions.

10.    The full list of materials considered in forming my opinion are listed in Exhibit B attached hereto.

## C.    Summary of Opinion

11.    It is my opinion that the Challenged Transfers were made in the ordinary course of the secured lending business, including secured lending of digital assets. The secured lending Agreements between the Parties contemplate margin calls, partial repayments of loans, and interest payments, which are consistent with typical secured lending agreements throughout the digital asset and traditional asset markets. Payments and transfers consistent with such typical market terms as outlined in agreements among secured lending parties is ordinary course conduct. Additionally, in a market where prices are falling and credit exposure is becoming more stark, tightening terms, managing leverage, and adjusting collateral are all typical and done in the ordinary course. Such conduct is not only ordinary business activity across the entire digital asset

---

[5]    *See* First Objection, Exs. G, H, K.

[6]    *See, e.g.*, First Objection, Ex. B of Exhibit G.

[7]    *See, e.g.,* First Objection, Ex. L.

market in 2022, but this conduct is ordinary in all market downturns and is at the foundation of the effective functioning of secured lending markets in general.

## D.    The Parties

### a.  3AC

12.    3AC was a digital asset hedge fund that primarily engaged in speculative activity in the digital asset space.  To that end, 3AC had a portfolio composed of many different tokens, and made extensive use of leverage in order to fulfill its investment objectives, specifically secured lending arrangements with multiple counterparties. [8]  These characteristics and financing arrangements were typical of digital asset hedge funds during the relevant time period, as there was no material unsecured lending market for digital asset hedge funds.  Similar to traditional financial markets, entities lending to these firms rely upon the underlying value of pledged assets in order to facilitate the extension of credit.

### b.  Genesis

13.    Genesis is a lending firm that engaged in significant secured lending activities in the digital asset space during the time period in question.  In line with the market, Genesis had a preference for extending secured credit, where underlying assets were pledged as collateral in order to protect against volatility in digital asset markets.  Therefore, similar to other sell-side firms engaging in such activities in traditional financial markets, the primary risks that Genesis had to manage in order to successfully operate its business across all market regimes and timeframes were the credit risk and liquidity risk of its lending book.

---

[8]    *See* POCs ¶¶ 5-7, 12.

### c. The Lending Relationship Between 3AC & Genesis

14.     The lending relationship between 3AC and Genesis closely mirrors the repurchase agreement or securities lending regimes of traditional financial markets, where the ordinary commercial understanding of such loans is that, in return for borrowing funds, the borrower will post collateral, pay interest, and keep the loan current as the market moves, and that failure to do so will result in margin calls, the termination of the loans, or both.  The lending relationship was memorialized in both the MLAs and in the individual Term Sheets and Telegram Agreements.[9]

15.     The use of messaging platforms, like Telegram and similar applications, are used in the ordinary course by participants in the secured digital asset lending market to memorialize individualized lending terms.  In each market, there are preferred platforms for communication. Typically, in traditional financial markets, Bloomberg is the dominant chat platform, in part due to a regulatory requirement for monitoring of chats that can easily be fulfilled, and in part due to the fact that majority of pricing and market information is already found on the platform.  In other markets, email or voice dominates, especially in cases where over-the-counter markets require more discussion for each trade.  In that context, digital asset market participants settled upon Telegram as the chat platform that was used for the discussion of trades and lending.  This is partially because it is multi-national, which suits the digital asset space well, given that the underlying market is 24/7 and global.  This is also partially because it was free, and a platform that many crypto users were already familiar with and using to communicate with each other.  As a result, the group chats in Telegram were very similar to the group chats one would find between firms on Bloomberg in traditional markets, with some mix of sales, trading, risk, and operations

---

[9]     *See, e.g.*, First Objection, Ex. L at pages 1-4. 13-16, 20-22, 26-27, 74-76 (showing that Telegram Agreements memorialized discussions regarding the terms of the MLAs, collateral requirements or margin calls, substitution of collateral, and interest payments).

personnel negotiating trades, confirming receipt of funds and details, exchanging notes, or just engaging in normal social chatter.  Moreover, the Telegram Agreements used here, including agreements concerning pledges of collateral, were typical of what was used by professionals in the digital asset industry.

16.    Particular to the digital asset lending market, it is typical to both discuss precise trade terms that would later be the kinds of things represented in confirms and term sheets, to exchange operational information and wallet addresses, to confirm receipt of funds, and to commingle discussions of trades with discussions of borrowing (as often, trades were done utilizing leverage and both had to be agreed to simultaneously).  This was common conduct for the majority of trading firms in the space, along with other related participants such as stablecoin issuers, and Telegram served as a central communication tool for the market in 2022, and largely still does today.

17.    Under the terms set forth in the Agreements, Genesis would lend digital currency to 3AC in return for 3AC paying a "Loan Fee", analogous to an interest payments, and an obligation for 3AC to return of the borrowed digital currency at the termination of the loan. Notably, these loans also contained provisions where Genesis could call a loan earlier than the agreed upon termination date, or 3AC could prepay the loan, meaning that at the outset of the lending relationship, both parties agreed that in the ordinary course of business, loans could be adjusted, terminated, or otherwise managed on both sides.  Similarly, collateral is well defined within the Agreements, including the concept of multiple forms of collateral, collateral thresholds, and margin calls.  In essence, it appears clear that the intent of both parties was that the collateral relationship between the two would not be a static pledge of a single asset in perpetuity for the course of the loan, but rather an agreement that closely resembles modern standards for repurchase

agreements or interest rate derivatives, where initial collateral, variable collateral due to price changes, and collateral substitution are all commonly used tools.  Beyond the use of master loan agreements, the use of messaging platforms, like Telegram and similar applications, are used in the ordinary course to memorialize individualized lending terms in the secured digital asset lending market.

### E. Overall Market Conditions

18.     During at least part of the relevant time period, digital asset markets were generally experiencing a significant downturn in prices.  This was not unique to the Parties, but rather simply a broader market context in which all firms were operating.  Across the space, as the general perception of risk rose due to falling prices and increased volatility, a number of actions were taken.  Other lenders and sell-side firms were reducing their lending activity, tightening terms, calling for margin, and otherwise managing their risk in the exact manner one would expect during a broad market downturn.  Similarly, many borrowers were closing out positions pre-emptively, reducing leverage, or trimming exposure to ensure they would not be exposed to margin calls or at undue risk of default on agreements.  As is typical of a well-functioning market with a diverse set of views, there were also some participants who expressed their own views by adding to leverage, or perhaps shorting the market, or even lending at higher rates in greater size if they believed the downturn was temporary.  This diversity of views is what makes a market, and in the collateralized lending space, the adjustable nature of collateral and loan sizes and terms is what allows the market to function.

19.     Indeed, it is important to consider that this behavior through cycles is typical market behavior.  Looking beyond simply the local events of the digital asset lending market in 2022, we can look at secured lending in traditional markets in 2020 when prices fell due to the pandemic, which lead to margin calls on Wall Street and tightening of risk management.  Similarly, we can

look at 2008, and the subsequent structural changes out the back of that crisis that lead to the tightening of standards around collateral, derivatives, and lending.  In fact, many of the contractual terms present in the Agreements are likely the result of lessons learned in that crisis and have become orderly and ordinary course of business for the multi-trillion dollar overnight repo market.  Similarly, the entire initial margin plus variation margin regime for derivative contracts (swaps, etc.) operates in nearly identical fashion, and the replacement of uncollateralized derivatives with collateralized derivatives following the 2008 financial crisis further supports the notion that this has been ordinary market conduct globally across a broad variety of asset classes over the course of the past decade and a half.

20.     Ordinary conduct between 3AC and Genesis during the relevant time period, in relation to the broader market in digital assets and also past market cycles of volatility in other similar lending markets, included reductions in leverage, tightening of terms, greater focus on collateral and collateral pricing, and overall precision with regard to conduct.  If, for example, the relevant collateral threshold is 120% and the collateral is worth 180%, it is not particularly risk-relevant if a borrower is late by one day on a payment.  On the other hand, if the relevant collateral threshold is 120% and the collateral is worth 120.1% and market volatility is extremely heightened, that same one day delay will not be tolerated.  Market participants do not exist completely independent of information about prices, volatility, and risk.  In fact, the very definition of ordinary conduct in a lending or trading business is to actively manage of risk.

### F.  Margin Calls

21.     With respect to the Challenged Transactions, 3AC and Genesis established that collateral for a loan must satisfy a pre-specified set of terms, that those terms are laid out in the Agreements, and that in the case of insufficiency of the posted collateral, there is a process for a margin call and a set of consequences for the borrower if the margin call is not met.  I have

reviewed the margin calls relevant to the Challenged Transactions and believe that they are consistent with ordinary market practice as set forth below.

22.     Notably, a failed margin call gives the lender the ability to call the loan, often on punitive terms, or can lead to a default.  Equally, failure to deliver on a margin call is widely considered to be a sign of deteriorating creditworthiness in almost all markets, meaning that entities that fail margin calls (or even are severely delayed on fulfilling them) usually are disfavored across all credit agreements as market participants begin to rationally downgrade their ability to repay loans.  This is ordinary across all credit markets, as the act of lending money is an acknowledgement that one may not be repaid and that risk must be managed.  There are many ways of doing this: higher rates, restrictive covenants, pledged collateral, and more.  These terms existing within the agreement are part of the initial consideration in return for the rate of the loan; without these margin provisions, undoubtedly Genesis would only have lent to 3AC at much higher rates of interest, if they would have extended credit at all.

23.     As one considers margin calls in the ordinary course of business, it is very typical that if the price of collateral falls and more margin is required, a counterparty to a loan will deliver additional collateral or swap out collateral for less volatile assets.  By definition, the non-ordinary conduct is the failure to deliver on a margin call, as this is how one defaults upon a loan.  This is uniformly true across digital asset lending markets, securities lending markets, repo markets, interest rate derivatives markets, and more; routine satisfaction of margin calls is the very definition of ordinary conduct for trillions of dollars of instruments.  Additionally, it is ordinary (and indeed expected) that, under secured loans, a borrower delivers collateral pursuant to a margin call without the lender extending any additional principal under the lending agreement.  Such margin terms are generally part of the initial consideration for entering into a loan, meaning that if

each margin call is considered to be some sort of new event that requires additional consideration, then adjustable provisions within loans are simply not functional. For a loan to be structured to require new consideration for each margin call would refute the entire collateralized lending regime's use of variable terms, as variations in margin, floating rate terms, and the like would then require complete renegotiations of a loan agreement at each step. This would have the effect in the market of allowing only fixed rate, fixed term, fixed collateral agreements.

24.    Again, this flexibility is the essence of collateralized lending across many markets. Collateral with a value of $X, specified in the original contract (usually as a percentage of the loan), needs to be maintained for the loan to remain in good standing. Likewise, if that collateral fails to conform with the terms, it is standard procedure to call for more (and if that fails, close out the loan). All of this is working as intended, across many markets. The fact that specifically digital assets are involved does not change this general principle. To say to a large investment bank calling for collateral when equities fall in price and a hedge fund client has a deficit with regard to their loan terms is not ordinary course of business would be an extreme surprise in light of over 30 years of business conduct in the secured lending space. Such conduct was ordinary in 2008 when prices fell, around volatility in the case of Brexit, throughout the pandemic period of market declines in 2020, and more. In fact, even in the digital asset space, it was standard operating procedure through previous drawdowns.

25.    It is also expected in the ordinary course of secured lending markets for a lender to respond to market volatility of tightening risk bands and reducing exposure. Because the structure of lending trades is typically that $X is lent for more than $X in collateral being pledged, the margin of safety of the excess collateral is related to two factors: first, the amount of overcollateralization, and second, the volatility of that collateral. A collateral ratio of 150% might

present limited exposure to the lender some cases, but if the volatility of the asset composing that collateral is 40%+ price swings per day, the lender's exposure and risk increases. That market volatility and collateral levels have this relationship means that across secured lending markets in general, when volatility increases, the risk appetite of lenders typically goes down. This allows lenders to maintain, essentially, similar actual economic exposure through various price and volatility regimes, as failure to adjust behavior in these moments would actually imply wildly different risk appetites. Indeed, tightening of collateral and loan terms was observed in and after 2008 in traditional markets across the overwhelming majority of fixed income asset classes and securities lending against equities. To give a specific example, in overnight repo markets, it is market standard that the collateral amounts required for posting U.S. Treasury bills as collateral are much lower than longer dated government debt, which themselves are much lower than corporate debt, equities, or other more volatile securities, and in times of stress, parties may even restrict collateral only to government securities or increase these margins of safety further.

### G. Loan Repayments

26.    As a lending relationship between two counterparties develops over the years, new loans will be extended and other loans will be repaid from time to time. The ability for 3AC to repay loans (or partially repay loans) under the Agreements prior to the applicable maturity date is consistent with the ordinary practice of secured lending. Indeed, partial repayment of a loan can serve many purposes, one of which is to avoid exposure to future margin calls. Where there is an agreement that requires collateral in an amount fixed relative to the size of the loan principal, management of exposure to margin calls can be done through both sides of the equation: increasing the collateral while holding the loan constant to increase the collateral ratio, or decreasing the loan amount while holding the collateral constant to increase the collateral ratio. In theory, it is entirely possible to do both at once. The choice to avoid a margin call by reducing the size of the loan as

opposed to adding additional collateral is expressly contemplated within the initial agreement, otherwise a partial prepayment option and a collateral definition that relied upon the size of the outstanding loan would not have been present.  Such actions, especially when there are multiple loans between two counterparties, is entirely ordinary.  Borrowers frequently wish to adjust positions, increase or decrease leverage, substitute collateral for other collateral (as keep in mind, unless the borrower is closed out, the collateral price variation is ultimately their risk and impacts their returns), or otherwise manage their entire book of business.  In particular, hedge funds often do not wish to disclose their entire portfolio and strategy to a single lender, a lender may not be aware of all of a borrower's positions and cannot ascertain with certainty whether actions are being taken for a specific reason.

## H.  Interest Payments

27.    It is ordinary, and in fact expected, for lenders in a secured lending space to require interest payments (and for borrowers to make such payments) and to make modifications as agreed upon by the parties from time to time.  Interest payments on loans are a standard across many of these types of agreements in various markets, usually on a daily (in the case of overnight repo), monthly, quarterly, semi-annual, or annual basis.  In short, interest is the primary tool for compensation in return for taking the risk of lending funds, and timely and regular payment of interest is a core facet of lending agreements and relationships in both digital asset markets but also fixed income markets more broadly.  As with margin calls, failure to make a loan fee payment in a timely fashion can lead to an event of default and the termination of the loan.  These terms are again contemplated within the initial four corners of the lending relationship between the parties, and are regular course of business as defined within a document that is representative of the industry norms at the time.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:  September 1, 2023                        */s/ J. Austin Campbell*
       Brooklyn, New York                        J. Austin Campbell

**Exhibit A**

## Exhibit B

## Materials Referenced[1]

- *Attachment to Amended Proof of Claim filed by the Joint Liquidators of Three Arrows Capital, Ltd.* filed in support of proofs of claim numbered 523, 526, 527, 981, 982, and 990[2] filed by Three Arrows Capital Ltd. in the Chapter 11 Cases.

- *Debtors' First Omnibus Objection (Substantive) To Claim Nos. 523, 526 And 527 Pursuant To 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (No Liability)* (the "First Objection") and associated exhibits (ECF No. 530).

- Master Digital Currency Loan Agreement, dated January 10, 2019 between Genesis Global Capital, LLC and Three Arrows Capital Ltd.

- Master Loan Agreement, dated January 10, 2019 between Genesis Global Capital, LLC and Three Arrows Capital Ltd.

- Master Loan Agreement, dated January 24, 2020 between Genesis Asia Pacific Pte. Ltd. and Three Arrows Capital Ltd.

- Loan Term Sheets under the MLAs,[3] executed by GAP or GGC on the one hand and 3AC on the other hand.

- Term sheets between the Parties under the MLAs reflected in Telegram Communications.

- Communications between the Parties related to certain margin calls relevant to the Challenged Transactions.

- International Swaps and Derivatives Association, Inc. 2002 Master Agreement dated as of March 22, 2011 between Bank of America, N.A. and LKQ Corporation.

- Securities Industry and Financial Markets Association form of Master Repurchase Agreement.

---

[1]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Objection.

[2]   Proofs of claim numbered 981, 982, and 990 supersede and amend proofs of claim numbered 523, 526, and 527.

[3]   *See, e.g.*, First Objection, Ex. B of Exhibit G.

**J. AUSTIN CAMPBELL**

<u>Experience</u>

| 2023-current | **Managing Partner & Founder** | **Zero Knowledge Consulting** |

- Senior advisor to traditional financial firms with digital asset exposure on risk management, regulatory policy, media, and business model transformation
- Advisor on risk frameworks, financial integration, and regulation for crypto firms and projects attempting to interface with the real-world financial system
- Speaker at major crypto & financial conferences, industry contact point for senior businesspeople, regulators, lawyers, and policymakers

| 2022-current | **Adjunct Professor** | **Columbia Business School** |

- Co-professor for Blockchain Markets Infrastructure class
- Collaborator with the Center for Digital Finance and Technologies
- Contributor to academic research on stablecoins, banking interactions with crypto, and governance models

| 2022-2023 | **Head of Portfolio Management & Chief Risk Officer** | **Paxos & Paxos National Trust** |

- Head of reserve management for >$22B of stablecoins (BUSD, USDP)
- Chief Risk Officer implementing risk framework and policies for lending, financial risk, and Paxos National Trust setup
- Head of stablecoin strategy and DeFi ecosystem partnerships

| 2020-2021 | **Head of Stable Value & Crypto, Global Rates** | **Citi** |

- Co-Head of Digital Assets Rates Trading (DART), exploring cash-secured lending against crypto assets (BTC, ETH), and built stable value offering for Citi
- Built and managed traditional finance and crypto native relationships as the leading expert within Citi's markets division on crypto
- Designed scalable, regulated stablecoin structures for potential Citi usage or partnership with external firms

| 2018-2020 | **Portfolio Manager** | **Stone Ridge Asset Management & NYDIG** |

- Structurer for NYDIG, working on US regulation compliant BTC lending & financing trades
- Manager of investment funds SHRIX (~$1bn AUM), SRRIX (~$4.5bn AUM), and private fund SRRF (~$400mm AUM)

| 2009-2018 | **Executive Director, Global Rates** | **JP Morgan** |

- Ran JPM insurance-linked trading desk, covering Stable Value, Bank-Owned Life Insurance (BOLI), catastrophe bonds, and other cash/NAV stability products
- Managing over $100B of exotic derivative exposure at the peak across multiple fixed income asset classes
- Restructured market standard for Stable Value Wraps post-crisis, providing over $65B of wrap capacity to 401k funds and ensuring continued smooth functioning of retirement cash stability markets

<u>Education</u>

| 2010 | **New York University, Leonard N Stern School of Business** | **New York, NY** |
|---|---|---|
| | Master of Business Administration | |
| 2005 | **California State University, Chico** | **Chico, CA** |
| | Bachelor of Sciences, Mathematics | |

<u>Additional</u>

Former advisor to the board of the Stable Value Industry Association (SVIA)

Congressional Expert for the House Financial Services committee on Stablecoins

**Speaker and Panelist at:**

New York Federal Reserve Fintech Conference, September 23, 2022
- Stablecoins and DeFi, risks, promises, and markets

Chicago Federal Reserve Payments Symposium, October 3-4, 2022
- Payments markets, digital currencies, and CBDCs, risk & rewards

AlleyCon, New York, February 17, 2023
- Risk Management, regulation, and future of the crypto market

DeFiCon, New York, March 25, 2023
- Stablecoin design, financial markets integration, trading, and risk management

House Financial Services Committee Hearing, Washington DC, April 19, 2023
- Subcommittee on Digital Assets, Financial Technology, and Inclusion Hearing: "Understanding Stablecoins' Role in Payments and the Need for Legislation"

Consensus, Austin TX, April 26-28, 2023
- Future of leverage, risk management, and lending in crypto

CryptoQuants, New York, August 30, 2023
- Stablecoins, lending, future of use