# EXHIBIT W
# Sanction Judgment

**EASTERN CARIBBEAN SUPREME COURT**
**TERRITORY OF THE VIRGIN ISLANDS**

**IN THE HIGH COURT OF JUSTICE**

**COMMERCIAL DIVISION**

**CLAIM NO. BVIHCM 2022/0119**

**BETWEEN:**

**RUSSELL CRUMPLER AND CHRISTOPHER FARMER**
**(AS JOINT LIQUIDATORS OF THREE ARROWS CAPITAL LTD.)**

Applicants

**and**

**THREE ARROWS CAPITAL LTD. (IN LIQUIDATION)**

Respondent

**and**

**DIGITAL CURRENCY GROUP INC**

Third Party

**Appearances:**

Richard Fisher K.C., with him Henry Phillips, Grant Carroll and Daniel Mitchell for
the Joint Liquidators
Sue Prevezer K.C., with her Ben Woolgar, Mark Forte, Mathew Brown, Marie
Stewart for Digital Currency Group Inc

1

---

2023: June 20; 22;
July 7.

---

**JUDGMENT**

[1]    **MANGATAL, J (Ag.)**: On the 24th of May 2023, Mr. Russell Crumpler and Mr. Christopher Farmer, the Joint Liquidators ("**the JLs**") of Three Arrows Capital Limited ("**the Company**"), filed an application ("**the Sanction Application**") by which they seek the following relief:

> *"The Court's sanction for the Joint Liquidators to commence Chapter 11 proceedings in respect of the Company in the State of New York, United States of America ("Chapter 11 Proceedings"), including, for the avoidance of doubt, sanction to cause the Company to commence, continue, discontinue or defend any claim, action or legal proceedings within the Chapter 11 Proceedings as they deem appropriate."*

[2]    The Sanction Application is made pursuant to section 186(5) of the *Insolvency Act 2003* ("**the BVI IA**").

[3]    The Application had originally been listed for a Directions Hearing ("**the Initial Directions Hearing**") on the application of the JLs on an urgent basis on 31st May 2023, for the purposes of determining Digital Currency Group Inc. ("**DCG**")'s standing to appear at the substantive hearing of the Sanction Application. At paragraphs [4] and [5] of their Skeleton Arguments ("**SKA**") for the Initial Directions hearing, the JLs expressly stated that:

> *"4….the purpose of commencing the Chapter 11 Proceedings is to enable the Company to access certain transaction avoidance powers under section 544 (so-called 'strong arm powers'), 547 ('preference') and 550 (liability of transferee of avoided transfer) of the U.S. Bankruptcy Code ("**the U.S. Avoidance Powers**). The primary motivation for gaining access to those powers is to use them to pursue significant claims in the U.S. against Genesis Global Capital LLC ("**Genesis Global**"), Genesis Asia Pacific Pte. Ltd. ("**Genesis Asia**", together with Genesis Global*

2

> ("**Genesis**") and Digital Currency Group Inc ("**DCG**"), (together with
> Genesis, the Genesis Entities).
> 5. The Liquidators consider that commencing Chapter 11 Proceedings to
> bring and pursue claims against the Genesis Entities is in the best
> interests of the estate."

[4]    It was DCG's contention, by way of a preliminary issue, that the Initial Directions Hearing and the Sanction Application were not so urgent as to necessitate a hearing on short notice to DCG. I accepted that submission and had the Directions Hearing listed for 20 June 2023, with a time estimate of one day.

[5]    The Directions Hearing was completed on 20 June, and on 22 June, I gave my Ruling that DCG shall have standing to appear at the substantive hearing of the Sanction Application. I indicated that I would give my reasons in writing and this I now do.

[6]    At the Initial Directions Hearing, the JLs had argued that the question of DCG's standing should be dealt with as a preliminary/ separate issue from the substantive hearing of the Sanction Application. DCG, on the other hand, had submitted that the issue of standing should be dealt with at the substantive hearing. I accepted the JLs' argument, and accordingly, fixed the Directions Hearing on 20 June 2023 as a hearing to solely address the issue of DCG's standing. I also, at the request of the JLs, who pressed the urgency of the Sanction Application, fixed the substantive hearing of the Sanction Application provisionally for 28 June 2023, with a time estimate of one day. On the 22 June, having ruled that DCG had standing, I vacated the date of 28 June, and fixed the substantive hearing instead for 21 July 2023 and 24 July 2023 for 1.5 days. I will return to this matter briefly at the end of this Ruling.

[7]    DCG has asserted in correspondence prior to the hearings, and at the Initial Directions Hearing, that it has standing to be heard. It has been the JLs' firm posture that DCG does not have such standing.

[8]     As a result of the manner in which the matter first came before the Court at the Initial Hearing, with the JLs filing their SKA's on 25 May 2023, and DCG filing its own on 30 May 2023, I continued that sequence of addressing the Court on 20 June 2023. Thus, the JLs addressed the Court first, followed by DCG.

[9]     In its initial SKA, learned Counsel, Mr. Fisher K.C., lead Counsel for the JLs, at paragraph 8, offered a very helpful and focused identification of the JLs essential position as follows:

> *"8......While DCG claims to be a substantial creditor of the estate (and for the purposes of this hearing, can be assumed to be so), it is also a putative defendant to claims the Liquidators wish to bring via the Chapter 11 Proceedings. DCG is also the parent company of the other Genesis Entities (which themselves are putative defendants to substantive claims). In these circumstances and having regard to the Creditors' Committee's support for the commencement of Chapter 11 Proceedings, it is plain that DCG is seeking to oppose the Sanction Application in its capacity as a dissatisfied putative defendant. It has no proper standing/legitimate interest to appear at the Sanction Application in that capacity and oppose the relief being sought by the Liquidators. Furthermore, nearly all, if not all, of the materials which will be relied on in support of the Sanction Application will be confidential and privileged, such that they cannot be shared with DCG."*

[10]    Time does not permit me to here set out the general background to this matter comprehensively, but I consider that paragraphs 12-23 of the JLs Initial SKA do set out main elements of the general background, and most of the contents are largely uncontroversial.

[11]    In particular, the contents of paragraphs 15-17, and 22 and 23 are relevant and I have extracted gratefully from those paragraphs in order to provide the background which follows.

**Background**

4

[12]     On 27 June 2022 the Company commenced liquidation proceedings before the BVI Court for the appointment of the JLs. One of the creditors, DRB Panama Inc, also filed an application to appoint joint provisional liquidators over the Company. These applications were consolidated and came on for hearing on 27 June 2022, during which the Court, Jack J (Ag), appointed the JLs of the Company pursuant to the appointment order ("**the Appointment Order** ").

[13]     Following their appointment, and pursuant to the sanction given at paragraph 5(b) of the Appointment Order, the Liquidators as the Company's "foreign representatives" sought recognition of the Company's liquidation under Chapter 15 of the U.S. Bankruptcy Code. On 22 July 2022, Chief Judge Martin Glenn made an order recognizing the BVI Liquidation "*as foreign main proceedings*" ("**the Recognition Order"**). Among other things, the Recognition Order entrusted the Liquidators with the administration and realization of all the Company's assets located within the territorial jurisdiction of the United States. In August 2022, the Liquidators also obtained recognition of the liquidation in Singapore (where a significant proportion of the Company's operations were carried out) as a "*foreign main proceeding*".

[14]     The JLs assert that the general progress of the liquidation of the Company has been hampered and delayed through a lack of cooperation by the Directors. This has meant that the Liquidators have had limited access to the books and records of the Company and have had to take a number of important decisions in the liquidation on the basis of incomplete information concerning the Company and its operations.

[15]     On 29 November 2022, the Liquidators issued an application under sections 186 and 274A of the BVI IA naming Genesis Global, Genesis Asia, and DCG as Respondents ("**the BVI DCG Application**"). The BVI DCG Application concerns certain assets ("**the Disputed Assets**") with a value of approximately U.S.$578,542,142.30 (as of 27 June 2022) which the JLs say Genesis Asia

purported to foreclose on as collateral pledged in connection with lending under the relevant Master Loan Agreements. The JLs say that at the time the BVI DCG Application was commenced, the JLs were unaware of any documentation purporting to grant security over the Disputed Assets. The JLs say that accordingly, they sought declarations as to the beneficial ownership of the Disputed Assets (or their traceable proceeds) and an order under section 274A of the BVI IA requiring a delivery up of the assets/proceeds.

[16]   By a consent order dated 25 April 2023, the BVI DCG Application is currently subject to a stay, which in their Initial SKA, the JLs describe as a "*permanent stay*". The terms of the consent order provide that the BVI DCG Application is stayed sine die, save for certain purposes set out in an earlier March Consent Order. However, the consent order also provides that there be permission for the JLs to lift the stay upon the expiry of 7 days written notice given to the Respondents, including DCG, with subsequent filing of documents and evidence.

[17]   There is also a bit of important background set out in correspondence. This is relevant information as to the matters that led up to the Sanction Application and provides a frame of reference through which it can be seen how standing became a contentious issue. On the very next day after the consent stay order on 25 April, on 26 April 2023, DCG's legal practitioners Conyers wrote a Letter Before Action to the JLs' legal practitioners Ogier. This Letter was concerned with seeking an amendment to the Appointment Order.

[18]   Although there is not before me any application to amend the Appointment Order, and nor is it necessary for me to construe the meaning of certain paragraphs of the Order, it is important background information, and part of the chronology leading up to the present issue of standing. It is also relevant to the issue of the correct approach to the Sanction Application.

[19]     The main aspect of the dispute concerned paragraph 5 (a) of the Appointing Order. Paragraphs 4 and 5 of the Appointing Order read as follows:

> *"4. The Liquidators may exercise all those powers set out in section 186 and Schedule 2 of the Insolvency Act 2003 and as set out in the annex to this Order.*
> *5. The Joint Liquidators shall, at the date of this Order, have sanction to:*
> *(a) commence, continue, discontinue or defend any claim, action or legal proceeding in the United States of America ("**U.S.**") as they see fit.*
> *(b) commence proceedings pursuant to Chapter 15 of the U.S. Bankruptcy Code as they deem appropriate; and*
> *(c) seek recognition of this order in any jurisdiction as the JLs deem appropriate."*

[20]     The Annex to the Appointment Order, which like paragraph 4, is in standard terms, contains a section headed "*With Sanction of the Court*". In that section, as is standard, paragraph 4 provides for "*power to commence, continue or defend any action or other legal proceeding in the name and on behalf of the Company.*" It is common ground that paragraph 5(a) of the Appointment Order is not in standard terms.

[21]     On 26 April 2023, Conyers wrote to Ogier, making, amongst other points, an assertion that there was no proper material put before the Court when paragraph 5(a) of the Appointment Order was made. The letter foreshadowed an intended court application as follows:

> " *Intended Application*
> *In the circumstances, we intend to apply to the BVI Court for an order to remove Paragraph 5 (a) from the Appointing Order, so as to ensure that the JLs are required to seek sanction from the BVI Court for any US proceedings going beyond those already commenced.*
> *Aside from the general need to effect that variation so as to ensure that the JLs powers are being properly supervised by the  BVI Court, we understand that the JLs are currently considering commencing chapter 11 proceedings in the US and pursuing preference claims (within those proceedings) in relation to the assets that are already in issue within BVIHC (Com) 2022/0119 ("the Disputed Assets") and notwithstanding,*

> *more generally, that the Company's liquidation has been commenced and continues in the BVI, under the supervision of the BVI Court.*
>
> *Our client considers that, before commencing any such proceedings in the US, the JLs should be required to seek the BVI Court's sanction. Our client also considers it highly likely that, were the JLs to seek such sanction our client would oppose the grant of such sanction. Pending sight of a full and proper application by the JLs compliant with the principles in **Redhouse**, our client's detailed reasons as to why sanction should be refused are reserved, but we anticipate that they will include (i) the fact that the BVI Court is already seized of issues concerning entitlement to the Disputed Assets; (ii) BVI law recognizes, in ss 245 and 249 of the Insolvency Act, claims in respect of preferences, which represent a proper and sufficient protection for the Company ; (iii) the proper forum for determination of any claims in respect of preferences is the BVI Court, in light of the fact that the liquidation is the liquidation of a BVI company. (iv) as a result any attempt to commence Chapter 11 proceedings would represent an impermissible attempt at forum shopping."*

[22]    Ogier responded to Conyers, by letters dated 1 and 19 May 2023, in which, amongst other matters, it was stated that the JLs refused to agree to amend paragraph 5(a) of the Appointing Order, since they were of the view that the Judge must have formed the view that the terms of the order were in the circumstances appropriate. The JLs asserted their intention to seek the BVI Court's sanction in relation to the Chapter 11 Proceedings, and maintained that DCG should have no standing to be heard on the Sanction Application.

**The JLs' Arguments**

[23]    In their Initial SKA, at sub- paragraphs 30(1)-(4), the JLs discuss the Court's approach to sanction. They helpfully, and correctly, summarize, that the approach to sanction depends on whether: (a) the Liquidators are seeking sanction to exercise a power which they do not have, and may not exercise, in the absence of such sanction ("**Type 1 Case**") (in which case the Court must be satisfied that the proposed course of action is appropriate in the totality of the circumstances); or (b) the Liquidators are seeking "sanction" in the sense of obtaining the Court's blessing or approval of a course of action which is undoubtedly within the scope of their existing powers but which involves a significant or momentous step within the

8

liquidation ("**Type 2 Case**") (in which case the Court must be satisfied as to the rationality and *bona fides* of the Liquidators' decision). Reference was made to the oft-cited decision of the ECSC Court of Appeal in ***Phoenix Group.***[1]

[24]    The JLs go on to express their belief that paragraph 5(a) of the Appointment Order is drafted in terms which are wide enough to enable them to cause the Company to initiate Chapter 11 Proceedings and to cause claims to be brought within those proceedings without the need to obtain sanction. On that basis, the Liquidators believe it would be open to the Court to approach the Sanction Application as a "Type 2 Case"- concerning the legality, rationality and *bona fides* of what is undoubtedly a momentous decision for the JLs.

[25]    The JLs go on to discuss, that at the same time, the terms of the Order are wider than is typical in that they appear to confer a broad power on the Liquidators to commence proceedings in the US without further sanction from the Court. They indicate that the order was approved by Jack J (Ag) and posit that Jack J may well have considered that litigation was inevitable and should be permitted under the terms of the appointment order from the outset. However, the JLs concede that there was certainly no indication that Chapter 11 Proceedings were being contemplated from the outset. In those circumstances, the JLs recognize that that Court may wish to approach the Sanction Application as a "Type 1 Case" and be satisfied that the commencement of Chapter 11 Proceedings would be appropriate in the totality of the circumstances.

[26]    Learned Counsel Mr. Fisher K.C., accepts, and indeed, this is common ground, that as a general rule, creditors of a company, acting in the capacity as creditor, are entitled to be heard on an application by a liquidator for sanction in relation to the exercise of powers under the BVI IA. Reference was made to the oft-cited decision of Chadwick LJ sitting in the English Court of Appeal in ***Re Greenhaven***

---

[1] BVIHCMAP 2020/0019 at paragraphs [40]-[42].

9

*Motors.*[2] However, it was submitted that in order to be heard and have standing, creditors must not be influenced by extraneous considerations.

[27]    It was argued that the fact that a person is a creditor does not, without more, provide a sufficient basis for him to have standing to oppose an application for sanction. Standing will only exist if a person is seeking to appear before the Court in the capacity of a creditor i.e., has a legitimate interest in seeking relief in that capacity (Learned Counsel's emphasis). Further, if that person is seeking to appear in some other capacity (e.g. as a defendant to claims which a liquidator has brought or wishes to bring) then they are strangers to the liquidation, without standing to appear or oppose the liquidator's application.

[28]    Those principles have been recognized in a number of cases, learned Counsel submits, under section 273 BVI IA in which the Courts have considered whether a defendant to proceedings commenced by a liquidator has standing to challenge the liquidator's conduct as a "*person aggrieved*". The argument is that the same principles ought to apply in the sanction context if a person has no standing to challenge a decision of an officeholder to commence proceedings under s. 273 BVI IA, then by parity of reasoning, he must also lack standing to appear to challenge an application by a liquidator to sanction a decision to commence proceedings. Learned Counsel suggested that this is an application of the wider principle established in ***Deloitte & Touche v Johnson AG***[3], that a person must have a legitimate interest in seeking relief. Mr. Fisher K.C. also opined during his Reply that the reasoning in ***Greenhaven*** has in any event been "overtaken" by the reasoning in ***Deloitte***.

[29]    The Liquidators also rely upon three decisions of the BVI Courts, the first of which is the decision of Hariprashad-Charles J in ***Re Gold & Appel Transfer SA v***

---

[2] [1999] B.C.C.463, at 468 E-F.
[3] [1999] 1 WLR 1605.

***Meade Malone***.[4]   In that case, the liquidators of a BVI company commenced ancillary bankruptcy proceedings in the U.S. under s. 304 of the U.S. Bankruptcy Codes (s. 304 was the pre-cursor to Chapter 15, which replaced it). They subsequently commenced US-law fraudulent conveyance actions against defendants before the U.S. Bankruptcy Courts. The defendant applicants' (one of which claimed to be a secured creditor and another claimed to be a member) sought to challenge the liquidator's decision to bring those proceedings under s. 273 of the BVI IA. The JLs submit that the judge held, paragraphs 35-36, that the applicants were seeking relief in their capacity as putative defendants and not in their capacity as creditors or members, and thus did not have standing to seek relief under section 273.

[30]    The second BVI case relied upon is ***ABN AMRO Fund Services v Krys***[5], where BVI liquidators of Fairfield Sentry obtained sanction to pursue proceedings in the United States against certain redeeming shareholders. The defendants to those proceedings brought an application under s.273 BVI IA to restrain the liquidators from pursuing those proceedings. One of the issues before the Court of Appeal was whether they had standing to bring the application. The Court of Appeal held that they did not. In doing so, learned Counsel submits, the Court of Appeal approved the decision in ***Re Gold & Appel***. See paragraphs [27], [59], [32] and [36].

[31]    The JLs also rely on the decision of the Court of Appeal in ***Stevanovich v McDonald***[6] where it was held that a sole director of the company in liquidation lacked standing to seek relief under s. 273 when he had brought his application "*not as a former sole director of the company, but as a defendant to proceedings brought against him*" at [25]. Following a review of the English and BVI authorities, the CA held:

---

[4] BVIHCV2004/0130.
[5] BVIHCMAP 2016/0012.
[6] BVIHCMAP2019/004.

> *"A person must go beyond demonstrating that they possess some characteristic or act in some capacity which would usually be attributed to a person capable of being aggrieved by the decision of an office holder in liquidation proceedings and show that the relief sought is in the capacity claimed."*

**The Views of the Creditors' Committee**

[32]    The JLs place significant weight on the views of the unconflicted members of the Creditors' Committee as demonstrating that DCG's opposition to the Sanction Application is brought exclusively in its capacity as a putative defendant to substantial claims.

[33]    The position of the Creditors' Committee and DCG's position in relation to it, is explained in Crumpler 10 and Crumpler 11. I gratefully adopt the summary set out at paragraphs 17(1) – (6) and 18 and 19 of the JLs Supplemental SKA as follows at paragraphs [34] – [41] below.

[34]    On 13 April 2023, a conflict management protocol (suggested by the JLs as the Court understands it) was approved and adopted by the Creditors' Committee as part of its proceedings. Rule 71 of the Insolvency Rules 2005 provides that a creditors' committee may, by resolution, adopt rules governing its proceedings. That protocol sets out a process for designating a member of the Committee a "Conflicted Member" by way of a simple majority vote. The consequences of a person becoming a "Conflicted Member" are set out in paragraph 11 of the protocol which reads as follows:

> *"A Conflicted Member shall not participate in any part of the proceedings of the 3ACC where consideration is to be given to, or decisions made, in relation to confidential information (**including, for the avoidance of doubt, any form of litigation … against or in respect of the Conflicted Member)**"* (Leading Counsel's emphasis)

[35]    The Creditors' Committee met on 14 April 2023 at which it resolved, in accordance with the protocol, that two of its members (DCG and Blockchain) were "*Conflicted*

*Members of the Creditors' Committee as it relates to the current US Legal Strategy and proposed steps."*

[36]    The remaining three non-conflicted members of the Creditors' Committee were subsequently provided with near final copies of the Sanction Application and the supporting evidence for the purposes of ascertaining their views as to the commencement of Chapter 11 Proceedings in respect of the Company.

[37]    On 30 May 2023, the non-conflicted members of the Creditors' Committee attended a meeting with DCG and its legal team, at DCG's request. At that meeting, DCG expressed its views on the merits of commencing Chapter 11 Proceedings and sought to persuade the non-conflicted members of the Creditors' Committee not to pass a resolution supporting the Liquidators' proposed course of action.

[38]    Following that meeting, the non-conflicted members of the Creditors' Committee unanimously passed resolutions approving the Liquidators' decision to commence Chapter 11 Proceedings and seek the Court's sanction. In passing those resolutions, the non-conflicted Members of the Creditors' Committee also expressed the view recorded at Recital 1(f) that: "*…it is in the best interests of the Company and its creditors for Blockchain and DCG to be excluded from the hearing of the Application."*

[39]    The JLs have concluded a signed settlement agreement with Blockchain and have filed an application seeking the Court's sanction in respect of the same (Crumpler 11 [4.3]). Once that settlement agreement has been sanctioned by the BVI Court, the JLs say that Blockchain will no longer be deemed conflicted in relation to the Chapter 11 Proceedings. At that stage, the JLs will canvass the views of Blockchain regarding the proposed Chapter 11 Proceedings, as it has done with the other Non-Conflicted members of the Creditors' Committee (Crumpler 11 [4.4]). In the meantime, the JLs indicate that Blockchain has confirmed that it

agrees in principle that moving forward, the proposed Chapter 11 Proceedings
would appear to be in the best interests of the Company.

[40]   The position, therefore, argues learned Counsel, is that the proposed course of
conduct has been considered by the representative body of creditors to be in the
best interests of the estate as a whole. That is the unanimous view of the
unconflicted members of the Creditors' Committee, reached following a review of
the evidence filed by the Liquidators in support of the Sanction Application and
having heard representations from DCG.

[41]   The JLs postulate that in those circumstances, it is obvious that DCG would be
seeking to attend the Sanction Hearing not in its capacity as a (conflicted) creditor
but because it does not want substantial claims to be brought against it. Crucially,
it would be making submissions in opposition to the Sanction Application
*irrespective* of whether the proposed course of action would be for the benefit of
the creditors as a whole. It is asserted that there is no other capacity in which it
can realistically be expected to act (given its position of conflict).

### DCG's Arguments

[42]   DCG emphasize that the default position is that a creditor is entitled to be heard on
an application for sanction and refer to the decision in **Greenhaven** as authority
for that proposition. Learned Counsel Ms. Prevezer K.C. sought to analyze the
facts of that case and submits that the applicant, who sought to challenge the
relevant Settlement Agreement entered into between the liquidator of a company
GML and another party, was undoubtedly a contributory of GML, but it was unclear
whether he was also a creditor.

[43]   Learned Counsel asked the Court to note that the first instance judge Harman J
had approached the application on the basis that it was a challenge to the
liquidator's decision to compromise the proceedings. However, as explained by
Chadwick LJ, the true position was that the liquidator required the Court's sanction

14

to compromise the proceedings, and therefore it was the liquidator who ought to have made the relevant application under the English s.167(1)(a) :468 C-E. In other words, the application was on a similar footing to one under section 186(5) of the BVI IA.

[44]    At page 468 E-H of the judgment, Chadwick LJ discussed Mr. Mayers' standing.

[45]    Learned Counsel submits that importantly, Mr. Mayers' interest in the application was made partly as a creditor, but partly as a co-defendant to the County Court proceedings. However, the submission continues, Chadwick LJ did not consider this to make a difference. It was posited that *Greenhaven* is therefore straightforward authority for the proposition that a creditor is entitled to be heard on an application for sanction and that there is no relevant caveat to that position.

[46]    It was further submitted that the JLs' reliance on a line of cases under s.273 of the BVI IA or equivalent, does not assist the Court. It was contended that this is because:

(1)    these cases are all concerned with the specific statutory context, namely, that an applicant must be a "person aggrieved" by the decision and are therefore directed to a different point; and

(2)    The substantive exercise to be conducted on this sanction application, which it was submitted should be treated as a Type 1 Case, is different from that on a s.273 application, and in turn that explains why the standing requirements on each would be different.

[47]    Reference was made to the decision of the ECCS Court of Appeal in *Farnum Place LLC v Krys*[7], which was an application for sanction for an appeal to the US Second Circuit Court of Appeals in ongoing insolvency proceedings, where at paragraph [47] Baptiste JA held that:

---

[7] BVIHCVAP 2013/0014.

> "…the correct approach for the BVI court to adopt in circumstances where it is exercising its discretion, is not that the Liquidator's wish to appeal should prevail unless it is satisfied that the Liquidator was not acting bona fide. As the court is exercising discretion, it is entitled to have regard and to give such weight as it considers appropriate to all the relevant circumstances and factors in exercising that discretion."

[48]    DCG also asserts that the issues it wishes to raise on the Sanction Application are essentially matters of law and principle rather than matters of commercial judgment for the discretion of the liquidators. In such a case, the "perversity" test commonly used under s.273 will not apply. Reference was made to the decision in *Re Baglan Operations Ltd.*[8] Ms. Prevezer opined that it is instructive that in this case (where the issue was as to the *vires* of the Official Receiver to continue certain types of trading), standing on behalf of non-creditors was conceded.

[49]    DCG argue that in any event, where the party who seeks to be heard is a <u>creditor</u>, the cases cited on behalf of the JLs do not establish that a creditor is not entitled to be heard because he is also acting in an additional capacity as a putative defendant to proposed litigation. On the contrary, the true position is that a creditor may, and normally will, be entitled to be heard in a "dual capacity".

[50]    Learned Counsel contended that the position has been authoritatively established in *Tottenham Hotspur v Ryman & Others (Re Edennote Ltd).*[9] I accept learned Counsel's description of the facts as being somewhat complicated, and gratefully accept her summary of them. The application was to set aside a Deed of Assignment between the liquidator of Edennote (Mr. Ryman) and Mr. Venables, assigning claims against Tottenham PLC and Tottenham Ltd for breach of contract and under the Companies Act. The claims had been dismissed for failure to pay an order for security for costs, and Tottenham PLC and Ltd had caused Edennote to be wound up. They applied to set aside the Assignment on the basis that the liquidator had failed to offer it to other parties to see if a better price was

---

[8] [2022] BCC 884 at [43]-[45].
[9] [1996] BCC 718.

obtainable. The application was made under s.168(5), which was the English equivalent of s. 273. As to their standing, Nourse LJ said as follows at 721F-G:

> "It is neither necessary nor desirable to attempt a classification of those who may be persons aggrieved by an act or decision of a liquidator in a compulsory winding up. On the footing that the claims of secured creditors have been or will be satisfied, it is perfectly clear that unless and until there proves to be a surplus available for contributories (a most improbable event) 'persons aggrieved' must include the company's unsecured creditors. If the liquidator disposes of an asset of the company at an undervalue, their interests are prejudiced and each of them can claim to be a person aggrieved by his act. Such was the position of the applicants here. <u>Mr. Rayner James submitted that they brought the application not as creditors but as persons who had not been given an opportunity to make an offer for the asset. In the latter capacity alone, like any other outsider to the liquidation, they would not have had the locus standi to apply under s.168(5). But even if that were wrong, they would still have been able to apply in a dual capacity.</u>  (DCG's emphasis)

[51]    Ms. Prevezer submitted that **Re Edennote** therefore establishes that, even under a regime such as s. 273 where the relevant test is whether the applicant is a "*person aggrieved*", a creditor has standing if they are applying in a "dual capacity" i.e. as a creditor and also in some other capacity.

[52]    The argument was advanced that the position is also supported by the ECSC Court of Appeal's decision in **Stanford v Akers**.[10]

[53]    DCG further submitted that even if it is also applying in its capacity as a putative defendant to the proposed Chapter 11 Proceedings, it plainly also has an interest in its capacity as a creditor. Learned Counsel posited that the instigation of Chapter 11 Proceedings is a momentous decision for the liquidation estate, and the proposed proceedings are likely to involve a significant use of the estate's funds in a long, protracted process with a minimal likelihood of success. The costs are likely to be substantial, even compared to the potential value of the claims- DCG's U.S. lawyers indicate that a chapter 11 case typically costs the estate tens

---

[10] BVIHCMAP 2017/0019.

of millions of dollars, and in one recent case handled by Latham & Watkins, the JLs' US counsel, the fees for just Latham & Watkins was approximately U.S.$80m, without considering the debtors' other professionals. In addition, the estate is normally liable for the costs of the creditors' committee's professional advisors, and potentially the appointment of an examiner. It was further contended that litigation over the preference claims in the U.S. would likely take years to conclude if all appeals are pursued, which appears likely given the amounts at stake. It was further suggested that this litigation would further delay distributions to creditors, including DCG. In addition, DCG wishes to raise certain points of principle outlined in its SKA which it suggests it plainly has an interest in raising. Thus, argues Ms. Prevezer K.C., DCG squarely falls within the class of persons entitled to seek s. 273 relief and/or to be heard on an application for sanction, even if it does so in a "dual capacity" as per *Re Edennote*.

[54]    DCG made a number of points about the three BVI cases relied upon by the JLs. First, they say, by way of a preliminary observation, that all three cases refer to *Re Edennote,* without any suggestion that it was wrongly decided. Therefore, it was inherently improbable that there was any intention to qualify or limit the principle in *Re Edennote* regarding dual capacity.

[55]    As regards the *ABN AMRO Fund* case, it was argued that the case was distinguishable because it concerned applicants whose apparent status was as alleged debtors, and not as creditors, and the applicants had no interest in the relevant Company's assets.

[56]    As regards *Stefanovich*, it was submitted that this case concerned a former director and has no relevance to the position of creditor.

[57]    As regards, the decision in *Re Gold & Appel*, DCG accepts that, on its face, the decision suggests that there may be cases where an applicant creditor may nevertheless be denied standing. However, the Court was asked by learned

Counsel to note that (i) of the seven applicants, five were undoubtedly not creditors or contributories [33]; (ii) the only putative creditor, Space Inc, had not had any claim admitted and had been struck off the register without making any claim in the prescribed form [34], such that it was unclear whether it was in fact a creditor at all; and (iii) as a result, the passage at [35] relied on by the JLs is strictly *obiter*. ***Gold & Appel***, it was further advanced, is not binding on this Court, and if necessary, DCG will say that it should not be followed. However, the decision can in any event, the argument continues, be understood to be consistent with ***Re Edennote****,* but as deciding that Space Inc was not applying as a creditor at all (as opposed to in a "dual capacity").

[58]    In its closing paragraphs, DCG referred to paragraph [79] of the decision in ***Stanford*** as clarifying that the question of standing to be heard on an application under the Court's inherent jurisdiction is not strictly speaking a matter of jurisdiction, but rather "*a matter of judicial restraint*". Learned Counsel submits that it follows logically that this is so for an application for sanction. As a result, the Court is entitled to consider discretionary factors when deciding whether to permit DCG to be heard. It was posited that the discretionary factors all support permitting DCG to be heard.

**Discussion and Analysis**

**Proper approach to the Sanction Application-Type 1 or Type 2 Case?**

[59]    Let me state from the outset that I am of the view that it is desirable and just that this sanction application be treated as a Type 1 case, for the reasons advanced in Conyers letter of 26 April 2023 and as anticipated by the JLs in sub - paragraph 30 (3) of their Initial SKA. The main point is that the Court did not have sufficient or any material before it relating to Chapter 11 Proceedings at the time that the Appointing Order was made. There is in any event nothing to indicate that Chapter 11 Proceedings were being contemplated by the JLs from the outset. Commencement of Chapter 11 Proceedings is in my view of such significance that

the Court ought to have had the matter now specifically addressed before it so that the appropriateness of such Proceedings can be considered in the totality of the circumstances. The decision of Wallbank J (Ag) in *Redhouse Holdings Ltd. v Christopher Johnson et al*[11] cited by DCG, makes it plain that the usual position in this jurisdiction is that liquidators will require specific sanction to commence foreign proceedings.

[60]     I am bolstered in my view that the Sanction Application should be treated as a Type 1 case by the fact, which is common ground, that no company in liquidation in the BVI has been placed in parallel Chapter 11 bankruptcy proceedings in the U.S. The two experienced and highly qualified legal teams representing the parties have not been able to unearth any case law directly addressing these matters. No legal precedent has been cited in which the question of whether a BVI company in liquidation in the BVI should be placed in Chapter 11 Bankruptcy Proceedings in the U.S. has been considered.

[61]     In my judgment, the Court will therefore be concerned to satisfy itself that the commencement of Chapter 11 Proceedings would be appropriate in all of the relevant circumstances. The passage in *Farnum Place* referred to by DCG is in the circumstances applicable. I also accept DCG's submission that the points that it wishes to raise on the Sanction Application are essentially matters of law and principle, as discussed in *Re Baglan*.  In my view it is logical to extend DCG's argument, given that the JLs have accepted that they should raise these matters themselves if I rule against DCG on the issue of standing, to say that the JLs Sanction Application will therefore itself involve substantial matters of law and principle. This provides an additional reason for treating the Sanction Application as a Type 1 application, and as in any event, requiring the Court to have regard to all the relevant circumstances.

---

[11] BVIHCM2010/0138.

**The views of the Non-conflicted Members of the Creditors' Committee**

[62]     I consider it useful to deal with the points about the members of the Creditors'
         Committee at this stage before embarking on a substantive consideration of the
         standing issues. In my judgment, the resolutions/views of the Non-Conflicted
         Members, approving the JLs proposed course of commencing Chapter 11
         Proceedings and seeking the Court's sanction, may well be relevant to the Court's
         consideration of the Sanction Application itself. However, this information does not
         assist me greatly in determining the question presently before me as a preliminary
         matter, which is whether DCG has standing to be heard on the Sanction
         Application.

[63]     This is because it is obvious that the position of the Non-Conflicted Members, is
         different from that of DCG because the JLs have filed an application in the BVI
         Liquidation, the BVI DCG Application to which DCG is a respondent, whereas I am
         not aware of any such applications being filed against the Non-Conflicted
         Members of the Creditors' Committee. It therefore does not follow that because
         the Non-Conflicted Members (or Blockchain) take the view that they do, that the
         Court can infer that DCG wishes standing not as a (conflicted creditor), but solely
         as a putative defendant in the U.S. Chapter 11 Proceedings.

[64]     Reference has been made to the view of the Non-Conflicted Members that DCG
         should be excluded from the hearing of the Sanction Application. DCG's leading
         Counsel Ms. Prevezer K.C. has also made a point about the JLs not asking
         Blockchain (when, it seems, the argument is that they should have) what their
         views are on whether DCG should have standing/ be excluded. I am of the view,
         that such opinions do not take the matter much further, since they are ultimately
         still based on the characterization of DCG's interest in appearing as being solely
         as a putative defendant. Further, the question of standing is a legal issue, and in
         so far as it may involve the Court's discretion, the views of the Non-Conflicted
         Members, or Blockchain cannot assist the Court greatly in arriving at a decision as
         to the correct and just course to adopt.

**Standing - Greenhaven**

[65]     Turning now to the substance of the standing issue, as is common ground, the general position is that a creditor is entitled to be heard on a sanction application. At page 468 E-H of **Greenhaven**, Chadwick LJ elucidated the issues as follows:

> *"In deciding whether or not to sanction the exercise of a power under s. 167(1)(a) of the Insolvency Act 1986, the court may have regard to the wishes of the creditors and contributories, as proved to it by evidence-see s. 175 of the Insolvency Act. The Court may, if it thinks fit, direct that a meeting be called for that purpose.*
> *In my view it is plain that a creditor or contributory of a company is entitled to be heard on an application by the liquidator under s.167(1)(a). I do not understand that to be in dispute. But an application under s.167(1)(a) of the Act is not a suitable context in which to decide whether or not a person claiming to be a creditor is indeed a creditor…. At the end of the day it is a matter for the discretion of the court whether or not to authorize or sanction the compromise…The court may, and usually will, take into account the views of someone claiming to be a creditor or contributory, but it is not bound by those views…I think it is sufficient that the court should be satisfied that the claim is made bona fide and it is not plainly misconceived. If the claimant satisfies that test, then it seems to me that he should be heard. It remains a matter for the court what weight should be given to his wishes." (emphasis provided)*

[66]     Mr. Fisher K.C. relied on a passage at page 469 E-G of **Greenhaven** as supporting his argument that DCG has no standing and that the Court would not take its views into account because it is a creditor influenced by extraneous considerations, i.e. its interests as a putative defendant. This is what Chadwick LJ stated in the relevant passage:

> *"…. The court may have to weigh the different interests of creditors and contributories and, perhaps, the different interests of preferential and non-preferential creditors. It will not give weight to the wishes of those who will be unaffected which ever way the decision goes; for example, the interests of contributories who have no realistic prospect of receiving a distribution in any unforeseen circumstances, or the wishes of preferential or secure creditors who will be paid in full in any event. Subject to that, the court will give **weight** to the wishes of creditors and contributories whose interests it has to consider, for the reason that creditors and contributories,*

> *if uninfluenced by extraneous considerations, are likely to be good judges of where their own best interests lies.* For the same reason the court will give weight to the views of the liquidator, who may, and normally will, be in the best position to take an informed and objective view. But, as I said, *at the end of the day it is for the court to decide whether or not to sanction compromise.* (my emphasis)

[67]    In my judgment, in the passage at page 469, Chadwick LJ is not "walking back", so to speak, what he said in the passage at page 468 about the standing of creditors. In the passage at page 469 the learned Judge of Appeal is there speaking about weight, not about standing. In other words, having decided that a creditor has a right to be heard, that they have standing, then the Court will decide what, if any weight to accord their views. In my view, far from supporting the JLs argument, the passage supports DCG's position that it has standing qua creditor. Further, in the passage at page 468, Chadwick LJ points out that the sanction application is not even a suitable context in which to decide whether a person claiming to be a creditor is indeed a creditor. The court simply needs to be satisfied that a person's claim to be a creditor is *bona fide* and not misconceived. If therefore, the sanction application is not an appropriate arena for delving into whether someone who claims to be a creditor is even indeed a creditor, then plainly, this Court has no proper basis at the Directions Hearing to eliminate a party that claims to be a creditor from the Sanction Hearing on the basis that as a creditor it has no claim *qua* creditor.

[68]    In the instant case, it cannot be said that DCG is not *bona fide* claiming to be a creditor, or that its claim to be a creditor is misconceived. Indeed, DCG claims to be not just a creditor of the Company; it claims to be its largest single creditor, accounting for more than a third of total claims on the estate. It has been common ground between the parties that for the purposes of this Directions Hearing DCG should be assumed to be a creditor of the Company.

**Relevance of the Deloitte Decision**

[69]     Mr. Fisher K.C. has submitted that the principles in the **Deloitte** case have "overtaken" the reasoning in **Greenhaven**. That is an interesting and thought-provoking submission, albeit no authority in support of it was cited. The **Greenhaven** case is oft-cited in relation to sanction applications by liquidators. In my view it has constituted foundational precedent for decisions in multiple common law jurisdictions where sanction applications by liquidators have been considered, including in the BVI. It is considered a *locus classicus* in the arena of sanction applications by liquidators.

[70]     Mr. Fisher K.C. also relies upon this case to demonstrate that the JLs do not rely solely on section 273 cases, and further, that the reasoning in **Deloitte** has been accepted by the Court of Appeal in the **ABN Amro** case as being of more general applicability.

[71]     **Deloitte** was a decision of the Judicial Committee of the Privy Council emanating from the Cayman Islands. It concerned an application by a claimant, who was not a creditor or contributory of the company but which was a defendant to an action brought by the JLs of the relevant company in liquidation. The application was brought under section 106 (1) of the *Companies Law* of the Cayman Islands which provided as follows:

> *"Any official liquidator may resign or be removed by the court on due cause shown: and any vacancy in the office of an official liquidator shall be filled by the court."*

[72]     The passages relied upon by the JLs, in the judgment delivered by Lord Millett, include page 1610 E-F, and 1611 B-G as follows:

> *"[1610]…the court has consistently regarded the creditors (in the case of an insolvent liquidation) and the contributories (in the case of a solvent liquidation) as the proper persons to make the application, being the only persons interested in the liquidation. Their Lordships have not been shown any case in which the court has removed a liquidator who is able and willing to act on the application of anyone who is not a creditor or contributory as the case may be……..*

24

*[1611]  In their Lordships opinion two different kinds of case must be distinguished when considering the question of a party's standing to make an application to the court. The first occurs when the court is asked to exercise a power conferred on it by statute. In such a case the court must examine the statute to see whether it identifies the category of person who may make the application. This goes to the jurisdiction of the court, for the court has no jurisdiction to exercise a statutory power except on the application of a person qualified by the statute to make it.  The second is more general. Where the court is asked to exercise a statutory power or its inherent jurisdiction, it will act only on the application of a party with a sufficient interest to make it. This is not a matter of jurisdiction. This is a matter of judicial restraint. Orders made by the court are coercive. Every order of the court affects the freedom of action of the party against whom it is made and sometimes (as in the present case) of other parties as well. It is therefore, incumbent on the court to consider not only whether it has jurisdiction to make the order but whether the applicant is a proper person to invoke the jurisdiction.*

*Where the court is asked to exercise a statutory power, therefore, the applicant must show that he is a person qualified to make the application. But this does not conclude the question. He must also show that he is a proper person to make the application. This does not mean, as the plaintiff submits, that he "has an interest in making the application or may be affected by its outcome." It means that he has a legitimate interest <u>in the relief sought.</u> Thus even though the statute does not limit the category of persons who may make the application, the court will not remove a liquidator of an insolvent company on the application of a contributory who is not also a creditor: see In re Corbenstoke Ltd. (No. 2) [1990] B.C.L.C. 60. This case was criticized by the plaintiff but their Lordships consider that it was correctly decided.*

*The standing of an applicant cannot therefore be considered separately and without regard to the nature of the relief for which the application is made. Section 106(1) does not limit the category of persons who may make the application, The plaintiff, therefore, does not lack statutory qualification to invoke the section. But the question remains whether it has a legitimate interest in the relief which it seeks. It is not asking the court to appoint a liquidator to fill a vacancy. It is asking the court to remove incumbent liquidators for cause. The English cases relied upon by the plaintiff show that an interest which is sufficient to support an application of the former kind may not be sufficient to support an application of the latter kind."*

[73]    In my judgment, it is plain that the **Deloitte** case involved very different facts and that the application before the Court there was of a completely different nature. **Deloitte** does not assist me in determining the application I have before me now. I

accept learned Counsel for DCG's submission that an important distinction is that in *Deloitte* the Court was examining a statutory provision concerning an application by the claimant (the party whose standing was being examined), whereas in the instant case, the Sanction Application does not involve, and is not an application by DCG. I observe also that at page 1610-B the Board noted that the claimant conceded that not everyone is a proper person to make the application.

[74]    Further, I accept the submission that in *ABN AMRO* the Court was considering a section 273 case. In addition, it seems clear to me that it is therefore important to note that at paragraph [35] of the judgment where the learned Pereira C.J. held that she saw no good reason for treating the dictum of Lord Millett in *Deloitte* as case specific, this was followed by the statement:*"I consider it to be of more general import in a consideration of the issue of locus standi <u>where equivalent relief is being sought</u>." (*my emphasis). I accept Ms. Prevezer K.C's submission that plainly in the instant application and circumstances, no "equivalent relief" is being sought. Indeed, DCG is not making an application, and section 186(5) itself contains no restrictions on the category of person who can be a respondent to such applications.

[75]    The *Deloitte* rationale has no applicability to the instant case, since the Sanction Application is an application that sub-section 186(5) decrees may be brought by the JLs, and they, the JLs, obviously have a legitimate interest in making it. However, in the event that the reasoning can be applied to the respondent to a sanction application, or a party such as DCG claiming a right to be heard not on its application, but the JLs', in my judgment, DCG has a legitimate interest in the Sanction Application. All roads lead back to the reasoning in *Greenhaven* where it is made plain that a creditor has a sufficient and legitimate interest in a sanction application by the liquidator.

**Section 273 Cases**

[76]     Sub-section 186(5), of the BVI IA, under the sub-heading "*General powers of liquidator*" deals with a liquidator's ability to apply for the Court's sanction. It provides as follows:

> "**186** (5) The liquidator of a company, whether or not appointed by the Court, may at any time apply to the Court for directions in relation to a particular matter arising in the liquidation."

[77]     Section 273, under the sub-heading "*Application to Court concerning office holder*" provides as follows:

> "273. A person aggrieved by an act, omission or decision of an office holder may apply to the Court and the Court may confirm, reverse or modify the act, omission or decision of the office holder,"

[78]     In my judgment, it is clear that the two sections are addressing different types of matters. I accept learned Counsel for DCG's submission that section 273 is addressing a Type 2 case kind of review whereas section 186(5) relates to both types of cases. Therefore, since in a Type 1 case, the Court is required to consider all of the circumstances and is not just applying the "perversity" test typically applied to type 2 applications, it seems logical that there may be a comparatively more restrictive standing requirement imposed in the section 273 cases than for a sanction application of the Type 1 variety. It may be that since in a section 273 application the Court is not engaged in a review of all of the circumstances, not all persons interested in the liquidation will be entitled to be heard, regardless of their reasons for doing so.

[79]     However, in my judgment, the issue being argued does not require the Court to go so far. I am concerned with whether DCG, in an application by the JLs for sanction under s.186(5) is entitled to be heard. I am not concerned with a section 273 application, and **Greenhaven** makes it clear that a creditor has a right to be heard on an application under s.186(5).

[80]    As DCG is a putative defendant in the U.S. Proceedings, it may be said that DCG is influenced by "*extraneous considerations*" as discussed in **Greenhaven**. However, such considerations go towards a determination of what weight to give DCG's views; they do not go to the root issue of standing.

[81]    Further, and in any event, a distinguishing feature of this case is that DCG is not simply a putative defendant in the U.S. Proceedings; it is a respondent to the BVI DCG Application. It is a Respondent/ Defendant to extant liquidation proceedings already commenced before the BVI Court. It is clear to me that this circumstance casts a different light on DCG's status than if it were solely a putative defendant in the U.S. Proceedings. As DCG says in its SKA, the JLs have not indicated that they intend to discontinue the BVI DCG Application if they receive permission to pursue the Chapter 11 Proceedings. Though there is presently a stay in place, as I outlined at paragraph [17] above, there is provision in the Consent Order for the JLs to apply for the stay to be lifted. DCG quite plainly is entitled to claim to be a creditor in a *bona fide* and not plainly misconceived manner. During the hearing on 20 June 2023, in his Reply Mr. Fisher K.C. made clear that the JLs have no intention of pursuing parallel proceedings in the BVI. That may be so, but that does not take away from the fact that DCG has standing as a party claiming to be a creditor qua creditor.

[82]    However, in any event, even if DCG can be said to be applying or before the Court in a dual capacity, **Re Edennote** makes plain that even under a section 273 type of regime or analysis, that is permissible.

[83]    It is plain that the three BVI cases relied upon by the JLs refer to **Re Edennote** and there is no suggestion that **Re Edennote** was wrongly decided.

[84]    I accept that the decision in **ABN AMRO** concerned alleged debtors, who were not creditors. At paragraph [36] the Court stated:

> *"The appellants here do not suggest that they have any interest in the assets of Sentry or the manner in which they are to be distributed or spent. Their sole complaint is that of being sued by the Liquidators and are seeking either to prevent or restrain the pursuit of the US Proceedings against them mainly on the basis that the pursuit of such proceedings are vexatious and oppressive or otherwise an abuse of process. Thus, they invoke section 273 not as a creditor of Funds which are insolvent but in essence as a defendant in those proceedings. In this capacity, they are strangers to the liquidation. Further, as in Deloitte, their interests are adverse to the liquidation and the interest of the creditors."*

[85]   It is also apparent that similarly, the decision in ***Stevanovich*** which was a case of a former director who sought to restrain proceedings brought against him, is of no relevance to the position of a creditor.

[86]   In ***Gold & Appel***, the JLs rely upon passages from the judgment, including paragraph [35] and [36] where it is stated:

> *"[35] Furthermore, even if Space Inc were to be a secured creditor as Mr. Fay suggested, the mind-boggling question is: what is Space Inc. doing here in this application? It is not in the capacity of a secured creditor that it seeks the relief it does. The same can be said of the Smaller World Foundation. It is asserted that The Smaller World is a member. This has not been disputed by the Liquidator. However, the Liquidator submits that by joining forces with the other Applicants, Space Inc and the Smaller World seek a remedy as Defendants in the U,S, Proceedings, not as an aggrieved creditor or member in dispute. Each and every one of the Applicants are defendants in substantive proceedings in the U.S. in which the merits will be tested as to whether or not there is a case to answer or whether they will be found liable thereon. They have a right to appear and challenge the U.S. Proceedings on its merits rather than circumventing another jurisdiction's ability to heart he substantive actions especially when that forum is the natural forum for the merits of the case.*
> *[36] The plain fact in this case is that the Applicants are "outsiders to the liquidation." They bring this application simply because they have been sued by the Liquidator, and it is in the course of those proceedings in which they can challenge the authority being exercised by him."*

[87]   I am persuaded, and find logical, DCG's argument that ***Gold & Appel*** can be understood to be consistent with ***Re Edennote*** in so far as it was decided that Space Inc (whose status as a creditor was not at all clear), was not applying as a creditor at all, as opposed to in a "dual capacity".

[88]    In my judgment, the facts and circumstances in the instant case are distinguishable from those in *Re Gold & Appel* and *ABN AMRO* in that there is no proper basis upon which DCG could be described as a "*stranger/ or outsider to the liquidation.*" Indeed, DCG is very much immersed in the liquidation proceedings here in the BVI.

[89]    A point which follows from DCG's status as a respondent in the BVI DCG proceedings, is that it is in the BVI Proceedings, in the course of the Sanction Application that DCG can raise its abuse of process argument, and challenge the JLs proposed course of action, and not in the U.S. Proceedings. DCG is not seeking to restrain the BVI proceedings; one of its claims is that it seeks to prevent the JLs from forum-shopping. This also distinguishes this case from *Re Gold & Appel* -paragraph [36].

**Discretionary Factors**

[90]    Further, at the end of the day, on the hearing of the Sanction Application, it will be for the Court to decide whether or not in all of the circumstances, it is appropriate to grant sanction. The Court is in my judgment entitled to consider discretionary factors when deciding whether to permit DCG to make submissions at the Sanction Application.

[91]    In my view, there are a number of discretionary factors pointing in favour of hearing from DCG on the Sanction Application. Firstly, as explained earlier, the Sanction Application is unprecedented in this jurisdiction. Indeed, no English or other Commonwealth cases considering the point about parallel Chapter 11 Bankruptcy Proceedings have been found. Though in Crumpler 10, at paragraph 46(c) and in exhibits Mr. Crumpler cites the example of *Inverness Distribution Ltd.*, it does not appear that there was any decision of the Bermuda Court, whether on a contested or uncontested application, to determine whether the

liquidators in *Inverness* should have sanction to pursue the Chapter 11 Proceedings that were pursued in that case.

[92]    DCG is a Respondent/Defendant to existing proceedings in the BVI DCG Application. It has expressed an interest in raising the question of whether the Sanction Application represents an exercise by the JLs in forum-shopping. DCG have also brought up questions that concern this Court's own authority, its right to control the conduct of its own officers, the JLs. Reference has also been made to issues as to legislative intent of the BVI Legislature as manifested in the BVI IA.  It is the case that the JLs' legal team have made clear that these are matters upon which, in keeping with their obligations of full and frank disclosure, they would have raised themselves. However, in my view, in all of the circumstances, the Court will be better served by hearing from both the JLs and DCG on these very important, and other issues.

[93]    It may also be that there are matters of U.S. law that the Court ought properly to bear in mind, in hearing the Sanction Application, albeit whilst not engaging in a determination of such issues. Though I would expect that the JLs will wish to point certain matters of law out to the Court, DCG also wishes to raise certain points, including as to the U.S. Avoidance Powers. At this stage I am of the view that it would be beneficial to have DCG make brief points on such issues as are relevant.

[94]    For completeness, I would just add that even if this application were to be treated as if the JLs did, because of the width of the Appointment Order, have the power to bring the Chapter 11 Proceedings, and therefore they would be seeking the Courts "sanction", or blessing of what is plainly a momentous and significant decision within the liquidation, I am of the view that DCG would have standing to be heard.


**Ruling**

31

[95]     It is for these reasons that I ruled that DCG shall have standing to appear at the
substantive hearing of the Sanction Application.


**The Hearing Date/Urgency of the Sanction Application**

[96]     As to the timing of the substantive application, there has been evidence from legal
experts on both sides. Evidence from Mr. Adam Goldberg of Latham & Watkins
LLP on behalf of the JLs, and from Ms. Ronit Berkovich of Weil, Gotshal & Manges
LLP on behalf of DCG.  Both of these experts each act for and are part of the U.S.
legal team for the respective parties. They are fully entitled to give evidence to
assist this Court. However, there are conflicting views advanced by them as to the
urgency of commencing the Chapter 11 Proceedings. On the other hand, though
in Crumpler 11, the JLs continue to stress the urgency of getting on with the U.S.
Proceedings,   their evidence is that there is not yet a single "drop-dead date"
before mid-August by which the Company must enter the Chapter 11 process.


[97]     I had set 28 June 2023 as a provisional date for the substantive hearing of the
Sanction Application. However, in light of the views expressed by the experts, I
think that it may be useful to have the views of independent experts, who do not
act for the parties concerned. That plainly would not be available in time for the 28
June.


[98]     I am also generally of the view at this point, upon reflection, and based upon the
additional information to hand, that it would be best to fix a date that is convenient
both to the Court and to both parties and their legal teams. There is in my view no
need for the Court to hear the Sanction Application in such a time-compressed
process as a hearing on the 28 June would necessitate for all concerned.


[99]     The date of 28 June has been vacated and the Sanction Application has now been
fixed for 21 and 24 July, with a time estimate of 1.5 days.  Case Management
Orders have been made regarding the subject of expert evidence and other

matters, with the question of costs being reserved to the hearing of the Sanction Application.

[100]    I wish to record my great appreciation for the hard work and thoroughness displayed by Leading Counsel, and the legal teams for both the JLs and DCG. Coupled with the thoroughness has been the unstinting degree of clarity in submissions, both written and oral, on issues of variety and complexity. This approach has been of tremendous assistance to the Court.

**Ingrid Mangatal (Ag)**
High Court Judge

**By the Court**

**Registrar**