CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
*Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

**DEBTORS' REPLY IN SUPPORT OF**
**MOTION FOR ENTRY OF AN ORDER EXTENDING THE**
**DEBTORS' EXCLUSIVE PERIODS IN WHICH TO FILE A CHAPTER 11 PLAN**
**AND SOLICIT ACCEPTANCES THEREOF AND GRANTING RELATED RELIEF**

Genesis Global Holdco, LLC ("Holdco") and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors," and these cases, collectively, the "Chapter 11 Cases") hereby submit this reply (the "Reply") in further support of *Debtors' Second Motion for Entry of an Order Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereof and Granting Related Relief* (ECF No. 574) (the "Motion")[2] and in reply to the (i) *Objection of the Fair Deal Group to Debtors' Second Motion*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Motion.

*to Extend Exclusivity* (ECF No. 633) (the "BRG Objection"), (ii) *Objection of Gemini Trust Company, LLC to Debtors' Second Motion to Extend Exclusivity* (ECF No. 634) (the "Gemini Objection"), and (iii) the *Objection of Ad Hoc Group of Genesis Lenders to Debtors' Second Motion for Entry of an Order Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereof and Granting Related Relief* (ECF No. 635) (the "AHG Objection, and, together with the BRG Objection and Gemini Objection, the "Objections"), and respectfully state as follows:

**REPLY**

1. Over the past seven months, the Debtors have worked diligently and hand in hand with their creditors, primarily the Committee,[3] the Ad Hoc Group, and Gemini, to reach a deal with DCG that will provide a viable path to confirmation and emergence. In just over seven months, the Debtors brought the major constituencies together and filed the February 2022 Restructuring Term Sheet (ECF No. 80), filed a proposed plan of reorganization (ECF No. 20), continued to facilitate negotiations after the appointment of the Committee, filed the first amended plan in June of 2023 (ECF No. 427), and led the effort to try to bring parties together through a court-appointed mediation process. *See* Motion ¶ 1. On August 29, 2023, the Debtors announced that they have reached an agreement in principle with the Committee and DCG, subject to the resolution of various issues, including distribution mechanics and definitive documentation (the "Agreement in Principle"). *See Notice of Mediation Termination* (ECF No. 625). The Agreement in Principle, which is the result of many months of negotiation with key stakeholders, including the Ad Hoc Group and Gemini, has the support of the only fiduciaries in these cases—the Debtors and the Committee—and marks substantial progress towards the Debtors' goal of reaching a value-

---

[3] Capitalized terms used herein but not defined shall have the meanings ascribed to them in the Motion.

2

maximizing resolution to these cases. That said, the Debtors realize that significant work remains unfinished.

2. The Debtors are now working collaboratively with the Committee to resolve remaining open issues with respect to an amended plan (the "Proposed Amended Plan"), including working on definitive documentation that reflects the terms of the Agreement in Principle. *See id.* In addition, as contemplated by the Agreement in Principle, the Debtors and the Committee are collaborating in obtaining payments owed by DCG pursuant to various unsecured loans that came due in May 2023. In the coming weeks, the Debtors will continue to engage with other parties in interest to try and resolve objections that they may have to the Proposed Amended Plan, address concerns that they may have regarding its terms, and reach a resolution to the maximum extent possible. While the mediation has terminated, the Debtors' efforts to reach a consensual resolution among the key stakeholders have not.

3. The Ad Hoc Group, Gemini and another group of certain unsecured claimants (the "Brown Rudnick Group") (together, the "Objecting Parties") argue that the Proposed Amended Plan will not garner sufficient votes and the Court should accordingly deny the Debtors' Motion.[4] However, to show cause to extend exclusivity, the Debtors need only to have "demonstrated *reasonable prospects* for filing a viable plan." *In re Adelphia Comm. Corp.*, 352 B.R. 578, 589 (Bankr. S.D.N.Y. 2006)[5] (emphasis added). Such a demonstration "requires only that a debtor be able to attain confirmation of at least *some* viable plan, not necessarily the

---

[4]  The sole case cited by any of the Objecting Parties on this point does little to bolster their argument and presents circumstances that are not analogous to these cases. *See In re GMG Capital Partners III, L.P.*, 503 B.R. 596 (Bankr. S.D.N.Y. 2014) (finding that the cases were small and uncomplicated and the debtors had failed to even commence plan negotiations).

[5]  While the court in *Adelphia* was reviewing a motion to terminate the exclusive period, courts apply the same multi-factor analysis in determining whether cause exists to both reduce and increase a debtor's exclusive period. *See Adelphia*, 352 B.R. at 586-87; *see also In re Borders Group, Inc.*, 460 B.R. 818, 822 (Bankr. S.D.N.Y. 2011) (applying the *Adelphia* factors in evaluating a motion to extend the exclusive periods).

plan currently proposed." *Id.* (emphasis in original); *compare In re Gen. Bearing Corp.*, 136 B.R. 361, 367 (Bankr. S.D.N.Y. 1992) (concluding that a debtor failed to establish reasonable prospects of filing a viable plan where it "ha[d] not demonstrated . . . any financial ability to propose a confirmable Chapter 11 plan or that any further delay [would] enhance its prospects"). While the Debtors believe that the Proposed Amended Plan provides a viable path to confirmation, whether or not it ultimately proves confirmable is a question to be answered through the voting and confirmation process. As the court in *Adelphia* noted, "displeasure with a plan . . . is not one of the enumerated factors, and is not a basis for terminating exclusivity. Nor, without more, is creditor constituency unhappiness with a debtor's plan proposals." 352 B.R. at 587.

4. With respect to the other factors,[6] the Objecting Parties' arguments are likewise unconvincing:

   a. **Size and Complexity of the Cases.** The Ad Hoc Group argues that this factor weighs against extension of the Exclusive Periods because "the sheer amount of assets and liabilities is but one measure of the size and complexity of a chapter 11 case" and "the Debtor's estates are relatively straightforward." AHG Objection ¶ 15.[7] In addition to the size and breadth of the Debtors' assets and liabilities, the complexity of issues involving DCG and Gemini and the digital asset industry itself introduce significant and novel complexities into the Chapter 11 Cases, such as substantial intercreditor issues among various creditors holding claims in respect of fiat and different digital assets, which have been the subject of intensive discussion.

   b. **Time Elapsed and Necessity of Sufficient Time to Negotiate a Plan.** The Objecting Parties argue that, seven months into the Chapter 11 Cases, (i) the Debtors have already had sufficient time to try to negotiate a plan, and (ii) because the Proposed Amended Plan is, they assert, unconfirmable, additional time is not

---

[6] As outlined in the Motion, courts look to nine factors in determining whether to extend or shorten the plan exclusivity periods. *See* Motion ¶ 11 (listing factors). In addition to whether the debtor has demonstrated reasonable prospects for filing a viable plan, *see supra* ¶ 3, the factors are: "(a) the size and complexity of the case; (b) the necessity of sufficient time to permit the debtor to negotiate a plan of reorganization and prepare adequate information; (c) the existence of good faith progress towards reorganization; (d) the fact that the debtor is paying its bills as they become due; . . . (f) whether the debtor has made progress in negotiations with its creditors; (g) the amount of time which has elapsed in the case; (h) whether the debtor is seeking an extension of exclusivity in order to pressure creditors to submit to the debtors' reorganization demands; and (i) whether an unresolved contingency exists." *In re Borders Group, Inc.*, 460 B.R. 818, 822 (Bankr. S.D.N.Y. 2011) (citing *Adelphia*, 352 B.R. at 587).

[7] Gemini, on the other hand, concedes that the size and complexity of the Debtors' cases weigh in favor of extending the Exclusive Periods. *See* Gemini Objection ¶ 18.

4

warranted. *See* AHG Objection ¶¶ 16, 18; Gemini Objection ¶¶ 13-14; BRG Objection ¶¶ 28-31. As the Ad Hoc Group itself acknowledges, however, seven months "is relatively short in the context of a typical chapter 11 case." AHG Objection ¶ 18. And, as outlined in the Motion and this Reply, the Debtors have made significant progress during the Exclusive Periods towards reaching a value-maximizing resolution to the Chapter 11 Cases by coming to an Agreement in Principle with the Committee. *See* Motion ¶ 1. This is not a case where the "Debtors have failed to formulate or file a proposed reorganization plan" or "abused exclusivity." *In re Adelphia Communications Corp.*, 336 B.R. 610, 643-44 (Bankr. S.D.N.Y. 2006) ("*Adelphia II*"); *see also In re Glob. Crossing Ltd.*, 295 B.R. 726, 730 (Bankr. S.D.N.Y. 2003) (where a debtor provides "no reason to believe that they are abusing their exclusivity rights . . . [a] requested extension of exclusivity . . . should be granted").

While the Debtors have made significant progress, additional time is needed to file the Proposed Amended Plan, engage in the solicitation process, and bring the Proposed Amended Plan to confirmation. A further extension of the Exclusive Periods would align with the intent of section 1121 of the Bankruptcy Code by allowing the Debtors sufficient time to try to bring their Proposed Amended Plan to confirmation without the threat of multiple competing plans. *See, e.g., In re Michigan Produce Haulers, Inc.*, 525 B.R. 408, 411 (Bankr. W.D. Mich. 2015).

c. **Good Faith Progress Towards Reorganization.** While the Objecting Parties claim that the Debtors have failed to make good faith progress towards reorganization, their arguments boil down to another attack on the basis of their opposition to the Agreement in Principle. But good faith progress requires merely that—progress. *See Adelphia* 352 B.R. at 588 (finding good faith progress where the debtors had not yet confirmed a plan). The Agreement in Principle, which has garnered the support of both fiduciaries in these cases and offers, among other things, higher recoveries for unsecured creditors than the February 2022 Restructuring Term Sheet (ECF No. 80) that was negotiated by the Ad Hoc Group, is a mark of substantial progress.

d. **Progress in Negotiations With Creditors.** The Debtors have been actively negotiating with their creditors and working tirelessly to bring all parties in interest to the table since the beginning of the Chapter 11 Cases. Neither the Ad Hoc Group nor Gemini meaningfully disputes this, and the Ad Hoc Group Objection actually outlines the history of these negotiations in detail. *See* AHG Objection ¶¶ 2-7. The Brown Rudnick Group's three-sentence argument on this point does little more than declare that the Debtors have made no progress with *them*.[8] *See* BRG Objection ¶¶ 37-38. The progress that the Debtors have made through negotiations with their creditors is evident in the Agreement in Principle, as discussed above. *See supra* ¶ 4(c). Even so, the Debtors seek additional time to try and obtain more consensus.

---

[8]  While the Brown Rudnick Group claims that the "Debtors refused to engage" with them, *see* BRG Objection ¶ 18, the Debtors vehemently dispute this account.

5

e. **Whether the Debtors Are Paying Bills as They Come Due.** As stated in the Motion, the Debtors have continued to make payments on their postpetition obligations as they come due in the ordinary course and will continue to do so. *See* Motion ¶ 18. None of the Objecting Parties dispute this point. *See* Gemini Objection ¶ 18 (conceding that this factor weighs in favor of an extension of the Exclusive Periods).

f. **Whether the Debtors Are Seeking Exclusivity to Pressure Creditors.** The Ad Hoc Group claims that the Debtors are seeking an extension of the Exclusive Periods, seemingly suggesting that the Debtors are using delay tactics to pressure time-sensitive creditors into accepting the Proposed Amended Plan. *See* AHG Objection ¶ 19. This is simply not the case. The Debtors have remained committed to working cooperatively with their creditors through the duration of these Chapter 11 Cases to reach a value-maximizing and consensual resolution. The Debtors' have moved to extend the Exclusive Periods in order to give them additional time to negotiate with parties in interest and bring the Proposed Amended Plan to confirmation, which the Debtors believe is in the best interest of all stakeholders. A free-for-all among competing plans filed by creditors with competing goals will not be helpful to the process at this point.

g. **Unresolved Contingencies.** The Ad Hoc Group and Brown Rudnick Group both contend that this factor does not weigh in favor of extending the Exclusive Periods, but on entirely conflicting bases. The Ad Hoc Group, for its part, claims that there are no unresolved contingencies. *See* AHG Objection ¶ 20. The Brown Rudnick Group, on the other hand, concedes that there are unresolved contingencies, but claims that such contingencies do not justify extending the Exclusive Period. *See* BRG Objection ¶ 40. As the Debtors established in the Motion, several important contingencies remain unresolved at this stage that could meaningfully factor into the Proposed Amended Plan, including analysis and reconciliation of the claims pool, consideration of the FTX settlement, litigation of the 3AC Claims Objection, and evaluation of potential preference claims. *See* Motion ¶ 20. Accordingly, this factor weighs in favor of extending the Exclusive Periods.

5. Finally, the assertions of Genesis and the Brown Rudnick Group that terminating the Exclusive Periods will not prejudice the Debtors because the Debtors "can still attempt to progress their amended plan . . . simultaneously" are wrong. *See* Gemini Obj. ¶ 17; *see also* BRG Obj. ¶ 42. As the court recognized in *Adelphia*, "a competing plans battle . . . might well jeopardize current fragile agreements between various stakeholders, re-ignite intercreditor disputes, . . . push this process back to square one . . . [and] drag out the solicitation process, subjecting the estate to substantial extra costs that might otherwise be avoided." 352 B.R. at 590. Introducing competing

6

plans at this stage, particularly where there are intercreditor disagreements and multiple ad hoc groups and where the Debtors have just reached an Agreement in Principle with the only other fiduciary in these cases after months of negotiations, would only serve to disrupt and stall the meaningful progress that the Debtors have made.

6. In addition to responding to the legal arguments set forth above, the Debtors believe that it is necessary to address various mischaracterizations included in the Objections:

a. First, the Ad Hoc Group is incorrect when it suggests that the Debtors have not sought to obtain payment from DCG in respect of $630 million in loans due in May 2023. *See* AHG Objection ¶ 5. The Debtors have held off on filing an action to collect on these amounts after consulting with the Committee and other creditors who expressed concern that suing DCG would have a negative impact on negotiations. In fact, it was the Debtors' threat to file a turnover action that caused DCG to begin hosting principal-to-principal negotiations with creditors in June 2023. These discussions were the driving force behind the Agreement in Principle. The Debtors are now working with the Committee to document a Partial Repayment Agreement with DCG that would result in immediate payment of $75 million, with additional amounts to be paid over the coming months, all without prejudice to the ability to seek full payment if a definitive deal is not reached.

b. Second, the Brown Rudnick Group's objection includes a number of misleading statements that should be corrected. Most notably, the Brown Rudnick Group fails to mention that the key driving member of the Brown Rudnick Group is Gemini. Thus, through the Brown Rudnick Group, Gemini is effectively filing two objections without disclosing its multiple hats. More importantly, the Brown Rudnick Group claims to represent approximately $1.5 billion in claims. *See Verified Statement of Fair Deal Group Pursuant to Bankruptcy Rule 2019* (ECF No. 649). But the vast majority is held by Gemini, which has **no** voting rights in respect of the claims held by Gemini Earn Users[9] (and none of the actual Gemini Earn Users—many of whom are suing Gemini—have objected to an extension of the Exclusive Periods). In other words, it is misleading and wrong to suggest that the Brown Rudnick Group holds $1.5 billion in claims.

c. In addition, the Brown Rudnick Group does not mention that its proposed "backstop" for the cash-out offer relating to litigation against DCG for payment of $630 million in May 2023 maturities, *see* BRG Objection ¶ 15, requires a $38 million fee for the "backstopping parties." Upon receipt of the proposal, the Debtors had several discussions with the Ad Hoc Group and the Committee, and no stakeholder was interested in pursuing the proposal at that time, as the mediation was ongoing.

---

[9] "Gemini Earn Users" refers to a subset of Gemini's users that agreed to lend certain of their digital assets at Gemini to GGC through what is referred to as the "Gemini Earn Program."

7

    Moreover, the fees were viewed as excessive given that the litigation to collect the $630 million in May 2023 maturities would be a relatively simple breach of contract action.

    d.    Lastly, the Brown Rudnick Group criticizes the Debtors for failing to immediately engage with them on a confidentiality agreement. *See* BRG Objection ¶ 18. The BRG Objection, however, fails to mention that, at the time, there were only two members of the Brown Rudnick Group, both of which had already executed confidentiality agreements, and that the Debtors, Committee and the Ad Hoc Group were negotiating directly with Gemini, one of the Brown Rudnick Group members, as part of the then-pending mediation (and continue to do so).[10]

## CONCLUSION

WHEREFORE, for the reasons set forth in the Motion and this Reply, the Debtors respectfully request that the Court grant the Motion and enter the Proposed Order, and grant such other and further relief as is just and proper.

Dated: September 1, 2023
       New York, New York

*/s/ Sean A. O'Neal*
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors and Debtors-in-Possession*

---

[10] Further, it appears that entry into an NDA is not important to the Brown Rudnick Group, because it has not yet responded to provide a markup to the proposed agreement that the Debtors sent on August 28, 2023.