PROSKAUER ROSE LLP
Brian S. Rosen
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000

-and-

Jordan E. Sazant
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone: (312) 962-3550

*Counsel to the Ad Hoc Group of Genesis Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*, | Case No. 23-10063 (SHL) |
| Debtors.[1] | Jointly Administered |

### AD HOC GROUP OF GENESIS LENDERS' MEMORANDUM CONCERNING DEBTORS' IMPROPERLY WITHHELD DOCUMENTS

Pursuant to the Court's direction at the discovery conference held today, the Ad Hoc Group

of Genesis Lenders (the "Ad Hoc Group") hereby submits this memorandum concerning the 77

documents the Debtors have improperly withheld on the basis of work-product and common-

interest privilege with the Official Committee of Unsecured Creditors (the "UCC"), as set forth on

Debtors' Privilege Log (as defined below).[2]

*///*

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable) are:  Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (9564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

[2]      Per the Court's request, relevant legal authorities for the Court's consideration are attached hereto as Exhibit B.

## PRELIMINARY STATEMENT

1.    The Debtors have asked this court to approve their proposed settlement (the "Proposed Settlement") with the debtors in the chapter 11 cases captioned *In re FTX Trading Ltd.*, Case No. 22-11068 (JTD) (Bankr. D. Del.) (collectively, the "FTX Debtors"), pursuant to which the Debtors ask this Court to grant Alameda Research Ltd. ("Alameda") an allowed general unsecured claim against Genesis Global Capital, LLC ("GGC") in the amount of $175,000,000, while releasing Alameda and the other FTX Debtors from valuable claims and causes of action held by the Debtors.

2.    Flouting their burden to establish that the Proposed Settlement is affirmable under the standards of Rule 9019 of the Federal Rules of Bankruptcy Procedure, the Debtors sought approval by filing a boilerplate and conclusory *Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(A) for Entry of an Order Approving Settlement Agreement* [Docket No. 603] (the "Settlement Motion"), supported only by the equally boilerplate and conclusory *Declaration of A. Derar Islim in Support of the Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure for Entry of an Order Approving Settlement Agreement with FTX Debtors* (the "Islim Declaration"). Neither the Settlement Motion nor the Islim Declaration contained any analysis of the weaknesses in the FTX Debtors' claims nor the strengths of the Debtors' claims against Alameda.

3.    The Ad Hoc Group objected to the Settlement Motion, and promptly propounded discovery requests in an effort to discern whether the Debtors conducted any analysis of the strengths and weaknesses of the respective claims in requesting Court approval of the Proposed Settlement. *See Ad Hoc Group of Genesis Lenders' First Set of Document Requests* [Docket No. 664].

4.    The Debtors have refused to produce 77 documents responsive to the Ad Hoc Group's discovery requests. Each of the withheld communications and documents were exchanged between counsel to the Debtors and counsel for UCC. Debtors assert the documents are protected

by the "Work Product (Common Interest)" privilege. *See Declaration of Peter Doyle in Support of the Ad Hog Group of Genesis Lenders' Memorandum Concerning Debtors' Improperly Withheld Documents* (the "Doyle Declaration") at ¶ 2.  Debtors are wrong.

5.      As a threshold matter, it is illogical for Debtors to claim "Work Product (Common Interest)" over documents predating the UCC's reservation of rights filed on September 5, 2023 because, until that point, the UCC stood in the position of an adverse third party that could have objected to Debtors' Rule 9019 Motion.  Even if Debtors could say that they and the UCC were aligned in interest as of September 5, 2023, when the UCC made itself a "noncombatant" for purposes of the Rule 9019 motion, there is no evidence even suggesting Debtors and the UCC were aligned in interest before that date (e.g., a common-interest agreement).  Further, while the Privilege Log indicates that the withheld documents are "Communications related to FTX settlement discussions," the UCC and the Debtors do not share an identical legal interest with respect to the Proposed Settlement:  UCC has a duty to represent the interests of the creditor body as a whole and thus represents FTX as an adversary in the settlement—and more importantly, the Proposed Settlement threatens to improperly diminish the Debtors' estates, which the UCC has a legal interest in maximizing, by not accounting at all for the value of Debtors' claims against FTX.  As such, each of the 77 documents identified on Debtors' privilege log must be produced.

6.      It is equally clear that whatever protection Debtors believed could have applied to the 77 documents disappeared when Debtors sent those documents to a third party—namely, counsel to the UCC.  Even if the descriptions in the privilege log were sufficient to establish a claim of privilege (and they are not), the actual conduct of the Debtors waives any possible assertion of work-product protection or privilege.

7.      Accordingly, because the documents enumerated on the Privilege Log are not protected, the Ad Hoc Group respectfully requests this Court order the Debtors to produce such highly relevant and responsive documents.

## RELEVANT BACKGROUND

8.      The Ad Hoc Group objected to the Settlement Motion, and on September 1, 2023, issued a *Notice of Deposition of A. Derar Islim* [Docket No. 665], the sole declarant upon whom the Debtors rely in support of their Settlement Motion.  Upon the parties' agreement, the deposition was conducted on September 13, 2023.

9.      On September 1, 2023, the Ad Hoc Group also propounded the following requests for documents on the Debtors:

1.  All documents concerning the reconciliation by the Debtors and their representative of the allowable amount of the FTX Claims;

2.  All documents concerning the reconciliation by the Debtors and their representative of the allowable amount of the Genesis Claims;

3.  All communications, presentations, and analysis delivered to the Special Committee or concerning the FTX Claims, the Genesis Claims, or otherwise prepared for or in support of the Proposed Settlement Agreement;

4.  All communications with the FTX Debtors concerning the Proposed Settlement Agreement;

5.  All documents and/or communications since February 6, 2019, between the Genesis Debtors and the FTX Debtors concerning the MLAs, the Genesis Claims, or the FTX Claims, including, but not limited to, (a) a ledger of all transactions between the Genesis Debtors (and their non-debtor direct or indirect affiliates) and the FTX Debtors (and their non-debtor direct or indirect affiliates), and (b) a log of communications between the Genesis Debtors (and their non-debtor direct or indirect affiliates) and the FTX Debtors (and their non-debtor direct or indirect affiliates);

6.  All documents supporting the statement in the Islim Declaration that "weighing the reasonableness factors for purposes of Bankruptcy Rule 9019, the Genesis Debtors, acting through their independent Special Committee and their advisors have concluded that the Settlement Agreement is fair and equitable, reasonable, and in the best interests of the Genesis Debtors' estates …."; and

       7.   All documents and communications between the Debtors and the UCC in connection with the Settlement Motion and the Proposed Settlement Agreement.

*See* Docket No. 664.

10.     On September 5, 2023, the UCC filed its *Statement and Reservation of Rights of the Official Committee of Unsecured Creditors with Respect to Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(A) for Entry of an Order Approving Settlement Agreement with FTX Debtors* (Dkt. 603) (the "Reservation of Rights Statement").

11.     On September 6, 2023, the Debtors served their *Objections and Responses to the Ad Hoc Group's Documents Requests* and began their document production.

12.     On September 8, 2023, the Debtors produced a *Communications with White Case LLP Privilege Log* (the "Privilege Log"). The Privilege Log contains 77 entries, and, with the exception of six entries (Log Nos. 4, 11, 26, 28, 51, and 57) all purport to be "Communications related to FTX settlement discussions" that are withheld on the basis of "Work Product (Common Interest)." Log Numbers 4, 11, 26, 28, 51, and 57 purport to be "Non-Responsive embedded attachment(s)." A true and correct copy of the Privilege Log is attached as Exhibit 1 to the concurrently filed Doyle Declaration.

13.     Every document on the Privilege Log represents a communication or document that was exchanged with White & Case LLP (counsel for the UCC), beginning on July 2, 2023 and proceeding until the UCC filed its reservation of rights on September 5, 2023.

## ARGUMENT

## DEBTORS HAVE WAIVED ANY APPLICABLE WORK PRODUCT PROTECTION

14.     The Debtors seek to justify application of the work product doctrine over the seventy-seven documents enumerated on the Privilege Log, but, even if the documents constitute work

product, the Debtors have waived any protection of those documents by exchanging them with UCC's counsel, and such waiver cannot be saved by the common interest doctrine.

15.     The common interest doctrine "serves as 'an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege,'" including materials protected by the work product doctrine. *In re Hypnotic Taxi LLC*, 566 B.R. 305, 314 (Bankr. E.D.N.Y. 2017) (citation omitted). The common interest doctrine only applies if the party to whom the protected information was disclosed (1) "share[s] a common legal interest"; and (2) "the sharing of the privileged information was intended to be in furtherance of the common legal interest shared by" them. *Id*. at 314-15. "In order for the common interest privilege to apply, the parties must share a common legal interest at the time that the communications were exchanged. *In re Quigly Co., Inc.*, No. 04-15739 (SMB), 2009 WL 9034027, at *5 (Bankr. S.D.N.Y. April 24, 2009).

16.     "The key consideration is that the nature of the [parties' common] interest be **identical**, not similar, and be **legal**, not solely commercial." *Bank of America, N.A. v. Terra Nova Ins. Co. Ltd.*, 211 F. Supp. 2d 493, 496 (S.D.N.Y. 2002) (citation omitted) (emphasis added). "[T]he mere existence of a common business strategy or shared commercial interest, even if combined with the anticipation of or concern about litigation is not enough to invoke the doctrine." *In re Hypnotic Taxi LLC*, 566 B.R. at 315. Thus, notwithstanding the UCC's current position on the Proposed Settlement, the Debtors "must demonstrate, at a minimum, that they shared communications with the [UCC] in furtherance of a common interest at that time." *In re Quigly Co., Inc.*, 2009 WL 9034027, at *5. The Debtors cannot do so.

17.     As a threshold issue, the Debtors and the UCC cannot have shared an identical common legal interest until at least September 5, 2023, at which point the UCC—which had the

option of joining or objecting to the Debtors' 9019 motion—filed a reservation of rights.[3]  From July through September 5, 2023, the Debtors and the UCC may have shared some general commercial interest with respect to the estate's asset pool (a commercial interest that the Ad Hoc Group itself shares), but a general commercial interest is insufficient to invoke the common interest doctrine.  *See In re Hypnotic Taxi LLC*, 15-43300(CEC), 2017 WL 1393674, at *3 (Bankr. E.D.N.Y. April 18, 2017) ("[The parties], share at most a common economic or personal interest in the preservation of the Trusts' assets. . . . such a shared desire to succeed in litigation does not qualify as the identical legal interest needed to invoke the common interest doctrine.")*; Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.*, 215 F.R.D 466 (S.D.N.Y 2003) (finding that common commercial interest failed to invoke the common interest doctrine).

18.    Moreover, there is zero evidence suggesting the Debtors knew or could have reasonably believed the UCC would support the Proposed Settlement until at least September 5, 2023, and thus the subject documents were exchanged at a period of time during which the Debtors' and the UCC's legal interests could not have been common with respect to that settlement.  Indeed, any suggestion that Debtors knew or believed the UCC would approve the settlement prior to September 5, 2023 would require some undisclosed and undiscovered prior understanding between Debtors and the UCC that the settlement would be approved without question.

19.    Critically, the Debtors and the UCC actually do not share an identical legal interest with respect to the FTX settlement.  Setting aside the issue that, as set forth in the Ad Hoc Group's Objection, the Proposed Settlement threatens to diminish the asset pool by waiving the affirmative claims and causes of actions held by the Debtors against the FTX Debtors, and, thus, contravenes

---

[3] For the avoidance of doubt, the Ad Hoc Group does <u>not</u> agree that filing a reservation of rights establishes a common legal interest as a matter of law.  Instead, the Ad Hoc Group focuses on this event because (1) there is zero evidence suggesting a common legal interest prior to that date, and (2) all of the disputed documents and communications were exchanged on or before that date.

the legal interests of the UCC and the Ad Hoc Group, the UCC represents a group of creditors, including the FTX Debtors who are unquestionably the Debtors' adversaries until a settlement is reached. Because the purportedly protected documents bear on the FTX settlement discussions, with respect to which the UCC and the Debtors do not share an identical legal interest (and certainly did not at the time of disclosure), the Debtors' bare assertion that the privilege applies is insufficient to invoke the common interest doctrine.

## **CONCLUSION**

20.     For the foregoing reasons, the Ad Hoc Group respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, overruling the Debtors' assertion of the common interest privilege and ordering the Debtors to produce the 71 documents identified on their privilege log.

Dated: September 15, 2023
        New York, New York

<div style="margin-left:40%">

**PROSKAUER ROSE LLP**

*/s/ Jordan E. Sazant*
Brian S. Rosen
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000
Email: brosen@proskauer.com


-and-

Jordan E. Sazant
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone: (312) 962-3550
Email:  jsazant@proskauer.com

*Counsel to the Ad Hoc Group of Genesis Lender*

</div>

# **EXHIBIT A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*, | Case No. 23-10063 (SHL) |
| Debtors. | Jointly Administered |

### ORDER GRANTING AD HOC GROUP OF GENESIS LENDERS' MOTION CONCERNING
### DEBTORS' IMPROPERLY WITHHELD DOCUMENTS

Upon the motion (the "Motion"),[4] dated September 15, 2023, of the Ad Hoc Group of

Genesis Lenders ("Ad Hoc Group"), for the entry of an order (this "Order"), as more fully

described in the Motion, to compel the above-captioned debtors and debtors-in-possession

(collectively, the "Debtors") to produce the 77 (and any other) documents withheld based on an

improper assertion of a purported common interest privilege with the Official Committee of

Unsecured Creditors (the "UCC"); and the Court having jurisdiction over this matter pursuant to

28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States

District Court for the Southern District of New York, dated January 31, 2012; and the Court having

found that the relief request in the Motion is in the best interests of the Debtors, their estates, their

creditors and other parties in interest; and the Court having found that the Ad Hoc Group's notice

of the Motion was appropriate and no other notice need be provided; and the Court having

reviewed the Motion and having determined that the legal and factual bases set forth in the Motion

---

[4]     Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Motion.

establish just cause for the relief granted herein; and upon all of the proceedings had before the

Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT** the Motion is granted and the Debtors are ordered to

produce the 77 (and any other) documents listed on the Privilege Log and previously withheld.


Dated: _____, 2023

New York, New York

_____
HONORABLE SEAN H. LANE
UNITED STATE BANKRUPTCY JUDGE

**EXHIBIT B**

**Relevant Cases**

566 B.R. 305
United States Bankruptcy Court, E.D. New York.

IN RE HYPNOTIC TAXI LLC, et al., Debtors.

Citibank, N.A., Plaintiff,

v.

Bombshell Taxi LLC, et al., Defendants.

Case No. 15–43300 (CEC)

|

Adv. Pro. No.: 15–01185 (CEC)

|

Signed April 10, 2017

**Synopsis**

**Background:** Bank filed state court action against borrowers
and individual who had guaranteed borrowers' repayment of
more than $31 million in bank loans. After cause of action
was removed to federal court following commencement
of borrowers' bankruptcy case, bank moved to compel
production of allegedly privileged information, on theory that
any privilege was lost due to sharing of this information
between guarantor and trusts, and guarantor and trusts
asserted that common interest doctrine applied.

**Holdings:** The Bankruptcy Court, Carla E. Craig, Chief
Judge, held that:

[1] bare assertion that common interest existed between
guarantor and trusts, without any description of nature of that
interest, was insufficient to support invocation of common
interest doctrine;

[2] even if there would be some benefit to trusts if guarantor
prevailed in suit by bank, because bank's failure to obtain
judgment against guarantor would mean that bank could
not seek to attach or execute on assets that guarantor had
transferred to trusts, this was insufficient, without more, to
establish common legal interest between them; and

[3] absent showing that guarantor of bank loans, after settling
trusts for benefit of his heirs and/or parents, and after
transferring his assets to trusts, had retained some beneficial
or remainder interest therein, neither he nor the trusts
established existence of requisite common legal interest.

Motion granted; production ordered.

West Headnotes (15)

[1]  **Bankruptcy** 🔑 Related proceedings

**Bankruptcy** 🔑 Consent to or Waiver of
Objections to Jurisdiction or Venue

While bankruptcy courts may not enter final
orders in non-core, "related to" proceedings
without consent of the parties, they may enter
interlocutory orders in such proceedings.

[2]  **Bankruptcy** 🔑 Particular proceedings or
issues

**Bankruptcy** 🔑 Proceedings and order

Order directing the production of discovery is
"interlocutory order," which bankruptcy court
may enter in non-core proceeding even without
parties' consent.

[3]  **Privileged Communications and
Confidentiality** 🔑 Common interest doctrine;
joint clients or joint defense

Common interest doctrine is not an independent
privilege, but rather an extension of attorney-
client privilege.

[4]  **Federal Civil Procedure** 🔑 Work Product
Privilege; Trial Preparation Materials

**Privileged Communications and
Confidentiality** 🔑 Communications
Through or in Presence or Hearing of Others;
Communications with Third Parties

Common interest doctrine serves as exception
to the general rule that voluntary disclosure of
confidential, privileged material to third-party
waives any applicable privilege, and applies
to materials protected by both attorney-client
privilege and work product doctrine.

1 Case that cites this headnote

**[5]    Privileged Communications and Confidentiality** 🔑 Common interest doctrine; joint clients or joint defense

Common interest doctrine applies, to prevent the disclosure of privileged materials from resulting in a waiver of the privilege, in situations in which a joint defense effort or strategy has been decided upon and undertaken by parties and their respective counsel.

**[6]    Privileged Communications and Confidentiality** 🔑 Construction in general

Privileges should be narrowly construed and expansions cautiously extended.

**[7]    Privileged Communications and Confidentiality** 🔑 Presumptions and burden of proof

Party asserting that a privilege exists by virtue of common interest doctrine bears burden of establishing each element necessary to demonstrate its applicability.

**[8]    Privileged Communications and Confidentiality** 🔑 Weight and sufficiency

To demonstrate that common interest doctrine applies, the party relying on this doctrine to assert that a privilege still exists must produce competent proof, usually through admission of affidavits, deposition testimony or other admissible evidence; party cannot satisfy its burden by mere conclusory or ipse dixit assertions in unsworn motion papers authored by attorneys.

1 Case that cites this headnote

**[9]    Privileged Communications and Confidentiality** 🔑 Common interest doctrine; joint clients or joint defense

**Privileged Communications and Confidentiality** 🔑 Waiver of privilege

To establish that an otherwise waived privilege is preserved under common interest doctrine, it must be shown: (1) that party or parties asserting the applicability of this doctrine share a common legal interest with party or parties with whom privileged information was shared, and (2) that the sharing of privileged information was intended to be in furtherance of the common legal interest shared by the parties; if each of these elements is not established, then the disclosure of the privileged information constitutes a waiver of privilege.

2 Cases that cite this headnote

**[10]    Privileged Communications and Confidentiality** 🔑 Common interest doctrine; joint clients or joint defense

In order for party to invoke common interest doctrine to prevent a sharing of privileged information from resulting in waiver of privilege, the interest shared by parties among whom the privileged information passed must be legal in nature; mere existence of common business strategy or shared commercial interest, even if combined with the anticipation of or concern about litigation, is not enough to permit party to invoke the doctrine.

**[11]    Privileged Communications and Confidentiality** 🔑 Common interest doctrine; joint clients or joint defense

Parties among whom privileged information is passed must share identical, and not merely similar, legal interest in order for common interest doctrine to apply to prevent waiver of privilege.

1 Case that cites this headnote

**[12]    Privileged Communications and Confidentiality** 🔑 Common interest doctrine; joint clients or joint defense

Shared desire to succeed in legal action, or even a coordinated legal strategy, is insufficient to support invocation of common interest doctrine, to prevent a sharing of privileged information

from resulting in waiver of privilege, where there is only a common commercial interest and no identity of legal interests.

1 Case that cites this headnote

[13]  **Bankruptcy**  Privilege

Bare assertion that common interest existed between individual who was liable as guarantor on multimillion dollar loans and trusts which he had settled, and to which he had transferred his assets after being named as defendant in lawsuit brought by lender, without any description of nature of that interest, was insufficient to support invocation of common interest doctrine to prevent sharing of allegedly privileged information between guarantor and trusts from resulting in waiver of privilege.

[14]  **Bankruptcy**  Privilege

Even if there would be some benefit to trusts in event that guarantor of bank loans prevailed in suit against him by bank, because bank's failure to obtain judgment against guarantor would mean that bank could not seek to attach or execute on assets that guarantor had transferred to trusts after being named as defendant in bank's lawsuit, this was insufficient, without more, to establish common legal interest between guarantor and trusts, as required for invocation of common interest doctrine to prevent sharing of allegedly privileged information between guarantor and trusts from resulting in waiver of privilege.

[15]  **Bankruptcy**  Privilege

Absent showing that guarantor of bank loans, after settling trusts for benefit of his heirs and/or parents, and after transferring his assets to trusts, had retained some beneficial or remainder interest therein, neither he nor the trusts established existence of common legal interest, such as would prevent a sharing of privileged information between guarantor and trusts, after guarantor was named as defendant in

lawsuit brought by bank, from resulting in waiver of privilege.

**Attorneys and Law Firms**

**\*307** Jantra Van Roy, Esq., Nathan Schwed, Esq., Zeichner Ellman & Krause LLP, 1211 Avenue of the Americas, New York, NY 10036, Attorneys for the Plaintiff

Paul S. Hollander, Esq. Margreta M. Morgulas, Esq., Okin Hollander LLC, 500 Frank W. Burr Blvd., Suite 40, 2nd Floor, Glenpointe Centre West, Teaneck, New Jersey 07666, Attorneys for The Lindy Funding Trust, The Evelyn Funding Trust, The Kelly, Funding Trust, and The Birkin Funding Trust

Brett A. Berman, Esq. Fox Rothschild LLP, 2000 Market St., 20th Floor, Philadelphia PA 19103, Attorneys for Defendant Evgeny Freidman

Michael D. Sirota, Esq. David Bass, Esq., Cole Schotz P.C., 1325 Avenue of the Americas, 19th Floor, New York, New York 10019, Attorneys for Defendant Evgeny Freidman

**\*308**  DECISION

CARLA E. CRAIG, Chief United States Bankruptcy Judge

This matter comes before the Court on the motion of Citibank, N.A. ("Citibank") for an order directing The Lindy Funding Trust, The Evelyn Funding Trust, The Kelly Funding Trust, and The Birkin Funding Trust (collectively, the "Trusts"), Evgeny Freidman, and their respective counsel to produce to Citibank all communications (including attachments) between (i) Freidman and/or any of Freidman's counsel on the one hand and (ii) the Trusts and/or any of the Trusts' counsel on the other hand. The Trusts and Freidman oppose Citibank's motion, arguing that the communications are protected by the common interest doctrine. Because Freidman and the Trusts have not met the burden to establish their entitlement to the protections of common interest doctrine, Citibank's motion is granted.

JURISDICTION

**[1]** **[2]** This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012. This non-core proceeding is related to these bankruptcy cases.

Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.), 980 F.2d 110, 114 (2d Cir. 1992). A bankruptcy judge may hear a non-core proceeding that is related to a bankruptcy case. 28 U.S.C. § 157(c)(1). Although bankruptcy courts may not enter final orders in non-core proceedings absent consent of the parties, bankruptcy courts may enter interlocutory orders in non-core proceedings. O'Toole v. McTaggart (In re Trinsum Grp., Inc.), 467 B.R. 734, 739–40 (Bankr. S.D.N.Y. 2012). An order directing the production of the discovery sought by Citibank is interlocutory. See Chase Manhattan Bank, N.A. v. Turner & Newall, PLC, 964 F.2d 159 (2d Cir. 1992); Bower v. Weisman (In re Weisman), 835 F.2d 23 (2d Cir. 1987).

## BACKGROUND

The facts set forth below are not in dispute except where otherwise noted.

### A. Citibank's State Court Action
On March 5, 2015, Citibank began this action by filing a summons and complaint in Supreme Court, New York County (Index No. 650691/15) (the "State Court Action"), asserting twelve causes of action against Freidman and the other defendants. Citibank seeks, among other things, a judgment against Freidman as guarantor of three loans totaling $31.5 million in principal amount extended by Citibank to entities closely held by Freidman (the "Loans"). (Verified Compl., ECF No. 2–2, ¶¶ 178–183.) [1]

The Loans are secured by taxi medallions owned by the borrowers, who are the debtors in these procedurally consolidated bankruptcy cases (the "Debtors"). [2] On July 22, 2015, after the state court entered an order allowing Citibank to seize the taxi medallions, which was stayed pending appeal on the condition that defendants post a $50 million bond, the Debtors, unable to **\*309** post the bond, commenced these bankruptcy cases. [3] (Pet., Case No. 15–43300–CEC, ECF No. 1; Aff. of Evgeny Freidman, Case No. 15–43300–CEC, ECF No. 2, ¶¶ 39–46.)

On July 29, 2015, the Debtors removed the State Court Action to the United States District Court for the Southern District of New York, and after transfer to the United States District Court for the Eastern District of New York, the action was referred to this Court by order dated October 28, 2015. (Notice of Removal, ECF No. 1.)

In February, 2016, Citibank filed a motion seeking summary judgment against Freidman on his guaranties of the Loans and dismissal of his counterclaims. (Pl.'s Mot. for Summ. J., ECF No. 92.) On March 30, 2017, this Court issued proposed findings of fact and conclusions of law, pursuant to Fed. R. Bankr. P. 9033, recommending that Citibank's motion be granted. (Proposed Findings of Fact and Conclusions of Law, ECF No. 418.)

### B. The Transfers to the Trusts
On August 1, 2003, Freidman purchased residential real property located at 136 E 65th Street, New York, New York. (Joint Pre–Trial Order ("JPTO"), ECF No. 411, ¶ 5(1).) On March 7, 2011, Freidman transferred the 65th Street Property to the 136 East 65th Street Irrevocable Residence Trust U/A 10/28/2010, a trust settled by Freidman under New York law. (JPTO, ECF No. 411, ¶ 5(1).)

On November 11, 2008, the 200 East 66th Street Residence Trust U/A 6/15/08, a trust settled by Freidman under New York law, purchased a condominium located at 200 E 66th Street, Apt. A1101, New York, New York. (JPTO, ECF No. 411, ¶ 5(3).)

On January 25, 2013, Freidman purchased real property located at 108 Halsey Street, Bridgehampton, New York. (JPTO, ECF No. 411, ¶ 5(6).) On July 10, 2013, Freidman transferred that property to the 108 Halsey Street Irrevocable Residence Trust U/A February 2013 ("Halsey Street Residence Trust," and together with the 65th Street Residence Trust and the 66th Street Residence Trust, the "New York Residence Trusts"), a trust settled by Freidman under New York law. (JPTO, ECF No. 411, ¶ 5(6).)

On or about April 17, 2015, after Citibank commenced this action against Freidman, the trustees of the 65th Street Residence Trust transferred the 65th Street Property to the East 65th Street Owners LLC ("East 65th Street LLC"), a limited liability company organized under the laws of the State of New York on or about April 1, 2015, and whose

membership interests were titled in Freidman. (JPTO, ECF No. 411, ¶ 5(2).)

Also on April 17, 2015, the trustees of the 66th Street Residence Trust transferred the 66th Street Property to 66th Street Unit Owners LLC ("66th Street LLC"), a limited liability company organized under the laws of the State of New York on or about April 1, 2015, and whose membership interests were titled in Freidman.

On May 27, 2015, the trustees of the Halsey Street Residence Trust transferred the Halsey Street Property to Halsey Street Owners LLC ("Halsey Street LLC," and together with East 65th Street LLC and 66th Street LLC, the "Residential LLCs"), a limited liability company **\*310** organized under the laws of the State of New York, and whose membership interests were titled in Freidman. (JPTO, ECF No. 411, ¶ 5(7).)

In or about June, 2015, Freidman created the Trusts, and pursuant to assignments dated June 15, 2015, he transferred (1) his interests in the 65th Street LLC to the Lindy Funding Trust; (2) his membership interests in the 66th Street LLC to The Evelyn Funding Trust; and (3) his membership interests in Halsey Street LLC to The Lindy Funding Trust. (Trusts' CPLR 6221 Pet., ECF No. 100, ¶¶ 3, 6, 9; JPTO, ECF No. 411, ¶ 5(5).)

In addition, in or about March, 2015, Freidman transferred parcels of real property held as investments to twenty-eight separate limited liability companies and corporations controlled by him and established for that purpose (the "Business Real Estate Entities," and together with the Residential LLCs, the "Real Estate Entities"). Freidman thereafter transferred all of his interests in the Business Real Estate Entities to the Trusts. (Opp'n to Citibank's Mem. of Law Regarding Common Interest Privilege/Protection, ECF No. 395, ¶ 12.)

As a result of these transfers, all of Freidman's interests in the Real Estate Entities were transferred to the Trusts. (JPTO, ECF No. 411, ¶ 5(10).)

## C. The Order of Attachment and the Trusts' Petition

On November 5, 2015, pursuant to [] CPLR 6210, Citibank moved by order to show cause in this Court for a temporary restraining order and order of attachment, seeking to restrain any transfer of assets in which Freidman has an interest,

and to restrain any further transfer of the assets transferred by Freidman to the Trusts. (Mot. for Order of Attach. and TRO, ECF No. 4.) Citibank sought this relief based upon the contention that Freidman had transferred his interests in the Real Estate Entities to the Trusts with intent to defraud his creditors or frustrate the enforcement of a judgment that might be entered in Citibank's favor, which constituted grounds for attachment under [] New York Civil Practice Law and Rules ("CPLR") 6201(3). On November 5, 2015, a temporary restraining order (the "TRO") was issued pursuant to [] CPLR 6210, restraining any transfers of Freidman's property or property of the Trusts not in the ordinary course of business. (Order to Show Cause and TRO, ECF No. 6.)

On November 12, 2015, a hearing was held on Citibank's motion for an order of attachment, at which it was disclosed that the trustees of the Trusts, who were individuals located in New York, resigned following the issuance of the TRO. (Tr. 11/12/15, Case No. 15–43300–CEC, ECF No. 116, 8:2–7, 33:5–9.)[4] The following day, it was disclosed that Freidman had appointed, as successor trustees for all of the Trusts, two individuals located in Moscow. (Letter, ECF No. 24.)

On November 17, 2015, an order of attachment (the "Order of Attachment," ECF No. 28) and an amended temporary restraining order (the "Amended TRO," ECF No. 29) were entered in favor of Citibank. The Order of Attachment authorized levy on assets transferred by Freidman to the Trusts, and the Amended TRO restrained various parties, including the Trusts, from, among other things, transferring or encumbering those assets.

On November 19, 2015, the Court stayed the Order of Attachment pending a hearing. (Order, ECF No. 34.) On November 30, 2015, an evidentiary hearing was held **\*311** on Citibank's motion for an order of attachment.

On January 12, 2016, the Court issued a decision finding that grounds for attachment existed under [] CPLR 6201(3) because Freidman transferred his interests in the Real Estate Entities to the Trusts with intent to defraud his creditors or to frustrate a judgment that might be entered in Citibank's favor. (Decision, ECF No. 73.) For that reason, and because the elements of [] CPLR 6212(a) were satisfied, the Court determined that Citibank was entitled to an order of attachment against Freidman's property and that, under § 278 of the New York Debtor and Creditor Law, such an order

of attachment could properly reach the assets transferred to the Trusts in June, 2015. On January 15, 2016, an order was issued an order lifting the stay of the Order of Attachment. (Order, ECF No. 80.)

On March 23, 2016, the Trusts filed a petition pursuant to CPLR 6221 (the "Trusts' Petition"), claiming an adverse interest in the property attached by the Order of Attachment, and challenging the attachment of the interests in the Real Estate Entities held by the Trusts. (Trusts' CPLR 6221 Pet., ECF No. 100.) The Trusts argue, among other things, that the Court lacks personal jurisdiction over the Trusts because the Order of Attachment was not served on the current trustees, and lacks subject matter jurisdiction because, at the time the Order of Attachment was issued, Freidman did not own any interests in the Real Estate Entities. (Trusts' CPLR 6221 Pet., ECF No. 100, 18, 21–22.)

On March 25, 2016, Citibank filed an application for an order to show cause seeking expedited discovery regarding the appointments and resignations of the trustees of the Trusts and the protector of the trusts. (Mot. for Order to Show Cause, ECF No. 104.) A conference was held that day, at the conclusion of which the Court set a schedule for expedited discovery. (Tr. 3/25/16, ECF No. 110.)

On April 11, 2016, Citibank filed another application for an order to show cause seeking an order directing Freidman and the Trusts to disclose (1) whether they have transferred or otherwise disposed of ownership interests in any of the Real Estate Entities; (2) the details of any transfers or other disposition by any of the Trusts of ownership interests in any of the Real Estate Entities; (3) the names of any past or current managing member for each of the Real Estate Entities that are LLCs or any person otherwise authorized to manage the affairs of those LLCs; and (4) the names of any past or current presidents of each of the Real Estate Entities that are corporations. (Mot. for Order to Show Cause, ECF No. 124.) That same day, the Trusts sought a protective order pursuant to Fed. R. Civ. P. 26(b)(2)(C)(iii) and 26 (c)(1)(D), incorporated in Fed. R. Bankr. P. 7026, barring Citibank from seeking responses to its request for document production and compelling the attendance of the current and former trustees of the Trusts at depositions. (Mot. for Protective Order, ECF No. 125.) In response, Citibank filed a motion seeking to prevent the Trusts from relying on facts in relation to which the Trusts refuse to produce document discovery, and to produce the former and current trustees of the Trusts for deposition. (Cross Mot. for Order of Preclusion, ECF No.

148.) A hearing on these motions was scheduled for April 22, 2016.

On April 15, 2016, Citibank filed a motion seeking an order declaring that the levies by the U.S. Marshals upon the assets Freidman transferred to the Trusts were effective, and seeking related relief. **\*312** (Mot. for Order Declaring Levies by U.S. Marshals Effective, ECF No. 142.)

On April 19, 2016, the Trusts filed an amended petition under CPLR 6221 to challenge, among other things, the Order of Attachment, the Amended TRO, and the Court's determination to permit discovery in connection with the Petition. (Trusts' Am. Pet., ECF No. 150.) The Trusts again argued that the Court lacks personal jurisdiction over the Trusts and lacks in rem jurisdiction over the Trusts' property, and that Citibank failed to properly serve the Trusts. (Trusts' Am. Pet., ECF No. 150, 12, 14–15.) The Trusts also argued that they are not the proper garnishee under CPLR 6202 because they are not holding any property owned by Freidman nor do they owe a debt to him. (Trusts' Am. Pet., ECF No. 150, 12–13.) The Trusts further argued that the discovery sought by Citibank is irrelevant to the determination of the Trusts' Amended Petition. (Trusts' Am. Pet., ECF No. 150, 10–11.) The Trusts, as permitted by CPLR 6221, have not consented to the jurisdiction of this Court with respect to any matter other than the claims asserted in the petition.

On April 21, 2016, Citibank responded to the Trusts' Amended Petition, filing opposition which included a cross-motion seeking a determination that Freidman and the Trusts are alter egos. (Opp'n and Cross Mot. for Alter Ego Determination, ECF No. 156.)

A hearing on Citibank's motions for disclosure and for preclusion, and on the Trusts' motion for a protective order, was held on April 22, 2016. On April 29, 2016, the Court issued a decision and order, which was amended on May 9, 2016. (Decision and Order, ECF No. 173; Am. Order, ECF No. 190.) The May 9, 2016 amended order denied the Trusts' motion for a protective order, and directed, among other things, that the Trusts and Freidman respond to certain discovery requests. (Am. Order, ECF No. 190.) The order also directed the Trusts and Freidman to provide a privilege log identifying any responsive documents withheld on the basis of privilege. (Am. Order, ECF No. 190.)

Discovery continued through the summer. On October 5, 2016, the Court issued an order in response to various

motions regarding discovery, directing, among other things, that Freidman and the Trusts certify in writing that they have produced all non-privileged documents in their possession, custody, or control as previously ordered by the Court, and that they have delivered to Citibank a privilege log identifying all responsive documents withheld on the basis of privilege, including the common interest privilege. (Am. Order, ECF No. 301.)

On October 21, 2016, Citibank filed an application for an order to show cause to compel Freidman, the Trusts, and Okin Hollander LLC ("Okin Hollander"), attorneys to the Trusts, among others, to immediately comply with the Court's October 5, 2016 order, which was scheduled for a hearing on November 2, 2016. (Mot. for Order to Show Cause, ECF No. 314; Order to Show Cause, ECF No. 322.)

At the hearing on November 2, 2016, the Court instructed the Trusts and Freidman to provide amended certifications to comply with the October 5, 2016 order. (Tr. 11/2/16, ECF No. 328.) The Court also instructed Freidman to determine whether Cole Schotz, P.C. ("Cole Schotz"), a law firm that also represented Freidman and/or his business entities, was in possession of any documents responsive to Citibank's document requests, and, if so, directed that all responsive documents in the possession of Cole Schotz be provided to Citibank in accordance with the prior discovery orders. (Tr. 11/2/16, ECF No. 328, 17:2–7.)

**\*313**  On January 10, 2017, Citibank's attorneys received documents produced by Cole Schotz, together with a privilege log identifying documents being withheld by Cole Schotz on the basis of privilege.

On January 17, 2017, Citibank filed a motion (the "Adverse Inference Motion"), pursuant to Fed. R. Civ. P. 37, made applicable by Fed. R. Bankr. P. 7037, seeking, among other things, an inference that Freidman and/or Cole Schotz controlled and/or directed the Trusts and the Trusts' counsel, Okin Hollander, based upon Okin Hollander's alleged noncompliance with discovery orders by failing to disclose communications with Cole Schotz on its privilege log dated October 25, 2016. (Adverse Inference Mot., ECF No. 348, ¶¶ 29–37.) Citibank claimed that Okin Hollander failed to disclose hundreds of communications with Cole Schotz, which appear on the privilege log of Cole Schotz produced on January 10, 2017, but did not appear on any Okin Hollander privilege log. (Adverse Inference Mot., ECF No. 348, ¶¶ 29–37.)

On January 27, 2017, Citibank filed a proposed order to show cause and an application seeking, in part, the same relief requested in the Adverse Inference Motion. (Mot. for Order to Show Cause, ECF No. 356.) Citibank requested an order (1) determining that the failure of Freidman, the Trusts, and their respective counsel to produce, or disclose in a privilege log, communications and documents concerning communications between the Trusts and their counsel, Okin Hollander, and Freidman and his counsel, Cole Schotz and Fox Rothschild LLP ("Fox Rothschild"), was knowing and intentional and that any asserted privileges as to intentionally concealed communications have been waived; (2) requiring Cole Schotz to deliver to the Court, in word searchable format, all invoices for legal services rendered by Cole Schotz to Freidman or any entity affiliated with Freidman; (3) requiring respondents to immediately produce all documents concerning communications between any respondent(s) and Artur Galstian, including any communications withheld on the asserted basis of "common interest privilege" or any other basis; and (4) requiring respondents to immediately produce all documents concerning communications between (i) any Trustee of the Trusts and/or counsel for the Trusts and (ii) Freidman and/or counsel for Freidman, including invoices reflecting same and any communications withheld on the asserted basis of "common interest privilege" or any other basis ("Common Interest Motion"). (Mot. for Order to Show Cause, ECF No. 356.) Citibank has since withdrawn its request for Cole Schotz's invoices and for communications involving Artur Galstian, but continues to seek documents reflecting communications between Freidman and/or his counsel and the Trusts and/or their counsel, on the basis that Freidman and the Trusts have not met their burden to show that they are entitled to invoke the common interest doctrine, and that any entitlement to do so was waived by the failure to properly and timely disclose those communications in privilege logs.

On February 24, 2017, Okin Hollander filed a supplemental privilege log. (Letter, ECF No. 385.) The Trusts also filed opposition to the Common Interest Motion, asserting, among other things, that the discrepancy between the Cole Schotz privilege log and the Okin Hollander privilege logs was attributable, in part, to the fact that Okin Hollander's privilege logs had identified only the last email in a "thread," while Cole Schotz had logged each email as a separate communication. (Opp'n to Adverse Inference Mot., ECF No. 375.)

A hearing with respect to a number of matters, including the Common Interest **\*314** Motion, was held on February 27, 2017, at the conclusion of which the parties were directed to submit a statement of agreed facts and additional briefings with respect to the Common Interest Motion. (Tr. 2/27/17, ECF No. 425, 138–139.) After the parties unsuccessfully attempted to arrive at an agreed statement of facts on which the Common Interest Motion could be decided, the matter was set down for a trial on March 27, 2017. The parties filed pretrial submissions (ECF Nos. 368, 390, 391, 394, 395, 396, 397, 401), a Joint Pre-Trial Order (JPTO, ECF No. 411), and post-trial submissions (ECF Nos. 414, 423, 424, 426).

Citibank seeks production of these communications on an expedited basis, in advance of a trial that has been scheduled for May 2, 2017 on various issues relating to, among other things, the Trusts' Petition, and the adequacy and propriety of Citibank's levies. This opinion decides the Common Interest Motion.

<u>DISCUSSION</u>

Though the procedural history is lengthy, the issue on this motion may be simply stated: whether communications between the Trusts and their attorneys, on the one hand, and Freidman and his attorneys, on the other hand, are protected from disclosure by the common interest doctrine, and if so, whether the disclosure of those communications should nevertheless be required because of the Trusts' failure to properly and timely identify these communications in privilege logs provided to Citibank. Because the Trusts and Freidman have not met the burden to demonstrate that the common interest doctrine applies, it is not necessary to resolve the second question.

**[3]    [4]    [5]** The common interest doctrine is not an independent privilege, but rather "an extension of the attorney-client privilege." Pem–Am., Inc. v. Sunham Home Fashions, LLC, No. 03 CIV. 1377JFKRLE, 2007 WL 3226156, at \*2 (S.D.N.Y. Oct. 31, 2007) (citing United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir.1989)). The doctrine serves as "an exception to the general rule that voluntary disclosure of confidential, privileged material to a third-party waives any applicable privilege," and applies to materials protected by both the attorney-client privilege and the work product doctrine. HSH Nordbank AG N.Y. Branch v. Swerdlow, 259 F.R.D. 64, 71 (S.D.N.Y.

2009)(citations omitted). The common interest doctrine arises in situations where "a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir. 1989) (citing United States v. Bay State Ambulance and Hosp. Rental Serv., 874 F.2d 20, 28 (1st Cir.1989)).

**[6]    [7]    [8]    [9]** "Privileges should be narrowly construed and expansions cautiously extended." United States v. Weissman, 195 F.3d 96, 100 (2d Cir. 1999) (citing University of Pennsylvania v. EEOC, 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990)). The party asserting that a privilege exists by virtue of the common interest doctrine bears the burden of establishing each element necessary to demonstrate its applicability. Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 472 (S.D.N.Y. 2003). "Such a showing must be based on competent evidence, usually through the admission of affidavits, deposition testimony or other admissible evidence." Id. "The burden cannot be met by 'mere conclusory or ipse dixit assertions' in unsworn motion papers authored by attorneys." Id. (quoting von Bulow by Auersperg v. von Bulow, 811 F.2d 136, 146 (2d Cir. 1987), cert. denied, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987)). To establish that an otherwise waived privilege **\*315** is preserved by the common interest doctrine, it must be shown: (1) that the party or parties asserting the applicability of the doctrine share a common legal interest with the party or parties with whom the information protected by the privilege was shared and (2) that the sharing of the privileged information was intended to be in furtherance of the common legal interest shared by the parties. Id. at 471. If these elements are not met, the disclosure of the privileged information constitutes a waiver of privilege. See In re F.T.C., No. M18-304 (RJW), 2001 WL 396522, at \*2 (S.D.N.Y. Apr. 19, 2001) (citations omitted).

**[10]    [11]    [12]** In order to invoke the common interest doctrine, the interest shared by the parties, among whom the privileged information passed, must be legal; the mere existence of a common business strategy or shared commercial interest, even if combined with the anticipation of or concern about litigation, is not enough to invoke the doctrine. See Bank Brussels Lambert v. Credit Lyonnais

In re Hypnotic Taxi LLC, 566 B.R. 305 (2017)

(Suisse) S.A., 160 F.R.D. 437, 447 (S.D.N.Y. 1995), see also Gulf Islands Leasing, 215 F.R.D. at 472–73. Such a legal interest must also be identical, not merely similar. See Gulf Islands Leasing, 215 F.R.D. at 471 (citing N. River Ins. Co. v. Columbia Cas. Co., No. 90 CIV. 2518 (MJL), 1995 WL 5792, at *3 (S.D.N.Y. Jan. 5, 1995)). Furthermore, the shared desire to succeed in a legal action does not meet the requirement of the doctrine. See Shamis v. Ambassador Factors Corp., 34 F.Supp.2d 879, 893 (S.D.N.Y.), on reargument, 187 F.R.D. 148 (S.D.N.Y. 1999) (citing Int'l Ins. Co. v. Newmont Min. Corp., 800 F.Supp. 1195, 1196 (S.D.N.Y. 1992)), see also N. River Ins. Co. v. Columbia Cas. Co., No. 90 CIV 2518 (MJL), 1995 WL 5792, at *4 (S.D.N.Y. Jan. 5, 1995) (Holding that a shared desire to succeed in litigation "does not qualify as an identical legal interest."). "[T]he existence even of...a coordinated legal strategy is insufficient where there is only a common commercial interest and no identity of legal interests." Gulf Islands Leasing, 215 F.R.D. at 473.

For example, courts have found a common legal interest sufficient to invoke the common interest doctrine between an agent for a syndicated loan group and the members of the group, in an action against the borrower brought by the agent on behalf of the lending group, HSH Nordbank, 259 F.R.D. at 64, 73; and between an assignor and assignee of trademark rights, in an action involving a challenge to the assignee's right to use the trademark and a challenge to the validity of the assignment agreement, where the non-party assignor had a contractual duty to indemnify the assignee. Am. Eagle Outfitters, Inc. v. Payless ShoeSource, Inc., No. CV 07-1675 ERK VVP, 2009 WL 3786210, at *3 (E.D.N.Y. Nov. 12, 2009).

On the other hand, an asserted common legal interest was found insufficient to invoke the common interest doctrine between two wholly owned subsidiaries of a common parent, even where one subsidiary had financed the plaintiff's purchase of an aircraft from the other, and the finance and purchase agreements contained cross-defaults. See Gulf Islands Leasing, 215 F.R.D. at 467–69. The court rejected the contention that the subsidiaries shared a common legal interest that the plaintiff not breach any of the agreements with either subsidiary, characterizing the non-party subsidiary's ultimate interest in the dispute as a desire to ensure that the sums owed under its agreements with the plaintiff were paid, and noting that "[a] concern to ensure the payment of money is commercial in nature and does not qualify for protection under the common interest rule." Id. at 472–73.

**\*316** In the instant case, Freidman and the Trusts shared communications protected by the attorney-client privilege with each other and their respective counsel. Despite multiple submissions, and the evidentiary hearing held on March 27, 2017, neither Freidman, nor the Trusts, have met their burden to demonstrate that either shares a common legal interest with the other sufficient to invoke the common interest doctrine and thereby preserve the privileged nature of the shared communications notwithstanding such disclosure.

A. Cole Schotz's Submissions Regarding the Common Interest Doctrine

Cole Schotz has presented no evidence, either at trial or in papers, which establishes the existence of a common legal interest between Freidman and the Trusts. Cole Schotz, in their objection to Citibank's OSC, makes a single reference to "parties with whom Freidman has a common interest." (Objection to Mot. for Order to Show Cause, ECF No. 368, 3.) No mention is made of the type of interest shared by Freidman and these parties, be it legal, commercial, or otherwise. Cole Schotz also states that they have "[a]t all relevant times...acted under the understanding that a valid common interest privilege exists between Freidman and his counsel, the Trusts and their counsel." Id. at 5 n.6. However, Cole Schotz fails to provide any information about what facts led them to this conclusion. Finally, Cole Schotz states that they had been informed, by the Trusts, that the Trusts had informed Citibank that the common interest doctrine applied to preserve the privilege. See id.

[13] Here, Cole Schotz has made a bare assertion that a common interest exists, stated their belief that the common interest doctrine applies, and noted that Citibank had been made aware of the Trusts' position that the common interest doctrine was applicable. None of this establishes that Freidman and the Trusts share a common legal interest sufficient to invoke the common interest doctrine. See Gulf Islands Leasing, 215 F.R.D. at 472 ("[I]t is the burden of the party asserting a privilege to establish its existence" and "[s]uch a showing must be based on competent evidence."). As Cole Schotz has failed to demonstrate the existence of a common legal interest between the Trusts and Freidman, Cole Schotz has not succeeded in meeting the burden required

to show that the attorney-client privilege, created by their relationship with Freidman, was preserved by the common interest doctrine and not waived through communications with the Trusts and their attorneys.

## B. The Trusts' and Freidman's Claims Regarding the Common Interest Doctrine

[14]   The Trusts, through their attorneys, Okin Hollander, and Freidman, through his attorneys, Fox Rothschild, have also failed to show that they share a common legal interest. (Non-Party Trusts' Opp'n to Mot. for Adverse Inferences, ECF No. 375; Opp'n to Citibank's Mem. of Law Regarding Common Interest Privilege/Protection, ECF No. 395; Decl. of Paul S. Hollander, ECF No. 396; Trusts' Post-Trial Submission, ECF No. 423.) The Trusts' and Freidman's joint opposition on this issue states that the Trusts' retention of Okin Hollander related to the defense and resolution of the State Court Action and that they "share a common interest with respect to the State Court Action." (Opp'n to Citibank's Mem. of Law Regarding Common Interest Privilege/Protection, ECF No. 395, ¶¶ 22–23, 50.) The opposition neither details, nor describes, the nature of that common interest. The Trusts are not **\*317** defendants in the State Court Action, and even if the Trusts would benefit if Freidman were successful in the State Court Action (on the theory that if Citibank fails to obtain a judgment against Freidman, it cannot seek to attach or execute on the assets Freidman transferred to the Trusts), this is insufficient to establish a common legal interest. Just as in 🔖 Gulf Islands Leasing, the non-party subsidiary's desire to ensure the payment of sums owed under its agreements with the plaintiff was insufficient to invoke the doctrine, here the Trusts' desire to protect their assets from attachment or execution falls short of a common legal interest with Freidman. 🔖 215 F.R.D. at 472–73. At most, this constitutes a shared desire that Freidman should succeed in the State Court Action. See 🔖 Shamis, 34 F.Supp.2d at 893 ("[S]haring a desire to succeed in an action does not create a 'common interest.' "); 🔖 N. River Ins. Co., 1995 WL 5792 at \*4 (The shared desire to succeed in litigation "does not qualify as an identical legal interest.").

[15]   In their post-trial submission, the Trusts assert that the common legal interest they share with Freidman is "the protection of the assets validly vested in the Non-Party Trusts for the benefit of Freidman's heirs and/or parents." (Trusts' Post-Trial Submission, ECF No. 423, ¶¶ 41, 43–44.) However, the Trusts have not identified any legal

interest Freidman has in protecting the property they hold. Although Freidman is the settlor of the Trusts, and transferred his interests in the Real Estate Entities to the Trusts, no showing has been made that Freidman retains any interest in the Trusts or in Trust property. (Opp'n to Citibank's Mem. of Law Regarding Common Interest Privilege/Protection, ECF No. 395, ¶ 12). It has not been shown that Freidman is a beneficiary of the Trusts, a trustee of the Trusts, holds a remainder interest in any property held by the Trusts, possesses the power to revoke or amend the Trusts, or retains any interest whatsoever in the property conveyed to the Trusts. Indeed, the evidentiary record shows the contrary: by letters dated March 1, 2016, offered in evidence by Citibank at the hearing as Exhibit HH, Freidman resigned as protector of the Trusts, and was removed as a discretionary beneficiary of the Trusts. See N.Y. Est. Powers & Trusts Law § 7–2.1(a) (McKinney) ("Except as otherwise provided in this article, an express trust vests in the trustee the legal estate, subject only to the execution of the trust."), see also N.Y. Est. Powers & Trusts Law § 7–1.7 (McKinney) ("Every legal estate and interest not embraced in an express trust and not otherwise disposed of remains in the creator.").

As there has not been a showing that Freidman holds a legal or beneficial interest in the property of the Trusts, it appears that Freidman shares only a personal or business interest with the Trusts, i.e. the desire for "the protection of the assets [held by the] Trusts for the benefit of Freidman's heirs and/or parents." (Trusts' Post-Trial Submission, ECF No. 423, ¶¶ 41, 43–44.) Such an interest is not a common legal interest sufficient to invoke the common interest doctrine. See 🔖 Gulf Islands Leasing, 215 F.R.D. at 472–73. As such, neither Freidman, nor the Trusts, have met the burden required to show that the attorney-client privilege, created by their relationships with their respective counsel, was preserved by the common interest doctrine notwithstanding disclosure of otherwise privileged communications by Freidman or his attorneys to the Trusts or their attorneys, or vice versa.

## CONCLUSION

As neither Freidman, nor the Trusts, have met the burden required to demonstrate **\*318** that the common interest doctrine applies, the Court finds that the attorney-client privilege was waived with respect to the communications shared between the Trusts and/or their counsel, on the one hand, and Freidman and/or his counsel, on the other

hand. Accordingly, the Trusts, Freidman, and their respective counsel, are directed to produce all such communications previously requested and withheld on the basis of the common interest doctrine to Citibank on or before April 18, 2017.

**All Citations**

566 B.R. 305

## Footnotes

1   Citations to "ECF No." are to documents filed in Adv. Pro. No. 15–01185–CEC, identified by docket entry number. Citations to "Case No. 15–43300–CEC, ECF No. [ ]" are to documents filed in the main bankruptcy case, In re Hypnotic Taxi LLC, identified by docket entry number.

2   One of the borrowers, Taxi Club Management, Inc., does not own any of the taxi medallions that were pledged to Citibank and is not a debtor in these bankruptcy cases.

3   These cases were commenced under chapter 11, and were converted to cases under chapter 7 on September 22, 2016.

4   "Tr." refers to the transcript of the hearing held on the date specified.

---

**End of Document**                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   11

2017 WL 1393674
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
E.D. New York.

IN RE HYPNOTIC TAXI LLC, et al., Debtors.
Citibank, N.A., Plaintiff,
v.
Bombshell Taxi LLC, et al., Defendants.

Case No. 15–43300 (CEC)
|
Adv. Pro. No.: 15–01185 (CEC)
|
Signed April 18, 2017

**Attorneys and Law Firms**

Jantra Van Roy, Esq., Nathan Schwed, Esq., Zeichner Ellman & Krause LLP, 1211 Avenue of the Americas, New York, NY 10036, Attorneys for the Plaintiff

Paul S. Hollander, Esq., Margreta M. Morgulas, Esq., Okin Hollander LLC, 500 Frank W. Burr Blvd., Suite 40, 2nd Floor, Glenpointe Centre West, Teaneck, New Jersey 07666, Attorneys for The Lindy Funding Trust, The Evelyn Funding Trust, The Kelly, Funding Trust, and The Birkin Funding Trust

Brett A. Berman, Esq., Fox Rothschild LLP, 2000 Market St., 20th Floor, Philadelphia PA 19103, Attorneys for Defendant Evgeny Freidman

Michael D. Sirota, Esq., David Bass, Esq., Cole Schotz P.C., 1325 Avenue of the Americas, 19th Floor, New York, New York 10019, Attorneys for Defendant Evgeny Freidman

## DECISION

Carla E. Craig, United States Bankruptcy Judge

**\*1** This matter comes before the Court on the motion of Mr. Evgeny Freidman ("Freidman") and The Lindy Funding Trust, The Evelyn Funding Trust, The Kelly Funding Trust, and The Birkin Funding Trust (the "Trusts," and, with Freidman, the "Movants") for a stay pending appeal of this Court's order entered on April 10, 2017 (the "Discovery Order"). (Mot. for Stay Pending Appeal, ECF No. 434.) [1] The Discovery Order directed Freidman and the Trusts to produce

all documents previously requested by the Plaintiff, Citibank, N.A. ("Citibank"), and withheld on the basis of the common interest doctrine. (Order, ECF No. 429.) The Discovery Order was entered as a result of this Court's finding, as explained in the decision dated April 10, 2017 (the "Discovery Decision"), that the Movants had not met their burden to show that they shared a common legal interest sufficient to invoke the common interest doctrine. (Decision, ECF No. 430.) In the absence of a common legal interest, the sharing of privileged material between the Trusts and/or their attorneys, on the one hand, and Freidman and/or his attorneys, on the other hand, constitutes a waiver of the attorney-client privilege and work product doctrine with respect to the shared material. See In re F.T.C., No. M18–304 (RJW), 2001 WL 396522, at \*2 (S.D.N.Y. Apr. 19, 2001) (citations omitted). [2]

The materials ordered to be disclosed were the subject of a motion filed by Citibank on January 27, 2017 (the "Discovery Motion"), seeking production on several grounds, including the asserted failure of the Trusts to properly and timely disclose these communications on privilege logs, as well as the claim that the Movants do not share a common legal interest sufficient to invoke the common interest doctrine. (Mot. for Order to Show Cause, ECF No. 356.) The motion was first heard on February 27, 2017, and after the parties unsuccessfully attempted to arrive at an agreed statement of facts, an evidentiary hearing on the Discovery Motion was held on March 27, 2017. (Tr. 2/27/17, ECF No. 425; Tr. 3/27/17, ECF No. 416.) [3]

The documents in question are sought for use in a trial, on a petition filed by the Trusts challenging Citibank's garnishment of their assets pursuant to CPLR 6221 (the "Petition"), scheduled to begin on May 2, 2017, which trial date was set at the February 27 hearing. (Tr. 2/27/17, ECF No. 425.) Pursuant to the Discovery Order, the Movants were directed to produce these documents by April 18. (Order, ECF No. 429.) Instead, they filed an appeal and this motion for a stay, pursuant to Fed. R. Bankr. P. 8007. (Mot. for Stay Pending Appeal, ECF No. 434.)

## JURISDICTION

This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. § 1334(b), and the Eastern District of New York standing order of reference dated August 28, 1986, as amended by order dated December 5, 2012. This

non-core proceeding is related to these bankruptcy cases. Publicker Indus. Inc. v. United States (In re Cuyahoga Equip. Corp.), 980 F.2d 110, 114 (2d Cir. 1992). A bankruptcy judge may hear a non-core proceeding that is related to a bankruptcy case. 28 U.S.C. § 157(c)(1). Although bankruptcy courts may not enter final orders in non-core proceedings absent consent of the parties, bankruptcy courts may enter interlocutory orders in non-core proceedings. O'Toole v. McTaggart (In re Trinsum Grp., Inc.), 467 B.R. 734, 739–40 (Bankr. S.D.N.Y. 2012). An order directing the production of the discovery sought by Citibank is interlocutory. See Chase Manhattan Bank, N.A. v. Turner & Newall, PLC, 964 F.2d 159 (2d Cir. 1992); Bower v. Weisman (In re Weisman), 835 F.2d 23 (2d Cir. 1987). This Court has authority to hear this motion for a stay pending appeal pursuant to Fed. R. Bankr. P. 8007(a).

## DISCUSSION

**\*2** An application for a stay pending appeal from a decision of a bankruptcy court is governed by Bankruptcy Rule 8007, which requires a party to move first in the bankruptcy court for a stay pending appeal and related relief. Fed. R. Bankr. P. 8007(a). The decision to grant or deny a stay pending appeal lies within the discretion of the bankruptcy court. In re Sabine Oil & Gas Corp., 551 B.R. 132, 142 (Bankr. S.D.N.Y. 2016).

In In re Gen. Motors Corp., Bankruptcy Judge Gerber explained the factors to be considered in evaluating an application for a stay pending appeal:

Though the factors that must have to be satisfied have been stated in slightly different ways, and sometimes in a different order, it is established that to get a stay pending appeal under Rule 8005 [4], a litigant must demonstrate that:

(1) it would suffer irreparable injury if a stay were denied;

(2) there is a substantial possibility, although less than a likelihood, of success on the merits of movant's appeal;

(3) other parties would suffer no substantial injury if the stay were granted; and that

(4) the public interest favors a stay.

See, e.g., Hirschfeld v. Bd. of Elections, 984 F.2d 35, 39 (2d Cir.1992); In re DJK Residential, LLC, 2008 WL 650389 (S.D.N.Y. Mar.7, 2008) (Lynch, J.); In re WestPoint Stevens, Inc., No. 06 Civ. 4128, 2007 WL 1346616, at \*4 (S.D.N.Y. May 9, 2007) (Swain, J.).

The burden on the movant is a "heavy" one. See, e.g., DJK, 2008 WL 650389 at \*2; see also United States v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc., 44 F.3d 1082, 1084 (2d Cir.1995). To be successful, the party must "show satisfactory evidence on all four criteria." In re Turner, 207 B.R. 373, 375 (2d Cir. BAP 1997) (citations and internal quotation marks omitted).

In re Gen. Motors Corp., 409 B.R. 24, 30 (Bankr. S.D.N.Y. 2009).

While some lower courts within the Second Circuit have held that the failure of the movant to satisfy any of the four criteria compels denial of a motion for a stay pending appeal, e.g., In re Baker, No. CV05–3487(CPS), 1–01–24227(DEM), 2005 WL 2105802, at \*3 (E.D.N.Y. Aug. 31, 2005), other courts have approached the question as a balancing test. E.g., ACC Bondholder Grp. v. Adelphia Commc'ns Corp. (Adelphia Commc'ns Corp.), 361 B.R. 337, 347 (S.D.N.Y. 2007); Sabine Oil & Gas, 551 B.R. at 142–43. Each of the criteria for a stay pending appeal will be considered in turn.

### A. Irreparable Harm

Movants argue that the disclosure of communications for which a privilege is claimed necessarily constitutes irreparable harm, because once the materials are disclosed, the privilege is lost. (Mot. for Stay Pending Appeal, ECF No. 434.) They cite several cases in which writs of mandamus were granted by the Second Circuit to permit interlocutory review of discovery orders, based, in part, on the conclusion that disclosure of privileged information would create irreparable harm. E.g., In re von Bulow, 828 F.2d 94 (2d Cir. 1987); Chase Manhattan Bank, N.A. v. Turner & Newall, PLC, 964 F.2d 159 (2d Cir. 1992); In re Long Island Lighting Co., 129 F.3d 268 (2d Cir. 1997); In re Cty. of Erie, 473 F.3d 413 (2d Cir. 2007).

2017 WL 1393674

The Second Circuit employs a three-part test to determine whether mandamus review of a discovery order is appropriate, granting the writ only where "(A) the petition raises an important issue of first impression; (B) the privilege will be lost if review must await final judgment; and (C) immediate resolution will avoid the development of discovery practices or doctrine that undermine the privilege." Cty. of Erie, 473 F.3d at 416–17 (citing Turner & Newall and Long Island Lighting Co.). In Turner & Newall, the court explained why limiting disclosure through such means as a confidentiality order may be inadequate to prevent the harm resulting from production of attorney-client privileged documents:

> *3 In the case of the attorney-client privilege, however, a litigant claiming the privilege would probably prefer almost anyone other than adversary counsel to review the documents in question. The attorneys'-eyes-only condition simply does not limit disclosure to persons whose knowledge of the confidential communication is not material to the purpose of the privilege. To the contrary, it allows one kind of critical disclosure—to opposing counsel in litigation—that the privilege was designed to prevent.

964 F.2d at 164.

Notwithstanding this concern, in this case, the harm from requiring the Movants to disclose their communications may be mitigated, at least in part, by limiting disclosure in this adversary proceeding. Review of those communications could be limited to counsel and, potentially, selected representatives of Citibank; their use restricted to this adversary proceeding; and access to the trial transcript and exhibits in this proceeding could be similarly limited. If, on appeal from a final determination of the Trusts' Petition, it is determined that the Movants were entitled to invoke the common interest doctrine, then destruction or return of the disclosed communications can be ordered. To the extent that the outcome of the trial was based upon evidence found on

appeal to be privileged, appropriate appellate relief could be fashioned.

Nevertheless, for the purposes of this motion, it will be assumed that the Movants have satisfied this prong of the four-part test.

B. Substantial Possibility of Success on Appeal

Because the Discovery Order is interlocutory, the Movants' appeal is governed by 28 U.S.C. § 158(a), which provides for district court review of bankruptcy court interlocutory orders and decrees. The standard of review of an interlocutory order of the bankruptcy court under 28 U.S.C. § 158(a) is the standard which governs an interlocutory appeal under 28 U.S.C. § 1292(b) from the district court to the circuit court. Buckskin Realty Inc. v. Greenberg, 552 B.R. 40, 43 (E.D.N.Y. 2016), In re Poseidon Pool & Spa Recreational, Inc., 443 B.R. 271, 275 (E.D.N.Y. 2010); In re Futter Lumber Corp., 473 B.R. 20, 26 (E.D.N.Y. 2012). Section 1292(b) permits review of an interlocutory order only where the order "involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b).

That standard is not met in this case. The question on this appeal is whether the Movants satisfied their burden to demonstrate that they share a common legal interest sufficient to invoke the common interest doctrine. The legal standard for the application of the common interest doctrine is well established. Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466, 471–73 (S.D.N.Y. 2003); HSH Nordbank AG N.Y. Branch v. Swerdlow, 259 F.R.D. 64, 70–72 (S.D.N.Y. 2009). Movants submitted no evidence at trial or otherwise to demonstrate the existence of a common legal interest. (Decision, ECF No. 430.) Based upon the record of this proceeding, it appears that the Trusts and Freidman, their settlor, share at most a common economic or personal interest in the preservation of the Trusts' assets for the benefit of Freidman's relatives, who are beneficiaries of the Trusts. Id. Evidence submitted by Citibank shows that as of March 1, 2016, prior to the filing of the Trusts' petitions, Freidman resigned as protector of the Trusts and was removed as a discretionary beneficiary. (Pl.'s Ex. HH, Hr'g 3/27/17.) No evidence was introduced to show that he has any continuing interest in the Trusts. (Decision, ECF No. 430.) Nor has it been show that the Trusts have any legal

interest in the outcome of Citibank's action against Freidman. Id. They are not defendants in that action, and though they may want Freidman to succeed in avoiding liability, on the theory that Citibank will no longer pursue their assets for attachment or execution, such a shared desire to succeed in litigation does not qualify as the identical legal interest needed to invoke the common interest doctrine. 🔖 Shamis v. Ambassador Factors Corp., 34 F. Supp. 2d 879, 893 (S.D.N.Y.), on reargument, 187 F.R.D. 148 (S.D.N.Y. 1999) (citing 🔖 Int'l Ins. Co. v. Newmont Min. Corp., 800 F. Supp. 1195, 1196 (S.D.N.Y. 1992)) ("[S]haring a desire to succeed in an action does not create a 'common interest.' "); 🔖 N. River Ins. Co. v. Columbia Cas. Co., No. 90 CIV. 2518 (MJL), 1995 WL 5792, at *4 (S.D.N.Y. Jan. 5, 1995) (The shared desire to succeed in litigation "does not qualify as an identical legal interest.").

**\*4** Nor is the second prong which must be satisfied for an interlocutory appeal met here. Rather than advancing the ultimate termination of this litigation, immediate appeal, if accompanied by a stay, would delay the scheduled trial of this matter.

The Movants argue that Citibank is advocating "incompatible legal doctrines and positions" by asserting in response to the Petition that Freidman and the Trusts are alter egos, while simultaneously arguing that they are not entitled to invoke the common interest doctrine. (Mot. for Stay Pending Appeal, ECF No. 434, 20–21.) This argument ignores two points: first, it is the Movants' obligation to show that the doctrine applies, not Citibank's obligation to show that it does not. 🔖 Gulf Islands Leasing, 215 F.R.D. at 472. Second, when the factual record is fully developed at trial, it may become apparent that there is no inconsistency: if, for example, Freidman and the Trusts did not share a common legal interest after March 1, 2016, when Freidman resigned as protector, or at some other point after Citibank's commencement of this litigation, that may not preclude a finding of alter ego status, based upon events or activity prior to that date, or based upon other conduct.

Movants' arguments that the Discovery Order is an inappropriately harsh sanction for any failure to properly disclose the communications in question in privilege logs are also misplaced. (Mot. for Stay Pending Appeal, ECF No. 434, 21–23.) The Discovery Order was not issued as a sanction for failure to disclose, but based upon the finding that the Movants had not met their burden to show that the common interest doctrine applies. (Decision, ECF No. 430, 12.) (Declining to decide whether production should be required based upon the alleged failure to properly disclose communications in privilege logs.)

For all of these reasons, the Movants have failed to demonstrate a substantial possibility of success on appeal.

### C. Lack of Substantial Injury to Other Parties and Public Interest Favoring a Stay

Movants argue that Citibank will not be prejudiced by a stay pending appeal. However, the Trusts' Petition and related matters, including the validity of Citibank's levy on Trust assets, are scheduled for trial commencing on May 2. Issuance of a stay pending appeal would require either adjournment of the trial, or require Citibank to proceed to trial without the documents in question. This delay adversely affects Citibank, to the extent it is competing with other creditors of Freidman to realize on the assets in question.

The public interest generally does not favor a stay of proceedings to permit interlocutory review of discovery orders. In re Weisman, 835 F.2d 23, 25 (2d Cir. 1987) (enumerating the "sound reasons" for the "general refusal of federal courts to allow interlocutory review of discovery orders."). One of these reasons, in particular, applies here: the fact that such an appeal "tends to delay or deter trial or settlement of a lawsuit." Id. (citations omitted). This matter has been pending for over a year and is scheduled for trial in two weeks. Extensive proceedings have been had in this Court to get the parties to this point. This is not a circumstance where the public interest, to the extent that it is implicated, favors a stay.

### CONCLUSION

**\*5** Based upon a balancing of the four criteria to be considered in evaluating a motion for stay pending appeal, the Movants' request for a stay is denied.

### All Citations

Slip Copy, 2017 WL 1393674

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   4

## Footnotes

1   Citations to "ECF No." are to documents filed in Adv. Pro. No. 15–01185–CEC, identified by docket entry number.

2   A more complete discussion of the background of this proceeding may be found in the Discovery Decision.

3   "Tr." refers to the transcript of the hearing held on the date specified.

4   In 2014, Bankruptcy Rule 8005 was revised and renumbered as Bankruptcy Rule 8007.

**End of Document**                                            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

In re Quigley Co., Inc., Not Reported in B.R. (2009)

2009 WL 9034027

KeyCite Yellow Flag - Negative Treatment

Supplemented by In re Quigley Co., Inc., Bankr.S.D.N.Y., June 19, 2009

2009 WL 9034027
Only the Westlaw citation is currently available.
United States Bankruptcy Court,
S.D. New York.

In re QUIGLEY COMPANY, INC., Debtors.

No. 04–15739 (SMB).
|
April 24, 2009.

**Attorneys and Law Firms**

Schulte Roth & Zabel LLP, Michael L. Cook, Esq., Lawrence V. Gelber, Esq., Victoria A. Lepore, Esq. Of Counsel, New York, NY, for the Debtor.

Cadwalader, Wickersham & Taft LLP, Dennis J. Block, Esq., Gary D. Ticoll, Esq., Michele L. Angell, Esq. Of Counsel, New York, NY, for Pfizer Inc.

Greenberg Traurig, LLP, Bruce R. Zirinsky, Esq., John H. Bae, Esq. Of Counsel, New York, NY, for Pfizer Inc.

Brown Rudnick Berlack Israels LLP, Jeffrey L. Jonas, Esq., James W. Stall, Esq., Gregory T. Arnold, Esq., Edward S. Weisfelner, Esq. Of Counsel, New York, NY, for The Ad Hoc Committee of Tort Victims.

**MEMORANDUM DECISION AND
ORDER REGARDING PRIVILEGES**

STUART M. BERNSTEIN, Chief United States Bankruptcy Judge.

**\*1** The unofficial Ad Hoc Committee of Tort Victims (the "Ad Hoc Committee") has objected to the confirmation of the plan filed by the debtor, Quigley Company, Inc. ("Quigley"). Faced with the assertion of various privileges by Quigley and its parent, Pfizer Inc., that would bar the production of documents and information to the Ad Hoc Committee, the latter moved to compel disclosure. For the reasons that follow, the motion to compel is granted in part and denied in part.

**BACKGROUND**

The underlying facts are detailed in the Court's prior opinions, including In re Quigley Co., Inc., 346 B.R. 647 (Bankr.S.D.N.Y.2006) ("Quigley I ") and In re Quigley Co., Inc., 377 B.R. 110 (Bankr.S.D.N.Y.2007). I assume familiarity with those opinions, and state the facts relevant to the disposition of the pending motion.

Quigley had been engaged in the business of developing, producing and marketing a broad range of refractories and related products, including products containing asbestos. In 1968, Pfizer & Co., Inc., Pfizer Inc.'s predecessor (collectively "Pfizer"), acquired Quigley, and in 1992, Pfizer sold substantially all of Quigley's assets to Minteq International, Inc. Under the sale terms, Quigley and Pfizer retained all liability stemming from Quigley's distribution and use of asbestos-containing products.

Quigley and Pfizer became caught up in the asbestos litigation explosion. On September 3, 2004, when Quigley filed its chapter 11 petition, it estimated that 212,000 asbestos personal injury claims were pending or would be asserted against it. Although Quigley was no longer an operating company, the continuing litigation threatened the common insurance shared by Pfizer and Quigley. It also threatened Pfizer and its own assets. Pfizer was a defendant in many of the asbestos lawsuits, although the pleadings in those cases did not necessarily indicate why. Furthermore, although Pfizer had allegedly manufactured or distributed its own products containing asbestos, which had nothing to do with Quigley, it seems that many of the claims asserted against Pfizer were derivative of the claims against Quigley rather than based on exposure to Pfizer products.

At some point, Pfizer and Quigley embarked, or so it appears, on a plan to place Quigley in bankruptcy and confirm a plan under 11 U.S.C. § 524(g). A plan confirmed under § 524(g) could discharge Pfizer from its derivative liability, and channel those claims into the same trust that addressed the claims against Quigley.

Quigley filed its chapter 11 petition on September 3, 2004. Since then, Quigley and Pfizer have jointly prosecuted the bankruptcy case. The Court approved the appointment of a legal representative to represent the interests of the future creditors (the "FCR"), and the United States Trustee appointed an Official Committee of Unsecured Creditors (the

In re Quigley Co., Inc., Not Reported in B.R. (2009)
2009 WL 9034027

"Committee"). In addition, the Ad Hoc Committee weighed in on numerous issues, and opposed Quigley and Pfizer at virtually every turn. As the case now stands, the Court approved the disclosure statement; Quigley solicited the vote, and has certified that it has sufficient acceptances in number and amount to satisfy the confirmation requirements.

**\*2** The Ad Hoc Committee filed an extensive objection to confirmation .[1] (*See Objection of the Ad Hoc Committee of Tort Victims to the Quigley Co., Inc. Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as Modified as of March 28, 2008* ), dated Sept. 4, 2008)(ECF Doc. # 1542.) Many of its arguments were raised earlier in connection with other disputes. For example, questions surrounding the Pfizer settlements described in *Quigley I* arose several times in connection with allegations of Quigley's bad faith, improper classification, unequal treatment and voter manipulation. The Ad Hoc Committee also maintains that Quigley cannot satisfy and has not satisfied the "ongoing business" requirement contained in § 524(g)(2)(B)(i)(II)-(III). In essence, it maintains that Quigley was a non-operating entity that Pfizer sought to resuscitate artificially by setting Quigley up to conduct illusory business operations. This alleged strategy is part and parcel of the Pfizer strategy to obtain a partial discharge through a Quigley chapter 11 plan without the need to file its own chapter 11.

The parties have engaged in discovery, and their efforts have led to discovery disputes. Pfizer and Quigley have withheld documents on the basis of various privileges, and the Ad Hoc Committee moved to compel the production of some of the withheld documents. The Court received briefing and oral argument on the issue, and reviewed the documents *in camera*. What follows is the Court's determination of the motion to compel.

## DISCUSSION

Before turning to any specific documents, it is helpful to outline the issues, and where possible, make certain preliminary determinations. Quigley and Pfizer have relied on the attorney-client privilege, the work product privilege and the joint defense/common interest privilege. The Ad Hoc Committee primarily challenges the assertion of the latter two privileges, and further contends that any privileges have been waived or overcome by countervailing considerations.

### A. Attorney–Client Privilege

Federal Rule of Evidence 501 states that the federal common law of privileges applies when federal law determines the substantive rights of the parties. *Accord* 🚩 *United States v. Zolin,* 491 U.S. 554, 562 (1989); 🚩 *In re Asia Global Crossing, Ltd.,* 322 B.R. 247, 254–55 (Bankr.S.D.N.Y.2005). Here, the privilege question arises in the context of a bankruptcy case, and specifically, a confirmation dispute, which is governed by a federal statute. Accordingly, the federal common law rules of privilege apply.

The attorney-client privilege "attaches to only those communications (1) where legal advice of any kind is sought, (2) from a professional legal advisor in his or her capacity as such, (3) the communication relates to that purpose, (4) made in confidence, (5) by the client, and (6) are at his or her insistence permanently protected, (7) from disclosure by the client or the legal advisor, (8) except if the protection is waived." *Lugosch v. Congel,* 219 F.R.D. 220, 234–35 (N.D.N.Y.2003); *accord* 🚩 *United States v. Int'l Bhd. of Teamsters,* 119 F.3d 210, 214 (2d Cir.1997); *accord* 🚩 *Madanes v. Madanes,* 199 F.R.D. 135, 143 (S.D.N.Y.2001). The purpose behind the privilege "is to encourage full and frank communications between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." 🚩 *Upjohn Co. v. United States,* 449 U.S. 383, 389 (1981); *accord* 🚩 *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 348 (1985); 🚩 *von Bulow v. von Bulow (In re von Bulow),* 828 F.2d 94, 100 (2d Cir.1987). The privilege belongs to the client, and only the client can waive it. 🚩 *Id.* at 100; 🚩 *Republic Gear Co. v. Borg–Warner Corp.,* 381 F.2d 551, 556 (2d Cir.1967). It must be narrowly construed, and its application limited to the extent necessary to encourage full and frank communication between the attorney and the client. 🚩 *Fisher v. United States,* 425 U.S. 391, 403–04 (1976); *Misek–Falkoff v. Int'l Bus. Machs. Corp.,* 144 F.R.D. 48, 49 (S.D.N.Y.1992). The burden of establishing entitlement to the privilege rests on the person asserting it. 🚩 *Clark v. Am. Commerce Nat'l Bank,* 974 F.2d 127, 129 (9th Cir.1992).

### B. The Joint Defense/Common Interest Privilege

**\*3** As a rule, the attorney-client privilege is waived when a protected communication is disclosed to a third party. *S.R. Int'l Bus. Ins. Co. Ltd. v. World Trade Ctr. Props. LLC,* No. 01 Civ. 9291(JSM), 2002 WL 1334821, at \*3 (S.D.N.Y. June 19, 2002). However, the exception to this general rule is the common interest privilege, which is itself an extension of the attorney-client privilege. *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989). The common interest privilege "serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Id.* The doctrine is limited to situations where multiple parties are represented by separate counsel but share a common interest about a legal matter. [2] *Id.; Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 447 (S.D .N.Y.1995).

"There are two elements of the common interest rule: (1) the party who asserts the rule must share a common legal interest with the party with whom the information was shared and (2) the statements for which protection is sought were designed to further that interest." *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.,* 215 F.R.D. 466, 471 (S.D.N.Y.2003) (citation omitted). Mere cooperation among the parties, absent the intent to participate in a joint strategy, does not create the requisite ongoing common enterprise. *See United States v. Weissman,* 195 F .3d 96, 99–100 (2d Cir.1999). Rather, "some form of joint strategy is necessary to establish the existence of a joint defense agreement, which would then operate to protect evidence under the common interest rule." 3 WEINSTEIN § 503.21[3], at 503–72 (citing *Weissman,* 195 F.3d at 99–100). As in all claims of privilege arising out of the attorney-client relationship, the proponent must establish that the communication was given in confidence, and under circumstances that made it objectively reasonable for the client to believe that the communication was confidential. *Schwimmer,* 892 F.2d at 244. Once established, the privilege cannot be waived without the consent of all of the parties that share it. *John Morrell & Co. v. Local Union 304A,* 913 F.2d 544, 555–56 (8th Cir.1990); *In re Grand Jury Subpoenas, 89–3 and 89–4, John Doe 89–129,* 902 F.2d 244, 248 (4th Cir.1990); *Bass Pub. Ltd. Co. v. Promus Cos. Inc.,* 868 F.Supp. 615, 620–21 (S.D.N.Y.1994).

It is undisputed that Quigley and Pfizer have engaged in a joint strategy to file and prosecute this chapter 11 case. In fact, their concerted efforts have, in great part, led to charges by the Ad Hoc Committee and the United States Trustee that Quigley and its managers lack independence and have breached their fiduciary duties. Instead, the Ad Hoc Committee contends that Quigley and Pfizer do not share common legal interests, and in fact, are adverse. [3]

**\*4** In this case, the commonality or lack of commonality of an interest depends on which interest you consider. It is true, as the Ad Hoc Committee argues, that Pfizer and Quigley have certain divergent interests in this case. For example, Quigley owes a fiduciary duty to its creditors and its estate. It has an interest in procuring the largest possible contribution from Pfizer to the Asbestos PI Trust (the "Trust") formed under the *Quigley Co., Inc. Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as Modified as of March 28 2008),* dated March 28 2008 (the "Plan") (ECF Doc. # 1380). Pfizer, on the other hand, owes no ostensible duties to the Quigley estate or its creditors, and obviously wants to minimize its contribution. There are doubtless other points of adversity.

On the other hand, they share a common interest and overall strategy geared toward the confirmation of Quigley's Plan. Initially, they are co-defendants in numerous lawsuits. Many of the claims against Pfizer appear to be derivative of the claims against Quigley. I infer this because the Plan will only channel the Quigley-derivative claims asserted against Pfizer, and will not affect direct claims arising from Pfizer's own products. The level of opposition to the release that Pfizer will receive if the Plan is confirmed implies that the opponents (as well as the proponents) hold Quigley-derivative claims against Pfizer. Thus, they are being sued, often jointly, based upon the same alleged wrong: Quigley's manufacture or sale, or both, of asbestos products. Their co-defendant status bolsters the claim of common interest. *See Niagara Mohawk Power Corp. v. Megan–Racine Assocs., Inc. (In re Megan–Racine Assocs., Inc.),* 189 B.R. 562, 573 (Bankr.N.D.N.Y.1995) ("A common *legal* interest exists where the parties asserting the privilege were co-parties to litigation or reasonably believed that they could be made a party to litigation.") (emphasis in the original).

Furthermore, they share a common interest in resolving their joint liabilities through Quigley's chapter 11 case to the extent permitted by § 524(g). They are covered by shared insurance that they have used to defend against these claims. Both

seek the confirmation of Quigley's Plan in order to preserve the shared insurance, protect their other assets and avoid continued litigation by channeling all asbestos-related claims against Quigley and derivative claims against Pfizer to the Trust.

As noted above, and confirmed by the Court's own observations, Quigley and Pfizer have engaged in a joint strategy to prosecute a Quigley bankruptcy to achieve the common benefits of the release and channeling injunction. It should come as no surprise that this organized effort predated the bankruptcy filing in September 2004. While Quigley and Pfizer have operated a joint defense against asbestos claims since the early 1980's, the parties formally entered into a Joint Defense Agreement in September 2003. The Joint Defense Agreement provides, *inter alia,* that Quigley and Pfizer authorize their respective attorneys and other representatives to cooperate in taking whatever actions may be in their mutual interests relating to the investigation, defense, and resolution of asbestos personal injury claims, including the use of insurance to fund the resolution of such claims. The Joint Defense Agreement also provides that if anyone requests or demands privileged information from either Quigley or Pfizer, the recipient of such request must notify the other entity, and the parties will take all steps necessary to permit the assertion of all applicable privileges with respect thereto. Where "a joint defense agreement exists there is an implicit understanding that one attorney is permitted not only to confer with another but with the other attorney's party." See *Lugosch,* 219 F.R.D. at 237–38 (citations omitted).

 **\*5** The sharing of documents with the Committee and the FCR present a different question. The Committee and the FCR do not necessarily share a common interest with Quigley and Pfizer in this case. In fact, they are adversaries. The Committee's members and constituents have been litigating against Quigley and Pfizer since before the chapter 11 case was filed. The chapter 11 stayed those litigations. Quigley and Pfizer seek, through confirmation under § 524(g), to discharge their present and future liability, and channel the claims into the Trust.

In addition, although Quigley and the Committee have the duty to maximize the estate, see *Value Prop. Trust v. Zim Co. (In re Mortgage & Realty Trust),* 212 B.R. 649, 653 (Bankr.C.D.Cal.1997), Quigley does not have an interest in maximizing the recovery of the present creditors at the expense of the future creditors. [4] The Committee and the FCR, in this regard, have a natural antagonism;

the Committee wants to maximize the payments to current creditors, while the FCR wants to ensure that enough is available to future creditors. See *Ortiz v. Fibreboard Corp.,* 527 U.S. 815, 856 (1999) (" '[F]or the currently injured [asbestos claimants], the critical goal is generous immediate payments,' but, '[t]hat goal tugs against the interest of exposure-only plaintiffs in ensuring an ample, inflation-protected fund for the future.' ") (quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 626 (1997)).

In order for the common interest privilege to apply, the parties must share a common legal interest at the time that the communications were exchanged. *In re United Mine Workers of Am. Employee Benefit Plans Litig.,* 159 F.R.D. 307, 314 (D.D.C.1994). Advice discussed during negotiations with an adversary in the absence of circumstances supporting a reasonable expectation of confidentiality is not entitled to protection. *SCM Corp. v. Xerox Corp.,* 70 F.R.D. 508, 525 (D.Conn.1976). Thus, notwithstanding the FCR's and the Committee's current support of the Plan, the party asserting the common interest privilege—Quigley or Pfizer, or both—must demonstrate, at a minimum, that they shared communications with the Committee or the FCR in furtherance of a common interest at that time.

### C. The Work Product Privilege

#### 1. Introduction

The work product rule is a qualified privilege codified in Rule 26(b)(3) of the Federal Rules of Civil Procedure. *Upjohn Co.,* 449 U.S. at 398; *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 471 (S.D.N.Y.1993). Rule 26(b)(3) provides, in pertinent part, as follows:

> [A] party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative .... [unless] they are otherwise discoverable under Rule 26(b)(1), and ... the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other

means.... If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.

**\*6** First recognized by the Supreme Court in the landmark decision of 🔖 *Hickman v. Taylor,* 329 U.S. 495 (1947), the doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." 🔖 *United States v. Nobles,* 422 U.S. 225, 238 (1975). The party asserting work product protection bears the burden of proving that the material sought (1) is a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by his representative. 🔖 *Allied Irish Banks, p.l.c. v. Bank of Am., N.A.,* 240 F.R.D. 96, 105 (S.D.N.Y.2007) (internal quotation marks and citations omitted). It generally does so through a combination of affidavits and privilege logs that address each document at issue. 🔖 *Bowne of New York City, Inc.,* 150 F.R.D. at 474.

"[D]ocuments should be deemed prepared 'in anticipation of litigation,' and thus within the scope of the Rule, if 'in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.' " 🔖 *U.S. v. Adlman,* 134 F.3d 1194, 1202 (2d Cir.1998) (quoting 8 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, FEDERAL PRACTICE & PROCEDURE § 2024, at 343 (1994)) (emphasis in the original). This involves two questions. The first is "whether the party actually thought it was threatened with litigation and the objective question of whether that belief was reasonable." 🔖 *Gulf Islands Leasing,* 215 F.R.D. at 475. The second is "what 'would have' happened had there been no litigation threat-that is, whether [the party] 'would have' generated these documents if it were acting solely for its 'business-related purposes.' " 🔖 *Allied Irish Banks,* 240 F.R.D. at 106. While documents need not be prepared for the primary or exclusive purpose of assisting in that litigation to acquire protection, the work product privilege will not be afforded to materials prepared

in the ordinary course of business or that " 'would have been prepared in essentially similar form irrespective of litigation.' " *Id.* (quoting 🔖 *Adlman,* 134 F.3d at 1204).

The Ad Hoc Committee challenges Quigley's and Pfizer's assertion of work product privilege, arguing that the requested documents were not prepared "in anticipation of litigation," but, instead, in the ordinary course of business. (*Motion of the Ad Hoc Committee of Tort Victims to Compel Production Documents and Testimony from Pfizer, Inc. and Quigley Co., Inc. Withheld on Basis of Privilege or Not Produced,* dated Jan. 9, 2009 ("*Motion to Compel* "), at 3, 23) (ECF Doc. # 1675.) With few exceptions, the documents withheld by the parties were created because of the anticipated bankruptcy filing by Quigley or in connection with the pending chapter 11 case. Furthermore, they relate to issues triggered by the bankruptcy case, and would not have been created if Quigley never contemplated or filed bankruptcy. The Ad Hoc Committee's motion, therefore, raises the question whether this bankruptcy, without more, can be considered litigation for the purpose of the work product privilege. (*See Response of Pfizer Inc. to Motion of the Ad Hoc Committee of Tort Victims to Compel Production of Documents and Testimony from Pfizer, Inc and Quigley Co., Inc. Withheld on Basis of Privilege or Not Produced,* dated Jan. 23, 2009 ("*Pfizer Response* "), at 20)(ECF Doc. # 1691); *Opposition of Quigley Co., Inc. to Motion of Ad Hoc Committee of Tort Lawyers [sic] for Order Compelling Disclosure of Documents and Testimony from Pfizer and Quigley,* dated Jan. 23, 2009 ("*Quigley Opposition* "), at 4–5, 29)(ECF Doc. # 1692.)

**\*7** I conclude that it can. Asbestos bankruptcies, by their nature, are designed to stop existing and threatened litigation. In substance, the asbestos bankruptcy establishes a framework for the settlement of the non-bankruptcy litigation through the creation of an injunction that channels those claims into a trust. When Quigley commenced this case on September 4, 2004, there were approximately 212,000 asbestos bodily injury claims pending against it. (*Quigley Opposition,* at 6; *Pfizer Response,* at 3.) Quigley and Pfizer estimate that there will be 261,567 future claims filed against Quigley. (*Fifth Amended and Restated Disclosure Statement with Respect to Quigley Co., Inc. Fourth Amended and Restated Plan of Reorganization Under Chapter 11 of the Bankruptcy Code (as Modified as [of] March 28, 2008* ), dated March 28, 2008, ("*Fifth Amended Disclosure Statement* " at 9)(ECF Doc. # 1379.) According to Quigley, the Quigley Board considered at length Quigley's legal options during the summer of 2004, which included the benefits of filing for

bankruptcy protection, one solution to the looming litigation ahead which would allow Quigley and Pfizer to settle the claims that it faced. (*Quigley Opposition,* at 7.) Quigley considered, and ultimately chose, this option "[a]s a result of" the impending litigation. (*Id.*) In short, although bankruptcies are typically filed to address financial problems, and indeed, the numerous lawsuits had created financial problems for Quigley and Pfizer, this chapter 11 case was filed to resolve mass tort litigation.

### 2. Substantial Need

As the privilege is qualified, factual work product material may be ordered produced if the party seeking the discovery satisfies a two-part test. First, it must demonstrate a substantial need for the materials in preparation of the party's case. "[S]ubstantial need for work product materials exists where the information sought is 'essential' to the party's defense, is 'crucial' to the determination of whether the defendant could be held liable for the acts alleged, or carries great probative value on contested issues." *Nat'l Congress for Puerto Rican Rights v. City of New York,* 194 F.R.D. 105, 110 (S.D.N.Y.2000) (citations and footnotes omitted); *see also Hickman,* 329 U.S. at 511 ("Where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had. Such written statements and documents might, under certain circumstances, be admissible in evidence or give clues as to the existence or location of relevant facts. Or they might be useful for purposes of impeachment or corroboration.").

The subject matter of the documents requested by the Ad Hoc Committee is, with one exception, relevant to the contested issues. It is hard to gauge whether the documents are essential or crucial since it is not entirely clear how the Ad Hoc Committee intends to use them. Nevertheless, they should be entitled to the benefit of the doubt. The exception concerns the FCR. A few of the documents relate to the identification of the FCR in other cases, and perhaps imply something about the selection process in this case. The Ad Hoc Committee has failed to demonstrate that this information is relevant much less crucial to any confirmation issue.

**\*8** Second, the discovering party must demonstrate that it is unable, without undue hardship, to obtain the substantial equivalent of the materials by other means. *Madanes,* 199 F.R.D. at 150 (citing Fed.R.Civ.P. 26(b)(3)). Undue hardship

may be established when a witness can no longer recall statements reflected in documents, *see A.F.L. Falck S.p.A v. E.A. Karay Co., Inc.,* 131 F.R.D. 46, 49 (S.D.N.Y.1990), or where it would be unusually expensive to obtain the requested information. 6 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 26.70[5][d], at 26–460 (3d ed. 2009)("MOORE"). In addition, "production might be justified where the witnesses are no longer available or can be reached only with difficulty." *Hickman,* 329 U.S. at 511.[5]

The Ad Hoc Committee argues that it has met its burden of demonstrating a substantial need. The requested documents "are critical to the central issues in its Objection—the bad faith of Pfizer and Quigley in pursuing the Plan, including the lack of a legitimate ongoing business, the vote buying/manufacturing of claims, assessing the value of the Pfizer contribution, the AIG Assignment, the shared insurance assets, and the treatment of Pfizer's secured and unsecured claims." (*Motion to Compel,* at 14.) Obviously, this must be decided on a document by document basis, and not in the abstract. Nevertheless, the proposition that documents relating to these issues are needed rings true.

The Ad Hoc Committee also maintains that it has shown that it "is unable ... to obtain the substantial equivalent of the materials by other means." According to the Ad Hoc Committee, all of the requested information rests solely within Pfizer and Quigley and depositions of their Federal Rule of Civil Procedure 30(b)(6) witnesses, and the Ad Hoc Committee's document requests have been entirely unfruitful. The Ad Hoc Committee has deposed a number of witnesses, including Sandy Berland and Kim Jenkins, Pfizer's and Quigley's Rule 30(b)(6) witnesses,[6] respectively, who have refused to provide critical information based on privilege or a lack of recollection or knowledge. During the depositions of Mr. Berland and Ms. Jenkins, the Ad Hoc Committee alleges that it was generally met with objections and directions not to answer by the witness' counsel. Finally, although the Ad Hoc Committee made this motion before discovery was complete, it has since completed discovery, and has not been able to obtain the "substantial equivalent" of the withheld materials.

### 3. Waiver Through Disclosure

The disclosure of work product to a third party does not automatically waive the privilege. Rather, "[w]aiver of work-product immunity is found whenever a party has disclosed the work-product in such a manner that it is likely to be revealed to his adversary." *Gramm v. Horsehead Indus., Inc.,*

No. 87 Civ. 5122(MJL), 1990 WL 142404, at *2 (S.D.N.Y. Jan. 25, 1990). In other words, the deliberate disclosure of work product must create a "substantial danger" that it will be disclosed thereafter to an adversary. 6 MOORE § 26.70[6] [c], at 26–465.

**\*9**  The conclusions relating to the joint defense/common interest privilege apply equally to the waiver of the work product privilege. Quigley and Pfizer shared many of the communications memorialized by the documents placed in issue by the pending motion. Having reviewed the documents *in camera*, I conclude that neither waived the work product privilege by sharing its documents with the other.

### THE DOCUMENTS

#### A. Pfizer

The Pfizer documents primarily consist of emails and email chains. In the main, the documents concern the "on-going" business requirement. The Court reviewed the Pfizer documents *in camera* aided by (1) the *Supplemental Privilege Log of Pfizer Inc., as Pertaining to Pfizer Inc. Documents Sought By Ad Hoc Committee of Tort Victims January 9, 2009 Motion to Compel, Not Already Produced* ("*Pfizer Supp. Log* "),(2) the *Pfizer Response* and (3) the *Declaration of Michele L. Angell in Support of Response of Pfizer Inc. to Motion of the Ad Hoc Committee of Tort Victims to Compel Production of Documents and Testimony From Pfizer, Inc. and Quigley Co., Inc. Withheld on Basis of Privilege or Not Produced,* dated Jan. 23, 2009, attached as Exhibit A to the *Pfizer Response*. The Court concludes that Pfizer has sustained the claims of privilege, except as noted below. The documents are identified in the same manner as they were in the *Pfizer Supp. Log* .

**Document # 9** consists of two emails, each dated July 21, 2004. Pfizer asserts the attorney-client privilege. The earlier email (4:11 pm) is privileged. The later email (5:54 pm) also appears as part of an email chain that comprises Document # 10. Pfizer did not assert any privilege in connection with the identical email in Document # 10, and accordingly, waived the claim of privilege. The later email should be produced.

**Document # 23** consists of a chain of five emails exchanged between and among Pfizer's in house counsel and Pfizer's employees. All of the emails concern the identification of products that Pfizer planned to transfer to Quigley to satisfy the "on-going" business requirement. Pfizer asserted the

attorney-client privilege with respect to the top (latest) email (10/28/04, at 11:36 am) only, and represented in the *Pfizer Supp. Log* that it would produce the remaining emails.

It is not clear how or why Pfizer made this distinction. The production of the four preceding emails waived any assertion of privilege regarding the top (latest) email, and it should be produced.

**Document # 31** consists of three emails relating to the products to be transferred by Pfizer to Quigley. Pfizer asserted the attorney-client privilege and the work product privilege. The earliest (bottom) email (1/12/05, at 7:23 am) contains claims-related information about the products. Pfizer has failed to sustain its claim of attorney-client privilege as to the bottom email, and although the email falls within the protection of the work product privilege, the Ad Hoc Committee has demonstrated a substantial need. Accordingly, Pfizer is directed to produce this email, except for the last clause in the opening paragraph that begins with the word "but." That clause is pure opinion work product.

**\*10**  The middle email (1/13/05, at 11:27 am) is privileged. The top (latest) email (1/13/05, at 11:56 am) consists of two sentences. The first sentence is factual work product, and should be produced. The second sentence is not factual, and may be withheld.

**Document # 74** consists of six emails and an attached tax-related agreement. Pfizer has asserted the attorney-client and work product privileges. Pfizer has failed to sustain the assertion of the work product privilege since the tax agreement does not appear to be the type of document that was created in anticipation of litigation (it would have been created anyway), and the emails relate to the tax agreement. Nevertheless, Pfizer has sustained its claim of attorney-client privilege as to the email sent on December 22, 2003 (11:28 am) from Linda Swartz, Esq. to John H. Bae, Esq. of Cadwalader Wickersham & Taft ("Cadwalader"). The balance of the emails and the attachment should be produced.

**Document # 173** concerns the draft *Fifth Amended Disclosure Statement.* The document consists of two emails and the draft. The bottom (earlier) email (5/15/07, at 9:17 pm) sent by Jessica L. Fainman, Esq. of Schulte Roth & Zabel LLP ("Schulte Roth"), attached and sent a version of the draft to, among others, the FCR and his attorneys, the attorneys for the Committee and the attorneys for Pfizer. Pfizer has asserted the work product privilege. It has also asserted the

joint defense privilege although it did not assert the attorney-client privilege.

With one caveat, the work product privilege was waived by the transmission of the email and draft to the FCR and the Committee. For the reasons already discussed, there was always a substantial risk that they would be adversaries of each other and adversaries of Pfizer and Quigley.

The top (later email) (5/17/07, at 2:32 pm) was sent by Jennifer A. Brennan, Esq., a Pfizer attorney, to other Pfizer and Quigley attorneys. It also transmitted a draft *Fifth Amended Disclosure Statement,* but this draft contained the handwritten comments of her firm, Gilbert Randolph LLP. If this was not the same version transmitted to the FCR and the Committee, and the handwritten comments were shared only with Pfizer and Quigley lawyers, the handwritten comments can be redacted. The email may also be withheld on the ground of work product.

**Document # 77** consists of a single email sent on May 28, 2004 (11:22 am) by a Pfizer in house attorney to John H. Bae, Esq. of Cadwalader. Pfizer asserted the attorney-client privilege, but the email does not concern legal advice. Accordingly, Pfizer has failed to sustain the privilege.

**Document # 127** is an internal Cadwalader email sent on August 31, 2004 (8:54 am)by John H. Bae, Esq. to Bruce R. Zirinsky, Esq. It transmits the comments made by Baron & Budd, P.C. ("Baron & Budd") to three paragraphs in the proposed Pfizer Settlement Agreement. The paragraphs are numbered 1, 2 and 3 in the email. Pfizer has asserted both the attorney-client and the work product privileges.

 **\*11** Pfizer obviously shared the draft agreement with Baron & Budd, and thereby waived any privilege in the draft, including any draft that reflected Baron & Budd's comments. The bulk of this email contains verbatim quotations from the three paragraphs of the draft that include Baron & Budd's comments. These verbatim quotations cannot be withheld.

Each verbatim quotation is also followed by a sentence or short paragraph that includes some opinion work product supplied by Mr. Bae. Pfizer may redact the following from this trailing matter: (1) the second sentence of the two sentence paragraph following the paragraph numbered 1, (2) the second clause of the sentence following the paragraph numbered 2, and (3) the second clause of the first sentence

following the paragraph numbered 3, and the entire second sentence.

**B. Quigley**

Like the Pfizer documents, the Quigley documents consist primarily of email chains. The Court reviewed the Quigley documents *in camera* aided by (1) the *Supplemental Privilege Log of Quigley Company, Inc. Documents Sought By Ad Hoc Committee of Tort Victims January 9, 2009 Motion to Compel, Not Already Produced* ("*Quigley Supp. Log* "), and (2) the *Amended Affidavit of Michael L. Cook in Support of Objection to Ad Hoc Committee of Tort Lawyers [sic] Motion for an Order Compelling Disclosure of Documents and Testimony From Pfizer and Quigley,* sworn to Feb 5, 2009 ("*Amended Cook Affidavit* ")(ECF Doc. # 1709). The Court concludes that Quigley has sustained the claim of privilege, except as noted below. The documents are identified in the same manner as they are in the *Quigley Supp. Log.*

**1. September 11, 2008 Privilege Log** [7]
**Document # 37** consists of two emails, each with the subject "Potential Business." Quigley asserts the attorney-client privilege. The bottom (earlier) email (5/24/06, at 3:06 pm) includes a brief message of what appears to be a verbatim transcription of a voicemail from a third party to Kim Jenkins, Quigley's current president. The voicemail is not protected by the attorney-client privilege, [8] and did not become privileged because Ms. Jenkins sent it to a lawyer at Schulte Roth. The transcription of the voicemail should be produced.

Both emails also include a brief statement from Ms. Jenkins to Schulte Roth lawyers that identifies and transmits the transcription. The assertion of privilege is sustained as to these statements.

**2. September 11, 2007 Privilege Log**
**Document78, 80, 83 and 84** are related. Document # 83 (# 84 is identical) consists of two emails and an attachment. The attachment is the clean and black-lined versions of a Product License and Services Agreement between Quigley and Pfizer. The bottom (earlier) email (7/12/05, at 10:33 am) was prepared by Philip J. Nichols, a law clerk employed by Cadwalader, and sent to Jason A. Cohen, Esq. and Darryl Pinsker, Esq., Cadwalader attorneys. The email comments on some of the points apparently raised by Laura Chenoweth, Esq. an in house Pfizer lawyer, and explains how those points were addressed in the annexed draft. The top (later)

email (9/16/05, at 3:47 pm) does not contain text, but simply forwards the earlier email and attachment to Jessica L. Fainman, Esq. of Schulte Roth. Quigley asserts the work product and joint defense privileges with respect to the two emails and the attachment.

 **\*12**  The earlier email was written by a Cadwalader lawyer and sent to Cadwalader lawyers. Viewed in isolation, only Pfizer or Cadwalader could assert a privilege. The Pfizer privilege logs do not list the Nichols' email. Its omission raises several possibilities: (1) the email (and attachment) were not responsive to document requests sent by the Ad Hoc Committee to Pfizer, and hence, Pfizer had no need to identify them in any privilege log, (2) the email (and attachment) were produced by Pfizer, or (3) the email (and attachment), though responsive to a document request, were neither produced nor identified on a privilege log.

The last two possibilities raise the question of waiver, and if Pfizer waived any privileges, it is not clear that Quigley can assert a privilege simply because a copy of the document was in its files. For these reasons, Quigley has failed to demonstrate that it can assert any privilege with respect to the earlier email and attachment, unless it supplements its submission within ten days of the date of this order, with evidence or legal argument, or both, that justify the assertion of the privilege. Absent supplementation and further proceedings in connection with this document, Quigley should produce it.

The later email sent by Mr. Cohen forwards Mr. Nichols' email of two months earlier to Ms. Fainman of Schulte Roth. It does not include any text in the body of the email. There is no basis to assert a privilege since the email merely provides proof, generated by the email system, that the Nichols' email and attachments were forwarded.

The top (latest) email (9/16/05, at 3:58 pm) in the three email chain that comprises Document # 80 transmits the two emails and attachment referred to immediately above from Ms. Fainman to Lawrence V. Gelber, Esq., also of Schulte Roth. It includes a brief message that characterizes what is being transmitted, and is protected by the work product privilege.

Finally, Document # 78 includes the latter three emails and the attachment, and one new email. The new (top) email (9/16/05, at 4:00 pm) reflects Mr. Gelber's response to Ms. Fainman,

regarding how to proceed. It is covered by the work product privilege.

**Document # 369** consists of ten emails. Quigley asserts the work product and joint defense privileges over the first nine (5/12/05, at 9:13 am; 5/12/05, at 12:13 pm; 5/12/05, at 1:18 pm; 5/12/05, at 1:23 pm; 5/13/05, at 9:34 am; 5/13/05, at 9:35 am; 5/13/05, at 9:50 am; 5/13/05, at 1:40 pm; 5/16/05, at 10:16 am), and the attorney-client, work product and joint defense privileges with respect to the top (latest) email (5/16/05, at 10:40 am). The first seven emails were sent by Pfizer employees to Pfizer employees, and the eighth and ninth emails were also sent to a Pfizer in house attorney. [9] The tenth email, authored by Ms. Jenkins, forwarded the email chain, *inter alia,* to lawyers at Schulte Roth and Cadwalader.

The email chain relates to the relocation of the claims handling unit to different leased premises. It appears to be a document that was prepared in the ordinary course of Pfizer's business, and is not protected work product. Furthermore, Quigley has failed to show that the tenth email, which has no substance other than an innocuous transmittal message, should be protected by any of the cited privileges. Accordingly, this email chain should be produced.

 **\*13**  **Document 387 and 390** are identical with one exception. Document # 387 consists of a chain of eight emails, but Quigley asserts a privilege only with respect to the last three (4/18/05, at 1:16 pm; 4/20/05, at 4:49 pm; 4/20/05, at 4:52 pm). [10] Document # 390 consists of the first seven of the eight emails that comprise Document # 387. The *Amended Cook Affidavit,* at ¶ 61, states that Quigley was asserting the attorney-client privilege only as to the top (latest) email (4/20/05, at 4:49 pm) in Document # 390, but the privilege log states that the entire chain is privileged.

The assertions of privilege are contradictory, as are the supporting affidavit and privilege log. The first five emails (4/5/05, at 12:13 pm; 4/5/05, at 5:02 pm; 4/8/05, at 10:24 am; 4/8/05, at 10:35 am; 4/18/05, at 12:28 pm) in both documents should be produced, and the seventh email (4/20/05, at 4:49 pm) reflects a communication protected by the attorney-client privilege. The sixth email (4/18/05, at 1:16 pm) also reflects a communication that is protected by the attorney-client privilege, as does the eighth email (4/20/05, at 4:52) in Document # 387.

**Document # 402** consists of one email and two attachments, as to which Quigley asserts the attorney-client and work

product privileges. The email (4/20/05, at 9:00 am) from Lawrence V. Gelber, Esq. of Schulte Roth to John H. Bae, Esq. of Cadwalader concerns the selection of a valuation expert for pharmaceutical product lines. The email is work product, and there is no discernable factual work product.

The attachments were prepared by two valuation firms, LifeTech Research, Inc. and The Foresight Group, which Quigley had consulted. The attachments are the proposed retention agreements submitted by each, but differ markedly. The LifeTech Research proposal is almost completely generic. Except for the "Project Objective" on page two, the proposal does not indicate what the parties discussed, and another section on the same page, "Project Scope," is so general that it looks like "boilerplate" included in every valuation proposal. Quigley may redact the "Project Objective" since it is intertwined with the disclosure of Quigley's strategy to satisfy the "ongoing business" requirement, was obviously revealed to LifeTech Research so that it could make a retention proposal, and is protected work product. The balance of the LifeTech Research proposal should be produced.

The Foresight Group, who Quigley ultimately retained, submitted a much more comprehensive proposal. It includes a summary of projected financial information regarding the profitability of the product lines, an identification of the issues that must be analyzed, and a discussion of Foresight's step-by-step approach. Disclosure of this document would provide a roadmap crafted by Foresight with respect to how to tackle the "ongoing business" requirement as proposed by Quigley and Pfizer at that time. These portions of the document reflect strategy and are protected work product.

*14  Some of the content, on the other hand, is generic and should be produced. This includes page eight, starting with the section marked "Indemnification" through page ten, and page twelve through page nineteen.

### 3. June 20, 2007 Log
**Documents 4 and 6** concern email communications between Kevin M. Altit, a Quigley director, on the one hand, and other Quigley directors and lawyers at Schulte Roth, Quigley's

counsel, on the other. One of the emails at issue (7/14/04, at 7:13 pm) from Mr. Altit to other directors and Schulte Roth attorneys, appears in both documents. Document # 6 also includes a second and later email (7/15/04, at 7:17 am) in which Michael Cook, Esq. responds to Mr. Altit's email. Quigley asserts the attorney-client privilege with respect to Document # 4 and the conforming email in Document # 6. Quigley asserts the attorney-client and work product privileges with respect to Mr. Cook's response.

Quigley has failed to demonstrate that an attorney-client relationship existed between Mr. Altit and Schulte Roth, or, notwithstanding the description in the privilege log, that Mr. Altit was seeking legal advice. "[A]n attorney's representation of a corporation does not make that attorney counsel to the corporate officers and directors as individuals." *Correspondent Servs. Corp. v. J.V.W. Inv. Ltd.,* No. 99 Civ. 8934(RWS), 2000 WL 1174980, at *13 (S.D.N.Y. Aug. 18, 2000); *see* 22 N.Y.C.R.R. § 1200.28(a) (requiring the lawyer for an organization when dealing with a director to explain that the lawyer represents the organization and not the director in situations where it appears that the interests of the organization and director may differ). The subject of the emails between Mr. Altit and the Schulte Roth attorneys was one on which a reasonable observer could conclude that their interests might differ. Accordingly, the assertion of the attorney-client privilege is overruled.

Quigley has also failed to demonstrate that the Cook email in Document # 6 is entitled to protection as work product. The email concerns the content of the minutes following a Quigley board meeting. On its face, the Cook email does not appear to relate to the impending bankruptcy or any other pending or contemplated litigation. Rather, it appears to relate to ordinary corporate business. For this reason, the assertion of the work product privilege is also overruled, and both documents should be produced.

So ordered.

### All Citations

Not Reported in B.R., 2009 WL 9034027

### Footnotes

2009 WL 9034027

1   Other parties in interest also filed objections, but I focus on the Ad Hoc Committee's.

2   In contrast, the "joint defense" or "joint client" privilege applies when two or more clients are represented by the same attorney on matters of common interest. *See* 3 HON. JACK B. WEINSTEIN, ET AL., WEINSTEIN'S FEDERAL EVIDENCE § 503.21[1], at 503–67 to 68 (2d ed. 2008)("WEINSTEIN"). Nevertheless, courts sometimes use "joint defense" and "common interest" interchangeably. *See* 🚩*Schwimmer,* 892 F.2d at 243.

3   The Ad Hoc Committee contends that Quigley and Pfizer must share *identical* legal interests. Under Second Circuit law, however, parties asserting the common interest privilege need not share identical legal interests, despite the use of the term identical in a number of cases. Rather, the parties need only share "a common interest about a legal matter." 🚩*Schwimmer,* 892 F.2d at 243 (internal quotation marks and citations omitted); 🚩*Walsh v. Northrop Grumman Corp.,* 165 F.R.D. 16, 18 (E.D.N.Y.1996); 🚩*Bank Brussels Lambert,* 160 F.R.D. at 447; 🚩*United States v. United Techs. Corp.,* 979 F.Supp. 108, 111 (D.Conn.1997); 🚩*Asia Global Crossing, Ltd.,* 322 B.R. at 264; 🚩*Kingsway Fin. Servs., Inc. v. Pricewaterhouse–Coopers LLP,* No. 03 Civ. 5560(RMB)(HBP), 2008 WL 4452134, at *7 (S.D.N.Y. Oct. 2, 2008); 🚩*Bruker v. City of New York,* No. 93 Civ. 3848(MGC)(HBP), 2002 WL 484843, at *4 (S.D.N.Y. Mar. 29, 2002); *see also* 🚩*Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974,* 406 F.Supp. 381, 386 (S.D.N.Y.1975) ("[W]here there is consultation among several clients and their jointly retained counsel, allied in a *common* legal cause, it may reasonably be inferred that resultant disclosures are intended to be insulated from exposure beyond the confines of the group ....") (emphasis added).

    In any event, the distinction between *identical* and common interests is semantic, and depends on how one defines the interest. The emphasis of the privilege is properly placed, not on the similarity of the parties' interest but on whether, in practice, they "have demonstrated cooperation in formulating a common legal strategy." 🚩*Bank Brussels Lambert,* 160 F.R.D. at 447; *accord* 🚩*N. River Ins. Co. v. Columbia Cas. Co.,* No. 90 Civ. 2518(MJL), 1995 WL 5792, at *4 (S.D.N.Y. Jan. 5, 1995) ("The common thread of these cases is that the determination of whether the common interest doctrine applies cannot be made categorically.... What is important is not whether the parties theoretically share similar interests but rather whether they demonstrate actual cooperation toward a common legal goal."); 🚩*Strougo v. BEA Assocs.,* 199 F.R.D. 515, 520 (S.D.N.Y.2001) (same). Moreover, it has been held that "a joint defense may be made by somewhat unsteady bedfellows." 🚩*Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974,* 406 F.Supp. at 392. *See* 🚩*Kingsway Fin. Servs., Inc.,* 2008 WL 4452134, at *8 (parties who were currently adverse in a related action still shared a common interest at the time the communications alleged to be privileged were made); 🚩*Megan–Racine Assocs., Inc.,* 189 B.R. at 572 (privilege can extend even where a lawsuit between the two parties is foreseeable).

4   As already indicated, Pfizer has no ostensible duty or interest in maximizing the size of the Quigley estate or the recovery by present or future creditors.

5   Opinion work, in contrast to factual work product, enjoys a near absolute immunity. It " ' can be discovered only in very rare and extraordinary cases where weighty considerations of public policy and proper administration of justice would militate against nondiscovery.' " 🚩*Comair Rotron, Inc. v. Minebea Co., Ltd (In re Minebea Co., Ltd.),* 143 F.R.D. 494, 499 (S.D.N.Y.1992) (internal quotation marks and ellipses omitted); *accord*

⚑ *Upjohn Co.,* 449 U.S. at 401; ⚑ *Adlman,* 134 F.3d at 1204; ⚑ *In re Sealed Case,* 676 F.2d 793, 809–10 (D.C.Cir.1982).

6    Quigley repeatedly argues that Ms. Jenkins is not a Rule 30(b)(6) witness. (*Quigley Opposition,* at 5, 30.)

7    Quigley assembled its documents in the same manner as they are listed on the three Quigley privilege logs.

8    Quigley has not asserted that the transcription is protected by the work product privilege.

9    The ninth email was also sent to Kim Jenkins.

10   Quigley agreed to produce the five earlier emails subject to review by the Committee. (*Amended Cook Affidavit,* at ¶ 60(a).) The Committee's January 30, 2009 letter to the Court did not list this document as one to which it might assert a privilege.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.