# **Exhibit B**

## **Additional Cases**

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Follow by GUS Consulting GMBH v. Chadbourne & Parke LLP,
N.Y.Sup., May 22, 2008

215 F.R.D. 466
United States District Court, S.D. New York.

GULF ISLANDS LEASING, INC., Plaintiff,

v.

BOMBARDIER CAPITAL, INC., Defendant.

Bombardier Capital, Inc.,

Counterclaim Plaintiff,

v.

Gulf Islands Leasing, Inc.,

Counterclaim Defendant.

Bombardier Capital, Inc.,

Cross–Claim Plaintiff,

v.

Andrew L. Evans and Ann L.

Evans, Cross–Claim Defendants.

No. 02 Civ. 2839(WHP)(GWG)
|
May 29, 2003.

**Synopsis**

Borrower brought action against lender to determine its liability for prepayment fee after settlement with seller. On lender's motion for protective order, the District Court, Gorenstein, United States Magistrate Judge, held that: (1) communications between lender and seller regarding seller's dispute with borrower were not protected by attorney-client privilege, and (2) documents prepared by lender regarding calculation of payoff amount of loan were not protected under work product doctrine.

Motion denied.

West Headnotes (12)

**[1]    Federal Courts** ⚖ Privilege and confidentiality

In diversity action, state law provides rule of decision concerning claim of attorney-client privilege. Fed.Rules Evid.Rule 501, 28 U.S.C.A.

3 Cases that cite this headnote

**[2]    Privileged Communications and Confidentiality** ⚖ Common interest doctrine; joint clients or joint defense

Under New York law, before communication can be protected under common interest rule, communication must meet other applicable elements of attorney-client privilege.

4 Cases that cite this headnote

**[3]    Privileged Communications and Confidentiality** ⚖ Elements in general; definition

Under New York law, critical inquiry in determining whether attorney-client privilege protects communication from disclosure is whether, viewing its contents in full, communication was made to facilitate rendition of legal advice or services to client.

4 Cases that cite this headnote

**[4]    Privileged Communications and Confidentiality** ⚖ Common interest doctrine; joint clients or joint defense

Under New York law, common interest rule of attorney-client privilege is intended to allow clients to share information with attorney for another party who shares same legal interest.

21 Cases that cite this headnote

**[5]    Privileged Communications and Confidentiality** ⚖ Common interest doctrine; joint clients or joint defense

Under New York law, common interest rule of attorney-client privilege is narrowly construed.

30 Cases that cite this headnote

**[6]    Privileged Communications and
Confidentiality 🔑 Common interest doctrine;
joint clients or joint defense**

Under New York law, there are two elements
of common interest rule of attorney-client
privilege: (1) party who asserts rule must share
common legal interest with party with whom
information was shared, and (2) statements for
which protection is sought must have been
designed to further that interest.

39 Cases that cite this headnote

**[7]    Privileged Communications and
Confidentiality 🔑 Presumptions and burden
of proof**

Under New York law, it is burden of party
asserting privilege to establish its existence.

7 Cases that cite this headnote

**[8]    Privileged Communications and
Confidentiality 🔑 Common interest doctrine;
joint clients or joint defense**

Under New York law, lender and seller did
not have common legal interest in buyer's
compliance with purchase agreement, and thus
communications between lender and seller
regarding seller's dispute with buyer were not
protected by attorney-client privilege, even
though lender and seller were subsidiaries
of common owner and lender shared seller's
commercial interest in resolution of dispute,
where lender was not party to lawsuits between
seller and buyer, lender and seller utilized
different attorneys, no apparent legal strategies
were discussed between lender and seller, and
communications dealt primarily with amount of
money owed under lender's loan and security
agreements with buyer.

5 Cases that cite this headnote

**[9]    Privileged Communications and
Confidentiality 🔑 Common interest doctrine;
joint clients or joint defense**

Under New York law, mere existence of
affiliate relationship does not excuse party from
demonstrating applicability of common interest
rule of attorney-client privilege.

7 Cases that cite this headnote

**[10]    Federal Civil Procedure 🔑 Work Product
Privilege;  Trial Preparation Materials**

Whether material was prepared "in anticipation
of litigation," for purposes of work product
doctrine, requires determination of subjective
question of whether party actually thought it was
threatened with litigation and objective question
of whether that belief was reasonable.

22 Cases that cite this headnote

**[11]    Federal Civil Procedure 🔑 Work Product
Privilege;  Trial Preparation Materials**

Mere potential for future dispute is insufficient
to show that party acted in "anticipation of
litigation" for purposes of work product doctrine;
instead, substantial probability of litigation must
exist and concern that litigation may occur must
be real, not speculative.

12 Cases that cite this headnote

**[12]    Federal Civil Procedure 🔑 Work Product
Privilege;  Trial Preparation Materials**

Documents prepared by lender regarding
calculation of payoff amount of loan were not
protected from production under work product
doctrine in borrower's action to determine its
liability for prepayment fee after settlement
with seller, even if borrower had been involved
in litigation with seller, seller and lender
were subsidiaries of common owner, and
lender might have foreseen that there might
someday be dispute with borrower about its
calculations, where lender routinely calculated
payoff amounts, borrower was not in default of
payments due lender during pendency of dispute
with seller, and borrower did not contact lender
about disputed amounts until after documents at
issue were created.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*467** William B. Fleming, Gage Spencer & Fleming, LLP, New York City, Robert B. Lovett, Jennifer L. Conrad, Testa, Hurwitz & Thibeault, LLP, Boston, MA, for Gulf Islands Leasing, Inc.

Patrick P. Salisbury, Salisbury & Ryan LLP, New York City,for Bombardier Capital, Inc.

*OPINION AND ORDER*

GORENSTEIN, United States Magistrate Judge.

Bombardier Capital, Inc. ("Bombardier Capital") has moved for a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure with respect to a number of documents listed on its privilege log. Originally, Bombardier Capital moved for a protective order solely on the ground that the documents were protected by the joint defense or common interest rule, an extension of the attorney-client privilege. After a telephone conference on February 3, 2003, however, Bombardier Capital was granted leave to brief its assertion that the materials were also protected by the work-product doctrine. Gulf Islands Leasing, Inc. ("Gulf") has opposed Bombardier Capital's motion for a protective order. For the reasons stated below, Bombardier Capital's motion is denied.

I. *INTRODUCTION*

A. *Factual History*

Bombardier Capital and Bombardier Aerospace Corporation ("Bombardier Aerospace") are separate corporations that are each wholly-owned subsidiaries of Bombardier Inc. *See* Memorandum of Law of Bombardier Capital, Inc. in Support of its Assertion of the Joint Defense Privilege, dated December 5, 2002 ("Def.Mem."), at 1. Bombardier Inc. is in the business of manufacturing aircraft. *Id.* Bombardier Aerospace manages and sells "fractional ownership interests" of aircraft manufactured by Bombardier Inc. *Id.* A fractional ownership interest allows the buyer to use a Bombardier airplane for a period of time and have the plane serviced by Bombardier Aerospace. *Id.* Bombardier Capital offers

financing for the sales of Bombardier Inc. aircraft, including sales of fractional ownership interests. *Id.*

On July 31, 2000, Gulf purchased a 50% fractional ownership interest in a Bombardier Global Express corporate aircraft. *See* Gulf Island Leasing, Inc.'s Memorandum of Law in Opposition to Bombardier Capital, Inc.'s Assertion of the Joint Defense Privilege, dated December 13, 2002 (Docket # 25) **\*468** ("Pl.Mem."), at 1. Gulf executed a Purchase Agreement and a Management Agreement (collectively the "Aerospace Agreements") with Bombardier Aerospace. The Purchase Agreement governed the terms of sale of the interest in the aircraft. *See* Purchase Agreement, dated July 31, 2000 ("Purchase Agreement") (reproduced in Declaration of Patrick P. Salisbury, dated December 5, 2002 ("Salisbury Decl."), Ex. C). The Management Agreement governed the use and management of the aircraft. *See* Management Agreement, dated July 31, 2000 ("Management Agreement") (reproduced in Salisbury Decl. Ex. D). Gulf paid $19,600,000 for its ownership interest. *See* Def. Mem. at 1. To finance its purchase of the airplane, Gulf obtained a loan of $16,339,488.50 from Bombardier Capital. This loan transaction is reflected in a Loan Agreement and a Security Agreement (collectively the "Capital Agreements"). *See id.;* Loan Agreement, dated July 31, 2000 ("Loan Agreement") (reproduced in Salisbury Decl. Ex. A); Security Agreement, dated July 31, 2000 ("Security Agreement") (reproduced in Salisbury Decl. Ex. B).

While the agreements with Bombardier Capital and Bombardier Aerospace were separate, a default by Gulf under the Aerospace Agreements would have consequences under the Capital Agreements, and vice versa. For example, upon a default by Gulf under the Management Agreement, Bombardier Capital could foreclose upon and sell the airplane. *See* Management Agreement, § 10. Other sections in the Aerospace and Capital Agreements give both Bombardier Aerospace and Bombardier Capital rights upon a default by Gulf on either set of agreements. *See* Purchase Agreement, §§ 4(a)–(c); Security Agreement, §§ 8(a)–(c).

Soon after the purchase, Gulf became dissatisfied with Bombardier Aerospace's performance. Ultimately, Bombardier Aerospace filed a lawsuit against Gulf in the United States District Court for the Northern District of Texas alleging breach of contract. *See* Complaint, filed January 12, 2001 (reproduced in Affidavit of Jennifer L. Conrad in Support of Gulf Island Leasing, Inc.'s Memorandum of Law in Opposition to Bombardier Capital, Inc.'s Assertion

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    3

of the Joint Defense Privilege, dated December 13, 2002 (Docket # 26) ("Conrad Aff."), Ex. 7). Several days later, Gulf filed suit against Bombardier Aerospace in Washington state court also alleging breach of contract. *See* Complaint, dated January 22, 2001 (reproduced in Conrad Aff. Ex. 6). While the lawsuits between Gulf and Bombardier Aerospace proceeded, Gulf continued to make payments to Bombardier Capital under the Capital Agreements. *See* Deposition of Andrew L. Evans (undated) (reproduced in Conrad Aff. Ex. 8), at 38. Bombardier Capital was not a party to either lawsuit.

During 2001, Gulf and Bombardier Aerospace engaged in settlement negotiations and ultimately reached a settlement that was signed on December 21, 2001. Under the terms of the Settlement Agreement (also referred to as the "repurchase agreement"), Bombardier Aerospace agreed to repurchase Gulf's fractional interest in the airplane. *See* Confidential Settlement Agreement, dated December 21, 2001 ("Settlement Agreement") (reproduced in Conrad Aff. Ex. 10), § 5.3(b). Bombardier Aerospace agreed to pay Gulf the fair market value of Gulf's fractional interest in the airplane less the amount Gulf owed under the Capital Agreements, which Bombardier Aerospace would pay directly to Bombardier Capital on Gulf's behalf. *See id.* Thus, after Bombardier Capital was paid the portion it owed, Bombardier Aerospace was to pay the remainder—minus a management fee of $165,368.94, *see id.,* § 5.3(a)—to Gulf. *See id.,* § 5.3(b).

Bombardier Capital was not part of the negotiations of the settlement with Gulf although, as is discussed more fully later, Bombardier Aerospace and Bombardier Capital had communications regarding the transaction—both before and after the Settlement Agreement was signed. Gulf contends that Bombardier Aerospace told Gulf that Bombardier Capital would play no part in the Settlement Agreement. *See* Pl. Mem. at 3. The Settlement Agreement itself provides that it shall not "affect the rights of Gulf Islands with regard to Bombardier Capital, Inc. ('BCI') and no terms of this agreement **\*469** shall be construed to include BCI or affect its relationship with Gulf Islands unless it is specifically referred to therein." Settlement Agreement, § 2.4. Bombardier Capital was specifically exempted from the provision of the Settlement Agreement releasing the parties from liabilities, *id.,* § 3.1, and the requirement that mutual releases be executed. *Id.,* § 7.

One issue that arose as a result of the settlement was the extent that Gulf would be responsible for "breakage costs," which

Bombardier Capital defines as a charge to compensate for "the loss [Bombardier Capital] suffered when Gulf prepaid the loan as a result of the attendant early termination of an interest rate swap transaction that [Bombardier Capital] entered into relating to the Gulf loan." Def. Mem. at 5. Also at issue was a "make-whole payment," which Bombardier Capital defines as "the prepayment fee required to make [Bombardier Capital] whole for a 'loss of yield' on the loan due to early repayment of the loan." *Id.*

Bombardier Capital contends that, in connection with the repurchase, it agreed to waive "breakage costs" due from Gulf but only in exchange for receiving the "make-whole payment" allegedly owed by Gulf under the Capital Agreements. *See* Def. Mem. at 5. Gulf disputes that it was obligated to pay the "make-whole payment." *See* Pl. Mem. at 3–4. On February 1, 2002, pursuant to the Settlement Agreement, Bombardier Aerospace transferred $16,775,053.58 to Bombardier Capital—an amount that included a "make-whole payment" of $1,002,235.62. *See* Bombardier—Gulf Islands Leasing, Inc., Closing Statement, dated February 1, 2002 (reproduced in Conrad Aff. Ex. 18), at 1. Gulf's liability for this "make-whole payment" is the subject of the current lawsuit.

### B. *The Communications*

Bombardier Capital has submitted an index of the documents that it asserts are privileged. *See* Bombardier Capital Inc.'s Joint Defense Privileged Documents Index (undated). It has also submitted the documents themselves to the Court, which the Court has reviewed *in camera.* The documents, primarily in the form of e-mails, consist of communications between employees of Bombardier Aerospace and Bombardier Capital. On the Bombardier Aerospace side, the communications are to or from Dylan Haynie, an in-house attorney, and/or Cheryl Hayes, a legal assistant. On the Bombardier Capital side, the employees sending or receiving the communications were Julia Males, an in-house attorney; Patrick Mathieson, the Director of Asset Management and Collections; Carolyn Gipson, a Collections Manager; and/or Lynn Parah, a Collections Coordinator.

The documents are divisible into two broad categories. First, there are a number of documents generated after the January 2001 lawsuits were filed, almost all of which relate to the amount owed by Gulf to Bombardier Capital under the Capital Agreements. Exhibits 9–13, 25, 28. The bulk of these documents were generated in late July and early August 2002. Second, there are a series of e-mails sent between employees

of Bombardier Aerospace and Bombardier Capital from January 29 through February 1, 2002—after the Settlement Agreement had been signed. These communications also involve discussions of the amount of money owed under the Capital Agreements as well as what documentation would be required to consummate the Settlement Agreement. Exhibits 3–8, 14–23, 26–27.[1]

Bombardier Capital seeks to avoid production of these documents and to prevent Gulf from obtaining deposition testimony of the persons involved in the communications. As noted, Bombardier seeks to protect these documents and communications under two theories: the attorney-client/joint-defense privilege and work product protection. Each is discussed separately.

**\*470**   II.   *ATTORNEY–CLIENT/JOINT   DEFENSE PRIVILEGE*

A. *Choice of Law*

**[1]**   This Court's subject matter jurisdiction is based upon diversity. Accordingly, State law provides the rule of decision concerning the claim of attorney-client privilege. *See* Fed.R.Evid. 501; *Dixon v. 80 Pine Street Corp.,* 516 F.2d 1278, 1280 (2d Cir.1975); *ECDC Envt'l. v. New York Marine and Gen. Ins. Co.,* 1998 WL 614478, at \*3 (S.D.N.Y. June 4, 1998). In this case, the potentially relevant contracts contain choice of law provisions for two different states. The Capital Agreements—under which the disputed "make-whole payment" arose—specify that New York law governs their construction. *See* Loan Agreement § 7.7; Security Agreement § 12(f). The Settlement Agreement—which ostensibly settled the dispute between Bombardier Aerospace and Gulf—specifies that Texas law governs. *See* Settlement Agreement § 9.1. The parties' briefing does not address the choice-of-law issue and instead simply cites cases applying the attorney-client privilege under New York and federal law. As such, the parties have implicitly consented to having New York privilege law apply and this "implied consent ... is sufficient to establish choice of law." *Krumme v. WestPoint Stevens Inc.,* 238 F.3d 133, 138 (2d Cir.2000) (citing *Tehran–Berkeley Civil & Envtl. Eng'rs v. Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239, 242 (2d Cir.1989)).[2]

B. *Law Governing Joint Defense/Common Interest Privilege*

**[2]**   Bombardier Capital has asserted that the documents and subjects it seeks to protect are covered by a "joint defense"

privilege or "common interest" rule. Bombardier Capital makes this argument without any reference to the applicability of the attorney-client privilege itself. The common interest rule, however, is not a separate privilege but " 'an extension of the attorney client privilege.' " *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989) (quoting *Waller v. Financial Corp. of Am.,* 828 F.2d 579, 583 n. 7 (9th Cir.1987)), *cert. denied,* 502 U.S. 810, 112 S.Ct. 55, 116 L.Ed.2d 31 (1991). It protects "the confidentiality of communications from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties." *Id.; accord Bank of America, N.A. v. Terra Nova Ins. Co. Ltd.,* 211 F.Supp.2d 493, 496 (S.D.N.Y.2002); *Strougo v. BEA Assocs.,* 199 F.R.D. 515, 520 (S.D.N.Y.2001); *Shamis v. Ambassador Factors Corp.,* 34 F.Supp.2d 879, 893 (S.D.N.Y.1999). Thus, before a communication can be protected under the common interest rule, the communication must meet the other applicable elements of the attorney-client privilege.

**[3]**   "The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law." *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) (citation omitted). Under New York law, in order for the attorney-client privilege to apply, there must be a communication made " 'for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship.' " *Spectrum Sys. Int'l Corp. v. Chemical Bank,* 78 N.Y.2d 371, 377–78, 575 N.Y.S.2d 809, 581 N.E.2d 1055 (1991) (quoting *Rossi v. Blue Cross & Blue Shield,* 73 N.Y.2d 588, 593, 542 N.Y.S.2d 508, 540 N.E.2d 703 (1989)). In addition, "[t]he communication itself must be primarily or predominantly of a legal character." *Id.* at 378, 575 N.Y.S.2d 809, 581 N.E.2d 1055 (citation omitted). The "critical inquiry" requires the Court to determine whether, viewing its contents in full, the communication was made to facilitate rendition of legal advice or services **\*471** to a client. *Id.* at 379, 575 N.Y.S.2d 809, 581 N.E.2d 1055.

New York courts applying the common interest rule to civil proceedings have often looked to federal case law for guidance. *See, e.g., Stenovich v. Wachtell, Lipton, Rosen & Katz,* 199 Misc.2d 99, 756 N.Y.S.2d 367, 376–78 (Sup.Ct.N.Y.Co.2003); *Brooklyn Navy Yard Cogeneration Partners, L.P. v. PMNC,* 194 Misc.2d 331, 753 N.Y.S.2d 343, 345–46 (Sup.Ct. Kings Co.2002). With few exceptions, New York law involving the attorney-client privilege and the common interest rule follows federal privilege

law. *See Bowne v. AmBase Corp.,* 150 F.R.D. 465, 470 (S.D.N.Y.1993). Therefore the Court will examine both federal and New York cases to determine if Bombardier Capital has proven the applicability of the rule.

**[4] [5] [6]** The common interest rule is intended to allow clients to share information with an attorney for another party who shares the same legal interest. *See SR Int'l Bus. Ins. Co. Ltd. v. World Trade Center Properties, LLC,* 2002 WL 1334821, at *3 (S.D.N.Y. June 19, 2002) ("SR Int'l I"). Like all privileges, the common interest rule is narrowly construed. *See, e.g., United States v. Weissman,* 195 F.3d 96, 100 (2d Cir.1999) ("[p]rivileges should be narrowly construed and expansions cautiously extended.") (citing *Univ. of Pennsylvania v. EEOC,* 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990)); *see also Aetna Cas. and Sur. Co. v. Certain Underwriters at Lloyd's London,* 176 Misc.2d 605, 612, 676 N.Y.S.2d 727 (Sup.Ct.N.Y.Co.1998) (the common interest rule "is subject to severe limitations and a 'narrow construction.' "), *aff'd,* 263 A.D.2d 367, 692 N.Y.S.2d 384 (1st Dep't 1999), *leave* to *appeal dismissed,* 94 N.Y.2d 875, 705 N.Y.S.2d 6, 726 N.E.2d 483 (2000). There are two elements of the common interest rule: (1) the party who asserts the rule must share a common legal interest with the party with whom the information was shared and (2) the statements for which protection is sought were designed to further that interest. *See Johnson Matthey, Inc. v. Research Corp.,* 2002 WL 1728566, at *6 (S.D.N.Y. July 24, 2002). "The key consideration is that the nature of the interest is identical, not similar, and be legal, not solely commercial." *North River Ins. Co. v. Columbia Cas. Co.,* 1995 WL 5792, at *3 (S.D.N.Y. Jan.5, 1995) (quotation marks and citation omitted); *accord Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 447 (S.D.N.Y.1995).

With regard to the "interest" that must be shown, federal case law has repeatedly held that communications regarding business matters—even where litigation is pending or imminent—do not qualify for protection from discovery under the common interest rule. *See, e.g., In re FTC,* 2001 WL 396522, at *5 (S.D.N.Y. Apr. 19, 2001) ("courts have recognized that a business strategy which happens to include a concern about litigation is not a ground for invoking the common interest rule"); *Walsh v. Northrop Grumman Corp.,* 165 F.R.D. 16, 18 (E.D.N.Y.1996) ("[t]he doctrine does not extend to communications about a joint business strategy that happens to include a concern about litigation") (citation omitted); *Bank Brussels,* 160 F.R.D. at 447. New York case law is no broader on this point, restricting the doctrine to

"communication between counsel and parties with respect to legal advice in pending or reasonably anticipated litigation." *Aetna,* 176 Misc.2d at 612, 676 N.Y.S.2d 727; *see also Parisi v. Leppard,* 172 Misc.2d 951, 956, 660 N.Y.S.2d 307 (Sup.Ct.N.Y.Co.1997) ("[a] proper assertion of the privilege in a given instance therefore will rest on whether the exchange was for the purpose of giving and receiving shared legal counsel in or in anticipation of litigation, as opposed to transmitting information that was business-oriented ... in nature") (citing *Rossi,* 73 N.Y.2d at 593, 542 N.Y.S.2d 508, 540 N.E.2d 703).

Under New York law, "the burden of establishing any right to protection is on the party asserting it; the protection claimed must be narrowly construed; and its application must be consistent with the purposes underlying the immunity." *Spectrum Sys.,* 78 N.Y.2d at 377, 575 N.Y.S.2d 809, 581 N.E.2d 1055 (citing cases). The same is true under federal law. *Schwimmer,* 892 F.2d at 244 (citing cases).

**\*472** C. *Discussion*

1. *Rendition of Legal Advice or Counsel*

**[7]** As discussed above, the common interest rule is an extension of the attorney-client privilege to protect communications that otherwise would be lacking in any such privilege. *See Schwimmer,* 892 F.2d at 243. Thus, the communications at issue must be "for the purpose of giving and receiving shared legal counsel," *Parisi,* 172 Misc.2d at 956, 660 N.Y.S.2d 307, and it is the burden of the party asserting a privilege to establish its existence. *See Spectrum Sys.,* 78 N.Y.2d at 377, 575 N.Y.S.2d 809, 581 N.E.2d 1055. Such a showing must be based on competent evidence, usually through the admission of affidavits, deposition testimony or other admissible evidence. *See von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 147 (2d Cir.), *cert. denied,* 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987); *Bowne,* 150 F.R.D. at 472. The burden cannot be met by " 'mere conclusory or ipse dixit assertions' " in unsworn motion papers authored by attorneys. *von Bulow,* 811 F.2d at 146 (quoting *In re Bonanno,* 344 F.2d 830, 833 (2d Cir.1965)); *see also Watson v. Mix,* 38 A.D.2d 779, 328 N.Y.S.2d 161 (4th Dep't 1972) ("Defendants ... have not shown what is in [the file] or that anything in it is privileged. The mere conclusory unverified statement that it is confidential establishes nothing.").

The only evidence that ostensibly supports Bombardier Capital's position that the communications were for the

Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466 (2003)

purpose of seeking legal advice comes from Haynie, who testified conclusorily that the communications at issue involved "legal advice." *See* Deposition of Dylan Haynie, dated November 13, 2002 (reproduced in Conrad Aff. Ex. 12) ("Haynie Dep."), at 61, 68. Yet, Haynie also acknowledged that he was representing Bombardier Aerospace's interests, that he did not discuss "the legal strategy concerns of [Bombardier Capital]" and that Bombardier Capital was "essentially a third party." *Id.* at 68, 328 N.Y.S.2d 161. Haynie's recounting of the communications between him and Parah revealed that the communications involved the amount of money owed under the Capital Agreements, *see id.* at 65–67, 328 N.Y.S.2d 161, not any legal strategies. The Court's *in camera* review of the documents confirms this testimony. No apparent legal strategies were discussed.

Moreover, the circumstances of the communications do not suggest that Bombardier Capital would be receiving legal advice from Bombardier Aerospace's attorney. Bombardier Capital was not a party to the lawsuits and continued receiving payments due to it under the Loan Agreement. Each corporation had its own attorney. While Bombardier Capital certainly had an interest in the dispute between Gulf and Bombardier Capital being resolved and no default occurring, this does not suggest any need for the receipt of legal advice from Bombardier Aerospace's attorneys.

 [8]   In any event, the burden of showing that Bombardier Aerospace was providing Bombardier Capital with legal advice rests with Bombardier Capital. It has failed to meet this burden and an *in camera* review of the documents does not provide any additional support for such a claim. Because Bombardier Capital has failed to carry its burden of demonstrating that the communications at issue are "predominately of a legal character" or indeed at all legal in nature, the attorney-client privilege does not apply and there is no need to reach the issue of whether Bombardier Capital may invoke the common interest doctrine.

### 2. *The Nature of the Communications Involved*

Even if Bombardier Capital had met its burden of showing that the communications were for the purpose of rendering legal advice, its claim of privilege would still fail because it has not proven that Bombardier Capital and Bombardier Aerospace had identical legal interests.

Bombardier Capital claims that its common legal interest with Bombardier Aerospace was the interest both companies had in Gulf not breaching any of the various agreements.

*See* Def. Mem. at 2. But Bombardier Capital's ultimate interest in the dispute was merely a desire to ensure that the sums owed by Gulf to Bombardier Capital under its own agreements were paid. A concern to **\*473** ensure the payment of money is commercial in nature and does not qualify for protection under the common interest rule. *See, e.g., Johnson Matthey,* 2002 WL 1728566, at *6 ("[t]he shared desire to maximize royalty income is ... simply a commercial concern"). Accordingly, these interests were commercial and do not qualify for protection under the common interest rule.

Moreover, to the extent that the asserted interest could be construed to encompass a desire for Bombardier Aerospace to reach a favorable outcome in the litigation with Gulf, it is also insufficient to invoke the common interest rule. A concern shared by parties regarding litigation does not establish by itself that the parties held a common legal interest. *See, e.g., SR Int'l I,* 2002 WL 1334821, at *3 ("[s]haring a desire to succeed in an action does not create a 'common interest' ") (citations omitted); *In re FTC,* 2001 WL 396522, at *5 ("a business strategy which happens to include a concern about litigation is not a ground for invoking the common interest rule"); *Shamis,* 34 F.Supp.2d at 893 ("[a]lthough [the parties] would both benefit from a judgment in favor of the plaintiff, they do not share identical legal interests. Indeed, sharing a desire to succeed in an action does not create a 'common interest' ") (citing *Int'l Ins. Co. v. Newmont Mining Corp.,* 800 F.Supp. 1195, 1196 (S.D.N.Y.1992)).

Bombardier Capital also argues that the documents should be protected because both Bombardier Capital and Bombardier Aerospace had "coordinate[d] their legal strategy" against Gulf. Def. Mem. at 5. This argument suffers from two defects. First, the citation for the proposition that there existed such a "coordinated" legal strategy is the deposition testimony of Bombardier Aerospace's attorney, Haynie, who gave no testimony that there was such a "coordinated" strategy. Instead he testified only that he *discussed* legal strategy and that he was representing only Bombardier Aerospace's interests. Haynie Dep. at 68. Moreover, the existence even of such a coordinated legal strategy is insufficient where there is only a common commercial interest and no identity of legal interests. *See, e.g., Aetna,* 176 Misc.2d at 612–13, 676 N.Y.S.2d 727 (rejecting the use of a "coordinated legal strategy" as a basis for invoking the common interest doctrine).

Bombardier Capital's position also suffers from the defect that —even if there were some common interests—these interests

Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466 (2003)

were not "identical." For instance, Mathieson specifically stated that Bombardier Aerospace and Bombardier Capital had "different interests." Continued Deposition of Patrick J. Mathieson, dated October 29, 2002 (reproduced in Salisbury Decl. Ex. L), at 14. Males, who was Bombardier Capital's attorney, testified as follows:

> Q Let me ask a different [question]. [Bombardier Capital's] interests respecting Gulf were to be paid, correct?
>
> A [Bombardier Capital's] interests, yes, sure.
>
> Q And those interests were business interests, right?
>
> A Yes.
>
> Q And those interests were separate interests from Bombardier Aerospace, correct?
>
> A Yes.

Deposition of Julia Males, dated October 30, 2002 (reproduced in Salisbury Decl. Ex. N), at 43. Thus Males acknowledged that Bombardier Capital and Bombardier Aerospace held different interests—in addition to admitting that Bombardier Capital's interests were business in nature.

Bombardier Capital's argument that the two companies had the same interests relies heavily on the fact that the two companies are subsidiaries of a common owner. *See generally* Bombardier Capital Inc.'s Reply to Gulf Islands Leasing Inc.'s Opposition to Assertion of the Joint Defense Privilege, dated December 18, 2002, at 3. While cases have upheld assertions of the common interest rule for related companies, "they have done so only upon a showing that a common attorney was representing both corporate entities or that the two corporations shared a common legal interest." *Bowne,* 150 F.R.D. at 491 (citing cases). Thus, the proponent of the privilege must still prove a common legal interest and may not rely solely on the fact that the entities at issue are affiliated with **\*474** each other. *See Roberts v. Carrier Corp.,* 107 F.R.D. 678, 687–88 (N.D.Ind.1985); *United States v. Am. Tel. & Tel. Co.,* 86 F.R.D. 603, 616 (D.D.C.1979).

Some cases state the broad proposition that disclosure of attorney-client privileged information to an affiliated company does not waive the privilege—thereby obviating the need to invoke the common interest rule. *See, e.g., Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.,* 2000 WL 1800750, at \*6 (S.D.N.Y. Dec. 7, 2000); *Music Sales Corp. v. Morris,* 1999 WL 974025, at \*7 (S.D.N.Y. Oct. 26, 1999); *Duplan Corp. v. Deering Milliken, Inc.,* 397

F.Supp. 1146, 1185 (D.S.C.1974), *aff'd,* 540 F.2d 1215 (4th Cir.1976). But it appears that in such cases no waiver was found because the entities were represented by a common attorney, *see Cary Oil,* 2000 WL 1800750, at \*3–6, or shared a common legal interest. *See Music Sales,* 1999 WL 974025, at \*3; *Duplan,* 397 F.Supp. at 1184. In this case, however, Bombardier Capital and Bombardier Aerospace utilized different attorneys and held different interests of a commercial, not legal, nature.

**[9]** The mere existence of an affiliate relationship does not excuse a party from demonstrating the applicability of the common interest rule. Having chosen to operate as separate entities—and to obtain whatever advantages inure from so operating—Bombardier Capital and Bombardier Aerospace must be held to their burden of proving the applicability of any privilege in the same manner as two unrelated entities. That burden has not been met in this case.

## III. *THE WORK PRODUCT DOCTRINE*

### A. *Applicable Law*

Bombardier Capital also seeks to protect the documents from disclosure under the work product doctrine on the ground that they were "prepared in anticipation of litigation or for trial." Fed.R.Civ.P. 26(b)(3). The work product doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy 'with an eye towards litigation,' free from unnecessary intrusion by his adversaries." *United States v. Adlman,* 134 F.3d 1194, 1196 (2d Cir.1998) (quoting *Hickman v. Taylor,* 329 U.S. 495, 510–11, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). The party asserting work product protection "bears the burden of establishing its applicability to the case at hand." *In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002,* 318 F.3d 379, 384 (2d Cir.2003) (citing cases). This includes establishing that all required elements exist and that the protection has not been waived. *See RLS Assocs., LLC v. United Bank of Kuwait, PLC,* 2003 WL 1563330, at \*3 (S.D.N.Y. Mar. 26, 2003); *Resolution Trust Corp. v. Mass. Mut. Life Ins. Co.,* 200 F.R.D. 183, 188 (W.D.N.Y.2001) (citation omitted); *Granite Partners v. Bear, Stearns & Co. Inc.,* 184 F.R.D. 49, 52 (S.D.N.Y.1999) (citing cases).

" '[T]hree conditions must be met to earn work product protection. The material must (1) be a document or a tangible thing, (2) that was prepared in anticipation of litigation, and (3) was prepared by or for a party, or by his representative.' " *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.,* 2002 WL

Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc., 215 F.R.D. 466 (2003)

31556382, at *4 (S.D.N.Y. Nov. 15, 2002) (quoting *In re Grand Jury Subpoenas Dated December 18, 1981 & January 4, 1982,* 561 F.Supp. 1247, 1257 (E.D.N.Y.1982)) (citations omitted); *accord SR Int'l Bus. Ins. Co., Ltd. v. World Trade Center Properties LLC,* 2002 WL 1455346, at *2 (S.D.N.Y. July 3, 2002) (citation omitted). The dispute in this case focuses on the second element: whether the documents at issue were prepared in anticipation of litigation.

In *Adlman,* the Second Circuit held that material will meet the "in anticipation of litigation" requirement if " 'in light of the nature of the document and the factual situation of the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.' " 134 F.3d at 1202 (emphasis in original) (quoting 8 Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, *Federal Practice and Procedure* § 2024, at 343 (1994)) (citing cases). Work product protection, however, is not afforded to

> documents that are prepared in the ordinary course of business or that would have been created in essentially similar form **\*475** irrespective of the litigation. It is well established that work-product privilege does not apply to such documents. *See* Fed.R.Civ.P. 26(b)(3), Advisory Committee's note ("Materials assembled in the ordinary course of business ... are not under the qualified immunity provided by this subdivision.") ... Even if such documents might also help in preparation for litigation, they do not qualify for protection because it could not fairly be said that they were created "because of" actual or impending litigation.

*Id.* (citations omitted); *see also In re Grand Jury Proceedings,* 2001 WL 1167497, at *14 (S.D.N.Y. Oct. 3, 2001) ("It is not enough that a document is created after the threat of litigation becomes real, but it is also necessary that the motivation for creating that document be the litigation."). Accordingly, while a document does not lose work product protection "merely because it is created in order to assist with a business decision," *Adlman,* 134 F.3d at 1202, it "will not be protected if it is created in the ordinary course of business." *In re Grand Jury,* 2001 WL 1167497, at *14 (citing cases).

### B. *Bombardier Capital's Assertion of Work Product Protection*

As noted, the documents at issue all concern the same subject: the amount owed Bombardier Capital under the Capital Agreements and the steps necessary to ensure that Bombardier Capital was paid the proper amount upon the consummation of the Settlement Agreement. The amount

to be paid to Bombardier Capital was certainly critical to Bombardier Aerospace's resolution of the lawsuit against it because Bombardier Aerospace needed to know how much money Gulf would have to pay to Bombardier Capital in the event of a settlement. Thus, the documents reflect Bombardier Aerospace's efforts to obtain from Bombardier Capital the "payoff amount" for this loan. Bombardier Capital's argument that the communications are attorney work product rests on its assertion that the communications occurred "only because of the threatened or anticipated litigation between Gulf and [Bombardier Capital]." Memorandum of Law of Bombardier Capital Inc. in Support of its Assertion of the Work Product Protection, dated February 11, 2003 (Docket # 36) ("Def. Work Product Mem."), at 7–8.

**[10]**    Whether material was prepared "in anticipation of litigation" requires a determination of the subjective question of whether the party actually thought it was threatened with litigation and the objective question of whether that belief was reasonable. *See, e.g., Rexford v. Olczak,* 176 F.R.D. 90, 91 (W.D.N.Y.1997) (citing *Chiquita Int'l Ltd. v. M/V Bolero Reefer,* 1994 WL 263603, at *2 (S.D.N.Y. June 7, 1994)). In order to demonstrate such a subjective belief, a party asserting work product protection will generally submit affidavits or similar evidence establishing that it held such a belief. *See, e.g., Prebena Wire Bending Machinery Co. v. Transit Worldwide Corp.,* 1999 WL 1063216, at *4 (S.D.N.Y. Nov. 23, 1999); *Atlantic Richfield Co. v. Current Controls, Inc.,* 1997 WL 538876, at *2 (W.D.N.Y. Aug. 21, 1997). Other than the unsupported statements in its memoranda of law, however, Bombardier Capital submitted no evidence in its initial motion papers that would establish that Bombardier Capital subjectively believed at the time that litigation was imminent.

Gulf, which does not bear any burden, responded by submitting deposition testimony to support its position that communications regarding payoff amounts were routine and thus not created in anticipation of litigation. For example, Bombardier Capital's employees who oversee finance loans are called upon to provide approximately 25 payoff amounts per month. *See* Deposition of Carolyn R. Gipson, dated October 29, 2002 ("Gipson Dep.") (reproduced in Affidavit of William B. Fleming in Support of Gulf Island Leasing, Inc.'s Memorandum of Law in Opposition to Bombardier Capital, Inc.'s Assertion of the Work Product Privilege, filed February 21, 2003 (Docket # 40) ("Fleming Aff."), Ex. 15), at 15. These amounts are generated by a computer program, *id.* at 11, and require examining documentation

available to both sides—the Loan Agreement—to determine the amounts due. *Id.* at 31–33. The generation of such amounts was part of Bombardier Capital's regular business. Thus, communications generated for purposes **\*476** of this function would have taken place "in essentially similar form irrespective of the litigation." *Adlman,* 134 F.3d at 1202. Notably, the agreement with Bombardier Capital itself contemplated the potential for prepayment of the loan in certain situations. *See* Loan Agreement, § 2.4. That the calculation of the payoff amount included a calculation of the "make whole" or "breakage" amounts does not convert these calculations into those undertaken in anticipation of litigation. Such calculations were regularly performed as part of computing the payoff amounts. *See* Gipson Dep. at 12–13; Deposition of Patrick J. Mathieson, dated September 12, 2002 (reproduced in Fleming Aff. Ex. 18), at 66.

Bombardier Capital makes much of the fact that there was ongoing litigation between Bombardier Aerospace and Gulf during much of the period at issue. *See* Reply Memorandum of Law of Bombardier Capital, Inc. in Support of its Assertion of the Work Product Protection, dated February 28, 2003 (Docket # 41) ("Def. Work Product Reply"), at 7–8. But this argument shows only that the documents were created because of the litigation against *Bombardier Aerospace.* Litigation against a separate entity, however, is insufficient to show that the documents were created "because of" Bombardier Capital's own anticipation of litigation. *Adlman,* 134 F.3d at 1202. For its own part, Bombardier Capital was receiving the payments due to it under the Loan Agreement. Once the Settlement Agreement was entered into, it had every reason to expect that it would be paid as part of the consummation of that agreement.

**[11]    [12]**    Certainly, Bombardier Capital might have foreseen that there might someday be a dispute with Gulf about its calculations or the imposition of the "make whole" or "breakage" payments. But a mere potential for a future dispute is insufficient to show that a party acted in "anticipation of litigation." Instead a "substantial probability" of litigation must exist and the concern that litigation may occur must be real, not speculative. *In re Grand Jury,* 2001 WL 1167497, at *14. No such showing has been made here.

Notably, the first time that Gulf wrote Bombardier Capital, as opposed to Bombardier Aerospace, about the disputed "make-whole payment" was after the date the payment was

made and after the documents at issue were created. *See* Letter from Craig S. Sternberg to Patrick Mathieson, dated February 12, 2002 (reproduced in Fleming Aff. Ex. 16), at 1–3. Moreover, Males testified that she was unaware of any legal dispute between Gulf and Bombardier Capital until after the settlement between Gulf and Bombardier Aerospace was completed. *See* Deposition of Julia Males, dated October 30, 2002 (reproduced in Fleming Aff. Ex. 13), at 17.

By way of reply brief, Bombardier Capital claims that the threat of litigation existed because of statements made by Gulf to employees of Bombardier Aerospace or Bombardier Inc., questioning their obligation to pay Bombardier Capital under the Loan Agreement, contesting the "make whole" payment and preserving Gulf's rights against Bombardier Capital in settling with Bombardier Aerospace. *See* Def. Work Product Reply at 5–6. The Court could properly ignore these arguments because they were first made by way of reply memorandum. *See, e.g., Romeu v. Cohen,* 121 F.Supp.2d 264, 273 (S.D.N.Y.2000), *aff'd,* 265 F.3d 118 (2d Cir.2001). In any event, the mere fact that a potential dispute looms on the horizon is insufficient to show that the communications regarding the payoff amount, including the make-whole payment, would not have been made in precisely the same form as part of the regular course of Bombardier Capital's business irrespective of the possibility of litigation. *See Adlman,* 134 F.3d at 1202. The documents at issue consist only of discussions that were directly relevant to provide the payoff amount needed to consummate the Settlement Agreement. *See RLS Associates,* 2003 WL 1563330, at *5 ("Although [defendant] may have been concerned that, should it opt to follow a certain course, litigation might follow, it appears that the document ... would have been created irrespective of the anticipated litigation. For this reason, the document may not be protected as work product.") (citing *Adlman,* 134 F.3d at 1203–05).

## **\*477**  *Conclusion*

For the reasons stated above, the motion for a protective order is denied.[3]

## **All Citations**

215 F.R.D. 466

Footnotes

1    During the course of briefing on the instant motion, Gulf announced that it does not seek production of the remaining
     documents, Exhibits 1, 2, and 24, which were created after Gulf had filed this lawsuit. *See* Gulf Island Leasing, Inc.'s
     Memorandum of Law in Opposition to Bombardier Capital, Inc.'s Assertion of the Work Product Privilege, dated February
     21, 2003 (Docket # 38) ("Gulf Work Product Opp."), at 5 n. 4.

2    Following the initial briefing, the Court asked the parties to affirmatively state their views as to what state law should
     apply regarding the attorney-client privilege. Bombardier Capital thereafter sent a letter stating that Vermont law, which it
     contended follows Second Circuit precedent, should apply because the communications at issue originated in that state.
     *See* Letter from Patrick Salisbury, dated January 30, 2003, at 1–2. Gulf indicated that this Court should apply the "law
     of the Second Circuit." Letter from Robert Lovett, dated January 31, 2003, at 1–2. As discussed further below, the issue
     is of no consequence because federal law, as interpreted by the Second Circuit, is essentially in accord with New York
     law on the pertinent issues.

3    While not listed on the privilege log of the documents ostensibly at issue in this motion, Bombardier Capital asserted in the
     middle of the briefing on this motion that one document, stamped 1035, is protected by the attorney-client privilege and the
     work product doctrine. *See* Def. Work Product Mem. at 9. This document, which has been reviewed *in camera,* consists
     of two e-mails sent between Bombardier Capital employees discussing how much Bombardier Capital was entitled to
     receive under the Loan Agreement. One e-mail was sent to Michel Bourgeois, a Bombardier Capital Vice–President and
     General Manager who apparently is also an attorney, although not admitted to practice in the United States. *See* Gulf
     Work Product Opp. at 12, 13 n. 5.

     The document is not protected by the attorney-client privilege because Bombardier Capital has failed to show either that
     the e-mails were communications made to or from an individual acting in his capacity as an attorney or that they were
     made for the purpose of obtaining or providing legal advice. Bombardier Capital's mere assertion in its brief that the e-
     mails were created "as a part of [Bombardier Capital's] legal review ... of the provisions in the [Capital Agreements] ...,"
     Def. Work Product Mem. at 10, is insufficient to meet its burden. *von Bulow,* 811 F.2d at 146 ("mere conclusory or ipse
     dixit assertions" insufficient to show privilege) (citation omitted).

     Bombardier Capital also asserts this document is entitled to work product protection. This document was created at
     the same time as the other documents discussed herein, however, and addresses the same topic: the payoff amount
     resulting from Gulf's prepayment. For the same reasons as stated above, it does not qualify for work product protection.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S.
                                                                    Government Works.

⚑ KeyCite Yellow Flag - Negative Treatment

Distinguished by Wellin v. Wellin, D.S.C., September 30, 2016

259 F.R.D. 64
United States District Court,
S.D. New York.

HSH NORDBANK AG NEW YORK
BRANCH, as Administrative Agent
for Itself and Certain Lenders, Plaintiff.

v.

Michael SWERDLOW et al., Defendants.

No. 08 Civ. 6131(GEL).
|
July 24, 2009.

**Synopsis**

**Background:** Administrative agent for five non-party lenders who participated in loan syndication brought action against guarantors, seeking to enforce guaranties for $192 million loan for a residential condominium development. Agent sought to recall, under claw-back provision of discovery protective order, inadvertently produced documents for which it claimed attorney-client privilege.

**Holdings:** The District Court, Gerard E. Lynch, J., held that:

[1] e-mail message that merely expressed a lender's desire to formally retain the agent's counsel was not protected by attorney-client privilege;

[2] common interest doctrine was applicable;

[3] crime/fraud exception to attorney-client privilege was not applicable; and

[4] attorney-client privilege was not waived by carelessness.

Relief granted in part and denied in part.

**West Headnotes (26)**

**[1]** **Privileged Communications and Confidentiality** ☞ Parties and Interests Represented by Attorney

**Privileged Communications and Confidentiality** ☞ E-mail and electronic communication

E-mail message between counsel retained by administrative agent for five lenders who participated in syndication of $192 million loan for a residential condominium development, and one of lenders, regarding lender's desire to formally retain the agent's counsel, were not protected by attorney-client privilege, in agent's action seeking to collect on loan guaranties, in which action the lenders were not parties.

**[2]** **Privileged Communications and Confidentiality** ☞ Client information; retainer and authority

There is no attorney-client privilege as to a client's identity.

10 Cases that cite this headnote

**[3]** **Privileged Communications and Confidentiality** ☞ Elements in general; definition

Under New York law, the attorney-client privilege protects confidential communications between client and counsel where such communications are made for the purpose of providing or obtaining legal advice. N.Y.McKinney's CPLR 4503(a)(1).

15 Cases that cite this headnote

**[4]** **Privileged Communications and Confidentiality** ☞ Effect of delivery of nonprivileged materials to attorney; preexisting documents

A document is not privileged under the attorney-client privilege merely because it was sent or received between an attorney and client.

5 Cases that cite this headnote

**[5]    Privileged Communications and Confidentiality 🔑 Purpose of privilege**

The attorney-client privilege is designed to encourage attorneys and their clients to communicate fully and frankly and thereby promote broader public interests in the observance of law and administration of justice.

2 Cases that cite this headnote

**[6]    Privileged Communications and Confidentiality 🔑 Construction**

Because the attorney-client privilege renders relevant information undiscoverable, it must be narrowly construed, and its application must be consistent with the purposes underlying the immunity.

1 Case that cites this headnote

**[7]    Privileged Communications and Confidentiality 🔑 Presumptions and burden of proof**

Under New York law, the burden of establishing attorney-client privilege is on the party asserting it.

12 Cases that cite this headnote

**[8]    Privileged Communications and Confidentiality 🔑 Presumptions and burden of proof**

Under New York law, the party asserting attorney-client privilege bears the burden of demonstrating that it has not been waived.

11 Cases that cite this headnote

**[9]    Privileged Communications and Confidentiality 🔑 Communications**

Through or in Presence or Hearing of Others; Communications with Third Parties

**Privileged Communications and Confidentiality 🔑 Waiver of privilege**

Under New York law, although communications between client and counsel relating to legal advice are generally privileged, the attorney-client privilege is waived where such communications are made in the known presence of a third party.

15 Cases that cite this headnote

**[10]    Privileged Communications and Confidentiality 🔑 Common interest doctrine; joint clients or joint defense**

The common interest doctrine is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege.

5 Cases that cite this headnote

**[11]    Privileged Communications and Confidentiality 🔑 Common interest doctrine; joint clients or joint defense**

Under federal law, the common interest doctrine precludes a waiver of the underlying privilege concerning confidential communications between the parties made in the course of an ongoing common enterprise and intended to further the enterprise, irrespective of whether an actual litigation is in progress.

9 Cases that cite this headnote

**[12]    Privileged Communications and Confidentiality 🔑 Common interest doctrine; joint clients or joint defense**

The common interest doctrine, which is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege, does not encompass a joint business strategy which happens to include as one of its elements a concern about litigation, nor does it provide an independent source of privilege or confidentiality.

5 Cases that cite this headnote

**[13]** Federal Civil Procedure 🔑 Work Product Privilege; Trial Preparation Materials

Privileged Communications and Confidentiality 🔑 Common interest doctrine; joint clients or joint defense

Where the underlying communication is not protected by the attorney-client privilege or the attorney work-product doctrine, the common interest doctrine does not apply.

21 Cases that cite this headnote

**[14]** Privileged Communications and Confidentiality 🔑 Common interest doctrine; joint clients or joint defense

Demonstrating the applicability of the common interest doctrine, which is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege, requires a two-part showing: (1) the party who asserts the doctrine must share a common legal interest with the party with whom the information was shared, and (2) the statements for which protection is sought must have been designed to further that interest.

15 Cases that cite this headnote

**[15]** Privileged Communications and Confidentiality 🔑 Common interest doctrine; joint clients or joint defense

Common interest doctrine, which is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waived the attorney-client privilege as to communications between counsel retained by administrative agent for five lenders who participated in syndication of $192 million loan for a residential condominium development, and the lenders, relating to timing and conduct of litigation to collect on loan guaranties, though lenders were not parties to the litigation and counsel communicated directly with lenders

because lenders were not represented by their own counsel; administrative agent, who was also a lender, shared a common interest in enforcing the guaranties, loan agreement identified administrative agent as the only party capable of enforcing or exercising any of the rights or remedies under any of the loan documents, and loan agreement contemplated that administrative agent's counsel would effectively represent the interests of the various lenders, which interests the agreement presumed to be identical.

2 Cases that cite this headnote

**[16]** Privileged Communications and Confidentiality 🔑 Common interest doctrine; joint clients or joint defense

Although the common interest doctrine, which is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege, applies only where a party has demonstrated the existence of an agreement to pursue a common legal strategy, the agreement need not be in writing.

9 Cases that cite this headnote

**[17]** Privileged Communications and Confidentiality 🔑 Criminal or other wrongful act or transaction; crime-fraud exception

Under the crime/fraud exception, attorney-client privilege is to be invaded when it is abused for purposes of engaging in fraud.

2 Cases that cite this headnote

**[18]** Privileged Communications and Confidentiality 🔑 Criminal or other wrongful act or transaction; crime-fraud exception

The crime/fraud exception to the attorney-client privilege is aimed at serious misconduct, and it can be invoked only if the party seeking to invoke it demonstrates that there is probable cause to believe that a fraud or crime has been committed

and that the communications in question were in furtherance of the fraud or crime.

2 Cases that cite this headnote

**[19]   Privileged Communications and Confidentiality** 🔑 **Criminal or other wrongful act or transaction; crime-fraud exception**

Alleged conduct of administrative agent for five non-party lenders who participated in syndication of $192 million loan for a residential condominium development, and of counsel retained by administrative agent, in failing to inform loan guarantors of administrative agent's intent to sue on the guaranties, did not constitute a fraud, for purposes of crime/fraud exception to attorney-client privilege, with respect to communications between counsel retained by administrative agent, and the lenders, relating to timing and conduct of litigation to collect on loan guaranties, in which litigation the lenders were not parties.

2 Cases that cite this headnote

**[20]   Privileged Communications and Confidentiality** 🔑 **Offensive use doctrine; abuse of privilege**

The attorney-client privilege cannot at once be used as a shield and a sword.

1 Case that cites this headnote

**[21]   Privileged Communications and Confidentiality** 🔑 **Offensive use doctrine; abuse of privilege**

**Privileged Communications and Confidentiality** 🔑 **Waiver of privilege**

In order to prevent the attorney-client privilege from at once being used as a shield and a sword, the "at issue" doctrine precludes a party from disclosing only self-serving communications while barring discovery of other communications that an adversary could use to challenge the truth of the claim.

2 Cases that cite this headnote

**[22]   Privileged Communications and Confidentiality** 🔑 **Offensive use doctrine; abuse of privilege**

**Privileged Communications and Confidentiality** 🔑 **Waiver of privilege**

The "at issue" doctrine, which precludes a party from using the attorney-client privilege to disclose only self-serving communications while barring discovery of other communications that an adversary could use to challenge the truth of the claim, relates to issues that the party asserting privilege puts in issue, not to issues raised by that party's adversary.

3 Cases that cite this headnote

**[23]   Privileged Communications and Confidentiality** 🔑 **Waiver of privilege**

Under New York law, inadvertent disclosure of documents containing legal advice may constitute a waiver of the attorney-client privilege, but such a waiver is inappropriate where: (1) the party asserting the privilege intended to maintain confidentiality and took reasonable steps to prevent the documents' disclosure; (2) the party promptly sought to remedy the situation after learning of the disclosure; and (3) the party in possession of the materials will not suffer undue prejudice if a protective order is granted.

1 Case that cites this headnote

**[24]   Privileged Communications and Confidentiality** 🔑 **Waiver of privilege**

Under federal law, determining whether a party's inadvertent disclosure of otherwise privileged material constitutes a waiver requires balancing four factors: (1) the reasonableness of the precautions taken by the producing party to prevent inadvertent disclosure of privileged documents; (2) the volume of discovery versus the extent of the specific disclosure issue; (3) the length of time taken by the producing party to

rectify the disclosure; and (4) the overarching issue of fairness.

5 Cases that cite this headnote

[25]   **Privileged Communications and Confidentiality** 🔑 Waiver of privilege

Attorney-client privilege was not waived by carelessness, with respect to inadvertent production, during discovery in action to collect on loan guaranties, by administrative agent for five non-party lenders who participated in syndication of $192 million loan for a residential condominium development, of nine documents involving communications between counsel retained by administrative agent, and the lenders, relating to timing and conduct of litigation to collect on loan guaranties, in which litigation the lenders were not parties; agent reviewed millions of pages of documents, about 250,000 of which were eventually produced during discovery, agent promptly sought to recall the documents, and parties had executed a discovery protective order in which they had agreed that inadvertent production of a document subject to attorney-client privilege would not effect a waiver of the producing party's rights.

1 Case that cites this headnote

[26]   **Privileged Communications and Confidentiality** 🔑 Waiver of privilege

For production of a document protected by attorney-client privilege to be completely reckless, so that the privilege is waived despite a discovery protective order providing that inadvertent production of a document subject to attorney-client privilege will not effect a waiver of the producing party's rights, the producing party must have shown no regard for preserving the confidentiality of the privileged documents.

10 Cases that cite this headnote

**Attorneys and Law Firms**

**\*67**  Michael H. Barr, Sonnenschein Nath & Rosenthal LLP, New York, NY, for plaintiff.

Raymond N. Hannigan, Herrick, Feinstein LLP, New York, NY, for defendants Brian Street and James Cohen.

John Shubin, Shubin & Bass, Miami, FL, for defendant Michael Swerdlow.

**OPINION AND ORDER**

GERARD E. LYNCH, District Judge.

Plaintiff HSH Nordbank AG New York Branch ("Nordbank"), as administrative **\*68**  agent for five lenders ("non-party lenders"),[1] brings this breach of contract action against defendants Michael Swerdlow, Brian Street, and James Cohen, seeking to enforce various guarantees of a $192 million loan. By letter dated June 9, 2009, the parties seek judicial resolution of a dispute that has arisen during the course of discovery. For the reasons discussed below, Nordbank's request for relief is granted in part and denied in part.

**BACKGROUND**

**I. The Dispute**
The following facts are alleged in the complaint, and/or set forth in the parties' joint letter presenting the discovery dispute.

In December 2005, Nordbank agreed to loan Holly Hill I Associates, Ltd. ("Holly Hill") up to $192 million (the "Loan") for a residential condominium development in Holly Hill, Florida. (Compl. ¶¶ 1, 13.) Under the terms of the Loan, a "Default" is "any event which, if it were to continue uncured, would, with notice or lapse of time or both, constitute an Event of Default." (*Id.* Ex. A, § 1.1, at 10.) Events of Default, in turn, include Holly Hill's "failure to pay ... any regularly scheduled installment of principal, interest ... or other amount due under the Loan Documents ... on the date when due" (*id.* § 14.1), and its violation of any of the specific covenants contained in the Loan. (*Id.* § 14.5.)

Article 17 of the Loan identifies Nordbank as the Administrative Agent for the non-party lenders and provides:

> In the event that Administrative Agent has such actual knowledge or receives such a notice of the occurrence of a Default or Event of Default, Administrative Agent ... following consultation with Lenders, shall take such action (or refrain from taking such action) with respect to such Default or Event of Default as it shall deem appropriate and in the best interests of Lenders in Administrative Agent's sole and absolute discretion.... [E]ach of [the] Lenders acknowledges and agrees that no individual Lender may separately enforce or exercise any of the provisions, rights or remedies of or under any of the Loan Documents ... other than by and through Administrative Agent.

(*Id.* § 17.16.) Article 17 further notes:

> Administrative Agent selected, and the other Lenders consented to the selection of, Sonnenschein Nath & Rosenthal LLP as Administrative Agent's counsel for all matters in connection with the Loan, the Project and the transactions contemplated by the Loan Documents. If, at any time during the term of the Loan, any Lender shall decide that its interests have become so divergent from the interests of the other Lenders or Administrative Agent that it does not feel it is prudent to be represented by the same counsel, such Lender may retain, at its sole cost and expense, its own counsel (but such Lender shall nevertheless remain responsible for its pro rata share of costs, expenses and liabilities including with respect to counsel selected by Administrative Agent)[.]

(*Id.* § 17.17.)

To support Holly Hill's obligations under the Loan, defendants Swerdlow, Street, and Cohen, all of whom were principals of Holly Hill at the time the Loan was made, executed various guaranties in favor of Nordbank. (*Id.* ¶¶ 2, 18.) These guaranties included a Guaranty of Payment, which jointly and severally guaranteed "full payment when due of all interest on the Loan," and a Completion Costs Guaranty.[2] (*Id.* ¶¶ 2, 19.)

In 2006, the Loan was syndicated among Nordbank and the non-party lenders. (*Id.* ¶ 1.) The same year, defendants executed a Principal Guaranty in consideration of certain amendments to the Loan. (*Id.* ¶¶ 2, 20.) The Principal Guaranty jointly and severally guaranteed "payment when due ... of the outstanding principal balance of the Loan" up to $40 million. (*Id.*)

**\*69** As a result of deterioration of the Florida real estate market, the Holly Hill development project has met with several challenges. (*Id.* ¶ 3.) In particular, during the first six months of 2008, various construction liens were filed against the project. (*Id.*) According to Nordbank, the filing of these liens, as well as Holly Hill's failure to discharge them, constitutes a default under the terms of Loan. (*Id.*) Given this default and others, on April 3, 2008, Nordbank decided to accelerate the Loan, thus causing the outstanding principal and all accrued interest and fees to become due immediately. (*Id.*) It subsequently notified defendants not only that Holly Hill had defaulted on the Loan, and that it had chosen to accelerate repayment, but also that defendants would be required to pay all sums due under the Guaranties immediately. (*Id.* ¶ 4.)

When defendants failed to comply with its written demand, Nordbank commenced this action on July 3, 2008, alleging that defendants breached the Guaranties and are therefore jointly and severally liable for more than $40 million. (*Id.* ¶¶ 28–40.) During the course of discovery, Nordbank reviewed more than two million pages of material and produced approximately 250,000 pages. (Jt. Ltr. at 26; Kattan Decl. ¶¶ 2, 4.) In producing this information, it inadvertently produced nine documents that it claims are subject to the attorney-client privilege.[3] (Jt. Ltr. Exs. 1–9.) Once apprised of its error, Nordbank promptly sought to invoke its rights under the "claw-back" provision of the parties' protective order.[4] (*Id.* at 25–26; Kattan Decl. ¶ 5.) Defendants, however, asserted that—for a variety of reasons-the documents were not protected by attorney-client privilege and therefore could not be recalled. The parties' formal request for resolution of this dispute ensued.

## II. The Parties' Contentions

[1] [2] Nordbank argues that under the common interest doctrine, the communications at issue in this dispute are protected from disclosure by the attorney-client privilege, and may therefore be recalled. (Jt. Ltr. at 16–17.) While defendants do not dispute that the content of the communications is subject to protection by the attorney-client privilege,[5] they do contend that the common interest doctrine cannot be used to extend attorney-client privilege to the communications because Nordbank's attorneys made the communications directly to the nonparty lenders rather than to their attorneys. (*Id.* at 6–13.) Defendants also raise several other arguments to support their claim that Nordbank cannot invoke the attorney-client privilege, including that

the documents **70** it seeks to "claw back" constitute communications in furtherance of a fraud and are therefore not protected (*id.* at 5–6), that the common interest agreement signed by the lenders was dated October 24, 2008, and does not relate back to the date of the communications (*id.* at 12–13), that Nordbank is impermissibly attempting to use the attorney-client privilege as a shield and sword (*id.* at 14–15), and that Nordbank's production of the purportedly privileged documents was so careless as to constitute a waiver. (*Id.* 15.)

## DISCUSSION

### I. Attorney–Client Privilege and the Common–Interest Doctrine

A. *Overview of Attorney–Client Privilege*

 [3]  [4]  [5]  [6]   Under New York law,[6] the attorney-client privilege protects confidential communications between client and counsel where such communications are made for the purpose of providing or obtaining legal advice.[7] *See* N.Y.C.P.L.R. § 4503(a)(1); *Rossi v. Blue Cross & Blue Shield of Greater N.Y.,* 73 N.Y.2d 588, 593, 542 N.Y.S.2d 508, 540 N.E.2d 703 (1989); *see also Sokol v. Wyeth, Inc.,* No. 07 Civ. 8442, 2008 WL 3166662, at *5 (S.D.N.Y. Aug.4, 2008) ("The privilege ... shields from discovery advice given by the attorney as well as communications from the client to the attorney."). The privilege is designed "to encourage attorneys and their clients to communicate fully and frankly and thereby to promote 'broader public interests in the observance of law and administration of justice.' " *In re County of Erie,* 473 F.3d 413, 418 (2d Cir.2007), quoting *Upjohn Co. v. United States,* 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *see also In re Grand Jury Subpoena Duces Tecum Dated Sept. 15.1983,* 731 F.2d 1032, 1036–37 (2d Cir.1984) ("The availability of sound legal advice inures to the benefit not only of the client who wishes to know his options and responsibilities in given circumstances, but also of the public which is entitled to compliance with the ever growing and increasingly complex body of public law."). Nevertheless, because it "renders relevant information undiscoverable," *In re County of Erie,* 473 F.3d at 418, it "must be narrowly construed; and its application must be consistent with the purposes underlying the immunity." *Spectrum Sys. Int'l Corp. v. Chem. Bank,* 78 N.Y.2d 371, 377, 575 N.Y.S.2d 809, 581 N.E.2d 1055 (1991); *see also Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); *In re County of Erie,* 473 F.3d at 418.

 [7]  [8]   The burden of establishing attorney-client privilege is on the party asserting it. *See Spectrum Sys.,* 78 N.Y.2d at 377, 575 N.Y.S.2d 809, 581 N.E.2d 1055. Likewise, the party asserting the privilege also bears the burden of demonstrating that it has not been waived. *See John Blair Commc'ns, Inc. v. Reliance Capital Group, L.P.,* 182 A.D.2d 578, 579, 582 N.Y.S.2d 720 (1st Dep't 1992). Such a party satisfies its burden of proof where it "establish[es] that the information was a communication between client and counsel, that it was intended to be and was kept confidential, and [that] it was made in order to assist in obtaining or providing legal advice or services to the client." *Charter One Bank, F.S.B. v. Midtown Rochester, LLC,* 191 Misc.2d 154, 166, 738 N.Y.S.2d 179 (N.Y.Sup.Ct.2002); *see also United States v. Constr. Prods. Research, Inc.,* 73 F.3d 464, 473 (2d Cir.1996).

B. *Common Interest Doctrine*

 [9]   Although communications between client and counsel relating to legal advice are generally privileged, the privilege is waived where such communications are "made ... in the known presence of a third party." *People* **71** *v. Osorio,* 75 N.Y.2d 80, 84, 550 N.Y.S.2d 612, 549 N.E.2d 1183 (1989). As New York courts have explained, "disclosure of attorney-client communication to a third person or communications with an attorney in the presence of a third party, not an agent or employee of counsel, vitiates the confidentiality required for asserting the privilege." *Delta Fin. Corp. v. Morrison,* 13 Misc.3d 441, 444–45, 820 N.Y.S.2d 745 (N.Y.Sup.Ct.2006); *see also United States v. Jacobs,* 117 F.3d 82, 91 (2d Cir.1997).

 [10]  [11]  [12]  [13]   The common interest doctrine "is an exception to the general rule that voluntary disclosure of confidential, privileged material to a third party waives any applicable privilege."[8] *Sokol,* 2008 WL 3166662, at *5; *see also Kingsway Fin. Servs., Inc. v. Pricewaterhouse–Coopers LLP,* No. 03 Civ. 5560, 2008 WL 4452134, at *7 (S.D.N.Y. Oct.2, 2008). The doctrine "precludes a waiver of the underlying privilege concerning confidential communications between the parties 'made in the course of an ongoing common enterprise and intended to further the enterprise,' irrespective of whether an actual litigation is in progress."[9] *Sokol,* 2008 WL 3166662, at *5, quoting *United States v. Schwimmer,* 892 F.2d 237, 243 (2d Cir.1989). It does not, however, "encompass a joint business strategy which happens to include as one of its elements a concern about litigation," *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 447 (S.D.N.Y.1995), nor

does it provide "an independent source of privilege or confidentiality." *Sokol,* 2008 WL 3166662, at \*5, quoting *In re Commercial Money Ctr., Inc., Equipment Lease Litig.,* 248 F.R.D. 532, 536 (N.D.Ohio 2008). Accordingly, where the underlying "communication is not protected by the attorney-client privilege or the attorney work-product doctrine, the common interest doctrine does not apply." *Sokol,* 2008 WL 3166662, at \*5.

 **[14]**   Demonstrating the applicability of the common interest doctrine requires a two-part showing: "(1) the party who asserts the rule must share a common legal interest with the party with whom the information was shared and (2) the statements for which protection is sought [must have been] designed to further that interest." *Allied Irish Banks,* 252 F.R.D. at 171; *see also Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.,* 215 F.R.D. 466, 471 (S.D.N.Y.2003). Such a showing often exists in those instances in which "multiple persons are represented by the same attorney," *Bank Brussels Lambert,* 160 F.R.D. at 446 (quotation omitted), or "a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *Schwimmer,* 892 F.2d at 243.

 **[15]**   Although Nordbank contends that the common interest doctrine is applicable because this case involves a joint legal strategy that it and the non-party lenders decided upon and undertook, defendants argue that the doctrine "does not extend to communication between the first party or its attorneys and the third parties directly," but only to communications between a first party and *counsel* for one or more third parties. (Jt. Ltr. at 6 (emphasis omitted), citing *Schwimmer* and *Walsh v. Northrop Grumman Corp.,* 165 F.R.D. 16 (E.D.N.Y.1996).) Thus, because the nonparty lenders were not represented by counsel at the time the communications at issue were made, defendants assert that any common interest privilege that may have existed has been waived. (*Id.* 6–12.) This position is meritless, and is not supported by the cases cited by defendants.

 **\*72**   In *United States v. Schwimmer,* the Second Circuit noted that in order to apply the common interest doctrine, it is not "necessary for the attorney representing the communicating party to be present when the communication is made to the other party's attorney." 892 F.2d at 244. This passing reference to communications between attorneys, which simply reflects the particular facts of *Schwimmer,* does not represent a holding, or even a statement by way of dicta, that a communication from one party's attorney directly to a third

party exceeds the bounds of the common interest doctrine and thus waives privilege. The *Schwimmer* court simply did not address, and had no occasion to address, that issue.

While defendants cite *Walsh v. Northrop Grumman Corp.* as evidence that the *Schwimmer* court's pronouncement should be read as barring application of the common interest doctrine to this case, *Walsh* is inapposite.[10] In that case, the court held that communications between parties could not be privileged simply because *one of the parties* first discussed the information with its attorney and then shared the information with the other party (not the other party's counsel). *Walsh,* 165 F.R.D. at 18. Here, *counsel* for one of the parties was actively engaged in the communications at issue. Thus, this is not a situation where the various non party lenders and Nordbank discussed subject matter previously discussed with counsel and now seek to assert privilege for that reason alone. *Compare id.* ("To extend the common interest doctrine [in the manner advocated by the non-party asserting privilege] would mean that a party could shield from disclosure any discussions it had with another person about a matter of common interest simply by discussing that matter first with its attorneys."). To the contrary, the asserted basis for privilege is that Nordbank's counsel was directly involved in the communications involving the non-party lenders and—for that reason—all parties expected that the communications would remain confidential. This is precisely the sort of situation the common interest doctrine contemplates.

 **[16]**   Absent any authority to the contrary, it is immaterial that the confidential communications passed from Nordbank's counsel directly to the non-party lenders, rather than passing from Nordbank or its counsel to the non-party lenders' attorneys. Nordbank and the non-party lenders are co-lenders of the Loan and thus share a common interest in enforcing defendants' obligations under the Guaranties. Any doubt regarding this identity of legal interests is resolved by the terms of the Loan itself. Not only does the Loan identify Nordbank as the only party capable of "enforc[ing] or exercis[ing] any of the ... rights or remedies of or under any of the Loan Documents," (Compl. Ex. A § 17.16), but it also contemplates that Nordbank's counsel will effectively represent the interests of the various lenders, which interests are presumed to be identical.[11] (*Id.* § 17.17.) When viewed in conjunction with the fact that the relevant communications involve development of the appropriate legal strategy for obtaining relief, and that the parties privy to the communication understood the communication to be confidential on account of attorney-client privilege, these

facts bring the communications at issue squarely within the common interest doctrine.[12]

 **\*73** Defendants' suggestion that it would be improper to apply the common interest doctrine because Nordbank's common interest with the non-party lenders is a business interest, rather than a legal interest, also fails. While the lenders' business interests may coincide or overlap with their legal interests, the obligations they seek to enforce are grounded in contract and, by definition, involve the pursuit of legal rights and remedies. This is underscored by the fact that the very subject of the communications was what legal strategy would best serve the interests of Nordbank and the non-party lenders. Under these circumstances, Nordbank's showing clearly satisfies the requirements for application of the common interest doctrine. *See Strougo v. BEA Assocs.,* 199 F.R.D. 515, 520 (S.D.N.Y.2001) ("A community of interest exists among ... separate corporations where they have an identical legal interest .... The key consideration is that the nature of the interest be identical, not similar, and be legal, not solely commercial. The fact that there may be an overlap of a commercial and legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest.").

For the foregoing reasons, the common interest doctrine covers the communications at issue and, absent any other exception to or waiver of the attorney-client privilege, Nordbank is entitled to recall any such communication inadvertently produced.

## II. The Crime/Fraud Exception

Defendants next argue that because the communications at issue were made in furtherance of a fraud, the crime/fraud exception precludes application of the attorney-client privilege. (Jt. Ltr. at 5–6.) Because defendants' allegations fail to meet the requirements of the crime/fraud exception, however, this argument must be rejected.

 **[17]** **[18]** Under the crime/fraud exception, attorney-client privilege is "to be invaded when it is abused for purposes of engaging in fraud." *Danisco A/S v. Novozymes A/S,* 427 F.Supp.2d 443, 445 (S.D.N.Y.2006). This rule "is aimed at serious misconduct," *id.,* and can be invoked only if defendants demonstrate that there is "probable cause to believe that a fraud or crime has been committed and that the communications in question were in furtherance of the fraud or crime." *Jacobs,* 117 F.3d at 87; *see also In re Fresh Del*

*Monte Pineapple Antitrust Litig.,* No. 04 MD 1628, 2007 WL 64189, at \*3 (S.D.N.Y. Jan.4, 2007).

 **[19]** Here, defendants complain primarily of Nordbank's discussions with its counsel regarding the optimal timing for this litigation. In particular, they contend that Nordbank's counsel advised it to intentionally withhold information regarding its intent to sue so that Holly Hill would be induced to transfer the development property from the original sponsors to a third party under false pretenses. (Jt. Ltr. at 5.) Defendants, however, provide no authority for the proposition that a party is obligated to inform a potential adversary of its intent to sue, or that the failure to do so gives rise to a claim of fraud. Nordbank, on the other hand, has asserted legitimate reasons why its conduct and its counsel's conduct cannot be deemed fraudulent (*see* Jt. Ltr. at 22–24),[13] none of which defendants have adequately rebutted. Under these circumstances, defendants' allegations fall far short of the showing of probable cause required to invoke the crime/fraud exception. **\*74** Accordingly, the exception provides no basis for vitiating Nordbank's claimed privilege.

## III. Attorney–Client Privilege as a "Shield and Sword"

 **[20]** **[21]** It is well-established that "the attorney-client privilege cannot at once be used as a shield and a sword." *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.1991). In order to prevent such use, the "at issue" doctrine precludes a party from "disclos[ing] only self-serving communications," while "bar[ring] discovery of other communications that an adversary could use to challenge the truth of the claim." *In re Adelphia Commc'ns Corp.,* No. 02–41729, 2007 WL 601452, at \*3 (Bankr.S.D.N.Y. Feb.20, 2007); *see also Bilzerian,* 926 F.2d at 1292; *American Re–Insurance Co. v. U.S. Fid. & Guar. Co.,* 40 A.D.3d 486, 492, 837 N.Y.S.2d 616 (1st Dep't 2007); *cf. In re von Bulow,* 828 F.2d 94, 101 (2d Cir.1987) (noting that the "fairness doctrine" "aim[s] to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information").

 **[22]** Defendants argue that because Nordbank seeks to assert privilege over documents that are allegedly harmful to its position, while simultaneously producing related documents that are allegedly favorable to its position, its use of the attorney-client privilege violates the "sword and shield" prohibition. (Jt. Ltr. at 14–15.) This argument is meritless. Defendants do not claim, much less demonstrate, that any

of the "favorable" documents produced by Nordbank were written by or to its counsel, or that the documents contain legal advice and/or related client confidences sufficient to implicate attorney-client privilege. As discussed above, however, the documents at issue in this dispute are privileged, as they involve confidential communications made by Nordbank's counsel regarding the legal strategy that would best suit Nordbank and the non-party lenders' common interests. For the foregoing reasons, there is no basis for concluding that Nordbank has used the attorney-client privilege as a shield and sword.[14]

### IV. Nordbank's Alleged Carelessness

Assuming that the inadvertently-produced communications are protected by attorney-client privilege, defendants' final contention is that Nordbank's carelessness in producing such documents waives the privilege and precludes it from exercising any right to recall them. (Jt. Ltr. at 15.) This argument is also meritless.

**[23]**   New York law "recognize[s] that inadvertent disclosure of documents containing legal advice may constitute a waiver of the attorney-client privilege." *Atronic Int'l, GMBH v. SAI Semispecialists of Am., Inc.,* 232 F.R.D. 160, 161 (E.D.N.Y.2005), citing 58A N.Y. Jur.2d § 880. Such a waiver is inappropriate, however, where (1) the party asserting the privilege "intended to maintain confidentiality and took reasonable steps to prevent [the document's] disclosure," (2) the "party promptly sought to remedy the situation after learning of the disclosure," and (3) "the party in possession of the materials will not suffer undue prejudice if a protective order is granted." *AFA Protective Sys., Inc. v. City of New York,* 13 A.D.3d 564, 565, 788 N.Y.S.2d 128 (2d Dep't 2004); *New York Times Newspaper Div. of New York Times Co. v. Lehrer McGovern Bovis, Inc.,* 300 A.D.2d 169, 172, 752 N.Y.S.2d 642 (1st Dep't 2002).

**[24]**   Although federal courts describe the standard differently, courts in this circuit have noted that the differing description is a "distinction without a meaningful difference." *Atronic,* 232 F.R.D. at 161. Under the federal standard, determining whether a party's inadvertent disclosure of otherwise privileged material constitutes a waiver requires balancing four factors: "(1) the reasonableness of **\*75** the precautions taken by the producing party to prevent inadvertent disclosure of privileged documents; (2) the volume of discovery versus the extent of the specific disclosure issue; (3) the length of time taken by the producing

party to rectify the disclosure; and (4) the overarching issue of fairness." *United States v. Rigas,* 281 F.Supp.2d 733, 738 (S.D.N.Y.2003).

**[25]**   Whichever of these standards is applied, Nordbank's inadvertent disclosure of privileged communications clearly does not constitute a waiver. During discovery, Nordbank engaged in extensive review of millions of pages of documents, 250,000 of which were eventually produced. (Jt. Ltr. at 26; Kattan Decl. ¶¶ 2, 4.) As soon as it was apprised of its inadvertent production of nine purportedly privileged documents, it promptly sought to recall those documents and initiated targeted searches to determine whether any other privileged documents had been inadvertently produced. (Jt. Ltr. at 26; Kattan Decl. ¶ 5.) Moreover, when judged against the total number of documents produced, as well as the total number of documents reviewed, the number of privileged documents released is minuscule.

While Nordbank would thus be entitled to assert privilege under applicable case law, it is unnecessary to rely on such case law because the parties in this dispute executed a protective order in which they expressly agreed that the inadvertent production of a document subject to the attorney-client privilege would be "without prejudice to any claim that such material is protected by the attorney/client privilege" and would not effect a waiver of the producing party's rights. (Jt. Ltr. Ex. O ¶ 8.) Under the terms of the protective order, Nordbank has an even more compelling case that inadvertent production of the privileged documents does not constitute a waiver of attorney-client privilege. Indeed, courts have held that where parties execute such an order, waiver is appropriate only if production of the privileged material was "completely reckless." *U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.,* No. 97 Civ. 6124, 2000 WL 744369, at *4 (S.D.N.Y. June 8, 2000); *Prescient Partners, L.P. v. Fieldcrest Cannon, Inc.,* No. 96 Civ. 7590, 1997 WL 736726, at *4 (S.D.N.Y. Nov. 26, 1997).

**[26]**   "For a production to be 'completely reckless,' the producing party must have shown no regard for preserving the confidentiality of the privileged documents." *Prescient,* 1997 WL 736726, at *4. Such recklessness is manifestly absent from this case. Nordbank's counsel has submitted sworn testimony that in attempting to separate all privileged material from all non-privileged and, thus, discoverable material, his firm adopted a multi-layered review process, in which documents—particularly those presenting "close calls"—were examined by attorneys of varying levels of

seniority. (Kattan Decl. ¶¶ 3–4.) That privileged documents were ultimately produced was the result not of counsel's lack of regard for preserving the documents' confidentiality, but of a technical error by which iterations of documents identified as requiring further "follow up" were improperly tagged. (*Id.* ¶ 3.) Accordingly, because it was not completely reckless in its production of the privileged materials, Nordbank is entitled to avail itself of the provisions contained in the protective order, including its right to demand that defendants "return all copies of identified materials protected by the asserted privilege and treat those materials as if they had been initially excluded from the production." (Jt. Ltr. Ex. O ¶ 8.)

**CONCLUSION**

For the foregoing reasons, Nordbank's application is granted in part and denied in part. With the exception of the September 23 and 24, 2008, emails between non-party lender KBC Bank and counsel for Nordbank, the documents inadvertently produced by Nordbank are protected by the attorney-client privilege and may be recalled. Defendants are therefore ordered to return the privileged documents and are prohibited from using them in discovery or at trial. To the extent any of the documents at issue contain otherwise discoverable non-privileged information, redacted versions of the documents shall be provided.

SO ORDERED.

**All Citations**

259 F.R.D. 64

**Footnotes**

1    The non-party lenders are Deutsche Hypothekenbank, Bank of Scotland, Natixis Banques Populaires, KBC Bank, NV, and LRP Landesbank Rheinland–Pfalz. (Compl. ¶ 17.)

2    The various guaranties are collectively referred to as the "Guaranties."

3    Although only nine documents are at issue in this dispute, it appears that various iterations of those documents were produced prior to Nordbank's discovery of its error. (Jt. Ltr. at 4.)

4    The protective order signed by the parties and entered by this Court on January 26, 2009, provides for the return of any privileged materials inadvertently produced during discovery. (*Id.* Ex. O ¶ 8; *see also id.* Ex. P ¶ 9.) In particular, it states:

> No production of Documents in this litigation shall be deemed a waiver of any legally cognizable privilege applicable to any information or Document printed therefrom. The production in this action of any Documents or other information that is subject to a claim or privilege shall be deemed to be inadvertent and to be without prejudice to any claim that such material is protected by the attorney/client privilege, the work product doctrine, or any other applicable privilege or ground for withholding production, and no party shall be held to have waived any rights by such production. Upon the discovery of a disclosure of information for which a privilege is asserted, the producing party shall promptly notify the party in receipt of the information in writing of the disclosure, identify the Document that contains such information, and immediately take steps to preclude further disclosure. In such an event, the party in receipt of the information will return all copies of identified materials protected by the asserted privilege and treat those materials as if they had been initially excluded from the production.

> (*Id.* Ex. O ¶ 8.)

5    Review of the purportedly privileged documents reveals a valid basis for assertion of the attorney-client privilege in all cases except one. The document containing the September 23 and 24, 2008, emails between Nordbank's counsel and KBC Bank (*Id.* Ex. 8) cannot be deemed privileged, as there is no privilege as to a client's identity. *Lefcourt v. United States,* 125 F.3d 79, 86 (2d Cir.1997). Because the emails reveal little more than KBC's desire to formally retain Nordbank's counsel, and thus its status as a potential client, the emails are not protected by the attorney-client privilege.

6    Because the basis for subject matter jurisdiction in this case is diversity of citizenship, state law provides the rule of decision. *See* Fed.R.Evid. 501. Accordingly, New York privilege law applies. At any rate, the New York law of attorney-

HSH Nordbank AG New York Branch v. Swerdlow, 259 F.R.D. 64 (2009)

client privilege is, with certain exceptions, substantially similar to the federal doctrine. *See Bowne of New York City. Inc. v. AmBase Corp.,* 150 F.R.D. 465, 470 (S.D.N.Y.1993).

7      Accordingly, "[a] document is not privileged merely because it was sent or received between an attorney and client." *Dep't of Econ. Dev. v. Arthur Andersen & Co.,* 139 F.R.D. 295, 300 (S.D.N.Y.1991). Instead, it "must contain confidential communication relating to legal advice." *Id.*

8      Because "New York courts applying the common interest rule to civil proceedings have often looked to federal case law for guidance," both New York and federal case law are instructive here. *Allied Irish Banks, P.L.C. v. Bank of America, N.A.,* 252 F.R.D. 163, 170 (S.D.N.Y.2008).

9      While federal case law makes clear that the common interest doctrine applies even where there is no litigation in progress, "New York law appears to restrict the doctrine to communications with respect to legal advice 'in pending or reasonably anticipated litigation.' " *Allied Irish Banks,* 252 F.R.D. at 171, quoting *Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's London,* 176 Misc.2d 605, 612, 676 N.Y.S.2d 727 (N.Y.Sup.Ct.1998). For purposes of this dispute, the distinction is irrelevant because the communications at issue pertain to the timing and conduct of this litigation, and thus demonstrate that Nordbank and the non-party lenders had, in fact, reasonably anticipated litigation at the time the communications were made.

10     Even if *Walsh* were relevant, the decision is not binding on this Court.

11     The expectation that, under normal circumstances, the lenders' legal interests would be identical is supported by a provision in the Loan permitting a lender to retain separate counsel should it "decide that its interests have become so divergent from the interests of the other Lenders or Administrative Agent [Nordbank] that it does not feel it is prudent to be represented by the same counsel." (Compl. Ex. A § 17.17.)

12     Defendants' argument that the communications cannot be deemed in furtherance of the parties' common legal strategy because Nordbank and the non-party lenders did not enter into a written common interest agreement until well after the communications occurred is wholly unpersuasive. Courts in this circuit have acknowledged that although the common interest doctrine applies only where a party has demonstrated the existence of an agreement to pursue a common legal strategy, the agreement need not be in writing. *See, e.g., Denny v. Jenkens & Gilchrist,* 362 F.Supp.2d 407, 415 (S.D.N.Y.2004); *Lugosch v. Congel,* 219 F.R.D. 220, 237 (N.D.N.Y.2003); *cf. Doctor's Assocs., Inc. v. QIP Holder LLC,* 3:06 Civ. 1710, 2009 WL 1683628, at *6 (D.Conn. Feb.26, 2009). Accordingly, while Nordbank and the non-party lenders wisely chose to reduce their common agreement to writing, their decision to do so does not mean that there was no prior agreement. To the contrary, Nordbank has made a persuasive showing that the parties shared a common interest and were pursuing a joint legal strategy at the time the relevant communications were made. Indeed, given that Nordbank is the only lender that can take legal action on behalf of the group, there is no reasonable argument that there was *not* a common interest.

13     In particular, Nordbank argues that it cannot be held liable for fraudulent concealment absent a finding that it had a legal duty to disclose the allegedly concealed information, and there is no basis for such a finding in this case. (Jt. Ltr. at 23, citing *Musalli Factory for Gold & Jewellry v. JPMorgan Chase Bank, N.A.,* No. 08 Civ. 1720, 2009 WL 860635, at *8– 9 (S.D.N.Y. Mar.31, 2009).)

14     To the extent defendants also argue that Nordbank should be precluded from recalling the inadvertently produced documents because the documents go to the heart of their defense, their position is unpersuasive. The "at issue" doctrine relates to issues that the party asserting privilege puts in issue, not to issues raised by that party's adversary. Accordingly, the fact that the documents at issue might be relevant to defendants' defense is of no moment.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

227 B.R. 606
United States Bankruptcy Court,
S.D. New York.

In re CENTENNIAL TEXTILES,
INC. and Dynasty Prints, Inc., Debtors.
Hal M. HIRSCH, as Interim Trustee
of Centennial Textiles, Inc. and
Dynasty Prints, Inc., Plaintiffs,
v.
PENNSYLVANIA TEXTILE
CORPORATION, INC., d/b/a Penn–Tex,
and Joseph J. Hannagan, Jr., Defendants.

Bankruptcy Nos. 96 B 46472(BRL), 96 B 46473(BRL).
|
Adversary No. 97–8501A (SMB).
|
Dec. 11, 1998.

**Synopsis**

Chapter 7 trustee sued to set aside, as unauthorized postpetition transfers, payments that debtors made pursuant to scheme with creditor to honor creditor's inflated invoices for postpetition processing work, in order to reduce debtors' obligations to creditor for processing work performed prepetition. The Bankruptcy Court, Stuart M. Bernstein, J., held that: 1) payments could be avoided, as being in nature of unauthorized postpetition transfers; 2) trustee could not recover on common law fraud theory; 3) debtors and their president breached their fiduciary duties by knowingly paying these inflated invoices; but 4) trustee failed to establish that creditor's vice-president knowingly participated in these fiduciary breaches.

Judgment for trustee.

**Attorneys and Law Firms**

**\*608** Gainsburg & Hirsch, New York City, Eric H. Lindenman, of counsel, for plaintiff.

Moritt, Hock & Hamroff, LLP, Garden City, New York, David A. Loglisci, of counsel, for defendants.

**POST–TRIAL MEMORANDUM DECISION**

STUART M. BERNSTEIN, Bankruptcy Judge.

The trustee commenced this adversary proceeding to recover damages, and for equitable subordination, based upon events that occurred during the debtors' failed chapter 11 cases. His complaint charges, in substance, that the defendants—Pennsylvania Textile Corporation, Inc. d/b/a PENN–TEX ("Penn–Tex"), and its vice president, Joseph J. Hannagan, Jr.—entered into a fraudulent scheme with the debtors' president, Barry Gersten, to repay a portion of Penn–Tex's prepetition claims. I conducted a trial on August 31, 1998.

The principal issue before me is whether Hannagan should be held liable for the estates' losses under a theory of aiding and abetting the debtors' and Gersten's breach of their fiduciary duties—a theory that the plaintiff neither pleaded nor expressly articulated. For the reasons that follow, I conclude that he should not. Accordingly, the trustee is entitled to recover a judgment solely against Penn–Tex in the aggregate sum of $140,462. In addition, Penn–Tex's counterclaim is dismissed.

**BACKGROUND**

At all relevant times, the debtors were engaged in the business of converting raw textiles, or greige goods, into finished goods pursuant to their customers' requests. (Transcript of trial, held August 31, 1998 ("Tr.") at 17.) Toward that end, the debtor used third party processors, such as Penn–Tex. Typically, the debtors received orders from customers, and shipped the greige goods, in bulk, to Penn–Tex. Penn–Tex finished the amounts needed and shipped the finished goods directly to the debtors' customers. Penn–Tex retained any unfinished greige goods supplied by the debtors for future orders. (*Compare* Complaint ¶ 17 *with* Amended Answer ¶ 2.) Hannagan was a vice-president of Penn–Tex, (*see* Amended Answer ¶ 6), and was authorized and empowered to conduct business transactions on its behalf. (*Compare* Complaint ¶ 40 *with* Amended Answer ¶ 2.) Barry Gersten, a non-party who figures in the case, was the president of the debtors.[1]

The debtors filed these chapter 11 cases on November 27, 1996. On that date, they owed Penn–Tex approximately $690,000.00. (*See* Plaintiff's Ex. ("PX") 1, at p. 2.) Although

Penn–Tex claimed to be secured, it also contended that it was undercollateralized in the amount of $232,533.11. (*Id.*)[2] After the case was converted to chapter 7 on February 13, 1997, and the plaintiff was appointed trustee, he commenced this action primarily to recover postpetition payments by the debtors to Penn–Tex. His complaint charges that the debtors and Penn–Tex entered into a fraudulent scheme to pay down Penn–Tex's prepetition debt. Specifically, Gersten agreed with Hannagan to pay inflated Penn–Tex invoices covering postpetition processing, enabling Penn–Tex to "catch up" and reduce its prepetition claim.

 **\*609** The complaint asserted five causes of action based on this fact pattern. The plaintiff sought recovery against Penn–Tex on theories of unauthorized postpetition transfers (First Claim), common law fraud (Second Claim), intentional fraudulent transfers under state law (Third Claim), a related state law claim for attorney's fees (Fourth Claim) and equitable subordination (Fifth Claim). The trustee also sought to recover under the second, third and fourth claims against Hannagan, essentially for aiding and abetting the improper transfers to Penn–Tex.

At trial, the trustee proffered testimonial and documentary evidence in support of his claim. The debtors had paid Penn–Tex a total of $347,038 for postpetition processing.[3] (PX 3; *compare* Complaint ¶ 26 *with* Amended Answer ¶ 5.) Andrew Plotzker, a partner at BDO Seidman, LLP, the trustee's accountant, reviewed postpetition invoices representing approximately 16%, in amount, of the postpetition work, and compared the prices the debtors paid to Penn–Tex prepetition and postpetition for the same processing services. He concluded that Penn–Tex overcharged the debtors, on the average, by 68% for the postpetition services. (Tr. 44.) At the prepetition prices, the same processing services would have cost $206,570. (*Id.* 51.) Thus, the total overcharge equaled $140,462; Centennial overpaid $130,262 and Dynasty overpaid $10,200.[4]

While Plotzker's analysis proved the overpayment, it did not illuminate the debtors' reasons for overpaying. Hannagan—who did not testify—supplied the answer in a letter he wrote to Gersten on January 16, 1997, (PX 1), while the debtors were still in chapter 11. Hannagan stated that "Penn–Tex will need 'Centennial' to send in another 250,000 greige goods to be processed at the prices agreed to; for Penn-Tex to break even." The attached schedule, apparently prepared by Penn–Tex employee Gina Roman, depicted the amounts that the debtors owed Penn–Tex, and the value of Penn–

Tex's collateral, on the chapter 11 filing date and on January 15, 1997. While the schedule is hardly self-explanatory, it shows that between these two dates, Penn–Tex had reduced its total claim by $235,523.16 and its undersecured position by approximately $30,000.00. The schedule and covering letter, considered in light of Plotzker's testimony, leads to the conclusion that the debtors overpaid for postpetition services to reduce Penn–Tex's prepetition debt.

At the conclusion of the trustee's direct case, Hannagan moved to dismiss the complaint. *See* Fed.R.Civ.P. 52(c),[5] made applicable by Fed.R.Bankr.P. 7052. He correctly contended that the trustee had not offered evidence that Hannagan had ever received any of these overcharge payments. Pursuant to 11 U.S.C. § 550(a), a trustee may recover a fraudulent transfer from the transferee or from one for whose benefit the transfer is made.[6] Conversely, section 550(a) does not permit recovery from one who merely aids and abets a fraudulent transfer, and neither does state law. *Lippe v. Bairnco Corp.,* 225 B.R. 846, 857 (S.D.N.Y.1998); **\*610** *Federal Deposit Ins. Corp. v. Porco,* 75 N.Y.2d 840, 552 N.Y.S.2d 910, 552 N.E.2d 158, 159–60 (N.Y.1990). Consequently, I granted the motion to dismiss the third and fourth claims which sounded in aiding and abetting a fraudulent transfer.

However, I denied the motion to dismiss the second cause of action. It alleged that Hannagan had aided and abetted Penn–Tex's common law fraudulent scheme to overcharge the debtors. (Complaint ¶¶ 39–42, 45.) The second cause of action did not specifically mention breach of fiduciary duty, but the allegations and the proof appeared to support recovery under the unpleaded theory. (*See* Tr. 69–70.) Hannagan's counsel protested that the theory had not been properly raised or tried, and he was not prepared to meet it. (Tr. 70–72, 76.)[7]

I adjourned the trial (it was 4:30 p.m.) until 10:00 a.m. the next morning, at which time Hannagan could testify if he so chose. The following day, his counsel announced that the defense rested without offering any evidence. (*See* Transcript of hearing, held Sept. 1, 1998, at 3.) I reserved decision on this claim as well as the claims asserted against Penn–Tex.

# DISCUSSION

## A. Claims Against Penn–Tex

The trustee's first cause of action is straightforward and meritorious. It charges that Penn–Tex received an unauthorized postpetition transfer in the aggregate sum of $140,462 from the debtors in violation of 11 U.S.C. § 549.[8] The party asserting the validity of a postpetition transfer has the burden of proof. Fed .R.Bankr.P. 6001. Penn–Tex did not offer any evidence at trial, and failed to carry its burden.

Further, the trustee established each of the elements of the claim at trial. He demonstrated that Centennial overpaid $130,262, and Dynasty overpaid $10,200, after the commencement of the case. The transfers were made on account of prepetition debts, and were unauthorized. Accordingly, the trustee can avoid the transfers under 11 U.S.C. § 549(a), and recover their value from the initial transferee, Penn–Tex. *See* 11 U.S.C. § 550(a).

Conversely, the trustee's third and fourth causes of action, brought under state fraudulent conveyance law, made applicable through 11 U.S.C. § 544(b)[9], must be dismissed. The only improper transfers proved at trial occurred postpetition. Section 544(b), and hence, state law, applies solely to prepetition transfers. *Moratzka v. Clark (In re Metropolitan Cosmetic Reconstructive Surgery P.A.),* 125 B.R. 556, 557 (Bankr.D.Minn.1991); *Eisenberg v. Bank of New York (In re Sattler's, Inc.),* 73 B.R. 780, 790–91 (Bankr.S.D.N.Y.1987).

Next, the trustee's request for equitable subordination has been rendered moot. By virtue of the entry of judgment in connection with the first claim, any Penn–Tex claim is subject to disallowance under 11 U.S.C. § 502(d).[10] Equitable subordination, **\*611** on the other hand, merely postpones payment but does not disallow the claim. *80 Nassau Assocs. v. Crossland Fed. Sav. Bank (In re 80 Nassau Assocs.*), 169 B.R. 832, 837 (Bankr.S.D.N.Y.1994). It is an alternative remedy to monetary recovery from the wrongdoing claimant. *ABF Capital Management v. Kidder Peabody & Co. (In re Granite Partners, L.P.*), 210 B.R. 508, 517 (Bankr.S.D.N.Y.1997). Consequently, a trustee cannot recover damages and equitably subordinate a claim based upon the same wrong. *Id.*

Penn–Tex cannot receive any distribution until it pays the judgment in this case as well as other judgments that the trustee has recovered against it on account of preferential transfers. If it pays the judgments, the estates will be made whole. In that event, the trustee will not be entitled to the remedy of equitable subordination.

Finally, the trustee purports to assert a common law fraud claim in his second cause of action. For the reasons discussed below, the trustee failed to prove a fraud claim, and it is dismissed.

**B. Claims Against Hannagan**

As noted, I dismissed the aiding and abetting claims asserted against Hannagan in the third and fourth causes of action at the conclusion of the trustee's direct case. In addition to the reasons then given, I have now also dismissed the third and fourth claims against the principal wrongdoer. If the trustee cannot recover the transfers from Penn–Tex under his third and fourth causes of action, he cannot prevail against Hannagan for aiding and abetting those transfers. This leaves the second claim.

**1. Common Law Fraud**

The second claim does not state a claim for common law fraud, and the trustee did not prove one. Under New York law, the plaintiff asserting fraud must show that the defendant made a false representation of a material fact with intent to deceive, the plaintiff reasonably relied upon the false representation, and suffered damages as a result. *Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 599 (2d Cir.1991); *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 970–71 (2d Cir.1987). Proof of a scheme to receive unauthorized postpetition transfers does not necessarily give rise to an action for fraud. *In re Sattler's, Inc.,* 73 B.R. at 789.

Here, the trustee mistakenly equates common law fraud with the more generic and amorphous "scheme to defraud." For example, he points to the January 16th letter as "a clear misrepresentation of the facts with respect to Centennial" because it details what Centennial had to do to reduce Penn–Tex's prepetition debt. (*Trustee's Post–Trial Brief,* dated Sept. 24, 1998, at 6). Whatever else the letter shows about the scheme, it does not contain a misrepresentation of fact, and cannot support a claim of fraud. And without proof that Penn–Tex committed common law fraud, the trustee cannot recover against Hannagan for aiding and abetting a common law fraud.

**2. Aiding and Abetting a Breach of Fiduciary Duty**

This leaves the unpleaded theory that Hannagan aided and abetted, or participated in, a breach of fiduciary duty. The claim requires proof that (1) the fiduciary breached his obligations to another, (2) the defendant knowingly

participated in the breach, and (3) the plaintiff suffered damages as a result of the breach. *Independent Order of Foresters v. Donald, Lufkin & Jenrette, Inc.,* 157 F.3d 933, 943 (2d Cir.1998); *Whitney v. Citibank, N.A.,* 782 F.2d 1106, 1115 (2d Cir.1986); *Philip Morris Inc. v. Heinrich,* No. 95 Civ. 0328, 1997 WL 781907, at *12 (S.D.N.Y. Dec. 18, 1997); *see Crowthers McCall Pattern, Inc. v. Lewis (In re Crowthers McCall Pattern, Inc.*), 129 B.R. 992, 999 (S.D.N.Y.1991). The plaintiff is not required to prove that the participant acted with an intention to harm. *S & K Sales Co. v. Nike, Inc.,* 816 F.2d 843, 848 (2d Cir.1987).

Hannagan challenges this claim on due process grounds as well as on the merits. He contends that he lacked notice and a meaningful opportunity to defend the claim. *See Rodriguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1172 (1st Cir.1995). Further, he argues that the trustee failed to prove his **\*612** claim. Ultimately, I agree with the second point, and hence, do not reach Hannagan's due process claim.

### a. Breach of Fiduciary Duty and Injury

Initially, the trustee established the first and third elements of his cause of action. A debtor in possession owes the same fiduciary duty as a trustee to the creditors and the estate. *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. 343, 355, 105 S.Ct. 1986, 85 L.Ed.2d 372 (1985); *Wolf v. Weinstein,* 372 U.S. 633, 649, 83 S.Ct. 969, 10 L.Ed.2d 33 (1963). The trustee's fiduciary obligations also fall upon the officers and managing employees who conduct the debtor in possession's affairs. *Commodity Futures Trading Comm'n v. Weintraub,* 471 U.S. at 355–56, 105 S.Ct. 1986; *Wolf v. Weinstein,* 372 U.S. at 649–50, 83 S.Ct. 969; *Gumport v. China Int'l Trust & Inv. Corp. (In re Intermagnetics America, Inc.*), 926 F.2d 912, 917 (9th Cir.1991); *see generally* 7 Lawrence P. King, *et al., Collier on Bankruptcy* ¶ 1107.02[4], at 1107–13 (15th ed. rev.1998) ( "*Collier* "). Indeed, the willingness to leave the debtor in possession of its assets rests upon the assurance that its managers will carry out these fiduciary responsibilities. *Wolf v. Weinstein,* 372 U.S. at 651, 83 S.Ct. 969; *Slater v. Smith (In re Albion Disposal, Inc.*), 152 B.R. 794, 813 (Bankr.W.D.N.Y.1993); *In re V. Savino Oil & Heating Co.,* 99 B.R. 518, 526 (Bankr.E.D.N.Y.1989).

As fiduciaries, the debtor in possession and its managers are obligated to treat all parties to the case fairly, maximize the value of the estate, 7 *Collier* ¶ 1107.02[4], at 1107–12; *see In re Central Ice Cream Co.,* 836 F.2d 1068, 1072 (7th Cir.1987), and protect and conserve the debtor's

property. *In re Sal Caruso Cheese, Inc.,* 107 B.R. 808, 817 (Bankr.N.D.N.Y.1989). These duties parallel those imposed by section 549: to avoid depletion of the estate. *Shields v. Duggan (In re Dartco, Inc.*), 197 B.R. 860, 865 (Bankr.D.Minn.1996); 5 *Collier* ¶ 549.02, at 549–4 to 549–5. Not surprisingly, therefore, the debtor in possession and the managers breach their fiduciary duties when they violate section 549. *See Stalford v. Blue Mack Transport, Inc. (In re Lands End Leasing, Inc.*), 193 B.R. 426, 434 (Bankr.D.N.J.1996); *Official Unsecured Creditors Comm. v. Kuhns (In re Kuhns* ), 101 B.R. 233, 242 (Bankr.D.Mont.1989); *In re Sal Caruso Cheese, Inc.,* 107 B.R. at 817; 7 *Collier* ¶ 1107.02[4], at 1107–14.

The debtors, as debtors in possession, and Gersten, their president, owed fiduciary duties to the creditors and the estate. They breached those duties by knowingly paying inflated invoices to permit Penn–Tex to recover a portion of its prepetition debt in violation of 11 U.S.C. § 549. As a result, the estates suffered injuries in the amount of the unauthorized, excess payments.

### b. Hannagan's Knowing Participation

The trustee's proof of Hannagan's *knowing* participation is more problematical, and ultimately falls short. A person knowingly participates in a breach of fiduciary duty if he (1) knows that the primary violator is a fiduciary, (2) knows that the primary violator's conduct is a breach of his fiduciary duty, and (3) affirmatively assists or conceals the breach. *See Diduck v. Kaszycki & Sons Contractors, Inc.,* 974 F.2d 270, 282–84 (2d Cir.1992); RESTATEMENT (SECOND) OF TORTS §§ 874 cmt.c, 876(b) (1979). Under New York common law, which applies here, the participant must have actual, as opposed to constructive, knowledge, *Kolbeck v. LIT America, Inc.,* 939 F.Supp. 240, 246 (S.D.N.Y.1996), *aff'd,* 152 F.3d 918 (2d Cir.1998) (Table) and the assistance must be "substantial." *Id.* at 247.

Proving actual knowledge is a heavy task, particularly where the aider and abettor does not have a fiduciary or confidential relationship with the injured party. *In re Consol. Welfare Fund ERISA Litig.,* 856 F.Supp. 837, 843 (S.D.N.Y.1994); *Terrydale Liquidating Trust v. Barness,* 611 F.Supp. 1006, 1027 (S.D.N.Y.1984). Liability cannot be imposed absent actual knowledge of the tortious conduct of the primary violator. *Id.* Further, the case may not rest on a bare inference that the defendant must have known the facts; "[t]he plaintiff must support the inference with some reason to conclude that the defendant has thrown in his lot with the primary

violators." *Barker v. Henderson,* **\*613** *Franklin, Starnes & Holt,* 797 F.2d 490, 497 (7th Cir.1986); *accord Glidden Co. v. Jandernoa,* 5 F.Supp.2d 541, 558 (W.D.Mich.1998). Here, it is not enough to show that Penn–Tex and Gersten or the debtors schemed to pay off Penn–Tex's claim; the trustee must prove that Hannagan actually knew about it.

To do so, the trustee had to prove Hannagan's actual knowledge of the chapter 11 cases at the time that the debtors paid the inflated invoices. If Hannagan did not know that the debtors were in chapter 11, he could not know that they and Gersten were fiduciaries of the creditors and the estates, or that they breached their fiduciary duties by paying Penn–Tex's prepetition claims in violation of bankruptcy law. In this regard, Hannagan's possible knowledge that Gersten was the debtors' president, and hence, a fiduciary *of the debtors,* is not the same. Absent bankruptcy, the payment of Penn–Tex's valid debt would not, without more, breach a fiduciary duty. Further, the trustee concedes that Penn–Tex was "vital" to the debtors' business, (*Trustee's Post–Trial Brief* at 7), and ordinarily, the debtors and Gersten would want do everything in their collective power to satisfy Penn–Tex. Rather, it is the bankruptcy that creates the requisite fiduciary duty *to the creditors and the estate,* and the unauthorized payment under bankruptcy law that breaches it.

The sole evidence of Hannagan's knowledge is the January 16th letter. Admittedly, the letter supports an inference that Hannagan knew about the chapter 11 cases, at least as of January 16th. It compared Penn–Tex's debt position on November 27, 1996, and January 15th. November 27 was the petition date, and there is no reason to select it for comparison purposes except for its significance as the petition date.

Other possibilities, however, also exist. The trustee did not offer evidence regarding Hannagan's role *vis-a-vis* the debtors generally, or in the preparation or transmission of the letter or the accompanying, confusing schedule.[11] It is conceivable that Hannagan's superiors at Penn–Tex directed Hannagan to prepare and send the letter without explaining its significance. Further, the letter speaks to Hannagan's knowledge, if any, as of January 16th. There is no evidence of Hannagan's involvement before then, and most of the invoices that

Plotzker reviewed covered services rendered before that date. (*See* PX 2.)

The trustee needed more than the bare inference supplied by the January 16th letter to foist liability on Hannagan. He could have resolved all doubt through the testimony of Gersten or Hannagan, but he called neither. It may be, as Hannagan's counsel suggests, that the trustee was caught totally unprepared to prove a theory he never intended to raise in the first place. Whatever the reason, this record is too flimsy to conclude that Hannagan knew that the debtors' or Gersten's conduct was tortious, or that he threw in his lot with them.

### C. Penn–Tex's Counterclaim

The sole remaining issue is Penn–Tex's counterclaim. It avers that Penn–Tex received the payments in good faith and for value. (Amended Answer ¶ 12.) Citing 11 U.S.C. § 548(c),[12] Penn–Tex alleges that if the transfers are avoided, it is entitled to retain the payments to the extent of the value given. (Amended Answer ¶ 13.) The counterclaim must be dismissed for two reasons. As a threshold matter, the debtors did not assert fraudulent conveyance claims under section 548, and hence, section 548(c) is inapplicable. In any event, Penn–Tex did **\*614** not offer evidence of good faith or value at trial.

### CONCLUSION

The trustee is entitled to recover judgment on behalf of the Centennial estate against Penn–Tex in the sum of $130,262. The trustee is also entitled to recover judgment on behalf of the Dynasty estate against Penn–Tex in the sum of $10,200. The trustee is not entitled to recover judgment against Hannagan, and the claims against him are dismissed. Finally, Penn–Tex's counterclaim is also dismissed. The foregoing shall constitute the Court's findings of fact and conclusions of law.

Settle judgment on notice.

### All Citations

227 B.R. 606

Footnotes

1    The complaint does not allege that Gersten was the president of the debtors, and the only evidence of his status came during the testimony of the trustee's accountant. (*See* Tr. 24.) Nevertheless, the defendants refer to Gersten as the

debtors' president in their post-trial brief, *see Defendants' Post–Trial Brief,* dated Oct. 5, 1998, at 3, 13, 14, and hence, concede the point.

2    Penn–Tex did not offer any evidence of a security interest. The fact that Penn–Tex processed the debtors' raw textiles does not necessarily give it a processor's lien. *See Ash Handkerchief Corp. v. Hickory Finishing, Inc. (In re Ash Handkerchief Corp.),* 191 B.R. 588, 591–93 (Bankr.S.D.N.Y.1996) (discussing the common law of processor's liens).

3    Of this sum, $321,836 was paid by Centennial, and $25,202 was paid by Dynasty. (PX 3.)

4    Centennial accounted for 92.74% of the debtors' postpetition business with Penn–Tex. (*See* footnote 3, *supra.*) Accordingly, it paid a like per cent of the overcharges which I have rounded off to the nearest whole dollar amount.

5    Rule 52(c) states:

> If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

6    Section 550(a) states:

> Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—
>
> (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
>
> (2) any immediate or mediate transferee of such initial transferee.

7    Hannagan did not attend the trial. He was available and on call the entire day, (Tr. 72, 76), but his attorney could not reach him when he tried at the conclusion of the trustee's direct case. (Tr. 73.)

8    Section 549(a) states, with exceptions that are not relevant:

> [T]he trustee may avoid a transfer of property of the estate—
>
> (1) that occurs after the commencement of the case; and
>
> (2)(A) that is authorized only under section 303(f) or 542(c) of this title; or
>
> (B) that is not authorized under this title or by the court.

9    Section 544(b) states:

> The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

10    Section 502(d) states:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11    For example, the schedule takes the form of a communication from Gina to "Joe." There is no evidence that "Joe" refers to Joseph Hannagan. At best, an inference arises by virtue of its attachment to and transmission with Hannagan's January 16th letter.

12    Section 548(c) states:

> Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred, or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

199 B.R. 92
United States Bankruptcy Court,
S.D. New York.

In re The CIRCLE K CORP., et al., Debtors.

S.N. PHELPS & COMPANY, Commonwealth
Oil Refining Company, Inc. and
Realmark Holdings, Inc., Plaintiffs,

v.

The CIRCLE K CORPORATION
and its affiliated companies, and
CK Acquisition Corp., Defendants.

Bankruptcy No. 90–5052–PHX–
GBN to 90–5075–PHX–GBN.
|
Arizona Adversary No. 93–1123.
|
S.D.N.Y. Misc. No. 95–437.
|
Aug. 7, 1996.

**Synopsis**

Chapter 11 debtor's former debenture holders commenced adversary proceeding against reorganized debtor and entity that purchased all of debtor's newly issued stock under reorganization plan, claiming that confirmation was fraudulently procured. Reorganized debtor and purchaser sought to compel disclosure of documents prepared by counsel for debenture holders' committee. The Bankruptcy Court, Stuart M. Bernstein, J., held that: (1) counsel's documents were work product; (2) disclosure to debenture holder did not waive privilege; (3) disclosure by counsel's partner at deposition did not waive privilege; (4) extraordinary justification did not warrant discovery; and (5) sanctions were not warranted for overbroad subpoena served on committee's counsel.

So ordered.

West Headnotes (33)

**[1]** **Bankruptcy** 🔑 Conclusiveness

To overcome res judicata effect of order confirming Chapter 11 reorganization plan, debenture holders seeking equitable relief from alleged fraud in procurement of confirmation had to demonstrate at trial that they did not discover fraud prior to confirmation and could not have discovered it through exercise of due diligence.

**[2]** **Federal Civil Procedure** 🔑 Work Product Privilege; Trial Preparation Materials

Work product rule is qualified privilege codified in Federal Rules of Civil Procedure, which shelters mental processes of attorney, providing privileged area within which he can prepare client's case. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

**[3]** **Federal Civil Procedure** 🔑 Work product privilege; trial preparation materials

**Federal Civil Procedure** 🔑 Work Product Privilege; Trial Preparation Materials

Work product rule's immunity applies both to tangible work product and deposition testimony concerning substance of work product. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

1 Case that cites this headnote

**[4]** **Federal Civil Procedure** 🔑 Work Product Privilege; Trial Preparation Materials

Work product doctrine represents balance struck between right to know and lawyer's ability to prepare case, and purpose of privilege is to protect integrity of adversary process by preventing adversary from obtaining free ride in preparing client's case. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

**[5]** **Federal Civil Procedure** 🔑 Nature and Purpose

Discovery was not intended to enable learned profession to perform its functions either without wits or on wits borrowed from adversary.

**[6]**    Federal Civil Procedure 🔑 Work Product Privilege; Trial Preparation Materials

Party asserting work product privilege has burden of proving its basis, and generally does so through combination of affidavits and privilege logs that address each document at issue. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

1 Case that cites this headnote

**[7]**    Federal Civil Procedure 🔑 Determination of motion

In camera review should be undertaken if parties genuinely dispute description of documents as work product, but is neither appropriate nor preferable as substitute for proponent's submission of adequate record to support privilege claim. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

**[8]**    Federal Civil Procedure 🔑 Work Product Privilege; Trial Preparation Materials

Federal Civil Procedure 🔑 Motion and Proceedings Thereon

Once proponent of work product privilege satisfies its burden, party seeking discovery must come forward and demonstrate ground for piercing privilege by showing that exception to work product doctrine excludes material from its protection, that holder impliedly waived privilege, or need. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

2 Cases that cite this headnote

**[9]**    Federal Civil Procedure 🔑 Work Product Privilege; Trial Preparation Materials

Exception to work product privilege comes into play when privileged relationship is used to further crime, fraud, or other fundamental misconduct. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

**[10]**    Federal Civil Procedure 🔑 Waiver

Implied waiver of work product privilege deals with abuse of privilege itself rather than of privileged relationship; thus, holder of privilege cannot use it as tool to manipulate truth-seeking process. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

**[11]**    Federal Civil Procedure 🔑 Work Product Privilege; Trial Preparation Materials

For purposes of obtaining work product upon showing of need, law distinguishes between non-opinion work product and opinion work product; opinion work product receives higher protection, and party seeking to discover it must show extraordinary justification. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

3 Cases that cite this headnote

**[12]**    Bankruptcy 🔑 Production of documents

Federal Civil Procedure 🔑 Work Product Privilege; Trial Preparation Materials

Memoranda prepared by counsel for debenture holders' committee, which concerned interim order, Chapter 11 reorganization plan, and letter agreement regarding reorganization and were prepared for possible inclusion in pleading to be filed on behalf of committee, were work product. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

**[13]**    Bankruptcy 🔑 Production of documents

Federal Civil Procedure 🔑 Work Product Privilege; Trial Preparation Materials

Handwritten notes prepared by counsel for debenture holders' committee during meeting in which objection that committee intended to file against Chapter 11 debtor's disclosure statement was discussed, which contained attorneys' thoughts respecting subject matter and drafting of objection, were work product. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

**[14]**    Federal Civil Procedure 🔑 Work Product Privilege; Trial Preparation Materials

**Federal Civil Procedure** 🔑 Waiver

Work product doctrine protects attorney's materials, and consequently, attorney may waive benefit of privilege. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

**[15]**    **Federal Civil Procedure** 🔑 Waiver

Although client can waive work product privilege as to non-opinion work product, attorney may still contest waiver as to opinion work product. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

3 Cases that cite this headnote

**[16]**    **Bankruptcy** 🔑 Creditors' and equity security holders' committees and meetings

Creditors' committee in bankruptcy proceeding owes fiduciary duties to class of creditors that it represents.

2 Cases that cite this headnote

**[17]**    **Bankruptcy** 🔑 Creditors' and equity security holders' committees and meetings

For purposes of bankruptcy proceedings, creditors' committee constituents are not clients of committee's attorneys, since committee is party in interest, and may object to creditor's claim, obtain authorization to sue creditor on behalf of estate, and seek to equitably subordinate creditor's claim. Bankr.Code, 11 U.S.C.A. § 1109(b).

1 Case that cites this headnote

**[18]**    **Attorneys and Legal Services** 🔑 Persons entitled to assert or benefit from relationship

**Bankruptcy** 🔑 Examination and Discovery

Debenture holder did not become client of counsel for debenture holders' committee simply because he owned debentures and committee represented interests of debenture holders or by requesting status reports; thus, any disclosures by counsel to debenture holder constituted disclosures to non-client, for discovery purposes.

**[19]**    **Federal Civil Procedure** 🔑 Work Product Privilege; Trial Preparation Materials

**Federal Civil Procedure** 🔑 Waiver

Work product privilege is designed to protect adversary system rather than confidential communications, and to effect forfeiture of work product protection by waiver, disclosure must occur in circumstances in which attorney cannot reasonably expect to limit future use of otherwise protected material. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

**[20]**    **Federal Civil Procedure** 🔑 Waiver

Holder of work product privilege waives it only by voluntarily disclosing it in such a manner that it is likely to be revealed to its adversary; conversely, holder does not waive privilege by disclosing work product to another person who has common interest with client and is not reasonably viewed as someone who will, in turn, disclose it to adversary. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

2 Cases that cite this headnote

**[21]**    **Bankruptcy** 🔑 Production of documents

**Federal Civil Procedure** 🔑 Waiver

Debenture committee's counsel's disclosure of work product to debenture holder did not waive work product privilege, since counsel was required to keep constituents informed and could reasonably assume that debenture holder would not run to debtor and disclose counsel's opinions on controversy. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

**[22]**    **Bankruptcy** 🔑 Production of documents

**Federal Civil Procedure** 🔑 Waiver

Debenture holder's deposition testimony did not waive work product protection for documents prepared by counsel for debenture holders' committee, since counsel reasonably believed debenture holder would not turn information

over to adversary, debenture holder was non-client and so did not hold privilege, and privilege holders were not at deposition and so did not have opportunity to object. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

[23]    **Federal Civil Procedure** 🔑 Waiver

Counsel's partner could waive work product privilege through disclosure. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

[24]    **Federal Civil Procedure** 🔑 Waiver

Implied waiver of work product privilege is based ultimately on fairness, and court need not allow privilege to stand when proponent seeks to use it for purpose that is inconsistent with privilege. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

[25]    **Federal Civil Procedure** 🔑 Work Product Privilege; Trial Preparation Materials

Material is opinion work product when it is reflective of counsel's approach. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

[26]    **Bankruptcy** 🔑 Production of documents

Deposition testimony of counsel's partner, in which he disclosed mental impressions and opinions, did not require waiver of work product privilege, based on fairness, since memoranda sought to be discovered were pure advocacy and were consistent with deposition testimony, and discovery of documents would not open new avenues of questioning. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

[27]    **Federal Civil Procedure** 🔑 Work Product Privilege; Trial Preparation Materials

Party seeking discovery can obtain non-opinion work product upon showing of substantial need and inability to obtain substantial

equivalent without undue hardship. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

2 Cases that cite this headnote

[28]    **Federal Civil Procedure** 🔑 Work Product Privilege; Trial Preparation Materials

Party seeking to discover opinion work product must show extraordinary justification. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

[29]    **Bankruptcy** 🔑 Production of documents

**Federal Civil Procedure** 🔑 Work Product Privilege; Trial Preparation Materials

Extraordinary justification did not warrant discovery of opinion work product, where memoranda sought to be discovered were pure advocacy and were consistent with counsel's deposition testimony, in which he disclosed mental impressions and opinions, and discovery of documents would not open new avenues of questioning. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

[30]    **Witnesses** 🔑 Subpoenas

Subpoena invokes power of court and can disrupt lives of nonparties.

[31]    **Attorneys and Legal Services** 🔑 Other particular conduct

**Witnesses** 🔑 Remedies for improper subpoena

Attorney who issues improper subpoena directly implicates court and undermines it; courts are therefore granted wide discretion to impose sanctions which penalize wrongdoer, deter future abuse, and compensate injured. Fed.Rules Civ.Proc.Rule 45(c)(1), 28 U.S.C.A.

1 Case that cites this headnote

[32]    **Witnesses** 🔑 Documents; subpoena duces tecum

Sweeping subpoena which requires nonparty to sift through virtually every document in its files is prima facie improper.

1 Case that cites this headnote

[33]    **Bankruptcy**  Examination and Discovery

Although subpoena requiring counsel for debenture holders' committee to produce all documents relating to Chapter 11 case was overly broad and unreasonable and, therefore, improper, sanctions were not warranted, since counsel neutralized effect of subpoena with brief letter of objection, suffered no burden in attempting to comply, and failed to propose resolution. Fed.Rules Civ.Proc.Rule 45(c)(1), 28 U.S.C.A.

1 Case that cites this headnote

**Attorneys and Law Firms**

**\*95** Thomas P. Puccio, New York City, Winthrop, Stimson, Putnam & Roberts (Richard L. Epling, Frederick A. Brodie, Robert E. Bailey, of counsel), New York City, Co–Counsel to Plaintiff.

Gibson, Dunn & Crutcher (Mitchell A. Karlan, Meredith C. Braxton, Leslie E. Moore, of counsel), New York City, for Defendants.

Anderson, Kill, Olick & Oshinsky, P.C. (Martin F. Brecker, Gabriella Jordan, of counsel), New York City, Subpoenaed Person, Pro Se.

Andrews & Kurth, L.L.P. (James D. Higgason, Jr., of counsel), New York City, Subpoenaed Person, Pro Se.

Harvey Greenfield, New York City, for Intervenor Jerry Krim.

**MEMORANDUM DECISION REGARDING WORK PRODUCT PRIVILEGE**

STUART M. BERNSTEIN, Bankruptcy Judge.

Three former debenture holders of the Circle K Corporation ("Circle K") commenced this adversary proceeding in the United States Bankruptcy Court for the District of Arizona. The defendants are the reorganized debtors ("New Circle

K") and CK Acquisitions Corporation ("CK"), the entity that purchased all of New Circle K's newly issued stock under the plan. The **\*96** plaintiffs seek legal and equitable relief in connection with their claim that the defendants fraudulently procured Circle K's confirmation.

The defendants seek to compel the disclosure of three documents prepared by non-party Anderson, Kill, Olick, & Oshinsky, P.C. ("AKOO") in the course of its representation of the Official Committee of Debenture Holders in the Circle K bankruptcy. AKOO opposes the disclosure, invoking the work product doctrine. After considering the parties' arguments and examining the three documents, I conclude that the latter contain opinion work product which need not be disclosed. Accordingly, the defendants' motion to compel disclosure is denied. I further conclude that sanctions are not warranted.

**FACTS**

The facts underlying this dispute are set out in an unreported decision setting forth my conclusion, *inter alia*, that AKOO did not waive the work product privilege by failing to provide a privilege log when it initially interposed its objection to the document request. *S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.),* S.D.N.Y. Misc. No. 95–437 (Bankr.S.D.N.Y. May 30, 1996) ("Slip op."). I repeat only those facts necessary to provide a context for this decision.

Circle K and its affiliates filed their chapter 11 cases in the United States Bankruptcy Court for the District of Arizona on May 15, 1990. During the case, an official committee (the "Committee") was appointed to represent the debenture holders, a constituency that included the plaintiffs as well as the intervenor, Jerry Krim. The Committee retained AKOO as its counsel, and Martin Brecker, a member of AKOO, was in charge of the matter.

New Circle K confirmed its plan on June 16, 1993. Under the plan, New Circle K sold all of its newly issued stock to CK for $399.5 million.[1] *S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.),* 171 B.R. 666, 667 (Bankr.D.Ariz.1994) ("*Circle K I*"). The plan did not provide for any distribution to Circle K's debenture holders, and the Committee vigorously opposed it. Among other things, the Committee believed that Circle K's management had undervalued the debtor's assets, which, if properly valued, would have been sufficient to pay a dividend to the debenture holders.

Following the Committee's unsuccessful direct challenge to the confirmation order, the plaintiffs commenced this adversary proceeding in the Arizona bankruptcy court to revoke the confirmation order under 11 U.S.C. § 1144. They charged that the defendants had fraudulently procured the confirmation order, primarily by concealing the right of Circle K's management to purchase equity in New Circle K, and by undervaluing the debtor in the confirmation process. *Circle K I*, 171 B.R. at 667–68. In other words, management "low balled" the price and sold out the debenture holders because they were to receive an undisclosed benefit from the buyer. Chief Judge Nielsen dismissed the complaint as moot, ruling that the plan had advanced to the point that he could not fashion effective relief even if the plaintiffs prevailed. *Id.* at 670.

**[1]** The plaintiffs then filed an amended complaint which relied upon the same allegations, but sought damages and equitable relief instead of revocation. The defendants again moved to dismiss the complaint, or in the alternative, for summary judgment. Chief Judge Nielsen denied the motion, holding that although the plaintiffs could not revoke the confirmation, they could seek damages on account of the alleged fraud. *S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.),* 181 B.R. 457, 465 (Bankr.D.Ariz.1995) ( "*Circle K II* "). To overcome the *res judicata* effect of the confirmation order, the plaintiffs would have to demonstrate at trial that they did not discover the fraud prior to confirmation, *id.* at 462, and could not have discovered it through the exercise of due diligence. *See id.* at 463.

In due course, the defendants issued a subpoena duces tecum to AKOO, by Martin Brecker, on June 30, 1995. AKOO immediately objected. The defendants then moved **\*97** to compel compliance with the subpoena in this Court, and after some legal skirmishing among the parties, narrowed their request to documents concerning management incentives, such as bonuses, success fees or equity participations, under the debtor's plan. AKOO eventually produced a privilege log identifying four documents it maintained were attorney work product, but thereafter withdrew the claim as to one of them, leaving only three. AKOO also supplemented the privilege log with the Affidavit of Martin Brecker, sworn to June 6, 1996 ("Brecker Aff.".)

Two depositions that took place during this adversary proceeding bear directly on the work product issue. In March, 1994, the parties deposed Martin Brecker. At his deposition

("Brecker Dep."), Brecker said, among other things, that he wanted to discover the identity of Investcorp's investors, including whether they were part of Circle K's management, because it might help the Committee in its litigation. (*Id.* at 17.) He also testified that he was interested in learning if the investors included members of management because he believed that the purchase price was inadequate and he was looking for reasons why the company was willing to accept such a low price. (*Id.* at 18.) Finally, he stated that he was concerned because the bondholders were getting nothing under the plan, and he was looking for reasons why management was willing to sell the business for such a low price. (*Id.*) The defendants point to this testimony as a waiver of the work product privilege concerning management incentives and their connection to the allegedly inadequate sale price.

The defendants also deposed Jerry Krim. Krim is a former debenture holder who has intervened in this adversary proceeding, and is seeking to represent a class of debenture holders. At his March 1996 deposition ("Krim Dep."), Krim testified about certain conversations he had with AKOO attorneys during the Circle K proceedings and prior to the confirmation of the debtor's plan. He stated that he did not retain a personal attorney to represent him in connection with the bankruptcy case (*Id.* at 38.) To keep abreast, he spoke to Committee counsel, but does not remember the name of the attorneys. (*Id.* at 42.) He called several times, and was referred to a woman attorney, but he does not remember her name. (*Id.* at 43.) He asked her to keep him apprised of the details of the case. (*Id.* at 44.)

At one point, the AKOO attorney told Krim "that they had an expert that evaluated the value of the—franchise, and it was much higher than the Court was placing on it." (*Id.*) She also told him that in her opinion, the auction was not a true auction (*id.* at 45), and discouraged others from bidding. (*Id.* at 47.) She and Krim never discussed Circle K's management's attitude toward the auction, the bidders or the bondholders. (*Id.* at 45–46.) The defendants point to the original conversations, and to Krim's testimony about those conversations, as additional grounds to find a waiver.

## DISCUSSION

### A. Introduction

**[2]**    **[3]**    The work-product rule is a qualified privilege codified in Rule 26(b)(3) of the Federal Rules of Civil

Procedure.[2] *Upjohn Co. v. United States,* 449 U.S. 383, 398, 101 S.Ct. 677, 687, 66 L.Ed.2d 584 (1981); *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 471 (S.D.N.Y.1993). First recognized by the Supreme Court in the landmark decision of *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the doctrine "shelters the mental processes of the attorney, providing a privileged area within which he can prepare his client's case." **\*98** *United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 2170, 45 L.Ed.2d 141 (1975). The immunity applies both to the tangible work product and deposition testimony concerning the substance of that work product. *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. at 471.

 **[4]**  **[5]**  The work product doctrine represents a balance struck between the right to know and the lawyer's ability to prepare his case:

Inherent in recognition of a privilege for attorney work product is a judgment that society's interest in ferreting out the truth through litigation will not best be served by exposing a party's case to impeachment by documents reflecting the opinions or preliminary evaluations of its counsel, even if the party's position in court is inconsistent with counsel's private thoughts.

*In re Sealed Case,* 676 F.2d 793, 817 n. 95 (D.C.Cir.1982). The purpose of the privilege is to protect the integrity of the adversary process by preventing an adversary from obtaining a free ride in preparing his client's case. *Martin v. Valley Nat'l Bank,* 140 F.R.D. 291, 320 (S.D.N.Y.1991). "Discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary." *Hickman v. Taylor,* 329 U.S. 495, 516, 67 S.Ct. 385, 396, 91 L.Ed. 451 (1947) (Jackson, J., concurring).

 **[6]**  **[7]**  The party asserting the privilege has the burden of proving its basis, *In re Leslie Fay Cos. Sec. Litig.,* 161 F.R.D. 274, 280 (S.D.N.Y.1995); *Park Avenue Bank, N.A. v. Bankasi,* 93 Civ. 1483 (JFK), 1994 WL 722690 at \*1 (S.D.N.Y. Dec. 30, 1994); *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. at 470, and generally does so through a combination of affidavits and privilege logs that address each document at issue. *Id.* at 474. In camera review should be undertaken if the parties genuinely dispute the description of the documents, but is neither appropriate nor preferable as a substitute for the proponent's submission of an adequate record to support the privilege claim. *Id.* at 475.

 **[8]**  **[9]**  **[10]**  Once the proponent satisfies its burden, the party seeking discovery must come forward and demonstrate a ground for piercing the privilege. He may generally do so in one of several ways. First, he can show that an exception to the work product doctrine excludes the material from its protection. "Exception comes into play when a privileged relationship is used to further a crime, fraud, or other fundamental misconduct." *In re Sealed Case,* 676 F.2d at 807. Second, he can show that the holder impliedly waived the privilege. "Implied waiver deals with an abuse of a privilege itself rather than of a privileged relationship." *Id.* Thus, the holder of the privilege cannot use it as a tool to manipulate the truth-seeking process. *Id.*

 **[11]**  Third, since the privilege is a qualified one, the opponent may sometimes obtain work product upon a showing of need. The law distinguishes, however, between non-opinion work product (work product containing non-privileged, relevant facts) and opinion work product (work product that contains the attorney's opinions, judgments and thought processes). Opinion work product receives higher protection, and a party seeking to discover it must show "extraordinary justification." *In re Sealed Case,* 676 F.2d at 809–10; *see also Upjohn Co. v. United States,* 449 U.S. 383, 401, 101 S.Ct. 677, 688, 66 L.Ed.2d 584 (1981) ("As Rule 26 and *Hickman* make clear, such work product cannot be disclosed simply on a showing of substantial need and inability to obtain the equivalent without undue hardship.").

## B. The AKOO Documents

AKOO asserts the work product privilege to protect three documents from disclosure to the defendants. The defendants primarily contend that AKOO waived any protection through (1) disclosure to Krim, (2) Krim's disclosure at his deposition and (3) Brecker's testimony at his own deposition. The defendants also contend that they have established a need even in the absence of any waiver. I need not address these arguments, however, unless I conclude that AKOO has met its burden of establishing that these three documents are work product.

### \*99 1. AKOO's Burden of Proof

 **[12]**  **[13]**  AKOO's privilege log and the Brecker affidavit make this required showing. According to the privilege log, two of the documents, dated April 1, 1992, are memoranda prepared by Brecker and circulated to several lawyers who are identified by name. The memoranda concern, respectively, (1) an interim order and the plan and (2) a letter agreement

regarding the plan of reorganization. The third document is dated October 26, 1992, and is described as handwritten notes prepared by David C. Forman, Esq. According to the privilege log, Mr. Forman did not send these notes to anyone.

While the privilege log identifies the documents as having been prepared by attorneys, it says nothing of the circumstances surrounding their preparation, and in particular, whether they were prepared for, or in anticipation of, litigation. The Brecker affidavit, at paragraph 3, supplies the missing information. Brecker prepared the two April 1, 1992 memoranda for possible inclusion in a pleading to be filed on behalf of the Committee, and circulated the drafts to other AKOO attorneys. They therefore satisfy the criteria for work product.

The third document was prepared during a meeting between Messrs. Brecker and Forman at which they discussed an objection that the Committee intended to file against the debtor's disclosure statement. According to the Brecker affidavit, "[t]he notes contain my thoughts and David's thoughts respecting the subject matter and drafting of the objection and allocation of responsibilities between us and others who would be working on the task." (Brecker Aff. ¶ 3(a).) This document also satisfies the criteria for work product.

### 2. Waiver by Disclosure

[14]    [15]    The work product doctrine protects the attorney's materials, and consequently, the attorney may waive the benefit of the privilege. *Carte Blanche (Singapore) PTE, Ltd. v. Diners Club Int'l, Inc.,* 130 F.R.D. 28, 32 (S.D.N.Y.1990). Although the client can also waive the privilege as to non-opinion work product, the attorney may still contest the waiver as to opinion work product. *See Buck v. Aetna Life & Casualty Co.,* Civ. A. No. 91–2832, 1992 WL 130024 at *2 (E.D. Pa. June 5, 1992). As noted, the defendants contend that AKOO waived the work product privilege through its disclosure to Krim, or Krim's subsequent disclosure of those communications at his deposition.

### a. Disclosure to Krim

[16]    The disclosure to Krim raises an important threshold bankruptcy question: was Krim, in his capacity as a debenture holder, a client of AKOO for purposes of the attorney client and work product privileges? The committee owes fiduciary

duties to *the class* of creditors that it represents (*i.e.,* its constituency). *In re SPM Mfg. Corp.,* 984 F.2d 1305, 1315 (1st Cir.1993); *Pan Am Corp. v. Delta Air Lines, Inc.,* 175 B.R. 438, 514 (S.D.N.Y.1994), and several courts have held, in analogous circumstances, that the members of an association are the clients of the association's attorneys. *See, e.g., Philadelphia Hous. Auth. v. American Radiator & Standard Sanitary Corp.,* 294 F.Supp. 1148, 1149–50 (E.D.Pa.1969); *United States v. American Radiator & Standard Sanitary Corp.,* 278 F.Supp. 608, 614 (W.D.Pa.1967); *Schwartz v. Broadcast Music, Inc.,* 16 F.R.D. 31, 32–33 (S.D.N.Y.1954).

*Glueck v. Jonathan Logan, Inc.,* 653 F.2d 746 (2d Cir.1981), an attorney disqualification case, casts doubt on this reasoning, instead characterizing the association's members as "vicarious clients." *Id.* at 749; *accord British Airways, PLC v. Port Auth.,* 862 F.Supp. 889, 894–95 (E.D.N.Y.1994); *North Star Hotels Corp. v. Mid–City Hotel Assocs.,* 118 F.R.D. 109, 112 (D.Minn.1987). Thus, mere status as a constituent did not make the association member a client —in the traditional sense—of the association's lawyers, and this conclusion follows even more strongly in light of the committee's role in a bankruptcy proceeding.[3]

[17]    The committee and its counsel often take positions against particular creditors.  **\*100**  An official committee is a party in interest, and has the right to be heard on any issue in the case. 11 U.S.C. § 1109(b). A committee may object to a creditor's claim. *See In re Angeles Corp.,* 177 B.R. 920 (Bankr.C.D.Cal.1995). It may, under certain circumstances, obtain authorization to sue third parties, including creditors, on behalf of the estate, *see Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.),* 779 F.2d 901 (2d Cir.1985), and may seek to equitably subordinate the claim of a creditor. *Tennessee Valley Steel Corp. v. B.T. Commercial Corp. (In re Tennessee Valley Steel Corp.),* 183 B.R. 795 (Bankr.E.D.Tenn.1995). Neither the committee nor its lawyers could function if each constituent was a client.

[18]    Accordingly, Krim did not become a client of AKOO simply because he owned debentures and the Committee represented the interests of the debenture holders. In addition, nothing has been brought out to show that he ever became a client of AKOO in the traditional sense; he sought status reports rather than legal advice when he spoke to AKOO. As a result, if AKOO disclosed work product to Krim, which I assume it did for the purpose of analysis, this constitutes disclosure to a non-client. It does not follow, however, that AKOO thereby waived the work product privilege.

[19]    [20]    The work product privilege is designed to protect the adversary system rather than confidential communications. *United States v. American Tel. & Tel. Co.,* 642 F.2d 1285, 1299 (D.C.Cir.1980). Consequently, "to effect a forfeiture of work product protection by waiver, disclosure must occur in circumstances in which the attorney cannot reasonably expect to limit the future use of the otherwise protected material." *Doe v. United States (In re Doe),* 662 F.2d 1073, 1081 (4th Cir.1981), *cert. denied,* 455 U.S. 1000, 102 S.Ct. 1632, 71 L.Ed.2d 867 (1982). The holder of the work product privilege waives it only by voluntarily disclosing it in such a manner that it is likely to be revealed to its adversary. *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. at 479. Conversely, the holder does not waive the privilege by disclosing the work product to another person who has a common interest with the client and is not reasonably viewed as someone who will, in turn, disclose it to an adversary. *In re Doe,* 662 F.2d at 1081; *Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. at 479; *GAF Corp. v. Eastman Kodak Co.,* 85 F.R.D. 46, 51–52 (S.D.N.Y.1979).

[21]    The disclosure of any work product to Krim did not waive the privilege. AKOO and the Committee represented Krim's interest as a bondholder. It would have been reasonable to assume that Krim would not run to Circle K or Investcorp and disclose AKOO's opinion that the auction process was unfair. Further, a contrary rule would prevent a committee and its counsel from doing their job. A committee has an implied if not express duty to advise its constituents of the status of the case and respond to their reasonable inquiries. Those communications may involve recommendations regarding proposed plans or other matters. If counsel must remain guarded in those communications for fear of disclosing an opinion and waiving the work product, the creditors will ultimately suffer.

[22]    For the same reasons, Krim's deposition testimony did not waive any work product protection. First, it would be anomalous to hold that AKOO did not waive the privilege by disclosing work product to Krim because it reasonably believed that he would not turn it over to an adversary, but conclude that a waiver occurred because Krim acted contrary to that reasonable expectation. Second, as a non-client, Krim could not waive the privilege he did not hold. Third, neither AKOO nor the Committee, the holders of the privilege, are parties to this adversary proceeding, or attended the Krim deposition. It would be grossly unfair under these circumstances to conclude that Krim could waive the privilege through his deposition testimony when the holders of the privilege did not have the opportunity to object.

### b. Disclosure by Brecker

[23]    [24]    [25]    Brecker's deposition testimony raises a more significant issue. Brecker, as a partner in AKOO, could waive the privilege through disclosure. Implied waiver is based **\*101** ultimately on "fairness," *In re Sealed Case,* 676 F.2d at 817, and a court need not allow a privilege to stand when the proponent seeks to use it for a purpose that is inconsistent with the privilege. *Id.* at 818. The defendants maintain and I agree that Brecker disclosed his mental impressions and opinions at his deposition. He revealed his opinion and strategy regarding the connection between management incentives and his real concern: an inadequate sale price.[4] "[M]aterial is opinion work-product because it is 'reflective of a counsel's approach.' " Breckinridge L. Willcox, *Martin Marietta and the Erosion of the Attorney–Client Privilege and Work–Product Protection,* 49 Md.L.Rev. 917, 931–32 (1990) (quoting *United States v. Pollard (In re Martin Marietta Corp.),* 856 F.2d 619, 625 (4th Cir.1988), *cert. denied,* 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989)). That said, I must consider whether he thereby waived his right to assert work product to protect the three documents at issue.

In determining the scope of an implied waiver, the cases distinguish between opinion work product and non-opinion work product. Some hold that although waiver extends to all non-opinion work product involving the same subject matter, the doctrine of subject matter waiver does not extend to opinion work product. *Cox v. Administrator U.S. Steel & Carnegie,* 17 F.3d 1386, 1422 (11th Cir.), *modified on other grounds,* 30 F.3d 1347 (11th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995); *United States v. Pollard (In re Martin Marietta Corp.),* 856 F.2d 619, 625–26 (4th Cir.1988), *cert. denied,* 490 U.S. 1011, 109 S.Ct. 1655, 104 L.Ed.2d 169 (1989); *see Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. at 485 (the unauthorized disclosure of work product results in the waiver of any privilege concerning non-opinion work product involving the same subject matter); *Bernstein v. Bernstein,* No. 91–0785 (RR), 1993 WL 184201 at *1 (E.D.N.Y May 24, 1993). *But see United States v. Family Practice Assocs.,* 162 F.R.D. 624, 627 (S.D.Cal.1995) (stating, without citation to authority, that once the privilege is waived, there is no need to distinguish between opinion and non-opinion work product).

*Marietta* explained that opinion work product receives greater protection under Rule 26(b)(3), and there is little danger that a litigant can make unfair, testimonial use of an attorney's thoughts and mental impressions. *In re Martin Marietta Corp.,* 856 F.2d at 626.

Other courts which decline to take the absolute view, still grant "particular solicitude" to opinion work product, *In re Kidder Peabody Sec. Litig.,* No. 94 Civ. 3954 (BSJ), 1996 WL 263030 at *15 (S.D.N.Y. May 17, 1996), and limit the disclosure to the extent necessary to avoid unfairness. *Alpex Computer Corp. v. Nintendo Co.,* 86 Civ. 1749 (KMW), 1994 WL 330381 at *2 (S.D.N.Y. July 11, 1994) (courts should "take care to extend the scope of the waiver only so far as necessary to ensure fairness to the litigants"); *see, e.g., Micron Separations, Inc. v. Pall Corp.,* 159 F.R.D. 361, 365 (D.Mass.1995) (finding waiver where proponent had interjected issue of reliance on advice of counsel, but excepting from waiver work product consistent with that advice); *United States v. Rosenthal,* 142 F.R.D. 389, 394 (S.D.N.Y.1992) (declining to find subject matter **\*102** waiver where there was no possibility of inconsistent testimonial use and the materials were not relevant or admissible; *Charlotte Motor Speedway, Inc. v. International Ins. Co.,* 125 F.R.D. 127, 130 (M.D.N.C.1989) (finding waiver where activities and advice of counsel were at issue).

[26] I have examined the three documents at issue, and conclude that fairness does not require that I find a waiver. None of the documents refer to any factual work product; they consist entirely of opinion work product with regard to the management incentive issue. The memoranda are pure advocacy, and are consistent with Brecker's deposition testimony. The meeting notes also reflect concerns consistent with those expressed at his deposition. Thus, there is no danger that Brecker can give inconsistent testimony, and selectively disclose his opinions or mental impressions. Furthermore, the defendants already deposed Brecker in this adversary proceeding, asked him questions about management incentives and the auction price, and he answered fully. He has stated that nothing in the three documents refreshes his recollection regarding what he said (Brecker Aff. ¶ 9), and hence, would not open new avenues of questioning. In addition, the plaintiffs—who were not even Brecker's clients—have not relied on anything he said or did,[5] and his mental impressions are neither relevant nor admissible nor in issue. In short, the defendants have failed to make the required showing of unfairness to support the conclusion that AKOO waived its opinion work product by disclosure.

### 3. The Defendant's Need

[27] [28] All agree that the protection afforded work product is qualified. Under Rule 26(b)(3), the party seeking discovery can obtain non-opinion work product upon a showing of substantial need and the inability to obtain the substantial equivalent without undue hardship. *Accord Horn & Hardart Co. v. Pillsbury Co.,* 888 F.2d 8, 12 (2d Cir.1989). The bar is raised even higher for opinion work product; a party seeking to discover opinion work product must show "extraordinary justification." *In re Sealed Case,* 676 F.2d at 809–10; *see Upjohn Co. v. United States,* 449 U.S. at 401, 101 S.Ct. at 688.

[29] The defendants argue that independent of the waiver issue, they have made the requisite showing of need to discover the work product. I disagree. My analysis overlaps with the earlier analysis of the waiver issue. Having concluded that fairness does not demand production, I conclude, for the same reason, that the defendants have failed to show an "extraordinary justification" for qualifying the protection for opinion work product.

### C. Costs and Other Relief

[30] [31] Rule 45(c)(1) of the Federal Rules of Civil Procedure authorizes the court to impose an appropriate sanction against any party that issues a subpoena, but in so doing, fails to take reasonable steps to avoid imposing an undue burden on the subpoenaed party. A subpoena invokes the power of the court, and can disrupt the lives of non-parties. *Bowers v. Buchanan,* 110 F.R.D. 405, 406 (S.D.W.Va.1986). An attorney who issues an improper subpoena directly implicates the court and undermines it. *See United States v. Santiago–Lugo,* 904 F.Supp. 43, 48 (D.P.R.1995). Courts are therefore granted wide discretion to impose sanctions which penalize the wrongdoer, deter future abuse and compensate the injured. *Mann v. University of Cincinnati,* 152 F.R.D. 119, 126–27 (S.D.Ohio 1993).

[32] [33] A sweeping subpoena which requires a non-party to sift through virtually every document in its files is *prima facie* improper. *See In re Elec. Weld Steel Tubing Antitrust Litig.,* 512 F.Supp. 81, 84 (N.D.Ill.1981). In my earlier decision, I ruled that **\*103** the defendants' subpoena, served upon AKOO, was overly broad and unreasonable. It required AKOO to produce all documents relating to the

case rather than those documents limited to the inquiry of management incentives under the debtor's plan. *S.N. Phelps v. Circle K Corp.*, slip op. at 21–22. Hence, it was improper. Nevertheless, I conclude that an award of sanctions is not warranted.

While the defendants served an unduly broad subpoena which relieved AKOO of its obligation to file a privilege log in response to it, AKOO "neutralized" the effect of the subpoena with a brief letter objection. Hence, it did not suffer any burden in attempting to comply. In addition, AKOO's objection did not propose a resolution, and it is clear to me that both parties required judicial intervention to craft a narrower subpoena. Thus, a substantial portion of the motion practice between the defendants and AKOO was made necessary by the seeming intransigence of both parties. Accordingly, awarding sanctions would confer a windfall on AKOO which, in my view, is undeserved.

The parties are directed to settle an order consistent with this opinion.

## All Citations

199 B.R. 92, 29 Bankr.Ct.Dec. 655

## Footnotes

1  CK was controlled by an investment entity known as Investcorp. *S.N. Phelps & Co. v. Circle K Corp. (In re Circle K Corp.), 171 B.R. 666, 667 (Bankr.D.Ariz.1994).*

2  Rule 26(b)(3) provides, in pertinent part, as follows:

 [A] party may obtain discovery of documents and tangible things otherwise discoverable ... and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative ... only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation.

3  This conclusion does not foreclose a situation in which the facts support the existence of a traditional attorney-client relationship between a creditor and committee counsel.

4  In addition, AKOO produced a document containing a handwritten notation which, the defendants also argue, constitutes a waiver. AKOO had filed an appellate brief on behalf of the Committee, seeking to overturn the bankruptcy court's order approving an amendment to the stock purchase agreement. The brief attached a page from the debtor's draft disclosure statement intended to show newly revealed information regarding management's participation in the New Circle K equity. The attached page includes the following statement:

 "*Other than those members of management* who will be granted equity incentive options in the Purchaser, the shareholders of the purchaser are:" [Emphasis added.]

 Anthony Princi, an AKOO lawyer, circled this language and wrote on the page: "Explain in detail."

 The defendants maintain that this statement, like the Brecker testimony, reveals AKOO's strategy on the management incentive/auction price issue. This notation is far less compelling than, and at most cumulative of, Brecker's testimony. In addition, the brief and annotated exhibit were filed long before Brecker's deposition in this adversary proceeding, yet no one, particularly the defendants, every asked him any question about it. This undercuts the recent claim of its critical nature.

5  The defendants argue that the plaintiffs can only prove due diligence by showing what AKOO did. The plaintiffs disagree. In the event that the plaintiffs call Brecker as a witness, or attempt to use his testimony in a manner which is inconsistent with the purposes of the work product privilege, the defendants can raise the issue with Judge Nielsen at that time. He

**In re Circle K Corp., 199 B.R. 92 (1996)**
29 Bankr.Ct.Dec. 655

can obviously review the matter, and if he agrees, strike the testimony or condition its admission upon the production of the work product and the opportunity to redepose Brecker.

| | |
|---|---|
| **End of Document** | © 2023 Thomson Reuters. No claim to original U.S. Government Works. |

437 B.R. 493
United States Bankruptcy Court, D. Delaware.

## Re: LESLIE CONTROLS, INC.

No. 10–12199
|
Sept. 21, 2010.

### Synopsis

**Background:** Insurance companies sought discovery of information otherwise protected by attorney-client privilege, on theory that Chapter 11 debtor's sharing of information with ad hoc committee of asbestos claimants and future claims representative had resulted in waiver of privilege, and debtor asserted protection of "common interest doctrine."

**Holdings:** The Bankruptcy Court, Christopher S. Sontchi, J., held that:

interest possessed by debtor, ad hoc committee of asbestos claimants, and future claims representative in preserving and maximizing insurance available to pay asbestos claims by analyzing insurance documents and applying contract, insurance and bankruptcy law to argue that policies provided coverage not just for existing, but for future asbestos claims, was in nature of common "legal interest," such as would permit the sharing of privileged communications among them in furtherance of their claims against liability insurers, and

mere fact that parties were involved in ongoing negotiations regarding treatment of asbestos claims in plan and may have had adverse interests as to how pie was divided did not mean that they did not have common legal interest in maximizing size of pie.

Judgment for debtor.

### Attorneys and Law Firms

**\*495** Norman L. Pernick, Marion M. Quirk, Sanjay Bhatnagar, Cole, Schotz, Meisel, Forman & Leonard, P.A., Wilmington, DE, G. David Dean, Baltimore, MD, for Debtor and Debtor in Possession.

Mark D. Plevin, Crowell Moring, Washington, DC, for Century Indemnity Company.

Edwin J. Harron, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE, for Future Claimants' Representative.

Natalie D. Ramsey, Montgomery, McCracken, Walker & Rhoads, LLP, Wilmington, DE, for The Official Committee Of Unsecured Creditors.

John D. Demmy, Stevens & Lee, Wilmington, DE, for Fireman's Fund Insurance Comp.

### Opinion

CHRISTOPHER S. SONTCHI, Bankruptcy Judge.

Dear Counsel:

Before the Court is a discovery dispute between (i) Century Indemnity Company and Fireman's Fund Insurance Company (collectively, the "Insurers"); and (ii) the Debtor.[1] The question is whether privileged communications between the Debtor and its counsel that were shared pre-petition with an ad hoc committee of asbestos plaintiffs (the "Ad Hoc Committee") and the Debtor's proposed future claimants' representative (the "Pre-Petition FCR") remain protected from discovery under the "common interest doctrine."

There are 26 documents at issue. The main document in question is a memorandum that was prepared by insurance coverage counsel for the Debtor providing advice with respect to the effect of the Insurers' likely position on insurance recoveries under various bankruptcy scenarios. Other documents contain information or analysis obtained from the memorandum.

**\*496** In late 2009, the Debtor determined that a bankruptcy filing was necessary to deal with its mounting liabilities arising from asbestos personal injury lawsuits. In early 2010, the Debtor began negotiations with the Ad Hoc Committee and the Pre–Petition FCR in hopes of developing a consensual plan of reorganization. Those negotiations were ultimately successful.[2]

During the negotiations, the Debtor shared the memorandum with counsel to the Ad Hoc Committee and the Pre–Petition FCR. Subsequently, the Debtor, the Ad Hoc Committee and the Pre–Petition FCR exchanged a number of emails in which the email and/or the attachment referenced the privileged material in the memorandum. A number of those exchanges

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    1

In re Leslie Controls, Inc., 437 B.R. 493 (2010)

(but not all) occurred prior to the parties reaching agreement on the terms of the plan. All of the exchanges occurred pre-petition. The memorandum, the emails and the attachments constitute the documents at issue.

### 1) The Common Interest Doctrine

The common interest doctrine "allows attorneys representing different clients with similar legal interests to share information without having to disclose it to others."[3] It expands the reach of the attorney-client privilege and work product doctrine by providing that, under certain circumstance, the sharing of privileged communications with third parties does not constitute a waiver of the privilege. Thus, the doctrine is only applicable if an underlying privilege has been established.[4]

The party invoking the protection of the common interest doctrine must establish: (1) the communication was made by separate parties in the course of a matter of common interest, (2) the communication was designed to further that effort, and (3) the privilege has not otherwise been waived.[5]

Although the common interest doctrine has its origin in the joint defense privilege, it has completely replaced that privilege for information sharing among clients with different attorneys.[6] Thus, the doctrine is not limited to communications among co-defendants to ongoing litigation. Indeed, "[p]ending litigation is not necessary to invoke the common interest [doctrine]: '[it] is irrespective of litigation begun or contemplated.' "[7] Rather, the common interest doctrine "applies whenever the communication is made in order to facilitate the rendition of legal services to each of the clients involved in the conference."[8]

The common interest of the parties must be "at least a substantially similar legal interest."[9] Nonetheless, the parties need not be in complete accord:

> **\*497** The common interest privilege does not require a complete unity of interests among the participants. The privilege applies where the interests of the parties are not identical, and it applies even where the parties' interests are adverse in substantial respects. The privilege applies even where a lawsuit is foreseeable in the future between the co-defendants.[10]

When the interests of the parties diverge to some extent the common interest doctrine applies "only insofar as their interests [are] in fact identical; communications relating to matters as to which they [hold] opposing interests ... lose any privilege."[11]

As mentioned above, the second prong of the common interest doctrine requires the party invoking the doctrine to establish that the communication was designed to further the common interest. "[I]t is not sufficient for the party seeking the protection of the common interest doctrine merely to show that a unified legal interest theoretically existed. Rather, it must also demonstrate that the parties demonstrated cooperation in developing a common legal strategy."[12]

### 2) Application In This Case

#### a) The Attorney–Client Privilege And The Attorney Work Product Doctrine

As a necessary, preliminary matter, the Court must find that the documents are protected under the attorney-client privilege and/or the attorney work product doctrine. The Debtor has produced a privilege log and submitted the documents to the Court *in camera*. Based upon a review of the documents in question, the Court finds that the documents reflect insurance coverage counsel's legal analysis and mental impressions concerning insurance issues and strategies in anticipation of possible litigation with the Insurers in a bankruptcy proceeding and/or subsequent coverage litigation. Thus, the information contained in the documents is, indeed, privileged. The nub of the dispute, however, is whether the Debtor waived that privilege by sharing the information with the Ad Hoc Committee and the Pre–Petition FCR.

#### b) The Common Interest Doctrine

The party invoking the protection of the common interest doctrine must establish: (1) the communication was made by separate parties in the course of a matter of common interest, (2) the communication was designed to further that effort, and (3) the privilege has not otherwise been waived.[13] The Insurers argue that the Debtor has failed to meet that burden for two reasons.

The common interest of the parties must be "at least a substantially similar *legal* interest."[14] Quoting the Debtor's statement in its letter brief that the Debtor, the Ad Hoc Committee and the Pre–Petition FCR shared a common interest in "preserv[ing] and maximiz[ing] the insurance available to pay asbestos claims," the Insurers argue that, at most, *the parties shared a common commercial interest—not a legal interest.*

**\*498**  In addition, the Insurers argue that the Debtor, the Ad Hoc Committee and the Pre–Petition FCR do not share a *common* interest in connection with the insurance proceeds. Rather, they are adversaries on this issue since the information was shared pre-petition and prior to the parties reaching an agreement on the terms of a plan of reorganization.

### c) Commercial Interest vs. Legal Interest

The Insurers argue that the parties shared, at most, a common commercial interest as opposed to a legal interest. They cite to a number of cases in support of that argument.[15] All of those cases, however, either support the Debtor's position or are readily distinguishable.

*In re Rivastigmine Patent Litigation* involved a suit for patent infringement. The purported infringers sought discovery of communications between the inventors and the pharmaceutical companies holding the relevant patent(s) (collectively, "Novartis"). In support of their argument the Insurers cite to the following:

> Whether the inventors and Novartis continued to have a common legal interest after all patent rights were assigned to Novartis is more doubtful. At that point, the patent rights of [the inventors] were extinguished, even though they continued to have rights to royalties. Such economic rights, standing alone, are generally not sufficient to support application of the common interest doctrine.[16]

The Insurers ignore, however, the bulk of the Court's decision in which it held that "even though Novartis and the inventors may have ultimately anticipated a transfer of the patent rights to Novartis exclusively, until that occurred they had a *common legal interest* in obtaining the patents in order to maximize the value of the property that would ultimately be conveyed."[17] The Court further held that the common interest was "not

diminished" by the fact that the parties were negotiating the ultimate assignment of the patent to Novartis.[18]

The issue in *Shamis* was whether communications between the plaintiff in the action and BancBoston, which was *not* a party to the suit, were protected by the common interest doctrine where "[plaintiff] and BankBoston would both benefit from a judgment in favor of the plaintiff."[19] The Court held that sharing a desire to succeed in an action, in and of itself, does not create a common interest.[20] The Court went on to hold, however, that the common interest doctrine was inapplicable because there was no shared legal interest whatsoever.

> [Plaintiff] has not produced any agreement between plaintiff and his counsel and BankBoston establishing a joint prosecution of plaintiff's claims. There is no evidence of a coordinated legal strategy between [plaintiff] and BankBoston. BankBoston is not, and has never been a party to this action. BankBoston has not exercised control over the conduct of this action, nor has it  **\*499**  contributed to plaintiff's legal expenses.[21]

*Gulf Islands Leasing* presents a somewhat similar fact pattern as to that in *Shamis*. In 2000, Gulf Islands Leasing purchased from Bombardier Aerospace a fractional interest in an aircraft. In addition, Gulf Islands Leasing and Bombardier Aerospace entered into a management agreement governing the use and management of the aircraft. Gulf Islands Leasing financed the purchase of the fractional share through a loan from Bombardier Capital—an affiliate of Bombardier Aerospace. The purchase agreement, management agreement, and finance agreement all contained cross-default provisions.

Ultimately, litigation arose between Gulf Islands Leasing and Bombardier Aerospace. The litigation settled and Gulf Islands Leasing and Bombardier Aerospace entered into a settlement agreement. Subsequently, a dispute arose over the terms of the settlement agreement and litigation arose once again. Bombardier Capital was not a party to the initial suit, the settlement agreement nor the second suit.

Gulf Islands Leasing sought discovery from Bombardier Capital of communications between Bombardier Aerospace and Bombardier Capital relating to the initial lawsuit and the settlement. Bombardier Capital objected invoking the protection of the common interest doctrine.

The Court's holding in *Gulf Islands Leasing* is, frankly, somewhat confusing. First, the Court mistakenly states that "communications regarding business matters—even where litigation is pending or imminent—do not qualify for protection from discovery under the common interest rule."[22] That statement is overly broad or, perhaps more accurately, imprecise. Indeed, the very cases cited by the Court stand for an entirely different proposition, i.e., that an *incidental* legal issue is insufficient to transform a commercial interest into a legal one.[23]

Second, the Court incorrectly held that an attorney-client privilege must exist between counsel to Bombardier Aerospace and Bombardier Capital for the common interest doctrine to be applicable.[24] That **\*500** is incorrect. When multiple clients engage one or more common attorneys to represent them on a matter of interest to all the applicable parties, the applicable privilege is the "co-client (or joint-client) privilege" and not the common interest doctrine.[25]

Ultimately, however, the *Gulf Islands Leasing* Court applied the correct legal standard and held that, as in *Shamis,* there was no evidence of a common legal interest or strategy.[26] The communications between counsel for the Bombardier entities were limited to status reports and inquiries regarding the account balance under the financing—hardly a basis to assert a common legal interest.[27]

Broadly speaking, these cases stand for the proposition that the party invoking the common interest doctrine must present evidence that a legal interest is implicated. If such a legal interest is established then the common interest doctrine will apply (assuming the other elements of the test are met) even if there are separate or overlapping commercial interests.

*Rivastigmine Patent Litigation* is particularly instructive in this case.[28] There, the Court drew a distinction between legal and commercial interests. It held that the parties shared a common legal interest in the strength of the patents prior to the assignment to Novartis. Upon assignment, the inventors' sole interest was in continuing to receive royalty payments, i.e., a commercial interest. The inventors' status as "third party beneficiaries" to litigation did not, in and of itself, give rise to a legal interest.

The interest of the Debtor, the Ad Hoc Committee and the Pre–Petition FCR at the time the documents were shared was in "preserv[ing] and maximiz[ing] the insurance available to

pay asbestos claims." This is an inherently legal question. It involves an analysis of the insurance documents, as well as contract, insurance and bankruptcy law. It requires the involvement of the bankruptcy court. The parties interest in the insurance in this case is virtually identical to the legal interest of Novartis and the investors in the patents in *Rivastigmine Patent Litigation.* Thus, the interest involved here is a legal one.

In short, at the time the documents were shared, the Ad Hoc Committee and Pre–Petition were not merely third party bystanders. As representatives of the ultimate beneficiaries of at least a portion of the proceeds they were directly involved in the effort to maximize insurance coverage. They were working with the Debtor to maximize the size of the pie. Whether their competing interests in getting the biggest piece of pie possible prevented the application of the common interest doctrine in this case is another matter.

### d) Did The Debtor, The Ad Hoc Committee And The Pre–Petition FCR Share A Common Interest?

The common interest privilege does not require a complete unity of interests among the participants, but it is limited by the scope of the parties' common interest.[29] "[C]ommunications relating to matters as to which [the parties hold] opposing interests ... lose any privilege."[30] The Insurers argue that the Debtor, the Ad Hoc Committee and the Pre–Petition FCR do **\*501** not share a *common* interest in connection with the insurance proceeds. Rather, they argue, the parties are adversaries on this issue since the information was shared pre-petition and prior to the parties reaching an agreement on the terms of a plan of reorganization.

The common interest exception does not protect information exchanged among parties simply because they are negotiating toward what they hope will be an agreement. During negotiations, adverse parties "ha[ve] no common interest, and indeed, their interests [a]re in conflict—each [party] want[s] to get the best deal from the other [ ], and to the extent that one succeed[s] in its goal, the other suffer[s]." As a result, until an agreement is actually reached, it is not "objectively reasonable for [a negotiating party] to believe that" a communication of privileged material to other negotiating parties "was confidential" and thus protected by the common interest privilege because, while negotiating parties "may all have

*In re Leslie Controls, Inc.,* 437 B.R. 493 (2010)

hoped for a successful outcome, [ ] each side is representing its or their own interest, and a successful outcome was not assured."

This principle has been specifically applied in the context of negotiations between prospective asbestos debtors and the claimants who are suing them. Courts recognize that the interests of such parties are "profoundly adverse to each other" because the "claimants wish to receive as much as possible" and the prospective debtors "wish to hold their payment obligations to a minimum." Courts have therefore rejected arguments that a "common interest" exists to protect information exchanged during bankruptcy negotiations between prospective debtors and asbestos claimants.

Debtor ... made the disclosures at issue here ... in an attempt to persuade its negotiating adversaries, the Committee and [the Pre–Petition] FCR, to reach agreement with Debtor on the terms of a plan. But ... the parties' divergent interests could not have been "common" after they had actually reached an agreement on the Plan and its treatment of their respective rights and interests. Yet, Debtor admits that it disclosed these material to the Committee and [the Pre–Petition] FCR before there was agreement on a plan or even the structure of a plan.[31]

The Insurers argue, in effect, for establishment of a *per se* rule that parties engaged in negotiations can never share a common interest. While there are cases that support this argument,[32] they are not universal. For example, the Third Circuit has held that parties engaged in merger negotiations may share a common interest.[33] This Court believes that the imposition **\*502** of a black-line rule is inappropriate. Rather, commonality must be measured on a case by case basis.

The New Jersey District Court addressed this precise issue in *Louisiana Mun. Police Employees Retirement System v. Sealed Air Corp.*[34] That case was a class action for alleged violations of the Securities Exchange Act of 1934 related to a corporate transaction between W.R. Grace & Co. ("Grace") and Sealed Air Corporation ("Sealed Air"). The primary issue in the case was whether Grace was solvent at the time of the transaction. The plaintiff in the class action sought the production of documents shared between Grace and Sealed Air relating to potential asbestos liabilities. Sealed Air objected asserting that the common interest doctrine was applicable even though, at the time the documents were shared, Grace and Sealed Air were on opposite sides of a business transaction.

The Court held that "the fact that the parties were on adverse sides of a business deal ... does not compel the conclusion that the parties did not share a common legal interest."[35] The Court went on to hold that Sealed Air had established a sufficient commonality of interest with Grace.

Sealed Air has shown that it had a sufficient common legal interest with Grace ... Prior to the transaction, both Grace and Sealed Air anticipated potential litigation related to asbestos issues. They also retained a substantially similar legal interest in defending against such claims. Plaintiff contends that there was not an identical legal strategy, but that is beside the point. All of the participants interests "need not coincide." Defendant has established that pre-transaction they anticipated the same claims and shared a common-interest in defending against those claims. Thus, Defendants have established that the common-interest privilege precludes the discovery sought.[36]

In this case, the question is, regardless of the fact that there were ongoing plan negotiations, whether the Debtor shared information with the Ad Hoc Committee and the Pre–Petition FCR that was related to the parties common legal interest against their "common enemy," the Insurers? The Court finds that they did.

The Debtor, the Ad Hoc Committee and the Pre–Petition FCR had a conflicting interest relating to the distribution of the Debtor's assets. Each of those parties clearly desired to obtain the largest share of those assets as possible. However, the parties shared a common interest in maximizing the asset pool, which would include insurance proceeds. To return to the pie analogy, the size of the pie and the size of the pieces are two separate questions. The parties are in accord as to the former and adversaries as to the latter.[37] The information contained in the documents that were shared with the Ad Hoc Committee and the Pre–Petition FCR goes to the size of the asset pool—a matter of common interest.

### 3) Conclusion

The party invoking the protection of the common interest doctrine must establish: (1) the communication was made by separate **\*503** parties in the course of a matter of common interest, (2) the communication was designed to further that effort, and (3) the privilege has not otherwise been waived. The Debtor has met that burden. Thus, all 26 documents at

issue are protected from discovery. The Debtor is instructed to submit an order under certification of counsel.

Yours very truly,

Christopher S. Sontchi

United States Bankruptcy Judge

**All Citations**

437 B.R. 493

Footnotes

1     The Official Committee of Unsecured Creditors and the Future Claimants' Representative support the Debtor's position.

2     A confirmation hearing is scheduled to occur shortly. The Insurers object to the plan of reorganization currently before the Court.

3     *In re Teleglobe Communications Corp.,* 493 F.3d 345, 364 (3d Cir.2007).

4     *Louisiana Municipal Police Employees Retirement System v. Sealed Air Corp., et al.,* 253 F.R.D. 300, 309 (D.N.J.2008).

5     *In re Mortgage & Realty Trust,* 212 B.R. 649, 653 (Bankr.C.D.Cal.1997).

6     *Teleglobe,* 493 F.3d at 364 n. 20. As such, cases applying the joint defense privilege—such as *In re Bevill, Bresler & Schulman Asset Management Corp., et al.,* 805 F.2d 120 (3d Cir.1986)—are of limited utility.

7     *Mortgage & Realty Trust,* 212 B.R. at 653 (quoting *Continental Oil Co. v. United States,* 330 F.2d 347, 350 (9th Cir.1964)).

8     *Id.*

9     *Teleglobe,* 493 F.3d at 365. That said, "[t]he fact that there may be an overlap of a commercial and a legal interest for a third party does not negate the effect of the legal interest in establishing a community of interest." *Duplan Corp. v. Deering Milliken, Inc.,* 397 F.Supp. 1146, 1172 (D.S.C.1974).

10    *Mortgage & Realty Trust,* 212 B.R. at 653 (internal citations omitted).

11    *In re Rivastigmine Patent Litigation,* 2005 WL 2319005, *4 (S.D.N.Y. Sept.22, 2005).

12    *Id.* at *2.

13    *Mortgage & Realty Trust,* 212 B.R. at 653.

14    *Teleglobe,* 493 F.3d at 365 (emphasis added).

15    *In re Rivastigmine Patent Litigation, supra*; *Shamis v. Ambassador Factors Corp.,* 34 F.Supp.2d 879 (S.D.N.Y.1999); and *Gulf Islands Leasing, Inc. v. Bombardier Capital, Inc.,* 215 F.R.D. 466 (S.D.N.Y.2003).

16    *In re Rivastigmine Patent Litigation, supra* at *4.

17    *Id.* at *3 (emphasis added).

18    *Id.* at *4.

19    *Shamis,* 34 F.Supp.2d at 893.

20    *Id.*

21    *Id.*

22    *Gulf Islands Leasing,* 215 F.R.D. at 471.

23    See, e.g., *In re FTC,* 2001 WL 396522, at *5 (S.D.N.Y. Apr.19, 2001) ("courts have recognized that a business strategy which happens to include a concern about litigation is not a ground for invoking the common interest rule"); *Walsh v. Northrop Grumman Corp.,* 165 F.R.D. 16, 18 (E.D.N.Y.1996) ("[t]he doctrine does not extend to communications about a joint business strategy that happens to include a concern about litigation") (citation omitted).

    *Id.* (emphasis added).

24    *Moreover, the circumstances of the communications do not suggest that Bombardier Capital would be receiving legal advice from Bombardier Aerospace's attorney.* Bombardier Capital was not a party to the lawsuits and continued receiving payments due to it under the Loan Agreement. Each corporation had its own attorney. While Bombardier Capital certainly had an interest in the dispute between Gulf and Bombardier Capital being resolved and no default occurring, this does not suggest any need for the receipt of legal advice from Bombardier Aerospace's attorneys.

    *In any event, the burden of showing that Bombardier Aerospace was providing Bombardier Capital with legal advice rests with Bombardier Capital.* It has failed to meet this burden and an *in camera* review of the documents does not provide any additional support for such a claim. Because Bombardier Capital has failed to carry its burden of demonstrating that the communications at issue are "predominately of a legal character" or indeed at all legal in nature, *the attorney-client privilege does not apply and there is no need to reach the issue of whether Bombardier Capital may invoke the common interest doctrine.*

    *Id.* at 472–473 (emphasis added).

25    *Teleglobe,* 493 F.3d at 362–366.

26    *Gulf Islands Leasing, supra* at 472–474.

27    *Id.* at 472.

28    *Rivastigmine Patent Litigation, supra.*

29    *Mortgage & Realty Trust,* 212 B.R. at 653.

30    *Rivastigmine Patent Litigation,* at *4.

31    Insurers' Letter Brief [D.I. 217] at 2–3 (internal citations omitted, emphasis in original).

32    See, e.g., *In re JP Morgan Chase & Co. Securities Litigation,* 2007 WL 2363311 at *5 (N.D.Ill. Aug.13, 2007) ("The Court is not convinced that the pre-merger documents shared between JP Morgan and Bank One remains protected by the attorney-client privilege and the common interest doctrine. Fundamentally, the Court does not understand how Bank One and JP Morgan can be said to share a common legal interest prior to their signing the merger. Prior to the merger, these organizations stood on opposite sides of a business transaction. From a business standpoint and from a legal standpoint, the merger parties' interests stood opposed to each other. They had no common interest, and indeed, their interests were in conflict-each company wanted to get the best deal from the other company, and to the extent that one succeeded in its goal, the other suffered.").

33    *Teleglobe,* 493 F.3d at 364 (The common interest doctrine "applies in civil and criminal litigation, *and even in purely transactional contexts.*") (emphasis added).

34    *Louisiana Mun. Police Employees Retirement System, supra.*

35    *Id.* at 310.

36    *Id.* (internal citations omitted).

37    Think of Thanksgiving. Everyone wants the biggest turkey possible (except, perhaps, the chef) but all bets are off when it's time to wrestle over who gets a leg.

---

**End of Document**                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

617 B.R. 806
United States Bankruptcy Court, D. Delaware.

IN RE: MAXUS ENERGY
CORPORATION, et al., Debtors.
Maxus Liquidating Trust, Plaintiff,
v.
YPF S.A., YPF International S.A., YPF
Holdings, Inc., CLH Holdings, Inc., Repsol,
S.A., Repsol Exploration, S.A, Repsol
E&P USA, Inc., Repsol Offshore E&P
USA, Inc., Repsol E&P T&T Limited and
Repsol Services Company Defendants.

Case No. 16-11501 (CSS) Jointly Administered
|
Adv. Pro. No.: 18-50489 (CSS)
|
Signed June 23, 2020

**Synopsis**

**Background:** Debtors' liquidating trust commenced adversary proceeding against debtors' parent company and parent company's former parent company, alleging fraudulent transfers and asserting alter-ego and veil-piercing theories of liability. Discovery motions were made.

**Holdings:** The Bankruptcy Court, Christopher S. Sontchi, Chief Judge, held that:

[1] the Court would give the parties leave to conduct up to 20 depositions;

[2] scope of discovery would not be expanded to include the bases for the individualized claims against debtors' estates;

[3] individuals who allegedly worked both for debtors' parent company and debtors would be presumed to be wearing their "subsidiary hat" at the time of creation of certain documents, as was relevant to privilege;

[4] liquidating trust's reference in complaint to a report prepared by debtors' counsel did not constitute a waiver of attorney-client privilege regarding the report or its drafts; and

[5] debtors and official committee of unsecured creditors were not adverse to one another during time period so as to preclude common-interest doctrine from allowing the maintenance of attorney-client privilege as to communications between debtors and committee during time period.

Ordered accordingly.

See also 560 B.R. 111 and 571 B.R. 650.

West Headnotes (17)

**[1]     Bankruptcy** 🔑 Scope and Extent of Inquiry

Bankruptcy court would give debtors' liquidating trust, which was plaintiff, and chapter 11 debtor's parent company and parent company's former parent company, which were defendants, leave to conduct up to 20 depositions in adversary proceeding based on allegations concerning fraudulent transfers and on alter-ego and veil-piercing theories of liability, even though defendants requested that each side be allowed 35 depositions and argued that the case was very complex, given that involved a 485-paragraph complaint and 23 causes of action, there was a long history between the parties, and the claims were not overly complex. Fed. R. Civ. P. 26(b)(1), 30(a)(2)(A); Fed. R. Bankr. P. 7026, 7030.

2 Cases that cite this headnote

**[2]     Bankruptcy** 🔑 Scope and Extent of Inquiry

Scope of discovery would not be expanded to include the bases for the individualized claims against debtors' estates, in debtors' liquidating trust's adversary proceeding against debtors' parent company and parent company's former parent company, which alleged fraudulent transfers and asserted alter-ego and veil-piercing theories of liability; adversary proceeding concerned claim of corporate misconduct, which was a general claim with no particularized injury.

**[3]**   **Bankruptcy** 🔑 **Privilege**

Individuals who allegedly worked both for debtors' parent company and debtors would be presumed to be wearing their "subsidiary hat" at the time of creation of certain documents requested in discovery, in debtors' liquidating trust's adversary proceeding against parent company and parent company's former parent company, alleging fraudulent transfers and asserting alter-ego and veil-piercing theories of liability, and thus any privilege that debtor's parent held concerning the documents was waived, absent evidence showing that the individuals were not working in their capacity for debtors when documents were created.

1 Case that cites this headnote

**[4]**   **Corporations and Business Organizations** 🔑 **Parent and subsidiary corporations**

That directors of a parent corporation serve as directors of its subsidiary may not serve to expose the parent corporation to liability for its subsidiary's acts.

1 Case that cites this headnote

**[5]**   **Bankruptcy** 🔑 **Privilege**

Debtors' liquidating trust's reference in adversary-proceeding complaint to a report prepared by debtors' counsel, which was a report that discussed causes of action against debtor's parent company and parent company's former parent company in anticipation of debtors' chapter 11 cases, did not constitute a waiver of attorney-client privilege regarding the report or its drafts; the only mention of substance was a conclusion, which was the same the alleged counts in the complaint.

2 Cases that cite this headnote

**[6]**   **Privileged Communications and Confidentiality** 🔑 **Waiver of privilege**

Disclosure of even a part of the contents of a privileged communication surrenders the privilege as to those communications; however, the so called "rule of partial disclosure" limits the waiver to the subject matter of the disclosed communication, and the exact extent of the disclosure is guided by the purposes behind the rule: fairness and discouraging use of the attorney-client privilege as a litigation weapon.

**[7]**   **Privileged Communications and Confidentiality** 🔑 **Attorney-Client Privilege**

**Privileged Communications and Confidentiality** 🔑 **Elements in general; definition**

The "attorney-client privilege" is a common-law privilege that protects communications between attorneys and clients from compelled disclosure.

1 Case that cites this headnote

**[8]**   **Privileged Communications and Confidentiality** 🔑 **Elements in general; definition**

In order for attorney-client privilege to apply, there must be (1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client.

1 Case that cites this headnote

**[9]**   **Privileged Communications and Confidentiality** 🔑 **Elements in general; definition**

**Privileged Communications and Confidentiality** 🔑 **Presumptions and burden of proof**

The party asserting attorney-client privilege bears the burden of establishing the requisite elements, i.e., (1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client.

1 Case that cites this headnote

**[10]**    **Privileged Communications and Confidentiality** 👈 **Confidential character of communications or advice**

**Privileged Communications and Confidentiality** 👈 **Agents or employees of attorney or client in general**

A communication is only covered by attorney-client privilege if made in confidence, and if persons other than the client, its attorney, or their agents are present, the communication is not made in confidence.

1 Case that cites this headnote

**[11]**    **Privileged Communications and Confidentiality** 👈 **Communications Through or in Presence or Hearing of Others; Communications with Third Parties**

If a client subsequently shares an attorney-client privileged communication with a third party, then it is no longer confidential, and the attorney-client privilege ceases to protect it.

**[12]**    **Privileged Communications and Confidentiality** 👈 **Common interest doctrine; joint clients or joint defense**

The "common-interest doctrine," which protects all communications shared within a proper community of interest, is an exception to the general rule that voluntary disclosure to a third party of purportedly privileged information waives the attorney-client privilege.

**[13]**    **Privileged Communications and Confidentiality** 👈 **Common interest doctrine; joint clients or joint defense**

For the common-interest doctrine, which protects all attorney-client-privileged communications shared within a proper community of interest, to apply, the interests must be identical, not similar, and be legal, not solely commercial.

**[14]**    **Privileged Communications and Confidentiality** 👈 **Common interest doctrine; joint clients or joint defense**

To show that the members of the community are allied in a common legal cause, as required for the common-interest doctrine, which protects all attorney-client-privileged communications shared within a proper community of interest, to apply, the party asserting the privilege bears the burden of showing that the disclosures would not have been made but for the sake of securing, advancing, or supplying legal representation.

**[15]**    **Privileged Communications and Confidentiality** 👈 **Common interest doctrine; joint clients or joint defense**

Although a written agreement is evidence of a common interest so as to allow the common-interest doctrine, which protects all attorney-client-privileged communications shared within a proper community of interest, to apply, it is not necessary.

1 Case that cites this headnote

**[16]**    **Bankruptcy** 👈 **Privilege**

Debtors and official committee of unsecured creditors were not "adverse" to one another during time period in which debtors filed a motion to approve settlement with parent company, committee argued against approving that settlement, committee filed proofs of claim, and debtors and committee entered into a site transition agreement concerning environmental liabilities, and thus common-interest doctrine could apply to preserve attorney-client privilege as to communications between debtors and committee during the time period, as was relevant to debtors' liquidating trust's adversary proceeding against debtors' parent company and parent company's former parent company; during period, debtors and committee were negotiating and reaching settlement that included litigation against the "common enemy" of the parent companies.

**[17]**   **Bankruptcy**  🔑  Scope and Extent of Inquiry

Debtors' liquidation trust would not be required to turn over laptop computers to debtors' parent company as requested in trust's adversary proceeding against parent company; laptop computers were used by debtors' employees in their roles for debtors, and all documents on the laptop computers were searched in the discovery process.

**Attorneys and Law Firms**

**\*809**  FARNAN LLP, Brian E. Farnan, Michael J. Farnan, 919 North Market Street, 12th Floor, Wilmington, DE 19801 -and- WHITE & CASE LLP, J. Christopher Shore, 1221 Avenue of the Americas New York, New York 10020, Counsel for the Liquidating Trust

John J. Kuster, SIDLEY AUSTIN LLP, 787 Seventh Avenue, New York, New York 10019 -and- Matthew McGuire, LANDIS RATH & COBB LLP, 919 N. Market Street, Suite 1800, Wilmington, Delaware 19801, Counsel for YPF S.A., YPF International S.A., YPF Holdings, Inc. and CLH Holdings, Inc.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Robert J. Dehney, Curtis S. Miller, 1201 North Market Street, Wilmington, Delaware 19899 -and- WEIL, GOTSHAL & MANGES LLP, Corey D. Berman, 1395 Brickell Avenue, Suite 1200, Miami, Florida 33131, Counsel for Defendants Repsol, S.A., Repsol Exploración S.A., Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., Repsol E&P T&T Limited and Repsol Services Company

**OPINION**

Sontchi, C.J.

**INTRODUCTION**

Before the Court is a discovery dispute between (i) the Maxus Liquidating Trust, the plaintiff (the "Trust"), (ii) defendants YPF S.A., YPF International S.A., YPF Holdings, Inc. and CLH Holdings, Inc. (collectively, "YPF"), and

(iii) defendants Repsol S.A., Repsol Exploración, S.A., Repsol USA Holdings Corp., Repsol E&P USA, Inc., Repsol Offshore E&P USA, Inc., Repsol E&P T&T Ltd., and Repsol Services Company (collectively, "Repsol" and together with YPF, the "Defendants"). By way of background the causes of action in the complaint principally revolve around fraudulent conveyance, and alter ego/veil-piercing claims. Pursuant to the simultaneous discovery dispute letters[1] and simultaneous **\*810** responses[2] there appear to be three main unresolved issues: (i) the number of depositions each side will be permitted to take; (ii) the extent of discovery into the facts underlying certain environmental claims against the estate; and (iii) the validity of certain privilege claims. Several collateral issues were raised in the Letters and will be discussed below. The Court conducted a telephonic hearing on April 20, 2020, regarding these disputes[3] (the "Hearing"). At the conclusion of the Hearing, the Court took the matter under advisement. The matter is ripe for decision.

**JURISDICTION AND VENUE**

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and this Court has the judicial power to enter a final order.

**BACKGROUND**

**A. General Background**

In December 2005, the State of New Jersey (the "State") filed a civil action against Maxus, Tierra Solutions, Inc. ("Tierra"), CLH Holdings, YPF, YPF Holdings, Repsol, and Occidental Chemical Corporation ("Occidental") (collectively, the "Defendants"), alleging they were liable for environmental damage and pollution of the Passaic River in New Jersey (the "New Jersey Action"). Specifically, the State alleged that the pollution stemmed from 80 Lister Avenue in Newark, New Jersey (the "Lister Site"), a former site of Maxus, which is expressly covered as part of Maxus's defense and indemnity obligation to Occidental in the Stock Purchase Agreement (wherein Maxus sold its chemicals business to Occidental), and that the Defendants were responsible for environmental remediation of the Passaic River arising out of the Lister Site.

The New Jersey Action consists of (i) the YPF Claims brought by Occidental, alleging mainly that YPF is an alter ego of Maxus; (ii) the Occidental Claims, alter ego-based claims against Repsol; and (iii) the Repsol Counterclaim, a counterclaim brought by Repsol against Occidental under the New Jersey Spill Act.

Extensive discovery was conducted with respect to those cross-claims, among other claims, which included deposing nearly 50 fact witnesses, many of whom were deposed for more than one day, for a collective total of 71 days of depositions. Importantly, in the New Jersey Action, before the 35 fact witness depositions were taken, the New Jersey court had already dismissed ten of Occidental's twelve asserted cross-claims against Maxus, YPF, and Repsol.

On June 17, 2016 (the "Petition Date"), Maxus and certain of its affiliates and subsidiaries (collectively, the "Debtors") filed voluntary petitions under chapter 11 of the Bankruptcy Code in this Court.

On June 20, 2016, Occidental moved in the New Jersey Bankruptcy Court to transfer the venue of the NJ Environmental Litigation to this Court. On June 28, 2016, the New Jersey Bankruptcy Court granted Occidental's motion, and the NJ Environment Litigation was transferred to **811 this Court. The NJ Environmental Litigation consists of (i) the YPF Claims, brought by Occidental, alleging mainly that YPF is an alter ego of Maxus; (ii) the OCC Claims, alter ego-based claims against Repsol, and (iii) the Repsol Counterclaim, a counterclaim brought by Repsol against Occidental under the New Jersey Spill Act. The Removed Claims are thus comprised of the YPF Claims, the OCC Claims, and the Repsol Counterclaim.

On July 20, 2016, Repsol moved to remand the OCC Claims and Repsol Counterclaim to the New Jersey Court. The YPF Claims were not at issue in Repsol's motion to remand. On November 15, 2016, this Court entered the Order and the Opinion,[4] granting Repsol's motion, and remanded the OCC Claims and Repsol Counterclaim to New Jersey. The Court based its decision on permissive abstention.[5] Following this Court's decision to grant Repsol's motion to remand, on November 29, 2016, Occidental filed a motion for clarification or, in the alternative, for reconsideration of the Court's aforementioned Order and Opinion. Thereafter, the Court entered its "Clarification Opinion"[6] and Order. Wherein the Court held:

The Court's previous finding that the claims were property of the Debtors' estates (i) is supported by controlling Third Circuit law, and (ii) was a necessary element for ruling on the Motion for Remand, and, therefore, does not meet the burden of "completely disregarding controlling law," nor does it result in manifest injustice necessary to warrant clarification or reconsideration under Rule 59(e).[7]

On April 19, 2017, the Debtors filed the *Amended Disclosure Statement for the Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors.*[8] On May 20, 2017, the Debtors filed the *Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and the Official Committee of Unsecured Creditors*[9] (as the same may be amended, modified, and/or supplemented from time to time, the "Plan"). On May 22, 2017, the Court entered *Order Confirming Amended Chapter 11 Plan of Liquidation Proposed by Maxus Energy Corporation, et al. and The Official Committee of Unsecured Creditors Pursuant to Chapter 11 of the Bankruptcy Code*[10] confirming the Plan (the "Confirmation Order"). On July 17, 2017, the Debtors filed the *Notice of (I) Entry of Order Confirming Amended Chapter 11 Plan of Liquidation, (II) Occurrence of Effective Date, and (III) Related Bar Dates*[11] (the "Effective Date Notice") informing parties in interest that the Plan became effective on July 14, 2017 **812 (the "Effective Date"). On the Effective Date, the Trust was formed.

### B. Procedural Background Regarding this Adversary Proceeding

This adversary action was commenced by the Trust on June 18, 2018.[12] Thereafter, Repsol moved this Court to abstain from hearing the adversary action.[13] YPF, and later Repsol, moved to dismiss the adversary action.[14] The Court denied both motions to dismiss on February 15, 2019.[15] On February 25, 2019, the Court entered an Order and Opinion denying the motion for abstention;[16] from which the Defendants filed motions to filed interlocutory appeals;[17] which were subsequently denied by the United States District Court for the District of Delaware (the "District Court").[18]

Thereafter, separately, YPF and Repsol filed a motions to file an interlocutory appeal related to the denial YPF's motion to dismiss.[19] The District Court denied both motions for

*In re Maxus Energy Corporation, 611 B.R. 806 (2020)*

interlocutory appeal.[20] The Defendants also filed motions to withdraw the reference,[21] which were also denied by the District Court.[22]

The Defendants also filed a motion to, among other things, treat the depositions taken in the NJ Environmental Litigation as if they were taken in this adversary action.[23] These motions were denied by this Court.[24]

As a result, the adversary action is proceeding before this Court pursuant to *Amended Case Management Plan and Scheduling Order Scope of Discovery* ("Case Scheduling Order").[25] Pursuant to the Case Scheduling Order, fact discovery was scheduled to conclude at the end of April 2020. However, at the conclusion of the argument on the current discovery dispute, held April 20, 2020, the Court held all discovery in abeyance until the issues set forth herein could be decided.[26] As a result, the Case Scheduling Order must also be further amended pursuant to the rulings set forth herein.

## ANALYSIS

### A. Number of Depositions

[1] The Trust asserts that each side, i.e., plaintiff on the one hand and Defendants on the other, should be allowed up to 15 fact witness depositions whereas the Defendants request up to 35 fact witnesses per side. Federal Rule of Civil Procedure 30(a)(2)(A) states:

(2) *With Leave.* A party must obtain leave of the court, and the court **must grant leave to the extent consistent with Rule 26(b)(1) and (2)**:

**\*813** (A) if the parties have not stipulated to the deposition and:

(i) the deposition would result in more than 10 depositions being taken under this rule or Rule 31 by the plaintiffs, or by the defendants, or by the third-party defendants ....[27]

Importantly, Federal Rule of Civil Procedure 26(b)(1) states that the requested discovery must be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed

discovery outweighs its likely benefit."[28] The rule continues that discovery should not be unreasonably cumulative or duplicative.[29] Furthermore, "[t]o justify its request, a party is required to specify the individuals it wishes to depose and make a 'particularized showing' of the reasons the additional depositions are needed.[30] Although Rule 30(a)(2)(A) uses the word "must," the judge's decision must be "proportional."

In support of the argument that each side should be allowed 35 depositions, the Defendants make several points. The Defendants assert that (i) this is a very complex case involving a 485 paragraph complaint (130 pages long) asserting 23 causes of action against 12 defendants, the allegations of which span decades and three separate regimes of corporate ownership; (ii) the Trust asserts damage claims as high as $14 billion under the alter-ego theory of liability; and (iii) witnesses are located on three continents and have individual knowledge of distinct facts. Furthermore, the Defendants assert that if the Court and/or the Trust would allow use of the depositions previously taken in the NJ Action, then twenty of the requested depositions would not be needed to be taken in this action.

The Court notes that the Trust does not have its own witnesses *per se*, as it is an entity created out of the Plan and Confirmation Order. This, in and of itself, limits the number of depositions required by Defendants as many of the persons on the Defendants' deposition list will also appear on the Trust's list. Nonetheless, the Court is mindful of the extensive time-period covered by the allegations and the numerous changes in corporate regimes, which has served to multiply the number of potential witnesses. On the other hand, the Court does not believe it is proportional discovery to take the deposition of every person at a meeting, for example. Rather, the information can be fairly gathered through a representative person or persons at each meeting. Moreover, although there is a long history between the parties, the Trust is alleging a series of fraudulent transfers and alter-ego/veil piercing theories of liability against the Defendants. Although rooted in the facts, these claims are not overly complex. Bankruptcy lawyers routinely litigate large fraudulent conveyance cases without taking anything remotely approaching **\*814** 70 depositions. Thus, the Court has considered the "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information,"[31] and finds that each side shall be given leave to take the depositions of no more than 20 fact witnesses.[32]

**B. Scope of Discovery**

**[2]**   The parties disagree regarding the scope of discovery for the alter ego/veil piercing claims and related damages.

In the Plan and related Confirmation Order, the Court approved settlement and allowance of the most significant claims against the Debtors' estates. The Plan-related claims comprise approximately $700 million of the total allowed Class 4 environmental claims, which were liquidated and non-contingent. The Trust and the Debtors further settled or allowed additional claims after the Effective Date, in accordance with Article X.C of the Plan, with a total Class 4 claims pool of around $708 million as of today (plus disputed claims).

The Trust believes that this Court's claims allowance and settlement approvals sufficiently establish the existence of valid prepetition claims against the Debtors' estates that provide *prima facie* proof of damages on the alter ego counts. The Trust argues that the Defendants' proposed discovery (outlined below) would be expensive and time consuming and is simply unnecessary.

YPF and Repsol seek blanket authorization to take discovery on, and challenge, the underlying allowed creditor claims, on the assumption that the Trust must prove the validity of every allowed claims of every creditor. YPF and Repsol argue that Article XV.P of the Plan provides: "[n]either the allowance or disallowance of any Claim against any Debtor in these Chapter 11 Cases, nor the allowed amount of any Claim, shall have any precedential, preclusive or other effect, including as a purported measure of any valuation or damages, against any person or entity in any litigation, including in any Causes of Action preserved under the Plan ...."[33] Although none of the Defendants objected to the Plan in relation to the Class 4 claims nor do they object to the claim settlements now, they argue that the claims, as settled are not proven damages.

The linchpin of the Defendants' argument is that there is a casual connection between the specific environmental claims and purported alter ego conduct, such that if the Defendants' purported alter ego conduct did not cause the underlying claim to go unpaid, then neither Defendant can be held liable for it as Maxus's alter ego.[34]

**\*815**   The Defendants further assert that there is no basis in law that the Trust's assertion that so long as independent parties settle claims against the estate and the Court approves them as reasonable that the Defendants are limited to challenging only the propriety of the claim settlement process and not for the merits of the underlying claim.

The Trust responds that (i) no casual connection between the Defendant' conduct and the harm to creditors for which recovery is required and (ii) discovery relating to the claims themselves will not be relevant to damages because the Debtors "harm" was the claims. Furthermore, an analysis of creditor-by-creditor harm is not necessary for damages – it can be generalized per this Court's Clarification Opinion, wherein the Court held that there was a "two-part test for determining whether a claim constitutes property of the bankruptcy estate: (1) the claim must be one that both existed at the commencement of the filing and that the trustee could have asserted on his own behalf under applicable state law; and (2) the claim must be a general one, with no particularized injury arising from it."[35] The Trust conclude that the damages are what the Defendants took out of the Debtors because of their derogation of proper corporate separateness.

YPF and Repsol argue that nothing in Confirmation Order limits YPF from fully defending themselves, including from underlying environmental liability that the Trust seeks to impose on YPF though alter-ego theory. The Defendants further reply that they are not challenging the Trust's claims process. Rather, they are challenging the use of those claims against YPF as a measure of damages against YPF even though the Plan specifically reserved the right for YPF to defend themselves.

In other words, the Defendants are arguing that *if* they committed the "wrong" it, nonetheless, did not cause the environmental liabilities to occur. However, the alter-ego liability being asserted is the spin-off of Maxus and isolating the environmental liabilities with the Debtors, not necessarily causing the pollution in the first instance. As a result, the Defendants do not believe they should be responsible for the environmental remediation; rather, *at most* the "harm" caused by the corporate action of isolating the liabilities. This argument is too clever by half because *if* the wrongs alleged are true – then these environmental liabilities would have been the Defendants' responsibility, but now they want to limit the alleged wrongs to *just* the damages arising from the corporate **\*816**   behavior. Environmental liability is not like a breach of contract claim or a tort – environmental liability stays with the land and the ownership regardless of who caused the original

damage.[36] Here, the alleged alter-ego claims directly resulted in the claims against the estates, including the settled claims.

The Trust asserts that the Court should accept the "all liability theory," or general theory of liability. The Trust's theory is that once a defendant is liable for abusing the corporate form, the defendant is susceptible to a claim of each creditor that the individual liability needs to be addressed by the claim of each creditor. In other words, the Trust seeks to establish that the independent directors looked at each claim and reached an appropriate settlement of each claim. This would necessitate information *only* concerning the settlements in the Plan and that spring out of the Plan. The Trust asserts that this would negate the need for discovery based on, for example, the soil samples at the polluted sites (i.e. opening up discovery in the Environmental Protection Agency's claim, the Ohio Environmental Protection Agency's claim, etc.), which the Defendants are now seeking.

The Defendants refer to *FirstEnergy Corp.* for the proposition that the fraud or wrong sought to be imposed on the Defendants was the corporate misconduct of the merger being alleged and not the creation of the pollution. The Defendants assert that this stands for the proposition that there must be a proximate cause for the damages being asserted.[37] *FirstEnergy Corp.* states:

> Courts will pierce the corporate veil to prevent fraud or achieve equity by imposing a corporate obligation upon a parent. But to successfully pierce the veil, a plaintiff must show both domination of the corporation and that "such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury."[38]

**\*817** However, the *FirstEnergy Corp.* held that the fraud was the corporate misconduct as a result of the merger and not the creation of the pollution. Similarly, here, the wrong being alleged is the corporate misconduct and not the actual pollution, as a result it seems inconsistent that the Defendants also want discovery related to the soil samples. Here, the Trust is alleging that the alter ego has stripped the Debtors' assets so they could not pay their liabilities. The alleged harm to the Debtors is those liabilities, which are claims and/or settled claims against the estates. The damages are not related to the actual pollution or clean-up thereof. The Defendants, if liable, should be responsible for the damages arising from the corporate misconduct, and here that is the claims alleged and/or settled claims against the Debtors' estates.

Additionally, as this Court ruled earlier in these cases:

this Court reads *Emoral* as setting forth a two-part test for determining whether a claim constitutes property of the bankruptcy estate: (1) the claim must be one that both existed at the commencement of the filing and that the trustee could have asserted on his own behalf under applicable state law; and (2) the claim must be a general one, with no particularized injury arising from it.[39]

It is law of the case, that this is a "general" claim with no particularized injury. As a result, and consistent with *FirstEnergy Corp.*, the particularized claim of the underlying pollution and resultant clean-up costs (i.e. discovery relating to the soil samples) is likewise unnecessary.

Thus, the Court will not expand the scope of discovery to include the bases for the individualized claims against the Debtors' estates.

### C. Privilege Claims

#### (i) YPF Defendants' Privilege Designations

 **[3]**  YPF Defendants purport to rely on privilege applicable to YPF Holdings Inc. ("YPFH") or CLH Holdings, Inc. ("CLHH") as a basis to withhold producing documents and communications that were prepared by or sent to directors, officers, or employees of the Debtors to prevent the Trust from using those documents and communications in this matter. These "shared" employees include the Debtors' management, including their ex-Chief Executive Officers, Chief Financial Officers, treasurer, comptroller, Human Resources director, and Debtors' successive general counsels. YPF asserts that because these individuals simultaneously worked for YPFH or CLHH, the holding companies that held all of the Debtors' equity, because they were working in their capacity as YPF employees and not for the Debtors.

The Trust asserts that the facts on record establish that YPFH and CLHH never had corporate identity independent of the Debtors and both were merely empty holding companies for the Debtors' equity. The Trust further argues that all corporate actions of YPFH and CLHH related exclusively to management of the Debtors.

YPF replies that each employee wore "two-hats" – and if individuals sent or received YPF-privileged information in their YPF capacities, the applicable privilege is not waived. YPF claims that corporate separateness was observed in good

faith. YPF further asserts that it is the nature and content of material that is important and that it does not matter that similar **\*818** communications are not privileged; or similar communications to the same people does not mean that privilege is destroyed as to all communications.

[4] Although it is "entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary, and that fact alone may not serve to expose the parent corporation to liability for its subsidiary's acts."[40]

> This recognition that the corporate personalities remain distinct has its corollary in the "well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately, despite their common ownership." Since courts generally presume "that the directors are wearing their 'subsidiary hats' and not their 'parent hats' when acting for the subsidiary[.]"[41]

However, it is YPF's burden to show that those individuals were not wearing their "subsidiary hat."[42]

To date, YPF has not met this burden and, thus, must produce these documents. The only argument in Court was that there should not be a blanket waiver of privilege because these employees wore "two hats," however, YPF did not produce any information to show that these individuals were not working in their capacity for the Debtors at the time of the e-mails and YPF is required to carry that burden. The Court presumes that these shared employees were acting on behalf of Maxus, as YPF has not met its burden. As a result, the documents must be produced. To be clear, YPF has not met its burden to those shared employees regardless of whether they were using a "Maxus" email.


### (ii) Trust's Privilege Designations

#### a. Morrison & Foerster Report

[5] In its Complaint, the Trust refers to a 196-page report prepared by Morrison & Foerster ("MoFo") and Zolfo Cooper, dated May 16, 2016 (the "MoFo Report").[43] MoFo was the Debtors' counsel and the MoFo Report discusses causes of action against the Defendants in anticipation of the Debtors' Chapter 11 Cases. YPF seeks to discover the MoFo Report and all drafts thereof. YPF claims that the Debtors

**\*819** waived their privilege by referring to the MoFo Report twice in a 485-paragraph complaint.

The Trust asserts that the MoFo Report was intended to demonstrate the conflict of interest that YPF imposed on the Debtors' special independent directors depriving them of authority to prosecute any of the estate claims against YPF and that only minimal disclosure of MoFo Report does not mean the whole report should be turned over. Furthermore, the Trust asserts that YPF cannot state any "disadvantage" from not receiving MoFo Report.

YPF responds that the MoFo Report is 196-page report and that the complaint relies upon that report, which is an unequivocal waiver of privilege. YPF continues that the disclosure of even a part of the contents of a privileged communication surrenders the privilege as to those communications.

The Trust replies that using MoFo Report is different than referencing MoFo Report; and the limited references did not put advice/recommendations from MoFo report in "view."

YPF, in turn, replies that the law does not require "heavy" use of the MoFo report to in order to waive privilege because the Trust identified the content and conclusions. YPF asserts that the MoFo Report is the whole basis for the alleged conflict of interest argument because that is the conclusion in MoFo Report. YPF concludes that the Trust, in effect, cannot use the MoFo Report as a sword and a shield.

[6] The Trust's disclosure of the MoFo Report in the Complaint is only a partial disclosure:

> It is clear that the disclosure of even a part of the contents of a privileged communication surrenders the privilege as to those communications. However, such a waiver does not open to discovery all communications between attorney and client. The so-called "rule of partial disclosure" limits the waiver to the subject matter of the disclosed communication. The exact extent of the disclosure is guided by the purposes behind the rule: fairness and discouraging use of the attorney-client privilege as a litigation weapon.[44]

In *Interfaith Housing of Delaware, Inc. v. Town of Georgetown*,[45] the plaintiff proposed to purchase and develop low-income housing. After a public hearing, the planning commission approved the development plan with numerous conditions. The developer asserted that the conditions were

racially motivated and imposed without authority. During his deposition, the defendant, a member of the planning commission, discussed a statement which had been attributed to him in a newspaper article. The plaintiff claimed that defendant Tyndall's statement constituted a waiver of the attorney-client privilege with respect to the Town Council's authority to adopt all twelve conditions imposed upon the development project. The defendant responded that his statements were not a waiver because they were not "clear and intentional." The court held that the statements were voluntary and that "Tyndall disclosed a significant part of the Town Solicitor's legal advice without compulsion or asserting the privilege, he waived the attorney-client privilege as to the subject matter of his statement."[46] The Court's ruling, however, was narrow.

**\*820**  At the time Tyndall waived the attorney-client privilege, he stated the Town Council had to "eliminate that Section 8 or stipulation 8 from the proposals." Based on this statement, the Court holds the subject matter of Tyndall's waiver of the attorney-client privilege is limited to stipulation or condition 8; it does not reach the other stipulations or conditions.[47]

Here, there were two references to the MoFo Report in a lengthy Complaint – with only one of those references relating to the MoFo Report's conclusions regarding the alter-ego claims being asserted against the Defendants. The Court finds that this is not even "light use" of the MoFo Report and the privilege was not waived by such limited use in the Complaint. This is not akin to the statements made regarding the Town Counsel's decision making in *Interfaith Housing of Delaware*. The only mention of substance is a conclusion, which is the same as the alleged counts in the Complaint. As a result, there is nothing to be gleaned from the reference in the Complaint that is not subject of the Complaint in and of itself – there is no rationale, or facts, or anything other than a conclusion. As a result, the Court finds that there was no waiver of privilege and the MoFo Report or drafts thereof need not be disclosed.

### b. Common Interest Privilege Asserted by the Trust

YPF disputes the propriety of certain categories or common interest privilege, pursuant to which the Trust has withheld documents regarding communications between the Debtors and the Official Committee of Unsecured Creditors ("OCC"). The Trust asserts that communications should remain privileged because they go to preservation and maximization of the estate's main asset (the causes of actions against Defendants). YPF asserts that two time periods could not possibly be covered by the "common interest privilege" because, at those times, the Debtors and the OCC were adverse to one another.

**[7]    [8]    [9]    [10]    [11]    [12]    [13]    [14]    [15]**  The common-interest privilege is a waiver exception to the attorney-client privilege.

The attorney-client privilege" is a common-law privilege that "protects communications between attorneys and clients from compelled disclosure." In order for the privilege to apply, there must be "(1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client." The party asserting the privilege bears the burden of establishing the requisite elements. A communication is only privileged if made in confidence. If "persons other than the client, its attorney, or their agents are present, the communication is not made in confidence." Further, "if a client subsequently shares a privileged communication with a third party, then it is no longer confidential, and the privilege ceases to protect it."

The common interest doctrine is an exception to the general rule that voluntary disclosure to a third party of purportedly privileged information waives the privilege. The privilege protects "all communications shared within a proper 'community of interest.' " The interests "must be 'identical, not similar, and be legal, not solely commercial.' " Additionally, to show that the members of the community are "allied in a common legal cause," the party asserting the privilege bears the burden of showing "that the disclosures would not have been made  **\*821**  but for the sake of securing, advancing, or supplying legal representation."[48] Although a written agreement is evidence of such common interest, it is not necessary.[49] The Third Circuit has stated that "the community-of-interest privilege allows attorneys representing different clients with similar legal interests to share information without having to disclose it to others. It applies in civil and criminal litigation, and even in purely transactional contexts."[50]

Defendants assert that the Debtors and the OCC could not have a common interest during two distinct time-periods:

**(1) Category 7 – August 19, 2016 through December 15, 2016**

[16] YPF claims that the Debtors and OCC could not have shared a common interest privilege between August 19, 2016 and December 15, 2016 ("Category 7 Time Period") because Debtors and OCC were adverse to one another. During this time Debtors and YPF entered into a settlement for $130 million (the "YPF Settlement") and the Debtors filed a motion to approve the settlement[51] (the "9019 Motion") and proposed plan which included the YPF Settlement[52] (the "YPF Plan"). OCC argued against approval of the 9019 Motion and YPF Plan claiming that the settlement with YPF was inadequate and below range of reasonableness. On April 24, 2017, the Debtors withdraw the 9019 Motion and filed an amended plan which no longer contained the YPF Settlement.[53] YPF asserts that it was after the withdrawal of the 9019 Motion that the Debtors and OCC aligned.

While the Trust agrees that the OCC was adverse to the YPF Settlement, the adversity is not preclusive of having other similar interests. The Trust asserts that it withheld documents on the matters where the Debtors and the OCC were not adverse to one another during the Category 7 Time Period.

YPF asserts that "common interest" only exists insofar as interests are identical; if not, then the common interest loses any privilege. YPF continues that as to all issues of plan modifications and corporate governance during the Category 7 Time Period, the time during which the YPF Settlement was being pursued by the Debtors, then it is not conceivable that the Debtors (and now the Trust asserting in the shoes of the Debtors) and the OCC can assert a "common interest," because the OCC was actively opposing the YPF Settlement.

**(2) Category 9 – Petition Date (June 17, 2016) through April 28, 2017**

YPF also asserts that communications between the Petition Date and April 28, 2017 ("Category 9 Time Period"), among the Debtors, MoFo, Zolfo, OCC and White & Case also cannot be withheld under the common interest privilege. The Trust withheld documents stating that "[c]ommunications and/or documents relating to environmental **\*822** liabilities shared by the Debtors and OCC, related remediation obligations and expenditures, and/

or Site Transition Agreement" for the period June 19, 2016 through March 27, 2017 among the Debtors, MoFo, Zolfo, OCC and White & Case.

YPF asserts that several arguments in support of its position. First, as discussed above, prior to the withdrawal of the 9019 Motion on April 24, 2017, OCC's legal interests were adverse to the Debtors' legal interests. Second, the lack of a shared common interest between the Debtors and OCC is evidenced by the Site Transition Agreement, by and between the Debtors and Glenn Spring Holdings, Inc. (acting for the benefit of OCC) and executed on March 28, 2017. The Debtors in their motion to approve the Site Transition Agreement stated that the Debtors and the OCC had been negotiating for two months (i.e. January 2017). Third, during this time period the OCC filed four identical proofs of claims in the amount of $579 million, plus contingent and/or unliquidated amounts, against Tierra (Claim Nos. 316 and 408) and Maxus (Claim Nos. 320 and 413). YPF asserts that the filing of a proof of claim is akin to filing a complaint, and that it is evidence of the adversity between the parties. Fourth, the Debtors and OCC entered into a "joint defense and common interest agreement" on July 14, 2017 ("JDA"), which states that it dates back to *April 28, 2017*.[54] Furthermore, YPF asserts that negotiations on Site Transition Agreement did not begin until January 2017 – so there could not have been a common interest for the period from the Petition Date (June 17, 2016) through March 27, 2017.

The Trust replies that the Debtors and OCC, in fact, had a 30-year commonality of interest relating to certain environmental liabilities (not just limited to the Site Transition Agreement), and that negotiations between the Debtors and the OCC were continual and ongoing throughout their entire history, which now results in a common interest privilege.

YPF replied that Debtors and OCC were opposing each other with respect to the conduct and progress of Chapter 11 proceedings; and OCC had been actively suing Debtors in the NJ Action for years regarding environmental liability and remediation obligations.

*In re Leslie Controls, Inc.*[55] involved a discovery dispute between insurers and the debtor over whether a legal memorandum shared by the debtor pre-petition with an ad hoc committee of asbestos plaintiffs (the "Ad Hoc Committee") and the debtor's proposed future claimants' representative (the "Pre-Petition FCR") was protected from discovery by the insurers under the common interest doctrine.[56] The

legal memorandum was prepared by insurance coverage counsel for the debtor providing advice with respect to the effect of the insurers' likely position on insurance recoveries in bankruptcy.[57] The debtor ultimately determined that a bankruptcy filing was necessary to deal with mounting liabilities from asbestos personal injury lawsuits **\*823** and, pre-filing, began negotiations with the Ad Hoc Committee and the Pre-Petition FCR to develop a consensual plan of reorganization—those negotiations were successful and the plan of reorganization, which the insurers objected to, was then pending before the court.[58] The insurers sought to discover the memorandum and emails regarding the memorandum—all of which occurred prior to the bankruptcy filing and several occurred prior to a proposed settlement.[59]

The *Leslie Controls* court noted that "[b]roadly speaking, these cases stand for the proposition that the party invoking the common interest doctrine must present evidence that a legal interest is implicated. If such a legal interest is established then the common interest doctrine will apply (assuming the other elements of the test are met) even if there are separate or overlapping commercial interests."[60] The insurers had argued that the debtor, the Ad Hoc Committee, and the Pre-Petition FCR were adversaries on the issue of insurance proceeds since the information was shared pre-petition and prior to those parties reaching an agreement on the terms of a plan of reorganization.[61] But the court noted that "the common interest privilege does not require a complete unity of interests among the participants, but it is limited by the scope of the parties' common interest."[62] Regardless of the ongoing negotiations at the time of the communications, the court found the operative question was "whether the Debtor shared information related to the parties' common legal interest against the insured, their "common enemy."[63] The court held that while the debtor, the Ad Hoc Committee, and the Pre-Petition FCR had conflicting interests in the sense that each desired to obtain the largest share of the debtor's assets possible, the parties "shared a common interest in maximizing the asset pool, which would include insurance proceeds ... the size of the pie and the size of the pieces are two separate questions. The parties are in accord as to the former and adversaries as to the latter."[64] Thus, because the information contained in the documents went to the size of the asset pool—a matter of common interest—a common legal interest existed and the communications were shielded by the common interest doctrine.[65] The *Leslie Controls* court also held:

The common interest exception does not protect information exchanged among parties simply because they are negotiating toward what they hope will be an agreement. During negotiations, adverse parties have no common interest, and indeed, their interests are in conflict —each party wants to get the best deal from the other, and to the extent that one succeeds in its goal, the other suffers. As a result, until an agreement is actually reached, it is not objectively reasonable for a negotiating party to believe that a communication of privileged material to other negotiating parties "was confidential" and thus protected by the common interest privilege because, while negotiating parties may all have hoped for a successful outcome each side is representing its or **\*824** their own interest, and a successful outcome was not assured.[66]

Here, the facts are remarkably similar to *Leslie Controls*, the Debtors and the OCC were negotiating and eventually reaching a settlement against which included withdrawal from the proposed settlement with the Defendants, litigation against the Defendants, and a consensual plan of reorganization between the Debtors and the OCC – all against their "common enemy," the Defendants.

Additionally, the complexity of a bankruptcy case, the numerous moving parts, the multitude of motions on different topics and the negotiations between the debtors and official committees cannot be downplayed. This is not a simple three-party litigation. Hundreds of parties were involved in these cases. It is not surprising that the Debtors would be discussing case strategy with the OCC from the inception of the OCC. Although, at the time, the Debtors were in settlement with the now-Defendants, it is not the least bit alarming that the Debtors were also having discussions with the OCC, which ultimately led the Debtors to withdraw the settlement with the Defendants and pursue litigation. Furthermore, the agreements between the Debtors and the OCC were eventually approved by the Court – they were not failed negotiations.[67] As a result, the documents are protected by the common interest doctrine and the Court will not order production of these documents.

### D. Production Deficiencies

#### (i) Repsol

There appears to be a dispute over whether and to what extent Repsol must review and produce documents pre-dating

the NJ Action discovery cut-off. It appears that the Trust has requested that Repsol include additional search terms related to the NJ Action. Repsol claims that it is "too late" to add additional search terms because Repsol was substantially completed with production of documents and the Trust waited nearly four months to question whether Repsol applied the "Agreed-Upon Search Terms" to the NJ Documents.

The Trust does not agree regarding Repsol's production of pre-2012 documents. The Trust claims that the parties have engaged in discussions regarding targeted search terms for Repsol to apply to such documents and have reached a workable compromise such that the Court does not need to be involved at this time.

As such, and although raised in the letters presented to the Court, this is not ripe for decision.

### (ii) YPF

Furthermore, the Trust asserts that YPF has not produced documents similar to the sample documents in March 18, 2020 discovery dispute. The Trust disputes whether YPF's production is "substantially complete" based on an alleged subset of documents that YPF hand-picked. YPF replies that they need additional information as this is a wholesale objection and YPF has no understanding of what was not produced.

This issue was not discussed at oral argument and the Court does not have enough information to make a decision at this time. As a result, and without requesting **\*825** additional information on this issue, the Court will not require this production - without prejudice.

### (iii) Return of Laptops

 **[17]**  YPF asserts that the Trust has nine YPF laptops that should be returned to YPF. YPF asserts that there is no legitimate reason for the Trust not to return these laptops. The Trust responded that these are not YPF laptops but that they belonged to Maxus employees. Furthermore, the Trust asserts that these laptops were used to search for discoverable documents and that such documents were produced to YPF.

As the laptops were used by Maxus employees in their roles for Maxus, and all documents on the laptops were searched

in the discovery process, the Trust does not have to turn over the laptops.

### CONCLUSION

For the reasons set forth above, the Court will (i) limit the number of fact depositions to 20 per side; (ii) will not allow discovery related to the underlying environmental claims; (iii) reject the "two-hat" basis for withholding production of documents and communications on the basis of privilege claimed by YPF, and require production; (iv) uphold the assertion of privilege relating to the MoFo Report; (v) uphold the privilege of the Trust under the common interest privilege, notwithstanding disclosures and communications to the UCC; (vi) not require production of documents related to alleged production deficiencies asserted by the Trust; and (vii) not require turnover of the laptops.

Furthermore, the Case Scheduling Order must be amended pursuant to the rulings set forth herein. The Court requires that the parties meet and confer and submit an amended Case Scheduling Order within 30 days of the date hereof. If the parties are unable to agree regarding an amended Case Scheduling Order, the parties shall submit dueling proposed orders within 30 days of the date hereof.

An order will be entered.

### ORDER

For the reasons set forth in the Court's Opinion dated June 23, 2020, the Court will GRANT, in part, and DENY, in part, the relief sought in the Letters[1] as follows:

1. The number of fact depositions is limited to 20 per side.

2. The request to expand the scope of discovery and to allow discovery related to the underlying environmental claims (i.e. soil sample discovery) is DENIED.

3. The "two-hat" basis for withholding production of documents and communications claimed by YPF is DENIED and production of the purportedly privileged documents is required.

4. The request to produce the MoFo Report and drafts related thereto is DENIED.

5. The Trust's request to sustain the privilege of the Trust under the common interest privilege, notwithstanding disclosures and communications to the OCC, is GRANTED.

6. The request to order production related to deficiencies claimed by the Trust against both YPF and Repsol is DENIED without prejudice.

7. YPF's request for turnover of certain laptops is DENIED.

8. The parties shall meet and confer regarding an amended Case Scheduling Order and submit such amended (proposed)

order under certification of counsel within 30 days of the date hereof. If the **826** parties are unable to reach an agreement on an amended Case Scheduling Order, the parties shall submit competing (proposed) orders under certification of counsel by that same date.

IT IS SO ORDERED.

**All Citations**

617 B.R. 806

Footnotes

1    Adv. D.I. 216, 217, and 219 (the "Opening Letters").

2    Adv. D.I. 220, 221, and 222 (the "Responsive Letters" and, together with the "Opening Letters," the "Letters").

3    Transcript of Hr'g, Apr. 20, 2020 (D.I. 225). Docket items in the main case (Del. Bankr. Case No. 16-11501) shall be noted as "D.I. #"); and docket items in the adversary action (Del. Adv. Case No. 18-50489) shall be noted as "Adv. D.I. #."

4    *NJ Dep't of Envtl. Prot. v. Occidental Chem. Corp. (In re Maxus Energy Corp.)*, 560 B.R. 111 (Bankr. D. Del. 2016).

5    *Maxus Energy Corp.*, 560 B.R. at 128–29 ("[C]ourts have held that "evaluating the twelve factors is not a mathematical formula" yet, when the majority of factors weigh in favor of abstention, the court should do just that. Specifically, when those factors favoring abstention are the more substantive ones, abstention is appropriate. All substantive factors in the instant permissive abstention analysis favor abstention and remand.").

6    *NJ Dep't of Envtl. Prot. v. Occidental Chem. Corp. (In re Maxus Energy Corp.*), 571 B.R. 650, 653 (Bankr. D. Del. 2017) (the "Clarification Opinion").

7    *Id.* at 653.

8    D.I. 1232.

9    D.I. 1451.

10   D.I. 1460.

11   D.I. 1701.

12   Adv. D.I. 1.

13   Adv. D.I. 32 and 35.

14   Adv. D.I. 50, 51, 57 and 58.

15   Adv. D.I. 107 (Letter Op.) and 108 (Order).

16   Adv. D.I. 111 (Opinion) and 112 (Order).

17   Adv. D.I. 131 (notice of interlocutory appeal) and 132 (motion for leave to appeal).

18   Adv. D.I. 211.

19   Adv. D.I. 119 (YPF) and 123 (Repsol).

20   Adv. D.I. 207.

21   Adv. D.I. 181 (Repsol) and 186 (YPF).

22   Adv. D.I. 215.

23   Adv. D.I. 153 (Repsol) and 156 (YPF).

24   Adv. D.I. 193 (Letter Op.) and 194 (Order).

25   Adv. D.I. 213.

26   Transcript of Hr'g, Apr. 20, 2020, 81:6-20. Adv. D.I. 225.

27   Fed. R. Civ. P. 30(a)(2)(A)(i) (emphasis added), made applicable by Fed. R. Bankr. P. 7030.

28   Fed. R. Civ. Pro. 26(b)(1), made applicable by Fed. R. Bankr. P. 7026.

29   Fed. R. Civ. P. 26(b)(2), made applicable by Fed. R. Bankr. P. 7026. "According to Rule 26(b)(1) and (2), parties may obtain discovery of non-privileged matters relevant to any party's claim or defense so long as they are proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1)." *Jenkins v. Miller*, No. 2:12-CR-184, 2020 WL 64306, at *2 (D. Vt. Jan. 7, 2020).

30   *Arconic Inc. v. Novelis Inc.*, No. CV 17-1434, 2018 WL 6732992, at *6 (W.D. Pa. Nov. 6, 2018) (citation omitted).

31   Fed. R. Civ. Pro. 26(b)(1), made applicable by Fed. R. Bankr. P. 7026.

32   The Court has already ruled that the depositions taken in the NJ Action would not be admissible as if taken in this action. Adv. D.I. 193 (Letter Op.) and 194 (Order). Although the parties may come to some sort of agreement regarding the use of the NJ Action depositions; the Court is not reconsidering its ruling at this time and does not weigh-in on the parties discussions regarding use of the NJ Action depositions.

33   D.I. 1451 (Art. XV.P).

34   Repsol also claims that it was not a party in interest in the Chapter 11 Cases and did not have standing to object or to challenge actions taken by the Debtors, Trust, or claims asserted by Maxus' creditors and that Repsol never filed a proof of claim. The Repsol Defendants appeared numerous times in these Chapter 11 Cases; including, but not limited to, (i) the remand and removal proceedings in front of this Court (Case No. 16-51025, D.I. 28; Case No. 16-11502, D.I. 85, 758, 1024, and 1100), (ii) attendance at depositions on the Debtors' DIP Motion, (iii) agreeing to be bound by the Protective Order in effect in the Chapter 11 Cases (*see* Case No. 16-11501, D.I. 402), (iv) filing an objection to the Disclosure Statement Motion (Case No. 16-11501; D.I. 1172), and (v) filing an objection to the Committee's motion to enforce the Site Transition Agreement (Case No. 16-11501; D.I. 1986). Furthermore, Article XI.J of the Plan was included at the express request of Repsol to resolve their Plan objection (Case No. 16-11501; D.I. 1410). Although the Court is not remarking on Repsol's standing, as such was not requested of the Court and is thus not ripe; the Court dismisses this argument without further discussion, as Repsol was an active participant in these Chapter 11 cases and this argument is wholly without merit.

35   Clarification Opinion, 571 B.R. at 658 (citations omitted). The Court also held "for purposes of determining whether a claim based upon a theory of successor or alter ego liability against a third-party non-debtor belongs to the bankruptcy estate, *Emoral* holds that, notwithstanding the individualized nature of the injury or cause of action, to the extent the other creditors and the debtor could pursue claims based upon the same theory, the claim in question should be considered general, and, therefore, property of the bankruptcy estate." *Id.* at 657 (*citing In re Emoral, Inc.*, 740 F.3d 875, 877 (3d Cir. 2014)).

36    *See, e.g., New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 808 F. Supp. 2d 417, 488 (N.D.N.Y. 2011), *aff'd in part, vacated in part, remanded*, 766 F.3d 212 (2d Cir. 2014) (citations omitted) ("Generally speaking, § 107(a) [of Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), Pub.L. No. 96–510, 94 Stat. 2767] provides for joint and several liability among [Potentially Responsible Parties ("PRPs")] ... ; under that section one PRP can be potentially responsible for the entire amount expended to remove or remediate hazardous materials."); *Niagara Mohawk Power Corp. v. Chevron U.S.A., Inc.*, 596 F.3d 112, 120 (2d Cir. 2010) (citations omitted)) ("CERCLA empowers the federal government and the states to initiate comprehensive cleanups and to seek recovery of expenses associated with those cleanups. Somewhat like the common law of ultra-hazardous activities, property owners are strictly liable for the hazardous materials on their property, regardless of whether or not they deposited them there."); *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 216 (3d Cir. 2010).

37    Tr. 40:8-41:4.

38    *New York State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 229 (2d Cir. 2014) (citations omitted) ("Here, the 'fraud' or 'wrong' committed by AGECO would be the merger of the subsidiaries into NYSEG, not the creation of coal tar. There is nothing in the record to suggest AGECO was directing the creation of coal tar at the subsidiaries prior to purchasing them. While AGECO may have sought to merge its subsidiaries into NYSEG to further its financial improprieties, NYSEG does not allege AGECO did so to avoid CERCLA liability. Environmental liability for spilling coal tar was not a major concern at the time these subsidiaries were merged. AGECO's domination was not used to commit a fraud or wrong against NYSEG regarding pollution, and domination by itself is not enough to justify veil piercing—it must be accompanied by a showing of wrongful or unjust action toward the plaintiff.").

39    Clarification Opinion, 571 B.R. at 658 (*citing In re Emoral, Inc.*, 740 F.3d at 879); additional citations omitted).

40    *United States v. Bestfoods*, 524 U.S. 51, 69, 118 S. Ct. 1876, 1888, 141 L. Ed. 2d 43 (1998) (internal quotation marks and citations omitted).

41    *Bestfoods*, 524 U.S. at 69, 118 S.Ct. 1876 (citations omitted).

42    *Id.* ("The Government would have to show that, despite the general presumption to the contrary, the officers and directors were acting in their capacities as CPC officers and directors, and not as Ott II officers and directors, when they committed those acts.").

43    Morrison and Forrester, along with Zolfo Cooper, were hired by the Special Independent Committee ("SIC") of Maxus' board to evaluate any potential claims against YPF held by Maxus. Complaint at ¶202. The Complaint refers to the MoFo Report twice in the Complaint:

    204. Even with such glaring limitations, MoFo and Zolfo concluded in a 196-page report dated May 16, 2016 (the "MoFo Report"), that, while alter ego claims are difficult to prove, if a court were to look at the overall history and pattern of parent corporation conduct from YPF's acquisition of Maxus and Tierra in 1995 through 2016, there was a reasonable likelihood that the court would find alter ego liability.

    205. Despite the MoFo Report, and after a rapid round of negotiations, the SIC and YPF agreed upon the settlement of all of the Debtors' claims against YPF for merely $130 million (the "YPF Settlement"), far below the reasonably equivalent value of the claims. ...

Complaint at ¶¶204-205. There are no other references to the MoFo Report in the Complaint.

44    *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 825 (Del. 1992) (citations omitted).

45    *Interfaith Hous. Delaware, Inc. v. Town of Georgetown*, 841 F. Supp. 1393 (D. Del. 1994).

46    *Id.* at 1398-99.

47    *Id.* at 1399.

48    *TC Tech. LLC v. Sprint Corp.*, No. 16-CV-153-RGA, 2018 WL 6584122, at *2 (D. Del. Dec. 13, 2018) (citations and footnotes omitted).

49    *Id.* at *5 ("I did not set a firm rule that parties must have a written agreement or have filed suit to share a legal interest. Rather, I merely considered the lack of an agreement or suit as evidence of the lack of a shared interest.").

50    *In re Teleglobe Commc'ns Corp.*, 493 F.3d 345, 364 (3d Cir. 2007), as amended (Oct. 12, 2007) (citations omitted).

51    D.I. 300 (later withdrawn, *see*, D.I. 1260).

52    D.I. 697.

53    *See* D.I. 1260 and amended plan, D.I. 1056, 1209, 1231, and 1451.

54    D.I. 217, Exh. H (Paragraph 15 of the JDA reads: "Each of the Parties agrees that, to the extent its attorneys have already been in communication or had any discussions with attorneys for any of the other Parties, dating back to April 28, 2018, about matters related to the Claims their communications, discussions, and work product have been and are subject to the attorney-client privilege, joint defense privilege, common interest doctrine, and business strategies doctrine and are specifically incorporated herein.").

55    *In re Leslie Controls, Inc.*, 437 B.R. 493 (Bankr. D. Del. 2010).

56    *Id.* at 495.

57    *Id.*

58    *Id.* at 495-96.

59    *Id.* at 496.

60    *Id.* at 500.

61    *Id.* at 498.

62    *Id.* at 500.

63    *Id.* at 502.

64    *Id.*

65    *Id.* at 502-03.

66    *Id.* at 501 (citations, quotations marks and modifications omitted).

67    Furthermore, such common interests were legal in nature as they sought to reach agreement on a proposed plan of reorganization and approval of the Site Transition Agreement. *See, e.g., In re Simplexity, LLC*, 584 B.R. 495, 501 (Bankr. D. Del. 2018) (finding that there was a financial common interest but not a legal common interest).

1    Undefined capitalized terms used herein have the meaning set forth in the Opinion.

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

189 B.R. 562
United States Bankruptcy Court,
N.D. New York.

In re MEGAN–RACINE
ASSOCIATES, INC., Debtor.
NIAGARA MOHAWK POWER
CORPORATION, Plaintiff,

v.

MEGAN–RACINE ASSOCIATES,
INC. and The Federal Deposit Insurance
Corporation, as Receiver for the New
Bank of New England, N.A., Defendants.

Bankruptcy No. 92–00860.
|
Adv. No. 94–70113.
|
Feb. 1, 1995.

## Synopsis

In adversary proceeding brought by purchaser of power from Chapter 11 debtor-cogenerator alleging that debtor violated provisions of power purchase agreement (PPA) by falling below certain qualified facility (QF) standards under the Public Utility Regulatory Policies Act, purchaser moved to compel discovery. On assertions of joint-defense privilege by debtor and Federal Deposit Insurance Corporation (FDIC), as receiver for assignee of PPA, the Bankruptcy Court, Stephen D. Gerling, Chief Judge, held that: (1) state law provided rule of decision on issues in adversary proceeding, and thus, state law privileges applied, rather than federal law privileges; (2) New York courts would apply joint-defense privilege in civil case; (3) to claim joint-defense privilege, debtor and FDIC had to demonstrate that prior to divulging communication to each other, each party to communication had agreed to pursue joint-defense strategy and had agreed that such communications would be kept confidential; and (4) parties asserting joint-defense privilege in bankruptcy cases must have common legal interest which exists where parties asserting privilege were coparties to litigation or reasonably believed that they could be made party to litigation.

So ordered.

## Attorneys and Law Firms

**\*566**  Menter, Rudin & Trivelpiece, P.C. (Jeffrey Dove, of counsel), Syracuse, NY, for debtor.

**\*567**  Swidler & Berlin, Chartered (Michael L. Shor, of counsel), Washington, DC, for Niagara Mohawk.

Bingham, Dana & Gould (Sabin Willett, of counsel), Boston, MA, for FDIC.

House, Golden, Kingsmill & Reiss (Marguerite Kingsmill and W. Richard House, Jr., of counsel), New Orleans, LA, Bond, Schoeneck & King (James Dati, of counsel), Syracuse, NY, for Hudson Engineering.

Goldberg & Fabiano (Harold Goldberg, of counsel), Syracuse, NY, for Creditors Committee.

Michael Collins, Office of U.S. Trustee, Utica, NY.

MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

Before this Court are two motions by Niagara Mohawk Power Corporation ("NIMO") in the adversary proceeding commenced by NIMO against Megan Racine Associates, Inc. ("Debtor") and Federal Deposit Insurance Corporation ("FDIC"), as receiver for the New Bank of New England, N.A. NIMO's first motion, filed November 29, 1994, sought to compel FDIC to produce allegedly privileged documents pursuant to Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr.P.") 7026 and 7034 which incorporate by reference Federal Rules of Civil Procedure ("Fed.R.Civ.P.") 26 and 34. NIMO's second motion, filed December 13, 1994, sought to compel Debtor to produce allegedly privileged documents also pursuant to Fed.R.Bankr.P. 7026 and 7034.

Both of NIMO's motions were orally argued on the Court's regular motion terms in Utica, New York. NIMO's Motion to Compel FDIC was argued on December 6, 1994 and the Motion to Compel Debtor was argued on December 20, 1994. The parties and Hudson Engineering Corporation, as *amicus curiae,* filed memoranda of law and the respective motions were submitted for decision on December 6, 1994 and December 23, 1994.

In re Megan-Racine Associates, Inc., 189 B.R. 562 (1995)

34 Collier Bankr.Cas.2d 943

As the number of documents in dispute is extensive, the Court afforded the parties additional time to submit privilege logs and/or documents for *in camera* review. For purposes of this Memorandum–Decision, the Court consolidates the two motions pursuant to Fed.R.Bankr.P. 7042(a).

*JURISDICTIONAL STATEMENT*

The Court has core jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a), (b) (1), (b)(2)(B), (C), (H), and (O).

*FACTS*

Debtor is a corporation engaged in the business of developing, building and operating a 49–megawatt cogeneration facility ("Facility") located at Canton, New York. Debtor's current business consists of the production and sale of both steam and electrical power. On March 17, 1992, Debtor filed a voluntary petition for reorganization under Chapter 11 of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code").

On or about November 21, 1987, Debtor and NIMO entered into a power purchase agreement ("PPA") pursuant to which NIMO purchases electrical power from Debtor. On or about September 7, 1989, Debtor assigned the PPA to the New Bank of New England, N.A., ("Bank") as collateral security for construction financing. FDIC later succeeded to the Bank's rights and allegedly holds a perfected security interest, by way of collateral assignment, in the PPA.

On or about August 1, 1994, NIMO initiated the instant adversary proceeding against defendant and counterclaim plaintiff Debtor and defendant and counterclaim plaintiff FDIC. Arguably, the adversary proceeding goes to the heart of Debtor's Chapter 11 case, as Debtor's hopes of reorganization allegedly hinge on the assumption of the PPA while NIMO seeks to adjust its claim in the event the PPA is determined to be null and void. NIMO alleges that Debtor violated two contract provisions which render the PPA null and void and which entitle NIMO to at least $26,796,917 in damages. *See* NIMO Complaint ¶ 2 and Count III "Wherefore" clause. The first provision requires **\*568** Debtor to certify that its Facility is a Qualified Facility ("QF") within the meaning of the Public Utility Regulatory Policies Act of 1978 ("PURPA"), 16 U.S.C. § 2601 *et seq.,* and relevant New York State laws. *Id.* The second provision states that should the

Facility lose QF status, then, at the option of either party, the PPA shall become null and void. *Id.*

During the course of discovery, NIMO requested the production of documents from both Debtor and FDIC. In responding to certain document requests, both Debtor and FDIC have asserted the existence of privileged documentation by virtue of the "joint defense privilege". Additionally, Debtor has asserted that certain other documents are privileged because they were "prepared in anticipation of litigation." *See* Debtor's Response to NIMO at 2.

Aside from the joint defense privilege, FDIC has asserted that certain documents are privileged by virtue of the attorney-client privilege. FDIC also alleges that some documents are not discoverable because they were prepared by FDIC's expert in anticipation of the present and related litigation. *See* FDIC's Opposition to NIMO at 3. Many of the documents in dispute concern QF matters.

*ARGUMENTS*

NIMO contends that the New York State law of privileges applies to the instant proceeding. NIMO argues that the joint defense privilege is not recognized by statute in New York. Nevertheless, NIMO concedes that the privilege exists in New York, but not to the extent that Debtor and FDIC would like to stretch it. *See* NIMO's Response to Debtors's Response at 3.

Debtor and FDIC argue that both New York state law and federal common law recognize the joint defense privilege. FDIC contends that the federal common law of privileges is applicable because PURPA, a federal statute, determines whether the Facility met QF standards. FDIC also argues that because this proceeding arises within the context of a bankruptcy case, which is also governed by a federal statute, the federal common law of privileges applies.

FDIC argues that in order to establish the joint-defense privilege under state or federal law, the party claiming the privilege must show that: (1) the statements were made to its attorney or the other party's attorney or between the attorneys; (2) the statements concerned a matter in which legal advice was sought; (3) the statements were confidential, and; (4) the parties were pursuing a common interest. *See* FDIC's Opposition to NIMO at 7. Debtor echoes FDIC's argument and also asserts that the claimant must show that

the statements were designed to further the joint-defense effort and that the privilege has not been waived. *See* Debtor's Response to NIMO at 5. Debtor and FDIC assert that communications between themselves and R.W. Beck & Associates, an engineering firm, for purposes of New York Public Service Commission proceedings, a Federal Energy Regulatory Commission waiver, and a response to NIMO's objection to Debtor's disclosure statement are protected by the joint-defense privilege.

NIMO argues that under New York law the joint-defense privilege has limited application. NIMO asserts that New York courts would not extend the joint defense privilege to cover materials arising under nonlitigative, nonadversarial proceedings. Thus, communications between Debtor, FDIC and R.W. Beck Associates are not shielded by the joint-defense privilege.

*DISCUSSION*

Debtor and FDIC allege that many of the disputed documents fall under the joint-defense privilege and have submitted voluminous privilege logs and documents for *in camera* review. In an effort to secure a just, speedy and inexpensive determination of this adversary proceeding, the Court provides the parties with a road map for the requirements of the joint-defense privilege. With the aid of this Memorandum–Decision, the Court affords the parties further opportunity to confer in a good faith effort to resolve their disputes concerning discovery. *See* Fed.R.Civ.P. 26 and 37(a)(2). Any disputes that remain after such good faith effort, shall be submitted to the Court for determination.

**\*569  A. CHOICE OF LAW ISSUE**

1. *Vertical Choice of Law: Federal Law or State Law*
Congressional disagreement over the concepts of federalism and privileges eventually led to the adoption of Federal Rules of Evidence 501 ("FRE").[1] FRE 501 requires courts to apply the federal common law of privileges except "in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege ... shall be determined in accordance with State law." FRE 501.

It is well accepted that where the substantive law being applied is a federal statute then the state law of privileges does not apply. Although bankruptcy courts function under the umbrella of a federal statute, they are frequently required to determine the validity of state claims. Courts have applied the state law of privileges when confronted with a proceeding arising within a bankruptcy case and that proceeding concerns state law. *See In re Tidewater Group, Inc.,* 65 B.R. 179, 181 (Bankr.N.D.Ga.1986).

FDIC relies on *In re Muscatell,* 93 B.R. 268, 271 (Bankr.M.D.Fla.1988), in arguing that, "Generally, all issues arising in an adversary proceeding in a Bankruptcy case are governed by federal law." *See* FDIC's Opposition to NIMO at n. 2. FDIC's reliance on *In re Muscatell* is misplaced. The *Muscatell* court was concerned with a traditional question of federal bankruptcy law: whether the debtor was entitled to a general bankruptcy discharge. *See In re Muscatell, supra,* 93 B.R. at 271. The *Muscatell* court pointed out that, "Inasmuch as *the issues involved in this adversary proceeding have absolutely nothing to do with state law* to which state law applies the rule of decision, there is hardly any question that the privilege recognized by state law cannot be invoked ..." *Id.* (emphasis added).

The matter before this Court, unlike in *In re Muscatell,* concerns an adversary proceeding dealing with issues where state law provides the rule of decision. The main questions are whether Debtor violated the PPA by falling below the required QF standards and whether Debtor and FDIC have a defense to the alleged violation. These are issues where state law provides the rule of decision.[2] Therefore, state law privileges apply to the instant case.

2. *Horizontal Choice of Law*
The Court will decide the case as would a state court in this district and will consequently apply New York's choice-of-law-rules. *See Woodling v. Garrett Corp.,* 813 F.2d 543, 551 (2d Cir.1987). The PPA contains a choice of law clause which deems New York as the governing state. *See* NIMO Complaint, Exhibit "A" PPA at ¶ 17. Following New York's autonomy principle, this Court honors the parties' choice of law insofar as matters of substantive law are concerned. *Joy v. Heidrick & Struggles, Inc.,* 93 Misc.2d 818, 821, 403 N.Y.S.2d 613, 614 (N.Y.City Civ.Ct.1977). In addition, because FDIC, Debtor and NIMO addressed only New York law when state law was argued, the parties are apparently in agreement that if state law is to apply to this case, it will be New York law.

## B. INTRODUCTION

A fundamental theme running through American jurisprudence is that full disclosure is to be encouraged because it facilitates the uncovering of the truth. *See* McCormick, *Evidence*, at 268–269 (4th ed. 1992). As **\*570** Judge Learned Hand stated, "The suppression of truth is a grievous necessity at best ... it can be justified at all only when the opposed private interest is supreme." *McMann v. Securities and Exchange Commission,* 87 F.2d 377, 378 (2d Cir.1937), *cert. denied* 301 U.S. 684, 57 S.Ct. 785, 81 L.Ed. 1342 (1937). At times, however, the policy of uncovering the truth yields to the commitment to protect interests and relationships which are regarded of sufficient social importance. *See* McCormick, *supra,* at 269. Thus the law has carved out privileges and immunities on the assumption that they preserve the vitality of the adversary system by fostering, among other things, complete disclosure to one's attorney and the adequate preparation of a case. *See e.g. In re Sealed Case,* 676 F.2d 793, 825 (D.C.Cir.1982).

However, courts have generally followed the reasoning of Dean Wigmore and confined privileges to a narrow and limited enclave. *See In re Grand Jury Subpoena Duces Tecum,* 391 F.Supp. 1029, 1033 (S.D.N.Y.1975). A narrow interpretation of privileges rests on the assumption that while privileges have some social good, there is the concern that they may be used as a device for cover-ups.

When applied in the bankruptcy context, privilege questions are made slightly more difficult. The Code's interest in full disclosure is based on the premise that disclosure tends to militate against the abuse of the bankruptcy process and aids in the discovery of the problems which precipitated the debtor's decline. A cursory examination of the Code reveals a strong commitment to the duty to disclose. For example, discovery in the bankruptcy context is not limited to that discovery available in connection with a particular matter that is the subject of actual litigation. *See e.g.* Fed.R.Bankr.P. 2004. The Code's reluctance to frustrate disclosure is also evident in Code § 542(e) which was intended to restrict, not expand, the ability of accountants and attorneys to withhold information from the trustee. *In re Commodity Futures Trading Com'n v. Weintraub,* 471 U.S. 343, 350, 105 S.Ct. 1986, 1992, 85 L.Ed.2d 372 (1985).[3]

## C. JOINT–DEFENSE PRIVILEGE[4]

1. *New York Law*

Conscious of the above policies and considerations, the Court proceeds with an analysis of the joint-defense privilege under New York law. Many of New York's privileges are codified in Article 45 of New York Civil Practice Law and Rules ("NYCPLR"). New York courts recognize that there is no privilege in the absence of statute. *See Application of Heller,* 184 Misc. 75, 53 N.Y.S.2d 86 (N.Y.Sup.Ct.1945).

NIMO argues that New York law "does not recognize a free-standing 'common interest privilege.' " *See* NIMO Memo in Support of Motion to Compel Megan–Racine at n. 2. While there is no New York statute that recognizes the common interest privilege as a distinct privilege, most commentators and courts view it as an extension of the attorney-client privilege or work-product doctrine. *See* NYCPLR § 4503, Commentary at c;4503:3; *Chahoon v. The Commonwealth,* 62 Va. 822 (Va.1871); *but see* Susan K. Rushing, *Separating the Joint Defense Doctrine from the Attorney–Client Privilege,* 68 Tex.L.Rev. 1273 (1990).

Although Debtor and FDIC were unable to cite to any New York cases *applying* the joint-defense privilege, there is case law *recognizing* the privilege *in dicta. See People v. Osorio,* 75 N.Y.2d 80, 85, 550 N.Y.S.2d 612, 615, 549 N.E.2d 1183, 1186 (1989); *People v. Borcsok,* 107 A.D.2d 42, 485 N.Y.S.2d 766, 767 (N.Y.App.Div.1985); *People v. Calandra,* 120 Misc.2d 1059, 1061, 467 N.Y.S.2d 141 (Sup.Ct.N.Y.City 1983). The paucity of decisional law, however, does not prevent this Court from prophesying how New York courts would apply the joint-defense privilege. *See* **\*571** Wright and Graham, *supra,* § 5432 at 852 n. 50 (citations omitted). Courts often rely on federal precedents where state courts have recognized the privilege, but there are no decisions on point. *See e.g. Martin v. American Employers' Ins. Co.,* 115 F.R.D. 532, 534–535 (D.C.Miss.1987).

The New York courts recognizing the joint-defense privilege have done so within the context of criminal cases. *But see Magnaleasing, Inc. v. Staten Island Mall,* 76 F.R.D. 559, 563 n. 6 (S.D.N.Y.1977) (civil action where court assumed New York law would recognize the joint-defense privilege). Although the joint-defense privilege is developed within the context of criminal cases, its purpose is to encourage interparty communications such that the parties receive effective legal representation as well as to facilitate a just determination of the case. *See United States v. McPartlin,* 595 F.2d 1321, 1336 (7th Cir.1979), *cert. denied* 444 U.S. 833, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). As these purposes are common to civil and criminal cases, the Court does not find

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.   4

it anomalous to extend New York's recognition of the joint-defense privilege to civil cases. *See* Patricia Welles, *A Survey of Attorney–Client Privilege in Joint Defense,* 35 U.Miami L.Rev. 321, n. 28.

### 2. *Elements of Joint–Defense Privilege*

Generally, when a communication between a client and an attorney occurs in the presence of third parties, the attorney-client privilege is waived. *AMBAC Indemnity Corp. v. Bankers Trust Co.,* 151 Misc.2d 334, 573 N.Y.S.2d 204, 208 (1991). Similarly, the general rule for the work-product doctrine is that it is deemed waived when an attorney reveals his materials prepared in anticipation of litigation to third parties. *See In re Crazy Eddie Securities Litigation,* 131 F.R.D. 374, 379 (E.D.N.Y.1990) (stating that if counsel shares work-product with an adversary to encourage settlement, the protection of the doctrine is waived). The joint-defense privilege acts as an exception to these general waiver rules in order to facilitate cooperative efforts among parties who share common interests.

The joint-defense privilege can only exist where there is an applicable underlying privilege, such as the attorney-client privilege or the work-product doctrine. *See generally Matter of Grand Jury Subpoena Duces Tecum, Nov. 16, 1974,* 406 F.Supp. 381, 387–388 (S.D.N.Y.1975). The Court assumes, for the limited purpose of determining the parameters of the joint-defense privilege in New York, that the documents at issue are protected by a valid underlying privilege.[5] As there is no independent statutory provision that recognizes the joint-defense privilege, it is axiomatic that an interpretation of the joint-defense privilege conform with the purposes of its underlying privilege whenever possible.[6]

### a. UNDERLYING PRIVILEGE: ATTORNEY–CLIENT

### (i) Confidentiality

It is well established that confidentiality lies at the heart of the attorney-client privilege. Where a client has no expectation of confidentiality at the time of the communication, the claim of privilege will be inapplicable. *See e.g. People v. Osorio, supra,* 75 N.Y.2d at 84, 550 N.Y.S.2d at 615.

In keeping with this principle, the Court finds that the joint-defense privilege is only applicable where the party asserting it can demonstrate an agreement between the parties privy to the communication that such communication will be kept confidential. *See In re Bevill, Bresler & Schulman Asset Management Corp.,* 805 F.2d 120, 126 (3rd Cir.1986); *Matter of Grand Jury Subpoena, supra,* 406 F.Supp. at 386. The **\*572** requisite agreement of confidentiality, however, is inferable from the circumstances. *See People v. Fentress,* 103 Misc.2d 179, 425 N.Y.S.2d 485 (1980). Thus, it is incumbent on Debtor and FDIC to demonstrate that prior to divulging the communication to each other, each party to the communication had agreed to pursue a joint-defense strategy and had agreed that such communications would be kept confidential.

### (ii) The Participants

Generally, the attorney-client privilege shields certain communications between the attorney and the client. The joint-defense privilege widens this sphere. The most common application of the privilege is when attorneys representing different parties pool their information together. In *Hunydee v. United States,* 355 F.2d 183 (9th Cir.1965), the joint-defense privilege was interpreted so as to shield statements made in furtherance of a common defense by a defendant in front of his attorney, a codefendant and the codefendant's attorney. Courts and commentators have suggested that the *Hunydee* reasoning can be extended such that even inter-client communications in the presence of their attorneys are protected. *See Matter of Grand Jury Subpoena, supra,* 406 F.Supp. at 388.

The Court notes, however, that the joint-defense privilege, like the attorney-client privilege in New York, does not extend to communications made to representatives of quasi-legal professions unless such representatives act as *agents* for the attorney.[7] *See People v. Doe,* 99 Misc.2d 411, 416 N.Y.S.2d 466 (1979); *In re John Doe Corp.,* 675 F.2d 482, 488–489 (2d Cir.1982) (reports prepared by corporation's legal department were not afforded attorney-client privilege where the reports had been disclosed to an accounting firm in connection with a 1977 audit and to an attorney for an underwriter in connection with a 1978 public offering of Doe Corp. securities); *Permian Corp. v. United States,* 665 F.2d 1214, 1219–1220 (D.C.Cir.1981) (client's disclosure to SEC staff destroys confidentiality and results in waiver of privilege). However, statements made to an *agent* of the co-defendant's attorney in the absence of the speaker's attorney are protected. *See United States v. McPartlin, supra,* 595

F.2d at 1321. Therefore, the party asserting the joint-defense privilege must demonstrate that the communications were made to his attorney or the other party's attorney or between attorneys or to an agent of the attorney for the purpose of seeking legal advice. *See also* FDIC's Opposition to NIMO at 7.

(iii) Interests of the Participants

In recognizing the exigencies of the joint-defense privilege, courts have not required a total identity of interest among the participants. The privilege applies when a limited common purpose necessitates disclosure to certain parties. Thus, even where a later law-suit is foreseeable between the co-defendants that does not prevent them from sharing confidential information for the purpose of a common interest. *See Matter of Grand Jury Subpoena, supra,* 406 F.Supp. at 392.

In determining the extent of the "common interest" required to invoke the joint-defense privilege, the Court notes that a consequence of the privilege is that the participants can preclude each other from unilaterally waiving it. *See Western Fuels Ass'n Inc. v. Burlington N.R.R.,* 102 F.R.D. 201, 203 (D.Wyo.1984). The joint-defense privilege cannot be waived unless all the parties consent or where the parties become adverse litigants. *See e.g. Matter of Grand Jury Subpoena,* 406 F.Supp. at 381.

Bankruptcy cases, by their very nature, involve common commercial interests. Chapter 11, after all, is a forum where a debtor and its creditors have a common interest **\*573** in maximizing the value of the estate. Following Wigmore's policy that a privilege should "be strictly confined within the narrowest possible limits," the Court finds that the joint-defense privilege should be limited to those who share more than a common commercial interest, as that is not a discriminating factor in the bankruptcy context. J. Wigmore, *Evidence,* § 2291 at 554 (McNaughton rev. ed. 1961).

The power to restrict communications by another party is a powerful weapon which may frustrate the Code's commitments to full disclosure and expediency. Arguably, in the bankruptcy context, the joint-defense privilege could lead to strong-arming and collusive efforts which frustrate the Code's fundamental purposes. Thus, the Court finds that although total identity of interest is not necessary, the parties asserting the privilege must have a common *legal* interest.

A common *legal* interest exists where the parties asserting the privilege were co-parties to litigation or reasonably believed that they could be made a party to litigation.[8] *See e.g. Matter of Grand Jury Subpoena, supra,* 406 F.Supp. at 387 (communications between potential codefendants privileged).

*In re Kaiser Steel Corp.,* 84 B.R. 202 (Bankr.D.Colo.1988), a case that Debtor relies heavily on, provides support for the Court's requirement of a common legal interest. In *In re Kaiser Corp.,* the Unsecured Creditors Committee obtained court approval to engage the accounting firm of Coopers & Lybrand to provide accounting services for the Committee. Among the work performed by Coopers & Lybrand was an analysis of prepetition transfers by the debtor in connection with a leveraged buyout. Thereafter, the debtor and the Committee became involved as party-plaintiffs in adversary proceedings concerning fraudulent transfer litigation. The Committee, which was subsequently dismissed from the proceedings, provided the debtor with the analysis performed by Coopers & Lybrand. The *Kaiser* court held that the Coopers & Lybrand analysis was privileged because "the Committee and the debtor have common interests." *Id.* at 205. The court stated that, "Each [the Committee and the debtor] has an *obligation* to seek to maximize the assets in the debtor's estate. Had the debtor failed and refused to file the present cases, *the Committee could have sought separate authorization* to do so ..." *Id.* (emphasis added).

A careful reading of *In re Kaiser* reveals that the "common interest" that the debtor and the Committee shared was "legal" in nature. The debtor and the Committee shared a *duty* to maximize the debtor's estate and not merely a common commercial interest. Further, the Committee reasonably believed that it could be, and it in fact became, a party to the litigation.

(iv) Nature of Communication

The parties asserting the privilege must also demonstrate that each communication was made in the course of the joint-defense effort and was designed to further that effort. *See In re Bevill, supra,* 805 F.2d at 126. This requirement parallels the burden for the proponent of the attorney-client privilege who must show that it is applicable to the specific communications whose disclosure is sought. *See generally People v. Mitchell,* 58 N.Y.2d 368, 461 N.Y.S.2d 267 (1983).

b. UNDERLYING DOCTRINE: WORK–PRODUCT[9]

(i) Confidentiality

The work-product doctrine protects such items as "interviews, statements, **\*574** memoranda, correspondence, briefs, mental impressions, [and] personal beliefs." *Hickman v. Taylor,* 329 U.S. 495, 510, 67 S.Ct. 385, 393, 91 L.Ed. 451 (1947). The purpose of the doctrine is to encourage careful and thorough preparation by counsel and it provides him or her with a "certain degree of privacy, free from necessary intrusion by opposing parties and their counsel." *Id.* at 510–511, 67 S.Ct. at 393. In conforming with the purpose of the work-product doctrine, the Court requires the parties asserting the joint-defense privilege to demonstrate that they shared a common legal interest and that prior to the work-product communications the parties had agreed to pursue a joint-defense strategy and to keep their work-product communications confidential.

(ii) In Anticipation of Litigation

Fed.R.Civ.P. 26(b)(3) provides that documents "prepared in anticipation of litigation by or for the party may not be obtained by one's opponent through discovery without a showing of substantial need or undue hardship in obtaining the substantial equivalent of the document." Consequently, information shared among co-parties in a joint representation context will only be protected under the work-product doctrine if those documents were prepared in anticipation of litigation. Thus, the parties asserting the privilege must demonstrate that a substantial probability of litigation existed at the time the material sought to be protected was created. *See Weil Ceramics & Glass, Inc. v. Work,* 110 F.R.D. 500, 505 (E.D.N.Y.1986) (citations omitted). A determination of whether there was a substantial probability of litigation is fact specific. *Id.*

The Court notes that the work-product doctrine provides a qualified privilege for materials prepared in anticipation of *litigation. See* Fed.R.Civ.P. 26(b)(3). As such, materials prepared for administrative litigation or judicial proceedings maybe protected under Fed.R.Civ.P. 26(b)(3) and the joint-defense privilege. However, materials assembled in the ordinary course of business, or pursuant to public requirements unrelated to litigation, or for other nonlitigation

purposes are not shielded by the work-product doctrine's qualified immunity and consequently are not protected by the joint-defense privilege. *See* Fed.R.Civ.P. 26(b)(3) Advisory Committee notes; *In re Minebea Co., Ltd.,* 143 F.R.D. 494, 499 (S.D.N.Y.1992) (work-product doctrine does not protect material prepared for prosecution of patent application because it is a non-adversarial, *ex parte* proceeding); *Goosman v. A. Duie Pyle, Inc.,* 320 F.2d 45, 52 (4th Cir.1963) (written statements made pursuant to Interstate Commerce Commission regulations were not protected). Thus, self-serving disclosure of documents to a government agency charged with enforcing regulatory policy will not be protected under the work-product doctrine or joint-defense privilege.

(iii) Duration of Privilege

One of the purposes of the work-product doctrine is to implement the adversarial process and foster the opportunity for each attorney to prepare his case. *See In re Crazy Eddie Securities Litigation, supra,* 131 F.R.D. at 379. Thus, the privilege only protects information "against opposing parties, rather than against all others outside a particular confidential relationship." *United States v. American Tel. & Tel. Co.,* 642 F.2d 1285, 1299 (D.C.Cir.1980).

The Court is cognizant of the fact that courts are split into three major positions as to whether materials prepared in anticipation of a prior litigation will be protected in a subsequent litigation. *See* Scott N. Stone & Ronald B. Liebman, *Testimonial Privileges* 180–182 (1983) (citations omitted). The Second Circuit admonishes that in determining whether work-product protection is limited to materials prepared for the litigation in which the discovery is sought, courts must not defeat the broad purposes of the doctrine as set forth by the Supreme Court in *Hickman. See Republic Gear Company v. Borg–Warner Corporation,* 381 F.2d 551, 557 (2d Cir.1967). Thus, this Court adopts the view that documents prepared for one **\*575** litigation, which were or would have been shielded, have the same protection in a second litigation if the two litigations are *closely related* in parties or subject matter. *See Hercules Inc. v. Exxon Corp.,* 434 F.Supp. 136, 153 (D.Del.1977) (citing *Republic Gear Company v. Borg–Warner Corporation, supra,* 381 F.2d at 551). Thus, the parties asserting the work-product doctrine and joint-defense privilege in order to protect documents prepared in anticipation of prior litigation must show how, and to what extent, the prior litigation is related to the present case.

(iv) Nature of Communication

The parties asserting the work-product doctrine and the joint-defense privilege must also show whether the material sought to be protected is "ordinary" work-product, that is, documents not implicating the mental impressions, conclusions, opinions or legal theories of an attorney or whether the material is "opinion" work-product. The Court notes that "ordinary" work product is discoverable if the party seeking discovery demonstrates a "substantial need of the materials ... and the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3). "Opinion" work-product, however, enjoys "a near absolute immunity and can be discovered only in very rare and extraordinary cases ..." *P. & B. Marina, Ltd. Partnership v. Logrande,* 136 F.R.D. 50, 57 (E.D.N.Y.1991) (quoting *In re Murphy,* 560 F.2d 326, 336 (8th Cir.1977)); *In re John Doe Corp., supra,* 675 F.2d at 492.

**D. CONCLUSION**

As noted above, it is a fundamental rule that the public is entitled to every person's evidence. *See supra* text at 8; *Garner v. Wolfinbarger,* 430 F.2d 1093, 1100 (5th Cir.1970), *cert. denied* 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971) (citing 8 Wigmore, *Evidence,* § 2192 at 70). However, certain communications which are thought to improve legal representation and facilitate a more effective administration of justice are protected by the cloak of privilege. In an effort to balance these competing policies, the Court has provided the parties with guideposts that expands the law of privileges in New York but also places a heavy burden on the claimant.

With this Memorandum–Decision in hand, the Court affords the parties a further opportunity to make a good faith effort to resolve discovery disputes. *See* Fed.R.Civ.P. 26 and 37. If any documents remain in dispute following such effort, the claimants of the privilege shall submit those documents in question for *in camera* review. *See In re Federal Skywalk Cases,* 95 F.R.D. 477, 478 (W.D.Missouri 1982) (citations omitted); *Spectrum Systems International Corp. v. Chemical Bank,* 78 N.Y.2d 371, 378, 575 N.Y.S.2d 809, 814, 581 N.E.2d 1055, 1060 (1991). Any remaining disputed documents must be submitted to the Court within twenty (20) days of the date of this order.[10]

It is, of course, the claimants burden to establish the elements of an alleged privilege. *See In re Fidelity Guarantee Mortg. Corp.,* 150 B.R. 864, 865 (Bankr.D.Mass.1993). Thus, the claimants shall also submit an *explanation* of *each* document for which a privilege is claimed identifying the document by: (1) content; (2) date; (3) preparer; (4) parties privy to the document and; (5) position of preparer and position of parties privy to the document (e.g. (name of preparer) is counsel for (name of corporation); the communication was shared with (name of person) and he/she is counsel for (name of corporation)). Where the privilege claimed is joint-defense with the underlying privilege being *attorney-client,* the *explanation* accompanying *each* document shall also demonstrate: (6) that the underlying privilege is applicable to the document; (7) that there was an agreement, made prior to the communication, between the parties to keep the communication confidential; (8) that the parties privy to the document shared a common legal interest and; (9) that the document was made in the course of the joint-  ***576** defense and that the document was designed to further the joint-defense effort. Where the privilege claimed is joint-defense with the underlying doctrine being *work-product,* the *explanation* accompanying *each* document shall also demonstrate: (6) that the underlying doctrine is applicable to the document as "ordinary" work-product or "opinion" work-product; (7) that there was an agreement, made prior to the communication, between the parties to keep the communication confidential; (8) that there was an agreement to pursue a joint-defense strategy; (9) that at the time the document was prepared there was a substantial probability of litigation and; (10) that if the document was prepared in anticipation of prior litigation, how the previous litigation is closely related in parties or subject matter to the present proceeding. An *explanation* shall be attached to each document and will also be reviewed *in camera.* The parties may submit additional memoranda within the twenty day period.

Accordingly, it is hereby

ORDERED that in accord with this Memorandum–Decision the parties make a good faith effort to resolve their discovery disputes pursuant to Fed.R.Civ.P. 26 and 37 as made applicable to adversary proceedings in this Court by Fed.R.Bankr.P. 7026 and 7037; and it is further

ORDERED that any documents that remain in dispute shall be submitted with an attached explanation, as set forth herein, within twenty (20) days of the date of this order.

**All Citations**

189 B.R. 562, 34 Collier Bankr.Cas.2d 943

Footnotes

1    The Federal Rules of Evidence are made applicable to actions in this Court by FRE 101 and 1101(a) and Fed.R.Bankr.P.
9017.

2    FDIC argues in a footnote that the federal law of privileges applies because PURPA, a federal statute, establishes the
applicable standards for QF certification. *See* FDIC's Opposition to NIMO at n. 2. The Court finds that establishing whether
Debtor met QF standards is an item of proof culminating in a state law claim (i.e. violation of the PPA) and as such state
law privileges apply. The Court's conclusion is based on the legislative history of FRE 501 which states that, "If an item
of proof tends to support or defeat a claim or defense, or an element of a claim or defense, and if state law supplies the
rule of decision for that claim or defense, then state privilege law applies to that item of proof." *See* Wright & Graham,
*Federal Practice & Procedure,* § 5434 at 860 (1980) (citing Conference Report).

3    The Code, however, is not completely hostile toward privileges. *See e.g.* Code § 344 legislative history.

4    Courts and commentators use the terms "joint-defense privilege," "common interest privilege" and "pooled information
situation" interchangeably. Perhaps the best term, as it is the least misleading, is "common interest exception to waiver."

5    The Court reiterates that the instant Memorandum–Decision does not dispose of the issues as to whether the application
of the underlying attorney-client privilege or the work-product doctrine are valid with respect to each document which
is claimed to be privileged.

6    The Court recognizes that the joint-defense privilege cannot always be interpreted to conform to the purposes of its
underlying privilege. For example, one of the purposes of the attorney-client privilege is to "entice clients to divulge
information to their own lawyers" while the joint-defense privilege is meant to encourage communications with third parties
having a common interest. *See* Rushing, *supra,* at 1279–1280.

7    The Court notes that under the doctrine of "subject matter waiver," disclosure of specific communications *may* also lead
to the disclosure of all other communications relating to the subject matter. This doctrine is applicable where the privilege
holder has made some affirmative use of the disclosed material and it would be patently unfair to uphold a claim of
privilege. *See e.g. In re von Bulow,* 828 F.2d 94, 101–102 (2d Cir.1987); *United States v. Aronoff,* 466 F.Supp. 855,
862–863 (S.D.N.Y.1979).

8    The Court is cognizant of the argument that since the attorney-client privilege extends to any communication regardless
of the presence or absence of litigation, the joint-defense privilege should have the same parameters. *See SCM Corp.
v. Xerox Corp.,* 70 F.R.D. 508, 513–514 (D.Conn.1976). However, as noted above, the joint-defense privilege may not
always conform with the purposes of the underlying privilege. *See supra* text at 12–13 and accompanying notes.

9    For purposes of FRE 501, "privileges" are to be determined pursuant to federal standards. *See* Wright & Graham, *supra,*
§ 5432 at 851. Although there is conflicting authority, the Court does not consider the "work-product doctrine" a privilege
under the federal standards and as such relies on Fed.R.Civ.P. 26(b)(3). The Court finds further support for its decision
from the fact that New York courts rarely rely on the ill-defined work-product doctrine under NYCPLR 3101(c); rather,
when New York courts seek to exclude material they often grant *conditional immunity* pursuant to NYCPLR 3101(d). *See*
NYCPLR § 3101, Commentary at c; 3101:28.

10    The Court affords the parties 20 days in an effort to preserve the parties' First Amended Joint Stipulated Order of
Consolidation and Pretrial Order, which requires the trial to begin on March 30, 1995.

**WESTLAW**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

In re Megan-Racine Associates, Inc., 189 B.R. 562 (1995)

34 Collier Bankr.Cas.2d 943

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S.
Government Works.

56 Collier Bankr.Cas.2d 100, 45 Bankr.Ct.Dec. 250

336 B.R. 187
United States Bankruptcy Court,
S.D. New York.

# In re REFCO INC., et al., Debtors.

No. 05–60006 (RDD).
|
Jan. 20, 2006.

## Synopsis

**Background:** Official committee of unsecured creditors in Chapter 11 case of bankrupt providers of execution and securities clearing services moved for order regarding its obligations under provision of the Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) requiring creditors' committee to provide access to information by creditors whom it represents.

**Holdings:** The Bankruptcy Court, Robert D. Drain, J., held that:

committee would not be required, without further court order, to disclose certain confidential and non-public, proprietary, privileged and other protected information; but

except with respect to such information, committee would be required to proactively provide specified types of information on website.

Motion granted.

## Attorneys and Law Firms

**\*189** Milbank, Tweed, Hadley & McCloy, by Luc. A. Despins, for the Official Committee of Unsecured Creditors of Refco Inc. and affiliated debtors.

Strook, Stroock & Lavan LLP, by Michael J. Sage, for the Ad Hoc Committee of Senior Subordinated Noteholders.

## MEMORANDUM OF DECISION ON OFFICIAL COMMITTEE'S MOTION FOR AN ORDER REGARDING ACCESS TO INFORMATION UNDER 11 U.S.C. § 1102(b)(3)(A)

ROBERT D. DRAIN, United States Bankruptcy Judge.

Soon after its appointment, the Official Committee of Unsecured Creditors (the "Committee") filed a motion to clarify its obligation under section 1102(b)(3)(A) of the Bankruptcy Code to provide unsecured creditors who are not members of the Committee with access to information. Recently enacted as part of the Bankruptcy **\*190** Abuse Prevention and Consumer Protection Act of 2005, Pub.L. No. 109–08, 119 Stat. 23 (2005) ("BAPCPA"), section 1102(b)(3) states:

> A committee appointed under subsection (a) shall—(A) provide access to information for creditors who—(i) hold claims of the kind represented by that committee; and (ii) are not appointed to the committee; and (B) solicit and receive comments from the creditors described in subparagraph (A); and (C) be subject to a court order that compels any additional report or disclosure to be made to the creditors described in subparagraph (A).

11 U.S.C. § 1102(b)(3).

BAPCPA does not define the "information" that section 1102(b)(3)(A) requires an official creditors' committee to make available to its constituency (for example, whether it includes information obtained in confidence) or state how it is to be delivered (for example, whether to all unsecured creditors at once, or upon individual creditors' demand), but its language permits a broad construction.[1] The Committee's motion was based on the fear that section 1102(b)(3)(A) might be interpreted to impose an obligation contrary to other applicable laws and the Committee's fiduciary duties and hamper the Committee's performance under section 1103 of the Bankruptcy Code.

Notwithstanding the possibility of such a broad construction, the Court's first inclination, particularly given the review process contemplated by section 1102(b)(3)(C), the absence from the statute of any adverse consequences for an initial failure to comply, and the qualified immunity accorded official committees and their professionals,[2] was to deny the motion as not raising a case or controversy. Until a creditor contended that the Committee was being too stingy with information, the Committee could be left to make reasonable efforts to provide access to relevant information consistent with its resources and any conflicting duties.

This is, however, a large and rapidly moving case, and meaningful information may become stale before the completion of litigation over whether and how it should be provided. Moreover, it appears that the Committee's motion did not arise in a vacuum; unsecured creditors apparently were pressing for information in ways that raised issues neither expressly addressed by the statute nor, given the section's recent enactment, the case law. Under the circumstances, therefore, the Committee's request to establish parameters for the provision of information under section 1102(b)(3)(A) of the Bankruptcy Code was appropriate, although, as the law develops, the need for comfort orders should end.

**Background**

Refco, Inc. ("Refco") and its direct and indirect subsidiaries were providers of execution **\*191** and clearing services for exchange-traded derivatives and prime brokerage services in the fixed income and foreign exchange markets. In 2004, they were the largest providers of customer transaction volume to the Chicago Mercantile Exchange, the largest derivatives exchange in the United States.

On October 10, 2005, Refco disclosed that an entity owned by Refco's CEO and Chairman, Phillip R. Bennett, owed Refco entities approximately $430 million, and soon Mr. Bennett was arrested and charged with various crimes, including securities fraud in connection with Refco's initial public offering, which had occurred only two months earlier.[3] This news precipitated a crisis of customer confidence in Refco and its various subsidiaries, which in turn led Refco to impose a moratorium on withdrawals from its largest unregulated subsidiary, Refco Capital Management, Inc. ("RCM"), and the filing of voluntary chapter 11 petitions on October 17, 2005 by Refco, RCM and twenty-two related entities.

Under a new Chief Executive Officer, Refco immediately sought to sell its largest asset, its regulated futures business, on an expedited basis to prevent further erosion of value and satisfy regulators. At the same time, Refco pursued the sale of other substantial assets and attempted to address the demands of numerous RCM customers for the immediate return of money and securities in which they claimed an interest, while other parties in interest contended that such property was, instead, property of RCM's chapter 11 estate, available to pay all unsecured creditors.

The Committee was appointed on October 28, 2005 and promptly turned its attention to these pressing issues, working closely with the Debtors and their professionals—particularly on the proposed sales of the regulated futures business and other assets, which involved the exchange of significant confidential information regarding the businesses proposed to be sold, strategies for negotiating with competing bidders and the evaluation of competing bids. In large part because of this cooperative approach, the regulated futures business was successfully sold. On its own, but with information provided by the Debtors, the Committee also analyzed the issues raised by RCM's customers' claims to money and securities. And it also began to investigate the events that precipitated the chapter 11 filings, which entailed a more circumspect approach to information-sharing with the Debtors and others (indeed, the Court granted the Committee's motion for discovery under Bankruptcy Rule 2004 only after the imposition of certain confidentiality requirements in the light of, among other things, an ongoing criminal investigation).

Thus, in the early days of the chapter 11 cases the Committee was engaged in tasks that required it to exchange confidential information with the Debtors and other parties, develop factual and legal analyses of significant inter-creditor issues, and pursue an investigation on a confidential basis. The Committee believed that the premature, unguarded or selective disclosure of information obtained in performing these tasks not only could jeopardize the Committee's desired result in each instance, but also might violate the securities laws (given Refco's public stock and debt) or violate a Court order (in the case of information obtained pursuant to the Rule 2004 order).

**\*192** It is not particularly surprising, then, that the Committee moved three days after its appointment for approval of a protocol for complying with section 1102(b)(3)(A). On an interim basis it sought an order providing that it was not required in the first instance to divulge any (i) confidential, proprietary, non-public information concerning the Debtors or (ii) any other information if the effect of such disclosure would constitute a waiver of the attorney-client or other privilege of the Committee. With minor changes, the Court entered the interim order, which also required the Debtors to assist the Committee by identifying the proprietary or non-public nature of any information given to the Committee, pending a final hearing.

The Committee's motion received one response, by an *ad hoc* committee of holders of approximately $487 million

In re Refco Inc., 336 B.R. 187 (2006)
56 Collier Bankr.Cas.2d 100, 45 Bankr.Ct.Dec. 250

of senior subordinated notes and bank debt. The *ad hoc* committee's primary objections focused on the circumstances under which the Committee could be forced to provide access to confidential information if the requesting party was prepared to agree to certain confidentiality constraints, as well as on the Committee's proposed schedule for resolving disputes regarding whether particular information should be disclosed. Without accusing the Committee of any dereliction of duty, the *ad hoc* committee asserted that because the interests of the *ad hoc* committee were under-represented on the Committee, the Committee might not use certain information (for example, information related to the RCM customer dispute) in an even-handed way.

With additional input by Refco and the United States Trustee, however, the objection was ultimately resolved by the final form of Order Regarding Creditor Access to Information, which is attached as Exhibit *A*.

### Discussion

Notwithstanding the statute's ambiguity and unhelpful legislative history, there are sources for construing the Committee's obligation to provide "access to information" under Bankruptcy Code section 1102(b)(3)(A). First, the Code has long contained a similar requirement for bankruptcy trustees. Bankruptcy Code section 704(7), which applies under 11 U.S.C. §§ 1106(a)(1) and 1107(a) to chapter 11 trustees and debtors in possession, respectively, states that a "trustee shall ... unless the court orders otherwise, furnish such information concerning the estate and the estate's administration as is requested by a party in interest."

The facial differences between Bankruptcy Code sections 704(7) and 1102(b)(3) do not appear to be material. Under section 704(7), information shall be furnished only upon a party's request, whereas section 1102(b)(3)(A) may envision a committee's volunteering information or at least establishing a mechanism for unsecured creditors to obtain it. Equally the right to court review also is more explicit in section 704(7) than in section 1102(b)(3)(C). On the other hand, each section contemplates that the bankruptcy court shall resolve disputes over whether information should be shared. Once that fact is recognized, the two provisions do not differ in practical terms, as long as court resolution is sought on a timely basis. (For the same reason, a committee's good faith decision not to volunteer information under section 1102(b)(3)(A) also may not be of practical consequence: ultimately

the issue would come down to the Court's decision whether to compel the information's release under section 1102(b)(3)(C)). In addition, the information to be provided under section 704(7) is limited to "information concerning the estate and the estate's administration," while **\*193** section 1102(b)(3)(A) refers perhaps more broadly to "information." However, the Code's definition of "estate" is itself so broad[4] that it is hard to see how section 704(7)'s requirement generally would be any more limited in practical terms than section 1102(b)(3)(A)'s reference to "information."[5] Thus cases construing section 704(7) may be applied by analogy to section 1102(b)(3).

Authorities interpreting Bankruptcy Code section 704(7) stand for three propositions relevant to the scope of a committee's obligation under section 1102(b)(3). First, a trustee's duty under section 704(7)

> is fairly extensive, as § 704(7) places the burden of providing requested information on the trustee, and reflects the overriding duty to keep parties in interest informed. Courts have interpreted the trustee's responsibilities broadly, making a request for information difficult for the trustee to avoid, in the absence of a court order to the contrary.

*Pineiro v. Pension Benefit Guaranty Corporation,* 318 F.Supp.2d 67, 102 (S.D.N.Y.2003) (internal citations and quotations omitted). *See also In re Robert Landau Assocs., Inc.,* 50 B.R. 670, 677 (Bankr.S.D.N.Y.1985) ("The policy of open inspection, established in the Code itself through section 704(7) and F.R.B.P. 5005 and 5007, is fundamental to the operation of the bankruptcy system and is the best means of avoiding any suggestion of impropriety that might or could be raised.") (internal citation and quotation omitted); *In re Sports Accessories, Inc.,* 34 B.R. 80, 82 (Bankr.D.Md.1983) (discussing importance of trustee's duty to disclose).

Second, the duty to provide information under section 704(7) is not unlimited, however, as is made clear by the section's introductory clause. *Robert Landau,* 50 B.R. at 675; *Speleos v. McCarthy,* 201 B.R. 325, 328 (D.D.C.1996). In particular, a trustee may obtain a protective order against disclosure of information under section 704(7) if disclosure would result in waiver of the attorney-client privilege, *In re Lee Way Holding Co.,* 120 B.R. 881, 908 (Bankr.S.D.Ohio 1990), or of information that is proprietary and confidential. *In re Grabill Corp.,* 109 B.R. 329, 333 (N.D.Ill.1989); *see also* 6 *Collier on Bankruptcy* ¶ 704.11 (15th ed.2005), at 704–23 (noting that

section 107 of the Bankruptcy Code must also be kept in mind when considering a trustee's duty to furnish information).[6]

 Third, a trustee's right to a protective order under section 704(7) is informed by the trustee's fiduciary duties, because the requirement to disclose information under section 704(7) derives from a trustee's fiduciary duties to creditors and the estate. **\*194** *In re Scott,* 172 F.3d 959, 967 (7th Cir.1999); *In re Modern Office Supply, Inc.,* 28 B.R. 943, 944 (Bankr.W.D.Okla.1983). If the request for such an order is not also in furtherance of those duties, but is, rather, designed to obtain an undue advantage over a party in interest, it should be denied. *Robert Landau,* 50 B.R. at 677. To override the duty to disclose, a trustee should point to a countervailing fiduciary duty, such as to protect creditors and the estate from a particular harm, whose performance is more important than avoiding the harm resulting from withholding the information in question. *See generally Garner v. Wolfinbarger,* 430 F.2d 1093, 1103–04 (5th Cir.1970), *cert. denied,* 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971) (holding that attorney-client privilege may be asserted by corporation against those for whom it acts as fiduciary, subject to right of such beneficiaries to show cause why it should not be invoked in the particular instance).

Each of these aspects of section 704(7) should also apply to a creditor's committee's analogous obligation to provide access to information under Bankruptcy Code section 1102(b)(3)(A).

There also were provisions similar to section 1102(b)(3)(A) under the Bankruptcy Act of 1898. Section 339(1) of the Act listed the functions that a creditors' committee appointed under Chapter XI could perform, including "(d) to report to the creditors from time to time concerning the progress of the proceeding;" and under Bankruptcy Act Rule 11–29, which was derived from section 339(1) of the Act, 14 *Collier on Bankruptcy* ¶ 11–29.02 (14th ed.1982) at 11–29–3, one of the functions of an official committee was to "advise the creditors of its recommendations with respect to the proposed plan [and] report to the creditors concerning the progress of the case...." Bankruptcy Act Rule 11–29(a).

The case law and commentary concerning this information-provision role is very scant. One court, however, construed Bankruptcy Act Rule 11–29(a) in affirming a bankruptcy court's confirmation of a Chapter XI plan over the objection that acceptances of the plan were not solicited in good faith. *In re Gilchrist Co.,* 410 F.Supp. 1070 (E.D.Pa.1976).

The appellants contended that although the committee had circulated a letter recommending the plan, it had kept creditors in the dark about several material facts, such as the debtor's receipt of a tax abatement and rent reduction, the existence of additional proofs of claim and potential fraudulent transfer recoveries, and the opposition of four members of the creditors committee to the plan followed by two members' resignation. *Id.* at 1076–77. The court determined, however, expressly notwithstanding Rule 11–29(a), that "It is clear that the Creditors' Committee is not required to forward to each creditor all of the raw data it receives and considers in the process of carrying out its duties." *Id.* at 1078. Instead, the committee had to provide "a fair presentation of the status of the Debtor." *Id.* Finding no support for the appellants' argument that the committee had made material omissions or otherwise acted improperly, such as acting collusively with the debtor, the court found that the plan was solicited and accepted in good faith. *Id.*

The *Gilchrist* court's statement that a committee should not have to "forward all of the raw data it receives and considers," as if it were a virtual information bank for its constituents, would appear to apply with equal logic to Bankruptcy Code section 1102(b)(3)(A), although courts may differ about what constitutes a material development in the case and, therefore, a material disclosure omission in the context **\*195** of a committee solicitation letter or otherwise.

Last, the proper scope of section 1102(b)(3)(A) may be analyzed in the light of the duties and functions of an official creditors' committee under the Bankruptcy Code and by analogy to several pre-BAPCPA decisions that have considered committee confidentiality restrictions in the context of such duties and functions.

 "An official committee of creditors plays a pivotal role in the bankruptcy process. The function of an official creditors committee is to aid, assist and monitor the debtor to ensure that the unsecured creditors' views are heard and their interests promoted and protected." *Pan Am Corp. v. Delta Air Lines, Inc.,* 175 B.R. 438, 514 (S.D.N.Y.1994) (citations omitted). Official committees have diverse duties: they are the primary negotiating bodies for a chapter 11 plan; they also provide supervision of the debtor and execute an oversight function; they may investigate the debtor's assets and affairs; and they may perform such other services as are in the interest of the unsecured creditor body. *Johns–Manville Sales Corp. v. Doan* (*In re Johns–Manville Corp.*), 26 B.R. 919, 925 (Bankr.S.D.N.Y.1983); *see also* 11 U.S.C. §§ 1103(c) (stating

tasks an official committee may undertake) and 1109(b) (stating that an official creditors' committee "may raise and may appear and be heard on any issue" in a chapter 11 case).[7] Broadly speaking,

> The creditors' committee is not merely a conduit through whom the debtor speaks to and negotiates with creditors generally. On the contrary, it is purposely intended to represent the necessarily different interests and concerns of the creditors it represents. It must necessarily be adversarial in a sense, though its relations with the debtor may be supportive and friendly. There is simply no other entity established by the Code to guard those interests. The committee as the sum of its members is not intended to be merely an arbiter but a partisan which will aid, assist, and monitor the debtor pursuant to its own self-interest.

*In re Daig Corp.,* 17 B.R. 41, 43 (Bankr.D.Minn.1981). It is well recognized that, to fulfill these roles, the members of an official committee owe a fiduciary duty to their constituents—in the case of an official creditors' committee, to all of the debtor's unsecured creditors. *The Bohack Corp. v. Gulf & Western Indus., Inc.* (*In re Bohack Corp.*), 607 F.2d 258, 262 n. 4 (2d Cir.1979); *see also Pan Am,* 175 B.R. at 514; *Rickel & Associates v. Smith (In re Rickel & Associates)*, 272 B.R. 74, 99 (Bankr.S.D.N.Y.2002); *Johns–Manville,* 26 B.R. at 925 (noting, "In the case of reorganization committees, these fiduciary duties are crucial because of the importance of committees.").

In addition, under certain circumstances, an official creditors committee may be authorized by the bankruptcy court to act not only on behalf of the unsecured creditor body but also as a fiduciary on behalf of the debtor's estate. *Commodore Int'l Ltd. v. Gould* (*In re* **\*196** *Commodore Int'l Ltd.*), 262 F.3d 96, 100 (2d Cir.2001) (authorizing official committee to pursue fraudulent transfer avoidance litigation for the benefit of the chapter 11 estate).

It is important to keep these functions in mind when sorting out the circumstances under which a creditors' committee should not be required to make information available to its constituents. For example, in performing its oversight and negotiation function, a committee acts as the voice of all of the unsecured creditors, many of whom lack the resources to speak for themselves and all of whom benefit from the committee's representative role. *See* 4 *Norton Bankr.L. & Prac.* § 78.1 (2d ed.2004). This means that committee members should and will receive commercially sensitive or

proprietary information from the debtor and other parties (including each other, because plan negotiations are as often conducted between unsecured creditor groups as between the unsecured creditors and the debtor), often in the context of settlement discussions. It has frequently been held that committee members' fiduciary duties of loyalty and care to the unsecured creditor body require such information to be held in confidence. Otherwise, communications between the committee and third parties and among committee members themselves would be improperly curtailed, or the debtor might be harmed with a resulting decline in the creditors' recovery. *See In re Swolsky,* 55 B.R. 144, 146 (Bankr.N.D.Ohio 1985); *Johns–Manville,* 26 B.R. at 926; *Daig,* 17 B.R. at 42; *see also* 7 *Collier on Bankruptcy* ¶ 1103.05[2][a] at 1103–30.

When the debtor has public stock or debt, moreover, the securities laws may preclude the debtor from disclosing material non-public information on a selective basis to committee members absent a binding confidentiality agreement. *See, e.g.,* SEC Regulation FD (17 C.F.R. § 243.100). In addition, a committee's selective disclosure of material non-public information that it has developed on its own (including the results of inter-creditor negotiations and its own investigations) may raise similar issues, although the underlying concern would not be a breach of the securities laws as much as a breach of members' fiduciary duties of loyalty and care to all unsecured creditors by profiting from, or enabling selected creditors to profit from, non-public information obtained as a result of committee membership. *See In re Federated Dep't Stores,* 1991 WL 79143 (Bankr.S.D.Ohio 1991) (recognizing ability of creditors' committee members to trade in the debtor's securities, subject to applicable securities laws, *provided* that such members institute procedures for screening personnel engaged in trading from personnel involved in committee work); *see also In re Spiegel,* 292 B.R. 748, 750–51 (Bankr.S.D.N.Y.2003), in which the court discussed its concerns regarding committee members' trading in the debtor's securities even if information blocking procedures were to be adopted. If a committee member's use of non-public information for trading without an appropriate information wall breaches its fiduciary duties of care and loyalty to unsecured creditors, one can readily see the mischief that might arise by construing section 1102(b)(3) to require the unfettered release of such information to other, perhaps friendly, parties who are engaged in such trading, particularly given today's enormous market in distressed debt securities and claims.[8] The selective possession **\*197** of material information can equate to very large swings in value

56 Collier Bankr.Cas.2d 100, 45 Bankr.Ct.Dec. 250

and, therefore, creditors may seek such information not for legitimate purposes related to their position in the case but, rather, to obtain an unfair trading edge.

Maintaining the parties' reasonable expectations of confidentiality, therefore, is often critical to a committee's performance of its oversight and negotiation functions, compliance with applicable securities laws, and the proper exercise of committee members' fiduciary duties.

Maintaining confidentiality against unsecured creditors generally also may be necessary to preserve a committee's attorney-client privilege. That privilege clearly can be enforced against those who are not represented by the committee or who are standing in an adversarial relationship to the unsecured creditors as a group. *In re Subpoenas Duces Tecum,* 978 F.2d 1159, 1161 (9th Cir.1992); *In re Baldwin–United Corp.,* 38 B.R. 802, 804–5 (Bankr.S.D.Ohio 1984); 7 *Collier on Bankruptcy* ¶ 1103.03[8] at 1103–17 ("When a committee is engaged in litigation with a third party, there is no doubt that the attorney-client privilege is applicable to shield communications between the committee and its counsel relating to the litigation. The privilege ought also to be available for communications relating to strategy in the case *vis-à-vis* the debtor and third parties. This should be particularly so for strategy and negotiations over the plan of reorganization.").[9] Thus, one should proceed cautiously concerning the disclosure of information that could reasonably have the effect of waiving the attorney-client or other privilege (for example when the committee has been given standing to pursue a claim on behalf of the debtor's estate, including against an unsecured creditor, or is conducting an investigation that might give rise to such a claim, or the information relates to ongoing negotiations with a third party), notwithstanding Bankruptcy Code section 1102(b)(3).

On the other hand, although a committee's assent to a plan or a transaction does not bind its members, let alone its constituents, *see generally* 7 *Collier on Bankruptcy* ¶ 1103.05[1][d][i] at 1103–26; *see also In re Armstrong World Indus., Inc.,* 432 F.3d 507, 2005 U.S.App. LEXIS 28897 (3d Cir.2005), the importance of a committee's recommendations should require a committee to remain in touch with its constituents to determine their reasonable views.

How should a committee balance the foregoing tension, however—that is, the committee's need to preserve access to sensitive information (which usually is the only information

of any value to unsecured creditors, whether for legitimate or illegitimate purposes), to protect the attorney-client privilege, and to comply with the securities laws, on the one hand, against the right, now codified in section 1102(b)(3), of unsecured creditors to be informed of material developments in the case before they are presented with what in practical terms may be a *fait accompli,* on the other?

In Refco's case, as set forth in the order attached as Exhibit *A* hereto, the balance has been achieved by not requiring **\*198** in the first instance—that is, without further court order —the Committee's disclosure of information (a) that could reasonably be determined to be confidential and non-public or proprietary, (b) the disclosure of which could reasonably be determined to result in a general waiver of the attorney-client or other applicable privilege, or (c) whose disclosure could reasonably be determined to violate an agreement, order or law, including applicable securities laws. Because many, if not all, of the adverse consequences of releasing certain information discussed above may be acceptably reduced or eliminated by the requesting party's agreement to be bound by confidentiality and/or trading constraints, however, the order further provides that the Committee shall take into account the requesting party's willingness to agree to such constraints when the Committee determines whether to release otherwise protected information. Consistent with Bankruptcy Code section 1102(b)(3)(C), the order also contemplates that the Court will promptly decide disputes over the provision of such information if they are not resolved by the parties.[10]

Except with respect to the foregoing protected information, the order contemplates the Committee's proactive provision of specified types of information on a website.[11] Finally, recognizing the policy behind the qualified immunity given to members of an official creditors' committee and the committee's professionals,[12] the order provides for exculpation of such parties coextensive with such immunity.

Of course, those seeking protected information under the attached order are free to raise any argument to show that the Committee's need to protect specified information is not outweighed by the creditor's legitimate need to receive it. For example, the balance described above depends in large measure upon the assumption that the Committee is adequately representative of the unsecured creditors and functioning properly.[13]

**\*199  Conclusion**

For the foregoing reasons, the Committee's motion is granted to the extent provided in the order attached hereto as Exhibit *A.*

**EXHIBIT A**

**ORDER REGARDING CREDITOR ACCESS TO INFORMATION PURSUANT TO 11 U.S.C. §§ 105(a), 1102(b)(3) AND 1103(c)**

Upon the motion, dated November 1, 2005 (the "Motion"), filed by the Official Committee of Unsecured Creditors of Refco Inc., et al. (the "Committee"), pursuant to sections 105(a), 1102(b)(3) and 1103(c) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), for an order clarifying the Committee's requirement to provide access to information *nunc pro tunc* to October 28, 2005, the date the Committee was appointed; and upon the order to show cause, dated November 1, 2005, provisionally granting the relief requested in the Motion until the Court further clarifies the requirements under section 1102(b)(3)(A) of the Bankruptcy Code or the Committee establishes an acceptable information sharing protocol, and requiring that all interested parties show cause by filing and serving an objection setting forth why the Motion and the relief requested therein should not be entered on a final basis; and the Court having held a hearing on the Motion on December 8, 2005 (the "Hearing") and having considered the Committee's proposed protocol, the objection thereto by the Ad Hoc Committee of Senior Subordinated Noteholders, the statement of the United States Trustee, and the record of the Hearing, the Committee having revised the proposed protocol in the light of the foregoing; and after due deliberation and sufficient cause appearing therefor,

IT IS HEREBY FOUND AND DETERMINED THAT:[1]

A. *Jurisdiction and Venue; Core Proceeding.* The Court has jurisdiction to grant the relief provided for herein pursuant to 28 U.S.C. §§ 157 and 1334. This matter constitutes a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue of this chapter 11 case and the Motion is proper under 28 U.S.C. §§ 1408 and 1409(a).

B. *Statutory Predicates.* The statutory predicates for the relief sought in the Motion are sections 105(a), 1102(b)(3) and 1103 of the Bankruptcy Code.

C. *Adequacy of Notice.* Notice of the Motion was timely, adequate, proper and sufficient and constituted the best notice practicable under the particular circumstances, and no other or further notice of the Motion is required.

D. *Memorandum of Law Waiver.* The requirements of Rule 9013–1(b) of the Local Rules are waived.

E. *Opportunity to be Heard.* A reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein and granted in this Order has been afforded.

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:

1. All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, including all reservations of rights included therein, which are not otherwise resolved in this Order, are overruled on the merits.

**\*200**  2. The Motion is granted to the extent provided herein.

3. Access To Creditor Information. In satisfaction of the Committee's obligations to provide access to information for creditors ("Creditor Information Protocol") in accordance with section 1102(b)(3)(A) and (B) of the Bankruptcy Code, the Committee shall, until the earliest to occur of dissolution of the Committee, dismissal, or conversion of these chapter 11 cases, and a further order of the Court:

(a) Establish and maintain an Internet-accessed website (the "Committee Website") that provides, without limitation:

(1) general information concerning the chapter 11 cases of Refco Inc. and its affiliated debtors (collectively, the "Debtors"), including, case dockets, access to docket filings, and general information concerning significant parties in the cases;

(2) monthly Committee written reports summarizing recent proceedings, events and public financial information;

(3) highlights of significant events in the cases;

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

(4) a calendar with upcoming significant events in the cases;

(5) access to the claims docket as and when established by the Debtors or any claim agent retained in the cases;

(6) a general overview of the chapter 11 process;

(7) press releases (if any) issued by each of the Committee and the Debtors;

(8) a non-public registration form for creditors to request "real-time" case updates via electronic mail;

(9) a non-public form to submit creditor questions, comments and requests for access to information;

(10) responses to creditor questions, comments and requests for access to information; provided, that the Committee may privately provide such responses in the exercise of its reasonable discretion, including in the light of the nature of the information request and the creditor's agreements to appropriate confidentiality and trading constraints;

(11) answers to frequently asked questions; and

(12) links to other relevant websites.

(b) Distribute case updates via electronic mail for creditors that have registered for this service on the Committee website.

(c) Establish and maintain a telephone number and electronic mail address for creditors to submit questions and comments.

4. Privileged and Confidential Information. The Committee shall not be required to disseminate to any entity (all references to "entity" herein shall be as defined in section 101(15) of the Bankruptcy Code, "Entity"): (i) without further order of the Court, confidential, proprietary, or other non-public information concerning the Debtors or the Committee, including (without limitation) with respect to the acts, conduct, assets, liabilities and financial condition of the Debtors, the operation of the Debtors' business and the desirability of the continuance of such business, or any other matter relevant to these cases or to the formulation of one or more chapter 11 plans (including any and all confidential, proprietary, or other nonpublic materials of the Committee)

whether provided (voluntarily or involuntarily) by or on behalf of the Debtors or by any third party or prepared **201 by or for the Committee (collectively, the "Confidential Information") or (ii) any other information if the effect of such disclosure would constitute a general waiver of the attorney-client, work-product, or other applicable privilege possessed by the Committee.

5. Any information received (formally or informally) by the Committee from any Entity in connection with an examination pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure or in connection with any formal or informal discovery in any contested matter, adversary proceeding or other litigation shall not be governed by the terms of this Order but, rather, by any order governing such discovery.

6. The Debtors shall assist the Committee in identifying any Confidential Information concerning the Debtors that is provided by the Debtors or their agents or professionals, or by any third party, to the Committee, its agents and professionals.

7. Creditor Information Requests. If a creditor (the "Requesting Creditor") submits a written request (including on the Committee Website or by electronic mail) (the "Information Request") for the Committee to disclose information, the Committee shall as soon as practicable, but no more than twenty (20) days[2] after receipt of the Information Request, provide a response to the Information Request (including on the Committee Website) (the "Response"), including providing access to the information requested or the reasons the Information Request cannot be complied with. If the Response is to deny the Request because the Committee believes the Information Request implicates Confidential Information that need not be disclosed pursuant to the terms of this Order or otherwise under 11 U.S.C. § 1102(b)(3)(A), or that the Information Request is unduly burdensome, the Requesting Creditor may, after a good faith effort to meet and confer with an authorized representative of the Committee regarding the Information Request and the Response, seek to compel such disclosure for cause pursuant to a motion. Such motion shall be served and the hearing on such motion shall be noticed and scheduled pursuant to the Case Management Order. The Committee shall not object to any Requesting Creditor's request to participate in any such hearing by telephone conference. Nothing herein shall be deemed to preclude the Requesting Creditor from requesting (or the Committee objecting to such request) that the Committee provide the Requesting Creditor a log or

other index of any information specifically responsive to the Requesting Creditor's request that the Committee deems to be Confidential Information or protected by the attorney/client, work product, or any other privilege. Furthermore, nothing herein shall be deemed to preclude the Requesting Creditor from requesting that the Court conduct an *in camera* review of any information specifically responsive to the Requesting Creditor's request that the Committee claims is Confidential Information or subject to the attorney/client, work product, or other privilege.

8. In its Response to an Information Request for access to Confidential Information, the Committee shall consider whether (a) the Requesting Creditor is willing to agree to reasonable confidentiality and trading restrictions with respect to such Confidential Information and represents that such trading restrictions and any information-screening process complies with applicable securities laws; and (b) under the particular facts, such agreement and any information-screening process **\*202** that it implements will reasonably protect the confidentiality of such information; provided, however, that if the Committee elects to provide access to Confidential Information on the basis of such confidentiality and trading restrictions, the Committee shall have no responsibility for the Requesting Creditor's compliance with, or liability for violation of, applicable securities or other laws. Any disputes with respect to this paragraph shall be resolved as provided in the preceding paragraph, and, to the extent applicable, the next paragraph.

9. Release of Confidential Information of Third Parties. In addition, if the Information Request implicates Confidential Information of the Debtors (or any other Entity) and the Committee agrees that such request should be satisfied, or if the Committee on its own wishes to disclose such Confidential Information to creditors, the Committee may demand (the "Demand") for the benefit of the Debtors' creditors: (a) if the Confidential Information is information of the Debtors, by submitting a written request, each captioned as a "Committee Information Demand," to Skadden, Arps, Slate, Meagher & Flom LLP, counsel for the Debtors, Four Times Square, New York, New York 10036 (Attention: J. Gregory Milmoe, Esq. (gmilmoe@skadden.com) and Sally McDonald Henry, Esq. (shenry@skadden.com)) ("Debtors' Counsel"), stating that such information will be disclosed in the manner described in the Demand unless the Debtors object to such Demand on or before fifteen (15) days after the service of such Demand; and, after the lodging of such an objection, the Committee, the Requesting Creditor and the

Debtors may schedule a hearing with the Court pursuant to the Case Management Order seeking a ruling with respect to the Demand under 11 U.S.C. § 704(a)(7); and (b) if the Confidential Information is information of another Entity, by submitting a written request to such Entity and its counsel of record, with a copy to Debtors' Counsel, stating that such information will be disclosed in the manner described in the Demand unless such Entity objects to such Demand on or before fifteen (15) days after the service of such Demand; and, after the lodging of such an objection, the Committee, the Requesting Creditor, such Entity and the Debtors may schedule a hearing with the Court pursuant to the Case Management Order seeking a ruling with respect to the Demand.

10. Nothing in this Order requires the Committee to provide access to information or solicit comments from any Entity that has not demonstrated to the satisfaction of the Committee, in its sole discretion, or to the Court, that it holds claims of the kind described in section 1102(b)(3) of the Bankruptcy Code.

11. Exculpation. None of the Debtors, the Committee and any of their respective directors, officers, employees, members, attorneys, consultants, advisors and agents (acting in such capacity) (collectively, the "Exculpated Parties"), shall have or incur any liability to any Entity (including the Debtors and their affiliates) for any act taken or omitted to be taken in connection with the preparation, dissemination, or implementation of the Creditor Information Protocol, the Committee Website and other information to be provided pursuant to section 1102(b)(3) of the Bankruptcy Code; provided, however, that the foregoing shall not affect the liability of any Exculpated Party protected pursuant to this paragraph 11 that otherwise would result from any such act or omission to the extent that such act or omission is determined in a final non-appealable order to have constituted a breach of fiduciary duty, gross negligence, or willful misconduct, including, without limitation, fraud and criminal **\*203** misconduct, or the breach of any confidentiality agreement or Order. Without limiting the foregoing, the exculpation provided in this paragraph shall be coextensive with any Exculpated Party's qualified immunity under applicable law.

12. This Order shall be effective as of January 3, 2006, however, the terms of this Order shall apply to all information governed by this Order, including information in the Committee's possession prior to January 3, 2006.

13. This Order shall be binding in all respects upon the Debtors and any successors thereto.

**All Citations**

336 B.R. 187, 56 Collier Bankr.Cas.2d 100, 45 Bankr.Ct.Dec. 250

Footnotes

1    The legislative history of section 1102(b)(3) does not provide meaningful guidance regarding the type of information to which access must be given, the manner in which it should be communicated or whether an official creditors' committee faces any sanction, other than being subject to a court order compelling the provision of additional information, if the committee's view of the proper scope and means of delivering access to information is too narrow. The House Report states merely, "Section 405(b) requires the committee to give creditors having claims of the kind represented by the committee access to information. In addition, the committee must solicit and receive comments from these creditors and, pursuant to court order, make additional reports or disclosures available to them." H.R.Rep. No. 109–31, 109th Cong., 1st Sess. 87 (2005), U.S.Code Cong. & Admin.News 2005, pp. 88, 153.

2    *See In re PWS Holding Corp.,* 228 F.3d 224, 246 (3d Cir.2000); *Pan Am Corp. v. Delta Air Lines, Inc.,* 175 B.R. 438, 514 (S.D.N.Y.1994).

3    In addition to Refco's publicly held stock, Refco and several of its subsidiaries have issued or guarantied a large amount of public debt.

4    *See* 11 U.S.C. § 541(a).

5    *But see In re Walters,* 136 B.R. 256, 258 (Bankr.C.D.Cal.1992), in which the court found that information pertaining to the trustee's investigation of claims against the debtor's wife was not covered by the plain meaning of section 704(7), because, after the estate's claims against the wife were settled, such information did not relate to the status of the trustee's pursuit or administration of estate property.

6    Bankruptcy Code section 107(a) provides for public access to all papers filed in a bankruptcy case, but subjects such access to the right to obtain an order preventing the disclosure of trade secrets, confidential research, development, or commercial information; protecting a person with respect to disclosure of scandalous or defamatory matter; and protecting individuals from disclosure of means of identification that would create undue risk of identity theft or other unlawful injury. 11 U.S.C. § 107(b), (c).

7    Because any transaction not in the ordinary course of the debtor's business requires notice and the opportunity for a hearing, 11 U.S.C. § 363(b), an official committee may consider and challenge everything important that a debtor undertakes. Under section 1109(b), official committees also have the right to intervene in adversary proceedings. *Term Loan Holder Comm. v. Ozer Group, L.L.C.* (*In re Caldor Corp.*), 303 F.3d 161, 175 (2d Cir.2002); *Adelphia Communications Corp. v. Rigas* (*In re Adelphia Communications Corp.*), 285 B.R. 848, 850–51 (Bankr.S.D.N.Y.2002)

8    *See* Drain and Schwartz, *Are Bankruptcy Claims Subject to the Federal Securities Laws?,* 10 Am. Bankr. Inst. L. Rev. 569, 569 n. 1 (2002) (noting reasonableness of multi-billion dollar estimates of distressed debt market).

9    Even *In re Christian Life Center, First Assembly of God,* 16 B.R. 35, 37 (Bankr.N.D.Cal.1981), which the Ninth Circuit in *In re Subpoenas Duces Tecum,* 978 F.2d at 1161, found to have unduly limited a committee's attorney-client privilege, suggested that a committee has an attorney-client privilege when the committee has the power to act, or is acting in the guise of a trustee.

10    The schedule specified in the order for the resolution of such disputes was driven by the large size of these cases, the large number of unsecured creditors and, particularly in the early days of these cases, the intense demands on the time and resources of the Committee and its professionals.

11    Obviously, this may not be justified in a smaller case.

In re Refco Inc., 336 B.R. 187 (2006)

56 Collier Bankr.Cas.2d 100, 45 Bankr.Ct.Dec. 250

12    *Supra,* note 2.

13    In an analogous context, courts have declined to apply the attorney-client privilege against a committee's own constituents' assertion that committee members or professionals have breached their fiduciary duties to them. *See, e.g., In re Fibermark, Inc.,* 330 B.R. 480, 498 n. 6 (Bankr.D.Vt.2005) (noting that while "(a) attorney-client privilege is available to a creditors committee in a chapter 11 case, ... (b) that privilege may not be asserted as a shield to protect against disclosure of fraud or other misconduct on the part of the committee or its attorneys"); *In re Baldwin–United Corp.,* 38 B.R. 802, 805 (Bankr.Ohio 1984); *see also In re Christian Life Center, First Assembly of God,* 16 B.R. 35, 37–38 (Bankr.C.D.Cal.1981); 7 *Collier on Bankruptcy* ¶ 1103.03[8] ("Committee members have a fiduciary responsibility to their constituency and should not use the attorney-client privilege to shield themselves in litigation from the people they are supposed to be representing."). However, before opening wide the gates to such information, it should be kept in mind that (a) a committee member's fiduciary duties do not preclude it from representing its own interests, provided that in so doing it does not abuse its position on the committee at the expense of the creditor class, *In re Rickel & Associates, Inc.,* 272 B.R. 74, 100 (Bankr.S.D.N.Y.2002), and (b) resolving intercreditor disputes is one of an official committee's primary functions, which may require committee professionals and members to share the differing views of various unsecured creditor groups with a reasonable expectation of confidentiality.

1    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact, as appropriate.

2    This shall read ten (10) days on or after January 31, 2006.

---

**End of Document**                                      © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2011 WL 386827
United States Bankruptcy Court, D. Delaware.

In re TRIBUNE COMPANY, et. al [1], Debtors.

No. 08–13141 (KJC).
|
Feb. 3, 2011.

**Attorneys and Law Firms**

Bryan Krakauer, Sidley, Austin, Brown & Wood LLP, James F. Conlan, Sidley Austin LLP, Patrick Theodore Garvey, Johnson & Bell, Ltd, Stephen Novack, Novack and Macey LLP, Chicago, IL, Carl D. Neff, Ciardi Ciardi & Astin, J. Kate Stickles, Norman L. Pernick, Patrick J. Reilley, Cole, Schotz, Meisel, Forman & Leonard, John H. Strock, III, Fox Rothschild LLP, Robert S. Brady, Young, Conaway, Stargatt & Taylor, Wilmington, DE, Edward Cerasia, II, Seyfarth Shaw LLP, Jared D. Zajac, McDermott Will & Emery LLP, New York, NY, Michael A. Henry, Gross, McGinley, Labarre & Eaton, LLP, Allentown, PA, for Debtors.

*MEMORANDUM AND ORDER* [2]

KEVIN J. CAREY, United States Bankruptcy Judge.

**\*1** Currently before the Court is a discovery dispute among parties who are proponents of competing plans of reorganization. On January 14, 2011, the Noteholder Plan Proponents [3] filed a Motion to Compel Production of Documents and Information from the Debtor/Committee/Lender Plan Proponents and Other Parties, or, Alternatively For an Order of Preclusion Respecting Certain Issues (the "Motion to Compel")(D.I.7527). On January 19, 2011, the Debtor/Committee/Lender Plan Proponents [4] filed an objection to the Motion to Compel (D.I.7552). A hearing to consider the Motion to Compel was held on January 24, 2011.

*BACKGROUND* [5]

On December 8, 2008, Tribune Company and certain of its subsidiaries (the "Debtors") filed voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. § 101 *et seq.*). On April 12, 2010, the Debtors

filed a proposed plan (the "April 2010 Plan") that sought to implement the terms of a settlement agreement regarding certain LBO–Related Causes of Action. [6] A confirmation hearing for the April 2010 Plan was scheduled for August 16, 2010.

By order dated April 20, 2010, the Bankruptcy Court entered an Agreed Order Directing the Appointment of an Examiner (the "Examiner Order"). On May 10, 2010, the Bankruptcy Court approved the U.S. Trustee's application appointing Kenneth N. Klee as examiner (the "Examiner"). On May 11, 2010, the Bankruptcy Court entered an order approving the Examiner's proposed work and expense plan and modifying the Examiner Order. The Examiner's principal duties were to:

(1) Evaluate the potential claims and causes of action held by the Debtors' estates that are asserted by the Parties (as defined in the Examiner Order) in connection with the leveraged buy-out of Tribune that occurred in 2007 [defined as the LBO–Related Causes of Action] which may be asserted against any entity which may bear liability, including without limitation, the Debtors, the Debtors' former and/or present management, former and/or present members of Tribune's board of directors, the Debtors' lenders and the Debtors' advisors, said potential claims and causes of action including, but not being limited to, claims for fraudulent conveyance, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and equitable subordination, and to evaluate the potential defenses asserted by the Parties to such potential claims and causes of action;

(2) evaluate whether Wilmington Trust Company violated the automatic stay under 11 U.S.C. § 362 by its filing, on March 3, 2010, of its Complaint for Equitable Subordination and Disallowance of Claims, Damages, and Constructive Trust; and

(3) evaluate the assertions and defenses made by certain of the Parties in connection with the Motion of JP Morgan Chase Bank, N.A. for Sanctions Against Wilmington Trust Company for Improper Disclosure of Confidential Information in Violation of Court Order.

The Examiner conducted in-person meetings with the parties and invited the parties to share their views in writing on the issues to be considered by him. The Examiner was assisted, in addition to counsel, by a financial advisor who developed a financial analysis of issues presented, including issues

WESTLAW © 2023 Thomson Reuters. No claim to original U.S. Government Works. 1

concerning solvency, unreasonably small capital, the flow of funds, and matters pertaining to intercompany claims.

**\*2** On July 26, 2010, the Examiner filed a report containing the results of his investigation. By Order dated August 3, 2010, the Court ordered the unsealing of the Examiner's Report, with exhibits and transcripts.[7] The Examiner did not reach definitive conclusions regarding the issues considered in the Report, but suggested a range of potential outcomes.[8] After the Examiner's Report was filed, the April 2010 Plan and the settlement it embodied were abandoned.

The Debtors' exclusive period within which to file a chapter 11 plan and solicit acceptances, as extended by court order, expired on August 8, 2010. After the Examiner's Report was filed and the settlement in the April 2010 Plan was abandoned, interested parties continued to negotiate, but failed to reach any consensus. Thereafter, the Debtors asked the Bankruptcy Court to appoint a mediator.

On September 1, 2010, I appointed my colleague, the Honorable Kevin Gross, as a mediator (the "Mediator") to conduct non-binding mediation concerning the terms of a plan of reorganization, including appropriate resolution of the LBO–Related Causes of Action (the "Mediation"). The parties to the Mediation included (i) the Debtors, (ii) the Creditors' Committee, (iii) Angelo Gordon, (iv) the Credit Agreement Lenders, (v) the Step One Credit Agreement Lenders, (vi) Wells Fargo Bank, N.A. (vii) Law Debenture Trust Company of New York ("Law Debenture"), (viii) Deutsche Bank Trust Company Americas, (ix) Centerbridge Credit Advisors, LLC, (x) Aurelius, (xi) EGI–TRB LLC, and (xii) Wilmington Trust Company (collectively, the "Mediation Parties"). On September 20, 2010, each of the Mediation Parties submitted to the Mediator a statement setting forth such Mediation Party's position respecting the structure and economic substance of an acceptable plan of reorganization.

The Mediation began on September 26, 2010, and the Mediation Parties continued settlement discussions on September 27, 2010. On September 28, 2010, the Mediator filed a report which, among other things, reported a settlement agreement between the Debtors, on the one hand, and Angelo Gordon and Oaktree, on the other. The Mediator continued settlement discussions with certain parties. On October 12, 2010, the Mediator filed the Mediator's Second Report which included the terms of an expanded settlement among the

Debtors, the Committee, Oaktree, Angelo Gordon, and JP Morgan (the "October Term Sheet").

Pursuant to the deadlines set forth in the Bankruptcy Court's Order dated October 18, 2010 (D.I.6022), four competing plans of reorganization were filed: (i) the Debtor/Committee/Lender Plan, (ii) the Noteholder Plan, (iii) the Bridge Lender Plan,[9] and (iv) the Step One Credit Lender Plan.[10] The Step One Credit Lender Plan was withdrawn on December 14, 2010 (D.I.7190). Pursuant to the procedures set forth in the Order dated December 9, 2010 (D.I .7126), as amended by Order dated December 16, 2010 (D.I.7215), the three competing plans were distributed for solicitation and voting.

**\*3** On December 20, 2010, the Bankruptcy Court entered the Discovery and Scheduling Order for Confirmation (the "Case Management Order" or "CMO"). The parties commenced discovery, which was quickly followed by a number of discovery disputes. Through various "meet and confer" conferences, the parties resolved many of these disputes. However, when they reached an impasse on certain discovery matters, the parties sent letters to the Court, as called for in the CMO. After a teleconference held on January 10, 2011, the Court directed the parties to file discovery motions on or before January 14, 2011, with replies due by January 19, 2011. Seven discovery motions were filed, and a hearing to consider them was held on January 24, 2011. The parties are continuing efforts to resolve some of the discovery issues, and some motions have been continued to February 8, 2011. Even so, new disputes continue to arise.

At the January 24, 2011 hearing, the Court heard argument regarding the Motion to Compel, and took the matter under advisement.

## DISCUSSION

The Noteholder Plan Proponents (the "Noteholders") are seeking production of documents from the DCL Plan Proponents about the proposed settlement of the LBO–Related Causes of Action embodied in the DCL Plan. To test the arms-length nature and good faith of the settlement negotiations, the Noteholders are seeking documents and communications regarding the parties' discussions concerning the merits of the LBO–Related Causes of Action, specifically in connection with negotiations concerning the DCL Plan, the April 2010 Plan, and any other negotiations during the bankruptcy case.

The parties met and conferred in an attempt to limit the scope of the Noteholders' discovery requests and the objections thereto, but three main objections to discovery remain:

(1) objections to producing documents protected by a common interest privilege,

(2) objections to producing documents protected by the Mediation Order, Local Bankruptcy Rule 9019–5(d), and Fed.R.Evid. 408, and

(3) objections to producing documents for the period December 8, 2008 (the petition date) through December 15, 2009 (the date of the Document Depository Order).[11]

(1) *Community of Interest (or Common Interest) Privilege*[12] The Noteholders argue that the common interest privilege cannot apply in connection with the settlement and DCL Plan because the parties have no common legal interests. The Debtors' and Committee's interests are in maximizing the estate, and the Lenders' interest is in paying as little as possible to resolve the LBO-related claims.

The DCL Plan Proponents argue in response that "parties to a settlement or proponents of a plan of reorganization share a common legal interest in gaining court approval of the plan and settlement pursuant to section 1129 of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure."

In *Leslie Controls,* Judge Sontchi discussed the common interest privilege as follows:

**\*4** The common interest doctrine "allows attorneys representing different clients with similar legal interests to share information without having to disclose it to others." [*Teleglobe,* 493 F.3d at 364.] It expands the reach of the attorney-client privilege and the work product doctrine by providing that, under certain circumstances, the sharing of privileged communications with third parties does not constitute a waiver of the privilege. Thus, the doctrine is only applicable if an underlying privilege has been established. [*Louisiana Mun. Police Emp. Ret. Sys. v. Sealed Air Corp.,* 253 F.R.D. 300, 309 (D.N.J.2008).]

**The party invoking the protection of the common interest doctrine must establish: (1) the communication was made by separate parties in the course of a** matter of common interest, (2) the communication was designed to further that effort, and (3) the privilege was not otherwise waived. [*In re Mortg. & Realty Trust,* 212 B.R. 649, 653 (Bankr.C.D.Cal.1997).]

....

[T]he doctrine is not limited to communications among co-defendants to ongoing litigation. Indeed, "pending litigation is not necessary to invoke the common interest [doctrine] [*Id.*] ... Rather, the common interest doctrine "applies whenever the communication is made in order to facilitate the rendition of legal services to each of the clients involved in the conference." [*Id* .]

The common interest of the parties must be "at least a substantially similar legal interest." [*Teleglobe,* 493 F.3d at 365]. Nonetheless, the parties need not be in complete accord:

The common interest privilege does not require a complete unity of interests among the participants. The privilege applies where the interests of the parties are not identical, and it applies even where the parties' interests are adverse in substantial respects. The privilege applies even where a lawsuit is foreseeable in the future between co-defendants. [*Mortg. & Realty Trust,* 212 B.R. at 653.]

When the interests of the parties diverge to some extent the common interest doctrine applies "only insofar as their interests [are] in fact identical; communications relating to matters as to which they [hold] opposing interests ... lose any privilege." [*In re Rivastigmine Patent Litig.,* 2005 WL 2319005, \*4 (S.D.N.Y. Sept.22, 2005).]

*In re Leslie Controls, Inc.,* 437 B.R. 493, 496–98 (Bankr.D.Del.2010)(emphasis added).

Even though the DCL Plan Proponents' interests are not completely in accord, they share the common legal interest of obtaining approval of their settlement and confirmation of the DCL Plan, thereby resolving the legal disputes between and among them. *See also Teleglobe,* 493 F.3d at 365–66 ("[I]t is sufficient to recognize that members of the community of interest must share at least a substantially similar legal interest.... In the community of interest context, ... because the clients have separate attorneys, courts can afford to relax the degree to which clients' interests must converge without worrying that their attorneys' ability to represent them zealously and single-mindedly will suffer."). Accordingly, the community of interest privilege can apply to parties whose interests are not totally in accord.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    3

**\*5** The Third Circuit has held that parties engaged in a merger negotiation may share a common interest. *Teleglobe,* 493 F.3d at 364 (noting that the common interest doctrine applies in civil and criminal litigation, and even in purely transactional contexts)). *See also Sealed Air,* 253 F.R.D. at 310 (parties engaged in a transaction may anticipate future claims that they share an interest in defending against, which can form the basis of a common interest privilege). Common interests must be determined on a case by case basis. In *Leslie Controls,* Judge Sontchi held that parties who shared information regarding "preserving and maximizing insurance available to pay asbestos claims" during the plan negotiation process shared the common interest of maximizing the asset pool. *Leslie Controls,* 437 B.R. at 502. I am satisfied that, based upon the chronology of events which took place in connection with the mediation, a community of interests was established.

(A) *Date the community of interest privilege began*
The question of **when** a community of interest privilege arose remains. The DCL Plan Proponents argue that a common interest among the Debtors, Committee, and lenders arose on October 12, 2010, when the mediator filed the October Term Sheet. The Debtors, Oaktree and Angelo Gordon also assert that their common interest began as early as September 27, 2010, when they agreed to resolve the LBO–Related Causes of Action and became proponents of a joint plan, pursuant to the Mediator's filing of the first Term Sheet on that date.

The Noteholders argue that no common interest privilege could arise until November 23, 2010, when the DCL Plan was actually filed with the Court. The Noteholders argue that the Term Sheet filings do not establish the emergence of a common interest because the parties continued to negotiate and certain terms changed. For example, they argue that the October Term Sheet relied on a Distributable Enterprise Value ("DEV") of $6.1 billion, while the final DCL Plan refers to a DEV of $6.75 billion. The DCL Plan Proponents respond by stating that DEV was not a material negotiated term, and was changed (ironically, they say) to address objections of the Noteholders.

Once the DCL Plan Proponents agreed upon material terms of a settlement, it is reasonable to conclude that the parties might share privileged information in furtherance of their common interest of obtaining approval of the settlement through confirmation of the plan. I conclude that the date the Mediator's Term Sheets were filed—October 12, 2010

for all DCL Plan Proponents, and September 27, 2010 for the Debtor/Oaktree/Angelo Gordon group—constitute dates upon which the respective parties' community of interest privilege arose.[13]

(B) *Dispute concerning specific documents covered by the community of interest privilege*
The Noteholders and the DCL Plan Proponents also disagree about the scope of communications that are covered by the community of interest privilege. In particular, the Noteholders argue that "common interest communications" should include only communications that were written or made by lawyers,[14] citing *Teleglobe* in support of this view:

**\*6** First, to be eligible for continued protection, the communication must be shared with the *attorney* of the member of the community of interest. *Cf. Ramada Inns, Inc. v. Dow Jones & Co. .,* 523 A.2d 968, 972 (Del.Super.Ct.1986)(emphasizing that the relevant Delaware evidentiary rule protects communications disclosed to an attorney. Sharing the communication directly with a member may destroy the privilege.

*Teleglobe,* 493 F.3d at 364 (emphasis in original). The DCL Plan Proponents point out that the *Teleglobe* Court itself notes that this language is dicta.[15]
The community of interest doctrine applies only if the underlying communication was subject to the attorney-client privilege or the work product doctrine. The attorney-client privilege "protects communications between attorneys and clients from compelled disclosure" and applies to a communication that satisfies the following elements: (1) a communication (2) made between privileged persons (3) in confidence (4) for the purpose of obtaining or providing legal assistance for the client. *Teleglobe,* 493 F.3d at 359 *citing* Restatement (Third) of the Law Governing Lawyers § 68 (2000). "Privileged persons" include the client, the attorney(s), and any of their agents that help facilitate attorney-client communications or the legal representation." *Id.* "When disclosure to a third party is necessary for the client to obtain informed legal advice, courts have recognized exceptions to the rule that disclosure waives the attorney-client privilege." *WebXchange, Inc. v. Dell Inc.,* 264 F.R.D. 123, 126 (D.Del.2010) *quoting Westinghouse Elec. Corp. v. Republic of the Philippines,* 951 F.2d 1414, 1424 (3d Cir.1991).

2011 WL 386827, 54 Bankr.Ct.Dec. 84

The Third Circuit has adopted a two-part test for ascertaining whether a document is protected by the work product doctrine: (1) the first inquiry is the "reasonable anticipation test," which requires that the court determine whether "litigation could reasonably have been anticipated" (2) the second inquiry is whether the document were prepared "primarily for the purpose of litigation (i.e., documents created in the ordinary course of business, even if useful in subsequent litigation, are not protected by the work product doctrine. *Sealed Air,* 253 F.R.D. at 306–07.

The DCL Plan Proponents argue that the Noteholders' proposal to limit "common interest communications" to those prepared by lawyers limits artificially the community of interest privilege and would needlessly increase legal costs by requiring parties to funnel all communications through their attorneys. They contend that the appropriate inquiry is whether the subject matter of the communication at issue would be protected by the attorney-client or work product privilege but for its disclosure to a party with the common interest.[16] I agree. The Noteholders' proposal to limit common interest communications to attorney-prepared communications is too restrictive. The DCL Plan Proponents will have the opportunity to assert (and, ultimately demonstrate, if challenged) that requested communications fall within the community of interest privilege.

2. *Whether the DCL Plan Proponents must either (i) waive protections of the Mediation Order and Local Rule 9019–5(d), or (ii) be precluded from introducing any evidence regarding the mediation, including the Mediator's endorsement of the settlement or arguing that the DCL Plan was the result of arm's length bargaining*

**\*7** The Noteholders assert that they are seeking documents and communications related to the Mediation to assess (and challenge) the alleged arms-length nature of the settlement negotiations for the LBO–Related Causes of Action, and the degree to which the Debtors and Committee acted in good faith as estate fiduciaries to maximize recoveries for non-LBO lenders. The Noteholders argue that the DCL Plan Proponents put such discovery "in issue" by arguing that the proposed settlement is fair because it is the product of a mediation conducted by a judge.[17] In other words, the Noteholders argue, it is not fair to allow the DCL Plan Proponents to use the Mediation Order as a sword and a shield. *See Westinghouse,* 951 F.2d at 1426 n. 12 ("If a partial waiver does disadvantage the disclosing party's adversary by, for example, allowing the disclosing party to present a one-

sided story to the court, the privilege will be waived as to all communications on the same subject.").

The DCL Plan Proponents respond that they have offered to waive part of the protections of the Mediation Order[18] by proposing that only the following documents or communications be protected from discovery:

1. written or oral communications between a "Mediation Party" and Judge Gross;

2. written or oral communications between or among Mediation Parties concerning the Mediation to the extent such communications were exchanged on any Mediation Day (i.e., a day when Judge Gross convened a Mediation Session between two or more Mediation Parties)

3. written or oral communications reflecting the substance of any discussion between or among Mediation Parties on a Mediation Day or documenting any offers or counter-offers exchanged or agreements reached on a Mediation Day; and

4. written or oral communications between Judge Gross and the Examiner or the Examiner's professionals concerning the Mediation

The DCL Plan Proponents argue that this proposal provides adequate discovery to the Noteholders to assess whether the settlement was at arms-length, while preserving the confidentiality of the Mediation because it permits discovery of (i) communications relating to negotiation and abandonment of the April Plan, (ii) communications prior to the mediation, and (iii) most communications between the Mediation Parties that occurred outside the presence of the Mediator on a day that is not a Mediation Day. It also allows discovery into the Mediation *process,* but protects the *substance* of the Mediation discussions.

In *Dent v. Westinghouse,* 2010 WL 56054 (E.D.Pa. Jan.4, 2010), Magistrate Judge Hey discussed the "crossroads" of Fed.R.Civ.P. 26 (which allows discovery of relevant information, even if that information is not admissible at trial, as long as it appears reasonably calculated to lead to admissible evidence) and Fed.R.Evid. 408 (providing that information regarding settlements and negotiations is inadmissible if offered to prove liability for, or invalidity of, the amount of a claim). The *Dent* Court joined judges in

this circuit who require a party requesting discovery about a settlement to make a particularized showing that the evidence related to settlement is relevant and calculated to lead to the discovery of admissible evidence. *Id.* at * 1.

**\*8** There is a strong policy in promoting full and frank discussions during a mediation. Courts have recognized that confidentiality is essential to the mediation process:

> Absent the mediation privilege, parties and their counsel would be reluctant to lay their cards on the table so that a neutral assessment of the relative strengths and weaknesses of their opposing positions could be made. Assuming they would even agree to participate in the mediation process absent confidentiality, participants would necessarily "feel constrained to conduct themselves in a cautious, tight-lipped, non-committal manner more suitable to poker players in a high-stakes game than to adversaries attempting to arrive at a just resolution of a civil dispute." The effectiveness of mediation would be destroyed, thereby threatening the well established public needs of encouraging settlement and reducing court dockets.

*Sheldone v. Pennsylvania Turnpike Comm'n,* 104 F.Supp.2d 511, 514 (W.D.Pa.2000) (citations omitted) *quoting Lake Utopia Paper Ltd. v. Connelly Containers, Inc.,* 608, 928, 930 (2d Cir.1979). This policy is also reflected in Local Delaware Bankruptcy Rule 9019–5(d).[19]

The Noteholders agree, as they must, that discussions with the Mediator are confidential, but complain that barring discovery of communications between Mediation Parties on a Mediation Day might protect discussions by Mediation Parties who are not actively participating in the Mediation that day, which would be discoverable if held on a non-Mediation Day. The DCL Plan Proponents' proposal to limit the protected Mediation communications generally strikes an appropriate balance between allowing discovery of potentially relevant information and protecting the confidentiality of the mediation.

This chapter 11 case is complex, involving a large, national media company, administration of which has been full of acrimony among the various constituents. The central disputes surround challenges to an $8 billion prepetition leveraged buyout. This particular mediation involved twelve parties consisting of multiple interests owed collectively billions of dollars of debt, falling into different tranches among the various Debtors. In balancing these vastly competing interests, I conclude that the DCL Plan Proponents' proposal is reasonable, but further conclude that it is appropriate to adjust it slightly and protect those "written or oral communication between or among Mediation Parties concerning the Mediation to the extent such communications were exchanged on any Mediation Day" (*see* # 2 of the DCL Plan Proponents proposal, *supra),* but only if the communications are between Mediation Parties who were present at the Mediation or were participating in the Mediation off-site. The protections afforded by the Mediation Order, Fed.R.Evid. 408, and Local Rule 9019–5 will otherwise remain.

3. *Whether the reasonable "start date" for discovery requests is the Petition Date (December 8, 2008) or the date of the Document Depository Order (December 15, 2009)?*

**\*9** The Noteholders believe that they should be able to reach back to the petition date to discover information relevant to their opposition to confirmation of the DCL Plan. The Noteholders offer examples of hypothetical emails that may have occurred between parties prior to December 15, 2009, but would not be produced just because of the proposed "random" start date.[20] The Noteholders argue that it is possible that in the immediate wake of Tribune's business failure, key persons involved in the transactions might have assessed what went wrong or engaged in some degree of finger-pointing. Further, the Committee's investigation began in Spring 2009, months before the proposed December 15, 2009 start date. Because approval of the LBO settlement is part of plan confirmation, the Noteholders claim they are entitled to discovery of all potential settlement discussions during the chapter 11 case.

The DCL Plan Proponents argue that December 15, 2009 is a reasonable and logical discovery start date because most of the events relevant to the negotiation and settlement of the LBO–Related Causes of Action occurred *after* the Court entered the Document Depository Order. The DCL Plan Proponents argue that this date is even earlier than what might also be considered a reasonable discovery start date of September 2010—which is when negotiations for the current DCL Plan began after the Examiner's Report and the Mediation. They also argue that using December 15, 2009 will help to limit the costs of an already massive document production. Finally, the DCL parties argue, persuasively, that discovery regarding the merits of the LBO–Related Claims is "well trodden ground" that has been investigated by and comprehensively addressed by the Examiner.

"Discovery of relevant, nonprivileged ... [information] is limited if the party from whom discovery is sought establishes that it is unreasonably cumulative or duplicative or that the burden or expense of the proposed discovery outweighs its likely benefit. *See* Fed.R.Civ.P. 26(b)(2)(B)." *Helmert v. Butterball, LLC,* 2010 WL 2179180, *3 (E.D.Ark.2010).

On balance, the proposed discovery start date of December 15, 2009 will allow discovery regarding LBO settlements, while limiting the burden and expense of completing discovery within the time frame provided by the CMO. The Noteholders have not demonstrated that an earlier discovery start date is likely to yield admissible, relevant information needed to litigate approval of the proposed settlement and plan confirmation.

### *EPILOGUE*

Lest this decision be read too broadly, I add a cautionary note: A determination involving whether a community of interest privilege applies is an intensely fact-and-circumstance-driven exercise. The balancing of tensions which arise during the search for truth may, depending upon the particular circumstances involved, fall either way. Guided by Circuit precedent, other persuasive decisional law, applicable local rule, and orders governing mediation, I have decided that the matter before me involves circumstances warranting a determination that a community of interest privilege may be invoked by co-proponents of a plan. This is not to say that parties who are co-proponents of a plan or parties who reach settlements arising from mediation are always entitled to assert this privilege. Neither should it be said that the privilege can never be invoked unless the circumstances involve the proposal of a joint plan or a settlement resulting from mediation.

### *ORDER*

 **\*10**  Upon consideration of the Motion to Compel and the objection thereto, and for the reasons set forth above, it is

hereby ORDERED that the Motion to Compel is GRANTED, in part, and DENIED, in part, as follows:

(A) The DCL Plan Proponents may assert a community of interest privilege for privileged communications that were shared among the community of interest parties in furtherance of their common interest beginning on October 12, 2010 for all DCL Plan Proponents, and September 27, 2010 for the Debtor/Oaktree/Angelo Gordon group;

(B) The following are protected from discovery:

(i) written or oral communications between a "Mediation Party" and Judge Gross;

(ii) written or oral communications between or among Mediation Parties concerning the Mediation to the extent such communications were exchanged by Mediation Parties who were present at the Mediation or were participating in the Mediation off-site on any Mediation Day (i.e., a day when Judge Gross convened a Mediation Session between two or more Mediation Parties);

(iii) written or oral communications reflecting the substance of any discussion between or among Mediation Parties who were present at the Mediation or participating in the Mediation off-site on a Mediation Day, or documenting any offers or counter-offers exchanged or agreements reached on a Mediation Day; and

(iv) written or oral communications between Judge Gross and the Examiner or the Examiner's professionals concerning the Mediation;

(C) The Noteholder Plan Proponents may seek discovery of information for the period of time beginning December 15, 2009; and

(D) All other relief requested in the Motion to Compel is **DENIED.**DP: Norman L. Pernick, Esquire[21]

### All Citations

Not Reported in B.R., 2011 WL 386827, 54 Bankr.Ct.Dec. 84

---

Footnotes

1    The chapter 11 case filed by Tribune Media Services, Inc. (Bky. Case No. 08–13236) is being jointly administered with the Tribune Company bankruptcy case and 109 additional affiliated debtors pursuant to the Order dated December 10,

2008 (main case docket no. 43) (collectively, the "Debtors" or "Tribune"). An additional Debtor, Tribune CNLBC, LLC (f/k/a Chicago National League Ball Club, LLC) commenced a chapter 11 case on October 12, 2009 as one of the steps necessary to complete a transaction involving the Chicago Cubs and certain related assets. In all, the Debtors now comprise 111 entities.

2    This Memorandum constitutes the findings of fact and conclusions of law as required by Fed.R.Bankr.P. 7052. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b) and § 157(a). This is a core proceeding pursuant to 28 U.S.C. 157(b)(1) and (b)(2)(A) and (L).

3    The Noteholder Plan Proponents are those parties who are proponents of the Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Aurelius Capital Management, LP, on Behalf of Its Managed Entities ("Aurelius"), Deutsche Bank Trust Company Americas, in Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes ("Deutsche Bank"), Law Debenture Trust Company of New York, in Its Capacity as Successor Indenture Trustee for Certain Series of Senior Notes ("Law Debenture"), and Wilmington Trust Company, in Its Capacity as Successor Indenture Trustee for the PHONES Notes ("Wilmington Trust")(D.I.7073)(the "Noteholder Plan").

4    The Debtor/Committee/Lender Plan Proponents are those parties who are proponents of the First Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by the Debtors, the Official Committee of Unsecured Creditors (the "Committee"), Oaktree Capital Management, L.P. ("Oaktree"), Angelo, Gordon & Co., L.P. ("Angelo Gordon"), and JPMorgan Chase Bank, N.A. ("JPMorgan") (D.I.7136)(the "DCL Plan").

5    Most of the Background is taken from the Joint Disclosure Statement (D.I.7134), approved by order dated December 9, 2010 (D.I.7126), as amended by order dated December 16, 2010 (D.I.7215).

6    The "LBO–Related Causes of Action" is defined in the DCL Plan as meaning "any and all claims, obligations, suits, judgments, damages, debts, rights, remedies, causes of action, avoidance powers or rights, liabilities of any nature whatsoever, and legal or equitable remedies against any Person arising from the leveraged buy-out of Tribune that occurred in 2007, including, without limitation, the purchase by Tribune of its common stock on or about June 4, 2007, the merger and related transactions involving Tribune on or about December 20, 2007, and any financing committed to, incurred or repaid in connection with any such transaction, regardless of whether such claims, causes of action, avoidance powers or rights, or legal or equitable remedies may be asserted pursuant to the Bankruptcy Code or any other applicable law.

7    The Examiner's Report (volumes 1 through 4) were docketed as D.I.s 5247, 5248, 5249, and 5250. The exhibits were docketed as D.I .s 5437, 5438, 5439, 5441, 5442, 5444, 5445, 5447, 5449, 5451, 5453, 5454, 5455, 5456, 5458, 5461, 5462, 5464, 5466, 5467, 5468, 5469, and 5480.

8    Specifically, the Examiner framed his conclusions about the merits of various claims using the following continuum: (1) highly likely, (2) reasonably likely, (3) somewhat likely, (4) equipoise, (5) somewhat unlikely, (6) reasonably unlikely, and (7) highly unlikely.

9    The Bridge Lender Plan is the Amended Joint Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by King Street Acquisition Company, L.L.C., King Street Capital, L.P., and Marathon Asset Management, L.P. (D.I.7089) (as the same may be amended from time to time, the "Bridge Lender Plan").

10    The Step One Lender Plan is the First Amended Plan of Reorganization for Tribune Company and Its Subsidiaries Proposed by Certain Holders of Step One Senior Loan Claims (D.I.6683).

11    The Document Depository Order (D.I.2858) authorized the Debtors to establish and maintain a centralized document depository program to store certain documents produced to the Committee in connection with the Committee's investigation and analysis of the LBO–Related Causes of Action.

12    In *Teleglobe,* the Court distinguished between "common interest" (i.e., when multiple clients hire the same counsel to represent them on a matter of common interest), and "community of interest" (i.e., when clients with separate attorneys share otherwise privileged information in order to coordinate their legal activities). *In re Teleglobe Commc'n Corp.,* 493

F.3d 345, 359 (3d Cir.2007). While the matter before me falls into the "community of interest" category, the parties, here, as well as many courts, refer to the multiple attorney situation as "common interest" privilege.

13    Of course, this does not mean that every communication between the DCL Plan Proponents occurring after those dates is privileged. Any party asserting privilege first must demonstrate that the communication at issue is subject to an underlying attorney-client or work product privilege, and that sharing the communication with the common interest parties meets the three-part test adopted by Judge Sontchi in *Leslie Controls* from the *Mortg. & Realty Trust* decision: (i) the communication was made by separate parties in the course of a matter of common interest, (ii) the communication was designed to further that effort, and (iii) the privilege was not otherwise waived.

14    The Noteholders' proposed definition of what might be protected "Common Interest Communications" is as follows:

"Common Interest Communications" means oral, written or electronic communications, draft pleadings, briefs, plans, disclosure statements or correspondence exchanged between counsel and/or non-testifying financial advisors to two or more different parties within a Common Interest Relationship and not disclosed or provided to any Person outside the Common Interest Relationship *provided, however,* that qualifying communications shall not lose their status as Common Interest Communications merely because clients of such outside counsel received any such written or electronic communications, or listened to or were told of any such oral communications. Common Interest Communications do not include written, electronic or oral communications by persons other than outside counsel or non-testifying financial advisors for different parties, or written, electronic or oral communications internal to any one party or any one financial advisor.

Revised Proposed Common Interest Stipulation and Order (D.I.7587).

15    *See Teleglobe,* 493 F.3d at 363 n. 18 stating that the issue before the court involved clients of the same attorneys, not clients with separate counsel, and therefore the community of interest analysis may seem "surplusage." However, because the lower court erroneously ruled that the parties before it were in a community of interest, the Third Circuit Court explained how the community of interest and co-client privilege differ. *Id.* This guidance is helpful.

The *Teleglobe* Court also considered the "plain text" of a Delaware rule of evidence in its community of interest analysis. Delaware Rule of Evidence 502(b)(3) recognizes that a client has a privilege to protect from disclosure confidential communications "made for the purpose of facilitating the rendition of professional legal services to the client by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest." *See Rembrandt Tech. LP v. Harris Corp.,* 2009 Del.Super. LEXIS 46, *25, 2009 WL 402332 (Feb. 12, 2009), in which the Delaware Superior Court determined that "separately represented clients sharing a common legal interest may, at least in certain situations and under the close supervision of counsel, communicate directly with one another regarding that shared interest ." *Id.* at *30. The *Rembrandt* Court further decided that "the privilege may be extended to communications among the community of interest if the communications relate to that common interest." *Id.* at *31.

16    The DCL Plan Proponents propose the following language for the definition of "Common Interest Communications" in the proposed Common Interest Stipulation:

"Common Interest Communications" means oral, written or electronic communications, draft pleadings, briefs, plans, disclosure statements or other correspondence exchanged solely between parties within a Common Interest Relationship that, if only exchanged between or among a single party, its counsel and/or advisors, would have been protected from discovery by any applicable attorney-client privileges or work product protections.

DCL Plan Proponents Objection, D.I. 7552, Ex.3.

17    I suppose it is conceivable that *who* conducted a mediation may, under some presently unknowable circumstances, be relevant to a determination of whether a settlement should be approved. I have the deepest respect for my colleague, who willingly undertook this challenging mediation, but I am aware of nothing in the record before me which informs me that this factor should be accorded any special weight. Whether a settlement should be approved or a plan confirmed must rest upon the application of standards articulated in the Bankruptcy Code and by controlling decisional law.

In re Tribune Co., Not Reported in B.R. (2011)
2011 WL 386827, 54 Bankr.Ct.Dec. 84

**18**     The Mediation Order provides that:

> 7. All: (a) discussions among the Mediation Parties relating to the Mediation, including discussions with or in the presence of the Mediator, (b) Mediation Statements, Ownership Statements and any other documents or information provided to the Mediator or the Mediation parties in the course of the Mediation, (c) correspondence, draft resolutions, offers, and counteroffers produced for or as a result of the Mediation, and (d) communications between the Mediator and the Examiner or the Examiner's Professionals are strictly confidential and shall not be admissible for any purpose in any judicial or administrative proceeding, and no person or party participating in the Mediation, including counsel for any Mediation Party or any other party, shall in any way disclose to any non-party or to any court, including without limitation in any pleading or other submission to any court, any such discussion, Mediation Statement, Ownership Statement, other document or information, correspondence, resolution, offer or counteroffer which may be made or provided in connection with the Mediation. Except with the express consent of the affected Mediation party, the Mediator shall not share with any Mediation Party any other Mediation Party's Mediation Statement or Ownership Statement.

> D.I. 5591, ¶ 7.

**19**     Local Bankruptcy Rule 9019–5(d) provides, in pertinent part:

> (d) *Confidentiality of Mediation Proceedings.*

> (i) *Protection of Information Disclosed at Mediation.* The mediator and the participants in mediation are prohibited from divulging, outside of the mediation, any oral or written information disclosed by the parties or by witnesses in the course of the mediation. No person may rely on or introduce as evidence in any arbitral, judicial or other proceeding, evidence pertaining to any aspect of the mediation effort, including but not limited to: (A) views expressed or suggestions made by a party with respect to a possible settlement of the dispute; (B) the fact that another party had or had not indicated willingness to accept a proposal for settlement made by the mediator; (C) proposals made or views expressed by the mediator; (D) statement or admissions made by a party in the course of the mediation; and (E) documents prepared for the purpose of, in the course of, or pursuant to the mediation. In addition, without limiting the foregoing, Rule 408 of the Federal Rules of Evidence, any applicable federal or state statute, rule, common law or judicial precedent relating to the privileged nature of settlement discussions, mediations or other alternative dispute resolution procedures shall apply. Information otherwise discoverable or admissible in evidence does not become exempt from discovery, or inadmissible in evidence merely by being used by a party in the mediation.

> ....

> (iv) *Preservation of Privileges.* The disclosure by a party of privileged information to the mediator does not waive or otherwise adversely affect the privileged nature of the information.

**20**     On December 15, 2009, the Court entered the Document Depository Order (D.I.2858) which authorized the Debtors to establish and maintain a centralized document depository related to the LBO–Related causes of action and provided that written and oral communications between "Negotiating Parties" regarding the leveraged ESOP Transactions "shall be deemed confidential" and may not be used or disclosed except in connection with settlement discussions and may not be introduced at any trial or hearing. Following entry of that order, the Debtors and a number of parties participated in negotiations which resulted in a proposed settlement embodied in the April 2010 Plan.

**21**     Counsel shall serve copies of this Memorandum and Order on all interested parties and file a Certificate of Service with the Court.

---

**End of Document**                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

473 B.R. 509
United States Bankruptcy Court, S.D. New York.

In re VELO HOLDINGS INC., et al., Debtors.

Velo Holdings Inc., et al., Plaintiffs,

v.

Paymentech, LLC, Defendant.

Bankruptcy No. 12–11384 (MG)

|

Adversary No. 12–1564 (MG)

|

June 12, 2012.

**Synopsis**

**Background:** Debtors brought adversary proceeding,
seeking to enjoin defendant's termination of its credit card
processing agreements with debtors. Debtors objected to
defendant's request for production of documents.

**Holdings:** The Bankruptcy Court, Martin Glenn, J., held that:

[1] debtors and administrative agent for debtors' first lien
lenders shared common legal interest required for application
of common interest doctrine;

[2] debtors and agent had expectation of confidentiality at
the time otherwise-privileged communications were shared,
as required for application of common interest doctrine;

[3] disputed communications were made in anticipation of
litigation, as required for communications to come within
protection of common interest doctrine under New York law;
and

[4] common interest doctrine applied to protect from
discovery shared documents and communications related
to debtors' financial results, liquidity issues, restructuring
proposals, pre-negotiated bankruptcy, and any threats to
terminate debtors' credit card processing agreements.

Objections sustained.

West Headnotes (17)

**[1]    Bankruptcy    🔑    Privilege**

"Common interest doctrine" is an exception to
the general rule that voluntary disclosure of
confidential, privileged material to a third party
waives any applicable privilege.

**[2]    Bankruptcy    🔑    Privilege**

Demonstrating the applicability of the common
interest doctrine, which operates as exception
to general rule that voluntary disclosure of
confidential, privileged material to third party
waives any applicable privilege, requires two-
part showing: (1) party who asserts doctrine must
share a common legal interest with party with
whom privileged information was shared, and (2)
statements for which protection is sought must
have been designed to further that interest.

**[3]    Bankruptcy    🔑    Privilege**

Applicability of common interest doctrine,
which is exception to general rule that voluntary
disclosure of confidential, privileged material to
third party waives any applicable privilege, is
limited to situations in which multiple parties
are represented by separate counsel that share a
common interest about a legal matter.

1 Case that cites this headnote

**[4]    Bankruptcy    🔑    Privilege**

As with all claims of privilege arising out of the
attorney-client relationship, proponent asserting
common interest doctrine to preclude waiver
of privilege based on voluntary disclosure of
confidential, privileged material to third party
must establish that communication was given in
confidence and under circumstances that made it
objectively reasonable for proponent to believe
that communication was confidential.

In re Velo Holdings Inc., 473 B.R. 509 (2012)

**[5]**   **Bankruptcy** 🗝 Privilege

Clients with common interests may also have conflicting interests without losing the benefit of the common interest doctrine providing exception to waiver of applicable privilege through voluntary disclosure of confidential, privileged material to third party where the communications that clients seek to protect relate to their common interests.

2 Cases that cite this headnote

**[6]**   **Bankruptcy** 🗝 Privilege

Common interest doctrine applies to both attorney-client communications and work product materials to preclude waiver of privilege based upon voluntary disclosure of confidential, privileged material to third party.

**[7]**   **Bankruptcy** 🗝 Privilege

To come within protection of common interest doctrine, which is exception to general rule that voluntary disclosure of confidential, privileged material to third party waives any applicable privilege, parties asserting a common interest need only share a common interest about a legal matter; interests of the parties asserting a common interest need not be universally congruent.

4 Cases that cite this headnote

**[8]**   **Bankruptcy** 🗝 Privilege

A key consideration respecting applicability of common interest doctrine, which provides exception to general rule that voluntary disclosure of confidential, privileged material to third party waives any applicable privilege, is that the nature of the common interest be legal, not solely commercial.

**[9]**   **Bankruptcy** 🗝 Privilege

Debtors and administrative agent for debtors' first lien lenders shared common interest in crafting legal strategy to prevent termination

of debtors' credit card processing agreements following receipt of letter in which other party to agreements informed debtors of its intent to terminate agreements, and thus had common interest about legal matter required to bring otherwise-privileged documents and communications shared between debtors, agent, and their respective counsel within protection from waiver of privilege under common interest doctrine, even though debtors and agent also had shared interest in implementing effective restructuring of debtors that was commercial in nature.

1 Case that cites this headnote

**[10]**   **Bankruptcy** 🗝 Privilege

Debtors and administrative agent for debtors' first lien lenders both had expectation of confidentiality at the time otherwise-privileged communications were shared between them and their respective counsel, as required for common interest doctrine to apply to preclude waiver of privilege with respect to shared communications related to developing legal strategy to prevent termination of debtors' credit card processing agreements, given that announcements were made at start of meetings between debtors and agent regarding their confidential nature.

1 Case that cites this headnote

**[11]**   **Bankruptcy** 🗝 Privilege

Written agreement is not necessary to establish a common legal interest, or to establish an expectation of confidentiality, under common interest doctrine, which operates as exception precluding waiver of privilege based upon voluntary disclosure of confidential, privileged material to third party.

**[12]**   **Bankruptcy** 🗝 Privilege

It is not necessary for litigation to be in progress for the common interest doctrine, which provides exception to waiver of privilege through voluntary disclosure of confidential, privileged material to third party, to apply.

**[13]**  **Bankruptcy** 🔑 **Privilege**

Under New York law, common interest doctrine providing exception to general rule that voluntary disclosure of confidential, privileged material to third party waives any applicable privilege applies only to communications with respect to legal advice in pending or reasonably anticipated litigation, but requirement that the legal advice must be with respect to pending or reasonably anticipated litigation is not present under federal common law.

**[14]**  **Bankruptcy** 🔑 **Privilege**

Communications between debtors and administrative agent for debtors' first lien lenders, and their respective counsel, respecting their legal strategy to prevent termination of debtors' credit card processing agreements were made in anticipation of litigation, as required for communications to come within protection from waiver of privilege under common interest doctrine under New York law.

**[15]**  **Bankruptcy** 🔑 **Privilege**

Under either New York or federal law, communications exchanged between debtors and administrative agent for debtors' first lien lenders could be protected from waiver of privilege under common interest doctrine despite agent's non-party status in proceeding in which debtors sought to protect communications from disclosure.

**[16]**  **Bankruptcy** 🔑 **Privilege**

Once debtors and administrative agent for debtors' first lien lenders entered into protocol outlining terms of proposed restructuring of debtors, pursuant to which lenders would credit bid for some of debtors' assets and court would oversee auction process for remainder of debtors' business in which lenders would serve as stalking-horse bidder, debtors and agent held common legal interest, and it was objectively

reasonable for both debtors and agent to believe that communications between them would be confidential, and therefore common interest doctrine applied to preclude waiver of applicable privileges, based on sharing of privileged information, for documents and communications related to debtors' financial results, liquidity issues, restructuring proposals, pre-negotiated bankruptcy, and any threats to terminate debtors' credit card processing agreements.

**[17]**  **Bankruptcy** 🔑 **Privilege**

Communications of information, even confidential information, exclusively for a business purpose are not protected by common interest doctrine providing exception to general rule that voluntary disclosure of confidential, privileged material to third party waives any applicable privilege.

**Attorneys and Law Firms**

**\*511**  Quinn Emanuel Urquhart & Sullivan, LLP, By: Susheel Kirpalani, Esq., James C. Tecce, Esq., Stephen Broome, Esq., New York, NY, Special Counsel for the Debtors.

Wilkie Farr & Gallagher LLP, By: Margot B. Schonholtz, Esq., Ana M. Alfonso, Esq., New York, NY, for Barclays Bank PLC, as First Lien Prepetition Agent and DIP Agent.

Lowenstein Sandler PC, By: Norman N. Kinel, Esq., Terence D. Watson, Esq., New York, NY, John K. Sherwood, Esq., Roseland, NJ, for Paymentech, LLC.

*MEMORANDUM OPINION AND ORDER SUSTAINING PLAINTIFFS' OBJECTION TO DEFENDANT'S REQUEST FOR PRODUCTION OF DOCUMENTS*

MARTIN GLENN, Bankruptcy Judge

Velo Holdings Inc. and its affiliated debtors ("Vertrue" or "Velo") and Paymentech, **\*512** LLC ("Paymentech") continue to dispute the application of common interest doctrine as applied to certain documents and communications

otherwise protected by attorney-client privilege and attorney work product. The documents and communications at issue were created or exchanged between Vertrue and Barclays Bank PLC, as administrative agent (the "Agent") for Vertrue's first lien lenders (the "First Lien Lenders"), and their respective counsel. Paymentech seeks production of documents and testimony about the communications, most of which relate to the development of legal strategy to prevent Paymentech's termination of credit card processing agreements. The Court previously addressed some of the issues in this discovery dispute in an Order entered on May 22, 2012, overruling Vertrue's objections in part, and ordering further proceedings before addressing the remaining objections. ("May 22 Order"; ECF Doc. # 28.) For the reasons explained below, the Court **SUSTAINS** Vertrue's remaining objections based on the common interest doctrine.

## BACKGROUND

Vertrue commenced this adversary proceeding against Paymentech seeking to enjoin termination of credit card processing agreements between Vertrue and Paymentech. On April 25, 2012, the Court granted Vertrue a temporary restraining order preventing Paymentech from terminating the processing agreements, and setting the matter down for a preliminary injunction hearing. (ECF Doc. # 12.) During discovery in advance of the preliminary injunction hearing, Vertrue and the Agent have raised issues relating to attorney-client privilege, work product protection, and a possible common legal interest between the Agent and Vertrue that would protect otherwise privileged documents from waiver because they were shared between Vertrue and the Agent. In response to a discovery request from Paymentech, Vertrue objected to certain discovery, asserting attorney-client privilege, work product protection, and the common interest doctrine.

In the May 22 Order, the Court overruled Vertrue's objections to Paymentech's discovery requests seeking discovery of all documents and communications between Vertrue and its attorneys, on the one hand, and the Agent and First Lien Lenders and their attorneys, on the other hand, that took place before April 2, 2012, relating to (i) financial results, liquidity issues, restructuring proposals, a pre-negotiated bankruptcy case, (ii) Vertrue's November 14, 2011 meeting with Paymentech and Visa and (iii) any threats to terminate the processing agreements.[1] The Court ordered **\*513** that

responsive documents relating to these subjects be produced on or before May 26, 2012 at 5:00 p.m.

According to the declaration of Lorraine DiSanto, dated May 17, 2012 (the "DiSanto Decl.," ECF Doc. # 24), "[a]fter Chase Paymentech's January 20, 2012 letter to Vertrue advising that Chase Paymentech planned to try to terminate the processing agreements on April 20, 2012, Vertrue and the Agent, with their respective attorneys and financial advisors, worked together to develop a litigation strategy to prevent Chase Paymentech from impermissibly terminating the processing agreements." DiSanto Decl. ¶ 7. With respect to documents or discussions between counsel for Vertrue and the Agent after January 20, 2012 about developing a legal strategy to prevent termination of the processing agreements, the May 22 Order concluded that such communications *may* be protected from discovery by attorney work product and common interest protection, but it was not possible for the Court to resolve the issues on the record before the Court. Therefore, the Court required Vertrue to provide a privilege log identifying each document Vertrue claims is privileged.[2] The Court also permitted the parties to take limited deposition discovery addressing any disputed factual issues concerning Vertrue's assertion of privilege, and to submit supplemental letter briefs and evidence addressing the privilege issues.

The parties submitted the additional letter briefs and evidence. While the May 22 Order provided that the parties could submit any disputed documents for *in camera* review, counsel advised the Court in a telephone hearing on June 5, 2012 that *in camera* review of documents is unnecessary.[3] Paymentech has agreed that prior to disclosure to the Agent, the documents were protected from disclosure by attorney-client privilege or attorney work product; Paymentech contends, however, that disclosure of these communications to the Agent had the effect of waiving the applicable privilege. Vertrue contends and Paymentech disputes that the so-called **\*514** common interest doctrine applies and continues to protect the documents (and any related communications) from discovery.

## DISCUSSION

Paymentech argues that the common interest doctrine does not apply for three reasons. First, Paymentech claims that the interest shared between Vertrue and the Agent was purely commercial and that such a shared interest cannot create a common legal interest. Second, Paymentech argues that neither Vertrue nor the Agent had an expectation

of confidentiality at the time of the communications at the center of this dispute. Third, Paymentech argues that the common interest doctrine is inapplicable because none of the communications were made in anticipation of litigation. Based on the facts established in the declarations and deposition excerpts submitted to the Court, each of Paymentech's arguments fails.

[1] [2] [3] [4]    The common interest doctrine is "an exception to the general rule that voluntary disclosure of confidential, privileged material to a third-party waives any applicable privilege." *HSH Nordbank AG N.Y. Branch v. Swerdlow,* 259 F.R.D. 64, 71 (S.D.N.Y.2009) (Lynch, J.) ("*Nordbank* "). As the court held in *Nordbank,* "[d]emonstrating the applicability of the common interest doctrine requires a two-part showing: (1) the party who asserts the rule must share a common legal interest with the party with whom the information was shared and (2) the statements for which protection is sought must have been designed to further that interest." *Id.* (internal quotation marks omitted). "The doctrine is limited to situations where multiple parties are represented by separate counsel that share a common interest about a legal matter." *In re Quigley Co., Inc.,* No. 04–15739(SMB), 2009 Bankr.LEXIS 1352, at *8 (Bankr.S.D.N.Y. April 24, 2009) ("*Quigley* "). "As in all claims of privilege arising out of the attorney-client relationship, the proponent must establish that the communication was given in confidence, and under circumstances that made it objectively reasonable for the client to believe that the communication was confidential." *Id.* at *9 (citing *United States v. Schwimmer,* 892 F.2d 237, 244 (2d Cir.1989)).

[5]    The rationale for the doctrine is that it "permits persons who have common interests to coordinate their positions without destroying the privileged status of their communications with their lawyers." *Restatement (Third) of the Law Governing LawyersS § 76* cmt. b. "The communication must relate to the common interest, which may be either legal, factual, or strategic in character. The interests of the separately represented clients need not be entirely congruent." *Id.* cmt. e. Clients with common interests may also have conflicting interests without losing the benefit of the common interest doctrine where the communications they seek to protect relate to their common interests. *See Eisenberg v. Gagnon,* 766 F.2d 770, 787–88 (3d Cir.1985).

[6]    The common interest doctrine applies to both attorney-client communications and work product materials. *Am.*

*Eagle Outfitters, Inc. v. Payless ShoeSource, Inc.,* No. CV 07–1675(ERK)(VVP), 2009 WL 3786210, at *3 (E.D.N.Y. Nov. 12, 2009). In this case, one or both of attorney-client privilege and work product protection may be involved at different points in time, but each document or communication must be separately evaluated to determine whether disclosure is shielded by attorney-client privilege or work product protection. *See Niagara Mohawk Power Corp. v. Megan–Racine Assocs., Inc. (In re Megan–Racine Assocs., Inc.),* 189 B.R. 562, 573 (Bankr.N.D.N.Y.1995) ("The parties **\*515** asserting the privilege must also demonstrate that each communication was made in the course of the joint-defense effort and was designed to further that effort.").

In this case Paymentech acknowledged in the June 5, 2012 telephone hearing that the documents at issue were, in the first instance, protected from discovery by attorney-client privilege or attorney work product. It is the subsequent sharing with the Agent of documents and communications of otherwise protected information that is the focus of the parties' dispute.

**A. The Common Interest Between Vertrue and the Agent is Not Purely Commercial**

[7]    Paymentech insists that Vertrue and the Agent must share identical legal interests, but that is not the case. Parties asserting a common interest need only share a common interest about a legal matter. *Schwimmer,* 892 F.2d at 243. *See also Nordbank,* 259 F.R.D. at 70–73. Indeed, the interests of the parties asserting a common interest need not be universally congruent. *See Grand Jury Subpoena Duces Tecum Dated Nov. 16, 1974,* 406 F.Supp. 381, 392 (S.D.N.Y.1975) ("a joint defense may be made by somewhat unsteady bedfellows"); *Megan–Racine,* 189 B.R. at 572 (concluding that doctrine can protect communications between two parties even where a lawsuit between the two parties is foreseeable).

[8]    A "key consideration" is that the nature of the interest "be legal, not *solely commercial,*" as Paymentech argues is the case here. *Nordbank,* 259 F.R.D. at 73 (citing *Strougo v. BEA Assocs.,* 199 F.R.D. 515, 520 (S.D.N.Y.2001) (emphasis added)). As to this point, Paymentech cites cases that are inapposite. In *Bank of America, N.A. v. Terra Nova Insurance Co. Ltd.,* 211 F.Supp.2d 493, 497 (S.D.N.Y.2002), Magistrate Judge Gorenstein rejected an argument that the common interest doctrine applied when the asserted common interest was "the structuring and effectuation of the letter of credit agreement and the supporting reinsurance policies." (internal

quotation marks omitted.) The court noted that despite the fact that the parties engaged in a "collaborative effort ... the mere fact that the parties were working together to achieve a commercial goal cannot by itself result in an identity of interest between the parties." *Id.* (internal quotation marks omitted).[4]

Similarly, in *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 447 (S.D.N.Y.1995), the court addressed the issue "whether the doctrine can be stretched to apply to communications between entities that have parallel interests but are not actively pursuing a common legal strategy." The court also wrote that the common interest doctrine does not "encompass a joint business strategy which happens to include as one of its elements a concern about litigation." *Id.*

 [9]    The facts presented by the relationship between Vertrue and the Agent are distinguishable from those of *Bank of America* and *Bank Brussels.* First, the interest claimed as common does not encompass the entire commercial relationship or "joint business strategy" between Vertrue and the Agent; rather, Vertrue, **\*516** the Agent, and their respective counsel, shared a common legal interest in "developing a strategy to prevent the termination of the company's ... merchant processing agreements with ... Paymentech." (ECF Doc. # 33 at 2.) In November of 2011, Vertrue and the Agent began discussions regarding how to implement an effective restructuring of Vertrue, a shared interest that was commercial in nature. The May 22 Order overruled Vertrue's assertion of common interest doctrine with respect to these commercial discussions. But the evidence clearly shows that after receipt of the January 20, 2012 letter, in which Paymentech informed Vertrue of its intent to terminate the processing agreements,[5] Vertrue and the Agent promptly began to formulate a legal strategy aimed at preserving these agreements. While grounded in the parties' commercial relationship, after January 20, 2012, Vertrue and the Agent shared a common legal interest in crafting a strategy to prevent the termination of the processing agreements.

## B. There Was an Expectation of Confidentiality Between Vertrue and the Agent

 [10]    Paymentech also argues that "[n]either Vertrue nor the Agent had an objectively reasonable expectation of confidentiality with respect to any exchange of information concerning any litigation strategy relating to Paymentech." (ECF Doc. # 34 at 2.) Paymentech insists that

the parties relied only upon the Restructuring Confidentiality Agreement, entered on November 28, 2011, which could not create a reasonable expectation of confidentiality because the Restructuring Confidentiality Agreement did not specifically provide for confidentiality of information shared relating to developing a legal strategy to prevent termination of the Processing Agreements.[6]

 [11]    Paymentech relies too heavily on the Restructuring Confidentiality Agreement as the only possible source of a common legal interest between the Agent and Vertrue. Courts in this circuit have routinely held that a writing is unnecessary to establish a common legal interest. *See, e.g. Nordbank,* 259 F.R.D. at 72 (citing *Denney v. Jenkens & Gilchrist,* 362 F.Supp.2d 407, 415 (S.D.N.Y.2004); *Lugosch v. Congel,* 219 F.R.D. 220, 237 (N.D.N.Y.2003); *Doctor's Assocs., Inc. v. QIP Holder LLC,* No. 3:06 Civ. 1710, 2009 WL 1683628, at *6 (D.Conn. Feb. 26, 2009)). Indeed, the evidence establishes that at the start of the meetings between **\*517** the Agent and Vertrue, announcements were made about the confidential nature of the meetings. (McLean Tr. 21:3–12, ECF Doc. # 34, Ex. A.) A written agreement is neither necessary to establish a common legal interest, nor to establish an expectation of confidentiality. The Court finds that the Agent and Vertrue both had an expectation of confidentiality at the time the disputed communications were made.

## C. The Communications Were Made in Anticipation of Litigation

 [12]    [13]    "[I]t is not necessary for litigation to be in progress for the common interest doctrine to apply." *Bank Brussels,* 160 F.R.D. at 447 (citing *Schwimmer,* 892 F.2d at 244). However, "New York law appears to restrict the doctrine to communications with respect to legal advice 'in pending or reasonably anticipated litigation.' " *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.,* 252 F.R.D. 163, 171 (S.D.N.Y.2008) (quoting *Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's London,* 176 Misc.2d 605, 676 N.Y.S.2d 727, 732 (N.Y.Sup.Ct.1998)). The requirement that the legal advice must be with respect to pending or reasonably anticipated litigation is not present under federal common law. *Nordbank,* 259 F.R.D. at 71 n. 9.

 [14]    [15]    While the parties have not made any express statements regarding choice of law, the distinction is irrelevant here because the communications between the parties were made in anticipation of litigation. The fact that the Agent is not currently a party to the litigation

before this Court does not preclude the common interest doctrine from application.[7] *See id.* (holding that the facts demonstrated that the plaintiff and "the non-party lenders had, in fact, reasonably anticipated litigation at the time the communications were made"). Under either New York or federal law, communications between Vertrue and the Agent may still be protected under the common interest doctrine despite the Agent's non-party status.

### D. The Parties Had a Common Legal Interest After April 2, 2012

[16]    [17]    On April 2, 2012, the First Lien Lenders and Vertrue entered into a Protocol outlining the terms of a proposed restructuring. In the May 22 Order, the Court held that prior to April 2, 2012, it was not objectively reasonable for Vertrue to believe that its communications with the Agent were confidential, except as related to legal strategy to prevent termination of the processing agreements. (May 22 Order at 5.) But after the parties entered into the Protocol—providing that the First Lien Lenders would credit bid for some of Vertrue's assets, and that the Court would oversee an auction process for the remainder of Vertrue's business in which the First Lien Lenders would also serve as stalking-horse bidder—Vertrue and the Agent held a common legal interest with regard to restructuring proposals. Further, after April 2, 2012 it was objectively reasonable for both Vertrue and the Agent to believe that the communications between the parties would be confidential. *See Quigley,* 2009 Bankr. LEXIS 1352, at *9. Accordingly, the Court concludes that after April 2, 2012, Vertrue and the Agent had a common legal interest protecting from discovery otherwise privileged documents and communications relating to "financial results, liquidity issues, restructuring **\*518** proposals, pre-negotiated bankruptcy, and any threats to terminate the processing agreement."[8]

### CONCLUSION

As was the case in *Quigley,* "the commonality or lack of commonality" of the interest between Vertrue and the Agent "depends on which interest you consider." *Quigley,* 2009 Bankr. LEXIS 1352, at *13. In November 2011, the common interest of Vertrue and the Agent was primarily, if not purely, commercial. However, after Vertrue received the January 20, 2012 letter, the parties had a common legal interest in preventing termination of the processing agreements. The documents and communications shared between the parties made in furtherance of this interest were made in reasonable anticipation of litigation with Paymentech, and the evidence establishes that the parties reasonably expected that the communications would remain confidential.

After the Protocol was entered on April 2, 2012, the parties' common legal interests expanded beyond simply preventing termination of the processing agreements. From that time forward, the parties had a common legal interest in effectuating a successful restructuring of Vertrue's business. To the extent documents or communications were otherwise privileged, the common interest doctrine prevented privilege from being lost because documents or communications were shared between Vertrue and the Agent, and their respective counsel.

Accordingly, the Court **SUSTAINS** the balance of Vertrue's objections to the disputed discovery based on common interest privilege.

### IT IS SO ORDERED.

### All Citations

473 B.R. 509

Footnotes

1    The May 22 Order provided, in relevant part:

According to the Debtors, "[o]n November 17, 2011, Vertrue held a confidential meeting with the secured lenders ... to discuss financial results and liquidity issues and to present the financial restructuring proposal that included a pre-negotiated bankruptcy case." Velo further explains that, at the November 17 meeting, it reported to the lenders the results of its November 14, 2011 meeting with Visa and Paymentech. Velo's description of the November 17 meeting makes clear that these discussions between a borrower and its lenders were business discussions not protected by attorney-client privilege or work product protection. Velo and the lenders continued to negotiate the terms of a proposed restructuring and on April 2, 2012, the First Lien Lenders and the Debtors entered into a Protocol outlining the terms of a proposed restructuring. Before entering into the Protocol, the interests of Velo and the First Lien Lenders were not

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    7

aligned insofar as an agreement on restructuring was concerned. Velo cannot shield from discovery documents and communications that might otherwise have been subject to a claim of privilege that were shared between Velo and the First Lien Lenders, or their respective counsel, before the Protocol was reached. Velo has failed to carry its burden of establishing the existence of a common interest privilege with respect to documents and communications regarding any restructuring proposals until April 2, 2012, when the Protocol was entered. Until that date, it was not "objectively reasonable for [Velo] to believe that the communication was confidential." *In re Quigley Co., Inc.,* No. 04–15739(SMB), 2009 Bankr.LEXIS 1352, at *9 (Bankr.S.D.N.Y. April 24, 2009). Factual presentations or discussions before April 2, 2012 about Paymentech's threats to terminate the processing agreements with Vertrue stand on no stronger footing.

May 22 Order at 4–5.

2    Vertrue had not submitted a privilege log when the common interest doctrine issue was initially presented to the Court. Fed.R.Civ.P. 45(d)(2)(A) requires a person withholding documents under a claim of privilege to "describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim." Without knowing the dates of the communications, authors, addressees, who received copies, and the subject matter, and an *in camera* review of documents, if necessary, it is impossible to know whether the documents or communications were subject to attorney-client privilege or work product protection in the first instance, and, if so, whether the result is altered by any subsequent communications between Vertrue and its counsel, and the lenders or their counsel. After Vertrue provided a privilege log, Paymentech elected not to challenge the existence of privilege in the first instance.

3    The parties agree that the current dispute relates to 291 documents listed in Vertrue's privilege log asserting common interest privilege, and to possible deposition examination relating to the subject of these communications.

4    In *Sokol v. Wyeth, Inc.,* No. 07–Civ.–8442 (SHS)(KNF), 2008 WL 3166662, at *8 (S.D.N.Y. Aug. 4, 2008), the court found no common interest between two parties where an attorney hired by the plaintiff, who had also been retained by a third party, mentioned the third party "occasionally, [and] for the purpose of updating [the plaintiff] on its status, not to develop a common legal strategy." The facts of *Sokol* are plainly distinguishable from the facts of this case.

5    Whether the January 20, 2012 letter terminated the Processing Agreements or evidenced Paymentech's intent to terminate the Processing Agreements is still an issue in dispute in this case. The Court's statements regarding this letter are not to be construed as conclusions regarding the alleged legal effect of the January 20, 2012 letter from Paymentech to Vertrue.

6    The May 22 Order concluded that the Restructuring Confidentiality Agreement did not shield information shared between Vertrue and the Agent on the basis of common interest doctrine:

> One thing that should be clear is the fact that Velo and the First Lien Lenders entered into the Restructuring Confidentiality Agreement on November 28, 2011 does not mean that all information shared between them is protected from discovery by attorney-client privilege or work product protection. The effect of the Restructuring Confidentiality Agreement is that the First Lien Lenders could not further disclose confidential information provided by Velo. But that agreement cannot create privilege where none exists, or limit discovery by Paymentech in the context of this adversary proceeding, unless specific documents or communications are protected by attorney-client privilege or work product.

May 22 Order at 4.

7    Initially, Paymentech disputed the Agent's right to be heard in this litigation absent formal intervention. The issue was resolved with an agreement permitting the Agent's participation to a limited extent without formal intervention. The Agent's counsel has appeared and been heard at each hearing in the case.

8    The documents and communications must, of course, relate to the rendering or receipt of legal advice to the client (or those sharing the common legal interest), intended to be confidential and, in fact, otherwise remaining confidential. Communications of information—even confidential information—exclusively for a business purpose are not protected.

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

47 F.R.D. 334

United States District Court S. D. New York.

STIX PRODUCTS, INC., Roysons,

Inc., and the Firestone Tire and

Rubber Company, Plaintiffs,

v.

UNITED MERCHANTS &

MANUFACTURERS, INC., Defendant.

UNITED MERCHANTS &

MANUFACTURERS, INC., Plaintiff,

v.

STIX PRODUCTS, INC., Defendant.

No. 64 Civil 1222.

|

May 12, 1969.

**Synopsis**

Action to determine validity of patent, consolidated with action for infringement. Defendant in former action moved for order compelling discovery of plaintiff's customer and subsequently objected to report of special master who, upon reference, determined that matters sought were privileged. The Supreme Court, Herlands, J., held, inter alia, that writing prepared by attorney, couched in legal terminology, embodying compendium of attorney's mental impressions and beliefs, and reflecting attorney's opinion based on legal analysis and reasoning involving exercise of legal skills was 'work-product' and as such was not subject to discovery where it was prepared in anticipation of litigation.

Order accordingly.

West Headnotes (9)

**[1]   Federal Civil Procedure** 🔑 Work Product
Privilege;  Trial Preparation Materials

Work-product privilege is not limited to documents prepared by party in course of actual litigation with party seeking discovery of document; rather, privilege attaches if legal opinion was prepared with litigation in mind and his proper subject of protection.

26 Cases that cite this headnote

**[2]   Federal Civil Procedure** 🔑 Work Product
Privilege;  Trial Preparation Materials

Work-product privilege becomes operative upon preparation of document.

6 Cases that cite this headnote

**[3]   Federal Civil Procedure** 🔑 Work Product
Privilege;  Trial Preparation Materials

Writing prepared by attorney, couched in legal terminology, embodying compendium of attorney's mental impressions and beliefs, and reflecting attorney's opinion based on legal analysis and reasoning involving exercise of legal skills was "work-product" and as such was not subject to discovery where it was prepared in anticipation of litigation.

14 Cases that cite this headnote

**[4]   Patents** 🔑 Work product privilege or
immunity

Disclosure of plaintiff charged with patent infringement of legal opinion relating to patent prepared for customer did not, in view of community of interest between customer and plaintiff, waive work-product privilege so as to entitle defendant to examine opinion.

8 Cases that cite this headnote

**[5]   Federal Civil Procedure** 🔑 Work Product
Privilege;  Trial Preparation Materials

Work-product privilege should not be deemed waived by disclosure unless disclosure is inconsistent with maintaining secrecy from possible adversaries.

29 Cases that cite this headnote

**[6]   Privileged Communications and
Confidentiality** 🔑 Patents and trademarks

Letters exchanged by customer of plaintiff charged with patent infringement and its attorneys wherein legal advice was either sought or given were protected from discovery by defendant by attorney-client privilege.

2 Cases that cite this headnote

**[7]    Privileged Communications and Confidentiality** 👉 Communications between attorneys

Portion of communication between cocounsel containing legal advice was protected from discovery by attorney-client privilege.

3 Cases that cite this headnote

**[8]    Federal Civil Procedure** 👉 Work Product Privilege;  Trial Preparation Materials

Written communication between cocounsel for potential litigant which related to litigation and involved traditional work-product material was protected from discovery.

1 Case that cites this headnote

**[9]    Privileged Communications and Confidentiality** 👉 Privilege logs

Party seeking discovery was not entitled to have documents to which claim of privilege had been made identified as to date and subject where such identification might tend to defeat purpose of privilege.

5 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*335** Kenyon & Kenyon, New York City, for defendant; John A. Fogarty, Jr., New York City, of counsel.

Cleary, Gottlieb, Steen & Hamilton, New York City, for Weiss & Klau, third-party witness; James C. Blair, New York City, of counsel.

**Opinion**

OPINION

HERLANDS, District Judge:

Interesting questions relating to the scope and applicability of the attorney-client and work-product privileges are raised by the instant motion made by the defendant United Merchants and Manufacturers, Inc. (UMM).

Pursuant to the agreement of counsel and the Court's ruling of February 24, 1969 (Transcript of Hearing, February 24, 1969, at 2–3), this motion is deemed one made under Fed.R.Civ.P. 53(e)(2)—objections to the report of the Special Master, filed on February 4, 1969. The following facts will facilitate understanding of the procedural genesis of the instant motion and the legal issues presented.

UMM originally moved for an order pursuant to Fed.R.Civ.P. 37(a) and 45(f), compelling third-party witness Weiss & Klau, being deposed by its president (William J. Oppenheim), to answer certain questions propounded during the course of the deposition and to identify and produce the various books, papers, and documents within its possession or control which are specified in paragraphs 11–13 of the subpoena duces tecum served on Weiss & Klau and their attorneys on May 22, 1968 and May 23, 1968.

Prior to the date of the deposition, counsel for Weiss & Klau met with counsel for UMM; and they reached an agreement as to which groups of documents would have to be produced at the deposition. Weiss & Klau immediately made available certain groups of documents to UMM for inspection and photocopying, and produced these same documents at the deposition. Under the agreement, UMM thereafter could seek further documents, and Weiss & Klau could resist further production. The agreement had the effect of obviating a motion to quash the subpoena before the commencement of the deposition. *See* Transcript of Deposition of Weiss & Klau and Standard Coated Products by William J. Oppenheim, June 27, 1968, p. 3. ('Tr.').

At the taking of the deposition, counsel for UMM (John A. Fogarty, Jr., Esq.) learned that Weiss & Klau had received an opinion—regarding the validity of the patent about which this lawsuit revolves—from the firm of Brumbaugh, Free, Graves & Donohue (now Brumbaugh, Graves, Donohue & Raymond, and hereinafter referred to as 'Brumbaugh'). (Tr. p. 41). Mr. Fogarty then learned that Weiss & Klau sought

and received advice from Cleary, Gottlieb, Steen & Hamilton (Weiss & Klau's general counsel, hereinafter referred to as 'Cleary, Gottlieb') on how to answer customer's questions and letters regarding the patent. (Tr. p. 41). Mr. Fogarty thereafter asked whether, during the course of searching for records to be submitted in connection with the deposition, any letters were discovered from Weiss & Klau to Cleary, Gottlieb dealing with the patent. (Tr. p. 42). Oppenheim refused to answer, claiming that that information fell within the attorney-client privilege.

Mr. Fogarty explained that he wanted to know the subject or matter with respect to which the claim of privilege had been raised. (Tr. p. 42). Oppenheim refused to answer this, as well. Counsel for Weiss & Klau acknowledged that documents of the sort covered by Mr. Fogarty's initial question did, in fact, exist. (Tr. pp. 42–43). Mr. Fogarty **\*336** then explained that he wanted merely an identification of the documents —'[a]nd by that I mean who they were from and to whom they were directed, the date, general subject matter and to whom copies were sent.' (Tr. p. 43). Counsel for the witness refused to permit such an identification, claiming that UMM had a sufficient description to enable it to obtain a ruling on the claim of privilege. (Tr. p. 44).

Mr. Fogarty, upon further questioning, was informed by counsel that the Brumbaugh opinion was the only document which fell within the groups of documents sought by paragraphs 12 and 13 of the subpoena, (Tr. p. 45), and that there were certain other correspondence between Weiss & Klau and Cleary, Gottlieb, covered by paragraph 11 of the subpoena. (Tr. pp. 45–47).

None of these documents was produced or inspected by UMM, nor have any of them been identified in the degree of specificity requested by counsel for UMM. In order to compel production and to have the documents identified (and, presumably, discussed) by the witness, UMM brought on the original motion under Rules 37 and 45.

The Court referred the matter to Gregory J. Potter, Esq., as Special Master, to hear and report to the Court. Mr. Potter heard argument; inspected *in camera* those documents which counsel for Weiss & Klau asserted were called for by paragraphs 11–13 of the subpoena; and filed his report. Mr. Potter recommended that the motion be denied in all respects. He was of the opinion that all of the documents he reviewed were protected by the attorney-client privilege. Moreover, he believed that further identification of the documents would

circumvent and frustrate the very purpose of the attorney-client privilege, and, thus, should not be required.

I.

At the oral argument of UMM's objections to the master's report, the Court directed that counsel for Weiss & Klau submit all documents which meet the description contained in paragraphs 11–13 of the subpoena and as to which Weiss & Klau are resisting production upon a claim of privilege. The Court has reviewed all of these documents as well as an affidavit submitted to the Court, *ex parte* by counsel for Weiss & Klau giving a brief description of each document.

These documents fall into three general groupings:

(1) Opinions rendered to Weiss & Klau regarding the validity of the patent;

(2) Correspondence between Weiss & Klau and its counsel relating to the instant litigation and to customer letters regarding infringement; and

(3) Correspondence between Cleary, Gottlieb and Brumbaugh generally relating to the subject matter of group (2) above.

OPINIONS ON PATENT VALIDITY

The first category includes the Brumbaugh opinion referred to at the deposition. This also appears to be the only document within this group. Despite intimations in UMM's brief to the contrary, there are no opinions regarding patent validity rendered to Weiss & Klau by Cleary, Gottlieb or any other law firm (except Brumbaugh) among the documents submitted to either the Special Master or the Court.

UMM contends that opinions of counsel respecting patent invalidity which are based on analyses of public records do not fall within the attorney-client privilege. Thus, it asserts, the Special Master's report, recommending that the claim of attorney-client privilege be upheld with respect to the Brumbaugh opinion, is in error. Moreover, UMM submits, even if there is an attorney-client privilege available with respect to this opinion, the privilege must be deemed waived by virtue of the fact that **\*337** a copy of the opinion admittedly was sent on February 5, 1965 to Pennie, Edmonds, Martin, Taylor & Adams ('Pennie, Edmonds'), counsel for plaintiffs in this action.

Weiss & Klau, on the other hand, contend that they do not now (and did not before the Special Master) rely on the attorney-client privilege to justify their refusal to produce

this opinion, but, rather, that they invoked the lawyer's work-product privilege.

UMM counters that the work-product privilege is inapplicable because Weiss & Klau is not a party to this lawsuit and the opinion was not prepared for use in any other litigation. Furthermore, any privilege that would be available must be deemed waived because of the voluntary disclosure of the opinion to Pennie, Edmonds.

*Applicability of the Work-Product Privilege*

 [1]    [2]    The work-product privilege is not, as UMM suggests, limited to documents prepared by a party in the course of actual litigation with the party seeking discovery of the document. The Supreme Court recognized that there is no requirement that the documents be prepared after litigation is under way. In Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the Court stated that the privilege extends to those documents prepared 'with an eye toward litigation.' 329 U.S. at 511, 67 S.Ct. 385. If the prospect of litigation is identifiable because of specific claims that have already arisen, the fact that, at the time the document is prepared, litigation is still a contingency has not been held to render the privilege inapplicable. *See, e.g.*, Natta v. Hogan, 392 F.2d 686, 693 (10th Cir. 1968); Lichter v. Mellon-Stuart Company, 24 F.R.D. 397, 399 (W.D.Pa.1959); Developments in the Law—Discovery, 74 Harv.L.Rev. 940, 1044 (1961). *Cf.* Republic Gear Company v. Borg-Warner Corporation, 381 F.2d 551, 557 (2d Cir. 1967). And, since the privilege thus appears to become operative upon preparation of the document, the additional circumstance that litigation has not yet materialized at the time discovery is sought should not alter the conclusion that the privilege is applicable. If the Brumbaugh opinion was prepared with litigation in mind, and is a proper subject of protection, the Court holds that the privilege attached.

 [3]    UMM has not asserted that the Brumbaugh opinion is not of the character intended to be covered by the work-product privilege. Indeed, the Court finds that it is work-product because it is a writing prepared by an attorney, couched in legal terminology, embodying a compendium of the attorney's mental impressions and beliefs, and reflects the attorney's opinion which is based on legal analysis and reasoning and involved the exercise of legal skills. *Cf.* Hickman v. Taylor, *supra*, at 510–511, 67 S.Ct. 385.

The facts in this case also establish that the preparation of the Brumbaugh opinion was induced by the issuance to UMM of

the patent in question and the substantial likelihood that Weiss & Klau would be called upon to defend an infringement action based on the existence of that patent.

The patent was issued on April 21, 1964. A declaratory action challenging the validity of the patent and an infringement action action (both now consolidated in the instant action) were filed that same day. UMM also immediately began placing advertisements in trade and general newspapers announcing its intention 'to protect and enforce its patent rights.'

The Brumbaugh opinion was dated May 11, 1964. About that date, Weiss & Klau began receiving inquiries from customers relating to the effect of UMM's patent, advertising, and infringement action on their purchases of Weiss & Klau's products.

 **\*338**  By letter dated July 13, 1964, UMM informed Weiss & Klau as follows:
'\* \* \* United Merchants and Manufacturers, Inc., intends to enforce its patent rights against all infringers at every level of manufacture and distribution. We are advised that products sold by you may infringe this patent.

The validity of the patent is presently the subject of litigation in actions pending in the United States District Court for the Southern District of New York (File Nos. 1222/1964; 1224/1964; 1317/1964). If the patent is judicially sustained, as we believe it will be, we intend to enforce all of our rights, including the assertion of damages from the date of issue of the patent.'


Under these circumstances, the Brumbaugh opinion undoubtedly was prepared in anticipation of litigation. It constitutes work-product.

*Waiver*

 [4]    The Court rejects UMM's argument that this privilege was waived by the voluntary disclosure to the attorneys for plaintiffs herein. The opinion was not made available to Pennie, Edmonds until February 5, 1965—a date subsequent to Weiss & Klau's receipt of UMM's threat of litigation. That letter made plaintiffs' success in this action more than a matter of intellectual curiosity to Weiss & Klau. At stake are valuable economic interests. A decision favorable to UMM here would expose Weiss & Klau to liability as an infringer —Weiss & Klau being a customer of plaintiff Roysons, Inc. Thus, its interest in this litigation is substantially identical with plaintiffs' and perhaps can be considered 'joint'.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    4

Under circumstances similar to these, disclosure to counsel for a party with interests adverse to that of the party seeking discovery does not constitute a waiver. *E. g.*, Transmirra Products Corporation v. Monsanto Chemical Company, 26 F.R.D. 572 (S.D.N.Y.1960); Vilastor-Kent Theatre Corporation v. Brandt, 19 F.R.D. 522 (S.D.N.Y.1956); Note, Waiver of Attorney-Client Privilege on Inter-Attorney Exchange of Information, 63 Yale L.J. 1030, 1035–1036 (1954).

 **[5]**    The presence of a community of interest between Weiss & Klau and plaintiffs distinguishes D'Ippolito v. Cities Service Company, 39 F.R.D. 610 (S.D.N.Y.1965), strongly relied on by UMM. There the disclosure was made to one not (even potentially) having similar interests. Moreover, the conclusion reached in *D'Ippolito* was the result of equating the work-prodct privilege with the attorney-client privilege, though the purposes and policies served by these privileges are distinct and require different rules as to waiver. Connecticut Mutual Insurance Company v. Shields, 16 F.R.D. 5, 8 (S.D.N.Y.1954). The work-product privilege should not be deemed waived unless the disclosure is inconsistent with maintaining secrecy from possible adversaries. Developments in the Law—Discovery, 74 Harv.L.Rev. 940, 1045 (1961). A postscript to the transmittal letter from Brumbaugh to Pennie, Edmonds clearly shows that the confidentiality of the work-product, vis-à-vis any potential adversary, was to be maintained:

‘It is understood that the enclosure is for your office use only and not for other publication either directly or indirectly, including knowledge of its delivery to you.’

The Court holds that the privilege has not been waived.

In the absence of the required showing by UMM that this document is essential to the preparation of its case, the work-product privilege protects against discovery of the Brumbaugh opinion.

## CLEARY, GOTTLIEB AND BRUMBAUGH—WEISS & KLAU CORRESPONDENCE

 **[6]**    Extensive discussion need not be devoted to the documents which fall ***339** within the second category —communications between Weiss & Klau and its counsel (Cleary, Gottlieb and Brumbaugh). The Court has reviewed each document, *in camera*. All of them are letters either seeking or giving legal advice. As such, they are conventional exemplars of privileged communications immune against discovery. To the extent that those papers which were attached to these letters do not constitute or contain legal advice, counsel for Weiss & Klau has represented to the Court that they were made available to UMM. There is no indication from any document in this category that the document was disclosed to any third-person, or that the confidentiality of the communication was otherwise waived. The attorney-client privilege as to all of these documents is in full force and effect.

## BRUMBAUGH-CLEARY,                        GOTTLIEB CORRESPONDENCE

 **[7]**    The documents within this group are protected from discovery by UMM under both the attorney-client and work-product privileges. There are only two documents of significance within this category-both communications from Brumbaugh to Cleary, Gottlieb. Portions of one such letter contain legal advice of the same nature as that in correspondence from Cleary, Gottlieb to Weiss & Klau (group 2 above). As a communication between co-counsel containing legal advice, this much of that letter constitutes matter protected by the attorney-client privilege. *Cf.* Note, 63 Yale L.J., *supra* at 1036.

 **[8]**    The remainder of this letter and the other document relate to the instant litigation and involve traditional work-product material insofar as it is a written communication between co-counsel for a potential litigant. No disclosure of any kind appears to have been made of the contents of either of these documents. The claim of privilege must be sustained.

## II.

 **[9]**    UMM presses the point that the Special Master was in error in not recommending that a more specific identification be required of each document to which a claim of privilege has been made. The Court agrees with the Special Master that even the identification of a communication between attorney and client in terms of the date and subject might well tend to defeat the very purpose of the privilege. It may be tactically relevant for UMM to know (and correspondingly important for Weiss & Klau to keep secret) the mere fact that on a certain date Weiss & Klau requested advice with respect to a specific subject, or that on a certain date advice was rendered on a specific subject, though the precise inquiry or advice given remains secret. The only possible reason for requiring such additional identification (in view of the circumstance that the documents themselves have already been held to be privileged) is to enable UMM to prove waiver. Unless UMM

162 U.S.P.Q. 508

has some probative basis for believing that certain (albeit presently unidentifiable) documents otherwise privileged, were disclosed to a third-party, the Court concludes that the probable injury to Weiss & Klau resulting from such identification outweighs the slender possibility that UMM, upon receiving such identification, will be able to show waiver. Absent any contraindication, the Court accepts the representation of counsel for Weiss & Klau that none of these documents had, in fact, been disclosed to a third-party. UMM has sufficient identification from the various motion papers and this Court's opinion to investigate the possibility of waiver and to determine for itself the soundness of the Court's conclusion that all of the documents are privileged.

III.

Since the Court has sustained the claim of privilege as to all of the submitted documents, and since Weiss &  **\*340**  Klau is not a party to this litigation, the Court orders the return of these documents to counsel, who shall hold them in their custody pending the final outcome of this action. The *ex parte* affidavit of James C. Blair, Esq., sworn to February 28, 1969, which contains a document-by-document description of the privileged material, is ordered impounded and sealed, subject to further court order, pending the final outcome of this action, at which time it will be ordered released and returned to counsel.

Settle order on notice in accordance with the views expressed in this opinion.

**All Citations**

47 F.R.D. 334, 162 U.S.P.Q. 508

---

End of Document

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Stix Products, Inc. v. United Merchants & Mfrs., Inc.

**Filings**

There are no Filings for this citation.

**History**

There are no History results for this citation.

U.S. v. Adlman, 134 F.3d 1194 (1998)

81 A.F.T.R.2d 98-820, 98-1 USTC P 50,230, 39 Fed.R.Serv.3d 1189

KeyCite Yellow Flag - Negative Treatment

Declined to Follow by In re Grand Jury Subpoena (Mark Torf/Torf Environmental Management), 9th Cir.(Idaho), February 9, 2004

134 F.3d 1194

United States Court of Appeals, Second Circuit.

UNITED STATES of
America, Petitioner–Appellee,

v.

Monroe ADLMAN, as Officer
and Representative of Sequa
Corporation, Respondent–Appellant.

No. 236, Docket 96–6095
|
Argued Oct. 3, 1996.
|
Decided Feb. 13, 1998.

**Synopsis**

Internal Revenue Service (IRS) petitioned to enforce summons for memorandum prepared by taxpayer's outside accounting firm at request of taxpayer's tax attorney to evaluate tax consequences of proposed corporate reorganization upon expected litigation with IRS. The United States District Court for the Southern District of New York, 1996 WL 84502, Knapp, J., rejected taxpayer's claim of work-product privilege, and taxpayer appealed. The Court of Appeals, Leval, Circuit Judge, held that: (1) memorandum was work product if it was prepared because of expected litigation, and (2) if memorandum was work product, IRS failed to make highly persuasive showing necessary to overcome work product protection.

Vacated and remanded.

Kearse, Circuit Judge, filed dissenting opinion.

West Headnotes (3)

**[1]    Federal Civil Procedure**  🔑  Work Product Privilege;  Trial Preparation Materials

Document created because of anticipated litigation, which tends to reveal mental impressions, conclusions, opinions or theories concerning the litigation, does not lose work-product protection merely because it is intended to assist in making business decision influenced by likely outcome of anticipated litigation; where document was created because of anticipated litigation, and would not have been prepared in substantially similar form but for prospect of that litigation, it falls within work-product protection. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

847 Cases that cite this headnote

**[2]    Federal Civil Procedure**  🔑  Work Product Privilege;  Trial Preparation Materials

Document should be deemed prepared "in anticipation of litigation" and thus eligible for work-product privilege, if document was prepared "because of" existing or expected litigation; it is not necessary that document have been prepared "primarily to assist in" the litigation. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

725 Cases that cite this headnote

**[3]    Federal Civil Procedure**  🔑  Work Product Privilege;  Trial Preparation Materials

If memorandum prepared by taxpayer's outside accounting firm at request of taxpayer's tax attorney to evaluate tax consequences of proposed corporate reorganization upon expected litigation with Internal Revenue Service (IRS) was work product, IRS failed to make highly persuasive showing necessary to overcome work product protection; memorandum did not address or reflect taxpayer's business reason for the proposed restructuring, but only technical and legal analysis of outside accountants, and IRS had made no showing, beyond bare assertion, that relevant information in memorandum was unavailable by other means. Fed.Rules Civ.Proc.Rule 26(b)(3), 28 U.S.C.A.

295 Cases that cite this headnote

81 A.F.T.R.2d 98-820, 98-1 USTC P 50,230, 39 Fed.R.Serv.3d 1189

**Attorneys and Law Firms**

**\*1194**  John J. Tigue, Jr., New York City, (Linda A. Lacewell, Morvillo, Abramowitz, Grand, Iason & Silberberg, P.C., New York City, Bryan C. Skarlatos, Kostelanetz & Fink, New York City), for Respondent–Appellant.

William J. Hoffman, Assistant United States Attorney, (Mary Jo White, United States Attorney for the Southern District of New York, Steven M. Haber, Assistant United States Attorney, New York City, of Counsel), for Petitioner–Appellee.

Before KEARSE, LEVAL, and CABRANES, Circuit Judges.

**Opinion**

LEVAL, Circuit Judge:

**[1]**  This appeal concerns the proper interpretation of Federal Rule of Civil Procedure 26(b)(3) ("the Rule"), which grants limited protection against discovery to documents **\*1195**  and materials prepared "in anticipation of litigation."[1] Specifically, we must address whether a study prepared for an attorney assessing the likely result of an expected litigation is ineligible for protection under the Rule if the primary or ultimate purpose of making the study was to assess the desirability of a business transaction, which, if undertaken, would give rise to the litigation. We hold that a document created because of anticipated litigation, which tends to reveal mental impressions, conclusions, opinions or theories concerning the litigation, does not lose work-product protection merely because it is intended to assist in the making of a business decision influenced by the likely outcome of the anticipated litigation. Where a document was created because of anticipated litigation, and would not have been prepared in substantially similar form but for the prospect of that litigation, it falls within Rule 26(b)(3).

The district court ruled that the document sought by the IRS in this case did not fall within the scope of Rule 26(b)(3) and ordered its production. Because we cannot determine whether the district court used the correct standard in reaching its decision, we vacate the judgment and remand for reconsideration.

*Background*

Sequa Corporation is an aerospace manufacturer with annual revenues of nearly $2 billion. Prior to 1989, Atlantic Research Corporation ("ARC") and Chromalloy Gas Turbine Corporation ("Chromalloy") were wholly-owned Sequa subsidiaries. Appellant Monroe Adlman is an attorney and Vice President for Taxes at Sequa.

In the spring of 1989, Sequa contemplated merging Chromalloy and ARC. The contemplated merger was expected to produce an enormous loss and tax refund, which Adlman expected would be challenged by the IRS and would result in litigation. Adlman asked Paul Sheahen, an accountant and lawyer at Arthur Andersen & Co. ("Arthur Andersen"), to evaluate the tax implications of the proposed restructuring. Sheahen did so and set forth his study in a memorandum (the "Memorandum"). He submitted the Memorandum in draft form to Adlman in August 1989. After further consultation, on September 5, 1989, Sheahen sent Adlman the final version. The Memorandum was a 58–page detailed legal analysis of likely IRS challenges to the reorganization and the resulting tax refund claim; it contained discussion of statutory provisions, IRS regulations, legislative history, and prior judicial and IRS rulings relevant to the claim. It proposed possible legal theories or strategies for Sequa to adopt in response, recommended preferred methods of structuring the transaction, and made predictions about the likely outcome of litigation.

Sequa decided to go ahead with the restructuring, which was completed in December 1989 in essentially the form recommended by Arthur Andersen. Sequa sold 93% of its stock in ARC to Chromalloy for $167.4 million, and the remaining 7% to Bankers Trust for $12.6 million. The reorganization resulted in a $289 million loss. Sequa claimed the loss on its 1989 return and carried it back to offset 1986 capital gains, thereby generating a claim for a refund of $35 million.

In an ensuing audit of Sequa's 1986–1989 tax returns, the IRS requested a number of documents concerning the restructuring transaction. Sequa acknowledged the existence of the Memorandum, but cited work-product privilege as grounds for declining to  **\*1196**  produce it.[2] On September 23, 1993, the IRS served a summons on Adlman for production of the Memorandum.

When Adlman declined to comply, the IRS instituted an action in the United States District Court for the Southern District of New York to enforce the subpoena. Adlman

defended on the grounds that the Memorandum was protected by both the attorney-client and work-product privileges. The district court (Knapp, J.) in its first decision rejected Adlman's claim that the Memorandum was protected by attorney-client privilege, finding that Adlman had not consulted Arthur Andersen in order to obtain assistance in furnishing legal advice to Sequa. *United States v. Adlman,* M–18–304, 1994 WL 191869, at *2 (S.D.N.Y. May 16, 1994). It rejected Adlman's claim of work-product privilege because the Memorandum was prepared for litigation based on actions or events that had not yet occurred at the time of its creation. *Id.* at *3. The court granted the IRS's petition to enforce the summons.

On appeal, we affirmed denial of Adlman's claim of attorney-client privilege. *United States v. Adlman,* 68 F.3d 1495 (2d Cir.1995). We vacated the district court's enforcement order, however, because the district court had evaluated Adlman's claim of work-product privilege under the wrong standard. Although the non-occurrence of events giving rise to litigation prior to preparation of the documents is a factor to be considered, we explained, it does not necessarily preclude application of work-product privilege. *See id.* at 1501. For example, where a party faces the choice of whether to engage in a particular course of conduct virtually certain to result in litigation and prepares documents analyzing whether to engage in the conduct based on its assessment of the likely result of the anticipated litigation, we concluded that the preparatory documents should receive protection under Rule 26(b)(3). *Id.* We therefore remanded for reconsideration whether the Memorandum was protected work product. *Id.*

On remand, Adlman argued that the Memorandum was protected by Rule 26(b)(3) because it included legal opinions prepared in reasonable anticipation of litigation. Litigation was virtually certain to result from the reorganization and Sequa's consequent claim of tax losses. Sequa's tax returns had been surveyed or audited annually for at least 30 years. In addition, the size of the capital loss to be generated by the proposed restructuring would result in a refund so large that the Commissioner of Internal Revenue would be required by federal law to submit a report to the Joint Congressional Committee on Taxation. *See* 26 U.S.C.A. § 6405(a). Finally, Sequa's tax treatment of the restructuring was based on an interpretation of the tax code without a case or IRS ruling directly on point. In light of the circumstances of the transaction, Adlman asserted there was "no doubt that Sequa would end up in litigation with the IRS." Sequa's accountant at Arthur Andersen concurred, opining that "any corporate

tax executive would have realistically predicted that this capital loss would be disputed by the IRS" because of the "unprecedented and creative nature of the reorganization, the fact that Sequa was continually under close scrutiny by the IRS and the size of the refund resulting from the capital loss."

The district court again rejected the claim of work-product privilege, concluding that the Memorandum was not prepared in anticipation of litigation. M–18–304, 1996 WL 84502, at *1 (S.D.N.Y. Feb. 27, 1996). Adlman appeals.

*Discussion*

The work-product doctrine, codified for the federal courts in Fed.R.Civ.P. 26(b)(3), is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy "with an eye toward litigation," free from unnecessary intrusion by his adversaries. *Hickman v. Taylor,* 329 U.S. 495, 510–11, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947). Analysis of one's case "in anticipation **\*1197** of litigation" is a classic example of work product, *see NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 154, 95 S.Ct. 1504, 1518, 44 L.Ed.2d 29 (1975), and receives heightened protection under Fed.R.Civ.P. 26(b)(3).

This case involves a question of first impression in this circuit: whether Rule 26(b)(3) is inapplicable to a litigation analysis prepared by a party or its representative in order to inform a business decision which turns on the party's assessment of the likely outcome of litigation expected to result from the transaction. Answering that question requires that we determine the proper interpretation of Rule 26(b)(3)'s requirement that documents be prepared "in anticipation of litigation" in order to qualify for work-product protection.

I.

In *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947), the Supreme Court held that notes taken by the defendant's attorney during interviews with witnesses to the event that eventually gave rise to the lawsuit in the case were not discoverable by the plaintiff. 329 U.S. at 510, 67 S.Ct. at 393. As the Court explained,

In performing his various duties, ... it is essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their

counsel. Proper preparation of a client's case demands that he ... prepare his legal theories and plan his strategy without undue and needless interference.

*Id.* at 510–11, 67 S.Ct. at 393.

Were the attorney's work accessible to an adversary, the *Hickman* court cautioned, "much of what is now put down in writing would remain unwritten" for fear that the attorney's work would redound to the benefit of the opposing party. *Id.* at 511, 67 S.Ct. at 393–94. Legal advice might be marred by "[i]nefficiency, unfairness and sharp practices," and the "effect on the legal profession would be demoralizing." *Id.* at 511, 67 S.Ct. at 394. Neither the interests of clients nor the cause of justice would be served, the court observed, if work product were freely discoverable. *Id.*

The Supreme Court has reaffirmed the "strong public policy" underlying the work-product privilege in the decades since *Hickman. See United States v. Nobles,* 422 U.S. 225, 236, 95 S.Ct. 2160, 2169, 45 L.Ed.2d 141 (1975); *Upjohn Co. v. United States,* 449 U.S. 383, 398, 101 S.Ct. 677, 687, 66 L.Ed.2d 584 (1981). It has also made clear that documents that "tend[ ] to reveal the attorney's mental process"—described by commentators as "opinion work product," *see* Special Project, *The Work Product Doctrine,* 68 Cornell L.Rev. 760, 817 (1983)—receive special protection not accorded to factual material. *Upjohn,* 449 U.S. at 399, 101 S.Ct. at 687. Special treatment for opinion work product is justified because, "[a]t its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze and prepare his client's case." *Nobles,* 422 U.S. at 238, 95 S.Ct. at 2170.

Rule 26(b)(3) codifies the principles articulated in *Hickman.* The Rule states that documents "prepared in anticipation of litigation or for trial" are discoverable only upon a showing of substantial need of the materials and inability, without undue hardship, to obtain their substantial equivalent elsewhere. Even where this showing has been made, however, the Rule provides that the court "shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."

II.

 **[2]**   The first problem we face is to determine the meaning of the phrase prepared "in anticipation of litigation." The phrase has never been interpreted by our circuit; furthermore, courts and commentators have expressed a range of views as to its meaning. It is universally agreed that a document whose purpose is to assist in preparation for litigation is within the scope of the Rule and thus eligible to receive protection if the other conditions of protection prescribed by the Rule are met. The issue is less clear, however, as to documents which, although prepared because of expected litigation, are intended to inform a business decision influenced by **\*1198** the prospects of the litigation. The formulation applied by some courts in determining whether documents are protected by work-product privilege is whether they are prepared "primarily or exclusively to assist in litigation"—a formulation that would potentially exclude documents containing analysis of expected litigation, if their primary, ultimate, or exclusive purpose is to assist in making the business decision. Others ask whether the documents were prepared "because of" existing or expected litigation—a formulation that would include such documents, despite the fact that their purpose is not to "assist in" litigation. Because we believe that protection of documents of this type is more consistent with both the literal terms and the purposes of the Rule, we adopt the latter formulation.

1. *"Primarily to assist in" litigation.*
The "primarily to assist in litigation" formulation is exemplified by a line of cases from the United States Court of Appeals for the Fifth Circuit. In *United States v. Davis,* 636 F.2d 1028 (5th Cir.), *cert. denied,* 454 U.S. 862, 102 S.Ct. 320, 70 L.Ed.2d 162 (1981), the Fifth Circuit denied protection to documents made in the course of preparation of a tax return. This result was well justified as there was no showing whatsoever of anticipation of litigation. In what might be characterized as a dictum, or in any event a statement going far beyond the issues raised in the case, the court asserted that the Rule applies only if the "primary motivating purpose behind the creation of the document was to aid in possible future litigation." *Id.* at 1040.

Then, in *United States v. El Paso Co.,* 682 F.2d 530 (5th Cir.1982), *cert. denied,* 466 U.S. 944, 104 S.Ct. 1927, 80 L.Ed.2d 473 (1984), a large public corporation sought to shield documents that analyzed prospective liabilities that might result from litigation with the IRS over its tax returns. The documents were prepared not to assist in litigation but to establish and justify appropriate reserves in El Paso's financial statements. Treating the *Davis* dictum as law, the Fifth Circuit held that because the "primary motivating force [behind the preparation of the documents was] not to ready

U.S. v. Adlman, 134 F.3d 1194 (1998)
81 A.F.T.R.2d 98-820, 98-1 USTC P 50,230, 39 Fed.R.Serv.3d 1189

El Paso for litigation" but rather "to bring its financial books into conformity with generally accepted auditing principles," *id.* at 543, and because the documents' liability analysis was "only a means to a business end," *id.,* the documents were not prepared "in anticipation of litigation" within the meaning of the Rule and enjoyed no work-product protection. The *El Paso* requirement that the document be prepared *to aid* in litigation was then applied by a Fifth Circuit judge writing for the Temporary Emergency Court of Appeals in *United States v. Gulf Oil Corp.,* 760 F.2d 292, 296–97 (Temp.Emer.Ct.App.1985).[3]

We believe that a requirement that documents be produced primarily or exclusively to assist in litigation in order to be protected is at odds with the text and the policies of the Rule. Nowhere does Rule 26(b)(3) state that a document must have been prepared *to aid* in the conduct of litigation in order to constitute work product, much less *primarily or exclusively* to aid in litigation. Preparing a document "in anticipation of litigation" is sufficient.

The text of Rule 26(b)(3) does not limit its protection to materials prepared to assist at trial. To the contrary, the text of the Rule clearly sweeps more broadly. It expressly states that work-product privilege applies not only to documents "prepared ... for trial" but also to those prepared "in anticipation of litigation." If the drafters of the Rule intended to limit its protection to documents made to assist in preparation for litigation, this would have been adequately conveyed by the phrase "prepared ... for trial." The fact that documents prepared "in anticipation of litigation" were also included confirms that the drafters considered this to be a different, and broader category. Nothing in the Rule states or suggests that documents prepared "in anticipation of litigation" with the purpose **\*1199** of assisting in the making of a business decision do not fall within its scope.

In addition, the Rule takes pains to grant special protection to the type of materials at issue in this case—documents setting forth legal analysis. While the Rule generally withholds protection for documents prepared in anticipation of litigation if the adverse party shows "substantial need" for their disclosure and inability to obtain their equivalent by other means, even where the party seeking disclosure has made such a showing the Rule directs that "the court *shall* protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of ... [a party or its representative] concerning the litigation." Fed.R.Civ.P. 26(b)(3) (emphasis added). As the Advisory Committee notes indicate, Rule

26(b)(3) is intended to ratify the principles that "each side's informal evaluation of its case should be protected, that each side should be encouraged to prepare independently, and that one side should not automatically have the benefit of the detailed preparatory work of the other side." Where the Rule has explicitly established a special level of protection against disclosure for documents revealing an attorney's (or other representative's) opinions and legal theories concerning litigation, it would oddly undermine its purposes if such documents were excluded from protection merely because they were prepared to assist in the making of a business decision expected to result in the litigation.

Admittedly, there are fragmentary references in the caption to the Rule and in its commentary that can be read to lend support to a contrary interpretation. The caption, for example, refers to "Trial Preparation," and the Advisory Committee Notes make occasional reference to "trial preparation materials." We attach small importance to those references. Given that the text of the Rule (and of the commentary) expressly goes beyond documents "prepared ... for trial" to encompass also those documents "prepared in anticipation of litigation," we cannot read the references in the caption and commentary as overriding the text of the Rule. *See United States v. Minker,* 350 U.S. 179, 185, 76 S.Ct. 281, 285, 100 L.Ed. 185 (1956); *Whitehouse v. United States District Court,* 53 F.3d 1349, 1358 n. 12 (1st Cir.1995).

In addition to the plain language of the Rule, the policies underlying the work-product doctrine suggest strongly that work-product protection should not be denied to a document that analyzes expected litigation merely because it is prepared to assist in a business decision. Framing the inquiry as whether the primary or exclusive purpose of the document was to assist in litigation threatens to deny protection to documents that implicate key concerns underlying the work-product doctrine.

The problem is aptly illustrated by several hypothetical fact situations likely to recur:

(i) A company contemplating a transaction recognizes that the transaction will result in litigation; whether to undertake the transaction and, if so, how to proceed with the transaction, may well be influenced by the company's evaluation of the likelihood of success in litigation. Thus, a memorandum may be prepared in expectation of litigation with the primary purpose of helping the company decide whether to undertake the contemplated transaction. An example would be a publisher contemplating publication

of a book where the publisher has received a threat of suit from a competitor purporting to hold exclusive publication rights. The publisher commissions its attorneys to prepare an evaluation of the likelihood of success in the litigation, which includes the attorneys' evaluation of various legal strategies that might be pursued. If the publisher decides to go ahead with publication and is sued, under the "primarily to assist in litigation" formulation the study will likely be disclosed to the opposing lawyers because its principal purpose was not to assist in litigation but to inform the business decision whether to publish. We can see no reason under the words or policies of the Rule why such a document should not be protected. *See United States v. Adlman,* 68 F.3d at 1501.

(ii) A company is engaged in, or contemplates, some kind of partnership, merger, joint undertaking, or business association with another company; the other company reasonably requests that the company furnish **\*1200** a candid assessment by the company's attorneys of its likelihood of success in existing litigations. For instance, the company's bank may request such a report from the company's attorneys concerning its likelihood of success in an important litigation to inform its lending policy toward the company. Or a securities underwriter contemplating a public offering of the company's securities may wish to see such a study to decide whether to go ahead with the offering without waiting for the termination of the litigation. Such a study would be created to inform the judgment of the business associate concerning its business decisions. No part of its purpose would be to aid in the conduct of the litigation. Nonetheless it would reveal the attorneys' most intimate strategies and assessments concerning the litigation. We can see no reason why, under the Rule, the litigation adversary should have access to it. But under the Fifth Circuit's "to assist" test, it would likely be discoverable by the litigation adversary.

(iii) A business entity prepares financial statements to assist its executives, stockholders, prospective investors, business partners, and others in evaluating future courses of action. Financial statements include reserves for projected litigation. The company's independent auditor requests a memorandum prepared by the company's attorneys estimating the likelihood of success in litigation and an accompanying analysis of the company's legal strategies and options to assist it in estimating what should be reserved for litigation losses.

In each scenario, the company involved would require legal analysis that falls squarely within *Hickman*'s area of primary concern—analysis that candidly discusses the attorney's litigation strategies, appraisal of likelihood of success, and perhaps the feasibility of reasonable settlement. The interpretation of Rule 26(b)(3) advocated by the IRS imposes an untenable choice upon a company in these circumstances. If the company declines to make such analysis or scrimps on candor and completeness to avoid prejudicing its litigation prospects, it subjects itself and its co-venturers to ill-informed decisionmaking. On the other hand, a study reflecting the company's litigation strategy and its assessment of its strengths and weaknesses cannot be turned over to litigation adversaries without serious prejudice to the company's prospects in the litigation. *Cf. Hickman,* 329 U.S. at 516, 67 S.Ct. at 396 (Jackson, J., concurring) ("Discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary.").

We perceive nothing in the policies underlying the work-product doctrine or the text of the Rule itself that would justify subjecting a litigant to this array of undesirable choices. The protection of the Rule should be accorded to such studies in these circumstances. *See United States v. Adlman,* 68 F.3d at 1501 ("[T]here is no rule that bars application of work-product protection to documents created prior to the event giving rise to litigation."). We see no basis for adopting a test under which an attorney's assessment of the likely outcome of litigation is freely available to his litigation adversary merely because the document was created for a business purpose rather than for litigation assistance. The fact that a document's purpose is business-related appears irrelevant to the question whether it should be protected under Rule 26(b)(3).[4]

**\*1201** We note that in *Delaney, Migdail & Young, Chartered v. IRS,* 826 F.2d 124 (D.C.Cir.1987), the IRS successfully argued against the very position it here advocates. The D.C. Circuit sustained the IRS's claim of work-product privilege in circumstances where the claim would have failed under the test applied by the Fifth Circuit and advocated by the IRS on this appeal. The documents sought in *Delaney* were prepared by IRS attorneys for a business purpose—to help the IRS decide whether to adopt a proposed system of statistical sampling for its corporate audit program for large accounts. However, the study was prepared because of expected litigation which would result from adoption of the program; it analyzed expected legal challenges to the use of the proposed program, potential defenses available to the agency, and the

likely outcome. Based on the preparatory study, the IRS concluded that the proposed statistical sampling program presented an acceptable legal risk and authorized it. The court refused discovery with the observation that the party requesting discovery was

> seeking the agency's attorneys' assessment of the program's legal vulnerabilities in order to make sure it does not miss anything in crafting its legal case against the program. *This is precisely the type of discovery the [Supreme] Court refused to permit in Hickman v. Taylor.*

*Id.* at 127 (emphasis added) (footnote omitted). The Seventh Circuit has also considered and rejected the contention that documents automatically fall outside the scope of the work-product doctrine when they are prepared for purposes other than assistance in litigation. *See In re Special September 1978 Grand Jury (II),* 640 F.2d 49, 61–62 (7th Cir.1980).[5]

Similarly, several district courts have rejected the contention that Rule 26(b)(3) does not apply to documents that are not prepared for the primary or exclusive purpose of assisting in that litigation. *See Vanguard Sav. and Loan Ass'n v. Banks,* No. CIV. 93–CV–4627, 1995 WL 555871, at *4 (E.D.Pa.1995) (letters from defendant's attorneys giving the attorneys' opinion as to the likely outcome of pending litigation protected from discovery even though the letters "were created primarily for the business purpose of satisfying the regulatory examination required by the Pennsylvania Department of Banking"); *American Optical Corp. v. Medtronic,* 56 F.R.D. 426, 431 (D.Mass.1972) (memoranda prepared by a lawyer in the course of counseling a client whether to accept a license or challenge the validity of a competitor's patent in court protected work product); *Sylgab Steel & Wire Corp. v. Imoco–Gateway Corp.,* 62 F.R.D. 454, 456 (N.D.Ill.1974) (opinion letters analyzing whether proposed products violated patents is protected work product), *aff'd,* 534 F.2d 330 (7th Cir.1976); *Chemcentral/Grand Rapids Corp. v. EPA,* No. 91 C 4380, 1992 WL 281322, at *5 (N.D.Ill. Oct. 6, 1992) (EPA documents analyzing likely legal challenges to proposed toxic waste cleanup plans are protected work product); *In re Woolworth Corp. Sec. Class Action Litig.,* No. 94 CIV. 2217 (RO), 1996 WL 306576, at *3 (S.D.N.Y. June 7, 1996) (company's business purpose for creating material would not preclude application of Rule 26(b)(3)).

The few commentators to have specifically addressed whether the work-product doctrine should apply to documents analyzing **\*1202** anticipated litigation, but prepared to assist

in a business decision rather than to assist in the conduct of the litigation, have generally concluded that protection is desirable. One argues that the work-product doctrine is intended to protect a lawyer's (or other representative's) personal evaluation of his or her case, and to ensure that adversaries have the opportunity to memorialize their mental impressions, strategies, and ideas free from the concern that their litigation opponents might gain access to the material. Special Project, *The Work Product Doctrine,* 68 Cornell L.Rev. at 784–85. "The fact that the materials serve other functions apart from litigation does not mean that they should not be protected by work-product immunity if they reveal directly or indirectly the mental impressions or opinions of the attorney who prepared them." Note, *The Work Product Doctrine: Why Have an Ordinary Course of Business Exception?,* 1988 Colum.Bus. L.Rev. 587, 604. Allowing discovery of this type of material has also been characterized as an "intolerable intrusion on the [settlement] bargaining process ... [which] allow[s] one party to take advantage of the other's assessment of his prospects for victory and an acceptable settlement figure." Edward H. Cooper, *Work Product of the Rulesmakers,* 53 Minn.L.Rev. 1269, 1283 (1969). Under the standard advocated by the IRS, documents assessing the strengths and weaknesses of one's case, or the likelihood of settlement and its expected cost, would be unprotected if prepared for a business purpose rather than to assist in litigation. This result is unwarranted.

2. *Prepared "because of" litigation.*

The formulation of the work-product rule used by the Wright & Miller treatise, and cited by the Third, Fourth, Seventh, Eighth and D.C. Circuits, is that documents should be deemed prepared "in anticipation of litigation," and thus within the scope of the Rule, if "in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation." Charles Alan Wright, Arthur R. Miller, and Richard L. Marcus, 8 *Federal Practice & Procedure* § 2024, at 343 (1994) (emphasis added). *See In re Grand Jury Proceedings,* 604 F.2d 798, 803 (3d Cir.1979); *National Union Fire Ins. Co. v. Murray Sheet Metal Co., Inc.,* 967 F.2d 980, 984 (4th Cir.1992); *Binks Mfg. Co. v. National Presto Indus., Inc.,* 709 F.2d 1109, 1118–19 (7th Cir.1983); *Simon v. G.D. Searle & Co.,* 816 F.2d 397, 401 (8th Cir.), *cert. denied,* 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987); *Senate of Puerto Rico v. United States Dep't of Justice,* 823 F.2d 574, 586 n. 42 (D.C.Cir.1987).

The Wright & Miller "because of" formulation accords with the plain language of Rule 26(b)(3) and the purposes underlying the work-product doctrine. Where a document is created because of the prospect of litigation, analyzing the likely outcome of that litigation, it does not lose protection under this formulation merely because it is created in order to assist with a business decision.

Conversely, it should be emphasized that the "because of" formulation that we adopt here withholds protection from documents that are prepared in the ordinary course of business or that would have been created in essentially similar form irrespective of the litigation. It is well established that work-product privilege does not apply to such documents. *See* Fed.R.Civ.P. 26(b)(3), Advisory Committee's note ("Materials assembled in the ordinary course of business ... are not under the qualified immunity provided by this subdivision."); *see, e.g.,* National Union Fire, 967 F.2d at 984. Even if such documents might also help in preparation for litigation, they do not qualify for protection because it could not fairly be said that they were created "because of" actual or impending litigation. *See* Wright & Miller § 2024, at 346 ("even though litigation is already in prospect, there is no work-product immunity for documents prepared in the regular course of business rather than for purposes of the litigation").

Furthermore, although a finding under this test that a document is prepared because of the prospect of litigation warrants application of Rule 26(b)(3), this does not necessarily mean that the document will be protected against discovery. Rather, it means that a **\*1203** document is *eligible* for work-product privilege. The district court can then assess whether the party seeking discovery has made an adequate showing of substantial need for the document and an inability to obtain its contents elsewhere without undue hardship. The district court can order production of the portions of the document for which a litigant has made an adequate showing. The court can focus its attention on whether the document or any portion is the type of material that should be disclosed, while retaining the authority to protect against disclosure of the mental impressions, strategies, and analyses of the party or its representative concerning the litigation.

In short, we find that the Wright & Miller "because of" test appropriately focuses on both what should be eligible for the Rule's protection and what should not. We believe this is the proper test to determine whether a document was prepared "in anticipation of litigation" and is thus eligible for protection depending on the further findings required by the Rule.

III.

We cannot determine from the district court's opinion what test it followed in concluding that the Memorandum was ineligible for protection.

There are indications that the district court may have followed the "primarily to assist in litigation" test, which we here reject. At one point the opinion asserted that "the court must determine whether the party seeking [work-product protection] has shown that the 'documents were prepared *principally or exclusively* to assist in anticipated or ongoing litigation.' United States v. Construction Products Research Inc., [73 F.3d 464, 473 (2d Cir.), *cert. denied,* 519 U.S. 927, 117 S.Ct. 294, 136 L.Ed.2d 213 (1996) ]." (emphasis added by district court).[6] Then, in stating its conclusion, the court said, "The primary purpose [of the Memorandum] was not to prepare for litigation; the primary purpose was to decide whether or not to go through with a multimillion dollar transaction." These passages suggest the district court may have employed the test we reject.

On the other hand, the tenor of the discussion in the court's opinion suggests it may have focussed properly on the question whether the Memorandum studying the tax implications of the contemplated restructuring would have been prepared in substantially similar form regardless whether litigation was contemplated, and thus was not prepared "because of" the expected litigation.

We remand with instructions to the district court to reconsider the issue under the Wright & Miller test of whether "the document can fairly be said to have been prepared **\*1204** ... because of the prospect of litigation." Wright & Miller, § 2024 at 343. There is little doubt under the evidence that Sequa had the prospect of litigation in mind when it directed the preparation of the Memorandum by Arthur Andersen. Whether it can fairly be said that the Memorandum was prepared because of that expected litigation really turns on whether it would have been prepared irrespective of the expected litigation with the IRS.

If the district court concludes that substantially the same Memorandum would have been prepared in any event— as part of the ordinary course of business of undertaking

the restructuring—then the court should conclude the Memorandum was not prepared because of the expected litigation and should adhere to its prior ruling denying the protection of the Rule.

On the other hand, if the court finds the Memorandum would not have been prepared but for Sequa's anticipation of litigation with the IRS over the losses generated by the restructuring, then judgment should be entered in favor of Sequa.

[3]   The IRS contends that even if the Memorandum qualifies as work product, it has made a sufficient showing of substantial need and unavailability so as to overcome the qualified protection accorded by Rule 26(b)(3). We disagree. The Memorandum falls within the most protected category of work product—that which shows the "mental impressions, conclusions, opinions or legal theories of an attorney or other representative." Fed.R.Civ.P. 26(b)(3). The Rule makes clear that a showing of "substantial need" sufficient to compel disclosure of other work product is not necessarily sufficient to compel disclosure of such materials. We need not decide whether such opinion work product is ever discoverable upon a showing of necessity and unavailability by other means. *See* *Duplan Corp. v. Moulinage et Retorderie de Chavanoz,* 509 F.2d 730, 734 (4th Cir.1974) (opinion work product never discoverable), *cert. denied,* 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975). *Contra* *Holmgren v. State Farm Mut. Auto. Ins. Co.,* 976 F.2d 573, 577 (9th Cir.1992). The Rule is clear that, at a minimum, such material is to be protected unless a highly persuasive showing is made. *See* *Upjohn,* 449 U.S. at 402, 101 S.Ct. at 689. The IRS has failed to meet that high standard.

The IRS claims necessity for the Memorandum on the ground that it will provide insight into Sequa's subjective motivation for engaging in corporate restructuring and is thus relevant to determining whether the transaction was motivated by a legitimate business purpose. *See, e.g.,* *Kirchman v. Commissioner,* 862 F.2d 1486, 1492 (11th Cir.1989); *Rice's Toyota World, Inc. v. Commissioner,* 752 F.2d 89, 91–92 (4th Cir.1985). In camera review of the Memorandum shows that it does not reflect the motives of Sequa's executives, but rather the legal analysis of its accountants. While the Memorandum unquestionably presupposes a desire to achieve a favorable tax result, such a desire is in no way incompatible with the existence of a "legitimate non-tax business reason" for its choice. *Newman v. Commissioner,* 902 F.2d 159, 163 (2d Cir.1990); *see also* *Frank Lyon Co. v. United States,* 435

U.S. 561, 580, 98 S.Ct. 1291, 1302, 55 L.Ed.2d 550 (1978) ( "The fact that favorable tax consequences were taken into account ... on entering into [a] transaction is no reason for disallowing those consequences" where the transaction has a legitimate business purpose.). The Memorandum, being the technical and legal analysis of outside accountants, and not the reflections of decisionmakers at Sequa, simply does not address or reflect Sequa's business reason for the proposed restructuring.

Moreover, the IRS has made no showing, beyond bare assertion, that the relevant information in the Memorandum is unavailable by other means. This falls far short of the heightened showing mandated by *Upjohn.*[7]

**\*1205**  In short, the enforceability of the IRS summons for the Memorandum will turn on whether it (or substantially the same document) would have been prepared irrespective of the anticipated litigation and therefore was not prepared because of it.

*Conclusion*

The order enforcing the IRS summons is vacated, and the matter is remanded to the district court for further findings under the standard prescribed in this ruling.

KEARSE, Circuit Judge, dissenting:

I respectfully dissent. It does not appear to me that the district court applied an erroneous standard in this case. Accordingly, I would affirm.

The attorney work product privilege accords limited protection for materials that were "prepared in anticipation of litigation or for trial." *See* Fed.R.Civ.P. 26(b)(3). Where the only prospect of litigation is what would be anticipated if the party undertakes a contemplated transaction but not otherwise, and the materials in question were prepared in connection with providing legal advice to the party as to whether or not to undertake that transaction, I do not regard the materials as having been prepared "in anticipation of litigation." I regard the majority as having extended the work product privilege to a stage that precedes any possible "anticipation" of litigation.

U.S. v. Adlman, 134 F.3d 1194 (1998)

81 A.F.T.R.2d 98-820, 98-1 USTC P 50,230, 39 Fed.R.Serv.3d 1189

This does not mean, as suggested by the majority opinion *ante* at 1199–1201, 1202–03, that such materials will normally be discoverable. Documents in which a party's attorney assesses the legal advisability of contemplated business transactions, including the possibility and efficacy of litigation if the client elects to proceed with the transaction, will normally be protected from discovery by the attorney-client privilege, so long as the client meets the usual requirements of, *inter alia,* maintaining confidentiality and showing that it was seeking legal advice. The assertion of attorney-client privilege in the present case was rejected only because the client had failed to make any record that distinguished the present consultation of its accounting firm from its normal business consultations.

See *United States v. Adlman,* 68 F.3d 1495, 1499–1500 (2d Cir.1995).

I disagree with the majority's expansion of the work-product privilege to afford protection to documents not prepared in anticipation of litigation but instead prepared in order to permit the client to determine whether to undertake a business transaction, where there will be no anticipation of litigation unless the transaction is undertaken.

## All Citations

134 F.3d 1194, 81 A.F.T.R.2d 98-820, 98-1 USTC P 50,230, 39 Fed.R.Serv.3d 1189

## Footnotes

1   Fed.R.Civ.P. 26(b)(3) provides in relevant part that "a party may obtain discovery of documents and tangible things otherwise discoverable ... and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation."

2   IRS summons are "subject to the traditional privileges and limitations," *United States v. Euge,* 444 U.S. 707, 714, 100 S.Ct. 874, 879, 63 L.Ed.2d 141 (1980), including the work product doctrine codified at Rule 26(b)(3). *Upjohn Co. v. United States,* 449 U.S. 383, 398–99, 101 S.Ct. 677, 687, 66 L.Ed.2d 584 (1981).

3   Other court opinions that have used the "principally or exclusively to assist in litigation" formulation include: *In re Kidder Peabody Sec. Litig.,* 168 F.R.D. 459, 462, 466 (S.D.N.Y.1996); *Bowne v. AmBase Corp.,* 150 F.R.D. 465, 471 (S.D.N.Y.1993); *Martin v. Valley Nat'l Bank of Arizona,* 140 F.R.D. 291 (S.D.N.Y.1991).

4   Judge Kearse argues in dissent that Rule 26(b)(3) has no application where the anticipated litigation will not occur unless the client makes a contemplated business decision. We believe this view writes a significant and unauthorized limitation into the Rule. The Rule extends limited protection to documents prepared "in anticipation of litigation." According to Judge Kearse's reading, it protects documents prepared "in anticipation of litigation, but not where the anticipated litigation would result from a business decision still in contemplation." We can find no justification in the Rule, the commentary, or the purposes underlying the Rule for adding such a limitation.

    Judge Kearse also argues that work product protection is unnecessary because protection will generally be accorded by the attorney-client privilege. No doubt in many instances this will be true, but it is irrelevant. Where true, the issue is moot. In other circumstances, however, the attorney-client privilege may be unavailable for a number of reasons. For example, as suggested in hypothetical examples considered above, the document may have been shown to others simply because there was some good reason to show it. The attorney-client privilege and the work product rule serve different objectives. The fact that a document does not come within the attorney-client privilege should not result in the deprivation of the protection accorded by Rule 26(b)(3).

5   In *Special September 1978 Grand Jury,* the government contended that the reports sought to be protected from subpoena could not be work product because they were prepared for the filing of legally required state campaign contribution reports. 640 F.2d at 61. Acknowledging that the reports had indeed been prepared for that nonlitigation purpose, the court pointed out that they were prepared with the knowledge that litigation was imminent and in anticipation of that

litigation. Accordingly, the protection of the Rule was allowed. *Id.* at 62. We do not necessarily concur with the holding of the case. Since the documents at issue were required to be prepared under Illinois law, it is arguable that they were not prepared "because of" litigation. We agree fully, however, that preparation for a nonlitigation purpose should not disqualify documents that were prepared in anticipation of litigation.

6   The district court may have believed that we endorsed the "primarily to assist in litigation" test in *Construction Products,* from which the district court quoted in the passage cited above. If so, the perception was mistaken.

First, the district court's quotation of the passage from *Construction Products* was incomplete, and the omitted portion makes clear that our opinion does not support that interpretation. On turning to the issue of work product privilege in *Construction Products,* we said, "To invoke the privilege a party *generally* must show that the documents were prepared principally or exclusively to assist in anticipated or ongoing litigation." 73 F.3d at 473 (emphasis added). In quoting the passage, the district court omitted the word "generally." The omitted word is of great significance, for it indicates that the court was not enunciating a categorical rule but rather describing the conventional circumstances in which work product privilege applies.

In the vast majority of cases, work product protection is sought for documents that were prepared to assist in the conduct of the litigation. Use of the word "generally" implies, however, that there exist circumstances in which the requirements of proof are different. The statement cannot stand as authority for the proposition that, *whenever* Rule 26(b)(3) is invoked, the applicant must show that the documents were prepared to assist in the litigation.

Second, the part of the quoted passage on which the district court relied was unrelated to the issues in dispute. We denied work product protection in *Construction Products* because the applicant's privilege log "simply [did] not provide enough information to support the privilege claim, particularly in the glaring absence of any supporting affidavits or other documentation." *Id.* at 474. The question whether documents prepared because of anticipated litigation but intended to inform a business decision are covered by the Rule was not at issue. Accordingly, the observation on which the district court may have relied was pure dictum. *Construction Products* simply does not address the question here presented.

7   A brief introductory section of the Memorandum discusses the historical background of the proposed restructuring. This factual information, although not subject to the heightened standard accorded opinion work product under *Upjohn,* is nonetheless available to the IRS only upon a showing of substantial need and inability to obtain the material elsewhere without undue hardship. *See* Fed.R.Civ.P. 26(b)(3). Although the IRS has asserted that it is unable to obtain this material elsewhere, it has offered no support for this proposition and is in all likelihood able to obtain it, since it appears that the information sought would have been included on Sequa's tax returns for the relevant time periods. Disclosure of this portion of the Memorandum is thus unwarranted.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.