Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 23-10063-shl

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    GENESIS GLOBAL HOLDCO, LLC,

8

9            Debtor.

10   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                    United States Bankruptcy Court

13                    300 Quarropas Street, Room 248

14                    White Plains, NY 10601

15

16                    September 18, 2023

17                    10:09 AM

18

19

20

21   B E F O R E :

22   HON SEAN H. LANE

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:  ALIANNA PERSAUD

1    HEARING re Doc. #701 Notice Of Agenda

2

3    HEARING re EVIDENTIARY HEARING RE: Doc. #603 (FTX

4    Settlement) Motion To Approve Compromise / Genesis Debtors

5    Motion Pursuant To Federal Rule Of Bankruptcy Procedure

6    9019(a) For Entry Of An Order Approving Settlement Agreement

7    With FTX Debtors

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:   Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    CLEARY GOTTLIEB STEEN & HAMILTON LLP

4         Attorneys for Debtors-in-Possession

5         One Liberty Plaza

6         New York, NY 10006

7

8    BY:  LUKE A. BAREFOOT

9         ANDREW WEAVER

10

11   WHITE & CASE LLP

12        Attorneys for Official Committee of Unsecured Creditors

13        1221 Avenue of the Americas

14        New York, NY 10020

15

16   BY:  J. CHRISTOPHER SHORE

17        COLIN WEST

18

19   SULLIVAN & CROMWELL LLP

20        Attorneys for FTX Debtors

21        125 Broad Street

22        New York, NY 10004

23

24   BY:  BRIAN D. GLUECKSTEIN

25

1    PROSKAUER ROSE LLP

2         Attorneys for Ad Hoc Group

3         Eleven Times Square

4         New York, NY 10036

5

6    BY:   JORDAN SAZANT

7          PETER DOYLE

8          WILLIAM DALSEN

9

10   UNITED STATES DEPARTMENT OF JUSTICE

11        Attorneys for the U.S. Trustee

12        201 Varick Street, Suite 1006

13        New York, NY 10014

14

15   BY:   GREG M. ZIPES

16

17   HUGHES HUBBARD & REED LLP

18        Attorneys for Gemini Trust Company

19        One Battery Park Plaza

20        New York, NY 10004

21

22   BY:   ANSON B. FRELINGHUYSEN

23

24

25

1   BROWN RUDNICK LLP

2        Attorneys for Ad Hoc Group of Claimants

3        7 Times Square

4        New York, NY 10036

5

6   BY:   KENNETH J. AULET

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1                    P R O C E E D I N G S

2            THE COURT:  Good morning to you all.  We are here

3    -- well, I know we have some folks on Zoom as well.  We're

4    here this morning for Genesis Global Holdco, LLC, a hearing

5    on the debtors' motion seeking of authority under Rule 9019

6    for a settlement.  And we'll start, as we always do, with

7    appearances.  This time it's in-person because it's an

8    evidentiary hearing.  So we'll start with the debtors.

9            MR. BAREFOOT:  Good morning, Your Honor.  Luke

10   Barefoot and Andrew Weaver, for the debtors-in-possession.

11           THE COURT:  All right.  Good morning.  And on

12   behalf of the official committee?

13           MR. SHORE:  Good morning, Your Honor.  Chris Shore

14   and Colin West, from White & Case.

15           THE COURT:  All right, and on behalf of the ad hoc

16   group?

17           MR. SAZANT:  Good morning, Your Honor.  Jordan

18   Sazant, joined by Peter Doyle and William Dawson, of

19   Proskauer Rose, on behalf of the ad hoc group.

20           THE COURT:  All right.  Good morning.  Any other

21   appearances for this morning?

22           MR. GLUECKSTEIN:  Good morning, Your Honor.

23           THE COURT:  Just to be on the safe side, I'd make

24   your way to a microphone.  Any microphone.

25           MR. GLUECKSTEIN:  Good morning, Your Honor.  Brian

Page 7

1    Glueckstein and Benjamin Beller, Sullivan & Cromwell, for

2    the FTX (indiscernible) --

3         THE COURT:  All right.  Good morning.  Anyone

4    else?  Sorry.  I always think of this as like a baseball

5    stadium.  There's seating one way and seating at a right

6    angle, which is a bit awkward.  I did in a prior life try a

7    jury trial in this courtroom.  So I always think of you all.

8    I'll always forever think of you on that side as the juror.

9    As jurors.  So go ahead, Mr. Zipes.

10        MR. ZIPES:  Greg Zipes, with the U.S. trustee's

11   office.  I don't expect to speak today, Your Honor.

12        THE COURT:  All right.  Happy to have you here.

13   Anyone else?

14        MR. FRELINGHUYSEN:  Good morning, Your Honor.

15   Anson Frelinghuysen, with Hughes Hubbard & Reed, for the

16   Gemini Trust Company.

17        THE COURT:  All right.  Good morning.

18        MR. AULET:  Good morning, Your Honor.  Kenneth

19   Aulet, of Brown Rudnick, for the (indiscernible) --

20        THE COURT:  Good morning.  All right.  So with

21   that, I think I'd gotten an inquiry from someone about being

22   able to do some things on Zoom for today's hearing.  As you

23   all no doubt know, the administrative office has issued new

24   guidance with the end of the COVID emergency, which sounds

25   fatally like a Stephen King novel appellation.  But in any

Page 8

1    event, we're all trying to figure out the appropriate way to

2    handle things going forward.  And we'll obviously get that

3    information out to folks who appear at our court regularly

4    as soon as we can.  But what's pretty clear is that things

5    that are evidentiary are the most important things to return

6    back to court.  For lots of reasons that we all know and

7    understand, it's the best way to conduct proceedings.

8                 So with that, we are here for an evidentiary

9    hearing on the Rule 9019.  It's the debtors' motion.  I know

10   we have a preliminary matter dealing with some discovery and

11   privilege issues, but I'll turn it over to debtors' counsel

12   to sort of set the stage for how to proceed this morning.

13                 MR. BAREFOOT:  Good morning, Your Honor.  Again

14   for the record, Luke Barefoot, from Cleary Gottlieb, for the

15   Genesis debtors.  Your Honor, we are here this morning on

16   the evidentiary hearing for approval of the debtors' motion

17   under Rule 9019 of the settlement agreement with the FTX

18   debtors, which was originally filed at Docket Item 603.

19                 The parties have agreed to dispense with the need

20   for opening statements given the limited evidentiary issues

21   and the single witness that we have.  As you mentioned, we

22   do have a preliminary matter.  If Your Honor would like any

23   further arguments or statements from counsel in support of

24   their respective positions, we'd be happy to do that.  But

25   we believe that with the briefing that Your Honor received

Page 9

1    over the weekend, that issue is fully submitted and so we

2    would, subject to Your Honor's views, be prepared to hear

3    Your Honor's ruling on the evidentiary issue, proceed

4    directly to Mr. Islim's testimony and any cross and redirect

5    and then proceed to argument.

6              THE COURT:  All right.  Thank you very much.  I

7    did receive and review all of the documents relating to the

8    privilege issue that was teed up in the ad hoc group of

9    Genesis lenders' memorandum concerning debtors' improperly

10   withheld documents at Docket 709.  The debtors filed a

11   response to that and then the committee filed a joinder at

12   Docket 713.  I confess I don't have the debtors' response in

13   terms of the docket number, but it's on there.

14             And so based on what I've read and what we

15   discussed the other day, it's a pretty straightforward issue

16   and I don't need any party to provide additional argument.

17   But it's the ad hoc group's motion, so I'll hear from you,

18   but if there's going to be additional argument, it's going

19   to be really short.

20             MR. DOYLE:  Thank you, Your Honor.

21             THE COURT:  You grabbing a binder leads me to

22   believe you may have a different view about how long we're

23   going to chat about this.

24             MR. DOYLE:  I will be brief, Your Honor.  Peter

25   Doyle, of Proskauer, for the ad hoc committee.  Your Honor,

1   we submitted three decisions to the court.  The debtor

2   submitted approximately ten.  The only decision addressing

3   the claim for common interest between -- and holding the

4   claim of common interest between the debtor is the In re

5   Quigley decision.  That was 2009, Chief Judge Bernstein and

6   It found there was no common interest.  The rest of the In

7   re Quigley decision, debtors argue too much in arguing that

8   it is sufficient to both be aligned in trying to grow the

9   estate, obviously differences in strategy, differences which

10  evolved and --

11          THE COURT:  But what's the alternative?  Right?

12  So as is often the case, you look at the legal tests

13  involved and the niceties and start thinking about how they

14  apply in the real world.  And it can be a little confusing

15  to do sometimes by just looking at the situation here.

16          So a debtor is supposed to get buy-in from the UCC

17  whenever possible, right?  That's one of the things.  Again,

18  it's Chapter 11 is run for the benefit of all stakeholders.

19  A committee exists to give statutorily authorized

20  essentially opinions to the estate.  And so if the debtor

21  wants to share and convince the committee of the

22  righteousness of the course of action, how is it supposed to

23  do it if it can't be candid?

24          MR. DOYLE:  It can certainly advocate, Your Honor

25  and the practical reality --

1          THE COURT:  Well right, but under your rule,

2     they'd have to advocate to the committee like they advocate

3     to somebody on the street, in formal pleadings and nothing

4     else, no candid conversations because all of those things,

5     by sharing them with the committee, it's gone.

6          MR. DOYLE:  No.  As to a certain point, clearly,

7     they could have -- the debtors and anyone else could have a

8     common interest.  The court struggles with this all the

9     time.  That's why many courts require that joint defense

10    agreements have to be in writing because there's a point in

11    time where you are antagonistic and a point in time where --

12         THE COURT:  But the rule doesn't require it.

13    Right?  And the rule doesn't require it for a reason, right?

14    To have flexibility in circumstances like this, particularly

15    where it's not lost on anyone where the debtors and the UCC

16    stood on some of these issues.

17         But I understand.  You're citing to Quigley.  I

18    read Quigley, as I read all the decisions that were provided

19    to me, which prevented me from watching the first half of

20    the Giant game, which was the half to miss.  So I -- it's

21    fine.  But again, I'm having a problem with your rule, your

22    proposed rule wreaking havoc in Chapter 11 cases in terms of

23    working between the debtor and a committee.

24         MR. DOYLE:  Your Honor, our rule is -- we believe,

25    we propose that our rule is the current rule, is the actual

1    rule.  It's the rule from Quigley and it's how this is

2    supposed to be done by debtors.  And what debtors have done

3    here in arguing that anyone who wants to grow the estate has

4    a common interest is far too broad.

5            THE COURT:  I don't -- well, I don't think it's

6    articulated quite that broadly, but I see your point.

7    Anything else, counsel?

8            MR. DOYLE:  We rest on Quigley, Your Honor.

9            THE COURT:  All right, thank you.  Anything else

10   very briefly from any other party?

11           MR. WEAVER:  Your Honor, Andrew Weaver, on behalf

12   of the debtors.  We would rest on our papers, Your Honor.  I

13   think the facts and circumstances that are before you is

14   what's relevant and any decision you make would be tied to

15   those facts and circumstances and we (indiscernible) --

16           THE COURT:  All right.

17           MR. WEAVER:  Thank you, Your Honor.

18           THE COURT:  Thank you very much.  All right.  With

19   that, before the court is the ad hoc group of Genesis

20   lenders' request as memorialized in their memorandum at

21   Docket 709 concerning what they characterize as debtors'

22   improperly withheld documents.  As I said before, there's a

23   debtors' response and there's a committee joinder.

24           And just to briefly set the stage here, the

25   debtors have asked the court to approve a proposed

Page 13

1    settlement between debtors in these Chapter 11 cases and FTX

2    Trading, which has its own bankruptcy in Delaware, In re FTX

3    Trading Limited, Case Number 22-11068.  The ad hoc group has

4    objected to the settlement motion and propounded discovery

5    requests in an effort to gain additional information about

6    the debtors' analysis of the strength and weaknesses of

7    their respective claims that are at issue in the proposed

8    settlement.

9         And based on the parties' papers, it appears that

10   everyone agrees that the debtors have refused to produce

11   some 77 documents that are responsive to the ad hoc group's

12   discovery request, although I think the committee notes that

13   number is actually smaller than that given the multiple

14   iterations of documents, as is often the case as the emails

15   fly fast and furious.  But each of the withheld

16   communications and documents were exchanged between counsel

17   of the debtors and counsel for the UCC.  And debtor has

18   asserted the documents are protected by the work product

19   privilege and also the common interest privilege.

20        So the debtors asserted their position and then in

21   addition, the committee has in its joinder states it's

22   reviewed all 77 documents and that all portions of the

23   relevant communications that were authored by committee's

24   council in response to the debtors' request, in their view,

25   are in fact protected from discovery by the attorney work

Page 14

1     product doctrine.  And the committee adopts the debtors'

2     assertion of attorney work product with respect to the

3     portions of communications authored by committee's counsel.

4     And therefore the committee fully joins in the arguments

5     made by the debtors in their response.

6              So with that, I will turn to the standard here and

7     I think that's the one thing that everybody agrees upon.  So

8     we'll start with the work product doctrine and that's

9     intended to preserve a zone of privacy in which a lawyer can

10    prepare and develop legal theories and strategy, quote,

11    "with an eye towards litigation, free from unnecessary

12    intrusion by adversaries."  And the most common case cited

13    for that is Hickman v. Taylor, 329 US 495, 510-11, a case

14    from 1947 that is quoted and quoted and requoted in cases,

15    including all the cases that are provided by the parties.

16             So it's well established that the party asserting

17    work product privilege protection bears the burden of

18    establishing its applicability to the case at hand.  There's

19    a Second Circuit case for that, In re Grand Jury Subpoenas

20    Dated March 19, 2002 and August 2, 2002.  The case is at 318

21    F.3d 379, 384 (2d Cir. 2003), which collects cases.

22             There are three conditions that must be met to

23    earn work product protection.  The materials must be, one, a

24    document or tangible thing; two, prepared in anticipation

25    for litigation; and three, prepared buy or for a party or

Page 15

1    his or her representative.

2           So there are other applicable standards here as

3    well.  And the other one here is the common interest

4    doctrine.  And as the ad hoc group submission explains,

5    common interest doctrine serves an exception to the general

6    rule that voluntary disclosure of confidential privileged

7    material to a third party waives any applicable privilege,

8    including materials protected by the work product doctrine.

9    See In re Hypnotic Taxi LLC, 543 BR 365, at 314 (Bankr.

10   E.D.N.Y 2017).

11          The common interest doctrine, as explained in the

12   ad hoc's papers, only applies to party to whom the protected

13   information was disclosed, one, shares a common legal

14   interest and, two, the sharing of the privileged information

15   was intended to be in furtherance of the common legal

16   interest shared by them.

17          I will note that the ad hoc's pleadings leave out

18   a part of the test, which is that the holder of the work

19   product privilege waives it only if voluntary disclosing it

20   is done in such a manner as likely to be revealed to the

21   adversary.  See In re SN Phelps and Company v. Circle K

22   Corp.,  199 BR 92, at 100 (Bankr. S.D.N.Y. 1996).

23          So turning to this case, it seems that the

24   withheld documents here appear to be classic examples of

25   work product materials; that is, documents containing the

Page 16

1    mental impressions, opinions and legal assessments of

2    counsel for the debtor and debtors' and the creditors

3    committee.  Indeed, the ad hoc doesn't really appear to

4    seriously challenge this fact, although they say that it's

5    not established based on the information provided in the

6    privilege log.  Certainly if there's a dispute, the court is

7    happy to review a document or two in camera, but frankly,

8    that seems unnecessary given the description of the

9    documents and the representation of counsel.

10          So given what I've been presented with, I'm

11   content in finding that these are work product information,

12   protected information that's at issue here.

13          So with that, I will then turn to waiver and

14   common interest privilege.  So in these circumstances, the

15   ad hoc group contends that the debtor waived any privilege

16   here by sharing the information with the committee and

17   contends that that sharing of information is not covered by

18   the common interest privilege because, in the ad hoc group's

19   view, there could be no common interest privilege until

20   September 5th when the UCC filed its reservation of rights

21   as to the settlement.

22          The court disagrees.  The debtors and the

23   committee clearly share a common interest here observing and

24   maximizing the value of these estates, but more specifically

25   in evaluating the potential settlement with the FTX debtors

Page 17

1    in order to reach a value maximizing resolution of the FTX

2    debtors' significant claims that are again a resolution

3    that's in furtherance of the value maximizing goal.

4            And so there are cases that support such a notion.

5    See for example, In re Maxus Energy Corporation, 617 BR 806,

6    824 (Bankr. D. Del. 2020), a case applying the common

7    interest doctrine to communications between debtors and the

8    creditors committee when their joint goal was achieving a

9    consensual plan of reorganization between the debtors and

10   UCC.  After all, that plan is a value maximizing exercise.

11           See also the In re Quigley case, 2019 Westlaw

12   9034027, at * 4, (Bankr. S.D.N.Y April 24, 2009) applying a

13   common interest document based on shared interest in

14   confirming a plan of reorganization.  See also In re Leslie

15   Controls, 437 BR 493, at 502 (Bank. D. Del 2010), a common

16   interest doctrine between the debtor and ad hoc group of

17   creditors based on their common interest in maximizing the

18   asset pool of its creditors.  See also In re Tribune

19   Corporation, 2011 Westlaw 386827, at * 3, (Bank. D. Del

20   February 3, 2011) common interest doctrine where the debtors

21   and noteholders have a shared interest in gaining court

22   approval of the plan and a settlement.

23           So in response to the notion this is a very

24   generalized assertion that shouldn't survive here because

25   it's too general, I disagree.  The common interest here is

Page 18

1    confirmed by the facts and circumstances of this particular

2    case, more particularly by the common positions taken by the

3    debtors and the UCC as to litigation with FTX well before

4    the Rule 1919 motion was filed that's on for today.

5            Indeed, the battle lines between the debtors and

6    FTX were drawn when the FTX debtor filed their motion in

7    this court to lift the stay seeking to litigate their claims

8    elsewhere, namely in their own bankruptcy case for all the

9    reasons explained in their pleadings.  The debtors responded

10   by filing their motion to estimate the FTX claims in this

11   court.  And notably, the UCC filed a joinder to the debtors'

12   opposition to FTX's lift stay motion.  And it also joined

13   with the debtors at the June 15th hearing arguing that

14   estimation of the FTX's claims would bring benefits to the

15   estate.  And so it's pretty clear from those activities that

16   as to FTX, the debtors and the committee have a common

17   interest and have acted accordingly.

18           And so, in reaching that conclusion, I did review

19   my notes from the hearing on June 15th when there was

20   argument on the estimation motion and discussion of the

21   estimation motion.  And I also went back to see the joinder

22   and reservation of rights of the official committee of

23   unsecured creditors to debtors' objection to the motion of

24   FTX Trading Limited and its affiliated debtors for order to

25   modify the automatic stay.  And that's at Docket 407.

1          So, last but not least, the court concludes that

2    the work product privilege here has not been waived for

3    another reason.  The materials were not disclosed in a

4    manner likely to reveal the privileged materials to the

5    adversary here that is FTX.  And as the debtors note in

6    their papers, nowhere does the ad hoc group suggest that

7    disclosure among the debtors and the committee made it

8    likely that the work product at issue would be disclosed to

9    the adversaries in question, that is, the FTX debtors.  And

10   that's because the committee's bylaws as well as its

11   fiduciary duties to all creditors, would have prevented

12   disclosure of their respective impressions and reactions to

13   the FTX debtors' claims and any settlement thereon to the

14   FTX debtors.

15          So, for all those reasons, and considering all the

16   facts and circumstances of this case and applicable law and

17   the party submissions, the court is going to deny the ad hoc

18   group's request to require the disclosure of the documents

19   in question and override the work product privilege and the

20   common interest privilege at issue in this case.

21          So with that, I think we're ready to proceed with

22   the hearing on the 9019 motion.  Counsel?

23          MR. WEAVER:  Thank you, Your Honor.  Again, for

24   the record, Andrew Weaver, Cleary Gottlieb Steen Hamilton,

25   on behalf of the debtors.  Your Honor, one bit of

Page 20

1    housekeeping before we present Mr. Islim's testimony.

2    Pursuant to Paragraph 48 of the case management order,

3    parties submitted a joint exhibit book to chambers on

4    Friday, which I believe (indiscernible) available for you.

5            THE COURT:  I do have that, and it's got nine

6    tabs.  Am I correct?

7            MR. WEAVER:  That is correct, Your Honor.

8            THE COURT:  All right.

9            MR. WEAVER:  For purposes of the record today, we

10   would ask to move those joint exhibits into the record

11   before Your Honor.

12           THE COURT:  All right.  Let me hear from the other

13   side.

14           MR. DALSEN:  Your Honor, William Dalsen, from

15   Proskauer, for the ad hoc group.  We don't object, Your

16   Honor.  We would reserve as to for the deposition

17   transcript.  There were two objections we made during

18   redirect.  We'd reserve as to those in case that comes up.

19   And also, I'm not sure if it was added to the binder, but

20   Mr. Islim did submit errata that should be appended to the

21   deposition transcript.

22           THE COURT:  All right.  Thank you very much.

23           MR. DALSEN:  Thank you.

24           THE COURT:  All right.  Anybody else wish to be

25   heard on this issue?  All right.  So let me just make it

Page 21

1    clear what my approach is to exhibits in any evidentiary

2    matter, which is I rely on the portions of the exhibits that

3    are called out by the parties as relevant for the

4    proceeding.  Nobody wants trial by ambush and the loser or

5    winner be able to cite things in some appeal that nobody

6    talked about at the evidentiary hearing and say, well, my

7    cousin Vinny would say that's the case cracker.

8             So I will rely on all of you to identify for me

9    the parts of the exhibits.  And this is particularly true

10   for the deposition transcript, since we have the live

11   witness here that you, I think, are relevant.  And that's

12   great.  And I'm going to assume the deposition transcript is

13   really here just for my use and any impeachment or

14   reference.  And so with that, counsel, take it away.

15           MR. WEAVER:  Thank you, Your Honor.  At this

16   point, the debtors would call Derar Islim to the stand.

17           THE COURT:  Please.

18           MR. ISLIM:  Good morning.

19           THE COURT:  And if you'd raise your right hand and

20   (indiscernible) swear the witness.

21           CLERK:  I can do it.

22           THE COURT:  Please.

23           CLERK:  Do you solemnly swear or affirm that the

24   testimony you're about to provide is the truth, the whole

25   truth and nothing but the truth?

Page 22

 1              MR. ISLIM:   (indiscernible)

 2              THE COURT:  All right.  Please have a seat.  And

 3    just a note, if you're ever asked about any documents, and

 4    no doubt you will be given a binder, just take your time

 5    finding what you need to look at, and we'll wait because

 6    you're the witness.  So with that, counsel?

 7              MR. WEAVER:  Thank you, Your Honor.

 8                DIRECT EXAMINATION OF A. DERAR ISLIM

 9    BY MR. WEAVER:

10    Q     Just briefly, good morning, Mr. Islim.

11    A     Good morning to you.

12    Q     Could you please introduce yourself to the court?

13    A     Yes.  I'm Derar Islim.  I'm the interim chief executive

14    officer of Genesis Global Trading.

15              THE COURT:  Good morning.  Do me a favor.  Get as

16    close to that microphone.  Maybe a little bit closer.  You

17    don't have to be right on top, but just so everybody can

18    hear you.  Thank you.

19              MR. WEAVER:  Thank you, Your Honor.

20    BY MR. WEAVER:

21    Q     How long have you been in that position, Mr. Islim?

22    A     For three years and four months.

23    Q     I'm sorry.  In the role of interim CEO.

24    A     For just about a year.

25    Q     Thank you.  Did you provide a declaration in this

Page 23

1    matter?

2    A    Yes, I did.

3            MR. WEAVER:  Your Honor, permission to approach.

4            THE COURT:  Please.

5            MR. WEAVER:  Your Honor, do you need to copy the

6    declaration?

7            THE COURT:  If it's the one that was provided in

8    support of the motion, I have it.

9            MR. WEAVER:  It is.

10           THE COURT:  Thank you.

11   BY MR. WEAVER:

12   Q    Mr. Islim, I've just handed you the declaration of A.

13   Derar Islim in support of the Genesis debtors' motion

14   pursuant to Federal Rule of Bankruptcy Procedure 9019(a) for

15   the entry of an order approving settlement agreement with

16   the FTX debtors.  Do you see that?

17   A    Yes, I do.

18   Q    Is this a declaration that you submitted in this

19   action?

20   A    Yes.

21   Q    If you turn to the last page, Mr. Islim, is that your

22   signature?

23   A    Yes, it is.

24   Q    Is there anything in this declaration that you wish to

25   change?

Page 24

1    A    No.

2              MR. WEAVER:  At this point, Your Honor, we would

3    ask to move Mr. Islim's declaration into evidence as his

4    direct testimony for purposes of today's hearing.

5              THE COURT:  All right.  Thank you very much.  Any

6    objection?

7              MR. DALSEN:  No objection, Your Honor.

8              THE COURT:  All right.  His declaration is

9    received as his direct testimony in this proceeding.

10             MR. WEAVER:  Thank you, Your Honor.

11             THE COURT:  And I assume at this point, you're

12   going to tender the witness for cross-examination.

13             MR. WEAVER:  We will tender the witness for cross-

14   examination.

15             THE COURT:  All right.  Thank you very much.  And

16   with that, I believe the ad hoc group is -- it's your

17   witness.

18             MR. DALSEN:  Thank you, Your Honor.  Just before

19   we get started, just some housekeeping.  May I approach the

20   witness with a binder, please?

21             THE COURT:  Sure.

22             MR. DALSEN:  Thank you.  And, Your Honor, may I

23   approach the bench with a binder?

24             THE COURT:  Please.

25             MR. WEAVER:  I'm sorry.  Your Honor, there appear

Page 25

1    to be additional exhibits here in the binder which we were

2    not made aware of before the hearing.

3              MR. DALSEN:  Your Honor, we may or may not use

4    these exhibits with the witness, but they're available if we

5    need them.

6              MR. WEAVER:  Your Honor --

7              THE COURT:  So here's what I'd like to do.  Well,

8    I don't know what the parties worked out or didn't work out

9    ahead of time, so maybe it's worth having a brief

10   discussion.  Should the witness be here or not be here for

11   that?

12             MR. WEAVER:  I don't think it's too substantive.

13   It's fine, Your Honor.  So Your Honor --

14             THE COURT:  All right.  Go ahead.

15             MR. WEAVER:  -- pursuant to the case management

16   order, we approached the ad hoc group after deposition on

17   Wednesday.  We got a one-day extension to submit the joint

18   exhibits, which we appreciate, Your Honor, and told them

19   we'd be sending over our joint exhibits pursuant to the case

20   management order for them to review, let us know if they

21   have any issues and provide us with their list of exhibits.

22   We would combine them into the joint book, and we'd provide

23   them to Your Honor.  We did that on Thursday morning.  They

24   provided us their exhibits Thursday afternoon.  We compiled

25   them, delivered them to your office's chambers on Friday,

Page 26

1    and our understanding is those were the joint exhibits for

2    purposes of today's evidentiary hearing.  We were never

3    informed, just now noticed additional exhibits that we

4    believe would be inconsistent with the court's practice and

5    the case management order for joint exhibits.

6              THE COURT:  All right.

7              MR. DALSEN:  Yes, Your Honor.  William Dalsen,

8    from Proskauer, for the ad hoc group.  Your Honor, I don't

9    take issue with the recitation of events, but, of course,

10   even though those are the joint exhibits, our view is that

11   there may be additional exhibits where we may need to ask

12   additional questions about them.  Maybe impeachment

13   material, maybe refreshing recollection material.  That's

14   why they're here.  If there's a specific objection to some

15   of the specific additional exhibits in here, I'm willing to

16   entertain that.

17             THE COURT:  So there are, if I'm counting right,

18   15 exhibits.

19             MR. DALSEN:  That's right, Your Honor.

20             THE COURT:  So I understand that the concept of

21   having exhibits that you use for purposes of cross-

22   examination and the distinguishment between that and things

23   that are evidence that you're putting in your case or things

24   you're just using for cross.  What's your intention with

25   these?  It is noteworthy there's 15 of these, so that's a

Page 27

1   hefty number.  So I'm just curious what your intention is.

2   Are you moving these into evidence or is your intention to

3   use them for cross-examination?

4            MR. DALSEN:  Your Honor, we don't tend to move --

5   there are 15 listed here.  But I believe there's significant

6   overlap.  It's almost entirely overlapping with the

7   exception of a few with the exhibits that are joint.  And so

8   for the additional ones, I do not intend to move them into

9   evidence.  But they're here in case we need to use them

10  (indiscernible) --

11           THE COURT:  All right.  So here's what I'm going

12  to do.  We'll wait and see how it goes, because certainly

13  there are times when it's appropriate to use a document for

14  examination of witness, and there's no intent to actually

15  put it into evidence.  So we'll see how it goes.  So I'll

16  reserve a ruling as to any objection.  Everybody reserves

17  their rights to see how it all plays out.

18           MR. WEAVER:  Thank you, Your Honor.

19           MR. DALSEN:  Your Honor, may I inquire?

20           THE COURT:  Please proceed.

21              CROSS-EXAMINATION OF A. DERAR ISLIM

22  BY MR. DALSEN:

23  Q    Good morning, Mr. Islim.

24  A    Good morning.

25  Q    My name is William Dalsen.  I represent the ad hoc

1    group of lenders in this proceeding.  I realize you've been

2    sitting in the courtroom, but before today, you and I have

3    never met or spoken; is that right?

4    A    That is correct.

5    Q    You are the interim CEO of Genesis Global Holdco LLC?

6    A    Correct.

7    Q    And Genesis Global Holdco is a debtor in this case?

8    A    Correct.

9    Q    Genesis Global Holdco is the parent of Genesis Global

10   Capital LLC and Genesis Asia Pacific PTE Limited, correct?

11   A    That is correct.

12   Q    And both of those entities are also debtors in this

13   case?

14   A    Yes.

15   Q    Genesis Global Holdco is the parent of Genesis Global

16   Capital International, correct?

17   A    Yes.

18   Q    And your current employer is Genesis Global Trading,

19   correct?

20   A    Correct.

21   Q    Is it fair to say that your role as interim CEO extends

22   to the various debtor and non-debtor entities that I just

23   mentioned?

24   A    That is correct.

25   Q    Mr. Islim, you have never served as an interim CEO of

1    another company, correct?

2    A    Correct.

3    Q    You've also never served as CEO of another company,

4    correct?

5    A    That is correct.

6    Q    Prior to this case, you've never worked on a bankruptcy

7    before, correct?

8    A    Correct.

9    Q    You're aware we're here today to discuss the debtors'

10   motion to approve a settlement agreement between Genesis

11   debtors and FTX, correct?

12   A    Correct.

13   Q    Mr. Islim, you yourself were not involved in the

14   negotiation of that settling agreement, correct?

15   A    Correct.

16   Q    You're aware that Genesis Global Holdco LLC has a

17   special committee for its board of directors?

18   A    Yes.

19   Q    That special committee is formed of two people,

20   correct?

21   A    Yes.

22   Q    Those two people are Tom Conheeney and Paul Aronzon; is

23   that right?

24   A    Yes.

25   Q    You are not member of the special committee; is that

Page 30

1   right?

2   A    I am not member of special committee.  Correct.

3   Q    And if I use the phrase special committee to talk about

4   the special committee of the board of directors, is that all

5   right?

6   A    Yes.

7   Q    Okay.  Thank you.  Also, you have never been member of

8   the special committee, correct?

9   A    No.

10  Q    Just because of the double negative, it's correct that

11  you've never been a member of the special committee?

12  A    So the special committee has been formed with those two

13  directors you mentioned since inception and never changed

14  the formation of that committee.  So I've never been part of

15  that committee, and the committee never changed since it was

16  created.

17  Q    Thank you.  The special committee gets to decide

18  whether Genesis enters into or agrees to a settlement with

19  FTX, correct?

20  A    Correct.

21  Q    You would agree that there's no one else that is also

22  part of that decision, correct?

23  A    The special committee is the ultimate decision-maker

24  with all funding and settlement and governance aspects of

25  GGH.  Yes.

1    Q    And only the special committee gets to make those

2    decisions, right?

3    A    Yes.

4    Q    Mr. Islim, you believe that the proposed settlement

5    we're discussing today is reasonable, right?

6    A    Yes.

7    Q    Mr. Islim, you did not consider the probability of

8    success of the Genesis debtors' defenses to FTX's claims to

9    reach that conclusion, correct?

10   A    That is not correct.  We did consider the likelihood of

11   the outcomes of the defenses.

12   Q    My question was different.  You did not consider the

13   probability of success of the Genesis debtors' defenses to

14   FTX's claims to reach the conclusion that the proposed

15   settlement was reasonable, correct?

16   A    That is incorrect.  We did consider them.

17            MR. DALSEN:  Your Honor, I'd like to read from Mr.

18   Islim's deposition transcript.  This is from September 15th.

19            THE COURT:  Well, the way you do that is you say

20   you gave a deposition in this case.  You remember you were

21   under oath.  You remember I asked questions, you gave

22   answers.  Do you remember the following question?  You

23   remember the following answer?  So sorry, I'm just a

24   creature of habit, so I would go that way.  So what exhibit

25   are we looking at?

```
1              MR. DOYLE:  Seven.

2              THE COURT:  Seven.  Okay.  Thank you.

3              MR. DOYLE:  In the joint exhibit.

4              THE COURT:  In the joint exhibit.  All right.

5    Thank you.

6              MR. DALSEN:  (indiscernible)

7              THE COURT:  Yeah, I've got it.  What page?

8              MR. DALSEN:  This is at Page 58 --

9              THE COURT:  Fifty-eight.

10             MR. DALSEN:  (indiscernible)

11   BY MR. DALSEN:

12   Q    Mr. Islim, do you recall giving a deposition in this

13   proceeding?

14   A    Yes.

15   Q    And you were under oath for that deposition?

16   A    Yes.

17   Q    You gave truthful answers during that deposition?

18   A    Yes, I did.

19   Q    You were made aware during your deposition that you had

20   the opportunity to review the transcript and submit any

21   corrections you believed were necessary, right?

22   A    Yes.

23   Q    And in fact, yesterday evening, you did submit errata

24   to your deposition transcript, correct?

25   A    Yes.
```

1   Q    And Mr. Islim, during that deposition, you were asked a

2   question: "Question: Did you analyze the probability of

3   success of Genesis's defenses?"  You gave the answer, "No."

4   A    Would you please guide me to the exact section seven

5   here of the (indiscernible) I don't see that position in the

6   transcript.

7             MR. DALSEN:  Your Honor, I think you already

8   completed the --

9             MR. WEAVER:  Objection, Your Honor.  He wants to

10  look at the transcript.

11            THE COURT:  Well, so it's always good everybody's

12  on the same page, both figuratively and literally.  So if

13  you would turn to this black binder.

14            MR. WEAVER:  Your Honor, he doesn't have that

15  binder (indiscernible) --

16            THE COURT:  Oh, he doesn't have that black binder.

17  Okay.

18            MR. WEAVER:  (indiscernible) their binder.

19            THE COURT:  All right.  Yes, you can approach the

20  witness and provide it.  Thank you.  All right.  So Mr.

21  Islim, I believe it's tab seven, page 58, going on to page

22  59.  Why don't you read those pages and then look up when

23  you've gotten a chance to do so?  Thank you.

24            THE WITNESS:  Thank you.

25  BY MR. DALSEN:

Page 34

1    Q    Okay.  So I want to direct you, Mr. Islim --

2              MR. WEAVER:  Objection, Your Honor.  This is an

3    improper impeachment.  Counsel knows his testimony was

4    clarified later on the record.

5              THE COURT:  All right.  Bo speaking objections.

6    He gets to present his case.  You get to present yours.

7              MR. WEAVER:  Fair enough, Your Honor.  I'm happy

8    to reserve.

9              THE COURT:  If there's context, I'm sure you'll

10   point it out.

11             MR. WEAVER:  Thank you, Your Honor.

12   BY MR. DALSEN:

13   Q    Mr. Islim, I'm directing you now to Exhibit 7 that's

14   been entered as a joint exhibit with this attached

15   (indiscernible) do you have the deposition in front of you,

16   the deposition transcript?.

17   A    Yes, I do.

18   Q    Okay.  Now I want to direct you to page 58, line 19.

19   Let me know when you're there.

20   A    I am there.

21   Q    Mr. Islim, at your deposition, you were asked the

22   question at line 19: "Question: Did you analyze the

23   probability of success of Genesis's defenses?"  And at page

24   59, line five, you gave the answer, "No," correct?

25   A    Correct.

1   Q    Mr. Islim, the Genesis debtors also did not consider

2   the probability of success of their defenses to FTX's claims

3   to reach the conclusion that the settlement was reasonable,

4   correct?

5   A    That is incorrect.

6   Q    All right.  Mr. Islim, referring to the same deposition

7   transcript, I'd like to direct you to page 59, line seven.

8   Let me know when you are there.

9   A    Yes, I am there.

10  Q    Mr. Islim, at your deposition that we've already talked

11  about, at line seven, page 59, you were asked a question:

12  "Question: Did the Genesis debtors analyze the probability

13  of success of Genesis's defenses," and line eleven, you gave

14  the answer, "No," correct?

15  A    That is correct.

16           THE COURT:  So to loop back to counsel's earlier

17  objection, the idea is that your question is supposed to be

18  the same as the questions asked.  So when you use different

19  words, technically the objection that was made has a point.

20  So I think your phrasing of this was different than the

21  phrasing of the question.  So just to save us all time, so

22  I'll let it in.  But I think that we'll get bogged down if

23  that becomes an issue going forward.

24           MR. WEAVER:  And I may address it even further

25  later, Your Honor.

Page 36

```
 1              THE COURT:  All right.

 2    BY MR. DALSEN:

 3    Q    Mr. Islim, you did not consider the probability -- let

 4    me ask you a different question.  Mr. Islim, you never

 5    discuss the probabilities or possibilities of success of the

 6    FTX's claim of FTX's claims in determining whether or not

 7    this is a reasonable proposed settlement, correct?

 8    A    That is incorrect.  We did consider the likelihood.

 9    Q    Mr. Islim, I'd direct you again to your deposition

10    transcript, this time to page 114.  Page 114, line 18,

11    please.  Let me know when you're there.

12    A    You said page 114?

13    Q    Yes.

14    A    Okay.  I'm there.

15    Q    At line 18, you were asked a question: "Do you also

16    consider the probability of success of those claims in

17    determining whether or not this is a reasonable proposed

18    settlement?"  And at page 115, line one, you gave the

19    following answer: "Answer: As I mentioned earlier, I never

20    discussed the probabilities or possibilities of them,"

21    correct?

22    A    Correct.

23    Q    Mr. Islim, you're aware that FTX filed a proof of claim

24    against the Genesis debtors (indiscernible) --

25    A    Yes, I am.
```

1    Q    You're aware that part of the claim FTX asserts against

2    the Genesis debtors is for alleged repayment of a loan by

3    Alameda?

4    A    Yes.

5    Q    That preference claim relating to the alleged repayment

6    of an Alameda loan is for about $1.8 billion.

7    A    Correct.

8    Q    Mr. Islim, you assessed the strength of the Genesis

9    debtors' defenses to that claim, correct?

10   A    Yes, we did.

11   Q    But you will not be telling the court today the

12   ultimate conclusion of the Genesis debtors' analysis of the

13   strength of the Alameda loan repayment claim because it was

14   served as a privileged conversation, correct?

15   A    That is correct.

16   Q    You will also not testify as to the specifics and the

17   details of the Genesis debtors' assessment of the strengths

18   of their defenses to the Alameda loan claim because, again,

19   you assert privilege, correct?

20        THE COURT:  So I'm going to interject myself here.

21   I'm not quite sure where we're going with this.  Obviously,

22   any decision that's made in a case of whether to settle or

23   not settle has certain -- is a product of lots of

24   communications and conversations, and folks decide to share

25   what they're going to share in terms of justifying it, and

1    they have a burden to meet.  So I guess I'm asking a

2    question.  What do you want me to take from this line of

3    questioning?

4              MR. DALSEN:  Yes, Your Honor.  What we want you to

5    take from this is that this is a commensurate sword and

6    shield problem, that what you have been provided as to that

7    testimony.

8              THE COURT:  But isn't for every 9019 ever then,

9    right?  Are people expected to throw open their books

10   completely and discuss everything?  What if the settlement

11   doesn't get approved?

12             MR. DALSEN:  I don't think it's that stark, Your

13   Honor, respectfully.  I think that what we're saying is that

14   if you're going to offer testimony that a settlement is

15   reasonable, that leads to what are factors that are set by

16   the law.  Those factors include, among other things,

17   probability of success.

18             THE COURT:  But that's always, isn't it, right?

19   You always have to justify settlement.

20             MR. DALSEN:  You always have to justify

21   settlement.  Of course.

22             THE COURT:  Right.  And I would be surprised if

23   there wasn't evidence provided in this case, if there wasn't

24   a witness to testify that it was reasonable, there'd be an

25   objection that there's no witness to testify that it's

Page 39

1    reasonable.

2          MR. DALSEN:  And our point, Your Honor, is that

3    however much the debtors say that the settlement is

4    reasonable, the problem is that there's no backing for it.

5          THE COURT:  Okay.  But can't you do -- isn't that

6    irrelevant to the privilege issues?  Right?  Isn't that he

7    presents what he presents and then you decide whether it

8    satisfies the requirements?

9          MR. DALSEN:  Your Honor, in our view, no.  The

10   reason it's relevant is because it identifies for the court

11   everything that the court does not have before it because

12   this is a sword and shield issue.  They can't say the

13   settlement is reasonable --

14         THE COURT:  So here's what I'm going to add.  I'm

15   going to ask Mr. Islim to take a walk back in the conference

16   room.  You don't need to be burdened with this, and it's

17   probably a good idea that you're not.  So you're still under

18   oath, but you can use that conference room back there.  I

19   confess there are lots of boxes back there for lots of

20   things, including the Purdue case.  So I'd ask you not to

21   look at any of those, but please make yourself comfortable.

22         So I get it.  But here's the way I understand the

23   dynamic.  Like any case, you're not obligated to set forth

24   everything.  You say, I have a burden to meet.  Here's what

25   I'm going to present.  And then people can attack it and

Page 40

1   say, here's where it's deficient.  But I don't know the fact

2   that they didn't share everything that's privileged is

3   necessarily relevant per se.  So you can attack anything he

4   says and says is insufficient and doesn't satisfy the

5   requirements for 9019.  I just want to get a sense of what

6   we're doing here today so that we have productive

7   conversations.  So if I'm misunderstanding it, please

8   straighten me out.

9            MR. DALSEN:  Well, I think, Your Honor, what we're

10  getting at, when we're looking at the factors that you use

11  to approve 9019, you have to understand the probability of

12  success.  You have to understand foreign judgment, among

13  other things.  And what we're going to hear from the

14  witness, and what we heard at deposition is that when asked

15  questions, what did you consider, will you even tell us what

16  factors you considered, he's going to say it was a

17  privileged conversation.  And so the evidence here, to the

18  extent that the court looks at this declaration and says,

19  well, here's a witness who's going to say this is

20  reasonable, he's going to say that a lot of people did a lot

21  of work on this, therefore you should approve it.  The

22  question that we have, the questions we asked at deposition

23  were, okay, well, what did you do?  What factors did you

24  consider?  Did you assess the strengths?  He would answer

25  yes to that question.  What did you do to assess the

1    strengths?  He would describe the process where he relied on

2    legal counsel.  At that point, we're saying, okay, what was

3    that process?  What did you actually consider?  What did you

4    conclude?  What was the basis for the conclusion?  Because

5    otherwise the court only has a conclusory statement in the

6    declaration.  But if the court wants to take that all that

7    they have is a conclusory statement in the declaration and

8    that there was not discovery permitted in these other areas,

9    then that can be what it is.  But what we wanted to do is

10   make a record that these are all the things that we do not

11   know that will not be presented to the court.

12            THE COURT:  All right.  Well --

13            MR. WEAVER:  Can I be heard, Your Honor, just

14   briefly?

15            THE COURT:  Please.

16            MR. WEAVER:  First of all, the comments by counsel

17   about what is or is not before you in the record, you have

18   his declaration where he goes through factors.  This is his

19   testimony.  They could have challenged it during the

20   deposition if they wanted to.  They could have gone through

21   line by line if they wanted to.  They didn't.  Now the idea

22   that the witness provided no information during his

23   deposition was just proven by the very comments we just

24   heard.  They asked about assessing the strengths of the

25   claims, and they said, what is your process?  The witness

1   described the process.  The process obviously involved legal

2   counsel, but there was a process.  There are minutes in the

3   record, Your Honor, when these meetings took place.  All

4   this evidence is before you.  The only evidence that's not

5   before the court is the one thing they want to repeatedly

6   ask the witness, what did your lawyers tell you?  And that's

7   just not appropriate in a case like this, Your Honor.  The

8   declaration speaks for itself.  The deposition testimony,

9   there's pages and pages and pages of describing the factors,

10  describing the process.  But when you get to that ultimate

11  question, yes, he was instructed not to answer.

12          MR. DALSEN:  Your Honor --

13          THE COURT:  So when you say when it gets to the

14  ultimate question, and are you saying the question is, what

15  did counsel tell you?

16          MR. WEAVER:  The question is, what were your

17  conclusions as to the strength of the claims?  What were

18  your conclusions (indiscernible) --

19          THE COURT:  Well, if he's the witness, I don't

20  tell you who to present as a witness.

21          MR. WEAVER:  Correct.

22          THE COURT:  He's got to have evidence on the

23  relevant test and he's got to be able to speak to it.  Maybe

24  it's a burden issue in terms of whether you've met your

25  burden and you say, well, we think we have, and he thinks

```
1    you haven't.  But he's got to have -- it would be unusual if

2    he didn't have an opinion on certain things.  But again,

3    we'll go through it.  My brief look at the lines after the

4    question on page 58 is that some of this is not so clear.

5    And I'm trying to avoid the situation where you get all

6    these categorical statements and then he introduces all the

7    statements that say, well, here's what I did, and there are

8    two ships passing in the night.  I mean, I guess we can do

9    that.  But if that's the case, then the parties' estimate of

10   two hours is going to be woefully underestimated as to how

11   long it's going to take.

12              But again, you know the case better than I do, so

13   I just wanted to get a sense of where we are.  And I think

14   I've gotten that.  And so I think we can call Mr. Islim out

15   and we'll see where we end up.

16              MR. WEAVER:  Thank you, Your Honor.

17              THE COURT:  Thank you, Mr. Islim.  If you would,

18   again, make yourself comfortable.

19              THE WITNESS:  Thank you, Your Honor.

20              THE COURT:  And I just remind you, you're still

21   under oath.  And thank you for your patience as we talk

22   through some issues which may or may not result in a

23   shortened hearing.  But we'll see.  Counsel, you're up.

24              MR. DALSEN:  Thank you, Your Honor.

25   BY MR. DALSEN:
```

```
 1    Q    Mr. Islim, forgive me if I'm asking you the same

 2    questions a second time.  Let me make sure I didn't lose my

 3    place.

 4            THE COURT:  I think we had gone through 58 and 59

 5    and 114 and 115, and then you talked about Alameda.

 6            MR. DALSEN:  Thank you, Your Honor.

 7    BY MR. DALSEN:

 8    Q    Mr. Islim, just to be clear about this.  You will not

 9    testify as to specifics and details (indiscernible) Genesis

10    did its assessment of strengths of the defenses to the

11    Alameda loan claim because you assert privilege, correct?

12    A    Correct.

13    Q    It is your position, sir, that the settlement agreement

14    we're discussing today will avoid the possibility of rulings

15    in either these bankruptcy proceedings or in the FTX

16    bankruptcy proceedings that can negatively impact the

17    Genesis debtors' defenses to claims, right?

18    A    Would you please question or break it down, if you

19    don't mind?

20    Q    Of course.  I'm asking whether it's your view that the

21    settlement agreement we're talking about today, that

22    entering into it would avoid the possibility of rulings in

23    this proceeding.  Let's start with that.  This proceeding

24    that could negatively impact the Genesis debtors' defenses

25    to claims.
```

Page 45

1    A    That is correct.

2    Q    And similarly, it is also your view that the settlement

3    agreement we're talking about today will avoid the

4    possibility of rulings in the FTX bankruptcy proceedings

5    that could negatively impact the Genesis debtors' defenses

6    to claims, correct?

7    A    That is correct.

8    Q    You made that statement in your declaration, right?

9    A    Yes.

10   Q    And you made that statement in your declaration --

11   actually, let me be specific.  Do you have your declaration

12   in front of you, Mr. Islim?

13   A    I do.

14   Q    Could you turn to page five of your declaration,

15   paragraph 12, please.  I'm going to direct you to the second

16   sentence of paragraph 12.

17   A    In paragraph 12?

18   Q    Yes.

19   A    Okay.

20   Q    And that sentence reads, "The settlement agreement will

21   also avoid the possibility of liens in either of the Genesis

22   bankruptcy proceedings or the FTX bankruptcy proceedings

23   that could negatively impact the Genesis debtors' defenses

24   to claims or claims (indiscernible) may assert against third

25   parties."  That's what you wrote in paragraph 12.

1    A    Correct.

2    Q    And that's true today as well, correct?

3    A    (indiscernible)

4    Q    That's still a correct statement today?

5    A    Yes.

6    Q    Now to make that statement in your declaration, you had

7    to assess a lot of factors with relationship to the claims,

8    counterclaims and settlement as a whole, correct?

9    A    That is correct.

10   Q    But today we will not be telling the court whether you

11   assessed the defenses the Genesis debtors had to FTX's

12   claims because it asserted privilege, right?

13   A    That is incorrect.  We did assess the likelihood, the

14   outcome of those (indiscernible) factors.  We did.

15   Q    Mr. Islim, I want to direct you again your deposition

16   transcript.  You still have that in front of you?

17   A    Yes, it is.

18   Q    I'd like to direct you to page 94, please.  And if you

19   go to line 13, Mr. Islim, at your deposition you were asked

20   the question, "Did you assess the defenses?"  The answer you

21   gave is at line 17, "Yeah, I wish not to answer this one,

22   but in general, we discussed all the factors, including the

23   defense."  Is that the testimony you gave?

24   A    The answer in this, what's written here is correct, but

25   the context might be different.  So I'm happy to elaborate

Page 47

1    further if you wish.

2    Q    Mr. Islim, you relied on Genesis debtors' restructuring

3    experts, including legal counsel, to say what you said in

4    paragraph 12 of your declaration, right?

5    A    I relied on the restructuring expert, but also those

6    are my statements.  So I'm fully convinced and in agreement

7    with all of that..

8    Q    And the restructuring experts that you refer to, that

9    includes legal counsel --

10   A    It's (indiscernible) our financial advisors who

11   analyzed the FTX transaction.

12   Q    And you would agree that you are the most familiar and

13   capable person at the Genesis debtors to have submitted the

14   declaration you submitted in support of the motion we're

15   talking about today, right?

16   A    Can you repeat your question?  Sorry.

17   Q    Sure.  You would agree that you are the most familiar

18   and capable person at the Genesis debtors to have submitted

19   the declaration that you submitted in support --

20   A    From the business side, yes.

21   Q    From the business side.

22   A    Yes.

23   Q    But you also agree that you do not have the knowledge

24   or the specifics of the claims FTX has asserted against the

25   Genesis debtors, correct?

1   A    I was briefed on the analysis and we assessed all the

2   defenses and the likelihoods and such.  But what I mean by

3   that is there are a lot of technical and legal details that

4   is not my area of expertise.  It's a complex exercise, so

5   I'm not knowledgeable with all the areas that we had to

6   navigate to come up to that (indiscernible) --

7   Q    Mr. Islim, you do not have knowledge of the specifics

8   of the claims certified against the Genesis debtors,

9   correct?

10   A    I do.  I do, but not all of them.

11   Q    Okay.  Well, let's look at your deposition transcript

12   again.  If you could go to page 101, please.

13   A    Yes.

14   Q    At line three, you were asked the question, "But you

15   also mentioned that you do not have the knowledge of the

16   specifics of the claims," and you gave the answer, "That is

17   correct."  Is that your testimony?

18   A    Yes, it is.

19   Q    Mr. Islim, you are also aware that as part of FTX's

20   proof of claim against the Genesis debtors, part of it

21   concerns alleged collateral posted or returned to Genesis

22   Global Capital by Alameda; is that right?

23   A    Yes.

24   Q    And the Genesis debtors did assess the strength of

25   those collateral claims, correct?

1    A    Correct.

2    Q    But as with the prior claims, you will not be telling

3    the court today what the Genesis debtors did to assess the

4    strength of their defenses because you assert privilege,

5    correct?

6    A    We did assess the defenses.  And as I mentioned in my

7    deposition, we looked at different factors that went into

8    that.  But what I meant by that is I cannot comment on the

9    final details when it comes to all the legal aspects of

10   those defenses and the different legal details that go into

11   that.

12   Q    So, for example, Mr. Islim, you cannot comment as to

13   the factors that you discussed in order to make that

14   assessment, correct, because of privilege?

15   A    I can -- I can comment on that.  I can mention some of

16   the factors, but not the substance and the finer details of

17   that.  I'm happy to elaborate if you wish.

18   Q    When you say not the substance or finer details, what

19   do you mean?

20   A    For example, we looked at the claims.  We looked at the

21   magnitude of those claims.  We looked at the likelihood of

22   defenses of those claims.  We looked at factors that emerge

23   on the back of the administrative complexities of the two

24   bankruptcies.  We looked at also potential claims that

25   Genesis asserted against third parties and similar claims

Page 50

1    asserted by other parties against Genesis.  So we looked at

2    the factors.  My understanding is, when you ask about the

3    specific is what was the conclusion of those factors, how do

4    we analyze it in final details?  This is what I'm not privy

5    to, but definitely we assessed all the factors when it comes

6    to those claims and the nature of them.  But I cannot

7    comment on the specifics of the analysis of each of those

8    claims and what our final conclusion on those because this

9    is privileged communication.

10   Q    Okay.  So Mr. Islim, you're not telling us the

11   conclusion that the Genesis debtors reached because you're

12   asserting privilege, correct?

13   A    We communicated the conclusion.  The conclusion is we

14   found a global settlement and it's fair and robust and

15   brings a lot of value to our creditors.  But I mentioned

16   earlier here means you cannot look at -- it's not very

17   valuable to communicate the individual outcome of each

18   defense and each factor.  You have to look at it globally,

19   consider all factors and all defenses and everything I

20   mentioned earlier, and then you make a conclusion.  So no,

21   the conclusion is public.  We reached settlement with FTX.

22   We communicated that and we continue to (indiscernible)

23   robust settlement (indiscernible) privileged.

24   Q    My question was different.  Mr. Islim, you will not be

25   sharing the conclusions and the analysis or anything more

Page 51

1   specific than the fact that you reached a settlement with

2   FTX with the court today because you're asserting privilege,

3   correct?

4   A    No.  What I mentioned, we shared the factors.  We did

5   the comprehensive analysis that is needed.  But that is

6   correct, I do not wish to share further details about how we

7   analyzed and what was the conclusion of each of those

8   dimensions because this is privileged information.

9   Q    Okay.  So you will not be sharing how you analyzed each

10  of the factors that you say that were considered because of

11  privilege, correct?

12  A    Correct.

13  Q    You will not be sharing the conclusion as to each of

14  the factors because of privilege, correct?

15  A    Correct.

16  Q    You will not be sharing any conclusions about the

17  strength of the Genesis debtors' claims because of

18  privilege.

19  A    I share that we assessed them, but I do not want to

20  share -- I do not wish to share the result of those

21  assessments.  Correct.

22  Q    You will not be sharing with the court information and

23  conclusions about any weaknesses of the Genesis debtors'

24  claims or defenses, again, because of privilege.

25  A    I think the court -- it's important to know that we

Page 52

1    assessed the likelihood and the outcome, and we

2    (indiscernible) all the factors.  But I do not -- again, I

3    cannot comment on the specifics and the internal discussions

4    and the outcome of those individual factors.  That is

5    correct.

6    Q    So the answer to my question was yes.

7    A    It's a bit of a generic question.  I keep repeating

8    that we discussed the factors and the likelihood, and it's a

9    global settlement.  It's one number that considers multiple

10   factors, multiple dimensions.  What matters at the end is

11   that we considered the factors and we assessed them, and we

12   reached that global resolution considering the strength and

13   the weaknesses of all those things.

14   Q    Beyond what you just said, is there anything more that

15   you're going to share with the court today about the

16   analysis that you're talking about?

17   A    Well, what I can share with the court is the analysis

18   is very comprehensive.  We worked for months and weeks

19   extensively with our restructuring and bankruptcy experts to

20   look into those factors.  I hope everyone appreciates that

21   those are extremely technical details that requires people

22   who are very knowledgeable with the space and add into that

23   the complexity of the two bankruptcies at once.  But also,

24   we have a very seasoned special committee who has tens of

25   years of experience actually in restructuring and in capital

1    markets.  And I believe putting all that together, we did

2    our best efforts to finalize this global resolution.

3    Q    Mr. Islim, you're also aware that part of FTX's claim

4    against the Genesis debtors concerns withdrawals from the

5    ftx.com exchange by Genesis Global Capital; is that right?

6    A    By Genesis Global Capital International.  Maybe if you

7    might repeat that question.

8    Q    Sure.  I'll just ask you.  There's a claim that FTX has

9    asserted that concerns withdrawals from the ftx.com

10   exchange.  Are you aware of that claim?

11   A    Yes.

12   Q    And does that concern withdrawals from the FTX exchange

13   by Genesis Global Capital International?

14   A    That is correct.

15   Q    And FTX seeks approximately $1.6 billion related to

16   those claims?

17   A    That is correct.

18   Q    The Genesis debtors assessed the strength of the FTX

19   claim, the withdrawal claim; is that right?

20   A    Yes.

21   Q    And the process, you've already described the process

22   that the Genesis debtors followed to assess the strength of

23   claim; is that right?

24   A    Yes.

25   Q    But you did not assess or rely on others to assess the

Page 54

1   probability of success of FTX's withdrawal claims, correct?

2   A    That is incorrect.

3   Q    All right.  Mr. Islim, let's look at your deposition

4   transcript again.  Let's look at page 125, please.  I would

5   direct you to line five, please.  Mr. Islim, you were asked

6   at your deposition the question: "Did you assess or rely on

7   others to assess the probability of success of FTX's

8   withdrawal claims?"  At line ten, you gave the answer: "We

9   did not consider the probabilities."  That was a testimony,

10  correct?

11  A    Correct.

12  Q    Mr. Islim, the Genesis debtors also did not consider or

13  assess the probability of success of FTX's withdrawal

14  claims, correct?

15  A    Correct.

16  Q    And as such, you will not tell the court today whether

17  the Genesis debtors concluded that the withdrawal claims

18  from FTX would be successful because you assert privilege,

19  correct?

20  A    We assessed the withdrawals strength and weaknesses and

21  we communicated also our position with the FTX UCC and we

22  explained that extensively.  So basically we understand

23  those weaknesses and strengths and we analyzed them

24  extensively with M3 and Cleary and also we communicated with

25  FTX UCC our position on those claims.

Page 55

1    Q    Mr. Islim, let me ask you a different question.  You

2    did not know whether the withdrawal claims from FTX would be

3    successful if brought against Genesis, correct?

4    A    It's very -- this is uncertain.  It's just a claim.

5    The certainty comes, I believe, after -- it could take years

6    between estimation and mitigation and concluding the

7    bankruptcy exercises in the two courts.  So it's an

8    uncertain outcome, but we analyzed all of that.  We analyzed

9    the likelihood.  We analyzed the strength and weaknesses.

10   But no matter what, it continues to be uncertain.

11   Q    Mr. Islim, I'd again point you to your deposition

12   transcript, this time page 123, line 16, please.  Are you

13   there, sir?

14   A    Sixteen?

15   Q    Yes, page 123, line 16.

16   A    Okay.  So this question -- so my question is you did

17   not know whether the withdrawal claims from FTX would be

18   successful against Genesis.  Objection.  And I would like to

19   instruct the witness not to answer. You want me to read my

20   answer?

21   Q    Well, the answer, if we look on page 124 at line one,

22   the answer you gave is, "I'm not answering this question,"

23   correct?

24   A    That is --

25            MR. WEAVER:  Objection, Your Honor.  This is not -

1    - this is not impeachment.  We're looking at different lines

2    of the transcript.  We're jumping around.

3            THE COURT:  So I don't think the question you

4    asked lines up with this testimony, but I got it.

5            MR. WEAVER:  Sorry.  I'm sorry.  I apologize, Your

6    Honor.

7            THE COURT:  It's fine.  I think I understand your

8    point and I get it.  And this is -- so next question.

9    BY MR. DALSEN:

10   Q    Mr. Islim, you also will not tell the court today the

11   many factors Genesis debtors considered to evaluate the

12   withdrawal claim because of a privilege, correct?

13   A    As I mentioned earlier, I just communicated the factors

14   with the court earlier when I discussed about we analyzed

15   the claim and the magnitude of those claims, the cost of

16   litigation and time and all of that.  So I'm happy to show

17   you the --

18   Q    Mr. Islim, my question is different, but let me just

19   again point you to your deposition transcript, page 125,

20   line 13.  At your deposition mistress and you were asked a

21   question: "Question: Did the Genesis debtors consider or

22   assess the probability of success of the withdrawal claims?"

23   "Answer: We did not consider the probabilities."  Question

24   at line 18, "What did you do to evaluate this claim?"

25   Answer at line 21, "The same was a very complex exercise.

Page 57

1    We were presented with many factors which I cannot discuss

2    now due to privilege and we made that determination based on

3    all those factors."  That was your testimony, correct?

4    A    That is correct.

5    Q    Mr. Islim, you agree that legal counsel to the Genesis

6    debtors led to negotiation the settlement agreement

7    discussed today?

8    A    It did.

9    Q    You also agree that legal counsel for Genesis debtors

10   helps the Genesis debtors make determination of whether the

11   settlement is reasonable.

12   A    They provide special committee and senior management

13   with analysis and provide us with the expertise needed for

14   the special committee to make a final decision.

15   Q    The legal counsel helped Genesis debtors make that

16   determination, right?

17   A    Yes.

18   Q    But you will not be telling the court today why you

19   believe the proposed settlement is reasonable as you

20   understand it because a lot of the input into that decision

21   is privileged information.  You will not be telling the

22   court today why you believe the proposed settlement is

23   reasonable as you understand it because a lot of the input

24   that went into that decision is privileged information,

25   right?

1    A    Well, I'm happy, I mean to share with -- no, I mean the

2    settlement is reasonable and as you are aware, the potential

3    cost and timing of litigation and destination is extremely

4    uncertain and very expensive and our creditors are looking

5    for certain.  So this plan allows us to proceed with our

6    plan and allows us also to provide liquidity for our

7    creditors in a timely manner.  Litigating this between two

8    very large or the largest two crypto bankruptcies will be

9    very costly and unfavorable for our creditors.

10   Q    Mr. Islim, you would agree that a lot of the input,

11   fortunately, that the Genesis debtors received is privileged

12   information?

13   A    Well, it depends on the context.  But a lot of the

14   input meaning when special committee wants to make decision,

15   the input to their decision is the likelihood and the

16   estimation and our privileged information about how we view

17   those claims success and failures.  This is what I mean by

18   the input.  But again, those questions are very pigmental

19   because they are asked in different times and different

20   contexts.  But we consider the input that our expert

21   provided, our legal analysis about the successes and initial

22   failures of those claims and we consider those very

23   seriously.  And that was a major input of the global

24   settlement.  And I cannot comment on that input in the

25   context that I cannot tell you what really told us about and

Page 59

1    what the success of that claim of area is because it doesn't

2    matter.  What matters is global settlement.  They know all

3    the factors and that special community measurement received

4    that input and that input is cryptocurrency.  Correct.

5    Q    Okay.  So the answer to my question, a lot of the input

6    went into reasonable as you understand it, a lot of that

7    input is privileged.

8    A    Absolutely.

9    Q    You will not be disclosing that privilege information

10   to the court today, right?

11   A    No.

12   Q    Mr. Islim, I'd like to show you -- but you have one too

13   many binders up there.

14            MR. DALSEN:  If I just may have a moment.

15            THE COURT:  Sure (indiscernible) it is, but it's a

16   white binder from that nice gentleman over there.

17            THE WITNESS:  Is it the other one?

18            MR. DALSEN:  All right.  It's just like a tab.

19   Ten of the white binder.  Unless you have a black binder

20   there.

21            THE COURT:  They're both white.  There's one

22   binder that has nine tabs.  Do you happen to have that one

23   in front of you?  They're both white.

24            THE WITNESS:  I have 15 and 15.

25            MR. DALSEN:  (indiscernible) net binder there?  If

1    you turn a tab down.

2            THE COURT:  All right.  So I'm in my white binder.

3    BY MR. DALSEN:

4    Q    Now, Mr. Islim, this one, can you tell us what is that

5    type of tab ten of --

6    A    This is a presentation prepared by (indiscernible) to

7    present to the FTX UCC and their legal counsel.

8    Q    If you look at the bottom right corner, should be a

9    control number down there.  Genesis.  Do you see that?

10   A    I do.

11   Q    Okay, from the last couple of numbers there, 9632.  You

12   see that?

13   A    I do.

14   Q    Mr. Islim, you are not in a position to approve this

15   presentation on behalf of the debtors, right?

16   A    That is correct.

17   Q    You also do not have any input into this presentation.

18   A    This is Brooklyn.  Potentially, I did.  It's hard,

19   remember, this is month of exercise.  It's hard to pinpoint

20   link the details to my conversations over the months, but

21   potentially, maybe.

22   Q    Do you recall having any direct input on this

23   presentation?

24   A    No.  No direct input.

25   Q    Mr. Islim, you will not tell us today whether you agree

Page 61

1    with this presentation and what it contains because it's

2    their privilege, correct?

3    A    That is incorrect.

4    Q    Okay, let's look at your deposition transcript.  I'm

5    sorry to make you shuffle these binders again.  Look at page

6    74.

7    A    It's it 70.  Correct, sir?

8    A    Yes, I'm there.

9    Q    Okay, I want to direct your attention to one at your

10   deposition that you gave in this proceeding.  You asked a

11   question: "Question: Do you agree with the presentation and

12   what it contains at line ten?"  You gave the answer, "I have

13   nothing to comment on."

14   A    (indiscernible)

15          MR. WEAVER:  -- reads right over the objection,

16   which was an important part before the witness answered the

17   question.

18          THE COURT:  Well, read the whole transcript.  Just

19   because that's what the record is, because the deposition is

20   not going in.

21          MR. DALSEN:  Okay.  That's fine, Your Honor.

22   BY MR. DALSEN:

23   Q    Mr. Islim, I'll just read from page 74, line 510.  I'm

24   going to ask you the question and answer your case question

25   at line five.  You agree with this presentation of what it

Page 62

1    contains at line seven?  Your counselor objects.  She says,

2    objection, and I caution the witness not to reveal any

3    privileged information.  Your answer at line ten.  I have

4    nothing to comment on that.  Was that the answer that you

5    gave your deposition?

6    A    Yes.

7    Q    The reason you didn't comment is because of what your

8    counsel cautioned you not to reveal privileged information,

9    correct?

10   A    Not necessarily.  Because the question was, do you

11   agree with the presentation and what it contains.  And

12   remember, this is presentation authorized by the special

13   committee created by and of course, after consulting with

14   all the restructuring advisors and presented to was not -- I

15   didn't have direct input to it.  It was part of ongoing

16   negotiations at one point in time.  And it's very generic

17   for me to say I agree or disagree because we are here now.

18   And that was a point of time when it comes to the details

19   and the defenses and the legal analysis.  And lastly, it was

20   a very difficult presentation between lawyers.  So, out of

21   caution, I didn't comment.

22   Q    At your deposition, you had no comment whether you

23   agreed this presentation as content, correct?

24   A    Yes.

25   Q    Okay.  In fact, we're not going to tell the court even

Page 63

1    a yes or no answer, at least the deposition.  You did not as

2    to whether you disagreed with something in this document

3    because you understood privilege, right?

4    A    Yes.  The details of that is privilege.  And that's

5    what we need to understand, that that was part of ongoing

6    negotiation authorized by the special committee were the

7    ultimate decision maker with that.  But absolutely, we were

8    briefed on it and special committee authorized.

9    Q    Mr. Islim, my question is very specific.  You will not

10   tell the court yes or no --

11           THE COURT:  I got it.  It's in the deposition that

12   you read.  And that was his testimony.  I got it.  Next

13   question.

14   BY MR. DALSEN:

15   Q    Mr. Islim, the same presentation we've been looking at,

16   this was a presentation.  I believe you're testified to this

17   presentation to the FTX debtors, the FTX UCC and their

18   respective legal advisors.  Is that right?  And this is

19   their respective legal advisors?

20   A    Yes.

21   Q    I want you to turn to the second to last page of this

22   presentation, number ending 9642.  Let me know when you're

23   there's.

24   A    Okay.

25   Q    I want to direct you to the third bullet point on that

Page 64

```
 1   page.  Actually, I'm sorry, I should have been more

 2   specific.  So under the rationale for settlement okay.  I'd

 3   like to direct you to the third bullet point underneath

 4   that, provide value.  Do you see that?

 5   A     I do.

 6   Q     Genesis debtors told FTX the settlement we're talking

 7   about today provides value to FTX debtors, even though

 8   Genesis debtors believe they had valid defenses and would

 9   succeed in reducing the FTX debtors claims to zero.  That's

10   what he told the FTX debtors, right?

11   A     That is correct.

12   Q     The Genesis debtors also told the FTX debtors that the

13   settlement eliminates substantial legal costs and

14   distractions, right?

15   A     That is correct for both of us, not just for them.

16   Q     Where on page 9642, that last bullet point, does it say

17   that it eliminates substantial legal costs and distractions?

18   A     No, what I'm saying is what you mentioned is correct,

19   but I'm just adding that it's beneficial for both.

20   Q     Okay, so it's not a presentation, but your testimony is

21   that it would be beneficial for both.  From that

22   perspective.

23   A     It's common sense when you reach a settlement, it's

24   beneficial for both parties.

25   Q     Absolutely.  But the Genesis debtors did not present
```

Page 65

1    any information actually, let's just start with you.  You

2    yourself not present any information as part of this

3    presentation that we're looking at about how the Genesis

4    debtors have their own benefits and settlements.

5    A    Correct.  Again, when it comes to the -- there are

6    different stakeholders involved in the process we were

7    conducting along the way.  So from senior management

8    perspective, our main involvement has been providing the

9    experts with the records, with the context, with the

10   transactions, with the history between the entities and

11   provide them with all that basically data and history for

12   them to be able to make those assessments.  If you add to

13   that that both FTX and Genesis filed for bankruptcy, it's

14   not my expertise to provide input around specific benefits

15   of settlement.  Beyond that, it's a cost saving.  It's

16   bringing more timely resolution for our bankruptcy case and

17   helping our creditors basically access their liquid assets

18   faster and sooner.  So from my perspective, absolutely, I

19   had to give an input.  And as a fiduciary, my responsibility

20   is actually to maximize recovery and accelerate it and help

21   our creditors recover their money as soon as possible.  So

22   of course, I was engaged and involved in certain areas and

23   make assessment there.  But beyond that, it requires the

24   experts who provide that input and provide us basically the

25   global and all factors that Genesis for reaching that I'm

1    going to.

2            MR. DALSEN:  Move to strike that answer is not

3    responsive.  I don't want to have to do that every time.

4    But note that for the record, Mr. Islim, this one, my

5    question was quite different.

6            THE COURT:  I understand it talks about the

7    benefits to the FTX debtors.  It's a presentation to FTX.

8    Next question.

9            MR. DALSEN:  My question, if I may, Your Honor.

10            THE COURT:  Your question was so it doesn't

11    describe this presentation doesn't describe the genus

12    debtors own benefits of settlement.  I can see the document.

13    It doesn't again, it's a presentation to FTX.  I'm not sure

14    of the probative value of that question in the context of a

15    presentation to FTX.  Next question.

16    BY MR. DALSEN:

17    Q    Mr. Islim, the special committee generally relied on

18    analysis by counsel to decide whether to approve the

19    settlement, right?

20    A    Yes.

21    Q    Process that you follow to assess the strength let me

22    ask you a question specific to the withdrawal.  Do you have

23    that in mind?  The process that the Genesis debtors follow

24    to assess the strength of the withdrawal fight was rely on

25    legal counsel Cleary Gottlieb, who worked with financial

Page 67

1    advisors, to assess the strength of the Genesis debtors,

2    right?

3    A     Yes.

4    Q     And you use that same process to assess all the FTX

5    claims, right?

6    A     In general, yes.

7    Q     New topic.  Genesis debtors have their own claims

8    against the FTX debtors, right?

9    A     That is correct.

10   Q     One of those claims, approximately $38 million claim

11   that GGC has against Alameda relating to loan principal,

12   correct?

13   A     Yes.

14   Q     Second claim is $140 million claim GGC has against

15   Alameda relating to the 90-day preference period.  A third

16   claim is a $176 million claim that GGCI has against FTX,

17   your deposits on the FTX.  So we're talking about roughly

18   $355 million of claims that the Genesis debtors have against

19   FTX, correct?

20   A     At this grant?

21   Q     I'm sorry?

22   A     Yes.  Correct.

23   Q     The Genesis debtors believe that those claims, claims

24   they have FTX have significant value, right?

25   A     Yes.

Page 68

1   Q    And the Genesis debtors have assessed the strength of

2   their claims as FTX, right?

3   A    Yes.

4   Q    But as with the FTX claims against Genesis, you will

5   not tell the court today what you concluded about the

6   strength of Genesis that is claimed because of the cert

7   privilege, right?

8   A    That is correct.

9   Q    You will not tell the court today whether the Genesis

10  debtors determined that their claims were strong or weak

11  because this is correct.

12  A    That is correct.

13  Q    You're aware, Mr. Islim, that FTX itself asserted that

14  it owes GGCI of Genesis Global Capital International $227

15  million bankruptcy filings?

16  A    Correct.  Yes.  Correct.

17  Q    You will not be telling the court today whether the

18  Genesis debtors had any reason to dispute FTX's assertion

19  because of privilege, correct?

20  A    That is correct.

21  Q    You also will not tell the court about the specifics,

22  the composition or the validity of the customer deposit

23  claim of about $226 or $227 million because you assert

24  privilege over that analysis, right?

25  A    That is correct.

Page 69

1  Q    I want to ask you about the preference claim.  Do you

2  have that in mind, the $140 million?

3  A    Yes.

4  Q    For that $140 million claim, you also will not tell the

5  court today whether you know FTX has any defenses to that

6  claim because you assert privilege, correct?

7  A    You mean Genesis or FTX?

8  Q    Whether Genesis has any -- or I'm sorry, whether FTX --

9  whether the Genesis debtors have concluded that FTX has

10 defenses to its claim because you assert privilege.

11 A    Yes.  Again, all the analysis is the same thing, all

12 the analysis that comes to those claims, I can't share the

13 details of that with the court because of privilege.

14 Q    Okay, and you will not tell the court today even the

15 extent of your involvement in the process assessing that

16 claim because of privilege, correct?

17 A    Well, again, I can share as a management, our main role

18 has been to provide the records and the history and the

19 transactions and the context and everything needed for the

20 Cleary Gottlieb and (indiscernible) to make the assessments

21 and the likelihoods and initial outcome.  But you understand

22 those are very technical matters.  As an interim CEO, I

23 cannot -- number one, from (indiscernible) perspective and

24 also from (indiscernible) perspective to comment on those

25 findings.

Page 70

1    Q    Mr. Islim, let's look at your deposition transcript

2    again, please.  This is page 184.  I'm going to direct you

3    to page 184, line five.  Please let me know when you're

4    there.

5    A    I am there.

6    Q    All right.  Mr. Islim, at your deposition, you were

7    asked the question: "What was the extent of your involvement

8    in the process of assessing the strengths of the Genesis

9    claims?"  Your lawyer objected and, at line nine, you gave

10   the answer: "This calls for privilege."  That was your

11   testimony, correct?

12   A    Yes.  But in the context, the question here is

13   assessing the strength of the Genesis claim.  What I

14   answered you earlier was what was my role in general.  My

15   role in general was providing records and providing the

16   history of the transactions.  Here the question says

17   assessing the strength of the Genesis claims.  Again, this

18   is privileged information.

19            THE COURT:  Counsel, I think this is his testimony

20   both here today and in the depositions.  It's consistent if

21   you look at line five through line 18 or line 20.

22            MR. DALSEN:  I respectfully disagree, Your Honor.

23   But I will move on to the next question.

24            THE COURT:  So what did I miss?

25            MR. DALSEN:  Just that we asked him previously the

Page 71

1    extent of his involvement --

2            THE COURT:  Right.

3            MR. DALSEN:  -- and (indiscernible) asserting

4    privilege.

5            THE COURT:  No.  And then he said my involvement

6    in the process, can you share what we did to share

7    information so that Cleary Gottlieb and 3M can make

8    assessment.  So, I mean, there's slightly different parsing

9    of the language in lines 14 through 18, but I don't think

10   it's inconsistent.

11           MR. DALSEN:  Why don't I move on to the next

12   question, Your Honor?

13           THE COURT:  Yeah.

14   BY MR. DALSEN:

15   Q    Mr. Islim, you do not recall discussing probabilities

16   of success in any numerical sense relating to this $140

17   million claim, correct?

18   A    That is correct.

19   Q    And you will not tell the court today what conclusion

20   you reached about the probability of success or potential

21   outcome of the Genesis debtors' $140 million avoidance claim

22   because you assert privilege, right?

23   A    We discussed the likelihood.  We did not discuss the

24   new record numbers.  And again, the final assessment is

25   privileged.  Correct.

1  Q    You're not going to testify about the probability of

2  success of the potential outcome of the avoidance claims,

3  correct, because of privilege?

4  A    The likelihood and the outcome and our final

5  assessments (indiscernible) are privileged.  Correct.

6  Q    Okay.  I want to ask you about the $40 million loan

7  balance claim.  That $40 million claim relates to a loan

8  that Alameda did not repay; is that right?

9  A    Correct.

10  Q    As with the other claims, you asked the debtors to

11  assess the strength of that claim, correct?

12  A    Yes.

13  Q    You're not going to tell the court what you concluded

14  about the strength of the claim because of privilege, as

15  with the other claims; is that correct?

16  A    Correct.

17  Q    You will not tell the court what you concluded

18  (indiscernible) --

19          MR. DALSEN:  May I just have one moment, Your

20  Honor, to consult with my client?

21          THE COURT:  Sure.

22          THE WITNESS:  Your Honor, may I get my water from

23  the --

24          THE COURT:  Yes.  If somebody would give the

25  witness his water so you can --

1          THE WITNESS:  Thank you.

2          THE COURT:  Sure.  Thank you, Counsel.  Having

3    been a witness, it's no fun being a witness for anyone.  But

4    at least we won't have you die on the vine without your

5    water.  So it's the least we can do.  Counsel?

6          MR. DALSEN:  Your Honor, we'll pass the witness.

7          THE COURT:  All right.

8          MR. DALSEN:  (indiscernible)

9          THE COURT:  Thank you.

10          MR. WEAVER:  Just one moment, Your Honor.

11          THE COURT:  Sure.  So if you need five minutes

12    just to figure out what you want to do or if you think a

13    minute or two will be --

14          MR. WEAVER:  I think -- I think I'm actually ready

15    now, Your Honor.

16          THE COURT:  All right.

17          MR. DALSEN:  Your Honor, I appreciate a little bit

18    of the guidance on some of the comments you made about the

19    deposition testimony.  Since the witness is here obviously

20    and testifying live, I do not intend to go through with the

21    witness all the places in his testimony that I think provide

22    more context to the excerpts.

23          THE COURT:  Well, that's a tough question for me

24    in the sense of we have a witness, so I don't accept the

25    deposition because then I'm always concerned about the sort

1    of hidden evidence problem.  And so to the extent that he's

2    identified certain questions and there's context, I would

3    just have you go through it.  I recognize that takes more

4    time.  If you all want a minute, maybe there's a stipulation

5    of some sort that you can work out.  But if you've reached

6    this point, I doubt it.  So I would just be inclined to just

7    go through it.

8                MR. DALSEN:  Understood, Your Honor.  Also --

9                THE COURT:  That's why I was just trying to get in

10   front of that issue earlier.  But I don't want to trample on

11   people's ability to present their case.

12               MR. WEAVER:  Understood, Your Honor.  Well, why

13   don't we just see if we get testimony from the witness on

14   redirect and perhaps that will satisfy my concerns.

15               THE COURT:  All right.

16                REDIRECT EXAMINATION OF A. DERAR ISLIM

17   BY MR. WEAVER:

18   Q    Good morning, Mr. Islim, again.  Good to see you.

19   A    Thank you.

20   Q    Mr. Islim, you were asked a lot of questions on cross-

21   examination about probabilities.  Do you recall those

22   questions?

23   A    Yes, I do.

24   Q    And you were shown a lot of deposition testimony about

25   you answering no to questions about considering

Page 75

```
1   probabilities.  Do you recall those questions?

2   A    Yes, I do.

3   Q    At your deposition, when you said you and the special

4   committee did not consider the probabilities of success,

5   what did you understand the word probabilities to mean?

6             MR. DALSEN:  Objection, Your Honor.  There was no

7   objection to the question at the time of deposition that

8   there was something unclear about it.

9             THE COURT:  You can recross him on it.  I'm -- he

10  -- you --

11            MR. DALSEN:  Understood, Your Honor.

12            THE COURT:  Overruled.  Would you repeat the

13  question?

14            MR. WEAVER:  Certainly, Your Honor.

15  BY MR. WEAVER:

16  Q    Mr. Islim, at your deposition, when you testified that

17  the senior management and special committee did not consider

18  probabilities of success, what did you understand the word

19  probabilities to mean when answering those questions?

20  A    Probabilities, by definition, are actual numbers,

21  numerical numbers.  So I assumed the question was, did you

22  assign 50, 60 percent, 70 percent, which we did not.

23  Q    And did you make that clarification at your deposition,

24  Mr. Islim?

25  A    Yes, I did.
```

Page 76

1    Q    Okay, and I don't want to do this too often, but if you

2    could look at your deposition transcript, Mr. Islim, at page

3    242.

4    A    Yes, I'm there.

5    Q    I'm going to begin on line seven, if you'll just read

6    along with me.  "Question: Mr. Islim, earlier you were asked

7    about the FTX claim," --

8              THE COURT:  Well, if you're asking these questions

9    here, just ask him those questions from the podium.

10             MR. WEAVER:  That's fine, Your Honor.  I was

11   confused a little bit about the issue with the transcript

12   and --

13             THE COURT:  Well, again, sorry, I'm an old trial

14   lawyer.  So when we have a live witness, we don't use

15   depositions except to impeach a witness.  And so since he's

16   here to offer testimony, he's here to offer testimony.  So I

17   realize that there are times when that seems like an unwise

18   rule because we could just throw everything in from the

19   deposition.  But since we have the witness here, that's what

20   it's designed to do.

21             MR. WEAVER:  Your Honor, that is our preference.

22   We did not want to go line by line, and I apologize for my

23   confusion earlier.

24             THE COURT:  No, no, no.  That wasn't -- all judges

25   don't handle this stuff the same, and that's particularly

Page 77

```
 1    true in bankruptcy court where it's a bench trial.  So there

 2    are certain times that the rules of evidence are a little

 3    less vigorously enforced and everybody has their own way of

 4    doing it.  So all questions on both sides about that are

 5    fair game.

 6               MR. WEAVER:  Thank you, Your Honor.

 7               THE COURT:  And I'm happy to answer any of those

 8    questions so that we can do it efficiently.

 9               MR. WEAVER:  Thank you, Your Honor.

10    BY MR. WEAVER:

11    Q    Mr. Islim, just to be clear, did the special committee

12    and the senior management consider probability of success

13    when evaluating the settlement?

14    A    Yes, we did.

15    Q    Now you were also asked questions today, Mr. Islim,

16    about the ftx.com withdrawal claims.  Do you recall those

17    questions?

18    A    Yes.

19    Q    And there was a discussion about whether or not it was

20    GGCI or GGC.  Do you recall that?

21    A    Yes.

22    Q    What is the issue with the asserted claims by FTX

23    regarding ftx.com withdrawal claims?

24    A    FTX, since they bundled all their claims against all

25    Genesis entities and asserted one claim against GGC, from
```

Page 78

1   our perspective, historically GGC never had an account with

2   ftx.com.  So we see two sets of claims.  One claim should be

3   asserted against GGC and one claim asserted against GGCI.

4   So, in a nutshell, FTX just bundled them and asserted them

5   against one entity, GGC, which, again, we think is not

6   correct.

7   Q    And was that information provided to the FTX debtors?

8   A    Yes.

9   Q    And what did they do?

10  A    They ignored it.  They didn't consider it.  And they

11  continued to assert the same claim, $3.8 billion against

12  GGC.

13  Q    And from a business perspective, Mr. Islim, if FTX were

14  to assert that $1.6 billion claim against GGCI, what would

15  happen?

16  A    Well, for one, GGCI is not a debtor entity and it

17  doesn't have sufficient funds to cover that claim.  So I'm

18  not a lawyer, but I would assume it has to go through

19  restructuring or filing for bankruptcy.

20  Q    And sitting here today, Mr. Islim, who is the largest

21  creditor of GGCI?

22  A    It's actually GGC, the debtor entity.

23  Q    Mr. Islim, you were asked also a number of questions

24  today regarding the process, the process of assessing

25  settlements and assessing the claims and defenses.  Do you

1    recall those questions?

2    A    Yes, I do.

3    Q    In the context of discussing the various claims,

4    defenses, et cetera, how would you describe senior

5    management's interactions with the advisors, Cleary Gottlieb

6    and M3?

7    A    We have been working very closely for months now with

8    Cleary Gottlieb and with the M3 partners on this large case.

9    But again, from senior management perspective, our critical

10   work has been to establish the history, the transactions,

11   all the way from the term sheets, all the way to the

12   technical details, looking at the wallets, the transactions,

13   the deposits, the withdrawals and providing Cleary Gottlieb

14   and M3 with all the context and the history and the nuances

15   of that complex relationship.

16   Q    And within the context of discussing these claims

17   between FTX and Genesis, how would you describe the special

18   committee's interactions with its advisors, Cleary Gottlieb

19   and M3?

20   A    Well, I mean, the special committee is -- we have been

21   -- they have been -- this topic has been on their agenda for

22   a long time.  They have been very involved in challenging

23   the factors and the outcomes that the advisors have been

24   proposing.  They debated all the potential scenarios of the

25   different claims, of the different claims and all the

1    complexities of the restructuring.  And they have been

2    guiding us towards a global settlement, and I'm very

3    involved in the process.

4    Q    And Mr. Islim, on cross-examination you were asked

5    questions about statements in your declaration about

6    concerns about rulings in this case that could have

7    implications in other disputes with other creditors or

8    brought by GGC against other counterparties.  Do you

9    remember that testimony?

10   A    Yes.

11   Q    Are there any other currently claims asserted by

12   creditors against the Genesis debtors in this bankruptcy?

13   A    Yes.

14   Q    Could you provide an example?

15   A    Three Arrows Capital.

16   Q    And as a general matter, how would you describe from a

17   business perspective the types of claims being asserted by

18   Three Arrows Capital against the Genesis debtors?

19   A    Similar to Alameda, there are principal loans, there

20   are interest payments and there is also collateral dispute

21   as well.

22   Q    And Mr. Islim, again, you were asked numerous questions

23   about the process and interactions between the advisors and

24   special committee.  When did the special committee first

25   begin to discuss Alameda and FTX?

Page 81

1    A    Very early on, around December 2022.

2    Q    And how often did the special committee discuss FTX and

3    Alameda with its advisors?

4    A    Very regularly, in a regular manner.  Yeah.

5    Q    And when did the discussions between the parties about

6    a global settlement really begin in this case?

7    A    Early July, (indiscernible) July 4th.

8    Q    And after that point forward, how often did the special

9    committee and its advisors discuss the FTX settlement?

10   A    At that point, it was very frequent and we discussed it

11   extensively during the special committee weekly meetings.

12   Q    And finally, Mr. Islim, it's kind of come out in

13   pieces, bits and pieces today, so I just want to give you an

14   opportunity to answer this question.  Based upon what you've

15   observed, why do you believe the special committee approved

16   this settlement as reasonable?

17   A    There are many reasons, but most importantly,

18   eliminating the uncertainty around (indiscernible) allowing

19   us to basically bring conclusion to one of the largest

20   claims ever asserted against the estate and allowing our

21   plan to proceed and to be able to basically provide

22   liquidity and a prompt outcome to our creditors.  So those

23   are the main reasons I think the settlement is fair and

24   reasonable.

25   Q    Thank you for your time, Mr. Islim.

Page 82

1          MR. WEAVER:  Your Honor, I'd pass the witness for

2     any further questioning.

3          THE COURT:  All right.  Thank you.

4          MR. DALSEN:  Just one --

5          THE COURT:  Do you need a minute?

6          MR. DALSEN:  Just one moment, Your Honor.

7          THE COURT:  Sure.

8          MR. DALSEN:   No further questions, Your Honor.

9          THE COURT:  All right.  Thank you very much.  Just

10    in an abundance of caution, any further questioning of this

11    witness by any party?  All right.  Mr. Islim, thank you very

12    much for your testimony.  You can leave the witness box and

13    make yourself comfortable elsewhere in the courtroom.

14          All right.  It is now just about noon and so my

15    thought would be to proceed to argument.  Let me get a sense

16    of how long folks want for argument.  The reason why I ask

17    is it may be sitting in your shoes that it'd be helpful to

18    have a few minutes to tweak what you were going to say based

19    on what you've heard.  It's hard to do that when you're at

20    the podium.

21          So is there a preference as to how to proceed?

22    I'm happy to take a -- I do have something at 12:30 for

23    probably about a half an hour, but other than that I'm happy

24    to work around your preference for this afternoon.

25          MR. SAZANT:  Subject to the debtors, we're ready

Page 83

1  to proceed.  I think we need five minutes for argument or

2  so, so I don't think it'll take us into your 12:30.

3            THE COURT:  Okay.

4            MR. BAREFOOT:  Your Honor, I don't think ours will

5  be longer than 15.

6            THE COURT:  All right.

7            MR. BAREFOOT:  I would ask if we could just have a

8  very quick five-minute bathroom break.

9            THE COURT:  Sure.  Why don't we take a five-minute

10 break?  And I feel the need to translate that because I know

11 five minutes means different things in various courts at

12 various times.  So is that clock correct?  About four

13 minutes to noon.  So why don't we come back at 12:05.  Thank

14 you.

15            (Recess)

16            THE COURT:  So with that, it is the debtors'

17 motion.  So let me hear from the debtor first.

18            MR. BAREFOOT:  Good afternoon, Your Honor.  Luke

19 Barefoot, from Cleary Gottlieb, for the debtors.  Your

20 Honor, I will try to be brief, and I apologize if this

21 hearing ended up taking longer than we had originally

22 estimated.

23            THE COURT:  No worries.  Any requests for

24 estimates on time are always asked just to get a general

25 sense.  I don't hold people to it because it's impossible to

Page 84

1    know.  And when I was a lawyer, I always found that question

2    incredibly uncomfortable.  I understand now being here why

3    it's asked.  But true for everybody, it takes what it takes.

4    So please proceed.

5            MR. BAREFOOT:  So Your Honor, just let me set the

6    stage a little bit because I think from today's proceedings,

7    it may have been confusing about what we are here to do and

8    what we're not here to do.  We are here to carry our burden

9    to demonstrate that this settlement is not below the lowest

10   point in the range of potential outcomes.  But we are not

11   here to conduct a trial on the numerous legal and factual

12   issues that would have been litigated, which, Your Honor,

13   has the benefit of understanding from the extensive

14   exchanges we had over the lift stay proceedings and the

15   estimation proceedings.

16           We are also not here, Your Honor, and I've never

17   been in a settlement hearing where we disclose the

18   intricacies of the advice that the special committee

19   considered and weighed from counsel on the probabilities of

20   success, on the potential risks and rewards of all the

21   claims, the counterclaims and defenses had the special

22   committee instead directed the debtors to proceed with

23   litigation, either through a full claims objection or by way

24   of estimation.

25           And from the testimony you did hear today, Your

1    Honor, making any such disclosures on the substance of those

2    privileged communications that the special committee

3    weighted and debated would be reckless, contrary to our

4    fiduciary duties, and detrimental to the very constituents

5    that the objectors claim to represent where not only is this

6    settlement not a done deal until it is approved by Your

7    Honor.  It has been approved by Judge Dorsey in Delaware.

8    But whereas you heard from Mr. Islim, there are numerous

9    other potential claims either held by the Debtors or

10   asserted against the Debtors that raise many of the same

11   claims and defenses.  Not least of all the billion-plus-

12   dollar claims that have been asserted that we are in the

13   course of litigating with (indiscernible) capital.

14           So what are these claims, Your Honor?  You heard

15   the number 3.3 billion.  And as Your Honor likes to say,

16   that's a B.  This element resolves those claims as well as

17   all other claims and counterclaims for a single allowed

18   claim against GGC of $175 million.

19           As we pointed out in our papers, that is less than

20   five percent of the claims as they were asserted by FTX.

21   And by comparison, the asserted FTX claims of $3.8 billion

22   represented 90 percent of the value of all scheduled claims

23   against GGT combined.

24           Now, you've heard much, Your Honor, about whether

25   of that $3.6 billion, approximately $1.6 billion in the

Page 86

1    FTX.com withdrawals bucket, which the debtors vigorously

2    asserted should not have been asserted against GGC and

3    should have been asserted against their non-debtor

4    affiliate, GGCI.

5           But just two points on that, Your Honor.  Even we

6    had prevailed on that and reduced the claims against GGC to

7    the approximately $2.2 billion that excluded the FTX.com

8    withdrawals, the settlement would still be less than eight

9    percent of the remaining total asserted GGC claims by FTX.

10          And in addition, Your Honor, in light of the novel

11   and untested legal and factual uncertainties with the

12   defenses including ordinary course solvency and safe harbor

13   defenses that Your Honor is familiar with from our exchanges

14   over the estimation proceeding, even eight percent is a

15   significant victory and can't credibly be argued to be

16   outside the range of (indiscernible).

17          Moreover, Your Honor, notwithstanding the vigorous

18   advocacy and production of documents that the debtors made

19   to FTX, FTX never conceded that the FTX.com withdrawals

20   could not have been asserted against GGC.  Counsel for FTX

21   had their theories and arguments as to why and how those

22   withdrawal claims could have been asserted, including on a

23   subsequent transferee theory under Section 550.  Those

24   claims were never stipulated to be withdrawals, the claims

25   were never amended.  And as we stand here today, they are

1    still asserted at the full $3.8 billion value.

2           Your Honor, you also heard testimony that even if

3    GGCI were the initial transferee for those $1.6 billion of

4    FTX withdrawal claims, that claim would have had significant

5    consequences and impacts on the debtor's estates.  In fact,

6    you heard Mr. Slim testify that GGC is the largest creditor

7    of GGCI to the tune of more than $100 million and that GGCI

8    does not have sufficient funds to satisfy a potential FTX

9    judgement.

10          Your Honor, you also heard unsurprising testimony

11   about the importance of resolving these claims given the

12   impact in terms of the time and expense of litigation as

13   well as the impact that these would have on creditor

14   distributions.  The sheer size of these claims ensures that

15   the debtors are making reasonable progress to make timely

16   and sizeable distributions on account of allowed claims,

17   particularly if the lift stay motion had been granted and

18   this Court did not control the timing of an estimation or a

19   claims objection proceeding.

20          Moreover, Your Honor, as you heard, no man is an

21   island, and the FTX claims are not an island.  If litigated,

22   the outcome of the FTX claims could have had significant

23   consequences, both on other potential avoidance actions that

24   the Debtors have against other defendants, as well as claims

25   that other creditors have asserted against the debtors.

1          Your Honor, I want to talk a little bit about the

2    evidence that was adduced on the timeline and process to get

3    to the resolution today.  As you can see from the board

4    minutes from the Genesis Special Committee that were

5    submitted as Exhibit 6 -- and you also heard testimony on

6    this from Mr. Slim -- the special committee began receiving

7    advice and considering the FTX and Alameda potential claims

8    even before these cases were filed in December of 2022.

9          Thereafter, the special committee had regular,

10   frequent discussions concerning the FTX claims as we

11   approached the competing but intertwined contested matters

12   on the FTX debtor's lift-stay motion and in Genesis debtor's

13   estimation motion.

14         And the Court will recall from the numerous

15   hearings and status conferences of those contested matters,

16   the complexity and difficulty that those matters presented.

17         And as Exhibit 6 shows, but just to be clear, the

18   special committee met and considered the FTX claims,

19   defenses, and counterclaims a total of no less than seven

20   times leading up to their ultimate approval of the

21   settlement that's before Your Honor today.

22         Your Honor, the Court also has before it exhibits

23   1, 2, and 3, which together reflect the procedural history

24   of the hard-fought arm's length negotiations that culminated

25   in the very favorable settlement that we're seeking approval

1    of today.

2            What those exhibits show is that following more

3    than a month-and-a-half of spirited meet and confers and

4    exchanges on discovery and on the timeline and parameters

5    for litigation of our estimation motion, we went from an

6    opening offer from the (indiscernible) debtors for a reserve

7    for a claim against the estates or more than $2 billion to

8    where we are today, a full and final resolution on all

9    claims for a single $175 million allowed general unsecured

10   claim against GGC.  And you can see that at Exhibit 1 at

11   Bates page ending in 971.

12           There's two important points, Your Honor, of the

13   course of these negotiations, all of which are in the

14   evidentiary record as exhibits 1, 2, and 3.  They refute

15   some of the objectors' arguments.

16           First, while there were dramatic moves on orders

17   of magnitude by the FTX side, the Debtors made very

18   incremental and carefully-considered moves in these arm's

19   length negotiations.  As you'll see from Exhibit 1 at the

20   Bates page ending in 972, the debtor's negotiations showed

21   that their movements in total went from proposing a $100

22   million reserve up to the final and ultimately successful

23   offer of a $175 million allowed claim.

24           Second, Your Honor, the course of these

25   negotiations across the table affirmatively show that the

Page 90

1   debtors carefully and separately considered the risks and

2   value associated with a settlement construct that would have

3   preserved affirmative claims against the (indiscernible)

4   estate versus the one that is now before Your Honor that

5   provides for global peace.

6           The first several settlement constructs between

7   the parties had the former construct where they preserved

8   estate claims against FTX for subsequent litigation in their

9   court in Delaware.  And you can see that in Exhibit 1 in the

10  July 4th offer, which is at Page 971 at the middle of the

11  page.  Only after several weeks of further exchanges and

12  further consideration by the special committee with the

13  benefit of its advisors did discussions shift to discuss

14  both a final allowed claim rather than a reserve and second,

15  a resolution both for the FTX claims against Genesis estates

16  and Genesis' affirmative or counterclaims against FTX.  And

17  you can see that at Exhibit 2 at Page 887 and Exhibit 2 at

18  Page 886 in terms of the July 17th counterproposal from

19  Genesis.

20          While obviously I think we heard repeatedly it

21  would be privileged information that the debtors would be

22  quite careless to disclose on how they got there,

23  (indiscernible) given the parallel claims that are held by

24  or may be asserted either by or against the Genesis estates.

25  This record evidence alone demonstrates that the debtors and

Page 91

1    the special committee understood, assessed, and acted in the

2    exercise of their fiduciary duties and their business

3    judgment in separately considering the claims the FTX

4    debtors held in the estates and the FTX debtor's claims

5    against the Genesis debtors.

6            The assertions that they made to the contrary,

7    Your Honor, that the affirmative claims against FTX are

8    highly valuable and not subject to any defenses is ipse

9    dixit.  There is no evidence to support that argument.

10   There is also no evidence on what the distributional amounts

11   from the FTX debtors could or would have been even if those

12   claims could have been successful.

13           And, Your Honor, I would just ask you again to

14   look at the spread where the parties negotiations moved.  We

15   started at $100 million reserve offer.  The FTX debtors

16   started at $2 billion.  We ended pretty close to where we

17   started at $175 million.

18           I do want to briefly, Your Honor, address Exhibit

19   8, the presentation we gave to the FTX creditors' committee.

20   I think it's not lost on Your Honor what the context of this

21   was.  This was an advocacy piece designed to induce and

22   convince the FTX committee to stand down from its potential

23   objection to our settlement.  Of course in that context our

24   focus was going to be not on making concessions or

25   discussing the benefits of the settlement to the Genesis

Page 92

1    estates, but rather to hammer home the strengths in our

2    defenses to the FTX claims and the flaws in FTX's pursuit of

3    those claims.

4          As Your Honor mentioned at our settlement

5    conference on Friday, of course there is a natural tension

6    between the litigation position that you have to take when

7    you're actively at one another's throats and the positions

8    you have to take to meet your burden under Rule 9019.  And I

9    would say that this is just one example of that and that of

10   course in the context of discussions with our adversary, we

11   had a particular focus.

12         Lastly, Your Honor, I just want to address --

13   which you heard no evidence on today, unsurprisingly -- the

14   unsupported and frankly shocking suggestion from Gemini and

15   the Fair Deal Group that the settlement should be rejected

16   because it somehow represents an attempt to manipulate or

17   secure votes from the FTX debtors in favor of the plan.

18         THE COURT:  So let me ask you about that.  Am I --

19   I wanted to get your view about what that would mean.  I

20   mean, wouldn't that mean that the committee here is

21   essentially going along with something that is not as good

22   as it could get to somehow grant the benefit to the parent

23   company?

24         MR. BAREFOOT:  Yeah, I think it would, Your Honor,

25   in breach of their fiduciary duties.  I think it also

Page 93

1    ignores the evidence that you do have before you.  There is

2    no requirement in -- and this was carefully considered.

3    There is no requirement in the FTX settlement that they vote

4    in favor of the plan, that they vote at all.  And it's very

5    clear that the allowed claims that they will have are freely

6    transferrable.  They could sell them to one of our -- they

7    could sell them to Gemini, right?  We have no understanding

8    or guarantee about how those votes will be noted or if they

9    will be noted.

10         The closest credible thing I think they said is

11   that we wanted to rush to get this settlement done so that

12   FTX would have a ballot to vote in the first place.  But I

13   think we all would have been quite shocked if we were still

14   in the throes of estimation proceeding given the size of

15   those asserted claims if FTX had not brought a Rule 3018

16   motion to obtain a ballot in any event.

17         So I think Your Honor can dismiss that at the

18   outset.  On the basis of a lack of any evidence.  But what

19   evidence there is in terms of the very terms of the

20   settlement refute the idea that this is some sort of a vote

21   manipulation gamut.

22         And unless Your Honor has any questions, I would

23   just like to reserve possible time for a rebuttal.  But

24   otherwise, we would rest on our papers and the evidence you

25   heard today.

Page 94

1          THE COURT:  All right.  Thank you very much.

2          MR. BAREFOOT:  Thank you, Your Honor.

3          THE COURT:  And I think it makes sense to hear

4    from the Official Committee before hearing from the Ad Hoc

5    Group.

6          MR. SHORE:  Thank you, Your Honor.  Chris Shore

7    from White & Case on behalf of the Unsecured Creditors'

8    Committee.  I want to focus on one point, transparency, and

9    otherwise rest on our papers.

10          I raise the issue of transparency at the first

11    time I appeared in this court on this case.  And as I noted

12    at the last hearing, there continue to be issues of trust

13    within the creditor body about things that are coming from

14    the debtors and what the debtor's agenda is.  And the

15    committee has been very focused on maintaining a level of

16    transparency.

17          But I think what you're hearing today from the Ad

18    Hoc Committee is frankly an irresponsible fueling of the

19    concerns about transparency that is not justified here, and

20    I want to address that.

21          You heard first with respect to the idea that

22    communications between the UCC and the debtors were being

23    withheld with the innuendo that there must be something

24    there to hide, that the debtors and the committee are doing

25    something that they don't want other people to see and

1    that's why they're holding it up and making it sound

2    ominous.  And today the entire cross seems built around the

3    idea that it's somehow inappropriate for the debtors to be

4    withholding privileged information while seeking a

5    settlement.

6         And the issue of transparency as we've seen

7    throughout the case is that there is consequences to

8    transparency.  And we saw it obviously with respect to the

9    holding of customer information.  It is, as the U.S. Trustee

10   was arguing, there is the need for transparency in the

11   bankruptcy case as Your Honor pointed out.  There is

12   consequences to doing that.  And that consequence was

13   sufficient to justify the lack of transparency.

14        We heard it with Your Honor's ruling on the

15   privileged information.  There is obviously a desire to have

16   information out there.  But the consequence of requiring a

17   committee to reveal its communications with the debtors is

18   (indiscernible) of a process that needs to occur in the

19   case, that is the exchange of information between a debtor

20   and an official committee, to have a frank and open

21   discussion about the risks and rewards of attacking a

22   particular claim.

23        Here today with respect to the information that

24   Cleary provided (indiscernible) made it sound like one

25   expects in a regular way Chapter 11 case that there would be

1    a total disclosure of all information that a debtor received

2    or a decisionmaker received in determining whether or not to

3    agree to a settlement.  And, quite frankly, that is an

4    irresponsible fueling of the fires of the lack of trust that

5    exists in this case.  In every case claims are filed by

6    creditors.  In every case disputed claims are determined

7    whether they can be ripe for settlement.  In every case

8    decisionmakers for the debtor receives legal advice.  That's

9    the nature of a claim.  There are legal and factual aspects.

10   Factual aspects are handled by the business side people, the

11   legal aspects are handled by the professionals.  And we want

12   that process to be frank and open.  All creditors want that.

13   IF there are risks to a particular claim, the decisionmakers

14   need to be advised about it.  If there are rewards, the same

15   thing.  And so in every case, legal case, advise the

16   decisionmakers, listen, how it is fair that in some cases

17   with the claims of this size, the debtors decide to reveal

18   their board deck without redaction.  We've looked at the

19   following claims, here's our advice.

20          Cynically speaking, those board decks tend to be

21   highly damaged.  And what you see is advice that's given to

22   a board that is either so banal it makes no difference in

23   the context of the case or it is so managed that there isn't

24   a fair and frank and open discussion of risks and rewards of

25   litigation.

Page 97

```
 1              But in almost every case, there is legal advice
 2     that is provided, and it is withheld.  And it has everything
 3     to do with what Your Honor pointed out, the what-if
 4     scenario.
 5              What if we don't get the settlement approved?  For
 6     example, if the advice is we have no legitimate defenses and
 7     we are dead to rights with the claimants so we'd better
 8     settle, if you don't get that settlement approved, that
 9     document and that advice exists there in all the litigation
10     going forward.  So there is -- there has to be a way to
11     manage that interface of transparency and consequence in a
12     way that allows the decisionmakers to receive a full and
13     frank and open discussion of claims, just as the committee
14     does that with its committee, without putting yourself at
15     risk if in fact creditors come forward and are able to
16     substantiate what they're doing.
17              And that's -- so what you heard today, just for
18     the people who aren't involved in bankruptcy cases, is
19     typically what you're going to get in a 9019, a
20     decisionmaker coming on and saying here are the risks and
21     rewards as we saw it.  We got advice, we ran a process, and
22     we're not disclosing the legal advice.
23              And what that does is it leaves it for counsel to
24     argue the merits of the litigation.  Counsel for the Ad Hoc
25     Committee has papers and an opportunity to stand in front of
```

1    Your Honor and say here are the legal issues that are raised

2    by the settlement, here's our opinion with respect to how

3    those legal issues would play out.  Sometimes someone comes

4    forward and points out a defense that is an absolute bar to

5    a claim.  But the process of the legal advice is one that

6    plays out in front of the court with the advocates, which,

7    quite frankly, is a much better way of dealing with legal

8    issues when counsel can address the Court rather than

9    quizzing an interim CEO on his knowledge of the intricacies

10   of preference laws and how those are handled in Chapter 11.

11            So if there is an issue with respect to the

12   underlying legal merits of the claim, counsel for the Ad Hoc

13   Committee or counsel for Gemini is free to stand up in front

14   of the court and argue all the merits of the underlying

15   litigation.  But it is irresponsible to say that the

16   decision made by the debtors here, which as I said is made

17   in almost every case to withhold the legal advice is not a

18   basis for people to be concerned about whether or not the

19   debtors are moving appropriately here.

20            The committee has reviewed its -- satisfied its

21   fiduciary duties by looking a the claims, looking at the

22   risks and the rewards, and coming to the conclusion that a

23   full-blown litigation of these claims is a far, far worse

24   result than the settlement that's on the table.

25            So unless Your Honor has any questions,

1    (indiscernible).

2            THE COURT:  All right.  Thank you.  I don't want

3    to jam the Ad Hoc Group.  So if you want to take a beak for

4    lunch and then come back.  A short break, say 1:30.  The one

5    thing that I did need to comment on -- and Mr. Shore has

6    given me a segue to do it -- is it would be irresponsible of

7    me in this job to not comment on the transparency issue as

8    well.  And as folks are aware, I did issue an opinion

9    allowing certain information to be sealed to protect

10   important values and the safety and protection of folks who

11   are creditors here.  And there's somewhat of an irony that

12   folks who are the benefit of that have complained loudly

13   about secrecy here.

14           It has in my experience never ever been the case

15   that someone has come in with a frank discussion about their

16   breakdown of each of the claims and defenses, the likelihood

17   of success.  And perhaps a picture is worth a thousand

18   words.  It's because the people you're litigating against

19   are over there.  They're in the gallery.  And they're very

20   smart people.  And so putting aside the even more obvious

21   point that the FTX debtors and their professionals are not

22   potted plants that are willing to go along with anything and

23   everything that folks want to do in this case -- which I

24   guess would come as no surprise to the professionals --

25   you're always walking a tightrope.

Page 100

1          So I have no problems with people debating where

2    to draw the line in the tightrope.  But the notion that it

3    isn't a tightrope is -- and that it's sort of per se

4    improper is incorrect.  It's irresponsible to share -- there

5    is a point which sharing certain details is just flat-out

6    irresponsible, incorrect.  And it's frankly inconsistent

7    with the rule.  Right?  So Rule 9019 requires these almost

8    pejorative-sounding standard that the lowest point in the

9    range of reasonableness.  And you can ask yourself why that

10   is.  And it's partially for reasons like this.  Because you

11   can't have a mini trial on things or there's no point in

12   settlement.  And also having a mini trial if the case is not

13   approved, different judges will see the merits of cases

14   differently.  I'll find certain people more persuasive as

15   witnesses.  And if you torpedo the settlement, then you've

16   torpedoed the litigation.  And you don't know how and who is

17   going to end up with the short end of the stick on that.

18   And it could be -- but I would submit to you everybody loses

19   because you're really torpedoing the process.  And if you

20   don't permit settlements in bankruptcy, cases will fall

21   under the weight of the cost of bankruptcy.

22          So I haven't made a decision on this particular

23   9019, but that's information that I had to and felt duty-

24   bound to share with folks who are on the phone.  This is not

25   their first bankruptcy.  No one should have to apologize for

Page 101

1   that.  But I do want people to be aware of what some of the

2   way things work in bankruptcy, which is not necessarily

3   something you can figure out by your intuition alone.

4           So with that, I come to the Ad Hoc Group and ask

5   you what you would like to do.

6           MR. SAZANT:  Your Honor, I guess we'll come back

7   at 1:30 and conclude argument then.

8           THE COURT:  All right.  I would imagine we should

9   be able to finish it fairly promptly.  And so I'll see you

10  all then.  Thank you very much.

11          (Recess)

12          THE COURT:  all right.  So we are here to finish

13  up the argument on the 9019 motion.  Before we do that, the

14  meeting that I had at 12:30 was with other judges to talk

15  about what judges are going to be doing in proceedings now

16  that the COVID emergency has ended.  And so I think I've

17  been speaking to you folks, and I spoke about it.  And I

18  think judges are really going to I think be most concerned

19  about evidentiary proceedings.  But -- but if you read the

20  rule carefully, the rule is concerned with what can be done

21  or not done with the public in evidentiary proceedings.  So

22  what that leaves open is the ability to work with

23  participants for what is permissible, sensible for

24  participants.

25          So please think about that in this case, in other

Page 102

1    cases you have.  And don't be shy about talking to judges

2    about what you think you might want to do and how you want

3    to handle certain things.  Again, I think the closer we are

4    to evidentiary matters, that's where things get more

5    complicated and can sometimes be, well, you can do this, but

6    you raise all sorts of ancillary concerns.

7              So -- but for participants, there is an ability to

8    try to again do things that are as efficient as possible in

9    court.  And so we're all working to try to do that as much

10   as we can.  So I just wanted to get that message out to all

11   of you in all our cases.  And please don't be shy about

12   bringing those concerns to the court about how you want to

13   handle hearings, how you want to handle cases.  Just make

14   sure to talk amongst yourselves first.

15             And we always count on the bar to (indiscernible).

16   No different.  So that's why I didn't want to skip that

17   12:30 meeting because it's important that we all support and

18   are on the same page and can get the message out to all of

19   you people as soon as possible.

20             So with that said, I think we were getting ready

21   to hear from the Ad Hoc Group.

22             MR. SAZANT:  Thank you, Your Honor.  Thank you,

23   Your Honor.  For the record, Jordan Sazant of Proskauer Rose

24   on behalf of the Ad Hoc Group.

25             The first thing I want to do right off the top is

Page 103

1    dispel the notion that has been presented in this court

2    earlier that we are seeking a broad waver of all privileged

3    communications that the debtors have had or analysis --

4            THE COURT:  Well, I've already ruled on that.  So

5    I think you can dispense with that.  That's why I made the

6    ruling that I did.

7            MR. SAZANT:  I mean with respect to the analysis

8    that underlies the 9019 motion today.

9            THE COURT:  All right.  Well, so then what are you

10   seeking?  Right?  So the concern -- so what I have -- and

11   there's a bit of a disconnect.  Sometimes it happens in

12   depositions where a word you use doesn't mean the same thing

13   to the witness as to the counsel and there's a bit of

14   talking past each other.  It's always unfortunate.

15   Sometimes it happens.  It doesn't mean there's anything

16   nefarious.  Sometimes people have a different way of viewing

17   the world.

18           So in light of this, it seems pretty clear that he

19   did not share, won't share with you or with me the -- his

20   assessment which he sort of thinks of as a numerical

21   calculation on individual claims and defenses.  But it's

22   pretty clear he's got a lot of stuff about process and the

23   special committee and relying on counsel, which -- so I

24   guess the question probably from the debtor as proponent of

25   this they'll say, well, what's wrong with that, that they're

Page 104

1    relying on counsel.  After all, that's why they hired us, to

2    make these very bankruptcy-specific assessments.

3              So what's your response to that?

4              MR. SAZANT:  Yeah.  Thank you, Your Honor.  I

5    think it's completely appropriate to converse with counsel

6    and to rely on counsel.  But I think that this issue really

7    goes to, one, at the end of the day the debtors have a

8    burden of proof that they have to meet and they have to make

9    a determination as to what evidence they put forward and

10   what privilege they will assert versus waive in putting that

11   evidence forward to meet that burden.  And we believe that

12   the debtors have not met their burden today.

13             THE COURT:  So what else do you want?  Right?  So

14   what does that look like at the context of this case?  Does

15   it say, well, we don't like this witness, we think somebody

16   should be from the special committee?  Does it mean, well,

17   we want -- what kind of level of granularity before you

18   cross the Rubicon?

19             MR. SAZANT:  Yeah, I think there's a few things.

20   I think Judge Glenn's decision in ResCap -- and that's at

21   491 B.R. 68-69, really distills this.  And when he was done

22   analyzing this issue he said (indiscernible) having a burden

23   of showing the reasonableness of their process and also of

24   the result that they reached would want to expose their

25   deliberative process to full view, but they are not legally

Page 105

```
1    required to do so.  The debtors are the masters of the

2    evidence that they will present, but they must accept the

3    consequences of their tactful choice.

4            Here, the tactical decision to bar on privilege

5    grounds discovery (indiscernible) and into the content of

6    the board's deliberations will in turn preclude them from

7    proving those deliberations at trial to defend their

8    position that their decision was reasonable and made with

9    care.

10           And I believe that that's directly on point with

11   what's happened here.  You know, we've heard from --

12           THE COURT:  But normally when I get something like

13   that, what I get isn't the that as the main objection.  We

14   don't know because they haven't told us.  I usually get

15   we've looked at this issue and the caselaw and the facts

16   that we're aware of, and we see the world differently.  And

17   then it's sort of back to the debtors.  I would say sort of

18   you can almost think of it as a shifting burden, right?  So

19   their burden (indiscernible) the range of reasonableness.

20   They present it, and then you get a chance to poke holes in

21   it.  And if you poke a specific hole in a specific thing,

22   then they have to come back, and they do it or not.

23           What I'm sort of h earing is putting aside some of

24   the more inflammatory things in one of the joinders about

25   votes and things of that sort, which I think is highly
```

Page 106

1    problematic as an argument for so many reasons, but thinking

2    of it just getting down to brass tacks, the merits of

3    things.  So I don't see in your objection that kind of an

4    argument as to this specific claim, this specific defense.

5    And so what am I supposed to do if all I have is essentially

6    a transparency argument on the assessment?

7            MR. SAZANT:  Well, respectfully, Your Honor, I

8    don't think it's just a transparency argument.  I do believe

9    -- and I'm ready to go through with Your Honor our view on

10   the strengths and weaknesses of the various defenses both of

11   the claims against the Genesis debtors as well as the claims

12   the Genesis debtors have against the FTX estate.

13           And from what we've seen in the declaration, Mr.

14   Islim has said he is not involved in the negotiation of

15   settlement agreement, he can't speak to any analysis of the

16   probability of success of FTX's claims --

17           THE COURT:  Well, I get that point.  But again, I

18   think you're right, live by the sword, dive by the sword.

19   And they have to make a choice what they want to share.  And

20   that does vary from case to case.

21           But he has said somewhat candidly.  There are

22   times people come in and say all sorts of stuff and then you

23   poke at it and they go, oh, you know, I was talking to those

24   people.  And so he sort of skipped that part about, well,

25   I'm going to put a nice face on this.  He said I'm relying

Page 107

```
1    on my advisors.  And I can tell you about the process and

2    the various steps we went through and things of that sort.

3             So I get that point.  But again, I keep

4    interrupting you and I'll stop in a second.  But I'm not --

5    before you get to the merits of your views on the claims,

6    I'm just having trouble figuring out what it is process-wise

7    is -- so if he got up and said we view this as more likely

8    than not to succeed, that's less likely than not to succeed,

9    this is 40 percent, is that what you're looking for?

10            MR. SAZANT:  Certainly that analysis would be

11   helpful.  And I think --

12            THE COURT:  But why would they share that with

13   you?  That's my point.  With the FTX people witting over

14   there.  So, again, there are times when people say we've

15   reached a point in a case that for whatever reason we're

16   comfortable sharing that.  But it is a perilous thing if

17   that's what you're asking, if that's the only way to satisfy

18   you.

19            MR. SAZANT:  I mean, I think the declaration

20   speaks in general terms of we believe that we have defenses

21   to these claims that speaks in general terms to we believe

22   that our claims against FTX have significant value, but

23   there's no analysis of -- outside --

24            THE COURT:  But then don't you need to bring --

25   okay, so maybe we just have to get to your views of things.
```

1   But is it -- do you have a problem with the fact that this

2   witness is not in the special committee?  Does that factor

3   into your analysis in terms of things?

4           MR. SAZANT:  Certainly I think having someone from

5   the special committee who was actually involved in making

6   the decision to enter into this settlement agreement would

7   be helpful.  But that's the Debtor's determination --

8           THE COURT:  What if the special committee person

9   said exactly the same thing?

10          MR. SAZANT:  I think that the debtors still have a

11  burden to meet, and I don't think that they've put enough

12  evidence into the record (indiscernible).

13          THE COURT:  All right.  So with that, I will get

14  out of your way and you can walk me through your more nitty-

15  gritty analysis.

16          MR. SAZANT:  Thank you.  It's always more helpful

17  for me to answer your questions anyways to make sure that

18  you understand where I'm trying to meet you.

19          So as I've said, the issue for Your Honor is not

20  complicated.  The question is have the debtors satisfied

21  their burden of proof to demonstrate that the proposed

22  settlement  meets the requirements of Rule 9019.  And from

23  our view, the answer here is not a close call.  The witness

24  in his declaration offered no more than boilerplate

25  statements.  And on cross-examination, we just heard that

Page 109

 1    Mr. Islim was not involved in the negotiation of the

 2    settlement agreement, can't speak to any analysis of the

 3    probability of success of the claims or defenses going

 4    either way or weigh their respective values.  In fact, the

 5    debtors have offered no justification for the settlement

 6    beyond the large difference between the asserted amount of

 7    the claims and the final settlement amount and avoiding

 8    litigation.  And those statements can apply to any

 9    settlement that is before Your Honor.  So the debtors don't

10    mention any analysis of the claims and defenses.

11            Mr. Islim today testified that the debtors

12    analyzed various factors in reaching the settlement but then

13    stated how did we analyze those factors?  That I was no

14    privy to.

15            He also said that they did not boil it down to

16    numerical values to determine whether 175 was the right

17    number --

18            THE COURT:  I get your point on this.  But -- and

19    again, I was hoping you would give me some segue to the

20    specific views on claims.

21            MR. SAZANT:  Okay.

22            THE COURT:  But before I do, I'm going to violate

23    my promise to leave you alone.  So you mentioned the large

24    difference -- they only mentioned the large difference and

25    the litigation cost.  And I would add to that the delay.

1    And all of which I think are undisputed and self-evident and

2    all of which in a case like this weigh fairly significantly

3    in favor of determining this is within the lowest point in

4    the range of reasonableness, right?  So we're talking about

5    five to eight percent of the value.  You're talking about

6    litigation with the debtors in one of the largest cases in

7    the country that doesn't seem likely to wrap up any time

8    soon given the other significant issues that are in that

9    case.  And the obvious litigation costs given the amount of

10   lawyers involved.

11          So I think the debtors would say that plus what's

12   said here gets them there.  And my question for you is what

13   else is needed to get there from your point of view.

14          MR. SAZANT:  Sure.  Thank you, Your Honor.  I

15   think, one, that gets you to the idea that a settlement is

16   favorable.  But having to determine that 175 is the right

17   number for that settlement or that is above the lowest point

18   in the range of reasonableness, as an initial matter, you

19   know, we've heard five percent, we've heard eight percent.

20   I don't believe that that's the actual correct percentage or

21   value that we should be applying to these claims because it

22   doesn't account for the waiver of the affirmative claims

23   that the debtors have --

24          THE COURT:  Yeah, but you're then applying the --

25   I understand the five and eight percent is taking things at

Page 111

```
 1   face value, right?  So it's the amount of the claims

 2   asserted by the FTX and the amount of claims that the

 3   debtors have, putting this all in a hopper without making

 4   value judgments.  Because your value judgements and the

 5   people close by you from FTX, their value judgements are

 6   going to be markedly different.

 7              MR. SAZANT:  They will certainly be markedly

 8   different.  But what I'm saying is the five percent and the

 9   80 percent only account for the claims asserted by FTX

10   against Genesis.  They do not account for the claims

11   asserted the other way.

12              THE COURT:  Fair.  I misspoke.  Yeah.

13              MR. SAZANT:  And that was the only

14   (indiscernible), Your Honor.

15              THE COURT:  So what else am I supposed to take

16   from the fact that the FTX judge has heard the settlement

17   agreement and has approved it?  Does that have any relevance

18   here to me or no?

19              MR. SAZANT:  Sure.  I mean, it's above the lowest

20   point in the range of reasonableness for FTX.  It doesn't

21   necessarily mean that it is for Genesis.

22              THE COURT:  All right.  So let's get to the nitty-

23   gritty of your numbers if you have anything to share on

24   that.

25              MR. SAZANT:  Yes, Your Honor.  Thank you, Your
```

Page 112

1    Honor.  So the claims against Genesis that are asserted.  We

2    have the Alameda loan repayments claim asserted in the

3    amount of $1.8 billion.  These claims are subject to

4    numerous (indiscernible) defenses, including settlement and

5    payment defense under Section 546(e).  But most notably, the

6    vast majority of this claim relates to loans that came due

7    in August and were paid in full on their maturity date and

8    for which the collateral supporting that loan was returned.

9    It's difficult for me to imagine anything more ordinary

10   course than that.  And so it's subject to the strong

11   ordinary course defense.

12          The second claim that's asserted is the withdrawal

13   claims asserted in the amount of $1.6 billion.  But as

14   you've heard today, these are assertable against GGCI, not a

15   debtor entity, not GGC.  And I understand that FTX disputes

16   that and believes that the events can be traced.  But that

17   is obviously subject to further litigation.

18          The third amount is the collateral claims

19   collectively asserted in the amount of about $400 million,

20   approximately one-third of which occurred prior to the

21   preference period and so are non-recoverable.  And the rest

22   of which is subject to multiple defenses, including the

23   ordinary course of business defense, Section 546(e)

24   protection again, and contemporaneous new value related to

25   either the extension of new loans during that time period

1    supported by such collateral or agreeing to forbear on

2    immediately calling the existing loans that underly the

3    collateral call.  So that's on the one hand.

4            On the other hand, Genesis has claims against FTX

5    and Alameda also broken down into three categories, but the

6    majority of which are not subject to defense.

7            You have the customer claims, which are claims

8    against FTX.com in the asserted amount of $176 million for

9    the amount of funds locked up on FTX's trading platform as a

10   result of their bankruptcy filing and for which Genesis was

11   listed as FTX's top unsecured creditor.

12           You have the outstanding loan claims which are

13   claims against Alameda for approximately $40 million plus

14   interest that remains due and owing under the master loan

15   agreement with GGC.

16           And then finally, the avoidance actions which are

17   asserted in the amount of $140 million which are potentially

18   subject to similar defenses as the FTX claims against

19   Genesis.

20           Now, Mr. Barefoot in his presentation earlier said

21   that there's no evidence in the record supporting that these

22   claims have value or what that value is.  But from our

23   perspective, that's really the point, isn't it?  There's no

24   evidence in the record at all of the merits of these claims

25   or the defenses either way.  And consequently, there's no

1   evidence in support of the settlement.

2         THE COURT:  But so I don't mean to be pejorative,

3   but this sounds like somebody -- this sounds, frankly, very

4   client-driven.  People who have very strong views about

5   various claims and various things that they are convinced

6   are true or not true.  And as a bankruptcy judge, the minute

7   you're talking about claims that genesis has against FTX,

8   you have to be thinking about what recovery will be

9   available in FTX for any claims, right?  And what do we know

10  about that at this point?

11        MR. SAZANT:  At this point I believe it's too

12  early to tell other than --

13        THE COURT:  We know nothing.  We know nothing.

14  Right?  And as to the claims against Genesis -- well, the

15  claims that genesis has, we know it's going to take a lot of

16  money and a lot of time.  But we have no idea what money is

17  available for recovery.

18        And as to the claims against Genesis, I understand

19  that there are issues.  If there weren't issues, there

20  wouldn't be a settlement.  But we've identified -- you've

21  identified a host of very specific legal issues that would

22  have to be litigated on this side of the house that is

23  claims against genesis.  Lots of defenses, whether we're

24  talking about ordinary course, whether you're talking about

25  forbearance, whether you're talking about safe harbor.  And

1    if the claims are filed as they're filed, no doubt the

2    debtors, the committee, and creditors have very strong views

3    about which ones are more meritorious than others.  But I

4    certainly as a judge would be I think on very poor ground to

5    say, well, the FTX debtors counsel when they filed their

6    claims, those are poorly considered and will be easily just

7    sort of chewed away.  It doesn't work that way.

8            So, again, there's a question about dotting Is and

9    crossing Ts here in terms of exactly what evidence and level

10   of specificity to share in terms of things.  But I just -- I

11   just have to dissuade the Ad Hoc Group of some of the --

12   some of the notions that they have about how this works.

13   The only way you figure out what these claims are worth is

14   to litigate them against the folks sitting over there who

15   are highly paid and highly professional counsel who are not

16   a potted plant.  And they're not going to go along with you

17   just to make it easy.

18           And we also heard the other day in Voyager the

19   amount of fees that were at stake in litigating that case.

20   And so when you start comparing that with the settlement

21   here, that gives us some serious numbers to think about.

22           So having heard your presentation, what I hear is

23   an identification of the issues.  But I don't hear a lot

24   that allows me to second-guess the lowest point in the range

25   of reasonableness on any of these things.

1          MR. SAZANT:  And I think from our view all that's

2     being offered in support of the settlement for the debtors

3     to meet their burden of proof (indiscernible) the lowest

4     point in the range of reasonableness is at best an

5     identification of the issues.  And that's not sufficient for

6     Your Honor to make an independent determination that the

7     Supreme Court --

8          THE COURT:  Well, but I think I just said I have

9     litigation costs, I have delay, and I have a large

10    difference between the claims. And I have also to add to

11    that list the amount that we have no idea what recovery

12    might be available as creditors in FTX.  So I don't think

13    that's insignificant.

14         Now, again, if the settlement here was 50 percent,

15    I think we're having a different conversation.  And then I

16    think given that percentage, I think the burden sort of goes

17    up on a sliding scale the higher the recovery.  I mean,

18    that's -- everybody sort of understands that as a rule of

19    the road.

20         But given what the numbers are here, again, I'm

21    just sort of frustrated trying to understand what the Ad Hoc

22    Group is trying to accomplish here and what is a -- do you

23    think it would be appropriate for me to look at some of the

24    privileged matters in camera for me to make an independent

25    determination?

1        MR. SAZANT:  I think from our view, you know, the

2    analysis that we've seen -- one, I don't think that alone

3    the discrepancy in the large amount of claim that was filed

4    versus the ultimate settlement amount that was reached is

5    (indiscernible).

6        THE COURT:  I would agree.  But it's not by

7    itself.  So would you be okay with me or would you urge me

8    to conduct an in-camera review of various things that are

9    attorney-client privilege in a way that I could review them

10   and satisfy myself as to the lowest point in the range of

11   reasonableness without -- first of all, I'm not sure it's

12   appropriate at all.  But I'm just using it as a thought

13   exercise.  Is that one way to check the box here?

14       MR. SAZANT:  I think that is certainly one way to

15   check the box.  And if Your Honor is so inclined.  But I

16   don't know that I can say standing here that that would one

17   way or the other -- you know, what it would provide because

18   we don't -- haven't seen that --

19       THE COURT:  No, I understand that.  That's the

20   nature of in-camera review.  It means that a judge is

21   getting to see things that a certain party is not, and it's

22   only used in circumstances where that information there is a

23   concern about sharing it on the record, on the public

24   record.

25       MR. SAZANT:  From our view, the claims that were

Page 118

1    filed by FTX against the Genesis debtors were wildly

2    overinflated and I don't think that's necessarily a matter

3    of huge dispute.

4            THE COURT:  Actually, I do -- it is a claim.  It

5    is subject to all the rules about filing in court where

6    you're making the representation about what's owed.  And so

7    having represented government clients who filed claims, I

8    never urged them to say, well, you know, it's wildly

9    inflated, but that's fine, no one's going to care.  That was

10   not my attitude, and I have not seen counsel in cases behave

11   that way.

12           MR. SAZANT:  I understand.  I'm not saying that

13   (indiscernible).  I think the claims that were filed only

14   accounted for gross amounts that went out of the FTX estate

15   and did not account for net of amounts that were returned to

16   the FTX estate in exchange for the amounts.  For example,

17   the $1.8 billion loan claim that was (indiscernible) went

18   into in Augusta as a surety date also involved the return of

19   over a billion dollars' worth of collateral.  And now I

20   understand that there are disputes as to how to value that

21   collateral and how (indiscernible) are valued.  And that's

22   not an issue before Your Honor today.  But to say that these

23   claims were $3.8 billion in our view was never in the realm

24   of realistic.

25           And so when we and -- you know, in the lines on

Page 119

1   what the debtors have done in analyzing these claims took a

2   look at the net value, that exchange between the two

3   parties.  We believe that the realm of a possible claim

4   against the Genesis estates was somewhere in the range of

5   $150 to $200 million.  Now, 175 falls right within that

6   range.  But that doesn't account for the waiver of the

7   affirmative claims against the FTX estates.

8           THE COURT:  I will say that nothing you've told me

9   allows me to reach the conclusion that this -- that what's

10  really at issue is $150 million.  You've identified issues.

11  You've identified buckets.  And I understand you have

12  positions.  But I haven't -- I just can't get there.  I

13  understand that's your position.  But if what you're asking

14  me to do is evaluate the settlement and say it's not within

15  the lowest point in the range of reasonableness because the

16  real value of the claims is $150 million, I have not been

17  presented anything that allows me to reach that conclusion.

18          MR. SAZANT:  I understand, Your Honor.

19          THE COURT:  I have been presented with my clients

20  think the real value of the claim is $150 million.

21          MR. SAZANT:  And I agree that you have not been

22  presented with sufficient information to make that

23  determination.  I also believe you have not been presented

24  with sufficient information to determine that 175 is

25  (indiscernible) reasonable range.

Page 120

```
 1              THE COURT:  All right.  Anything else, Counsel?

 2              MR. SAZANT:  So just to briefly touch on the

 3      standards for approving a settlement.  Of course

 4      (indiscernible) eight-factor test to determine whether as

 5      settlement is within the range of reasonableness.  And I'm

 6      not going to rattle through each of them, as Your Honor is

 7      well aware of the standard.  But applying the factors to the

 8      evidence in the record in our view shows the deficiencies in

 9      the debtor's case in support of the settlement.  To briefly

10      touch on a few of these factors with the probability of

11      success in litigation, of course any litigation outcome is

12      uncertain.  But the debtors have offered no analysis of the

13      strength and weaknesses associated with the claims and

14      defenses.

15              Of course Your Honor does not need to conduct a

16      mini-trial of the claims and defenses to determine the

17      merits of the settlement, but you at least have to be

18      advised of what they are and the facts underlying them to

19      make that determination.

20              Second, the proportion of objecting creditors.  As

21      you know, the ad hoc group represents $2.4 billion in claims

22      against GGC, including the majorities in each of the USD and

23      crypto creditor classes.  Along with Gemini's opposition,

24      the majority of creditors oppose the proposed settlement.

25              And finally, the debtors (indiscernible)
```

Page 121

1  judgement. And while the debtor obviously supports the

2  settlement, if it cannot support the settlement with a

3  factual basis that it is willing to put on the record, I

4  don't see how this Court can find that the debtor's

5  judgement is informed. The court must know what facts make

6  up the debtor's informed judgement in order to rule in their

7  favor.

8          And I will leave it at that.

9          THE COURT: All right. Thank you very much. Any

10 other party that wishes to be heard on the Debtor's motion

11 seeking approval under Rule 9019?

12         Any response by Debtors?

13         MR. BAREFOOT: Very, very briefly, Your Honor.

14         THE COURT: All right.

15         MR. BAREFOOT: Your Honor, just five very discrete

16 points. To the point that we heard for the first time that

17 they think that a fair amount of the settlement would have

18 been somewhere between $150 to $200 million. There is no

19 briefing, no evidence in the record as to how they arrived

20 at those numbers or what factors differed from the factors

21 that the debtors considered. And I suspect that's for the

22 very reason that we didn't want to disclose our legal

23 analysis and the probabilities of success that we ascribe to

24 claims that are being litigated not only with FTX, but with

25 a number of other parties. They recognize that that would

                                                              Page 122

1    be detrimental.

2             Second, to the extent they continue to harp on the

3    ordinary course defense, they never mention, they ignore and

4    don't address the arguments that FTX had asserted that to

5    the extent they were a fraud or a Ponzi scheme, the ordinary

6    course defense would be unavailable entirely.

7             Third, Your Honor, they continue to say that the

8    $1.8 billion should only be asserted against GGCI.  Again,

9    have no response or analysis that would suggest that the

10   prospect of GGCI being sued as a subsequent transferee was a

11   very real prospect or that there would be significant

12   collateral impacts on GGC as the largest creditor at GGCI if

13   that claim were brought.

14            And just finally, Your Honor, to the extent that

15   they suggest in passing that they would have liked to speak

16   to someone from the special committee, there was never any

17   effort to serve a notice of deposition or to depose them,

18   all of whom of course are located in this district and could

19   have been produced and is within the debtor's control.

20            And I believe unless Your Honor has any more

21   questions, we amply satisfy our 9019 burden.

22            THE COURT:  All right.  Thank you very much.

23   Anything else from any other party before the Court

24   considers this matter closed?  All right.

25            I will tell you now that I am going to hold off on

Page 123

1    ruling because I want to dot some Is and cross some Ts to

2    account for the arguments and evidence today.  But I will

3    tell you that I -- two impressions.  One is that this --

4    that the actual objection that's been made.  And there's

5    been more than one objection, and it's (indiscernible) that

6    no one wanted to stand up and take ownership of the vote

7    creation argument which I think is perilously close to the

8    rules of advocacy and what's permitted because it doesn't

9    make any sense and it's a serious accusation to make because

10   it's accusing folks of violating their fiduciary duty.

11           So putting that aside, I am not -- I am not

12   particularly persuaded by what I'm hearing from the Ad Hoc

13   Group, which strikes me as a desire to want to litigate

14   these issues to the death, but without a whole lot more or

15   even the same level of analysis that's existed going into

16   the settlement.  I think there's a whole host of problems

17   with it, whether we're talking about it is relevant not by

18   itself, but with all the other factors, the amount of the

19   settlement in terms of the percentage versus the whole

20   claim, the litigation costs are highly relevant.  The delay

21   is highly relevant.  The uncertainty in recovery dealing

22   with any claims against FTX, the uncertainty in the defenses

23   identified, which to the extent that they have been

24   identified by the Ad Hoc Group have been responded to by the

25   debtors.

Page 124

1           What I haven't figured out is if there's

2    additional Is to be dotted and Ts to be crossed in terms of

3    presenting me with some additional thought.  I recognize

4    this witness is being very candid in terms of what he did

5    and what he didn't do.  And he did what one would expect him

6    to do in a circumstance where you have to analyze the

7    viability of claims filed in the bankruptcy court, he relied

8    upon professionals.

9           I am not sure though of the real merits of

10   starting to do the counting exercise of each claim and each

11   defense.  That begins to look an awful lot like a mini

12   trial, which is what Rule 9019 is not supposed to be.

13          And so that's where I am.  I'm trying to figure

14   out if there's anything additional, as you may have

15   discerned from my question, whether it makes a difference

16   whether somebody who is on the special committee who is

17   actually making the decisions, whether that helps to push

18   things over the finish line.

19          But again, I haven't seen anything from the Ad Hoc

20   Group that raises alarm bells to me.  It's a hard-fought

21   settlement.  It's pretty clear that all the parties, both in

22   this bankruptcy and in the other bankruptcy, realize that

23   amongst all the difficult challenges of their cases, that

24   taking on a full litigation of all these issues was not in

25   anyone's interest.  That's not a surprising proposition, nor

Page 125

1    do the numbers that are appearing offend me in any way,

2    shape, or form.  And again, I don't know that the Ad Hoc

3    Group has identified something for me for which the Debtors

4    have had no response and for which raises significant

5    substantive question that I feel like I need to get to the

6    bottom of.

7            So what I would do though is go back through some

8    of the exhibits.  I know that some of the minutes that are

9    cited as exhibits are heavily redacted.  So I will ask the

10   debtors whether they think it would be efficient or

11   appropriate for me to look at anything in camera.  I am

12   trying to do this in an efficient way, mindful of the costs

13   -- one of the reasons for settling this matter is the cost

14   involved.  And we've had an evidentiary hearing.  We have a

15   lot of lawyers here today.  And we're all mindful of the

16   fees and costs.  But you have to do what you have to do.  So

17   that's the reason I threw it out.

18           It may be that, like some idea that judges have on

19   the bench, it sounds good but it's a terrible idea, in which

20   case you all can straighten me out that it's -- and I will

21   not take any offense at all.  You can take it as more sort

22   of a spit balling idea, much like my questions about whether

23   somebody from the special committee would make a difference.

24           So that's where I am, and I'm happy to hear from

25   the debtors if they have nay thoughts about additional steps

Page 126

1  that might be appropriate or helpful that you can think of.

2  And if you want a few minutes to think about it, I'm happy

3  to do that as well.

4          MR. BAREFOOT:  Could you give us just a moment,

5  Your Honor?

6          THE COURT:  Yeah, that's fine.  Do you want me to

7  leave the bench, give you about five?

8          MR. BAREFOOT:  Literally about one minute.

9          THE COURT:  Okay, that's fine.

10         MR. BAREFOOT:  Hi, Your Honor.  Luke Barefoot from

11  Cleary Gottlieb from the debtors.

12         In terms of the idea of having a member of the

13  special committee testify, we are -- our view at this stage

14  is that's not likely to be particularly helpful to Your

15  Honor because I believe that (indiscernible) the same

16  privilege issues and concerns and instructions from us would

17  be given.

18         THE COURT:  Right.

19         MR. BAREFOOT:  Given the -- not only the

20  disclosure to FTX, but given the parallel engagement of

21  other issues.

22         THE COURT:  Right.

23         MR. BAREFOOT:  We will, with Your Honor's

24  permission, just take under advisement whether we can submit

25  these exhibits that, as you mentioned, were heavily redacted

Page 127

1    or any other materials that the special committee considered

2    for Your Honor's in camera review.  And we can submit those

3    promptly.

4              THE COURT:  All right.  Well, what I would say is

5    let me know in the next couple of days what you intend to

6    do.  I am mindful that I am not the last word on things.

7    And so the idea is to have an appropriate, fulsome record so

8    that there's not an appeal just based on lack of clarity or

9    lack of information.  That just doesn't serve anybody's

10   purposes.  But where that line is to be drawn is another

11   question.

12             So think about it.  Maybe if you can let me know

13   in the next day or two.  But I understand it to be an

14   analysis of litigation risks that is of the kind that's

15   privileged.

16             And so again, I realize that the idea sounds very

17   simple, but in execution it may be considerably more

18   complicated.

19             All right.  And if you let me know in the next two

20   days now to think about what you want to do and you can just

21   maybe put a letter on the docket.  And that way everybody

22   has it.  And if there is something to submit that's under

23   seal, then you'll just follow whatever appropriate

24   procedures.

25             MR. BAREFOOT:  Very good, Your Honor.  We will do

Page 128

1   so.  Oh, understanding, Your Honor, that if we submit these

2   in camera, that would not be a waiver of --

3           THE COURT:  No.  I think that would have to be the

4   case.  You're right.  And I would consider it akin to when

5   there's a debate about what's privileged and what's not

6   privileged, submitting things in-camera.  And so if we need

7   to get there for the first thing on for today, if you had to

8   submit some of the 77 documents, that wouldn't have been a

9   waiver of privilege on there, either.

10          MR. BAREFOOT:  Understood.  Just wanted to

11  confirm.

12          THE COURT:  all right.  And again, I don't know

13  the law on this in the context of Rule 9019.  So I am --

14  it's an idea.  So again, I have not sort of thought this all

15  the way through.  So you have a bunch of smart people in

16  this room who will think about it.  And if it's an

17  inappropriate or problematic idea, you'll let me know.

18          MR. BAREFOOT:  Will do, Your Honor.

19          THE COURT:  All right.  And I see Mr. Zipes

20  chiming in.

21          Mr. Zipes?

22          MR. ZIPES:  Greg Zipes with the U.S. Trustee's

23  Office.  And, Your Honor, my intention would not be to get

24  in the way of any settlement.  But again, this is an issue

25  that my office may have had a concern about.  We would

Page 129

1    obviously (indiscernible) the parties disagree, and I'm not

2    saying whether we're going to weigh in or not.  But we would

3    get it before (indiscernible).  So we would just ask to be

4    involved with that to the extent necessary.

5              THE COURT:  All right.

6              MR. ZIPES:  I would say the 9019 should generally

7    be supported by the record that everybody can see and that -

8    - and I think everybody agrees with that generally.

9              THE COURT:  Yeah.  No, I think that's right.  And

10   if you have any thoughts about how to walk the line that we

11   were talking about.  I mean, there are significant claims

12   here, in the billions of dollars that have been filed.

13   There's a significant settlement.  It's crucial to the case.

14   There's a potential for extended litigation if the claims go

15   forward.  There's also a potential for extended litigation

16   on the settlement issue for a variety of reasons.

17             And again, I think that's why I'm trying to share

18   my view that I hadn't heard anything in the objection that

19   gives me pause on the substance of the settlement.  But as

20   to having sort of an ideal record in which to make the

21   findings under rule 9019, that's really where I'm at.

22             Again, just an idea.  You all let me know if it is

23   not suitable or fitting for the case.

24             All right.

25             MR. BAREFOOT:  Your Honor, we will discuss the

Page 130

1    issue before submitting the letter you suggested.

2            THE COURT:  Yeah.  Please talk to all the

3    stakeholders.  But I'm trying to grapple candidly with the

4    idea that say, well, we don't have enough information,

5    Judge, you don't have enough information.  And again, the

6    process that has been described to me is the process that

7    one would think should occur, an iterative feedback loop

8    between the folks making decisions, special counsel, the

9    witness, and the professionals.  And so sometimes that's not

10   quite the case in terms of all the people needing to be

11   consulted who were consulted.  So I'm not disturbed by any

12   of the process that I've seen.  And so I also haven't been

13   presented with anything specifically on any of the

14   particular claims or defenses that gives me pause that

15   somehow someone has missed the boat.

16           So what I'm left with then is a question about how

17   robust it is in the scale of one to ten vis-a-vis the 9019

18   standard.  And I tend to be more cautious than not where I

19   think there's a potential for additional collateral

20   litigation that's in nobody's interest.  And so -- and I'm

21   trying to avoid that.  So if it's done, it's done.

22           All right.  With that, I realize that we should

23   talk about dates.  I think there was a request made to

24   chambers to talk about the disclosure statement hearing and

25   timing.  So if the right people are here to have that

Page 131

1    conversation, great.  If they are not, then I can get out of

2    the way and let Ms. Ebanks do that.  But I figured since

3    we're all here.

4              MR. BAREFOOT:  Well, Your Honor, I think part of

5    the question was whether we wanted to cancel the September

6    26th hearing.  But that is now set down for the lift stay

7    motion filed by Three Arrows Capital.  It was an order

8    entered on short notice setting that as that hearing.  We

9    would very much like to keep that hearing date for that.

10             THE COURT:  Okay.  And I think I granted that, but

11   I think I granted it by the time -- from the filing to the

12   September 26th, it actually isn't shortened notice.  So --

13             MR. BAREFOOT:  By one day.

14             THE COURT:  Oh, it is by one day?  I'm sorry.  All

15   right.  But I thought it wasn't implicating any sort of

16   concerns about due process.

17             MR. BAREFOOT:  No, no.  We supported the shortened

18   notice.

19             THE COURT:  Okay. So that's fine.  I'm happy to

20   leave that on.  And then I guess the other dates -- so

21   you're moving the disclosure statement hearing.  And I think

22   we already have one date in October.  And this would be a

23   new date, is that right?

24             MR. BAREFOOT:  Correct.  I believe it's October

25   6th is the date that we were given that was available.

Page 132

1           THE COURT:  Okay, October 6th.  And I think --

2    what's the other date we have in October?  Later in the

3    month.

4           MR. BAREFOOT:  October 24th I believe.

5           THE COURT:  24th.  All right.

6           MR. BAREFOOT:  Yes.  Because October 24th will

7    also be the status conference on the Three Arrows Capital

8    claims objection.

9           THE COURT:  Oh, right, right.

10          MR. BAREFOOT:  Because it will coincide with the

11   conclusion of fact discovery.

12          THE COURT:  All right.  Hold on one second.  All

13   right.  So if my courtroom deputy thought we had time, then

14   I would have deferred to her wisdom because she is much

15   better at this than I am.  So that's fine.

16          The only thing I would say is to just try to keep

17   things on the calendar that we use one or either of those

18   dates.  We used the existing dates we have as omnibus

19   hearings as opposed to sort of picking up other dates

20   somewhere.

21          I certainly understand the dynamic that leads to

22   needing to adjourn things.  And I don't want to stand in the

23   way of that.  The problem I have in terms of managing a

24   calendar is you can have a date and then you cross it off

25   the calendar just before it happens.

Page 133

```
 1              So one way to do that is if there are things that

 2    are a bit more quantumly uncertain (indiscernible) problem,

 3    we can -- if you can let me know that, we could pick a

 4    Monday or a Friday or a less likely to have regular

 5    customers schedule so we can work our way through that.  But

 6    I'm happy to give you the 6th.  So we would have the 26th

 7    for the lift stay on three arrows, we would have the 6th for

 8    a disclosure statement, and we would have the 24th, among

 9    other things, the status on Three Arrows.

10              MR. BAREFOOT:  Perfect, Your Honor.

11              THE COURT:  All right.  Did you work out with Ms.

12    Ebanks the time on the 6th?

13              MR. BAREFOOT:  I don't know that we did work out a

14    time for the 6th.  The time of day.

15              THE COURT:  That's all right.

16              MR. BAREFOOT:  I'm not sure Your Honor.

17              THE COURT:  That's fine.  It is what it is.  All

18    right.  All right.  Thank you for that.  I just wanted to

19    make sure I had things nailed down while you were all here.

20    And so I see Mr. Zipes.

21              MR. ZIPES:  Could I just -- while we're here --

22    and it's bene a long day I know.  Just two more matters.

23    One is that we're going to see the amended disclosure

24    statement when it's ready and (indiscernible).  And also I

25    did want to raise to Your Honor the idea of (indiscernible)
```

Page 134

1    in this case that's played out in different ways.  And one

2    of the way that's played out is the 2019 statements that are

3    being filed are filed with redacted information.  And I

4    don't know how to bring this up exactly.  But I think it is

5    relevant.  There is some overlap among the committees that

6    are filing.  It's not necessarily a bad thing, but they are

7    the obvious -- if there were these redactions.  So I'm just

8    flagging that as an issue.  I think it's something to --

9                THE COURT:  So am I right in saying that your

10   office is raising this just to try to figure out an

11   appropriate way to get that kind of information about the

12   overlap interest of the public domain without violating

13   anybody's appropriate confidence?

14               MR. ZIPES:  Right.  The Court has ruled on that,

15   obviously.  So we're respecting that.  But we're also making

16   note of that.

17               THE COURT:  I think that's fair and that's

18   relevant.  So I would certainly encourage -- it's an issue

19   that's come up in this case in terms of being identified

20   from the point of view of certain functions being relevant.

21   So I would ask the folks who are involved and implicated by

22   that concern to have a conversation and try to figure out

23   what should be on the public docket.  And I am available to

24   chat about it as the need arises.  So I thank you for

25   bringing it up.

Page 135

1          CLERK:  October 6th the time is 10:00 a.m.

2          THE COURT:  Okay.  October 6th is 10:00 a.m. I'm

3   being told.  All right.  So last note is that the debtors

4   will let me know what if anything else they want to do.  And

5   then I will promptly make a decision once we sort through

6   that, recognizing that this is an important event in the

7   life of the case.  So it's -- it will be dealt with

8   promptly.  So let me know as soon as you can, and I will

9   then, whether it's a written decision or it's a bench

10  ruling, I don't quite know.  But it will be done promptly.

11          All right.  With that, anything else from the

12  Debtors?

13          MR. BAREFOOT:  No, Your Honor.  That concludes our

14  agenda.  And thank you very much.

15          THE COURT:  All right.  Anything else from the

16  Committee?

17          MR. SHORE:  No, Your Honor.

18          THE COURT:  All right.  Anything else from the Ad

19  Hoc Group?

20          MR. SAZANT:  Nothing further, Your Honor.

21          THE COURT:  All right. Thank you very much.  Have

22  a good afternoon.

23          (Whereupon these proceedings were concluded)

24

25

Page 136

1                          I N D E X

2

3                          RULINGS

4                                              Page        Line

5

6   Document Disclosure Denied                 19          17

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 137

1                    C E R T I F I C A T I O N

2

3          I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *[signature: Sonya M. Ledanski Hyde]*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 19, 2023