Page 1

1   UNITED STATES BANKRUPTCY COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   Case No. 23-10063-shl

4   - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5   In the Matter of:

6

7   GENESIS GLOBAL HOLDCO, LLC,

8

9           Debtor.

10  - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

11

12                  United States Bankruptcy Court

13                  300 Quarropas Street, Room 248

14                  White Plains, NY 10601

15

16                  September 6, 2023

17                  2:10 PM

18

19

20

21  B E F O R E :

22  HON SEAN H. LANE

23  U.S. BANKRUPTCY JUDGE

24

25  ECRO:  ALIANNA PERSAUD

Page 2

1    HEARING re Omnibus Hearing

2

3    HEARING re Doc. #663 Amended Notice Of Agenda

4

5    HEARING re Doc. #602 (Liens) Motion to Authorize / Debtors

6    Motion for Entry of an Order (I) Authorizing the Debtors to

7    Consent to Priming of the Debtors Liens on Certain Property

8    and (II) Authorizing and Approving Procedures for the

9    Debtors to Consent to the Priming or Release of Liens on

10   Other De Minimis Assets

11

12   HEARING re Doc. #601 (Payroll Contract) Motion to Authorize

13   / Debtors Motion for an Order Authorizing Holdco to Enter

14   Into Payroll Contract, Incur Obligations Related to

15   Employee Transfer and Granting Related Relief

16

17   HEARING re Doc. #659 (Scheduling Motion) Motion To Approve/

18   Debtors Motion For Entry Of A Scheduling Order Concerning

19   The Debtors Second Omnibus Objection (Substantive) To

20   Claim Nos. 523, 526, 527, 981, 982 and 990

21

22   HEARING re Doc. #660 (Motion To Shorten Time) Motion To

23   Shorten Time / Debtors Motion To Shorten The Notice Period

24   For Debtors Motion For Entry Of A Scheduling Order

25   Concerning The Debtors Second Omnibus Objection

1   (Substantive) To Claim Nos. 523, 526, 527, 981, 982 and 990

2

3   HEARING re Doc. #574 (Exclusivity) Second Motion To Extend

4   Exclusivity Period For Filing A Chapter 11 Plan And

5   Disclosure Statement

6

7   HEARING re Doc. #603 (Status Conference Re: FTX Settlement)

8   Motion To Approve Compromise / Genesis Debtors Motion

9   Pursuant To Federal Rule Of Bankruptcy Procedure 9019(a) For

10  Entry Of An Order Approving Settlement Agreement With FTX

11  Debtors

12

13  HEARING re Doc. #529 First Application For Interim

14  Professional Compensation For Cleary Gottlieb

15  Steen & Hamilton LLP, Debtor's Attorney, Period: 1/19/2023

16  To 5/31/2023, Fee: $23,894,770.50, Expenses: $256,085.65

17

18  HEARING re Doc. #516 First Application For Interim

19  Professional Compensation For Moelis & Company LLC, Other

20  Professional, Period: 1/19/2023 To 5/31/2023, Fee:

21  $600,000.00, Expenses: $29,411.00

22

23  HEARING re Doc. #522 First Application For Interim

24  Professional Compensation For Morrison Cohen

25  LLP, Special Litigation And Enforcement Counsel To The

1    Debtors, Period: 1/19/2023 To 5/31/2023, Fee: $933,249.00,

2    Expenses: $13,087.58

3

4    HEARING re Doc. #524 First Application For Interim

5    Professional Compensation For M3 Advisory Partners, LP,

6    Other Professional, Period: 4/1/2023 To 5/31/2023, Fee:

7    $448,737.00, Expenses: $971. 93

8

9    HEARING re Doc. #527 First Application For Interim

10   Professional Compensation For Alvarez & Marsal North

11   America, LLC, Other Professional, Period: 1/20/2023 To

12   5/31/2023, Fee: $4,858,933.75, Expenses: $46,875.63

13

14   HEARING re Doc. #523 First Application For Interim

15   Professional Compensation For White & Case LLP, Counsel To

16   The Official Committee Of Unsecured Creditors Period:

17   2/10/2023 To 5/31/2023, Fee: $7,759,595.00, Expenses:

18   $11,065.14

19

20   HEARING re Doc. #525 First Application For Interim

21   Professional Compensation For Houlihan Lokey

22   Capital, Inc., Investment Banker For The Official Committee

23   of Unsecured Creditors, Period: 2/12/2023 To 5/31/2023, Fee:

24   $541,071.43, Expenses: $12,832.54

25

1    HEARING re Doc. #561 First Application For Interim

2    Professional Compensation For Berkeley Research Group, LLC

3    As Financial Advisor To The Official Committee Of Unsecured

4    Creditors, Period: 2/14/2023 To 5/31/2023, Fee:

5    $4,729,898.50, Expenses: $3,624.20

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 6

```
 1   A P P E A R A N C E S :

 2

 3   CLEARY GOTTLIEB STEEN & HAMILTON LLP

 4         Attorneys for the Debtors

 5         One Liberty Plaza

 6         New York, NY 10006

 7

 8   BY:  JANE VANLARE

 9         LUKE A. BAREFOOT

10         SEAN A. O'NEAL

11         HOO RI KIM

12

13   WHITE & CASE LLP

14         Attorneys for the Official Committee of

15         Unsecured Creditors

16         1221 Avenue of the Americas

17         New York, NY 10020

18

19   BY:  J. CHRISTOPHER SHORE

20         PHILIP ABELSON

21         COLIN WEST

22

23

24

25
```

Page 7

1   PROSKAUER ROSE LLP

2        Attorneys for the Ad Hoc Group

3        Eleven Times Square

4        New York, NY 10036

5

6   BY:  JORDAN SAZANT

7

8   HUGHES HUBBARD & REED LLP

9        Attorneys for Gemini Trust Company, LLC

10        One Battery Park Plaza

11        New York, NY 10004

12

13   BY:  ANSON B. FRELINGHUYSEN

14        ERIN DIERS

15        DUSTIN SMITH

16

17   SULLIVAN & CROMWELL LLP

18        Attorneys for the FTX Debtors

19        125 Broad Street

20        New York, NY 10004

21

22   BY:  BRIAN D. GLUECKSTEIN

23

24

25

Page 8

```
 1   WEIL, GOTSHAL & MANGES LLP

 2        Attorneys for Digital Currency Group

 3        767 Fifth Avenue

 4        New York, NY 10153

 5

 6   BY:  JESSICA LIOU

 7

 8   LATHAM & WATKINS LLP

 9        Attorneys for the Joint Liquidators of

10        Three Arrows Capital

11        1271 Avenue of the Americas

12        New York, NY 10020

13

14   BY:  ADAM J. GOLDBERG

15        CHRISTOPHER HARRIS

16        BRETT NEVE

17        NACIF TAOUSSE

18

19   UNITED STATES DEPARTMENT OF JUSTICE

20        Attorneys for the U.S. Trustee

21        Alexander Hamilton Custom House

22        One Bowling Green, Room 534

23        New York, NY 10004

24

25   BY:  TARA TIANTIAN
```

```
1   BROWN RUDNICK LLP

2       Attorneys for the Ad Hoc Group of Unsecured Creditors

3       7 Times Square

4       New York, NY 10036

5

6   BY:  KENNETH AULET

7       TRISTAN AXELROD

8       MATT SAWYER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                       P R O C E E D I N G S

2              THE COURT:  Good afternoon.  This is Judge Sean

3      Lane in the United States Bankruptcy Court for the Southern

4      District of New York and we're here for 2:00 hearing in

5      Genesis Global Holdco, LLC., a jointly administered Chapter

6      11 case.  And before we start, we'll get appearances

7      starting with the Debtors.

8              MS. VANLARE:  Good afternoon, Your Honor.  Jane

9      VanLare, Cleary Gottlieb Steen & Hamilton, on behalf of the

10     Debtors.  We also have Sean O'Neal, Luke Barefoot, and Ms.

11     Hoo Ri Kim on as well.

12             THE COURT:  All right, good afternoon.  On behalf

13     of the Official Committee of Unsecured Creditors.

14             MR. SHORE:  Good afternoon, Your Honor.  Chris

15     Shore from White & Case, along with Phil Abelson and Colin

16     West.

17             THE COURT:  Good afternoon.  On behalf of the Ad

18     Hoc Group of Unsecured Claimants.

19             MR. SAZANT:  Good afternoon, Your Honor.  Jordan

20     Sazant of Proskauer Rose on behalf of the Ad Hoc Group.

21             THE COURT:  Good afternoon.  On behalf of Gemini

22     Trust Company.

23             MR. FRELINGHUYSEN:  Good afternoon, Your Honor.

24     Anson Frelinghuysen from Hughes Hubbard & Reed and I have my

25     colleagues, Erin Diers and Dustin Smith as well.

Page 11

1              THE COURT:  All right, good afternoon.  On behalf

2      of the FTX debtors.

3              MR. GLUECKSTEIN:  Good afternoon, Your Honor.

4      Brian Glueckstein, Sullivan & Cromwell, on behalf of the FTX

5      debtors.

6              THE COURT:  Good afternoon.  On behalf of Digital

7      Currency Group.

8              MS. LIOU:  Good afternoon, Your Honor.  Jessica

9      Liou from Weil, Gotshal & Manges, here on behalf of Digital

10     Currency Group.

11             THE COURT:  Good afternoon.  On behalf of the

12     Joint Liquidators of Three Arrows Capital.

13             MR. GOLDBERG:  Good afternoon, Your Honor.  Adam

14     Goldberg of Latham & Watkins on behalf of the Joint

15     Liquidators of Three Arrows Capital.  I'm joined by my

16     partner, Christopher Harris, along with my colleagues, Brett

17     Neve and Nacif Taousse.

18             THE COURT:  Good afternoon.  On behalf of a group

19     that identifies itself as the Fair Deal Group.

20             MR. AULET:  Good afternoon, Your Honor.  Kenneth

21     Aulet of Brown Rudnick, and I'm joined by my colleagues,

22     Tristan Axelrod and Matt Sawyer.

23             THE COURT:  Good afternoon.  On behalf of the

24     United States Trustee's Office.

25             MS. TIANTIAN:  Good afternoon, Your Honor.  Tara

Page 12

1    Tiantian for the U.S. Trustee.

2            THE COURT:  All right, good afternoon.  Of course,

3    as is always the case with a hearing of this type, I have

4    many pages of appearances and it would be unproductive to go

5    through them all because a lot of folks are listening but

6    don't intend to participate.

7            So at this point, I will throw it open to anybody

8    else who wishes to make an appearance who has not yet done

9    so.  Going once, going twice.  All right.  Of course,

10   somebody may not have chimed in because they're having

11   technical issues in the wonderful virtual world in which

12   we're holding this hearing or because they don't anticipate

13   chiming in and something changes, so I can always take

14   appearances later on if that need arises.

15           So with that, I do have a copy of the amended

16   agenda that was filed setting forth matters that are on for

17   today, a variety of uncontested matters and one contested

18   matter on exclusivity, and then a status conference on some

19   things, and so I'll turn it over to Debtors' counsel to

20   start us off.

21           MS. VANLARE:  Thank you, Your Honor.  Jane

22   VanLare, Cleary Gottlieb.

23           So as you mentioned, Your Honor, on the amended

24   agenda, we have two uncontested matters, so we'd like to

25   begin with those and Miss Kim will present those.  We'd then

Page 13

1    like to go slightly out of order and next go to the

2    exclusivity extension motion.  Mr. O'Neal will address that.

3    Then we'll proceed to the Three Arrows Capital contested

4    motions, that's the motion to shorten notice, that's Agenda

5    Item No. 3, and the scheduling motion, Agenda Item No. 4,

6    and those will be handled by Mr. Barefoot.  And then we'd

7    like to proceed to the status conference on the FTX matter,

8    and then conclude with the fee applications.

9            THE COURT:  All right.  If I could suggest a

10   slight tweak to that order, just because I think some of the

11   status and some other things really go to the issues of

12   exclusivity meaning what's actually going on in the case,

13   what are we working on, what has progress made on, what's

14   still outstanding.

15           So I thought at the very least it would be

16   appropriate to deal with the status conference on the FTX

17   settlement agreement and perhaps the other matters as well

18   before Three Arrows Capital, for example, before dealing

19   with exclusivity.  I think exclusivity obviously should come

20   before the fee applications, but that would be my suggestion

21   just because we can, I think, have probably a more efficient

22   argument on exclusivity by doing it in that fashion,

23   probably just makes sense.

24           So if that's all right with you, I would just move

25   that one item back a little bit and obviously, we'll make

1    sure to get to it.

2              MS. VANLARE:  That's fine with us, Your Honor.  As

3    I understood it, so we'd like to after the uncontested

4    matters proceed with the FTX status conference, then the

5    Three Arrows Capital motions, and then exclusivity, followed

6    by fee applications; is that right?

7              THE COURT:  Yeah, that would be great.  Thank you

8    very much.

9              MS. VANLARE:  Of course.  With that, Your Honor,

10   I'll pass it on to Miss Kim.

11             THE COURT:  All right.  Thank you very much.  Miss

12   Kim.

13             MS. KIM:  Good afternoon, Your Honor.

14             THE COURT:  Good afternoon.

15             MS. KIM:  Hoo Ri Kim, Cleary Gottlieb Steen &

16   Hamilton for the Debtors.  I'll be presenting the two

17   uncontested matters on the agenda.

18             The first motion is the motion for authorization

19   for the Debtors to consent to the priming or release of

20   their liens; it was filed at ECF No. 602.  We filed two

21   declarations with this motion, Your Honor: one from myself

22   with the relevant pleadings in the File Storage Partners

23   Chapter 11 proceeding, and another from the Debtors'

24   financial advisor, Mr. Joseph Sciametta of Alvarez & Marsal.

25   We'd ask that these declarations be admitted to the record,

Page 15

1    Your Honor.

2              THE COURT:  All right, thank you.  Anybody have

3    any objection to admitting those declarations for purposes

4    of this motion?  All right.  Hearing no objection, they are

5    received.

6              MS. KIM:  Thank you, Your Honor.  Prior to the

7    petition date, the Debtors and Genesis Global Capital in

8    particular have engaged in various lending activities.  The

9    borrowers were often other companies in the cryptocurrency

10   industry, which has weathered industrywide turbulence

11   recently.

12             And one of these borrowers was File Source

13   Partners, which was a borrower of file coins under a master

14   loan agreement with Genesis Global Capital and it has since

15   filed for Chapter 11 proceedings in the United States

16   Bankruptcy Court in the District of Delaware and has sought

17   to obtain debtor-in-possession financing to fund their

18   Chapter 11 cases.

19             As part of the DIP financing, FSP has sought to

20   grant super priority liens on most of its assets to the DIP

21   lender, including on the collateral pledge to Genesis under

22   the master loan agreement between Genesis Global Capital and

23   FSP.  The FSP debtors have accordingly asked for Genesis

24   Global Capital's consent to prime its lien, which would be

25   void if this Court does not approve the motion.

1          We negotiated an adequate protection package for

2     any diminution of the value of the Genesis collateral as

3     well, as further described in the pleadings.

4          Note that the DIP lender to File Storage Partners

5     is also the proposed buyer of the FSP assets and the sale

6     was with the purchase price to include a credit bid of the

7     outstanding DIP obligations and the assumed liabilities were

8     to include all obligations of FSP under the Genesis master

9     loan agreement.  We understand that the sale has closed from

10    the correspondence with counsel to the DIP lender and the

11    buyer but seek this relief regardless in an abundance of

12    caution.

13         Your Honor will note that this is not the first

14    time the Debtors have sought this kind of relief and Your

15    Honor has already granted such relief for the Chapter 11

16    proceedings of Cash Cloud at ECF No. 77 in this Court.

17         So going forward for the orderly administration of

18    similar issues, the Debtors have also proposed procedures

19    for the priming or release of their liens in property with a

20    di minimis value of less than $2 million as of the petition

21    date without seeking further relief from this Court,

22    provided that the Debtors provide advance notice to counsel

23    to the committee.  The Debtors respectfully noted that

24    providing such consent constitutes an ordinary course

25    transaction, but nevertheless, request this Court's approval

Page 17

1    under Section 363(b) in an abundance of caution as well.  We

2    believe that granting consent to the priming of its lien is

3    in the Debtors' sound business judgment.

4            The Debtors understand that debtor-in-possession

5    financing was critical to the File Storage Partners debtor's

6    cases and it would also enhance our recovery of the

7    outstanding obligations under the loan to File Storage

8    Partners.  The proposed sale of assets to the DIP lender

9    also contemplated the assumption of liabilities under the

10   master loan agreement, so the Debtors believe that providing

11   consent to the priming of its lien was in the best interest

12   of the debtors and their stakeholders as it represents the

13   best option for a value maximizing financing for File

14   Storage Partners.

15           The Debtors also note that the proposed adequate

16   protection package represents reasonable terms for a secured

17   creditor in this situation.

18           The proposed procedures going forward, Your Honor,

19   are also in the Debtors' sound business judgment.  The

20   Debtors noted that we've expended considerable resources

21   while seeking authority to consent to the priming of its

22   lien in favor of DIP facilities, such as in Cash Cloud and

23   in this case, and it would be the most efficient and cost

24   effective for the Court to grant this relief going forward.

25   We believe that the relief requested protects the interest

Page 18

1    of the creditors and all parties-in-interest because we'll

2    provide advance notice to the counsel to the committee and

3    notice on the Court's docket in time for objections should

4    anyone have any objections.

5              The Debtors have consulted with the committee

6    about this motion, which has represented it has no

7    objections, and we have received no formal objection to the

8    motion otherwise.

9              Unless you have any questions, Your Honor, we

10   would ask the Court to enter the proposed order filed with

11   this motion.

12             THE COURT:  All right.  Thank you very much.

13   Anything from the committee?

14             MR. ABELSON:  No, Your Honor.  Apologies.

15             THE COURT:  All right.  Not at all.  The buildup

16   was bigger than the delivery.  Anyone else who might wish to

17   be heard on this motion?  All right.  Hearing no response, I

18   am happy to grant the motion as appropriate under the facts

19   and circumstances of the case and applicable law.

20             I find it's appropriate and consistent with the

21   Bankruptcy Code, including Section 363(c), and just

22   generally makes sense for the Debtors, and I believe the

23   procedures going forward also make sense.  As you said, this

24   is not the first time we've had that discussion.  I think I

25   handled the Cash Cloud hearing from overseas and so, I think

1   that the estate can save some money by virtue of those

2   procedures in the event that this issue comes up again.

3           So I'm happy to grant this motion and we can move

4   on to the next motion.

5           MS. KIM:  Thank you very much, Your Honor.  The

6   next motion is a motion for an order authorizing Holdco to

7   enter into a payroll contract and incur related obligations

8   to the transfer of employees; it was filed at ECF No. 601.

9           With this motion, we submitted a declaration from

10  Mr. Joseph Sciametta from Alvarez & Marsal and we ask that

11  this declaration be admitted to the record.

12          THE COURT:  All right.  Any party wish to be heard

13  on the admission of this declaration into evidence?  All

14  right.  Hearing no response, the Court is happy to receive

15  that declaration for purposes of this motion.

16          MS. KIM:  Thank you, Your Honor.  Just briefly to

17  the facts.  All employees that provide services to the

18  Debtors are currently employed by Genesis Global Trading,

19  which is a non-debtor affiliate entity.  And to prepare for

20  the possible sale or winddown of Genesis Global Trading, the

21  Debtors are planning to transition payroll services,

22  employment agreements, and other related obligations from

23  Genesis Global Trading to Genesis Global Holdco.

24          To that end, Holdco proposes to enter into a

25  payroll processing contract with TriNet USA, Inc., which is

1     a vendor who has historically provided these types of

2     services to the employees.  Holdco is seeking to begin the

3     transition of employees as early as October 1st and

4     anticipate that the cost associated with the contract to be

5     around $11,000 a month.  Once they enter into the payroll

6     contract looking forward, the Debtors anticipate that a

7     subset of employees will enter into employment agreements

8     with Holdco and Holdco would begin to incur related

9     obligations, such as paying their wages and providing

10    benefits.

11          The Debtors believe that these are ordinary course

12    transactions, but request Court authority regardless.  And

13    needless to say, the employees are a critical part of the

14    Debtors' business and providing for their continued

15    employment and receiving the benefit of their services is

16    absolutely necessary for their operations and the

17    implementation of any Chapter 11 plan in these cases.

18          So the Debtors have determined in their sound

19    business judgment that the relief requested is necessary

20    here.

21          We've consulted on this motion with the committee

22    and counsel to DCG, the parent company of Genesis Global

23    Trading.  The motion and the proposed order reflect comments

24    from the committee, which has reserved its rights under the

25    proposed order.  We have received no formal objections to

Page 21

1    the motion otherwise.

2           And Your Honor will note that the proposed order

3    also notes that this order does not approve any transfer

4    under Section 503(c) and the Debtors will file a separate

5    motion for any such transfers to insiders.

6           Unless you have any questions, Your Honor, we

7    would ask the Court to enter the proposed order filed with

8    this motion.

9           THE COURT:  All right.  Thank you very much.  Any

10   party wish to be heard on this motion at No. 2 on the

11   amended agenda?  All right.  I see Mr. Abelson shaking his

12   head no, and I don't hear any other party.  I am happy to

13   grant the motion for all the reasons that you set forth in

14   the papers and summarized here this morning on the record,

15   again, as appropriate under the facts and circumstances and

16   consistent with applicable law.

17          And with that, I think we can move on to the next

18   agenda item.

19          MS. KIM:  Thank you very much, Your Honor.  I'll

20   hand it back to Miss Vanlare.

21          THE COURT:  All right.  Thank you very much, and

22   it's always great to have younger members of the Bar appear

23   in these cases, so thank you, Miss Kim.

24          MS. VANLARE:  Thanks very much, Your Honor.  So

25   next, we'd like to hold a status conference on the FTX

1    matter; more specifically, the Debtors had filed a motion to

2    approve a settlement agreement with FTX.  We had noticed it

3    for today.  We had received an objection that was filed by

4    the ad hoc group.  The objection was joined by the Brown

5    Rudnick group, as well as Gemini.  We subsequently were

6    served with discovery.  Consistent with the conversation

7    that we had with your chambers, as a result of that, we

8    converted this into a status conference and would like to

9    ask Your Honor to set an evidentiary hearing for approval of

10   the motion.

11           We've already begun production of documents, so we

12   anticipate being able to respond to the document request in

13   the next few days.  We're also prepared to schedule a

14   deposition of Mr. Islim, which is what had been noticed by

15   the ad hoc group for early next week, and we had reached out

16   to chambers to see if Your Honor was available either

17   Thursday or Friday of next week.

18           We understand that the ad hoc group may feel that

19   they need more time.  We do think that it's quite important,

20   Your Honor, that we proceed expeditiously to hear the motion

21   and to have the evidentiary hearing.  It's very important to

22   the sale process the Debtors have been running of certain

23   non-debtor assets.

24           And furthermore, the ad hoc group and counsel to

25   the ad hoc group is intimately familiar with the issues

1    involved in the FTX settlement.  They have been part of the

2    process since November of 2022.  They've been involved in

3    the analysis and discussions about the claims and the facts

4    that are relevant.  They were furthermore regularly updated

5    as to the process of the settlement negotiations, so they're

6    very familiar with the facts and the legal issues involved,

7    and the same is true of Gemini.

8            So, Your Honor, obviously subject to your

9    availability, we would ask that you schedule the hearing for

10   next week at the end of the week if that's possible.  Thank

11   you.

12           THE COURT:  Thank you very much.  Let me ask just

13   a couple of general questions.  What do you envision the

14   hearing consisting of in terms of number of witnesses,

15   length.  A 9019 hearing almost like as to standing is not --

16   you know, you're not trying the merits of the claims, and so

17   you're canvassing things to get a sense of how to assess the

18   factors and the case law under Rule 9019.  So what do the

19   Debtors anticipate their essentially case-in-chief on the

20   settlement motion would look like?

21           MS. VANLARE:  So, Your Honor, we think that we can

22   -- we don't need a very long hearing on these issues.  We

23   had submitted a declaration of Mr. Islim.  We'd propose that

24   we submit that in lieu of any direct testimony.  I'm not

25   sure if the ad hoc group or others intend to cross-examine

Page 24

1   Mr. Islim, but that would be par for the course following

2   his deposition.  And then we would anticipate having opening

3   and closing arguments.  Again, I don't think this should be

4   a very lengthy hearing.

5           THE COURT:  All right.  And in light of the

6   potential for cross, I'm assuming that we would -- Mr. Islim

7   and counsel and would be here in person for that hearing.

8           MS. VANLARE:  We were planning on that, Your

9   Honor.  Obviously, we are happy to do whatever Your Honor

10  would prefer on that point, but we're certainly prepared to

11  appear in person.

12          THE COURT:  Yeah.  Now again, if everyone reaches

13  an agreement where there's no need for live testimony, it's

14  one thing.  But I just -- one of the things, we're obviously

15  doing this hearing remotely and we're doing it remotely

16  because it's efficient and because folks feel that it's an

17  appropriate alternative.  But as we all know, evidentiary

18  things don't work so well remotely and I think all judges

19  and all parties, frankly, counsel, are happy to leave the

20  virtual evidentiary hearing in the past.

21          All right.  Well, thank you for that.  Anything

22  else on your take about what a hearing would look like?

23          MS. VANLARE:  No, Your Honor.

24          THE COURT:  All right.  So let me hear from other

25  parties who wish to be heard about FTX settlement hearing.

1          MR. SAZANT:  Thank you, Your Honor.  This is

2     Jordan Sazant for the record from Proskauer Rose on behalf

3     of the Ad Hoc Group.

4          As Miss Vanlare said, we filed an objection to the

5     FTX settlement motion.  We appreciate that Cleary Gottlieb

6     and the Debtors have begun document production.  We received

7     the first production earlier today.  Obviously, I've not had

8     a chance to review it.  At a quick glance, it's 8,000 pages

9     of documents that we are going to have to go through, and I

10    anticipate that there are further documents that will be

11    produced based on representations from the Debtors.

12         We've also propounded discovery on the UCC and are

13    waiting to meet and confer with them on the timing and scope

14    of their production.

15         So we don't believe that at this time, it's

16    appropriate to set a hearing for next week when we haven't

17    had an opportunity to review any of the documents or to

18    determine when we will be able to receive the full scope of

19    documents from both the Debtors and the committee, so we are

20    waiting to (sound glitch) on that, but we have a...

21         As you know, we have a hearing scheduled currently

22    for the 26th and we don't see a reason to expedite this in

23    advance of that hearing at this point.  Of course, however

24    Your Honor wishes to proceed, we will make ourselves

25    available.

Page 26

1            THE COURT:  All right.  Let me hear from other

2     parties who filed objections.

3            MR. AULET:  Your Honor, Kenneth Aulet from the

4     Fair Deal Group.  We agree with Mr. Sazan.  We don't see a

5     reason that this needs to be on such an abbreviated schedule

6     given that there's already a hearing in 20 days.

7            THE COURT:  All right.  Anyone else?

8            MR. FRELINGHUYSEN:  Your Honor, Anson

9     Frelinghuysen, Hughes Hubbard for Gemini Trust Company.  We

10    join in the other oppositions.

11           THE COURT:  All right.  And obviously, let me hear

12    from the committee if the committee has anything it wants to

13    say on this score.

14           MR. WEST:  Your Honor, Colin West from White &

15    Case on behalf of the committee.  I just want to note in

16    response to Mr. Sazan's comment about discovery propounded

17    on the UCC.  It's true that we haven't met and conferred.

18    That discovery was served, I believe, late Friday night

19    before the weekend.  It appears that discovery, the requests

20    are completely duplicative of information requested from the

21    Debtor, so I don't think that alone should be a

22    consideration for the timing of the requested hearing.

23           THE COURT:  All right.  Anything else from the

24    committee?

25           MR. WEST:  Nothing else from the committee, Your

1    Honor.

2              THE COURT:  All right.  And since we're talking

3    about a settlement with FTX, it seems only appropriate to

4    ask FTX if they have any views about any of this.

5              MR. GLUECKSTEIN:  Good afternoon, Your Honor.

6    Brian Glueckstein, Sullivan & Cromwell for FTX.  From our

7    perspective, certainly we would like the Court to consider

8    the settlement as early as practicable.

9              Judge Dorsey today in our case in Delaware entered

10   an order approving the settlement, but obviously, the

11   effectiveness is contingent on consideration by Your Honor,

12   but obviously defer to the Court on the appropriate timing

13   for that.

14             THE COURT:  All right.  Thank you very much.

15   Anyone else who wishes to be heard on this issue?

16             Ms. Vanlare, did you want to chime in?

17             MS. VANLARE:  Yes, Your Honor, just briefly.  I

18   just wanted to address the question about the reason for the

19   expedited hearing.  As I mentioned earlier, we are

20   conducting a sale process of non-debtor assets.  We're

21   hoping to close that sale by the end of the month; that is

22   driving the timing.  And so, that's an important reason as

23   to why we are hoping to have the hearing next week, rather

24   than on the 26th, which is a bit too close to the month's

25   end.  We again, we don't think that there are a lot of

Page 28

1    issues here, certainly nothing really new.  Again, the ad

2    hoc groups and Gemini have been involved in this for close

3    to a year.

4           I did want to mention, just clarify the sale

5    point; that's very important as far as the timing.

6           THE COURT:  All right.  Thank you very much.  So I

7    can't do it on the 14th as a practical matter.  We already

8    have a fairly full calendar.  And so, my thought would be to

9    -- and again, someone will have to clue me in as to the

10   exact dates of some of the Jewish holidays.  Obviously, my

11   intention is not to interfere with any of those.

12          But I believe with Rosh Hashana ending on the

13   17th, we could schedule it for the 18th, which would give

14   people a little more time, I understand.  At the same time,

15   I suspect that the hearing that we already have probably has

16   a number of things already scheduled, and so, I find it's

17   (sound glitch) to take evidentiary matters and separate them

18   out if we can.

19          So my thought would be if we could use the 18th

20   starting at 10:00, and if folks think that the hearing is

21   not likely to take more than, say, three or four hours, I'm

22   open to starting at 11:00, but I don't want to do that

23   unless folks are on the same page about the amount of time

24   we need.  The idea would be to finish it that day without

25   any concerns about getting through it.  So I don't know what

1      folks think about that suggested day.

2              MS. VANLARE:  Thank you very much, Your Honor.  If

3      we may, Your Honor, we'd like to confer with our client, if

4      we could, and with the other parties and reach out to

5      chambers following this hearing.

6              THE COURT:  All right, that's fine.  And if that

7      doesn't work, then you talk to Miss Ebanks about some other

8      possible dates and I will do the same and she will do the

9      wonderous job that she usually has in bringing order to

10     chaos and getting us all a date that works.  All right, so

11     I'll wait to hear back from you on that.

12              So anything else that we should discuss as to the

13     FTX settlement?

14              MS. VANLARE:  Nothing else on FTX, Your Honor, so

15     I'll cede the virtual podium to Mr. Barefoot.

16              THE COURT:  All right.  And before we segue to

17     other things, there's something I didn't want to forget to

18     mention.  I don't quite know when the appropriate time is to

19     mention this, so now may be as good as any.

20              We have been getting a considerable number of pro

21     se emails from folks who are investors, customers.  I have a

22     stack of some of the most recent ones, and they range in

23     sort of a variety of things.  So sometimes people are,

24     understandably is often the case in bankruptcy cases,

25     explaining the importance of this to them and what their

Page 30

1   economic involvement is and how important the case is and,

2   obviously, that's understandable.  Sometimes people will

3   talk about, you know, we'll sort of see their emails an

4   objection and wonder why it hasn't been filed, and sometimes

5   it's arguments on various things.  Occasionally, you get a

6   one off that has sort of more personal views about the

7   bankruptcy process, the case, or even me in particular.

8            And so, the question is how to handle these, and I

9   think there's two -- there's a couple of observations that I

10  wanted to pass along because obviously there are a lot of

11  folks here who are representing these folks, you know, in

12  some capacity or another.

13           One is that people I don't think understand that

14  sending an email to chambers is not the same as filing

15  something, and that's sort of one issue and concern.

16  Another is that in sending these things to us, sometimes

17  people may not have a full appreciation for what the reason

18  ruling about sealing means or doesn't mean.

19           Some people may have taken away the headline that

20  says all the information is protected no matter what I do,

21  which I think the professionals on the phone understand that

22  that's not quite exactly right; that once you want to be

23  heard in a case, that you sort of surrender some of your

24  privacy in the sense of saying you're going to become an

25  active participant.  And so, you essentially might be

Page 31

1    waiving some of the protections that might otherwise be

2    available to you by virtue of that decision in the sealing

3    order.  But again, it's not that easy thing to figure out if

4    you don't spend your days in the Bankruptcy Court and in

5    legal proceedings.

6            So I certainly understand there's some confusion

7    about that, but I want to make sure that we get it as

8    straight as possible so that nobody inadvertently waives any

9    rights.  So we haven't taken any of these emails and put

10   them on the docket for that reason because they have lots of

11   identifying information.  At the same time, it presents a

12   volume problem for us because I don't know what the latest

13   count is of how many emails we've gotten, whether it's 50 or

14   whatever it is, but I have a stack of the recent ones.

15           And so, I would very much appreciate your

16   assistance in some sort of protocol, whether it's sending

17   the emails to folks who represent these customers in one

18   capacity or another and try to figure out a protocol for

19   handling them.  But again, I understand why people may not

20   quite understand the protocol and the extent of the privacy

21   protections that are available to them versus when they

22   surrender those protections by virtue of becoming an active

23   participant.

24           So I realize that these emails and this kind of

25   issue touches on a number of the counsel here, and maybe all

1    in one way or another because they're customers of the

2    Debtor, the Debtor wants to protect their information,

3    they're being represented by the committee; they're also

4    being represented by various other groups, the ad hoc group,

5    for example.  And so, I just wanted to at least present the

6    issue and canvass the room so that we can figure out an

7    appropriate way to address it.  And we may be able to figure

8    it now on the fly, but it may be something that people want

9    to think about and we can circle back to.

10          So with that, I'll open it up to folks if anybody

11   has any comments about what you think the next steps are.

12          MR. O'NEAL:  Your Honor, Sean O'Neal, Cleary

13   Gottlieb, on behalf of the Debtors.  Perhaps we can have a

14   discussion with the Official Committee of Unsecured

15   Creditors about the best approach, and then we can report

16   back and discuss among the other constituencies as well.

17          THE COURT:  All right, that makes sense to me.  I

18   at least wanted to identify the issue today.  Mr. Abelson?

19          MR. ABELSON:  Yeah, Your Honor.  Phil Abelson,

20   White & Case, on behalf of the UCC.  I was going to say

21   exactly what Mr. O'Neal suggested, which is let us take it

22   back.  We'll come up with a protocol.  Some of them may be

23   Gemini holders, so we want to speak to Hughes Hubbard who

24   represents them, and we'll incorporate and see who should be

25   included depending on if we recognize the names as being

1   part of any of the groups, so we'll contact appropriate

2   counsel as well.

3          THE COURT:  All right.  So why don't I assume

4   that's what we're going to do unless somebody wants to chime

5   in and has a different path.  All right.

6          So the one question then I would have is that for

7   some of these, I know you all have been copied, so I'm

8   looking at one that includes a cc to Mr. O'Neal and Miss

9   Vanlare and Mr. Barefoot, and others of which are less clear

10  that anybody else other than chambers it was sent to.  So my

11  guess is you probably have a lot of these, but not

12  necessarily all of these.

13         So what we can do in chambers is go through and

14  identify any ones that we think weren't sent to -- were sent

15  only to chambers, and then maybe we can put those in an

16  email package and then send them to Mr. O'Neal and Mr.

17  Abelson to look at and disseminate as appropriate.  And ones

18  where either the Debtors or the committee or some other

19  party-in-interest, which is Gemini, is copied on them, we

20  won't do that, we'll assume you have them.

21         But this way at least we'll do the best we can to

22  make sure we think you have as complete a package as

23  possible.  Does that make sense?

24         MR. O'NEAL:  That sounds like a great approach,

25  Your Honor, appreciate it.  I mean, we endeavor to respond

Page 34

1    to every single email and question that comes to us from

2    creditors.  We may have missed some, but I think we hit them

3    all and we logged them as well.  So I think that'd be a

4    terrific idea and we can compare notes with Phil and also

5    Gemini's counsel as well, as Mr. Abelson suggested.

6              THE COURT:  All right.  And one thing to just sort

7    of preview a potential future conversation.  Certainly the

8    opinion that was issued on the issue of privacy and sealing

9    provided guidance on how to address folks' privacy going

10   forward in instances where folks may be taking actions to

11   surrender that privacy.

12             And so, for example, there was cited if somebody

13   is going to serve on the committee that that's consistent

14   with I think another judge who reached the same conclusion.

15   Well, if that's what you're going to do, then that has

16   implications on the privacy point of view.  But it also may

17   be that folks understand that opinion on a sort of big

18   picture level but may not understand the specific

19   consequences for them and what their actions are.

20             So it could be -- and you may be way ahead of me

21   on this, but it could be that some sort of an email with

22   some guidance as to various actions that folks take and what

23   consequences those have or don't have as to their privacy

24   might be useful.  And again, you may already be in front of

25   this, whether it be the committee or the ad hoc group, the

Page 35

1    Debtors, and I realize there's so much of what happens in a

2    case that I don't see, but I throw that out there for what

3    it's worth and you can think about it.

4            But again, and I think of that just specifically

5    where someone had said why wasn't my objection filed and

6    they were sort of wondering about that, and the answer, as

7    we all know, is a little more complicated than that.  So I

8    throw that out for your consideration when you chat and

9    we'll take it from there.

10           All right.  Thank you for your assistance on that.

11   It's an important issue; that's why I spent some time to

12   write an opinion on it.  I know there have been various

13   bench rulings, but a certain point, opinions I think are

14   more helpful to try to clear away any issues and provide

15   clear guidance for folks.

16           And in the same vein about privacy, I know I did

17   get notification of a data breach.  I don't know if there

18   was anything worth discussing on the record about that;

19   obviously, it's a serious issue.  I suspect that all the

20   folks involved are doing what has to be done on that.  And I

21   guess I only mention it to the extent there's anything that

22   you might need from me on that or that's worth discussing in

23   this particular forum.

24           MR. O'NEAL:  Your Honor, I think we'll defer to

25   Miss Vanlare on that one.  She's really been taking the

1   lead.  I don't think we need anything from Your Honor, but

2   I'll defer to Miss Vanlare.

3          MS. VANLARE:  Yes, Your Honor.  As you mentioned,

4   that is correct, there was a data breach at the claims

5   agent.  We have been following up on this.  They have been

6   working with the authorities about this matter.  They

7   included a notice on the docket and sent out notifications

8   to the creditors that were, unfortunately, affected by the

9   breach.  And so, we have undertaken a lot of effort to try

10  to notify the relevant parties and notify other parties.

11          I guess the only thing I think worth adding is,

12  again, to underline to anyone who's listening that you

13  should be very mindful of any communications that you

14  receive about any of your claims, and certainly anything

15  asking for personal information is very likely not coming

16  from either us or the claims agent or any of the appropriate

17  parties in this case.  And so, we just urge everyone to be

18  incredibly vigilant and not provide any personal

19  information.

20          THE COURT:  All right.  Go ahead, Mr. O'Neal.

21          MR. O'NEAL:  Sorry.  I just wanted to interject

22  that it, you know, just to be clear, it was not a data

23  breach at Genesis.  It was a data breach at the claims

24  administrator that has affected a number of the crypto

25  cases, not just Genesis.  But, you know, I think we've done

Page 37

1    all the notifications that need to occur and appreciate your

2    raising it.

3              THE COURT:  All right.  Thank you very much for

4    that.  I wanted to mention it just because I know -- we all

5    know personally the number of notifications that we all get

6    about your data being breached.  You bought a pair of

7    sneakers from a department store, you get a notification

8    that your data's been breached from that store, and so,

9    there's always concern that people become a bit sort of numb

10   to it all.  But we also know that in other cases, people

11   have taken action on the data that's been breached here, and

12   so the consequences are potentially very serious.

13              I appreciate all your efforts.  Again, if there's

14   anything that I can ever do to assist on that, you'll let me

15   know.  And so, with that, those are two issues I just

16   thought now was as good a time as any.

17              And with that, I'll turn it back to Miss Vanlare

18   to tee up the next item.

19              MS. VANLARE:  Thank you, Your Honor.  I was

20   actually just ceding the virtual podium to Mr. Barefoot to

21   address the Three Arrows Capital motions.

22              THE COURT:  All right, Mr. Barefoot.

23              MR. BAREFOOT:  Good afternoon, Your Honor.  Luke

24   Barefoot from Cleary Gottlieb for the Debtors.  Can you hear

25   me all right?

1              THE COURT:  I can hear you just fine.  Thank you.

2              MR. BAREFOOT:  Great.  Thank you, Your Honor.

3     Turning to the Three Arrows Capital portion of this

4     afternoon's agenda that was originally listed at Items 3 and

5     4 on the amended agenda.

6              Following the disputes that Your Honor heard back

7     in August concerning the liquidators amendments of their

8     proofs of claim against the Debtors, liquidators did file

9     amended proofs of claim against each of the Debtors on

10    August 18th, and we filed our renewed claims objection to

11    those amended claims this past Friday, September 1st.

12             In tandem, Your Honor, with that process of filing

13    a revised objection to the amended claims, the parties were

14    discussing in earnest the schedule to have an evidentiary

15    hearing to finally have those claims adjudicated.  As a

16    result of those discussions and that process, you have

17    before you today two competing schedules filed by the

18    Debtors and by the Three Arrows liquidators respectively.

19             As a threshold matter at the outset, Your Honor, I

20    wanted to address the shortened notice issue.  I think given

21    that Your Honor does have before him competing proposed

22    schedules and competing submissions on the appropriateness

23    of those schedules, in the Debtors' view, that really

24    renders moot the opposition hearing this matter today.  The

25    parties had been in discussions concerning those amended

1      schedules for about two weeks.

2              And the main reason stated by the liquidators in

3      opposing shortened notice was that they wanted time and an

4      opportunity to submit a brief with their reasons for

5      advocating for a more extended schedule.  They've now done

6      that in a 10-page submission that was filed yesterday

7      afternoon with a proposed order embodying their proposed

8      schedule.

9              So as I said, from the Debtors' perspective, that

10     effectively moots any of the rationale or dispute over

11     hearing this matter today and we'd ask that the shortened

12     notice motion be granted.

13              THE COURT:  All right.  So I'll hear from Three

14     Arrows Capital in a second.  My thought is that it's not

15     very productive to spend too much time on the shortened time

16     motion, other than to observe that this is not a way to make

17     any friends or to influence adversaries in any positive way.

18     It was filed the Friday before the Labor Day weekend and it

19     made reference, I noted, to something that said, well, we

20     did this on September 1st and then, you know, we waited

21     before filing this motion; of course, the motion was filed

22     September 1st and it was filed in the afternoon.

23              So I would just urge folks to stay away from

24     things like that.  It just adds a level of fuel to the fire

25     that is not very conducive to a good relationship and to

Page 40

1   getting things done.  But with that said, I do have the

2   parties' views and I have Three Arrows proposed schedule

3   right in front of me.  But with that, I don't want to rob

4   Three Arrows of a chance to be heard on the shortened time,

5   even though it's clear I'm trying to lead the witness that

6   we should get to the merits of the schedules.  But let me

7   hear from Three Arrows Capital counsel.

8           MR. GOLDBERG:  Thank you, Your Honor.  For the

9   record, Adam Goldberg of Latham & Watkins on behalf of the

10  joint liquidators of Three Arrows Capital.

11          Your Honor, if you're ready, we're ready and our

12  objection is withdrawn.

13          THE COURT:  All right.  So let me ask Mr.

14  Barefoot, I know there's the thought about the importance of

15  this getting done and, obviously, there's significant

16  claims, there's significant issues to be resolved.

17          I will say that when we were in the throes of the

18  debate between the Debtors and FTX about lifting the stay,

19  estimation, various things, and pushing towards

20  confirmation, this wasn't really on the front burner.  And

21  so, I'm not saying it's not important, but it's certainly --

22  so I was a little confused, I guess, when thinking about all

23  this where this fits and the issues that need to be resolved

24  before confirmation.

25          So certainly, I understand that what goes on with

1    the parent is something that's a settlement that's going to

2    be either teed up separately or teed up at confirmation if

3    it's a preliminary backed confirmation and that the

4    litigation with FTX falls into that same category.  I wasn't

5    really sure how this does, where it fits in the grand scheme

6    of things.  It's obviously important, but we know there's

7    all sorts of time when you confirm and then you have lots of

8    litigation that happens in the aftermath.

9              So any wisdom you can shed on that?

10             MR. BAREFOOT:  Yes, thank you, Your Honor; that's

11   exactly where I was going to start.  Just putting things in

12   the orders of magnitude, the FTX claims were in excess of 3

13   billion when these were filed.  These are smaller, but still

14   incredibly large; they're in excess of a billion dollars.

15             And in the context of that case where the debtors'

16   distributable assets are slightly north of $2.5 billion, the

17   magnitude of a reserve that would be required to satisfy

18   these and continue to litigate them post effective date and

19   post initial distributions would have an incredibly dramatic

20   effect on creditor recoveries.

21             And I think that's particularly important, Your

22   Honor, in the context of this case going to some of the

23   comments that Your Honor has seen and emails that we've all

24   received from creditors.  This is not a company that had

25   publicly held securities or large syndicated debt facilities

Page 42

1   invested and by institutional investors that may have an

2   appetite to wait some months or some years beyond the

3   effective date to get returns on their distributions.  These

4   are much smaller creditors for whom liquidity is incredibly

5   important.

6            And if we were in a scenario where, as the

7   liquidators would propose, we wouldn't have an evidentiary

8   hearing until the end of January.  We would anticipate that

9   to be significantly later than our confirmation and

10  effectiveness and would tie up a significant amount of the

11  Debtors' available funds that could otherwise go out the

12  door towards making creditors whole.

13           THE COURT:  All right.  Anything else from you,

14  Mr. Barefoot, before I hear from Three Arrows?

15           MR. BAREFOOT:  If I could just make a couple of

16  additional points, Your Honor, and then I believe the UCC

17  also wanted to be heard in support of our proposed schedule.

18           Your Honor, I think the other two points that I

19  wanted to make are, first, that while these claims may seem

20  voluminous and messy, they are not factually complex.  There

21  are four transfers that are challenged as preferences and

22  there are discreet and agreed number of transfers challenged

23  as the collateral not being appropriately pledged and,

24  therefore, bringing conversion or related claims against the

25  Debtors.

Page 43

1           I would anticipate that in advance of a hearing,

2    Mr. Goldberg and we could make significant progress towards

3    stipulating on a number of those facts.  That's not to say

4    that there are not complex legal issues; in particular, I

5    think our arguments under the Safe Harbors, but that's more

6    of an issue for the decision than it is for needing a long

7    time for discovery.

8           The second point that I just wanted to make, Your

9    Honor, is the imperative to get a schedule ordered.  I know

10   it may seem like this is brand new because we've just filed

11   our amended claims objection on Friday, but the parties have

12   been in informal information exchanges going back five or

13   six months and the parties have been in more formal

14   discovery for the past six or eight weeks.

15          Despite that, while the Debtors have produced

16   thousands of pages of documents, we have yet to receive a

17   single document from the Three Arrows liquidators.  We were

18   also quite disappointed, Your Honor, that their lift stay

19   motion was only filed today, coincidentally just beyond the

20   21-day notice period that would have allowed it to be heard

21   on September 26th.  So it's very important to us that we not

22   lose more time to delay tactics and that we all have a clear

23   guidepost to move towards the efficient resolution of these

24   claims.

25          THE COURT:  All right.  I think it makes sense to

Page 44

1    hear from the committee before I hear from Three Arrows

2    Capital as the committee is aligned in interest with the

3    Debtors on this issue, it sounds like, so let me hear from

4    the committee.

5            MR. WEST:   Thank you, Your Honor.   Just for the

6    record, again, Colin West of White & Case for the Official

7    Committee.

8            Just to start out with the basics.   We fully agree

9    with the Debtors that the discovery and hearing schedule

10   that they've proposed is entirely reasonable.   The committee

11   has worked incredibly hard over the last several months

12   fighting to get a deal that we believe provides a good

13   outcome for unsecured creditors under the circumstances.

14           And while there are clearly some uncertainties and

15   some creditors who have expressed some disagreement, we

16   believe those differences can be resolved and that we have a

17   structure that provides a path to a confirmable plan that is

18   fundamentally what the creditors want and what the creditors

19   deserve.   As committee professionals, we continuously hear

20   from the creditor body that an overarching concern of theirs

21   is to get their money back as soon as possible, and I expect

22   that the Court is hearing some of those same types of

23   sentiments expressed in some of the communications we just

24   discussed.

25           Unfortunately, Your Honor, the Three Arrows

Page 45

1    liquidators have seized on some of those disagreements among

2    creditors to argue that there would be no harm caused by a

3    drawn out discovery schedule targeting a hearing in late

4    July; that is simply not the case.  While there is some

5    disagreement, the committee believes it is resolvable and

6    that we can get to a confirmable plan.  In any event, Your

7    Honor, injecting further uncertainty around the exit date or

8    around a reserve for Three Arrows while claims are being

9    litigated is only going to be a further impediment to

10   resolving those disagreements.

11           And again, I just reiterate in that context it's

12   worth noting the liquidators waited until two hours before

13   this hearing to lob in their lift stay motion to have their

14   claims litigation elsewhere, presumably under the belief

15   that this would delay the entry of a scheduling order.

16   Respectfully, we think that tactic should be rejected.

17           The schedule that the Debtors propose is

18   reasonable and the committee fully supports it.

19           THE COURT:  All right.  Thank you very much.  And

20   so, anybody else who wishes to be heard before I hear from

21   Three Arrows Capital?  All right.  Let me hear from Three

22   Arrows Capital.

23           MR. GOLDBERG:  Thank you, Your Honor.  Again, for

24   the record, Adam Goldberg of Latham & Watkins on behalf of

25   the joint liquidators of Three Arrows Capital.

1          THE COURT:  Do me a favor, just make sure you're

2     close enough to a microphone.  Your voice is dropping off

3     there at the end.  Again, the joys of the virtual world, so

4     continue, please.

5          MR. GOLDBERG:  Sorry about that.  I'll speak up,

6     Your Honor.  Thank you.

7          Let me reiterate at the outset, Your Honor, that

8     we consent to entry of a scheduling order as Your Honor may

9     determine today, and we would also consent to a hearing of

10     the stay motion on September 26th if that is acceptable to

11     the other parties and Your Honor.  We had reached out to

12     chambers to seek a hearing date for that motion before the

13     -- we filed it today and had not yet heard back; that's why

14     we filed it as a TBD and so, we're happy to have that

15     scheduled today.

16          THE COURT:  Any one of the parties here has a much

17     larger contingent of folks working on this particular case

18     than we have in the entirety of our chambers, so we do the

19     best to be prompt in our response.

20          MR. GOLDBERG:  I'm sure, Your Honor.

21          THE COURT:  But same-day service is not

22     guaranteed, and I had morning hearings from 10:00 to 12:30,

23     but continue.

24          MR. GOLDBERG:  No, of course, Your Honor.  Didn't

25     mean that as any criticism of Your Honor or chambers, simply

Page 47

1      just that it was in process.

2              So to focus on the schedule, Your Honor, I think

3      the justification the Debtors have advanced here is focused

4      on their alleged impairment to distribution to creditors.  I

5      think Your Honor is right to focus on how this is different

6      from the FTX situation that was dealt with earlier on in the

7      process.  Those claims, in addition to being larger,

8      presented a very different situation in the Debtors'

9      arguments to this Court.

10             I'd like to highlight what they argued and why

11     it's different from the current situation.  They argued,

12     "Given the sheer size of the asserted FTX claims compared to

13     the Debtors' assets and scheduled claims pool, it would be

14     practically impossible to implement any Chapter 11 plan

15     without estimating the FTX claims."  That was at Docket No.

16     373, Paragraph 18, and that was filed on June 1st.

17             The situation now is very different from the

18     situation the Court faced with FTX.  The Debtors are not

19     saying that they need to resolve the Three AC claims before

20     they can formulate a plan.  They're earnestly working --

21             THE COURT:  Well, but let me ask you this

22     question.  I sort of see where you're going.  But I think --

23     I wouldn't say the universal response of judges in these

24     circumstances, but a common response of judges in these

25     circumstances is to say we don't know how it's all going to

Page 48

1    work out, but certain things have to get addressed and the

2    larger they are, the bigger impact they have.  They have to

3    get teed up so they get cited.  Maybe the confirmation

4    happens before, maybe the confirmation happens after, but if

5    it's an impediment to distribution, then it's obviously

6    sensitive.

7            And so, I mention that now just because I can't

8    predict the future, Rome wasn't built in a day, and so, it's

9    going to take time to get all these things done.  At the

10   same time, it seems pretty clear that there's a need to act

11   promptly to try to move things forward, so that's my prism

12   for it because, I confess, I can't predict how this, vis-à-

13   vis confirmation, is going to work and that may depend on

14   whether people reach agreements about other things.  And so,

15   I don't really -- I don't really necessarily view it in such

16   concrete categories because things often change.

17           Again, I've probably bored some of you in the past

18   with the various analogies, the Schrödinger's cat, which I

19   never thought on taking the bench would be such an apt

20   metaphor that I would turn to again and again, but it often

21   fits the case.

22           MR. GOLDBERG:  Understood, Your Honor.  And we

23   don't oppose the prompt resolution.  I think the issue that

24   Your Honor will have to balance today are the goals of a

25   prompt resolution on the one hand and due process on the

1    other.  And I think Your Honor is exactly right that we

2    don't know when a plan is going to be confirmed.  We don't

3    know.  There is no confirmation hearing scheduled.  And we

4    don't really know what the impact of distributions of, of

5    reserve for the Three Arrow claims would be on distribution.

6         THE COURT:  Well, but it's -- just like FTX, it's

7    a billion dollar claim.  And when FTX said you can go ahead

8    with the case without worrying about this, I think my

9    response was that's billion with a B.  And the same applies

10   to your circumstance.  So let me ask you this.  I understand

11   that some of these things haven't been formally teed up.

12        It's been sort of scattershot in the way -- in

13   terms of what's coming in front of me for Three Arrows'

14   purposes.  But I have been hearing for some months that the

15   parties have been going back and forth in terms of informal

16   discovery.  We got together to talk about, you know, filing

17   an amended claims objection.  I understand that happened.  I

18   applaud that step as a way to move the ball forward.  But

19   you know, if you -- lots of adversary proceedings or cases

20   in district court are subject to a 60-day discovery

21   schedule, and in bankruptcy even more so.  So what I

22   understand that the Debtors are proposing is November, which

23   is basically two months away.  And you're proposing January,

24   which is I guess all of November, all of December, and most

25   of January.  So two and a half months away.

Page 50

1          But that -- your schedule does seem to be a bit

2    lengthy, and I'm not sure why we need that amount of time

3    given what clearly has been going on in terms of information

4    exchange over the course of the past however many months.

5          MR. GOLDBERG:  Well, I'd like to say just one more

6    remark about the context of that difference between two

7    months for the -- from the Debtor's perspective and four

8    months from our perspective, which is that we don't know

9    when distributions will be made, but we know they won't be

10   complete for years in this case, Your Honor.  We have seen

11   -- all we know about the --

12         THE COURT:  I get it, but it's a large claim.  And

13   in order to understand the mechanics of what a case would

14   look like, and recoveries might look like, it's not a

15   frivolous position for us to say, Judge, it's important for

16   us to have a handle on what that looks like when we figure

17   out what the case looks like and what we can tell Creditors

18   their recoveries might look like.

19         MR. GOLDBERG:  Understood, Your Honor.  Let's

20   focus on what is the issues in this case.  I think that the

21   Debtor's 863-page claim objection speaks for itself, that

22   this is a deeply fact-intensive and complex matter

23   addressing issues that some of which have never been ruled

24   upon by any court, including a bankruptcy court, such as the

25   safe harbor issues that Mr. Barefoot referenced, how those

Page 51

1    should apply to cryptocurrency transactions, and the

2    transactions that are issue here, and how --

3              THE COURT:  But that isn't -- that's briefing.  So

4    my question is what discovery needs to happen, right?

5    That's where we build out things.  And there are times when

6    folks want a ruling from the court very quickly, and there

7    are times I'll say I'm moving as fast as I can, and it's

8    going to take longer than you may want because the issues

9    are complicated.  But that's -- let's build this from the

10   ground up.  What discovery is left to be done in this case?

11             MR. GOLDBERG:  Well, Your Honor, there is

12   extensive discovery that remains.  I mean, first of all, we

13   have only started with production of documents from

14   ourselves to the Debtors as well as receiving productions

15   from the Debtors.  There --

16             THE COURT:  Well, that -- that's not normally the

17   way people lead in discovery.  They normally say here's what

18   I need from the other side.  You have what you have.  So

19   I'll leave it to Mr. Barefoot to complain about things he

20   doesn't have that he needs before the case gets ready for an

21   evidentiary hearing.  So what is it that you need to do?

22   What documents are left to be discovered?  From where, from

23   whom, and what depositions would you contemplate are

24   necessary?

25             MR. GOLDBERG:  Well, Your Honor, we have submitted

Page 52

1   document requests to the Debtors.  We have issued document

2   requests to DCG as well.  DCG for many weeks was opposing to

3   distribute -- to produce any documents and only just started

4   to trickle in documents to us.  We have issued a number of

5   deposition requests to both the Debtors and DCG.  We have

6   seen --

7                THE COURT:  Well, how many folks do you want to

8   depose?

9                MR. GOLDBERG:  Well, I think we don't fully know

10   yet, Your Honor, because we don't have all the documents

11   yet.  A key part of the issues here is whether there were

12   valid security interests created and the assets that are

13   subject to the claim.  And the Debtors are arguing in their

14   objection that the security interests are created by virtue

15   of chat messages that they attached in reams of

16   communications among over a dozen people on these strings.

17   We need the opportunity to look at those, the deposed people

18   who were on those text messages or in chat room messages,

19   and then decide whether we may need more.

20                I think the -- and another key issue here, Your

21   Honor, is there is no one on the Three Arrows' side who has

22   any historic knowledge of these facts.  The Debtors have had

23   access to these people for months.  We have had zero access

24   to anyone with actual knowledge of these facts.  There is a

25   huge information asymmetry, and that is a key reason why the

Page 53

1    Debtors are pushing forward for this schedule on an

2    expedited basis.  Your Honor, it isn't --

3              THE COURT:  I don't want to dissuade you from a

4    high opinion of yourself.  They're pushing forward with this

5    because that's what Debtors do in large cases.  They push

6    forward with things.  You're not the first request that I've

7    gotten for things that need to be done yesterday.  We were

8    talking about FTX only a month ago in this similar vein.  So

9    I don't think it's designed to make it so that you can't

10   litigate appropriately.  And obviously, we'll make sure that

11   you can.  So can you identify for me at this point how many

12   witnesses you would anticipate deposing?

13             MR. GOLDBERG:  I don't know that we have a

14   specific number that we can identify yet, Your Honor, until

15   we've had the opportunity to review the productions from

16   both Genesis and DCG.  We've also seen four fact

17   declarations, some of which could potentially be argued to

18   the expert declarations attached to the motion, including

19   one that focuses on safe harbor issues.  Those are complex

20   and highly technical issues that will require, and we will

21   have to consider whether experts are needed on our side on

22   some of these issues.

23             THE COURT:  All right.  And let me interrupt for a

24   second and ask Mr. Barefoot the status of production, when

25   the Debtors anticipate getting any remaining documents out

Page 54

1    to Three Arrows Capital.

2              MR. BAREFOOT:  Your Honor, we anticipate making a

3    supplemental production this week.  And then absent an order

4    on a motion to compel from the Debtor's perspective of our

5    productions, our production will at that point be

6    substantially complete.  As Mr. Goldberg alluded to, we have

7    a number of documents we have not received from them, but

8    that's I think an issue for another day.  If I could also

9    just point very briefly, Your Honor, to your question about

10   witnesses, Latham did --

11             THE COURT:  Well, let me just -- I'm certainly

12   going to give you a chance to respond.

13             MR. BAREFOOT:  Okay.

14             THE COURT:  I want to let him finish first, but I

15   just wanted to get that bit of facts so I can --

16             MR. BAREFOOT:  Of course.

17             THE COURT:  -- factor it into the discussion.  All

18   right.  Am I -- I think I heard the Committee saying earlier

19   that they viewed the request to be largely duplicative of

20   what was asked of the Debtor, and that may be the case.  It

21   doesn't mean you're not entitled to ask, but I guess we can

22   sort that out.  Do you anticipate any other document

23   requests on behalf of Three Arrow Capital from any other

24   parties?

25             MR. GOLDBERG:  We don't anticipate serving other

Page 55

1    parties at this time.  No, Your Honor.

2            THE COURT:  All right.  All right.  Counsel,

3    anything else you wanted to address in the context of

4    thinking about a schedule?

5            MR. GOLDBERG:  Your Honor, I think I can provide

6    more clarity based on a sidebar with my team that we would

7    anticipate at a minimum five to ten depositions on the fact

8    side plus depositions, and that there is, from our

9    perspective, a high degree of analysis that will be required

10   of the communications that the Debtors are arguing creates

11   an authenticated security interest.  And we need the

12   opportunity to depose the people who supposedly were

13   receiving those authenticated messages.

14           THE COURT:  All right.  All right.  So Mr.

15   Barefoot, let me hear your response.

16           MR. BAREFOOT:  Your Honor, I will be brief.  In

17   terms of witnesses, I'm not sure where the numbers that we

18   just heard came from.  Because in the pleadings that Latham

19   filed yesterday, they said it would be 130(b)(6), three

20   employees, and an individual from DCG.  That's at Paragraph

21   24 of their objection filed yesterday.  I also wanted just

22   to clarify in terms of closing the loop on the universe of

23   documents.  I acknowledge that Mr. Goldberg has served third

24   party discovery requests on DCG.  And we have confirmed with

25   them and gotten assurances that they will complete their

Page 56

1    production by our proposed September 20th deadline for fact

2    document productions.

3              In terms of these -- Mr. Goldberg's point about

4    the need to analyze these Telegram chats and voluminous

5    communications that were appended to our objection, they

6    have had those documents since April, and we have produced a

7    number of related correspondence around those.  So I believe

8    that they have and have had everything they need to do that

9    analysis.

10             I think those are the main points.  The only other

11   point I wanted to cover, Your Honor, is in terms of Mr.

12   Goldberg saying that distributions won't be completed for

13   years.  What he's referring to there is the maturity dates

14   on the notes that DCG contemplates contributing under the

15   settlement arrangements.  But completing, you know,

16   repayments and maturity of a new debt instrument is

17   certainly different from making initial distributions under

18   a plan.  So we anticipate and are working towards making as

19   many distributions in as large a volume as we can on the

20   initial effective date.

21             THE COURT:  All right.  All right.

22             MR. GOLDBERG:  Your Honor, if I may make one or

23   two remarks?

24             THE COURT:  Yeah, briefly.

25             MR. GOLDBERG:  Yes.  Thank you. Your Honor.  While

Page 57

1    we may have had communications that were provided by the

2    Debtors, we have not had access to any of the witnesses in

3    order to depose them to date.  There are outstanding

4    disputes over our document requests, which will require

5    resolution by this court.  And so far, based on the

6    discussions of the parties, will like require Rule 2004

7    motion against DCG to compel them to produce documents and

8    witnesses.

9            And I would add in conclusion, Your Honor, that

10   these claims of Three Arrows are one of, if not the largest

11   asset of the Three Arrows estate, which basis recoveries

12   that are far lower than those that are projected in this

13   case.  The Creditors of Three Arrows are -- deserve due

14   process on these claims, which includes a fulsome

15   opportunity to present and litigate the question of

16   solvency.  We are also facing parallel litigation on these

17   same issues and other Chapter 11 cases where the Three

18   Arrows estate has claims, including the places -- the case

19   of Block Fi, which is we are currently facing a claim

20   objection and estimation motion.

21           We also have similar claims that were filed in the

22   Celsius and FTX cases and against other parties that are not

23   in Chapter 11.  These matters are all running in parallel,

24   some of which are on timelines outside of our control.

25   We're -- the -- that is one of the main reasons why we filed

1    the stay motion in order to have a centralized forum for

2    these issues.

3           And what, Your Honor, we're proposing is that we

4    advance back discovery and then move onto expert discovery

5    as quickly as possible.  And we hold the hearing on the stay

6    motion without any delay in the ongoing discovery and

7    litigation process.  And the schedule that we have proposed,

8    Your Honor, is something that we put a lot of thought into

9    how to move these cases as quickly as possible, Your Honor.

10   And in contrast to other cases where we have worked out

11   schedules for similar preference claims that run in years.

12          THE COURT:  All right.  So --

13          MR. GOLDBERG:  Thank you, Your Honor.

14          THE COURT:  -- a couple of observations.  One is

15   there's reference to the stay motion was filed today.  I

16   don't have it.  I haven't read it.  It's not in front of me,

17   and so I can't really rely on that or factor that into my

18   decision for purposes of setting a schedule here.

19          Like all judges, I find that the theoretical is

20   much more difficult to determine than the actual.  And by

21   that I mean talking about what theoretically something may

22   look like, particularly at the beginning of a discovery

23   process versus what it actually turns out to look like is

24   another thing entirely.  And so the idea that all judges I

25   think have is that discovery should commence, and things

1    should happen, and documents should get exchanged, and

2    people should get deposed.

3          And then the universe of potential things to

4    address and concerns that may exist become either real and

5    tangible that we can deal with, or they melt away.  And so

6    the theoretical is -- I understand why Three Arrows Capital

7    is discussing it, but it's just not that helpful at this

8    point because I don't know what's going to happen and nobody

9    knows what's going to happen in terms of something like, you

10   know, various defenses that may be raised.  And you don't

11   know whether you have the fact to assert them yet.  It's too

12   difficult to figure that out now.

13         So what -- I think January is too far out.  I

14   think November is the -- the date proposed of November 6th

15   is probably too soon.  But I think that fact discovery

16   should be something that can be substantially completed in

17   the next 30 to 60 days in terms of getting documents

18   together and deposing folks so that we can have a conference

19   then at the end of December after September, October, and

20   part of November go by and figure out what an actual

21   procedure looks like.  At that point, people will say -- and

22   again, I don't know what level of expert testimony is

23   appropriate or not, and I suspect people don't either yet.

24         So my thought would be to get fact discovery done

25   now in the next 60 days.  That doesn't seem like an

Page 60

1    inappropriate thing to get done in September and October and

2    through that November 6th date, and then schedule a

3    conference shortly after that to figure out where we are and

4    what else needs to be done to have a hearing.  And that

5    leaves open the possibility we'd have it for the end of the

6    year.  But it's also flexible enough that we'll see actually

7    what problems -- what actual problems we're confronting at

8    that point.

9            So what that will mean is that we'll need a date.

10   And I think Mr. Barefoot provided one for sort of his side

11   of the V in terms of when folks are going to get their

12   document productions completed.  And so we'll need a date I

13   think from Three Arrows Capital as to when it's going to get

14   its document production completed.  And then I think you can

15   work through that in September, and then work through

16   depositions in October, particularly probably the latter

17   half of October.  So that's how I would see a discovery

18   schedule working going forward, and then I think we can have

19   a conference on the -- I would even be open to having a

20   conference sometime in the end of October to touch base.

21   It's often helpful to have one before discovery ends just to

22   give parties a vehicle and an opportunity to be heard on

23   issues that have come up rather than having to file motions

24   in the first instance.

25           And so I'd be open for that if we wanted to pick

Page 61

1   something perhaps the last week in October to have a

2   conference and to touch base and see where we are.  And then

3   we'll set some schedules after that to figure out where we

4   go from there to completion.  So that's what I would

5   propose.  And so, Mr. Barefoot, any thoughts?

6           MR. BAREFOOT:  That's understood, Your Honor, and

7   we will work with Mr. Goldberg and with your chambers to get

8   a status conference date in October, and we will continue to

9   proceed with the discovery in the interim.

10          THE COURT:  I can probably give you one now if

11  that's helpful.  So I'll throw some out, and then you all

12  can talk about what works for you because I think this

13  should all go into an order.  So October 25th, 10:00.

14  October 31st is another one.  I don't know what dates this

15  case might already have or be contemplating getting for

16  October.  So it may be that it's productive to stick it on a

17  date that we're going to use for an omnibus hearing date,

18  but I'm not sure.  Ms. Ebanks might know, but I'm not -- I

19  don't have it in my head.  So I'll leave you to think about

20  scheduling, but the idea is to pick a date sometime in the

21  last week of October.

22          MR. BAREFOOT:  Understood, Your Honor.

23          THE COURT:  So let me ask Mr. Goldberg, any

24  thoughts from you?

25          MR. GOLDBERG:  Thank you, Your Honor.  Your

Page 62

1    direction is clear, and we will work with Mr. Barefoot on

2    filling in an order and scheduling with chambers.

3              THE COURT:  All right.  Thank you very much.  All

4    right.  With that, I believe we are ready to move forward

5    with exclusivity, unless I've skipped something on the

6    agenda.  In which case, you will helpfully remind me of

7    that.

8              MR. BAREFOOT:  I believe that's correct, Your

9    Honor, and Mr. O'Neal from Cleary will be handling the

10   exclusivity presentation.

11             THE COURT:  All right.  Mr. O'Neal?

12             MR. O'NEAL:  Good afternoon, Your Honor, again.

13   Thank you very much.  Sean O'Neal, Cleary Gottlieb on behalf

14   of the Debtors.  I guess this agenda item is Agenda Item

15   Number 5.  It is our second request to extend the exclusive

16   right to file the plan and the exclusive solicitation

17   period.  Your Honor, from the beginning of this case, our

18   goal has been to give Creditors a choice, a choice between

19   litigation with DCG and appeal with DCG.  You may recall

20   that on the first day of the case we filed a plan that would

21   provide for litigation.  And then shortly thereafter, we

22   were able to negotiate a deal with the Ad Hoc Group and DCG.

23             We call it the February 2023 term sheet.  That

24   would've provided for a consensual resolution.  That deal

25   died on the vine, but we kept trying.  We kept trying to

Page 63

1    come up with a proposal that the Creditors would negotiate

2    alongside of the Debtors.  This is not a case where the

3    Debtors simply negotiated a deal and then told the Creditors

4    to take it or leave it.  The Creditors have been alongside

5    of us from day one.

6              And since the appointment of the Creditors

7    Committee, we've been working hand in hand with the

8    Creditors Committee, the only other fiduciary in this case,

9    to see if we could reach a resolution.  We have facilitated

10   multiple in-person meetings among the various Creditor

11   constituencies and the Creditors and DCG principals.  We've

12   had multiple rounds of mediation.  Some of those were led by

13   a former bankruptcy judge, Judge (Indiscernible).  Those

14   efforts over the past few months involve representatives of

15   the Creditors' Committee, the Ad Hoc Group, and Gemini at

16   every step.

17             And eventually that led to an agreement in

18   principal with the only other fiduciary in this case, the

19   Creditors' Committee.  We announced that agreement in

20   principal on August 29th.  Now, we don't have a deal with

21   the Ad Hoc Group or Gemini, but we are trying.  It's not a

22   perfect deal, but it is a deal that the estate fiduciaries

23   have negotiated.  We view that the alternative to our deal

24   is litigation.  That litigation could take years with

25   uncertain requests.

Page 64

1           And ultimately, the Debtors believe, as I believe

2    the Creditors' Committee believes, is that a deal in

3    principal is better than litigating.  We also believe it's

4    better than the February 2023 deal that was negotiated by

5    the Ad Hoc Group.  But we're not here to force any deal on

6    any party.  The Creditors will have the opportunity to give

7    an up or down vote on the deal that has been negotiated as

8    it may be modified along the way.

9           Now, before I get to kind of the argument about

10   our exclusivity extension, I do want to mention another

11   issue, and that's an issue that really hasn't come before

12   the Court just yet.  There are a variety of intercreditors.

13   This case is not just about the potential claims against the

14   parent and PCG, but it also involves an accreditor issue.

15   Here we have various types of lenders.  We have dollar

16   lenders, we have BTC lenders, we have HEEP lenders, we have

17   alt coin lenders, and we have stable coin lenders.

18           They all have different perspectives about what is

19   the best approach for this Chapter 11 case and for the

20   distribution mechanics.  And one of the greatest

21   complications that we have faced, and that the Creditors'

22   Committee has faced is how to deal with these issues.  That

23   has been important to the Creditors' Committee to the Ad Hoc

24   Group to Gemini and all of us.

25           We all agree that the goal should be to maximize

1    in-kind distributions so that Creditors get the kind of

2    currency or digital asset that they lent.  That is our

3    sincere desire, and it's complicated by a variety of

4    factors.  And so I just want the Court to know that behind

5    the scenes what you haven't seen is there -- is this

6    tremendous intercreditor discussion.

7          Now, let's turn to the exclusivity request.  This

8    is not a confirmation hearing.  To meet the standards for

9    extension of exclusivity, we just have to demonstrate a

10   reasonable prospect for filing a viable plan.  This is not a

11   debate about our Chapter 11 plan or whether that will

12   ultimately prove confirmable.  That's a question that will

13   be answered through the voting process.  Yes, we do have an

14   agreement in principal, and that was not easy task, but

15   that's not really what is being heard today.

16          What is being heard today is a request to extend

17   our exclusivity period, our second request.  Now,

18   admittedly, we have a lot of challenges in this case.  As

19   you have seen, the reaction to the agreement and principal

20   has not been universal pleasure, but that does not mean that

21   we are not entitled, and that the estate should not be

22   granted and extension of the exclusivity.  To the extent

23   that people have issues with the proposed agreement and

24   principal, we can deal with that at confirmation.

25          We have tried to negotiate the best deal possible.

Page 66

1    It's the best deal we could negotiate, and now we need time

2    to pull the documents together and bring something to the

3    Creditors to vote on.  This will be also a complex

4    intercreditor negotiation.  We need to finalize the

5    distribution mechanics for example.  This is critical to the

6    Creditors' Committee as you saw in its pleading.  We're very

7    close to reaching agreement on those issues, but it will

8    take some time.

9              There is a divergence of views, and we believe

10   that the intercreditors use our best resolve by the

11   fiduciaries in the case, the Creditors' Committee and the

12   Debtors working hand in hand.  And we're committed to work

13   with the other parties in interest as well, not just the

14   Creditors' Committee.

15             Now, Your Honor, we believe that having competing

16   plans at this stage after only our second request when we've

17   made so much progress with the only other fiduciary on the

18   case would be a mistake.  Having BTC and Dollar and the HEEP

19   Creditors filing competing plans would not be helpful to the

20   estates.  We don't need an alternative plan right now that

21   provides for a cash-out mechanism because that's what our

22   plan provides for.  We have a cash-out mechanism.

23             We're also considering other things that we could

24   do to allow Creditors to make a choice, make a choice

25   between the litigation approach or settlement.  But the fact

Page 67

1    is, is that as we go forward, Creditors will have the

2    ability to vote whether or not they would accept the plan,

3    the agreement of principal that has been proposed and

4    negotiated by the Creditors' Committee and the Debtors.

5             Now, I do want to spend just a few minutes on some

6    of the points that the objectors have made.  In particular,

7    the Brown Rudnick Group has suggested a cash-out option.  We

8    actually like the cash-out option where we've actually

9    included that concept in the deal and principal.  One of the

10   big differences between our cash-out option and the Brown

11   Rudnick Group's cash-out option is it doesn't require the

12   payment of $38 million in fees.  We think that that fee

13   would be too extensive, and that we really just don't need

14   it.  Because what are we talking about?  We are talking

15   about part of it.  The key aspect of it is pursuing

16   litigation in respect of the $630 million made maturities.

17   That's a simple breach of contract action.  And fact, we've

18   commenced that action today.

19            Now, at the time that we received the Ad Hoc

20   Group's proposal -- I'm sorry, the Brown Rudnick Group's

21   proposal -- it's hard to keep them straight because there's

22   so much overlap between them, but at the time that we

23   received the Brown Rudnick Group proposal, we ran mediation.

24   We were at the table with Gemini, and we were at the table

25   with other Creditors as well.  And we spoke with the Ad Hoc

Page 68

1    Group, and we spoke with the Creditors' Committee.  And at

2    that point in time, people were not particularly interested

3    in approaching that.  They wanted to finish the mediation.

4    And that's fine.

5             And as we said in our pleading in our reply, we

6    held off filing what is known as the turnover action until

7    just today because Creditors who were part of the

8    negotiations wanted us to hold off on filing that complaint.

9    Not all of them, but many of them.  There was a concern that

10   pursuing a turnover action at that time would force DCG, who

11   owed us and continues to owe us a lot of money, $630

12   million, that causing them or that filing a turnover action

13   would cause them to have to refinance their debt.

14            And refinancing the debt at that point in time

15   would lead to onerous terms, high interest rates, very

16   strict covenants, large lender fees, basically consideration

17   that should've gone to the DCG Creditors and not to a new

18   third party lender.  And on top of that, I think we all were

19   concerned that bringing in another party, a third party

20   lender, would be problematic to our negotiations.

21            And lastly I would say, Your Honor, we didn't file

22   that turnover complaint because we were having negotiations

23   with DCG.  And they were productive, and they were fruitful,

24   and there was a concern by many Creditors that pursuing that

25   turnover complaint at that point in time would have

Page 69

1    disrupted the negotiations and would've caused people to

2    focus on litigation.  For those reasons, we held off on the

3    turnover complaint.  Now as you may have seen, Your Honor,

4    you probably didn't because it was just filed, we have filed

5    the turnover actions.

6          Now, as part of the turnover actions, we've been

7    engaged in discussions as demonstrated and described in the

8    Agreement of Principal for a partial repayment agreement.

9    The idea behind the partial repayment agreement is to get

10   downpayments on the amount that DCG owes and to basically

11   hold off on exercising rights while we continue to try to

12   prosecute the plan.

13         We're very close to finalizing that partial

14   repayment agreement.  And to the extent that we do reach an

15   agreement on that, then we will stay the turnover actions.

16   But the idea behind filing the turnover actions is to keep

17   parties moving, and that's been our goal throughout this

18   entire case is to keep parties moving.  Set up deadlines,

19   try to keep parties moving.

20         Before I cede the podium, I do want to say a

21   couple of other things as it pertains to the objecting

22   parties.  We have an unusual situation, and I'm sure Your

23   Honor has observed this.  What we have in this case is we

24   have multiple parties appearing twice in these Chapter 11

25   proceedings as part of different groups.  Normally, Your

1    Honor, you would see that.  You would have complete vision

2    into when you have one party appearing in one name and then

3    appearing in another name.

4            But here, we don't have that visibility, at least

5    from a public perspective, because the 2019 statements are

6    redacted.  And when people file pleadings, they are not

7    saying who they are representing.  And that's fine, but we

8    have to be wary.  We have to be wary.  For example. Gemini

9    has appeared on its own in this case, but it's also a member

10   of the Brown Rudnick Group.

11           The Brown Rudnick Group and Gemini are making

12   identical arguments.  Perhaps not surprising coming from

13   Gemini, the twins, but they are making identical arguments.

14   And what is even more problematic is that Gemini doesn't

15   even have voting rights.  So they are -- the Brown Rudnick

16   Group is saying we hold $1.5 billion in claims, but they

17   don't have voting rights with respect to those claims, and

18   it's duplicative of the existing objection that was filed by

19   Gemini.

20           Another interesting thing about the Brown Rudnick

21   Group, Your Honor, is that the bulk of its members are

22   actually members of the Ad Hoc Group.  We've already

23   appeared by virtue of the Ad Hoc Group.  I think there are

24   eight crossover members, so they're also appearing twice;

25   once as an Ad Hoc Group member and once as a Brown Rudnick

1    Group member.  And when you look at the list, it turns out

2    that there are only three distinct members of the Brown

3    Rudnick Group, and they hold perhaps, you know, five percent

4    of the outstanding claims.  They don't hold the $1.55

5    billion.  They hold a much smaller portion.

6          So what we have is we've kind of built a bit of an

7    echo chamber, and I think it's just important to acknowledge

8    that we have multiple parties appearing multiple times under

9    different names.  So where do we go from here?  I think we

10   are on a path to a viable plan.  It's been negotiated among

11   the estates' fiduciaries.  This is only our second request.

12          MAN 1:  (Indiscernible).

13          MR. O'NEAL:  And it's a short request.

14          THE COURT:  Somebody appears to have an open line

15   at the hearing, and so they need to mute their line.

16          MAN 1:  Okay.

17          THE COURT:  Or we will mute it for them.  Thank

18   you.

19          MR. O'NEAL:  Your Honor, it looks like it was me.

20   So what I was just saying is that we are on the path for a

21   viable plan.  We've negotiated an agreement in principal

22   with the estate's other fiduciary.  Creditors will have a

23   chance to vote on that settlement if it goes forward.

24   Sitting here today, we don't know how Creditors will vote.

25   I think we all know that there's uncertainty.  And when

1    people look at the dark staircase of litigation, they may

2    choose settlement over litigation.  We don't know.

3           Certainly that has been what the fiduciaries have

4    been focused on is trying to reach a resolution.  And so

5    right now, Your Honor, we do need some time.  We need some

6    time to finish up the documentation.  We need some time to

7    complete --

8           MAN 2:  Time is up.

9           MR. O'NEAL:  -- (indiscernible) principals.

10           MEM 2:  Time is up.

11           THE COURT:  All right.  I don't know who is

12    talking, but time is not up.  Counsel is talking in a

13    hearing on a motion, and so you need to mute yourself and

14    keep quiet please unless there comes a time where the

15    microphone in the virtual hearing is given to you.  Thank

16    you.

17           MR. O'NEAL:  All right, Your Honor.  I think I was

18    muted, but I think you probably muted everyone.  So I'm back

19    on.

20           THE COURT:  You're back on.  And just -- let me

21    make a more soft pitch.  We're having this virtual hearing.

22    And by having a virtual hearing, we allow a lot of people to

23    participate remotely.  I know there are a lot of people who

24    have invested, and a lot of people are interested in the

25    case, and it's one of the benefits of having a virtual

1    hearing.

2            On the other hand, it doesn't take too many people

3    to make a virtual hearing impossible to conduct.  At which

4    point then we'll have to have these hearings in person, and

5    our ability to do things virtually may be circumscribed for

6    the detriment of the larger group.  So please, it is very

7    much a help-us-to-help-you kind of moment.  And so I urge

8    people to behave appropriately while we carry out this

9    virtual hearing.  So Mr. O'Neal, if you would finish up, and

10   then I'll hear from other parties.

11           MR. O'NEAL:  And Your Honor, I think I am

12   finished.  I was just saying that we just need additional

13   time.  It's not that much time to continue the work, to pool

14   together the documents, to pool together the distribution

15   mechanics, and to try to finalize the arrangements to the

16   best that we can.  And then to allow Creditors to vote.

17   Thank you.

18           THE COURT:  All right.  So at this point, I think

19   it makes sense to hear from the Committee, and then I'll

20   hearing from the objecting parties.  So Mr. Shore?

21           MR. SHORE:  Thank you, Your Honor.  Chris Shore

22   from White and Case on behalf of the official committee.

23   Rather than tic through the exclusivity extension factors

24   and what constitutes cause, I thought I'd pick up on what

25   Your Honor did in scheduling this hearing on the agenda

Page 74

1    today, which is try to get a better understanding of where

2    the case currently stands and where it's going and apply

3    that to the exclusivity factors to see if an extension is

4    warranted.

5         Let me start here.  Every big case these days

6    seems to have a hearing that becomes known as the

7    exclusivity hearing that usually marks the tipping point of

8    a case.  And in my experience, very few large Chapter 11

9    Debtors make the run from a filing to a plan confirmation

10   hearing without having material exclusivity objections.

11   That's not a bad thing.  Objections signal meaningful

12   Creditor involvement in determining their own fate in the

13   case.  And as a Committee, we welcome Creditors' points of

14   view with respect to how a case should proceed.

15        But this modern exclusivity objection phenomenon

16   tends to be driven in -- by a few factors in cases like

17   these.  One, Creditor mistrust or dissatisfaction with

18   Debtors in their agenda; two, disagreements over how best to

19   create distributable value for Creditors; and three,

20   disagreements over how best to distribute distributable

21   value to Creditors.  And this case has all three of those

22   facts present right now.  In fact, this case may be the

23   exclusivity hearing in this case.

24        Let me focus on mistrust.  From the beginning of

25   this case, as Your Honor has seen from even the emails you

1    talked about today, there has been real and vocal and

2    repeated expressions of mistrust of the Debtors and their

3    connections to DCG.  And despite the passing of time and the

4    goldfish bowl aspects of Chapter 11, there is still a

5    meaningful amount of Creditor sentiment that DCG stole their

6    money, that the Debtors allowed their money to be stolen,

7    and that this whole Chapter 11 case might be seen as a means

8    to get DCG a release.

9            Okay.  We can all see that.  And to some extent,

10   the Debtors and DCG did actively earn their Creditors'

11   distrust in a couple of ways.  But to that end, one of the

12   primary activities of the Committee from day one has been

13   the investigation of Creditors' claims and concerns with

14   respect to the DCG involvement in the case and the Debtor's

15   involvement in the DCG machinations pre-petition.

16           So for the past eight months, there has been no

17   love lost between the Committee, the Debtors, and the DC --

18   and DCG in conducting that investigation.  To be clear, our

19   work was always practically constrained by what I mentioned

20   on the first days, an overwhelming Creditor desire to

21   velocity of actual distributions in a plan.  And obviously a

22   longer investigation would've allowed for the turning over

23   of more rocks, though from our view not necessarily to any

24   additional value.

25           But with that time constraint in place, we put a

1    full-time team of seasoned litigators on the matter, many of

2    whom have in fact litigated cases against Debtor parents and

3    shareholders in cases much like this one.  We obtained and

4    reviewed 80,000 emails, texts, board presentations, and

5    financial documents.  We held multiple calls per week with

6    the Debtors between attorneys and FAs.  We've had multiple

7    meetings both with advisors and principals with DCF, both in

8    and out of mediation.

9            Through that process, we found claims that the

10   Debtors never identified.  We developed better evidence for

11   what was identified, and now, based on all of that, the UCC

12   feels it is in a unique position to assess the risks and

13   rewards of litigation against DCG where one might test out

14   the merits of the mistrust that people have.

15           Two, despite our work and vantage point, there

16   remains a significant amount of Creditor dispute as to how

17   best to maximize the value of the claims against DCG.  In

18   fact, there seems to be the centerpiece of today's hearing

19   is the DCG settlement the best way to proceed, or should we

20   just litigate.  In other words, the merits of a plan process

21   going forward, which isn't really up, but let's address that

22   for a second.

23           As the fiduciary, not for the estate but for

24   unsecured Creditors that has done the work, has reviewed the

25   confidential documents, has met with the targets, has

Page 77

1    advised the clients, we believe this settlement should be

2    consummated with one caveat, which I'll get to in a bit.

3    And the reason we feel that way is not a day issue, but

4    anyone who thinks litigation is a better option, including

5    DCG, needs to have informed realistic expectations about the

6    velocity and cost about the company litigation, the timing

7    and character of actual distributions following entry of a

8    final order, and the ability of DCG to pay a judgment

9    outside of its own restructuring among other factors.

10          I'm not speaking for individual members.  I'm

11   speaking for the UCC, and the UCC as a whole has weighed all

12   of that and come to our conclusion.  Settlement in our view

13   is a better option.  And I supposed today we'll hear from

14   those who have come to the opposite conclusion by not having

15   looked at the documents or done the work that we've done.

16   So be it.

17          The third factor usually present at the

18   exclusivity hearing in the case are disagreements over

19   distribution mechanics.  And as counsel said, we have that

20   here in spades.  While it is true we are largely one

21   Creditor body of general unsecured Creditors given the wide

22   array of pre-petition holdings between crypto and USD

23   denominating claims, there has been substantial disagreement

24   over who gets what and when.  And having said that, I do not

25   want to ignore, nor should anyone ignore, the hundreds if

Page 78

1     not thousands of hours of work done by Creditors and

2     Committee members trying to reach an equitable distribution

3     scheme that all can support.

4            As of today, we're not there.  And so the

5     Committee believes we are at the tipping point in these

6     cases with only three ways for this case to tilt.  People

7     haven't said it, but given the audience we have for this, I

8     think we all need to understand what doomsday is.  If there

9     is no Creditor support for a plan in any form, we don't --

10    we exactly half want to litigate it, exactly half want to

11    settle, this tips to a Chapter 7 conversion.

12           Your Honor's not, I believe, going to be patient

13    sitting in Chapter 7 interminably.  And based upon the

14    liquidation analysis appended to the draft disclosure

15    statement, which the Committee has reviewed and signed off

16    on, a Chapter 7 Trustee liquidates all crypto and makes cash

17    distributions.  I.e. there will be zero in-kind

18    distributions by a Chapter 7 Trustee.  And two, the Trustee

19    settles with DCG regardless of whether any particular

20    Creditor wants that deal or not and then distributes cash.

21    That's the purview of the Chapter 7 Trustee.  So for anybody

22    who's taking the position that there should be no deal at

23    all, the conversion risk is there.  And that's all I'll say

24    on that.

25           Two, another way this case can tilt is towards a

1    deal with all key players, what we would call a global peace

2    deal.  Practically for a global peace deal to materialize

3    given where we are, two things have to happen.  DCG has to

4    put better economics on the table, and a critical mass of

5    Creditors have to agree on how to distribute that value.

6    But in the absence of actual votes for an actual DCG deal,

7    option two isn't going to happen.

8            In other words, the UCC has formed the view that

9    this settlement should be done, but this settlement has to

10   be done in a plan.  And if people aren't going to support

11   it, we're not going to go ahead with a global settlement

12   plan.  There won't be a global settlement.  So the only

13   other option is a plan that distributes all cash and crypto

14   on hand as of the effective date of the plan, preserves the

15   DCG claims for post-effective date litigation, and moves on.

16   What I would call the punt plan.

17           As I said, the Committee has detailed, informed

18   views as to the risks and rewards of such a plan.  But at

19   the end of the day, the cynic (indiscernible) of a

20   confirmable plan are the votes of those with actual money at

21   risk.  Even if they're being advised by counsel, which

22   hasn't done the work, and even if they don't have financial

23   advisors to advise them on the consequences of doing so,

24   people get to vote on a plan.

25           And one last thing about a tipping point, and this

Page 80

1    informs the Committee's views with respect to exclusivity,

2    in a case like this it's impossible to maintain an

3    equilibrium for any extended period.  Forces of gravity will

4    always just tilt this case towards one of those three

5    options.  Conversion, global peace plan, punt plan.  So in

6    adding all of this up, the Committee's position on

7    exclusivity is three-fold.

8            First, there is cause to extend exclusivity.  And

9    we've come this far on a consensual global plan.  I don't

10   think there's any doubt that that plan would have material

11   benefits for Creditors, and it deserves more oxygen and time

12   to be concluded.  Second, that said, exclusivity is now a

13   matter of days, not months, and certainly not multiple

14   months.

15           The Debtors have a very short window, say 30 days,

16   to keep this case to the equilibrium and see if they can get

17   consensus for a global peace plan to try to resolve the DCG

18   contribution in a manner that brings the votes and try to

19   resolve the distribution mechanisms in a way that prevents

20   Creditor in-fighting and votes in opposite directions that

21   cancel themselves out on the way to a conversion.

22           In that regard, the Debtors and the independents

23   have to appreciate that DCG must put more on the table

24   because a plan with Debtor and UCC support, but no actual

25   votes is not a confirmable plan.  And DCG (indiscernible)

1    part has to just deal with that.  Because the no-deal

2    scenario in our view is an existential crisis for that

3    company.

4            But Creditors too have to get past the fight over

5    fractions of pennies and how a distribution mechanism will

6    occur, because for them, a conversion is an existential

7    crisis in their recoveries.  Third, one way or another, come

8    October, the Debtors have to solicit a plan.  Whether that's

9    a global peace plan or a punt plan or some toggle hybrid, it

10   needs to go out.  These cases aren't getting better with

11   age.  And if they don't, if the independents refuse to

12   solicit such a plan, then the Committee will be ready,

13   willing, and able in mid-October to do so, and will have a

14   confirmable plan ready to go.

15           So that's what I have for now.  A short extension

16   for exclusivity should be granted.  Thirty days is tolerable

17   at this point, but everybody has to understand that that 30

18   days can't be more of the same shuttle diplomacy and what I

19   consider to be what's going on, which is a parent stepping

20   backwards in the pool and requiring kids to swim further.

21   So unless Your Honor has questions, that's the Committee's

22   position.

23           THE COURT:  Thank you very much.  So let me hear

24   from the objectors.

25           MR. SAZANT:  Thank you, Your Honor.  For the

Page 82

1    record again, Jordan Sazant of Proskauer Rose on behalf of

2    the Ad Hoc Group.  You know, I would like to start just by

3    echoing much of what Mr. Shore just said.  And I think the

4    gravitas of what Mr. Shore just said was that a plan agreed

5    to by just the Debtors DCG and UCC is not a confirmable plan

6    and does not have votes.  The Ad Hoc Group, which represents

7    $2.4 billion in claims, has spoken and has majorities in

8    each of the proposed classes except for, of course, the

9    Gemini are in customer class, and does not believe that this

10   is a supportable plan at this time.

11         Mr. Shore also said that DCG needs to put more on

12   the table in order for this plan to become a confirmable

13   plan, and we wholeheartedly agree.  That is our position as

14   well.  So simply put, Your Honor, I think we just take away

15   from that the opposite conclusion of Mr. Shore.  And we

16   believe that it's time for Creditors to take control of

17   their own destiny.

18         This is not a typical Chapter 11 case with a

19   reorganizing Debtor that needs to maintain business

20   operations post-bankruptcy, and we believe that the Debtors

21   have not met their burden of proof to demonstrate cause

22   sufficient to extend the exclusivity periods further.  These

23   Debtors came into Chapter 11 with businesses that had

24   already been non-operational for three months as a result of

25   the fraud perpetrated upon the Creditors and the billions of

Page 83

1   dollars' worth of (indiscernible) and crypto currency assets

2   syphoned away by the Debtors' parent.

3          In the ten month stint, the Debtors froze their

4   operations.  The Ad Hoc Group has worked collaboratively

5   with the Debtors DCG, Gemini, and since it's appointment the

6   UCC in an effort to reach a consensual plan framework that

7   either provides fair value from DCG and resolution of the

8   estate's claims and may be asserted against it or turns over

9   control of the estate and those estate claims to Creditors

10  to pursue appropriate remedies and recoveries.

11         We believe based on the public update that was

12  filed that it's now become clear that the Debtors have

13  squandered their exclusive window to propose a confirmable

14  plan that provides for a fair value from DCG.  And the

15  Creditors could be given the opportunity to formulate their

16  own confirmable plan for consideration by the voting

17  Creditors.

18         To briefly touch upon the economic concerns of the

19  Ad Hoc Group, it's uncontested that DCG owes $1.7 billion to

20  GGP just under the loan currency it imposed on GGP.  And in

21  fact, approximately $630 million of that amount was due

22  almost four months ago now.  Mr. O'Neal represented to, and

23  today we saw on the docket that the turnover action as it's

24  been termed was filed about 15 minutes prior to this

25  hearing.

Page 84

1           Of course I've not had an opportunity to

2   thoroughly review to confirm that all of the relief that was

3   requested by the Ad Hoc Group was included in that action.

4   And that appears to not be the case as Footnote 7 states

5   that the Debtors are not seeking the payment of late fees at

6   this time.  But its filing is a positive development in

7   these cases, nonetheless.

8           That said, the Ad Hoc Group desperately wants to

9   prevent that victory from being (indiscernible) in nature.

10  As disclosed in the public update and just referenced by Mr.

11  O'Neal, the Debtors have reached an agreement in principal

12  with the DCG and the UCC that proposes to forebear on this

13  turnover action in favor of a pre-payment plan, and instead

14  to extend the majority of these amounts that are owed

15  already for another two years post-effective date, and to do

16  so at a discount requiring DCG to pay only $604 million in

17  principal on account of its 630 million overdue and

18  continuing to accrue.

19          Not only that, but it proposes to do so for free

20  because the token forbearance fee of .375 percent is

21  credited against the pre-effective date payment.  So it is

22  entirely illusory.  On top of all of these concessions to

23  DCG, the Debtors propose not only to release all of the

24  estate's valuable claims for fraud, alter ego liability, and

25  more that Mr. Shore was describing having conducted thorough

Page 85

1   investigations into without any additional compensation, but

2   also to seek nonconsensual third party releases that may not

3   be confirmable.

4          Our Creditors are the only parties with a

5   financial interest in the outcome of these Chapter 11 cases,

6   and they deserve to have their voices heard and the ability

7   to propose their own Chapter 11 plan for consideration.  We

8   believe that this plan is not confirmable, will not receive

9   an impaired accepting class.  And I hear the comments that

10  have been made throughout this hearing by Mr. Barefoot who

11  said that the Creditors here are small Creditors for whom

12  liquidity is important, by Mr. West for the UCC who said

13  that they constantly hear from Creditors how imperative it

14  is to recover their assets as soon as possible, and from Mr.

15  O'Neal who just said that the debtors have reached the best

16  agreement that they can reach.

17         Respectfully, we believe that this agreement is

18  not proficient.  And if this is the best agreement that the

19  Debtors can reach, the Creditors should be able to move

20  forward expeditiously, propose their own competing plans on

21  the same timeline, and move forward, and to let Creditors

22  determine which path they believe is the best path forward.

23  Unless Your Honor has any questions, that'll be it for me.

24         THE COURT:  All right.  Thank you very much.  Next

25  objector?

1          MR. AULET:  Good afternoon, Your Honor.  Kenneth

2     Aulet, Brown Rudnick for the Fair Deal Group again.  You

3     know, I want to echo something Mr. Sazant said.  For the

4     most part when Mr. O'Neal was talking about his actual

5     proposal to go forward instead of details of my group, I

6     agreed with many of the things he said.  You know, Mr.

7     O'Neal promised that, you know, he's going to give Creditors

8     a choice here.

9          You know, let me flip it a little bit back when he

10    said he's considering there's a way to give Creditors a

11    choice on litigation, but that's -- it's an important thing.

12    And also, what Mr. O'Neal and Mr. Shore said that, you know,

13    as we all know, cram down is an option in Chapter 11.  And

14    the proposed deal and principal has four to five classes.

15    And it sounds like, and they can correct me if I'm wrong,

16    but Mr. O'Neal and Mr. Shore are not looking to cram down a

17    plan based on one class, which you know, would be a very

18    helpful thing to say.

19          But let me back up a little bit.  You know, my

20    group exists because, you know, we had a -- my clients had a

21    concern about where these negotiations were headed.  And I

22    think that the, you know, deal and principal that was

23    announced on the 29th validated those concerns.  The Debtors

24    didn't really want to talk very much about the economics of

25    this, but they have the burden here.  They chose to put, you

Page 87

1    know, this agreement and principal as one of their causes

2    for extending exclusivity.  And so I think it's important to

3    look at it.

4            You know, another thing that Mr. O'Neal said today

5    and in their papers was that the litigation to recover the

6    past due amounts, the 630 million, is a relatively simple

7    breach of contract action.  We wholeheartedly agree with

8    that.  We -- it should've been filed a long time ago.  Like

9    Mr. Sazant, I had a chance to look over it, and I was

10   troubled that it did not seek the late fees and accrued

11   interest.

12           But I also want to talk a little bit more about

13   those late fees and accrued interest because I had a little

14   bit of time to do some rough math, and it looks to me like

15   between the approximately 10 percent interest rate on the

16   630 million owed and the 10 percent late fee that is accrued

17   on top of that, every month that DCG has not been paying the

18   estate it is owed $10 million more.  The Debtors propose to

19   waive that entirely.  We've had four months of no payment.

20   That's over $40 million left on the table by the Debtors,

21   and that's not including the discount that they've offered

22   to DCG of a little under I think 28 million.

23           So Mr. O'Neal and the Debtors say that this

24   turnover action is a simple, simple breach of contract

25   action.  And why would anyone pay a $38 million backstop fee

Page 88

1    for it when they are proposing to weigh far more than that

2    in their dealings.  The estates -- every month we go by

3    without getting that money back is an $11 million gift to

4    the parent company of the Debtor.

5           And the -- but this -- I think everybody would be

6    happy if we got that 630 million back and the accrued

7    interest and the accrued late fees, and there was no need

8    for the facility.  But let's get to the facility we offered

9    because the facility we offered was an attempt to thread

10   what Mr. Shore correctly identified as a very big problem in

11   this case.

12          As the Debtors stated multiple times, there's a

13   lot of people who need money back today for whom every

14   months counts.  And those people are the people who are

15   looking at this and saying I need a deal with DCG, and I

16   need it now.  But the deal on the table proposes to give

17   them a two-year note and a seven-year note.  And what we

18   proposed was, look, this is a simple breach of contract

19   action.  Very simple.  Could've been done a long time ago,

20   but it hasn't been done.  We'll put up the money for it

21   because we believe in this litigation.

22          It's always a problem when people come in to say

23   that, you know, the settlement's wrong, it's not the right

24   value.  And the response is, well, what do you have at

25   stake?  How do you prove it?  A group was formed and put up

Page 89

1    -- is offering to put up the money to put their money where

2    their mouth is.  They believe in this litigation.  They

3    believe it is volume maximizing to the estate to get this

4    litigation.  And if anybody doesn't believe that, they want

5    to take them out.

6          The Debtors are offering to essentially sell this

7    incredibly valuable estate asset to DCG at what looks like

8    less than even what is owed on an undisputed basis.  And we

9    want to beat that number.  Frankly, we don't think that

10   people should take our offer.  We believe that they should

11   believe as we do that you want to believe -- that you want

12   to take this litigation.  But people who need the money now

13   take the money and, you know, we all continue the

14   litigation.

15         And the distributions figures, you know, in this

16   deal and principal were similarly troubling because, you

17   know, the only way that I can make sense of these top ranges

18   is if you're off -- if you're valuing the seven-year note at

19   face value, and again, you know, Mr. O'Neal said what an

20   independent lender would need to lend to DCG, high interest

21   rates, onerous fees, and strict covenants, which is by far

22   the most important thing he said.  DCG is a terrible credit

23   risk.  The seven-year note, it is not worth 830 billion.  It

24   is nowhere close to 830 billion.  Even if it gets some form

25   of security, which completely undisclosed what the security

Page 90

1   will be, completely undisclose what the covenants will be,

2   but there is no note that we're going to have strict

3   covenants.

4           Nor will we.  The estates have cut a deal where

5   DCG will get a release of all claims.  Creditor claims

6   involuntarily and estate claims for less than it owes today.

7   It will pay tens of millions of dollars less on what the

8   Debtors themselves characterize as a simple contract action

9   that anybody could file and litigate.  Why on earth is it

10  going to agree to strict covenants when this deal is reduced

11  from, you know, these deals -- this deal in principal to

12  something in writing?  It has -- it is one.

13          So that's where we come out on, you know, troubled

14  that the Debtors delayed giving us an NDA until, you know,

15  literally hours before filing this proposed deal and

16  principal.  You know, fortunately we've now had productive

17  discussions over an NDA though.  We still seem to be stuck

18  on one point as of last night, but I'm hopeful that that

19  will be resolved today.  Because like Mr. O'Neal said, what

20  we need here is choice.  And that goes back to, as Mr.

21  Sazant said, why exclusivity should end.  Because this is a

22  liquidating Chapter 11.  We don't have a Debtor that's going

23  to go back into business.

24          The case for a debtor-in-possession running the

25  case is as weak as it can be in this kind of Chapter 11.  So

1    liquidating Chapter 11, it is essentially a financial

2    company, and virtually all financial companies are note even

3    eligible for a Chapter 11.  The so the real way forward

4    here, as Mr. Sazant said, is for Creditors to negotiate a

5    plan.  I don't believe that liquidation is a real option

6    here.  I think that everybody realizes that there's enough

7    value on the table that when Creditors get together, that we

8    can get a resolution of these issues, and that we can get

9    something on file.

10           The Debtors are no longer a help here.  This deal

11   and principal, it was supported only by the UCC, and the UCC

12   just announced that it is not (indiscernible).  So the cause

13   that the Debtors have come in here with isn't even a -- it's

14   not even a settlement.  What they needed to come in here and

15   show as meaningful progress towards a confirmable plan.

16   These intercreditor issues should've been first and

17   foremost.  They are the thing that you have to solve to get

18   a plan done.  You do not need to solve DCG to get a plan

19   done.  You must solve intercreditor issues, and the

20   intercreditor issues were put to the side while a deal in

21   principal with DCG was what we have here today.  And it's

22   just not confirmable.

23           Mr. Sazant's group, as he said, represents, you

24   know, majorities of all the Creditors (indiscernible).  We

25   are simply at the point where it is no longer helpful for

1    exclusivity to continue.  Because what we are concerned

2    about, again, is the months of delay.  If we have a plan

3    that tries to cram this DCG settlement down on the Creditor

4    body, you know, even if the Debtor's discussion about, you

5    know, we need local peace is interpreted to mean that

6    they're not going to try and cram it down, if there's not a

7    real choice between the DCG settlement and litigation, that

8    is itself pressure on those Creditors who have to decide do

9    I take this deal now, or do I start another three-month

10   process to get a confirmed plan.

11         And that's why this case calls out for competing

12   plans.  If the Debtors want to believe that this deal is the

13   best that they can do, let them put forward that plan and

14   vote on it while letting Creditors put forward an

15   alternative plan.  And the choice that the Debtors talked

16   about, the choice that they wanted to give their Creditor

17   body, Creditors get a real choice, not the sort of Hobson's

18   choice of take my deal or spend another three months in this

19   bankruptcy case.  A real choice where we have resolved the

20   intercreditor issues, and the choice is up or down.  Do you

21   want to settle with DCG on these terms or not?

22         Because the answer is going to be no.  Nobody is

23   going to want to settle with DCG on these terms.  A minority

24   of Creditors might, and that's why what we put forward to

25   try and solve and what we are hopeful that we can get, you

1    know, some actual traction on.  But at the end of the day,

2    what we believe in is that this isn't good enough.  It's not

3    a matter of, all right, this is seven years and six percent

4    interest.  How about six years and eight percent interest?

5    That's not good enough.

6            This needs to be meaningful real value from DCG to

7    avoid the litigation.  And again, Mr. Sazant briefly touched

8    on this, but this demands involuntary third party releases.

9    And now that the supreme court has accepted cert in Perdue,

10   even if the court confirms such a plan, it would need to be

11   stayed until -- like Perdue's plan until the supreme court

12   ruled on that issue.  And so this plan is, again, a recipe

13   for months more of delay.

14           THE COURT:  All right.  With that, let me hear

15   from the last objecting party.

16           MR. FRELINGHUYSEN:  Good afternoon, Your Honor.

17   Anson Frelinghuysen, Hughes Hubbard and Reed, counsel for

18   Gemini Trust Company, LLC, agent for over 232,000 Gemini

19   lenders.  Gemini opposes the Debtor's request for continued

20   exclusivity because the time has come to permit greater

21   Creditor control over this process.  The professionals at

22   today's hearing have been at this for months, and the good

23   faith efforts of most involved to reach a deal should not be

24   understated or devalued.

25           But the parties are no closer to a deal today than

Page 94

1    they were when Mr. O'Neal first introduced the case to the

2    court in January or when mediation started or when mediation

3    was extended ten times, or when Mr. O'Neal said the parties

4    were close at the end of July, nor when the Debtors with the

5    UCC support published the so-called deal and principal with

6    their parent Digital Currency Group at the end of August.

7           The Debtors have staked the successful outcome of

8    these cases on a resolution with their parent.  The purpose

9    of four months of mediation was to determine an appropriate

10   level of contribution from DCG.  Months later there are only

11   vague contours of a deal with the parent described with the

12   definitive documents apparently around the corner.  The

13   broad brush deal itself has been widely attacked by

14   Creditors, and its finer details where the devil lurks has

15   not even been disclosed, and potentially not yet even

16   negotiated.

17          But we are told again and again we are very close.

18   The history of these cases tells us that we are not, and

19   that we may never be with a counterparty like DCG.  It is

20   time to move outside the loop of doing the same thing while

21   expecting different results.  Gemini stepped out of that

22   loop in July when it sued DCG for fraud and objected to

23   Genesis' repeated requests for more extensions of the

24   mediation period.

25          At the same time on July 5th, Gemini wrote to the

1    Debtors urging them to sue DCG for the turnover of the

2    estate property, an action the Debtors rebuffed for two

3    months until today when faced with the loss of exclusivity.

4    The Creditor body as represented by the Ad Hoc Group is

5    starting to exit the loop as well.  And as Mr. Aulet just --

6    already explained, Gemini and a group of other Creditors are

7    working outside the loop to introduce alternative structures

8    that would bring near term recoveries to Creditors or allow

9    them to go the distance against DCG and recover what they

10   deserve.

11          At its core, this case is a liquidating Chapter 11

12   that will require significant Creditor support to achieve a

13   confirmable plan.  It is counterproductive to continue to

14   keep Creditors at arm's length while a proposed plan is

15   cooked behind closed doors.  Gemini has been pushing the

16   Debtors for months to share the terms of proposed deals for

17   the purpose of gaining consensus among Creditors.  They

18   refused to disclose terms for months, and when they did, the

19   overwhelming response was negative.  A more productive

20   approach is to allow the Creditors to lead the process to

21   ensure that any deal that is ultimately reached will be

22   palatable to the people that will need to vote on it.

23          Gemini lenders, 232,824 of them, have been

24   separated from over $1 billion of their assets for nine

25   months.  Gemini's message to its lenders is clear.  The

Page 96

1    Debtors need to pay Gemini lenders back in full, and they

2    cannot cut a deal with their parent that does not bring

3    enough value to the Gemini lenders, and that potentially

4    seeks nonconsensual third party releases with the Debtor's

5    parents.

6            Gemini will not stop advocating for the Gemini

7    lenders and for a full recovery.  These cases must move

8    towards a resolution.  The Court should terminate the

9    Debtors exclusivity and allow the Creditors to propose their

10   own Chapter 11 plan for consideration.  Thank you.

11           THE COURT:  Thank you very much.  Any other party

12   that wishes to be heard before I circle back to Mr. O'Neal?

13           JESSICA LIOU:  Yes, Your Honor.  Jessica Liou from

14   Weil, Gotschal and Manges on behalf of DCG.

15           THE COURT:  All right.  Briefly.  I don't have an

16   papers from your client, so I -- it puts us all in a bit of

17   an awkward posture that we don't quite know what your

18   client's going to say, but I'll give you a brief

19   opportunity.

20           JESSICA LIOU:  Thank you, Your Honor.  I

21   appreciate that.  I'll be very brief.  I just wanted to

22   correct a couple of misstatements that were made on the

23   record and focus back on --

24           THE COURT:  Well --

25           JESSICA LIOU:  -- what we think is relevant here.

Page 97

1        THE COURT:  Well, before you do that, I don't know

2    that this is the place to defend your client's honor.  This

3    is an exclusivity motion.  We're not here on the merits of

4    any of the settlements.  And if I were to try to navigate

5    and have a record that was trying to reflect every party's

6    views about the ultimate merits of the settlement, that's a

7    very different hearing.  So I don't think that that's a

8    productive rabbit hole to go down.

9        Because I'm guessing, and I could be wrong, but I

10   think if you have some various things you're going to say,

11   you're going to elicit responses.  And again, I think

12   they're going to be on the merits or demerits of various

13   aspects of settlement.  And so I want to avoid that.

14       JESSICA LIOU:  Your Honor, I couldn't agree more.

15   I do not believe that the nature of this hearing warrants a

16   tit for tat.  The merits of the settlement proposal, and

17   that's exactly where I do not intend to go.  I did want to

18   reiterate, however, that the Debtors DCG and the UCC have

19   made good faith use of the time that has been provided by

20   exclusivity to reach this deal and principal.

21       THE COURT:  Well, but why don't I hear from Mr.

22   O'Neal on that?  I mean, that's Mr. O'Neal's burden.  So let

23   me do this.  Let me hear from Mr. O'Neal.  If there's

24   something that he doesn't cover that cries out for an

25   additional comment, I'll loop back to you.  But I think it's

Page 98

1    really -- it's the Debtor's burden, and I think it should

2    squarely remain there to keep -- we have a lot of parties

3    already, and I want to keep my eye on the way these -- this

4    kind of a proceeding should work.  So let me hear from Mr.

5    O'Neal.  And if he's done and there's something that still

6    cries out for comment, then I'll loop back to you.  Mr.

7    O'Neal?

8              JESSICA LIOU:  Perfect.  Thank you.

9              MR. O'NEAL:  Thank you, Your Honor.  Sean O'Neal

10   on behalf of the Debtors.  Since November, we have worked

11   every day every hour to try to reach agreement with DCG and

12   the Creditors.  That has been our obligation.  That's

13   consistent with our fiduciary duties, and we've been trying

14   relentlessly to get to an agreement.

15             When I heard the Creditors say that they want to

16   control their destiny, frankly I'm frustrated because we've

17   had them in the room with us the entire time.  As I said,

18   Your Honor, this is not a deal where we have negotiated a

19   potential settlement in a vacuum.  We've kept the Creditors

20   in the loop.  And in fact, we have created a platform for

21   them to engage in direct negotiations.  The deal in

22   principal is the product of those direct Creditor-led

23   negotiations with principals at DCG.

24             We've also reached a deal in principal with the

25   Debtor's Committee fiduciaries.  Like a representative of

Page 99

1    the Creditor.  The only other fiduciary is part of this

2    deal, is part of this deal and principal.  Now, there's work

3    to do.  Don't -- I'm not kidding you.  There is work to be

4    done, and we take that very seriously.  But I want Your

5    Honor to realize that we have been with the Creditors at

6    every step of the way.

7           We can't force DCG to do an agreement to settle

8    the claims in the way that all of the Creditors want.  We

9    can't force DCG to pay the Gemini lenders in full.  What we

10   can do is we can try to create a platform, and we can try to

11   squeeze everybody and create as much leverage as we possibly

12   can, and that is what we've tried to do, Your Honor.

13   Because the other alternative is litigation.  A long

14   litigation.  The plan that we filed on the first day of the

15   case.

16          Now, in terms of the turnover actions, I do -- I

17   think we need to correct some things.  And I don't blame

18   counsel because they haven't had time to look at the

19   complaint, and that's okay.  So I'm not going to criticize

20   them, but we do need to talk about facts.  And the facts

21   are, is that the turnover complaint does in fact seek late

22   fees for the digital loans.  BTC.  I think it's Count 3.

23   There's two complaints.

24          We seek payment of late fees under the digital

25   loans.  We don't seek late fees for payment of the dollar

Page 100

1    loans.  There's a very good reason for that.  Turnover, as I

2    think Your Honor knows, can only be used for undisputed

3    claims.  There is a dispute with respect to late fees owed

4    under the dollar loans, and I think Mr. Sazant knows that,

5    and we've talked about it.  And I think that -- I don't

6    think there is any disagreement that turnover is for

7    undisputed claims.

8             In addition, we don't seek payment of ordinary

9    contract interests because DCG has been paying that.  That's

10   four and a half million dollars a month.  DCG has paying the

11   four and a half million dollars a month.  You can bet if DCG

12   had not been paying that, that would've been part of our

13   turnover action.

14            On kind of smaller issue, I do want to just say a

15   few things.  On the NDA, at the time that the Brown Rudnick

16   Group asked for an NDA, it's then existing two members had

17   NDAs.  So they didn't get another NDA, and we were

18   negotiating in the context of a mediation.  We actually had

19   Gemini in the room under an NDA and a mediation order.  And

20   then in terms of the debt terms and the covenants, we're

21   going to take care of that as part of the definitive

22   documents.

23            You can bet that we're going to put as onerous

24   terms as we can.  We're going to try to limit DCG as much as

25   we can.  But we also realize that DCG is an important part

Page 101

1    of the capital structure even if you litigate against them,

2    you want them to be as strong as possible because of the

3    source of recovery.

4            Lastly, I would just say in terms of the

5    nonconsensual releases, folks have tried to make a big deal

6    of that.  We get it.  We understand that the supreme court

7    is ruling on or going to consider third party releases.

8    That's why our plan will not make it a condition precedent

9    that they get nonconsensual third party releases.  We will

10   have a severability clause.  So we're -- a lot of what is

11   being said today, frankly, I'm not so sure if people are

12   taking it serious enough to consider that we have looked at

13   all of these issues, and we are trying our hardest to create

14   a plan, to create a platform that does provide as much

15   recovery as possible given the other alternative of

16   litigation.

17           So with that, Your Honor, we just renew our

18   request.  We would like to have an extension of exclusivity.

19   We'll continue working with all of the objecting parties and

20   try to reach an agreement on all of the key issues.  Thank

21   you.

22           THE COURT:  All right.  Any other party that

23   wishes to be heard on exclusivity?  All right.  I'd like to

24   take a five-minute or ten-minute break, and I will come back

25   and render my decision.  I -- rather than have everyone get

Page 102

1    off and then redial, which is an enormous hassle for all of

2    you, I'm just going to mute my line and come back in about

3    ten minutes.  Thank you.

4            (Recess)

5            THE COURT:  Before the Court is the Debtor's

6    second motion to improve an extension of exclusivity at ECF

7    Number 574.  Three objections have been filed.  One is the

8    objection to the Ad Hoc Group of Genesis lenders at ECF 635.

9    A second is the objection of Gemini Trust Company LLC at ECF

10   Number 634, and the third is an objection of the Fair Deal

11   Group at ECF Number 633.  All objecting parties are

12   unsecured Creditors of the Debtor.  Debtors -- as the

13   Debtors have made clear in their comments, they assert that

14   Gemini is a key member of the Fair Deal Group.

15           In addition to the objections, the Court

16   considered the following pleadings.  The Debtor's reply at

17   ECF Number 662, the statement in support and reservation of

18   rights of the Official Committee of Unsecured Creditors at

19   ECF Number 654.  Of course this all happens with the

20   background of the order signed on June 21, 2023 that granted

21   the Debtor's first request for an extension of the exclusive

22   period.  See ECF Number 444.  The Debtors today request an

23   extension of 60 days for both exclusive periods.

24           So turning to the legal standard Section 1121(d)

25   provides that a court may extend or reduce the Debtor's

1    exclusive periods for cause.  See 11 USC Section 1121(d)(1).

2    The decision to extend or reduce exclusivity is within the

3    discretion of the court.  See In re Adelphia Communications

4    Corporation, 336 B.R. 610 at 674 (Bankr. S.D.N.Y. 2006).

5    The burden of proving cause to reduce or increase

6    exclusivity is on the Debtor.  See In re Borders Group,

7    Inc., 460 B.R. 818, 822 (Bankr. S.D.N.Y. 2011).

8              So while "cause" for the extension of exclusivity

9    is not determined -- is not defined in the bankruptcy code,

10   several factors are enumerated in the case law particularly

11   by Judge Gerber in the Adelphia case at 336 B.R. at 674.

12   And then include, one, the size and complexity of the case;

13   two, the necessity of sufficient time to permit the Debtors

14   to negotiate a plan of reorganization and provide adequate

15   information to allow a Creditor to determine whether to

16   accept such plan; three, the existence of good faith

17   progress towards reorganization; four, the fact that

18   Debtor's paying its bills, they become due; five, whether a

19   Debtor has demonstrated reasonable prospects for filing a

20   viable plan; six, whether the Debtor has made progress in

21   negotiations with its Creditors; seven the amount of time

22   which has elapsed in the case; eight, whether the Debtor is

23   seeking an extension of exclusivity in order to pressure

24   Creditors to submit to its organization demands; and nine,

25   whether an unresolved contingency exists.

Page 104

1          The decision whether to extend exclusivity is a

2     fact-specific inquiry, as Judge Glenn explained in the

3     Borders case 460 B.R. at 822.  So in applying all these

4     standards here, the Court finds that an extension of

5     exclusivity is appropriate for 30 days.  In reaching that

6     conclusion, the Court can share some comments on some of the

7     relevant factors.

8          So, first, the size and complexity of the case.

9     One objector said that this is not a complex case.  That,

10    wrong.  The Debtors' cases are both large and complex.

11    Billions of dollars in asses and liabilities that need to be

12    restructured.  The Debtors' business operates in the digital

13    asset industry, which has experienced unprecedented upheaval

14    in current market conditions as well as an evolving

15    regulatory regime.  Digital assets involve novel issues,

16    such as intercreditor issues relating to claims, and a

17    number of complex issues must be addressed with respect to

18    the claims of FTX and Three Arrows.  And there are also

19    outstanding issues relating to obviously the parent DCG.  So

20    they clearly are large and complex.

21          As for the necessity of sufficient time, the

22    second factor, these cases were filed in January of 2023.

23    As everyone's pleadings made clear, there has been

24    substantial activity in the cases.  The last extension of

25    exclusivity was granted.  The Debtors in FTX were engaged in

Page 105

1    significant litigation facing off in FTX's motion to lift

2    the automatic stay in the Debtors' responsive motion to

3    estimate the claims of FTX.

4           After several hearings on those matters, matters

5    that everyone agreed were critical to the cases, the debtors

6    reached an agreement in principle with FTX to resolve those

7    issues and we had discussions even at today's hearing about

8    the pathway forward to have that settlement put on for a

9    hearing.

10          And so, obviously we've spent a lot of time today

11   talking about the debtors' reported agreement with

12   (indiscernible) DCG and given the recency of these

13   developments the debtors now seek additional time to work on

14   definitive documentation as well as to negotiate the terms

15   of any resulting planned solicitation process confirmation.

16   It's also clear from the tenor of comments here by everyone

17   that I don't think anyone thinks that deal is fully baked,

18   whether I'm listening to the Committee or even listening to

19   -- reading between the lines of Mr. O'Neal's comments.

20          So, in the context of exclusivity extensions, the

21   Court is well aware that the alternative here, that is, a

22   battle of competing plans, can under certain circumstances

23   "jeopardize current fragile agreements between various

24   stakeholders, reignite creditor/intercreditor disputes, and

25   push the process back to square one, dragging out the

Page 106

1    solicitation process and subjecting the state to substantial

2    extra costs that might otherwise be avoided.  See 'in re

3    Adelphi Communications Corporation 352 B.R. 578 and 590,

4    Bankruptcy Southern District of New York 2006.'"

5            So, again, a lot of these factors overlap, so

6    you'll hear some of the same things discussed.  As for the

7    existence of good faith progress towards reorganization, one

8    objector said there's been no progress and that's nonsense.

9    There has been progress.  There's various plans of

10   reorganization filed.  There was a restructured term sheet

11   that was filed.  That later died on the vine.  There was a

12   court-ordered mediation process that included lots of

13   parties, and there have been various agreements reached in

14   principle with FTX as well as with DCG.  So, the primary

15   focus of the objector's arguments is their unhappiness with

16   the proposed deal struck by the debtors with (indiscernible)

17   DCG.  The objectors say it doesn't represent progress at

18   all, but instead represents a step backwards.  They contend

19   the settlement with FTX was struck to obtain votes necessary

20   for the plan and complain the FTX claim was overly inflated,

21   leading to a settlement amount that is too high.

22           But the Committee has made it clear that they've

23   done an extensive assessment of all the available options in

24   the claims against both FTX and against the parent, and that

25   they believe that the current agreement in principles

Page 107

1    between the debtors, the Committee and DCG, as well as FTX,

2    appear to be better than the alternatives in that they can

3    provide a path forward if further progress can be made.

4           And the Committee has determined that the deal --

5    these deals can provide -- let me make it clear that these

6    deals as opposed to all-out thermonuclear war in the form of

7    full-blown litigation can provide more certain recovery to

8    creditors and can reduce bankruptcy risk by providing the

9    debtors and ultimately their creditors with a first lien

10   security interest in DGC's assets, something these states

11   don't currently have.  Didn't have under the February terms

12   sheet and wouldn't have in a litigation scenario.  The deal

13   as contemplated also supports in-kind recoveries by

14   denominating portions of the new debts, Bitcoin and

15   Ethereum, something that the February term sheet didn't

16   provide and the litigation path also doesn't provide.  See

17   the Committee's statement in support of exclusivity at Page

18   3.

19          So, it is clear that the debtors have -- they've

20   stated, and it's true, that they'll need to continue to

21   engage the constituencies in addressing outstanding issues

22   of all kinds.  That's what the case is for.  In addition,

23   the Court notes that to the extent the objections rise or

24   fall on the merits of the settlement, the Court can't

25   determine the merits of the settlement today.  They're

Page 108

1    actually not on for my consideration.  The settlements must

2    be addressed separately in the context of Rule 9019 or

3    through voting on a plan proposed.  Obviously, steps have

4    already been taken in this regard.  The Ad Hoc Committee has

5    filed pre-requests and issues are being litigated in due

6    course.

7          So, I am mindful the objectors have said the

8    debtors have essentially squandered their opportunities, but

9    there's a real risk that denial of the motion at this time

10   will lead to a creditor free-for-all with the resulting

11   chaos leading to liquidation, and the Committee has made it

12   very clear in its role as a fiduciary that that is a result

13   to be avoided, and that may be the one thing that all

14   parties agree upon.  So, turning to other factors, the

15   debtors are in fact paying their bills as they come due.  No

16   one has argued to the contrary.

17          As to whether the debtors demonstrated reasonable

18   prospect for filing a viable plan, again, the debtors are

19   continuing to negotiate with the constituencies on resolving

20   objections, and for purposes of extending exclusivities, the

21   debtor need only demonstrate a reasonable prospect for

22   filing a viable plan -- see in re Adelphi at 352 B.R. 589 --

23   and this requires only a debtor be able to obtain

24   confirmation of at least some viable plan, not necessarily

25   the plan currently proposed.  And relatedly, (indiscernible)

Page 109

1   with the plan is not one of the enumerated factors and not a

2   basis for terminating exclusivity, nor (indiscernible)

3   creditor constituency unhappiness with the debtors' planned

4   proposals. See Adelphi at 352 B.R. 587.

5           So, turning to whether the debtors made progress

6   in negotiations with creditors, again, there's been a

7   reference to agreements in principle that may serve as a

8   path forward if further progress can be made.  Certainly,

9   the Court recognizes that the three objectors represent

10  pager constituencies in these cases and by their objections

11  they've made very clear their unhappiness with the state of

12  these cases, and of course unhappiness is regrettably part

13  of the bankruptcy process, as business entities only file

14  when the status quo is no longer sustainable.  Bad news and

15  unhappiness follow, but once bankruptcy is filed, folks need

16  to avoid measuring their unhappiness by the promise of

17  possibilities and deals that may exist before bankruptcy.

18  Instead, they need to look at the new economic realities

19  revealed by the bankruptcy process and measure when it's

20  possible against these new realities.

21          And as for the debtors' part, they seek by asking

22  for further exclusivity to be in control of any settlement

23  with the parent and the timing of the plan.  Of course, in

24  assuming that mantle, the debtors are acting as a fiduciary

25  of the estate and together with the other fiduciary, the

Page 110

1    UCC, it's imperative that they act in a way to inspire

2    confidence so as to gain the votes for (indiscernible).

3          So, turning to the amount of time that's elapsed

4    in the case, this is only the second request for an

5    extension of exclusivity.  The case is not yet a year old,

6    and there has been significant activity.  For anyone who

7    thinks the case -- disagrees with that, I ask you to look at

8    the state of affairs in all the other cryptocurrency cases.

9    There is no magic bullet for any of these cases.  They are

10   all struggling with very difficult and complex issues, both

11   individually and in the context of the larger industry.

12         So, turning to the other factor, where the debtor

13   is seeking an extension of exclusivity to pressure creditors

14   to submit to its reorganization demands, and certainly this

15   is an allegation essentially made by the objecting parties.

16   Of course the debtors don't agree and point to their

17   continuing negotiations with parties in the case, including

18   the objecting parties, and in the end it's impossible for

19   the Court to determine at this point who's correct in this

20   particular debate because doing so would require the Court

21   to determine the merits of substantive issues such as the

22   debtors' proposed settlement with FTX and the debtors'

23   proposed settlement with the parent DGC.  Each of those is a

24   significant and weighty issue in its own right, the merits

25   of which are not before the Court today and cannot be

1    appropriately resolved as part of this exclusivity motion.

2    The parties still have an opportunity to litigate -- object

3    to and litigate the merits of each of those settlements and

4    any others that the debtors may reach, but that is not for

5    today.

6           Of course, the Court is mindful that the so-called

7    "fair deal group" objection makes reference to another

8    potential avenue for resolution in these cases, which is

9    presented in broad strokes, subject to due diligence.  As

10   with any other case, the parties in interest and courts

11   always pay close attention when someone has the courage of

12   their convictions by putting their own money on the line.

13   This case is no different.  So, if the fair deal group has

14   an economic proposal to make, they should make it, and then

15   the debtors and the UCC in their capacity as state

16   fiduciaries will evaluate that proposal as they are required

17   to do with other stakeholders no doubt weighting in as well.

18          And last factor in whether an unresolved

19   contingency exists -- there are plenty of unresolved

20   contingencies in this case, resolution of various claims,

21   both of FTX and Three Arrow, which will require further

22   progress.  So, in granting this extension for 30 days, I

23   agree that the UCC is correct in characterizing an

24   exclusivity hearing as something that can be a useful

25   measure of progress in a case by taking the temperature of

1    interested parties as to how things are going.  But in

2    listening to the presentation of the parties today, it is

3    also crucial to note that exclusivity can be used as a

4    weapon wielded by parties.  This is true both by an estate

5    that wishes to control the narrative or by objectors who can

6    stand in the way of an appropriate global resolution to

7    further their own (indiscernible) ends, and in such a

8    weapon, exclusivity or an exclusivity objection can be a

9    means to thwart progress and derail negotiations that need

10   to occur.

11            So, I urge all parties to reject such a

12   weaponization here and focus on improving the economics of

13   deals that will allow the case to go forward and that are

14   far, far better results than liquidation, which is a result

15   that all wish to avoid.  So, that's the Court's ruling on

16   the exclusivity motion.  I'd ask that the debtors submit a

17   proposed order to memorialize the grant of the extension,

18   and I'll so order the record today so that that is a done

19   deal.  So, it's 30 days, and frankly, I think at this point

20   there does need to be urgency injected into this time.  This

21   is not a bottle of fine wine.  Time is not on anyone's side

22   and it needs to have velocity to get done.  It's either

23   going to go get done or not get done, and I don't think 30

24   days or 60 days is frankly going to make any difference.

25   And of course, we'll see where the case is at the end of the

Page 113

1    30 days and assess where things are, and everybody retains

2    all their rights under the Bankruptcy Code, including the

3    provision about exclusivity extensions or requests to

4    shorten exclusivity.  But that's the Court's ruling on the

5    pending motion.

6            So, with that, Mr. O'Neal, I turn the virtual

7    podium back over to you.  I believe the only thing that we

8    have left is attorneys' fees.

9            MR. O'NEAL:  That's correct, Your Honor, and just

10   one quick question:  that's a 30-day extension for both the

11   plan and solicitation periods?

12           THE COURT:  Correct.

13           MR. O'NEAL:  Thank you.  And that's from today --

14   for a plan, it would be from today's date, and for the

15   solicitation, from the date that we requested?

16           THE COURT:  Yes.  I believe it's -- I'm not trying

17   to change any of the dates.  I'm just trying to give you 30

18   rather than 60.

19           MR. O'NEAL:  Gotcha.  Okay.

20           THE COURT:  Yeah.

21           MR. O'NEAL:  Thank you.  And I think --

22           THE COURT:  All right.

23           MR. O'NEAL:  My colleague, Ms. VanLare, will

24   handle (indiscernible)

25           THE COURT:  All right.  Give me just one second.

Page 114

1    I have notes on another pad that has disappeared on me --

2    but I will deal with that separately, so Ms. Vanlare, take

3    it away.

4         MS. VANLARE:  Thank you, Your Honor, and actually,

5    before I get into the fee applications, I just wanted to go

6    back to the FTX status conference matter for a brief moment.

7    Your Honor kindly offered September 18th as the hearing date

8    for the evidentiary hearing.  We did have a chance to confer

9    with our client and we are available and able to proceed on

10   that date if that works for Your Honor.

11        THE COURT:  All right.  That would be fine.  So,

12   let's say 10 o'clock, and what I'd appreciate is just -- as

13   you get closer just a sense of any updates on what you

14   expect a hearing to consist of, just so that everybody's on

15   the same page.  It sounds like based on what you said we

16   have one witness whose declaration would be used as their

17   written direct, so you'd make them available for cross-

18   examination and any redirect, and that -- it's that -- an

19   argument to the extent it's different than that, it would be

20   helpful to just have an idea.

21        In the what seems likely event that it wouldn't

22   get done that day, I think we'd reach the conclusion of the

23   day and then pick another day to finish, but certainly I

24   just -- I want to make sure nobody's surprised about what

25   the process looks like.

1           MS. VANLARE:  Of course, Your Honor.  We will do

2     that.

3           THE COURT:  All right, thank you.

4           MS. VANLARE:  So, now --

5           THE COURT:  All right.  Take it away.

6           MS. VANLARE:  So, the last items on the agenda

7     relate to the various professional fee applications.  I will

8     address the ones relating to the debtors' advisors, and then

9     I will let White & Case address the applications for the

10    Committee advisors.

11          So, first, Your Honor, the application of Cleary

12    Gottlieb Steen & Hamilton.  This is the first interim fee

13    application, filed at Docket No. 529.  Your Honor, the

14    application received no objections and I believe it's

15    uncontested.  We did receive comments from the office of the

16    United States Trustee and following some discussions with

17    the US Trustee, we agreed to reduce our fee request by

18    approximately $73,000 and our expenses by approximately

19    $6,500.  And so, the revised amounts are reflected on the

20    revised proposed order, which we have filed on the docket

21    and will of course provide to your chambers.  We will also

22    share that proposed order with the US Trustee.

23          So, Your Honor, I'm happy to answer questions, but

24    would request that Your Honor enter an order approving our

25    application.

Page 116

1            THE COURT:  All right.  Thank you very much.  So,

2     let me ask -- I see the US Trustee's Office on the line, so

3     I'll ask them first if they have any comments.

4            MR. ZIPES:  Your Honor, Greg Zipes with the US

5     Trustee's Office.  Ms. VanLare's statements do reflect our

6     agreement regarding reductions.  My office did go through

7     the fee applications of all the professionals and we have

8     asked for reductions or explanations.  You'll probably hear

9     more of these statements about reductions.  These are

10    interim fees, so there's a certain -- without getting into

11    too many details, Your Honor, but there are certain time

12    records that can't really be reviewed at the moment because

13    they're redacted or they're subject to ongoing litigation,

14    and my office is reserving its rights generally to reject

15    the fees at the end of the case.

16            THE COURT:  All right, thank you very much.  Any

17    other party that wishes to be heard on the fee application

18    of debtor's counsel?  All right.  Given my review of the fee

19    application here, I am satisfied that the fees that have

20    been requested are appropriate for the granting of interim

21    compensation and will grant that interim compensation here,

22    subject to a holdback -- the traditional holdback that I

23    have in all cases of 20 percent, which really reflects the

24    uncertainty of cases, and so we can move on to the next

25    application.

Page 117

1          MS. VANLARE:  Thank you, Your Honor.  Next we have

2     the application of Moelis & Company.  This was filed at

3     Docket No. 516.  Similarly, it is uncontested.  It does

4     reflect comments received by the -- received from the US

5     Trustee's Office, and the proposed revised order we

6     submitted does reflect a reduction of $2,970, and so with

7     that, Your Honor, we request that you enter an order

8     approving that application.

9          THE COURT:  All right.  Mr. Zipes, anything from

10    your office?

11         MR. ZIPES:  No, Your Honor.  We did review this

12    fee application, as stated, and we have a reduction in

13    expenses.

14         THE COURT:  All right, thank you very much.  Any

15    other party wish to be heard on this application?  All

16    right.  Hearing no objection, I am happy to approve the most

17    up-to-date version of this application as appropriate under

18    the facts and circumstances of the case and applicable law.

19    Next up, Ms. VanLare?

20         MS. VANLARE:  Next, Your Honor, we have the

21    Alvarez & Marsal first interim fee application.  This is

22    Docket No. 529.  Alvarez & Marsal serves as financial

23    advisor for the debtors.  This application is uncontested,

24    and similarly, the proposed revised order reflects certain

25    reductions that were made following comments received from

Page 118

1    the Office of the US Trustee.  So, with that, Your Honor, we

2    ask that you enter an order approving the application.

3              THE COURT:  All right.  Mr. Zipes, anything from

4    your office?

5              MR. ZIPES:  Nothing further, Your Honor.

6              THE COURT:  All right, thank you.  Any other party

7    that wishes to be heard?  All right.  I have the same ruling

8    on this application that based on the facts and

9    circumstances it's appropriate to approve this interim fee

10   application, given the work being done in this case and that

11   it's consistent with applicable law.  So, next up?

12             MS. VANLARE:  Next, Your Honor, we have the M3

13   first interim fee application, filed at Docket No. 524.  M3

14   Advisory Partners was appointed as a financial advisor to

15   assist the debtors in connection with the FTX matter due to

16   a conflict that Alvarez & Marsal has.  The M3 application is

17   also uncontested.  M3 agreed to reduce their fees by $605

18   following comments received from the Office of the US

19   Trustee.  With that, Your Honor, we ask that you enter an

20   order approving that application.

21             THE COURT:  All right.  Mr. Zipes, anything from

22   your office?

23             MR. ZIPES:  Nothing, Your Honor.  Thank you.

24             THE COURT:  All right, thank you very much.

25   Anything from any other party on this application?  All

1    right, hearing nothing, I will approve this application on

2    an interim basis as appropriate under the facts and

3    circumstances of the case and applicable law, and obviously,

4    it's important to retain this party for work for which there

5    is a conflict.  Next up?

6              MS. VANLARE:  Your Honor, next we've got the

7    application of Morrison Cohen, filed at Docket No. 522.

8    Morrison Cohen is debtors' enforcement and special

9    litigation counsel.  Following the comments received from

10   the US Trustee, Morrison Cohen agreed to reduce their

11   request by approximately -- by $2,790.  With those comments,

12   we believe that the US Trustee has no objection to Morrison

13   Cohen's fee application and no objections have been filed on

14   the docket, so with that, Your Honor, we ask that you enter

15   an order approving Morrison Cohen's first interim fee

16   application.

17             THE COURT:  All right.  Mr. Zipes, anything from

18   your office?

19             MR. ZIPES:  Your Honor, nothing further, except to

20   note that some of the investigation work is done by Cleary

21   and some is done by Morrison Cohen, and my office did spend

22   some time to understand what they were doing.  Some of it is

23   not appropriate to disclose publicly, but my office has

24   reviewed (indiscernible)

25             THE COURT:  All right, thank you very much for

Page 120

1   that.  Anyone else who wishes to be heard on the Morrison

2   Cohen first interim fee application?

3           MR. ROSENBLAT:  Your Honor, Heath Rosenblat of

4   Morrison Cohen.  Just to correct the record, it was a

5   reduction of $22,000, not $2,000.  Just want to make sure

6   that every penny is going back to the estate that's supposed

7   to.

8           THE COURT:  All right, thank you very much.  I

9   appreciate that update on the record.

10          MR. ROSENBLAT:  Thank you.

11          THE COURT:  All right, anyone else  with a

12  comment?  All right.  I -- based on my review of the

13  application, I'm happy to review -- I'm sorry, I'm happy to

14  approve the application as has been amended on the record

15  here, the first interim application of Morrison Cohen, with

16  the reduction contemplated as appropriate under the facts

17  and circumstances of the case and applicable law.  Ms.

18  Vanlare?

19          MS. VANLARE:  Yes, Your Honor.  Thank you.  Just a

20  few more remarks about some of the other advisors to the

21  debtors.  First, Kobre & Kim, as Your Honor probably

22  recalls, was retained as conflicts counsel to the debtors.

23  Kobre & Kim did not file an interim fee application because

24  they have not incurred any fees in connection with the case

25  other than preparing the retention application, and general

1    background and getting up to speed on the case.  Kobre Kim,

2    Cleary Gottlieb and the US Trustee discussed an appropriate

3    approach to this and concluded that it would be more cost

4    efficient to refrain from filing additional fee statements

5    and incurring additional fees in connection with filing an

6    interim fee application.  Kobre has agreed to waive the

7    whole back payment until it files an interim or final fee

8    application, and our understanding is the US Trustee

9    consents to this approach.

10         The debtors do wish to confirm with Your Honor

11   that should Kobre & Kim incur fees in the future, they would

12   be permitted to receive compensation for fees incurred going

13   forward in accordance with the interim compensation order

14   provided that they file a monthly fee statement and fee

15   applications for any such future work.  Kobre & Kim will

16   also file a final fee application at the end of the case,

17   regardless of whether any future work is done, that will

18   cover this fee period as well as any future fees incurred.

19         THE COURT:  All right, thank you very much.  Mr.

20   Zipes, any thoughts?

21         MR. ZIPES:  Nothing further, Your Honor.  We did

22   agree to that, subject to the Court's approval.

23         MS. VANLARE:  And Your Honor --

24         THE COURT:  I'm fine with it.  As it's been set

25   forth on the record, I appreciate the transparency on the

1   issue.

2           MS. VANLARE:  Thank you very much, Your Honor.  We

3   do appreciate that.  And finally, I'll just note that Grant

4   Thornton, who is debtors' tax advisor, did not file an

5   interim fee application because they had not filed or served

6   any monthly fee statements during the first interim fee

7   period, and so determined again that they would hold off

8   until they were able to file a monthly fee statement to file

9   an interim fee application.  Again, just wanted to be

10  transparent about that.

11          THE COURT:  All right, thank you very much.  And I

12  know the Committee has some professionals that we'll address

13  in a second.  I want to raise the issue -- it's not for

14  today, but certainly I'm aware of the sizeable amount of

15  fees that have been incurred in these cases, and that's

16  understandable given the complex and challenging work that

17  needs excellent counsel to do it.  Today's hearing is a

18  perfect example of that.

19          But for some time, I've been -- I guess I've noted

20  the seemingly automatic increases in attorney fee rates,

21  such that the top rates have undergone a large increase over

22  the last decade.  And so, at some point -- and again, it's

23  not a today issue -- I would welcome some insight and a

24  conversation on the issue.  In particular, I'd welcome

25  insight as to how sort of the highest rates for bankruptcy

1   work at a firm compare with the highest rates for work in

2   other practice areas for that same firm, because obviously,

3   clients often negotiate discounts for various work.

4           And so, it's not something that's appropriate to

5   discuss without giving you a heads-up about it, because you

6   need to think about it, and I'm not making any value

7   judgments one way or the other.  It's just something that

8   is, I think, worthy of a discussion for purposes of

9   transparency on the record, and so, we'll have that

10  discussion at some point in the future and I welcome your

11  thought not only on the issue but also on the timing for

12  having that discussion.

13          So, with that, it sounds like it's time to turn to

14  --

15          MR. ZIPES:  Your Honor?  I don't mean to interrupt

16  -- I guess I do mean to interrupt.  Greg Zipes with the US

17  Trustee's Office, very briefly, because this is going very

18  long.  I just want to bring to the Court's attention the US

19  Trustee large fee guidelines, and there are statements made

20  by professionals both at the retention stage and at the fee

21  application stage -- they do give an analysis of some of the

22  points that you're making.  My office does share the concern

23  of the Court relating to hourly rates generally, but I will

24  point out that the fee applications actually do answer

25  questions in that regard, so --

Page 124

1              THE COURT:  Yeah.  No, I understand that that's in

2      there and I appreciate you pointing it out to sort of round

3      out the picture.  You're exactly right.  I guess my thought

4      is that that's something that is the subject of discussion

5      outside of court, but probably less so in the context of

6      having discussions in court in approving fees and thinking

7      about fees.  So, that's why I said I'd appreciate having

8      sort of a conversation where you can sort of share your

9      insights sort of on a more holistic level, right, in terms

10     of the industry.  And so, that's -- but you're exactly

11     right, Mr. Zipes, to point that out to sort of complete the

12     picture.  Thank you.

13             All right, Mr. Abelson.  I think your applications

14     are up.

15             MR. ABELSON:  Yes, Your Honor, and thank you.

16     Once again, Phil Abelson, White & Case, on behalf of the

17     UCC.  Your Honor, I will present three fee applications

18     today.  The first is the first interim fee application for

19     White & Case, counsel for the Committee, which can be found

20     at Docket No. 523.  Your Honor, the application seeks

21     compensation for fees and expenses incurred between February

22     10th and May 31st.  No objections were raised, either

23     formally or informally, and we respectfully request that

24     Your Honor approve the fees and expenses sought in White &

25     Case's interim fee application.

Page 125

1          THE COURT:  All right.  Thank you very much.  Mr.

2    Zipes, any thoughts?

3          MR. ZIPES:  Yes.  Your Honor, we did review this

4    fee application and had no comments for the interim period.

5          THE COURT:  All right, thank you very much.  Any

6    other comments from any other party?  All right.  Based on

7    the record before me and having reviewed the fee

8    application, I'm happy to grant White & Case's first interim

9    fee application as appropriate under the facts and

10   circumstances of the case and applicable law, and we can

11   move on to the next application, Mr. Abelson.

12         MR. ABELSON:  Yes, thank you, Your Honor.  The

13   next application is the first interim fee application for

14   Berkeley Research Group, which is the financial advisor to

15   the Committee, which can be found at Docket No. 561.  This

16   application seeks fees and expenses incurred between

17   February 14th and May 31st.  There were no objections

18   raised, either formally or informally, other than some

19   questions were raised by the United States Trustee's Office

20   and that led to a reduction of $3,060 in fees and that is

21   reflected in the proposed order.  And with that, Your Honor,

22   we respectfully request that you approve BRG's first interim

23   fee application.

24         THE COURT:  All right, thank you.  Mr. Zipes, any

25   comments?

Page 126

1           MR. ZIPES:  No, Your Honor.  Thank you.

2           THE COURT:  All right, thank you very much.  Any

3    other party that wishes to be heard on this fee application?

4    All right.  Based on my review of this application and all

5    the facts and circumstances of the case, I will grant the

6    first interim fee application as appropriate and consistent

7    with applicable law, and I think that means we have one more

8    from Houlihan Lokey Capital.

9           MR. ABELSON:  That's correct, Your Honor, and that

10   can be found at Docket No. 525, and this application seeks

11   compensation for fees and expenses incurred between February

12   12th and May 31st.  Again, there were no objections raised,

13   either formally or informally, and we ask Your Honor to

14   approve the Houlihan Lokey interim fee application.

15          THE COURT:  All right.  Mr. Zipes, one more time:

16   anything else from your office?

17          MR. ZIPES:  Your Honor, no comments on this one.

18          THE COURT:  All right, thank you very much.  Any

19   other party that wishes to be heard on this application?

20   All right.  Once again, hearing no responses, I will grant

21   this first interim fee application as appropriate under the

22   facts and circumstances of the case and applicable law, and

23   with that, I think that's all the fee applications.

24          So, let me ask debtors' counsel if there is

25   anything else that is on the agenda for today.

1            MS. VANLARE:  We don't have anything further, Your

2       Honor.  Thank you very much.

3            THE COURT:  All right, thank you very much.

4       Anything else from any other party?  All right.  So, I'll

5       wait to sort of get an update on the 18th, and I believe we

6       have a hearing that week -- I think it's the 26th; is that

7       right?  I couldn't remember if it was the 25th or the 26th,

8       and given the conversations today, certainly to the extent

9       that there's anything I can do to be of use for something

10      that's not scheduled, feel free to reach out to chambers.

11      I'm happy to make myself available, and with that, I wish

12      you all a good afternoon.  Thanks so much.

13            MS. VANLARE:  Thank you very much.

14            MR. ABELSON:  Thank you, Your Honor.

15            (Whereupon these proceedings were concluded at

16      5:25 PM)

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3                          RULINGS

4                                        Page      Line

5    Extension of Exclusivity Granted    56        14

6    Fee Applications Granted:

7    Moelis & Company                    117       16

8    Alvarez & Marsal                    118       9

9    M3 Advisory Partners                119       1

10   Morrison Cohen                      120       14

11   White & Case                        125       8

12   Berkeley Research Group             126       6

13   Houlihan Lokey                      126       20

14

15

16

17

18

19

20

21

22

23

24

25

Page 129

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6    *Sonya M. Ledanski Hyde*

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  September 8, 2023

| & | | | |
|---|---|---|---|
| **&**   3:15,19 4:10 | **10036**   7:4 9:4 | **12th**   126:12 | 129:25 |
| 4:15 6:3,13 7:8 | **10153**   8:4 | **13,087.58**   4:2 | **20th**   56:1 |
| 7:17 8:1,8 10:9 | **10601**   1:14 | **130**   55:19 | **21**   43:20 |
| 10:15,24 11:4 | **10:00**   28:20 | **14**   128:5,10 | 102:20 |
| 11:9,14 14:15 | 46:22 61:13 | **14th**   28:7 | **22,000**   120:5 |
| 14:24 19:10 | **10th**   124:22 | 125:17 | **23,894,770.50** |
| 26:14 27:6 | **11**   3:4 10:6 | **15**   83:24 | 3:16 |
| 32:20 40:9 | 14:23 15:15,18 | **16**   128:7 | **23-10063**   1:3 |
| 44:6 45:24 | 16:15 20:17 | **17th**   28:13 | **232,000**   93:18 |
| 115:9,12 117:2 | 47:14 57:17,23 | **18**   47:16 | **232,824**   95:23 |
| 117:21,22 | 64:19 65:11 | **18th**   28:13,19 | **24**   55:21 |
| 118:16 120:21 | 69:24 74:8 | 38:10 114:7 | **248**   1:13 |
| 120:23 121:11 | 75:4,7 82:18 | 127:5 | **256,085.65** |
| 121:15 124:16 | 82:23 85:5,7 | **1st**   20:3 38:11 | 3:16 |
| 124:19,24 | 86:13 88:3 | 39:20,22 47:16 | **25th**   61:13 |
| 125:8 128:7,8 | 90:22,25 91:1 | | 127:7 |
| 128:11 | 91:3 95:11 | **2** | **26th**   25:22 |
| | 96:10 103:1 | | 27:24 43:21 |
| **1** | **11,000**   20:5 | **2**   16:20 21:10 | 46:10 127:6,7 |
| | **11,065.14**   4:18 | 72:8,10 | **28**   87:22 |
| **1**   71:12,16 | **1121**   102:24 | **2,000**   120:5 | **29,411.00**   3:21 |
| 95:24 103:1 | 103:1 | **2,790**   119:11 | **29th**   63:20 |
| 128:9 | **11501**   129:23 | **2,970**   117:6 | 86:23 |
| **1.5**   70:16 | **117**   128:7 | **2.4**   82:7 | **2:00**   10:4 |
| **1.55**   71:4 | **118**   128:8 | **2.5**   41:16 | **2:10**   1:17 |
| **1.7**   83:19 | **119**   128:9 | **2/10/2023**   4:17 | |
| **1/19/2023**   3:15 | **11:00**   28:22 | **2/12/2023**   4:23 | **3** |
| 3:20 4:1 | **12,832.54**   4:24 | **2/14/2023**   5:4 | |
| **1/20/2023**   4:11 | **120**   128:10 | **20**   26:6 116:23 | **3**   13:5 38:4 |
| **10**   39:6 87:15 | **12151**   129:6 | 128:13 | 41:12 99:22 |
| 87:16,18 | **1221**   6:16 | **2004**   57:6 | 107:18 |
| 114:12 | **125**   7:19 | **2006**   103:4 | **3,060**   125:20 |
| **10004**   7:11,20 | 128:11 | 106:4 | **3,624.20**   5:5 |
| 8:23 | **126**   128:12,13 | **2011**   103:7 | **30**   59:17 80:15 |
| **10006**   6:6 | **1271**   8:11 | **2019**   70:5 | 81:17 104:5 |
| **10020**   6:17 | **12:30**   46:22 | **2022**   23:2 | 111:22 112:19 |
| 8:12 | | **2023**   1:16 | 112:23 113:1 |
| | | 62:23 64:4 | 113:10,17 |
| | | 102:20 104:22 | |

**300**   1:13
   129:22
**31st**   61:14
   124:22 125:17
   126:12
**330**   129:21
**336**   103:4,11
**352**   106:3
   108:22 109:4
**363**   17:1 18:21
**373**   47:16
**375**   84:20
**38**   67:12 87:25

**4**

**4**   13:5 38:5
**4,729,898.50**
   5:5
**4,858,933.75**
   4:12
**4/1/2023**   4:6
**40**   87:20
**444**   102:22
**448,737.00**   4:7
**46,875.63**   4:12
**460**   103:7
   104:3

**5**

**5**   62:15
**5/31/2023**   3:16
   3:20 4:1,6,12
   4:17,23 5:4
**50**   31:13
**503**   21:4
**516**   3:18 117:3
**522**   3:23 119:7

**523**   2:20 3:1
   4:14 124:20
**524**   4:4 118:13
**525**   4:20
   126:10
**526**   2:20 3:1
**527**   2:20 3:1
   4:9
**529**   3:13
   115:13 117:22
**534**   8:22
**541,071.43**
   4:24
**56**   128:5
**561**   5:1 125:15
**574**   3:3 102:7
**578**   106:3
**587**   109:4
**589**   108:22
**590**   106:3
**5:25**   127:16
**5th**   94:25

**6**

**6**   1:16 55:19
   128:12
**6,500**   115:19
**60**   49:20 59:17
   59:25 102:23
   112:24 113:18
**600,000.00**
   3:21
**601**   2:12 19:8
**602**   2:5 14:20
**603**   3:7
**604**   84:16
**605**   118:17

**610**   103:4
**630**   67:16
   68:11 83:21
   84:17 87:6,16
   88:6
**633**   102:11
**634**   102:10
**635**   102:8
**654**   102:19
**659**   2:17
**660**   2:22
**662**   102:17
**663**   2:3
**674**   103:4,11
**6th**   59:14 60:2

**7**

**7**   9:3 78:11,13
   78:16,18,21
   84:4
**7,759,595.00**
   4:17
**73,000**   115:18
**767**   8:3
**77**   16:16

**8**

**8**   128:11
   129:25
**8,000**   25:8
**80,000**   76:4
**818**   103:7
**822**   103:7
   104:3
**830**   89:23,24
**863**   50:21

**9**

**9**   128:8
**9019**   3:9 23:15
   23:18 108:2
**93**   4:7
**933,249.00**   4:1
**971**   4:7
**981**   2:20 3:1
**982**   2:20 3:1
**990**   2:20 3:1

**a**

**abbreviated**
   26:5
**abelson**   6:20
   10:15 18:14
   21:11 32:18,19
   32:19 33:17
   34:5 124:13,15
   124:16 125:11
   125:12 126:9
   127:14
**ability**   67:2
   73:5 77:8 85:6
**able**   22:12
   25:18 32:7
   62:22 81:13
   85:19 108:23
   114:9 122:8
**absence**   79:6
**absent**   54:3
**absolutely**
   20:16
**abundance**
   16:11 17:1
**ac**   47:19

accept 67:2
103:16
acceptable
46:10
accepted 93:9
accepting 85:9
access 52:23,23
57:2
accordance
121:13
account 84:17
accreditor
64:14
accrue 84:18
accrued 87:10
87:13,16 88:6
88:7
accurate 129:4
achieve 95:12
acknowledge
55:23 71:7
act 48:10 110:1
acting 109:24
action 37:11
67:17,18 68:6
68:10,12 83:23
84:3,13 87:7
87:24,25 88:19
90:8 95:2
100:13
actions 34:10
34:19,22 69:5
69:6,15,16
99:16
active 30:25
31:22

actively 75:10
activities 15:8
75:12
activity 104:24
110:6
actual 52:24
58:20 59:20
60:7 75:21
77:7 79:6,6,20
80:24 86:4
93:1
actually 13:12
37:20 58:23
60:6 67:8,8
70:22 100:18
108:1 114:4
123:24
ad 7:2 9:2
10:17,20 22:4
22:15,18,24,25
23:25 25:3
28:1 32:4
34:25 62:22
63:15,21 64:5
64:23 67:19,25
70:22,23,25
82:2,6 83:4,19
84:3,8 95:4
102:8 108:4
adam 8:14
11:13 40:9
45:24
add 57:9
adding 36:11
80:6
addition 47:7
100:8 102:15

107:22
additional
42:16 73:12
75:24 85:1
97:25 105:13
121:4,5
address 13:2
27:18 32:7
34:9 37:21
38:20 55:3
59:4 76:21
115:8,9 122:12
addressed 48:1
104:17 108:2
addressing
50:23 107:21
adds 39:24
adelphi 106:3
108:22 109:4
adelphia 103:3
103:11
adequate 16:1
17:15 103:14
adjudicated
38:15
administered
10:5
administration
16:17
administrator
36:24
admission
19:13
admitted 14:25
19:11
admittedly
65:18

admitting 15:3
advance 16:22
18:2 25:23
43:1 58:4
advanced 47:3
adversaries
39:17
adversary
49:19
advise 79:23
advised 77:1
79:21
advisor 5:3
14:24 117:23
118:14 122:4
125:14
advisors 76:7
79:23 115:8,10
120:20
advisory 4:5
118:14 128:9
advocating
39:5 96:6
affairs 110:8
affected 36:8
36:24
affiliate 19:19
aftermath 41:8
afternoon 10:2
10:8,12,14,17
10:19,21,23
11:1,3,6,8,11
11:13,18,20,23
11:25 12:2
14:13,14 27:5
37:23 39:7,22
62:12 86:1

93:16 127:12

**afternoon's**
38:4

**age** 81:11

**agenda** 2:3
12:16,24 13:4
13:5 14:17
21:11,18 38:4
38:5 62:6,14
62:14 73:25
74:18 115:6
126:25

**agent** 36:5,16
93:18

**ago** 53:8 83:22
87:8 88:19

**agree** 26:4 44:8
64:25 79:5
82:13 87:7
90:10 97:14
108:14 110:16
111:23 121:22

**agreed** 42:22
82:4 86:6
105:5 115:17
118:17 119:10
121:6

**agreement**
3:10 13:17
15:14,22 16:9
17:10 22:2
24:13 63:17,19
65:14,19,23
66:7 67:3 69:8
69:8,9,14,15
71:21 84:11
85:16,17,18

87:1 98:11,14
99:7 101:20
105:6,11
106:25 116:6

**agreements**
19:22 20:7
48:14 105:23
106:13 109:7

**ahead** 34:20
36:20 49:7
79:11

**alexander** 8:21

**alianna** 1:25

**aligned** 44:2

**allegation**
110:15

**alleged** 47:4

**allow** 66:24
72:22 73:16
95:8,20 96:9
103:15 112:13

**allowed** 43:20
75:6,22

**alluded** 54:6

**alongside** 63:2
63:4

**alt** 64:17

**alter** 84:24

**alternative**
24:17 63:23
66:20 92:15
95:7 99:13
101:15 105:21

**alternatives**
107:2

**alvarez** 4:10
14:24 19:10

117:21,22
118:16 128:8

**amended** 2:3
12:15,23 21:11
38:5,9,11,13
38:25 43:11
49:17 120:14

**amendments**
38:7

**america** 4:11

**americas** 6:16
8:11

**amount** 28:23
42:10 50:2
69:10 75:5
76:16 83:21
103:21 106:21
110:3 122:14

**amounts** 84:14
87:6 115:19

**analogies**
48:18

**analysis** 23:3
55:9 56:9
78:14 123:21

**analyze** 56:4

**announced**
63:19 86:23
91:12

**anson** 7:13
10:24 26:8
93:17

**answer** 35:6
92:22 115:23
123:24

**answered**
65:13

**anticipate**
12:12 20:4,6
22:12 23:19
24:2 25:10
42:8 43:1
53:12,25 54:2
54:22,25 55:7
56:18

**anybody** 12:7
15:2 32:10
33:10 45:20
78:21 89:4
90:9

**anyone's**
112:21

**apologies**
18:14

**apparently**
94:12

**appeal** 62:19

**appear** 21:22
24:11 107:2

**appearance**
12:8

**appearances**
10:6 12:4,14

**appeared** 70:9
70:23

**appearing**
69:24 70:2,3
70:24 71:8

**appears** 26:19
71:14 84:4

**appended** 56:5
78:14

**appetite** 42:2

applaud 49:18
applicable
 18:19 21:16
 117:18 118:11
 119:3 120:17
 125:10 126:7
 126:22
application
 3:13,18,23 4:4
 4:9,14,20 5:1
 115:11,13,14
 115:25 116:17
 116:19,25
 117:2,8,12,15
 117:17,21,23
 118:2,8,10,13
 118:16,20,25
 119:1,7,13,16
 120:2,13,14,15
 120:23,25
 121:6,8,16
 122:5,9 123:21
 124:18,20,25
 125:4,8,9,11
 125:13,13,16
 125:23 126:3,4
 126:6,10,14,19
 126:21
applications
 13:8,20 14:6
 114:5 115:7,9
 116:7 121:15
 123:24 124:13
 124:17 126:23
 128:6
applies 49:9

apply 51:1
 74:2
applying 104:3
appointed
 118:14
appointment
 63:6 83:5
appreciate
 25:5 31:15
 33:25 37:1,13
 80:23 96:21
 114:12 120:9
 121:25 122:3
 124:2,7
appreciation
 30:17
approach
 32:15 33:24
 64:19 66:25
 95:20 121:3,9
approaching
 68:3
appropriate
 13:16 18:18,20
 21:15 24:17
 25:16 27:3,12
 29:18 32:7
 33:1,17 36:16
 59:23 83:10
 94:9 104:5
 112:6 116:20
 117:17 118:9
 119:2,23
 120:16 121:2
 123:4 125:9
 126:6,21

appropriately
 42:23 53:10
 73:8 111:1
appropriaten...
 38:22
approval 16:25
 22:9 121:22
approve 2:17
 3:8 15:25 21:3
 22:2 117:16
 118:9 119:1
 120:14 124:24
 125:22 126:14
approving 2:8
 3:10 27:10
 115:24 117:8
 118:2,20
 119:15 124:6
approximately
 83:21 87:15
 115:18,18
 119:11
april 56:6
apt 48:19
areas 123:2
aren't 79:10
 81:10
argue 45:2
argued 47:10
 47:11 53:17
 108:16
arguing 52:13
 55:10
argument
 13:22 64:9
 114:19

arguments
 24:3 30:5 43:5
 47:9 70:12,13
 106:15
arises 12:14
arm's 95:14
arrangements
 56:15 73:15
array 77:22
arrow 49:5
 54:23 111:21
arrows 8:10
 11:12,15 13:3
 13:18 14:5
 37:21 38:3,18
 39:14 40:2,4,7
 40:10 42:14
 43:17 44:1,25
 45:8,21,22,25
 54:1 57:10,11
 57:13,18 59:6
 60:13 104:18
arrows' 49:13
 52:21
asked 15:23
 54:20 100:16
 116:8
asking 36:15
 109:21
aspect 67:15
aspects 75:4
 97:13
assert 59:11
 102:13
asserted 47:12
 83:8

| | | | |
|---|---|---|---|
| **asses** 104:11 | **attorney** 3:15 | 112:15 | **bad** 74:11 |
| **assess** 23:17 | 122:20 | **avoided** 106:2 | 109:14 |
| 76:12 113:1 | **attorneys** 6:4 | 108:13 | **baked** 105:17 |
| **assessment** | 6:14 7:2,9,18 | **aware** 105:21 | **balance** 48:24 |
| 106:23 | 8:2,9,20 9:2 | 122:14 | **ball** 49:18 |
| **asset** 57:11 | 76:6 113:8 | **awkward** | **banker** 4:22 |
| 65:2 89:7 | **audience** 78:7 | 96:17 | **bankr** 103:4,7 |
| 104:13 | **august** 38:7,10 | **axelrod** 9:7 | **bankruptcy** |
| **assets** 2:10 | 63:20 94:6 | 11:22 | 1:1,12,23 3:9 |
| 15:20 16:5 | **aulet** 9:6 11:20 | | 10:3 15:16 |
| 17:8 22:23 | 11:21 26:3,3 | **b** | 18:21 29:24 |
| 27:20 41:16 | 86:1,2 95:5 | **b** 1:21 7:13 | 30:7 31:4 |
| 47:13 52:12 | **authenticated** | 17:1 49:9 | 49:21 50:24 |
| 83:1 85:14 | 55:11,13 | 55:19 | 63:13 82:20 |
| 95:24 104:15 | **authorities** | **b.r.** 103:4,7,11 | 92:19 103:9 |
| 107:10 | 36:6 | 104:3 106:3 | 106:4 107:8 |
| **assist** 37:14 | **authority** | 108:22 109:4 | 109:13,15,17 |
| 118:15 | 17:21 20:12 | **back** 13:25 | 109:19 113:2 |
| **assistance** | **authorization** | 21:20 29:11 | 122:25 |
| 31:16 35:10 | 14:18 | 32:9,16,22 | **bar** 21:22 |
| **associated** 20:4 | **authorize** 2:5 | 37:17 38:6 | **barefoot** 6:9 |
| **assume** 33:3,20 | 2:12 | 43:12 44:21 | 10:10 13:6 |
| **assumed** 16:7 | **authorizing** | 46:13 49:15 | 29:15 33:9 |
| **assuming** 24:6 | 2:6,8,13 19:6 | 58:4 72:18,20 | 37:20,22,23,24 |
| 109:24 | **automatic** | 86:9,19 88:3,6 | 38:2 40:14 |
| **assumption** | 105:2 122:20 | 88:13 90:20,23 | 41:10 42:14,15 |
| 17:9 | **availability** | 96:1,12,23 | 50:25 51:19 |
| **assurances** | 23:9 | 97:25 98:6 | 53:24 54:2,13 |
| 55:25 | **available** 22:16 | 101:24 102:2 | 54:16 55:15,16 |
| **asymmetry** | 25:25 31:2,21 | 105:25 113:7 | 60:10 61:5,6 |
| 52:25 | 42:11 106:23 | 114:6 120:6 | 61:22 62:1,8 |
| **attached** 52:15 | 114:9,17 | 121:7 | 85:10 |
| 53:18 | 127:11 | **backed** 41:3 | **base** 60:20 |
| **attacked** 94:13 | **avenue** 6:16 | **background** | 61:2 |
| **attempt** 88:9 | 8:3,11 111:8 | 102:20 121:1 | **based** 25:11 |
| **attention** | **avoid** 93:7 | **backstop** 87:25 | 55:6 57:5 |
| 111:11 123:18 | 97:13 109:16 | **backwards** | 76:11 78:13 |
| | | 81:20 106:18 | |

83:11 86:17
114:15 118:8
120:12 125:6
126:4
**basically**   49:23
68:16 69:10
**basics**   44:8
**basis**   53:2
57:11 89:8
109:2 119:2
**battery**   7:10
**battle**   105:22
**beat**   89:9
**becoming**
31:22
**beginning**
58:22 62:17
74:24
**begun**   22:11
25:6
**behalf**   10:9,12
10:17,20,21
11:1,4,6,9,11
11:14,18,23
25:2 26:15
32:13,20 40:9
45:24 54:23
62:13 73:22
82:1 96:14
98:10 124:16
**behave**   73:8
**belief**   45:14
**believe**   17:2,10
17:25 18:22
20:11 25:15
26:18 28:12
42:16 44:12,16

56:7 62:4,8
64:1,1,3 66:9
66:15 77:1
78:12 82:9,16
82:20 83:11
85:8,17,22
88:21 89:2,3,4
89:10,11,11
91:5 92:12
93:2 97:15
106:25 113:7
113:16 115:14
119:12 127:5
**believes**   45:5
64:2 78:5
**bench**   35:13
48:19
**benefit**   20:15
**benefits**   20:10
72:25 80:11
**berkeley**   5:2
125:14 128:12
**best**   17:11,13
32:15 33:21
46:19 64:19
65:25 66:1,10
73:16 74:18,20
76:17,19 85:15
85:18,22 92:13
**bet**   100:11,23
**better**   64:3,4
74:1 76:10
77:4,13 79:4
81:10 107:2
112:14
**beyond**   42:2
43:19

**bid**   16:6
**big**   34:17 67:10
74:5 88:10
101:5
**bigger**   18:16
48:2
**billion**   41:13
41:14,16 49:7
49:9 70:16
71:5 82:7
83:19 89:23,24
95:24
**billions**   82:25
104:11
**bills**   103:18
108:15
**bit**   13:25 27:24
37:9 50:1
54:15 71:6
77:2 86:9,19
87:12,14 96:16
**bitcoin**   107:14
**blame**   99:17
**block**   57:19
**blown**   107:7
**board**   76:4
**body**   44:20
77:21 92:4,17
95:4
**borders**   103:6
104:3
**bored**   48:17
**borrower**
15:13
**borrowers**
15:9,12

**bottle**   112:21
**bought**   37:6
**bowl**   75:4
**bowling**   8:22
**brand**   43:10
**breach**   35:17
36:4,9,23,23
67:17 87:7,24
88:18
**breached**   37:6
37:8,11
**break**   101:24
**brett**   8:16
11:16
**brg's**   125:22
**brian**   7:22 11:4
27:6
**brief**   39:4
55:16 96:18,21
114:6
**briefing**   51:3
**briefly**   19:16
27:17 54:9
56:24 83:18
93:7 96:15
123:17
**bring**   66:2 95:8
96:2 123:18
**bringing**   29:9
42:24 68:19
**brings**   80:18
**broad**   7:19
94:13 111:9
**brown**   9:1
11:21 22:4
67:7,10,20,23
70:10,11,15,20

70:25 71:2
86:2 100:15
**brush** 94:13
**btc** 64:16 66:18
99:22
**build** 51:5,9
**buildup** 18:15
**built** 48:8 71:6
**bulk** 70:21
**bullet** 110:9
**burden** 82:21
86:25 97:22
98:1 103:5
**burner** 40:20
**business** 17:3
17:19 20:14,19
82:19 90:23
104:12 109:13
**businesses**
82:23
**buyer** 16:5,11

**c**

**c** 6:1 10:1
18:21 21:4
129:1,1
**calendar** 28:8
**call** 62:23 79:1
79:16
**called** 94:5
111:6
**calls** 76:5
92:11
**cancel** 80:21
**canvass** 32:6
**canvassing**
23:17

**can't** 53:9
58:17 81:18
99:7,9
**capacity** 30:12
31:18 111:15
**capital** 4:22
8:10 11:12,15
13:3,18 14:5
15:7,14,22
37:21 38:3
39:14 40:7,10
44:2 45:21,22
45:25 54:1,23
59:6 60:13
101:1 126:8
**capital's** 15:24
**care** 100:21
**carry** 73:8
**case** 1:3 4:15
6:13 10:6,15
12:3 13:12
17:23 18:19
23:18,19 26:15
27:9 29:24
30:1,7,23
32:20 35:2
36:17 41:15,22
44:6 45:4
46:17 48:21
49:8 50:10,13
50:17,20 51:10
51:20 54:20
57:13,18 61:15
62:6,17,20
63:2,8,18
64:13,19 65:18
66:11,18 69:18

69:23 70:9
72:25 73:22
74:2,5,8,13,14
74:21,22,23,25
75:7,14 77:18
78:6,25 80:2,4
80:16 82:18
84:4 88:11
90:24,25 92:11
92:19 94:1
95:11 99:15
103:10,11,12
103:22 104:3,8
104:9 107:22
110:4,5,7,17
111:10,13,20
111:25 112:13
112:25 115:9
116:15 117:18
118:10 119:3
120:17,24
121:1,16
124:16,19
125:10 126:5
126:22 128:11
**case's** 124:25
125:8
**cases** 15:18
17:6 20:17
21:23 29:24
36:25 37:10
49:19 53:5
57:17,22 58:9
58:10 74:16
76:2,3 78:6
81:10 84:7
85:5 94:8,18

96:7 104:10,22
104:24 105:5
109:10,12
110:8,9 111:8
116:23,24
122:15
**cash** 16:16
17:22 18:25
66:21,22 67:7
67:8,10,11
78:16,20 79:13
**cat** 48:18
**categories**
48:16
**category** 41:4
**cause** 68:13
73:24 80:8
82:21 91:12
103:1,5,8
**caused** 45:2
69:1
**causes** 87:1
**causing** 68:12
**caution** 16:12
17:1
**caveat** 77:2
**cc** 33:8
**cede** 29:15
69:20
**ceding** 37:20
**celsius** 57:22
**centerpiece**
76:18
**centralized**
58:1
**cert** 93:9

certain 2:7
22:22 35:13
48:1 105:22
107:7 116:10
116:11 117:24
certainly 24:10
27:7 28:1 31:6
34:7 36:14
40:21,25 54:11
56:17 72:3
80:13 109:8
110:14 114:23
122:14 127:8
certified 129:3
challenged
42:21,22
challenges
65:18
challenging
122:16
chamber 71:7
chambers 22:7
22:16 29:5
30:14 33:10,13
33:15 46:12,18
46:25 61:7
62:2 115:21
127:10
chance 25:8
40:4 54:12
71:23 87:9
114:8
change 48:16
113:17
changes 12:13
chaos 29:10
108:11

chapter 3:4
10:5 14:23
15:15,18 16:15
20:17 47:14
57:17,23 64:19
65:11 69:24
74:8 75:4,7
78:11,13,16,18
78:21 82:18,23
85:5,7 86:13
90:22,25 91:1
91:3 95:11
96:10
character 77:7
characterize
90:8
characterizing
111:23
chat 35:8 52:15
52:18
chats 56:4
chief 23:19
chime 27:16
33:4
chimed 12:10
chiming 12:13
choice 62:18
62:18 66:24,24
86:8,11 90:20
92:7,15,16,17
92:18,19,20
choose 72:2
chose 86:25
chris 10:14
73:21
christopher
6:19 8:15

11:16
circle 32:9
96:12
circumscribed
73:5
circumstance
49:10
circumstances
18:19 21:15
44:13 47:24,25
105:22 117:18
118:9 119:3
120:17 125:10
126:5,22
cited 34:12
48:3
claim 2:20 3:1
38:8,9 49:7
50:12,21 52:13
57:19 106:20
claimants
10:18
claims 23:3,16
36:4,14,16,23
38:10,11,13,15
40:16 41:12
42:19,24 43:11
43:24 45:8,14
47:7,12,13,15
47:19 49:5,17
57:10,14,18,21
58:11 64:13
70:16,17 71:4
75:13 76:9,17
77:23 79:15
82:7 83:8,9
84:24 90:5,5,6

99:8 100:3,7
104:16,18
105:3 106:24
111:20
clarify 28:4
55:22
clarity 55:6
class 82:9 85:9
86:17
classes 82:8
86:14
clause 101:10
clear 33:9
35:14,15 36:22
40:5 43:22
48:10 62:1
75:18 83:12
95:25 102:13
104:23 105:16
106:22 107:5
107:19 108:12
109:11
clearly 44:14
50:3 104:20
cleary 3:14 6:3
10:9 12:22
14:15 25:5
32:12 37:24
62:9,13 115:11
119:20 121:2
client 29:3
96:16 114:9
clients 77:1
86:20 123:3
client's 96:18
97:2

**close** 27:21,24
  28:2 46:2 66:7
  69:13 89:24
  94:4,17 111:11
**closed** 16:9
  95:15
**closer** 93:25
  114:13
**closing** 24:3
  55:22
**cloud** 16:16
  17:22 18:25
**clue** 28:9
**code** 18:21
  103:9 113:2
**cohen** 3:24
  119:7,8,10,21
  120:2,4,15
  128:10
**cohen's** 119:13
  119:15
**coin** 64:17,17
**coincidentally**
  43:19
**coins** 15:13
**colin** 6:21
  10:15 26:14
  44:6
**collaboratively**
  83:4
**collateral**
  15:21 16:2
  42:23
**colleague**
  113:23
**colleagues**
  10:25 11:16,21

**come** 13:19
  32:22 60:23
  63:1 64:11
  77:12,14 80:9
  81:7 88:22
  90:13 91:13,14
  93:20 101:24
  102:2 108:15
**comes** 19:2
  34:1 72:14
**coming** 36:15
  49:13 70:12
**commence**
  58:25
**commenced**
  67:18
**comment**
  26:16 97:25
  98:6 120:12
**comments**
  20:23 32:11
  41:23 85:9
  102:13 104:6
  105:16,19
  115:15 116:3
  117:4,25
  118:18 119:9
  119:11 125:4,6
  125:25 126:17
**committed**
  66:12
**committee**
  4:16,22 5:3
  6:14 10:13
  16:23 18:2,5
  18:13 20:21,24
  25:19 26:12,12

26:15,24,25
  32:3,14 33:18
  34:13,25 44:1
  44:2,4,7,10,19
  45:5,18 54:18
  63:7,8,15,19
  64:2,22,23
  66:6,11,14
  67:4 68:1
  73:19,22 74:13
  75:12,17 78:2
  78:5,15 79:17
  81:12 98:25
  102:18 105:18
  106:22 107:1,4
  108:4,11
  115:10 122:12
  124:19 125:15
**committee's**
  107:17
**committee's**
  80:1,6 81:21
**common** 47:24
**communicati...**
  36:13 44:23
  52:16 55:10
  56:5 57:1
  103:3 106:3
**companies**
  15:9 91:2
**company** 3:19
  7:9 10:22
  20:22 26:9
  41:24 77:6
  81:3 88:4 91:2
  93:18 102:9
  117:2 128:7

**compare** 34:4
  123:1
**compared**
  47:12
**compel** 54:4
  57:7
**compensation**
  3:14,19,24 4:5
  4:10,15,21 5:2
  85:1 116:21,21
  121:12,13
  124:21 126:11
**competing**
  38:17,21,22
  66:15,19 85:20
  92:11 105:22
**complain**
  51:19 106:20
**complaint** 68:8
  68:22,25 69:3
  99:19,21
**complaints**
  99:23
**complete** 33:22
  50:10 54:6
  55:25 70:1
  72:7 124:11
**completed**
  56:12 59:16
  60:12,14
**completely**
  26:20 89:25
  90:1
**completing**
  56:15
**completion**
  61:4

complex   42:20
   43:4 50:22
   53:19 66:3
   104:9,10,17,20
   110:10 122:16
complexity
   103:12 104:8
complicated
   35:7 51:9 65:3
complications
   64:21
compromise
   3:8
concept   67:9
concern   30:15
   37:9 44:20
   68:9,24 86:21
   123:22
concerned
   68:19 92:1
concerning
   2:18,25 38:7
   38:25
concerns   28:25
   59:4 75:13
   83:18 86:23
concessions
   84:22
conclude   13:8
concluded
   80:12 121:3
   127:15
conclusion
   34:14 57:9
   77:12,14 82:15
   104:6 114:22

concrete   48:16
condition
   101:8
conditions
   104:14
conducive
   39:25
conduct   73:3
conducted
   84:25
conducting
   27:20 75:18
confer   25:13
   29:3 114:8
conference   3:7
   12:18 13:7,16
   14:4 21:25
   22:8 59:18
   60:3,19,20
   61:2,8 114:6
conferred
   26:17
confess   48:12
confidence
   110:2
confidential
   76:25
confirm   41:7
   84:2 121:10
confirmable
   44:17 45:6
   65:12 79:20
   80:25 81:14
   82:5,12 83:13
   83:16 85:3,8
   91:15,22 95:13

confirmation
   40:20,24 41:2
   41:3 42:9 48:3
   48:4,13 49:3
   65:8,24 74:9
   105:15 108:24
confirmed   49:2
   55:24 92:10
confirms   93:10
conflict   118:16
   119:5
conflicts
   120:22
confronting
   60:7
confused   40:22
confusion   31:6
connection
   118:15 120:24
   121:5
connections
   75:3
consensual
   62:24 80:9
   83:6
consensus
   80:17 95:17
consent   2:7,9
   14:19 15:24
   16:24 17:2,11
   17:21 46:8,9
consents   121:9
consequences
   34:19,23 37:12
   79:23
consider   27:7
   53:21 81:19

confirmation
   101:7,12
considerable
   17:20 29:20
consideration
   26:22 27:11
   35:8 68:16
   83:16 85:7
   96:10 108:1
considered
   102:16
considering
   66:23 86:10
consist   114:14
consistent
   18:20 21:16
   22:6 34:13
   98:13 118:11
   126:6
consisting
   23:14
constantly
   85:13
constituencies
   32:16 63:11
   107:21 108:19
   109:10
constituency
   109:3
constitutes
   16:24 73:24
constrained
   75:19
constraint
   75:25
consulted   18:5
   20:21

consummated
  77:2
contact  33:1
contemplate
  51:23
contemplated
  17:9 107:13
  120:16
contemplates
  56:14
contemplating
  61:15
contend  106:18
contested
  12:17 13:3
context  41:15
  41:22 45:11
  50:6 55:3
  100:18 105:20
  108:2 110:11
  124:5
contingencies
  111:20
contingency
  103:25 111:19
contingent
  27:11 46:17
continue  41:18
  46:4,23 61:8
  69:11 73:13
  89:13 92:1
  95:13 101:19
  107:20
continued
  20:14 93:19
continues
  68:11

continuing
  84:18 108:19
  110:17
continuously
  44:19
contours  94:11
contract  2:12
  2:14 19:7,25
  20:4,6 67:17
  87:7,24 88:18
  90:8 100:9
contrary
  108:16
contrast  58:10
contributing
  56:14
contribution
  80:18 94:10
control  57:24
  82:16 83:9
  93:21 98:16
  109:22 112:5
conversation
  22:6 34:7
  122:24 124:8
conversations
  127:8
conversion
  42:24 78:11,23
  80:5,21 81:6
converted  22:8
convictions
  111:12
cooked  95:15
copied  33:7,19
copy  12:15

core  95:11
corner  94:12
corporation
  103:4 106:3
correct  36:4
  62:8 86:15
  96:22 99:17
  110:19 111:23
  113:9,12 120:4
  126:9
correctly  88:10
corresponde...
  16:10 56:7
cost  17:23 20:4
  77:6 121:3
costs  106:2
couldn't  97:14
  127:7
could've  88:19
counsel  3:25
  4:15 12:19
  16:10,22 18:2
  20:22 22:24
  24:7,19 31:25
  33:2 34:5 40:7
  55:2 72:12
  77:19 79:21
  93:17 99:18
  116:18 119:9
  120:22 122:17
  124:19 126:24
count  31:13
  99:22
counterparty
  94:19
counterprod...
  95:13

country  129:21
counts  88:14
couple  23:13
  30:9 42:15
  58:14 69:21
  75:11 96:22
courage  111:11
course  12:2,9
  14:9 16:24
  20:11 24:1
  25:23 39:21
  46:24 50:4
  54:16 82:8
  84:1 102:19
  108:6 109:12
  109:23 110:16
  111:6 112:25
  115:1,21
court  1:1,12
  10:2,3,12,17
  10:21 11:1,6
  11:11,18,23
  12:2 13:9 14:7
  14:11,14 15:2
  15:16,25 16:16
  16:21 17:24
  18:10,12,15
  19:12,14 20:12
  21:7,9,21
  23:12 24:5,12
  24:24 26:1,7
  26:11,23 27:2
  27:7,12,14
  28:6 29:6,16
  31:4 32:17
  33:3 34:6
  36:20 37:3,22

| | | | |
|---|---|---|---|
| 38:1 39:13 | 122:11 123:23 | 109:3 | 68:1 74:13 |
| 40:13 42:13 | 124:1,5,6 | **creditors** 4:16 | 75:10,13 |
| 43:25 44:22 | 125:1,5,24 | 4:23 5:4 6:15 | **cries** 97:24 |
| 45:19 46:1,16 | 126:2,15,18 | 9:2 10:13 18:1 | 98:6 |
| 46:21 47:9,18 | 127:3 | 32:15 34:2 | **crisis** 81:2,7 |
| 47:21 49:6,20 | **court's** 16:25 | 36:8 41:24 | **critical** 17:5 |
| 50:12,24,24 | 18:3 112:15 | 42:4,12 44:13 | 20:13 66:5 |
| 51:3,6,16 52:7 | 113:4 121:22 | 44:15,18,18 | 79:4 105:5 |
| 53:3,23 54:11 | 123:18 | 45:2 47:4 | **criticism** 46:25 |
| 54:14,17 55:2 | **courts** 111:10 | 50:17 57:13 | **criticize** 99:19 |
| 55:14 56:21,24 | **covenants** | 62:18 63:1,3,4 | **cromwell** 7:17 |
| 57:5 58:12,14 | 68:16 89:21 | 63:6,8,11 64:6 | 11:4 27:6 |
| 61:10,23 62:3 | 90:1,3,10 | 65:1 66:3,19 | **cross** 23:25 |
| 62:11 64:12 | 100:20 | 66:24 67:1,25 | 24:6 114:17 |
| 65:4 71:14,17 | **cover** 56:11 | 68:7,17,24 | **crossover** |
| 72:11,20 73:18 | 97:24 121:18 | 71:22,24 73:16 | 70:24 |
| 81:23 85:24 | **cram** 86:13,16 | 74:19,21 76:24 | **crucial** 112:3 |
| 93:9,10,11,14 | 92:3,6 | 77:21 78:1 | **crypto** 36:24 |
| 94:2 96:8,11 | **create** 74:19 | 79:5 80:11 | 77:22 78:16 |
| 96:15,24 97:1 | 99:10,11 | 81:4 82:16,25 | 79:13 83:1 |
| 97:21 101:6,22 | 101:13,14 | 83:9,15,17 | **cryptocurrency** |
| 102:5,5,15,25 | **created** 52:12 | 85:4,11,11,13 | 15:9 51:1 |
| 103:3 104:4,6 | 52:14 98:20 | 85:19,21 86:7 | 110:8 |
| 105:21 106:12 | **creates** 55:10 | 86:10 91:4,7 | **currency** 8:2 |
| 107:23,24 | **credit** 16:6 | 91:24 92:8,14 | 11:7,10 65:2 |
| 109:9 110:19 | 89:22 | 92:17,24 94:14 | 83:1,20 94:6 |
| 110:20,25 | **credited** 84:21 | 95:6,8,14,17 | **current** 47:11 |
| 111:6 113:12 | **creditor** 17:17 | 95:20 96:9 | 104:14 105:23 |
| 113:16,20,22 | 41:20 44:20 | 98:12,15,19 | 106:25 |
| 113:25 114:11 | 63:10 74:12,17 | 99:5,8 102:12 | **currently** |
| 115:3,5 116:1 | 75:5,20 76:16 | 102:18 103:21 | 19:18 25:21 |
| 116:16 117:9 | 77:21 78:9,20 | 103:24 107:8,9 | 57:19 74:2 |
| 117:14 118:3,6 | 80:20 90:5 | 109:6 110:13 | 107:11 108:25 |
| 118:21,24 | 92:3,16 93:21 | **creditors'** | **custom** 8:21 |
| 119:17,25 | 95:4,12 98:22 | 63:15,19 64:2 | **customer** 82:9 |
| 120:8,11 | 99:1 103:15 | 64:21,23 66:6 | **customers** |
| 121:19,24 | 105:24 108:10 | 66:11,14 67:4 | 29:21 31:17 |

[customers - debtors] Page 14

32:1
**cut** 90:4 96:2
**cynic** 79:19

**d**

**d** 7:22 10:1
102:24 103:1
128:1
**dark** 72:1
**data** 35:17
36:4,22,23
37:6,11
**data's** 37:8
**date** 15:7 16:21
29:10 41:18
42:3 45:7
46:12 56:20
57:3 59:14
60:2,9,12 61:8
61:17,17,20
79:14,15 84:15
84:21 113:14
113:15 114:7
114:10 117:17
129:25
**dates** 28:10
29:8 56:13
61:14 113:17
**day** 28:24 29:1
39:18 43:20
46:21 48:8
49:20 54:8
62:20 63:5
75:12 77:3
79:19 93:1
98:11 99:14
113:10 114:22
114:23,23

**days** 22:13
26:6 31:4
59:17,25 74:5
75:20 80:13,15
81:16,18
102:23 104:5
111:22 112:19
112:24,24
113:1
**dc** 75:17
**dcf** 76:7
**dcg** 20:22 52:2
52:2,5 53:16
55:20,24 56:14
57:7 62:19,19
62:22 63:11
68:10,17,23
69:10 75:3,5,8
75:10,14,15,18
76:13,17,19
77:5,8 78:19
79:3,6,15
80:17,23,25
82:5,11 83:5,7
83:14,19 84:12
84:16,23 87:17
87:22 88:15
89:7,20,22
90:5 91:18,21
92:3,7,21,23
93:6 94:10,19
94:22 95:1,9
96:14 97:18
98:11,23 99:7
99:9 100:9,10
100:11,24,25
104:19 105:12

106:14,17
107:1
**de** 2:10
**deadline** 56:1
**deadlines**
69:18
**deal** 11:19
13:16 26:4
44:12 59:5
62:22,24 63:3
63:20,22,22,23
64:2,4,5,7,22
65:24,25 66:1
67:9 78:20,22
79:1,2,2,6 81:1
81:1 86:2,14
86:22 88:15,16
89:16 90:4,10
90:11,15 91:10
91:20 92:9,12
92:18 93:23,25
94:5,11,13
95:21 96:2
97:20 98:18,21
98:24 99:2,2
101:5 102:10
102:14 105:17
106:16 107:4
107:12 111:7
111:13 112:19
114:2
**dealing** 13:18
**dealings** 88:2
**deals** 90:11
95:16 107:5,6
109:17 112:13

**dealt** 47:6
**debate** 40:18
65:11 110:20
**debt** 41:25
56:16 68:13,14
100:20
**debtor** 1:9
15:17 17:4
19:19 22:23
26:21 27:20
32:2,2 54:20
76:2 80:24
82:19 88:4
90:22,24
102:12 103:6
103:19,20,22
108:21,23
110:12
**debtor's** 3:15
17:5 50:7,21
54:4 75:14
92:4 93:19
96:4 98:1,25
102:5,16,21,25
103:18 116:18
**debtors** 2:5,6,7
2:9,13,18,19
2:23,24,25 3:8
3:11 4:1 6:4
7:18 10:7,10
11:2,5 12:19
14:16,19,23
15:7,23 16:14
16:18,22,23
17:3,4,10,12
17:15,19,20
18:5,22 19:18

19:21 20:6,11
20:14,18 21:4
22:1,22 23:19
25:6,11,19
32:13 33:18
35:1 37:24
38:8,9,18,23
39:9 40:18
41:15 42:11,25
43:15 44:3,9
45:17 47:3,8
47:13,18 49:22
51:14,15 52:1
52:5,13,22
53:1,5,25
55:10 57:2
62:14 63:2,3
64:1 66:12
67:4 74:9,18
75:2,6,10,17
76:6,10 80:15
80:22 81:8
82:5,20,23
83:3,5,12 84:5
84:11,23 85:15
85:19 86:23
87:18,20,23
88:12 89:6
90:8,14 91:10
91:13 92:12,15
94:4,7 95:1,2
95:16 96:1,9
97:18 98:10
102:12,13,22
103:13 104:25
105:5,11,13
106:16 107:1,9

107:19 108:8
108:15,17,18
109:3,5,21,24
110:16,22,22
111:4,15
112:16 115:8
117:23 118:15
119:8 120:21
120:22 121:10
122:4 126:24
**debtors'** 83:2
104:10,12
105:2
**debts** 107:14
**decade** 122:22
**december**
49:24 59:19
**decide** 52:19
92:8
**decision** 31:2
43:6 58:18
101:25 103:2
104:1
**declaration**
19:9,11,13,15
23:23 114:16
**declarations**
14:21,25 15:3
53:17,18
**deeply** 50:22
**defend** 97:2
**defenses** 59:10
**defer** 27:12
35:24 36:2
**defined** 103:9
**definitive**
94:12 100:21

105:14
**degree** 55:9
**delaware** 15:16
27:9
**delay** 43:22
45:15 58:6
92:2 93:13
**delayed** 90:14
**delivery** 18:16
**demands** 93:8
103:24 110:14
**demerits** 97:12
**demonstrate**
65:9 82:21
108:21
**demonstrated**
69:7 103:19
108:17
**denial** 108:9
**denominating**
77:23 107:14
**department**
8:19 37:7
**depend** 48:13
**depending**
32:25
**depose** 52:8
55:12 57:3
**deposed** 52:17
59:2
**deposing** 53:12
59:18
**deposition**
22:14 24:2
52:5
**depositions**
51:23 55:7,8

60:16
**derail** 112:9
**described** 16:3
69:7 94:11
**describing**
84:25
**deserve** 44:19
57:13 85:6
95:10
**deserves** 80:11
**designed** 53:9
**desire** 65:3
75:20
**desperately**
84:8
**despite** 43:15
75:3 76:15
**destiny** 82:17
98:16
**detailed** 79:17
**details** 86:5
94:14 116:11
**determine**
25:18 46:9
58:20 85:22
94:9 103:15
107:25 110:19
110:21
**determined**
20:18 103:9
107:4 122:7
**determining**
74:12
**detriment** 73:6
**devalued** 93:24
**developed**
76:10

development
  84:6
developments
  105:13
devil 94:14
dgc 110:23
dgc's 107:10
di 16:20
didn't 68:21
  69:4 86:24
  100:17 107:11
  107:15
died 62:25
  106:11
diers 7:14
  10:25
difference 50:6
  112:24
differences
  44:16 67:10
different 33:5
  47:5,8,11,17
  56:17 64:18
  69:25 71:9
  94:21 97:7
  111:13 114:19
difficult 58:20
  59:12 110:10
digital 8:2 11:6
  11:9 65:2 94:6
  99:22,24
  104:12,15
diligence 111:9
diminution
  16:2
dip 15:19,20
  16:4,7,10 17:8

17:22
diplomacy
  81:18
direct 23:24
  98:21,22
  114:17
direction 62:1
directions
  80:20
disagreement
  44:15 45:5
  77:23 100:6
disagreements
  45:1,10 74:18
  74:20 77:18
disagrees
  110:7
disappeared
  114:1
disappointed
  43:18
disclose 95:18
  119:23
disclosed 84:10
  94:15
disclosure 3:5
  78:14
discount 84:16
  87:21
discounts
  123:3
discovered
  51:22
discovery 22:6
  25:12 26:16,18
  26:19 43:7,14
  44:9 45:3

49:16,20 51:4
  51:10,12,17
  55:24 58:4,4,6
  58:22,25 59:15
  59:24 60:17,21
  61:9
discreet 42:22
discretion
  103:3
discuss 29:12
  32:16 123:5
discussed
  44:24 106:6
  121:2
discussing
  35:18,22 38:14
  59:7
discussion
  18:24 32:14
  54:17 65:6
  92:4 123:8,10
  123:12 124:4
discussions
  23:3 38:16,25
  57:6 69:7
  90:17 105:7
  115:16 124:6
dispute 39:10
  76:16 100:3
disputes 38:6
  57:4 105:24
disrupted 69:1
dissatisfaction
  74:17
disseminate
  33:17

dissuade 53:3
distance 95:9
distinct 71:2
distributable
  41:16 74:19,20
distribute 52:3
  74:20 79:5
distributes
  78:20 79:13
distribution
  47:4 48:5 49:5
  64:20 66:5
  73:14 77:19
  78:2 80:19
  81:5
distributions
  41:19 42:3
  49:4 50:9
  56:12,17,19
  65:1 75:21
  77:7 78:17,18
  89:15
district 1:2
  10:4 15:16
  49:20 106:4
distrust 75:11
divergence
  66:9
doc 2:3,5,12,17
  2:22 3:3,7,13
  3:18,23 4:4,9
  4:14,20 5:1
docket 18:3
  31:10 36:7
  47:15 83:23
  115:13,20
  117:3,22

118:13 119:7
119:14 124:20
125:15 126:10
**document**
22:12 25:6
43:17 52:1,1
54:22 56:2
57:4 60:12,14
**documentation**
72:6 105:14
**documents**
22:11 25:9,10
25:17,19 43:16
51:13,22 52:3
52:4,10 53:25
54:7 55:23
56:6 57:7 59:1
59:17 66:2
73:14 76:5,25
77:15 94:12
100:22
**doesn't** 51:20
54:21 59:25
67:11 70:14
73:2 89:4
97:24 106:17
107:16
**doing** 13:22
24:15,15 35:20
79:23 94:20
110:20 119:22
**dollar** 49:7
64:15 66:18
99:25 100:4
**dollars** 41:14
90:7 100:10,11
104:11

**dollars'** 83:1
**don't** 48:23
49:4 52:9,10
53:3,9 54:25
58:16 59:23
61:19 63:20
66:20 67:13
70:4,17 71:4
78:9 79:22
80:9 81:11
89:9 90:22
91:5 96:15,17
97:1,7,21 99:3
99:17,25 100:5
100:8 105:17
107:11 110:16
112:23 123:15
127:1
**doomsday** 78:8
**door** 42:12
**doors** 95:15
**dorsey** 27:9
**doubt** 80:10
111:17
**downpayments**
69:10
**dozen** 52:16
**draft** 78:14
**dragging**
105:25
**dramatic** 41:19
**drawn** 45:3
**driven** 74:16
**driving** 27:22
**dropping** 46:2
**due** 48:25
57:13 83:21

87:6 103:18
108:5,15 111:9
118:15
**duplicative**
26:20 54:19
70:18
**dustin** 7:15
10:25
**duties** 98:13

**e**

**e** 1:21,21 6:1,1
10:1,1 128:1
129:1
**earlier** 25:7
27:19 47:6
54:18
**early** 20:3
22:15 27:8
**earn** 75:10
**earnest** 38:14
**earnestly** 47:20
**earth** 90:9
**easy** 31:3 65:14
**ebanks** 29:7
61:18
**ecf** 14:20 16:16
19:8 102:6,8,9
102:11,17,19
102:22
**echo** 71:7 86:3
**echoing** 82:3
**economic** 30:1
83:18 109:18
111:14
**economics** 79:4
86:24 112:12

**ecro** 1:25
**effect** 41:20
**effective** 17:24
41:18 42:3
56:20 79:14,15
84:15,21
**effectively**
39:10
**effectiveness**
27:11 42:10
**efficient** 13:21
17:23 24:16
43:23 121:4
**effort** 36:9
83:6
**efforts** 37:13
63:14 93:23
**ego** 84:24
**eight** 43:14
70:24 75:16
93:4 103:22
**either** 22:16
33:18 36:16
41:2 59:4,23
83:7 112:22
124:22 125:18
126:13
**elapsed** 103:22
110:3
**eleven** 7:3
**elicit** 97:11
**eligible** 91:3
**email** 30:14
33:16 34:1,21
**emails** 29:21
30:3 31:9,13
31:17,24 41:23

74:25 76:4
**embodying**
39:7
**employed**
19:18
**employee** 2:15
**employees** 19:8
19:17 20:2,3,7
20:13 55:20
**employment**
19:22 20:7,15
**endeavor**
33:25
**ends** 60:21
112:7
**enforcement**
3:25 119:8
**engage** 98:21
107:21
**engaged** 15:8
69:7 104:25
**enhance** 17:6
**enormous**
102:1
**ensure** 95:21
**enter** 2:13
18:10 19:7,24
20:5,7 21:7
115:24 117:7
118:2,19
119:14
**entered** 27:9
**entire** 69:18
98:17
**entirely** 44:10
58:24 84:22
87:19

**entirety** 46:18
**entities** 109:13
**entitled** 54:21
65:21
**entity** 19:19
**entry** 2:6,18,24
3:10 45:15
46:8 77:7
**enumerated**
103:10 109:1
**envision** 23:13
**equilibrium**
80:3,16
**equitable** 78:2
**erin** 7:14 10:25
**essentially**
23:19 30:25
89:6 91:1
108:8 110:15
**estate** 19:1
57:11,18 63:22
65:21 76:23
83:9,9 87:18
89:3,7 90:6
95:2 109:25
112:4 120:6
**estates** 66:20
88:2 90:4
**estates'** 71:11
**estate's** 71:22
83:8 84:24
**estimate** 105:3
**estimating**
47:15
**estimation**
40:19 57:20

**ethereum**
107:15
**evaluate**
111:16
**event** 19:2 45:6
114:21
**eventually**
63:17
**everybody**
81:17 88:5
91:6 99:11
113:1
**everybody's**
114:14
**everyone's**
104:23
**evidence** 19:13
76:10
**evidentiary**
22:9,21 24:17
24:20 28:17
38:14 42:7
51:21 114:8
**evolving**
104:14
**exact** 28:10
**exactly** 30:22
32:21 41:11
49:1 78:10,10
97:17 124:3,10
**examination**
114:18
**examine** 23:25
**example** 13:18
32:5 34:12
66:5 70:8
122:18

**excellent**
122:17
**except** 82:8
119:19
**excess** 41:12,14
**exchange** 50:4
**exchanged**
59:1
**exchanges**
43:12
**exclusive** 62:15
62:16 83:13
102:21,23
103:1
**exclusivities**
108:20
**exclusivity** 3:3
3:4 12:18 13:2
13:12,19,19,22
14:5 62:5,10
64:10 65:7,9
65:17,22 73:23
74:3,7,10,15
74:23 77:18
80:1,7,8,12
81:16 82:22
87:2 90:21
92:1 93:20
95:3 96:9 97:3
97:20 101:18
101:23 102:6
103:2,6,8,23
104:1,5,25
105:20 107:17
109:2,22 110:5
110:13 111:1
111:24 112:3,8

112:8,16 113:3
113:4 128:5
**exercising**
69:11
**exist** 59:4
109:17
**existence**
103:16 106:7
**existential** 81:2
81:6
**existing** 70:18
100:16
**exists** 86:20
103:25 111:19
**exit** 45:7 95:5
**expect** 44:21
114:14
**expectations**
77:5
**expecting**
94:21
**expedite** 25:22
**expedited**
27:19 53:2
**expeditiously**
22:20 85:20
**expended**
17:20
**expenses** 3:16
3:21 4:2,7,12
4:17,24 5:5
115:18 117:13
124:21,24
125:16 126:11
**experience**
74:8

**experienced**
104:13
**expert** 53:18
58:4 59:22
**experts** 53:21
**explained** 95:6
104:2
**explaining**
29:25
**explanations**
116:8
**expressed**
44:15,23
**expressions**
75:2
**extend** 3:3
62:15 65:16
80:8 82:22
84:14 102:25
103:2 104:1
**extended** 39:5
80:3 94:3
**extending** 87:2
108:20
**extension** 13:2
64:10 65:9,22
73:23 74:3
81:15 101:18
102:6,21,23
103:8,23 104:4
104:24 110:5
110:13 111:22
112:17 113:10
128:5
**extensions**
94:23 105:20
113:3

**extensive** 51:12
67:13 106:23
**extent** 31:20
35:21 65:22
69:14 75:9
107:23 114:19
127:8
**extra** 106:2
**eye** 98:3

**f**

**f** 1:21 129:1
**face** 89:19
**faced** 47:18
64:21,22 95:3
**facilitated** 63:9
**facilities** 17:22
41:25
**facility** 88:8,8
88:9
**facing** 57:16,19
105:1
**fact** 50:22
53:16 55:7
56:1 59:11,15
59:24 66:25
67:17 74:22
76:2,18 83:21
98:20 99:21
103:17 104:2
108:15
**factor** 54:17
58:17 77:17
104:22 110:12
111:18
**factors** 23:18
65:4 73:23
74:3,16 77:9

103:10 104:7
106:5 108:14
109:1
**facts** 18:18
19:17 21:15
23:3,6 43:3
52:22,24 54:15
74:22 99:20,20
117:18 118:8
119:2 120:16
125:9 126:5,22
**factually** 42:20
**fair** 11:19 26:4
83:7,14 86:2
102:10,14
111:7,13
**fairly** 28:8
**faith** 93:23
97:19 103:16
106:7
**fall** 107:24
**falls** 41:4
**familiar** 22:25
23:6
**far** 28:5 57:5
57:12 59:13
80:9 88:1
89:21 112:14
112:14
**fas** 76:6
**fashion** 13:22
**fast** 51:7
**fate** 74:12
**favor** 17:22
46:1 84:13
**february** 62:23
64:4 107:11,15

124:21 125:17
126:11
**federal**  3:9
**fee**  3:16,20 4:1
4:6,12,17,23
5:4 13:8,20
14:6 67:12
84:20 87:16,25
114:5 115:7,12
115:17 116:7
116:17,18
117:12,21
118:9,13
119:13,15
120:2,23 121:4
121:6,7,14,14
121:16,18
122:5,6,6,8,9
122:20 123:19
123:20,24
124:17,18,25
125:4,7,9,13
125:23 126:3,6
126:14,21,23
128:6
**feel**  22:18
24:16 77:3
127:10
**feels**  76:12
**fees**  67:12
68:16 84:5
87:10,13 88:7
89:21 99:22,24
99:25 100:3
113:8 116:10
116:15,19
118:17 120:24

121:5,11,12,18
122:15 124:6,7
124:21,24
125:16,20
126:11
**fi**  57:19
**fiduciaries**
63:22 66:11
71:11 72:3
98:25 111:16
**fiduciary**  63:8
63:18 66:17
71:22 76:23
98:13 99:1
108:12 109:24
109:25
**fifth**  8:3
**fight**  81:4
**fighting**  44:12
80:20
**figure**  31:3,18
32:6,7 50:16
59:12,20 60:3
61:3
**figures**  89:15
**file**  14:22 15:12
15:13 16:4
17:5,7,13 21:4
38:8 60:23
62:16 68:21
70:6 90:9 91:9
109:13 120:23
121:14,16
122:4,8,8
**filed**  12:16
14:20,20 15:15
18:10 19:8

21:7 22:1,3
25:4 26:2 30:4
35:5 38:10,17
39:6,18,21,22
41:13 43:10,19
46:13,14 47:16
55:19,21 57:21
57:25 58:15
62:20 69:4,4
70:18 83:12,24
87:8 99:14
102:7 104:22
106:10,11
108:5 109:15
115:13,20
117:2 118:13
119:7,13 122:5
**files**  121:7
**filing**  3:4 30:14
38:12 39:21
49:16 65:10
66:19 68:6,8
68:12 69:16
74:9 84:6
90:15 103:19
108:18,22
121:4,5
**filling**  62:2
**final**  77:8
121:7,16
**finalize**  66:4
73:15
**finalizing**
69:13
**finally**  38:15
122:3

**financial**  5:3
14:24 76:5
79:22 85:5
91:1,2 117:22
118:14 125:14
**financing**
15:17,19 17:5,7
17:13
**find**  18:20
28:16 58:19
**finds**  104:4
**fine**  14:2 29:6
38:1 68:4 70:7
112:21 114:11
121:24
**finer**  94:14
**finish**  28:24
54:14 68:3
72:6 73:9
114:23
**finished**  73:12
**fire**  39:24
**firm**  123:1,2
**first**  3:13,18,23
4:4,9,14,20 5:1
14:18 16:13
18:24 25:7
42:19 51:12
53:6 54:14
60:24 62:20
75:20 80:8
91:16 94:1
99:14 102:21
104:8 107:9
115:11,12
116:3 117:21
118:13 119:15

120:2,15,21
122:6 124:18
124:18 125:8
125:13,22
126:6,21
**fits** 40:23 41:5
48:21
**five** 43:12 55:7
71:3 86:14
101:24 103:18
**flexible** 60:6
**flip** 86:9
**fly** 32:8
**focus** 47:2,5
50:20 69:2
74:24 96:23
106:15 112:12
**focused** 47:3
72:4
**focuses** 53:19
**fold** 80:7
**folks** 12:5
24:16 28:20,23
29:1,21 30:11
30:11 31:17
32:10 34:9,10
34:17,22 35:15
35:20 39:23
46:17 51:6
52:7 59:18
60:11 101:5
109:15
**follow** 109:15
**followed** 14:5
**following** 24:1
29:5 36:5 38:6
77:7 102:16

115:16 117:25
118:18 119:9
**footnote** 84:4
**forbearance**
84:20
**force** 64:5
68:10 99:7,9
**forces** 80:3
**forebear** 84:12
**foregoing**
129:3
**foremost** 91:17
**forget** 29:17
**form** 78:9
89:24 107:6
**formal** 18:7
20:25 43:13
**formally** 49:11
124:23 125:18
126:13
**formed** 79:8
88:25
**former** 63:13
**formulate**
47:20 83:15
**forth** 12:16
21:13 49:15
121:25
**fortunately**
90:16
**forum** 35:23
58:1
**forward** 16:17
17:18,24 18:23
20:6 34:10
48:11 49:18
53:1,4,6 60:18

62:4 67:1
71:23 76:21
85:20,21,22
86:5 91:3
92:13,14,24
105:8 107:3
109:8 112:13
121:13
**found** 76:9
124:19 125:15
126:10
**four** 28:21
42:21 50:7
53:16 83:22
86:14 87:19
94:9 100:10,11
103:17
**fractions** 81:5
**fragile** 105:23
**framework**
83:6
**frankly** 24:19
89:9 98:16
101:11 112:19
112:24
**fraud** 82:25
84:24 94:22
**free** 84:19
108:10 127:10
**frelinghuysen**
7:13 10:23,24
26:8,9 93:16
93:17
**friday** 22:17
26:18 38:11
39:18 43:11

**friends** 39:17
**frivolous** 50:15
**front** 34:24
40:3,20 49:13
58:16
**froze** 83:3
**fruitful** 68:23
**frustrated**
98:16
**fsp** 15:19,23,23
16:5,8
**ftx** 3:7,10 7:18
11:2,4 13:7,16
14:4 21:25
22:2 23:1
24:25 25:5
27:3,4,6 29:13
29:14 40:18
41:4,12 47:6
47:12,15,18
49:6,7 53:8
57:22 104:18
104:25 105:3,6
106:14,19,20
106:24 107:1
110:22 111:21
114:6 118:15
**ftx's** 105:1
**fuel** 39:24
**full** 25:18 28:8
30:17 76:1
96:1,7 99:9
107:7
**fully** 44:8
45:18 52:9
105:17

| | | | |
|---|---|---|---|
| **fulsome** 57:14 | **gemini's** 34:5 | 116:18 118:10 | 17:18,24 18:23 |
| **fund** 15:17 | **gemini's** 95:25 | 122:16 127:8 | 25:9 30:24 |
| **fundamentally** | **general** 23:13 | **giving** 90:14 | 32:20 33:4 |
| 44:18 | 77:21 120:25 | 123:5 | 34:9,13,15 |
| **funds** 42:11 | **generally** | **glance** 25:8 | 41:1,11,22 |
| **further** 16:3,21 | 18:22 116:14 | **glenn** 104:2 | 43:12 45:9 |
| 25:10 45:7,9 | 123:23 | **glitch** 25:20 | 47:22,25 48:9 |
| 81:20 82:22 | **genesis** 1:7 3:8 | 28:17 | 48:13 49:2,15 |
| 107:3 109:8,22 | 10:5 15:7,14 | **global** 1:7 10:5 | 50:3 51:8 |
| 111:21 112:7 | 15:21,22,23 | 15:7,14,22,24 | 54:12 59:8,9 |
| 118:5 119:19 | 16:2,8 19:18 | 19:18,20,23,23 | 60:11,13,18 |
| 121:21 127:1 | 19:20,23,23 | 20:22 79:1,2 | 61:17 74:2 |
| **furthermore** | 20:22 36:23,25 | 79:11,12 80:5 | 76:21 78:12 |
| 22:24 23:4 | 53:16 102:8 | 80:9,17 81:9 | 79:7,10,11 |
| **future** 34:7 | **genesis'** 94:23 | 112:6 | 81:19 86:7 |
| 48:8 121:11,15 | **gerber** 103:11 | **glueckstein** | 90:2,10,22 |
| 121:17,18 | **getting** 28:25 | 7:22 11:3,4 | 92:6,22,23 |
| 123:10 | 29:10,20 40:1 | 27:5,6 | 96:18 97:10,11 |
| | 40:15 53:25 | **go** 12:4 13:1,1 | 97:12 99:19 |
| **g** | 59:17 61:15 | 13:11 25:9 | 100:21,23,24 |
| | 81:10 88:3 | 33:13 36:20 | 101:7 102:2 |
| **g** 10:1 | 116:10 121:1 | 42:11 49:7 | 112:1,23,24 |
| **gain** 110:2 | **ggp** 83:20,20 | 59:20 61:4,13 | 120:6 121:12 |
| **gaining** 95:17 | **gift** 88:3 | 67:1 71:9 | 123:17 |
| **gemini** 7:9 | **give** 28:13 | 79:11 81:10,14 | **goldberg** 8:14 |
| 10:21 22:5 | 54:12 60:22 | 86:5 88:2 | 11:13,14 40:8 |
| 23:7 26:9 28:2 | 61:10 62:18 | 90:23 95:9 | 40:9 43:2 |
| 32:23 33:19 | 64:6 86:7,10 | 97:8,17 112:13 | 45:23,24 46:5 |
| 63:15,21 64:24 | 88:16 92:16 | 112:23 114:5 | 46:20,24 48:22 |
| 67:24 70:8,11 | 96:18 113:17 | 116:6 | 50:5,19 51:11 |
| 70:13,14,19 | 113:25 123:21 | **goal** 62:18 | 51:25 52:9 |
| 82:9 83:5 | **given** 26:6 | 64:25 69:17 | 53:13 54:6,25 |
| 93:18,18,19 | 38:20 47:12 | **goals** 48:24 | 55:5,23 56:12 |
| 94:21,25 95:6 | 50:3 72:15 | **goes** 40:25 | 56:22,25 58:13 |
| 95:15,23 96:1 | 77:21 78:7 | 71:23 90:20 | 61:7,23,25 |
| 96:3,6,6 99:9 | 79:3 83:15 | **going** 12:9,9 | **goldberg's** |
| 100:19 102:9 | 101:15 105:12 | 13:12 16:17 | 56:3 |
| 102:14 | | | |

**goldfish** 75:4
**good** 10:2,8,12
  10:14,17,19,21
  10:23 11:1,3,6
  11:8,11,13,18
  11:20,23,25
  12:2 14:13,14
  27:5 29:19
  37:16,23 39:25
  44:12 62:12
  86:1 93:2,5,16
  93:22 97:19
  100:1 103:16
  106:7 127:12
**gotcha** 113:19
**gotschal** 96:14
**gotshal** 8:1
  11:9
**gotten** 31:13
  53:7 55:25
**gottlieb** 3:14
  6:3 10:9 12:22
  14:15 25:5
  32:13 37:24
  62:13 115:12
  121:2
**grand** 41:5
**grant** 15:20
  17:24 18:18
  19:3 21:13
  112:17 116:21
  122:3 125:8
  126:5,20
**granted** 16:15
  39:12 65:22
  81:16 102:20
  104:25 128:5,6

**granting** 2:15
  17:2 111:22
  116:20
**gravitas** 82:4
**gravity** 80:3
**great** 14:7
  21:22 33:24
  38:2
**greater** 93:20
**greatest** 64:20
**green** 8:22
**greg** 116:4
  123:16
**ground** 51:10
**group** 5:2 7:2
  8:2 9:2 10:18
  10:20 11:7,10
  11:18,19 22:4
  22:5,15,18,24
  22:25 23:25
  25:3 26:4 32:4
  34:25 62:22
  63:15,21 64:5
  64:24 67:7,23
  68:1 70:10,11
  70:16,21,22,23
  70:25 71:1,3
  73:6 82:2,6
  83:4,19 84:3,8
  86:2,5,20
  88:25 91:23
  94:6 95:4,6
  100:16 102:8
  102:11,14
  103:6 111:7,13
  125:14 128:12

**groups** 28:2
  32:4 33:1
  69:25
**group's** 67:11
  67:20,20
**guaranteed**
  46:22
**guess** 33:11
  35:21 36:11
  40:22 49:24
  54:21 62:14
  122:19 123:16
  124:3
**guessing** 97:9
**guidance** 34:9
  34:22 35:15
**guidelines**
  123:19
**guidepost**
  43:23

**h**

**h** 1:22
**half** 49:25
  60:17 78:10,10
  100:10,11
**hamilton** 3:15
  6:3 8:21 10:9
  14:16 115:12
**hand** 21:20
  48:25 63:7,7
  66:12,12 73:2
  79:14
**handle** 30:8
  50:16 113:24
**handled** 13:6
  18:25

**handling** 31:19
  62:9
**happen** 51:4
  59:1,8,9 79:3,7
**happened**
  49:17
**happens** 35:1
  41:8 48:4,4
  102:19
**happy** 18:18
  19:3,14 21:12
  24:9,19 46:14
  88:6 115:23
  117:16 120:13
  120:13 125:8
  127:11
**harbor** 50:25
  53:19
**harbors** 43:5
**hard** 44:11
  67:21
**hardest** 101:13
**harm** 45:2
**harris** 8:15
  11:16
**hashana** 28:12
**hasn't** 64:11
  79:22 88:20
**hassle** 102:1
**haven't** 49:11
  58:16 65:5
  78:7 99:18
**head** 21:12
  61:19
**headed** 86:21
**headline** 30:19

**heads** 123:5
**hear** 21:12
22:20 24:24
26:1,11 29:11
37:24 38:1
39:13 40:7
42:14 44:1,1,3
44:19 45:20,21
55:15 73:10,19
77:13 81:23
85:9,13 93:14
97:21,23 98:4
106:6 116:8
**heard** 18:17
19:12 21:10
24:25 27:15
30:23 38:6
40:4 42:17
43:20 45:20
46:13 54:18
55:18 60:22
65:15,16 85:6
96:12 98:15
101:23 116:17
117:15 118:7
120:1 126:3,19
**hearing** 2:1,1,3
2:5,12,17,22
3:3,7,13,18,23
4:4,9,14,20 5:1
10:4 12:3,12
15:4 18:17,25
19:14 22:9,21
23:9,14,15,22
24:4,7,15,20
24:22,25 25:16
25:21,23 26:6

26:22 27:19,23
28:15,20 29:5
38:15,24 39:11
42:8 43:1 44:9
44:22 45:3,13
46:9,12 49:3
49:14 51:21
58:5 60:4
61:17 65:8
71:15 72:13,15
72:21,22 73:1
73:3,9,20,25
74:6,7,10,23
76:18 77:18
83:25 85:10
93:22 97:7,15
105:7,9 111:24
114:7,8,14
117:16 119:1
122:17 126:20
127:6
**hearings** 46:22
73:4 105:4
**heath** 120:3
**heep** 64:16
66:18
**held** 41:25 68:6
69:2 76:5
**help** 73:7,7
91:10
**helpful** 35:14
59:7 60:21
61:11 66:19
86:18 91:25
114:20
**helpfully** 62:6

**here's** 51:17
**he's** 56:13 86:7
86:10 98:5
**high** 53:4 55:9
68:15 89:20
106:21
**highest** 122:25
123:1
**highlight** 47:10
**highly** 53:20
**historic** 52:22
**historically**
20:1
**history** 94:18
**hit** 34:2
**hobson's** 92:17
**hoc** 7:2 9:2
10:18,20 22:4
22:15,18,24,25
23:25 25:3
28:2 32:4
34:25 62:22
63:15,21 64:5
64:23 67:19,25
70:22,23,25
82:2,6 83:4,19
84:3,8 95:4
102:8 108:4
**hold** 21:25
58:5 68:8
69:11 70:16
71:3,4,5 122:7
**holdback**
116:22,22
**holdco** 1:7 2:13
10:5 19:6,23
19:24 20:2,8,8

**holders** 32:23
**holding** 12:12
**holdings** 77:22
**hole** 97:8
**holidays** 28:10
**holistic** 124:9
**hon** 1:22
**honor** 10:8,14
10:19,23 11:3
11:8,13,20,25
12:21,23 14:2
14:9,13,21
15:1,6 16:13
16:15 17:18
18:9,14 19:5
19:16 21:2,6
21:19,24 22:9
22:16,20 23:8
23:21 24:9,9
24:23 25:1,24
26:3,8,14 27:1
27:5,11,17
29:2,3,14
32:12,19 33:25
35:24 36:1,3
37:19,23 38:2
38:6,12,19,21
40:8,11 41:10
41:22,23 42:16
42:18 43:9,18
44:5,25 45:7
45:23 46:6,7,8
46:11,20,24,25
47:2,5 48:22
48:24 49:1
50:10,19 51:11
51:25 52:10,21

53:2,14 54:2,9
55:1,5,16
56:11,22,25
57:9 58:3,8,9
58:13 61:6,22
61:25 62:9,12
62:17 66:15
68:21 69:3,23
70:1,21 71:19
72:5,17 73:11
73:21,25 74:25
81:21,25 82:14
85:23 86:1
93:16 96:13,20
97:2,14 98:9
98:18 99:5,12
100:2 101:17
113:9 114:4,7
114:10 115:1
115:11,13,23
115:24 116:4
116:11 117:1,7
117:11,20
118:1,5,12,19
118:23 119:6
119:14,19
120:3,19,21
121:10,21,23
122:2 123:15
124:15,17,20
124:24 125:3
125:12,21
126:1,9,13,17
127:2,14
**honor's** 78:12
**hoo** 6:11 10:11
14:15

**hopeful** 90:18
92:25
**hoping** 27:21
27:23
**houlihan** 4:21
126:8,14
128:13
**hour** 98:11
**hourly** 123:23
**hours** 28:21
45:12 78:1
90:15
**house** 8:21
**hubbard** 7:8
10:24 26:9
32:23 93:17
**huge** 52:25
**hughes** 7:8
10:24 26:9
32:23 93:17
**hundreds**
77:25
**hybrid** 81:9
**hyde** 5:25
129:3,8

**i**

**i.e.** 78:17
**idea** 28:24 34:4
58:24 61:20
69:9,16 114:20
**identical** 70:12
70:13
**identified**
76:10,11 88:10
**identifies** 11:19
**identify** 32:18
33:14 53:11,14

**identifying**
31:11
**ignore** 77:25
77:25
**ii** 2:8
**illusory** 84:22
**impact** 48:2
49:4
**impaired** 85:9
**impairment**
47:4
**impediment**
45:9 48:5
**imperative**
43:9 85:13
110:1
**implement**
47:14
**implementati...**
20:17
**implications**
34:16
**importance**
29:25 40:14
**important**
22:19,21 27:22
28:5 30:1
35:11 40:21
41:6,21 42:5
43:21 50:15
64:23 71:7
85:12 86:11
87:2 89:22
100:25 119:4
**imposed** 83:20
**impossible**
47:14 73:3

80:2 110:18
**improve** 102:6
**improving**
112:12
**inadvertently**
31:8
**inappropriate**
60:1
**include** 16:6,8
103:12
**included** 32:25
36:7 67:9 84:3
106:12
**includes** 33:8
57:14
**including**
15:21 18:21
50:24 53:18
57:18 77:4
87:21 110:17
113:2
**incorporate**
32:24
**increase** 103:5
122:21
**increases**
122:20
**incredibly**
36:18 41:14,19
42:4 44:11
89:7
**incur** 2:14 19:7
20:8 121:11
**incurred**
120:24 121:12
121:18 122:15
124:21 125:16

126:11
**incurring**
121:5
**independent**
89:20
**independents**
80:22 81:11
**indiscernible**
63:13 71:12
72:9 79:19
80:25 83:1
84:9 91:12,24
105:12 106:16
108:25 109:2
110:2 112:7
113:24 119:24
**individual**
55:20 77:10
**individually**
110:11
**industry**  15:10
104:13 110:11
124:10
**industrywide**
15:10
**inflated**  106:20
**influence**  39:17
**informal**  43:12
49:15
**informally**
124:23 125:18
126:13
**information**
26:20 30:20
31:11 32:2
36:15,19 43:12
50:3 52:25

103:15
**informed**  77:5
79:17
**informs**  80:1
**initial**  41:19
56:17,20
**injected**  112:20
**injecting**  45:7
**inquiry**  104:2
**insiders**  21:5
**insight**  122:23
122:25
**insights**  124:9
**inspire**  110:1
**instance**  60:24
**instances**  34:10
**institutional**
42:1
**instrument**
56:16
**intend**  12:6
23:25 97:17
**intensive**  50:22
**intention**  28:11
**intercreditor**
65:6 66:4
91:16,19,20
92:20 104:16
105:24
**intercreditors**
64:12 66:10
**interest**  17:11
17:25 18:1
33:19 44:2
55:11 66:13
68:15 85:5
87:11,13,15

88:7 89:20
93:4,4 107:10
111:10
**interested**  68:2
72:24 112:1
**interesting**
70:20
**interests**  52:12
52:14 100:9
**interfere**  28:11
**interim**  3:13
3:18,23 4:4,9
4:14,20 5:1
61:9 115:12
116:10,20,21
117:21 118:9
118:13 119:2
119:15 120:2
120:15,23
121:6,7,13
122:5,6,9
124:18,25
125:4,8,13,22
126:6,14,21
**interject**  36:21
**interminably**
78:13
**interpreted**
92:5
**interrupt**
53:23 123:15
123:16
**intimately**
22:25
**introduce**  95:7
**introduced**
94:1

**invested**  42:1
72:24
**investigation**
75:13,18,22
119:20
**investigations**
85:1
**investment**
4:22
**investors**  29:21
42:1
**involuntarily**
90:6
**involuntary**
93:8
**involve**  63:14
104:15
**involved**  23:1,2
23:6 28:2
35:20 93:23
**involvement**
30:1 74:12
75:14,15
**involves**  64:14
**islim**  22:14
23:23 24:1,6
**isn't**  51:3 53:2
76:21 79:7
91:13 93:2
**issue**  19:2
27:15 30:15
31:25 32:6,18
34:8 35:11,19
38:20 43:6
44:3 48:23
51:2 52:20
54:8 64:11,11

64:14 77:3
93:12 100:14
110:24 122:1
122:13,23,24
123:11
**issued**  34:8
52:1,4
**issues**  12:11
13:11 16:18
22:25 23:6,22
28:1 35:14
37:15 40:16,23
43:4 50:20,23
50:25 51:8
52:11 53:19,20
53:22 57:17
58:2 60:23
64:22 65:23
66:7 91:8,16
91:19,20 92:20
101:13,20
104:15,16,17
104:19 105:7
107:21 108:5
110:10,21
**item**  13:5,5,25
21:18 37:18
62:14,14
**items**  38:4
115:6
**it's**  49:6,6,12
50:12,14,15
51:7 53:9
58:16 59:7,11
60:6,13 61:16
63:21 64:3
65:3 66:1

67:21 70:9,18
71:7,10,13
72:25 73:13
74:2 80:2
82:16 83:5,12
83:19,23 86:11
87:2 88:23
91:13,21 93:2
97:25 98:1
99:22 100:16
**i'd**  50:5 60:25
73:24 101:23
**i'll**  51:7,19
61:11,19 73:10
73:19 77:2
78:23 96:18,21
97:25 98:6
**i'm**  50:2 51:7
54:11 55:17
61:18,18 67:20
69:22 72:18
77:10,10 86:15
90:18 97:9
98:16 99:3,19
101:11 102:2
**i've**  53:6 62:5
84:1

**j**

**j**  6:19 8:14
**jane**  6:8 10:8
12:21
**january**  42:8
49:23,25 59:13
94:2 104:22
**jeopardize**
105:23

**jessica**  8:6 11:8
96:13,13,20,25
97:14 98:8
**jewish**  28:10
**job**  29:9
**join**  26:10
**joined**  11:15
11:21 22:4
**joint**  8:9 11:12
11:14 40:10
45:25
**jointly**  10:5
**jordan**  7:6
10:19 25:2
82:1
**joseph**  14:24
19:10
**joys**  46:3
**judge**  1:23
10:2 27:9
34:14 50:15
63:13,13
103:11 104:2
**judges**  24:18
47:23,24 58:19
58:24
**judgment**  17:3
17:19 20:19
77:8
**judgments**
123:7
**july**  45:4 94:4
94:22,25
**june**  47:16
102:20
**justice**  8:19

**justification**
47:3

**k**

**keep**  67:21
69:16,18,19
72:14 80:16
95:14 98:2,3
**kenneth**  9:6
11:20 26:3
86:1
**kept**  62:25,25
98:19
**key**  52:11,20
52:25 67:15
79:1 101:20
102:14
**kidding**  99:3
**kids**  81:20
**kim**  6:11 10:11
12:25 14:10,12
14:13,15,15
15:6 19:5,16
21:19,23
120:21,23
121:1,11,15
**kind**  16:14
31:24 64:9
65:1,1 71:6
73:7 78:17
90:25 98:4
100:14 107:13
**kindly**  114:7
**kinds**  107:22
**know**  23:16
24:17 25:21
28:25 29:18
30:3,11 31:12

33:7 35:7,12
35:16,17 36:22
36:25 37:4,5
37:10,15 39:20
40:14 41:6
43:9 47:25
49:2,3,4,16,19
50:8,9,11 52:9
53:13 56:15
59:8,10,11,22
61:14,18 65:4
71:3,24,25
72:2,11,23
82:2 86:3,6,7,9
86:12,13,17,19
86:20,22 87:1
87:4 88:23
89:13,15,17,19
90:11,13,14,16
91:24 92:4,5
93:1 96:17
97:1 122:12
**knowledge**
52:22,24
**known** 68:6
74:6
**knows** 59:9
100:2,4
**kobre** 120:21
120:23 121:1,6
121:11,15

**l**

**labor** 39:18
**lane** 1:22 10:3
**large** 41:14,25
50:12 53:5
56:19 68:16

74:8 104:10,20
122:21 123:19
**largely** 54:19
77:20
**larger** 46:17
47:7 48:2 73:6
110:11
**largest** 57:10
**lastly** 68:21
101:4
**late** 26:18 45:3
84:5 87:10,13
87:16 88:7
99:21,24,25
100:3
**latest** 31:12
**latham** 8:8
11:14 40:9
45:24 54:10
55:18
**law** 18:19
21:16 23:18
103:10 117:18
118:11 119:3
120:17 125:10
126:7,22
**lead** 36:1 40:5
51:17 68:15
95:20 108:10
**leading** 106:21
108:11
**leave** 24:19
51:19 61:19
63:4
**leaves** 60:5
**led** 63:12,17
98:22 125:20

**ledanski** 5:25
129:3,8
**left** 51:10,22
87:20 113:8
**legal** 23:6 31:5
43:4 102:24
129:20
**lend** 89:20
**lender** 15:21
16:4,10 17:8
68:16,18,20
89:20
**lenders** 64:15
64:16,16,16,17
64:17 93:19
95:23,25 96:1
96:3,7 99:9
102:8
**lending** 15:8
**length** 23:15
95:14
**lengthy** 24:4
50:2
**lent** 65:2
**letting** 92:14
**let's** 50:19 51:9
65:7 76:21
88:8
**level** 34:18
39:24 59:22
94:10 124:9
**leverage** 99:11
**liabilities** 16:7
17:9 104:11
**liability** 84:24
**liberty** 6:5

**lien** 15:24 17:2
17:11,22 107:9
**liens** 2:5,7,9
14:20 15:20
16:19
**lieu** 23:24
**lift** 43:18 45:13
105:1
**lifting** 40:18
**light** 24:5
**likely** 28:21
36:15 114:21
**limit** 100:24
**line** 71:14,15
102:2 111:12
116:2 128:4
**lines** 105:19
**liou** 8:6 11:8,9
96:13,13,20,25
97:14 98:8
**liquidates**
78:16
**liquidating**
90:22 91:1
95:11
**liquidation**
78:14 91:5
108:11 112:14
**liquidators** 8:9
11:12,15 38:7
38:8,18 39:2
40:10 42:7
43:17 45:1,12
45:25
**liquidity** 42:4
85:12

**list** 71:1

**listed** 38:4

**listening** 12:5
36:12 105:18
105:18 112:2

**literally** 90:15

**litigate** 41:18
53:10 57:15
76:20 78:10
90:9 101:1
111:2,3

**litigated** 45:9
76:2 108:5

**litigating** 64:3

**litigation** 3:25
41:4,8 45:14
57:16 58:7
62:19,21 63:24
63:24 66:25
67:16 69:2
72:1,2 76:13
77:4,6 79:15
86:11 87:5
88:21 89:2,4
89:12,14 92:7
93:7 99:13,14
101:16 105:1
107:7,12,16
116:13 119:9

**litigators** 76:1

**little** 13:25
28:14 35:7
40:22 86:9,19
87:12,13,22

**live** 24:13

**llc** 1:7 3:19
4:11 5:2 7:9

10:5 93:18
102:9

**llp** 3:15,25 4:15
6:3,13 7:1,8,17
8:1,8 9:1

**loan** 15:14,22
16:9 17:7,10
83:20

**loans** 99:22,25
100:1,4

**lob** 45:13

**local** 92:5

**logged** 34:3

**lokey** 4:21
126:8,14
128:13

**long** 23:22 43:6
87:8 88:19
99:13 123:18

**longer** 51:8
75:22 91:10,25
109:14

**look** 23:20
24:22 33:17
50:14,14,18
52:17 58:22,23
71:1 72:1 87:3
87:9 88:18
99:18 109:18
110:7

**looked** 77:15
101:12

**looking** 20:6
33:8 86:16
88:15

**looks** 50:16,17
59:21 71:19

87:14 89:7
114:25

**loop** 55:22
94:20,22 95:5
95:7 97:25
98:6,20

**lose** 43:22

**loss** 95:3

**lost** 75:17

**lot** 12:5 27:25
30:10 33:11
36:9 58:8
65:18 68:11
72:22,23,24
88:13 98:2
101:10 105:10
106:5

**lots** 31:10 41:7
49:19 106:12

**love** 75:17

**lower** 57:12

**lp** 4:5

**luke** 6:9 10:10
37:23

**lurks** 94:14

**m**

**m3** 4:5 118:12
118:13,16,17
128:9

**machinations**
75:15

**made** 13:13
39:19 50:9
66:17 67:6,16
85:10 96:22
97:19 102:13
103:20 104:23

106:22 107:3
108:11 109:5,8
109:11 110:15
117:25 123:19

**magic** 110:9

**magnitude**
41:12,17

**main** 39:2
56:10 57:25

**maintain** 80:2
82:19

**majorities** 82:7
91:24

**majority** 84:14

**make** 12:8
13:25 18:23
25:24 31:7
33:22,23 39:16
42:15,19 43:2
43:8 46:1 53:9
53:10 56:22
66:24,24 72:21
73:3 74:9
89:17 101:5,8
107:5 111:14
111:14 112:24
114:17,24
120:5 127:11

**makes** 13:23
18:22 32:17
43:25 73:19
78:16 111:7

**making** 42:12
54:2 56:17,18
70:11,13 123:6
123:22

**man**   71:12,16
72:8
**manges**   8:1
11:9 96:14
**manner**   80:18
**mantle**   109:24
**market**   104:14
**marks**   74:7
**marsal**   4:10
14:24 19:10
117:21,22
118:16 128:8
**mass**   79:4
**master**   15:13
15:22 16:8
17:10
**material**   74:10
80:10
**materialize**
79:2
**math**   87:14
**matt**   9:8 11:22
**matter**   1:5
12:18 13:7
22:1 28:7
30:20 36:6
38:19,24 39:11
50:22 76:1
80:13 93:3
114:6 118:15
**matters**   12:16
12:17,24 13:17
14:4,17 28:17
57:23 105:4,4
**maturities**
67:16

**maturity**   56:13
56:16
**maximize**
64:25 76:17
**maximizing**
17:13 89:3
**mean**   30:18
33:25 46:25
51:12 54:21
58:21 60:9
65:20 92:5
97:22 123:15
123:16
**meaning**   13:12
**meaningful**
74:11 75:5
91:15 93:6
**means**   30:18
75:7 112:9
126:7
**measure**
109:19 111:25
**measuring**
109:16
**mechanics**
50:13 64:20
66:5 73:15
77:19
**mechanism**
66:21,22 81:5
**mechanisms**
80:19
**mediation**
63:12 67:23
68:3 76:8 94:2
94:2,9,24
100:18,19

**106:12**
**meet**   25:13
65:8
**meetings**   63:10
76:7
**melt**   59:5
**mem**   72:10
**member**   70:9
70:25 71:1
102:14
**members**
21:22 70:21,22
70:24 71:2
77:10 78:2
100:16
**memorialize**
112:17
**mention**   28:4
29:18,19 35:21
37:4 48:7
64:10
**mentioned**
12:23 27:19
36:3 75:19
**merits**   23:16
40:6 76:14,20
97:3,6,12,16
107:24,25
110:21,24
111:3
**message**   95:25
**messages**   52:15
52:18,18 55:13
**messy**   42:20
**met**   26:17
76:25 82:21

**metaphor**
48:20
**microphone**
46:2 72:15
**mid**   81:13
**million**   16:20
67:12,16 68:12
83:21 84:16,17
87:6,16,18,20
87:22,25 88:3
88:6 100:10,11
**millions**   90:7
**mindful**   36:13
108:7 111:6
**mineola**   129:23
**minimis**   2:10
16:20
**minimum**   55:7
**minority**   92:23
**minute**   101:24
101:24
**minutes**   67:5
83:24 102:3
**missed**   34:2
**misstatements**
96:22
**mistake**   66:18
**mistrust**   74:17
74:24 75:2
76:14
**modern**   74:15
**modified**   64:8
**moelis**   3:19
117:2 128:7
**moment**   73:7
114:6 116:12

**money**  19:1
44:21 68:11
75:6,6 79:20
88:3,13,20
89:1,1,12,13
111:12
**month**  20:5
27:21 53:8
83:3 87:17
88:2 92:9
100:10,11
**month's**  27:24
**monthly**
121:14 122:6,8
**months**  42:2
43:13 44:11
49:14,23,25
50:4,7,8 52:23
63:14 75:16
80:13,14 82:24
83:22 87:19
88:14 92:2,18
93:13,22 94:9
94:10 95:3,16
95:18,25
**moot**  38:24
**moots**  39:10
**morning**  21:14
46:22
**morrison**  3:24
119:7,8,10,12
119:15,21
120:1,4,15
128:10
**motion**  2:5,6
2:12,13,17,17
2:18,22,22,23

2:24 3:3,8,8
13:2,4,5 14:18
14:18,21 15:4
15:25 18:6,8
18:11,17,18
19:3,4,6,6,9,15
20:21,23 21:1
21:5,8,10,13
22:1,10,20
23:20 25:5
39:12,16,21,21
43:19 45:13
46:10,12 53:18
54:4 57:7,20
58:1,6,15
72:13 97:3
102:6 105:1,2
108:9 111:1
112:16 113:5
**motions**  13:4
14:5 37:21
60:23
**mouth**  89:2
**move**  13:24
19:3 21:17
43:23 48:11
49:18 58:4,9
62:4 85:19,21
94:20 96:7
116:24 125:11
**moves**  79:15
**moving**  51:7
69:17,18,19
**multiple**  63:10
63:12 69:24
71:8,8 76:5,6
80:13 88:12

**mute**  71:15,17
72:13 102:2
**muted**  72:18
72:18

**n**

**n**  6:1 10:1
128:1 129:1
**nacif**  8:17
11:17
**name**  70:2,3
**names**  32:25
71:9
**narrative**
112:5
**nature**  84:9
97:15
**navigate**  97:4
**nda**  90:14,17
100:15,16,17
100:19
**ndas**  100:17
**near**  95:8
**necessarily**
33:12 48:15
75:23 108:24
**necessary**
20:16,19 51:24
106:19
**necessity**
103:13 104:21
**need**  12:14
22:19 23:22
24:13 28:24
35:22 36:1
37:1 40:23
47:19 48:10
50:2 51:18,21

52:17,19 53:7
55:11 56:4,8
60:9,12 66:1,4
66:20 67:13
71:15 72:5,5,6
72:13 73:12
78:8 88:7,13
88:15,16 89:12
89:20 90:20
91:18 92:5
93:10 95:22
96:1 99:17,20
104:11 107:20
108:21 109:15
109:18 112:9
112:20 123:6
**needed**  53:21
91:14
**needing**  43:6
**needless**  20:13
**needs**  26:5
51:4,20 60:4
77:5 81:10
82:11,19 93:6
112:22 122:17
**negative**  95:19
**negotiate**  62:22
63:1 65:25
66:1 91:4
103:14 105:14
108:19 123:3
**negotiated**
16:1 63:3,23
64:4,7 67:4
71:10,21 94:16
98:18

**negotiating**
100:18
**negotiation**
66:4
**negotiations**
23:5 68:8,20
68:22 69:1
86:21 98:21,23
103:21 109:6
110:17 112:9
**neve** 8:16
11:17
**never** 48:19
50:23 76:10
94:19
**nevertheless**
16:25
**new** 1:2 6:6,17
7:4,11,20 8:4
8:12,23 9:4
10:4 28:1
43:10 56:16
68:17 106:4
107:14 109:18
109:20
**news** 109:14
**night** 26:18
90:18
**nine** 95:24
103:24
**nobody's**
114:24
**non** 19:19
22:23 27:20
82:24
**nonconsensual**
85:2 96:4

101:5,9
**nonsense** 106:8
**normally** 51:16
51:17 69:25
**north** 4:10
41:16
**nos** 2:20 3:1
**note** 16:4,13
17:15 21:2
26:15 88:17,17
89:18,23 90:2
91:2 112:3
119:20 122:3
**noted** 16:23
17:20 39:19
122:19
**notes** 21:3 34:4
56:14 107:23
114:1
**notice** 2:3,23
13:4 16:22
18:2,3 36:7
38:20 39:3,12
43:20
**noticed** 22:2,14
**notification**
35:17 37:7
**notifications**
36:7 37:1,5
**notify** 36:10,10
**noting** 45:12
**novel** 104:15
**november** 23:2
49:22,24 59:14
59:14,20 60:2
98:10

**numb** 37:9
**number** 23:14
28:16 29:20
31:25 36:24
37:5 42:22
43:3 52:4
53:14 54:7
56:7 62:15
89:9 102:7,10
102:11,17,19
102:22 104:17
**numbers** 55:17
**ny** 1:14 6:6,17
7:4,11,20 8:4
8:12,23 9:4
129:23

## o

**o** 1:21 10:1
129:1
**o'clock** 114:12
**o'neal** 6:10
10:10 13:2
32:12,12,21
33:8,16,24
35:24 36:20,21
62:12 71:13,19
72:9,17 73:11
85:15 98:9
113:6,9,13,19
113:21,23
**o'neal's** 105:19
**object** 111:2
**objected** 94:22
**objecting**
69:21 73:20
93:15 101:19
102:11 110:15

110:18
**objection** 2:19
2:25 15:3,4
18:7 22:3,4
25:4 30:4 35:5
38:10,13 40:12
43:11 49:17
50:21 52:14
55:21 56:5
57:20 70:18
74:15 102:8,9
102:10 111:7
112:8 117:16
119:12
**objections** 18:3
18:4,7 20:25
26:2 74:10,11
102:7,15
107:23 108:20
109:10 115:14
119:13 124:22
125:17 126:12
**objector** 85:25
104:9 106:8
**objector's**
106:15
**objectors** 67:6
81:24 106:17
108:7 109:9
112:5
**obligation**
98:12
**obligations**
2:14 16:7,8
17:7 19:7,22
20:9

observations
30:9 58:14
observe 39:16
observed 69:23
obtain 15:17
106:19 108:23
obtained 76:3
obviously
13:19,25 23:8
24:9,14 25:7
26:11 27:10,12
28:10 30:2,10
35:19 40:15
41:6 48:5
53:10 75:21
104:19 105:10
108:3 119:3
123:2
occasionally
30:5
occur 37:1
81:6 112:10
october 20:3
59:19 60:1,16
60:17,20 61:1
61:8,13,14,16
61:21 81:8,13
offer 89:10
offered 87:21
88:8,9 114:7
offering 89:1,6
office 11:24
115:15 116:2,5
116:6,14 117:5
117:10 118:1,4
118:18,22
119:18,21,23

123:17,22
125:19 126:16
official 4:16,22
5:3 6:14 10:13
32:14 44:6
73:22 102:18
okay 54:13
71:16 75:9
99:19 113:19
old 110:5
129:21
omnibus 2:1
2:19,25 61:17
once 12:9 20:5
30:22 70:25,25
109:15 124:16
126:20
onerous 68:15
89:21 100:23
ones 29:22
31:14 33:14,17
115:8
ongoing 58:6
116:13
open 12:7
28:22 32:10
60:5,19,25
71:14
opening 24:2
operates
104:12
operational
82:24
operations
20:16 82:20
83:4

opinion 34:8
34:17 35:12
53:4
opinions 35:13
opportunities
108:8
opportunity
25:17 39:4
52:17 53:15
55:12 57:15
60:22 64:6
83:15 84:1
96:19 111:2
oppose 48:23
opposed 107:6
opposes 93:19
opposing 39:3
52:2
opposite 77:14
80:20 82:15
opposition
38:24
oppositions
26:10
option 17:13
67:7,8,10,11
77:4,13 79:7
79:13 86:13
91:5
options 80:5
106:23
order 2:6,13,18
2:24 3:10 13:1
13:10 18:10
19:6 20:23,25
21:2,3,7 27:10
29:9 31:3 39:7

45:15 46:8
50:13 54:3
57:3 58:1
61:13 62:2
77:8 82:12
100:19 102:20
103:23 112:17
112:18 115:20
115:22,24
117:5,7,24
118:2,20
119:15 121:13
125:21
ordered 43:9
106:12
orderly 16:17
orders 41:12
ordinary 16:24
20:11 100:8
organization
103:24
originally 38:4
outcome 44:13
85:5 94:7
outset 38:19
46:7
outside 57:24
77:9 94:20
95:7 124:5
outstanding
13:14 16:7
17:7 57:3 71:4
104:19 107:21
overarching
44:20
overdue 84:17

**overlap**  67:22
  106:5
**overly**  106:20
**overseas**  18:25
**overwhelming**
  75:20 95:19
**owe**  68:11
**owed**  68:11
  84:14 87:16,18
  89:8 100:3
**owes**  69:10
  83:19 90:6
**own**  70:9 74:12
  77:9 82:17
  83:16 85:7,20
  96:10 110:24
  111:12 112:7
**oxygen**  80:11
**o'neal**  62:9,11
  62:13 73:9
  83:22 84:11
  86:4,7,12,16
  87:4,23 89:19
  90:19 94:1,3
  96:12 97:22,23
  98:5,7,9
**o'neal's**  97:22

**p**

**p**  6:1,1 10:1
**package**  16:1
  17:16 33:16,22
**pad**  114:1
**page**  28:23
  39:6 50:21
  107:17 114:15
  128:4

**pager**  109:10
**pages**  12:4
  25:8 43:16
**pair**  37:6
**palatable**
  95:22
**papers**  21:14
  87:5 96:16
**par**  24:1
**paragraph**
  47:16 55:20
**parallel**  57:16
  57:23
**parent**  20:22
  41:1 64:14
  81:19 83:2
  88:4 94:6,8,11
  96:2 104:19
  106:24 109:23
  110:23
**parents**  76:2
  96:5
**park**  7:10
**part**  15:19
  20:13 23:1
  33:1 52:11
  59:20 67:15
  68:7 69:6,25
  81:1 86:4 99:1
  99:2 100:12,21
  100:25 109:12
  109:21 111:1
**partial**  69:8,9
  69:13
**participant**
  30:25 31:23

**participate**
  12:6 72:23
**particular**  15:8
  30:7 35:23
  43:4 46:17
  67:6 78:19
  110:20 122:24
**particularly**
  41:21 58:22
  60:16 68:2
  103:10
**parties**  18:1
  24:19,25 26:2
  29:4 36:10,10
  36:17 38:13,25
  40:2 43:11,13
  46:11,16 49:15
  54:24 55:1
  57:6,22 60:22
  66:13 69:17,18
  69:19,22,24
  71:8 73:10,20
  85:4 93:25
  94:3 98:2
  101:19 102:11
  106:13 108:14
  110:15,17,18
  111:2,10 112:1
  112:2,4,11
**partner**  11:16
**partners**  4:5
  14:22 15:13
  16:4 17:5,8,14
  118:14 128:9
**party**  19:12
  21:10,12 33:19
  55:24 64:6

  68:18,19,19
  70:2 85:2 93:8
  93:15 96:4,11
  101:7,9,22
  116:17 117:15
  118:6,25 119:4
  125:6 126:3,19
  127:4
**party's**  97:5
**pass**  14:10
  30:10
**passing**  75:3
**past**  24:20
  38:11 43:14
  48:17 50:4
  63:14 75:16
  81:4 87:6
**path**  33:5
  44:17 71:10,20
  85:22,22 107:3
  107:16 109:8
**pathway**  105:8
**patient**  78:12
**pay**  77:8 84:16
  87:25 90:7
  96:1 99:9
  111:11
**paying**  20:9
  87:17 100:9,10
  100:12 103:18
  108:15
**payment**  67:12
  84:5,13,21
  87:19 99:24,25
  100:8 121:7
**payroll**  2:12,14
  19:7,21,25

20:5

**pcg**  64:14

**peace**  79:1,2
  80:5,17 81:9
  92:5

**pending**  113:5

**pennies**  81:5

**penny**  120:6

**people**  28:14
  29:23 30:2,13
  30:17,19 31:19
  32:8 37:9,10
  48:14 51:17
  52:16,17,23
  55:12 59:2,21
  59:23 65:23
  68:2 69:1 70:6
  72:1,22,23,24
  73:2,8 76:14
  78:6 79:10,24
  88:13,14,14,22
  89:10,12 95:22
  101:11

**percent**  71:3
  84:20 87:15,16
  93:3,4 116:23

**perdue**  93:9

**perdue's**  93:11

**perfect**  63:22
  98:8 122:18

**period**  2:23 3:4
  3:15,20 4:1,6
  4:11,16,23 5:4
  43:20 62:17
  65:17 80:3
  94:24 102:22
  121:18 122:7

125:4

**periods**  82:22
  102:23 103:1
  113:11

**permit**  93:20
  103:13

**permitted**
  121:12

**perpetrated**
  82:25

**persaud**  1:25

**person**  24:7,11
  63:10 73:4

**personal**  30:6
  36:15,18

**personally**
  37:5

**perspective**
  27:7 39:9 50:7
  50:8 54:4 55:9
  70:5

**perspectives**
  64:18

**pertains**  69:21

**petition**  15:7
  16:20 75:15
  77:22

**phenomenon**
  74:15

**phil**  10:15
  32:19 34:4
  124:16

**philip**  6:20

**phone**  30:21

**pick**  60:25
  61:20 73:24
  114:23

**picture**  34:18
  124:3,12

**pitch**  72:21

**place**  75:25
  97:2

**places**  57:18

**plains**  1:14

**plan**  3:4 20:17
  44:17 45:6
  47:14,20 49:2
  56:18 62:16,20
  65:10,11 66:20
  66:22 67:2
  69:12 71:10,21
  74:9 75:21
  76:20 78:9
  79:10,12,13,14
  79:16,18,20,24
  80:5,5,9,10,17
  80:24,25 81:8
  81:9,9,12,14
  82:4,5,10,12
  82:13 83:6,14
  83:16 84:13
  85:7,8 86:17
  91:5,15,18,18
  92:2,10,13,15
  93:10,11,12
  95:13,14 96:10
  99:14 101:8,14
  103:14,16,20
  106:20 108:3
  108:18,22,24
  108:25 109:1
  109:23 113:11
  113:14

**planned**
  105:15 109:3

**planning**  19:21
  24:8

**plans**  66:16,19
  85:20 92:12
  105:22 106:9

**platform**  98:20
  99:10 101:14

**players**  79:1

**plaza**  6:5 7:10

**pleading**  66:6
  68:5

**pleadings**
  14:22 16:3
  55:18 70:6
  102:16 104:23

**please**  46:4
  72:14 73:6

**pleasure**  65:20

**pledge**  15:21

**pledged**  42:23

**plenty**  111:19

**plus**  55:8

**pm**  1:17
  127:16

**podium**  29:15
  37:20 69:20
  113:7

**point**  12:7
  24:10 25:23
  28:5 34:16
  35:13 43:8
  53:11 54:5,9
  56:3,11 59:8
  59:21 60:8
  68:2,14,25

73:4,18 74:7
76:15 78:5
79:25 81:17
90:18 91:25
110:16,19
112:19 122:22
123:10,24
124:11
**pointing**  124:2
**points**  42:16,18
56:10 67:6
74:13 123:22
**pool**  47:13
73:13,14 81:20
**portion**  38:3
71:5
**portions**
107:14
**position**  50:15
76:12 78:22
80:6 81:22
82:13
**positive**  39:17
84:6
**possession**
15:17 17:4
90:24
**possibilities**
109:17
**possibility**  60:5
**possible**  19:20
23:10 29:8
31:8 33:23
44:21 58:5,9
65:25 85:14
101:2,15
109:20

**possibly**  99:11
**post**  41:18,19
79:15 82:20
84:15
**posture**  96:17
**potential**  24:6
34:7 59:3
64:13 98:19
111:8
**potentially**
37:12 53:17
94:15 96:3
**practicable**
27:8
**practical**  28:7
**practically**
47:14 75:19
79:2
**practice**  123:2
**pre**  75:15
77:22 84:13,21
108:5
**precedent**
101:8
**predict**  48:8,12
**prefer**  24:10
**preference**
58:11
**preferences**
42:21
**preliminary**
41:3
**prepare**  19:19
**prepared**
22:13 24:10
**preparing**
120:25

**present**  12:25
32:5 57:15
74:22 77:17
124:17
**presentation**
62:10 112:2
**presentations**
76:4
**presented**  47:8
111:9
**presenting**
14:16
**presents**  31:11
**preserves**
79:14
**pressure**  92:8
103:23 110:13
**presumably**
45:14
**pretty**  48:10
**prevent**  84:9
**prevents**  80:19
**preview**  34:7
**price**  16:6
**primary**  75:12
106:14
**prime**  15:24
**priming**  2:7,9
14:19 16:19
17:2,11,21
**principal**  63:18
63:20 64:3
65:14,19,24
67:3,9 69:8
71:21 84:11,17
86:14,22 87:1
89:16 90:11,16

91:11,21 94:5
97:20 98:22,24
99:2
**principals**
63:11 72:9
76:7 98:23
**principle**  105:6
106:14 109:7
**principles**
106:25
**prior**  15:6
83:24
**priority**  15:20
**prism**  48:11
**privacy**  30:24
31:20 34:8,9
34:11,16,23
35:16
**pro**  29:20
**probably**  13:21
13:23 28:15
33:11 48:17
59:15 60:16
61:10 69:4
72:18 116:8
120:21 124:5
**problem**  31:12
88:10,22
**problematic**
68:20 70:14
**problems**  60:7
60:7
**procedure**  3:9
59:21
**procedures**  2:8
16:18 17:18
18:23 19:2

**proceed** 13:3,7
14:4 22:20
25:24 61:9
74:14 76:19
114:9
**proceeding**
14:23 98:4
**proceedings**
15:15 16:16
31:5 49:19
69:25 127:15
129:4
**process** 22:22
23:2,5 27:20
30:7 38:12,16
47:1,7 48:25
57:14 58:7,23
65:13 76:9,20
92:10 93:21
95:20 105:15
105:25 106:1
106:12 109:13
109:19 114:25
**processing**
19:25
**produce** 52:3
57:7
**produced**
25:11 43:15
56:6
**product** 98:22
**production**
22:11 25:6,7
25:14 51:13
53:24 54:3,5
56:1 60:14

**productions**
51:14 53:15
54:5 56:2
60:12
**productive**
39:15 61:16
68:23 90:16
95:19 97:8
**professional**
3:14,19,20,24
4:5,6,10,11,15
4:21 5:2 115:7
**professionals**
30:21 44:19
93:21 116:7
122:12 123:20
**proficient**
85:18
**progress** 13:13
43:2 66:17
91:15 103:17
103:20 106:7,8
106:9,17 107:3
109:5,8 111:22
111:25 112:9
**projected**
57:12
**promise**
109:16
**promised** 86:7
**prompt** 46:19
48:23,25
**promptly**
48:11
**proof** 82:21
**proofs** 38:8,9

**property** 2:7
16:19 95:2
**proposal** 63:1
67:20,21,23
86:5 97:16
111:14,16
**proposals**
109:4
**propose** 23:23
42:7 45:17
61:5 83:13
84:23 85:7,20
87:18 96:9
**proposed** 16:5
16:18 17:8,15
17:18 18:10
20:23,25 21:2
21:7 38:21
39:7,7 40:2
42:17 44:10
56:1 58:7
59:14 65:23
67:3 82:8
86:14 88:18
90:15 95:14,16
106:16 108:3
108:25 110:22
110:23 112:17
115:20,22
117:5,24
125:21
**proposes** 19:24
84:12,19 88:16
**proposing**
49:22,23 58:3
88:1

**propounded**
25:12 26:16
**prosecute**
69:12
**proskauer** 7:1
10:20 25:2
82:1
**prospect** 65:10
108:18,21
**prospects**
103:19
**protect** 32:2
**protected**
30:20
**protection** 16:1
17:16
**protections**
31:1,21,22
**protects** 17:25
**protocol** 31:16
31:18,20 32:22
**prove** 65:12
88:25
**provide** 16:22
18:2 19:17
35:14 36:18
55:5 62:21
101:14 103:14
107:3,5,7,16
107:16 115:21
**provided** 16:22
20:1 34:9 57:1
60:10 62:24
97:19 121:14
**provides** 44:12
44:17 66:21,22
83:7,14 102:25

**providing**
16:24 17:10
20:9,14 107:8
**proving** 103:5
**provision**
113:3
**public** 70:5
83:11 84:10
**publicly** 41:25
119:23
**published** 94:5
**pull** 66:2
**punt** 79:16
80:5 81:9
**purchase** 16:6
**purpose** 94:8
95:17
**purposes** 15:3
19:15 49:14
58:18 108:20
123:8
**pursuant** 3:9
**pursue** 83:10
**pursuing** 67:15
68:10,24
**purview** 78:21
**push** 53:5
105:25
**pushing** 40:19
53:1,4 95:15
**put** 31:9 33:15
58:8 75:25
79:4 80:23
82:11,14 86:25
88:20,25 89:1
89:1 91:20
92:13,14,24

100:23 105:8
**puts** 96:16
**putting** 41:11
111:12

**q**

**quarropas**
1:13
**question** 27:18
30:8 33:6 34:1
47:22 51:4
54:9 57:15
65:12 113:10
**questions** 18:9
21:6 23:13
81:21 85:23
115:23 123:25
125:19
**quick** 25:8
113:10
**quickly** 51:6
58:5,9
**quiet** 72:14
**quite** 22:19
29:18 30:22
31:20 43:18
96:17
**quo** 109:14

**r**

**r** 1:21 6:1 10:1
129:1
**rabbit** 97:8
**raise** 122:13
**raised** 59:10
124:22 125:18
125:19 126:12

**raising** 37:2
**ran** 67:23
**range** 29:22
**ranges** 89:17
**rate** 87:15
**rates** 68:15
89:21 122:20
122:21,25
123:1,23
**rather** 27:23
60:23 73:23
101:25 113:18
**rationale** 39:10
**reach** 29:4
48:14 63:9
69:14 72:4
78:2 83:6
85:16,19 93:23
97:20 98:11
101:20 111:4
114:22 127:10
**reached** 22:15
34:14 46:11
84:11 85:15
95:21 98:24
105:6 106:13
**reaches** 24:12
**reaching** 66:7
104:5
**reaction** 65:19
**read** 58:16
**reading** 105:19
**ready** 40:11,11
51:20 62:4
81:12,14
**real** 59:4 75:1
91:3,5 92:7,17

92:19 93:6
108:9
**realistic** 77:5
**realities** 109:18
109:20
**realize** 31:24
35:1 99:5
100:25
**realizes** 91:6
**really** 13:11
28:1 35:25
38:23 40:20
41:5 48:15,15
49:4 58:17
64:11 65:15
67:13 76:21
86:24 98:1
116:12,23
**reams** 52:15
**reason** 25:22
26:5 27:18,22
30:17 31:10
39:2 52:25
77:3 100:1
**reasonable**
17:16 44:10
45:18 65:10
103:19 108:17
108:21
**reasons** 21:13
39:4 57:25
69:2
**rebuffed** 95:2
**recall** 62:19
**recalls** 120:22
**receive** 19:14
25:18 36:14

43:16 85:8
115:15 121:12
**received**  15:5
18:7 20:25
22:3 25:6
41:24 54:7
67:19,23
115:14 117:4,4
117:25 118:18
119:9
**receiving**  20:15
51:14 55:13
**recency**  105:12
**recent**  29:22
31:14
**recently**  15:11
**recess**  102:4
**recipe**  93:12
**recognize**
32:25
**recognizes**
109:9
**record**  14:25
19:11 21:14
25:2 35:18
40:9 44:6
45:24 82:1
96:23 97:5
112:18 120:4,9
120:14 121:25
123:9 125:7
129:4
**records**  116:12
**recover**  85:14
87:5 95:9
**recoveries**
41:20 50:14,18

57:11 81:7
83:10 95:8
107:13
**recovery**  17:6
96:7 101:3,15
107:7
**redacted**  70:6
116:13
**redial**  102:1
**redirect**  114:18
**reduce**  102:25
103:2,5 107:8
115:17 118:17
119:10
**reduced**  90:10
**reduction**
117:6,12 120:5
120:16 125:20
**reductions**
116:6,8,9
117:25
**reed**  7:8 10:24
93:17
**reference**
39:19 58:15
109:7 111:7
**referenced**
50:25 84:10
**referring**  56:13
**refinance**
68:13
**refinancing**
68:14
**reflect**  20:23
97:5 116:5
117:4,6

**reflected**
115:19 125:21
**reflects**  116:23
117:24
**refrain**  121:4
**refuse**  81:11
**refused**  95:18
**regard**  80:22
108:4 123:25
**regarding**
116:6
**regardless**
16:11 20:12
78:19 121:17
**regime**  104:15
**regrettably**
109:12
**regularly**  23:4
**regulatory**
104:15
**reignite**  105:24
**reiterate**  45:11
46:7 97:18
**reject**  112:11
116:14
**rejected**  45:16
**relate**  115:7
**related**  2:14,15
19:7,22 20:8
42:24 56:7
**relatedly**
108:25
**relating**  104:16
104:19 115:8
123:23
**relationship**
39:25

**relatively**  87:6
**release**  2:9
14:19 16:19
75:8 84:23
90:5
**releases**  85:2
93:8 96:4
101:5,7,9
**relentlessly**
98:14
**relevant**  14:22
23:4 36:10
96:25 104:7
**relief**  2:15
16:11,14,15,21
17:24,25 20:19
84:2
**rely**  58:17
**remain**  98:2
**remaining**
53:25
**remains**  51:12
76:16
**remark**  50:6
**remarks**  56:23
120:20
**remedies**  83:10
**remember**
127:7
**remind**  62:6
**remotely**  24:15
24:15,18 72:23
**render**  101:25
**renders**  38:24
**renew**  101:17
**renewed**  38:10

reorganization
103:14,17
106:7,10
110:14
reorganizing
82:19
repayment
69:8,9,14
repayments
56:16
repeated 75:2
94:23
reply 68:5
102:16
report 32:15
reported
105:11
represent
31:17 106:17
109:9
representations
25:11
representative
98:25
representatives
63:14
represented
18:6 32:3,4
83:22 95:4
representing
30:11 70:7
represents
17:12,16 32:24
82:6 91:23
106:18
request 16:25
20:12 22:12

53:6 54:19
62:15 65:7,16
65:17 66:16
71:11,13 93:19
101:18 102:21
102:22 110:4
115:17,24
117:7 119:11
124:23 125:22
requested
17:25 20:19
26:20,22 84:3
113:15 116:20
requests 26:19
52:1,2,5 54:23
55:24 57:4
63:25 94:23
108:5 113:3
require 53:20
57:4,6 67:11
95:12 110:20
111:21
required 41:17
55:9 111:16
requires
108:23
requiring
81:20 84:16
research 5:2
125:14 128:12
reservation
102:17
reserve 41:17
45:8 49:5
reserved 20:24
reserving
116:14

resolution
43:23 48:23,25
57:5 62:24
63:9 72:4 83:7
91:8 94:8 96:8
111:8,20 112:6
resolvable 45:5
resolve 47:19
66:10 80:17,19
105:6
resolved 40:16
40:23 44:16
90:19 92:19
111:1
resolving 45:10
108:19
resources
17:20
respect 67:16
70:17 74:14
75:14 80:1
100:3 104:17
respectfully
16:23 45:16
85:17 124:23
125:22
respectively
38:18
respond 22:12
33:25 54:12
response 18:17
19:14 26:16
46:19 47:23,24
49:9 55:15
88:24 95:19
responses
97:11 126:20

responsive
105:2
restructured
104:12 106:10
restructuring
77:9
result 22:7
38:16 82:24
108:12 112:14
resulting
105:15 108:10
results 94:21
112:14
retain 119:4
retained
120:22
retains 113:1
retention
120:25 123:20
returns 42:3
revealed
109:19
review 25:8,17
53:15 84:2
116:18 117:11
120:12,13
125:3 126:4
reviewed 76:4
76:24 78:15
116:12 119:24
125:7
revised 38:13
115:19,20
117:5,24
rewards 76:13
79:18

ri  6:11 10:11
  14:15
right  10:12
  11:1 12:2,9
  13:9,24 14:6
  14:11 15:2,4
  18:12,15,17
  19:12,14 21:9
  21:11,21 24:5
  24:21,24 26:1
  26:7,11,23
  27:2,14 28:6
  29:6,10,16
  30:22 32:17
  33:3,5 34:6
  35:10 36:20
  37:3,22,25
  39:13 40:3,13
  42:13 43:25
  45:19,21 47:5
  49:1 51:4
  53:23 54:18
  55:2,2,14,14
  56:21,21 58:12
  62:3,4,11,16
  66:20 72:5,11
  72:17 73:18
  74:22 85:24
  88:23 93:3,14
  96:15 101:22
  101:23 110:24
  113:22,25
  114:11 115:3,5
  116:1,16,18
  117:9,14,16
  118:3,6,7,21
  118:24 119:1

  119:17,25
  120:8,11,12
  121:19 122:11
  124:3,9,11,13
  125:1,5,6,24
  126:2,4,15,18
  126:20 127:3,4
  127:7
rights  20:24
  31:9 69:11
  70:15,17
  102:18 113:2
  116:14
rise  107:23
risk  78:23
  79:21 89:23
  107:8 108:9
risks  76:12
  79:18
road  129:21
rob  40:3
rocks  75:23
role  108:12
rome  48:8
room  1:13 8:22
  32:6 52:18
  98:17 100:19
rose  7:1 10:20
  25:2 82:1
rosenblat
  120:3,3,10
rosh  28:12
rough  87:14
round  124:2
rounds  63:12
rudnick  9:1
  11:21 22:5

  67:7,11,20,23
  70:10,11,15,20
  70:25 71:3
  86:2 100:15
rule  3:9 23:18
  57:6 108:2
ruled  50:23
  93:12
ruling  30:18
  51:6 101:7
  112:15 113:4
  118:7
rulings  35:13
  128:3
run  58:11 74:9
running  22:22
  57:23 90:24

**s**

s  6:1 10:1
s.d.n.y.  103:4,7
safe  43:5 50:25
  53:19
sale  16:5,9 17:8
  19:20 22:22
  27:20,21 28:4
satisfied
  116:19
satisfy  41:17
save  19:1
saw  66:6 83:23
sawyer  9:8
  11:22
saying  30:24
  40:21 47:19
  54:18 56:12
  70:7,16 71:20
  73:12 88:15

says  30:20
sazan  26:4
sazan's  26:16
sazant  7:6
  10:19,20 25:1
  25:2 81:25
  82:1 86:3 87:9
  90:21 91:4
  93:7 100:4
sazant's  91:23
scattershot
  49:12
scenario  42:6
  81:2 107:12
scenes  65:5
schedule  22:13
  23:9 26:5
  28:13 38:14
  39:5,8 40:2
  42:17 43:9
  44:9 45:3,17
  47:2 49:21
  50:1 53:1 55:4
  58:7,18 60:2
  60:18
scheduled
  25:21 28:16
  46:15 47:13
  49:3 127:10
schedules
  38:17,22,23
  39:1 40:6
  58:11 61:3
scheduling
  2:17,18,24
  13:5 45:15
  46:8 61:20

62:2 73:25
**scheme** 41:5
  78:3
**schrödinger's**
  48:18
**sciametta**
  14:24 19:10
**scope** 25:13,18
**score** 26:13
**se** 29:21
**sealing** 30:18
  31:2 34:8
**sean** 1:22 6:10
  10:2,10 32:12
  62:13 98:9
**seasoned** 76:1
**second** 2:19,25
  3:3 39:14 43:8
  53:24 62:15
  65:17 66:16
  71:11 76:22
  80:12 102:6,9
  104:22 110:4
  113:25 122:13
**section** 17:1
  18:21 21:4
  102:24 103:1
**secured** 17:16
**securities**
  41:25
**security** 52:12
  52:14 55:11
  89:25,25
  107:10
**see** 21:11 22:16
  25:22 26:4
  30:3 32:24

35:2 47:22
60:6,17 61:2
63:9 70:1 74:3
75:9 80:16
102:22 103:1,3
103:6 106:2
107:16 108:22
109:4 112:25
116:2
**seek** 16:11
  46:12 85:2
  87:10 99:21,24
  99:25 100:8
  105:13 109:21
**seeking** 16:21
  17:21 20:2
  84:5 103:23
  110:13
**seeks** 96:4
  124:20 125:16
  126:10
**seem** 42:19
  43:10 50:1
  59:25 90:17
**seemingly**
  122:20
**seems** 27:3
  48:10 74:6
  76:18 114:21
**seen** 41:23
  50:10 52:6
  53:16 65:5,19
  69:3 74:25
  75:7
**segue** 29:16
**seized** 45:1

**sell** 89:6
**send** 33:16
**sending** 30:14
  30:16 31:16
**sense** 13:23
  18:22,23 23:17
  30:24 32:17
  33:23 43:25
  73:19 89:17
  114:13
**sensitive** 48:6
**sent** 33:10,14
  33:14 36:7
**sentiment** 75:5
**sentiments**
  44:23
**separate** 21:4
  28:17
**separated**
  95:24
**separately** 41:2
  108:2 114:2
**september**
  1:16 38:11
  39:20,22 43:21
  46:10 56:1
  59:19 60:1,15
  114:7 129:25
**serious** 35:19
  37:12 101:12
**seriously** 99:4
**serve** 34:13
  109:7
**served** 22:6
  26:18 55:23
  122:5

**serves** 117:22
**service** 46:21
**services** 19:17
  19:21 20:2,15
**serving** 54:25
**set** 21:13 22:9
  25:16 61:3
  69:18 121:24
**setting** 12:16
  58:18
**settle** 78:11
  92:21,23 99:7
**settlement** 3:7
  3:10 13:17
  22:2 23:1,5,20
  24:25 25:5
  27:3,8,10
  29:13 41:1
  56:15 66:25
  71:23 72:2
  76:19 77:1,12
  79:9,9,11,12
  91:14 92:3,7
  97:6,13,16
  98:19 105:8
  106:19,21
  107:24,25
  109:22 110:22
  110:23
**settlements**
  97:4 108:1
  111:3
**settlement's**
  88:23
**settles** 78:19
**seven** 88:17
  89:18,23 93:3

103:21

**severability**
101:10

**several** 44:11
103:10 105:4

**shaking** 21:11

**share** 95:16
104:6 115:22
123:22 124:8

**shareholders**
76:3

**shed** 41:9

**sheer** 47:12

**sheet** 62:23
106:10 107:12
107:15

**shl** 1:3

**shore** 6:19
10:14,15 73:20
73:21,21 82:3
82:4,11,15
84:25 86:12,16
88:10

**short** 71:13
80:15 81:15

**shorten** 2:22
2:23,23 13:4
113:4

**shortened**
38:20 39:3,11
39:15 40:4

**shortly** 60:3
62:21

**should've**
68:17 87:8
91:16

**show** 91:15

**shuttle** 81:18

**side** 51:18
52:21 53:21
55:8 60:10
91:20 112:21

**sidebar** 55:6

**signal** 74:11

**signature**
129:6

**signed** 78:15
102:20

**significant**
40:15,16 42:10
43:2 76:16
95:12 105:1
110:6,24

**significantly**
42:9

**similar** 16:18
53:8 57:21
58:11

**similarly** 89:16
117:3,24

**simple** 67:17
87:6,24,24
88:18,19 90:8

**simply** 45:4
46:25 63:3
82:14 91:25

**sincere** 65:3

**single** 34:1
43:17

**sitting** 71:24
78:13

**situation** 17:17
47:6,8,11,17

47:18 69:22

**six** 43:13,14
93:3,4 103:20

**size** 47:12
103:12 104:8

**sizeable** 122:14

**skipped** 62:5

**slight** 13:10

**slightly** 13:1
41:16

**small** 85:11

**smaller** 41:13
42:4 71:5
100:14

**smith** 7:15
10:25

**sneakers** 37:7

**soft** 72:21

**solicit** 81:8,12

**solicitation**
62:16 105:15
106:1 113:11
113:15

**solutions**
129:20

**solve** 91:17,18
91:19 92:25

**solvency** 57:16

**somebody**
12:10 33:4
34:12 71:14

**sonya** 5:25
129:3,8

**soon** 44:21
59:15 85:14

**sorry** 36:21
46:5 67:20

120:13

**sort** 29:23 30:3
30:6,15,23
31:16 34:6,17
34:21 35:6
37:9 47:22
49:12 54:22
60:10 92:17
122:25 124:2,8
124:8,9,11
127:5

**sorts** 41:7

**sought** 15:16
15:19 16:14
124:24

**sound** 17:3,19
20:18 25:20
28:17

**sounds** 33:24
44:3 86:15
114:15 123:13

**source** 15:12
101:3

**southern** 1:2
10:3 106:4

**spades** 77:20

**speak** 32:23
46:5

**speaking** 77:10
77:11

**speaks** 50:21

**special** 3:25
119:8

**specific** 34:18
53:14 104:2

**specifically**
22:1 35:4

speed  121:1
spend  31:4
   39:15 67:5
   92:18 119:21
spent  35:11
   105:10
spoke  67:25
   68:1
spoken  82:7
squandered
   83:13 108:8
square  7:3 9:3
   105:25
squarely  98:2
squeeze  99:11
stable  64:17
stack  29:22
   31:14
stage  66:16
   123:20,21
staircase  72:1
stake  88:25
staked  94:7
stakeholders
   17:12 105:24
   111:17
stand  112:6
standard
   102:24
standards  65:8
   104:4
standing  23:15
stands  74:2
start  10:6
   12:20 41:11
   44:8 74:5 82:2
   92:9

started  51:13
   52:3 94:2
starting  10:7
   28:20,22 95:5
state  106:1
   109:11 110:8
   111:15
stated  39:2
   88:12 107:20
   117:12
statement  3:5
   78:15 102:17
   107:17 121:14
   122:8
statements
   70:5 116:5,9
   121:4 122:6
   123:19
states  1:1,12
   8:19 10:3
   11:24 15:15
   84:4 107:10
   115:16 125:19
status  3:7
   12:18 13:7,11
   13:16 14:4
   21:25 22:8
   53:24 61:8
   109:14 114:6
stay  39:23
   40:18 43:18
   45:13 46:10
   58:1,5,15
   69:15 105:2
stayed  93:11
steen  3:15 6:3
   10:9 14:15

115:12
step  49:18
   63:16 99:6
   106:18
stepped  94:21
stepping  81:19
steps  32:11
   108:3
stick  61:16
stint  83:3
stipulating
   43:3
stole  75:5
stolen  75:6
stop  96:6
storage  14:22
   16:4 17:5,7,14
store  37:7,8
straight  31:8
   67:21
street  1:13
   7:19
strict  68:16
   89:21 90:2,10
strings  52:16
strokes  111:9
strong  101:2
struck  106:16
   106:19
structure
   44:17 101:1
structures  95:7
struggling
   110:10
stuck  90:17
subject  23:8
   49:20 52:13

111:9 116:13
   116:22 121:22
   124:4
subjecting
   106:1
submission
   39:6
submissions
   38:22
submit  23:24
   39:4 103:24
   110:14 112:16
submitted  19:9
   23:23 51:25
   117:6
subsequently
   22:5
subset  20:7
substantial
   77:23 104:24
   106:1
substantially
   54:6 59:16
substantive
   2:19 3:1
   110:21
successful  94:7
sue  95:1
sued  94:22
sufficient
   82:22 103:13
   104:21
suggest  13:9
suggested  29:1
   32:21 34:5
   67:7

suggestion
  13:20
suite  129:22
sullivan  7:17
  11:4 27:6
summarized
  21:14
super  15:20
supplemental
  54:3
support  42:17
  78:3,9 79:10
  80:24 94:5
  95:12 102:17
  107:17
supportable
  82:10
supported
  91:11
supports  45:18
  107:13
supposed
  77:13 120:6
supposedly
  55:12
supreme  93:9
  93:11 101:6
sure  14:1 23:25
  31:7 33:22
  41:5 46:1,20
  50:2 53:10
  55:17 61:18
  69:22 101:11
  114:24 120:5
surprised
  114:24

surprising
  70:12
surrender
  30:23 31:22
  34:11
suspect  28:15
  35:19 59:23
sustainable
  109:14
swim  81:20
syndicated
  41:25
syphoned  83:2

t

t  129:1,1
table  67:24,24
  79:4 80:23
  82:12 87:20
  88:16 91:7
tactic  45:16
tactics  43:22
take  12:13
  24:22 28:17,21
  32:21 34:22
  35:9 48:9 51:8
  63:4,24 66:8
  73:2 82:14,16
  89:5,10,12,13
  92:9,18 99:4
  100:21 101:24
  114:2 115:5
taken  30:19
  31:9 37:11
  108:4
talk  29:7 30:3
  49:16 61:12
  86:24 87:12

99:20
talked  75:1
  92:15 100:5
talking  27:2
  53:8 58:21
  67:14,14 72:12
  72:12 86:4
  105:11
tandem  38:12
tangible  59:5
taousse  8:17
  11:17
tara  8:25 11:25
targeting  45:3
targets  76:25
task  65:14
tat  97:16
tax  122:4
tbd  46:14
team  55:6 76:1
technical  12:11
  53:20
tee  37:18
teed  41:2,2
  48:3 49:11
telegram  56:4
tell  50:17
tells  94:18
temperature
  111:25
ten  55:7 83:3
  94:3 101:24
  102:3
tends  74:16
tenor  105:16
tens  90:7

term  62:23
  95:8 106:10
  107:15
termed  83:24
terminate  96:8
terminating
  109:2
terms  17:16
  23:14 49:13,15
  50:3 55:17,22
  56:3,11 59:9
  59:17 60:11
  68:15 92:21,23
  95:16,18 99:16
  100:20,20,24
  101:4 105:14
  107:11 124:9
terrible  89:22
terrific  34:4
test  76:13
testimony
  23:24 24:13
  59:22
text  52:18
texts  76:4
thank  12:21
  14:7,11 15:2,6
  18:12 19:5,16
  21:9,19,21,23
  23:10,12 24:21
  25:1 27:14
  28:6 29:2
  35:10 37:3,19
  38:1,2 40:8
  41:10 44:5
  45:19,23 46:6
  56:25 58:13

61:25 62:3,13
71:17 72:15
73:17,21 81:23
81:25 85:24
96:10,11,20
98:8,9 101:20
102:3 113:13
113:21 114:4
115:3 116:1,16
117:1,14 118:6
118:23,24
119:25 120:8
120:10,19
121:19 122:2
122:11 124:12
124:15 125:1,5
125:12,24
126:1,2,18
127:2,3,13,14
thanks 21:24
127:12
that'd 34:3
that'll 85:23
that's 49:9
51:3,5,9,16
53:5 55:20
60:17 61:4,6
61:11 62:8
64:11 65:12
66:21 67:17
68:4 69:17
70:7 74:11
78:21,23 81:8
81:15,21 86:11
87:20,21 90:13
90:22 92:11,24
93:5 97:6,7,17

97:22 98:12
99:19 100:9
101:8 107:22
110:3 112:15
113:4,10,13
120:6 122:15
123:4 124:1,4
124:7,10 126:9
127:10
theirs 44:20
theoretical
58:19 59:6
theoretically
58:21
there's 58:15
67:21 71:25
80:10 86:10
88:12 91:6
92:6 97:23
98:5 99:2,23
100:1
thermonuclear
107:6
they're 53:4
70:24 79:21
92:6 97:12
they've 87:21
106:22 107:19
109:11
thing 24:14
31:3 34:6
36:11 58:24
60:1 70:20
74:11 79:25
86:11,18 87:4
89:22 91:17
94:20 108:13

113:7
things 12:19
13:11 23:17
24:14,18 28:16
29:17,23 30:5
30:16 39:24
40:1,19 41:6
41:11 48:1,9
48:11,14,16
49:11 51:5,19
53:6,7 58:25
59:3 66:23
69:21 73:5
79:3 86:6
97:10 99:17
100:15 106:6
112:1 113:1
think 13:10,19
13:21 18:24,25
21:17 22:19
23:21 24:3,18
26:21 27:25
28:20 29:1
30:9,13,21
32:9,11 33:14
33:22 34:2,3
34:14 35:3,4
35:13,24 36:1
36:11,25 38:20
41:21 42:18
43:5,25 45:16
47:2,5,22
48:23 49:1,8
50:20 52:9,20
53:9 54:8,18
55:5 56:10
58:25 59:13,14

59:15 60:10,13
60:14,18 61:12
61:19 67:12
68:18 70:23
71:7,9,25
72:17,18 73:11
73:18 78:8
80:10 82:3,14
86:22 87:2,22
88:5 89:9 91:6
96:25 97:7,10
97:11,25 98:1
99:17,22 100:2
100:4,5,6
105:17 112:19
112:23 113:21
114:22 123:6,8
124:13 126:7
126:23 127:6
thinking 40:22
55:4 124:6
thinks 77:4
105:17 110:7
third 55:23
68:18,19 77:17
81:7 85:2 93:8
96:4 101:7,9
102:10
thirty 81:16
thornton 122:4
thorough
84:25
thoroughly
84:2
thought 13:15
28:8,19 37:16
39:14 40:14

[thought - transfers]                                              Page 47

48:19 58:8
59:24 73:24
123:11 124:3
**thoughts** 61:5
61:24 121:20
125:2
**thousands**
43:16 78:1
**thread** 88:9
**three** 8:10
11:12,15 13:3
13:18 14:5
28:21 37:21
38:3,18 39:13
40:2,4,7,10
42:14 43:17
44:1,25 45:8
45:21,21,25
47:19 49:5,13
52:21 54:1,23
55:19 57:10,11
57:13,17 59:6
60:13 71:2
74:19,21 78:6
80:4,7 82:24
92:9,18 102:7
103:16 104:18
109:9 111:21
124:17
**threshold**
38:19
**throes** 40:17
**throw** 12:7
35:2,8 61:11
**thursday** 22:17
**thwart** 112:9

**tiantian** 8:25
11:25 12:1
**tic** 73:23
**tie** 42:10
**tilt** 78:6,25
80:4
**time** 2:22,23
16:14 18:3,24
22:19 25:15
28:14,14,23
29:18 31:11
35:11 37:16
39:3,15,15
40:4 41:7 43:7
43:22 48:9,10
50:2 55:1 66:1
66:8 67:19,22
68:2,10,14,25
72:5,6,6,8,10
72:12,14 73:13
73:13 75:3,25
76:1 80:11
82:10,16 84:6
87:8,14 88:19
93:20 94:20,25
97:19 98:17
99:18 100:15
103:13,21
104:21 105:10
105:13 108:9
110:3 112:20
112:21 116:11
119:22 122:19
123:13 126:15
**timeline** 85:21
**timelines** 57:24

**times** 7:3 9:3
51:5,7 71:8
88:12 94:3
**timing** 25:13
26:22 27:12,22
28:5 77:6
109:23 123:11
**tipping** 74:7
78:5 79:25
**tips** 78:11
**tit** 97:16
**today** 12:17
22:3 25:7 27:9
32:18 38:17,24
39:11 43:19
46:9,13,15
48:24 58:15
65:15,16 67:18
68:7 71:24
74:1 75:1
77:13 78:4
83:23 87:4
88:13 90:6,19
91:21 93:25
95:3 101:11
102:22 105:10
107:25 110:25
111:5 112:2,18
113:13 122:14
122:23 124:18
126:25 127:8
**today's** 105:7
113:14 122:17
**today's** 76:18
93:22
**together** 49:16
59:18 66:2

73:14,14 91:7
109:25
**toggle** 81:9
**token** 84:20
**told** 63:3 94:17
**tolerable** 81:16
**top** 68:18
84:22 87:17
89:17 122:21
**touch** 60:20
61:2 83:18
**touched** 93:7
**touches** 31:25
**towards** 40:19
42:12 43:2,23
56:18 78:25
80:4 91:15
96:8 103:17
106:7
**traction** 93:1
**trading** 19:18
19:20,23 20:23
**traditional**
116:22
**transaction**
16:25
**transactions**
20:12 51:1,2
**transcribed**
5:25
**transcript**
129:4
**transfer** 2:15
19:8 21:3
**transfers** 21:5
42:21,22

**transition**
19:21 20:3
**transparency**
121:25 123:9
**transparent**
122:10
**tremendous**
65:6
**trickle** 52:4
**tried** 65:25
99:12 101:5
**tries** 92:3
**trinet** 19:25
**tristan** 9:7
11:22
**troubled** 87:10
90:13
**troubling**
89:16
**true** 23:7 26:17
77:20 107:20
112:4 129:4
**trust** 7:9 10:22
26:9 93:18
102:9
**trustee** 8:20
12:1 78:16,18
78:18,21
115:16,17,22
118:1,19
119:10,12
121:2,8 123:19
**trustee's** 11:24
116:2,5 117:5
123:17 125:19
**try** 31:18 35:14
36:9 48:11

69:11,19 73:15
74:1 80:17,18
92:6,25 97:4
98:11 99:10,10
100:24 101:20
**trying** 23:16
40:5 62:25,25
63:21 72:4
78:2 97:5
98:13 101:13
113:16,17
**turbulence**
15:10
**turn** 12:19
37:17 48:20
65:7 113:6
123:13
**turning** 38:3
75:22 102:24
108:14 109:5
110:3,12
**turnover** 68:6
68:10,12,22,25
69:3,5,6,15,16
83:23 84:13
87:24 95:1
99:16,21 100:1
100:6,13
**turns** 58:23
71:1 83:8
**tweak** 13:10
**twice** 12:9
69:24 70:24
**twins** 70:13
**two** 12:24
14:16,20 30:9
37:15 38:17

39:1 42:18
45:12 49:23,25
50:6 56:23
74:18 76:15
78:18,25 79:3
79:7 84:15
88:17 95:2
99:23 100:16
103:13
**type** 12:3
**types** 20:1
44:22 64:15
**typical** 82:18

**u**

**u.s.** 1:23 8:20
12:1
**ucc** 25:12
26:17 32:20
42:16 76:11
77:11,11 79:8
80:24 82:5
83:6 84:12
85:12 91:11,11
94:5 97:18
110:1 111:15
111:23 124:17
**ultimate** 97:6
**ultimately** 64:1
65:12 95:21
107:9
**uncertain**
63:25
**uncertainties**
44:14
**uncertainty**
45:7 71:25
116:24

**uncontested**
12:17,24 14:3
14:17 83:19
115:15 117:3
117:23 118:17
**under** 15:13,21
16:8 17:1,7,9
18:18 20:24
21:4,15 23:18
43:5 44:13
45:14 56:14,17
71:8 83:20
87:22 99:24
100:4,19
105:22 107:11
113:2 117:17
119:2 120:16
125:9 126:21
**undergone**
122:21
**underline**
36:12
**understand**
16:9 17:4
22:18 28:14
30:13,21 31:6
31:19,20 34:17
34:18 40:25
49:10,17,22
50:13 59:6
78:8 81:17
101:6 119:22
124:1
**understandable**
30:2 122:16
**understanda...**
29:24

**understanding** 74:1 121:8

**understated** 93:24

**understood** 14:3 48:22 50:19 61:6,22

**undertaken** 36:9

**undisclose** 90:1

**undisclosed** 89:25

**undisputed** 89:8 100:2,7

**unfortunately** 36:8 44:25

**unhappiness** 106:15 109:3 109:11,12,15 109:16

**unique** 76:12

**united** 1:1,12 8:19 10:3 11:24 15:15 115:16 125:19

**universal** 47:23 65:20

**universe** 55:22 59:3

**unprecedented** 104:13

**unproductive** 12:4

**unresolved** 103:25 111:18 111:19

**unsecured** 4:16 4:23 5:3 6:15 9:2 10:13,18 32:14 44:13 76:24 77:21 102:12,18

**unusual** 69:22

**update** 83:11 84:10 120:9 127:5

**updated** 23:4

**updates** 114:13

**upheaval** 104:13

**urge** 36:17 39:23 73:7 112:11

**urgency** 112:20

**urging** 95:1

**usa** 19:25

**usc** 103:1

**usd** 77:22

**use** 28:19 61:17 66:10 97:19 127:9

**used** 100:2 112:3 114:16

**useful** 34:24 111:24

**usually** 29:9 74:7 77:17

**v**

**v** 60:11

**vacuum** 98:19

**vague** 94:11

**valid** 52:12

**validated** 86:23

**valuable** 84:24 89:7

**value** 16:2,20 17:13 74:19,21 75:24 76:17 79:5 83:7,14 88:24 89:19 91:7 93:6 96:3 123:6

**valuing** 89:18

**vanlare** 6:8 10:8,9 12:21 12:22 14:2,9 21:20,24 23:21 24:8,23 25:4 27:16,17 29:2 29:14 33:9 35:25 36:2,3 37:17,19 113:23 114:2,4 115:1,4,6 117:1,19,20 118:12 119:6 120:18,19 121:23 122:2 127:1,13

**vanlare's** 116:5

**vantage** 76:15

**variety** 12:17 29:23 64:12 65:3

**various** 15:8 30:5 32:4 34:22 35:12

40:19 48:18 59:10 63:10 64:15 97:10,12 105:23 106:9 106:13 111:20 115:7 123:3

**vehicle** 60:22

**vein** 35:16 53:8

**velocity** 75:21 77:6 112:22

**vendor** 20:1

**veritext** 129:20

**version** 117:17

**versus** 31:21 58:23

**viable** 65:10 71:10,21 103:20 108:18 108:22,24

**victory** 84:9

**view** 34:16 38:23 48:15 63:23 74:14 75:23 77:12 79:8 81:2

**viewed** 54:19

**views** 27:4 30:6 40:2 66:9 79:18 80:1 97:6

**vigilant** 36:18

**vine** 62:25 106:11

**virtual** 12:11 24:20 29:15 37:20 46:3 72:15,21,22,25

73:3,9 113:6
**virtually** 73:5
91:2
**virtue** 19:1
31:2,22 52:14
70:23
**vis** 48:12,13
**visibility** 70:4
**vision** 70:1
**vocal** 75:1
**voice** 46:2
**voices** 85:6
**void** 15:25
**volume** 31:12
56:19 89:3
**voluminous**
42:20 56:4
**vote** 64:7 66:3
67:2 71:23,24
73:16 79:24
92:14 95:22
**votes** 79:6,20
80:18,20,25
82:6 106:19
110:2
**voting** 65:13
70:15,17 83:16
108:3

**w**

**wages** 20:9
**wait** 29:11 42:2
127:5
**waited** 39:20
45:12
**waiting** 25:13
25:20

**waive** 87:19
121:6
**waives** 31:8
**waiving** 31:1
**want** 26:15
27:16 28:4,22
29:17 30:22
31:7 32:8,23
40:3 44:18
51:6,8 52:7
53:3 54:14
64:10 65:4
67:5 69:20
77:25 78:10,10
86:3,24 87:12
89:4,9,11,11
92:12,21,23
97:13,17 98:3
98:15 99:4,8
100:14 101:2
114:24 120:5
122:13 123:18
**wanted** 27:18
30:10 32:5,18
36:21 37:4
38:20 39:3
42:17,19 43:8
54:15 55:3,21
56:11 60:25
68:3,8 92:16
96:21 114:5
122:9
**wants** 26:12
32:2 33:4
78:20 84:8
**war** 107:6

**warranted**
74:4
**warrants** 97:15
**wary** 70:8,8
**watkins** 8:8
11:14 40:9
45:24
**way** 32:1,7
33:21 34:20
39:16,17 49:12
49:18 51:17
64:8 76:19
77:3 78:25
80:19,21 81:7
86:10 89:17
91:3 98:3 99:6
99:8 110:1
112:6 123:7
**ways** 75:11
78:6
**we've** 17:20
18:24 20:21
22:11 25:12
31:13 36:25
41:23 43:10
105:10 119:6
**weak** 90:25
**weapon** 112:4
112:8
**weaponization**
112:12
**weathered**
15:10
**week** 22:15,17
23:10,10 25:16
27:23 54:3
61:1,21 76:5

127:6
**weekend** 26:19
39:18
**weeks** 39:1
43:14 52:2
**weigh** 88:1
**weighed** 77:11
**weighting**
111:17
**weighty** 110:24
**weil** 8:1 11:9
96:14
**welcome** 74:13
122:23,24
123:10
**west** 6:21
10:16 26:14,14
26:25 44:5,6
85:12
**we'd** 60:5
**we'll** 53:10
60:6,9,12 61:3
73:4 77:13
88:20 101:19
**we're** 57:25
58:3 60:7
61:17 64:5
66:6,12,23
69:13 72:21
78:4 79:11
90:2 97:3
100:20,23,24
101:10
**we've** 53:15,16
63:7,11 66:16
67:8,17 69:6
70:22 71:6,21

76:6 77:15
80:9 87:19
90:16 98:13,16
98:19,24 99:12
100:5
**what's** 49:13
59:8,9 81:19
**white** 1:14 4:15
6:13 10:15
26:14 32:20
44:6 73:22
115:9 124:16
124:19,24
125:8 128:11
**wholehearte...**
82:13 87:7
**who's** 78:22
**wide** 77:21
**widely** 94:13
**wielded** 112:4
**willing** 81:13
**winddown**
19:20
**window** 80:15
83:13
**wine** 112:21
**wisdom** 41:9
**wish** 18:16
19:12 21:10
24:25 112:15
117:15 121:10
127:11
**wishes** 12:8
25:24 27:15
45:20 96:12
101:23 112:5
116:17 118:7

120:1 126:3,19
**withdrawn**
40:12
**witness** 40:5
114:16
**witnesses**
23:14 53:12
54:10 55:17
57:2,8
**wonder** 30:4
**wonderful**
12:11
**wondering**
35:6
**wonderous**
29:9
**won't** 50:9
56:12 79:12
**words** 76:20
79:8
**work** 24:18
29:7 48:1,13
60:15,15 61:7
62:1 66:12
73:13 75:19
76:15,24 77:15
78:1 79:22
98:4 99:2,3
105:13 118:10
119:4,20
121:15,17
122:16 123:1,1
123:3
**worked** 44:11
58:10 83:4
98:10

**working** 13:13
36:6 46:17
47:20 56:18
60:18 63:7
66:12 95:7
101:19
**works** 29:10
61:12 114:10
**world** 12:11
46:3
**worrying** 49:8
**worth** 35:3,18
35:22 36:11
45:12 83:1
89:23
**worthy** 123:8
**wouldn't**
114:21
**would've** 62:24
69:1 75:22
100:12
**write** 35:12
**writing** 90:12
**written** 114:17
**wrong** 86:15
88:23 97:9
104:10
**wrote** 94:25

**x**

**x** 1:4,10 128:1

**y**

**yeah** 14:7
24:12 32:19
56:24 113:20
124:1

**year** 28:3 60:6
88:17,17 89:18
89:23 110:5
**years** 42:2
50:10 56:13
58:11 63:24
84:15 93:3,4
**yesterday** 39:6
53:7 55:19,21
**york** 1:2 6:6,17
7:4,11,20 8:4
8:12,23 9:4
10:4 106:4
**younger** 21:22
**you're** 49:23
53:6 54:21
72:20 89:18,18
97:10,11

**z**

**zero** 52:23
78:17
**zipes** 116:4,4
117:9,11 118:3
118:5,21,23
119:17,19
121:20,21
123:15,16
124:11 125:2,3
125:24 126:1
126:15,17

**à**

**à** 48:12