| | |
|---|---|
| Adam J. Goldberg | Nima H. Mohebbi (admitted *pro hac vice*) |
| Christopher Harris | Tiffany M. Ikeda (admitted *pro hac vice*) |
| Brett M. Neve | Sarah F. Mitchell (admitted *pro hac vice*) |
| Nacif Taousse | Emily R. Orman (admitted *pro hac vice*) |
| **LATHAM & WATKINS LLP** | **LATHAM & WATKINS LLP** |
| 1271 Avenue of the Americas | 355 South Grand Avenue, Suite 100 |
| New York, NY 10020 | Los Angeles, CA 90071 |
| Telephone: (212) 906-1200 | Telephone: (213) 485-1234 |
| Facsimile: (212) 751-4864 | Facsimile: (213) 891-8763 |
| Email:  adam.goldberg@lw.com | Email:  nima.mohebbi@lw.com |
|   christopher.harris@lw.com |   tiffany.ikeda@lw.com |
|   brett.neve@lw.com |   sarah.mitchell@lw.com |
|   nacif.taousse@lw.com |   emily.orman@lw.com |

*Counsel to the Foreign Representatives of*
*Three Arrows Capital, Ltd. (in liquidation)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al*.,[1] | Case No. 23-10063 (SHL) |
| Debtors. | Jointly Administered |
| | **Related Docket Nos. 711 and 763** |

**REPLY IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING THE ISSUANCE OF SUBPOENAS FOR THE PRODUCTION OF DOCUMENTS BY THE DEBTORS**

Russell Crumpler and Christopher Farmer, in their capacities as the duly authorized joint liquidators and foreign representatives of Three Arrows Capital, Ltd. ("**3AC**" or the "**3AC Debtor**"), hereby submit this reply in support of their motion (the "**Motion**," Docket No. 711)

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

1

pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure for entry of an order authorizing the 3AC Debtor to issue subpoenas for the production of documents on Debtors Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific, Pte. Ltd. ("**GAP**") (collectively, the "**Genesis Debtors**"). In further support of the Motion, the 3AC Debtor respectfully represents as follows:

## REPLY

1. Following receipt of the Genesis Debtors' Objection to the Motion (the "**Objection**," Docket No. 763), the parties' counsel conferred regarding the Genesis Debtors' responses to document requests concerning trusts managed by Grayscale Investments, LLC, a subsidiary of the Genesis Debtors' parent company, Digital Currency Group, Inc. ("**DCG**"). *See* Mot. Ex. B, Request Nos. 1-5. The Genesis Debtors agreed to conduct additional searches and amend their responses to previously issued requests regarding Grayscale, obviating the need for Rule 2004 discovery on the Grayscale requests at this time.

2. Thus, the only remaining issue in this Motion is quite limited: the 3AC Debtor's request that the Genesis Debtors produce "**All Documents and Communications, dated June 14, 2022 through July 31, 2022, concerning the assignment of certain claims from Genesis to DCG, as set forth in the Assignment and Assumption of Master Loan Agreement executed on July 14, 2022**" (the "**DCG Assignment Agreement**"). Mot. Ex. B, Request No. 6.

3. As the 3AC Debtor explained in the Motion, the relief requested is necessary for its representatives to discharge their obligations, as fiduciaries of 3AC's estate, to investigate all potential claims against the Genesis Debtors, including potential claims arising in connection with GAP's assignment of all of the Genesis Debtors' lending activities with 3AC to DCG on July 14, 2022—shortly *after* 3AC's collapse and commencement of BVI liquidation proceedings on June 27, 2022. *See* Mot. ¶¶ 15, 27. Such assignment may give rise to a fraudulent transfer claim to the

2

extent it was designed to frustrate any setoff rights 3AC may have against the Genesis Debtors in the BVI. *See id.*

4. Although the Genesis Debtors agreed to conduct searches for documents and communications related to the DCG Assignment Agreement through June 13, 2022, they also represented that they believe no such documents or communications exist because the DCG Assignment Agreement was contemplated and negotiated after that date. *See* Mot. ¶ 27 n.4. Thus, through this Motion the 3AC Debtor seeks documents and communications from June 14 to July 31, 2022—a narrow, reasonably tailored time period surrounding the July 14, 2022 execution of the DCG Assignment Agreement.

5. Remarkably, the Genesis Debtors have stridently opposed this discovery—limited in scope to documents and communications concerning a single agreement over a 1.5 month period—despite the highly suspicious timing of their purported assignment of all 3AC claims to DCG, and their assertions in this case that "pursuant to [the DCG Assignment Agreement], liability for 3AC's claims (if any) lies with DCG." Docket No. 530 at ¶ 50 n.14; Docket No. 658 at ¶ 62 n.13. The Genesis Debtors' refusal to respond to this basic discovery has necessitated Court intervention through the Motion.

6. In opposing the Motion, the Genesis Debtors notably do not contest that the discovery sought is within the scope of Rule 2004, and indeed admit that "discovery under Rule 2004 is broad in scope, often likened to a 'fishing expedition.'" Obj. ¶ 28. Nor do the Genesis Debtors contest that the 3AC Debtor's severe informational deficiencies have made it extremely difficult, and indeed impossible, to investigate 3AC's potential claims without discovery. *See* Mot. ¶ 3. Rather, the Genesis Debtors argue that the Court should exercise its discretion to deny the

Rule 2004 Motion because it is aimed at investigating a fraudulent transfer claim that the Genesis Debtors contend would be time-barred in this Chapter 11 proceeding. *See* Obj. ¶¶ 41–50.

7.   The Genesis Debtors' arguments fail for at least three independent reasons, explained in more detail below. *First*, the Genesis Debtors misconstrue the nature of the Court's inquiry and purpose of Rule 2004—the question is not a technical analysis of whether one hypothetical claim that the 3AC Debtor suspects may exist could ultimately be brought, but rather whether the 3AC Debtor has shown good cause to seek Rule 2004 discovery to investigate potential claims. *Second*, in any event, if the 3AC Debtor sought to amend the 3AC proofs of claim to assert a fraudulent transfer claim against the Genesis Debtors, such amendment would "relate back" to timely filed claims and should be freely allowed. *Third*, even if a claim uncovered through this discovery did not relate back to the original claims, the Court should permit the claim to proceed under the "excusable neglect" doctrine.

8.   The Genesis Debtors' arguments therefore all fail, and they should be ordered to produce documents and communications related to the DCG Assignment Agreement.

## ARGUMENT

### I. The Genesis Debtors' Focus on the Claim Bar Date Is Misplaced

9.   To avoid producing discovery on the DCG Assignment Agreement, the Genesis Debtors narrowly argue that the 3AC Debtor would be time-barred from asserting a fraudulent transfer claim in this proceeding after receiving the requested discovery. Obj. ¶¶ 41–50. Although that is not the case (*see* §§ II–III, *infra*), the Genesis Debtors' focus is misplaced, and the Court need not definitively find that a hypothetical claim would be timely in order to permit Rule 2004 discovery.

10.   "As numerous courts have recognized when presented with a Rule 2004 motion, 'there is no way to determine where the investigations will lead, what claims may be revealed, and

what issues are core and non-core'"; accordingly, in order to grant Rule 2004 relief, a court need not "speculate over possible causes of action that may be pursued after the investigation is complete." *In re Millennium Lab Holdings II, LLC*, 562 B.R. 614, 623, 625 (Bankr. D. Del. 2016). To hold otherwise would "endow[] the Court with prophetic powers it does not, and cannot, have," and undermine "a fundamental purpose of Rule 2004": "to grant debtors . . . a broad power to determine what causes of action they may possess." *Id.* at 623, 631; *see also In re Boulder Operations Holdings LLC*, No. 22-10664, 2023 Bankr LEXIS 1401, at *3 (Bankr. D. Del. May 30, 2023) (cited in Obj. ¶ 30) ("the propriety of a Rule 2004 examination does not necessarily turn on whether the bankruptcy court would have subject-matter jurisdiction over the claims that may come out of the investigation").

11.     Here, the 3AC Debtor explained that reasoned suspicions of a fraudulent transfer claim establish good cause for the discovery it seeks. Mot. ¶¶ 15, 27. However, the 3AC Debtor does not, and cannot, know at this stage where its investigation will lead, the precise details of any resulting claim(s), and even whether such claim(s) would be asserted against the Genesis Debtors in this proceeding. To impose a requirement that the 3AC Debtor establish in detail, before receiving any discovery, that a suspected claim would be timely puts the cart before the horse. Rule 2004 is intended as a tool to *investigate* potential claims, and the 3AC Debtor established good cause to warrant an investigation. *See, e.g., In re Hughes*, 281 B.R. 224, 226 (Bankr. S.D.N.Y. 2002) (joint liquidators' "investigation of potential claims on behalf of a debtor" was a proper use of Rule 2004 discovery).

### II.     Potential Claims Based on the DCG Assignment Agreement Would Be Permitted as Amendments to Timely-Filed Claims

12.     Even if the Genesis Debtors' misplaced arguments regarding application of the claim bar date to a potential fraudulent transfer claim are taken at face value, they still fail.

5

Although the 3AC Debtor cannot know the exact details of a fraudulent transfer claim prior to receiving the requested discovery, if the 3AC Debtor were to assert such a claim, it would not be time barred.

### 1. *A Fraudulent Transfer Claim Would Relate Back to the 3AC Claims*

13. The court in *In re Enron Corp.* explained that amendments are "freely allowed" when they "relate back" to a timely filed claim; that is, when there was a "timely assertion of a similar claim or demand evidencing an intention to hold the estate liable." 419 F.3d 115, 133 (2d Cir. 2005) (cited in Obj. ¶ 45). An amendment relates back when it "pleads a new theory of recovery on the facts set forth in the original claim." *Id.*; *see, e.g., In re Integrated Res., Inc.*, 157 B.R. 66, 71 (Bankr. S.D.N.Y. 1993) (cited in Obj. ¶ 46) (permitting amendment that raised "an alternative legal theory" where it did "not change any fact set forth in the Original Claim and . . . [arose] out of the identical set of facts as the Original Claim").

14. Here, were the 3AC Debtor to assert a fraudulent transfer claim after receiving discovery on the DCG Assignment Agreement, such claim would relate back to the 3AC Debtor's timely filed proofs of claims (the "**3AC Claims**," Claim Nos. 523, 526–27). The 3AC Claims identify certain transactions that the 3AC Debtor believed, based on the information available as of the bar date, were the basis for claims against the Genesis Debtors. 3AC Claims ¶ 6. Such transactions concern the lending relationship between GAP and 3AC that was purportedly subsequently assigned to DCG through the DCG Assignment Agreement. The 3AC Claims thus put the Genesis Debtors on notice of the 3AC Debtor's "intention to hold the estate liable" with respect to the lending relationship between GAP and 3AC and their transactions in or around May and June 2022—*i.e.*, the essential subject matter of the DCG Assignment Agreement. *See Enron*, 419 F.3d at 133; *see also In re Frontier Commc'ns Corp.*, 641 B.R. 64, 73 (Bankr. S.D.N.Y. 2022) ("to determine whether an amendment relates back to an earlier claim, the court must decide

'whether there is a sufficient commonality of facts between the allegations relating to the two causes of action to preclude the claim of unfair surprise'").[2]

15.    Moreover, the 3AC Claims made clear that the 3AC Debtor's investigation into potential claims against the Genesis Debtors was ongoing and efforts to identify claims had been frustrated by 3AC's limited books and records and the refusal of 3AC's founders to comply with their obligations to furnish information. 3AC Claims ¶ 5. In consideration of the limited information available as of the bar date, the 3AC Debtor expressly reserved rights to amend the 3AC Claims, including based on further facts discovered through discovery. *Id.* ¶¶ 7, 9-10. Accordingly, while an amendment to add a claim regarding the DCG Assignment Agreement could potentially raise a new legal theory, it would relate back because it arises "out of the same set of facts" as the 3AC Claims, and would not "change any fact set forth in the" 3AC Claims. *See Integrated Res.*, 157 B.R. at 71.

16.    Indeed, the Genesis Debtors implicitly recognized the relevance of the DCG Assignment Agreement to the 3AC Claims—and demonstrated that they were on notice of the relationship between the two—by attaching the DCG Assignment Agreement to their objection to the 3AC Claims, describing it in their objection, and alleging that "pursuant to [the DCG Assignment Agreement], liability for 3AC's claims (if any) lies with DCG." Docket No. 530 at ¶

---

[2] The Genesis Debtors were further put on notice of the relation of the DCG Assignment Agreement to 3AC's claims when the 3AC Debtor, in its amended proofs of claims, discussed and attached the DCG Assignment Agreement, and reserved rights to bring additional claims against the Genesis Debtors that may be uncovered in discovery, including those arising from "the relationships among 3AC's Founders, the [Genesis] Debtors, the [Genesis] Debtors' parent DCG, DCG's CEO Barry Silbert, and DCG's subsidiary Grayscale, among other related parties," and including, but "not limited to, claims for fraudulent misrepresentation," among other claims. Claim Nos. 981–82, 990 at ¶ 66; *see also id.* ¶¶ 4, 11, Ex. D.

50 & n.14, Ex. K. The fraudulent transfer claim that the 3AC Debtor suspects exists therefore relates back to the 3AC claims and should be "freely allowed." *See Enron*, 419 F.3d at 133.[3]

### 2. Equitable Considerations Would Support Allowing Amendment to Assert a Fraudulent Transfer Claim

17. After finding that the amendment relates back, the Court would then consider equitable factors, such as (1) "whether the debtor, or other creditors, would be unduly prejudiced by the amendment," (2) whether "other creditors would 'receive a windfall' from the disallowance of the amendment," and (3) "whether the late claimant acted in good faith and the delay was justified." *Enron*, 419 F.3d at 133. Undue prejudice is the most important factor. *Id.*; *see also United States v. Owens*, 84 B.R. 361, 363 (E.D. Pa. 1988) ("amendments to proofs of claim should in the absence of contrary equitable considerations or prejudice to the opposing party be freely permitted"). In the context of a proof of claim amendment, prejudice does not mean "that if the error is corrected someone will lose, which is almost always true, but that the error itself imposed a cost, as by misleading someone." *In re Stoecker*, 5 F.3d 1022, 1028 (7th Cir. 1993).

18. With respect to equitable concerns, the Genesis Debtors merely assert that the 3AC Debtor has "no excuse" for the delay because it was aware of the DCG Assignment Agreement months before the bar date. Obj. ¶ 49. The Genesis Debtors do not, and cannot, contend that they, or anyone else, would be unfairly prejudiced—the most important factor in determining whether

---

[3] The Genesis Debtors' cited cases on the relation back analysis do not compel a different result. *See* Obj. ¶¶ 44–49 & n.9. The cases concern an amendment that would have added *an entirely new party* (*Enron*, 419 F.3d at 120; *In re Enron*, 298 B.R. 513, 518 (Bankr. S.D.N.Y. 2003)); amended claims involving entirely new factual circumstances (*In re M. Fabrikant & Sons, Inc.*, 447 B.R. 170, 182 (Bankr. S.D.N.Y. 2011); *In re Asia Glob. Crossing, Ltd.*, 324 B.R. 503, 508 (Bankr. S.D.N.Y. 2005)); a claimant that represented that it was not going to seek the type of claim it later attempted to raise through an amendment (*In re Uvino*, Case No. 09-15225, 2012 Bankr. LEXIS 1089, at *9 (Bankr. S.D.N.Y. Mar. 14, 2012)); and an amended claim based on actions that occurred *four years* after the conduct that formed the basis of the original claim (*In re AMR Corp.*, Case No. 11-15463, 2014 Bankr. LEXIS 4314, at *27 (Bankr. S.D.N.Y. Oct. 9, 2014)).

The Genesis Debtors' remaining cited cases either declined to analyze the relation back question (*In re Residential Cap., LLC*, 507 B.R. 477, 494–95 (Bankr. S.D.N.Y. 2014)), or actually *permitted* amendments (*In re McLean Indus., Inc.*, 121 B.R. 704, 710 (Bankr. S.D.N.Y. 1990); *Integrated Res.*, 157 B.R. at 71–73).

to allow amendment. There is no evidence that the Genesis Debtors or other creditors reasonably relied on the lack of a fraudulent transfer claim to their detriment. Further, neither the Genesis Debtors nor other creditors could credibly contend that they would be unfairly surprised by a fraudulent transfer claim. As discussed, there is a severe informational asymmetry in that the Genesis Debtors have all information needed to identify and analyze this potential claim, while, by contrast, the 3AC Debtor's only avenue to obtain such information is seeking discovery from the Genesis Debtors. And, the Genesis Debtors described, attached, and asserted arguments regarding the DCG Assignment Agreement to their objection to the 3AC Claims. Docket No. 530 at ¶ 50 & n.14, Ex. K.[4]

19.     Additionally, the equities favor amendment because if the 3AC Debtor uncovers a fraudulent transfer claim after receiving the requested discovery, "other creditors would receive a windfall were the amendment not allowed" by increasing distributions to creditors beyond what would be available if this valid claim were permitted, in addition to the windfall the Genesis Debtors and other parties that participated in a fraudulent transfer would receive by avoiding the claim. *See Frontier*, 641 B.R. at 74.

20.     Finally, under the hypothetical facts the Genesis Debtors argue, an amendment would be permitted because the 3AC Debtor "acted in good faith and the delay was justified." *See Enron*, 419 F.3d at 133. As previously discussed, the 3AC Debtor lacked critical information to articulate its claims with all possible details as of the bar date, and has pursued all available means, including discovery from the Genesis Debtors, in an effort to supplement 3AC's records and obtain

---

[4] Were the Genesis Debtors to claim "prejudice" in the form of increased administrative and litigation costs, such argument would fail. *See, e.g., In re Brown*, 159 B.R. 710, 717 (Bankr. D.N.J. 1993) ("the fact that allowing this amendment may increase the litigation costs of the estate is not the type of prejudice that will overcome the liberal policy towards allowing amendments"); *McLean*, 121 B.R. at 710 ("Increased administration and litigation costs, cited by the Trust as a potential prejudice, are not alone sufficient to overcome the policy favoring liberal amendments, particularly where the trial has not yet commenced.").

information necessary to supplement the 3AC Claims.  There is no evidence of bad faith by the 3AC Debtor—represented by fiduciaries of the 3AC estate, charged with the immense task of fairly and efficiently liquidating 3AC to maximize the value of its assets for the benefit of all creditors.  Some delay in pursuing claims is justified, given that the 3AC Debtor's representatives' initial priority upon their June 2022 appointment was securing 3AC's assets across the globe, a major and sensitive undertaking that involved securing cryptocurrency wallets and related keys that were vulnerable to theft, along with numerous digital and tangible assets subject to varying levels of negotiations and disputes as to value.  The 3AC Debtor then pursued claims against several creditors, often subject to their own bankruptcy and liquidation proceedings, while attempting to reconstruct 3AC's meager books and records, and contending with the 3AC founders' lack of cooperation and active efforts to hinder the 3AC Debtor's efforts.

21.    Considering the complete lack of unfair prejudice to the Genesis Debtors or other creditors, the potential windfall to other creditors, and the 3AC Debtor's good faith actions and unique challenges, the Court's balancing of the equities would favor permitting amendment.

### III. Any New Claims Uncovered as a Result of the Requested Discovery Could Be Permitted Under the "Excusable Neglect" Standard

22.    The Genesis Debtors' entire argument hinges on their misplaced relation back analysis, and they do not even acknowledge that, even if a hypothetical claim resulting from the requested Rule 2004 discovery did not relate back to the 3AC Claims, the Court, in its discretion, could still permit a late-filed, entirely new claim.

23.    Again, the 3AC Debtor does not know the exact contours of any claim that would be revealed once the discovery requested in this Motion is produced.  But, to the extent such claim does not relate back to the 3AC Claims, it may still be admitted by the Court.  Bankruptcy Rule 9006(b)(1) allows a court to permit late-filed claims "where the failure to act was the result of

excusable neglect." Excusable neglect is an equitable determination, taking into account "(1) the danger of prejudice to the debtor; (2) the length of the delay and its potential impact on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and (4) whether the movant acted in good faith." *Frontier*, 641 B.R. at 74 (quoting *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993)); *see id.* at 77 (finding excusable neglect for post-bar date claims where there was no evidence of prejudice to debtors or bad faith by claimants).

24.     As discussed above, equitable considerations likely support allowing this (currently unidentified) claim, because the Genesis Debtors cannot show prejudice, the delay is not significant considering the overall timeline of this case, and the 3AC Debtor's delay was the result of good faith actions to work through informational deficiencies and other difficulties in identifying claims and discharging fiduciary duties.

## CONCLUSION

For the foregoing reasons, the 3AC Debtor respectfully requests that the Court order the Genesis Debtors to produce the discovery requested in Request No. 6 in Exhibit B to the Motion—*i.e.*, to produce all documents and communications concerning the DCG Assignment Agreement.

11

| | |
|---|---|
| Dated: October 4, 2023<br>Los Angeles, California | Respectfully submitted,<br><br>*/s/ Nima H. Mohebbi*<br>Nima H. Mohebbi (admitted *pro hac vice*)<br>Tiffany M. Ikeda (admitted *pro hac vice*)<br>Sarah F. Mitchell (admitted *pro hac vice*)<br>Emily R. Orman (admitted *pro hac vice*)<br>**LATHAM & WATKINS LLP**<br>355 South Grand Avenue, Suite 100<br>Los Angeles, CA 90071<br>Telephone: (213) 485-1234<br>Facsimile: (213) 891-8763<br>Email:   nima.mohebbi@lw.com<br>            tiffany.ikeda@lw.com<br>            sarah.mitchell@lw.com<br>            emily.orman@lw.com<br><br>– and –<br><br>Christopher Harris<br>Adam J. Goldberg<br>Brett M. Neve<br>Nacif Taousse<br>**LATHAM & WATKINS LLP**<br>1271 Avenue of the Americas<br>New York, NY 10020<br>Telephone: (212) 906-1200<br>Facsimile: (212) 751-4864<br>Email:   christopher.harris@lw.com<br>            adam.goldberg@lw.com<br>            brett.neve@lw.com<br>            nacif.taousse@lw.com<br><br>*Counsel to the Foreign Representatives*<br>*of Three Arrows Capital, Ltd.* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 4th day of October, 2023, a true and correct copy of the foregoing Objection was furnished to all ECF Participants via the Court's CM/ECF system.

                                                  */s/ Nima H. Mohebbi*
                                                  Nima H. Mohebbi