**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x

| | |
|---|---|
| In re | Chapter 11 |
| GENESIS GLOBAL HOLDCO, LLC, *et al.* | Case No. 23-10063 (SHL) |
| Debtors. | (Jointly Administered) |

----------------------------------------------------------------x

## MEMORANDUM OF DECISION

**A P P E A R A N C E S :**

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
*Counsel for the Debtors*
One Liberty Plaza
New York, New York 10006
By:    Sean A. O'Neal, Esq.
        Luke A. Barefoot, Esq.
        Jane VanLare, Esq.
        Andrew Weaver, Esq.

**PROSKAUER ROSE LLP**
*Counsel for the Ad Hoc Group of Genesis Lenders*
Eleven Times Square
New York, New York 10036
By:    Brian S. Rosen, Esq.

      -and-

70 West Madison, Suite 3800
Chicago, Illinois 60602
By:    Jordan E. Sazant, Esq.

      -and-

One International Place
Boston, Massachusetts 02110
By:    William D. Dalsen, Esq.

**HUGHES HUBBARD & REED LLC**
*Counsel for the Gemini Trust Company, LLC*
One Battery Park Plaza
New York, New York 10004
By:    Anson B. Frelinghuysen, Esq.
       Dustin P. Smith, Esq.
       Erin E. Diers, Esq.

**BROWN RUDNICK LLP**
*Counsel for the Fair Deal Group*
Seven Times Square
New York, New York 10036
By:    Kenneth J. Aulet, Esq.

       -and-

One Financial Center
Boston, Massachusetts 02111
By:    Matthew A. Sawyer, Esq.

**WHITE & CASE LLP**
*Counsel for the Official Committee of Unsecured Creditors*
1221 Avenue of the Americas
New York, New York 10020
By:    J. Christopher Shore, Esq.
       Philip Abelson, Esq.
       Michele J. Meises, Esq.

       -and-

111 South Wacker Drive, Suite 5100
Chicago, Illinois 60606-4302
By:    Gregory F. Pesce, Esq.

       -and-

200 South Biscayne Boulevard, Suite 4900
Chicago, Illinois 60606-4302
By:    Amanda Parra Criste, Esq.

**SEAN H. LANE**
**UNITED STATES BANKRUPTCY JUDGE**

Before the Court is the *Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(A) for Entry of an Order Approving a Settlement Agreement with FTX Debtors* [ECF No. 603][1] (the "Settlement Motion"). Pursuant to the Settlement Motion, Genesis Global Holdco, LLC ("Holdco") and its affiliated debtors (collectively, the "Genesis Debtors") in the above-captioned Chapter 11 proceeding seek approval of a settlement agreement (the "Settlement Agreement") between (i) the Genesis Debtors and certain of their non-debtor affiliates (collectively, the "Genesis Entities"); and (ii) FTX Trading Ltd. and its affiliated debtors (the "FTX Debtors"), as well as certain of the FTX Debtors' non-debtor affiliates (collectively, the "FTX Entities"). The Settlement Agreement was previously approved in the FTX Debtors' pending Chapter 11 proceeding in the Bankruptcy Court for the District of Delaware (the "FTX Bankruptcy Proceeding").[2] *See In re FTX Trading Ltd., et al.*, Bankr. D. Del. [Case No. 22-11068, ECF No. 2433].

In support of the Settlement Motion, the Genesis Debtors submitted the *Declaration of A. Derar Islim in Support of the Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(A) for Entry of an Order Approving Settlement Agreement with FTX Debtors* [ECF No. 603-1] (the "Islim Declaration"). Mr. Islim is the interim Chief Executive Officer of Holdco and has held that role since August 17, 2022. *See* Islim Decl. ¶ 2. Prior to that position, Mr. Islim was a member of senior management for the Genesis Debtors and their non-debtor

---

[1]    Unless otherwise indicated, references in this Memorandum of Decision to docket entries on the Case Management/Electronic Case Files ("ECF") system are to Case No. 23-10063.

[2]    A copy of the Settlement Agreement is attached as Exhibit B to the Settlement Motion.

subsidiaries and Genesis Global Trading, Inc. ("GGT"), a sister company of Holdco, for two and a half years and was historically the Chief Operating Officer at GGT.  *See id.*

An objection to the Settlement Motion has been filed by the Ad Hoc Group of Lenders (the "Ad Hoc Group"), and is joined by Gemini Trust Company, LLC ("Gemini") and another ad hoc group of creditors that refers to itself as the "Fair Deal Group."  *See Objection of Ad Hoc Group of Genesis Lenders to Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(A) for Entry of an Order Approving Settlement Agreement with FTX Debtors* [ECF No. 648] (the "Ad Hoc Group Objection"); *Joinder of Gemini Trustee Company, LLC in Objection of Ad Hoc Group of Genesis Lenders to Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) for Entry of an Order Approving Settlement Agreement with FTX Debtors* [ECF No. 651] (the "Gemini Joinder"); *Amended Joinder of the Fair Deal Group to the Objection of Ad Hoc Group of Genesis Lenders to Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(A) for Entry of an Order Approving Settlement Agreement with FTX Debtors* [ECF No. 652] (the "Fair Deal Group Joinder").[3]  The Official Committee of Unsecured Creditors appointed in the Genesis Debtors' bankruptcy cases (the "Genesis Official Committee") filed a reservation of rights with respect to the Settlement

---

[3]    The objectors represent a variety of creditors.  Gemini is agent for more than 232,000 lenders owed more than $1 billion by the Genesis Debtors.  *See* Gemini Joinder ¶ 1.  The Ad Hoc Group represents approximately $2.4 billion in claims asserted against Genesis Debtor Genesis Global Capital LLC, including majorities of the USD, BTC and ETH creditor classes.  *See* Ad Hoc Group Objection ¶ 29.  The Fair Deal Group is an ad hoc group of unsecured claimants of the Genesis Debtors.  *See* Fair Deal Group Joinder ¶ 1.

In connection with a prior motion, the Genesis Debtors asserted that Gemini and members of the Ad Hoc Group make up the majority of the Fair Deal Group.  *See Debtors' Reply in Support of Motion for Entry of an Order Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereof and Granting Related Relief* ¶ 6(b) [ECF No. 662]; Hr'g Tr. 70:20-71:9 (Sept. 6, 2023) [ECF No. 734].  The issue of transparency surrounding the composition of the Fair Deal Group was also raised by the Office of the United States Trustee at the hearing on the Settlement Motion.  *See* Hr'g Tr. 133:24-134:25 (Sept. 18, 2023).  The question that arises is whether Gemini and the Ad Hoc Committee have essentially used the Fair Deal Group to take a second bite of the apple by filing an additional objection to the Settlement Motion and advancing certain arguments in a name other than their own.

Motion and, ultimately, did not object to the settlement. *See Statement and Reservation of Rights of the Official Committee of Unsecure Creditors with Respect to Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(A) for Entry of an Order Approving Settlement Agreement with FTX Debtors* [ECF No. 671] (the "Committee Statement"). For the reasons set forth below, the Settlement Motion is granted.

## BACKGROUND

As part of the Genesis Entities' operations prior to the Genesis Debtors' bankruptcy filing, both the Genesis Debtors and non-debtor GGC International Limited ("GGCI") engaged in transactions with the FTX Debtors, including FTX Debtor Alameda Research Ltd. ("Alameda"). *See* Settlement Motion ¶ 7. The Genesis Debtors' operations generally included lending and borrowing services, while GGCI—a subsidiary of Holdco—offered trading services. *See* Settlement Motion ¶ 7. GGCI maintained a customer account on the FTX.com cryptocurrency exchange, in which it deposited and withdrew digital assets. *See* Settlement Motion ¶ 7. Debtor Genesis Global Capital LLC ("GGC") engaged in a number of loan transactions with Alameda. *See* Settlement Motion ¶ 7. These loans were governed by various master lending agreements ("MLAs") that provided for certain loan terms, collateral requirements, and loan repayment procedures. *See* Settlement Motion ¶ 8. Under these MLAs, GGC and Alameda engaged in a number of transactions involving fiat currency and digital assets between approximately February 2019 and November 2022. *See* Settlement Motion ¶ 8.

The terms of the MLAs required that when GGC loaned funds or digital currency to Alameda, Alameda needed to maintain a certain level of collateral with GGC and also pay a financing fee that would accrue and become payable in-kind until the loan was repaid. *See* Settlement Motion ¶ 9. This collateral served as security for Alameda's obligations under the

5

MLAs.  *See* Settlement Motion ¶ 9.  If the value of the total amount of collateral maintained with GGC fell below a certain percentage of the total value of the loaned assets outstanding under the MLAs, Alameda was required to provide additional collateral to GGC.  *See* Settlement Motion ¶ 9.  When Alameda repaid a loan to GGC, GGC was then required to return the collateral that Alameda had provided in connection with that loan.  *See* Settlement Motion ¶ 9.  GGC could also borrow funds from Alameda pursuant to the MLAs; in that circumstance, the same process for holding collateral occurred in reverse.  *See* Settlement Motion ¶ 9.

Between August 13 and November 11, 2022 (the "FTX Preference Period"), GGC and Alameda provided certain cryptocurrency and fiat loans to one another.[4]  *See* Settlement Motion ¶ 10.  In connection with those loans, assets that were held as collateral were also transferred between GGC and Alameda.  *See* Settlement Motion ¶ 10.  During the FTX Preference Period, GGCI also deposited and withdrew digital assets from its customer wallet on FTX.com.  *See* Settlement Motion ¶ 10.

In November 2022, the FTX Debtors commenced their Chapter 11 proceedings in the Delaware Bankruptcy Court.  *See* Settlement Motion ¶ 11.  The Genesis Debtors' bankruptcy cases were filed in January 2023.  *See* Settlement Motion ¶ 6.

In May 2023, the FTX Debtors filed the *Motion of FTX Trading Ltd. and its Affiliated Debtors for an Order Modifying the Automatic Stay Pursuant to 11 U.S.C. 362(d)(1) and Bankruptcy Rule 4001* [ECF No. 289] (the "Lift Stay Motion").  The Lift Stay Motion sought to lift the automatic stay in these Genesis bankruptcy cases to allow the FTX Debtors to bring preference actions against the Genesis Debtors in the FTX Bankruptcy Proceedings to recover an

---

[4]    The FTX Preference Period constitutes the 90 day period prior to the filing of the FTX Bankruptcy Proceeding on November 11, 2022.  *See* Settlement Motion ¶ 11.  Under Section 547 of the Bankruptcy Code, the FTX Debtors may seek to avoid a transfer that took place during this period if the transfer constitutes a preference under the requirements of the statute.  *See* 11 U.S.C. § 547(b).

alleged $3.673 billion in transfers made to the Genesis Debtors during the FTX Preference

Period.  *See* Settlement Motion ¶ 12.  The Genesis Debtors filed an objection to the Lift Stay

Motion, which was joined by the Genesis Official Committee and the Ad Hoc Group.  *See*

*Debtors' Objection to Motion of FTX Trading Ltd. and its Affiliated Debtors for an Order*

*Modifying the Automatic Stay Pursuant to 11 U.S.C. 362(d)(1) and Bankruptcy Rule 4001* [ECF

No. 405]; *Joinder and Reservation of Rights of the Official Committee of Unsecured Creditors to*

*Debtors' Objection to the Motion of FTX Trading Ltd. and its Affiliated Debtors for an Order*

*Modifying the Automatic Stay Pursuant to 11 U.S.C. 362(d)(1) and Bankruptcy Rule 4001* [ECF

No. 407]; *Joinder and Reservation of Rights of the Ad Hoc Group to Debtors' Objection to the*

*Motion of FTX Trading Ltd. and its Affiliated Debtors for an Order Modifying the Automatic*

*Stay Pursuant to 11 U.S.C. § 362(d)(1) and Bankruptcy Rule 4001* [ECF No. 412].

Shortly after the filing of the Lift Stay Motion, the FTX Debtors filed numerous proofs of

claim in these bankruptcy cases (the "FTX Claims"), collectively asserting claims totaling

$3,876,473,714.[5]  *See* Settlement Motion ¶ 14.  The FTX Claims include approximately (i) $1.8

billion in loan repayments allegedly made by Alameda to GGC pursuant to the MLAs during the

FTX Preference Period; (ii) $272 million of collateral allegedly pledged by Alameda to GGC

pursuant to the MLAs during the FTX Preference Period; (iii) $143 million of collateral

allegedly pledged by Alameda to GGC pursuant to the MLAs prior to the FTX Preference

---

[5]    On May 22, 2023, FTX Trading Ltd. filed Claim No. 415 against Holdco, Claim No. 419 against Genesis
Asia Pacific, Ltd. ("GAP"), and Claim No. 426 against GGC; Alameda Research LLC filed Claim No. 422 against
Holdco, Claim No. 420 against GAP, and Claim No. 513 against GGC; Alameda Research Ltd. filed Claim No. 512
against Holdco, Claim No. 457 against GAP, and Claim No. 508 against GGC; West Realm Shires Inc. filed Claim
No. 516 against Holdco, Claim No. 463 against GAP, and Claim No. 438 against GGC; West Realm Shires Services
Inc. filed Claim No. 465 against Holdco, Claim No. 432 against GAP, and Claim No. 515 against GGC.  *See*
Settlement Motion ¶ 13.

Period; and (iv) $1.6 billion of assets allegedly withdrawn by the Genesis Debtors from the FTX.com exchange during the FTX Preference Period. *See* Settlement Motion ¶ 14.

In June 2023, the Genesis Debtors filed a *Motion to Establish Procedures and a Schedule for Estimating the Amount of the FTX Debtors' Claims Against the Debtors Under Bankruptcy Code Sections 105(a) and 502(c) and Bankruptcy Rule 3018* [ECF No. 373] (the "Estimation Motion"). In the Estimation Motion, the Genesis Debtors proposed procedures to estimate the FTX Claims, arguing that estimation would avoid undue delay in these bankruptcy cases. *See* Settlement Motion ¶ 17. The Estimation Motion noted that the Genesis Debtors would seek to estimate the FTX Claims at $0. *See* Settlement Motion ¶ 17. The FTX Debtors objected to estimation, which was joined by the Official Committee of Unsecured Creditors that has been appointed in the FTX Bankruptcy Proceeding. *See FTX Debtors' Objection to Genesis Debtors' Motion to Establish Procedures and a Schedule for Estimating the Amount of the FTX Debtors' Claims Against the Genesis Debtors Under Bankruptcy Code Sections 105(a) and 502(c) and Bankruptcy Rule 3018* [ECF No. 404]; *Objection of the FTX Committee and Joinder to the FTX Debtors' Objection to Motion to Establish Procedures and a Schedule for Estimating the Amount of the FTX Debtors' Claims Against the Debtors Under Bankruptcy Code Sections 105(a) and 502(c) and Bankruptcy Rule 3018* [ECF No. 406].

On June 15, 2023, July 6, 2023, and July 20, 2023, the Court held contested hearings on both the Lift Stay Motion and the Estimation Motion. *See generally* Hr'g Tr. (June 15, 2023) [ECF No. 448]; Hr'g Tr. (July 6, 2023) [ECF No.492]; Hr'g Tr. (July 20, 2023) [ECF No. 551]. After argument on each of these days, the Court ordered that the Lift Stay Motion and the Estimation Motion be continued and directed the parties to begin exchanging discovery in an attempt to narrow the extensive issues in dispute. *See, e.g.,* Hr'g Tr. 77:3-11 (June 15, 2023).

The Court acknowledged that the Lift Stay Motion and the Estimation Motion involved important and complex issues for both the Genesis Debtors and the FTX Debtors, including how to balance concerns regarding the potential delay of the Genesis Debtors' bankruptcy cases with issues about the proper forum for litigating issues that are central to the FTX Debtors' Bankruptcy Proceedings, such as the value of FTX's proprietary currency FTT. *See, e.g.,* Hr'g Tr. 20:5-21:3, 59:1-2, 66:15-23 (June 15, 2023) [ECF No. 448]; Hr'g Tr. 26:11-25, 60:8-16, 87:9-88:1 (July 6, 2023) [ECF No. 492].

At the end of June 2023, the Genesis Entities filed proofs of claim in the in the FTX Bankruptcy Proceeding (the "Genesis Claims") asserting claims against the FTX Debtors, including (a) an approximately $176 million customer claim against FTX Trading Ltd.; (b) an approximately $140 million avoidance claim against Alameda; (c) an approximately $40 million outstanding loan claim against Alameda; and (d) to the extent of any allowed FTX Claim, claims under Section 502(h) of the Bankruptcy Code. *See* Settlement Motion ¶¶ 22-27.

After the filing of the Lift Stay Motion and the Estimation Motion, the parties began settlement negotiations. *See* Islim Decl. ¶ 5. After several weeks—and a narrowing of the issues to be considered by the Court in any proposed estimation proceeding—the parties began to discuss a potential global resolution of all claims between the FTX Entities and the Genesis Entities. *See id.* After numerous exchanges of settlement offers and conversations between counsel, the parties reached a deal in principle in late July 2023. *See* Islim Decl. ¶ 7.

The Settlement Agreement is a resolution of both the FTX Claims and the Genesis Claims. *See* Settlement Motion ¶ 1. The terms of the Settlement Agreement generally provide that:

    (a) Alameda shall receive an allowed general unsecured claim against GGC in the amount of $175,000,000 (the "Allowed Alameda Claim");

(b) the Allowed Alameda Claim shall be entitled to receive *pro rata* distributions with all other allowed general unsecured claims pursuant to the Genesis Debtors' plan of reorganization (the "Genesis Plan") and shall be entitled to the same treatment as allowed general unsecured claims in its respective class under the Genesis Plan;

(c) the FTX Entities and the Genesis Entities shall not object to any Chapter 11 plan in the other parties' bankruptcy proceedings that is not inconsistent with the terms and conditions of the Settlement Agreement;

(d) the FTX Debtors and the Genesis Debtors shall withdraw with prejudice the Lift Stay Motion and the Estimation Motion, as well as the FTX Claims and the Genesis Claims; and

(e) each of the FTX Entities and the Genesis Entities shall release each other from any claims that they have against one another.

*See* Settlement Motion ¶ 2.

The Genesis Debtors filed the Settlement Motion in August 2023 and the Court held a contested evidentiary hearing on the Settlement Motion on September 18, 2023. At the hearing, the Court heard further testimony from Mr. Islim on cross-examination and redirect, as well as closing arguments by counsel to the parties.

## DISCUSSION

A. Legal Standard

Bankruptcy Rule 9019(a) provides that "on motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a). The decision to approve or deny a particular compromise or settlement involving a bankruptcy estate lies within the discretion of the bankruptcy court. *See Vaughn v. Drexel Burnham Lambert Grp., Inc. (In re Drexel Burnham Lambert Grp., Inc.)*, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991); *see also Nellis v. Shugrue*, 165 B.R. 115, 122-23 (S.D.N.Y. 1994). As a general matter, "[s]ettlements and compromises are favored in bankruptcy as they minimize costly litigation and

further parties' interests in expediting the administration of the bankruptcy estate." *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 641-42 (Bankr. S.D.N.Y. 2012) (quoting *In re MF Global Inc.*, No. 11-2790, 2012 WL 3242533, at *5 (Bankr. S.D.N.Y Aug. 10, 2012)); *see also Motorola, Inc. v. Official Comm. of Unsecured Creditors* (*In re Iridium Operating LLC*), 478 F.3d 452, 455 (2d Cir. 2007) (stating that settlements are important in bankruptcy because they "help clear a path for the efficient administration of the bankrupt estate"); 10 Collier on Bankruptcy ¶ 9019.01 at 9019-20 (16th ed. rev. 2013) (highlighting that "compromises are favored in bankruptcy"). A court may exercise its discretion "in light of the general public policy favoring settlements." *In re Hibbard Brown & Co., Inc.*, 217 B.R. 41, 46 (Bankr. S.D.N.Y. 1998).

To approve a proposed settlement, a court must determine that a settlement under Rule 9019 is fair, equitable, and in the best interests of the estate. *See Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968); *Air Line Pilots Assoc. v. Am. Nat'l Bank & Trust Co. of Chi.* (*In re Ionosphere Clubs, Inc.*), 156 B.R. 414, 426 (S.D.N.Y. 1993), *aff'd*, 17 F.3d 600 (2d Cir. 1994); *MF Global Inc.*, 2012 WL 3242533, at *5; *In re Mrs. Weinberg's Kosher Foods, Inc.*, 278 B.R. 358, 361 (Bankr. S.D.N.Y. 2002). In so doing, however, the court need not conduct a "mini-trial" or decide the numerous issues of law and fact raised by a compromise or settlement, but must only "canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness." *In re Dewey & LeBoeuf LLP*, 478 B.R. at 640 (quoting *In re Adelphia Commc'ns Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005)). "To be approved, '[t]he settlement need not be the best that the debtor could have obtained.'" *In re Sabine Oil & Gas Corp.*, 555 B.R. 180, 257 (Bankr. S.D.N.Y. 2016) (quoting *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 225 (Bankr. S.D.N.Y. 2007)). "Indeed, '[i]f courts required settlements to be perfect, they would seldom be approved.'" *Id.*

(quoting *Official Comm. of Unsecured Creditors v. CIT Grp./Bus. Credit Inc. (In re Jevic Holding Corp.)*, 787 F.3d 173, 180 (3d Cir. 2015)).  "Rather, 'there is a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion.'"  *Id.* at 257-58 (quoting *Newman v. Stein*, 464 F.2d 689, 693 (2d Cir. 1972)).

In the Second Circuit, *Iridium* directs courts to balance the following seven interrelated factors in deciding whether a settlement is fair and equitable:

(1) the balance between the litigation's possibility of success and the settlement's future benefits;

(2) the likelihood of complex and protracted litigation, "with its attendant expense, inconvenience, and delay," including the difficulty in collecting on the judgment;

(3) "the paramount interests of the creditors," including each affected class's relative benefits "and the degree to which creditors either do not object to or affirmatively support the proposed settlement";

(4) whether other parties in interest support the settlement;

(5) the "competency and experience of counsel" supporting, and "[t]he experience and knowledge of the bankruptcy court judge" reviewing, the settlement;

(6) "the nature and breadth of releases to be obtained by officers and directors"; and

(7) "the extent to which the settlement is the product of arm's length bargaining."

*Iridium*, 478 F.3d at 462.

When evaluating the necessary facts, a court may rely on the opinion of the debtor, parties to the settlement, and professionals.  *In re Dewey & LeBoeuf LLP*, 478 B.R. at 641.  *See In re Chemtura Corp.*, 439 B.R. 561, 594 (Bankr. S.D.N.Y. 2010); *In re Purified Down Prods. Corp.*, 150 B.R. 519, 522-23 (Bankr. S.D.N.Y. 1993).  In particular, the business judgment of the debtor in recommending the settlement should be factored into the court's analysis."  *MF Global Inc.*, 2012 WL 3242533, at *5 (citing *JP Morgan Chase Bank, N.A. v. Charter Commc'ns*

12

Operating LLC (*In re Charter Commc'ns*), 419 B.R. 221, 252 (Bankr. S.D.N.Y. 2009)).  "While

the bankruptcy court may consider the objections lodged by parties in interest, such objections

are not controlling. . . . [T]he bankruptcy court must still make informed and independent

judgment."  *In re WorldCom, Inc.*, 347 B.R. 123, 137 (Bankr. S.D.N.Y. 2006).

    B.  The Settlement Agreement Satisfies the *Iridium* Factors

      The Court finds that the *Iridium* factors weigh in favor of approving the Settlement

Agreement.  More specifically, the Court finds that these factors weigh in favor of approving the

Settlement Agreement: the balance between the litigation's possibility of success and the

settlement's future benefits; the likelihood of complex and protracted litigation, "with its

attendant expense, inconvenience, and delay," including the difficulty in collecting on the

judgment;  and "the paramount interests of the creditors," including each affected class's relative

benefits.  *Iridium*, 478 F.3d at 462.

      To begin with, the Court notes that the terms of the Settlement Agreement resolve the

FTX Claims at less than 5% of their face value, while at the same time insulating the Genesis

Entities from any other claims held by the FTX Entities.  As asserted, the FTX Claims constitute

more than 250% of the value of the Genesis Debtors' liquid assets and equal approximately 90%

of all scheduled claims against GGC combined.  *Compare* FTX Claims (filed against the Genesis

Debtors in the amount of approximately $3.8 billion and detailed *supra*, note 4) with ECF No.

471 (Genesis Debtors' Cash and Coin Report as of June 30, 2023, reporting approximately $1.3

billion in cash, digital assets, and shares held in brokerage accounts); ECF No. 187 (Summary of

Genesis Debtors' Schedules and Statements, reporting $4.079 billion in GGC liabilities).  The

Settlement Agreement therefore avoids the potential for a litigated judgment that could value the

FTX Claims at an amount above the Allowed Alameda Claim of $175,000,000 provided for

under the Settlement Agreement, which will be paid on a *pro rata* basis with other unsecured creditors under the Genesis Debtors' Plan.

The Settlement Agreement also avoids the litigation risks that would be involved in contesting the FTX Claims. The litigation regarding the FTX Claims is inherently uncertain given that many of the defenses available to the Genesis Debtors have not been addressed in the context of the cryptocurrency industry and therefore raise novel legal issues. Litigating these claims would also involve the possibility of adverse rulings in either the Genesis Debtors Bankruptcy Proceedings or the FTX Bankruptcy Proceedings that would negatively impact any claims the Genesis Debtors might be able to assert against third parties. *See* Hr'g Tr. 80:4-21. Settling the FTX Claims also insulates non-debtor affiliates of the Genesis Debtors, including GGCI, from claims that the FTX Debtors might assert against them, which could in turn result in the bankrupting of those entities. *See* Islim Decl. ¶ 12. This could result in harm to the overall structure of the Genesis Entities, including the Genesis Debtors.

The Settlement Agreement will also help the Genesis Debtors to confirm a Chapter 11 plan on their proposed timeline, a process that is already underway. It eliminates the possibility that certain issues relating to the FTX Claims—such as the insolvency of the FTX Debtors and the value of the native token FTT—would be litigated in the FTX Bankruptcy Proceedings, a position that was strongly advocated for by the FTX Debtors in the Lift Stay Motion. *See* Islim Decl. ¶ 11; *Letter to Judge Lane re Estimation and Lift Stay* [ECF No. 476]. Litigating these issues in the FTX Bankruptcy Proceedings could subject the Genesis Debtors to protracted litigation on a timeline that the Genesis Debtors and this Court do not control, thus exposing the stakeholders in these Genesis Debtors' bankruptcy cases to potential extensive delay. *See* Islim Decl. ¶ 11. The Court also notes that any recoveries that the Genesis Debtors might ultimately

receive in the FTX Bankruptcy Proceeding would likely occur in the distant future, if at all.
Islim Decl. ¶ 10.  Litigation regarding the FTX Claims would also deplete the Genesis Debtors'
estates, delay distributions to creditors, and undermine the viability of the Genesis Debtors' Plan,
including by requiring the Genesis Debtors to set higher than expected reserves.  *See* Islim Decl.
¶¶ 11, 12, 14.  The Settlement Agreement avoids the necessity of withholding an estimated claim
on behalf of the FTX Claims in the Genesis Debtors' plan process, which would serve to delay
distributions to creditors.  Formulation of the Genesis Debtors' plan requires certainty regarding
the status and amount of the FTX Claims and the Settlement Agreement aids that process.  *See*
Islim Decl. ¶ 11.

Relatedly, the Settlement Agreement will avoid extensive litigation costs, which will in
turn maximize creditor recoveries.  Whether the claims were resolved through an estimation
proceeding or full litigation of the claims, the results would have entailed significant professional
fees, including for discovery, preparation of experts and motion practice.  The Genesis Debtors
estimate that the cost would be at least $5 million if the Court had agreed to proceed with
estimation of the FTX Claims, which the Court notes was still an open question at the time the
Settlement Agreement was reached.  *See* Islim Decl. ¶ 12.  Had the Court decided that a
conventional litigation of the FTX Claims was a more appropriate approach—either before this
Court or in the FTX bankruptcy proceeding—the Genesis Debtors believe the total would have
been several times that amount.  *See* Islim Decl. ¶ 12.

The Court also finds that the "competency and experience of counsel" and "the extent to
which the settlement is the product of arm's length bargaining" both weigh in favor of approving
the Settlement Agreement.  *Iridium*, 478 F.3d at 462.  The Court notes that the parties to the
Settlement Agreement were represented by sophisticated and experienced counsel and financial

15

advisors that are highly regarded and have significant restructuring experience. *See* Islim Decl. ¶ 15.  The Genesis Debtors' professionals understand the difficulties of successfully concluding a litigation of this size and complexity and have been analyzing, discussing, and preparing for litigation on the issues relating to the FTX Debtors for several months. *See* Islim Decl. ¶ 13. The Genesis Debtors' professionals also understand the potential consequences to creditors of the Genesis Debtors' estates if the Settlement Agreement is not consummated and recommended that the Genesis Debtors enter into the Settlement Agreement. *See* Islim Decl. ¶¶ 6–7, 15.  The Court also finds that the Settlement Agreement is the product of arm's length negotiations between the Genesis Debtors and the FTX Debtors. *See* Islim Decl. ¶ 15.  It is Mr. Islim's testimony that the settlement negotiations were primarily handled on behalf of the Genesis Debtors by their counsel, Cleary Gottlieb Steen & Hamilton LLP, in consultation with the independent Special Committee of the Board of Directors of Holdco and the Company's senior management. *See* Islim Decl. ¶ 6.[6]  Mr. Islim also testified that the Genesis Debtors, acting through their independent Special Committee and their advisors have determined that the Settlement Agreement is fair and equitable, reasonable, and in the best interests of the Genesis Debtors' estates. *See* Islim Decl. ¶ 7.

As for "the degree to which creditors either do not object to or affirmatively support the proposed settlement" and whether other parties in interest support the settlement, this factor is more complicated. *Iridium*, 478 F.3d at 462.  It is true that there are creditors that oppose the Settlement Agreement.  But importantly, the Genesis Official Committee—which has a fiduciary duty to all the unsecured creditors—does not oppose the Settlement Motion.  Indeed, counsel to

---

[6]    Mr. Islim testified that the Special Committee was the ultimate decisionmaker for all funding, settlement and governance aspects of Holdco, including whether to enter into the Settlement Agreement. *See* Hr'g Tr. 30:17-25 (Sept. 18, 2023).

the Genesis Official Committee voiced support for the Settlement Motion at the hearing, noting

that it had fully vetted the settlement consistent with its fiduciary duties and determined that

litigation of the claims at issue was a "far, far worse" outcome than the Settlement Agreement.

*See* Hr'g Tr. 98:20-24 (Sept. 18, 2023).  The broad fiduciary duties of the Genesis Official

Committee make it distinct from the objectors, each of which are protecting their parochial

interests.[7]  In assessing the extent of creditor support, the Court notes the Genesis Debtors and

the Office of the United States Trustee have questioned the composition of the Fair Deal Group

and whether it is really another guise for the Ad Hoc Group and Gemini, thus potentially

skewing the consideration of this factor.  But the Court does not need to determine the

composition of the Fair Deal Group, as the Court finds that approval of the Settlement

Agreement is appropriate even assuming there is no overlap in the identity of the objectors.

For the foregoing reasons, the Court finds that the first *Iridium* factor weighing the

balance between the litigation's possibility of success and the settlement's future benefits, the

second *Iridium* factor relating to the likelihood of complex and protracted litigation including the

difficulty in collecting on the judgment, the third *Iridium* factor examining the paramount

interests of the creditors, the fifth *Iridium* factor dealing with the competency and experience of

counsel supporting the settlement, and the seventh *Iridium* factor relating to the extent to which

the settlement is a product of arms' length negotiations all support approval of the Settlement

Agreement.  The Court therefore finds that the balance of the *Iridium* factors weigh in favor of

---

[7]      Indeed, one of the objectors has been at loggerheads with the Genesis Debtors for some time.  *See, e.g.,*
Hr'g Tr. 10:2-12:3 (July 13, 2023) [ECF No. 531] (counsel to Gemini objecting to extension of deadline to disclose
information regarding current proposals while mediation taking place between Ad Hoc Group, Digital Currency
Group and Genesis Official Committee is extended, noting its dissatisfaction with current proposals and stating that
"Gemini is very concerned that the very close proposal may result in creditors being railroaded by a deal that is
announced on the eve of the hearing on the proposed disclosure statement."); *see also Objection of Gemini Trust
Company, LLC to Debtors' Second Motion to Extend Exclusivity* [ECF No. 634].

approving the Settlement Agreement. The Court also finds that the Settlement Agreement is fair,

equitable, and in the best interests of the estate and falls within the range of reasonableness and

therefore meets the standard for approval under Bankruptcy Rule 9019(a).

### C. Arguments of the Objectors

The objectors begin by complaining that Mr. Islim and the Genesis Debtors have failed to

disclose their legal analysis and assessments[8] regarding the potential strengths and weaknesses of

the various asserted claims and defenses thereto and the input of legal counsel due to that

information being privileged.[9] *See* Hr'g Tr. 38:13-17 (Sept. 18, 2023) (counsel to the Ad Hoc

Group stating, "I think that what we're saying is that if you're going to offer testimony that a

settlement is reasonable, that leads to what are factors that are set by the law. Those factors

include, among other things, probability of success."); *see, e.g.,* Hr'g Tr. 71:15-72:3 (Sept. 18,

---

[8]     The objectors also argued that Mr. Islim never considered the probabilities of success when assessing the
Settlement Agreement. But at the hearing on the Settlement Motion, Mr. Islim clarified that during his deposition
when he responded that senior management and the Special Committee did not consider the probabilities of success
on various issues, his interpretation of the word "probabilities" related to actual numbers. He stated, "Probabilities,
by definition, are actual numbers, numerical numbers. So I assumed the question was, did you assign 50, 60
percent, 70 percent, which we did not." Hr'g Tr. 75:16-22 (Sept. 18, 2023). Importantly, Mr. Islim made this same
clarification during his deposition. *See id.* at 75:23-25. Mr. Islim noted that the Special Committee and senior
management had indeed considered the probability of success when evaluating the Settlement Agreement. *See id.* at
77:11-14. Thus, the Debtors and Mr. Islim gave the objectors notice of his views in discovery and avoided the
possibility of any surprise to the objectors as to Mr. Islim's views on this subject. The Court finds Mr. Islim's
testimony on this subject to be credible and notes that it dovetails with the written declaration that served as his
direct testimony. *See* Islim Decl. ¶¶ 12, 13 (stating that the Settlement Agreement avoids the possibility of adverse
rulings in the Genesis bankruptcy cases or the FTX Bankruptcy Proceedings that could negatively impact the
Genesis Debtors' defenses to claims and noting that the Genesis Debtors' professionals understand the difficulties of
successfully concluding litigation of this size and complexity). Indeed, it would be hard to reconcile the objectors'
views of his testimony with the totality of his testimony.

[9]     Relatedly, the Ad Hoc Group complains that the Genesis Debtors withheld as privileged certain documents
setting forth their detailed analysis of the strengths and weaknesses of specific claims. Similarly, Mr. Islim refused
to answer certain questions based on privilege. But the Court ruled on the record at the beginning of the hearing on
the Settlement Motion, finding that the information in question was protected by the work product privilege and
common interest exception and did not need to be disclosed to the Ad Hoc Committee in discovery. *See* Hr'g Tr.
12:18-19:20 (Sept. 18, 2023) [ECF No. 723]. Indeed, had the Genesis Debtors disclosed this information in the
process, they would have given away invaluable information to the FTX Debtors with respect to litigation of both
the FTX and the Genesis Claims if the Settlement Agreement had ultimately been denied. For the same reasons,
privacy of this information is even more important given that the Genesis Debtors anticipate litigating the same
issues with similarly situated creditors such as Three Arrows Capital. *See id.* at 80:4-21.

2023) (highlighting that Mr. Islim would not provide information relating to "the probability of success of the potential outcome" of the Genesis Entities' $140 million avoidance claim against the FTX Debtors due to privilege).  The suggestion is that without the specific analysis and details of the resulting conclusions of the Genesis Debtors in consultation with their counsel about the value of each claim, the Court does not have the information necessary to approve the Settlement Agreement.

But the Court disagrees.  In reviewing the Genesis Debtors' decision to enter into the Settlement Agreement, "the Court need only consider the legal positions underlying the disputed claims.  The Court is not required to delve into privileged matters. . . ."  *In re Health Diagnostic Lab., Inc.*, 2016 Bankr. LEXIS 3724, *15-16 (Bankr. E.D. Va. Oct. 14, 2016).  Nor is it "'necessary for the [Genesis] Debtors to waive the attorney/client privilege by presenting testimony regarding what counsel felt was the likelihood they would win on the claims being settled . . . .  It is sufficient to present the Court with legal positions asserted by each side and the facts relevant to those issues.  The Court itself can then evaluate the likelihood of the parties' prevailing in that litigation to determine whether the settlement is reasonable.'"  *Id.* at *16 (quoting *In re Washington Mutual, Inc.*, 442 B.R. 314, 330 (Bankr. D. Del. 2011)); *see also In re Lee Way Holding Co.*, 120 B.R. 881, 897 (Bankr. S.D. Ohio 1990) (approving settlement where trustee's counsel "reviewed documents which . . . [were] successfully withheld . . . under assertions of privilege").

Indeed, the objectors are advocating for a standard of review that is higher than that set forth in existing case law under Rule 9019.  Their approach is akin to requiring a full-blown hearing on the merits of the claims covered by the Settlement Agreement.  But in making an evaluation under Bankruptcy Rule 9019, "[t]he reviewing court need not conduct its own

investigation concerning the reasonableness of the settlement and may credit and consider the

opinion of the Trustee and counsel that the settlement is fair and equitable." *In re Purofied*

*Down Prods. Corp.*, 150 B.R. 519, 522-523 (S.D.N.Y. 1993) (internal citations and quotations

omitted); *In re Dewey & LeBoeuf*, 478 B.R. at 641(in evaluating the necessary facts, the Court

may rely on the opinion of the debtor, parties to the settlement, and professionals).  Thus, the

Court is not required to "conduct a 'mini-trial' to determine the merits of the underlying

litigation.  Rather, the court's responsibility is 'to canvass the issues and see whether the

settlement falls below the lowest point in the range of reasonableness.'"  *Id.* (quoting *In re W.T.*

*Grant Co.,* 699 F.2d 599, 609 (2d Cir. 1983)).  This policy "reflect[s] the considered judgment

that little would be saved by the settlement process if bankruptcy courts could approve

settlements only after an exhaustive investigation and determination of the underlying claims."

*Id.* at 522-23.[10]

Applying the proper standard here, the Court is satisfied that it has an appropriate

evidentiary basis to review and approve the Settlement Agreement.  The Genesis Debtors have

conducted a thorough analysis of all the claims—together with their restructuring

professionals—and the Genesis Official Committee has done the same.  The Court believes it is

appropriate to rely on their opinion in making its decision to resolve these complex disputes

without further litigation.  Moreover, the Court concludes that the testimony provided by Mr.

Islim is sufficient for the Court to determine that the Settlement Agreement is reasonable.

Specifically, Mr. Islim testified that the settlement negotiations were primarily handled on behalf

of the Genesis Debtors by their counsel in consultation with the independent Special Committee

---

[10]    The objectors' approach seems particularly perilous here given that counsel to the FTX Debtors was sitting in the courtroom during the hearing on the Settlement Motion—as they are entitled to do—no doubt considering the significance of the information provided by Mr. Islim if the Settlement Agreement was not approved.  *See* Hr'g Tr. 6:22-7:2 (Sept. 18, 2023) (counsel to FTX Debtors noting their appearance at the hearing on the Settlement Motion).

and the Company's senior management.  *See* Islim Decl. ¶ 6.  Mr. Islim also testified that the

Genesis Debtors, acting through their independent Special Committee and their advisors

determined that the Settlement Agreement is fair and equitable, reasonable, and in the best

interests of the Genesis Debtors' estates.  *See* Islim Decl. ¶ 7.  This was bolstered by Mr. Islim's

testimony at the hearing that during the process senior management and the Special Committee

worked extensively with their restructuring experts and examined the relevant factors, including

the various claims and the likelihood of defenses to those claims, the administrative complexities

involving two bankruptcy proceedings, the potential claims that the Genesis Debtors were

asserting against third parties and that those third parties were asserting against Genesis and that

the conclusion was they found the Settlement Agreement to be fair and robust and to bring a

large amount of value to the Genesis Debtors' creditors.  *See* Hr'g Tr. 49:15-50:20, 52:17-53:2,

57:5-17, 58:20-24, 79:7-80:3, 80:22-81:24 (Sept. 18, 2023).  An appropriate factual basis has

been provided for the Court to determine that the Settlement Agreement falls above the lowest

point in the range of reasonableness and meets the standard required under Bankruptcy Rule

9019.

The objectors' second series of arguments raises concerns about the specifics of the

various claims.  But the Debtors have counterarguments for each of these arguments.  For

example, the Ad Hoc Group asserts that the FTX Claims as filed were substantially inflated and

consideration of them is therefore inappropriate in determining whether the final settlement

amount of $175 million is appropriate.  At the hearing, counsel to the Ad Hoc Group stated that

in their assessment, the total amount of the FTX Claims was actually only in the range of $150 to

$200 million.  *See* Hr'g Tr. 118:25-119:5 (Sept. 18, 2023).  But the Ad Hoc Group has provided

no evidence to back this assertion, relying instead on the arguments of counsel.  Perhaps this is

because, like the Genesis Debtors, the objectors wish to avoid divulging any of their privileged

work product assessing the mathematical probability of success for each of the specific claims.

And while inconvenient for the Ad Hoc Group's analysis, it is well established that a properly

filed claim is *prima facie* valid. Specifically, Section 502(a) of the Bankruptcy Code provides

that a filed proof of claim is "deemed allowed, unless a party in interest . . . objects." 11 U.S.C.

§ 502(a). When a claim is properly filed, it is *prima facie* evidence that the claim is

valid. *See* Fed. R. Bankr. P. 3001(f). A party in interest may object to a proof of claim, and once

an objection is made, the court then determines whether the objection is well founded. *See* 4

Collier on Bankruptcy ¶ 502.02[2] (16th ed. rev. 2013). Moreover, there is a shifting burden of

proof and the burden of proof rests on different parties at different times. *See In re Allegheny*

*Int'l, Inc.*, 954 F.2d 167, 173 (3d Cir. 1992). A correctly filed proof of claim "constitute[s] prima

facie evidence of the validity and amount of the claim . . . . [and] [t]o overcome this prima

facie evidence, an objecting party must come forth with evidence which, if believed, would

refute at least one of the allegations essential to the claim." *Sherman v. Novak (In re Reilly)*, 245

B.R. 768, 773 (2d Cir. B.A.P. 2000). Only by producing "evidence equal in force to the prima

facie case," can an objector negate a claim's presumptive legal validity, and thereby shift the

burden back to the claimant to "prove by a preponderance of the evidence that under

applicable law the claim should be allowed." *Creamer v. Motors Liquidation Co. GUC Trust (In*

*re Motors Liquidation Co.)*, 2013 U.S. Dist. LEXIS 143957, at *12-13 (S.D.N.Y. Sept. 26, 2013)

(internal quotation marks omitted). If the objector does not "introduce[] evidence as to the

invalidity of the claim or the excessiveness of its amount, the claimant need offer no further

proof of the merits of the claim." 4 Collier on Bankruptcy ¶ 502.02 (16th ed. rev. 2013); *see*

*also In re Residential Capital, LLC*, 507 B.R. 477, 490 (Bankr. S.D.N.Y. 2014).  The Ad Hoc Group did not provide any evidence of the excessiveness of the FTX Claims.

Relatedly, the Ad Hoc Group argues that the settlement amount fails to account for the value of the Genesis Claims against the FTX Debtors.  But the outcome of the FTX Bankruptcy Proceedings and the recovery for creditors in those proceedings is unknown at this point—a fact that cannot credibly be disputed—and the issues in those cases are interwoven with complex civil and criminal proceedings in various courts that may take years to resolve.  Even assuming that the Genesis Claims were not disputed by the FTX Debtors—which is not the case, *see* Hr'g Tr. 86:17-87:1 (Sept. 18, 2023)—there is no telling when or how much the Genesis Debtor would recover in the FTX Bankruptcy Proceeding.

The Ad Hoc Group also takes issue with the merits of the FTX Claims against the Genesis Debtors.  They argue that the Genesis Debtors have numerous defenses with respect to the FTX Claims, but fail to take into consideration the cost and complexity of litigating the claims.  For instance, the Ad Hoc Group points out that the Genesis Debtors could assert the ordinary course defense in response to $1.6 billion of the Alameda claim for $1.8 billion in loan repayments allegedly made by Alameda to GGC pursuant to the MLAs during the FTX Preference Period.  *See* Ad Hoc Group Objection ¶ 12.  But the Genesis Debtors note that the FTX Debtors have indicated they are ready to assert the 'Ponzi-Scheme Exception'[11] due to the allegedly fraudulent manner in which the former management of FTX and Alameda operated their businesses.[12]  The Ad Hoc Group also cites to the safe harbor provisions of Section 546(e).

---

[11]    The Ponzi-Scheme Exception "holds that, because a Ponzi scheme is not a legitimate business, no transfers made under a Ponzi scheme can be in the ordinary course of business."  *Faulkner v. Ford Motor Credit Co., LLC (In re Reagor-Dykes Motors, LP)*, 2022 Bankr. LEXIS 1570, at *30 (Bankr. N.D. Tex. June 3, 2022) (citing *In re Am. Hous. Found.*, 785 F.3d 143, 160-61 (5th Cir. 2015)).

[12]    *See* Hr'g Tr. 18:10-23 (June 13, 2023) (counsel for FTX Debtors stating during argument on the Lift Stay Motion and the Exclusivity Motion, "Our ordinary course defense, though, Your Honor, or question is not an

But in the Court's experience, these provisions are anything but straightforward, *see, e.g., Off. Comm. of Unsecured Creditors of Arcapita Bank B.S.C.(c) v. Bahr. Islamic Bank (In re Arcapita Bank B.S.C.(c))*, 628 B.R. 414, 459-72 (Bankr. S.D.N.Y. 2021), and are novel in the context of cryptocurrency. The same applies to arguments by the Ad Hoc Group regarding defenses for collateralization and contemporaneous or subsequent new value.

The Ad Hoc Group also contends that the FTX Claims based on withdrawals made from the FTX.com trading platform are not properly asserted against the Genesis Debtors because it was non-debtor GGCI that withdrew those amounts. But despite the Genesis Debtors' urging on this issue with the FTX Debtors, the FTX Debtors have not agreed to withdraw those claims. *See* Hr'g Tr. 86:17-87:1 (Sept. 18, 2023). In fact, counsel to the FTX Debtors has raised the possibility of asserting that Genesis Debtor GGC would still be liable for those amounts as a subsequent transferee under Section 550 of the Bankruptcy Code. Even if the Genesis Debtors were to be successful on this issue and the FTX Claims were commensurately reduced, the Genesis Debtors note that the settlement would still be reasonable as accounting for less than 8% of the remaining asserted claims of the FTX Debtors against the Genesis Debtors. *See* Hr'g Tr. 86:5-9 (Sept. 18, 2023). And if those claims were ultimately asserted against GGCI, this too would have ramifications for the Genesis Debtors. As Mr. Islim explained, GGCI does not have sufficient funds to satisfy a potential judgment of the FTX Debtors and might itself have to file for bankruptcy. *See* Hr'g Tr. 78:13-22 (Sept. 18, 2023). That would have direct negative consequences on Genesis Debtor GGC, as it is GGCI's largest creditor. *See id.*

---

ordinary, ordinary course question because our case also implicates the possible fraud or Ponzi scheme exception to ordinary course. We don't know where we're coming out on that yet, but it's very much on the table. So whatever judge decides our preferences, will have to decide ordinary course and will also have to decide to ask whether or not the Ponzi scheme exception or the fraud exception to ordinary course plays a role[.]").

Finally, the Fair Deal Group contends that the real reason that the Genesis Debtors have struck a deal with the FTX Debtors is to cram down a settlement on its creditors through the Genesis Debtors' Plan. *See Amended Joinder of the Fair Deal Group to the Objection of Ad Hoc Group of Genesis Lenders* at ¶¶ 8-10 [ECF No. 652]. The Fair Use Group seems to suggest that the ultimate purpose of doing so is to give the Genesis Debtors' parent—Digital Currency Group—a release. *See id.* But accepting such an allegation would require the Court to find that both the Genesis Debtors and the Genesis Official Committee are willing to ignore their fiduciary duties to their constituencies in favor of the non-debtor Digital Currency Group. The Fair Use Group, however, provides absolutely no evidence to support this serious accusation beyond mere speculation. Moreover, there is nothing in the Settlement Agreement that prevents the FTX Debtors from selling or otherwise transferring their allowed claim or stating how or even whether FTX is required to vote their claim in a plan process. *See* Hr'g Tr. 93:3-9 (Sept. 18, 2023) (counsel to the Genesis Debtors noting with respect to FTX that "[t]here is no requirement in the FTX settlement that they vote in favor of the plan, that they vote at all. And it's very clear that the allowed claims that they will have are freely transferrable. They could sell them . . . to Gemini, right? We have no understanding or guarantee about how those votes will be noted or if they will be noted."). For all these reasons, the Court finds that the allegations of the Fair Deal Group are completely unsupported and border on frivolous. *See* Fed. R. Bankr. P. 9011. The Court will not allow unsupported conjecture to influence its decisions in these cases. Nor should counsel.

## CONCLUSION

For the reasons stated above, the Settlement Motion is granted.  The Debtors should settle an order on three days' notice.  The proposed order must be submitted by filing a notice of the proposed order on the Case Management/Electronic Case Files docket, with a copy of the proposed order attached as an exhibit to the notice.  A copy of the notice and proposed order shall also be served upon counsel to the Ad Hoc Group, Gemini and the Fair Deal Group.

Dated: White Plains, New York
      October 6, 2023

          */s/ Sean H. Lane*
          UNITED STATES BANKRUPTCY JUDGE