# EXHIBIT B

## Ad Hoc Group Letter

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

AMERICAS
NEW YORK
SAN FRANCISCO
SÃO PAULO
SILICON VALLEY
WASHINGTON, D.C.

ASIA
BEIJING
HONG KONG
SEOUL

EUROPE & MIDDLE EAST
ABU DHABI
BRUSSELS
COLOGNE
FRANKFURT
LONDON
MILAN
PARIS
ROME

CRAIG B. BROD
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
DAVID C. LOPEZ
MICHAEL A. GERSTENZANG
LEV L. DASSIN
DAVID H. BOTTER
JORGE U. JUANTORENA
DAVID LEINWAND
JEFFREY A. ROSENTHAL
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
FRANCISCO L. CESTERO
FRANCESCA L. ODELL
WILLIAM L. MCRAE
JASON FACTOR
JOON H. KIM
ALAN M. LEVINE
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
CHANTAL E. KORDULA
BENET J. O'REILLY
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
DEBORAH NORTH
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU

ROGER A. COOPER
LILLIAN TSU
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
JONATHAN S. KOLODNER
DANIEL ILAN
MEYER H. FEDIDA
ADRIAN R. LEIPSIC
ELIZABETH VICENS
ADAM J. BRENNEMAN
ARI D. MACKINNON
JAMES E. LANGSTON
JARED GERBER
RISHI ZUTSHI
JANE VANLARE
AUDRY X. CASUSOL
ELIZABETH DYER
DAVID H. HERRINGTON
KIMBERLY R. SPOERRI
AARON J. MEYERS
DANIEL C. REYNOLDS
ABENA A. MAINOO
HUGH C. CONROY, JR.
JOHN A. KUPIEC
JOSEPH LANZKRON
MAURICE R. GINDI
KATHERINE R. REAVES
RAHUL MUKHI
ELANA S. BRONSON
MANUEL SILVA
KYLE A. HARRIS
LINA BENSMAN

ARON M. ZUCKERMAN
KENNETH S. BLAZEJEWSKI
MARK E. MCDONALD
F. JAMAL FULTON
PAUL V. IMPERATORE
CLAYTON SIMMONS
CHARLES W. ALLEN
JULIA L. PETTY
HELENA K. GRANNIS
SUSANNA E. PARKER
THOMAS S. KESSLER
RESIDENT PARTNERS

JUDITH KASSEL
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
HEIDE H. ILGENFRITZ
ANDREW WEAVER
CATHERINE S. GRIMM
JOHN V. HARRISON
MATTHEW BRIGHAM
EMILIO MINVIELLE
LAURA BAGARELLA
JONATHAN D.W. GIFFORD
DAVID W.S. YUDIN
KARA A. HAILEY
ANNA KOGAN
BRANDON M. HAMMER
BRIAN J. MORRIS
CARINA S. WALLANCE
ALEXANDER JANGHORBANI
RESIDENT COUNSEL

D: +1 212-225-2416
soneal@cgsh.com

September 27, 2023

Ad Hoc Group of Genesis Lenders
c/o Proskauer Rose LLP
Eleven Times Square
New York, NY 10036
Attn: Brian Rosen, Esq.

To the Ad Hoc Committee:

The Special Committee of the Board of Directors of Genesis Global Holdco, LLC asked that we respond to your letter, dated September 26, 2023, concerning the Ad Hoc Group's views on the Agreement in Principle, including the Ad Hoc Group's proposed improvements to the Agreement in Principle, and the Debtors' intentions to solicit a "toggle plan" that would allow creditors to express a preference between (i) a plan that liquidates the Debtors, distributes existing assets and provides for future distributions as contemplated by the Agreement in Principle (a "DCG Deal Plan") and (ii) a plan that liquidates the Debtors, distributes existing assets, authorizes the commencement of litigation against DCG and distributes the proceeds of such litigation (a "No Deal Plan").

First, I want to memorialize what the Special Committee told the Ad Hoc Group during our zoom meeting on Tuesday, September 26. During that meeting, in response to our questions, representatives of the Ad Hoc Group said that there was broad support among the creditor body for its proposed improvements to the Agreement in Principle (the "Revised DCG Deal Plan"). The Special Committee made it clear that if the Ad Hoc Group can demonstrate broad support, including support from the Official Committee of Unsecured Creditors (the "UCC"), as evidenced by binding commitments by a broad coalition of creditors who agree to vote to accept the Revised DCG Deal Plan and the No Deal Plan, the Special Committee would not pursue the toggle plan, and would instead seek to implement the Revised DCG Deal Plan (assuming that DCG accepts the revised terms) or the No Deal Plan, as applicable. This approach is consistent with our conduct throughout these proceedings, which started with our filing of a litigation plan on the Petition Date that did not include any settlement with DCG and has continued with our continuous efforts to achieve a consensual, creditor-led resolution. **In light of pending**

Ad Hoc Group Letter, p. 2

**<u>deadlines, we request that you provide such binding commitments by no later than Monday, October 2, 2023, at 5:00 p.m. Eastern Time</u>**.

Second, I want to use this opportunity to correct a few factual mischaracterizations we have heard from the Ad Hoc Group:

- Any suggestion that the Special Committee has been operating without any concern for creditor input is simply wrong and not supported by the facts. Throughout these Chapter 11 cases, we have worked collaboratively with creditors and have given creditors every opportunity to negotiate directly with DCG. Our efforts initially achieved an agreement in principle with the Ad Hoc Group (represented by Proskauer and Houlihan) that we filed with the bankruptcy court on February 10, 2023, only a few weeks after the Petition Date. After the Ad Hoc Group abandoned that agreement in principle, we pulled together a mediation process with support from the creditors that allowed creditors to negotiate directly with DCG representatives. When those initial efforts failed, we continued to encourage the parties to have discussions, including by filing a revised litigation plan on June 13, 2023 following extensive negotiations with the Ad Hoc Group and the UCC and telling DCG we would file turnover actions relating to the DCG/DCGI loans maturing in May 2023 unless they immediately re-started discussions with creditors. Those efforts led to weeks of in-person meetings with representatives of the UCC and the Ad Hoc Group. It was the Ad Hoc Group and the UCC, not the Debtors, that chose the creditor representatives who attended these discussions. Following these multiple day-long meetings, we understood that only a few issues remained unresolved, namely DCG's liability with respect to 3AC claims and intercreditor distribution mechanics. To try to resolve those issues, we then engaged in additional formal mediation sessions, which led to the Agreement in Principle approved by the UCC, the only other fiduciary in these Chapter 11 cases. At all times, the Ad Hoc Group was involved in the discussions.

- Your letter suggests that there is something nefarious about the toggle plan. This can only be described as paranoid and misinformed. The toggle plan concept is intended to allow creditors to control their own destinies and allow creditors to express their own preferences. In our initial discussions with creditors and their advisors, the toggle concept was received favorably, so we were surprised to receive push back from the Ad Hoc Group in the past few days. [redacted] As we previously shared with Proskauer and UCC counsel, the toggle plan would require the Debtors to pursue whatever preference a majority of voting claims across all classes expressed on their ballots (excluding any cash out claims). Given that the Ad Hoc Group controls $2.4 billion in claims, it would presumably control the preference chosen by a majority of the claims.

Ad Hoc Group Letter, p. 3

- ███████████████████████████████████████ neither the Special Committee nor the advisors "rejected" the distribution model that the UCC or the Ad Hoc Group proposed (frankly, it has not been obvious to us whether the Ad Hoc Group ever supported the UCC distribution model). ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Surely we do not live in a world where advisors cannot ask questions. █████████████████████████████████████████████████████████████ As professionals, we owe it to our clients not to let unsubstantiated rumors overtake actual facts. But all of this is irrelevant because the UCC and the Ad Hoc Group did not actually agree on the model that was presented to the Debtors. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Please be aware that, as fiduciaries, we do have an obligation to ask questions about your proposed distribution model (when presented), including who is supporting the model, who opposes the model, how various constituencies who are not represented by the Ad Hoc Group are affected by the model, and whether the model conforms to the requirements of the Bankruptcy Code, including Sections 502(b) and 1129 of the Bankruptcy Code.

- To respond to your comments about the Partial Repayment Agreement, as you know, the economic terms of the agreement were negotiated by representatives of the UCC and the Ad Hoc Group during the principal-to-principal discussions in June and July that we were asked not to attend. Even before those discussions, the Special Committee had been engaging with creditors (including members of the UCC and Ad Hoc Group) about entry into a forbearance agreement and the filing of turnover actions. Creditors informed us that they did not want the Debtors to enter into a forbearance agreement that would have required DCG and DCGI to make periodic payments. Instead, they wanted to keep the pressure on DCG and DCGI through the threat of litigation. In addition, creditors told us that they did not want the Debtors to file the turnover actions at that time because they were concerned that (i) pursuing immediate turnover actions would force DCG to refinance the DCG/DCGI loans, thereby shifting value in the form of high interest rates and fees from Genesis creditor to DCG's third party lenders (and adding another party to the negotiation), and (ii) cause DCG to walk away from negotiations or otherwise focus on obtaining financing. As we have told you, the

Ad Hoc Group Letter, p. 4

Special Committee's main goal in entering into the Partial Repayment Agreement was to start collecting more than $75 million from DCG and DCGI every 47 days. In addition, we made improvements to the deal the creditors had negotiated, including (i) adding a fiduciary out that allows the Debtors to terminate the agreement, (ii) separating the Partial Repayment Agreement from the global settlement agreement to allow the Debtors to start collecting funds promptly, and (iii) adding detailed contractual limitations on dividends, new financing, incurrence of liens and sales / use of proceeds. This agreement has resulted in the Debtors receiving more than $75 million, as well as limitations on DCG and DCGI's ability to take actions that would prejudice the estates.

Rest assured, the Special Committee is very focused on maximizing recoveries for the creditors. If we reach agreement on the DCG deal debt terms and an appropriate distribution model, the Special Committee and UCC each believe that a DCG Deal Plan provides better recoveries for creditors than a No Deal Plan, for a variety of reasons, including uncertainty about the likelihood of success of litigation, the delay in distributions that would result from prolonged litigation, the costs of litigation (estimated to be $40-60 million), and significant credit risks arising out of Genesis holding an unsecured claim against DCG and DCGI pending the conclusion of any litigation. [REDACTED] As fiduciaries, the Special Committee does not have the luxury of gambling with the creditors' recovery or picking sides in an intercreditor battle over a contested distribution model that does not comport with bankruptcy law. The Special Committee therefore plans to see this process through appropriately and in compliance with applicable bankruptcy law, subject to the oversight of the Bankruptcy Court.

While we may not always agree on strategy, we will always agree with the shared goal of maximizing recoveries. We know this has not been an easy process, and we appreciate your continued efforts to find a consensual resolution.

Sincerely,

/s/ Sean A. O'Neal

Sean A. O'Neal