Adam J. Goldberg
Christopher Harris
Brett M. Neve
Nacif Taousse
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:  adam.goldberg@lw.com
       christopher.harris@lw.com
       brett.neve@lw.com
       nacif.taousse@lw.com

Nima H. Mohebbi (admitted *pro hac vice*)
Tiffany M. Ikeda (admitted *pro hac vice*)
Sarah F. Mitchell (admitted *pro hac vice*)
Emily R. Orman (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email:  nima.mohebbi@lw.com
       tiffany.ikeda@lw.com
       sarah.mitchell@lw.com
       emily.orman@lw.com

*Counsel to the Foreign Representatives of*
*Three Arrows Capital, Ltd. (in liquidation)*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | ) ) | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | ) ) ) | Case No. 23-10063 (SHL) |
| Debtors. | ) ) ) | Jointly Administered **Related Docket Nos. 711, 763, 778** |

**SUPPLEMENTAL FILING IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER PURSUANT TO BANKRUPTCY RULE 2004 AUTHORIZING THE ISSUANCE OF SUBPOENAS FOR THE PRODUCTION OF DOCUMENTS BY THE DEBTORS**

Russell Crumpler and Christopher Farmer, in their capacities as the duly authorized joint liquidators and foreign representatives of Three Arrows Capital, Ltd. ("**3AC**" or the "**3AC Debtor**"), hereby submit this supplemental filing in support of their motion (the "**Motion**," Docket

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

No. 711) pursuant to Rule 2004 of the Federal Rules of Bankruptcy Procedure for entry of an order authorizing the 3AC Debtor to issue subpoenas for the production of documents on Debtors Genesis Global Holdco, LLC, Genesis Global Capital, LLC, and Genesis Asia Pacific, Pte. Ltd. ("**GAP**") (collectively, the "**Genesis Debtors**").  In further support of the Motion, the 3AC Debtor respectfully represents as follows:

### ADDITIONAL CASES IN SUPPORT OF THE MOTION

1.       At the hearing on the Motion on October 6, 2023, this Court informed the parties that they could submit, by October 13, 2023, a list of 3 to 5 cases providing additional legal support for the issues raised in the Motion and at argument.  Pursuant to the Court's instruction, the 3AC Debtor submits the following:[2]

2.       *Adelphia Recovery Tr. v. Bank of Am., N.A.*, 624 F. Supp. 2d 292, 299, 332–34 (S.D.N.Y. 2009) (attached hereto as **Exhibit 1**).

3.       *In re Bernard L. Madoff Inv. Secs. LLC*, 468 B.R. 620, 634 (Bankr. S.D.N.Y. 2012) (attached hereto as **Exhibit 2**).

4.       *In re Woodbridge Grp. of Cos.*, Adv. Proc. No. 19-51027 (JKS), 2021 WL 5774217, at *5–11 (Bankr. D. Del. Dec. 6, 2021) (attached hereto as **Exhibit 3**).

5.       *In re Circle Y of Yoakum, Tex.*, 354 B.R. 349, 357 (Bankr. D. Del. 2006) (attached hereto as **Exhibit 4**).

6.       *In re Waterscape Resort LLC*, 520 B.R. 424, 435–36 (Bankr. S.D.N.Y. 2014) (attached hereto as **Exhibit 5**).

---

[2] The 3AC Debtor was unable to find any cases denying a Rule 2004 motion on the basis that the claim uncovered by Rule 2004 discovery would potentially be time-barred.

Dated: October 13, 2023
      Los Angeles, California

Respectfully submitted,

*/s/ Nima H. Mohebbi*
_____

Nima H. Mohebbi (admitted *pro hac vice*)
Tiffany M. Ikeda (admitted *pro hac vice*)
Sarah F. Mitchell (admitted *pro hac vice*)
Emily R. Orman (admitted *pro hac vice*)
**LATHAM & WATKINS LLP**
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
Facsimile: (213) 891-8763
Email:   nima.mohebbi@lw.com
        tiffany.ikeda@lw.com
        sarah.mitchell@lw.com
        emily.orman@lw.com

– and –

Christopher Harris
Adam J. Goldberg
Brett M. Neve
Nacif Taousse
**LATHAM & WATKINS LLP**
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Facsimile: (212) 751-4864
Email:   christopher.harris@lw.com
        adam.goldberg@lw.com
        brett.neve@lw.com
        nacif.taousse@lw.com

*Counsel to the Foreign Representatives
of Three Arrows Capital, Ltd.*

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on this 13th day of October, 2023, a true and correct copy of

the foregoing Objection was furnished to all ECF Participants via the Court's CM/ECF system.

*<u>/s/ Nima H. Mohebbi</u>*
Nima H. Mohebbi

# EXHIBIT 1

Adelphia Recovery Trust v. Bank of America, N.A., 624 F.Supp.2d 292 (2009)

🚩 KeyCite Yellow Flag - Negative Treatment

Reconsideration Granted in Part by   Adelphia Recovery Trust v. Bank of America, N.A.,   S.D.N.Y.,   June 16, 2009

624 F.Supp.2d 292
United States District Court,
S.D. New York.

ADELPHIA RECOVERY TRUST, Plaintiff,

v.

BANK OF AMERICA, N.A., et al., Defendants.

No. 05 Civ. 9050(LMM).
|
May 6, 2009.

**Synopsis**

**Background:** Agent banks and investment banks, which allegedly helped company's prior management to structure co–borrowing loan facilities from which management personally borrowed billions of dollars which were guaranteed almost exclusively by company's assets, moved to dismiss tort claims brought against them by a trust which was formed to prosecute company's claims against numerous entities that allegedly assisted former management in perpetrating a massive financial fraud against company.

**Holdings:** The District Court, McKenna, J., held that:

[1] aiding and abetting fraud was a valid claim under Pennsylvania law;

[2] elements of aiding and abetting fraud were pled with the necessary particularity to sustain such claims in regards to certain agent banks and their affiliated investment banks;

[3] claims of aiding and abetting company's prior management's breaches of fiduciary duty were pled with the necessary particularity as to certain agent banks and their affiliated investment banks; and

[4] investment banks did not have a duty to disclose to company's independent directors material information about co–borrowing facilities.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

West Headnotes (25)

**[1]** **Fraud** 🔑 **Persons liable**

Aiding and abetting fraud is a valid claim under Pennsylvania law. Restatement (Second) of Torts § 876.

11 Cases that cite this headnote

**[2]** **Federal Courts** 🔑 **Highest court**

**Federal Courts** 🔑 **Anticipating or predicting state decision**

In cases where it is unclear if a cause of action is allowed by a state supreme court, federal court may not impose its view of what the state law should be, but must apply existing state law as interpreted by the state's highest court in an effort to determine how the state court would decide the precise legal issue before the federal court; in the absence of a reported decision by the state's highest court addressing the precise issue before it, a federal court applying state substantive law must predict how the state's highest court would rule if presented with the case.

1 Case that cites this headnote

**[3]** **Courts** 🔑 **Conclusiveness of decisions of Court of Appeals within its circuit**

District court will conclusively defer to a federal court of appeals' interpretation of the law of a state that is within its circuit.

**[4]** **Fraud** 🔑 **Persons liable**

Under Pennsylvania law, aiding and abetting fraud has three elements: (1) that an independent wrong exist; (2) that the aider or abettor know of that wrong's existence; and (3) that substantial assistance be given in effecting that wrong.

10 Cases that cite this headnote

Adelphia Recovery Trust v. Bank of America, N.A., 624 F.Supp.2d 292 (2009)

**[5]    Federal Civil Procedure** 🔑 **Fraud, mistake and condition of mind**

To meet the pleading requirements, a claim for aiding and abetting fraud requires plaintiff to plead facts showing, the existence of a fraud, defendant's knowledge of the fraud, and that the defendant provided substantial assistance to advance the fraud's commission. 🚩 Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

11 Cases that cite this headnote

**[6]    Federal Civil Procedure** 🔑 **Fraud, mistake and condition of mind**

Elements of aiding and abetting fraud were pled with the necessary particularity to sustain such claims in regards to certain agent banks and their affiliated investment banks which allegedly helped company's prior management to structure co–borrowing loan facilities from which management personally borrowed billions of dollars which were guaranteed almost exclusively by company's assets; trust, which was formed to prosecute company's claims, pled facts which give rise to a strong inference that banks had knowledge of the fraud and provided substantial assistance to advance the commission of the fraud. 🚩 Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

3 Cases that cite this headnote

**[7]    Federal Civil Procedure** 🔑 **Fraud, mistake and condition of mind**

Group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint; no specific connection between fraudulent representations in an offering memorandum and particular defendants is necessary where defendants are insiders or affiliates participating in the offer of the securities in question. 🚩 Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

6 Cases that cite this headnote

**[8]    Federal Civil Procedure** 🔑 **Fraud, mistake and condition of mind**

Grouping of defendants will be allowed in pleading securities fraud if the defendants had drafted, prepared or approved collectively a document and the defendants had knowledge and involvement in the everyday business of the company. 🚩 Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

3 Cases that cite this headnote

**[9]    Fraud** 🔑 **Allegations of fraud in general**

To adequately plead a claim of aiding and abetting a breach of fiduciary duty under Pennsylvania law, a plaintiff must plead: (1) a breach of fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and, (3) substantial assistance or encouragement by the aider and abettor in effecting that breach.

6 Cases that cite this headnote

**[10]    Federal Civil Procedure** 🔑 **Fraud, mistake and condition of mind**

Rule establishing heightened pleading requirements for fraud extends to all averments of fraud or mistake, whatever may be the theory of legal duty-statutory, common law, tort, contractual, or fiduciary. 🚩 Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

5 Cases that cite this headnote

**[11]    Federal Civil Procedure** 🔑 **Fraud, mistake and condition of mind**

Claims of aiding and abetting company's prior management's breaches of fiduciary duty were pled with the necessary particularity as to certain agent banks and their affiliated investment banks which allegedly helped company's prior management to structure co–borrowing loan facilities from which management personally borrowed billions of dollars which were guaranteed almost exclusively by company's assets; complaint, which relied on group

pleading doctrine, contained specific allegations which tied specific groups of banks to the aiding and abetting of fiduciary duty by prior management related to specific co–borrowing facilities, and alleged that those banks provided substantial assistance or encouragement to the prior management in effecting the breach of fiduciary duty with regards to all three co–borrowing facilities. 🚩 Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

4 Cases that cite this headnote

[12]    **Fraud** 👈 Duty to disclose facts

Under Pennsylvania law, a defendant is only liable for fraudulent concealment if he was under an affirmative duty to disclose the information.

[13]    **Fraud** 👈 Duty to disclose facts

Under Pennsylvania law, elements of a claim of fraudulent concealment are: (1) an affirmative act of concealment by defendants, (2) which misled or relaxed plaintiffs' investigation into possible causes of action, (3) that plaintiffs' ignorance is not attributable to lack of diligence in investigating possible claims, and (4) defendant had an affirmative duty to speak.

[14]    **Fraud** 👈 Duty to disclose facts

Under Pennsylvania law, a duty to speak arises when a defendant owes a fiduciary duty to the plaintiff or "as a result of one party's reliance on the other's representations, if one party is the only source of information to the other party, or the problems are not discoverable by other reasonable means."

[15]    **Brokers** 👈 Fraud of broker or his agent

Investment banks did not have a duty under Pennsylvania law to disclose to company's independent directors material information about co–borrowing facilities from which company's prior management personally borrowed billions of dollars which were guaranteed almost

exclusively by company's assets based on either a fiduciary duty or unique knowledge; thus, banks could not be held liable for fraudulent concealment.

[16]    **Fraud** 👈 Fiduciary or confidential relations

Under Pennsylvania law, a fiduciary duty will arise where by virtue of the respective strength and weakness of the parties, one has a power to take advantage of or exercise undue influence over the other; confidential or fiduciary relationship does not exist merely because one party relies on and pays for the specialized skill or expertise of the other party, rather, the critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed on the other side.

[17]    **Fraud** 👈 Fiduciary or confidential relations

Under Pennsylvania law, a fiduciary relationship will be formed only when the level of overmastering is such that the dependent party seeks no other counsel.

[18]    **Fraud** 👈 Elements of Actual Fraud

Under Pennsylvania law, elements of common law fraud are: (1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

[19]    **Federal Civil Procedure** 👈 Fraud, mistake and condition of mind

Various subclaims of fraud against agent banks and their affiliated investment banks, which allegedly helped company's prior management to structure co–borrowing loan facilities from which management personally borrowed billions

of dollars which were guaranteed almost exclusively by company's assets, were not pled with sufficient particularity such as claims based on concealment of wrongful transactions and fraudulent representations since such sub-claims failed to either specify what the fraudulent representations were, which defendants made them, or failed to identify which defendants were responsible for various actions or inactions; however, other sub-claims, such as one based on misrepresentation of company's finances in offering materials, met pleading requirements.

⚑ Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

1 Case that cites this headnote

[20]   **Fraud** ⚎ Statements recklessly made;
negligent misrepresentation

Under Pennsylvania law, scienter element in civil fraud case is satisfied by either conscious knowledge of the falsity of the representation or such recklessness as amounts to conscious indifference to the truth.

[21]   **Limitation of Actions** ⚎ Nature of action in
general

Amended complaint's newly alleged claims to avoid fraudulent transfers from debtor to margin lender related back to timely filed creditor complaint, and thus were not time barred; the new margin loan payments in the amended complaint arose out of the same transactions as those pled in the creditors complaint and occurred during the same time period as those alleged in the creditors complaint, and margin lender was on notice that additional margin loan payments might be pled. Fed.Rules Civ.Proc.Rule 15(c)(2), 28 U.S.C.A.

13 Cases that cite this headnote

[22]   **Fraudulent Conveyances** ⚎ Particular facts
and circumstances
**Fraudulent Conveyances** ⚎ Fraudulent
Transaction

Pleader is allowed to rely on "badges of fraud" to support his fraudulent conveyance case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent; badges of fraud which supply fraudulent intent for the purposes of a fraudulent conveyance by a party include, (1) a close relationship between the parties to the conveyance, (2) inadequacy of consideration received, (3) retention of control of the property by the transferor, (4) suspicious timing of the conveyance after the debt was incurred, (5) the use of fictitious parties, and (6) information that the transferor was insolvent as a result of the conveyance.

6 Cases that cite this headnote

[23]   **Fraudulent Conveyances** ⚎ Knowledge and
intent of grantee

Pleadings were sufficient to allege fraudulent intent with regards to transferor's margin loan payments to margin lender, and therefore stated claim against lender to recover fraudulent transfer; complaint alleged that margin lender continued to accept payments on the margin loans after it had reason to believe that transferor was insolvent by virtue of transferor's disclosure of huge liabilities. ⚑ Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

3 Cases that cite this headnote

[24]   **Federal Civil Procedure** ⚎ Fraud, mistake
and condition of mind

Allegations supporting claims for intentional fraudulent transfers are subject to the heightened pleading requirements for fraud. ⚑ Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

[25]   **Federal Civil Procedure** ⚎ Fraud, mistake
and condition of mind

Complaint, which specified the funds that were allegedly conveyed, the timing of margin loan payments, frequency of the payments, the amounts of the payments to lender, and

Adelphia Recovery Trust v. Bank of America, N.A., 624 F.Supp.2d 292 (2009)

the consideration for the margin payments, pled fraudulent transfer claim with sufficient particularity. 🚩 Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

2 Cases that cite this headnote

**\*296**  *MEMORANDUM AND ORDER*

McKENNA, District Judge.

## Table of Contents

1.  **Factual Background**...............................................................................................  298

    A.  **The Adelphia Fraud**................................................................................  298

    B.  **Overview of the Co–Borrowing Facilities**...........................................  298

    C.  **The UCA/HHC Co–Borrowing Facility**................................................  299

        i.  The UCA/HHC Term Sheet Was Prepared by the Defendants...................................  300

        ii.  The UCA/HHC Term Sheet Contained Omissions and Misstatements.........................  300

        iii.  The UCA/HHC Term Sheet Defects were known To the Defendants...........................  301

    D.  **The CCH Co–Borrowing Facility**..........................................................  301

        i.  The CCH Term Sheet Was Prepared by the Defendants..............................................  301

        ii.  The CCH Term Sheet Contained Omissions and Misstatements...................................  302

        iii.  The CCH Term Sheet Defects were known to the Defendants......................................  302

    E.  **The Olympus Credit Facility**...............................................................  303

        i.  The Olympus Term Sheet Was Prepared by the Defendants.......................................  303

        ii.  The Olympus Term Sheet Contained Omissions and Misstatements..............................  304

        iii.  The Olympus Term Sheet Defects were known to the Defendants................................  304

2.  **Procedural Background**.......................................................................................  305

    A.  **Proceedings in the Bankruptcy Court**...............................................  305

    B.  **Proceedings before this Court**............................................................  306

3.  **Standard of Review**............................................................................................  307

    A.  **Substantive Law is Pennsylvania State Law**......................................  307

**B. Procedural Law used is that of the Southern District of New York** ................. 307

**C. Pleading Standard under Fed.R.Civ.P. 8(a)** ........................................... 308

**D. Pleading Standard for Fraud under Fed. R. Civ. P. 9(b)** .............................. 308

**4. Discussion** .................................................................................... 308

**A. Claim 38—Aiding and Abetting Fraud against the Agent Banks and Their Affiliated Investment Banks is not Dismissed** .................................. 308

  i. Background of Claim ...................................................................... 309

  ii. Aiding and Abetting Fraud is a Valid Claim under Pennsylvania State Law ................ 309

  iii. Aiding and Abetting Fraud is Plead with Particularity .................................... 312

  iv. Group Pleading of the Agent Banks and Their Affiliated Investment Banks Is Permitted ... 315

  v. Co–Borrowing Term Sheets Do Not Contradict the Amended Complaint ............................ 317

**B. Claim 37—Aiding and Abetting a Breach of Fiduciary Duty against the Agent Banks and Their Affiliated Investment Banks** ......................................... 318

  i. Background of Claim ...................................................................... 318

  ii. Aiding and Abetting a Breach of Fiduciary Duty is Pled with Enough Particularity ......... 319

  iii. Pleadings Related To the Three Facilities ............................................... 320

**C. Claim 54—Fraudulent Concealment against the Investment Banks Is Dismissed** ................................................................................. 320

  i. Background of Claim ...................................................................... 320

  ii. Elements of Fraudulent Concealment ...................................................... 321

  iii. The Investment Banks Did Not Have an Affirmative Duty to Speak Based on a Fiduciary Duty or Unique Knowledge ...................................................................... 322

**D. Claim 55—Fraud against the Agent Banks and their Affiliated Investment Banks Is Dismissed In Part** .............................................................. 324

  i. Background of Claim ...................................................................... 325

  ii. Elements of a Fraud Claim ............................................................... 325

  iii. Claim 55 Sub–Claims which are not pled with the Necessary Particularity .................. 326

  iv. The Following Sub–Claims Meet Pleading Requirements ...................................... 328

**E. Claim 31 Avoidance and Recover of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548 and 550 against the Margin Lenders** ........ 332

      i. **Claim 31 Background**................................................................................................................ ............332

      ii. **SSB Moves For Dismissal of Claim 31 on the Basis it is Untimely**........................................... ............333

      iii. **Goldman Sachs Moves for Dismissal of Claim 31 on the Basis That It Had Not Been
          Plead With Particularity**.......................................................................................................... ............334

   **5.  Order**.................................................................................................................................................. 336

**\*297**  This action arises from the bankruptcy of Adelphia Communications Corporation ("Adelphia") following the disclosure of $2.2 billion in liabilities that had not previously been reported on its balance sheet. The liabilities at Adelphia stemmed in part from Adelphia's participation in Co–Borrowing Loan Facilities ("Co–Borrowing Facilities"). Beginning in 1999 Adelphia participated in three such Co–Borrowing Facilities. The Rigas family which was the prior management of Adelphia [1] had Rigas family entities ("RFEs") enter into Co–Borrowing Facilities with public Adelphia subsidiaries. This arrangement allowed the RFEs controlled by the Rigas family to borrow billions of dollars guaranteed almost exclusively by Adelphia's assets. The Rigas family used the Co–Borrowing Facilities to draw down billions of dollars for their own purposes. Adelphia was left to pay the bill.

Adelphia's disclosure of billions of dollars in liabilities connected to the Co–Borrowing Facilities led to a precipitous chain of events concluding with Adelphia filing for bankruptcy. The Adelphia Recovery Trust ("ART") was formed to prosecute Adelphia's claims against numerous entities that allegedly assisted the Rigas family in perpetrating a massive financial fraud against Adelphia. [2]

**\*298**  This order addresses ART's claims against 26 Banks and 22 affiliated Investment Banks. ART alleges these Banks and their affiliated Investment Banks helped to structure the Co–Borrowing Facilities which played a role in the collapse of Adelphia. This Court previously addressed some of Defendants' motions to dismiss ART's claims pursuant to Rule 12(b)(6). This order addresses the various Agent Banks and Investment Banks motions' to dismiss the October 31st 2007 Amended Complaint Claims 37, 38, 54 and 55 (collectively, the "Tort Claims"). In addition, this order addresses the motions for dismissal of Claim 31 against Salomon Smith Barney ("SSB") and Goldman Sachs ("GS").

This Court DENIES the various Defendants' motions for dismissal of Claims 31, 37 and 38. This Court GRANTS Defendants' motions for dismissal of Claim 54 against the Investment Bank Defendants. This Court GRANTS in part and DENIES in part Defendants' motions to dismiss Claim 55.

*1. Factual Background*

It is useful to summarize the factual history of the Rigas family fraud owing to the complexity of this case. On a 12(b)(6) motion for dismissal a court will take factual allegations in the Amended Complaint as true. "For purposes of reviewing the dismissal of a complaint for failure to state a claim, we accept the complaint's factual allegations ... as true." *Roth v. Jennings,* 489 F.3d 499, 501 (2d Cir.2007); *see also Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993).

**A. The Adelphia Fraud**

Adelphia was a cable company founded in 1952 by John Rigas. By the late 1990's Adelphia had grown to be the sixth largest cable-television provider in the United States. However, beginning in the late 1990's the Rigas family needed access to billions of dollars of capital to acquire cable businesses, purchase stock to maintain their majority stockholder status at Adelphia, and finance an extravagant lifestyle. (Am. Cmpl. ¶ 807.) The Rigas family did not have enough personal capital or available credit to finance these expenditures. Lacking in capital or credit, the Rigas family turned to the balance sheet of Adelphia to finance their acquisitions, stock purchases, and lifestyle. The Rigas family caused Adelphia to enter into a series of financial transactions whereby RFEs could borrow hundreds of billions of dollars against the balance sheet of Adelphia under Co–Borrowing Facilities. The Rigas family was not entitled to use Adelphia as a source of credit or capital for their own ends because Adelphia was a public company. (Am. Cmpl. ¶ ¶

Adelphia Recovery Trust v. Bank of America, N.A., 624 F.Supp.2d 292 (2009)

802–04.) The Rigas family worked with the Agent Banks and their affiliated Investment Banks to create the Co–Borrowing Facilities. (Am. Cmpl. ¶¶ 825–30.)

**B. Overview of the Co–Borrowing Facilities**

Co–Borrowing Facilities allowed the Rigas family to gain access to the credit and capital of Adelphia. According to the Amended Complaint, the Co–Borrowing Facilities were structured primarily with this purpose in mind. All Co–Borrowing Facilities were set up so both Adelphia and the RFEs could borrow up to the entire amount of the Co–Borrowing Facility. **\*299** (Am. Cmpl. ¶ 826.) The impact of this arrangement was that Adelphia was liable for the entire amount borrowed by the RFEs. Further, the Co–Borrowing Facilities were capitalized in a lopsided manner. Adelphia pledged significant assets to the Co–Borrowing Facilities, while the RFEs pledged a minute share of assets.[3] The Co–Borrowing Facilities were unprecedented. They pledged the credit and assets of a publicly-held company for the benefit of private enterprises owned by the public company's senior management.

To put each Co–Borrowing Facility into operation the Rigas family needed the approval of Adelphia's independent directors. To win the approval of the Adelphia independent directors, the Rigas family worked with the Agent Banks and their affiliated Investment Banks to prepare deceptive term sheets. (Am. Cmpl. ¶¶ 6, 10, 827.) At board meetings the Adelphia independent directors relied on these term sheets and misrepresentations made by the Rigas family to approve the Co–Borrowing Facilities. Yet the Adelphia independent directors did not know that the information supplied to Adelphia was misleading. (Am. Cmpl. ¶ 10.) The actual terms of the Co–Borrowing Facilities later memorialized in the credit agreements were materially different than the terms in the term sheets. (Am. Cmpl. ¶¶ 827, 879, 947.)

After the Co–Borrowing Facilities were approved, the RFE Co–Borrowers began to withdraw significant amounts of money from the facilities. According to the Amended Complaint, by the time the full amount of money borrowed was disclosed, the RFEs had withdrawn roughly 3.4 billion dollars. (Am. Cmpl. ¶ 11.) The money withdrawn from the Co–Borrowing Facilities was used to purchase Adelphia securities for Rigas family accounts, purchase cable companies controlled by the Rigas family, build a private golf course, and for numerous other personal purposes. (Am. Cmpl. ¶ 7.)

The Amended Complaint alleges three Co–Borrowing Facilities were used to perpetuate the Rigas family's fraud: the UCA/HHC Facility, the CCH Facility, and the Olympus Facility.[4] (Am. Cmpl. ¶ 825.) The extent to which the Co–Borrowing Facilities are described in the Amended Complaint is critical in determining the adequacy of the pleadings. The following focuses on the three Co–Borrowing Facilities whose creation the Plaintiffs allege was critical to the fraud.

**C. The UCA/HHC Co–Borrowing Facility**

The UCA/HHC Co–Borrowing Facility was approved at the April 22, 1999 board meeting by the Adelphia independent directors. (Am. Cmpl. ¶ 848.) Wachovia, BMO, and PNC Bank acted as Agent Banks (collectively, the "UCA/HHC Agent **\*300** Banks").[5] The Investment Banks affiliated with these Agent Banks were Wachovia Securities, BMO ND, and PNC Capital Markets. (Am. Cmpl. ¶ 1037.) The UCA/HHC Agent Banks and their affiliated Investment Banks structured the facility and assisted in drafting documentation. (Am. Cmpl. ¶ 843.) At the board meeting the independent directors were presented with a summary term sheet which described the terms and conditions of the UCA/HHC Co–Borrowing Facility ("UCA/HHC Term Sheet"). (Am. Cmpl. ¶¶ 847, 861, 862, 864.) However, the credit agreement for the UCA/HHC Co–Borrowing Facility (which memorialized the actual terms of the facility) was finalized two weeks later on May 6, 1999 and was not shown to the independent directors at the time they approved the transaction. (Am. Cmpl. ¶ 842.) By the time of the petition date, 831 million dollars was outstanding under the UCA/HHC Facility. (Am. Cmpl. ¶ 877.)

ART argues the UCA/HHC Term Sheet was prepared by the UCA/HHC Agent Banks and their affiliated Investment Banks. The UCA/HHC Term Sheet contained omissions and misstatements which the UCA/HHC Agent Banks and their affiliated Investment Banks were aware of. This allegation forms the basis for the Plaintiffs' claims of aiding and abetting fraud, aiding and abetting a breach of fiduciary duty, fraudulent concealment, and fraud.

**i. The UCA/HHC Term Sheet Was Prepared by the Defendants**

In furtherance of the Rigas family fraud in early 1999, the Rigas family worked with UCA/HHC Agent Banks and

Adelphia Recovery Trust v. Bank of America, N.A., 624 F.Supp.2d 292 (2009)

their affiliated Investment Banks to prepare and approve a summary term sheet describing the terms and conditions of the UCA/HHC Co–Borrowing Facility. (Am. Cmpl. ¶¶ 847, 861, 862, 864.) On April 22, 1999, the UCA/HHC Term Sheet was presented by Timothy Rigas and James Brown at a meeting of the Adelphia board of directors. Present at this meeting were the Adelphia independent directors. (Am. Cmpl. ¶ 848.) Timothy Rigas and James Brown presented the UCA/HHC Term Sheet and made verbal misrepresentations about the UCA/HHC Facility based on the information set forth in the term sheet. (Am. Cmpl. ¶¶ 850–52.)

### ii. The UCA/HHC Term Sheet Contained Omissions and Misstatements

The Amended Complaint alleges the UCA/HHC Term Sheet portrayed the Co–Borrowing Facility as being restrictive and significantly limiting of affiliate transactions. (Am. Cmpl. ¶ 860.) During the same period the UCA/HHC Term Sheet was being drafted the UCA/HHC Agent Banks and Investment Banks were aware that the Rigas family was planning to engage in conduct and affiliate transactions in violation of those restrictions. (Am. Cmpl. ¶ 861.)

Had the actual terms of the UCA/HHC Facility (which appeared in the credit agreement, not the UCA/HHC Term Sheet) been disclosed to the independent directors or had the intentions of the Rigas family (which were known by the Investment and Agent Banks) been disclosed, the UCA/HHC Facility would not have been approved. (Am. Cmpl. ¶¶ 860, 864, 866–68.)

### *301  iii. The UCA/HHC Term Sheet Defects were known To the Defendants

The Agent Banks and Investment Banks were made aware of the violative plans of the Rigas family on or about February 1999 "in a request for proposal that [the Rigas's] sent to the Agent Banks and to 25 to 30 other banks seeking participation in this facility". (Am. Cmpl. ¶ 862.) On February 23, 1999, Wachovia ("Lead Agent Bank") was informed via email by Adelphia's Director of Finance that the Rigas family intended to use the UCA/HHC Facility to borrow money for personal use. (Am. Cmpl. ¶ 863.) A similar email was sent on the same date to Bank of America. (Am. Cmpl. ¶ 863.) At no time prior to March 27, 2002 did Adelphia disclose the enormous "contingent liabilities it had amassed as a result of the RFE's draws from the UCA/HHC Co–Borrowing Facility." (Am. Cmpl. ¶ 875.)

### D. The CCH Co–Borrowing Facility

The Rigas family went back to the trough less than a year after the UCA/HHC Facility was approved. "Once again, the Rigas family made use of Adelphia's access to bank debt and the public capital markets for their own benefit." (Am. Cmpl. ¶ 878.) The Rigas family worked with a set of Agent Banks and their affiliated Investment Banks to design another Co–Borrowing Facility, based on the UCA/HHC Facility blueprint. This facility was named the CCH Facility.

The CCH Co–Borrowing Facility was approved at the March 9, 2000 board meeting by the Adelphia independent directors. (Am. Cmpl. ¶ 879.) The CCH Facility was a Co–Borrowing Facility with the following banks acting as Agent Banks: BofA, Chase, CIBC, BAS, TDI, Barclays, BMO, Wachovia, Citibank, ABN AMRO, BNS, BONY, Credit Lyonnais, CSFB, DLJ, Fleet, Merrill Lynch, Mitsubishi Trust, Morgan Stanley, Rabobank, and SunTrust (collectively, the "CCH Agent Banks"). (Am. Cmpl. ¶ 881.) The Investment Banks affiliated with the CCH Agent Banks are identified in paragraph 1037 of the Amended Complaint (Am. Cmpl. ¶ 1037.)

At the Board Meeting, the independent directors were presented with a summary term sheet which described the terms and conditions of the CCH Co–Borrowing Facility ("CCH Term Sheet"). (Am. Cmpl. ¶ 903.) However, the credit agreement for the CCH Co–Borrowing Facility (which memorialized the actual terms of the facility) was prepared a month later on April 14, 2000 and was not shown the independent directors at the time they approved the transaction. (Am. Cmpl. ¶¶ 879, 886, 901.) By the petition date, the CCH Facility had approximately 2.5 billion dollars outstanding. (Am. Cmpl. ¶ 923.)

ART alleges the CCH Term Sheet was prepared by the CCH Agent Banks and their affiliated Investment Banks. The CCH Term Sheet contained omissions and misstatements which the CCH Agent Banks and their affiliated Investment Banks were aware of. This allegation forms the basis for ART's claims of aiding and abetting fraud, aiding and abetting breach of fiduciary duty, fraudulent concealment, and fraud.

### i. The CCH Term Sheet Was Prepared by the Defendants

The CCH Agent Banks were deeply involved in drafting documents related to the CCH Facility. The CCH Agent Banks and Investment Banks conducted significant due diligence, prepared an offering memorandum with the

Adelphia Recovery Trust v. Bank of America, N.A., 624 F.Supp.2d 292 (2009)

assistance of Adelphia, and received compliance certificates from Adelphia. (Am. Cmpl. ¶ 882.) The CCH Agent Banks and their affiliated Investment Banks worked closely with the Rigas family to prepare a summary term **\*302** sheet describing the terms of the CCH Co–Borrowing Facility. (Am. Cmpl. ¶ 885.)

### ii. The CCH Term Sheet Contained Omissions and Misstatements

The Amended Complaint catalogs three areas of omissions and misstatements in the CCH Term Sheet. (Am. Cmpl. ¶¶ 891–97.) First, provisions in the CCH Term Sheet implied affiliate transactions would be restricted. The CCH Term Sheet contains a clause prohibiting transactions not on the same terms as could be obtained in transactions with 3rd parties. (Am. Cmpl. ¶ 893.) The CCH Term Sheet contained a clause which led the independent directors to believe that the proceeds of the CCH Facility would be used in specific ways which would be to the benefit of Adelphia. (Am. Cmpl. ¶ 891.) The CCH Term Sheet represented the CCH Facility would contain a restrictive investments clause which would place substantial limits on affiliated transactions. (Am. Cmpl. ¶¶ 894, 895.)

Second, the CCH Term Sheet did not define whether the leverage ratio (the amount which each borrower could borrow in relation to assets) was calculated on a combined basis or individual basis. The failure to define the leverage ratio was a material omission. If the leverage ratio was defined as being individualized then each borrower was limited to only borrowing under the CCH Facility the amount of assets and collateral which that borrower pledged to the CCH Facility. (Am. Cmpl. ¶ 889.) If the leverage ratio was calculated on a combined basis then each borrower could borrow up to the total value of all assets pledged to the facility. In the Adelphia board meeting of March 9, 2000 the leverage ratio was described by Rigas and Brown as being individualized against each borrower. The CCH Term Sheet could be taken to support these oral contentions because the CCH Term Sheet was ambiguous and did not define the leverage ratio. *Id.* However, the final CCH Credit Agreement (which was finalized after the March 9, 2000 board meeting) explicitly stated that, "[l]everage ratio means, with respect to the Companies on a combined basis." (Am. Cmpl. ¶ 901.)

Third, the CCH Term Sheet did not disclose that each borrower would be permitted to draw down the entire amount available under the facility (without regard to the amount of capital they had pledged). This was a material omission. As an exemplar, Highland Prestige, an RFE and Co–Borrower in the facility, would be able to borrow up to the total amount of the CCH Facility even though it had pledged a relatively small amount of collateral. (Am. Cmpl. ¶¶ 902, 914.)

### iii. The CCH Term Sheet Defects were known to the Defendants

The CCH Agents Banks and their affiliated Investment Banks knew or should have known that the statements in the CCH Term Sheet were false and/or misleading. First, the structure of the CCH Facility was so unprecedented that it should have raised red flags. According to the Amended Complaint the CCH Agent Banks were sophisticated parties who knew or should have known the CCH Term Sheet was misleading. (Am. Cmpl. ¶¶ 4, 826.) The CCH Agent Banks and their affiliated Investment Banks knew that despite the representations made to the independent directors, "the true terms and conditions of the CCH Co–Borrowing Facility provided no benefit to Adelphia and were not in Adelphia's interests." (Am. Cmpl. ¶ 917.)

Second, a Confidential Information Memorandum prepared in March 2000 indicates the CCH Agent Banks and their **\*303** affiliated Investment Banks knew the CCH Term Sheet contained misstatements and omissions. The Confidential Information Memorandum was prepared by the CCH Agent Banks and affiliated Investment Banks and was sent to CCH Lenders. The Memorandum "made clear that the collateral put up by the ACC co-borrowers was significantly greater than the collateral put up by Highland Prestige." (Am. Cmpl. ¶ 905.) "This information was not stated in the CCH Term Sheet presented to the Independent Directors and was not disclosed to them at the March 9, 2000 Board of Directors Meeting." *Id.*

Third, the Agent Banks and Investment Banks knew in March 2000 that the collateral pledged by the RFEs was de minimis in comparison to the amount which could be withdrawn by the RFEs. (Am. Cmpl. ¶ 908, 1036.) The Investment Banks and Agent Banks knew the Rigas family "intended to engage in conduct and affiliate transactions that violated these restrictions." (Am. Cmpl. ¶ 908.) [6]

### E. The Olympus Credit Facility

Roughly a year after opening the CCH Credit Facility the Rigas family sought to raise additional funds. (Am. Cmpl. ¶ 924.) The Olympus Credit Facility was structured in much the same way as the CCH and UCA/HHC Facilities had been structured. (Am. Cmpl. ¶ 930.) The Olympus Credit Facility

was a Co–Borrowing Facility with both RFEs and Adelphia contributing capital. (Am. Cmpl. ¶ 952.)

The Olympus Co–Borrowing Facility was approved at the August 7, 2001 board meeting by the Adelphia independent directors. (Am. Cmpl. ¶ 932.) The Olympus Facility was a Co–Borrowing Facility with the following banks acting as Agent Banks: BMO, Wachovia, BNS, Fleet, BONY, BofA, Bankers Trust Company, Citicorp, TDI, Chase, Deutsche Bank, CSFB, Credit Lyonnais, Royal Bank of Scotland, Societe Generale, and Fuji Bank (collectively, the "Olympus Agent Banks"). (Am. Cmpl. ¶ 927.) The Investment Banks associated with the Olympus Agent Banks are identified in paragraph 1037 of the Amended Complaint. (Am. Cmpl. ¶ 1037.)

At the board meeting the independent directors were presented with a summary term sheet describing the terms and conditions of the CCH Co–Borrowing Facility ("Olympus Term Sheet"). (Am. Cmpl. ¶ 933.) However, the credit agreement for the Olympus Co–Borrowing Facility (which memorialized the actual terms of the facility) was finalized after the board meeting and was not shown to the independent directors at the time they approved the transaction. (Am. Cmpl. ¶¶ 947, 951.) As of the petition date approximately 1.3 billion dollars was outstanding under the Olympus Credit Facility. (Am. Cmpl. ¶ 969.)

ART alleges the Olympus Term Sheet was prepared by the Olympus Agent Banks and their affiliated Investment Banks. The Olympus Term Sheet contained omissions and misstatements the Olympus Agent Banks and their affiliated Investment Banks were aware of. This allegation forms the basis of ART's claims of aiding and abetting fraud, aiding and abetting breach of fiduciary duty, fraudulent concealment, and fraud.

### i. The Olympus Term Sheet Was Prepared by the Defendants

The Agent Banks and their affiliated Investment Banks in concert with the Rigas **\*304** family drafted a summary term sheet for the Olympus Facility ("Olympus Term Sheet"). (Am. Cmpl. ¶¶ 928, 931.)

### ii. The Olympus Term Sheet Contained Omissions and Misstatements

The Amended Complaint alleges three defective areas in the Olympus Term Sheet. The alleged defects in the Olympus

Term Sheet mirror the defects in the CCH and UCA/HHC Term Sheets. First, the Olympus Term Sheet contained clauses preventing participants in the Co–Borrowing Facility from engaging in transactions which do not benefit Adelphia. The Olympus Term Sheet prohibited transactions which were "not on the same terms as could be obtained by third parties." (Am. Cmpl. ¶ 939.) The restricted investments clause in the Olympus Term Sheet claimed to place limits on affiliated transactions. (Am. Cmpl. ¶¶ 940, 941.)

Second, the Olympus Term Sheet did not define whether the 'leverage ratio' was to be calculated on a combined or individual basis. (Am. Cmpl. ¶ 942, 945.) The omission of a definition for the 'leverage ratio' is a material omission according to ART's pleadings. The leverage ratio (as in the CCH Facility) was critical in determining how much each of the borrowers could borrow from the facility. (Am. Cmpl. ¶ 942–47.)

Third, the Olympus Term Sheet failed to disclose that an RFE could pledge de minimis capital compared to the amount which it intended to borrow from the facility. (Am. Cmpl. ¶ 948.) The omission of this fact from the Olympus Term Sheet was material. If the RFEs' intended use under the facility had been exposed to the independent directors the Olympus Facility would not have been approved. (Am. Cmpl. ¶¶ 949, 950.)

### iii. The Olympus Term Sheet Defects were known to the Defendants

The Olympus Agents Banks and their affiliated Investment Banks knew or should have known that the statements in the Olympus Term Sheet were false and/or misleading. The Amended Complaint lists three independent grounds for actual or constructive knowledge. First, according to the Amended Complaint the structure of the Olympus Facility was highly unusual. The Olympus Agent Banks should have disclosed the unusual arrangement in the Olympus Term Sheet and called attention to its risks. (Am. Cmpl. ¶¶ 961, 962.)

Second, the Olympus Agent Banks and their affiliated Investment Banks knew or should have known that the Olympus Term Sheet was defective based on the Rigas family's use of the CCH and UCA/HHC Facilities in the preceding two years. Many of the Olympus Agent Banks assisted in the structuring and management of the previous Co–Borrowing Facilities. By the time the Olympus Term Sheet was drafted by the Olympus Agent Banks the Rigas

family had withdrawn hundreds of millions of dollars from the CCH and UCA/HHC Facilities. This money was used for the benefit of the Rigas family. (Am. Cmpl. ¶¶ 956, 965, 1036.)

Third, a Confidential Information Memorandum prepared by the Olympus Agent Banks and their affiliated Investment Banks demonstrated the Banks were aware the Olympus Facility was going to be used in ways contravening the Olympus Facility Term Sheet. The Confidential Information Memorandum prepared in August of 2001 stated, "the collateral put up by the ACC co-borrowers would be significantly greater than the collateral put up by the RFE co-borrowers." (Am. Cmpl. ¶¶ 951, 952.)

*305  *2. Procedural Background*
The collapse of Adelphia led to numerous civil, criminal, and bankruptcy proceedings. This particular case was part of an original case filed six years ago in the Southern District of New York Bankruptcy Court before Judge Robert E. Gerber. From 2003 until 2006 the case proceeded in the Southern District of New York Bankruptcy Court. On February 9, 2006, this Court withdrew the reference to the Bankruptcy Court, pursuant to 🚩28 U.S.C. 157(d), and assigned to the undersigned as related to the Adelphia multidistrict litigation (03 MDL 1529). The background of the case is complex and impacts this decision so an overview of the proceedings in the Southern District of New York Bankruptcy Court and before this Court is appropriate.

**A. Proceedings in the Bankruptcy Court**
On July 6, 2003 Adelphia's Official Committee of Unsecured Creditors filed a complaint ("Creditors Complaint") in the Southern District of New York Bankruptcy Court before Judge Gerber. The Creditors Complaint alleged fifty-two claims against hundreds of Defendants. The Creditors Complaint divided the Defendants into four categories: Agent Banks, Investment Banks, Non–Agent Banks and Assignees. [7] The Creditors Complaint alleged the Defendants benefited from the Rigas's fraud and in some cases aided in its perpetration.

On July 31, 2003 the Official Committee of Equity Security Holders filed an intervenor complaint ("Intervenor Complaint") in the Southern District of New York Bankruptcy Court (also before Judge Gerber). The Intervenor Complaint joined in the bulk of the claims which had been filed by

the Creditors Committee and asserted claims against the Investment Banks for fraudulent concealment; and against the Agent Banks and Investment Banks for fraud and RICO violations.

The Defendants raised two lines of attack to the claims made against them in the Creditors Complaint and the Intervenor Complaint. First, the Defendants alleged the Creditors Committee and Equity Committee lacked Article III standing to bring their claims. Second, the Defendants brought various 12(b)(6) motions to dismiss the claims in the two complaints.

Judge Gerber of the Bankruptcy Court issued three decisions addressing the issues raised by the Defendants. In the first decision, Judge Gerber held both the Equity and Creditor Committees had standing to bring their claims. 📁*In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 377 (Bankr.S.D.N.Y.2005). In the second decision, Judge Gerber examined the various Defendants' 12(b)(6) motions to dismiss the Creditors Complaint claims. 📁*In re Adelphia Commc'ns Corp.*, 365 B.R. 24 (Bankr.S.D.N.Y.2007). Judge Gerber in an extensive opinion dismissed some of the *306 claims and sustained others. [8] In the third decision, Judge Gerber considered the various Defendants' 12(b)(6) motions to dismiss the claims made in the Intervenor Complaint. *In re Adelphia Commc'ns Corp.*, Adversary N. 03–04942(REG), 2007 WL 2403553 (Bankr.S.D.N.Y. Aug. 17, 2007). Judge Gerber dismissed the claims asserted in the Intervenor Complaint, but granted leave to replead the claims for fraud and fraudulent concealment.

Concurrent with the Bankruptcy Court issuing these three decisions a Chapter 11 reorganization of Adelphia was proceeding. The First Modified Fifth Amended Joint Chapter 11 Plan of Reorganization of Adelphia Communications Corporation and Certain Affiliated Debtors was confirmed and became effective on January 17, 2007 ("Joint Chapter 11 Plan"). The confirmation of the Joint Chapter 11 Plan led to the consolidation of the Creditor's Complaint and Intervenor Complaint. The consolidated claims were transferred to the Adelphia Recovery Trust (ART) to prosecute.

**B. Proceedings before this Court**
The Defendants sought leave to appeal all of the claims which Judge Gerber had failed to dismiss. This Court [9] granted leave to appeal with respect to particular discreet areas of law.

*Adelphia Recovery Trust v. Bank of Am.,* N.A., No. 05 Civ 9050, 2007 WL 2585065 (S.D.N.Y. Sept.05, 2007); *Adelphia Recovery Trust v. Bank of Am., N.A.,* No. 05 Civ 9050, 2007 WL 2890220 (S.D.N.Y. Sept.28, 2007).

ART filed an Amended Complaint on October 31, 2007. (Adversary Proceeding Amended Complaint ("Am. Cmpl.")). The Amended Complaint consolidated the Creditors' Complaint and Intervenor Complaint. ART also made revisions to the claims. The Amended Complaint is in excess of 500 pages, naming many hundreds of defendants, and provides additional details to various claims.

This Court on January 17, 2008, issued an order based on the legal issues which it had granted review of in the Sept 5, 2007 and September 28, 2007 decisions. *Adelphia Recovery Trust v. Bank of Am., N.A.,* 390 B.R. 64 (S.D.N.Y.2008). This Court held Claim 37 for aiding and abetting a breach by the Rigas family, Michael Mulcahey, and James R. Brown of their fiduciary obligations to Adelphia would be governed by Pennsylvania state law. This Court also held aiding and abetting a breach of fiduciary duty was a valid tort under Pennsylvania state law. In addition, this Court held the doctrine of *in pari delicto* would not lead to the dismissal of a claim on a 12(b)(6) motion. *Adelphia Recovery Trust,* 390 B.R. at 78–79. This Court concluded the Adelphia Recovery Trust had Article III standing to bring its claims. *Adelphia Recovery Trust,* 390 B.R. at 71. Lastly, the court dismissed the Bank Holding Company Act Claim (Claim 32) with leave to replead to cure ambiguity in the original allegations. *Id.*

This Court next turned its attention to the Defendants' various 12(b)(6) motions for dismissal of the Amended Complaint's claims 1 to 16; 33; 41 to 44; and 49 to 52. This Court entered an order on these issues on June 17, 2008. ⚑ *Adelphia Recovery Trust v. Bank of America, N.A.,* 390 B.R. 80 (S.D.N.Y.2008). The claims comprised the statutory bankruptcy avoidance claims and the equitable subordination and equitable **\*307** disallowance claims; collectively known as the 'Bankruptcy Claims'. The Court issued a memorandum and order dismissing the Bankruptcy Claims. On December 8, 2008, this Court entered a stipulation and order of a final judgment [10] whereby claims 1–16, 33, 41–44, and 49–52 of the Amended Complaint were dismissed as to the Non–Agent Lenders.

On March 5, 2008, this Court entered an order severing and transferring ten of the claims in the Amended Complaint. *Adelphia Recovery Trust v. Bank of America, N.A.,* No. 05 Civ. 9050, 2009 WL 636719 (S.D.N.Y. March 5, 2009). The ten claims transferred were factually and legally distinct from other claims in the Amended Complaint and were collectively known as the Sabres Claims. *Id.* The Sabres Claims (claims 17–24 and 56–57) alleged the Rigas family had fraudulently conveyed roughly 30 million dollars to three banks in a series of transactions which allowed the Rigas family to assume control of the Buffalo Sabres Hockey Team. [11] These claims were transferred to the Western District of New York.

### 3. Standard of Review

**A. Substantive Law is Pennsylvania State Law**
Claims in this case will be decided using the substantive law of the State of Pennsylvania. At this stage no parties are challenging the choice of Pennsylvania state law as the substantive law of the case. Pennsylvania state law was used repeatedly as the basis to resolve claims in this case. Judge Gerber used Pennsylvania state law in his opinion addressing the Defendants' 12(b)(6) motions to dismiss the Equity Committee's Complaint. ⚑ *In re Adelphia Commc'ns Corp.,* 365 B.R. at 39. This Court used Pennsylvania state law for evaluating other claims in the Amended Complaint. *Adelphia Recovery Trust,* 390 B.R. at 76.

**B. Procedural Law used is that of the Southern District of New York**
The procedural law governing this case is that of the Southern District of New York. Courts have a compelling reason to adopt the procedural law of their local court for deciding the sufficiency of pleadings on a 12(b)(6) motion to dismiss. In ⚑ *Texaco Inc. v. Pennzoil Co.,* the Second Circuit Court of Appeals reasoned that a forum had compelling reasons for applying its own procedural rules and enormous burdens were avoided when a court applied its own rules, rather than the rules or interpretations of another jurisdiction. ⚑ *Texaco Inc. v. Pennzoil Co.,* 784 F.2d 1133, 1156 (2d Cir.1986). "A court usually applies its own local law rules prescribing how litigation shall be conducted even when it applies the local law rules of another state to resolve other issues in the case." *Restatement (Second), Conflict of Laws, §* 122 (comment a) (1971). [12]

**\*308  C. Pleading Standard under Fed.R.Civ.P. 8(a)**
This memorandum and order responds to various defendants' motions to dismiss the tort claims against them under Rule

Adelphia Recovery Trust v. Bank of America, N.A., 624 F.Supp.2d 292 (2009)

12(b)(6). [13]  For ART to avoid dismissal of claims under Rule 12(b)(6) ART must plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). However, adequate pleadings must raise a right to relief above the speculative level. "[A] plaintiff's obligation to provide the 'grounds' of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964–65, 167 L.Ed.2d 929 (2007).

**D. Pleading Standard for Fraud under Fed.R.Civ.P. 9(b)**

There is a heightened pleading requirement when a claim is grounded in fraud. Fed.R.Civ.P. 9(b) requires that fraud be pled with particularity. Harsco Corp. v. Segui, 91 F.3d 337, 347 (2d Cir.1996). "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. We have explained that in order to comply with Rule 9(b), 'the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " Rombach v. Chang, 355 F.3d 164, 170 (2d Cir.2004) (quoting Mills v. Polar Molecular Corp., 12 F.3d 1170, 1175 (2d Cir.1993)).

Under Rule 9(b), "[m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). But, "we must not mistake the relaxation of Rule 9(b)'s specificity requirement regarding condition of mind for a license to base claims of fraud on speculation and conclusory allegations[,] ... plaintiffs must allege facts that give rise to a strong inference of fraudulent intent." Acito v. IMCERA Group, Inc., 47 F.3d 47, 52 (2d Cir.1995) (internal quotation marks and citation omitted). "The requisite 'strong inference' of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1128 (2d Cir.1994).

(citing Lerner v. Fleet Bank, N.A., 459 F.3d 273, 278–91 (2d Cir.2006)).

*4. Discussion*

**A. Claim 38—Aiding and Abetting Fraud against the Agent Banks and Their Affiliated Investment Banks is not Dismissed**

Claim 38 in the Amended Complaint alleges that the Agent Banks and their affiliated Investment Banks aided and abetted the Rigas family's fraud. Claim 38 alleges the Agent Banks and their affiliated Investment Banks drafted deceptive term sheets which misrepresented or omitted key provisions concerning the UCA/HHC, CCH, and Olympus Co-Borrowing Facilities. The preparation and approval of these term sheets aided and abetted the Rigas family's fraud.

**\*309**  The Defendants have filed various memorandums of law in support of their motions to dismiss Claim 38. Four primary arguments for dismissal are laid out in the memorandums of law: aiding and abetting fraud is not recognized under Pennsylvania state law, the elements of aiding and abetting fraud are not pled with particularity, the Amended Complaint uses impermissible group pleading (the lumping of defendants together), and the term sheets prepared by the Defendants affirmatively disclosed problems with the Co-Borrowing Facilities.

The Defendants' motions for dismissal of Claim 38 are DENIED.

**i. Background of Claim 38**

Claim 38 was first pled in the Creditors Complaint. The Creditors Complaint alleged the Agent Banks and their affiliated Investment Banks aided and abetted the Rigas family's fraud. (CC ¶ 868.) Judge Gerber dismissed Claim 38 with leave to replead. Gerber ruled the pleadings in the Creditors Complaint 'lack the requisite particularity' required for a fraud claim. In re Adelphia Commc'ns Corp., 365 B.R. at 61. Judge Gerber did not address whether Pennsylvania courts would recognize a tort for aiding and abetting fraud. "The Court does not need to decide, and does not now decide, whether Pennsylvania would recognize the tort of aiding and abetting fraud, as a general matter." Id. Claim 38 was repled in the Amended Complaint which is now before this Court.

### ii. Aiding and Abetting Fraud is a Valid Claim under Pennsylvania State Law

[1]    The Defendants urge this Court to dismiss Claim 38 on the basis that Pennsylvania state law does not recognize the tort of aiding and abetting fraud. The Defendants' argument is rejected. This Court's January 17, 2008 decision recognized the tort of aiding and abetting a breach fiduciary duty but did not address directly whether Pennsylvania state law would recognize a tort for aiding and abetting fraud. *Adelphia Recovery Trust,* 390 B.R. at 77. However, the analysis underlying this Court's earlier recognition of a tort for aiding and abetting a breach of fiduciary duty leads this Court to conclude the Pennsylvania Supreme Court would also recognize a tort for aiding and abetting fraud.

[2]    [3]    The Pennsylvania Supreme Court has not directly ruled on whether it recognizes a tort of aiding and abetting fraud. *Klein v. Boyd,* No. 95–5410, 1996 WL 675554, at *33 (E.D.Pa. November 19, 1996). In cases where it is unclear if a cause of action is allowed by a state supreme court, "[t]he federal court may not impose its view of what the state law should be, but must apply existing state law as interpreted by the state's highest court in an effort to determine how the state court would decide the precise legal issue before the federal court." *Walsh v. Strenz,* 63 F.Supp.2d 548, 551 (M.D.Pa.1999) (citing *Koppers Co., Inc. v. Aetna Cas. & Sur. Co.,* 98 F.3d 1440, 1445 (3d Cir.1996)). "In the absence of a reported decision by the state's highest court addressing the precise issue before it, a federal court applying state substantive law must predict how the state's highest court would rule if presented with the case." *Carrasquilla v. Mazda Motor Corp.,* 197 F.Supp.2d 169, 172 (M.D.Pa.2002). In the Second Circuit, a federal district court will "conclusively defer to a federal court of appeals' interpretation of the law of a state that is within its circuit." *Booking v. General Star Management Co.,* 254 F.3d 414, 421 (2d Cir.2001), *see also Official Comm. of Unsecured Creditors of Color Tile, Inc.* **\*310** *v. Coopers & Lybrand, LLP,* 322 F.3d 147, 157 n. 4 (2d Cir.2003).

Four factors lead this Court to conclude the Pennsylvania Supreme Court would recognize a tort for aiding and abetting fraud. First, the adoption of Section 876 of the Restatement (Second) of Torts by the Pennsylvania Supreme Court is strongly indicative that it would recognize a tort for aiding and abetting fraud. The Pennsylvania Supreme Court held

when adopting Section 876 of the Restatement (Second) of Torts that, "[t]his theory provides in pertinent part that '[f]or harm resulting to a third person from the tortious conduct of another, one is subject to liability if he (a) does a tortious act in concert with the other or pursuant to a common design with him ...' " *Skipworth by Williams v. Lead Industries Ass'n, Inc.,* 547 Pa. 224, 690 A.2d 169, 174 (1997) (quoting *Restatement (Second) of Torts, § 876.*)[14] Pennsylvania state courts have relied on the holding in *Skipworth* to conclude that the entirety of Section 876 was adopted under Pennsylvania state law. "Our Supreme Court addressed Section 876 in *Skipworth by Williams v. Lead Industries Association, Inc.,* and this Court is convinced by this language in *Skipworth* that Section 876 is a viable cause of action in Pennsylvania." *Koken v. Steinberg,* 825 A.2d 723, 732 (Pa.Cmwlth.2003) (citations omitted). The opinion in *Koken* cites the entirety of Section 876 in finding that *Skipworth* leads to viable claims under all of Section 876. The Superior Court of Pennsylvania has also explicitly adopted all of Section 876. "In the alternative, a defendant must render substantial assistance to another to accomplish a tortious act. As specifically stated in comment (d) to *§ 876(b),* 'in determining liability, the factors are the same as those used in determining the existence of legal causation when there has been negligence.' " *Cummins v. Firestone Tire & Rubber Co.,* 344 Pa.Super. 9, 21–22, 495 A.2d 963 (Pa.Super.1985). Other courts in Pennsylvania have similarly found the adoption of Section 876 makes aiding and abetting a viable cause of action. "[A]s set forth in Section 876 of the Restatement (Second) of Torts, [aiding and abetting] is a recognized civil cause of action under Pennsylvania law." *Sovereign Bank v. Valentino,* 914 A.2d 415, 416 (Pa.Super.2006). "[D]efendants aver that Count XX fails to state a claim upon which relief can be granted for tortious aiding and abetting. Pennsylvania courts have declared that such a claim, based upon section 876 of the Restatement (Second) of Torts, is a viable cause of action in the Commonwealth...." *Cruz v. Roberts,* 70 Pa. D. & C.4th 225, 234–235 (Pa.Com.Pl.2005) (concluding that although Section 876 has been adopted the defendant did not state a claim on which relief could be granted due to insufficient pleading of facts).

Federal courts from around the country have taken a state court's adoption of Section 876 of the Restatement (Second) of Torts to mean that a state supreme court would recognize

common law aiding and abetting fraud. This Court's review of various federal court opinions has found broad agreement that where a state has adopted Section 876 of the Restatement aiding and abetting fraud is a valid cause of action under the law of that state. This Court is not bound by the holdings of these other federal courts. However, this **\*311** Court finds the broad agreement between federal courts on this issue to be persuasive. In *Cope v. Price Waterhouse* the Ninth Circuit Court of Appeals reasoned, "[t]he Second Restatement of Torts also supports a finding that actual knowledge is the proper standard for a claim of aiding and abetting fraud. Section 876(b) provides for secondary liability for tortious conduct if a party 'knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself.' " *Cope v. Price Waterhouse,* No. 92–15901, 1993 WL 102598, at \*6 (9th Cir.1993) (*citing Restatement (Second) of Torts, § 876(b)*); *see also Pathe Computer Control Systems Corp. v. Kinmont Industries, Inc.,* 955 F.2d 94, 98 (1st Cir.1992) (*citing Norman v. Brown, Todd & Heyburn,* 693 F.Supp. 1259, 1264 (D.Mass.1988) (recognizing a cause of action under Massachusetts law for aiding and abetting fraud by looking to Section 876)); *El Camino Resources, Ltd. v. Huntington Nat. Bank,* No. 1:07–cv–598, 2009 WL 427278, at \*3 (W.D.Mich. February 20, 2009) (looking to Section 876 of the Restatement to define the elements for aiding and abetting fraud); *In re Enron Corporation Securities, Derivative & "ERISA" Litigation,* 540 F.Supp.2d 800, 811 (S.D.Tex.2007) (examining Section 876 and *Aetna Casualty and Surety Co. v. Leahey Construction Co., Inc.,* 219 F.3d 519, 532–33 (6th Cir.2000) to determine the elements for aiding and abetting common law fraud.); *Neilson v. Union Bank of California N.A.,* 290 F.Supp.2d 1101, 1119–1120 (C.D.Cal.2003) (looking to Section 876 to define the elements for common law fraud.)

A federal court in the Southern District of Mississippi looked at twenty-eight cases (dealing with state court adoption of Section 876 prior to 2002) and concluded, "the majority of jurisdictions that have addressed the validity of a claim for aiding and abetting under § 876(b) have held that such a claim exists. Therefore, Mississippi's adoption of the related and analogous tort of civil conspiracy, coupled with the majority rule regarding 876(b), persuades this Court that Mississippi would recognize a claim of aiding and abetting fraud, foreclosing dismissal for failure to state a claim." *Dale v. Ala Acquisitions, Inc.,* 203 F.Supp.2d 694, 700–

701 (S.D.Miss.2002). The Pennsylvania Supreme Court's adoption of Section 876 of the Restatement Second of Torts in *Skipworth* is a significant factor in concluding the Pennsylvania Supreme Court would recognize a tort for aiding and abetting fraud.

Second, lower courts in Pennsylvania have recognized the broad tort of civil aiding and abetting. Pennsylvania state courts' recognition of aiding and abetting claims is a strong indicium that the Supreme Court would recognize the subset tort of aiding and abetting fraud. As noted above a number of lower courts in Pennsylvania have recognized aiding and abetting based on Section 876 of the Restatement. *See Koken,* 825 A.2d at 732; *Cummins,* 344 Pa.Super. at 21–22, 495 A.2d 963; *Sovereign Bank,* 914 A.2d at 416; *Cruz,* 70 Pa. D. & C.4th at 234–35.

Third, several federal courts have recognized the broad tort of civil aiding and abetting under Pennsylvania state law. "The tort of civil aiding and abetting, which is also known as concerted tortious conduct, has recently been recognized as 'a viable cause of action' under Pennsylvania common law." *Nelson v. DeVry, Inc.,* No. 07–4436, 2008 WL 2845300, at \*4 (E.D.Pa. July 22, 2008) (*quoting Koken,* 825 A.2d at 731); *Thompson v. Glenmede Trust Co.,* 1993 WL 197031 (E.D.Pa. June 8, 1993) (recognizing aiding and abetting a breach of fiduciary duty is a tort under Pennsylvania Law and that the tort does not require actual harm to be shown). In *Huber v.* **\*312** *Taylor* the Court of Appeals for the Third Circuit held Pennsylvania state law recognizes a tort for aiding and abetting a breach of fiduciary duty. *Huber v. Taylor,* 469 F.3d 67, 79 (3d Cir.2006) (recognizing there is no conflict of law between Texas and Pennsylvania law regarding aiding and abetting a breach of fiduciary duty since both states do not require a party to show actual harm or injury to state a claim). The federal district court cases and the case from the Third Circuit Court of Appeals all cite the Commonwealth Court of Pennsylvania's decision in *Koken* to find a tort for aiding and abetting. [15] As analyzed above the reasoning behind the decision in *Koken* (the adoption of Section 876 of the Restatement (Second) of Torts by the Pennsylvania Supreme Court) leads this Court to recognize aiding and abetting fraud as a viable cause of action.

Fourth, recognizing the tort of aiding and abetting fraud would be a natural extension of this Court's earlier holding

recognizing a tort for aiding and abetting a breach of fiduciary duty. This Court's January 17, 2008 order recognizing aiding and abetting a breach of fiduciary duty was in part based on the Third Circuit Court of Appeals recognizing of the tort under Pennsylvania state law. *Adelphia Recovery Trust,* 390 B.R. at 77. This Court also held aiding and abetting a breach of fiduciary duty was a valid tort because the Pennsylvania Supreme Court had adopted Section 876 of the Restatement. *Id.* As discussed above the adoption of Section 876 leads not only to recognizing a tort for aiding and abetting a breach of fiduciary duty but also one for aiding and abetting fraud.

### iii. Aiding and Abetting Fraud is Plead with Particularity

**[4]** **[5]** The Defendants argue the elements of aiding and abetting fraud have not been pled with the needed particularity to meet the requirements of Fed.R.Civ.P. 9(b). Aiding and abetting fraud has three elements: "(1) that an independent wrong exist; (2) that the aider or abettor know of that wrong's existence; and (3) that substantial assistance be given in effecting that wrong." *Landy v. Federal Deposit Ins. Corp.,* 486 F.2d 139, 162–163 (3d Cir.1973); *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880, 886 (3d Cir.1975) (defining the elements for aiding and abetting using Restatement of Torts Section 876). To meet the pleading requirements, "a claim for aiding and abetting fraud requires plaintiff to plead facts showing, the existence of a fraud, defendant's knowledge of the fraud, and that the defendant provided substantial assistance to advance the fraud's commission." *Wight v. BankAmerica Corp.,* 219 F.3d 79, 91 (2d Cir.2000).

In analyzing the sufficiency of the pleadings for aiding and abetting fraud this Court looks to the following: the elements of an aiding and abetting fraud claim, the section of the Amended Complaint which lays out Claim 38 for aiding and abetting fraud, and facts which are pleaded elsewhere in the Amended Complaint (with regards to the three Co–Borrowing Facilities). *Hertz Corp. v. City of New York,* 1 F.3d 121, 125 (2d Cir.1993) (in analyzing the sufficiency of pleadings a court is to look at all pleaded facts in a complaint).

**[6]** The Amended Complaint has a Byzantine-like structure. Judge Learned **\*313** Hand described digging through a voluminous complaint as requiring "a great deal of archeology". Judge Augustus Hand, *'Trial Efficiency,'*

dealing with antitrust cases, *Business Practices Under Federal Antitrust Laws, Symposium,* New York State Bar Assn. (C.C.H., 1951) 31–32. This is such a case.

Paragraphs 1421 to 1433 of the Amended Complaint lay out aiding and abetting fraud by the Agent Banks and their affiliated Investment Banks across the three Co–Borrowing Facilities. The allegations in paragraphs 1421 to 1433 are not specific enough of themselves to meet the requirements of Fed.R.Civ.P. 9(b). However, Claim 38 references the preceding paragraphs 1 to 1078 of the Amended Complaint. (Am. Cmpl. ¶ 1434.)

The preceding paragraphs of the Amended Complaint plead sufficient facts related to the Co–Borrowing Facilities to sustain the aiding and abetting fraud claim with regards to the UCA/HHC, CCH, and Olympus Co–Borrowing Facilities. This Court concludes that the elements of aiding and abetting fraud have been pled with the necessary particularity to sustain the claim in regards to the following defendants and associated Co–Borrowing Facilities: the UCA/HHC Agent Banks and their affiliated Investment Banks in connection with the UCA/HHC Co–Borrowing Facility; the CCH Agent Banks and their affiliated Investment Banks in connection with the CCH Co–Borrowing Facility; the Olympus Agent Banks and their affiliated Investment Banks in connection with the Olympus Co–Borrowing Facility.

### a. Aiding And Abetting Fraud Related to the UCA/HHC Facility is Pled with Particularity

The Amended Complaint pleads with particularity the elements necessary to sustain a claim for aiding and abetting fraud by the UCA/HHC Agent Banks and their affiliated Investment Banks related to the UCA/HHC Co–Borrowing Facility. First, the Amended Complaint pleads the Rigas family was involved in fraud related to the UCA/HHC Facility. The fraud conducted by the Rigas family occurred when the Rigas family made fraudulent misstatements and omissions regarding the UCA/HHC Facility at the April 22, 1999 board meeting. (Am. Cmpl. ¶ 863.) The Rigas family used the UCA/HHC Facility to loot Adelphia of hundred of millions of dollars for personal gain. (Am. Cmpl. ¶ 877.)

Second, the UCA/HHC Agent Banks and their affiliated Investment Banks had knowledge of the fraud. UCA/HHC Agent Banks and their affiliated Investment Banks knew at the time they provided the UCA/HHC Term Sheet that the "Rigas family intended to engage in conduct ... that

violated those restrictions" and engage in fraud. (Am. Cmpl. ¶ 861.) Banks were aware prior to presenting the UCA/HHC Term Sheet that the Rigas family was planning on borrowing extensively from the facility and using the funds for their personal benefit. (Am. Cmpl. ¶ 862.) Emails between the parties establish the Banks knew the Rigas family intended to use the UCA/HHC facility for their personal gain. (Am. Cmpl. ¶ 863.) The Banks involved in the UCA/HHC Facility had ongoing knowledge that the facility was being used in violation of the Rigas family, Brown and Mulcahey's fiduciary obligations—as hundreds of millions of dollars were withdrawn from the facility over the coming years and used for the personal benefit of the Rigas family. (Am. Cmpl. ¶¶ 873–75.)

The Defendants assert ART has not pled knowledge with the requisite particularity to satisfy 🚩 Rule 9(b). However, this Court in its January 17, 2008 decision, held **\*314** knowledge may be averred generally. *Adelphia Recovery Trust,* 390 B.R. at 64. The Second Circuit has held, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." 🚩 *Rombach v. Chang,* 355 F.3d 164, 171 (2d Cir.2004). "We apply the more general standard to scienter for the simple reason that 'a plaintiff realistically cannot be expected to plead a defendant's actual state of mind.' " 🚩 *Wight v. BankAmerica Corp.,* 219 F.3d 79, 91– 92 (2d Cir.2000) (*citing* 🚩 *Connecticut Nat'l Bank v. Fluor Corp.,* 808 F.2d 957, 962 (2d Cir.1987)).

The Defendants argue 🚩 *Lerner v. Fleet Bank, N.A.* overruled the Second Circuits' earlier decisions and requires the Plaintiff to plead facts showing actual knowledge of the fraud by the Defendants. (Investment. B. Mem. at 17 (*citing* 🚩 *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 293 (2d Cir.2006))). The Defendants' argument overstates the holding in 🚩 *Lerner.* 🚩 *Lerner* does not overrule 🚩 *Wight* (and earlier Second Circuit cases). Instead, 🚩 *Lerner* incrementally heightens the pleading standard for knowledge. 🚩 *Lerner,* 459 F.3d at 293. 🚩 *Lerner* stands for the proposition that one can plead facts which give rise to a strong inference that the defendant had knowledge of the fraud. The inference "may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by

alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." 🚩 *Id.* at 290– 91. 🚩 *Lerner* does not require the plaintiff to plead actual knowledge on the part of a defendant; if a party pleads facts leading to a "substantial inference" that will be enough.

🚩 *Id.; see also* 🚩 *M–101, LLC v. iN Demand L.L.C.,* No. 06 Civ. 12938, 2007 WL 4258191, at \*2 (S.D.N.Y. Dec. 03, 2007), 🚩 *Oh v. Imagemark, Inc.,* No. 06 Civ. 10187, 2007 WL 2962381, at \*3 (S.D.N.Y. Oct. 10, 2007). In this case ART has met the burden laid out in 🚩 *Lerner.* ART has pled facts (emails, meetings, correspondence, and conduct) which constitute strong circumstantial evidence that the UCA/HHC Agent Banks and Investment Banks were aware of the fraud related to the UCA/HHC Co–Borrowing Facility.

Third, the UCA/HHC Agent Banks and their affiliated Investment Banks (involved in the UCA/HHC Facility) provided substantial assistance to advance the commission of the fraud. The UCA/HHC Agent Banks and Investment Banks worked together to draft and approve the UCA/HHC Term Sheet. (Am. Cmpl.¶ 861.) The UCA/HHC Term Sheet omitted key terms and made specific misstatements. These misstatements included: presenting the UCA/HHC Facility as being in the best interest of Adelphia, that the proceeds would only be used for specific purposes, the UCA/HHC Facility would be restricted in its work with RFEs, transactions with affiliates would be prohibited, and the restricted investments clause placed substantial limits on the type of transaction permitted. (Am. Cmpl. ¶¶ 853–61.) The Amended Complaint alleges that but for the omissions and misstatements in the UCA/HHC Term Sheet the UCA/HHC Facility would not have been approved and the fraud would not have occurred. (Am. Cmpl. ¶¶ 867–72.) The UCA/HHC Agent Banks and their affiliated Investment Banks are alleged to have played a key role in furthering the UCA/HHC related fraud.

### b. Aiding And Abetting Fraud Related to the CCH Facility is Pled with Particularity

The Amended Complaint has enough particularity to meet the pleading requirements **\*315** for aiding and abetting fraud related to the CCH Facility (by the CCH Agent Banks and their affiliated Investment Banks). The Amended Complaint's pleading of the facts surrounding the CCH Facility mirror the pleadings for the UCA/HHC Facility so this order will briefly summarize the pleadings (after the more exhaustive overview of the UCA/HHC Facility).

First, the pleadings state with particularity that the Rigas family was involved in fraudulent activities related to the CCH Facility. (Am. Cmpl. ¶¶ 917, 922, 923.) Second, the Amended Complaint pleads specific facts showing the CCH Agent Banks and their affiliated Investment Banks had knowledge of the fraud related to the CCH Facility. (Am. Cmpl. ¶¶ 905, 909, 975, 978.) Third, the Amended Complaint pleads facts showing the CCH Agent Banks and their affiliated Investment Banks provided substantial assistance to the Rigas family by crafting term sheets which induced the independent directors of Adelphia to enter into the CCH Co–Borrowing Facility. (Am. Cmpl. ¶¶ 878, 885, 910, 902, 904, 896, 900.)

### c. Aiding And Abetting Fraud Related to the Olympus Facility is Pled with Particularity

The Amended Complaint pleads aiding and abetting fraud related to the Olympus Facility by the Olympus Agent Banks and their affiliate Investment Banks with the required particularity. The facts alleged with regards to the Olympus Facility and the aiding and abetting of fraud mirror those of the UCA/HHC Facility and the CCH Facility.

First, the pleadings state the Rigas family was involved in fraud related to the Olympus Facility. (Am. Cmpl. ¶¶ 924, 932, 933, 935, 936, 950.) Second, the Amended Complaint pleads specific facts showing the Olympus Agent Banks and their affiliated Investment Banks had knowledge of fraud related to the Olympus Facility. (Am. Cmpl. ¶¶ 928, 931, 951, 952, 955.) Third, the Amended Complaint pleads facts showing the Olympus Agent Banks and their affiliated Investment Banks provided substantial assistance to the Rigas family by crafting term sheets which induced the independent directors of Adelphia to enter into the Olympus Co–Borrowing Facility. (Am. Cmpl. ¶¶ 937–49, 958, 960.)

### iv. Group Pleading of the Agent Banks and Their Affiliated Investment Banks Is Permitted

**[7]**    The Defendants argue ART's grouping together of the Agent Banks and Investment Banks in their pleadings fails to satisfy the pleading standards of Rule 9(b) and Rule 8(a). The Defendants argue " 'the time, place, speaker and content of the alleged misrepresentation' of each defendant" must be pled individually. (Lenders Mem. at 10 (*citing Caputo v. Pfizer, Inc.,* 267 F.3d 181, 191 (2d Cir.2001))). Although the lumping of defendants is frowned upon particularly to meet the higher standards of pleading under Rule 9(b) a limited

exception is allowed where defendants have collaborated on or approved a document together and the document is the basis for the liability. "The group pleading doctrine is an exception to the requirement that the fraudulent acts of each defendant be identified separately in the complaint."

*Polar Intern. Brokerage Corp. v. Reeve,* 108 F.Supp.2d 225, 237 (S.D.N.Y.2000). "[N]o specific connection between fraudulent representations in the Offering Memorandum and particular defendants is necessary where, as here, defendants are insiders or affiliates participating in the offer of the securities in question." **\*316** *Luce v. Edelstein,* 802 F.2d 49, 55 (2d Cir.1986). The group pleading doctrine holds defendants can be pled together where, " 'prospectuses, registration statements, annual reports, press releases, or other group-published information,' are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Oxford Health Plans, Inc.,* 187 F.R.D. 133, 142 (S.D.N.Y.1999) (*citing In re Stratosphere Corp. Securities Litig.,* 1 F.Supp.2d 1096, 1108 (D.Nev.1998)).

**[8]**    Grouping of defendants will be allowed if the defendants had drafted, prepared or approved collectively a document and the defendants had knowledge and involvement in the everyday business of the company. *Id.* The two elements required by the group pleading doctrine are met by ART's Amended Complaint. First, the term sheets were prepared and approved by the Agent Banks and their affiliated Investment Banks. (Am. Cmpl. ¶ 861.) Second, the Agent Banks and Investment Banks worked with Adelphia and had knowledge of the everyday business of the company owing to their due-diligence, conversations with the Rigas family, and structuring of the large and complex Co–Borrowing Facilities. (Am. Cmpl. ¶ 841, 844, 861–63.)

An overview of cases from this circuit shows the group pleading doctrine is used in narrow instances factually similar to the case at hand. In *Polar Intern. Brokerage, Corp.,* a federal district court held the group pleading doctrine was appropriate for grouping defendants where they drafted and/or approved offering documents. Defendants pleaded together included a private equities firm initiating a tender offer, an indirectly owned subsidiary of the firm, individual officers and directors of the target corporation, and investment banks working on the offer. *Polar Intern. Brokerage, Corp.,* 108 F.Supp.2d at 238. In *In re AOL Time Warner, Inc.*

*Securities and "ERISA" Litigation,* a federal district court held group pleading was appropriate in a lawsuit brought against AOL Time Warner by investors for misstatements in written documents: "[w]ith respect to group-published documents such as prospectuses, plaintiffs may rely on a presumption that the group-information is the collective works of those individuals." *In re AOL Time Warner, Inc. Securities and "ERISA" Litigation,* 381 F.Supp.2d 192, 220 (S.D.N.Y.2004); *see also In re Adelphia Communications Corporation Securities and Derivative Litigation,* 398 F.Supp.2d 244, 250 (S.D.N.Y.2005) [16]; *In re Refco, Inc. Securities Litigation,* 503 F.Supp.2d 611, 642 (S.D.N.Y.2007) (applying group pleading doctrine to members of an audit committee who approved statement); *In re Parmalat Securities Litigation,* 479 F.Supp.2d 332, 340 (S.D.N.Y.2007); *In re NTL, Inc. Sec. Litig.,* 347 F.Supp.2d 15, 22 n. 26 (S.D.N.Y.2004).

The Defendants contend that group pleading is inappropriate in this case based on the United States Court of Appeals for the Second Circuit opinion in *DiVittorio.* In *DiVittorio,* the Second Circuit held group pleading was inappropriate where the amended complaint did not allege that the putative defendants had knowledge of **\*317** the inner workings of the company. *DiVittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242, 1249 (2d Cir.1987). The *DiVittorio* case cited by the Defendants is distinguishable from the facts of this case. In *DiVittorio,* the complaint did not identify the grouped Defendants as being insiders or affiliates or even being involved in the drafting of misleading documents. *Id.* Further, "[n]o allegations in the amended complaint are sufficient to describe any of them as insiders or affiliates, and there is no allegation linking any of them in any specific way to any fraudulent misrepresentation or omission." *Id.* In contrast, the Amended Complaint pleads the Agent Banks and their affiliated Investment Banks conducted due diligence, worked with the Rigas family, and detailed contact regarding Adelphia's business.

### v. Co–Borrowing Term Sheets Do Not Contradict the Amended Complaint
Defendants argue Claim 38 should be dismissed because the term sheets for the three Co–Borrowing Facilities disclosed the true nature of the facilities. The Banks argue the provisions in the term sheets did not differ from the final terms of the credit agreements. "None of the term sheets imposes any restriction on any individual co-borrower's ability to borrow up to the full amount of the facility." Agent B. Mem. at 10. "[A]s such, nothing in the term sheets would have given the directors any reasonable basis to conclude that a co-borrower was contractually limited in its borrowing rights by its individual financial condition." Agent B. Mem. at 11. The Agent Banks continue, "such alleged misunderstandings are in direct conflict with the express terms of the documents themselves and cannot support Plaintiff's fraud claims." Agent B. Mem. at 13–14.

The Defendants overstate the clarity of the clauses in the term sheets. Although some sections of the term sheets might contradict allegations in the Amended Complaint other clauses in the same term sheet support allegations in the Amended Complaint. Construing all facts pleaded in the Amended Complaint in favor of the Plaintiff in this case one can conclude the term sheets contain misleading, self contradictory terms and omissions.

The Defendants argue that where plain language of an agreement clearly contradicts the facts alleged in the Amended Complaint then the allegations in the Amended Complaint need not be accepted as true and the attached document controls. Agent Banks' Reply Memorandum of Law in Support of Motion to Dismiss Amended Complaint ("Agent B. Reply Mem.") at 4. But the term sheets referenced in the Amended Complaint are not so clear as to plainly contradict the facts alleged in the Amended Complaint.

The cases cited by the Defendants to support their claim that the plain language of the agreements disproves an aiding and abetting fraud claim are not analogous to the facts in this case. The cases cited by Defendants involve documents with clear provisions which are not contradicted by provisions elsewhere in the same documents. The facts in this case are distinguishable because the clauses in the Co–Borrowing Facilities summary term sheets are contradicted by provisions elsewhere in the same term sheets or are vague or ambiguous.

In contrast, the cases cited by Defendants *(Feick* and *Echostar )* are based on documents which unambiguously and clearly contradict statements made in the Complaint.

*Feick v. Fleener,* 653 F.2d 69 (2d Cir.1981) (plain language of a 'power of attorney' document where lawsuit was over what power of attorney the defendant had); *Echostar DBS Corp. v.* **\*318** *Gemstar–TV Guide Int'l, Inc.,* No. 05

Civ. 8510, 2007 WL 438088 (S.D.N.Y. Feb. 8, 2007) (plain language in a contract suit over a contract). This Court will not dismiss the claims on this basis. Dismissal at this stage in the proceedings is inappropriate. *Gonzalez v. Caballero,* 572 F.Supp.2d 463, 466 (S.D.N.Y.2008); *see also Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008).

**B. Claim 37—Aiding and Abetting a Breach of Fiduciary Duty against the Agent Banks and Their Affiliated Investment Banks**

Claim 37 in the Amended Complaint alleges the Agent Banks and their Affiliated Investment Banks aided and abetted breaches of fiduciary duty by the Rigas family toward Adelphia. The Defendants urge this Court to dismiss Claim 37 for aiding and abetting breach of fiduciary duty against the Agent Banks and their affiliated Investment Banks. Lenders Reply Mem. at 4. The arguments for dismissal of Claim 37 are similar to those for dismissal of Claim 38. The Defendant's allege Claim 37 should be dismissed because it was not pled with the necessary particularity and the Pennsylvania Supreme Court would not recognize a tort of aiding and abetting a breach of fiduciary duty. This Court has already examined in previous orders some of the issues which are raised again by the Defendants.

**i. Background of Claim 37**

Claim 37 was originally pled in the Creditors Complaint. In the Creditors Complaint, Claim 37 alleged the Agent Banks and their affiliated Investment Banks had aided and abetted the Rigas family's breaches of fiduciary duty to shareholders. The breaches of fiduciary duty stemmed from six loan facilities. The loan facilities were categorized into two groups. The first group was the Co–Borrowing Facilities (Olympus, CCH, and UCA/HHC Facilities). The second grouping was loan facilities which did not have structures enabling the Rigas family to use the balance sheet of Adelphia for personal gain (the FrontierVision, Parnassos, and Century–TCI Facilitates).

Judge Gerber's opinion dismissed Claim 37 "to the extent aiding and abetting claims are based on wrongful acts in connection with FrontierVision, Parnassos and Century–TCI facilities. Claims otherwise survive [as to claims involving the three co-borrowing facilitates]." *In re Adelphia Communications Corp.,* 365 B.R. at 81. The Bankruptcy Court held the Creditors Committee had Article III standing

to bring Claim 37. *In re Adelphia Commc'ns Corp.,* 330 B.R. at 377. The Bankruptcy Court held Pennsylvania state law applies in this case and Pennsylvania state law would recognize the claim of aiding and abetting a breach of fiduciary duty. *In re Adelphia Communications Corp.,* 365 B.R. at 41. Lastly the bankruptcy court held the *in pari delicto* doctrine should not lead to the dismissal of Claim 37. *In re Adelphia Communications Corp.,* 365 B.R. at 45–57.

This Court on January 17, 2008, issued an order on four issues raised in Judge Gerber's opinions. First, this Court held aiding and abetting would be a tort recognized by the Pennsylvania State Supreme Court (thus ART could properly bring a claim on this ground). *Adelphia Recovery Trust,* 390 B.R. at 77–79. Second, this Court held ART had Article III standing to bring a claim for aiding and abetting a breach of fiduciary duty. *Adelphia Recovery Trust,* 390 B.R. at 69–71. Third, this Court held the *in pari delicto* defense should not lead to the dismissal of a claim on a 12(b)(6) motion. Fourth, this Court in response to limited briefing from some **\*319** of the banks, found Claim 37 should not be dismissed for failing to satisfy Rule 9(b) requirements.

The January 17, 2008 decision did not fully address the sufficiency of the pleadings for claim 37 as new issues have been raised in subsequent briefs filed by parties after the January 17, 2008 opinion and after Claim 37 was repled (the January 17, 2008 decision looked at the sufficiency of the Creditor Complaint not the Amended Complaint which was filed shortly before the January 17th 2008 decision was released). [17] In addition, the 'Lenders' filed their Reply Memorandum of Law in Support of their Motion to Dismiss after this Court had issued its January 17, 2008 opinion. Lenders Reply Mem. at 4. The Lenders argue they "were not among the Agent Banks Defendants who previously moved to dismiss. As described in the Lenders' opening Memorandum, the Lenders ... were not required to respond in this action until December 21, 2007, when the present motion was filed." *Id.* Because of this the Lenders motions for dismissal are alive and are addressed here.

**ii. Aiding and Abetting a Breach of Fiduciary Duty is Pled with Enough Particularity**

[9]    To adequately plead a claim of aiding and abetting a breach of fiduciary duty under Pennsylvania state law a plaintiff must plead the following elements: "(1) a breach of fiduciary duty owed to another; (2) knowledge of the

breach by the aider and abettor; and, (3) substantial assistance or encouragement by the aider and abettor in effecting that breach." *Baker v. Family Credit Counseling Corp.,* 440 F.Supp.2d 392, 417–418 (E.D.Pa.2006); *Reis v. Barley, Snyder, Senft & Cohen LLC.,* 484 F.Supp.2d 337, 343 (E.D.Pa.2007).

**[10]** ART's claim of aiding and abetting a breach of fiduciary duty by the Agent Banks and their affiliated Investment Banks must meet the heightened pleading requirement of Fed.R.Civ.P. 9(b). The Amended Complaint's Claim 37 is based on the fraudulent actions of the Rigas family. "Rule 9(b) extends to all averments of fraud or mistake, whatever may be the theory of legal duty-statutory, common law, tort, contractual, or fiduciary." *Frota v. Prudential–Bache Securities, Inc.,* 639 F.Supp. 1186, 1193 (S.D.N.Y.1986). "[W]hen a breach of fiduciary duty claim is, in substance, a claim of fraud, the requirements of Rule 9(b) are triggered." *Strougo on Behalf of Brazil Fund, Inc. v. Scudder, Stevens & Clark, Inc.,* 964 F.Supp. 783, 804 (S.D.N.Y.1997). The cases not subjected to Rule 9(b) requirements (involving aiding and abetting a breach of fiduciary duty) are limited. These cases typically involve conduct not amounting to fraud, such as by breaching a duty of care, disclosure or loyalty. "It is well-established that Rule 9(b) is not applicable to breach of fiduciary duty ... claims; it applies only to claims sounding in fraud." *Strougo on Behalf of Brazil Fund, Inc. v. Scudder, Stevens & Clark, Inc.,* 964 F.Supp. 783, 804 (S.D.N.Y.1997) (*citing Schupak v. Florescue,* No. 92 Civ. 1189, 1993 WL 256572, at *2–3 (S.D.N.Y. July 8, 1993)). ART's claim of aiding and abetting a breach of fiduciary duty is distinguishable from cases where Rule 9(b) has not been applied. The breach of the **\*320** fiduciary duty in this case is firmly rooted in fraud. The complaint alleges that "in pursuing a fraudulent course of conduct, each member of the Rigas family ... was a faithless fiduciary." (Am. Cmpl. ¶ 1417.) The conduct of each of the Agent Banks and each of the Investment Banks was "wrongful .... committed with actual malice and/or a wanton and willful disregard of Adelphia's rights." (Am. Cmpl. ¶ 1418.)

**[11]** The aiding and abetting of fiduciary duty claim is tied to the three Co–Borrowing Facilities. To determine whether the claim is pleaded with the necessary particularity this Court looks at the entirety of the Amended Complaint to determine whether there are specific enough allegations; in addition it is necessary to break down the compound nature of the claim which appears in paragraphs 1413 to 1419 by looking at the specific participation of the Agent Banks and their affiliated Investment Banks in aiding and abetting a breach of fiduciary duty using the three Co–Borrowing Facilities.

### iii. Pleadings Related To The Three Facilities

The facts surrounding the three Co–Borrowing Facilities have been described in detail above. The pleadings meet the requirements for pleading aiding and abetting a breach of fiduciary duty. First, the Amended Complaint alleges, the Rigas family breached its fiduciary duty by entering into the UCA/HHC, CCH and Olympus Facilities. (Am. Cmpl. ¶¶ 862–69, 878, 888, 889, 890, 924, 933, 935–36, 1416.) Second, the Agent Banks and their affiliated Investment Banks were aware of the breach of fiduciary duty by the Rigas family regarding all three of the Co–Borrowing Facilities. (Am. Cmpl. ¶¶ 905–06, 951, 952, 1416.) Finally, the Agent Banks and their affiliated Investment Banks provided substantial assistance or encouragement to the Rigas family in effecting the breach of fiduciary duty with regards to all three Co–Borrowing Facilities. (Am. Cmpl. ¶¶ 848–52, 885, 891–903, 923, 931, 934, 937–49, 1419.) The Amended Complaint taken as a whole contains specific allegations which tie specific groups of defendants (i.e. the UCA/HHC Agent Banks) to the aiding and abetting of fiduciary duty by the Rigas family related to specific Co–Borrowing Facilities (i.e. the UCA/HHC Co–Borrowing Facility).

Defendants argue the pleadings are insufficient because they rely on grouping together defendants. The applicability of the group pleading doctrine to this case is discussed above and this Court finds group pleading is appropriate.

### C. Claim 54—Fraudulent Concealment against the Investment Banks Is Dismissed

**[12]** Claim 54 alleges the Investment Banks fraudulently concealed material information about the Co–Borrowing Facilities from the independent directors at Adelphia. (Am. Cmpl. ¶ 1565.) Under Pennsylvania state law, a defendant is only liable for fraudulent concealment if he was under an affirmative duty to disclose the information. However, the applicable case law does not establish that Investment Banks had an affirmative duty to disclose information about the Co–Borrowing Facilities to either Adelphia or the independent

directors. ART has failed to establish a duty to disclose and Claim 54 is DISMISSED.

#### i. Background of Claim 54

Claim 54 was originally pled in the Equity Committee's Intervenor Complaint. Bankruptcy Judge Gerber issued an order on the Defendants' motions to dismiss the claim. **\*321** *In re Adelphia Commc'ns.,* Adversary No. 03–04942(REG), 2007 WL 2403553 (Bankr.S.D.N.Y. Aug. 17, 2007). In Judge Gerber's opinion the claim is identified as Claim 64 (the claim was later redrafted and merged into the Amended Complaint as Claim 54). Judge Gerber granted the Defendant Investment Banks' 12(b)(6) motions to dismiss. The Investment Banks' status as underwriters for Adelphia securities offerings did not give rise to a fiduciary relationship and the Investment Banks were under no duty to speak (and cannot be liable for fraudulent concealment). *Id.* Judge Gerber granted the Investment Banks leave to replead but only to the extent they can allege duties of the Investment Banks arising from the Banks' capacity as advisors to the Debtors. Following the dismissal of the fraudulent concealment claim against the Investment Banks the claim was redrafted and placed in the Amended Complaint as Claim 54. This Court has not till now directly examined the Defendants' 12(b)(6) motions to dismiss Claim 54.

#### ii. Elements of Fraudulent Concealment

**[13]**    Under Pennsylvania state law there are four elements of a claim of fraudulent concealment. "Plaintiffs must establish (1) an affirmative act of concealment by defendants, (2) which misled or relaxed plaintiffs' investigation into possible causes of action, and (3) that plaintiffs' ignorance is not attributable to lack of diligence in investigating possible claims." *In re Aspartame Antitrust Litigation,* No. 2:06–CV–1732, 2007 WL 5215231, at \*3 (E.D.Pa. January 18, 2007); *Knit With v. Knitting Fever, Inc.,* No. Civ.A. 08–4221, 2008 WL 5381349, at \*21 (E.D.Pa. December 18, 2008). The fourth element of fraudulent concealment is that the plaintiff must allege that the defendant had an affirmative duty to speak. The Third Circuit Court of Appeals has held:

> The threshold inquiry on this point is whether Pennsylvania has adopted [Restatement (Second) of Torts] section 551. In *Neuman v. Corn Exchange Nat. Bank & Trust Co.,* the Pennsylvania Supreme Court held that '[t]he deliberate nondisclosure of a material fact amounts to culpable misrepresentation no less than does

an intentional affirmation of a material falsity.' .... Numerous intermediate appellate courts in Pennsylvania have followed *Neuman's* lead and held, following the principles in the Restatement, that to be liable for material nondisclosures, a party must have a duty to speak.

*Duquesne Light Co. v. Westinghouse Elec. Corp.,* 66 F.3d 604, 611 (3d Cir.1995) (citing *Neuman v. Corn Exchange Nat. Bank & Trust Co.,* 356 Pa. 442, 51 A.2d 759, 764 (1947)). The Third Circuit's opinion is binding on this Court when determining Pennsylvania law where the Pennsylvania Supreme Court has not made a final determination. *Booking,* 254 F.3d at 421.

Since the opinion in *Duquesne Light* was issued a variety of lower Pennsylvania state courts and federal district courts have held that fraudulent concealment requires the plaintiff to show that the defendant was under a duty to disclose the omitted information. "The elements of fraudulent concealment are the same as those of fraudulent misrepresentation, with the additional requirement that defendant possess a duty to disclose the concealed facts." *GMH Assocs. Inc. v. Prudential Realty Group,* No. 96–17366, 1998 WL 1053679, at \*44 (Pa.Com.Pl. Sep. 16, 1998). A federal district court held, "[a] fraud claim based on intentional non-disclosure (i.e. omission) has the same elements as fraud, except that 'an omission is actionable as fraud only where there is an independent duty to disclose the omitted information.' " **\*322** *Bucci v. Wachovia Bank, N.A.,* 591 F.Supp.2d 773, 783 (E.D.Pa.2008) (citing *Duquesne Light Co. v. Westinghouse Electric Corp.,* 66 F.3d 604, 612 (3d Cir.1995)); *see also Daniel Boone Area School District v. Lehman Bros., Inc.,* 187 F.Supp.2d 400 (W.D.Pa.2002) (dismissing plaintiff's fraud by omission claim where plaintiff failed to allege a confidential or fiduciary relationship existed between the parties); *City of Harrisburg v. Bradford Trust Company,* 621 F.Supp. 463 (M.D.Pa.1985) (omission is actionable only where there is an independent duty to disclose omitted information and such duty exists from a fiduciary or confidential relationship); *Debbs v. Chrysler Corp.,* 810 A.2d 137, 155 (Pa.Super.2002) ("mere silence without a duty to speak will not constitute fraud.").

Adelphia Recovery Trust v. Bank of America, N.A., 624 F.Supp.2d 292 (2009)

The Amended Complaint meets the first three elements required for a fraudulent concealment claim. ART identifies six areas where the Investment Banks had knowledge of a transaction which they did not disclose to Adelphia. (Am. Cmpl. ¶ 1565.) The Amended Complaint alleges that had the true nature of the Co–Borrowing Facilities and attendant financial transactions been disclosed Adelphia would not have been lulled into a false sense of security. (Am. Cmpl. ¶¶ 1563–66.) The Investment Banks due to their unique position as a conduit for information had information which Adelphia's independent directors would not have been able to uncover through a reasonable investigation. (Am. Cmpl. ¶¶ 1562–64.) However, the Amended Complaint fails to allege the last element of a claim for fraudulent concealment. The Investment Banks did not have a duty to speak.

### iii. The Investment Banks Did Not Have an Affirmative Duty to Speak Based on a Fiduciary Duty or Unique Knowledge

**[14]**   **[15]**   Under Pennsylvania state law a duty to speak arises when a defendant owes a fiduciary duty to the plaintiff or "as a result of one party's reliance on the other's representations, if one party is the only source of information to the other party, or the problems are not discoverable by other reasonable means." *Reichhold Chemicals, Inc. v. Millennium Intern. Technologies, Inc.,* No. 99–799, 1999 WL 270391, at *2 (E.D.Pa. May 5, 1999).* The Amended Complaint does not adequately allege that the Investment Banks had a duty to disclose based on either formulation (fiduciary duty or unique knowledge).

### 1. A Duty to Speak Did Not Arise From Being the Sole Party with Knowledge of the Fraud

The Amended Complaint does not plead facts establishing that the Investment Banks were the sole party with knowledge of information concealing fraud. ART is unable to plead the Investment Banks were the sole party in possession of information—even if one were to construe all allegations in the Amended Complaint as true—for three reasons. First, ART concedes in its Memorandum of Law that the Investment Banks' duty to disclose does not flow from being the only party with knowledge of the concealed information. ART Mem. at 57–58. Second, the Amended Complaint pleads the Rigas family had knowledge of the allegedly concealed information. Because the Rigas family also had access to the same information the Investment Banks were not solely in control of the information. Claim 38 and Claim 37 for aiding and abetting fraud and breaches of fiduciary duty lay out

the detailed knowledge which the Rigas family had of the fraudulent activities related to the Co–Borrowing Facilities. (Am. Cmpl. ¶¶ 801, 907.) Third, other Investment Banks were aware of the allegedly concealed information. The standard for a **\*323** duty to disclose is that "one party is the only source of the information to the other party." *Reichhold Chemicals, Inc.,* 1999 WL 270391, at *2.* Because multiple Investment Banks worked on each transaction at any one time there was never 'a singular' party who had knowledge of the fraudulent nature of the transactions and thus the standard for 'only source of information' can not be met.

### 2. Investment Banks Did Not Have a Duty to Disclose Based On Fiduciary Duty

Pennsylvania courts have not examined whether an Investment Bank owes a fiduciary duty to a corporation, the corporation's independent directors, or shareholders.[18] Because the Pennsylvania Courts have not addressed this issue this Court will look at Pennsylvania state law standards for establishing a breach of fiduciary duty to attempt to predict how the Pennsylvania Supreme Court would rule. *Carrasquilla,* 197 F.Supp.2d at 172.* This Court concludes that the Pennsylvania Supreme Court would not find a fiduciary relationship between an Investment Bank and a corporation, its shareholders, or independent directors (barring a duty set by written contract). Because the Investment Banks do not owe a fiduciary duty to Adelphia, ART has not alleged a claim on which relief can be granted.

**[16]**   **[17]**   Under Pennsylvania state law a fiduciary duty will arise "where by virtue of the respective strength and weakness of the parties, one has a power to take advantage of or exercise undue influence over the other." *eToll, Inc. v. Elias/Savion Advertising, Inc.,* 811 A.2d 10, 22 (Pa.Super.Ct.2002).* "A confidential or fiduciary relationship does not exist merely because one party relies on and pays for the specialized skill or expertise of the other party. Rather, the critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by overmastering influence on one side or weakness, dependence, or trust, justifiably reposed on the other side." *MRED General Partner, LLC v. Tower Economics Co., Inc.,* No. 2531, 2005 WL 957707, at *2 (Pa.Com.Pl. April 12, 2005) (citations omitted).* Further, "[b]oth our [Pennsylvania] Supreme Court and other courts have recognized that those who purport to give advice in business may engender confidential relations if others ... invest such a level of trust

Adelphia Recovery Trust v. Bank of America, N.A., 624 F.Supp.2d 292 (2009)

that they seek no other counsel." *Basile v. H & R Block, Inc.,* 777 A.2d 95, 102 (Pa.Super.2001). Under Pennsylvania state law, a fiduciary relationship will be formed only when the level of overmastering is such that the dependent party seeks no other counsel. *Smith v. John Hancock Ins. Co.,* 06–CV–3876, 2008 WL 4072585, at *7 (E.D.Pa. September 2, 2008)

An examination of cases from federal district courts (applying Pennsylvania **\*324** state law) and Pennsylvania state courts shows a general disinclination to find a fiduciary duty between two parties except where there is overmastering influence. *Binary Semantics Ltd. v. Minitab, Inc.,* 07–CV–1750, 2008 WL 763575, at *13 (M.D.Pa. March 20, 2008) (finding no fiduciary duty between two commercial parties where one party had agreed to distribute the other's computer related products); *Ross v. Met. Life Ins. Co.,* 411 F.Supp.2d 571, 583 (W.D.Pa.2006) (finding the contractual relationship between insurer and insured does not automatically give rise to a fiduciary relationship); *AAMCO Transmissions, Inc. v. Harris,* 759 F.Supp. 1141, 1147 (E.D.Pa.1991) (holding no fiduciary relationship exists between franchisee and franchisor); *Smith v. John Hancock Ins. Co.,* 06–CV–876, 2008 WL 4072585, at *7 (E.D.Pa. September 02, 2008) (holding no fiduciary duty between purchaser of an annuity and the issuer of the annuity and the investment advisor who counseled the plaintiff to buy the annuity where the plaintiff sought other counsel); *In re Scott's Estate,* 455 Pa. 429, 316 A.2d 883 (1974) (joint tenants of a bank account created by brother and sister, without more, does not place them in a relationship of confidentiality); *Temp–Way Corp. v. Continental Bank,* 139 B.R. 299 (E.D.Pa.1992) (a lender "does not ordinarily owe a fiduciary duty to a borrower").

The Amended Complaint does not plead facts which are sufficient to establish a fiduciary relationship between the Investment Banks and Adelphia. First, the Amended Complaint merely alleges that Adelphia "reasonably relied" or "depended and relied" based on the investment banks' superior skill. (Am. Cmpl. ¶¶ 1561, 1562). But mere reliance based on a superior skill is not enough. "The critical question is whether the relationship goes beyond mere reliance on superior skill, and into a relationship characterized by 'overmastering influence' on one side or 'weakness, dependence, or trust, justifiably reposed' on the other side."

*eToll, Inc.,* 811 A.2d at 23 (Pa.Super.2002) (*quoting Basile v. H & R Block,* 777 A.2d 95, 101 (Pa.Super.2001)). The Amended Complaint does not plead the Investment Banks exerted overmastering influence and control over Adelphia. Second, the Amended Complaint pleads that the Investment Banks assisted the Rigas family and the Rigas family was the party with control over Adelphia. Third, the Amended Complaint fails to allege that Adelphia relied solely on the advice of the Investment Banks. In *Basile* the court held a fiduciary duty would be formed where the nature of advice was such that the dependent party did not seek any additional counsel. *Basile,* 777 A.2d at 102. The Amended Complaint does not plead that Adelphia relied to such an extent that Adelphia or the Adelphia independent directors did not look to other sources for advice. Fourth, ART does not provide any evidence of a contractual term which shows a fiduciary duty was contracted for as part of providing advisory services. Fifth, the Amended Complaint does not plead that Investment Banks were aware that they were in a fiduciary relationship with Adelphia. A fiduciary relationship requires that "both parties must have acknowledged such a fiduciary relationship." *In re Cara Corp.,* 148 B.R. 760, 772 (Bkrtcy.E.D.Pa.1992). Taken together these factors show the pleadings have not alleged facts which establish a fiduciary duty between the Investment Banks and Adelphia.

Claim 54 alleging fraudulent concealment on the part of the Investment Banks is DISMISSED.

### D. Claim 55—Fraud against the Agent Banks and their Affiliated Investment Banks Is Dismissed In Part

Claim 55 alleges fraud on the part of the Agent Banks and their affiliated Investment **\*325** Banks. Claim 55's structure is such that it is comprised of fifteen sub-claims of fraud. (Am. Cmpl. ¶¶ 1571–576.) Some of these sub-claims overlap one another. Other sub-claims allege conduct which is independent of the other sub-claims. To determine the sufficiency of the pleadings for fraud this Court will examine each sub-claim in Claim 55.

Paragraph 1572 of the Amended Complaint alleges the Agent Banks and their affiliated Investment Banks engaged in fraud against Adelphia and its other creditors. (Am. Cmpl. ¶ 1572.) Paragraph 1572 lists nine sub-claims alleging fraud. The fraud sub-claims run the gamut from use of the central cash management system ("CMS") to loot funds from Adelphia to misrepresenting Adelphia's finances in offering materials

by excluding 2 billion dollars in off-balance sheet debt. (Am. Cmpl. ¶¶ 1572(vi), 1572(iii).)

Paragraph 1573 of the Amended Complaint alleges the Agent Banks and their affiliated Investment Banks participated in the Rigas family's fraudulent schemes to siphon money and assets from Adelphia by failing to disclose information and acting to further the schemes. (Am. Cmpl. ¶ 1573.) Paragraph 1573 iterates six 'schemes'. *Id.* The six schemes range from the Agent Banks and their affiliated Investment Banks designing and implementing Co–Borrowing Facilities to Salomon Smith Barney ("SSB") providing a 'fairness opinion' regarding the purchase of Adelphia Securities by the Rigas family and RFEs. (Am. Cmpl. ¶¶ 1573(i), 1573(v).)

Claim 55 is composed of fifteen sub-claims. Because of the compound nature of Claim 55 this Court will examine each of Claim 55 sub-claims to determine if the Amended Complaint has sufficiently pled the elements of fraud.

### i. Background of Claim 55

Claim 55 was originally pled in the Equity Committee's Intervenor Complaint. On August 17, 2007, Bankruptcy Judge Gerber issued a memorandum and order dismissing the claim with leave to replead. Judge Gerber dismissed the claim of fraud against the Agent Banks and their affiliated Investment Banks on grounds that "[t]he Equity Committee bases its fraud claim on exactly the same facts on which the Creditors' Committee based its aiding and abetting fraud claim. For that reason, the Equity Committee intervenor complaint suffers from the same 🚩 Rule 9(b) deficiencies as the Creditors' Committee's complaint." *In re Adelphia Communications Corp.,* 2007 WL 2403553, at *11. Judge Gerber ruled the particularity requirements of 🚩 Rule 9(b) had not been satisfied and to meet the pleading requirements of 🚩 Rule 9(b) ART would have to, "allege what fraudulent representations were made (or not made) by the banks, to whom and by whom, when, and under what circumstances." *Id.* Judge Gerber granted leave to replead. The claim was subsequently repled in the Amended Complaint as Claim 55. (Am. Cmpl. ¶¶ 1571–576.)

### ii. Elements of a Fraud Claim

**[18]**   Under Pennsylvania State Law, the tort of common law fraud has the following six elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it

is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." 🚩 *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 889 (1994) (footnote omitted); 🚩 **\*326** *Debbs v. Chrysler Corp.,* 810 A.2d 137, 155 (Pa.Super.2002). All of these elements must appear in the pleadings to support a claim of fraud. *Rivello v. New Jersey Auto. Full Ins. Underwriting Ass'n,* 432 Pa.Super. 336, 638 A.2d 253 (1994). The elements of a fraud claim must be pled with the particularity described in 🚩 Fed.R.Civ.P. 9(b). 🚩 *Christidis v. First Pennsylvania Mortg. Trust,* 717 F.2d 96, 99 (3d Cir.1983).

### iii. Claim 55 Sub–Claims which are not pled with the Necessary Particularity

#### 1. Amended Complaint ¶ 1572(i)

**[19]**   The sub-claim in paragraph 1572(i) of the Amended Complaint alleges fraud based on the Agent Banks and their affiliated Investment Banks improperly transferring Adelphia's assets and funds for the benefit the Rigas family's own interests. (Am. Cmpl. ¶ 1571(i).) The pleading of this sub-claim falls short of the requirements of 🚩 Rule 9(b). The pleadings provide no notice to the Defendants of which of the many Agent Banks and Investment Banks transferred Adelphia's assets, when these transfers occurred and the nature of these transfers (so the Defendants know which transfers are alleged to be fraudulent). The Defendants are not placed on notice with which to defend themselves from such broad pleadings. Amended Complaint ¶ 1572(i) is dismissed for failure to state a claim with particularity.

#### 2. Amended Complaint ¶ 1572(ii)

The sub-claim in paragraph 1572(ii) of the Amended Complaint alleges the Agent Banks and their affiliated Investment Banks concealed, "wrongful transactions through, for example, the improper use of 'netting' and 'reclassification' procedures.' " (Am. Cmpl. ¶ 1572(ii).) Like sub-claim ¶ 1572(i) this sub-claim fails to meet the particularity requirements of 🚩 Rule 9(b). It is unclear from the pleadings what wrongful transactions the sub-claim is referring to. The 483 page Amended Complaint lists hundreds of transactions many of which might be construed by ART as wrongful or benefiting of the Rigas family. (Am. Cmpl. ¶ 1572(ii).)

A search of the Amended Complaint finds the specific term 'wrongful transaction' is only used in this sub-claim. Because no other transactions in the Amended Complaint are labeled 'wrongful transaction' the Amended Complaint does not make it possible for a Defendant to determine which transactions the sub-claim is referring to when they use the term 'wrongful transaction'. The general nature of the pleading in this sub-claim fails to provide notice to defendants and thus fails to meet the particularity requirement of 🔖Rule 9(b).

### 3. Amended Complaint ¶ 1572(v)

The sub-claim in paragraph 1572(v) of the Amended Complaint alleges the Agent Banks and their affiliated Investment Banks falsely and fraudulently represented "that Adelphia's stock sales had the effect of de-leveraging the company, when in fact they had the opposite effect." (Am. Cmpl. ¶ 1572(v).) This sub-claim fails because it does not specify what the fraudulent representations were, which defendants made them, and when they were made.

Under 🔖Rule 9(b) the plaintiff must identify what misrepresentations regarding de-leveraging were made, who made them, and when they were made. 🔖Fed.R.Civ.P. 9(b). A search of the Amended Complaint yields scant reference to 'de-leveraging'. The term 'de-leveraging' is used in four places in the nearly 500 page Amended Complaint. (Am. Cmpl. ¶¶ 1007, 1019, 1423.) None of the sections referencing 'de-leveraging' provide specifics about **\*327** when and who represented the Adelphia stock sales as de-leveraging. A representative section of the Amended Complaint which uses the term de-leveraging provides no specifics. "[T]he Rigas family—with Defendants' [referring to all the Agent Banks and their affiliated Investment Banks] knowledge or reckless disregard or conscious avoidance—concocted a ploy to convince the public that Adelphia was deleveraging [sic] when its actual debt load was increasing." (Am. Cmpl. ¶ 1007.) This allegation like the other allegations about de-leveraging in the Amended Complaint does not plead specific details. Sub-claim ¶ 1572(v) is dismissed for failing to meet the pleading requirements of 🔖Rule 9(b).

### 4. Amended Complaint ¶ 1572(vi)

The sub-claim in paragraph 1572(vi) of the Amended Complaint alleges the Agent Banks and their affiliated Investment Banks engaged in fraud against Adelphia by

"using or permitting to be used funds drawn down from the Co–Borrowing Facilities into the CMS to pay the Rigas family's or RFEs' personal margin calls." (Am. Cmpl. ¶ 1572(vi).) This sub-claim fails to identify which Defendants were responsible for the drawing down of funds and when the draw downs occurred. The proceeding 400 pages of the Amended Complaint fails to provide additional details about these margin calls and which banks were aware of them. Paragraph 13 of the Amended Complaint provides the only other mention of margin calls in the Amended Complaint. (Am. Cmpl. ¶ 13.) However, paragraph 13 of the Amended Complaint does not identify which defendants were involved in the margin calls or when they occurred. *Id.* The sub-claim in paragraph 1572(vi) fails to meet the particularity requirements of 🔖Rule 9(b).

### 5. Amended Complaint ¶ 1572(vii)

The sub-claim in paragraph 1572(vii) of the Amended Complaint alleges the Agent Banks and their affiliated Investment Banks failed to disclose that the Rigas family's purchase of Adelphia stock was financed with loans guaranteed by Adelphia. (Am. Cmpl. ¶ 1572(vii).) This sub-claim fails to state with particularity when the disclosures should have been made and which stock purchases made by the Rigas family were fraudulent. The sub-claim does not even reference the fraudulent Co–Borrowing Facilities. The language of this sub-claim is broad and could encompass loans which are unrelated to the Co–Borrowing Facilities. The sub-claims expansive wording fails to meet the particularity requirements of 🔖Rule 9(b).

### 6. Amended Complaint ¶ 1572(viii)

The sub-claim in paragraph 1572(viii) of the Amended Complaint alleges the Agent Banks and Investment Banks worked with the Rigas family to allow the " 'purchasing' or permitting to be 'purchased' through Highland 2000 over 800 million dollars worth of Adelphia's debt and equity securities by simply recording journal entries." (Am. Cmpl. ¶ 1572(viii).) This sub-claim is dismissed because it fails to state with any particularity which Agent Banks and Investment Banks worked with the Rigas family to allow the purchase of debt and securities through Highland 2000.

The entity Highland 2000 is only mentioned in the Amended Complaint in paragraph 1551 and 1552 and neither paragraph details which banks worked with Highland 2000. (Am. Cmpl. ¶¶ 1551, 1552.) Further, paragraph 1551 and 1552 of the

Amended Complaint allege $260,416,000 million dollars of Adelphia debt and securities were purchased by Highland 2000 (not the 800 million dollar figure which is attributed in paragraph **\*328** 1572). *Id.* The remainder of the Amended Complaint does not provide additional details to buttress or particularize the allegation in sub-claim 1572(viii).

#### 7. Amended Complaint ¶ 1573(iii)

The sub-claim charged in paragraph 1573(iii) of the Amended Complaint alleges the Investment Banks issued securities to the Rigas family paid for by the Rigas family or RFE's using Adelphia funds. (Am. Cmpl. ¶ 1573(iii).) Further, the Investment Banks knew the provenance of the funds used to purchase the securities. *Id.* The Amended Complaint does not meet the requirements of ⚑ Rule 9(b) because it does not specify which investment banks were issuing securities to the Rigas family, when these securities were issued, which securities they were, or even the amount of the securities involved. The Amended Complaint fails to provide details necessary to sustain this claim under ⚑ Rule 9(b). The sub-claim is dismissed.

#### 8. Amended Complaint ¶ 1573(iv)

The sub-claim contained in paragraph 1573(iv) of the Amended Complaint alleges the Investment Banks participated in the Rigas family's fraudulent schemes by "providing substantial assistance to the Rigas family in perpetuating their control over Adelphia through the acquisition of ACC stock in public offerings, [and] private placements." (Am. Cmpl. ¶ 1573(iv).) However, the Amended Complaint does not provide any specific details outlining how the Investment Banks provided assistance through the acquisition of Adelphia Stock through public offerings and private placements. Further neither the public offerings nor the private placements are identified. Private placements are only mentioned five other times in the Amended Complaint and none of these examples provide additional details regarding the who, what, or when of the private placements. (Am. Cmpl. ¶¶ 1555–558.) The Amended Complaint fails to establish with the necessary particularity the details of this sub-claim to meet the requirements of ⚑ Rule 9(b).

#### 9. Amended Complaint ¶ 1573(vi)

Paragraph 1573(vi) alleges the Investment Banks and their affiliated Agent Banks aided the Rigas family's fraudulent

schemes by crafting materials for "Adelphia's debt and equity offerings that contained material misstatements and omissions regarding Adelphia's financial condition that operated to deceive not only prospective public investors but also Adelphia's Independent Directors themselves." (Am. Cmpl. ¶ 1573(vi).) This sub-claim fails to provide the particularized allegations required by ⚑ Rule 9(b). The sub-claim does not identify when the materials were authored or which of the Investment Banks authored them. The sub-claim is not limited to the Co–Borrowing Facilities and could encompass all offering materials issued on behalf of Adelphia. The sub-claim fails to meet the pleading requirements of ⚑ Rule 9(b).

#### iv. The Following Sub–Claims Meet Pleading Requirements

#### 1. Amended Complaint ¶ 1572(iii)

The sub-claim in paragraph 1572(iii) of the Amended Complaint alleges the Agent Banks and their affiliated Investment Banks misrepresented "Adelphia's finances in offering materials by excluding more than 2 billion dollars in off-balance-sheet debt that was borrowed by the Rigas family or RFEs for their own benefit and for which Adelphia was nevertheless jointly and severally liable." (Am. Cmpl. ¶ 1572(iii).) The Amended Complaint alleges facts which provide support for sub- **\*329** claim 1572(iii) and which meet the six elements of common law fraud. These elements are pled with the necessary particularity required by ⚑ Rule 9(b) with regards to the Investment Banks. (Am. Cmpl. ¶ 1060.) However, the Amended Complaint does not provide details related to the Agent Banks involvement and the claim as against them is dismissed.

First, the pleading identifies specific prospectuses drafted or approved by the Investment Banks. (Am. Cmpl. ¶¶ 1060, 1061.) 6 debt offerings are identified and the underwriters who drafted the offering materials are named. *Id.* The pleadings do not allege the Agent Banks were involved in the drafting of these prospectuses for debt securities.

Second, the pleadings allege misstatements about the off-balance-sheet debt were material to the fraud. "Investment Banks ... offering materials contained material misrepresentations and omissions regarding the business and financial condition of Adelphia, including, without limitation, the extent of Adelphia's leverage." (Am. Cmpl. ¶ 1375.)

Third, the Amended Complaint pleads that the exclusion of the off-balance sheet debt from the offering materials was either known to be false by the banks or was made in a reckless manner by the parties. Knowledge of falsity can be adequately pleaded by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness which lead to an inference that the defendants knew of the falsity. 🚩 *Lerner,* 459 F.3d at 293. As discussed above (with regard to the Co–Borrowing Facilities) the Amended Complaint contains many allegations of specific facts which indicate that the Defendants were aware that their filings were false (indicia included: memorandums, meetings, emails, and familiarity with past conduct of the Rigas family.)

Fourth, the Amended Complaint alleges the Investment Banks had the requisite intent to commit fraud. In the Third Circuit, a plaintiff may establish the strong inference of fraudulent intent either (a) "by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." 🚩 *In re Suprema Specialties, Inc. Securities Litigation,* 438 F.3d 256, 275 (3d Cir.2006) (*citing* 🚩 *In re Burlington Coat Factory,* 114 F.3d 1410, 1418 (3d Cir.1997)).

The Amended Complaint does not plead facts showing a 'motive and opportunity to commit fraud' on the part of the Investment Banks. ART alleges generating fee income provided a motive to commit fraud by the Investment Banks. (Am. Cmpl. ¶ 1062.) However, this Court has held that profit motive does not provide the requisite inference of fraudulent intent. 🚩 *Mazzaro de Abreu v. Bank of Am. Corp.,* 525 F.Supp.2d 381, 389 (S.D.N.Y.2007). This is supported by other cases which have held that a motive to earn transaction fees "is not alone sufficient to sustain a strong inference of fraudulent intent." *Fisher v. Offerman & Co.,* No. 95 Civ. 2566, 1996 WL 563141, at \*7 (S.D.N.Y. Oct.2, 1996); 🚩 *GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 238 (3d Cir.2004).

[20]    The Amended Complaint alleges facts which establish the banks were reckless in structuring the Co–Borrowing Facilities (and issuing documents related to these facilities). The recklessness alleged establishes scienter. Under Pennsylvania state law the "scienter element in civil fraud [sic] case is satisfied by either conscious knowledge of the falsity of the representation or such recklessness

as amounts to conscious indifference to the **\*330** truth." 🚩 *Office of Disciplinary Counsel v. Anonymous Attorney A,* 552 Pa. 223, 231, 714 A.2d 402 (Pa.1998). Allowing a court to find scienter through recklessness conduct is particularly appropriate in cases arising through the bankruptcy of a party where the state of mind of parties is hard to know. "Faced with this issue other Courts have determined that fraudulent intent can be established by circumstantial evidence or by inferences drawn from a course of conduct as established by the evidence." *In re Kisberg,* 150 B.R. 354, 356 (Bkrtcy.M.D.Pa.1992). "The Third Circuit has defined a reckless act as one 'involving not merely simple, inexcusable negligence, but an extreme departure from the standards of ordinary care, and which present a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.' " 🚩 *Ravisent Technologies, Inc.,* 2004 WL 1563024, at \*8 (E.D.Pa.2004) (*citing* 🚩 *In re Advanta Corp. Securities Litigation,* 180 F.3d 525, 535 (3d Cir.1999)).

Viewing the Amended Complaint in the light most favorable to the Plaintiff (ART) and drawing all reasonable inferences in its favor, as this Court must, we conclude that ART pled sufficient facts constituting strong evidence the Defendants knew or were reckless in not knowing that the statements they made in the offering materials were materially false and misleading. (Am. Cmpl. ¶¶ 1062, 1375, 1377.)

Fifth, the amended complaint alleges Adelphia relied on the misrepresentations made in the offering materials. (Am. Cmpl. ¶¶ 1411, 1419.) Lastly, the Amended Complaint alleges that the resulting injury was proximately caused by the reliance. The failure to disclose debt incurred through the Co–Borrowing Facilities led to the purchase of debt offerings and the continuation of the Co–Borrowing Facilities. (Am. Cmpl. ¶¶ 1417, 1419.)

## 2. Amended Complaint ¶ 1572(iv)

Paragraph 1572(iv) of the Amended Complaint alleges that Agent Banks and their affiliated Investment Banks allowed the Rigas family to use the proceeds from Co–Borrowing Facilities to be used for the purchase of stock in Adelphia that had the effect of artificially reducing Adelphia's reported debt while at the same time artificially increasing reported equity. (Am. Cmpl. ¶ 1572(iv).) The Amended Complaint alleges the details of this allegation with enough particularity to maintain the claim. Because this claim overlaps to an extent with sub-

claim ¶ 1572(iii) the court will focus on two issues raised by the Defendants.

The Amended Complaint alleges there was a fraud. The fraud was the establishment of the UCA/HHC, CCH, and Olympus Co–Borrowing Facilities which had an unusual structure allowing the Rigas family and RFEs to withdraw funds against the balance sheet of Adelphia. (Am. Cmpl. ¶ 5.) The details of the structuring of these facilities and the role of the Agent Banks and their affiliated Investment Banks are provided in extensive detail in the Amended Complaint. (Am. Cmpl. ¶¶ 841–1003.)

The Amended Complaint alleges the Agent Banks and their affiliated Investment Banks were so reckless in the structuring of the Co–Borrowing Facilities (and drafting of documents related to the facilities) that scienter is established. (Am. Cmpl. ¶¶ 970–86.) This recklessness was not limited to structuring the facilities but also the continued use of the facilities by the Rigas family to purchase Adelphia stock. *Id.*

**\*331  3. Amended Complaint ¶ 1572(ix)**
Paragraph 1572(ix) alleges fraud on the part of the Agent Banks and their affiliated Investment Banks for assisting the Rigas family in using the Co–Borrowing Facilities and the Cash Management System ("CMS") to loot billions of dollars from Adelphia. (Am. Cmpl. ¶ 1572(ix).) The adequacy of the pleadings related to fraud and the UCA/HHC, CCH, and Olympus Co–Borrowing Facilities is discussed with relation to the preceding two claims. The Amended Complaint pleads facts which meet the requirements of 🚩 Rule 9(b) with regards to these three Co–Borrowing Facilities.

The CMS at Adelphia allowed the commingling of funds among the Adelphia subsidiaries and Rigas family entities. (Am. Cmpl. ¶ 1011.) The commingling of funds was central to the Adelphia fraud by making it difficult to distinguish between funds belonging to Adelphia and funds which belonged to the Rigas family or RFEs. *Id.* The CMS was established and managed by Wachovia. (Am. Cmpl. ¶ 1012.) Further the CMS was tied into the Co–Borrowing Facilities which were structured or managed by the Agent Banks and their affiliated Investment Banks. (Am. Cmpl. ¶ 1015.) The Amended Complaint alleges that the establishment and continued use of the CMS amounted to reckless behavior and ran counter to Wachovia's internal policies and standard practices. (Am. Cmpl. ¶ 1013.) The Amended Complaint provides enough particularity to show that the Agent Banks

and their affiliated Investment Banks by allowing the CMS to be used by the Rigas family with regards to the Co–Borrowing Facilities constituted fraud and was reckless.

**4. Amended Complaint ¶ 1573(i)**
Paragraph 1573(i) alleges the Agent Banks and their affiliated Investment Banks committed fraud by designing, implementing, and funding the Co–Borrowing Facilities and making it possible for the Rigas family to use co-borrowing funds for their own benefit. (Am. Cmpl. ¶ 1573(i).) This sub-claim overlaps with other sub-claims which have been discussed above including ¶ 1572(iii), ¶ 1572(vi), ¶ 1572(ix). As established above the Amended Complaint pleads facts which establish the Agent Banks and their affiliated Investment Banks committed fraud by helping structure fraudulent Co–Borrowing Facilities. The fraud was present not only in the very structure of the UCA/HHC, CCH, and Olympus Co–Borrowing Facilities but also in the term sheets of the Co–Borrowing Facilities. As discussed above the Amended Complaint alleges recklessness to an extent which fulfills the requirement for scienter at this stage in the proceedings.

**5. Amended Complaint ¶ 1573(ii)**
Paragraph 1573(ii) alleges the Agent Banks, and where appropriate, their affiliated Investment Banks, participated in a fraudulent scheme by permitting the RFEs to draw upon the Co–Borrowing Facilities when they did not have sufficient capital to secure the funds allocated to them. (Am. Cmpl. ¶ 1573(ii).) This sub-claim mirrors the sub-claim preceding it. As discussed above the Amended Complaint alleges with particularity the role of the Agent Banks and their Investment Banks in structuring the Co–Borrowing Facilities and alleges that these Co–Borrowing Facilities constituted a fraudulent course of conduct which the Defendants were reckless in setting up and allowing to continue to operate.

**6. Amended Complaint ¶ 1573(v)**
Paragraph 1573(v) of the Amended Complaint alleges Salomon Smith Barney **\*332** participated in the Rigas family's fraudulent schemes "by providing a 'fairness opinion' as to the Rigas family's or the RFEs' purchases of ACC securities, when such purchases were inherently unfair to Adelphia." (Am. Cmpl. ¶ 1573(v).) The Amended Complaint provides details surrounding this claim to meet the requirements of 🚩 Rule 9(b). The Amended Complaint identifies specific omissions in the fairness opinion which

rose to the level of fraud. (Am. Cmpl. ¶¶ 1546–551.) Further the Amended complaint alleges that the actions of SSB were reckless enough to establish scienter. (Am. Cmpl. ¶¶ 1538, 1548, 1557.) SSB had intimate knowledge of Adelphia's finances owing to their work on Co–Borrowing Facilities, Margin Loans, and other financial offerings. (Am. Cmpl. ¶ 25, 1060, 1065.) Despite this SSB failed to disclose the material information which it had a duty to disclose in the fairness opinion. (Am. Cmpl. ¶ 1557.)

### E. Claim 31 Avoidance and Recover of Intentionally Fraudulent Obligations and Transfers Under 11 U.S.C. §§ 548 and 550 against the Margin Lenders

Claim 31 alleges Salomon Smith Barney, Bank of America, Goldman Sachs and Deutsche Bank (collectively, the "Margin Lenders") received payments in the months preceding the Adelphia Bankruptcy. ART seeks to have the monies paid to these banks avoided, recovered or preserved for ART under 11 U.S.C. §§ 548 and 550. (Am. Cmpl. ¶ 1357–362.) The Investment Banks move to dismiss Claim 31 against SSB under Fed. R. Civ. P. 12(c). Investment. B. Mem. at 23. Goldman Sachs moves in a separate motion for dismissal of Claim 31 pursuant to Rule 12(b)(6) and 9(b). Goldman Sachs Memorandum of Law in Support of Motion to Dismiss Amended Complaint ("Goldman Mem.") at 1. This Court DENIES both motions for dismissal of Claim 31.

### i. Claim 31 Background

Claim 31 was originally pled in the Creditors Complaint. Judge Gerber's June 11, 2007 order addressed the Defendants' various motions to dismiss all of the claims in the Creditors Complaint. *In re Adelphia Communications Corp.,* 365 B.R. 24. Judge Gerber rejected Defendants' motions to dismiss Claim 31 (various other claims in the Creditors Complaint were dismissed). *In re Adelphia Communications Corp.,* 365 B.R. at 38. Judge Gerber's order found Claim 31 had been pled with the necessary particularity to satisfy Rule 9(b). *Id.* Following Judge Gerber's ruling, ART added details to the complaint including roughly 95 million dollars of additional fraudulent transfers made to SSB. (Am. Cmpl. ¶ 1359.)

This Court has not addressed Claim 31. However, this Court on June 17, 2008 addressed the Bankruptcy Claims in the Amended Complaint. [19] *Adelphia Recovery Trust,* 390 B.R. at 80. Many of the claims addressed in the June 17, 2008

order were brought based on 11 U.S.C. §§ 548 and 550. This is the same legal foundation on which Claim 31 is brought. The Court found ART did not have standing to bring Bankruptcy Claims on behalf of creditors of the subsidiaries of Adelphia based on 11 U.S.C. §§ 548 and 550.

However, the claims addressed in the June 17, 2008 order were factually distinct from Claim 31. The claims addressed in the June 17, 2008 order sought recovery of monies (on behalf of creditors) which had been paid by obligor debtors (subsidiaries **\*333** of Adelphia). *Id.* In contrast, Claim 31 seeks to recover monies on behalf of the creditors of Adelphia itself (not Adelphia subsidiaries). This distinction is fundamental. The Joint Plan of Bankruptcy extinguished claims of the creditors of subsidiaries of Adelphia (collectively, the "Obligor Debtor Creditors") by deeming them 'paid in full'. Joint Plan of Bankruptcy § 5.2. The June 17, 2008 order held, because the Obligor Debtor Creditors were deemed to be 'paid in full' the Obligor Debtors Creditors no longer had an injury on which basis they could recover. "It is therefore impossible to see how any recovery by the ART could result in any benefit, direct or indirect, to the creditors of the Obligor Debtors." *Adelphia Recovery Trust,* 390 B.R. at 97. In contrast, the creditors of Adelphia (on whose behalf Claim 31 is brought) were not subject to a release and ART has standing to bring a claim on their behalf.

### ii. SSB Moves For Dismissal of Claim 31 on the Basis it is Untimely

The Amended Complaint adds 95 million dollars of allegedly fraudulent transfer payments to the existing fraudulent transfers pled in the Creditors Complaint. [20] The Defendants argue the addition of the 95 million dollars in fraudulent transfers is time-barred because it was added after the tolling agreement expired.

However, the addition of fraudulent transfer claims is not time-barred if the claims 'relate back' to claims made in earlier pleadings. "Under Rule 15(c)(2), an amended pleading relates back to an earlier pleading if the amended pleading sets forth claims arising out of the same conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading." *In re 360networks (USA) Inc.,* 367 B.R. 428, 433 (Bkrtcy.S.D.N.Y.2007); *Fama v. Comm'r of Corr. Servs.,* 235 F.3d 804, 816 (2d Cir.2000). "[T]he purpose of Rule 15 is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural

technicalities;" however, a court must not "undermine the purpose of repose for which statutes of limitations were designed." *Enron Corp. v. J.P. Morgan Sec. Inc.,* 357 B.R. 257, 263 (Bankr.S.D.N.Y.2006) (citations and quotations omitted).

**[21]**    The newly alleged fraudulent transfers relate back to the Creditor Complaint and are not time barred. The new margin loan payments in the Amended Complaint arise out of the same Co–Borrowing Facility transactions as those pled in the Creditors Complaint. The newly alleged margin loan payments occurred during the same time period as those alleged in the Creditors Complaint.

SSB was on notice that additional margin loan payments might be pled. "One test that many courts have employed in order to determine whether an amendment to pleadings will relate back is to determine whether the initial complaint put the defendants ... on notice of what must be defended against in the amended pleadings. This test does not require that the prior complaint put the defendants on notice of new or additional legal theories that **\*334** the plaintiffs seek to assert against the defendants, but it must inform the defendants of the facts that support those new claims." *Barr v. Charterhouse Group Int'l, Inc.,* 238 B.R. 558, 573–74 (Bankr.S.D.N.Y.1999) (citations omitted). SSB was placed on notice in the original complaint because the Creditors Complaint listed roughly 84 million dollars in loan payments to SSB. The Creditors Complaint also pled that ART was seeking repayment of monies related to the margin loans broadly. (C.C. ¶ 462.)

Courts hold the addition of new fraudulent transfers to a complaint 'relates back' if the fraudulent transfers arise from the same course of conduct as the original alleged fraudulent transfers. In *Gerardo Leasing, Inc.,* the court held that an amendment alleging additional fraudulent payments would relate back where the timing and amount of the payments suggested that they were "part of the common scheme or pattern of fraudulent conduct." *In re Gerardo Leasing, Inc.,* 173 B.R. 379, 390–391 (Bkrtcy.N.D.Ill.1994). "In the context of preference or fraudulent transfer actions, courts have found the existence of a factual nexus (i.e., transactions arising from the same pattern of conduct), and thus allowed relation back." *In re Circle Y of Yoakum, Texas,* 354 B.R. 349, 357 (Bkrtcy.D.Del.2006). The fraudulent transfers in this case are similar to those in *Gerardo Leasing* and *Circle*

*Y.* The newly pled fraudulent transfers in the Amended Complaint and those pled in the Creditors Complaint arose out of the same conduct, at the same time, and involved the same Co–Borrowing Facilities.

The Defendants argue there is no relation back because "for fraudulent transfer and preference claims, each transfer is a separate and distinct event." Investment. B. Mem. at 23. The Defendants cite *Metzler* to support the proposition that fraudulent transfers cannot relate back. *Metzler v. Bouchard Transp. Co., Inc.,* 66 B.R. 977, 983, 984 (Bankr.S.D.N.Y.1986). However, the facts in *Metzler* involve fraudulent transfers which arose out of different transactions. *Id.* The facts in *Metzler* are distinguishable from this case. In this case all the fraudulent transfers were related to the Co–Borrowing Facilities. Courts have recognized that where fraudulent transfers arise out of the same conduct and transaction there is a relation back. "[P]reference actions stand in contrast to actions to avoid fraudulent transfers, which often involve a common scheme to defraud which provides a nexus for relation back." *In re Austin Driveway Services, Inc.,* 179 B.R. 390, 398 (Bkrtcy.D.Conn.1995).

### iii. Goldman Sachs Moves for Dismissal of Claim 31 on the Basis That It Had Not Been Plead With Particularity

Goldman Sachs moves for dismissal of Claim 31 on two bases. First, Adelphia did not have any intent to defraud creditors in making the margin loan payments to Goldman Sachs. Second, Adelphia did not plead fraud with the necessary particularity.

### iv. Adelphia Had the Intent to Defraud Creditors through Margin Loan Payments.

Goldman Sachs argues that Claim 31 should be dismissed (as to Goldman Sachs) since Adelphia did not have the requisite fraudulent intent when it made margin loan payments to Goldman Sachs. Under 11 U.S.C. §§ 548 and 550, the payments which the parties are seeking to have avoided or recovered must have been made with the intent to defraud creditors. Goldman Sachs argues that because they did not structure the Co–Borrowing Facilities, **\*335** the margin loan payments which were made to them were not related to any intent to defraud creditors. "[T]hose creditors knew and approved, of such uses of the Co–Borrowing Facilities by the Rigas Family and that the Rigas Family used those funds

not with intent to defraud creditors ..." Goldman Mem. at 2. Goldman Sachs argues any payments which they received were not made with the intent to defraud creditors. This is in contrast to "[s]uch assertions [made in the amended complaint] that the various lenders under the Co–Borrowing Facilities were allegedly complicit in the Rigas Family's [sic] personal financial arrangements are fully understandable in context of plaintiff's many claims against those lenders." Goldman Mem. at 2. Goldman Sachs draws a distinction between it and the other lenders who were given margin loan payments.

[22]   In the Second Circuit, "[d]ue to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *In re Sharp Intern. Corp.,* 403 F.3d 43, 56 (2d Cir.2005) (citing *Wall St. Assocs. v. Brodsky,* 257 A.D.2d 526, 529, 684 N.Y.S.2d 244 (N.Y.A.D. 1st Dep't 1999)). These badges of fraud which supply fraudulent intent for the purposes of a fraudulent conveyance by a party include, "(1) a close relationship between the parties to the conveyance; (2) inadequacy of consideration received; (3) retention of control of the property by the transferor; (4) suspicious timing of the conveyance after the debt was incurred; (5) the use of fictitious parties; and (6) information that the transferor was insolvent as a result of the conveyance." *Scantek Medical, Inc. v. Sabella,* 583 F.Supp.2d 477, 497 (S.D.N.Y.2008) (citing *In re Sharp,* 403 F.3d at 56).

[23]   The Amended Complaint pleads badges of fraud which are sufficient to allege 'intent to hinder, delay or defraud creditors.' *Id.* It is plausible that the Rigas family made payments on the margin loans in order to prolong their fraud and further enrich themselves at the expense of their creditors. The Amended Complaint alleges the payments on the margin loans were used to keep the margin lending facilities open. (Am. Cmpl. ¶ 990.)

The Amended Complaint pleads the margin lenders continued to accept payments on the margin loans after they had reason to believe that Adelphia was insolvent. On March 27, 2002, Adelphia disclosed that it had fraudulently concealed the true amount of liability under the Co–Borrowing Facilities. Despite the disclosure the margin lenders accepted 194 million dollars in margin loan payments after March 27, 2002. (Am. Cmpl. ¶ 991.) According to the Amended Complaint

roughly 30 million dollars was transferred to Goldman Sachs after March 27, 2002. (Am. Cmpl. ¶ 992.) The fact that Adelphia had disclosed huge liabilities on March 27, 2002 was a strong indicium that the transferor was insolvent at the time it was transferring tens of million of dollars to Goldman Sachs. *Scantek Medical, Inc.,* 583 F.Supp.2d at 497. The pleadings are enough at this stage of the proceedings to plead fraudulent intent with regards to the margin loan payments to Goldman Sachs.

### v. The Amended Complaint Alleges Claim 31 with the Necessary Particularity

[24]   Goldman Sachs alleges that the Amended Complaint is deficient as to the basic particulars of the alleged fraud and fails to meet Rule 9(b). Goldman. Mem. at 12. As a rule, "allegations supporting **\*336** claims for intentional fraudulent transfers are subject to the heightened pleading requirements of Rule 9(b)." *In re Allou Distributors, Inc.,* 387 B.R. 365, 400 (Bkrtcy.E.D.N.Y.2008) (citing *Atlanta Shipping Corp. v. Chemical Bank,* 818 F.2d 240, 251 (2d Cir.1987)). The courts have explained that the requirements for pleading under Rule 9(b) include that "[t]he party asserting an intentional fraudulent transfer claim must 'specify the property that was allegedly conveyed, the timing and frequency of those allegedly fraudulent conveyances, [and] the consideration paid.' " *In re M. Fabrikant & Sons, Inc.,* 394 B.R. 721, 733 (Bkrtcy.S.D.N.Y.2008) (quoting *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.,* 216 F.Supp.2d 198, 221 (S.D.N.Y.2002)).

[25]   The Amended Complaint pleads details regarding Claim 31. The Amended Complaint alleges money was paid to make payments on margin loans owed by the members of the Rigas family on personal margin accounts maintained by "BofA, SSB, Deutsche Bank Securities, and Goldman Sachs." (Am. Cmpl. ¶ 990.) The Amended Complaint provides the timing of the payments, frequency of the payments, and the amounts of the payments to Goldman Sachs. (Am. Cmpl. ¶ 1359.) The Amended Complaint alleges consideration for the margin payments. (Am. Cmpl. ¶¶ 1358, 1360, 1361.)

### 5. Order

For the foregoing reasons, Defendants' 12(b)(6) motions for dismissal are GRANTED as to Claim 54. Defendants' 12(b)(6) motions are DENIED as to Claims 31, 37, and 38. Defendants' 12(b)(6) motions are GRANTED as to Claim 55 ¶ 1572(i), (ii), (iii) as to the Agent Banks, (v), (vi), (vii), (viii); ¶ 1573(iii), (iv), (vi). Defendants' 12(b)(6) motions are DENIED as to Claim 55 ¶ 1572(iii) as to the Investment Banks, (iv), (ix); ¶ 1573(i), (ii), (v).

SO ORDERED.

**All Citations**

624 F.Supp.2d 292

# Footnotes

1    Six senior Adelphia officials orchestrated this widespread scheme: J. Rigas, Adelphia's founder, Chief Executive Officer ("CEO") and Chairman; T. Rigas, J. Rigas' son and Adelphia's Chief Financial Officer ("CFO"), Chief Accounting Officer ("CAO"), Treasurer and a Director; M. Rigas, J. Rigas' son, Adelphia's Executive Vice President for Operations and Secretary; J.P. Rigas, J. Rigas' son, and Adelphia's then Executive Vice President for Strategic Planning and a Director; Brown, Adelphia's then Vice President of Finance; and Mulcahey, a Vice President of Adelphia as well as its then Assistant Treasurer.

2    The Adelphia Recovery Trust is a Delaware Statutory Trust that was formed pursuant to the Joint Chapter 11 Plan of Reorganization. The Trust holds certain litigation claims transferred pursuant to the Plan against various third parties and exists to prosecute the causes of action transferred to it for the benefit of holders of Trust interests.

3    The assets pledged to the co-borrowing facilities were often subscribers which provided a stream of revenue to either Adelphia or an RFE. For example, under the CCH Co–Borrowing Facility Adelphia provided collateral contributions in the form of two subsidiaries with 1,476,983 cable television subscribers. The RFE under the CCH Co–Borrowing Facility pledged only 55,831 cable television subscribers. (Am. Cmpl. ¶ 905.)

4    Adelphia had entered into a previous Co–Borrowing Facilities. In 1996 Adelphia entered into the 1996 HVA/TALP/Global Credit Facility. According to the Amended Complaint the 1996 HVA/TALP/Global Credit Facility was structurally differently then the Co–Borrowing Facilities which followed. The 1996 HVA/TALP/Global Credit Facility placed strict limits on the amount of money which could be withdrawn by each entity and the entities which entered into the facility pledged adequate collateral. (Am. Cmpl. ¶¶ 831–840.)

5    Short forms are used to identify specific Agent Banks and their affiliated Investment Banks.

6    At no time prior to March 27, 2002 did Adelphia, the Agent Banks or the Investment Banks disclose the liability amassed by Adelphia as a result of its participation in the CCH Facility. (Am. Cmpl. ¶ 923.)

7    Different defendants played different roles in the Co–Borrowing which Adelphia entered into. The Agent Banks provided services and advice to Adelphia in structuring, arranging, and managing the Co–Borrowing Facilities. (C.C. ¶ 69.) The Investment Banks were each affiliated with one of the Agent Banks, and assisted their affiliated Agent Banks and the Rigas family in structuring the Co–Borrowing Facilities and providing services and advice to Adelphia in connection with debt and equity offerings issued during the during the same period that the Loan Facilities were created. (C.C. ¶ 70.) The Non–Agent Banks were bank lenders under various debt facilities. (C.C. ¶ 71–114.) The Assignees were various lenders who had acquired bank debt

related to Adelphia. (C.C. ¶ 144–402.) The Creditors Complaint uses a different nomenclature in grouping defendants then that which is used in the Amended Complaint.

8   The opinion contains a useful table which summarizes the disposition of the various claims. ⚑ *In re Adelphia Commc'ns Corp.,* 365 B.R. at 81.

9   The phrase 'this Court' refers to proceedings before the undersigned unless otherwise noted.

10   Fed.R.Civ.P. 54(b).

11   The transactions underlying the claims involved loan facilities originated in and around Buffalo, New York.

12   The analysis in the Restatement (Second), Conflict of Laws provides compelling reasons for adopting local interpretations of pleading standards, "[e]normous burdens are avoided when a court applies its own rules, rather than the rules of another state, to issues relating to judicial administration, such as the proper form of action, service of process, pleading, rules of discovery, mode of trial and execution and costs." Restatement, supra at § 122. It is "an unreasonable burden on the judicial machinery of the forum" to require a court to apply the procedural law of another court. ⚑ *Bournias v. Atlantic Maritime Co.,* 220 F.2d 152, 154 (2d Cir.1955) (Harlan, J.); *see also* ⚑ *Dar El–Bina Engineering & Contracting Co., Ltd. v. Republic of Iraq,* 79 F.Supp.2d 374, 388 (S.D.N.Y.2000).

13   The Investment Bank defendants move for dismissal of Claim 31 as to the addition of SSB as a defendant pursuant to Rule 12(c). However, the effect of this is minimal as 12(c) imposes the same standards of reviewing a claim as 12(b)(6). ⚑ *Cleveland v. Caplaw Enterprises,* 448 F.3d 518, 521 (2d Cir.2006).

14   The remainder of Section 876 reads:

(b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or

(c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts Section 876.

15   ⚑ *Huber* cites a case from the Commonwealth Court of Pennsylvania and a case from the Eastern District of Pennsylvania to support recognition of aiding and abetting a breach of fiduciary duty. ⚑ *Koken v. Steinberg,* 825 A.2d 723, 732 (Pa.Cmwlth.2003); ⚑ *Thompson v. Glenmede Trust Co.,* No. CIV. A. 92–5233, 1993 WL 197031 (E.D.Pa. June 8, 1993).

16   In this class action brought by investors against directors and/or senior officers of Adelphia Business Solutions related to the failure of Adelphia Communications (in a separate case from the one at hand) this Court held that group pleading was appropriate against the directors since the Amended Complaint alleged that they were involved in the preparation/approval of documents in which fraudulent statements were made. ⚑ *In re Adelphia Communications Corporation Securities and Derivative Litigation,* 398 F.Supp.2d at 250.

17   The Amended Complaint alleges a breach of fiduciary duty with respect to the "Co–Borrowing Facilities." (Am. Cmpl. ¶ 1414.) The Amended Complaint describes these facilities as "fraudulently structured Co–Borrowing Facilities for the purpose of obtaining access to funds for their personal use." *Id.* This refers to the UCA/

HHC, CCH and Olympus Co–Borrowing Facilities. The FrontierVision, Parnassos, and Century–TCI Credit Facilities are not named Claim 37 of the Amended Complaint.

18    The Pennsylvania Supreme Court has never addressed directly whether an Investment Bank owes a fiduciary duty to its clients outside of any duties which are imposed by the contract governing the Investment Bank's engagement. However, the analysis of the Court of Appeals for the Seventh Circuit in the case of 🚩 *Joyce v. Morgan Stanley & Co.* is persuasive. In that case the Court of Appeals held that under Illinois Law, Morgan Stanley did not owe shareholders of an acquired corporation (Morgan Stanley was the advisor to the acquired corporation) a fiduciary duty since none was mentioned in the contract. The court held that "[t]he fact that one party trusts the other is insufficient. We trust most people with whom we choose to do business. The dominant party must accept the responsibility, accept the trust of the other party before a court can find a fiduciary relationship." 🚩 *Joyce v. Morgan Stanley & Co. Inc.,* 538 F.3d 797, 802 (7th Cir.2008) (*quoting Pommier v. Peoples Bank Marycrest,* 967 F.2d 1115, 1119 (7th Cir.1992) (internal citations omitted.))

19    The Bankruptcy Claims addressed in that order included claims 1 to 16, 33, 41 and 42 to 44, and 49 to 52. 🚩 *Adelphia Recovery Trust,* 390 B.R. at 84.

20    Adelphia filed its voluntary petition for bankruptcy on June 26, 2002 (the statute of limitations would have expired on June 25, 2004). Under the Bankruptcy Code, Section 548 avoidance actions are governed by a two year statute of limitations which begins to run upon the entry of an order for relief 11 U.S.C § 546(a). The filing of a Chapter 11 petition constitutes such an order of relief 11 U.S.C. § 301(b). The parties entered into a tolling agreement on June 24, 2004 which expired on June 1, 2007. The Amended Complaints addition of 95 million dollars in alleged fraudulent transfers to SSB was added five months after the tolling agreement expired.

---

**End of Document**    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# <u>EXHIBIT 2</u>

In re Bernard L. Madoff Inv. Securities LLC, 468 B.R. 620 (2012)

56 Bankr.Ct.Dec. 85

🚩 KeyCite Yellow Flag - Negative Treatment

Distinguished by   In re Kingate Management Ltd. Litigation,   S.D.N.Y.,
September 21, 2016

468 B.R. 620
United States Bankruptcy Court, S.D. New York.

In re BERNARD L. MADOFF
INVESTMENT SECURITIES LLC, Debtor.
In re Irving H. Picard, Trustee for the Liquidation of
Bernard L. Madoff Investment Securities LLC, Plaintiff,
v.
Peter B. Madoff, Estate of Mark D. Madoff, Andrew
H. Madoff, Individually and as Executor of the Estate
of Mark D. Madoff, and Shana D. Madoff, Defendants.

Bankruptcy No. 08–01789 (BRL)
|
Adversary No. 09–01503 (BRL)
|
April 4, 2012.

Synopsis
**Background:** Trustee for substantively consolidated
liquidation, under Securities Investor Protection Act (SIPA),
of investment company and its principal filed motion for leave
to file a second amended complaint to avoid and recover
alleged preferential and fraudulent transfers, seeking, inter
alia, to add as defendants former and current spouses of
principal's sons. Spouse defendants objected.

**Holdings:** The Bankruptcy Court, Burton R. Lifland, J., held
that:

[1] trustee failed to satisfy the relation-back standard and so
would not be granted leave to add the spouse defendants to
pursue the bankruptcy claims;

[2] trustee would be granted leave to add the spouse
defendants to pursue the subsequent transfer claims, which
were not time-barred; and

[3] with regard to the common law claims of constructive trust
and unjust enrichment, trustee would be granted leave to add
one son's widow and other son's wife.

Motion granted in part and denied in part.

See also 424 B.R. 122, 458 B.R. 87.

West Headnotes (16)

**[1]    Bankruptcy**   ⬗   Pleading;  dismissal

While a court should freely give leave to amend
a complaint when justice so requires, it must
deny it where the amendment would be futile.
Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.;
Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

**[2]    Bankruptcy**   ⬗   Pleading;  dismissal

Amendment to a complaint is "futile" if the
proposed claim could not withstand a motion to
dismiss for failure to state a claim. Fed.Rules
Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules
Civ.Proc.Rules 12(b)(6), 15, 28 U.S.C.A.

1 Case that cites this headnote

**[3]    Bankruptcy**   ⬗   Pleading;  dismissal

Amendment filed after the applicable statute
of limitations has run and where the claims
do not relate back to the date of an earlier
timely pleading will be deemed futile. Fed.Rules
Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules
Civ.Proc.Rule 15, 28 U.S.C.A.

1 Case that cites this headnote

**[4]    Bankruptcy**   ⬗   Limitations and time to sue;
computation

Purpose of relation back of amendments is to
balance the interests of the defendant protected
by the statute of limitations with the preference
expressed in the Federal Rules of Civil Procedure
in general, and the rule governing amendment
of pleadings in particular, for resolving disputes
on their merits; a prospective defendant who
legitimately believed that the limitations period
had passed without any attempt to sue him has a
strong interest in repose, whereas repose would
be a windfall for a prospective defendant who

understood, or who should have understood, that he escaped suit during the limitations period only because the plaintiff misunderstood a crucial fact about his identity. Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(c)(1), 28 U.S.C.A.

**[5]**    **Bankruptcy** 🔑 Limitations and time to sue; computation

Under rule governing relation back of amendment that changes the party or the naming of the party against whom a claim is asserted, the movant must show that the proposed defendant knew or should have known the action would have been brought against him but for a mistake. Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(c)(1)(C)(ii), 28 U.S.C.A.

1 Case that cites this headnote

**[6]**    **Bankruptcy** 🔑 Limitations and time to sue; computation

Under rule governing relation back of amendment that changes the party or the naming of the party against whom a claim is asserted, the question is what the prospective defendant reasonably should have understood about the plaintiff's intent in filing the original complaint against the first defendant. Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(c)(1)(C)(ii), 28 U.S.C.A.

**[7]**    **Bankruptcy** 🔑 Limitations and time to sue; computation

Under rule governing relation back of amendment that changes the party or the naming of the party against whom a claim is asserted, court may consider the plaintiff's post-filing conduct during the period for serving the summons and complaint to the extent it informs the prospective defendant's understanding of whether the plaintiff initially made a mistake concerning the proper party's identity. Fed.Rules Bankr.Proc.Rule 7015, 11

U.S.C.A.; Fed.Rules Civ.Proc.Rules 4(m), 15(c)(1)(C)(ii), 28 U.S.C.A.

**[8]**    **Bankruptcy** 🔑 Limitations and time to sue; computation

Under rule governing relation back of amendment that changes the party or the naming of the party against whom a claim is asserted, if the original complaint and the plaintiff's conduct compel the conclusion that the failure to name the prospective defendant in the original complaint was the result of a fully informed decision, the requirements of the rule are not met. Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(c)(1)(C)(ii), 28 U.S.C.A.

1 Case that cites this headnote

**[9]**    **Bankruptcy** 🔑 Limitations and time to sue; computation

For purposes of rule governing relation back of amendment that changes the party or the naming of the party against whom a claim is asserted, a deliberate choice to sue one party instead of another while fully understanding the factual and legal differences between the two parties is the antithesis of making a "mistake" concerning the proper party's identity. Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(c)(1)(C)(ii), 28 U.S.C.A.

**[10]**    **Securities Regulation** 🔑 Proceedings

Trustee for substantively consolidated liquidation, under Securities Investor Protection Act (SIPA), of investment company and its principal, who sought leave to file second amended complaint to avoid and recover alleged preferential and fraudulent transfers, failed to satisfy relation-back standard and so would not be granted leave to add as defendants former and current spouses of principal's sons; bankruptcy claims against spouse defendants were time-barred, and trustee failed to show that, but for a mistake on his part, spouse defendants knew or should have known that they would

have been included in his complaint, as, given allegations set forth in original complaint, spouse defendants' omission from amended complaint, and decision of trustee, a sophisticated and well-represented party, to sue spouses instead in separate adversary proceedings, it was not unreasonable for them to have believed that their omission from original complaint was result of fully informed decision. 11 U.S.C.A. §§ 544, 545, 546(a), 547, 548, 553; Securities Investor Protection Act of 1970, § 1 et seq., 15 U.S.C.A. § 78aaa et seq.; Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(c)(1) (C)(ii), 28 U.S.C.A.

6 Cases that cite this headnote

[11]   **Limitation of Actions** 🗝 Intervention or bringing in new parties

New York's relation-back rule requires that the new party knew or should have known that, but for a mistake as to the identity of the proper parties, the action would have been brought against him as well.

1 Case that cites this headnote

[12]   **Securities Regulation** 🗝 Proceedings

Trustee for substantively consolidated liquidation, under Securities Investor Protection Act (SIPA), of investment company and its principal would be granted leave to file second amended complaint to pursue subsequent transfer claims against former and current spouses of principal's sons; no transfer had yet been avoided, so the subsequent transfer claims were not time-barred, and trustee was not required to satisfy the relation-back standard under the rule governing amendment of pleadings. 11 U.S.C.A. § 550(a, f); Securities Investor Protection Act of 1970, § 1 et seq., 15 U.S.C.A. § 78aaa et seq.; Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

1 Case that cites this headnote

[13]   **Securities Regulation** 🗝 Proceedings

Trustee for substantively consolidated liquidation, under Securities Investor Protection Act (SIPA), of investment company and its principal would be granted leave to file second amended complaint to pursue common law claims of constructive trust and unjust enrichment against former and current spouses of principal's sons; as of the date of trustee's motion, the approximately $33 million that had been alleged against one son's widow and the $43 million that had been alleged against other son's wife were all still within the six-year statutes of limitations applicable to the claims under New York law, trustee thus could add these claims irrespective of whether they related back to date of original complaint, and it was not clear from face of pleadings that amendment would be futile. 11 U.S.C.A. § 108(a); Securities Investor Protection Act of 1970, § 1 et seq., 15 U.S.C.A. § 78aaa et seq.

1 Case that cites this headnote

[14]   **Bankruptcy** 🗝 Time limitations; computation

New fraudulent transfer claims relate back to existing ones if the former were part of the same "course of conduct." Fed.Rules Civ.Proc.Rules 15, 15(c)(1)(B), 28 U.S.C.A.

9 Cases that cite this headnote

[15]   **Bankruptcy** 🗝 Time limitations; computation

In determining whether new fraudulent transfer claims relate back to existing ones, the principal inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party by the general fact situation alleged in the original pleading. Fed.Rules Civ.Proc.Rules 15, 15(c)(1)(B), 28 U.S.C.A.

10 Cases that cite this headnote

[16]   **Bankruptcy** 🗝 Limitations and time to sue; computation

Rule governing relation-back of amended pleadings does not set high bar for relation-back,

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.

In re Bernard L. Madoff Inv. Securities LLC, 468 B.R. 620 (2012)

56 Bankr.Ct.Dec. 85

as long as the claims attempted to be asserted in new complaint share a reasonable measure of common ground with allegations of original pleading. Fed.Rules Bankr.Proc.Rule 7015, 11 U.S.C.A.; Fed.Rules Civ.Proc.Rule 15(c), 28 U.S.C.A.

7 Cases that cite this headnote

**Attorneys and Law Firms**

**\*623** Baker & Hostetler LLP, By: David J. Sheehan, Tracy L. Cole, Timothy S. Pfeifer, M. Elizabeth Howe, David M. McMillan, John Siegal, Marc D. Powers, Jimmy Fokas, Adam B. Oppenheim, New York, NY, for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff.

Cohen & Gresser LLP, By: Mark S. Cohen, Daniel H. Tabak, New York, NY, for Proposed Defendant Deborah Madoff.

Cooley LLP, By: Alan Levine, Lawrence C. Gottlieb, Laura Grossfield Birger, Michael A. Klein, New York, NY, for Proposed Defendant Stephanie S. Mack.

Day Pitney LLP, By: Thomas D. Goldberg, Matthew E. Smith, Stamford, CT, for Proposed Defendant Susan Elkin.

Paul, Weiss, Rifkind, Wharton & Garrison LLP, By: Martin Flumenbaum, Stephen J. Shimshak, Andrew J. Ehrlich, Hannah S. Sholl, New York, NY, for the Estate of Mark D. Madoff and Andrew H. Madoff individually and as Executor of the Estate of Mark D. Madoff.

*MEMORANDUM DECISION AND ORDER DENYING IN PART AND GRANTING IN PART THE TRUSTEE'S MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT*

BURTON R. LIFLAND, Bankruptcy Judge.

*Query: Given ongoing forensic activity and the restrictions set forth by the Supreme Court in Krupski,[1] can the Madoff trustee simply add defendants at any time? Here, inclusion of ex and current spouses of Madoff's two sons is at play.*

Before the Court is the motion (the "Motion") of Irving H. Picard, Esq. (the "Trustee"), trustee for the substantively consolidated Securities Investor Protection Act ("SIPA") liquidation of Bernard L. Madoff Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff") seeking leave to file a second amended complaint to (i) add Susan Elkin, Mark Madoff's first wife; Stephanie S. Mack, Mark Madoff's widow; and Deborah Madoff, Andrew Madoff's wife (collectively, the "Spouse Defendants"),[2] who allegedly received approximately $115 million in transfers from BLMIS;[3] (ii) include **\*624** $28,948,035 in additional transfers (the "New Transfers") as to Peter B. Madoff; Andrew H. Madoff, individually, and as Executor of the Estate of Mark D. Madoff;[4] the Estate of Mark D. Madoff; and Shana D. Madoff (collectively, the "Family Defendants"); and (iii) clarify that $2,899,000 of the transfers to Shana D. Madoff alleged in the original complaint are now also claimed as transfers to Peter B. Madoff, and $2,500,000 of the transfers to Peter B. Madoff alleged in the original complaint are now also claimed as transfers to Shana D. Madoff (these transfers, together with the New Transfers, the "Family Transfers").

The Trustee seeks to add the Spouse Defendants to bring Bankruptcy Claims, Subsequent Transfer Claims and Common Law Claims (all defined below) against them. The heart of the dispute revolves around whether the Trustee has satisfied the relation back standard set forth in Federal Rule of Civil Procedure ("Rule") 15(c)(1)(C)(ii) to permit him to add the Spouse Defendants in connection with the Bankruptcy Claims. Specifically, the issue is whether the Trustee has demonstrated that but for a mistake on his part, the Spouse Defendants knew or should have known that they would be included in the Trustee's complaint. The Trustee posits that the Spouse Defendants were on constructive notice that they should have been sued, as (i) this has been a highly publicized case, (ii) the Trustee's investigation has been ongoing, (iii) the Trustee sought transfers in the original complaint of which the Spouse Defendants were beneficiaries, and (iv) it became clear to the Trustee, upon Mark's death, that naming only Mark and not Stephanie was a mistake. The Spouse Defendants object, arguing that they reasonably believed their omission from the original complaint was not a mistake but rather a deliberate tactic on the part of the Trustee. Indeed, the

Trustee is a sophisticated party who had access to extensive documentation regarding the roles, status, and finances of the Spouse Defendants, as well as ample legal support to review and analyze such documentation. Furthermore, he elected to exclude *all* of the Spouse Defendants from not only the original complaint but also from the amended complaint, opting instead to sue them in a number of separate adversary proceedings. Under these circumstances, the Court finds that the Trustee has not met the relation back standard under Rule 15. In fact, it would not be unreasonable for the Spouse Defendants to infer that their omission from the original complaint was the result of a strategic decision on the part of the Trustee and not a mistake. Accordingly, the Court declines to permit leave to the Trustee to add the Spouse Defendants to pursue the Bankruptcy Claims.

With regard to the Subsequent Transfer Claims, the Court grants leave to add the Spouse Defendants because, as these claims are not time barred, the Trustee need not satisfy the relation back standard under Rule 15.

With regard to the Common Law Claims of constructive trust and unjust enrichment, the Court grants leave to add Stephanie S. Mack and Deborah Madoff because (i) these claims are not time barred and (ii) the futility of such an amendment is not clear on the face of the proposed second amended complaint, as determining the applicability of *in pari delicto* to these **\*625** claims against the Spouse Defendants involves unsettled law.

The Trustee also seeks to add and clarify transfers with regard to the Family Defendants. As these transfers relate back under Rule 15 and no one has objected to such relief, the Court permits the Trustee leave to add and clarify them.

Accordingly, for the reasons set forth below and at oral argument, the Trustee's Motion is DENIED in part and GRANTED in part to the extent described herein.

### *BACKGROUND* [5]

The Motion arises in connection with the infamous Ponzi scheme perpetrated by Madoff through his investment company, BLMIS.

### 1. The Trustee's Complaints Against The Family And Spouse Defendants

The Trustee commenced the instant adversary proceeding on October 2, 2009 by filing a complaint (the "Original Complaint") against the Family Defendants. [6] The Original Complaint sought to avoid and recover more than $180 million in fraudulent transfers and preferences from BLMIS to the Family Defendants and asserted various common law claims. The Family Defendants filed motions to dismiss (the "Motions to Dismiss") the Original Complaint on or about March 15, 2010. This Court subsequently issued an order (the "Bankruptcy Court Order") denying in part and granting in part the Motions to Dismiss, with leave granted to amend. On November 7, 2011, the Trustee filed an amended complaint (the "Amended Complaint") against the same defendants for largely the same claims as those specified in the Original Complaint. On December 22, 2011, the United States District Court for the Southern District of New York (the "District Court") denied leave to appeal the Bankruptcy Court Order. *See* Order of U.S. District Court Judge William H. Pauley, III signed on 12/22/2011 (Dkt. No. 74). The Trustee filed the instant Motion the next day.

The Trustee did not name Susan Elkin, Stephanie Mack, or Deborah Madoff in either the Original or Amended Complaint, suing them instead in separate adversary proceedings in December 2010. Susan Elkin was married to Mark from September 1989 until their divorce in June 2000, which took place more than eight years prior to the commencement of the BLMIS SIPA liquidation. She has been named by the Trustee in her capacity as guardian of K.M. [7] in an adversary proceeding challenging gifts made by Madoff to the children of Susan and Mark Madoff. *See* Adv. Pro. No. 10–05328; PSAC, [8] ¶ 9. Stephanie Mack was married to Mark Madoff from October 2004 until his death in 2010. She has been named by the Trustee in two adversary proceedings seeking transfers to her or the Mark and Stephanie Madoff Foundation, in the total amount of nearly $2.1 million. *See* Adv. Pro. Nos. 10–05325, 10–05328; PSAC, ¶ 4. Finally, Deborah Madoff married Andrew in January 1992 and commenced divorce proceedings against him in December 2008. She has been named by the Trustee in two separate **\*626** adversary proceedings seeking transfers to her or the Deborah and Andrew Madoff Foundation in the total amount of nearly $2.1 million. *See* Adv. Pro. Nos. 10–05330, 10–05332.

### 2. The Instant Motion And The Proposed Second Amended Complaint

On December 23, 2011, the Trustee filed the instant Motion seeking leave to file the proposed second amended complaint. In the PSAC, the Trustee seeks to avoid and recover fraudulent transfers in the collective amount of over $255 million made to the Family and Spouse Defendants pursuant to sections 105(a), 502(d), 510(c), 544, 547, 548(a), and 551 of the Bankruptcy Code (the "Code"), and New York Debtor and Creditor Law (the "NYDCL") [9] (the "Bankruptcy Claims"). He argues these claims should be permitted because the Spouse Defendants knew or should have known that their exclusion from the Original Complaint was a mistake in accordance with Rule 15(c)(1)(C)(ii), as (i) the Trustee previously sought recovery of the entirety of transfers to the Family and Spouse Defendants—rather than the portion attributable to only one spouse," *see* Tr. Mem., p. 12; (ii) the PSAC "reflects the continuing nature of the Trustee's investigation," *see id.;* (iii) the "Trustee has brought a very public case against the Family Defendants," *see id.* at 9; and (iv) "it became apparent to the Trustee that naming Mark alone, and not Stephanie as well, could have been a mistake" when, upon Mark's death, Stephanie "took the position that [certain] homes became hers alone," Reply Memorandum of Law in Further Support of Trustee's Motion for Leave to File a Second Amended Complaint [hereinafter "Tr. Rep."] (Dkt. No. 98), p. 14.

The Trustee also seeks to bring subsequent transfer claims of approximately $5.5 million against the Spouse Defendants [10] under section 550 of the Code (the "Subsequent Transfer Claims"). Specifically, the PSAC includes allegations of additional subsequent transfers received by Shana Madoff in the amount of $2,500,000, Susan Elkin in the amount of $2,395,000, Deborah Madoff in the amount of $625,000, and subsequent transfers of interests in property of undetermined value to Stephanie S. Mack. *See* Tr. Rep., p. 14. The Trustee argues that these claims should be permitted since they were filed within the relevant statute of limitations period.

In addition, the Trustee seeks damages for breach of fiduciary duty, negligence, unjust enrichment, constructive trust, and accounting under New York common law (the "Common Law Claims"), arguing they should be permitted as to the Spouse Defendants since, *inter alia,* the Spouse Defendants cannot rely on *in pari delicto* as an affirmative defense.

On February 22, 2012, each of the Spouse Defendants, as well as Andrew and the Estate of Mark Madoff, filed an objection, all arguing against the inclusion of the Spouse Defendants

as to the Bankruptcy Claims because the Trustee has not met his burden under Rule 15(c)(1)(C)(ii). In addition, the Spouse Defendants argue that *in pari delicto* is available as an affirmative defense. No one has objected to the inclusion or clarification of the Family Transfers. A hearing was held on April 3, 2012.

## *627  STANDARD FOR GRANTING LEAVE TO FILE AN AMENDED COMPLAINT

**[1]    [2]    [3]**    While a court should freely give leave to amend a complaint when justice so requires, it must deny it where the amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994) (citing *Foman v. Davis,* 371 U.S 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)). "An amendment to a complaint is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)." *Lucente v. Int'l Bus. Machines Corp.,* 310 F.3d 243, 258 (2d Cir.2002). An amendment filed after the applicable statute of limitations has run and where the claims do not relate back to the date of an earlier timely pleading will therefore be deemed futile. *See Rodriguez v. City of New York,* 10–CIV–1849, 2011 WL 4344057, at *6 (S.D.N.Y. Sept. 7, 2011).

**[4]**    The relate back standard is set forth in Rule 15(c)(1). A plaintiff seeking to add defendants may satisfy this standard if:

> (B) the amendment asserts a claim or defense that arose out of the conduct, transaction or occurrence set out—or attempted to be set out—in the original pleading; or

> (C) the amendment changes the party or the naming of the party against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

>> (i) received such notice of the action that it will not be prejudiced in defending on the merits; and

>> (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

FED. R. CIV. PROC. 15(c)(1). The purpose of relation back under Rule 15(c)(1)(C) is "to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits." *Krupski v. Costa Crociere S.p.A.,* ––– U.S. ––––, 130 S.Ct. 2485, 2494, 177 L.Ed.2d 48 (2010). Specifically, "[a] prospective defendant who legitimately believed that the limitations period had passed without any attempt to sue him has a strong interest in repose," whereas "repose would be a windfall for a prospective defendant who understood, or who should have understood, that he escaped suit during the limitations period only because the plaintiff misunderstood a crucial fact about his identity." *Id.*

[5] [6] [7] [8] [9] Under Rule 15(c)(1)(C)(ii), the movant must show the proposed defendant knew or should have known the action would have been brought against him but for a mistake. *Enron Corp. v. J.P. Morgan Sec. Inc. (In re Enron Corp.),* 361 B.R. 36, 41 (Bankr.S.D.N.Y.2006). As the Supreme Court explained, "the question under Rule 15(c)(1)(C)(ii) is what the prospective defendant reasonably should have understood about the plaintiff's intent in filing the original complaint against the first defendant." *Krupski,* 130 S.Ct. at 2496. Therefore, this "requisite knowledge ... typically is established" by the movant's demonstrating that there were allegations in the original complaint "respecting a named party that, in fact, concern the originally unnamed party plaintiff seeks to add." *Esmilla v. Cosmopolitan Club,* No. 09–CIV–10169, 2011 WL 814007, at *3 (S.D.N.Y. Mar. 3, 2011) (internal citations and quotations omitted); *see, e.g., Krupski,* 130 S.Ct. at 2490–92 (permitting plaintiff to add defendant because her original complaint "made clear that Krupski meant to sue the company that owned **\*628** ... the ship on which she was injured" but mistakenly listed Costa Cruise Lines N.V. instead of Costa Crociere S.p.A.); *VKK Corp. v. Nat'l Football League,* 244 F.3d 114, 128 (2d Cir.2001) (finding a Rule 15 mistake because the complaint described the plaintiff's interactions with Touchdown Jacksonville *Inc.,* but mistakenly named Touchdown Jacksonville, *Ltd.*). A court may also consider the plaintiff's post filing conduct during the Rule 4(m) period to the extent it "informs the prospective defendant's understanding of whether the plaintiff initially made a 'mistake concerning the proper party's identity.' " *Krupski,* 130 S.Ct. at 2496–97 (quoting Rule 15). On the other hand, if "the original complaint and the plaintiff's conduct compel the

conclusion that the failure to name the prospective defendant in the original complaint was the result of a fully informed decision ... the requirements of Rule 15(c)(1)(C)(ii) are not met." *Id.* at 2496. Indeed, "a deliberate choice to sue one party instead of another while fully understanding the factual and legal differences between the two parties is the antithesis of making a mistake concerning the proper parties identity." *Id.* at 2494.

### DISCUSSION

### I. THE TRUSTEE MAY NOT ADD THE SPOUSE DEFENDANTS IN CONNECTION WITH THE BANKRUPTCY CLAIMS

[10]   As the statute of limitations for bringing the Bankruptcy Claims against the Spouse Defendants has lapsed, any attempt to do so by the Trustee would be deemed futile unless those claims relate back to the Original Complaint. Here, the Trustee has failed to satisfy the relation back requirements of Rule 15. Accordingly, the Court denies the Motion to the extent it seeks to add the Spouse Defendants in connection with the Bankruptcy Claims.

  a. *The Bankruptcy Claims Against The Spouse Defendants Are Time Barred*

The Trustee's Bankruptcy Claims against the Spouse Defendants are barred by the applicable statute of limitations. Section 546(a) of the Code requires, in relevant part, that the Trustee must commence any action or proceeding under section 544, 545, 547, 548 or 553 no later than either (i) two years after the entry of the order of relief, or (ii) one year after the appointment or the election of a trustee. *See* 11 U.S.C. § 546(a). In this case, the order for relief was filed on December 11, 2008 when the District Court granted SIPC's application to provide SIPA protection to BLMIS customers. *See* SIPA § 78*lll* (7). Therefore, in order to timely assert the Bankruptcy Claims against the Spouse Defendants, the Trustee was required to commence an adversary proceeding by December 11, 2010, which he failed to do. Accordingly, the Trustee's Bankruptcy Claims against the Spouse Defendants are barred by the relevant statute of limitations.

  b. *The Bankruptcy Claims Against The Spouse Defendants Do Not Relate Back To The Original Complaint*

Granting leave to add the Spouse Defendants as beneficiaries of the Bankruptcy Claims is deemed futile and may not be permitted because those claims against the Spouse Defendants are time barred and do not relate back to the Original Complaint. With respect to relation back, the parties' main dispute centers on Rule 15(c)(1)(C)(ii), which requires that but for the plaintiff's mistake concerning the identity of the proper party, the party to be brought in by amendment "knew or should have known that the action would have been brought against it." FED. R. CIV. PROC. 15(c)(1)(C)(ii). The Trustee has not met this requirement; he has failed to **\*629** show that, but for a mistake on his part, the Spouse Defendants knew or should have known that they would have been included in his complaint.

### i. *The Trustee Has Not Met His Burden Under Rule 15(c)(1)(C)(ii)*

The Trustee has not satisfied his burden under Rule 15(c)(1)(C)(ii). In light of the allegations set forth in the Original Complaint and the Trustee's conduct, it was not unreasonable for the Spouse Defendants to believe that their omission from the Original Complaint was not a mistake but rather the result of a fully informed decision for two principal reasons. *First,* the Trustee opted to omit the Spouse Defendants from both the Original and the Amended Complaint even though the circumstances surrounding the instant proceeding suggest that he was aware of the "factual and legal differences" between the Family Defendants and the Spouse Defendants.

*See* Krupski, 130 S.Ct. at 2494. Indeed, the Trustee, a sophisticated party who has commenced hundreds of adversary proceedings in this case, was (i) in possession of numerous relevant documents, including financial disclosure forms from Mark and Andrew Madoff, that identified the roles, legal status, and interests of the Spouse Defendants [11] alleged by the Trustee in the Original Complaint, and (ii) armed with a large team of lawyers who had a significant period of time to assist the Trustee in his review and analysis of this documentation. Then, with this extensive knowledge and these plentiful resources, the Trustee omitted all three of the Spouse Defendants from the Original Complaint, omitted them again from the Amended Complaint (which was filed almost a year after the death of Mark Madoff), and instead chose to sue them in a number of separate adversary proceedings. This does not appear, therefore, to be a case where plaintiff intended to sue party A but sued party B due to mistaken identity. *See, e.g.,* Krupski, 130 S.Ct. at 2490–

92; VKK Corp., 244 F.3d at 128. Nor is this a case where the Trustee knew that party A exists while incorrectly believing him to have the status of party B, or one in which he misunderstood the roles of party A and party B. *See* Krupski, at 2494. Rather, the Trustee described the actions of the Family Defendants—not the Spouse Defendants—and then sued only the Family Defendants. *See* **\*630** Esmilla, 2011 WL 814007, at \*4 ("Based on these allegations, Plaintiff's initial decision to proceed against the Club—and *none* of its officers—reasonably would have been viewed by the Officers as a strategic decision, not a mistake by Plaintiff....") (emphasis in original).

*Second,* the Original Complaint included voluminous faithless servant allegations, which could reasonably be interpreted as reflecting an intention to sue only high level employees at BLMIS. In fact, the Trustee publicly indicated on national television that the Original Complaint represents claims against family members, all of whom held senior positions at BLMIS:

> [T]hey were officers of [BLMIS], and directors in certain instances as well, and also compliance officers in a very highly regulated environment. So, I think clearly they would have to have known what was going on given their own personal transactions, the longevity of what was happening, and their responsibilities as officers of the company.

*See* 60 Minutes: Meet the Liquidators (Sept. 27, 2009), *available at* http:// www.bakerlaw.com/files/PublicDocs/ Video/Madoff/2009/60_Minutes_Picard_Sheehan_ Madoff_9-2009.wmv (last visited April 3, 2012). Therefore, it would not be unreasonable for the Spouse Defendants to infer that their omission was deliberate.

### ii. *The Trustee's Relate Back Arguments Under Rule 15 Are Unavailing*

The Trustee asserts four primary arguments to demonstrate that the Spouse Defendants knew or should have known that

their omission from the Original Complaint was a mistake, none of which are persuasive.

*First,* the Trustee argues that since he "previously sought recovery of the entirety of transfers to the Family and Spouse Defendants—rather than the portion attributable to only one spouse," the Spouse Defendants were on constructive notice of the Original Complaint and therefore should have known that their omission was a mistake. Tr. Mem., p. 12. Yet, in light of the Trustee's extensive knowledge and ample resources and given the Trustee chose to exclude all of the Spouse Defendants from both the Original and Amended Complaints, suing them instead in separate adversary proceedings, it seems that the Trustee chose to pursue the entirety of the transfers solely from the Family Defendants and not from the Spouse Defendants. In addition, were the Court to adopt this argument, Rule 15 would not pose any obstacle to future plaintiffs seeking to obtain transfers from the spouses of individuals named in actions years earlier. Put differently, accepting this argument would reduce pleading requirements such that a movant would have to name only transfers, not parties.

*Second,* the Trustee asserts that the PSAC "reflects the continuing nature of the Trustee's investigation and analysis of transfers." *Id.* The Trustee contends that his "investigation has, for example, accurately identified the individuals for whom real estate was purchased with Customer Property." *Id.* The Trustee is seemingly arguing that the continuing nature of the investigation somehow implies that the Spouse Defendants knew or should have known that they were mistakenly omitted from this proceeding. Lending credence to this argument, though, would eviscerate the statute of limitations by providing a basis for future plaintiffs to relate back pleadings under Rule 15 solely because their investigations were of a "continuing nature." The Court refuses to adopt such a position, as it would affect a dramatic reduction in pleading requirements at the expense of the "strong interest in repose" of those "who legitimately believed that the limitations period had passed without any attempt to sue him." **\*631** *Krupski,* 130 S.Ct. at 2494; *see also In re Morgan Stanley Mortg. Pass– Through Certificates Litigation,* No. 09–CIV–2137, 2010 WL 3239430, at \*9 (S.D.N.Y. Aug. 17, 2010) ("Rule 15(c) may not be used as an end-run around the statute of limitations to add a party that filed a separate complaint that was time barred.") (internal quotations and citations omitted).

*Third,* the Trustee alleges that the Spouse Defendants were on constructive notice of the Trustee's mistake based on the extensive media coverage of the Trustee's actions, which sought transfers from which the Spouse Defendants allegedly benefitted. This allegation, however, only reaches what the Spouse Defendants *could have known* and not whether they *knew or should have known* that they were not named because of a mistake concerning identity, as is required under Rule 15. More importantly, though, this argument can be turned on its head: as there has been extensive media coverage and the Trustee has nevertheless omitted the Spouse Defendants, it was not unreasonable for them to infer the Trustee made a conscious decision to exclude them.

**[11]**   *Finally,* the Trustee asserts that because Stephanie took the position that certain homes became hers alone upon Mark's death, "it became apparent to the Trustee that naming Mark alone, and not Stephanie as well, could have been a mistake." Tr. Rep., p. 1. But evidence suggesting that a plaintiff seeking to add a new defendant only after learning that the originally named defendant would not be able to satisfy a judgment "counter[s] any implication that [the plaintiff] had originally failed to name [the proposed defendant] because of any 'mistake concerning the proper party's identity,' " especially where the plaintiff "had originally been under no misimpression about the function [the proposed defendant] played in the underlying dispute.... [And plaintiff] knew of [proposed defendant's] role as well as his existence." *Krupski,* 130 S.Ct. at 2495– 96 (internal quotations omitted). Furthermore, this apparent mistake concerns only some transfers, only one of the Spouse Defendants and arose from events transpiring more than a year after the Trustee filed the Original Complaint. [12]

## II. THE TRUSTEE MAY ADD THE SPOUSE DEFENDANTS IN CONNECTION WITH THE SUBSEQUENT TRANSFER CLAIMS

**[12]**   Section 550 of the Code provides:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from—

(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

**\*632** (2) any immediate or mediate transferee of such initial transferee.

11 U.S.C. § 550(a). Section 550(f) of the Code "provides that a recovery action must be brought no later than one year after the avoidance of the transfer or the closing or dismissal, whichever occurs first." *Official Comm. of Unsecured Creditors of M. Fabrikant & Sons, Inc. v. J.P. Morgan Chase Bank (In re M. Fabrikant & Sons, Inc.),* 394 B.R. 721, 746 n. 23 (Bankr.S.D.N.Y.2008). Therefore, "without the judgment of avoidance, the period of limitations under § 550(f) would never start to run." *Id.* In this action, no transfer has been "avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a)." Accordingly, the Subsequent Transfer Claims are not time barred. *See Pry v. Maxim Global, Inc. (In re Maxim Truck Co.),* 415 B.R. 346, 353 (Bankr.S.D.Ind.2009) (permitting the trustee to add a named defendant's spouse as a subsequent transferee where no transfer had been avoided and more than seven years had elapsed between the commencement of the case and the trustee's filing an amended complaint); *see also In re Enron Corp.,* 361 B.R. at 49–50 (indicating section 550(f) of the Code can provide a basis to add a party as a subsequent transferee when Rule 15(c) does not). Therefore, the Trustee may add the Spouse Defendants in connection with the Subsequent Transfer Claims.

## III. THE TRUSTEE MAY ADD STEPHANIE MACK AND DEBORAH MADOFF [13] IN CONNECTION WITH THE COMMON LAW CLAIMS OF CONSTRUCTIVE TRUST AND UNJUST ENRICHMENT

[13] As of the date of the Trustee's Motion, the approximately $33 million that has been alleged against Stephanie S. Mack and the $43 million that has been alleged against Deborah Madoff for the Common Law Claims of constructive trust and unjust enrichment were all still within the six-year statutes of limitations applicable to those claims under New York law. Section 108(a) of the Code permits the Trustee to utilize the New York statutes of limitation applicable to common law causes of action. *See* 11 U.S.C. § 108(a) ("If applicable nonbankruptcy law ... fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action ... before ... the end of such period"); *see also Pereira v.*

*Centel Corp. (In re Argo Commc'ns Corp.),* 134 B.R. 776, 785 (Bankr.S.D.N.Y.1991) ("As the forum State, New York's relevant limitations periods must thus be applied here in determining whether Trustee's common law claims are time-barred."). Accordingly, the Trustee may add these claims irrespective of whether they relate back to the date of the Original Complaint.

The Spouse Defendants argue that these claims should not be added because such an amendment would be futile. In this respect, they emphasize that *in pari delicto* bars the Trustee from asserting the Common Law Claims since the Trustee has not alleged that the Spouse Defendants are insiders of BLMIS. *See In re BLMIS,* 458 B.R. at 124 (concluding that *in pari delicto* may not apply to the Trustee's claims against the Family Defendants because of their status as insiders of BLMIS). The Trustee counters that *in pari delicto* cannot apply here because, if it did, it would effectively permit insiders to escape accountability for corporate **\*633** wrongdoing by simply pawning transfers off to their spouses. Neither side has cited to a case on point—namely, whether *in pari delicto* applies to transfers to a non-insider that were joint and simultaneous with transfers to an insider—and this Court has not found one either. As this issue therefore appears to be one of first impression, it is not clear from the face of the pleadings that the amendment would be futile, such that "it appears to a *certainty* that [Plaintiff] cannot state a claim." *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n,* 377 F.3d 682, 687 (7th Cir.2004) (emphasis added); *see Town of New Windsor v. Tesa Tuck, Inc.,* 919 F.Supp. 662, 678 (S.D.N.Y.1996) ("Although defendants ... appear to have strong defenses to the [plaintiff's] claims, because the [plaintiff's] claims present issues of first impression, this Court cannot conclude that they are futile on their face."). Accordingly, the Trustee may add Stephanie Mack and Deborah Madoff in connection with the Common Law Claims of constructive trust and unjust enrichment.

## IV. THE TRUSTEE MAY ADD AND CLARIFY THE FAMILY TRANSFERS

[14] The Court grants the Trustee leave to add and clarify the Family Transfers because they were part of the same course of conduct as the transfers alleged in the Original Complaint, which provided adequate notice to the Family Defendants of the Family Transfers. Rule 15(c)(1)(B) requires that an amendment asserting "a claim or defense" must arise out of "the conduct, transaction or occurrence set out—or attempted

to be set out—in the original pleading." FED. RULE CIV. PROC. 15(c)(1)(B). Accordingly, new fraudulent transfer claims relate back to existing ones if the former were part of the same "course of conduct." *Adelphia Recovery Trust v. Bank of Am., N.A.,* 624 F.Supp.2d 292, 334 (S.D.N.Y.2009); *see also Hill v. Oria (In re Juliet Homes, LP),* No. 07–36424, 2011 WL 6817928, at *8 (Bankr.S.D.Tex. Dec. 28, 2011) ("[P]referential transfers may be part of a course of conduct when they are alleged to have occurred alongside fraudulent transfers as part of an overarching scheme.").

**[15]**  "The principal inquiry is whether adequate notice of the matters raised in the amended pleading has been given to the opposing party 'by the general fact situation alleged in the original pleading.' "

**[16]**  The "principal inquiry" in this regard is whether "the general fact situation alleged in the original pleading" provides "adequate notice" to the opposing party "of the matters raised in the amended pleading." *Buchwald Capital Advisors LLC v. J.P. Morgan Chase Bank, N.A. (In re Fabrikant & Sons, Inc.),* 447 B.R. 170, 181 (Bankr.S.D.N.Y.2011) (internal quotations and citations omitted). That is, "Rule 15(c) does not set a high bar for relation back, so long as the claims attempted to be asserted in the new complaint share a reasonable measure of common ground with the allegations of the original pleading." *See Silverman v. K.E.R. U. Realty Corp. (In re Allou Distribs., Inc.),* 379 B.R. 5, 27 (Bankr.E.D.N.Y.2007).

In the PSAC, the Trustee sets forth the Family Transfers against the Family Defendants under the same legal theories as the ones set forth in the Original Complaint—where the Family Defendants were also named—including that BLMIS was engaged in a Ponzi scheme and made the Transfers with the actual intent to defraud its creditors. *See* PSAC, Exs. D, F, J, M. In addition, allegations in the Original Complaint of Madoff's Ponzi scheme gave reasonable notice that the Trustee was still uncovering additional transfers and seeking any amounts that may have been transferred as part of that scheme:

**\*634**  BLMIS was operated as if it were the family piggy bank.

Each of the Family Defendants took huge sums of money out of BLMIS to fund personal business ventures and personal expenses such as homes, cars, and boats. The Family Defendants' misappropriations of BLMIS customer funds ranged from the extraordinary (the use of BLMIS customer funds to pay for multi-million dollar vacation homes) to the routine (the use of BLMIS customer funds to pay their monthly credit card charges for restaurants, vacations, and clothing). *At this time,* the Trustee has identified at least $198,743,299 of customer funds received by the Family Defendants.

Complaint against Peter B. Madoff, Mark D. Madoff, Andrew H. Madoff, Shana D. Madoff (Dkt. No. 1), ¶¶ 3–4 (emphasis added); *see also Juliet Homes,* 2011 WL 6817928, at *7. Indeed, no Family Defendant, or anyone else, has objected to the addition of the Family Transfers. As such, the Court grants the Trustee leave to add and clarify them.

### *CONCLUSION*

For the reasons stated above, the Court denies leave to the Trustee to add the Spouse Defendants with respect to the Bankruptcy Claims, but grants leave to add them in connection with the Subsequent Transfer Claims and to add Stephanie Mack and Deborah Madoff in connection with the Common Law Claims of constructive trust and unjust enrichment. In addition, the Court grants leave for the Trustee to add and clarify the Family Transfers. Accordingly the Motion is DENIED in part and GRANTED in part to the extent described herein.

**IT IS SO ORDERED.**

### All Citations

468 B.R. 620, 56 Bankr.Ct.Dec. 85

## Footnotes

1  🚩 *Krupski v. Costa Crociere S. p. A.,* —— U.S. ——, 130 S.Ct. 2485, 177 L.Ed.2d 48 (2010).

2  Scott Skoller, the husband of Madoff's niece, Shana Madoff, was originally named in this Motion. The Trustee, however, has since withdrawn the Motion as against Skoller. *See* Notice of Withdrawal Without Prejudice of Trustee's Motion for Entry of an Order Pursuant to Rules 15 and 20 of the Federal Rules of Civil Procedure as Incorporated by Rules 7015 and 7020 of the Federal Rules of Bankruptcy Procedure Granting Motion for Leave to File a Second Amended Complaint as Against Proposed Defendant Scott Skoller (Dkt. No. 87).

3  Specifically, the Trustee alleges that the Spouse Defendants received the following amounts in avoidable and recoverable transfers from BLMIS or benefits from such transfers: Deborah Madoff ($67,766,382); Susan Elkin ($14,846,708); and Stephanie Mack ($33,269,358). *See* Memorandum of Law in Support of Trustee's Motion for Leave to File a Second Amended Complaint (Dkt. No. 71) [hereinafter "Tr. Mem."].

4  Mark D. Madoff passed away on December 11, 2010. The parties have stipulated that Mark D. Madoff in the above-captioned adversary proceeding is substituted by the Estate of Mark D. Madoff and Andrew H. Madoff, as Executor. *See* Stipulation and Order Substituting Party (Dkt. No. 47).

5  For a detailed background of the mechanics of the Madoff Ponzi scheme and the events preceding the Trustee's complaints, see 🚩 *SIPC v. BLMIS LLC (In re BLMIS),* 424 B.R. 122, 125–32 (Bankr.S.D.N.Y.2010).

6  For a detailed description of the Family Defendants' involvement in BLMIS, see 🚩 *In re Bernard L. Madoff Investment Securities LLC (In re BLMIS),* 458 B.R. 87, 101–03 (Bankr.S.D.N.Y.2011).

7  K.M. refers to one of the two children of Susan and Mark Madoff.

8  Proposed Second Amended Complaint (Dkt. No. 71), Ex. 1 [hereinafter the "PSAC"].

9  N.Y. Debt. & Cred. Law § 270 *et seq.* (McKinney 2001).

10  The Trustee has also alleged subsequent transfers received by Peter Madoff ($312,500), the Estate of Mark Madoff ($625,000), and Andrew Madoff ($625,000), *see* Tr. Rep., p. 14, which are included within the Family Transfers.

11  The Trustee even acknowledges that he "had documents describing the Spouse Defendants' interest in homes purchased with the avoidable and recoverable Transfers identified in the original complaint." Tr. Rep., p. 6; *see also* Complaint Against Stephanie Morgan, Individually, And As Guardian Of A.V.M., Daniel Madoff, K.M., A.V.M., Susan Elkin, As Guardian Of K.M., Mark Madoff, As Guardian Of K.M. And A.V.M. (Adv. Pro. No. 10–05328) (Dkt. No. 1), ¶ 13 ("Susan Elkin is the former wife of Mark Madoff and maintains her residence in Greenwich, Connecticut. Mrs. Elkin is named as a defendant herein in her capacity as the legal guardian of minor defendant K.M."); *id.* at ¶ 9 ("Stephanie Morgan f/k/a Stephanie Madoff (née Mikesell) is currently married to Mark Madoff ... and maintains her residence in New York, New York. Mrs. Morgan is named as a defendant in this Complaint individually, as the recipient or beneficiary of some of the avoidable transfers referenced herein, and in her capacity as the legal guardian of minor defendant A.V.M."); *id.* at ¶¶ 27–29 (alleging deposits of purportedly avoidable transfers were made "into a bank or brokerage account to, or for the benefit of, Mrs. Morgan."); Complaint Against Deborah Madoff, Individually And As Guardian Of A.M. And E.M., E.M., A.M., Andrew Madoff, As Guardian Of A.M. And E.M. (Adv. Pro. No. 10–05332) (Dkt. No. 1), ¶ 9 ("Deborah Madoff (née West) was married to Andrew Madoff, Madoff's son, and maintains her residence in New York, New York. Ms. Madoff and Andrew Madoff filed for divorce on December 11, 2008. Ms. Madoff is

named as a defendant in this Complaint individually, as the recipient or beneficiary of some of the avoidable transfers referenced herein, and in her capacity as the legal guardian of minor defendants A.M. and E.M.").

12    The Trustee suggests that, in determining whether the Trustee's NYDCL claims alleged in the PSAC relate back to the Original Complaint, the Court may also apply New York's relation-back rule. But New York's rule is unavailing because, like Rule 15, it requires that the new party knew or should have known that, but for a mistake as to the identity of the proper parties, the action would have been brought against him as well. *Fisher v. County of Nassau,* No. 10–CIV–0677, 2011 WL 4899920, at *5 (E.D.N.Y. Oct. 13, 2011) (internal quotation and citations omitted). With respect to this requirement, therefore, "New York's relation back law employs the same standard as the federal rule." *Sloane v. Town of Greenburgh,* No. 01–CIV–11551, 2005 WL 1837441, at *3 (S.D.N.Y. July 27, 2005); *see, e.g., Fisher,* 2011 WL 4899920, at *5; *Corcoran v. New York Power Auth.,* 935 F.Supp. 376, 393 n. 24 (S.D.N.Y.1996). In turn, given that the Trustee has not met his burden under Rule 15(c)(1)(C)(ii), he likewise cannot meet his burden under the New York rule.

13    The Trustee may not, however, add Susan Elkin in connection with the Common Law Claims of constructive trust and unjust enrichment because all transfers naming her are alleged to have taken place outside the relevant six year statute of limitation period.

---

End of Document                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

# **EXHIBIT 3**

71 Bankr.Ct.Dec. 28

2021 WL 5774217

United States Bankruptcy Court, D. Delaware.

IN RE: WOODBRIDGE GROUP OF

COMPANIES, LLC, et al., [1] Remaining Debtors.

Michael Goldberg, in his capacity as Liquidating

Trustee of the Woodbridge Liquidation Trust, Plaintiff,

v.

Kenneth Halbert, Defendant.

Case No. 17-12560 (JKS) (Jointly Administered)

|

Adv. Proc. No. 19-51027 (JKS)

|

Signed December 6, 2021

**Reference D.I. Nos. 53, 59, 62, 74, 81**

**MEMORANDUM OPINION**

J. Kate Stickles, United States Bankruptcy Judge

**\*1** Before the Court is a motion to amend a complaint
in an adversary proceeding arising from a Ponzi scheme
bankruptcy. After confirmation of a plan of liquidation,
the liquidating trustee filed a complaint seeking to avoid
prepetition transfers of fictious profits to one of the scheme's
investors. Approximately 20 months later, the liquidating
trustee moved to amend the complaint to recover prepetition
transfers of principal repayments to the same investor. For
the reasons explained below, justice requires the Court grant
leave to amend.

**Background** [2]

**I. The Woodbridge Ponzi Scheme**
Woodbridge Group of Companies, LLC and various affiliates
(collectively, "Woodbridge" or the "Debtors") were operated
by founder, Robert Shapiro, as part of a Ponzi scheme (the
"Woodbridge Ponzi Scheme"). [3] Between 2012 and 2017,
the Woodbridge Ponzi Scheme raised over one billion dollars
from approximately 10,000 investors. [4]

The Woodbridge Ponzi Scheme primarily raised money
through the sale of fraudulent securities, including

purportedly secured notes. [5] Funds raised from the sales
of the notes were supposed to be lent to third parties
for the purchase of real properties that would collateralize
the notes. [6] Instead, the funds were used to pay principal
and interest due on previously issued securities, and
the real properties were purchased by affiliates of Mr.
Shapiro. [7] By late 2017, Mr. Shapiro was under investigation
by the Securities and Exchange Commission and state
regulatory agencies. [8] These investigations interfered with
Woodbridge's ability to attract sufficient new investment, and
the Woodbridge Ponzi Scheme collapsed. [9]

**II. The Woodbridge Bankruptcy**
On December 4, 2017 (the "Initial Petition Date"),
Woodbridge filed voluntary petitions for relief under chapter
11 of the Bankruptcy Code; additional affiliates filed
petitions the following year. [10] On October 26, 2018, the
Court entered the Confirmation Order confirming the *First
Amended Joint Chapter 11 Plan of Liquidation of Woodbridge
Group of Companies, LLC and its Affiliated Debtors* (the
"Plan"). [11] The Confirmation Order contained a finding that
Woodbridge was operated as part of a Ponzi scheme (the
"Ponzi Scheme Finding"). [12] The Plan provided for the
creation of a liquidation trust (the "Trust") on the effective
date (the "Effective Date") to pursue, among other things,
avoidance actions on behalf of trust beneficiaries (the "Trust
Beneficiaries"). [13] The Effective Date occurred on February
15, 2019. [14]

**\*2** The Trust Beneficiaries include prepetition holders of
Woodbridge's fraudulent securities [15] who did not recover the
entirety of their principal investment in Woodbridge before
the Initial Petition Date, in other words, the "net losers" of
the Woodbridge Ponzi Scheme. [16] In contrast, investors who
received more than their principal investment in prepetition
cash transfers, "net winners," are not Trust Beneficiaries. [17]
The payments that net winners received in excess of their
principal investment are referred to as "fictious profits" and
are subject to claw back through avoidance actions.

After the Effective Date, the Liquidating Trustee of the Trust
(the "Trustee") filed 425 adversary complaints against net
winners. [18] In these complaints, the Trustee did not seek to
avoid prepetition principal repayments to net winners, only
fictitious profits. [19] Had the Trustee sought to recover the

principal repayments each net winner had invested, each net winner defendant would have been required to plead the good faith affirmative defense (the "Good Faith Affirmative Defense") of section 548(c) of the Bankruptcy Code and analogous state law, and prove they acted in good faith, in order to retain prepetition repayments of principal. [20] The Trustee presumed each net winner defendant acted in good faith and declined to pursue principal repayments in the net winner adversary proceedings rather than requiring hundreds of misled investors to raise and litigate the Good Faith Affirmative Defense. [21]

### III. The Adversary Proceeding

On December 1, 2019, the Trustee filed one such net winner complaint [22] (the "Original Complaint") against Kenneth Halbert to avoid prepetition payments of profits on prepetition "bridge loans" Mr. Halbert had extended to the Debtors which were repaid in full before the Initial Petition Date. [23] Like the other net winner adversary complaints, the Original Complaint only sought to avoid fictious profits paid to Mr. Halbert in the form of interest on the loans in the amount of $1,678,583.38. [24]

On January 15, 2020, Defendant filed an answer to the Original Complaint. [25] The case was assigned to mediation [26] pursuant to an agreed scheduling order (the "Scheduling Order"). [27] Mediation has been unsuccessful. [28] No discovery or dispositive motion practice has occurred. [29]

### IV. The Motion for Leave to Amend

On July 12, 2021, the Trustee filed *Plaintiff's Motion for Leave to File Amended Complaint* (the "Motion"), [30] which attached the proposed amended complaint (the "Proposed Amended Complaint"). [31] Accompanying the Motion was the *Declaration of Thomas P. Jeremiassen in Support of Plaintiff's Motion for Leave to File Amended Complaint* (the "Jeremiassen Declaration"). [32]

**\*3** The Jeremiassen Declaration included as exhibits various emails between Messrs. Halbert and Shapiro. [33] The Jeremiassen Declaration also included a demand promissory note (the "Promissory Note") between Mr. Halbert, as payee, and Sturmer Pippin Investments, LLC, as maker. Sturmer Pippin Investments, LLC was the owner of the Owlwood

Estate, which was Woodbridge's flagship property. [34] Mr. Shapiro signed the Promissory Note as manager of Sturmer Pippin Investments, LLC, even though Woodbridge purported to make loans to third parties for the purchase of real estate. [35]

Based on Mr. Shapiro's signature on the Promissory Note on behalf of Sturmer Pippin Investments, LLC—suggesting that the Owlwood Estate was owned by an affiliate of Mr. Shapiro rather than a true third party borrower—and customized loan documentation provided to Mr. Halbert, as well as the other exhibits to the Jeremiassen Declaration, the Trustee asserts that Mr. Halbert was aware of the "central lie" [36] of the Woodbridge Ponzi Scheme and likely was not a good faith investor who could successfully raise the Good Faith Affirmative Defense (a "Good Faith Investor"). [37] Accordingly, the Proposed Amended Complaint also seeks to avoid principal repayments (the "New Transfers"), in addition to fictitious profits, in the aggregate amount of $38,424,675.31. [38]

On August 2, 2021, Mr. Halbert filed *Defendant Kenneth Halbert's Opposition to Plaintiff's Motion for Leave to File Amended Complaint* [39] (the "Opposition"), and on August 16, 2021, the Trustee filed a reply (the "Reply"). [40] At the request of the parties, [41] oral argument was held on October 19, 2021. [42] Following oral argument, *Defendant Kenneth Halbert's Ex Parte Motion for Leave to File Post-Oral Argument Summary* was filed [43] along with *Defendant Kenneth Halbert's Post-Oral Argument Summary* (the "Defendant's Summary"). [44] In response, the Trustee filed *Plaintiff's Objection to Defendant Kenneth Halbert's Ex Parte Motion for Leave to File Post-Oral Argument Summary*. [45] On November 9, 2021, the Court entered an order permitting the Defendant to file the Defendant's Summary (the "Summary Order"). [46] On November 16, 2021, the Trustee filed *Plaintiff's Response to Defendant Kenneth Halbert's Post-Oral Argument Summary* (the "Trustee's Summary"). [47]

### Jurisdiction

The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1134(b). This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §

157(b)(2). Venue is proper in this Court pursuant to 28 U.S.C. § 1409(a).

### Standard of Review

Under Rule 15(a)(2) of the Federal Rules of Civil Procedure, made applicable by Bankruptcy Rule 7015,[48] after the time for amendment as a matter of course has expired, "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires."[49]

**\*4** Rule 15 reflects a "liberal pleading philosophy" that generally favors amendment.[50] The Third Circuit has adopted a liberal approach to the amendment of pleadings to ensure that "a particular claim will be decided on the merits rather than on technicalities."[51] Under this approach, a mistake should not necessarily preclude a party from obtaining relief on the merits of a claim.[52] Good-faith lapses in judgment and misunderstandings may be corrected through amendment, as long as the movant acts diligently and reasonably.[53]

Whether to grant leave to amend is within the discretion of the court but should be freely given unless equitable considerations counsel against it.[54] The court may consider a "broad range of equitable factors" in considering whether leave should be granted.[55] This Court weighs five equitable factors considered by the Third Circuit in *Cureton v. N.C.A.A.* to determine whether to grant leave to amend: undue delay, bad faith, substantial or undue prejudice to the opposing party, failure to provide an amended complaint and futility.[56] The parties agree that 🚩*Cureton* provides the controlling standard.[57]

### Discussion

**I. Undue Delay**

"The 'undue delay' factor recognizes that a gap between when amendment becomes possible and when it is actually sought can, in certain circumstances, be grounds to deny leave to amend."[58] Delay alone, however, is insufficient to deny a motion to amend.[59] Because there is no set length of time in which delay becomes undue,[60] "the question of undue delay requires that [the court] focus on the movant's reasons for not amending sooner."[61] Delay may become undue when, for example, a movant had prior opportunities to amend a complaint or a proposed amended complaint repleads facts that could have been pleaded earlier.[62] To demonstrate that delay is not undue, the movant must articulate a "colorable excuse" for the delay.[63]

#### A. The Parties' Arguments Regarding Undue Delay

**\*5** The Trustee offers two explanations for the delay. First, the Trustee asserts that he did not discover that Mr. Halbert knew of Mr. Shapiro's fraud and thus was not entitled to the Good Faith Affirmative Defense until he conducted a targeted review of records in connection with mediation.[64] Although the documents became available to the Trust on the Effective Date, the delay in review, the Trustee explains, was partly due to the large volume of documents in the Trust's possession.[65] Second, the Trustee argues that the agreed Scheduling Order forestalled litigation.[66] Had litigation and the filing of initial disclosures proceeded earlier, the Trustee says he likely would have moved to amend earlier.[67] The Trustee maintains that after discovering this information he moved to amend promptly.[68]

In opposition, the Defendant claims that the Trustee's professionals possessed the documents underlying the claims in the Proposed Amended Complaint since at least February 15, 2018,[69] and consequently should have sought amendment earlier or included the New Transfers in the Original Complaint.[70] The Defendant also argues that the Trustee's delay in amending the Original Complaint is due to a "calculated decision not to include the New Transfers" in the Original Complaint.[71] It would be unfair, the Defendant argues, to allow the Trustee to revisit his decision and amend the Original Complaint to seek principal repayments.[72]

#### B. The Trustee's Delay in Moving to Amend Was Not Undue

The Trustee's first explanation, that the volume of records in his possession accounted for the delay, is persuasive and has been previously recognized as a colorable excuse.[73] The Defendant's argument about the Trustee's prior possession of the documents is thus unavailing. The Defendant's prior

*In re Woodbridge Group of Companies, LLC, Slip Copy (2021)*
71 Bankr.Ct.Dec. 28

possession argument also misses the point of the leave-to-amend analysis: The question is not whether the Trustee could have pleaded the amended allegations in the Original Complaint. Rather, it is whether the Trustee should have moved to amend earlier. The Trustee had no reason to scrutinize every document in his possession earlier than he did because, as the Trustee correctly points out, the Scheduling Order forestalled discovery. Managing one's time in compliance with a scheduling order is not undue delay.

**\*6** The Defendant's statement that the delay resulted from the Trustee's calculated decision to presume good faith is accurate, but such delay is not undue. The Trustee acknowledges that he assumed the good faith of all 675 potential defendants to minimize costs and streamline litigation, rather than litigate the Good Faith Affirmative Defense in each net winner lawsuit. [74] The Trustee's choice to assume good faith, given the volume of net winner defendants, was sensible and appropriate under the facts of this case. Proceeding in this manner reduced costs and facilitated settlements for the benefit of Trust Beneficiaries. The decision also protected net winners, most of whom are victims of the Ponzi scheme, from unnecessary litigation. The Trustee's efficient management of the litigation also promoted judicial economy. Having learned that the Good Faith Affirmative Defense might not apply to the Defendant, the Trustee moved to amend in furtherance of his fiduciary duties. [75]

These facts do not establish undue delay, particularly under the circumstances of a Ponzi scheme bankruptcy, which requires mass net winner litigation to achieve equitable distribution.

## II. Prejudice

To establish prejudice, the non-movant "must show that it was unfairly disadvantaged or deprived of the opportunity to present facts or evidence which it would have offered had the ... amendments been timely." [76] In assessing prejudice, the court considers whether permitting amendment would result in additional cost, discovery, or preparation in defense of new legal theories or facts. [77] The "mere allegation of prejudice" and "the possibility that some additional discovery will be required" are insufficient to show prejudice. [78]

### A. The Parties' Arguments Concerning Prejudice

The Trustee maintains that Mr. Halbert is not prejudiced by the amendment because his legal position has not worsened with the passage of time. Mr. Halbert's defenses to the Proposed Amended Complaint, the Trustee asserts, are the same today as they would have been had the Proposed Amended Complaint been filed on December 1, 2019, in lieu of the Original Complaint. [79] Since that date, no evidence or witnesses have become unavailable. [80] Moreover, since all discovery has been tolled, the Defendant "will have a full and fair opportunity" to defend against the claims in the Proposed Amended Complaint and establish the Good Faith Affirmative Defense. [81]

The Defendant's primary argument for prejudice is that the Proposed Amended Complaint will require a costlier defense owing to the immense increase in potential liability and involve different defenses than the Original Complaint. [82] Mr. Halbert's potential liability increased in the Proposed Amended Complaint by nearly $37 million—an increase more than twenty-two fold. [83] The Defendant also argues that he spent significant legal fees investigating the defense that he released in good faith valid liens on property of Woodbridge in exchange for certain of the interest payments described in the Original Complaint. [84] This defense, the Defendant asserts, would not be applicable against the Proposed Amended Complaint, [85] presumably because the Trustee no longer assumes Mr. Halbert was a Good Faith Investor. [86] Mr. Halbert also argues that "mediation of the $1 million claim, absent discovery on the entire case, would not have been considered" had he known he might be liable to the much greater extent pleaded in the Proposed Amended Complaint. [87]

### B. There Is No Prejudice

**\*7** Although the Proposed Amended Complaint may require a costlier defense than the Original Complaint, this is not prejudice. Prejudice is "damage or detriment to one's legal rights or claims." [88] Mr. Halbert's rights and defenses against the claims raised in the Proposed Amended Complaint, as the Trustee correctly points out, are no worse today than they would have had the Trustee filed the Proposed Amended Complaint in lieu of the Original Complaint. Because Mr. Halbert's rights and defenses against the claims remain fully available, the substantial increase in Mr. Halbert's potential liability is not prejudicial: The Scheduling Order's tolling of litigation has fully preserved Mr. Halbert's ability to conduct

discovery and present facts or evidence to defend against the new allegations. Mr. Halbert is not precluded or prejudiced from defending against the Proposed Amended Complaint on the merits.

The Defendant's prior investigation of his liens does not establish prejudice. The Defendant undertook that investigation voluntarily before the commencement of discovery. At such an early phase in litigation, amendment of the complaint is always a possibility. There is no reason to believe, moreover, that Mr. Halbert's lien investigation is less applicable to the Proposed Amended Complaint than the Original Complaint. Furthermore, that Mr. Halbert would not have considered mediation had he known the Trustee would pursue the claims in the Proposed Amended Complaint "absent discovery on the entire case," is not prejudice. Mr. Halbert is not bound by any legal positions taken in mediation in response to the Original Complaint. Litigation remains fully available to Mr. Halbert.

For these reasons, granting the Motion would not result in substantial or undue prejudice to Mr. Halbert.

## III. Bad Faith

Inquiries into bad faith require the court to consider the plaintiff's motives for not having amended the complaint sooner. [89] In determining whether a motion to amend is brought in bad faith, the court's inquiry is limited to "whether the motion to amend itself is being made in bad faith, not whether the original complaint was filed in bad faith or whether conduct outside the motion to amend amounts to bad faith." [90] Bad faith is found where, for example, a movant callously disregards professional responsibilities in connection with failing to amend promptly. [91]

### A. The Parties' Arguments Regarding Bad Faith

The Trustee denies the Motion was filed in bad faith, arguing that the adversary proceeding has been litigated in the same manner as hundreds of other net winner adversary proceedings, except that "the good faith of Defendant here, unlike the good faith of the defendants in those other matters, is uniquely suspect – a fact the Opposition never denies." [92] The Trustee contends that "treating differently situated defendants differently is not bad faith [and] neither is proceeding with litigation when mediation is not successful." [93]

The Defendant argues that the Motion has been brought in bad faith for three reasons. First, the Defendant asserts that the Motion is based on purported facts that have been in Trustee's possession for years and was only filed after the parties failed to resolve the Original Complaint amicably. [94] Second, the Trustee filed the Motion, the Defendant claims, to "increase the costs of this case and create fear of astronomical claims." [95] Third, the Defendant alleges that it was bad faith for the Trustee to attempt to procure a settlement for the total amount alleged in the Original Complaint by essentially threatening in mediation to amend the Original Complaint to claw back principal repayments. [96]

### B. The Motion Has Not Been Brought in Bad Faith

**\*8** Although delay can constitute bad faith, the Trustee's prior possession of the documents attached to the Jeremiassen Declaration does not establish that he should have moved to amend sooner, as explained above. [97] With respect to the Defendant's second and third arguments, the Court sees no support for these assertions. Attempting to establish bad faith, the Defendant relies on statements purportedly made during mediation, but the disclosure of these statements violates Local Rule 9019-5(d)(i). [98] Based solely on the statements properly before the Court, [99] it appears that the parties participated in mediation and, after failing to reach a settlement, the Trustee moved to amend the Original Complaint. On its face, the Trustee's request does not suggest bad faith.

For these reasons, the Motion was not brought in bad faith.

## IV. Futility

Amendment of a complaint is futile where the proposed amendment would fail to state a claim upon which relief could be granted. [100] "In assessing 'futility,' the ... court applies the same standard of legal sufficiency as applies under Rule 12(b)(6)." [101] Just as it would be dismissed under Rule 12(b)(6), an amendment to a complaint that is barred by a statute of limitations is futile and should not be permitted. [102] The Proposed Amended Complaint seeks to avoid transfers under section 548 of the Bankruptcy Code and analogous state law. Because nearly four years have passed since the Initial Petition Date, certain of the New Transfers in the Proposed Amended Complaint would be barred by statutes of limitations. [103]

An amended claim that may otherwise be barred by the statute of limitations can be considered timely if it relates back to a timely filed complaint. [104] Rule 15(c) "permits a party to file an otherwise untimely claim in an amended pleading where the claim related back to the party's original pleading in the action." [105] Rule 15(c)(1)(B) provides that, "An amendment to a pleading relates back to the date of the original pleading when ... the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading ...."

**\*9** "In essence, application of Rule 15(c) involves a search for a common core of operative facts in the two pleadings." [106] The court considers "whether the opposing party has had fair notice of the general fact situation and legal theory upon which the amending party proceeds." [107] "Rule 15(c) is not merely an 'identity of transaction test,' such as the rules governing joinder of claims or parties[,] ..." despite containing language like Rule 20. [108] Amendments "that significantly alter the nature of a proceeding by injecting new and unanticipated claims are treated far more cautiously." [109]

Rule 15(c)'s purpose is "to balance the interests of the defendant protected by the statute of limitations with the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits." [110] Rule 15(c) should not be read to undermine a statute of limitations, which "could cause defendants' liability to increase geometrically and their defensive strategy to become far more complex long after the statute of limitations had run." [111] "Pleadings are not like magic tricks, where a plaintiff can hide a claim with one hand, only to pull it from her hat with the other." [112] Still, Rule 15(c) is not meant to provide defendants who had notice of their potential liability with a windfall. [113]

Rule 15(c), unlike Rule 15(a), "does not leave the decision whether to grant relation back to the ... court's equitable discretion." [114] While denying relation back under Rule 15(c) is reason to find futility under 🚩 *Cureton*, the equitable considerations of the Rule 15(a) analysis do not relate to the enumerated conditions under Rule 15(c). [115] For example, while undue delay is a reason to deny leave to amend, it is not a reason to deny relation back. [116]

A. The Parties' Arguments About Relation Back and Futility

The Trustee argues that the Proposed Amended Complaint asserts claims that arise out of the same conduct, transaction or occurrence as the Original Complaint and thus relate back. [117] The Trustee makes two primary arguments in support of relation back. First, the Trustee argues that each interest payment and principal repayment are two parts of the same transaction; the Trustee reasons that interest derives from principal and points out that, in this case, certain of the wire transfers in the Original Table included both interest and principal. [118] Second, the Trustee maintains that the Original Complaint sufficiently put the Defendant on notice of the general fact situation and legal theory of the case and that the Defendant would need to be prepared to defend potentially all aspects of his investment in the Woodbridge Ponzi Scheme. [119]

**\*10** The Defendant argues that the New Transfers do not arise from the same conduct, transaction or occurrence as the Original Complaint. In support of this position, the Defendant makes three arguments and attempts to analogize two decisions: a 1999 decision from the Bankruptcy Court for the Northern District of Georgia, 🚩 *Gordon v. Slaughter*, [120] and this Court's 2004 decision of 🚩 *In re MBC Greenhouse, Co.* [121] First, the Defendant argues that the Original Complaint did not put him on notice that he might be liable for the New Transfers because the Original Complaint lacked a reservation of rights or similar language notifying him that he might be liable for "any later-discovered transfers." [122] Second, the Defendant argues that the allegations purporting to establish his lack of good faith are not included in the Original Complaint and thus cannot relate back. [123] Third, the Defendant argues that the Proposed Amended Complaint is so fundamentally different from the Original Complaint that allowing relation back would not align with the spirit of the same conduct, transaction or occurrence limitation of Rule 15(c). [124]

In 🚩 *Gordon*, the Georgia bankruptcy court denied a plaintiff's motion to file a third amended complaint to plead additional fraudulent transfer claims arising from payments on a loan made to the defendant, the chapter 7 debtor's son, which were not discovered for over two years following the filing of the initial complaint. [125] Like 🚩 *Gordon*, the

Defendant argues, this Court should deny relation back because "the New Transfers are based on completely new facts and the New Transfers are never identified in the Complaint." [126]

In 🚩*MBC Greenhouse*, Judge Walsh declined to find relation back where an amended complaint sought to plead additional preferences, finding that the new claims were "a whole new set of specific transactions" and noting that there was "no claim that these payments are systematic or part of a 'scheme' ...." [127] In 🚩*MBC Greenhouse*, the Defendant points out, Judge Walsh analogized the 🚩*Gordon* decision. [128]

Regarding 🚩*Gordon*, the Trustee replies that "the sole commonality between the transaction proposed to be added by the amended complaint and the transactions in the original complaint was merely that 'they all occurred during the year before the petition was filed.'" [129] And with regard to 🚩*MBC Greenhouse*, the Trustee highlights that "there was no commonality between the proposed additional transfers and the existing transfers '[a]side from their characterization as preferential transfers and similar payees.'" [130] These cases have, the Trustee asserts, "no import here, where the [P]roposed Amended Complaint merely expands the same challenges made in the Original Complaint to encompass both profits and principal repayment, rather than profits alone." [131]

B. Amendment Would Not Be Futile Because the Amended Claims Relate Back

🚩*Gordon* and 🚩*MBC Greenhouse* are inapposite. As the Trustee correctly notes, the amended claims in 🚩*Gordon* and 🚩*MBC Greenhouse* did not arise from the same investments or conduct as the initial claims. In those cases, the only commonalities between the initial and amended claims were the identities of the parties and the claims were close in time. Indeed, in 🚩*MBC Greenhouse*, Judge Walsh noted that there was no allegation that the amended claims and original claims "are systematic or part of a 'scheme' ...." [132] Those cases are markedly different from the instant case where both the initial and amended claims arise from the Defendant's investment in the Woodbridge Ponzi Scheme.

**\*11** As to the Defendant's first argument, upon entry of the Confirmation Order containing the Ponzi Scheme Finding, investors in Woodbridge were on notice that any prepetition payments received from Woodbridge could have been made with fraudulent intent. In addition, the Debtors' prepetition payments to Mr. Halbert on account of his investment in Woodbridge form the factual basis for both the Original Complaint and the Proposed Amended Complaint. Even though the Trustee chose only to pursue fictitious profits in the Original Complaint, because of his investment relationship and the Ponzi Scheme Finding, Mr. Halbert remained on notice that any prepetition transfers, including receipt of principal, might also be subject to claw back. Accordingly, the Defendant had sufficient notice for relation back.

Although the Trustee's assertion that all the principal and interest payments arise from precisely the same loans is a question of fact that may be disputed, [133] at this stage of the case the Court must take the Trustee's allegations as true for the purpose of the futility analysis under 🚩*Cureton* because the Trustee would be the nonmovant if the Defendant moved to dismiss the amended claims. Principal repayments and interest payments on the same loans can be part of the same conduct, transaction or occurrence. Here, however, the receipt of payments is characterized very differently in the Original Complaint and the Proposed Amended Complaint. As acknowledged by the Trustee, Mr. Halbert's "apparent lack of good faith *fundamentally changes* the calculus of this Adversary Proceeding ...'" [134] As a result of this fundamental change, Mr. Halbert's potential liability increased by nearly $37 million in the Proposed Amended Complaint. The fundamental change in the nature of the proceeding and magnitude of Mr. Halbert's potential amended liability gives pause. [135]

However, the uncontroverted exhibits to the Jeremiassen Declaration, [136] particularly Mr. Shapiro's signature on the Promissory Note, are a sufficient showing for purpose of Rule 15(c) that Mr. Halbert should have known of the fraud and thus had notice that the Original Complaint might be revised to claw back principal repayments. The Jeremiassen Declaration establishes that principal and interest payments arose from the same conduct, transaction or occurrence as that of the Original Complaint, namely Mr. Halbert's investment in the Woodbridge Ponzi Scheme. [137] The Court does not have discretion in applying Rule 15(c): The uncontroverted Jeremiassen Declaration, which was attached to both the

Trustee's and the Defendant's pleadings, requires the Court to find, solely for purposes of this Motion, that the otherwise time-barred transfers identified in the Proposed Amended Complaint relate back to the transfers in the Original Complaint.

For these reasons, granting the Motion would not be futile.

**Conclusion**

For the reasons explained above, leave to amend will be granted.

**All Citations**

Slip Copy, 2021 WL 5774217, 71 Bankr.Ct.Dec. 28

## Footnotes

1    The Remaining Debtors and the last four digits of their respective federal tax identification numbers are as follows: Woodbridge Group of Companies, LLC (3603) and Woodbridge Mortgage Investment Fund 1, LLC (0172). The Remaining Debtors' mailing address is 14140 Ventura Boulevard #302, Sherman Oaks, California 91423.

2    References to the docket in this adversary proceeding, *Goldberg v. Halbert*, Adv. Proc. No. 19-51027 (JKS), are cited as "Adv. D.I." References to the docket in the bankruptcy case, *In re Woodbridge Group of Companies, LLC, et al.*, Case No. 17-12560 (JKS), are cited as "D.I."

3    *Findings of Fact, Conclusions of Law, and Order Confirming the First Amended Joint Chapter 11 Plan of Liquidation of Woodbridge Group of Companies, LLC and Its Affiliated Debtors*, D.I. 2903 (the "Confirmation Order") ¶ NN. *See also Opinion on Confirmation* 2–3, D.I. 2901 (the "Confirmation Opinion").

4    *Liquidation Trust's Status Report for May 19, 2021 Status Conference*, Adv. D.I. 46 (the "May 5th Status Report") ¶ 1.

5    May 5th Status Report ¶ 3.

6    *Id.*

7    *Id.* ¶¶ 4–5.

8    *Id.* ¶ 6.

9    *Id.*

10    Original Compl. ¶ 7, Adv. D.I. 1. Additional affiliates filed petitions on February 9, 2018, March 9, 2018, March 23, 2018, and March 27, 2018. Confirmation Opinion 2. The Original Complaint calculates relevant dates using the Initial Petition Date. *See* Original Compl. ¶ 16.

11    D.I. 2903 Ex. 1.

12    The Confirmation Order contained the following finding, establishing that Woodbridge was operated as part of a Ponzi Scheme:

The evidence demonstrates, and the Bankruptcy Court hereby finds, that (i) beginning no later than July 2012 through December 1, 2017, Robert H. Shapiro used his web of more than 275 limited liability companies, including the Debtors, to conduct a massive Ponzi scheme raising more than $1.22 billion from

over 8,400 unsuspecting investors nationwide; (ii) the Ponzi scheme involved the payment of purported returns to existing investors from funds contributed by new investors; and (iii) the Ponzi scheme was discovered no later than December 2017.

Confirmation Order ¶ NN. *See also* Confirmation Opinion 2–3.

13   Plan § 5.4.4. The Plan refers to beneficiaries of the Liquidation Trust as "Liquidation Trust Beneficiaries." Plan § 1.79.

14   D.I. 3421.

15   May 5th Status Report ¶ 13; Plan §§ 3.4–6.

16   May 5th Status Report ¶ 15.

17   The Plan provides that holders of Woodbridge's fraudulent securities would receive interests in the Trust in the amount of their net claims. Plan §§ 3.4–5. Net claims were determined by subtracting any prepetition distributions holders received from their principal investments in Woodbridge. Plan §§ 1.89–90; *see also* Confirmation Opinion.

18   Reply ¶ 16; Tr. 13:20. The Trustee pursued approximately 675 potential defendants but resolved 250 claims without initiating litigation. Tr. 13:14–16.

19   Tr. 11:6–20.

20   *Id.* 10:20–25, 11:1–20.

21   Reply 3.

22   Original Compl. ¶ 5.

23   *Id.* ¶ 5.

24   *Id.* ¶¶ 1–2 (Prayer for Relief).

25   Adv. D.I. 4.

26   Adv. D.I. 27.

27   Adv. D.I. 23.

28   A Mediator's Certificate of Completion has not yet been filed.

29   Under the Scheduling Order, all formal discovery between the parties, including, but not limited to the service of initial disclosures under Fed. R. Civ. P. 26(a)(1), is tolled until after the filing of the Mediator's Certificate of Completion pursuant to Local Rule 9091–5(f)(ii). Scheduling Order ¶ 5.

30   Adv. D.I. 53.

31   Mot. Ex. 1.

32   *Id.*

33   Jeremiassen Decl. ¶¶ 8–12.

34    *Id.* ¶ 16.

35    *Id.*

36    Proposed Amended Compl. ¶¶ 19–20.

37    Tr. 15:1–8. To be clear, the Trustee's allegation in the Motion that Mr. Halbert lacked good faith does not preclude Mr. Halbert from raising the Good Faith Affirmative Defense. The Trustee's allegation means that, if leave to amend is granted, Mr. Halbert's good faith must be litigated, whereas it was assumed under the Original Complaint.

38    Proposed Amended Compl. ¶¶ 47–50.

39    Adv. D.I. 59.

40    Adv. D.I. 62.

41    Adv. D.I. 63–64.

42    The oral argument transcript (the "Transcript") is Adv. D.I. 76.

43    Adv. D.I. 75.

44    Adv. D.I. 74.

45    Adv. D.I. 77.

46    Adv. D.I. 79.

47    Adv. D.I. 81.

48    Fed. R. Bankr. P. 7015.

49    Fed. R. Civ. P. 15(a)(2).

50    *Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d 267, 273 (3d Cir. 2001); *see also* *Arthur v. Maersk, Inc.*, 434 F.3d 196, 206 (3d Cir. 2006) ("The liberality of Rule 15(a) counsels in favor of amendment even when a party has been less than perfect in the preparation and presentation of a case.") (citing *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989) ("We have noted that the courts 'have shown strong liberality ... in allowing amendments under Rule 15(a).' ") (quoting *Heyl & Patterson Int'l, Inc. v. F.D. Rich Housing*, 663 F.2d 419, 425 (3d Cir. 1981)); *Dole v. Arco Chemical Co.*, 921 F.2d 484, 486 (3d Cir. 1990) (observing that Rule 15(a) "embodies a liberal approach to amendment ....").

51    *Dole*, 921 F.2d at 487 (internal citations omitted).

52    *See* *Arthur*, 434 F.3d at 202 (citing *Foman*, 371 U.S. at 182, 83 S.Ct. 227) (noting that, together, Rules 15(a) and 15(c) "ensure that an inadvertent error in pleading will not preclude a party from securing relief on the merits of a claim.").

53    *Id.* at 206 (citing *Adams v. Gould, Inc.*, 739 F.2d 858, 868–69 (3d Cir. 1984); 6A Charles Alan Wright et al., Federal Practice and Procedure § 1488 (2d ed. 1990)).

54    *Foman*, 371 U.S. at 182–83, 83 S.Ct. 227.

55    *Arthur*, 434 F.3d at 203 (internal citations omitted).

56    *Cureton*, 252 F.3d at 273; *see, e.g.*, *MagSil Corp. v. Seagate Tech.*, No. CIV. A. 08-940, 2010 WL 2710472, at *2, 2010 U.S. Dist. LEXIS 67547 (D. Del. Jul. 7, 2010) (applying *Cureton* and denying leave to amend); *Mylan Pharms., Inc. v. Kremers Urban Dev. Co.*, No. 02-1628 GMS, 2003 WL 22711586, at *2, 5, 2003 U.S. Dist. LEXIS 20665 (D. Del. Nov. 14, 2003) (citing *Foman* and *Cureton* for four-factor test (exclusive of failure to attach proposed amended complaint) for Rule 15(a) analysis).

57    Trustee's Summary ¶ 1 ("Both parties agree that Cureton governs ...."); *see also* Defendant's Summary ¶ 9; Tr. 7:1–21, 19:2–6, 26:1–16, 40:11–19.

58    *Mullin v. Balicki*, 875 F.3d 140, 151 (3d Cir. 2017).

59    *Cureton*, 252 F.3d at 273 (citing *Cornell & Co., Inc. v. Occupational Safety & Health Review Comm'n.*, 573 F.2d 820, 823 (3d Cir.1978)).

60    *Mullin*, 875 F.3d at 151 (citing *Maersk*, 434 F.3d at 205).

61    *Cureton*, 252 F.3d at 273 (citing *Adams*, 739 F.2d at 868).

62    *Id.*; *see also* *Jang v. Bos. Sci. Scimed, Inc.*, 729 F.3d 357, 368 (3d Cir. 2013) ("Delay may become undue 'when a movant has had previous opportunities to amend a complaint' but instead 'delays making a motion to amend until after [judgment] has been granted to the adverse party,' and when 'allowing an amendment would result in additional discovery, cost, and preparation to defend against new facts or new theories.' ") (citing *Cureton*, 252 F.3d at 273).

63    *See* *Arthur*, 434 F.3d at 205 & n.11 (3d Cir. 2006) (citing *Adams*, 739 F.2d at 867–68).

64    It is not clear, based on the Trustee's statements, exactly when, relative to the first session of mediation, he reviewed the documents that were attached to the Jeremiassen Declaration, and specifically whether he discovered them before or after mediation. *Compare* Mot. ¶ 3 ("*During the course of litigating* this Adversary Proceeding, the Trustee *has recently learned* that, unlike the typical Woodbridge investor, Halbert had a close personal and business relationship with Shapiro.") (emphasis added), *and* Mot. ¶ 15 ("The Trustee *has recently uncovered* emails in which Shapiro refers to Halbert as his 'good friend,' and in which Shapiro offers his vacation home, rent-free, to Halbert's son.") (emphasis added), *with* Reply ¶ 19 ("*During the course of the mediation process*, it is not uncommon for parties to undertake further investigation of materials in their possession. *The Trustee did so*, and ultimately discerned based on the records in his possession that there are serious questions as to Halbert's good faith.") (emphasis added), *and* Tr. 22:9–16 ("And *as part of that process of preparing*, getting ready, and deciding how to proceed *with respect to mediation*, *that is when the trustee became aware* ....") (emphasis added). Even if the newly discovered facts were brought up for the first time in mediation before the Trustee moved to amend, this would not constitute undue delay or bad faith.

65    Tr. 24:4–13.

66    Reply ¶ 5. The other argument advanced in this paragraph, that, "Halbert is no worse off as a result of the Trustee's challenge to principal repayments having been made 19 months after the Original Complaint than Halbert would have been had that same challenge been made in the Original Complaint itself" goes to prejudice rather than undue delay. *Id.*

67    *Id.* ¶ 10.

68    Mot. ¶ 23.

69    Opp'n ¶ 19.

70    *See id.* ¶ 20.

71    Opp'n ¶ 19.

72    Tr. 52:24–25; 53:1–8; *see also* Defendant's Summary ¶ 13 ("This simply is just Plaintiff saying it did not want to review its documents at that time.").

73    *See* 🚩 *Le v. City of Wilmington*, CIV NO. 08-615-LPS, 2010 WL 2754253, at *3, 2010 U.S. Dist. LEXIS 69038 (D. Del. Jul. 12, 2010) ("Defendants have articulated a colorable excuse for the delay, as the ten to twelve screen shots that provide the basis for the proposed amendment were difficult to locate amidst Defendants' electronic document production of more than 55,000 pages.").

74    Mot. ¶ 19 ("[T]he Trustee made the sensible and appropriate initial choice to assume that all of the net winners were acting in good faith and should not be subjected to an initial complaint seeking recovery of both interest and principal when in all likelihood they had an iron-clad affirmative defense that would shield the repayment of invested principal."); Tr. 13:5–9 ("So that is really an appropriate way of proceeding, the decision not to assume that everybody acted in bad faith, but instead to proceed on the assumption and to seek recovery of the fictitious profits only.").

75    *See* Tr. 11:18.

76    🚩 *Bechtel*, 886 F.2d at 652 (quoting 🚩 *Heyl & Patterson Int'l*, 663 F.2d at 426) (internal quotations omitted).

77    🚩 *Cureton*, 252 F.3d at 273.

78    *Dasso Int'l, Inc., v. MOSO N. Am., Inc.*, C.A. No. 17-1574-RGA, 2020 WL 6287673, at *4, 2020 U.S. Dist. LEXIS 199505, (D. Del. Oct. 27, 2020) (citing 🚩 *Dole*, 921 F.2d at 488).

79    *See supra* note 64.

80    Tr. 28:7–8; *see also* Reply ¶ 14.

81    Mot. ¶¶ 7, 22.

82    Opp'n ¶¶ 23, 24.

83    *Id.* ¶ 23.

84   Tr. 44:15–25; Defendant's Summary ¶ 14 ("This endeavor cost Halbert substantial amounts of time and over $30,000 in legal fees.").

85   Tr. 44:24–25.

86   This argument was raised for the first time at oral argument. Tr. 54:6–13. The Defendant's Summary also discusses the previous lien research but does not explain how it is no longer applicable against the allegations in the Proposed Amended Complaint. Defendant's Summary ¶ 14.

87   Defendant's Summary ¶ 15.

88   *Prejudice*, *Black's Law Dictionary* (11th ed. 2019).

89   🚩 *Adams*, 739 F.2d at 868.

90   *Trueposition, Inc. v. Allen Telecom, Inc.*, C.A. No. 01-823 GMS, 2002 WL 1558531, at *2, 2002 U.S. Dist. LEXIS 12848, (D. Del. Jul. 16, 2002) (citing *J.E. Mamiye & Sons, Inc v. Fidelity Bank*, 813 F.2d 610, 614 (3d Cir. 1987)).

91   *See Sweeney v. St. Joseph's Hosp.*, 769 F. Supp. 747, 750 (M.D. Pa. 1991) (citing 🚩 *Nat'l Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976)), *aff'd*, 980 F.2d 724 (3d Cir. 1992).

92   Reply ¶ 6.

93   *Id.* (cleaned up).

94   Opp'n ¶ 27; Defendant's Summary ¶ 17.

95   Opp'n ¶ 27.

96   Tr. 45:4–25; 46:1–17.

97   *See supra* pp. 11–12.

98   Del. Bankr. L.R. 9019-5(d); *see also* Summary Order ¶ 4.

99   The statements of defense counsel at oral argument and in the Defendant's Summary divulging information from mediation have been deemed stricken. Summary Order ¶ 4.

100   🚩 *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1435 (citing 🚩 *Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996)).

101   🚩 *Id.*; *see also* 🚩 *Garvin v. City of Philadelphia*, 354 F.3d 215, 222 (3d Cir. 2003) ("[A]ny amendment of her complaint would have been futile because the amended complaint could not have withstood a motion to dismiss on the basis of the statute of limitations.").

102   🚩 *Garvin*, 354 F.3d at 222 ("Thus, if, as we shall conclude, the district court correctly held that the complaint would not relate back it surely did not abuse its discretion in denying the motion to amend."). *But see* 🚩 *Mullin*, 875 F.3d at 158 ("While courts are permitted to combine the question of whether amendment should be granted with the issue of whether the proposed amendment relates back, the two inquiries are analytically distinct; relation back is a test of the legal viability of the proposed amendment, and not a discretionary factor

weighing in favor of or against amendment.") (internal citations omitted). This Court first analyzes whether leave to amend would be appropriate under *Cureton*'s discretionary factors and then proceeds to the non-discretionary relation-back analysis, bearing in mind the following: While a negative finding on relation back would require the Court to deny leave to amend (solely with regard to the time barred claims), the converse is not necessarily true. *See* *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 553, 130 S.Ct. 2485, 177 L.Ed.2d 48 (2010) ("The mandatory nature of the inquiry for relation back under Rule 15(c) is particularly striking in contrast to the inquiry under Rule 15(a), which sets forth the circumstances in which a party may amend its pleading before trial.").

103    *See* Opp'n ¶¶ 28–37.

104    *Krupski*, 560 U.S. at 541, 130 S.Ct. 2485.

105    *Damiani v. Duffy*, Civ No. 12-1637-RGA, 2014 WL 5795683, at *5, 2014 U.S. Dist. LEXIS 156978 (D. Del. Nov. 5, 2014) (citing *Krupski*, 560 U.S. at 540, 130 S.Ct. 2485).

106    *Bensel v. Allied Pilots Ass'n*, 387 F.3d 298, 310 (3d Cir. 2004).

107    *T Mobile Ne. LLC v. City of Wilmington*, 913 F.3d 311, 328 (3d Cir. 2019) (quoting *Bensel*, 387 F.3d at 310).

108    *Glover v. FDIC*, 698 F.3d 139, 145 (3d Cir. 2012) (citing 6A Charles Alan Wright, et al., Federal Practice & Procedure § 1497 (2d ed. 1990 and Supp. 2010)).

109    *Id.* at 146 (quoting *United States v. Hicks*, 283 F.3d 380, 388 (D.C. Cir. 2002)) (internal citations omitted); *see also* *T Mobile*, 913 F.3d at 328 (cautioning that when "[a]mendments ... go beyond the mere correction or factual modification of the original pleading and significantly alter the claim or defense alleged in that pleading," courts should hesitate before granting leave to amend and carefully determine whether amendment is appropriate) (internal quotations omitted).

110    *T Mobile*, 913 F.3d at 328 (quoting *Krupski*, 560 U.S. at 550, 130 S.Ct. 2485) (internal quotations omitted).

111    *Glover*, 698 F.3d at 148 (internal quotations omitted).

112    *Id.*

113    *See* *Krupski*, 560 U.S. at 550, 130 S.Ct. 2485.

114    *Id.* at 553.

115    *See supra* note 102.

116    *See* *Krupski*, 560 U.S. at 553, 130 S.Ct. 2485 (observing that "the speed with which a plaintiff moves to amend her complaint or files an amended complaint after obtaining leave to do so has no bearing on whether the amended complaint relates back.") (internal citations omitted); *see also* *Arthur*, 434 F.3d at 203 (internal citations omitted) (noting that "The relation back inquiry is more circumscribed[,] ..." than the leave-to-amend inquiry.).

117    Mot. ¶ 26.

118    Reply ¶ 26.

119    Mot. ¶ 26.

120    🏳 *Gordon v. Slaughter (In re Slaughter Co. & Assocs.)*, 242 B.R. 97 (Bankr. N.D. Ga. 1999).

121    🏳 *Peltz v. CTC Direct, Inc. (In re MBC Greenhouse, Co.)*, 307 B.R. 787 (Bankr. D. Del. 2004).

122    Opp'n ¶ 35.

123    *Id.* ¶ 37.

124    Tr. 51:9–21.

125    🏳 242 B.R. at 99, 102–03.

126    Opp'n ¶ 34.

127    🏳 307 B.R. at 792.

128    Opp'n ¶ 33 (citing 🏳 *MBC Greenhouse*, 307 B.R. at 790–93).

129    Reply ¶ 23 (citing 🏳 *Gordon*, 242 B.R. at 102).

130    Reply ¶ 23 (first citing 🏳 *Gordon*, 242 B.R. at 102; and then citing 🏳 *MBC Greenhouse*, 307 B.R. at 793).

131    Reply ¶ 24.

132    🏳 *MBC Greenhouse, Co.*, 307 B.R. at 792.

133    Tr. 39:10–25; 40:1–9.

134    Mot. ¶ 6 (emphasis added).

135    *See supra* note 109.

136    Mr. Halbert attached the Jeremiassen Declaration and cites it for multiple propositions in his Opposition. Opp'n 2, ¶¶ 2, 19. Mr. Halbert did not contest the accuracy of the Jeremiassen Declaration or offer any competing evidence.

137    *See, e.g.*, 🏳 *In re Bernard L. Madoff Inv. Sec. LLC*, 468 B.R. 620, 633 (Bankr. S.D.N.Y. 2012) (granting leave to amend and finding relation back for additional transfers, reasoning that the additional transfers being made as part of the same Ponzi scheme was sufficient common factual ground to provide the defendant with notice); 🏳 *Adelphia Recovery Trust v. Bank of America, N.A.*, 624 F. Supp. 2d 292, 297, 334 (S.D.N.Y. 2009) (finding relation back for additional transfers on the basis that they were part of the same scheme of financial fraud as the original complaint.).

In re Woodbridge Group of Companies, LLC, Slip Copy (2021)

71 Bankr.Ct.Dec. 28

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# <u>EXHIBIT 4</u>

In re Circle Y of Yoakum, Texas, 354 B.R. 349 (2006)
47 Bankr.Ct.Dec. 117

🚩 KeyCite Yellow Flag - Negative Treatment

Declined to Follow by   In re Rocky Mountain Recreational Communities, LLC,   Bankr.D.Mont.,   October 23, 2012

354 B.R. 349
United States Bankruptcy Court, D. Delaware.

In re CIRCLE Y OF YOAKUM, TEXAS, Debtor.
Jeoffrey L. Burtch, Chapter 7 Trustee, Plaintiff,
v.
Stephen G. Dent, Defendant.
Jeoffrey L. Burtch, Chapter 7 Trustee, Plaintiff,
v.
Dent and Company, Inc., Defendant.

Bankruptcy No. 03–12465 (MFW).
|
Adversary Nos. A–05–52254
(MFW), A–05–52253 (MFW).
|
Nov. 21, 2006.

**Synopsis**

**Background:** Chapter 7 trustee brought adversary proceedings against debtor's sole director and against company of which sole director was president, seeking to recover alleged fraudulent and preferential transfers. Defendants moved for partial dismissal of complaints against them and for extension of time to file answer, and trustee moved for consolidation of proceedings and leave to file second amended complaint.

**Holdings:** The Bankruptcy Court, Mary F. Walrath, J., held that:

[1] under applicable version of Bankruptcy Code, trustee could not seek to avoid alleged fraudulent and preferential transfers made more than one year prior to petition date;

[2] trustee failed to plead fraud aspects of fraudulent transfer claims with requisite particularity;

[3] new claims asserted in amended complaint against director did not relate back to date of original complaint;

[4] new claims against company related back to date of original complaint;

[5] rule governing amendment of pleadings permitted trustee to supplement facts alleged in original and amended complaints and assert new claims relating to breach of fiduciary duty; and

[6] consolidation of adversary proceedings was warranted.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss for Failure to State a Claim.

West Headnotes (25)

[1]   **Bankruptcy**   Retrospective operation

Version of Bankruptcy Code in effect prior to amendments made by Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) governed timeliness of Chapter 7 trustee's claims to avoid alleged preferential and fraudulent transfers that occurred prior to BAPCPA's effective date. 11 U.S.C.A. §§ 547, 548.

1 Case that cites this headnote

[2]   **Bankruptcy**   Time of Transfer
**Bankruptcy**   Time of making transfer

Under version of Bankruptcy Code in effect prior to effective date of Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA), Chapter 7 trustee could not seek to avoid alleged fraudulent and preferential transfers that were made to debtor's sole director and company of which sole director was president more than one year prior to debtor's petition date. 11 U.S.C.A. §§ 547(b), 548(a)(1).

[3]   **Bankruptcy**   Recovery of preferences or fraudulent conveyances

As proceeding to determine, avoid, or recover fraudulent conveyance, Chapter 7 trustee's claim to avoid transfer to debtor's sole director pursuant to trustee's strong-arm powers under Bankruptcy

Code and Delaware law was "core matter," even though it relied upon state law, and therefore bankruptcy court retained jurisdiction over claim following its dismissal of other avoidance claims asserted under Code. 11 U.S.C.A. § 544; 28 U.S.C.A. §§ 157(b)(2)(H), 157(b)(3).

3 Cases that cite this headnote

[4]    **Bankruptcy** 🖑 Recovery of preferences or fraudulent conveyances

An avoidance action relying on trustee's strong-arm powers is a "core proceeding," even though it relies on state law, and avoidance claim is a "core matter" as a proceeding to determine, avoid, or recover fraudulent conveyances. 11 U.S.C.A. § 544; 28 U.S.C.A. § 157(b)(2)(H).

3 Cases that cite this headnote

[5]    **Bankruptcy** 🖑 Pleading
**Bankruptcy** 🖑 Judgment or order; relief

Even under liberal pleading standard applied in bankruptcy cases, amended complaints in which Chapter 7 trustee recited general, conclusory allegations that almost completely parroted statutory language did not plead fraud aspects of fraudulent transfer claims with requisite particularity, warranting dismissal with leave to amend allowing trustee to amend complaints to add specific facts regarding alleged fraudulent activity. 11 U.S.C.A. §§ 544, 548; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

12 Cases that cite this headnote

[6]    **Bankruptcy** 🖑 Pleading

To plead fraud as part of fraudulent transfer claim, trustee cannot merely recite statutory elements. 11 U.S.C.A. §§ 544, 548; Fed.Rules Civ.Proc.Rule 9(b), 28 U.S.C.A.

6 Cases that cite this headnote

[7]    **Limitation of Actions** 🖑 Amendment of Pleadings

Central consideration of rule providing for relation back of amended pleadings, for limitations purposes, is whether there is a nexus between the factual allegations in the original pleading and those in the amended complaint. Fed.Rules Civ.Proc.Rule 15(c)(2), 28 U.S.C.A.

3 Cases that cite this headnote

[8]    **Bankruptcy** 🖑 Time limitations; computation

Language in Chapter 7 trustee's complaints seeking to avoid allegedly preferential and fraudulent transfers, indicating that trustee reserved right to amend complaints to include additional transfers and to have amendments relate back to date of original complaint for limitations purposes, did not, standing alone, satisfy notice requirements for relation back of amended complaints to date of original complaints, which required trustee to establish existence of factual nexus between conduct or transactions alleged in amendments and those alleged in original pleadings. 11 U.S.C.A. §§ 544, 546(a), 548; Fed.Rules Civ.Proc.Rule 15(c), 28 U.S.C.A.

6 Cases that cite this headnote

[9]    **Bankruptcy** 🖑 Time limitations; computation

Prepetition payments made by Chapter 7 debtor to its sole director were not part of single schematic pattern of payments, and therefore new claims to avoid payments as fraudulent or preferential transfers that trustee raised in amended complaint did not relate back to date of original complaint and were time-barred, given that six payments listed in original complaint were not made on any regular basis and, except for two payments, were in different amounts, that four of added payments were not equal in amount or paid at regular intervals, and that remaining eight additional payments, though possibly establishing pattern, were not linked to dissimilar, unequal, and varied payments listed in

original complaint. 11 U.S.C.A. §§ 544, 546(a), 548; Fed.Rules Civ.Proc.Rule 15(c), 28 U.S.C.A.

1 Case that cites this headnote

[10] **Bankruptcy** 🗝 Time limitations; computation

Prepetition transfers by Chapter 7 debtor to related company underlying new avoidance claims asserted by trustee in amended complaint were schematic in nature, and thus related back to date of original complaint and were timely filed, given that, of 13 payments listed in original complaint and 20 additional payments raised in amended complaint, most were made on monthly basis in amount of either $20,000 or $40,000. 11 U.S.C.A. §§ 544, 546(a), 548; Fed.Rules Civ.Proc.Rule 15(c), 28 U.S.C.A.

2 Cases that cite this headnote

[11] **Bankruptcy** 🗝 Pleading; dismissal

It is within court's discretionary powers to grant or deny a motion for leave to amend. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

[12] **Bankruptcy** 🗝 Pleading; dismissal

Among the grounds that could justify a denial of leave to amend pleading are undue delay, bad faith, dilatory motive, prejudice, and futility. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.

[13] **Bankruptcy** 🗝 Limitations and time to sue; computation

Bankruptcy court must apply forum state's choice of law rules to determine which state's statute of limitations applies to claim.

8 Cases that cite this headnote

[14] **Corporations and Business Organizations** 🗝 Internal affairs doctrine in general

Delaware's choice of law rules require application of the law of the state of

incorporation to issues involving corporate internal affairs.

7 Cases that cite this headnote

[15] **Bankruptcy** 🗝 Limitations and time to sue; computation

Under Delaware's choice of law rules, which required application of laws of state of incorporation to issues involving corporate internal affairs, Texas law governed limitations period for Chapter 7 trustee's proposed claim that debtor's sole director breached his fiduciary duties to debtor, which was Texas corporation with mailing address in Texas, despite trustee's contention that Delaware law applied.

6 Cases that cite this headnote

[16] **Bankruptcy** 🗝 Limitations and time to sue; computation

At the latest, under Texas law, which provided four-year statute of limitations for claims for breach of fiduciary duty, statute of limitations on Chapter 7 trustee's proposed claim against debtor's sole director for breach of fiduciary duty would expire four years after trustee's appointment in debtor's case, given that allegations of fraud were subsumed in claim and that, prior to debtor's bankruptcy filing, there was no party with standing to file derivative or other lawsuit for breach of fiduciary duty, since director was debtor's only director and was also president of holding company that was debtor's sole shareholder. V.T.C.A., Civil Practice & Remedies Code § 16.051.

1 Case that cites this headnote

[17] **Limitation of Actions** 🗝 Discovery of Fraud

Under Texas law, fraud prevents the running of the statute of limitations until it is discovered, or, by the exercise of reasonable diligence, should have been discovered.

[18] **Bankruptcy** 🗝 Pleading; dismissal

Defendants' added expense of briefing second motion to dismiss did not justify denial of Chapter 7 trustee's motion to amend complaint to add new claims and allegations on grounds of undue delay. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.


**[19]**    **Bankruptcy** 🔑 Pleading; dismissal

Lapse of time did not establish prejudice warranting denial of Chapter 7 trustee's motion to amend complaint to assert new claims against debtor's sole director for alleged breach of fiduciary duty and against company for which director was president for alleged aiding and abetting breach of fiduciary duty, notwithstanding contention that memories had faded and witnesses might not be available, given failure of director and company to identify specific witnesses or evidence that had become unavailable due to any delay. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.


**[20]**    **Bankruptcy** 🔑 Pleading; dismissal

Additional preparation that would be required by debtor's sole director and company for which director was president if Chapter 7 trustee was allowed to amend complaint against them to assert new claims alleging breach of fiduciary duty and aiding and abetting breach of fiduciary duty did not establish prejudice warranting denial of motion to amend, given that director and company had not issued fact discovery and that discovery period remained open. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.


**[21]**    **Bankruptcy** 🔑 Pleading; dismissal

Contention that district court might have decided motion to withdraw the reference differently had it been aware of state-law claims for breach of fiduciary duty that Chapter 7 trustee sought to assert against debtor's sole director and related company in amended complaint was unfounded and speculative, and thus did not support denial of trustee's motion to amend complaint on grounds that trustee used delay as litigation

tactic, thereby prejudicing director and company. Fed.Rules Civ.Proc.Rule 15(a), 28 U.S.C.A.


**[22]**    **Bankruptcy** 🔑 Limitations and time to sue; computation

Additional facts included in Chapter 7 trustee's proposed second amended complaint regarding management agreement authorizing payments that were made by debtor to transferee and challenged by trustee as preferential or fraudulent added detail to conduct surrounding schematic payments made to transferee and thus related back to original complaint, such that requested amendment was not "futile." 11 U.S.C.A. §§ 544, 547, 548; Fed.Rules Civ.Proc.Rules 15(a, c), 28 U.S.C.A.

6 Cases that cite this headnote


**[23]**    **Bankruptcy** 🔑 Pleading; dismissal

Rule governing amendment of pleadings permitted Chapter 7 trustee to supplement facts alleged in original and amended complaints and assert new claims relating to breach of fiduciary duty, notwithstanding defendants' contention that added facts were known or should have been known at time of original pleading, given that added information merely shed light on nature of transfers challenged as preferential or fraudulent, and claims related to alleged breach of fiduciary duty arose out of same conduct alleged in original complaint. 11 U.S.C.A. §§ 544, 547, 548; Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.

3 Cases that cite this headnote


**[24]**    **Bankruptcy** 🔑 Pleading; dismissal

Rule governing amendment of pleadings does not prohibit the addition of information relating to the same conduct alleged in the original pleading. Fed.Rules Civ.Proc.Rule 15, 28 U.S.C.A.


**[25]**    **Bankruptcy** 🔑 Proceedings

Consolidation of Chapter 7 trustee's avoidance actions against debtor's sole director and

company of which director was president and shareholder was warranted, given that two proceedings involved common facts and questions, that claims were premised upon alleged use by director and company of their insider status to effectuate challenged payments made by debtor, that trustee alleged, on information and belief, that director owned debtor's parent companies and controlled transferee-company at time of alleged events, and that director and company reportedly had same mailing address. 11 U.S.C.A. §§ 544, 547, 548; Fed.Rules Civ.Proc.Rule 42(a), 28 U.S.C.A.

**Attorneys and Law Firms**

**\*353** Peter James Duhig, Buchanan Ingersoll & Rooney PC, Wilmington, DE, for Debtor.

Kathleen M. Miller, Smith, Katzenstein & Furlow LLP, Wilmington, DE, for Defendant.

Adam Singer, Cooch and Taylor, Wilmington, DE, for Trustee, Plaintiff.

*OPINION* [1]

MARY F. WALRATH, Bankruptcy Judge.

Before the Court are the joint Motions of Stephen G. Dent ("Dent") and Dent and Company, Inc., (collectively, the "Defendants") for partial dismissal of the complaints against them and for an extension of time to answer the remainder of the amended complaints and the Motion of Jeoffrey L. Burtch, the chapter 7 trustee (the "Trustee"), for consolidation of the adversary proceedings against the Defendants and for leave to file a Second Amended Complaint. All except the request for consolidation is opposed. For the reasons set forth below, the Court will grant both Motions in part.

I. *BACKGROUND*
On August 7, 2003, Circle Y of Yoakum, Texas (the "Debtor") filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. [2] On August 20, 2003, the Trustee was appointed.

On August 5, 2005, the Trustee filed Complaints (the "Original Complaints") against the Defendants seeking to avoid and recover alleged preferential and fraudulent transfers pursuant to sections 547(b), 548(a)(1)(A)-(B), 544(b) (applying the Uniform Fraudulent Transfer Act ("UFTA")), and 550 of the Bankruptcy Code. Specifically, the Trustee sought to avoid and recover thirteen $20,000 payments—totaling $260,000—made to Dent and Company between February 2000 and October 2002 and six payments —totaling $247,028—made to Dent. [3]

On December 2, 2005, the Trustee filed amendments to the Original Complaints (the "Amended Complaints") against the Defendants. The Trustee sought to recover twenty additional payments—totaling **\*354** $620,000—made to Dent and Company through November 2002. The Trustee also sought to recover twelve more payments in varying amounts— totaling $198,650—made to Dent between March 2000 and January 2002.

On January 27, 2006, the Defendants each filed a Motion to dismiss. On August 5, 2006, the Trustee filed a Motion to amend the Complaint. The proposed Second Amended Complaint adds two new causes of action: one against Dent for breach of fiduciary duty and one against Dent and Company for aiding and abetting the breach of fiduciary duty. The Second Amended Complaint also adds information concerning a management services contract ("Management Agreement") between WEG and Dent and Company that sheds light on the alleged scheme surrounding some of the payments.

Briefing on both Motions is complete, and the Motions are ripe for decision.

II. *JURISDICTION*
This is a core proceeding. The Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) & 157(b)(2)(A), (F), & (H).

III. *DISCUSSION*

A. *Motions for Partial Dismissal*
The Defendants jointly move for partial dismissal of the claims against them in accordance with Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable

47 Bankr.Ct.Dec. 117

to adversary proceedings by Rule 7012(b) of the Federal Rules of Bankruptcy Procedure. Specifically, they contend dismissal is warranted "for failure of the pleading to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6).

### 1. *Standard of Review*

To be successful on a motion to dismiss, the movant must establish "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "A complaint will withstand an attack under [Rule] 12(b)(6) if the material facts as alleged, in addition to inferences drawn from those allegations, provide a basis for recovery." Emerson v. Thiel Coll., 296 F.3d 184, 188 (3d Cir.2002). *See also* Albright v. Oliver, 510 U.S. 266, 268, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994); In re Rockefeller Ctr. Props., Inc., 311 F.3d 198, 215 (3d Cir.2002). When there is ample time left for discovery, a complaint will survive a motion to dismiss if it provides enough detail to ensure fair notice of the alleged claims. *See* Conley, 355 U.S. at 47–48, 78 S.Ct. 99.

### 2. *Preference and Fraudulent Transfer Counts*

The Defendants move for dismissal of the preference and fraudulent transfer claims that pertain to payments not made within one year of the petition date. They assert that under sections 547 and 548 of the Bankruptcy Code, the Trustee can only avoid transfers made within one year of the filing of the bankruptcy petition. The Trustee does not refute the one-year requirement in his response.

**[1]    [2]**    The Court agrees with the Defendants. The transfers at issue occurred before the effective date of the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"). Pub.L. 109–8, 119 Stat. 23 (2005). Consequently, the pre-BAPCPA provisions apply. Pub.L. 109–8, § 1501, 119 Stat. 23, 216 (2005) (providing that Act takes effect 180 days after date of enactment). Pre–BAPCPA, section 547(b) provided in relevant part:

**\*355**  (b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

...

(4) made—

(A) *on or within 90 days before the date of the filing of the petition;* or

(B) *between ninety days and one year before the date of the filing of the petition,* if such creditor at the time of such transfer was an insider....

11 U.S.C. § 547(b) (2004) (emphasis added).

Similarly, section 592 places a one-year time limit on the Trustee's avoidance powers. 11 U.S.C. § 548(a)(1) (2004) (permitting the avoidance of a fraudulent transfer that "was made or incurred on or within one year before the date of the filing of the petition...."). Consequently, the Court concludes that neither section 547 nor 548 allows avoidance of transfers that were not made on or within one year of the petition date.

In this case, the petition was filed on August 7, 2003. Therefore, the Trustee may only avoid preferential and fraudulent transfers that were made between August 7, 2003 and August 7, 2002. The eighteen payments to Dent, which the Trustee seeks to avoid, were made before August 7, 2002. (*See* Dent Amended Complaint, Exhibit A.) Thirty of the thirty-three payments made to Dent and Company, which the Trustee seeks to avoid, were similarly made before August 7, 2002. (*See* Dent and Company Amended Complaint, Exhibit A.)

Therefore, with respect to the payments made before August 7, 2002, one of the required elements of a cause of action under either section 547 or 548 is not satisfied. *See In re M Group, Inc.,* 308 B.R. 697, 700 (Bankr.D.Del.2004) (citation omitted) ("Unless each and every one of these elements is proven, a transfer is not avoidable as a preference under 11 U.S.C. § 547(b)."); Hassett v. Zimmerman (In re O.P.M. Leasing Servs., Inc.,) 32 B.R. 199, 201 (Bankr.S.D.N.Y.1983) (dismissing a section 548 claim pursuant to Rule 12(b)(6) because the transaction occurred more than one year before the petition).

Accordingly, the Court concludes that the Trustee's claims to avoid transfers under sections 547 and 548 should be dismissed for failure to state a claim, except for the three payments made to Dent and Company within the year before the bankruptcy filing.

### 3. *Fraud Claims*

#### a. *Claim Under Section 544 Against Dent*

**[3]** The Defendants contend that because the Court must dismiss the claims against Dent under sections 547 and 548, it must also dismiss the claim against him under section 544. Specifically, they argue that the claim under section 544 is based solely on Delaware law and is the only substantive claim left after dismissal. For that reason, they contend the Court no longer has jurisdiction to hear the claim.

The Trustee, on the contrary, asserts that the Court does not lose jurisdiction because the claim is a core matter. 28 U.S.C. § 157(B)(2)(A), (F), and (O) (2006).

**[4]** The Court agrees with the Trustee. An avoidance action under section 544 is a core proceeding, even though it relies on state law. A section 544 claim, although ultimately based on state law (UFTA), is a core matter because it is a proceeding "to determine, avoid, or recover fraudulent conveyances." 28 U.S.C. § 157(b)(2)(H) (2006); *In re Mankin,* 823 F.2d 1296, 1298–1300 (9th Cir.1987) (concluding that a fraudulent conveyance action under **\*356** section 544 was a core proceeding). *See also* 28 U.S.C. § 157(b)(3) (2006) ("A determination that a proceeding is not a core proceeding shall not be made solely on the basis that its resolution may be affected by State law.").

Consequently, the Court will not dismiss the claim against Dent under section 544.

#### b. *Sufficient Particularity*

**[5]** The Defendants further argue that the fraudulent transfer claims under sections 544 and 548 should also be dismissed because they were not pled with sufficient particularity. Fed.R.Civ.P. 9(b) ("In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated

with particularity."). In this case, the Amended Complaints simply recite the statutory elements of fraud without adequate factual support.

The Trustee responds that in bankruptcy cases more liberality is afforded to pleadings of fraud. *See, e.g., In re Global Link Telecom Corp.,* 327 B.R. 711, 717 (Bankr.D.Del.2005) (using the liberality approach); *O.P.M. Leasing Servs.,* 32 B.R. at 203.

**[6]** While the Court applies the liberal pleading standard, the Court agrees with the Defendants' argument. To plead fraud, the Trustee cannot merely recite the statutory elements. *Global Link Telecom,* 327 B.R. at 718 (concluding that "even under the more liberal pleading requirements applicable in [the] case, the Amended Complaint still fail[ed] to meet its burden.... [I]t simply allege[d] the statutory elements of a constructive fraud action under section 548(a)(1)(B)."). Here, the Trustee recites general, conclusory allegations that almost completely parrot the statutory language. (*See* Original Complaints, Counts I and II.) The fraud claims "smack[ ] of multiple choice or menu pleading." *O.P.M. Leasing Servs.,* 32 B.R. at 204.

Consequently, the Court will dismiss the fraud claims. The Court, however, will grant the Trustee leave to amend his Complaint to add specific facts regarding the alleged fraudulent activity. *Global Link Telecom,* 327 B.R. at 718 (granting leave to amend, after dismissing fraud claim under Rule 9(b)); Fed.R.Civ.P. 15(a) ("A party may amend the party's pleading ... by leave of court ... and leave shall be freely given when justice so requires.").

### 4. *Claims Added in First Amended Complaints*

The Defendants argue that the claims added in the First Amended Complaints should be dismissed because they are barred by the statute of limitations. The Trustee responds that, although the deadline to file the claims passed, the claims relate back to the Original Complaints. The Trustee asserts that this is appropriate because the Defendants had sufficient notice of the claims and the transfers arose from the same conduct, transaction, or occurrence as the claims in the Original Complaint. *See* Fed.R.Civ.P. 15(c) (made applicable to adversary proceedings by Federal Rule of Bankruptcy Procedure 7015).

The Defendants argue that the claims do not "relate back" to the Original Complaints because each allegedly avoidable transfer is a separate claim. *See In re Metzeler,* 66 B.R. 977, 984 (Bankr.S.D.N.Y.1986) (concluding that each preferential and fraudulent transfer is a separate and distinct transaction and does not relate back "merely because [they all] bear the same label"). *See also Peltz v. CTC Direct, Inc. (In re MBC Greenhouse Co.),* 307 B.R. 787, 793 (Bankr.D.Del.2004) (determining that commonality does not necessarily exist between transfers made to similar payees).

**\*357** Section 546(a) provides a two-year statute of limitations for the commencement of preference and fraudulent conveyance actions, running from the filing of the case on August 7, 2003. Thus, the statute of limitations expired on August 7, 2005, months before the First Amended Complaint was filed on December 2, 2005. Therefore, unless the claims in the Amended Complaint relate back to the date of the Original Complaint, they must be dismissed. *Rouge Steel Co. v. OmniSource Corp. (In re Rouge Indus.),* No. A–05–52242, 2006 WL 148946, at \*2–4 (Bankr.D.Del.2006) (concluding that a claim must relate back to the original pleadings to be added after the statute of limitations has expired).

**[7]    [8]** "An amendment relates back to the date of the original pleading when ... the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading." Fed.R.Civ.P. 15(c). The central consideration of Rule 15(c)(2) is whether there is a nexus between the factual allegations in the original pleading and those in the amended complaint. *Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 150 n. 3, 104 S.Ct. 1723, 80 L.Ed.2d 196 (1984) (citation omitted) ("The rationale of Rule 15(c) is that a party who has been notified of litigation concerning a particular occurrence has been given all the notice that statutes of limitations were intended to provide."); *MBC Greenhouse,* 307 B.R. at 790 ("An amendment of a pleading relates back to the date of the original pleading when ... [a party] has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits."); *Brandt v. Gerardo (In re Gerardo Leasing, Inc.),* 173 B.R. 379, 388 (Bankr.N.D.Ill.1994) (stating that notice is the most important factor in determining if an amendment relates back).

The Trustee argues that the Complaints provided the proper notice. In particular, the Trustee asserts paragraph 24 of the Original Dent Complaint and paragraph 23 of the Original Dent and Company Complaint stated: "The Trustee reserves his right to amend this Original Complaint to include ... additional Transfers ... and for the Amendments to relate back to this Original Complaint."

The Court concludes that this language of the Complaint, standing alone, is not sufficient notice under Rule 15(c). Otherwise, the Trustee would insert similar language in every complaint and declare that the opposing party has sufficient notice of any amendment he may make to that complaint. That is not a proper reading of Rule 15(c). Rather, a factual nexus must exist between the conduct or transactions alleged in the amendment and those alleged in the original pleading.

**[9]** In the context of preference or fraudulent transfer actions, courts have found the existence of a factual nexus (i.e., transactions arising from the same pattern of conduct), and thus allowed relation back, where a series of payments are made in equal amounts at uniform periodic intervals. *See Gerardo Leasing,* 173 B.R. at 390 (concluding that a stream of weekly payments of $1,500 were sufficiently related to permit amendment to relate back to the original complaint). *Cf. MBC Greenhouse,* 307 B.R. at 792–93 (concluding that absent a claim that a series of payments were systematic or schematic, they did not arise out of the same "conduct, transaction, or occurrence" as the payments in the original pleading).

In this case, the Original Complaint against Dent listed a series of six payments that were not made on any regular basis, and except for two payments, were **\*358** in different amounts. (*See* Original Dent Complaint, Exhibit A.) In the Amended Complaint, the Trustee added twelve payments made to Dent. (*See* Amended Dent Complaint, Exhibit A.) Four of the added payments were not equal in amount nor paid at regular intervals. (*See id.*) The other eight payments consisted of two payments of $2,625 and six payments of $3,750. (*Id.*) The eight payments were made monthly, but not on the same day of the month. (*Id.*) Although the stream of eight payments may show a pattern, there is no indication in the Amended Complaint that the payments are related to the dissimilar, unequal and varied payments listed in the Original Complaint.

**[10]**   On the other hand, the transfers to Dent and Company appear schematic in nature. The Original Complaint against Dent and Company listed thirteen payments of $20,000 made to Dent and Company at inconsistent intervals. (*See* Dent and Company Original Complaint, Exhibit A.) The Amended Complaint included twenty additional payments. (*See* Dent and Company Amended Complaint, Exhibit A.) On the Amended list of thirty-three payments, most payments were made in monthly intervals, and the first twelve payments were $20,000 each. (*Id.*) The next ten payments (payments thirteen through twenty-two) were $40,000 each. (*Id.*) The twenty-third to thirty-second payments were for $20,000. (*Id.*) The final payment was for $40,000. (*Id.*) With the exception of approximately two months that were missed, all payments were made, roughly, on a monthly basis.

Therefore, it appears there is a nexus between the $20,000 payments that were listed in the Original Complaint and the payments added in the Amended Complaint against Dent and Company. Accordingly, the Court agrees with the Trustee that all payments made to Dent and Company appear schematic. However, the Court does not agree that the payments made to Dent are a part of a single schematic pattern of payments. Consequently, the Court concludes that only the additional twenty transfers made to Dent and Company relate back to the Original Complaint.

### B. *Second Motion for Leave to Amend and for Consolidation*

#### 1. *Standard of Review*

**[11]**   **[12]**   Once a responsive pleading is filed, "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). It is within the Court's discretionary powers to grant or deny a motion for leave to amend. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410, 1434 (3d Cir.1997) (citations omitted). *See also* *Global Link Telecom,* 327 B.R. at 718.

#### 2. *Second Amended Complaint*

The Trustee has filed a Motion seeking leave to file a Second Amended Complaint. The Defendants oppose the Motion on the following grounds: (1) undue delay; (2) prejudice; (3) the new claims do not relate back to the Original Complaint and, therefore, the amendment is futile; and (4) supplementing the old claims with a new theory is impermissible.

##### a. *Undue Delay*

The Defendants contend that the Trustee's Second Amended Complaint results in undue delay and shows inexcusable neglect. They describe the Trustee's Second Amended Complaint as an attempt to take **\*359** a "second bite at the apple." Specifically, they assert that the facts in the proposed amendment were known at the time of the Original Complaint and bankruptcy petition (over one and three years ago, respectively). *See* *Sandcrest Outpatient Servs., P.A. v. Cumberland County Hosp. Sys., Inc.,* 853 F.2d 1139 (4th Cir.1988) (denying a second motion to amend to add an additional remedy of injunctive relief eight months after original complaint because the movant should have known of the remedy at the time of the original pleading). The Defendants further assert that they will face a large amount of undue expense as a result of extensive briefing related to the Second Amended Complaint.

The Trustee counters that the Defendants' argument is flawed. Moreover, he asserts that none of the cases cited in support of the Defendants' argument involved a case in which the motion to amend took place within the statute of limitations.

**[13]**   **[14]**   **[15]**   This Court must apply the Delaware choice of law rules to determine which statute of limitations applies. *See, e.g., In re PHP Healthcare Corp.,* 128 Fed.Appx. 839, 843 (3d Cir.2005) (applying the choice of law rules of the state in which the bankruptcy court sits); *In re Garden Ridge Corp.,* 338 B.R. 627, 632 (Bankr.D.Del.2006) ("To determine which state's law to apply, the Court turns to Delaware choice of law rules."). Delaware's choice of law rules require application of "the law of the state of incorporation to issues involving corporate internal affairs." *VantagePoint Venture Partners 1996 v. Examen, Inc.,* 871 A.2d 1108, 1115 (Del.2005). A breach of fiduciary duty involves the internal

affairs of the corporation. 🚩⚠️ *Coleman v. Taub,* 638 F.2d 628, 629 n. 1 (3d Cir.1981).

 **[16]**   Here, the Debtor is a Texas corporation, with a mailing address in Yoakum, Texas. Therefore, despite the Trustee's contention that Delaware law applies, Texas law governs the applicable limitations period. 🚩⚠️ *Schum v. Bailey,* 578 F.2d 493, 494–96 (3d Cir.1978) (concluding that the court should apply the statute of limitations of the state whose substantive law applies). Texas law provides a four-year statute of limitations for breaches of fiduciary duty. Tex. Civ. Prac. & Rem. § 16.051 (Vernon 1997); *Rowe v. Rowe,* 887 S.W.2d 191, 201 (Tex.App.1994) ("The four-year limitations provision in section 16.051 of the Texas Civil Practice and Remedies Code applies to the breach of fiduciary duty claims....").

 **[17]**   Furthermore, "[f]raud prevents the running of the statute of limitations until it is discovered, or by the exercise of reasonable diligence it should have been discovered."

*Rowe,* 887 S.W.2d at 202. *See also* 🚩 *Computer Assocs. Int'l, Inc. v. Altai, Inc.,* 918 S.W.2d 453, 455–56 (Tex.1996).

In this case, the allegations of fraud are subsumed in the breach of fiduciary duty claim. *Resolution Trust Corp. v. Bright,* 872 F.Supp. 1551, 1565 (N.D.Tex.1995) ("Under Texas law, breach of fiduciary duty is constructive fraud by virtue of the breach of the duty itself." (citation omitted)). Dent was the sole director of the Debtor and the President of Circle Y Holding Corporation, the sole shareholder of the Debtor. Consequently, prior to the bankruptcy filing, there was no party, such as the Trustee, with standing to file a derivative or other lawsuit for the breach of fiduciary duty. As a result, the statute of limitations will expire at the latest on August 20, 2007—four years after the Trustee's appointment on August 20, 2003. *Id.* at 1564–67 (concluding that under Texas' adverse domination doctrine, when a numerical majority of the board of directors **\*360** actively participates in wrongdoing or fraud, the limitations period is tolled until such time as the corporation is no longer under the wrongdoers' control). *See generally* 11 U.S.C. § 108 (2006) (extending the limitations period in bankruptcy cases for causes of action resulting from a non-bankruptcy order or agreement). Therefore, because the statute of limitations has not run, it is not necessary that the claims relate back to the Original Complaint. Consequently, the Court agrees with the Trustee that his Motion to amend was timely.

 **[18]**   The Defendants' argument that they will have the added expense of briefing a second motion to dismiss is insufficient justification to deny the Motion to Amend. *See* 🚩 *UNR Indus., Inc. v. Cont'l Ins. Co.,* 623 F.Supp. 1319, 1325 (N.D.Ill.1985) (rejecting a similar argument). Consequently, the Court does not find undue delay.

### b. *Prejudice*

 **[19]**   The Defendants argue that they are prejudiced in three ways. The Defendants first contend that the lapse of time has prejudiced their ability to prepare adequately for the case. Specifically, they note that many of the payments were made in 2000 (more than six years ago). Memories have faded and witnesses may not be available. The Court rejects this argument as unpersuasive. The Defendants have cited no specific witnesses or evidence that is now unavailable due to any delay.

 **[20]**   In addition, the Defendants maintain that they cannot prepare for claims that have largely been uncertain. The Defendants assert that the Trustee's substantial change in theory of recovery requires significant new preparation. The Court rejects this argument as well. While the Trustee has issued fact discovery, the Defendants have not. The discovery period remains open and will remain open an additional 120 days following the Court's decision on the Motions. *Cf.*

🚩 *Ross v. Houston Indep. Sch. Dist.,* 699 F.2d 218, 229 (5th Cir.1983) (denying motion to amend where amendment would add new and complex issues and twenty-six additional parties, resulting in an extensive amount of additional discovery); *Ohio–Sealy Mattress Mfg. Co. v. Kaplan,* 90 F.R.D. 40, 42–44 (N.D.Ill.1981) (finding undue prejudice where additional damages were sought in amendment and discovery was at an advanced stage); 🚩 *Conroy Datsun Ltd. v. Nissan Motor Corp.,* 506 F.Supp. 1051, 1054 (N.D.Ill.1980) (denying motion to amend filed "ten days before the close of discovery"). Further, every amended complaint requires additional preparation, but that is not a basis for denying the amendment. 🚩 *UNR Indus., Inc.,* 623 F.Supp. at 1325.

 **[21]**   The Defendants also allege that the Trustee used the delay as a litigation tactic by waiting until after the District Court had denied their Motion to withdraw the reference. The Defendants believe that the District Court may have decided that motion differently if it had been aware of the Trustee's

state law claims of breach of fiduciary duty. The Court finds the allegations unfounded and purely speculative. *See Burtch v. Dent (In re Circle Y of Yoakum),* No. CIV. A. 06–322–KAJ, 2006 WL 2346458, at *2 (D.Del. June 23, 2006) (denying Dent's motion to withdraw the reference due to an assertion of a right to jury trial because after nine months, the bankruptcy court had "familiarize[d] itself with the underlying facts of [the] case" and possessed the necessary resources to handle the pre-trial stages of the proceeding); **\*361** *Burtch v. Dent and Company, Inc. (In re Circle Y of Yoakum),* No. CIV. A. 06–327–KAJ, 2006 WL 2346462, at *2 (D.Del. June 23, 2006) (denying Dent and Company's motion for the same reasons). The District Court has reached similar conclusions in other cases. *See, e.g., In re EXDS, Inc.,* No. CIV. A. 06–400–KAJ, 2006 WL 2346419, at *2 (D.Del. July 20, 2006) (denying motion to withdraw the reference based on right to jury trial and permitting renewal of the "[m]otion at the conclusion of pre-trial proceedings."); *In re Am. Classic Voyages Co.,* 337 B.R. 509, 512 (D.Del.2006) (declining to withdraw the reference based on jury trial demand because the proceeding was in the "preliminary stages," discovery had not begun, and the action was "a core proceeding with which the Bankruptcy Court [was] familiar, the continued handling of the matter by the ... [Bankruptcy] Court would foster efficient use of judicial resources, promote uniformity in bankruptcy administration, and avoid confusion."). Accordingly, the Court finds no undue prejudice.

### c. *Futility*

The Defendants contend that the amendment is "futile" because the claims should be dismissed. *Glassman v. Computervision Corp.,* 90 F.3d 617, 623 (1st Cir.1996) (" 'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted.... In reviewing for 'futility,' the district court applies the same standard of legal sufficiency as applies to a Rule 12(b)(6) motion."). The Defendants reassert the argument they proffered in the partial motion to dismiss (i.e., none of the claims added in the amendments relate back to the Original Complaint). Similarly, the Trustee reasserts his position that the claims and added facts pertaining to the Management Agreement arise from the same scheme or conduct that was alleged in the Original Complaint, namely that the Defendants used their control as insiders to effectuate the transfer of payments which breached their fiduciary duty.

The Defendants assert that the transfers were not part of a concerted scheme and, therefore, do not relate back to the Original Complaint. Further, the Defendants argue that the fraud claims were not pled with sufficient particularity and the limitations period for the breach of fiduciary claim has expired.

The Court agrees with the Defendants on two points. First, as noted above, the Court concludes that the preferential and fraudulent transfer claims should be dismissed for payments made to Dent more than one year before the petition date. Therefore, to the extent the amendment relates to the dismissed claims against Dent, it is futile. Second, the fraud claims against both Defendants should be dismissed because they were not pled with sufficient particularity. However, the Court grants the Trustee leave to amend the fraud claims. As the Court concluded above, all the additional payments to Dent and Company relate back to the Original Complaint. Further, the breach of fiduciary duty claim against Dent and the claim for aiding and abetting the breach against Dent and Company were filed within the four-year statute of limitations period. Therefore, there is no requirement that the added claims relate back.

**[22]** The Trustee adds additional facts to the Complaint regarding a Management Agreement between Dent and Company and WEG under which the $20,000 payments were authorized. The Management Agreement adds detail to the conduct surrounding the schematic payments made to Dent and Company. Accordingly, the Court concludes that the Management Agreement and its accompanying facts relate back to the Original Complaint. *See* *In re Kam Kuo Seafood Corp.,* 67 B.R. 304, 305–06 (Bankr.S.D.N.Y.1986) ("It has **\*362** thus been established that an amended complaint will relate back notwithstanding the bar of the statute of limitations if it ... spells out the details of the transaction originally alleged....").

Consequently, except as to the claims noted above, the Court finds that the requested amendment is not futile.

### d. *Supplementation*

**[23]** The Defendants oppose, without citation to authority, the Trustee's supplementation of facts alleged in the Original and Amended Complaints. They assert that the new facts were known or should have been known at the time of the original pleading. They particularly object to the addition

In re Circle Y of Yoakum, Texas, 354 B.R. 349 (2006)
47 Bankr.Ct.Dec. 117

of information relating to the existence of the Management Agreement and the claims relating to breach of fiduciary duty.

**[24]** The Court disagrees with the assertion that the Second Amended Complaint is the Trustee's "second bite at the apple." Rule 15 does not prohibit the addition of information relating to the same conduct alleged in the original pleading. Here, the Management Agreement simply sheds new light on the nature of the $20,000 payments made to Dent and Company. Additionally, the breach of fiduciary duty and aiding and abetting claims arise out of the same conduct alleged in the Original Complaint (i.e., fraudulent and preferential transfers caused by insider control). *Austin Driveway Servs., Inc.,* 179 B.R. 390, 395 (Bankr.D.Conn.1995) (concluding that a new cause of action can be added in an amendment if it arises from the same facts alleged in the prior pleading).

Therefore, the Court concludes that the supplementation is proper under Rule 15.

### 3. Consolidation

**[25]** The Trustee requests consolidation of the Defendants' adversary proceedings under Rule 42(a) of the Federal Rules of Civil Procedure. *See Blake v. Farrell Lines, Inc.,* 417 F.2d 264, 266 (3d Cir.1969) (stating a court "under Rule 42(a), is given ... broad authority to 'make such orders concerning proceedings therein as may tend to avoid unnecessary delay' "); *Honeywell Intern, Inc. v. Audiovox Commc'ns Corp.,* Nos. CIV. A. 04–1337–KAJ, CIV. A. 04–1338–KAJ, CIV. A. 04–1536–KAJ, 2005 WL 2465898, at *2 (D.Del. May 18, 2005).

The Trustee contends that the two cases involve common questions of law and fact. The request for consolidation is not opposed.

Rule 42(a) provides:

> When actions involving a common question of law or fact are pending

before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

Fed.R.Civ.P. 42(a). In this case, the two adversary proceedings involve common facts and legal questions. The claims against the Defendants are premised on their use of their insider status to effectuate the payments. Dent was Vice–Chairman and the sole director of the Debtor; he was also President and a shareholder of Dent and Company at the time of the transfers. Further, the Trustee alleges, upon information and belief, that Dent owned the Debtor's parent companies and controlled Dent and Company at the time of the alleged events. Lastly, both Defendants reportedly had the same mailing address.

Accordingly, the Court concludes that consolidation is warranted in this case.

**\*363** **C.** *Extension of Time to Answer*
The Defendants request, pursuant to Federal Rule of Bankruptcy Procedure 9006(b)(1), an additional ten days to respond after the decision on their Motion to Dismiss. The Request is granted. Because the Court is granting the Trustee leave to amend the Complaint, the Defendants' answer will be due ten days from that amendment.

### IV. CONCLUSION
For the foregoing reasons, the Court will grant, in part, the Motions to Dismiss and Motion to Amend and Consolidate.

An appropriate Order is attached.

**All Citations**

354 B.R. 349, 47 Bankr.Ct.Dec. 117

## Footnotes

1    This Opinion constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

2    At the time of the events mentioned in the Complaints, Circle Y was a wholly owned subsidiary of CY Holding Corporation ("CY"). CY was a wholly owned subsidiary of Western Equestrian Group, LLC ("WEG"). WEG was a wholly owned subsidiary of Equestrian Sports International, LLC ("ESI"). Dent was the sole member of ESI.

3    At the time of the transfers, Dent was the Vice–Chairman and sole director of the Debtor and President of Dent and Company.

---

**End of Document**
© 2023 Thomson Reuters. No claim to original U.S. Government Works.

# EXHIBIT 5

520 B.R. 424

United States Bankruptcy Court, S.D. New York.

IN RE: WATERSCAPE RESORT LLC, Debtor.

Pavarini McGovern, LLC, Plaintiff,

v.

Waterscape Resort LLC, et al. Defendants.

Case No. 11-11593(SMB)

|

Adv. Proc. No. 11-02248

|

Signed November 24, 2014

**Synopsis**

**Background:** General contractor that Chapter 11 debtor had hired to construct hotel on its property filed motion for leave to amend to assert punitive damages claim, and debtor objected and sought leave to assert counterclaims.

**Holdings:** The Bankruptcy Court, Stuart M. Bernstein, J., held that:

[1] general contractor's motion for leave to amend its complaint would be treated as request for leave to amend proof of claim after claims bar date had expired;

[2] confirmation of property owner's proposed Chapter 11 plan did not prevent general contractor from amending its informal proof of claim to assert punitive damages claim;

[3] general contractor would be allowed to amend its informal proof of claim to assert punitive damages claim based on allegedly willful nature of property owner's diversion of trust funds that it received from construction lender for benefit of itself and its insiders;

[4] claim for willful exaggeration of mechanics' lien was properly asserted as counterclaim only in proceeding to enforce mechanics' lien; and

[5] whether bankrupt property owner was barred by preclusive effect of prior decisions of state court and Dispute Resolutions Board (DRB) from asserting fraud claim against general contractor, based on its conduct in allegedly billing property owner for insurance that it never obtained or intended to obtain, was matter properly raised on motion

for summary judgment, not on motion to dismiss, and did not provide permissible basis for denying, as futile, property owner's motion for leave to amend.

So ordered.

West Headnotes (18)

**[1]    Bankruptcy**    Effect as discharge

Confirmation of property owner's proposed Chapter 11 plan did not discharge general contractor's punitive damages claim for property owner's allegedly willful prepetition diversion of trust funds that it had received from lender financing real estate development project, where plan and plan confirmation order expressly provided that claims of trust fund claimants, including general contractor, were excepted from the discharge, release and injunctive provisions of plan. 11 U.S.C.A. § 1141(d)(1)(A).

**[2]    Bankruptcy**    Proof; Filing

Filing of timely proof of claim is proper procedure to assert right to distribution from Chapter 11 estate. Fed. R. Bankr. P. 3003(c)(2).

**[3]    Bankruptcy**    Informal proof

Complaint that general contractor filed, to recover for bankrupt property owner's allegedly improper prepetition diversion of trust funds that it had received from lender financing real estate development project, could be treated as informal proof of claim to extent that it asserted "right to payment." 11 U.S.C.A. § 101(5)(A).

**[4]    Bankruptcy**    Informal proof

Court may treat a request for monetary relief asserted in complaint as informal proof of claim where complaint (1) is timely filed and becomes part of judicial record, (2) states nature, existence and amount of debt, and (3) evidences creditor's

intent to hold estate liable. 🚩11 U.S.C.A. § 101(5)(A).

**[5]**    **Bankruptcy** 🗝 Amendment or withdrawal

General contractor's motion for leave to amend its complaint to assert punitive damages claim against bankrupt property owner, based on property owner's alleged willful prepetition diversion of trust funds that it had received from lender financing real estate development project, would be treated as request for leave to amend proof of claim after claims bar date had expired, given that complaint was in nature of informal proof of claim.

1 Case that cites this headnote

**[6]**    **Bankruptcy** 🗝 Amendment or withdrawal

Decision to permit post-bar date amendment to proof of claim is within discretion of bankruptcy court.

**[7]**    **Bankruptcy** 🗝 Amendment or withdrawal

While amendments should be freely allowed, post-bar date amendments to proofs of claim are subject to careful scrutiny to ensure that there is no attempt to file new claim under the guise of amendment.

1 Case that cites this headnote

**[8]**    **Bankruptcy** 🗝 Equitable powers and principles

**Bankruptcy** 🗝 Amendment or withdrawal

Courts generally engage in two-step inquiry when considering allowance of late amendment to proof of claim, pursuant to which they (1) decide whether amended claim relates back to timely filed proof of claim as, for example, curing a defect of form in original claim, describing original claim with greater particularity, or pleading new theory of recovery on facts set forth in original claim, and (2) consider the facts of case and determine whether it would be equitable to allow amendment.

**[9]**    **Bankruptcy** 🗝 Amendment or withdrawal

Belated amendments to timely claims will be freely allowed in absence of prejudice to other parties.

**[10]**    **Bankruptcy** 🗝 Discharge as injunction

**Bankruptcy** 🗝 Amendment or withdrawal

**Bankruptcy** 🗝 Effect as discharge

Leave to amend proof of claim may be less appropriate after confirmation, which acts, with certain exceptions, to discharge all pre-confirmation debts other than those provided for in plan and operates as injunction against collection of discharged debt. 11 U.S.C.A. §§ 524(a)(2), 1141(d)(1)(A).

1 Case that cites this headnote

**[11]**    **Bankruptcy** 🗝 Amendment or withdrawal

Bankruptcy court has no authority to permit amendment to assert a discharged claim, even if the proposed amendment relates back to timely proof of claim.

1 Case that cites this headnote

**[12]**    **Bankruptcy** 🗝 Amendment or withdrawal

**Bankruptcy** 🗝 Effect

Confirmation of property owner's proposed Chapter 11 plan did not prevent general contractor from amending its informal proof of claim to assert punitive damages claim based on allegedly willful nature of property owner's diversion of trust funds that it received from construction lender for benefit of itself and its insiders, and did not require showing of exceptional circumstances as prerequisite to amendment, where plan expressly provided that claims of trust fund claimants, including general contractor, were excepted from the discharge, release and injunctive provisions of plan, and debtor did not contend that assertion of punitive

damages claim would disrupt the plan or threaten its ultimate consummation.

[13]  **Bankruptcy**  🔑  Amendment or withdrawal

General contractor would be allowed, after deadline for filing proofs of claim had passed, to amend its informal proof of claim to assert punitive damages claim based on allegedly willful nature of bankrupt property owner's diversion of trust funds that it received from construction lender for benefit of itself and its insiders, where punitive damages claim arose out of same facts underlying contractor's original, informal proof of claim and merely relied on new theory of recovery, and debtor failed to identify any prejudice to itself or to creditors if post-bar-date amendment were allowed.

[14]  **Bankruptcy**  🔑  Amendment or withdrawal

Court may deny leave to amend claim as futile where the proposed amended claim would not withstand a motion to dismiss for failure to state cause of action. Fed. R. Civ. P. 12(b)(6).

1 Case that cites this headnote

[15]  **Bankruptcy**  🔑  Amendment or withdrawal

Allegations in general contractor's proposed amended claim, regarding bankrupt property owner's knowing diversion of construction trust funds to its principals while claims of contractors, subcontractors and suppliers remained unsatisfied, stated plausible claim for recovery of punitive damages, such that amendment could not be denied as being futile.

1 Case that cites this headnote

[16]  **Bankruptcy**  🔑  Amendment or withdrawal

To extent that post-bar-date amendment to general contractor's informal proof of claim, in addition to asserting punitive damages claim based on willful nature of bankrupt property owner's diversion of construction trust funds for benefit of itself and its insiders at time when property owner knew that trust fund claimants

were still unpaid, also sought to compel property owner to identify and return all these diverted funds, these claims were duplicative of claims asserted in its original, informal proof of claim, such that leave to amend to assert such duplicative claims had to be denied.

1 Case that cites this headnote

[17]  **Mechanics' Liens**  🔑  Payment to Principal Contractor, or to Subcontractor Employing Claimant

Claim for willful exaggeration of mechanics' lien was properly asserted as counterclaim only in proceeding to enforce mechanics' lien, and could not be raised, after mechanics' lien was discharged, as counterclaim to claim asserted by general contractor for property owner's alleged willful diversion of construction trust funds. N.Y. Lien Law § 39.

1 Case that cites this headnote

[18]  **Bankruptcy**  🔑  Pleading; dismissal
**Bankruptcy**  🔑  Judgment or Order

Whether bankrupt property owner was barred by preclusive effect of prior decisions of state court and Dispute Resolutions Board (DRB) from asserting fraud claim against general contractor, based on its conduct in allegedly billing property owner for insurance that it never obtained or intended to obtain, was matter properly raised on motion for summary judgment, not on motion to dismiss, and did not provide permissible basis for denying, as futile, property owner's motion for leave to amend its answer to assert fraud claim against general contractor.

**Attorneys and Law Firms**

**\*427** Barton Barton & Plotkin LLP, Attorneys for Plaintiff, 420 Lexington Avenue, New York, NY 10170, Eric W. Sleeper, Esq., Of Counsel

Medina Law Firm LLC, Attorneys Defendant, Waterscape Resort LLC, The Chrysler Building, 405 Lexington Avenue, Seventh Floor, New York, NY 10174, Eric S. Medina, Esq., John Carlson, Esq., Of Counsel

Lazarus & Lazarus, P.C., Attorney for Defendants, Salim Assa a/k/a Solly Assa and Ezak Assa, 240 Madison Avenue, 8th Floor, New York, New York 10016, Harlan M. Lazarus, Esq., Of Counsel

### MEMORANDUM DECISION GRANTING IN PART AND DENYING IN PART MOTIONS FOR LEAVE TO AMEND

STUART M. BERNSTEIN, United States Bankruptcy Judge:

The plaintiff Pavarini McGovern, LLC ("Pavarini") moves to amend its complaint to assert a claim for punitive damages against the Waterscape Defendants, defined below, and a separate claim against defendant Salim Assa ("Assa"), the debtor's principal, for punitive damages and other relief. The gravamen of the proposed amendments is that Assa diverted to himself certain funds that the defendant Waterscape Resort LLC ("Waterscape"), the debtor in this case, held in trust for Pavarini under the New York Lien Law. Waterscape opposes the motion, and Assa joins in the opposition. The other Waterscape Defendants have remained silent. In addition, Waterscape cross-moves to amend its answer to assert counterclaims against Pavarini sounding in fraud and willful exaggeration of its mechanic's lien. Assa joins in the cross-motion and Pavarini opposes it. For the reasons that follow, Pavarini is granted leave to amend Count II in the complaint to allege a claim for punitive damages, Waterscape is granted leave to assert a counterclaim for fraud, and the motions are otherwise denied.

### BACKGROUND

#### A. The Project

The background to this bankruptcy case is discussed at length in *Pavarini McGovern, LLC v. Waterscape Resort LLC (In re Waterscape Resort LLC )*, 483 B.R. 601 (Bankr.S.D.N.Y.2012) ("*Waterscape I* ") and *In re Waterscape Resort LLC,* Case No. 11–11593, 2014 WL 1389762 (Bankr.S.D.N.Y. Apr. 9, 2014) ("*Waterscape II* "). I assume familiarity with those decisions and discuss the facts relevant to the current dispute.

Waterscape entered into a Construction Management Agreement ("CMA") with Pavarini pursuant to which Pavarini agreed to act as general contractor to construct a hotel and condominium building on Waterscape's property in Manhattan (the "Project"). Pavarini was responsible for managing and hiring subcontractors, and was entitled to a fee of 2.75% of the entire cost of construction exclusive of the fee itself.

The Project was funded with loans from U.S. Bank, National Association and USB Capital Resources, Inc. f/k/a USB Capital Funding Corp. (collectively "US Bank"). **\*428** Pursuant to the loan agreements, U.S. Bank agreed to make advances to Waterscape to fund Project costs based on monthly Draw Requests containing copies of, among other things, invoices of the Project contractors and vendors. The Draw Requests had to be accompanied by a Draw Request Certification containing affirmative representations by Waterscape to U.S. Bank that, among other things, the funds being drawn would be applied to fund the Project as specified in the requisition. Once approved, U.S. Bank transferred the funds to Waterscape.

Disputes between Waterscape and Pavarini arose, and Waterscape unilaterally terminated the CMA in September 2010. Pavarini filed a mechanics lien on December 17, 2010 in the amount of $10,674,440.59. (*See Claim no. 38–1,* dated June 8, 2011, Ex. C at 8.) A later proof of claim revealed that Pavarinis secured claim consisted of two components: (a) $8,581,289 that it owed its subcontractors, (*Claim no. 38–3,* dated July 22, 2011, at 5), and (b) $2,251,783.59 that Pavarini contended Waterscape owed it under the CMA. (*See Claim no.* 38–3, dated July 22, 2011, at 5.) The subcontractors hired by Pavarini also filed mechanics liens against the Property for their unpaid work, and these liens, for the most part, duplicated the portion of the Pavarini mechanics lien that included their unpaid claims.

#### B. The Bankruptcy Case

##### 1. The Plan

Waterscape commenced this chapter 11 case on April 5, 2011, and filed its initial plan and disclosure statement one month later. The plan proposed to sell the hotel portion of the Project free of liens, claims and interests, and pay all of the proceeds to U.S. Bank. Pavarini objected complaining, *inter alia,* that hotel sale proceeds constituted trust funds under the New York Lien Law, and the plan proposed to divert these trust

funds (as well as future condominium sale proceeds) to U.S. Bank.

After numerous proceedings and significant plan amendments, Waterscape confirmed its *Second Amended Plan of Reorganization* ("*Plan*") on July 21, 2011. (*See Order Approving Disclosure Statement and Confirming Plan of Reorganization,* dated July 21, 2011 ("*Confirmation Order*") (ECF/Main Case Doc. # 128).) [1] The *Plan* represented the product of substantial negotiation and comment from Pavarini, U.S. Bank and the Court. It still contemplated the sale of the hotel portion of the Project free and clear of all liens, claims and interests. (*See Confirmation Order* at ¶ 18.) However, the *Plan* carved out $11 million from the hotel sale proceeds and used the carve out to fund a Trust Fund Account for the benefit of the overlapping Class 🔖 3 Lien Law/trust fund claimants. (*Plan* at §§ 4.1(b), 5.3.) [2] The $11 million number was not random; it was selected because it rounded up Pavarini's approximate $10.8 million claim. All Class 3 claims were deemed disputed, (*Plan* at § 4.3(b)), and the Class 3 claimants would continue to litigate their rights primarily in non-bankruptcy *fora*. (*Id.* at § 5.6(c).) Once a Class 3 Claim was finally resolved, the claim would be allowed and paid from the Trust Fund Account, the Secured Claim Reserve Account, new financing, or general funds of the Debtor. (*Id.* at § 4.3(c).) [3]

**\*429** The *Plan* also contained various releases and injunctions. To the extent relevant and with certain exceptions that no party has invoked, the *Plan* enjoined the commencement or continuation of any action against Waterscape to recover any claim that arose before the confirmation date regardless of whether a proof of claim was filed. (*Plan* at § 7.1.) The releases and injunctions were subject to several exceptions, including the following:

> 7.9 **Release Clarification**. No provision in this Plan, including sections 7.1, 7.2 and 7.6 hereof, shall release, waive, enjoin, or limit the liability of the Debtor or the Released Parties with respect to any Claim, cause of action or other proceeding of any kind and in whatever forum, brought or asserted by or on behalf of any of the Claimants classified in Class 3 of the Plan, including Pavarini

> and Civetta, and all said Claimants' Claims, rights, interests, and defenses are hereby, and within the Plan and its provisions, preserved.

The *Confirmation Order,* at ¶ 15, repeated the exception contained in § 7.9 of the *Plan.*

The *Plan* became effective on January 20, 2012, when the parties closed on the sale of the hotel. (*See Debtor's Second Post–Confirmation Report and Notice of Effective Date of the Debtor's Confirmed Second Amended Plan of Reorganization,* dated Jan. 20, 2012, at ¶ 3 (ECF/Main Case Doc. # 306).)

### 2. The Adversary Proceeding

On June 10, 2011, Pavarini commenced this adversary proceeding. (*See Complaint,* dated June 10, 2011 (ECF Doc. # 1).) The *Complaint* included seven counts, but the last four were directed at U.S. Bank and have been dismissed by stipulation. The three remaining counts asserted against Waterscape and the "Waterscape Defendants" [4] centered on the allegations that they had violated Article 3–A of the New York Lien Law by diverting funds that Waterscape was required to hold in trust for the benefit of Pavarini and the subcontractors. (*See Complaint* at ¶¶ 2, 11, 20(d), 34, 36, 37, 38, 60, 68, 69, 74, 76, 78, 80, 82, 84.) Although the Complaint focused on diversions to U.S. Bank and the John Doe defendants, it also alleged that the "Debtor and/ or the Waterscape Defendants *divided among themselves* or otherwise diverted" the trust funds. (*Id.* at ¶ 76 (emphasis added).) Count I sought a declaration that the estate held only bare legal title to any and all trust funds, including the Trust Assets, [5] and had no equitable interest in those funds until the claims of Pavarini and the subcontractors were fully satisfied. (*Id.* at ¶ 63.) Count II alleged that Waterscape "should be compelled to identify all trust funds that were diverted and/ or distributed by them, and all such trust funds should be recovered and returned to the benefit of Pavarini and the Trade Contractors, as the trust beneficiaries." ( **\*430** *Id.* at ¶ 80.) Count III demanded an accounting of all trust funds. (*Id.* at ¶ 84.)

Pavarini eventually moved for partial summary judgment on Counts I and II. It contended that Waterscape had diverted approximately $14.5 million received from the proceeds of the sale of condominium units, and paid the proceeds

to U.S. Bank. Pavarini also maintained that Waterscape had diverted $4,458,616.97 from requisitions funded by U.S. Bank. *Waterscape I* referred to the latter sum as the "Shortfall." *Waterscape I, 483 B.R. at 606.*

The Court granted partial summary judgment to the extent of concluding that the condominium proceeds were trust funds, and Waterscape had diverted the trust funds by paying them to U.S. Bank. *Id.* at 613. The Court declined, however, to award any monetary relief because Waterscape and U.S. Bank had restored $11 million by funding the Trust Fund Account under the *Plan. Id.* at 616. The Court denied the motion for partial summary judgment with respect to the Shortfall because Waterscape had failed to demonstrate as a matter of law that a diversion had occurred. *Id.* at 612–13.

### C. The Final Accounting

The CMA included an alternate dispute resolution procedure to resolve contract-related claims before a Dispute Resolution Board ("DRB"). After years of litigation between Waterscape and Pavarini, the DRB rendered its Final Accounting on March 11, 2014, in which it concluded that Waterscape owed Pavarini $8,093,655.92 under the CMA. Pavarini moved to compel Waterscape to pay this sum, plus interest, in accordance with the provisions of the Plan and prior to judicial review. The Court granted the motion, *Waterscape II,* 2014 WL 1389762, at *6, and Waterscape subsequently paid Pavarini. As matters stand, and subject to the possibility of further proceedings following judicial review of the DRB determinations, Waterscape has fully satisfied its contract debt to Pavarini.

### D. The Motion and Cross–Motion

One day after the DRB rendered its Final Accounting, Pavarini moved to amend its complaint to assert two additional claims relating to the diversion of trust funds. The proposed amended complaint (the "PAC") alleges that Waterscape and/or Assa "intentionally and maliciously" diverted trust funds drawn from U.S. Bank to Assa's other businesses, including 511 9th LLC, Assa Realty LLC, 940 8th Ave LLC, Denver West LLC, Donna Loren LLC, Sheermax LLC, Assa Hospitality Management LLC, Cassa 28, Cassa NYC, and Ayalon SA. (PAC at ¶¶ 41, 78–80.) [6] It identifies four instances between December 29, 2008 and July 1, 2010 involving diversions totaling $8.3 million to Assa, and alleges upon information and belief, that Waterscape and/or Assa intended to deprive Pavarini as beneficiary of the diverted funds. (PAC at ¶¶ 42–43.) Based on these allegations, Pavarini

proposes to add a claim for punitive damages against the Waterscape Defendants to Count II and a new Count VIII [7] through which it **\*431** seeks to compel Assa (1) to identify all trust funds that he diverted, (2) repay the diverted funds to Pavarini and the Trade Contractors, and (3) pay punitive damages.

In its moving memorandum, (*see Memorandum of Law in Support of Motion for Leave to Amend Complaint to Add a Demand for Punitive Damages,* dated Mar. 12, 2014 (ECF Doc. # 150)), Pavarini contended that the information regarding the specific diversions came to light either during discovery or as a result of the DRB's Final Accounting, (*id.* at 3–6), the Waterscape Defendants would not suffer prejudice and Pavarini did not unduly delay in proposing the amendment. (*Id.* at 7–10.) In addition, Count VIII arose out of the conduct and transactions alleged in the *Complaint,* and consequently, related back. (*Id.* at 11.)

Waterscape opposed Pavarini's motion to amend and cross moved to add two counterclaims. [8] (*See Waterscape Resort LLC's: (I) Opposition to the Motion of Pavarini McGovern, LLC to Amend its Complaint to Assert Punitive Damages; and (II) Cross–Motion in Support of Motion to Amend Answer to Assert Counterclaim Against Pavarini McGovern, LLC for Willful Overstatement of Lien Pursuant to* 🔖 *N.Y. Lien Law § 39,* dated Mar. 27, 2014 ("*Waterscape Opposition*") (ECF Doc. # 161–1).) Waterscape argued that Pavarini had unduly delayed in seeking to amend its complaint to assert a punitive damage claim, (*id.* at ¶ 17), Waterscape would suffer prejudice because the Court had already decided the scope of Pavarini's damages resulting from the diversion of funds in *Waterscape I,* (*id.* at ¶ 18,), punitive damages are reserved for "exceptional cases," and the mere diversion of funds did not approach the "outrageous" level of conduct required to impose punitive damages. (*Id.* at ¶¶ 21, 24.) Waterscape also contended that the allegations in the PAC regarding intent and malice were conclusory, (*id.* at ¶ 23), and the doctrine of law of the case barred Pavarini's claim for punitive damages because the Court ruled in *Waterscape I* that Waterscape had established the defense of restoration. Waterscape argued that this ruling negated the contention that Waterscape had intended to permanently deprive Pavarini of the funds. (*Id.*)

As noted, Waterscape sought leave to interpose two counterclaims. Count I charged that Pavarini filed an exaggerated notice of lien. (*Counterclaim* at ¶¶ 4–8, 37–

39.) Count II asserted a fraud claim primarily alleging that Pavarini charged Waterscape $200,000 for subguard insurance that it never procured. (*Id.* at ¶¶ 9–35, 40–41.) Pavarini opposed the cross-motion, contending that the proposed counterclaims were futile. The willful exaggeration claim fell because the adversary proceeding did not involve an effort by Pavarini to foreclose a mechanic's lien, (*Reply Memorandum of Law in Further Support of Pavarini McGovern, LLC's Motion for Leave to Amend Its Complaint and in Opposition to Waterscape Resort LLC's Cross Motion for Leave to Amend Its Answer,* dated Apr. 2, 2014 ("*Pavarini Reply* "), at 6–7 (ECF Doc. # 164)), and the fraud claim relating to subguard insurance **\*432** was barred by prior decisions of the DRB and the state court. (*Id.* at 7–8.)

During oral argument of the motion and cross-motion, the Court raised the possibility that the confirmation of the *Plan* discharged the claim for punitive damages, and offered the parties an additional opportunity to brief the issue. Waterscape belatedly submitted a supplemental memorandum, (*see Waterscape Resort LLC's Supplement in Further Opposition to Pavarini McGovern's Motion to Amend the Complaint to Assert Claims for Punitive Damages,* dated Aug. 14, 2014 (ECF Doc. # 185–1)), in which it argued that the claim for punitive damages arose prior to the petition date, the heavily negotiated plan dealt with Pavarini's prepetition claims, and the punitive damage claim was barred by the discharge and injunction provisions in the *Plan.* (*Id.* at ¶¶ 15–17) (citing 🚩 *Olin Corp. v. Riverwood Int'l Corp.* (*In re Manville Forest Prods. Corp.*), 209 F.3d 125 (2d Cir.2000)). Waterscape also contended that the payment of Pavarini's claim coupled with the release contained in the *Plan,* which did not exclude the punitive damage claim, rendered the claim moot. (*Id.* at ¶¶ 18–19.) Pavarini responded that the 🚩 *Manville* case cited by Waterscape was distinguishable, it could amend the *Complaint* to assert a punitive damage claim because the claim related back to the diversion claim asserted in the original complaint (citing 🚩 *In re Ben Franklin Hotel Associates,* 186 F.3d 301 (3d Cir.1999)), and the Plan did not restrict the distribution to the Class 3 creditors to the $11 million Trust Fund Account. (*Pavarini McGovern, LLC's Response to Waterscape Resort LLC's Supplement in Further Opposition to Pavarini McGovern, LLC's Motion to Amend the Complaint to Assert Demand for Punitive Damages,* dated Aug. 20, 2014, at ¶¶ 5–7, 9 (ECF Doc. 186–1).)

Concluding that the first round of supplemental briefing did not adequately answer the question, the Court ordered a second round of briefing centered on two issues. (*See Order Directing Further Supplemental Briefing,* dated Sept. 12, 2014 (ECF Doc. # 190).) First, did the *Plan* discharge Pavarini's punitive damage claim as against Waterscape and bar Pavarini from now asserting it under 🚩 *Farber v. Wards Co., Inc.,* 825 F.2d 684 (2d Cir.1987)? Second, if the claim was not discharged, "what is the appropriate test for determining whether to grant leave to amend a claim *after* confirmation?" (Emphasis in original.)

Waterscape responded, (*see Waterscape Resort LLC's Supplemental Briefing Pursuant to September 12, 2014 Order,* dated Sept. 29, 2014 (ECF Doc. # 191)), that the punitive damage claim was discharged and therefore barred under 🚩 *Farber.* It further argued that even if it was not discharged, the Court should not permit the post-confirmation amendment because Pavarini failed to show a "compelling reason." *See* 🚩 *In re Winn–Dixie Stores, Inc.,* 639 F.3d 1053, 1056 (11th Cir.2011); 🚩 *Holstein v. Brill,* 987 F.2d 1268, 1270 (7th Cir.1993); 🚩 *Allstate Insurance Co. v. Credit Suisse Securities (USA) LLC,* Case No. 11–cv–2232, 2011 WL 4965150, at \*6 n. 7 (S.D.N.Y. Oct. 19, 2011).

In reply, (*see Pavarini McGovern, LLC's Response to Waterscape Resort LLC's Supplemental Briefing Pursuant to September 12, 2014 Order,* dated Oct. 17, 2014 (ECF Doc. # 192)), Pavarini asserted that the confirmation did not discharge the punitive damage claim, directing the Court's attention for the first time to the exception to the discharge of Class 3 claims contained in the *Confirmation Order.* As to the second question, Pavarini ignored the case law cited by Waterscape, and argued for the more liberal test under **\*433** 🚩 *In re Ben Franklin Hotel Associates,* 186 F.3d 301 (3d Cir.1999). [9]

## DISCUSSION

### A. Discharge

[1] With exceptions that are not relevant, Bankruptcy Code § 1141(d)(1)(A) [10] discharges the debtor from any debts that arose prior to confirmation *unless the plan or confirmation order provide otherwise.* Although it required two rounds of briefing, it is now clear that the *Plan* and *Confirmation Order* excepted the claims of the Class 3 claimants, including Pavarini, from the discharge, release and

injunction provisions of the *Plan*. (*Plan* at § 7.9; *Confirmation Order* at ¶ 15.) Pavarini's claims were not discharged, and I turn to the question of whether the proposed amendment should be permitted.

## B. The Proposed Amendment

### 1. Introduction

The *Complaint, inter alia,* asserted that Waterscape had diverted trust funds aggregating $4,457,983.07 by failing to pay over to Pavarini the work requisitions funded by U.S. Bank and owed to Pavarini based upon the work provided under the CMA. (*See* ¶¶ 36–41.) The *Complaint* also alleged that Waterscape had diverted trust funds by paying the proceeds of condominium sales to U.S. Bank. (*See* ¶¶ 42–49.) In Count II, the *Complaint* demanded that the diverted trust funds "should be recovered and returned to the benefit of Pavarini and the Trade Contractors, as the trust beneficiaries." (¶ 80.)

[2] [3] [4] The filing of a timely proof of claim is the proper procedure to assert a right to a distribution from a chapter 11 estate. *See* FED. R. BANKR.P. 3003(c)(2) (stating that a creditor who fails to file a timely proof of claim "shall not be treated as a creditor with respect to such claim for the purposes of voting or distribution"). Pavarini's proof of secured claim sought the unpaid amounts due under the CMA, but did not attach the *Complaint* or assert the specific claims alleged in the *Complaint.* Nevertheless, the proof of claim arguably subsumed the claim for recovery of the diverted trust funds to the extent the unpaid amounts formed part of its claim, but even if it did not, Waterscape has never objected to the assertion of the diversion claim in the *Complaint* rather than in a proof of claim. Moreover, the *Complaint* may be treated as an informal proof of claim to the extent that the diversion claim asserts a "right to payment" under 11 U.S.C. § 101(5)(A).[11]

**\*434** [5] [6] [7] [8] [9] The *Complaint* did not, however, assert a claim for punitive damages, and the deadline for filing claims expired on June 10, 2011. (*Order Establishing Deadline for Filing Proofs of Claim and Approving the Form and Manner of Notice Thereof,* dated May 4, 2011 (ECF/Main Case Doc. # 41).) Pavarini's current motion seeks leave to amend the *Complaint, inter alia,* to now assert the punitive damages claim, but for the reasons stated, it should be viewed as a motion for leave to amend a proof of claim after the bar date. The decision to permit a post-bar date

amendment to a proof of claim is within the discretion of the bankruptcy court. *In re Integrated Resources, Inc.,* 157 B.R. 66, 69–70 (S.D.N.Y.1993). Amendments should be freely allowed, but post-bar date amendments are subject to "careful scrutiny to assure that there was no attempt to file a new claim under the guise of an amendment." *Midland Cogeneration Venture L.P. v. Enron Corp.* (*In re Enron Corp.*), 419 F.3d 115, 133 (2d Cir.2005) (quoting *Integrated Resources,* 157 B.R. at 70). Courts generally engage in a two-step inquiry when considering the allowance of late amendments. First, the amended claim must "relate back" to a timely filed proof of claim. An amendment relates back to an original claim if it cures a defect of form in the original claim, describes the original claim with greater particularity, or pleads a new theory of recovery on the facts set forth in the original claim. *Enron,* 419 F.3d at 133. Second, courts will consider the facts of the case and determine whether it would be equitable to allow the amendment. *Id.* Belated amendments to timely claims will be freely allowed in the absence of prejudice to the other parties. *Id.* at 133–34.

[10] [11] Leave to amend may be less appropriate after confirmation. *Holstein v. Brill,* 987 F.2d 1268, 1270 (7th Cir.1993). With certain exceptions, confirmation discharges all pre-confirmation debts other than those provided for in the plan. 11 U.S.C. § 1141(d)(1)(A) and Bankruptcy Code § 524(a)(2) operates as an injunction against the collection of a discharged debt. "[E]ach claimant gets a 'new' claim, based upon whatever treatment is accorded to it in the plan itself." *Holstein,* 987 F.2d at 1270 (quoting *In re Benjamin Coal Co.,* 978 F.2d 823, 827 (3d Cir.1992)). In the Second Circuit, the bankruptcy court has no authority to permit an amendment to assert a discharged claim even if the proposed amendment relates back to a timely claim. *Farber v. Wards Co.,* 825 F.2d 684, 689 (2d Cir.1987). Even in those circuits where post-confirmation amendments are not foreclosed as a matter of law, the creditor must demonstrate a "compelling reason" to amend the claim given the discharge, the *res judicata* effect of the plan, the disruption to the orderly process of adjudication and the interests of finality. *IRT Partners, L.P. v. Winn–Dixie Stores, Inc.* (*In re Winn–Dixie Stores, Inc.*), 639 F.3d 1053, 1056–57 (11th Cir.2011); *Holstein,* 987 F.2d at 1270–71; *but cf. In re Ben Franklin Hotel Associates,* 186 F.3d 301, 309

(3d Cir.1999) (affirming bankruptcy court's application of relation back test to post-confirmation amendment).

 **[12]**  Here, the rationale for requiring Pavarini to show "compelling circumstances" is missing. The *Plan* did not discharge Pavarini's claims, and distribution on its allowed claim was not limited to the Trust Fund Account. In fact, **\*435** Court has been advised that the Trust Fund Account was insufficient to discharge Pavarini's allowed claim liquidated through the Final Accounting, and Waterscape had to use additional funds. Nor will the amendment disrupt the claims resolution process; the only claim left to resolve in this Court is Pavarini's punitive damage claim. In short, the confirmation of the *Plan* lacked the finality that the "compelling circumstances" test is designed to foster.

Most important, Waterscape has never contended that the assertion of the punitive damage claim will disrupt the *Plan* or threaten its ultimate consummation. The only prejudice that Waterscape has asserted is based on its belief that the Court had already decided the scope of Pavarini's damages on the diversion theory when it ruled "that diversion did occur but Waterscape had restored the funds, absolving it of further liability." (*Waterscape Opposition* at ¶ 18.)

Waterscape is mistaken. The Court granted partial summary judgment to Pavarini concluding that Waterscape had diverted nearly $14.5 million of condominium sales proceeds, *Waterscape I,* 483 B.R. at 613, but had restored $11 million of the diverted funds by establishing the Trust Fund Account, *id.* at 616, and it was premature to conclude that Waterscape should be required to restore any more funds especially in light of the other security available to the Class 3 claimants. *Id.* at 616–17. The Court denied summary judgment with respect to Pavarini's distinct claim that the Waterscape Defendants had diverted $4.46 million of trust funds requisitioned from U.S. Bank primarily because Pavarini conceded for the purpose of its motion that Waterscape's trust fund expenditures exceeded its trust fund receipts. *Id.* at 612–13. The Court did not rule on the amount of that claim. Accordingly, Pavarini's motion must be judged under the two-step analysis discussed in 📁 *Enron.*

### 2. Proposed Count II

 **[13]**  Although the *Complaint* focused on two types of diversion—the payments to U.S. Bank and the Shortfall —Count II of the *Complaint* alleged more broadly that the Waterscape Defendants "divided among themselves or

otherwise diverted" trust funds. (*Complaint* at ¶ 76.) Through discovery, Pavarini has identified with greater specificity the diversion claim alleged in the *Complaint.* The claim for punitive damages pleads a new theory of recovery arising from the same facts asserted in the *Complaint,* and therefore, relates back. 📁 *Ben Franklin Hotel,* 186 F.3d at 309 (punitive damage claim related back to timely claims).

Furthermore, equitable considerations weigh in favor of granting leave to amend.

> Multiple factors play a role in this analysis, including whether the debtor, or other creditors, would be unduly prejudiced by the amendment, or whether, instead, other creditors would "receive a windfall" from the disallowance of the amendment, and whether the late claimant acted in good faith and the delay was justified. [Citation omitted.] Of these, however, "[t]he critical consideration is whether the opposing party will be unduly prejudiced by the amendment."

📁 *Enron,* 419 F.3d at 133 (quoting *In re Integrated Resources,* 157 B.R. at 70).

As just discussed, Waterscape has not identified any prejudice to itself or the Class 3 creditors if Pavarini is permitted to assert a claim for punitive damages. Furthermore, Pavarini has acted in good faith and not unduly delayed in asserting its proposed amendment. Although Pavarini raised diversion claims at the outset **\*436** of the adversary proceeding, it only learned through discovery that Assa diverted millions of requisitioned funds to himself while Pavarini remained unpaid. Accordingly, equitable considerations support Pavarini's request.

 **[14]**   **[15]**  Waterscape also contends that leave to amend should be denied because the amendment would be futile. A court may deny leave to amend as futile where the proposed amended claim would not withstand a motion to dismiss under Federal Civil Rule 12(b)(6). *Krys v. Pigott,* 749 F.3d 117, 134 (2d Cir.2014); 📁 *Ricciuti v. New York City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991). While not every diversion of trust funds will support a punitive damage award, *see ARA Plumbing & Heating Corp. v. Abcon Assocs., Inc.,* 44 A.D.3d 598, 843 N.Y.S.2d 154, 154–55 (2007), the allegations that trust funds were diverted to the owner's principals while the claims of contractors, subcontractors and suppliers remained unsatisfied meets the high threshold of moral culpability to support an award

of punitive damages. *Sabol & Rice, Inc. v. Poughkeepsie Galleria Co.,* 175 A.D.2d 555, 572 N.Y.S.2d 811, 813 (1991); *see Pinnacle Environmental Sys., Inc. v. R.W. Granger & Sons, Inc.,* 245 A.D.2d 773, 665 N.Y.S.2d 473, 475 (1997). The PAC alleges that Assa diverted trust funds drawn from U.S. Bank to fund shortfalls in his other businesses at a time when the claims of Pavarini and the subcontractors remained unpaid. (PAC at ¶¶ 41–42, 78–80.) These allegations assert a plausible claim for punitive damages. [12]

The Court notes that the same conclusion would flow from the application of the general rules that govern the amendment of pleadings under Rule 15(a) of the Federal Rules of Civil Procedure. Generally, leave should be freely granted, but the court may deny the motion in instances of undue delay, bad faith, dilatory motive, undue prejudice to the opposing party or futility. *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). Legal prejudice involves consideration, *inter alia,* of whether the new claim would require the opposing party to expend significant additional resources to conduct discovery or prepare for trial and whether the amendment would significantly delay the resolution of the case. *Block v. First Blood Assocs.,* 988 F.2d 344, 350 (2d Cir.1993). For the reasons stated, the amendment was not interposed with undue delay or in bad faith, Waterscape has not identified any legal prejudice and the amendment is not futile.

The motion for leave to assert Count II is, therefore, granted.

### 3. Proposed Count VIII

[16] Proposed Count VIII alleges that Assa exercised dominion and control over the trust assets, "intentionally and maliciously" used the funds drawn from U.S. Bank to pay himself millions of dollars without satisfying Pavarini's trust claims, and upon information and belief, intended to deprive Pavarini permanently of these assets. (PAC at ¶¶ 117–19.) As a consequence, Assa should be compelled to identify all such diverted trust assets, all such funds should be recovered and returned to **\*437** the benefit of Pavarini and the subcontractors and Assa should pay Pavarini punitive damages. (PAC at ¶¶ 120–21.)

This claim duplicates proposed Count II, which already alleges the Waterscape Defendants, including Assa, diverted funds and seeks punitive damages. (PAC at ¶¶ 78–80, 87.) Moreover, the *Complaint* already seeks to compel the

Waterscape Defendants, including Assa, to identify all trust funds that were diverted or distributed to them and recover and return the diverted funds to the benefit of Pavarini and the Trade Contractors. (*Complaint* at ¶ 80.) Accordingly, the motion for leave to assert Count VIII is denied.

### C. The Cross–Motion to Amend to Add Counterclaims

Waterscape is not seeking to amend a proof of claim, and the usual rules governing leave to amend, discussed *supra,* apply to the cross-motion. Pavarini's opposition to the cross-motion is limited to the argument that the amendment is futile. [13]

#### 1. Count I—Willful Exaggeration of Lien

[17] Waterscape seeks to add a counterclaim for willful exaggeration of a mechanic's lien relying on New York Lien Law § 39. Section 39 states:

> In any action or proceeding to enforce a mechanic's lien upon a private or public improvement or in which the validity of the lien is an issue, if the court shall find that a lienor has wilfully exaggerated the amount for which he claims a lien as stated in his notice of lien, his lien shall be declared to be void and no recovery shall be had thereon. No such lienor shall have a right to file any other or further lien for the same claim. A second or subsequent lien filed in contravention of this section may be vacated upon application to the court on two days' notice.

N.Y. LIEN LAW § 39 (McKinney 2014).

I agree that the claim is futile. The *Complaint* did not assert a claim to foreclose a mechanic's lien. In fact, Pavarini's mechanic's lien was discharged under the *Plan* when the Trust Fund Account was funded. (*Plan* at § 5.3.) Consequently, the cross-motion for leave to amend to add this counterclaim is denied.

#### 2. Count II—Fraud

 **[18]**  Count II mainly concerns Pavarini's failure to procure subguard insurance. Subguard insurance pays for the costs of subcontractor defaults by enabling the prime contractor to terminate a defaulting subcontractor and recover the costs of the default through insurance. (*Counterclaim* at ¶ 10.) The *Counterclaim* alleges upon information and belief that "Pavarini falsely or fraudulently took $200,000 in trust funds" to pay insurance premiums to cover 160 Broadway Concrete Corp. ("Broadway Concrete"), a major subcontractor, but did not obtain the required subguard insurance. (*Counterclaim* at ¶¶ 9, 11–13.) Toward that end, Pavarini submitted inaccurate and untruthful Applications for Payment to Waterscape between September 2007 and June 2009 in which it sought reimbursement for subguard premiums it never paid.[14] (*Counterclaim* at ¶¶ 18, 22–24.) **\*438** Waterscape alleges upon information and belief that Pavarini refused to place Broadway Concrete in default although it was responsible for 140 days of delay because its default was not insured. (*Counterclaim* at ¶¶ 14, 15, 29.)

The *Counterclaim* includes additional allegations that purport to sound in fraud. Waterscape asserts that Pavarini failed to disclose the terms of the Broadway Concrete Trade Contract (and obtain Waterscape's approval), (*Counterclaim* at ¶¶ 16, 20), and that Broadway Concrete lacked adequate financial resources and bondability, was not included in Pavarini's subguard program, and had not provided payment and performance bonds. (*Counterclaim* at ¶¶ 17, 21.) Waterscape claims that Pavarini failed to bill Waterscape for and collect from Waterscape only actual costs of work and the agreed fee. (*Counterclaim* at ¶ 19.) Finally, Waterscape avers that Pavarini misrepresented the levels of completion by the subcontractors in its Application for Payments and that Waterscape paid for incomplete and defective work in reliance on those misrepresentations. (*Counterclaim* at ¶¶ 30–34.) Nevertheless, its fraud claim appears to be limited to the subguard insurance that Pavarini billed but never procured or intended to procure, the resulting cover up and the adverse effects that these actions had on the Project. (*Counterclaim* at ¶ 41.)

As noted, Pavarini argues that the fraud claim is barred by prior decisions of the state court and the DRB. In determining the legal sufficiency of a claim, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.,* 551 U.S. 308, 322, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007). The court may also consider documents that the party relied on in bringing suit and that are either in the party's possession or that the party knew of when bringing suit. *Chambers v. Time Warner, Inc.,* 282 F.3d 147, 153 (2d Cir.2002); *Brass v. Am. Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47–48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *McKevitt v. Mueller,* 689 F.Supp.2d 661, 665 (S.D.N.Y.2010). Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss. *131 Main St. Assocs. v. Manko,* 897 F.Supp. 1507, 1532 n. 23 (S.D.N.Y.2010).

Pavarini's opposition goes well beyond the four corners of the record, and cites evidence that Waterscape did not rely on in drafting its fraud claim. Furthermore, Pavarini implies that Waterscape's fraud claim is really a breach of contract claim, but the distinction is not always an easy one to make. *See Sommer v. Federal Signal Corp.,* 79 N.Y.2d 540, 583 N.Y.S.2d 957, 593 N.E.2d 1365, 1369 (1992) (discussing the "guideposts for separating tort from contract claims"). The Court declines to speculate on the viability of the fraud claim without the benefit of briefing on the issue. Moreover, if Pavarini contends that prior determinations in another forum estop Waterscape from asserting a fraud claim relating to subguard insurance, it should place that information before the Court on a motion for summary judgment. Accordingly, the cross-motion for leave to amend to assert the fraud claim in Count **\*439** II of the *Counterclaim* is granted. To avoid any misreading of the scope of this determination, the Court is not deciding that the fraud claim is legally sufficient, but only that Pavarini's specific futility arguments are procedurally improper for the reasons stated.

The Court has considered the remaining arguments asserted by the parties and concludes that they lack merit. The parties are directed to submit a consensual order or settle non-consensual orders that reflect the disposition of the motions and provide for the service and filing of the amended complaint and the amended answer.

72 Collier Bankr.Cas.2d 1514

**All Citations**

520 B.R. 424, 72 Collier Bankr.Cas.2d 1514

# Footnotes

1    "ECF/Main Case" refers to the docket in the bankruptcy case, and "ECF" refers to the docket in this adversary
     proceeding.

2    A copy of the *Plan* is annexed to the *Confirmation Order.*

3    An additional $3 million was carved out of the hotel sale proceeds to fund the Class 5 Reserve Account for
     the benefit of the unsecured creditors. (*Plan* at § 4.1(b).)

4    The *Complaint* defined the "Waterscape Defendants" to include the Debtor, 45 Inmex Corp., Catmex 45,
     Corporation, Gemstone 45 LLC, Salim Assa a/k/a Solly Assa, Ezak Assa, Elias Hanono, Jacobo Hanono,
     Simon Masri, Salomon Masri and Ezra Tawil. (*Complaint* at ¶ 8.)

5    "Trust Assets" meant "the proceeds generated from the Debtor's proposed sale of condominium units of the
     Project pursuant to this Court's Order entered on May 31, 2011, and the Debtor's proposed sale of the hotel
     portion of the Project, *i.e.,* the Hotel Assets, pursuant to the Debtor's pending Plan of Reorganization filed
     on May 6, 2011." (*Complaint* at ¶ 46.)

6    The parenthetical "PAC at ¶ —" refers to the paragraphs in the proposed amended complaint, dated Mar. 12,
     2014, a copy of which is annexed as Exhibit 1 to the *Declaration of Eric Sleeper, Esq. in Support of Pavarini
     McGovern, LLC's Motion for Leave to Amend Complaint to Add a Demand for Punitive Damages,* dated Mar.
     12, 2014 (ECF Doc. # 151).

7    The PAC reasserted Counts IV through VII in the original complaint. Those Counts had been directed against
     U.S. Bank but were subsequently dismissed. Pavarini confirmed that it was a mistake to reassert these
     Counts in the PAC.

8    A black-lined copy of Waterscape's proposed *Answer to Complaint with Counterclaims* ("*Counterclaims* ") is
     annexed as Exhibit A to the *Affirmation of Eric S. Medina,* dated Mar. 27, 2014 (ECF Doc. # 161–2). The
     portion of the answer responding to the allegations in the *Complaint* ends at paragraph 122 on page 14 of
     Exhibit A, and the counterclaims follow thereafter. All citations to the *Counterclaim* refer to paragraphs in
     the counterclaim portion of the answer. For example, "*Counterclaim* at ¶ 4" refers to paragraph 4 on page
     15 of Exhibit A.

9    Pavarini subsequently filed an unauthorized supplemental declaration attaching an unsworn memorandum
     from a state court proceeding involving allegations that Assa had diverted trust funds from another project.
     (*See* ECF Doc. # 193.) The submission was unauthorized and irrelevant, and the facts presented in it were
     hearsay. The Court has not considered the submission.

10   Bankruptcy Code § 1141(d)(1)(A) provides:

     (1) Except as otherwise provided in this subsection, in the plan, or in the order confirming the plan, the
     confirmation of a plan-

(A) discharges the debtor from any debt that arose before the date of such confirmation, and any debt of a kind specified in section 502(g), 502(h), or 502(i) of this title, whether or not—

(i) a proof of the claim based on such debt is filed or deemed filed under section 501 of this title;

(ii) such claim is allowed under section 502 of this title; or

(iii) the holder of such claim has accepted the plan....

11    A Court may treat a request for monetary relief asserted in a complaint as an informal proof of claim where the complaint (1) is timely filed and becomes part of the judicial record, (2) states the nature, existence and amount of the debt, and (3) evidences the creditor's intent to hold the estate liable. *See Wilson v. Residential Capital, LLC (In re Residential Capital, LLC)*, Adv. P. No. 12–01936, 2014 WL 3057111, at *7 (Bankr.S.D.N.Y. July 7, 2014).

12    Waterscape contends that the restoration of funds under the *Plan* "negates any contention that Waterscape intended to permanently deprive [Pavarini] of its funds." (*Waterscape Opposition* at ¶ 23.) The relevant time to determine Assa's intent is when the diversion occurred. The restoration of the trust funds occurred after the alleged acts of diversion and were not contemplated by Waterscape in its initial plan. Waterscape (and U.S. Bank) agreed to establish the Trust Fund Account as a compromise to settle Pavarini's objection to the original plan.

13    Neither side discussed the possibility that the cross-motion would be rendered moot if I granted Pavarini's motion for leave to amend. Waterscape would then have the opportunity to file an answer to the amended complaint that could include the counterclaims identified in its cross-motion. Since neither side discussed the issue, I will decide the cross-motion independent of the disposition of Pavarini's motion.

14    Waterscape alleges that Pavarini's project executive represented in a March 27, 2014 e-mail that it had subguard insurance that covered Broadway Concrete. (*Counterclaim* at ¶ 24.) The email could not have induced Waterscape to pay premiums between 2007 and 2009.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.