PROSKAUER ROSE LLP
Brian S. Rosen
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000

-and-

Jordan E. Sazant
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone: (312) 962-3550

*Counsel to the Ad Hoc Group of Genesis Lenders*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*, | Case No. 23-10063 (SHL) |
| Debtors.[1] | Jointly Administered |
| | **Re:  Docket No. 785** |

**AD HOC GROUP OF GENESIS LENDERS' (I) OBJECTION
TO DEBTORS' THIRD MOTION FOR ENTRY OF AN ORDER
EXTENDING THE DEBTORS' EXCLUSIVE PERIODS IN WHICH TO
FILE A CHAPTER 11 PLAN AND SOLICIT ACCEPTANCES THERETO AND
GRANTING RELATED RELIEF, AND (II) CROSS-MOTION TO TERMINATE
THE DEBTORS' EXCLUSIVE PERIODS PURSUANT TO 11 U.S.C. § 1121(d)(1)**

The Ad Hoc Group of Genesis Lenders (the "Ad Hoc Group") hereby submits this

(i) objection to the *Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive*

*Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereof and Granting Related*

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable) are:  Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (9564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

*Relief* [Docket No. 785] (the "Motion")[2] filed by the debtors and debtors-in-possession

(collectively, the "Debtors") in the above-captioned chapter 11 cases (the "Chapter 11 Cases") to

extend (a) the Exclusive Filing Period through and including November 22, 2023, and (b) the

Exclusive Solicitation Period through and including December 22, 2023; and (ii) cross-motion

(this "Cross-Motion") seeking entry of an order, substantially in the form attached hereto as

**Exhibit A** (the "Order"), terminating the Exclusive Filing Period and the Exclusive Solicitation

Period pursuant to section 1121(d)(1) of chapter 11 of title 11 of the United States Code (the

"Bankruptcy Code").   In support of the relief requested herein, the Ad Hoc Group relies on the

*Declaration of Jordan E. Sazant in Support of the Ad Hoc Group of Genesis Lenders' (I) Objection*

*to Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods in Which*

*to File a Chapter 11 Plan and Solicit Acceptances Thereto and Granting Related Relief, and (II)*

*Cross-Motion to Terminate the Debtors' Exclusive Periods Pursuant to 11 U.S.C. § 1121(d)(1)*

filed contemporaneously herewith (the "Sazant Declaration"), and respectfully states as follows:

### PRELIMINARY STATEMENT

1.     The Ad Hoc Group, which represents approximately $2.4 billion in claims against

Genesis Global Capital, LLC ("GGC") (including majorities in amount of asserted USD, Bitcoin,

and Ethereum claims against GGC), has repeatedly made clear in public filings and direct

communications to both the Debtors and the official committee of unsecured creditors (the "UCC")

that the "Agreement in Principle" described in the *Public Update on Plan Discussions* [Docket

No. 625] (the "Agreement in Principle") does not have creditor support, and will not be acceptable

if foisted upon creditors through the solicitation of a chapter 11 plan.

---

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

2.      Most recently, and as requested by the Debtors and the UCC, the Ad Hoc Group

submitted to the Debtors and UCC statements signed by creditors holding in excess of $3.5 billion

in claims, including greater than 80% of the voting claims in each potential class, which provide

that such creditors (a) do not support, and vehemently oppose, the Agreement in Principle, (b) do

not support the filing of a "toggle" plan based on the Agreement in Principle (a "Toggle Plan"),

(c) would support a plan centered around certain revised terms delivered by the Ad Hoc Group

(the "Revised Proposal"), and would be prepared to execute a restructuring support agreement to

that effect, and (d) if no agreement were reached on such Revised Proposal, would support a

chapter 11 plan centered on the immediate distribution of current assets and the prosecution of

retained claims and causes of action.

3.      The path forward is clear.  The Debtors have squandered their exclusive opportunity

to propose and solicit a chapter 11 plan that would receive sufficient creditor support.  Rather,

already knowing the creditors' perspective, the Debtors (with the seeming support of the UCC)

still choose a path doomed to fail.  Doing so would be an extreme waste of estate resources through

the expenditure of tens of millions of dollars in professional fees and, most importantly, delay the

conclusion of these chapter 11 cases and the distribution of available assets to creditors holding

valid and undisputed claims.  It is time for this Court to permit the loud creditor voices to be heard

and to take control of their own destiny.  The Debtors' Exclusive Periods must be terminated.

## BACKGROUND

4.      As the Court is aware, the Ad Hoc Group represents creditors holding

approximately $2.4 billion in claims against Genesis Global Capital, LLC ("GGC"), including

majorities in amount of asserted USD, Bitcoin, and Ethereum claims against GGC.  Consequently,

the Ad Hoc Group is a vital, and probably the most critical, constituency in the Chapter 11 Cases.

5.      Since shortly after the freeze of withdrawals/loan repayments by GGC in November 2022, the Ad Hoc Group was involved in negotiations with the Debtors and their parent company, Digital Currency Group ("DCG"), and Gemini Trust N.A. ("Gemini"), negotiating a potentially consensual holistic restructuring of both the claims asserted against the Debtors, as well as the claims and causes of action held by the Debtors' estates against DCG and Gemini (the "Estate Claims").  At first, the Ad Hoc Group participated in an effort to avoid bankruptcy and establish a repayment schedule for creditors' loans.  Following the filing of these Chapter 11 Cases, the Ad Hoc Group has pursued maximization of creditor recoveries and the return of creditors' valuable digital assets.

6.      These efforts, while unsuccessful at staving off the Debtors' decision to commence the Chapter 11 Cases (and there was no urgency to do so), resulted in a non-binding term sheet providing for a proposed compromise and settlement of such Estate Claims (the "Term Sheet"). Unfortunately, shortly thereafter, and following the appointment of the UCC on February 3, 2023, the Ad Hoc Group, the Debtors, Gemini, and the UCC acknowledged that circumstances had changed materially, and additional information had been acquired that made proceeding with the proposed Term Sheet transaction inconsistent with the interests of the Debtors' creditors.

7.      Thereafter, the parties returned to the negotiating table and the Ad Hoc Group continued to pursue a value-maximizing transaction that would provide (a) significant in-kind recoveries through an initial distribution, including the proceeds of the approximately $630 million in loans payable by DCG to GGC by no later than May 11, 2023 (the "DCG Loans"), (b) recognizable value in exchange for the release of any Estate Claims against DCG and its directors and officers on account of preference claims potentially valued in the hundreds of millions of dollars, fraud, alter ego liability for the creditors' claims, and more, and (c) additional

long-dated recoveries denominated in line with creditor claims such that creditors can expect to continue to receive the benefit of their independent investment decisions with respect to the various cryptocurrency assets they lent to GGC.

8.    While the parties returned to the negotiating table under the auspices of a Court-ordered mediation process, during such period, DCG defaulted on its obligations to pay the DCG Loans, further altering the DCG/creditor dynamics and elevating uncertainty about the viability of any long-term solution and any near-term recovery.  Worsening the situation, the Debtors failed to enter into a forbearance agreement with DCG with respect to such default or, despite repeated requests to do so, to require payment of the amounts due and owing, again heightening the concerns of creditors about the prompt collectability of undisputed amounts.[3]  Notwithstanding, the Ad Hoc Group continued to participate in formal mediation and informal discussions, and its goals have been clear throughout—develop a chapter 11 plan that either (a) provides for fair value from DCG in resolution of the Estate Claims asserted against it, or (b) turns over control of the estate and the Estate Claims to creditors to pursue appropriate recoveries.

9.    In that regard, the Ad Hoc Group, through its Steering Committee, met, and, until the Debtors' abrupt cessation of mediation, continued to meet, with all parties in interest to seek a reasonable, confirmable chapter 11 plan structured around a potential resolution of the Estate

---

[3] On September 6, 2023, at the request of the Ad Hoc Group, the Debtors finally filed Adv. Pros. Nos. 23-11068 and 23-11069 (collectively, the "Turnover Actions") against DCG and its affiliate entity DCG International Investments, Ltd., seeking the turnover of the overdue DCG Loans.  Shortly thereafter, on September 12, 2023, the Debtors executed a Partial Repayment Agreement and voluntarily stayed prosecution of the Turnover Actions.  Under the terms of the Partial Repayment Agreement, DCG is required to pay approximately $75 million every 47 days up to an aggregate total of $275 million in exchange for forbearance of the Turnover Actions.  DCG is not required to pay a value-additive fee in exchange for such forbearance, which fee is instead credited against the principal payments to be made under the Partial Repayment Agreement.  To date, upon information and belief, the Debtors have received approximately $117 million and 1,308.89678695 BTC from DCG and its affiliate on account of the principal and late fees accrued in respect of the DCG Loans, as well as a forbearance fee payment in the amount of $2,315,937.92, which fee is contemplated to be credited against the outstanding principal amounts of the DCG Loans pursuant to the Partial Repayment Agreement.  *See* Turnover Actions, Docket Nos. 5 and 6.

Claims, including the payment in full of the defaulted DCG Loans (including accrued late fees and a real, value-additive forbearance fee), as well as the $1.1 billion promissory note from DCG payable to the Debtors in 2032, and the multitude of viable and valuable claims and causes of action against not only DCG and its principals, but other parties in interest as well. And, the Ad Hoc Group believed the parties were continuing to make progress towards a supportable agreement, but, in the event not reached, that a chapter 11 plan that left these issues to the creditors would ultimately be pursued.

10. Despite the clear representations of the Ad Hoc Group—representing majorities in amount of USD, BTC, and ETH creditors—that the proposed contribution by DCG and plan distribution mechanics were unsupportable and would not receive the approval of any class of creditors, the Debtors, with the agreement of the UCC, terminated all mediation efforts under the guise of "needing to move forward" and, on August 29, 2023, published the *Public Update on Plan Discussions* [Docket No. 625], disclosing the terms of an agreement in principle tentatively reached among the Debtors, DCG, and the UCC (the "Agreement in Principle"). For reasons described in the *Statement of Ad Hoc Group of Genesis Lenders in Respect of Public Update on Plan Discussions* [Docket No. 632] (the "AHG Statement"), the Ad Hoc Group does not believe a plan premised upon the Agreement in Principle is confirmable either (a) as a factual matter, because without the support of the Ad Hoc Group, Gemini,[4] and other members of the "Fair Deal Group,"[5] the conceptual plan will not receive an impaired accepting class, and (b) as a legal matter, because the DCG contribution is indefensible under the law.

---

[4] *See Objection of Gemini Trust Company, LLC to Debtors' Second Motion to Extend Exclusivity* [Docket No. 634].

[5] *See Objection of the Fair Deal Group to Debtors' Second Motion to Extend Exclusivity* [Docket No. 633].

11.     With this factual backdrop, at a hearing held on September 6, 2023, the Court granted the Debtors a second, albeit limited, extension of the Exclusivity Periods, rejecting the Debtors' request to extend the Exclusivity Periods by sixty (60) days, limiting such extension to thirty (30) days, and emphasizing the need for urgency in these Chapter 11 Cases.

12.     Since that time, the Ad Hoc Group has worked diligently with the other key creditor constituencies to reach agreement on a construct for a confirmable chapter 11 plan.  Over the course of several weeks, the Ad Hoc Group worked with such constituencies to reach an understanding on "Distribution Scenarios" that would be acceptable to creditors holding U.S. Dollar and cryptocurrency-denominated claims (or a combination of both) pursuant to both a consensual chapter 11 plan with a DCG related agreement (a "Deal Plan") and one where such an agreement is not reached (a "No Deal Plan").  The creditor groups, at the Debtors' request, also held meetings and solicited their members' positions regarding the Agreement in Principle and a proposed "Toggle Plan", a plan concept where the Debtors seek to gain confirmation of a chapter 11 plan where dueling recovery concepts are offered, but no real closure or guidance is provided. In connection with such discussions, the Ad Hoc Group worked with Gemini and the Fair Deal Group to develop the Revised Proposal, including (i) a term sheet setting forth economic terms to be incorporated into a settlement with DCG and (ii) a form of plan support agreement to be entered into among the Debtors, DCG, the UCC, and all key creditor constituencies, including the members of the Ad Hoc Group.

13.     Following such discussions, at the request of the Debtors and the UCC, on October 3, 2023, counsel to the Ad Hoc Group circulated to each member of the Ad Hoc Group a form of the *Ad Hoc Group Member Statement with Respect to Chapter 11 Plan and DCG Litigation*, a copy of which is attached to the Sazant Declaration as **Exhibit A** (the "Statement in Support").

Therein, the applicable member of the Ad Hoc Group stated that it (i) does not support, and vehemently opposes, the Agreement in Principle, (ii) does not support the filing of a Toggle Plan, (iii) does support a proposed chapter 11 plan incorporating the terms set forth in the Revised Proposal, and would be prepared to execute a restructuring support agreement to such effect, and (iv) if DCG does not accept the Revised Proposal, does support (a) the termination of the Agreement in Principle and Partial Repayment Agreement, (b) the immediate resumption of litigation against DCG, and (c) the filing of a chapter 11 plan which would distribute all current estate assets to creditors and establish a litigation trust to pursue claims against DCG. *See* Sazant Decl. Ex. A.

14.    The Revised Proposal received overwhelming creditor support. As of October 6, 2023, creditors holding well over $3 billion in claims, representing more than 80% in each class under a proposed plan incorporating the Revised Proposal, had signed a Statement in Support. *See* Sazant Decl. ¶ 4. On October 6, 2023, counsel to the Ad Hoc Group provided the Debtors and the UCC with the form of Statement in Support, the dollar amounts and percentages of creditors who had signed a Statement in Support, the proposed term sheet incorporating the Revised Proposal, and a form of plan support agreement. *See* Sazant Decl. ¶ 6.

15.    The Ad Hoc Group offered to meet with the Debtors (and its Special Committee and the UCC to discuss the Revised Proposal, with the goal of reaching agreement and engaging with DCG. However, on October 12, 2023, the Debtors sent a letter to the Ad Hoc Group (the "Letter"), a copy of which is attached to the Sazant Declaration as **Exhibit C**, wherein the Debtors declined to make the Special Committee available for a discussion, and continued to advocate for the Toggle Plan which, as shown by the Statements in Support, creditors overwhelmingly oppose.

16.    In light of the overwhelming opposition to the Debtors' approach to these cases, it
would be futile to grant a further extension of the Exclusivity Periods.  Likewise, continuing the
ill-fated approach would only mean the further erosion of creditor recoveries through the continued
incurrence of professional fees and expenses which have already exceeded $67.5 million through
August 31, 2023.  More importantly, such an extension would only further delay the distributions
to which creditors are entitled.  Instead, the Court should terminate exclusivity and permit the
creditor parties—the same parties who were fraudulently induced to lend billions of fiat and
cryptocurrency assets usurped by the Debtors' parent, DCG,[6] and the only parties with a financial
stake in the outcome of these Chapter 11 Cases—to propose their own chapter 11 plan for
consideration.  The Motion and the relief requested therein should thus be denied, and this Cross-
Motion should be granted.

## JURISDICTION AND VENUE

17.    The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and
1334 and the *Amended Standing Order of Reference* from the United States District Court for the
Southern District of New York dated January 31, 2012 (Preska, C.J.). Venue is proper pursuant to
28 U.S.C. §§ 1408 and 1409. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). The
statutory predicates for the relief requested herein are section 1121(d) of the Bankruptcy Code,
Rule 9006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule
9006-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of New
York.

---

[6] Earlier today, on October 19, the New York Attorney General filed a complaint in the New York Supreme Court,
County of New York, against the Debtors, DCG, Barry Silbert, Michael Moro, and Gemini setting forth, among other
allegations, the extensive fraud perpetrated upon creditors.

**RELIEF REQUESTED**

18.    By this objection and Cross-Motion, the Ad Hoc Group seeks entry of the Order, substantially in the form attached hereto as **Exhibit A**, terminating the Debtors' exclusive period to file a chapter 11 plan and solicit acceptances thereto pursuant to section 1121(d)(1) of the Bankruptcy Code, so that the Ad Hoc Group can file and solicit votes in favor of a chapter 11 plan centered around the prompt acceptance of the Revised Proposal by DCG, or litigation of the DCG Loans, the Promissory Note, and the many viable and valuable Estate Claims against DCG, its principals and affiliates.

**ARGUMENT**

19.    Section 1121 of the Bankruptcy Code clearly recognizes that there comes a point in every chapter 11 case at which the parties should be placed on equal footing. *See* 11 U.S.C. § 1121; *In re Pub. Serv. Co. of New Hampshire*, 99 B.R. 155, 176 (Bankr. D.N.H. 1989) (noting that a "level playing field is essential in the present circumstances of this case to foster a consensual plan.").  It is time that the playing field be leveled between the Debtors and their creditors, who were fraudulently induced to lend billions of dollars, are the only parties with a financial stake in these Chapter 11 Cases, and have reached substantial agreement on the framework for a confirmable chapter 11 plan on which the Debtors refuse to engage.

20.    Pursuant to section 1121(d) of the Bankruptcy Code, "the court may for cause reduce or increase the 120-day [Exclusive Filing Period] or the 180-day [Exclusive Solicitation Period] referred to in this section." 11 U.S.C. 1121(d).  The Debtors, as the party seeking to extend the Exclusive Periods have the burden of proving the existence of "cause" for such extension. *In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 601 (Bankr. S.D.N.Y. 2014).

21.    The Bankruptcy Code does not define "cause" for modifying the exclusivity period,
leaving the decision to the discretion of the courts on a case-by-case basis. *See In re Geriatrics
Nursing Home, Inc.*, 187 B.R. 128, 132 (D.N.J. 1995) (Section 1121(d)(1) "grants great latitude to
the Bankruptcy Judge in deciding, on a case-specific basis, whether to modify the exclusivity
period on a showing of 'cause.'") (citing *In re Kerns*, 111 B.R. 777, 781 (S.D. Ind. 1990)); *see
also In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006) ("A decision to
extend or terminate exclusivity for cause is within the discretion of the bankruptcy court, and is
fact-specific."); *In re Lehigh Valley Prof'l Sports Club, Inc.*, No. 00–11296, 2000 WL 290187, at
*2 (Bankr. E.D. Pa. Mar. 14, 2000) (relief under Section 1121(d) is committed to the sound
discretion of the bankruptcy judge).

22.    Although the Bankruptcy Code does not define "cause," courts in this District have
considered nine factors when determining whether cause exists to grant an extension of the
Exclusive Periods at a party's request.  Specifically, courts have considered:

> (1) the size and complexity of the case; (2) the necessity for sufficient time
> to permit the debtor to negotiate a plan of reorganization and prepare
> adequate information; (3) the existence of good faith progress toward
> reorganization; (4) the fact that the debtor is paying its bills as they become
> due; (5) whether the debtor has demonstrated reasonable prospects for
> filing a viable plan; (6) whether the debtor has made progress in
> negotiations with its creditors; (7) the amount of time which has elapsed
> in the case; (8) whether the debtor is seeking an extension of exclusivity
> in order to pressure creditors to submit to the debtor's reorganization
> demands; and (9) whether an unresolved contingency exists.

*In re GMG Capital Partners III, L.P.*, 503 B.R. 601–02.

23.    Because not all factors are pertinent to every chapter 11 case, courts may consider
the relevant factors in determining whether cause to extend or terminate plan exclusivity periods
exists. *See In re Adelphia Commc'ns Corp.*, 352 B.R. at 586 ("A decision to extend or terminate
exclusivity for cause is within the discretion of the bankruptcy court, and is fact-specific.").

### A. The Size and Complexity of these Chapter 11 Cases Does Not Warrant an Extension

24.     The Debtors point to the "billions of dollars of assets and liabilities that will need to be restructured in these Chapter 11 Cases" and "novel complexities" arising from the Debtors' operation in the digital asset industry—primarily, intercreditor disputes between U.S. Dollar and cryptocurrency creditors—as reasons supporting the extension of the Exclusive Periods.  *See* Motion ¶ 15.  However, despite the large amounts in question, the Debtors' assets are relatively straightforward and the "novel complexities" of intercreditor issues in the cryptocurrency industry have recently been resolved by the creditors, and not by the Debtors or the UCC.  The Debtors no longer operate as ongoing businesses, and aside from the fiat and cryptocurrency assets already sitting on their balance sheets and the Estate Claims (including the overdue $630 million in DCG Loans and $1.1 billion promissory note), the Debtors have no other assets that they must distribute. The Debtors have no employees of their own that they must decide to retain or discharge, have no real property leases that they must decide to assume or reject, and have no operating business to restructure.  ***Stated simply, the Debtors are but caretakers for the interests of creditors and should only be following the lead of those parties***.

25.     Further, the Agreement in Principle is opposed by super-majorities of creditors, the Revised Proposal is supported by an overwhelming majority of the Debtors' cryptocurrency and U.S. Dollar creditors, and the various creditor constituencies have agreed on distribution mechanics under scenarios where the Revised Proposal is either accepted or refused, leading to a litigation-centered plan.  The intercreditor issues between these constituencies that the Debtors cite therefore are not an impediment to the negotiation and formulation of a chapter 11 plan.  This factor weighs against extending the Exclusive Periods and in favor of terminating exclusivity.  *In re GMG Capital Partners III, L.P.*, 503 B.R. at 601.

### B. The Debtors Have Not Made Sufficient Progress in Negotiations with Creditors or Toward Exiting these Chapter 11 Cases

26.     The Debtors cite their "substantial, good faith progress toward exiting chapter 11" and "engage[ment] with key stakeholders" as a reason to extend the Exclusive Periods, and describe the discussions that have taken place among the Debtors and their stakeholders regarding a chapter 11 plan. *See* Motion ¶¶ 16, 18–23.  However, despite the Ad Hoc Group delivering a proposal supported by an overwhelming majority of creditors, the Debtors have declined to engage in conversation with respect thereto, and are dead-set on continuing to support the Agreement in Principle and the Toggle Plan, which, as explained above, is unconfirmable and strongly opposed by creditors.  The Debtors' failure to advance a chapter 11 plan that can be confirmed by this Court shows a lack of progress towards exiting these Chapter 11 Cases and a disdain for the interests of creditors, the only voices that matter in a liquidating chapter 11 case.

27.     Indeed, at the September 6 hearing where this Court evaluated the previous request for an extension of the Exclusive Periods, counsel to the UCC readily admitted that, "for a global peace deal to materialize given where we are, two things have to happen.  DCG has to put better economics on the table, and a critical mass of Creditors have to agree on how to distribute that value." Sept. 6 Hrg. Tr. 79:2-5.  As counsel further expanded, "the Debtors and the independents have to appreciate that DCG must put more on the table because a plan with Debtor and UCC support, but not actual votes, is not a confirmable plan." *Id*. at 80:22-25.

28.     As described above, the members of the Ad Hoc Group have resolved the distribution mechanics, leaving only DCG's obligation to put better economics on the table standing in the way of a confirmable plan.  Despite its prior representations, however, the UCC and the Debtors continue to pursue the Agreement in Principle that is not "fully baked," *id*. at 105:17, and stand in the way of a confirmable global peace plan.  The Ad Hoc Group and other

key creditor constituencies have proposed a framework for a confirmable plan, and are prepared to file such a plan upon the termination of exclusivity. Accordingly, this factor weighs against extending the Exclusive Periods and in favor of terminating exclusivity.

### C. The Debtors are Seeking an Extension of the Exclusive Periods to Pressure Creditors

29.     The Debtors assert that an extension of the Exclusive Periods will not prejudice or pressure creditors. *Motion* ¶ 25. However, the Debtors are intimately familiar with the time pressures facing many of their creditors. Many members of the Ad Hoc Group invested millions of dollars worth of fiat and cryptocurrency assets with the Debtors and have been forced to, among other things, sell other assets prematurely to fund living expenses and other obligations. Moreover, the cryptocurrency creditors in particular are acutely aware that every day cryptocurrency prices increase is another day that they are losing out on the benefit of the investment they have held for, in some cases, over a decade. The Debtors say they are working "to put forward a version of the plan that gives creditors a choice," but creditors have made clear that they do not support such a Toggle Plan. Instead of heeding this Court's guidance to "reject such a weaponization [of exclusivity] and focus on improving the economics of deals that will allow the case to go forward," Sept. 6 Hrg. Tr. at 112:11-15, the Debtors are seeking to further delay these chapter 11 cases while pursuing a plan that lacks creditor support, and standing in the way of the creditors' desire to pursue an enhanced global peace deal. These pressure tactics are unavailing and should not be countenanced.

### D. Sufficient Time Has Elapsed in these Chapter 11 Cases to Terminate Exclusivity

30.     In addressing this factor, the Debtors simply state that their requested extension is within statutory limits and is therefore reasonable, failing to address the fact that an extension of exclusivity is a fact-specific determination. *See* Motion ¶ 27; *In re Borders Group, Inc.*, 460 B.R.

818, 821–22 (Bankr. S.D.N.Y. 2011) ("The determination of cause under section 1121(d) is a fact-specific inquiry and the court has broad discretion in extending or terminating exclusivity."). These Chapter 11 Cases have been pending for nine months, and this is the Debtors' third request for an extension of the Exclusive Periods.  Further, these proceedings involve cryptocurrency assets and liabilities which are in constant flux and which can dramatically increase or decrease at a moment's notice.  It is for that reason that time is of the essence in putting forth a confirmable chapter 11 plan, not one flawed at the outset and unable to pass the muster of creditors or satisfy the requirements of section 1129 of the Bankruptcy Code, which the Debtors have not demonstrated an ability to do.  Sufficient time has elapsed that the Exclusive Periods should be terminated to allow creditors to put forth a confirmable chapter 11 plan.

### E.  There Are No Unresolved Contingencies

31.    The Debtors argue that unresolved contingencies—related to claims reconciliation and potential avoidance actions—require an extension of the Exclusive Periods.  *Motion* ¶ 30. However, there are no unresolved contingencies that stand in the way to prevent the Debtors or their creditors from determining their course of action in these Chapter 11 Cases.  The Debtors are no longer operating businesses and there are no factors external to the bankruptcy process or the Chapter 11 Cases that would materially impact the Debtors' ability to prosecute a chapter 11 plan. As this Court is aware, it is typical for claims to be reconciled and avoidance actions to be prosecuted after the confirmation and effectiveness of a chapter 11 plan.  These are not valid reasons for further delay.  A confirmable chapter 11 plan can be proposed now, but the Debtors have instead determined to proceed down an alternate path.

**F. The Debtors Have Not Established Reasonable Prospects for Filing a Viable Plan**

32.     Tellingly, the Motion does not address the fifth factor in the *GMG Capital Partners* test: "whether the debtor has demonstrated reasonable prospects for filing a viable plan."  The Debtors have not established reasonable prospects of developing and proposing a viable chapter 11 plan that the Ad Hoc Group, Gemini or the Fair Deal Group will support, which together comprise majorities (in most cases, substantial majorities) in amount of each potential class of impaired creditors entitled to vote on a plan.  To the contrary, through their Statements in Support, creditors holding over $3 billion in claims, consisting of an overwhelming majority of the claims in each class, strongly oppose the Agreement in Principle and Toggle Plan being advanced by the Debtors and the UCC.  Because the Debtors have failed to demonstrate any reasonably viable path towards achieving a confirmed plan, extending the Exclusive Periods would be futile and contrary to creditors' best interests.  *See In re GMG Capital Partners III, L.P.*, 503 B.R. 596 (Bankr. S.D.N.Y. 2014) (denying extension of the exclusive plan filing period where, among other factors, creditors holding a supermajority of the debtors' unsecured debt opposed the proposed plan).

\*       \*       \*

33.     For the foregoing reasons, the factors support termination of the Exclusive Periods.  After nine months in chapter 11 and two prior extensions of the Exclusive Periods, the Debtors have not demonstrated any prospect of filing a viable chapter 11 plan.  Instead, the Debtors continue to advocate for their proposed Toggle Plan incorporating the Agreement in Principle, which the vast majority of creditors have expressed vehement opposition to and which is unconfirmable, while declining to engage with stakeholders on a proposal that is supported by the majority of creditors.  Time is of the essence in these chapter 11 cases, and the Exclusive Periods should be terminated to permit creditors to propose a competing plan of adjustment that can be

confirmed by this court, moving these chapter 11 cases towards a resolution for the benefit of the Debtors' estates and all stakeholders.  Accordingly, the Court should deny the Motion and grant the Cross-Motion.

## NOTICE

34.     The Ad Hoc Group has provided notice of this Cross-Motion in accordance with the procedures set forth in the *Order Implementing Certain Notice and Case Management Procedures* [Docket No. 44].  The Ad Hoc Group submits that, in light of the nature of the relief requested, no other or further notice need be provided.

## CONCLUSION

35.     For the foregoing reasons, the Ad Hoc Group respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, (a) denying the Motion and granting the Cross-Motion, and terminating the Debtors' Exclusive Periods, and (b) granting such other and further relief as is just.

Dated: October 19, 2023
      New York, New York

**PROSKAUER ROSE LLP**

*/s/ Brian S. Rosen*
Brian S. Rosen
Eleven Times Square
New York, NY 10036
Telephone: (212) 969-3000
Email: brosen@proskauer.com


-and-

Jordan E. Sazant
70 West Madison, Suite 3800
Chicago, IL 60602
Telephone: (312) 962-3550
Email:  jsazant@proskauer.com

*Counsel to the Ad Hoc Group of
Genesis Lenders*

**Exhibit A**

**Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*, | Case No. 23-10063 (SHL) |
| Debtors.[7] | Jointly Administered |

**ORDER (I) DENYING DEBTORS' THIRD MOTION FOR
ENTRY OF AN ORDER EXTENDING THE DEBTORS' EXCLUSIVE
PERIODS IN WHICH TO FILE A CHAPTER 11 PLAN AND SOLICIT
ACCEPTANCES THERETO AND GRANTING RELATED RELIEF, AND
(II) GRANTING THE AD HOC GROUP'S CROSS-MOTION TO TERMINATE
THE DEBTORS' EXCLUSIVE PERIODS PURSUANT TO 11 U.S.C. § 1121(d)(1)**

Upon (i) the *Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereto and Granting Related Relief* (the "Motion"),[8] seeking entry of an order (a) extending the Exclusive Filing Period through and including November 22, 2023 and the Exclusive Solicitation Period through and including December 22, 2023, and (b) granting related relief, and (ii) the *Ad Hoc Group of Genesis Lenders' (I) Objection to Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereto and Granting Related Relief, and (II) Cross-Motion to Terminate the Debtors' Exclusive Periods Pursuant to 11 U.S.C. § 1121(d)(1)* (the "Cross-Motion"), seeking entry of an order denying the Motion and terminating the Exclusive Periods; and the Court having jurisdiction over this matter pursuant to 28 U.S.C.

---

[7]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable) are:  Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (9564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

[8]    Capitalized terms used but not defined herein shall have the meanings given to them in the Motion or the Cross-Motion, as applicable.

§§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District

Court for the Southern District of New York dated January 31, 2012; and the Court having found

that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final

order consistent with Article III of the United States Constitution; and the Court having found that

venue of this proceeding and the Cross-Motion in this district is proper pursuant to 28 U.S.C.

§§ 1408 and 1409; and the Court having found that the relief requested in the Cross-Motion is in

the best interests of the Debtors, their estates, their creditors and other parties in interest; and the

Court having found that the Debtors' notice of the Cross-Motion and opportunity for a hearing on

the Cross-Motion was appropriate and no other notice need be provided; and the Court having

reviewed the Cross-Motion and having heard the statements in support of the relief requested

therein at a hearing before the Court on October 24, 2023 (the "Hearing"); and the Court having

determined that the legal and factual bases set forth in the Cross-Motion and on the record of the

Hearing establish just cause for the relief granted herein; and all objections to the Cross-Motion

(if any) having been withdrawn or overruled; and upon all of the proceedings had before the Court;

and after due deliberation and sufficient cause appearing therefor;

　　　　**IT IS HEREBY ORDERED THAT:**

　　　　1.　　　The Motion is DENIED and the Cross-Motion is GRANTED and approved to the

extent set forth herein.

　　　　2.　　　The exclusive periods of section 1121(d) of the Bankruptcy Code are hereby

terminated.

　　　　3.　　　The Ad Hoc Group may file a chapter 11 plan, disclosure statement, and motion to

approve the disclosure statement and related solicitation procedures.

4.      This Court shall retain jurisdiction with respect to any matters, claims, rights, or

disputes arising from or related to the Motion, the Cross-Motion, or the implementation,

interpretation, or enforcement of this Order.


Dated: _____, 2023
            New York, New York

                                                          _____
                                                          THE HONORABLE SEAN H. LANE
                                                          UNITED STATES BANKRUPTCY JUDGE