**BROWN RUDNICK LLP**
Kenneth J. Aulet, Esq.
Seven Times Square
New York, NY 10036
Telephone: (212) 209-4800
Email: kaulet@brownrudnick.com

-and-

Matthew A. Sawyer, Esq. (admitted *pro hac vice*)
One Financial Center
Boston, MA 02111
Telephone: (617) 856-8200
Email: msawyer@brownrudnick.com

*Counsel to the Fair Deal Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X
                                                                  :
In re:                                                            :    Chapter 11
                                                                  :
GENESIS GLOBAL HOLDCO, LLC, et al.,                               :    Case No. 23-10063 (SHL)
                                                                  :
                                    Debtors[1].                   :    (Jointly Administered)
                                                                  :
------------------------------------------------------------------X

**OBJECTION OF THE FAIR DEAL GROUP**
**TO DEBTORS' THIRD MOTION TO EXTEND EXCLUSIVITY**

Members of that certain ad hoc group of unsecured claimants (the "Fair Deal Group") identified in Docket No. 649, as it may be amended and supplemented from time to time, of the above-captioned affiliated debtors and debtors-in-possession (collectively, "Genesis" or, the "Debtors"), by and through its undersigned counsel, hereby submits this objection (the

---

[1] The Genesis Debtors in the Genesis Bankruptcy Proceedings along with the last four digits of each Genesis Debtor's tax identification number as applicable, are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of the Genesis Bankruptcy Proceedings, the service address for the Genesis Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

"Objection") to the *Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods in which to File a Chapter 11 Plan and Solicit Acceptances thereof and Granting Related Relief* (the "Third Exclusivity Motion") [Docket No. 785] seeking entry of an order extending the Debtors' exclusivity period pursuant to section 1121(d) of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). In support of the Objection, the Fair Deal Group respectfully states as follows:

## PRELIMINARY STATEMENT

1. The only thing standing between a confirmed plan and an exit to these chapter 11 cases is the Debtors, and their exclusive right to file a plan. This Court should decline to extend exclusivity and allow these cases to come to a quick and appropriate conclusion.

2. Weeks ago, with the Debtors "Agreement in Principle"[2] dead on arrival, the Debtors requested in writing that the Ad Hoc Group[3] work with all creditor groups to develop "support among a broad group of creditors" for a revised DCG deal, or (if such deal was rejected) support for a "No Deal" plan. *See* Third Exclusivity Motion ¶ 21.

3. Creditors delivered. Negotiations among the Ad Hoc Group, the Fair Deal Group, Gemini, and other groups of creditors led to widespread agreement on all issues necessary to exit bankruptcy. Specifically:

   a. An agreement on "allocation" issues (*i.e.*, how the estate's assets should be distributed to the different classes of creditors – dollar, bitcoin, ether, and altcoin, along with certain other aspects of a plan required by the agreement) was reached (the "Allocation Agreement").

   b. An agreement on a term sheet of a confirmable deal with DCG was reached (the "Acceptable DCG Deal"). This term sheet laid out the critical economic and other components that creditors would accept from DCG in settlement.

---

[2] The "Agreement in Principle" is the purported agreement contained in Docket No. 625.

[3] The Ad Hoc Group is that certain ad hoc group of unsecured claimants identified in Docket No. 114, as it may be amended and supplemented from time to time.

2

  c. Agreement was reached that, in the absence of DCG's acceptance of the Acceptable DCG Deal, creditors rejected the "Agreement in Principle" and wanted a "No Deal" plan that would preserve all litigation against DCG in a litigation trust (or other litigation vehicle) (the "<u>No Deal Agreement</u>").

4. The Ad Hoc Group collected signatures from individual creditors (*not* simply the leadership of creditor groups) expressing their support for the three points above (collectively, the "<u>Creditor Agreements</u>"). Those signatures represented an overwhelming supermajority of creditors: **over 80% of every single class**. The Creditor Agreements, which are supported by the Fair Deal Group, were embodied in term sheets and a proposed plan support agreement delivered to the Debtors on October 6.

5. The Creditor Agreements are momentous. They cut through every one of the issues that have plagued this bankruptcy. They resolve the thorny issue of claim valuation and asset distribution that has plagued these cases since the petition date. They resolve the issue of what an acceptable DCG settlement is – and, that if that settlement is not available, that these cases should immediately end and litigation begin. They address *every single point* that these cases need to resolve to exit, to begin returning funds to customers as quickly as possible and to end the enormous fee burn of this case.

6. Given this widespread agreement on every point necessary to exit bankruptcy, one would expect that the Debtors would do what they suggested they would do when they asked creditors to reach such an agreement: immediately implement a plan that enacted the Creditor Agreements. Indeed, the Debtors' Third Exclusivity Motion acknowledges many of these key facts and suggests that the Debtors simply need more time to evaluate.

7. Unfortunately, this is not the case, and more time is being lost. Instead, since October 6, the Debtors have resorted to tactics that would make a Kafkaesque bureaucracy proud.

3

8.  Instead of written statements of support, the Debtors demand a signed plan support agreement. However, the Debtors were provided with a proposed plan support agreement on October 6 (more than 10 days ago, which would bind parties to support the Acceptable DCG Deal) and (to the best of the Fair Deal Group's understanding) have *neglected to provide any comments to that agreement* (or, the alternative form of agreement delivered several days later binding parties to support a No Deal plan). Of course, creditors cannot (and should not) sign the agreement until there is agreement with the Debtors on its terms (and, that the Debtors view it as sufficient). So, while the Debtors block any agreement on the form of a plan support agreement, they point to the lack of a signed plan support agreement.

9.  Further, the Debtors have refused to so much as meet with the Ad Hoc Group until the UCC signs onto the Creditor Agreements. But – as the UCC itself stated in open court – "the Debtors and the independents have to appreciate that DCG must put more on the table because a plan with Debtor and UCC support, but no actual votes is not a confirmable plan." Hr'g Tr., *In re Genesis Global Holdco, LLC*, 23-10063 (SHL) (Bankr. S.D.N.Y. Sept. 6, 2023) at 80:22-25. As the UCC admits, it has no actual votes – and DCG must put more on the table. The Debtors ignore the UCC's concessions in open court and refuse to move these cases to a conclusion.

10. Instead, the Debtors continue to advocate for their "toggle" plan (where creditors vote to accept or reject the "Agreement in Principle" and, if they reject, go to a Debtor-drafted "No Deal" plan) instead. This is despite having in their possession overwhelming creditor rejection of that Agreement in Principle. Creditors *got* a choice. They made it. The Debtors apparently dislike the answer and hope to get a different result if they ask again. Under the circumstances (written proof of what the results will be – overwhelming rejection of the "Agreement in Principle") the Debtors' "toggle" plan is value-destructive to the estates in at least two ways.

4

11. The first is time: the Debtors' "toggle" plan would cause creditor groups to lose at least two months' worth of preparation time for litigation against DCG. Given that DCG owes the estates well over $1.6 billion (and, in the view of the Fair Deal Group, significantly more) this time is money: each month of delay costs the estate millions of dollars of present value.

12. The second is the loss of a chance to negotiate an *acceptable* settlement: the Debtors' obstructionist behavior eliminates the opportunity for creditors to determine if the Acceptable DCG Deal can be agreed upon in these proceedings before litigation begins. As the UCC itself put it: DCG must put more on the table. Yet the Debtors, for reasons known only to them, refuse to participate in demanding more from DCG.

13. There are other likely flaws in such a plan, beyond the further waste of time and money. For example, there is inherent potential conflict in the "Toggle Plan" – the "No Deal" component is being drafted by the *only* parties that support the "Agreement in Principle." Creditors cannot be faced with a choice where they pick between the "Agreement in Principle" and a litigation trustee[4] selected by parties who support the "Agreement in Principle" that creditors have rejected. Creditors can have no reason to believe that an appointee of the Debtors and the UCC will not continue to believe as the UCC and the Debtors believe – and, thus, the choice would be a false choice. Litigation post-confirmation must be controlled by *the creditors who believe in that litigation and who will benefit from that litigation.*

14. It was made clear at the last hearing on exclusivity that a confirmable plan must be filed in October. The creation of the Creditor Agreements should have been the justification for one final extension of the Debtors' exclusivity, to enact the Creditor Agreements in a plan that

---

[4] Litigation trustee is used in the generic sense of the ultimate decision-maker for the post-confirmation litigation vehicle.

5

would glide to a quick and consensual confirmation.

15. Instead, thanks to the Debtors' actions, the Creditor Agreements require the Debtors' exclusivity end, so that creditor groups can jointly propose a plan that implements the Creditor Agreements as soon as possible, ends this bankruptcy, and allows distributions to creditors to begin.

## ARGUMENT

### I. No Cause Exists To Extend Exclusivity Because No More Time Is Needed.

16. Section 1121 represents a compromise between debtor and creditor interests. A debtor's statutory exclusivity period acknowledges potential benefits to a debtor staying in control of the business and encourages troubled entities to seek relief under the Bankruptcy Code. *See In re GMG Capital Partners III, L.P.*, 503 B.R. 596, 600 (Bankr. S.D.N.Y. 2014) (discussing "the debtor's need to remain in control to some degree [which] thereby encourage[s] debtors to seek chapter 11 before it is too late"). However, Congress also recognized that a debtor may wield exclusivity "as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory." S. Rep. No. 99-764; H.R. Conf. Rep. No. 99-958, reprinted in 1986 U.S. Code Cong. & Adm. News 5227. Therefore, exclusivity under section 1121 is not indefinite, but rather, vests with a debtor for a finite period, and may be extended or terminated for cause. *See* 11 U.S.C. § 1121.

17. The Debtors are now squarely within the period contemplated by Congress, where they use exclusivity as a means to pressure an unsatisfactory plan instead of negotiating a satisfactory plan. The Creditor Agreements are the blueprint to end this case, and the Debtors have declined to file a plan implementing them.

A.  **Ample Cause Exists To Terminate Exclusivity,
Rather Than Extend It, Under Section 1121(d)(1).**

18. Section 1121 of the Bankruptcy Code describes who may file a Chapter 11 plan and the period during which that right is reserved for the debtor alone. Although section 1121(b) grants a debtor the exclusive right to file a plan during the first 120 days following the petition date, section 1121(d)(1) further provides that "the court may for cause reduce or increase" the debtor's exclusivity periods. *See* 11 U.S.C. § 1121(d)(1).

19. Section 1121(d) "represents a congressional acknowledgement that creditors, whose money is invested in the enterprise no less than the debtor's, have a right to a say in the future of that enterprise." *In re Timbers of Inwood Forest Assocs., Ltd.*, 808 F.2d 363, 372 (5th Cir. 1987), *aff'd*, 484 U.S. 365 (9188) (citing H.R. Rep. No. 95-595, at 174 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6191, 6192).

20. Section 1121(d) is intended to ensure that a debtor does not exploit exclusivity "as a tactical device to put pressure on parties in interest to yield to a plan they consider unsatisfactory." S. Rep. No. 99-764; H.R. Conf. Rep. No. 99-958, reprinted in 1986 U.S. Code Cong. & Adm. News 5227; *see In re All Seasons Indus.*, 121 B.R. 1002, 1006 (Bankr. N.D. Ind. 1990) (denying extension of exclusivity when "such an extension would have the result of continuing to hold creditors hostage to the Chapter 11 process and pressuring them to accept a plan they believe to be unsatisfactory"). The statute was "designed, and should be faithfully interpreted, to limit the delay that makes creditors the hostages of Chapter 11 debtors." *Timbers of Inwood Forest*, 808 F.2d at 372.

21. The Bankruptcy Code does not define "cause" for modifying the exclusivity period, leaving the decision to the discretion of the courts on a case-by-case basis. *See In re Geriatrics Nursing Home, Inc.*, 187 B.R. 128, 132 (D.N.J. 1995) (Section 1121(d)(1) "grants great latitude to

7

the Bankruptcy Judge in deciding, on a case-specific basis, whether to modify the exclusivity period on a showing of cause") (citing *In re Kerns*, 111 B.R. 777, 781 (S.D. Ind. 1990)); *see also In re Adelphia Commc'ns Corp.*, 352 B.R. 578, 586 (Bankr. S.D.N.Y. 2006) ("A decision to extend or terminate exclusivity for cause is within the discretion of the bankruptcy court, and is fact-specific."); *In re Lehigh Valley Prof'l Sports Club, Inc.*, No. 00–11296, 2000 WL 290187, at *2 (Bankr. E.D. Pa. Mar. 14, 2000) (relief under Section 1121(d) is committed to the sound discretion of the bankruptcy judge); *In re Sharon Steel Corp.*, 78 B.R. 762, 763-64 (Bankr. W.D. Pa. 1987) ("Congress has left the meaning of the phrase 'for cause' to be determined by the facts and circumstances in each individual case.").

22. In determining whether cause exists to terminate exclusivity, courts have identified a variety of factors to consider, including, among others: (1) whether the debtor has had sufficient time to negotiate a plan of reorganization; (2) whether the debtor has made progress in negotiations with stakeholders; (3) whether the debtor is using exclusivity to pressure creditors; and (4) whether or not unresolved contingencies exist. *See, e.g.*, *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 184 (Bankr. D.N.J. 2002); *In re Dow Corning Corp.*, 208 B.R. 661, 664-65 (Bankr. E.D. Mich. 1997); *In re Express One Int'l*, 194 B.R. 98, 100 (Bankr. E.D. Tex. 1996). Application of these factors here militates in favor of terminating exclusivity, rather than extending it.

### i. Not Extending Exclusivity Will Move The Case Forward And Benefit The Estate.

23. A "primary consideration" in determining whether to terminate exclusivity (or, not to extend it) is whether terminating exclusivity will "facilitate moving the case forward." *In re Dow Corning Corp.*, 208 B.R. at 670; *In re Adelphia Commc'ns Corp.*, 352 B.R. at 590 ("[T]he test is better expressed as determining whether terminating exclusivity would move the case forward materially, to a degree that wouldn't otherwise be the case.").

24. The "threat posed [] by the prospect of a competing plan may stimulate movement towards a consensual plan." *In re Henry Mayo Newhall Mem'l Hosp.*, 282 B.R. 444, 453 (B.A.P. 9th Cir. 2002). Thus, the potential for alternative, confirmable creditor-sponsored plans has been found to satisfy the "cause" requirement for terminating exclusivity. *See*, *e.g.*, *In re Situation Mgmt. Syst.*, 252 B.R. 859, 865 (Bankr. D. Mass. 2000) (terminating exclusivity to give creditors option to choose between competing plans); *In re Dave's Detailing, Inc.*, 2015 Bankr. LEXIS 2528, at *65 (Bankr. D. Ind. July 30, 2015) ("termination of exclusivity provides an open market for competition in the form of competing plans").

25. It was reasonable, on October 6, for the Debtors to need an additional week or two to implement the Creditor Agreements. Indeed, the Fair Deal Group was pleased to see the numerous statements in the Third Exclusivity Motion suggesting that was the basis for the motion. *See* Third Exclusivity Motion ¶ 4. Unfortunately, this does not appear to be the case, and based on the Debtors' communications in the last week it appears the Debtors have no intention of taking *any* action to implement the Creditor Agreements – not even to meet with creditors to discuss.

26. No more time is needed. If, unexpectedly, the Debtors file a plan enacting the Creditor Agreements by October 24 – and it is acceptable to creditor groups, which is not a given as the Debtors have neither circulated one nor asked for comments – then this objection may become moot. If the Debtors instead file a "toggle" plan – or no plan at all – then the runway has ended. As the Court noted at the last hearing, "there does need to be urgency injected … [t]ime is not on anyone's side and it needs to have velocity to get done." Hr'g Tr., *In re Genesis Global Holdco, LLC*, 23-10063 (SHL) (Bankr. S.D.N.Y. Sept. 6, 2023) at 112:19-22. Creditors heard this Court's admonition to "focus on improving the economics of deals that will allow the case to go forward" and have done so. *Id.* at 112:12-13. The Debtors, apparently, have not.

9

27.     No other factor weighs in favor of extending exclusivity, and the Debtors have failed to meet their burden to show it should be extended.  Creditors are done with this case.  The Debtors should be done with this case.  Exclusivity should be allowed to expire to allow creditor groups – jointly – to file a plan implementing the Creditor Agreements.  This will enable a rapid negotiation of the Acceptable DCG Deal during the plan process[5], and a rapid progression to a "No Deal" plan if DCG does not hit the bid.  Either way, these cases will **quickly** end in a way that over 80% of every creditor group supports, and allow distributions to finally begin.

## CONCLUSION

**WHEREFORE**, based on the foregoing, the Fair Deal Group respectfully requests that this Court (i) not extend, and allow to expire, the Debtors' exclusive period to file and solicit votes on a plan of reorganization under Section 1121(d)(1) of the Bankruptcy Code and (ii) grant such other and further relief as the Court deems necessary and appropriate.

Respectfully submitted,

Dated: October 19, 2023
        New York, New York

**BROWN RUDNICK LLP**

*/s/ Kenneth J. Aulet*
Kenneth J. Aulet, Esq.
Seven Times Square
New York, NY  10036
Telephone: (212) 209-4800
Email: kaulet@brownrudnick.com

-and-

Matthew A. Sawyer, Esq. (admitted *pro hac vice*)
One Financial Center

---

[5] DCG would have until a disclosure statement was approved to negotiate any minor tweaks needed to the Acceptable DCG Deal if such a plan was solicited, to resolve any implementation issues that did not meaningfully degrade the economics or security of the Acceptable DCG Deal.

Boston, MA  02111
Telephone: (617) 856-8200
Email: msawyer@brownrudnick.com

*Counsel to the Fair Deal Group*