CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
One Liberty Plaza
New York, New York 10006
Telephone: 212-225-2000
Facsimile: 212-225-3999
*Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

**DEBTORS' REPLY IN SUPPORT OF**
**DEBTORS' THIRD MOTION FOR ENTRY OF AN ORDER EXTENDING THE**
**DEBTORS' EXCLUSIVE PERIODS IN WHICH TO FILE A CHAPTER 11 PLAN**
**AND SOLICIT ACCEPTANCES THEREOF AND GRANTING RELATED RELIEF**

Genesis Global Holdco, LLC ("Holdco") and its affiliated debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors," and these cases, collectively, the "Chapter 11 Cases") hereby submit this reply (the "Reply") in further support of *Debtors' Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereof and Granting Related Relief* (ECF No. 785) (the "Motion")[2] and in reply to the (i) *Ad Hoc Group of Genesis Lenders' (I) Objection to Debtors'*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

[2] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Motion.

*Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods in Which To File a Chapter 11 Plan and Solicit Acceptances Thereto and Granting Related Relief, and (II) Cross-Motion to Terminate the Debtors' Exclusive Periods Pursuant to 11 U.S.C. § 1121(d)(1)* (ECF No. 813) (the "AHG Objection"), and (ii) *Objection of the Fair Deal Group to Debtors' Third Motion to Extend Exclusivity* (ECF No. 815) (the "BR Group Objection," and together with the AHG Objection, the "Objections"), and respectfully state as follows:

## REPLY

1. Since the last exclusivity extension on September 6, 2023, the Debtors have continued to work diligently on a consensual path to confirmation and resolution of these Chapter 11 Cases. In particular, over the past several weeks the Debtors have focused on:

- engaging in ongoing and productive negotiations with creditors and their legal and financial advisors, including having more than five meetings with members of the Ad Hoc Group, with a goal of resolving outstanding concerns regarding the chapter 11 plan and the distribution model;

- updating, and circulating for review and comment by the Committee and the Ad Hoc Group, a revised No Deal Plan, which contemplates no settlement with DCG and provides that the estates will pursue litigation claims against various DCG parties;

- negotiating the terms and conditions of a potential plan (the "Creditor Choice Plan"), with enhanced protections for the Ad Hoc Group, that would allow creditors to express a preference between a No Deal Plan and a DCG Deal Plan;

- negotiating, along with the Committee, the terms and conditions of potential first-lien and second-lien facilities with DCG as contemplated by the Agreement in Principle;

- responding to multiple inquiries and requests from various regulators concerning the status of the plan and related matters;

- making progress on repayment of the DCG Loans, including receipt of an additional payment in the amount of $75 million pursuant to the Partial Repayment Agreement (ECF Nos. 7 and 8 in Adv. Pro. No. 23-01169 (SHL) and ECF No. 5 and 6 in Adv. Pro. No. 23-01168 (SHL)) (the "Partial Repayment Agreement"), raising the aggregate total amount of payments received pursuant to the Partial Repayment Agreement to $225 million;

2

- conducting document discovery and defending depositions with respect to the 3AC claims objections; and

- reaching an agreement in principle with 3AC and DCG, subject to ongoing review and Court approval, that would resolve 3AC's claims against the Debtors' estates.

2. More specifically, with respect to the chapter 11 plan, the Debtors have been working to finalize one or more of the following chapter 11 plans: (i) a Creditor Choice Plan; (ii) a standalone No Deal Plan; and (iii) an amended plan that incorporates any agreed-upon revisions to the Agreement in Principle (a "Revised Deal Plan"). In light of several recent developments, however, the Debtors, with the support of the Committee, have determined to proceed with a standalone No Deal Plan, while encouraging DCG, Gemini, the Ad Hoc Group, the Committee and other parties in interest to seek a consensual resolution on a Revised Deal Plan that provides greater recoveries than the DCG Deal Plan.

3. *First*, on October 19, 2023, the Attorney General of the State of New York filed a complaint against Gemini, DCG, the Debtors and certain individuals in the Supreme Court of the State of New York in the case captioned *New York v. Gemini Trust Company, LLC, et al.*, Index No. 452784/2023 (the "NYAG Complaint"). The NYAG Complaint, among other things, seeks an order enjoining DCG and Gemini from conducting business in the state of New York, creating a significant credit risk under the proposed Agreement in Principle unless the NYAG Complaint is resolved favorably. The Debtors believe that it is necessary at this time for DCG and Gemini to focus their efforts on negotiating a resolution with the Debtors, Committee and the Ad Hoc Group, while also trying to negotiate a fair resolution with the New York Attorney General and any other relevant authorities.

4. *Second,* the Debtors, the Committee and DCG have not yet reached an agreement on the proposed first-lien and second-lien debt terms contemplated by the Agreement in Principle,

3

the resolution of which is a necessary condition to finalization of the DCG Deal Plan. Given this critical element of the Agreement in Principle has not been resolved, the Debtors believe they need to move forward with the No Deal Plan at this time. The Debtors remain hopeful that the parties will continue to seek a consensual resolution even as the Debtors proceed with the No Deal Plan.

5.     Given the Debtors' decision to move forward with the standalone No Deal Plan, the Objections should be moot. The Debtors anticipate, however, that the Ad Hoc Group and Brown Rudnick Group (together, the "Objectors") will not withdraw their objections, even when the Debtors are pursuing the plan they favor. In their Objections, the Objectors opposed an extension of exclusivity because they opposed the Creditor Choice Plan, even though (i) it would permit creditors to express a preference between the DCG Deal Plan or the No Deal Plan, (ii) the Ad Hoc Group, by its own count, claims to control the majority of all claims, and (iii) the Debtors would be bound to follow the preference expressed by a majority of voted claims across all classes. Now that the Debtors are pursuing a standalone No Deal Plan (with no option to express a preference, or vote on, a DCG Deal Plan), one would think that the Objectors would withdraw their objections. Indeed, as with the Creditor Choice Plan, the Debtors are giving creditors a chance to vote on the No Deal Plan (a plan they have had on file since the beginning of the case). However, the Objectors have so far refused to withdraw their objections.

6.     Here, because the Debtors are pursuing the No Deal Plan, there is no benefit to terminating exclusivity. A "no deal" plan is the only chapter 11 plan that the Objectors are advocating for, and there is no reason to have competing "no deal" plans. Doing so would only increase costs to the detriment of the estates and their creditors and hinder the solicitation process. To the extent that the Ad Hoc Group has any comments to the No Deal Plan, the Debtors are, as always, willing to listen and discuss them. While the Debtors and the Objectors may disagree

about strategy, the Debtors continue to share the goal of maximizing creditor recoveries and allowing creditors to vote their preferences. Therefore, and for the reasons set forth in the Motion and this Reply, particularly in light of the Debtors' filing of the No Deal Plan, the circumstances warrant a further extension of the Exclusive Periods.

7.  Despite the fact that the Debtors' believe the Objections are moot, the Debtors are compelled to correct a few of the many misrepresentations raised in the Objections in order to set the record straight. Professionals who sign pleadings filed in this Court have a duty of candor and owe it to their clients not to recklessly spin conspiracy theories and false narratives. As the Court has already admonished in the context of the FTX settlement: "[t]he Court will not allow unsupported conjecture to influence its decisions in these cases. Nor should counsel." Memorandum of Decision (ECF No. 781) at 25 (citing Bankruptcy Rule 9011).

- The Objectors claim that the Debtors have refused to meet with the Ad Hoc Group. *See* AHG Obj. ¶ 15 ("the Debtors declined to make the Special Committee available for discussion"); BR Group Obj. ¶ 15 ("the Debtors have refused to so much as meet with the Ad Hoc Group until the UCC signs onto the Creditor Agreements"). This statement is false. The Debtors have met with the Ad Hoc Group at least four times during these cases, including a meeting on September 26, 2023. In addition, the Debtors' advisors have had countless discussions with the Ad Hoc Group's advisors. And the Debtors and/or their advisors have met with individual members of the Ad Hoc Group on more than five occasions since the last exclusivity hearing. After the Ad Hoc Group failed to provide the requisite binding commitments to support a No Deal Plan, the Ad Hoc Group requested another meeting, presumably to convince the Debtors to break away from the Committee and the Agreement in Principle. In response to that request, the Debtors simply said that they had no interest in a meeting that merely repeated things and sought to drive a wedge between the Special Committee and the Committee. In fact, the Special Committee never refused to meet, and the Ad Hoc Group never responded that the meeting was for a different purpose.

- In spinning a false narrative, the Objectors refused to acknowledge that the Creditor Choice Plan would allow creditors to control their own destiny. They also ignored the Debtors' offer to adjust the Creditor Choice Plan to provide great protections, including (i) rendering ballots void if the Debtors refused to follow the preference of the majority of voted claims, and (ii) giving the Ad

5

   Hoc Group certain consent rights over the Creditor Choice Plan. The key point here is that the Debtors have always pursued the creditors' interests, giving them a choice and appropriate protections. The Objectors' resistance makes one wonder if the Objectors are concerned that if given a choice, creditors would actually prefer the DCG Deal Plan. This question is now moot in light of recent events (i.e., the NYAG Complaint seeking to stop DCG and Gemini from doing business in New York and failure to reach agreement on the first- and second-lien debt terms underlying the DCG Deal Plan) that have forced the Debtors to pursue the No Deal Plan.[3]

- The Objections assert that the Debtors have been causing delay and interfering with the creditors' efforts to reach a deal. *See, e.g.*, AHG Obj. ¶¶ 16, 29 ("continuing the ill-fated approach would only mean the further erosion of creditor recoveries through the continued incurrence of professional fees and expenses" and "the Debtors are seeking to further delay these chapter 11 cases . . . and standing in the way of the creditors' desire to pursue an enhanced global peace deal."). Nothing could be further from reality. Since the beginning of these cases, the Debtors have worked cooperatively with all parties in interest to reach a value-maximizing resolution to these cases. The Debtors worked very hard to move forward with the February 10 Term Sheet that the Ad Hoc Group and its advisors negotiated but then abandoned. And then the Debtors and their advisors worked very hard to move forward with the Agreement in Principle with the Committee following extensive months-long negotiations with creditor representatives. In response to creditor concerns about the Agreement in Principle, the Debtors crafted the Creditor Choice Plan to empower creditors to choose their own destiny and, importantly, minimize the risk that the Debtors would have to extend the case in order to re-solicit creditors if a global resolution with DCG and the Ad Hoc Group were achieved. Any suggestion that the Debtors' pursuit of the Creditor Choice Plan or request for an extension of the Exclusive Periods were motivated by anything other than a desire to reach a resolution to these cases that is in the best interests of the Debtors' estates and their creditors is baseless.

- The Objections assert that the Ad Hoc Group and Brown Rudnick Group have developed distribution (or allocation) models for both a Revised DCG Deal and No Deal Plan that would resolve all outstanding intercreditor disputes regarding distribution. *See* AHG Obj. ¶¶ 12, 28; BR Group Obj. ¶ 3(a). The Debtors understand, based on discussions with those who actually run the model, that no agreement was reached on the distribution model for the No Deal Plan. The

---

[3] The Ad Hoc Group also asserts that the Debtors have failed to address whether they have demonstrated reasonable prospects of filing a chapter 11 plan, which is one of the factors that courts evaluate in determining whether to extend exclusivity periods. *See* AHG Obj., ¶ 32. To the contrary, the Debtors described in the Motion at length their intent to finalize one of three chapter 11 plans, informed by the outcome of their ongoing discussions with creditors, which would provide a viable path towards confirmation regardless of the outcome of those discussions. *See* Motion, ¶¶ 1-2, 18-23. In any case, the Debtors' filing of the No Deal Plan demonstrates the Debtors' reasonable prospects of filing a chapter 11 plan, in light of the Ad Hoc Group's express support for such a litigation plan.

6

Debtors have asked the Ad Hoc Group and Brown Rudnick Group to share the proposed distribution model for a No Deal Plan on multiple occasions, but none has been provided. Over the weekend, counsel to the Ad Hoc Group provided the undersigned counsel with a copy of the alleged distribution model, but that model related only to the Revised Deal Plan (as was clear from even a quick read) and <u>not</u> the No Deal Plan. The Debtors therefore believe and understand that contrary to the statements made in the Objections, there was no agreement on the distribution model with respect to the No Deal Plan at the time the Objections were filed.

- The Ad Hoc Group and Brown Rudnick Group are wrong when they say that they delivered creditor support statements for a Revised DCG Deal and a No Deal Plan as requested by the Debtors. *See* AHG Obj. ¶ 13; BR Group Obj. ¶¶ 2-3. As the Debtors stated in the Motion, the Debtors requested "*binding commitments* from a broad coalition of creditors to *vote to accept* both a Revised Deal Plan and the *No Deal Plan* in the event that the Revised Deal Plan is not agreed upon." Motion ¶ 21 (emphasis added). The Ad Hoc Group delivered a one-page document stating that creditors would support the filing of the No Deal Plan if DCG did not agree to the Ad Hoc Group's proposed revisions to the Agreement in Principle. This statement did not satisfy the request: the Ad Hoc Group did not provide a commitment to vote to accept the No Deal Plan, it only delivered a commitment to "support" the "filing" of a No Deal Plan. Obviously, there is a big difference between "support for the filing" of a plan and "an agreement to vote to accept" a plan. The Debtors have little need for the Ad Hoc Group to "support the filing of a plan" that merely sits on the docket, particularly given that a No Deal Plan was filed on the docket in July 2023. The Debtors are trying to develop a plan that will obtain "votes to accept" the plan.

- The Objectors state that they obtained signatures to support a Revised Deal Plan (the "<u>AHG Support Statement</u>") from an "overwhelming supermajority of creditors: over 80% of every single class." BR Group Obj. ¶ 4 (emphasis removed). The Objectors, however, neglect to mention that a large portion of this purported amount (approximately $1 billion) is held by Gemini Earn Program users who have not signed any commitments. Only Gemini, which does not have the power to vote the claims of Gemini Earn users in bankruptcy, signed the AHG Support Statement. While Gemini may have the power to settle claims on behalf of Gemini Earn users, the Debtors are not aware of any specific voting rights held by Gemini on behalf of the Earn users.

- The Brown Rudnick Group suggested that the Debtors are moving slowly. BR Group Obj. ¶ 3 ("Debtors have resorted to tactics that would make a Kafkaesque bureaucracy proud."). This is absolutely wrong. The Debtors and their advisors have been working tirelessly on both the Creditor Choice Plan and the No Deal Plan and have achieved significant results since the last exclusivity extension. If anyone is moving slowly here, it is the Brown Rudnick Group. As the Court will recall, the Brown Rudnick Group entered these Chapter 11 Cases with a proposal to purchase litigation claims against DCG from creditors. In response,

7

the Debtors opened a data room and met with the advisors to the Brown Rudnick Group and one of its members to brief them on these litigation claims. Since the initial meetings, however, there has been radio silence. The Brown Rudnick Group has not asked any follow up questions or made any proposal, suggesting that it is not likely to "put its money where its mouth is."

- The Objections assert that the creditors provided the Debtors with a plan support agreement for a Revised DCG Deal, which the Debtors purportedly ignored. *See* BR Group Obj. ¶ 8. This is misleading and wrong. First, to avoid any confusion, it needs to be said the referenced plan support agreement was a proposal for a deal with DCG that has not been accepted by DCG. Second, the Debtors commented on the plan support agreement and have had several discussions with counsel to the Ad Hoc Group about the plan support agreement. Third, the Debtors do not even know what to say in response to the suggestion by the Brown Rudnick Group that "the Debtors block[ed] any agreement on the form of a plan support agreement," *see* BR Group Obj. ¶ 8, because obviously the Debtors have no such power to do that and never suggested they did.

## CONCLUSION

WHEREFORE, for the reasons set forth in the Motion and this Reply, the Debtors respectfully request that the Court grant the Motion, overrule the Objections, and enter the Proposed Order, and grant such other and further relief as is just and proper.

Dated: October 23, 2023  
      New York, New York

*/s/ Sean A. O'Neal*  
Sean A. O'Neal  
Luke A. Barefoot  
Jane VanLare  
CLEARY GOTTLIEB STEEN & HAMILTON LLP  
One Liberty Plaza  
New York, New York 10006  
Telephone: (212) 225-2000  
Facsimile: (212) 225-3999  

*Counsel to the Debtors and Debtors-in-Possession*