Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 23-10063 (SHL)

4    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    GENESIS GLOBAL HOLDCO, LLC, et al.,

8              Debtors.

9    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

10

11                    United States Bankruptcy Court

12                    300 Quarropas Street, Room 248

13                    White Plains, NY 10601

14

15                    November 7, 2023

16                    2:07 PM

17

18

19

20

21    B E F O R E :

22    HON SEAN H. LANE

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:   UNKNOWN

1    HEARING re ***Participants In Person*** Omnibus Hearing

2

3    HEARING re ***Participants In Person*** Doc. #890 Notice of

4    Agenda

5

6

7    HEARING re ***Participants In Person*** Doc. #461

8    (Disclosure Statement) Motion: Motion to Approve (I) the

9    Adequacy of Information in the Disclosure Statement, (II)

10   Solicitation and Voting Procedures, (III) Forms of Ballots,

11   Notices and Notice Procedures in Connection Therewith, and

12   (IV) Certain Dates with Respect Thereto.

13

14   HEARING re ***Participants In Person*** Doc. #785 Third

15   Motion to Extend Exclusivity Period for Filing a Chapter 11

16   Plan and Disclosure Statement

17

18

19

20

21

22

23

24

25   Transcribed by:  Sonya Ledanski Hyde

1    A P P E A R A N C E S :

2

3    CLEARY GOTTLIEB STEEN HAMILTON, LLP

4         Attorneys for Debtors

5         One Liberty Plaza

6         New York, NY 10006

7

8    BY:  SEAN O'NEAL

9         JAN VANLARE

10

11   WHITE & CASE LLP

12        Attorneys for Official Committee

13        1221 Avenue of the Americas

14        New York, NY 10020

15

16   BY:  J. CHRISTOPHER SHORE

17        PHILLIP ABELSON

18

19   PROSKAUER ROSE LLP

20        Attorneys for Ad Hoc Group of Genesis Lenders

21        Eleven Times Square

22        New York, NY 10036

23

24   BY:  BRIAN ROSEN

25        JORDAN SAZANT

Page 4

1  HUGHES HUBBARD REED LLP

2       Attorneys for Gemini Trust Company, LLC

3       One Battery Park Plaza

4       New York, NY 10004

5

6  BY:  ANSON B. FLELINGHUYSEN

7       DUSTIN SMITH

8

9  UNITED STATES DEPARTMENT OF JUSTICE

10      Attorneys for the U.S. Trustee

11      201 Varick Street, Suite 1006

12      New York, NY 10014

13

14  BY:  GREGORY ZIPES

15

16  WEIL GOTSHAL MANGES LLP

17      Attorneys for Digital Currency Group, Inc.

18      767 Fifth Avenue

19      New York, NY 10153

20

21  BY:  JEFFREY D. SAFERSTEIN

22       JESSICA LIOU

23       FURQAAN SIDDIQUI

24

25

Page 5

```
 1   PRYOR CASHMAN LLP
 2        Attorney for Ad Hoc Group of Dollar-Denominated
 3        Creditors
 4        7 Times Square
 5        New York, NY 10036
 6
 7   BY:  MATTHEW W. SILVERMAN
 8
 9   OTTERBOURG P.C.
10        Attorney for SOF International, LLC
11        230 Park Avenue
12        New York, NY 10169
13
14   BY:  James Drew
15
16   SECURITIES AND EXCHANGE COMMISSION
17        Attorney for SEC
18        950 East Paces Ferry Road, N.E., Suite 900
19        Atlanta, GA 30326
20
21   BY:  WILLIAM MATTHEW UPTEGROVE
22        THERESE SCHEUER
23
24
25
```

```
 1   HORWOOD MARCUS BERK CHARTERED

 2        Attorney for Foundry Digital LLC

 3        500 West Madison, Suite 3700

 4        Chicago, IL 60661

 5

 6   BY:  AARON L. HAMMER

 7        NATHAN DELMAN

 8

 9   TROUTMAN PEPPER HAMILTON SANDERS, LLP

10        Attorney for Valour, Inc.

11        1313 N. Market Street

12        P.O. Box 1709

13        Wilmington, DE 19899-1709

14

15   BY:  EVELYN J. MELTZER

16

17   BROWN RUDNICK LLP

18        Attorney for Fair Deal Group

19        Seven Times Square

20        New York, NY 10036

21

22   BY:  KENNETH AULET

23

24

25
```

Page 7

1    MCELROY DEUTSCH MULVANEY CARPENTER LLP

2         Attorney for New Jersey Bureau of Securities

3         570 Broad Street

4         Newark, NJ 07102

5

6    BY:  JEFFREY BERNSTEIN

7

8    LATHAM WATKINS

9         Attorney for Joint Liquidators of Three Arrows Capital

10        1271 Avenue of the Americas

11        New York, NY 10020

12

13   BY: ADAM J. GOLDBERG

14

15   LOWENSTEIN SANDLER LLP

16        Attorneys for Securities Class Action Lead Plaintiffs

17        65 Livingston Avenue

18        Roseland, NJ 07068

19

20   BY: MICHAEL PAPANDREA

21

22

23

24

25

1              P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Please be seated.  Good afternoon.  We

4    are here for the case of Genesis Global Holdco, LLC for a

5    variety of matters.  And I am working off the three-binder

6    sets that were sent up here today as opposed to the two-

7    binder set that was sent at the end of last week.

8              I will say I don't know that I've ever had a case

9    in my more than 13 years on the bench where I've had as many

10   objections to disclosure statements.  I think this breaks a

11   record.  Probably not a good record to break.  So we have a

12   lot to get through.  But before we delve into the nitty-

13   gritty, I did see there was a plan that was just filed.  I

14   saw there was a committee response that was filed yesterday.

15   I saw there was a plan and amended disclosure statement --

16   oh, I am muted actually.  So I am sorry for all of you in-

17   person, you're going to have to hear that again.

18             Good afternoon.  This is Judge Sean Lane in the

19   United States Bankruptcy Court for the Southern District of

20   New York and we are here this afternoon for Genesis Global

21   Holdco, LLC, on for a variety of matters, particularly the

22   disclosure statements.

23             So let's start by getting appearances.  So we'll

24   start with the Debtors.

25             MR. O'NEAL:  Your Honor, Sean O'Neal and Jane

Page 9

1    VanLare from Cleary Gottlieb on behalf of the Debtors.

2              THE COURT:  All right.  Good afternoon.  On behalf

3    of the Official Committee?

4              MR. SHORE:  Chris Shore and Phil Abelson from

5    White & Case.

6              THE COURT:  Good afternoon.  On behalf of the Ad

7    Hoc Group?

8              MR. ROSEN:  Good afternoon, Your Honor.  Brian

9    Rosen and Jordan Sazant on behalf of the Ad Hoc Committee.

10             THE COURT:  All right.  And on behalf of Gemini?

11             MR. FRELINGHUYSEN:  Good afternoon, Your Honor.

12   Anson Frelinghuysen and Dustin Smith on behalf of Gemini

13   Trust Company.

14             THE COURT:  Good afternoon.  On behalf of the

15   United States Trustee's Office?

16             MR. ZIPES:  I'm a step ahead, Your Honor.  Greg

17   Zipes with the U.S. Trustee's Office.

18             THE COURT:  All right.  Good afternoon.  And

19   anyone else who is here in-person who needs to make an

20   appearance, just step up to the microphone.  Just be mindful

21   that is actually not the Zoom microphone.  But I think we

22   are pretty good -- if there's anyone online who is having

23   trouble hearing us, please shout out and let us know.  But

24   let me get the appearance.

25             MR. SAFERSTEIN:  Good afternoon, Your Honor.

Page 10

1    Jeffrey Saferstein from Weil Gotshal & Manges on behalf of

2    Digital Currency Group.  I am here with Jessica Liou and

3    Furqaan Siddiqui.

4            THE COURT:  All right.  Good afternoon.  Anyone

5    else for an appearance in-person?

6            MR. SILVERMAN:  Good afternoon, Your Honor.

7    Matthew Silverman, Pryor Cashman.  I represent an ad hoc

8    group of dollar-denominated creditors.  Thank you.

9            THE COURT:  All right.  Good afternoon.  Anyone

10   else in-person?  All right.  Let me ask if there is anybody

11   online on the Zoom who would like to make an appearance who

12   expects to speak at today's hearing.

13           All right, I see Mr. Drew.  Let me get Mr. Drew to

14   chime in first.

15           MR. DREW:  Your Honor, James Drew, Otterbourg PC,

16   on behalf of SOF International LLC.

17           THE COURT:  All right.  Good afternoon.  Anyone

18   else?

19           MR. UPTEGROVE:  Good afternoon, Your Honor.

20   William Uptegrove on behalf of the United States Securities

21   and Exchange Commission.  And with me today is my colleague,

22   Therese Scheuer.

23           THE COURT:  All right.  Good afternoon.  Anyone

24   else?

25           MR. HAMMER:  Good afternoon, Your Honor.  Aaron

Page 11

1    Hammer for Foundry.  I am with my colleague, Nathan Delman,

2    on the phone as well.  Thank you.

3              THE COURT:  All right.  Thank you.  Good

4    afternoon.  Anyone else?

5              MS. MELTZER:  Good afternoon, Your Honor.  Evelyn

6    Meltzer of Troutman Pepper on behalf of Valour, Inc.

7              THE COURT:  All right.  Anyone else?

8              MR. AULET:  Good afternoon, Your Honor.  Kenneth

9    Aulet, Brown Rudnick, for the Fair Deal Group.

10             THE COURT:  All right.  Good afternoon.  Anyone

11   else?

12             MR. BERNSTEIN:  Good afternoon, Your Honor.  Just

13   in case, Jeffrey Bernstein, McElroy Deutsch Mulvaney &

14   Carpenter for the New Jersey Bureau of Securities.  Thank

15   you.

16             THE COURT:  All right.  Thank you.  Good

17   afternoon.  I see Mr. Goldberg, so let me get that

18   appearance.

19             MR. GOLDBERG:  Thank you, Your Honor.  Good

20   afternoon.  Adam Goldberg of Latham & Watkins on behalf of

21   the Joint Liquidators of Three Arrows Capital.

22             THE COURT:  All right.  Good afternoon.  Anyone

23   else?

24             MR. PAPANDREA:  Good afternoon, Your Honor.  This

25   is Mike Papandrea from Lowenstein Sandler on behalf of the

Page 12

1    Securities Litigation Lead Plaintiffs.

2         THE COURT:  Good afternoon.  Anyone else?  All

3    right.  I recognize there are plenty of other folks on the

4    line.  And to the extent that the circumstances change and

5    someone has not entered an appearance and needs to speak,

6    you can identify yourself at that time and we'll do the best

7    we can in terms of dealing with both folks who are here in-

8    person and folks who are online.  Let me just ask anybody in

9    particular, can the folks who are online on the Zoom call

10   hear all of us in the courtroom?  Anyone?

11        All right.  I'll take that as a yes.  All right.

12   Thank you very much.  I realize the awkwardness of that.

13        All right.  So turning back to the agenda.  I

14   think I was saying before I realized my microphone was off,

15   I don't know that I've ever seen this many objections to a

16   disclosure statement in my more than 13 years on the bench.

17   That's probably a dubious record.  I see there's been a lot

18   of developments in recent time.  When the Plaintiffs filed

19   their reply, it came along with substantial additional

20   disclosures.  That was Friday.  Yesterday I saw the

21   Committee's statements that were filed.  And then I know

22   when I was coming out here, I saw a plan that was filed at

23   1:09.  So there's a lot of things in motion.

24        It is a liquidating plan and so there were some

25   things that -- there's a whole -- I have a chart of all the

1    things that were contained in the Debtor's reply.  I have my

2    own list.  And so the question is how to do this

3    efficiently.  Whenever things are changing this rapidly, we

4    want to try to figure out how to best handle this.  So that

5    has sort of two points to that.  One is I did see the

6    committee filed something saying there's still meaningful

7    discussions.  And obviously a disclosure statement follows a

8    plan, and the plan is the substance.  And if there's still

9    meaningful discussions, we don't want the cart to get in

10   front of the horse.  So that's the first question as to

11   what's a sensible way to proceed here today.  And the second

12   is there are a lot of objections that are no longer state-

13   of-the-art.  They've been superseded by subsequent language

14   and conversations among the party and additions.  And so we

15   need to find a way to prevent the parade to the podium of we

16   had this issue and that issue and the other issue, this has

17   been addressed, that hasn't been addressed.  There's a more

18   efficient way to do that.  And so at some point it may make

19   sense to take a break to give various folks a chance to talk

20   to the Debtors and try to narrow the scope of things that we

21   would need to address today.

22          But first things first is the idea of meaningful

23   discussions.  We had a chambers conference the last time we

24   were here.  And again, chambers conferences, for people who

25   are not familiar with bankruptcy, as I am the decider for

Page 14

1    lack of a better term, I don't get into settlement

2    discussions.  What I ask is procedurally where are we.  Do

3    the parties want more time to talk about things?  Are they

4    trying to come up with a better solution than a court

5    decision might give them?  This is often true in cases.  And

6    so that's what the focus of that was, was just to get a

7    sense procedurally where things stand in the case.  Again, I

8    stay out of any actual contents of any settlement so that I

9    can make any decisions that need to be made.

10          And so certainly in reading the Committee's

11   statement, which is at Docket 895, about there's still

12   meaningful discussions, I am trying to figure out what is

13   the sort of order of operations for purposes of today.  And

14   with that, I will turn to Debtor's counsel to get some

15   guidance as to what you think would be meaningful and

16   helpful to do today and in what order.  Counsel?

17          MR. O'NEAL:  Certainly.  Thank you, Your Honor.

18   We have been engaged in substantially meaningful

19   discussions, some more meaningful than others.  But they

20   have been substantial and meaningful.

21          We do believe that it would be appropriate, and I

22   understand that the key stakeholders also believe that it

23   would be appropriate to have a chambers conference to

24   commence before we commence the substance of the hearing.

25   After that chambers conference, we would move to the two

Page 15

1    matters that are before the Court today.  One is disclosure

2    statement approval and the second would be an exclusivity

3    extension.  In the meantime, I can tell you that we have

4    resolved many of the objections with respect to the

5    disclosure statement.  Some of those objections remain.

6    Many of those objections we would view as confirmation

7    objections and not really disclosure objections.  But as

8    you'll see, Your Honor, we have made substantial changes to

9    the disclosure statement.  We've tried to meet the

10   disclosure statement objections where we thought it was

11   appropriate.  But we do believe that it's the best next step

12   as far as to have a chambers conference among the key

13   stakeholders.

14          THE COURT:  All right.  So let me hear from the

15   Official Committee since it has a special fiduciary role

16   recognized by statute on that.  And then I'll canvass the

17   room.

18          MR. SHORE:  Chris Shore from White & Case on

19   behalf of the Official Committee.  We agree with Debtor's

20   counsel that a chambers conference might help, particularly

21   in light of the discussions that are going on.  We never

22   want to force people to put things on the record that are

23   not ready to be on the record.  So we agree with that.

24          With respect to the disclosure statement, we did

25   not file an objection.  We filed a statement.  We've been

Page 16

1    working with the Debtors to bake the various additional

2    items into the disclosure statement.  There's going to be a

3    period between this hearing, and if there is an approval, an

4    actual solicitation.  And we have every belief that the

5    Debtors are going to address the concerns that we have.

6    We've got commitments to do so.

7         So our view as articulated at the last hearing

8    continues today.  In the absence of a deal, we need to get

9    this case moving.  Hard dates work to keep people focused.

10   And the next step is an approval of the disclosure

11   statement.  And if we have to pull the reins on that, we

12   can.  But we can't wait around at the door of the barn

13   forever.

14        THE COURT:  Fair enough.  All right.  And I know

15   there are lots of other folks here from lots of other key

16   constituencies.  And so I want to make sure that nobody has

17   a problem with following the lead that's been suggested in

18   terms of having a chambers conference.  If anybody has a

19   different view, I would obviously be happy to hear it.  But

20   rather than poll everybody, I think I'll just throw that out

21   to the collective group who is assembled here if anybody has

22   a dissenting view.  All right.

23        MR. ZIPES:  Your Honor, Greg Zipes with the U.S.

24   Trustee's Office.  My office doesn't oppose this meeting,

25   but as with the last one, we ask that it be short and that

Page 17

1    there is some summary of what took place on the record.

2          THE COURT:  Yes.  I think that's entirely correct.

3    We will check in.  I think that's what we did last time.

4    Even if we keep it short, we'll still also check in to the

5    extent it goes a little longer than anticipated and provide

6    a short summary of things.  But again, I want to make it

7    clear, I am not a mediator in this case.  I am the presiding

8    judge.  So I don't mediate.  And various people have been

9    involved in mediation in this case, and again, it's not in

10   front of me because I'm the one who has to decide issues if

11   it comes to that.  So my interest is procedural.

12         And particularly because as I am the party

13   probably with the least information about exactly where

14   things stand, moving forward, as Mr. Shore mentioned, with

15   certain things prematurely can do damage to a case and cause

16   things to be inefficient and expensive.  And so that's one

17   of the things that judges try not to do in cases.  And so

18   that's my primary goal, is to be procedurally singing from

19   the same sheet of music as the parties-in-interest.

20         So with that, it is 20 after one.  So what I would

21   propose is that we say we're going to chat.  I have the

22   right time, I'm using the clock.  But it's a government-

23   issued clock, so it's right twice a day.  Do I have the

24   right time?

25         UNIDENTIFIED SPEAKER:  I think you're just an hour

Page 18

1    off, Your Honor.

2            THE COURT:  Oh, I'm sorry.  Yes.  Okay.  2:20.  So

3    why don't we say 20 minutes and then we'll check in with the

4    folks online just so that they know where we are.  And with

5    that, the Court will adjourn for about 20 minutes and we'll

6    convene chambers conference.  Thank you very much for

7    everyone's patience and cooperation.  It is much

8    appreciated.

9            (Recess)

10           THE COURT:  Good afternoon once again.  This is

11   Judge Sean Lane in the United States Bankruptcy Court.  And

12   I just wanted to let you know that I've just finished

13   chatting with folks here in court offline.  They are going

14   to chat for about five more minutes.  So I expect we'll be

15   back on the line to proceed with the hearing in about

16   another five to seven minutes.  Thank you again for your

17   patience and good humor in this, and look for ward to

18   chatting with you all in ten minutes or less.  Thank you.

19           (Recess)

20           CLERK:  All rise.

21           THE COURT:  Please be seated.  Good afternoon once

22   again.  We are resuming the hearing in Genesis Global Holdco

23   LLC.  For those folks on the line, we had a discussion about

24   procedurally where we find ourselves and what is

25   procedurally the best path forward in terms of handling what

Page 19

1   we have.  And I will summarize the discussion and I'm happy

2   to have anybody else chime in.

3         The consensus is that there is a consensus around

4   the new deal plan absent some better option that emerges.

5   I'm sorry, no deal, not new deal.  The no deal plan absent

6   something else that would emerge, but that the best way to

7   move forward is in fact to move forward, including with

8   today's hearing, and that parties who may significantly

9   differ with one another about the outcome and the substance

10  and the recoveries and all those things I think agree on the

11  process in terms of moving forward.  So that really is what

12  the conversation is centered around.  And so the thought is

13  to move forward with today's hearing and make progress.

14        And with that I would note there was also a

15  disclosure statement file as amended filed at Docket 900 --

16  nice round number -- at 2:15 this afternoon.  Which just

17  goes to show there's a lot of progress and effort to move

18  forward.  And I understand or I'm guessing -- and people can

19  talk about it -- that really that new disclosure statement

20  is a reflection of the many conversations that the

21  interested parties are having about how to move forward in

22  the case and address comments.

23        So with that, I will turn it back over to the

24  Debtors to start us off.  And what I really could use --

25  obviously I have the chart that was in the Debtor's reply at

Page 20

1    Docket 884.  I have my own list of issues that I culled from

2    various objections.  But obviously there has been a

3    significant amount of change up through and including this

4    afternoon at 2:15.  So the question is how to do this

5    efficiently.  And I will say in that connection there may be

6    some things that are a bridge too far today, but there are

7    other things that maybe are ideally suited to be resolved

8    today.  And if you need any breaks at any point for any

9    constituents to talk to one another, to try to clarify some

10   issues and put some issues to bed, I am happy to do that as

11   well.

12            So with that, Ms. VanLare, please proceed.

13            MS. VANLARE:  Thank you very much, Your Honor.

14   Jane VanLare, Cleary Gottlieb Steen & Hamilton, on behalf of

15   the Debtors.

16            Your Honor, yes, there a number of objections

17   filed to the disclosure statement.  We have been working

18   around the clock to resolve them.  And I think we've made a

19   lot of progress.  We resolved a number of them.

20            And so in response to your comment just now, Your

21   Honor, what I would propose is I will go through the

22   objections.  I will highlight the ones that are resolved.

23   There are a number of others where we've exchanged language

24   and we're at a point where we believe we are resolved.  But

25   obviously parties sometimes need more time to look at the

Page 21

1    specific language.  So I will note that on the record.  And

2    then there are a few objections that are unresolved.  Even

3    for those, substantially -- well, many of the issues in the

4    unresolved objections have been resolved.  So we're really

5    down to a handful of outstanding issues.  So I will leave

6    those to the end and we can address those.  But I think that

7    way we'll kind of streamline the process.

8            And we did file, as Your Honor noted, we filed an

9    amended plan and disclosure statement.  That was intended to

10   reflect the language that we have been discussing and

11   negotiating with various parties.  We hope that they take a

12   look and see that we've reflected it as we've discussed with

13   them over the phone and over email.  And obviously anybody

14   can correct us at the hearing, but I will go through again

15   and just tell Your Honor where we are.

16           THE COURT:  And is your thought that we make as

17   much progress on as many issues today and that we might need

18   another hearing in the near future to sort of get us to

19   closure just so that people have a chance perhaps to process

20   certain amount of information or changing language or, as

21   you say, some of the last issues that you're not quite there

22   yet?

23           MS. VANLARE:  Your Honor, I would propose that we

24   see where we are at the end.  I think that we really have

25   resolved the great majority of the issues.  I think the

Page 22

1    remaining issues really are largely confirmation issues.

2    And I'm not sure that people disagree on that, actually.

3    But I think certainly if Your Honor feels that at the end of

4    this hearing people need additional time, certainly open to

5    that.  But I do think that we've made a lot of progress.

6          THE COURT:  Oh yes.  I'm certainly not suggesting

7    otherwise.  And I think the point of my comment was I guess

8    at the end which is to say in the near-term, meaning that

9    nobody wants to have this language languish.  And so if

10   we're going to get a lot of things done today and need

11   another hearing date, I will promise to get that to you

12   promptly so we can keep the train moving on the no deal

13   plan, which is what has the support of folks.  So that I

14   guess is the main point.  So with that, why don't you take

15   it away.

16         MS. VANLARE:  Appreciate that, Your Honor.  I will

17   also note before I go into the specific objections, because

18   there were a number of folks who noted this, the

19   distribution principles, which are an exhibit to the

20   disclosure statement, have not yet been filed.  They are --

21   we have been discussing them and we've been exchanging

22   drafts for a long time.  We're in substantial agreement on

23   them.  They're not quite final, but I think that we intend

24   to file them today.  And I think that the issues that remain

25   we really view as more technical issues and things that can

Page 23

1    be resolved at confirmation.

2              So I say that just to make everybody aware of

3    that.  Because, like I said, that was something that came up

4    in a number of objections.

5              THE COURT:  All right.

6              MS. VANLARE:  So with that -- and we did file an

7    amended agenda also to assist.  But granted that came late

8    because we were resolving objections until the beginning of

9    this hearing.

10             So at Docket 475, there was an objection filed by

11   Mr. Morton.  We believe that objection is resolved.

12             THE COURT:  And I'm assuming since it starts off -

13   - you're working off the Exhibit A, which is a summary of

14   responses to objections, and we'll just go right down the

15   list.

16             MS. VANLARE:  Yes.  Thank you, Your Honor.  Yes.

17   We filed on Exhibit A to our reply.  That kind of went

18   through all the objections.  And so I'm just going to follow

19   that same order so that Your Honor can follow it.  And I'll

20   add the status for many of these --

21             THE COURT: That's great.  And just for those

22   following along at home, we're looking at Docket 884, which

23   was filed on the 3rd of this month.  And the Exhibit A

24   starts at Page 36 of 45 in terms of the larger document.  So

25   please, take it away.

Page 24

1            MS. VANLARE:  Thank you, Your Honor.  So 475, Mr.

2    Morton's objection.  We believe that's bene resolved.

3    That's Docket 475.

4            Docket 496, the lead securities plaintiffs, that

5    was a reservation of rights rather than an objection.  So

6    it's noted.  No response was necessary.

7            Docket 510, that was an objection filed by the

8    Securities and Exchange Commission.  That one we've been in

9    discussions with the SEC for some time and have been working

10   hard to address the comments and the objections in the SEC

11   objection.  We did send them language, although recognize

12   that was I think this morning.  So we have not gotten

13   confirmation.

14           So I think where we are, at least from the

15   Debtor's perspective, is that we believe we've resolved all

16   of these issues and addressed them in our additional

17   language that we've included in the amended disclosure

18   statement.  We have not -- we don't have confirmation from

19   the SEC.  And I will note, and we have added this to the

20   disclosure statement, but I do want to say it on the record

21   as well, that the SEC does object to the scope and some

22   other aspects of the exculpation provisions.  And I'll just

23   note again for the record that the SEC and certain other

24   governmental actors and others may have objections to the

25   scope of the release provision and any exculpation

Page 25

```
1    provision.  And we recognize that and say, stating on the

2    record, that everyone's rights are reserved.  And we view

3    those really as issues for confirmation.  And so with

4    respect to the SEC objection and with respect to others as

5    well.

6              THE COURT:  And I'm assuming that for those

7    objections that sounds like they crop up in a few different

8    places, the exculpation and release provision, are you going

9    to -- is the intent to note in the disclosure statement that

10   there are objections or various parties have let Debtors

11   know that they do object to these and that those will be the

12   subject of any confirmation hearing?

13             MS. VANLARE:  Yes, Your Honor.  I believe we've

14   added that language already.

15             THE COURT:  Okay, great.

16             MS. VANLARE:  If not, we can certainly check.

17             Next we have New Jersey Bureau of Securities.

18   That's Docket 553.  That objection is resolved.  Docket

19   number --

20             THE COURT:  And so let me just make sure.  The way

21   you broke it down is you hopefully broke down the different

22   objections that an individual party might make.  And so

23   there were a number of line items for the SEC.  So I'm

24   taking your comment to mean that your discussions are to

25   address all those things and the hope is that the language
```

1    will get to yes on those issues -- all issues other than the

2    ones that are confirmation issues.

3              MS. VANLARE:  Correct, Your Honor.

4              THE COURT:  Okay, great.  Thank you.  I just want

5    to be as clear as possible because I now we have a lot of

6    people listening in and I don't expect that bankruptcy is

7    their area of expertise or their first love.  And so it can

8    be a little challenging sometimes to follow along.  So thank

9    you for your help on that.

10             MS. VANLARE:  Thank you, Your Honor.

11             THE COURT:  And you were talking about the New

12   Jersey Bureau of Securities and Docket 553.

13             MS. VANLARE:  Yes.  That objection is resolved.

14   The objection filed by the Helium party, that's Docket 582.

15   That objection is resolved as well.

16             The objection filed by the New York State Office

17   of the Attorney General at Docket 591, that objection is

18   resolved.

19             Objection filed by Valour, that's at Docket 858.

20   That objection is resolved for purposes of the disclosure

21   statement hearing.  Valour does want to note that they

22   reserve their rights for plan confirmation.  Of course we

23   respect that.

24             Next we have the objection of the Ad Hoc Group

25   that was filed at Docket 859.  That objection, Your Honor,

Page 27

1    is not fully resolved.  It's substantially resolved.  And

2    I'll address it and I'm sure the Ad Hoc Group will probably

3    want to respond as well.

4           But there were three points in their objection.

5    We believe that the only one that's outstanding based on our

6    communications with them is that they would like to see

7    additional disclosure about the identity of released

8    parties.

9           Now, in response to their objection, we did modify

10   the disclosure statement.  What we have said is that we will

11   file a notice as part of the plan supplement indicating the

12   current -- the officers and directors and employees that are

13   being released who were current as of the petition date.  So

14   we will file that notice as part of the plan supplement and

15   will include a general basis for those releases.  The

16   decision whether or not to grant those releases is being

17   made by the Special Committee under the terms of the plan.

18          So as a disclosure issue we believe we've resolved

19   the objection.  I know they may disagree and you may hear

20   from them later, but again, we responded to that objection

21   that way.  And again, our view is that we've resolved it for

22   purposes of today.  And as with others, we understand that

23   they may object as a confirmation matter with respect to the

24   scope.

25          THE COURT:  All right.  So just since now seems as

Page 28

1  good a time as any, the timing of the plan supplement was

2  the subject of some discussions, so we might as well just

3  jump into that while we're talking about it.

4          MS. VANLARE:  Yes.  We did modify the timing in

5  response to -- I can't recall -- one or more objections

6  raise that.  And so we did change it.  I think it was five

7  days before the voting deadline.  It's now seven days before

8  the voting deadline.  I'm not aware of anyone who has an

9  issue with the new timing.

10          THE COURT:  All right.  And I will just say that

11  under applicable law, there is a question -- it's not a

12  question for disclosure, it's a question for confirmation,

13  but just to get it out there, about releases in the context

14  of a liquidating plan.  Right?  Where nobody is contributing

15  anything of value, who would get released and why.  And so

16  that's something that I haven't looked at the most up-to-

17  date version on what it says about releases, but certainly

18  it's not a disclosure statement issue.  But to the extent

19  that Debtors may want to include what the inquiry will be at

20  confirmation so that parties understand who are not familiar

21  with that.  But I think that's all I have on that.  All

22  right.  Thank you.

23          MS. VANLARE:  Next we have the Securities

24  Litigation Lead Plaintiffs.  They filed an objection at

25  Docket 860.  I believe that objection is resolved for

Page 29

1    purposes of today.  But I think we are in discussions

2    regarding the language.

3              THE COURT:  All right.  So resolved in principle.

4              MS. VANLARE:  I'm sorry, Your Honor.  That one

5    actually I need to come back to.  I am not aware of an

6    objection that's outstanding, but I can't represent right

7    now on the record that it's resolved.

8              THE COURT:  You can check in on that in a break

9    and we'll -- there's quite a few of these.

10             MS. VANLARE:  Next we have an objection filed by

11   Foundry at ECF 863.  That objection is resolved.

12             Next we have an objection filed by Gemini at

13   Docket 864.  This one, there are some issues.  And I think

14   we should maybe skip it now and we'll come back to it at the

15   end.  We've made substantial progress, but there are a few

16   issues on that one.

17             Next we have Docket 865, Three Arrows Capital.

18   That objection is resolved.  I would like to represent on

19   the record as per our discussion with counsel to Three

20   Arrows Capital that their objection raised issues with

21   respect to the reserve.  And we do understand that their

22   rights with respect to that issue is reserved for purposes

23   of confirmation.

24             Next we have the Unsecured Creditors Committee

25   filed their reservation of rights, which we note we have

Page 30

1    been in discussions with the Unsecured Creditors Committee,

2    as I think you've heard already, Your Honor.  So we've been

3    working with them and sharing language.  So I believe that

4    we have made a lot of progress in addressing a lot of their

5    concerns.

6            Docket 867 is an objection filed by Digital

7    Currency Group.  This is another one that I would like to

8    skip until the end.  We have included a lot of additional

9    disclosures that they've asked us to include, and that's

10   reflected in the amended disclosure statement.  But there is

11   language that we have not included.  And so I believe that

12   that's still outstanding.

13           Next we have an objection filed by SOF

14   International at Docket 874.  I believe that most of the

15   issues raised in that objection have been resolved.  There

16   is one outstanding item where they've asked us to include

17   recovery percentages on the Gemini claims and we are looking

18   to see if we can add those additional recoveries.  I believe

19   we can.  With that I think it's resolved.  But basically the

20   issue there is that the disclosure statement as would be

21   typical includes the recovery percentage on the secured

22   portion of the claim, which is a hundred percent, and the

23   unsecured portion of the claim, the deficiency claim, there

24   is a dispute, as Your Honor has heard, with respect to the

25   amount of the deficiency claim and the recovery percentages

Page 31

1    that we reflect in the disclosure statement and in the

2    disclosure statement exhibit do show there's quite a bit of

3    information and there's a range of recoveries.  So there's

4    no issue with respect to that.  It's just that SOF would

5    like us to include something that puts the secured and the

6    unsecured portion together.  So we may be able to do that,

7    and we're working with our financial advisors to try to make

8    that happen.

9              THE COURT:  And is there overlap between that and

10   some of the Gemini objections being worked on?

11             MS. VANLARE:  Not that I am aware of.

12             THE COURT:  All right.

13             MS. VANLARE:  Next we have the Office of the

14   United States Trustee filed at Docket 875.  We have been in

15   discussions with the Office of the United States Trustee.

16   We have added a lot of language to the disclosure statement

17   in response to the comments, both informal and the ones that

18   were part of the objection.  I don't believe the objection

19   is resolved, but I think that's another one that probably

20   Mr. Zipes will want to address on the record.  I will just

21   say on our part, I believe that we have addressed all of the

22   points other than ones that we believe are really issues for

23   confirmation.

24             With that, Your Honor, I think that gives you the

25   lay of the land.  And if I could just summarize.  And again,

Page 32

1    parties may have additional comments.  But I believe that

2    really we are down to a handful of issues.  I think that

3    includes the Digital Currency Group objection which we

4    should address.  The Ad Hoc Group, it's really just that

5    limited point around disclosure of the releases being part

6    of the plan supplement and the Gemini objection, which we

7    have been working and I think we've resolved all the issues

8    that we could.  And I really think the ones remaining are

9    issues for confirmation.  We have been working with them.

10   There are some drafting points on the plan that remain.  And

11   again, I think they are ones we anticipate resolving in the

12   next few days and/or they can be left for confirmation.

13           There is one issue that I think relates to the

14   disclosure statement and really to solicitation involving

15   Gemini.  And that is that Gemini has asked to include as

16   part of the solicitation package a cover note for the Gemini

17   lenders.  We are not in theory opposed to them doing it, but

18   we are not in agreement with the version of that cover note

19   that they have proposed because we believe that it

20   mischaracterizes the plan.  And so it's somewhat tied with

21   some of the plan issues.  But to the extent Your Honor were

22   to say they don't really need to send a note, I think we're

23   done and we could just solicit the -- we have our

24   solicitation package to the extent you are inclined to allow

25   them to include something.  I'll just note that, again, we

Page 33

1    want to make sure it's accurate.

2              THE COURT:  Yeah.  So as to the note, I guess

3    there's two separate issues.  One is a note by a specific

4    party sent separately.  I get a right to tell you straight

5    from the horse's mouth what my view is.  That can lead to a

6    proliferation of notes, just (indiscernible), and that can

7    be a bit unwieldy.  It can also be a bit confusing.  And so

8    I am not necessarily a fan of individual notes.  I am a fan

9    of getting the information out.  And one of the benefits of

10   having an official committee which has a fiduciary

11   obligation is to ask the committee to sort of referee a

12   little bit and say here's a supplement on behalf of the

13   official committee and say here's various constituencies

14   within that who have various views about things and to help

15   mediate through that.  So that tends to be my approach.

16   Because obviously we want people to get the information.

17   And I think that's what the concern is about.  But it can

18   easily break out into a bit of anarchy.  Nobody's fault.

19   I'm not trying to blame anybody.  It's just sort of the

20   natural problem that arises when you have this many folks

21   involved.

22              So I can't say I've never had an individual

23   letter, but usually if it becomes a flashpoint, I've tried

24   to address it some other way to get the information.  So you

25   would still work on the information, but the vehicle might

1   be slightly different.  But it would still be -- again, the

2   committee has -- and I certainly have been struck by this in

3   other parts of this case -- is people need to recognize -- I

4   know there is a certain level of mistrust and concern that

5   happens in any case, and certainly exists here.  And people

6   who don't have experience with bankruptcy won't really

7   necessarily understand the role of the official committee,

8   that a reason it's in the statute is to be a statutorily-

9   recognized fiduciary for unsecured creditors.  And so they

10  are required to look out for folks who are all the unsecured

11  creditors.  And judges will often therefore use the

12  committee in circumstances where their exercising their

13  fiduciary duties gives them a certain standing and a certain

14  ability to sort of moderate these kinds of things and to

15  call balls and strikes in a certain kind of capacity.  So I

16  just add that, throw that out there just to the extent that

17  there are a lot of people on the line who don't really know

18  bankruptcy and don't really necessarily want to know

19  bankruptcy.  But I've made comments about the official

20  committee before, and they may not really understand why.

21  There's a lot of committees in bankruptcy, and it can be a

22  bit mind-numbing for folks who aren't used to it.  But the

23  official committee has a special status for that reason.  So

24  that's why I'm invoking them here and have talked about them

25  in previous circumstances.  That's one way to overcome trust

Page 35

1     issues and concerns about getting a fair shake.

2              So that would be my view.  I think you would work

3     on the substance, but the delivery vehicle would be a little

4     different if that becomes a sticking point.

5              MS. VANLARE:  I think, Your Honor, right now our

6     cover letter we've shared with the committee.  I don't -- we

7     accepted their comments.  If they wanted to add a letter, we

8     would have no issue with that.  I'm not sure they need to,

9     but --

10             THE COURT:  Or add things to your letter.  I will

11    leave it to you all.  To the extent I can be of help, you'll

12    let me know.  I don't think -- there's a lot of smart

13    professionals here.  I don't think you need me to

14    micromanage that.  That's why I'm just sort of throwing out

15    some of the ways I think about it.  But as long as people

16    get the information.  But I do think one letter can beget

17    many letters, and many letters just sows confusion.  So

18    we're trying to avoid -- people already get a very lengthy

19    stack of things to consider.

20             MS. VANLARE:  I agree, Your Honor.  And for what

21    it's worth, I did get another request for another letter

22    right ahead of this hearing.

23             THE COURT:  Well, and that's the way it goes.  And

24    I totally understand.  And you can't blame somebody saying,

25    well, if one party is submitting a letter, why don't I get

1    to submit a letter.

2            MS. VANLARE:  Exactly.

3            THE COURT:  And we really don't want to be picking

4    and choosing among people.  All the professionals here are

5    doing a good job for their constituents.  I am very happy to

6    have them.  And so I'm not trying to pick winners and

7    losers.  So we're just trying to pick a vehicle that's fair

8    and allows us all to move forward.  All right.

9            MS. VANLARE:  That's understood and very helpful,

10   Your Honor.  So I think with that with Gemini I think we are

11   down to really technical modifications on the plan, which to

12   the extent they're not technical are really confirmation

13   issues.

14           THE COURT:  All right.  So one thing I thought we

15   could do for purposes of trying to get through certain

16   issues today, you identified a number of parties where the

17   issues are completely resoled.  And I thought it would

18   behoove us all to have that clear on the record today.  So

19   what I thought we would do is if you could identify those

20   folks in a list and then we can ask anybody who is on that

21   list if they wish to be heard on anything if they have any

22   remaining concerns.  And if not, anybody who doesn't have

23   remaining concerns, we can take those issues off the table

24   and then we've reduced the number of moving pieces in the

25   case.

1              So I have made a note as you've gone through, but

2       you probably have a better list.  So I am happy to defer to

3       you.

4              MS. VANLARE:  Yes, Your Honor.  Happy to do that.

5       Okay, so I will go through my list.  First is --

6              THE COURT:  And these are all the folks who --

7              MS. VANLARE:  Who are resolved.

8              THE COURT:  From your point of view the objections

9       have been resolved.

10             MS. VANLARE:  Correct.

11             THE COURT:  Okay.  Please.

12             MS. VANLARE:  Objection filed by Mr. Morton, Mr.

13      David Morton.  That's at ECF 475.  The New Jersey Bureau of

14      Securities, that's filed at 553.  Helium, 582.  The New York

15      State Office of the Attorney General, that's 591.  Valour,

16      858.  Foundry, 863.  And counsel to Three Arrows Capital,

17      that's 865.

18             THE COURT:  All right.  So let me ask if there's

19      any of those parties who have just been identified as having

20      their objection resolved, if any of them wish to be heard.

21      If I don't hear from any of you folks, that's fine.  Then I

22      will assume that the disclosure statement objection is

23      resolved.  But if anybody has a different view of things,

24      now is the time to chime in.  So let me open that up to

25      anyone who wishes to be heard among that group.

1          All right.  I am not hearing any responses.  I

2     know it's conceivable somebody wants to respond and is

3     having a technical issue.  That happens all the time in the

4     wonderful world of Zoom.  But right now I'm not hearing

5     anyone.  If anybody is not being heard and wants to be

6     heard, they'll manage to fight their way through their

7     technical problems and chime in in the next couple of

8     minutes.  But otherwise, we'll consider all those objections

9     to be resolved.

10          MS. VANLARE:  Thank you, Your Honor.  So next I

11    would say the ones that are close to being resolved, which

12    is the SOF International, 874.  That's one where, as I

13    noted, I think the only issue that's currently on the table

14    is whether we can add additional disclosure around

15    recoveries on the entirety of the Gemini lender claims, both

16    secured and unsecured.  I think we can do that as a footnote

17    in the disclosure statement exhibits.  And so I think with

18    that, we are resolved.

19          THE COURT:  All right.  So anybody here from SOF

20    International that wishes to be heard?

21          MR. DREW:  Yes, Your Honor.  That's accurate.

22       I'm happy to hear that counsel is going to work with us

23       on that table.

24          THE COURT:  Okay.

25          MR. DREW:  So that would resolve the objection.

Page 39

1             THE COURT:  So I think we'll call these category

2     trust but verify that you're all working together to get the

3     requisite stuff put together and in the disclosure

4     statement.  And to the extent there's any bumps in the road,

5     we can circle back to that.  Any other in the trust but

6     verify category?

7             MS. VANLARE:  Yes.  And actually this one I think

8     should really be in the resolved category.  It's the one

9     that I wasn't sure about before that I received

10    confirmation.  That's Docket 860, the Securities Litigation

11    Lead Plaintiffs.  We did have an exchange with them.  There

12    may be language that they would like to see in the document

13    preservation provision of the plan, but they've agreed that

14    that's really an issue for confirmation.  In other words,

15    we'll either resolve it or it can be an issue for

16    confirmation.

17            THE COURT:  All right.  Let me ask if there's

18    anybody who is in the Securities Litigation Plaintiffs who

19    filed the objection at Docket 860 who wishes to be heard.

20            MR. PAPANDREA:  Yes.  Good afternoon, Your Honor.

21    It's Michael Papandrea from Lowenstein Sandler on behalf of

22    the Securities Litigation Lead Plaintiffs.  Just figured in

23    light of the confusion that I would chime in and just

24    confirm that the way counsel characterized it is fair enough

25    in our book.  I think at this point as far as the disclosure

Page 40

1    statement is concerned, we're fine and we're happy with

2    dealing with whatever concerns we have in connection with

3    the plan and in connection with confirmation.  Thank you.

4           THE COURT:  All right.  Thank you very much.  That

5    is very helpful to hear from you.  And so we'll put that

6    actually in the resolved category because it's been resolved

7    for purposes of the disclosure statement.  Obviously folks

8    reserve their rights as to the plan.  And we sometimes

9    identify that specifically, but it's true in any event even

10   if we don't say it.  Excellent.  All right.  So that is

11   resolved.

12          Any other ones that we should address, Ms.

13   VanLare?

14          MS. VANLARE:  Yes.  This one is another one for

15   trust but verify category.  That's the Securities and

16   Exchange Commission objection at Docket 510.

17          THE COURT:  All right.  And as I understood it

18   during discussions and hope to resolve them and there was

19   talk about the exculpation and the release.  So let me hear

20   from the SEC.  Happy to hear from them.  Counsel?

21          MR. UPTEGROVE:  Good afternoon, Your Honor.

22   William Uptegrove for the United States Securities and

23   Exchange Commission.  And with me is my colleague Therese

24   Scheuer.

25          After a number of productive conversations with

Page 41

1   the Debtors, as alluded to by Ms. VanLare, we believe based

2   on an email exchange today that the Debtors have agreed to

3   language that addresses our outstanding disclosure issues.

4   However, given that the most recent amended disclosure

5   statement was filed during the hearing, we have not had a

6   chance to confirm that all the changes that we believe were

7   agreed on made it into the new amendment.

8          On a (indiscernible) review, it does look like we

9   have some additional comments for the debtors including how

10  the exculpation and (indiscernible) regulatory language has

11  been incorporated.  I think it's something we can work with

12  the Debtors on.  But these are very important issues to us

13  and we want to make sure they are addressed.

14         With respect to two other issues, those being

15  subordination of the government penalty claims and the

16  exculpation provision, the debtors have agreed that these

17  are reserved for confirmation.  And finally, the Debtors

18  don't appear to have filed, and it sounds like they are

19  filing later today, the distribution principles that are

20  referenced in the disclosure statement and have been -- Ms.

21  VanLare mentioned earlier that describe the mechanics of the

22  distribution.

23         The SEC is not taking a position on those

24  principles today.  But going forward we have asked and

25  believe that debtors have agreed to provide us with three

Page 42

1    business days' notice to the SEC for any amendment to the

2    distribution principles and any contemplated acquisition of

3    crypto assets other than BTC and ETH.  And that's one of the

4    areas where it looks like we might have been passing ships

5    in the night.  Because there is some new language it looks

6    like in the disclosure statement with respect to advance

7    notice to the SEC about the purchase of crypto assets other

8    than BTC and ETH.  But the amendment part of that didn't

9    seem to get in there.  So that's something I think we could

10   just talk with -- we think it's probably an oversight and

11   we'll talk with debtors about it.

12          Sort of just stepping back to finish up at a

13   30,000-foot view, we've had conversations and expect to

14   continue to have conversations with the Debtors concerning

15   the expected distributions and related issues.  But we want

16   to make clear for the record that the SEC is not opining as

17   to the legality under the security laws, the transactions

18   outlined in the plan, or the distribution principles.  And

19   the SEC is reserving its rights in those regards.

20          And that's all I have unless Your Honor has some

21   questions.

22          THE COURT:  I certainly understand that as a

23   confirmation issue.  Obviously I recognize that this is a

24   sensitive issue and also an important one in terms of the

25   legality of transactions contemplated by the plan.  And so I

Page 43

1   know it's come up in various guises in various crypto cases.

2   So I guess my one comment given all that is that I'm

3   assuming those are conversations that are going to be

4   ongoing among the SEC and the Debtors and other interested

5   parties rather than something that lands with a thud at the

6   objection deadline just because it doesn't serve anybody's

7   interest to have things happen that way.

8           So I don't know if you have any thoughts about

9   that.  But certainly obviously I expect the SEC is looking

10  at a lot of things in a lot of cryptocurrency cases.  And so

11  perhaps you have some gained wisdom from other cases or

12  other circumstances that you might share.  But I welcome any

13  thoughts you have about that.  My goal is that procedurally

14  things are handled in a way where everybody gets to have

15  their issues heard in a way that's fair and appropriate.

16  And surprises are bad for everybody.

17          So any thoughts, Counsel, on that particular set

18  of problems?

19          MR. UPTEGROVE:  Totally understandable, Your

20  Honor.  I think that it all depends on the facts and

21  circumstances of the particular issue and transaction of,

22  you know, we are continuing to review the plan and the

23  distribution principles once they're filed.  And I think

24  we'll continue to have those discussions with the debtors

25  and other constituencies.  To the extent there are issues,

Page 44

1    we hear the concerns and we'll raise them with the Debtors

2    or the Court at the appropriate time and try to give enough

3    runway so there's not any type of a thud anywhere.

4            THE COURT:  I appreciate that, particularly in

5    light of the fact that there's the New York State AG action

6    which raises other issues as a matter of state law.  And

7    having spent a little bit of time in the government, I can

8    appreciate the challenges of trying to get clarity on these

9    kinds of challenging issues that arise in different ways in

10   multiple cases.

11           So I will say to the debtors and the SEC and

12   anybody else, any other regulators, to the extent it's every

13   helpful to have a conference, have a discussion, happy to do

14   that just so we can try to get in front of the issues and

15   avoid unnecessary fire drills, unnecessary confusion, and

16   also unnecessary pleadings.  Because if people don't know

17   what's going on, it often leads to people needing to file

18   things to protect their rights.  And that isn't necessarily

19   the best way for anybody to use their time.  So I just want

20   to make it clear, I'm happy to do any of that, anything that

21   people think would be helpful in moving the ball forward

22   with everybody reserving their rights, obviously.  But just

23   in terms of clarity, position, and where people stand and

24   the impact on the case and things of that sort.

25           So with that, anything else from the SEC?

Page 45

```
 1              MR. UPTEGROVE:  No, Your Honor.  That was it.
 2    Thank you.
 3              THE COURT:  All right.  Thank you very much.  So,
 4    Ms. VanLare, so I will put that in the trust but verified.
 5    There's obviously some discussions that continue to need to
 6    happen and some language.  But it did give sort of a good
 7    excuse to have a conversation.  Obviously we're all paying
 8    attention to cryptocurrency cases in general.  These issues
 9    can arise at really lots of different ways.  And so again,
10    anything I can do to help to try to get in front of those
11    issues, let me know.
12              MS. VANLARE:  Thank you, Your Honor.
13              THE COURT:  If you need a moment.
14              MS. VANLARE:  Some water would be helpful.
15              So I think that leaves the ones I had noted
16    earlier, which is the Ad Hoc Group objection, Gemini, DCG,
17    and the...
18              THE COURT:  And the U.S. Trustee's Office.
19              MS. VANLARE:  The U.S. Trustee.
20              THE COURT:  All right.  So what's the best way to
21    move forward on those?  And if you want to take a minute or
22    two to think about that and to talk to various folks, or
23    we'll deal with it in real-time.  And if you want to take a
24    moment, just...
25              MS. VANLARE:  I'm sorry, Your Honor.  I actually
```

Page 46

1    think we've had conversations.  I think we can just go

2    forward.

3              THE COURT:  All right.

4              MS. VANLARE:  What I would propose is that we just

5    go one-by-one.  To the extent issues are resolved, perhaps

6    they can note that for you.  And they can obviously tell you

7    the issues that are still bothering them, and I would like

8    an opportunity to respond.

9              THE COURT:  All right.  So as to not look like I'm

10   picking any favorites, what's the first one on the list, on

11   the chart?

12             MS. VANLARE:  Why don't we just go in order?  The

13   Ad Hoc Group.

14             THE COURT:  Okay.  All right.  So let's hear from

15   the Ad Hoc Group, who filed an objection at 859.  And it

16   sounds like there have been some substantial progress, but

17   there are still some outstanding issues about the identity

18   of released parties.

19             MR. ROSEN:  Let me take my water so I don't have

20   to go back and forth.  I didn't know if the podium had that

21   effect on people.

22             Your Honor, Brian Rosen, Proskauer Rose, on behalf

23   of the Ad Hoc Group.

24             Yes, we did interpose an objection that raised

25   several points.  And Ms. Vanlare is correct that they did

Page 47

1    make modifications to the disclosure statement to try and

2    address those.  But one major one remains, and I actually

3    think it was picked upon on by the Creditors' Committee in

4    their pleading that they filed this morning as well.  I

5    don't know if it was their first, second, or lastly, but it

6    was one of those.

7              Your Honor, there is language in the plan that

8    provides that the Special Committee is going to have

9    unlimited rights to grant releases, and it may do so at any

10   time and for any reason.  And I understand that Ms. VanLare

11   has come back and said, well, we'll let you know now seven

12   days prior to the -- when we filed the plan supplement,

13   seven days prior to the voting deadline.  But that's never

14   enough time.  And as a seasoned or experienced bankruptcy

15   debtor's lawyer, I know that when you do something in the

16   plan supplement, the argument usually is that we never saw

17   it prior to the time that we had to submit our vote.

18             The problem that you have here is it's coupled

19   with the fact that they are saying that anybody who votes in

20   favor of the plan is therefore going to be agreeing to the

21   granting of the releases to these parties, which as you

22   noted, Your Honor, are parties that in a liquidating plan

23   are not providing any value.

24             We're not addressing today the issue of the

25   propriety of granting the releases.  What we're trying to

1   address, Your Honor, is who were they talking about.  There

2   needs to be disclosure here so that parties know what

3   unlimited rights the Special Committee is looking to grab

4   and to whom they are offering to provide the benefits.

5              THE COURT:  And why.

6              MR. ROSEN:  And why.  And that's exactly it, Your

7   Honor.  So we are trying to limit what we have to do today

8   solely to the disclosure issue, saving for the rest whether

9   or not this is even kosher, whether they should be even

10  trying to do that.

11             So our view is simple.  If you want to do this

12  special committee, if you think you want to reserve your

13  rights to grant John Doe, Jane Doe, et cetera --

14             THE COURT:  I frankly haven't seen this.  And

15  maybe it's been in other cases and in other plans.  I

16  haven't seen it.  I've seen releases brought to the Court

17  under Metromedia and under law dealing with exculpation,

18  which is fairly well-developed in this district.  And judges

19  are always concerned about giving a blank check.  So we have

20  our own trust but verify moments.  And so I think I

21  understand where you're coming from, Counsel.  Anything else

22  before I hear from the Debtors?

23             MR. ROSEN:  No, Your Honor.  That's our sole

24  remaining point.

25             THE COURT:  All right.

```
 1              MR. ROSEN:  Thank you.

 2              MS. VANLARE:  Your Honor, I just wanted to clarify

 3    certain things about the releases, understanding that of

 4    course it's an issue for confirmation.

 5              But the releases that are proposed in the plan are

 6    very limited.  They are solely consensual releases.  There

 7    are no non-consensual third-party releases.  And the

 8    releases under the terms of the plan are limited in several

 9    ways.  First --

10              THE COURT:  When you say consensual, consensual by

11    whom to whom?  I just want to be clear because I don't know

12    who they are and what they're for.  So it's hard to anchor

13    it.  It seems to be a bit ephemeral at the moment.

14              MS. VANLARE:  They are granted by creditors who

15    are voting to accept the plan.  So a lot of times, as I'm

16    sure Your Honor knows --

17              THE COURT:  In a separate check box or an opt-in,

18    an opt-out, or just automatic?

19              MS. VANLARE:  No.  They're voting for the plan.

20    That is --

21              THE COURT:  Well, usually there is an opt-in or an

22    opt-out for things like that.  Right?

23              MS. VANLARE:  So based on our view of many cases,

24    typically the opt-out/opt-in issue comes up in the case of

25    creditors who are unimpaired who are not voting.
```

Page 50

1            THE COURT:  I don't know that I would characterize

2    it that way.  I mean -- well, let me get to -- I'm trying to

3    figure out why are releases -- who do you want to release

4    and why.  Let's sort of start with the basics.

5            MS. VANLARE:  In terms of the parties, it is -- we

6    are not including anyone who is defined as a DCG party under

7    the plan.  In other words, DCG, the parent entity and

8    anybody who fits in that definition is excluded from the

9    releases.  We're not including anyone who --

10           THE COURT:  No, but who are we including?  Because

11   it's a liquidating plan.  That's what I'm -- let's just cut

12   to the chase.  Who?

13           MS. VANLARE:  Yes.  So it would be directors and

14   officer and employees as of the petition date.

15           THE COURT:  But why?

16           MS. VANLARE:  Your Honor, we will include a

17   general statement, the basis for the releases, as part of

18   the plan supplement.  But I think --

19           THE COURT:  But I'm asking as a judge.  I want to

20   know why.  I don't think we need to bury the lead on that.

21   It shouldn't be shrouded in mystery.  I understand it's a

22   confirmation issue, but it's a legitimate question to ask.

23   It's a liquidating plan.  Nobody is contributing anything at

24   all or liquidating the estate assets.  And typically

25   releases are tied to something of value.  That's different

Page 51

1    from exculpation, people working on the case who shouldn't

2    get sued for working on the case and trying to reach a good

3    result for all stakeholders.  So I get the exculpation and I

4    get the releases of things of value with the very large

5    caveat of whatever the Supreme Court is going to tell us the

6    law is in the next year.  But I'm just trying to figure out

7    why in a liquidating plan we're even talking about releases.

8            MS. VANLARE:  Well, Your Honor, they're also

9    limited to -- so we're carving out --

10           THE COURT:  I know you're trying to carve it out.

11           MS. VANLARE:  Yes.

12           THE COURT:  But it sort of buries the lead.  Why?

13   Right?  So if it's in a seven, there's no releases.  And

14   this is essentially a seven.  I understand why it's in 11,

15   because there's lots of good reasons for it to be an 11.

16   I'm not quibbling about the validity of having a liquidating

17   plan in 11.  But it's still a liquidating plan.

18           MS. VANLARE:  I think these are individuals that

19   were employed and were directors and officers as of the

20   petition date and have continued -- many of them continued

21   during the cases and they've spent a lot of time and effort

22   in contributing to preserving the estate and --

23           THE COURT:  Well, wouldn't that be exculpation,

24   right?  That we're going to give them the protection that

25   they deserve for things they've done in connection with the

Page 52

1    case?  Because it shouldn't be a get-out-of-jail-free card.

2    Again, I'm not trying to say anything negative about folks.

3    I appreciate that they're working hard.  And so this isn't

4    personal.  I'm just thinking about it as a conceptual

5    matter.  I am perfectly fine with giving them appropriate

6    exculpation.  You might have a joust or two with the U.S.

7    Trustee's Office about exculpation.  They tend to have a

8    particular view about what it should be covering.  There's a

9    little bit of play in the caselaw.  But I think the concept

10   is pretty clear.  And I don't have a problem with the

11   concept at all because I think you can't make a case

12   successfully if people who are helping to make it work

13   successfully are on the hook for their efforts.

14          But for things that predated the filing of the

15   case and really don't have anything to do with it, I'm just

16   not sure why they should get a release.

17          MS. VANLARE:  Your Honor, we will make that very

18   clear in the submissions relating to confirmation.  I think

19   to answer your question, again, these are people who -- it's

20   a narrow group and it's a narrow set of causes of action.

21          THE COURT:  But what's the anchor for that group?

22   What actions and/or responsibilities or duties is the anchor

23   for those release?  And I think that's what Mr. Rosen's

24   question is; what is it that out of which the release

25   authority springs or the anchor springs that makes one

1    executive different than another executive?  And so that

2    would be my question.  I think that's a legitimate question

3    just because we'll still fight about it at confirmation and

4    I'm not -- I don't think anybody is contemplating ruling on

5    any of that stuff now.  But the idea is that people should

6    have some sense of the disclosure as to we're going to seek

7    releases for these kinds of people for this kind of conduct.

8    Various people have concerns or may or may not have

9    concerns, and we'll decide it at confirmation.  But it at

10   least gives people -- especially if your argument is that by

11   voting in favor of the plan, they're automatically approving

12   those releases.  Because otherwise they are being asked to

13   vote and then sign up for a scope of releases and they don't

14   even know what it is.  So I think it's got to be defined for

15   purposes of the disclosure statement.

16          MS. VANLARE:  Understood, Your Honor.  We can see

17   if we can add additional disclosures on that point.

18          THE COURT:  All right.  So we'll put that as sort

19   of an open item.  I'll take a different color pen and we can

20   mark that.  Because I don't think it's an unfair ask,

21   especially if the Debtors want to do it the way they want to

22   do it.  And we can talk about that in terms of -- but if a

23   vote for the plan is a vote for a release of unidentified

24   people for unidentified things, that's just -- people are

25   entitled to know what they're voting for.

1          MS. VANLARE:  Your Honor, we do have an issue with

2     -- the Ad Hoc Group has asked that we identify specific

3     individual.  We do have an issue with that, and that I think

4     is worth raising.

5          THE COURT:  Well, I am more concerned about if

6     there is a principle, right?

7          MS. VANLARE:  Understood.  Okay.

8          THE COURT:  What are the category of people and

9     for what conduct in a way that can be identified.  I don't

10    think anybody is trying to in this day and age of the

11    internet put -- make somebody the subject of Twitter

12    campaign.  But I do think people need to understand the

13    principles enough that they could -- if somebody was

14    identified to them, they would be able to apply those

15    factors and understand whether that person is in our out.

16         Mr. Rosen, am I missing something on that?

17         MR. ROSEN:  Your Honor, that is fine with us as

18    long as we have adequate disclosure, with respect to exactly

19    what you're suggesting, that will work.

20         THE COURT:  All right.  And let me ask Mr. Shore

21    as well because I know the Committee weighed in on this as

22    well.

23         MR. SHORE:  Yes, that will work.  As we put in our

24    pleading, we're working through this with the Debtors.  I

25    think we're going to get to a place where there will be a

Page 55

1   disclosures that will meet the creditors' concerns.

2           THE COURT:  All right.  All right.  So we're going

3   to work on that.  And let me ask Mr. Rosen, that's the

4   remaining issue for the Ad Hoc Group?

5           MR. ROSEN:  Yes,  Your Honor.  The other points

6   were taken care of.  And we thank Ms. VanLare for that.

7           THE COURT:  Okay.  Great.  So we are continuing to

8   make progress.  Excellent.

9           So that's the Ad Hoc Group.  And next up on the

10  chart in this group of unresolved issues I guess is Gemini.

11  Is that right?

12          MS. VANLARE:  Y es, Your Honor.

13          THE COURT:  All right.  Thank you.

14          MR. FRELINGHUYSEN:  Good afternoon, Your Honor.

15  Anson Frelinghuysen, Hughes Hubbard & Reed, for Gemini Trust

16  Company.  My colleague, Dustin Smith, is in the courtroom

17  today.  Also want to express my gratitude to Elizabeth

18  Beitler, who did a lot of work on this and is on the line.

19          THE COURT:  All right.

20          MR. FRELINGHUYSEN:  Appreciate all our associates.

21          THE COURT:  I'm sure they appreciated being called

22  that.

23          MR. FRELINGHUYSEN:  Well, then that's a longer

24  list.

25          As you know, Your Honor, we've already discussed

Page 56

1    plans are flying around.  We received the latest draft a

2    little bit before it was docketed.  We're not through our

3    review of it.  It does get us a lot closer, but we're not

4    there.

5            In our objection we described the plan as

6    siphoning value away from the Gemini lenders for the other

7    creditors.  I would now go more to a characterization of

8    plugging some leaks.  We are much, much closer to being in a

9    place where we can support a plan being solicited with

10   appropriate disclosures.

11           THE COURT:  So let me ask you given the timing of

12   things, which is fair -- you can't read it while you're

13   sitting here.  So what would you suggest the best and most

14   efficient way to move forward from where we are to where we

15   need to be?  Because I think everybody agrees that we want

16   to move the case forward expeditiously.  What would you

17   suggest?  We could do everything from taking a break, we can

18   do everything from we're going to set another hearing date

19   and we'll sort of circle back then.  Any thoughts?

20           MR. FRELINGHUYSEN:  Your Honor, I don't think

21   we'll be able to settle on the language via remote and with

22   some of our colleagues in the office.  But we can definitely

23   resolve the language in the next couple of days.  I don't

24   feel like we'll have a problem getting there.

25           There are two things that I would like to address

Page 57

1    here though.

2            THE COURT:  Sure.

3            MR. FRELINGHUYSEN:  One of which pertains to the

4    note from Gemini that we already had a little bit of

5    colloquy on.  And then also I just would like to talk about

6    the solicitation process because it's unique in that it's

7    not being run by a solicitation agent, it's being run by

8    Gemini.  And most of our -- actually, nearly all of our

9    issues there were just a matter of timing of when the plan

10   was filed versus when we were sorting through the mechanics.

11           I think we, and I think the Debtors would agree,

12   we've come up with a very good solution to getting

13   information to our users, allowing them to vote through the

14   Kroll portal and then having the process to tabulate those

15   votes and get it back to Kroll so that they can then

16   tabulate the actual outcome of the votes.  And the process

17   is now outlined in the plan.  And I just want to make sure

18   that everyone is clear that it's different than usual, but

19   we feel like we designed a good plan and solicitation

20   procedures to get there.

21           THE COURT:  All right.  Well, if you are all in

22   agreement on it as you think that it allows the case to move

23   forward and protects your customers, then I am certainly --

24   from what I have seen of it, I am on board as well.

25           MR. FRELINGHUYSEN:  So one thing in connection

Page 58

1    with that is that -- and also with our role later down the

2    line would be as the distribution agent for the assets

3    moving to the earn users, I think one of our issues -- and

4    I'm not sure if it's resolved or not -- is receiving

5    exculpation for Gemini's human beings that do the work --

6    I'm getting positive nods, so I feel great about that.  I'll

7    move on.

8            THE COURT:  Well, that seems to be consistent with

9    our earlier discussion about people who are helping to get

10   the case done who are acting in good faith should not be

11   legally in peril for their efforts.

12           MR. FRELINGHUYSEN:  Right.  Great.  And then the

13   last kind of structural issue that will inform a lot of the

14   resolution that we are able to make with the debtors or not

15   regards the cover letter that Gemini will be providing to

16   its users.  Now, most of our users they have a high capacity

17   to track this case.  They are tracking it in a way.  But

18   most of them have -- the vast majority of them have claims

19   under $10,000.  Their level of sophistication with respect

20   to bankruptcy is the full range.  And they do tend to look

21   to Gemini for information on the Genesis case.

22           And when we were talking about a note and when you

23   were talking about a note earlier, a cover note, if the plan

24   doesn't provide appropriate safeguards for the Gemini

25   lenders, if we can't plug these holds, then Gemini doesn't

1    want its users to support the plan.  And if the plan doesn't

2    provide -- in the next step what I'm saying -- consent

3    rights for the ongoing administration of the plan both with

4    respect to the final documentation of the plan, the plan

5    supplement, other definitive documents, and then the post-

6    effective management of the post-effective date debtors,

7    that presents a problem for Gemini.  And we wouldn't be in a

8    position to support the plan.

9           Now, the Debtors have said you can't get consent

10   rights because you aren't supporting the plan.  It's a bit

11   of a chicken and egg problem.  We would support a plan if we

12   had the consent rights that would allow us to protect the

13   Gemini lenders on a go-forward basis.  And that's a little

14   bit where we're stuck with the rounds of changes that we've

15   been going through.  And it pertains to whether or not in

16   the note that we send to Gemini lenders telling them how to

17   access their ballots and some of the technical things,

18   whether we include in that note, which we intend to do, we

19   vote that -- we recommend that you vote against or vote in

20   favor of this plan.

21          We want very much to be in a position where we say

22   we recommend you vote in favor of this plan.  And we are

23   within spitting distance of being able to do that.  And it's

24   just a matter of plugging the holes and having the forward-

25   looking consent rights on the rest of the plan akin not to -

Page 60

1    - I mean, I know the UCC is a different entity.  But as akin

2    as possible to what the UCC has and as what the Ad Hoc Group

3    has.  Obviously excepting in the instances where the Debtors

4    and Gemini will be in a dispute regarding the collateral

5    action that we filed week before last.

6         THE COURT:  So I guess I'm trying to get a sense of

7    whether this is a topic that's still a subject of ongoing

8    discussion.  I don't want to wade into it and somehow derail

9    ongoing discussions, or if this is something where you've

10   reached sort of a dead stop in your back-and-forth.

11        MR. FRELINGHUYSEN:  I would have said it was more

12   of a topic of ongoing discussion until Your Honor's earlier

13   statements regarding sending notes to creditors in that we

14   would agree that we don't need a plethora of notes, but we

15   do need to send a communication to our users --

16        THE COURT:  All right.  Well, let me put that in

17   context.  So I am sort of encapsulating my general

18   experience.  Also, however, we are all very practical people

19   and there are times when a certain amount of flexibility is

20   appropriate.  And so I would encourage people to have a

21   negotiation if there's a way to resolve an issue that

22   everybody can live with that's fair to everybody.  So I am

23   not trying -- again, I see what's above the waterline of the

24   iceberg.  So that remains my general view about notes,

25   because one note can lead to many notes and it can confuse

Page 61

1    people.  However, I recognize that there are a lot of

2    different constituencies in this case.  And in terms of

3    communications, there may be special issues.  And I don't

4    know.

5             What I do know, taking a step back and looking at

6    it from the 3,000-foot view, is this is really the

7    creditor's plan.  This is what the creditors want.  And so

8    we need to be able to make this work.  Right?  So there were

9    other options.  People said no, we don't want to do that.

10   We want the no deal plan.  At the verge of the no-deal plan,

11   at a certain point I'm not sure if you don't do this, is

12   there -- what else is there?  Another no-deal plan?  I mean,

13   there is nothing else. Right?  So people really have to find

14   a way to make this work.

15            So we're in a position where people have asked to

16   do this, and now we're doing it.  So people have to be a

17   little bit flexible and try to figure out ways to get it

18   done.  Because there is no other option after this.  And I

19   don't know what the case sinks into then other than being

20   dead in the water, spending a huge amount of time and money.

21   And people, particularly those people you mentioned, who

22   have the vast majority of claims under $10,000, who knows

23   when they're going to see their money?  And that's a real

24   miscarriage of justice.

25            So I am sort of loathe to give more specific

Page 62

1    guidance.  I think then I'm in ruling territory.  But people

2    have to get it done because this is the plan.  If you've

3    ever seen the Paul Newman movie The Verdict, he says, "This

4    is the case.  There is no other case.  This is the case."

5    This is the plan.  This is the plan everybody wants.

6          MR. FRELINGHUYSEN:  Your Honor, I think this is

7    the plan that we want.  We just need appropriate safeguards

8    on it.  I think we'll take what you said and we'll keep on

9    discussing with the debtors.  Hopefully we'll be back to you

10   or they'll be back to you with language that we are all in

11   favor of and that includes Gemini's support of the plan.

12          I do have to preserve one argument for later,

13   which is the classification of the Gemini lenders in their

14   own class, which of course permits them to be crammed down

15   by the other classes.  That's a confirmation issue.  We'll

16   raise it then.  We just want to preserve our rights.

17          THE COURT:  Well, that I think of all the things

18   we've talked about today, that is very clearly a

19   confirmation issue.  So I would agree.  And I think

20   everybody understands the positions -- the reservation of

21   rights that everybody has on that issue.  All right.

22          MR. FRELINGHUYSEN:  Your Honor, that's it.

23   (indiscernible) other questions, I'm all set.

24          THE COURT:  All right.  I appreciate your

25   thoughts.  And so my sense for this is that there is still

1    some work to be done.  And I'm going to stay out of it to

2    the extent I don't want to -- I think any further

3    involvement beyond comments at this point might impede your

4    discussions.  I'm happy to make myself available if you

5    think I can be of use.  You're in a better position than I

6    am.  But I would think that what we could do is -- my

7    intention is to set another hearing date so that we can get

8    to approval of the disclosure statement, and to set it soon.

9    So I may take a break at some point and we can talk about

10   what date is soon to keep the pressure on and to keep things

11   moving forward.  But at that point if we're not at yes on

12   that issue, then I'll make a ruling.  So I am open to other

13   suggestions, but that seems to be the default.

14            MS. VANLARE:  I think that's fine, Your Honor.  I

15   think where we are is, again, there are issues on the plan,

16   drafting issues.  I think we can work with Hughes Hubbard

17   and resolve them.  I think the issue of consent, we really

18   view that as a confirmation issue.  We're open to discussing

19   consent rights for Gemini if there is a plan support

20   agreement signed.  But I don't think the consent issue,

21   which again is a confirmation issue, should be used as a

22   reason to delay solicitation, which is why I think our issue

23   is really tying it to this note, the cover note.  That's

24   where we have an issue.  But I think Your Honor -- at least

25   what I took away from your earlier comments was that there's

Page 64

1    not going to be a letter such that we can proceed with

2    solicitation and leave the confirmation issues at the

3    confirmation.

4            THE COURT:  All right.  Well, I will leave it to

5    you all to have a discussion on that.  Again, I stand by my

6    earlier comments as a general matter.  But again, I think

7    anything more that I will say will potentially impede your

8    ability to negotiate.

9            But since we're talking about Gemini, certainly

10   one of the issues that was discussed is the adversary

11   proceeding and sort of how that works vis-á-vis the plan.

12   And that certainly -- maybe you already included language,

13   maybe you already have -- again, like everybody else, I

14   haven't gotten a chance to digest the tome.  So what can you

15   tell me about that?  Is the plan to reserve?  Is the plan to

16   -- judges always want to know if we have to resolve

17   something before confirmation.  That's always kind of an

18   important thing so I can get you time.

19           MR. O'NEAL:  Your Honor, Sean O'Neal, Cleary

20   Gottlieb, on behalf of the Debtors.

21           We are trying to address that in language.  What

22   we want to establish is that basically there is a

23   possibility to do a reserve if necessary.  It's obviously

24   the burden of Gemini to demonstrate, for example, that there

25   is a constructive trust or that they have a security

Page 65

1    interest.  We dispute those things, and we say that we

2    dispute that in the disclosure statement.

3            We don't want to have this process held up by

4    that.  And so we will just move forward.  And to the extent

5    reserves are necessary and required by the Court based on

6    estimation or otherwise, we would do that of course.  But

7    we're not going to make it a condition precedent to the

8    plan.

9            THE COURT:  All right.  I'm happy to hear that

10   because obviously the ability to get in any plan

11   distributions out to folks is important, and I don't know

12   exactly what that litigation will look like.  And everybody

13   has to be able to present their case and garner their

14   evidence.  And so I'm heartened to hear that.

15           MR. O'NEAL:  That's right.  Your Honor, there's

16   roughly $800 million worth of GBTC being held that can be

17   distributed.  So we would like to get on with that.

18           THE COURT:  All right.  Mr. Rosen?

19           MR. ROSEN:  Yes, Your Honor.  Thank you very much.

20   Brian Rosen on behalf of the Ad Hoc Committee.

21           Mr. O'Neal knows this.  It is the Ad Hoc Group

22   intention to seek to intervene in that litigation because of

23   the importance of it.  I think the Creditors Committee

24   probably shares that perspective as well.

25           We understand the reserve issue.  We do not wish

Page 66

```
1    to delay in any way distributions to creditors.  But at the

2    same time, we would like to not diminish what could be an

3    initial effective date distribution.  So we would want to

4    process this litigation as quickly as possible.

5             THE COURT:  Yeah.  I think there's a bit of a

6    social compact here in the court where people say we're

7    going to reserve this, but, Judge, we need to get this done

8    promptly.  I get that.  But if done properly, it allows

9    people to get recoveries and to handle litigation in an

10   appropriate way, but on a timely basis.  So I would agree

11   with that.

12            MR. O'NEAL:  And to make it clear, Your Honor --

13   Sean O'Neal again, Cleary Gottlieb, on behalf of the

14   debtors.  We fully endorse the idea that any kind of

15   reserves and any kinds of disputes over these matters should

16   be resolved expeditiously, even if it's not a condition.

17            THE COURT:  I would be surprised to hear you say

18   otherwise.  All right.  Fair enough.

19            MR. FRELINGHUYSEN:  Your Honor, Anson

20   Frelinghuysen, Hughes Hubbard & Reed, for Gemini Trust

21   Company again.  The language and the plugs that we're trying

22   to -- what we're doing are plugging those holes.  This is

23   the reserve that we're talking about.  If it's the intention

24   of the debtors that those reserves are not being held to the

25   plan that we're trying to support, then we need to keep on
```

Page 67

1    working on the language.  The idea is that there are going

2    to be reserves created.  We're going to get as much out the

3    door as possible while we litigate.  We also hope we can

4    move very expeditiously through the litigation while

5    everybody's rights are preserved to do what they need to do

6    to preserve their rights.

7              THE COURT:  Yeah, no, I think it's one thing where

8    all the parties seem to be on the same page about that.  And

9    it's a big enough issue that I didn't want to leave it go

10   sort of unspoken or just dealt with implicitly.  I think if

11   you were a creditor who is listening in, this is something

12   worth making explicit.  All right.

13             MR. FRELINGHUYSEN:  Thank you.

14             THE COURT:  Anything else, Counsel, you wanted to

15   address?  All right.

16             So we will loop back to those issues, but it

17   sounds like we've made some progress.

18             So going down the charts, what's next?

19             MS. VANLARE:  It's Digital Currency Group.

20             THE COURT:  All right.

21             MR. SAFERSTEIN:  Good afternoon, Your Honor,

22   again.  Jeffrey Saferstein from Weil Gotshal & Manges on

23   behalf of Digital Currency Group.

24             Your Honor, I think there are three main issues

25   that we could use your guidance on.  We have tried to work

1    out these issues with the debtors, and unfortunately we just

2    haven't landed in a spot that is satisfactory to us.

3            THE COURT:  So let me ask you, I don't know if

4    those discussions are ongoing such that -- again, I try to

5    temper my comments based on various things including the

6    fact that I don't want to be a bull in the China shop.  I

7    certainly have seen that in my prior life as a litigator

8    where judges thought they had ideas about what were going on

9    that turned out to be markedly incorrect.  So I will be

10   guided by you.  But if there are ongoing discussions where

11   there's still room to make progress, I appreciate knowing

12   that so I sort of stay away from certain things.

13           MR. SAFERSTEIN:  No, I appreciate that.  I don't

14   think so.  I think we have just a difference of opinion on

15   certain disclosure issues.

16           THE COURT:  All right.

17           MR. SAFERSTEIN:  Which I am happy to go through.

18   And I think I can do it relatively quickly.

19           THE COURT:  Please.

20           MR. SAFERSTEIN:  I think the first issue relates

21   to the claims and causes of action that the Debtors believe

22   they have against my client.  And that's obviously a key

23   element of the plan here, which obviously we disagree with

24   and we intend to oppose any litigation brought against our

25   client.

1           So what we did was we went through the disclosure

2      statement, and in every section where they laid out claims

3      that they thought that they had against my client, we had

4      our response to that.  And so, for instance, there is a

5      section on alter ego and veil piercing.  So they have a

6      paragraph or two on it.  We then have our response to why we

7      think they're wrong as a matter of law and a matter of the

8      facts.

9           And so we've sent them our proposed inserts to go

10     with each one of the claims.  And what we got back from them

11     was they put them all together and they put them in an

12     exhibit at the back of the disclosure statement.  And so

13     anybody who is looking at this would have to go through over

14     200 pages to see our response.  And when I actually got the

15     binder today to come to court, I couldn't even find it at

16     first.  I did ultimately find it.  It's Exhibit I think G in

17     the back of the disclosure statement.

18           And that's if you're looking at paper.  I mean, if

19     you're trying to look on your computer and see what is --

20           THE COURT:  Well, let me ask.  Is there a

21     placeholder that sends you to Exhibit G, or is it that you

22     would have to go through all the exhibits to find G and then

23     find it?

24           MR. SAFERSTEIN:  I am not aware of any

25     placeholder, Your Honor.  And so it's a simple fix.  If you

Page 70

1   go, for instance, to each of the sections, all we're asking

2   is to put our insert after -- so they claim X, we say Y.

3   And that's simple.  And we think that given that this is the

4   key element of this plan is litigation, creditors when

5   they're voting on it in order to have adequate information

6   should know both sides.  Right?  They should say we like

7   this plan or we don't like this plan because of the

8   litigation.

9           And so I don't think we're asking for a lot, but

10  we do think it's fair.  We think it provides adequate

11  information to creditors to see both sides and the risks.

12  By voting in favor of this plan, what are they voting on and

13  what are the risks to them.

14          So we would just ask that those be reinserted in

15  each one of the sections.

16          THE COURT:  And as I understand it looking at the

17  chart, that's probably the second of the three boxes for

18  Digital Currency Group about the risks of pursuing certain

19  causes of action against DGC's source of recoveries.  Right?

20          MR. SAFERSTEIN:  That sounds right, Your Honor.

21          THE COURT:  All right.  What I would like to do

22  since there are three of these is just go back and forth on

23  each one rather than aggregate.

24          MS. VANLARE:   Your Honor, I am happy to do that.

25  So just to respond on this point, again, just to be clear,

```
 1   we are not -- it's not a disagreement about the content of
 2   the disclosure, it's a disagreement about the placement.  So
 3   the -- actually DCG's counsel prepared the exhibit that lays
 4   out their position on these issues.  We agreed to include
 5   that exhibit.  They subsequently said, well, actually, no,
 6   let's break it up and let's kind of insert a paragraph after
 7   each point.
 8               So two points on that.  First, any time they've
 9   asked us to say DCG disputes these points, we have added
10   that language.
11               THE COURT:  Can you add a link or an
12   identification to the exhibition?
13               MS. VANLARE:  We have also referenced the exhibit
14   and we're happy to -- again, every time they have asked us
15   to say DCG disputes this, we can say please see Exhibit G.
16               THE COURT:  And let me ask, is there sort of a
17   link that if you're looking at this online, you can click it
18   and go to Exhibit G?
19               MS. VANLARE:  That's beyond my technical
20   expertise.  I'm happy to try and do that.
21               THE COURT:  I think that would solve the problem.
22   Because if you're worried about somebody looking at it, they
23   can click on it and go right to what you all say every time
24   it's mentioned.  That would seem to solve the problem.
25   Again, don't ask me to be the one to put in the link, but it
```

1    doesn't seem all that complicated.  I have at least one

2    child who could do that for all of us if that came to it.

3               MS. VANLARE:  Yes.  As do I.  Just not myself.

4    But, Your Honor, I think our issue, our concern with doing

5    what they are proposing, which is including a paragraph from

6    the debtors, a paragraph from DCG, people don't know --

7               THE COURT:  No, I get it.  It can get to be -- it

8    can get to be a bit cumbersome.  And, frankly, you could

9    really back the whole thing out and have one exhibit and say

10   to see the Debtors and DCG.  But I don't want to snatch

11   defeat from the jaws of victory by having you change it.  So

12   as long as it can be easily -- it's there, there's a

13   placeholder and there's a way to click on it and find it so

14   that somebody could say I would like to hear what the other

15   side has to say.  And I think given the population of folks

16   here who I assume are fairly tech-savvy, that if there's a

17   link that allows them to click on it every time it's

18   referenced, then they can go right to it.  I think that

19   should solve the problem.

20              MR. SAFERSTEIN:  Your Honor, I obviously would

21   prefer it be together so people can see both sides so that

22   they don't have to be flipping back and forth and back and

23   forth.  But I will be guided by Your Honor.

24              THE COURT:  I think it will allow folks to see

25   your full-throated view of the litigation and the exhibit.

Page 73

1    And I know we're walking the line between disclosure, which

2    is obviously what this is all about, and length and

3    repetition and things of that sort.  So again, the link

4    sounds minor, but I actually think it's important so that

5    people can -- when they're looking at this on their

6    computer, they can easily find it without any issue at all.

7            So I would say any time that there is an

8    explanation of the Debtor's views and you say DCG disagrees,

9    for its position, please see.  And with a link that allows

10   them to find it easily.  I think that should solve that

11   issue.

12           So what's next?

13           MR. SAFERSTEIN:  Okay.  So we'll work on that

14   language, Your Honor, for the link.  The second relates to

15   inclusion of the deal in principle.  One other comment, Your

16   Honor, on our inserts.  We've given them additional language

17   in the version that came out just before the hearing.  I

18   don't think it was included in it.  So my expectation would

19   be that they would include whatever we want to put in it as

20   our position.

21           THE COURT:  All right.  Well, I will let you work

22   through that.

23           MS. VANLARE:  That's fine.

24           MR. SAFERSTEIN:  Thank you.  So the second relates

25   to the deal in principle.  And we asked for more disclosure

1    with respect to the deal in principle that had been reached

2    between the Debtor, the UCC, and DCG.  And Your Honor said a

3    few minutes ago when speaking to Gemini's counsel about this

4    is the plan and this is the only plan and what happens next.

5    Well, the fact of the matter is that deal in principle from

6    our perspective is still on the table.

7              THE COURT:  But I have bad news.  It's not the

8    plan.

9              MR. SAFERSTEIN:  I understand that.

10             THE COURT:  They're not dueling plans.

11             MR. SAFERSTEIN:  I understand.

12             THE COURT:  So it's not going to be afforded plan

13   treatment in the context of the disclosure statement.

14             MR. SAFERSTEIN:  Understood a hundred percent,

15   Your Honor.  I just think creditors who have not been in the

16   room negotiating and understanding -- I imagine that most of

17   the creditors have no idea that there was a deal reached,

18   that the UCC stood up in court and said was better than the

19   litigation plan because it provided quicker recoveries in

20   the -- all of that.

21             THE COURT:  No, I read your papers.  I get it.

22             MR. SAFERSTEIN:  Right.  So we just think --

23             THE COURT:  So what is it that you're asking?  So

24   I think this is a matter of degree.  Because it can't be and

25   shouldn't be afforded plan treatment.

```
 1              MR. SAFERSTEIN:  Agreed.

 2              THE COURT:  I am okay with mentioning it, but it

 3    can't eclipse the narrative of the no-deal plan.  That I

 4    think is not where we are.  And I think it has the potential

 5    to be very confusing where I think you'll have people

 6    looking at it, am I voting on both of these.  And that's not

 7    what we have here.

 8              MR. SAFERSTEIN:  And I'm not asking for that, Your

 9    Honor.

10              THE COURT:  So what is it precisely that you are

11    asking for?

12              MR. SAFERSTEIN:  I think we would just like a

13    little bit more description about the deal that was on the

14    table, that is still on the table, so that creditors, when

15    they're voting on this plan, may say we don't like

16    litigation --

17              THE COURT:  So where would that go?  Would that go

18    in the history of the case?

19              MR. SAFERSTEIN:  Correct.  It is the history of

20    the case,  Your Honor.

21              THE COURT:  All right.  So let me hear from the

22    Debtors.

23              MS. VANLARE:  Your Honor, it is in there.  We have

24    a paragraph that describes it.  It is precisely in the

25    history sort of how did we get to this point.  We describe
```

1   it.  We don't think it's still on the table, frankly.  We

2   don't think that that is an accurate representation of the

3   state as we know it today.

4          THE COURT:  Well, I think people have stood here

5   and said we don't have the votes, to quote Hamilton.  So I

6   think that's the takeaway.

7          So if you want to put a link to some other docket

8   entry where the plan is -- where that historically was --

9   that issue was presented, then that's fine.  But I think it

10  should be in the context of the history of the case.

11  Because otherwise, I think it runs the risk of really

12  confusing the people who are voting.

13         Now, I understand you are advocating for your

14  client.  But I think the only way there is another plan is

15  an agreement that people reach.  And if people reach another

16  agreement that's better than fighting over things or the no-

17  deal plan, great.  But it's not a dual plan situation.

18         So if there's a particular docket entry, Counsel,

19  would you be all right with that, I assume?

20         MS. VANLARE:  Yes, that's perfectly fine.

21         THE COURT:  So we'll do the same thing.  So we're

22  going to keep the computer programmers busy.

23         MR. SAFERSTEIN:  And, Your Honor, we're not trying

24  to confuse the creditors when they're voting.  But when

25  creditors are voting, they should understand that there's

1    history here and that there is -- you even said it yourself,

2    you know, what's the alternative.  There is an alternative.

3         THE COURT:  Well, there is and there isn't.  It

4    depends on how you phrase it.  There historically was

5    something on the table, but it doesn't have the votes.

6         MR. SAFERSTEIN:  Well, we don't know that.

7         THE COURT:  Well, the Committee stood up and said

8    we don't have the votes.  And the Debtor said we would like

9    to go ahead with this plan, but we don't have the votes.

10   And all the objections to that said, Judge, they don't have

11   the votes.  And I don't think anybody told me otherwise.

12        So you can argue at the wisdom of that, but again,

13   I don't think we have an alternative plan.  So I think we

14   can't treat it that way.  And I think if there's something

15   where it's implicitly treated that way, I think it will

16   cause great confusion.  Because when people say, well, I

17   rejected that plan because I thought I was getting the other

18   plan, and you're going to say what other plan.  So that

19   would be an interesting negation.

20        So, again, I think that's why putting it in the

21   history and putting a link to a document that historically

22   was filed that describes that deal is the way -- the

23   agreement in principle is the way to handle it because it

24   puts it in its historical context.

25        MR. SAFERSTEIN:  Understood, Your Honor.

1              THE COURT:  All right.

2              MR. SAFERSTEIN:  Thank you.

3              THE COURT:  All right.  So that's two.  You're

4    welcome.  And so number three.

5              MR. SAFERSTEIN:  So the three is probably more of

6    a confirmation objection.  But I think it does go to

7    disclosure here.  And it has to do with the rise of crypto

8    prices.  Crypto prices are up significantly from the

9    petition date and even from a month ago.  And it's very

10   possible that the debtors are or will be solvent here.  And

11   I think if you look in the chart in the disclosure

12   statement, I think the high end has creditors getting a

13   hundred cents on the dollar.

14             And so we haven't gone through each provision of

15   the plan and the disclosure statement, but to the extent

16   that the debtors are solvent, one, DCG as the sole

17   shareholder should be in the waterfall.  There would be no

18   reason to cut us out of it.  And two, there are a number of

19   plan provisions on corporate governance, et cetera, that

20   would make no sense for others to control the winddown

21   debtors, the post effective date debtors, other than DCG

22   because everybody will have been paid par.

23             So again, that may be more of a confirmation

24   objection as to whether or not we should be in the waterfall

25   or not.  But I do think it's somewhat of a disclosure in

1   that people understand that --

2          THE COURT:  But how does it affect a creditor

3   voting on the plan?  I don't think it does.

4          MR. SAFERSTEIN:  Well, they may for instance think

5   that they're going to get paid -- if crypto prices go to

6   $100,000, they're going to get 250 percent on their claims.

7   I don't know what they're going to think.  All I'm saying is

8   that if the Debtors are solvent, there are lots of issues in

9   this plan that need to be reworked.

10          And so I am happy to reserve those for

11   confirmation, but I wanted to kind of lay that out today so

12   that you understand and that I've made it clear we are

13   reserving our rights on all of those issues.  And, frankly,

14   I think there's a lot of stuff in here on the disclosures

15   that are probably not accurate when the Debtors are solvent.

16          THE COURT:  All right.  I think I get that.  So

17   let me hear from the Debtors.

18          MS. VANLARE:  Your Honor, I think our view is

19   that, as Mr. Saferstein said, it's an issue for

20   confirmation.  We would like to leave it for confirmation.

21   Obviously the percentage recoveries are for general

22   unsecured claims, does not include subordinated claims.  And

23   obviously there is issues around that as well.  But this may

24   never be relevant.  If it's relevant, we can talk about it

25   at confirmation.

```
 1              THE COURT:  All right.  Mr. Shore, it looks like

 2      you wanted to add something on behalf of the Committee,

 3      Official Committee.

 4              MR. SHORE:  Are you finished?  Because I -- Chris

 5      Shore, again, for the Committee.  We are here on a

 6      disclosure statement for one plan, a no-deal plan.  What is

 7      a no-deal plan is a deal that has the absence of two deals,

 8      a deal with Gemini and a deal with DCG.  The deal with

 9      Gemini is an issue over the foreclosure or purported

10      foreclosure of GBTC that is currently in the possession of

11      Gemini and their claim to additional GBTC that is in the

12      possession of the Debtors.  The absence of a deal on that is

13      addressed in the no-deal plan and in the no-deal disclosure

14      statement.  And there are some sequalae to that which Your

15      Honor is noting, which is when a claim objection goes out to

16      the claim, how are we going to handle both the affirmative

17      claim in and the claim for additional reserves of property

18      that's in the Debtor's possession right now that they are

19      claiming a superior right to.

20              That's all addressed in the disclosure statement.

21      It's all in there.  Gemini's position with respect to that

22      litigation and their direction as an agent to their employee

23      -- or to their customers is something that's happening

24      outside the plan, and that will have whatever effects it

25      had.  We'll work that out.
```

1          There is no DCG deal.  Whatever deal existed

2    before, leave aside the votes.  We are at a different point

3    in history.

4          THE COURT:  I think I've already ruled on that.  I

5    think it's fine to put it in the history of the case, but I

6    think anything beyond that is a bridge too far.

7          MR. SHORE:  But I'm just concerned that Mr.

8    Saferstein standing up here with an entire creditor body

9    watching and listening to this, that there is some

10   misapprehension that's already being created with respect to

11   the no-deal plan.  There is no deal with DCG.  There is no

12   outstanding offer to DCG.  There is none of that.  That is

13   history of the case.  What we are doing now is cleaning up

14   the last few bits of documentation and cleaning up the last

15   few bits of disclosure to get that out to creditors.

16   Creditors will be asked to either accept that plan or reject

17   that plan.  But there is no alternative to the plan that's

18   being put out.

19          THE COURT:  I would agree.  I wholeheartedly

20   agree.  This is the plan.  There is no other plan.  There

21   was talk about a plan based on the agreement-in-principle.

22   There was a lot of talk.  And it didn't happen.  It was

23   talked about for a variety of people for a variety of time.

24   And this is the plan.  So I think that's right.  And that's

25   why I don't want to put it anywhere other than the history

1    of the case because that's where it belongs.

2           So what about this notion about the solvency and

3    the rise of crypto prices?

4           MR. SHORE:  I'm going to have a discussion with

5    Mr. Saferstein after this about whether he really wants a

6    whole bunch of disclosure around what subordinated creditors

7    would be getting, which would be for example, agencies who

8    are bringing claims against his client and whether he wants

9    to put disclosure in there.  But I think the issue of

10   disclosures around a solvent debtor exception are not

11   appropriate and necessary at this point because the premise

12   of it is that there are not subordinated classes, which is

13   not the disclosure that's being made.

14          THE COURT:  All right.  Is there anything -- as is

15   often the case, one way of dealing with things is to include

16   a line or two without a full-blown dissertation on the

17   issue, which creates a misimpression.  Is there a line or

18   two that's appropriate here, or not really because it's

19   really just not germane to voting on the plan for the people

20   who are being solicited?

21          MR. SHORE:  I think Your Honor put your finger

22   exactly on it.  I don't know that a creditor would say I

23   would vote for the plan if I was getting 80 cents on the

24   dollar, but the possibility that I'm getting a hundred cents

25   on the dollar is something that would cause me to vote no.

1    Or if I am deemed to have been paid in full all of my

2    statutory entitlements, I'm going to vote no because I don't

3    want that money going to DCG.  That's just not what's out

4    there.

5                THE COURT:  So let me offer this thought.  Judges

6    do this all the time and say we are not in the business of

7    writing a treatise about whatever everybody's rights are

8    under potential law that may apply someday.  It's very

9    dangerous, it's very confusing, and it will make everything

10   very lengthy.

11               So I am not hearing anything that justifies

12   delving down that particular rabbit hole at this point

13   because I'm not hearing anything that makes that something

14   that needs to be disclosed to a creditor when trying to

15   decide whether to vote on the plan.  The range of

16   recoveries, yes.  And if the cookie crumbles in a particular

17   way and we have to address additional legal issues -- I had

18   to address additional value that had to be distributed in

19   the American Airlines case.  And when we got there, we got

20   there.  And we had an argument about what the plan said and

21   how it should be handled and how it should be valued and

22   what time it should be valued and all that good stuff.  None

23   of it was in the plan.  It was controlled by the -- I'm

24   sorry, none of it was addressed that specifically in the

25   plan.  It was all covered by people -- we had the issue, it

Page 84

1    was addressed.  So I don't know that hypothetical issue is

2    something that is necessary for purposes of disclosure and

3    voting rights.

4            MR. SHORE:  One last comment I wanted to make,

5    Your Honor, coming back to comments you made earlier with

6    respect to the role of the Committee.

7            I did want to point out that our statement, even

8    in the end, is the result of a huge net that was cast

9    throughout this case by the Committee both through formal

10   communications with the creditor body and informal

11   communications with the creditor body so that the Committee

12   got to the place to understand the needs and concerns of the

13   creditors both with respect to a plan or no plan or

14   disclosures or what issues people have and what confusion

15   they have and what more they want.  And we have been in

16   constant dialogue with the Debtors with respect to

17   disclosures.  They've taken a whole raft of comments that

18   have come in.  And if you can believe it, the disclosure

19   statement objections, the pile you've got could have been

20   significantly larger without those issues getting addressed

21   through that process.  So I think where we are right now is

22   we have a disclosure statement subject to the few additional

23   issues that need to be done.  They're going to tell

24   creditors everything they need to know about whether they

25   should vote for a plan which leaves issues to be addressed

1   at a later date or vote no and face whatever is out there

2   which none of us can conceive of, a way of resolving this

3   case differently than we're doing it now.

4           THE COURT:  All right.  So anything else from DCG?

5           MR. SAFERSTEIN:  No, Your Honor.  As I said, we

6   haven't had a chance to look at the version, so we'll look

7   at that.  And hopefully that will address some of the

8   smaller issues we have.  But those are the three points we

9   wanted to make.

10          THE COURT:  That's a fair point.  Thank you very

11  much for your comments.

12          MR. SAFERSTEIN:  Thank you.

13          THE COURT:  And, Mr. Shore, since you were just up

14  there, I know you filed that statement at Docket 895 on the

15  7th.  And the question is where there's anything that you

16  need addressed for the Committee for purposes of today or

17  these were all issues well underway in terms of being

18  resolved.

19          MR. SHORE:  The latter, Your Honor.  Thank you.

20          THE COURT:  Okay.  All right.  Thank you very

21  much.

22          And so with that, if my scorecard is up to date,

23  the remaining issue that needs to be addressed is the U.S.

24  Trustee issues.  And so with that, I thought it made sense

25  to hear from Mr. Zipes.

Page 86

```
 1              MR. ZIPES:  Good afternoon, Your Honor.

 2              THE COURT:  Good afternoon.

 3              MR. ZIPES:  Your Honor, I will try to be brief

 4     here.  I've been listening closely and hopefully I've been

 5     able to incorporate certain comment already made.  Some of

 6     our objections obviously mirror some of the other objections

 7     that have been filed.

 8              THE COURT:  Right.

 9              MR. ZIPES:  So, Your Honor, if I repeat, I

10     apologize for that beforehand.

11              THE COURT:  No, that's fine.  And let me sort of

12     start us off by asking a question.  So there was talk about

13     the distribution principles and there's a lot of talk about

14     additional disclosures about recovery rates and things of

15     that sort.  So the question is what's still missing in your

16     view and how to handle that.  That is the distribution

17     principles are sort of a term of art.  And then we use non-

18     defined terms to talk about the information being provided

19     on various things.  So maybe we can start there.  Because I

20     was just trying to sort through that myself.  Because the

21     plan supplement is designed to supplement the core parts of

22     the plan.  And the question is where do you draw the line.

23              So if you would be so kind.  I think that's one of

24     your -- if we look at the chart, I think that's probably the

25     second box of the U.S. Trustee's Office.
```

1          MR. ZIPES:  Yes, Your Honor.  And I think just as

2     a general matter, I'll address your point directly right

3     now.  I have some general comments which I think may be

4     helpful.

5          In connection with the plan supplement, Your

6     Honor, we've heard a lot today about putting in additional

7     language in the disclosure statement.  And I frankly haven't

8     had a chance to review the latest version of the disclosure

9     statement.  The Debtors are cooperative and always reaching

10    out and asking how they can disclose more for everybody

11    involved.

12         But there is a conceptual issue.  The supplemental

13    disclosure, the supplemental statement that's to be filed

14    five or we hear now seven days before the balloting

15    deadline, it contains very material terms.  It contains

16    things like the new governance documents, bylaws, names of

17    the committee to be appointed, intercompany claims.  And,

18    Your Honor, that's -- supplements are obviously filed in

19    every large case.  But we are talking about disclosure right

20    now and the disclosure statement.  And in my office's view,

21    it would be very helpful and relevant to have more

22    disclosure in the disclosure statement about what's going to

23    be in the supplement.  You can punt on certain things, but

24    this is --

25              THE COURT:  Well, that's why I sort of started off

Page 88

1    with the distribution principles.  Right?  Because there are

2    some details about how material the identify of certain

3    people who are going to act after the plan is confirmed.

4    I'm not saying that isn't important, but it's not as crucial

5    as what am I going to get and how is the value going to be

6    distributed.  So I think that's why I started there, because

7    that's --

8            MR. ZIPES:  Right.  That was our point -- okay.

9    And, Your Honor, that was one of our first points in the

10   objection.  The distribution principles, we have seen them

11   in draft.  I understand this is not yet filed online.  I do

12   think that it raises certain material points about what's

13   going to happen, namely when debtors are going to get paid

14   and how much.  And it proposes certain ranges.  And I don't

15   want to say too much about it.

16           THE COURT:  No, that's fair.  But maybe the thing

17   to do is to ask the debtors now -- because I did hear

18   reference to how soon they anticipate getting that together

19   and making that available on an amended disclosure

20   statement.

21           So, Ms. VanLare, can you address that?

22           MS. VANLARE:  yes.  So I just would like to

23   clarify something.  The distribution principles don't

24   contain recovery percentages or timing.  That information is

25   in the -- so we filed an additional exhibit to the

1    disclosure statement that has additional ranges.  So none of

2    that is actually in the distribution principles.

3              THE COURT:  So what do the distribution principles

4    contain?  What is it -- and when do you expect to have those

5    available?

6              MS. VANLARE:  So the distribution principles are

7    really focused around how to distribute and the principles

8    by which different types of digital assets will be

9    distributed both on an initial basis and moving forward.  As

10   we've said, our goal is to try to do as much in-kind

11   distributions as possible.  That has been an issue that's

12   very important to our creditor body and it's something that

13   we have been in many discussions with various parties-in-

14   interest, including creditors as well as the regulators.  So

15   the distribution principles is the -- again, the way in

16   which --

17             THE COURT:  Am I right?  You're characterizing it

18   as sort of the description of the mechanics?

19             MS. VANLARE:  The mechanics, the rules of how --

20             THE COURT:  So you've got the recoveries, which

21   are germane.

22             MS. VANLARE:  Correct.

23             THE COURT:  And the mechanics of how that's going

24   to happen.

25             MS. VANLARE:  Exactly.

1                  THE COURT:  Okay.

2                  MS. VANLARE:  So nothing in the distribution

3      principles in that document has to do with recoveries.  I

4      think we've included lengthy discussions and disclosures

5      around recovery percentages.  Again, we even updated that

6      further given the different prices.  And that's the

7      additional --

8                  THE COURT:  That's very helpful.  Because the word

9      principles is obviously amenable to a lot of different

10     understandings and could be how do we understand who should

11     get what and why.

12                 MS. VANLARE:  Correct, yes.

13                 THE COURT:  But it sounds like what you're really

14     talking about is the distribution mechanics of what kind of

15     -- how the value will be conveyed and the mechanics for

16     distributing the value.

17                 MS. VANLARE:  Exactly.

18                 THE COURT:  So when would you expect to -- I know

19     that that has been the subject of a lot of negotiations.

20     And do you have any sense of when you might have that

21     available?  Just because it might moot out some of the

22     discussion we are having here.

23                 MR. O'NEAL:  Certainly.  Sean O'Neal, Cleary

24     Gottlieb, on behalf of the Debtors.

25                 So this has been something that we've been working

Page 91

1    on for some number of weeks.  But I will tell you that it's

2    largely a creditor-driven process.  We've had the Ad Hoc

3    Group really working on it and the Creditor's Committee

4    working on it and other constituencies.  So it's very much a

5    collaborative effort.  And we are hoping, we are aiming to

6    get that done today.  And I would like to say we're going to

7    do it today because that might actually help us get it done

8    today.  So I think we're going to do it today.

9           THE COURT:  Well, the reason why I mention it is

10   if we are going to have another hearing to close the loop,

11   if it's done by then, then it's part of the disclosure

12   statement that would be approved.  Right?  And that would be

13   the benefit because it would --

14          MS. VANLARE:  That's always been our intent, Your

15   Honor.

16          THE COURT:  Okay, all right.

17          MS. VANLARE:  It is an exhibit to the disclosure

18   statement.  We are not proposing it be filed as part of the

19   plan supplement.

20          THE COURT:  Okay.  All right.  I think that's

21   helpful.  Although Gemini might have some thoughts about

22   that?

23          MR. FRELINGHUYSEN:  Sorry, Your Honor.  Anson

24   Frelinghuysen, Hughes Hubbard & Reed, with Gemini.  We have

25   not been part of the collaborative process that leads to

Page 92

1    distribution principles.  And the draft that we saw this

2    morning was prejudicial to Gemini's interests.  So we will

3    continue to work and hope it gets resolved today.  But it's

4    not there yet.

5              THE COURT:  All right.  Mr. Rosen?

6              MR. ROSEN:  Thank you, Your Honor.  Debtor's

7    counsel is absolutely correct.  This has been a creditor-

8    driven concept.  The Ad Hoc Group has been working for long

9    and hard with both the Debtors and the Creditors' Committee

10   to try and develop these principles.  And it's almost like a

11   waterfall.  The sequencing is how the distributions will

12   flow out in the future.  We do understand that Gemini did

13   express a concern about one issue this morning.  Mr. O'Neal

14   conveyed that to me.  And we also understand that the UCC

15   has one issue that they would like to address with us.

16             I think you are right, Your Honor, we will put

17   this together.  I know we would all like to do it today, but

18   day follows night and we're almost at night now, Your Honor.

19   And so I'm not sure it's going to get filed today.  But I

20   think your suggestion about getting it done quickly and

21   having it with a set deadline is the right way to go.  And

22   we will endeavor to make that work for everybody.

23             THE COURT:  And certainly to Gemini's point, what

24   we're talking about here is disclosure.  Right?  So it

25   doesn't prejudice anybody's rights to be heard on the actual

Page 93

1    substance.  But the idea is that creditors would have a

2    sense of what the distribution principles -- or I'm going to

3    start calling them the mechanics are, and then we can take

4    it from there.  And I think that that helps address the U.S.

5    Trustee's disclosure objection to say we don't know what

6    those are and when are we going to get those.  So it sounds

7    like we would have those before.  And I'll go out to say we

8    should have those -- we'll set a hearing date and maybe

9    we'll set a deadline based on that next hearing date so that

10   they would be done in enough time to take a look at them.

11            So hopefully that's helpful in thinking about

12   these issues, Mr. Zipes.

13            MR. ZIPES:  And I appreciate that, Your Honor.

14   And on that subject, that's a more general point, Your

15   Honor.  We think it is appropriate to -- these are material

16   terms to the disclosure statement, and the parties here may

17   understand the terms, but this is confusing to the general

18   creditor population.  And we do think to the extent the

19   disclosure statement is being amended or added to, that it

20   be done on a deadline and then parties have a chance to

21   review --

22            THE COURT:  I think that makes sense just in terms

23   of having it be an orderly process.  Although I will say the

24   creditors have a lot of representation here.  So I know that

25   if you're an individual and you have, say, $10,000 invested,

1    this is a bit of a white-knuckle flight.  I think we all

2    understand that.  But I will say that there are a large

3    number of professionals who are looking out for the

4    interests.  You have the Creditors' Committee, you have the

5    Ad Hoc Group, and you have Gemini speaking on behalf of the

6    Gemini users.  And so

7            I think as long as we can get this done in advance

8    of the hearing, so as part of the Disclosure Statement, then

9    people can talk about things as necessary at confirmation.

10   But it'll be out there for purposes of the Disclosure

11   Statement.  So, let me ask you, Mr. Zipes, because the

12   existence of this thing being filed today, this afternoon,

13   and a lot of the changes which overlap with some of the

14   concerns you raised, put you in a bit of a challenging

15   position because I know I had the pleasure of spending the

16   morning with you on a variety of matters.  So, is -- we can

17   certainly go through any particular issues you want to talk

18   about.  But we could certainly also table it if you wanted

19   to say, "Judge, there's been a lot of changes and I need to

20   look at the changes because a lot of them address our

21   issues", and then we loop back.  I'm sort of open to

22   suggestions because I don't think you have an ability to

23   sort of hold it up to your head and understand the contents

24   of the current document.  So, do you have a preference or a

25   thought about the best way to do this?

1          MR. ZIPES:  Your Honor, I don't need to go through

2    every point.  I think some general guidance --

3          THE COURT:  Sure.

4          MR. ZIPES:  -- from the Court would be helpful

5    right now and I think the parties would basically respect

6    that, at least --

7          THE COURT:  All right.  Then raise whatever issues

8    you'd like.  That's fine.

9          MR. ZIPES:  So, Your Honor, on the issue -- and

10   these are only a couple of points at this time because I

11   think most of it's been addressed subject to confirmation.

12   But confirmation of the language in the Disclosure

13   Statement, I should say, not confirmation of the Plan.  On

14   the issue of the Plan Supplement that's being filed, I know,

15   again, this is standard.  We do think it would be helpful to

16   have further information in the Disclosure Statement about

17   what is going to be in the Plan Supplement.  Right now, it's

18   very general and vague and just has new governance documents

19   and has very vague language.  So, Your Honor --

20         THE COURT:  All right.  So, what I'd like to do is

21   take each one of these in turn if it's all right with you.

22         MR. ZIPES:  Yes.

23         THE COURT:  Just to get the Debtor's view.  Ms.

24   Vanlare, any thoughts on adding some language to that?

25         MS. VANLARE:  I'm happy to do that.  I'm honestly

1   not sure what additional disclosures Mr. Zipes is looking

2   for.  I think we list, as is common, the types of documents

3   that --

4            THE COURT:  I guess what he's saying is, that this

5   way, a creditor who might be interested in a particular

6   issue, the Plan Supplement say, "Oh, this is going to be

7   included in the Plan Supplement."  So, it's more a laundry

8   list of what you anticipate including there.  So, it's sort

9   of the promise of additional disclosures.

10           MS. VANLARE:  We have that, Your Honor.  We have

11   that list.

12           MR. ZIPES:  Your Honor, I agree that there's a

13   laundry list in there.  It would be helpful to have further

14   language.  Obviously --

15           THE COURT:  So, what language did you have in

16   mind, I guess, is the question?

17           MR. ZIPES:  Well, a general statement of what the

18   Bylaws might be of the new Committee.  Just rather than just

19   saying "Bylaws", have some description -- some re-

20   description of what that is, the names of the Appointees,

21   Your Honor.  I think you've --

22           THE COURT:  But I'm guessing they don't know the

23   names yet or the names would be in there.  That would be my

24   guess.

25           MS. VANLARE:  We do not.

1            MR. ZIPES:  Right.  So, Your Honor, that -- I

2    understand that that point has been brought up.

3    Intercompany claims, what that -- there's going to be some

4    sort of disclosure about intercompany claims.  And Your

5    Honor, this is just someone speaking from the outside.  So,

6    there might be -- there might be someone --

7            THE COURT:  No, no.  That's fair --

8            MR. ZIPES:  -- there might be -- this might be

9    completely obvious to the parties --

10            THE COURT:  So, for intercompany claims, I think

11    it might be helpful to include a line or two because I don't

12    think necessarily somebody who has got a $10,000 investment

13    understands the significance of an intercompany claim and

14    whether it's going to affect them.  So, I think that's a

15    very fair point, Mr. Zipes, and probably one that can be

16    fairly easily remedied.  So --

17            MR. ZIPES:  Okay, and --

18            THE COURT:  So, hold on a second.  I'm just going

19    to -- that's my view and I want to make sure that I'm not

20    missing something, and that Ms. Vanlare and Mr. O'Neal agree

21    with that.  Again, just -- because again, "intercompany

22    claims" sounds very mysterious to a user who may only have

23    $10,000 invested and has not taken bankruptcy as a course in

24    college or law school.

25            MS. VANLARE:  We can take a look and see if

1    there's additional information we can include on that point.

2    I think our understanding is, what we're thinking is that it

3    would be an additional disclosure around intercompany claims

4    that may change between now and then, which is why it hasn't

5    -- why we don't have that information today.

6              THE COURT:  All right.  I think the idea is,

7    somebody might say, "I had no idea what this has to do with

8    me.  Does it have anything to do with me?"  So maybe just

9    the context, the significance of it.  That, I think is --

10             MS. VANLARE:  We can do that.

11             THE COURT:  -- would be helpful.

12             MS. VANLARE:  We can do that.

13             THE COURT:  All right.  Mr. Zipes?

14             MR. ZIPES:  Then, turning to the Releases and the

15   Exculpations, Your Honor, I again think some disclosure -- I

16   understand that this --

17             THE COURT:  Well, I think I made clear that I had

18   a view about the need for additional disclosures on that.

19   So, I think you had me at hello --

20             MR. ZIPES:  Okay.

21             THE COURT:  -- in the sense of, I think it needs

22   to identify the kind of individuals, as well as the kind of

23   conduct we're talking about so people can understand, even

24   if they don't know the names of the individual people, and I

25   don't think that's necessary, but they can understand the

1    reason for it and the scope of it.  So, I agree with you on

2    that.

3              MR. ZIPES:  And Your Honor, there was some

4    disagreement about -- I'm sorry, did you --

5              MS. VANLARE:  No, no, no.

6              MR. ZIPES:  Okay.  There was some disagreement

7    about the relevance of Purdue and the opt-in/opt-out, which

8    the Court also mentioned.  I would just state that, to the

9    extent the parties are still going in that direction of

10   releases, the ballot may have to be changed to reflect opt-

11   ins for releases.  And so, that's another thing that we

12   would like to see, Your Honor, and I don't know that there's

13   an agreement on whether that --

14             THE COURT:  Well, I confess, I don't really know

15   how to respond to that because I don't know the scope of the

16   releases and who is being released and why.  So, I think

17   we'll have to have another conversation about that at the

18   next hearing.

19             MR. ZIPES:  Okay.

20             THE COURT:  I'm not smart enough to predict the

21   future on that one.

22             MR. ZIPES:  And Your Honor, it's possible my

23   office can be satisfied on that depending on what the

24   Debtors are proposing.  My office has been pretty clear, I

25   think, on what we'd agree to.  We understand that the

Page 100

1    parties don't necessarily agree with us, and --

2              THE COURT:  All right, all right.  Well, I trust

3    you'll have a conversation about that and obviously, the

4    state of the law is the state of the law until the Supreme

5    Court speaks and tells us what the state of the law is.  And

6    so, I think everybody's been, in cases I've seen, have been

7    operating that way, and so, I think this case is no

8    different.  So, all right.  That's fair enough.

9              MR. ZIPES:  And I'm just bringing up the Committee

10   getting the release, the post-Confirmation Committee getting

11   a release on the issues that have already been discussed in

12   that regard, as well.

13             THE COURT:  All right.  Again, my thought with

14   releases, it's all the same.  We need to understand the who

15   and the why as an intellectual matter, particularly in the

16   context of the liquidating Plan.

17             MR. ZIPES:  Okay.  Just moving on very briefly,

18   Your Honor.  I heard you on exculpations and I understand,

19   as well, that the Court has the final say on this unless

20   it's appealed.  But my office's position is, fiduciaries

21   only can get an exculpation.  Did the Court rule or make a

22   statement in connection with that?

23             THE COURT:  I didn't make any ruling because

24   things are, sort of, in flux, so I don't have particular --

25   I don't think anybody brought in front of me particular

1    language to debate today.  So, that is a confirmation issue.

2    But again, I think the law is fairly well developed in this

3    District on those issues.  So, I confess, I don't see the

4    need to blaze a particularly new trail.  I don't think

5    anybody would be surprised, I guess, is where I would be --

6    how I would be looking at those things.  Because you need to

7    have people working on the case, be able to do the work that

8    leads to getting the value distributed to creditors,

9    interested parties.  At the same time, it's not a laundry

10   list of somebody who worked on the case's grandmother.

11   That's not what we're doing.  So, I think people should have

12   a pretty idea of where the judges in this District come out.

13   And frankly, I don't know that we're a whole lot different

14   than judges in other districts that handle large cases, so -

15   -

16          MR. ZIPES:  Okay, and also, in connection with

17   exculpations, the period of time between -- generally, it's

18   between the Petition date and the confirmation -- the

19   effective date and so, we'd ask for clarification on that

20   and confirmation that that's the period of time that we're

21   talking about.

22          THE COURT:  All right.

23          MR. ZIPES:  As to the ad hoc group, it is getting

24   paid its -- if it agrees, and I understand that it's not

25   agreeing, at least at the moment, if it agrees subject to

Page 102

1     the terms that are laid out by the Debtor, I think it's $1.5

2     billion and the ad hoc group agreeing to it.  The ad hoc

3     group's professionals get their professional fees paid, at

4     least that's our --

5                THE COURT:  Well, but we're really segueing into

6     confirmation issues, though, aren't we?  Is there an issue

7     about disclosure?

8                MR. ZIPES:  Well, the issue here is, they need to

9     explain why this group of creditors gets legal fees paid,

10    basically, and others, are not.  So, there needs to be some

11    disclosure about that.

12               THE COURT:  All right.  I mean, I think the

13    recoveries really are -- I'm in favor of disclosure, but I

14    do think it's more of a confirmation issue in terms of

15    that's -- whether it's proper or not proper as opposed to a

16    creditor saying, who cares about the recoveries as opposed

17    to whether the ad hoc group is being paid.  That's just my

18    sense of what creditors are going to care about.  But I

19    think it's fine.  There's no reason not to get in front of

20    it.

21               MR. ZIPES:  Okay.

22               THE COURT:  Next?

23               MR. ZIPES:  Just something that came up today, the

24    letters in support of the Petition.  No issues at all with

25    the fiduciary, the Unsecured Creditors Committee, finalizing

Page 103

```
1    a letter for or against whatever it wants to do.  But we

2    would also have issues with just other letters going in and

3    --

4            THE COURT:  Well, I think everybody has an

5    interest in clarity.  We don't want to muddy the waters, so

6    that somebody receiving this package, which we all know will

7    be substantial, having a -- being confused about what's

8    going on and what's happening.  So, that's why, and for my

9    general view in talking to Gemini about letters, the getting

10   other letters, and so it's not -- I'm not trying to rain on

11   Gemini's parade, I'm just talking about just multiple

12   letters from anyone really.  So, it sounds like there's

13   still going to be some discussion about that, the devils and

14   the details and so, again, I don't want to impede those

15   discussions.  But it's got to be as clear as we can make it.

16           MR. ZIPES:  And then finally, I think the last

17   point here, Your Honor, is, there are basic carve outs for

18   exculpation and releases for the usual gross negligence.

19   There is some language in this Plan that is a little bit

20   vague in connection with the post-Confirmation Committee and

21   whether it also is getting releases from liability --

22           THE COURT:  Well, again, I think the issue is

23   about who and why in a liquidating plan.  So, I think that's

24   true across the board and I think people voting on the Plan,

25   that's something that's appropriate for them to know.  And
```

Page 104

1    it's also appropriate for interested parties to know, so I

2    think that's right.

3              MR. ZIPES:  Your Honor --

4              THE COURT:  I mean, the Committee mentioned it in

5    one of its three points.  So, I think it's fair game.  And I

6    was looking at the chart and I think what you were talking

7    about, the ad hoc group is the justification for payments,

8    the ad hoc group.  So, I don't see any reason why a line or

9    two can't be added to get in front of that issue and

10   obviously, it can be the subject of discussion at

11   confirmation if necessary.

12             MR. ZIPES:  Your Honor, I very much appreciate it

13   and I appreciate the parties' cooperation.  Your Honor, just

14   again in terms of notice and to make sure that we're not at

15   the next hearing getting papers presented --

16             THE COURT:  No, what I'd like to do is schedule a

17   hearing and then I'd like to schedule a deadline.  I think

18   I'm going to steal Mr. O'Neal's notion, that by saying it

19   out loud.  We're going to say it out loud because it's a

20   good idea to have it happen by then.  And so, what I'd like

21   to do is find out from folks when we think a next hearing

22   makes sense and then we can work a deadline from them so

23   that we can do this as efficiently as possible.  That's a

24   very fair point.

25             MR. ZIPES:  And before I sit down, Your Honor, I

Page 105

1    just want to ask that the Objections were already filed and

2    we wouldn't need to file them again, at least --

3            THE COURT:  Oh, no.  Everybody filed their

4    Objections.  We've gone through them, and the understanding

5    is, you're looking at the language.  If something about the

6    new language raises an issue, then you'll talk to the

7    Debtors about it and other interested parties and if you can

8    resolve it, great and if you can't resolve it, then we'll

9    talk about it at the next hearing.

10           MR. ZIPES:  Thank you.

11           THE COURT:  All right.  Thank you very much.  All

12    right, so unless I'm missing something, I think we're at the

13    part of the program where we would set another hearing date.

14    And so, let me ask the Debtors what you would have in mind

15    in terms of timing.  I think we've had a very productive

16    afternoon, so I thank all the professionals, everybody

17    involved, for that.  So, in terms of taking the final step

18    forward, Ms. Vanlare, what do you have in mind?

19           MS. VANLARE:  So, Your Honor -- and we agree it's

20    been very productive, and we appreciate it.  I think we'd

21    propose Monday if Your Honor is available.

22           THE COURT:  All right, and if we had Monday, the

23    question would be, when would things be filed so that people

24    have the most up to date Disclosure Statement?

25           MS. VANLARE:  We would propose Friday.  Friday at

Page 106

```
 1    5.

 2               THE COURT:  All right.  If you could indulge me, I

 3    want to take a two -- less than two-minute break to just

 4    wander off, although, I might just talk to this nice lady to

 5    find out what my life looks like on Monday.

 6               CLERK:  Monday at 11, you have (inaudible)

 7               THE COURT:  All right.  Anything in the afternoon?

 8               CLERK:  (inaudible)

 9               THE COURT:  Oh, all right.  So, I don't need to

10    leave the bench.  So, how would Monday afternoon work?

11               MS. VANLARE:  I think that works for us.

12               THE COURT:  All right.  So, 2 o'clock, and any

13    changes to the Disclosure Statement would be filed by Friday

14    at 5.  Obviously, I'm not trying to stand in the way of

15    further improvements or people having discussions, but the

16    idea is, it resolves the problem of people saying, "I

17    haven't seen that, and it affects me."  So, there may be

18    some very, particularly, parochial issues and I'm thinking,

19    for example, of Gemini talking about some specific things

20    that are specific to it, and so, filing that Friday at 5

21    doesn't impair your ability to continue to talk.  But for

22    anything of general interest, I would think that Friday at

23    5, it should be in there.  I'm sorry, Friday at 5, and

24    Monday at 2.  And just to, sort of, jump ahead, I know

25    exclusivity is on today.  I think today's hearing is
```

1    evidence of progress.  I think it almost, by itself,

2    satisfies the requirements for an exclusivity extension and

3    so, I'm happy to spend as much time as is necessary.  I

4    don't want to cut off anybody's rights, but we're clearly

5    making progress on the Plan that has been the focus of

6    Creditors' aspirations.  And so, I'm happy to get into

7    whatever record we might need to make, but I'm hoping that

8    that will be a short process.

9            MS. VANLARE:  Just one other point about the

10   hearing on Monday, Your Honor.  Should we assume it's going

11   to be another hybrid hearing or should it be a Zoom --

12           THE COURT:  So, the idea between -- and behind

13   getting together was, some things are actually more

14   productive, and I do think today was more productive as a

15   result of you all being here, so I thank you very much.

16   It's also nice to see real faces and not have to worry about

17   somebody unmuting.  That's a real joy.  So, my thought is,

18   I'm happy to follow your lead.  If you think another in-

19   person would be helpful, I'm happy to do that.  If you think

20   remote would be fine, I'm happy to do that.  Your call.

21           MS. VANLARE:  Okay.  We'd like to have another

22   hybrid.  So, have an in-person option available.

23           THE COURT:  Okay.  That's fine.  Again, whatever

24   best serves the needs of the case, and you all are in a

25   better position to judge that than I am.  And obviously,

Page 108

```
1    anybody who wants to participate remotely, can participate

2    remotely, but I think that there is some efficiency gained

3    by having everybody here.  So, all right.  So, Monday at 2

4    o'clock, deadline of Friday at 5.  I've given a preview of

5    my view about exclusivity, but I guess, Ms. Vanlare, I'll

6    turn it over to the Debtors, or Mr. O'Neal, to briefly tee

7    it up and then if anybody wants to be heard.

8              MR. O'NEAL:  Your Honor, I don't think we need to

9    spend much time on this request.  I think we have made

10   progress with respect to the Plan and the Disclosure

11   Statement, the distribution principles and a variety of

12   different documents and discussions are ongoing.  I think

13   it's been a collaborative process.  We've taken the

14   objections to the Disclosure Statement seriously and we've

15   tried to remedy those objections.  We're continuing to work

16   on documenting the (indiscernible) capital settlement --

17             THE COURT:  And when is that on for?  I know that

18   (indiscernible) soon.

19             MR. O'NEAL:  (indiscernible) to finalize the

20   documentation --

21             THE COURT:  All right.

22             MR. O'NEAL:  -- which is in progress and then

23   we're hoping to get it on file on -- the hearing is on

24   November 30th.

25             THE COURT:  All right.  Great.  Thank you.
```

1          MR. O'NEAL:  So, we wanted to get it on file in

2     time to give people notice for that.  Then also, we do

3     continue to have unresolved contingencies, particularly with

4     respect to the Gemini matters.  So, I think, with that,

5     we've continued to make progress and I feel like we've made

6     the necessary showing for an extension of exclusivity.

7          THE COURT:  All right.

8          MR. O'NEAL:  I think the question may be, what is

9     the period of time?

10         THE COURT:  Yes.

11         MR. O'NEAL:  I am interested in Your Honor's views

12    on that.  I have a sense of what Your Honor might say.  We,

13    of course, would like to have as much as possible.  But we

14    also realize there is now a hearing that has been scheduled

15    on Monday.  The last time we did this, you scheduled it for

16    the date of the hearing and then we could make an oral

17    Motion.  We're happy to approach it that way again, if that

18    is Your Honor's wish, or we could go out further.  I'm sure

19    that the Creditors will have something to say about that, as

20    well.

21         THE COURT:  All right.  Thank you.  Mr. Rosen?

22         MR. ROSEN:  Yes, Your Honor.  I appreciate that

23    Mr. O'Neal finished the way he did.  We, as you know, Your

24    Honor, were opposed to any extension previously.  We all

25    agreed that we would go to today's hearing.  Similarly, we

Page 110

1    would agree to go to next Monday's hearing with the same

2    reservation of rights to orally do whatever we need to do,

3    extend or challenge, if, in fact, we don't get there.

4              THE COURT:  All right.

5              MR. ROSEN:  Thank you.

6              THE COURT:  Anything from any other party that

7    might wish to be heard on this issue?  All right.  I'm going

8    to extend it to the next hearing, but in so doing, I'm not

9    trying to send a message about unhappiness, right.  We made

10   a lot of progress today.  I'm just trying to not have to

11   deal with things if we don't have to deal with them.  And

12   so, we've made a lot of progress.  My expectation is that

13   we'll be able to finish rolling this boulder up the hill at

14   the next hearing.  And this is the Plan the Creditors want.

15   That point is pretty clear.  There's been significant

16   progress made in the Disclosure Statement, just today alone.

17   And so, it's clear progress is being made and I think my

18   general sense in the room is that people are pretty happy

19   about the progress being made because we're getting closer

20   to being able to make distributions to creditors and that's

21   the goal.  So, I'm not sending any message, I just wanted to

22   be clear.  It's not -- there are times when you are sending

23   a message by having exclusivity tied to a shorter date.  But

24   I just think it's the end of the day, so we don't want to

25   have to spend any more time trying to figure out the date.

Page 111

1   And again, I have every expectation that we'll continue to

2   make progress on Monday.  And again, you can make an oral

3   application on Monday, and we'll figure that out as we go

4   forward.  So, let me ask if there's anything else, Mr.

5   O'Neal or Ms. Vanlare, from the Debtors to address?

6                MR. O'NEAL:  No.

7                MS. VANLARE:  Nothing further.

8                THE COURT:  All right.  Anything else from the

9   Official Committee?

10               MAN 1:  No, Your Honor.  Thank you very much.

11               THE COURT:  All right.  Mr. Rosen, anything from

12   you?

13               MR. ROSEN:  Nothing.  Thank you, Your Honor.

14               THE COURT:  All right.  Anything from Gemini?

15               MAN 2:  No, Your Honor.  Thank you very much.

16               THE COURT:  All right.  The U.S. Trustee?

17               MR. ZIPES:  No, Your Honor.  Thank you.

18               THE COURT:  All right.  And I don't want to

19   exclude anybody.  DCG?

20               MAN 3:  Nothing, Your Honor.  Thank you.

21               THE COURT:  All right.  Thank you.  Anyone else?

22   All right.  Thank you all very much.  Good to see you all.

23   Thank you for your hard work and I look forward to seeing

24   you on Monday.

25               MS. VANLARE:  Thank you.

Page 112

1              MR. ZIPES:  Thank you.

2              THE COURT:  And it's nice to put that conference

3    room to use for conferences.

4              (Whereupon these proceedings were concluded at

5    5:27 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1              C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4     transcript is a true and accurate record of the proceedings.

5

6

7

8     Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  November 9, 2023
```