CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors
and Debtors-in-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, et al.,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

**AMENDED DISCLOSURE STATEMENT WITH RESPECT
TO THE AMENDED JOINT PLAN OF GENESIS GLOBAL
HOLDCO, LLC *ET AL*., UNDER CHAPTER 11 OF THE BANKRUPTCY CODE**

Dated: November 27, 2023

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

ALL CREDITORS ARE ADVISED AND ENCOURAGED TO READ THIS AMENDED DISCLOSURE STATEMENT AND THE AMENDED PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE AMENDED PLAN.  PLAN SUMMARIES AND STATEMENTS MADE IN THIS AMENDED DISCLOSURE STATEMENT, INCLUDING THE FOLLOWING SUMMARY, ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE AMENDED PLAN, EXHIBITS ANNEXED TO THE AMENDED PLAN, THE PLAN SUPPLEMENT, AND ALL EXHIBITS TO THIS AMENDED DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS AMENDED DISCLOSURE STATEMENT ARE MADE ONLY AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER SUCH DATE.  ALL CREDITORS SHOULD CAREFULLY READ THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING TO ACCEPT OR REJECT THE AMENDED PLAN.  SEE SECTION IX BELOW, "RISK FACTORS."

THE DEBTORS URGE EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY LEGAL, FINANCIAL, SECURITIES, TAX, OR BUSINESS ADVICE IN REVIEWING THIS AMENDED DISCLOSURE STATEMENT, THE AMENDED PLAN, AND THE PROPOSED TRANSACTIONS CONTEMPLATED THEREBY.

THIS AMENDED DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW.  PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS SHOULD EVALUATE THIS AMENDED DISCLOSURE STATEMENT AND THE AMENDED PLAN IN LIGHT OF THE PURPOSES FOR WHICH THEY WERE PREPARED.

THE INFORMATION IN THIS AMENDED DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE AMENDED PLAN.  NOTHING IN THIS AMENDED DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON, PARTY, OR ENTITY FOR ANY OTHER PURPOSE EXCEPT AS PERMITTED BY APPLICABLE LAW.  NOTHING IN THIS AMENDED DISCLOSURE STATEMENT SHALL CONSTITUTE OR BE DEEMED AN ADMISSION BY ANY PERSON, PARTY OR ENTITY OR CONSTITUTE EVIDENCE FOR ANY PURPOSE.

THE TERMS OF THE AMENDED PLAN, EXHIBITS ANNEXED TO THE AMENDED PLAN, AND THE PLAN SUPPLEMENT (WHICH SHALL BE FILED WITH THE BANKRUPTCY COURT NO LATER THAN TEN (10) DAYS BEFORE THE VOTING DEADLINE) GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THIS AMENDED DISCLOSURE STATEMENT.  ALL EXHIBITS TO THIS AMENDED DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF THIS AMENDED DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

UNLESS OTHERWISE INDICATED, ALL CAPITALIZED TERMS USED BUT NOT DEFINED HEREIN SHALL HAVE THE MEANINGS ASCRIBED TO THEM IN THE

AMENDED PLAN.  IN THE EVENT OF AN INCONSISTENCY BETWEEN THE AMENDED PLAN AND THE AMENDED DISCLOSURE STATEMENT, THE TERMS OF THE AMENDED PLAN SHALL CONTROL IN ALL RESPECTS.  IN THE EVENT OF AN INCONSISTENCY BETWEEN THE AMENDED PLAN AND THE PLAN SUPPLEMENT, THE TERMS OF THE RELEVANT DOCUMENT IN THE PLAN SUPPLEMENT SHALL CONTROL (UNLESS STATED OTHERWISE IN SUCH PLAN SUPPLEMENT DOCUMENT OR IN THE CONFIRMATION ORDER).

AS TO CONTESTED MATTERS, EXISTING LITIGATION INVOLVING, OR FUTURE LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTORS OR SUBSIDIARIES OF THE DEBTORS, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS AMENDED DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER BY ANY PERSON, PARTY, OR ENTITY FOR ANY PURPOSE, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION OR EVIDENTIARY PURPOSE WHATSOEVER BY ANY PERSON, PARTY, OR ENTITY.  AS SUCH, THIS AMENDED DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL, OR OTHER EFFECTS OF THE AMENDED PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR EQUITY INTERESTS IN, THE DEBTORS OR ANY OTHER PARTY IN INTEREST.

SPECIAL NOTICE REGARDING FEDERAL AND STATE SECURITIES LAWS

NEITHER THIS AMENDED DISCLOSURE STATEMENT NOR THE AMENDED PLAN HAS BEEN FILED WITH THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "SEC") OR ANY STATE AUTHORITY. THE AMENDED PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THIS AMENDED DISCLOSURE STATEMENT OR THE MERITS OF THE AMENDED PLAN.   ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

ANY OFFER, ISSUANCE, DISTRIBUTION OR SALE OF SECURITIES CONTEMPLATED TO BE OFFERED, ISSUED, DISTRIBUTED OR SOLD UNDER THE AMENDED PLAN WILL NOT BE REGISTERED UNDER THE SECURITIES ACT OF 1933 (THE "SECURITIES ACT") OR ANY SIMILAR STATE OR FOREIGN SECURITIES OR "BLUE SKY" LAWS.  ANY OFFERS, ISSUANCES, DISTRIBUTIONS OR SALES UNDER THE AMENDED PLAN WILL BE MADE IN RELIANCE ON EXEMPTIONS FROM REGISTRATION SPECIFIED IN THE SECURITIES ACT OR THE RULES PROMULGATED THEREUNDER, INCLUDING SECTIONS 4(a)(1) AND 4(A)(2) OR THE SECURITIES ACT, RULE 506 OF REGULATION D, REGULATION S, AND/OR RULE 144 OR OTHER EXEMPTIONS FROM REGISTRATION UNDER THE SECURITIES ACT OR APPLICABLE

FOREIGN SECURITIES LAWS, SUBJECT TO CERTAIN LIMITATIONS DESCRIBED HEREIN AND IN THE AMENDED PLAN.

NOTWITHSTANDING ANYTHING TO THE CONTRARY IN THIS DISCLOSURE STATEMENT, THE AMENDED PLAN OR THE CONFIRMATION ORDER, OR ANY FINDINGS ANNOUNCED IN CONNECTION WITH THIS DISCLOSURE STATEMENT, THE AMENDED PLAN OR CONFIRMATION ORDER, NOTHING IN THIS DISCLOSURE STATEMENT, THE AMENDED PLAN OR THE CONFIRMATION ORDER SHALL CONSTITUTE A FINDING UNDER EITHER FEDERAL OR STATE (INCLUDING NEW YORK STATE) SECURITIES LAWS AS TO WHETHER CRYPTO TOKENS OR TRANSACTIONS INVOLVING CRYPTO TOKENS ARE SECURITIES, AND THE RIGHT OF THE SEC OR OTHER GOVERNMENTAL UNITS TO CHALLENGE TRANSACTIONS INVOLVING CRYPTO TOKENS ON ANY BASIS IS EXPRESSLY RESERVED. THE BANKRUPTCY COURT IS NOT MAKING ANY FINDINGS AS TO THE AVAILABILITY OF ANY EXEMPTIONS UNDER THE SECURITIES LAWS.

THIS AMENDED DISCLOSURE STATEMENT CONTAINS "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995. READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS IN THIS AMENDED DISCLOSURE STATEMENT ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE BUT ARE SUBJECT TO A WIDE RANGE OF RISKS, INCLUDING RISKS ASSOCIATED WITH THE FOLLOWING:

- THE EVOLVING REGULATORY LANDSCAPE AND POTENTIAL ADOPTION AND IMPACT OF NEW GOVERNMENTAL REGULATIONS;
- THE OVERALL HEALTH OF THE DIGITAL ASSET INDUSTRY;
- THE POPULARITY AND RATE OF ADOPTION OF CRYPTOCURRENCIES AND OTHER DIGITAL ASSETS;
- CYBERSECURITY CONCERNS PECULIAR TO DIGITAL ASSETS, SUCH AS 51% ATTACKS, SYBIL ATTACKS, AND LOSS OF CONTROL OVER PRIVATE KEYS;
- TRANSACTIONS RISKS PECULIAR TO DIGITAL ASSETS, SUCH AS SLASHING PENALITIES, IRREVERSIBLY SENDING OR RECEIVING DIGITAL ASSETS AT AN INCORRECT OR INVALID WALLET ADDRESS, AND CENTRALIZATION OVER CERTAIN DIGITAL ASSETS;
- EFFECTIVENESS OF THE DEBTORS' RISK MANAGEMENT POLICIES AND ACTIVITIES;
- TAXATION APPLICABLE TO THE DEBTORS AND ANY CHANGES THERETO;
- GENERAL ECONOMIC AND BUSINESS CONDITIONS;
- BANK VOLATILITY;
- THE INABILITY TO MAINTAIN RELATIONSHIPS WITH EMPLOYEES AND OTHER THIRD PARTIES AS A RESULT OF THESE CHAPTER 11 CASES OR OTHER FAILURE OF SUCH PARTIES TO COMPLY WITH THEIR CONTRACTUAL OBLIGATIONS;

- COUNTERPARTY CREDIT RISK;
- THE OUTCOME OF PENDING AND FUTURE LITIGATION;
- EXCHANGE RATE FLUCTUATIONS AND DIGITAL ASSET PRICE FLUCTUATIONS;
- RISKS IN CONNECTION WITH DISPOSITIONS; AND
- PLANS, OBJECTIVES, AND EXPECTATIONS.

STATEMENTS CONCERNING THESE AND OTHER MATTERS ARE NOT GUARANTEES OF ANY FUTURE PERFORMANCE. THERE ARE RISKS, UNCERTAINTIES, AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL PERFORMANCE OR ACHIEVEMENTS TO BE DIFFERENT FROM THOSE THEY MAY PROJECT, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE THE PROJECTIONS MADE HEREIN OTHER THAN AS REQUIRED BY APPLICABLE LAW. THESE RISKS, UNCERTAINTIES, AND FACTORS MAY INCLUDE THE FOLLOWING:

- THE RISKS AND UNCERTAINTIES ASSOCIATED WITH THE CHAPTER 11 CASES;
- THE DEBTORS' ABILITY TO MAINTAIN COMPLIANCE WITH LAWS AND REGULATIONS OR THE INTERPRETATION OR APPLICATION OF SUCH LAWS THAT CURRENTLY APPLY OR MAY BECOME APPLICABLE TO THE DEBTORS' BUSINESS BOTH IN THE UNITED STATES AND INTERNATIONALLY;
- CHANGES TO A PARTICULAR DIGITAL ASSET'S OR PRODUCT OFFERING'S STATUS AS A "SECURITY" IN ANY RELEVANT JURISDICTION UNDER RELEVANT LAWS AND REGULATIONS OR REGULATORY INTERPRETATION THEREOF;
- REGULATORY RISKS LIMITING OR OTHERWISE IMPACTING THE DEBTORS' ABILITY TO MAKE DISTRIBUTIONS OF DIGITAL ASSETS;
- LOSS OF CRITICAL BANKING OR INSURANCE RELATIONSHIPS OR FINANCIAL LOSSES IN EXCESS OF FDIC INSURED COVERED AMOUNTS CAUSED BY THE FAILURE OF CRITICAL BANKING RELATIONSHIPS;
- THE DIVERSION OF MANAGEMENT'S ATTENTION AS A RESULT OF THE CHAPTER 11 CASES;
- INCREASED LEVELS OF EMPLOYEE ATTRITION AS A RESULT OF THE CHAPTER 11 CASES;
- CLIENT RESPONSES TO THE CHAPTER 11 CASES;
- THE DEBTORS' ABILITY TO CONFIRM OR CONSUMMATE THE AMENDED PLAN;
- THE POTENTIAL THAT THE DEBTORS MAY NEED TO PURSUE AN ALTERNATIVE TRANSACTION IF THE AMENDED PLAN IS NOT CONFIRMED OR IF AN ALTERNATIVE PLAN WOULD PROVIDE MORE VALUE TO STAKEHOLDERS THAN THE AMENDED PLAN;

- THE DEBTORS' INABILITY TO DISCHARGE OR SETTLE CLAIMS DURING THESE CHAPTER 11 CASES;
- THE AVAILABILITY OF CASH TO MAINTAIN THE DEBTORS' OPERATIONS AND FUND WIND-DOWN EXPENSES;
- RISKS ASSOCIATED WITH WEAK OR UNCERTAIN GLOBAL ECONOMIC CONDITIONS AND THEIR IMPACT ON DEMAND FOR DIGITAL ASSETS;
- OTHER GENERAL ECONOMIC AND POLITICAL CONDITIONS IN THE UNITED STATES AND INTERNATIONALLY, INCLUDING THOSE RESULTING FROM RECESSIONS, POLITICAL EVENTS, ACTS OR THREATS OF TERRORISM, AND MILITARY CONFLICTS;
- RISK OF INFORMATION TECHNOLOGY OR DATA SECURITY BREACHES OR OTHER CYBERATTACKS;
- CHANGES IN LABOR RELATIONS;
- FLUCTUATIONS IN OPERATING COSTS;
- SHIFTS IN POPULATION AND OTHER DEMOGRAPHICS;
- LEGISLATIVE OR REGULATORY REQUIREMENTS;
- ADVERSE TAX CHANGES; AND
- FLUCTUATIONS IN INTEREST RATES, EXCHANGE RATES, DIGITAL ASSET VALUES, AND CURRENCY VALUES.

YOU ARE CAUTIONED THAT ALL FORWARD-LOOKING STATEMENTS ARE NECESSARILY SPECULATIVE, AND THERE ARE CERTAIN RISKS AND UNCERTAINTIES THAT COULD CAUSE ACTUAL EVENTS OR RESULTS TO DIFFER MATERIALLY FROM THOSE REFERRED TO IN SUCH FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS ARE OFTEN CHARACTERIZED BY THE USE OF WORDS SUCH AS "BELIEVES," "ESTIMATES," "EXPECTS," "PROJECTS," "MAY," "INTENDS," "PLANS" OR "ANTICIPATES" OR BY DISCUSSIONS OF STRATEGY, PLANS, OR INTENTIONS. THE LIQUIDATION ANALYSIS, AND OTHER PROJECTIONS AND FORWARD-LOOKING INFORMATION CONTAINED HEREIN AND ATTACHED HERETO ARE ONLY ESTIMATES, AND THE TIMING AND AMOUNT OF ACTUAL DISTRIBUTIONS TO HOLDERS OF ALLOWED CLAIMS, AMONG OTHER THINGS, MAY BE AFFECTED BY MANY FACTORS THAT CANNOT BE PREDICTED. ANY ANALYSES, ESTIMATES, OR RECOVERY PROJECTIONS MAY OR MAY NOT TURN OUT TO BE ACCURATE. ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE DEBTORS SPEAK ONLY AS OF THE DATE THEY WERE MADE AND THE DEBTORS DO NOT UNDERTAKE TO PUBLICLY UPDATE OR REVISE ANY SUCH FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED HEREIN OR THEREIN WILL NOT BE REALIZED. EXCEPT AS OTHERWISE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED

ACCOUNTING PRINCIPLES OR INTERNATIONAL FINANCIAL REPORTING STANDARDS.

**THE DISCLOSURE STATEMENT
REFLECTS COMMENTS FROM THE COMMITTEE.**

**DISCUSSIONS AMONG SUCH PARTIES REMAIN ONGOING
WITH RESPECT TO KEY ASPECTS OF THE DISCLOSURE STATEMENT.**

**FOR THE AVOIDANCE OF DOUBT, AS OF THE DATE HEREOF,
EACH OF THE DEBTORS, THE COMMITTEE, AND THE AD HOC GROUP
RESERVE ALL RIGHTS WITH RESPECT TO THE DISCLOSURE STATEMENT.**

**THE DEBTORS RESERVE THE RIGHT TO AMEND OR
SUPPLEMENT THIS AMENDED DISCLOSURE STATEMENT
AT OR BEFORE THE CONFIRMATION HEARING.**

# TABLE OF CONTENTS

                                                                                    Page

I.    INTRODUCTION ........................................................................................................1

      A.    General ............................................................................................................1

      B.    Treatment and Classification of Claims and Interests; Impairment ...............................3

II.   IMPORTANT INFORMATION ABOUT THIS AMENDED DISCLOSURE STATEMENT .............3

III.  QUESTIONS AND ANSWERS REGARDING THIS AMENDED DISCLOSURE
      STATEMENT AND THE AMENDED PLAN ...........................................................................4

      A.    What is chapter 11? ...........................................................................................4

      B.    Why are the Debtors sending me this Amended Disclosure Statement? ...........................5

      C.    Am I entitled to vote on the Amended Plan? .......................................................5

            (i)    Classification of Claims Against and Interests in GGH ...........................6
            (ii)   Classification of Claims Against and Interests in GGC ...........................7
            (iii)  Classification of Claims Against and Interests in GAP ...........................7

      D.    How do the Debtors intend to treat Holders who deposited collateral with Genesis?  Will
            Holders receive their collateral back? ..................................................................8

      E.    What will I receive from the Wind-Down Debtors if the Amended Plan is consummated? ...........8

      F.    If I am entitled to vote, how do I submit a vote on the Amended Plan? .........................2

      G.    How many Classes must vote to accept the Amended Plan to satisfy confirmation
            requirements? ..................................................................................................12

      H.    What happens to my recovery if the Amended Plan is not confirmed, or does not go
            effective? .......................................................................................................12

      I.    Are any regulatory approvals required to consummate the Amended Plan? .......................12

      J.    If the Amended Plan provides that I am entitled to a distribution, do I receive it upon
            Confirmation, when the Amended Plan goes effective, or some other date, and what do
            you mean when you refer to "Confirmation," "Plan Effective Date," and
            "Consummation?" ............................................................................................12

      K.    Is there potential litigation related to the Amended Plan? .........................................13

      L.    What are the PA Officer, New Board, Wind-Down Oversight Committee and Litigation
            Oversight Committee and who are their members?  What are their respective powers,
            duties and obligations? .....................................................................................13

      M.    What are the sources of consideration used to make Distributions under the Amended
            Plan? .............................................................................................................17

      N.    How are Gemini Lender Claims being treated under the Amended Plan?  How will
            resolution of disputed issues with Gemini affect distributions on such claims? ...............18

      O.    Does the Amended Plan provide for the subordination of any Claims? ...........................19

      P.    Will the Wind-Down Debtors be obligated to continue to pay statutory fees as part of the
            bankruptcy process after the Plan Effective Date? .................................................19

      Q.    When will the Plan Supplement be filed and what will it include? ...............................19

      R.    What are the Debtors' Intercompany Claims and Interests? .......................................19

S.      What information will be included in the exhibit identifying the intercompany claims that shall constitute Excluded Claims? .................................................20

T.      Will Claims asserted with respect to damages resulting from the Debtors' rejection of certain executory contracts or unexpired leases of nonresidential real property affect my recovery under the Amended Plan? ..........................................20

U.      Will there be releases or exculpations granted to parties in interest as part of the Amended Plan? ..........................................................................20

V.      Are the Debtors' directors, officers or employees being released under the Amended Plan?  What is the basis for the releases? ..................................................22

W.      What is the deadline to vote on the Amended Plan? ...........................................23

X.      What is a Confirmation Hearing and will the Bankruptcy Court hold a Confirmation Hearing? ..................................................................................23

Y.      What is the effect of the Amended Plan on the Debtors' ongoing businesses? .............23

Z.      Do the Debtors recommend voting in favor of the Amended Plan? ............................24

IV.     THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW ...........25

A.      The Debtors' Prepetition Organizational Structure ..........................................25

B.      Summary of the Debtors' Businesses and Corporate History ................................25

C.      Summary of the Company's Prepetition Capital Structure ...................................27

V.      EVENTS LEADING TO CHAPTER 11 AND PREPETITION RESTRUCTURING INITIATIVES ......................................................................................31

A.      Impact of the 3AC Liquidation ...............................................................31

B.      FTX Collapse ...............................................................................31

C.      Impact on Customer Confidence ...............................................................31

D.      Debtors' Decision to File for Chapter 11 ....................................................32

VI.     EVENTS OF THE CHAPTER 11 CASES ...............................................................33

A.      Voluntary Petitions ........................................................................33

B.      First and Second Day Relief ................................................................33

C.      Appointment of Official Committee of Unsecured Creditors ..................................34

D.      Ad Hoc Groups in the Chapter 11 Cases ......................................................34

E.      The Restructuring Term Sheet ...............................................................35

F.      Special Committee Investigation ............................................................35

        (i) Potential Claims Against the DCG Parties .............................................36
        (ii)      Potential Claims Against Gemini and/or the Gemini Lenders ........................43

G.      The Committee's Investigation ..............................................................45

H.      Redaction Decision .........................................................................46

I.      Cash Cloud Proceedings .....................................................................46

        (i)       Emergency Lien Priming ..........................................................46
        (ii)      Cash Cloud Sale Process .........................................................46
        (iii)     Cash Cloud Surcharge Motion .....................................................47

J.     File Storage Partners Proceedings ................................................................. 47

       (i)     Lien Priming ................................................................................. 47

K.     Three Arrows Capital ("3AC") Liquidation Proceedings ............................ 47

L.     Recognition of the Chapter 11 Cases in Singapore ..................................... 48

M.     Schedules and Statements ............................................................................ 48

N.     Claims .......................................................................................................... 48

O.     Sale Process and Wind Down of Non-Debtor Subsidiaries ......................... 52

P.     Settlement with Digital Currency Group, Inc. ............................................. 54

       (i)     Mediation with DCG and Key Stakeholders ............................... 54
       (ii)    Partial Repayment Agreement ..................................................... 55

Q.     Employee Matters ........................................................................................ 56

R.     Debtors' New Lease ..................................................................................... 56

S.     Director & Officer Insurance ...................................................................... 56

T.     Motions to Extend Exclusivity .................................................................... 57

U.     Litigation Matters ........................................................................................ 57

       (i)     Certain Non-Bankruptcy Litigation Matters ............................... 57
       (ii)    FTX Preference Litigation ........................................................... 58
       (iii)   DCG Turnover Action .................................................................. 60
       (iv)    The NYAG Action ........................................................................ 60
       (v)     The Gemini Adversary Proceeding ............................................. 61

V.     Ordinary Course Professionals .................................................................... 62

VII.   SUMMARY OF THE AMENDED PLAN ............................................................... 63

A.     General Basis for the Amended Plan ........................................................... 63

B.     Governing Law ............................................................................................. 63

C.     Treatment of Unclassified Claims ............................................................... 63

       (i)     Administrative Expense Claims ................................................... 64
       (ii)    Professional Compensation ......................................................... 64
       (iii)   Priority Tax Claims ...................................................................... 65
       (iv)    Statutory Fees .............................................................................. 65
       (v)     Ad Hoc Group Restructuring Expenses ....................................... 65

D.     Classification and Treatment of Claims and Interests ................................. 66

       (i)     Classification of Claims and Interests ......................................... 66
       (ii)    Special Provision Governing Unimpaired or Reinstated Claims ....................... 78
       (iii)   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
               Code ............................................................................................. 78
       (iv)    Elimination of Vacant Classes .................................................... 78
       (v)     Voting Classes; Presumed Acceptance by Non-Voting Classes .................... 78
       (vi)    Intercompany Interests ................................................................ 78
       (vii)   Controversy Concerning Impairment .......................................... 78
       (viii)  Subordinated Claims .................................................................... 78

E.     Means for Implementation of the Amended Plan ......................................... 79

       (i)     Wind-Down Debtors .................................................................... 79
       (ii)    Means for Implementation ........................................................... 84

| | (iii) | GAP and GGC Intercompany Settlement | 90 |
|---|---|---|---|
| | (iv) | GGC and GGH Intercompany Settlement | 90 |
| F. | | Treatment of Executory Contracts and Unexpired Leases | 90 |
| | (i) | Assumption and Rejection of Executory Contracts and Unexpired Leases | 90 |
| | (ii) | Claims Based on Rejection of Executory Contracts or Unexpired Leases and Deadline by Which to File Proofs of Claim | 91 |
| | (iii) | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 91 |
| | (iv) | Indemnification Obligations | 92 |
| | (v) | Insurance Policies | 93 |
| | (vi) | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 93 |
| | (vii) | Reservation of Rights | 93 |
| | (viii) | Nonoccurrence of Effective Date | 93 |
| G. | | Provisions Governing Distributions | 93 |
| | (i) | Timing and Calculation of Amounts to Be Distributed | 93 |
| | (ii) | Disbursing Agent and Gemini Distribution Agent | 94 |
| | (iii) | Delivery of Distributions and Undeliverable or Unclaimed Distribution | 95 |
| | (iv) | Manner of Payment | 96 |
| | (v) | Compliance with Tax Requirements | 96 |
| | (vi) | Foreign Currency Exchange Rate | 97 |
| | (vii) | Surrender of Cancelled Instruments or Securities | 97 |
| | (viii) | Allocations | 97 |
| | (ix) | No Postpetition Interest on Claims | 97 |
| | (x) | Setoffs and Recoupment | 97 |
| | (xi) | Claims Paid or Payable by Third Parties | 98 |
| H. | | Procedures for Resolving Contingent, Unliquidated, and Disputed Claims | 98 |
| | (i) | Allowance of Claims | 98 |
| | (ii) | Claims and Interests Administration Responsibilities | 99 |
| | (iii) | Estimation of Claims | 99 |
| | (iv) | Adjustment to Claims or Interests Without Objection | 99 |
| | (v) | Time to File Objections to Claims | 99 |
| | (vi) | Disallowance of Claims | 99 |
| | (vii) | Amendments to Claims | 100 |
| | (viii) | No Distributions Pending Allowance | 100 |
| | (ix) | Single Satisfaction of Claims | 100 |
| I. | | Settlement, Release, Injunction, and Related Provisions | 100 |
| | (i) | Compromise and Settlement of Claims, Interests, and Controversies | 100 |
| | (ii) | Term of Injunctions or Stays | 101 |
| | (iii) | Release of Liens | 101 |
| | (iv) | Releases by the Debtors | 101 |
| | (v) | Releases by Releasing Parties | 102 |
| | (vi) | Exculpation | 103 |
| | (vii) | Injunction | 104 |
| | (viii) | Additional Provisions Regarding Governmental Units | 104 |
| | (ix) | Protection Against Discriminatory Treatment | 105 |
| | (x) | Recoupment | 105 |
| | (xi) | Reimbursement or Contribution | 105 |
| | (xii) | Document Retention | 105 |
| J. | | Conditions Precedent to Consummation of the Amended Plan | 106 |
| | (i) | Conditions Precedent to the Plan Effective Date | 106 |
| | (ii) | Waiver of Conditions | 107 |
| | (iii) | Substantial Consummation | 107 |

(iv)   Effect of Non-Occurrence of Conditions to the Confirmation Date or the
Effective Date ............................................................................................ 107

K.   Modification, Revocation, or Withdrawal of the Amended Plan ................................ 107

(i)   Modification and Amendments ................................................................... 107
(ii)   Effect of Confirmation of the Amended Plan on Modifications ................... 108
(iii)   Revocation or Withdrawal of Amended Plan ............................................. 108

VIII.   PROJECTED FINANCIAL INFORMATION ............................................................. 109

IX.   RISK FACTORS ............................................................................................................. 112

A.   Risks Relating to the Amended Plan, Solicitation and Confirmation ........................ 112

The Debtors may seek to amend, waive, modify or withdraw the Amended Plan at any
time prior to Confirmation. ................................................................................... 114
Other parties in interest might be permitted to propose alternative plans of reorganization,
which may be less favorable to certain of the Debtors' constituencies than the
Amended Plan. ..................................................................................................... 115
Release, injunction and exculpation provisions may not be approved. ........................... 115
The Wind-Down Debtors are subject to governmental laws and regulations. ............... 115
The Debtors' insurance does not fully cover all of the Debtors' risks, and changes in the
cost of insurance or the availability of insurance could materially increase the
Debtors' insurance costs or result in a decrease in insurance coverage. ................ 116
The assumptions and estimates contained in the financial projections may prove to be
inaccurate. ............................................................................................................ 117
The Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy
Code. .................................................................................................................... 117

B.   Risks Related to Recoveries ....................................................................................... 117

The Debtors cannot guarantee recoveries or the timing of such recoveries. .................. 117
The Wind-Down Debtors are subject to the volatility of Digital Assets. ....................... 118
Distributions under the Amended Plan will not be made prior to Consummation and may
be delayed or changed if the Confirmation Order is appealed. .............................. 118
The wind down process may take longer and cost more than estimated due to regulatory
or other causes, which may impact recoveries. ..................................................... 118
The loss of key personnel could adversely affect the wind down process and the Wind-
Down Debtors' ability to effectuate distributions. ............................................... 118
There are certain risks and contingencies that may affect the value of the Retained Causes
of Action and recoveries to Holders of Claims. .................................................... 118
The Amended Plan may cause certain adverse tax consequences for the Wind-Down
Debtors. ............................................................................................................... 119
Litigation with respect to claims filed in these Chapter 11 Cases, including the Gemini
Master Claim, and the 3AC Claims may reduce recoveries available to other
creditors of the Debtors. ....................................................................................... 119
The Debtors may be adversely affected by current and potential litigation, including
litigation in connection with the Chapter 11 Cases, as well as ongoing
governmental investigations. ................................................................................ 120
DCG is a significant source of recovery for distributions under the Amended Plan .......... 120

X.   CONFIRMATION OF THE AMENDED PLAN ........................................................... 122

A.   Requirements for Confirmation of the Amended Plan ................................................ 122

B.   Best Interests of Creditors/Liquidation Analysis ....................................................... 122

C.   Feasibility .................................................................................................................. 122

D.   Acceptance by Impaired Class ................................................................................... 122

E.    Confirmation without Acceptance by All Impaired Classes. .........................................123

      (i)    No Unfair Discrimination. ..................................................................123
      (ii)   Fair and Equitable Test. .....................................................................124

XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE AMENDED
       PLAN ..................................................................................................................................125

A.    Liquidation Under Chapter 7 ....................................................................................125

B.    Alternative Plan(s) of Reorganization ......................................................................125

C.    Dismissal of the Debtors' Chapter 11 Cases ............................................................125

XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE
        AMENDED PLAN ...........................................................................................................126

      (i)      The Wind-Down Entities. ....................................................................129
      (ii)     General Unsecured Claims against GGH............................................129
      (iii)    General Unsecured Claims against GAP. ............................................130
      (iv)     Other Unsecured Claims against GGC. ..............................................130
      (v)      Gemini Lender Claims against GGC. ..................................................131
      (vi)     Net Investment Income Tax. ...............................................................131
      (vii)    Limitations on Losses. ........................................................................131
      (i)      Gain Recognition ................................................................................131
      (ii)     U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and
               Disposing of Digital Assets Received Under the Amended Plan. .................132
      (iii)    FATCA ................................................................................................132

XIII.    SOLICITATION AND VOTING PROCEDURES ...........................................................134

A.    Voting Deadline ........................................................................................................135

B.    Voting Instructions....................................................................................................135

      (i)    Note to Holders of Claims in Classes Eligible to Vote ....................................136

C.    Voting Tabulation .....................................................................................................138

XIV.    RECOMMENDATION .....................................................................................................139

## EXHIBITS

EXHIBIT A    Debtors' Amended Joint Chapter 11 Plan

EXHIBIT B    Organizational Chart

EXHIBIT C    Liquidation Analysis

EXHIBIT D    Financial Projections

EXHIBIT E    Illustrative Range of Recoveries

EXHIBIT F    DCG Response

EXHIBIT G    Gemini Response

EXHIBIT H    Distribution Principles

EXHIBIT I    Gemini Earn Operations Assets Schedule

**THE DEBTORS HEREBY ADOPT AND INCORPORATE EACH
EXHIBIT ATTACHED TO THIS DISCLOSURE STATEMENT
BY REFERENCE AS THOUGH FULLY SET FORTH HEREIN**

## I.    INTRODUCTION

Genesis Global Holdco, LLC ("Holdco" or "GGH") and its debtor affiliates, as debtors and debtors-in-possession in the above captioned chapter 11 cases (collectively, the "Debtors" and these cases, the "Chapter 11 Cases") submit this disclosure statement (including all exhibits hereto and as may be supplemented or amended from time to time, the "Amended Disclosure Statement"), pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Interests in the Debtors in connection with the solicitation of votes for acceptance of the *Debtors' Amended Joint Chapter 11 Plan*, ECF No. 838 (as supplemented or amended from time to time, the "Amended Plan" or the "Plan").  A copy of the Amended Plan is attached hereto as **Exhibit A** and is incorporated herein by reference.  All capitalized terms used but not defined herein shall have the meaning ascribed to them in the Amended Plan.  The Amended Plan constitutes a separate chapter 11 plan for each of the Debtors.

The Debtors and their advisors engaged in extensive, arm's-length negotiations with the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases (the "Committee"), Digital Currency Group, Inc. ("DCG"), Holdco's corporate parent and the Debtors' largest borrower, an ad hoc group of lenders of Genesis Global Capital, LLC (the "Ad Hoc Group"), and an additional group of creditors represented by Brown Rudnick LLP (the "Brown Rudnick Group").  Unfortunately, despite substantial efforts, including participation in a court-ordered mediation, the parties were unable to reach a consensual resolution to these Chapter 11 Cases.

**THE DEBTORS BELIEVE THAT THE AMENDED PLAN PROVIDES THE BEST RECOVERY AVAILABLE UNDER THE CIRCUMSTANCES TO HOLDERS OF ALLOWED CLAIMS.  AT THIS TIME, THE DEBTORS BELIEVE THIS IS THE BEST AVAILABLE ALTERNATIVE FOR COMPLETING THESE CHAPTER 11 CASES.**

### A.    General

The Amended Plan is the product of extensive effort by the Debtors, their management, directors, and employees, and the Debtors' advisors to preserve the Debtors' estates, and chart a path to a transparent, efficient, and consensual restructuring.  These efforts began months prior to the filing of these Chapter 11 Cases, as the Debtors took measures to respond to significant turmoil in the digital asset industry as a whole.  Since November 2022, following the shockwave caused by the sudden collapse of FTX Trading Ltd. and certain of its affiliates, the Debtors have engaged in extensive discussions with the Debtors' creditors and stakeholders, including the Committee, the Ad Hoc Group, Gemini Trust Company, LLC ("Gemini"), and DCG, in an effort to reach a value-maximizing consensual resolution of the Debtors' financial situation, including by participating in a Bankruptcy Court-approved mediation process.  At the outset of these Chapter 11 Cases, on January 23, 2023 the Debtors filed a standalone *Debtors' Joint Chapter 11 Plan*, ECF No. 20 (the "Initial Plan") to provide a framework for a confirmable chapter 11 plan even in the absence of a global settlement.

Since the filing of the Initial Plan, the Debtors continued to engage in discussions with key stakeholders in an attempt to reach a global settlement with all parties in interest.  Those efforts led to the filing of the *Debtors' Amended Joint Chapter 11 Plan*, ECF No. 427 (the "June Plan") on June 13, 2023, reflecting substantial agreement on certain key issues among the Debtors, the Committee and the Ad Hoc Group.  The June Plan proposed to provide, among other things, (a) the distribution of the Debtors' cash and digital assets on hand to creditors and (b) the subsequent pursuit of causes of action, including preference claims and litigation claims against DCG, after the plan effective date.

The Debtors and the Committee further continued with negotiations with DCG and the Ad Hoc Group after the filing of the June Plan, including bringing the parties together for further mediation sessions in August 2023.  In the weeks since the mediation, the Debtors had made extensive progress negotiating with the parties in interest.  On August 23, 2023, the mediation was terminated and on August 28, 2023, the Debtors filed a notice of the termination along with details of an Agreement in Principle (defined below) among the Debtors, the Committee and DCG.  As part of the Agreement in Principle, DCG had agreed to enter into the New First Lien Facility, the New Second Lien Facility and the Partial Repayment Agreement in satisfaction of its existing liabilities to the Debtors.  The Ad Hoc Group did not agree with the Agreement in Principle.

Following the termination of the mediation, the Debtors and the Committee began working towards negotiating a global restructuring agreement with DCG and developing an amended plan that incorporated the key terms of the Agreement in Principle, while continuing discussions with the Ad Hoc Group and the Brown Rudnick Group. As noted in the Debtors' Third Exclusivity Motion, due to disagreements among creditors regarding the best path forward to resolve these cases, the Debtors and the Committee worked towards finalizing a plan that would allow creditors to express their preference between consummating a plan that incorporated a deal with DCG, which the Debtors believed would provide further value to creditors, and a plan that would preserve any and all of the Debtors' claims and causes of action against DCG and distribute the proceeds of any litigation against DCG to creditors.

Ultimately, however, the Debtors have been unable to reach an agreement with DCG on final debt terms, with significant open issues still pending as of the end of the Debtors' then current exclusivity period. Further complicating matters, on October 19, 2023, the Office of the New York Attorney General (the "NYAG") filed a lawsuit in the Supreme Court of the State of New York against certain of the Debtors, DCG and Gemini and other related parties (the "NYAG Action") alleging that they defrauded investors in connection with the Gemini Earn Program and the DCG Note. Given the relief sought in the NYAG Action, the Debtors and the Committee have determined that pursuing the Agreement in Principle with DCG while the NYAG Action is pending is not a viable route at this time. Accordingly, the Debtors are pursuing the Amended Plan, which incorporates the key concepts of the June Plan with additional modifications as set forth herein.

The Debtors understand that DCG and Gemini intend to vigorously defend against all allegations asserted against DCG and Gemini, respectively, in the NYAG Action.

Throughout these Chapter 11 Cases, the Debtors have remained steadfastly committed to providing a transparent process that would produce a value-maximizing restructuring for their creditors on an expedited timeline. The Debtors, in consultation with their legal and financial advisors, and particularly in light of recent developments, have concluded that the Amended Plan achieves that objective. In addition, the Debtors are continuing to engage with their key stakeholders and, to the extent the Debtors achieve a settlement that would provide more value to their stakeholders than the Amended Plan, the Amended Plan will be further amended to reflect such settlement.

The Amended Plan contemplates that Holders of Allowed General Unsecured Claims against the Debtors will receive a combination of, among other things and subject to the conditions set forth in the Amended Plan, the Debtors' or Wind-Down Debtors' (i) Cash, (ii) Digital Assets, (iii) certain Avoidance Recoveries (including proceeds from any and all Causes of Action or other claims against any of the DCG Parties or Gemini Parties), (iv) proceeds resulting from the sale of assets of the Wind-Down Debtors, and (v) proceeds from obligations of the DCG Parties, including the Partial Repayment Agreement, the DCG Loans, the DCGI Loans, the DCG Note, the DCG Tax Receivables, and any and all Causes of Action or other claims against any of the DCG Parties, including the proceeds from any settlements thereof.

Additional key components of the Amended Plan include:[2]

- Payment in full of all Allowed Administrative Expense Claims, Priority Tax Claims, Other Priority Claims, and Professional Fee Claims;

- The funding of a Litigation Reserve that allocates a fixed amount of funds to enable the pursuit of litigation of any Retained Causes of Action, which shall include (but not be limited to): (i) all Causes of Action or other claims against any of the Gemini Parties or any of the DCG Parties and (ii) any other Causes of Action or other claims identified in a schedule attached to the Plan Supplement; but shall not include any claim or Cause of Action belonging to a Holder of a Claim (other than Debtor or an Other Genesis Entity), including any such claim or Cause of Action that is based on gross negligence, fraud, or willful misconduct of another Person;

---

[2]    The following is only a summary of key components of the Amended Plan and is qualified in its entirety by reference to the full text of the Amended Plan.

- Customary releases by the Releasing Parties in favor of (i) the Debtors, (ii) the Wind-Down Debtors, (iii) the Other Genesis Entities, (iv) the Committee and its members (solely in their capacities as such), (v) the members of the Ad Hoc Group SteerCo (solely in their capacities as such) if the Ad Hoc Group Acceptance Event occurs and is continuing, (vi) the PA Officer (solely in its capacity as such), and (vii) each Related Party of each Entity described in the foregoing clauses (i)–(vi) (in each case, solely in its capacity as such); *provided*, *however*, that the Amended Plan shall not release any DCG Parties or any former employees, officers, and directors of the Debtors who did not serve as employees, officers or directors of the Debtors as of the Petition Date; *provided further*, that any of the current and former employees, officers, and directors of the Debtors (solely in such Person's capacity as such) who served as employees, officers or directors of the Debtors as of the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date, shall be released only with the written consent of the Special Committee, which will be disclosed in the Plan Supplement, with the exception of (x) the members of the Special Committee (solely in their capacities as such), who will be released without the need for such consent, and (y) any current and former employees, officers, and directors of the Debtors who served as employees, officers or directors of the Debtors as of the Petition Date and are also DCG Parties, who will not be released;

- Subject to applicable law and certain conditions set forth in the Amended Plan, Holders of Allowed Claims denominated in Digital Assets will receive in-kind distributions in the form of the Digital Asset in which such respective Claims are denominated; and

- For purposes of distributions (and subject to the Distribution Principles) and not for voting purposes, the Amended Plan considers Gemini to be the Holder of all Gemini Lender Claims, and all distributions on account of Allowed Gemini Lender Claims will be made to the Gemini Distribution Agent and held in trust in a segregated account for the benefit of the Holders of Allowed Gemini Lender Claims.

### B.    Treatment and Classification of Claims and Interests; Impairment

A table showing the classification of Claims and Interests for all purposes, including voting on and distributions under the Amended Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code is provided in Section III.C further below.  The table is qualified in its entirety by reference to the full text of the Amended Plan.  A more detailed summary of the treatment of each Class of Claims and Interests is provided below in Section VII.

The Debtors have prepared the Amended Disclosure Statement using the best information regarding their assets, liabilities, and affairs available to them as of the date hereof.  To the extent that updated books and records impact the estimates regarding creditor recoveries, the Debtors shall promptly prepare and file an amended version of the Amended Disclosure Statement with the Bankruptcy Court.  If necessary, the Debtors will also promptly prepare and file an amended version of the Amended Plan.  Any amended versions of the Amended Disclosure Statement and Amended Plan will be served in the same manner and on the same parties as the original versions of the Amended Disclosure Statement and Amended Plan.

## II.    IMPORTANT INFORMATION ABOUT THIS AMENDED DISCLOSURE STATEMENT

This Amended Disclosure Statement provides information regarding the Amended Plan.  The Debtors believe that the Amended Plan is in the best interests of all creditors and urge all Holders of Claims entitled to vote to vote in favor of the Amended Plan.

Unless the context requires otherwise, reference to "*we*," "*our*," and "*us*" are to the Debtors.

The confirmation of the Amended Plan and effectiveness of the Amended Plan are subject to certain material conditions precedent described herein and in the Amended Plan.  There is no assurance that the Amended Plan will be confirmed, or if confirmed, that the conditions required to be satisfied will be satisfied (or waived).

You are encouraged to read this Amended Disclosure Statement in its entirety, including without limitation, the Amended Plan, which is annexed as **Exhibit A** hereto, and the section entitled "Risk Factors," before submitting your ballot to vote on the Amended Plan.

Summaries of the Amended Plan and statements made in this Amended Disclosure Statement are qualified in their entirety by reference to the Amended Plan, this Amended Disclosure Statement and the Plan Supplement, as applicable, and the summaries of the financial information and the documents annexed to this Amended Disclosure Statement are qualified in their entirety by reference to those documents. The statements contained in this Amended Disclosure Statement are made only as of the date of this Amended Disclosure Statement, and there is no assurance that the statements contained herein will be correct at any time after such date. Except as otherwise provided in the Amended Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Amended Disclosure Statement.

The information contained in this Amended Disclosure Statement is included for purposes of soliciting acceptances to, and confirmation of, the Amended Plan and may not be relied on for any other purpose. The Debtors believe that the summary of certain provisions of the Amended Plan and certain other documents and financial information contained or referenced in this Amended Disclosure Statement is fair and accurate. The summaries of the financial information and the documents annexed to this Amended Disclosure Statement, including, but not limited to, the Amended Plan are qualified in their entirety by reference to those documents.

This Amended Disclosure Statement has not been approved or disapproved by the SEC, or any federal, state, local or foreign regulatory agency, nor has the SEC nor any other such agency passed upon the accuracy or adequacy of the statements contained in this Amended Disclosure Statement.

The Debtors have sought to ensure the accuracy of the financial information provided in this Amended Disclosure Statement, but the financial information contained in this Amended Disclosure Statement has not been, and will not be, audited or reviewed by the Debtors' independent auditors unless explicitly stated herein.

Securities issued, distributed or sold in reliance on Sections 4(a)(1) or 4(a)(2) of the Securities Act, and/or Regulation D or Regulation S may be, depending on the specific facts and circumstances, "restricted securities" and may be subject to resale restrictions, including any applicable holding periods, and may be resold, exchanged, assigned or otherwise transferred only pursuant to an available exemption from registration under the Securities Act, including compliance with the applicable provisions of Rule 144 or Rule 144A under the Securities Act (if available), or if such securities are registered with the SEC.

The Debtors make statements in this Amended Disclosure Statement that are considered forward-looking statements under the federal securities laws. Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements. In addition to statements which explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be uncertain and forward-looking. There can be no assurance that the restructuring transaction described herein will be consummated. Creditors and other interested parties should see the section entitled "Risk Factors" of this Amended Disclosure Statement for a discussion of certain factors that may affect the future financial performance of the Wind-Down Debtors.

## III.    QUESTIONS AND ANSWERS REGARDING THIS AMENDED DISCLOSURE STATEMENT AND THE AMENDED PLAN

### A.    What is chapter 11?

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for creditors and similarly situated equity interest holders, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a chapter 11 case creates an estate that comprises all of the legal and equitable interests of the debtor as of the date the chapter 11 case is commenced. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

Consummating a plan is the principal objective of a chapter 11 case. Except as otherwise provided in section 1141(d)(3) of the Bankruptcy Code, and subject to the occurrence of the Plan Effective Date, a bankruptcy court's confirmation of a plan binds the debtor, any person acquiring property under the plan, any creditor or equity interest holder of the debtor, and any other entity as may be ordered by the bankruptcy court. Subject to certain limited exceptions, the order issued by a bankruptcy court confirming a plan provides for the treatment of the debtor's liabilities in accordance with the terms of the confirmed plan.

**B.     Why are the Debtors sending me this Amended Disclosure Statement?**

The Debtors are seeking to obtain Bankruptcy Court approval of the Amended Plan. Before soliciting acceptances of the Amended Plan, section 1125 of the Bankruptcy Code requires the Debtors to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding whether to accept or reject the Amended Plan. This Amended Disclosure Statement is being submitted in accordance with such requirements.

**C.     Am I entitled to vote on the Amended Plan?**

Your ability to vote on, and your distribution under, the Amended Plan, if any, depends on what type of Claim you hold. In general, a Holder of a Claim or an Interest may vote to accept or reject a chapter 11 plan if (i) no party in interest has objected to such Claim or Interest (or the Claim or Interest has been Allowed subsequent to any objection or estimated for voting purposes), (ii) the Claim or Interest is Impaired by the Amended Plan, and (iii) the Holder of such Claim or Interest will receive or retain property under the Amended Plan on account of such Claim or Interest.

In general, if a Claim or an Interest is Unimpaired under a chapter 11 plan, section 1126(f) of the Bankruptcy Code deems the Holder of such Claim or Interest to have accepted such plan, and thus the Holders of Claims in such Unimpaired Classes are not entitled to vote on such plan. Because the following Classes are Unimpaired under the Amended Plan, the Holders of Claims in these Classes are not entitled to vote:

- Classes 1, 2, and 9 against GGH;

- Classes 1, 2, 10 and 11 against GGC; and

- Classes 1, 2, 9 and 10 against GAP.

In general, if the Holder of an Impaired Claim or Impaired Interest will not receive any distribution under a chapter 11 plan in respect of such Claim or Interest, section 1126(g) of the Bankruptcy Code deems the Holder of such Claim or Interest to have rejected such plan, and thus the Holders of Claims in such Classes are not entitled to vote on such plan. Holders in the following Classes are conclusively presumed to have rejected the Amended Plan pursuant to section 1126(g) and are not entitled to vote:

- Classes 7, 8, 9 and 10 against GGH;

- Classes 8, 9, 10 and 11 against GGC; and

- Classes 7, 8, 9 and 10 against GAP.

Holders in the following Classes will be entitled to vote under the Amended Plan:

- Classes 3, 4, 5 and 6 against GGH;

- Classes 3, 4, 5, 6 and 7 against GGC; and

- Classes 3, 4, 5 and 6 against GAP.

A summary of the classes of Claims (each category of Holders of Claims or Interests, as set forth in Article III of the Amended Plan pursuant to section 1122(a) of the Bankruptcy Code, is referred to as a "Class") and their respective status and entitlement to vote is set forth below.  The Amended Plan shall apply as a separate Amended Plan for each of the Debtors, and the classification of Claims and Interests set forth in the Amended Plan shall apply separately to each of the Debtors.  All of the potential Classes for the Debtors are set forth herein and in the Amended Plan.  Certain of the Debtors may not have Holders of Claims or Interests in a particular Class or Classes, and such Classes shall be treated as set forth in Article III.G of the Amended Plan:

*(i)*     ***Classification of Claims Against and Interests in GGH***

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 4 | BTC-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 5 | ETH-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Alt-Coin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Government Penalty Claims | Impaired | Deemed to Reject |
| 9 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |
| 10 | Interests | Impaired | Deemed to Reject |

*(ii)*    ***Classification of Claims Against and Interests in GGC***

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 4 | BTC-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 5 | ETH-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Alt-Coin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Gemini Lender Claims | Impaired | Entitled to Vote |
| 8 | Subordinated Claims | Impaired | Deemed to Reject |
| 9 | Government Penalty Claims | Impaired | Deemed to Reject |
| 10 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |
| 11 | Intercompany Interests | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |

*(iii)*    ***Classification of Claims Against and Interests in GAP***

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 4 | BTC-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 5 | ETH-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Alt-Coin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Government Penalty Claims | Impaired | Deemed to Reject |
| 9 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |
| 10 | Intercompany Interests | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |

Under the Amended Plan, the only Classes of Claims that meet the requirements to vote with respect to each Debtor are:

- Holders of Claims in Classes 3, 4, 5 and 6 against GGH. A Holder of Claims in Class 3, 4, 5 or 6 against GGH is entitled to vote to accept or reject the Amended Plan if such Holder held such Claim

7

as of [November 3], 2023 (the "Voting Record Date"), which date is subject to the Bankruptcy
Court's approval of the Debtors' *Motion to Approve (I) the Adequacy of Information in the Amended
Disclosure Statement, (II) Solicitation and Voting Procedures, (III) Forms of Ballots, Notices and
Notice Procedures in Connection Therewith, and (IV) Certain Dates with Respect Thereto*, ECF No.
461 (the "Solicitation and Voting Procedures Motion"). Holders in such Classes against GGH will
be entitled to vote their respective Claims; their votes will be used to evaluate satisfaction with the
Bankruptcy Code's requirements for confirmation of the Amended Plan.

- Holders of Claims in Classes 3, 4, 5, 6 and 7 against GGC. A Holder of a Claims in Class 3, 4, 5, 6
  or 7 against GGC is entitled to vote to accept or reject the Amended Plan if such Holder held such
  Claim as of the Voting Record Date. Holders of such Claims will be entitled to vote their respective
  Claims; their votes will be used to evaluate satisfaction with the Bankruptcy Code's requirements
  for confirmation of the Amended Plan.

- Holders of Claims in Classes 3, 4, 5 and 6 against GAP. A Holder of a Claims in Class 3, 4, 5 or 6
  against GAP is entitled to vote to accept or reject the Amended Plan if such Holder held such Claim
  as of the Voting Record Date. Holders of such Claims against GAP will be entitled to vote their
  respective Claims; their votes will be used to evaluate satisfaction with the Bankruptcy Code's
  requirements for confirmation of the Amended Plan.

**D.     How do the Debtors intend to treat Holders who deposited collateral with Genesis?  Will
        Holders receive their collateral back?**

The Debtors assert that collateral pledged by creditors pursuant to MLAs are property of the Debtors' estates
and will not be returned. Claims by creditors for the return of such collateral are treated as General Unsecured Claims
under the Amended Plan.

MLAs generally provide each of the Debtors, as applicable, with broad rehypothecation rights. For example,
the typical MLA provides that the "Borrower agrees and affirms that, Lender's entitlement to and use of any of the
Collateral in any manner, including but not limited to use in lending, investing, selling, assigning, commingling,
transferring to bank and other accounts upon which Lender, or a third party, is the account holder or the beneficiary,
or re-pledging as collateral in other transactions involved with Lender's digital currency lending and borrowing
business." In accordance with the MLAs, and as was typical in the digital asset lending and borrowing industry, the
Debtors typically rehypothecated collateral pledged to the Debtors as security for creditors' obligations and such
collateral was not segregated. As such, the collateral is being treated by the Debtors as part of the Debtors' estates.

Certain of the MLA parties dispute the fact that their collateral is property of the Debtors' Estates and reserve
their rights to protect their asserted rights to such collateral by objecting to confirmation of the Amended Plan, seeking
turnover of such collateral by the Bankruptcy Court by motion or adversary proceeding, or otherwise taking such
action as may be necessary and appropriate under the circumstances before the Bankruptcy Court or any other court
of competent jurisdiction. The Debtors reserve their rights to dispute any such actions.

**E.     What will I receive from the Wind-Down Debtors if the Amended Plan is consummated?**

The following chart provides a summary of the anticipated recovery to Holders of Claims and Interests under
the Amended Plan. Any estimates of Claims and Interests in this Amended Disclosure Statement may vary from the
final amounts allowed by the Bankruptcy Court. Your ability to receive distributions under the Amended Plan depends
on the ability of the Debtors to obtain Confirmation and meet the conditions necessary to consummate the Amended
Plan. Any Claims referenced as being *pari passu* will receive equal treatment between the Classes of Claims.

The Wind-Down Debtors will use commercially reasonable efforts, subject to applicable law, to provide
recoveries in respect of Claims denominated in Digital Assets in kind in the form of Digital Asset in which such
Claims are denominated; *provided* that no distribution in the form of Digital Assets shall be made to any Holder that
has not responded to all requests by the Debtors, the Wind-Down Debtors, or the Disbursing Agent, or the Gemini
Distribution Agent, as applicable, for information necessary to facilitate a particular distribution to such Holder.

The projected recoveries set forth in the table below are estimates only and are based on certain assumptions described herein. Recoveries actually received by Holders of Allowed Claims and Allowed Interests in a liquidation scenario may differ materially from the projected liquidation recoveries listed in the table below.

THE PROJECTED RECOVERIES ARE SUBJECT TO CHANGE BASED ON, AMONG OTHER THINGS, MARKET VOLATILITY, THE ULTIMATE TREATMENT OF SUBORDINATED CLAIMS, THE RESOLUTION OF LITIGATION, INCLUDING THE SEC ACTION, THE NYAG ACTION AND ANY OTHER PROCEEDINGS BROUGHT OR THAT MAY BE BROUGHT BY GOVERNMENTAL ENTITIES AGAINST GENESIS AND/OR GEMINI, AND THE RESOLUTION OF DISPUTED CLAIMS.  FOR A COMPLETE DESCRIPTION OF THE DEBTORS' CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS, REFERENCE SHOULD BE MADE TO THE ENTIRE AMENDED PLAN.[3]

| GENESIS GLOBAL HOLDCO LLC | | |
|---|---|---|
| Class | Claim/Equity Interest | Projected Recovery Under the Amended Plan |
| 1 | Other Priority Claims | 100% |
| 2 | Secured Claims | 100% |
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | 59% |
| 4 | BTC-Denominated Unsecured Claims | N/A |
| 5 | ETH-Denominated Unsecured Claims | N/A |
| 6 | Alt-Coin-Denominated Unsecured Claims | N/A |
| 7 | Subordinated Claims | N/A |
| 8 | Government Penalty Claims | N/A |

---

[3] The estimated recoveries provided below do not include any proceeds that may be obtained from the Retained Causes of Action, including Causes of Action that may be brought against DCG.  Recoveries from any such litigation are highly uncertain and there is no guarantee of success.  *See* Section IX.b, "Risk Factors – There are certain risks and contingencies that may affect the value of the Retained Causes of Action and recoveries to Holders of Claims" and Risk Factors – DCG is a significant source of recovery for distributions under the Amended Plan." By way of example, every additional $100 million in recoveries available to Holders of Claims in Classes 1-7 against GGC and GAP, would result in a 3% increase to the percentage recoveries. *See* Section VI.F for a more fulsome discussion of such potential Causes of Action.  The success or failure in pursuing the Retained Causes of Action may materially affect recoveries of Holders of Allowed Claims.

| 9 | Intercompany Claims | 59% |
| 10 | Interests | N/A |

| GENESIS GLOBAL CAPITAL LLC | | |
| --- | --- | --- |
| Class | Claim/Equity Interest | Projected Recovery Under the Amended Plan |
| 1 | Other Priority Claims | 100% |
| 2 | Secured Claims | 100% |
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | 61 - 100% |
| 4 | BTC-Denominated Unsecured Claims | 61 - 100% |
| 5 | ETH-Denominated Unsecured Claims | 61 - 100% |
| 6 | Alt-Coin-Denominated Unsecured Claims | 61 - 100% |
| 7 | Gemini Lender Claims | 61 - 100% |
| 8 | Subordinated Claims | N/A |
| 9 | Government Penalty Claims | N/A |
| 10 | Intercompany Claims | N/A |
| 11 | Intercompany Interests | N/A |

| GENESIS ASIA PACIFIC PTE LTD. | | |
| --- | --- | --- |
| Class | Claim/Equity Interest | Projected Recovery Under the Amended Plan |
| 1 | Other Priority Claims | 100% |

| 2 | Secured Claims | 100% |
|---|---|---|
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | 61 - 100% |
| 4 | BTC-Denominated Unsecured Claims | 61 - 100% |
| 5 | ETH-Denominated Unsecured Claims | 61 – 100% |
| 6 | Alt-Coin-Denominated Unsecured Claims | 61 - 100% |
| 7 | Subordinated Claims | N/A |
| 8 | Government Penalty Claims | N/A |
| 9 | Intercompany Claims | N/A |
| 10 | Intercompany Interests | N/A |

**F.    If I am entitled to vote, how do I submit a vote on the Amended Plan?[4]**

With respect to Holders of Claims in Classes that are eligible to vote on the Amended Plan (the "Voting Classes"), the following materials will be included in the solicitation package (the "Solicitation Package"):

- the appropriate Ballot, together with detailed voting instructions and, if applicable, a pre-addressed, postage pre-paid return envelope (the "Voting Instructions");

- this Amended Disclosure Statement with all exhibits, including the Amended Plan, and any other supplements or amendments to these documents;

- the Disclosure Statement Order (without exhibits, except the solicitation and voting procedures);

- the notice of the Confirmation Hearing approved by the Bankruptcy Court for transmission to Holders of Claims and other parties in interest (the "Confirmation Hearing Notice");

- a cover letter describing the content of the Solicitation Package and urging Holders of Claims in each Voting Class to vote to accept the Amended Plan;

---

[4]    The procedures detailed herein may not reflect the procedures ultimately approved by the Bankruptcy Court. The Debtors will amend this Amended Disclosure Statement prior to solicitation to reflect the final, approved, solicitation procedures if different from those described herein, and such details will be provided in the Solicitation Package sent to Holders of Claims in the Voting Classes.

- any letter(s) from the Committee, Gemini, or the Ad Hoc Group stating their position with respect to the Amended Plan; and

- such other documents as the Debtors may seek to include or the Bankruptcy Court may direct.

With respect to Holders of Claims who are ineligible to vote on the Amended Plan (the "Non-Voting Classes"), the Solicitation Package shall include:

- the Confirmation Hearing Notice; and

- the applicable notice of non-voting status (the "Non-Voting Status Notice").

With respect to the U.S. Trustee, a copy of each document contained in the Solicitation Packages, which may include non-customized Ballots and a non-customized Notice of Non-Voting Status.

**Holders of Claims entitled to vote to accept or reject the Amended Plan shall be served (or were caused to be served) the Solicitation Package (including the appropriate Ballot) providing solicitation and other voting-related information to such Holders.**

**Each Gemini Lender whose Gemini Borrowings were included in the Gemini Master Claim, thus entitling such Gemini Lender to vote as a Holder of a Claim in Class 7 against GGC as of the Voting Record Date, shall receive the Solicitation Package, including the appropriate Class 7 Ballot (the "Gemini Lender's Ballot"), from Gemini by email within seven (7) days of the entry of an order approving the Debtors' Solicitation and Procedures Motion.  The Solicitation Agent has worked with Gemini to create a unique electronic ballot identification number ("E-Ballot ID(s)") for each Holder of Gemini Lender Claims.  Gemini, using the email address for such Holder of the Gemini Lender Claim in Gemini's records, will send instructions on how to obtain such Gemini Lender's unique E-Ballot ID by accessing such Gemini Lender's Gemini account for purposes of completing the Gemini Lender Ballot. Holders of Gemini Lenders Claims may then use the E-Ballot ID to cast their votes directly on the Debtors' designated voting portal for Gemini Lenders (the "Gemini Lender Voting Portal").**

**Additional paper copies of these documents may be requested, free of charge from the Solicitation Agent by (i) writing to Genesis Global Holdco, LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232; (ii) calling U.S. Toll Free: (888) 524-2017 or International Toll: (646) 440-4183; or (iii) by e-mailing genesisinfo@ra.kroll.com (with "Genesis Solicitation" in the subject line).**

The Debtors have engaged Kroll Restructuring Administration LLC as the solicitation agent ("Kroll" or the "Solicitation Agent") to assist in the balloting and tabulation process.  The Solicitation Agent will, among other things, answer questions, provide additional copies of all Solicitation Package materials, and generally oversee the solicitation process.

**Unless otherwise permitted by the Debtors, in their discretion, to be counted, all votes must be received by the Solicitation Agent by [January 10], 2023 at 4:00 p.m. (prevailing Eastern Time)] (the "Voting Deadline").[5]**

**VOTING INSTRUCTIONS ARE ATTACHED TO EACH BALLOT.  PLEASE SEE SECTION XIII BELOW ENTITLED "SOLICITATION AND VOTING PROCEDURES" FOR ADDITIONAL INFORMATION.**

Unless the Debtors, in their sole discretion decide otherwise, any Ballot received after the Voting Deadline shall not be counted.  The Solicitation Agent will process and tabulate the Ballots for the Classes entitled to vote to

---

[5]     The Voting Deadline is subject to approval by the Bankruptcy Court.

accept or reject the Amended Plan and will file a voting report (the "Voting Report") as soon as practicable after the Voting Deadline, which Voting Report will be supplemented as soon as practicable, if necessary.

Holders of Claims or Interests may contact the Solicitation Agent directly, at U.S. Toll Free: (888) 524-2017 or International Toll: (646) 440-4183, with any questions related to the solicitation procedures applicable to their Claims and Interests.

**Any Ballot that is properly executed, but fails to clearly indicate an acceptance or rejection, or that indicates both an acceptance and a rejection of the Amended Plan, shall not be counted.**

**All Ballots are accompanied by Voting Instructions. It is important to follow the specific instructions provided with each Ballot.**

G.      **How many Classes must vote to accept the Amended Plan to satisfy confirmation requirements?**

The Bankruptcy Code requires, as a condition to Confirmation, that, except in certain circumstances, each Class of Claims or Equity Interests that is Impaired under the Amended Plan, accept the Amended Plan. Section 1129(b) of the Bankruptcy Code, however, allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, provided that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, under such scenario, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

H.      **What happens to my recovery if the Amended Plan is not confirmed, or does not go effective?**

In the event that the Amended Plan is not confirmed, the Amended Plan will not be effectuated. The Debtors may propose revisions to the Amended Plan (with the necessary consents, including the consent of the Committee) or, if the Debtors' exclusive period has lapsed, other parties in interest may propose an alternative plan. It is possible that any amended or alternative plan may provide Holders of Claims and Interests with less than they would have received pursuant to the Amended Plan. For a more detailed description of the consequences of an extended chapter 11 proceeding, or of a liquidation scenario, *see* "Confirmation of the Amended Plan – Best Interests of Creditors/Liquidation Analysis" in Section X below and the Liquidation Analysis attached as **Exhibit C** to this Amended Disclosure Statement.

I.      **Are any regulatory approvals required to consummate the Amended Plan?**

The Debtors are not aware of any regulatory approvals required to consummate the Amended Plan.

J.      **If the Amended Plan provides that I am entitled to a distribution, do I receive it upon Confirmation, when the Amended Plan goes effective, or some other date, and what do you mean when you refer to "Confirmation," "Plan Effective Date," and "Consummation?"**

"Confirmation" of the Amended Plan refers to approval of the Amended Plan by the Bankruptcy Court. "Confirmation" of the Amended Plan does not guarantee that you will receive the distribution indicated under the Amended Plan. After Confirmation of the Amended Plan by the Bankruptcy Court, there are conditions that need to be satisfied or waived so that the Amended Plan can be consummated and go effective. *See* "Conditions Precedent to Confirmation and Consummation of the Amended Plan," in Section VII.J below, for a discussion of the conditions to Consummation of the Amended Plan. Initial distributions to Holders of Allowed Claims may be made on the Plan Effective Date or as soon as practicable thereafter in accordance with the terms and conditions established by the Amended Plan. Additional distributions to Holders of Allowed Claims may be made months or years after the Plan Effective Date, once assets of the Wind-Down Debtors are received, liquidated or otherwise become distributable.

**K.      Is there potential litigation related to the Amended Plan?**

Parties in interest may object to the approval of this Amended Disclosure Statement and may object to Confirmation of the Amended Plan, which could potentially lead to litigation.  See Section IX of this Amended Disclosure Statement titled "The Debtors' Businesses May Be Adversely Affected by Active Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases as well as Ongoing Regulatory Investigations" for further discussion on this issue.

As of the Petition Date, the Debtors were parties to certain litigation matters that arose in the ordinary course of operating their business and could become parties to additional litigation in the future.  Although the Debtors have disputed, are disputing, or will dispute in the future the amounts asserted by such litigation counterparties, to the extent these parties are ultimately entitled to a higher amount than is reflected in the amounts estimated by the Debtors herein, the value of recoveries to creditors entitled to receive distributions under the Amended Plan could change, and such changes could be material.

Additionally, the Amended Plan provides that the Debtors may object to certain Proofs of Claim, which may be subject to a resolution by the Bankruptcy Court after the Amended Plan becomes effective, and ultimately could cause the total amount of claims to change.

On October 27, 2023, Gemini commenced the Gemini Adversary Proceeding seeking a declaratory judgment from the Bankruptcy Court as to the appropriateness of its purported foreclosure on the GBTC Shares and its legal entitlement to the Additional GBTC Shares.  Gemini's position with respect to the Gemini Adversary Proceeding is set forth in **Exhibit G**.  The Debtors raised counterclaims and defenses in a motion to dismiss and answer to the complaint, both of which were filed on November 21, 2023.  The Amended Plan proposes to reduce the Allowed amount of the Gemini Lender Claim by the amount of the Gemini Asset Value, which shall be equal to the sum of the value of (i) solely to the extent that the Gemini GBTC Shares Determination determines that Gemini, on behalf of the Gemini Lenders, has a valid security interest in the Gemini GBTC Shares, the Gemini GBTC Shares, as determined by the Gemini Deficiency Claim Determination, (ii) those Digital Assets, identified on Exhibit D to the Gemini Master Claim, being held in a reserve by Gemini on behalf of Gemini Lenders (the "Gemini Reserved Coins"), valued using the Average Price, as determined by the Debtors in good faith and with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), (iii) the Gemini Earn Operations Assets using the Average Price, as determined by the Debtors in good faith and with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), and (iv) solely to the extent that the Gemini Additional Collateral Determination determines that Gemini, on behalf of the Gemini Lenders, has a valid security interest in or constructive trust over the Additional GBTC Shares, the Additional GBTC Shares; *provided*, *however*, that the value of the Gemini Reserved Coins shall be excluded from the calculation of the Gemini Asset Value if (x) mutually agreed in writing by Gemini and the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent, or (y) the Bankruptcy Court enters an order determining that the value of the Gemini Reserved Coins is not included in the amount of the Allowed Gemini Lender Claims and such order has not been stayed or vacated.

Finally, the Amended Plan contemplates the preservation of Retained Causes of Action that are preserved and retained by the Wind-Down Debtors (which include claims against DCG, the DCG Parties, Gemini, and the Gemini Parties) under the Amended Plan and may be pursued by the Wind-Down Debtors for the benefit of Holders of Allowed Claims.  The Debtors understand that it is DCG's position that such claims against DCG or the DCG Parties are without merit and that DCG intends to vigorously defend against such claims.  Gemini's position with respect to such potential claims against Gemini or the Gemini Parties is set forth in **Exhibit G**.

**L.      What are the PA Officer, New Board, Wind-Down Oversight Committee and Litigation Oversight Committee and who are their members?  What are their respective powers, duties and obligations?**

The Amended Plan provides for the creation of the PA Officer, New Board, Wind-Down Oversight Committee and Litigation Oversight Committee, and each will have distinct powers, duties and obligations in connection with the management of the Wind-Down Debtors and charged with winding down their estates for the benefit of the Wind-Down Debtors' Beneficiaries (i.e., Holders in respect of their Allowed Claims or Allowed Interests that are entitled to

receive distributions from the Wind-Down Debtors pursuant to the terms of the Amended Plan, whether or not such Claims or Interests are Allowed as of the Effective Date).

### *The Wind-Down Oversight Committee*

The Wind-Down Oversight Committee will consist of seven (7) members mutually appointed by the Committee and the Ad Hoc Group SteerCo (if the Ad Hoc Group Acceptance Event has occurred and is continuing), in consultation with the Debtors to oversee the New Board, the PA Officer and the Wind-Down Debtors' wind-down activities in accordance with the Amended Plan and the Plan Administration Agreement. The Wind-Down Oversight Committee will consist of (i) at least two (2) Wind-Down Oversight BTC Members, (ii) at least one (1) Wind-Down Oversight ETH Members, (iii) at least two (2) Wind-Down Oversight Fiat-or-Stablecoin Members, (iv) the Wind-Down Oversight Gemini Lender Member, and (v) the Wind-Down Oversight Crossover Member (i.e., a member at least (x) thirty percent (30%) of whose Claims are Fiat-or-Stablecoin-Denominated Unsecured Claims and (y) thirty (30%) of whose Claims are BTC-Denominated Unsecured Claims, ETH-Denominated Unsecured Claims and/or Alt-Coin-Denominated Unsecured Claims. The Wind-Down Oversight Gemini Lender Member will be a Person, the majority of whose Claims are Gemini Lender Claims and who owns claims (which may be Gemini Lender Claims) denominated in BTC. The appointment of the Wind-Down Oversight Gemini Lender Member will require Gemini's Consent. The identity of each of the members of the Wind-Down Oversight Committee will be disclosed in the Plan Supplement filed ten (10) days in advance of the Voting Deadline. The Wind-Down Oversight Committee will have various consent rights and consultation rights in respect of key aspects of the wind-down process.

The Wind-Down Oversight Committee will have consent rights (as defined in Art. I.A. 217 of the Amended Plan) over the following matters:

- **Post-Effective Date Distributions of Digital Assets**. Once all assets available for distribution on the Effective Date of the Amended Plan have been distributed, the PA Officer will determine which remaining Digital Assets are available for distribution and when such distributions will be effectuated. The Wind-Down Oversight Committee will have consent rights over such determinations. The Wind-Down Oversight Committee must also approve any material amendments to the Distribution Principles.
- **Claim Settlement Approval**. The Wind-Down Oversight Committee must approve any settlement that would Allow a Claim at a value at or above $5 million.

Moreover, the Wind-Down Oversight Committee will have consultation rights and receive advance notice regarding decisions on the following matters:

- **Digital Asset Rebalancing**. The Wind-Down Debtors are permitted to "rebalance" (i.e., buy, sell, or exchange) Cash and Digital Assets to enable them to make like-kind distributions in the denomination of the underlying claim to the maximum extent possible. The Wind-Down Oversight Committee will be consulted on all rebalancing efforts.
- **Dissolution of the Wind-Down Debtors**. The Wind-Down Debtors will dissolve after the PA Officer has fully performed all duties and functions set forth under the Amended Plan. If the PA Officer determines, however, that the Wind-Down Debtors lack sufficient resources to further carry out their duties and obligations, the Wind-Down Debtors may dissolve prior to full performance. The Wind-Down Oversight Committee will be consulted on this decision.
- Settlement of Claims. The PA Officer must consult with the Wind-Down Oversight Committee before compromising or settling any Claims related to the Wind-Down Debtors' Assets.
- **Abandonment of De Minimis Assets**. The PA Officer must provide the Wind-Down Oversight Committee with notice before abandoning any assets that have de minimis value or are otherwise burdensome, including legal actions commenced or commenceable by the Debtors.

In addition to these rights, the Wind-Down Oversight Committee will have additional responsibilities, including:

- **Reviewing Actions of the PA Officer and New Board**. The Wind-Down Oversight Committee will receive semi-annual reports from the PA Officer regarding the administration of property to be distributed under the Amended Plan.

- **Nominating New Board Member Replacements**.  In the event that a New Board member must be replaced, the Wind-Down Oversight Committee is responsible for submitting a list of three nominees to replace each member that must be replaced.  The election of one of the nominees will proceed according to the New Governance Documents.
- **Filling Wind-Down Oversight Committee Vacancies**.  Vacancies on the Wind-Down Oversight Committee, which consent shall not be unreasonably withheld, conditioned, or delayed. If a vacancy on the Wind-Down Oversight Committee is not filled within five (5) Business Days of such vacancy occurring the PA Officer shall have the authority to seek an order from the Bankruptcy Court approving the appointment of a Person, with such Person's prior written consent, to the Wind-Down Oversight Committee to fill such vacancy.
- **PA Officer Successor**.  In the event that the PA Officer must be replaced, the Wind-Down Oversight Committee will appoint a successor in accordance with the terms of the Plan Administration Agreement.

The Wind-Down Oversight Committee Bylaws shall expressly provide that the Wind-Down Oversight Committee Gemini Member shall be recused from all matters pertaining to (x) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (y) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413.

### *The PA Officer*

The PA Officer will be selected by the Committee and the Ad Hoc Group SteerCo (if an Ad Hoc Group Acceptance Event has occurred and is continuing), in consultation with the Debtors.  The identities of the individuals selected for these roles will be disclosed at least ten (10) days prior to the Voting Deadline in the Plan Supplement.  Upon appointment, the PA Officer will have the following duties and responsibilities:

- Serve as successor to and representative of the Estates to, among other things, enforce Retained Causes of Action;
- Serve as a fiduciary to all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Amended Plan;
- Manage each Wind-Down Debtor in accordance with the terms of the Plan Administration Agreement;
- Administer distributions in accordance with and pursuant to the Distribution Principles;
- Determine when to make distributions to Holders of Allowed Claims and Interests and any related record date for such distributions;
- Determine which Digital Assets are available for distribution to creditors after the Effective Date;
- Select entities (in its discretion) to make or facilitate distributions pursuant to the Amended Plan;
- Monetize any non-Cash assets of the Wind-Down Debtors (except for Retained Causes of Action) and deposit such proceeds in the Wind-Down Accounts; *provided*, that any monetization of GBTC shares and ETHE shares must be in accordance with the Distribution Principles and; *provided further*, that any Monetization Transactions in respect of the Additional GBTC Shares shall not occur  until the Bankruptcy Court makes determinations with respect to such shares in connection with the Debtors' disputes with Gemini;
- File semi-annual reports in a form reasonably acceptable to the New Board and Wind-Down Oversight Committee regarding the administration of property subject to its ownership and control pursuant to the Amended Plan, distributions made by it, and other matters relating to the implementation of the Amended Plan; and
- Comply with all applicable tax withholding and reporting requirements imposed by any Governmental Unit.

The PA Officer will also have the following powers, which will be subject to the consent rights of the New Board, the Wind-Down Oversight Committee and/or the Litigation Oversight Committee, to the extent and as set forth in the Amended Plan:

- Monetization of any Retained Causes of Action;
- Dissolve the Wind-Down Debtors upon (i) full performance of all duties and functions set forth in the Amended Plan and Plan Administration Agreement or (ii) determination that the Wind-Down Debtors lack sufficient resources to complete such duties and functions;
- Determine any surplus of Cash and Digital Assets in any Claims Reserve, Litigation Reserve, or Wind-Down Reserve;
- Seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Oversight Committee for cause;
- Retain counsel, accountants, financial advisors, or other professionals and pay such professionals from the Wind-Down Reserve;
- Invest Cash within certain limitations;
- All rights, powers, immunities, and privileges applicable to a chapter 7 trustee;
- Obtain insurance coverage with respect to its liabilities and obligations under the Plan Administration Agreement;
- Issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Amended Plan and the Securities issued pursuant to the Amended Plan (if any) in the name of and on behalf of the Wind-Down Debtors; and
- Permit the destruction or abandonment of the Wind-Down Debtors' books, records, electronically stored information or other documents, consistent with the Amended Plan.

### *The New Board*

The New Board will be the five (5) member board of Wind-Down GGH, to be appointed by DCG out of seven (7) potential candidates to be selected by the Committee, in consultation with the Debtors and with the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing). Unless all Claims against Wind-Down Debtors are ultimately determined by a Final Order to have been rendered Unimpaired, DCG will not have any other voting rights or powers. The Wind-Down Oversight Committee will be responsible for identifying nominees to replace members of the New Board by submitting a list of three (3) Persons for each member of the Board who needs to be replaced. Moreover, DCG will not be entitled to terminate any member of the New Board. The identities of the members of the New Board will be disclosed prior to the Voting Deadline in the Plan Supplement.

The following actions will require the consent or approval of the New Board:

- **Any Rights, Powers, Immunities, and Privileges Provided in the New Governance Documents**. The New Governance Documents, which will be provided in the Plan Supplement, will govern the Wind-Down Debtors and New Board.
- **Asset Sales**. The PA Officer is permitted to monetize Distributable Assets subject to the prior consent of the New Board.
- **Notice**. The New Board will receive notice of the following decisions:
  - The PA Officer's abandonment of Wind-Down Debtor Assets that have de minimis value or are otherwise burdensome.
  - Dissolution of the Wind-Down Debtors by the PA Officer prior to completion of the Amended Plan due to a lack of sufficient resources.

### *The Litigation Oversight Committee*

The Litigation Oversight Committee will consist of seven (7) members mutually appointed by the Committee and the Ad Hoc Group SteerCo (if the Ad Hoc Group Acceptance Event has occurred and is continuing), in consultation with the Debtors, and will be charged with overseeing the PA Officer and the Wind-Down Debtors with respect to the commencement, management, settlement, compromise, or other disposition of the Retained Causes of Action in accordance with the Amended Plan and the Litigation Oversight Committee Bylaws. The Litigation Oversight Committee Bylaws will require the membership of the Litigation Oversight Committee to, at all times, to the maximum extent practicable, include the following: (i) at least two (2) Litigation Oversight BTC Members, (ii) at least two (2) Litigation Oversight Fiat-or-Stablecoin Members, (iii) at least one (1) Litigation Oversight ETH Member,

(iv) at least one (1) Litigation Oversight Crossover Member (i.e., a member at least (x) thirty percent (30%) whose Claims are Fiat-or-Stablecoin-Denominated Unsecured Claims and (y) thirty percent (30%) of whose Claims are BTC-Denominated Unsecured Claims, ETH-Denominated Unsecured Claims and/or Alt-Coin-Denominated Unsecured Claims), and (v) at least one (1) Litigation Oversight Gemini Lender Member. The Litigation Oversight Gemini Lender Member shall be recused from all matters pertaining to (x) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (y) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413. The members of the Litigation Oversight Committee will be disclosed in the Plan Supplement filed ten (10) days before the Voting Deadline. Upon the occurrence of a USD Recovery Event (i.e., the allocation or distribution, in accordance with the Distribution Principles, to Holders of Fiat-or-Stablecoin Denominated Unsecured Claims of Distributable Assets the value of which are equal to the amount of such Holders' Fiat-or-Stablecoin Denominated Unsecured Claims), the two positions reserved for Litigation Oversight Fiat-or-Stablecoin Members will be eliminated from the Litigation Oversight Committee.

The Litigation Oversight Committees responsibilities will include:

- **Directing the Wind-Down Debtors and Advising on Strategy with Respect to the Retained Causes of Action**. The Litigation Oversight Committee will provide direction to the Wind-Down Debtors with respect to the initiation, filing, prosecution, enforcement, abandonment, settlement, compromise, release, withdrawal or litigation to judgment of any Retained Causes of Action. The Litigation Oversight Committee will also review and advise the PA Officer on strategy in pursuing the Retained Causes of Action, including with respect to the management and direction of counsel and other advisors; and
- **Litigation Reserve.** The Litigation Oversight Committee will be responsible for managing the Litigation Reserve and assisting the PA Officer with its determination regarding whether there is a surplus.

The Litigation Oversight Committee will have consent rights over the following matters:
- The PA Officer's monetization of any Retained Causes of Action; and
- The settlement, compromise, release, withdrawal or abandonment of any Causes of Action.

The Litigation Oversight Committee will also have consultation rights and receive advance notice with respect to the following matters:
- The PA Officer's decision to abandon any Retained Causes of Action that it determines, in its reasonable discretion to be of *de minimis* value or burdensome to the Wind-Down Debtors; and
- The PA Officer's determination regarding whether there is a surplus of Cash in the Litigation Reserve.

**M.      What are the sources of consideration used to make Distributions under the Amended Plan?**

Distributions under the Amended Plan shall be funded by Distributable Assets, which includes (subject to various conditions and limitations as set forth in the Amended Plan), with respect to each Debtor or Wind-Down Debtor, (i) Cash, (ii) Digital Assets, and (iii) to the extent allocated to such Debtor or Wind-Down Debtor in the discretion of the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing), or, following the Effective Date, the discretion of the PA Officer, (a) Avoidance Recoveries, including any and all Causes of Action or other claims against any of the DCG Parties or Gemini Parties, (b) proceeds from the Partial Repayment Agreement, (c) proceeds from any Monetization Transactions (other than those allocated to GGT, and with respect to a Monetization Transaction performed by the Gemini Distribution Agent to the extent permitted under the Amended Plan, only for the benefit of Holders of Allowed Gemini Lender Claims), and (d) proceeds from the DCG Loans, the DCGI Loans, the DCG Note, the DCG Tax Receivables, and any and all Causes of Action or other claims against any of the DCG Parties, including the proceeds from any settlements thereof; *provided, however*, that Distributable Assets shall not include any payments required to fund the Required Reserve Payments, including the Professional Fee Reserve Amount used to fund the Professional Fee Escrow Account and which shall be used to pay Allowed Professional Fee Claims and the Wind Down Reserve.

Moreover, Digital Assets available for distribution to creditors shall be determined, (x) on the Effective Date if the Debtors determine, no later than 7 Business Days prior to the Effective Date, and in consultation with the

Committee and the Ad Hoc Group SteerCo (if the Ad Hoc Group Acceptance Event has occurred and is continuing), after considering legal, financial, tax, and other factors in good faith, that such Digital Assets are available for distribution to Holders of Allowed Claims or Interests on the Effective Date or (y) at any time after the Effective Date if the PA Officer determines, with the Wind-Down Oversight Committee's Consent, and after considering legal, financial, tax, and other factors in good faith, that such Digital Assets held by such Wind-Down Debtor are available for distribution to Holders of Allowed Claims or Interests as provided for under the Amended Plan. If the Committee or the Ad Hoc Group SteerCo (if applicable) disagrees with the Debtors on whether any Digital Assets held by a Debtor should constitute Distributable Assets of such Debtor on the Effective Date, the Committee or the Ad Hoc Group SteerCo may seek a determination from the Bankruptcy Court on an expedited basis.

**N.    How are Gemini Lender Claims being treated under the Amended Plan?  How will resolution of disputed issues with Gemini affect distributions on such claims?**

As discussed in further detail in Section VI herein, there are various disputes regarding the Gemini Lender Claims and the Gemini Master Claims. Gemini and the Debtors disagree on key issues, including whether Gemini, on behalf of the Gemini Lenders, has a valid security interest in the GBTC Shares purportedly foreclosed on by Gemini in November 2022 (the "Gemini GBTC Shares"), how to value the Gemini GBTC Shares and Gemini's legal entitlement to the Additional GBTC Shares that were purportedly pledged as collateral but never delivered to Gemini. Resolution of these issues will impact the classification of and recoveries on the Claims held by the Gemini Lenders, including the amount by which the Gemini Lender Claims will be offset to account for the purported foreclosure and the extent to which the Gemini Lender Claims may be considered secured. It is the Debtors' position that in the event Gemini were to prevail in the Gemini Adversary Proceeding with respect to the Gemini GBTC Shares, any appreciation in the value of the Gemini GBTC Shares from the date of the purported foreclosure until the date of any Monetization Transaction of such Gemini GBTC Shares should accrue to the benefit of Gemini Lenders. In this scenario, distributions to Gemini Lenders from the Debtors' estates on the unsecured portion of their claims would be equivalent to distributions received by other similarly situated unsecured creditors. However, in this scenario, Gemini Lenders would also receive from the Gemini Distribution Agent their pro rata share of the appreciation in value (if any) of the Gemini GBTC Shares.

Pending resolution of these disputed issues, all of the Gemini GBTC Shares (or such other amount that is established prior to the Effective Date) shall be held in reserve by Gemini or the Gemini Distribution Agent (the "Gemini GBTC Shares Reserve") and an amount of Additional GBTC Shares (the "Additional GBTC Shares Reserve") shall be held in reserve by the Debtors or the Wind-Down Debtors. Notwithstanding anything to the contrary in the Plan (including the Distribution Principles), (i) until the Gemini GBTC Shares Determination has occurred, the Gemini GBTC Shares Reserve shall not be distributed, subject to any Monetization Transactions, or otherwise subject to dissipation, use, or encumbrance without Gemini's Consent and the Wind-Down Oversight Committee's Consent, and (ii) until the Gemini Additional Collateral Determination has occurred, the Additional GBTC Shares Reserve shall not be distributed, subject to any Monetization Transactions, or otherwise subject to dissipation, use, or encumbrance without Gemini's Consent. The amount of the Gemini GBTC Shares Reserve (if not all of the Gemini GBTC Shares) and the Additional GBTC Shares Reserve shall each be established prior to the Effective Date (and is a condition to the occurrence of the Effective Date) by (i) the Debtors and Gemini, with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing) or (ii) an order of the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part; *provided* that, prior to seeking any judicial determination pursuant to foregoing clause (ii), the Debtors and Gemini shall have engaged in good faith negotiations, and the Committee and the Ad Hoc Group shall have been given the opportunity to contemporaneously participate in such negotiations, with respect to the Gemini GBTC Shares Reserve and the Additional GBTC Shares Reserve, as applicable, through the date that is ten (10) days prior to the Voting Deadline; *provided*, *however*, that any determination by the Bankruptcy Court in accordance with clause (ii) above shall be limited to the amount of the Gemini GBTC Shares Reserve and the Additional GBTC Shares Reserve, as applicable, during the pendency of the Gemini Determinations (as defined in the Plan).

For additional information on the issues in dispute, see Section IV.C and Section VI.F(ii) of this Disclosure Statement, and **Exhibit G** for Gemini's response to the Debtors' position.

**O.      Does the Amended Plan provide for the subordination of any Claims?**

Yes.  The Debtors believe that the Government Penalty Claims are penalties within the meaning of section 726(a)(4) of the Bankruptcy Code, applicable in chapter 11 cases through section 1129(a)(7) of the Bankruptcy Code, pursuant to which they are subordinated to General Unsecured Claims.  If any of the Holders of Governmental Penalty Claims disputes these points, the Debtors will further demonstrate the legal and factual bases for subordinating the Government Penalty Claims prior to or at Confirmation.  The Debtors understand that the SEC disputes this characterization and all rights of the Debtors and the SEC with respect to the subordination of Government Penalty Claims are reserved.  Although the Debtors have classified the Government Penalty Claims as subordinated claims, the Bankruptcy Court may rule that subordination of the Government Penalty Claims is improper.  If the Bankruptcy Court denies subordination of the Government Penalty Claims, then such Government Penalty Claims shall be *pari passu* with the General Unsecured Claims.

The Debtors and the Wind-Down Debtors reserve their rights to seek to subordinate any and all portions of the 3AC Claims.  The Debtors also reserve their right to seek to subordinate the DCG claims.  DCG believes there is no basis to subordinate or separately classify the DCG Claims, and the Debtors understand DCG will object to any attempts by the Debtors or the Wind-Down Debtors to subordinate the DCG Claims.  All parties' rights with respect to the subordination of claims under the Amended Plan are reserved.

**P.      Will the Wind-Down Debtors be obligated to continue to pay statutory fees as part of the bankruptcy process after the Plan Effective Date?**

Yes.  On the Plan Effective Date, the Wind-Down Debtors will be required to pay in Cash any fees due and owing to the U.S. Trustee at the time of Confirmation.  Additionally, on and after the Confirmation Date, the Debtors, the Wind-Down Debtors must pay all statutory fees due and payable under 28 U.S.C. § 1930(a)(6) until the entry of a final decree, dismissal or conversion of the cases to chapter 7 of the Bankruptcy Code.  The Debtors, the Wind-Down Debtors will also be required to comply with reporting requirements, such as filing quarterly post-Confirmation reports and schedule quarterly post-Confirmation status conferences until the entry of a final decree, dismissal, or conversion of the Chapter 11 Cases to chapter 7 of the Bankruptcy Code.

**Q.      When will the Plan Supplement be filed and what will it include?**

The Plan Supplement (which refers to the forms of documents effectuating the Restructuring) will be filed on or before ten (10) days prior to the Voting Deadline, or such later date as may be approved by the Bankruptcy Court, on notice to parties in interest, and additional documents may be filed before the Plan Effective Date as supplements or amendments to the Plan Supplement, all such documents being in form and substance in accordance with the terms of the Amended Plan, including, without limitation, the following, each of which shall be subject to the consent of the Committee and the Ad Hoc Group (if the Ad Hoc Group Acceptance Event has occurred): (i) the New Governance Documents, (ii) the Plan Administration Agreement, the Litigation Oversight Committee Bylaws, and the Wind-Down Oversight Committee Bylaws, (iii) an exhibit disclosing the identity and affiliations of the PA Officer and any Person proposed to serve on the New Board or proposed to serve as an officer of any of the Wind-Down Debtors, (iv) the Schedule of Assumed Executory Contracts and Unexpired Leases, (v) an exhibit identifying the members of the Litigation Oversight Committee and the Wind-Down Oversight Committee, (vi) an exhibit identifying the intercompany claims that shall constitute Excluded Claims, (vii) an exhibit identifying Retained Causes of Action, and (viii) the Digital Assets Conversion Table, all of which shall be incorporated by reference into, and are an integral part of, the Amended Plan, as all of the same may be amended, modified, replaced, and/or supplemented from time to time.  When filed, the Plan Supplement will be made available on the electronic docket or the Debtors' restructuring website.  The Debtors will not serve paper or electronic copies of the Plan Supplement.

**R.      What are the Debtors' Intercompany Claims and Interests?**

In the ordinary course of business and as a result of their corporate structure, certain of the Debtor entities hold equity of other Debtor entities and maintain business relationships with each other, resulting in Intercompany Claims and Interests.  The Intercompany Claims reflect costs and revenues, which are allocated among the appropriate Debtor entities, resulting in Intercompany Claims.  Further, the Intercompany Claims include Claims arising from intercompany receivables by and between certain Debtors.

The Amended Plan contemplates the adjustment, reinstatement or compromise of Intercompany Claims, as determined in the Debtors' discretion with the Committee's consent, as necessary or appropriate to enable the Wind-Down Debtors to satisfy their obligations under the Amended Plan. Moreover, the Amended Plan incorporates (i) an intercompany settlement between GAP and GGC, which provides for GGC to make a contribution to GAP in an amount necessary for General Unsecured Claims against GAP to effectively receive the same recovery as General Unsecured Claims against GGC and (ii) an intercompany settlement between GGH and GGC that provides for GGC or Wind-Down GGC (as applicable) to receive the proceeds of any Monetization Transaction(s) allocated to the Debtors.

The Amended Plan's treatment of Intercompany Claims and Interests represents a common component of a chapter 11 plan involving multiple debtors in which the value of the going concern enterprise may be replicated upon emergence for the benefit of creditor constituents receiving distributions under a plan. The Debtors believe the intercompany settlement between GAP and GGC is necessary and appropriate in light of preference and/or other actions that could be asserted by GAP against GGC, including with respect of transfers and transactions relating to the 3AC lending relationship. The GAP/GGC settlement seeks to resolve any and all claims by ensuring that GAP creditors receive the same treatment as creditors against GGC.

**S.      What information will be included in the exhibit identifying the intercompany claims that shall constitute Excluded Claims?**

A schedule will be filed with the Plan Supplement (to be filed 10 days before the Voting Deadline) which will list all claims held by the Debtors against the Other Genesis Entities (i.e., non-Debtor Affiliates) for intercompany amounts that are being expressly preserved under the Amended Plan. For example, GGCI is not being released from paying obligations it owes to GGC.

**T.      Will Claims asserted with respect to damages resulting from the Debtors' rejection of certain executory contracts or unexpired leases of nonresidential real property affect my recovery under the Amended Plan?**

Because the Debtors do not anticipate a significant amount of claims arising from the rejection of executory contracts and unexpired leases, any such Claims are unlikely to have a significant impact on recoveries under the Amended Plan.

**U.      Will there be releases or exculpations granted to parties in interest as part of the Amended Plan?**

The Amended Plan proposes to release the "Released Parties", consisting of the following: (i) the Debtors, (ii) the Wind-Down Debtors, (iii) the Committee and its members (solely in their capacities as such), (iv) the members of the Ad Hoc Group SteerCo (solely in their capacities as such) if the Ad Hoc Group Acceptance Event occurs, (v) the PA Officer (solely in its capacity as such), and (vi) each Related Party of each Entity described in the foregoing clauses (i)–(v) (in each case, solely in its capacity as such). The release provision of the Amended Plan does not propose to release claims against any Released Party that are found, pursuant to a final order of a court of competent jurisdiction, to be the result of such Released Party's fraud, gross negligence, or willful misconduct.

The Amended Plan does not propose to release the DCG Parties and the former employees, officers, and directors of the Debtors who did not serve as employees, officers, or directors of the Debtors as of the Petition Date. Any current and former officers and directors of the Debtors (solely in their capacity as such) who served as employees, officers or directors of the Debtors as of the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date, shall be a Released Party only with the written consent of the Special Committee, which shall be disclosed in the Plan Supplement, with the exception of (x) the members of the Special Committee (solely in their capacities as such), who shall be Released Parties without the need for such consent, (y) any current and former employees, officers, and directors of the Debtors who served as employees, officers, or directors of the Debtors as of the Petition Date and are also DCG Parties, who shall not be Released Parties. The Debtors intend to disclose in the Plan Supplement (to be filed ten (10) days before the Voting Deadline) the Special Committee's decision with respect to whether any current or former employees, officers, or directors who served as employees, officers, or directors of

the Debtors as of the Petition Date will be released under the Amended Plan and the general basis for that decision. Any releases under the Amended Plan will not apply to claims that are found, pursuant to a final order of a court of competent jurisdiction, to be the result of fraud, gross negligence, or willful misconduct.

Additionally, the Amended Plan contemplates the exculpation of the "Exculpated Parties", consisting of the following: (i) the Debtors, (ii) the Wind-Down Debtors, (iii) the Committee and its members (solely in their capacities as such), (iv) the members of the Ad Hoc Group SteerCo (solely in their capacities as such) if the Ad Hoc Group Acceptance Event occurs, (v) the PA Officer (solely in its capacity as such), (vi) the members of the Wind-Down Oversight Committee (solely in their capacities as such), (vii) the members of the Litigation Oversight Committee (solely in their capacities as such), (viii) the Gemini Distribution Agent (solely in its capacity as such and solely to the extent that the Gemini Distribution Agent is implementing the Amended Plan), and (ix) each Related Party of each Entity described in the foregoing clauses (i)–(viii) (in each case, solely in such Person's capacity as such). However, the Related Parties of the Gemini Distribution Agent shall only be exculpated in respect of actions that are directly in furtherance of the performance by the Gemini Distribution Agent of its duties expressly outlined under the Amended Plan. Moreover, DCG Parties shall not be Exculpated Parties and the former employees, officers, and directors of the Debtors who did not serve as employees, officers, and directors as of the Petition Date shall not be Exculpated Parties. Any of the current and former employees, officers, and directors of the Debtors (solely in such Person's capacity as such) who served as employees, officers or directors of the Debtors as of the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date, shall be an Exculpated Party only with the written consent of the Special Committee, which shall be disclosed in the Plan Supplement, with the exception of (x) the members of the Special Committee (solely in their capacities as such), who shall be Exculpated Parties without the need for such consent, and (y) any current and former employees, officers, and directors of the Debtors who served as employees, officers, or directors of the Debtors as of the Petition Date and are also DCG Parties, who shall not be Exculpated Parties.

The Amended Plan and Confirmation Order will provide that the Exculpated Parties have, and upon Consummation of the Amended Plan shall have or incur no liability for any Claim, Cause of Action, obligation or other liability for any claim related to any act or omission in connection with, relating to, or arising out of the Chapter 11 Cases. Actions for which Exculpated Parties will have no liability include the formulation, preparation, dissemination, negotiation or filing of the Disclosure Statement, the Amended Plan, the Plan Supplement, the Alameda/Genesis Settlement Agreement, the 3AC Settlement Agreement, any Monetization Transaction or related documents, the solicitation of votes with respect to the Amended Plan, or the Restructuring or any related contract, instrument, release, or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document or other agreement), the Sales Process, the pursuit of Confirmation, or any act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date related to the foregoing. However, the exculpation of the Exculpated Parties shall not apply to claims related to any act or omission that is determined in a Final Order to have constituted fraud, willful misconduct, or gross negligence. Notwithstanding anything to the contrary in the foregoing, nothing in this Article VIII.F shall, nor shall it be deemed to, release or exculpate any DCG Party.

Notwithstanding any language to the contrary contained in the Disclosure Statement, Amended Plan and/or the Plan Confirmation Order, no provision of the Amended Plan or the Confirmation Order shall (i) preclude the SEC or other governmental units from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair or delay the SEC or other governmental units from commencing or continuing any claims, causes of action, proceedings or investigations against any nondebtor person or nondebtor entity in any forum. The enforcement of any money judgment by the SEC or other governmental units against the Debtors shall be subject to the Amended Plan. In addition, the SEC and other governmental units reserve their rights to amend any filed proofs of claim and the Debtors and Wind-Down Debtors reserve all of their defenses and rights to dispute such amendments.

The SEC and the Office of the U.S. Trustee have indicated to the Debtors that they object to the scope of the exculpation being provided under the Amended Plan, including the recipients of the exculpation and its temporal scope. The rights of all parties, including the Debtors, the SEC and the U.S. Trustee, are reserved with respect to the proposed exculpation provision in the Amended Plan.

Please consult the Amended Plan to understand the full nature and scope of the releases and exculpations to be provided under the Amended Plan.

The Debtors believe that the releases and exculpations in the Amended Plan are necessary and appropriate and meet the requisite legal standard promulgated by the United States Court of Appeals for the Second Circuit.

**PURSUANT TO THE AMENDED PLAN, IF YOU ARE A HOLDER OF A CLAIM IN A CLASS ELIGIBLE TO VOTE AND RETURN A BALLOT ACCEPTING THE AMENDED PLAN AND AFFIRMATIVELY OPT IN TO THE RELEASES PROVIDED BY THE AMENDED PLAN ON YOUR BALLOT (REGARDLESS OF WHETHER YOU CAST A TIMELY BALLOT FAILING TO OPT IN TO THE RELEASES OR REJECTING THE AMENDED PLAN WITH RESPECT TO ANY OTHER CLASS OF CLAIMS), YOU WILL BE SUBJECT TO THE RELEASE PROVISIONS IN ARTICLE VIII OF THE AMENDED PLAN AND SHALL BE DEEMED, AS OF THE PLAN EFFECTIVE DATE, TO HAVE CONCLUSIVELY, ABSOLUTELY, UNCONDITIONALLY, IRREVOCABLY, AND FOREVER RELEASED AND DISCHARGED ALL CLAIMS AND ALL CAUSES OF ACTION (EXCEPT AS OTHERWISE SET FORTH IN THE AMENDED PLAN) AGAINST THE RELEASED PARTIES (AS DEFINED IN THE AMENDED PLAN).**

For more detail see "Effect of Confirmation of the Amended Plan," in Section VII.K below.

### V.     Are the Debtors' directors, officers or employees being released under the Amended Plan? What is the basis for the releases?

Article VIII.D and VIII.E of the Amended Plan provide that the Releasing Parties will release the Released Parties from certain Claims that have been or could have been brought against the Released Parties.

**Importantly, the releases by the Debtors expressly exclude any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of a Released Party's  gross negligence, fraud, or willful misconduct.**

Subject to the above-described exclusion relating to gross negligence, fraud and willful  misconduct, the Claims to be released by the Debtors under the Amended Plan include Claims based on or relating to the Debtors (including the management, ownership, or operation thereof), the Wind-Down Debtors, their Estates, the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Amended Plan, the business or contractual arrangements between any Debtor and any Released Party, the Alameda/Genesis Settlement Agreement and any Monetization Transaction.

The Released Parties include the Debtors and each Related Party of the Debtors, including officers, directors, and employees who were employed as of the Petition Date, solely in their capacity as officers, directors, and employees. However, the following Persons are not Released Parties:  (i)  former employees, officers and directors of the Debtors who did not serve as of the Petition Date, (ii) DCG Parties, (iii) Gemini Parties, and (iv) any officers, directors or employees of the Debtors as to which the Special Committee determines to exclude from the list of Released Parties prior to the Effective Date.

The Amended Plan does not provide for any non-consensual releases by Holders of Claims.  All Holders of Claims who cast a timely Ballot to accept the Amended Plan (regardless of whether such Holders cast a timely Ballot to reject the Amended Plan with respect to any other separate Class of Claims) will be given the option to affirmatively opt in to the releases of Released Parties, including any of the Debtors' Related Parties, provided in the Amended Plan.  Holders of Claims who vote to accept the Amended Plan without opting in or who vote to reject the Amended Plan or abstain from voting on the Amended Plan will not be deemed to have released any of the Released Parties, including any of the Debtors' Related Parties, and thus will not constitute Releasing Parties.

The Debtors believe that granting the above-described releases in favor of the directors, officers and employees providing services as of the Petition Date (such Persons, excluding, for the avoidance of doubt, any DCG Parties, the "Current D&Os") is reasonable in light of the following factors:  (i) any such releases will not apply to

any gross negligence, fraud or willful misconduct, as determined by a Final Order, (ii) any such releases will not apply to DCG Parties or Gemini Parties, and (iii) any such releases apply only to post-petition officers, directors and employees who have provided services to the estates following the Petition Date. In addition, the post-petition directors, officers and employees have knowledge and insight into the Debtors' business and transactions that is critical to the resolution of litigation against the DCG Parties and the Gemini Parties, as well as various enforcement actions relating to the Debtors' prepetition businesses.

Moreover, the directors, officers and employees providing services as of the Petition Date are entitled to indemnification pursuant to the Debtors' governing documents. GGC and GGH's operating agreements require GGC and GGH to indemnify employees for any claims that are not found to be the result of gross negligence and willful misconduct pursuant to a Final Order. Similarly, GAP's Constitution requires GAP to indemnify directors for any claims other than those in connection with any negligence, default, breach of duty or breach of trust. Thus, to the extent that the Wind-Down Debtors were successful in asserting claims against such directors, officers and employees, those Persons who have a right to indemnification and reimbursement, including with respect to legal fees. Absent the limited releases in the Amended Plan, any third parties bringing such actions against the specified individuals would be recovering from the Debtors' estates, in turn depleting the resources otherwise available for distribution to the creditors. Thus, there is alignment between the Debtors' estates and the directors, officers and employees who would receive releases.

Based on the internal investigation to date, the Special Committee has not identified intentional wrongdoing on the part of the current officers, directors, or employees who were employed as of the Petition Date that would give rise to claims or Causes of Action that are likely to provide value to the Debtors' estates. The Special Committee further reserves the right to exclude any Current D&Os (expressly excluding any DCG Parties) from the list of Released Parties prior to the Effective Date.

**W.     What is the deadline to vote on the Amended Plan?**

[January 10], 2023 at 4:00 p.m. (prevailing Eastern Time).

**X.     What is a Confirmation Hearing and will the Bankruptcy Court hold a Confirmation Hearing?**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a chapter 11 plan. On [[  ]], 2023, the Debtors notified all parties in interest that a Confirmation Hearing would be held before the Bankruptcy Court on [[  ]], 2023 at [[11:00 a.m.]] (prevailing Eastern Time), ECF No. [[  ]].[6] The Confirmation Hearing may be continued from time to time, without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Amended Plan, if any, without further notice to parties in interest. The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing. Subject to section 1127 of the Bankruptcy Code, the Amended Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation. The Debtors have also notified parties in interest of the deadline by which objections to the Amended Plan must be received, which, upon approval by the Bankruptcy Court, will be [[  ]], 2023 at 4:00 p.m. (prevailing Eastern Time). All objections to the Amended Plan must be filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received on or before the deadline to file such objections.

**Y.     What is the effect of the Amended Plan on the Debtors' ongoing businesses?**

The Amended Plan provides that each of the Debtors will wind down their businesses and liquidate their assets for the benefit of their creditors. In addition, GGCI and GGML, which historically supported the Company's

---

[6]     Upon approval by the Bankruptcy Court, the Debtors shall also file a separate Confirmation Hearing Notice.

derivatives trading business, will be wound down as well.  For additional information regarding the current business of GBHL and its subsidiaries and the businesses of such Wind-Down Debtors, please review Section VI.N.

**Z.      Do the Debtors recommend voting in favor of the Amended Plan?**

Yes.  The Debtors believe the Amended Plan provides for a larger distribution to the Debtors' creditors than would otherwise result from any other alternative that is available at this time.  Therefore, the Debtors believe the Amended Plan is in the best interest of all creditors.

.

## IV.    THE DEBTORS' CORPORATE HISTORY, STRUCTURE, AND BUSINESS OVERVIEW

### A.    The Debtors' Prepetition Organizational Structure

The Debtors' organizational chart is attached to this Amended Disclosure Statement as **Exhibit B**.

### B.    Summary of the Debtors' Businesses and Corporate History

Genesis Global Trading, Inc. ("GGT") was the first Genesis entity and had been trading digital assets since 2013. As of the Petition Date, the Debtors, their non-Debtor subsidiaries (together with the Debtors, the "Company") and GGT had grown into a number of entities that handled different aspects of the digital asset services offered.

Holdco is a sister company of GGT and 100% owned by DCG, a corporation organized under the laws of Delaware. GGC and Genesis Asia Pacific Pte. Ltd. ("GAP") are in turn 100% owned by Holdco. *See* **Exhibit B**.

GGC is a private limited liability company organized under the laws of Delaware that provided lending and borrowing services for digital assets and fiat currency primarily to and from institutional and high net worth individual customers. It is registered as a Money Services Business with the Financial Crimes Enforcement Network ("FinCEN"). GGC does not have a separate board of directors.

GAP is a Singapore-based digital payment token service provider which carried out digital asset trading and lending activities. As of July 2022, GAP had received an In-principle Approval for a Major Payment Institution license under the Payment Services Act 2019 by the Monetary Authority of Singapore and was operational under the pre-licensing regime until September 30, 2023. As of October 2023, GAP has communicated to the Monetary Authority of Singapore that it no longer intends to pursue long-term licensing.

Other than GGC and GAP, Holdco's subsidiaries and its sister company GGT have not filed petitions for relief and are not a part of these Chapter 11 Cases (collectively, the "Non-Debtor Subsidiaries"). The Non-Debtor Subsidiaries include, without limitation, Genesis UK Holdco Limited, Genesis Global Assets, LLC, Genesis Asia (Hong Kong) Limited, Genesis Bermuda Holdco Limited, Genesis Custody Limited ("GCL"), GGC International Limited ("GGCI"), GGA International Limited, Genesis Global Markets Limited ("GGM"), GSB 2022 II LLC, GSB 2022 III LLC, and GSB 2022 I LLC.

The Board of Directors at Holdco (the "Board") is comprised of Paul Aronzon, Thomas Conheeney, Mark Murphy, and A. Derar Islim. Holdco is a holding company and does not operate any business separate from GGC and its other operating subsidiaries. On November 18, 2022, the Board formed the Special Committee and elected Paul Aronzon and Thomas Conheeney, its two independent directors, to serve on the Special Committee.

The purposes of the Special Committee are, among other things, to (i) evaluate on behalf of Holdco or its subsidiaries various strategic alternatives or transactions involving Holdco and its subsidiaries that affect the liquidity or balance sheet of Holdco or its subsidiaries, including, without limitation, the commencement of any financing, sale, restructuring, reorganization, liquidation, or other strategic alternatives or any transaction involving DCG, Holdco's corporate parent and its largest borrower; (ii) address issues of real or potential conflicts; (iii) conduct investigations; and (iv) act on behalf of, and bind, the Company with respect to such matters. Since its formation, the Special Committee has met frequently to discuss and evaluate matters within its purview, including the commencement of these Chapter 11 Cases.

#### *The Company and GGT's Business Operations*

Historically, the Company and GGT's operations were divided into four main categories: (i) the trading service, which facilitated spot trading in digital assets; (ii) the lending and borrowing service, whereby the Company lent and borrowed digital assets and fiat currency in consideration for the payment of interest; (iii) the derivatives service, which allowed customers to enter into a variety of derivatives on digital asset underliers; and (iv) the custodial service, which permitted customers to securely store digital assets. Traditionally, the Debtors engaged in lending, borrowing and certain trading services, while the derivatives, custodial and most of the trading services were operated by Non-Debtor Subsidiaries and GGT.

### Trading Service

Non-Debtor GGT launched its first over the counter ("OTC") bitcoin trading desk in 2013.  Since then, the Company and GGT have offered spot trading services to a wide variety of institutional investors seeking exposure to the digital asset market.  The trading service historically operated 24 hours a day, seven days a week.  Other than GAP, none of the trading business entities have commenced Chapter 11 Cases.

As part of its trading service, the Company and GGT made markets in digital assets by offering liquidity to buyers and sellers.  This service functioned similarly to a traditional brokerage in some respects, in that the Company and GGT, respectively, received requests for quotes or buy/sell orders from their respective customers on a variety of accepted digital assets.  The Company and GGT, respectively, then gathered the quotes from, or executed the orders with, a variety of digital asset exchanges, institutional service providers and counterparties worldwide, endeavoring to achieve optimal price and point-in-time execution.

The Company and GGT's trading brokerage service was offered through three entities: GGT, GGCI, and GAP.  GGT is a New York-based non-custodial, OTC market-maker in digital assets and brokerage, has a virtual currency BitLicense issued by the New York State Department of Financial Services ("NYDFS"), and is registered as a broker-dealer with the SEC and the Financial Industry Regulatory Authority ("FINRA").  As noted above, GGT is a sister company to Holdco and is not a Debtor in these Chapter 11 Cases; Holdco has no ownership interests in GGT, and GGT has no ownership interests in any of the Debtors.  GGT provided services and employees to the Debtors and Holdco's various subsidiaries pursuant to various contractual arrangements.  GGT no longer provides services to clients.  It intends to surrender its BitLicense and has applied to FINRA and the SEC for the withdrawal of its broker-dealer registration.  GGCI is a BVI company that carried out spot and derivatives trading activity.  GGCI is not a Debtor in these Chapter 11 Cases.  GAP, which is one of the Debtors in these Chapter 11 Cases, is the entity that provided similar trading services primarily to Singapore residents and is operated from Singapore.

In August 2023, GAP began winding down its operations and commenced dissolution proceedings under Singapore law.  As of September 2023, GGT, GGCI and GGML began winding down operations.

### Lending and Borrowing Service

The Company's lending and borrowing service permitted customers to loan and borrow digital assets and fiat currency to and from, as applicable, the Company and provided institutional funds and market makers with access to liquidity designed to meet their needs.

Prior to November 16, 2022, when the lending and borrowing service was paused, the service generally permitted customers to enter into bespoke loan terms and structures specifically designed to meet their needs.  These loans were often open-term loans (i.e., callable on demand), but could also be fixed-term loans with maturity dates of up to 12 months.  Loans were made across a variety of digital assets, including stablecoins, BTC, ETH and more than 20 other assets.  In connection with this service, the Company provided its customers with access to additional tools, such as custody services offered by third-party custodians for loan collateral (including by tri-party custodians), real-time and historical analytics, instant collateral transfer and a platform for ease of portfolio management.

The Company's lending and borrowing service was offered primarily through two entities serving different geographies: GGC and GAP.

### Derivatives Service

Prior to September 2023, the Company also offered a derivatives service through its sell-side dealing desk and acted as a liquidity provider that operated across all major crypto option markets.  In connection with this service, Non-Debtor Subsidiaries offered customers customized derivatives solutions to express nuanced market views, manage volatility and hedge risk.

26

The derivatives service provided customers exposure to digital assets through a variety of derivative transactions, including options and forwards. The service accepted a broad range of assets as collateral (although some transactions were required to have U.S. dollar collateral consistent with CFTC variation margin requirements).

The Company's derivatives service was offered through GGCI, which carried out spot and derivatives trading activity. GGCI also provided the Company with access to digital asset platforms and exchanges through its membership on such venues.

### Custody Service

One of Holdco's Non-Debtor Subsidiaries, GCL, has historically provided an institutional-grade custody service to manage, move and store digital assets. GCL is not a Debtor in these Chapter 11 Cases. The custody service was intended as an integrated offering for sophisticated investors that incorporates best practices used by government agencies to protect digital assets. These measures include multiple layers of cryptographic security, including multi-party computation technology and private keys that are stored in hardware security modules in bunkers. The service also permitted customers to earn liquidity on assets stored in cold storage by leveraging the trading desk.

GCL has been a UK-based provider of non-fiduciary digital asset storage services to institutional clients and high net worth individuals in permitted jurisdictions. GCL is registered as a cryptoasset business with the Financial Conduct Authority ("FCA") under the Money Laundering Regulations 2017 ("MLRs") as of December 2021 and as a Money Services Business with FinCEN. In 2023, GCL began to wind down its operations.

### C.    Summary of the Company's Prepetition Capital Structure

### Debtors' Cash, Digital Assets and Shares Held in Brokerage Accounts

As of the Petition Date, the Debtors had more than $180 million in cash, approximately $495 million in digital assets, and approximately $442 million in shares in brokerage accounts. As of the same date, the Debtors had approximately $539 million in outstanding loans to third parties. In connection with the outstanding loans, the Debtors have received approximately $584 million in collateral against those loans in both U.S. dollars and/or digital assets.

### Institutional Creditors

According to information made available by the Company's management, as of January 19, 2023, GGC and GAP had outstanding borrowings in U.S. dollars and digital assets totaling approximately $1.7 billion with approximately 173 non-affiliated institutional lenders and $1.8 billion with non-affiliated individual lenders. These borrowings are generally documented under master digital asset loan agreements ("MLAs") individually negotiated with each lender as well as associated term sheets. In connection with such borrowings, GGC and GAP have posted approximately $408.8 million[7] in collateral denominated in U.S. dollars and/or digital assets as of September 30, 2023.

### Gemini Lenders

GGC also has outstanding borrowings of digital assets with customers of Gemini (such customers, the "Gemini Lenders") and such borrowings, the "Gemini Borrowings"). As with the Debtors' other borrowings, these transactions are documented under MLAs. However, GGC did not interact with the Gemini Lenders directly. Rather, the Gemini Lenders appointed Gemini to act as their agent in connection with the Gemini Borrowings.

In addition, the Gemini Borrowings with Gemini Lenders are not documented under term sheets. Rather, pursuant to the MLAs, GGC provided Gemini with the terms of the loans it was willing to enter into. Gemini then was required to provide such terms to the Gemini Lenders who chose to enter into loans subject to those terms. GGC does not have information about the number or identity of the Gemini Lenders and understands that Gemini is privy to that information.

---

[7]    This amount excludes collateral posted to Gemini, which is valued approximately at $284.3 million as of November 16, 2022 and $593 million as of September 30, 2023.

On August 15, 2022, GGC entered into a security agreement with Gemini as agent for the Gemini Lenders pursuant to which GGC pledged 30,905,782 shares of the Grayscale Bitcoin Trust ("GBTC") to Gemini for the benefit of the Gemini Lenders to secure GGC's obligations under the MLAs (such pledge, the "August 2022 Collateral"). On November 7, 2022, GGC and Gemini entered into an amendment to the security agreement, which extended its term until GGC paid what it owed under the MLAs in full and eliminated, without consideration, the requirement that Gemini return the August 2022 Collateral on November 15, 2022. On November 10, 2022, GGC, Gemini and DCG entered into a second amendment to the security agreement pursuant to which DCG agreed to deliver an additional 31,180,804 shares of GBTC to GGC (such shares, the "Additional GBTC Shares"). GGC, in turn, agreed to transfer such shares to Gemini for the benefit of the Gemini Lenders and pledged any shares so transferred to Gemini to secure GGC's obligations under the MLAs. However, no shares were transferred (and thus no shares were pledged) to Gemini by GGC pursuant to this second amendment.

On November 16, 2022 Gemini informed GGC that it had allegedly foreclosed on 30,905,782 of shares pledged under the security agreement through a private sale, to Gemini itself, at the market price as of 4:00 p.m. (prevailing Eastern Time) of $9.20 per share. On that date, Gemini further informed GGC that the proceeds of such sale, $284,333,194.40, less costs and expenses of the purported foreclosure, would be applied to GGC's outstanding obligations under the MLAs. GGC disputes whether Gemini actually foreclosed on the collateral under applicable law, and whether any such foreclosure complied with the commercial reasonableness and notice requirements set forth in the Uniform Commercial Code. Pursuant to the purported foreclosure, Gemini continues to hold the August 2022 Collateral, such that recoveries by Earn Users on the secured portion of their claims is contingent on Gemini distributing the value of the August 2022 Collateral.

Separate from the Earn Program collateral disputes described above, since before the Petition Date, the Debtors have had approximately $6.8 million in funds and digital assets located in accounts held at Gemini, which they have been unable to access or transfer. Those funds and assets are listed in the Gemini Earn Operations Assets Schedule attached to the Amended Plan as **Exhibit I**.

As set forth in **Exhibit G**, Gemini disputes the Debtors' characterizations of fact and law relating to the August 2022 Collateral and the Additional GBTC Shares and all parties' rights are reserved with respect thereto.

### *Intercompany Loans*

#### (i)      *DCG Loans*

According to information made available by the Company's management, as of April 30, 2023, GGC had outstanding loans to DCG, entered into pursuant to a Master Loan Agreement dated November 10, 2022, in the aggregate principal amount of approximately $500,000,000. The loans consist of:

- A $100,000,000 USD loan, which was entered into pursuant to a term sheet dated January 24, 2022 with an original maturity date of July 24, 2022, which was later extended to May 11, 2023 (the "January Loan");

- A $100,000,000 USD loan, which was entered into pursuant to a term sheet dated February 23, 2022 with an original maturity date of August 23, 2022, which was later extended to May 11, 2023 (the "February Loan");

- A $200,000,000 USD loan, which was entered into pursuant to a term sheet dated May 9, 2022 with a maturity date of May 9, 2023 (the "May 9 Loan");

- A $100,000,000 USD loan, which was entered into pursuant to a term sheet dated May 10, 2022 with a maturity date of May 10, 2023 (the "May 10 Loan" and together with the May 9 Loan, the January Loan, and February Loan, the "DCG Loans").

On November 10, 2022, in connection with various transactions, including an equity injection from DCG into GGCI, a Non-Debtor Subsidiary, of a total value of approximately $140 million, including contributions of $50 million in cash, various digital currency and GBTC shares, GGC and DCG entered into an amended and restated Master Digital Asset Loan Agreement (the "A&R DCG Loan Agreement") to memorialize the terms governing the DCG Loans. On the same date, the parties also extended the maturity of the January Loan and the February Loan

each to May 11, 2023.  On November 15, 2022, GGC repaid $50,000,000 it had borrowed from DCG on June 15, 2022.

As of October 15, 2023, in connection with the Partial Repayment Agreement, the January Loan has been fully paid off and the outstanding principal on the May 9 Loan was $124.5 million.  The total aggregate amount outstanding under the DCG Loans following payments made by DCG pursuant to the Partial Repayment Agreement is $324.5 million.

### (ii)    *DCGI Loans*

As of the Petition Date, GGC had outstanding loans to DCG International Investments Ltd. ("DCGI"), a subsidiary of DCG, of 14,048 BCH (approximately $1.7 million USD as of the Petition Date and $1.7 million as of April 30, 2023) and 4,550.45 BTC (approximately $96 million USD as of the Petition Date and $132.9 million as of April 30, 2023).  GGC originally loaned to DCGI 18,697.74308758 BTC pursuant to a Master Loan Agreement dated June 21, 2019 and a term sheet dated June 18, 2022 (the "DCGI Loan").  The original maturity date is not specified in the loan term sheet.  On November 10, 2022, DCGI partially paid off the DCGI Loan by delivering 25,999,457 GBTC shares to GGC (approximately $250 million USD as of the date of transfer), which resulted in the remaining obligation of 4,550.45 BTC.  On the same date, the parties memorialized DCGI's obligation to return the remaining 4,550.45 BTC pursuant to a revised term sheet, which converted the loan to a fixed-term loan with a maturity date for the outstanding balance as of May 11, 2023.  As of October 15, 2023, following payments made by DCGI pursuant to the Partial Repayment Agreement, the total remaining outstanding principal amount under the DCGI Loan was 2,737.77105962 BTC.

GGC also owes DCGI 78,539.01 ETHW (approximately $301,589.81 USD as of April 30, 2023) under a loan between the parties dated November 15, 2022.  On May 22, 2023, DCGI filed a proof of claim against GGC, asserting that as of the Petition Date, GGC owes DCGI $3,400,518.46, consisting of (i) 78,539.01 EthereumPoW (ETHW) (valued at $301,589.80 as of Petition Date), which properly belonged to DCGI but were airdropped in November 2022 on account of Ethereum (ETH) tokens on loan to GGC by DCGI; and (ii) collateral held by GGC, consisting of (a) 182,492.96 Cardano (ADA) (valued at $61,938.11 as of the Petition Date), (b) 970,717.23 Helium (HNT) (valued at $2,892,349.06 as of the Petition Date), (c) 465 Kusama (KSM) (valued at $15,619.35 as of the Petition Date), and (d) 129,151.29 Tezos (XTZ) (valued at $129,022.14 as of the Petition Date).  The Debtors reserve their rights to object to such proof of claim.

### (iii)    *May 2023 Maturities*

In May 2023, the DCG Loans, in the aggregate principal amounts of $500,000,000 USD, and the DCGI Loan to DCGI in the principal amount of 4,550.45173345 BTC (described above) matured and became due and payable to GGC.  On May 12, 2023, following the maturity date of each of these loans, GGC sent to DCG and DCGI a notice of default and reservation of rights with respect to the amounts outstanding under the loans, including default interest.  Based on the A&R DCG Loan Agreement (as defined above), it is the Debtors' view that, as of the date of maturity of each of the DCG Loans, default interest began accruing at a rate of 10% annually on the dollar-denominated loans to DCG, and 5% annually on the DCGI Loan to DCGI.  However, DCG disputes that default interest is owed or accruing.  Additionally, pursuant to the terms of the relevant master lending agreements, costs relating to enforcement of GGC's rights under these loans continue to accrue and will be charged to DCG and DCGI.  Further details about the maturity and exercise of remedies relating to these loans is discussed below in Section VI.R.

### (iii)    *DCG Note*

On June 30, 2022, DCG assumed a $1.1 billion payable GAP owed to GGC and evidenced the assumed payable with a $1.1 billion promissory note (the "DCG Note") in favor of GGC that had a 10-year maturity and fixed interest rate of 1% that may, at DCG's option, be paid in kind.  The $1.1 billion payable GAP owed to GGC related to amounts that GGC had provided to GAP in connection with loans made to Three Arrows Capital Ltd. ("3AC").  On July 14, 2022, DCG assumed all of GAP's rights, burdens, obligations, and liabilities in connection with its lending and pledge agreements with 3AC, including any outstanding loans and collateral.   Under the assignment, DCG also agrees to observe and perform all of GAP's duties, obligations, terms, provisions and covenants, and to pay and discharge all of the liabilities in connection with GAP's lending and pledge agreements with 3AC, including any

outstanding loans and collateral. The Debtors have objected to the 3AC liquidators' purported claims against GAP, GGC, and Holdco have no merit (see Section VI.N(ii)(b) for further information regarding the 3AC Claims) and that, in any event, pursuant to the assumption and assignment agreement between DCG and GAP, DCG is liable for any such claims and obligations. DCG disputes that it has any liability for the $1.2 billion of collateral GAP foreclosed upon following the 3AC Default (see Section V.A) to 3AC or any liability to the Debtors. In addition, the circumstances of the DCG Note were the subject of the Investigation conducted by the Special Committee and the Committee, discussed further below in Sections VI.D and E. As of the date hereof, the Debtors, DCG and 3AC have reached an agreement to settle the 3AC Claims and are seeking Court approval with respect to such settlement. For further information on such settlement, see Section VI.N(ii)(b).

On May 22, 2023, DCG filed a proof of claim against GGC and GAP preserving its rights in connection with, among other things, the DCG Note.

> (iii)     *Luno Setoff*

On August 30, 2022, GGC entered into a master loan agreement (the "<u>Luno MLA</u>") with Luno Australia Pty Ltd. ("<u>Luno</u>"), a subsidiary of DCG. On November 11, 2022, DCG purportedly issued to Luno a guarantee, to which GGC was not a party, of GGC's obligations to Luno under the Luno MLA. As of November 17, 2022, GGC had owed Luno digital assets which were valued at approximately $52.5 million under loans governed by the Luno MLA with maturity dates in the future. On that date, Luno purportedly demanded the transfer of such digital assets from DCG under the guarantee and DCG purportedly transferred such digital assets promptly after receiving the demand.

DCG purportedly set off GGC's obligation to reimburse DCG for the $52.5 million transfer to Luno against DCG's obligations under the January Loan (the "<u>Luno Transaction</u>"). If this setoff is valid, the $500,000,000 owed to GGC by DCG would be reduced by the $52.5 million setoff amount. DCG asserts that it would also be reduced by any interest accrued on the setoff amount that has been paid by DCG to GGC. The Debtors dispute DCG's purported exercise of set off rights, which is one of the transactions the Special Committee has been investigating.

On May 22, 2023, DCG filed a proof of claim against GGC preserving its rights in connection with, among other things, the Luno Transaction.

## V.    EVENTS LEADING TO CHAPTER 11 AND PREPETITION RESTRUCTURING INITIATIVES

The Debtors have commenced these Chapter 11 Cases to maximize value for creditors and restructure their balance sheets, including approximately $4.6 billion of total liabilities outstanding (including intercompany balances) as of April 30, 2023.

Over the past year, the digital asset industry has experienced tremendous dislocation.  In particular, in May 2022, LUNA ("Luna") and TerraUSD ("UST") collapsed, causing widespread market turmoil.  Shortly thereafter, the British Virgin Islands digital asset hedge fund Three Arrows Capital, Ltd. or 3AC commenced liquidation proceedings. The collapse of Luna and UST and subsequent liquidation of 3AC signaled the onset of a new "crypto winter" and a growing industry-wide reluctance to do business with digital asset companies.

As market conditions worsened, other companies faced financial difficulties.  In July 2022, Celsius Network LLC and certain affiliates and Voyager Digital Holdings, Inc. and certain affiliates filed for bankruptcy.  Most recently, FTX Trading Ltd. ("FTX"), Alameda Research Ltd. ("Alameda") and certain affiliates (together with FTX and Alameda, the "FTX Entities") filed for Chapter 11 bankruptcy on November 11, 2022.

These drastic market shifts have decreased investor confidence in the digital asset markets in which the Company operates and severely and adversely impacted the Company's business.  As the FTX Entities' situation unfolded, the Company experienced unprecedented withdrawals, leading GGC and GAP to pause all lending and borrowing on November 16, 2022.

### A.    Impact of the 3AC Liquidation

In 2020, GAP established a lending relationship with 3AC.  In June 2022, the various loans extended to 3AC by GAP amounted to approximately $2.4 billion in cash and digital assets. After it became clear that 3AC would not be in a position to pay back its loans, GAP foreclosed on collateral pledged by 3AC in connection with those loans. But by the time GAP foreclosed on the collateral, the value of that collateral was approximately $1.2 billion.

In light of these events, DCG assumed the remaining payable GAP owed to GGC in connection with the 3AC lending relationship.  On June 30, 2022, DCG evidenced the assumed payable with the DCG Note (the terms of which are described in Section IV.C).  DCG asserts that after 3AC defaulted, and through November 2022, DCG contributed approximately $340 million of capital across the Genesis entities through equity contributions and loan forgiveness. The Debtors dispute this characterization.  As described in Section VI.F, DCG structured these transactions in a way such that they did not resolve GGC's liquidity issues.  The Debtors also note that DCG has defaulted on approximately $627 million in loans that were due in May 2023 and continue to owe the Debtors more than $430 million in defaulted debt.  In addition, as described in Section VI.F, the Special Committee has investigated the DCG Parties' conduct and determined that the Debtors have colorable claims against the DCG Parties.

### B.    FTX Collapse

In early November 2022, the digital asset market plummeted further as the FTX Entities, including what was previously one of the world's largest and most respected digital asset exchanges, collapsed.  Starting November 6, 2022, FTT, a Digital Asset issued by the FTX Entities, lost over 80% of its worth in the span of 72 hours.  The contagion effect from the FTX Entities' collapse spread throughout the digital asset market.  Because a large bulk of the Debtors' business was with the FTX Entities, the collapse of the FTX entities adversely affected the Debtors, precipitating the Debtors' own bankruptcy filings.

### C.    Impact on Customer Confidence

Consistent with industry practice, many of the loans offered by the Company were open term loans, meaning that the Company could repay a loan in full or in part at any point in time and lenders could "call" (demand repayment) under the loans in whole or in part at any point in time.

As the FTX Entities began to experience their collapse, the Company received calls on its loans amounting to approximately $827 million.  This "run on the bank" following the FTX Entities' collapse was outsized and severely impacted the Company's available liquidity.

At the same time, Holdco's corporate parent, DCG, and its various subsidiaries, including DCGI, were also impacted by the market turmoil and did not have the liquidity to pay back the Company on certain loans, adding pressure to the Debtors' balance sheets.

As a result of the unprecedented number and size of the loan calls, on November 16, 2022, GGC and GAP paused all lending and borrowing to preserve the Debtors' estates, ensure fair distribution and begin discussions with their stakeholders.

**D.       Debtors' Decision to File for Chapter 11**

In close consultation with their advisors, the Debtors ultimately decided to commence the Chapter 11 Cases and move expeditiously to seek to achieve a consensual resolution that avoids the costs and uncertainty of litigation.

As noted in Section VI.G. below, the Committee believes that, in addition to the factors outlined above, DCG's actions before and during this time period also likely contributed to the Debtors' liquidity issues and need to commence these Chapter 11 Cases.  DCG rejects these assertions and the Debtors understand DCG intends to vigorously defend against any such claims.

## VI.    EVENTS OF THE CHAPTER 11 CASES

As noted above, the Debtors filed for relief under chapter 11 of the Bankruptcy Code on January 19, 2023. Since the Petition Date the Debtors have continued to operate as debtors-in-possession subject to the supervision of the Bankruptcy Court in accordance with the Bankruptcy Code.  An immediate effect of the filing of the Debtors' bankruptcy petitions was the imposition of the automatic stay under section 362(a) of the Bankruptcy Code which, with limited exceptions, enjoined the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtors, and the continuation of litigation against the Debtors.

### A.    Voluntary Petitions

The following entities filed chapter 11 bankruptcy petitions on the Petition Date commencing the Chapter 11 Cases: (i) Genesis Global Holdco, LLC, (ii) Genesis Global Capital, LLC, and (iii) Genesis Asia Pacific Pte. Ltd.

### B.    First and Second Day Relief

Upon the commencement of the Chapter 11 Cases, the Debtors filed numerous motions seeking the relief provided by certain first day orders (the "First Day Orders").  First Day Orders are intended to ensure a seamless transition between a debtor's prepetition and postpetition business operations by approving certain normal business conduct that may not be specifically authorized under the Bankruptcy Code or as to which the Bankruptcy Code requires prior approval by the Bankruptcy Court.

On January 23, 2023, the Bankruptcy Court held a hearing to consider the relief requested in the motions and granted the relief requested.  Certain of the First Day Orders were entered on an interim basis and subsequently approved on a final basis.  The First Day Orders, which were designed to stabilize the Debtors' business operations and business relationships with customers, vendors, employees, and others, authorized the Debtors to, among other things:

- procedurally consolidate each of the Chapter 11 Cases for ease of administration, ECF No. 37;

- appoint GAP to act as a foreign representative of the Debtors in Singapore to seek recognition of the Chapter 11 Cases, ECF Nos. 38, 100;

- appoint Kroll Restructuring administration as claims agent, ECF No. 39;

- authorize notice of the automatic stay, ECF No. 40;

- extend the deadline to file Schedules and Statements, ECF No. 42;

- continue to pay certain taxes and fees, ECF Nos. 43, 97;

- establish notice, case management, and administrative procedures for the Chapter 11 Cases, ECF No. 44;

- continue to pay critical and foreign vendors and service providers, ECF Nos. 45, 98;

- file a consolidated list of the 50 largest creditors and redact certain personal identification information, ECF No. 46;

- continue to use the Debtors' cash management system and make and receive intercompany loans and extend the deadline to comply with section 345 of the Bankruptcy Code, ECF Nos. 47, 99; and

- pay certain prepetition employee wages, reimbursable expenses, and benefits, ECF No. 48;

Shortly after the commencement of the Chapter 11 Cases, the Debtors filed motions seeking additional relief (the "Second Day Orders"). The Second Day Orders included seeking permission to pay professionals, ECF No. 101, and redact and seal certain information, ECF No. 67, as well as authorizing the Debtors to retain, as of the Petition Date, various professionals and advisors to assist the Debtors during the Chapter 11 Cases, including:

- Cleary Gottlieb Steen & Hamilton LLP ("Cleary") as counsel, ECF No. 103;

- Alvarez & Marsal North America, LLC as financial advisor, ECF No. 108;

- Moelis & Company LLC as investment banker, ECF No. 151;

- Kobre & Kim LLP as special counsel, ECF No. 104;

- Morrison Cohen LLP as special counsel, ECF No. 106;

- Kroll Restructuring Administration LLC as administrative advisor, ECF No. 107;[8]

- Grant Thornton LLP as tax services provider, ECF No. 228;

- M3 Advisory Partners, LP as financial advisor, ECF No. 268;[9] and

- other professionals relied upon in the Debtors' ordinary course of business, ECF No. 102.

### C.      Appointment of Official Committee of Unsecured Creditors

On February 3, 2023, the U.S. Trustee appointed the Committee in the Chapter 11 Cases. The Committee comprises (1) SOF International, LLC, (2) Teddy Andre Amadeo Gorisse, (3) Digital Finance Group Co., (4) Richard R. Weston, (5) Mirana Corp., (6) Amelia Alvarez, and (7) Bitvavo Custody B.V. *See* ECF No. 53.

On or around February 10, 2023, the Committee retained White & Case LLP as counsel, Houlihan Lokey, Inc as investment banker, and Berkeley Research Group, LLC as financial advisor. The Committee subsequently retained Seward & Kissel LLP as conflicts counsel.

### D.      Ad Hoc Groups in the Chapter 11 Cases

In November 2022, before the Petition Date, the Ad Hoc Groups were formed. The Ad Hoc Groups consisted of two separate groups of creditors. One group of creditors initially retained Kirkland & Ellis LLP as counsel, and the other group of creditors retained Proskauer Rose LLP as counsel. As time progressed, the group represented by Proskauer Rose LLP has become the predominant Ad Hoc Group.

On March 3, 2023, the Ad Hoc Group represented by Proskauer Rose LLP filed a Verified Statement pursuant to Bankruptcy Rule 2019. *See* ECF No. 114. This Statement represents that there are 78 members of the Ad Hoc Group with a dollarized claim amount of $1,535,158,736.57.

In August 2023, the Brown Rudnick Group was formed. On August 31, 2023 the Brown Rudnick Group filed a Verified Statement pursuant to Bankruptcy Rule 2019. *See* ECF No. 649. The Brown Rudnick Group holds $1.55 billion in claims. However, only about $200 million represents claims that are not either Gemini Lender Claims

---

[8]       Kroll Restructuring Administration was also retained as claims and noticing agent pursuant to the First Day Orders.

[9]       While initially retained solely to assist the Debtors and its advisors in connection with matters relating to FTX Trading Ltd. and its affiliated debtors, on September 8, 2023, the Debtors obtained an order expanding the scope of M3 Advisory Partner, LP's services to include matters relating to 3AC. *See* ECF No. 687.

or claims held by members of the Ad Hoc Group. The Brown Rudnick Group includes eight members of the Ad Hoc Group.

The Amended Plan provides for the payment of the Ad Hoc Group's fees as an administrative expense in the event that the Ad Hoc Group Acceptance Event has occurred and is continuing, pursuant to a prepetition fee reimbursement letter executed by the Debtors and the Ad Hoc Group. The Debtors believe the payment of the Ad Hoc Group's fees, which as of September 30, 2023 total approximately $4.7 million, including certain fees and expenses relating to litigation prosecuted by the Ad Hoc Group in these Chapter 11 Cases, is appropriate given that the Ad Hoc Group is a key party in interest and has contributed significant value to the Chapter 11 Cases by assisting the Debtors with formulating, negotiating, and developing the Amended Plan on behalf of the Ad Hoc Group members, representing creditors that are members of the Ad Hoc Group and supporting the Debtors in mediation, and communicating to the Ad Hoc Group members.

The Office of the U.S. Trustee objects to the payment of the Ad Hoc Group's fees provided under the Amended Plan and the rights of all parties with respect to this provision are expressly reserved.

E.    **The Restructuring Term Sheet**

On February 10, 2023, a non-binding agreement in principle among the Debtors and key parties in interest was memorialized in the Restructuring Term Sheet (the "Restructuring Term Sheet") attached as Exhibit A to the *Notice of Filing of the Restructuring Term Sheet*, ECF. No. 80. While the Restructuring Term Sheet was executed by certain parties (including the Debtors, DCG, Gemini, and certain members of the Ad Hoc Group), it was not executed by a number of Ad Hoc Group members that had been part of the negotiations. The parties, however, continued to engage in discussions toward a possible consensual settlement of the issues addressed in the Restructuring Term Sheet. The Committee was not a party to, and was not involved in the negotiation of, the Restructuring Term Sheet, which was filed a few days after the Committee was appointed.

F.    **Special Committee Investigation**

On November 18, 2022, the Holdco Board of Directors established the Special Committee, comprised of Paul Aronzon and Tom Conheeney, with responsibility for making all decisions relating to the liquidity and restructuring of Holdco and its subsidiaries.[10] As part of its mandate, the Special Committee was charged with evaluating and approving transactions with affiliates including DCG Parties and investigating the Debtors' relationships and transactions with DCG Parties. One of the primary purposes of this investigation has been to assess whether the Debtors have potentially viable claims against the DCG Parties and to assist the Special Committee in the exercise of its fiduciary duties.

In accordance with this mandate, at the request of the Special Committee, Cleary commenced an investigation (the "Investigation") into the relationships and transactions between or among the Debtors and various DCG Parties, (i) corporate governance and corporate separateness between the Debtors and DCG Parties, (ii) the entry into the DCG Loans and the DCG Note, (iii) the restructuring of the DCG Loans at various points in time, including in November 2022; (iv) DCG's purported exercise of setoff rights in connection with DCG's $52.5 million payment to Luno; (v) communications relating to the DCG Loans and DCG Note; and (vi) other transactions between the Debtors and the DCG Parties, including transactions occurring during the applicable avoidance periods under applicable law.

In connection with the Investigation, Cleary has reviewed over 294,000 documents and communications collected from 21 current and former employees allocated to the Debtors from January 1, 2021 to December 31, 2022. These documents and communications include corporate documents, financial statements, lending agreements and term sheets, and internal and external communications including emails, Microsoft Teams messages, Telegram messages, and social media posts. The document review process served the purpose of aiding (i) the Investigation, (ii) the Company's responses to requests from various authorities, and (iii) document requests from the UCC and DCG

---

[10]    On August 17, 2022, Thomas Conheeney was appointed as Independent Director of the Holdco Board of Directors. That same day, he was retained as a senior advisor to GGH. He was subsequently appointed to the Special Committee on November 18, 2022, when it was formed.

Parties, discussed in further detail below. These documents and communications (other than privileged documents and communications) were shared with counsel to the Committee as part of its own investigation.

As part of the Investigation, Cleary conducted more than 30 interviews with approximately twelve current and former employees allocated to the Company. Between December 4, 2022 and January 24, 2023, Cleary conducted 10 preliminary interviews with current employees on topics including lending processes and procedures, bookkeeping and loan management, compliance and risk policies, and intercompany lending. Following these preliminary interviews, from March 9, 2023 through September, 2023, Cleary conducted at least 19 more substantive interviews with both current and former employees regarding a variety of topics, including but not limited to client communications, risk management, accounting, and the relationship between GGC and DCG.

Additionally, on March 9, 2023, Cleary on behalf of the Special Committee requested from DCG various documents and communications related to, among other things, borrowing, lending, or financing arrangements between or among the Debtors, the DCG Parties and any other subsidiaries and affiliates, including those related to the transactions described above. As of the date of this filing, Cleary has received over 50,000 documents from DCG.

Cleary has shared the findings from the Investigation with the Special Committee and counsel to the UCC and the Ad Hoc Group. The Special Committee has concluded that there are colorable claims[11] against certain DCG Parties for various causes of action, including potential claims based on alter ego theories, preference law, and other legally cognizable rights. With respect to officers, directors and employees and whether such parties would be released as Released Parties under the Amended Plan, the Special Committee will provide additional disclosure regarding this issue in the Plan Supplement to be filed ten (10) days in advance of the Voting Deadline.

Nonetheless, the Special Committee continues to believe a viable settlement would be in the best interests of the creditors for several reasons. First, the Special Committee recognizes that the law governing such claims, particularly alter ego claims, creates significant challenges to a successful prosecution, and that the DCG Parties would vigorously defend against such claims. Moreover, any litigation against the DCG Parties with respect to these claims would be costly and subject to significant uncertainties, in terms of the ultimate likelihood of success, the ability to recover from responsible parties and the timing of any such recoveries. The Special Committee believes that any litigation over these claims would likely take years to complete, particularly in light of the time it could take to resolve potential appeals.

### (i) Potential Claims Against the DCG Parties

In the exercise of its fiduciary duties, the Special Committee has investigated and analyzed potential litigation Causes of Action against various DCG Parties, including, but not limited to, alter ego claims, preferences, fraudulent conveyances, equitable subordination, recharacterization, and improper setoff. The Investigation considered, among other things, prepetition transactions, relationships, and conduct involving the DCG Parties, including officers and directors of GGH. Additional information regarding certain current and potential Causes of Action against various DCG Parties is provided below.

The Special Committee reserves the right to supplement this description at any time. The descriptions of the various Causes of Action in this Disclosure Statement are intended to assist Holders of Claims entitled to vote on the Amended Plan in evaluating the benefits and risks of the Amended Plan. Nothing in this Disclosure Statement is, or should be construed as, an admission, or in any way limits or prejudices the Debtors or their potential pursuit of Causes of Action against any of the DCG Parties and any and all rights of the Debtors or the Wind-Down Debtors with respect to the potential pursuit of Causes of Action against any or all of the DCG Parties, regardless of whether they are

---

[11]     Generally speaking, a claim is "colorable" when it has "some legal and factual support, considered in light of the reasonable beliefs of the individual making the claim." *Schalifer Nance & Co. v. Warhol*, 194 F.3d 323, 337 (2d Cir. 1999) (citations and quotations omitted); *see also In re Sabine Oil & Gas Corporation*, 547 B.R. 503, 516 (Bankr. S.D.N.Y. 2016) (stating a colorable claim is one that is "plausible or not without some merit."); *In re KDI Holdings, Inc.*, 277 B.R. 493, 508 (Bankr S.D.N.Y. 1999) ("In determining whether there is a colorable claim, the Court must engage in an inquiry that is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim.").

described herein, are fully reserved. Importantly, nothing in this Disclosure Statement is, or should be construed as, a representation as to whether the Debtors or the Wind-Down Debtors will ultimately be successful or unsuccessful in pursuit of any of the Retained Causes of Action. Litigation is inherently uncertain and any recovery will depend upon a number of factors, including the probability of success in litigation, the difficulties in collection and the expense and delay of litigation. Many of these factors are not within the Debtors' control and, litigation of the Retained Causes of Action may not result in any incremental distributable value to the Debtors' estates.

(a)    Claims for Recovery of Undisputed Amounts Owed by DCG and DCGI to GGC

As described in Section VI.T(iii) of this Disclosure Statement, on May 12, 2023, the Debtors delivered a notice of default to DCG and DCGI for DCG and DCGI's non-payment of approximately $627 million in loans that were due on May 9, 10 and 11, 2023. On May 19, 2023, the Debtors received a forbearance proposal from DCG related to its nonpayment of such loans. As part of the mediation with DCG and other key stakeholders ordered by the Bankruptcy Court and described in Section VI.P(i) herein, including certain members of the Committee and the Ad Hoc Group, the Debtors and DCG began negotiating a forbearance agreement with respect to the unpaid loans soon after their maturity dates. Ultimately, these discussions led to an Agreement in Principle, as reflected in the *Notice of Mediation Termination*, ECF No. 625, filed with the Bankruptcy Court on August 29, 2023.

As negotiation over definitive documentation were in process, on September 6, 2023, GGC commenced the DCG Turnover Action under section 542(b) of the Bankruptcy Code to recover more than $500 million in undisputed principal and interest (including Loan Fees) owed to GGC under the DCG Loans, described in Section IV.C herein. The DCG Turnover Action does not seek payment of default interests (i.e., Late Fees) because DCG disputes the obligation to pay such amounts, and the relevant provisions of the Bankruptcy Code do not permit the Debtors to seek payment of disputed amounts pursuant to a turnover action. However, the Debtors have reserved all rights to assert that DCG is obligated to pay Late Fees under the DCG Loans.

On the same day, GGC commenced the DCGI Turnover Action under section 542(b) of the Bankruptcy Code to recover 4,550.45173345 BTC (approximately $117 million as of September 6, 2023) and accompanying payable non-default and default interest (i.e., Loan Fees and Late Fees) owed under the DCGI Loan. *See* Section IV.C *supra.*

On September 12, 2023, the Debtors, DCG and DCGI entered into the Partial Repayment Agreement, which provides for a limited forbearance by GGC in respect of the DCG Parties' obligations to GGC that are the subject of the Turnover Actions filed against DCG and DCGI. In exchange for such forbearance, each of DCG and DCGI agreed to make three installment payments of $75 million and a fourth installment payment of $50 million, with the full $275 million payable upon the occurrence of the Plan Effective Date, if not already paid by such date. Further details of the Partial Repayment Agreement are included in Section VI.P(ii) of this Disclosure Statement. The Debtors agreed to voluntarily stay the Turnover Actions pursuant to the Partial Repayment Agreement. As of the date hereof, DCG and DCGI have paid or transferred a total of approximately $227.3 million pursuant to the Partial Repayment Agreement, plus approximately $4.5 million in Loan Fees and $460,000 in Late Fees each month (for a total of approximately $10 million in Loan Fees and $2.3 million in Late Fees during the term of the Partial Repayment Agreement).

In the event that the Debtors determine to terminate the Partial Repayment Agreement pursuant to the terms of the Partial Repayment Agreement, including in the exercise of their fiduciary duties, the Debtors or the Wind-Down Debtors intend to prosecute the Turnover Actions. In such event, the Special Committee believes that the Turnover Actions could reach judgment stage in 60-90 days, in part because the Turnover Actions seek only undisputed amounts owed by the DCG Parties (as required under section 542(b)). There can be no assurance, however, that the Turnover Actions could reach judgment on such time frame, and the DCG Parties could appeal any judgment in favor of the Debtors. In response to the continued prosecution of the Turnover Actions, or a judgment in favor of the Debtors, the DCG Parties might seek to refinance the DCG Loans on terms that may be less favorable than the terms that the Debtors may otherwise agree to in connection with a consensual resolution.

Please refer to "DCG Position on Agreement in Principle" in **Exhibit F** for DCG's position on the amounts owed by DCG and DCGI to GGC.[12]

        (b)        Claims Based on Alter Ego Liability

A primary focus of the Special Committee's Investigation has been potential claims of alter ego liability against DCG, which if successful would result in a finding that DCG is liable for all of the Debtors' unpaid obligations owed to creditors of the Debtors. DCG disputes the viability of any alter ego claims. For a discussion of DCG's purported defenses, please refer to "DCG Response to Alleged Alter Ego Claims" in **Exhibit F** which has been prepared by DCG for inclusion in this Disclosure Statement. The Debtors and Committee strongly disagree with the assertions made by DCG in the DCG Response.

The Investigation found that DCG, the ultimate sole owner of GGC, exerted significant financial and corporate control over GGC. Among other things, the Investigation revealed that DCG referred to GGC as the "de facto" treasury for certain DCG Parties, and did not maintain appropriate corporate formalities, including failing to implement policies with respect to entry into related party transactions, such as the DCG Loans and the DCG Note. In addition, the Investigation determined that DCG did not properly capitalize GGC, that DCG benefited from significant unsecured loans that were not available to other Genesis creditors (who typically had to borrow on a secured basis) and that on several occasions, despite opposition from GGC, DCG was granted flexible or extendible maturity dates and interest rates.

The Investigation also found that, beginning in June 2022, DCG took steps to delay a potential insolvency filing by GGC in a manner that gave DCG and DCGI more time to pay off or extend approximately $830 million in loans, including $100 million due in July 2022 and $50 million due in August 2022. Around that time, GGC faced equity and liquidity constraints and sought to obtain capital injections from DCG. GGC's continued survival was critical to DCG, as a default by GGC could negatively affect the DCG Parties and accelerate intercompany lending arrangements. DCG implemented several intercompany transactions to prevent withdrawals and redemptions by GGC lenders, but these transactions did not resolve GGC's liquidity issues. At the same time, certain DCG Parties continued extending the time to repay numerous unsecured loans from GGC, further exacerbating GGC's liquidity issues. Several of these loans were ultimately restructured under conditions that were not at arm's length and included terms that may not have reflected market interest rates or maturities.

Below is a brief description of certain transactions considered as part of the Investigation that support a potential claim of alter ego liability against DCG. Some of these facts may also support other potential claims, such as equitable subordination, fraudulent conveyance and/or recharacterization claims.

        (i)        DCG Note

As described in Section IV.C(iii) of this Disclosure Statement, on June 30, 2022, DCG assumed a $1.1 billion payable that GAP owed to GGC and evidenced the assumed payable with a $1.1 billion promissory note in favor of GGC that had a 10-year maturity and fixed interest rate of 1% that may, at DCG's option, be paid in kind. To date, DCG has not repaid GGC, nor has it made any interest payments relating to the 10-year DCG Note.

The Investigation has considered 3AC's default on loans made by GAP with working capital from GGC, the assumption of the liability for the amounts owed by GAP to GGC, issuance of the DCG Note to evidence the obligation, the negotiations surrounding the DCG Note, the terms of the DCG Note, and the effect of the DCG Note on GGC's balance sheet, liquidity, net interest margin, equity and underlying business. Based on the Investigation, there is evidence that DCG sought to avoid or delay a GGC bankruptcy and structured the DCG Note to favor its own interests. DCG was concerned that a GGC insolvency or bankruptcy could pose risks to DCG's capital and solvency, but it was also concerned about the risks of using its own assets to improve GGC's equity and liquidity positions. Rather than contribute liquid equity or transfer assets to GGC, in connection with assuming the $1.1 billion payable

---

[12]      DCG's positions are hyperlinked throughout the Amended Disclosure Statement to the relevant section of **Exhibit F**.

from GAP to GGC, DCG and its advisors proposed the idea of the DCG Note to satisfy the payable obligation and set the terms of that note, including the 10-year term and 1% paid in kind interest.

The Investigation identified evidence that DCG leadership was involved in crafting the messaging surrounding the support DCG was providing to GGC, which included messaging about GGC as a going concern and did not include the terms of the DCG Note.

Shortly after the execution of the DCG Note at the end of June 2022, GGC was entitled to repayment by DCG of two loans, the January Loan and February Loan, amounting to a net total of $150,000,000 (the January Loan, which was due in July 2022, and the February Loan, which was due in August 2022). DCG also had outstanding loans amounting to $300,000,000 that would be due in May 2023. There was also the outstanding then open term DCGI Loan to DCGI. DCG sought the extension of the loans that would become due in July and August 2022. In seeking to extend the maturity dates of the January Loan and February Loan (which would come due in the event of a GGC bankruptcy), DCG was able to retain $150,000,000 in otherwise matured loans due to GGC, benefitting its own liquidity at the detriment of GGC's liquidity and causing a duration mismatch in GGC's loan portfolio.

DCG strongly disagrees with the assertions made by the Debtors with respect to the DCG Note. Please refer to "DCG Response to Claims in Connection with the Note" in **Exhibit F** for DCG's position on the DCG Note.

(ii)     September 29 Transaction

GGC repeatedly requested equity injections from DCG in the summer and fall of 2022. Beginning at the end of June 2022, GGC flagged concerns regarding what it perceived as a flight risk of various lenders, especially large open-term lenders, if its liquidity and equity positions continued to deteriorate. On September 27, 2022, near the end of Q3 2022, DCG's advisors proposed a transaction to contribute $100 million in equity to GGC, whereby (i) GGC would repay an existing $100 million loan extended to it by DCGI; (ii) DCGI would then contribute that $100 million to DCG in the form of a dividend distribution; and (iii) DCG would then contribute the $100 million back to GGC as equity. This transaction was executed on September 29, 2022 (the "September 29 Transaction"). DCG was again seen to provide support to GGC, improving GGC's equity position such that it avoided a run on the bank and a threat to GGC as a going concern.

The Investigation considered the negotiations for the September 29 Transaction (and the discussions leading up to it), the terms of the September 29 Transaction, and the effect of the September 29 Transaction on GGC's balance sheet, liquidity, net interest margin, equity and underlying business. The evidence shows that DCG and its advisors prepared the documentation for the September 29 Transaction on the same day that the transaction was consummated. Although the September 29 Transaction improved the appearance of GGC's balance sheet, it did not improve GGC's liquidity or net interest margin, nor provide the level of equity support that GGC had determined was necessary to sustain its underlying business. Despite assurances that DCG would support GGC and allow it to remain a going concern, GGC was undercapitalized throughout this period. Additionally, at the same time that DCG proposed the September 29 Transaction, it also sought to further extend its outstanding intercompany loans from GGC without providing any collateral. As a result, GGC continued to suffer liquidity constraints and duration mismatches in its lending portfolio.

The Investigation has also identified potential preference claims against DCGI with respect to the September 29 Transaction. Specifically, the Debtors paid $100,581,975 to DCGI on September 29, 2022, pursuant to the first leg of transaction, described above. This payment to DCGI occurred within the one-year preference period and could potentially be recovered by GGC as a preference.

DCGI asserts that any such claims are without merit and DCGI intends to vigorously defend against any such preference claims, as through the September 29 Transaction, DCGI contributed new value in the amounts set forth above for Genesis' benefit.

(iii)     Transactions on November 10 and 11, 2022

In September and October 2022, deteriorating market conditions increased the likelihood that major GGC open-term lenders, including Gemini, would seek repayment of their loans. Gemini requested that GGC transfer 31

million shares of GBTC to Gemini as collateral to hold on behalf of Gemini Earn customers. On November 10, 2022, GGC began negotiations with DCG on a structure to provide Gemini with the requested assets. While GGC requested that DCG post the GBTC shares to Genesis as collateral for the DCGI Loan, DCG was resistant to this structure and wanted to instead provide the GBTC shares to GGC as repayment for the DCGI Loan.

On November 11, 2022, the parties agreed to the following series of transactions (together, the "<u>November Transactions</u>"):

- DCGI distributed to DCG a dividend of 31,180,804 shares of GBTC. These shares were then transferred from DCG to GGC. Of those approximately 31 million GBTC shares, 5,181,437 GBTC shares were contributed as follows: (i) from DCGI to DCG, (ii) from DCG to GGH, (iii) from GGH to GGC, and (iv) from GGC to GGCI as an injection of equity. The other 25,999,457 GBTC shares were transferred to GGC as a partial repayment of the DCGI Loan, leaving approximately 4,550 BTC still owed to GGC by DCGI. See Section IV.C supra.

- GGC repaid a $50 million USD loan from DCG executed between the parties on June 15, 2022. This $50 million repayment to DCG was then contributed (i) from DCG to GGH, (ii) from GGH to GGC, and (iii) from GGC to GGCI as an injection of equity. *See* Section IV.C *supra*.

- GGC repaid approximately $40 million worth of loans it owed to DCGI for various transactions. This approximately $40 million was contributed (i) from DCGI to DCG, (ii) from DCG to GGH, (iii) from GGH to GGC, and (iv) from GGC to GGCI as equity in the form of various digital assets.

Altogether, GGCI received approximately $140 million in equity. In return for these equity injections, GGC agreed to extend the maturity dates of (i) the January Loan; (ii) the February Loan; and (iii) the remaining 4,550 BTC portion of the DCGI Loan still owed to GGC by DCGI, each to May 11, 2023 (six-month extensions). *See* Section IV.C *supra*.

The Investigation has focused on the effect of the collapse of the FTX Entities on the Debtors' business, the negotiations between and among Gemini, GGC, and DCG regarding the November Transactions, the terms of the November Transactions, and the effect of the November Transactions on GGC's balance sheet, liquidity, net interest margin, equity and underlying business. The Investigation has also examined whether repayment of the DCGI Loan in GBTC was adequate given the value and restrictions on GBTC at the time, and the effect of those restrictions on GGC's liquidity position.

The Investigation further identified potential preference claims against certain DCG Parties with respect to the November Transactions. Specifically, the Debtors paid $40 million to DCGI and $50 million to DCG on November 11, 2022 in connection with the November Transactions, as described above. These payments to DCG and DCGI have been identified as potential preference payments subject to claw-back. It is DCG and DCGI's position that any such claims are without merit and the Debtors under that DCG and DCGI intend to vigorously defend against any such preference claims, as through the November Transactions, DCG and DCGI assert that they contributed new value in the amounts set forth above for Genesis' benefit. Accordingly, DCG and DCGI reserve all rights and defenses with respect to such transactions.

(iv)    Claims Arising out of the Tax Sharing Agreement

On October 5, 2021, DCG entered into an *Agreement to Allocate Consolidated Income Tax Liabilities and Benefits* with GGH and other DCG subsidiaries (the "<u>Tax Sharing Agreement</u>"). The Tax Sharing Agreement provided that DCG would have "maximum discretion regarding the tax affairs" of GGH and other subsidiaries, including over the allocation of tax benefits and liabilities, and that DCG "may deviate from the provisions in the Agreement without causing a breach, and [DCG] may require [GGH and other subsidiaries] to modify and/or amend the terms of [the Tax Sharing Agreement] as [DCG] deems appropriate or fit in [DCG's] sole discretion."

Pursuant to the Tax Sharing Agreement, GGC made payments to DCG of $23,902,602 on April 18, 2022, and $10,384,298 on June 15, 2022.

23-10063-shl    Doc 980    Filed 11/27/23    Entered 11/27/23 12:57:41    Main Document
Pg 56 of 312

The terms of the Tax Sharing Agreement and the payments made thereunder, including during times when GGC had significant liquidity constraints, illustrate DCG's ability to exert corporate and financial control over GGC. The April 18, 2022 and June 15, 2022 payments under the Tax Sharing Agreement also have been identified as potential preference payments subject to claw-back.

DCG strongly disagrees with the assertions made by the Debtors with respect to the Tax Sharing Agreement. Please refer to "DCG Response to Alleged Claims Arising under Tax Sharing Agreement" in **Exhibit F** for DCG's position on the Tax Sharing Agreement.

(v)    Potential Recoveries for Alter Ego Claims

The outcome of a claim based on alter ego liability is generally binary—either the claim will prevail and DCG will be fully liable for the Debtors' unpaid obligations, or the claim will fail and DCG will bear no liability for those obligations. Alter ego claims are challenging both to prove and to defend against. Based on the Investigation, an alter ego claim against DCG would present significant litigation risk to DCG, although there are serious challenges in ultimately proving such claim.

Alter ego liability is an exceptional remedy and the burden of proof is generally high. Alter ego litigation is typically long, expensive, and highly fact-intensive. Courts evaluate a number of factors, no single factor being dispositive, to determine whether to pierce a company's corporate veil. Under Delaware law, courts consider whether the subsidiary was solvent, whether the subsidiary was adequately capitalized, whether corporate formalities were observed, whether the parent siphoned the subsidiary's funds, and whether the subsidiary functioned as a façade for the parent. Additionally, Delaware law would require a showing of fraud or similar injustice committed by DCG. In this case, the relevant factors may include (i) the observation of corporate formalities in transactions between GGC and the DCG Parties; (ii) GGC's solvency and capitalization; (iii) siphoning of GGC's funds by the DCG Parties; (iv) any absence of corporate records; (v) whether GGC was merely a façade for the operations of certain DCG Parties; (vi) the independence of GGC's corporate functions and decision-making; and (vii) any payment of dividends by GGC to the DCG Parties.

While the Investigation has uncovered facts that indicate significant litigation risk to DCG with respect to alter ego liability, as described in Section VI.F(i)(b) above, these claims may be difficult to prosecute and are especially challenging in the context of single-member limited liability companies that are Chapter 11 debtors. As a result, potential recoveries for the alter ego claims are uncertain.

DCG strongly disagrees with the assertions made by the Debtors with respect to the Alter Ego Claims. Please see "DCG Response to Alleged Alter Ego Claims" in **Exhibit F** for DCG's position on the Alter Ego Claims.

(c)    Preference Claims

The Special Committee's Investigation has also focused on identifying and analyzing potential preference claims that the Debtors may have against the DCG Parties. Inclusive of the potential preference claims related to the September 29 Transaction and the November Transactions detailed in Sections VI.F(i)(b)(ii) and (iii) above, the Investigation has identified various payments from the Debtors to certain DCG Parties during the one-year preference period totaling $2,020,314,043. This amount includes:

- $961,073,011 in payments that DCG and its subsidiaries received during the preference period to close out existing loans to the Debtors;
- $913,579,201 in new loans that the Debtors made to DCG and its subsidiaries during the preference period;
- $92,757,482 in collateral returned by the Debtors to DCG during the preference period;
- $7,876,872 in interest payments by the Debtors to DCG during the preference period; and
- $45,027,477 in cash outflows from the Debtors to DCG during the preference period, $34,292,242 of which relates to tax payments under the Tax Sharing Agreement between the Debtors and DCG.

During the preference period, payments in the amounts listed below were made to the following DCG Parties:

41

- $1,094,278,529 to DCG;
- $413,746,865 to DCGI;
- $138,004,978 to Luno; and
- $101,181,121 to HQ Cash Management Fund LP.

The Investigation has also identified potential preference claims related to the early redemption of loans by various DCG-related insiders with exposure to GGC in June 2022.

(i)    Potential Recoveries for Preference Claims

Although there were approximately $2 billion in intercompany outflows, the large majority of these transactions may be subject to a number of defenses under bankruptcy law, including that (i) GGC was not insolvent at the time of certain transfers; (ii) payments were in the ordinary course of business, consistent with the usual course of dealing between GGC and the DCG Parties; and (iii) certain transactions cannot give rise to preference liability based on a subsequent new value defense.

DCG strongly disagrees with the assertions made by the Debtors with respect to the Preference Claims. Please refer to "DCG Response to Alleged Preference Claims" in **Exhibit F** for DCG's position on the Preference Claims.

(d)    Setoff of Loans Between Luno Australia Pty Ltd. and GGC, DCG and GGC

On January 24, 2022, GGC lent $100,000,000 to DCG, with a maturity date of July 24, 2022. As noted above in Section A.i.b.i, the January Loan's maturity date was extended to May 11, 2023. As described in Section IV.C of this Disclosure Statement, GGC borrowed $52,500,000 from Luno under the Luno MLA. On November 11, 2022, DCG issued a guarantee to Luno regarding GGC's obligations under the Luno MLA. On November 17, 2022, after the collapse of the FTX Entities, Luno demanded repayment of its loan from DCG, resulting in the Luno Transaction.

The Investigation has focused on the provisions of the MLA between GGC and DCG, and between GGC and Luno, contingency and mutuality between the two loans, whether the setoff would be considered equitable and whether the setoff constitutes a fraudulent conveyance.

(i)    Potential Recoveries for Luno Setoff Claims

Depending on the validity of DCG's setoff as governed by the Luno MLA, and potential characterization of the setoff as a fraudulent conveyance, as an action that was unavailable to DCG under common law, or as inequitable and thus unenforceable, GGC's claims against DCG relating to the January Loan could range from $47,500,000 to $100,000,000, plus interest and applicable fees.

DCG strongly disagrees with the assertions made by the Debtors with respect to the Luno Setoff Claims. Please refer to "DCG Response to Alleged Luno Setoff Claims" in **Exhibit F** for DCG's position on the Luno Setoff Claim.

(e)    DCG's Liability Under the Assumption and Assignment Agreement Relating to the Three Arrows Capital Loans

Between January 2019 and the date of 3AC's default in June 2022, GAP extended loans to 3AC (the "3AC Loans") pursuant to a Master Loan Agreement dated January 10, 2019, and a Master Loan Agreement dated January 24, 2020 (together, the "3AC MLAs"). Exchanges of collateral in connection with the 3AC Loans were governed by a Pledge Agreement dated May 28, 2020, a Pledge Agreement dated November 16, 2021, and a Pledge Agreement dated January 27, 2022 (collectively, the "Pledge Agreements"). On June 27, 2022, 3AC commenced the 3AC Liquidation Proceeding before the BVI Court and subsequently sought recognition of the proceeding in the Bankruptcy Court for the Southern District of New York. *See* Verified Pet. Under Chapter 15 for Recognition of a Foreign Main Proceeding and Related Relief, In re Three Arrows Capital, Ltd., *In re Three Arrows Capital, Ltd.*, Case No. 22-10920 (MG) (Bankr. S.D.N.Y. July 1, 2022), ECF No. 2, at ¶ 1.

On July 14, 2022, GAP and DCG executed an Assignment and Assumption of Master Loan Agreement (the "3AC Loan Assignment and Assumption Agreement"), by which (i) GAP assigned to DCG all of its outstanding 3AC Loans, (ii) DCG assumed all liabilities of GAP under the MLAs; and (iii) GAP assigned to DCG, and DCG assumed, all of GAP's rights and obligations pursuant to the Pledge Agreements, as well as rights to any remaining collateral received by GAP.

On August 18, 2023, 3AC filed the Amended 3AC Claims, *see* Section VI.N(ii)(b) *infra*, (i) seeking damages in respect of certain of the collateral pledged by 3AC to GAP pursuant to the Pledge Agreements that was foreclosed upon by Genesis (the "3AC Loan-Related Claims"), and (ii) describing "potential" claims for avoidance of transfers made by 3AC to GAP pursuant to 3AC's obligations under the MLAs and Pledge Agreements in connection with the 3AC Loans (the "3AC Preference Claims"). *See* Amended 3AC Claims at ¶ 37, 45, 50, 56, 65. The Amended 3AC Claims fail to plead with particularity the origin or circumstances of the transfers of the assets purportedly subject to the 3AC Loan-Related Claims. *See* Renewed 3AC Objection at ¶ 46. However, because the entire lending and borrowing relationship between GAP and 3AC was governed by the MLAs and the Pledge Agreements, all of the assets subject to the 3AC Claims were transferred pursuant to the MLAs and the Pledge Agreements. *See* Renewed 3AC Objection at ¶ 77.

Therefore, pursuant to the 3AC Loan Assignment and Assumption Agreement, DCG is liable for any and all amounts that may be due in connection with the 3AC Loan-Related Claims, the "potential" 3AC Preference Claims, and any other claims under or related to the MLAs and the Pledge Agreements. DCG has disputed the Debtors' view of DCG's liability under the 3AC Assignment and Assumption Agreement.

DCG strongly disagrees with the assertions made by the Debtors with respect to DCG's liability under the 3AC Assignment and Assumption Agreement. Please refer to "DCG Response to Alleged Claims under the Assignment and Assumption Agreement" in **Exhibit F** for DCG's position on the Assignment and Assumption Agreement.

(f)      DCG Parties' Reservation of Rights

Please refer to "DCG Reservation of Rights" in **Exhibit F** for DCG's reservation of rights with respect to any and all alleged claims identified herein or in the future by any party.

(g)      The Impact on Recoveries from the Causes of Action in the Event of the Debtors' Solvency

Please refer to "The Impact on Recoveries From the Causes of Action In the Event of the Debtors' Solvency" in **Exhibit F** for DCG's position on the impact of recoveries in the event of the Debtors' solvency. The Debtors disagree with DCG's position. As noted above, DCG has defaulted on approximately $627 million in loans that were due in May 2023 and continue to owe the Debtors more than $430 million in defaulted debt. In addition, as described above, the Special Committee has investigated the DCG Parties' conduct and determined that they have colorable claims against the DCG Parties. The Debtors have reserved their right to subordinate the DCG Claims. No distributions under the Amended Plan shall be made on account of Equity Interests in GGH until all Claims are ultimately determined by a Final Order to have been rendered Unimpaired. Moreover, no distribution will be made to DCG in the event there are still pending disputes or litigation between the Wind-Down Debtors and the DCG Parties.

(ii)      *Potential Claims Against Gemini and/or the Gemini Lenders*

In the exercise of its fiduciary duties, the Special Committee has investigated and analyzed potential litigation Causes of Action against Gemini and the Gemini Lenders, including, but not limited to, preferences, constructive fraudulent conveyances, and declaratory judgments relating to Gemini's purported foreclosure on the August 2022 Collateral and its assertion of a security interest in the Additional GBTC Shares. The investigation considered, among other things, prepetition transactions, including transfers of collateral, Gemini's purported foreclosure, and other conduct involving Gemini and the Gemini Lenders.

On October 27, 2023, Gemini filed the Gemini Adversary Proceeding (defined below) naming the Debtors as defendants. In the Gemini Adversary Proceeding, Gemini seeks declaratory judgments from the Bankruptcy Court that (1) it validly foreclosed on the August 2022 Collateral and is entitled to set off the proceeds of its purported foreclosure on the August 2022 Collateral, (2) it has a security interest in the Additional GBTC Shares, and/or (3) the Additional GBTC Shares are not property of the Debtors' estates. The complaint filed by Gemini in the Gemini Adversary Proceeding alternatively asserts a claim of constructive trust over the Additional GBTC Shares. On November 21, 2023, the Debtors filed a motion to dismiss the majority of the claims asserted in the Adversary Proceeding, asserting that (1) the Adversary Proceeding should be dismissed as to Holdco and GAP for failure to state a claim against such entities and (2) the Adversary Proceeding's claims that (i) Gemini has a security interest in the Additional GBTC shares, (ii) the Additional GBTC Shares are not property of the Debtors' estates, and (iii) Gemini is entitled to a constructive trust over the Additional GBTC Shares, should be dismissed because such claims fail based on the language of the relevant agreements and/or as a matter of law. Also on November 21, 2023, the Debtors filed an answer to Gemini's complaint, denying the allegations in support of Gemini's claim that it validly foreclosed on the August 2022 Collateral and is entitled to set off the proceeds of its purported foreclosure on the August 2022 Collateral, principally by asserting counterclaims that no valid foreclosure took place with respect to the August 2022 Collateral. The Debtors also asserted that the November 7, 2022 amendment to the Security Agreement is avoidable pursuant to section 548 of the Bankruptcy Code. Gemini's response to the Debtors' positions in the above-discussed dispute are described in **Exhibit G** hereto.

On November 21, 2023, GGC commenced the Gemini Preference Action (defined below) naming Gemini and the Gemini Lenders as defendants. In the Gemini Preference Action, GGC seeks to avoid and recover payments from the Debtors to Gemini and/or the Gemini Lenders during the ninety-day preference period with a gross total of approximately $689,302,000, plus interest and costs. The complaint filed by GGC in the Gemini Preference Action also seeks to disallow any Claims filed by Gemini and/or the Gemini Lenders until such time as the property at issue in the Gemini Preference Action is returned to GGC or the value of such property is paid to GGC.

The Special Committee reserves the right to supplement this description at any time. The descriptions of the various Causes of Action in this Disclosure Statement are intended to assist Holders of Claims entitled to vote on the Amended Plan in evaluating the benefits and risks of the Amended Plan. Nothing in this Disclosure Statement is, or should be construed as, an admission, or in any way limits or prejudices the Debtors or their pursuit of Causes of Action against any of Gemini or the Gemini Lenders and any and all rights of the Debtors or the Wind-Down Debtors with respect to the pursuit of Causes of Action against any or all of Gemini or the Gemini Lenders, regardless of whether they are described herein, are fully reserved. Importantly, nothing in this Disclosure Statement is, or should be construed as, a representation as to whether the Debtors or the Wind-Down Debtors will ultimately be successful or unsuccessful in pursuit of any of the Retained Causes of Action. Litigation is inherently uncertain and any recovery will depend upon a number of factors, including the probability of success in litigation, the difficulties in collection and the expense and delay of litigation. Many of these factors are not within the Debtors' control and, litigation of the Retained Causes of Action may not result in any incremental distributable value to the Debtors' estates.

(a)    Preference Claims

The Special Committee's Investigation has focused on identifying and analyzing potential preference claims that the Debtors may have against Gemini and/or the Gemini Lenders. The Investigation has identified various payments from the Debtors to Gemini and/or the Gemini Lenders during the ninety-day preference period with a gross total of approximately $689,302,000. Moreover, the allegations in Gemini's Adversary Proceeding concede that the Debtors were insolvent during this time. As noted above, on November 21, 2023, GGC filed the Gemini Preference Action against Gemini and the Gemini Lenders seeking to avoid and recover these payments.

(i)    Potential Recoveries for Preference Claims

Although there were approximately $689,302,000 in outflows, the large majority of these transactions may be subject to a number of defenses under bankruptcy law, including that (i) payments were in the ordinary course of business, consistent with the usual course of dealing between GGC and Gemini and/or the Gemini Lenders; (ii) the

transactions are protected from avoidance by the Bankruptcy Code's "safe harbor" provisions; and/or (ii) certain transactions cannot give rise to preference liability based on a subsequent new value defense.

        (b)        Declaratory Judgments and Preferential Transfers

The Special Committee has analyzed the claims raised in the Adversary Proceeding. The Special Committee has concluded that the claims raised in the Adversary Proceeding are not meritorious, and the Debtors have sought relief in the form of dismissal of the claims on the merits and counterclaims in the same action. Specifically, as described above, the Debtors have moved to dismiss and/or asserted counterclaims and sought declaratory judgments on the grounds that (1) Gemini did not foreclose on the August 2022 Collateral and (2) Gemini does not have a security interest in the Additional GBTC Shares, which remain property of GGC. The Debtors have also asserted that, to the extent that Gemini prevails on its claims that the Additional GBTC Shares were validly pledged, such pledge is a voidable preference pursuant to Section 547 of the Bankruptcy Code.

        (i)        Potential Recoveries from Declaratory Judgments

Declaratory judgments in favor of the Debtors on the above-described issues would result in a determination by the court that the August 2022 Collateral was not foreclosed upon in November 2022, and therefore remains collateral held by Gemini for the benefit of the Earn Users, such that the current value of the August 2022 Collateral (more than $900 million) is the appropriate value to use as the set-off amount for the Gemini Lenders' claims against GGC, rather than the much lower price at which Gemini purported to sell the August 2022 Collateral to itself, to the detriment of the Gemini Lenders, in November 2022.

        (c)        Constructive Fraudulent Conveyance

As discussed in Section IV.C above, on August 15, 2022, GGC and Gemini executed a Security Agreement (the "Security Agreement") pursuant to which GGC transferred the August 2022 Collateral to Gemini in support of the Gemini Borrowings. The Security Agreement provided that the August 2022 Collateral would be returned to GGC on November 15, 2022 irrespective of the Gemini Borrowings outstanding as of that date. On November 7, 2022, GGC and Gemini executed an amendment to the Security Agreement (the "First Amendment to the Security Agreement") by which GGC agreed that the August 2022 Collateral would be returned to GGC when it had repaid the Gemini Borrowings in full, rather than on November 15, 2022. No consideration was given by Gemini in exchange for GGC's agreement to extend the term of the pledge, which facts support the constructive fraudulent conveyance counterclaim brought by GGC in the Gemini Adversary Proceeding for the value given by GGC in the First Amendment to the Security Agreement.

        (i)        Potential Recoveries for Constructive Fraudulent Conveyance Claim

If the Bankruptcy Court finds in favor of the Debtors on the constructive fraudulent conveyance claim against Gemini, it will set aside the effective elimination of Gemini's obligation to return the August 2022 Collateral on November 15, 2022 (i.e. the agreement in the First Amendment to the Security Agreement to extend the term of the pledge of the August 2022 Collateral), and return the parties to their positions prior to the execution of the First Amendment to the Security Agreement, whereby Gemini would have been obligated to return the August 2022 Collateral prior to its alleged foreclosure. GGC would then be entitled to a return of the August 2022 Collateral or its value as determined by the Bankruptcy Court, in accordance with the terms of the Security Agreement prior to its amendment.

    **G.**        **The Committee's Investigation**

The Committee, in furtherance of its fiduciary duty to unsecured creditors, has been investigating all prepetition conduct that may give rise to potential claims or causes of action against third parties, including the DCG Parties. Such claims may be a valuable source for improving creditor recoveries. To date, the Committee has received approximately 100,000 documents from the Debtors, DCG, and Gemini, with productions from the Debtors still being made on an ongoing basis.

The Committee's investigations focused on issues identified above that were the subject of the Special Committee's investigation, with a special focus on alter ego and preference claims. The Committee also focused on

statements made publicly or to individual investors by DCG concerning the DCG Note, as well as the extent to which communications by the Debtors were directed by DCG.

The Committee's advisors have shared the findings of their investigation with the Committee members on a regular basis to inform the Committee as to the scope and strength of potential litigation claims against the DCG Parties and other third parties. The Committee agrees with the Special Committee's assessment of the potential claims against the DCG Parties. Additionally, the Committee believes that certain transactions and transfers with, or directed by, DCG contributed to the Genesis liquidity issues that precipitated the Chapter 11 Cases.

The Debtors understand that DCG rejects these assertions and intends to vigorously defend against any such claims.

### H.    Redaction Decision

On April 24, 2023, the Bankruptcy Court conducted an evidentiary hearing on the motions by the Debtors and the Committee to redact all personally identifiable information ("PII") for the Debtors' lenders, including both individual and institutional lenders, from publicly-filed documents, including Schedules and Statements. The Debtors and the Committee sought to redact PII of the Debtors' lenders from public filings on the grounds of two alternate arguments based on two separate provisions of the Bankruptcy Code: (i) as confidential commercial information under section 107(b) of the Bankruptcy Code and (ii) based on undue risk of harm under section 107(c) of the Bankruptcy Code, ECF Nos. 14, 67, 137. The Bankruptcy Court agreed that PII of both individual and institutional lenders should be redacted under section 107(b) based on the first argument and issued a memorandum decision on August 4, 2023, ECF No. 581. On September 12, 2023, the Bankruptcy Court entered an order granting the motions as set forth in the Bankruptcy Court's decision, ECF No. 694.

### I.    Cash Cloud Proceedings

Holdco is the lender with respect to (i) an unsecured loan facility in the aggregate principal amount of approximately $100 million to Cash Cloud Inc. ("Cash Cloud", such facility, the "Cash Cloud Facility") and (ii) a secured promissory note in the aggregate principal amount of $7.5 million, secured by substantially all of the assets of Cash Cloud (such lien, the "Lien"), and such note, the "Cash Cloud Note"). This Cash Cloud Facility was originally between GGC and Cash Cloud pursuant to that certain Master Loan Agreement dated July 27, 2020. On October 29, 2022, GGC assigned to Holdco all of its rights and obligations in and to the Cash Cloud Facility. DCG disputes the appropriateness of this intercompany transfer and may assert counterclaims against the Debtors that could, if successful, reduce creditor recoveries on account of the Cash Cloud Facility.

On February 8, 2023, Cash Cloud filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Nevada (the "Nevada Bankruptcy Court").

#### (i)    Emergency Lien Priming

The Debtors filed a motion with the Bankruptcy Court to authorize Holdco to consent to the priming of the Lien by a new superpriority lien to secure Cash Cloud's obligations under a contemplated debtor-in-possession loan facility, in exchange for payment of adequate protection by Cash Cloud to Holdco against any diminution in the value of the collateral securing the Lien. *See* ECF No. 59. The Bankruptcy Court entered an order granting the Debtors authority to consent to the priming of the Lien on February 10, 2023. *See* ECF No. 77. On March 20, 2023, the Nevada Bankruptcy Court entered a final order approving the Cash Cloud debtor-in-possession facility and the adequate protection package. Order, *In re Cash Cloud Inc., dba Coin Cloud*, No. 23-10424 (MKN) (Bankr. D. Nev. Mar. 20, 2023), ECF No. 133.

#### (ii)    Cash Cloud Sale Process

Cash Cloud conducted a sale process of substantially all of its assets. In April, the Nevada Bankruptcy Court approved Cash Cloud's proposed bidding procedures. *See* Order, *In re Cash Cloud Inc., dba Coin Cloud*, No. 23-10424 (MKN) (Bankr. D. Nev. Apr. 27, 2023), ECF No. 483. On June 2, 2023 Cash Cloud held an auction for the sale of substantially all of its assets and announced winning bids on June 5, 2023. *See* Notice of Auction Results Regarding

Sale of Substantially All of the Debtors' Assets, *In re Cash Cloud Inc., dba Coin Cloud*, No. 23-10424 (MKN) (Bankr. D. Nev. June 5, 2023), ECF No. 618. Heller Capital, LLC, Genesis Coin, Inc. and Christopher McAlary submitted the winning bids, totaling $6,350,000.00 for substantially all of Cash Cloud's assets. On August 25, 2023, the Nevada Bankruptcy Court confirmed Cash Cloud's plan of reorganization. *See* Order, *In re Cash Cloud Inc., dba Coin Cloud*, No. 23-10424 (MKN) (Bankr. D. Nev. Aug. 25, 2023), ECF No. 1130.

### (iii)    *Cash Cloud Surcharge Motion*

On July 24, 2023, Cash Cloud filed a *Motion for Entry of an Order Authorizing Debtor to Surcharge the Collateral of Genesis Global Holdco, LLC, Enigma Securities Limited, and AVT Nevada, L.P.* (the "Surcharge Motion"). Surcharge Motion, In *re Cash Cloud Inc., dba Coin Cloud*, No. 23-10424 (MKN) (Bankr. D. Nev. July 24, 2023), ECF No. 926. The Surcharge Motion seeks recovery of (i) the warehousing costs associated with the storage and transportation of Holdco's collateral, and (ii) costs and expenses associated with the sale of the collateral securing Holdco's claim. The Debtors filed an objection to the Surcharge Motion on September 1, 2023. An evidentiary hearing on the Surcharge Motion is scheduled for October 16-17, 2023.

### J.    File Storage Partners Proceedings

GGC is the lender of approximately 176,415 Filecoin to File Storage Partners, LLC ("FSP"), secured by a lien on the equivalent amount of Filecoin (the "FSP Lien"). On June 30, 2023, FSP and its affiliated debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Bankruptcy Court").

### (i)    *Lien Priming*

The Debtors filed the *Motion for Entry of an Order (I) Authorizing the Debtors to Consent to Priming of the Debtors' Liens on Certain Property and (II) Authorizing and Approving Procedures for the Debtors to Consent to the Priming or Release of Liens on Other De Minimis Assets* (the "Lien Priming Procedures Motion"), ECF No. 602. The Lien Priming Procedures Motion requests that the Bankruptcy Court authorize GGC to consent to the priming of the FSP Lien by a new superpriority lien to secure FSP's obligations under a debtor-in-possession loan facility, in exchange for payment of adequate protection by FSP to GGC against any diminution in the value of the collateral securing the FSP Lien. The Lien Priming Procedures Motion also requests the Bankruptcy Court's approval of procedures for the Debtors to consent to the priming or release of liens in other de minimis assets without further authorization from the Bankruptcy Court. The Bankruptcy Court granted the motion on September 15, 2023, ECF No. 707.

On August 3, 2023, the Delaware Bankruptcy Court entered a final order approving the FSP debtor-in-possession facility and the adequate protection package. *See* Final Order, *In re File Storage Partners, LLC*, Case No. 23-10877-CTG (Bankr. D. Del. Aug. 3, 2023), ECF No. 88.

### K.    Three Arrows Capital ("3AC") Liquidation Proceedings

On June 27, 2022, 3AC commenced a liquidation proceeding (the "3AC Liquidation Proceeding") before the Eastern Caribbean Supreme Court in the High Court of Justice Virgin Islands (Commercial Division) (the "BVI Court"). Following the commencement of the 3AC Liquidation Proceeding and the appointment of Russell Crumpler and Christopher Farmer as joint liquidators of 3AC (the "Joint Liquidators"), the Joint Liquidators made a request for adequate protection with respect to certain Grayscale Bitcoin Cash Trust Shares, Grayscale Litecoin Trust Shares, Bitcoin, and Ether that the Foreign Representatives asserted may be in the possession of the Debtors. While the Debtors dispute that 3AC has any interest in any property or assets in the Debtors' possession, on February 22, 2023, the Debtors and the Joint Liquidators entered into a stipulation pursuant to which the Debtors agreed not to transfer or encumber any Grayscale Bitcoin Cash Trust Shares, Grayscale Litecoin Trust Shares, Bitcoin or Ether in their possession without providing 14 calendar days' prior written notice to the Joint Liquidators, except for certain transactions. *See Stipulation and Agreed Order by and Among the Debtors and the Foreign Representatives of Three Arrows Capital, Ltd. Regarding Certain Disputed Assets*, ECF No. 96 (the "3AC Stipulation"). On March 21, 2023, the Bankruptcy Court so ordered the 3AC Stipulation. On May 22, 2023, 3AC filed proofs of claim against the Debtors in the Chapter 11 Cases. *See* Section VI.N(ii)(b).

### L.   Recognition of the Chapter 11 Cases in Singapore

Due to the global nature of the Debtors' business operations, the ability of creditors to seize collateral in foreign jurisdictions, and the possibility that creditors and courts in foreign jurisdictions may not respect the automatic stay, the Debtors conducted an analysis of jurisdictions where it would be sensible to obtain recognition of these Chapter 11 Cases and enforcement of the automatic stay, or to commence parallel proceedings where remedies were then available under local law.

Therefore, the Debtors sought recognition of the Chapter 11 Cases by commencing parallel proceedings in Singapore.  The Debtors' recognition applications were heard before the High Court of the Republic of Singapore (the "Singapore Court") on July 6, 2023.  On July 17, 2023, the Singapore Court granted recognition of the Chapter 11 Case of Holdco as a foreign main proceeding.  On July 20, 2023, the Singapore Court granted recognition of the Chapter 11 Case of GGC as a foreign main proceeding.  On July 25, 2023, the Singapore Court granted recognition of the Chapter 11 Case of GAP as a foreign non-main proceeding.  On August 9, 2023 the Debtors filed a Notice of Recognition Proceedings in Singapore with the Bankruptcy Court.  *See* ECF No. 589.

### M.   Schedules and Statements

On January 27, 2023, the Bankruptcy Court entered the *Order (I) Extending Time to File Schedules of Assets and Liabilities, Schedules of Current Income and Expenditures, Schedules of Executory Contracts and Unexpired Leases, Statements of Financial Affairs, and Rule 2015.3 Financial Reports*, ECF No. 42, extending the deadline by which the Debtors were required to file their schedules of assets and liabilities and statements of financial affairs (the "Schedules and Statements") by an additional thirty-five (35) days for a total of forty-nine (49) days after the Petition Date.  On March 6, 2023, the Debtors filed a notice that they had agreed with the U.S. Trustee to further extend the deadline to file the Schedules and Statements to March 20, 2023, *see* ECF No. 119.

On March 21, 2023, the Debtors filed their Schedules and Statements. *See* ECF Nos. 141, 142, 143, 144, 145, 146, 147.  On June 22, 2023, the Debtors filed an amendment to their statements of financial affairs 4 to correct a clerical error.  *See* ECF No. 450.

### N.   Claims

#### (i)   *Bar Date Motion*

On March 16, 2023, the Debtors filed the *Debtors' Application for an Order (I) Establishing Bar Dates for Filing Proofs of Claim; (II) Approving Proof of Claim Forms, Bar Date Notices, and Mailing and Publication Procedures; (III) Implementing Uniform Procedures Regarding 503(B)(9) Claims; and (IV) Providing Certain Supplemental Relief*, ECF No. 135 (the "Bar Date Motion").  On April 4, 2023, the Bankruptcy Court entered an order (the "Bar Date Order"), ECF No. 200, establishing (i) May 22, 2023 at 4:00 p.m. (prevailing Eastern Time) as the last date and time for each person or entity to file proofs of claim based on prepetition Claims or on section 503(b)(9) of the Bankruptcy Code and (ii) July 18, 2023 at 4:00 p.m. (prevailing Eastern Time) as the last day for governmental units to file proofs of claim in the Debtors' Chapter 11 Cases.  Additionally, the Bar Date Order establishes separate Bar Dates for Claims arising from the Debtors' rejection of executory contracts and unexpired leases and Claims that the Debtors have amended in the Debtors' Schedules (collectively, the "Bar Dates").

On April 7, 2023, the Debtors mailed a notice of the Bar Dates to the U.S. Trustee, the Committee, and other parties as required by the Bar Date Order.  Additionally, in compliance with the Bar Date Order, the Debtors caused a notice to be published in the New York Times and USA Today.

The Bar Date Order authorized and directed Gemini to file a single proof of claim (the "Gemini Master Claim") against the Debtors on behalf of all creditors that loaned assets to the Debtors through the Gemini Earn program with Gemini acting as agent.  Additionally, the Bar Date Order authorized and directed the Ad Hoc Group to file a single proof of claim, together with a schedule of amounts asserted by each such member, on or before the

general bar date (May 22, 2023 at 4:00 p.m. (prevailing Eastern Time)), on account of Claims held by members of the Ad Hoc Group pursuant to relevant prepetition master loan agreements and loan term sheets.

### (ii)    *Claims Reconciliation Process*

#### (a)    Claim Objection Procedures

On June 22, 2023, the Debtors filed the *Motion for an Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 3007 (i) Establishing Claims Objection and Notice Procedures and (ii) Establishing Claim Hearing Procedures*, ECF No. 449 (the "Claims Objection Procedures Motion") seeking to establish certain procedures for objections to Claims, including broader authority to file omnibus objections to Claims than that granted in Federal Rule of Bankruptcy Procedure 3007(d).  On July 6, 2023 the Bankruptcy Court approved the Claims Objection Procedures Motion, ECF No. 498.

#### (b)    3AC Claims

On May 22, 2023, 3AC filed proofs of claim nos. 523, 526, and 527 (together, the "Original 3AC Claims") against Holdco, GGC, and GAP, respectively.  In the Original 3AC Claims, the Joint Liquidators represented that these Claims, including avoidance actions, arise from transfers to the Debtors with a value in excess of $1 billion.  On July 19, 2023, the Debtors filed an omnibus objection to each of the Original 3AC Claims, seeking an order disallowing and expunging the Original 3AC Claims because of, *inter alia*, 3AC's failure to allege sufficient facts to support a finding that the Debtors are legally liable under any cognizable law.  *See* ECF No. 530 (the "Original 3AC Objection").  On August 18, 2023, the Joint Liquidators filed amended proofs of claim nos. 981, 982, and 990 (the "Amended 3AC Claims" and together with the Original 3AC Claims, the "3AC Claims").  In response to the Amended Claims, the Debtors requested adjournment *sine die* of the hearing on the Original 3AC Objection that had been scheduled for August 24, 2023, to allow time for the Debtors to review and respond to the Amended 3AC Claims.  On September 1, 2023, the Debtors filed a renewed omnibus objection to the 3AC Claims (the "Renewed 3AC Objection", ECF No. 658), and withdrew the Original 3AC Objection, ECF No. 661.  The Renewed 3AC Objection raises defenses to all of the Amended 3AC Claims, including defenses under section 546(e) of the Bankruptcy Code.  Also on September 1, 2023, the Debtors filed a scheduling motion to establish a timeline for resolution of the 3AC Claims (the "3AC Scheduling Motion", ECF No. 659), to which 3AC objected on September 5, 2023.  On September 6, 2023, the Bankruptcy Court held a hearing and approved the 3AC Scheduling Motion with certain modifications, and an order was entered on September 12, 2023, ECF No. 695.

Separately, on September 6, 2023, 3AC filed a motion seeking relief from the automatic stay to pursue the 3AC Claims in the BVI or, in the alternative, in 3AC's chapter 15 proceeding in the U.S. Bankruptcy Court of the Southern District of New York before Judge Glenn (the "Lift Stay Motion"), ECF No. 678.  On September 19, 2023, the Debtors filed their objection to the Lift Stay Motion (the "Lift Stay Objection"), ECF No. 720.  On September 22, 2023, 3AC filed a reply to the Lift Stay Objection. *See* ECF No. 730.  A hearing on the Lift Stay Motion was scheduled for October 24, 2023.  *See* ECF No. 747.  In the meantime, the Parties engaged in fact discovery on the merits of the 3AC Claims.

On September 28, 2023, 3AC filed a motion requesting consultation between the Bankruptcy Court, the BVI Court, and other courts presiding over bankruptcy cases in which 3AC asserts preference claims, including the United States Bankruptcy Court for the District of New Jersey presiding over the chapter 11 cases of BlockFi Inc. and its debtor affiliates, the United States Bankruptcy Court for the District of Delaware presiding over the chapter 11 cases of FTX Trading Ltd. and its debtor affiliates, and the United States Bankruptcy Court for the Southern District of New York presiding over the chapter 11 cases of Celsius Network LLC and its debtor affiliates, in order to establish procedures to adjudicate the asserted common issues of fact and law raised by the 3AC Claims in a centralized forum, ECF No. 754.  On October 9, 2023, the Debtors filed a letter objecting to 3AC's coordination motion in BlockFi Inc.'s chapter 11 cases, Case No. 22-19361 (Bankr. D. N.J.), ECF No. 1692, and on October 11, 2023, the United States Bankruptcy Court for the District of New Jersey denied 3AC's coordination motion, ECF No. 1717.  On October 16, 2023, the Debtors objected to the motion, *see* ECF No. 805.  On October 17, 2023, 3AC withdrew the motion.

On October 22, 2023, the Debtors, DCG and 3AC reached an agreement in principle that would resolve disputes among the Debtors and 3AC and DCG and 3AC, including claims asserted by 3AC against the Debtors and

DCG, and claims asserted by DCG against 3AC. On November 9, 2023, the Debtors filed the *Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) for Entry of an Order Approving Settlement Agreement with the Joint Liquidators of Three Arrows Capital, Ltd.* (the "3AC 9019 Motion") seeking approval to effectuate a settlement agreement by and among the Debtors and 3AC and 3AC and DCG (the "3AC Settlement Agreement"), a form of which was attached as Exhibit B to the 3AC 9019 Motion. *See* ECF No. 906. The relief sought by the Debtors in the 3AC 9019 Motion is solely with respect to the terms of settlement between 3AC and the Debtors. *See id.* Simultaneously with the filing of the 3AC 9019 Motion, the Debtors also sought relief from the Bankruptcy Court to file certain aspects of the 3AC Settlement Agreement, and certain limited information in the 3AC 9019 Motion describing confidential terms of the Settlement Agreement, in redacted form, in all instances solely with respect to details of the terms of the settlement between 3AC and DCG. *See id.* The Debtors plan to file with the Bankruptcy Court a final and fully-executed 3AC Settlement Agreement, together with a blackline to reflect any changes as against the filed version, prior to the objection deadline for the 3AC 9019 Motion, which is currently set for November 24, 2023. *See id.*

The 3AC Settlement Agreement provides that the 3AC Releasing Parties and the Genesis Releasing Parties (as applicable and as defined in the 3AC Settlement Agreement) release and discharge each other from any and all past and present claims or causes of action of whatever nature that the 3AC Releasing Parties and the Genesis Releasing Parties have against each other arising from or relating to the 3AC Proofs of Claim or any other Claim that could be asserted.

In summary, the 3AC Settlement Agreement provides that (a) 3AC shall have an allowed general unsecured claim against GGC in the amount of $33 million (the "Allowed 3AC Claim"); (b) the Allowed 3AC Claim shall be entitled to receive pro rata distributions with all other Allowed General Unsecured Claims against GGC (other than Gemini Lender Claims to the extent separately classified) pursuant to the Amended Plan and shall be entitled to all treatment afforded to Allowed General Unsecured Claims in its respective class under the Amended Plan, subject to the terms of the 3AC Settlement Agreement; (c) each of the Debtors shall relinquish and release 3AC from any and all past and present claims the Debtors have asserted or may assert in connection with certain loan documents identified in the 3AC Settlement Agreement; (d) 3AC and the Debtors agree to use commercially reasonable efforts to cooperate in good faith with respect to each other's pursuit of claims against third parties by allowing, subject to applicable confidentiality obligations, use of non-privileged documents and information previously shared through discovery regarding the 3AC Claims; € 3AC shall not object to or, directly or indirectly, support an objection to any chapter 11 plan in these Chapter 11 Cases that is consistent with the terms of the 3AC Settlement Agreement; and (f) the debtors and upon the settlement effective date 3AC shall withdraw or dismiss or be deemed to withdraw or dismiss, as applicable, the 3AC Claims, the Renewed 3AC Objection, the arbitration proceeding commenced by GAP under the caption Genesis Asia Pacific PTE. Ltd. v. Three Arrows Capital, Ltd., AAA/ICDR Case No. 01-22-0002-5568, the Lift Stay Motion, and the *Motion for Entry of an Order Pursuant to Bankruptcy Rule 2004 Authorizing the Issuance of Subpoenas for the Production of Documents By the Debtors filed by 3AC*, ECF No. 711. Nothing in the 3AC Settlement Agreement operates as a release by the Debtors of DCG or any of DCG's non-Debtor affiliates or subsidiaries, which claims are fully preserved. The 3AC Settlement Agreement remains subject to approval by the BVI Court, which approval the Joint Liquidators are pursuing.

(c)        Gemini Master Claim and Gemini Proprietary Claim

On May 22, 2023, Gemini filed the Gemini Master Claim (proof of claim no. 356) asserting a $1.122 billion claim (the "Gemini Master Claim") against each of GGC, GGH, and GAP based on the Gemini Borrowings. The Debtors believe that the claims are duplicative and that a significant number of individuals have filed claims that are covered by, and therefore also duplicative of, the Gemini Master Claim. In its annex to the Gemini Master Claim, Gemini states that its claims are secured to the extent of certain collateral pursuant to a security agreement between GGC and Gemini and any subsequent amendments thereto. Whether the Gemini Master Claim is secured is subject to dispute.

More specifically as stated above, GGC pledged 30,905,782 shares of GBTC to Gemini pursuant to the security agreement, on which Gemini purported to foreclose on November 16, 2022. The Debtors dispute whether a foreclosure of the GBTC shares occurred and, if a foreclosure were found to have occurred, whether Gemini's foreclosure satisfies applicable law, including whether such sale was completed in a commercially reasonable manner and in accordance with the notice requirements set forth in the Uniform Commercial Code. Specifically, there is no

evidence that Gemini acted as purchaser in the foreclosure sale of the GBTC shares. If it had done so, one would have expected it to distribute the purchase price to the Gemini Lenders in accordance with the Uniform Commercial Code's requirements for distributions of proceeds or alternatively to have provided the GBTC shares to the Gemini Lenders. In addition, the Debtors did not receive any notice of the purported foreclosure sale, and the Debtors do not believe the shares were marketed publicly or privately; rather, the GBTC shares were transferred to an affiliate of Gemini, who continues to hold the GBTC shares. In addition, Gemini claims to have an interest in approximately 31,180,804 GBTC Shares which were never pledged or transferred to Gemini. The Debtors dispute that Gemini has any interest in such GBTC shares. As set forth in **Exhibit G**, Gemini disputes the Debtors' characterizations of fact and law relating to the Gemini Master Claim and all parties' rights are reserved with respect thereto.

Also on May 22, 2023, Gemini filed proofs of claim nos. 406, 407 and 413 (collectively, the "Gemini Proprietary Claim") representing direct claims that Gemini asserts it has against the Debtors in respect of assets loaned by Gemini Lenders, in the amount of no less than $13,541,860.54, as well as obligations by GGC to indemnify Gemini for losses suffered in connection with GGC's pause of redemptions relating to the Gemini Earn Program and the Chapter 11 Cases, in the amount of no less than approximately $6,500,000. The Gemini Proprietary Claim also seeks various unliquidated amounts, including for damages allegedly incurred in connection with claims sounding in fraud, misrepresentation and related torts. The Debtors are reviewing the Gemini Proprietary Claim and reserve all rights to object to the Gemini Master Claim and the Gemini Proprietary Claim, including on the basis that they are duplicative and filed as against the incorrect Debtor.

<div align="center">(d)   DCG Proofs of Claim</div>

On May 22, 2023, DCG filed proofs of claim nos. 464, 487, 511 against Holdco, GGC and GAP preserving its rights in connection with, among other things, the DCG Loans, the DCGI Loans and the Luno Setoff.

The Debtors vigorously reject the assertions made in DCG's proofs of claim and intend to file objections to the claims.

<div align="center">(e)   FTX Proofs of Claim</div>

On May 22, 2023, FTX Trading Ltd. filed Claim No. 415 against Holdco, Claim No. 419 against GAP, and Claim No. 426 against GGC; Alameda Research LLC filed Claim No. 422 against Holdco, Claim No. 420 against GAP, and Claim No. 513 against GGC; Alameda Research Ltd. filed Claim No. 512 against Holdco, Claim No. 457 against GAP, and Claim No. 508 against GGC; West Realm Shires Inc. filed Claim No. 516 against Holdco, Claim No. 463 against GAP, and Claim No. 438 against GGC; West Realm Shires Services Inc. filed Claim No. 465 against Holdco, Claim No. 432 against GAP, and Claim No. 515 against GGC (the proofs of claim collectively, the "FTX Proofs of Claim"). The FTX Proofs of Claim collectively assert claims totaling $3,876,473,714, comprising (i) $1,819,183,169 in loan repayments allegedly made by Alameda to GGC pursuant to the MLAs between the FTX Preference Period (defined below); (ii) $272,690,086 of collateral allegedly pledged by Alameda to GGC pursuant to the MLAs during the FTX Preference Period; (iii) $143,615,599 of collateral allegedly pledged by Alameda to GGC pursuant to the MLAs prior to the FTX Preference Period; and (iv) $1,640,984,160 of assets allegedly withdrawn by the Debtors from the FTX.com exchange between the FTX Preference Period (defined below).

On October 6, 2023, the Bankruptcy Court issued a decision approving the Debtors entry into a settlement agreement with FTX Trading Ltd. and its affiliates resolving the FTX Proofs of Claim, *see* ECF No. 781, and on October 17, 2023 entered an order approving the settlement. *See* ECF No. 806. Further discussion on the resolution of the FTX Proofs of Claim and the FTX Settlement Agreement (defined below) is described in Section XI.T(ii).

<div align="center">(f)   Governmental Claims</div>

Pursuant to the Bar Date Motion, the Bankruptcy Court established July 18, 2023 at 4:00 p.m. (prevailing Eastern Time) as the last day for governmental units to file proofs of claim in the Chapter 11 Cases. As of July 18, 2023, twelve governmental units filed twenty-seven proofs of claim against the Debtors totaling approximately $32.9 billion. To the extent such claims seek payment of fines or penalties or seek restitution and are not compensation for actual pecuniary loss suffered by the holder of such claims and fall within the scope of section 726(a)(4) of the

Bankruptcy Code, made applicable to chapter 11 cases by section 1129(a)(7) of the Bankruptcy Code, such claims shall be classified as Government Penalty Claims and will be subordinated to General Unsecured Claims.

### O.        Sale Process and Wind Down of Non-Debtor Subsidiaries

Beginning on March 31, 2023, the Debtors commenced a sales process to market the assets of the Debtors as well as certain non-Debtor assets (including GGT) (collectively, the "Assets"). On March 16, 2023, the Debtors filed the *Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Deadlines, (II) Scheduling Hearings and Objection Deadline with Respect to the Debtors' Sale, and (III) Granting Related Relief*, ECF No. 133 (the "Bidding Procedures Motion"). The Bidding Procedures Motion was approved by the Bankruptcy Court on March 30, 2023, ECF No. 191 (the "Bidding Procedures Order").

As set forth in the Bidding Procedures (as defined in the Bidding Procedures Motion), and as contemplated by the Restructuring Term Sheet, the purpose of the sales process was to maximize the value of any disposition of the Assets – whether through a sale, wind-down, or reorganization. During the sales process, the Debtors marketed the Assets for sale both individually and as a package in combination with any other subset of Assets. The Bidding Procedures Order made clear that the sale of GGT, or any other Asset that is not directly or indirectly owned by the Debtors, required DCG's consent. The sale of any direct or indirect Asset of the Debtors was overseen by the Special Committee.

The Bidding Procedures (as defined in the Bidding Procedures Motion) established a process for solicitation, receipt, and evaluation of bids on an efficient timeline for equity in, or assets of, the Debtors and certain of their non-Debtor subsidiaries (the "GGH Assets"), as well as non-Debtor affiliate GGT (together with the GGH Assets, the "Assets"). The Debtors envisioned that GGT and GGCI, the legal entities housing the Companies' spot and derivatives trading activities respectively, together with GGM, which had applied for registration as a Swap Dealer with the Commodities Futures Trading Commission (the "CFTC"), would be sold or recapitalized in a potential sale transaction. As further described herein, GGT holds several existing licenses which supported the Company's trading business and GGCI and GGM had applied for several others, with the BVI Financial Service Commission and the Bermuda Monetary Authority, respectively, to carry out spot and derivatives trading activities. GGT has a virtual currency BitLicense issued by the NYDFS and is registered as a broker-dealer with the SEC and FINRA.

The Debtors determined, in their business judgment and in consultation with the Required Consenting GGC Creditors (as defined in the Bidding Procedures Motion), the Committee, and the Ad Hoc Group (collectively, the "Consultation Parties") and with the consent of DCG, as it relates to GGT, that the Bidding Procedures represented the best path forward to effectuate an efficient sale process that would maximize recoveries to creditors. The Bidding Procedures and Sale Schedule (as defined in the Bidding Procedures Motion) allowed potential bidders adequate time to review the data room and submit bids, and provided adequate time for the Debtors, in consultation with the Consulting Parties and the consent of DCG, as it relates to GGT, to evaluate the bids, hold an Auction, if needed, and seek Bankruptcy Court approval of the sale pursuant to a chapter 11 plan.

The Bidding Procedures set forth the following Sale Schedule, which was amended by the *Notice of Amended Sale Schedule*, ECF No. 295 and further amended by the *Notice of Second Amended Sale Schedule*, ECF No. 439, the *Notice of Third Amended Sale Schedule*, ECF No. 456, the *Notice of Fourth Amended Sale Schedule*, ECF No. 502, the *Notice of Fifth Amended Sale Schedule*, ECF No. 515, and the *Notice of Sixth Amended Sale Schedule*, ECF No. 566 in consultation with the Consultation Parties and consent of DCG, as it relates to GGT:

| Action | Description | Deadline |
|---|---|---|
| Bidding Procedures Hearing | The hearing before the Bankruptcy Court to consider the Bidding Procedures Motion | March 30, 2023 |
| Indications of Interest Deadline | The deadline by which all indications of interest must be actually received | May 19, 2023 |
| Stalking Horse Designation Deadline | The deadline to designate one or more Qualified Bidders as the Stalking Horse Bidder(s), if any | July 25, 2023 |

| Bid Deadline | The deadline by which all binding Bids must be actually received pursuant to the Bidding Procedures | July 26, 2023 |
|---|---|---|
| Auction | The date and time of the Auction, if one is needed, which will be held at the offices of Cleary Gottlieb Steen & Hamilton LLP, One Liberty Plaza, 38th Floor, New York, NY 10006 and/or via Zoom | August 16, 2023 |
| Deadline to file the Designation of Successful Bid | The deadline to file a notice designating the Successful Bid and Successful Bidder, as well as the Back-up Bid and Back-up Bidder | One business day following the conclusion of the Auction |
| Sale Objection Deadline | The deadline by which objections to the entry of an order by the Bankruptcy Court approving the Sale must be filed with the Bankruptcy Court and served so as to be actually received by the appropriate notice parties (the "Sale Objection Deadline") | To be determined |
| Sale Hearing (subject to the Bankruptcy Court's availability) | The Sale will be implemented under the Plan and shall be approved at the Confirmation Hearing | To be determined |

The Debtors officially launched the sale process on March 31, 2023. The deadline to receive initial indications of interest was May 19, 2023. The Debtors received multiple indications of interest and engaged in a diligence process with potential bidders to respond to questions and provide information about the Assets. In light of ongoing diligence with bidders after the initial deadlines, the Debtors extended the sale deadlines. The final binding bid deadline was July 26, 2023.

Over the course of the sales process, (i) 149 parties were contacted, (ii) 30 parties executed a nondisclosure agreement, (iii) eight indications of interest were received, and (iv) one party was selected as lead bidder. The lead bidder submitted an offer to purchase 100% of the equity of non-Debtor subsidiaries Genesis Global Markets Limited ("GGML") and GGCI, as well as certain assets of non-Debtor GGT needed for the operation of GGML and GGCI. The value of the offer received, however, did not represent a meaningful premium over the book value of the assets, with a modest sale premium of approximately $10 million, which accounted for potential estate cost savings in the event the transactions could be successfully and expeditiously consummated. By the terms of the Bidding Procedures, the Debtors were required to review every bid received, and in consultation with the Committee, (i) determine which bids were "Qualified Bids" and (ii) evaluate the Qualified Bids to determine which bid presented the highest and otherwise best offer for the Assets. Qualified Bid because Ultimately, no actionable bid for GGT or its other assets that was acceptable to DCG emerged. Nor did any actionable bid with respect to any other Assets that was acceptable to the Debtors emerge.

To limit the costs that would be incurred by GGML and GGCI from protracted negotiations with an uncertain outcome, whose employees remained at those entities in part to support the sales process, the Debtors conditioned further negotiations with the lead bidder meeting certain deal milestones on a specified timeline. The Committee was notified and agreed with this approach.

Because of a lack of progress in reaching certain deal milestones with the lead bidder, as well as a divergence of views between the parties related to regulatory risks and approvals, among other open points, the Debtors determined that the sale would not be able to be executed in a timely fashion, if at all. Given the small size of the sale premium and the high likelihood that the incremental operating expense spend for each month the sales process continued would exceed $1 million, the Debtors decided that commencing an immediate winding down of GGML and GGCI, whereby liquid assets would be transferred to the Debtors as soon as practicable, would be more likely to maximize the value of the Assets and would be more beneficial for creditors than continuing the sale process.

In addition to removing an ongoing operating expense, the cessation of the sales process allows tens of millions of dollars' worth of cash and digital assets to be released back to the Debtors via settlement of intercompany obligations. To the extent that GGML and GGCI were to continue operating, either to further an ultimate sale or a reorganization, the release of those assets to the Debtors would be in question as such assets would be needed to capitalize the business from both an operational and regulatory perspective.

By winding down and liquidating their existing Assets, the Debtors are expected to unlock the value of the assets of GGML and GGCI for the benefit of creditors of GGH and/or GGC.  Liquid assets at GGML and GGCI are in the process of being transferred to the Debtors, with some of those assets already having been transferred through intercompany settlements.  Such wind-down ultimately benefits GGH and will likely flow down to creditors of GGC. The Debtors estimate that they stand to recover approximately $63 million from GGCI and $69 million from GGML.

There is currently no plan to relaunch the Genesis platform.  DCG is not a transferee of any GGCI or GGML assets and is not expected to benefit from the liquidation of such entities.

Additionally, once it became clear there was no acceptable bid for GGT resulting from the sale process, DCG determined that it would proceed with winding down that entity.  Although it is an affiliate of the Debtors, GGT is not a subsidiary of any of the Debtors.  Accordingly, Genesis creditors are not affected by the winding down of GGT or the related disposition of its assets and/or liabilities.  However, DCG has agreed to transfer any net proceeds from the GGT wind-down to GGC to fund the repayment of the obligations owed from DCG to GGC.

### P.      Settlement with Digital Currency Group, Inc.

#### (i)      *Mediation with DCG and Key Stakeholders*

After unsuccessful attempts at reaching a resolution of certain issues involving potential claims against DCG, on April 24, 2023, the Debtors filed the *Motion for Appointment of a Mediator*, ECF No. 252.  On May 1, 2023, the Bankruptcy Court entered the *Order Appointing Mediator*, ECF No. 279 (the "Mediation Order"), which provided for the Debtors, DCG, the Committee, the Ad Hoc Group, and Gemini (collectively, the "Mediation Parties") to engage in mediation through May 31, 2023, which could be extended by agreement among the Mediation Parties.  The Mediation Parties, along with their respective counsel, selected Randall J. Newsome, a former bankruptcy judge in the Northern District of California, as their mediator.

Initial mediation sessions were held on May 4 and May 5, 2023 with the Mediation Parties and their respective counsel and financial advisors.  On May 31, 2023, the Mediation Parties agreed to extend the mediation period through and including June 16, 2023, which was subsequently extended with consent from the Mediation Parties through July 10, 2023. *See* ECF Nos. 436, 445, 453, 473, 480.  On July 13, 2023, the Debtors requested that the Bankruptcy Court extend the mediation period over the objection of Gemini.  The Bankruptcy Court granted the request, extending the mediation period through July 27, 2023.  *See* ECF No. 517. On August 4, 2023, the Bankruptcy Court extended the mediation period through August 16, 2023.  *See* ECF No. 580.  On August 16 and August 17, 2023, mediation sessions were held with the Mediation Parties and their respective counsel and financial advisors. The mediation period was then subsequently extended with consent from the Mediation Parties through August 23, 2023. *See* ECF Nos. 599, 600.  On August 29, 2023, the Debtors filed the *Notice of Mediation Termination*, ECF No. 625, announcing that the mediation terminated on August 23, 2023 and resulted in a deal in principle (the "Agreement in Principle") among the Debtors, the Committee, and DCG, subject to definitive documentation and continued negotiation over the terms and conditions of an amended chapter 11 plan that was annexed as an exhibit thereto.  The Agreement in Principle was reliant on an agreement on the terms of a chapter 11 plan between the Debtors and the Committee.

Main components of the Agreement in Principle included:

- An approximately $328.8 million first-lien facility with a 2-year maturity (based on market prices as of 8/15/23) and interest rates varying between 6 and 10 percent depending on whether the loans issued thereunder are issued in proportional denomination between USD or Digital Assets;

- An $830.0 million second-lien facility with a 7-year maturity and a 6% percent interest rate on both USD- and Digital Asset-based loans;

- a distribution model to be agreed in definitive documentation, but which would include the following principles:

o   Distributions would be in kind to the extent possible;
o   Creditors would be able to elect to receive an early payment exceeding their pro rata initial distribution, in full satisfaction of their claims;
o   The early payment option would provide recoveries of about 60-62.5% of total claims and would be paid in U.S. Dollars;
o   The Debtors would make an initial distribution that would provide about 30-40% recoveries (which is subject to change for market values, a disputed claims reserve and restructuring or wind-down costs) consisting of all cash and coin on hand except certain reserve amounts and the early-pay distribution;
o   After the initial distribution, creditors would receive proceeds of designated longer-term assets on future distribution dates as assets are monetized or received; and
o   The estate would seek to match assets with claims to maximize in-kind recoveries.

Please consult the following link for more information on the Agreement in Principle: https://restructuring.ra.kroll.com/genesis/Home-DownloadPDF?id1=MjQ2NzEwNg==&id2=-1.

### *(ii)    Partial Repayment Agreement*

In accordance with the Agreement in Principle, on September 12, 2023, the Debtors, DCG and DCGI entered into that certain *Partial Repayment Agreement* dated September 12, 2023 (the "Partial Repayment Agreement") which provides for a limited forbearance by GGC in respect of the DCG Parties' obligations to GGC that are the subject of the Turnover Actions filed against the DCG Parties.  A copy of the Partial Repayment Agreement is attached as Exhibit A to the Notice of Stay filed in the Turnover Actions.  *See* Section VI.T(iii).

In exchange for such forbearance, each of DCG and DCGI agreed to make three installment payments of $75 million (payable every 45 or 47 days) and a fourth installment payment of $50 million (payable 45 days after the third installment payment), with the full $275 million payable upon the occurrence of the Effective Date, if not already paid by such date.  Seventy-eight percent of the installment payments will be paid in US Dollars, while the remaining 22% will be in BTC.  The DCG Parties also agreed to pay a forbearance fee equal to 0.375% of the aggregate principal amount outstanding under the DCG Loans and the DCGI Loan which shall be credited towards the USD portion of the final installment payment.  While GGC and the DCG Parties reserved all their rights with respect to the payment of Late Fees (or default interest) under the DCG Loans (and the Partial Repayment Agreement does not require DCG to make any payments in respect thereof during the forbearance period), DCG and DCGI are required to pay Loan Fees (or interest) under all loan obligations and Late Fees (or default interest) under the DCGI Loan.

DCG and DCGI also agreed to be bound by certain restrictions for the term of the forbearance period, including on the incurrence of debt, the payment of dividends, the sale of assets, and the use of proceeds from the sale of designated assets.  However, the negative covenants provided for in the Partial Repayment Agreement shall survive termination of the forbearance in the event that DCG or DCGI breaches any of its payment obligations under the Partial Repayment Agreement.  In the event that GGC, in consultation with its legal and financial advisors, determines that the termination of the Partial Repayment Agreement is appropriate, necessary, or consistent with the exercise of its fiduciary duties, GGC is entitled to terminate the agreement.

On September 13, 2023, GGC received, pursuant to the terms of the Partial Repayment Agreement, the following payments or transfers from the applicable DCG Party: (i) a forbearance fee in the amount of $2,315,937.92, (ii) a payment of $58,500,000 on account of outstanding principal in respect of the DCG Loans, (iii) a transfer of 638.54616543 BTC on account of outstanding principal in respect of the June 22 Loan and (iv) a transfer of 70.43849944 BTC on account of Late Fees accrued under the June 22 Loan as of August 31, 2023.

On October 3, 2023, GGC received, prior to the applicable Payment Date under the Partial Repayment Agreement, the following payments or transfers from the applicable DCG Party: (i) two payments totaling $58,500,000 on account of outstanding principal in respect of the DCG Loans and (ii) a transfer of 599.91212208 BTC on account of outstanding principal in respect of the June 22 Loan.

On October, 20, 2023, GGC received prior to the applicable Payment Date under the Partial Repayment Agreement, the following payments or transfers from the applicable DCG Party: (i) one payments in the amount of

$58,500,000 on account of outstanding principal in respect of the DCG Loans and (ii) a transfer of 574.2224245 BTC on account of outstanding principal in respect of the June 22 Loan.

As of the date hereof, DCG or DCGI have paid or transferred a total of approximately $227.3 million pursuant to the Partial Repayment Agreement, plus approximately $4.5 million in Loan Fees and $460,000 in Late Fees each month (for a total of approximately $10 million in Loan Fees and $2.3 million in Late Fees during the term of the Partial Repayment Agreement).

As of October 29, 2023, GGC may terminate the Partial Repayment Agreement in accordance with its terms as a result of the Debtors' failure to execute a global restructuring agreement with DCG or to file an amended chapter 11 plan consistent with the Agreement in Principle and, contrary to DCG's assertion, as of October 30, 2023, GGC may terminate the forbearance period if it determines that termination is appropriate, necessary or consistent with the exercise of its fiduciary duties. DCG disputes that the Debtors may terminate the forbearance period on the basis of their fiduciary duties. The Debtors are in discussions with DCG, the Committee and the Ad Hoc Group about a potential continuation of the voluntary stay of the Turnover Actions in exchange for additional amounts to be paid by the DCG Parties in respect of the DCG Loans and the DCGI Loan. At this time, the Committee believes that the Partial Repayment Agreement should be terminated and that the Debtors should immediately lift the voluntary stay to continue prosecution of the Turnover Actions to recover full repayment under the DCG Loans and the DCGI Loan. The Debtors believe that any litigation is likely to take approximately 60-90 days, without accounting for any appeals.

Q.     **Employee Matters**

On May 15, 2023, the Debtors filed a *Motion to Authorize Genesis Asia Pacific Pte. Ltd. to Pay Certain Employee Severance Obligations*, ECF No. 312. The Debtors asked for authorization to pay severance to four employees totaling approximately $21,850.62 USD. On June 21, 2023, the Bankruptcy Court granted the motion. *See* ECF No. 442.

On August 16, 2023, the Debtors filed a *Motion for an Order Authorizing Holdco to Enter into Payroll Contract, Incur Obligations Related to Employee Transfer and Granting Related Relief*, ECF No. 601. The Debtors requested authorization for Holdco to enter into a payroll contract and transfer employees from GGT to Holdco to prepare for the possible sale or wind down of GGT. The Bankruptcy Court granted the motion on September 15, 2023, ECF No. 706.

R.     **Debtors' New Lease**

On October 3, 2023, the Debtors filed the *Motion for an Order Authorizing the Debtors to Enter into New Lease of Real Property and Granting Related Relief*, ECF No. 775. The Debtors requested authorization for Holdco to enter into a new six-month term lease for commercial office space. The Bankruptcy Court granted the motion on October 30, 2023, ECF No. 855.

S.     **Director & Officer Insurance**

On March 27, 2023, Soichiro "Michael" Moro, a former Genesis director, filed a *Motion for Relief from Stay*, ECF No. 165, to allow him to enforce his rights and demand and receive proceeds payable under the Debtors' D&O Insurance Policy. The policies at issue cover claims made both by the Debtors and their directors and officers. The Committee objected to the motion, and while the Debtors refrained from objecting to the motion, they filed a response requesting that, should the Bankruptcy Court grant the motion, it lift the stay to permit all covered directors and officers to file claims under the insurance policies. On May 9, 2023, the Bankruptcy Court issued an order granting the motion and ordering that, to the extent applicable, the automatic stay is modified to the extent necessary to allow any of the Debtors' current and former directors and officers insured under the policies to enforce their rights and demand and receive proceeds payable under the D&O Insurance Policy to the extent of their coverage thereunder, incorporating the Debtors' request. *See* ECF No. 300. The order did not constitute a finding that the proceeds of the D&O Insurance Policies are or are not property of the Debtors' estates, and the Bankruptcy Court made no finding as to the applicability of the automatic stay to the proceeds of the D&O Insurance Policy.

56

On May 15, 2023, the Debtors filed the *Debtors' Motion for Entry of an Order Authorizing the Debtors to (I) Extend the Coverage Period of Certain Insurance Policies and (II) Granting Related Relief*, ECF No. 311 (the "Insurance Extension Motion") seeking authorization, to the extent required, to extend their directors and officers liability insurance policies by a period of six months to December 28, 2023. The requested relief would enable the Debtors and covered directors and officers, whether former or incumbent, who are currently navigating multiple actions and investigations, to continue discharging their duties without fear that they will not have insurance coverage. On June 21, 2023, the Bankruptcy Court granted the Insurance Extension Motion, ECF No. 442. While provisional coverage disbursements under the policies have been made, the insurers continue to consult with their counsel as to their obligation to cover claims made under the policies. The Debtors may wish to seek the Bankruptcy Court's authorization for a further extension of its liability insurance policies for the benefit of the Debtors and covered directors and officers prior to expiration of such policies on December 28, 2023.

### T.    Motions to Extend Exclusivity

On May 19, 2023, the Debtors filed the *Motion for Entry of an Order Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereof and Granting Related Relief*, ECF No. 329 (the "First Exclusivity Motion"), to extend their exclusive periods to file a chapter 11 plan and obtain acceptances thereof by 100 days (to August 27, 2023 and October 3, 2023, respectively). The Debtors, the Committee, and the Ad Hoc Group subsequently agreed to a reduced 75-day extension of the exclusive periods. On June 21, 2023, the Bankruptcy Court entered the order extending the Debtors' exclusive period to file a chapter 11 plan through and including August 27, 2023 and to solicit acceptances thereof through and including October 26, 2023, ECF No. 444.

On August 2, 2023, the Debtors filed the *Second Motion for Entry of an Order Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereof and Granting Related Relief*, ECF No. 574 (the "Second Exclusivity Motion") to extend their exclusive periods to file a chapter 11 plan and obtain acceptances thereof to October 2, 2023 and November 30, 2023, respectively. The Committee filed a statement and reservation of rights in support of the Second Exclusivity Motion. *See* ECF No. 654. The Ad Hoc Group, Gemini, and the Brown Rudnick Group all filed objections to the Second Exclusivity Motion. *See* ECF Nos. 633, 634 and 635.

On September 15, the Bankruptcy Court granted the Second Exclusivity Motion. *See* ECF No. 705. The Bankruptcy Court extended the Debtors' exclusive period to file a chapter 11 plan through and including October 6, 2023 and to solicit acceptances thereof through and including October 31, 2023.

On October 6, 2023, the Debtors filed the *Third Motion for Entry of an Order Extending the Debtors' Exclusive Periods in Which to File a Chapter 11 Plan and Solicit Acceptances Thereof and Granting Related Relief*, ECF No. 785 (the "Third Exclusivity Motion"). The Ad Hoc Group and the Brown Rudnick Group all filed objections to the Third Exclusivity Motion. *See* ECF Nos. 813, 815. At a hearing on the Third Exclusivity Motion on October 24, 2023, the Bankruptcy Court extended the Debtors' exclusive period to file a chapter 11 plan through and including November 7, 2023 and to solicit acceptances thereof through and including December 7, 2023, and adjourned the Third Exclusivity Motion to November 7, 2023 for further consideration. On November 7, 2023, upon an oral motion for a further extension by the Debtors, the Bankruptcy Court extended the Debtors' exclusive period to file a chapter 11 plan through and including the date of the continued hearing on the Debtors' Disclosure Statement, set for November 28, 2023.

### U.    Litigation Matters

#### (i)    Certain Non-Bankruptcy Litigation Matters

The Debtors are party to certain lawsuits and proceedings. The Debtors cannot predict with certainty the outcome of these lawsuits or proceedings. Upon the filing of the Chapter 11 Cases, the automatic stay acts as a pause with respect to the commencement or continuation of litigation by private plaintiffs against the Debtors. The filing of the Chapter 11 Cases likewise generally stays any legal proceedings commenced to obtain possession of, or to exercise control over, the property of the Debtors' bankruptcy estate. Pursuant to section 362(b)(4) of the Bankruptcy Code, however, the filing of the Chapter 11 Cases does not operate as a stay of any action or proceeding by a governmental unit seeking to enforce such unit's police or regulatory power.

A list of certain non-bankruptcy litigation matters follows. The outcome of the below matters is uncertain and unpredictable.

(a)    SEC v. Genesis Global Capital, LLC[13]

On January 12, 2023, the Securities and Exchange Commission (the "SEC") filed a complaint in the United States District Court for the Southern District of New York against GGC and Gemini, (the "SEC Action"). The SEC alleges that GGC and Gemini offered and sold securities through the Gemini Earn program without a valid registration statement filed or in effect with the SEC, in violation of Sections 5(a) and 5(c) of the Securities Act of 1933. On May 26, 2023, GGC and Gemini filed motions to dismiss, which are fully briefed as of August 18, 2023.

(b)    Levin v. Genesis Global Capital, LLC[14]

On January 21, 2023 Woodrow Levin filed a complaint in the United States District Court for the Northern District of Illinois, Eastern Division against GGC. Levin alleged that he lent digital assets to GGC, and that his digital assets have not been returned to him despite due demand. Levin asserted claims for breach of contract and conversion. On February 9, 2023, the court, after being made aware of GGC's bankruptcy petition, *sua sponte* dismissed the action without prejudice.

(c)    GGC International Limited v. Roger Ver[15]

On March 28, 2023 GGCI filed a complaint against Roger Ver in the Supreme Court of New York. GGCI alleged that Ver paid to settle Digital Asset options agreements under which Ver owed GGCI roughly $110 million, minus amounts owed by GGCI to Ver for a total amount of $20,869,788 owed to GGCI. Ver filed an answer on May 9, 2023 with counterclaims. On June 14, 2023 GGCI filed a motion to dismiss the counterclaims filed by Ver. Ver filed an amended answer with additional counterclaims on July 31, 2023, and GGCI filed a motion to dismiss the amended counterclaims on August 21, 2023. Oral argument in this litigation will proceed on November 8, 2023.

(d)    Gemini Earn Arbitration Proceedings

There are also a number of private arbitration proceedings filed against various Debtor entities related to the Gemini Earn Program. These arbitration proceedings are stayed in light of the bankruptcy proceedings.

*(ii)    FTX Preference Litigation*

On May 3, 2023, FTX Trading Ltd. and its affiliated debtors, including Alameda Research, Ltd. (referred to herein as the FTX Entities), filed a *Motion for Relief from Stay,* ECF No. 289 (the "Lift Stay Motion") requesting the Debtors' automatic stay be lifted in order for the FTX Entities to bring preference actions against Debtor GGC in connection with approximately $3.673 billion in alleged transfers made to the Debtors in the 90 days before the FTX Entities' chapter 11 petition date of November 11, 2023 (the "FTX Preference Period"). Specifically, the FTX Entities sought to bring preference actions with respect to (i) the alleged repayment of loans to GGC by Alameda in the aggregate amount of approximately $1.8 billion; (ii) the alleged pledge of collateral by Alameda to GGC in the aggregate amount of approximately $273 million; and (iii) the alleged withdrawal of assets from the FTX.com exchange in the aggregate amount of approximately $1.6 billion in the United States Bankruptcy Court for the District of Delaware, where FTX's bankruptcy case is pending. In the Lift Stay Motion, FTX also alleged claims against non-Debtor GGCI.

---

[13]    Complaint, *Securities and Exchange Commission v. Genesis Global Capital, LLC*, No. 23-CV-00287 (ER) (S.D.N.Y. 2023), ECF No. 1.

[14]    Amended Complaint, *Levin v. Genesis Global Capital, LLC*, No. 22-CV-07249 (N.D. Ill. 2023), ECF No. 7.

[15]    Pl. Complaint, March 28, 2023, NYSCEF Doc. No. 9. Case No. 650439/2023.

On June 8, 2023, the Debtors filed an objection to the Lift Stay Motion. *See* ECF No. 405. Both the Committee and the Ad Hoc Group filed joinders to the objection. *See* ECF Nos. 407, 412. In the Lift Stay Motion objection, the Debtors explained that the FTX Entities sought to litigate claims that are central to these Chapter 11 Cases in a different forum and on an uncertain timeline that threatens the Debtors' timeline for confirming the Amended Plan. On this basis, the Debtors do not believe that there is cause to modify the automatic stay. The FTX Entities filed a response to the objection on June 13, 2023, ECF No. 428. The Bankruptcy Court heard the Lift Stay Motion on June 15, 2023 and adjourned the matter to July 6, 2023 with a direction to the parties to meet and confer.

On June 1, 2023, the Debtors filed a *Motion to Establish Procedures and a Schedule for Estimating the Amount of the FTX Entities' Claims Against the Debtors Under Bankruptcy Code Sections 105(a) and 502(c) and Bankruptcy Rule 3018*, ECF No. 373 (the "Estimation Motion") requesting that the Claims asserted by FTX/Alameda be estimated for purposes of voting, allowance, and distribution at $0.00. Given the magnitude of the asserted FTX Entities' Claims, which the Debtors disputed, estimation for the purposes of voting, allowance, and distribution is needed in order to avoid undue delay in the timing and amount of creditor distributions, and to ensure the timely confirmation of the Amended Plan.

Because the fixing of the amounts of the FTX Entities' Claims through the traditional litigation process would cause undue delay to the administration of the Chapter 11 Cases, the Debtors proposed an expedited timeline for the estimation process.

The FTX Entities filed an objection to the Estimation Motion on June 8, 2023, ECF No. 406. The Debtors filed a reply to the objection on June 13, 2023, ECF No. 430. The Bankruptcy Court heard the Estimation Motion on June 15, 2023 and adjourned the matter to July 6, 2023 with a direction to the parties to meet and confer to help clarify the areas of disagreement between the parties. After engaging in limited discovery pursuant to the Bankruptcy Court's directive, the Bankruptcy Court heard the Estimation Motion on July 6, 2023 and again adjourned the Estimation Motion to July 20, 2023 to allow the parties to further narrow the issues in dispute and with a direction to continue with discovery along the schedule proposed by the Debtors. After further information exchange and several meet and confers between the parties, on July 20, 2023, the Bankruptcy Court again adjourned the Estimation Motion and scheduled a status conference for early August regarding the parties' open issues and proposed estimation schedule.

On July 27, 2023 the Debtors filed a letter with the Bankruptcy Court announcing that they had reached a deal in principle with the FTX Entities. On August 17, 2023 the Debtors filed the *Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) for Entry of an Order Approving Settlement Agreement with FTX Entities* seeking the Bankruptcy Court's approval to effectuate a settlement agreement with the FTX Entities (the "FTX Settlement Agreement"). *See* ECF No. 603. The FTX Settlement Agreement provides for a resolution, on a global basis, of all claims asserted or held by the FTX Entities against the Genesis Entities. In summary, the FTX Settlement Agreement provides that (a) Alameda Research Ltd. shall receive an allowed general unsecured claim against GGC in the amount of $175,000,000 (the "Allowed Alameda Claim"); (b) the Allowed Alameda Claim shall be entitled to receive pro rata distributions with all other allowed general unsecured claims pursuant to the Amended Plan and shall be entitled to all treatment afforded to allowed general unsecured claims in its respective class under the Amended Plan, subject to the terms of the FTX Settlement Agreement; (c) the FTX Entities and the Genesis Entities shall not object to any chapter 11 plan in the other parties' chapter 11 cases that is not inconsistent with the terms and conditions of the FTX Settlement Agreement; and (d) the FTX Entities and the Genesis Debtors shall withdraw with prejudice (i) the Lift Stay Motion and the Estimation Motion, respectively, and (ii) the FTX Proofs of Claim.

The Committee filed a statement and reservation of rights regarding the FTX Settlement Agreement. *See* ECF No. 671. The Ad Hoc Group, Gemini, and the Brown Rudnick Group all filed objections to the FTX Settlement Agreement. *See* ECF Nos. 648, 650, 651, and 652. On September 6, 2023 the Bankruptcy Court held a status conference on the FTX Settlement Agreement. On September 18, 2023, the Bankruptcy Court held an evidentiary hearing on the FTX Settlement Agreement. On September 6, 2023, the United States Bankruptcy Court for the District of Delaware issued an order approving the FTX Settlement Agreement for the FTX Entities pending approval by the Genesis Bankruptcy Court.

On October 6, 2023, the Bankruptcy Court issued a memorandum decision discussing the basis for its approval of the FTX Settlement Agreement. *See* ECF No. 781. On October 17, 2023, the Bankruptcy Court entered an order approving the FTX Settlement Agreement. *See* ECF No. 806.

### (iii)    *DCG Turnover Action*

On May 12, 2023, the Debtors delivered a notice of default for DCG and DCGI's non-payment of approximately $627 million in loans that were due on May 9, 10 and 11, 2023.  On May 19, 2023, the Debtors received a forbearance proposal from DCG related to its nonpayment of such loans.

On September 6, 2023 the Debtors commenced two adversary proceedings against DCG (the "DCG Turnover Action") and against DCGI (the "DCGI Turnover Action") for turnover of property of the estate of GGC under section 542 of the Bankruptcy Code (the "Turnover Actions").  *See* Complaint, *Genesis Global Capital, LLC v. Digital Currency Group, Inc.*, Adv. Pro. 23-01168 (SHL) (Bankr. S.D.N.Y. Sept. 6, 2023) ("DCG AP"), ECF No. 1; Complaint, *Genesis Global Capital, LLC v. DCG International Investments*, Adv. Pro. 23-01169 (SHL) (Bankr. S.D.N.Y. Sept. 6, 2023) ("DCGI AP"), ECF No. 1.  The DCG Turnover Action seeks to recover undisputed amounts of money DCG owes in connection with loans that matured on May 9, 10, and 11, 2023. The DCGI Turnover Action seeks to recover undisputed amounts of digital assets owed to GGC by DCGI in connection with a loan that matured on May 11, 2023.  *See* Section IV.C.  A pre-trial conference has been scheduled for November 30, 2023.

On September 12, 2023, the Debtors filed notices on each of the docket of the Turnover Actions (together, the "Notice of Stay") stating that they have agreed to voluntarily stay the Turnover Actions pursuant to the Partial Repayment Agreement entered into that same day between the Debtors, DCG and DCGI, a component of the Agreement in Principle. *See Notice of Voluntary Stay of Prosecution of Complaints Against Digital Currency Group, Inc. and DCG International Investments Ltd.*, DCG AP ECF No. 4; DCGI AP ECF No. 6.  DCG and DCGI have continued to make payments to GGC in satisfaction of the May Loans pursuant to the Partial Repayment Agreement. *See supra* Section VI.P.

As of October 29, 2023, GGC may terminate the Partial Repayment Agreement in accordance with its terms as a result of the Debtors' failure to execute a global restructuring agreement with DCG or to file an amended chapter 11 plan consistent with the Agreement in Principle.  The Debtors are in discussions with DCG, the Committee and the Ad Hoc Group about a potential continuation of the voluntary stay of the Turnover Actions in exchange for additional amounts to be paid by the DCG Parties in respect of the DCG Loans and the DCGI Loan.  Provided that DCG and DCGI continue to comply with the Partial Repayment Agreement, the Debtors will not prosecute the Turnover Actions, without prejudice to their ability to continue to prosecute the Turnover Actions in accordance with the terms of the Partial Repayment Agreement.  At this time, the Committee believes that the Partial Repayment Agreement should be terminated and that the Debtors should immediately lift the voluntary stay to continue prosecution of the Turnover Actions to recover full repayment under the DCG Loans and the DCGI Loan.  The Debtors believe that any litigation is likely to take 2-3 months, without accounting for any appeals.

### (iv)    *The NYAG Action*

On October 19, 2023, the NYAG filed a complaint (the "NYAG Complaint") in the Supreme Court of the State of New York against Gemini, GGC, GAP, GGH, DCG, Soichiro "Michael" Moro, a former officer of the Debtors, and Barry Silbert, current chief executive officer of DCG (collectively, the "NYAG Defendants"), commencing the NYAG Action.  In the NYAG Complaint, the NYAG alleges that the NYAG Defendants defrauded more than 230,000 Gemini Earn Program investors of more than $1 billion, in violation of New York General Business Law ("GBL") §§ 352 et seq. (the "Martin Act"), and New York Executive Law § 63(12).

Among other things, the NYAG Complaint alleges that GGC, GAP, GGH, DCG, Moro, and Silbert perpetrated a "DCG Scheme" to conceal more than $1 billion in losses at the Debtors relating to the insolvency of 3AC.  The NYAG Complaint alleges that these parties falsely represented GGC's financial condition to conceal the structural hole created by the 3AC default and made misleading statements to investors about the DCG Note, including omitting that the DCG Note was an illiquid obligation payable in ten years at one percent interest.  It also alleges that DCG and DCGI created a liquidity crunch at GGC by borrowing more than $800 million from GGC from January 2022 through July 2022, requiring GGC to extend the maturity dates of several of these loans, and ultimately failing to repay them.  According to the NYAG Complaint, the "DCG Scheme" disguised the Debtors' true losses through a campaign of misstatements and omissions to the public, including Gemini Lenders.  The NYAG Complaint alleges that on

November 16, 2022, when GGC announced that it was suspending all withdrawals from the Gemini Earn Program, Gemini Lenders were unable to redeem their investments and allegedly suffered more than $1 billion in losses.

The Debtors dispute the allegations in the NYAG Complaint regarding the involvement of GGC, GAP, GGH, and any of their directors and officers in the "DCG Scheme" or any other fraudulent conduct related to the Gemini Earn Program or the DCG Note.[16]  The NYAG Complaint did not name any current directors, officers, or employees of the Debtors.  The Debtors are reviewing the facts of the NYAG Complaint in light of potential claims the Estate may have against the DCG Parties and Gemini.  The Debtors and the Committee have determined that pursuing the Agreement in Principle with DCG is not currently viable given the present status of the NYAG Action.

DCG strongly disputes—and the Debtors understand it intends to vigorously defend against—the allegations contained in the NYAG Complaint, the vast majority of which DCG asserts concern conduct by Gemini and the Debtors, not DCG.  DCG believes that the allegations relating to DCG largely center on the DCG Note, an assumption of a $1.1 billion liability that DCG asserts was for the express purpose of assisting Genesis.  DCG also asserts that the DCG Note was reviewed by numerous top-tier professional firms and that Genesis was involved in the structuring of the DCG Note and Genesis's board of directors approved the transaction.  DCG is reviewing the facts of the NYAG Complaint as it pertains to the alleged conduct of the Debtors and Gemini in light of defenses to any claims brought by the Debtors, and affirmative counterclaims DCG could assert.  The Debtors dispute DCG's characterization of the allegations in the NYAG Complaint.

The NYAG Complaint alleges a separate "Gemini Scheme" through which Gemini purportedly made public misstatements or omissions regarding its monitoring of GGC's risk ratios and financial condition while the Earn program was available to Gemini users.  The Debtors understand that Gemini strongly disputes the allegations, which it asserts are in direct conflict with the NYAG's allegations that Gemini and the Earn users were defrauded by DCG, Silbert, GGC, and the other participants in the "DCG Scheme."  Gemini asserts that (i) its due diligence, ongoing risk monitoring, and actions to secure collateral from GGC and DCG were prudent and appropriate; (ii) that its public statements were accurate in light of the information it asserts GGC and DCG provided to it during the summer and fall of 2022; and (iii) that the "DCG Scheme," rather than any failure on Gemini's part, caused the collapse of the Earn program.  The Debtors understand that Gemini is considering the new facts alleged against the Debtors in the NYAG Complaint in connection with any potential claim brought by the Debtors against Gemini.

### *(v)       The Gemini Adversary Proceeding*

On October 27, 2023, Gemini commenced an adversary proceeding captioned *Gemini Trust Company, LLC v. Genesis Global Capital, LLC, et al.*, Adv. Pro. No. 23-01192 (SHL) (the "Gemini Adversary Proceeding") naming the Debtors as defendants.  In the Gemini Adversary Proceeding, Gemini seeks declaratory judgments from the Bankruptcy Court that (1) it validly foreclosed on the August 2022 Collateral and is entitled to set off the proceeds of its purported foreclosure on the August 2022 Collateral, (2) it has a security interest in the Additional GBTC Shares, and/or (3) the Additional GBTC Shares are not property of the Debtors' estates.  The complaint filed by Gemini in the Gemini Adversary Proceeding alternatively asserts a claim of constructive trust over the Additional GBTC Shares.  The Debtors' answer to the complaint in the Gemini Adversary Proceeding, filed November 21, 2023, includes denials of the allegations in support of this claim and asserts certain counterclaims, in particular (i) a declaratory judgment that Gemini did not foreclose on the August 2022 Collateral, (ii) in the alternative, any foreclosure of the August 2022 Collateral by Gemini was improper; (iii) a constructive fraudulent conveyance claim relating to the value of conveyed by GGC pursuant to the First Amendment to the Security Agreement; (iv) a declaratory judgment that Gemini does not have a security interest in the Additional GBTC Shares; (v) a declaratory judgment that the imposition of a constructive trust over the Additional GBTC Shares is unwarranted; (vi) in the alternative to claim (iv), a claim for preferential transfer of the Additional GBTC Shares; and (vii) a claim for recovery of the August 2022 Collateral and the Additional GBTC Shares.  Gemini's response to the Debtors' positions in the above-discussed dispute are described in **Exhibit G** to this Disclosure Statement.

---

[16]     The Debtors understand DCG and Gemini intend to vigorously defend against all allegations asserted against DCG and Gemini, respectively, in the NYAG Action.

*(i)*        ***The Gemini Preference Action***

On November 21, 2023, GGC filed the Gemini Preference Action naming Gemini and the Gemini Lenders as defendants. In the Gemini Preference Action, GGC seeks to avoid and recover payments from the Debtors to Gemini and/or the Gemini Lenders during the ninety-day preference period with a gross total of approximately $689,302,000, plus interest and costs. The complaint filed by GGC also seeks to disallow any Claims filed by Gemini and/or the Gemini Lenders until such time as the property at issue in the Gemini Preference Action is returned to GGC or the value of such property is paid to GGC.

**V.        Ordinary Course Professionals**

On February 8, 2023, the Debtors filed a motion seeking authority to employ professionals in the ordinary course and procedures for paying such professionals, *see* ECF No. 65, which was granted by the Bankruptcy Court on February 24, 2023. *See Order Authorizing the Debtors to Retain and Compensate Certain Professionals Utilized in the Ordinary Course of Business*, ECF No. 102 (the "OCP Order"). The OCP Order authorized the Debtors to employ professionals in the ordinary course of business and authorized a monthly cap on payments to such professionals of $100,000 (the "OCP Monthly Cap") and an overall cap of $300,000 (the "OCP Case Cap") for the duration of the Chapter 11 Cases.

Given the length of these cases and finding the existing caps difficult to live within while obtaining quality legal representation and maintaining the benefit of their historic counsel and their particular knowledge and expertise of the Debtors and their operations, on July 6, 2023, the Debtors filed the *Debtors' Motion to Amend the Order Authorizing the Debtors to Retain and Compensate Certain Professionals Utilized in the Ordinary Course of Business*, ECF No. 483 (the "Motion to Amend OCP Order"), seeking to amend the OCP Order to increase the OCP Monthly Cap from $100,000 to $150,000 and the OCP Case Cap to $500,000. On July 26, 2023, the Bankruptcy Court granted the Motion to Amend OCP Order, ECF No. 548.

## VII.    SUMMARY OF THE AMENDED PLAN[17]

### A.    General Basis for the Amended Plan

The Amended Plan represents the product of extensive and ongoing arm's-length negotiation among the Debtors and the Committee, as well as various other creditor groups involved in these Chapter 11 Cases and their advisors, in an effort to reach a solution that the parties believe is in the best interest of the Debtors, their estates, and stakeholders.  The Debtors believe that prolonged Chapter 11 Cases would be detrimental to the Debtors' restructuring efforts and reduce recoveries to Holders of Allowed Claims.

The Amended Plan contemplates that Holders of Allowed General Unsecured Claims against the Debtors will receive a combination of, among other things and subject to the conditions set forth in the Amended Plan, the Debtors' or Wind-Down Debtors' (i) Cash, (ii) Digital Assets, and (iii) to the extent allocated to such Debtor or Wind-Down Debtor in the discretion of the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), or, following the Effective Date, the discretion of the PA Officer, (a) Avoidance Recoveries, including any and all Causes of Action or other claims against any of the DCG Parties or Gemini Parties, (b) proceeds from the Partial Repayment Agreement, (c) proceeds from any Monetization Transactions (other than those allocated to GGT, and with respect to a Monetization Transaction performed by the Gemini Distribution Agent to the extent permitted under the Amended Plan, only for the benefit of Holders of Allowed Gemini Lender Claims), and (d) proceeds from the DCG Loans, the DCGI Loans, the DCG Note, the DCG Tax Receivables, and any and all Causes of Action or other claims against any of the DCG Parties, including the proceeds from any settlements thereof.

### B.    Governing Law

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated in the Amended Plan, the laws of the State of New York without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Amended Plan, any agreements, documents, instruments, or contracts executed or entered into in connection with the Amended Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that the corporate or limited liability company governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Wind-Down Debtor.

### C.    Treatment of Unclassified Claims

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims and statutory fees under section 1930 of title 28 of the U.S. Code (the "Judicial Code") have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Amended Plan.

---

[17]    This Section VII is intended only to provide a summary of the key terms, structure, classification, treatment, and implementation of the Amended Plan, and is qualified in its entirety by reference to the entire Amended Plan and exhibits thereto.  Although the statements contained in this Amended Disclosure Statement include summaries of the provisions contained in the Amended Plan and in documents referred to the Amended Plan, this Amended Disclosure Statement does not purport to be a precise or complete statement of all such terms and provisions and should not be relied on for a comprehensive discussion of the Amended Plan.  Instead, reference is made to the Amended Plan and all such documents for the full and complete statements of such terms and provisions.  The Amended Plan itself (including attachments) will control the treatment of creditors and equity holders under the Amended Plan.  To the extent there are any inconsistencies between this Section VII and the Amended Plan (including attachments thereto), the latter shall govern.

(i)      *Administrative Expense Claims*

Except with respect to Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of the Judicial Code, and except to the extent that an Administrative Expense Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Expense Claim and the applicable Debtor(s) or, from and after the Effective Date, the applicable Wind-Down Debtor(s) agree to less favorable treatment, each Holder of an Allowed Administrative Expense Claim shall be paid in full in Cash on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Expense Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed, but in any event no later than ninety (90) days after the date on which an order allowing such Administrative Claim becomes a Final Order; (c) the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is reasonably practicable; (d) such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Wind-Down Debtors, as applicable; and (e) such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except as otherwise provided in Article II.A of the Amended Plan and except with respect to Professional Fee Claims, requests for allowance and payment of Administrative Expense Claims must be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors pursuant to the procedures specified in the Bar Date Order, the Confirmation Order, and the notice of entry of the Confirmation Order no later than the Administrative Expense Claims Bar Date. Holders of Administrative Expense Claims that are required to, but do not, File and serve on the Debtors or, from and after the Effective Date, the Wind-Down Debtors a request for allowance and payment of such Administrative Expense Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or, from and after the Effective Date, the Wind-Down Debtors, or their respective assets or property. Objections to such requests, if any, must be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors (if not the objecting party) and the requesting party no later than ninety (90) days after the Effective Date or such other date fixed by the Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be Filed with respect to an Administrative Expense Claim that has been previously Allowed.

(ii)     *Professional Compensation*

(a)      Final Fee Applications

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through and including the Effective Date, shall be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors no later than sixty (60) days after the Effective Date. Each such final request will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, and once approved by the Bankruptcy Court, such Allowed Professional Fee Claims shall be promptly paid in Cash from the Professional Fee Escrow Account up to their full Allowed amount.

If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims shall be promptly paid by the Wind-Down Debtors, without any further action or order of the Bankruptcy Court. Obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

Objections to any Professional Fee Claim must be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors and the requesting party no later than twenty (20) days after such Professional Fee Claim is Filed with the Bankruptcy Court.

(b)      Professional Fee Escrow Account

On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the "Professional Fee Reserve Amount" described in Article II.B.3 of the Amended Plan. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals. Such funds shall not be considered property of the Estates of the Debtors or of the Wind-Down Debtors. The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Disbursing Agent for the Wind-Down Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. After all such

Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be distributed to the Wind-Down Debtors in accordance with Article IV.B.2.b of the Amended Plan without any further action or order of the Bankruptcy Court, but such estimate shall in no way limit or be deemed to limit such Professional's Allowed Professional Fee Claims.

(c)        Professional Fee Reserve Amount

No later than five (5) Business Days prior to the Effective Date, the Debtors shall request from Professionals estimates of their unpaid Professional Fee Claims before and as of the Effective Date, and such Professionals shall deliver such estimate to the Debtors in writing via email two (2) Business Days prior to the Effective Date; provided, however, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims. If a Professional does not timely provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

(d)        Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Amended Plan, from and after the Effective Date, the Wind-Down Debtors shall, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Amended Plan and Consummation incurred on or after the Effective Date by the Professionals (including any fees related to the preparation of Professional fee applications). Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtors may employ and pay any Professional for fees and expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

### (iii)      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date or as soon as practicable thereafter (including if such Allowed Priority Tax Claim will not be due and payable until after the Effective Date) or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

### (iv)      *Statutory Fees*

On or before the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors in Cash.

After the Effective Date, each Wind-Down Debtor will pay any and all such fees owed by it for each quarter (including any fraction thereof), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, until its Chapter 11 Case is converted, dismissed, or a Final Decree is issued, whichever occurs first.  The Wind-Down Debtors shall continue to file quarterly, post-confirmation operating reports in accordance with the U.S. Trustee's guidelines.

### (v)      *Restructuring Fees and Expenses*

If the Ad Hoc Group Acceptance Event has occurred and is continuing, (i) the Ad Hoc Group Restructuring Expenses payable by the Debtors shall constitute Allowed Administrative Expense Claims and shall be paid in full in Cash on the Effective Date pursuant to (and subject to) the terms and conditions of the existing fee reimbursement letters executed by the Debtors, without the need to file a proof of such Claim and without further order of the Court and (ii) the Dollar Group Restructuring Fees and Expenses incurred up to and including the Effective Date in an amount up to three hundred thousand dollars ($300,000) shall constitute Allowed Administrative Expense Claims and shall be paid in full in Cash on the Effective Date without any requirement to file a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval.

D.        **Classification and Treatment of Claims and Interests**

*(i)        Classification of Claims and Interests*

The Amended Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Amended Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Class(es) to the extent that any portion of the Claim or Interest fits within the description of such other Class(es).  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Amended Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

| SUMMARY OF AMENDED PLAN TREATMENT AND EXPECTED RECOVERIES | | | | | |
|---|---|---|---|---|---|
| **GENESIS GLOBAL HOLDCO, LLC** | | | | | |
| **Class** | **Claim/Equity Interest** | **Status** | **Voting Rights** | **Treatment of Claim/Interest** | **Projected Recovery Under the Amended Plan** |
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept | Except to the extent that a Holder of an Allowed Other Priority Claim against GGH agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim against GGH will, at the option of GGH or Wind-Down GGH, as applicable, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim against GGH, in each case, or as soon as reasonably practicable thereafter. | 100% |
| 2 | Secured Claims | Unimpaired | Presumed to Accept | Except to the extent that a Holder of an Allowed Secured Claim against GGH agrees to less favorable treatment, in full and final satisfaction of such Allowed Secured Claim, at the option of GGH or Wind-Down GGH, as applicable, such Holder will receive (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Secured Claim becomes an Allowed Secured Claim against GGH, in each case, or as soon as reasonably practicable thereafter, (ii) the return of the collateral securing such Allowed Secured Claim, or (iii) such other | 100% |

| | | | | treatment so as to render such Holder's Allowed Secured Claim against GGH Unimpaired pursuant to section 1124 of the Bankruptcy Code. | |
|---|---|---|---|---|---|
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired | Entitled to Vote | Each Holder of an Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Amended Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Amended Plan and otherwise subject to the provisions of the Amended Plan (including the release and injunction provisions set forth in Article VIII of the Amended Plan), remain obligations of Wind-Down GGH after the Effective Date.  Notwithstanding anything to the contrary in the Amended Plan, from and after the Effective Date, the Holders of Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Amended Plan. | 59% |
| 4 | BTC-Denominated Unsecured Claims | Impaired | Entitled to Vote | Each Holder of an Allowed BTC-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed BTC-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Amended Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Amended Plan and otherwise subject to the provisions of the Amended Plan (including the release and injunction provisions set forth in Article VIII of the Amended Plan), remain obligations of Wind-Down GGH after the Effective Date. Notwithstanding anything to the contrary in the Amended Plan, from and after the Effective Date, the Holders of Allowed BTC-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such Allowed BTC-Denominated Unsecured Claims other than | N/A |

| | | | | the right to receive distributions pursuant to the Amended Plan. | |
|---|---|---|---|---|---|
| 5 | ETH-Denominated Unsecured Claims | Impaired | Entitled to Vote | Each Holder of an Allowed ETH-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles. Allowed ETH-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Amended Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Amended Plan and otherwise subject to the provisions of the Amended Plan (including the release and injunction provisions set forth in Article VIII of the Amended Plan), remain obligations of Wind-Down GGH after the Effective Date. Notwithstanding anything to the contrary in the Amended Plan, from and after the Effective Date, the Holders of Allowed ETH-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such Allowed ETH-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Amended Plan. | N/A |
| 6 | Alt-Coin-Denominated Unsecured Claims | Impaired | Entitled to Vote | Each Holder of an Allowed Alt-Coin-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles. Allowed Alt-Coin-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Amended Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Amended Plan and otherwise subject to the provisions of the Amended Plan (including the release and injunction provisions set forth in Article VIII of the Amended Plan), remain obligations of Wind-Down GGH after the Effective Date. Notwithstanding anything to the contrary in the Amended Plan, from and after the Effective Date, the Holders of Allowed Alt-Coin-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such Allowed Alt-Coin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Amended Plan. | N/A |

| 7 | Subordinated Claims | Impaired | Deemed to Reject | Holders of Subordinated Claims against GGH shall not receive any distribution on account of such Subordinated Claims. On the Effective Date, all such Subordinated Claims shall be cancelled, released, and extinguished. | N/A |
|---|---|---|---|---|---|
| 8 | Government Penalty Claims | Impaired | Deemed to Reject | The Government Penalty Claims against GGH shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to the General Unsecured Claims and Intercompany Claims against GGH, and the Government Penalty Claims against GGH will not receive any distribution on account of such Government Penalty Claims until all Allowed General Unsecured Claims and Allowed Intercompany Claims against GGH are paid in full; *provided*, *however*, that, if the Bankruptcy Court determines that the Government Penalty Claims against GGH should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then such Government Penalty Claims shall be *pari passu* with Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH. | N/A |
| 9 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject | All Intercompany Claims (subject to the GGC/GGH Settlement) against GGH will be adjusted, Reinstated, or compromised on the Effective Date in the Debtors' discretion, with the Committee's Consent. | 59% |
| 10 | Interests | Impaired | Deemed to Reject | (i) Holders of Interests in GGH shall not receive any distribution on account of such Interests unless all Claims against any of the Debtors are ultimately determined by a Final Order to have been rendered Unimpaired and (ii) all Interests in GGH shall, solely for Plan administrative purposes, continue to be held by the Holders of such Interests on and after the Effective Date; *provided*, *however*, that, for the avoidance of doubt and in accordance with the New Governance Documents, unless all Claims against the Wind-Down Debtors are ultimately determined by a Final Order to have been rendered Unimpaired, the Holders of Interests in GGH shall not (A) be entitled to exercise any rights or remedies appurtenant thereto, (B) have any economic interests, voting interests (other than those limited voting rights expressly set forth in Article IV.B.7 of the Amended Plan), or rights to influence, direct, or otherwise control GGC or its subsidiaries, (C) have any | N/A |

| | | | | right to any dividends or distributions as a result of such ownership, or (D) be entitled to Transfer or take a worthless stock deduction with respect to the Interests in GGH. | |
|---|---|---|---|---|---|
| | | | **GENESIS GLOBAL CAPITAL, LLC** | | |
| **Class** | **Claim/Equity Interest** | **Status** | **Voting Rights** | **Treatment of Claim/Interest** | **Projected Recovery Under the Amended Plan** |
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept | Except to the extent that a Holder of an Allowed Other Priority Claim against GGC agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim against GGC will, at the option of the GGC or Wind-Down GGC, as applicable, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim against GGC, in each case, or as soon as reasonably practicable thereafter. | 100% |
| 2 | Secured Claims | Unimpaired | Presumed to Accept | Except to the extent that a Holder of an Allowed Secured Claim against GGC agrees to less favorable treatment, in full and final satisfaction of such Allowed Secured Claim, at the option of GGC or Wind-Down GGC, as applicable, such Holder will receive (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Secured Claim becomes an Allowed Secured Claim against GGC, in each case, or as soon as reasonably practicable thereafter, (ii) the return of the collateral securing such Allowed Secured Claim, or (iii) such other treatment so as to render such Holder's Allowed Secured Claim against GGC Unimpaired pursuant to section 1124 of the Bankruptcy Code. | 100% |
| 3 | Fiat-or-Stablecoin-Denominated | Impaired | Entitled to Vote | Each Holder of an Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the | 61 - 100% |

| | Unsecured Claims | | | Distribution Principles. Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC shall, in the absence of any other treatment under the Amended Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Amended Plan and otherwise subject to the provisions of the Amended Plan (including the release and injunction provisions set forth in Article VIII of the Amended Plan), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Amended Plan, from and after the Effective Date, the Holders of Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Amended Plan. | |
|---|---|---|---|---|---|
| 4 | BTC-Denominated Unsecured Claims | Impaired | Entitled to Vote | Each Holder of an Allowed BTC-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the Distribution Principles. Allowed BTC-Denominated Unsecured Claims against GGC shall, in the absence of any other treatment under the Amended Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Amended Plan and otherwise subject to the provisions of the Amended Plan (including the release and injunction provisions set forth in Article VIII of the Amended Plan), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Amended Plan, from and after the Effective Date, the Holders of Allowed BTC-Denominated Unsecured Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed BTC-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Amended Plan. | 61 - 100% |
| 5 | ETH-Denominated Unsecured Claims | Impaired | Entitled to Vote | Each Holder of an Allowed ETH-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the Distribution Principles. Allowed ETH-Denominated Unsecured Claims against GGC shall, in the | 61 - 100% |

| | | | | | |
|---|---|---|---|---|---|
| | | | | absence of any other treatment under the Amended Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Amended Plan and otherwise subject to the provisions of the Amended Plan (including the release and injunction provisions set forth in Article VIII of the Amended Plan), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Amended Plan, from and after the Effective Date, the Holders of Allowed ETH-Denominated Unsecured Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed ETH-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Amended Plan. | |
| 6 | Alt-Coin-Denominated Unsecured Claims | Impaired | Entitled to Vote | Each Holder of an Allowed Alt-Coin-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the Distribution Principles. Allowed Alt-Coin-Denominated Unsecured Claims against GGC shall, in the absence of any other treatment under the Amended Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Amended Plan and otherwise subject to the provisions of the Amended Plan (including the release and injunction provisions set forth in Article VIII of the Amended Plan), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Amended Plan, from and after the Effective Date, the Holders of Allowed Alt-Coin-Denominated Unsecured Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed Alt-Coin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Amended Plan | 61 - 100% |
| 7 | Gemini Lender Claims | Impaired | Entitled to Vote | Each Holder of an Allowed Gemini Lender Claim against GGC shall (x) have the amount of its Allowed Gemini Lender Claim reduced by its pro rata share of the Gemini Asset Value in accordance with the Distribution Principles, (y) after accounting for the foregoing reduction, receive the treatment provided to such Holder under the Distribution Principles. Allowed Gemini | 61 - 100% |

| | | | | Lender Claims against GGC shall, in the absence of any other treatment under the Amended Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Amended Plan and otherwise subject to the provisions of the Amended Plan (including the release and injunction provisions set forth in Article VIII of the Amended Plan), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Amended Plan, from and after the Effective Date, the Holders of Allowed Gemini Lender Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed Gemini Lender Claims other than the right to receive distributions pursuant to the Amended Plan. | |
|---|---|---|---|---|---|
| 8 | Subordinated Claims | Impaired | Deemed to Reject | Holders of Subordinated Claims against GGC shall not receive any distribution on account of such Subordinated Claims. On the Effective Date, all Subordinated Claims against GGC shall be cancelled, released, and extinguished. | N/A |
| 9 | Government Penalty Claims | Impaired | Deemed to Reject | The Government Penalty Claims against GGC shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to the General Unsecured Claims and Intercompany Claims against GGC, and the Government Penalty Claims against GGC will not receive any distribution on account of such Government Penalty Claims until all Allowed General Unsecured Claims and Allowed Intercompany Claims against GGC are paid in full; *provided*, *however*, that, if the Bankruptcy Court determines that the Government Penalty Claims against GGC should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then such Government Penalty Claims shall be *pari passu* with Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC. | N/A |
| 10 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject | All Intercompany Claims (subject to the GAP/GGC Settlement and the GGC/GGH Settlement) against GGC will be adjusted, Reinstated, or compromised on the Effective Date in the Debtors' discretion, with the Committee's Consent. | N/A |
| 11 | Intercompany Interests | Impaired or Unimpaired | Presumed to Accept or | Holders of Intercompany Interests in GGC shall not receive any distribution on account | N/A |

| | | | Deemed to Reject | of such Intercompany Interests unless all senior Claims against GGC are paid in full or otherwise treated as Unimpaired. All Intercompany Interests in GGC shall, solely for Plan administrative purposes, continue to be held by the Holders of such Intercompany Interests on and after the Effective Date; *provided*, *however*, that, for the avoidance of doubt and in accordance with the New Governance Documents, the Holders of Intercompany Interests in GGC shall not (A) be entitled to exercise any rights or remedies appurtenant thereto, (B) have any economic interests, voting interests, or rights to influence, direct, or otherwise control GGC or its subsidiaries, (C) have any right to any dividends or distributions as a result of such ownership, or (D) be entitled to Transfer or take a worthless stock deduction with respect to the Interests in GGC. | |

**GENESIS ASIA PACIFIC PTE LTD.**

| Class | Claim/Equity Interest | Status | Voting Rights | Treatment of Claim/Interest | Projected Recovery Under the Amended Plan |
|---|---|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept | Except to the extent that a Holder of an Allowed Other Priority Claim against GAP agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim against GAP will, at the option of GAP or Wind-Down GAP, as applicable, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim against GAP, in each case, or as soon as reasonably practicable thereafter. | 100% |
| 2 | Secured Claims | Unimpaired | Presumed to Accept | Except to the extent that a Holder of an Allowed Secured Claim against GAP agrees to less favorable treatment, in full and final satisfaction of such Allowed Secured Claim, at the option of GAP or Wind-Down GAP, as applicable, such Holder will receive (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which | 100% |

| | | | | such Secured Claim becomes an Allowed Secured Claim against GAP, in each case, or as soon as reasonably practicable thereafter, (ii) the return of the collateral securing such Allowed Secured Claim, or (iii) such other treatment so as to render such Holder's Allowed Secured Claim against GAP Unimpaired pursuant to section 1124 of the Bankruptcy Code. | |
|---|---|---|---|---|---|
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired | Entitled to Vote | Each Holder of an Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the Amended Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Amended Plan and otherwise subject to the provisions of the Amended Plan (including the release and injunction provisions set forth in Article VIII of the Amended Plan), remain obligations of Wind-Down GAP after the Effective Date.  Notwithstanding anything to the contrary in the Amended Plan, from and after the Effective Date, the Holders of Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP shall have no rights or remedies against GAP or Wind-Down GAP with respect to such Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Amended Plan. | 61 - 100% |
| 4 | BTC-Denominated Unsecured Claims | Impaired | Entitled to Vote | Each Holder of an Allowed BTC-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed BTC-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the Amended Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Amended Plan and otherwise subject to the provisions of the Amended Plan (including the release and injunction provisions set forth in Article VIII of the Amended Plan), remain obligations of Wind-Down GAP after the Effective Date.  Notwithstanding anything to the contrary in the Amended Plan, from and after the Effective Date, the Holders of Allowed BTC-Denominated Unsecured Claims | 61 - 100% |

| | | | | | |
|---|---|---|---|---|---|
| | | | | against GAP shall have no rights or remedies against GAP or Wind-Down GAP with respect to such Allowed BTC-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Amended Plan. | |
| 5 | ETH-Denominated Unsecured Claims | Impaired | Entitled to Vote | Each Holder of an Allowed ETH-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles. Allowed ETH-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the Amended Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Amended Plan and otherwise subject to the provisions of the Amended Plan (including the release and injunction provisions set forth in Article VIII of the Amended Plan), remain obligations of Wind-Down GAP after the Effective Date. Notwithstanding anything to the contrary in the Amended Plan, from and after the Effective Date, the Holders of Allowed ETH-Denominated Unsecured Claims against GAP shall have no rights or remedies against GAP or Wind-Down GAP with respect to such Allowed ETH-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Amended Plan. | 61 – 100% |
| 6 | Alt-Coin-Denominated Unsecured Claims | Impaired | Entitled to Vote | Each Holder of an Allowed Alt-Coin-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles. Allowed Alt-Coin-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the Amended Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Amended Plan and otherwise subject to the provisions of the Amended Plan (including the release and injunction provisions set forth in Article VIII of the Amended Plan), remain obligations of Wind-Down GAP after the Effective Date. Notwithstanding anything to the contrary in the Amended Plan, from and after the Effective Date, the Holders of Allowed Alt-Coin-Denominated Unsecured Claims against GAP shall have no rights or remedies against GAP or Wind-Down GAP with | 61 – 100% |

| | | | | respect to such Allowed Alt-Coin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Amended Plan. | |
|---|---|---|---|---|---|
| 7 | Subordinated Claims | Impaired | Deemed to Reject | Holders of Subordinated Claims against GAP shall not receive any distribution on account of such Subordinated Claims. On the Effective Date, all Subordinated Claims against GAP shall be cancelled, released, and extinguished. | N/A |
| 8 | Government Penalty Claims | Impaired | Deemed to Reject | The Government Penalty Claims against GAP shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to the General Unsecured Claims and Intercompany Claims against GAP, and the Government Penalty Claims against GAP will not receive any distribution on account of such Government Penalty Claims until all Allowed General Unsecured Claims and Allowed Intercompany Claims against GAP are paid in full; *provided*, *however*, that, if the Bankruptcy Court determines that the Government Penalty Claims against GAP should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then such Government Penalty Claims shall be *pari passu* with Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP. | N/A |
| 9 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject | All Intercompany Claims (subject to the GAP/GGC Settlement) against GAP will be adjusted, Reinstated, or compromised on the Effective Date in the Debtors' discretion, with the Committee's Consent. | N/A |
| 10 | Intercompany Interests | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject | Holders of Intercompany Interests in GAP shall not receive any distribution on account of such Intercompany Interests unless all senior Claims against GAP are paid in full or otherwise treated as Unimpaired. All Intercompany Interests in GAP shall, solely for Plan administrative purposes, continue to be held by the Holders of such Intercompany Interests on and after the Effective Date; *provided*, *however*, that, for the avoidance of doubt and in accordance with the New Governance Documents, the Holders of Intercompany Interests in GAP shall not (A) be entitled to exercise any rights or remedies appurtenant thereto, (B) have any economic interests, voting interests, or rights to influence, direct, or otherwise control GGC or its subsidiaries, (C) have any right to any | N/A |

77

| | | | | dividends or distributions as a result of such ownership, or (D) be entitled to Transfer or take a worthless stock deduction with respect to the Interests in GAP. | |
|---|---|---|---|---|---|

**(ii)   Special Provision Governing Unimpaired or Reinstated Claims**

Except as otherwise provided in the Amended Plan, nothing under the Amended Plan shall affect the Debtors' or the Wind-Down Debtors' claims, Causes of Action, rights, or defenses in respect of any Unimpaired Claims or Reinstated Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims or Reinstated Claims.

**(iii)   Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code**

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Amended Plan by one or more of the Classes entitled to vote pursuant to Article III.B–D of the Amended Plan. The Debtors reserve the right to modify the Amended Plan in accordance with Article X of the Amended Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

**(iv)   Elimination of Vacant Classes**

Any Class of Claims or Interests that does not contain an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Amended Plan for purposes of voting to accept or reject the Amended Plan and for purposes of determining acceptance or rejection of the Amended Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

**(v)   Voting Classes; Presumed Acceptance by Non-Voting Classes**

If a Class contains Claims or Interests eligible to vote and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Amended Plan, the Amended Plan shall be presumed accepted by Holders of such Claims or Interests in such Class but such Class shall not constitute the sole impaired accepting Class for purposes of satisfying section 1129(a)(10) of the Bankruptcy Code.

**(vi)   Intercompany Interests**

To the extent Reinstated under the Amended Plan, distributions (if any) on account of Intercompany Interests are not being recovered by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' or the Wind-Down Debtors' agreement under the Amended Plan to make certain distributions to Holders of Allowed Claims.

**(vii)   Controversy Concerning Impairment**

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

**(viii)   Subordinated Claims**

Except as expressly provided in the Amended Plan, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Amended Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510

78

of the Bankruptcy Code, the Debtors or the Wind-Down Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto. The Debtors and Wind-Down Debtors reserve their rights to seek to subordinate any and all portions of the 3AC Claims and the DCG Claims; *provided* that, for the avoidance of doubt, with respect to the 3AC Claims, any such subordination shall not be pursuant to the Amended Plan or Confirmation Order.

### E.    Means for Implementation of the Amended Plan

#### (i)    *Wind-Down Debtors*

##### (a)    The Wind-Down Debtors Activities

The Wind-Down Debtors shall be successors to the Debtors' rights, title, and interests to the Wind-Down Debtors' Assets. The Wind-Down Debtors will not conduct business operations and will be charged with winding down the Debtors' Estates for the benefit of the Wind-Down Beneficiaries. Each Wind-Down Debtor shall be managed by the PA Officer and the New Board, which shall consult with or be directed by the Wind-Down Oversight Committee, in accordance with the Plan Administration Agreement and the applicable New Governance Documents and shall be subject to the Wind-Down Budget.

On the Effective Date, the Wind-Down Debtors and the PA Officer shall execute the Plan Administration Agreement. In the event of any conflict between the terms of Article IV.A of the Amended Plan and the terms of the Plan Administration Agreement, the terms of the Plan Administration Agreement shall control.

##### (b)    PA Officer

The PA Officer shall be selected by the Committee, in consultation with the Debtors and with the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing), and shall be identified in the Plan Supplement. The appointment of the PA Officer shall be approved in the Confirmation Order, and the PA Officer's duties shall commence as of the Effective Date. The PA Officer shall administer the distributions to the Wind-Down Debtors' Beneficiaries in accordance with and pursuant to the Distribution Principles and shall serve as the successor to and representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Retained Causes of Action belonging to such Estates (including any Causes of Action that belong to the Other Genesis Entities) that are not released, waived, settled, compromised, or transferred pursuant to the Amended Plan and subject to the limitations set forth in the Amended Plan.

The powers, rights, and responsibilities of the PA Officer shall be specified in the Plan Administration Agreement and shall include the authority and responsibility to fulfill the items identified in the Amended Plan. Other rights and duties of the PA Officer and the Wind-Down Debtors' Beneficiaries shall be as set forth in the Plan Administration Agreement. Pursuant to the Amended Plan and the Plan Administration Agreement, the PA Officer shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Amended Plan.

In accordance with the Plan Administration Agreement, the PA Officer shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtors are dissolved in accordance with the Amended Plan and the Plan Administration Agreement, and (ii) the date on which the PA Officer resigns, is terminated (in accordance with the Plan Administration Agreement), or is otherwise unable to serve; provided, however, that, in the event that a PA Officer resigns, is terminated, or is otherwise unable to serve, the Wind-Down Oversight Committee shall elect a successor to be appointed by the New Board to serve as a PA Officer in accordance with the Plan Administration Agreement. If the Wind-Down Oversight Committee does not elect a successor within the time periods specified in the Plan Administration Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtors, shall approve a successor to serve as a PA Officer.

##### (c)    The Wind-Down Oversight Committee

The Committee and the Ad Hoc Group SteerCo (if the Ad Hoc Group Acceptance Event has occurred and is continuing) shall mutually appoint, in consultation with the Debtors (and, with respect to the Wind-Down Oversight

Gemini Lender Member, with Gemini's Consent), a committee of seven (7) members identified in the Plan Supplement to oversee the New Board, the PA Officer, and the Wind-Down Debtors' wind-down activities in accordance with the Amended Plan (including the Distribution Principles) and the Plan Administration Agreement. On the Effective Date, the Wind-Down Oversight Committee shall be deemed to have adopted the Wind-Down Oversight Committee Bylaws, which shall require the membership of the Wind-Down Oversight Committee to at all times, to the maximum extent practicable, include the following: (i) at least two (2) Wind-Down Oversight BTC Members, (ii) at least one (1) Wind-Down Oversight ETH Member, (iii) at least two (2) Wind-Down Oversight Fiat-or-Stablecoin Members, (iv) the Wind-Down Oversight Gemini Lender Member and (v) the Wind-Down Oversight Crossover Member; *provided*, *however*, that the Wind-Down Oversight Committee Bylaws shall expressly provide that the Wind-Down Oversight Gemini Lender Member shall be recused from all matters pertaining to (x) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (y) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413.

The Wind-Down Oversight Committee's responsibilities shall include (i) reviewing, and advising the PA Officer with respect to, the distribution or other disposition of the Distributable Assets in accordance with the Amended Plan (including the Distribution Principles) and the Plan Administration Agreement and (ii) approving any material amendments to the Distribution Principles. For the avoidance of doubt, in advising the PA Officer, the Wind-Down Oversight Committee shall maintain the same fiduciary responsibilities as the PA Officer, which for the avoidance of doubt includes fiduciary duties to all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Amended Plan. Vacancies on the Wind-Down Oversight Committee shall be filled by the unanimous consent of the remaining member or members of the Wind-Down Oversight Committee, which consent shall not be unreasonably withheld, conditioned, or delayed. If a vacancy on the Wind-Down Oversight Committee is not filled within five (5) Business Days of such vacancy occurring, the PA Officer shall have the authority to seek an order from the Bankruptcy Court approving the appointment of a Person, with such Person's prior written consent, to the Wind-Down Oversight Committee to fill such vacancy. The PA Officer shall also have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Oversight Committee for cause.

(d)     The Litigation Oversight Committee

The Committee and the Ad Hoc Group SteerCo (if the Ad Hoc Group Acceptance Event has occurred and is continuing) shall mutually appoint, in consultation with the Debtors, a committee of seven (7) members identified in the Plan Supplement to oversee the PA Officer and the Wind-Down Debtors with respect to the commencement, management, settlement, compromise, or other disposition of the Retained Causes of Action in accordance with the Amended Plan and the Litigation Oversight Committee Bylaws. On the Effective Date, the Litigation Oversight Committee shall be deemed to have adopted the Litigation Oversight Committee Bylaws, which shall require the membership of the Litigation Oversight Committee to at all times, to the maximum extent practicable, include the following: (i) at least two (2) Litigation Oversight BTC Members, (ii) at least two (2) Litigation Oversight Fiat-or-Stablecoin Members, (iii) at least one (1) Litigation Oversight ETH Member, (iv) at least one (1) Litigation Oversight Crossover Member, and (v) at least one (1) Litigation Oversight Gemini Lender Member; *provided*, *however*, that the Litigation Oversight Committee Bylaws shall expressly provide that the Litigation Oversight Gemini Lender Member shall be recused from all matters pertaining to (x) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (y) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413; and, *provided*, *further*, that upon the occurrence of a USD Recovery Event, the Litigation Oversight Fiat-or-Stablecoin Members shall be deemed to resign their positions, and the Litigation Oversight Committee shall be reduced to five (5) members.

The Litigation Oversight Committee's responsibilities shall include (i) reviewing, and advising the PA Officer with respect to, the strategy and pursuit of Retained Causes of Action, including the management and direction of counsel and other advisors, (ii) approving settlements on account of any Retained Causes of Action, and (iii) managing the Litigation Reserve. For the avoidance of doubt, in advising the PA Officer, the Litigation Oversight Committee shall maintain the same fiduciary responsibilities as the PA Officer, which for the avoidance of doubt includes fiduciary duties to all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Amended Plan. Vacancies on the Litigation Oversight Committee shall be filled by the unanimous consent of the remaining member or members of the Litigation Oversight Committee, which consent shall not be unreasonably withheld, conditioned, or delayed. If a vacancy on the Litigation Oversight Committee is not filled within five (5)

Business Days of such vacancy occurring, the PA Officer shall have the authority to seek an order from the Bankruptcy Court approving the appointment of a Person, with such Person's prior written consent, to the Litigation Oversight Committee to fill such vacancy.  The PA Officer shall also have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Litigation Oversight Committee for cause.

(e)    Plan Administration Agreement

The Plan Administration Agreement generally will provide for, among other things: (i) the payment of reasonable and documented compensation to the PA Officer; (ii) the payment of other expenses of the Wind-Down Debtors by the PA Officer; (iii) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their compensation; (iv) the investment of Cash by the PA Officer within certain limitations; (v) the preparation and filing of appropriate tax returns and other reports on behalf of the Wind-Down Debtors and the Debtors and the payment of taxes or other obligations owed by the Wind-Down Debtors and the Debtors; (vi) the PA Officer's orderly liquidation of the Wind-Down Debtors' Assets subject to the oversight of the New Board and the Wind-Down Oversight Committee as set forth in the Amended Plan; and (vii) the litigation, settlement, abandonment, or dismissal of the Retained Causes of Action and any other claims, rights, or causes of action assigned to the Wind-Down Debtors subject to the oversight of the Litigation Oversight Committee as set forth herein.

(f)    Reports to Be Filed by the PA Officer

The PA Officer, on behalf of the Wind-Down Debtors, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Plan Administration Agreement, including the New Board and the Wind-Down Oversight Committee), no later than thirty-one (31) days after June 30 and December 31 of each calendar year, a semi-annual report (in a form reasonably acceptable to the New Board and the Wind-Down Oversight Committee) regarding the administration of property subject to its ownership and control pursuant to the Amended Plan, distributions made by it, and other matters relating to the implementation of the Amended Plan.

(g)    Fees and Expenses of the Wind-Down Debtors

The Wind-Down Debtors' Expenses shall be paid from the Wind-Down Reserve, subject to the Wind-Down Budget.  The fees and expenses of the PA Officer (including those incurred prior to the Effective Date in connection with the preparation of the Plan Administration Agreement) shall be paid after the Effective Date pursuant to the terms and conditions of the Plan Administration Agreement.  The PA Officer, on behalf of the Wind-Down Debtors, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously employed by the Debtors) to assist in carrying out its duties under the Plan Administration Agreement and may compensate and reimburse the expenses of these professionals based upon the nature of the work performed by such professional, without further order of the Bankruptcy Court, subject to any limitations and procedures established by the Plan Administration Agreement.  For the avoidance of doubt, the PA Officer, the Wind-Down Oversight Committee, and the Litigation Oversight Committee may employ the same professionals to the extent appropriate, as determined by each in its reasonable discretion and in accordance with the Plan Administration Agreement, the Litigation Oversight Committee Bylaws, or the Wind-Down Oversight Committee Bylaws, as applicable.

(h)    Liability of the Wind-Down Debtors; Indemnification

The Plan Administration Agreement may include reasonable and customary indemnification provisions for the benefit of the PA Officer, the New Board, the Litigation Oversight Committee, the Wind-Down Oversight Committee, and/or other parties.  Any such indemnification shall be the sole responsibility of the Wind-Down Debtors and payable solely from the Wind-Down Debtors' Assets.

The Wind-Down Debtor Parties shall not be liable for losses, claims, damages, liabilities, or expenses in connection with the affairs of the Wind-Down Debtors or for the act or omission of any other Wind-Down Debtor Party, nor shall the Wind-Down Debtor Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers, and authority conferred, or in good faith believed to be conferred, by the Plan Administration Agreement or the Amended Plan other than for specific acts or omissions resulting from such Wind-Down Debtor Party's willful misconduct, gross negligence, or actual fraud.  Subject to the Plan Administration Agreement, the PA Officer shall be entitled to enjoy all of the rights, powers, immunities, and privileges applicable to a chapter 7 trustee,

81

and the New Board shall be entitled to enjoy all of the rights, powers, immunities, and privileges provided in the New Governance Documents. The PA Officer or the New Board, as applicable, may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors, and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, none of the Wind-Down Debtor Parties shall be under any obligation to consult with its attorneys, accountants, financial advisors, or agents, and their determination not to do so shall not result in the imposition of liability on any of the Wind-Down Debtor Parties, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud. The Wind-Down Debtor Parties shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth in the Amended Plan, and no implied covenants or obligations shall be read into the Plan Administration Agreement, the Litigation Oversight Committee Bylaws, or the Wind-Down Oversight Committee Bylaws against any of them. The Wind-Down Debtors shall promptly, upon submission of invoices therefor, pay expenses reasonably incurred by any Wind-Down Debtor Party in defending, participating in, or settling any action, proceeding, or investigation in which such Wind-Down Debtor Party is a party or is threatened to be made a party and which arises out of or due to such Wind-Down Debtor Party's duties, acts, or omissions, or the consequences of such duties, acts, or omissions, with respect to the implementation of the Amended Plan or otherwise in connection with the affairs of the Wind-Down Debtors, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise; provided, however, that no expenses will be paid to a Wind-Down Debtor Party to the extent such expenses result from such Wind-Down Debtor Party's willful misconduct, gross negligence, or actual fraud.

(i)    Tax Treatment

The Debtors will not issue an IRS Form 1099-B to any Holder of a Claim in respect of any return of Digital Assets to such Holder, to the extent the Holder receives Digital Assets of the same type as those deposited with a Debtor in an amount not in excess of the amount of such Digital Assets so deposited, except to the extent otherwise required pursuant to a "final determination" within the meaning of section 1313(a) of the Internal Revenue Code or as the result of a change in law.

(j)    Insurance; Bond

The PA Officer may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the PA Officer under the Plan Administration Agreement. Unless otherwise agreed to by the New Board, the PA Officer shall serve with a bond, the terms of which shall be agreed to by the New Board, and the cost and expense of which shall be paid by the Wind-Down Debtors.

(k)    Settlement of Claims

Except as otherwise provided in the Amended Plan or the Plan Administration Agreement, on and after the Effective Date, the PA Officer, in consultation with the Wind-Down Oversight Committee, may compromise or settle any Claims related to the Wind-Down Debtors' Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Wind-Down Debtors' Expenses, professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court; provided, however, that the Wind-Down Oversight Committee's Consent shall be required for any settlement that would Allow a Claim at a value at or above $5 million; provided further that the Litigation Oversight Committee's Consent shall be required for any settlement of Retained Causes of Action as provided in the Amended Plan and in the Plan Administration Agreement.

(l)    Sales of Assets by the Wind-Down Debtors

The PA Officer may conduct any Monetization Transactions of non-Cash Wind-Down Debtors' Assets (except for Retained Causes of Action, GBTC shares, and ETHE shares) on any terms it deems reasonable, without further order of the Bankruptcy Court. The PA Officer may conduct any Monetization Transactions of Retained Causes of Action without further order of the Bankruptcy Court, but only to the extent the PA Officer has obtained the prior consent of the New Board and the Litigation Oversight Committee's Consent, subject to the provisions of the Plan Administration Agreement. Subject to subsection (i) below, the PA Officer may conduct any Monetization

82

Transactions of GBTC shares or ETHE shares without further order of the Bankruptcy Court and free of any prohibition on assignability or transfer under applicable non-bankruptcy law that otherwise may be applicable to such shares, but only in accordance with the Distribution Principles. Upon the sale, liquidation, transfer, or other disposition of the Wind-Down Debtors' Assets by the PA Officer, the PA Officer shall deposit the proceeds of all such sales, liquidations, transfers, or dispositions into one or more of the Wind-Down Accounts (and such proceeds shall become and be deemed to be Distributable Assets).

(i)        Additional GBTC Shares Reserve

Notwithstanding anything to the contrary in the Amended Plan (including the Distribution Principles), until the Gemini Additional Collateral Determination has occurred, the Additional GBTC Shares Reserve shall be held in reserve by the Wind-Down Debtors and shall not be distributed, subject to any Monetization Transactions, or otherwise subject to dissipation, use, or encumbrance, without Gemini's Consent.

(ii)        Gemini GBTC Shares Reserve

Notwithstanding anything to the contrary in the Amended Plan (including the Distribution Principles), until the Gemini GBTC Shares Determination has occurred, the Gemini GBTC Shares Reserve shall be held in reserve by Gemini or the Gemini Distribution Agent and shall not be distributed, subject to any Monetization Transactions, or otherwise subject to dissipation, use, or encumbrance, without Gemini's Consent and the Wind-Down Oversight Committee's Consent.

(m)        Abandonment of Assets by the Wind-Down Debtors

With five (5) Business Days' prior notice to the New Board, the Wind-Down Oversight Committee, and, with respect to the abandonment of any Retained Causes of Action, the Litigation Oversight Committee, the PA Officer may abandon any Wind-Down Debtors' Assets that the PA Officer determines in his, her, or its reasonable discretion to be of de minimis value or burdensome to the Wind-Down Debtors, including any pending adversary proceeding or other legal action commenced or commenceable by the Debtors prior to the Effective Date.

(n)        Dissolution of the Wind-Down Debtors

On and after the Effective Date, the Wind-Down Debtors will be authorized and directed to implement the Amended Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Debtors, subject to the remaining provisions of Article IV.A.14 of the Amended Plan shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates. As soon as practicable after the Effective Date, the Wind-Down Debtors shall take such actions as the Wind-Down Debtors  may determine to be necessary or desirable to carry out the purposes of the Amended Plan.

Upon making all distributions provided for under the Amended Plan, the Wind-Down Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the applicable Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) except as otherwise provided in the Amended Plan, shall be deemed to have cancelled all Interests pursuant to the Amended Plan, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Pursuant to the terms of the Amended Plan, on the Effective Date, any Money Transmitter Licenses that have not been terminated shall be deemed withdrawn and no further action is required to be taken by the Debtors or the Wind-Down Debtors to effectuate such withdrawal; *provided* that, following the Effective Date, the Wind-Down Debtors shall use commercially reasonable efforts to comply with all state banking department requirements for the surrender of a Money Transmitter License. Nothing in this Plan shall be construed to limit the rights of creditors, the Debtors, the Wind-Down Debtors, or regulators to pursue recoveries against surety bonds maintained by the Debtors in connection with Money Transmitter Licenses.

The Wind-Down Debtors will dissolve on the earlier of the date on which: (i) (a) the Wind-Down Debtors have made the final liquidation, administration, and distribution of the Wind-Down Debtors' Assets in accordance with the terms of the Plan Administration Agreement and the Amended Plan, and the PA Officer has fully performed

all other duties and functions as set forth under the Amended Plan, the Confirmation Order, and/or the Plan Administration Agreement and (b) the Chapter 11 Cases of the Debtors have been closed; or (ii) the PA Officer determines in his, her, or its reasonable judgment, with notice to the New Board and in consultation with the Wind-Down Oversight Committee, that the Wind-Down Debtors lack sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him, her, or it under the Amended Plan, the Confirmation Order, and/or the Plan Administration Agreement. After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Debtors of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the PA Officer, the Wind-Down Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction. The PA Officer, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states. Any certificate of dissolution or equivalent document may be executed by the PA Officer on behalf of any Wind-Down Debtor without the need for any action or approval by the shareholders or board of directors or managers of such Wind-Down Debtor.

### *(ii)    Means for Implementation*

#### (a)    Restructuring

On the Effective Date, or as soon as reasonably practicable thereafter, each of the Wind-Down Debtors shall undertake the Restructuring, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, sale transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Amended Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Amended Plan or as otherwise agreed by the Debtors with the Committee's Consent and the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing); (3) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) the issuance of securities (if any), which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule; (6) the execution and delivery of a tax sharing agreement allocating the benefits and burdens of tax attributes and tax costs between the Debtors and DCG and of Definitive Documents not otherwise included in the foregoing, if any; (7) the implementation of the terms and conditions of the Alameda/Genesis Settlement Agreement; and (8) all other actions that the Debtors or the Wind-Down Debtors, as applicable, determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law. The Confirmation Order shall and shall be deemed, pursuant to sections 363, 365 and 1123 of the Bankruptcy Code, to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Amended Plan, including the Distribution Principles and Monetization Transactions.

#### (b)    Segregated Accounts for Plan Distributions

#### (i)    Claims Reserve

The Claims Reserve for each Debtor shall be held in trust in a segregated account by the applicable Wind-Down Debtor for distributions and/or payment in accordance with the terms of Articles II and III of the Amended Plan. Each Wind-Down Debtor shall be entitled to (i) any Cash or Digital Assets held in the applicable Claims Reserve after all applicable distributions are made to Holders of Allowed Claims entitled to the Cash or Digital Assets in such applicable Claims Reserve under the Amended Plan and (ii) any surplus Cash or Digital Assets in the applicable Claims Reserve, which surplus shall be determined by the PA Officer based on the potential amount of Administrative Expense Claims, Other Priority Claims, and Secured Claims that remain unpaid as of such date of determination and any such Cash or Digital Assets shall constitute Distributable Assets to be distributed pursuant to the Amended Plan (including the Distribution Principles).

#### (ii)    Professional Fee Escrow Account

The Professional Fee Reserve Amount shall be held in trust in a segregated Professional Fee Escrow Account by the Wind-Down Debtors solely for distributions or payment in accordance with the terms of Article II of the Amended Plan.  Each Wind-Down Debtor shall be entitled to its pro rata share (based on the percentage of the Professional Fee Reserve Amount funded by such Entity or the applicable Debtor) of any Cash held in the Professional Fee Escrow Account after all Allowed Professional Fee Claims are satisfied in full in Cash and any such remaining Cash shall constitute Distributable Assets to be distributed pursuant to the Amended Plan (including the Distribution Principles).

<div align="center">(iii)    Litigation Reserve</div>

The Litigation Reserve shall be held in a separate segregated account from the Wind-Down Reserve and used by the Wind-Down Debtors to pay the Wind-Down Debtors' Expenses incurred in connection with the Wind-Down Debtors' pursuit of any claims or Causes of Action, including the Retained Causes of Action; provided, however, that the Litigation Reserves shall not be used to pay the Wind-Down Debtors' Expenses incurred in connection with the Wind-Down Debtors' other wind down efforts, which expenses shall be paid from the Wind-Down Reserve unless otherwise ordered by the Bankruptcy Court. The Wind-Down Debtors shall be entitled to any (i) Cash held in the Litigation Reserve after all Retained Causes of Action have been settled or determined by a Final Order and (ii) surplus Cash in the Litigation Reserve, which surplus shall be determined by the PA Officer in consultation with the Litigation Oversight Committee, in each case, which Cash shall constitute Distributable Assets to be distributed pursuant to the Amended Plan  (including the Distribution Principles) unless otherwise ordered by the Bankruptcy Court.

<div align="center">(iv)    Wind-Down Reserve</div>

The Wind-Down Reserve for each Wind-Down Debtor shall be held in trust in a segregated account by such Wind-Down Debtor to pay the applicable Wind-Down Debtors' Expenses; provided, however, that the Wind-Down Reserves shall not be used to pay the Wind-Down Debtors' Expenses incurred in connection with the Wind-Down Debtors' pursuit of any claims or Causes of Action, including the Retained Causes of Action, which Wind-Down Debtors' Expenses shall be paid out of the Litigation Reserve.  Each Wind-Down Debtor shall be entitled to any (i) Cash held in the applicable Wind-Down Reserve after all Wind-Down Debtors' Expenses of such Wind-Down Debtor have been paid and (ii) surplus Cash in the applicable Wind-Down Reserve, which surplus shall be determined by the PA Officer in consultation with the Wind-Down Oversight Committee, in each case, which Cash shall constitute Distributable Assets to be distributed pursuant to the Amended Plan (including the Distribution Principles).

<div align="center">(c)    Sources of Consideration for Amended Plan Distributions; Digital Asset Rebalancing</div>

The Wind-Down Debtors shall make distributions under and in accordance with the Amended Plan from Distributable Assets, the Claims Reserve, and the Professional Fee Escrow Account, as applicable.

The Debtors and the Wind-Down Debtors shall, in consultation with the Wind-Down Oversight Committee and to the maximum extent permitted by law, be authorized to rebalance their Cash and Digital Assets to enable the Debtors or the Wind-Down Debtors, as applicable, to make distributions in respect of Claims denominated in Digital Assets in the like kind form of Digital Asset in which such Claims are denominated.  The Debtors and the Wind-Down Debtors, to the maximum extent permitted by law, are authorized to effectuate such rebalancing by buying and selling Digital Assets or otherwise exchanging any type of Digital Asset into any other type of Digital Asset; provided, however, that no distribution in the form of Digital Assets shall be made to any Holder that has not responded to all requests by the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, for information necessary to facilitate a particular distribution to such Holder.

The Wind-Down Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Wind-Down Debtors to satisfy their obligations under the Amended Plan. Except as set forth in the Amended Plan, any changes in intercompany account balances resulting from such transfers may be accounted for and/or settled in accordance with the Debtors' historical intercompany account settlement practices and any such action will not violate the terms of the Amended Plan.

(d)      Corporate Existence

Except as otherwise provided in the Amended Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated in the Amended Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the New Governance Documents.

(e)      Vesting of Assets

Except as otherwise provided in the Amended Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated the Amended Plan or the Plan Supplement, on the Effective Date: all Assets in each Estate, including all Retained Causes of Action and any Assets owned or acquired by any of the Debtors, shall vest in each applicable Wind-Down Debtor free and clear of all Liens, Claims, charges, or other encumbrances (other than, for the avoidance of doubt, any Allowed General Unsecured Claims), including any prohibition on assignability or transfer under applicable non-bankruptcy law.  The vesting of Assets pursuant to the Amended Plan shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Wind-Down Debtors as if the asset or right was still held by the Debtors.  On and after the Effective Date, except as otherwise provided in the Amended Plan, the New Governance Documents, or the Plan Administration Agreement, each Wind-Down Debtor may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and free of any prohibition on assignability or transfer under applicable non-bankruptcy law that otherwise may be applicable.

Notwithstanding any prohibition on assignability or transfer under applicable non-bankruptcy law, on and after the Effective Date, if additional Assets become available, such additional Assets shall be treated as if they were transferred to (as applicable) and vested in the applicable Wind-Down Debtor as a successor to the Debtors with all attendant rights, title, and interests in and to all such Assets, in accordance with section 1141 of the Bankruptcy Code. All such Assets shall automatically vest in the Wind-Down Debtors free and clear of all Liens, Claims, charges, or other encumbrances (other than, for the avoidance of doubt, any Allowed General Unsecured Claims pursuant to the terms of the Amended Plan).

Except as otherwise provided for in the Amended Plan, to the extent that any Holder of a Secured Claim that has been satisfied in full pursuant to the Amended Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtors that are necessary to cancel and/or extinguish such Liens and/or security interests.

On and after the Effective Date, the Wind-Down Debtors may present Bankruptcy Court order(s) or assignment(s) suitable for filing in the records of every county or governmental agency where the property vested in accordance with the foregoing paragraph is or was located, which provide that such property is conveyed to and vested in the Wind-Down Debtors.  The Bankruptcy Court order(s) or assignment(s) may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred, assigned, and/or vested free and clear of. The Amended Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished and no notice, other than by the Amended Plan, shall be given prior to the presentation of such Bankruptcy Court order(s) or assignment(s). Any Person having a Lien, Claim, encumbrance, or other interest against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer, assignment, and vesting of such property to or in the Wind-Down Debtors free and clear of all Liens, Claims, charges, or other encumbrances by failing to object to confirmation of the Amended Plan, except as otherwise provided in the Amended Plan.

(f)      Cancellation of Existing Securities and Agreements

Except as otherwise provided in the Amended Plan, on the Effective Date: (a) all Interests, and each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise

86

to any Claim or Interest shall be cancelled or extinguished and the Debtors and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or Claims against or Interests in, the Debtors shall be released; provided that, notwithstanding the releases set forth in Article VIII of the Amended Plan, Confirmation, or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Amended Plan as provided in the Amended Plan; provided further that, absent the consent of the Debtors and the Committee's Consent, nothing in Article IV.B.6 of the Amended Plan shall effectuate a cancellation of any  Intercompany Interests, Intercompany Claims (except for claims settled as part of the GAP/GGC Settlement or the GGC/GGH Settlement), or Interests.

Notwithstanding anything to the contrary in Article IV.B.6 of the Amended Plan, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, a Debtor or its Interests, as a result of the cancellations, terminations, satisfaction, or releases provided for in Article IV.B.6 of the Amended Plan shall be deemed null and void and shall be of no force and effect.  Nothing contained in the Amended Plan shall be deemed to cancel, terminate, or release the obligation of a Debtor or any of its counterparties under any Executory Contract or Unexpired Lease to the extent such executory contract or unexpired lease has been assumed by such Debtor or Wind-Down Debtor, as applicable, pursuant to the Amended Plan or a Final Order of the Bankruptcy Court.

(g)      Corporate Action

Upon the Effective Date, all actions (whether to occur before, on, or after the Effective Date) contemplated by the Amended Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the appointment of the New Board, the PA Officer, and other directors and officers for the Wind-Down Debtors, including the Litigation Oversight Committee and the Wind-Down Oversight Committee; (2) the implementation of the Restructuring; (3) the re-vesting of the Wind-Down Debtors' Assets in the Wind-Down Debtors and the transactions and distributions contemplated under the Amended Plan and the Distribution Principles, including any rebalancing of Distributable Assets; (4) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (5) all other actions contemplated by the Amended Plan and the Definitive Documents.  Upon the Effective Date, all matters provided for in the Amended Plan involving the corporate structure of the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with the Amended Plan (including any items listed in the first sentence of this paragraph) shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security Holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors. On or (as applicable) before the Effective Date, the appropriate directors, managers, officers, or other authorized persons of the Debtors or the Wind-Down Debtors shall be authorized and empowered to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Amended Plan (or necessary or desirable to effectuate the transactions contemplated by the Amended Plan) in the name of and on behalf of the Wind-Down Debtors to the extent not previously authorized by the Bankruptcy Court.  The New Board shall be appointed by DCG subject to the limitations set forth in the Amended Plan; provided, however, in selecting the Persons for appointment to the New Board, DCG shall only be entitled to choose those Persons that are identified on a list of seven (7) candidates that is delivered to DCG by the Committee, in consultation with the Debtors and with the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing).  The authorizations and approvals contemplated by Article IV.B.7 of the Amended Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

(h)      New Governance Documents

To the extent required under the Amended Plan or applicable non-bankruptcy law, the Wind-Down Debtors will, on or as soon as practicable after the Effective Date, file their respective New Governance Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. To the extent required by section 1123(a)(6) of the Bankruptcy Code, the New Governance Documents of the Wind-Down Debtors will prohibit the issuance of non-voting equity securities. After the Effective Date, the Wind-Down

Debtors may amend and restate their respective New Governance Documents and other constituent documents, as permitted by the laws of their respective states, provinces, or countries of organization and their respective New Governance Documents.

On the Effective Date, the New Governance Documents, substantially in the forms set forth in the Amended Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with their terms and provisions.

(i)        Directors and Officers of the Wind-Down Debtors

As of the Effective Date, the term of the current members of the board of directors, board of managers, or other governing body of the Debtors shall expire automatically and each person serving as a director or manager of a Debtor shall be removed and shall be deemed to have resigned and cease to serve automatically. The New Board shall be appointed by DCG subject to the limitations set forth in the Amended Plan; *provided*, *however*, in selecting the Persons for appointment to the New Board, DCG shall only be entitled to appoint those Persons who are identified on a list of seven (7) candidates selected by the Committee, in consultation with the Debtors and with the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing); and, *provided*, *further*, that following the Effective Date, the Wind-Down Oversight Committee shall be responsible for identifying any nominees to replace members of the New Board by submitting a list of three (3) Persons for each member of the New Board who needs to be replaced; and, *provided*, *further*, that in no event shall DCG be entitled to terminate any member of the New Board. The New Board shall govern each of the Wind-Down Debtors and consult with the Wind-Down Oversight Committee on various matters identified in the Amended Plan and the Plan Administration Agreement.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent known, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Board, as well as those Persons that will serve as an officer of any of the Wind-Down Debtors. If any such director or officer is an "insider" as defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed to the extent required under the Bankruptcy Code. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Governance Documents and other constituent documents of each of the Wind-Down Debtors.

(j)        Effectuating Documents; Further Transactions

On and after the Effective Date, the Wind-Down Debtors, their respective officers, the PA Officer, and the members of the New Board are, subject to the New Governance Documents and the Plan Administration Agreement, authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Amended Plan and the Securities issued pursuant to the Amended Plan (if any) in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Amended Plan.

(k)        Reserved

(l)        Exemption from Certain Taxes and Fees

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, (a) any issuance, transfer, or exchange of a Security (if any), (b) any creation of any Lien, mortgage, deed of trust, or other security interest, or (c) any sale, liquidation, or transfer of property, in each case, pursuant to, in contemplation of, or in connection with, the Amended Plan, including the transfer of any Assets to the Wind-Down Debtors and any rebalancing of Distributable Assets, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments of transfer or other relevant documents without the payment of any such tax, recordation fee, or governmental assessment.

(m)        Exemption from Registration Requirements

Any Securities offered, issued, or distributed pursuant to the Amended Plan will be so offered, issued, or distributed pursuant to an exemption from registration under the Securities Act and all rules and regulations promulgated thereunder, including sections 4(a)(1) and 4(a)(2) of the Securities Act, Rule 506 of Regulation D, Regulation S, and/or Rule 144.

Notwithstanding anything to the contrary in the Amended Plan, no Person shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Amended Plan, including whether any Securities are exempt from registration and/or eligible for book-entry delivery, settlement, and depository services.

(n)        Preservation of Causes of Action

In accordance with and subject to section 1123(b)(3) of the Bankruptcy Code, but subject in all respects to Article VIII of the Amended Plan, the Wind-Down Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action belong to the Debtors or their Estates (including any Causes of Action that belong to Other Genesis Entities), whether arising before or after the Petition Date, including any Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Wind-Down Debtors shall be vested with all rights, powers, and privileges of the Debtors (including the rights and powers of the Debtors under chapter 5 of the Bankruptcy Code) and may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. Notwithstanding anything to the contrary in the Amended Plan, all rights in any Retained Causes of Action shall vest in the Wind-Down Debtors as of the Effective Date, and may be pursued by the PA Officer in accordance with the provisions of the Amended Plan and the Plan Administration Agreement**. No Entity may rely on the absence of a specific reference in the Amended Plan, the Plan Supplement, or the Amended Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Wind-Down Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Wind-Down Debtors expressly reserve all rights to prosecute any and all Causes of Action (including any Causes of Action that belong to the Other Genesis Entities) against any Entity, except as otherwise expressly provided in the Amended Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Amended Plan or a Court order, including pursuant to Article VIII of the Amended Plan, the Debtors and the Wind-Down Debtors expressly reserve all Causes of Action (including any Causes of Action that belong to the Other Genesis Entities) for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to Article IV.B.14 of the Amended Plan include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with and subject to section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided in the Amended Plan, any Causes of Action that a Debtor may hold against any Entity (including any Causes of Action that belong to the Other Genesis Entities) shall vest in the applicable Wind-Down Debtor. The applicable Wind-Down Debtors, through their authorized agents or representatives (including the PA Officer), shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtors shall have the exclusive right, authority, and, at the direction of the Litigation Oversight Committee, ability to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing (at the direction of the Litigation Oversight Committee) without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; *provided* that any settlement, compromise, release, withdrawal, or abandonment of any Cause of Action shall require the Litigation Oversight Committee's Consent. The Wind-Down Debtors shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the applicable Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtors' Asset (including any Causes of Action that belong to the Other Genesis Entities) without the need for filing any motion for such relief.

(o)        Director and Officer Liability Insurance

The Wind-Down Debtors shall be authorized to obtain directors' managers' and officers' liability insurance policies.  Notwithstanding anything in the Amended Plan to the contrary, effective as of the Effective Date, the Wind-Down Debtors shall be deemed to have assumed all D&O Liability Insurance Policies (including tail coverage liability insurance) pursuant to section 365(a) of the Bankruptcy Code, to the extent they are Executory Contracts. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Wind-Down Debtors' assumption of each of the D&O Liability Insurance Policies, to the extent they are Executory Contracts.  Notwithstanding anything to the contrary contained in the Amended Plan, Confirmation of the Amended Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Wind-Down Debtors under the Amended Plan as to which no Proof of Claim need be Filed, and shall survive the Effective Date.

(p)    Offsetting of Collateral

The Debtors and the Wind-Down Debtors are authorized, but shall not be required to, for purposes of calculating the Allowed amount of any Claim entitled to receive distributions under the Amended Plan, set off (i) any Claim against the Debtors with the value of any Loan Collateral that the applicable Debtor delivered to the Holder of such Claim, (ii)  the value of any debt owed by the Holder of such Claim to the applicable Debtor by the value of any Loan Collateral that the Holder of such Claim delivered to the applicable Debtor to secure a loan from such Debtor, and/or (iii) any Claim against a Debtor with the value of any debt owed by the Holder of such Claim to the applicable Debtor.

**(iii)    GAP and GGC Intercompany Settlement**

The Amended Plan incorporates a good faith settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Intercompany Claims between GGC and GAP and provides for GGC to make a settlement contribution to GAP in an amount necessary for (i) Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC, (ii) Allowed BTC-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed BTC-Denominated Unsecured Claims against GGC, (iii) Allowed ETH-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed ETH-Denominated Unsecured Claims against GGC, and (iv) Allowed Alt-Coin-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed Alt-Coin-Denominated Unsecured Claims against GGC.

**(iv)    GGC and GGH Intercompany Settlement**

The Amended Plan incorporates a good faith settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Intercompany Claims between GGC and GGH and provides for GGC or Wind-Down GGC, as applicable, to receive the proceeds of any Monetization Transaction(s) allocated to any portion of the Genesis Platform other than GGT.

**F.    Treatment of Executory Contracts and Unexpired Leases**

**(i)    Assumption and Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except as otherwise provided in the Amended Plan or in any contract, instrument, release, or other agreement or document entered into in connection with the Amended Plan, the Amended Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume, assume and assign, or reject Executory Contracts and Unexpired Leases, and all Executory Contracts or Unexpired Leases shall be deemed rejected as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is designated on the Schedule of Assumed Executory Contracts and Unexpired Leases in the Plan Supplement; (ii) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date; or (v) is the subject of a motion to reject pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Amended Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code. Each Executory Contract or Unexpired Lease assumed pursuant to the Amended Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Wind-Down Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Amended Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment under applicable federal law. Notwithstanding anything to the contrary in the Amended Plan, the Debtors or the Wind-Down Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases with the Committee's Consent at any time on or prior to the date that is forty-five (45) days after the Effective Date on no less than seven (7) days' notice to the applicable non-Debtor counterparties.

Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Amended Plan are effective as of the Effective Date. Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date (or as soon as reasonably practicable thereafter) by a Final Order.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Amended Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), such provision shall be deemed modified such that the transactions contemplated by the Amended Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

> (ii)      *Claims Based on Rejection of Executory Contracts or Unexpired Leases and Deadline by Which to File Proofs of Claim*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Amended Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court in accordance with the Bar Date Order. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Wind-Down Debtors, the Estates, or their property (as applicable), without the need for any objection by the Debtors or the Wind-Down Debtors, or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and any Claim arising out of such rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, and released, and be subject to the permanent injunction set forth in Article VIII of the Amended Plan, notwithstanding anything in the Proof of Claim, if any, to the contrary.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contracts or Unexpired Leases pursuant to section 365 of the Bankruptcy Code shall be treated as General Unsecured Claims in accordance with Article III.B–D of the Amended Plan and may be objected to in accordance with the provisions of Article VII of the Amended Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

> (iii)      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under an Executory Contract or Unexpired Lease assumed by the Debtors, as reflected on the applicable Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the proposed cure amount (if any) in Cash by the Debtors or the Wind-Down Debtors, as applicable, on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. At least fourteen (14) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed cure amounts to the applicable third parties. Unless otherwise agreed upon in writing by

the parties to the applicable Executory Contract or Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount paid or proposed to be paid by the Debtors or the Wind-Down Debtors to such counterparty must be filed with the Bankruptcy Court and served on and actually received by the Debtors at least seven (7) days before the Confirmation Hearing. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or proposed cure amount shall be deemed to have assented to such assumption and cure amount, and any such objection shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Wind-Down Debtor, without the need for any objection by the Wind-Down Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and there is no listed Cure amount, such Cure amount shall be considered to be zero.

Any Cure Claim shall be deemed fully satisfied, and released upon payment by the Debtors or the Wind-Down Debtors of the amount set forth in the applicable Cure Notice or, if the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is determined by a Final Order to be greater than the applicable amount set forth in the Cure Notice, the amount of such Allowed Cure Claim; provided, however, that following entry of a Final Order resolving any such dispute, the applicable Debtor or Wind-Down Debtor shall have the right to reject any Executory Contract or Unexpired Lease within thirty (30) days of such resolution; and, *provided*, *further*, that nothing in the Amended Plan shall prevent the Wind-Down Debtors from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The Wind-Down Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

If there is any dispute regarding any Cure Claim, the ability of the Wind-Down Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Wind-Down Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Claims, the applicable Debtor may assume the Executory Contract or Unexpired Lease (subject to the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing)) prior to the resolution of any such dispute; and *provided*, *however*, that, the Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Claim by the contract counterparty; and, *provided*, *however*, that following entry of a Final Order resolving any such dispute, the applicable Debtor or Wind-Down Debtor shall have the right to reject any Executory Contract or Unexpired Lease within thirty (30) days of such resolution.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Amended Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy or insolvency-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

### (iv)    *Indemnification Obligations*

The Indemnification Obligations shall remain in full force and effect and shall not be discharged or Impaired by Confirmation of the Amended Plan, and the Indemnification Obligations shall be deemed and treated as Executory Contracts assumed by the Debtors under the Amended Plan, and shall continue as obligations of the Wind-Down Debtors; *provided*, *however*, that the Wind-Down Debtors shall not indemnify (i) employees, directors, or officers of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission that constitutes knowing and intentional fraud, gross negligence, or willful misconduct or (ii) any current or former employees, directors, or officers of the Debtors that are also DCG Parties.

*(v)*     ***Insurance Policies***

To the extent that any of the Debtors' insurance policies constitute Executory Contracts, such insurance policies (including all D&O Liability Insurance Policies) and any agreements, documents, or instruments relating thereto are treated as and deemed to be Executory Contracts under the Amended Plan and shall be assumed by the Wind-Down Debtors on the Effective Date, and all other insurance policies shall vest in the Wind-Down Debtors.

*(vi)*     ***Modifications, Amendments, Supplements, Restatements, or Other Agreements***

Unless otherwise provided in the Amended Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Amended Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

*(vii)*     ***Reservation of Rights***

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Amended Plan, shall constitute an admission by the Debtors or the Wind-Down Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Wind-Down Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or, after the Effective Date, the Wind-Down Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

*(viii)*     ***Nonoccurrence of Effective Date***

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code.

**G.**     **Provisions Governing Distributions**

*(i)*     ***Timing and Calculation of Amounts to Be Distributed***

Unless otherwise provided in the Amended Plan (including the Distribution Principles), on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim, including any portion of a Claim that is an Allowed Claim notwithstanding that other portions of such Claim are a Disputed Claim or a Disallowed Claim, shall, with respect to the portion of the Claim that is an Allowed Claim, receive the full amount of the distributions that the Amended Plan (including the Distribution Principles) provides for Allowed Claims in each applicable Class and in the manner provided in the Amended Plan (including the Distribution Principles). In the event that any payment or act under the Amended Plan is required to be made or performed on a date that is not a Business Day, the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Amended Plan and subject to the Distribution Principles. Notwithstanding any provision of the Amended Plan to the contrary, to the extent a Claim is disallowed by an order of the Bankruptcy Court, the Disbursing Agent or the Gemini Distribution Agent, as applicable, shall not

be required to reserve any amount for payment of such Claim, regardless of whether the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has not expired or whether an appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing is pending with respect to such order.

Except as otherwise provided in the Amended Plan (including the Distribution Principles), Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Amended Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

(ii)      *Disbursing Agent and Gemini Distribution Agent*

All distributions under the Amended Plan shall be made by the Disbursing Agent and, in the case of distributions on Allowed Gemini Lender Claims, the Gemini Distribution Agent.  The Disbursing Agent and the Gemini Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court.  Additionally, in the event that the Disbursing Agent or the Gemini Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind-Down Debtors.

(a)      Powers of the Disbursing Agent and the Gemini Distribution Agent

The Disbursing Agent and the Gemini Distribution Agent, as applicable, shall be empowered and directed to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Amended Plan; (b) make all distributions contemplated hereby; (c) take all actions required of it by the Distribution Principles; (d) employ professionals to represent it with respect to its responsibilities; and (e) exercise such other powers as may be vested in the Disbursing Agent or the Gemini Distribution Agent by order of the Bankruptcy Court, pursuant to the Amended Plan and the Distribution Principles, or as deemed by the Disbursing Agent or the Gemini Distribution Agent to be necessary and proper to implement the provisions of the Amended Plan and the Distribution Principles.

The Gemini Distribution Agent shall, at its sole discretion and to the maximum extent permitted by law, be authorized to (i) enter into a Monetization Transaction of assets distributed or transferred to the Gemini Distribution Agent, including the Gemini GBTC Shares (other than the Gemini GBTC Shares Reserve, which shall be subject to the limitations set forth in Article IV.A.12.b of the Amended Plan), the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value), and the Gemini Earn Operations Assets, and (ii) rebalance the Cash and Digital Assets distributed or transferred to the Gemini Distribution Agent, including the Gemini GBTC Shares (other than the Gemini GBTC Shares Reserve, which shall be subject to the limitations set forth in Article IV.A.12.b of the Amended Plan), the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value), and the Gemini Earn Operations Assets, in each case, to enable the Gemini Distribution Agent to make distributions in respect of Gemini Lender Claims denominated in Digital Assets in the like kind form of Digital Asset in which such Claims are denominated; *provided*, *however*, that in no event shall the Gemini Distribution Agent be authorized to provide any Holder of an Allowed Claim with any lesser treatment than such Holder was entitled to under the Amended Plan.  The Gemini Distribution Agent, to the maximum extent permitted by law, is authorized to effectuate such rebalancing by buying and selling of Digital Assets or otherwise exchanging any type of Digital Asset into any other type of Digital Asset.

(b)      Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent or the Gemini Distribution Agent (each solely in its capacity as such solely with respect to its duties in such capacity) on or after the Effective Date, and any reasonable and documented compensation and expense reimbursement claims (including reasonable and documented attorney fees and expenses) made by the Disbursing Agent or the Gemini Distribution Agent (each solely in its capacity as such), shall be paid in Cash by the Wind-Down Debtors from the Wind-Down Reserve; *provided*, *however*, that the fees and expenses incurred by the Gemini Distribution Agent shall be subject to the Wind-Down Budget; and, *provided*, *further*, that the amount of fees and expenses budgeted for the Gemini Distribution Agent in the Wind-Down Budget shall be determined in the Debtors' reasonable discretion, with the Committee's Consent, Gemini's Consent, and the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing), and the Gemini Distribution

Agent shall not incur any fees and expenses in excess of the Wind-Down Budget without the prior written consent of the PA Officer, which consent shall not be unreasonably withheld, conditioned, or delayed.

<p style="text-align:center">(c)    No Liability</p>

Except on account of gross negligence, fraud, or willful misconduct, each of the Disbursing Agent and the Gemini Distribution Agent shall have no (a) liability to any party for actions taken in accordance with the Amended Plan or in reliance upon information provided to it in accordance with the Amended Plan or (b) obligation or liability to any party who (i) does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a distribution is made or (ii) does not otherwise comply with the terms of the Amended Plan.

<p style="text-align:center">***(iii)    Delivery of Distributions and Undeliverable or Unclaimed Distribution***</p>

<p style="text-align:center">(a)    Delivery of Distributions on Allowed Claims and Allowed Interests</p>

<p style="text-align:center">(i)    Distribution Record Date</p>

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Interests maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims and Interests. The Disbursing Agent and the Gemini Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring after the close of business on the Distribution Record Date.

<p style="text-align:center">(ii)    Delivery of Distributions in General</p>

Subject to the Distribution Principles and except as otherwise provided in the Amended Plan (including in the next paragraph), the Disbursing Agent shall make distributions to Holders of Allowed Claims (other than Gemini Lender Claims) and Allowed Interests (if any) as of the Distribution Record Date at the address (physical address or digital wallet, as applicable) for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder; provided, however, that the manner of such distributions shall be determined at the discretion of the Debtors or the Wind-Down Debtors.  Holders of Claims may notify the Disbursing Agent by email of any changes to their address for receipt of distributions.

<p style="text-align:center">(iii)    Delivery of Distributions on Claims Denominated in Digital Assets</p>

Subject to the Distribution Principles, the Debtors and the Wind-Down Debtors will use commercially reasonable efforts, subject to applicable law and the terms of the Amended Plan, to provide recoveries in respect of Claims denominated in Digital Assets in the like-kind form of Digital Asset in which such Claims are denominated, including by buying Digital Assets with the Debtors' or Wind-Down Debtors' Cash, selling Digital Assets for Cash, or otherwise exchanging any type of Digital Asset into any other type of Digital Asset; *provided*, *however*, that no distribution in the form of Digital Assets shall be made to any Holder that has not responded to all requests by the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, for information necessary to facilitate a particular distribution to such Holder; and *provided*, *further*, that, upon the request of a Holder of an Allowed Fiat-or-Stablecoin Denominated Claim, the Debtors or the Wind-Down Debtors, as applicable, will use commercially reasonable efforts, subject to applicable law (including any regulatory or tax considerations) and the terms of the Amended Plan, to provide recoveries to such Holder in Cash in respect of such Allowed Fiat-or-Stablecoin Denominated Claim; and *provided*, *further*, that, notwithstanding anything to the contrary in the Amended Plan, this Disclosure Statement, or the Confirmation Order, the Debtors or the Wind-Down Debtors, as applicable, shall provide at least three (3) Business Days' prior written notice with an opportunity to object to the SEC (c/o William M. Uptegrove, U.S. Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326, UptegroveW@SEC.GOV) before buying or selling any type of Digital Asset other than BTC or ETH.

<p style="text-align:center">(iv)    Delivery of Distributions on Gemini Lender Claims.</p>

<p style="text-align:center">95</p>

Subject to the Distribution Principles, for purposes of distributions and treatment under the Amended Plan only (and not for voting purposes), Gemini shall be deemed to be the Holder of all Gemini Lender Claims and all distributions on account of Allowed Gemini Lender Claims shall be made to the Gemini Distribution Agent and held in trust in a segregated account for the benefit of the Holders of Allowed Gemini Lender Claims.  As soon as practicable following delivery of any distribution to the Gemini Distribution Agent under the Amended Plan on account of Allowed Gemini Lender Claims, the Gemini Distribution Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Gemini Lender Claims on a pro rata basis. In addition, the Gemini Distribution Agent shall arrange to deliver or direct the delivery of (i) in connection with, and contemporaneous with, Gemini effectuating the Debtors' initial distribution to the Gemini Lenders, the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value) and the Gemini Earn Operations Assets and (ii) as soon as practicable following any Monetization Transaction of Gemini GBTC Shares (other than the Gemini GBTC Shares Reserve), the proceeds of such Monetization Transaction of Gemini GBTC Shares, in each case to the Holders of Allowed Gemini Lender Claims on a pro rata basis.  Any distributions made to Gemini on account of the Allowed Gemini Lender Claims shall reduce the Gemini Lender Claims on a dollar-for-dollar basis and release the Wind-Down Debtors from any further responsibility related to such distributions; *provided*, *however*, that the value of the Gemini Reserved Coins shall be excluded from such dollar-for-dollar reduction if (x) mutually agreed in writing by Gemini and the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing), or (y) the Bankruptcy Court enters an order determining that the value of the Gemini Reserved Coins is not included in the amount of the Allowed Gemini Lender Claims and such order has not been stayed or vacated.

(v)      Minimum Distributions

Subject to the Distribution Principles, no distribution shall be made by the Disbursing Agent or the Gemini Distribution Agent on account of an Allowed Claim if the amount to be distributed to the Holder of such Claim on the applicable Distribution Date has an economic value of less than $250, provided, however, that the Gemini Distribution Agent may elect to make such distributions to Gemini Lenders in its sole discretion.

(b)      Undeliverable Distributions and Unclaimed Property

In the event that (a) any distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Interest does not respond to a request by the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, shall have determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall be deemed to be "Distributable Assets" and distributed to Holders of Allowed Claims in accordance with the Amended Plan and the Distribution Principles (it being understood that, for purposes of Article VI.C of the Amended Plan, the Claim underlying such unclaimed distribution shall be treated as Disallowed) without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be forever barred and shall not be entitled to any distributions under the Amended Plan.

(iv)      *Manner of Payment*

At the option of the Disbursing Agent or the Gemini Distribution Agent, as applicable, any Cash payment to be made under the Amended Plan may be made by check, wire transfer, or ACH as otherwise required or provided in applicable agreements.

(v)      *Compliance with Tax Requirements*

In connection with the Amended Plan, to the extent applicable, the Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, the Gemini Distribution Agent, and any applicable withholding agent shall comply

with all applicable tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Amended Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Amended Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Amended Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions until receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate. All Persons holding Claims against any Debtor shall be required to provide any additional information reasonably necessary for the Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, the Gemini Distribution Agent, and any applicable withholding agent to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, including an IRS Form W-8 or W-9, as applicable, and any other applicable tax forms. The Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, the Gemini Distribution Agent, and any applicable withholding agent reserve the right to allocate all distributions made under the Amended Plan in a manner that complies with all other legal requirements, such as applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances. Any amounts withheld pursuant to the Amended Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Amended Plan. Notwithstanding any other provision of the Amended Plan to the contrary, each Holder of an Allowed Claim or Allowed Interest shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

      *(vi)*    ***Foreign Currency Exchange Rate***

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in Foreign Currency shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable Foreign Currency as published in The Wall Street Journal, National Edition, on the Petition Date.

      *(vii)*    ***Surrender of Cancelled Instruments or Securities***

As a condition precedent to receiving a full and final distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall be deemed to be cancelled pursuant to Article IV of the Amended Plan, except to the extent otherwise provided in the Amended Plan.

      *(viii)*    ***Allocations***

The aggregate consideration to be distributed to each Holder of an Allowed Claim will be allocated first to the principal amount of such Allowed Claim, with any excess allocated to unpaid interest that accrued on such Allowed Claims, if any.

      *(ix)*    ***No Postpetition Interest on Claims***

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Amended Plan (including the Distribution Principles), or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

      *(x)*    ***Setoffs and Recoupment***

The Debtors or the Wind-Down Debtors may, but shall not be required to, set off against, or recoup from, any Allowed Claim against a Debtor any claim, right, or Cause of Action of any nature whatsoever that the applicable Debtor or Wind-Down Debtor may have against the Holder of such Claim, to the extent such claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Amended Plan or otherwise). Notwithstanding the foregoing, neither the failure to do so nor the allowance of any Claim against a Debtor hereunder shall constitute a waiver or release by the applicable Debtor or Wind-Down Debtor of any such Claim it may have against the Holder of such Allowed Claim.

(xi)     *Claims Paid or Payable by Third Parties*

(a)     Claims Paid by Third Parties

The Debtors or the Wind-Down Debtors shall reduce in full an Allowed Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Wind-Down Debtor; *provided*, *however*, that the Debtors or the Wind-Down Debtors shall provide 21 days' written notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor or a Wind-Down Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Debtors or the Wind-Down Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Amended Plan exceeds the amount of such Claim as of the Petition Date. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Debtors or the Wind-Down Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

(b)     Claims Payable by Insurers

No distributions under the Amended Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged to the extent of any agreed upon satisfaction without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

(c)     Applicability of Insurance Policies

Except as otherwise provided in the Amended Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Amended Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any insurers under any policies of insurance, nor shall anything contained in the Amended Plan constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**H.     Procedures for Resolving Contingent, Unliquidated, and Disputed Claims**

*(i)     Allowance of Claims*

On or after the Effective Date, the Wind-Down Debtors shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim immediately prior to the Effective Date.  Except as expressly provided in the Amended Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Amended Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including, if applicable, the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.  Any setoff exercised pursuant to Article IV.B.16 of the Amended Plan shall be taken into account when calculating the extent to which any Claim is Allowed for any purpose hereunder.  All settlements of Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019, or otherwise shall be binding on all parties.

Notwithstanding anything in the Amended Plan to the contrary, (1) Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease, (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code, and (3) Claims that the Debtors seek to have

determined by the Bankruptcy Court shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

### (ii)   *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Amended Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Wind-Down Debtors, by order of the Bankruptcy Court, shall together have the sole authority to, with five (5) days prior notice to the Wind-Down Oversight Committee: (1) File, withdraw, or litigate to judgment objections to Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, provided that any settlement or compromise of a Disputed Claim that results in an Allowed Claim equal to or greater than $5 million shall require the Wind-Down Oversight Committee's Consent; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. In any action or proceeding to determine the existence, validity, or amount of any Claim, any and all claims or defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such Claim are preserved as if the Chapter 11 Cases had not been commenced.

### (iii)   *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Wind-Down Debtors may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during any appeal relating to such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Amended Plan (including for purposes of distributions), and the Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

### (iv)   *Adjustment to Claims or Interests Without Objection*

Any duplicate Claim or Interest, any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded may be adjusted or expunged on the Claims Register at the direction of the Debtors, the Wind-Down Debtors, or the PA Officer, as applicable, without the Debtors, the Wind-Down Debtors, or the PA Officer, as applicable, having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

### (v)   *Time to File Objections to Claims*

Any objections to Claims, which, prior to the Effective Date, may be Filed by any party, shall be Filed on or before the Claims Objection Deadline.

### (vi)   *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Court order with respect thereto has been entered and all

sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Debtors; *provided*, *however*, that, notwithstanding the foregoing and the commencement of the Gemini Preference Action, the Holders of Allowed Gemini Lender Claims (other than any Gemini Party) shall be entitled to receive distributions in accordance with the Amended Plan (including the Distribution Principles) until the Gemini Preference Determination.

**ANY CLAIM THAT HAS BEEN LISTED IN THE SCHEDULES AS DISPUTED, CONTINGENT, OR UNLIQUIDATED, AND FOR WHICH NO PROOF OF CLAIM HAS BEEN TIMELY FILED, SHALL BE DEEMED DISALLOWED AND SHALL BE EXPUNGED WITHOUT FURTHER ACTION AND WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**EXCEPT AS PROVIDED IN THE AMENDED PLAN, IN AN ORDER OF THE BANKRUPTCY COURT, OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS AT OR PRIOR TO THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN ALLOWED BY A FINAL ORDER.**

(vii)    *Amendments to Claims*

On or after the Effective Date, except as provided in the Amended Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court and any such new or amended Claim Filed without the Bankruptcy Court's prior approval shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

(viii)    *No Distributions Pending Allowance*

Notwithstanding any other provision of the Amended Plan to the contrary, no payment or distribution of any kind or nature provided under the Amended Plan shall be made on account of any Claim to the extent that all or any portion of such Claim is a Disputed Claim, including if an objection to such Claim or portion thereof is Filed as set forth in Article VII of the Amended Plan, unless and until such Disputed Claim becomes an Allowed Claim; provided that any portion of a Claim that is an Allowed Claim shall receive the payment or distribution provided under the Amended Plan thereon notwithstanding that any other portion of such Claim is a Disputed Claim.

(ix)    *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Amended Plan on account of any Allowed Claim exceed 100% of such Allowed Claim.

I.    **Settlement, Release, Injunction, and Related Provisions**

(i)    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Amended Plan, which distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Amended Plan, and the distributions, releases, and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Amended Plan.

The Amended Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and

controversies, as well as a finding by the Bankruptcy Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Amended Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Wind-Down Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities, subject to any applicable consent rights and procedures set forth in the Amended Plan.

### (ii)        *Term of Injunctions or Stays*

Unless otherwise provided in the Amended Plan, the Confirmation Order, or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in the Amended Plan or the Confirmation Order), shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay.  All injunctions or stays contained in the Amended Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

### (iii)       *Release of Liens*

**Except as otherwise specifically provided in the Amended Plan, the Plan Supplement, or in any other contract, instrument, agreement, or document created pursuant to the Amended Plan or Plan Supplement, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the** Amended **Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Wind-Down Debtors, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Wind-Down Debtors or the PA Officer.**

From and after the Effective Date, any Holder of a Secured Claim (and the applicable agents for such Holder) secured by Liens or security interests which are to be released under the Amended Plan shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested to give effect to the Amended Plan by the Wind-Down Debtors and to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.  The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.  To the extent that any Holder of a Secured Claim that has been satisfied in full pursuant to the Amended Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Wind-Down Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests in accordance with the Amended Plan, and the Wind-Down Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

### (iv)       *Releases by the Debtors*

**Except as otherwise specifically provided in the Amended Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released by the Debtors, their Estates, and the Wind-Down Debtors (as applicable), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, that such Person or its estate, Affiliates, heirs, executors, administrators,**

successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Wind-Down Debtors, their Estates, the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Amended Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Amended Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Amended Disclosure Statement, the Amended Plan, the Plan Supplement, the Alameda/Genesis Settlement Agreement, the 3AC/Genesis Settlement Agreement, any Monetization Transaction, the related agreements, instruments, and other documents (including the Definitive Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Amended Plan, the administration and implementation of the Amended Plan, including the issuance or distribution of any property pursuant to the Amended Plan, the Definitive Documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, nothing in Article VIII.D of the Amended Plan shall, nor shall it be deemed to, release (i) any post-Effective Date obligations of any Person or Entity under the Amended Plan, including any such obligations created in connection with the Restructuring; (ii) any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct; (iii) any Excluded Claim; or (iv) any Causes of Action or other claims against any of the Gemini Parties or any of the DCG Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in Article VIII.D of the Amended Plan, which includes by reference each of the related provisions and definitions contained in the Amended Plan, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, or their Estates asserting any Claim or Cause of Action released pursuant to such releases.

*(v)    Releases by Releasing Parties*

Except as otherwise specifically provided in the Amended Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, to the fullest extent allowed by applicable law, each Releasing Party hereby conclusively, absolutely, unconditionally, irrevocably, and forever releases each Debtor, Estate, Wind-Down Debtor, and Released Party from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, that such Releasing Party or its estate, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Wind-Down Debtors, their Estates, the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of

the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Amended Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Amended Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Amended Disclosure Statement, the Amended Plan, the Plan Supplement, the Alameda/Genesis Settlement Agreement, the 3AC/Genesis Settlement Agreement, any Monetization Transaction, the related agreements, instruments, and other documents (including the Definitive Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Amended Plan, the administration and implementation of the Amended Plan, including the issuance or distribution of any property pursuant to the Amended Plan, the Definitive Documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; provided, however, that except as expressly provided under the Amended Plan, the foregoing releases shall not release obligations of the Debtors or the Wind-Down Debtors on account of any Allowed Claims that are treated under the Amended Plan or obligations otherwise arising under any contract, agreement, or other business arrangement between any non-Debtor Releasing Party and any non-Debtor Released Party. Notwithstanding anything to the contrary in the foregoing, nothing in Article VIII.E of the Amended Plan shall, nor shall it be deemed to, release (i) any post-Effective Date obligations of any Person or Entity under the Amended Plan, including any such obligations created in connection with the Restructuring; (ii) any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct; (iii) any Excluded Claim; or (iv) any Causes of Action or other claims against any of the Gemini Parties or any of the DCG Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Releasing Parties set forth in Article VIII.E of the Amended Plan, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Amended Plan and the Restructuring; and (7) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases except as expressly set forth in the Amended Plan.

(vi)    *Exculpation*

Except as otherwise specifically provided in the Amended Plan or Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from, any Claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Amended Disclosure Statement, the Amended Plan, the Plan Supplement, the Alameda/Genesis Settlement Agreement, the 3AC/Genesis Settlement Agreement, any Monetization Transaction, or the related agreements, instruments, and other documents (including the Definitive Documents), the solicitation of votes with respect to the Amended Plan, or the Restructuring, or any related contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Amended Plan or the reliance by any Exculpated Party on the Amended Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Debtors' in or out-of-court restructuring efforts, the Amended Disclosure Statement, the Amended Plan, the related agreements, instruments, and other documents (including the Definitive Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the solicitation of votes with respect to the Amended Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Amended Plan and the Sales Process, including the issuance of or distribution of any property pursuant to the

Amended Plan and the Sales Process, the related agreements, instruments, and other documents (including the Definitive Documents), or upon any other act or omission, the transaction, agreement, event, or other occurrence taking place on or before the Effective Date related to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Amended Plan. The Confirmation Order shall provide that the Exculpated Parties (to the extent applicable) have, and upon completion of the Amended Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Amended Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Amended Plan or such distributions made pursuant to the Amended Plan.  Notwithstanding anything to the contrary in the foregoing, nothing in Article VIII.F of the Amended Plan shall, nor shall it be deemed to, release or exculpate any DCG Party.

### (vii)    *Injunction*

Except as otherwise expressly provided in the Amended Plan or for obligations issued or required to be paid pursuant to the Amended Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Amended Plan or are presumed to have accepted or deemed to have rejected the Amended Plan) and other parties in interest, together with their respective present or former employees, agents, officers, directors, principals, and Affiliates, are enjoined, from and after the Effective Date through and until the date on which all remaining property of the Debtors' Estates vested in the Wind-Down Debtors has been liquidated and distributed to Holders of Claims or otherwise in accordance with the terms of the Amended Plan and the Plan Administration Agreement and the Amended Plan has been fully administered, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Released Parties, or the Exculpated Parties (collectively, the "Enjoined Actions"): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests.  Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Amended Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Amended Plan from bringing an action to enforce the terms of the Amended Plan or such document, instrument, or agreement (including those attached to the Amended Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Amended Plan.  Further, to the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any Causes of Action released or exculpated pursuant to the Amended Plan, including the Enjoined Actions, against any Released Party or Exculpated Party other than the Debtors or the Wind-Down Debtors.  Nothing in the Amended Plan or the Confirmation Order shall grant the Debtors a discharge pursuant to section 1141(d) of the Bankruptcy Code.

### (viii)    *Additional Provisions Regarding Governmental Units*

Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan and/or the Confirmation Order, no provision of the Amended Plan or the Confirmation Order shall (i) preclude the SEC or any other Governmental Unit from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair, or delay the SEC or any other Governmental Unit from commencing or continuing any claims, causes of action, proceedings, or investigations against any non-Debtor Person or non-Debtor Entity in any forum.

The enforcement of any money judgment by the SEC or other Governmental Units against the Debtors or the Wind-Down Debtors shall be subject to the Amended Plan. In addition, the SEC and other Governmental Units reserve their rights to amend any Filed Proofs of Claim and the Debtors and the Wind-Down Debtors reserve all of their defenses and rights to dispute such amendments.

Notwithstanding anything to the contrary in the Amended Plan, this Disclosure Statement, or the Confirmation Order, or any findings announced in connection with the Amended Plan, this Disclosure Statement, or the Confirmation Order, nothing in the Amended Plan, this Disclosure Statement, or the Confirmation Order shall constitute a finding under either federal or state (including New York State) securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the SEC or other Governmental Units to challenge transactions involving crypto tokens on any basis is expressly reserved. The Bankruptcy Court is not making any findings as to the availability of any exemptions under the securities laws.

### (ix)    *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Entity, including Governmental Units, shall discriminate against the Wind-Down Debtors, deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to the Wind-Down Debtors, or condition such a grant to, or discriminate with respect to such a grant against, the Wind-Down Debtors or another Entity with whom the Wind-Down Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

### (x)    *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Wind-Down Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

### (xi)    *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

### (xii)    *Document Retention*

On and after the Effective Date, the Wind-Down Debtors or the PA Officer may maintain documents in accordance with the Debtors' existing standard document retention policy, as may be altered, amended, modified, or supplemented by the Wind-Down Debtors or the PA Officer; *provided*, *however*, that the Wind-Down Debtors shall not destroy or otherwise abandon any such books, records, electronically stored information, or other documents without providing advance notice to the SEC (c/o William M Uptegrove, U.S. Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326, UptegroveW@SEC.GOV), which shall have seven (7) days to object to any proposed destruction or abandonment, and with the permission of the PA Officer or authorization from the Bankruptcy Court; *provided further* that, nothing in the Amended Plan or the Confirmation Order shall affect the obligations of the Debtors, the Wind-Down Debtors, and/or any transferee or custodian to maintain any books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

**J.** **Conditions Precedent to Consummation of the Amended Plan**

*(i)* *Conditions Precedent to the Plan Effective Date*

It shall be a condition to the occurrence of the Effective Date that the following conditions, as determined by the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing), shall have been satisfied (or waived pursuant to the provisions of Article IX.B of the Amended Plan):

(a)     the Confirmation Order, with respect to which the Debtors shall have obtained the Committee's Consent, the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing), and, to the extent applicable, Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing), shall have been entered, and the Confirmation Order shall not have been stayed, modified, or vacated on appeal;

(b)     the New Governance Documents, with respect to which the Debtors shall have obtained the Committee's Consent and the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing), and the effectiveness of which requires filing with the Secretary of State of any jurisdiction, shall have been duly filed with the applicable authorities in the relevant jurisdictions;

(c)     all other Definitive Documents shall have been effected or executed and delivered in accordance with the terms of the Amended Plan;

(d)     all required governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Amended Plan shall have been obtained, shall not be subject to unfulfilled conditions, and shall be in full force and effect, and all applicable waiting periods shall have expired without any action having been taken by any competent authority that would restrain or prevent such transactions;

(e)     all documents and agreements necessary to implement the Amended Plan and the Restructuring shall have been (a) tendered for delivery and (b) effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements;

(f)     to the extent any 3AC Claims are not disallowed by an order of the Bankruptcy Court prior to the Effective Date, a reserve shall have been established in respect of such 3AC Claims in an amount, manner, and form of consideration satisfactory to the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing);

(g)     each Claims Reserve shall have been funded in an amount equal to the applicable Claims Reserve Amount, with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing);

(h)     (a) the Gemini Determinations shall have occurred or (b) the Gemini Additional Collateral Determination shall have occurred and the Gemini GBTC Shares

106

Reserve shall have been established by Gemini or the Gemini Distribution Agent in the manner provided for in Article IV.A.12 of the Amended Plan;

(i) each Wind-Down Reserve and the Litigation Reserve shall have been funded in the amounts set forth in the Wind-Down Budget, with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing); and

(j) the Professional Fee Escrow Account shall have been funded with Cash in an amount equal to the Professional Fee Reserve Amount.

### (ii)    *Waiver of Conditions*

The Debtors, with the Committee's Consent, the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing), and, solely with respect to Article IX.A.1 and IX.A.8 of the Amended Plan, Gemini's Consent (solely with respect to Article IX.A.1, if the Gemini Acceptance Event has occurred and is continuing) may waive any of the conditions precedent to the Effective Date of the Amended Plan set forth in Article IX.A therein at any time, without any notice to any other parties in interest, any further notice, leave, or order of the Bankruptcy Court, or any formal action other than proceedings to confirm or consummate the Amended Plan.

### (iii)    *Substantial Consummation*

"Substantial Consummation" of the Amended Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

### (iv)    *Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date*

If the Effective Date does not occur, the Amended Plan shall be null and void in all respects and nothing contained in the Amended Plan or the Amended Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; or (4) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

### K.    Modification, Revocation, or Withdrawal of the Amended Plan

### (i)    *Modification and Amendments*

Subject to the limitations contained in the Amended Plan, the Debtors reserve the right, with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification), and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification) or in the exercise of the Debtors' Fiduciary Duty Action, to alter, amend, or modify the Amended Plan (including the Distribution Principles) prior to Confirmation (including any exhibit or Plan Supplement) and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the restrictions on modifications set forth in the Amended Plan, the Debtors expressly reserve their rights, with the Committee's Consent, the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification), and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification) or in the exercise of the Debtors' Fiduciary Duty Action, to alter, amend, or modify the Amended Plan (including any exhibit or Plan Supplement), one or more times, after Confirmation, and, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Amended Plan (including any exhibit or Plan Supplement), or remedy any defect or omission, or reconcile any inconsistencies in the Amended Plan, the Amended Disclosure Statement, or the Confirmation Order, in such manner as may be necessary

to carry out the purposes and intent of the Amended Plan.  Notwithstanding anything to the contrary in the Amended Plan, this Disclosure Statement, or the Confirmation Order, the Debtors shall provide at least three (3) Business Days' prior written notice with an opportunity to object to the SEC (c/o William M. Uptegrove, U.S. Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326, UptegroveW@SEC.GOV) of any alteration, amendment, or modification of the Distribution Principles.

### (ii)    *Effect of Confirmation of the Amended Plan on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Amended Plan in accordance with Article X.A therein occurring after the solicitation thereof but before entry of the Confirmation Order are approved pursuant to section 1127(a) of the Bankruptcy Code and shall constitute a finding that such modifications or amendments to the Amended Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

### (iii)    *Revocation or Withdrawal of Amended Plan*

The Debtors reserve the right, with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing at the time of such revocation or withdrawal), and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing) at the time of such revocation or withdrawal) or in the exercise of the Debtors' Fiduciary Duty Action, to revoke or withdraw the Amended Plan with respect to any or all Debtors prior to the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Amended Plan, or if Confirmation and Consummation do not occur, then: (1) the Amended Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Amended Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Amended Plan, and any document or agreement executed pursuant to the Amended Plan shall be deemed null and void; and (3) nothing contained in the Amended Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity; or (iv) be used by the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

## VIII.    PROJECTED FINANCIAL INFORMATION

The Debtors have attached their projected financial information as **Exhibit D** to this Amended Disclosure Statement. The Debtors believe that the Amended Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code. In connection with the development of the Amended Plan and for the purposes of determining whether the Amended Plan satisfies this feasibility standard, the Debtors' management analyzed the Debtors' ability to satisfy its financial obligations while maintaining sufficient liquidity and capital resources. The Debtors have prepared financial projections (the "Projections") for the period ending December 31, 2023 to December 31, 2025 (the "Projection Period").

The Debtors have also prepared illustrative range of recovery estimates (the "Illustrative Range of Recoveries") to further supplement the Projections, which is attached as **Exhibit E** to this Amended Disclosure Statement. The Illustrative Range of Recoveries have been developed as a series of pricing adjustments to the Projections and are estimated based on Digital Asset prices as of various dates. The Illustrative Range of Recoveries are being provided solely to enable Holders of Claims entitled to vote on the Amended Plan to make an informed judgment of how to vote on the Amended Plan. The Debtors' advisors expressly disclaim any liability to any Holder of Claims in connection with such information or its decision with respect to how to vote on the Amended Plan

After the date of the Amended Disclosure Statement, the Debtors do not intend to update or otherwise revise the Projections or Illustrative Range of Recoveries to reflect circumstances existing since their preparation or to reflect the occurrence of unanticipated events, even in the event that any or all of the underlying assumptions are shown to be in error. Furthermore, the Debtors do not intend to update or revise the Projections or the Illustrative Range of Recoveries to reflect changes in general economic or industry conditions or otherwise.

In connection with the planning and development of the Amended Plan, the Projections and Illustrative Range of Recoveries were prepared by the Debtors' advisors to present the anticipated recoveries under the Amended Plan. The Projections and Illustrative Range of Recoveries assume that the Amended Plan will be implemented in accordance with its stated terms. While the Illustrative Range of Recoveries are based on Digital Asset prices as of specified dates, these prices may change following the date hereof, which may significantly impact the estimated recoveries therein. Moreover, the Projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in the Amended Plan and the Amended Disclosure Statement. Accordingly, the estimates and assumptions underlying the Projections and Illustrative Range of Recoveries are inherently uncertain and are subject to significant business, economic and competitive uncertainties. Therefore, such Projections and Illustrative Range of Recoveries, estimates and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Projections and Illustrative Range of Recoveries should be read in conjunction with the significant assumptions, qualifications and notes set forth below and in **Exhibit D** and **Exhibit E**.

**THE PROJECTIONS AND ILLUSTRATIVE RANGE OF RECOVERIES WERE NOT PREPARED TO COMPLY WITH THE GUIDELINES FOR PROSPECTIVE FINANCIAL STATEMENTS PUBLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS AND THE RULES AND REGULATIONS OF THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION. THE DEBTORS' INDEPENDENT ACCOUNTANTS HAVE NEITHER EXAMINED NOR COMPILED THE PROJECTIONS NOR THE ILLUSTRATIVE RANGE OF RECOVERIES THAT ACCOMPANY THE AMENDED DISCLOSURE STATEMENT AND, ACCORDINGLY, DO NOT EXPRESS AN OPINION OR ANY OTHER FORM OF ASSURANCE WITH RESPECT TO THE PROJECTIONS OR THE ILLUSTRATIVE RANGE OF RECOVERIES, ASSUME NO RESPONSIBILITY FOR THE PROJECTIONS OR THE ILLUSTRATIVE RANGE OF RECOVERIES AND DISCLAIM ANY ASSOCIATION WITH THE PROJECTIONS OR THE ILLUSTRATIVE RANGE OF RECOVERIES. EXCEPT FOR PURPOSES OF THE AMENDED DISCLOSURE STATEMENT, THE DEBTORS DO NOT PUBLISH PROJECTIONS OF THE DEBTORS' ANTICIPATED FINANCIAL POSITION OR RESULTS OF OPERATIONS.**

**MOREOVER, THE PROJECTIONS CONTAIN CERTAIN STATEMENTS THAT ARE "FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF THE PRIVATE SECURITIES**

LITIGATION REFORM ACT OF 1995. THESE STATEMENTS ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE AMENDED PLAN, CURRENCY EXCHANGE RATE FLUCTUATIONS, MAINTAINING GOOD EMPLOYEE RELATIONS, EXISTING AND FUTURE GOVERNMENTAL REGULATIONS AND ACTIONS OF GOVERNMENTAL BODIES, INDUSTRY-SPECIFIC RISK FACTORS (AS DETAILED IN SECTION IX OF THE AMENDED DISCLOSURE STATEMENT ENTITLED "RISK FACTORS"), AND OTHER MARKET AND COMPETITIVE CONDITIONS. HOLDERS OF CLAIMS AND INTERESTS ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS SPEAK AS OF THE DATE MADE AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS, AND THE DEBTORS UNDERTAKE NO OBLIGATION TO UPDATE ANY SUCH STATEMENTS.

THE PROJECTIONS AND ILLUSTRATIVE RANGE OF RECOVERIES, WHILE PRESENTED WITH NUMERICAL SPECIFICITY, ARE NECESSARILY BASED ON A VARIETY OF ESTIMATES AND ASSUMPTIONS THAT, THOUGH CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE INHERENTLY SUBJECT TO SIGNIFICANT ECONOMIC, REGULATORY, MARKET AND FINANCIAL UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE WIND-DOWN DEBTORS' CONTROL. THE DEBTORS CAUTION THAT NO REPRESENTATIONS CAN BE MADE OR ARE MADE AS TO THE ACCURACY OF THE PROJECTIONS OR THE ILLUSTRATIVE RANGE OF RECOVERIES OR TO THE WIND-DOWN DEBTORS' ABILITY TO ACHIEVE THE PROJECTED RESULTS. SOME ASSUMPTIONS INEVITABLY WILL BE INCORRECT. MOREOVER, EVENTS AND CIRCUMSTANCES OCCURRING SUBSEQUENT TO THE DATE ON WHICH THE DEBTORS PREPARED THESE PROJECTIONS OR ILLUSTRATIVE RANGE OF RECOVERIES MAY BE DIFFERENT FROM THOSE ASSUMED, OR, ALTERNATIVELY, MAY HAVE BEEN UNANTICIPATED, AND THUS THE OCCURRENCE OF THESE EVENTS MAY AFFECT FINANCIAL RESULTS IN A MATERIALLY ADVERSE OR MATERIALLY BENEFICIAL MANNER. EXCEPT AS OTHERWISE PROVIDED IN THE AMENDED PLAN OR AMENDED DISCLOSURE STATEMENT, THE DEBTORS AND WIND-DOWN DEBTORS, AS APPLICABLE, DO NOT INTEND AND UNDERTAKE NO OBLIGATION TO UPDATE OR OTHERWISE REVISE THE PROJECTIONS OR ILLUSTRATIVE RANGE OF RECOVERIES TO REFLECT EVENTS OR CIRCUMSTANCES EXISTING OR ARISING AFTER THE DATE THE AMENDED DISCLOSURE STATEMENT IS INITIALLY FILED OR TO REFLECT THE OCCURRENCE OF UNANTICIPATED EVENTS. THEREFORE, THE PROJECTIONS AND ILLUSTRATIVE RANGE OF RECOVERIES MAY NOT BE RELIED UPON AS A GUARANTY OR OTHER ASSURANCE OF THE ACTUAL RESULTS THAT WILL OCCUR. IN DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE AMENDED PLAN, HOLDERS OF CLAIMS MUST MAKE THEIR OWN DETERMINATIONS AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS OR ILLUSTRATIVE RANGE OF RECOVERIES AND SHOULD CONSULT WITH THEIR OWN ADVISORS.

The Debtors make statements in this Amended Disclosure Statement that are considered forward-looking statements under the federal securities laws. Statements concerning these and other matters are not guarantees of the Debtors' future performance. Such forward-looking statements represent the Debtors' estimates and assumptions only as of the date such statements were made and involve known and unknown risks, uncertainties and other unknown factors that could impact the Debtors' restructuring plans or cause the actual results of the Debtors to be materially different from the historical results or from any future results expressed or implied by such forward-looking statements. In addition to statements which explicitly describe such risks and uncertainties, readers are urged to consider statements labeled with the terms "believes," "belief," "expects," "intends," "anticipates," "plans," or similar terms to be uncertain and forward-looking. There can be no assurance that the restructuring transactions described herein will be consummated. The Debtors consider all statements regarding anticipated or future matters, including the following, to be forward-looking statements:

- any future effects as a result of the pendency of the Chapter 11 Cases;
- disruption of wind down operations;

110

- the Debtors' expected future financial position, liquidity, results of operations or asset dispositions;

- the results of the wind down process or associated costs;

- projected cost reductions;

- projected and estimated liability costs;

- plans and objectives of management for future operations;

- contractual obligations;

- projected price increases;

- projected general market conditions;

- changes in technology; and

- effect of changes in accounting due to recently issued accounting standards.

The Projections and the Illustrative Range of Recoveries should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Amended Disclosure Statement and the Amended Plan.

Creditors and other interested parties should read the following section of this Amended Disclosure Statement entitled "Risk Factors" for a discussion of certain factors that may affect the future financial performance of the Debtors.

IX.    RISK FACTORS

There are risks, uncertainties and other important factors that could cause the Debtors' actual performance or achievements to be materially different from those they may project, and the Debtors undertake no obligation to update any such statement.  These risks, uncertainties and factors include:

- the Debtors' ability to develop, confirm and consummate the Amended Plan;

- employee response to the Chapter 11 Cases;

- general economic, business, and market conditions, with particular regard to Digital Assets as an asset class;

- dependence upon key personnel;

- the impact of rapid technological change on the Wind-Down Debtors' ability to make in-kind distributions or on maintaining their operations during the wind down process;

- difficulty with, or changes in value related to, asset and property dispositions, risks in connection with dispositions or the effects of dispositions on the Debtors' cash position and levels of indebtedness;

- the reliability, stability, performance, and scalability of the Debtors' infrastructure and technology;

- taxation applicable to the Debtors and any adverse tax changes;

- the availability of reliable financial service providers to the Debtors or the impact of volatility in the banking industry or fluctuations in the stability or creditworthiness of banking providers on the Debtors and their assets;

- volatility in the value of Digital Assets;

- changes in laws and regulations, uncertainty in the regulatory landscape, and regulatory burden on the Debtors ensuing from the application of overlapping regulatory regimes to the Digital Asset space, and resulting in increased cost of compliance; and

- the outcome of pending and future litigation.

PRIOR TO VOTING TO ACCEPT OR REJECT THE AMENDED PLAN, ALL HOLDERS OF CLAIMS AND INTERESTS THAT ARE IMPAIRED SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS AMENDED DISCLOSURE STATEMENT.

ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE AMENDED PLAN AND ITS IMPLEMENTATION.

A.    Risks Relating to the Amended Plan, Solicitation and Confirmation

*The Debtors may fail to satisfy vote requirements to confirm the Amended Plan.*

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Amended Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation.  If the Amended Plan does not receive the required support from eligible voting Classes, the Debtors may elect to seek Confirmation regardless of the rejection by amending the Amended Plan or seeking to confirm an alternative chapter 11 plan or other restructuring alternative.  There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims and Allowed Interests as those proposed in the Amended Plan.

*The Debtors may fail to satisfy solicitation requirements.*

The solicitation of votes by the Debtors to accept the Amended Plan is subject to several requirements under applicable bankruptcy law.  If the Bankruptcy Court does not find that the Debtors' solicitation complied with such requirements, confirmation of the Amended Plan could be denied.

Section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- the chapter 11 plan is transmitted to substantially all creditors and other interest holders entitled to vote;

- the time prescribed for voting is not unreasonably short; and

- the solicitation of votes is in compliance with any applicable non-bankruptcy law, rule or regulation governing the adequacy of disclosure in such solicitation or, if no such law, rule or regulation exists, votes be solicited only after the disclosure of "adequate information".

Section 1125(a)(1) of the Bankruptcy Code describes adequate information as information of a kind and in sufficient detail as would enable a hypothetical reasonable investor typical of holders of claims and interests to make an informed judgment about the plan.

To satisfy the requirements of section 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b), the Debtors intend to deliver this Amended Disclosure Statement to all Holders of Claims in Classes eligible to vote as of the Voting Record Date. In that regard, the Debtors believe that the solicitation of votes to accept or reject the Amended Plan is proper under applicable non-bankruptcy law, rules and regulations. The Debtors cannot be certain, however, that the solicitation of acceptances or rejections will be approved by the Bankruptcy Court. If such approval is not obtained, the confirmation of the Amended Plan could be denied. *See* "The Bankruptcy Court may not confirm the Amended Plan".

*If the original solicitation by the Debtors is not successful, the Debtors may opt to resolicit.*

If the Bankruptcy Court were to conclude that the Debtors did not satisfy the solicitation requirements, then the Debtors may seek to resolicit votes to accept or reject the Amended Plan or to solicit votes to accept or reject the Amended Plan from one or more Classes that were not previously solicited. Typically, this process involves a 60- to 90-day period and includes a bankruptcy court hearing for the required approval of the disclosure statement, followed by another solicitation of claim and interest holder votes for the chapter 11 plan, followed by a confirmation hearing where the bankruptcy court will determine whether the requirements for confirmation have been satisfied, including the requisite claim and interest holder acceptances. The Debtors cannot provide any assurances that such a resolicitation would be successful. In addition, confirmation of the Amended Plan could be delayed and possibly jeopardized as a result. Furthermore, the need to undertake a resolicitation or any other delay in the Confirmation Date or Plan Effective Date may also result in a deterioration in the Debtors' relationships with its clients and regulators which could adversely affect the Debtors' ability to retain key employees, the Debtors' liquidity, the Debtors' assets, and the Debtors' ability to continue operations.

Moreover, there may be complications related to the solicitation of Holders of Claims in Class 7 against GGC. Gemini is responsible for sending the Solicitation Package, including the Amended Disclosure Statement, Amended Plan and appropriate Ballots to such Holders. While the Debtors do not anticipate any issues with the solicitation of such Holders, nor with their ability to cast their Ballots, any complications with respect to their solicitation and vote may delay the solicitation process, requiring their resolicitation.

*Holders of Claims or Interests may object to, and the Bankruptcy Court may disagree with, the Amended Plan's classification of Claims and Interests.*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class. The Debtors believe that the classification of the Claims and Interests under the Amended Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class. However, a Holder of a Claim or Interest could challenge the Debtors' classification. In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Amended Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification. If the Bankruptcy Court determines that the Amended Plan's classification of Claims and Interests is improper, the Debtors may be required to modify the Amended Plan,

which could require resolicitation of votes on the Amended Plan, or the Bankruptcy Court may determine that the Amended Plan may not be confirmed.  *See* "The Bankruptcy Court may not confirm the Amended Plan."

   ***The Bankruptcy Court may not confirm the Amended Plan.***

   In the event that votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Amended Plan, the Debtors intend to seek Confirmation of the Amended Plan by the Bankruptcy Court. However, even if the requisite votes are received, the Bankruptcy Court is not obligated to confirm the Amended Plan as proposed.  In addition, a dissenting Holder of a Claim against the Debtors could challenge the balloting procedures as not being in compliance with the Bankruptcy Code, which could mean that the balloting results may be found invalid.  Even if the Bankruptcy Court determines that the balloting procedures are appropriate and the results are valid, the Bankruptcy Court could still decline to confirm the Amended Plan, if the Bankruptcy Court finds that any of the statutory requirements for confirmation have not been met.  Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a chapter 11 plan, requires, among other things, a finding by the Bankruptcy Court that the chapter 11 plan is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the chapter 11 plan, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the chapter 11 plan becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of sections 1122, 1123, 1129, and the other applicable provisions of the Bankruptcy Code have been met with respect to the Amended Plan.  *See* "The Debtors may fail to satisfy solicitation requirements" and "Holders of Claims or Interests may object to, and the Bankruptcy Court may disagree with, the Amended Plan's classification of Claims and Interests."

   If the Amended Plan is not confirmed by the Bankruptcy Court, (a) the Debtors' ability to wind down their businesses in an orderly and equitable manner may be negatively impacted, (b) the distributions that Holders of Claims ultimately would receive, if any, with respect to their Claims is uncertain, (c) there is no assurance that the Debtors will be able to successfully develop, prosecute, confirm, and consummate an alternative plan that will be acceptable to the Bankruptcy Court and the Holders of Claims, and (d) there can be no assurance that any Chapter 11 Cases would continue rather than be converted into liquidation cases under chapter 7 of the Bankruptcy Code.  *See* Section IX.A, "The Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code."  It is also possible that third parties may seek and obtain approval from the Bankruptcy Court to terminate or shorten the exclusivity period during which only the Debtors may propose and solicit votes to accept a chapter 11 plan.  If a liquidation or protracted reorganization of the Debtors' Estates were to occur under the Bankruptcy Code, there is a substantial risk that the distributions currently contemplated by the Amended Plan would be substantially eroded to the detriment of all stakeholders.

   ***The Debtors may seek to amend, waive, modify or withdraw the Amended Plan at any time prior to Confirmation.***

   The Debtors reserve the right, prior to the Confirmation of the Amended Plan or substantial Consummation thereof, subject to the provisions of section 1127 of the Bankruptcy Code and applicable law, to amend the terms of the Amended Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Amended Plan. The potential impact of any such amendment or waiver on the Holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Amended Plan on some or all of the proposed Classes or a change in the relative rights of such Classes.  Holders of Claims and Interests will receive notice of such amendments or waivers as required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Amended Plan, the Debtors seek to modify the Amended Plan the previously solicited acceptances will be valid only if (a) all classes of adversely affected creditors and interest holders accept the modification in writing, or (b) the Bankruptcy Court determines, after notice to designated parties, that such modification was *de minimis* or purely technical or otherwise did not adversely change the treatment of Holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

***Other parties in interest might be permitted to propose alternative plans of reorganization, which may be less favorable to certain of the Debtors' constituencies than the Amended Plan.***

Other parties in interest could seek authority from the Bankruptcy Court to terminate exclusivity or propose an alternative chapter 11 plan.  Under the Bankruptcy Code, a debtor-in-possession initially has the exclusive right to propose and solicit acceptances of a chapter 11 plan for a period of 120 days from filing, or for such further extended period as may be approved by the Bankruptcy Court.  Here, the Debtors' exclusivity period had been extended twice and currently is set to expire on November 7.  Such exclusivity period may not be further extended or if extended, maybe reduced or terminated upon a showing of cause pursuant to an order of the Bankruptcy Court.  If such an order were to be entered, other parties in interest would then have the opportunity to propose alternative plans of reorganization.

If other parties in interest were to propose an alternative chapter 11 plan following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to existing Holders of Claims and Interests.  Alternative plans of reorganization also may treat less favorably the Claims of a number of other constituencies, including but not limited to Holders of General Unsecured Claims.  Proponents of alternative plans may not share the Debtors' assessments and may seek to impair the Claims of such constituencies to a greater degree.  If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated and much more expensive.

***The conditions precedent to the Effective Date of the Amended Plan may not occur.***

As more fully set forth in Article IX of the Amended Plan, the Plan Effective Date is subject to a number of conditions precedent, including entry of an order confirming the Amended Plan and the funding of specified reserves .  If such conditions precedent are not met or waived, the Plan Effective Date will not take place and the Debtors may be forced to propose and solicit a further amended plan.

***Release, injunction and exculpation provisions may not be approved.***

Article VIII of the Amended Plan provides for certain releases, injunctions and exculpations, including releases by third parties of claims that may otherwise be asserted against the Debtors, the Wind-Down Debtors or the other Released Parties.  The releases, injunctions, and exculpations (including, for the avoidance of doubt, the definitions of Released Parties, Releasing Parties, and Exculpated Parties) provided in the Amended Plan are subject to objection by parties in interest and may not be approved.  The SEC has indicated to the Debtors that the SEC objects to the scope of the exculpation being provided under the Amended Plan, including the recipients of the exculpation and its temporal scope.  The rights of all parties, including the Debtors and the SEC, are reserved with respect to the proposed exculpation provision in the Amended Plan.

If the releases or exculpations are not approved, certain parties may not be considered Released Parties, Releasing Parties, or Exculpated Parties, and certain Released Parties may withdraw their support for the Amended Plan.

***The Wind-Down Debtors are subject to governmental laws and regulations.***

The Wind-Down Debtors are subject to various generally applicable national, state and local laws and regulations, and may also be subject to national, state and local laws and regulations targeted specifically at the Digital Asset industry, financial institutions and financial instruments including those governing money transmission, financial services, securities, broker-dealers and alternative trading systems, commodities and commodities interests such as derivatives, credit, Digital Asset custody, exchange and transfer, cross-border and domestic money and Digital Asset transmission, retail and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, tax, anti-bribery, economic and trade sanctions, anti-money laundering, intellectual property and counterterrorist financing, among others.  Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, Digital Assets, and related technologies.  As a result, some applicable laws and regulations do not contemplate or address unique issues associated with Digital Assets, are subject to significant uncertainty, and vary widely across U.S. federal, state, local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be

modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another and may conflict with one another. Violation by the Wind-Down Debtors of any of these laws and regulations could subject it to lawsuits, governmental investigations, potentially significant fines, and adverse publicity, in addition to administrative, civil, or criminal sanctions, which could include significant fines and penalties.

Moreover, the significant uncertainty surrounding the regulation of the Digital Asset industry require the Wind-Down Debtors to exercise their judgment as to whether certain laws, rules, and regulations apply to the Wind-Down Debtors, despite no longer continuing to operate their businesses, and it is possible that governmental bodies and regulators may disagree with their conclusions. Any changes to the regulatory framework applicable to the Wind-Down Debtors may have a material impact on their ability to make distributions to Holders of Allowed Claims, including distributions of cryptocurrencies or other digital assets. To the extent the Debtors or the Wind-Down Debtors, as applicable, have not complied with such laws, rules, and regulations, the Debtors or the Wind-Down Debtors could be subject to reputational harm, significant fines, limitations on their activities, cease and desist orders in one or more states, and other regulatory consequences, each of which may be significant and could adversely affect their wind down operations. Additionally, economic and trade sanctions, anti-money laundering, and anti-terrorism laws in the United States and other jurisdictions may restrict the Wind-Down Debtors' from engaging in transactions in or relating to certain countries, individuals, and entities. The imposition of sanctions and related restrictions by different jurisdictions have been evolving quickly, including in response to the military conflict between Russia and Ukraine, and the ultimate impact of this conflict and imposition of sanctions on global economic and commercial activity as well the wind down process is difficult to predict.

Additionally, various governmental and regulatory bodies, including legislative and executive bodies, in the United States and in other countries may adopt new laws and regulations, the direction and timing of which may be influenced by changes in the governing administrations and major events in the Digital Asset economy. In the near future, various governmental and regulatory bodies, including in the United States, may introduce new policies, laws, and regulations relating to Digital Assets and related transactions generally, and crypto asset platforms in particular. Furthermore, new interpretations of existing laws and regulations may be issued by such bodies or the judiciary, which may adversely impact the development of the Digital Asset economy as a whole. Therefore, the regulatory framework applicable to entities operating in the Digital Asset industry and the Wind-Down Debtors is highly evolving and subject to considerable uncertainty, with little guidance in this area. As noted in Section VI.T herein, certain governmental and regulatory authorities have instituted regulatory or enforcement proceedings against the Debtors relating to the Debtors' operation, such as the SEC Action and the NYAG Action and other authorities or jurisdictions may follow suit, which may impact the Wind-Down Debtors' obligations under the Amended Plan or the wind down process.

Moreover, the Wind-Down Debtors' existing compliance processes and internal control systems may not be sufficient to prevent or detect all inappropriate practices, fraud or violations of law by it, its subsidiaries, directors, officers, employees or other persons acting on its behalf, especially in light of the unclear and patchy regulatory framework. The Wind-Down Debtors may in the future discover instances in which they have failed to comply with applicable laws and regulations or internal controls. If their subsidiaries, directors, officers, employees or other persons acting on their behalf engage in fraudulent, corrupt or other unfair business practices or otherwise violate applicable laws, regulations or internal controls, they could become subject to one or more enforcement actions or otherwise be found to be in violation of such laws, which may result in penalties, fines and sanctions and in turn adversely affect its reputation, business, financial condition and results of operations.

***The Debtors' insurance does not fully cover all of the Debtors' risks, and changes in the cost of insurance or the availability of insurance could materially increase the Debtors' insurance costs or result in a decrease in insurance coverage.***

The Debtors are subject to a broad variety of risks. While the Debtors have certain types of property and liability insurance, the Debtors are self-insured for a portion of their potential liabilities. In certain instances, the Debtors' insurance may not fully cover an insured loss depending on the magnitude and nature of the claim. Additionally, changes in the cost of insurance or the availability of insurance in the future could substantially increase the Debtors' costs to maintain their current level of coverage or could cause the Debtors to reduce their insurance coverage and increase the portion of the risks that the Debtors self-insure.

116

***The assumptions and estimates contained in the financial projections may prove to be inaccurate.***

In developing the Projections set forth in **Exhibit D** and the Illustrative Range of Recoveries set forth in **Exhibit E**, the Debtors have made certain assumptions and determinations based on current information and estimates with respect to these and other factors. However, the assumptions and estimates underlying these projections are inherently uncertain and are subject to significant risks and uncertainties, many of which are beyond the Debtors' control. As a result, the Wind-Down Debtors' actual financial results may differ significantly from the Projections and the Illustrative Range of Recoveries. The Projections and Illustrative Range of Recoveries should not be regarded as a representation by the Debtors' management, their advisors or any other person that the Projections or Illustrative Range of Recoveries will be achieved. Holders of Claims and Interests are cautioned not to place undue reliance on the Projections or the Illustrative Range of Recoveries.

***The Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code.***

Upon the motion of a party in interest for conversion, there is a risk the Bankruptcy Court may find that causes exists to convert these Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code. In such event, a chapter 7 trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code. In the opinion of the Debtors, the recovery that would be received by creditors in a liquidation scenario would very likely be materially less than they would receive under the Amended Plan because of (a) the likelihood that the assets would have to be sold or otherwise disposed of in a disorderly fashion over a short period of time, including when commodities prices are at low levels, rather than selling the business as a going concern in a controlled manner, (b) additional administrative expenses involved in the appointment of a chapter 7 trustee, and (c) additional expenses and Claims, some of which would be entitled to priority, that would be generated during the liquidation. *See* the Liquidation Analysis attached as **Exhibit C** to this Amended Disclosure Statement.

### B.    Risks Related to Recoveries

***The Debtors cannot guarantee recoveries or the timing of such recoveries.***

A significant portion of Distributable Assets require litigation before they can be liquidated and proceeds made available for distribution to Holders of Allowed Claims. Specifically, the most valuable Distributable Assets are the estates' claims against the DCG Parties. Aside from the claims brought in the Turnover Actions, these claims have not yet been asserted in litigation and once asserted, could take several years before a judgment is entered. As discussed in detail in Section VI.F. *supra*, these claims may be subject to various defenses and may not ultimately be successful. As disclosed below, there is significant uncertainty related to the Retained Causes of Action, especially those claims and causes of action against the DCG Parties. Moreover, because a significant portion of Distributable Assets relate to DCG's obligations or claims against DCG, any potential financial distress or bankruptcy of DCG would impact the ability of the Wind-Down Debtors to liquidate such assets for distribution to Holders of Allowed Claims that are entitled to distributions under the Amended Plan as discussed further below.

Another potential significant source of recoveries are Avoidance Recoveries in respect of avoidance litigation that may be brought by the Debtors. In the 90 days prior to filing, over $2 billion in transfers were made in respect of repayment on outstanding loan obligations, new loans initiated, pledging of collateral to secure new or outstanding loan obligations, or return of collateral held by the Debtors to secure existing loan obligations owed by third parties to the Debtors. However, the amount of Avoidance Recoveries will ultimately depend on the Debtors success in prosecuting avoidance actions, which the Debtors understand may be subject to various defenses.

Although the Debtors have made commercially reasonable efforts to estimate Allowed Claims and Allowed Interests, it is possible that the actual amount of such Allowed Claims and Allowed Interests is materially different than the Debtors' estimates. Creditor recoveries could be materially reduced or eliminated in this instance. For example, the Bankruptcy Court may not approve the Debtors subordination of Government Penalty Claims, which may include any claims resulting from the NYAG Action. In the event it does not, the Government Penalty Claims would be treated *pari passu* which would dilute recoveries to all other creditors. Specifically with respect to the NYAG Action, if the NYAG is successful and the Bankruptcy Court does not approve subordination of any Government Penalty Claims arising from the NYAG Action, it is possible the claims pool could increase by as much

as the amount currently asserted by the Gemini Master Claim or $1.122 billion, which would have a very significant dilutive effect on recoveries.

In addition, the timing of actual distributions to Holders of Allowed Claims and Allowed Interests may be affected by many factors that cannot be predicted. Therefore, the Debtors cannot guaranty the timing or amount of any recovery on an Allowed Claim or an Allowed Interest.

### *The Wind-Down Debtors are subject to the volatility of Digital Assets.*

The price of digital assets and associated demand for buying, selling, and trading digital assets have historically been subject to significant volatility. Under the Amended Plan, certain Classes will receive distributions of Digital Assets, subjecting those creditors to risks with respect to any diminution of value of the Digital Assets to be distributed in satisfaction of Allowed Claims. This could result in lower recoveries for certain creditors than the Debtors' current estimates.

### *Distributions under the Amended Plan will not be made prior to Consummation and may be delayed or changed if the Confirmation Order is appealed.*

The Debtors estimate that the process of obtaining Confirmation will last approximately 75 days from the date hereof, plus an additional period of time until Consummation. However, this period could be significantly longer due to appeal, regulatory uncertainty or delay, as has been the case in other cases involving businesses in the Digital Asset space.

### *The wind down process may take longer and cost more than estimated due to regulatory or other causes, which may impact recoveries.*

The Debtors estimate that the wind down of their businesses and the businesses of their subsidiaries' will take approximately two years to be completed. However, this is merely an estimate and it is possible that winding down operations may take longer. Factors influencing the timing of the wind down process include the time it may take to litigate Retained Causes of Action to judgment, regulatory uncertainty or delay and pending litigation and regulatory proceedings against the Debtors, including the SEC Action and NYAG Action, and the impact of any further proceedings brought by governmental or regulatory entities in the future. In the event the wind down takes longer to be completed, the associated costs, such as professional fees, will also be higher than estimated. The Wind-Down Debtors and their ability to monetize their assets or to make in-kind distributions to Holders of Allowed Claims may also be impacted by regulatory uncertainty, including with respect to the classification of certain cryptocurrencies and digital assets and the regulatory framework applicable to such assets. Accordingly, estimated recoveries may also be lower than estimated.

### *The loss of key personnel could adversely affect the wind down process and the Wind-Down Debtors' ability to effectuate distributions.*

The Debtors' and Wind-Down Debtors' operations are dependent on a relatively small group of key management personnel. Finding experienced personnel to facilitate the wind-down of a Digital Asset business could be difficult and the Debtors and Wind-Down Debtors may be unable to find acceptable replacements with comparable skills and experience and the loss of such key management personnel could adversely affect the Debtors' ability to consummate the Amended Plan.

### *There are certain risks and contingencies that may affect the value of the Retained Causes of Action and recoveries to Holders of Claims.*

There is no guarantee as to the success of the Wind-Down Debtors or the PA Officer in prosecuting any of the Retained Causes of Action (which include causes of action against DCG and the DCG Parties). The success of the Wind-Down Debtors or PA Officer in pursuing any of the Retained Causes of Action, as well as the expenses incurred in investigating and prosecuting the Retained Causes of Action, may materially affect the recoveries of Holders of Allowed Claims. Even if successful, it is uncertain whether any litigation judgment will be valued in the original amount of Digital Assets that form the basis of the alleged harm or in the U.S. dollar value of such assets as

of the Petition Date or the date of alleged harm. If a judgment is entered in U.S. dollars based on the original amount of Digital Assets and such Digital Assets have significantly appreciated at the time of such judgment, more proceeds will be required to rebalance into Digital Assets for distribution in-kind to creditors under the Amended Plan. This would significantly reduce in-kind recovery rates.

### The Amended Plan may cause certain adverse tax consequences for the Wind-Down Debtors.

As a result of the transactions contemplated under the Amended Plan, it is possible that the Wind-Down Debtors will cease to be members of the affiliated group of corporations of which DCG is the common parent and which files a single consolidated U.S. federal income tax return (the "Tax Group"). If the Wind-Down Debtors are no longer treated as members of the Tax Group, they will be liable for U.S. federal income taxes, and will not have access to net operating losses and other tax attributes to the extent such losses and attributes have been used by the Tax Group to offset items of members other than the Wind-Down Debtors (including in respect of the Tax Group's full taxable year that contains the date on which the Wind-Down Debtors ceased to be members of the Tax Group). Furthermore, the usability of any such net operating losses or tax attributes that remain with the Wind-Down Debtors might otherwise be limited (and thus of lesser value) if the Wind-Down Debtors are no longer treated as members of the Tax Group. Lastly, it is possible that the exit of the Wind-Down Debtors from the Tax Group could cause the immediate recognition of gains in any intergroup transactions that had been subject to deferral treatment under the tax rules applicable to consolidated groups. Accordingly, if the Wind-Down Debtors are no longer treated as members of the Tax Group following the Effective Date, this could adversely impact the Debtors' liquidity and the recovery to Holders of Claims. If the Wind-Down Debtors continue to be members of the Tax Group, they will remain jointly and severally liable for any U.S. federal income taxes owed by any other member of the Tax Group. In such event, the Wind-Down Debtors may be responsible for their allocable share of the Tax Group's net U.S. federal income tax liability, which may take into account any net operating losses.

The U.S. federal tax consequences of the Amended Plan are complex, and Holders of Claims are urged to review the considerations described in the section entitled "Certain United States Federal Income Tax Consequences of the Amended Plan" and to consult their own tax advisors regarding the Amended Plan.

### Litigation with respect to claims filed in these Chapter 11 Cases, including the Gemini Master Claim, and the 3AC Claims may reduce recoveries available to other creditors of the Debtors.

It is possible that litigation concerning disputed and unliquidated claims filed in these Chapter 11 Cases, could affect the Amended Plan.

Litigation of the Gemini Master Claim may have a material impact on the Debtors' projected recoveries and may diminish the amount of Distributable Assets available to other General Unsecured Creditors. As set forth in Section VI above, there are various disputes regarding the Gemini Lender Claims and the Gemini Master Claims. Gemini and the Debtors disagree on key issues, including how to value the GBTC Shares purportedly foreclosed on by Gemini in November 2022 and Gemini's legal entitlement to the Additional GBTC Shares that were purportedly pledged as collateral but never delivered to Gemini. Resolution of these issues will impact the classification of the Gemini Lender Claims, including the amount by which the Gemini Lender Claims will be offset to account for the purported foreclosure and the extent to which the Gemini Lender Claims may be considered secured, which will have further implications on the nature of Distributable Assets available for distribution to Holders of General Unsecured Claims (including Gemini Lenders with deficiency claims on account of their Gemini Lender Claims) and recoveries in respect thereof. Moreover, while the Debtors will be reserving amounts to account for these contingencies, if Gemini is successful in proving these contested issues, the Debtors estimate that projected recoveries to Holders of General Unsecured Claims may decrease by as much as 10%.

Although the Debtors dispute the 3AC Claims, in the event they have not been already settled, the Bankruptcy Court may allow them. If the Bankruptcy Court or the BVI Court does not approve the 3AC Settlement Agreement and allows the 3AC Claims and the Debtors do not exercise their right to equitably subordinate the 3AC Claims, then the 3AC Claims would be *pari passu* with other General Unsecured Claims against the Debtors.

119

***The Debtors may be adversely affected by current and potential litigation, including litigation in connection with the Chapter 11 Cases, as well as ongoing governmental investigations.***

The nature of the Debtors' business exposed the Debtors to litigation, including regulatory, tax and administrative proceedings and enforcement actions, as well as governmental investigations. As noted in Section VI.T, such litigation includes the SEC Action and the NYAG Action, and any other proceedings that may be brought by other governmental or regulatory authorities. It is difficult to estimate the impact of such litigation and governmental investigations, as it is inherently costly and unpredictable. Although the Debtors may establish reserves as they deem necessary, the amounts that the Debtors reserve could vary significantly from any amounts the Debtors ultimately pay due to the inherent uncertainties in the claims process.

The Debtors continue to be subject to ongoing proceedings, as well as investigations of potential claims, and it is possible that parties may commence additional litigation with respect to treatment of their Claims or Interests under the Amended Plan.

The Debtors have also received various requests from authorities over the course of the last twelve months, and are cooperating with investigations by various governmental authorities, which may impact the Wind-Down Debtors. The Debtors have worked with the authorities to narrow the scope of these investigations and provide documents responsive to the requests, and continue to work with the authorities on requests related to the business and the documents of the Debtors.

On January 12, 2023, the SEC filed the SEC Complaint against GGC and Gemini, alleging that GGC and Gemini offered and sold securities through the Gemini Earn program without a valid registration statement filed or in effect with the SEC, in violation of Sections 5(a) and 5(c) of the Securities Act of 1933.

On October 19, 2023, the NYAG filed the NYAG Complaint against certain Debtors and other defendants, asserting claims under the Martin Act and New York Executive Law § 63(12) based on allegations that the NYAG Defendants defrauded Gemini Earn Program investors, including by misrepresenting GGC's financial condition. As other regulators review the NYAG action, it is possible that there will be further regulatory actions that follow. The NYAG Action may have several impacts on the Amended Plan, the Debtors' ability to make distributions (including potentially in-kind distributions, which may have adverse tax consequences for Holders of Allowed Claims) and ultimately on recoveries available to creditors. Moreover, if the NYAG Action were successful in prohibiting DCG or Gemini from continuing to operate, this may impact the potential to recover proceeds relating to litigation against both DCG and Gemini, as provided for under the Amended Plan. The NYAG Action may also have a negative impact on Gemini's ability to make distributions to Holders of Gemini Lender Claims in its capacity as Gemini Distribution Agent.

The course of these investigations and litigations and their outcome are unpredictable and uncertain, and may impact the Wind-Down Debtors and distributions to Holders of Allowed Claims. Although the Debtors may establish reserves as they deem necessary, the amounts that the Debtors reserve could vary significantly from any amounts the Debtors ultimately pay due to the inherent uncertainties in litigation, as well as in the claims process. Moreover, there remains uncertainty about whether Digital Assets should be treated for legal and regulatory purposes like property, securities, commodities, currencies or some other type of asset. There is the potential that certain types of Digital Assets, such as bitcoin, stablecoins, or nonfungible tokens, will be classified and regulated differently from other types of Digital Assets. All of these variables may have a material impact on the Wind-Down Debtors and their estates.

***DCG is a significant source of recovery for distributions under the Amended Plan.***

Major sources of recoveries for Holders of Claims under the Amended Plan include proceeds from the DCG Loans, the DCGI Loans, the DCG Note, and the DCG Tax Receivables. Accordingly, recoveries will depend on the ability of DCG to satisfy its obligations to the Debtors and Wind-Down Debtors. DCG's inability to satisfy such obligations will reduce funds available for distribution to creditors. The maturity on the DCG Note is more than seven years from the date of filing of this Amended Disclosure Statement. Pending litigation against DCG, including the NYAG Action, may impact the creditworthiness of DCG and its ability to satisfy its obligations to the Debtors and Wind-Down Debtors, resulting in reduced recoveries to Holders of Allowed Claims.

Moreover, the Amended Plan contemplates the possible prosecution of claims against DCG and other DCG Parties. As discussed in Section VI.F and G above, the Special Committee has investigated these potential claims and concluded that the estates have colorable claims against certain DCG Parties for various causes of action, including potential claims based on alter ego liability and preference law. The Debtors understand that the DCG Parties deny that any such claims have merit and that the DCG Parties intend to vigorously defend against any such claims. In defense of any claim, the DCG Parties may raise a variety of defenses under bankruptcy law and may assert counterclaims against the Debtors, including but not limited to claims relating to DCG's entry into an agreement following 3AC's default to assume liabilities in connection with GAP's loans to 3AC. To that end, on May 22, 2023, DCG filed proofs of claim against the Debtors asserting certain rights and/or defenses in connection with such assumption. The Debtors vigorously contest DCG's asserted defenses.

Any litigation against the DCG Parties would involve significant time and expense for an uncertain outcome, which may result in additional costs to the Debtors' estates and may not result in additional recoveries for Holders of Claims. Distributions to creditors could be significantly delayed pending the results of litigation, and would not be available to the extent that the Wind-Down Debtors were not successful in litigation. Particularly with respect to the alter ego claims, the Debtors believe that the law governing such claims poses significant challenges to a successful prosecution, and that the DCG Parties would vigorously defend against such claims. Pending resolution of litigation, creditors would be exposed to DCG credit risk because the Wind-Down Debtors do not have the benefit of a security interest or contractual covenants limiting DCG's activities. In the event that DCG were to seek bankruptcy protection pending the resolution of litigation, creditors of the Debtors would face additional risks.

X.     **CONFIRMATION OF THE AMENDED PLAN**

A.     **Requirements for Confirmation of the Amended Plan**

Among the requirements for the Confirmation of the Amended Plan are that the Amended Plan (i) is accepted by all impaired Classes of Claims and Interests, or if rejected by an Impaired Class, that the Amended Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (ii) is feasible; and (iii) is in the "best interests" of Holders of Claims.

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Amended Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Debtors believe that: (i) the Amended Plan satisfies or will satisfy all of the necessary statutory requirements of chapter 11; (ii) the Debtors have complied or will have complied with all of the necessary requirements of chapter 11; and (iii) the Amended Plan has been proposed in good faith.

B.     **Best Interests of Creditors/Liquidation Analysis**

Often called the "best interests of creditors" test, section 1129(a)(7) of the Bankruptcy Code requires that the Bankruptcy Court find, as a condition to Confirmation, that the Amended Plan provides, with respect to each Class, that each Holder of a Claim or Interest in such Class either (i) has accepted the Amended Plan or (ii) will receive or retain under the Amended Plan property of a value that is not less than the amount that such Holder would receive or retain if the Debtors liquidated under chapter 7 of the Bankruptcy Code.

To demonstrate that the Amended Plan satisfies the "best interests of creditors" test, the Debtors have attached hereto as **Exhibit C**, a Liquidation Analysis prepared by the Debtors' management with the assistance of their advisors, including Alvarez & Marsal North America LLP, the Debtors' financial advisor. The Liquidation Analysis presents recovery available assuming a hypothetical liquidation based on certain assumptions discussed in this Amended Disclosure Statement and in the accompanying notes to the Liquidation Analysis.

C.     **Feasibility**

Section 1129(a)(11) of the Bankruptcy Code requires that Confirmation of the Amended Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors, or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Amended Plan).

The Amended Plan provides for the liquidations of GGC, GAP and GGH and distribution of their assets to Holders of Allowed Claims and Interests. Accordingly, the Debtors believe that all Amended Plan obligations with respect to the Debtors will be satisfied, following by their winding down, pursuant to the Amended Plan. The Debtors have analyzed the ability of the Wind-Down Debtors to meet their respective obligations under the Amended Plan. As part of this analysis, the Debtors prepared the Projections, as set forth on **Exhibit D** attached hereto, and the Illustrative Range of Recoveries, as set forth on **Exhibit E** attached hereto.

D.     **Acceptance by Impaired Class**

The Bankruptcy Code requires, as a condition to Confirmation, that, except in certain circumstances, each Class of Claims or Equity Interests that is Impaired under the Amended Plan, accept the Amended Plan. A Class that is not "impaired" under the Amended Plan is deemed to have accepted the Amended Plan and, therefore, solicitation of acceptances with respect to such Class is not required.[18]

---

[18]     A class is "impaired" unless the plan: (a) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; or (b) cures any default, reinstates the original terms of such obligation, compensates the holder for certain damages or losses, as applicable, and does

(Continued…)

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of allowed claims in that class, counting only those claims that _actually_ voted to accept or to reject the plan. Thus, a Class of Claims will have voted to accept the Amended Plan only if two-thirds (2/3) in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

Section 1126(d) of the Bankruptcy Code defines acceptance of a plan by a class of impaired interests as acceptance by holders of at least two-thirds (2/3) in dollar amount of allowed interests in that class, counting only those interests that _actually_ voted to accept or to reject the plan. Thus, a Class of Interests will have voted to accept the Amended Plan only if two-thirds (2/3) in amount actually voting cast their Ballots in favor of acceptance.

Section 506(a) of the Bankruptcy Code provides that holders of allowed claims secured by liens on property of a debtor shall have an allowed secured claim to the extent of the value of such holder's interest in the debtors' estates' property and shall have an unsecured claim to the extent the value of such holder's interest is less than the allowed amount of such claim. Under the Amended Plan, holders of Secured Claims shall be receiving such treatment rendering their claims Unimpaired pursuant to section 1124(1) or (2) of the Bankruptcy Code, as applicable. For purposes of Voting, to the extent the value of the interest of a Holder of a Secured Claim in property of the Estates exceeds the Allowed amount of such Secured Claim, such Holder shall not have any General Unsecured Claim nor be permitted to Vote in Classes with other General Unsecured Claims.

E.      **Confirmation without Acceptance by All Impaired Classes.**

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a plan even if all impaired classes have not accepted the plan, provided that the plan has been accepted by at least one impaired class of claims. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class rejection or deemed rejection of the plan, the plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cramdown" so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

If any Impaired Class rejects the Amended Plan, including Classes of Claims or Interests deemed to reject the Amended Plan, the Debtors will request Confirmation of the Amended Plan, as it may be modified from time to time, utilizing the "cramdown" provision under section 1129(b) of the Bankruptcy Code. The Debtors reserve the right to modify the Amended Plan in accordance with Article X of the Amended Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims to render such Class of Claims Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules or to withdraw the Amended Plan as to such Debtor. The Debtors believe that the Amended Plan and the treatment of all Classes of Claims and Interests under the Amended Plan satisfy the requirements for cramdown, and the Debtors will be prepared to meet their burden to establish that the Amended Plan can be Confirmed pursuant to section 1129(b) of the Bankruptcy Code as part of Confirmation of the Amended Plan.

(i)      ***No Unfair Discrimination.***

The "unfair discrimination" test applies with respect to classes of claim or interests that are of equal priority but are receiving different treatment under a proposed plan. The test does not require that the treatment be the same or equivalent, but that the treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly. Under certain circumstances, a proposed plan may treat two classes of unsecured creditors differently without unfairly discriminating against either class.

---

not otherwise alter the legal, equitable, or contractual rights to which such claim or equity interest entitles the holder of such claim or equity interest.

(ii)     *Fair and Equitable Test.*

The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100 percent of the amount of the allowed claims in such class. As to each non-accepting class and as set forth below, the test sets different standards depending on the type of claims or interests in such class. The Debtors believe that the Amended Plan satisfies the "fair and equitable" requirement, notwithstanding the fact that certain Classes are deemed to reject the Amended Plan. There is no Class receiving more than a 100 percent recovery and no junior Class is receiving a Distribution under the Amended Plan until all senior Classes have received a 100 percent recovery or agreed to receive a different treatment under the Amended Plan.

(a)     Unsecured Claims.

The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the requirement that either: (i) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date, equal to the allowed amount of such claim; or (ii) the holder of any claim or any interest that is junior to the claims of such class will not receive or retain any property under the plan on account of such junior claim or junior interest, subject to certain exceptions.

(b)     Interests.

The condition that a plan be "fair and equitable" to a non-accepting class of interests, includes the requirements that either: (i) the plan provides that each holder of an interest in that class receives or retains under the plan on account of that interest property of a value, as of the effective date, equal to the greater of: (a) the allowed amount of any fixed liquidation preference to which such holder is entitled; (b) any fixed redemption price to which such holder is entitled; or (c) the value of such interest; or (ii) the holder of any interest that is junior to the interests of such class will not receive or retain any property under the plan on account of such junior interest.

## XI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE AMENDED PLAN

If the Amended Plan is not consummated, the Debtors' financial obligations will exceed their ability to pay them.  Accordingly, if the Amended Plan is not confirmed and consummated, the alternatives include:

### A.    Liquidation Under Chapter 7

If the Amended Plan is not confirmed, the Debtors may choose to file a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the Debtors' assets for distribution in accordance with the priorities established by chapter 7 of the Bankruptcy Code.  A discussion of the effects that a liquidation would have on the recoveries of Holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit C**.  For the reasons articulated in Section VIII above, the Debtors believe that a liquidation would result in lower aggregate distributions being made to Holders of Allowed Claims than those provided in the Amended Plan.

### B.    Alternative Plan(s) of Reorganization

The Debtors believe that failure to confirm the Amended Plan will likely lead to expensive and protracted Chapter 11 Cases.  In formulating and developing the Amended Plan, the Debtors have explored numerous other alternatives and engaged in an extensive negotiating process.

The Debtors believe that not only does the Amended Plan fairly adjust the rights of Holders of Allowed Claims receiving distributions under the Amended Plan and enable the Holders of all Claims to maximize their returns, but also that rejection of the Amended Plan in favor of some alternative method of reconciling the Claims and Interests will require, at the very least, an extensive and time consuming process (including the possibility of protracted and costly litigation) and will not result in a better recovery for any Class.

THE DEBTORS BELIEVE THAT CONFIRMATION OF THE AMENDED PLAN IS PREFERABLE TO ANY ALTERNATIVE BECAUSE THE AMENDED PLAN MAXIMIZES THE AMOUNT OF DISTRIBUTIONS TO ALL HOLDERS OF CLAIMS, AND ANY ALTERNATIVE TO CONFIRMATION OF THE AMENDED PLAN WILL RESULT IN SUBSTANTIAL DELAYS IN THE DISTRIBUTION OF ANY RECOVERIES.  THEREFORE, THE DEBTORS RECOMMEND THAT ALL HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE ON THE AMENDED PLAN VOTE TO ACCEPT THE AMENDED PLAN.

### C.    Dismissal of the Debtors' Chapter 11 Cases

Dismissal of the Chapter 11 Cases would have the effect of restoring (or attempting to restore) all parties to the status quo ante.  Upon dismissal of the Chapter 11 Cases, the Debtors would lose the protection of the Bankruptcy Code, thereby requiring, at the very least, an extensive and time-consuming process of negotiation with their creditors, possibly resulting in costly and protracted litigation in various jurisdictions.  Dismissal would also permit unpaid secured and unsecured creditors to obtain and enforce judgments against the Debtors.  The Debtors believe that these actions would seriously undermine their ability to continue operations.  Therefore, the Debtors believe that dismissal of the Chapter 11 Cases is not a viable reorganizational alternative to the Amended Plan.

**XII.    CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE AMENDED PLAN**

    **A.    Introduction.**

The following discussion is a summary of certain U.S. federal income tax consequences of the Consummation of the Amended Plan to the Debtors and to certain Holders of Allowed Claims. The following summary does not address the U.S. federal income tax consequences to Holders of Claims or Interests not entitled to vote to accept or reject the Amended Plan. This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder, judicial authorities and published administrative positions of the U.S. Internal Revenue Service (the "IRS"), and other applicable authorities (collectively, "Applicable Tax Law"), all as in effect on the date of this Amended Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect.

Due to the lack of authority addressing the taxation of transactions in Digital Assets, the application of Applicable Tax Law to numerous material aspects of the transactions contemplated by the Amended Plan, and to Digital Assets in general, is subject to a high level of uncertainty. No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS or any other authorities, as to any of the tax consequences of the Amended Plan discussed below. The discussion below is not binding upon the IRS or the courts in the United States. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain Holders in light of their individual circumstances. This summary does not address any tax consequences under the laws of any state, municipality or locality of the United States or the laws of any taxing jurisdiction other than the federal tax laws of the United States. This summary does not address tax issues with respect to such Holders that are subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, foreign taxpayers, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, Holders of Claims who are themselves in bankruptcy, regulated investment companies and those holding, or who will hold, consideration received pursuant to the Amended Plan, as part of a hedge, straddle, conversion, or other integrated transaction). In addition, this summary does not address the Medicare tax on net investment income or the special timing rules prescribed under Section 451(b) of the IRC. No aspect of state, local, estate, gift, or taxes other than U.S. federal income taxation is addressed. Furthermore, this summary assumes that a Holder of a Claim holds a Claim as a "capital asset" (within the meaning of Section 1221 of the IRC). Except as stated otherwise, this summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form and, to the extent relevant, that the Claims constitute interests in the Debtors "solely as a creditor" for purposes of section 897 of the IRC. This overview does not discuss differences in tax consequences to Holders that act or receive consideration in a capacity other than any other Holder of a Claim of the same Class or Classes, and the tax consequences for such Holders may differ materially from that described below. The U.S. federal income tax consequences of the implementation of the Amended Plan to the Debtors, Wind-Down Debtors (Wind-Down GAP and Wind-Down GGC and Wind-Down GGH), and Holders of Claims described below also may vary depending on the ultimate nature of any restructuring transactions that the Debtors and/or Wind-Down Debtors engage in. This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are Unimpaired or otherwise entitled to payment in full under the Amended Plan, or (b) that are deemed to reject the Amended Plan.

For purposes of this discussion, a "U.S. Holder" is a Holder of a Claim or Interest that for U.S. federal income tax purposes is: (i) an individual who is a citizen or resident of the United States; (ii) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate the income of which is subject to U.S. federal income taxation regardless of the source of such income; or (iv) a trust (a) if a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more United States persons (within the meaning of section 7701(a)(30) of the IRC) has authority to control all substantial decisions of the trust or (b) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person (within the meaning

126

of section 7701(a)(30) of the IRC.  For purposes of this discussion, a "Non-U.S. Holder" is any Holder that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes) is a Holder, the tax treatment of a partner (or other beneficial owner) generally will depend upon the status of the partner (or other beneficial owner) and the activities of the partner (or other beneficial owner) and the entity. Partnerships (or other pass-through entities) and partners (or other beneficial owners) of partnerships (or other pass-through entities) that are Holders are urged to consult their own respective tax advisors regarding the U.S. federal income tax consequences of the Amended Plan.

The below discussion assumes that the Debtors obtained tax ownership of Digital Asset deposits when customers made such deposits.  The Debtors believe that position is the right one based on, among other things, the fact that the Debtors had the right to transfer, rehypothecate, and otherwise deal in deposited Digital Assets.  If the Debtors were determined to not have tax ownership of the Digital Assets, the consequences of the Amended Plan to Holders of Claims and the Debtors would vary significantly from the discussion below.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND NON-U.S. TAX CONSEQUENCES OF THE AMENDED PLAN.**

**B.      Certain U.S. Federal Income Tax Consequences of the Amended Plan to the Debtors.**

For U.S. federal income tax purposes, each of the Debtors is (i) a member of an affiliated group of corporations of which DCG is the common parent and which files a single consolidated U.S. federal income tax return (the "Tax Group"), or (ii) a foreign branch or entity disregarded as separate from its owner for U.S. federal income tax purposes whose business activities and operations are reflected on the consolidated U.S. federal income tax returns of the Tax Group.  Whether the Debtors' tax attributes (if any) will survive the implementation of the Amended Plan is subject to uncertainty.  Accordingly, the application of the rules regarding cancellation of indebtedness and section 382 of the IRC (which could significantly limit the Wind-Down Debtors' ability to utilize net operating losses and other tax attributes going forward) is also uncertain at this time.

In connection with the Amended Plan, the Debtors (or Wind-Down Debtors, as applicable) may, among other things, sell certain assets, receive Avoidance Recoveries and other proceeds from pursing Retained Causes of Action, distribute Digital Assets (including newly purchased Digital Assets with Cash or recoveries from the aforementioned items) to certain Holders that are substantially identical to the Digital Assets such Holders previously loaned to the Debtor (i.e., to attempt to return to certain Holders some or all of the Digital Assets such Holders previously loaned to the Debtor through a distribution "in kind") ("Like-Kind Distribution"), and distribute Cash and otherwise distribute Digital Assets (in a non-"in-kind" fashion, i.e., by distributing Digital Assets to a Holder other than Digital Assets that such Holder previously loaned to the Debtor).

In connection with any rebalancing of the Debtors' Digital Assets in order to facilitate Like-Kind Distributions (a "Rebalancing"), the Debtors would realize gain or loss upon the sale of property involved in such rebalancing.  The amount of such gain or loss would be equal to the difference between the value of the consideration received by the Debtors (including, for this purpose, assumption of liabilities) and the Debtors' tax basis in such assets. Gain would be reduced by the amount of tax attributes (if any) available for use by the Debtors, and any remaining gain would be recognized by the Debtors and result in a cash tax obligation.

Thus, the U.S. federal income tax consequences of a Rebalancing would in large part be a function of the Debtors' tax basis in their assets that the Debtors transfer or are deemed to have transferred, including the Debtors' Digital Assets.  There is generally no direct guidance under Applicable Tax Law on how to treat a Holder's transfer of Digital Assets to a business like the Debtors' (and as a result there is significant uncertainty with respect to the Debtors' tax basis in such Digital Assets) or the transferee's utilization of the transferred Digital Assets (for example,

and without limitation, holding, lending, staking, selling, entering derivatives transactions). Accordingly, there is significant uncertainty with respect to the tax consequences of a Rebalancing by the Debtors.

It is possible that the IRS or a court could disagree with the Debtors' determination of their basis in their assets, including the Debtors' Digital Assets. Any such disagreement could lead to a redetermination of the Debtors' basis in their assets and a resultant increase in the Debtors' tax liability, potentially in a way that would have a materially adverse impact on the Debtors. The Debtors, together with their advisors, continue to study this issue.

With respect to the Debtors' distribution of Cash and/or property to Holders of Claims, the Debtors would recognize income or cancellation of indebtedness income related to any excess of the amount of such Claim over the value of what a Holder receives in exchange for its Claim.

The Debtors continue to evaluate how "dollarization" of Claims as of the Effective Date may modify the above analysis, either with respect to the implementation of the Amended Plan itself or with respect to any administrative tax period more generally. The Debtors currently cannot say with certainty that there will not be material administrative income tax liabilities that must be satisfied under the Amended Plan.

**C.    Certain U.S. Federal Income Tax Consequences of the Amended Plan to Holders of Allowed Claims.**

Before discussing the consequences to any particular Class of Claims entitled to vote, we discuss certain U.S. federal income tax considerations that are relevant to U.S. Holders who may receive a Like-Kind Distribution of Digital Assets pursuant to the Amended Plan.

The tax treatment of such U.S. Holders under the Amended Plan depends significantly on the tax treatment of their transfer of Digital Assets to the Debtors in the first instance. There is uncertainty with respect to whether loan deposits in which tax ownership of the Digital Assets transferred to the Debtors were taxable when they occurred, but the Debtors generally expect that most U.S. Holders have taken the position that the act of lending Digital Assets to the Debtors is not a taxable event. While there is substantial theoretical debate regarding that position, it is a position that has some level of support in the idea that the exchange of Digital Assets for a contractual right to the return of such Digital Assets is not a transaction that results in a realization event under section 1001 of the IRC, because it does not involve an exchange of property for other property "differing materially either in kind or in extent." Such position relies, among other things, on case law that predates the enactment of section 1058 of the IRC and analogies to the treatment afforded to securities lending under section 1058 of the IRC.

To the extent an initial loan deposit of Digital Assets was not taxable, there is an argument that the same position could be taken with respect to the return by the Debtors of the same kind of Digital Asset to U.S. Holders in a Like-Kind Distribution, because the exchange of the contractual right to the return of such Digital Asset for the underlying Digital Asset is itself not an exchange of property for other property "differing materially either in kind or in extent." The Debtors emphasize that, like other aspects of Digital Asset taxation, this position is subject to significant uncertainty, including because of the existence of proposed Treasury Regulation section 1.1058-1(e)(2), which causes a securities lending transaction to become taxable where a borrower fails to return to the lender securities identical to the securities transferred, or otherwise defaults under the agreement. While this proposed Treasury Regulation is inapplicable by its terms to Digital Assets, it would very likely cause such a transaction to be taxable to a U.S. Holder (or other person that transferred Digital Assets to the Debtors in a transaction intended to be treated as non-taxable in the first instance) if it is applied to Digital Assets by analogy. Furthermore, even if the foregoing argument would apply to a recovery that comprises solely Like-Kind Distributions, in the case of a Holder receiving Like-Kind Distributions with other distributions, the argument would need to be supplemented by a general "bifurcation" approach that permitted U.S. Holders to take the position that such U.S. Holders retained their Digital Asset positions in a tax-free manner, even if the receipt of other consideration constituted a taxable exchange. The Debtors emphasize that these positions are unclear.

The ability to take the position that a Like-Kind Distribution of Digital Assets is not taxable to U.S. Holders is subject to increased risk as a result of the "dollarization" of Claims. It may be the case that "dollarization" resulted, or will result, in a taxable event to U.S. Holders, either as of the Petition Date or as of the Confirmation Date. If such a taxable event were determined to have occurred, it would be because the contract to receive particular Digital Assets was modified, as a result of dollarization, to have an economic "cap." In light of this, it is unclear whether the argument

described above that supports tax-free treatment of a Like-Kind Distribution could still apply. Such a "capped" contract arguably "differ[s] materially either in kind or in extent" from the underlying Digital Assets.

The Debtors emphasize in the strongest possible terms that the law applicable to Digital Asset loan transactions with the Debtors, "dollarization," and the Consummation of the Amended Plan is subject to a high level of uncertainty. Although there are instructive analogous authorities, there is effectively no "controlling" authority on any of these issues. Accordingly, there is a material risk that the positions described throughout this discussion may not be sustained. The concept of a non-taxable Like-Kind Distribution referred to above rests in large part on the theory that the property that the Debtors would distribute in kind to a U.S. Holder would be in respect of an obligation that does not differ "materially either in kind or in extent" from the obligation that arose when the U.S. Holder deposited property with the Debtors. Given the structure of the Amended Plan, and in particular the way in which the Debtors have valued Claims as of the Petition Date, there is a significant risk that the Claim that a U.S. Holder has against the Debtors as of the Petition Date is with respect to property that differs "materially either in kind or in extent" from the property that the U.S. Holder previously deposited with the Debtors, such that the Debtors would be distributing property in respect of an obligation that differs "materially either in kind or in extent" from the one that existed when the U.S. Holder loaned Digital Assets to the Debtors (and thus tax-free in-kind treatment would likely be unavailable).

       (i)       *The Wind-Down Entities.*

The Amended Plan provides that on the Effective Date, Allowed Claims shall, in the absence of any other treatment under the Amended Plan or the Confirmation Order, be deemed to pass through the Chapter 11 Cases and, solely for purposes of receiving distributions pursuant to the Amended Plan and otherwise subject to the provisions of the Amended Plan (including, without limitation, the release and injunction provisions set forth in Article VIII of the Amended Plan and the treatment of Gemini Lender Claims), shall remain obligations of Wind-Down GGH, as applicable, on and after the Effective Date. It is uncertain at this time whether the Wind-Down Debtors will continue to be members of the Tax Group following the Effective Date.

If the Wind-Down Debtors are no longer treated as members of the Tax Group, they will be liable for U.S. federal income taxes, and will not have access to net operating losses and other tax attributes to the extent such losses and attributes have been used by the Tax Group to offset items of members other than the Wind-Down Debtors (including in respect of the Tax Group's full taxable year that contains the date on which the Wind-Down Debtors ceased to be members of the Tax Group). Furthermore, the usability of any such net operating losses or tax attributes that remain with the Wind-Down Debtors might otherwise be limited (and thus of lesser value) if the Wind-Down Debtors are no longer treated as members of the Tax Group. Lastly, it is possible that the exit of the Wind-Down Debtors from the Tax Group could cause the immediate recognition of gains in any intergroup transactions that had been subject to deferral treatment under the tax rules applicable to consolidated groups. Accordingly, if the Wind-Down Debtors are no longer treated as members of the Tax Group following the Effective Date, this could adversely impact the Debtors' liquidity and the recovery to Holders of Claims.

If the Wind-Down Debtors continue to be members of the Tax Group, they will remain jointly and severally liable for any U.S. federal income taxes owed by any other member of the Tax Group. In such event, the Wind-Down Debtors may be responsible for their allocable share of the Tax Group's net U.S. federal income tax liability, which may take into account any net operating losses.

       (ii)      *General Unsecured Claims against GGH.*

Pursuant to the Amended Plan, each Holder of an Allowed General Unsecured Claim against GGH shall, in full and final satisfaction of such Claim, receive its pro rata share of the available Distributable Assets (including the proceeds of the Wind-Down that are allocated to GGH), in accordance with the Distribution Principles.

To the extent any Digital Asset distributed to a U.S. Holder of an Allowed General Unsecured Claims against GGH is the same as the type of Digital Asset such U.S. Holder previously loaned to the Debtor, then such return may be treated as a Like-Kind Distribution to such U.S. Holder, consistent with (and subject to the uncertainties around) the discussion set forth above.

In the case where such tax-free treatment did not apply with respect to such Like-Kind Distribution, and for any consideration that a U.S. Holder of an Allowed General Unsecured Claims against GGH receives in satisfaction of its Claim that is not the same as the type of Digital Asset such U.S. Holder initially transferred to the Debtor as of the Petition Date, the exchange will be taxable to the U.S. Holder. In such case, such U.S. Holder would recognize gain or loss in an amount equal to the difference between the fair market value of such consideration received under the Amended Plan and such U.S. Holder's adjusted tax basis in the Claim (this assumes that all of the consideration is received in a taxable fashion; see immediately below for a discussion of a bifurcated approach). The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder had a holding period in respect of the Claim of more than one year at the time of the exchange. Such U.S. Holder's tax basis in such consideration should equal the fair market value of such property as of the Effective Date, and such U.S. Holder's holding period in such consideration should begin on the day after the Effective Date.

Where a U.S. Holder receives some consideration tax-free and other consideration that is taxable (e.g., some but not all of the consideration that a U.S. Holder of an Allowed General Unsecured Claim against GGH receives in satisfaction of its Claim is a Like-Kind Distribution), such U.S. Holder could recognize gain or loss in an amount equal to the difference between (i) the fair market value of such consideration received under the Amended Plan in a taxable fashion, and (ii) while subject to uncertainty, a proportionate portion of the tax basis in such Claim (possibly based on relative fair market values of the consideration received in a tax-free fashion and the consideration received in a taxable fashion, although other potential ways of calculating gain or loss may exist). The character of any such gain or loss as capital or ordinary would be determined by a number of factors including the tax status of the U.S. Holder, whether the Claim constituted a capital asset in the hands of the U.S. Holder, and whether and to what extent the U.S. Holder had previously claimed a bad-debt deduction with respect to its Claim. If any such recognized gain or loss were capital in nature, it generally would be long-term capital gain if the U.S. Holder had a holding period in respect of the Claim of more than one year at the time of the exchange. Such U.S. Holder's tax basis in any consideration received in a taxable exchange should equal the fair market value of such property as of the Effective Date, and such U.S. Holder's holding period in any such consideration should begin on the day after the Effective Date.

For a very simplified numerical example of the abovementioned methodology (which, for the avoidance of doubt, may be one among others) for determining gain or loss where a U.S. Holder receives some consideration tax-free and other consideration that is taxable, assume the following: (i) such U.S. Holder has an adjusted tax basis in its Claim of $1,000; (ii) such Claim corresponds entirely to BTC that such U.S. Holder previously loaned to the Debtors; and (iii) such Holder receives, in satisfaction of its Claim, BTC worth $3,000 and ETH worth $2,000. Pursuant to the above methodology, the U.S. Holder would have gain equal to the difference between (a) $2,000 (the fair market value of the ETH), and (b) $2,000 / ($3,000 + $2,000) x $1,000, i.e., $1,600 of gain.

It is generally expected that a Holder of Allowed General Unsecured Claims against GGH should not be taxed on distributions received after the Effective Date until such distributions are received (if at all).

(iii)    *General Unsecured Claims against GAP.*

Pursuant to the Amended Plan, each Holder of an Allowed General Unsecured Claim against GAP shall, in full and final satisfaction of such Claim, receive its pro rata share of the available Distributable Assets (including the proceeds of the Wind-Down that are allocated to GAP), in accordance with the Distribution Principles.

The treatment to each U.S. Holder of an Allowed General Unsecured Claim against GAP will be as described above for U.S. Holders of Allowed General Unsecured Claims against GGH.

(iv)    *Other Unsecured Claims against GGC.*

Pursuant to the Amended Plan, each Holder of an Allowed General Unsecured Claim against GGC shall, in full and final satisfaction of such Claim, receive its pro rata share of Distributable Assets (including the proceeds of the Wind-Down that are allocated to GGC), in accordance with the Distribution Principles.

The treatment to each U.S. Holder of a GGC Class 3 Claim will be as described above for U.S. Holders of Allowed GGH Class 3 Claims.

### (v)    *Gemini Lender Claims against GGC.*

Pursuant to the Amended Plan, each Holder of an Allowed Gemini Lender Claim against GGC shall, in full and final satisfaction of such Claim, receive its pro rata share of the available (a) Cash and (b) Digital Assets (including the proceeds of the Wind-Down that are allocated to GGC), in accordance with the Distribution Principles.

The treatment to each U.S. Holder of a GGC Class 7 Claim will be as described above for U.S. Holders of Allowed GGH Class 3 Claims.

### (vi)    *Net Investment Income Tax.*

Certain U.S. Holders that are individuals, estates, or trusts are required to pay an additional 3.8 percent tax on, among other things, gains from the sale or other disposition of capital assets. U.S. Holders that are individuals, estates, or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of any consideration to be received under the Amended Plan.

### (vii)    *Limitations on Losses.*

U.S. Holders who recognize capital losses as a result of the distributions under the Amended Plan will be subject to limits on their use of capital losses. For non-corporate U.S. Holders, capital losses may be used to offset any capital gains (without regard to holding periods) plus ordinary income to the extent of the lesser of (i) $3,000 ($1,500 for married individuals filing separate returns) or (ii) the excess of the capital losses over the capital gains. Non-corporate U.S. Holders may carry over unused capital losses and apply them to capital gains and a portion of their ordinary income for an unlimited number of years. For corporate U.S. Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate U.S. Holders who have more capital losses than can be used in a tax year may be allowed to carry over the excess capital losses for use in the five years following the capital loss year, and are allowed to carry back unused capital losses to the three years preceding the capital loss year.

**D.    Certain U.S. Federal Income Tax Consequences to U.S. Holders of Owning and Disposing of Digital Assets Received Under the Amended Plan.**

The U.S. federal income tax consequences to a U.S. Holder of owning and disposing of Digital Assets received under the Amended Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including (i) the U.S. federal income tax characterization of the relationship between such Holder and a third-party exchange (if any) to which such Holder transfers any such Digital Assets, and (ii) the activities that such Holder and/or such third-party exchange (if applicable) pursue with respect to such Digital Assets. U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of holding and disposing of Digital Assets.

**E.    Certain U.S. Federal Income Tax Consequences of the Amended Plan to Non-U.S. Holders of Allowed Claims.**

The following discussion includes only certain U.S. federal income tax consequences of the Amended Plan to Non-U.S. Holders. This discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder is urged to consult its own tax advisor regarding the U.S. federal, state, local, non-U.S., and non-income tax consequences of the Consummation of the Amended Plan and the Restructuring Transactions to such Non-U.S. Holder.

### (i)    *Gain Recognition*

Gain, if any, recognized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the Restructuring Transactions occur and certain other conditions are met or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in

the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States). If the first exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's capital gains allocable to U.S. sources exceed capital losses allocable to U.S. sources during the taxable year of the exchange. If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder (except that the Net Investment Income Tax would generally not apply). In order to claim an exemption from or reduction of withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates). In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments. **The taxation of Digital Assets is subject to a high level of uncertainty, and each Non-U.S. Holder should consult its own tax advisor regarding the possibility of being deemed to be engaged in a trade or business in the United States as a result of its Digital Asset-related activities.**

(ii)    *U.S. Federal Income Tax Consequences to Non-U.S. Holders of Owning and Disposing of Digital Assets Received Under the Amended Plan.*

The U.S. federal income tax consequences to a Non-U.S. Holder of owning and disposing of Digital Assets received under the Amended Plan will depend upon a variety of factors outside of the control and/or knowledge of the Debtors, including (i) the U.S. federal income tax characterization of the relationship between such Holder and a third-party exchange (if any) to which such Holder transfers any such Digital Assets, and (ii) the activities that such Holder and/or such third-party exchange (if applicable) pursue with respect to such Digital Assets. Further, owning and disposing of Digital Assets received under the Amended Plan may not qualify for the trading safe harbors described in Code section 864, and therefore, a Non-U.S. Holder may be required to recognize income that is effectively connected with a U.S. trade or business and be subject to U.S. federal income taxation on such effectively connected income. Non-U.S. Holders are urged to consult their own tax advisors regarding the tax consequences of holding and disposing of Digital Assets.

(iii)    *FATCA*

Under legislation commonly referred to as the Foreign Account Tax Compliance Act ("FATCA"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding at a rate of 30 percent on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S. source payments of fixed or determinable, annual or periodical income, and, subject to the paragraph immediately below, also include gross proceeds from the sale of any property of a type which can produce U.S. source interest or dividends.

FATCA withholding will apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding. FATCA withholding rules were previously scheduled to take effect on January 1, 2019, that would have applied to payments of gross proceeds from the sale or other disposition of property of a type that can produce U.S. source interest or dividends. However, such withholding has effectively been suspended under proposed Treasury Regulations that may be relied on until final regulations become effective. Nonetheless, there can be no assurance that a similar rule will not go into effect in the future. Each Non-U.S. Holder should consult its own tax advisor regarding the possible impact of FATCA withholding rules on such Non-U.S. Holder.

**F.      Information Reporting and Back-up Withholding**

The Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, and any applicable withholding agent will withhold all amounts required by law to be withheld from payments of interest and will comply with all applicable reporting requirements of the IRC. In general, information reporting requirements may apply to distributions or payments made to a U.S. Holder of a claim. Additionally, backup withholding will generally apply to such payments if a U.S. Holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the backup withholding rules will be allowed as a credit against such U.S. Holder's U.S. federal income tax liability and may

entitle such U.S. Holder to a refund from the IRS, provided that the required information is timely provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  U.S. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Amended Plan would be subject to these regulations and require disclosure on the U.S. Holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE AMENDED PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION.  ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE AMENDED PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XIII.    SOLICITATION AND VOTING PROCEDURES[19]

With respect to the Voting Classes, the following materials will be included in the Solicitation Package:

- the appropriate Ballot and Voting Instructions;

- this Amended Disclosure Statement with all exhibits, including the Amended Plan, and any other supplements or amendments to these documents;

- the Amended Disclosure Statement Order (without exhibits, except the solicitation and voting procedures;

- the Confirmation Hearing Notice;

- a cover letter describing the content of the Solicitation Package and urging Holders of Claims in each Voting Class to vote to accept the Amended Plan;

- any letter(s) from the Committee, Gemini, or the Ad Hoc Group stating their position with respect to the Amended Plan; and

- such other documents as the Debtors may seek to include or the Bankruptcy Court may direct.

With respect to the <u>Non-Voting Classes</u>, the Solicitation Package shall include:

- the Confirmation Hearing Notice; and

- the Non-Voting Status Notice.

With respect to the U.S. Trustee, a copy of each document contained in the Solicitation Packages, which may include non-customized Ballots and a non-customized Notice of Non-Voting Status.

**Holders of Claims entitled to vote to accept or reject the Amended Plan shall be served (or were caused to be served) the Solicitation Package (including the appropriate Ballot) providing solicitation and other voting-related information to such Holders.**

**Each Gemini Lender whose Gemini Borrowings were included in the Gemini Master Claim, thus entitling such Gemini Lender to vote as a Holder of a Claim in Class 7 against GGC as of the Voting Record Date shall receive the Solicitation Package (including the Gemini Lender's Ballot) from Gemini by email within seven (7) days of the entry of an order approving the Debtors' Solicitation and Procedures Motion.   The Solicitation Agent has worked with Gemini to create E-Ballot ID(s) for each Holder of Gemini Lender Claims. Gemini, using the email address for such Holder of the Gemini Lender Claim in Gemini's records, will send instructions on how to obtain such Gemini Lender's unique E-Ballot ID by accessing such Gemini Lender's Gemini account for purposes of completing the Gemini Lender Ballot.**

**<u>Any party who desires additional or paper copies of these documents may request copies, free of charge, from the Solicitation Agent by (i) by writing to Genesis Global Holdco, LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232; (ii) by calling U.S. Toll Free: 888-524-2017 or International Toll: 646-440-4183; or (iii) by emailing: genesisinfo@ra.kroll.com (with "Genesis Solicitation" in the subject line).</u>**

---

[19]    The procedures detailed herein may not reflect the procedures ultimately approved by the Bankruptcy Court. The Debtors will amend this Disclosure Statement prior to solicitation to reflect the final, approved, solicitation procedures if different from those described herein, and such details will be provided in the Solicitation Package sent to Holders of Claims in the Voting Classes.

On or before ten (10) days before the Voting Deadline, the Debtors intend to file the Plan Supplement. As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the electronic ECF or the Debtors' restructuring website. The Debtors will not serve paper or electronic copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Solicitation Agent by: (i) writing to Genesis Global Holdco, LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232; (ii) by calling U.S. Toll Free: 888-524-2017 or International Toll: 646-440-4183; or (iii) by emailing: genesisinfo@ra.kroll.com (with "Genesis Solicitation" in the subject line).

## A.    Voting Deadline

The period during which Ballots with respect to the Amended Plan will be accepted by the Debtors will terminate on [January 10] , 2023 at 4:00 p.m. (Prevailing Eastern Time**).**

Except to the extent the Debtors so determine, or as permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline may not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Amended Plan (or any permitted modification thereof).

The Debtors reserve the right at any time or from time to time, in consultation with the Committee, to extend the period of time (on a daily basis, if necessary) during which Ballots will be accepted for any reason, including determining whether or not the requisite number of acceptances have been received, by making a public announcement of such extension no later than the first Business Day next succeeding the previously announced Voting Deadline. The Debtors will give notice of any such extension in a manner deemed reasonable to the Debtors in their discretion. There can be no assurance that the Debtors will exercise their right to extend the Voting Deadline.

## B.    Voting Instructions

Only the Holders of Claims in Classes 3, 4, 5 and 6 against GGH, Classes 3, 4, 5, 6 and 7 against GGC; and Classes 3, 4, 5 and 6 against GAP as of the Voting Record Date are entitled to vote to accept or reject the Amended Plan. Holders of Claims in Class 7 against GGC will receive the Gemini Lenders' Ballots from Gemini, using the email address for such Holder of the Gemini Lender Claim in Gemini's records, and will receive instructions on how to obtain such Gemini Lender's unique E-Ballot ID by accessing such Gemini Lender's Gemini account for purposes of completing the Gemini Lender Ballot. It is important to follow the specific instructions provided on each Ballot, which may provide different instructions based on the Class you belong to. Ballots should be sent to the Solicitation Agent on or before the Voting Deadline as indicated below.

The Debtors have engaged Kroll Restructuring Administration LLC as the Solicitation Agent to assist in the balloting and tabulation process. The Solicitation Agent will process and tabulate Ballots for each Class entitled to vote to accept or reject the Amended Plan and will file the Voting Report as soon as practicable after the Voting Deadline, which Voting Report may be supplemented after being filed.

**The deadline by which the Solicitation Agent must receive the Ballot is on
[January 10], 2023 at 4:00 p.m. (prevailing Eastern Time).**

**Any Ballot or that is properly executed, but which does not clearly indicate an acceptance or rejection of the Amended Plan or which indicates both an acceptance and a rejection of the Amended Plan, shall not be counted.**

**It is important to follow the specific instructions provided on each Ballot. All Ballots must be properly executed, completed and delivered to the Solicitation Agent, <u>so as to be actually received on or before the Voting Deadline</u> by using the envelope provided, or by delivery as follows:**

---

**BALLOTS**

**Submitting Your Vote Online through the Online Portal**

The Solicitation Agent will accept properly completed Ballots online through the Online Portal.  To submit your customized electronic Ballot via the Online Portal, visit https://restructuring.ra.kroll.com/genesis and click on the "Submit E-Ballot" section of the website. Follow the instructions to submit your customized electronic Ballot.

IMPORTANT NOTE: You will need the following information to retrieve and submit your customized electronic Ballot:

Unique E-Ballot ID#:_____

Kroll's Online Portal is the sole manner in which Ballots will be accepted via electronic or online transmission.  Ballots submitted by facsimile, email, or other means of electronic transmission will not be counted.

Each Unique E-Ballot ID# is to be used solely for voting only those Claims described in your electronic Ballot.  Please complete and submit an electronic Ballot for each Unique E-Ballot ID# you receive, as applicable.

If your Ballot is not received by Kroll on or before the Voting Deadline, and such Voting Deadline is not extended by the Debtors as noted above, your vote will not be counted.

**If you vote via the Online Portal, you SHOULD NOT also submit the hard copy version of your Ballot.**

---

**If by First Class Mail, Overnight Courier or Hand Delivery:**

**Genesis Global Holdco, LLC Ballot Processing Center**
**c/o Kroll Restructuring Administration LLC**
**850 Third Avenue, Suite 412**
**Brooklyn, NY 11232**

To arrange for hand delivery of your Ballot, please email genesisballots@ra.kroll.com (with "Genesis Ballot—Hand Delivery" in the subject line) at least 24 hours prior to arrival and provide the anticipated date and time of delivery.

---

If you have any questions regarding the voting process please direct them to contact the Solicitation Agent (i) by (i) writing to Genesis Global Holdco, LLC Ballot Processing, c/o Kroll Restructuring Administration LLC, 850 3rd Avenue, Suite 412, Brooklyn, NY 11232; (ii) calling U.S. Toll Free: 888-524-2017 or International Toll: 646-440-4183; or (iii) by e-mailing genesisinfo@ra.kroll.com (with "Genesis Solicitation" in the subject line).

*(i)        Note to Holders of Claims in Classes Eligible to Vote*

(a)        Certification.

By signing and returning a Ballot, each Holder of a Claim in a Class eligible to vote (Holders of Claims in Class 3, 4, 5 and 6 against GGH, Classes 3, 4, 5, 6 and 7 against GGC, and Classes 3, 4, 5 and 6 against GAP) will be certifying to the Bankruptcy Court and the Debtors that, among other things:

136

- was the Holder (or authorized signatory) of Claims in Classes 3, 4, 5 or 6 against GGH, Classes 3, 4, 5, 6 or 7 against GGC, or Classes 3, 4, 5 or 6 against GAP in the amount set forth on the Ballot as of the Voting Record Date;

- has received a copy of the Amended Disclosure Statement, the Amended Plan and the remainder of the Solicitation Package and acknowledges that the solicitation of votes for the Amended Plan is subject to the terms and conditions set forth therein;

- has not relied on any statement made or other information received from any person with respect to the Amended Plan other than the information contained in the Solicitation Package or other publicly available materials; if it votes in favor of the Amended Plan, will be deemed to have consented to the release of the Released Parties pursuant to Article VIII of the Amended Plan;

- has cast the same vote with respect to all of the Holder's respective Claims;

- understands the treatment provided for its Claims under the Amended Plan;

- understands the recoveries provided for in the Amended Plan are expressly conditioned upon confirmation and consummation of the Amended Plan;

- acknowledges and agrees that the Debtors may make conforming changes to the Amended Plan as may be reasonably necessary; provided that the Debtors will not re-solicit acceptances or rejections of the Amended Plan in the event of such conforming changes unless otherwise required by the Bankruptcy Court or the Bankruptcy Code;

- as of the Voting Record Date, (i) has not transferred any claim or interest in or related to the Claims and (ii) has not granted any Lien or encumbrance in its Claims that precludes the Holder from voting on the Amended Plan or submitting the Ballot;

- has full and complete authority to execute and submit the Ballot;

- understands and acknowledges that all authority conferred or agreed to be conferred pursuant to the Ballot, and every obligation of the undersigned Holder thereunder, will be binding upon the transferees, successors, assigns, heirs, executors, administrators, and legal representatives of the undersigned and will not be affected by, and will survive, the death or incapacity of the undersigned; and

- understands and acknowledges that only the latest-received properly completed Ballot cast and actually received by the Solicitation Agent prior to the Voting Deadline with respect to its eligible voting Claims set forth in Item 1 on the Ballot will be counted, and, if any other Ballot has been previously cast with respect to such Claims set forth in Item 1 on the Ballot, such other Ballot shall be deemed revoked.

(b)    Releases.

Each Ballot provides that if the Holder timely returns a Ballot and votes to accept the Amended Plan for any Class of Claims for which such Holder is eligible to vote and affirmatively opts into the releases provided in the Amended Plan on such Holder's Ballot (regardless of whether the Holder timely returns a Ballot to reject the Amended Plan with respect to any other Class of Claims), they will be deemed as of the Plan Effective Date, to have conclusively, absolutely, unconditionally, irrevocably and forever released and discharged the Released Parties (as defined in the Amended Plan) from any and all Claims and Causes of Action (as set forth in the Amended Plan), except as otherwise provided in the Amended Plan.

**Holders of Claims in Classes eligible to vote on the Amended Plan are urged to consult the Amended Plan to understand the nature and scope of the releases they will be deemed to have granted if they vote to accept the Amended Plan and affirmatively opt in to the releases provided for under the Amended Plan.**

(c)    Gemini

Each Gemini Lender whose Gemini Borrowings were included in the Gemini Master Claim, thus entitling such Gemini Lender to vote as a Holder of a Claim in Class 7 against GGC as of the Voting Record Date shall receive the Solicitation Package (including the Gemini Lender's Ballot) from Gemini by email by the Solicitation Deadline or as soon as reasonably practicable thereafter. The Solicitation Agent has worked with Gemini to create E-Ballot ID(s) for each Holder of Gemini Lender Claims. Gemini, using the email address for such Holder of the Gemini Lender Claim in Gemini's records, will send instructions on how to obtain such Gemini Lender's unique E-Ballot ID by accessing such Gemini Lender's Gemini account for purposes of completing the Gemini Lender Ballot.

To be included in the tabulation, each individual Gemini Lender's Ballot must be **submitted electronically via the Gemini Lender Voting Portal** on or before the Voting Deadline. **The Voting Deadline is [January 10] 2023 at 4:00 P.M. (Prevailing Eastern Time). The Debtors strongly advise submitting your ballot online as promptly as possible.** If a Gemini Lender's Ballot is submitted electronically via the Gemini Lender Voting Portal after the Voting Deadline, it will not be counted unless the Debtors determine otherwise or as permitted by the Bankruptcy Court.

## C.    Voting Tabulation

Any single Ballot does not constitute, and shall not be deemed to be, a Proof of Claim or an assertion or admission of a Claim or Interest. Only Holders of Claims in the voting Classes shall be entitled to vote with regard to such Claims.

Unless the Debtors decide otherwise, Ballots received after the Voting Deadline may not be counted. Except as otherwise provided in the solicitation procedures, a Ballot will be deemed delivered only when the Solicitation Agent actually receives the executed Ballot as instructed in the Voting Instructions. No Ballot should be sent to the Debtors, the Debtors' agents (other than the Solicitation Agent) or the Debtors' financial or legal advisors. The Debtors expressly reserve the right to amend from time to time the terms of the Amended Plan (subject to compliance with the requirements of section 1127 of the Bankruptcy Code and the terms of the Amended Plan regarding modifications). The Bankruptcy Code may require the Debtors to disseminate additional Solicitation Packages if the Debtors make material changes to the terms of the Amended Plan or if the Debtors waive a material condition to Amended Plan Confirmation. In that event, the solicitation will be extended to the extent directed by the Bankruptcy Court. To the extent there are multiple Claims within Classes, the Debtors may, in their discretion, and to the extent possible, aggregate the Claims of any particular Holder within a Class for the purpose of counting votes.

In the event a designation of lack of good faith is requested by a party in interest under section 1126(e) of the Bankruptcy Code, the Bankruptcy Court will determine whether any vote to accept and/or reject the Amended Plan cast with respect to that Claim will be counted for purposes of determining whether the Amended Plan has been accepted and/or rejected.

The Solicitation Agent will file with the Bankruptcy Court, as soon as practicable after the Voting Deadline, the Voting Report prepared by the Solicitation Agent. The Voting Report shall, among other things, delineate every Ballot that does not conform to the Voting Instructions or that contains any form of irregularity (each, an "Irregular Ballot"), including, but not limited to, those Ballots that are late or (in whole or in material part) illegible, unidentifiable, lacking signatures or lacking necessary information or damaged. The Solicitation Agent will attempt to reconcile the amount of any Claim reported on a Ballot with the Debtors' records, but in the event such amount cannot be timely reconciled without undue effort on the part of the Solicitation Agent, the amount shown in the Debtors' records shall govern. The Voting Report also shall indicate the Debtors' intentions with regard to such Irregular Ballots. Neither the Debtors nor any other Person or Entity will be under any duty to provide notification of defects or irregularities with respect to delivered Ballots other than as provided in the Voting Report, nor will any of them incur any liability for failure to provide such notification.

## XIV.    RECOMMENDATION

The Debtors believe the Amended Plan is in the best interest of all creditors and urge the Holders of Claims entitled to vote to accept the Amended Plan and to evidence such acceptance by returning their Ballots so they will be received by the Solicitation Agent no later than [January 10], 2023 at 4:00 p.m. (prevailing Eastern Time).

Dated:  November 27, 2023.

Respectfully submitted,

Genesis Global Holdco LLC
(on behalf of itself and its Debtor Affiliates)

By:/s/ *A. Derar Islim*
    Name: A. Derar Islim
    Title: Interim Chief Executive Officer

Prepared by:

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**
1 Liberty Plaza
New York, New York 10006

Telephone:        (212) 225-2000
Facsimile:        (212) 225-3999

*Counsel for the Debtors and Debtors-in-Possession*

## <u>EXHIBIT A</u>

**Debtors' Amended Joint Chapter 11 Plan**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

---

### DEBTORS' AMENDED JOINT CHAPTER 11 PLAN

---

CLEARY GOTTLIEB STEEN & HAMILTON LLP
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

Dated: November 27, 2023

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

# TABLE OF CONTENTS

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION,
## COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms* ............................................................................................. 1
B.    *Rules of Interpretation* ............................................................................... 27
C.    *Computation of Time* .................................................................................. 28
D.    *Governing Law* ............................................................................................ 28
E.    *Reference to Monetary Figures* .................................................................. 29
F.    *Reference to the Debtors or the Wind-Down Debtors* ................................ 29
G.    *Controlling Document* ................................................................................ 29

## ARTICLE II.
## ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS

A.    *Administrative Expense Claims* .................................................................. 29
B.    *Professional Compensation* ........................................................................ 30
C.    *Priority Tax Claims* .................................................................................... 31
D.    *Statutory Fees* ............................................................................................. 32
E.    *Ad Hoc Group Restructuring Expenses* ..................................................... 32

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.    *Classification of Claims* ............................................................................. 32
B.    *Treatment of Claims Against and Interests in GGH* ................................... 35
C.    *Treatment of Claims Against and Interests in GGC* .................................... 40
D.    *Treatment of Claims Against and Interests in GAP* .................................... 45
E.    *Special Provision Governing Unimpaired or Reinstated Claims* ............... 49
F.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code* ............................................................................................................. 50
G.    *Elimination of Vacant Classes* ................................................................... 50
H.    *Voting Classes; Presumed Acceptance by Non-Voting Classes* ................. 50
I.    *Intercompany Interests* ............................................................................... 50
J.    *Controversy Concerning Impairment* ......................................................... 50
K.    *Subordinated Claims* .................................................................................. 50

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Wind-Down Debtors* .................................................................................... 51
B.    *Means for Implementation* .......................................................................... 58
C.    *GAP and GGC Intercompany Settlement* .................................................... 66
D.    *GGC and GGH Intercompany Settlement* .................................................... 67

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

| | | |
|---|---|---|
| A. | *Assumption and Rejection of Executory Contracts and Unexpired Leases* | 67 |
| B. | *Claims Based on Rejection of Executory Contracts or Unexpired Leases and Deadline by Which to File Proofs of Claim* | 68 |
| C. | *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases* | 68 |
| D. | *Indemnification Obligations* | 70 |
| E. | *Insurance Policies* | 70 |
| F. | *Modifications, Amendments, Supplements, Restatements, or Other Agreements* | 70 |
| G. | *Reservation of Rights* | 70 |
| H. | *Nonoccurrence of Effective Date* | 71 |

## ARTICLE VI.
## PROVISIONS GOVERNING DISTRIBUTIONS

| | | |
|---|---|---|
| A. | *Timing and Calculation of Amounts to Be Distributed* | 71 |
| B. | *Disbursing Agent and Gemini Distribution Agent.* | 71 |
| C. | *Delivery of Distributions and Undeliverable or Unclaimed Distribution* | 73 |
| D. | *Manner of Payment* | 75 |
| E. | *Compliance with Tax Requirements* | 75 |
| F. | *Foreign Currency Exchange Rate* | 76 |
| G. | *Surrender of Cancelled Instruments or Securities* | 76 |
| H. | *Allocations* | 76 |
| I. | *No Postpetition Interest on Claims* | 76 |
| J. | *Setoffs and Recoupment* | 77 |
| K. | *Claims Paid or Payable by Third Parties* | 77 |

## ARTICLE VII.
## PROCEDURES FOR RESOLVING CONTINGENT,
## UNLIQUIDATED, AND DISPUTED CLAIMS

| | | |
|---|---|---|
| A. | *Allowance of Claims* | 78 |
| B. | *Claims and Interests Administration Responsibilities* | 78 |
| C. | *Estimation of Claims* | 79 |
| D. | *Adjustment to Claims or Interests Without Objection* | 79 |
| E. | *Time to File Objections to Claims* | 79 |
| F. | *Disallowance of Claims* | 79 |
| G. | *Amendments to Claims* | 80 |
| H. | *No Distributions Pending Allowance* | 80 |
| I. | *Single Satisfaction of Claims* | 80 |

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

| | | |
|---|---|---|
| A. | *Compromise and Settlement of Claims, Interests, and Controversies* | 81 |
| B. | *Term of Injunctions or Stays* | 81 |
| C. | *Release of Liens* | 81 |
| D. | *Releases by the Debtors* | 82 |

E.    *Releases by Releasing Parties* ........................................................................ 83
F.    *Exculpation* ..................................................................................................... 85
G.    *Injunction* ........................................................................................................ 85
H.    *Additional Provisions Regarding Governmental Units* ................................. 86
I.     *Protection Against Discriminatory Treatment* ............................................... 87
J.     *Recoupment* ..................................................................................................... 87
K.    *Reimbursement or Contribution* ..................................................................... 87
L.     *Document Retention* ........................................................................................ 87

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date* .................................................... 88
B.    *Waiver of Conditions* ...................................................................................... 89
C.    *Substantial Consummation* ............................................................................. 89
D.    *Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective
       Date* .................................................................................................................. 89

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.    *Modification and Amendments* ........................................................................ 90
B.    *Effect of Confirmation on Modifications* ........................................................ 90
C.    *Revocation or Withdrawal of the Plan* ........................................................... 90

## ARTICLE XI.
## RETENTION OF JURISDICTION

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.    *Immediate Binding Effect* ................................................................................ 93
B.    *Additional Documents* ..................................................................................... 93
C.    *Reservation of Rights* ...................................................................................... 94
D.    *Successors and Assigns* ................................................................................... 94
E.    *Service of Documents* ...................................................................................... 94
F.    *Entire Agreement* ............................................................................................ 95
G.    *Exhibits* ............................................................................................................ 95
H.    *Nonseverability of Plan Provisions* ............................................................... 95
I.     *Votes Solicited in Good Faith* ......................................................................... 96
J.     *Request for Expedited Determination of Taxes* .............................................. 96
K.    *Closing of Chapter 11 Cases* .......................................................................... 96
L.     *No Stay of Confirmation Order* ...................................................................... 96
M.   *Waiver or Estoppel* .......................................................................................... 97
N.    *Dissolution of the Committee* .......................................................................... 97

iii

**THE PLAN IS THE PRODUCT OF EXTENSIVE AND ONGOING NEGOTIATION AMONG THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, GEMINI, AND THE AD HOC GROUP OF GENESIS LENDERS, AND REFLECTS SUBSTANTIAL AGREEMENT ON CERTAIN KEY ISSUES. HOWEVER, DISCUSSIONS AMONG SUCH PARTIES REMAIN ONGOING. FOR THE AVOIDANCE OF DOUBT, AS OF THE DATE HEREOF, EACH OF THE DEBTORS, THE COMMITTEE, GEMINI, AND THE AD HOC GROUP RESERVE ALL RIGHTS WITH RESPECT TO THE PLAN.**

## INTRODUCTION

Genesis Global Holdco, LLC and its affiliated debtors, as Debtors and debtors-in-possession in the above-captioned chapter 11 cases, jointly propose this amended chapter 11 plan for the resolution of outstanding Claims against, and Interests in, the Debtors. Although proposed jointly for administrative purposes, the Plan constitutes a separate Plan for each Debtor for the resolution of outstanding Claims against, and Interests in, such Debtor. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in Article I.A of the Plan or the Bankruptcy Code or Bankruptcy Rules. Holders of Claims and Interests should refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, Assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of the Plan. The Debtors are the proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code.

**ALL HOLDERS OF CLAIMS WHO ARE ELIGIBLE TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THE PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.**

## ARTICLE I.
## DEFINED TERMS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW

A.    *Defined Terms*

As used in the Plan, capitalized terms have the meanings set forth below.

1.    "***3AC***" means Three Arrows Capital, Ltd. and any of its Affiliates.

2.    "***3AC/Genesis Settlement Agreement***" means that certain Settlement Agreement and Release substantially in the form attached as Exhibit B to the *Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) for Entry of an Order Approving Settlement Agreement with the Joint Liquidators of Three Arrows Capital, Ltd.* [Docket No. 906].

3.    "***3AC Claims***" means, collectively, any Claims asserted by, or on behalf of, 3AC against a Debtor, including any alleged preference and other avoidance and related claims.

1

4.      "***Ad Hoc Group***" means the ad hoc group of creditors of GGC represented by Proskauer Rose LLP, which ad hoc group of creditors is comprised of members purporting to hold no less than $2.3 billion in Claims asserted against GGC as of October 20, 2023.

5.      "***Ad Hoc Group Acceptance Event***" means members of the Ad Hoc Group holding at least $1.5 billion of the Claims asserted against GGC have agreed, in writing, to support the Plan and not object to the Plan or commence any litigation in respect of the Plan.

6.      "***Ad Hoc Group Counsel***" means Proskauer Rose LLP.

7.      "***Ad Hoc Group Restructuring Expenses***" means, subject to the terms and conditions of the existing fee reimbursement letters executed by the Debtors, all accrued, but unpaid, documented fees and expenses of the Ad Hoc Group Counsel in connection with the Restructuring.

8.      "***Ad Hoc Group SteerCo***" means the steering committee of the Ad Hoc Group, the composition of which may be modified from time to time.

9.      "***Ad Hoc Group's Consent***" means the consent of the Ad Hoc Group SteerCo (which consent shall not be unreasonably withheld, conditioned, or delayed); *provided* that, with respect to any matter conditioned on the Ad Hoc Group's Consent pursuant to the Plan, the Ad Hoc Group's Consent shall be deemed granted to the extent the Ad Hoc Group SteerCo, through the Ad Hoc Group Counsel, has received written notice of such matter and the Ad Hoc Group SteerCo has not, within five (5) Business Days of the Ad Hoc Group Counsel's receipt of such notice, objected in writing to the Person requesting the Ad Hoc Group's Consent as to such matter; *provided*, *however*, that, notwithstanding anything to the contrary in the Plan, the Ad Hoc Group shall have no consent rights with respect to any matter relating to any of the Definitive Documents unless the Ad Hoc Group Acceptance Event has occurred and is continuing.

10.      "***Additional GBTC Shares***" means 31,180,804 GBTC shares held by the Debtors, against which Gemini asserts a security interest on behalf of the Gemini Lenders.

11.      "***Additional GBTC Shares Reserve***" means the amount of Additional GBTC Shares that is required to be held in reserve by the Debtors until the Gemini Additional Collateral Determination has occurred, the amount of which shall be established prior to the Effective Date by (i) the Debtors and Gemini, with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), or (ii) an order of the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part; *provided* that, prior to seeking a judicial determination pursuant to foregoing clause (ii), the Debtors and Gemini shall have engaged in good faith negotiations with respect to the Additional GBTC Shares Reserve, and the Committee and the Ad Hoc Group shall have been given the opportunity to contemporaneously participate in such negotiations, through the date that is ten (10) days prior to the Voting Deadline; *provided*, *however*, that any determination by the Bankruptcy Court in accordance with clause (ii) above shall be limited to the amount of the Additional GBTC Shares Reserve during the pendency of the Gemini Additional Collateral Determination.

12.    "*Administrative Expense Claim*" means any Claim for costs and expenses of administration of the Debtors' Estates pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including (i) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Debtors' Estates and operating the Debtors' businesses; (ii) Allowed Professional Fee Claims; (iii) all Allowed requests for compensation or expense reimbursement for making a substantial contribution in the Chapter 11 Cases pursuant to sections 503(b)(3), (4), and (5) of the Bankruptcy Code; and (iv) if the Ad Hoc Group Acceptance Event has occurred and is continuing, (a) the Ad Hoc Group Restructuring Expenses and (b) the Dollar Group Restructuring Fees and Expenses.

13.    "*Administrative Expense Claims Bar Date*" means the deadline for Filing requests for payment of Administrative Expense Claims, which: (i) with respect to Administrative Expense Claims other than Professional Fee Claims, shall be thirty (30) days after the Effective Date; and (ii) with respect to Professional Fee Claims, shall be sixty (60) days after the Effective Date.

14.    "*Affiliate*" shall have the meaning set forth in section 101(2) of the Bankruptcy Code when used in reference to a Debtor, and when used in reference to an Entity other than a Debtor, means any other Entity that directly or indirectly wholly-owns or controls such Entity other than a Debtor, or any other Entity that is directly or indirectly wholly-owned or controlled by such Entity other than a Debtor.

15.    "*Alameda/Genesis Settlement Agreement*" means that certain Settlement Agreement and Release substantially in the form attached as Exhibit B to the *Genesis Debtors' Motion Pursuant to Federal Rule of Bankruptcy Procedure 9019(a) for Entry of an Order Approving Settlement Agreement with FTX Debtors* [Docket No. 603], which was approved by the Bankruptcy Court in the Alameda/Genesis Settlement Order, pursuant to which, among other things, Alameda Research Ltd. holds a single Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GGC in the aggregate amount of $175,000,000, the treatment of which for all purposes under the Plan shall be on the terms and conditions set forth in the Alameda/Genesis Settlement Agreement.

16.    "*Alameda/Genesis Settlement Order*" means that certain *Order Approving the Settlement Agreement Between the Genesis Entities and the FTX Entities* [Docket No. 806].

17.    "*Allowed*" means, with reference to any Claim or Interest, except as otherwise provided herein, (i) (a) any Claim or Interest arising on or before the Effective Date that is either (x) evidenced by a Proof of Claim or Interest that is, as applicable, timely Filed by the applicable Claims Bar Date, or (y) a Claim or Interest that is listed in the Schedules as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim has been timely Filed by the applicable Claims Bar Date, and (b) as to which no objection to allowance has been interposed within the time period set forth in the Plan and such Claim or Interest is not Disputed or as to which any objection has been determined by a Final Order of the Bankruptcy Court to the extent such objection is determined in favor of the respective Holder or (ii) any Claim or Interest expressly allowed under the Plan or by a Final Order of the Bankruptcy Court; *provided* that, notwithstanding the foregoing, no Claim of any Entity subject to section 502(d) of the Bankruptcy Code shall be deemed Allowed unless and until such Entity pays in full the amount that it owes to

3

the applicable Debtor or Wind-Down Debtor; *provided further* that any setoff exercised pursuant to Article IV.B.16 of the Plan shall be taken into account when calculating the extent to which any Claim is Allowed.

18.     "*Alt-Coin*" means a type of Digital Asset that is not BTC, ETH, or a Stablecoin.

19.     "*Alt-Coin-Denominated Unsecured Claim*" means a General Unsecured Claim arising from or related to one or more master loan agreements or other instruments of indebtedness with GGC or GAP, as applicable, other than a Gemini Lender Claim, that is denominated in an Alt-Coin.

20.     "*Assets*" means all of the Debtors' property, rights, and interests that are property of the Estates pursuant to section 541 of the Bankruptcy Code.

21.     "*Average Price*" means the average price in U.S. dollars of the applicable type of Distributable Asset or the applicable GBTC shares or ETHE shares during the period commencing fifteen (15) calendar days prior to the entry of the Confirmation Order and ending fifteen (15) calendar days following the entry of the Confirmation Order.

22.     "*Avoidance Actions*" means any and all actual or potential avoidance, recovery, subordination, or other similar Claims, Causes of Action, or remedies that may be brought by or on behalf of the Debtors or their Estates or other authorized parties in interest under the Bankruptcy Code or applicable non-bankruptcy law, including Claims, Causes of Action, or remedies arising under chapter 5 of the Bankruptcy Code, or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws.

23.     "*Avoidance Recoveries*" means any proceeds arising from Avoidance Actions, including the proceeds from any settlements thereof.

24.     "*Ballots*" means the ballots, with respect to which the Debtors shall have obtained the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing as of the entry of the Disclosure Statement Order), approved pursuant to the Disclosure Statement Order and distributed to Holders of Impaired Claims entitled to vote on the Plan upon which such Holders shall, among other things, indicate their acceptance or rejection of the Plan in accordance with the Plan and the procedures governing the solicitation process.

25.     "*Bankruptcy Code*" means title 11 of the United States Code, as amended and in effect during the pendency of the Chapter 11 Cases.

26.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases and, to the extent of any withdrawal of the reference made under section 157(d) of title 28 of the United States Code, the United States District Court for the Southern District of New York.

27.     "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure promulgated under section 2075 of the Judicial Code and the general, local, and chambers rules of the Bankruptcy Court, in each case, as amended from time to time.

28.     "*Bar Date Order*" means the *Order (I) Establishing Bar Dates for Submitting Proofs of Claim, (II) Approving Proof of Claim Form, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Supplemental Relief* [Docket No. 200], which set the Claims Bar Date and the Governmental Bar Date.

29.     "*BCH*" means Bitcoin Cash, a Digital Asset that is a fork of BTC created in 2017.

30.     "*Bidding Procedures*" means the procedures governing the Sale Process approved in the *Order Authorizing the Debtors' Motion Seeking Entry of an Order (I) Approving the Bidding Procedures and Related Deadlines, (II) Scheduling Hearings and Objection Deadlines with Respect to the Debtors' Sale, and (III) Granting Related Relief* [Docket No. 192], as such procedures may be modified in accordance with their terms.

31.     "*BTC*" means bitcoin, a type of Digital Asset based on an open-source cryptographic protocol that was introduced in 2009 by an anonymous developer or group of developers using the name Satoshi Nakamoto.

32.     "*BTC-Denominated Unsecured Claim*" means a General Unsecured Claim arising from or related to one or more master loan agreements or other instruments of indebtedness with GGC or GAP, as applicable, other than a Gemini Lender Claim, that is denominated in BTC.

33.     "*Business Day*" means any day other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

34.     "*Cash*" or "*$*" means the legal tender of the United States of America or the equivalents thereof, including bank deposits, checks, and other similar items.

35.     "*Cause of Action*" means, whether asserted against a Debtor or any other Person or Entity, any action, claim, cause of action, controversy, third-party claim, dispute, proceeding, demand, right, action, Lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, account, defense, remedy, power, privilege, license, and franchise of any kind or character whatsoever, whether known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively, whether arising before, on, or after the Petition Date, in contract, in tort, in law, or in equity or pursuant to any other theory of law.  For the avoidance of doubt, a "Cause of Action" includes: (i) any right of setoff, counterclaim, or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (ii) any claim based on or relating to, or in any manner arising from, in whole or in part, tort, breach of fiduciary duty, or violation of state or federal law, including securities laws, negligence, and gross negligence; (iii) the right to object to or otherwise contest, recharacterize, reclassify, subordinate, or disallow Claims or Interests; (iv) any Claim pursuant to section 362 or chapter 5 of the

5

Bankruptcy Code (including any action under section 542 of the Bankruptcy Code or any Avoidance Actions); (v) any claim or defense including fraud, mistake, duress, and usury, and any other defenses set forth in section 558 of the Bankruptcy Code; and (vi) any state or foreign law fraudulent transfer or similar claim.

36.      "*Chapter 11 Cases*" means each individual case or the jointly administered cases pending under chapter 11 of the Bankruptcy Code for each individual Debtor or the Debtors, as applicable, in the Bankruptcy Court.

37.      "*Claim*" shall have the meaning set forth in section 101(5) of the Bankruptcy Code, against any Debtor.

38.      "*Claims Bar Date*" means such time and date established pursuant to the Bar Date Order by which Proofs of Claim must be Filed for all Claims and Interests (other than for Administrative Expense Claims and Claims held by Governmental Units).

39.      "*Claims Objection Deadline*" means the deadline for objecting to a Claim against a Debtor, which shall be on the date that is the later of (i) one hundred eighty (180) days after the Effective Date, (ii) ninety (90) days after the Filing of a Proof of Claim, (iii) such other period of limitation as may be fixed by the Plan, the Confirmation Order, the Bankruptcy Rules, or a Final Order for objecting to a Claim, or (iv) such other date as is established by (a) if such date is on or prior to the date that is one (1) year after the Effective Date, the filing of a notice by the Wind-Down Debtors prior to the then-current Claims Objection Deadline or (b) if such date is after the date that is one (1) year after the Effective Date, an order of the Bankruptcy Court following the filing of a motion by the Wind-Down Debtors prior to the then-current Claims Objection Deadline.

40.      "*Claims Register*" means the official register of Claims against and Interests in the Debtors maintained by the Solicitation Agent or the clerk of the Bankruptcy Court.

41.      "*Claims Reserve*" means, with respect to each Debtor, a reserve to be established by the Debtors on or before the Effective Date and comprised of Cash (or, at the option of the Debtors in the case of Secured Claims that are secured by Digital Assets, Digital Assets) in the amount of the applicable Claims Reserve Amount, less any portion of such amount that is distributed on the Effective Date pursuant to the Plan, which reserve shall vest in the applicable Wind-Down Debtor as of the Effective Date.

42.      "*Claims Reserve Amount*" means, with respect to each Debtor, the sum of (i) the applicable Priority Claims Reserve Amount, (ii) the applicable Secured Claims Reserve Amount, and (iii) the estimated aggregate face amount of accrued but unpaid Administrative Expense Claims (excluding Professional Fee Claims) against such Debtor as of the Effective Date.

43.      "*Class*" means a category of Claims against or Interests in the Debtors, pursuant to section 1122(a) of the Bankruptcy Code, as set forth in Article III of the Plan.

44.      "*Committee*" means the official committee of unsecured creditors of the Debtors appointed in the Chapter 11 Cases by the U.S. Trustee on February 3, 2023, as described in further detail in the *Notice of Appointment of Official Committee of Unsecured Creditors* [Docket No. 53].

45.     "***Committee Counsel***" shall mean White & Case LLP, in its capacity as counsel to the Committee.

46.     "***Committee's Consent***" means the consent of the Committee (which consent shall not be unreasonably withheld, conditioned, or delayed); *provided* that, with respect to any matter conditioned on the Committee's Consent pursuant to the Plan, the Committee's Consent shall be deemed granted to the extent the Committee has received written notice of such matter and has not, within five (5) Business Days of the Committee's receipt of such notice, objected in writing to the Person requesting the Committee's Consent as to such matter.

47.     "***Confirmation***" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

48.     "***Confirmation Date***" means the date upon which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases, within the meaning of Bankruptcy Rules 5003 and 9021.

49.     "***Confirmation Hearing***" means the hearing held by the Bankruptcy Court to consider Confirmation of the Plan pursuant to section 1128(a) of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

50.     "***Confirmation Order***" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code, with respect to which the Debtors shall have obtained (i) the Committee's Consent, (ii) the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing as of the entry of such order), and (iii) solely to the extent that (a) the treatment of Gemini Lender Claims, (b) the provisions with respect to the Additional GBTC Shares or the Gemini GBTC Shares, or (c) the Gemini Distribution Agent's role pursuant to the Confirmation Order is not consistent with the terms set forth in the Plan (including the Distribution Principles), Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing as of the entry of such order).

51.     "***Consummation***" means the occurrence of the Effective Date.

52.     "***Cure Claim***" means a monetary Claim based upon a Debtor's defaults under an Executory Contract or Unexpired Lease at the time such contract or lease is assumed by such Debtor pursuant to section 365 of the Bankruptcy Code.

53.     "***Cure Notice***" means a notice of a proposed amount, including an amount of $0.00, to be paid on account of a Cure Claim in connection with an Executory Contract or Unexpired Lease to be assumed under the Plan pursuant to section 365 of the Bankruptcy Code, which notice shall include (i) procedures for objecting to proposed assumptions of Executory Contracts and Unexpired Leases, (ii) Cure Claims to be paid in connection therewith, and (iii) procedures for resolution by the Bankruptcy Court of any related disputes; *provided* that, if no Cure Claim is listed for any assumed Executory Contract or Unexpired Lease, the Cure Claim shall be $0.00.

54.     "***D&O Liability Insurance Policies***" means all unexpired directors', managers', and officers' liability insurance policies (including any "tail policy") maintained by any of the

Debtors with respect to directors, managers, officers, and employees of the Debtors and any agreements, documents, and instruments related thereto.

55.     "*DCG*" means Digital Currency Group, Inc.

56.     "*DCG Claim*" means any Claim asserted by, or on behalf of, any of the DCG Parties.

57.     "*DCG Loans*" means, collectively, those certain loans, and all obligations of DCG thereunder, issued under a certain Amended and Restated Master Loan Agreement (as amended, restated, modified, or supplemented thereto) dated November 10, 2022 between GGC (as lender) and DCG (as borrower), including (i) that certain loan issued under a loan term sheet originally dated January 24, 2022, as amended by the loan term sheet dated as of November 10, 2022, in the initial principal amount of $100 million and current principal amount of $41.5 million due May 11, 2023, (ii) that certain loan issued under a loan term sheet originally dated February 23, 2022, as amended by the loan term sheet dated as of November 10, 2022, in the principal amount of $100 million due on May 11, 2023, (iii) that certain loan issued under a loan term sheet dated May 9, 2022 in the principal amount of $200 million due on May 9, 2023, and (iv) that certain loan issued under a loan term sheet dated May 10, 2022 in the principal amount of $100 million due May 10, 2023.

58.     "*DCG Note*" means that certain unsecured $1.1 billion promissory note, dated as of June 30, 2022 and due on June 30, 2032, issued by DCG to GGC with an interest rate of one percent (1%) per annum, which interest, per the terms of the DCG Note, may be paid in kind at DCG's option.

59.     "*DCG Parties*" means, collectively, DCG, DCGI, and each of their respective Affiliates and subsidiaries (excluding the Debtors and the Other Genesis Entities) and, in their capacities as such, all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustee, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, and management companies; *provided* that DCG Parties shall not include any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date.

60.     "*DCG Tax Receivable*" means any receivable relating to taxes that is owed by any DCG Party to any Debtor.

61.     "*DCGI*" means DCG International Investments Ltd.

62.     "*DCGI Loans*" means, collectively, (i) that certain loan issued under a certain Master Loan Agreement (as amended, restated, modified, or supplemented thereto) dated June 21, 2019 and loan term sheet originally dated June 22, 2022, as amended by the loan term sheet dated November 10, 2022, by and between GGC (as lender) and DCGI (as borrower) due on May 11, 2023 in the initial principal amount of 4,550.45173345 BTC and current principal amount of 3,990.90560624 BTC, (ii) that certain term loan dated September 21, 2020 with a principal amount

equal to 8,948 BCH, and (iii) that certain term loan dated December 21, 2020 with a principal amount equal to 5,107 BCH, in each case, including all obligations of DCGI thereunder.

63.    "*Debtors*" means, collectively, GGH, GGC, and GAP.    Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors from and after the Effective Date shall mean the Wind-Down Debtors to the extent context requires.

64.    "*Debtors' Fiduciary Duty Action*" means any action that a Debtor takes, or refrains from taking, with ten (10) calendar days advance notice to and in consultation with the Committee and the Ad Hoc Group SteerCo, upon the good faith determination by the Special Committee, upon the advice of counsel, that fiduciary obligations of such Debtor under applicable law require such Debtor to take or refrain from taking such action.

65.    "*Definitive Documents*" means: (i) the Plan (and any and all exhibits, annexes, and schedules thereto); (ii) the Confirmation Order; (iii) the Disclosure Statement and all other solicitation materials with respect to the Plan; (iv) the Disclosure Statement Order; (v) the Plan Supplement; (vi) the New Governance Documents; (vii) the Plan Administration Agreement; (viii) the Litigation Oversight Committee Bylaws and the Wind-Down Oversight Committee Bylaws; (ix) the Alameda/Genesis Settlement Agreement, (x) the Turnover Actions; (xi) any new material employment, consulting, or similar agreements; (xii) all documentation with respect to any post-emergence management incentive plan; and (xiii) any and all other deeds, agreements, filings, notifications, pleadings, orders, certificates, letters, instruments, or other documents reasonably desired or necessary to consummate and document the transactions contemplated by the Restructuring (including any exhibits, amendments, modifications, or supplements made from time to time thereto).

66.    "*Digital Asset*" means a digital currency or crypto asset in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by a centralized authority, including Stablecoins, digital coins, and tokens, such as security tokens, utility tokens, nonfungible tokens, and governance tokens.

67.    "*Digital Assets Conversion Table*" means the conversion table showing Digital Asset values in their equivalent U.S. dollar values using the price of the applicable Digital Asset as of 11:11 p.m. (prevailing Eastern time) on the Petition Date, the form of which shall be included in the Plan Supplement.

68.    "*Disallowed*" means any Claim or Interest, or any portion thereof, that: (i) has been disallowed by Final Order, settlement, the Plan, or Confirmation; (ii) is listed on the Schedules at an amount of $0.00 or as contingent, disputed, or unliquidated and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order; or (iii) is not listed on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely Filed or deemed timely Filed with the Bankruptcy Court pursuant to the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Bar Date Order; *provided*, *however*, that a Disputed Claim shall not be considered Disallowed until so determined by entry of a Final Order.

9

69.     "*Disbursing Agent*" means the PA Officer or the Entity or Entities selected by the PA Officer, with the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing as of the entry of such order) and the Committee's Consent with respect to distributions made on the Effective Date, and thereafter the consent of the Wind-Down Oversight Committee, to make or facilitate distributions pursuant to the Plan.

70.     "*Disclosure Statement*" means the disclosure statement with respect to the Plan, as may be amended, supplemented, or modified from time to time, subject to the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing as of the entry of such order).

71.     "*Disclosure Statement Order*" means the order (and all exhibits thereto) entered by the Bankruptcy Court approving the Disclosure Statement and the Solicitation Materials, and allowing solicitation of the Plan to commence (as amended, modified, or supplemented from time to time in accordance with the terms thereof), subject to the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing as of the entry of such order).

72.     "*Disputed*" means, with respect to any Claim or Interest, that such Claim or Interest (or a portion thereof) (i) is not yet Allowed, (ii) is not Disallowed by the Plan, the Bankruptcy Code, or a Final Order, as applicable, (iii) as to which a dispute is being adjudicated by a court of competent jurisdiction in accordance with non-bankruptcy law, or (iv) is or is hereafter listed in the Schedules as contingent, unliquidated, or disputed and for which a Proof of Claim is or has been timely Filed in accordance with the Bar Date Order.

73.     "*Distributable Assets*" means, in accordance with and pursuant to the Distribution Principles, for each Debtor or Wind-Down Debtor, after the Debtors have made the Required Reserve Payments, such Debtor's or Wind-Down Debtor's (i) Cash, (ii) Digital Assets, and (iii) to the extent allocated to such Debtor or Wind-Down Debtor in the discretion of the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), or, following the Effective Date, the discretion of the PA Officer, (a) Avoidance Recoveries, including any and all Causes of Action or other claims against any of the DCG Parties or Gemini Parties, (b) proceeds from the Partial Repayment Agreement, (c) proceeds from any Monetization Transactions (other than those allocated to GGT and with respect to a Monetization Transaction performed by the Gemini Distribution Agent to the extent permitted under the Plan, only for the benefit of the Holders of Allowed Gemini Lender Claims), and (d) proceeds from the DCG Loans, the DCGI Loans, the DCG Note, the DCG Tax Receivables, and any and all Causes of Action or other claims against any of the DCG Parties, including the proceeds from any settlements thereof; *provided*, *however*, that Digital Assets shall only constitute Distributable Assets (x) on the Effective Date if the Debtors determine, no later than seven (7) Business Days prior to the Effective Date, and in consultation with the Committee and the Ad Hoc Group SteerCo, after considering legal, financial, tax, and other factors in good faith, that such Digital Assets are available for distribution to Holders of Allowed Claims or Interests on the Effective Date or (y) at any time after the Effective Date if the PA Officer determines, with the Wind-Down Oversight Committee's Consent, and after considering legal, financial, tax, and other factors in good faith, that such Digital Assets held by such Wind-Down Debtor are available for

distribution to Holders of Allowed Claims or Interests as provided for under the Plan; *provided*, *however*, that, if the Committee or Ad Hoc Group SteerCo disagrees with the Debtors on whether any Digital Assets held by a Debtor should constitute Distributable Assets of such Debtor on the Effective Date, the Committee or the Ad Hoc Group SteerCo may seek a determination from the Bankruptcy Court on an expedited basis.

74.    "*Distribution Date*" means, except as otherwise set forth herein, the date or dates determined by the Wind-Down Debtors or the PA Officer on or after the Effective Date upon which the Disbursing Agent shall make distributions to Holders of Allowed Claims or Allowed Interests entitled to receive distributions under the Plan.

75.    "*Distribution Principles*" means the distribution mechanics described in Exhibit A attached to the Plan, which shall be subject to in all respects (i) the Committee's Consent, (ii) the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), and (iii) solely to the extent that (a) the treatment of Gemini Lender Claims, (b) the provisions with respect to the Additional GBTC Shares or the Gemini GBTC Shares, or (c) the Gemini Distribution Agent's role pursuant to the Distribution Principles is not consistent with the terms set forth in the Plan, Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing).

76.    "*Distribution Record Date*" means the record date for purposes of determining which Holders of Allowed Claims against or Allowed Interests in the Debtors are eligible to receive distributions under the Plan, which date shall be the Effective Date or such other date announced by the Debtors (in consultation with the Committee and the Ad Hoc SteerCo, the PA Officer (in consultation with the Wind-Down Oversight Committee), or as designated in a Final Order.

77.    "*Dollar Group Counsel*" means Pryor Cashman LLP.

78.    "*Dollar Group Restructuring Fees and Expenses*" means all accrued, but unpaid, documented fees and expenses of the Dollar Group Counsel in connection with the Restructuring.

79.    "*Effective Date*" means the date on which: (i) no stay of the Confirmation Order is in effect; (ii) all conditions precedent specified in Article IX hereof have been satisfied or waived (in accordance with Article IX.B hereof); and (iii) the Plan is declared effective in accordance with its terms; *provided*, *however*, that, if such date does not occur on a Business Day, the Effective Date shall be deemed to occur on the first Business Day after such date.

80.    "*Enjoined Actions*" has the meaning set forth in Article VIII.G of the Plan.

81.    "*Entity*" shall have the meaning set forth in section 101(15) of the Bankruptcy Code.

82.    "*Equity Security*" means an "equity security" as defined in section 101(16) of the Bankruptcy Code.

83. "***Estate***" means, as to each Debtor, the estate created for the Debtor in its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

84. "***ETH***" means ether, the native Digital Asset of the Ethereum blockchain, as described in https://ethereum.org/en/what-is-ethereum/.

85. "***ETH-Denominated Unsecured Claim***" means a General Unsecured Claim against GGC or GAP, as applicable, other than a Gemini Lender Claim, that is denominated in ETH.

86. "***ETHE***" means that certain Grayscale Ethereum Trust, a trust managed and operated by DCG.

87. "***Exchange Act***" means the Securities Exchange Act of 1934, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, or any similar federal, state, or local law.

88. "***Excluded Claim***" means (i) any claim, Cause of Action, or other item expressly provided for or preserved in this Plan and (ii) any claim for intercompany amounts (including any amounts owed between a Debtor and a subsidiary of GGH that is not a Debtor) as set forth in a schedule to be Filed as an exhibit to the Plan Supplement.

89. "***Exculpated Party***" means (i) the Debtors, (ii) the Wind-Down Debtors, (iii) the Committee and its members (solely in their capacities as such), (iv) the members of the Ad Hoc Group SteerCo (solely in their capacities as such) if the Ad Hoc Group Acceptance Event has occurred and is continuing, (v) the PA Officer (solely in its capacity as such), (vi) the members of the Wind-Down Oversight Committee (solely in their capacities as such), (vii) the members of the Litigation Oversight Committee (solely in their capacities as such), (viii) the Gemini Distribution Agent (solely in its capacity as such and solely to the extent that the Gemini Distribution Agent is implementing the Plan), and (ix) each Related Party of each Entity described in the foregoing clauses (i)–(viii) (in each case, solely in such Person's capacity as such); *provided* that the Related Parties of the Gemini Distribution Agent shall only be Exculpated Parties in respect of actions that are directly in furtherance of the performance by the Gemini Distribution Agent of its duties expressly outlined under the Plan; *provided further* that, notwithstanding anything to the contrary in the Plan, the DCG Parties shall not be Exculpated Parties and the former employees, officers, and directors of the Debtors who did not serve as employees, officers, or directors of the Debtors as of the Petition Date shall not be Exculpated Parties; *provided still further* that any of the current and former employees, officers, and directors of the Debtors (solely in such Person's capacity as such) who served as employees, officers, or directors of the Debtors as of the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date, shall be an Exculpated Party only with the written consent of the Special Committee, which shall be disclosed in the Plan Supplement, with the exception of (x) the members of the Special Committee (solely in their capacities as such), who shall be Exculpated Parties without the need for such consent, and (y) any current and former employees, officers, and directors of the Debtors who served as employees, officers, or directors of the Debtors as of the Petition Date and are or were also DCG Parties, who shall not be Exculpated Parties.

12

90.  "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

91.  "*Federal Judgment Rate*" means the federal judgment rate in effect pursuant to 28 U.S.C. § 1961 as of the Petition Date, compounded annually.

92.  "*Fiat-or-Stablecoin-Denominated Unsecured Claim*" means a General Unsecured Claim against GGC or GAP, as applicable, other than a Gemini Lender Claim, that is denominated in Cash, Foreign Currency, or a Stablecoin.

93.  "*File*," "*Filed*," or "*Filing*" means file, filed, or filing in the Chapter 11 Cases with the Bankruptcy Court or, with respect to the filing of a Proof of Claim, the Solicitation Agent or the Bankruptcy Court through the PACER or CM/ECF website.

94.  "*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

95.  "*Final Order*" means an order or judgment of the Bankruptcy Court or another a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court, which is in full force and effect and has not been reversed, vacated, stayed, modified, or amended and as to which (i) the time to appeal, petition for writ of certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for writ of certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending, or (ii) if an appeal, writ of certiorari, new trial, reargument, or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which such order was appealed, or writ of certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for writ of certiorari, or move for a new trial, reargument, or rehearing shall have expired; *provided, however*, for the avoidance of doubt, an order or judgment that is subject to appeal shall not constitute a Final Order even if a stay of such order or judgment pending resolution of the appeal has not been obtained; and, *provided, further*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under Rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be filed with respect to such order or judgment.

96.  "*Foreign Currency*" means, any government-issued currency other than Cash and, solely for purposes of the Plan, not including any Digital Assets.

97.  "*GAP*" means Genesis Asia Pacific Pte. Ltd.

98.  "*GAP/GGC Settlement*" means the compromise, settlement, and resolution of Intercompany Claims by and between GAP and GGC pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as provided in Article IV.C of the Plan.

99.  "*GBTC*" means that certain Grayscale Bitcoin Trust, a trust managed and operated by DCG.

100.    "*Gemini*" means Gemini Trust Company, LLC.

101.    "*Gemini Acceptance Event*" means Gemini has agreed, in writing prior to the Confirmation Hearing, to (i) support the Plan, (ii) not object to, delay, impede, or take any other action that interferes with acceptance or implementation of the Plan, and (iii) encourage the Gemini Lenders to vote to accept the Plan.

102.    "*Gemini Additional Collateral Determination*" means the entry of an order by the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part, or that has become a Final Order determining whether Gemini, on behalf of the Gemini Lenders, has a valid security interest in or constructive trust over the Additional GBTC Shares.

103.    "*Gemini Asset Value*" means the sum of the value of (i) solely to the extent that the Gemini GBTC Shares Determination determines that Gemini, on behalf of the Gemini Lenders, has a valid security interest in the Gemini GBTC Shares, the Gemini GBTC Shares, as determined by the Gemini Deficiency Claim Determination, (ii) the Gemini Reserved Coins using the Average Price, as determined by the Debtors in good faith and with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), (iii) the Gemini Earn Operations Assets using the Average Price, as determined by the Debtors in good faith and with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), and (iv) solely to the extent that the Gemini Additional Collateral Determination determines that Gemini, on behalf of the Gemini Lenders, has a valid security interest in or constructive trust over the Additional GBTC Shares, the Additional GBTC Shares; *provided*, *however*, that the value of the Gemini Reserved Coins shall be excluded from the calculation of the Gemini Asset Value if (x) mutually agreed in writing by Gemini and the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), or (y) the Bankruptcy Court enters an order determining that the value of the Gemini Reserved Coins is not included in the amount of the Allowed Gemini Lender Claims and such order has not been stayed or vacated.

104.    "*Gemini Deficiency Claim Determination*" means, solely if the Gemini GBTC Determination results in the entry of an order providing that the Gemini GBTC Shares are not property of GGC or are not recoverable by GGC on account of any Avoidance Actions, the entry of an order by the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part, or that has become a Final Order determining the value of the Gemini GBTC Shares (and any counterclaims or defenses thereto) for purposes of determining the Gemini Asset Value and making distributions to Holders of Allowed General Unsecured Claims under the Plan.

105.    "*Gemini Determinations*" means, together, the Gemini Additional Collateral Determination, the Gemini GBTC Shares Determination, and the Gemini Deficiency Claim Determination.

106.    "*Gemini Distribution Agent*" means Gemini or an entity appointed by Gemini, with the prior written consent of the Debtors and with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), solely

in its capacity as agent for the Debtors and the Wind-Down Debtors to make or facilitate distributions to Gemini Lenders pursuant to the Plan.

107.   "*Gemini Earn Agreements*" means those certain Master Digital Loan Agreements entered into among GGC, Gemini, and certain users of Gemini pursuant to which such users agreed to lend certain Digital Assets to GGC, with Gemini acting as custodian and agent for such users in certain respects.

108.   "*Gemini Earn Program*" means the transactional arrangement among GGC, Gemini, and the Gemini Lenders as set forth in the Gemini Earn Agreements.

109.   "*Gemini GBTC Shares*" means the 30,905,782 GBTC shares provided by GGC and maintained by Gemini for the benefit of the Gemini Lenders, which were purportedly foreclosed upon by Gemini on November 16, 2022.

110.   "*Gemini GBTC Shares Determination*" means the entry of an order by the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part, or that has become a Final Order determining (i) ownership of the Gemini GBTC Shares, including whether any foreclosure by Gemini took place, or (ii) whether the Gemini GBTC Shares are subject to Avoidance Actions, including, but not limited to, on account of theories of preferential or fraudulent transfers, for purposes of determining whether Gemini (x) is required to apply the value of the Gemini GBTC Shares to satisfy the Allowed Gemini Lender Claims or (y) is required to return the Gemini GBTC Shares to the Debtors' Estates for distribution among all Holders of Allowed General Unsecured Claims under the Plan.

111.   "*Gemini GBTC Shares Reserve*" means the amount of Gemini GBTC Shares that is required to be held in reserve by Gemini or the Gemini Distribution Agent until the Gemini Determinations have occurred, which shall mean all of the Gemini GBTC Shares or such other amount that is established prior to the Effective Date by (i) the Debtors and Gemini, with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), or (ii) an order of the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part; *provided* that, prior to seeking a judicial determination pursuant to foregoing clause (ii), the Debtors and Gemini shall have engaged in good faith negotiations, and the Committee and the Ad Hoc Group shall have been given the opportunity to contemporaneously participate in such negotiations, with respect to the Gemini GBTC Shares Reserve through the date that is ten (10) days prior to the Voting Deadline; *provided*, *however*, that any determination by the Bankruptcy Court under the foregoing clause (ii) shall be limited to the amount of the Gemini GBTC Shares Reserve during the pendency of the Gemini Determinations.

112.   "*Gemini Lender Claim*" means a General Unsecured Claim held by a Gemini Lender in connection with the Gemini Earn Program.

113.   "*Gemini Lenders*" means the users of Gemini participating in the Gemini Earn Program pursuant to the Gemini Earn Agreements.

114.    "**Gemini Parties**" means, collectively, Gemini, its predecessors, successors and assigns, parents, subsidiaries, and Affiliates, and, in their capacities as such, all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies and such persons' respective heirs, executors, estates, servants, and nominees.

115.    "**Gemini Preference Action**" means the adversary proceeding seeking to avoid and recover transfers made by GGC to or for the benefit of Gemini and the Gemini Lenders by filing the *Complaint*, ECF No. 1, Adv. Pro. 23-01203 (SHL) against Gemini and the Gemini Lenders.

116.    "**Gemini Preference Determination**" means the entry of an order by the Bankruptcy Court that has not been stayed or vacated (including during the pendency of a determination as to such stay or vacation), either in whole or in part, or that has become a Final Order determining whether GGC is entitled to avoid and recover transfers made by GGC to or for the benefit of Gemini and the Gemini Lenders.

117.    "**Gemini Reserved Coins**" means those Digital Assets, identified on Exhibit D to the Proof of Claim Filed by Gemini against GGC at Claim No. 356, that Gemini holds on behalf of the Gemini Lenders.

118.    "**Gemini Earn Operations Assets**" means the Cash and Digital Assets held by Gemini and owed to the Debtors, as set forth on the Gemini Earn Operations Assets Schedule.

119.    "**Gemini Earn Operations Assets Schedule**" means the schedule of Cash and Digital Assets that the Debtors, in consultation with Gemini, identify as being held by Gemini and owed to the Debtors.

120.    "**Gemini's Consent**" means the consent of Gemini (which consent shall not be unreasonably withheld, conditioned, or delayed); *provided* that, with respect to any matter conditioned on Gemini's Consent pursuant to the Plan, Gemini's Consent shall be deemed granted to the extent Gemini's Counsel has received written notice of such matter and has not, within five (5) Business Days of Gemini Counsel's receipt of such notice, objected in writing to the Person requesting Gemini's Consent as to such matter; *provided*, *however*, that, notwithstanding anything to the contrary in the Plan, Gemini shall have no consent rights (i) with respect to any matter relating to any of the Definitive Documents unless the Gemini Acceptance Event has occurred and is continuing and (ii) with respect to any matters pertaining to (a) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (b) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413.

121.    "**General Unsecured Claim**" means any Claim that is not secured, subordinated, or entitled to priority under the Bankruptcy Code or any Final Order of the Bankruptcy Court (other than a Government Penalty Claim, an Intercompany Claim, or a Subordinated Claim).  Any Government Penalty Claims, Intercompany Claims, or Subordinated Claims shall not constitute General Unsecured Claims.

16

122.    "***Genesis Platform***" means, in consultation with the Committee, one or more of the following:  (i) GGML, (ii) GGCI, and (iii) any other subsidiaries of GGH.

123.    "***GGC***" means Genesis Global Capital, LLC.

124.    "***GGC/GGH Settlement***" means the compromise, settlement, and resolution of Intercompany Claims by and between GGC and GGH pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, as provided in Article IV.D of the Plan.

125.    "***GGCI***" means GGC International Limited.

126.    "***GGH***" means Genesis Global Holdco, LLC.

127.    "***GGML***" means Genesis Global Markets Limited.

128.    "***GGT***" means Genesis Global Trading, Inc.

129.    "***Governmental Bar Date***" means such time and date established pursuant to the Bar Date Order by which Proofs of Claim of Governmental Units must be Filed.

130.    "***Government Penalty Claims***" means any Claims asserted by Governmental Units for any fine, penalty, forfeiture, or damages to the extent such fine, penalty, forfeiture, or damages are not compensation for actual pecuniary loss as provided for by section 726(a)(4) of the Bankruptcy Code, including, for the avoidance of doubt, any Claims asserted against the Debtors by the Attorney General of the State of New York in that certain complaint, dated as of October 19, 2023, styled *N.Y. v. Gemini, et al*. and filed before the Supreme Court of the State of New York.

131.    "***Governmental Unit***" shall have the meaning set forth in section 101(27) of the Bankruptcy Code.

132.    "***Holder***" means a Person or Entity holding a Claim against or Interest in a Debtor, as applicable.

133.    "***Impaired***" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is not Unimpaired.

134.    "***Indemnification Obligations***" means each of the Debtors' indemnification obligations, whether in the bylaws, certificates of incorporation or formation, limited liability company agreements, other organizational or formation documents, board resolutions, management or indemnification agreements, or employment contracts, for any Persons who served as an employee, director, or officer of the Debtors as of the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date, other than any Persons who are also DCG Parties or Gemini Parties.

135.    "***Insider***" has the meaning set forth in section 101(31) of the Bankruptcy Code.

136.    "*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

137.    "*Intercompany Interest*" means any Interest in a Debtor held by another Debtor.

138.    "*Interest*" means any Equity Security in any Debtor, including all ordinary shares, units, common stock, preferred stock, membership interest, partnership interest, or other instrument, evidencing any fixed or contingent ownership interest in such Debtor, whether or not transferable, including any option, warrant, stock appreciation rights, phantom stock rights, redemption rights, repurchase rights, convertible, exercisable or exchangeable securities or other agreements, arrangements, or commitments of any character, contractual or otherwise, to acquire any such interest, that existed immediately before the Effective Date.

139.    "*Internal Revenue Code*" means the Internal Revenue Code of 1986, as amended.

140.    "*IRS*" means the Internal Revenue Service.

141.    "*Judicial Code*" means title 28 of the United States Code, 28 U.S.C. §§ 1–4001, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder.

142.    "*Lien*" shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

143.    "*Litigation Oversight BTC Members*" means at least two (2) members of the Litigation Oversight Committee, the majority of whose Claims are BTC-Denominated Unsecured Claims.

144.    "*Litigation Oversight Committee*" means an oversight committee of seven (7) members mutually appointed by the Committee and the Ad Hoc Group SteerCo (if the Ad Hoc Group Acceptance Event has occurred and is continuing), in consultation with the Debtors, pursuant to Article IV.A.4 of the Plan to oversee PA Officer and the Wind-Down Debtors with respect to the commencement, management, settlement, compromise, or other disposition of the Retained Causes of Action in accordance with the Plan and the Litigation Oversight Committee Bylaws.

145.    "*Litigation Oversight Committee Bylaws*" means the bylaws to be adopted by the Litigation Oversight Committee on the Effective Date, which shall set forth the governance of the Litigation Oversight Committee and its members, the terms of which shall be consistent with the Plan and otherwise in form and substance reasonably acceptable to the Debtors and the Committee, with the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), and in substantially the form included in the Plan Supplement.

146.    "*Litigation Oversight Committee's Consent*" means the consent of the Litigation Oversight Committee (which consent shall not be unreasonably withheld, conditioned, or delayed and shall be given in accordance with the Litigation Oversight Committee Bylaws); *provided* that, with respect to any matter conditioned on the Litigation Oversight Committee's Consent pursuant to the Plan, the Litigation Oversight Committee's Consent shall be deemed granted to the extent the Litigation Oversight Committee has received written notice of such matter and has not, within

five (5) Business Days of the Litigation Oversight Committee's receipt of such notice, objected in writing to the Person requesting the Litigation Oversight Committee's Consent as to such matter.

147.    "*Litigation Oversight Crossover Member*" means at least one (1) member of the Litigation Oversight Committee, at least (i) thirty percent (30%) of whose Claims are Fiat-or-Stablecoin-Denominated Unsecured Claims and (ii) thirty percent (30%) of whose Claims are BTC-Denominated Unsecured Claims, ETH-Denominated Unsecured Claims, and/or Alt-Coin-Denominated Unsecured Claims.

148.    "*Litigation Oversight ETH Member*" means the one (1) member of the Litigation Oversight Committee, the majority of whose Claims are ETH-Denominated Unsecured Claims.

149.    "*Litigation Oversight Fiat-or-Stablecoin Members*" means at least two (2) members of the Litigation Oversight Committee, the majority of whose Claims are Fiat-or-Stablecoin-Denominated Unsecured Claims; *provided*, *however*, that such positions shall be eliminated from the Litigation Oversight Committee upon the occurrence of a USD Recovery Event.

150.    "*Litigation Oversight Gemini Lender Member*" means at least one (1) member of the Litigation Oversight Committee, the majority of whose Claims are Gemini Lender Claims and who owns Claims (which may be Gemini Lender Claims) denominated in BTC.

151.    "*Litigation Reserve*" means the Cash allocated in the Wind-Down Budget with respect to the litigation of any Retained Causes of Action, including any Causes of Action or other claims against any of the Gemini Parties or any of the DCG Parties, the amount of which shall be subject to the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing) and is currently estimated at $40 million.

152.    "*Loan Collateral*" means collateral in the form of Digital Assets provided in connection with any loan taken or extended by the Debtors; *provided*, *however*, that the Additional GBTC Shares and the Gemini GBTC Shares shall not constitute Loan Collateral for purposes of Article IV.B.16 of the Plan.

153.    "*Local Rules*" means the Local Bankruptcy Rules for the Southern District of New York.

154.    "*Monetization Transaction*" means any transaction that results in the sale, monetization, or liquidation of any of the assets of the Debtors or the Wind-Down Debtors, including any such transaction performed by the Gemini Distribution Agent with respect to the Gemini GBTC Shares, the Gemini Earn Operations Assets, the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value), or any assets of the Debtors or the Wind-Down Debtors distributed to the Gemini Distribution Agent.

155.    "*Money Transmitter Licenses*" means any license or similar authorization of a Governmental Unit that an Entity is required to obtain to operate as a broker of Digital Assets.

156. "*New Board*" means the five (5)-member board of Wind-Down GGH, as determined pursuant to Article IV.B.7 of the Plan and the Plan Supplement. For the avoidance of any doubt, the New Board shall be appointed by DCG subject to the limitations set forth in the Plan; *provided*, *however*, in selecting the Persons for appointment to the New Board, DCG shall only be entitled to appoint those Persons who are identified on a list of seven (7) candidates selected by the Committee, in consultation with the Debtors and with the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing); *provided*, *however*, that following the Effective Date, the Wind-Down Oversight Committee shall be responsible for identifying any nominees to replace members of the New Board by submitting a list of three (3) Persons for each member of the New Board who needs to be replaced; and, *provided*, *further*, that in no event shall DCG be entitled to terminate any member of the New Board.

157. "*New Governance Documents*" means the organizational and corporate governance documents of the Wind-Down Debtors and each of their subsidiaries, including certificates of incorporation, certificates of formation, certificates of limited partnership (or equivalent organizational documents), bylaws, and limited liability company agreements (or equivalent governing documents), which shall be in form and substance reasonably acceptable to the Debtors, subject to the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing).

158. "*Other Genesis Entities*" means, collectively, the following subsidiaries of GGH other than GGC and GAP: Genesis UK Holdco Limited, Genesis Global Assets, LLC, Genesis Asia (Hong Kong) Limited, Genesis Bermuda Holdco Limited, Genesis Custody Limited, GGC International Limited, GGA International Limited, Genesis Global Markets Limited, GSB 2022 II LLC, GSB 2022 III LLC and GSB 2022 I LLC.

159. "*Other Priority Claim*" means any Claim that is entitled to priority of payment under section 507(a) of the Bankruptcy Code other than an Administrative Expense Claim or a Priority Tax Claim.

160. "*PA Officer*" means the Person or Entity appointed pursuant to Article IV.A of the Plan (or any successor), in his or her capacity as such.

161. "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

162. "*Petition Date*" means January 19, 2023.

163. "*Partial Repayment Agreement*" means that certain Partial Repayment Agreement, dated September 12, 2023 and filed at ECF No. 4, *Genesis Global Capital, LLC v. Digital Currency Group, Inc*., Case No. 23-01168 (Bankr. S.D.N.Y. Sept. 13, 2023), entered into by and among GGC, DCG, and DCGI, as it may be amended, modified, or supplemented from time to time.

164. "*Plan*" means this chapter 11 plan, as it may be altered, amended, modified, or supplemented from time to time in accordance with the Bankruptcy Code, the Bankruptcy Rules,

and the terms of the Plan, including the Plan Supplement and all exhibits, supplements, appendices, and schedules to the Plan.

165.     "*Plan Administration Agreement*" means that certain agreement by and among the Wind-Down Debtors and the PA Officer, the terms of which shall be consistent with the Plan and otherwise in form and substance reasonably acceptable to the Debtors and the Committee, with the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), and in substantially the form included in the Plan Supplement.

166.     "*Plan Supplement*" means the forms of documents effectuating the Restructuring, each of which shall be subject to the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), including, to the extent applicable, (i) the New Governance Documents, (ii) the Plan Administration Agreement, the Litigation Oversight Committee Bylaws, and the Wind-Down Oversight Committee Bylaws, (iii) an exhibit disclosing the identity and affiliations of the PA Officer and any Person proposed to serve on the New Board or proposed to serve as an officer of any of the Wind-Down Debtors, (iv) the Schedule of Assumed Executory Contracts and Unexpired Leases, (v) an exhibit identifying the members of the Litigation Oversight Committee and the Wind-Down Oversight Committee, (vi) an exhibit identifying the intercompany claims that shall constitute Excluded Claims, (vii) an exhibit identifying Retained Causes of Action, and (viii) the Digital Assets Conversion Table, all of which shall be incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, modified, replaced, and/or supplemented from time to time, which shall be filed with the Bankruptcy Court on or before ten (10) days prior to the Voting Deadline.

167.     "*Priority Claims Reserve Amount*" means, with respect to each Debtor, the aggregate face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of all Claims, including Other Priority Claims and Priority Tax Claims, but excluding Administrative Expense Claims, against such Debtor that are either (i) identified in the Schedules as entitled to priority in right of payment under section 507(a) of the Bankruptcy Code or (ii) asserted to be entitled to such priority in a Proof of Claim validly submitted on or before the Claims Bar Date, less the face amount, or estimated amount under section 502(c) of the Bankruptcy Code, if applicable, of any such Claims identified by the Debtors in their reasonable discretion as duplicative of other such Claims.

168.     "*Priority Tax Claim*" means a Claim held by a Governmental Unit of the kind entitled to priority of payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

169.     "*Professional*" means an Entity employed in the Chapter 11 Cases pursuant to a Bankruptcy Court order in accordance with sections 327 or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date, pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code, or awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

170.     "*Professional Fee Claims*" means a Claim for the compensation of any Professional and the reimbursement of expenses incurred by such Professional through and including the Effective Date to the extent such fees and expenses have not been previously paid

21

pursuant to an order of the Bankruptcy Court, including, for the avoidance of doubt, any costs, fees, expenses, or commissions (including with respect to any investment banking transaction fees or commissions) incurred in connection with the Restructuring.

171. "*Professional Fee Escrow Account*" means an interest-bearing escrow account funded by the Debtors on the Effective Date in an amount equal to the Professional Fee Reserve Amount, pursuant to Article II.B hereof.

172. "*Professional Fee Reserve Amount*" means the total amount of Professional Fee Claims estimated in accordance with Article II.B hereof.

173. "*Proof of Claim*" means a timely-filed proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

174. "*Reinstated*" or "*Reinstatement*" means, with respect to Claims and Interests, the treatment provided for in section 1124 of the Bankruptcy Code.

175. "*Related Party*" means, with respect to any Entity, such Entity's predecessors, successors and assigns, parents, subsidiaries, Affiliates, and all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, and such persons' respective heirs, executors, estates, servants, and nominees.

176. "*Released Party*" means (i) the Debtors, (ii) the Committee and its members (solely in their capacities as such), (iii) the members of the Ad Hoc Group SteerCo (solely in their capacities as such) if the Ad Hoc Group Acceptance Event occurs and is continuing, and (iv) each Related Party of each Entity described in the foregoing clauses (i)–(iii) (in each case, solely in its capacity as such); *provided* that, notwithstanding anything to the contrary in the Plan, the DCG Parties shall not be Released Parties and the former employees, officers, and directors of the Debtors who did not serve as employees, officers, or directors of the Debtors as of the Petition Date shall not be Released Parties; *provided further* that any of the current and former employees, officers, and directors of the Debtors (solely in their capacities as such) who served as employees, officers, or directors of the Debtors as of the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date, shall be a Released Party only with the written consent of the Special Committee, which shall be disclosed in the Plan Supplement, with the exception of (x) the members of the Special Committee (solely in their capacities as such), who shall be Released Parties without the need for such consent, and (y) any current and former employees, officers, and directors of the Debtors who served as employees, officers, or directors of the Debtors as of the Petition Date and are also DCG Parties, who shall not be Released Parties.

177. "*Releasing Party*" means each of the following: (i) all Released Parties and (ii) all Holders of Claims who affirmatively (a) cast a timely Ballot to accept the Plan with respect to any Claim held by such Holder (regardless of whether any such Holder casts a timely ballot to reject the Plan with respect to any other separately-classified Claims) and (b) opt into the releases provided by the Plan on their Ballots.

22

178.    "*Required Reserve Payments*" means the Debtors' payments to fund, in accordance with the terms of this Plan and on or prior to the Effective Date, (i) the Claims Reserves, (ii) the Professional Fee Escrow Account with Cash in an amount equal to the Professional Fee Reserve Amount, (iii) the Wind-Down Reserves, and (iv) the Litigation Reserve.

179.    "*Restructuring*" means all actions that may be necessary or appropriate to effectuate the transactions described in, approved by, or contemplated by the Plan.

180.    "*Retained Causes of Action*" means those Causes of Action, if any, that belong to the Debtors or their Estates under section 1123(b)(3) of the Bankruptcy Code (including any Causes of Action that belong to the Other Genesis Entities) and are preserved and retained by the Wind-Down Debtors under the Plan and are not released, waived, or transferred to another Person pursuant to the Plan, which shall include (but not be limited to) (i) all such Causes of Action or other claims against any of the Gemini Parties or any of the DCG Parties and (ii) any other Causes of Action or other claims identified in a schedule attached to the Plan Supplement.  For the avoidance of doubt, notwithstanding anything to the contrary in the Plan, the Plan Supplement, or the Confirmation Order, the Retained Causes of Action shall not include any claim or Cause of Action belonging to a Holder of a Claim (other than a Debtor or an Other Genesis Entity), including any such claim or Cause of Action that is based on gross negligence, fraud, or willful misconduct of another Person.

181.    "*Sales Process*" means the marketing and sales process for the Genesis Platform conducted pursuant to the Bidding Procedures.

182.    "*Schedule of Assumed Executory Contracts and Unexpired Leases*" means the schedule of Executory Contracts and Unexpired Leases to be assumed (or assumed and assigned) by the Debtors or the Wind-Down Debtors pursuant to the Plan, as set forth in the Plan Supplement, as may be amended, modified, or supplemented from time to time prior to the Effective Date, which shall be in form and substance subject to the Committee's Consent.

183.    "*Schedules*" means, collectively, the schedules of assets and liabilities, schedules of Executory Contracts and Unexpired Leases, and statements of financial affairs Filed by the Debtors pursuant to section 521 of the Bankruptcy Code and in substantial conformance with the official bankruptcy forms, as the same may have been amended, modified, or supplemented from time to time.

184.    "*SEC*" means the United States Securities and Exchange Commission.

185.    "*Secured Claim*" means a Claim (i) secured by a Lien on property in which the applicable Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law, as (a) set forth in the Plan, (b) agreed to by the Holder of such Claim and the Debtors, or (c) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code, (ii) secured by the amount of any right of setoff of the Holder thereof in accordance with section 553 of the Bankruptcy Code, or (iii) Allowed, pursuant a Final Order of the Bankruptcy Court, as a secured Claim.

186.    "***Secured Claims Reserve Amount***" means, with respect to each Debtor, the aggregate amount of Claims against such Debtor that are deemed by Final Order of the Bankruptcy Court to be a Secured Claim.

187.    "***Securities Act***" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as now in effect or hereafter amended, and the rules and regulations promulgated thereunder, or any similar federal, state, or local law.

188.    "***Security***" shall have the meaning set forth in section 101(49) of the Bankruptcy Code.

189.    "***Solicitation Agent***" means Kroll Restructuring Administration LLC, the noticing, claims, and solicitation agent retained by the Debtors in the Chapter 11 Cases.

190.    "***Solicitation Materials***" means all solicitation materials in respect of the Plan together with the Disclosure Statement, with respect to which the Debtors shall have obtained the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing as of the filing of such solicitation materials).

191.    "***Special Committee***" means that certain Special Committee of the Board of Directors of GGH, established on November 18, 2022, comprised of Paul Aronzon and Thomas Conheeney.

192.    "***Stablecoin***" means a type of Digital Asset designed to reduce price volatility through either (i) pegging the value of the Digital Asset to a reserve asset, such as a fiat currency, exchange-traded commodity, or another Digital Asset, or (ii) algorithmically regulating the supply of the Digital Asset.

193.    "***Subordinated Claim***" means any Claim against a Debtor (i) arising from (a) rescission of a purchase or sale of a Security in any Debtor or an Affiliate of any Debtor, (b) purchase or sale of such a Security, or (c) reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim or (ii) that is equitably or otherwise subordinated, including pursuant to section 510(c) of the Bankruptcy Code.

194.    "***Transfer***" means to sell, resell, reallocate, use, pledge, assign, transfer, hypothecate, participate, donate, or otherwise encumber or dispose of, directly or indirectly (including through derivatives, options, swaps, pledges, forward sales, or other transactions).

195.    "***Turnover Actions***" means, collectively, the adversary proceedings seeking turnover of certain property from DCG and DCGI pursuant to Section 542(b) of the Bankruptcy Code by filing the *Complaint*, ECF No. 1, Adv. Pro. 23-01168 (SHL) against DCG and the *Complaint*, ECF No. 1, Adv. Pro. 23-01169 (SHL) against DCGI.

196.    "***Unclaimed Distribution***" means any distribution under the Plan on account of an Allowed Claim or Allowed Interest to a Holder that has not: (i) accepted such distribution or, in the case of distributions made by check, negotiated such check within one year of receipt; (ii) given notice to the Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agents, or the

24

Gemini Distribution Agent, as applicable, of an intent to accept such distribution within one year of receipt; (iii) responded to the Debtors', the Wind-Down Debtors', the PA Officer's, the Disbursing Agent's, or the Gemini Distribution Agent's, as applicable, requests for information necessary to facilitate such distribution prior to the deadline included in such request for information; or (iv) timely taken any other action necessary to facilitate such distribution.

197.    "*Unexpired Lease*" means a lease of nonresidential real property to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

198.    "*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class consisting of Claims or Interests that are not "impaired" within the meaning of section 1124 of the Bankruptcy Code, including through payment in full in Cash or Reinstatement.

199.    "*Unsecured*" means, with respect to a Claim, not a Secured Claim.

200.    "*USD Recovery Event*" means the allocation or distribution, in accordance with the Distribution Principles, to Holders of Fiat-or-Stablecoin Denominated Unsecured Claims of Distributable Assets the value of which are equal to the amount of such Holders' Fiat-or-Stablecoin Denominated Unsecured Claims.

201.    "*U.S. Trustee*" means the Office of the United States Trustee for the Southern District of New York.

202.    "*U.S. Trustee Fees*" means fees arising under 28 U.S.C. § 1930(a)(6) and, to the extent applicable, accrued interest thereon arising under 31 U.S.C. § 3717.

203.    "*Voting Deadline*" means the date established by the Disclosure Statement Order by which the Solicitation Agent must actually receive an otherwise valid vote on the Plan for such vote to count as a vote to accept or reject the Plan, subject to Article XII.H hereof.

204.    "*Wind-Down Accounts*" means the bank accounts to be held in the name of the Wind-Down Debtors that are created pursuant to Article IV.A of the Plan.

205.    "*Wind-Down Budget*" means that certain budget governing the fees, expenses, and disbursements required to fund the Wind-Down Debtors' Expenses until all distributions required to be made from the Wind-Down Debtors under the Plan are made, which shall be in form and substance reasonably acceptable to the Debtors and with respect to which the Debtors shall have obtained (i) the Committee's Consent, (ii) the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), and (iii) solely as to matters pertaining to the Gemini Distribution Agent, Gemini's Consent.

206.    "*Wind-Down Debtor Parties*" means the PA Officer, the New Board, the Litigation Oversight Committee, the Wind-Down Oversight Committee, and solely in their capacities as such, their respective members, employees, employers, designees or professionals, or any of their duly designated agents or representatives.

25

207.    "***Wind-Down Debtors***" means Wind-Down GGC, Wind-Down GAP, and Wind-Down GGH, or any successor thereto, by merger, consolidation, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, and as described in Article IV.A to, among other things, effectuate the wind down of such Debtors' Estates following the Effective Date, commence, litigate, and settle the Retained Causes of Action that are not released, waived, settled, compromised, or transferred under the Plan, and make distributions pursuant to the terms of the Plan and the Plan Administration Agreement; *provided*, *however*, that, for the avoidance of doubt, the Wind-Down Debtors shall not conduct any business operations or continue the Debtors' business operations after the Effective Date.

208.    "***Wind-Down Debtors' Assets***" means, for each Wind-Down Debtor, all Assets of the applicable Debtor's Estate.

209.    "***Wind-Down Debtors' Beneficiaries***" means Holders in respect of their Allowed Claims or Allowed Interests that are entitled to receive distributions from the Wind-Down Debtors pursuant to the terms of the Plan, whether or not such Claims or Interests are Allowed as of the Effective Date.

210.    "***Wind-Down Debtors' Expenses***" means, for each Wind-Down Debtor, any and all reasonable and documented fees, costs, and expenses incurred by such Wind-Down Debtor or the PA Officer (or any Disbursing Agent, Person, Entity, or professional engaged by the applicable Wind-Down Debtor or the PA Officer to effect distributions or otherwise assist the PA Officer with his or her duties under the Plan Administration Agreement) in connection with any of their duties under the Plan and the Plan Administration Agreement, including any reasonable and documented administrative fees, attorneys' or other professionals' fees and expenses, insurance fees, taxes, escrow expenses, and the U.S. Trustee Fees, or costs to maintain certain assets while they are held.

211.    "***Wind-Down GAP***" means GAP on and after the Effective Date.

212.    "***Wind-Down GGC***" means GGC on and after the Effective Date.

213.    "***Wind-Down GGH***" means GGH on and after the Effective Date.

214.    "***Wind-Down Oversight BTC Members***" means at least two (2) members of the Wind-Down Oversight Committee, the majority of whose Claims are BTC-Denominated Unsecured Claims.

215.    "***Wind-Down Oversight Committee***" means an oversight committee of seven (7) members mutually appointed by the Committee and the Ad Hoc Group SteerCo (if the Ad Hoc Group Acceptance Event has occurred and is continuing), in consultation with the Debtors (and, with respect to the Wind-Down Oversight Gemini Lender Member, with Gemini's Consent), pursuant to Article IV.A.3 of the Plan to oversee the New Board, the PA Officer, and the Wind-Down Debtors' wind-down activities in accordance with the Plan and the Wind-Down Oversight Committee Bylaws.

216.    "***Wind-Down Oversight Committee Bylaws***" means the bylaws to be adopted by the Wind-Oversight Committee on the Effective Date, which shall set forth the governance of the Wind-Down Oversight Committee and its members the terms of which shall be consistent with the Plan and otherwise in form and substance reasonably acceptable to the Debtors and the Committee, with the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), and in substantially the form included in the Plan Supplement.

217.    "***Wind-Down Oversight Committee's Consent***" means the consent of the Wind-Down Oversight Committee (which consent shall not be unreasonably withheld, conditioned, or delayed and shall be given in accordance with the Wind-Down Oversight Committee Bylaws); *provided* that, with respect to any matter conditioned on the Wind-Down Oversight Committee's Consent pursuant to the Plan, the Wind-Down Oversight Committee's Consent shall be deemed granted to the extent the Wind-Down Oversight Committee has received written notice of such matter and has not, within five (5) Business Days of the Wind-Down Oversight Committee's receipt of such notice, objected in writing to the Person requesting the Wind-Down Oversight Committee's Consent as to such matter.

218.    "***Wind-Down Oversight Crossover Member***" means at least one (1) member of the Wind-Down Oversight Committee, at least (i) thirty percent (30%) of whose Claims are Fiat-or-Stablecoin-Denominated Unsecured Claims and (ii) thirty percent (30%) of whose Claims are BTC-Denominated Unsecured Claims, ETH-Denominated Unsecured Claims, and/or Alt-Coin-Denominated Unsecured Claims.

219.    "***Wind-Down Oversight ETH Member***" means at least one (1) member of the Wind-Down Oversight Committee, the majority of whose Claims are ETH-Denominated Unsecured Claims.

220.    "***Wind-Down Oversight Fiat-or-Stablecoin Members***" means at least two (2) members of the Wind-Down Oversight Committee, the majority of whose Claims are Fiat-or-Stablecoin-Denominated Unsecured Claims.

221.    "***Wind-Down Oversight Gemini Lender Member***" means at least one (1) member of the Wind-Down Oversight Committee, the majority of whose Claims are Gemini Lender Claims and who owns Claims (which may be Gemini Lender Claims) denominated in BTC.

222.    "***Wind-Down Reserve***" means, with respect to each Wind-Down Debtor, the amount set forth in the Wind-Down Budget to pay the Wind-Down Debtors' Expenses incurred in connection with making distributions or otherwise carrying out the PA Officer's duties under the Plan; *provided* that the Wind-Down Reserve shall exclude any Wind-Down Debtors' Expenses budgeted in connection with the Wind-Down Debtors' pursuit of the Retained Causes of Action, including any Causes of Action or other claims against any of the Gemini Parties or any of the DCG Parties, which Wind-Down Debtors' Expenses shall be paid out of the Litigation Reserve.

B.    *Rules of Interpretation*

For purposes herein: (1) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the

masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (2) except as otherwise provided, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document, as previously amended, modified, or supplemented, if applicable, shall be substantially in that form or substantially on those terms and conditions; (3) except as otherwise provided, any reference herein to an existing document or exhibit having been Filed or to be Filed shall mean that document or exhibit, as it may thereafter be amended, restated, supplemented, or otherwise modified in accordance with the terms of the Plan; (4) unless otherwise specified, all references herein to "Articles" are references to Articles of the Plan; (5) any reference to an Entity as a Holder of a Claim or Interest includes that Entity's successors and assigns; (6) unless otherwise stated, the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (7) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (8) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (9) the words "include" and "including" and variations thereof, shall not be deemed to be terms of limitation, and shall be deemed to be followed by the words "without limitation;" (10) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (11) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (12) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, and as applicable to the Chapter 11 Cases, unless otherwise stated; (13) any effectuating provisions may be interpreted by the Debtors (or after the Effective Date, the Wind-Down Debtors or the PA Officer) in their or its sole discretion in a manner consistent with the overall purpose and intent of the Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity, without waiver of the rights of any Entity; and (14) any docket number references in the Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases.

C.      *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction, action, or event shall or may occur pursuant to the Plan is a day that is not a Business Day, then such transaction, action, or event shall instead occur on the next succeeding Business Day.

D.      *Governing Law*

Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code and Bankruptcy Rules) or unless otherwise specifically stated herein, the laws of the State of New York without giving effect to the principles of conflict of laws, shall govern the rights, obligations, construction, and implementation of the Plan, any agreements, documents,

instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); *provided* that the corporate or limited liability company governance matters relating to the Debtors or the Wind-Down Debtors, as applicable, shall be governed by the laws of the state of incorporation or formation (as applicable) of the applicable Debtor or Wind-Down Debtor.

E.       *Reference to Monetary Figures*

All references in the Plan to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided herein.  Unless otherwise expressly provided herein, references to Digital Assets denoted with a U.S. dollar value or "$" refer to the value of such Digital Assets in Cash as of the Petition Date, utilizing the conversion rates provided in the Digital Assets Conversion Table.

F.       *Reference to the Debtors or the Wind-Down Debtors*

Except as otherwise specifically provided in the Plan to the contrary, references in the Plan to the Debtors or the Wind-Down Debtors shall mean the Debtors and the Wind-Down Debtors, as applicable, to the extent the context requires.  References to the Wind-Down Debtors mean the Wind-Down Debtors or the PA Officer, as applicable, to the extent the context requires.

G.       *Controlling Document*

In the event of an inconsistency between the Plan, the Disclosure Statement, or any other Final Order (other than the Confirmation Order) referenced in the Plan (or any exhibits, schedules, appendices, supplements, or amendments to any of the foregoing, including the Distribution Principles but excluding the Plan Supplement), the terms of the Plan shall control in all respects. In the event of an inconsistency between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order). In the event of an inconsistency between the Confirmation Order, the Plan, and the Plan Supplement, the Confirmation Order shall control.

## ARTICLE II.
## ADMINISTRATIVE EXPENSE CLAIMS AND PRIORITY CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims, Professional Fee Claims, Priority Tax Claims and statutory fees under section 1930 of the Judicial Code have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III of the Plan.

A.       *Administrative Expense Claims*

Except with respect to Professional Fee Claims and Claims for fees and expenses pursuant to section 1930 of the Judicial Code, and except to the extent that an Administrative Expense Claim has already been paid during the Chapter 11 Cases or a Holder of an Allowed Administrative Expense Claim and the applicable Debtor(s) or, from and after the Effective Date, the applicable Wind-Down Debtor(s) agree to less favorable treatment, each Holder of an Allowed

29

Administrative Expense Claim shall be paid in full in Cash on the latest of: (a) on or as soon as reasonably practicable after the Effective Date if such Administrative Expense Claim is Allowed as of the Effective Date; (b) on or as soon as reasonably practicable after the date such Administrative Expense Claim is Allowed, but in any event no later than ninety (90) days after the date on which an order allowing such Administrative Claim becomes a Final Order; (c) the date such Allowed Administrative Expense Claim becomes due and payable, or as soon thereafter as is reasonably practicable; (d) such time and upon such terms as may be agreed upon by such Holder and the Debtors or the Wind-Down Debtors, as applicable; and (e) such time and upon such terms as set forth in a Final Order of the Bankruptcy Court.

Except as otherwise provided in this Article II.A of the Plan and except with respect to Professional Fee Claims, requests for allowance and payment of Administrative Expense Claims must be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors pursuant to the procedures specified in the Bar Date Order, the Confirmation Order, and the notice of entry of the Confirmation Order no later than the Administrative Expense Claims Bar Date.  Holders of Administrative Expense Claims that are required to, but do not, File and serve on the Debtors or, from and after the Effective Date, the Wind-Down Debtors a request for allowance and payment of such Administrative Expense Claims by such date shall be forever barred, estopped, and enjoined from asserting such Administrative Expense Claims against the Debtors or, from and after the Effective Date, the Wind-Down Debtors, or their respective assets or property.  Objections to such requests, if any, must be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors (if not the objecting party) and the requesting party no later than ninety (90) days after the Effective Date or such other date fixed by the Bankruptcy Court. Notwithstanding the foregoing, no request for payment of an Administrative Expense Claim need be Filed with respect to an Administrative Expense Claim that has been previously Allowed.

B.    *Professional Compensation*

1.    <u>Final Fee Applications</u>

All final requests for payment of Professional Fee Claims, including the Professional Fee Claims incurred during the period from the Petition Date through and including the Effective Date, shall be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors no later than sixty (60) days after the Effective Date.  Each such final request will be subject to approval by the Bankruptcy Court after notice and a hearing in accordance with the procedures established by the Bankruptcy Code and prior orders of the Bankruptcy Court in the Chapter 11 Cases, and once approved by the Bankruptcy Court, such Allowed Professional Fee Claims shall be promptly paid in Cash from the Professional Fee Escrow Account up to their full Allowed amount.

If the Professional Fee Escrow Account is insufficient to fund the full Allowed amounts of Professional Fee Claims, remaining unpaid Allowed Professional Fee Claims shall be promptly paid by the Wind-Down Debtors, without any further action or order of the Bankruptcy Court. Obligations to pay Allowed Professional Fee Claims shall not be limited or deemed limited to funds held in the Professional Fee Escrow Account.

Objections to any Professional Fee Claim must be Filed and served on the Debtors or, from and after the Effective Date, the Wind-Down Debtors and the requesting party no later than twenty (20) days after such Professional Fee Claim is Filed with the Bankruptcy Court.

2.      Professional Fee Escrow Account

On the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow Account with Cash equal to the "Professional Fee Reserve Amount" described in Article II.B.3 of the Plan. The Professional Fee Escrow Account shall be maintained in trust solely for the Professionals.  Such funds shall not be considered property of the Estates of the Debtors or of the Wind-Down Debtors.  The amount of Allowed Professional Fee Claims shall be paid in Cash to the Professionals by the Disbursing Agent for the Wind-Down Debtors from the Professional Fee Escrow Account as soon as reasonably practicable after such Professional Fee Claims are Allowed. After all such Allowed Professional Fee Claims have been paid in full, any remaining amount in the Professional Fee Escrow Account shall promptly be distributed to the Wind-Down Debtors in accordance with Article IV.B.2.b without any further action or order of the Bankruptcy Court, but such estimate shall in no way limit or be deemed to limit such Professional's Allowed Professional Fee Claims.

3.      Professional Fee Reserve Amount

No later than five (5) Business Days prior to the Effective Date, the Debtors shall request from Professionals estimates of their unpaid Professional Fee Claims before and as of the Effective Date, and such Professionals shall deliver such estimate to the Debtors in writing via email two (2) Business Days prior to the Effective Date; *provided*, *however*, that such estimate shall not be deemed to limit the amount of the fees and expenses that are the subject of the Professional's final request for payment of Professional Fee Claims. If a Professional does not timely provide an estimate, the Debtors may estimate the unpaid and unbilled fees and expenses of such Professional.

4.      Post-Effective Date Fees and Expenses

Except as otherwise specifically provided in the Plan, from and after the Effective Date, the Wind-Down Debtors shall, in the ordinary course of business and without any further notice or application to or action, order, or approval of the Bankruptcy Court, pay in Cash the reasonable, actual, and documented legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred on or after the Effective Date by the Professionals (including any fees related to the preparation of Professional fee applications). Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Wind-Down Debtors may employ and pay any Professional for fees and expenses incurred after the Effective Date in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

C.      *Priority Tax Claims*

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to a less favorable treatment, in full and final satisfaction, settlement, and release of and in exchange for

each Allowed Priority Tax Claim, each Holder of such Allowed Priority Tax Claim shall receive Cash in an amount equal to such Allowed Priority Tax Claim on the Effective Date or as soon as practicable thereafter (including if such Allowed Priority Tax Claim will not be due and payable until after the Effective Date) or such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code.

D.      *Statutory Fees*

On or before the Effective Date, all fees due and payable pursuant to 28 U.S.C. § 1930 will be paid by the Debtors in Cash.

After the Effective Date, each Wind-Down Debtor will pay any and all such fees owed by it for each quarter (including any fraction thereof), plus any interest due and payable under 31 U.S.C. § 3717 on all disbursements, until its Chapter 11 Case is converted, dismissed, or a Final Decree is issued, whichever occurs first.  The Wind-Down Debtors shall continue to file quarterly, post-confirmation operating reports in accordance with the U.S. Trustee's guidelines.

E.      *Restructuring Fees and Expenses*

If the Ad Hoc Group Acceptance Event has occurred and is continuing, (i) the Ad Hoc Group Restructuring Expenses payable by the Debtors shall constitute Allowed Administrative Expense Claims and shall be paid in full in Cash on the Effective Date pursuant to (and subject to) the terms and conditions of the existing fee reimbursement letters executed by the Debtors, without the need to file a proof of such Claim and without further order of the Court and (ii) the Dollar Group Restructuring Fees and Expenses incurred up to and including the Effective Date in an amount up to three hundred thousand dollars ($300,000) shall constitute Allowed Administrative Expense Claims and shall be paid in full in Cash on the Effective Date without any requirement to file a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval.

## ARTICLE III.
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims*

The Plan constitutes a separate Plan proposed by each Debtor.  Except for the Claims addressed in Article II of the Plan, all Claims and Interests are classified in the Classes set forth below in accordance with sections 1122 and 1123(a)(1) of the Bankruptcy Code.  A Claim or an Interest is classified in a particular Class only to the extent that the Claim or Interest fits within the description of that Class and is classified in other Class(es) to the extent that any portion of the Claim or Interest fits within the description of such other Class(es).  A Claim or an Interest also is classified in a particular Class for the purpose of receiving distributions under the Plan only to the extent that such Claim or Interest is an Allowed Claim or Interest in that Class and has not been paid, released, or otherwise satisfied prior to the Effective Date.

1.      Classification of Claims Against and Interests in GGH

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 4 | BTC-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 5 | ETH-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Alt-Coin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Government Penalty Claims | Impaired | Deemed to Reject |
| 9 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |
| 10 | Interests | Impaired | Deemed to Reject |

2.      Classification of Claims Against and Interests in GGC

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 4 | BTC-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 5 | ETH-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Alt-Coin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Gemini Lender Claims | Impaired | Entitled to Vote |
| 8 | Subordinated Claims | Impaired | Deemed to Reject |
| 9 | Government Penalty Claims | Impaired | Deemed to Reject |
| 10 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |
| 11 | Intercompany Interests | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |

3.    Classification of Claims Against and Interests in GAP

| Class | Claim or Interest | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Priority Claims | Unimpaired | Presumed to Accept |
| 2 | Secured Claims | Unimpaired | Presumed to Accept |
| 3 | Fiat-or-Stablecoin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 4 | BTC-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 5 | ETH-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 6 | Alt-Coin-Denominated Unsecured Claims | Impaired | Entitled to Vote |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Government Penalty Claims | Impaired | Deemed to Reject |
| 9 | Intercompany Claims | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |
| 10 | Intercompany Interests | Impaired or Unimpaired | Presumed to Accept or Deemed to Reject |

B.    *Treatment of Claims Against and Interests in GGH*

1.    Class 1 — Other Priority Claims

a.    *Classification*: Class 1 consists of all Other Priority Claims against GGH.

b.    *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim against GGH agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim against GGH will, at the option of GGH or Wind-Down GGH, as applicable, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim against GGH, in each case, or as soon as reasonably practicable thereafter.

c.    *Voting*: Class 1 is Unimpaired under the Plan. Holders of Class 1 Other Priority Claims against GGH are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.      <u>Class 2 — Secured Claims</u>

    a.      *Classification*: Class 2 consists of all Secured Claims against GGH.

    b.      *Treatment*: Except to the extent that a Holder of an Allowed Secured Claim against GGH agrees to less favorable treatment, in full and final satisfaction of such Allowed Secured Claim, at the option of GGH or Wind-Down GGH, as applicable, such Holder will receive (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Secured Claim becomes an Allowed Secured Claim against GGH, in each case, or as soon as reasonably practicable thereafter, (ii) the return of the collateral securing such Allowed Secured Claim, or (iii) such other treatment so as to render such Holder's Allowed Secured Claim against GGH Unimpaired pursuant to section 1124 of the Bankruptcy Code.

    c.      *Voting*: Class 2 is Unimpaired under the Plan. Holders of Class 2 Secured Claims against GGH are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.      <u>Class 3 — Fiat-or-Stablecoin-Denominated Unsecured Claims</u>

    a.      *Classification*: Class 3 consists of all Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH.

    b.      *Treatment*: Each Holder of an Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles.   Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGH after the Effective Date.   Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

    c.      *Voting*: Class 3 is Impaired under the Plan. Holders of Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH will be entitled to vote to accept or reject the Plan.

4.    <u>Class 4 — BTC-Denominated Unsecured Claims</u>

    a.    *Classification*: Class 4 consists of all BTC-Denominated Unsecured Claims against GGH.

    b.    *Treatment*: Each Holder of an Allowed BTC-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed BTC-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGH after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed BTC-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such Allowed BTC-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

    c.    *Voting*: Class 4 is Impaired under the Plan. Holders of Class 4 BTC-Denominated Unsecured Claims against GGH will be entitled to vote to accept or reject the Plan.

5.    <u>Class 5 — ETH-Denominated Unsecured Claims</u>

    a.    *Classification*: Class 5 consists of all ETH-Denominated Unsecured Claims against GGH.

    b.    *Treatment*: Each Holder of an Allowed ETH-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed ETH-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGH after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed ETH-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such Allowed ETH-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

    c.    *Voting*: Class 5 is Impaired under the Plan. Holders of Class 5 ETH-Denominated Unsecured Claims against GGH will be entitled to vote to accept or reject the Plan.

6.      <u>Class 6 — Alt-Coin-Denominated Unsecured Claims</u>

     a.      *Classification*: Class 6 consists of all Alt-Coin-Denominated Unsecured Claims against GGH.

     b.      *Treatment*: Each Holder of an Allowed Alt-Coin-Denominated Unsecured Claim against GGH shall receive the treatment provided to such Holder under the Distribution Principles.   Allowed Alt-Coin-Denominated Unsecured Claims against GGH shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGH after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Alt-Coin-Denominated Unsecured Claims against GGH shall have no rights or remedies against GGH or Wind-Down GGH with respect to such Allowed Alt-Coin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

     c.      *Voting*: Class 6 is Impaired under the Plan. Holders of Class 6 Alt-Coin-Denominated Unsecured Claims against GGH will be entitled to vote to accept or reject the Plan.

7.      <u>Class 7 — Subordinated Claims</u>

     a.      *Classification*: Class 7 consists of all Subordinated Claims against GGH.

     b.      *Treatment*: Holders of Subordinated Claims against GGH shall not receive any distribution on account of such Subordinated Claims. On the Effective Date, all such Subordinated Claims shall be cancelled, released, and extinguished.

     c.      *Voting*: Class 7 is Impaired under the Plan. Holders of Class 7 Subordinated Claims against GGH will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

8.      <u>Class 8 — Government Penalty Claims</u>

     a.      *Classification*: Class 8 consists of the Government Penalty Claims against GGH.

     b.      *Treatment*: The Government Penalty Claims against GGH shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to the General Unsecured Claims and Intercompany Claims against GGH, and the Government Penalty Claims against GGH will not receive any

distribution on account of such Government Penalty Claims until all Allowed General Unsecured Claims and Allowed Intercompany Claims against GGH are paid in full; *provided*, *however*, that, if the Bankruptcy Court determines that the Government Penalty Claims against GGH should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then such Government Penalty Claims shall be *pari passu* with Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GGH.

c.      *Voting*: Class 8 is Impaired under the Plan.  For purposes of solicitation, it is presumed that Holders of Class 8 Government Penalty Claims against GGH shall not receive any distribution on account of such Government Penalty Claims and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

9.      <u>Class 9 — Intercompany Claims</u>

a.      *Classification*: Class 9 consists of all Intercompany Claims against GGH.

b.      *Treatment*: All Intercompany Claims (subject to the GGC/GGH Settlement) against GGH will be adjusted, Reinstated, or compromised on the Effective Date in the Debtors' discretion, with the Committee's Consent.

c.      *Voting*: Class 9 is Unimpaired/Impaired under the Plan.  Holders of Class 9 Intercompany Claims against GGH are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

10.     <u>Class 10 — Interests</u>

a.      *Classification*: Class 10 consists of all Interests in GGH.

b.      *Treatment*: (i) Holders of Interests in GGH shall not receive any distribution on account of such Interests unless all Claims against any of the Debtors are ultimately determined by a Final Order to have been rendered Unimpaired and (ii) all Interests in GGH shall, solely for Plan administrative purposes, continue to be held by the Holders of such Interests on and after the Effective Date; *provided*, *however*, that, for the avoidance of doubt and in accordance with the New Governance Documents, unless all Claims against the Wind-Down Debtors are ultimately determined by a Final Order to have been rendered Unimpaired, the Holders of Interests in GGH shall not (A) be entitled to exercise any rights or remedies appurtenant thereto, (B) have any economic interests, voting interests (other than those limited voting rights expressly set forth in Article IV.B.7 of the Plan), or rights to influence, direct, or otherwise control GGC or its subsidiaries, (C) have any right to any dividends or distributions as a result of such ownership, or (D)

39

be entitled to Transfer or take a worthless stock deduction with respect to the Interests in GGH.

c. *Voting*: Class 10 is Impaired under the Plan. For purposes of solicitation, it is presumed that Holders of Class 10 Interests in GGH shall not receive any distribution on account of such Interests and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

C. *Treatment of Claims Against and Interests in GGC*

1. <u>Class 1 — Other Priority Claims</u>

   a. *Classification*: Class 1 consists of all Other Priority Claims against GGC.

   b. *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim against GGC agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim against GGC will, at the option of the GGC or Wind-Down GGC, as applicable, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim against GGC, in each case, or as soon as reasonably practicable thereafter.

   c. *Voting*: Class 1 is Unimpaired under the Plan. Holders of Class 1 Other Priority Claims against GGC are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2. <u>Class 2 — Secured Claims</u>

   a. *Classification*: Class 2 consists of all Secured Claims against GGC.

   b. *Treatment*: Except to the extent that a Holder of an Allowed Secured Claim against GGC agrees to less favorable treatment, in full and final satisfaction of such Allowed Secured Claim, at the option of GGC or Wind-Down GGC, as applicable, such Holder will receive (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Secured Claim becomes an Allowed Secured Claim against GGC, in each case, or as soon as reasonably practicable thereafter, (ii) the return of the collateral securing such Allowed Secured Claim, or (iii) such other treatment so as to render such Holder's Allowed Secured Claim against GGC Unimpaired pursuant to section 1124 of the Bankruptcy Code.

40

    c.    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Class 2 Secured Claims against GGC are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.    <u>Class 3 — Fiat-or-Stablecoin-Denominated Unsecured Claims</u>

    a.    *Classification*: Class 3 consists of all Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC.

    b.    *Treatment*: Each Holder of an Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the Distribution Principles. Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

    c.    *Voting*: Class 3 is Impaired under the Plan. Holders of Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC will be entitled to vote to accept or reject the Plan.

4.    <u>Class 4 — BTC-Denominated Unsecured Claims</u>

    a.    *Classification*: Class 4 consists of all BTC-Denominated Unsecured Claims against GGC.

    b.    *Treatment*: Each Holder of an Allowed BTC-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the Distribution Principles. Allowed BTC-Denominated Unsecured Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed BTC-Denominated Unsecured Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed BTC-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

41

    c.    *Voting*: Class 4 is Impaired under the Plan. Holders of Class 4 BTC-Denominated Unsecured Claims against GGC will be entitled to vote to accept or reject the Plan.

5.    <u>Class 5 — ETH-Denominated Unsecured Claims</u>

    a.    *Classification*: Class 5 consists of all ETH-Denominated Unsecured Claims against GGC.

    b.    *Treatment*: Each Holder of an Allowed ETH-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed ETH-Denominated Unsecured Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGC after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed ETH-Denominated Unsecured Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed ETH-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

    c.    *Voting*: Class 5 is Impaired under the Plan. Holders of Class 5 ETH-Denominated Unsecured Claims against GGC will be entitled to vote to accept or reject the Plan.

6.    <u>Class 6 — Alt-Coin-Denominated Unsecured Claims</u>

    a.    *Classification*: Class 6 consists of all Alt-Coin-Denominated Unsecured Claims against GGC.

    b.    *Treatment*: Each Holder of an Allowed Alt-Coin-Denominated Unsecured Claim against GGC shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed Alt-Coin-Denominated Unsecured Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGC after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Alt-Coin-Denominated Unsecured Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed Alt-Coin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

42

     c.     *Voting*: Class 6 is Impaired under the Plan. Holders of Class 6 Alt-Coin-Denominated Unsecured Claims against GGC will be entitled to vote to accept or reject the Plan.

7.     <u>Class 7 — Gemini Lender Claims</u>

     a.     *Classification*: Class 7 consists of all Gemini Lender Claims (however denominated) against GGC.

     b.     *Treatment*: Each Holder of an Allowed Gemini Lender Claim against GGC shall (x) have the amount of its Allowed Gemini Lender Claim reduced by its pro rata share of the Gemini Asset Value in accordance with the Distribution Principles, (y) after accounting for the foregoing reduction, receive the treatment provided to such Holder under the Distribution Principles. Allowed Gemini Lender Claims against GGC shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GGC after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Gemini Lender Claims against GGC shall have no rights or remedies against GGC or Wind-Down GGC with respect to such Allowed Gemini Lender Claims other than the right to receive distributions pursuant to the Plan.

     c.     *Voting*: Class 7 is Impaired under the Plan. Holders of Class 7 Gemini Lender Claims against GGC will be entitled to vote to accept or reject the Plan.

8.     <u>Class 8 — Subordinated Claims</u>

     a.     *Classification*: Class 8 consists of all Subordinated Claims against GGC.

     b.     *Treatment*: Holders of Subordinated Claims against GGC shall not receive any distribution on account of such Subordinated Claims. On the Effective Date, all Subordinated Claims against GGC shall be cancelled, released, and extinguished.

     c.     *Voting*: Class 8 is Impaired under the Plan. Holders of Class 8 Subordinated Claims against GGC will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

43

9.    <u>Class 9 — Government Penalty Claims</u>

    a.    *Classification*: Class 9 consists of the Government Penalty Claims against GGC.

    b.    *Treatment*: The Government Penalty Claims against GGC shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to the General Unsecured Claims and Intercompany Claims against GGC, and the Government Penalty Claims against GGC will not receive any distribution on account of such Government Penalty Claims until all Allowed General Unsecured Claims and Allowed Intercompany Claims against GGC are paid in full; *provided*, *however*, that, if the Bankruptcy Court determines that the Government Penalty Claims against GGC should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then such Government Penalty Claims shall be *pari passu* with Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC.

    c.    *Voting*: Class 9 is Impaired under the Plan.  For purposes of solicitation, it is presumed that Holders of Class 9 Government Penalty Claims against GGC shall not receive any distribution on account of such Government Penalty Claims and will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

10.    <u>Class 10 — Intercompany Claims</u>

    a.    *Classification*: Class 10 consists of all Intercompany Claims against GGC.

    b.    *Treatment*:  All Intercompany Claims (subject to the GAP/GGC Settlement and the GGC/GGH Settlement) against GGC will be adjusted, Reinstated, or compromised on the Effective Date in the Debtors' discretion, with the Committee's Consent.

    c.    *Voting*: Class 10 is Unimpaired/Impaired under the Plan.  Holders of Class 10 Intercompany Claims against GGC are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

11.    <u>Class 11 — Intercompany Interests</u>

    a.    *Classification*: Class 11 consists of all Intercompany Interests in GGC.

    b.    *Treatment*: Holders of Intercompany Interests in GGC shall not receive any distribution on account of such Intercompany Interests unless all senior Claims against GGC are paid in full or otherwise treated as Unimpaired. All Intercompany Interests in GGC shall, solely for Plan administrative

purposes, continue to be held by the Holders of such Intercompany Interests on and after the Effective Date; *provided*, *however*, that, for the avoidance of doubt and in accordance with the New Governance Documents, the Holders of Intercompany Interests in GGC shall not (A) be entitled to exercise any rights or remedies appurtenant thereto, (B) have any economic interests, voting interests, or rights to influence, direct, or otherwise control GGC or its subsidiaries, (C) have any right to any dividends or distributions as a result of such ownership, or (D) be entitled to Transfer or take a worthless stock deduction with respect to the Interests in GGC.

*Voting*: Class 11 is Impaired under the Plan. Holders of Class 11 Intercompany Interests in GGC are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

D.   *Treatment of Claims Against and Interests in GAP*

1.   Class 1 — Other Priority Claims

   a.   *Classification*: Class 1 consists of all Other Priority Claims against GAP.

   b.   *Treatment*: Except to the extent that a Holder of an Allowed Other Priority Claim against GAP agrees to less favorable treatment, in full and final satisfaction of such Allowed Other Priority Claim, each Holder of an Allowed Other Priority Claim against GAP will, at the option of GAP or Wind-Down GAP, as applicable, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim against GAP, in each case, or as soon as reasonably practicable thereafter

   c.   *Voting*: Class 1 is Unimpaired under the Plan. Holders of Class 1 Other Priority Claims against GAP are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

2.   Class 2 — Secured Claims

   a.   *Classification*: Class 2 consists of all Secured Claims against GAP.

   b.   *Treatment*: Except to the extent that a Holder of an Allowed Secured Claim against GAP agrees to less favorable treatment, in full and final satisfaction of such Allowed Secured Claim, at the option of GAP or Wind-Down GAP, as applicable, such Holder will receive (i) payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Secured Claim becomes an Allowed Secured

Claim against GAP, in each case, or as soon as reasonably practicable thereafter, (ii) the return of the collateral securing such Allowed Secured Claim, or (iii) such other treatment so as to render such Holder's Allowed Secured Claim against GAP Unimpaired pursuant to section 1124 of the Bankruptcy Code.

c.    *Voting*: Class 2 is Unimpaired under the Plan. Holders of Class 2 Secured Claims against GAP are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, such Holders are not entitled to vote to accept or reject the Plan.

3.    Class 3 — Fiat-or-Stablecoin-Denominated Unsecured Claims

a.    *Classification*: Class 3 consists of all Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP.

b.    *Treatment*: Each Holder of an Allowed Fiat-or-Stablecoin-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GAP after the Effective Date.  Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP shall have no rights or remedies against GAP or Wind-Down GAP with respect to such Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.    *Voting*: Class 3 is Impaired under the Plan. Holders of Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP will be entitled to vote to accept or reject the Plan.

4.    Class 4 — BTC-Denominated Unsecured Claims

a.    *Classification*: Class 4 consists of all BTC-Denominated Unsecured Claims against GAP.

b.    *Treatment*: Each Holder of an Allowed BTC-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles.  Allowed BTC-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article

46

VIII hereof), remain obligations of Wind-Down GAP after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed BTC-Denominated Unsecured Claims against GAP shall have no rights or remedies against GAP or Wind-Down GAP with respect to such Allowed BTC-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.    *Voting*: Class 4 is Impaired under the Plan. Holders of Class 4 BTC-Denominated Unsecured Claims against GAP will be entitled to vote to accept or reject the Plan.

5.    Class 5 — ETH-Denominated Unsecured Claims

a.    *Classification*: Class 5 consists of all ETH-Denominated Unsecured Claims against GAP.

b.    *Treatment*: Each Holder of an Allowed ETH-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles. Allowed ETH-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GAP after the Effective Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed ETH-Denominated Unsecured Claims against GAP shall have no rights or remedies against GAP or Wind-Down GAP with respect to such Allowed ETH-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.    *Voting*: Class 5 is Impaired under the Plan. Holders of Class 5 ETH-Denominated Unsecured Claims against GAP will be entitled to vote to accept or reject the Plan.

6.    Class 6 — Alt-Coin-Denominated Unsecured Claims

a.    *Classification*: Class 6 consists of all Alt-Coin-Denominated Unsecured Claims against GAP.

b.    *Treatment*: Each Holder of an Allowed Alt-Coin-Denominated Unsecured Claim against GAP shall receive the treatment provided to such Holder under the Distribution Principles. Allowed Alt-Coin-Denominated Unsecured Claims against GAP shall, in the absence of any other treatment under the Plan or the Confirmation Order, solely for purposes of receiving distributions pursuant to the Plan and otherwise subject to the provisions of the Plan (including the release and injunction provisions set forth in Article VIII hereof), remain obligations of Wind-Down GAP after the Effective

Date. Notwithstanding anything to the contrary in the Plan, from and after the Effective Date, the Holders of Allowed Alt-Coin-Denominated Unsecured Claims against GAP shall have no rights or remedies against GAP or Wind-Down GAP with respect to such Allowed Alt-Coin-Denominated Unsecured Claims other than the right to receive distributions pursuant to the Plan.

c.   *Voting*: Class 6 is Impaired under the Plan. Holders of Class 6 Alt-Coin-Denominated Unsecured Claims against GAP will be entitled to vote to accept or reject the Plan.

7.   Class 7 — Subordinated Claims

a.   *Classification*: Class 7 consists of all Subordinated Claims against GAP.

b.   *Treatment*: Holders of Subordinated Claims against GAP shall not receive any distribution on account of such Subordinated Claims. On the Effective Date, all Subordinated Claims against GAP shall be cancelled, released, and extinguished.

c.   *Voting*: Class 7 is Impaired under the Plan. Holders of Class 7 Subordinated Claims against GAP will be conclusively deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

8.   Class 8 — Government Penalty Claims

a.   *Classification*: Class 8 consists of the Government Penalty Claims against GAP.

b.   *Treatment*: The Government Penalty Claims against GAP shall be, pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, subordinated to the General Unsecured Claims and Intercompany Claims against GAP, and the Government Penalty Claims against GAP will not receive any distribution on account of such Government Penalty Claims until all Allowed General Unsecured Claims and Allowed Intercompany Claims against GAP are paid in full; *provided*, *however*, that, if the Bankruptcy Court determines that the Government Penalty Claims against GAP should not be subordinated pursuant to sections 726(a)(4) and 1129(a)(7) of the Bankruptcy Code, then such Government Penalty Claims shall be *pari passu* with Class 3 Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP.

c.   *Voting*: Class 8 is Impaired under the Plan. For purposes of solicitation, it is presumed that Holders of Class 8 Government Penalty Claims against GAP shall not receive any distribution on account of such Government Penalty Claims and will be conclusively deemed to have rejected the Plan

pursuant to section 1126(g) of the Bankruptcy Code. Therefore, such Holders will not be entitled to vote to accept or reject the Plan.

9.    Class 9 — Intercompany Claims

a.    *Classification*: Class 9 consists of all Intercompany Claims against GAP.

b.    *Treatment*: All Intercompany Claims (subject to the GAP/GGC Settlement) against GAP will be adjusted, Reinstated, or compromised on the Effective Date in the Debtors' discretion, with the Committee's Consent.

c.    *Voting*: Class 9 is Unimpaired/Impaired under the Plan. Holders of Class 9 Intercompany Claims are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

10.    Class 10 — Intercompany Interests

a.    *Classification*: Class 10 consists of all Intercompany Interests in GAP.

b.    *Treatment*: Holders of Intercompany Interests in GAP shall not receive any distribution on account of such Intercompany Interests unless all senior Claims against GAP are paid in full or otherwise treated as Unimpaired. All Intercompany Interests in GAP shall, solely for Plan administrative purposes, continue to be held by the Holders of such Intercompany Interests on and after the Effective Date; *provided*, *however*, that, for the avoidance of doubt and in accordance with the New Governance Documents, the Holders of Intercompany Interests in GAP shall not (A) be entitled to exercise any rights or remedies appurtenant thereto, (B) have any economic interests, voting interests, or rights to influence, direct, or otherwise control GGC or its subsidiaries, (C) have any right to any dividends or distributions as a result of such ownership, or (D) be entitled to Transfer or take a worthless stock deduction with respect to the Interests in GAP.

c.    *Voting*: Class 10 is Impaired under the Plan. Holders of Class 10 Intercompany Interests in GAP are proponents of the Plan within the meaning of section 1129 of the Bankruptcy Code. Therefore, the vote of such Holders to accept or reject the Plan will not be solicited.

E.    *Special Provision Governing Unimpaired or Reinstated Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Wind-Down Debtors' claims, Causes of Action, rights, or defenses in respect of any Unimpaired Claims or Reinstated Claims, including all rights in respect of legal and equitable defenses to or setoffs or recoupment against any such Unimpaired Claims or Reinstated Claims.

F.     *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by one or more of the Classes entitled to vote pursuant to Article III.B–D of the Plan.  The Debtors reserve the right to modify the Plan in accordance with Article X of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

G.     *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not contain an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court for voting purposes as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

H.     *Voting Classes*; *Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no Holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Plan shall be presumed accepted by Holders of such Claims or Interests in such Class but such Class shall not constitute the sole impaired accepting Class for purposes of satisfying section 1129(a)(10) of the Bankruptcy Code.

I.     *Intercompany Interests*

To the extent Reinstated under the Plan, distributions (if any) on account of Intercompany Interests are not being recovered by Holders of such Intercompany Interests on account of their Intercompany Interests but for the purposes of administrative convenience and due to the importance of maintaining the corporate structure given the existing intercompany systems connecting the Debtors and their Affiliates, and in exchange for the Debtors' or the Wind-Down Debtors' agreement under the Plan to make certain distributions to Holders of Allowed Claims.

J.     *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

K.     *Subordinated Claims*

Except as expressly provided herein, the allowance, classification, and treatment of all Allowed Claims and Allowed Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the

Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors or the Wind-Down Debtors reserve the right to reclassify any Allowed Claim or Allowed Interest in accordance with any contractual, legal, or equitable subordination relating thereto. The Debtors and Wind-Down Debtors reserve their rights to seek to subordinate any and all portions of the 3AC Claims and the DCG Claims; *provided* that, for the avoidance of doubt, with respect to the 3AC Claims, any such subordination shall not be pursuant to the Plan or Confirmation Order.

## ARTICLE IV.
## MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Wind-Down Debtors*

    1.    <u>The Wind-Down Debtors Activities</u>

The Wind-Down Debtors shall be successors to the Debtors' rights, title, and interests to the Wind-Down Debtors' Assets. The Wind-Down Debtors will not conduct business operations and will be charged with winding down the Debtors' Estates for the benefit of the Wind-Down Beneficiaries. Each Wind-Down Debtor shall be managed by the PA Officer and the New Board, which shall consult with or be directed by the Wind-Down Oversight Committee, in accordance with the Plan Administration Agreement and the applicable New Governance Documents and shall be subject to the Wind-Down Budget.

On the Effective Date, the Wind-Down Debtors and the PA Officer shall execute the Plan Administration Agreement. In the event of any conflict between the terms of this Article IV.A and the terms of the Plan Administration Agreement, the terms of the Plan Administration Agreement shall control.

    2.    <u>PA Officer</u>

The PA Officer shall be selected by the Committee, in consultation with the Debtors and with the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), and shall be identified in the Plan Supplement. The appointment of the PA Officer shall be approved in the Confirmation Order, and the PA Officer's duties shall commence as of the Effective Date. The PA Officer shall administer the distributions to the Wind-Down Debtors' Beneficiaries in accordance with and pursuant to the Distribution Principles and shall serve as the successor to and representative of the Estates under section 1123(b) of the Bankruptcy Code for the purpose of enforcing Retained Causes of Action belonging to such Estates (including any Causes of Action that belong to the Other Genesis Entities) that are not released, waived, settled, compromised, or transferred pursuant to the Plan and subject to the limitations set forth in the Plan.

The powers, rights, and responsibilities of the PA Officer shall be specified in the Plan Administration Agreement and shall include the authority and responsibility to fulfill the items identified in the Plan. Other rights and duties of the PA Officer and the Wind-Down Debtors' Beneficiaries shall be as set forth in the Plan Administration Agreement. Pursuant hereto and the Plan Administration Agreement, the PA Officer shall act in a fiduciary capacity on behalf of the interests of all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Plan.

In accordance with the Plan Administration Agreement, the PA Officer shall serve in such capacity through the earlier of (i) the date on which the Wind-Down Debtors are dissolved in accordance with the Plan and the Plan Administration Agreement, and (ii) the date on which the PA Officer resigns, is terminated (in accordance with the Plan Administration Agreement), or is otherwise unable to serve; *provided*, *however*, that, in the event that a PA Officer resigns, is terminated, or is otherwise unable to serve, the Wind-Down Oversight Committee shall elect a successor to be appointed by the New Board to serve as a PA Officer in accordance with the Plan Administration Agreement.  If the Wind-Down Oversight Committee does not elect a successor within the time periods specified in the Plan Administration Agreement, then the Bankruptcy Court, upon the motion of any party-in-interest, including counsel to the Wind-Down Debtors, shall approve a successor to serve as a PA Officer.

3.   The Wind-Down Oversight Committee

The Committee and the Ad Hoc Group SteerCo (if the Ad Hoc Group Acceptance Event has occurred and is continuing) shall mutually appoint, in consultation with the Debtors (and, with respect to the Wind-Down Oversight Gemini Lender Member, with Gemini's Consent), a committee of seven (7) members identified in the Plan Supplement to oversee the New Board, the PA Officer, and the Wind-Down Debtors' wind-down activities in accordance with the Plan (including the Distribution Principles) and the Plan Administration Agreement.  On the Effective Date, the Wind-Down Oversight Committee shall be deemed to have adopted the Wind-Down Oversight Committee Bylaws, which shall require the membership of the Wind-Down Oversight Committee to at all times, to the maximum extent practicable, include the following: (i) at least two (2) Wind-Down Oversight BTC Members, (ii) at least one (1) Wind-Down Oversight ETH Member, (iii) at least two (2) Wind-Down Oversight Fiat-or-Stablecoin Members, (iv) the Wind-Down Oversight Gemini Lender Member, and (v) the Wind-Down Oversight Crossover Member; *provided*, *however*, that the Wind-Down Oversight Committee Bylaws shall expressly provide that the Wind-Down Oversight Gemini Lender Member shall be recused from all matters pertaining to (x) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (y) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413.

The Wind-Down Oversight Committee's responsibilities shall include (i) reviewing, and advising the PA Officer with respect to, the distribution or other disposition of the Distributable Assets in accordance with the Plan (including the Distribution Principles) and the Plan Administration Agreement and (ii) approving any material amendments to the Distribution Principles. For the avoidance of doubt, in advising the PA Officer, the Wind-Down Oversight Committee shall maintain the same fiduciary responsibilities as the PA Officer, which for the avoidance of doubt includes fiduciary duties to all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Plan.  Vacancies on the Wind-Down Oversight Committee shall be filled by the unanimous consent of the remaining member or members of the Wind-Down Oversight Committee, which consent shall not be unreasonably withheld, conditioned, or delayed. If a vacancy on the Wind-Down Oversight Committee is not filled within five (5) Business Days of such vacancy occurring, the PA Officer shall have the authority to seek an order from the Bankruptcy Court approving the appointment of a Person, with such Person's prior written consent, to the Wind-Down Oversight Committee to fill such vacancy.  The PA Officer shall also

52

have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Wind-Down Oversight Committee for cause.

4.    The Litigation Oversight Committee

The Committee and the Ad Hoc Group SteerCo (if the Ad Hoc Group Acceptance Event has occurred and is continuing) shall mutually appoint, in consultation with the Debtors, a committee of seven (7) members identified in the Plan Supplement to oversee the PA Officer and the Wind-Down Debtors with respect to the commencement, management, settlement, compromise, or other disposition of the Retained Causes of Action in accordance with the Plan and the Litigation Oversight Committee Bylaws.  On the Effective Date, the Litigation Oversight Committee shall be deemed to have adopted the Litigation Oversight Committee Bylaws, which shall require the membership of the Litigation Oversight Committee to at all times, to the maximum extent practicable, include the following: (i) at least two (2) Litigation Oversight BTC Members, (ii) at least two (2) Litigation Oversight Fiat-or-Stablecoin Members, (iii) at least one (1) Litigation Oversight ETH Member, (iv) at least one (1) Litigation Oversight Crossover Member; and (v) at least one (1) Litigation Oversight Gemini Lender Member; *provided*, *however*, that the Litigation Oversight Committee Bylaws shall expressly provide that the Litigation Oversight Gemini Lender Member shall be recused from all matters pertaining to (x) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (y) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413; and, *provided*, *further*, that upon the occurrence of a USD Recovery Event, the Litigation Oversight Fiat-or-Stablecoin Members shall be deemed to resign their positions, and the Litigation Oversight Committee shall be reduced to five (5) members.

The Litigation Oversight Committee's responsibilities shall include (i) reviewing, and advising the PA Officer with respect to, the strategy and pursuit of Retained Causes of Action, including the management and direction of counsel and other advisors, (ii) approving settlements on account of any Retained Causes of Action, and (iii) managing the Litigation Reserve.  For the avoidance of doubt, in advising the PA Officer, the Litigation Oversight Committee shall maintain the same fiduciary responsibilities as the PA Officer, which for the avoidance of doubt includes fiduciary duties to all Holders of Claims and Interests that are entitled to receive distributions pursuant to the Plan.  Vacancies on the Litigation Oversight Committee shall be filled by the unanimous consent of the remaining member or members of the Litigation Oversight Committee, which consent shall not be unreasonably withheld, conditioned, or delayed.  If a vacancy on the Litigation Oversight Committee is not filled within five (5) Business Days of such vacancy occurring, the PA Officer shall have the authority to seek an order from the Bankruptcy Court approving the appointment of a Person, with such Person's prior written consent, to the Litigation Oversight Committee to fill such vacancy.  The PA Officer shall also have the authority to seek an order from the Bankruptcy Court removing or replacing members of the Litigation Oversight Committee for cause.

5.      Plan Administration Agreement

The Plan Administration Agreement generally will provide for, among other things: (i) the payment of reasonable and documented compensation to the PA Officer; (ii) the payment of other expenses of the Wind-Down Debtors by the PA Officer; (iii) the retention of counsel, accountants, financial advisors, or other professionals and the payment of their compensation; (iv) the investment of Cash by the PA Officer within certain limitations; (v) the preparation and filing of appropriate tax returns and other reports on behalf of the Wind-Down Debtors and the Debtors and the payment of taxes or other obligations owed by the Wind-Down Debtors and the Debtors; (vi) the PA Officer's orderly liquidation of the Wind-Down Debtors' Assets subject to the oversight of the New Board and the Wind-Down Oversight Committee as set forth herein; and (vii) the litigation, settlement, abandonment, or dismissal of the Retained Causes of Action and any other claims, rights, or causes of action assigned to the Wind-Down Debtors subject to the oversight of the Litigation Oversight Committee as set forth herein.

6.      Reports to Be Filed by the PA Officer

The PA Officer, on behalf of the Wind-Down Debtors, shall File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Plan Administration Agreement, including the New Board and the Wind-Down Oversight Committee), no later than thirty-one (31) days after June 30 and December 31 of each calendar year, a semi-annual report (in a form reasonably acceptable to the New Board and the Wind-Down Oversight Committee) regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it, and other matters relating to the implementation of the Plan.

7.      Fees and Expenses of the Wind-Down Debtors

The Wind-Down Debtors' Expenses shall be paid from the Wind-Down Reserve, subject to the Wind-Down Budget.  The fees and expenses of the PA Officer (including those incurred prior to the Effective Date in connection with the preparation of the Plan Administration Agreement) shall be paid after the Effective Date pursuant to the terms and conditions of the Plan Administration Agreement.  The PA Officer, on behalf of the Wind-Down Debtors, may employ, without further order of the Bankruptcy Court, professionals (including professionals previously employed by the Debtors) to assist in carrying out its duties under the Plan Administration Agreement and may compensate and reimburse the expenses of these professionals based upon the nature of the work performed by such professional, without further order of the Bankruptcy Court, subject to any limitations and procedures established by the Plan Administration Agreement.  For the avoidance of doubt, the PA Officer, Wind-Down Oversight Committee, and Litigation Oversight Committee may employ the same professionals to the extent appropriate, as determined by each in its reasonable discretion and in accordance with the Plan Administration Agreement, the Litigation Oversight Committee Bylaws, or the Wind-Down Oversight Committee Bylaws, as applicable.

8.      Liability of the Wind-Down Debtors; Indemnification

The Plan Administration Agreement may include reasonable and customary indemnification provisions for the benefit of the PA Officer, the New Board, the Litigation

Oversight Committee, the Wind-Down Oversight Committee, and/or other parties. Any such indemnification shall be the sole responsibility of the Wind-Down Debtors and payable solely from the Wind-Down Debtors' Assets.

The Wind-Down Debtor Parties shall not be liable for losses, claims, damages, liabilities, or expenses in connection with the affairs of the Wind-Down Debtors or for the act or omission of any other Wind-Down Debtor Party, nor shall the Wind-Down Debtor Parties be liable for any act or omission taken or omitted to be taken pursuant to the discretion, powers, and authority conferred, or in good faith believed to be conferred, by the Plan Administration Agreement or the Plan other than for specific acts or omissions resulting from such Wind-Down Debtor Party's willful misconduct, gross negligence, or actual fraud. Subject to the Plan Administration Agreement, the PA Officer shall be entitled to enjoy all of the rights, powers, immunities, and privileges applicable to a chapter 7 trustee, and the New Board shall be entitled to enjoy all of the rights, powers, immunities, and privileges provided in the New Governance Documents. The PA Officer or the New Board, as applicable, may, in connection with the performance of its functions, and in its sole and absolute discretion, consult with its attorneys, accountants, financial advisors, and agents, and shall not be liable for any act taken, omitted to be taken, or suffered to be done in accordance with advice or opinions rendered by such persons, regardless of whether such advice or opinions are provided in writing. Notwithstanding such authority, none of the Wind-Down Debtor Parties shall be under any obligation to consult with its attorneys, accountants, financial advisors, or agents, and their determination not to do so shall not result in the imposition of liability on the any of the Wind-Down Debtor Parties, or their respective members and/or designees, unless such determination is based on willful misconduct, gross negligence, or actual fraud. The Wind-Down Debtor Parties shall not be liable whatsoever except for the performance of such duties and obligations as are specifically set forth herein, and no implied covenants or obligations shall be read into the Plan Administration Agreement, the Litigation Oversight Committee Bylaws, or the Wind-Down Oversight Committee Bylaws against any of them. The Wind-Down Debtors shall promptly, upon submission of invoices therefor, pay expenses reasonably incurred by any Wind-Down Debtor Party in defending, participating in, or settling any action, proceeding, or investigation in which such Wind-Down Debtor Party is a party or is threatened to be made a party and which arises out of or due to such Wind-Down Debtor Party's duties, acts, or omissions, or the consequences of such duties, acts, or omissions, with respect to the implementation of the Plan or otherwise in connection with the affairs of the Wind-Down Debtors, whether in advance of the final disposition of such action, proceeding, or investigation or otherwise; *provided*, *however*, that no expenses will be paid to a Wind-Down Debtor Party to the extent such expenses result from such Wind-Down Debtor Party's willful misconduct, gross negligence, or actual fraud.

9.    Tax Treatment

The Debtors will not issue an IRS Form 1099-B to any Holder of a Claim in respect of any return of Digital Assets to such Holder, to the extent the Holder receives Digital Assets of the same type as those deposited with a Debtor in an amount not in excess of the amount of such Digital Assets so deposited, except to the extent otherwise required pursuant to a "final determination" within the meaning of section 1313(a) of the Internal Revenue Code or as the result of a change in law.

10.     <u>Insurance; Bond</u>

The PA Officer may obtain insurance coverage (in the form of an errors and omissions policy or otherwise) with respect to the liabilities and obligations of the PA Officer under the Plan Administration Agreement.  Unless otherwise agreed to by the New Board, the PA Officer shall serve with a bond, the terms of which shall be agreed to by the New Board, and the cost and expense of which shall be paid by the Wind-Down Debtors.

11.     <u>Settlement of Claims</u>

Except as otherwise provided in the Plan or the Plan Administration Agreement, on and after the Effective Date, the PA Officer, in consultation with the Wind-Down Oversight Committee, may compromise or settle any Claims related to the Wind-Down Debtors' Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Wind-Down Debtors' Expenses, professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court; *provided, however*, that the Wind-Down Oversight Committee's Consent shall be required for any settlement that would Allow a Claim at a value at or above $5 million; *provided further* that the Litigation Oversight Committee's Consent shall be required for any settlement of Retained Causes of Action as provided herein and in the Plan Administration Agreement.

12.     <u>Sales of Assets by the Wind-Down Debtors</u>

The PA Officer may conduct any Monetization Transactions of non-Cash Wind-Down Debtors' Assets (except for Retained Causes of Action, GBTC shares, and ETHE shares) on any terms it deems reasonable, without further order of the Bankruptcy Court.  The PA Officer may conduct any Monetization Transactions of Retained Causes of Action without further order of the Bankruptcy Court, but only to the extent the PA Officer has obtained the prior consent of the New Board and the Litigation Oversight Committee's Consent, subject to the provisions of the Plan Administration Agreement.  Subject to subsection (a) below, the PA Officer may conduct any Monetization Transactions of GBTC shares or ETHE shares without further order of the Bankruptcy Court and free of any prohibition on assignability or transfer under applicable non-bankruptcy law that otherwise may be applicable to such shares, but only in accordance with the Distribution Principles.  Upon the sale, liquidation, transfer, or other disposition of the Wind-Down Debtors' Assets by the PA Officer, the PA Officer shall deposit the proceeds of all such sales, liquidations, transfers, or dispositions into one or more of the Wind-Down Accounts (and such proceeds shall become and be deemed to be Distributable Assets).

a.     Additional GBTC Shares Reserve

Notwithstanding anything to the contrary in the Plan (including the Distribution Principles), until the Gemini Additional Collateral Determination has occurred, the Additional GBTC Shares Reserve shall be held in reserve by the Wind-Down Debtors and shall not be distributed, subject to any Monetization Transactions, or otherwise subject to dissipation, use, or encumbrance without Gemini's Consent.

56

b.    Gemini GBTC Shares Reserve

Notwithstanding anything to the contrary in the Plan (including the Distribution Principles), until the Gemini GBTC Shares Determination has occurred, the Gemini GBTC Shares Reserve shall be held in reserve by Gemini or the Gemini Distribution Agent and shall not be distributed, subject to any Monetization Transactions, or otherwise subject to dissipation, use, or encumbrance without Gemini's Consent and the Wind-Down Oversight Committee's Consent.

13.    Abandonment of Assets by the Wind-Down Debtors

With five (5) Business Days' prior notice to the New Board, the Wind-Down Oversight Committee, and, with respect the abandonment of any Retained Cause of Action, the Litigation Oversight Committee, the PA Officer may abandon any Wind-Down Debtors' Assets that the PA Officer determines in his, her, or its reasonable discretion to be of *de minimis* value or burdensome to the Wind-Down Debtors, including any pending adversary proceeding or other legal action commenced or commenceable by the Debtors prior to the Effective Date.

14.    Dissolution of the Wind-Down Debtors

On and after the Effective Date, the Wind-Down Debtors will be authorized and directed to implement the Plan and any applicable orders of the Bankruptcy Court, and the Wind-Down Debtors, subject to the remaining provisions of this Article IV.A.14 shall have the power and authority to take any action necessary to wind down and dissolve the Debtors' Estates. As soon as practicable after the Effective Date, the Wind-Down Debtors shall take such actions as the Wind-Down Debtors may determine to be necessary or desirable to carry out the purposes of the Plan.

Upon making all distributions provided for under the Plan, the Wind-Down Debtors (1) for all purposes shall be deemed to have withdrawn their business operations from any state in which the applicable Debtors were previously conducting, or are registered or licensed to conduct, their business operations, and shall not be required to file any document, pay any sum, or take any other action in order to effectuate such withdrawal, (2) except as otherwise provided in the Plan, shall be deemed to have cancelled all Interests pursuant to the Plan, and (3) shall not be liable in any manner to any taxing authority for franchise, business, license, or similar taxes accruing on or after the Effective Date. Pursuant to the terms of this Plan, on the Effective Date, any Money Transmitter Licenses that have not been terminated shall be deemed withdrawn and no further action is required to be taken by the Debtors or the Wind-Down Debtors to effectuate such withdrawal; *provided* that, following the Effective Date, the Wind-Down Debtors shall use commercially reasonable efforts to comply with all state banking department requirements for the surrender of a Money Transmitter License. Nothing in this Plan shall be construed to limit the rights of creditors, the Debtors, the Wind-Down Debtors, or regulators to pursue recoveries against surety bonds maintained by the Debtors in connection with Money Transmitter Licenses.

The Wind-Down Debtors will dissolve on the earlier of the date on which: (i) (a) the Wind-Down Debtors have made the final liquidation, administration, and distribution of the Wind-Down Debtors' Assets in accordance with the terms of the Plan Administration Agreement and the Plan, and the PA Officer has fully performed all other duties and functions as set forth under the Plan,

the Confirmation Order, and/or the Plan Administration Agreement and (b) the Chapter 11 Cases of the Debtors have been closed; or (ii) the PA Officer determines in his, her, or its reasonable judgment, with notice to the New Board and in consultation with the Wind-Down Oversight Committee, that the Wind-Down Debtors lack sufficient assets and financial resources, after reasonable collection efforts, to complete the duties and powers assigned to him, her, or it under the Plan, the Confirmation Order, and/or the Plan Administration Agreement.  After (x) the final distributions pursuant hereto, (y) the Filing by or on behalf of the Wind-Down Debtors of a certification of dissolution with the Bankruptcy Court, and (z) any other action deemed appropriate by the PA Officer, the Wind-Down Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions, including the Filing of any documents with the secretary of state for the state in which the Wind-Down Debtors are formed or any other jurisdiction.  The PA Officer, however, shall have authority to take all necessary actions to dissolve the Wind-Down Debtors in and withdraw the Wind-Down Debtors from applicable states.  Any certificate of dissolution or equivalent document may be executed by the PA Officer on behalf of any Wind-Down Debtor without the need for any action or approval by the shareholders or board of directors or managers of such Wind-Down Debtor.

B.    *Means for Implementation*

1.    Restructuring

On the Effective Date, or as soon as reasonably practicable thereafter, each of the Wind-Down Debtors shall undertake the Restructuring, including: (1) the execution and delivery of any appropriate agreements or other documents of merger, consolidation, restructuring, conversion, disposition, sale transfer, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Entities may agree; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan or as otherwise agreed by the Debtors with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing); (3) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; (4) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, consolidation, conversion, or dissolution pursuant to applicable state law; (5) the issuance of securities (if any), which shall be authorized and approved in all respects in each case without further action being required under applicable law, regulation, order, or rule; (6) the execution and delivery of a tax sharing agreement allocating the benefits and burdens of tax attributes and tax costs between the Debtors and DCG and of Definitive Documents not otherwise included in the foregoing, if any; (7) the implementation of the terms and conditions of the Alameda/Genesis Settlement Agreement; and (8) all other actions that the Debtors or the Wind-Down Debtors, as applicable, determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law.  The Confirmation Order shall and shall be deemed, pursuant to sections 363, 365, and 1123 of the Bankruptcy Code, to authorize, among other things, all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate the Plan, including the Distribution Principles and Monetization Transactions.

    2.    <u>Segregated Accounts for Plan Distributions</u>

    a.    Claims Reserve

The Claims Reserve for each Debtor shall be held in trust in a segregated account by the applicable Wind-Down Debtor for distributions and/or payment in accordance with the terms of Articles II and III of the Plan.  Each Wind-Down Debtor shall be entitled to (i) any Cash or Digital Assets held in the applicable Claims Reserve after all applicable distributions are made to Holders of Allowed Claims entitled to the Cash or Digital Assets in such applicable Claims Reserve under the Plan and (ii) any surplus Cash or Digital Assets in the applicable Claims Reserve, which surplus shall be determined by the PA Officer based on the potential amount of Administrative Expense Claims, Other Priority Claims, and Secured Claims that remain unpaid as of such date of determination and any such Cash or Digital Assets shall constitute Distributable Assets to be distributed pursuant to the Plan (including the Distribution Principles).

    b.    Professional Fee Escrow Account

The Professional Fee Reserve Amount shall be held in trust in a segregated Professional Fee Escrow Account by the Wind-Down Debtors solely for distributions or payment in accordance with the terms of Article II of the Plan.  Each Wind-Down Debtor shall be entitled to its pro rata share (based on the percentage of the Professional Fee Reserve Amount funded by such Entity or the applicable Debtor) of any Cash held in the Professional Fee Escrow Account after all Allowed Professional Fee Claims are satisfied in full in Cash and any such remaining Cash shall constitute Distributable Assets to be distributed pursuant to the Plan (including the Distribution Principles).

    c.    Litigation Reserve

The Litigation Reserve shall be held in a separate segregated account from the Wind-Down Reserve and used by the Wind-Down Debtors to pay the Wind-Down Debtors' Expenses incurred in connection with the Wind-Down Debtors' pursuit of any claims or Causes of Action, including the Retained Causes of Action; *provided, however*, that the Litigation Reserves shall not be used to pay the Wind-Down Debtors' Expenses incurred in connection with the Wind-Down Debtors' other wind down efforts, which expenses shall be paid from the Wind-Down Reserve unless otherwise ordered by the Bankruptcy Court. The Wind-Down Debtors shall be entitled to any (i) Cash held in the Litigation Reserve after all Retained Causes of Action have been settled or determined by a Final Order and (ii) surplus Cash in the Litigation Reserve, which surplus shall be determined by the PA Officer in consultation with the Litigation Oversight Committee, in each case, which Cash shall constitute Distributable Assets to be distributed pursuant to the Plan (including the Distribution Principles) unless otherwise ordered by the Bankruptcy Court.

    d.    Wind-Down Reserve

The Wind-Down Reserve for each Wind-Down Debtor shall be held in trust in a segregated account by such Wind-Down Debtor to pay the applicable Wind-Down Debtors' Expenses; *provided, however*, that the Wind-Down Reserves shall not be used to pay the Wind-Down Debtors' Expenses incurred in connection with the Wind-Down Debtors' pursuit of any claims or Causes of Action, including the Retained Causes of Action, which Wind-Down Debtors' Expenses

shall be paid out of the Litigation Reserve.  Each Wind-Down Debtor shall be entitled to any (i) Cash held in the applicable Wind-Down Reserve after all Wind-Down Debtors' Expenses of such Wind-Down Debtor have been paid and (ii) surplus Cash in the applicable Wind-Down Reserve, which surplus shall be determined by the PA Officer in consultation with the Wind-Down Oversight Committee, in each case, which Cash shall constitute Distributable Assets to be distributed pursuant to the Plan (including the Distribution Principles).

3.   Sources of Consideration for Plan Distributions; Digital Asset Rebalancing

The Wind-Down Debtors shall make distributions under and in accordance with the Plan from Distributable Assets, the Claims Reserve, and the Professional Fee Escrow Account, as applicable.

The Debtors and the Wind-Down Debtors shall, in consultation with the Wind-Down Oversight Committee and to the maximum extent permitted by law, be authorized to rebalance their Cash and Digital Assets to enable the Debtors or the Wind-Down Debtors, as applicable, to make distributions in respect of Claims denominated in Digital Assets in the like kind form of Digital Asset in which such Claims are denominated.  The Debtors and the Wind-Down Debtors, to the maximum extent permitted by law, are authorized to effectuate such rebalancing by buying and selling Digital Assets or otherwise exchanging any type of Digital Asset into any other type of Digital Asset; *provided, however*, that no distribution in the form of Digital Assets shall be made to any Holder that has not responded to all requests by the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, for information necessary to facilitate a particular distribution to such Holder.

The Wind-Down Debtors will be entitled to transfer funds between and among themselves as they determine to be necessary or appropriate to enable the Wind-Down Debtors to satisfy their obligations under the Plan.  Except as set forth herein, any changes in intercompany account balances resulting from such transfers may be accounted for and/or settled in accordance with the Debtors' historical intercompany account settlement practices and any such action will not violate the terms of the Plan.

4.   Corporate Existence

Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated in the Plan or the Plan Supplement, on the Effective Date, each Debtor shall continue to exist after the Effective Date as a separate corporation, limited liability company, partnership, or other form of entity, as the case may be, with all the powers of a corporation, limited liability company, partnership, or other form of entity, as the case may be, pursuant to the New Governance Documents.

5.   Vesting of Assets

Except as otherwise provided in the Plan, the Plan Supplement, or any agreement, instrument, or other document incorporated herein or therein, on the Effective Date: all Assets in each Estate, including all Retained Causes of Action and any Assets owned or acquired by any of the Debtors, shall vest in each applicable Wind-Down Debtor free and clear of all Liens, Claims,

charges, or other encumbrances (other than, for the avoidance of doubt, any Allowed General Unsecured Claims), including any prohibition on assignability or transfer under applicable non-bankruptcy law.  The vesting of Assets pursuant to the Plan shall not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Wind-Down Debtors as if the asset or right was still held by the Debtors.  On and after the Effective Date, except as otherwise provided in the Plan, the New Governance Documents, or the Plan Administration Agreement, each Wind-Down Debtor may use, acquire, or dispose of property, and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and free of any prohibition on assignability or transfer under applicable non-bankruptcy law that otherwise may be applicable.

Notwithstanding any prohibition on assignability or transfer under applicable non-bankruptcy law, on and after the Effective Date, if additional Assets become available, such additional Assets shall be treated as if they were transferred to (as applicable) and vested in the applicable Wind-Down Debtor as a successor to the Debtors with all attendant rights, title, and interests in and to all such Assets, in accordance with section 1141 of the Bankruptcy Code.  All such Assets shall automatically vest in the Wind-Down Debtors free and clear of all Liens, Claims, charges, or other encumbrances (other than, for the avoidance of doubt, any Allowed General Unsecured Claims pursuant to the terms of the Plan).

Except as otherwise provided for in the Plan, to the extent that any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Debtors or the Wind-Down Debtors that are necessary to cancel and/or extinguish such Liens and/or security interests.

On and after the Effective Date, the Wind-Down Debtors may present Bankruptcy Court order(s) or assignment(s) suitable for filing in the records of every county or governmental agency where the property vested in accordance with the foregoing paragraph is or was located, which provide that such property is conveyed to and vested in the Wind-Down Debtors.  The Bankruptcy Court order(s) or assignment(s) may designate all Liens, Claims, encumbrances, or other interests which appear of record and/or from which the property is being transferred, assigned, and/or vested free and clear of. The Plan shall be conclusively deemed to be adequate notice that such Lien, Claim, encumbrance, or other interest is being extinguished and no notice, other than by the Plan, shall be given prior to the presentation of such Bankruptcy Court order(s) or assignment(s). Any Person having a Lien, Claim, encumbrance, or other interest against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer, assignment, and vesting of such property to or in the Wind-Down Debtors free and clear of all Liens, Claims, charges, or other encumbrances by failing to object to confirmation of the Plan, except as otherwise provided in the Plan.

6.      Cancellation of Existing Securities and Agreements

Except as otherwise provided in the Plan, on the Effective Date: (a) all Interests, and each certificate, share, note, bond, indenture, purchase right, option, warrant, or other instrument or document, directly or indirectly, evidencing or creating any indebtedness or obligation of or ownership interest in the Debtors or giving rise to any Claim or Interest shall be cancelled or extinguished and the Debtors and the Wind-Down Debtors shall not have any continuing obligations thereunder; and (b) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws, or certificate or articles of incorporation or similar documents governing the shares, certificates, notes, bonds, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or Claims against or Interests in, the Debtors shall be released; *provided* that, notwithstanding the releases set forth in Article VIII of the Plan, Confirmation, or the occurrence of the Effective Date, any such indenture or agreement that governs the rights of the Holder of a Claim or Interest shall continue in effect solely for purposes of enabling Holders of Allowed Claims and Allowed Interests to receive distributions under the Plan as provided herein; *provided further* that, absent the consent of the Debtors and the Committee's Consent, nothing in this Article IV.B.6 shall effectuate a cancellation of any  Intercompany Interests, Intercompany Claims (except for claims settled as part of the GAP/GGC Settlement or the GGC/GGH Settlement), or Interests.

Notwithstanding anything to the contrary in this Article IV.B.6, any provision in any document, instrument, lease, or other agreement that causes or effectuates, or purports to cause or effectuate, a default, termination, waiver, or other forfeiture of, or by, a Debtor or its Interests, as a result of the cancellations, terminations, satisfaction, or releases provided for in this Article IV.B.6 shall be deemed null and void and shall be of no force and effect.  Nothing contained herein shall be deemed to cancel, terminate, or release the obligation of a Debtor or any of its counterparties under any Executory Contract or Unexpired Lease to the extent such executory contract or unexpired lease has been assumed by such Debtor or Wind-Down Debtor, as applicable, pursuant to the Plan or a Final Order of the Bankruptcy Court.

7.      Corporate Action

Upon the Effective Date, all actions (whether to occur before, on, or after the Effective Date) contemplated by the Plan shall be deemed authorized and approved by the Bankruptcy Court in all respects, including, as applicable: (1) the appointment of the New Board, the PA Officer, and other directors and officers for the Wind-Down Debtors, including the Litigation Oversight Committee and the Wind-Down Oversight Committee; (2) the implementation of the Restructuring; (3) the re-vesting of the Wind-Down Debtors' Assets in the Wind-Down Debtors and the transactions and distributions contemplated under the Plan and the Distribution Principles, including any rebalancing of Distributable Assets; (4) the rejection, assumption, or assumption and assignment, as applicable, of Executory Contracts and Unexpired Leases; and (5) all other actions contemplated by the Plan and the Definitive Documents.  Upon the Effective Date, all matters provided for in the Plan involving the corporate structure of the Wind-Down Debtors, and any corporate action required by the Debtors or the Wind-Down Debtors in connection with the Plan (including any items listed in the first sentence of this paragraph) shall be deemed to have

occurred and shall be in effect, without any requirement of further action by the security Holders, directors, managers, or officers of the Debtors or the Wind-Down Debtors. On or (as applicable) before the Effective Date, the appropriate directors, managers, officers, or other authorized persons of the Debtors or the Wind-Down Debtors shall be authorized and empowered to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated by the Plan (or necessary or desirable to effectuate the transactions contemplated by the Plan) in the name of and on behalf of the Wind-Down Debtors to the extent not previously authorized by the Bankruptcy Court. The New Board shall be appointed by DCG subject to the limitations set forth in the Plan; *provided*, *however*, in selecting the Persons for appointment to the New Board, DCG shall only be entitled to choose those Persons that are identified on a list of seven (7) candidates that is delivered to DCG by the Committee, in consultation with the Debtors and with the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing). The authorizations and approvals contemplated by this Article IV.B.7 of the Plan shall be effective notwithstanding any requirements under non-bankruptcy law.

8.    New Governance Documents

To the extent required under the Plan or applicable non-bankruptcy law, the Wind-Down Debtors will, on or as soon as practicable after the Effective Date, file their respective New Governance Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states, provinces, or countries of incorporation in accordance with the corporate laws of the respective states, provinces, or countries of incorporation. To the extent required by section 1123(a)(6) of the Bankruptcy Code, the New Governance Documents of the Wind-Down Debtors will prohibit the issuance of non-voting equity securities. After the Effective Date, the Wind-Down Debtors may amend and restate their respective New Governance Documents and other constituent documents, as permitted by the laws of their respective states, provinces, or countries of organization and their respective New Governance Documents.

On the Effective Date, the New Governance Documents, substantially in the forms set forth in the Plan Supplement, shall be deemed to be valid, binding, and enforceable in accordance with their terms and provisions.

9.    Directors and Officers of the Wind-Down Debtors

As of the Effective Date, the term of the current members of the board of directors, board of managers, or other governing body of the Debtors shall expire automatically and each person serving as a director or manager of a Debtor shall be removed and shall be deemed to have resigned and cease to serve automatically. The New Board shall be appointed by DCG subject to the limitations set forth in the Plan; *provided*, *however*, in selecting the Persons for appointment to the New Board, DCG shall only be entitled to appoint those Persons who are identified on a list of seven (7) candidates selected by the Committee, in consultation with the Debtors and with the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing); and, *provided*, *further*, that following the Effective Date, the Wind-Down Oversight Committee shall be responsible for identifying any nominees to replace members of the New Board by submitting a list of three (3) Persons for each member of the New Board who needs to be replaced; and, *provided*, *further*, that in no event shall DCG be entitled to terminate any member of the New

Board.  The New Board shall govern each of the Wind-Down Debtors and consult with the Wind-Down Oversight Committee on various matters identified in the Plan and the Plan Administration Agreement.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will, to the extent known, disclose in advance of the Confirmation Hearing the identity and affiliations of any Person proposed to serve on the New Board, as well as those Persons that will serve as an officer of any of the Wind-Down Debtors. If any such director or officer is an "insider" as defined in section 101(31) of the Bankruptcy Code, the nature of any compensation to be paid to such director or officer will also be disclosed to the extent required under the Bankruptcy Code. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of the New Governance Documents and other constituent documents of each of the Wind-Down Debtors.

10.    Effectuating Documents; Further Transactions

On and after the Effective Date, the Wind-Down Debtors, their respective officers, the PA Officer, and the members of the New Board are, subject to the New Governance Documents and the Plan Administration Agreement, authorized to and may issue, execute, deliver, file, or record such contracts, Securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the Securities issued pursuant to the Plan (if any) in the name of and on behalf of the Wind-Down Debtors, without the need for any approvals, authorization, or consents except those expressly required pursuant to the Plan.

11.    Reserved

12.    Exemption from Certain Taxes and Fees

Pursuant to, and to the fullest extent permitted by, section 1146(a) of the Bankruptcy Code, (a) any issuance, transfer, or exchange of a Security (if any), (b) any creation of any Lien, mortgage, deed of trust, or other security interest, or (c) any sale, liquidation, or transfer of property, in each case, pursuant to, in contemplation of, or in connection with, the Plan, including the transfer of any Assets to the Wind-Down Debtors and any rebalancing of Distributable Assets, shall not be subject to any document recording tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, stamp act, real estate transfer tax, sales or use tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and upon entry of the Confirmation Order, the appropriate state or local governmental officials or agents shall forgo the collection of any such tax or governmental assessment and accept for filing and recordation any instruments of transfer or other relevant documents without the payment of any such tax, recordation fee, or governmental assessment.

13.    Exemption from Registration Requirements

Any Securities offered, issued, or distributed pursuant to the Plan will be so offered, issued, or distributed pursuant to an exemption from registration under the Securities Act and all rules and

regulations promulgated thereunder, including sections 4(a)(1) and 4(a)(2), Rule 506 of Regulation D, Regulation S, and/or Rule 144.

Notwithstanding anything to the contrary in the Plan, no Person shall be entitled to require a legal opinion regarding the validity of any transaction contemplated by the Plan, including whether any Securities are exempt from registration and/or eligible for book-entry delivery, settlement, and depository services.

14.    Preservation of Causes of Action

In accordance with and subject to section 1123(b)(3) of the Bankruptcy Code, but subject in all respects to Article VIII, the Wind-Down Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action belonging to the Debtors or their Estates (including any Causes of Action that belong to the Other Genesis Entities), whether arising before or after the Petition Date, including any Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. The Wind-Down Debtors shall be vested with all rights, powers, and privileges of the Debtors (including the rights and powers of the Debtors under chapter 5 of the Bankruptcy Code) and may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Wind-Down Debtors. Notwithstanding anything to the contrary herein, all rights in any Retained Causes of Action shall vest in the Wind-Down Debtors as of the Effective Date, and may be pursued by the PA Officer in accordance with the provisions of this Plan and the Plan Administration Agreement. **No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Causes of Action against it as any indication that the Debtors or the Wind-Down Debtors will not pursue any and all available Causes of Action against it. The Debtors or the Wind-Down Debtors expressly reserve all rights to prosecute any and all Causes of Action (including any Causes of Action that belong to the Other Genesis Entities) against any Entity, except as otherwise expressly provided in the Plan.** Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Court order, including pursuant to Article VIII of the Plan, the Debtors and the Wind-Down Debtors expressly reserve all Causes of Action (including any Causes of Action that belong to the Other Genesis Entities) for later adjudication and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation. For the avoidance of doubt, in no instance will any Cause of Action preserved pursuant to this Article IV.B.14 include any claim or Cause of Action with respect to, or against, a Released Party.

In accordance with and subject to section 1123(b)(3) of the Bankruptcy Code, except as otherwise provided herein, any Causes of Action that a Debtor may hold against any Entity (including any Causes of Action that belong to the Other Genesis Entities) shall vest in the applicable Wind-Down Debtor. The applicable Wind-Down Debtors, through their authorized agents or representatives (including the PA Officer), shall retain and may exclusively enforce any and all such Causes of Action. The Wind-Down Debtors shall have the exclusive right, authority, and, at the direction of the Litigation Oversight Committee, ability to initiate, file, prosecute,

enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, and to decline to do any of the foregoing (at the direction of the Litigation Oversight Committee) without the consent or approval of any third party or further notice to or action, order, or approval of the Bankruptcy Court; *provided* that any settlement, compromise, release, withdrawal, or abandonment of any Cause of Action shall require the Litigation Oversight Committee's Consent. The Wind-Down Debtors shall be deemed hereby substituted as plaintiff, defendant, or in any other capacity for the applicable Debtors and the Committee, as applicable, in any Causes of Action pending before the Bankruptcy Court or any other court that relates to a Wind-Down Debtors' Asset (including any Causes of Action that belong to the Other Genesis Entities) without the need for filing any motion for such relief.

15.    Director and Officer Liability Insurance

The Wind-Down Debtors shall be authorized to obtain directors', managers', and officers' liability insurance policies. Notwithstanding anything in the Plan to the contrary, effective as of the Effective Date, the Wind-Down Debtors shall be deemed to have assumed all D&O Liability Insurance Policies (including tail coverage liability insurance) pursuant to section 365(a) of the Bankruptcy Code, to the extent they are Executory Contracts. Entry of the Confirmation Order will constitute the Bankruptcy Court's approval of the Wind-Down Debtors' assumption of each of the D&O Liability Insurance Policies, to the extent they are Executory Contracts. Notwithstanding anything to the contrary contained in the Plan, Confirmation of the Plan shall not discharge, impair, or otherwise modify any indemnity obligations assumed by the foregoing assumption of the D&O Liability Insurance Policies, and each such indemnity obligation will be deemed and treated as an Executory Contract that has been assumed by the Wind-Down Debtors under the Plan as to which no Proof of Claim need be Filed, and shall survive the Effective Date.

16.    Offsetting of Collateral

The Debtors and the Wind-Down Debtors are authorized, but shall not be required to, for purposes of calculating the Allowed amount of any Claim entitled to receive distributions under the Plan, set off (i) any Claim against the Debtors with the value of any Loan Collateral that the applicable Debtor delivered to the Holder of such Claim, (ii) the value of any debt owed by the Holder of such Claim to the applicable Debtor by the value of any Loan Collateral that the Holder of such Claim delivered to the applicable Debtor to secure a loan from such Debtor, and/or (iii) any Claim against a Debtor with the value of any debt owed by the Holder of such Claim to the applicable Debtor.

C.    *GAP and GGC Intercompany Settlement*

The Plan incorporates a good faith settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Intercompany Claims between GGC and GAP and provides for GGC to make a settlement contribution to GAP in an amount necessary for (i) Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims against GGC, (ii) Allowed BTC-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed BTC-Denominated Unsecured Claims against GGC, (iii) Allowed ETH-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed

ETH-Denominated Unsecured Claims against GGC, and (iv) Allowed Alt-Coin-Denominated Unsecured Claims against GAP to effectively receive the same recovery as Allowed Alt-Coin-Denominated Unsecured Claims against GGC.

D.    *GGC and GGH Intercompany Settlement*

The Plan incorporates a good faith settlement pursuant to Bankruptcy Rule 9019 and section 1123 of the Bankruptcy Code of all Intercompany Claims between GGC and GGH and provides for GGC or Wind-Down GGC, as applicable, to receive the proceeds of any Monetization Transaction(s) allocated to any portion of the Genesis Platform other than GGT.

## ARTICLE V.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided herein or in any contract, instrument, release, or other agreement or document entered into in connection with the Plan, the Plan shall serve as a motion under sections 365 and 1123(b)(2) of the Bankruptcy Code to assume, assume and assign, or reject Executory Contracts and Unexpired Leases, and all Executory Contracts or Unexpired Leases shall be deemed rejected as of the Effective Date without the need for any further notice to or action, order, or approval of the Bankruptcy Court, unless such Executory Contract or Unexpired Lease: (i) is designated on the Schedule of Assumed Executory Contracts and Unexpired Leases in the Plan Supplement; (ii) was previously assumed or rejected by the Debtors, pursuant to a Final Order of the Bankruptcy Court; (iii) previously expired or terminated pursuant to its own terms or by agreement of the parties thereto; (iv) is the subject of a motion to reject filed by the Debtors on or before the Confirmation Date; or (v) is the subject of a motion to reject pursuant to which the requested effective date of such rejection is after the Effective Date.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's order approving the assumptions, assumptions and assignments, or rejections, as applicable, of Executory Contracts or Unexpired Leases as set forth in the Plan pursuant to sections 365(a) and 1123 of the Bankruptcy Code.   Each Executory Contract or Unexpired Lease assumed pursuant to the Plan or by Bankruptcy Court order but not assigned to a third party before the Effective Date shall re-vest in and be fully enforceable by the applicable Wind-Down Debtor in accordance with its terms, except as such terms may have been modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption or assumption and assignment under applicable federal law.  Notwithstanding anything to the contrary in the Plan, the Debtors or the Wind-Down Debtors, as applicable, reserve the right to alter, amend, modify, or supplement the Schedule of Assumed Executory Contracts and Unexpired Leases with the Committee's Consent at any time on or prior to the date that is forty-five (45) days after the Effective Date on no less than seven (7) days' notice to the applicable non-Debtor counterparties.

Unless otherwise indicated, assumptions, assumptions and assignments, or rejections of Executory Contracts and Unexpired Leases pursuant to the Plan are effective as of the Effective Date.  Any motions to reject Executory Contracts or Unexpired Leases pending on the Effective

67

Date shall be subject to approval by the Bankruptcy Court on or after the Effective Date (or as soon as reasonably practicable thereafter) by a Final Order.

To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

B.    *Claims Based on Rejection of Executory Contracts or Unexpired Leases and Deadline by Which to File Proofs of Claim*

Unless otherwise provided by a Final Order of the Bankruptcy Court, all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court in accordance with the Bar Date Order. **Any Claims arising from the rejection of an Executory Contract or Unexpired Lease not Filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Wind-Down Debtors, the Estates, or their property (as applicable), without the need for any objection by the Debtors or the Wind-Down Debtors, or further notice to, or action, order, or approval of, the Bankruptcy Court or any other Entity, and any Claim arising out of such rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, and released, and be subject to the permanent injunction set forth in Article VIII of the Plan, notwithstanding anything in the Proof of Claim, if any, to the contrary.** All Allowed Claims arising from the rejection by any Debtor of any Executory Contracts or Unexpired Leases pursuant to section 365 of the Bankruptcy Code shall be treated as General Unsecured Claims in accordance with Article III.B–D of the Plan and may be objected to in accordance with the provisions of **Error! Reference source not found.** of the Plan and the applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

C.    *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any monetary defaults under an Executory Contract or Unexpired Lease assumed by the Debtors, as reflected on the applicable Cure Notice, shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the proposed cure amount (if any) in Cash by the Debtors or the Wind-Down Debtors, as applicable, on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitations described below or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. At least fourteen (14) days before the Confirmation Hearing, the Debtors shall distribute, or cause to be distributed, Cure Notices of proposed assumption and proposed cure amounts to the applicable third parties. Unless otherwise agreed upon in writing by the parties to the applicable Executory Contract or

Unexpired Lease, any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related cure amount paid or proposed to be paid by the Debtors or the Wind-Down Debtors to such counterparty must be filed with the Bankruptcy Court and served on and actually received by the Debtors at least seven (7) days before the Confirmation Hearing. **Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or proposed cure amount shall be deemed to have assented to such assumption and cure amount, and any such objection shall be disallowed and forever barred, estopped, and enjoined from assertion, and shall not be enforceable against any Wind-Down Debtor, without the need for any objection by the Wind-Down Debtors or any other party in interest or any further notice to or action, order, or approval of the Bankruptcy Court.** For the avoidance of doubt, in the event that any counterparty to an Executory Contract or Unexpired Lease receives a notice of assumption and there is no listed Cure amount, such Cure amount shall be considered to be zero.

Any Cure Claim shall be deemed fully satisfied, and released upon payment by the Debtors or the Wind-Down Debtors of the amount set forth in the applicable Cure Notice or, if the Allowed Cure Claim with respect to any Executory Contract or Unexpired Lease is determined by a Final Order to be greater than the applicable amount set forth in the Cure Notice, the amount of such Allowed Cure Claim; *provided*, *however*, that following entry of a Final Order resolving any such dispute, the applicable Debtor or Wind-Down Debtor shall have the right to reject any Executory Contract or Unexpired Lease within thirty (30) days of such resolution; and, *provided*, *further*, that nothing herein shall prevent the Wind-Down Debtors from paying any Cure Claim despite the failure of the relevant counterparty to file such request for payment of such Cure Claim. The Wind-Down Debtors also may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

If there is any dispute regarding any Cure Claim, the ability of the Wind-Down Debtors or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then payment of the Cure Claim shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Debtors or the Wind-Down Debtors, as applicable, and the counterparty to the Executory Contract or Unexpired Lease. Notwithstanding the foregoing, to the extent the dispute relates solely to any Cure Claims, the applicable Debtor may assume the Executory Contract or Unexpired Lease (subject to the Committee's Consent and the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing)) prior to the resolution of any such dispute; *provided*, *however*, that the Debtor reserves Cash in an amount sufficient to pay the full amount reasonably asserted as the required Cure Claim by the contract counterparty; and, *provided*, *further*, that, following entry of a Final Order resolving any such dispute, the applicable Debtor or Wind-Down Debtor shall have the right to reject any Executory Contract or Unexpired Lease within thirty (30) days of such resolution.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy or insolvency-related defaults, arising under

any assumed Executory Contract or Unexpired Lease at any time before the date that the Debtors assume such Executory Contract or Unexpired Lease. Any Proofs of Claim Filed with respect to an Executory Contract or Unexpired Lease that has been assumed, including pursuant to the Confirmation Order, shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

D.    *Indemnification Obligations*

The Indemnification Obligations shall remain in full force and effect and shall not be discharged or Impaired by Confirmation of the Plan, and the Indemnification Obligations shall be deemed and treated as Executory Contracts assumed by the Debtors under the Plan, and shall continue as obligations of the Wind-Down Debtors; *provided*, *however*, that the Wind-Down Debtors shall not indemnify (i) employees, directors, or officers of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission that constitutes knowing and intentional fraud, gross negligence, or willful misconduct or (ii) any current or former employees, directors, or officers of the Debtors that are also DCG Parties.

E.    *Insurance Policies*

To the extent that any of the Debtors' insurance policies constitute Executory Contracts, such insurance policies (including all D&O Liability Insurance Policies) and any agreements, documents, or instruments relating thereto are treated as and deemed to be Executory Contracts under the Plan and shall be assumed by the Wind-Down Debtors on the Effective Date, and all other insurance policies shall vest in the Wind-Down Debtors.

F.    *Modifications*, *Amendments*, *Supplements*, *Restatements*, *or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract or Unexpired Lease that is assumed or assumed and assigned shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, and Executory Contracts and Unexpired Leases related thereto, if any, including easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

G.    *Reservation of Rights*

Neither the exclusion nor inclusion of any Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts and Unexpired Leases, nor anything contained in the Plan, shall constitute an admission by the Debtors or the Wind-Down Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Debtor or Wind-Down Debtor has any liability thereunder. If there is a dispute regarding whether a contract or

70

lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or, after the Effective Date, the Wind-Down Debtors shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

H.    *Nonoccurrence of Effective Date*

In the event that the Effective Date does not occur, the Bankruptcy Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting any Unexpired Lease pursuant to section 365(d)(4) of the Bankruptcy Code.

# ARTICLE VI.
# PROVISIONS GOVERNING DISTRIBUTIONS

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan (including the Distribution Principles), on the Effective Date or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each Holder of an Allowed Claim, including any portion of a Claim that is an Allowed Claim notwithstanding that other portions of such Claim are a Disputed Claim or a Disallowed Claim, shall, with respect to the portion of the Claim that is an Allowed Claim, receive the full amount of the distributions that the Plan (including the Distribution Principles) provides for Allowed Claims in each applicable Class and in the manner provided in the Plan (including the Distribution Principles).  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan and subject to the Distribution Principles.  Notwithstanding any provision of the Plan to the contrary, to the extent a Claim is disallowed by an order of the Bankruptcy Court, the Disbursing Agent or the Gemini Distribution Agent, as applicable, shall not be required to reserve any amount for payment of such Claim, regardless of whether the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has not expired or whether an appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing is pending with respect to such order.

Except as otherwise provided in the Plan (including the Distribution Principles), Holders of Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

B.    *Disbursing Agent and Gemini Distribution Agent.*

All distributions under the Plan shall be made by the Disbursing Agent and, in the case of distributions on Allowed Gemini Lender Claims, the Gemini Distribution Agent.  The Disbursing

Agent and the Gemini Distribution Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent or the Gemini Distribution Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Wind-Down Debtors.

1.    Powers of the Disbursing Agent and the Gemini Distribution Agent

The Disbursing Agent and the Gemini Distribution Agent, as applicable, shall be empowered and directed to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) take all actions required of it by the Distribution Principles; (d) employ professionals to represent it with respect to its responsibilities; and (e) exercise such other powers as may be vested in the Disbursing Agent or the Gemini Distribution Agent by order of the Bankruptcy Court, pursuant to the Plan and the Distribution Principles, or as deemed by the Disbursing Agent or the Gemini Distribution Agent to be necessary and proper to implement the provisions of the Plan and the Distribution Principles.

The Gemini Distribution Agent shall, at its sole discretion and to the maximum extent permitted by law, be authorized to (i) enter into a Monetization Transaction of assets distributed or transferred to the Gemini Distribution Agent, including the Gemini GBTC Shares (other than the Gemini GBTC Shares Reserve, which shall be subject to the limitations set forth in Article IV.A.12.b of the Plan), the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value), and the Gemini Earn Operations Assets, and (ii) rebalance the Cash and Digital Assets distributed or transferred to the Gemini Distribution Agent, including the Gemini GBTC Shares (other than the Gemini GBTC Shares Reserve, which shall be subject to the limitations set forth in Article IV.A.12.b of the Plan), the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value), and the Gemini Earn Operations Assets, in each case, to enable the Gemini Distribution Agent to make distributions in respect of Gemini Lender Claims denominated in Digital Assets in the like kind form of Digital Asset in which such Claims are denominated; *provided*, *however*, that in no event shall the Gemini Distribution Agent be authorized to provide any Holder of an Allowed Claim with any lesser treatment than such Holder was entitled to under the Plan.  The Gemini Distribution Agent, to the maximum extent permitted by law, is authorized to effectuate such rebalancing by buying and selling of Digital Assets or otherwise exchanging any type of Digital Asset into any other type of Digital Asset.

2.    Expenses Incurred on or After the Effective Date

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable and documented fees and expenses incurred by the Disbursing Agent or the Gemini Distribution Agent (each solely in its capacity as such solely with respect to its duties in such capacity) on or after the Effective Date, and any reasonable and documented compensation and expense reimbursement claims (including reasonable and documented attorney fees and expenses) made by the Disbursing Agent or the Gemini Distribution Agent (each solely in its capacity as such), shall be paid in Cash by the Wind-Down Debtors from the Wind-Down Reserve; *provided*, *however*, that the fees and expenses incurred by the Gemini Distribution Agent shall be subject to the Wind-Down Budget;

and, *provided*, *further*, that the amount of fees and expenses budgeted for the Gemini Distribution Agent in the Wind-Down Budget shall be determined in the Debtors' reasonable discretion, with the Committee's Consent, Gemini's Consent, and the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing), and the Gemini Distribution Agent shall not incur any fees and expenses in excess of the Wind-Down Budget without the prior written consent of the PA Officer, which consent shall not be unreasonably withheld, conditioned, or delayed.

3.    No Liability

Except on account of gross negligence, fraud, or willful misconduct, each of the Disbursing Agent and the Gemini Distribution Agent shall have no (a) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (b) obligation or liability to any party who (i) does not hold a Claim against the Debtors as of the Distribution Record Date or any other date on which a distribution is made or (ii) does not otherwise comply with the terms of the Plan.

C.    *Delivery of Distributions and Undeliverable or Unclaimed Distribution*

1.    Delivery of Distributions on Allowed Claims and Allowed Interests

a.    Distribution Record Date

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims and Interests maintained by the Debtors, or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims and Interests. The Disbursing Agent and the Gemini Distribution Agent shall have no obligation to recognize any transfer of Claims or Interests occurring after the close of business on the Distribution Record Date.

b.    Delivery of Distributions in General

Subject to the Distribution Principles and except as otherwise provided in the Plan (including in the next paragraph), the Disbursing Agent shall make distributions to Holders of Allowed Claims (other than Gemini Lender Claims) and Allowed Interests (if any) as of the Distribution Record Date at the address (physical address or digital wallet, as applicable) for each such Holder as indicated on the applicable register or in the Debtors' records as of the date of any such distribution (as applicable), including the address set forth in any Proof of Claim filed by that Holder; *provided*, *however*, that the manner of such distributions shall be determined at the discretion of the Debtors or the Wind-Down Debtors. Holders of Claims may notify the Disbursing Agent by email of any changes to their address for receipt of distributions.

c.    Delivery of Distributions on Claims Denominated in Digital Assets

Subject to the Distribution Principles, the Debtors and the Wind-Down Debtors will use commercially reasonable efforts, subject to applicable law and the terms of this Plan, to provide recoveries in respect of Claims denominated in Digital Assets in the like-kind form of Digital Asset

in which such Claims are denominated, including by buying Digital Assets with the Debtors' or Wind-Down Debtors' Cash, selling Digital Assets for Cash, or otherwise exchanging any type of Digital Asset into any other type of Digital Asset; *provided*, *however*, that no distribution in the form of Digital Assets shall be made to any Holder that has not responded to all requests by the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, for information necessary to facilitate a particular distribution to such Holder; and, *provided*, *further*, that, upon the request of a Holder of an Allowed Fiat-or-Stablecoin Denominated Claim, the Debtors or the Wind-Down Debtors, as applicable, will use commercially reasonable efforts, subject to applicable law (including any regulatory or tax considerations) and the terms of this Plan, to provide recoveries to such Holder in Cash in respect of such Allowed Fiat-or-Stablecoin Denominated Claim; and, *provided*, *further*, that, notwithstanding anything to the contrary in the Plan, the Disclosure Statement, or the Confirmation Order, the Debtors or the Wind-Down Debtors, as applicable, shall provide at least three (3) Business Days' prior written notice with an opportunity to object to the SEC (c/o William M. Uptegrove, U.S. Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326, UptegroveW@SEC.GOV) before buying or selling any type of Digital Asset other than BTC or ETH.

        d.      Delivery of Distributions on Gemini Lender Claims.

Subject to the Distribution Principles, for purposes of distributions and treatment under the Plan only (and not for voting purposes), Gemini shall be deemed to be the Holder of all Gemini Lender Claims and all distributions on account of Allowed Gemini Lender Claims shall be made to the Gemini Distribution Agent and held in trust in a segregated account for the benefit of the Holders of Allowed Gemini Lender Claims. As soon as practicable following delivery of any distribution to the Gemini Distribution Agent under the Plan on account of Allowed Gemini Lender Claims, the Gemini Distribution Agent shall arrange to deliver or direct the delivery of such distributions to or on behalf of the Holders of Allowed Gemini Lender Claims on a pro rata basis. In addition, the Gemini Distribution Agent shall arrange to deliver or direct the delivery of (i) in connection with, and contemporaneous with, Gemini effectuating the Debtors' initial distribution to the Gemini Lenders, the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value) and the Gemini Earn Operations Assets and (ii) as soon as practicable following any Monetization Transaction of Gemini GBTC Shares (other than the Gemini GBTC Shares Reserve), the proceeds of such Monetization Transaction of Gemini GBTC Shares, in each case to the Holders of Allowed Gemini Lender Claims on a pro rata basis. Any distributions made to Gemini on account of the Allowed Gemini Lender Claims shall reduce the Gemini Lender Claims on a dollar-for-dollar basis and release the Wind-Down Debtors from any further responsibility related to such distributions; *provided*, *however*, that the value of the Gemini Reserved Coins shall be excluded from such dollar-for-dollar reduction if (x) mutually agreed in writing by Gemini and the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent (if the Ad Hoc Group Acceptance Event has occurred and is continuing), or (y) the Bankruptcy Court enters an order determining that the value of the Gemini Reserved Coins is not included in the amount of the Allowed Gemini Lender Claims and such order has not been stayed or vacated.

e.       Minimum Distributions

Subject to the Distribution Principles, no distribution shall be made by the Disbursing Agent or the Gemini Distribution Agent on account of an Allowed Claim if the amount to be distributed to the Holder of such Claim on the applicable Distribution Date has an economic value of less than $250, *provided*, *however*, that the Gemini Distribution Agent may elect to make such distributions to Gemini Lenders in its sole discretion.

2.       Undeliverable Distributions and Unclaimed Property

In the event that (a) any distribution to any Holder is returned as undeliverable or (b) the Holder of an Allowed Claim or Interest does not respond to a request by the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, for information necessary to facilitate a particular distribution, no distribution to such Holder shall be made unless and until the Debtors, the Wind-Down Debtors, the Disbursing Agent, or the Gemini Distribution Agent, as applicable, shall have determined the then-current address of such Holder or received the necessary information to facilitate a particular distribution, at which time such distribution shall be made to such Holder without interest, dividends, or other accruals of any kind; *provided*, *however*, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code on the date that is one year after the Effective Date. After such date, all unclaimed property or interests in property shall be deemed to be "Distributable Assets" and distributed to Holders of Allowed Claims in accordance with the Plan and the Distribution Principles (it being understood that, for purposes of this Article VI.C, the Claim underlying such unclaimed distribution shall be treated as Disallowed) without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Interest in property shall be forever barred and shall not be entitled to any distributions under the Plan.

D.       *Manner of Payment*

At the option of the Disbursing Agent or the Gemini Distribution Agent, as applicable, any Cash payment to be made under the Plan may be made by check, wire transfer, or ACH as otherwise required or provided in applicable agreements.

E.       *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, the Gemini Distribution Agent, and any applicable withholding agent shall comply with all applicable tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions made pursuant to the Plan shall be subject to such withholding and reporting requirements. Notwithstanding any provision in the Plan to the contrary, such parties shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including liquidating a portion of the distribution to be made under the Plan to generate sufficient funds to pay applicable withholding taxes, withholding distributions until receipt of information necessary to facilitate such distributions, or establishing any other mechanisms they believe are reasonable and appropriate.

75

All Persons holding Claims against any Debtor shall be required to provide any additional information reasonably necessary for the Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, the Gemini Distribution Agent, and any applicable withholding agent to comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, including an IRS Form W-8 or W-9, as applicable, and any other applicable tax forms. The Debtors, the Wind-Down Debtors, the PA Officer, the Disbursing Agent, the Gemini Distribution Agent, and any applicable withholding agent reserve the right to allocate all distributions made under the Plan in a manner that complies with all other legal requirements, such as applicable wage garnishments, alimony, child support, and other spousal awards, Liens, and encumbrances. Any amounts withheld pursuant to the Plan shall be deemed to have been distributed to and received by the applicable recipient for all purposes of the Plan. Notwithstanding any other provision of the Plan to the contrary, each Holder of an Allowed Claim or Allowed Interest shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.

F.    *Foreign Currency Exchange Rate*

Except as otherwise provided in a Bankruptcy Court order, as of the Effective Date, any Claim asserted in Foreign Currency shall be automatically deemed converted to the equivalent U.S. dollar value using the exchange rate for the applicable Foreign Currency as published in The Wall Street Journal, National Edition, on the Petition Date.

G.    *Surrender of Cancelled Instruments or Securities*

As a condition precedent to receiving a full and final distribution on account of its Allowed Claim, each Holder of a Claim shall be deemed to have surrendered the certificates or other documentation underlying each such Claim, and all such surrendered certificates and other documentation shall be deemed to be cancelled pursuant to Article IV of the Plan, except to the extent otherwise provided in the Plan.

H.    *Allocations*

The aggregate consideration to be distributed to each Holder of an Allowed Claim will be allocated first to the principal amount of such Allowed Claim, with any excess allocated to unpaid interest that accrued on such Allowed Claims, if any.

I.    *No Postpetition Interest on Claims*

Unless otherwise specifically provided for in an order of the Bankruptcy Court, the Plan (including the Distribution Principles), or the Confirmation Order, or required by applicable bankruptcy law, postpetition interest shall not accrue or be paid on any Claims or Interests and no Holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim.

J.     *Setoffs and Recoupment*

The Debtors or the Wind-Down Debtors may, but shall not be required to, set off against, or recoup from, any Allowed Claim against a Debtor any claim, right, or Cause of Action of any nature whatsoever that the applicable Debtor or Wind-Down Debtor may have against the Holder of such Claim, to the extent such claims, rights, or Causes of Action have not been otherwise compromised, settled, or released on or prior to the Effective Date (whether pursuant to the Plan or otherwise). Notwithstanding the foregoing, neither the failure to do so nor the allowance of any Claim against a Debtor hereunder shall constitute a waiver or release by the applicable Debtor or Wind-Down Debtor of any such Claim it may have against the Holder of such Allowed Claim.

K.     *Claims Paid or Payable by Third Parties*

1.     <u>Claims Paid by Third Parties</u>

The Debtors or the Wind-Down Debtors shall reduce in full an Allowed Claim, and such Claim shall be Disallowed without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the Holder of such Claim receives payment in full on account of such Claim from a party that is not a Debtor or a Wind-Down Debtor; *provided*, *however*, that the Debtors or the Wind-Down Debtors shall provide 21 days' written notice to the Holder prior to any disallowance of such Claim during which period the Holder may object to such disallowance, and if the parties cannot reach an agreed resolution, the matter shall be decided by the Bankruptcy Court.  Subject to the last sentence of this paragraph, to the extent a Holder of a Claim receives a distribution on account of such Claim and thereafter receives payment from a party that is not a Debtor or a Wind-Down Debtor on account of such Claim, such Holder shall, within fourteen (14) days of receipt thereof, repay or return the distribution to the Debtors or the Wind-Down Debtors to the extent the Holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the Petition Date. The failure of such Holder to timely repay or return such distribution shall result in the Holder owing the Debtors or the Wind-Down Debtors annualized interest at the Federal Judgment Rate on such amount owed for each Business Day after the 14-day grace period specified above until the amount is repaid.

2.     <u>Claims Payable by Insurers</u>

No distributions under the Plan shall be made on account of an Allowed Claim that is payable pursuant to one of the Debtors' insurance policies until the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy. To the extent that one or more of the Debtors' insurers agrees to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged to the extent of any agreed upon satisfaction without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.

3.    Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to Holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy. Nothing contained in the Plan shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity may hold against any insurers under any policies of insurance, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

**ARTICLE VII.**
**PROCEDURES FOR RESOLVING CONTINGENT,**
**UNLIQUIDATED, AND DISPUTED CLAIMS**

A.    *Allowance of Claims*

On or after the Effective Date, the Wind-Down Debtors shall have and retain any and all rights and defenses that the Debtors had with respect to any Claim immediately prior to the Effective Date.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including, if applicable, the Confirmation Order (when it becomes a Final Order), in the Chapter 11 Cases allowing such Claim.  Any setoff exercised pursuant to Article IV.B.16 of the Plan shall be taken into account when calculating the extent to which any Claim is Allowed for any purpose hereunder.  All settlements of Claims approved prior to the Effective Date pursuant to a Final Order of the Bankruptcy Court, pursuant to Bankruptcy Rule 9019, or otherwise shall be binding on all parties.

Notwithstanding anything in this Plan to the contrary, (1) Claims against the Debtors that result from the Debtors' rejection of an Executory Contract or Unexpired Lease, (2) Claims filed to dispute the amount of any proposed Cure pursuant to section 365 of the Bankruptcy Code, and (3) Claims that the Debtors seek to have determined by the Bankruptcy Court shall in all cases be determined by the Bankruptcy Court, if not otherwise resolved through settlement with the applicable claimant.

B.    *Claims and Interests Administration Responsibilities*

Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Wind-Down Debtors, by order of the Bankruptcy Court, shall together have the sole authority to, with five (5) days prior notice to the Wind-Down Oversight Committee: (1) File, withdraw, or litigate to judgment objections to Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, *provided* that any settlement or compromise of a Disputed Claim that results in an Allowed Claim equal to or greater than $5 million shall require the Wind-Down Oversight Committee's Consent; and (3) administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  In any action or proceeding to determine the existence, validity, or amount of any Claim, any and all claims or

78

defenses that could have been asserted by the applicable Debtor(s) or the Entity holding such Claim are preserved as if the Chapter 11 Cases had not been commenced.

C.      *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Wind-Down Debtors may (but are not required to) at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during any appeal relating to such objection.  In the event that the Bankruptcy Court estimates any Disputed Claim, that estimated amount shall constitute a maximum limitation on such Claim for all purposes under the Plan (including for purposes of distributions), and the Debtors may elect to pursue any supplemental proceedings to object to any ultimate distribution on such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated. All of the aforementioned Claims and objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

D.      *Adjustment to Claims or Interests Without Objection*

Any duplicate Claim or Interest, any Claim or Interest that has been paid or satisfied, or any Claim that has been amended or superseded may be adjusted or expunged on the Claims Register at the direction of the Debtors, the Wind-Down Debtors, or the PA Officer, as applicable, without the Debtors, the Wind-Down Debtors, or the PA Officer, as applicable, having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

E.      *Time to File Objections to Claims*

Any objections to Claims, which, prior to the Effective Date, may be Filed by any party, shall be Filed on or before the Claims Objection Deadline.

F.      *Disallowance of Claims*

Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the

79

Wind-Down Debtors; *provided*, *however*, that, notwithstanding the foregoing and the commencement of the Gemini Preference Action, the Holders of Allowed Gemini Lender Claims (other than any Gemini Party) shall be entitled to receive distributions in accordance with the Plan (including the Distribution Principles) until the Gemini Preference Determination.

**ANY CLAIM THAT HAS BEEN LISTED IN THE SCHEDULES AS DISPUTED, CONTINGENT, OR UNLIQUIDATED, AND FOR WHICH NO PROOF OF CLAIM HAS BEEN TIMELY FILED, SHALL BE DEEMED DISALLOWED AND SHALL BE EXPUNGED WITHOUT FURTHER ACTION AND WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT.**

**EXCEPT AS PROVIDED HEREIN, IN AN ORDER OF THE BANKRUPTCY COURT, OR OTHERWISE AGREED, ANY AND ALL PROOFS OF CLAIM FILED AFTER THE APPLICABLE BAR DATE SHALL BE DEEMED DISALLOWED AND EXPUNGED AS OF THE EFFECTIVE DATE WITHOUT ANY FURTHER NOTICE TO OR ACTION, ORDER, OR APPROVAL OF THE BANKRUPTCY COURT, AND HOLDERS OF SUCH CLAIMS MAY NOT RECEIVE ANY DISTRIBUTIONS ON ACCOUNT OF SUCH CLAIMS, UNLESS AT OR PRIOR TO THE CONFIRMATION HEARING SUCH LATE CLAIM HAS BEEN ALLOWED BY A FINAL ORDER.**

G.      *Amendments to Claims*

On or after the Effective Date, except as provided in the Plan or the Confirmation Order, a Claim may not be Filed or amended without the prior authorization of the Bankruptcy Court and any such new or amended Claim Filed without the Bankruptcy Court's prior approval shall be deemed Disallowed in full and expunged without any further action, order, or approval of the Bankruptcy Court.

H.      *No Distributions Pending Allowance*

Notwithstanding any other provision of this Plan to the contrary, no payment or distribution of any kind or nature provided under the Plan shall be made on account of any Claim to the extent that all or any portion of such Claim is a Disputed Claim, including if an objection to such Claim or portion thereof is Filed as set forth in Article VII, unless and until such Disputed Claim becomes an Allowed Claim; *provided* that any portion of a Claim that is an Allowed Claim shall receive the payment or distribution provided under the Plan thereon notwithstanding that any other portion of such Claim is a Disputed Claim.

I.      *Single Satisfaction of Claims*

Holders of Allowed Claims may assert such Claims against each Debtor obligated with respect to such Claim, and such Claims shall be entitled to share in the recovery provided for the applicable Class of Claims against each obligated Debtor based upon the full Allowed amount of the Claim. Notwithstanding the foregoing, in no case shall the aggregate value of all property received or retained under the Plan on account of any Allowed Claim exceed 100% of such Allowed Claim.

## ARTICLE VIII.
## SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS

A.    *Compromise and Settlement of Claims, Interests, and Controversies*

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019 and in consideration for the distributions, releases, and other benefits provided pursuant to the Plan, which distributions, releases, and other benefits shall be irrevocable and not subject to challenge upon the Effective Date, the provisions of the Plan, and the distributions, releases, and other benefits provided hereunder, shall constitute a good-faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan.

The Plan shall be deemed a motion to approve the good-faith compromise and settlement of all such Claims, Interests, and controversies pursuant to Bankruptcy Rule 9019, and the entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise and settlement of all such Claims, Interests, and controversies, as well as a finding by the Bankruptcy Court that all such compromises and settlements are in the best interests of the Debtors, their Estates, and Holders of Claims and Interests and is fair, equitable, and reasonable. In accordance with the provisions of the Plan, pursuant to Bankruptcy Rule 9019, without any further notice to or action, order, or approval of the Bankruptcy Court, after the Effective Date, the Wind-Down Debtors may compromise and settle Claims against, and Interests in, the Debtors and their Estates and Causes of Action against other Entities, subject to any applicable consent rights and procedures set forth herein.

B.    *Term of Injunctions or Stays*

Unless otherwise provided herein, the Confirmation Order, or in a Final Order, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code or otherwise, and in existence on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order), shall remain in full force and effect until the later of the Effective Date and the date set forth in the order providing for such injunction or stay. All injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

C.    *Release of Liens*

**Except as otherwise specifically provided in the Plan, the Plan Supplement, or in any other contract, instrument, agreement, or document created pursuant to the Plan or Plan Supplement, on the Effective Date and concurrently with the applicable distributions or other treatment made pursuant to the Plan, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released, and all of the right, title, and interest of any Holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Wind-Down Debtors, and their successors and assigns, in each case, without any further approval or order of the Bankruptcy Court and without any action or Filing being required to be made by the Wind-Down Debtors or the PA Officer.**

From and after the Effective Date, any Holder of a Secured Claim (and the applicable agents for such Holder) secured by Liens or security interests which are to be released under this Plan shall be authorized and directed to release any collateral or other property of any Debtor (including any cash collateral and possessory collateral) held by such Holder (and the applicable agents for such Holder), and to take such actions as may be reasonably requested to give effect to the Plan by the Wind-Down Debtors and to evidence the release of such Liens and/or security interests, including the execution, delivery, and filing or recording of such releases.   The presentation or filing of the Confirmation Order to or with any federal, state, provincial, or local agency, records office, or department shall constitute good and sufficient evidence of, but shall not be required to effect, the termination of such Liens.   To the extent that any Holder of a Secured Claim that has been satisfied in full pursuant to the Plan, or any agent for such Holder, has filed or recorded publicly any Liens and/or security interests to secure such Holder's Secured Claim, then as soon as practicable on or after the Effective Date, such Holder (or the agent for such Holder) shall take any and all steps requested by the Wind-Down Debtors that are necessary or desirable to record or effectuate the cancellation and/or extinguishment of such Liens and/or security interests in accordance with the Plan, and the Wind-Down Debtors shall be entitled to make any such filings or recordings on such Holder's behalf.

D.    *Releases by the Debtors*

**Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, each Released Party is hereby deemed conclusively, absolutely, unconditionally, irrevocably, and forever released by the Debtors, their Estates, and the Wind-Down Debtors (as applicable), in each case on behalf of themselves and their respective successors, assigns, and representatives, and any and all other Entities who may purport to assert any claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Entities, from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, that such Person or its estate, Affiliates, heirs, executors, administrators, successors, assigns, managers, accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Wind-Down Debtors, their Estates, the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring, contract,**

instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Alameda/Genesis Settlement Agreement, the 3AC/Genesis Settlement Agreement, any Monetization Transaction, the related agreements, instruments, and other documents (including the Definitive Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of any property pursuant to the Plan, the Definitive Documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing. Notwithstanding anything to the contrary in the foregoing, nothing in this Article VIII.D shall, nor shall it be deemed to, release (i) any post-Effective Date obligations of any Person or Entity under the Plan, including any such obligations created in connection with the Restructuring; (ii) any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct; (iii) any Excluded Claim; or (iv) any Causes of Action or other claims against any of the Gemini Parties or any of the DCG Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Debtors set forth in this Article VIII.D, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are: (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after reasonable investigation by the Debtors and after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Wind-Down Debtors, or their Estates asserting any Claim or Cause of Action released pursuant to such releases.

E.      *Releases by Releasing Parties*

Except as otherwise specifically provided in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, the adequacy of which is hereby confirmed, on and after the Effective Date, to the fullest extent allowed by applicable law, each Releasing Party hereby conclusively, absolutely, unconditionally, irrevocably, and forever releases each Debtor, Estate, Wind-Down Debtor, and Released Party from any and all Claims, Causes of Action, Avoidance Actions, obligations, suits, judgments, damages, demands, losses, liabilities, and remedies whatsoever (including any derivative claims, asserted or assertable on behalf of the Debtors, the Wind-Down Debtors, or their Estates), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, accrued or unaccrued, existing or hereinafter arising, in law, equity, contract, tort, or otherwise, that such Releasing Party or its estate, heirs, executors, administrators, successors, assigns, managers,

accountants, attorneys, representatives, consultants, agents, and any other persons claiming under or through them would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the Holder of any Claim or Interest or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors (including the management, ownership, or operation thereof), the Wind-Down Debtors, their Estates, the Debtors' in- or out-of-court restructuring efforts, the Debtors' intercompany transactions, any Avoidance Actions, the purchase, sale, or rescission of the purchase or sale of any Security of the Debtors or the Wind-Down Debtors, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between any Debtor and any Released Party, the restructuring of any Claim or Interest before or during the Chapter 11 Cases, or any Restructuring, contract, instrument, document, release, or other agreement or document (including any legal opinion regarding any such transaction, contract, instrument, document, release, or other agreement or the reliance by any Released Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Disclosure Statement, the Plan, the Plan Supplement, the Alameda/Genesis Settlement Agreement, the 3AC/Genesis Settlement Agreement, any Monetization Transaction, the related agreements, instruments, and other documents (including the Definitive Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the pursuit of Confirmation, the pursuit of Consummation, the solicitation of votes with respect to the Plan, the administration and implementation of the Plan, including the issuance or distribution of any property pursuant to the Plan, the Definitive Documents, or upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date related or relating to the foregoing; *provided*, *however*, that except as expressly provided under the Plan, the foregoing releases shall not release obligations of the Debtors or the Wind-Down Debtors on account of any Allowed Claims that are treated under the Plan or obligations otherwise arising under any contract, agreement, or other business arrangement between any non-Debtor Releasing Party and any non-Debtor Released Party.  Notwithstanding anything to the contrary in the foregoing, nothing in this Article VIII.E shall, nor shall it be deemed to, release (i)  any post-Effective Date obligations of any Person or Entity under the Plan, including any such obligations created in connection with the Restructuring; (ii) any Released Party from any Claims or Causes of Action that are found, pursuant to a Final Order, to be the result of such Released Party's gross negligence, fraud, or willful misconduct; (iii) any Excluded Claim; or (iv) any Causes of Action or other claims against any of the Gemini Parties or any of the DCG Parties.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the releases by the Releasing Parties set forth in this Article VIII.E, which includes by reference each of the related provisions and definitions contained herein, and, further, shall constitute the Bankruptcy Court's finding that such releases are:  (1) in exchange for the good and valuable consideration provided by the Released Parties; (2) a good faith settlement and compromise of the Claims and Causes of Action released by such releases; (3) in the best interests of the Debtors and their Estates; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; (6) an essential component of the Plan and the Restructuring; and (7) a bar to any

of the Releasing Parties asserting any Claim or Cause of Action released pursuant to such releases except as expressly set forth in the Plan.

F.    *Exculpation*

Except as otherwise specifically provided in the Plan or Confirmation Order, no Exculpated Party shall have or incur liability for, and each Exculpated Party is hereby exculpated from, any Claim, Cause of Action, obligation, suit, judgment, damage, demand, loss, or liability for any claim related to any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the formulation, preparation, dissemination, negotiation, or Filing of the Disclosure Statement, the Plan, the Plan Supplement, the Alameda/Genesis Settlement Agreement, the 3AC/Genesis Settlement Agreement, any Monetization Transaction, or the related agreements, instruments, and other documents (including the Definitive Documents), the solicitation of votes with respect to the Plan, or the Restructuring, or any related contract, instrument, release or other agreement or document (including providing any legal opinion requested by any Entity regarding any transaction, contract, instrument, document, or other agreement contemplated by the Plan or the reliance by any Exculpated Party on the Plan or the Confirmation Order in lieu of such legal opinion) created or entered into in connection with the Debtors' in or out-of-court restructuring efforts, the Disclosure Statement, the Plan, the related agreements, instruments, and other documents (including the Definitive Documents), the Chapter 11 Cases, the filing of the Chapter 11 Cases, the Sales Process, the solicitation of votes with respect to the Plan, the pursuit of Confirmation, the pursuit of Consummation, the administration and implementation of the Plan and the Sales Process, including the issuance of or distribution of any property pursuant to the Plan and the Sales Process, the related agreements, instruments, and other documents (including the Definitive Documents), or upon any other act or omission, the transaction, agreement, event, or other occurrence taking place on or before the Effective Date related to the foregoing, except for claims related to any act or omission that is determined in a Final Order to have constituted fraud, willful misconduct, or gross negligence, but in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to the Plan. The Confirmation Order shall provide that the Exculpated Parties (to the extent applicable) have, and upon completion of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan. Notwithstanding anything to the contrary in the foregoing, nothing in this Article VIII.F shall, nor shall it be deemed to, release or exculpate any DCG Party.

G.    *Injunction*

Except as otherwise expressly provided in the Plan or for obligations issued or required to be paid pursuant to the Plan or Confirmation Order, all Entities who have held, hold, or may hold Claims against or Interests in the Debtors (whether proof of such Claims

or Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, together with their respective present or former employees, agents, officers, directors, principals, and Affiliates, are enjoined, from and after the Effective Date through and until the date on which all remaining property of the Debtors' Estates vested in the Wind-Down Debtors has been liquidated and distributed to Holders of Claims or otherwise in accordance with the terms of the Plan and the Plan Administration Agreement and the Plan has been fully administered, from taking any of the following actions against, as applicable, the Debtors, the Wind-Down Debtors, the Released Parties, or the Exculpated Parties (collectively, the "*Enjoined Actions*"): (i) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (ii) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (iii) creating, perfecting, or enforcing any Lien or encumbrance of any kind against such Entities or the property or the estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; and (iv) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property of such Entities on account of or in connection with or with respect to any such Claims or Interests.  Notwithstanding anything to the contrary in the foregoing, the injunction does not enjoin any party under the Plan or under any document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan from bringing an action to enforce the terms of the Plan or such document, instrument, or agreement (including those attached to the Disclosure Statement or set forth in the Plan Supplement, to the extent finalized) executed to implement the Plan.  Further, to the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person or Entity, whether directly, derivatively, or otherwise, of any Causes of Action released or exculpated pursuant to this Plan, including the Enjoined Actions, against any Released Party or Exculpated Party other than the Debtors or the Wind-Down Debtors.  Nothing in the Plan or the Confirmation Order shall grant the Debtors a discharge pursuant to section 1141(d) of the Bankruptcy Code.

H.    *Additional Provisions Regarding Governmental Units*

Notwithstanding any language to the contrary contained in the Disclosure Statement, Plan and/or the Confirmation Order, no provision of the Plan or the Confirmation Order shall (i) preclude the SEC or any other Governmental Unit from enforcing its police or regulatory powers; or (ii) enjoin, limit, impair, or delay the SEC or any other Governmental Unit from commencing or continuing any claims, causes of action, proceedings, or investigations against any non-Debtor Person or non-Debtor Entity in any forum.

The enforcement of any money judgment by the SEC or other Governmental Units against the Debtors or the Wind-Down Debtors shall be subject to the Plan.  In addition, the SEC and other

Governmental Units reserve their rights to amend any Filed Proofs of Claim and the Debtors and the Wind-Down Debtors reserve all of their defenses and rights to dispute such amendments.

Notwithstanding anything to the contrary in the Plan, the Disclosure Statement, or the Confirmation Order, or any findings announced in connection with the Plan, the Disclosure Statement, or the Confirmation Order, nothing in the Plan, the Disclosure Statement, or the Confirmation Order shall constitute a finding under either federal or state (including New York State) securities laws as to whether crypto tokens or transactions involving crypto tokens are securities, and the right of the SEC or other Governmental Units to challenge transactions involving crypto tokens on any basis is expressly reserved. The Bankruptcy Court is not making any findings as to the availability of any exemptions under the securities laws.

I.    *Protection Against Discriminatory Treatment*

Consistent with section 525 of the Bankruptcy Code and the Supremacy Clause of the U.S. Constitution, no Entity, including Governmental Units, shall discriminate against the Wind-Down Debtors, deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to the Wind-Down Debtors, or condition such a grant to, or discriminate with respect to such a grant against, the Wind-Down Debtors or another Entity with whom the Wind-Down Debtors have been associated, solely because each Debtor has been a debtor under chapter 11 of the Bankruptcy Code, has been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before the Debtors are granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

J.    *Recoupment*

In no event shall any Holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Wind-Down Debtors, unless such Holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of recoupment.

K.    *Reimbursement or Contribution*

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the time of disallowance, such Claim shall be forever Disallowed and expunged notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Confirmation Date: (1) such Claim has been adjudicated as non-contingent; or (2) the relevant Holder of a Claim has Filed a non-contingent Proof of Claim on account of such Claim and a Final Order has been entered prior to the Confirmation Date determining such Claim as no longer contingent.

L.    *Document Retention*

On and after the Effective Date, the Wind-Down Debtors or the PA Officer may maintain documents in accordance with the Debtors' existing standard document retention policy, as may be altered, amended, modified, or supplemented by the Wind-Down Debtors or the PA Officer;

*provided*, *however*, that the Wind-Down Debtors shall not destroy or otherwise abandon any such books, records, electronically stored information, or other documents without providing advance notice to the SEC (c/o William M Uptegrove, U.S. Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326, UptegroveW@SEC.GOV), which shall have seven (7) days to object to any proposed destruction or abandonment, and with the permission of the PA Officer or authorization from the Bankruptcy Court; *provided further* that, nothing in the Plan or the Confirmation Order shall affect the obligations of the Debtors, the Wind-Down Debtors, and/or any transferee or custodian to maintain any books and records that are subject to any governmental subpoena, document preservation letter, or other investigative request from a governmental agency.

## ARTICLE IX.
## CONDITIONS PRECEDENT TO CONSUMMATION OF THE PLAN

A.    *Conditions Precedent to the Effective Date*

It shall be a condition to the occurrence of the Effective Date that the following conditions, as determined by the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing), shall have been satisfied (or waived pursuant to the provisions of Article IX.B of the Plan):

1.    the Confirmation Order, with respect to which the Debtors shall have obtained the Committee's Consent, the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing), and, to the extent applicable, Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing), shall have been entered, and the Confirmation Order shall not have been stayed, modified, or vacated on appeal;

2.    the New Governance Documents, with respect to which the Debtors shall have obtained the Committee's Consent and the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing), and the effectiveness of which requires filing with the Secretary of State of any jurisdiction, shall have been duly filed with the applicable authorities in the relevant jurisdictions;

3.    all other Definitive Documents shall have been effected or executed and delivered in accordance with the terms of the Plan;

4.    all required governmental and third-party approvals and consents, including Bankruptcy Court approval, necessary in connection with the transactions provided for in the Plan shall have been obtained, shall not be subject to unfulfilled conditions, and shall be in full force and effect, and all applicable waiting periods shall have expired without any action having been taken by any competent authority that would restrain or prevent such transactions;

5.    all documents and agreements necessary to implement the Plan and the Restructuring shall have been (a) tendered for delivery and (b) effected or executed by all Entities party thereto, and all conditions precedent to the effectiveness of such documents and agreements (other than any conditions related to the occurrence of the Effective Date) shall have been satisfied or waived pursuant to the terms of such documents or agreements;

6.      to the extent any 3AC Claims are not disallowed by an order of the Bankruptcy Court prior to the Effective Date, a reserve shall have been established in respect of such 3AC Claims in an amount, manner, and form of consideration satisfactory to the Debtors, with the Committee's Consent and the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing);

7.      each Claims Reserve shall have been funded in an amount equal to the applicable Claims Reserve Amount, with the Committee's Consent and the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing);

8.      (a) the Gemini Determinations shall have occurred or (b) the Gemini Additional Collateral Determination shall have occurred and the Gemini GBTC Shares Reserve shall have been established by Gemini or the Gemini Distribution Agent in the manner provided for in Article IV.A.12;

9.      each Wind-Down Reserve and the Litigation Reserve shall have been funded in the amounts set forth in the Wind-Down Budget, with the Committee's Consent and the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing); and

10.     the Professional Fee Escrow Account shall have been funded with Cash in an amount equal to the Professional Fee Reserve Amount.

B.      *Waiver of Conditions*

The Debtors, with the Committee's Consent, the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing), and, solely with respect to Article IX.A.1 and IX.A.8 of the Plan, Gemini's Consent (solely with respect to Article IX.A.1, if the Gemini Acceptance Event has occurred and is continuing), may waive any of the conditions precedent to the Effective Date of the Plan set forth in Article IX.A at any time, without any notice to any other parties in interest, any further notice, leave, or order of the Bankruptcy Court, or any formal action other than proceedings to confirm or consummate the Plan.

C.      *Substantial Consummation*

"Substantial Consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code, shall be deemed to occur on the Effective Date.

D.      *Effect of Non-Occurrence of Conditions to the Confirmation Date or the Effective Date*

If the Effective Date does not occur, the Plan shall be null and void in all respects and nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by or Claims against or Interests in the Debtors; (2) prejudice in any manner the rights of the Debtors or any other Entity; (3) constitute an admission, acknowledgment, offer, or undertaking by the Debtors, any Holders of Claims or Interests, or any other Entity in any respect; or (4) be used by the Debtors or any Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

## ARTICLE X.
## MODIFICATION, REVOCATION, OR WITHDRAWAL OF THE PLAN

A.      *Modification and Amendments*

Subject to the limitations contained in the Plan, the Debtors reserve the right, with the Committee's Consent, the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification), and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification) or in the exercise of the Debtors' Fiduciary Duty Action, to alter, amend, or modify the Plan (including the Distribution Principles) prior to Confirmation (including any exhibit or Plan Supplement) and seek Confirmation consistent with the Bankruptcy Code and, as appropriate, not resolicit votes on such modified Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the restrictions on modifications set forth in the Plan, the Debtors expressly reserve their rights, with the Committee's Consent, the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification), and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing at the time of such alteration, amendment, or modification) or in the exercise of the Debtors' Fiduciary Duty Action, to alter, amend, or modify the Plan (including any exhibit or Plan Supplement), one or more times, after Confirmation, and, to the extent necessary, initiate proceedings in the Bankruptcy Court to so alter, amend, or modify the Plan (including any exhibit or Plan Supplement), or remedy any defect or omission, or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.  Notwithstanding anything to the contrary in the Plan, the Disclosure Statement, or the Confirmation Order, the Debtors shall provide at least three (3) Business Days' prior written notice with an opportunity to object to the SEC (c/o William M. Uptegrove, U.S. Securities and Exchange Commission, 950 East Paces Ferry Road, NE, Suite 900, Atlanta, GA 30326, UptegroveW@SEC.GOV) of any alteration, amendment, or modification of the Distribution Principles.

B.      *Effect of Confirmation on Modifications*

Entry of the Confirmation Order shall mean that all modifications or amendments to the Plan in accordance with Article X.A occurring after the solicitation thereof but before entry of the Confirmation Order are approved pursuant to section 1127(a) of the Bankruptcy Code and shall constitute a finding that such modifications or amendments to the Plan do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of the Plan*

The Debtors reserve the right, with the Committee's Consent, the Ad Hoc Group's Consent (if an Ad Hoc Group Acceptance Event has occurred and is continuing at the time of such revocation or withdrawal), and Gemini's Consent (if the Gemini Acceptance Event has occurred and is continuing at the time of such revocation or withdrawal) or in the exercise of the Debtors' Fiduciary Duty Action, to revoke or withdraw the Plan with respect to any or all Debtors prior to the Confirmation Date and to File subsequent chapter 11 plans.  If the Debtors revoke or withdraw

the Plan, or if Confirmation and Consummation do not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void; and (3) nothing contained in the Plan shall: (i) constitute a waiver or release of any Claims or Interests; (ii) prejudice in any manner the rights of the Debtors or any other Entity, including the Holders of Claims; (iii) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors or any other Entity; or (iv) be used by the Debtors or any other Entity as evidence (or in any other way) in any litigation, including with regard to the strengths or weaknesses of any of the parties' positions, arguments, or claims.

## ARTICLE XI.
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over the Chapter 11 Cases and the authority and power to adjudicate all matters, arising out of, or related to, the Chapter 11 Cases and the Plan, including jurisdiction, power, and authority to:

1. Allow, Disallow, determine, liquidate, classify, estimate, or establish the priority, secured, unsecured, or subordinated status, or amount of any Claim or Interest, including the resolution of any request for payment of any Administrative Expense Claim and the resolution of any and all objections relating to any of the foregoing;

2. decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals;

3. resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Cures pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4. ensure that distributions to Holders of Allowed Claims or Interests are accomplished pursuant to the provisions of the Plan;

5. consider any modifications of the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code, the Confirmation Order, or any contract, instrument, release, or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in each case, to remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document entered into, delivered, or created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

91

6.      adjudicate, decide, or resolve any motions, adversary proceedings (including the Turnover Actions), contested, or litigated matters, and grant or deny any applications involving a Debtor that may be pending on the Effective Date;

7.      adjudicate, decide, or resolve any and all matters related to Causes of Action by or against a Debtor;

8.      adjudicate, decide, or resolve any and all matters related to sections 1141, 1145, and 1146 of the Bankruptcy Code;

9.      enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan, and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan;

10.     enter and enforce any order for the sale of property pursuant to sections 363 or 1123 of the Bankruptcy Code;

11.     resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

12.     issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan;

13.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article VIII of the Plan and enter such orders as may be necessary or appropriate to implement such releases, injunctions, and other provisions;

14.     resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the Holder of a Claim or Interest for amounts not timely repaid pursuant to Article VII of the Plan;

15.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

16.     determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement;

17.     adjudicate any and all disputes arising from or relating to distributions under the Plan (including the Distribution Principles) or any transactions contemplated therein;

18.     determine requests for the payment of Claims entitled to priority pursuant to section 507 of the Bankruptcy Code;

19.      hear and determine matters concerning state, local, and U.S. federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

20.      hear and determine all disputes involving the existence, nature, or scope of the release provisions set forth in the Plan, including any dispute or matter involving the Wind-Down Debtors or relating to any liability arising out of the termination of employment or the termination of any employee or retiree benefit program, regardless of whether such termination occurred prior to or after the Effective Date;

21.      enforce all orders previously entered by the Bankruptcy Court;

22.      enter an order concluding or closing the Chapter 11 Cases;

23.      enforce the injunction, release, and exculpation provisions set forth in Article VIII of the Plan; and

24.      hear any other matter not inconsistent with the Bankruptcy Code.

## ARTICLE XII.
## MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article IX.B of the Plan and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan, the final versions of the documents contained in the Plan Supplement, and the Confirmation Order shall be immediately effective and enforceable and deemed binding upon the Debtors or the Wind-Down Debtors, as applicable, and any and all Holders of Claims or Interests (regardless of whether the Holders of such Claims or Interests are deemed to have accepted or rejected the Plan), all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions provided for in the Plan, each Entity acquiring property under the Plan or the Confirmation Order, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases. All Claims and debts shall be fixed, adjusted, or compromised, as applicable, pursuant to the Plan regardless of whether any Holder of a Claim or debt has voted on the Plan.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan. The Debtors or the Wind-Down Debtors, as applicable, and all Holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest shall, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.    *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect unless the Effective Date occurs.  Prior to the Effective Date, neither the Plan, any statement or provision contained in the Plan, nor any action taken or not taken by any Debtor or the Committee with respect to the Plan, the Disclosure Statement, the Confirmation Order, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor or the Committee with respect to the Holders of Claims or Interests.

D.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, manager, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

E.    *Service of Documents*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Wind-Down Debtors, as applicable, shall be served on:

| | |
|---|---|
| **The Debtors or the Wind-Down Debtors** | **Genesis Global Holdco, LLC**<br>175 Greenwich Street, Floor 38<br>New York, NY 10007<br>Attn:  A. Derar Islim |
| **Attorneys to the Debtors** | **Cleary Gottlieb Steen & Hamilton LLP**<br>One Liberty Plaza<br>New York, NY 10006<br>Attn:  Sean A. O'Neal<br>       Luke A. Barefoot<br>       Jane VanLare |
| **Committee** | **White & Case LLP**<br>1221 Avenue of the Americas<br>New York, NY 10020-1095<br>Attn:  Christopher Shore<br>       Philip Abelson<br>       Michele J. Meises<br><br>Southeast Financial Center<br>200 South Biscayne Blvd, Suite 4900<br>Miami, FL 33131<br>Attn: Amanda Parra Criste |
| **Ad Hoc Group** | **Proskauer Rose LLP** |

Eleven Times Square
New York, NY 100363-8299
Attn:  Brian S. Rosen

70 West Madison
Suite 3800
Chicago, IL 60602
Attn:  Jordan E. Sazant

| | |
|---|---|
| **Litigation Oversight Committee** | To be included in the Plan attached to the Confirmation Order. |
| **Wind-Down Oversight Committee** | To be included in the Plan attached to the Confirmation Order. |
| **PA Officer** | To be included in the Plan attached to the Confirmation Order. |
| **Gemini Distribution Agent** | **Hughes Hubbard & Reed LLP**<br>One Battery Park Plaza<br>New York, New York 10004<br>Attn:  Anson B. Frelinghuysen<br>Dustin P. Smith<br>Erin E. Diers |

F.    *Entire Agreement*

Except as otherwise indicated, on the Effective Date, the Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

G.    *Exhibits*

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are Filed, copies of such exhibits and documents shall be available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Debtors' restructuring website at https://restructuring.ra.kroll.com/genesis/ or the Bankruptcy Court's website at https://www.nysb.uscourts.gov/. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the non-exhibit or non-document portion of the Plan shall control.

H.    *Nonseverability of Plan Provisions*

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and

95

interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such terms or provision shall then be applicable as altered or interpreted. Notwithstanding any such alteration or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such alteration or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without the Debtors' consent; and (3) nonseverable and mutually dependent.

I.       *Votes Solicited in Good Faith*

Upon entry of the Confirmation Order, the Debtors will be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code, and to the extent that any Digital Asset is deemed to be a "security" by the SEC or any Governmental Unit, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors, the Wind-Down Debtors, the Disbursing Agent, the Gemini Distribution Agent, and the PA Officer and each of their respective Affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys will be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of Securities (if any) offered and sold, and in the distribution of Digital Assets, under the Plan and any previous plan, and, therefore, none of such parties or individuals will have any liability for the violation of any applicable law, rule, or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the Securities (if any) offered and sold under the Plan and any previous plan.

J.       *Request for Expedited Determination of Taxes*

The Debtors or the Wind-Down Debtors, as the case may be, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

K.       *Closing of Chapter 11 Cases*

The Wind-Down Debtors shall, promptly after the full administration of the Chapter 11 Cases, File with the Bankruptcy Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Bankruptcy Court to close the Chapter 11 Cases.

L.       *No Stay of Confirmation Order*

The Confirmation Order shall contain a waiver of any stay of enforcement otherwise applicable, including pursuant to Bankruptcy Rules 3020(e) and 7062.

M.      *Waiver or Estoppel*

Each Holder of a Claim or Interest shall be deemed to have waived any right to assert any argument, including the right to argue that its Claim or Interest should be Allowed in a certain amount, in a certain priority, secured or not subordinated by virtue of an agreement made with the Debtors or their counsel, or any other Entity, if such agreement or the Debtors' or the Wind-Down Debtors' right to enter into settlements was not disclosed in the Plan, the Disclosure Statement, or papers Filed with the Bankruptcy Court or the Solicitation Agent prior to the Confirmation Date.

N.      *Dissolution of the Committee*

On the Effective Date, the Committee and any other statutory committee formed in connection with the Chapter 11 Cases shall dissolve automatically and all members thereof (solely in their capacities as such) shall be released and discharged from all rights, duties, and responsibilities arising from, or related to, the Chapter 11 Cases; *provided*, *however*, that the Committee shall continue to exist and its Professionals shall continue to be retained without further order of the Court with respect to (1) the preparation and prosecution of any final fee applications of the Committee's Professionals and (2) all final fee applications Filed with the Bankruptcy Court.

* * * *

Respectfully submitted, as of the date first set forth below,

Dated:     November 27, 2023
           Park City, Utah

                              GENESIS GLOBAL HOLDCO, LLC
                              on behalf of itself and all other Debtors


                               /s/ Paul Aronzon
                              Paul Aronzon
                              Member of the Special Committee

**<u>Exhibit A</u>**

**Distribution Principles**

**Distribution Principles**

THE DISTRIBUTION PRINCIPLES REFLECT THE AGREEMENT OF THE DEBTORS, THE
OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE AD HOC GROUP OF
GENESIS LENDERS, AND THE DOLLAR CREDITOR GROUP. AS OF THE DATE
HEREOF, EACH OF THE DEBTORS, THE COMMITTEE, THE AD HOC GROUP OF
GENESIS LENDERS, AND THE DOLLAR CREDITOR GROUP RESERVES ALL RIGHTS
WITH RESPECT TO THE DISTRIBUTION PRINCIPLES.

THE INFORMATION CONTAINED IN THIS ANNEX IS PROVIDED IN SUMMARY FORM
FOR ILLUSTRATIVE PURPOSES ONLY AND IS SUBJECT TO CHANGE. THE DEBTORS,
WITH THE AD HOC GROUP'S CONSENT AND THE COMMITTEE'S CONSENT,
RESERVE ALL RIGHTS WITH RESPECT TO ALL CLAIMS AND THE CLAIMS
RECONCILIATION PROCESS. ACTUAL RECOVERIES MAY VARY, AND A
MODIFICATION OF ANY OF THE UNDERLYING ASSUMPTIONS, METHODOLOGIES,
AND MECHANICS OUTLINED IN THIS ANNEX COULD RESULT IN ADJUSTMENTS TO
THE ACTUAL DISTRIBUTION RECEIVED BY HOLDERS OF ALLOWED CLAIMS.

## A.    THE DISTRIBUTION PRINCIPLES

This Annex outlines the methodology and mechanics governing the allocation and distribution of the Debtors' current and future Distributable Assets as well as shares of Grayscale Bitcoin Trust ("**GBTC Shares**") and Grayscale Ethereum Trust ("**ETHE Shares**") under the Amended Plan.[1]

In accordance with the Bankruptcy Code, these Distribution Principles generally provide for the allocation of Distributable Assets, the GBTC Shares, and the ETHE Shares (collectively, "**Allocable Assets**"), to Holders of Allowed General Unsecured Claims on a *pro rata* basis. A Holder's *pro rata* share of a pool of Allocable Assets (its "***Pro Rata* Share**") for a given Distribution Date will generally equal (x) the value of the assets in U.S. Dollars ("**USD**") in which the Holder's claim is denominated as of the Petition Date (the "**Petition Date Value**") less certain offsets *over* (y) the Petition Date Value of the Claim Assets of all General Unsecured Claims less certain offsets.

Certain provisions of these Distribution Principles apply to Holders of Allowed General Unsecured Claims whose Claims are denominated in the same asset (such asset, a "**Claim Asset**," and such group, a "**Denomination Group**"), even though such Holders may not be part of the same Class for purposes of the Amended Plan.

One of the goals of these Distribution Principles is to maximize "in-kind" distributions, *i.e.*, distributions to Holders of Allowed General Unsecured Claims in the Claim Assets of their claims, including by (1) allocating Distributable Assets among Holders of Allowed General Unsecured Claims using the respective Claim Assets and, (2) as necessary, supplementing such allocation with allocations of "like-kind" assets, *i.e.*, assets that reference the Claim Assets. In furtherance of this goal, the Distribution Principles propose to provide Holders of Allowed Fiat-or-Stablecoin Denominated Unsecured Claims (and Remainder Gemini Lender Claims (as defined below) denominated in Cash, Foreign Currency, or Stablecoins) with near-term distributions in an amount equal to such Holders' *Pro Rata* Share of the total value of all Allocable Assets to be allocated to Holders of Allowed General Unsecured Claims on the Initial Distribution Date (as defined below), including the value (calculated in accordance with Step 3 below) of such Allocable Assets constituting GBTC Shares or ETHE Shares. To do this, the Debtors may need to monetize a certain amount of Digital Assets, GBTC Shares, or ETHE Shares prior to the Effective Date of the Amended Plan if the Cash and Stablecoins available for distribution are insufficient to provide the Holders of Allowed Fiat-or-Stablecoin Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in Cash, Foreign Currency, or Stablecoins) with their *Pro Rata* Share of the value (as calculated pursuant to these Distribution Principles). The costs of these monetization transactions will be borne by all Denomination Groups *pro rata*. In this way, Holders of Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in Cash, Foreign Currency, or Stablecoins) will receive in-kind distributions in an amount they would otherwise be entitled to receive, and the remaining GBTC Shares and ETHE Shares (exclusive of any such GBTC Shares or ETHE Shares held in escrow or otherwise

---

[1]    The Debtors reserve the right, in consultation with the Committee and the Ad Hoc Group, to further amend the Amended Plan to establish a litigation trust to pursue the Retained Causes of Action. Capitalized terms not otherwise defined herein shall have the meanings given to such terms in the Amended Plan or the Disclosure Statement, as applicable.

withheld for any of the Plan Reserves) will be allocated to BTC-denominated creditors, ETH-denominated creditors, and Alt-Coin denominated creditors, allowing such creditors to receive the benefit of any appreciation of such shares, while also bearing the risk of any depreciation of the value of such shares.

However, regulatory, legal, or practical considerations may impede the ability of the Debtors or the PA Officer to make in-kind or like-kind distributions. Accordingly, although these Distribution Principles are designed to maximize in-kind and like-kind distributions, such may not ultimately be possible in all instances.

In order to maximize in-kind and like-kind distributions, from time to time, the Wind-Down Debtors or the PA Officer, in consultation with the Wind-Down Oversight Committee, may engage in certain market transactions. Specifically, the Wind-Down Debtors or the PA Officer may, subject to regulatory, legal, and practical considerations as they may consider in their reasonable discretion, purchase, sell, or exchange Allocable Assets for Cash or other assets ("**Market Transactions**").[2] The Wind-Down Debtors or the PA Officer may in their reasonable discretion use such third-party service providers, exchanges, market makers, or others as they determine appropriate in their reasonable discretion to engage in such Market Transactions.

Due to regulatory, legal, or practical considerations, the Wind-Down Debtors or the PA Officer, with the consent of the Wind-Down Oversight Committee, may in their reasonable discretion determine it is not appropriate, legal, or practical to make "in-kind" or "like-kind" distributions. This may be particularly the case for General Unsecured Claims denominated in Alt-Coins. Likewise, GBTC Shares and ETHE Shares may not be Distributable Assets and may only become Distributable Assets when they are monetized into USD (or otherwise converted into Distributable Assets). To address these types of assets ("**Un-Distributable Assets**"), either (i) the Debtors, if prior to the Effective Date, with the Committee's Consent and Ad Hoc Group's Consent, or (ii) the Wind-Down Debtors or the PA Officer, if after the Effective Date, and at the direction of the Wind-Down Oversight Committee representatives of the Denomination Groups to whom such assets have been allocated, will endeavor to liquidate the relevant Allocable Assets or exchange them for Stablecoins or other assets ("**Liquidation Transactions**"). The proceeds of such Liquidation Transactions will be treated as Distributable Assets.

To the extent Market Transactions or Liquidation Transactions are effected prior to the allocation of the relevant assets, the costs of such transactions will be borne by all Denomination Groups *pro rata*; to the extent they are effected after allocation, the costs of such transactions will be borne by the Denomination Group directing such transactions.

These Distribution Principles consist of five steps. In the first two steps, a Holder's *Pro Rata* Share of Allocable Assets is calculated. The third step involves valuing the Allocable Assets. In the fourth step, the Allocable Assets are allocated to Holders of Allowed General Unsecured Claims based on Holders' Claim Assets. Lastly, the PA Officer will make distributions. To the extent that the Allocable Assets allocated to Holders of Allowed General Unsecured Claims (the "**Allocated Assets**") consist of Distributable Assets having the same denominations as the Holders' Claim

---

[2]    The Debtors, Wind-Down Debtors, or PA Officer, as applicable, will provide the Securities and Exchange Commission with no less than three (3) business days' notice prior to any Market Transaction or Liquidation Transaction involving Alt-Coins or Stablecoins.

Assets ("**Matching Assets**"), the Debtors or the PA Officer, as applicable, will distribute such assets to such Holders.

To the extent the Allocated Assets consist of Distributable Assets having different denominations from the Holders' Claim Assets ("**Mis-Matching Assets**"), the Debtors (in consultation with the Committee and the Ad Hoc Group SteerCo) or the PA Officer (in consultation with the Wind-Down Oversight Committee representatives of the relevant Denomination Group), as applicable, will endeavor to engage in Market Transactions, the proceeds of which will be distributed to the relevant Holders. To the extent the Allocated Assets consist of Un-Distributable Assets, (i) the Debtors, with the Ad Hoc Group's Consent and the Committee's Consent, or (ii) the PA Officer, at the direction of the Wind-Down Oversight Committee representatives of the Denomination Groups to whom such assets have been allocated, as applicable, and subject to the Un-Distributable Asset Monetization Agreement described below, will engage in Liquidation Transactions and distribute the proceeds of such Liquidation Transactions (subject to any further Market Transactions that may be necessary to make in-kind distributions) to the relevant Holders.

**Step 1 – Claim Value Calculation**: The first step of the Distribution Principles involves determining the numerator of the *Pro Rata* Share calculation for each Holder of an Allowed General Unsecured Claim (the "**Individual Claim Value**"). For a given Holder, the Individual Claim Value will equal the Petition Date Value of such Holder's Claim Assets, less certain collateral and payable offsets. The value of any collateral held by a Holder of an Allowed General Unsecured Claim shall be calculated as of the Effective Date. The value of any payable offsets shall be calculated using the value of such payable offset as of the Petition Date. With respect to Gemini Lender Claims, the value of the Gemini GBTC Shares will be offset against all Gemini Lender Claims on a *pro rata* basis, and the remaining amount of each Gemini Lender Claim shall equal such Holder's Individual Claim Value (the "**Remainder Gemini Lender Claim**").

**Step 2 – *Pro Rata* Share Calculation**: The next step in the *Pro Rata* Share calculation involves calculating the denominator of the calculation. This denominator will equal the aggregate of the Individual Claim Values for all Holders of Allowed General Unsecured Claims (the "**Aggregate Claim Value**"). The PA Officer may need to modify or revise the Aggregate Claim Value to address contingencies or unresolved issues. A Holder's *Pro Rata* Share is equal to its respective Individual Claim Value divided by the Aggregate Claim Value.

**Step 3 – Valuation of Allocable Assets Based on Conversion Rate**: Once each Holder's *Pro Rata* Share is calculated, the next step is to calculate the value of the relevant Allocable Assets so that they can be allocated to each Holder of an Allowed General Unsecured Claim based on each Holder's *Pro Rata* Share. This calculation will be conducted separately for each Distribution Date, in accordance with the following methodology.

> **Determination of Initial Conversion Rate**: For the Distributable Assets to be distributed on or around the Effective Date (the "**Initial Distribution Date**"), as well as any GBTC Shares and ETHE Shares that would be distributed on the Initial Distribution Date were they Digital Assets, the PA Officer will establish a conversion rate into USD for each type of Allocable Asset (other than USD or Stablecoins) (an "**Initial Conversion Rate**").

i.  For Distributable Assets, the Initial Conversion Rate will be the average price in USD of that type of Distributable Asset (the "**Average Price**") during the period commencing fifteen (15) calendar days prior to the entry of the Confirmation Order and ending fifteen (15) days following the entry of the Confirmation Order (the "**Measurement Period**").

ii. For GBTC Shares and ETHE Shares that would be distributed on the Initial Distribution Date were they Digital Assets, the Initial Conversion Rate will be the Initial Conversion Rate that would apply if such GBTC Shares or ETHE Shares were Digital Assets, less an amount estimated by the PA Officer of the per-share costs (including, but not limited to, brokerage or marketing fees, or any bid-offer costs) that were realized in connection with sales prior to the end of the Measurement Period of any GBTC Shares or ETHE Shares or, if no such sales have occurred prior to the end of the Measurement Period, the estimated amount of such costs that would be incurred in the future for sales of such GBTC Shares or ETHE Shares (the "**Trust Share Bid-Offer Cost Estimate**"). The Trust Share Bid-Offer Cost Estimate shall be determined at the PA Officer's sole discretion, calculated as a percentage of Average Price, but shall in no case beless than 2.5% or more than 5%; *provided*, *however*, that the Trust Share Bid-Offer Cost Estimate shall be 0% for the relevant Un-Distributable Asset upon the Grayscale Bitcoin Trust or the Grayscale Ethereum Trust converting into, and commencing active trading as, an exchange-traded fund.

**Determination of Conversion Rate for Subsequent Distributions:**[3] For each tranche of Distributable Assets to be distributed following the Initial Distribution Date (each such date, a "**Subsequent Distribution Date**"), as well as certain Un-Distributable Assets, the PA Officer will establish a conversion rate into USD for each such asset (other than USD or Stablecoins) (a "**Subsequent Conversion Rate**").

i.  For Distributable Assets, the Subsequent Conversion Rate will be based on the time-weighted average price of such asset during a seven-day period commencing on a date selected by the PA Officer, in consultation with the Wind-Down Oversight Committee.

ii. For Un-Distributable Assets that are made available for allocation at substantially the same time as any Distributable Assets ("**Concurrent Un-Distributable Assets**"), the Subsequent Conversion Rate will be the Subsequent Conversion Rate that would apply if such Un-Distributable Assets were Distributable Assets, less the Trust Share Bid-Offer Cost Estimate, if applicable.

For any other Un-Distributable Assets allocated after the Initial Distribution Date ("**Standalone Un-Distributable Assets**"), there will be no Subsequent Conversion Rate; rather, such assets will be allocated in Step 4 to each Denomination Group *pro rata*

---

[3] The PA Officer will determine appropriate modifications to the foregoing methodology to incorporate instances in which a given crypto asset is monetized in multiple different transactions on different dates (e.g., GBTC), and at various prices within a given distribution period (but prior to the period in which Average Price is determined for such period).

(subject to the Limitation on Recoveries, described below) based upon the number of shares or units, as applicable. For purposes of the Limitation on Recoveries described below, such assets will be valued as though they were Concurrent Un-Distributable Assets.

The Initial Conversion Rate and the Subsequent Conversion Rate for USD and Stablecoins will be 1.

**Calculation of As-Converted Allocable Asset Value:** The PA Officer will then calculate the value of the full pool of (i) Allocable Assets for the Initial Distribution Date and (ii) Distributable Assets and Concurrent Un-Distributable Assets for each Subsequent Distribution Date, in each case by first multiplying the applicable Initial Conversion Rate or Subsequent Conversion Rate for each type of asset by the number of assets that consist of such type to be allocated for such Distribution Date ("**Dollar Value**"). Then, the PA Officer will aggregate the Dollar Value for all types of Allocable Assets to be allocated for such Distribution Date, except for Standalone Un-Distributable Assets, which sum will yield the converted value of the Allocable Assets (the "**As-Converted Allocable Asset Value**").

**Step 4 – Allocation of Allocable Assets**: In the fourth step, the PA Officer will allocate individual assets to Holders of Allowed General Unsecured Claims. For each Distribution Date, the PA Officer will allocate to each Holder of an Allowed General Unsecured Claim its *Pro Rata* Share of the Allocable Assets for such Distribution Date based on the As-Converted Allocable Asset Value of the Allocable Assets for such Distribution Date, or, in the case of Standalone Un-Distributable Assets, to each Denomination Group *pro rata* based upon the number of shares or units, as applicable. For the avoidance of doubt, the Allocable Assets for the Initial Distribution Date shall consist of all Cash, Digital Assets, GBTC Shares, and ETHE Shares held by the Debtors, *less* any Cash and GBTC Shares required to be withheld for any of the Plan Reserves. Following the allocation of Allocable Assets among the Denomination Groups, in no instance will direct third-party costs related to Market Transactions effected in respect of such Allocable Assets allocated to one Denomination Group affect the Allocable Assets allocated to, or distributions to, another Denomination Group. In order to maximize "in-kind" and "like kind" recoveries, the PA Officer will allocate Allocable Assets for distribution in-kind or, to the extent necessary, monetize such assets pursuant to certain Market Transactions or Liquidation Transactions (except in the case of Standalone Un-Distributable Assets), as applicable, in advance of distribution, as follows:

A. **Cash/Stablecoin Allocation**:  The PA Officer will allocate to Holders of Allowed Fiat-or-Stablecoin Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in Cash, Foreign Currency, or Stablecoins) (1) *first*, Allocable Assets consisting of Cash or Stablecoins, (2) *second*, to the extent there are not sufficient Allocable Assets consisting of Cash and Stablecoins to provide Holders of Allowed Fiat-or-Stablecoin Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in Cash, Foreign Currency, or Stablecoins) with their *Pro Rata* Share of the As-Converted Allocable Asset Value, Allocable Assets consisting of Excess Alt-Coins, (3) *third*, to the extent there are not sufficient Allocable Assets consisting of Cash, Stablecoins, or Excess Alt-Coins to provide Holders of Allowed Fiat-or-Stablecoin Denominated Unsecured Claims (and Remainder

Gemini Lender Claims denominated in Cash, Foreign Currency, or Stablecoins) with their *Pro Rata* Shares of the As-Converted Allocable Asset Value, Allocable Assets consisting of Digital Assets, and (4) *fourth*, to the extent there are not sufficient Allocable Assets consisting of Cash, Stablecoins, Excess Alt-Coins, or Digital Assets to provide Holders of Allowed Fiat-or-Stablecoin Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in Cash, Foreign Currency, or Stablecoins) with their *Pro Rata* Shares of the As-Converted Allocable Asset Value, Allocable Assets consisting of GBTC Shares or ETHE Shares; *provided*, *however*, that to the extent there exists any Excess Alt-Coin, the PA Officer shall liquidate such Excess Alt-Coins.[4]

B. **BTC Allocation**: The PA Officer will allocate to Holders of Allowed BTC-Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in BTC) (1) *first*, Allocable Assets consisting of BTC, (2) *second*, Allocable Assets consisting of GBTC Shares, and (3) *third*, to the extent there are not sufficient Allocable Asset consisting of BTC and GBTC Shares to provide Holders of Allowed BTC-Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in BTC) with their *Pro Rata* Shares of the As-Converted Allocable Asset Value, Allocable Assets consisting of Digital Assets (other than BTC), Cash, Stablecoins, and ETHE Shares.

C. **ETH Allocation**: The PA Officer will allocate to Holders of Allowed ETH-Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in ETH) (1) *first*, Allocable Assets consisting of ETH, (2) *second*, Allocable Assets consisting of ETHE Shares, and (3) *third*, to the extent there are not sufficient Allocable Assets consisting of ETH and ETHE Shares to provide Holders of Allowed ETH-Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in ETH) with their *Pro Rata* Shares of the As-Converted Allocable Asset Value, Allocable Assets consisting of Digital Assets (other than ETH), Cash, Stablecoins, and GBTC Shares.

D. **Alt-Coin Allocation**: The PA Officer will allocate to Holders of Allowed Alt-Coin-Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in Alt-Coins) (1) *first*, all Allocable Assets consisting of Alt-Coins denominated in such Holder's Claim Asset, and (2) *second*, to the extent there are not sufficient Allocable Assets consisting of Alt-Coins to provide Holders of Allowed Alt-Coin-Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in Alt-Coins) with their *Pro Rata* Shares of the As-Converted Allocable Asset Value, BTC, ETH, Stablecoins, Cash, GBTC Shares, and ETHE Shares.

---

[4]     "**Excess Alt-Coin**" shall mean any and all Alt-Coins of any given denomination of Claim Assets remaining after the allocation described in Step 4(D)(1) below.

**Step 5 – Distributions**: In the final step, the PA Officer will distribute the Allocated Assets, engage in Market Transactions and Liquidation Transactions, and distribute the proceeds of such transactions to Holders of Allowed General Unsecured Claims as allocated in Step 4.

To the extent a Holder of an Allowed General Unsecured Claim has been allocated Matching Assets, the PA Officer will distribute such Matching Asset to such Holder. To the extent a Holder of an Allowed General Unsecured Claim has been allocated a Mis-Matching Asset, the PA Officer will try to convert such asset into a Matching Asset so as to provide an "in-kind" distribution. Specifically, the PA Officer, in consultation with the Wind-Down Oversight Committee representatives of the of the Denomination Group, will endeavor to engage in Market Transactions to the extent it determines such is legally permissible and feasible. To the extent the PA Officer is able to complete such Market Transactions, the PA Officer will distribute the proceeds of such transactions to the relevant Holders. To the extent the PA Officer is unable to complete such transactions (*e.g.*, due to regulatory, practical, or legal considerations), it will, in consultation with Wind-Down Oversight Committee representatives of the Denomination Group, determine whether to engage in Liquidation Transactions or distribute to Holders the Mis-Matching Assets. To the extent the Allocated Assets consist of Un-Distributable Assets, the PA Officer, in consultation with Wind-Down Oversight Committee representatives of the Denomination Group, will engage in Liquidation Transactions and distribute the proceeds of such Liquidation Transactions to the relevant Holders.  Lastly, to the extent multiple Denomination Groups are allocated Un-Distributable Assets of the same denomination, such Denomination Groups shall be subject to the Un-Distributable Asset Monetization Agreement. To the extent Market Transactions or Liquidation Transactions are effected prior to the allocation of the relevant assets, the costs of such transactions will be borne by all Denomination Groups *pro rata*; to the extent they are effected after allocation, the costs of such transactions will be borne by the Denomination Group directing such transactions.

Before receiving any distribution, a Holder may need to provide the PA Officer, a third-party service provider, or another party such know-your-customer, wallet address, identifying, or other information as the PA Officer, third-party service provider, or other party shall reasonably determine, and may need to be "on-boarded" to the third-party service provider.

> ***Limitations on Recoveries***. For the avoidance of doubt, except as set forth below, no Holder of an Allowed Unsecured Claim shall be entitled to receive distributions from the Wind-Down Debtors' estates having a value in excess of one hundred percent (100%) of the in-kind Claim Assets underlying such Holders' Allowed Unsecured Claims (or, solely to the extent it is not possible to make in-kind distributions in the relevant Claim Asset, the Dollar  Value thereof using the Initial Conversion Rate) (the "**Recovery Cap**"). To the extent any Holder of an Allowed Unsecured Claim receives distributions from the Wind-Down Debtors' estates valued at or above the Recovery Cap, then, subject to the accrual and payment of Post-Petition Interest or Post-Effective Date Interest, if applicable, as described below, such Holder's Allowed Unsecured Claim's *Pro Rata* Share shall be decreased to 0% and the *Pro Rata* Shares of all other Holders of Allowed General Unsecured Claims shall, on a *pro rata* basis, be increased, up to the amount that would allow such Holders to receive assets valued up to the Recovery Cap; *provided*, *however*, that, to the extent Post-Effective Date Interest becomes applicable, Holders of Allowed

Fiat-or-Stablecoin Denominated Claims' *Pro Rata* Share shall instead be decreased to the amount of accrued Post-Effective Date Interest.

*Post-Petition Interest*. All unsatisfied Allowed General Unsecured Claims shall, from the Petition Date, accrue interest at the rate (inclusive of both the loan fee and the late fee) set forth in the relevant master loan agreement between the relevant Debtor and the relevant Holder; *provided* that such interest shall only be factored into a Holder's *Pro Rata* Share pursuant to the foregoing steps once the Recovery Cap for all Holders of Allowed Unsecured Claims has been met; *provided further*, that, to the extent applicable and unpaid, Post-Effective Date Interest shall be paid *pari passu* with Post-Petition Interest.

*Post-Effective Date Interest*. Notwithstanding anything contained herein to the contrary, in the event that Holders of Allowed Fiat-or-Stablecoin Denominated Unsecured Claims do not receive distributions sufficient to reach the Recovery Cap within two years of the Effective Date, Holders of General Unsecured Claims shall be entitled to interest commencing as of such date on the unpaid portion of their claims and accruing at the federal judgment rate. Post-Effective Date Interest for any Holder of General Unsecured Claims shall be payable upon such Holder of General Unsecured Claims reaching the Recovery Cap, and shall be payable *pari passu* with (a) all other Holders of General Unsecured Claims who have not yet reached the Recovery Cap, or (b) if all Holders of General Unsecured Claims have reached the Recovery Cap, *pari passu* with Post-Petition Interest.

*Un-Distributable Asset Monetization Agreement*. If multiple Denomination Groups have been allocated Un-Distributable Assets of the same denomination, each Denomination Group agrees that (1) its share of such Un-Distributable Asset shall be monetized by the PA Officer at the direction of the Wind-Down Oversight Committee representatives of such Denomination Group, and (2) each Denomination Group shall be entitled, in any given day to sell, liquidate, or otherwise monetize, no greater than its *pro rata* share among the Un-Distributable Assets of such denomination held by the Wind-Down Debtors of 10% of the thirty (30) day average daily trading volume for such Un-Distributable Asset (the "**Liquidation Limit**"), as reported by www.OTCmarkets.com; *provided* that the PA Officer may apply a different Liquidation Limit to a given Un-Distributable Asset, with the consent of the Wind-Down Committee Representatives of all Denomination Groups holding such Un-Distributable Asset.

## <u>EXHIBIT B</u>

**Organizational Chart**



# The Genesis Group – Revised as of 1/12/23

© 2023 Genesis | CONFIDENTIAL DO NOT DISTRIBUTE OR COPY

# EXHIBIT C

**Liquidation Analysis**

## LIQUIDATION ANALYSIS

### I. Introduction

Section 1129(a)(7) of title 11 of the United States Code (the "Bankruptcy Code") requires that each holder of a claim or interest in a certain class either (i) accept the Amended Plan or (ii) receive or retain under the Amended Plan, property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. This is referred to as the "best interests of creditors" test. Accordingly, to demonstrate that the Debtors' proposed Amended Plan[1] satisfies the "best interests of creditors" test, the Debtors, with the assistance of their restructuring advisors, have prepared this hypothetical liquidation analysis (this "Liquidation Analysis"), which estimates the realizable liquidation value of the Debtors' assets and estimates the distribution to creditors resulting from such liquidation.

**The Liquidation Analysis is a hypothetical exercise that has been prepared for the sole purpose of presenting a reasonable, good-faith estimate of the proceeds that would be realized if the Debtors' assets were liquidated in accordance with chapter 7 of the Bankruptcy Code. The Liquidation Analysis is not intended and should not be used for any other purpose, including determining the value of any distribution to be made on account of Allowed Claims and Interests under the Amended Plan. The Liquidation Analysis does not purport to be a valuation of the Debtors' assets in the context of a holistic reorganization.**

**There may be a difference between the Liquidation Analysis and the values that may be realized or Claims generated in an actual liquidation. The underlying financial information in the Liquidation Analysis was not compiled or examined by any independent accountants in accordance with standards promulgated by the American Institute of Certified Public Accountants. Limited independent appraisals were available in preparing the Liquidation Analysis. In addition, the financial information has not been subject to procedures that would typically be applied to financial information prepared in accordance with Generally Accepted Accounting Principles in the United States ("GAAP"), International Financial Reporting Standards ("IFRS"), or Singapore Financial Reporting Standards ("SFRS"). The Liquidation Analysis should be read in conjunction with (1) the Disclosure Statement, including any of the key exhibits thereto or incorporated references therein, as well as the risk factors set forth therein, and (2) the significant assumptions and notes set forth below.**

**Nothing contained in the Liquidation Analysis is intended to be, or constitutes, a concession, admission, or allowance of any claim by the Debtors. The actual amount or priority of Allowed Claims in the Chapter 11 Cases could materially differ from the estimated amounts set forth and used in the Liquidation Analysis. The Debtors reserve all rights to supplement, modify, or amend the analysis set forth herein.**

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings set forth in the *Debtors' Amended Joint Chapter 11 Plan* (the "Amended Plan") and the *Disclosure Statement with Respect to the Amended Joint Chapter 11 Plan of Genesis Global Holdco, LLC et al., Under Chapter 11 of the Bankruptcy Code*.

THE DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THE ESTIMATES AND ASSUMPTIONS CONTAINED HEREIN, OR A CHAPTER 7 TRUSTEE'S ABILITY TO ACHIEVE FORECASTED RESULTS IN THE EVENT THAT THE CHAPTER 11 CASES ARE CONVERTED TO CHAPTER 7.  ACTUAL RESULTS COULD VARY MATERIALLY FROM THE ESTIMATES AND PROJECTIONS SET FORTH IN THIS LIQUIDATION ANALYSIS.

The Liquidation Analysis has been prepared assuming that the Debtors' Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code on or about December 31, 2023. Hypothetical recoveries under chapter 7 set forth in this Liquidation Analysis were determined through multiple steps, as set forth below.

## II. Significant Assumptions

### 1. Reliance on the Financial Projections

The Liquidation Analysis has been developed as a series of chapter 7 adjustments to the Financial Projections included as Exhibit D to the Disclosure Statement.  As such, the Liquidation Analysis should be read in conjunction with the Financial Projections, including the significant assumptions and notes included therein.

### 2. The Debtors Are Best Positioned to Maximize the Value of the Assets Under the Amended Plan

In a typical chapter 7 case, a trustee is elected or appointed to liquidate a debtor's assets and to make distributions to creditors in accordance with the priorities established in the Bankruptcy Code. The Amended Plan allows for the Wind-Down of the Debtors. Although a chapter 7 liquidation would achieve the same goal (i.e., a sale of the entirety of the Debtors' assets), the Debtors believe that the Amended Plan will provide greater proceeds and recoveries to Holders of Allowed Claims, than would be realized in a chapter 7 liquidation. A chapter 7 trustee would be unlikely to have the technical expertise and knowledge of the Debtors' businesses and assets that is required to maximize the proceeds from the sale of the Debtors' assets.  This is particularly true in light of the highly complex nature of the Debtors' business and these Chapter 11 Cases.  In particular, the Debtors' institutional knowledge of the business would be fundamental in maximizing the value of the Causes of Action and Retained Causes of Action that would be difficult for a chapter 7 trustee to replace and could have a significant impact on the recovery of these assets.

Moreover, a chapter 7 trustee could sell all of the Debtors' assets immediately and at depressed prices in a fire sale liquidation.  This fire sale of the Debtors' assets could flood the market with various types of Digital Assets, which could result in lower values than an orderly sale under the Amended Plan.

3.  **The Sale of the Debtors' Digital Assets Could Result in Adverse Tax Consequences for Creditors**

Creditors with claims denominated in Digital Assets could suffer material adverse tax consequences in a chapter 7 scenario.  The chapter 7 trustee may sell the Debtors' Digital Assets and distribute the proceeds in Cash.  As a result, Creditors with claims denominated in Digital Assets, the tax basis of which (as determined for U.S. federal income tax purposes) is less than the ultimate recovery, generally would recognize taxable gain for U.S. federal income tax purposes equal to the excess of such recovery over such tax basis in the claim (very generally, equal to the initial purchase price of the Digital Asset such Creditor had previously loaned to the Debtors).  In addition, if a Creditor receives a distribution of Digital Assets that is of a different type from the Digital Assets the Creditor had previously loaned to the Debtors, the Creditor would generally be expected to be subject to similar treatment, recognizing taxable gain equal to the difference between the fair market value of the Digital Assets received and the Creditor's tax basis in the claim.  If a Creditor receives a distribution of Digital Assets that are of the same type as those previously loaned to the Debtors, it is possible that such receipt can be reported as not giving rise to taxable gain for U.S. federal income tax purposes, although such tax treatment is subject to significant uncertainty, and Creditors are urged to consult with their tax advisors.  With respect to Creditors that are U.S. taxpayers, any gain recognized as a result of a distribution of Digital Assets would generally be subject to U.S. tax.  Creditors in non-U.S. jurisdictions may be subject to non-U.S. income tax consequences pursuant to applicable foreign tax law.

4.  **The Incremental Costs of a Chapter 7 Trustee Would Increase the Costs of a Wind-Down in the Event of a Conversion to Chapter 7 as Compared to Those to Be Incurred Under the Amended Plan**

Pursuant to section 326 of the Bankruptcy Code, the Bankruptcy Court may allow reasonable compensation for a trustee's services, not to exceed 25% on the first $5,000 or less, 10% on any amount in excess of $5,000 but not in excess of $50,000, 5% on any amount in excess of $50,000 but not in excess of $1.0 million, and reasonable compensation not to exceed 3% of such moneys in excess of $1,000,000 upon all moneys disbursed or turned over in the case by the trustee to parties in interests. This fee structure would represent a significant and incremental cost as compared to the Amended Plan.

In particular, as of September 30, 2023, the Debtors currently hold approximately $1.3 billion of Investments in Digital Assets at fair value.[2]  The Amended Plan allows for distributions in respect of Claims denominated in Digital Assets in kind in the form of Digital Asset in which such Claims are denominated.  As such, under the Amended Plan, the Debtors may not need

---

[2]   Includes the repayment of 1,812.68 BTC made pursuant to the Partial Repayment Agreement in three installments on September 13, October 3, and October 20, 2023.

to sell Digital Assets. In addition, to the extent that the Debtors were to monetize Digital Assets to make distributions in Cash under the Amended Plan, given the Debtors' expertise in trading Digital Assets, the Debtors would be able to do so at little to no additional cost as compared to the Financial Projections and estimated recoveries under the Amended Plan. In comparison, if a chapter 7 trustee were to sell Digital Assets to disburse money to Holders of Allowed Claims, this could result in up to approximately $39 million of incremental costs that would not be incurred under the Amended Plan.

In addition to Digital Assets, the Debtors also hold other large assets, including the DCG Loans and DCG Note, for which a 3% fee would represent a significant cost as compared to the Amended Plan and related Financial Projections.

In addition, the chapter 7 Trustee would incur many of the same costs assumed under the Amended Plan and related Financial Projections, including the Debtors' operating personnel and vendor costs. As such, a chapter 7 conversion would result in an increase in chapter 7 trustee fees, with little or no reduction in the operating costs assumed in the Amended Plan and related Financial Projections.

5. **The Incremental Cost of Professional Fees Would Increase the Costs of a Wind-Down in the Event of a Conversion to Chapter 7 as Compared to Those to Be Incurred Under the Amended Plan**

Following the appointment of a chapter 7 trustee, the chapter 7 Trustee would hire new professionals who would be unfamiliar with the complexities of the Debtors' assets, operations, and asserted claims. As such, it is likely that these new professionals would require significant time to obtain the knowledge commensurate with that of the Debtors' existing professionals and could increase the timeline to monetize the Debtors' assets and resolve asserted claims.

## III. Conclusion

As summarized in the Liquidation Analysis below, the Debtors have determined that upon the anticipated Effective Date, the Amended Plan will provide all Holders of Allowed Claims with a recovery that is not less than what they would otherwise receive pursuant to a liquidation of the Debtors under chapter 7 of the Bankruptcy Code. Therefore, the Debtors believe that the Amended Plan satisfies the requirements of Bankruptcy Code section 1129(a)(7).

## LIQUIDATION ANALYSIS SUMMARY

The Debtors have estimated the impact of a chapter 7 conversion compared to Estimated Net Assets Available for Distribution under the Amended Plan and related Financial Projections. Based on the analysis below, the Debtors believe that a chapter 7 conversion could add $75 - $81 million of costs across all Debtors, with no additional increase in asset values or reductions in claims:

| ($ in millions) | Notes | GGC | | GAP | | GGH | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| **Incremental Costs** | | | | | | | |
| Reduced Asset Recoveries | Note A | - | - | - | - | - | - |
| Chapter 7 Trustee Fees | Note B | (66.1) | (74.5) | (0.2) | (0.2) | (2.1) | (2.1) |
| Incremental Professional Fees | Note C | (6.8) | (3.8) | - | - | (0.1) | (0.0) |
| **Total Incremental Costs** | | $ (72.9) | $ (78.3) | $ (0.2) | $ (0.2) | $ (2.2) | $ (2.2) |

## Note A– Reduced Asset Recoveries

While the Debtors believe the Amended Plan will provide greater proceeds and recoveries to Holders of Allowed Claims relative to those realized in a chapter 7 liquidation, the Debtors have not estimated such impact in the table above.  The Debtors believe that such impact, were it to be estimated, would further prove the Amended Plan to be in the best interest of creditors as compared to a chapter 7 conversion.

## Note B – Chapter 7 Trustee Fees

Assumed to be approximately 3% of Net Assets Available for Distribution Under the Amended Plan less Debtor Affiliate Recoveries included in Exhibit D.

## Note C - Incremental Professional Fees

Assumed to include an additional 3-4 months of professional fees for new professional firms assuming the roles of Debtor counsel and financial advisor, partially offset by certain transaction and other professional fees that may not be incurred in a chapter 7 conversion.

# EXHIBIT D

**Financial Projections**

### FINANCIAL PROJECTIONS

In connection with developing the *Debtors' Amended Joint Chapter 11 Plan* (as may be amended, modified, or supplemented from time to time and including all exhibits thereto, the "Amended Plan"),[1] the Debtors prepared the following projections for each of the Wind-Down Debtors under the Amended Plan (collectively, the "Financial Projections"). The Financial Projections reflect the Debtors' good faith estimate of the expected cash and assets, including Digital Assets, available for distribution from the Wind-Down Debtors after the transactions contemplated by the Amended Plan.  For purposes of the Financial Projections, the Effective Date is assumed to be December 31, 2023 (the "Assumed Effective Date").

The Financial Projections are being provided solely to enable Holders of Claims entitled to vote on the Amended Plan to make an informed judgment of how to vote on the Amended Plan. The Debtors' advisors expressly disclaim any liability to any Holder of Claims in connection with such information or its decision with respect to how to vote on the Amended Plan.  The Financial Projections reflect the Debtors' judgment of expected future operating and business conditions, which are subject to change. Although the Debtors and their advisors have prepared the Financial Projections in good faith and believe the assumptions to be reasonable, it is important to note that the Debtors and their advisors can provide no assurance that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtors' financial results and must be considered. Accordingly, the Financial Projections should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes. The Debtors' financial advisors have relied upon the accuracy and completeness of financial and other information furnished by the Debtors and did not attempt to independently audit or verify such information. All estimates and assumptions shown within the Financial Projections were developed by the Debtors and their advisors. The Financial Projections have not been audited or reviewed by independent accountants. The assumptions disclosed herein are those that the Debtors believe to be significant to the Financial Projections. Although the Debtors are of the opinion that these assumptions are reasonable under the circumstances, such assumptions are subject to significant uncertainties, and as such, despite efforts to foresee and plan for the effects of changes in these circumstances, financial results cannot be predicted with certainty. Consequently, actual financial results could vary significantly from projected results.

THE FINANCIAL PROJECTIONS, INCLUDING THE UNDERLYING ASSUMPTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE AMENDED PLAN. ALTHOUGH THE DEBTORS BELIEVE THE ASSUMPTIONS UNDERLYING THE FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings set forth in the Amended Plan.

THE FINANCIAL PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, THE WIND-DOWN DEBTORS, OR ANY OTHER PERSON AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. WHILE THE DEBTORS HAVE ASSUMED FOR THE PURPOSES OF THESE FINANCIAL PROJECTIONS THAT THERE WILL BE CERTAIN SETOFFS OF AMOUNTS OWED AND AS AGAINST COLLATERAL HELD BETWEEN THE DEBTORS AND THEIR COUNTERPARTIES, NO SUCH COUNTERPARTIES HAVE SOUGHT LEAVE FROM THE BANKRUPTCY COURT TO EXERCISE SUCH SETOFF RIGHTS AS OF THE DATE HEREOF WHICH LEAVE WOULD BE REQUIRED TO EFFECTUATE ANY SUCH SETOFF ON OR AFTER THE PETITION DATE. FURTHER, ALL OF THE ASSUMPTIONS HEREIN WERE MADE FOR THE SOLE PURPOSE OF CONSTRUCTING THESE FINANCIAL PROJECTIONS AND SHOULD NOT BE TAKEN AS ANY INDICATION OF HOW THE DEBTORS MAY CHOOSE TO PROCEED IN THE FUTURE OR BE DEEMED AS AN ADMISSION BY OR BINDING ON THE DEBTORS FOR ANY OTHER PURPOSE.  NOTHING CONTAINED IN THE FINANCIAL PROJECTIONS SHALL CONSTITUTE A WAIVER OR ADMISSION BY THE DEBTORS IN ANY RESPECT, INCLUDING WITHOUT LIMITATION, WITH RESPECT TO MATTERS INVOLVING OBJECTIONS TO CLAIMS, SUBSTANTIVE CONSOLIDATION, EQUITABLE SUBORDINATION, DEFENSES, ANY ASSERTED RIGHTS OF OR PURPORTED EXERCISE OF FORECLOSURE, SETOFF OR RECOUPMENT, OR ANY OTHER RELEVANT APPLICABLE LAWS, AND THE DEBTORS RESERVE ALL RIGHTS AND DEFENSES RELATING TO ANY OF THE ASSUMPTIONS MADE HEREIN. THE SIGNIFICANT ASSUMPTIONS USED IN THE PREPARATION OF THE FINANCIAL PROJECTIONS ARE STATED BELOW. THE FINANCIAL PROJECTIONS ASSUME THAT THE DEBTORS WILL EMERGE FROM CHAPTER 11 ON THE ASSUMED EFFECTIVE DATE. THE FINANCIAL PROJECTIONS SHOULD BE READ IN CONJUNCTION WITH (1) THE DISCLOSURE STATEMENT, INCLUDING ANY OF THE EXHIBITS THERETO OR INCORPORATED REFERENCES THEREIN, AS WELL AS THE RISK FACTORS SET FORTH THEREIN, AND (2) THE SIGNIFICANT ASSUMPTIONS, QUALIFICATIONS, AND NOTES SET FORTH BELOW.

THE FINANCIAL PROJECTIONS WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (THE "AICPA"), THE FINANCIAL ACCOUNTING STANDARDS BOARD (THE "FASB"), OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED, REVIEWED, OR SUBJECTED TO ANY PROCEDURES DESIGNED TO PROVIDE ANY LEVEL OF ASSURANCE BY THE DEBTORS' INDEPENDENT PUBLIC ACCOUNTANTS. THE FINANCIAL STATEMENTS HAVE NOT BEEN SUBJECT TO PROCEDURES THAT WOULD TYPICALLY BE APPLIED TO FINANCIAL STATEMENTS PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES IN THE UNITED STATES ("GAAP"), INTERNATIONAL FINANCIAL REPORTING STANDARDS ("IFRS"), OR SINGAPORE FINANCIAL REPORTING STANDARDS ("SFRS"). WHILE

PRESENTED WITH NUMERICAL SPECIFICITY, THE FINANCIAL PROJECTIONS ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF MANAGEMENT. THESE UNCERTAINTIES INCLUDE, AMONG OTHER THINGS, THE ULTIMATE OUTCOME AND CONTENTS OF A CONFIRMED PLAN, THE TIMING OF THE CONFIRMATION OF SUCH PLAN, AND ORDERS OF THE COURT CONCERNING OBJECTIONS TO AND/OR ALLOWANCE OF CLAIMS. CONSEQUENTLY, THE FINANCIAL PROJECTIONS SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, AS TO THE ACCURACY OF THE FINANCIAL PROJECTIONS OR THAT THE FINANCIAL PROJECTIONS WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE FINANCIAL PROJECTIONS. HOLDERS OF CLAIMS OR EQUITY INTERESTS MUST MAKE THEIR OWN ASSESSMENT AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN MAKING THEIR DETERMINATION OF WHETHER TO ACCEPT OR REJECT THE AMENDED PLAN.

<div align="center">

**ASSUMPTIONS TO FINANCIAL PROJECTIONS**

</div>

1.  **Methodology**

    (a) The Financial Projections have been prepared on a Debtor-by-Debtor basis to estimate the amount of net assets that may be available for distribution at each individual Debtor entity;

    (b) The Financial Projections assume a period of up to twenty-four months following the Assumed Effective Date (the "Projection Period") to distribute all of the Debtors' assets and resolve all outstanding claims;

    (c) While the Financial Projections project various costs by function, many of the costs, and related functions, included in the Financial Projections are provided by Genesis Global Trading, Inc. ("GGT") under a shared services and cost reimbursement agreement;

    (d) The Financial Projections assume that all assets of each Debtor entity will be distributed during the Projection Period. While many of the Debtors' assets would be available for immediate distribution under the terms of the Amended Plan, certain assets may take additional time to distribute. Unless otherwise noted, all amounts included in the Financial Projections have not been discounted to present values;

    (e) The asset values in the Financial Projections, in many cases, assume a range of estimates to reflect economic, business, regulatory and competitive uncertainties and contingencies;

    (f) The Financial Projections do not include estimates for the value of certain assets that are currently subject to dispute or to which the recoveries are otherwise uncertain, including insurance claims and certain receivables from DCG. Any recovery on these assets would increase assets available for distribution relative to what has been included in the Financial Projections;

(g) Due to the uncertain nature of any litigation that might be pursued in connection with the Litigation Reserve (see Note 2: Causes of Action) under the Amended Plan, the Debtors have not estimated the value of any potential proceeds.  For this reason, the Financial Projections assume that in both the high and low case, the Litigation Reserve, which for purposes of the Financial Projections is assumed to be an estimated $40 million, does not yield any additional recoveries from litigation.  If such Litigation Reserve were to yield recoveries, net assets available for distribution pursuant to the Amended Plan would increase.

## 2.  **Causes of Actions**

(a) As described in the Amended Plan, the Wind-Down Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Retained Causes of Action, whether arising before or after the Petition Date, and such rights to commence, prosecute, or settle such Retained Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.

## 3.  **Digital Asset Values**

(a) In the high and low case, Digital Assets are valued using trading prices from Binance, Coinbase, and Kraken as of September 30, 2023 00:00 UTC. A schedule detailing these Digital Asset prices is below ("Current Digital Asset Prices").

(b) In the high case, loans and collateral pledged are valued using the Current Digital Asset Prices.  In the low case, loans and collateral pledged are valued using trading prices from Binance, Coinbase, Bitstamp, and Kraken as of 11:11 pm EST on the Petition Date of January 19, 2023. A schedule detailing Digital Asset values as of the Petition Date is included below ("Petition Date Digital Asset Prices").

(c) Note Digital Asset values are subject to material market volatility changes, and such changes may be significant and could have a material impact on the amount of assets available for distribution.

| Digital Asset | Current Digital Asset Prices | Petition Date Digital Asset Prices | Digital Asset | Current Digital Asset Prices | Petition Date Digital Asset Prices |
|---|---|---|---|---|---|
| 1INCH | 0.27 | 0.45 | KSM | 19.05 | 33.59 |
| AAVE | 67.54 | 81.34 | LINK | 8.19 | 6.50 |
| ADA | 0.25 | 0.34 | LPT | 5.45 | 5.50 |
| ALCX | 12.82 | 16.34 | LRC | 0.18 | 0.26 |
| ALGO | 0.10 | 0.22 | LTC | 65.97 | 84.11 |
| AMP | 0.00 | 0.00 | LUNA | 0.00 | 0.00 |
| ANKR | 0.02 | 0.02 | LUNC | 0.00 | 0.00 |
| APE | 1.24 | 4.99 | MANA | 0.31 | 0.65 |
| ATOM | 7.24 | 12.17 | MATIC | 0.53 | 0.95 |
| AVAX | 9.24 | 16.18 | MIR | 0.09 | 0.16 |
| AXS | 4.59 | 8.37 | MKR | 1,534.00 | 661.19 |
| BAL | 3.32 | 6.56 | NEAR | 1.14 | 2.10 |
| BAT | 0.18 | 0.24 | NEO | 7.37 | 7.45 |
| BCH | 234.00 | 121.55 | NFT | 0.00 | 0.00 |
| BIT | 0.40 | 0.48 | NU | 0.16 | 0.13 |
| BNB | 214.44 | 294.00 | OMG | 1.70 | 1.25 |
| BNT | 0.41 | 0.39 | OXT | 0.07 | 0.08 |
| BSV | 33.43 | 43.06 | PAXG | 1,870.34 | 1,907.00 |
| BTC | 26,961.00 | 21,091.98 | RBN | 0.16 | 0.20 |
| BUSD | 1.00 | 1.00 | REN | 0.05 | 0.07 |
| CHZ | 0.06 | 0.13 | RLY | 0.01 | 0.01 |
| COMP | 46.84 | 48.40 | SAND | 0.31 | 0.70 |
| CRV | 0.52 | 0.93 | SDIV | 21.91 | 25.55 |
| DAI | 1.00 | 1.00 | SGB | 0.00 | 0.01 |
| DASH | 27.77 | 49.55 | SHIB | 0.00 | 0.00 |
| DFE | 52.47 | 58.55 | SKL | 0.02 | 0.03 |
| DOGE | 0.06 | 0.08 | SNX | 2.08 | 2.25 |
| DOT | 4.10 | 5.86 | SOL | 21.36 | 21.28 |
| DVY | 107.64 | 121.29 | SPHD | 39.19 | 43.85 |
| EOS | 0.58 | 0.98 | SRM | 0.16 | 0.42 |
| ETC | 16.34 | 20.73 | STETH | 1,670.32 | 1,537.32 |
| ETH | 1,670.86 | 1,554.65 | STORJ | 0.41 | 0.33 |
| ETHE | 11.06 | 7.85 | SUSHI | 0.60 | 1.20 |
| ETHW | 1.33 | 3.84 | TOKE | 0.35 | 0.99 |
| FET | 0.22 | 0.27 | TRX | 0.07 | 0.06 |
| FIL | 3.36 | 4.40 | UMA | 1.41 | 1.81 |
| FLOW | 0.46 | 1.03 | UNI | 4.46 | 6.19 |
| FTM | 0.20 | 0.30 | USDC | 1.00 | 1.00 |
| FTT | 1.12 | 2.27 | USDT | 1.00 | 1.00 |
| GALA | 0.03 | 0.05 | USTC | 0.25 | 0.02 |
| GAS | 2.38 | 2.45 | VYM | 103.32 | 107.81 |
| GBTC | 19.19 | 11.46 | WBTC | 26,961.00 | 21,079.18 |
| GLMR | 0.24 | 0.39 | WLUNA | 0.00 | 0.00 |
| GRT | 0.09 | 0.08 | XEC | 0.00 | 0.00 |
| GUSD | 1.00 | 1.00 | XLM | 0.11 | 0.08 |
| HBAR | 0.05 | 0.06 | XRP | 0.51 | 0.39 |
| HNT | 1.29 | 2.98 | XTZ | 0.68 | 1.00 |
| HT | 2.39 | 4.92 | YFI | 5,241.05 | 6,736.54 |
| IDV | 25.40 | 28.97 | ZEC | 26.94 | 45.07 |
| INJ | 7.70 | 1.54 | ZEN | 7.77 | 9.88 |
| KNC | 0.69 | 0.80 | ZRX | 0.19 | 0.20 |

**4.** **Debtor and Non-Debtor Affiliates**

(a) In certain cases the Debtors may have receivables from, or equity interests in, certain Debtor and non-Debtor affiliates.  The Financial Projections reflect estimates related to these assets.

**5.** **Taxes**

(a) The Financial Projections do not include the effect of taxes payable in connection with the Debtors' dispositions of Digital Assets, GBTC or ETHE as part of a rebalancing.  The impact of such taxes is uncertain at this time, including as a result of uncertainty regarding whether the Debtors will be permitted to utilize existing Net Operating Losses after the Effective Date. If applicable, such taxes would reduce the amount of Distributable Assets, potentially by a material amount.

## ESTIMATED NET ASSETS AVAILABLE FOR DISTRIBUTION, BY DEBTOR

*($ in millions)*

| | Notes | GGC | | GAP | | GGH | |
|---|---|---|---|---|---|---|---|
| | | Low | High | Low | High | Low | High |
| **Proceeds / Available Assets** | | | | | | | |
| Cash and Cash Equivalents | Note A | $    394.6 | $    394.6 | $    0.1 | $    0.1 | $    0.1 | $    0.1 |
| Digital Assets | Note B | 1,314.7 | 1,314.7 | 0.3 | 0.3 | - | - |
| Third Party Loans | Note C | 2.1 | 33.1 | - | - | - | - |
| Pledged Collateral to Third Parties | Note D | - | - | - | - | - | - |
| DCG Asset Recovery | Note E | 493.9 | 731.9 | - | - | - | - |
| Debtor Affiliate Recovery | Note F | 68.7 | 68.7 | - | - | - | - |
| Non-Debtor Affiliate Recovery | Note G | 63.1 | 63.1 | 6.3 | 6.3 | 69.1 | 69.1 |
| Other Asset Recovery | Note H | 3.8 | 17.3 | 0.0 | 0.0 | - | - |
| **Total Proceeds / Available Assets** | | $  2,340.9 | $  2,623.3 | $    6.7 | $    6.7 | $    69.2 | $    69.2 |
| **Wind Down Costs** | | | | | | | |
| Operating Disbursements | Note I | (28.4) | (28.4) | (0.2) | (0.2) | - | - |
| Contingency | Note I | (8.3) | (8.3) | (0.0) | (0.0) | - | - |
| Professional Fees | Note J | (35.6) | (35.6) | - | - | (0.5) | (0.5) |
| **Total Wind Down Costs** | | $    (72.2) | $    (72.2) | $    (0.2) | $    (0.2) | $    (0.5) | $    (0.5) |
| **Estimated Net Assets Available For Distribution** | | $  2,268.6 | $  2,551.0 | $    6.5 | $    6.5 | $    68.7 | $    68.7 |

## NOTES TO FINANCIAL PROJECTIONS

Note A – Cash and Equivalents

Includes estimated cash and equivalents as of the Assumed Effective Date. Balances in both
the high and low cases have been reduced to reflect amounts that will be used to fund, as of
the Assumed Effective Date, the Professional Fee Escrow Account in respect of any assumed
accrued and unpaid Professional Fee Claims (including, for the avoidance of doubt, any
restructuring or sale success fees) and which amounts will not be available for distribution.
Additionally, balances in both cases have not been adjusted to reflect any Claims Reserve
amounts.

In both the high and low case, cash and equivalents balances have also been adjusted to reflect
the Litigation Reserve.

Note B – Digital Assets

Includes Digital Assets held at each of the respective Debtors as well as 35.9 million shares of
Grayscale Bitcoin Trust (the "GBTC Shares") and 3.8 million shares of Grayscale Ethereum
Trust (the "ETHE Shares"). In both cases, estimated values are based on Current Digital Asset
Prices. While the majority of Digital Assets may be available for distribution on or about the
Plan Effective Date, the GBTC Shares or ETHE Shares may take a longer period of time to
distribute.

Note C – Third Party Loans

Includes digital currency loans, at fair value and USD loans receivable, net of allowance for
loan losses from third party counterparties, which are assumed to be set off against digital
currency collateral payable and USD collateral payable held by the Debtors.

Third party loans are valued using Current Digital Asset Prices and Petition Date Digital Asset
Prices in the high and low cases, respectively. The value of Digital Assets held as collateral for
such loans are determined as of the Petition Date in both the high and low cases.

Additionally, certain third party counterparties have borrow balances with the Debtors in
excess of their net loan balance (after collateral set off). In these instances, the net loan balance
has been set off against the corresponding third party borrow and is not reflected in the Debtors'
proceeds. The value of third party borrows is valued using Petition Date Digital Asset Prices.

Third Party Loans are assumed to have an estimated recovery of $2 to $33 million, net of
allowance for loan losses and collateral payable.

Note D – Pledged Collateral to Third Parties

In the high case, digital currency collateral receivable from certain third parties are valued using Current Digital Asset Prices, which are set off against third party digital currency loans payable and USD loans payable as of the Petition Date.  In the low case, pledged collateral is assumed to be set off against the digital currency loans payable and USD loans payable as of either the Petition Date or the date of purported set off.

Pledged collateral to third parties are estimated to have no recovery.

Note E – DCG Asset Recoveries

Includes estimated proceeds related to the following assets at GGC:

*DCG Loans*[2] – Assumes the recovery of $325 million plus an additional 2,737.77 BTC and 14,048 BCH valued at a total of $72 million using Current Digital Asset Prices from DCGI;

*DCG Note* – Assumes an estimated illustrative valuation range of $97 to $335 million reflecting the estimated net present value of the note based on a number of assumptions, including yields on certain selected publicly traded crypto company debt issuances.[3]

Note F – Debtor Affiliate Recoveries

Includes GGC's recovery on its receivable from GGH of approximately $69 million, which is based primarily on GGH's estimated non-Debtor affiliate recovery from GGML.

Note G – Non-Debtor Affiliate Recoveries

Includes recovery of receivables from, or equity interests in, certain non-Debtor affiliates. Non-Debtor affiliate recoveries at GGC assume a recovery of approximately $63 million from GGCI. Both the low and high cases assume that GGCI does not continue as a going concern with an orderly wind-down, including estimated wind-down costs.

Non-Debtor affiliate recoveries at GGH assume a recovery of approximately $69 million from its equity interests in GGML.  The low and high cases reflect a discount to book value, including wind-down costs, assuming that going concern value will not be realized.

---

[2]     DCG Loan amounts reflect repayment of $175.5 million and 1,812.680712 BTC made pursuant to the Partial Repayment Agreement in three installments on September 13, October 3, and October 20, 2023.

[3]     The estimated illustrative valuation is not a prediction or guarantee of the market value of the DCG Note or the price at which the DCG Note may be sold.

Note H – Other Asset Recovery

Includes interest receivable from third party counterparties.  Interest receivable is valued using Current Digital Asset Prices and Petition Date Digital Asset Prices in the high and low cases, respectively.  The Other Asset Recovery Line does not include the value of any potential recovery on a pending claim under an insurance policy for the former custody business.  The Other Asset Recovery line also does not include the value of any potential recovery on certain third-party receivables, previously deemed uncollectible, which the Debtors and certain non-Debtor affiliates retain their rights to pursue.

Note I – Operating Disbursements

Primarily includes the cost associated with operating personnel required to distribute the assets of the Wind-Down Debtors in accordance with the Amended Plan as well as to assist in the resolution of Disputed Claims, with such costs expected to decrease throughout the Projection Period.   Furthermore, payroll costs include incremental cost associated with operating personnel required by federal and state law, contractual obligations, and other Debtor policies.

These figures also include vendor costs related to Digital Asset custody, cloud web hosting and related services, insurance costs primarily pertaining to directors, officers and other employees, rent and occupancy, information technology services, trading software and other technological services, and costs relating to ordinary course operating professionals (legal, regulatory, other), registration fees and other costs viewed in connection with administration of the Amended Plan. Additionally, an amount has been added to operating disbursements for contingency costs.

Note J – Professional Fees

Includes an estimate of fees for professionals required to assist the Debtors in workstreams pertaining to the Amended Plan.  These include, but are not limited to, achieving the recoveries contemplated herein, mitigating and resolving Disputed Claims, distributing select assets, making distributions, and assisting the Debtors in other daily matters.  The estimate shown in the table above for professional fees represents an aggregate amount of the fees estimated for the professionals to achieve the level of recoveries and claims contemplated by the Amended Plan.  The estimate also includes assumptions regarding the provision of day-to-day financial and other advisory services to the Wind-down Debtors. These services include, but are not limited to, fees associated with the Plan Administrator, claims agent, claims reconciliation process, cash management, tax-related services, bankruptcy court-related services, and other fees required to administer the Amended Plan.   Additionally, professional fees include potential commissions and fees related to asset sales of approximately $5 million.

# **EXHIBIT E**

## **Illustrative Range of Recoveries**

## Illustrative Range of Recoveries

In connection with developing the *Debtors' Amended Joint Chapter 11 Plan* (as may be amended, modified, or supplemented from time to time and including all exhibits thereto, the "Amended Plan"),[1] the Debtors prepared the following illustrative range of recovery estimates for each of the Wind-Down Debtors under the Amended Plan (collectively, the "Illustrative Range of Recoveries"). The Illustrative Range of Recoveries reflect the Debtors' good faith estimate of the expected cash and assets, including Digital Assets, available for distribution from the Wind-Down Debtors after the transactions contemplated by the Amended Plan.

The Illustrative Range of Recoveries has been developed as a series of pricing adjustments to the Financial Projections included as Exhibit D to the Disclosure Statement. As such, the Illustrative Range of Recoveries should be read in conjunction with the Financial Projections, including the significant assumptions and notes included therein.

While the Illustrative Range of Recoveries have been estimated based on Digital Asset prices as of various dates, there can be no assurances that future assets prices could be significantly higher or lower than the range of prices reflected in the Illustrative Range of Recoveries, and as such, actual recoveries could be materially different than those reflected in the Illustrative Range of Recoveries.

The Illustrative Range of Recoveries are being provided solely to enable Holders of Claims entitled to vote on the Amended Plan to make an informed judgment of how to vote on the Amended Plan. The Debtors' advisors expressly disclaim any liability to any Holder of Claims in connection with such information or its decision with respect to how to vote on the Amended Plan. Although the Debtors and their advisors have prepared the Illustrative Range of Recoveries, and related Financial Projections, in good faith and believe the assumptions to be reasonable, it is important to note that the Debtors and their advisors can provide no assurance that such assumptions will be realized. As described in detail in the Disclosure Statement, a variety of risk factors could affect the Debtors' financial results and must be considered. Accordingly, the Illustrative Range of Recoveries should be reviewed in conjunction with a review of the risk factors set forth in the Disclosure Statement and the assumptions described herein, including all relevant qualifications and footnotes.

THE ILLUSTRATIVE RANGE OF RECOVERIES, INCLUDING THE UNDERLYING ASSUMPTIONS AND RELATED FINANCIAL PROJECTIONS, SHOULD BE CAREFULLY REVIEWED IN EVALUATING THE AMENDED PLAN. ALTHOUGH THE DEBTORS BELIEVE THE ASSUMPTIONS UNDERLYING THE ILLUSTRATIVE RANGE OF RECOVERIES, AND THE RELATED FINANCIAL PROJECTIONS, WHEN CONSIDERED ON AN OVERALL BASIS, ARE REASONABLE IN LIGHT OF CURRENT CIRCUMSTANCES AND EXPECTATIONS, NO ASSURANCE CAN BE GIVEN THAT THE ILLUSTRATIVE RANGE OF RECOVERIES WILL BE REALIZED.

---

[1] Capitalized terms used but not otherwise defined herein have the meanings set forth in the Amended Plan.

THE ILLUSTRATIVE RANGE OF RECOVERIES SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, THE WIND-DOWN DEBTORS, OR ANY OTHER PERSON AS TO THE ACCURACY OF THE ILLUSTRATIVE RANGE OF RECOVERIES, OR THE RELATED FINANCIAL PROJECTIONS, OR THAT THE ILLUSTRATIVE RANGE OF RECOVERIES WILL BE REALIZED. WHILE THE DEBTORS HAVE ASSUMED FOR THE PURPOSES OF THIS ILLUSTRATIVE RANGE OF RECOVERIES, AND RELATED FINANCIAL PROJECTIONS, THAT THERE WILL BE CERTAIN SETOFFS OF AMOUNTS OWED AND AS AGAINST COLLATERAL HELD BETWEEN THE DEBTORS AND THEIR COUNTERPARTIES, NO SUCH COUNTERPARTIES HAVE SOUGHT LEAVE FROM THE BANKRUPTCY COURT TO EXERCISE SUCH SETOFF RIGHTS AS OF THE DATE HEREOF WHICH LEAVE WOULD BE REQUIRED TO EFFECTUATE ANY SUCH SETOFF ON OR AFTER THE PETITION DATE. FURTHER, ALL OF THE ASSUMPTIONS HEREIN WERE MADE FOR THE SOLE PURPOSE OF CONSTRUCTING THIS ILLUSTRATIVE RANGE OF RECOVERIES AND SHOULD NOT BE TAKEN AS ANY INDICATION OF HOW THE DEBTORS MAY CHOOSE TO PROCEED IN THE FUTURE OR BE DEEMED AS AN ADMISSION BY OR BINDING ON THE DEBTORS FOR ANY OTHER PURPOSE.  NOTHING CONTAINED IN THIS ILLUSTRATIVE RANGE OF RECOVERIES, OR THE RELATED FINANCIAL PROJECTIONS, SHALL CONSTITUTE A WAIVER OR ADMISSION BY THE DEBTORS IN ANY RESPECT, INCLUDING WITHOUT LIMITATION, WITH RESPECT TO MATTERS INVOLVING OBJECTIONS TO CLAIMS, SUBSTANTIVE CONSOLIDATION, EQUITABLE SUBORDINATION, DEFENSES, ANY ASSERTED RIGHTS OF OR PURPORTED EXERCISE OF FORECLOSURE, SETOFF OR RECOUPMENT, OR ANY OTHER RELEVANT APPLICABLE LAWS, AND THE DEBTORS RESERVE ALL RIGHTS AND DEFENSES RELATING TO ANY OF THE ASSUMPTIONS MADE HEREIN. THE SIGNIFICANT ASSUMPTIONS USED IN THE PREPARATION OF THE FINANCIAL PROJECTIONS ARE STATED BELOW. THE ILLUSTRATIVE RANGE OF RECOVERIES, AND THE RELATED FINANCIAL PROJECTIONS, ASSUME THAT THE DEBTORS WILL EMERGE FROM CHAPTER 11 ON THE ASSUMED EFFECTIVE DATE. THIS ILLUSTRATIVE RANGE OF RECOVERIES SHOULD BE READ IN CONJUNCTION WITH (1) THE DISCLOSURE STATEMENT, INCLUDING ANY OF THE EXHIBITS THERETO, INCLUDING THE FINANCIAL PROJECTIONS, OR INCORPORATED REFERENCES THEREIN, AS WELL AS THE RISK FACTORS SET FORTH THEREIN, AND (2) THE SIGNIFICANT ASSUMPTIONS, QUALIFICATIONS, AND NOTES SET FORTH BELOW.

THE ILLUSTRATIVE RANGE OF RECOVERIES, AND RELATED FINANCIAL PROJECTIONS, WERE NOT PREPARED WITH A VIEW TOWARD COMPLIANCE WITH THE GUIDELINES ESTABLISHED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS (THE "AICPA"), THE FINANCIAL ACCOUNTING STANDARDS BOARD (THE "FASB"), OR THE RULES AND REGULATIONS OF THE SECURITIES AND EXCHANGE COMMISSION. FURTHERMORE, THE FINANCIAL PROJECTIONS HAVE NOT BEEN AUDITED, REVIEWED, OR SUBJECTED TO ANY PROCEDURES DESIGNED TO PROVIDE ANY LEVEL OF ASSURANCE BY THE DEBTORS' INDEPENDENT PUBLIC ACCOUNTANTS. THE RANGE OF RECOVERIES,

INCLUDING THE RELATED FINANCIAL PROJECTIONS, HAVE NOT BEEN SUBJECT TO PROCEDURES THAT WOULD TYPICALLY BE APPLIED TO FINANCIAL STATEMENTS PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES IN THE UNITED STATES ("GAAP"), INTERNATIONAL FINANCIAL REPORTING STANDARDS ("IFRS"), OR SINGAPORE FINANCIAL REPORTING STANDARDS ("SFRS"). WHILE PRESENTED WITH NUMERICAL SPECIFICITY, THE ILLUSTRATIVE RANGE OF RECOVERIES, AND THE RELATED FINANCIAL PROJECTIONS, ARE BASED UPON A VARIETY OF ESTIMATES AND ASSUMPTIONS WHICH, ALTHOUGH DEVELOPED AND CONSIDERED REASONABLE BY THE DEBTORS, MAY NOT BE REALIZED AND ARE SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC, AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF MANAGEMENT. THESE UNCERTAINTIES INCLUDE, AMONG OTHER THINGS, THE ULTIMATE OUTCOME AND CONTENTS OF A CONFIRMED PLAN, THE TIMING OF THE CONFIRMATION OF SUCH PLAN, AND ORDERS OF THE COURT CONCERNING OBJECTIONS TO AND/OR ALLOWANCE OF CLAIMS. CONSEQUENTLY, THE ILLUSTRATIVE RANGE OF RECOVERIES, INCLUDING THE RELATED FINANCIAL PROJECTIONS, SHOULD NOT BE REGARDED AS A REPRESENTATION OR WARRANTY BY THE DEBTORS, OR ANY OTHER PERSON, AS TO THE ACCURACY OF THE RANGE OF RECOVERIES OR THAT THE RANGE OF RECOVERIES WILL BE REALIZED. ACTUAL RESULTS MAY VARY MATERIALLY FROM THOSE PRESENTED IN THE RANGE OF RECOVERIES. HOLDERS OF CLAIMS OR EQUITY INTERESTS MUST MAKE THEIR OWN ASSESSMENT AS TO THE REASONABLENESS OF SUCH ASSUMPTIONS AND THE RELIABILITY OF THE PROJECTIONS IN MAKING THEIR DETERMINATION OF WHETHER TO ACCEPT OR REJECT THE AMENDED PLAN.

## ASSUMPTIONS TO THE ILLUSTRATIVE RANGE OF RECOVERIES

The Illustrative Range of Recoveries has been developed as a series of pricing adjustments to the Financial Projections included as Exhibit D to the Disclosure Statement.  As such, the Illustrative Range of Recoveries should be read in conjunction with the Financial Projections, including the significant assumptions and notes included therein.  In the Financial Projections, Digital Assets are valued using trading prices from Binance, Coinbase, and Kraken as of September 30, 2023 00:00 UTC.

Since September 30, 2023 the value of certain digital assets have increased materially.  As such, given the recent volatility in pricing of Digital Assets, the Illustrative Range of Recoveries adjusts the pricing assumption in the high case of the Financial Projections to reflect a range of recoveries as if the pricing of digital assets was the pricing of those same assets (including the value of loans, interest, and collateral receivables) as of August 31, 2023 and October 31, 2023 using trading prices from Binance, Coinbase, and Kraken as of 00:00 UTC.

In the low case, loans and collateral pledged are valued using trading prices from Binance, Coinbase, Bitstamp, and Kraken as of 11:11 pm EST on the Petition Date of January 19, 2023. A schedule detailing Digital Asset values as of the Petition Date is included in the Financial Projections.

**ILLUSTRATIVE RANGE OF RECOVERIES**[1]

| Select Pricing Assumptions: | 8/31/2023 | | Financial Projections[2] | | 10/31/2023[3] | |
|---|---|---|---|---|---|---|
| BTC Price | 25,931.20 | | 26,961.00 | | 34,656.40 | |
| ETH Price | 1,645.58 | | 1,670.86 | | 1,815.14 | |
| GBTC Pricing | 18.71 | | 19.19 | | 26.76 | |

**Implied Recoveries, by Class:**

| | | Low | High | Low | High | Low | High |
|---|---|---|---|---|---|---|---|
| **GENESIS GLOBAL HOLDCO LLC** | | | | | | | |
| 1 | Other Priority Claims | 100% | 100% | 100% | 100% | 100% | 100% |
| 2 | Secured Claims | 100% | 100% | 100% | 100% | 100% | 100% |
| 3 | Fiat-or-Stablecoin  Denominated Unsecured Claims | 59% | 59% | 59% | 59% | 59% | 59% |
| 4 | BTC-Denominated Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a |
| 5 | ETH-Denominated Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a |
| 6 | Alt-Coin  Denominated Unsecured Claims | n/a | n/a | n/a | n/a | n/a | n/a |
| 7 | Subordinated Claims | n/a | n/a | n/a | n/a | n/a | n/a |
| 8 | Government Penalty Claims | n/a | n/a | n/a | n/a | n/a | n/a |
| 9 | Intercompany Claims | 59% | 59% | 59% | 59% | 59% | 59% |
| 10 | Interests | n/a | n/a | n/a | n/a | n/a | n/a |
| **GENESIS GLOBAL CAPITAL LLC** | | | | | | | |
| 1 | Other Priority Claims | 100% | 100% | 100% | 100% | 100% | 100% |
| 2 | Secured Claims | 100% | 100% | 100% | 100% | 100% | 100% |
| 3 | Fiat-or-Stablecoin  Denominated Unsecured Claims | 60% | 76% | 61% | 78% | 73% | 100% |
| 4 | BTC-Denominated Unsecured Claims | 60% | 76% | 61% | 78% | 73% | 100% |
| 5 | ETH-Denominated Unsecured Claims | 60% | 76% | 61% | 78% | 73% | 100% |
| 6 | Alt-Coin  Denominated Unsecured Claims | 60% | 76% | 61% | 78% | 73% | 100% |
| 7 | Gemini Lender Claims | 60% | 76% | 61% | 78% | 73% | 100% |
| 8 | Subordinated Claims[3] | n/a | n/a | n/a | n/a | n/a | n/a |
| 9 | Government Penalty Claims | n/a | n/a | n/a | n/a | n/a | n/a |
| 10 | Intercompany Claims | n/a | n/a | n/a | n/a | n/a | n/a |
| 11 | Interests | n/a | n/a | n/a | n/a | n/a | n/a |
| **GENESIS ASIA PACIFIC PTE LTD** | | | | | | | |
| 1 | Other Priority Claims | 100% | 100% | 100% | 100% | 100% | 100% |
| 2 | Secured Claims | 100% | 100% | 100% | 100% | 100% | 100% |
| 3 | Fiat-or-Stablecoin  Denominated Unsecured Claims | 60% | 76% | 61% | 78% | 73% | 100% |
| 4 | BTC-Denominated Unsecured Claims | 60% | 76% | 61% | 78% | 73% | 100% |
| 5 | ETH-Denominated Unsecured Claims | 60% | 76% | 61% | 78% | 73% | 100% |
| 6 | Alt-Coin  Denominated Unsecured Claims | 60% | 76% | 61% | 78% | 73% | 100% |
| 7 | Subordinated Claims[3] | n/a | n/a | n/a | n/a | n/a | n/a |
| 8 | Government Penalty Claims | n/a | n/a | n/a | n/a | n/a | n/a |
| 9 | Intercompany Claims | n/a | n/a | n/a | n/a | n/a | n/a |
| 10 | Interests | n/a | n/a | n/a | n/a | n/a | n/a |

**Notes:**

(1) The low end of recoveries above assumes that Gemini prevails in its assertion that it properly foreclosed on 30,905,782 of GBTC on November 16, 2022 at $9.20 per share whereas the high range of recoveries values that collateral at October 31, 2023 prices. In its complaint filed on October 27th 2023, Gemini Trust Company, LLC ("Gemini") asserts that an additional 31,180,804 shares of GBTC had been pledged to Gemini for the benefit of Gemini Lender Claims and that Gemini has a security interest in those shares. To the extent that Gemini prevails in its arguments, recoveries to creditors (other than Gemini Lender Claims) could decrease by as much as 10%

(2) Pricing for the Financial Projections was as of September 30, 2023

(3) While in the High Case, based on October 31, 2023 pricing, there may be excess value available for Class 8 claims, projected recoveries for these claims has not been reflected above given the unresolved nature of many of these claims

**<u>EXHIBIT F</u>**

**DCG Response**

## I.    DCG POSITION ON AGREEMENT IN PRINCIPLE

It is DCG's position that the Agreement in Principle continues to provide the best recovery available under the circumstances to Holders of Allowed Claims, irrespective of the initiation of the NYAG Action.  DCG remains committed to the Agreement in Principle and submits there is yet an opportunity for the Debtors, the UCC, the Ad Hoc Group, and Gemini to develop an amended plan that incorporates the Agreement in Principle so as to avoid lengthy and expensive litigation with uncertain outcomes under the No Deal Plan, and to ensure creditors receive substantial recoveries in the near term.

The No-Deal Plan is also not without risk.  A major source of recovery for Holders of Claims under the Amended Plan is proceeds from the possible prosecution of causes of action against DCG and Gemini.  Any litigation against DCG will involve significant time and expense for an uncertain outcome.  There is risk, for example, that the Debtors will be unsuccessful in their pursuit of causes of action against DCG.  There is also the risk that DCG will successfully prosecute its own causes of action or counterclaims against the Debtors, resulting in substantially lower recoveries to creditors.   The foregoing is only meant to be representative of some of the risks of litigation under the No-Deal Plan, and should not be construed as a comprehensive list of potential risks to creditor recoveries in these Chapter 11 Cases.

As cryptocurrency prices continue to increase, it is becoming increasingly likely that the Debtors' estates will become solvent.  Upon the Debtors' solvency, any excess recoveries after Holders of Allowed Claims are paid in full, including any recoveries on account of the Debtors' pursuit of causes of action against DCG, will benefit DCG as the Debtors' sole shareholder, not creditors.

DCG's Statement on the Agreement in Principle filed in these Chapter 11 Cases can be found at https://restructuring.ra.kroll.com/genesis/Home-DownloadPDF?id1=MjUyMDE4Mg==&id2=-1.

## II.    DCG RESPONSE TO CLAIMS FOR RECOVERY OF AMOUNTS OWED BY DCG AND DCGI TO GGC UNDER THE DCG AND DCGI LOANS

As noted by the Debtors, on September 12, 2023, the Debtors, DCG and DCGI entered into the Partial Repayment Agreement, which provides for a limited forbearance by GGC in respect of the DCG Parties' obligations to GGC, which are the subject of the Turnover Actions filed against DCG and DCGI.  In exchange for such forbearance, each of DCG and DCGI agreed to collectively make three installment payments of $75 million and a fourth installment payment of $50 million, with the full $275 million payable upon the occurrence of the Plan Effective Date, if not already paid by such date.  So far, DCG and DCGI have paid GGC $227.3 million in payments under the Partial Repayment Agreement.  DCG and DCGI reserve all rights and defenses with respect to the Partial Repayment Agreement, the DCG Loans and the DCGI Loans.

## III.    DCG RESPONSE TO ALLEGED ALTER EGO CLAIMS

It is DCG's position that the Debtors have no viable veil-piercing claims against DCG.  As the Debtors acknowledge, alter ego liability is an exceptional remedy and the standard for successfully asserting veil-piercing claims against DCG is high and creates significant challenges to a successful prosecution.  Under Delaware law, a veil-piercing claim requires (1) an overall element of fraud or injustice, such that the subsidiary operates for an illegitimate purpose; and (2) proof that the subsidiary is the alter ego of its corporate parent.  Effectively, the corporation must be a sham and exist for no other purpose than as a vehicle for fraud.  Neither the Debtors nor any other party in interest, including the UCC, the AHG or the FDG, can remotely establish that Genesis was an "alter ego" of DCG.

Among the various reasons that there are no viable piercing claims, the record, including the Debtors' own representations to the Bankruptcy Court, forecloses any finding that Genesis was a sham entity without legitimate business purpose.  Genesis represented that it was an industry leading crypto-lending platform, with independent annual revenues in the multiple hundreds of millions of dollars and significant profits.  Genesis retained the vast majority of its earnings each year, and maintained its own completely independent corporate infrastructure with separate management, legal, finance, risk, compliance, marketing and HR teams, and so on.  Genesis maintains structural and organizational separateness from DCG, including separation of operations, separation of books and

records, and maintaining arms' length contractual negotiations. Further, Genesis retained and was advised by its own outside counsel, accountants and investment bankers. The completely separate corporate relationship between DCG and Genesis was never publicly or internally conflated.

The Debtors' misleading description of events in the Disclosure Statement mischaracterizes the evidentiary record and selectively omits facts that are directly contrary to its attempted alter ego narrative. Indeed, DCG continued to voluntarily step in to support Genesis with several hundreds of millions of capital contributions and loan forgiveness following the 3AC collapse.

In short, it is DCG's position that there is no basis to support an alter-ego claim against DCG.

**A.      DCG Response to Claims in Connection with the Note**

It is DCG's position that when it assumed a $1.1 billion liability related to amounts that GGC had provided to GAP in connection with loans made to 3AC which it had no obligation to undertake, it did so for the express purpose of assisting Genesis. DCG made the determination that it was in the best interest of Genesis, its lenders, and DCG to try to help support Genesis. DCG did not receive value for the Note, it was highly unlikely that DCG would recover any meaningful amounts on account of the Note, and the transaction was not undertaken or structured "to favor DCG's interest." DCG relied on the advice of top-tier professionals to assist with the Note transaction from a legal, economic and accounting perspective. The record does not support any finding of wrongdoing in connection with DCG stepping in to assist Genesis through this assumption of liability, after careful consideration of a number of alternatives advised by outside professionals. Genesis was involved in the structuring of the Note transaction and Genesis's board of directors approved the Note transaction in support of the Company.

**B.      DCG Response to Alleged Claims Arising under Tax Sharing Agreement**

It is DCG's position that the referenced Tax Sharing Agreement is inapplicable to the Debtors' claim of corporate and financial control over GGC by DCG. DCG's response to the asserted preference claims are discussed in Section c of the Disclosure Statement.

**IV.      DCG RESPONSE TO ALLEGED PREFERENCE CLAIMS**

It is DCG's position that Genesis could not have been insolvent prior to, at the earliest, May 2022 (i.e., when 3AC, Genesis' largest counterparty, was impacted by the Terra Luna collapse). Accordingly, any transactions that occurred prior to Genesis' insolvency are, by definition, not preferences under 11 U.S.C. § 547(b) of the Bankruptcy Code. Furthermore, some of the Debtors' alleged preference claims are not even on account of an antecedent debt, as required by 11 U.S.C. § 547(b) of the Bankruptcy Code. It is DCG's position that all transactions with Genesis, regardless of when they occurred, and including the September 29 Transaction and the November Transaction, either do not constitute preference claims because they do not meet the threshold requirements of 11 U.S.C. § 547 of the Bankruptcy Code, or are otherwise subject to either ordinary course defenses or subsequent new value defenses.

Furthermore, the Debtors acknowledge that the amounts repaid in the September 29 Transaction and the November Transaction were repurposed and sent back to Genesis in the form of equity contributions. Even if such contributions were preceded by ordinary course repayments of debt obligations owed by Genesis to DCG – the fact that such amounts were then contributed as equity to Genesis represents significant new value provided by DCG to Genesis. This new value improved Genesis' balance sheet and reduced net interest expense, thereby improving net interest margin. Furthermore, the Debtors ignore other equity contributions made to Genesis at the time, which when combined with those made in the September 29 and November Transactions, totaled approximately $340 million during this period and served as a source of liquidity and capital for Genesis post-3AC collapse.

**V.      DCG RESPONSE TO ALLEGED LUNO SETOFF CLAIMS**

It is DCG's position that on November 16, 2022, DCG satisfied its obligations to Luno under the November 11 guarantee and, as a result, the outstanding amount of the $100 million intercompany loan from GGC to DCG was

reduced, pursuant to a setoff DCG effectuated, by the approximately $52.5 million worth of various crypto tokens DCG transferred to Luno to fulfill its obligations under the guarantee.

On May 22, 2023, DCG filed a proof of claim against GGC preserving its rights in connection with, among other things, the Luno Setoff, plus any interest accrued on the setoff amount that has been paid by DCG to GGC.

## VI.    DCG RESPONSE TO ALLEGED CLAIMS UNDER THE ASSIGNMENT AND ASSUMPTION AGREEMENT

DCG disputes that it assumed Genesis' obligations regarding the $1.2 billion of 3AC collateral upon which Genesis foreclosed prior to DCG's entry into the 3AC Loan Assignment and Assumption Agreement. The 3AC Loan Assignment and Assumption Agreement was a contract for forward-looking liabilities, not for the assumption of liabilities related to Genesis' past actions in which DCG was not involved, such as the 3AC collateral that Genesis allegedly wrongfully foreclosed upon.  However, to the extent a court were to find that the 3AC Loan Assignment and Assumption Agreement is ambiguous on this point, all ambiguity should be resolved in favor of DCG's reading of the 3AC Loan Assignment and Assumption Agreement.  Specifically, reading the 3AC Loan Assignment and Assumption Agreement together with the Note and June 2022 Assignment Agreement makes clear that DCG was only assuming "rights and obligations" in relation to the "Assumed Liability," which is defined narrowly as the $1.1 billion loan receivable from 3AC remaining following Genesis' foreclosure on the 3AC collateral, and no other obligations. Furthermore, and consistent with the intention of the parties to the 3AC Loan Assignment and Assumption Agreement, DCG did not receive any of the proceeds from Genesis' foreclosure of the 3AC collateral and did not otherwise benefit from such foreclosure.  All proceeds and benefits associated with Genesis' foreclosure of the 3AC collateral went to Genesis.  In addition to the legal arguments supporting the fact that DCG did not assume Genesis' liabilities arising from the allegedly wrongful foreclosure of property, it would also be both inequitable and unjust for DCG to be liable for a foreclosure of collateral that it did not receive or benefit from in any shape or form.

## VII.    DCG RESERVATION OF RIGHTS

Notwithstanding anything herein, DCG reserves all rights, defenses and counterclaims with respect to any and all alleged claims identified herein or in the future by any party and intends to vigorously defend or prosecute against any and all such claims.

## VIII.   THE IMPACT ON RECOVERIES FROM THE CAUSES OF ACTION IN THE EVENT OF THE DEBTORS' SOLVENCY

As a result of rising cryptocurrency prices, it is very possible that the Debtors will be solvent prior to or at the Confirmation Hearing.  In the event of the Debtors' solvency, any additional recoveries after payments in full to Holders of Allowed Claims would go directly to equity.  Accordingly, DCG would expect that such excess recoveries from a solvent Debtor would benefit DCG as the Debtors' sole shareholder, and will be objecting to the Amended Plan to the extent it does not include DCG in the waterfall, attempts to prohibit excess value to flow from GGC to GGH (and ultimately to DCG as sole shareholder), or contemplates the formation of a litigation trust without DCG's input, as any recoveries from successful Causes of Action would also benefit DCG as the Debtors' sole shareholder.

# **EXHIBIT G**

**Gemini Response**

## Gemini Response

### I.   GEMINI'S RESPONSE TO DEBTORS' POSITION AS TO GEMINI'S INTEREST IN THE GRAYSCALE BITCOIN TRUST COLLATERAL

#### a.   Gemini's Claims Against the Debtors

As noted by the Debtors, pursuant to a security agreement and amendments thereto, GGC pledged to Gemini a total of 62,086,586 shares of Grayscale Bitcoin Trust ("GBTC") as collateral (the "Collateral") to secure all loans made by the Gemini Lenders.  On October 27, 2023, Gemini commenced an adversary proceeding seeking the Court's determination of the Gemini Lenders' secured party and/or set off rights with respect to the Collateral.  *See* Compl. ¶ 1, *Gemini Trust Company, LLC v. Genesis Global Capital, LLC, et al.*, Adv. Pro. No. 23-01192 (SHL).  As of October 30, 2023, the Collateral was worth more than $1.6 billion.

GGC pledged the Collateral to Gemini in two tranches.  Gemini's position with respect to the first tranche of collateral—consisting of 30,905,782 shares of GBTC (the "Gemini GBTC Shares")—is that on November 16, 2022, Gemini, in accordance with the terms of the security agreement and the requirements of the Uniform Commercial Code, properly foreclosed on the Gemini GBTC Shares following GGC's announcement that it was suspending redemptions by Gemini Lenders, and therefore defaulting under the security agreement.  *See* Compl. ¶¶ 43-46.  Specifically, Gemini sold the Gemini GBTC Shares to itself in a private sale at the then-OTCQX market price of $9.20 per share for a total of $284,333,194.40.  *See* Compl. ¶¶ 43-46.

Gemini disputes the Debtors' challenge to the validity of the foreclosure and contends that the foreclosure was commercially reasonable given that OTCQX—the exchange on which GBTC is customarily traded—is a recognized market and that prior notice to GGC was not required.  *See* Compl. ¶ 45.

Gemini's position with respect to the second tranche of collateral—consisting of 31,180,804 shares of GBTC (the "Additional GBTC Shares")—is that Gemini has an absolute and unconditional security interest in the collateral.  *See* Compl. ¶ 72.  As acknowledged by the Debtors, pursuant to the terms of the security agreement and amendments thereto, DCG transferred the Additional GBTC Shares to GGC for the benefit of Gemini and the Gemini Lenders.  *See* Compl. ¶ 47 & n.11.  Despite GGC's failure to deliver the Additional GBTC Shares to Gemini, Gemini has a secured interest in Additional GBTC Shares by virtue of the terms of the security agreement and amendments thereto.  *See* Compl. ¶¶ 39-42.  In the alternative, Gemini asserts that GGC is holding the Additional GBTC Shares in constructive trust for the benefit of the Gemini Lenders.

#### b.   Gemini's Defenses to the Debtors' Potential Preference Claims

Gemini and the Gemini Lenders have strong defenses to any preference claims that the Debtors may assert with respect to the Debtors' return of Gemini Lenders' assets.  The Debtors acknowledge several of these defenses in their disclosure statement, which states that the large majority of the transactions at issue may be: (i) payments in the ordinary course of business,

consistent with the usual course of dealing between GGC and Gemini and/or the Gemini Lenders; (ii) protected from avoidance by the Bankruptcy Code's "safe harbor" provisions; and/or (iii) not the type that can give rise to preference liability because subsequent new value was provided. Gemini intends to assert all viable defenses—including those acknowledged by the Debtors—in response to any asserted preference claims.

### c. Gemini's Defenses to the Debtors' Potential Declaratory Judgement and Preferential Transfer Claims

Gemini's defenses to the Debtors' potential declaratory judgment claims mirror Gemini's arguments in favor of the declaratory judgments that Gemini is seeking in the Adversary Proceeding.  As explained above, Gemini conducted a valid foreclosure on the Gemini GBTC Shares and has a security interest in the Additional GBTC Shares.  In the alternative, GGC holds the Additional GBTC Shares in constructive trust for the benefit of the Gemini Lenders.

Gemini also has strong defenses to any claim by the Debtors that the Debtors' pledge of the Additional GBTC Shares is a voidable preference, including that the Bankruptcy Code's "safe harbor" provisions protect Gemini against any avoidance with respect to the Additional GBTC Shares.

### d. Gemini's Defenses to the Debtors' Potential Constructive Fraudulent Transfer Claims

Gemini has strong defenses to any constructive fraudulent transfer claim that the Debtors may assert premised on the first amendment to the security agreement.  Among other things, (i) in exchange for the Debtors' agreement to extend the security agreement's termination date, Gemini provided reasonably equivalent value and (ii) the transaction is protected from avoidance by the Bankruptcy Code's "safe harbor" provisions.

## II. GEMINI'S POSITION AS TO GENESIS'S OBLIGATION TO INDEMNIFY GEMINI FOR ANY LOSSES SUFFERED BY GEMINI IN CONNECTION WITH THE GEMINI EARN PROGRAM

Various Gemini Lenders have commenced or threatened individual actions, putative class actions, or arbitration proceedings arising from the Gemini Earn Program, naming Gemini and GGC as defendants.  Gemini asserts that GGC is obligated to indemnify Gemini for any losses suffered by Gemini in connection with the Gemini Earn Program under contractual and non-contractual bases for indemnification and contribution, including, without limitation, its costs and expenses related to these Chapter 11 Cases, settlement costs, investigation costs, indemnification costs, and the fees and expenses of counsel and related professionals.  The Debtors have acknowledged that GGC is obligated to indemnify Gemini with respect to any recoveries arising from GGC's breach of the Gemini MLAs.

## III.    GEMINI'S RESERVATION OF RIGHTS

Notwithstanding anything herein, Gemini reserves all rights, defenses and counterclaims with respect to any and all alleged claims identified herein or in the future by any party and intends to vigorously defend or prosecute against any and all such claims.

# <u>EXHIBIT H</u>

**Distribution Principles**

## Distribution Principles

THE DISTRIBUTION PRINCIPLES REFLECT THE AGREEMENT OF THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS, THE AD HOC GROUP OF GENESIS LENDERS, AND THE DOLLAR CREDITOR GROUP. AS OF THE DATE HEREOF, EACH OF THE DEBTORS, THE COMMITTEE, THE AD HOC GROUP OF GENESIS LENDERS, AND THE DOLLAR CREDITOR GROUP RESERVES ALL RIGHTS WITH RESPECT TO THE DISTRIBUTION PRINCIPLES.

THE INFORMATION CONTAINED IN THIS ANNEX IS PROVIDED IN SUMMARY FORM FOR ILLUSTRATIVE PURPOSES ONLY AND IS SUBJECT TO CHANGE. THE DEBTORS, WITH THE AD HOC GROUP'S CONSENT AND THE COMMITTEE'S CONSENT, RESERVE ALL RIGHTS WITH RESPECT TO ALL CLAIMS AND THE CLAIMS RECONCILIATION PROCESS. ACTUAL RECOVERIES MAY VARY, AND A MODIFICATION OF ANY OF THE UNDERLYING ASSUMPTIONS, METHODOLOGIES, AND MECHANICS OUTLINED IN THIS ANNEX COULD RESULT IN ADJUSTMENTS TO THE ACTUAL DISTRIBUTION RECEIVED BY HOLDERS OF ALLOWED CLAIMS.

## A.    THE DISTRIBUTION PRINCIPLES

This Annex outlines the methodology and mechanics governing the allocation and distribution of the Debtors' current and future Distributable Assets as well as shares of Grayscale Bitcoin Trust ("**GBTC Shares**") and Grayscale Ethereum Trust ("**ETHE Shares**") under the Amended Plan.[1]

In accordance with the Bankruptcy Code, these Distribution Principles generally provide for the allocation of Distributable Assets, the GBTC Shares, and the ETHE Shares (collectively, "**Allocable Assets**"), to Holders of Allowed General Unsecured Claims on a *pro rata* basis.  A Holder's *pro rata* share of a pool of Allocable Assets (its "***Pro Rata* Share**") for a given Distribution Date will generally equal (x) the value of the assets in U.S. Dollars ("**USD**") in which the Holder's claim is denominated as of the Petition Date (the "**Petition Date Value**") less certain offsets *over* (y) the Petition Date Value of the Claim Assets of all General Unsecured Claims less certain offsets.

Certain provisions of these Distribution Principles apply to Holders of Allowed General Unsecured Claims whose Claims are denominated in the same asset (such asset, a "**Claim Asset**," and such group, a "**Denomination Group**"), even though such Holders may not be part of the same Class for purposes of the Amended Plan.

One of the goals of these Distribution Principles is to maximize "in-kind" distributions, *i.e.*, distributions to Holders of Allowed General Unsecured Claims in the Claim Assets of their claims, including by (1) allocating Distributable Assets among Holders of Allowed General Unsecured Claims using the respective Claim Assets and, (2) as necessary, supplementing such allocation with allocations of "like-kind" assets, *i.e.*, assets that reference the Claim Assets. In furtherance of this goal, the Distribution Principles propose to provide Holders of Allowed Fiat-or-Stablecoin Denominated Unsecured Claims (and Remainder Gemini Lender Claims (as defined below) denominated in Cash, Foreign Currency, or Stablecoins) with near-term distributions in an amount equal to such Holders' *Pro Rata* Share of the total value of all Allocable Assets to be allocated to Holders of Allowed General Unsecured Claims on the Initial Distribution Date (as defined below), including the value (calculated in accordance with Step 3 below) of such Allocable Assets constituting GBTC Shares or ETHE Shares.  To do this, the Debtors may need to monetize a certain amount of Digital Assets, GBTC Shares, or ETHE Shares prior to the Effective Date of the Amended Plan if the Cash and Stablecoins available for distribution are insufficient to provide the Holders of Allowed Fiat-or-Stablecoin Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in Cash, Foreign Currency, or Stablecoins) with their *Pro Rata* Share of the value (as calculated pursuant to these Distribution Principles). The costs of these monetization transactions will be borne by all Denomination Groups *pro rata*. In this way, Holders of Allowed Fiat-or-Stablecoin-Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in Cash, Foreign Currency, or Stablecoins) will receive in-kind distributions in an amount they would otherwise be entitled to receive, and the remaining GBTC Shares and ETHE Shares (exclusive of any such GBTC Shares or ETHE Shares held in escrow or otherwise

---

[1]    The Debtors reserve the right, in consultation with the Committee and the Ad Hoc Group, to further amend the Amended Plan to establish a litigation trust to pursue the Retained Causes of Action. Capitalized terms not otherwise defined herein shall have the meanings given to such terms in the Amended Plan or the Disclosure Statement, as applicable.

withheld for any of the Plan Reserves) will be allocated to BTC-denominated creditors, ETH-denominated creditors, and Alt-Coin denominated creditors, allowing such creditors to receive the benefit of any appreciation of such shares, while also bearing the risk of any depreciation of the value of such shares.

However, regulatory, legal, or practical considerations may impede the ability of the Debtors or the PA Officer to make in-kind or like-kind distributions. Accordingly, although these Distribution Principles are designed to maximize in-kind and like-kind distributions, such may not ultimately be possible in all instances.

In order to maximize in-kind and like-kind distributions, from time to time, the Wind-Down Debtors or the PA Officer, in consultation with the Wind-Down Oversight Committee, may engage in certain market transactions. Specifically, the Wind-Down Debtors or the PA Officer may, subject to regulatory, legal, and practical considerations as they may consider in their reasonable discretion, purchase, sell, or exchange Allocable Assets for Cash or other assets ("**Market Transactions**").[2] The Wind-Down Debtors or the PA Officer may in their reasonable discretion use such third-party service providers, exchanges, market makers, or others as they determine appropriate in their reasonable discretion to engage in such Market Transactions.

Due to regulatory, legal, or practical considerations, the Wind-Down Debtors or the PA Officer, with the consent of the Wind-Down Oversight Committee, may in their reasonable discretion determine it is not appropriate, legal, or practical to make "in-kind" or "like-kind" distributions. This may be particularly the case for General Unsecured Claims denominated in Alt-Coins. Likewise, GBTC Shares and ETHE Shares may not be Distributable Assets and may only become Distributable Assets when they are monetized into USD (or otherwise converted into Distributable Assets). To address these types of assets ("**Un-Distributable Assets**"), either (i) the Debtors, if prior to the Effective Date, with the Committee's Consent and Ad Hoc Group's Consent, or (ii) the Wind-Down Debtors or the PA Officer, if after the Effective Date, and at the direction of the Wind-Down Oversight Committee representatives of the Denomination Groups to whom such assets have been allocated, will endeavor to liquidate the relevant Allocable Assets or exchange them for Stablecoins or other assets ("**Liquidation Transactions**"). The proceeds of such Liquidation Transactions will be treated as Distributable Assets.

To the extent Market Transactions or Liquidation Transactions are effected prior to the allocation of the relevant assets, the costs of such transactions will be borne by all Denomination Groups *pro rata*; to the extent they are effected after allocation, the costs of such transactions will be borne by the Denomination Group directing such transactions.

These Distribution Principles consist of five steps. In the first two steps, a Holder's *Pro Rata* Share of Allocable Assets is calculated. The third step involves valuing the Allocable Assets. In the fourth step, the Allocable Assets are allocated to Holders of Allowed General Unsecured Claims based on Holders' Claim Assets. Lastly, the PA Officer will make distributions. To the extent that the Allocable Assets allocated to Holders of Allowed General Unsecured Claims (the "**Allocated Assets**") consist of Distributable Assets having the same denominations as the Holders' Claim

---

[2]        The Debtors, Wind-Down Debtors, or PA Officer, as applicable, will provide the Securities and Exchange Commission with no less than three (3) business days' notice prior to any Market Transaction or Liquidation Transaction involving Alt-Coins or Stablecoins.

Assets ("**Matching Assets**"), the Debtors or the PA Officer, as applicable, will distribute such assets to such Holders.

To the extent the Allocated Assets consist of Distributable Assets having different denominations from the Holders' Claim Assets ("**Mis-Matching Assets**"), the Debtors (in consultation with the Committee and the Ad Hoc Group SteerCo) or the PA Officer (in consultation with the Wind-Down Oversight Committee representatives of the relevant Denomination Group), as applicable, will endeavor to engage in Market Transactions, the proceeds of which will be distributed to the relevant Holders. To the extent the Allocated Assets consist of Un-Distributable Assets, (i) the Debtors, with the Ad Hoc Group's Consent and the Committee's Consent, or (ii) the PA Officer, at the direction of the Wind-Down Oversight Committee representatives of the Denomination Groups to whom such assets have been allocated, as applicable, and subject to the Un-Distributable Asset Monetization Agreement described below, will engage in Liquidation Transactions and distribute the proceeds of such Liquidation Transactions (subject to any further Market Transactions that may be necessary to make in-kind distributions) to the relevant Holders.

**Step 1 – Claim Value Calculation**: The first step of the Distribution Principles involves determining the numerator of the *Pro Rata* Share calculation for each Holder of an Allowed General Unsecured Claim (the "**Individual Claim Value**"). For a given Holder, the Individual Claim Value will equal the Petition Date Value of such Holder's Claim Assets, less certain collateral and payable offsets. The value of any collateral held by a Holder of an Allowed General Unsecured Claim shall be calculated as of the Effective Date. The value of any payable offsets shall be calculated using the value of such payable offset as of the Petition Date. With respect to Gemini Lender Claims, the value of the Gemini GBTC Shares will be offset against all Gemini Lender Claims on a *pro rata* basis, and the remaining amount of each Gemini Lender Claim shall equal such Holder's Individual Claim Value (the "**Remainder Gemini Lender Claim**").

**Step 2 – *Pro Rata* Share Calculation**: The next step in the *Pro Rata* Share calculation involves calculating the denominator of the calculation. This denominator will equal the aggregate of the Individual Claim Values for all Holders of Allowed General Unsecured Claims (the "**Aggregate Claim Value**"). The PA Officer may need to modify or revise the Aggregate Claim Value to address contingencies or unresolved issues. A Holder's *Pro Rata* Share is equal to its respective Individual Claim Value divided by the Aggregate Claim Value.

**Step 3 – Valuation of Allocable Assets Based on Conversion Rate**: Once each Holder's *Pro Rata* Share is calculated, the next step is to calculate the value of the relevant Allocable Assets so that they can be allocated to each Holder of an Allowed General Unsecured Claim based on each Holder's *Pro Rata* Share. This calculation will be conducted separately for each Distribution Date, in accordance with the following methodology.

> **Determination of Initial Conversion Rate**: For the Distributable Assets to be distributed on or around the Effective Date (the "**Initial Distribution Date**"), as well as any GBTC Shares and ETHE Shares that would be distributed on the Initial Distribution Date were they Digital Assets, the PA Officer will establish a conversion rate into USD for each type of Allocable Asset (other than USD or Stablecoins) (an "**Initial Conversion Rate**").

i.    For Distributable Assets, the Initial Conversion Rate will be the average price in USD of that type of Distributable Asset (the "**Average Price**") during the period commencing fifteen (15) calendar days prior to the entry of the Confirmation Order and ending fifteen (15) days following the entry of the Confirmation Order (the "**Measurement Period**").

ii.    For GBTC Shares and ETHE Shares that would be distributed on the Initial Distribution Date were they Digital Assets, the Initial Conversion Rate will be the Initial Conversion Rate that would apply if such GBTC Shares or ETHE Shares were Digital Assets, less an amount estimated by the PA Officer of the per-share costs (including, but not limited to, brokerage or marketing fees, or any bid-offer costs) that were realized in connection with sales prior to the end of the Measurement Period of any GBTC Shares or ETHE Shares or, if no such sales have occurred prior to the end of the Measurement Period, the estimated amount of such costs that would be incurred in the future for sales of such GBTC Shares or ETHE Shares (the "**Trust Share Bid-Offer Cost Estimate**"). The Trust Share Bid-Offer Cost Estimate shall be determined at the PA Officer's sole discretion, calculated as a percentage of Average Price, but shall in no case beless than 2.5% or more than 5%; *provided*, *however*, that the Trust Share Bid-Offer Cost Estimate shall be 0% for the relevant Un-Distributable Asset upon the Grayscale Bitcoin Trust or the Grayscale Ethereum Trust converting into, and commencing active trading as, an exchange-traded fund.

**Determination of Conversion Rate for Subsequent Distributions:**[3]  For each tranche of Distributable Assets to be distributed following the Initial Distribution Date (each such date, a "**Subsequent Distribution Date**"), as well as certain Un-Distributable Assets, the PA Officer will establish a conversion rate into USD for each such asset (other than USD or Stablecoins) (a "**Subsequent Conversion Rate**").

i.    For Distributable Assets, the Subsequent Conversion Rate will be based on the time-weighted average price of such asset during a seven-day period commencing on a date selected by the PA Officer, in consultation with the Wind-Down Oversight Committee.

ii.    For Un-Distributable Assets that are made available for allocation at substantially the same time as any Distributable Assets ("**Concurrent Un-Distributable Assets**"), the Subsequent Conversion Rate will be the Subsequent Conversion Rate that would apply if such Un-Distributable Assets were Distributable Assets, less the Trust Share Bid-Offer Cost Estimate, if applicable.

For any other Un-Distributable Assets allocated after the Initial Distribution Date ("**Standalone Un-Distributable Assets**"), there will be no Subsequent Conversion Rate; rather, such assets will be allocated in Step 4 to each Denomination Group *pro rata*

---

[3]    The PA Officer will determine appropriate modifications to the foregoing methodology to incorporate instances in which a given crypto asset is monetized in multiple different transactions on different dates (e.g., GBTC), and at various prices within a given distribution period (but prior to the period in which Average Price is determined for such period).

(subject to the Limitation on Recoveries, described below) based upon the number of shares or units, as applicable. For purposes of the Limitation on Recoveries described below, such assets will be valued as though they were Concurrent Un-Distributable Assets.

The Initial Conversion Rate and the Subsequent Conversion Rate for USD and Stablecoins will be 1.

**Calculation of As-Converted Allocable Asset Value:** The PA Officer will then calculate the value of the full pool of (i) Allocable Assets for the Initial Distribution Date and (ii) Distributable Assets and Concurrent Un-Distributable Assets for each Subsequent Distribution Date, in each case by first multiplying the applicable Initial Conversion Rate or Subsequent Conversion Rate for each type of asset by the number of assets that consist of such type to be allocated for such Distribution Date ("**Dollar Value**"). Then, the PA Officer will aggregate the Dollar Value for all types of Allocable Assets to be allocated for such Distribution Date, except for Standalone Un-Distributable Assets, which sum will yield the converted value of the Allocable Assets (the "**As-Converted Allocable Asset Value**").

**Step 4 – Allocation of Allocable Assets**: In the fourth step, the PA Officer will allocate individual assets to Holders of Allowed General Unsecured Claims. For each Distribution Date, the PA Officer will allocate to each Holder of an Allowed General Unsecured Claim its *Pro Rata* Share of the Allocable Assets for such Distribution Date based on the As-Converted Allocable Asset Value of the Allocable Assets for such Distribution Date, or, in the case of Standalone Un-Distributable Assets, to each Denomination Group *pro rata* based upon the number of shares or units, as applicable. For the avoidance of doubt, the Allocable Assets for the Initial Distribution Date shall consist of all Cash, Digital Assets, GBTC Shares, and ETHE Shares held by the Debtors, *less* any Cash and GBTC Shares required to be withheld for any of the Plan Reserves. Following the allocation of Allocable Assets among the Denomination Groups, in no instance will direct third-party costs related to Market Transactions effected in respect of such Allocable Assets allocated to one Denomination Group affect the Allocable Assets allocated to, or distributions to, another Denomination Group. In order to maximize "in-kind" and "like kind" recoveries, the PA Officer will allocate Allocable Assets for distribution in-kind or, to the extent necessary, monetize such assets pursuant to certain Market Transactions or Liquidation Transactions (except in the case of Standalone Un-Distributable Assets), as applicable, in advance of distribution, as follows:

A. **Cash/Stablecoin Allocation**: The PA Officer will allocate to Holders of Allowed Fiat-or-Stablecoin Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in Cash, Foreign Currency, or Stablecoins) (1) *first*, Allocable Assets consisting of Cash or Stablecoins, (2) *second*, to the extent there are not sufficient Allocable Assets consisting of Cash and Stablecoins to provide Holders of Allowed Fiat-or-Stablecoin Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in Cash, Foreign Currency, or Stablecoins) with their *Pro Rata* Share of the As-Converted Allocable Asset Value, Allocable Assets consisting of Excess Alt-Coins, (3) *third*, to the extent there are not sufficient Allocable Assets consisting of Cash, Stablecoins, or Excess Alt-Coins to provide Holders of Allowed Fiat-or-Stablecoin Denominated Unsecured Claims (and Remainder

Gemini Lender Claims denominated in Cash, Foreign Currency, or Stablecoins) with their *Pro Rata* Shares of the As-Converted Allocable Asset Value, Allocable Assets consisting of Digital Assets, and (4) *fourth*, to the extent there are not sufficient Allocable Assets consisting of Cash, Stablecoins, Excess Alt-Coins, or Digital Assets to provide Holders of Allowed Fiat-or-Stablecoin Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in Cash, Foreign Currency, or Stablecoins) with their *Pro Rata* Shares of the As-Converted Allocable Asset Value, Allocable Assets consisting of GBTC Shares or ETHE Shares; *provided*, *however*, that to the extent there exists any Excess Alt-Coin, the PA Officer shall liquidate such Excess Alt-Coins.[4]

B. **BTC Allocation**:  The PA Officer will allocate to Holders of Allowed BTC-Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in BTC) (1) *first*, Allocable Assets consisting of BTC, (2) *second*, Allocable Assets consisting of GBTC Shares, and (3) *third*, to the extent there are not sufficient Allocable Asset consisting of BTC and GBTC Shares to provide Holders of Allowed BTC-Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in BTC) with their *Pro Rata* Shares of the As-Converted Allocable Asset Value, Allocable Assets consisting of Digital Assets (other than BTC), Cash, Stablecoins, and ETHE Shares.

C. **ETH Allocation**:  The PA Officer will allocate to Holders of Allowed ETH-Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in ETH) (1) *first*, Allocable Assets consisting of ETH, (2) *second*, Allocable Assets consisting of ETHE Shares, and (3) *third*, to the extent there are not sufficient Allocable Assets consisting of ETH and ETHE Shares to provide Holders of Allowed ETH-Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in ETH) with their *Pro Rata* Shares of the As-Converted Allocable Asset Value, Allocable Assets consisting of Digital Assets (other than ETH), Cash, Stablecoins, and GBTC Shares.

D. **Alt-Coin Allocation**:  The PA Officer will allocate to Holders of Allowed Alt-Coin-Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in Alt-Coins) (1) *first*, all Allocable Assets consisting of Alt-Coins denominated in such Holder's Claim Asset, and (2) *second*, to the extent there are not sufficient Allocable Assets consisting of Alt-Coins to provide Holders of Allowed Alt-Coin-Denominated Unsecured Claims (and Remainder Gemini Lender Claims denominated in Alt-Coins) with their *Pro Rata* Shares of the As-Converted Allocable Asset Value, BTC, ETH, Stablecoins, Cash, GBTC Shares, and ETHE Shares.

---

[4]      "**Excess Alt-Coin**" shall mean any and all Alt-Coins of any given denomination of Claim Assets remaining after the allocation described in Step 4(D)(1) below.

**Step 5 – Distributions**: In the final step, the PA Officer will distribute the Allocated Assets, engage in Market Transactions and Liquidation Transactions, and distribute the proceeds of such transactions to Holders of Allowed General Unsecured Claims as allocated in Step 4.

To the extent a Holder of an Allowed General Unsecured Claim has been allocated Matching Assets, the PA Officer will distribute such Matching Asset to such Holder. To the extent a Holder of an Allowed General Unsecured Claim has been allocated a Mis-Matching Asset, the PA Officer will try to convert such asset into a Matching Asset so as to provide an "in-kind" distribution. Specifically, the PA Officer, in consultation with the Wind-Down Oversight Committee representatives of the of the Denomination Group, will endeavor to engage in Market Transactions to the extent it determines such is legally permissible and feasible. To the extent the PA Officer is able to complete such Market Transactions, the PA Officer will distribute the proceeds of such transactions to the relevant Holders. To the extent the PA Officer is unable to complete such transactions (*e.g.*, due to regulatory, practical, or legal considerations), it will, in consultation with Wind-Down Oversight Committee representatives of the Denomination Group, determine whether to engage in Liquidation Transactions or distribute to Holders the Mis-Matching Assets. To the extent the Allocated Assets consist of Un-Distributable Assets, the PA Officer, in consultation with Wind-Down Oversight Committee representatives of the Denomination Group, will engage in Liquidation Transactions and distribute the proceeds of such Liquidation Transactions to the relevant Holders.  Lastly, to the extent multiple Denomination Groups are allocated Un-Distributable Assets of the same denomination, such Denomination Groups shall be subject to the Un-Distributable Asset Monetization Agreement. To the extent Market Transactions or Liquidation Transactions are effected prior to the allocation of the relevant assets, the costs of such transactions will be borne by all Denomination Groups *pro rata*; to the extent they are effected after allocation, the costs of such transactions will be borne by the Denomination Group directing such transactions.

Before receiving any distribution, a Holder may need to provide the PA Officer, a third-party service provider, or another party such know-your-customer, wallet address, identifying, or other information as the PA Officer, third-party service provider, or other party shall reasonably determine, and may need to be "on-boarded" to the third-party service provider.

> *Limitations on Recoveries*. For the avoidance of doubt, except as set forth below, no Holder of an Allowed Unsecured Claim shall be entitled to receive distributions from the Wind-Down Debtors' estates having a value in excess of one hundred percent (100%) of the in-kind Claim Assets underlying such Holders' Allowed Unsecured Claims (or, solely to the extent it is not possible to make in-kind distributions in the relevant Claim Asset, the Dollar  Value thereof using the Initial Conversion Rate) (the "**Recovery Cap**"). To the extent any Holder of an Allowed Unsecured Claim receives distributions from the Wind-Down Debtors' estates valued at or above the Recovery Cap, then, subject to the accrual and payment of Post-Petition Interest or Post-Effective Date Interest, if applicable, as described below, such Holder's Allowed Unsecured Claim's *Pro Rata* Share shall be decreased to 0% and the *Pro Rata* Shares of all other Holders of Allowed General Unsecured Claims shall, on a *pro rata* basis, be increased, up to the amount that would allow such Holders to receive assets valued up to the Recovery Cap; *provided*, *however*, that, to the extent Post-Effective Date Interest becomes applicable, Holders of Allowed

8

Fiat-or-Stablecoin Denominated Claims' *Pro Rata* Share shall instead be decreased to the amount of accrued Post-Effective Date Interest.

***Post-Petition Interest***. All unsatisfied Allowed General Unsecured Claims shall, from the Petition Date, accrue interest at the rate (inclusive of both the loan fee and the late fee) set forth in the relevant master loan agreement between the relevant Debtor and the relevant Holder; *provided* that such interest shall only be factored into a Holder's *Pro Rata* Share pursuant to the foregoing steps once the Recovery Cap for all Holders of Allowed Unsecured Claims has been met; *provided further*, that, to the extent applicable and unpaid, Post-Effective Date Interest shall be paid *pari passu* with Post-Petition Interest.

***Post-Effective Date Interest***. Notwithstanding anything contained herein to the contrary, in the event that Holders of Allowed Fiat-or-Stablecoin Denominated Unsecured Claims do not receive distributions sufficient to reach the Recovery Cap within two years of the Effective Date, Holders of General Unsecured Claims shall be entitled to interest commencing as of such date on the unpaid portion of their claims and accruing at the federal judgment rate. Post-Effective Date Interest for any Holder of General Unsecured Claims shall be payable upon such Holder of General Unsecured Claims reaching the Recovery Cap, and shall be payable *pari passu* with (a) all other Holders of General Unsecured Claims who have not yet reached the Recovery Cap, or (b) if all Holders of General Unsecured Claims have reached the Recovery Cap, *pari passu* with Post-Petition Interest.

***Un-Distributable Asset Monetization Agreement***. If multiple Denomination Groups have been allocated Un-Distributable Assets of the same denomination, each Denomination Group agrees that (1) its share of such Un-Distributable Asset shall be monetized by the PA Officer at the direction of the Wind-Down Oversight Committee representatives of such Denomination Group, and (2) each Denomination Group shall be entitled, in any given day to sell, liquidate, or otherwise monetize, no greater than its *pro rata* share among the Un-Distributable Assets of such denomination held by the Wind-Down Debtors of 10% of the thirty (30) day average daily trading volume for such Un-Distributable Asset (the "**Liquidation Limit**"), as reported by www.OTCmarkets.com; *provided* that the PA Officer may apply a different Liquidation Limit to a given Un-Distributable Asset, with the consent of the Wind-Down Committee Representatives of all Denomination Groups holding such Un-Distributable Asset.

## EXHIBIT I

**Gemini Earn Operations Assets Schedule**

**Project Genome**
Gemini Locked Liquidity - Coin Prices Updated for 10/31/2023*

*($ in USD)*

| Category | Currency | Price | Quantity | Market Value |
|---|---|---|---|---|
| | **Gemini Locked Assets by Coin** | | | |
| BTC | BTC | 34,656.4000 | 1.38270 | 47,919 |
| ETH | ETH | 1,815.1400 | 4.64575 | 8,433 |
| USD/Stable | USD | 1.0000 | 269,311.00000 | 269,311 |
| | USDC | 1.0000 | 72,127.31886 | 72,127 |
| | GUSD | 0.9990 | 274,102.04000 | 273,828 |
| Alt | MATIC | 0.6365 | 73,552.74577 | 46,816 |
| | FIL | 3.8310 | 332,985.31171 | 1,275,667 |
| | LTC | 68.9100 | 1,165.82731 | 80,337 |
| | DOGE | 0.0683 | 4,606,063.19593 | 314,502 |
| | LINK | 11.3580 | 1,317.89547 | 14,969 |
| | FTM | 0.2409 | 5,109,069.44386 | 1,230,775 |
| | APE | 1.3270 | 68,634.66171 | 91,078 |
| | BCH | 245.0600 | 4,395.32359 | 1,077,118 |
| | SOL | 38.4300 | 1,624.51050 | 62,430 |
| | DAI | 1.0000 | 1,492.05438 | 1,492 |
| | MANA | 0.3636 | 24,935.37266 | 9,067 |
| | UNI | 4.1520 | 7,080.56741 | 29,399 |
| | CRV | 0.4794 | 4,826.58716 | 2,314 |
| | AAVE | 81.4400 | 641.98830 | 52,284 |
| | BAT | 0.2081 | 4,212.11402 | 876 |
| | AMP | 0.0016 | 12,697,252.08387 | 20,443 |
| | ZEC | 28.3000 | 109.83631 | 3,108 |
| | PAXG | 1,965.0000 | 17.54432 | 34,475 |
| | GRT | 0.1042 | 511,348.28867 | 53,282 |
| | 1INCH | 0.2940 | 471,446.59138 | 138,605 |
| | MKR | 1,366.3100 | 34.06493 | 46,543 |
| | YFI | 5,682.3500 | 4.81534 | 27,362 |
| | AXS | 5.4700 | 2,425.10230 | 13,265 |
| | SUSHI | 0.7718 | 14,755.07914 | 11,388 |
| | XTZ | 0.7560 | 39,173.36133 | 29,615 |
| | LRC | 0.1966 | 1,555,797.01249 | 305,870 |
| | COMP | 45.8600 | 358.93908 | 16,461 |
| | STORJ | 0.4310 | 28,979.50844 | 12,490 |
| | ZRX | 0.2809 | 31,743.96452 | 8,918 |
| | ANKR | 0.0228 | 23,205,161.51570 | 529,078 |
| | FET | 0.3635 | 1,965,621.49805 | 714,503 |
| | SNX | 2.2630 | 23,465.59673 | 53,103 |
| | KNC | 0.7484 | 1,727.79251 | 1,293 |
| | REN | 0.0488 | 4,238,653.73172 | 206,846 |
| | OXT | 0.0681 | 94,912.56191 | 6,464 |
| | BAL | 3.3900 | 3,030.37812 | 10,273 |
| | INJ | 14.1700 | 6,601.47982 | 93,543 |
| | ALCX | 13.8400 | 1,602.68169 | 22,181 |
| | LPT | 6.1500 | 232.63711 | 1,431 |
| | UMA | 1.4680 | 2,638.51827 | 3,873 |
| | SKL | 0.0254 | 1,904,756.72718 | 48,381 |
| | BNT | 0.5329 | 22,566.62684 | 12,026 |
| | CHZ | 0.0668 | 32,785.72092 | 2,190 |
| | RLY | 0.0060 | 2,519,625.42696 | 15,009 |
| | TOKE | 0.3900 | 8,289.07956 | 3,233 |
| | MIR | 0.0120 | 90.35325 | 1 |
| | LUNA | 0.4554 | 61,360.59601 | 27,946 |
| | UST | 0.0119 | 13,263.57257 | 158 |
| | RBN | 0.1781 | 9,805.34161 | 1,746 |
| | **Total Market Value of Locked Assets** | | | **7,435,845** |

*Pricing provided by the Company*