Jeremy C. Hollembeak
BAIRD HOLM LLP
1700 Farnam St. Ste. 1500
Omaha, NE 68102
Telephone (402) 636-8317
jhollembeak@bairdholm.com

*Counsel to Claimants*
▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *and* ▮▮▮▮▮

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.: 23-10063 (SHL) |
| Debtors. | Jointly Administered |

**RESPONSE IN OPPOSITION TO DEBTORS' OBJECTIONS TO
CLAIM NOS. 402 AND 405 IN SEVENTH OMNIBUS OBJECTION [ECF No. 999]**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (▮▮▮▮), and ▮▮▮▮▮▮ (▮▮▮ and, together with ▮▮, the "Claimants") hereby respond (the "Response") in support of the full and final allowance of their respective Filed Claims (as defined below) pursuant to Sections 105 and 502 of title 11 of the United States Code (the "Bankruptcy Code"), and in opposition to the objection thereto by Genesis Global Holdco, LLC ("Holdco") and its affiliated debtors and debtors in possession (collectively, the "Debtors") set forth in the *Debtors' Seventh Omnibus Objection (Non-Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007 (Modify and Allow as Modified)* (ECF No. 999) (the "Seventh Omnibus Claims Objection"). For the

---

[1] The Genesis Debtors in the Chapter 11 Cases, along with the last four digits of each Genesis Debtor's tax identification number as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of the Chapter 11 Cases, the service address for the Genesis Debtors is 175 Greenwich Street, 38th Floor, New York, NY 10007.

1

reasons below, the Court should overrule the Seventh Omnibus Claims Objection as it relates to the Filed Claims, and allow the Filed Claims in their full stated amounts. In accordance with the Paragraph 19 of the Seventh Omnibus Claims Objection, the Claimants state as follows:

## RESPONSE

A. **Name of Claimants and Description of Filed Claims**

   *i. Claim No. 402*

1.  Claimant ▮ timely filed a proof of claim in the above-captioned cases (the "Chapter 11 Cases") asserting an unsecured, prepetition claim against Debtor Genesis Asia Pacific Pte. Ltd. ("GAP") in the amount of 17,075,824.887832 (USDC) ("Claim No. 402").

2.  The basis for Claim No. 402 is set forth in the addendum and exhibits thereto. In brief, on or about June 3, 2020, Debtor Genesis Global Capital, LLC (the "GGC"), as borrower, and Claimant ▮, as lender, entered into a Master Loan Agreement (the "▮ Master Loan Agreement"). After taking assignment of GGC rights under the ▮ Master Loan Agreement, GAP, as borrower, and Claimant ▮, as lender, entered into a Loan Term Sheet on or about May 28, 2022 (the "▮ Term Sheet"). On May 28, 2022, Claimant ▮, as Lender, transferred to GAP, as Borrower, 10,000,000 USDC on a fixed term, uncollateralized basis (the "GAP Loan").

3.  Pursuant to the ▮ Term Sheet and ▮ Master Loan Agreement, GAP agreed to retire the GAP Loan on November 28, 2022 (the "▮ Maturity Date") by transferring to ▮ an amount of USDC equal to the number originally transferred by ▮ on May 28, 2022 and not previously returned by GAP plus a Borrow Fee of "8.00% annual" calculated in accordance with the ▮ Master Loan Agreement, which provides in relevant part:

2

> Unless otherwise agreed, [GAP] agrees to pay [■] a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, [GAP] will be responsible to pay the Loan Fee as agreed to herein and annualized in the [■] Term Sheet …. Loan Fees shall accrue from and include the date on which the Loaned Digital Currencies are transferred to [GAP] to the date on which such Loaned Digital Currencies are repaid in their entirety to [■].
>
> [■] shall calculate any Loan Fees owed on a daily basis and provide [GAP] with the calculation upon request. The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies.

■ Master Loan Agreement § III(a).

4. Additionally, if GAP defaulted by failing to retire the GAP Loan on the ■ Maturity Date, then ■ would become entitled to receive a Late Fee from GAP calculated in accordance with the ■ Master Loan Agreement, which provides in relevant part

> For each Calendar Day in excess of the [■] Maturity Date … in which [GAP] has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee …, [GAP] shall incur an additional fee (the "Late Fee") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Digital Currencies.

■ Master Loan Agreement § III(b).

5. At various times up through October 31, 2022, GAP made transfers of USDC to Claimant ■ in the amount of Loan Fees that had accrued, such that the total outstanding balance of the GAP Loan as of the beginning of the day November 1, 2022 was 10,000,000 USDC. No transfers from GAP to Claimant were made thereafter.

6. On November 28, 2022, Claimant ■ (through counsel) provided notice to GAP in writing (the "■ Demand Letter") that, among other things, (i) ■ demanded immediate satisfaction in full of all outstanding amounts on the GAP Loan, including accrued Loan Fees, (ii) GAP would be in default unless by the end of that day (i.e., the ■ Maturity Date) it paid and ■ received the full outstanding balance on the GAP Loan, and (iii) for each calendar day from and after November 29, 2022, unless and until the GAP Loan was satisfied in full, GAP

would incur an additional Late Fee of 1% of the outstanding daily balance on the GAP Loan on such day.

7.  On November 30, 2022, a representative of GAP confirmed in writing that GAP had received the ▮ Demand Letter. In doing so, the representative gave no indication that GAP disputed ▮ stated methodology for calculating the Late Fee.

8.  On January 19, 2023, the Debtors (including GAP) each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Petition Date") with the United States Bankruptcy Court for the Southern District of New York (the "Court").

9.  On May 22, 2023, Claimant ▮ timely Claim No. 402 asserting an unsecured, prepetition claim against GAP in the amount of 17,075,824.887832 (USDC). As more fully described therein, this amount includes (i) 10,000,000 USDC (the original amount transferred to GAP), (ii) 564,887.551634429 USDC (accumulation of daily Loan Fee from November 1, 2022 through the Petition Date), and (iii) 6,860,950.08156890 USDC (accumulation of daily Late Fee from November 29, 2022 through the Petition Date).

10. On November 29, 2023, the Debtors objected to allowance of Claim No. 402 on the basis it is inconsistent with their books and records, which show GAP as owing Claimant ▮ 10,187,945.2006635 USDC. In subsequent discussions with the undersigned, Debtors' counsel has confirmed that Debtors' objection to Claim No. 402 is limited to Claimant ▮ calculation of the Late Fee, and further indicated that Debtors' position is Section III(b) of the ▮ Master Loan Agreement requires a Late Fee of 1% *per annum*, calculated daily. As part of these discussions, the prospect of a consensual resolution has been raised, but to date not all parties have been willing to meaningfully pursue that alternative.

4

*ii. Claim No. 405*

11. Claimant ▇ timely filed a proof of claim in the Chapter 11 Cases asserting an unsecured, prepetition claim against Debtor GGC in the amount of 11,351,699.3276656 (DOT) ("Claim No. 405," and, together with Claim No. 402, the "Filed Claims").

12. The basis for Claim No. 405 is set forth in the addendum and exhibits thereto. In brief, on or about September 20, 2022, GGC, as borrower, and ▇ as lender, entered into a Loan Term Sheet (the "▇ Term Sheet" and, together with the ▇ Term Sheet, the "Term Sheets") and related Master Loan Agreement (as exhibited and referred to in Claim No. 405, the "SRI Master Loan Agreement" and, together with the ▇ Master Loan Agreement, the "Master Loan Agreements"), by which ▇ transferred 7,000,000 DOT to GGC on a fixed term, uncollateralized basis (the "GGC Loan" and, together with the GAP Loan, the "Loans").

13. Pursuant to the ▇ Term Sheet and SRI Master Loan Agreement, GAP agreed to retire the GGC Loan on November 21, 2022 (the "▇ Maturity Date" and, together with the ▇ Maturity Date, the "Maturity Dates") by transferring to ▇ an amount of DOT equal to the number originally transferred by ▇ on September 20, 2022 and not previously returned by GGC plus a Borrow Fee of "14.00% annual" calculated in accordance with the SRI Master Loan Agreement, which provides in relevant part:

> Unless otherwise agreed, [GGC] agrees to pay [▇] a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, [GGC] will be responsible to pay the Loan Fee as agreed to herein and annualized in the [▇] Term Sheet …. Loan Fees shall accrue from and include the date on which the Loaned Digital Currencies are transferred to [GGC] to the date on which such Loaned Digital Currencies are repaid in their entirety to [▇].
>
> [▇] shall calculate any Loan Fees owed on a daily basis and provide [GGC] with the calculation upon request. The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies.

SRI Master Loan Agreement § III(a).

5

14. Additionally, if GGC defaulted by failing to retire the GGC Loan on the ▮ Maturity Date, then ▮ would become entitled to receive a Late Fee from GGC calculated in accordance with the SRI Master Loan Agreement, which provides in relevant part

> For each Calendar Day in excess of the [▮] Maturity Date … in which [GGC] has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee …, [GGC] shall incur an additional fee (the "Late Fee") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Digital Currencies.

SRI Master Loan Agreement § III(b).

15. On or about November 10, 2022, GGC transferred 1,000,000 DOT to ▮ in respect of the GGC Loan. No other transfers from GGC to ▮ on account of the GGC Loan have been made.

16. On November 23, 2022, Claimant ▮ (through counsel) provided notice to GGC in writing (the "▮ Demand Letter") that, among other things, (i) GGC was in default because of its failure to satisfy the GGC Loan in full by the ▮ Maturity Date, (ii) ▮ demanded immediate satisfaction in full of all outstanding amounts on the GGC Loan, including accrued Loan Fees, and (iii) for each calendar day from and after November 22, 2022, unless and until the GGC Loan was satisfied in full, GGC would incur an additional Late Fee of 1% of the outstanding daily balance on the GGC Loan on such day.

17. On November 23, 2022, a representative of GGC confirmed in writing that GGC had received the ▮ Demand Letter. In doing so, the representative gave no indication that GGC disputed ▮ stated methodology for calculating the Late Fee.

18. On December 2, 2022, ▮ (though counsel) responded to GGC's representative in writing, explicitly reiterating ▮ demand and ongoing daily calculation of the Late Fee GGC was incurring as 1% of the outstanding daily balance on the GGC Loan on such day.

6

19. On December 15, 2022, the same representative of GGC replied to ███ counsel, once again giving no indication that GGC disputed ███ stated methodology for calculating the Late Fee.

20. On January 19, 2023 (i.e. the Petition Date), the Debtors (including GGC) each filed a voluntary Chapter 11 petition with this Court.

21. On May 22, 2023, Claimant ███ timely Claim No. 405 asserting an unsecured, prepetition claim against GGC in the amount of 11,351,699.3276656 DOT. As more fully described therein, this amount includes (i) 6,000,000 DOT (the original amount transferred to GGC and not returned), (ii) 363,291.524544475 DOT (accumulation of daily Loan Fee from September 22, 2022 through the Petition Date), and (iii) 4,988,407.82312113 DOT (accumulation of daily Late Fee from November 22, 2022 through the Petition Date).

22. On November 29, 2023, the Debtors objected to allowance of Claim No. 405 on the basis it is inconsistent with their books and records, which show GGC as owing Claimant ███ 6,313,027.55613159 DOT. In subsequent discussions with the undersigned, Debtors' counsel has confirmed that Debtors' objection to Claim No. 405 is limited to Claimant ███ calculation of the Late Fee, and further indicated that Debtors' position is Section III(b) of the SRI Master Loan Agreement requires a Late Fee of 1% *per annum*, calculated daily. As part of these discussions, the prospect of a consensual resolution has been raised, but to date not all parties have been willing to meaningfully pursue that alternative.

**B.  Short Statement of Reasons Objections to Filed Claims Should Be Overruled**

23. The Debtors' objections to the Filed Claims are substantially if not entirely premised on a single issue: does the language of the Master Loan Agreements and in particular

7

Section III(b) thereof impose a Late Fee of 1% *per day* (as maintained by Claimants) or 1% *per year* (as maintained by the Debtors)?

24. For reasons discussed in Section D below, governing contractual language calls the Late Fee to be calculated as 1% of the outstanding balance on the Loans *per day*. This calculation results from a plain reading of Section III(b), and supplies the ordinary and customary meaning to the pivotal term "annualized" as used therein and in adjacent sections of the Master Loan Agreements. Indeed, 1% per day is the only reasonable construction available. Section III(b) cannot be read to call for a Late Fee of 1% per year without torturing the structure of the provision and violating canons of contract construction.

25. Moreover, a Late Fee of 1% per year produces an absurd result under the circumstances. A Late Fee of 1% per year would have imposed an obligation on GAP and GGC to return an additional 0.00274% of the outstanding balance per day following their default until their respective Loans were repaid. These were short-term unsecured Loans of bearer assets that traded in a largely unregulated marketplace at a time of widespread speculation and volatility. Besides compensating Claimants for the risks they were taking and the opportunity costs of not having their digital assets timely returned, a key purpose of a sizeable compounding Late Fee was to encourage timely repayment by making a prolonged default economically painful for GAP and GGC. A Late Fee of 1% *per year* would not have accomplished this purpose.

26. Finally, extrinsic evidence, to the extent considered, would also support a 1% *per day* construction. For example, prior to November 2022, the Debtors frequently lent cryptocurrencies to third-party borrowers under agreements with terms substantially similar to the Master Loan Agreements. On the occasions when those borrowers defaulted, on information

8

and belief, the Debtors imposed Late Fees calculated in accordance with Claimants' 1% per day construction of Section III(b) here.

27. For these and other reasons set forth below, the Debtors' objections to the Filed Claims should be overruled.

C. **Factual Bases Upon Which Claimants May Rely; Potential For Evidentiary Hearing**

28. For reasons discussed in Section D below, Claimants submit the governing language of the Master Loan Agreements is unambiguous and supports their calculation of the Late Fee as a matter of law. Therefore, as a threshold matter, Claimants intend to rely on fact-based evidence or testimony only if the Court disagrees with Claimants' construction of the governing language, or otherwise prefers to sequence adjudication of the Filed Claims by having the parties establish evidentiary records to support their arguments in the alternative before it delves into the merits of the issues raised.

29. If, for any reason, the Court is unwilling or unable to quickly dispose of the Debtors' objections and allow the Filed Claims in full, Claimants intend to pursue contested matter discovery in accordance Fed. R. Bankr. P. 9014. For example, if the Court determines the governing language of the Master Loan Agreements is ambiguous and it will consider extrinsic evidence to resolve the Debtors' objections to the Filed Claims, Claimants intend to rely on, and would seek discovery to obtain or elicit, documents and testimony evidencing the intent of the contracting parties regarding calculation of the Late Fee. Without limitation, this would include documents and testimony Claimants have reason to believe would show that before and/or during these Chapter 11 cases (as the case may be), the Debtors:

9

    a. Have taken the position in connection with cryptocurrency loans in which GAP or GGC acted as lender (as opposed to borrower) and GAP or GGC was entitled to a Late Fee (i) based on a construction of the same or similar governing contractual language in accord with Claimants construction of Section III(b) of the Master Loan Agreements, and/or (ii) in an amount approaching or greater than 1% per day of the outstanding loan balance;

    b. Have revised (or contemplated revising) the Late Fee provision language in master loan agreements governing transactions in which GAP or GGC borrowed cryptocurrency to avoid potentially incurring a Late Fee of 1% per day, and/or

    c. Have agreed to allow (or not object to allowance of) late fee claims asserted by other cryptocurrency lenders under language identical or similar to Section III(b) of the Master Loan Agreements that such lenders calculated at 1% per day.

**D.**    <u>**Supporting Legal Arguments**</u>

    *i. Master Loan Agreements Unambiguously Provide for Late Fee of 1% per day*

30.    The key provision here, Section III(b) of the Master Loan Agreements, provides that for each day a Loan remains outstanding past its Maturity Date, GAP or GGC (as the case may be) incurs a Late Fee equal to "1% (annualized, calculated daily)" of all amounts that remain outstanding on the Loan. A contract that is clear and unambiguous on its face must be interpreted and enforced according to the plain meaning of its terms. <u>249-251 Brighton Beach Ave., LLC v. 249 Brighton Corp.</u>, 217 A.D.3d 809, 192 N.Y.S.3d 133 (2023) (citing <u>25 Bay

Terrace Assoc., L.P. v. Public Serv. Mut. Ins. Co., 194 A.D.3d 668, 148 N.Y.S.3d 484 (2021)). The term "annualized" means "to calculate or adjust to reflect a rate based on a full year." See Merriam-Webster Dictionary Online, annualize, https://www.merriam-webster.com/dictionary/annualized, last visited December 21, 2023. As used in finance, "annualized" refers to the conversion of a short-term rate into an annual rate. See, e.g., Russkaya Reklama, Inc. v. Milman, 47 Misc. 3d 88, 90, 9 N.Y.S.3d 759, 760 (N.Y. App. Term. 2015) (explaining that, because usury laws express the maximum interest chargeable on certain loans in terms of annual percentage rates, "For a short-term note, the annualized interest rate must be ascertained in order to assess whether the note is usurious"); id. (explaining note with stated interest rate of 2% per month "annualized, would result in a 24% annual interest rate"). Cf. West's Tax Law Dictionary § A2040 (Definition of Annualized Rate: "The rate of tax for a period of less than a year computed as though it were for a full year.").

31. Accordingly, a late fee formula in a short-term loan agreement calling for a numerical percentage rate to be "annualized" is a conspicuous and overwhelming indication that such numerical rate is based on a period of time shorter than a year. Here, by expressing the Late Fee as a function of "1% (annualized, calculated daily)", the parties were conspicuously and overwhelmingly indicating that 1% was *not* an annual percentage rate. In turn, the plain and only reasonable reading of Section III(b) is that after the Maturity Date, GAP/GGC shall incur a daily, compounding Late Fee equal 1% of the amount outstanding on each day such fee is assessed.

32. This reading is corroborated by adjacent provision in the Master Loan Agreements also using the term "annualized". Section III(a) provides that Lender (i.e. ▇ under the GAP Loan, and ▇ under the GGC Loan) is to calculate Loan Fees on a daily basis and that

11

the Loan Fees are to be annualized in the Term Sheet. Similarly, Section III(e) provides that any Loan Fee paid in digital currency shall be calculated daily "on any day that Loan Fee accrues." Holistically reading these subsections together, it is clear that the parties intended the Claimants to calculate the Late Fee as a 1% fee *each day* the Loans remains outstanding beyond maturity, not as a 1% annual fee.

33. By contrast, Section III(b) cannot be read to provide a 1% annual Late Fee without torturing the contractual language and violating basic canons of contract construction. If 1% as used in Section III(b) is already an annual rate, calling for that rate to be "annualized" would be redundant and nonsensical. Such reading would either render "annualized" superfluous, in conflict with the canon against surplusage. Such reading is not reasonable and cannot be used by the Debtors to create ambiguity where none exists.

34. Moreover, construing Section III(b) as a 1% annual Late Fee would also produce an absurd result under the circumstances. To state the obvious, both Loans were made in cryptocurrencies (USDC and DOT) – which are bearer assets that trade in a largely unregulated marketplace – at a time of widespread speculation and volatility. That such loans can commend high non-default interest rates relative to traditional commercial loans denominated in fiat currency, illustrates the inherent risk of engaging in cryptocurrency lending. Here, the Loan Fee of "8% annual" on the GAP Loan and "14% annual" on the GGC Loan are by no means outliers.[2] Furthermore, both Loans here were unsecured – neither Claimant could look to any collateral for recompense if GAP and GGC failed to honor their obligations (as ended up happening).

---

[2] What Is Crypto Lending, Embroker (last visited Dec. 17, 2023), (https://www.embroker.com/blog/what-is-crypto-lending/) ("The interest rates with crypto lending vary quite a bit, and what you receive will depend on the platform selected and the type of asset. The interest could be between 3% and 7% or as high as 17% with stablecoins").

12

35. Under these circumstances, two remaining interdependent risk-mitigating levers are available: short maturities and large late fees. A short maturity might minimize a borrower's exposure to market volatility of the asset loaned. But a short maturity that a borrower can ignore without triggering material negative consequences provides little comfort to a lender. As a result, crypto loans typically include a substantial, compounding late fee, a key purpose of which (in addition to compensating a lender for its assumed risk and lost opportunity costs) is to encourage timely repayment by making a prolonged default economically painful for the borrower.

36. At just 1% per annum, the Late Fee would have imposed an obligation on GAP and GGC following their defaults to return merely an additional 0.00274% of the outstanding balance per day until their respective Loans were repaid. Such a small rate arguably undermines the very purpose of the Loans having a Late Fee in the first place. For example, although both Loans here were relatively short term, the GGC Loan in particular was scheduled to mature on November 21, 2022, just 62 days after it was made. After GGC defaulted, it continued to hold ▮ loaned DOT for another 59 days before the bankruptcy filing – effectively doubling the term of the loan with negligible consequences in terms of additional DOT owing to ▮. By contrast, a Late Fee of 1% per day, compounded daily, imposed real consequences on GGC that would almost certainly have caused a borrower not in financial distress to timely repay the loan.

### ii. *Extrinsic Evidence, If Considered, Also Supports Late Fee of 1% per day*

37. In the alternative, if the Court determines the Section III(b) in the Master Loan Agreements is ambiguous, it can and should consider extrinsic evidence to determine the Late Fee calculation intended by the parties. Here, the Master Loan Agreements were forms supplied by the Debtors and the terms of the Late Fee were not specifically negotiated with Claimants.

Therefore, evidence not in Claimants' possession concerning the Debtors' development of those forms, and any changes they made over time to their late fee provision would be highly probative.

38.     As would the Debtors' lending and borrowing practices with other counterparties during the same time period.  As noted above, Claimants have reason to believe discovery will show that the Debtors (i) used agreements with similar late fee provisions when they lent digital assets to other borrowers, (ii) enforced those provisions consistent with Claimants' calculation of the Late Fees in their Filed Claims and/or asserted late fees against their borrowers approaching or exceeding 1% per day, and (iii) have agreed with other lender claimants asserting similar late fee claims to allow or not object to or seek disallowance of those claims.  If Claimants are permitted to develop an evidentiary record on these issues, the Court can resolve any ambiguities in the Late Fee provisions based on the Debtors' own past conduct and intentions, and they can lie in the bed that they have made.

E.     **Additional Documentation On Which Claimants Rely**

39.     In addition to the agreements, calculations and other information set forth in or exhibited to the Filed Claims, Claimants response relies upon the ▮ Demand Letter and the GAP representative's response thereto, as well as the ▮ Demand Letter and the GGC representative's responses thereto and to the reiterated written demand of ▮ counsel.  The undersigned provided copies of these letters and correspondence to Debtors' counsel on December 6, 2023, and upon request will provide copies of the same and/or the Filed Claims to the Court and/or counsel to the Official Committee of Unsecured Creditors.

F.  **Notices to Claimants**

40.  Consistent with the information set forth on the Filed Claims, the Debtors should provide their reply to this Response (if any) to Claimants undersigned counsel at the postal and email addresses provided. Likewise, the Debtors should have their counsel contact the undersigned if they wish to engage in discussions about potentially resolving their objections to the Filed Claims on a consensual basis.

## RESERVATION OF RIGHTS

41.  The Debtors' proposed plan expressly contemplates the partial allowance of claims for purposes of receiving distributions thereunder. See Amended Plan (ECF No. 989), at VI.A. By the Seventh Omnibus Claims Objection, the Debtors have objected to the Filed Claims only to the extent they exceed the amounts shown as owing to ▮ and ▮ by GAP and GGC, respectfully, on the Debtors' books and records, which amounts are set forth on Exhibit 2 to the Seventh Omnibus Claims Objection.

42.  Accordingly, to the extent hereafter the Debtors' objections to the Filed Claims have not been timely resolved and/or fully adjudicated such that they remain Disputed Claims (as defined in the Amended Plan) in their entirety, Claimants hereby expressly reserve the right to ask the Court, with or without the consent of the Debtors and/or other parties in interest, to enter an order (i) partially allowing the Filed Claims for purposes of receiving distributions under a confirmed plan in the amounts set forth on the Debtors' books and records, and (ii) preserving the parties' rights with respect to the portions of the Filed Claims that remain in dispute and are not being allowed for purposes of distribution at such time.

[REMAINDER OF PAGE INTENTIONLLY BLANK]

## CONCLUSION

For all the foregoing reasons, the Court should enter an order (i) overruling the Seventh Omnibus Claims Objection as it relates to the Filed Claim, (ii) allowing the Filed Claims on a final basis for all purposes in their full stated amounts, and (iii) granting such other relief as it deems just and proper.

Dated: Omaha, Nebraska
December 21, 2023

/s/ Jeremy C. Hollembeak
Jeremy C. Hollembeak
BAIRD HOLM, LLP
1700 Farnam Street
Suite 1500
Omaha, NE 68102-2068
Phone: 402-344-0500
jhollembeak@bairdholm.com

*Counsel to Claimants*
███████████████ and ██████

## CERTIFICATE OF SERVICE

I certify that on December 21st, 2023, I caused a copy of the foregoing document to be served by Electronic Case Filings System for the United States Bankruptcy Court for the Southern District of New York.

/s/ Jeremy C. Hollembeak
Jeremy C. Hollembeak
BAIRD HOLM, LLP
1700 Farnam Street
Suite 1500
Omaha, NE 68102-2068
Phone: 402-344-0500
jhollembeak@bairdholm.com