**Hearing Date and Time: February 1, 2024 at 11:00 AM (ET)**
**Response Deadline: January 23, 2024 at 4:00 PM (ET)**

Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

---

**THIS OBJECTION SEEKS TO DISALLOW AND
EXPUNGE CERTAIN FILED PROOFS OF CLAIM**

**PLEASE CAREFULLY REVIEW THE
ATTACHED OBJECTON AND THE ATTACHMENTS
THERETO TO DETERMINE WHETHER IT AFFECTS YOUR CLAIM(S)**

**IF YOU HAVE ANY QUESTIONS, PLEASE CONTACT DEBTORS' COUNSEL:
DEANDRA FIKE, ESQ., DFIKE@CGSH.COM OR KATHARINE ROSS, ESQ.,
KROSS@CGSH.COM**

---

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich St., 38th Floor, New York, NY 10007.

**NOTICE OF HEARING ON**
**DEBTORS' EIGHTEENTH**
**OBJECTION (NON-SUBSTANTIVE) TO**
**CERTAIN CLAIMS PURSUANT TO 11 U.S.C. § 502**
**AND FED. R. BANKR. P. 3007 (CO-LIABILITY CONTINGENT)**

      **PLEASE TAKE NOTICE** that on January 19, 2023 (the "Petition Date"), Genesis Global Holdco, LLC ("Holdco") and its debtor affiliates, as debtors and debtors-in-possession in the above-captioned chapter 11 cases (collectively, the "Debtors"),[2] each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court").

      **PLEASE TAKE FURTHER NOTICE** that on January 2, 2024, the Debtors filed the *Debtors' Eighteenth Omnibus Objection (Non-Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007(Co-Liability Contingent)* (the "Objection"). A hearing (the "Hearing") on the Objection will be held before the Honorable Sean H. Lane, United States Bankruptcy Judge in the United States Bankruptcy Court for the Southern District of New York, 300 Quarropas Street, White Plains, NY 10610 pursuant to the *Order Implementing Certain Notice and Case Management Procedures* (ECF No. 44) (the "Case Management Order") and the *Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 3007 (I) Establishing Claims Objection and Notice Procedures, (II) Establishing Claim Hearing Procedures and (III) Granting Related Relief* (ECF No. 498) (the "Claims Procedures Order"). The Hearing will commence on **February 1, 2024, at 11:00 A.M. (Prevailing Eastern Time)**, and will be conducted through Zoom for government. Pursuant to the Claims Procedures Order, the Debtors reserve the right to adjourn the Hearing in their sole discretion on further notice. Claims Procedures Order at 3.

      **PLEASE TAKE FURTHER NOTICE** that parties wishing to register for the Zoom hearing should use the eCourt Appearances link on the Court's website: https://www.nysb.uscourts.gov/ecourt-appearances. After the deadline to make appearances passes, the Court will circulate by email prior to the Hearing the Zoom links to those persons who made eCourt Appearances, using the email addresses submitted with those appearances. Members of the public who wish to listen to, but not participate in, the Hearing free of charge may do so by calling the following muted, listen-only number: 1-929-205-6099, Access Code: 92353761344#.

      **PLEASE TAKE FURTHER NOTICE** that any objections or responses ("Responses"), if any, to the Objection or the relief requested therein shall be made in writing, filed with the Court no later than **January 23, 2024, at 4:00 P.M. (Prevailing Eastern Time)** (the "Response Deadline"), and served as required by the Case Management Order.

      **PLEASE TAKE FURTHER NOTICE** that if no Responses are timely filed and served with respect to the Objection, the Debtors may, on or after the Response Deadline, submit

---

[2]     Holdco, and its Debtor and non-Debtor subsidiaries are collectively referred to as the "Company".

to the Bankruptcy Court an order substantially in the form annexed as **Exhibit A** to the Objection, which order the Court may enter with no further notice or opportunity to be heard.

**PLEASE TAKE FURTHER NOTICE** copies of the Objection can be viewed and/or obtained by: (i) accessing the Court's website at www.nysb.uscourts.gov, or (ii) from the Debtors' notice and claims agent, Kroll Restructuring Administration located at One Grand Central Place, 60 East 42nd Street, Suite 1440, New York, New York 10165, at https://restructuring.ra.kroll.com/genesis or by calling +1 212 257 5450. Note that a PACER password is needed to access documents on the Court's website.

**PLEASE TAKE FURTHER NOTICE** that the Hearing may affect your rights. Please read the Objection carefully and, if you have one available, discuss it with your attorney. (If you do not have an attorney, you should consider consulting with one.)

**PLEASE TAKE FURTHER NOTICE** that if you oppose the relief requested in the Objection, or if you want the Court to hear your position on the Objection, then you or your attorney must attend the Hearing. If you or your attorney do not follow the foregoing steps, the Court may decide that you do not oppose the relief requested in the Objection and may enter orders granting the relief requested by the Debtors.

Dated:    January 2, 2024
          New York, New York

*/s/ Luke A. Barefoot*
Sean A. O'Neal
Luke A. Barefoot
Jane VanLare
Thomas S. Kessler
CLEARY GOTTLIEB STEEN &
HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to the Debtors*
*and Debtors-in-Possession*

**Hearing Date and Time: February 1, 2024 at 11:00 AM (ET)**
**Response Deadline: January 23, 2024 at 4:00 PM (ET)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |

**DEBTORS' EIGHTEENTH
OBJECTION (NON-SUBSTANTIVE) TO
CERTAIN CLAIMS PURSUANT TO TO 11 U.S.C. § 502 AND
FED. R. BANKR. P. 3007 (CO-LIABILITY CONTINGENT)**

TO THE CLAIMANTS LISTED ON <u>EXHIBIT 1</u> TO THE PROPOSED
ORDER OF THIS OBJECTION:

- **THIS OMNIBUS OBJECTION SEEKS TO DISALLOW AND EXPUNGE CERTAIN FILED PROOFS OF CLAIM.**

- **CLAIMANTS RECEIVING THIS OBJECTION SHOULD LOCATE THEIR NAMES AND CLAIMS ON <u>EXHIBIT 1</u> TO THE PROPOSED ORDER.**

- **YOUR RIGHTS MAY BE AFFECTED BY THIS OBJECTION AND BY ANY FURTHER OBJECTION(S) THAT MAY BE FILED BY THE DEBTORS.  YOUR CLAIM(S) MAY BE DISALLOWED, EXPUNGED, RECLASSIFIED, REDUCED, OR OTHERWISE AFFECTED AS A RESULT OF THIS OBJECTION.  THEREFORE, PLEASE READ THIS OBJECTION CAREFULLY AND DISCUSS IT WITH YOUR ATTORNEY.  IF YOU DO NOT HAVE AN ATTORNEY, YOU MAY WISH TO CONSULT ONE.**

- **THE RELIEF SOUGHT HEREIN IS WITHOUT PREJUDICE TO THE DEBTORS' RIGHTS, CONSISTENT WITH PRIOR COURT ORDERS, TO PURSUE FURTHER SUBSTANTIVE OR NON-**

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich St., 38th Floor, New York, NY 10007.

**SUBSTANTIVE OBJECTIONS AGAINST THE CLAIMS LISTED
ON <u>EXHIBIT 1</u> TO THE PROPOSED ORDER.**

Genesis Global Holdco, LLC ("<u>Holdco</u>") and its affiliated debtors and debtors-in-possession in the above-captioned cases (collectively, the "<u>Debtors</u>," and these cases, the "<u>Chapter 11 Cases</u>") hereby object to and incorporate by reference those certain claims listed on <u>Exhibit 1</u> (the "<u>Contingent Claims</u>") to the proposed order, substantially in the form attached hereto as <u>Exhibit A</u> (the "<u>Proposed Order</u>"), pursuant to section 502 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), Rule 3007 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") and the *Revised Order Pursuant to 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 3007 (I) Establishing Claims Objection and Notice Procedures, (II) Establishing Claim Hearing Procedures and (III) Granting Related Relief* (ECF No. 498) (the "<u>Claims Objection Procedures Order</u>") and seek entry of the Proposed Order disallowing and expunging the Contingent Claims.  In support of this Objection, the Debtors submit the *Declaration of Brad Lenox in Support of the Debtors' Eighteenth Omnibus Objection (Non-Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007(Co-Liability Contingent)* (the "<u>Lenox Declaration</u>"), attached hereto as <u>Exhibit B</u> and incorporated by reference, and respectfully state as follows:

<u>**Jurisdiction**</u>

1.      The United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York dated January 31, 2012 (Preska, C.J.).  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  The

statutory bases for the relief requested herein are Bankruptcy Code sections 105 and 502, and Bankruptcy Rule 3007.

## **Background**

### A.    **Procedural History**

2.      On January 19, 2023, the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the date of such filing, the "Petition Date") with the Court. The Debtors continue to operate their businesses and manage their properties as debtors-in-possession under sections 1107(a) and 1108 of the Bankruptcy Code.  The Chapter 11 Cases are jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b) and the *Order Directing Joint Administration of the Related Chapter 11 Cases* (ECF No. 37).  No trustee or examiner has been appointed in the Chapter 11 Cases.  On February 3, 2023, an official committee of unsecured creditors (the "Committee") was appointed in the Chapter 11 Cases pursuant to the *Notice of Appointment of Official Committee of Unsecured Creditors* (ECF No. 55).

3.      On March 21, 2023, each Debtor filed its *Summary of Assets and Liabilities* (ECF Nos. 145, 146, and 147) and *Statement of Financial Affairs* (ECF Nos. 142, 143 (as amended by ECF No. 450), and 144) (the "Schedules" and "Statements," respectively).

4.      On April 4, 2023, the Court granted the *Order (I) Establishing Bar Dates for Submitting Proofs of Claim, (II) Approving Proof of Claim Form, Bar Date Notices, and Mailing and Publication Procedures, (III) Implementing Uniform Procedures Regarding 503(b)(9) Claims, and (IV) Providing Certain Supplemental Relief* (ECF No. 200) (the "Bar Date Order"), which established May 22, 2023 as the general date by which most creditors have submitted their proofs of claim (the "General Bar Date").

5.      The General Bar Date passed on May 22, 2023.  As of January 1, 2024, 1,302 proofs of claim have been filed against the Debtors.

**B.      The Claims Resolution Process**

6.      In the ordinary course of business, the Debtors maintain books and records (the "Books and Records") that reflect, among other things, the Debtors' liabilities and the amounts owed to their creditors.

7.      The Debtors' Claims agent, Kroll Restructuring Administration (the "Claims Agent"), has prepared and maintains a register (the "Claims Register") of proofs of claim (each a "Proof of Claim") that were filed in these Chapter 11 Cases asserting claims against the Debtors (collectively, the "Claims," and each holder of a Claim, a "Claimant").  Pursuant to the *Stipulation and Confidentiality Agreement and Protective Order* (ECF No. 328) (the "Protective Order"), the Court's *Memorandum of Decision* (ECF No. 581) (the "Redaction Decision"), and the *Order Granting the Debtors' and the Official Committee of Unsecured Creditors' Motions for Entry of an Order Requiring the Redaction of Certain Personally Identifiable Information* (ECF No. 694) (the "Redaction Order"), much of that information is maintained under seal to protect the confidentiality of the Debtors' creditors.  The Debtors and their advisors are comprehensively reviewing and reconciling all claims, including both the claims listed on the Schedules ("Scheduled Claims") and the Claims asserted in the Proofs of Claim (including any supporting documents).  The Debtors are also comparing the Claims asserted in the Proofs of Claim with their Books and Records to determine the validity of the asserted Claims.

8.      The reconciliation process includes identifying particular categories of claims that may be targeted for disallowance, reduction and allowance or reclassification and allowance.  To reduce the number of Claims, and to avoid possible double recovery or otherwise improper recovery by Claimants, as well as unnecessary duplication or noise in the voting pool in respect

of the Debtors' ongoing solicitation, the Debtors will continue to file omnibus objections to such categories of claims if and where warranted. This Objection is one such omnibus objection.

9.      On July 12, 2023, the Court entered the Claims Objection Procedures Order granting the Debtors relief from certain requirements of Bankruptcy Rule 3007. The Debtors submit that this Objection and the notice provided to the Claimants in connection herewith are consistent with the Claims Objection Procedures Order, the Bankruptcy Code and the Bankruptcy Rules.

**C.      Facts Relevant to This Objection**

10.      On January 23, 2023, certain individuals filed a class action complaint (the "Securities Plaintiffs"), captioned *William McGreevy, Ashwin Gowda, Translunar Crypto LP, Christopher Buttenham, and Alex Sopinka v. Digital Currency Group, Inc., and Barry Silbert*, Case No. 3:23-cv-00082 (the "Securities Litigation"), in the United States District Court for the District of Connecticut (the "Connecticut District Court"). On November 13, 2023, the Securities Plaintiffs filed an amended complaint in the Securities Litigation at ECF No. 135 (the "Amended Complaint").[2] Certification of the proposed class is currently pending before the Connecticut District Court.

11.      The Amended Complaint names as co-defendants each of Digital Currency Group, Inc., the ultimate corporate parent of the Debtors ("DCG"), Barry Silbert, founder and Chief Executive Officer of DCG ("Mr. Silbert"), and Soichiro "Michael" Moro ("Mr. Moro," and together with Mr. Silbert, the "Contingent Claimants"), former Chief Executive Officer of Genesis Global Capital, LLC ("GGC").[3]

---

[2]      A true and correct copy of the Amended Complaint is attached as Exhibit 1 to the Lenox Declaration.

[3]      The Debtors are not named as defendants in the Securities Litigation, and the Amended Complaint states that "[b]ut for Genesis Global Capital's bankruptcy, it would have been named as a defendant . . . ." Securities Litigation, ECF No. 135, ¶ 24.

12.     Each of the named plaintiffs in the Securities Litigation (the "Litigation Plaintiffs") have filed Claims against the Debtors based on purported liabilities arising out of the causes of action asserted in the Securities Litigation, both in their individual capacities and as proposed lead plaintiffs on behalf of the purported class.  *See* proofs of claim numbers 344, 346, 347, 354, 359, 361, 366, 370, 372, 374, 376, 377, 378, 381, 382, 423, 425, and 427 (collectively, the "Plaintiff Claims").[4]

13.     Mr. Silbert has filed proofs of claim numbers 472 ("Claim No. 472"), 483 ("Claim No. 483") and 501 ("Claim No. 501" and together with Claim No. 472 and Claim No. 483, the "Silbert Claims"), which are listed in Exhibit 1 to the Proposed Order, asserting identical liabilities against each of the Debtors.  The Silbert Claims state that the Securities Litigation seeks to hold Mr. Silbert liable for the Debtors' purported conduct under a theory of control person liability.  Claim No. 472 ¶ 6, Claim No. 483 ¶ 6, Claim No. 501 ¶ 6.  The Silbert Claims further assert that should Mr. Silbert be found liable in the Securities Litigation, Mr. Silbert "may be entitled to payment from the Debtors arising from common law and/or statutory claims, including without limitation, rights to contribution under 15 U.S.C. § 78u-4(f)(5)."  *See* Claim No. 472 ¶ 6, Claim No. 483 ¶ 6, Claim No. 501 ¶ 6.

14.     Mr. Moro has filed proofs of claim numbers 375 ("Claim No. 375"), 398 ("Claim No. 398") and 408 ("Claim No. 408" and together with Claim No. 375 and Claim No. 398, the "Moro Claims"), which are listed together with the Silbert Claims (jointly, the "Contingent Claims") in Exhibit 1 to the Proposed Order, asserting identical liabilities against each of the Debtors.  The Moro Claims provide that Mr. Moro has "rights of contribution, indemnification, reimbursement and subrogation under applicable law and, upon information and belief, each

---

[4]     For the avoidance of doubt, the Objection does not seek any relief with respect to the Plaintiff Claims, against which the Debtors expressly reserve all rights and defenses.

Debtor's bylaws" and that "as a result of his various roles with various Genesis entities" has incurred $535,273.42 in defense costs (the "Defense Costs") as of May 17, 2023 in connection with "pending lawsuits, investigations, and disputes" for which he is "entitled to, among other things, indemnity." *See* Claim No. 375 ¶¶ 6-8, Claim No. 398 ¶¶ 6-8, Claim No. 408 ¶¶ 6-8. The Moro Claims further provide that Mr. Moro expects to incur additional defense costs for similar matters which may arise in the future. *See* Claim No. 375 ¶ 7, Claim No. 398 ¶¶ 7, Claim No. 408 ¶ 7.

## Relief Requested

15.    For the reasons set forth below, the Debtors object to each of the Contingent Claims.   By this Objection, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit C, disallowing, pursuant to section 502(e)(1)(B) of the Bankruptcy Code and Bankruptcy Rule 3007, each of the Contingent Claims to the extent that they assert claims for amounts that may accrue in the future but that are currently contingent.

## Legal Bases for Objection

16.    When asserting a proof of claim against a bankruptcy estate, a claimant must allege facts that, if true, would support a finding that a debtor is legally liable to a claimant. *See In re Avaya, Inc.*, 608 B.R. 366, 369-70 (Bankr. S.D.N.Y. 2019).   Where a claimant alleges sufficient facts to support a claim, that claim is afforded *prima facie* validity. *See id.*   A party wishing to dispute such claim must produce evidence in sufficient force to negate that claim's *prima facie* validity. *Id.*   Once an objecting party produces such evidence, the burden shifts back to the claimant to prove the validity of the claim by a preponderance of the evidence. *Id.*   The burden of persuasion is always on the claimant. *Id.*

17.     For the reasons set forth below, the Contingent Claims do not meet the standards for *prima facie* validity and, to avoid impermissible or unwarranted recoveries, the Debtors request that the Court disallow or expunge, as applicable, each of the Contingent Claims as set forth in <u>Exhibit</u> 1 to the Proposed Order.[5]

**A.     The Moro Claims should be disallowed under section 502(b) and the Claims Objection Procedures Order because they fail to sufficiently specify the basis for the alleged liability.**

18.     At the outset, the Debtors assert that the Moro Claims should be disallowed given that they provide insufficient information to support the alleged liability against the Debtors. Section 502(b)(1) of the Bankruptcy Code provides that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).  The Claims Objection Procedures Order permit the Debtors to file an objection to more than one claim on non-substantive bases, such as because such claims "fail[] to sufficiently specify the basis for the claim[.]"  Claims Objection Procedures Order ¶ 1(a)(v).

19.     The Debtors have reviewed the Moro Claims and determined that they fail to sufficiently specify the basis for the alleged liability.  The Moro Claims do not contain any information sufficient for the Debtors to determine the source of the alleged liability beyond vague reference to "pending lawsuits, investigations, and disputes", none of which are identified by name.  The Debtors therefore submit that the Moro Claims do not meet the standards for *prima facie* validity and should be dismissed to avoid impermissible or improper recoveries against the Debtors and their estates.  In the alternative, the Debtors assert the Moro Claims

---

[5]     In addition to the other bases for disallowance set forth herein, each of the Claimants have filed nearly identical claims against each of the Debtors without specifying the basis for liability against each of the Debtors, as to certain of which, the Claimants had no relationship and/or such Debtors had no involvement or role in the allegations at issue in the Securities Litigation.  This provides an independent basis for disallowance of certain of the Claims.

should be independently disallowed under section 502(e)(1)(b) given that, other than the Defense

Costs, they assert contingent claims for secondary liability, as further discussed below.

**B.      The Contingent Claims should be disallowed under section 502(e)(1)(B) because they assert contingent claims for secondary liability.**

20.      Section 502(e)(1)(B) of the Bankruptcy Code provides that courts "shall disallow

any claim for *reimbursement or contribution* of an *entity that is liable with the debtor* on or has

secured the claim of a creditor, to the extent that . . . such claim for reimbursement or

contribution is *contingent as of the time of allowance or disallowance* of such claim for

reimbursement or contribution." 11 U.S.C § 502(e)(1)(B) (emphasis added). At bottom, the

purpose of section 502(e)(1)(B) is to keep the bankruptcy estate from becoming "burdened by

estimated claims contingent in nature." *In re Drexel Burnham Lambert Grp. Inc*., 148 B.R. 982,

987 (Bankr. S.D.N.Y. 1992) (quotations omitted). Such burdens may result in delays to the

consummation of an ultimate plan of reorganization. *See In re GCO Servs., LLC*, 324 B.R. 459,

466-67 (Bankr. S.D.N.Y. 2005). Further, Congress enacted this provision in order to prevent

competition between a primary and a secondary creditor for the "limited proceeds in the estate."

*In re Wedtech Corp.*, 85 B.R. 285, 289 n.4 (Bankr. S.D.N.Y. 1988) (quoting H.R. Rep. No. 95-

595, 95th Cong., 1st Sess. 354 (1977)). By permitting debtors to disallow the contingent claims

of secondary creditors, section 502(e)(1)(B) protects debtors from having to make duplicative

distributions of estate assets. *See In re WorldCom Inc. Sec. Litig.*, 293 B.R. 308, 323 (S.D.N.Y.

2003) (citing *Aetna Cas. & Sur. Co. v. Ga. Tubing Corp.*, 93 F.3d 56, 57 (2d Cir. 1996)).

21.      Section 502(e)(1)(B) requires a debtor to establish three elements before a court

will disallow a claim. "First, the claim must be for reimbursement or contribution. Second, the

party asserting the claim must be 'liable with the debtor' on the claim. Third, the claim must be

contingent at the time of its allowance or disallowance." *In re Drexel Burnham Lambert Grp.
Inc.*, 148 B.R. at 985. A claim that satisfies all three of these elements must be disallowed.

22.     Section 502(e)(1)(B) broadly defines reimbursement and contribution. *See, e.g.*,
*In re Wedtech Corp.*, 87 B.R. at 287 (reimbursement "encompasses whatever claims a co-debtor
has which entitle him to be made whole for monies he has expended on account of a debt for
which he and the debtor are both liable."). Contractual liability is not required. *Id.* Further, the
phrase "liable with the debtor" is "broad enough to encompass any type of liability shared with
the debtor, whatever its basis." *In re Drexel Burnham*, 148 B.R. at 986. Finally, a claim is
"contingent" until a claimant's "liability is established . . . and the co-debtor has paid the
creditor." *Id.* at 987.

> a)     <u>The Contingent Claims seek contribution from the Debtors</u>

23.     Through the Contingent Claims, the Contingent Claimants seek contribution from
the Debtors in connection with the Securities Litigation.[6] None of the Debtors are parties to the
Securities Litigation, and none of the Contingent Claims include any claims for obligations
purportedly owed by the Debtors to the Contingent Claimants directly; in other words, any
obligations that the Debtors may have with respect to the Contingent Claims are entirely
derivative. That the Contingent Claims are for contribution or reimbursement is not disputed by
the Contingent Claimants; the Contingent Claims specifically provide that the Contingent
Claimants may be entitled to payment from the Debtors arising from common law and/or

---

[6]     Although, as discussed in Section A, the Moro Claims do not specify the exact lawsuits, investigations or
disputes in which Mr. Moro is involved and seeks contribution from the Debtors, the Debtors are aware that Mr.
Moro is at least a named defendant in the Securities Litigation. If the Moro Claims are not disallowed on the basis
of no liability, to the extent that Mr. Moro's asserted claims for contribution, indemnification, reimbursement and/or
subrogation are based on lawsuits, investigations or disputes other than the Securities Litigation, the Debtors
respectfully submit that it is likely that the regulators or counterparties pursuing such lawsuits, investigations or
disputes have also filed Claims against the Debtors in these Chapter 11 Cases.

statutory claims, including without limitation, rights to contribution, indemnification, reimbursement and subrogation. *See* Contingent Claims ¶ 6.

24.    Accordingly, because each of the Contingent Claims represent claims for contribution in the event the Contingent Claimants are found liable in the Securities Litigation for the Debtors' actions, the Debtors have satisfied the first element required for disallowance under section 502(e)(1)(B).

b)    <u>The Contingent Claimants assert they are co-liable with the Debtors with respect to the Securities Litigation</u>

25.    The Contingent Claimants contend that they are co-liable with the Debtors.[7] The Contingent Claims seek contribution and reimbursement in the event the Contingent Claimants are found liable in the Securities Litigation, and these assertions are only possible if the Contingent Claimants and the Debtors are liable together for the underlying claims in the first place. Indeed, any assertion of a reimbursement or contribution claim is necessarily predicated upon purported co-liability with the debtor. *See In re Drexel Burnham*, 146 B.R. at 101 ("By its nature a claim for contribution presupposes a sharing of liability and thus a codebtor relationship.") As set forth in the Contingent Claims, the Contingent Claimants do not dispute that they believe that they are co-liable with the Debtors. *See* Claim No. 472 ¶ 6 (stating the Securities Litigation seeks to hold Mr. Silbert liable for the Debtors' conduct under a theory of control person liability); Claim No. 483 ¶ 6 (same); Claim No. 501 ¶ 6 (same); Claim No. 375 ¶ 7 (stating Mr. Moro has incurred defense costs and may occur future defense costs in connection with pending lawsuits, investigations and disputes as a result of his various roles with various Genesis entities); Claim No. 398 ¶ 7 (same); Claim No. 408 ¶ 7 (same).

---

[7]    Further, the Amended Complaint specifically states that, but for the filing of the Chapter 11 Cases, the Debtors would be named as defendants to the Securities Litigation.

26.     The Contingent Claimants assert that they are co-liable with the Debtors, and, as noted above, the Litigation Plaintiffs (and likely any other regulatory or counterparty that has initiated a lawsuit, investigation or dispute against Mr. Moro other than the Securities Litigation) have filed Claims against the Debtors in these Chapter 11 Cases asserting the same purported liabilities as the Contingent Claims.  Accordingly, the Debtors have satisfied the second element required for disallowance under section 502(e)(1)(B).

c)     The Contingent Claims, absent certain exceptions, are entirely contingent

27.     The Contingent Claims assert liability for potential future payments in the event the Contingent Claimants are found liable in the Securities Litigation.  A claim is contingent until the claimant has both incurred liability and made payment on that liability.  *See In re Drexel Burnham Lambert*, 148 B.R. at 987.  Further, a claim is contingent "if the debtor's legal duty to pay does not come into existence until triggered by the occurrence of a future event."  *Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 580 (S.D.N.Y. 2001) (citing *Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 303 (2d Cir. 1997)).

28.     No judgment has been entered in the Securities Litigation against the Contingent Claimants, nor have the Contingent Claimants executed a settlement agreement or paid any amounts to the plaintiffs in connection with the Securities Litigation.  Further, to the extent that the Contingent Claims assert liability for future payments, the amounts, timing and quantum of any such costs are purely speculative.  The Contingent Claimants also do not dispute that the amounts asserted in the Contingent Claims are indeterminate and contingent.  *See* Claim No. 472 ¶ 6 (stating "if [the Claimant] is found liable in the Securities Class Action, [the Claimant] may be entitled to payment from the Debtors"); Claim No. 483 ¶ 6 (same); Claim No. 501 ¶ 6 (same); *see also* Claim No. 375 ¶ 7 (stating that Mr. Moro "expects to incur additional Defense Costs for

similar matters which may arise in the future . . . for which he will also be entitled to, among other things, indemnity"); Claim No. 398 ¶ 7 (same); Claim No. 408 ¶ 7 (same).

29.     The Moro Claims additionally assert that Mr. Moro has already incurred certain Defense Costs (as defined in the Moro Claims).  The Defense Costs, as initially set forth in each of the Moro Claims (*see* Claim No. 375 ¶ 8; Claim No. 398 ¶ 8; and Claim No. 408 ¶ 8) are further set forth in <u>Exhibit 1</u> to the Proposed Order attached hereto.  In this Objection, the Debtors do not seek to disallow the Defense Costs to the extent that such amounts have actually been incurred and are thus non-contingent, but nothing herein shall constitute or be construed as a waiver of the Debtors' ability to assert further objections on all grounds, whether legal, factual, procedural, substantive or non-substantive, and all defenses to the allowance of the Defense Costs, and/or equitable subordination of such claims, all of which are expressly reserved.

30.     In sum, because the entirety of the Contingent Claims, other than the Defense Costs, are contingent, the Debtors have satisfied the third and final element required for disallowance under section 502(e)(1)(B).

**Separate Contested Matters**

31.     To the extent that a response is filed regarding the Contingent Claims and the Debtors are unable to resolve the response, such Contingent Claim and the objection by the Debtors to such claim asserted herein, shall constitute a separate contested matter as contemplated by Bankruptcy Rule 9014.  Any order entered by the Court regarding an objection asserted in this Objection shall be deemed a separate order with respect to each Contingent Claim.

## Responses to Omnibus Objection

29.     To contest this Objection, a Claimant must file and serve a written response to this Objection (a "Response") so that it is received no later than **4:00 P.M.** (prevailing Eastern Time) on **January 23, 2024** (the "Response Deadline").  Every Response must be filed electronically with the Court on the docket of *In re Genesis Global Holdco, LLC*, Case No. 23-10063 (the "Docket") and served upon the following entities so that the Response is received no later than the Response Deadline, at the following addresses:

> Cleary Gottlieb Steen & Hamilton LLP
> One Liberty Plaza
> New York, New York 10006
> Attn:  Sean O'Neal, Esq., Luke A. Barefoot, Esq., Jane VanLare, Esq. and
> Thomas S. Kessler, Esq.
> soneal@cgsh.com, lbarefoot@cgsh.com, jvanlare@cgsh.com and
> tkessler@cgsh.com
>
> -and-
>
> Genesis Global Holdco, LLC
> 175 Greenwich St., 38th Fl.
> New York, NY 10007
> Attn: Arianna Pretto-Sakmann
> Arianna@Genesistrading.com
>
> -and-
>
> White & Case LLP
> 1221 Avenue of the Americas
> New York, NY 10020
> Attn: Philip Abelson, Esq.
> philip.abelson@whitecase.com
>
> -and-
>
> Bankruptcy Court of the Southern District of New York
> Chambers of Judge Sean H. Lane
> 300 Quarropas Street
> White Plains, NY 10610
> Attn: Chambers of Judge Sean H. Lane

30.     Every Response to this Objection must contain, at minimum, the following information:

> a.      A caption identifying the name of the Bankruptcy Court, the names of the Debtors, the case number and the title of the Objection to which the Response is directed;
>
> b.      The name of the Claimant and description of the basis for the Claim;
>
> c.      The specific factual basis and supporting legal argument upon which the party will rely in opposing this Objection;
>
> d.      A short statement describing the reasons for which the Claim should not be disallowed as set forth in the Objection
>
> e.      Additional documentation or other evidence upon which the Claimant relies in opposing the Objection (if it was not included with the Proof of Claim previously filed with the Court);
>
> f.      The address(es) to which the Debtors must return any reply to the Claimant's Response, if different from that presented in your Proof of Claim; and
>
> g.      The name, address, and telephone number of the person (which may be the Claimant or its legal representative) holding ultimate authority to resolve the Claim on the Claimant's behalf.

32.     If a Claimant fails to file and serve a timely Response by the Response Deadline, the Debtors may present to the Court an appropriate order disallowing or modifying the Contingent Claim, without further notice to the Claimant or a hearing.

### Replies to Responses

33.     The Debtors may, at their option, file and serve a reply to any Response no later than two (2) business days prior to the Hearing.

### Adjournment of Hearing

34.     The Debtors reserve the right to adjourn the Hearing on any Responses to this Objection.  In the event that the Debtors notice such an adjournment, it will be noted on the

notice of agenda for the Hearing, and such agenda will be served on the affected Claimants by serving the person designated in the Response.

### **Reservation of Rights**

35.     The Debtors expressly reserve the right to amend, modify or supplement this Objection.  Should the grounds of objection stated in this Objection be dismissed or overruled, the Debtors reserve the right to object to each of the Contingent Claims on any other grounds that the Debtors discover or elect to pursue.  This Objection sets out non-substantive objections to each of the Contingent Claims identified on Exhibit 1 to the Proposed Order.  The Debtors reserve their right to assert other non-substantive objections and/or one or more substantive objections to the Contingent Claims set forth on Exhibit 1 at a later time, to the extent consistent with the Claims Objection Procedures Order.

36.     Notwithstanding anything contained in this Objection or the attached exhibits, nothing herein shall be construed as a waiver of any rights that the Debtors may have to (a) commence avoidance actions under the applicable sections of the Bankruptcy Code, including, but not limited to, sections 547 and 548 of the Bankruptcy Code, against the Claimants subject to this Objection, (b) enforce the Debtors' rights of setoff against the Claimants relating to such avoidance actions or (c) seek disallowance pursuant to Bankruptcy Code Section 502(d) of each of the Contingent Claims that are subject to such avoidance actions.

**Notice**

37.     The Debtors have provided notice of this Objection in accordance with the procedures set forth in the *Order Implementing Certain Notice and Case Management Procedures* (ECF No. 44) (the "Case Management Order").   The Debtors respectfully submit that no other or further notice need be provided

**No Prior Request**

38.     No prior request for the relief requested herein has been made to this or any other Court.

*[The remainder of this page is left blank intentionally].*

WHEREFORE, for the reasons set forth herein the Debtors respectfully request that this

Court (a) enter the Proposed Order and (b) grant such other and further relief as is just and

proper.

Dated:      January 2, 2024                    */s/ Luke A. Barefoot*
            New York, New York                 Sean A. O'Neal
                                               Luke A. Barefoot
                                               Jane VanLare
                                               Thomas S. Kessler
                                               CLEARY GOTTLIEB STEEN &
                                               HAMILTON LLP
                                               One Liberty Plaza
                                               New York, New York 10006
                                               Telephone: (212) 225-2000
                                               Facsimile: (212) 225-3999

                                               *Counsel to the Debtors and*
                                               *Debtors-in-Possession*

# <u>EXHIBIT A</u>

## Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |

### ORDER GRANTING
### DEBTORS' EIGHTEENTH
### OMNIBUS OBJECTION (NON-SUBSTANTIVE)
### TO CERTAIN CLAIMS PURSUANT TO 11 U.S.C. § 502
### AND FED. R. BANKR. P. 3007 (CO-LIABILITY CONTINGENT)

Upon the *Debtors' Eighteenth Omnibus Objection (Non-Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed. R. Bankr. P. 3007(Co-Liability Contingent)* (the "Objection")[2] filed by the debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), requesting an order pursuant to section 502(e)(1)(B) of the Bankruptcy Code and Bankruptcy Rule 3007 disallowing or expunging, as applicable, each of the Contingent Claims to the extent set forth in Exhibit 1 attached hereto; and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the Southern District of New York dated January 31, 2012; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that the Court may enter a final order consistent with Article III of the United States Constitution; and the Court having found that venue of this proceeding and the Objection in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

[2]     Capitalized terms used, but not otherwise defined, herein shall have the meanings set forth in the Objection.

found that the relief requested in the Objection is in the best interests of the Debtors, their

estates, their creditors and other parties in interest; and the Court having found that the Debtors'

notice of the Objection and opportunity for a hearing on the Objection was appropriate and no

other notice need be provided; and the Court having reviewed the Objection and having heard

the statements in support of the relief requested therein at a hearing before the Court (the

"Hearing"); and the Court having determined that the legal and factual bases set forth in the

Objection and on the record of the Hearing establish just cause for the relief granted herein; and

all responses to the Objections (if any) having been withdrawn or overruled; and upon all of the

proceedings had before the Court; and after due deliberation and sufficient cause appearing

therefor;

IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      The Objection is GRANTED with respect to each of the Contingent Claims

identified on Exhibit 1 attached hereto.

2.      The Silbert Claims are for reimbursement or contribution with the meaning of

section 502(e)(1)(B) of the Bankruptcy Code.

3.      Mr. Silbert asserts that he is co-liable with the Debtors, within the meaning of

section 502(e)(1)(B) of the Bankruptcy Code, with respect to the Securities Litigation and/or

other relevant investigations or proceedings.  Moreover, the Securities Plaintiffs and other parties

have filed proofs of claim against the Debtors for claims arising from the same underlying

claims.

4.      The Silbert Claims are contingent within the meaning of section 502(e)(1)(B) of

the Bankruptcy Code as of the date hereof, including, without limitation, any defense costs not

yet incurred or paid as of the date of entry of this Order.

5.      The Contingent Claims are disallowed in full and shall be automatically expunged from the Claims Register.

6.      This Order shall be deemed a separate Order with respect to each of the Contingent Claims identified on Exhibit 1 attached hereto.  Any stay of this Order pending appeal by the Claimant whose Claims are subject to this Order shall only apply to the contested matter which involves such Claimant and shall not act to stay the applicability and/or finality of this Order with respect to the other contested matters listed in the Objection or this Order.

7.      The Debtors, the Debtors' claims agent, Kroll Restructuring Administration LLC, and the clerk of this Court are authorized to take all actions necessary and appropriate to give effect to this Order, including updating the Claims Register to reflect the relief granted herein.

8.      Except as provided in this Order, nothing in this Order shall be deemed (i) an admission or finding as to the validity of any Claim against a Debtor, (ii) a waiver of the right of the Debtors to dispute any Claim against any Debtor on any grounds whatsoever at a later date, (iii) a promise by or requirement on any Debtor to pay any Claim, or (iv) a waiver of the rights of the Debtors under the Bankruptcy Code or any other applicable law.

9.      This Court shall retain jurisdiction over any and all issues arising from or related to the implementation and interpretation of this Order.


Dated: _____, 2024
        New York, New York

                                        _____
                                        HONORABLE SEAN H. LANE
                                        UNITED STATES BANKRUPTCY JUDGE

# <u>EXHIBIT 1</u>

## Contingent Claims

**Genesis Global Holdco, LLC Case No. 23-10063**
**Eighteenth Omnibus Objection**
**Exhibit 1 - Contingent Claims**

## CLAIMS TO BE DISALLOWED

| # | NAME & ADDRESS | CLAIM # | ASSERTED DEBTOR | DATE FILED | TOTAL ASSERTED IN KIND AMOUNT |
|---|---|---|---|---|---|
| 1 | MORO, SOICHIRO MICHAEL C/O MARCUS ASNER 250 WEST 55TH STREET NEW YORK, NY 10019 | 375 | Genesis Global Capital, LLC | 05/19/23 | USD 535,273.42† |
| | *Reason: Insufficient support for alleged liability and/or 502(e)(1)(b) objection for contribution and/or reimbursement.* | | | | |
| 2 | MORO, SOICHIRO MICHAEL C/O MARCUS ASNER 250 WEST 55TH STREET NEW YORK, NY 10019 | 398 | Genesis Global Holdco, LLC | 05/19/23 | USD 535,273.42† |
| | *Reason: Insufficient support for alleged liability and/or 502(e)(1)(b) objection for contribution and/or reimbursement.* | | | | |
| 3 | MORO, SOICHIRO MICHAEL C/O MARCUS ASNER 250 WEST 55TH STREET NEW YORK, NY 10019 | 408 | Genesis Asia Pacific Pte. Ltd. (Singapore) | 05/19/23 | USD 535,273.42† |
| | *Reason: Insufficient support for alleged liability and/or 502(e)(1)(b) objection for contribution and/or reimbursement.* | | | | |
| 4 | SILBERT, BARRY 290 HARBOR DR. 4TH FLOOR STAMFORD, CT 06902 | 472 | Genesis Asia Pacific Pte. Ltd. (Singapore) | 05/22/23 | Unliquidated |
| | *Reason: 502(e)(1)(b) objection for contribution and/or reimbursement.* | | | | |
| 5 | SILBERT, BARRY 290 HARBOR DR. 4TH FLOOR STAMFORD, CT 06902 | 483 | Genesis Global Holdco, LLC | 05/22/23 | Unliquidated |
| | *Reason: 502(e)(1)(b) objection for contribution and/or reimbursement.* | | | | |
| 6 | SILBERT, BARRY 290 HARBOR DR. 4TH FLOOR STAMFORD, CT 06902 | 501 | Genesis Global Capital, LLC | 05/22/23 | Unliquidated |
| | *Reason: 502(e)(1)(b) objection for contribution and/or reimbursement.* | | | | |

†Indicates claim contains unliquidated and/or undetermined amounts

## **EXHIBIT B**

**Lenox Declaration**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |

## DECLARATION OF BRAD LENOX
## IN SUPPORT OF DEBTORS' EIGHTENTH
## OMNIBUS OBJECTION (NON-SUBSTANTIVE)
## TO CERTAIN CLAIMS PURSUANT TO 11 U.S.C. § 502
## AND FED. R. BANKR. P. 3007 (CO-LIABILITY CONTINGENT)

I, Brad Lenox, declare as follows pursuant to 28 U.S.C. § 1746:

1.      I am an associate at the law firm Cleary Gottlieb Steen & Hamilton LLP, counsel

to the Debtors in the above-captioned chapter 11 case.

2.      I respectfully submit this declaration in support of the *Debtors' Eighteenth*

*Omnibus Objection (Non-Substantive) to Certain Claims Pursuant to 11 U.S.C. § 502 and Fed.*

*R. Bankr. P. 3007 (Co-Liability Contingent)* (the "Objection").[2]

3.      A true and correct copy of the amended complaint ("Amended Complaint") filed

in *William McGreevy, Ashwin Gowda, Translunar Crypto LP, Christopher Buttenham, and Alex*

*Sopinka v. Digital Currency Group, Inc., and Barry Silbert*, Case No. 3:23-cv-00082 at ECF No.

135, is attached hereto as Exhibit 1.

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number as applicable), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

[2]      Capitalized terms used, but not otherwise defined, herein shall have the meanings set forth in the Objection.

2

Dated: January 2, 2024
      New York, New York

               Respectfully submitted,


               */s/ Brad Lenox*
               Brad Lenox
               blenox@cgsh.com
               CLEARY GOTTLIEB STEEN & HAMILTON LLP
               One Liberty Plaza
               New York, New York  10006
               T: 212-225-2000
               F: 212-225-3999

               *Counsel to the Debtors and*
               *Debtors-in-Possession*

**<u>Exhibit 1</u>**

**Amended Complaint**

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| WILLIAM MCGREEVY, ASHWIN GOWDA, TRANSLUNAR CRYPTO, LP, CHRISTOPHER BUTTENHAM, and REMO MARIA MORONE, Individually and on Behalf of All Others Similarly Situated, | Case No.: 3:23-cv-00082-SRU<br><br>CLASS ACTION<br><br>JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | |
| DIGITAL CURRENCY GROUP, INC., BARRY SILBERT, GLENN HUTCHINS, LAWRENCE LENIHAN, MICHAEL KRAINES, MARK MURPHY, SOICHIRO "MICHAEL" MORO, and DERAR ISLIM | |
| Defendants. | |

## AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES AND STATE CONSUMER PROTECTION LAWS

**SILVER GOLUB & TEITELL LLP**
Ian W. Sloss ct31244
Steven L. Bloch ct31246
Johnathan Seredynski ct30412
Krystyna Gancoss (*pro hac vice* forthcoming)
One Landmark Square, Floor 15
Stamford, Connecticut 06901
Telephone: (203) 325-4491
isloss@sgtlaw.com
sbloch@sgtlaw.com
jseredynski@sgtlaw.com
kgancoss@sgtlaw.com

*Lead Counsel for Lead Plaintiffs Christopher Buttenham, Ashwin Gowda, William McGreevy, and Translunar Crypto LP and the Proposed Class*

**KAPLAN FOX & KILSHEIMER LLP**
Donald R. Hall (CT Bar No. 416065)
Jeffrey P. Campisi (admitted *pro hac vice*)
Jason A. Uris (*pro hac vice* forthcoming)
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
dhall@kaplanfox.com
jcampisi@kaplanfox.com
juris@kaplanfox.com

*Lead Counsel for Lead Plaintiff Remo Maria Morone and the Proposed Class*

Dated: November 13, 2023

## TABLE OF CONTENTS

**Page(s)**

I.    NATURE OF THE CLAIMS ............................................................................. 1

II.   OVERVIEW OF THE SECURITIES ACT CLAIMS............................................ 6

III.  OVERVIEW OF THE EXCHANGE ACT CLAIMS ........................................... 8

IV.  OVERVIEW OF THE CONSUMER PROTECTION CLAIMS ................................ 15

V.   PARTIES ............................................................................................... 16

     A.    PLAINTIFFS. ................................................................................ 16

     B.    SECURITIES ACT DEFENDANTS........................................................ 17

     C.    EXCHANGE ACT DEFENDANTS. ....................................................... 19

     D.    CONSUMER PROTECTION DEFENDANTS. ............................................ 19

VI.  JURISDICTION AND VENUE ................................................................... 20

VII.  THE DCG CONGLOMERATE ..................................................................... 21

     A.    DIGITAL CURRENCY GROUP. ......................................................... 21

     B.    GRAYSCALE INVESTMENTS. ........................................................... 23

     C.    GENESIS GLOBAL TRADING, INC. & GENESIS GLOBAL
          CAPITAL, LLC. ............................................................................ 24

VIII. GENESIS GLOBAL CAPITAL'S YIELD SECURITIES............................................ 25

IX.  THE GENESIS YIELD INVESTMENT AGREEMENTS ARE SECURITIES. ............ 30

     A.    THE GENESIS YIELD INVESTMENT AGREEMENTS ARE
          NOTES UNDER REVES. .................................................................. 32

          i.     Motivations of Genesis Yield Securities Investors .................................. 32

          ii.    Distribution Plan of Genesis Yield ......................................... 36

          iii.   Expectations of the Investing Public........................................ 38

          iv.   No Risk Reducing Factors Exist ............................................. 39

B. THE GENESIS YIELD INVESTMENT AGREEMENTS ARE INVESTMENT CONTRACTS UNDER HOWEY ............................................. 40

C. STATE AND FEDERAL REGULATORS HAVE CONCLUDED IDENTICAL INVESTMENT PRODUCTS ARE "SECURITIES" AS DEFINED BY STATE AND FEDERAL SECURITIES LAWS. ........................ 43

X. SECURITIES ACT CLAIMS ........................................................................ 46

XI. EXCHANGE ACT CLAIMS ........................................................................ 50

A. EXCHANGE ACT DEFENDANTS CAUSED GENESIS GLOBAL CAPITAL TO FRAUDULENTLY MISREPRESENT ITS RISK-MANAGEMENT PRACTICES IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5. .......................................... 50

    i. Genesis Misrepresented its Risk Management Practices. ......................... 53

        a. Genesis Was Overly Concentrated in Risky Counterparty 3AC .......................................................... 53

        b. Genesis Was Overly Concentrated in Alemeda Research/FTX ...................................................................... 57

        c. Genesis Was Overly Concentrated in Related Parties ................. 58

    ii. 3AC Capital and Babel Finance Default on Genesis Loans .................... 60

    iii. 3AC Declares Bankruptcy ............................................................ 69

    iv. Defendant Silbert Saves DCG and Himself and Drains Liquidity from Genesis ............................................................................... 69

B. THE EXCHANGE ACT DEFENDANTS CAUSED GENESIS GLOBAL CAPITAL TO FRAUDULENTLY CONCEAL ITS INSOLVENCY IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5. ...................................... 71

    i. Genesis Global Capital Was Insolvent ...................................... 74

        a. The Exchange Act Defendants Made Materially False and Misleading Representations Concerning the Solvency of Genesis Global Capital ............................... 75

        b. Defendants DCG Fails to Repay Hundreds of Millions of Dollars Owed to Genesis Global Capital, Worsening Genesis Global Capital's Financial Condition ............................ 85

c. Exchange Act Defendants Misrepresented Genesis Global Capital's Financial Position to Investors in Connection with Each Purchase of Genesis Yield Securities ....................................................................... 86

C. DCG AND GENESIS CAPITAL CONCEALED INFORMATION THAT WOULD HAVE REVEALED THEIR DECEIT. ..................................... 92

D. DEFENDANT SILBERT PERSONALLY INTERVENED TO KEEP INVESTORS FROM WITHDRAWING INVESTMENTS. ............................... 94

E. THE TRUTH BEGINS TO BE REVEALED: GENESIS GLOBAL CAPITAL SUSPENDS REDEMPTIONS CAUSING INVESTOR LOSSES AND MISREPRESENTS THE REASON. ........................................... 99

F. PRESUMPTION OF RELIANCE FOR EXCHANGE ACT CLAIMS. ............. 100

XII. CONSUMER PROTECTION CLAIMS ................................................................. 102

CLASS ALLEGATIONS ............................................................................................. 105

CLAIMS FOR RELIEF ............................................................................................... 108

FIRST CLAIM FOR RELIEF   CONTROL PERSON LIABILITY FOR VIOLATIONS OF THE SECURITIES ACT SECTION 5, SECTION 12(a)(1) AND SECTION 15 OF THE SECURITIES ACT (Against the Securities Act Defendants) ............. 108

1. Defendant DCG Controlled Genesis ................................................... 111

2. Defendant Silbert Controlled Genesis ............................................... 113

3. Defendant Moro Controlled Genesis .................................................. 115

4. Defendant Islim Controlled Genesis .................................................. 116

5. Defendant Murphy Controlled Genesis .............................................. 117

6. Defendant Kraines Controlled Genesis .............................................. 118

7. Defendant Lenihan Controlled Genesis .............................................. 118

8. Defendant Hutchins Controlled Genesis ............................................ 119

SECOND CLAIM FOR RELIEF ................................................................................ 120

FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 (Against Defendants DCG, Silbert, Murphy Hutchins, Lenihan, Islim and Moro) ...................................................................................................................... 120

THIRD CLAIM FOR RELIEF .................................................. 125

CONTROL PERSON LIABILITY UNDER SECTION 20(a) OF THE EXCHANGE
ACT FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT (Against
the Exchange Act Defendants) .............................................. 125

FOURTH CLAIM FOR RELIEF ............................................... 128

FOR DECEPTIVE AND UNFAIR PRACTICES IN VIOLATION OF  THE
CONNECTICUT UNFAIR TRADE PRACTICES ACT, CONN. GEN. STAT. § 42-
110a, ET SEQ. (Against All Defendants) .................................. 128

FIFTH CLAIM FOR RELIEF ................................................. 131

FOR DECEPTIVE AND UNFAIR PRACTICES IN VIOLATION OF THE NEW
YORK UNIFORM DECEPTIVE TRADE PRACTICES ACT, N.Y. GEN. BUS.
LAW. § 349, ET SEQ. (Against All Defendants) ......................... 131

PRAYER FOR RELIEF ....................................................... 133

Lead Plaintiffs William McGreevy, Ashwin Gowda, Translunar Crypto LP, Christopher Buttenham, and Remo Maria Morone (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated, allege the following against Defendants (defined below) based upon the investigation of Plaintiffs' counsel and information and belief, except as to allegations specifically pertaining to Plaintiffs, which are based on personal knowledge. The investigation of counsel included, among other things, a review of publicly available information concerning Defendants, including information based on the pleading and filings in *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), *SEC v. Genesis Global Capital, LLC., et al.*, No. 23-cv-00287 (S.D.N.Y.), *Picha et al. v. Gemini Trust Company, LLC, et al.*, No. 22-cv-10922-NRB (S.D.N.Y.), *Gemini Trust Company, LLC v. Digital Currency Group, Inc. and Barry Silbert*, Index No. Unassigned (N.Y. Sup. Ct.) (filed July 7, 2023); *The People of the State of New York v. Genesis Global Capital, LLC, et al.*, Index No. [unassigned] (Sup. Ct. N.Y.) (filed Oct. 19, 2023) ("NYAG Action"); and *U.S. v. Samuel Bankman-Fried*, 22cr673 (LAK) (S.D.N.Y.). Plaintiffs believe substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE CLAIMS

1.     This class action (the "Action") is brought under Sections 12 and 15 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. §§ 77l and 77o, Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78j(b), and 78t(a), the rules and regulations promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), including Rule 10b-5, 17 C.F.R. §240.10b-5, and, alternatively, the Connecticut Unfair Trade Practices Act, CONN. GEN. STAT. § 42-110a, *et seq.*, and the New York Uniform Deceptive Trade Practices Act, GEN. BUS. LAW § 349, *et seq.*

2.     Plaintiffs bring claims on behalf of all persons who purchased Genesis Yield

securities (as defined in Section IX, below) offered and sold by non-party Genesis Global Capital, LLC ("Genesis Global Capital" or the "Company") during the period February 2, 2021 through November 16, 2022 (the "Class Period") who were damaged (the "Class").

3.      Before and during the Class Period, Genesis Global Capital purported to be a part of a "full-service digital currency prime brokerage providing a single point of access for select qualified individuals and global institutional investors" and provided "a full suite of services global investors require to manage their digital asset portfolios."

4.      Genesis Global Capital's role in the "full-service digital currency prime brokerage" was raising capital for the greater conglomerate of companies operated by Defendants Digital Currency Group, Inc. ("DCG") and Barry Silbert ("Silbert"), by offering and selling Genesis Global Capital's Genesis Yield securities (as defined in Section IX, below) to individuals and entities to be pooled and invested by Genesis Global Capital and DCG. Members of the Class invested in Genesis Yield securities offered or sold by Genesis Global Capital by entering into standard form agreements (the "Genesis Yield Investment Agreements") and then tendering digital assets or cash to Genesis Global Capital pursuant to either executed term sheets (for direct investors) or the terms presented to them via the Gemini Earn platform (for Gemini Earn investors). In exchange for their purchase of the Genesis Yield securities, members of the Class received interest payments and the promise of the eventual return of their digital assets on demand.

5.      Genesis Global Capital pooled investors' digital assets it received pursuant to the Genesis Yield Investment Agreements and invested the digital assets pursuant to certain strategies designed to generate revenue for Genesis Global Capital and its affiliates, and to pay Genesis Global Capital's investors interest.

6.      Defendant DCG is the parent entity of a conglomerate of subsidiaries that operate

and invest in the digital currency, or crypto, market, including the Genesis-affiliated companies. At all times alleged herein DCG was the 100% owner of a holding company, Genesis Global Holdco, LLC ("GGH"), that was the 100% owner of the Genesis Global Capital, which was the Company's sole managing member. GGH does not operate any business separate from Genesis Global Capital and its other operating subsidiaries. GGH and Genesis Global Capital do not have separate boards and the board members of GGH through GGH's board controlled and managed the day to day affairs of the Company. GGH is a sister company of Genesis Global Trading, Inc. ("GGT"), which is 100% owned by DCG and engaged in crypto trading, derivatives, and custody services. GGH and Genesis Global Capital had no independent board of directors until after June 30, 2022. Instead, non-party [GGT's] board of directors heard matters pertaining to Genesis Holdco and Genesis Capital through at least June 30, 2022.[1]

7.      Defendant Silbert is the founder of DCG, Genesis Global Capital, and several other DCG subsidiary companies. During the Class Period, Silbert was the controlling shareholder of DCG (owning approximately 40%), chairman of DCG's three-person board of directors, and DCG's Chief Executive Officer ("CEO"). Defendants Glenn Hutchins ("Hutchins") and Lawrence Lenihan ("Lenihan") were directors of DCG.

8.      Defendant DCG closely managed and controlled the Company and its affiliates through interlocking directors and officers. Defendant Mark Murphy ("Murphy") was the Chief Operating Officer ("COO") of DCG during the period January 2020 through November 2022, and has been President of DCG since October 2022, and is a member of the board of directors of GGH which managed and controlled the Company, and Defendant Michael Kraines ("Kraines") was the Chief Financial Officer ("CFO") of DCG from in or around September 2021 through April 2023,

---

[1] NYAG Compl., ¶26.

and is a member of the board of directors of GGH which managed and controlled the Company.

9.      Defendant Soichiro "Michael" Moro ("Moro") was the CEO of Genesis Global Capital and GGT since the start of the Class Period through August 17, 2022 when he "stepped down" as CEO, and was a member of the board of GGT.  Defendant Derar Islim ("Islim") has served as the COO of Genesis Global Capital and GGT since the start of the Class Period.  On or around August 17, 2022, Defendants DCG and Murphy hand-picked Defendant Islim to serve as interim CEO of Genesis Global Capital and GGT, and during the Class Period he was a member of the board of directors of GGH, which was the sole managing member of Genesis.  Matthew Ballensweig ("Ballensweig") was the managing director and co-head of sales and trading of GGT before the Class Period through September 28, 2022.

10.      The complaint in NYAG Action alleges that "Genesis Capital and Genesis Asia Pacific shared a single loan book managed by the Genesis Entities' Co-Head of Trading and Lending ("Managing Director No. 1") from New York."  On information and belief, Managing Director No. 1 alleged in the NYAG complaint is Ballensweig. According to a sworn declaration filed by Defendant Islim in the Genesis Bankruptcy Action (defined below), dated August 31, 2023, Ballensweig was "Managing Director, Co-Head Trading & Lending and the primary manager of Genesis's lending relationship with 3AC [Three Arrows Capital]."

11.      The Genesis Entities operated as a single entity during the Relevant Period. They shared officers, capital, offices, IT infrastructure, and back-office functions.[2] Genesis Capital and GGT, the broker-dealer entity, each had its own balance sheet, however, corporate formalities and separateness were regularly disregarded or ignored.  For example, investors who purchased Genesis Yield securities from Genesis Global Capital logged on to their accounts through GGT's

---

[2] *Id.,* ¶25.

platform, employees of GTT whose Internal Revenue Service W-2 forms reported GGT as their employer, performed services for Genesis Global Capital, and information concerning Genesis Global Capital was disseminated through the twitter account of GGT.

12.     During the Relevant Period, DCG controlled the Genesis Entities' key hiring decisions, business strategy, and budget.  DCG and the Genesis Entities also shared IT infrastructure and DCG had direct access to the Genesis Entities' books and records.  Members of DCG's management team served as directors of Genesis Trading and Genesis Holdco, and sat on the Genesis Entities' Organizational Risk Committee, which managed risks arising from the Genesis Entities' lending business.[3]

13.     On November 16, 2022, Genesis Global Capital experienced a slew of withdrawal requests from investors, and because Genesis Global Capital did not have the assets to honor redemption requests from investors, the Company unilaterally stopped honoring redemption requests from investors, meaning no investor could obtain their digital assets from Genesis Global Capital.  At the time the Company stopped honoring redemption requests from investors, the Company had offered or sold billions of dollars in securities to investors.

14.     As a result of the violations of the federal securities laws and state law violations alleged herein, Plaintiffs and members of the Class have been denied access to their digital assets since November 16, 2022 and have been damaged by Defendants' wrongful conduct.

15.     On January 19, 2023, the Company and certain of its affiliates filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101—1532 in the United States Bankruptcy Court for the Southern District of New York and the chapter 11 overview of cases are being jointly administered under the lead case *In re: Genesis Global Holdco,*

---

[3] *Id.,* ¶37.

*LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.) (the "Genesis Bankruptcy Action").
Under section 362(a) of the Bankruptcy Code, the Company's filing of its voluntary petition gave
rise to a stay of claims alleged against it in the Action. But for its bankruptcy, Genesis Global
Capital would have been named as a defendant in the Action for its wrongful conduct alleged
herein.[4]

## II.  OVERVIEW OF THE SECURITIES ACT CLAIMS

16.     The Securities Act claims are contained in Section X of this complaint. The
Securities Act claims expressly do not make any allegations of fraud or scienter and do not
incorporate any of the allegations contained in Section XI, including the allegations of scienter and
fraud.

17.     During the Class Period, Genesis Global Capital offered and sold securities
(Genesis Yield) to Plaintiffs and members of the Class whereby Plaintiffs and members of the
Class tendered consideration (the investment principal) to Genesis Global Capital in exchange for
Genesis Global Capital's promise to pay back the investment principal, together with accrued
interest, on demand.

18.     Genesis Global Capital did not register the offer or sale of the Genesis Yield
securities with the SEC and there was no registration statement in effect as to the Genesis Yield
securities as required under Section 5 of the Securities Act. Because no applicable exemption from
registration applied, Genesis Global Capital's failure to register the Genesis Yield securities
violated Section 5 of the Securities Act.

19.     Because Genesis Global Capital offered or sold securities to members of the Class
in violation of Section 5 of the Securities Act, Genesis Global Capital violated Section 12(a)(1) of

---

[4] *See* https://restructuring.ra.kroll.com/genesis/ (last visited Nov. 10, 2023).

the Securities Act and Plaintiffs and members of the Class are entitled to recover the consideration paid for the securities less the amount of any income received thereon, upon the tender of such security, or for damages if the securities are no longer owned.

20.     Under the Securities Act, the Company is strictly liable for its violations of Section 12(a)(1).  But for Genesis Global Capital's bankruptcy, it would have been named as a defendant for violating Section 12(a)(1) of the Securities Act.

21.     Under Section 15 of the Securities Act, the following Defendants were controlling persons of Genesis Global Capital during the Class Period through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controlled Genesis Global Capital: a) Defendant DCG as 100% owner of Genesis Global Capital through GGH; b) Defendant Silbert, founder of DCG and controlling shareholder of DCG (40% share ownership) and chair of the DCG board of directors and its CEO; c) Defendants Hutchins and Lenihan, as members of the board of directors of DCG; d) Defendant Kraines, the former CFO of DCG and a member of the board of GGH, which was the sole managing member of the Company; e) Defendant Murphy, the COO and President of DCG and a member of the board of GGH, which was the sole managing member of the Company; f) Defendant Moro, the former CEO of Genesis Global Capital, and g) Defendant Islim, the COO and interim CEO of Genesis Global Capital and member of the board of GGH, which was the sole managing member of the Company.

22.     Defendants DCG, Silbert, Hutchins, Lenihan, Kraines, Murphy, Moro, and Islim are referred to as the "Securities Act Defendants."

23.     Because the Securities Act Defendants were controlling persons of the Company, each of them is liable jointly and severally with and to the same extent as the Company to members

7

of the Class under Section 15 of the Securities Act.

## III.  **OVERVIEW OF THE EXCHANGE ACT CLAIMS**

24.     The Exchange Act claims are brought under Section 10(b) of the Exchange Act, and SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5 against Defendants DCG, Silbert, Hutchins, Lenihan, Moro, Islim and Murphy, and under Section 20(a) of the Exchange Act against Defendants DCG, Silbert, Hutchins, Lenihan, Moro, Islim, Kraines and Murphy.  But for Genesis Global Capital's bankruptcy, it would have been named as a defendant for violating Section 10(b) of the Exchange Act.

25.     Defendants Moro, Islim, DCG, Silbert, Hutchins, Lenihan, Kraines and Murphy are referred to as the "Exchange Act Defendants."

26.     Rule 10b-5 under Section 10(b) of the Exchange Act that "it shall be unlawful for any person . . . (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact . . . or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."

27.     During the Class Period, as alleged below, in violation of Section 10(b) Defendants Moro, Islim and Murphy, and Ballensweig made materially false and misleading statements in violation of Section 10b-5(b), and Defendants DCG, Silbert, Hutchins and Lenihan employed a device, scheme or artifice to defraud, and engaged in practices, or course of business which operated or would operate as a fraud or deceit upon members of the Class.

28.     The Exchange Act Defendants defrauded investors in at least two ways: 1) by making materially false and misleading statements, and failing to disclose material facts that in light of the circumstances should have been disclosed concerning the risk management policies and procedures of Genesis Global Capital; and 2) in response to a liquidity crises at Genesis Global

Capital in June 2022 as a result of a counterparty's bankruptcy which in effect rendered Genesis Global Capital insolvent, the Exchange Act Defendants engaged in an accounting fraud to hide Genesis Global Capital's insolvency from investors.

29.     During the Class Period, the Exchange Act Defendants invested the digital assets Genesis Global Capital received from investors in ways designed to line DCG's and Silbert's own pockets even though pursuit of these strategies contravened Genesis Global Capital's stated risk-management protocols, including, as discussed *infra* Section XI(A) that Genesis Global Capital, was "well protected" using "collateral, calculated exposure limits based on quantitative and qualitative due-diligence, margin management, ongoing transparency and financial updates, and macro hedging tools," and responsible risk management procedures such as lending on "an 'over-collateralized' basis."

30.     For example, the Exchange Act Defendants caused Genesis Global Capital to use Genesis Yield investors' digital assets to engage in transactions designed to benefit the DCG conglomerate. The Exchange Act Defendants caused Genesis Global Capital to loan digital asset to DCG itself without requiring DCG to post sufficient collateral, knowing the loan would be used for the purchase of shares of the Greyscale Bitcoin Trust ("GBTC"), a publicly traded security managed by DCG and Silbert's Grayscale Investments, LLC ("Grayscale") subsidiary, to maximize the management fees collectable by the DCG conglomerate. GBTC trades over the counter ("OTC") under the symbol "GBTC."

31.     The Exchange Act Defendants also caused Genesis Global Capital to contravene their own stated risk-management practices and take on an unreasonable amount of counterparty concentration risk by lending almost 30% of Genesis Global Capital's total loan book to a single party, digital asset hedge fund Three Arrows Capital ("3AC") in undercollateralized loans. This

too was designed to benefit the DCG conglomerate by maximizing the management fees earned for managing GBTC.

32.    These self-interested acts and undercollateralized loans had disastrous results. 3AC declared bankruptcy in June 2022, and after 3AC liquidated its assets, Genesis Global Capital was left with an uncollectable $1.1 billion debt, an impairment in value which the Exchange Act Defendants should have caused Genesis Global Capital to recognize on its balance sheet regularly distributed to investors or their agents.

33.    Recognition of the impairment, however, would have meant Genesis Global Capital recognizing its own insolvency, which would have terminated all Genesis Yield Investment Agreements and entitled investors such as Plaintiffs and members of the Class to the return of their digital assets. It also would have meant the end of Genesis Global Capital's business and DCG's source of capital.  Furthermore, Defendants DCG, Silbert, Lenihan and Hutchins had motive and opportunity to commit the fraud alleged herein.  Because Defendants DCG and Silbert personally had borrowed heavily from Genesis Global Capital, the viability of DCG as an ongoing concern and Silbert's personal fortune were inextricably intertwined with the fate of Genesis Global Capital.

34.    Instead of recognizing the impairment, Defendants DCG, Silbert, Hutchins and Lenihan (the DCG Board) directed and caused Genesis Global Capital and its executives, specifically Defendant Moro, to engage in a misleading sham transaction without any economic reality, designed to conceal its insolvency.  Defendants DCG, Silbert, Hutchins and Lenihan caused Genesis Global Capital and Defendant Moro to "sell" the uncollectable $1.1 billion 3AC debt to DCG in exchange for a 10-year promissory note (the "DCG Promissory Note") with an interest rate of 1% per year due in 2032. The DCG Promissory Note was executed by Defendant

Silbert on behalf of DCG and by Defendant Moro on behalf of the Company. Importantly, no cash, cash equivalents, or any assets meeting the definition of a current asset changed hands in this transaction, which meant that Genesis Global Capital received zero capitalization from DCG. Instead, Genesis Global Capital magically erased the bad debt from its books and replaced it with a "good" debt.

35. Defendants Moro and Islim caused Genesis Global Capital to misleadingly include the $1.1 billion amount of the DCG Promissory Note on its balance sheet as a "current asset and/or receivable," which falsely portrayed Genesis Global Capital as solvent when, in fact, it was insolvent.

36. Defendants Moro and Islim did so despite the fact that the DCG Promissory Note was objectively worth nowhere near $1.1 billion (its face value) at the time DCG, Silbert, Moro, and Genesis Global Capital executed the DCG Promissory Note. Gemini, the appointed agent for hundreds of thousands of Class Members, believes the DCG Promissory Note should have immediately been discounted by approximately 70%, and on July 11, 2023, the *Notice of Filing of Exhibit to Disclosure Statement* filed by Genesis Global Capital in the Genesis Bankruptcy Action estimated the value of the DCG Promissory Note as being somewhere between only $90 million (a 92% discount) to $323 million (a 70% discount).[5] Defendant Silbert has reportedly valued the DCG Promissory Note at $200 million.

37. As discussed in further detail below Defendants Moro, Murphy and Islim caused Genesis Global Capital and Ballensweig to disseminate misleading balance sheets and other documents containing misrepresentations to Genesis Yield investors and their appointed agent intended to induce additional parties to invest in Genesis Yield securities, convince existing

---

[5] *In re: Genesis Global Holdco, LLC, et al.,* Case No.: 23-10063, ECF No. 488 (Bankr. S.D.N.Y.)

Genesis Global Capital investors to reinvest in Genesis Yield securities and/or to prevent them from requesting redemptions of their securities and return of investors digital assets.

38. Defendants Moro and Islim caused Genesis Global Capital to represent to *each investor* that purchased Genesis Global Capital securities during the period July 1, 2022 through the end of the Class Period that it was solvent, when in fact it was not due to the 3AC bankruptcy in June 2022.

39. These material misrepresentations and omissions concerning Genesis Global Capital's solvency violated Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, codified at 17 CFR 240.10b-5, which prohibit defrauding or deceiving, including through misrepresentation of material information in connection with the purchase or sale of security, or failure to disclose material facts necessary in order to make the statements, in light of the circumstances under which they were made, not misleading.

40. The misrepresentations and omissions were material, as no reasonable investor would have invested in Genesis Yield securities had they known of Genesis Global Capital's undisclosed concentration of risk and under collateralization, true financial condition, or the undisclosed details of the $1.1 billion DCG Promissory Note, i.e. that Genesis Global Capital was in effect insolvent.

41. Plaintiffs, members of the Class, and/or their agents reasonably relied on Genesis Global Capital's materially false and misleading representations as to Genesis Global Capital's risk management and solvency in deciding to invest or reinvest in Genesis Yield securities.

42. Thus, as a result of the material misrepresentations and omissions, Genesis Global Capital received billions of dollars from Plaintiffs and members of the Class that Genesis Global Capital otherwise would not have.

43.     The truth began to be revealed on November 16, 2022 when Genesis Global Capital experienced a slew of withdrawal requests in the wake of the collapse of digital asset trading platform FTX with whom GGT and Genesis Global Capital engaged in substantial business. The collapse of FTX began to reveal Genesis Global Capital's true financial condition and that Genesis Global Capital did not have the assets to honor redemption requests from investors.

44.     On November 16, 2022, Genesis Global Capital unilaterally stopped honoring redemption requests, meaning no investor could obtain their digital assets from Genesis Global Capital. Even then, Genesis Global Capital continued to conceal its true financial condition, calling the cause of its inability to honor redemptions a result of a "liquidity and duration mismatch" when in reality it was because of insolvency that was fraudulently concealed through the DCG Promissory Note.

45.     On January 19, 2022, Genesis Global Capital, GGH and Genesis Asia Pacific filed the Genesis Bankruptcy Action.

46.     Reportedly, DCG's transactions involving Genesis Global Capital and GGT are being investigated by the U.S. Department of Justice and the SEC.

47.     On August 4, 2023, *Bloomberg* published a story titled "Silbert's Crypto Empire DCG Faces NY Attorney General Probe Over Genesis Ties" that stated:

> Barry Silbert's crypto empire, Digital Currency Group, is facing another probe into its financial dealings with subsidiary Genesis Global Capital — this time by New York state's top law enforcement officer, according to two people familiar with the investigation.
>
> In recent months, New York Attorney General Letitia James's office has requested information from former executives of Genesis, a cryptocurrency lender that filed for bankruptcy in January, said the people, who asked not to be identified because the inquiry had not been made public. Former Genesis chief risk officer, Michael Patchen, was questioned recently, one of the people said.

Federal prosecutors in Brooklyn and the Securities and Exchange Commission are already conducting investigations and seeking interviews with potential witnesses at Genesis and its parent company, DCG. Genesis suffered heavy losses last year during the crypto market downturn, primarily after the collapse of digital-assets hedge fund Three Arrows Capital and crypto exchange FTX. . . .

Patchen was an executive at Genesis for only three months before stepping down in October 2022. His lawyer, Doug Jensen, declined to comment when asked on Thursday about the testimony.

The state probe, which has not been previously reported, comes as James has sought to position herself as a leading crypto enforcer in the US, having raised the alarm about the industry several years ago and proposing a new state law in May to tighten rules over cryptocurrency companies. Lawmakers haven't taken up the proposal, but could do so at any time.

DCG, which was once valued at $10 billion, disclosed last year that the company received about $575 million in loans from Genesis Global Capital. In a letter to shareholders last November, Silbert, DCG's founder and chief executive officer, referred to a $1.1 billion promissory note, which he said came about as the parent company stepped in to assume liabilities from Genesis related to the implosion of Three Arrows. . . .

One focus for regulators and prosecutors has been on the promissory note and how it was characterized to investors, one person familiar with the investigations said. . . .

48.     On October 19, 2023, the Attorney General for the State of New York filed claims against Defendants DCG, Silbert, Moro, the Company and others alleging:

- Martin Act Securities Fraud ("DCG Defendants employed, or employs, or are about to employ a device, scheme or artifice to defraud or for obtaining money or property by means of any false pretense, representation or promise in the issuance, exchange, purchase, sale, promotion, negotiation, advertisement, investment advice or distribution within or from this state of securities or commodities, and constituted fraudulent practices . . . ."),

- Martin Act Failure to Register ("Genesis Capital's acts and practices constituted the sale or offer for sale to or purchase or offer to purchase from the public within

or from New York, any securities issued or to be issued without filing a registration statement."),

- Repeated and Persistent Fraud ("DCG Defendants engaged in repeated fraudulent acts or otherwise demonstrated persistent fraud in the carrying on, conducting or transaction of business.");

- Repeated and Persistent Illegality ("DCG Defendants engaged in repeated fraudulent or illegal acts in violation of GBL §§ 352, 352-c, and 353.");

- Repeated and Persistent Illegality and Scheme to Defraud under New York Penal Law ("DCG Defendants engaged in repeated fraudulent or illegal acts by violating New York Penal Law § 190.65(1)(b), Scheme to Defraud in the First Degree.");

- Repeated and Persistent Illegality and Conspiracy in the Fifth Degree under New York Penal Law ("DCG Defendants engaged in repeated fraudulent or illegal acts by violating New York Penal Law § 105.05(1), Conspiracy in the Fifth Degree."); and

- Repeated and Persistent Illegality, Failure to Register ("Genesis Capital's acts and practices constituted the sale or offer for sale to or purchase or offer to purchase from the public within or from New York, any securities issued or to be issued without filing a registration statement.").

49.    As a result of the conduct described herein, Plaintiffs and members of the Class defined below have suffered significant harm and are owed billions of dollars.

## IV.    OVERVIEW OF THE CONSUMER PROTECTION CLAIMS

50.    The Consumer Protection Claims are alleged by Plaintiffs in the alternative to Plaintiffs' Securities Act claims and Plaintiffs' Exchange Act claims in the event a determination

is made that the Genesis Yield securities do not qualify as "securities" under federal law.

51.     The Consumer Protection Claims are premised on the same conduct that forms the basis of Plaintiffs' Exchange Act Claims outlined above, and elsewhere in this Complaint.

52.     Assuming, *arguendo*, the Exchange Act Defendants' conduct did not violate the Exchange Act because the Genesis Yield securities are not "securities," the Exchange Act Defendants' conduct nevertheless constitute violations of the consumer protection laws of Connecticut, General Statutes § 42-110a, *et seq.*, and New York, General Business Law § 349, *et seq.*, the states in which Defendants DCG and Silbert were domiciled and transacted business from during the Class Period.

## V.     PARTIES

### A.     PLAINTIFFS.

53.     William McGreevy ("McGreevy") is a resident of Kansas. McGreevy purchased securities offered or sold by Genesis Global Capital (Genesis Yield securities), and was damaged, as reflected in his certification previously filed with the Court. ECF No. 38-2.

54.     Ashwin Gowda ("Gowda") is a resident of Texas. Gowda purchased securities offered or sold by Genesis Global Capital during the Class Period (Genesis Yield securities), and was damaged, as reflected in his certification previously filed with the Court. ECF No. 38-3.

55.     Translunar Crypto LP ("Translunar") is a limited partnership organized and existing under the laws of the State of Delaware and domiciled in the State of Texas. On September 2, 2022, Translunar purchased securities offered or sold by Genesis Global Capital during the Class Period (Genesis Yield securities) and was damaged, as reflected in its certification previously filed with the Court. ECF No. 38-4.

56.     Christopher Buttenham ("Buttenham") is a resident of Nevada. Buttenham purchased securities offered or sold by Genesis Global Capital during the Class Period (Genesis

Yield securities), and was damaged, as reflected in his certification previously filed with the Court. ECF No. 38-5.

57.     Remo Maria Morone ("Morone") is a resident of Turin, Italy. On August 4, 2021, June 15, 2022 and October 24, 2022, Morone purchased securities offered or sold by Genesis Global Capital (Genesis Yield securities), and was damaged, as reflected in his certification previously filed with the Court. ECF. No. 34-2.  Morone purchased Genesis Yield securities directly from Genesis.

**B.     SECURITIES ACT DEFENDANTS.**

58.     Defendant DCG is a corporation formed and existing under and pursuant to the laws of Delaware. DCG maintains its principal place of business in Stamford, Connecticut. Prior to moving to Stamford, Connecticut, DCG maintained its principal place of business in New York, New York.

59.     Defendant Silbert is the founder and the CEO of DCG, and chair of DCG's board of directors. Upon information and belief, during part of the Class Period Silbert was a resident of Connecticut and is currently a resident of Rye, New York. Silbert reportedly owns 40% of the equity of DCG. Silbert has consistent and daily management responsibilities for DCG's and DCG's subsidiaries' operations, including the Company, GGT, and Grayscale Investments. For example, Silbert reportedly prefers focusing on the capital allocation activities of DCG and its subsidiaries. Silbert's activities and responsibilities include making the decision not to register Genesis Global Capital's securities (notes or investment contracts) with the SEC, and engaging in the transaction which led to the issuance of the DCG Promissory Note and execution of the DCG Promissory Note. Silbert has repeatedly and publicly discussed his role in DCG and oversight of its wholly-owned subsidiaries.

60.     Defendant Hutchins was a director of DCG during the Class Period.

61. Defendant Lenihan was a director of DCG during the Class Period.

62. Defendant Moro was the CEO of Genesis Global Capital and GGT since the start of the Class Period through August 17, 2022, with August 26, 2022 as his last day at the Company.

63. Defendant Islim was the COO since the start of the Class Period and on August 17, 2022, he was appointed interim CEO by DCG and Murphy, and during the Class Period he was a member of the board of directors of GGH.

64. Defendant Kraines was CFO of DCG from on or around September 2021 through April 2023, and during the Class Period was a member of the board of directors of GGH, which was the sole managing member of the Company and through which Kraines controlled and managed the Company.

65. Defendant Murphy was the COO of DCG during the period January 2020 through November 2022, and has been President of DCG since October 2022, and is a member of the board of directors of GGH, which was the sole managing member of the Company and through which Murphy controlled and managed the Company. As COO of DCG Murphy worked closely with DCG's subsidiaries, including Genesis Global Capital, on strategy, execution, marketing and all management matters. Murphy led DCG's legal, communications, marketing, brand and public policy efforts and supported Defendant Silbert on day-to-day management of DCG. On August 17, 2022, Defendant Murphy, as COO of DCG and on DCG's behalf, stated "we're pleased to elevate [Defendant Islim] to the interim CEO role—he has our full trust and confidence and has been instrumental in developing key areas of the Genesis business," indicating that DCG and Murphy hand-picked the Company's interim CEO.

66. Defendants DCG, Silbert, Hutchins, Lenihan, Moro, Islim, Kraines and Murphy are referred to in Section X below as the "Securities Act Defendants."

67.     The Securities Act Defendants, because of their positions with DCG, GGH, Genesis Global Capital, and/or affiliates, possessed the power and authority to control Genesis Global Capital, as further alleged below in the First Claim for Relief.

### C.     EXCHANGE ACT DEFENDANTS.

68.     The "Exchange Act Defendants," as referred to in Section XI below, are Defendants DCG, Silbert, Hutchins, Lenihan, Moro, Islim, Kraines, and Murphy.

69.     The Exchange Act Defendants because of their positions with the DCG, GGH, Genesis Global Capital and/or GGT, possessed the power and authority to control the sale or offering of securities by Genesis Global Capital, and/or acted within the scope of their authority or employment.  Because of their positions and access to material non-public information available to them, but not to investors, each of them knew, or at least recklessly disregarded, that the adverse facts specified herein had not been disclosed to and were being concealed from investors in Genesis Yield Investment Agreements and that the positive representations which were being made were then materially false and misleading.

### D.     CONSUMER PROTECTION DEFENDANTS.

70.     Defendants DCG, Silbert, Hutchins, Lenihan, Moro, Islim, Kraines, and Murphy are referred in Section XII below as the "Consumer Protection Defendants."

71.     The Consumer Protection Defendants, because of their positions with DCG, GGH, Genesis Global Capital and/or GGT, possessed the power and authority to control the product offerings of Genesis Global Capital, and/or acted within the scope of their authority or employment.  Because of their positions and access to material non-public information available to them, but not to investors, each of them knew, or at least recklessly disregarded, that the adverse facts specified herein had not been disclosed to and were being concealed from investors in Genesis Yield Investment Agreements and that the positive representations which were being

19

made were then materially false and misleading.

## VI.    JURISDICTION AND VENUE

72.    This Court has subject matter jurisdiction over the Action under 28 U.S.C. § 1331 because the complaint asserts claims under the Securities Act and the Exchange Act.

73.    Jurisdiction of this Court is also founded upon Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a), which provides that federal courts have exclusive jurisdiction over violations of the Exchange Act, including Sections 10(b) and 20(a).

74.    Venue is proper in this judicial District pursuant to 28 U.S.C. §1391(b) and (c) because Defendants DCG and Silbert transact business in, are found in, and/or have agents in this District, and because some of the actions giving rise to the Action took place in this District.

75.    The Court has personal jurisdiction over Defendants. Defendants transacted business, maintained substantial contacts throughout the United States, including in this District. The wrongful conduct alleged in this complaint have been directed at, and have had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

76.    The Court also has personal jurisdiction over Defendants under the nationwide service of process provisions of Section 22 of the Securities Act, 15 U.S.C. § 77v.

77.    This Court has supplemental jurisdiction under 28 U.S. Code § 1367 over all other claims because they are so related to claims in the Action within such original jurisdiction that they form part of the same case or controversy under Article III of the U.S. Constitution.

78.    This Court has subject matter jurisdiction over the Action pursuant to 28 U.S.C. §1332(d)(2)(A), because this case is a class action where the aggregate claims of all members of the proposed Class exceed $5,000,000.00, exclusive of interest and costs, and the Plaintiffs and most members of the proposed Class are citizens of a state different from Defendant.

79.     This Court has jurisdiction over the Defendants who are domiciled in the State of Connecticut and because the Defendants have transacted business within the State of Connecticut.

## VII.   THE DCG CONGLOMERATE

### A.   DIGITAL CURRENCY GROUP.

80.     Defendant DCG was founded by Defendant Silbert in 2015.  In addition to founding DCG, Silbert has at all times served as CEO and Chairman of the board of directors of DCG. Until 2021, Defendant Silbert was also CEO of DCG's wholly-owned subsidiary business, Grayscale, and served as Chairman of Grayscale's board of directors.

81.     In addition to Defendant Silbert, Defendants Hutchins and Lenihan were directors of DCG during the Class Period.

82.     Defendant Silbert's aim has been to run DCG as a private conglomerate with divisions in every aspect of the digital asset market: "the model I use as an inspiration is Standard Oil," Silbert has stated, referring to the 19th-century oil conglomerate founded by John D. Rockefeller.

83.     DCG describes itself as follows:

Founded in 2015 by CEO Barry Silbert, DCG is the most active investor in the blockchain sector, with a mission to accelerate the development of a better financial system through the proliferation of digital assets and blockchain technology. Today, DCG sits at the epicenter of the industry, backing more than 175 blockchain-related companies in over 35 countries. DCG also invests directly in digital currencies and other digital assets. In addition to its investment portfolio, DCG is the parent company of Genesis (a global digital asset prime brokerage), Grayscale Investments (the largest digital currency asset manager), CoinDesk (a leading financial media, data, and information company), Foundry (a leader in bitcoin mining and staking) and Luno (a leading cryptocurrency platform with a large international footprint).

84.     To maintain control over Defendant DCG and its wholly-owned subsidiaries, Defendant Silbert has eschewed conducting an initial public offering to raise capital for Defendant DCG, stating "[DCG] doesn't need to dilute its ownership to raise capital . . . [i]t is not only not in

the works, it's not even being discussed."[6]

85.     For example, while Defendant DCG engaged in a 2021 financing round which valued Defendant DCG at more than $10 billion, according to Defendant Silbert, this transaction was less about raising capital and was more "an opportunity for some early investors to exit and take profits . . . all the money raised went to the selling shareholders, and none sold their entire stake."

86.     Importantly, Defendant Silbert, who then owned approximately 40% of DCG, didn't sell any stock in the offering.

87.     As just one example of his control of Defendant DCG and its subsidiaries Defendant Silbert decided to move DCG and many of its subsidiary businesses, including Grayscale, from New York, New York to Stamford, Connecticut, where Defendant Silbert then lived.[7] Defendant DCG and Grayscale's moves were completed in early 2022.

88.     Defendant Silbert still owns approximately 40% of DCG and at all relevant times controlled the day-to-day activities of DCG and its wholly-owned subsidiaries Grayscale, Genesis Global Capital, GGH, and GGT, including the capital allocation and investment strategies employed by these entities.

89.     In April 2022, Forbes estimated Defendant Silbert's net worth at $3.2 billion, up from 2021's estimate of $1.6 billion.

90.     Defendant DCG closely managed and controlled its subsidiaries through interlocking directors and officers.  Defendant Murphy was the COO of DCG during the period

---

[6] Paul Vigna, *Digital Currency Group Wants to Be Crypto's Standard Oil*, Wall Street Journal (Nov. 1, 2021), https://www.wsj.com/articles/digital-currency-group-wants-to-be-cryptos-standard-oil-11635764400

[7] Gregory Zucherman, Vicky Ge Huang and Caitlin Ostroff, *A Crypto Magnate Saw the Risks and Still Was Hammered*, Wall Street Journal (Jan. 17, 2023), https://www.wsj.com/articles/a-crypto-magnate-saw-the-risks-and-still-was-hammered-11673979412 ("Around 2020, Mr. Silbert decided to move most of the businesses from lower Manhattan to Stamford, Conn., where he lived.").

January 2020 through November 2022, and has been President of DCG since October 2022, and is a member of the board of directors of GGH, and Defendant Kraines was CFO of DCG from in or around September 2021 through April 2023, and is a member of the board of directors of GGH. GGH was the sole managing member of Genesis Global Capital and through their position on the GGH board Kraines and Murphy controlled the Company.

### B. GRAYSCALE INVESTMENTS.

91.     Grayscale is a subsidiary of Defendant DCG and is a digital asset management company that offers investment products that provide exposure to the price movement of various digital currencies. Grayscale's most popular investment product is the Grayscale Bitcoin Trust, or "GBTC."

92.     GBTC is a publicly traded investment vehicle managed by Grayscale that provides exposure to bitcoin's price movements without the need to directly buy and hold the digital currency.

93.     GBTC is traded on OTCQX, a market for OTC securities.

94.     GBTC shares can be acquired in two ways: (1) anyone with a brokerage account can buy GBTC shares in the OTC securities markets; and (2) investors can subscribe to the underlying trust (the "Trust").

95.     Subscribing to the Trust requires a minimum investment of $50,000 and is available only to accredited investors.

96.     Trust subscribers receive GBTC shares representing the value of Bitcoin held in the Trust equal to the amount of Bitcoin invested by the subscriber into the Trust.

97.     GBTC shares issued via subscriptions are subject to a six-month lockup period during which subscribers cannot sell their shares.

98.     GTBC subscribers are free to sell their GBTC shares once the lockup period ends.

99.     Grayscale charges a 2% annual management fee to manage GBTC, meaning that Grayscale, DCG, and Silbert take hundreds of millions of dollars annually and have an incentive to maximize the assets under management ("AUM") of Grayscale.

### C.   GENESIS GLOBAL TRADING, INC. & GENESIS GLOBAL CAPITAL, LLC.

100.    GGT was formed in 2005 and was initially operated by Defendant Silbert as the bitcoin trading arm of Silbert's company SecondMarket, which Silbert launched in 2004 as a private marketplace where accredited investors could buy and sell shares of private companies. Silbert served as CEO of SecondMarket until selling SecondMarket to Nasdaq in 2015.

101.    Defendant Silbert spun GGT out of SecondMarket prior to selling SecondMarket to Nasdaq and relaunched GGT as a standalone broker-dealer specializing in digital currencies on April 16, 2015, over six months before Defendant Silbert announced the formation of DCG.

102.    In October 2015, in conjunction with the formation of DCG, Defendant Silbert caused GGT to become a wholly-owned subsidiary of DCG with Defendant Silbert serving as DCG's CEO, Chairman, and controlling shareholder, thus controlling GGT.

103.    GGT operated as a New York-based non-custodial, OTC market-maker in digital assets and brokerage, holding a virtual currency BitLicense with the New York Department of Financial Services ("NYDFS"), and registered as a broker-dealer with the SEC and the Financial Industry Regulatory Authority, or FINRA.

104.    In late 2017, Defendant Silbert and DCG organized Genesis Global Capital under the laws of the State of Delaware to house the growing digital asset investment business of the DCG conglomerate GGT had been operating for Silbert and DCG.

105.    Defendants Silbert and DCG formally spun Genesis Global Capital out of GGT as a standalone entity in April 2018, provided Genesis Global Capital with $40 million in seed

capital,[8] and caused GGT to reassign all existing digital asset loan agreements to Genesis Global Capital.

106.     Defendant Moro was the CEO of Genesis Global Capital and GGT since the start of the Class Period through August 17, 2022.

107.     Defendant Islim was the COO of Genesis Global Capital and on August 17, 2022, Defendants DCG and Murphy appointed him interim CEO of Genesis Global Capital and GGT, and during the Class Period he was a member of the board of directors of GGH and the Company.

108.     Ballensweig was the managing director and co-head of sales and trading of GGT before the Class Period through September 28, 2022.

109.     Defendants DCG and Silbert controlled Genesis Global Capital through, *inter alia*, DCG's 100% ownership of Genesis Global Capital, the placement of DCG and Silbert's representatives on the board of GGH and GGT, as well as DCG and Silbert's ability to hire and fire executives of Genesis Global Capital and GGT.

## VIII.  GENESIS GLOBAL CAPITAL'S YIELD SECURITIES

110.     Beginning at least as early as July 2020, Genesis Global Capital began offering an investment and selling securities called "Yield Generation" (hereinafter "Genesis Yield"), which allowed "[h]olders of digital currencies [to] earn yield on their assets by lending directly to Genesis, a regulated and trusted counterparty."

111.     The following is a screenshot showing Genesis Global Capital's website on July 21, 2020, which include the Genesis and DCG logos:[9]

---

[8] Vikcy Ge Huang & Caitlin Ostroff, *The 2018 Meeting That Kicked off a Lending Relationship Between Alameda and Genesis*, Wall Street Journal (Jan. 19, 2023), https://www.wsj.com/livecoverage/stock-market-news-today-01-19-2023/card/the-2018-meeting-that-kicked-off-a-lending-relationship-between-alameda-and-genesis-7dzw1fYOFJUQqxDRt2IY ("Its parent company, Digital Currency Group, gave Genesis $40 million to start the lending business, according to people familiar with the matter.")

[9] https://web.archive.org/web/20200721225619/https://genesistrading.com/lending/ (visited Nov. 9, 2023).



112.    The basic terms of investment in Genesis Yield were simple: in exchange for an investor tendering digital assets or cash to Genesis Global Capital and granting Genesis Global Capital the attendant rights to use those assets or cash in Genesis Global Capital's investment activities, Genesis Global Capital promised to pay the investor lucrative rates of return.

113.    Genesis Yield investments made directly with Genesis Global Capital could be for fixed terms such as six-months, or could be open-term. Genesis Global Capital referred to open term investments as having a "call option." These "call options" on investments permitted an investor to demand repayment of all or a portion of an investment on any given business day, which would trigger an obligation on behalf of Genesis Global Capital to return the investor's capital.

114.    Initially, investment in Genesis Yield securities was open to public investment as long as an individual could meet certain investment minimums set by Genesis Global Capital. Although the investment minimums changed over time, Genesis Global Capital did not always adhere to these requirements. In November 2022, the minimums purportedly enforced by Genesis Global Capital were 100 BTC, 1,000 ETH, $2 million U.S. Dollars, or $1 million of certain alternative digital assets.

115.    Beginning February 2, 2021, however, Genesis Global Capital dropped the investment minimum and began offering investors a way to invest any amount of digital assets in

Genesis Yield securities via the Gemini digital asset platform.

116. Dubbed the "Gemini Earn" program on the Gemini digital asset platform, Genesis Global Capital began permitting any investor that held a Gemini digital asset platform account to elect to invest their digital assets in the Genesis Yield securities.

117. To invest, Gemini digital platform users entered into the Genesis Yield Investment Agreement with Genesis Global Capital and Gemini, and expressly appointed Gemini as their agent for purposes of their Genesis Yield investments. The agreement was a standard agreement and not individually negotiated with Gemini Earn investors. Genesis Yield investments made via Gemini Earn were open term investments, meaning that investors could redeem their investment at any time by giving notice to Genesis Global Capital. Other investors who purchased Genesis Yield securities directly from Genesis likewise entered into a standard Master Borrow Agreement which was not individually negotiated by direct investors. Genesis Yield investments made directly with Genesis were fixed term or open term, where investors could redeem their investment at any time by giving notice to Genesis.

118. The accrual of interest on the Genesis Yield securities were calculated using a daily periodic rate applied to the principal invested, and interest was paid the month after it accrued. Interest payments were denominated in the same type of cryptocurrency or digital asset (or cash) originally invested.

119. Each Genesis Yield investor—whether or not the investment was made via the Gemini Earn program—entered into a Genesis Yield Investment Agreement with Genesis Global Capital which set forth the terms of the investment, including the types of occurrences that constituted events of default and what could cause termination of the agreement and required parties to make certain representations and warranties regarding the parties' financial condition

(*i.e.,* neither party is insolvent), and more.

120.    In each Genesis Yield Investment Agreement, Genesis Global Capital made the following representations to investors:

> [Genesis Global Capital] represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws. (the "Solvency Warranty")

> [Genesis Global Capital] represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder. (the "Adverse Proceedings Warranty").

121.    Importantly, each Genesis Yield Investment Agreement executed by each Genesis Yield investor with Genesis Global Capital stated that the Solvency Warranty and Adverse Proceedings Warranty "shall continue" during the term of the investments.

122.    To generate the yield promised to investors, Genesis Global Capital commingled and/or pooled Genesis Yield investor principal with those of other Genesis Yield investors, held Genesis Yield investor's principal in accounts in Genesis Global Capital's name or other names; pledged, repledged, hypothecated, rehypothecated, sold, lent, staked, arranged for staking, and otherwise transferred Genesis Yield investors' digital assets separately or together with other property; and otherwise used or invested such digital assets or currency at the investor's sole risk.

123.    Genesis Global Capital had to engage in risky investment strategies to generate yield. As just one example, Genesis Global Capital invested billions of dollars' worth of Genesis Yield investors' digital assets and cash with now-infamous digital asset hedge funds Alameda Research, LLC (owned by Sam Bankman-Fried) and Three Arrows Capital (previously defined herein as "3AC"), as well as Genesis Global Capital's parent DCG, who themselves believed they would earn outsized returns with those funds via their own proprietary investment strategies. At the height of their relationship, Genesis Global Capital provided Alameda Research with over $6.5

billion in capital via loans that were often only 50% secured and were not over collateralized.

124.    Genesis Asia Pacific lent assets to Singapore-based clients, such as cryptocurrency hedge fund Three Arrows, on behalf of Genesis Capital. Genesis Capital provided virtually all of Genesis Asia Pacific's lending capital. Genesis Asia Pacific, in turn, repaid Genesis Capital when Genesis Asia Pacific's own borrowers repaid Genesis Asia Pacific. Genesis Capital and Genesis Asia Pacific shared a single loan book managed by the Genesis Entities' Co-Head of Trading and Lending ("Managing Director No. 1") from New York.[10]

125.    In short, Genesis Global Capital engaged in undisclosed, unduly risky and self-interested investment strategies with investors' capital to earn yield. The returns earned by each Genesis Yield investor depended on the pooling of the invested digital assets, and importantly the ways in which Genesis Global Capital invested those assets. Ultimately, investor returns on Genesis Yield securities were dependent on Genesis Global Capital's managerial or entrepreneurial or efforts and risk management in investing activities. Because Genesis Global Capital sought to gain by reinvesting investors' assets with counterparties, investors were dependent on the skill, experience and risk management policies and procedures of Genesis and its executives and employees.

126.    The income Genesis Global Capital earned investing Genesis Yield investors' assets was the only revenue-generating activity in which Genesis Global Capital engaged.

127.    Although Genesis Global Capital styled Genesis Yield investors' investments as "loans" to Genesis Global Capital and characterized Genesis Global Capital's redeployment of those assets as a "borrowing and lending" business, in substance, Genesis Global Capital managed a pooled investment vehicle and/or issued note securities used to fund its own investment business.

---

[10] NYAG Compl., ¶40.

128.    Despite the economic realities of the Genesis Yield product, however, Genesis Global Capital made no attempt to comply with federal or state securities laws.

129.    Genesis Global Capital is not licensed, registered, qualified, and did not otherwise file notice with the SEC.

130.    Genesis Yield securities are not registered with the SEC or any other securities regulatory authority, nor are they exempt from registration.

131.    Genesis Global Capital failed to disclose to Genesis Yield investors that Genesis Yield securities were not registered with federal or state securities regulatory authorities.

132.    Genesis Yield investors' principal was thus not protected by the Securities Investor Protection Corporation ("SIPC"), insured by the Federal Deposit Insurance Corporation ("FDIC"), or insured by the National Credit Union Administration ("NCUA"). This lack of a protective scheme or regulatory oversight subjected Genesis Yield investors to additional risks not borne by investors who maintain assets with most SIPC member broker-dealers, or with banks, savings associations, or credit unions.

## IX.    THE GENESIS YIELD INVESTMENT AGREEMENTS ARE SECURITIES.

133.    An analysis of the facts and circumstances surrounding the offer and sale execution of Genesis Global Capital's Genesis Yield securities, including the analysis set forth in a complaint filed by the SEC,[11] show that the Genesis Yield Investment Agreements are: (1) "investment contracts" when coupled with investors' deposits under the test set forth in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946); and (2) "notes" under *Reves v. Ernst & Young*, 494 U.S. 56, 64–69 (1990). The Genesis Yield Investment Agreements are also evidence of indebtedness.

---

[11] *SEC v. Genesis Global Capital, LLC and Gemini Trust Company, LLC*, Case No. 1:23-cv-00287, ECF No. 1 (S.D.N.Y) ("SEC Enforcement Action"). As noted in the SEC Enforcement Action, "digital asset" is another term for crypto asset, *id.*, at n.2, and thus both terms are used herein interchangeably.

134.    According to the NYAG's complaint, Genesis's Chief Legal Officer, Arianna Pretto-Sakmann, arrived at the same conclusion before the launch of the Gemini Earn program: "Genesis's Chief Legal Officer acknowledged several months before the launch of Gemini Earn that the program 'may be viewed as an investment contract under the securities laws.'"[12]

135.    The definition of a "security" under the Securities Act includes a wide range of investment vehicles, including "investment contracts" and "notes."  An "investment contract" is an investment of money in a common enterprise with a reasonable expectation of profits derived from the entrepreneurial or managerial efforts of others. Congress defined "security" broadly to embody a "flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits."[13]

136.    According to the Supreme Court, the broad definition of "security" is "sufficient to encompass virtually any instrument that might be sold as an investment," because "Congress' purpose in enacting the securities laws was to regulate *investments*, in whatever form they are made and by whatever name they are called."[14]

137.    Courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, and enterprises that exist only on the Internet, including crypto assets.[15]

138.    Therefore, under the definition of the Securities Act and the test articulated in *Reves* and *Howey,* the Genesis Yield Investment Agreements as offered and sold by Genesis Global Capital were securities subject to the federal securities laws.

---

[12] NYAG Compl., ¶191.
[13] *SEC v. Genesis Global Capital.*, ¶19 (citing *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946)).
[14] *Id.* (citing *SEC v. Edwards*, 540 U.S. 389, 393 (2004)).
[15] *Id.*

### A. THE GENESIS YIELD INVESTMENT AGREEMENTS ARE NOTES UNDER *REVES*.

139.    A note is a type of debt security that, as done in the Genesis Yield Investment Agreements, represents a promise to pay a specific amount of money at a specified time or on demand.

140.    A note is presumed to be security unless it bears a strong resemblance to instruments that are not securities, which courts determine by examining four factors: (1) the motivation of the parties; (2) the plan of distribution; (3) the expectations of the investing public; and (4) the availability of an alternative regulatory scheme that "significantly reduces the risk of the instrument" for investors other than securities laws, "thereby rendering application of the Securities Acts unnecessary."[16]

141.    Under the test articulated in *Reves*, the Genesis Yield Investment Agreements were notes that were offered and sold by Genesis Global Capital as securities.

### i.    Motivations of Genesis Yield Securities Investors

142.    Genesis Global Capital offered and sold the Genesis Yield securities to obtain digital assets, cash, and other capital to use in its business – namely, to run its investment activities, generate profits for itself, and to pay the interest promised to Genesis Yield investors.

143.    Genesis Yield securities investors—including those who invested through the Gemini Earn program—were primarily interested in the profit they expected the Genesis Yield product to generate.[17]

144.    In other words, Genesis Global Capital sought to generate enough revenue to (1) return profits to Genesis Global Capital, Defendant DCG, and Defendant Silbert; and (2) to pay

---

[16] *Id.,* ¶44 (citing *Reves v. Ernst & Young*, 494 U.S. 56, 64–69 (1990)).

[17] *Id.,* ¶45.

interest to Genesis Yield securities investors.

145.    Genesis Global Capital, at the direction and subject to the control of Defendants Moro, Islim, DCG, Silbert, Hutchins, Lenihan, Kraines and Murphy, controlled the digital assets invested by purchasers of Genesis Yield securities.

146.    Genesis Global Capital controlled the crypto assets it obtained from investors and had complete discretion in determining how much to hold, lend and otherwise use. Genesis Global Capital used the crypto assets it raised from investors to make loans to institutional borrowers or as collateral for Genesis Global Capital's own borrowing. Genesis also had the discretion to hold the assets on its balance sheet to provide Genesis with liquidity to meet potential demand for loans as well as to repay the investors in its crypto asset program.[18]

147.    In turn, Plaintiffs and members of the Class invested in Genesis Yield securities primarily for profit, *i.e.,* to receive a return on their crypto assets. Genesis and Gemini both touted the profits investors could earn by investing their crypto assets with Genesis, including for example, by advertising Gemini Earn as an investment and touting that investors could receive up to 8.05% annual percentage yield ("APY") on their crypto assets. Investors who purchased Genesis securities were led to expect that by tendering and giving control over their crypto assets to Genesis, they would receive profit in the form of interest on those assets.[19]

148.    Genesis also described itself as the "premier institutional digital asset financial services firm," and "the world's largest digital asset lender" and that "[h]olders of digital currencies can earn yield on their assets by lending directly to Genesis, a regulated and trusted counterparty." Accordingly, Genesis Yield investors were led to expect that Defendants' efforts to

---

[18] *Id.,* ¶46.
[19] *Id.,* ¶47.

generate the investment returns – *i.e.*, the promised interest – would result in profit for investors.[20]

149.    As part of the Genesis Yield Investment Agreements, investors ceded control over their crypto assets to Genesis, who has complete discretion in deploying the crypto assets. Genesis, not investors, undertook various complex tasks of pooling Genesis Yield crypto assets, identifying Institutional Borrowers to serve as counterparties, negotiating individual agreements with those counterparties, and managing market and counterparty risk. Investors understood that Genesis would conduct due diligence on Institutional Borrowers and evaluate market conditions in determining the appropriate collateral levels.[21]

150.    Moreover, the economic realities of the Genesis Yield program demonstrate that Genesis was motivated to use its experience and skill as the "premier institutional digital asset financial services firm" and its economic power as "the world's largest digital asset lender " to select appropriate Institutional Borrowers to serve as counterparties, negotiate for the highest interest rates from those Institutional Borrowers, and set appropriate collateral levels, in order to generate maximum profit for itself. Defendants' efforts were essential to the success or failure of the enterprise.[22]

151.    As a large institutional lender in the cryptocurrency industry, Genesis negotiated more favorable loan terms and interest rates with borrowers than Genesis Yield investors could negotiate on their own. Genesis paid yield to the Genesis Yield investors from the interest it earned on its loans to third parties. Thus, the Genesis Yield investors' fortunes were tied to the effort and expertise of Genesis, and the investors shared in the profits made by Genesis.[23]

152.    Investors in open-term Genesis Yield Investment Agreements understood that, on

---

[20] *Id.,* ¶63.
[21] *Id.,* ¶64.
[22] *Id.,* ¶65.
[23] NYAG Compl., ¶50.

a monthly basis, the interest rate for their Gemini Earn investments would be revised by Genesis, reflecting Genesis' ongoing managerial efforts to pay among "the highest rates in the market."[24]

153.    Thus, representations made by Genesis Global Capital to Genesis Yield investors in the Genesis Yield Investment Agreements caused Plaintiffs and members of the Class to invest their digital assets with the expectation of profits in the form of interest on those digital assets.

154.    The yield paid to Genesis Yield securities investors fluctuated. On a monthly basis, Genesis determined the types of cryptocurrencies it was willing to borrow and the yield it was willing to pay for each type of asset. With regard to Gemini Earn, after determining its agent fees, Gemini published the yield rates for different assets on the Gemini Earn Page. On February 1, 2021, the Earn Page set forth yield rates that Earn investors would receive on their invested cryptocurrencies as follows:[25]

### Interest Rates

| Asset | APY | Asset | APY | Asset | APY |
|---|---|---|---|---|---|
| Aave AAVE | 5.83% | Amp AMP | 1.98% | Balancer BAL | 1.54% |
| Basic Attention Token BAT | 3.49% | Bitcoin Cash BCH | 4.55% | Bitcoin BTC | 3.05% |
| Compound COMP | 2.47% | Curve CRV | 1.98% | Dai DAI | 4.16% |
| Ether ETH | 3.05% | Filecoin FIL | 7.40% | Kyber Network KNC | 2.58% |
| Chainlink LINK | 4.46% | Litecoin LTC | 5.10% | Decentraland MANA | 1.80% |
| Maker MKR | 1.98% | Orchid OXT | 2.47% | PAX Gold PAXG | 3.92% |
| Ren REN | 2.71% | Synthetix SNX | 2.69% | Storj STORJ | 1.98% |
| Uma UMA | 2.69% | Uniswap UNI | 3.59% | Yearn.finance YFI | 3.29% |
| Zcash ZEC | 2.25% | 0x ZRX | 3.68% | | |

155.    These rates frequently changed. For example, an Earn investor who invested one

---

[24] SEC Enforcement Action, ¶66.
[25] NYAG Compl., ¶52.

bitcoin at the start of Earn could have earned 3.05% APY on that investment in February 2021, 2.05% in May 2021, 1.65% APY in August 2021, 1.49% APY in September 2021, and 1.01% in February 2022. On the Earn page, Gemini claimed the rates it offered were "more than 100x the average national interest rate, among the highest rates on the market."[26]

156.    Genesis and Gemini controlled the interest rates and stated to investors: "rates may increase or decrease in the future."[27]

### ii.    Distribution Plan of Genesis Yield

157.    Genesis Global Capital publicly advertised Genesis Yield securities on its own websites, third party websites and social media.

158.    For example, on February 2, 2021, Genesis Global Capital tweeted the following from the GGT @genesistrading twitter account:



https://x.com/GenesisTrading/status/1356606264130871299?s=20

159.    Also on February 2, 2021, Genesis Global Capital tweeted the following from the @genesistrading account:

---

[26] *Id.*, ¶53.
[27] *Id.*, ¶54.



https://x.com/GenesisTrading/status/1356601826796326913?s=20

160.    Genesis Yield securities were offered and sold directly to investors and through the

Gemini Earn Program.

161.    An FAQ entitled "What are the risks of Gemini Earn?" on the Gemini Earn website

described Gemini Earn as an investment:

> Cryptocurrency, like many assets, can be volatile and subject to price swings. There
> is always a risk in **investing**, and each customer needs to assess their own risk
> tolerance before making any <u>investment decisions</u>. Our partners in Gemini Earn
> have an obligation to return funds according to the terms of their loan agreement.
> However, Gemini Earn customers (the lenders) always assume some level of risk
> when they decide to lend their funds. We believe **Gemini Earn gives our retail
> investors another way to stay long-term in the asset class and have the <u>option
> to invest and earn interest</u>**, all on the Gemini platform.

(Emphasis added.)[28]

162.    Gemini similarly promoted the profit that investors could earn through the Gemini

Earn program. In a February 2021 press release launching Gemini Earn, Gemini CEO Tyler

---

[28] SEC Enforcement Action ¶35.

Winklevoss stated, "We designed a program that allows our customers the ability to generate a real return on their crypto holdings." On February 27, 2021, Gemini also posted a video on YouTube titled, "Invest Better with Gemini Earn." On its website, Gemini described how users would earn interest, noting, "We are excited to launch Gemini Earn and offer more opportunities for you to grow your portfolio and earn yield." Similarly, Gemini advertised on its website that investors could "[p]ut your crypto to work. With Gemini Earn, you can receive up to 8.05% APY on your cryptocurrency," and listed the interest rate that investors could earn for each eligible crypto asset.[29]

163.    There was no minimum investment amount to be eligible to participate in the Gemini Earn program.  As of November 16, 2022, over 340,000 investors, most residing in the United States, had crypto assets invested in Genesis Yield through Genesis Yield Investment Agreements.[30]

### iii.    Expectations of the Investing Public

164.    Genesis Global Capital and Gemini, through websites and social media, promoted Genesis Yield securities as an investment, specifically as a way to earn high "returns" or "yield" on investors digital assets.[31]

165.    Gemini repeatedly described the Gemini Earn as an investment on its own website and social media and repeatedly touted that the Gemini Earn interest rates were "among the highest rates on the market" and "higher than most existing options." Gemini's website further claimed that Gemini Earn investors could "receive more than 100x the national interest rate."[32]

166.    The economic realities of the transaction, in which investors had an opportunity to

---

[29] Id., ¶34.
[30] Id., ¶25.
[31] Id., ¶50.
[32] Id.

tender crypto assets with Genesis in exchange for earning interest with some of the "highest rates" available for crypto assets, further underscore why the investing public considered Genesis Yield to be an investment opportunity.[33]

### iv. No Risk Reducing Factors Exist

167. No alternative regulatory scheme or risk-reducing factors existed to protect investors with respect to Genesis Yield investment.[34]

168. For example, in its own FAQs, Genesis Global Capital noted that "[d]igital assets are not covered by SIPC [(Securities Industry Protection Corporation)] insurance" and that "[e]stablishing a lending and borrowing relationship with Genesis is not the same as opening a depository account or a savings account" and that "[a]ccounts with Genesis do not enjoy FDIC protection."[35]

169. Under the terms of the Genesis Yield Investment Agreements, Genesis was not required to post collateral. Gemini told investors, "All lending by you through our Program will be on an unsecured basis. We will not collect or hold collateral from Borrowers, nor maintain any collateral account for your benefit." Although Genesis later provided some collateral to Gemini in August 2022, the collateral Genesis provided to Gemini was in the form of restricted shares that could not be liquidated immediately and amounted to only a fraction of the total investor assets held in Gemini Earn.

170. Similarly, although Gemini is registered with NYSDFS as a New York limited purpose trust company, NYSDF did not have oversight over Genesis Global Capital.

171. Similarly, NYDFS did not have oversight over DCG, or Silbert.[36]

---

[33] *Id.*
[34] *Id.,* ¶51.
[35] *Id.*
[36] *Id.,* ¶52.

172.     Months before the launch of the Gemini Earn program, Gemini knew that Genesis Capital was regulated only by FinCEN and, in fact, categorized Genesis Capital's lack of regulation as a "high" risk factor in internal documents.[37]

173.     FinCEN, the Financial Crimes Enforcement Network, is a bureau of the United States Department of the Treasury that collects and analyzes information about financial transactions in order to combat domestic and international money laundering, terrorist financing, and other financial crimes.  FinCEN does not purport to regulate securities or the disclosure of risks to investors.

174.     These statements, and facts, demonstrate that alternative regulatory schemes provided no protection for Genesis Yield investors.

**B.     THE GENESIS YIELD INVESTMENT AGREEMENTS ARE INVESTMENT CONTRACTS UNDER *HOWEY*.**

175.     The offer and sale of the Genesis Yield Investment Agreements, when coupled with investors' deposits constitutes the offer and sale of investment contracts under *Howey*.[38]

176.     Digital assets qualify as "money" under the federal securities laws. Genesis Yield therefore involved an investment of money.

177.     During the Class Period, Genesis Global Capital raised billions of dollars from hundreds of thousands of investors, who tendered crypto assets to Genesis under the Genesis Yield Investment Agreements.[39]

178.     Investors in Genesis Yield invested in a common enterprise with other investors. Genesis Global Capital pooled Genesis Yield investors' digital assets on Genesis Global Capital's balance sheet, and invested those assets in order to generate returns for both Genesis Global Capital

---

[37] NYAG Compl., ¶195.
[38] SEC Enforcement Action, ¶56.
[39] *Id.*, ¶57.

and investors.[40] In practice Genesis Global Capital did not segregate the crypto assets it received from different groups of investors.[41]

179.    Genesis Global Capital then invested the pooled digital assets in ways designed to generate returns for DCG, Silbert, Genesis Global Capital, and investors. Genesis retained possession and control over the investors' crypto assets on its balance sheet, and determined how much to hold, lent out to others, and otherwise use. Genesis exercised its discretion in how to use investors' crypto assets to generate revenue for its business and to pay the interest rates it promised Gemini Earn investors and other investors. The Genesis Yield Investment Agreements did not contain any explicit terms restricting how investors' crypto assets would be used by Genesis.[42]

180.    As the invested crypto assets were not segregated in any way by Genesis Global Capital, each investor's fortune was tied to the fortunes of the other investors.  Genesis did not manage individual or separate accounts for each investor in Gemini Earn. Instead, the returns earned by each investor were reliant on the pooling of the invested crypto assets. As the invested crypto assets were not segregated in any way by Genesis, each investor's fortune was tied to the fortunes of the other investors.[43]

181.    Generally, Genesis deployed the Genesis Yield investors' crypto assets by either lending them to Institutional Borrowers or using the assets as collateral for Genesis' own borrowing. Crypto assets not loaned to Institutional Borrowers or used for collateral were held by Genesis on its balance sheet in an effort to provide Genesis with liquidity to meet potential demand for loans as well as to repay the investors in its Genesis Yield program. Genesis also had the ability

---

[40] *Id.*, ¶¶58-59.
[41] *Id.*, ¶38.
[42] *Id.*
[43] *Id.*, ¶59.

to loan the crypto assets to related parties, including its parent company.[44]

182.    Genesis employed its discretion and judgment in determining the terms of transactions with Institutional Borrowers. For example, Genesis conducted due diligence on the Institutional Borrowers before entering into a transaction. Genesis negotiated an initial agreement with each Institutional Borrower, and then individually negotiated the terms – including the type of crypto assets to be lent, interest rate, duration of the loan, and collateral (if any) – of every subsequent lending transaction. Genesis separately evaluated each Institutional Borrower, as well as market conditions, when determining collateral rates.[45]

183.    Genesis Yield investors' fortunes were also tied to Genesis Global Capital's fortunes; both Genesis Global Capital and investors earned profits when Genesis Global Capital deployed the pooled assets.[46] The returns earned by each Genesis Yield investor were reliant on the pooling of the invested crypto assets and the ways in which Genesis deployed those assets, including Genesis' evaluation of the Institutional Borrowers, negotiation of favorable terms, and management of market and counterparty risk. When Genesis loaned crypto assets it received through the Genesis Yield program, the assets were transferred to the Institutional Borrowers and left Genesis' balance sheet. Ultimately, the returns of Genesis Yield investors were dependent on Genesis' managerial efforts and risk management in its lending activities.[47]

184.    The interest income that Genesis received from lending crypto assets to Institutional Borrowers was used to generate revenue for Genesis and to pay the promised interest to Genesis Yield investors. Genesis did not have any other revenue-generating activities. For example, for the three months ended March 31, 2022, Genesis received approximately $169.8 million in interest

---

[44] *Id.*, ¶39.
[45] *Id.*, ¶40.
[46] *Id.*, ¶60.
[47] *Id.*, ¶41.

42

income from Institutional Borrowers and paid $166.2 million in interest to the investors in its Genesis Yield program.[48]

185.     Similarly, Genesis Global Capital's suffering of losses and entering bankruptcy has harmed Plaintiffs and members of the Class by restricting their ability to access their digital assets.

### C.     STATE AND FEDERAL REGULATORS HAVE CONCLUDED IDENTICAL INVESTMENT PRODUCTS ARE "SECURITIES" AS DEFINED BY STATE AND FEDERAL SECURITIES LAWS.

186.     Over the past 18 months, the SEC and numerous state securities regulators have evaluated investment products offered by other companies that are nearly identical to the Genesis Yield securities and have concluded that the products constitute "securities."

187.     For example, Nexo, Inc., Nexo Capital Inc., and Nexo Financial, LLC (collectively, "Nexo") offered and sold the Nexo Earn Interest Product ("EIP") accounts, which "allowed United States investors to tender to Nexo certain crypto assets, which Nexo deposited in interest-yielding accounts and then used in various ways to generate income for its own business and to fund interest payments to EIP investors," including "staking, lending, and engaging in arbitrage on purportedly 'decentralized' finance platforms; investing in certain crypto assets; loaning funds to retail and institutional borrowers; and entering into options and swap contracts with respect to the crypto assets tendered."

    a)  The SEC determined that the EIP accounts were unregistered securities, and as a result, Nexo agreed to cease offer and sale thereof and pay a $22.5 million fine.

    b)  Eight state regulators similarly determined that the EIP accounts were securities, including the:

---

[48] *Id.*, ¶42.

i)  California Department of Financial Protection and Innovation;

ii)  State of Vermont Department of Financial Regulation;

iii)  State of Oklahoma Department of Securities;

iv)  South Carolina Attorney General, as Securities Commissioner;

v)  Commonwealth of Kentucky Public Protection Cabinet, Department of Financial Institutions, Division of Securities;

vi)  Securities Division of the Office of the Maryland Attorney General;

vii)  State of Washington Department of Financial Institutions, Securities Division; and

viii)  Office of Attorney General of New York.

188.  BlockFi Lending LLC ("BlockFi") "offered and sold BlockFi Interest Accounts ("BIAs") to investors, through which investors lend crypto assets to BlockFi in exchange for BlockFi's promise to provide a variable monthly interest payment," was generated and paid out to investors "in various ways, including loans of crypto assets made to institutional and corporate borrowers, lending U.S. dollars to retail investors, and by investing in equities and futures."[49]

a)  The SEC determined that the BIAs were securities because they were notes under *Reves* and investment contracts under *Howey*.[50] As a result, BlockFi agreed to pay a $50 million penalty.[51]

b)  The State of New Jersey Bureau of Securities also found that BlockFi's BIAs are "unregistered securities in the form of cryptocurrency interest-earning

---

[49] *Order Instituting Cease-And Desist Proceedings*, *In the Matter of BlockFi Lending,* LLC, SEC Administrative Proceeding File No. 3-20785, https://www.sec.gov/litigation/admin/2022/33-11029.pdf.
[50] *Id.*
[51] *BlockFi Agrees to Pay $100 Million in Penalties and Pursue Registration of its Crypto Lending Product*, SEC (Feb. 14, 2022) https://www.sec.gov/news/press-release/2022-26.

accounts."[52] BlockFi agreed to pay a $50 million penalty to state regulators in *all fifty states* (including New Jersey) as well Washington D.C., Puerto Rico, and the Virgin Islands, as participants in the North American Securities Administrators Association.[53]

189.  Voyager Digital Ltd., Voyager Digital Holdings, Inc., and Voyager Digital LLC (collectively, "Voyager") offered and sold Voyager Interest Accounts, through which investors opened accounts by transferring cryptocurrency or other digital assets to Voyager, "use[d] their principal to buy and trade more than 90 … digital assets," and then earned "interest on their purchase of certain digital assets" at a rate set by Voyager.  Several state enforcement agencies found that the Voyager Interest Accounts constituted securities under their respective state laws, including the:

a)  Texas State Securities Board;

b)  Securities Division of the Office of the Attorney General of the State of South Carolina;

c)  State of New Jersey Bureau of Securities;

d)  State of Washington Department of Financial Institutions Securities Division;

e)  State of Oklahoma Department of Securities; and

f)  State of Vermont Department of Financial Regulation.

190.  Celsius Network, Inc., Celsius Network Limited, Celsius US Holding, LLC, Celsius Network, LLC, and Celsius Lending, LLC (collectively, "Celsius") offered and sold

---

[52] *In the Matter of BlockFi Inc., BlockFi Lending, LLC, and BlockFi Trading, LLC*, New Jersey Attorney General Office, https://www.nj.gov/oag/newsreleases21/BlockFi-Cease-and-Desist-Order.pdf
[53] *Acting AG Platkin: Cryptocurrency Lending Platform BlockFi Agrees to $100 Million Settlement with State and Federal Securities Regulators*, New Jersey Attorney General Office (Feb. 14, 2022), https://www.njoag.gov/acting-ag-platkin-cryptocurrency-lending-platform-blockfi-agrees-to-100-million-settlement-with-state-and-federal-securities-regulators/; see also *BlockFi Agrees to Pay $100 Million in Penalties and Pursue Registration of its Crypto Lending Product,* SEC (Feb. 14, 2022), https://www.sec.gov/news/press-release/2022-26.

interest-earning accounts, known as the "Earn Rewards" program, through which investors "open accounts by transferring eligible cryptocurrency to [Celsius] to invest in Celsius Earn Interest-Bearing Accounts" and relinquish control of the cryptocurrency, in exchange for earning "lucrative interest rates." Several state regulatory agencies took action, finding that the Earn Interest-Bearing Accounts reward program constituted the offer and sale of unregistered securities, including the:

  a) Texas State Securities Board;

  b) State of New Jersey Bureau of Securities;

  c) State of Vermont Department of Financial Regulation;

  d) State of Alabama Securities Commission;

  e) Commonwealth of Kentucky; and

  f) State of Washington Department of Financial Institutions, Securities Division.

191.    Coinbase, Inc. and Coinbase Global Inc. (collectively, "Coinbase") planned to offer a program called "Coinbase Lend," allowing "eligible customers to earn interest on select assets on Coinbase, starting with 4% APY on USD Coin (USDC)" by, specifically, investors "lending the USDC they hold on Coinbase's platform" and earning interest from their participation. The SEC issued a Wells notice to Coinbase about its Lend program, advising that after assessing under *Howey* and *Reves*, the SEC will sue Coinbase if the program launches, because such a program would constitute a security.

## X.    SECURITIES ACT CLAIMS

192.    The Securities Act claims expressly do not make any allegations of fraud or scienter and do not incorporate any of the allegations contained in Section XI of this complaint or any other allegations of scienter and fraud.

193.    The federal securities laws require offers and sales of securities to be registered with the SEC unless an exemption from registration applies and to additionally require issuers to

provide a slate of disclosures informing investors of the risks of investing.

194.    Specifically, Sections 5(a) and 5(c) of the Securities Act require that an issuer like Genesis Global Capital file a registration statement with the SEC in order to offer or sell securities, including notes and investment contracts, unless an exemption from registration applies.

195.    Genesis Global Capital did not seek exemption from registration with the SEC.

196.    Genesis Global Capital never had a registration statement filed or in effect with the SEC regarding Genesis Yield securities.

197.    Plaintiffs and members of the Class were harmed by the failure to register the offer and sale of Genesis Yield securities because Genesis Global Capital's public disclosures contained selective or no information about Genesis Global Capital's financial history, audited financial statements, management discussion and analysis of financial condition and results of operations, ability to generate profits, and risk factors.

198.    Genesis Yield investors had limited or inadequate information about Genesis Global Capital's operations, financial condition, liquidity, risks, related party transactions and other factors relevant in considering whether to invest in Genesis Yield securities.

199.    Plaintiffs and members of the Class lacked full and detailed information regarding how Genesis Global Capital deployed their crypto assets, including its exposure to volatility in crypto asset markets, the financial condition of Genesis Global Capital's counterparties, and the amount of collateral Genesis Global Capital obtained, if any, as part of its loans to institutional borrowers, related party transactions, and concentrations of risk.

200.    Because of the above-described conduct Genesis Yield investors lacked information about Genesis Global Capital that the SEC requires issuers to provide under the Securities Act when they offer or sell securities to the investing public.

201.    On January 12, 2023, the SEC Enforcement Action was filed against non-parties Genesis Global Capital and Gemini for engaging "in an unregistered offer and sales of securities to U.S. retail investors, in violation of the federal securities laws" by offering the Genesis Yield securities via the Gemini Earn program.

202.    In the SEC Enforcement Action, the SEC alleges that Genesis Yield investors who invested via the Gemini Earn program entered into Genesis Yield Investment Agreements with Genesis Global Capital and Gemini, and Genesis Global Capital "pooled the crypto assets from [Genesis Yield] investors with assets from other investors. Genesis then deployed the crypto assets – primarily by lending the crypto assets to institutional counterparties ('Institutional Borrowers') – in order to generate revenue for its business, including the revenue necessary to pay interest to [Genesis Yield] investors. Genesis earned revenue by lending the crypto assets at a higher rate than it paid to [Genesis Yield] and other investors."

203.    The SEC alleges the conduct described in the preceding paragraph "were securities that Genesis . . . offered and sold to the investing public … without registering the offer and sale with the SEC as required by the federal securities laws."

204.    As a result, the SEC alleges, Genesis Yield investors such as Plaintiffs lacked material information about the risks of their investment in the Genesis Yield investment products, and have suffered significant harm as a result of Genesis Global Capital's conduct, losing access to approximately $900 million-worth of digital assets.

205.    As alleged above, on October 19, 2023, the New York Attorney General filed a complaint against Defendants DCG, Silbert, Moro, the Company and others alleging violations of New York's Martin Law for the sale of unregistered securities.

206.    Section 12(a)(1) of the Securities Act provides in relevant part: "Any person who

offers or sells a security in violation of section 77e of this title … shall be liable … to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C. § 77l(a)(1).

207.     Plaintiffs and members of the Class invested in Genesis Yield securities offered or sold by Genesis through the Genesis Yield Investment Agreements whereby investors agreed to tender their digital assets or cash to Genesis in exchange for interest payments and the eventual return of the digital assets on demand.

208.     Under the Securities Act, the terms "offer to sell", "offer for sale" or "offer" broadly include every attempt or offer to dispose of, or solicitation of an offer to buy, a security or interest in a security for value. 15 U.S.C.A. § 77b(a)(3). Genesis offered Genesis Yield securities to members of the Class through the Genesis Yield Investment Agreements and related marketing and solicitations alleged in above Section IX.

209.     By entering into the Genesis Yield Investment Agreements, investors sought an opportunity to invest in Genesis Yield securities offered by Genesis Global Capital.

210.     Furthermore, Genesis sold Genesis Yield securities to Plaintiffs and members of the Class.  To invest in Genesis Yield, investors entered into the Genesis Yield Investment Agreement with Genesis, and executed a "Loan Term Sheet," which incorporated the applicable Genesis Yield Investment Agreement, or authorized wire or electronic transactions through the Gemini Earn program, through which investors tendered their digital assets or cash to Genesis in exchange for interest payments from Genesis and the promise of eventual return of the digital assets on demand.

211. The Securities Act broadly defines "sale" or "sell" to include every contract of sale or disposition of a security or interest in a security, for value. 15 U.S.C. § 77b(a)(3). The Genesis Yield Investment Agreements provide that a "loan" means an exchange for digital currency or cash "in accordance with this Agreement." Master Borrow Agreement at 3; Master Digital Asset Loan Agreement at 3.

212. The Genesis Yield Investment Agreements were one component of the entire Genesis Yield program, through which Defendants offered and sold securities. The entirety of the parties' interactions regardless of whether transactions took effect at different points in time, constitutes Genesis' sale of Genesis Yield securities.

213. During the Class Period, Genesis Global Capital raised billions of dollars from hundreds of thousands of investors, who tendered crypto assets to Genesis under the Genesis Yield Investment Agreements through loan term sheets, or via wire or electronic transfer through the Gemini Earn program.

214. Transactions reflected in Plaintiffs' certifications constitute a purchase of Genesis Yield securities through which Plaintiffs tendered consideration (the investment principal) in exchange for Genesis's promise to pay back the investment principal, together with accrued interest, on demand.

## XI.    EXCHANGE ACT CLAIMS

### A. EXCHANGE ACT DEFENDANTS CAUSED GENESIS GLOBAL CAPITAL TO FRAUDULENTLY MISREPRESENT ITS RISK-MANAGEMENT PRACTICES IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5.

215. According to Gemini, the agent for Genesis Yield investors who invested via the Gemini Earn program, and the NYAG, from at least February 2, 2021, Genesis Global Capital— in concert with Exchange Act Defendants and with Exchange Act Defendants' active support and

encouragement—induced the Genesis Yield investors who invested via the Gemini Earn program to invest by touting Genesis Global Capital's purportedly robust risk-management practices and a supposedly thorough vetting process of the counterparties to which Exchange Act Defendants caused Genesis Global Capital to reinvest Class members' assets.

216. When Genesis sought to initiate the Gemini Earn Program and begin its lending relationships with Gemini Earn Lenders (at the start of the Class Period) Genesis Global Capital shared its "Overview of Enterprise Credit Risk Management" (the "Overview"). Gemini has stated that when Genesis Global Capital sought to solicit Genesis Yield investment from Gemini users, Genesis Global Capital shared the Overview with Gemini, the agent of Gemini users who invested in Genesis Yield.

217. The Overview, according to Gemini, declared that Genesis Global Capital had "many levers to pull to ensure Genesis Global Capital is well protected, including collateral, calculated exposure limits based on quantitative and qualitative due-diligence, margin management, ongoing transparency and financial updates, and macro hedging tools." It emphasized Genesis Global Capital's "ability to responsibly manage credit risk and face zero defaults" and to "maintain a consistently high level of creditworthiness across our entire loan portfolio."

218. In the Overview, Genesis Global Capital represented to Gemini that, "[a]side from credit extension, Genesis [Global Capital] primarily lends on an 'over-collateralized' basis – i.e., the collateral pledged exceeds the value of the loan." With respect to unsecured credit, Genesis Global Capital promised Gemini—who would serve as the agent for Gemini users that chose to invest in Genesis Yield—that "it would not extend credit unless we believe it's rightfully earned and appropriate within the context of the relationship, trade, and time of issuance."

219.     Genesis Global Capital used the Overview to give Gemini the misimpression that
Genesis Global Capital was a responsible financial institution, representing purportedly sound
risk-management practices and a safe, over-collateralized loan book.

220.     These representations to the agent of Genesis Yield investors who invested through
Gemini Earn caused hundreds of thousands of investors to invest in Genesis Yield, believing that
Genesis Global Capital observed sound risk management and counterparty risk policies.

221.     According to a February 2, 2021 *CoinDesk* article titled "Gemini Partners with
Crypto Lender Genesis to Offer 7.4% Yield on Customer Deposits":

> The product is offered in all 50 states, including New York where Gemini has its
> trust license. Users can get yield on any cryptocurrency available on the Gemini
> platform now and on Gemini's GUSD stablecoin at some point in the future. The
> product is open to active Gemini customers currently and will be rolled out to all
> Gemini customers later this month.
>
> Gemini collects part of the spread between interest paid on the crypto and interest
> Genesis charges on its loans to institutions. As part of the partnership, **Gemini
> reviewed Genesis' financial statements and verified that the lender's loans are
> overcollateralized, said Yusuf Hussain, Gemini's head of risk.**
>
> This is the third partnership of its kind for Genesis. It also powers interest-bearing
> accounts at crypto lender Ledn and crypto exchange Luno, which is also owned by
> Digital Currency Group.
>
> "As far as percentages of loans coming from partnerships, it's still relatively a small
> part right now, largely because they are relatively new," Genesis CEO Michael
> Moro said. "But we expect the numbers to become more significant over time as a
> sign of the success of these partnerships."

(Emphasis added).

222.     According to the NYAG Complaint, Gemini repeated Genesis' representations to
investors: "For example, on March 5, 2021, a business development employee at Gemini
responded to an investor inquiry about Earn by stating: "based on our due diligence, Genesis is

only lending assets deposited into [Earn] to institutional borrowers in an overcollateralized way."[54]

### i. Genesis Misrepresented its Risk Management Practices.

223.    Genesis Global Capital's representations regarding its risk-management practices made to Gemini were lies. In truth, according to the NYAG Complaint, Genesis Global Capital's loan book was not over-collateralized, and the below chart shows the approximate collateral coverage ratio for the following financial quarters:[55]

| December 2020 | March 2021 | June 2021 | September 2021 | December 2021 | March 2022 | June 2022 | September 2022 |
|---|---|---|---|---|---|---|---|
| 60% | 87% | 71% | 85% | 90% | 61% | 76% | 66% |

### a. Genesis Was Overly Concentrated in Risky Counterparty 3AC

224.    Moreover, as it turned out, Genesis Global Capital was recklessly lending huge amounts to a counterparty, Three Arrows Capital, or 3AC, that Exchange Act Defendants knew, or at least recklessly disregarded, was using these huge amounts to fuel a risky arbitrage trading strategy (the "Grayscale Trade").

225.    The Grayscale Trade was designed to capture the premium GBTC was trading at compared to the spot price of bitcoin. The premium was attributed to the fact that GBTC was the only way for institutional investors to get regulator-approved access to Bitcoin's price movements, which caused demand to exceed supply, hence the premium.

226.    The mechanics of the Grayscale Trade worked as follows: an investor like 3AC could borrow to source Bitcoin from Genesis, contribute that Bitcoin to Grayscale in exchange for new GBTC shares, hold the GBTC shares for the required holding period (six months), and then

---

[54] NYAG Compl., ¶72.
[55] Id., ¶73.

sell the GBTC shares at a premium in order to repay the Bitcoin loan taken out to source the Bitcoin

and keep the difference between the price paid for the Bitcoin and the amount they sold the GBTC

shares for (the "GBTC Premium"):

**THE GRAYSCALE TRADE**



227. The success of the Grayscale Trade depended on GBTC shares continuing to trade

at a premium to the NAV of the Greyscale Bitcoin Trust once the six-month holding period for

new GBTC shares had run.

228. It was in Defendants DCG's (and Silbert's) interest to fuel the creation of new

GBTC shares and support 3AC's Greyscale Trade in this reckless manner because Grayscale

receives significant compensation as the sponsor of GBTC. As discussed above, Grayscale

receives a 2% management fee for administering the trust's operations, which is calculated by

reference to the NAV (the "Net Asset Value" or "NAV")—*i.e.*, the market value of its underlying

Bitcoin holdings. This means that the issuance of new GBTC shares—which requires the

contribution of new Bitcoin into the trust—increases the fee that is paid to Grayscale. And because

operation of GBTC requires only trivial expenses, that fee is nearly all profit for Grayscale—and ultimately for Defendant DCG, its corporate parent, and Defendant Silbert, DCG's controlling shareholder.

229.    Defendants DCG and Silbert were all too willing to facilitate billions of dollars' worth of Genesis Yield investors' assets to support the Greyscale Trade because this arbitrage had the effect of massively increasing the AUM of, and fees earned by, Grayscale, another DCG subsidiary. As Grayscale's AUM swelled by billions of dollars' worth of bitcoin, so too did massive fees Grayscale earned for managing it—totaling a staggering $615.42 million in 2021 alone, a windfall that inured to the benefit of Defendants DCG and Silbert.

230.    The digital asset hedge fund 3AC was one of Genesis Global Capital primary counterparties and, not coincidentally, among the predominant investors in the Grayscale Trade.

231.    Until February 2021, GBTC shares traded at a premium or in excess of the NAV the assets held by GBTC, making the Greyscale Trade profitable. For example, on December 22, 2020, GBTC was trading at a 38.57% premium to its NAV.

232.    That changed starting in or around the start of the Class Period when the GBTC premium flipped to a discount as set forth below, which precipitated substantial fiscal losses for 3AC and other notable digital asset investors. After February 2021, the discount of GBTC shares to GBTC's NAV continued to increase:

> a)  On November 30, 2021, GBTC shares were trading at a 12.05% discount to GBTC's NAV.
>
> b)  On January 31, 2022, GBTC shares were trading at a 25.11% discount to GBTC's NAV.
>
> c)  On June 1, 2022, GBTC shares were trading at a 29.97% discount to the

GBTC's NAV.

233.    Defying conventional prudence and in contradiction of Genesis' risk management representations, Defendants DCG and Silbert, along with 3AC, did not mitigate their exposure to GBTC; rather, they escalated their engagement with the Grayscale Trade with funding provided by Genesis Global Capital who obtained Bitcoin from members of the Class through the offer and sale of Genesis Yield securities.

234.    The dissolution of the Grayscale Premium, alongside an intensifying discount, exerted immense financial strain upon Defendants DCG and Silbert. It diminished the allure of GBTC as an investment, which in turn depressed the AUM and NAV of GBTC, thereby reducing the management fees Defendants DCG and Silbert anticipated to accrue from running GBTC.

235.    The declining value of GBTC impinged upon Defendant DCG's ability to secure financing, given Defendant DCG's holdings of and intent to leverage GBTC as collateral in financing transactions.

236.    In a desperate bid to counteract GBTC's price decline, during the period January to May 2022, and in stark violation of the risk management and counterparty evaluation protocols previously discussed, Defendants DCG, Silbert, Hutchins, and Lenihan compelled Genesis Global Capital to execute self-serving intercompany loan transactions on commercially unreasonable terms: Genesis Global Capital loaned $575 million in cash and digital assets to DCG while requiring inadequate collateral.

237.    In fact, these loans were substantially under secured and were actually backed by GBTC shares pledged by Defendant DCG as collateral for loans *earmarked to purchase more GBTC shares*. Defendant DCG could not have secured financing on these conditions from an arm's length, independent party.

238.    The Exchange Act Defendants' endeavors to artificially prop up the price of GBTC proved futile, with the GBTC discount continually broadening instead of narrowing. Consequently, investors possessing illiquid GBTC shares like 3AC were exposed to considerable unrealized losses that they could not mitigate or arrest due to the lock-up period restrictions on selling their shares.

239.    Genesis Global Capital and Genesis Asia Pacific failed to conduct adequate due diligence on 3AC. Contrary to assurances to Gemini on February 18, 2022, that Genesis Global Capital reviewed its borrowers' "[m]ost recent financial statements with quarterly update cadence," neither Genesis Global Capital nor Genesis Asia Pacific had received audited financial statements from 3AC since July 2020. Genesis Global Capital and Genesis Asia Pacific also accepted from 3AC illiquid collateral to secure more than $500 million in loans.[56]

b.    **Genesis Was Overly Concentrated in Alemeda Research/FTX**

240.    In addition to massive undercollateralized lending to 3AC, Genesis had loaned at least $500 million to risky counterparty Alemeda, which was owned and controlled by now convicted fraudster, Sam Bankman-Fried.

241.    On July 6, 2022, Genesis Capital began to provide reports to Gemini regarding additional risk metrics. From July 6, 2022, through August 16, 2022, these reports showed that Genesis Capital's loans were heavily concentrated in a single counterparty, cryptocurrency trading firm Alameda, which was the borrower for nearly 60% of all outstanding loans from Genesis Capital to unaffiliated counterparties (*i.e.*, excluding loans to DCG and its affiliates). Further, Genesis Capital's loans to Alameda were mostly secured with FTT tokens issued by Alameda's

---

[56] NYAG Compl., ¶120.

affiliate, cryptocurrency platform FTX Trading, Ltd. This counterparty concentration and poor-quality collateral created a risk of massive losses if Alameda defaulted.[57]

242.    On August 8, 2022, Cameron Winklevoss spoke to Genesis Capital's Managing Director No. 1 regarding Gemini's concerns about Genesis Capital's risk management practices. During that conversation, Winklevoss said that unless DCG itself guaranteed repayment of the Earn investments, Gemini would wind down Earn. Gemini never informed Earn investors of these actions. Nor did Gemini ever receive a guarantee from DCG.[58]

243.    On August 16, 2022, Genesis Capital recalled nearly $2 billion in loans to Alameda. However, Gemini's risk assessments showed that Genesis Capital's risk ratios remained above Genesis Capital's own tolerance levels even after recalling these loans.[59]

### c.        Genesis Was Overly Concentrated in Related Parties

244.    From January 2022 through July 2022, DCG and its subsidiary, DCG International Investments, Ltd. ("DCGI"), collectively borrowed more than $800 million from Genesis Capital.[60]

245.    On January 24, 2022, Genesis Capital lent DCG $100 million in cash on an unsecured basis, with a stated maturity date of July 24, 2022.[61]

246.    Similarly, on February 23, 2022, Genesis Capital lent DCG another $100 million in U.S. dollars on an unsecured basis, with a stated maturity date of August 23, 2022.[62]

247.    During the period from January 2022 through May 2022, an entity called HQ Cash Management invested over $100 million with Genesis Global Capital:

---

[57] *Id.*, ¶95.
[58] *Id.*, ¶96.
[59] *Id.*, ¶97.
[60] *Id.*, ¶180.
[61] *Id.*, ¶181.
[62] *Id.*, ¶184.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Dec-21 | | $ | - | $ | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jan-22 | $ | - | $ | (1,000,000.00) | $ (1,000,000.00) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Feb-22 | $ | (1,000,000.00) | $ | (1,004,554.79) | $ (4,554.79) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Mar-22 | $ | (1,004,554.79) | $ | (1,011,297.69) | $ (6,742.90) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Apr-22 | $ | (1,011,297.69) | $ | (1,018,813.16) | $ (7,515.47) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | May-22 | $ | (1,018,813.16) | $ | (100,526,140.24) | $ (99,507,327.08) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jun-22 | $ | (100,526,140.24) | $ | (1,197,327.65) | $ 99,328,812.59 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jul-22 | $ | (1,197,327.65) | $ | - | $ 1,197,327.65 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Aug-22 | $ | - | $ | - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Sep-22 | $ | - | $ | - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Oct-22 | $ | - | $ | - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Nov-22 | $ | - | $ | - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Dec-22 | $ | - | $ | - | $ - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | 1/19/23 | $ | - | $ | - | $ - |

248.    HQ Digital appears to have served a single purpose: managing the personal wealth of Defendant Silbert and a select few other top DCG executives.

249.    A Form ADV filed by HQ Digital entity HQ Investments LLC revealed that HQ Digital had four clients: one high net worth individual with over $3.6 billion AUM, and three pooled investment vehicles with a combined total of $8.1 million AUM:

| Type of Client | (1) Number of Client(s) | (2) Fewer than 5 Clients | (3) Amount of Regulatory Assets under Management |
|---|---|---|---|
| (a) Individuals (other than high net worth individuals) | | ☐ | $ |
| (b) High net worth individuals | 1 | ☐ | $ 3,653,499,019 |
| (c) Banking or thrift institutions | | ☐ | $ |
| (d) Investment companies | | | $ |
| (e) Business development companies | | | $ |
| (f) Pooled investment vehicles (other than investment companies and business development companies) | 3 | | $ 8,100,000 |
| (g) Pension and profit sharing plans (but not the plan participants or government pension plans) | | ☐ | $ |
| (h) Charitable organizations | | ☐ | $ |
| (i) State or municipal government entities (including government pension plans) | | ☐ | $ |
| (j) Other investment advisers | | ☐ | $ |
| (k) Insurance companies | | ☐ | $ |
| (l) Sovereign wealth funds and foreign official institutions | | ☐ | $ |
| (m) Corporations or other businesses not listed above | | ☐ | $ |
| (n) Other: | | ☐ | $ |

250.    Upon information and belief, the high net worth individual with over $3.6 billion AUM with HQ Digital reflected on the Form ADV was Defendant Silbert.

251.    The Form ADV lists two "Control Person(s)" as controlling HQ Digital: Defendants DCG and Silbert.

252.    HQ Digital managed the funds of Defendant Silbert and others via a series of

limited partnerships named, *inter alia*, HQ Founders Liquidity Fund I LP, HQ Ecosystem Fund I LP, HQ Cash Management Fund LP, and HQ Enhanced Yield Fund LP, LP.

253.     Bankruptcy filings show that the HQ Cash Management Fund invested extensively with Genesis Global Capital during the Class Period as HQ Digital sought to earn money for Defendant Silbert and other HQ Digital members.

254.     From August 16, 2022, through November 16, 2022, nearly 50% of Genesis Capital's outstanding loans consisted of loans to its own affiliates, including hundreds of millions of dollars in unsecured loans to its own parent company, DCG.[63]

255.     As later revealed, Genesis' related-party unsecured lending to DCG had disastrous consequences when DCG failed to repay loans to Genesis.

### ii.     3AC Capital and Babel Finance Default on Genesis Loans

256.     In the days leading up to June 13, 2022, Three Arrows was the Genesis Entities' second-largest borrower. Although Three Arrows nominally borrowed from Genesis Asia Pacific, Genesis Capital used Genesis Asia Pacific as a pass-through entity to lend its own assets to Three Arrows. Genesis Asia Pacific's loans to Three Arrows were open-term and callable by Genesis Asia Pacific. Three Arrows paid between 8-15% interest on these loans.[64]

257.     On June 13, 2022, 3AC defaulted on billions in loans from Genesis Asia Pacific. As a result of this default, Genesis Asia Pacific (and thus, the Genesis lending business generally) incurred a loss of approximately $1 billion in open-term, on-demand assets. Around the same time as 3AC's default, Genesis Global Capital also incurred more than $100 million in losses arising from the default of another borrower, Babel Finance.[65]

---

[63] NYAG Compl., ¶99.
[64] *Id.*, ¶117.
[65] *Id.*, ¶121.

258.    The losses from 3AC and Babel created negative equity value at the Genesis Entities and created a deficit in the open-term assets available to repay Genesis Yield investors. Genesis Global Capital's internal documents stated that these losses opened a $1.1 billion structural hole in Genesis Global Capital's loan book.[66]

259.    During the Class Period, representatives of DCG and Genesis Global Capital would have weekly meetings on Microsoft Teams, which Defendant Silbert would attend. The frequency changed to daily meetings after the 3AC collapse, which Defendant Silbert would attend.

260.    According to sworn testimony and evidence in *U.S. v. Sam Bankman*-Fried, on or around June 13, 2022, Ballensweig in a Telegram chat with executives from Alemeda, including Caroline Ellison ("Ellison") asked Alemeda to return hundreds of millions loaned to Alemeda by Genesis on an open-term basis: "hey, guys - seeing a fair amount of continued outflows from retail deposit aggregators, so to get ahead of this, we're going to increase the OT [open term] loan pullback to $400 million. Can you please let us know once the first batch and second batch are sent. Do we have an ETA on the first 250 million?"

261.    From June 13, 2022, through July 2022, DCG employees and executives (including Silbert and DCG's Chief Operating Officer ("COO")) [Defendant Murphy] met with Genesis Capital's leadership daily, often multiple times a day. During these meetings, DCG and Genesis Capital employees discussed how to communicate with counterparties about Three Arrows, and how to bolster the Genesis Entities' financial condition in the wake of these losses. During the same period, DCG's COO [Defendant Murphy] and DCG's Head of Communications [Amanda Cowie] helped draft talking points documents for use by DCG and Genesis Capital personnel in conversations with counterparties.[67]

---

[66] *Id.*, ¶122.
[67] *Id.*, ¶124.

262.     On June 13, 2022, Silbert directed Moro and Genesis Capital's COO [Defendant Murphy] to lead the company's response to the Three Arrows' situation "with support and guidance from DCG."[68]

263.     On June 13, 2022, Silbert reported to DCG's board [which included Defendants Lenihan and Hutchins] that Three Arrows defaulted and that Genesis Capital's "unsecured exposure," or expected loss at the time, was "uncomfortably big (well over $500 mm now)." Silbert went on to explain that some of the collateral provided by Three Arrows was illiquid as it consisted of shares of the Grayscale Bitcoin Trust ("GBTC") issued by DCG-subsidiary Grayscale Investments, LLC, which Genesis Capital could not liquidate due to restrictions on sales of stock by the issuing company's affiliates. Accordingly, Silbert reported to DCG's board [Defendants Lenihan and Hutchins] that Genesis Capital was preparing for a bank run, and that DCG would seek additional financing both for itself and Genesis. In Silbert's words: "Everything needs to be on the table" regarding financing.[69]

264.     Also on June 13, 2020, the Exchange Act Defendants caused the Company to tweet and Defendant Moro to repost the following tweet that falsely represented that Genesis has "strong risk management practices and frameworks":



https://x.com/GenesisTrading/status/1536360521682849792?s=20

---

[68] *Id.,* ¶125.
[69] *Id.,* ¶126.

265.    Then, on June 14, 2022, Silbert, on behalf of DCG's board [Defendants Silbert, Lenihan and Hutchins] instructed Moro and Genesis "to continue aggressively shrinking the loan book and, until such time as we have the right controls, risk monitoring, etc. in place—and we're through the winter—… to limit the extension of any new loans to counterparties."[70]

266.    Also on June 14, 2022, Silbert reported to DCG's board of directors [Defendants Hutchins and Lenihan] regarding Genesis Capital's strategy after Three Arrows' default. In doing so, Silbert presented the option to "[j]ettison[] the Genesis Capital business" by not supplying Genesis Capital with additional capital to strengthen its balance sheet.[71]

267.    Nevertheless, on June 15, 2022, two days after Three Arrows' default, the Genesis Entities tweeted via their shared Twitter account:



268.    Defendants Silbert, DCG, Murphy and Kraines, and Ballensweig re-tweeted this statement on June 15, 2022 that falsely represented that Genesis Global Capital's balance sheet was "strong" when at that time it had massive unsecured exposure to 3AC.  Far from "operating normally," the Exchange Act Defendants knew, or at least recklessly disregarded, that Genesis was facing a "bank run."

269.    Indeed, that same day, Silbert wrote to Moro and other Genesis Capital personnel in a Microsoft Teams chat that "the word on the street is that genesis is the 'blue chip' in this mess…. we need to continue to perpetuate that of course." In other words, Silbert directed Genesis

---

[70] *Id.*, ¶127.
[71] *Id.*, ¶128.

Capital personnel to perpetuate the idea that, within the cryptocurrency industry, Genesis Capital was akin to highly stable "blue chip" companies.[72]

270.     Then, on June 17, 2022, the Genesis Entities' CEO Moro tweeted the following:



https://x.com/michaelmoro/status/1537822426536546306?s=20;
https://x.com/michaelmoro/status/1537822427790680066?s=20

271.     Also on June 17, 2022, Defendants DCG, Kraines, and Ballensweig reposted Defendant Moro's twitter thread:



272.    DCG's COO [Defendant Murphy] reviewed and edited these tweets before Moro posted them. In strategizing the release of the tweets, DCG's COO [Defendant Murphy] directed Moro to send these tweets "from Moro['s] [personal Twitter account]" despite directions from Genesis Capital's compliance department that these tweets should come from Genesis Capital's corporate account. The Genesis Entities reposted Moro's tweets that same day.[73]

273.    Similarly, in a June 17, 2022 phone call with Gemini's risk management personnel, Managing Director No. 1 [Ballensweig] stated, "Genesis remains solvent and operates [business as usual] at the moment.  With the strong [loan book] and capital support from DCG, Genesis has no concerns on business operations."  In the same call, Managing Director No. 1 further stated, "Genesis experienced a certain amount of losses from the liquidation, but will absorb the losses using its own balance sheet."[74]

274.    After the call with Gemini, Silbert and DCG's COO [Defendant Murphy] were updated that same day that Gemini "asked hard [questions] about [Three Arrows]," but that Managing Director No. 1 "fended it off."[75]

275.    Gemini continued to send Genesis Capital additional investor funds after June 17, 2022.[76]

276.    On or about June 18, 2022, Genesis Capital lent approximately 18,697 bitcoin (valued at over $355 million as of June 18, 2022) to affiliate, DCGI, on an open-term basis.[77]

277.    The tweets and statements to Gemini set forth above were false and misleading in at least five ways.[78]

---

[73] *Id.,* ¶133.
[74] *Id.,* ¶134.
[75] *Id.,* ¶135.
[76] *Id.,* ¶136.
[77] *Id.,* ¶185.
[78] *Id.,* ¶137.

278.     First, client funds had been impacted—the Three Arrows losses severely impaired Genesis Capital's ability to repay its counterparties, including Earn investors.[79]

279.     Second, due to Three Arrows' default on June 13, 2022, the Genesis Entities' balance sheets were not strong, solvent, or capable of absorbing the losses; the Genesis Entities suffered a loss that exceeded their equity. Indeed, in a June 21, 2022 email, Silbert informed colleagues at DCG that "the hole in Genesis equity due to the Three Arrows exposure is something they we [sic] will need to fill by 6/30," and asked his colleagues to "keep [that] between us." Three days later, Silbert further explained to DCG personnel "[w]e just can't allow people inside or outside [to] question Genesis' solvency" due to Silbert's concern that this could spark a bank run.[80]

280.     Third, the tweets discussed the sale or hedging of all "liquid" collateral while concealing that hundreds of millions of dollars' worth of the loans were secured by illiquid collateral that could not be sold and was not hedged.[81]

281.     Fourth, Genesis Capital had not "shed the risk and moved on"—as of June 17, 2022, it still held a more than $1 billion receivable relating to Three Arrows as an uncollectible asset on its balance sheet.[82]

282.     Fifth, Genesis Capital was not operating "business as usual;" the business was seeking to fill an equity deficiency and at Silbert's direction on June 14, 2022, limited the origination of new loans and started shrinking its loan book.[83]

---

[79] *Id.*, ¶138.
[80] *Id.*, ¶139.
[81] *Id.*, ¶140.
[82] *Id.*, ¶141.
[83] *Id.*, ¶142.

283. On or around June 20, 2022, in a Telegram chat with Alemeda executive Caroline Ellison, Ballensweig indicated that he discussed Genesis' loans to Alemeda with Sam Bankman-Fried and further indicated that Genesis sought repayment of $500 million loaned to Alemeda:

> hey there - so spoke with Sam [Bankman-Fried] and I'm sure he filled you in—— wouldn't be pushing you guys here if it wasn't totally necessary but we want to unwind $500 million in 250 clips. If you guys can show us what that's going to cost, it would be helpful, but we're basically in that position where this is no longer a luxury.

284. Ellison testified that Ballensweig told her that Genesis was experiencing recalls from its lenders and that she understood that Genesis needed Alemeda to repay $500 million in loans from Genesis or that it "might go under"—directly contradicting Genesis Global Capital's representation that its balance sheet was "strong":

> Q. Can you just explain what you mean by recalls that Genesis was getting on their end.
>
> [Ellison] A. It meant Genesis was——the money that they were lending us, they were borrowing from others, including retail lending platforms, and customers were withdrawing their money from those platforms, so Genesis had to have a way to fulfill those withdrawals, and that's why they needed their money back from us.
>
> Q. This refers to speaking with Sam. What, if anything, did the defendant [Sam Bankman-Fried] tell you about his call with Matt Ballensweig?
>
> [Ellison] A. He told me that he talked to Matt and that Matt said that Genesis really needed the money and implied that they might go under or have to default on some loans if they didn't get it . . . .

285. On June 27, 2022, Genesis Capital's then CEO, Moro, emailed DCG and Genesis Capital executives, explaining the need to show a "well-capitalized" balance sheet to counterparties like Gemini on June 30, 2022:

> Once the equity problem is solved, the liquidity problem is much easier to solve. I think we'll find people to lend us additional [cryptocurrency] with a well-capitalized 6/30 balance sheet.

> And yes, at some point, our losses in [Three Arrows] and potentially Babel will become public. But if we're able to show our balance sheet after all of that happened and it still looks strong, I think that 1) people will care less about the losses and 2) we'll be better able to operate from a place of strength going forward.

> But as I told Barry this evening, we have a lot of work to do before we can get back to full-steam-ahead on lending. Better to think of it in wind-down mode for the time being, and just manage liquidity as loans roll off. Then we can look to rebuild.[84]

286.    In a June 28, 2022 email, Moro wrote to Silbert that he had discussed with other Genesis Capital representatives how to "best fill the equity hole," euphemistically referring to the Genesis Entities' negative equity value caused by the more than $1 billion in losses. Moro wrote that "[w]hile liquidity [was] still [Genesis Capital's] number one focus, [they] only ha[d] a couple of days until quarter-end." Thus, he proposed an "overall plan" of injecting certain assets to "plug the equity hole" and then "work on consistent messaging to speak to the loss to counterparties when we put out [a] new balance sheet" in an effort to "[r]estore confidence in the market and keep looking to borrow with term." Moro continued:

> We wouldn't necessarily need to touch the [proposed] assets [that DCG would inject] … for liquidity purposes, it could just be for balance sheet support. And then with a strengthened balance sheet, we would be able to source additional unsecured funding to be able to continue to manage our liquidity and withdrawal obligations.[85]

287.    At this time, the Earn investors were one of Genesis Capital's largest sources of unsecured funding.[86]

288.    Silbert responded: "It is certainly our hope and intention to help Genesis address the equity-hole—hopefully by 6/30. To that end, the Genesis team should be working 24/7 with DCG and [DCG's subsidiary, DCG International Investments, Ltd.] teams to figure out all possible ways to do so along the lines" outlined in Moro's email.[87]

---

[84] *Id.,* ¶143.
[85] *Id.,* ¶144.
[86] *Id.,* ¶145.
[87] *Id.,* ¶146.

### iii. 3AC Declares Bankruptcy

289.    On June 27, 2022, 3AC was required to liquidate its assets by a British Virgin Islands court following default on several of its liabilities. Subsequently, on July 1, 2022, 3AC sought Chapter 15 bankruptcy protection within the United States Bankruptcy Court for the Southern District of New York.

290.    3AC's bankruptcy filings revealed it had procured billions in loans from Genesis Global Capital. As of July 1, 2022, 3AC was indebted to Genesis Global Capital to the tune of approximately $2.3 billion. Post-liquidation, 3AC's outstanding obligation to Genesis Global Capital was $1.1 billion.

291.    Because 3AC also owed other creditors billions of dollars, Genesis Global Capital would not recover any amount close to the $1.1 billion outstanding, which should have resulted in an immediate recognition of a substantial impairment of the 3AC debt on Genesis Global Capital's balance sheet.

292.    The insolvency of 3AC sent shockwaves through the digital asset market, inducing a credit crunch that detrimentally impacted digital asset companies like Genesis Global Capital and its competitors. This crisis led to several of Genesis Global Capital's competitors filing for bankruptcy protection or seeking emergency lines of credit, reflecting the severity of the resultant turmoil.

### iv. Defendant Silbert Saves DCG and Himself and Drains Liquidity from Genesis

293.    At the same time as Genesis was, in effect, insolvent and facing an "equity hole," starting in June 2022, Genesis Global Capital bankruptcy filings show that in June and July of 2022, Defendant Silbert personally extracted over $100 million of personal capital he had invested with Genesis Global Capital via HQ Cash Management Fund LP by recalling investments HQ

69

Cash Management Fund LP had made in Genesis Global Capital:

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Dec-21 | | $ | - | $ | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jan-22 | $ | - | $ | (1,000,000.00) | (1,000,000.00) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Feb-22 | $ | (1,000,000.00) | $ | (1,004,554.79) | (4,554.79) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Mar-22 | $ | (1,004,554.79) | $ | (1,011,297.69) | (6,742.90) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Apr-22 | $ | (1,011,297.69) | $ | (1,018,813.16) | (7,515.47) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | May-22 | $ | (1,018,813.16) | $ | (100,526,140.24) | (99,507,327.08) |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jun-22 | $ | (100,526,140.24) | $ | (1,197,327.65) | 99,328,812.59 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Jul-22 | $ | (1,197,327.65) | $ | - | 1,197,327.65 |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Aug-22 | $ | - | $ | - | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Sep-22 | $ | - | $ | - | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Oct-22 | $ | - | $ | - | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Nov-22 | $ | - | $ | - | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | Dec-22 | $ | - | $ | - | - |
| Genesis Global Capital, LLC | HQ Cash Management Fund LP | 1/19/23 | $ | - | $ | - | - |

Capital withdrawn

294. Bankruptcy filings show further that other DCG and Genesis Global Capital insiders were extracting hundreds of millions of dollars' worth of capital from Genesis Global Capital by redeeming their investments. The following two charts show that other Defendant DCG, Genesis Global Capital and GTT insiders extracted millions out of Genesis Global Capital:

| SOFA 4 - Rider 2: Wages, Benefits, Loans and Other Beneficial Transfers | | | |
|---|---|---|---|
| **NAME** | **DATE** | **DESCRIPTION** | **VALUE** |
| **CONHEENEY, THOMAS** Director | 1/19/2023 | Director Fees* | $ 250,000.00 |
| **KRAINES, MICHAEL** Director | 2/1/2022 | Interest Paid | $ 2,123.28 |
| | 3/1/2022 | Interest Paid | $ 1,917.81 |
| | 4/1/2022 | Interest Paid | $ 2,123.28 |
| | 5/2/2022 | Interest Paid | $ 2,054.79 |
| | 6/1/2022 | Interest Paid | $ 2,123.28 |
| | 7/1/2022 | Interest Paid | $ 2,054.79 |
| | 8/1/2022 | Interest Paid | $ 2,123.28 |
| | 9/1/2022 | Interest Paid | $ 2,123.28 |
| | 10/3/2022 | Interest Paid | $ 2,054.79 |
| | 11/1/2022 | Interest Paid | $ 2,123.28 |
| **PALEOKRASSAS, MICHAEL** Former Co-Head of Trading and Lending | 2/7/2022 | Borrow Returned | $ 60,000.00 |
| | 2/24/2022 | Borrow Returned | $ 40,000.00 |
| | 4/6/2022 | Borrow Returned | $ 20,000.00 |
| | 4/12/2022 | Borrow Returned | $ 70,000.00 |
| | 5/3/2022 | Borrow Returned | $ 75,000.00 |
| | 6/15/2022 | Borrow Returned | $ 1,295,890.81 |
| | 6/15/2022 | Interest Paid | $ 37.35 |
| | 6/15/2022 | Interest Paid | $ 4,970.53 |
| | 11/10/2022 | Borrow Returned | $ 37,801.39 |
| **PRETTO-SAKMANN, ARIANNA** Chief Legal Officer | 6/13/2022 | Loan Book Activity | $ 758,919.97 |
| **SILBERT, BARRY** Chief Executive Officer (Digital Currency Group) | 2/1/2022 | Interest Paid | $ 23,671.23 |
| | 3/1/2022 | Interest Paid | $ 24,547.95 |
| | 4/1/2022 | Interest Paid | $ 27,178.08 |
| | 4/14/2022 | Interest Paid | $ 11,397.26 |
| | 4/14/2022 | Borrow Returned | $ 4,000,000.00 |

Capital withdrawn

| SOFA Question 4: Payments or other transfers of property made within 1 year before filing this case that benefited any insider | | | | | | |
|---|---|---|---|---|---|---|
| SOFA 4 - Rider 3: Coin Transactions | | | | | | |
| NAME | DATE | TYPE | DESCRIPTION | COIN | COIN QUANTITY | COIN VALUE (USD) |
| BALLENSWEIG, MATT<br>Former Co-Head of Trading and Lending | 10/12/2022 | Outflow | Collateral Returned | BTC | 4.25 | $ 81,408.75 |
| PALEOKRASSAS, MICHAEL<br>Former Co-Head of Trading and Lending | 6/15/2022 | Outflow | Borrow Returned | BTC | 415.58718963 | $ 9,374,566.47 |
| | 6/15/2022 | Outflow | Borrow Returned | USDC | 12,173.504 | $ 12,173.50 |
| | 11/8/2022 | Outflow | Borrow Returned | ETH | 225.00 | $ 300,341.25 |
| | 11/9/2022 | Outflow | Borrow Returned | BCH | 415.70924001 | $ 37,018.91 |
| | 11/9/2022 | Outflow | Borrow Returned | USDC | 8,420.358958 | $ 8,420.36 |
| | 11/9/2022 | Outflow | Borrow Returned | SUSHI | 29,609.27643424 | $ 30,085.99 |
| | 11/9/2022 | Outflow | Borrow Returned | ZEC | 2,238.08806066 | $ 78,109.27 |
| PRETTO-SAKMANN, ARIANNA<br>Chief Legal Officer | 6/18/2022 | Outflow | Borrow Returned | ETH | 29.35833993 | $ 29,183.07 |
| | 6/18/2022 | Outflow | Interest Paid | ETH | 1.19938374 | $ 1,192.22 |
| | 6/20/2022 | Outflow | Borrow Returned | FIL | 120.0573083 | $ 658.27 |
| | 6/20/2022 | Outflow | Interest Paid | ETH | 0.05692946 | $ 64.16 |
| | 6/20/2022 | Outflow | Interest Paid | FIL | 9.17193948 | $ 50.29 |

Capital withdrawn

295.     As a former restructuring investment banker, Defendant Silbert knew that if Genesis Global Capital recognized its own insolvency immediately upon 3AC's collapse in June 2022 as it should have, it would have had to halt redemptions and potentially declare bankruptcy, which would have prevented *anyone*, including Defendant Silbert and other Genesis and DCG insiders, from withdrawing their capital from Genesis Global Capital.

296.     Instead, at least in part to preserve access to their personal investments, as alleged below, the Exchange Act Defendants orchestrated the sham DCG Promissory Note transaction and used it as an excuse to continue to claim Genesis Global Capital was solvent while they extracted their own capital.

## B. THE EXCHANGE ACT DEFENDANTS CAUSED GENESIS GLOBAL CAPITAL TO FRAUDULENTLY CONCEAL ITS INSOLVENCY IN VIOLATION OF SECTION 10(b) OF THE EXCHANGE ACT AND SEC RULE 10b-5.

297.     DCG and Genesis Capital engaged in a communications campaign designed to conceal Genesis Capital's financial condition and mislead counterparties into believing Genesis

Capital was operating "business as usual." Those counterparties included Gemini, which conducted ongoing due diligence on behalf of the Earn investors. [88]

298.    The economic reality of Genesis Global Capital's situation should have caused the Exchange Act Defendants to cause Genesis Global Capital to declare itself insolvent and either seek recapitalization or restructuring. Instead, the Exchange Act Defendants caused Genesis Global Capital to dubiously maintain that 3AC's $1.1 billion debt to Genesis Global Capital was still worth $1.1 billion.

299.    According to Defendant Silbert, he along with Defendants DCG, Hutchins and Lenihan determined to support Genesis Global Capital by assuming the 3AC bankruptcy claim and replacing it with the DCG Promissory Note: "***DCG and its board*** [Defendants Silbert, Lenihan and Hutchins] determined that it was in the best interest of Genesis [Global Capital], its lenders, and DCG to try to help support Genesis [Global Capital]."[89]

300.    Accordingly, on June 30, 2022, the Exchange Act Defendants caused Genesis Global Capital to "sell" 3AC's debt to Genesis Global Capital to DCG in exchange for the DCG Promissory Note executed by Defendant Silbert to Genesis Global Capital for $1.1 billion due in 10 years at an interest rate of 1%.  . Under the [DCG]Promissory Note, DCG agreed to pay Genesis Capital a decade later at only 1% interest per annum to "replace" the receivables Genesis Capital would have otherwise received from Genesis Asia Pacific for the Three Arrows loans. Genesis Capital categorized this $1.1 billion as an asset on its balance sheet.[90]

301.    Silbert signed the [DCG] Promissory Note as CEO of DCG.[91]

---

[88] *Id.*, ¶123.
[89] Barry Silbert, Q&A, https://dcgupdate.com/ (Jan. 10, 2023) (emphasis added).
[90] NYAG Compl., ¶147.
[91] *Id.*, ¶148.

302.     According to DCG, the [DCG] Promissory Note was fully approved by DCG's board of directors, which includes Defendants Silbert, Hutchins and Lenihan.

303.     Moro signed the [DCG] Promissory Note as the CEO of Genesis Capital and Genesis Holdco, and as director of Genesis Asia Pacific.[92]

304.     DCG dictated the terms of the [DCG] Promissory Note, including the ten-year duration and 1% interest rate. DCG provided no collateral to secure its obligations under the [DCG] Promissory Note. To the contrary, DCG's repayment of the [DCG] Promissory Note was subordinate to DCG's repayment of an over $350 million credit facility to unrelated third parties. DCG's pre-existing $350 million obligation reduced the likelihood that DCG could repay the [DCG] Promissory Note.[93]

305.     The [DCG] Promissory Note failed to ensure that Genesis Capital had sufficient capital to operate its business. The [DCG]Promissory Note required DCG to provide cash payments in no sooner than 10 years, whereas the Three Arrows-related liabilities DCG purportedly "assumed" were callable on demand; this created a mismatch between the [DCG] Promissory Note and Genesis Capital's billions of dollars' worth of on-demand obligations to Earn users. Genesis Capital's and DCG's internal documents reveal that the [DCG] Promissory Note's ten-year duration and 1% interest rate failed to address the "structural hole" caused by the Three Arrows losses. In an internal document, Genesis Capital's Chief Risk Officer acknowledged that the [DCG] Promissory Note "wreaks havoc on our balance sheet impacting everything we do."[94] According to filings in the Genesis Bankruptcy Action, Michael Pachen was Genesis Capital's Chief Risk Officer during the period January 19, 2022 through October 2022.

---

[92] *Id.*, ¶149.
[93] *Id.*, ¶150.
[94] *Id.*, ¶154.

### i. Genesis Global Capital Was Insolvent

306.    This June 30, 2022 "sale," however, was a sham. There was no exchange of money and no movement of capital. Moreover, this sale could never have occurred between two parties negotiating at arm's length for at least three reasons:

307.    First, the 3AC debt was not worth $1.1 billion at the time, and is not worth $1.1 billion now. The odds of Genesis Global Capital or DCG collecting anything near the full value of the debt were and remain incredibly low, and no party negotiating at arm's length with Genesis Global Capital would have valued the debt at $1.1 billion.

308.    Second, even if the debt *were* worth $1.1 billion, the terms of payment were simply not competitive with the financing terms DCG would have received from a nonrelated party. No party other than a subsidiary completely controlled by Defendants DCG and Silbert would have "sold" a $1.1 billion debt for a 10-year promissory note at 1% interest.

309.    Third, given the first two realities, there is simply no reasonable possibility the resulting DCG Promissory Note from DCG is worth anything close to $1.1 billion. According to Gemini, given the duration of the note and the underlying economic realities, the "note would be heavily discounted (approximately 70%) to reflect its value as of today (perhaps $300 million)."

310.    In fact, on July 11, 2023 Genesis Global Capital itself filed a *Notice of Filing of Exhibit to Disclosure Statement* in the Genesis Bankruptcy Action **which estimated the value of the DCG Promissory Note between $90 million (a 92% discount) to $323 million (a 70% discount).**[95]

311.    According to an interview on the podcast *Unchained* on or around November 4, 2023 with Genesis investors who invested directly with Genesis and were members of an ad hoc

---

[95] *In re: Genesis Global Holdco, LLC, et al.,* Case No.: 23-10063, ECF No. 488 (Bankr. S.D.N.Y.)

committee of creditors, after the Class Period Defendant Silbert informed a steering committee of Genesis Global Capital creditors that he placed a value of $200 million on the [DCG] Promissory Note: "Genesis was saying it's worth $1.1 billion. . . When we demanded the payment from Barry [Silbert] for it, he said, oh, well, you can't expect us to pay $1.1 billion for that piece of paper.  It's only worth 200 million."

312.    The DCG Promissory Note was a sham because the loan was uncollectable, and the economic reality was that Genesis Global Capital was insolvent at the time Defendants DCG and Silbert caused Genesis Global Capital to execute the DCG Promissory Note.

> **a.    The Exchange Act Defendants Made Materially False and Misleading Representations Concerning the Solvency of Genesis Global Capital**

313.    Worse, after Defendant Silbert executed the DCG Promissory Note on June 30, 2022, Defendants Moro, Islim, Kraines and Murphy caused Genesis Global Capital at the direction of and/or subject to the control of Defendant DCG, Silbert, Hutchins and Lenihan to disseminate misleading and false financial statements to prospective and existing investors, directly or via their designated agent, Gemini.

314.    In furtherance of the DCG Scheme, from July 2022 through November 2022, Genesis Capital sent Gemini, as the agent of Earn investors, reports falsely describing Genesis Capital's financial condition.  For example, these reports falsely included the [DCG] Promissory Note as an asset that could be reduced to cash within a year.  To further deceive Earn investors, Genesis Capital concealed and suppressed disclosure of quarterly income and cash flow statements from Gemini from June 30, 2022, through November 16, 2022.  Genesis Capital also omitted explanatory footnotes to its balance sheet because those footnotes would have revealed the [DCG] Promissory Note's true nature.  Genesis Capital's CFO and its finance team avoided joining phone

calls with counterparties to conceal Genesis Capital's financial condition. Instead, members of Genesis Capital's sales and lending teams answered financial questions using only approved talking points that contained no explanation of the [DCG] Promissory Note or its terms.[96]

315.  On July 6, 2022, in reference to Three Arrows, Moro tweeted:



https://x.com/michaelmoro/status/1544733041045786626?s=20;
https://x.com/michaelmoro/status/1544733042849320960?s=20

316.  DCG's COO and Head of Communications [Amanda Cowie] edited and helped draft these tweets. Silbert reviewed these tweets before Moro posted them.[97]

317.  The tweets were false, misleading, and omitted material facts. DCG did not simply "assume" the $1.1 billion, open-term liability related to Three Arrows, which could be called at any time; it *replaced* that liability with an illiquid ten-year [DCG] Promissory Note.[98]

318.  According to Gemini, this statement was false and misleading. In reality, DCG had not ensured that Genesis Global Capital had the capital to operate. In fact, DCG had not given Genesis Global Capital so much as a penny of actual funding to make up for the 3AC losses. Instead, DCG entered into a 10-year promissory note with Genesis Global Capital at an interest

---

[96] NYAG Compl., ¶14.
[97] *Id.,* ¶152.
[98] *Id.,* ¶153.

rate of 1% — due in 2032. This note was a complete gimmick that did nothing to improve Genesis Global Capital's immediate liquidity position or make its balance sheet solvent (more on this later)." As described above, no cash, capital, or assets changed hands from DCG to Genesis Global Capital.

319.    On July 6, 2022, Genesis Capital's Head of Communications and Public Relations [Mark Yaklofsky] sent a document titled "Talking Points to [Three Arrows] Questions" to Moro, as well as DCG's COO [Defendant Murphy], DCG's Head of Communications [Amanda Cowie], and various other senior employees at Genesis Capital and DCG with instructions to "review and approve." DCG's Head of Communications helped draft these talking points. DCG's COO also reviewed these talking points on July 6, 2022. These talking points were to be used by Genesis Capital personnel in conversations with counterparties, including Gemini.[99]

320.    These talking points did not provide any information regarding the [DCG] Promissory Note, its ten-year duration or 1% interest rate, or the $1.1 billion value of Genesis Capital's losses. Instead, the talking points included the misrepresentations that DCG "absorbed" the losses, that Genesis Capital was "well capitalized," and that "DCG has assumed certain liabilities of Genesis related to [Three Arrows] to ensure [Genesis Capital] ha[d] more than adequate capital to operate and scale our business for the long-term."[100]

321.    Relying on these talking points, on July 6, 2022, Genesis Entities' Co-Head of Trading and Lending, Managing Director No.1, informed Gemini, both over the phone and in writing, that the Three Arrows "[l]osses [were] predominantly absorbed by and netted against DCG balance sheet" and that Genesis Capital remained "well-capitalized." Genesis Capital misled investors and omitted material facts regarding its financial condition during these communications,

---

[99] *Id.*, ¶157.
[100] *Id.*, ¶158.

including that Genesis Capital's balance sheet contained an illiquid $1.1 billion [DCG] Promissory Note.[101]

322.     The same day—July 6, 2022—representatives of Genesis Global Capital and/or GGT spoke to Gemini representatives (the "July 6 Call"). People participating from Gemini wanted accurate information about Genesis Global Capital's financial condition.

323.      During the July 6 Call, Genesis Global Capital representatives made false and misleading statements about Genesis Global Capital's financial condition. These included false statements about Genesis Global Capital's assets and the nature of the collateral it was holding against loans Genesis Global Capital had made.

324.     Following the July 6 Call, Ballensweig sent an email to Gemini (the "July 6 Email") attaching three documents. The July 6 Email and its attachments contained multiple false statements.

325.     One attachment to the July 6 Email is a document entitled "Three Arrows Post-Mortem." This document stated, in part:

> We previously stated in June that we mitigated our losses with respect to a large counterparty who failed to meet a margin call. Now that the BVI bankruptcy process has commenced, we can confirm that the counterparty was Three Arrows Capital.

> The loans to this counterparty had a weighted average margin requirement of over 80%. Once they were unable to meet the margin call requirements, we immediately sold collateral and hedged our downside.

> Since then, we worked with DCG to find the optimal strategy to further isolate the risk. *DCG has assumed certain liabilities of Genesis related to this counterparty to ensure we have the capital to operate and scale our business for the long-term.*

(Emphasis added.)

---

[101] *Id.*, ¶159.

326.     Statements in the "Three Arrows Post-Mortem" were false. It was not true that "DCG has assumed certain liabilities of Genesis." It was not true that Genesis Global Capital ensured that it had the "capital to operate . . . for the long term."

327.     The second document attached to the July 6 Email is entitled "Gemini Risk Metric Request" and has a section titled "Financial Position per Asset." It included the following table:

| | Current Assets | Receivable | | Liabilities | |
|---|---|---|---|---|---|
| | | Loans | Collateral Rec. | Borrows | Collateral Pay. |
| Total | $3,377,241,616 | $4,449,809,050 | $2,845,541,484 | $7,178,964,609 | $3,401,109,542 |
| USD / Stables | $697,626,546 | $2,302,015,337 | $182,699,279 | $3,913,570,170 | $901,183,977 |
| BTC | $376,993,113 | $1,383,698,893 | $668,600,703 | $2,130,962,286 | $277,037,598 |
| ETH | $205,767,255 | $558,439,389 | $581,873,409 | $769,744,681 | $582,174,981 |
| Other Assets | $2,096,854,702 | $205,655,432 | $1,268,146,027 | $364,687,472 | $1,640,712,985 |
| **Assets** | **$10,672,592,150** | **Liabilities** | **$10,580,074,150** | **Equity** | **$92,518,000** |

328.     The table in the Gemini Risk Metric Request document is a fraud, because it includes the DCG Promissory Note as a "Current Asset" (within "Other Assets").

329.     As a matter of generally accepted accounting principles—and common understanding—a "current asset" refers to cash and other resources that are reasonably expected to be realized in cash within a one-year period.[102] The term thus specifically excludes amounts that are owed by an affiliate but are not collectible in the ordinary course of business within a year.[103]

330.     By including the DCG Promissory Note at its full-face value within the category of "Current Assets," Genesis falsely represented that there was $1.1 billion in value on its balance sheet that could be collected in cash within one year. The DCG Promissory Note is worth only a fraction of its notional value and does not mature for 10 years. The note is plainly not a current asset, but Genesis Global Capital falsely presented it as one in order to prevent Gemini Earn investors' appointed agent Gemini from pulling Gemini Earn investments from Genesis Global

---

[102] *See, e.g.*, FASB Accounting Standards Codification ¶¶ 210-10-45-1, 210-10-45-3.
[103] *See, e.g.*, FASB Accounting Standards Codification ¶ 210-10-45-1.d; *id*. ¶ 210-10-45-4.c ("current assets" do not encompass "Receivables arising from unusual transactions (such as . . . loans or advances to affiliates, officers, or employees) that are not expected to be collected within 12 months.").

Capital.

331.    It is not a matter of conjecture that the DCG Promissory Note is included in the "Current Assets" category in the Financial Position per Asset table. Gemini specifically inquired about this and received more lies from Genesis in response.

332.    On July 27, 2022, a Gemini representative sent Genesis an email inquiring about the "Other Assets" row in the "Current Assets" column (as depicted by Genesis in a subsequent iteration of the Financial Position per Asset table) and highlighted it:

| | Current | Receivable | | Liabilities | |
| | Assets | Loans | Collat Rec | Borrows | Collat Pay |
|---|---|---|---|---|---|
| Total | $3,630 | $5,105 | $2,516 | $7,038 | $4,010 |
| USD / Stables | 328 | 2,231 | 177 | 3,466 | 1,159 |
| BTC | 639 | 1,552 | 439 | 2,062 | 279 |
| ETH | 490 | 942 | 422 | 1,061 | 795 |
| Other Assets | 2,173 | 379 | 1,478 | 448 | 1,786 |

| Assets | $11,251 | Liabilities | $11,057 | Equity | $194 |
|---|---|---|---|---|---|

333.    According to Gemini, on July 27, 2022, Gemini asked Genesis Global Capital: "Do we know what's included in the $2.2bn other assets? Are they all crypto or a mix of crypto and non-crypto? Can you please shed some light on this?"

334.    On July 28, 2022, a Genesis Global Capital employee sent the following response:

"Other assets" is a real-time metric where we looked to replicate, digital currency loans receivable on a real-time basis. This is comprised of a $500mm in alts, $500mm Grayscale shares, $1.1bn in receivables from related parties.

335.    Genesis Global Capital's July 28, 2022 statement thus confirms that the $1.1 billion DCG Promissory Note was included in the "Other Assets" row in the "Current Assets" column represented on the documents given to Gemini. That was fraudulent. The DCG Promissory Note was not "receivable on a real-time basis."

336.    In addition, the Risk Metric report shared with Gemini on July 6 contained another section, labeled "Loan Book Metrics," in which Genesis Global Capital purported to provide

information regarding (among other things) the weighted average duration of its outstanding portfolio of loans.

337.   The Loan Book Metrics table stated, falsely, that the overall weighted average duration of Genesis Global Capital's outstanding loans was just 54.3 days:

**Loan Book Metrics**

*Duration calculated as Expiry Days from Today (Open Term as 7 Days). Rating from 1 to 12 corresponds to A to F rating, directionally*

| | Weighed Avg | | | Rating | Rating Characteristics |
|---|---|---|---|---|---|
| | Loan Duration (Days) | Rating | | 1 | de minimis risk profile; excellent capitalization; minimal to no leverage; demonstrable outstanding risk management |
| Total | 54.3 | 5.5 | | 2 | |
| USD / Stables | 76.3 | 5.1 | | 3 | |
| USDT | 58.9 | 4.4 | | 4 | low risk profile; strong capitalization; solid returns and performance trends; modest leverage; strong risk management |
| | | | | 5 | |
| BTC | 23.7 | 5.5 | | 6 | |
| ETH | 47.2 | 6.6 | | 7 | moderate risk profile; sustained capitalization; sustained positive returns and performance; demonstrable debt service capacity; established risk management |
| Alt | 33.6 | 6.9 | | 8 | |
| | | | | 9 | |
| | | | | 10 | minimum acceptable risk profile; short history of results; thin capitalization; adverse developments |
| | | | | 11 | event of default; collateral shortfall; cessation of operations; adverse management change |
| | | | | 12 | realized loss event; insolvency; fraud |

338.   Genesis Global Capital's statement that the weighted average duration of its outstanding loans was just 54.3 days was yet another fraud, because that calculation excluded the $1.1 billion DCG Promissory Note and its 10-year duration. Had the DCG Promissory Note been included, upon information and belief, the resulting calculation would have yielded a weighted average loan duration of more than *765 days*—approximately *14 times* the figure that Genesis Global Capital falsely reported.

339.   Genesis Global Capital excluded the DCG Promissory Note from its loan-duration calculations in order to conceal the existence and terms of the DCG Promissory Note from Genesis Global Capital's investors, thereby misrepresenting its true financial position.

340.   Another attachment to the July 6 Email purported to be Genesis Global Capital's balance sheet as of June 30, 2022. This document also materially misrepresented Genesis Global Capital's financial condition.

341.   As with the "Financial Position per Asset" table, the balance sheet did not disclose

the existence of the $1.1 billion promissory note. Instead, apparently, the note was included as an asset on the balance sheet in a line item labeled "Receivable from related parties"—which had a stated value of approximately $1.137 billion. The DCG Promissory Note was included on the balance sheet at its full face value of $1.1 billion, even though, as discussed above, its true fair value was only a small fraction of that amount.

342.    The purpose of misrepresenting the DCG Promissory Note's value is obvious: despite including the note at its full face value, the balance sheet showed "Total member's equity" of just $92.5 million. If the DCG Promissory Note had been included on the balance sheet at any reasonable estimate of its fair value, it would have disclosed that Genesis Global Capital was insolvent by *at least* hundreds of millions of dollars.

343.    In the following weeks and months, Genesis Global Capital made numerous other false statements to Gemini. These included, for example, updates to the false "Risk Metric" document described above, which contained the same Financial Position per Asset table that falsely included the DCG Promissory Note as a Current Asset. These updates were shared on a regular (sometimes daily) basis with Gemini.

344.    On July 18, 2022, DCG filed a bankruptcy claim against Three Arrows for more than $1 billion. The same day, DCG's COO [Defendant Murphy] instructed Managing Director No. 1 [Ballensweig] in writing to "manage [G]emini and the other largest counterparties" because DCG was concerned that Earn investors would withdraw their assets. Thus, on July 18, 2022, Managing Director No.1 [Ballensweig] told Gemini's risk personnel conducting due diligence for Earn investors: "There might be some information relating to DCG's claim against [Three Arrows] that gets published today or tomorrow. None of this is new information and all of our loses [sic] have already been absorbed by DCG/realized on our balance sheet.… All of the losses have already

been reflected and are with DCG."[104]

345.  Even after July 18, 2022, Gemini transferred hundreds of millions of dollars' worth

of investor assets to Genesis Capital under Earn.[105]

346.  These statements on July 6 and 18, 2022, were false, misleading, and omitted

material information. DCG did not "absorb" the Genesis Entities' losses. The [DCG] Promissory

Note concealed those losses on Genesis Capital's balance sheet but did not replace the lost open-

term assets. On July 7, 2022, Managing Director No. 1 [Ballensweig] described the issue to DCG's

COO [Defendant Murphy] as follows:

> the issue is more structural … even though DCG took on liability from [Genesis
> Asia Pacific], it still leaves a liquidity hole if we were to conceptually wind the
> book down to nothing, the liquidity hole long-term = the $900 m2m loss on [Three
> Arrows] + the lack of liquidity on the GBTC collateral which is another $450mm,
> so structurally, we have about 1.345B we'd need to get in the form of long-term
> debt or equity to ultimately have enough liquid capital to wind everything down.[106]

347.  In another communication dated July 22, 2022, Managing Director No. 1

[Ballensweig] explained to a high-level DCG employee that the Three Arrows losses created a

"[d]uration mismatch [at Genesis Capital] because we had [one billion] of open term assets with

[Three Arrows] which no longer exist and thus cannot be used to offset all of our open term

liabilities" including liabilities to the Earn investors. Managing Director No. 1 [Ballensweig]

continued to explain that there was an additional "asset quality mismatch because $500 [million]

of the collateral we absorbed to offset the [Three Arrows] losses was GBTC which isn't liquid. So

both of these things on net contribute to the overall net liquidity gap [Genesis Capital] [has] as an

organization."[107]

---

[104] NYAG Compl., ¶160.
[105] *Id.*, ¶161.
[106] *Id.*, ¶162
[107] *Id.*, ¶163.

348.    Further, the losses were not reflected on Genesis Capital's balance sheet—they were reflected on Genesis Asia Pacific's Q2 2022 income statement, which Genesis Capital never provided to Gemini.[108]

349.    On July 21, 2022, Genesis Capital's CFO corrected some of these misstatements, writing in an email to a member of Genesis Capital's sales team: "[w]e should avoid using the word 'well-capitalized'" and "DCG didn't absorb the loss." The same day, Genesis Capital's CFO also messaged Managing Director No. 1 [Ballensweig] and several members of the lending team: "[w]e have to stop making reference that we are well capitalized."[109]

350.    On July 21, 2022, Genesis Capital's CFO informed DCG and the Genesis Entities' Heads of Communications of similar false statements contained in Genesis Capital's and DCG's talking points. Neither DCG nor Genesis Capital corrected any prior misstatements made to Gemini or the Earn investors.[110]

351.    Genesis Capital's CFO objected to these false statements to further conceal Genesis Capital's financial condition. As Genesis Capital's CFO explained to Genesis Capital's Chief Marketing Officer on July 21, 2022: "I don't want sales to tell people we have no losses and then ask me to be on a call to justify that."[111]

352.    Genesis Capital's CFO and its finance team avoided joining phone calls with counterparties to conceal Genesis Capital's financial condition. Instead, members of Genesis Capital's sales and lending teams answered financial questions using only approved talking points that contained no explanation of the [DCG] Promissory Note or its terms. In a private message dated August 30, 2022, Genesis Capital's CFO confided to a colleague:

---

[108] *Id.*, ¶164.
[109] *Id.*, ¶165.
[110] *Id.,* ¶166.
[111] *Id.*, ¶167.

We are only comfortable to share what will yield the best outcome for the firm. [Having the finance team] on the call without anticipated questions is not putting finance on the spot. It's putting the firm on the spot. That's what we have to convey [to Genesis Capital personnel] [and] why [having the finance team join counterparty calls] will be putting c suites and [the] firm "at risk."[112]

353.    Starting in July 2022, and continuing multiple times per week until November 16, 2022, Genesis Capital provided reports to Gemini that listed the value of Genesis Capital's "current assets." A "current asset" is one that can be reduced to cash or cash equivalents within the course of one year. These reports fraudulently categorized the [DCG] Promissory Note as a current asset, even though it was payable ten years later. In response to inquiries from Gemini, on July 28, 2022, Genesis Capital's CFO helped Genesis Capital's lending team draft an email to Gemini which explained that the "current assets" column in this report contained "$1.1bn in receivables from related parties"—*i.e.*, the [DCG] Promissory Note. This email to Gemini omitted any reference to the [DCG] Promissory Note's duration or other terms.[113]

> **b.     Defendants DCG Fails to Repay Hundreds of Millions of Dollars Owed to Genesis Global Capital, Worsening Genesis Global Capital's Financial Condition**

354.    On July 24, 2022, with respect to the $100 Genesis Capital loaned to DCG on January 24, 2022, DCG failed to repay that loan on or before its maturity date. Instead, on July 25, 2022, a DCG executive informed Managing Director No. 1 [Ballensweig] that DCG "literally [did not] have the money right now" to repay the loan.[114]

355.    At this juncture, Genesis was insolvent and DCG was in existential danger.  Had Genesis gone bankrupt at that time, DCG's loans to Genesis would have been due, but DCG did not have the ability to repay the loan and would have been forced into bankruptcy.

---

[112] *Id.*, ¶168.
[113] *Id.,* ¶169
[114] *Id.*, ¶181.

356.    Also on July 25, 2022, the same day, DCG's treasurer emailed Genesis Capital's

COO [Defendant Islim] and Managing Director No. 1 [Ballensweig]:

> We received guidance from [Silbert] to re-paper the $100mm loan (with July 24th
> maturity) from Genesis to DCG by 10 months (until May 2023). Please let us know
> what documentation is needed to execute on the new loan. Also, we need to include
> language that the loan could be repaid early without any penalty.[115]

357.    Managing Director No. 1 [Ballensweig] objected, stating: "given the continued

pressure from major lenders such as … Gemini … this duration mismatch will certainly put

Genesis in a much worse spot." The same day, on July 25, 2022, DCG's Treasurer responded that

DCG "need[ed] to preserve liquidity to meet our operating cash needs over the next few months."

After additional objections, the next day, Managing Director No.1 [Ballensweig] relented stating:

"it sounds like we don't have much room to push back, so we will do what DCG needs us to do."

DCG also dictated the interest rate for this loan.[116]

358.    With respect to the February 23, 2022 loan from Genesis Capital to DCG of $100

million in U.S. dollars on an unsecured basis, with a stated maturity date of August 23, 2022, after

the payment became due, at DCG's insistence, Genesis Capital extended the maturity date of this

loan to May 2023.[117]

### c.    Exchange Act Defendants Misrepresented Genesis Global Capital's Financial Position to Investors in Connection with Each Purchase of Genesis Yield Securities

359.    The Exchange Act Defendants directly misled Genesis Global Capital investors and

the appointed agent of Gemini Earn users via false financial reporting.

---

[115] *Id.*, ¶182.
[116] *Id.*, ¶183.
[117] *Id.*, ¶184.

360.    In each Genesis Yield Investment Agreement through which Genesis Global Capital offered or sold Genesis Yield securities to investors, Genesis Global Capital made the following representations to investors:

> [Genesis Global Capital] represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws. (the "Solvency Warranty")

> [Genesis Global Capital] represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder. (the "Adverse Proceedings Warranty").

361.    As an initial matter, although Defendants DCG, Silbert, Kraines and Murphy should and could have corrected Defendant Moro's public statements regarding the nature of DCG's support for Genesis Global Capital, *see supra*, Paragraph 315, it failed to do so. Defendant DCG, Silbert, Kraines and Murphy knew, or had reason to know, that Genesis Global Capital investors would rely on Moro's statements regarding Defendant DCG's support. Defendants DCG, Silbert, Kraines and Murphy's silence in the face of Moro's misstatements demonstrates that Defendant DCG, Silbert, Kraines and Murphy likewise intended to mislead Genesis Yield investors.

362.    Even more troubling, key DCG officers and employees directly participated in the effort to mislead. For example, on July 18, 2022, in response to an email exchange with another Genesis Yield investor, Mark Nuvelstijn, CEO and co-founder of Bitvavo, regarding the possibility of a parent guaranty of Genesis Global Capital's borrowing from DCG, Ballensweig suggested the investor's representative speak with DCG's then-COO, Defendant Murphy. Ballensweig stated: "I've broached the topic of a guarantee with [Defendant] Mark Murphy, DCG's COO and before we get there, I think it would make sense for you guys to set up a call to go through how DCG has

viewed the loss and their plans to support Genesis [Global Capital] in perpetuity. There are many implications of establishing a formal guarantee but I think for starters you guys should hop on a call. Let me know if that works and we'll set something up this week."

363.    On July 19, 2022, Defendant Murphy held a call with that investor's representative. In substance, speaking on behalf of Defendant DCG, Defendant Murphy reiterated the false story that had previously been shared with the investor in the same "Three Arrows Post-Mortem" document that Genesis Global Capital had sent to Gemini. Defendant Murphy stated that Defendant DCG stepped in to absorb Genesis Global Capital's losses on its 3AC exposure, and he stated that those losses had been netted against Defendant DCG's balance sheet. He further stated that, following Defendant DCG's support, Genesis Global Capital was well capitalized to continue doing business as normal in the future. And he reassured the investor that Genesis Global Capital was among the most important parts of the broader DCG empire, that Defendant DCG had big plans for Genesis Global Capital's future business, and that DCG was committed to providing ongoing support to Genesis Global Capital to allow the company to continue growing.

364.    Each of these statements—made by Defendant Murphy on behalf of Defendant DCG—was false.

365.    Genesis Global Capital's losses were not absorbed by Defendant DCG or netted against Defendant DCG's balance sheet. Genesis Global Capital was insolvent, not well capitalized. And, as evidenced by Defendant DCG's failure to provide even the support that Genesis Global Capital had publicly claimed in the aftermath of 3AC's collapse, Defendant DCG in fact had no plans to continue providing ongoing support to Genesis Global Capital in order to permit Genesis Global Capital to avoid failure and continue growing.

366.    Defendant Murphy made these affirmative misrepresentations as part of DCG's

ongoing conspiracy with Genesis Global Capital.

367.     Thereafter, Defendant Murphy and other DCG representatives were copied on email exchanges in which Genesis Global Capital continued to provide false information in response to the investor's requests for information. For example, on July 26, 2022, Defendant Murphy, then Defendant DCG's COO, was copied on an email exchange in which Ballensweig made a series of false statements in response to inquiries from the investor. Ballensweig explained that his response had been prepared with assistance from the "Finance and Accounting teams at both DCG and Genesis."

368.     The Finance and Accounting team at DCG and Genesis included Ron DiPrete, and DCG's Head of Special Project, Finance, and DCG CFO Defendant Kraines.

369.     As part of that response, Ballensweig provided details about approximately $1.8 billion in lending from Genesis Global Capital to affiliated entities that had been disclosed in Genesis Global Capital's prior reports. Ballensweig falsely stated that Genesis Global Capital had approximately $922 million in outstanding loans to DCG—an amount that purposefully omitted the $1.1 billion promissory note that Defendants DCG and Silbert sought to conceal from Genesis Global Capital's investors. At the same time, Ballensweig falsely stated that DCG had "assumed the $1.1bn loan on June 30, 2022"—a misrepresentation calculated to reassure the investor that Genesis Global Capital had already been made whole for its loss on the 3AC loans.

370.     That was entirely fictitious, but Defendant Murphy made no effort to correct Ballensweig's misrepresentations. Nor did Ronald DiPrete, DCG's Head of Special Projects, Finance, who was also copied on the exchange.

371.     Later, on August 16, 2022, Defendant Murphy and DiPrete were copied (along with Jason Yacavone, a Director in DCG's Investments group) when Genesis Global Capital's Hamill

Serrant sent an updated Genesis Global Capital balance sheet to the same investor. The updated balance sheet, dated as of July 29, 2022, once again falsely included the $1.1 billion DCG Promissory Note at its full face value in a "Receivable from related parties" line item. Even with that false entry, the balance sheet showed "Total member's equity" of just $95.4 million. And once again, none of DCG's representatives lifted a finger to correct the falsehood, preferring instead to keep the public and Genesis Global Capital investors in the dark.

372.     During this period, Defendant DCG's representatives were repeatedly copied on email exchanges with Genesis Global Capital's personnel, in which Genesis Global Capital provided additional information in response to the investor's questions and requests. But DCG's representatives never stated that the core premise of the parties' discussions—namely, that DCG had already stepped in to absorb Genesis Global Capital's losses from its 3AC exposure—was false.

373.     The participation of DCG officers and employees in these communications demonstrates that the effort to mislead was an agreed-upon common scheme. The participation of DCG officers and employees in these communications also assisted Genesis Global Capital in misleading Genesis Global Capital investors.

374.     More broadly, the basic nature of the DCG Promissory Note also demonstrates that Defendant DCG was a willing participant in the scheme to mislead. After 3AC's collapse triggered a $1.2 billion loss for Genesis Global Capital, investors had good reason to question Genesis Global Capital's liquidity and the solvency of its balance sheet. The DCG Promissory Note was (unbeknownst to investors at the time) the basis of misrepresentations by Genesis that Defendant DCG had covered the loss. But a promissory note such as this would not be a rational response to investors' concerns: The DCG Promissory Note did not provide any short-term liquidity, and (on

any reasonable statement of its actual present value on a balance sheet basis) the DCG Promissory Note represented at most a small fraction of Genesis Global Capital's loss on the 3AC loan. For both Defendant DCG and Genesis Global Capital, the DCG Promissory Note made sense only if its existence and terms could be concealed—because doing so allowed DCG to pretend to support Genesis Global Capital, without taking on the financial cost that would have been required DCG to actually do so. Put simply, the terms of the DCG Promissory Note were tailor-made to allow Defendant DCG and Genesis Global Capital to conspire to deceive Genesis Global Capital investors.

375.    Eliminating any doubt that Defendant DCG and Genesis Global Capital worked hand-in-hand on the deception, multiple present or former Genesis Global Capital employees have stated as much in correspondence with Genesis Global Capital investors. Those communications specifically confirm that Defendant DCG's and Genesis Global Capital's finance and executive teams collaborated to prepare the false financial statements that were shared by Genesis Global Capital.

376.    Defendant DCG and Genesis Global Capital thus agreed to the misleading financial presentation that would conceal the DCG Promissory Note's existence and its terms from Genesis Global Capital's investors.

377.    According to an interview on the podcast *Unchained* on or around November 4, 2023 with Genesis investors who invested directly with Genesis:

> [Defendants Silbert and Moro] went out and publicly told people that [they] filled the hole . . . publicly said Genesis balance sheet is strong, it hasn't been affected. You induced us to loan new Bitcoin to you based on the fact that you stated Genesis was solvent because you have provided the $1.1 billion dollar note . . . If in June [2022], Barry [Silbert] had said, look, we're going to help Genesis by giving them $1.1 billion, and this is how we did it.  We give them a promissory note that's due in 10 years at 1% interest, nobody would have re-loaned. We would have seen basically what happened. But what they did is they kept it a secret. They guarded

that.

## C. DCG AND GENESIS CAPITAL CONCEALED INFORMATION THAT WOULD HAVE REVEALED THEIR DECEIT.

378. Genesis Capital's CFO and other personnel directed employees not to disclose the [DCG] Promissory Note to counterparties such as Gemini. Indeed, many Genesis Capital employees were not informed of the [DCG] Promissory Note until months after its signature.[118]

379. When counterparties requested additional information concerning Genesis Capital's financial statements, Genesis Capital continued to conceal and suppress information that would have revealed the [DCG] Promissory Note or losses on counterparty defaults. In July 2022, Genesis Capital's CFO directed other personnel to tell counterparties that the notes to Genesis Capital's balance sheet—which would have explained the [DCG] Promissory Note and its impact on Genesis Capital's balance sheet—were not prepared more frequently than the end of the year. This was false. Genesis Capital prepared notes for its quarterly balance sheets in prior quarters, including its unaudited balance sheets for the second and third quarters of 2021 and the first quarter of 2022.[119]

380. In a July 2022 Microsoft Teams chat, Genesis Capital's CFO confessed to her co-workers that the "real reason" why Genesis Capital would not provide these footnotes to counterparties was because "[i]n the notes, we are required to disclose a lot of things [w]hich will highlight what happened" including the "assignment of liab[ilities]"—*i.e.*, the [DCG] Promissory Note.[120]

---

[118] NYAG Compl., ¶170.
[119] *Id.,* ¶171.
[120] *Id.*, ¶172.

381. In another Microsoft Teams chat, in September 2022, Genesis Capital's CFO explained to coworkers that without the footnotes, counterparties would not know about the [DCG] Promissory Note from the balance sheet alone.[121]

382. After June 30, 2022, Genesis Capital's CFO, in consultation with DCG, directed Genesis Capital personnel not to share cash flow and income statements and to withhold Genesis Asia Pacific's financial statements from counterparties. These financial statements would have revealed hundreds of millions of dollars in losses during the second quarter of 2022 and would have revealed that DCG did not "absorb the loss."[122]

383. Cash flow and income statements were important to Gemini's ability to assess Genesis Capital's ability to pay back Earn investors. Thus, Gemini requested Genesis Capital's cash flow and income statements for the second quarter of 2022 on multiple occasions after June 30, 2022.[123]

384. Genesis Capital ignored these requests and Gemini allowed them to do so.[124]

385. Before executing the [DCG] Promissory Note, Genesis Capital executives, including Moro, Genesis Capital's CFO, and Managing Director No 1 [Ballensweig], informed DCG officers and employees what financial statements had previously been shared with counterparties, including Gemini. Thus, both DCG and Genesis Capital knew that they were deviating from past practices in providing only a balance sheet to Gemini.[125]

386. Genesis Capital personnel soon grew concerned that Genesis Capital had provided false information to counterparties. On September 1, 2022, Genesis Capital's Director of Lending

---

[121] *Id.*, ¶173.
[122] *Id.*, ¶174.
[123] *Id.*, ¶175.
[124] *Id.*, ¶176.
[125] *Id.*, ¶177.

reported to its interim CEO [Defendant Islim]: "I'm hearing concerns from front office folks…. They're concerned about the accuracy of information we have shared with clients re liquidity and variability in our equity…. There still is no liquidity infusion from DCG to fill the gap and instead we have a 'note'." Nevertheless, neither DCG nor Genesis Capital corrected the misstatements that Genesis Capital employees made to counterparties, including the Earn investors.[126]

## D. DEFENDANT SILBERT PERSONALLY INTERVENED TO KEEP INVESTORS FROM WITHDRAWING INVESTMENTS.

387.    Defendant Silbert—DCG's founder and CEO—personally participated in perpetuating the lie that Genesis was solvent and capable of honoring its obligations. On the afternoon of October 13, 2022 (following several direct discussions regarding the future of the Gemini Earn Program), Gemini sent an email to Genesis Global Capital providing 30 days' notice of the termination of the Gemini Earn Program and the Gemini Earn MLAs. Within 24 hours, Defendant Silbert personally emailed Cameron Winklevoss, co-founder of Gemini, seeking a face-to-face meeting.

388.    Defendant Silbert acknowledged that his request was prompted by the uncertain "future of the Gemini-Genesis lending relationship." Defendant Silbert posited that he and Cameron Winklevoss should be exploring "ways to take advantage of the crypto winter" and suggested that "there are a number of ways that Gemini-Genesis-DCG could more closely collaborate."

389.    Defendant Silbert's request resulted in a lunch meeting between Cameron Winklevoss and Silbert at a restaurant in New York City on October 22, 2022. At that lunch meeting, Defendant Silbert made numerous representations designed to induce Gemini not to discontinue the Earn program. Silbert was aware at the time that Genesis Global Capital was

---

[126] *Id.*, ¶178.

massively insolvent, because—unbeknownst to Gemini and Genesis Global Capital investors—DCG had provided Genesis with a 10-year promissory note rather than assuming the 3AC losses as had been claimed. Defendant Silbert was further aware that Defendant DCG had not provided meaningful near-term liquidity to Genesis Global Capital sufficient to allow Genesis Global Capital to honor its obligations, again contrary to statements made to Genesis Global Capital investors. Defendant Silbert disclosed none of those highly material facts regarding Genesis Global Capital's insolvency and lack of liquidity, even as he was urging Gemini to continue the Gemini Earn Program.

390. Defendant Silbert did more than conceal those numerous material facts. Rather, he created a cover story that was designed to—and did, in fact—affirmatively misrepresent the reason why he was urging Gemini to continue the Earn program. Defendant Silbert represented that Genesis Global Capital simply needed sufficient time to effect an orderly unwinding of its "complex" loan book, and that any difficulty that the termination of the Gemini Earn Program would cause for Genesis Global Capital was merely a mismatch in the timing of Genesis Global Capital's loan positions. That is, Silbert affirmatively misrepresented that Genesis Global Capital faced only a short-term timing mismatch between its outstanding loans and borrowing.

391. In reality, as Defendant Silbert well knew, Genesis Global Capital's problems ran far deeper than a mere "timing" issue. Genesis Global Capital had a gaping hole in its balance sheet, because the $1.1 billion of support that DCG had purportedly given Genesis in order to "assume" the Genesis 3AC losses was, in actuality, the 10-year-distant promissory note. As explained above, the DCG Promissory Note was worth (at most) a tiny fraction of its face value and offered no realistic prospect of allowing Genesis to meet its obligations as they came due. And the weighted average duration of Genesis's outstanding loans was more than 765 days (or more

than 2 years), hardly a short-term timing mismatch. Defendant Silbert pushed his cover story even further, suggesting that Genesis Global Capital, Defendant DCG, and Gemini should explore an arrangement to collaborate closely in the future.

392.    Defendant Silbert's misrepresentations had the desired effect. Relying on Defendant Silbert's claims, Gemini elected to delay the termination of the Gemini Earn Program—and not to explore the possibility of pursuing more rapid termination or other relief, as Gemini would have done if Defendant Silbert had stated the truth.

393.    Then, just days before the end of the Class Period, Defendant Silbert caused DCG to negotiate and enter into a November 10 tripartite agreement between and among Genesis Global Capital, Defendant DCG, and Gemini. Pursuant to that agreement, Defendant DCG promised to transmit additional collateral in the amount of 31,180,804 shares of GBTC (valued in excess of $626.1 million as of July 6, 2023) to Genesis Global Capital for the benefit of Gemini Earn investors. On information and belief, Defendant DCG transmitted the collateral to Genesis Global Capital but did not instruct or allow Genesis Global Capital to transfer that collateral to Gemini as agreed.

394.    But even assuming that Defendant DCG nominally fulfilled its contractual obligation, the real purpose of the agreement was a ruse. By purporting to demonstrate still further support for Genesis Global Capital's obligations in the form of collateral—despite knowing that Genesis Global Capital was massively insolvent—Defendant DCG induced Gemini to continue the Gemini Earn Program. Gemini would not have done so if Defendants Silbert and DCG had come clean about Genesis Global Capital's true financial condition, rather than repeatedly misrepresenting it.

395.    Under these circumstances, Defendants Silbert and DCG were under a legal

obligation not to conceal the true nature of Genesis Global Capital's financial condition. Defendants Silbert and DCG understood that Gemini was relying on the financial information and other representations provided by Genesis Global Capital—including, in particular, multiple assurances that Genesis Global Capital's losses relating to 3AC had been absorbed by Defendant DCG—as essential facts in deciding whether to terminate the Gemini Earn Program on the 30-day timeline Gemini had previously communicated. Moreover, the falsity of those representations was not discoverable by Gemini through ordinary diligence. Thus, Defendants Silbert and DCG were under a legal obligation to speak the truth and to correct those misrepresentations.

396.    Defendant Silbert's partial disclosures regarding Genesis Global Capital's financial condition were equivalent to actual misrepresentations—made on Defendant DCG's behalf—regarding Genesis Global Capital's solvency. In particular, Defendant Silbert's assurances that Genesis's problems were a mere "timing" issue were deliberate half-truths, calculated to mislead Gemini into concluding that Genesis Global Capital was not in fact insolvent.

397.    The above acts committed by Defendants DCG, Silbert, Moro, Islim, Kraines and Murphy caused Genesis Global Capital to mispresent its financial health to Plaintiffs via affirmative false statements made directly to investors and investors' agent *and* via Genesis Global Capital omitting to inform investors of its insolvency when it had a duty to do so under the Genesis Yield Investment Agreements.

398.    As noted above, in connection with investors' purchase of Genesis Yield securities during the period July 1, 2022 through the end of the Class Period Defendants Moro, Islim, Kraines and Murphy caused Genesis Global Capital to make the following representations to Plaintiffs and members of the Class via the Genesis Yield Investment Agreements:

> [Genesis Global Capital] represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws.

> [Genesis Global Capital] represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

399.    As a result of the misstatements and omissions described above, Plaintiffs and members of the Class purchased Genesis Yield securities. Plaintiffs and members of the Class would not have (nor would any reasonable investor) purchased Genesis Yield securities had they known Genesis Global Capital's true financial conditions.

400.    As alleged above, on or about June 18, 2022, Genesis Capital lent approximately 18,697 bitcoin (valued at over $355 million as of June 18, 2022) to affiliate, DCGI, on an open-term basis. Rather than repaying this loan in bitcoin—the denomination of the loan—DCGI partially repaid that loan on November 10, 2022, with 25,999,457 shares of GBTC which were worth approximately $250 million as of November 10, 2022.[127]

401.    This repayment deprived Genesis Capital of liquidity because unlike bitcoin, Genesis Capital neither borrowed nor lent GBTC, and could not liquidate the GBTC shares due to affiliate sales restrictions.[128]

402.    After this repayment, 4,550.45 bitcoin (approximately $80 million as of November 10, 2022) remained outstanding on Genesis Capital's loan to DCGI. On November 10, 2022, DCG made Genesis Capital extend the maturity date for the remaining amount to May 11, 2023. These loans all remain unpaid.[129]

403.    On or about November 12, 2022, Genesis Capital privately sought an emergency loan of between $750 million and $1 billion from a third party, and informed the proposed lender that it was facing a "liquidity crunch primar[ily] due to certain illiquid assets on its balance sheet

---

[127] NYAG Compl., ¶185.
[128] *Id.,* ¶186.
[129] *Id.*, ¶187.

following the events of [Three Arrows]" including (1) the [DCG] Promissory Note; (2) GBTC; and (3) unsecured loans to DCG. Genesis Capital did not—or could not—obtain this emergency loan.[130]

### E. THE TRUTH BEGINS TO BE REVEALED: GENESIS GLOBAL CAPITAL SUSPENDS REDEMPTIONS CAUSING INVESTOR LOSSES AND MISREPRESENTS THE REASON.

404. On November 16, 2022, Genesis Global Capital announced, via Twitter, that Genesis Global Capital would not permit further redemptions or new loan originations due to withdrawal requests exceeding Genesis Global Capital's liquidity, and the undisclosed material negative risks of Genesis' true financial condition that the Exchange Act Defendants concealed since June 2022 began to be revealed:

> "FTX events have created an unprecedented market, resulting in abnormal withdrawal requests, which have exceeded our current liquidity... In consultation with our professional financial advisors at counsel we have taken the difficult decision to temporarily suspend redemptions and the new loan origination in the lending business[.]"

405. The November 16, 2022 announcement misleadingly blamed FTX for Genesis Global Capital's inability to honor customer redemptions instead of acknowledging that the blame lay with the dubious transactions and accounting methods employed by Genesis Global Capital and the Exchange Act Defendants.

406. In fact, Genesis Global Capital was unable to continue to process redemption requests because Genesis Global Capital had become insolvent in June 2022 when it was unable to collect $1.1 billion of the $2.3 billion loaned to 3AC and the loan to parent Defendant DCG continued to decline in value.

407. Genesis Global Capital was not merely illiquid; it was insolvent and had been since

---

[130] *Id.*, ¶197.

June 2022. This fact was confirmed when, on January 19, 2023, Genesis Global Holdco, LLC,

Genesis Global Capital, LLC, and Genesis Asia Pacific Pte. Ltd., filed voluntarily petitions under

Chapter 11 of the U.S. Bankruptcy Code in the Southern District of New York.

### F. PRESUMPTION OF RELIANCE FOR EXCHANGE ACT CLAIMS.

408.   In connection with each purchase of Genesis Yield securities during the Class

Period, Genesis Global Capital made the following uniform representations to Plaintiffs and

members of the Class via the Genesis Yield Investment Agreements:

> [Genesis Global Capital] represents and warrants that it is not insolvent and is not
> subject to any bankruptcy or insolvency proceedings under any applicable laws.

> [Genesis Global Capital] represents and warrants there are no proceedings pending
> or, to its knowledge, threatened, which could reasonably be anticipated to have any
> adverse effect on the transactions contemplated by this Agreement or the accuracy
> of the representations and warranties hereunder or thereunder.

409.   As a result of the misstatements and omissions described above, Plaintiffs and

members of the Class purchased Genesis Yield securities in reliance on Genesis Global Capital's

representations.

410.   Plaintiffs and members of the Class would not have (nor would any reasonable

investor) purchased Genesis Yield securities had they known Genesis Global Capital's true

financial conditions.

411.   In addition, the Exchange Act Defendants made misrepresentations to the agent of

investors who purchased Genesis Yield securities through the Gemini Earn program.

412.   Plaintiffs and members of the Class who purchased Genesis Yield securities

through the Gemini Earn program did so in reliance on Genesis Global Capital's representations

to their agent. Plaintiffs and members of the Class who purchased Genesis Yield securities through

the Gemini Earn program would not have (nor would any reasonable investor) purchased Genesis

Yield securities had they known the truth about Genesis Global Capital's true financial conditions

and risk management policies and procedures.

413.    Moreover, Plaintiffs and the Class's Exchange Act claims are grounded in
Defendants' failure to disclose material adverse facts that Defendants had a duty to disclose.

414.    Plaintiffs and the Class are entitled to a presumption of reliance in accordance with
*Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

415.    The withheld facts were material in the sense that a reasonable investor may have
considered them important in making investment decisions.

416.    A fact is material if there is a substantial likelihood that the disclosure of the omitted
fact would have been viewed by the reasonable investor as having significantly altered the total
mix of information made available.

417.    Among the material omissions Plaintiffs allege are that the Exchange Act
Defendants did not disclose that Genesis Global Capital was insolvent.

418.    Genesis Global Capital had a duty to disclose this adverse undisclosed material
facts when it falsely and misleadingly represented to investors that "[Genesis Global Capital]
represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency
proceedings under any applicable laws" and "[Genesis Global Capital] represents and warrants
there are no proceedings pending or, to its knowledge, threatened, which could reasonably be
anticipated to have any adverse effect on the transactions contemplated by this Agreement or the
accuracy of the representations and warranties hereunder or thereunder."

419.    The omissions alleged here are common to all Plaintiffs and none of these Plaintiffs
were made aware of the insolvency of Genesis.

420.    Plaintiffs and members of the Class would not have invested in Genesis securities
had they known the undisclosed, material adverse facts that were not disclosed at the time of their

investment.

## XII.    **CONSUMER PROTECTION CLAIMS**

421.    The Consumer Protection Claims (as defined below) are pled in the alternative to the Securities Act and Exchange Act claims alleged herein.

422.    Genesis Yield was made available to consumers, who were exposed to the Consumer Protection Defendants' fraudulent marketing, advertising, and sales tactics designed to induce consumers to purchase, transfer, borrow, loan, and/or trade digital assets via Genesis Yield.

423.    Genesis Global Capital, individually and through the Consumer Protection Defendants, touted Genesis Yield as an opportunity to earn money, through which consumers could tender digital assets in exchange for earning some of the "highest" returns or yields and the eventual return of their digital assets – making it an attractive opportunity to the investing public.

424.    The Consumer Protection Defendants made various representations that Genesis Global Capital was and would remain solvent and was not and would not be subject to any bankruptcy or insolvency proceedings.

425.    In doing so, the Consumer Protection Defendants led consumers to expect that, by tendering and giving control of their digital assets to Genesis Global Capital, (1) they would receive profit in the form of interest on those assets, up to 8.05% annual percentage yield ("APY"), and (2) their digital assets would remain safe until their return.

426.    Despite the Consumer Protection Defendants' representations, the structure of Genesis Yield was such that Genesis Global Capital profited, not consumers, and Genesis Global Capital was in fact insolvent.

427.    Consumers such as Plaintiffs and Class Members reasonably relied on Consumer Protection Defendants' misrepresentations and omissions, as set forth herein, to their detriment, and would not have otherwise entered into the Genesis Yield Investment Agreements.

428. Consumer Protection Defendants each engaged in a wrongful scheme designed to mislead – and profit from – consumers such as Plaintiffs and Class Members, including but not limited to the following:

a) Defendant Moro and causing Genesis Global Capital, at the direction of and/or subject to the control of Defendants DCG, Silbert, Hutchins, and Lenihan, to disseminate misleading and false financial statements to consumers, as prospective investors, either directly or through Gemini as their designated agent, to induce consumers to invest their digital assets with Genesis Global Capital;

b) Defendants Moro, Islim, DCG, Silbert, Hutchins, Lenihan, Kraines and Murphy causing Genesis Global Capital to use consumers' digital assets to engage in transactions designed to benefit the DCG conglomerate, including the purchase of GBTC, which Grayscale, as wholly owned subsidiary of DCG, received significant profit therefrom, ultimately leading DCG (as the corporate parent) and Silbert (as DCG's controlling shareholder) to profit, rather than Genesis or Plaintiffs and Class Members;

c) Defendants Moro, Islim, DCG, Silbert, Hutchins, Lenihan, Kraines and Murphy causing Genesis Global Capital to lend almost 30% of Genesis Global Capital's total loan book to 3AC in order to maximize DCG's profit, rather than Genesis or Plaintiffs and Class Members;

d) Defendants DCG, Silbert, Hutchins, and Lenihan forcing Genesis Global Capital to sell the 3AC bankruptcy claim and execute a sham loan transaction on unfavorable terms whereby the fair market value of the DCG Promissory

Note was a fraction of its $1.1 billion face amount, it would not mature until 2032, and it bore interest at a rate of a mere 1% – which was done for DCG's and Silbert's benefit, and to mislead consumers as to Genesis Global Capital's financial standing, by artificially propping up the value of GBTC shares;

e) Defendant Silbert misrepresenting to Gemini, as authorized agent, that DCG "absorbed" 3AC losses and that Genesis Global Capital remained solvent, when that was not the case, in order to convince Gemini to not terminate the Gemini Earn Program;

f) Defendant Moro publicly announcing on Twitter, following the collapse of 3AC, that Genesis Global Capital had mitigated any losses due to its exposure and loss was "finite," when in fact 3AC owed a large debt of $2.36 billion to Genesis, and Genesis suffered a loss of roughly $1.2 billion at the time 3AC's liquidation commenced, and that DCG had assumed certain liabilities to ensure that Genesis had the capital to operate, when it had not;

g) Defendant Moro making misleading statements as to Genesis Global Capital's solvency, including that the $1.1 billion amount of the DCG Promissory Note on its balance sheet was a "current asset and/or receivable" when it was not; and

h) Defendants Moro and Islim causing Genesis Global Capital and Ballensweig to disseminate balance sheets and other documents misrepresenting Genesis's solvency to induce consumers to continue to invest in Genesis Global Capital Genesis Yield securities and/or to prevent them from requesting redemptions of their investments.

429.    As a result of Consumer Protection Defendants' deceptive and unfair acts or practices, since the start of the Class Period, Plaintiffs and Class Members, have suffered harm, including, *inter alia*, loss of access to their digital assets and nonreceipt of interest on their digital assets as promised.

## CLASS ALLEGATIONS

430.    Plaintiffs bring the Action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

431.    Plaintiffs seek class certification of the Class defined above in Paragraph 2. Plaintiffs reserve the right to modify or refine the definitions of the Class or add subclasses based upon discovery of new information.

432.    Excluded from the Class are: (a) any Judge or Magistrate Judge presiding over the Action and members of their staff, as well as members of their families; (b) Defendants and Defendants' predecessors, parents, successors, heirs, assigns, subsidiaries, and any entity in which any Defendant or its parents have a controlling interest, as well as Defendants' current or former employees, agents, officers, and directors; (c) persons who properly execute and file a timely request for exclusion from the Class; (d) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (e) counsel for Plaintiffs and Defendants; and (f) the legal representatives, successors, and assigns of any such excluded persons.

433.    **Ascertainability**. The proposed Class is readily ascertainable because it is defined using objective criteria so as to allow class members to determine if they are a member of the Class. Further, the Class can be readily identified through records maintained by Genesis Global Capital.

434.    **Numerosity (Rule 23(a)(1))**. The Class is so numerous that joinder of individual members herein is impracticable. The exact number of members of the Class, as herein identified

and described, is not known, upon information and belief there are hundreds of thousands of individuals and entities that purchased Genesis Yield securities who were damaged.

435. **Commonality (Rule 23(a)(2))**. Common questions of fact and law exist for each cause of action and predominate over questions affecting only individual Class members, including:

a) Whether the Genesis Yield products were securities;

b) Whether Genesis Global Capital was required to file a registration statement for the Genesis Yield Investment Agreements with the SEC;

c) Whether an exemption from registration applied to Genesis Global Capital's offer and sale of the Genesis Yield securities;

d) Whether Genesis Global Capital violated Sections 5 and 12(a)(1) of the Securities Act;

e) Whether the Securities Act Defendants were control persons under Section 15 of the Securities Act;

f) The means and form of rescission or appropriate measure of statutory damages under the Securities Act;

g) Whether Genesis Global Capital made untrue statement of a material fact or to omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading;

h) Whether the Exchange Act Defendants employed any device, scheme, or artifice to defraud, or engaged in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person;

i) Whether the Exchange Act Defendants acted with the requisite state of mind;

j)   Whether misstatements or omission made by Genesis Global Capital were material to the decision made by Plaintiffs and the Class to purchase securities offered or sold by Genesis Global Capital;

k)   Whether Plaintiffs and members of the Class suffered damages as a result of the misconduct alleged herein;

l)   Whether the Exchange Act Defendants were control persons of Genesis Global Capital under Section 20(a) of the Exchange Act;

m)  The appropriate measure of damages under the Exchange Act; and

n)   Whether Defendants' conduct violated certain state consumer protection laws, and the appropriate measure of damages.

436.   **Typicality (Rule 23(a)(3)).** Plaintiffs' claims are typical of the claims of the other members of the proposed Class. Plaintiffs and members of the Class suffered injuries as a result of Genesis Global Capital and Defendants' wrongful conduct that is uniform across the Class.

437.   **Adequacy (Rule 23(a)(4))**. Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interest that is antagonistic to those of the Class, and Defendants have no defenses unique to Plaintiffs. Plaintiffs and their counsel are committed to vigorously prosecuting the Action on behalf of the members of the Class, and they have the resources to do so. Neither Plaintiffs nor Plaintiffs' counsel have any interest adverse to those of the other members of the Class.

438.   **Substantial Benefits**. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class is impracticable. The prosecution of separate

actions by individual members of the Class would impose heavy burdens upon the Courts and

Defendants, would create a risk of inconsistent or varying adjudications of the questions of law

and fact common to members of the Class, and would be dispositive of the interests of the other

members not parties to the individual adjudications or would substantially impair or impede their

ability to protect their interests. This proposed class action presents fewer management difficulties

than individual litigation, and provides the benefits of single adjudication, economies of scale, and

comprehensive supervision by a single court. Class treatment will create economies of time, effort,

and expense and promote uniform decision- making.

439.     Class certification, therefore, is appropriate under Fed. R. Civ. P. 23(b)(3) because

the above common questions of law or fact predominate over any questions affecting individual

members of the Class, and a class action is superior to other available methods for the fair and

efficient adjudication of this controversy.

440.     Plaintiffs reserve the right to revise the foregoing class allegations and definitions

based on facts learned and legal developments following additional investigation, discovery, or

otherwise.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**CONTROL PERSON LIABILITY FOR VIOLATIONS OF THE SECURITIES ACT
SECTION 5, SECTION 12(a)(1) AND SECTION 15 OF THE SECURITIES ACT
(Against the Securities Act Defendants)**

441.     Plaintiffs reallege the allegations above alleged in ¶¶3-12, and Sections II, V(A)

and (B), and VII-X, and expressly disclaim incorporation of any allegations of fraud.

442.     This claim is asserted against the Securities Act Defendants pursuant to Section 15

of the Securities Act, 15 U.S.C. § 77o.

443.     This claim is based on strict liability.

444.     Section 15 of the Securities Act provides: "Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist." *Id*. § 77o(a).

445.     Section 5(a) of the Securities Act states: "Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly (1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or (2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a).

446.     Section 5(c) of the Securities Act states: "It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title." *Id.* § 77e(c).

447.     As alleged herein, Genesis Global Capital violated Sections 5 of the Securities Act

directly or indirectly, and making use of any means or instruments of transportation or communication in interstate commerce or of the mails sold and offered Genesis Yield securities without registering the securities offering or qualifying for an exemption from registration.

448.    Under Section 12(a)(1) of the Securities Act, any person who offers or sells a security in violation of Section 5 of the Securities Act shall be liable to the person purchasing such security from the offeror or seller and may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if the security is no longer owned.

449.    As set forth above, Genesis Global Capital violated Section 5 of the Securities Act and is therefore liable to Plaintiffs and members of the Class under Section 12(a)(1).

450.    Plaintiffs have tendered or if they have not done so already hereby tender the securities purchased from Genesis Global Capital.

451.    But for Genesis Global Capital's bankruptcy, the Company would have been named a defendant and violations of Sections 5 and 12(a)(1) would have been asserted against it on behalf of Plaintiffs and the Class.

452.    At the time of the violations of Sections 5 of the Securities Act by Genesis Global Capital alleged herein, the Securities Act Defendants controlled Genesis Global Capital.  The Securities Act Defendants, by virtue of their stock ownership, agency, agreements or understandings, specific acts, and otherwise, had the power and authority to direct the management and activities of Genesis Global Capital and its employees, and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein. The Securities Act Defendants at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and

policies of Genesis Global Capital.

453.    The Securities Act Defendants exercised their power and influence to cause Genesis

Global Capital to violate the Securities Act as described herein, including by promoting, soliciting,

offering, and selling unregistered securities to Plaintiffs and members of the Class in violation of

sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§ 77e(a), 77e(c), and 77*l*(a)(1).

454.    The Securities Act Defendants had sufficient influence to cause Genesis Global

Capital to refrain from offering and selling unregistered securities in violation of the Securities

Act.

### 1.    Defendant DCG Controlled Genesis

455.    At all times alleged herein DCG was the 100% owner of GGH, which was the 100%

owner of the Genesis Global Capital and the Company's sole managing member.  Defendant DCG

had the power and authority to direct the management and activities of Genesis Global Capital and

its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained

of herein. Defendant DCG, at the time of the wrongs alleged herein, had the power to direct or

cause the direction of the management and policies of Genesis Global Capital.

456.    Defendant DCG exercised its power and influence to cause Genesis Global Capital

to violate the Securities Act as described herein, including by directing Genesis Global Capital not

to register as an exchange or broker-dealer prior to offering and selling securities to Plaintiffs and

members of the Class in violation of sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id.* §§

77e(a), 77e(c), and 77*l*(a)(1).

457.    At the time of the violations of Section 5 of the Securities Act by Genesis Global

Capital alleged herein, Defendant DCG had sufficient influence to cause Genesis Global Capital

to refrain from offering and selling unregistered securities in violation of the Securities Act.

458. DCG executives, Defendants Silbert, Kraines and Murphy had effective control over GGH, the Company and GGT—controlling strategy, hiring, allocation of resources, which were implemented with DCG executives on board of GGH, namely Murphy and Kraines. Furthermore, Matt Kummel, DCG Senior VP of Operations, was Defendant Silbert's eyes and ears at the Company. Kummell was plugged into everything at Genesis and had a direct line to Defendant Silbert.

459. For example, on June 14, 2022, Defendant Silbert, on behalf of the DCG board, which included Defendants Hutchins and Lenihan, instructed Genesis to "shrink" its loan book.[131]

460. On June 17, 2022, Defendant Moro sent two tweets from his personal account regarding Genesis losses and its plan for recovery. Those tweets were reviewed and edited by DCG's COO, Defendant Murphy, who directed Defendant Moro to send the tweets from his personal account, "despite directions from Genesis Capital's compliance department that these tweets should come from Genesis Capital's corporate account."[132]

461. Further, in July 2022 to November 2022, DCG caused Genesis to extend the maturity date for hundreds of millions of dollars of loans to DCG for no consideration. In fact, on November 10, 2022, Defendant DCG "made" Genesis extend the maturity date for outstanding loans to May 11, 2023.[133]

462. Defendant DCG had reasonable grounds to believe in the existence of the facts alleged herein, which form the basis for Genesis Global Capital's liability under section 12(a)(1) of the Securities Act.

463. Accordingly, pursuant to Section 15 of the Securities Act, Defendant DCG is jointly

---

[131] NYAG Compl., ¶127.
[132] Id., ¶¶132-33.
[133] Id., ¶187.

and severally liable for the violations of the Securities Act by Genesis Global Capital complained of herein and is liable to Plaintiffs and the Class for damages relating to the Genesis Yield securities. *See id.* § 77*l*(a)(1).

### 2. Defendant Silbert Controlled Genesis

464. As CEO and founder of both Defendant DCG and Genesis Global Capital, and controlling shareholder owning 40% of the equity of DCG (which in turn owned 100% of Genesis Global Capital through GGH), Defendant Silbert had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein. Defendant Silbert, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Genesis Global Capital.

465. Defendant Silbert exercised his power and influence to cause Genesis Global Capital to violate the Securities Act as described herein, including by directing Genesis Global Capital not to register as an exchange or broker-dealer prior to offering and selling securities to Plaintiffs and members of the Class in violation of sections 5(a), 5(c), and 12(a)(1) of the Securities Act, *id*. §§ 77e(a), 77e(c), and 77*l*(a)(1).

466. At the time of the violations of Section 5 of the Securities Act by Genesis Global Capital alleged herein, Defendant Silbert had sufficient influence to cause Genesis Global Capital to refrain from offering and selling unregistered securities in violation of the Securities Act.

467. According to a Genesis' filing in *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), sworn to under oath and penalty of perjury by Defendant Islim as Interim CEO of Genesis, during the Class Period Defendant Silbert controlled Genesis Global Capital:

Debtor Name:  Genesis Global Capital, LLC                                                                Case Number:  23-10064

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

**SOFA Question 28:** List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position | % Interest |
|------|---------|----------|------------|
| A. DERAR ISLIM | ADDRESS ON FILE | CHIEF OPERATING OFFICER, INTERIM CHIEF EXECUTIVE OFFICER | N/A |
| ALICE CHAN | ADDRESS ON FILE | CHIEF FINANCIAL OFFICER | N/A |
| ANDREW SULLIVAN | ADDRESS ON FILE | GENERAL COUNSEL, LENDING | N/A |
| ARIANNA PRETTO-SAKMANN | ADDRESS ON FILE | CHIEF LEGAL OFFICER | N/A |
| BARRY SILBERT | ADDRESS ON FILE | CEO OF DIGITAL CURRENCY GROUP | N/A |
| GENESIS GLOBAL HOLDCO, LLC | 250 PARK AVE S 5TH FLOOR NEW YORK, NY 10003 | SOLE MEMBER | 100 |

468.    Defendant Silbert exercised his power to direct or cause the direction of the management and policies of Genesis numerous times throughout the Class Period. For example, according to the NYAG Complaint, on June 14, 2022, Defendant Silbert, on behalf of the DCG board, used his power and influence by giving Defendant Moro and Genesis instructions on how to utilize Genesis' loan book.[134] The next day, June 15, 2022, Defendant Silbert again demonstrated his power and influence over Genesis by directing Genesis Capital personnel, including Defendant Moro, to perpetuate the idea that Genesis Capital was "highly stable."[135] This instruction by Defendant Silbert to Defendant Moro, who was Genesis' CEO, resulted in Defendant Moro tweeting the sentiment that Genesis had "shed the risk."[136] Furthermore, in July 2022, Defendant Silbert reviewed tweets that Defendant Moro made on behalf of the Company concerning its financial condition before Defendant Moro posted them.[137]

469.    Defendant Silbert had reasonable grounds to believe in the existence of the facts alleged herein, which form the basis for Genesis Global Capital's liability under Section 12(a)(1)

---

[134] NYAG Compl., ¶127.
[135] *Id*, ¶131.
[136] *Id.*, ¶132.
[137] *Id.*, ¶152.

of the Securities Act.

470.     Accordingly, pursuant to Section 15 of the Securities Act, Defendant Silbert is jointly and severally liable for the violations of the Securities Act by Genesis Global Capital complained of herein and is liable to Plaintiffs and the Class for damages as to each Genesis Yield Investment Agreement. *See id.* § 77*l*(a)(1).

### 3.     Defendant Moro Controlled Genesis

471.     Defendant Moro was CEO of Genesis before and during the Class Period until August 2022, and during this time, Defendant Moro caused the Company to offer or sell Genesis Yield securities.

472.     According to Genesis' filing in *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), sworn to under oath and penalty of perjury by Defendant Islim as Interim CEO of Genesis, during the Class Period Defendant Moro controlled Genesis:

23-10063-shl     Doc 143     Filed 03/21/23     Entered 03/21/23 01:05:04     Main Document
Pg 82 of 82

Debtor Name:  Genesis Global Capital, LLC                                                                     Case Number:  23-10064

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

**SOFA Question 29:** Within 1 year before the filing of this case, did the debtor have officers, directors, managing members, general partners, members in control of the debtor, or shareholders in control of the debtor who no longer hold these positions?

| Name | Address | Position | Start | End |
|---|---|---|---|---|
| KRISTOPHER JOHNSON | ADDRESS ON FILE | FORMER SENIOR RISK MANAGER | 01/19/2022 | 01/20/2022 |
| MATTHEW BALLENSWEIG | ADDRESS ON FILE | FORMER CO-HEAD OF TRADING AND LENDING | 01/19/2022 | 09/2022 |
| MICHAEL PALEOKRASSAS | ADDRESS ON FILE | FORMER CO-HEAD OF TRADING AND LENDING | 01/19/2022 | 09/2022 |
| MICHAEL PATCHEN | ADDRESS ON FILE | FORMER CHIEF RISK OFFICER | 01/19/2022 | 10/2022 |
| SOICHIRO MICHAEL MORO | ADDRESS ON FILE | FORMER CHIEF EXECUTIVE OFFICER | 01/19/2022 | 08/15/2022 |

473.     As CEO of Genesis, Moro had the power to speak publicly, act on behalf of Genesis and enter into contracts and agreements on behalf of Genesis, and to hire executives of Genesis, and he exercised that power.  For example, on June 30, 2022, Moro executed the DCG Promissory Note on behalf of Genesis, GGH and as a director of Genesis Asia Pacific, and directed that the

DCG Promissory Note be reported as an asset on Genesis' balance sheet, and tweeted publicly on behalf of Genesis concerning its impact on the financial condition of Genesis.

474. As CEO, in 2019 Moro led Genesis' acquisitions of Qu Capital, an algorithmic trading firm, and in 2020 Vo1t, a digital currency custodian. Throughout the Class Period, Moro communicated with investors about Genesis through twitter, including updates on Genesis' financial condition. In 2019, Moro announced that he hired additional members to the Genesis leadership team, stating "It is really exciting to add this talented group to the Genesis team . . . We are confidential that these individuals will build on our sustained success in the digital currency marketplace and play critical role in expanding our business around the world." Furthermore, according to the *Wall Street Journal*, in late 2018, Moro participated in due diligence of Genesis' partners, including a 2018 site visit to meet Sam Bankman-Fried and Alameda Research in Berkeley, California. During the Class Period and during the time Defendant Moro served as CEO of Genesis, Genesis made hundreds of millions of dollars of unsecured loans to Alameda.

### 4. Defendant Islim Controlled Genesis

475. Defendant Islim has served as the COO of Genesis Global Capital and GGT since the start of the Class Period. On or around August 17, 2022, Defendants DCG and Murphy hand-picked Defendant Islim to serve as interim CEO of Genesis Global Capital and GGT, and during the Class Period he was a member of the board of directors of GGH which was sole managing member of the Company. As a member of the board of GGH, which was the sole managing member of Genesis, and CEO, Islim controlled the Company, and during the time Islim held these position through the end of the Class Period, Defendant Islim caused the Company to offer or sell Genesis Yield securities.

476. According to a Genesis' filing in *In re: Genesis Global Holdco, LLC, et al.*, Case No. 23-10063 (SHL) (Bankr. S.D.N.Y.), sworn to under oath and penalty of perjury by Defendant

DCG Islim as Interim CEO of Genesis, during the Class Period Islim controlled Genesis:

23-10063-shl    Doc 143    Filed 03/21/23    Entered 03/21/23 01:05:04    Main Document
Pg 81 of 82

Debtor Name: Genesis Global Capital, LLC          Case Number: 23-10064

**Statement of Financial Affairs for Non-Individuals Filing for Bankruptcy**

**SOFA Question 28:** List the debtor's officers, directors, managing members, general partners, members in control, controlling shareholders, or other people in control of the debtor at the time of the filing of this case.

| Name | Address | Position | % Interest |
|---|---|---|---|
| A. DERAR ISLIM | ADDRESS ON FILE | CHIEF OPERATING OFFICER, INTERIM CHIEF EXECUTIVE OFFICER | N/A |
| ALICE CHAN | ADDRESS ON FILE | CHIEF FINANCIAL OFFICER | N/A |
| ANDREW SULLIVAN | ADDRESS ON FILE | GENERAL COUNSEL, LENDING | N/A |
| ARIANNA PRETTO-SAKMANN | ADDRESS ON FILE | CHIEF LEGAL OFFICER | N/A |
| BARRY SILBERT | ADDRESS ON FILE | CEO OF DIGITAL CURRENCY GROUP | N/A |
| GENESIS GLOBAL HOLDCO, LLC | 250 PARK AVE S 5TH FLOOR NEW YORK, NY 10003 | SOLE MEMBER | 100 |

### 5.    Defendant Murphy Controlled Genesis

477.    Defendant Murphy was DCG's Chief Operating Officer during the period January 2020 through November 2022, and since October 2022 has served as President of DCG. According to his LinkedIn profile, Murphy led DCG's legal, communications, marketing, brand, and public policy efforts and supported DCG's CEO (Defendant Silbert) on day-to-day management of DCG.

478.    Defendant Murphy served as a director of GGH, a wholly owned subsidiary of DCG, and as a director of GGH, which was the sole managing member of Genesis, through which he controlled and managed Genesis.  According to his LinkedIn profile, Defendant Murphy worked closely with DCG's wholly owned subsidiaries, which include Genesis, on strategy, execution, and all management matters.

479.    On or around August 17, 2022, Defendant Murphy hand-picked Defendant Islim to serve as interim COO of the Company and GGT and to serve as a member of the board of GGH,

he further and hand-picked Tom Conheeney to serve as a special advisor to the Company and GGT and to serve as a member of the board of GGH.

480.    In July 2022, Defendant Murphy edited and helped draft tweets that Defendant Moro made on behalf of the Company concerning its financial condition.[138]

### 6.    Defendant Kraines Controlled Genesis

481.    Defendant Kraines is the Chief Financial Officer ("CFO") of DCG. In that role he oversaw all of DCG's financial operations, M&A activity, and corporate development efforts. Defendant Kraines also supported the continued growth of DCG's operating subsidiaries which included Genesis.

482.    Kraines further exercised his control over Genesis as a member of the board of GGH, which was the sole managing member of Genesis,

483.    By virtue of his position as CFO of DCG, which wholly owns GGH, and as a member of the board of GGH, Kraines possessed the power and influence to cause the direction and management of Genesis.

### 7.    Defendant Lenihan Controlled Genesis

484.    Defendant Lenihan, as a director of DCG, had the power and influence to cause the direction and management of Genesis. As stated above, DCG controlled Genesis by virtue of its 100% ownership of GGH, which in turn wholly owns Genesis. Therefore, Defendant Lenihan was involved in any direction given by the DCG board to Genesis.

485.    For example, on June 14, 2022, Defendant Silbert, on behalf of DCG's board (which includes Defendant Lenihan), instructed Defendant Moro, then CEO of Genesis, to "continue aggressively shrinking the loan book."[139] Defendant Lenihan was a member of the DCG

---

[138] NYAG Compl., ¶152.
[139] *Id.*, ¶127.

board when the DCG board gave this direction to Defendant Moro and Genesis.

486. According to Defendant Silbert, he along with Defendant Lenihan determined to support Genesis Global Capital by assuming the 3AC bankruptcy claim and replacing it with the DCG Promissory Note: "***DCG and its board*** [Defendants Silbert, Lenihan and Hutchins] determined that it was in the best interest of Genesis [Global Capital], its lenders, and DCG to try to help support Genesis [Global Capital]."

### 8. Defendant Hutchins Controlled Genesis

487. Defendant Hutchins, as a director of DCG, had the power and influence to cause the direction and management of Genesis. As stated above, DCG controlled Genesis by virtue of its 100% ownership of GGH, which in turn wholly owns Genesis. Therefore, Defendant Hutchins was involved in any direction given by the DCG and its board to Genesis.

488. For example, on June 14, 2022, Defendant Silbert, on behalf of DCG's board (which includes Defendant Hutchins), instructed Defendant Moro, then CEO of Genesis, to "continue aggressively shrinking the loan book."[140] Defendant Hutchins was a member of the DCG board when it gave this direction to Defendant Moro and Genesis.

489. According to Defendant Silbert, he along with Defendant Hutchins determined to support Genesis Global Capital by assuming the 3AC bankruptcy claim and replacing it with the DCG Promissory Note: "***DCG and its board*** [Defendants Silbert, Lenihan and Hutchins] determined that it was in the best interest of Genesis [Global Capital], its lenders, and DCG to try to help support Genesis [Global Capital]."

490. Defendants Hutchins, Lenihan, Moro, Islim, Kraines and Murphy had reasonable grounds to believe in the existence of the facts alleged herein, which form the basis for Genesis

---

[140] *Id.*

Global Capital's liability under section 12(a)(1) of the Securities Act.

491.    Accordingly, pursuant to Section 15 of the Securities Act, Defendants Hutchins, Lenihan, Moro, Islim, Kraines and Murphy are jointly and severally liable for the violations of the Securities Act by Genesis Global Capital complained of herein and are liable to Plaintiffs and the Class for damages relating to the Genesis Yield securities. *See id.* § 77*l*(a)(1).

**SECOND CLAIM FOR RELIEF**

**FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5**
**(Against Defendants DCG, Silbert, Murphy Hutchins, Lenihan, Islim and Moro)**

492.    Plaintiffs reallege the allegations above.

493.    During the Class Period, Genesis Global Capital and Defendants DCG, Silbert, Hutchins, Lenihan, Murphy, Islim and Moro violated Section 10(b) of the Exchange Act and Rule 10b-5.

494.    But for Genesis Global Capital's bankruptcy, the Company would have been named a defendant and violations of Section 10(b) and Rule 10b-5 would have been asserted against it on behalf of Plaintiffs and the Class.

495.    Section 10(b) of the Exchange Act Section 10(b) declares it unlawful for any person to "use or employ, in connection with the purchase or sale of any security" a "manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b).

496.    SEC Rule 10b-5 promulgated pursuant to Section 10(b) of the Exchange Act makes it unlawful for "any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . [t]o employ any device, scheme, or artifice to defraud . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light

of the circumstances under which they were made, not misleading, or . . . [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security. 17 C.F.R. § 240.10b-5.

497.     Defendants DCG, Silbert, Hutchins, Lenihan, Murphy, Islim and Moro caused Genesis Global Capital, by the use by use of the instrumentalities of interstate commerce, to intentionally, or at least recklessly:

> a)  employ a device, scheme, or artifice to defraud Plaintiffs and members of the Class and their agents into investing digital assets with Genesis Global Capital;
>
> b)  make untrue statements of material fact and omit to state material facts necessary in order to make the statements made not misleading, and/or
>
> c)  engage in acts, practices, or courses of business which operated as a fraud and deceit upon Plaintiffs and members of the Class in connection with Plaintiffs' purchases of Genesis Yield securities under the Genesis Yield Investment Agreements, which constitute securities pursuant to 15 U.S.C.§ 77b(a)(1), in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

498.     Defendants DCG, Silbert, Hutchins, Lenihan, Murphy, Islim and Moro caused Genesis Global Capital to engage in fraudulent and deceitful acts or practices by knowingly and intentionally, or at least recklessly, making materially false representations, including, but not limited to, its representations in documents circulated to all Genesis Global Capital investors and their agents describing Genesis Global Capital's financial conditions, including its solvency. In fact, Defendants DCG, Silbert, Hutchins, Lenihan, Murphy, Islim and Moro knew or at least

recklessly disregarded at the time of the statements and representations that Genesis Global Capital was insolvent, and that its financial condition was other than what was being represented to Plaintiffs and members of the Class.

499. Defendants DCG, Silbert, Hutchins, Lenihan, Murphy, Islim and Moro caused Genesis Global Capital to make these material misrepresentations or omit to disclose the material facts with the intention of deceiving the investing public, including Plaintiffs and members of the Class and their agents, and inducing Plaintiffs and members of the Class to continue to invest digital assets with Genesis Global Capital.

500. Not only did Defendants DCG, Silbert, Hutchins, Lenihan, Murphy, Islim and Moro caused Genesis Global Capital to withhold material information and thereby engage in conscious misbehavior, or at least reckless conduct, they had the motive and opportunity to do so, because their conduct resulted in higher compensation for Genesis Global Capital, Defendant DCG, and Defendant Silbert.

501. Defendants DCG, Silbert, Hutchins, Lenihan, Murphy, Islim and Moro had the motive to keep Genesis Global Capital's real financial condition secret, because they knew or had reason to know that its insolvency would likely result in mass investor redemptions, the end of its business, and losses to Defendants Silbert, DCG, and others.

502. Defendants DCG, Silbert, Hutchins, Lenihan, Murphy, Islim and Moro had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants DCG, Silbert, Hutchins, Lenihan, Murphy, Islim and Moro acted with at least reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were

readily available to Defendants DCG, Silbert, Hutchins, Lenihan, Murphy, Islim and Moro. Defendants DCG, Silbert, Hutchins, Lenihan, Murphy, Islim and Moro's acts and omissions on behalf of Genesis Global Capital were committed willfully or with reckless disregard for the truth. In addition, Defendants DCG, Silbert, Hutchins, Lenihan, Murphy, Islim and Moro knew or at least recklessly disregarded that material facts were being misrepresented or omitted as described above.

503. As a result of the aforementioned misrepresentations and/or omissions, Plaintiffs and the other members of the Class purchased securities from the Company and were damaged thereby.

504. Had Plaintiffs and members of the Class known the truth, they would not have purchased securities from Genesis Global Capital.

505. In addition to the material misrepresentations and omissions that Defendants DCG, Silbert, Hutchins, Lenihan, Murphy, Islim and Moro caused Genesis Global Capital to make, Defendants DCG, Silbert, Hutchins, Lenihan, Murphy, Islim and Moro engaged in the following fraudulent and deceitful acts or practices subjecting them to scheme liability:

    a) Defendants DCG, Silbert, Hutchins, and Lenihan forced Genesis Global Capital to execute the loan in the amount of approximately $500 million to Defendant DCG for Defendant DCG to use in its own profit seeking endeavors and to artificially prop up the value of GBTC shares;

    b) Defendant DCG, Silbert, Hutchins, and Lenihan caused Genesis Global Capital to execute the transaction whereby DCG assumed the 3AC bankruptcy claim in exchange for the DCG Promissory Note due to Genesis Global Capital.

    c) Defendants Moro and Murphy, and Ballensweig caused Genesis Global

Capital, at the direction of and/or subject to the control of Defendant DCG, Silbert, Hutchins, and Lenihan to disseminate misleading and false financial statements to prospective investors either directly or through Gemini as their designated agent.

d) Defendants Moro and Islim caused Genesis Global Capital to represent in connection with every offer or sale of Genesis Yield securities it executed from July 1, 2022 through the end of the Class Period with Plaintiffs and members of the Class that it was in fact solvent, when it was not. This includes causing Genesis Global Capital to misleadingly include the $1.1 billion amount of the DCG Promissory Note on its balance sheet as a "current asset and/or receivable."

e) Defendant Moro caused Genesis Global Capital and Ballensweig to disseminate its balance sheets and other documents containing misrepresentations (including Ballensweig's July 6, 2022 "Three Arrows Post-Mortem" email) as to its solvency to members of the Class, and/or their agent in order to induce the parties to continue to invest digital assets and/or to prevent them from requesting redemptions of their securities.

f) Defendant Moro publicly announced on Twitter that DCG had assumed certain liability to ensure that Genesis had the capital to operate, when it had not, tweets that were edited, reviewed and draft by DCG employees and Defendant Silbert.

506. By reason of the conduct alleged herein, Genesis Global Capital and Defendants DCG, Silbert, Hutchins, Lenihan, Islim and Moro knowingly, or at least recklessly, violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

507.    As a direct and proximate result of the material misrepresentations and omissions of Genesis Global Capital and Defendants DCG, Silbert, Hutchins, Lenihan, Islim and Moro, Plaintiffs and members of the Class have suffered damages in connection with their purchases of Genesis Yield securities from Genesis Global Capital in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF

### CONTROL PERSON LIABILITY UNDER SECTION 20(a) OF THE EXCHANGE ACT FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT
### (Against the Exchange Act Defendants)

508.    Plaintiffs reallege the allegations above.

509.    This claim is asserted against the Exchange Act Defendants pursuant to Section 20 of the Exchange Act, 15 U.S.C. § 78t(a).

510.    Section 20(a) of the Exchange Act provides: "Every person who, directly or indirectly, controls any person liable under any provision of [the Exchange Act] or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable … unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a).

511.    At the time of the violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged herein, Defendant DCG controlled Genesis Global Capital. Defendant DCG, by virtue of its stock ownership, agency, agreements or understandings, specific acts, and otherwise, had the power and authority to direct the management and activities of Genesis Global Capital and its employees, and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein. Defendant DCG, at the time of the wrongs alleged herein, had the power to direct or cause the direction of the management and policies of Genesis Global Capital.

512.    Defendant DCG purposefully exercised its power and influence to cause Genesis

Global Capital to violate Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as described herein, including by making material misstatements and/or omissions regarding the financial health of Genesis Global Capital.

513.    At the time of the violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged herein, Defendant DCG had sufficient influence to cause Genesis Global Capital to comply with the Exchange Act and/or to refrain from acts that are prohibited by the Exchange Act.

514.    Defendant DCG culpably participated in Genesis Global Capital's violations of the Exchange Act alleged herein.

515.    Accordingly, Defendant DCG is jointly and severally liable for the violations of the Exchange Act by Genesis Global Capital complained of herein and is liable to Plaintiffs and the Class for rescission and/or damages as to all transactions in which Plaintiffs and Class members relied on statement made by Genesis Global Capital in connection with the purchase or sale of securities pursuant to Section 20(a) of the Exchange Act.

516.    At the time of the violations of Section 10(b) of the Exchange Act and Rule 10b-5 alleged herein:

517.    Defendant Silbert had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein due to his status as founder and CEO of both DCG and Genesis Global Capital and controlling shareholder of DCG.

518.    Defendant Moro had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein due to his status as the CEO of Genesis Global Capital and GGT since the start of the Class Period through August 17, 2022.

519.     Defendant Islim had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein due to his status as the COO of Genesis Global Capital and GGT since the start of the Class Period, and interim CEO of Genesis Global Capital and GTT, and member of the board of GGH.

520.     Defendants Hutchins and Lenihan had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein due to their status as members of Defendant DCG's board of directors.

521.     Defendant Kraines had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein due to his status as the CFO of Defendant DCG from in or around September 2021 through April 2023 and member of the board of directors of GGH.

522.     Defendant Murphy had the power and authority to direct the management and activities of Genesis Global Capital and its employees and to cause Genesis Global Capital to engage in the wrongful conduct complained of herein due to his status as the COO of Defendant DCG during the period January 2020 through November 2022, President of Defendant DCG since October 2022, and member of the board of directors of GGH.

523.     Defendants Silbert, Moro, Islim, Hutchins, Lenihan, Kraines, and Murphy purposefully exercised their power and influence to cause Genesis Global Capital to violate Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder as described herein, including by making material misstatements and/or omissions regarding the financial health of

Genesis Global Capital.

524. At the time of the wrongs alleged herein, Defendants Silbert, Moro, Islim, Hutchins, Lenihan, Kraines, and Murphy had sufficient influence to cause Genesis Global to comply with the Exchange Act and/or to refrain from acts that are prohibited by the Exchange Act, but purposefully decided not to do so.

525. Defendants Silbert, Moro, Islim, Hutchins, Lenihan, Kraines, and Murphy culpably participated in Genesis Global Capital's violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder alleged herein.

526. Accordingly, Defendants Silbert, Moro, Islim, Hutchins, Lenihan, Kraines, and Murphy are jointly and severally liable for the violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by Genesis Global Capital complained of herein and are liable to Plaintiffs and the Class for rescission and/or damages as to all transactions in which Plaintiffs and Class members relied on statement made by Genesis Global Capital in connection with the purchase or sale of securities pursuant to Section 20(a) of the Exchange Act.

### FOURTH CLAIM FOR RELIEF

### FOR DECEPTIVE AND UNFAIR PRACTICES IN VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT, CONN. GEN. STAT. § 42-110a, *ET SEQ.* (Against All Defendants)

527. Plaintiffs reallege the allegations set forth in IV, V(d), and XII above.

528. This claim is asserted against Defendants DCG, Silbert, Hutchins, Lenihan, Kraines, Murphy, Moro, and Islim pursuant to Conn. Gen. Stat. § 42-110a, *et. seq.*

529. The Connecticut Unfair Trade Practices Act (CUTPA), Conn. Gen. Stat. § 42-110a, *et seq.,* declares that "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful."

530.    Pursuant to Conn. Gen. Stat. § 42-110g(a), any person who has suffered a loss as a result of a violation of CUTPA may bring an action to obtain a declaratory judgment that an act or practice violates CUTPA and to enjoin such person who has violated, is violating, or is otherwise likely to violate CUTPA.

531.    Pursuant to Conn. Gen. Stat. § 42-110g(a), any person who has suffered a loss as a result of a violation of CUTPA may bring an action for actual damages, attorneys' fees, and court costs.

532.    Plaintiffs and Defendants are each a "person" within the meaning of Conn. Gen. Stat. § 42-110a(3).

533.    Defendants DCG, Silbert, Hutchins, Lenihan, Kraines, Murphy, Moro, and Islim through their conduct as described above, engaged in unfair methods of competition and unfair or deceptive acts or practices in the conduct of their trade and commerce, as defined in General Statutes § 42-110a(4), within the State of Connecticut.

534.    Specifically, Defendants marketed, advertised, offered, and sold the Genesis Yield product, by which consumers and/or businesses such as Plaintiffs and Class Members could purchase, transfer, borrow, loan, and/or trade digital assets using the Genesis Global Capital trading platform.

535.    Defendants each engaged in unfair and deceptive acts or practices, including but not limited to:

a)  Systematically misrepresenting the solvency of Genesis Global Capital and the benefits of Genesis Yield;

b)  Using fraudulent, deceptive, unfair, and misleading tactics to induce consumers to enter into the Genesis Yield Investment Agreements;

c) Making misleading statements and misrepresentations to induce consumers to continue to invest their digital assets with Genesis Global Capital;

d) Providing false promises and using deceptive tactics to prevent Plaintiffs and Class Members from requesting redemptions of their investments;

e) Ignoring consumer requests for redemptions of their investments; and

f) Failing to return consumers' digital assets and/or pay interest owed thereon as promised.

536. Defendants' acts and practices, including their material omissions, described herein, were likely to, and did in fact, deceive and mislead members of the public as to the solvency of Genesis Global Capital and Genesis Yield, including consumers such as Plaintiffs and Class Members acting reasonably under the circumstances, to their detriment.

537. Because Defendants knew or should have known that their conduct was deceptive and/or unfair under Conn. Gen. Stat. § 42-110b(a), their conduct was willful under Conn. Gen. Statutes § 42-110o.

538. These unfair and deceptive acts and practices have caused Plaintiffs and other similarly situated consumers and/or businesses to suffer losses of money and property, including, but not limited to, loss of access to, capital from, and interest on their digital assets and/or denied return of their digital assets.

539. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Plaintiffs and other similarly situated consumers and/or businesses have suffered damages and are entitled to relief under CUTPA, including, but not limited to, actual damages, attorneys' fees, and costs.

540. Accordingly, Plaintiffs, individually and on behalf of all others similarly situated,

thus seek (a) a declaration that Defendants' acts and practices as described above violate the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110a, *et seq.;* (b) an award of actual damages; (c) an award of attorneys' fees and costs pursuant to Conn. Gen. Stat. § 42-110g(d); (d) an order enjoining Defendants from continuing to engage in the unfair and deceptive acts and practices described above; and € any further relief the Court deems just and proper.

### FIFTH CLAIM FOR RELIEF

### FOR DECEPTIVE AND UNFAIR PRACTICES IN VIOLATION OF THE NEW YORK UNIFORM DECEPTIVE TRADE PRACTICES ACT, N.Y. GEN. BUS. LAW. § 349, *ET SEQ.* (Against All Defendants)

541.  Plaintiffs reallege the allegations set forth in Sections IV, V(d), and XII above.

542.  This claim is asserted against Defendants DCG, Silbert, Hutchins, Lenihan, Kraines, Murphy, Moro, and Islim pursuant to New York's Uniform Deceptive Trade Practice Act ("GBL § 349") which prohibits "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." GBL § 349(a).

543.  Defendants conducted business, trade, or commerce in New York State.

544.  Plaintiffs are authorized to bring a private action under New York's Uniform Deceptive Trade Practices Act, Gen. Bus. Law § 349(h).

545.  Plaintiffs and Class Members executed transactions with Genesis Global Capital concerning the Genesis Yield product in connection with transactions in "business" "trade" or "commerce" within the meaning of GBL § 349.

546.  This Count is brought for Defendants' deceptive conduct, including their unlawful and deceptive acts concerning the Genesis Yield product, as alleged herein.

547.  Defendants DCG, Silbert, Hutchins, Lenihan, Kraines, Murphy, Moro, and Islim through their conduct as described above, engaged in unfair methods of competition and unfair or

deceptive acts or practices in the conduct of their trade and commerce, as defined in General
Statutes § 42-110a(4), within the State of Connecticut.

548.   Defendants each engaged in unfair and deceptive acts or practices relating to the
Genesis Yield product, including but not limited to:

   a)  Systematically misrepresenting the solvency of Genesis Global Capital and the
       benefits of the Genesis Yield product;

   b)  Using fraudulent, deceptive, unfair, and misleading tactics to induce consumers
       to invest in the Genesis Yield product;

   c)  Making misleading statements and misrepresentations to induce consumers to
       continue to invest in Genesis Yield product;

   d)  Providing false promises and using deceptive tactics to prevent Plaintiffs and
       Class Members from redeeming their investments in the Genesis Yield product;

   e)  Failing to return consumer funds after they had requested redemption of their
       investments in the Genesis Yield product; and

   f)  Failing to return consumers' digital assets and/or pay interest owed thereon as
       promised.

549.   Defendants systematically engaged in these deceptive, misleading, and unlawful
acts and practices to the detriment of Plaintiffs and Class members.

550.   Defendants willfully engaged in such acts and practices and knew or acted in
reckless disregard for whether they violated GBL § 349.

551.   Defendants' representations and omissions were material because they were likely
to deceive reasonable consumers regarding the Genesis Yield product, including its true risks and
characteristics.

552. Plaintiffs and Class members relied on Defendants' deceptive representations and omissions when they paid money or other consideration in exchange for yield via the Genesis Yield product.

553. Plaintiffs and Class members had no way of knowing Defendants' misrepresentations were false, as Defendants had exclusive knowledge of their own business practices.

554. Plaintiffs and Class members have been injured as a direct and proximate result of Defendants' violations as they would not invested in, or would have invested significantly less in, the Genesis Yield product had they known these statements were false and of Defendants' omissions.

555. The above unfair and deceptive acts and practices by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to consumers that the consumers could not reasonably avoid. This substantial injury outweighed any benefits to consumers or to competition.

556. Plaintiffs and Class members seek all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of $50 per class member, whichever is greater, treble damages, injunctive relief, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and the proposed Class respectfully requests relief as follows:

A. An order certifying this dispute and the Class requested herein as a class action, designating Plaintiffs as the representatives of the Class, and appointing Plaintiffs' counsel as counsel to the Class;

B.      A judgment awarding Plaintiffs and the Class appropriate damages based on the claims for relief outlined herein, or a rescissionary form of relief;

C.      A judgment awarding Plaintiffs and the Class prejudgment and post-judgment interest, as permitted by law;

D.      A judgment awarding Plaintiffs and the Class costs and fees, including attorneys' fees and costs as permitted by law; and

E.      Granting such other legal, equitable/injunctive or further relief as the Court may deem just and proper.

Dated:  November 13, 2023                     Respectfully submitted,

**SILVER GOLUB & TEITELL LLP**

*/s/ Ian W. Sloss*
Ian W. Sloss ct31244
Steven L. Bloch ct31246
Johnathan Seredynski ct30412
Krystyna Gancoss (*pro hac vice* forthcoming)
One Landmark Square, Floor 15
Stamford, Connecticut 06901
Telephone: (203) 325-4491
Facsimile: (203) 325-3769
isloss@sgtlaw.com
sbloch@sgtlaw.com
jseredynski@sgtlaw.com
kgancoss@sgtlaw.com

**KAPLAN FOX & KILSHEIMER LLP**
Donald R. Hall (CT Bar No. 416065)
Jeffrey P. Campisi (admitted *pro hac vice*)
Jason A. Uris (*pro hac vice* forthcoming)
800 Third Avenue, 38th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
dhall@kaplanfox.com
jcampisi@kaplanfox.com
juris@kaplanfox.com

*Lead Counsel for Lead Plaintiffs and the Proposed
Class*