WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Jeffrey D. Saferstein
Jessica Liou
Furqaan Siddiqui

*Attorneys for Digital Currency Group, Inc.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*, | Case No. 23-10063 (SHL) |
| Debtors.[1] | Jointly Administered |
| Genesis Global Capital, LLC, | |
| Plaintiff, | |
| v. | Adv. Proc. No. 23-01168 (SHL) |
| Digital Currency Group, Inc. | |
| Defendant. | |

---

[1]   The debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, 38th Floor, New York, NY 10007.

| | |
|---|---|
| Genesis Global Capital, LLC, | |
| Plaintiff, | Adv. Proc. No. 23-01169 (SHL) |
| v. | |
| DCG International Investments Ltd. | |
| Defendant. | |

**DCG ENTITIES' STATEMENT REGARDING
NOTICES AND STATEMENTS FILED BY THE DEBTORS,
THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS,
AND THE AD HOC GROUP WITH RESPECT TO THE PARTIAL
REPAYMENT AGREEMENT BETWEEN THE DEBTORS AND DCG ENTITIES**

Digital Currency Group, Inc. ("**DCG**") and DCG International Investments Ltd. ("**DCGI**" and together with DCG, the "**DCG Entities**") hereby submit this statement in response to the *Notice of Disputed Payments in Connection With Amended Partial Repayment Agreement Between Debtors and Digital Currency Group* [Adv. Proc. No. 23-01168, Docket No. 23] (the "**AHG Notice**") filed by the Ad Hoc Group of Genesis Lenders (the "**Ad Hoc Group**"), *Notice of Transfer of PRA Collateral and Receipt of Payments from Digital Currency Group, Inc. and DCG International Investments, Ltd. in Connection With Obligations Subject to Turnover Actions* [Adv. Proc. No. 23-01168, Docket No. 24] (the "**Debtors' Notice**") filed by the Debtors, and the *Statement of the Official Committee of Unsecured Creditors With Respect to the Partial Repayment Agreement Between the Debtors and the DCG Parties* [Adv. Proc. No. 23-01168, Docket No. 25] (the "**UCC Statement**"), filed by the Official Committee of Unsecured Creditors (the "**UCC**"),  and represent as follows:

**Statement**

*a.    Entry Into the Partial Repayment Agreement*

1.    On September 12, 2023, the DCG Entities and Genesis Global Capital, LLC

("**GGC**") entered into the Partial Repayment Agreement (the "**Original PRA**," attached hereto as

**Exhibit A**).

2.    On November 28, 2023,  the DCG Entities and GGC entered into the Amendment

to Partial Repayment Agreement (the "**Amendment**," attached hereto as **Exhibit B**, and together

with the Original PRA, the "**PRA**").[2]  Paragraph 4 of the Amendment provides:

> Transfer of Collateral.  Notwithstanding anything herein or in the Security Agreements to
> the contrary, pursuant to Section 13 of this Amendment, the DCG Parties shall have the
> right to transfer, in their sole discretion and upon written notice (each, a "Voluntary
> Transfer Notice"), all or part of the Collateral (as defined in the Security Agreements) to
> GGC, at which time, such transferred Collateral shall be valued using the market prices as
> of 8:00 p.m. Eastern Time on the date of such written notice and GGC shall apply the value
> of such transferred Collateral to the Outstanding Undisputed Amounts as specified in the
> Voluntary Transfer Notice (each, a "Voluntary Payment") (the foregoing, the "**Voluntary
> Transfer Provision**").

Further, Paragraph 13 of the Amendment provides:

> Payment of Repayment Amount Prior to Timeline Agreed Herein. Notwithstanding
> anything contained herein, in the Partial Repayment Agreement or in DCG MLA or DCGI
> MLA, the DCG Parties may pay at any time, prior to the timeline articulated in Section
> 6(a) of the Partial Repayment Agreement, their respective obligations under the DCG MLA
> and DCGI MLA, as applicable, in whole or in part at any time, from time to time and
> without penalty or premium.  The Partial Repayment Agreement shall terminate as to DCG
> upon full payment of the Outstanding Undisputed Amounts under the DCG MLA. The
> Partial Repayment Agreement shall terminate as to DCGI upon full payment of the
> Outstanding Undisputed Amounts under the DCGI MLA (the foregoing, the "**Early
> Payment Provision**").

3.    On the same day, the Debtors filed the *Debtors' Motion for Entry of (I) Consent*

*Judgment Against the DCG Parties and (II) Order Authorizing to the Extent Necessary, GGC to*

*Take Actions in Furtherance of the Partial Repayment Agreement Pursuant to Sections 105(a) and*

---

[2]    Capitalized terms used but not otherwise defined herein shall the meanings ascribed to such terms in the PRA.

363(b) of the Bankruptcy Code, or, in the Alternative, Bankruptcy Rule 9019(a) [Adv. Proc. No. 23-01168, Docket No. 9] (the "**PRA Motion**").

4.          On December 22, 2023, the Court entered two orders granting the relief requested in the PRA Motion.[3]  Notably, there were no objections to the PRA Motion from any party, let alone from the Ad Hoc Group or the UCC.

5.          Prior to the Voluntary Payment (as defined below), the DCG Entities had paid GGC a total of $268,194,517.83 and 2,582.98200614 BTC pursuant to the terms of the PRA.  *See Notice of Receipt of Payment from Digital Currency Group, Inc. and DCG International Investments Ltd. in Connection With Obligations Subject to Turnover Actions* [Adv. Proc. No. 23-01168, Docket No. 14].

*b.          The DCG Entities' Voluntary Transfer of Collateral to GGC*

6.          On December 28, 2023, the DCG Entities sent to GGC a Voluntary Transfer Notice (the "**Voluntary Transfer Notice**," attached hereto as **Exhibit C**), conveying all of the ETCG and ETHE Collateral (as defined in the Security Agreements) (the "**Voluntary Payment**") and specifying the outstanding loans the transfer of Collateral should be applied to as required by the Voluntary Transfer Provision.

7.          In response to the Voluntary Transfer Notice, on January 5, 2024, GGC sent to the DCG Entities a Letter (the "**Jan 5 Letter**," attached hereto as **Exhibit D**) asserting that the DCG Entities are obligated to repay the Outstanding Undisputed Amounts in the same asset types as the

---

[3]      *See Stipulated Order and Judgment Regarding Liability of DCG Under Master Lending Agreement* [Adv. Proc. No. 23-01168, Docket No. 18] and *Order Authorizing GGC to Take Actions in Furtherance of the Partial Repayment Agreement With the DCG Parties Pursuant to Section 105(a) and 363(b) of the Bankruptcy Code, or in the Alternative, Bankruptcy Rule 9019(a)* [Adv. Proc. No. 23-01168, Docket No. 19].

original loans and pay transaction costs in connection with converting the Collateral to those asset types.

c.    *Payoff of the Outstanding Undisputed Amounts Under the Partial Repayment Agreement*

8.    After the application of the Collateral to the Outstanding Undisputed Amounts by valuing the Collateral as of 8:00 p.m. Eastern Time on the date of the Voluntary Transfer Notice (as required by the Voluntary Transfer Provision), on January 5, 2024 (the "**Payoff Date**"), the remaining Outstanding Undisputed Amounts were $189,489,046.05 (the "**Remaining Amounts**").

9.    On the Payoff Date, pursuant to the Early Payment Provision, DCG paid to GGC the Remaining Amounts plus $221,364.74 of accrued and unpaid interest thereof (the "**Final Payment**") as of the Payoff Date, which was memorialized in a payoff notice (the "**Payoff Notice**," attached hereto as **Exhibit E**) sent to GGC on the same day.

10.    In response to the Payoff Notice, on January 8, 2024, GGC sent to the DCG Entities a Letter (the "**Jan 8 Letter**," attached hereto as **Exhibit F**), reiterating the assertions made in the Jan 5 Letter and further stating that the DCG Entities remain obligated to pay Late Fees and enforcement costs pursuant to the underlying loan documents.

d.    *The Voluntary Transfer Provision Does Not Require the DCG Entities to Repay Outstanding Undisputed Amounts in the Same Asset Types as the Underlying Loans and the DCG Entities Therefore Do Not Owe GGC Any Transaction or Conversion Costs*

11.    The Debtors, the UCC, and the Ad Hoc Group assert that the DCG Entities are obligated to repay the Outstanding Undisputed Amounts in the same asset types as the underlying loans and, therefore, the DCG Entities are obligated to pay transaction costs in connection with converting the Voluntary Payments to those asset types.  *See* Jan 8 Letter; UCC Statement at ¶ 6; AHG Notice at p. 6.

12.    Contrary to the Debtors, the UCC, and the Ad Hoc Group's position, the Voluntary Transfer Provision expressly permits the DCG Entities to satisfy their USD and BTC obligations by transferring the Collateral to GGC, valuing the Collateral as of the date of a notice of transfer, and "***apply***[ing] the value of such transferred Collateral to the Outstanding Undisputed Amounts as specified in the Voluntary Transfer Notice" (emphasis added).  Although the MLAs state that the DCG Entities "shall repay the entirety of the Loan Balance to Lender by Close of Business in the same Digital Currency of the Loan (in the case of Loans of Digital Currency) or in U.S. Dollars (in the case of Loans of U.S. Dollars)," the Amendment expressly contemplates amending the MLAs.  *See* Amendment at ¶ 14 ("all of the terms and conditions of . . . the MLAs . . . are hereby ratified and confirmed and continue unchanged and in full force and effect, ***except as otherwise set forth [in the Amendment]***.") (emphasis added).  In fact, the DCG Entities' previous payments to the Debtors under the terms of the PRA—and the Debtors' acceptance of these payments— indicate that the Debtors understand that certain provisions of the Amendment amend the terms of the MLAs.  More specifically, Paragraph 3 of the Amendment provides that all payments by the DCG Entities on account of DCG Loans and DCGI Loans "shall be made 77% in USD . . . and 23% in BTC," and all of the DCG Entities' repayments to the Debtors under the terms of the PRA have been in accordance with this split despite DCG Loans being denominated solely in USD and DCGI Loans being denominated solely in BTC and BCH.  Similarly, the Voluntary Transfer Provision supersedes the MLAs' requirement that loan repayments must be made in the same asset types as the underlying loans.

13.    Further, a basic principle of contract interpretation under New York law (the governing law of the PRA) is that "specific terms in a contract will override the general." *Baeshen v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c))*, 520 B.R. 15, 26 (Bankr. S.D.N.Y.

2014). The Voluntary Transfer Provision—which specifically governs the voluntary transfer of Collateral—does not contemplate GGC converting the Voluntary Payment to other asset types, nor does the PRA require the DCG Entities to pay such conversion costs.

14.     Based on the foregoing, the DCG Entities are not required to repay the Outstanding Undisputed Amounts in the same asset types as the underlying loans, and GGC is not entitled to any conversion costs.

*e.     The DCG Entities Dispute that They Owe the Disputed Amounts*

15.     The Debtors and the Ad Hoc Group assert that the DCG Entities remain obligated to pay Late Fees owed under the DCG Loans and enforcement costs pursuant to sections XII of the MLAs (collectively, the "**Disputed Amounts**"). *See* Jan 8 Letter ("Lastly, the DCG Parties also remain obligated to pay Late Fees owed under the DCG Loans (estimated at more than $27 million as of December 31, 2023) and enforcement costs (estimated at more than $1 million) pursuant to sections XII of the MLAs."); AHG Notice ("DCG Entities remain obligated to the Debtors for in excess of $26,000,000.00 for interest and late fees owed on account of the USD Portion of DCG's obligations pursuant to the respective master loan agreements giving rise to such obligations.").

16.     The DCG Entities' position that they do not owe the Disputed Amounts is well documented. *See* Amendment, paragraph 3 ("Disputed Amounts are subject to a mutual reservation of rights as to whether or not they are due or payable . . ."); Representation Letter, attached to the Amendment as **<u>Exhibit B</u>** ("GGC has asserted that certain amounts are due and owing under the DCG Loans, including Late Fees under section III(c) of the DCG MLA and enforcement costs pursuant to section XII of the DCG MLA, which DCG disputes"). Importantly, the definition of Outstanding Undisputed Amounts does not include the Disputed Amounts, and

the termination of the PRA is contingent upon the payment in full of ***only*** the Undisputed Outstanding Amounts under the DCG MLA and DCGI MLA.  Amendment ¶¶ 2, 13 ("The Partial Repayment Agreement shall terminate as to DCG upon full payment of the Outstanding Undisputed Amounts under the DCG MLA.  The Partial Repayment Agreement shall terminate as to DCGI upon full payment of the Outstanding Undisputed Amounts under the DCGI MLA.").

*f.*    *Conclusion*

17.    The DCG Entities are not required to repay the Outstanding Undisputed Amounts in the same asset types as the underlying loans.  Therefore the DCG Entities do not owe GGC any transaction or conversion costs and the PRA is now terminated as to DCG and DCGI.  Further, the DCG Entities dispute that they owe the Disputed Amounts.

18.    The DCG Entities expressly reserve, and nothing herein shall be construed as a waiver of, all rights, arguments, defenses, privileges, and/or remedies with respect to the Voluntary Payment, the Final Payment, the Disputed Amounts, and any terms under the PRA or Loan Documents.

*[Remainder of page intentionally left blank]*

Dated: January 15, 2024
New York, New York

Respectfully submitted,

*/s/ Jeffrey D. Saferstein*
Jeffrey D. Saferstein
Jessica Liou
Furqaan Siddiqui
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Tel:  (212) 310-8000
Fax:  (212) 310-8007
jeffrey.saferstein@weil.com
jessica.liou@weil.com
furqaan.siddiqui@weil.com

*Attorneys for Digital Currency Group, Inc.*

## **Exhibit A to DCG Statement**

**Original Partial Repayment Agreement**

**EXECUTION COPY**

## <u>PARTIAL REPAYMENT AGREEMENT</u>

This PARTIAL REPAYMENT AGREEMENT, dated as of September 12, 2023 (this "<u>Agreement</u>"), is entered into among Genesis Global Capital, LLC ("<u>GGC</u>"), a limited liability company organized and existing under the laws of Delaware with its principal place of business at 250 Park Avenue South, 5th Floor, New York, New York 10003, Digital Currency Group, Inc. ("<u>DCG</u>"), a Delaware corporation with its principal place of business at 290 Harbor Drive, 5th Floor, Stamford, Connecticut 06902, and DCG International Investments Ltd. ("<u>DCGI</u>", together with DCG, the "<u>DCG Parties</u>" and together with GGC, the "<u>Parties</u>"), a company incorporated in and existing under the laws of Bermuda, with its registered office at Century House, 16 Par-la-Ville Road, Pembroke, HM 08, Hamilton, Bermuda.  All capitalized terms used and not otherwise defined herein shall have the same meanings as set forth in the DCG MLA (as defined below) or the DCGI MLA (as defined below), as applicable.

## RECITALS:

WHEREAS, reference is made to (i) that certain Amended and Restated Master Loan Agreement, dated as of November 10, 2022 (the "<u>DCG MLA</u>"), by and between GGC, as Lender, and DCG, as Borrower and (ii) that certain Master Loan Agreement, dated as of June 21, 2019 (the "<u>DCGI MLA</u>" and, together with the DCG MLA, the "<u>MLAs</u>"), by and between GGC, as Lender, and DCGI, as Borrower).

WHEREAS, under the DCG MLA, the following Loans are currently outstanding:

(i)        that certain loan dated January 24, 2022, as amended by the Loan Term Sheet dated as of November 10, 2022, with a principal amount equal to $100,000,000 (the "<u>January 24 Loan</u>");

(ii)        that certain loan dated February 23, 2022, as amended by the Loan Term Sheet dated as of November 10, 2022, with a principal amount equal to $100,000,000 (the "<u>February 23 Loan</u>");

(iii)        that certain loan dated May 9, 2022, with a principal amount equal to $200,000,000 (the "<u>May 9 Loan</u>"); and

(iv)        that certain loan dated May 10, 2022, with a principal amount equal to $100,000,000 (the "<u>May 10 Loan</u>" and together with the January 24 Loan, the February 23 Loan, and the May 9 Loan, the "<u>DCG Loans</u>").

WHEREAS, under the DCGI MLA, that certain loan dated June 22, 2022, as amended by the Loan Term Sheet dated as of November 10, 2022, with a principal amount equal to 4,550.45173345 BTC (the "<u>June 22 Loan</u>"), is currently outstanding.

WHEREAS, under the DCGI MLA, that certain term loan dated September 21, 2020, and that certain term loan dated December 21, 2020 with a cumulative principal amount equal to 14,048 BCH (the "<u>BCH Loan</u>" and, together with the June 22 Loans, the "<u>DCGI Loans</u>") are currently outstanding.

WHEREAS, as of the date hereof, the following Events of Default (collectively, the "Specified Admitted Events of Default") under the MLAs, as applicable, have occurred and are continuing:

(i)      an Event of Default under clauses (a), (d), (e) and (f) of Section VIII of the DCG MLA (including, for the avoidance of doubt, Section VIII(f) of the DCGI MLA) relating to the failure of DCG to return any and all Loaned Assets outstanding under the January 24 Loan, the February 23 Loan, May 9 Loan and the May 10 Loan, in each case, when due between May 9, 2023 and May 11, 2023;

(ii)     an Event of Default under clauses (a), (d), (e) and (f) of Section VIII of the DCGI MLA (including, for the avoidance of doubt, Section VIII(f) of the DCG MLA) relating to the failure of DCGI to return any and all of the remaining BTC under the June 22 Loan when due on May 11, 2023;

(iii)    an Event of Default under Section VIII(b) of the DCGI MLA relating to the failure of DCGI to pay any and all Late Fees under the June 22 Loan within ten (10) days of the date when due;

WHEREAS, as of the date hereof, GGC has alleged, and DCG and DCGI dispute, that the following Events of Default (collectively, the "Specified Potential Events of Default" and, together with the Specified Admitted Events of Default, the "Specified Events of Default") under the DCG MLA or the DCGI MLA, as applicable, may have occurred and may be continuing:

(i)      an Event of Default under Section VIII(b) of the DCG MLA (including, for the avoidance of doubt, Section VIII(f) of the DCGI MLA) relating to the failure of DCG to pay any and all Loan Fees or Late Fees within ten (10) days of the date when due; and

(ii)     an Event of Default under Section VIII(b) of the DCGI MLA (including, for the avoidance of doubt, Section VIII(f) of the DCG MLA) relating to the failure of DCGI to pay any and all Loan Fees within ten (10) days of the date when due.

WHEREAS, on December 15, 2022, DCG sent a letter to GGC asserting that DCG had effectuated a setoff, as of November 17, 2022, of the approximately $52.5 million DCG paid to Luno Australia Pty Ltd ("Luno") pursuant to the Limited Guaranty, dated November 11, 2022, between DCG and Luno, under which DCG guaranteed up to $60 million of GGC's obligations to Luno (under that certain Master Digital Assets Loan Agreement dated August 30, 2022).

WHEREAS, as described in the December 15, 2022 letter to GGC, DCG asserts that it exercised its subrogation rights to Luno and set off the $52.5 million paid by DCG to Luno against amounts DCG owes to GGC under the January 24 Loan (the "Luno Setoff").

WHEREAS, GGC disputes the validity of the Luno Setoff.

WHEREAS, on August 29, 2023, the Genesis Debtors, the Committee and DCG announced an agreement-in-principle as set forth on that certain *Notice of Mediation Termination*, ECF No. 625 (the "Agreement in Principle") filed in the Genesis Chapter 11 Cases.

WHEREAS, on May 9, 2023, DCG sent GGC a request for wire instructions by email at 10:37 p.m. (ET) (the "Wire Instructions Request") to convert the Loans issued under the DCG MLA to Open Loans.

WHEREAS, on May 9, 2023, GGC responded to the Wire Instructions Request, which response, under the terms of the DCG MLA, constituted a denial by GGC of DCG's request to convert such loans to Open Loans.

WHEREAS, on May 12, 2023, GGC sent the DCG Parties a Notice of Default and Reservation of Rights letter ("GGC Notice of Default Letter"), which noted, among other things, that the Loans issued under the DCG MLA and DCGI MLA were due and owing, and that Late Fees were accruing under the DCG MLA and DCGI MLA.

WHEREAS, on May 25, 2023, the DCG Parties responded to the GGC Notice of Default Letter noting, among other things, that the DCG Parties dispute GGC's assertion that Late Fees are accruing under the DCG MLA and that any Late Fees on Loan Fees are accruing under the DCG MLA and DCGI MLA.

WHEREAS, the disputes relating to the validity of the Luno Setoff and the accrual of Late Fees under the DCG MLA and DCGI MLA remain open disputes and, notwithstanding anything contained in this Agreement, the Parties reserve all of their rights and defenses with respect thereto.

WHEREAS, DCG acknowledges and agrees that the Specified Admitted Events of Default have occurred and are continuing and GGC has the right under Section XII of each of the DCG MLA and the DCGI MLA to seek reimbursement for all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs, broker fees, and technology costs incurred by GGC in connection with the enforcement of its rights thereunder.

WHEREAS, the DCG Parties have requested, and GGC has agreed to, subject to the terms and conditions set forth herein, the Forbearance (as defined below) during the Forbearance Period (as defined below).

NOW, THEREFORE, in consideration of the foregoing and the agreements, promises, and covenants set forth below, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.      Defined Terms.  For purposes of this Agreement, the following terms, in addition to the terms defined in the preamble and recitals above, shall have the following meanings:

(a)      "Asset Carve-Out Schedule" has the meaning set forth in Section 3 of this Agreement.

(b)      "Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the chapter 11 cases of the Genesis

Debtors and, to the extent of any withdrawal of the reference made under section 157(d) of title 28 of the United States Code, the United States District Court for the Southern District of New York.

(c)    "BTC" means bitcoin, a type of Digital Asset based on an open-source cryptographic protocol that was introduced in 2009 by an anonymous developer or group of developers using the name Satoshi Nakamoto.

(d)    "BTC Portion" has the meaning set forth in Section 6(a) of this Agreement.

(e)    "Capital Stock" means any and all shares, stock, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership or profits interests in a Person that is another type of entity, including partnership interests, membership interests, voting trust certificates, certificates of interest, and profits interests, participations, or similar arrangements, and any and all warrants, rights or options to purchase, or other arrangements or rights to acquire, subscribe, convert to or otherwise receive or participate in the economic or other rights associated with any of the foregoing.

(f)    "Committee" means the Official Committee of Unsecured Creditors appointed in the Genesis Chapter 11 Cases.

(g)    "Digital Asset" means a digital currency or crypto asset in which transactions are verified and records are maintained by a decentralized system using cryptography, rather than by a centralized authority, including stablecoins, digital coins, and tokens, such as security tokens, utility tokens, and governance tokens.

(h)    "Event of Bankruptcy" shall mean, with respect to any person or entity, such person or entity (i) is dissolved, (ii) makes a general assignment, arrangement, scheme or composition with or for the benefit of its creditors generally, or such general assignment, arrangement scheme or composition becomes effective, (iii) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other similar relief under any bankruptcy or insolvency law or other law affective creditors' rights, or a petition is presented for its winding-up or liquidation, (iv) has a resolution passed for its winding-up or liquidation, (v) seeks or becomes subject to the appointment of an administration, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets, (vi) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced, sued on or against all or substantially all its assets, or (vii) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in (i) to (vii) above.

(i)    "Forbearance" has the meaning set forth in Section 4 of this Agreement.

(j)    "Forbearance Fee" has the meaning set forth in Section 6(b) of this Agreement.

(k)     "<u>Forbearance Period</u>" shall mean the period commencing on (and including) the Partial Repayment Agreement Effective Date and ending on the Forbearance Termination Date.

(l)     "<u>Forbearance Termination Date</u>" means the earliest of (i) the Plan Effective Date, (ii) the date on which GGC or the DCG Parties, as applicable, delivers a Termination Notice in accordance with Section 7 hereof and (iii) the date on which an Automatic Forbearance Termination Event occurs.

(m)     "<u>Forbearance Termination Event of Default</u>" has the meaning set forth in <u>Section 7</u> of this Agreement.

(n)     "<u>Genesis Chapter 11 Cases</u>" means, collectively, the cases commenced by the Genesis Debtors in the Bankruptcy Court jointly-administered under the case caption *In re Genesis Global Holdco, LLC, et al.*, Case No. 23-10063.

(o)     "<u>Genesis Debtors</u>" means, collectively, GGC, Genesis Global Holdco, LLC, and Genesis Asia Pacific Pte. Ltd.

(p)     "<u>Global Restructuring Agreement</u>" means that certain Global Restructuring Agreement that may be executed by and among the Genesis Debtors, DCG and the Committee in accordance with the Agreement in Principle.

(q)     "<u>Indebtedness</u>" means, with respect to any person or entity (i) all indebtedness for borrowed money; (ii) notes payable and drafts accepted representing extensions of credit whether or not representing obligations for borrowed money; (iii) all Indebtedness secured by any Lien on any property or asset owned or held by such person or entity regardless of whether the Indebtedness secured thereby will have been assumed by such person or entity or is nonrecourse to the credit of that person or entity; (iv) the face amount of any letter of credit issued for the account of such person or entity or as to which such person or entity is otherwise liable for reimbursement of drawings; (v) the direct or indirect guaranty, endorsement (otherwise than for collection or deposit in the ordinary course of business), co-making, discounting with recourse or sale with recourse by such person or entity of indebtedness of any other person or entity in respect of items in clauses (i)-(v) of this definition; (vi) any obligation of such person or entity the primary purpose or intent of which is to provide assurance to an obligee that the obligation of the obligor thereof will be paid or discharged, or any agreement relating thereto will be complied with, or the holders thereof will be protected (in whole or in part) against loss in respect thereof; (vii) obligations of such person or entity in respect of derivative transactions or instruments that are not principally for the purpose of hedging such person or entity's exposure; and (viii) obligations of such person in respect of any exchange traded or over the counter derivative transaction entered into for speculative purposes; <u>provided</u> that, notwithstanding the foregoing, Indebtedness shall exclude (i) capital leases, (ii) any obligation owed for all or any part of the deferred purchase price of property, equipment or services, (ii) accounts payable, payroll and other liabilities and accrued expenses incurred in the ordinary course of business that are not overdue by more than one hundred eighty (180) from the date of incurrence of the obligations in respect thereof, (iii) accruals for payroll and other liabilities

in the ordinary course of business, or (iv) other credit card, bank product or trade obligations incurred in the ordinary course of operating the DCG Parties' businesses.

(r)      "Loan Documents" has the meaning set forth in Section 10(c) of this Agreement.

(s)      "Material Adverse Change" means any circumstance, condition, or event that would reasonably be expected to materially and adversely affect (i) the business, assets, financial condition or results of operations, in each case, of DCG and its subsidiaries taken as a whole, or (ii) the ability of any DCG Party to perform its obligations under, or otherwise comply with any of the provisions of, this Agreement or the Loan Documents.

(t)      "Minimum Repayment Amount" has the meaning set forth in Section 6 of this Agreement.

(u)      "Net Proceeds" means the proceeds in excess of $10 million after payment of transaction expenses from any disposition of assets on the Asset Carve-Out Schedule.

(v)      "New Second Lien Facility" means the second-lien facility contemplated by the Agreement in Principle, as may be amended in the Global Restructuring Agreement, proposed to be entered into on the Plan Effective Date by DCG, as borrower, and GGC, as lender.

(w)      "Notice of Stay" has the meaning set forth in Section 6(a) of this Agreement.

(x)      "Partial Repayment Agreement Effective Date" has the meaning set forth in Section 5 of this Agreement.

(y)      "Payment Date" means the date on which each of the First Payment, Second Payment or Third Payment is due under this Agreement.

(z)      "Plan Effective Date" means the effective date of the chapter 11 plan for the Genesis Debtors in the Genesis Chapter 11 Cases.

(aa)      "Restricted Junior Payment" means (i) any dividend, other distribution, or liquidation preference, direct or indirect, on account of any shares of any class of Capital Stock of DCG now or hereafter outstanding; (ii) any redemption, retirement, sinking fund, or similar payment, purchase, or other acquisition for value, direct or indirect, of any shares of any class of Capital Stock of DCG (or any direct or indirect parent thereof) now or hereafter outstanding; (iii) any payment made to retire, or to obtain the surrender of, any outstanding warrants, options, or other rights to acquire shares of any class of Capital Stock of DCG (or any direct or indirect parent thereof) now or hereafter outstanding; (iv) management or similar fees payable to any of the holders of Capital Stock issued by DCG; and (v) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund, or similar payment with respect to, any indebtedness that is contractually subordinated in payment ranking to the obligations under the Loan Documents; provided, however, that nothing contained herein shall (a) affect the DCG Parties' ability to

effectuate any transactions set forth in (i) – (v) above if each such transaction is below $3 million or $8 million cumulatively, or (b) restrict DCG's issuance of shares of any class of Capital Stock to current and/or former employees pursuant to an ordinary course contractual or legal obligation or the honoring of any such employees' exercise of rights to shares of any class of Capital Stock of DCG or any of its subsidiaries, in each case, as DCG or its subsidiaries may be contractually obligated under ordinary course employee options agreements; provided further that such transaction or issuance is otherwise compliant with Section 3 herein.

(bb)    "Termination Notice" has the meaning set forth in Section 7 of this Agreement.

(cc)    "Turnover Actions" collectively mean those certain complaints filed in the Genesis Chapter 11 Cases on September 6, 2023, captioned as *Genesis Global Capital, LLC v. Digital Currency Group, Inc.*, Adv. Pro. 23-01168 and *Genesis Global Capital, LLC v. DCG International Investments Ltd.*, Adv. Pro. 23-01169, with respect to certain amounts outstanding under the DCG MLA and the DCGI MLA, respectively.

(dd)    "USD Portion" has the meaning set forth in Section 6(a) of this Agreement.

2.    Agreements and Acknowledgements.

(a)    Each DCG Party acknowledges, represents and warrants that the recitals to this Agreement are true and correct in all material respects.

(b)    Each DCG Party acknowledges and agrees that, as of the Partial Repayment Agreement Effective Date (as defined below), without giving effect to any reductions as shall be set forth in the Global Restructuring Agreement, (i) the aggregate outstanding principal amount of Loans under the DCG MLA is $500,000,000.00, (ii) the aggregate outstanding principal amount of Loans under the DCGI MLA is 4,550.45173345 BTC and 14,048 BCH, and (iii) the total outstanding amount of Late Fees under the DCGI MLA as of August 31, 2023 is 70.43849944 BTC.  Each of DCG and DCGI acknowledges, represents and warrants to GGC that such obligations are validly owed or owing under the respective MLAs, and each of DCG and DCGI is obligated with respect to the DCG MLA or the DCGI MLA, as applicable.

(c)    DCG acknowledges that GGC has not waived, released, or compromised any occurrences, acts, or omissions that may constitute or give rise to any defaults or Events of Default (including the Specified Events of Default) that existed or may have existed, may presently exist, or may arise in the future, nor does GGC waive any rights or remedies under the Loan Documents (other than, to the extent expressly set forth herein, with respect to the Specified Events of Default during the Forbearance Period) or any other agreements or arrangements with DCG or DCG not governed by the MLAs or terms sheets in respect thereof.  The Specified Admitted Events of Default shall be deemed to have occurred and be continuing for all purposes under the MLAs and the other Loan Documents, notwithstanding any subsequent cure or any other event or condition after the date hereof that would cause any Specified Admitted Event of Default to be no longer continuing, and

such Specified Admitted Event of Default may only be cured or waived on terms and conditions satisfactory to GGC.

3.      Negative Covenants.  Without the prior written consent of GGC, each DCG Party agrees that it shall not, during the Forbearance Period (unless the Forbearance Period is terminated pursuant to Section 7(a)(ii) of this Agreement, in which case this Section 3 shall survive the termination of the Forbearance Period or this Agreement), (a) directly or indirectly dispose of any assets having a fair market value in excess of $10 million in any single transaction or series of transactions or in excess of $30 million in aggregate, provided, however, a DCG Party may transfer assets identified on a schedule as agreed upon by the Parties prior to entry of this Agreement (the "Asset Carve-Out Schedule") if it uses the Net Proceeds to repay amounts due to GGC under the Loan Documents, (b) create, incur, assume, or otherwise become or remain liable with respect to any Indebtedness in an amount exceeding $30 million, (c) declare, order, pay, make, or set apart, or agree to declare, order, pay, make, or set apart, any sum for any Restricted Junior Payment, except with respect to DCG's issuance of any class of Capital Stock to current and/or former employees pursuant to an ordinary course legal or contractual obligation or the honoring of any such employees' exercise of rights to shares of any class of Capital Stock of DCG or any of its subsidiaries, in each case, as DCG or its subsidiaries may be contractually obligated under ordinary course employee options agreements, (d) enter into any transaction of merger or consolidation, or liquidate, wind up or dissolve itself (or suffer or consent to any such transaction, liquidation, winding up or dissolution), or dispose of, in any single transaction or series of related transactions, all or substantially all of its assets, or (e) enter into or permit to exist any transaction that is not on an arms' length basis (including the purchase, sale, lease or exchange of any property or the rendering of any service) with (i) any holder of ten percent (10%) or more of any class of Capital Stock of DCG or any of its subsidiaries or any affiliate of such holder, (ii) any affiliate of DCG (excluding the Genesis Debtors), or (iii) any joint venture in which any DCG Party or any of its respective affiliates holds any Capital Stock; provided that the DCG parties shall provide written notice to GGC of any affiliated transactions (other than those described in the following sentence) that are on an arms' length basis no later than two (2) business days after entering into such affiliated transaction; provided further that, if GGC does not file or cause to be filed the Notice of Stay on or prior to the date that is three (3) Business Days after the Partial Repayment Agreement Effective Date, the foregoing restrictions in this Section 3 (as applied to the DCG Parties) shall cease to be effective until such time as the Notice of Stay is filed.  Notwithstanding anything to the contrary herein, this Agreement shall not restrict or prohibit any of the DCG Parties from (A) funding any subsidiaries of the DCG Parties for payroll, overhead or operating costs and expenses of subsidiaries of GGC in the ordinary course, (B) entering into any token rebalancing transactions or selling any token positions, (C) receiving any payments, dividends, distributions or outflows from any of DCG's subsidiaries or companies within the DCG Parties' venture portfolio (D) selling any minority stakes in companies within the DCG Parties' venture portfolio for an aggregate value of no more than $8 million (provided that the foregoing $8 million cap shall not apply to the extent that proceeds from such sales are used to satisfy the DCG Parties' obligations under the Loan Documents), or (E) incurring any debt if the proceeds of such debt will be used to satisfy the DCG Parties' obligations under the Loan Documents; provided that DCG and DCGI shall provide written notice to GGC of any sale or incurrence of debt described in the foregoing clauses (D) and (E) no later than two (2) days following such sale or incurrence.

4.      Limited Forbearance.

(a)      Except as otherwise provided in this Agreement, and subject to the terms and conditions set forth in this Agreement, GGC agrees that during the Forbearance Period it will not pursue or prosecute the Turnover Actions, or (ii) file any action in any jurisdiction and/or initiate any legal proceeding to enforce any of its rights and remedies in respect of the Specified Events of Default (the "Forbearance"); provided that, notwithstanding the Forbearance or anything to the contrary in this Agreement, both GGC and the DCG Parties reserve their rights with respect to whether there are Late Fees accruing on the Loans issued under the DCG MLA; provided, further, that notwithstanding the Forbearance or anything to the contrary in this Agreement, GGC reserves the right to assert that it is entitled to (x) payment of any and all Loan Fees and Late Fees that may become due under the applicable provisions of MLAs (it being understood that DCG disputes that Late Fees are due under the DCG MLA) and (y) reimbursement of all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs, broker fees, and technology costs incurred by GGC in connection with the enforcement of its rights under the MLAs, as applicable, in each case including during the Forbearance Period.

(b)      The Forbearance shall be limited precisely as written, relate solely to the Specified Events of Default in the manner and to the extent described in this Agreement, and shall not (i) be deemed a waiver of any default or Event of Default that is not a Specified Event of Default that may now be in existence or that may hereafter occur, nor imply that GGC would be obligated to or would waive any default or Event of Default (including the Specified Events of Default) following the expiration or termination of the Forbearance Period, or (ii) prejudice any right or remedy that GGC may now have or may have in the future under or in connection with the Loan Documents or any other instrument or agreement referred to therein, including, without limitation, any right or remedy in connection with the Specified Events of Default following the expiration or termination of the Forbearance Period.

(c)      Notwithstanding the Forbearance granted pursuant to this Section 4, for the purposes of any provision of the MLAs permitting any action by DCG or DCGI, as applicable, in the absence of a default or Event of Default (or any kind of default or Event of Default), or conditioning any right of DCG, DCGI, or GGC on the absence of a default or Event of Default (or any kind of default or Event of Default), the Specified Events of Default shall be deemed to be continuing upon its occurrence.

(d)      Starting on the first Business Day after the expiration or termination of the Forbearance Period, GGC may at any time thereafter proceed to enforce any or all of its rights and remedies under any Loan Document and applicable law (subject to the terms of the applicable Loan Document and applicable law) in connection with the Specified Events of Default; provided that GGC shall be permitted to exercise any enforcement rights with respect to this Agreement at any time during the Forbearance Period and shall be permitted to file a notice of the termination or expiration of the Forbearance Period immediately upon such termination or expiration; provided further that DCG and DCGI shall have the later of (i) thirty (30) days after such termination or expiration of the Forbearance Period and

(ii) any date as ordered by the Bankruptcy Court, to file an answer in the Turnover Actions, unless the Forbearance Period is terminated pursuant to Section 7(a)(ii), in which case DCG and DCGI shall have ten (10) Business Days after such termination to file an answer in the Turnover Actions.  In furtherance of the foregoing, and notwithstanding the Forbearance, each DCG Party acknowledges and confirms that, following the expiration or termination of the Forbearance Period, all rights and remedies of GGC under the Loan Documents and applicable law in connection with the Specified Events of Default and with respect to the DCG Parties shall continue to be available to GGC.  For the avoidance of doubt, each DCG Party acknowledges and confirms that the Forbearance shall not apply to or preclude any remedy available to GGC in connection with any proceeding commenced by or on behalf of a DCG Party under any bankruptcy or insolvency law, including, without limitation, to any relief in respect of adequate protection or relief from any stay imposed under such law.

(e)   The Parties agree that the running of all statutes of limitation and the doctrine of laches applicable to all claims or causes of action that GGC may be entitled to take or bring in order to enforce its rights and remedies against any DCG Party under the MLAs are, to the fullest extent permitted by law, tolled and suspended during the Forbearance Period.

(f)   Each DCG Party understands and agrees to the temporary nature of the Forbearance provided hereby and that GGC has given no assurances that it will, and shall have no obligation to, extend the duration of the Forbearance Period or enter into any other waiver, forbearance, amendment or agreement.  Any agreement by the DCG Parties and GGC to extend the Forbearance Period, if any, shall be set forth in writing and signed by a duly authorized signatory of each of the DCG Parties and GGC.

(g)   The Forbearance granted pursuant to this Section 4 is granted on the condition that no default or Event of Default, other than the Specified Events of Default, shall exist under the Loan Documents.

5.   Effectiveness of Agreement.  This Agreement shall become effective on the first date (such date, the "Partial Repayment Agreement Effective Date") on which this Agreement has been duly executed and delivered by each of the Parties.

6.   Payments of Loans and Fees.  In consideration for the Forbearance as set forth herein:

(a)   The DCG Parties shall pay GGC, in payment of the DCG Loans and the June 2022 Loan, a total of $275,000,000 (the "Minimum Repayment Amount") in accordance with the following payment schedule: (i) $75,000,000 on the earlier of (A) a date within one (1) Business Days after the filing of a notice of stay with respect to the Turnover Actions in the Genesis Chapter 11 Cases (the "Notice of Stay"), which shall occur no later than three (3) Business Days after the Partial Repayment Agreement Effective Date, and (B) the Plan Effective Date (the "First Payment"); (ii) $75,000,000 on the earlier of (A) the date that is 47 days after the Partial Repayment Agreement Effective Date and (B) the Plan Effective Date (the "Second Payment"); (iii) $75,000,000 on the earlier of (A) the

date that is 45 days after the Second Payment and (B) the Plan Effective Date (the "Third Payment"); and (iv) $50,000,000 on the earlier of (A) the date that is 45 days after the Third Payment and (B) the Plan Effective Date; provided that the payments set forth in clauses (i)-(iv) shall cumulatively be made 78% in USD (the "USD Portion") and 22% in BTC (the "BTC Portion") and (2) the obligation of the DCG Parties to make the payments set forth in clauses (i)-(iv) shall be contingent on the timely filing of the Notice of Stay as described in clause (i)(A) above.  Any such USD payments made under this Section 6(a) will first reduce the principal balance of the January 24 Loan until such balance is fully repaid, and next will reduce the principal balance of the May 9 Loan until such balance is fully repaid; any such BTC payments made under this Section 6(a) will reduce the principal balance of the June 22 Loan.  DCG shall solely be responsible for the USD Portion and DCGI shall solely be responsible for BTC Portion.  Nothing herein shall impute joint or several liability to DCG with respect to the BTC Portion, or to DCGI with respect to the USD Portion of the payments, respectively.

(b)     The DCG Parties shall pay a total fee in USD (the "Forbearance Fee") in an amount equal to 0.375% of the aggregate principal amount outstanding of the Loans under the MLAs on the Partial Repayment Agreement Effective Date, each in their respective capacities as Borrowers under the MLAs, as applicable, within two (2) Business Days of the Partial Repayment Agreement Effective Date, and GGC agrees that the Forbearance Fee shall be credited against the USD Portion of the final $50,000,000 payment.  Each of DCG and DCGI shall be jointly and severable liable for the Forbearance Fee.

(c)     Notwithstanding anything to the contrary in the DCGI MLA, DCGI agrees to pay all Late Fees that are or become payable under the DCGI MLA and relevant term sheets in accordance with the terms of such agreements during the Forbearance Period; provided however, all rights and defenses of the Parties are fully preserved with respect to any Late Fees owing under the DCG MLA and relevant term sheets.

(d)     To the extent the DCG Parties make payments pursuant to this Agreement that are in the aggregate greater than the Minimum Repayment Amount (without consideration to any amounts paid under this Agreement in respect of Loan Fees or Late Fees under either the MLAs), DCG shall be entitled to a greater than dollar-for-dollar reduction in the original principal amount of the New Second Lien Facility (as described in the Agreement in Principle, as may be amended in the Global Restructuring Agreement), with an additional $65,000,000 in total aggregate amount of payments exceeding the Minimum Repayment Amount reducing the original principal amount of the New Second Lien Facility by $95,000,000 and each additional $10,000,000 in total aggregate amount of payments thereafter reducing the original principal amount of the New Second Lien Facility by a further $15,000,000; provided, however, that if the Parties do not execute the Global Restructuring Agreement, then any payments made under this Section 6(c) shall reduce the principal balance of the amounts owed under the DCG Loans or June 22 Loan, as applicable, by the amount actually paid, without any greater than dollar-for-dollar reduction.

7.    <u>Default</u>.

(a)    Except in respect of the Specified Events of Default, upon the occurrence of any one or more of the following events (each a "<u>Forbearance Termination Event of Default</u>"), GGC shall provide notice to the DCG Parties in accordance with Section XV of the DCG MLA or Section XV of the DCGI MLA, as applicable, of its intent to terminate the Forbearance Period, which termination shall become effective upon the delivery of the Termination Notice to the DCG Parties:

(i)    any DCG Party fails to observe, perform or comply with, or is in breach of, any covenant, term, or condition contained in this Agreement and (other than in the case of Section 6 (*Payments of Loans and Fees*)) such failure or breach is not cured (if curable) within fifteen (15) calendar days of (x) delivery of a written notice by GGC or (y) any DCG Party having actual knowledge of such breach or failure;

(ii)    any DCG Party fails to observe, perform or comply with, or is in breach of, any covenant, term, or condition in Section 6 (*Payments of Loans and Fees*)) if such failure or breach is not cured within one (1) Business Day;

(iii)    the occurrence of a Material Adverse Change;

(iv)    any DCG Party fails to observe, perform or comply with, or is in breach of, any covenant, term, or condition contained in any of the Loan Documents (including the failure to pay Loan Fees as required under the MLAs), other than a Specified Event of Default, and does not cure such failure within any applicable cure period provided in the applicable Loan Document;

(v)    the occurrence of an Event of Default under the DCG MLA or DCGI MLA, other than a Specified Event of Default;

(vi)    any Party fails to observe or perform, or is in breach of, any covenant, term, or condition contained in the Global Restructuring Agreement, and does not cure such failure within any applicable cure period provided in the Global Restructuring Agreement;

(vii)    the termination of the Global Restructuring Agreement in accordance with its terms; or

(viii)    GGC determines, in its sole discretion following consultation with its legal and financial advisors, that termination of this Agreement is appropriate, necessary or consistent with the exercise of its fiduciary duties; <u>provided</u> that, notwithstanding anything to the contrary in this Section 7(a), GGC shall provide the DCG Parties with at least ten (10) calendar days' prior written notice before such termination shall become effective; <u>provided</u> <u>further</u> that in the event a DCG Party makes a payment or uses proceeds from the sale of assets as described in Section 3(a) and Section 3(c) to pay obligations owed under the Loan Documents in advance of the next Payment Date, such payments shall be credited toward the

amounts due on future Payment Dates and GGC shall not exercise the termination right described in this Section 7(a)(viii) prior to the next Payment Date.

(b)     Upon the issuance by any governmental authority, including any regulatory authority or the Bankruptcy Court or a court of competent jurisdiction, of any ruling, judgment, or order enjoining GGC's or any of the DCG Parties' entry into and performance under this Agreement, the Parties may elect to provide notice to the other Parties in accordance with Section XV of the DCG MLA or Section XV of the DCGI MLA, as applicable, of its intention to terminate this Agreement, which termination shall become effective upon the delivery of a Termination Notice.

(c)     On or after the date that is forty-seven (47) days after the Partial Repayment Agreement Effective Date, any Party may give written notice to the other Parties of its intention to terminate this Agreement on the date, which termination shall be effective upon the delivery of such notice to the other Parties, in the event that at such time either (i) the Global Restructuring Agreement has not been executed; or (ii) the Genesis Debtors have not filed an amended chapter 11 plan and disclosure statement, consistent with the Agreement in Principle and as otherwise reasonably acceptable to DCG (as may be amended by the Global Restructuring Agreement or as otherwise agreed by the Parties).

(d)     Notwithstanding the foregoing or anything to the contrary in the MLAs, the Forbearance Period shall automatically be terminated without any action necessary by any Party upon the occurrence of an Event of Bankruptcy with respect to DCG or DCGI (an "Automatic Forbearance Termination Event").

(e)     Any notice provided by any Party indicating an intention to terminate either the Forbearance Period or this Agreement pursuant to (and in accordance with the terms of) this Section 7 shall be referred to as a "Termination Notice".

8.     Representations and Warranties of DCG.  To induce GGC to enter into this Agreement, each DCG Party represents and warrants to GGC that, as of the Partial Repayment Agreement Effective Date:

(a)     the execution, delivery, and performance of this Agreement (i) are within such DCG Party's corporate or other organizational powers (as applicable), (ii) have been duly authorized by all necessary corporate or other organizational action (as applicable) on the part of such DCG Party, and (iii) do not and will not breach, violate, conflict with, or constitute a default under (A) any provision of any law or any governmental rule or regulation applicable to such DCG Party, (B) any of the organizational documents of such DCG Party, (C) any order, judgment, or decree of any court or other agency of government binding on such DCG Party, or (D) any agreement to which such DCG Party is a party;

(b)     each of DCG and DCGI has duly executed and delivered this Agreement, and each of this Agreement, the DCG MLA or the DCGI MLA, as applicable, and the applicable Loan Term Sheets constitutes the legal, valid, and binding obligation of such DCG Party enforceable in accordance with its terms; and

(c)      (i) other than the Specified Events of Default, no actual or potential default or Event of Default has occurred and is continuing and (ii) except with respect to the Specified Events of Default, all representations and warranties made by either DCG Party contained herein, in the MLAs, as applicable, or in the other Loan Documents are true and correct in all material respects (or, with respect to any representation or warranty qualified by materiality or a material adverse change or material adverse effect standard, in all respects) with the same effect as though such representations and warranties are made on and as of the Partial Repayment Agreement Effective Date, except where such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall have been true and correct in all material respects as of such earlier date (or, with respect to any representation or warranty qualified by materiality or a material adverse change or material adverse effect standard, in all respects).

9.      Representations and Warranties of GGC.  To induce DCG to enter into this Agreement, GGC represents and warrants to the DCG Parties that, as of the Partial Repayment Agreement Effective Date:

(a)      GGC has full legal and corporate authority to enter into and perform under this Agreement without any order of the Bankruptcy Court or any court of competent jurisdiction; and

(b)      Other than the Specified Events of Default, GGC is not aware of any actual or potential default or Event of Default that has occurred and is continuing in the MLAs, as applicable.

10.      Reference to and Effect on Loan Documents.

(a)      Ratification.  Each of DCG and DCGI hereby expressly acknowledges and agrees that all of the terms and conditions of, and their continued obligations and liability (including all of its payment and performance obligations, covenant obligations and obligation to indemnify, contingent or otherwise) under, the MLAs, and the other Loan Documents, as applicable, are hereby ratified and confirmed and continue unchanged and in full force and effect, except as otherwise set forth herein.

(b)      No Waiver.  Except as expressly set forth herein, neither the execution, delivery and effectiveness of this Agreement shall, directly or indirectly, (i) create any obligation to continue to defer any enforcement action with respect to the Specified Events of Default after the occurrence of any Forbearance Termination Event of Default (or with respect to an Event of Default not constituting a Specified Event of Default after the date hereof) or termination of this Agreement; (ii) constitute a consent or waiver of any past, present or future violations, including the Specified Events of Default or any other defaults and Events of Default, of any provisions of the MLAs, or any other Loan Documents; (iii) amend, modify, prejudice or operate as a waiver of any right, power, defense or remedy of GGC or any of its successors under the MLAs, or any of the other Loan Documents; (iv) constitute a consent to any merger or other transaction or to any sale, restructuring or refinancing transaction, or (v) constitute a course of dealing or other basis for altering any Loans or any other contract or instrument.  No course of dealing or any passage of time on

14

account of the Forbearance Period shall be considered or used as a basis for asserting an untimely exercise of any such Party's rights, for altering any obligation of any of DCG, DCGI or any other Person or any right, privilege defense or remedy of GGC under the MLAs, or any other Loan Document, or to otherwise prejudice any such right, power, defense or remedy.  The DCG Parties expressly acknowledge and agree that there has not been, and this Agreement does not constitute or establish, a novation with respect to the MLAs, or any of the other Loan Documents.  Except as otherwise expressly provided in this Agreement, GGC hereby reserves all of its rights and remedies under the Loan Documents and any other documents, instruments or agreements executed and delivered in connection therewith and any and all applicable law.

(c)    Loan Document.  On and after the Partial Repayment Agreement Effective Date, this Agreement shall constitute a "Loan Document" as defined under the DCG MLA and shall constitute a "Loan Document" as defined under the DCGI MLA and the term "Loan Documents" shall collectively refer to this Agreement, the DCG MLA, the DCGI MLA, and any and all term sheets entered in connection with such MLAs.

11.    Miscellaneous.

(a)    Successors and Assigns.  This Agreement shall be binding on and shall inure to the benefit of each of the Parties and their respective successors and assigns to the same extent set forth in the Loan Documents.

(b)    Entire Agreement.  This Agreement and the Loan Documents, as amended hereby, constitute the entire agreement of the Parties with respect to the subject matter hereof and supersede all other understandings, oral or written, with respect to the subject matter hereof.

(c)    Headings.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(d)    Severability.  Wherever possible, each provision of this Agreement shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

(e)    Counterparts.  This Agreement may be executed in any number of separate original counterparts and by way of electronic signature, each of which shall be deemed to be an original, but all of such counterparts shall together constitute one agreement. Delivery of an executed counterpart of a signature page to this Agreement by electronic mail in portable document format (.pdf) shall be effective as delivery of a manually executed counterpart of this Agreement. For the avoidance of doubt, the words "execution," "signed," "signature," and words of like import in this Agreement shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature

or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

(f)     Expenses.  Without limiting any terms or provisions of the Loan Documents, the DCG Parties agree, jointly and severally, to pay promptly all reasonable and documented costs and expenses incurred by GGC in connection with the enforcement or protection of GGC's rights under this Agreement, including, without limitation, the reasonable fees, charges, and disbursements of GGC's legal counsel.

(g)     Governing Law; Jurisdiction; Waiver of Jury Trial.  This Agreement and the rights and obligations of the Parties hereunder shall be governed by, and construed and interpreted in accordance with, the law of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Agreement or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought exclusively in the Bankruptcy Court.  By execution and delivery of this Agreement, each of the Parties hereby irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court, generally and unconditionally, with respect to any such action, suit or proceeding.    EACH PARTY HERETO UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT.

(h)     Appointment of Process Agent.  DCG hereby agrees that service of process in any such action or proceeding brought in connection with the DCG MLA, DCGI MLA, the Loan Agreements, the Turnover Actions or this Agreement, may be made upon it by serving a copy of any relevant pleadings on an agent designated by the DCG Parties (the "Designated Agent"), which shall be irrevocably appointed by the DCG Parties as its agent for service of process in respect of any such action or proceeding.  Within two (2) business days of the Partial Repayment Agreement Effective Date, the DCG Parties shall provide GGC with the identity and address of Designated Agent.  The service, as herein provided, of such summons or other legal process in any such action or proceeding on the Designated Agent shall be deemed personal service and accepted by each of the DCG Parties as such, and shall be legal and binding on each of the DCG Parties for all the purposes of any such action or proceeding.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties have duly executed this Agreement as of the date first above written.

**DIGITAL CURRENCY GROUP, INC.**

By: _Mark Murphy_
       Name:  Mark Murphy
       Title:  President

**DCG INTERNATIONAL INVESTMENTS LTD.**

By: _Michael Katz_
       Name:  Mike Katz
       Title:  Legal Officer

17

Accepted and agreed as of the date first set forth above.

**HOLDER**:

**GENESIS GLOBAL CAPITAL, LLC**

By: _Derar Islim_

Name:

Title: Interim CEO

**<u>Exhibit B to DCG Statement</u>**

**Partial Repayment Agreement Amendment**

**Executed Version**

## AMENDMENT TO PARTIAL REPAYMENT AGREEMENT

This Amendment (the "Amendment") is entered into as of November 28, 2023 in reference to that certain Partial Repayment Agreement (the "Original Partial Repayment Agreement" and the Original Partial Repayment Agreement as amended by the Amendment, the "Partial Repayment Agreement"), dated as of September 12, 2023, between Genesis Global Capital, LLC ("GGC") Digital Currency Group, Inc. ("DCG"), and DCG International Investments Ltd. ("DCGI," together with DCG, the "DCG Parties," and collectively with GGC, the "Parties"). All capitalized terms used and not otherwise defined herein shall have the same meanings as set forth in the Partial Repayment Agreement.

WHEREAS, on September 13, 2023, GGC received, pursuant to the terms of the Original Partial Repayment Agreement, the following payments or transfers from the applicable DCG Party: (i) a Forbearance Fee in the amount of $2,315,937.92, (ii) a payment of $58,500,000 on account of outstanding principal in respect of the DCG Loans, (iii) a transfer of 638.54616543 BTC on account of outstanding principal in respect of the June 22 Loan and (iv) a transfer of 70.43849944 BTC on account of Late Fees accrued under the June 22 Loan as of August 31, 2023.

WHEREAS, on October 3, 2023, GGC received, prior to the applicable Payment Date under the Original Partial Repayment Agreement, the following payments or transfers from the applicable DCG Party: (i) two payments totaling $58,500,000 on account of outstanding principal in respect of the DCG Loans and (ii) a transfer of 599.91212208 BTC on account of outstanding principal in respect of the June 22 Loan.

WHEREAS, on October 20, 2023, GGC received, prior to the applicable Payment Date under the Original Partial Repayment Agreement, the following payments or transfers from the applicable DCG Party: (i) one payment in the amount of $58,500,000 on account of outstanding principal in respect of the DCG Loans and (ii) a transfer of 574.2224245 BTC on account of outstanding principal in respect of the June 22 Loan.

WHEREAS, as a result of the aforementioned payments by DCG under the Original Partial Repayment Agreement, DCG has paid, among other DCG Loans, the full principal balance of the January 24 Loan.

WHEREAS, the Global Restructuring Agreement was not executed by October 29, 2023 and the Genesis Debtors had not filed an amended chapter 11 plan and disclosure statement consistent with the Agreement in Principle by that date, and it is the Debtors' position that each of the Parties was, as of October 29, 2023, entitled to terminate the Original Partial Repayment Agreement pursuant to Section 7(c) thereof.

WHEREAS, the Parties seek to amend the Original Partial Repayment Agreement to provide for:

(i)     payment of the DCG Loans and the DCGI Loans in accordance with the payment schedule described herein;

(ii)    the pledge by DCG and DCGI of certain ETHE and ETCG (each as defined below) to GGC, pursuant to the Security Agreements, to secure the obligations of the DCG Parties with respect to the Outstanding Undisputed Amounts ; and

(iii)  entry of the joint stipulated orders and judgments (respectively, the "<u>DCG Joint Stipulated Order and Judgment</u>" and the "<u>DCGI Joint Stipulated Order and Judgment</u>" and together the "<u>Joint Stipulated Orders and Judgments</u>"), attached hereto as **Annex A** and **Annex B**, of which GGC will forbear from seeking execution except in the event of (a) failure by the applicable DCG Party to pay any portion of the Repayment Amount (as defined herein) on or prior to the dates set forth herein (any such failure by either of DCG or DCGI, a "<u>Nonpayment Event</u>"), (b) failure by DCG to make the transfer described in clause (ii) above in accordance with the terms of this Amendment, or (c) failure by the DCG Parties to comply with the Section 3 (Negative Covenants) of the Partial Repayment Agreement, each as set forth in amended Section 7 of the Partial Repayment Agreement; and

(iv)  extended Forbearance as set forth herein.

WHEREAS, after the DCG Parties have transmitted, and GGC has received, the Amendment Effectiveness Payment (as defined below), GGC intends to file a motion with the Bankruptcy Court seeking (i) entry of the Joint Stipulated Orders and Judgments and (ii) authority to take actions in furtherance of the Partial Repayment Agreement.

NOW THEREFORE, in consideration of the covenants and conditions set forth in the Original Partial Repayment Agreement and herein, it is agreed as follows:

1.  <u>Defined Terms</u>.

    a.  Section 1 of the Original Partial Repayment Agreement is hereby amended to add the following definitions in alphabetical order.

        i.  "<u>Amendment</u>" shall mean that certain Amendment to Partial Repayment Agreement, dated as of November 28, 2023, by and between GGC, DCG and DCGI.

        ii.  "<u>Amendment Effective Date</u>" has the meaning set forth in <u>Section 6</u> of the Amendment.

        iii.  "<u>BCH</u>" shall mean the cryptocurrency Bitcoin Cash.

        iv.  "<u>Committee</u>" shall mean the Official Committee of Unsecured Creditors in the chapter 11 cases of Genesis Global Holdco, LLC, *et al.*, Case No. 23-10063 (SHL).

        v.  "<u>DCG Security Agreement</u>" shall mean that certain Security Agreement, dated as of November 28, 2023, by and between GGC and DCG.

        vi.  "<u>DCGI Security Agreement</u>" shall mean that certain Security Agreement, dated as of November 28, 2023, by and between GGC and DCGI.

        vii.  "<u>ETHE</u>" shall mean shares of Grayscale Ethereum Trust.

viii.   "ETCG" shall mean shares of Grayscale Ethereum Classic Trust.

ix.   "Security Agreements" shall mean the DCG Security Agreement and the DCGI Security Agreement.

b.   The definition of Forbearance Period is hereby deleted and replaced with the following:

"Forbearance Period" shall mean the period commencing on (and including) the Partial Repayment Agreement Effective Date until the earlier of (i) occurrence of a Default and failure of the applicable DCG Party to cure such Default, to the extent such default can be cured by the terms of this Agreement, within the applicable time period, and (ii) April 1, 2024.

c.   The definition of Forbearance Termination Date is hereby deleted in its entirety.

d.   The definition of Forbearance Termination Event of Default is hereby deleted and replaced with the definition set forth herein.

e.   The definition of Material Adverse Change is hereby deleted and replaced with the following:

"Material Adverse Change" means any circumstance, condition, or event that is not known by GGC as of the Amendment Effective Date that would reasonably be expected to materially and adversely affect (i) the business, assets, financial condition or results of operations, in each case, of DCG and its subsidiaries taken as a whole, or (ii) the ability of any DCG Party to perform its obligations under, or otherwise comply with any of the provisions of, this Agreement or the Loan Documents.

2.   Agreements and Acknowledgements. Section 2(b) of the Original Partial Repayment Agreement is hereby deleted and replaced with the following:

Each DCG Party acknowledges and agrees that, as of the Amendment Effective Date, (i) the aggregate outstanding principal amount of Loans under the DCG MLA is $324,500,000, (ii) the aggregate outstanding principal amount of Loans under the DCGI MLA is 2,737.77102141 BTC and 14,048 BCH, and (iii) the total outstanding amount of Late Fees under the DCGI MLA as of Monday, November 28, 2023 is 10.12600241 BTC (the amounts in (i)-(iii) each an "Outstanding Undisputed Amount" and collectively the "Outstanding Undisputed Amounts"). Each of DCG and DCGI acknowledges, represents and warrants to GGC that such obligations are validly owed or owing under the respective MLAs, and each of

3

DCG and DCGI is obligated with respect to the DCG MLA or the DCGI MLA, as applicable.

3.  <u>Payment of Loans and Fees</u>.

a.  Section 6(a) of the Original Partial Repayment Agreement is hereby deleted and replaced with the following:

(a)     The DCG Parties shall comply with their obligations in Section 6(d) and make payments or transfers to GGC equal to the following amounts as payments of the DCG Loans and the DCGI Loans (the "<u>Repayment Amount</u>"), in accordance with the following payment schedule:

(i) within two (2) Business Days after the Amendment Effective Date, $35,000,000 (the "<u>Amendment Effectiveness Payment</u>");

(ii) commencing on December 7, 2023 and on the fifth (5th) Business Day of each calendar month thereafter, 50% of total digital assets and cash paid to DCG as a dividend from Grayscale Investments, LLC in the preceding calendar month in excess of $10,000,000, which dividend shall be paid and calculated in accordance with prior practice (the "<u>Monthly Payment</u>");

(iii) notwithstanding anything to the contrary in Section 3 of the Partial Repayment Agreement, within two (2) Business Days of the Amendment Effective Date, an amount of DCG's proceeds from the sale of CoinDesk, Inc. equal to the lesser of (x) $65,000,000 and (y) the total proceeds from the sale of CoinDesk, Inc., net of transaction costs for external advisors (the "<u>CoinDesk Sale Payment</u>");

(iv) the later of thirty (30) days after the Plan Effective Date and April 1, 2024, all Outstanding Undisputed Amounts owed under the DCG Loans and the DCGI Loans to the extent not previously paid pursuant to clauses (i)-(iii), other than in respect of (a) Late Fees owed under the DCG Loans and (b) enforcement costs pursuant to section XII of the DCG MLA and Section XII of the DCGI MLA ((a) and (b) together, the "<u>Disputed Amounts</u>"), which Disputed Amounts are subject to a mutual reservation of rights as to whether or not they are due or payable (such payment, the "<u>Final Payment</u>"), <u>provided, however</u>, that notwithstanding the foregoing, the Final Payment shall be made no later than April 1, 2024;

<u>provided</u>, that the payments set forth in clauses (i)-(iv) above shall be made 77% in USD (the "<u>USD Portion</u>") and 23% in BTC (the "<u>BTC Portion</u>"). Any payments of the USD Portion made under this Section 6(a) will first reduce the principal balance of the February 23 Loan until such balance is

fully repaid, and next will reduce the principal balance of the May 9 Loan until such balance is fully repaid, and next will reduce the principal balance of the May 10 Loan. Any payments of the BTC Portion made under this Section 6(a) will reduce the principal balance of the June 22 Loan. DCG shall solely be responsible for the USD Portion and DCGI shall solely be responsible for the BTC Portion. Notwithstanding anything to the contrary, nothing shall impute joint or several liability to DCG with respect to the BTC Portion, or to DCGI with respect to the USD Portion. BTC prices shall be based on the respective BTC market prices at 8:00 p.m. prevailing Eastern Time on the day before the applicable payment.

b.  Section 6(b) of the Original Partial Repayment Agreement is hereby amended to delete the phrase "and GGC agrees that the Forbearance Fee shall be credited against the USD Portion of the final $50,000,000 payment".

c.  Section 6(d) of the Original Partial Repayment Agreement is hereby deleted and replaced with the following:

(d)    No later than fourteen (14) calendar days (or such later date as may be agreed by GGC) after the Amendment Effective Date, DCG and DCGI shall satisfy their obligations under clauses (iii) or (iv) of Section 2(a) of the Security Agreements and GGC shall act reasonably, promptly and in good faith to assist with any negotiation and execution of documentation in connection therewith, and which obligations GGC shall be deemed to satisfy if it executes: (i) a control agreement substantially in the form attached hereto as Exhibit A; and (ii) a representation letter substantially in the form attached hereto as Exhibit B; provided, that if either DCG or DCGI are unable to satisfy their obligations under clauses (iii) or (iv) of Section 2(a) of the applicable Security Agreement, DCG and/or DCGI, as applicable, shall have an additional three (3) Business Days (or such additional time as GGC may agree) to satisfy their obligations under clauses (i) and (ii) of Section 2(a) of the Security Agreements.

4.    Transfer of Collateral. Notwithstanding anything herein or in the Security Agreements to the contrary, pursuant to Section 13 of this Amendment, the DCG Parties shall have the right to transfer, in their sole discretion and upon written notice (each, a "Voluntary Transfer Notice"), all or part of the Collateral (as defined in the Security Agreements) to GGC, at which time, such transferred Collateral shall be valued using the market prices as of 8:00 p.m. Eastern Time on the date of such written notice and GGC shall

apply the value of such transferred Collateral to the Outstanding Undisputed Amounts as specified in the Voluntary Transfer Notice (each, a "Voluntary Payment").

5. Limited Forbearance.

    a. Section 4(a) of the Original Partial Repayment Agreement is hereby deleted and replaced with the following:

        (a)    Except as otherwise provided in this Agreement, and subject to the terms and conditions set forth in this Agreement, GGC agrees that during the Forbearance Period it will not (i) further pursue or prosecute the Turnover Actions, (ii) file any action in any jurisdiction and/or initiate any legal proceeding to enforce any of its rights and remedies in respect of the Specified Events of Default, or (iii) seek execution of either of the Joint Stipulated Orders and Judgments (the "Forbearance"); provided that, notwithstanding the Forbearance or anything to the contrary in this Agreement, both GGC and the DCG Parties reserve their rights with respect to whether there are Late Fees accruing on the Loans issued under the DCG MLA; provided, further, that notwithstanding the Forbearance or anything to the contrary in this Agreement, GGC reserves the right to assert that it is entitled to (x) payment of any and all Loan Fees and Late Fees that may become due under the applicable provisions of MLAs (it being understood that DCG disputes that Late Fees are due under the DCG MLA) and (y) reimbursement of all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs, broker fees, and technology costs incurred by GGC in connection with the enforcement of its rights under the MLAs, as applicable, in each case including during the Forbearance Period.

    b. The following is hereby inserted as a new Section 4(h) of the Partial Repayment Agreement:

        (h)    The Forbearance Period (as set forth in this Section 4) is hereby extended until the earlier of (i) occurrence of a Default and failure of the applicable DCG Party to cure such Default, to the extent such Default can be cured by the terms of this Agreement, within the applicable time period, and (ii) April 1, 2024.

6. Effectiveness of Amendment. This Amendment shall be effective immediately upon the satisfaction of each of the following conditions: (i) this Amendment has been duly executed and delivered by each of the Parties; (ii) GGC and DGC have executed the DCG Joint Stipulated Order and Judgment, which shall be filed with the Bankruptcy Court after GGC has received the Amendment Effectiveness Payment; (iii) GGC and DGCI have executed the DCGI Joint Stipulated Order and Judgment, which shall be filed with the Bankruptcy Court after GGC has received the Amendment Effectiveness Payment; and (iv) the DCG Parties and GGC shall have entered into the Security Agreements (such date that each of the foregoing conditions has been satisfied, the

6

"Amendment Effective Date").

7.    Existing Defaults.  Section 9(b) of the Original Partial Repayment Agreement is hereby deleted in its entirety and replaced with the following:

> (b)    Other than the Specified Events of Default, GGC is not aware of any actual or potential default or Event of Default that has occurred and is continuing in the MLAs or the Partial Repayment Agreement.  During the Forbearance Period, GGC shall forbear from exercising any rights and remedies in respect of any actual or potential default or Event of Default that has occurred and is continuing in the MLAs or the Partial Repayment Agreement.

8.    Default.  Section 7 of the Original Partial Repayment Agreement is hereby deleted in its entirety and replaced with the following:

a.    Upon the occurrence of any one or more of the following events and a failure to cure within the applicable time period (each a "Default" or a "Forbearance Termination Event of Default"), GGC shall provide notice to the DCG Parties, in accordance with Section 11(i) of the Partial Repayment Agreement, of its intent to terminate the Forbearance Period, which termination shall become effective upon the delivery of a written notice of termination (the "Termination Notice") to the DCG Parties:

i.    Any DCG Party fails to observe, perform or comply with, or is in breach of, any covenant in Section 3 (Negative Covenants) and such failure or breach is not cured (if curable) within fifteen (15) calendar days of (x) delivery of a written notice by GGC or (y) any DCG Party having actual knowledge of such breach or failure.

ii.    Any DCG Party fails to make the payments or transfers set forth in the Partial Repayment Agreement if such failure or breach is not cured within three (3) Business Days.

iii.    Any DCG Party fails to comply with its obligations under the applicable Security Agreement or Section 6(d) of the Partial Repayment Agreement.

iv.    The occurrence of a Material Adverse Change (the "MAC Default"); provided, that GGC shall provide ten (10) days' written notice of a MAC Default to the DCG Parties (the "Notice Period") and shall not take any enforcement action with respect to the Collateral or seek to terminate the

Partial Repayment Agreement or the Forbearance Period prior to the expiration of the Notice Period.

v.     The occurrence of any Event of Bankruptcy with respect to DCG or DCGI.

vi.    Conversion of the Debtors' chapter 11 cases to cases under chapter 7 of section 11 of the United States Code.

vii.   Notification in writing by DCG or DCGI to GGC of DCG's or DCGI's inability to, or intention not to, perform its obligations hereunder, or disaffirmation, rejection, or repudiation by DCG or DCGI of its obligations hereunder.

b. Notwithstanding the foregoing or anything to the contrary in the MLAs, the Forbearance Period shall automatically be terminated without any action necessary by any Party upon the occurrence of an Event of Bankruptcy with respect to DCG or DCGI, or conversion of the Debtors' chapter 11 cases to cases under chapter 7 of section 11 of the United States Code (either such event, an "Automatic Forbearance Termination Event").

9.   **Terms of Original Partial Repayment Agreement Unchanged Except as Amended**. Except as otherwise provided herein, the Original Partial Repayment Agreement shall remain unchanged and in full force and effect. On and after the date hereof, each reference in the Original Partial Repayment agreement or the Partial Repayment Agreement to "this Agreement", "herein", "hereof", "hereunder" or words of similar import shall mean and be a reference to the Partial Repayment Agreement, as amended hereby, although it shall not alter the dates as of which any provision of the Partial Repayment Agreement speaks.

10.  **Provision of Grayscale Digital Asset and Cash Dividend Statement by DCG Parties**. Section 3 of the Original Partial Repayment Agreement is hereby amended to add the following as a new sentence at the end of Section 3:

Prior to the fifth (5th) Business Day of each month subsequent to the Amendment Effective Date, the DCG Parties shall provide to the advisors to GGC and the advisors to the Committee, on a confidential and professionals'-eyes-only basis, a verified statement, signed by an officer of DCG, including a calculation of the amount of digital assets and cash paid to DCG as a dividend from Grayscale Investments, LLC in the previous calendar month.

11.  **Rights Regarding Luno Setoff Claim**.  Nothing in this Amendment or in the Partial Repayment Agreement shall operate as a waiver of (i) DCG's rights, if any, to seek a reimbursement from GGC or any other person or entity or a declaratory judgment or enforcement of its setoff rights against GGC or any other person or entity on account of the Luno Setoff Dispute (as defined herein) or a claim for payment against GGC or any other person or entity of the amounts paid by DCG to Luno Australia Pty Ltd. on behalf of GGC on November 16, 2022, as identified in that certain *Notice of Setoff*,

dated December 15, 2022, in connection with that certain Limited Guaranty between DCG and Luno and any interest accrued on the setoff amount that has been paid by DCG to GGC (the "Luno Setoff Dispute"), or (ii) GGC's rights or defenses, if any, with respect to the Luno Setoff Dispute.

12.   Entry of Joint Stipulated Orders and Judgments.  After execution of this Amendment, GGC shall file and seek entry of the Stipulated Orders and Judgments by the Bankruptcy Court in the amount of the Outstanding Undisputed Amounts owed by DCG and DCGI, respectively, plus any additional Loan Fees and Late Fees (other than any Disputed Amounts) accrued under the applicable MLA, less any payments made by DCG or DCGI under the MLAs, including any payments made pursuant to Section 6(a) of the Partial Repayment Agreement, subsequent to the Amendment Effective Date (such total amounts, as against DCG, the "DCG Judgment Amount" and as against DCGI, the "DCGI Judgment Amount").

13.   Payment of Repayment Amount Prior to Timeline Agreed Herein.  Notwithstanding anything contained herein, in the Partial Repayment Agreement or in DCG MLA or DCGI MLA, the DCG Parties may pay at any time, prior to the timeline articulated in Section 6(a) of the Partial Repayment Agreement, their respective obligations under the DCG MLA and DCGI MLA, as applicable, in whole or in part at any time, from time to time and without penalty or premium.  The Partial Repayment Agreement shall terminate as to DCG upon full payment of the Outstanding Undisputed Amounts under the DCG MLA.  The Partial Repayment Agreement shall terminate as to DCGI upon full payment of the Outstanding Undisputed Amounts under the DCGI MLA.

14.   Reference to and Effect on Loan Documents.

a.   Ratification.  As of the date hereof, each of DCG and DCGI hereby expressly acknowledges and agrees that all of the terms and conditions of, and their continued obligations and liability (including all of its payment and performance obligations, covenant obligations and obligation to indemnify, contingent or otherwise) under the MLAs and the other Loan Documents, as applicable, including the Partial Repayment Agreement are hereby ratified and confirmed and continue unchanged and in full force and effect, except as otherwise set forth herein.

15.   Notice.  The Original Partial Repayment Agreement is hereby amended to add the following as Section 11(i):

(i)   Any notices to be provided pursuant to the Partial Repayment Agreement may be provided to the following email addresses and will be deemed effective upon receipt.

If to the DCG Parties: jeffrey.saferstein@weil.com; jessica.liou@weil.com

If to GGC:  soneal@cgsh.com; jvanlare@cgsh.com

16.  <u>Miscellaneous</u>.

    a.  <u>Successors and Assigns</u>.  This Amendment shall be binding on and shall inure to the benefit of each of the Parties and their respective successors and permitted assigns to the same extent set forth in the Loan Documents.

    b.  <u>Entire Agreement</u>.  This Amendment and the Loan Documents, as amended hereby, constitute the entire agreement of the Parties with respect to the subject matter hereof and supersede all other understandings, oral or written, with respect to the subject matter hereof.  In the event of a conflict between this Amendment and the Partial Repayment Agreement, the provisions of this Amendment will control.

    c.  <u>Headings</u>.  Section headings in this Amendment are included herein for convenience of reference only and shall not constitute a part of this Amendment for any other purpose.

    d.  <u>Severability</u>.  Wherever possible, each provision of this Amendment shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this Amendment shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Amendment.

    e.  <u>Survival</u>.  Notwithstanding anything contained herein or in the Partial Repayment Agreement, if the Partial Repayment Agreement is terminated in accordance with Section 7 of the Partial Repayment Agreement, no provision of the Partial Repayment Agreement shall survive.

    f.  <u>Counterparts</u>.  This Amendment may be executed in any number of separate original counterparts and by way of electronic signature, each of which shall be deemed to be an original, but all of such counterparts shall together constitute one agreement.  Delivery of an executed counterpart of a signature page to this Amendment by electronic mail in portable document format (.pdf) shall be effective as delivery of a manually executed counterpart of this Amendment. For the avoidance of doubt, the words "execution," "signed," "signature," and words of like import in this Amendment shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

    g.  <u>Expenses</u>.  Without limiting any terms or provisions of the Loan Documents, the DCG Parties agree, jointly and severally, to pay promptly all reasonable and documented costs and expenses incurred by GGC in connection with the

enforcement or protection of GGC's rights under this Amendment, including, without limitation, the reasonable fees, charges, and disbursements of GGC's legal counsel.

h.  Governing Law; Jurisdiction; Waiver of Jury Trial. This Amendment and the rights and obligations of the Parties hereunder shall be governed by, and construed and interpreted in accordance with, the law of the State of New York, without giving effect to the principles of conflict of laws that would require the application of the law of any other jurisdiction. By its execution and delivery of this Amendment, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit, or proceeding against it with respect to any matter under or arising out of or in connection with this Amendment or for recognition or enforcement of any judgment rendered in any such action, suit, or proceeding, may be brought exclusively in the Bankruptcy Court. By execution and delivery of this Amendment, each of the Parties hereby irrevocably accepts and submits itself to the exclusive jurisdiction of the Bankruptcy Court, generally and unconditionally, with respect to any such action, suit or proceeding. EACH PARTY HERETO UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AMENDMENT.

i.  Appointment of Process Agent. DCG hereby agrees that service of process in any such action or proceeding brought in connection with the DCG MLA, DCGI MLA, the Loan Agreements, the Turnover Actions, the Partial Repayment Agreement, or this Amendment, may be made upon it by serving a copy of any relevant pleadings on an agent designated by the DCG Parties (the "Designated Agent"), which shall be irrevocably appointed by the DCG Parties as its agent for service of process in respect of any such action or proceeding. Within two (2) Business Days of the Amendment Effective Date, the DCG Parties shall provide GGC with the identity and address of Designated Agent. The service, as herein provided, of such summons or other legal process in any such action or proceeding on the Designated Agent shall be deemed personal service and accepted by each of the DCG Parties as such, and shall be legal and binding on each of the DCG Parties for all the purposes of any such action or proceeding.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK; SIGNATURE PAGES FOLLOW]

IN WITNESS WHEREOF, the Parties have duly executed this Amendment as of the date first above written.

**DIGITAL CURRENCY GROUP, INC.**

By: _Simon Koster_ _____
DS31B1A8693F40F

    Name:  Simon Koster
    Title:   Chief Strategy Officer

**DCG INTERNATIONAL INVESTMENTS LTD.**

By: _Michael Katz_ _____
B16F21A873E5489

    Name:  Michael Katz
    Title:   Legal Officer

Accepted and agreed as of the date first set forth above.

**HOLDER**:

**GENESIS GLOBAL CAPITAL, LLC**

By:_____
Name:  Ahmed Derar Islim
Title:   Interim CEO

**<u>Exhibit A</u>**
**Control Agreement**

# CONTROL AGREEMENT AND
# ACKNOWLEDGMENT OF PLEDGE AND SECURITY INTEREST

Grantor:                                                    Lender:

TO:        Continental Stock Transfer & Trust Company
           Attn: Michael Mullings
           1 State Street, 30th Floor                                        DATE:
           New York City, NY 10004

## NOTICE TO TRANSFER AGENT

RE:        Security Owner:
           Account Number:
           Description of Security:
           Number of Shares:

DEAR MADAM OR SIR:

This is to notify you that pursuant to a Pledge Agreement signed by _____ (the "Owner(s)"), _____ ("Lender") has been granted a security interest in the above described security or securities (the "Securities"), for which you are the transfer agent. You are hereby notified of Lender's security interest, including the provision that the Securities, including all dividends in stock, stock splits and other proceeds are not to be paid to anyone other than to Lender until and unless you receive further written notice from Lender. Any regular cash dividends may be paid to the Owner(s), subject to further instructions from Lender as provided below. This pledge will remain in full force and effect until Lender notifies you in writing to the contrary. Please acknowledge receipt of this notice by signing and returning the attached control agreement and acknowledgment to Lender. This notice is dated _____.

ACCOUNT OWNER AUTHORIZATION:                          AUTHORIZED OFFICER OF LENDER:

X_____                     X_____
_____ Owner(s) Signature_____                     Authorized signature of Lender

## CONTROL AGREEMENT AND ACKNOWLEDGMENT OF PLEDGE AND SECURITY INTEREST

We acknowledge receipt on _____, 20___ of the above notice of Lender's security interest in the above-described Securities, and we will mark our records, by book-entry or otherwise, to indicate the pledge of, and Lender's security interest in, the Securities. To the best of our knowledge, and except for Lender's security interest or as noted below, and as of the date hereof (a) the Securities are identified on our books and records, by book-entry or otherwise, as being owned by _____; (b) we have identified on our books and records the Securities as being pledged to _____; (c) we have not confirmed any interest in the Securities to any persons other than to the Owner(s) and Lender; (d) our records do not indicate any adverse claims concerning the Securities nor do they indicate any person, other than Owner(s) and Lender, as having any interest in the Securities; (e) we have not created, nor have we received notice of any liens, claims or encumbrances with respect to the Securities, except to Lender; (f) we agree not to effect any transfer of the Owner(s)' interest in any of the Securities without Lender's prior written consent; (g) should we receive further written notice from Lender, we will hold the Securities and all dividends, distributions, and other proceeds relating to the Securities (whether in cash, securities or other property) subject to Lender's written instructions. We will comply with all written instructions originated by Lender concerning the Securities without further consent by the Owner(s) except that any transfer of the Securities will require a medallion guaranteed stock power executed by the Owner(s). It is suggested that the medallion guaranteed stock power is kept with the Pledge documents in case of a default/foreclosure.

Exceptions: _____

_____

## CONTINENTAL STOCK TRANSFER & TRUST COMPANY

X _____    _____
   Authorized Officer (Signature)        Date

**<u>Exhibit B</u>**
**Representation Letter**

Gunderson Dettmer LLP
One Bush Street, Suite 1200
San Francisco, California 94104

**Re: Pledges of Shares of Common Units or Equal, Fractional, Undivided Interests, as applicable (the "Shares") of the Sponsored Entities (as defined below)**

Ladies and Gentlemen:

Digital Currency Group, Inc. and DCG International Investments Ltd. (the "***Shareholders***") which hold shares representing common units of the Grayscale Ethereum Trust and the Grayscale Ethereum Classic Trust (collectively, the "***Sponsored Entities***") propose to pledge (the "***Pledge***s") shares representing common units or equal, fractional, undivided interests, as applicable, of the Sponsored Entities (the "***Pledged Shares***") pursuant to the applicable Partial Repayment Agreements, dated as of September 12, 2023 (as amended, supplemented, or otherwise modified from time to time) and the related Security Agreements as defined therein (collectively, as may be amended, modified or supplemented from time to time, the "***Repayment Documents***") between each Shareholder and Genesis Global Capital, LLC (together with its affiliates, "***Genesis***"). Grayscale Investments, LLC, as the sponsor of the Sponsored Entities (the "***Sponsor***"), has requested an opinion of counsel as a condition to delivering its consent to the Pledges. For the avoidance of doubt "***Pledged Shares***" shall also include any Shares of Grayscale sponsored entities added pursuant to any amendments or supplements to the Security Agreements.

Accordingly, in connection therewith, the undersigned, an authorized signatory of Genesis, represents and warrants to you on behalf of Genesis that:

1.      <u>Investment Representations</u>. Any sale of Pledged Shares in satisfaction of the obligations secured by the Pledges will be (a) pursuant to private transactions for the account of the Shareholders for investment and not be with a view to, or for sale in connection with, any unregistered distribution, resale or public offering of such Pledged Shares or any part thereof in violation of the Securities Act of 1933, as amended (the "***Act***"), (b) pursuant to another exemption from registration under the Act, or (c) pursuant to a registration statement for such transaction that is effective under the Act.. The Pledged Shares were not pledged, and will not be offered or sold, with any form of general advertising or general solicitation. The transfers of the Pledged Shares in connection with any defaults under the Repayment Documents will not violate any law or regulation applicable to Genesis.

2.      <u>Investment Experience</u>: Access to Information. Genesis (a) is an investor familiar with the business and financial condition of the Sponsored Entities, (b) has such knowledge and experience in financial and business matters as to be capable of evaluating the merits and risks of this investment and make an informed decision to so invest, (c) has the ability to bear the economic risks of an investment in the Pledged Shares, (d) has received such disclosure regarding the

Sponsored Entities, their business, financial condition and prospects as the undersigned has determined to be necessary in connection with the Pledges and the acquisition of the Pledged Shares in the event of foreclosure of the Pledged Shares, and (e) is an "accredited investor" as that term is defined under Rule 501(a) under Regulation D under the Act (the provisions of which are known to the undersigned).

3.      Restrictions on Transfer. The undersigned understands that (a) in the event of any defaults under the Repayment Documents, Genesis would cause the Shareholders to sell the Pledged Shares in transactions that are exempt from registration under the Act, or the securities laws of any state; (b) the Pledged Shares are and will be "restricted securities" as such term is defined in Rule 144 of the Act; (c) the Pledged Shares may not be sold, pledged or otherwise transferred unless a registration statement for such transaction is effective under the Act and any applicable state securities laws, or unless exemptions from such registration provisions are available with respect to such transactions; and (d) the certificates or book-entry positions for the Pledged Shares will bear a legend to the effect that their transfer is subject to the provisions of the Act and that no such transfer is permitted except pursuant to an exemption from registration under the Act, accompanied by an opinion of legal counsel that such sale qualifies for an exemption from registration.

4.      The representations and warranties set forth herein shall terminate and shall be of no further effect at such time as, and to the extent, the Pledged Shares become eligible for resale pursuant to Rule 144 under the Act.

5.      The undersigned hereby agrees and acknowledges that the representations and warranties set forth herein may and will be relied upon by Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP for the purpose of rendering the legal opinion to the Sponsor with respect to the Pledges of the Pledged Shares.

This letter shall serve as our standing representation letter to you in connection with the Pledges and you need not require further letters from us to deliver such opinion of counsel.  We undertake to notify you immediately of any occurrence that would render any of the foregoing inaccurate.

Sincerely yours,

**GENESIS GLOBAL CAPITAL, LLC**

By:_____

Name:

Title:

## **Annex A**
**DCG Stipulated Order and Judgment**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |
| Genesis Global Capital, LLC, | Adv. Pro. No. 23-01168 (SHL) |
| Plaintiff, | |
| v. | |
| Digital Currency Group, Inc. | |
| Defendant. | |

**STIPULATED ORDER AND JUDGMENT REGARDING
LIABILITY OF DCG UNDER MASTER LENDING AGREEMENT**

Upon the submission by Genesis Global Capital, LLC ("GGC") and Digital Currency

Group, Inc. ("DCG") of this stipulated order, and the Court having jurisdiction over this matter

pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the

United States District Court for the Southern District of New York dated January 31, 2012; and

the parties having stipulated to the jurisdiction and venue of this Court for entry of a final

judgment in this matter; and the Court having found that adequate notice of this stipulated order

and notice has been provided; and the Court having found that it may enter a final order

consistent with Article III of the United States Constitution; and the Court having determined

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

that the legal and factual bases set forth herein establish just cause for the relief herein granted; and upon all of the proceedings had before the Court, and after due deliberation and sufficient cause appearing therefor,

### THE COURT HEREBY FINDS THAT

A. As of the date of execution of that certain Amendment to Partial Repayment Agreement (such agreement attached hereto as **Exhibit 1** and such Amendment attached hereto as **Exhibit 2**),[2] certain specified Events of Default under that certain Amended and Restated Master Loan Agreement (the "DCG MLA"), dated as of November 10, 2022, by and between Genesis Global Capital, LLC ("GGC"), as Lender, and DCG, as Borrower, had occurred and were continuing, including the failure of DCG to return any and all amounts outstanding under the loans extended pursuant to the DCG MLA (such loans, the "DCG Loans").

B. GGC has asserted that certain amounts are due and owing under the DCG Loans, including Late Fees under section III(c) of the DCG MLA and enforcement costs pursuant to section XII of the DCG MLA, which DCG disputes (the "Disputed Amounts").

C. As of November 28, 2023, the aggregate outstanding principal amount of the DCG Loans that is immediately due and owing to GGC is $324,500,000 (the "DCG Judgment Amount").

D. GGC and DCG have agreed that DCG's rights, if any, to seek a reimbursement from GGC or any other person or entity or a declaratory judgment or enforcement of its setoff

---

[2] Capitalized terms not otherwise defined herein shall have the meanings given to them in the Partial Repayment Agreement and the Amendment.

rights against GGC or any other person or entity on account of the Luno Setoff Dispute (as defined below) or a claim for payment against GGC or any other person or entity of the amounts paid by DCG to Luno Australia Pty Ltd. on behalf of GGC on November 16, 2022, as identified in that certain *Notice of Setoff*, dated December 15, 2022, in connection with that certain Limited Guaranty between DCG and Luno, and any interest accrued on the setoff amount that has been paid by DCG to GGC (the "<u>Luno Setoff Dispute</u>"), or (ii) GGC's rights or defenses with respect to the foregoing, shall remain unaffected notwithstanding the DCG Judgment Amount.

**IT IS HEREBY ORDERED THAT**

1. GGC is awarded a judgment against DCG for the DCG Judgment Amount, as reduced by any amounts that have been and are paid to GGC in respect of the DCG Loans as set forth in the Amendment.

2. Nothing in this Order shall affect the Parties' rights with respect to the Disputed Amounts or any amounts at issue under the DCG Loans in addition to the DCG Judgment Amount.

3. Nothing in this Order shall affect DCG's or GGC's rights with respect to the Luno Setoff Dispute.

4. Notwithstanding anything to the contrary in this Order or in the Amendment, this Order shall be effective and enforceable only upon the Court's entry of an order approving the Debtors' entry into the Amendment in its entirety; provided, further, that if the Court denies the Debtors' request to enter into the Amendment in its entirety, this Order shall be deemed automatically withdrawn and null and void effective immediately.

5. This Order shall be binding on each of the Parties and their respective successors and permitted assigns.

6. This Court shall retain jurisdiction to, among other things, interpret, implement, and

enforce the terms and provisions of this Order.

DIGITAL CURRENCY GROUP, INC.          GENESIS GLOBAL CAPITAL, LLC

By: _____          By:_____
Name:                                  Name:    A. Derar Islim
Title:                                 Title:    Interim CEO

Dated: _____, 2023          _____
        White Plains, New York         The Honorable Sean H. Lane
                                        United States Bankruptcy Judge

6. This Court shall retain jurisdiction to, among other things, interpret, implement, and

enforce the terms and provisions of this Order.


DIGITAL CURRENCY GROUP, INC.          GENESIS GLOBAL CAPITAL, LLC

By: _Simon Koster_____       By:_____
Name: Simon Koster                    Name:
Title:   Chief Strategy Officer        Title:


Dated: _____, 2023          _____
        White Plains, New York         The Honorable Sean H. Lane
                                        United States Bankruptcy Judge

**<u>Annex B</u>**
**DCGI Stipulated Order and Judgment**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[3] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |
| | |
| Genesis Global Capital, LLC, | Adv. Pro. No. 23-01169 (SHL) |
| Plaintiff, | |
| v. | |
| DCG International Investments Ltd. | |
| Defendant. | |

**STIPULATED ORDER AND JUDGMENT REGARDING**
**LIABILITY OF DCGI UNDER MASTER LENDING AGREEMENT**

Upon the submission by Genesis Global Capital, LLC ("GGC") and DCG International

Investments Ltd. ("DCGI") of this stipulated order, and the Court having jurisdiction over this

matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference*

from the United States District Court for the Southern District of New York dated January 31,

2012; and the parties having stipulated to the jurisdiction and venue of this Court for entry of a

final judgment in this matter; and the Court having found that it may enter a final order

consistent with Article III of the United States Constitution; and the Court having found that

adequate notice of this stipulated order and notice has been provided; and the Court having

---

[3]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (or equivalent identifier), are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R).  For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

determined that the legal and factual bases set forth herein establish just cause for the relief

herein granted; and upon all of the proceedings had before the Court, and after due deliberation

and sufficient cause appearing therefor,

**THE COURT HEREBY FINDS THAT**

A.  As of the date of execution of that certain Amendment to Partial Repayment Agreement

(such agreement attached hereto as **Exhibit 1** and such Amendment attached hereto as

**Exhibit 2**),[4] certain specified Events of Default under that certain Master Loan

Agreement (the "DCGI MLA"), dated as of June 21, 2019, by and between Genesis

Global Capital, LLC ("GGC"), as Lender, and DCGI, as Borrower, had occurred and

were continuing, including the failure of DCGI to return any and all amounts outstanding

under the loans extended pursuant to the DCGI MLA (such loans, the "DCGI Loans").

B.  GGC has asserted that certain amounts are due and owing under the DCGI Loans,

including enforcement costs pursuant to section XII of the DCG MLA, which DCG

disputes (the "Disputed Amounts").

C.  As of November 28, 2023, the aggregate outstanding principal amount of the DCGI

Loans that is immediately due and owing to GGC is 2,737.77102141 BTC and 14,048

BCH, and the total outstanding amount of Late Fees under the DCGI MLA is

10.12600241 BTC (such amounts collectively, the "DCGI Judgment Amount").

**IT IS HEREBY ORDERED THAT**

1.  GGC is awarded a judgment against DCGI for the DCGI Judgment Amount, as reduced

by any amounts that are paid to GGC in respect of the DCGI Loans as set forth in the

---

[4]    Capitalized terms not otherwise defined herein shall have the meanings given to them in the Partial
Repayment Agreement and the Amendment.

Amendment.  For the avoidance of doubt, the DCGI Judgment Amount is denominated, and shall be paid, in BTC and BCH.

2. Nothing in this Order shall affect the Parties' rights with respect to the Disputed Amounts or any amounts at issue under the DCGI Loans in addition to the DCGI Judgment Amount.

3. Notwithstanding anything to the contrary in this Order or in the Amendment, this Order shall be effective and enforceable only upon the Court's entry of an order approving the Debtors' entry into the Amendment in its entirety; provided, further, that if the Court denies the Debtors' request to enter into the Amendment in its entirety, this Order shall be deemed automatically withdrawn and null and void effective immediately.

4. This Order shall be binding on each of the Parties and their respective successors and permitted assigns.

5. This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order.


DCG INTERNATIONAL INVESTMENTS
LTD.

By: _____
Name:
Title:

GENESIS GLOBAL CAPITAL, LLC

By:_____
Name:   A. Derar Islim
Title:   Interim CEO


Dated: _____, 2023
        White Plains, New York

_____
The Honorable Sean H. Lane
United States Bankruptcy Judge

Amendment.  For the avoidance of doubt, the DCGI Judgment Amount is denominated, and shall be paid, in BTC and BCH.

2. Nothing in this Order shall affect the Parties' rights with respect to the Disputed Amounts or any amounts at issue under the DCGI Loans in addition to the DCGI Judgment Amount.

3. Notwithstanding anything to the contrary in this Order or in the Amendment, this Order shall be effective and enforceable only upon the Court's entry of an order approving the Debtors' entry into the Amendment in its entirety; provided, further, that if the Court denies the Debtors' request to enter into the Amendment in its entirety, this Order shall be deemed automatically withdrawn and null and void effective immediately.

4. This Order shall be binding on each of the Parties and their respective successors and permitted assigns.

5. This Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order.


DCG INTERNATIONAL
INVESTMENTS LTD.

By: _____
Name: Michael Katz
Title:  Legal Officer


GENESIS GLOBAL CAPITAL, LLC

By:_____
Name:
Title:


Dated: _____, 2023
          White Plains, New York

_____
The Honorable Sean H. Lane
United States Bankruptcy Judge

**Exhibit C to DCG Statement**

**Voluntary Transfer Notice**

DocuSign Envelope ID: 67A0E89D-C194-405E-B751-D98B0999BD53

**To:**    **Genesis Global Capital, LLC**    December 28, 2023
175 Greenwich Street, Floor 38
New York, NY 10007

**RE: Voluntary Transfer Notice**

To whom it may concern:

Reference is made to that certain Amendment to Partial Repayment Agreement, dated as of November 28, 2023 (the "**Amendment**"), and that certain Partial Repayment Agreement (the "**Original Partial Repayment Agreement**" and the Original Partial Repayment Agreement as amended by the Amendment, the "**Partial Repayment Agreement**"), between Genesis Global Capital, LLC ("**GGC**"), Digital Currency Group, Inc. ("**DCG**"), and DCG International Investments Ltd. ("**DCGI**," together with DCG, the "**DCG Parties**," and collectively with GGC, the "**Parties**").  Further reference is made to that certain Security Agreement, dated as of November 28, 2023, by and between DCG and GGC (the "**DCG Security Agreement**), and that certain Security Agreement dated as of November 28, 2023, by and between DCGI and GGC (the "**DCGI Security Agreement**" together with the DCG Security Agreement, the "**Security Agreements**"). Capitalized terms used and not otherwise defined herein shall have the meanings assigned to such terms in the Partial Repayment Agreement and the Security Agreements.

Pursuant to Section 4 of the Amendment, and Section 8 of the Security Agreements, the DCG Parties hereby notify GGC that as of the date hereof (the "**Voluntary Payment Notice Date**"):

i.    DCGI is exercising its right to convey to GGC all of its right, title, and interest in the following Collateral Shares pledged to GGC under the DCGI Security Agreement: 1,422,175 shares of Grayscale Ethereum Classic Trust ("**ETCG**") and 4,830,343 shares of Grayscale Ethereum Trust ("**ETHE**") (the "**DCGI Voluntary Payment**").

ii.    DCG is exercising its right to convey to GGC all of its right, title, and interest in the following Collateral Shares pledged to GGC under the DCG Security Agreement: 1,548,717 shares of ETCG and 37,917 shares of ETHE (the "**DCG Voluntary Payment**", together with the DCGI Voluntary Payment, the "**Voluntary Payments**").

Pursuant to Section 3 of the Amendment, and Section 8 of the DCG Security Agreement, the value of the DCG Voluntary Payment will be applied as follows:

a)    First, to the Outstanding Undisputed Amounts under DCG's February 23 Loan, until such Outstanding Undisputed Amounts under DCG's February 23 Loan are fully repaid and satisfied in full; and

b)    Second, to the Outstanding Undisputed Amounts under DCG's May 9 Loan.

Pursuant to Section 3 of the Amendment, and Section 8 of the DCGI Security Agreement, the value of the DCGI Voluntary Payment will be applied as follows:

a)    First, to the Outstanding Undisputed Amounts under the DCGI MLA, until such Outstanding Undisputed Amounts under the DCGI MLA are fully repaid and satisfied in full; and

b)    Second, to the Outstanding Undisputed Amounts under DCG's May 9 Loan.

In accordance with Section 4 of the Amendment and Section 8 of the Security Agreements, the ETCG Collateral and ETHE Collateral transferred to GGC in the Voluntary Payments shall be valued as of 8:00 p.m. Eastern Time on the

date hereof.  Upon application of the ETCG Collateral and ETHE Collateral to satisfy the DCG Parties' obligations as set forth herein, please confirm the Outstanding Undisputed Amounts GGC believes remain due and owing to GGC.

Upon receipt of this Voluntary Transfer Notice, GGC should immediately notify and instruct Continental Stock Transfer & Trust Company to transfer the Collateral identified in this Voluntary Transfer Notice to GGC.

The DCG Parties reserve all rights with respect to the application of the Voluntary Payments in accordance with the Amendment, the Original Partial Repayment Agreement, and the Security Agreements.

Yours faithfully,

**Digital Currency Group, Inc.**

DocuSigned by:

*Simon Koster*

D531B1AB693F40F...

Name: Simon Koster
Title: Chief Strategy Officer

**DCG International Investments Ltd.**

DocuSigned by:

*Michael Katz*

B16F21A673E5489...

Name: Michael Katz
Title: Legal Officer

## **Exhibit D to DCG Statement**

**Jan 5 Letter**

# Genesis

January 5, 2024

<u>VIA EMAIL</u>

Digital Currency Group, Inc.
290 Harbor Drive, 5th Floor
Stamford, CT 06902
Attn:   Jeffrey Saferstein, jeffrey.saferstein@weil.com
        Jessica Liou, jessica.liou@weil.com

DCG International Investments Ltd.
Century House, 16 Par-la-Ville Road
Pembroke, HM 08, Hamilton, Bermuda

Re:     Voluntary Transfer of ETCG and ETHE Shares
        in Connection with Partial Repayment Agreement

Dear Sirs:

Reference is made to the Voluntary Transfer Notice sent by Digital Currency Group, Inc. ("<u>DCG</u>") and DCG International Investments Ltd. ("<u>DCGI</u>," together with DCG, the "<u>DCG Parties</u>," and the DCG Parties, together with GGC, the "<u>Parties</u>") to Genesis Global Capital, LLC ("GGC"), dated December 28, 2023 (the "<u>Voluntary Transfer Notice</u>").

As you know, GGC, DCG, and DCGI have entered into the following agreements:[1]

i.      Partial Repayment Amendment between the Parties, dated September 12, 2023 (the "<u>Original PRA</u>");

ii.     Amendment to Partial Repayment Agreement between the Parties, dated November 28, 2023 (the "<u>PRA Amendment</u>," and collectively with the Original PRA, the "<u>PRA</u>");

iii.    Security Agreement between GGC and DCG, dated November 28, 2023 (the "<u>DCG Security Agreement</u>");

iv.     Security Agreement between GGC and DCGI, dated November 28, 2023 (the "<u>DCGI Security Agreement</u>," collectively with the DCG Security Agreement, the "<u>Security Agreements</u>," and the Security Agreements collectively with the PRA, the "<u>Agreements</u>");

---

[1]     Capitalized terms used herein but not defined shall have the meaning ascribed to them in the PRA.

Digital Currency Group, Inc., p. 2
DCG International Investments, Ltd., p. 2

v.    Amended and Restated Master Loan Agreement between GGC and DCG, dated November 10, 2022 (the "DCG MLA"); and

vi.    Master Loan Agreement between GGC and DCGI, dated June 21, 2019 (the "DCGI MLA," and collectively with the DCG MLA, the "MLAs").

In the Voluntary Transfer Notice, the DCG Parties requested that GGC "confirm the Outstanding Undisputed Amounts GGC believes remain due and owing to GGC." However, nothing in the Agreements requires GGC to provide such information or alters the obligation of the DCG Parties, pursuant to the MLAs, to repay Outstanding Undisputed Amounts incurred pursuant to the DCG Loans and DCGI Loans in the same asset type as required in accordance with the original loans. Specifically, pursuant to the MLAs, all Outstanding Undisputed Amounts must be repaid in the asset type of the original loan, including, without limitation, U.S. dollars with respect to the DCG Loans and Digital Assets with respect to the DCGI Loans.

In light of the foregoing, GGC intends to notify the DCG Parties of the remaining Outstanding Undisputed Amounts upon the conversion of the Voluntary Payments (as defined in the Voluntary Transfer Notice) into the asset types denominating the Outstanding Undisputed Amounts. GGC will also notify the DCG Parties of all transaction costs incurred in connection with such conversions, which shall be included in amounts due and payable to GGC in accordance with Sections III and XII of the MLAs. Pending such notification, GGC agrees that Loan Fees and Late Fees (as applicable) due pursuant to the DCG Loans and DCGI Loans as of and following the Voluntary Transfer Notice may be calculated as if the DCG Loans and DCGI Loans had been paid as requested in the Voluntary Transfer Notice, using the price of ETCG and ETHE as of 8:00 p.m. Eastern Time on the date of the Voluntary Transfer Notice, subject to appropriate true-ups and adjustments following conversion (which true-ups and adjustments will include conversion and other transaction costs).

GGC reserves the right, at any time and without notice, to exercise any rights, powers or privileges and/or remedies it has and/or to which it is entitled in accordance with the Agreements and MLAs, including, without limitation, all rights and remedies under Sections IX and XII of the MLAs. As of the time of this letter, GGC has not exercised all of its rights and remedies; however, neither such non-exercise nor anything in this letter shall be construed or constitute a waiver of any kind by GGC of any rights or remedies under the Agreements, MLAs, or applicable law. No acceptance by GGC of performance from DCG or DCGI, or performance by GGC to DCG or DCGI, under the Agreements or MLAs (including, without limitation, the entry into any transactions under, or amendments, supplements, or modifications to, any agreement or otherwise), shall constitute a waiver by GGC of any of its rights or remedies. Furthermore, any accommodation made by GGC with respect to any contractual obligations of DCG or DCGI under the Agreements or MLAs or otherwise shall neither constitute a waiver by GGC of any of its rights or remedies nor constitute a commitment to continue such accommodation or provide any other accommodation to DCG or DCGI. Nothing herein shall serve as an acceptance or admission of any instruction or communication received from DCG or DCGI.

Nothing herein or in any correspondence with DCG or DCGI shall prejudice GGC's right to exercise any rights, remedies or powers or to assert any claims, causes of action, or defenses now or hereafter available under the MLAs, any instruments or agreements referred to therein

Digital Currency Group, Inc., p. 3
DCG International Investments, Ltd., p. 3

and/or applicable law, all of which rights, remedies, powers, claims and causes of action are cumulative and all of which are hereby specifically reserved. Further, GGC reserves the right to identify other Events of Default that have already occurred or shall occur.


Sincerely,

GENESIS GLOBAL CAPITAL LLC

## **Exhibit E to DCG Statement**

**Payoff Notice**

DocuSign Envelope ID: 66AEE125-5966-4E50-BE63-01BCED300B79

January 5, 2024

**To:**    **Genesis Global Capital, LLC**
250 Park Avenue South, 5th Floor,
New York, NY 10003

*Re: Payoff Notice*

Ladies and Gentlemen:

Reference is made to (i) the Amended and Restated Master Loan Agreement, dated as of November 10, 2022 (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "DCG MLA"), between Digital Currency Group, Inc., a Delaware corporation ("DCG"), as borrower, and Genesis Global Capital, LLC, a Delaware limited liability company (the "GGC"), as lender, and each of the loans made thereunder prior to the date hereof, including those described on Schedule I hereto under the heading "DCG Loans" (all such loans, collectively, the "DCG Loans"), (ii) the Master Loan Agreement, dated as of June 21, 2019 (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "DCGI MLA" and, together with the DCG MLA, collectively, the "MLAs" and each an "MLA"), between DCG International Investments Ltd. ("DCGI" and, together with DCG, collectively, the "Borrowers" and each a "Borrower"), as borrower, and GGC, as lender, and each of the loans made thereunder prior to the date hereof, including those described on Schedule I hereto under the heading "DCGI Loans" (all such loans, collectively, the "DCGI Loans" and, together with the DCG Loans, collectively, the "Loans" and each a "Loan"), (iii) the Partial Repayment Agreement, dated as of September 12, 2023 (as amended by the Amendment to Partial Repayment Agreement, dated as of November 28, 2023 (the "PRA Amendment," and as otherwise amended, restated, supplemented or otherwise modified prior to the date hereof, the "PRA"), (iv) the Security Agreement, dated as of November 28, 2023 (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "DCG Security Agreement"), made by DCG in favor of GGC, and (v) the Security Agreement, dated as of November 28, 2023 (as amended, restated, supplemented or otherwise modified prior to the date hereof, the "DCGI Security Agreement" and, together with the DCG Security Agreement, collectively, the "Security Agreements" and each a "Security Agreement"), made by DCGI in favor of GGC.  The Security Agreements, together with the MLAs, each loan term sheet evidencing the Loans, any other document executed and delivered by DCG and/or DCGI in respect of any Loan, any MLA or any Security Agreement, and all other instruments, agreements and other documents related to the foregoing shall be referred to herein as, collectively, the "Loan Documents".  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed thereto in the PRA.

In accordance with Section 13 of the PRA Amendment, on January 5, 2024 (the "Payoff Date"), the Borrowers paid, in full, all of their respective obligations under the Loan Documents (except for the Disputed Amounts (as defined in the PRA Amendment)). After giving effect to all prior repayments of the Loans and other obligations of DCG under the DCG MLA and DCGI under the DCGI MLA, including, without limitation, the Voluntary Payment (as defined in the PRA Amendment and the DCG Security Agreement) made by DCG on December 28, 2023, and the Voluntary Payment (as defined in the PRA Amendment and the DCGI Security Agreement) made by DCGI on December 28, 2023, DCG paid the total amount remaining under the Loan Documents (other than the Disputed Amounts) in the amount of $189,710,410.79 (the "Payoff Amount"), comprising $189,489,046.05 of principal of Loans outstanding under the DCG MLA (as agreed between the Borrowers and GGC) and $221,364.74 of accrued and unpaid interest thereon as of the Payoff Date.

DocuSign Envelope ID: 66AEE125-5966-4E50-BE63-01BCED300B79

Effective immediately and without further action by GGC or any other person: (a) the Loans and all other obligations, guaranties, liabilities and indebtedness (including, without limitation, for all principal, interest and fees of), and all other amounts owing by, the Borrowers (or either of them) relating to the Loan Documents (the foregoing, collectively, the "Loan Obligations"), in each case, other than (x) the Disputed Amounts and (y) any obligations that, by their express terms, survive payment in full of the Loans and termination of the Loan Documents (clauses (x) and (y), collectively, the "Excluded Obligations"), shall be deemed paid and satisfied in full and shall be irrevocably released, terminated and discharged, and DCG and DCGI shall be irrevocably released from all Loan Obligations (other than any Excluded Obligations); (b) the PRA (as amended by the PRA Amendment) shall be terminated as to each of DCG and DCGI pursuant to Section 13 of the PRA Amendment; (c) all of the other Loan Documents shall be terminated and be of no further force or effect (in each case, other than any provisions therein that, by their express terms, (x) govern or evidence the Disputed Amounts or (y) survive payment in full of the Loans and termination of the Loan Documents); and (d) all security interests, pledges and other liens or similar encumbrances granted to or held by GGC in any property or assets of DCG, DCGI or any other person as security for the Loan Obligations or otherwise arising under any Security Agreement or any other Loan Document (including, without limitation, any liens and security interests evidenced by Uniform Commercial Code financing statements) shall be irrevocably released, discharged and terminated.

The Borrowers reserve all rights with respect to (i) the approximately $52.5 million (the "Luno Setoff Amount") DCG paid to Luno Australia Pty Ltd ("Luno") pursuant that certain *Notice of Setoff*, dated December 15, 2022, in connection with that certain *Limited Guaranty*, between DCG and Luno, and any interest accrued on the Luno Setoff Amount that has been paid by DCG to GGC; (ii) the Disputed Amounts; and (iii) all other claims DCG and/or DCGI may have against GGC (including, without limitation, those claims described in the proof of claim filings made by DCG and DCGI against GGC and its affiliated debtors in their respective chapter 11 bankruptcy proceedings).

[*Remainder of page intentionally left blank*]

Very truly yours,

**Digital Currency Group, Inc.**

By: _____

Name:  Simon Koster

Title:   Chief Strategy Officer

**DCG International Investments Ltd.**

By: _____

Name:  Michael Katz

Title:   Legal Officer

DocuSign Envelope ID: 66AEE425-5966-4E50-BF63-01BCED300B79

**Schedule I**

Loans

DCG Loans

1.  That certain loan dated January 24, 2022, as amended by the Loan Term Sheet dated as of November 10, 2022, with an original principal amount equal to $100,000,000.

2.  That certain loan dated February 23, 2022, as amended by the Loan Term Sheet dated as of November 10, 2022, with an original principal amount equal to $100,000,000.

3.  That certain loan dated May 9, 2022, with an original principal amount equal to $200,000,000.

4.  That certain loan dated May 10, 2022, with an original principal amount equal to $100,000,000.

DCGI Loans

1.  That certain loan dated June 22, 2022, as amended by the Loan Term Sheet dated as of November 10, 2022, with a principal amount equal to 4,550.45173345 BTC.

2.  That certain term loan dated September 21, 2020, and that certain term loan dated December 21, 2020 with a cumulative principal amount equal to 14,048 BCH.

**Exhibit F to DCG Statement**

**Jan 8 Letter**

# **Genesis**

January 8, 2024

<u>VIA EMAIL</u>

Digital Currency Group, Inc.
290 Harbor Drive, 5th Floor
Stamford, CT 06902
Attn:   Jeffrey Saferstein, jeffrey.saferstein@weil.com
        Jessica Liou, jessica.liou@weil.com

DCG International Investments Ltd.
Century House, 16 Par-la-Ville Road
Pembroke, HM 08, Hamilton, Bermuda

            Re:    Payoff Notice

Dear Sirs:

Reference is made to (i) the Payoff Notice sent by Digital Currency Group, Inc. ("<u>DCG</u>") and DCG International Investments Ltd. ("<u>DCGI</u>," together with DCG, the "<u>DCG Parties</u>") to Genesis Global Capital, LLC ("<u>GGC</u>" and, together with the DCG Parties, the "<u>Parties</u>"), dated January 5, 2024 (the "<u>Payoff Notice</u>"), (ii) the Voluntary Transfer Notice sent by DCG and DCGI to GGC dated December 28, 2023 and the (iii) Letter Response sent by GGC to DCG and DCGI dated January 5, 2024 (the "<u>January 5 Letter</u>").[1]

In the Payoff Notice, the DCG Parties purport to have paid off in full "all of their respective obligations under the Loan Documents (except for the Disputed Amounts (as defined in the PRA Amendment))" and applied the Voluntary Payments (as defined in the Voluntary Transfer Notice) to reduce the outstanding principal balance under the DCG Loans and the DCGI Loans.  On the same day as the Payoff Notice, DCG published a statement on the social media platform X (formerly known as Twitter), stating that "DCG is pleased to announce that we have completed a payoff of all short-term loans from Genesis."

However, as noted in GGC's January 5 Letter, GGC disputes that the Voluntary Payments serve to reduce the principal amounts outstanding under the DCG Loans and DCGI Loans. Nothing in the Agreements (as defined in the January 5 Letter) alters the obligation of the DCG Parties, pursuant to the MLAs, to repay Outstanding Undisputed Amounts incurred pursuant to the DCG Loans and DCGI Loans in the same asset type as required in accordance with the original loans.  Specifically, pursuant to the MLAs, all the Outstanding Undisputed Amounts must be repaid in the asset type of the original loan, including without limitation, U.S. dollars with respect

---

[1]        Capitalized terms used herein but not defined shall have the meaning ascribed to them in the Payoff Notice, the January 5 Letter or the Partial Repayment Agreement, as applicable.

Digital Currency Group, Inc., p. 2
DCG International Investments, Ltd., p. 2

to the DCG Loans and Digital Assets with respect to the DCGI Loans. Moreover, as stated in the January 5 Letter, the DCG Parties remain obligated to pay all transaction or conversion costs in connection with the Voluntary Payments, which are payable in accordance with Sections III and XII of the MLAs. Lastly, the DCG Parties also remain obligated to pay Late Fees owed under the DCG Loans (estimated at more than $27 million as of December 31, 2023) and enforcement costs (estimated at more than $1 million) pursuant to sections XII of the MLAs.

GGC intends to notify the DCG Parties of the remaining Outstanding Undisputed Amounts upon the conversion of the Voluntary Payments (as defined in the Voluntary Transfer Notice) into the asset types denominating the Outstanding Undisputed Amounts. GGC will also notify the DCG Parties of all transaction costs incurred in connection with such conversions, which shall be included in amounts due and payable to GGC in accordance with Sections III and XII of the MLAs. GGC also intends to notify the DCG Parties of any appropriate true-ups and adjustments following conversion (which true-ups and adjustments will include conversion and other transaction costs).

GGC reserves the right, at any time and without notice, to exercise any rights, powers or privileges and/or remedies it has and/or to which it is entitled in accordance with the Agreements and MLAs, including, without limitation, all rights and remedies under Sections IX and XII of the MLAs. As of the time of this letter, GGC has not exercised all of its rights and remedies; however, neither such non-exercise nor anything in this letter shall be construed or constitute a waiver of any kind by GGC of any rights or remedies under the Agreements, MLAs, or applicable law. No acceptance by GGC of performance from DCG or DCGI, or performance by GGC to DCG or DCGI, under the Agreements or MLAs (including, without limitation, the entry into any transactions under, or amendments, supplements, or modifications to, any agreement or otherwise), shall constitute a waiver by GGC of any of its rights or remedies. Furthermore, any accommodation made by GGC with respect to any contractual obligations of DCG or DCGI under the Agreements or MLAs or otherwise shall neither constitute a waiver by GGC of any of its rights or remedies nor constitute a commitment to continue such accommodation or provide any other accommodation to DCG or DCGI. Nothing herein shall serve as an acceptance or admission of any instruction or communication received from DCG or DCGI.

Nothing herein or in any correspondence with DCG or DCGI shall prejudice GGC's right to exercise any rights, remedies or powers or to assert any claims, causes of action, or defenses now or hereafter available under the MLAs, any instruments or agreements referred to therein and/or applicable law, all of which rights, remedies, powers, claims and causes of action are cumulative and all of which are hereby specifically reserved. Further, GGC reserves the right to identify other Events of Default that have already occurred or shall occur.

Sincerely,

GENESIS GLOBAL CAPITAL LLC