Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 23-10063-shl

4    Adv. Case No. 23-01192-shl

5    - - - - - - - - - - - - - - - - - - - - - - - - - - - x

6    In the Matter of:

7

8    GENESIS GLOBAL HOLDCO, LLC,

9

10            Debtor.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

12   GEMINI TRUST COMPANY, LLC,

13               Plaintiff,

14         v.

15   GENESIS GLOBAL CAPITAL, LLC et al.,

16               Defendants.

17   - - - - - - - - - - - - - - - - - - - - - - - - - - - x

18

19               United States Bankruptcy Court

20               300 Quarropas Street, Room 248

21               White Plains, NY 10601

22

23               January 18, 2024

24               10:12 AM

25

Page 2

1  B E F O R E :

2  HON SEAN H. LANE

3  U.S. BANKRUPTCY JUDGE

4

5  ECRO:  ANA VARGAS

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    HEARING re Omnibus Hearing

2

3    HEARING re Doc. #1161 Notice of Agenda

4

5    HEARING re Discovery Conference Requested By Attorney Eric

6    Medina

7

8    HEARING re Doc. #1104 Motion To Approve Compromise/ Debtor's

9    Motion For Entry Of An Order Approving A Settlement

10    Agreement By And Among Genesis Global Capital And

11    Moonalpha Financial Service Limited

12

13    HEARING re Doc. #995 [REDACTED] Debtor's Fourth Omnibus

14    Objection To Certain Claims

15    (Duplicate, Amended, No Liability) (Non-Substantive)

16

17    HEARING re Doc. #1058 [REDACTED] Debtor's Fifteenth Omnibus

18    Objection To Certain Claims

19    (Non-Substantive) (Duplicate)

20

21    HEARING re Doc. #1059 [REDACTED] Debtor's Sixteenth Omnibus

22    Objection To Certain Claims

23    (Non-Substantive) (No Liability)

24

25

Page 4

1    HEARING re Doc. #1060 [REDACTED] Debtor's Seventeenth

2    Omnibus Objection To Certain

3    Claims (Non-Substantive)(No Liability)

4

5    HEARING re Adversary proceeding: 23-01 192-shl Gemini Trust

6    Company, LLC v. Genesis Global Capital, LLC et al

7    ***In Person Hearing For Adversary 23-1192***

8

9    HEARING re Adversary proceeding: 23-01192-shl Gemini Trust

10   Company, LLC v. Genesis Global Capital, LLC et al

11   ***In Person Hearing***Doc. #13 Scheduling And Pre-Trial

12   Order

13

14   HEARING re Adversary proceeding: 23-01192-shl Gemini Trust

15   Company, LLC v. Genesis Global Capital, LLC et al

16   In Person Hearing***Doc. #9 Motion To Dismiss Counts II,

17   III, and IV of The Complaint

18

19   HEARING re Adversary proceeding: 23-01192-shl Gemini Trust

20   Company, LLC v. Genesis Global Capital, LLC et al

21   ***In Person Hearing***Doc. #15 Motion To Dismiss Adversary

22   Proceeding / Gemini Trust Company, LLC's Motion To Dismiss

23   Counterclaims IV And VI In Their Entirety And Counterclaim

24   VII Insofar As It Pertains To The Additional Collateral

25

1    HEARING re Adversary proceeding: 23-01192-shl Gemini Trust

2    Company, LLC v. Genesis Global Capital, LLC et al

3    ***In Person Hearing***Doc. #16 Memorandum Of Law In Support

4    Of Gemini Trust Company, LLC's Motion To Dismiss

5    Counterclaims IV And VI In Their Entirety And Counterclaim

6    VII Insofar As It Pertains To The Additional Collateral

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 6

1   A P P E A R A N C E S :

2

3   WILLKIE FARR & GALLAGHER LLP

4        Attorneys for Gemini Trust Company

5        787 Seventh Avenue

6        New York, NY 10019

7

8   BY:  DONALD BURKE

9

10   HUGHES HUBBARD & REED LLP

11        Attorneys for Gemini Trust Company

12        One Battery Park Plaza

13        New York, NY 10004

14

15   BY:  CARL W. MILLS

16

17   WHITE & CASE LLP

18        Attorneys for the Unsecured Creditors Committee

19        1221 Avenue of the Americas

20        New York, NY 10020

21

22   BY:  J. CHRISTOPHER SHORE

23        COLIN WEST

24

25

Page 7

```
 1   CLEARY GOTTLIEB STEEN & HAMILTON LLP
 2        Attorneys for Genesis Debtors
 3        One Liberty Plaza
 4        New York, NY 10006
 5
 6   BY:  JACK MASSEY
 7        LUKE A. BAREFOOT
 8        BRAD LENOX
 9        DEANDRA FIKE
10        HOO RI KIM (TELEPHONICALLY)
11        JANE VANLARE (TELEPHONICALLYH)
12
13   BAIRD HOLM LLP
14        Attorneys for Digital Finance Group
15        1700 Faman Street, Suite 1500
16        Omaha, NE 68102
17
18   BY:  JEREMY C. HOLLEMBEAK
19
20   MEDINA LAW FIRM LLC
21        Attorneys for BAO Family Holdings
22        641 Lexington Avenue, 13th Floor
23        New York, NY 10022
24
25   BY:  ERIC S. MEDINA (TELEPHONICALLY)
```

Page 8

1    ALVAREZ AND MARSAL

2         Attorneys for the Debtors

3         600 Madison Avenue, 8th Floor

4         New York, NY 10022

5

6    BY:  PAUL KINEALY (TELEPHONICALLY)

7

8    PROSKAUER ROSE LLP

9         Attorneys for Ad Hoc Group of Genesis Lenders

10        Eleven Times Square

11        New York, NY 10036

12

13   BY:  BRIAN ROSEN

14

15   ALSO PRESENT TELEPHONICALLY:

16   PHILIP ABELSON

17   ELIZABETH BEITLER

18   ROBERT DERMODY

19   ERIN DIERS

20   ANSON B. FRELINGHUYSEN

21   SHAWN GILHOOLEY

22   BUSTER GORMAN

23   CHRIS KORTMANN

24   KEN LUKASZEWSKI

25   JEFFREY S. MARGOLIN

1   MICHELE MEISES

2   ANAIS MITRA

3   WALT NEUSCHAEFER

4   AMANDA PARRA CRISTE

5   GREGORY F. PESCE

6   PHILIP RIES

7   SHAYA ROCHESTER

8   SCOTT SANDERS

9   DUSTIN SMITH

10   GABE SUTHERLAND

11   JULES SUO

12   PAUL ARONZON

13   OLIVER BAKES

14   BRENDON BARNWELL

15   ANDREW BEHLMANN

16   BENJAMIN S. BELLER

17   GABRIEL BRUNSWICK

18   BRIAN BULTHUIS

19   DAVID CHAN

20   SAM CASCANTE

21   LOUIS CHERRONE

22   SADHANA CHERUKURI

23   TOM CONHEENEY

24   WILLIAM DALSEN

25   ERIC C. DAUCHER

```
 1    MICHAEL DIYANNI

 2    ERIN E. DIERS

 3    PETER DOYLE

 4    JAMES DREW

 5    MICHAEL S. ETKIN

 6    MADDIE HUNDLEY

 7    MITCHELL P. HURLEY

 8    DERAR ISLIM

 9    ALI A. ISMAIL

10    ZUL JAMAL

11    THOMAS S. KESSLER

12    BARAK KLEIN

13    OXAN A. KOZLOV

14    GLEN KRATOCHVIL

15    JESSICA LIOU

16    KEN LUKASZEWSKI

17    THOMAS Q. LYNCH

18    MEI MA

19    JACK MASSEY

20    MATTHEW MELBON

21    ANAIS MITRA

22    WALT NEUSCHAEFER

23    JOHN NGUYEN

24    SEAN A. O'NEAL

25    MICHAEL PAPANDREA
```

1    AMANDA PARRA CRISTE

2    REBEKAH PRESLEY

3    SHAYA ROCHESTER

4    HEATH ROSENBLAT

5    KATIE ROSS

6    RYAN ROWAN

7    JEFFREY D. SAFTERSTEIN

8    GENESIS SANCHEZ TAVAREZ

9    SCOTT SANDERS

10   JORDAN SAZANT

11   DAVID Z. SCHWARTZ

12   JOE SCIAMETTA

13   FURQAAN SIDDIQUI

14   DUSTIN P. SMITH

15   JASON SOTO

16   ANDREW SULLIVAN

17   GABE SUTHERLAND

18   ANDREW SWIFT

19   REBECCA TRICKEY

20   ANDREW TSANG

21   WILLIAM MATTHEW UPTEGROVE

22   FRANCISCO VAZQUEZ

23   ANDREW W. WEAVER

24   GREG M. ZIPES

25   IAN BERKMAN

Page 12

 1   ALEX VAN VOORHEES

 2   ERIC IAN ASQUITH

 3   AKIKO MATSUDA

 4   FELIPE MONTOYA RODRIGUEZ

 5   RICH ARCHER

 6   DANA L. CASTRO HERMIDA

 7   RODNIKA CARTER

 8   JADE DYER-KENNEDY

 9   ASHLYN GALLAGHER

10   UDAY GORREPATI

11   TAYLOR HARRISON

12   MIRANDA HATCH

13   DIETRICH KNAUTH

14   MIKE LEGGE

15   SAMUAL LEVANDER

16   AKIKO MATSUDA

17   KEITH MCCORMACK

18   KYLE MCKUHEN

19   RICHARD MINOTT

20   TYLER OKADA

21   CHRISTIAN RIBEIRO

22   ANDRES FELIPE SAENZ

23   SAMIRA SARAN

24   PETER J. SPOFERA

25   VINCE SULLIVAN

1    CATHY TA

2    KATE THOMAS

3    GEMMA TUNG

4    MICHAEL WEINBERG

5    TIM WOLFE

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                 P R O C E E D I N G S

2              CLERK:  All rise.

3              THE COURT:  Good morning.  Please be seated.

4              AUTOMATED VOICE:  Recording in progress.

5              THE COURT:  Yeah, please.  Good morning.  This is

6     Judge Sean Lane in the United States Bankruptcy Court for

7     the Southern District of New York, and we're here this

8     morning for a hearing in Genesis Global Holdco, and we'll

9     start as we always do with appearances, and I'll start first

10    with the folks who are here in the courtroom and then get

11    any other appearances for folks who are on Zoom.

12              So, starting in the courtroom, let me get the

13    appearances from Debtor's counsel.

14              MR. BAREFOOD:  Good morning.  Your Honor, Luke

15    Barefoot from Cleary Gottlieb Steen & Hamilton for the

16    Debtors.  I'm joined by my colleagues, Ms. Fike, Mr. Massey,

17    and Mr. Lenox.

18              THE COURT:  All right, good morning.  And let me

19    find out who is here on behalf of Gemini.

20              MR. BURKE:  Good morning, Your Honor.  Donald

21    Burke, Willkie Farr & Gallagher for Gemini Trust Company.

22    I'm joined by Carl Mills from Hughes Hubbard & Reed as well.

23              THE COURT:  All right, good morning.  And on

24    behalf of the official committee?

25              MR. WEST:  Good morning, Your Honor.  Colin West

Page 15

1    of White & Case on behalf of the Official Committee of

2    Unsecured Creditors.

3                THE COURT:  All right, good morning.  And let me

4    ask if there's anyone else in court who wants or needs to

5    make an appearance?  And what I would ask is we have

6    different kinds of microphones, and I apologize if I've

7    bored you with this speech before.  These are the ones to

8    amplify in the room.  These are the ones to amplify for

9    purposes of Zoom.

10               So, you sort of need to get close to one or both.

11   This is a little (indiscernible) exciting.  Sorry for the

12   folks who are on Zoom who are hearing some noise.  But any

13   other appearances?

14               MR. HOLLEMBEAK:  Yes, Your Honor.  Am I --

15               THE COURT:  Yeah, at least -- yeah, just make sure

16   to get close to that microphone.

17               MR. HOLLEMBEAK:  Yes.  Jeremy Hollembeak from the

18   law firm of Baird Holm.  I represent two related parties who

19   are claimants that asserted proof of claim 402 and 405

20   that's a matter on the agenda today --

21               THE COURT:  All right.

22               MR. HOLLEMBEAK:  -- regarding -- they've been

23   objected to.

24               THE COURT:  All right.  Thank you very much.  Any

25   other parties who are here in the courtroom who wish to make

1    an appearance at this time?

2           All right.  So, let me turn to the folks on Zoom

3    and find out who is here, who wishes to make an appearance.

4    So, we'll start if there's anyone from the Debtors who wants

5    to make an appearance?

6           MS. VANLARE:  Good morning, Your Honor.  Jane

7    Vanlare, Cleary Gottlieb Steen & Hamilton on behalf of the

8    Debtors, and I'm joined by my colleague, Ms. Hoo Ri Kim.

9           THE COURT:  All right, good morning.  And I

10   believe I see someone from the ad hoc group.  Let me get

11   that appearance.

12          MR. ROSEN:  Yes, Your Honor.  Brian Rosen,

13   Proskauer Rose on behalf of the ad hoc group, and I'm joined

14   by my colleague also on Zoom, Mr. Will Dalsen.

15          THE COURT:  All right, good morning.  And I

16   believe we have the declarant for the Debtor is also on.  I

17   believe I see Mr. Kinealy, so let me get his appearance.

18          MR. KINEALY:  Yes, Your Honor.  Paul Kinealy from

19   Alvarez & Marsal on behalf of the Debtor.

20          THE COURT:  All right, good morning.  Happy to

21   have you.  I also believe I see Mr. Medina who is -- has a

22   discovery issue.  So, Mr. Medina, let me get your

23   appearance.

24          MR. MEDINA:  Good morning, Your Honor.  Eric

25   Medina on behalf of BAO Family Holdings.

1           THE COURT:  All right, good morning.  And with

2      that, I will throw it open to any other party who wishes to

3      make an appearance.  I'll do that just because we have a

4      very lengthy list of folks who are here, and I don't think

5      we want to go through the entire list as many folks are here

6      for listen only.

7           Anyone else on Zoom who would like to make an

8      appearance?  All right.  Going once, going twice.  All

9      right.  And obviously, if that changes at any point, people

10     can identify themselves if they need to speak.

11          So, with that, I will turn it over to Debtor's

12     counsel here in the room as I -- sort of my -- I have the

13     agenda which is obviously very helpful.  Thank you for that.

14     I -- so, Mr. Barefoot?

15          MR. BAREFOOT:  Good morning, Your Honor.  Luke

16     Barefoot from Cleary Gottlieb for the Debtors.  As you know,

17     we --

18          THE COURT:  All right.  Let me just interrupt for

19     one second.  Everybody on Zoom hear Mr. Barefoot?  All

20     right, great.  Thank you.

21          MAN:  Yes.

22          THE COURT:  I just want to check.

23          MR. BAREFOOT:  Your Honor, we did file an amended

24     agenda at Docket Item 1161.  It has a number of uncontested

25     matters, and then we'll get to the Gemini adversary

Page 18

1    proceeding.

2            Just in terms of the order of operations,

3    subsequent to filing of that agenda, pursuant to discussions

4    with your chambers, we scheduled the added -- we'll add to

5    the agenda the BAO Family Holdings plan confirmation

6    discovery dispute and subject to Your Honor's preferences

7    would propose to slot that in at the end of the uncontested

8    matters before Gemini.

9            THE COURT:  All right, that sounds great.  So,

10   take it away.

11           MR. BAREFOOT:  Your Honor, I'll turn the first

12   matter over to my colleague, Ms. Kim, to present.

13           THE COURT:  All right, Ms. Kim.

14           MS. KIM:  Good morning, Your Honor.  Can you hear

15   me well?

16           THE COURT:  I can hear you just fine.  Thank you.

17           MS. KIM:  Great.  For the record, Hoo Ri Kim,

18   Cleary Gottlieb Steen & Hamilton on behalf of the Debtors.

19   I'll be presenting the Moonalpha settlement motion which was

20   filed at Docket Item 1104.  By this motion, the Debtors seek

21   authorization for entry into a Settlement Agreement and

22   performance under that agreement with Moonalpha Financial

23   Services Limited.

24           First, Your Honor, we would like to move into

25   evidence the declaration of Mr. Derar Islim, who is the

Page 19

1   interim Chief Executive Officer of Genesis Global Holdco in

2   support of this motion.  That declaration was attached to

3   the settlement motion, and Mr. Islim is present on Zoom to

4   answer any questions.

5             THE COURT:  All right.  Thank you.  Anybody wish

6   to be heard as to the request to receive that declaration

7   into evidence?  All right.  Hearing no response, I'm happy

8   to receive it for purposes of today's hearing.

9             MS. KIM:  Thanks, Your Honor.  Turning to the

10  request to enter into the settlement, the Debtors have been

11  engaging in negotiations with Moonalpha with respect to

12  certain loan agreements between Moonalpha and the Debtor,

13  Genesis Global Capital.  We'd note that Moonalpha is going

14  through its own restructuring process in Singapore with

15  certain of its affiliates as well.

16            The proposed settlement resolves those claims with

17  respect to the loan agreements and related collateral posted

18  by each party resulting in a single claim by GGC in the

19  amount of $184.8 million against Moonalpha.  The special

20  committee has determined and the Debtors submit that the

21  settlement is in the best interest of the Debtor's estates,

22  their creditors, and is well within the range of

23  reasonableness.

24            If I may, I'll briefly touch on some of the

25  reasons described in the motion in support.  First, the

Page 20

1    Settlement Agreement will result in GGC having no

2    outstanding amounts payable to Moonalpha and results in a

3    net claim for GGC.  This avoids the unnecessary risk of a

4    potential litigation with respect to these claims, which

5    could be lengthy and costly.  Not only that, but there are

6    also additional litigation risks related to any potential

7    litigation, including the uncertainty of any -- litigating

8    any issues in Singapore, the effects of Moonalpha's

9    restructuring, and any applicable law with respect to any

10   litigation with respect to the claims.

11           The Settlement Agreement represents significant

12   efforts from both parties and their sophisticated advisors

13   to reconcile their outstanding claims against one another

14   and would fully and finally resolve these claims under the

15   agreements without the need to divert the Debtor's adviser's

16   attention from other matters loaded in these Chapter 11

17   cases.

18           So, Debtors and Moonalpha are also entitled to a

19   mutual set-off of the claims arising out of their pre-

20   petition agreements, which are both governed by New York law

21   and are as between the same parties in the same capacities

22   as lender or borrower.

23           Relief from the stay to effectuate the set-off is

24   appropriate for the resolution of the sizable mutual claims

25   between the parties which results in a benefit to the

Page 21

1    estate.

2            For these reasons, and following extensive arms'-

3    length negotiations, the special committee of the Debtors

4    has in its business judgment approved the settlement.  We'd

5    also note that there were no objections or responses filed

6    with respect to the motion, and accordingly, the Debtors

7    request the entry of the order unless Your Honor has any

8    questions.

9            THE COURT:  All right.  Thank you very much.  Let

10   me ask if the committee -- the official committee wishes to

11   be heard on this settlement?

12           MR. WEST:  No, Your Honor, we don't.  We don't

13   object or have any other comments.

14           THE COURT:  All right, thank you very much.  Let

15   me solicit any other responses from any other party who

16   wishes to be heard in the settlement.

17           All right, Ms. Kim.  I just had one question,

18   which is that you talked about the set-off and the ultimate

19   sort of net benefit to the estate, and I saw the different

20   amounts that are being set off, some in dollars and some in

21   cryptocurrency.  Do you -- you can give me a sense just for

22   the record of what the net benefit is to the estate in terms

23   of the set-offs?

24           MS. KIM:  Yes, Your Honor.  So, in terms of how we

25   got to the set-off amount, there are various amounts at

Page 22

1    issue that are denominated in different digital assets, and

2    given the backdrop of the fluctuations in prices of these

3    various digital assets, the Debtors and Moonalpha have

4    agreed to calculate these amounts using a volume-weighted

5    average price for a certain period of time.  So, that's how

6    we -- and including for the outstanding principal amount and

7    how the collateral was priced during that period as well.

8            And so, that resulted in the number that's -- the

9    final number of the claim, which is 184.4 million U.S.

10   dollars, and that essentially is a claim that GGC has

11   asserted in Moonalpha's restructuring process, and under

12   their scheme, which is the equivalent of (indiscernible) as

13   I understand, GGC will get to choose the form of recovery

14   for that claim amount.

15           And so, that's the claim amount on its face, but

16   the recovery will not necessarily be that entire amount, if

17   that makes sense.

18           THE COURT:  Yeah, that makes sense.  Do you have

19   any sense of what the proposed recovery percentage would be

20   based on the current scheme?

21           MS. KIM:  Yes, Your Honor.  So, the creditors get

22   to choose whether to receive their recoveries in

23   (indiscernible) recovery coins, which is a new

24   cryptocurrency that (indiscernible) and Moonalpha Debtors

25   are proposing to issue, or an equity like CVR instrument

Page 23

```
 1    that's tied to the performance of certain assets, and I

 2    believe that the recovery ranges that we've received from

 3    their presentation is around -- is between 0 to 20 percent.

 4              THE COURT:  All right.  Thank you very much.  All

 5    right.  Anything else, Ms. Kim?

 6              MS. KIM:  No, that's all, Your Honor.

 7              THE COURT:  All right.  Thank you.  Anything else

 8    from any other party?  Hearing nothing further and seeing no

 9    objection on the docket, and for all the reasons you set

10    forth in your motion and Ms. Kim has explained on the

11    record, I'm happy to approve the settlement as consistent

12    with Rule 9019 and applicable case law under that rule and

13    find that the settlement here is in the best interest of the

14    estate, and find again in the vaguely pejorative way it's

15    sometimes phrased that it is -- doesn't fall below the

16    lowest point in the range of reasonableness and in fact is a

17    reasonable settlement for all the reasons and all the

18    factors -- when you consider all the factors set forth under

19    the 2nd Circuit in evaluating a settlement that are all set

20    forth and evaluated in detail in the motion.

21              So, that is granted.  Thank you very much, Ms.

22    Kim.

23              MS. KIM:  Thank you, Your Honor.  I'll turn it

24    back to the courtroom.

25              THE COURT:  All right.
```

Page 24

1          MR. LENOX:  Good morning, Your Honor.  Brad Lenox

2     of Cleary Gottlieb for the Debtors.

3          THE COURT:  Good morning.

4          MR. LENOX:  I will be addressing the second item

5     on the uncontested portion of today's agenda, which are the

6     no books and records claims initially identified on Exhibit

7     4 to the proposed order for the Debtor's fourth omnibus

8     claims objection, which was filed at ECF No. 995.

9          As Your Honor will recall following a colloquy at

10    the January 3rd hearing, the Debtors had adjourned

11    resolution of these no books and records claims in order to

12    provide further information that Your Honor had requested

13    with respect to what documentation, if any, had been

14    submitted by the affected claimants in support of the

15    disputed claims.

16         On January 12th, the Debtors filed a supplemental

17    declaration of Paul Kinealy of Alvarez & Marsal, the

18    Debtor's financial advisor, at ECF No. 1152.  This

19    supplemental declaration provides further analysis of the no

20    books and records claims subject to the fourth omnibus

21    claims objection as well as separate claims subject to the

22    17th omnibus claims objection, which is also on today's

23    agenda as Item No. 5.

24         Given that this supplemental declaration involves

25    two separate agenda items, if Your Honor is amenable, I

Page 25

1    would propose briefly discussing the supplemental

2    declaration first and then proceeding to the relief

3    requested on the fourth and 17th omnibus claims objections.

4            THE COURT:  Please.  Makes a lot of sense.

5            MR. LENOX:  Thank you.  As a housekeeping matter,

6    the Debtors move to introduce into evidence Mr. Kinealy's

7    supplemental declaration, which again is filed at ECF No.

8    1152 in further support of the Debtor's fourth and 17th

9    omnibus claims objections.

10           THE COURT:  All right.  Anyone wish to be heard on

11   that request?  Hearing no response, I am happy to receive

12   it.  I will say it's incredibly helpful.

13           MR. LENOX:  Thank you, Your Honor.  As explained

14   in Mr. Kinealy's declaration, for the vast majority of the

15   no books and records claims subject to the fourth omnibus

16   objection and the no liability claims subject to the 17th

17   omnibus objection, the affected claimants did not provide

18   any supporting information or documentation whatsoever to

19   identify the basis for their asserted liabilities, which

20   liabilities are also not reflected in the Debtors books and

21   records.

22           There were, however, two no books and records

23   claims and three no liability claims that did include some

24   form of supporting material although in all cases none of

25   that material identifies any relationship with any of the

Page 26

1    Debtors or any alleged liabilities owed by the Debtors.

2    Copies of those five claims have been provided to Your Honor

3    in unredacted form and are also described in detail in the

4    supplemental declaration.

5         Walking through each of these five claims briefly,

6    Claim No. 542 includes as support only an additional version

7    of the proof of claim itself.  Claim No. 803 includes only

8    screenshots of a medical portal containing various personal

9    medical information, which the Debtors believe is related to

10   the separate Chapter 11 Proceeding of Genesis Care, an

11   entity that is unrelated to the Debtors.

12        Claims Nos. 213 and 291 each attach screenshots of

13   account statements that appear related to investments made

14   by the claimants with a platform called Donut, which is also

15   unrelated to the Debtors.

16        And finally, Claim No. 1199 includes a screenshot

17   of a pending balance of Bitcoin, but this screenshot does

18   not otherwise indicate where this balance is purported to be

19   held or otherwise reference the Debtors whatsoever.

20        Unless Your Honor has any questions with respect

21   to the information that was provided in this declaration, we

22   would request that Your Honor grant the relief requested

23   with respect to the no books and records claims subject to

24   the fourth omnibus claims objection.

25        All right.  I'm happy -- well, let me ask if

Page 27

1    anybody wishes to be heard on that request?

2              MR. ROSEN:  Your Honor, this is Brian Rosen for a

3    moment.  I just -- we're not appearing in connection with

4    this, but I just heard counsel refer to Donut.  Donut is one

5    of the members of the ad hoc group that filed the claim.  I

6    don't know the relationship of that particular claim that he

7    just referred to as with respect to Donut, but clearly it

8    does relate to the Genesis case, and I know counsel said it

9    did not.  I would just ask that perhaps you remove that

10   claim for the moment and we have the ability to bring this

11   up to the Donut person involved in the case.

12             THE COURT:  Can you give me a sense of how Donut

13   is involved?  Is it a platform through which people invested

14   in Genesis?  Because there's this -- I do have a statement

15   saying that they're not involved with the Debtors, so that's

16   why I ask.

17             MR. ROSEN:  Donut is clearly a platform which I

18   think (indiscernible) millions of dollars or at least $100

19   million were invested with the Debtors, yes.

20             THE COURT:  All right.  Well, let me ask Debtor's

21   counsel what you want to do in connection with Donut.  I

22   know that there was a question of exactly how you would find

23   information relating to various platforms that -- which

24   individuals invested and whether the Debtor had the records

25   or the parties had the records.  I know it can get a little

Page 28

1    bit complicated.  So, I don't know if you want to chat for a

2    second, however you want to handle it.  And I think there

3    are -- some of these are clearly appropriate for -- to be

4    expunged, and I think Donut's mentioned in one or two.  I'm

5    not sure, so.

6              MR. ROSEN:  Yeah.  Your Honor, I apologize.  We're

7    not obviously appearing on behalf of that party that filed

8    the proof of claim.  I would just ask if counsel could move

9    forward with the balance of the omnibus objection and

10   adjourn solely with respect to those Donut-related claims so

11   that someone could get involved on their behalf.

12             MR. LENOX:  Your Honor, that's acceptable to the

13   Debtors.  We'll adjourn the relief with respect to those two

14   claims.

15             THE COURT:  All right.  All right.  Yeah, I think

16   it's 213 and 291?

17             MR. LENOX:  Correct.  And just to clarify for the

18   record, Your Honor, my reference was intended to convey that

19   Donut is not a Debtor entity or --

20             THE COURT:  Yeah.  No, I totally get it.  Although

21   it does say -- the supporting documentation doesn't indicate

22   a relationship with the Debtors, yeah, I guess that's right.

23   That's fine.  I don't know if you want to also take a look

24   at 1199.  That one -- although I guess that's a services

25   performed as opposed to digital assets held, right, so

Page 29

```
 1    that's not in the same bucket.  So, I guess it would just be

 2    those two.

 3            All right.  Anybody else wish to be heard?  All

 4    right, I'm happy to grant the request as just been amended

 5    for relief as to the no books and records, and so we would

 6    carve out Claim 213 and 291, which are identified as digital

 7    assets loaned to the Debtors in connection with the Donut

 8    platform, which may or may not have anything to do with the

 9    Debtors, but we'll take a look and see what's what, but it's

10    granted as to everything else.

11            And I will say I very much appreciate the

12    thoroughness of the declaration as well as providing the

13    attachments.  Sometimes seeing a claim, a picture is worth a

14    thousand words in terms of say the description of the

15    Genesis Healthcare entity and seeing what the claim looks

16    like.  You can clearly tell it's not meant to be filed in

17    this case, because it really has nothing to do with what

18    this case is about.

19            So, that is granted, and I know that Mr. Kinealy's

20    declaration was also provided in connection with the 17th

21    omnibus objection.  So, maybe we'll turn to that.  If

22    there's anything else you wanted to add to that or just

23    request relief on that one?

24            MR. LENOX:  No, Your Honor.  Just to clarify based

25    on the prior discussion, Claim Nos. 213 and 291 are actually
```

1    subject to the 17th omnibus objection.

2              THE COURT:  All right, got you.

3              MR. LENOX:  Not the fourth.  So, then just for the

4    record --

5              THE COURT:  Yeah, you covered everything Mr.

6    Kinealy addressed in both declarations --

7              MR. LENOX:  Correct, yeah, I did that

8    simultaneously.

9              THE COURT:  -- both objections.  All right.

10             MR. LENOX:  So, we will -- just again for one

11   other clarification, we will submit the revised proposed

12   order with respect to the fourth omnibus claims objection,

13   which will also not include Claim No. 1132, which we

14   subsequently withdrew the objection --

15             THE COURT:  All right.

16             MR. LENOX:  -- with respect thereto.

17             THE COURT:  All right, and I am happy to grant the

18   requested relief as has been amended as to the other

19   declaration -- I'm sorry, as to the other objection for

20   which Mr. Kinealy provided a declaration that is the 17th

21   subject to the carve-out we just discussed for all the

22   reasons that we have discussed and put on the record.

23             And again, I appreciate it, and providing the

24   claims and breaking it down the way you did in terms of

25   which ones don't have supporting documentation and which

Page 31

```
 1    ones do and why those are relevant or not relevant is very

 2    helpful.  So, thank you for the effort.

 3                 MR. LENOX:  You're welcome, Your Honor.  And just

 4    one final housekeeping matter, we just wanted to note that

 5    the orders for the third through the 14th omnibus objection,

 6    which were granted orally by Your Honor at the January 3rd

 7    hearing, have not yet been entered.  And so, we would

 8    respectfully request that Your Honor do so as soon as

 9    convenient.

10                 THE COURT:  All right.  I think they're close to

11    being in process.  I looked at them yesterday.  So, thank

12    you very much.

13                 MR. LENOX:  Thank you, Your Honor.

14                 THE COURT:  And in granting the relief, I'm

15    applying the same standards that I think I set forth in more

16    detail at the last hearing and will not bore you all with

17    another recitation of the shifting burdens on claim

18    objections, as exciting as that is.

19                 So, moving on.

20                 MR. LENOX:  Thank you, Your Honor.  I will cede

21    the podium to my colleague, Ms. Fike.

22                 THE COURT:  All right.  Thank you.

23                 MS. FIKE:  Good morning, Your Honor.  Deandra Fike

24    of Cleary Gottlieb on behalf of the Debtors.

25                 THE COURT:  Good morning.
```

Page 32

1            MS. FIKE:  And I'll be presenting Items 3 and 4 on

2      the uncontested portion of the agenda which correspond to

3      the Debtors 15th and 16th omnibus objections, which are

4      filed at ECF No. 1058 and 1059 on the docket.  And Your

5      Honor, if no objection as we did in the previous hearing,

6      given the overlap, I would propose to jointly present both

7      of the objections.

8            THE COURT:  Makes perfect sense.  Thank you.

9            MS. FIKE:  Thank you, Your Honor.  And as an

10     overview, these objections relate to claims that were

11     improperly asserted against multiple Debtors where only one

12     Debtor is potentially liable and claims that we've

13     identified as duplicates of the master claim filed by Gemini

14     Trust Company, LLC or Gemini.

15           And before moving forward, just as a housekeeping

16     matter, I would move to introduce into evidence the

17     declaration of Paul Kinealy, which is located at Exhibit B

18     to both of the omnibus objections.

19           THE COURT:  All right.  Anybody who wished to be

20     heard on that request?  All right, I'm happy to receive it.

21     And again, I do appreciate Mr. Kinealy being here to answer

22     any questions, which was helpful the last time we got

23     together.  Thank you very much, sir.

24           Counsel, proceed.

25           MS. FIKE:  Thank you, Your Honor.  And yes, he's

Page 33

1    on the line if you have any questions.  With respect to the

2    Debtor's 15th omnibus objection, the Debtors would object to

3    the claims on Exhibit 1 to the proposed order on the grounds

4    that they are duplicates of the master claim filed by Gemini

5    on behalf of the Gemini lenders pursuant to the authority

6    granted by this court in the bar date order.

7              The Debtors with the aid of their advisers

8    identified such Gemini duplicate claims based on a variety

9    of information including whether the claimant themselves

10   indicated that they were a Gemini lender in the proof of

11   claim, whether that be through supporting documentation or

12   through their specific answer to question eight on the proof

13   of claim form, or whether it be through informal exchanges

14   of information between the Debtors and Gemini.  The Debtors

15   seek to disallow and expunge such claims to avoid improper

16   duplicate recoveries for the same claimant against the

17   Debtor's estates.

18             With respect to the 16th omnibus objection, the

19   Debtors object to the claims on Exhibit 1 to the proposed

20   orders on the grounds that the claims were improperly filed

21   against multiple Debtors where only a single Debtor is

22   potentially liable.

23             The Debtors objected to two of the master claims

24   filed by Gemini on behalf of their lenders against Genesis

25   Global Holdco, or Holdco, and Genesis Asia Pacific, or GAP,

Page 34

1    preserving the Gemini master claim filed against Genesis

2    Global Capital or GGC.  Similarly, we objected to two claims

3    filed by Gemini in its individual capacity against Holdco

4    and GAP, again preserving the claim against GGC.

5          For both the master claim filed on behalf of the

6    Genesis lenders as well as the claims filed in Gemini's

7    individual capacity, the claims as asserted against each of

8    the three Debtors are identical.  The Debtors, with the aid

9    of their advisers, have identified that the liabilities

10   asserted in these duplicative claims are properly asserted

11   against GGC and that Gemini on behalf of its lenders or

12   itself does not have a business or otherwise relationship

13   with Holdco or GAP.

14         Neither Holdco nor GAP maintained a contractual or

15   business relationship with Gemini and Holdco itself did not

16   have any lending operations.  In fact, Gemini makes no

17   allegations concerning transactions with Holdco or GAP in

18   either the Gemini master claims asserted on behalf of its

19   lenders or as part of the claims asserted in its individual

20   capacity, nor do they cite to any agreements or

21   communications with Holdco or GAP as there are none to cite

22   to.

23         If the claims against Holdco and GAP are not

24   disallowed, Gemini and its lenders may obtain double

25   recovery for the same alleged liability or recovery from the

Page 35

1    incorrect Debtor.

2          The Debtors therefore seek disallowance of each of

3    the claims subject to the 16th omnibus objection to limit

4    Gemini to a single claim against the relevant Debtor's

5    estate arising from the same alleged liability.

6          And with that, unless Your Honor has any

7    questions, pursuant to Rule 3007 and the claims procedures

8    order, the Debtors request the claims listed on the exhibits

9    to the proposed orders for both the 15th and 16th omnibus

10   objections be disallowed in full and expunged from the

11   register.

12          THE COURT:  All right, thank you very much.  Let

13   me ask if Gemini wishes to be heard on these objections.

14          MR. BURKE:  We do not, Your Honor.

15          THE COURT:  All right.  Thank you very much.  Any

16   other party that might wish to be heard?  Hearing no

17   response, and based on the presentation here today as well

18   as the evidence submitted in support of the claim,

19   objections for the 15th and 16th omnibus claim objections,

20   I'm happy to grant the requested relief.  I find again

21   applying the shifting burdens of claim objections that are

22   the -- set forth in more detail at the last hearing that

23   you've satisfied the basis for getting relief, and I note

24   it's not objected to, and I appreciate the cooperation and

25   obvious consultation that's gone on between the Debtors and

Page 36

1    Gemini in order to sort of (indiscernible) and get an

2    accurate claims register dealing with the Earned users and

3    folks who are associated with Gemini.

4         So, I'm happy to grant your objection for the

5    duplicate claims as well as for the claims that are asserted

6    against Holdco and GAP that should be asserted against GGC,

7    and that claim -- those claims against GC are unaffected.

8         So, thank you very much.

9         MS. FIKE:  Thank you, Your Honor.

10        THE COURT:  And I appreciate seeing some young

11   lawyers in person in court.  It's a wonderful thing.  So, I

12   -- it's great to see you and look forward to seeing you both

13   in the future.

14        MS. FIKE:  Thank you very much, Your Honor, and

15   you will see my colleague, Brad Lenox, again very shortly --

16        THE COURT:  Oh, well, sooner than --

17        MS. FIKE:  -- and be dealing with a small

18   (indiscernible) matter.

19        THE COURT:  -- I may have anticipated.  Great.

20   All right.  Thanks so much.

21        MR. LENOX:  Thank you, Your Honor.  Again, for the

22   record, Brad Lennox of Cleary Gottlieb for the Debtors.

23   Before returning to the remainder of today's agenda, we

24   wanted to briefly address the forthcoming dates for which

25   the Debtors have scheduled certain other claims-related

Page 37

1    matters.

2          As Your Honor is aware, the Debtors have noticed

3    for February 8th two additional omnibus claims objections,

4    the 19th and the 20th omnibus claims objections which are

5    substantively similar to those presented to Your Honor today

6    and previously at the January 3rd hearing, and just to give

7    a sense of quantum, they involve a little over 50 claims in

8    total between the two.

9          And although the deadline has not passed for --

10   has not yet passed for objections, we expect them to proceed

11   on a largely if not a fully --

12         THE COURT:  All right.

13         MR. LENOX:  -- consensual basis.  And based on

14   discussions with Your Honor's chambers, the Debtors were

15   also given a February 1st date for which the Debtors have

16   noticed --

17         THE COURT:  Well, let me ask you about that.  I'm

18   trying to keep my calendar as manageable as possible.  So, I

19   think when we talked about the 8th, I didn't know there was

20   the first.  It's the danger of talking to me as opposed to

21   Ms. Ebanks, who's the Zen master of all things scheduling.

22   I'm a little less accomplished.

23         So, my question for you all is whether we can put

24   everything on the 8th without doing any harm to anything

25   just in the interest of efficiency and obviously understand

Page 38

1    -- and we all talked about this, a good idea to get -- have

2    a date for claims objections that we can work through, and

3    I'm happy to use the 8th so -- and the 8th using the later

4    date makes more sense than using the former, which it's

5    always harder to go backwards than to push things off a

6    little bit.

7              So, if it's all right with you, let's use the 8th

8    for everything, and we'll have all the claims objections on

9    the 8th and not have anything on the first.

10             MR. LENOX:  Great.  Thank you, Your Honor.  That -

11   -

12             THE COURT:  All right.  Thank you very much.

13             MR. LENOX:  -- that concludes that.  And with

14   that, my colleague Jane Vanlare will be turning to the

15   discovery conference.

16             THE COURT:  Okay, great.  And I appreciate your

17   cooper operation on that.  And I know, counsel, you were

18   here, if I remember, a 402 and 405.  As I understand it, if

19   I'm remembering correctly, those are the subjects of the 7th

20   omnibus objection.  I think there was a notion about

21   adjourning that, but maybe it makes sense to hear from

22   Debtor's counsel as to what the status is of that, and I'm

23   happy to hear from you to the extent there's anything you

24   wanted to address.

25             MR. LENOX:  Yes, Your Honor.  So, with respect to

Page 39

1    the 7th omnibus objection as it relates to Claims No. 402

2    and 405, we had originally requested an adjournment to the

3    February 1st date and then subsequently noticed that the

4    hearing date would be subject to a discussion with Your

5    Honor today.

6            So, if all right with Your Honor, we'll have that

7    as well as the other omnibus claims objection noticed for

8    the 1st moved to the eighth.

9            THE COURT:  To the 8th, right.

10           MR. LENOX:  Correct.

11           THE COURT:  Is there anything since counsel's here

12   on 402 and 405, anything that you can share in terms of what

13   you're working through or -- also, there is a room back

14   there if you all wanted to chat about things, nothing -- a

15   lot of business can be done here in the courthouse since

16   we're actually in the courthouse.

17           Anything to offer counsel?

18           MR. LENOX:  Nothing at this time, Your Honor.  We

19   will be submitting a reply in response to the response that

20   was filed by counsel for the claimants but nothing at this

21   time that needs to be addressed.

22           THE COURT:  All right.  And when do you anticipate

23   doing that?  I've lost track of scheduling.  Just --

24           MR. LENOX:  The deadline to do so is the 19th.

25           THE COURT:  All right.  The 19th.  Anything else

1    on that?  And I'm happy to hear from this gentleman if

2    there's anything particular he wanted to raise.

3              MR. LENOX:  No, nothing, Your Honor.  But before

4    turning it over to counsel, I -- we did also want to note

5    that we will need an additional hearing date in the end of

6    February or the beginning of March to resolve additional

7    claims.

8              THE COURT:  Absolutely, I would anticipate that

9    you'll be working through other things.  That's perfectly

10   fine.

11             So, before we get to Mr. Medina's discovery issue,

12   I don't know, Counsel, if that answers any of your

13   questions, but come on up if there's anything you wanted to

14   address.

15             MR. HOLLEMBEAK:  Thank you, Your Honor.  Again,

16   for the record, Jeremy Hollembeak of Baird Holm for

17   claimants asserting proof of claims 402 and 405.

18             I have no problem with coming back on February 8th

19   instead of February 1st.  I did just want to say on the

20   record that my clients are concerned that we don't get this

21   resolved prior to a plan getting confirmed and initial

22   distributions being given out to allowed claims as long as

23   our claim is objected to in any portion, it's not allowed at

24   all for purposes of distribution, and even the disputed

25   portion is very significant.

Page 41

1           So, it is important to us to move forward

2    expeditiously.  And as I -- our response was Docket 1076.

3    It's a contractual issue.  It may be something Your Honor

4    can decide as a matter of law, but if there's a

5    determination that there's ambiguity, we will need discovery

6    with respect to the dispute.

7           THE COURT:  All right.

8           MR. HOLLEMBEAK:  And you can see how that can take

9    time, so.

10          THE COURT:  All right.  Well, I appreciate the

11   preview, and we do have -- as you can tell by today's

12   agenda, there's a lot of things going on in the case, but it

13   sounds like we will get together February 8th and have a

14   discussion about it.  I'll be fully briefed at that point.

15   I confess, I haven't read any of the papers on 402 and 405

16   yet, but I promise I will by the 8th and be ready to go, and

17   we'll see where we end up.

18          But I certainly understand your concerns, and

19   we'll have a discussion on the 8th about where things stand

20   and what the next steps are so that we'll have some clarity

21   going forward.

22          MR. HOLLEMBEAK:  Thank you, Your Honor.

23          THE COURT:  You're welcome.  All right.  With

24   that, I'll turn it over to Ms. Vanlare to start us off on

25   the discovery issue.  And obviously, I see Mr. Medina on the

Page 42

1    line.  So, Ms. Vanlare, why don't you kick it off?

2          MS. VANLARE:  Oh, jeez, Your Honor, I see I was

3    muted.  Thanks very much, Your Honor.  Jane Vanlare, Cleary

4    Gottlieb Steen & Hamilton on behalf of the Debtors.

5          Your Honor, I'll just say a few brief words and

6    then turn it over to Mr. Medina to articulate his concerns.

7    First, I'll just state, Your Honor, we have had multiple

8    conversations, meet and confers with Mr. Medina.  We've told

9    him repeatedly that we remain open to hearing his concerns,

10   his issues, and are open to sharing information that is --

11   that we hope would facilitate resolution of whatever issues

12   his clients may have with respect to our plan.

13         To date, we have not heard articulated what his

14   objections may be to the plan.  Our position is that

15   discovery should be tailored to the objections that he may

16   assert.  That's the -- that's how the order approving the

17   disclosure statement and the related confirmation discovery

18   deadline (indiscernible) is framed.

19         Mr. Medina did not serve any discovery requests on

20   the Debtors on the deadline that is prescribed by the order.

21   Instead, what Mr. Medina has said is he would like all of

22   the discovery that's been produced in response to any and

23   all of the other objections.  Again, we do not think that's

24   appropriate.  We think that discovery should be tailored to

25   specific objections.

Page 43

1          The Debtor served his client with discovery on the

2    deadline.  Mr. Medina has not responded to a single document

3    request, to a single interrogatory, and has not told us when

4    his client may be available for a deposition.

5          Your Honor, we lack basic information with respect

6    to his client's claim such as amount or whether it's a

7    dollar claim or a crypto claim.  Again, we remain open, and

8    as recently as on Sunday after Mr. Medina reached out to

9    Your Honor for a conference of which we were unaware, after

10   he did that we reached out to him again on Sunday with a

11   detailed list of responses to the points he had made in the

12   e-mail, again offering to point him to information, to

13   provide documents, to respond to questions he may have, and

14   again, I reiterate that we are -- we're here to respond to

15   questions that he may have.

16         As an example, you know, he said that he objects

17   to valuation.  We pointed him to the coin reports, which the

18   Debtors file on a regular basis that denote the amounts of

19   dollars and digital assets that the Debtors have.  So, I

20   just note that as an example.  We've done that with other

21   documents as well.

22         There is also, I believe, another issue that he's

23   raised relating to redacted information.  Of course, as Your

24   Honor is well aware, certain of the information that we

25   filed is redacted in accordance with Your Honor's redaction

Page 44

1   order.  We are again respectful of the wishes of the

2   creditors and of the court order.  We are open to providing

3   confidential information as part of discovery where it is

4   tailored to a particular objection.  Again, we have yet to

5   hear what the specific objections are or how the information

6   would be helpful.

7           Thank you very much, Your Honor.

8           THE COURT:  All right.  Thank you very -- one

9   question, Ms. Vanlare.  Did you get a copy of the e-mail

10  that Mr. Medina sent to chambers requesting a discovery

11  conference?

12          MS. VANLARE:  I did.  There was one e-mail.  I

13  don't know if -- but I did see the e-mail from Friday.

14          THE COURT:  All right.  So, Mr. Medina, what shall

15  we talk about?

16          MR. MEDINA:  Thank you, Your Honor.  Good morning.

17  This is Eric Medina for BAO Holdings.

18          MAN:  (Indiscernible).

19          MR. MEDINA:  Your Honor, can you hear me okay?

20          THE COURT:  I can hear you fine.

21          MR. MEDINA:  Thank you, Judge.  So, Your Honor, I

22  just have to point out I heard everything Ms. Vanlare

23  indicated.  I did speak with Ms. Vanlare a few times, and

24  I'm surprised to hear Ms. Vanlare's take on many of the

25  discussions that her and I had with regards to Your Honor's

Page 45

1    confirmation protocols and the discovery regarding

2    confirmation.

3              Your Honor, on the 27th I sent a letter -- excuse

4    me.  On the 15th, I sent a letter --

5              THE COURT:  All right.  In the interest of cutting

6    to the chase, what is it that you want, right?  That's what

7    judges -- in terms of discovery, what is it that you're

8    looking for, for purposes of discovery, for confirmation?

9              MR. MEDINA:  All right, Your Honor.  So, we sent

10   her a letter indicating that we want information regarding

11   valuation.  I indicated to Ms. Vanlare that it's the

12   Debtor's burden of proof with regards to the discovery that

13   would be served on our client.  (Indiscernible) statement

14   that the Debtor -- Mr. -- excuse me (indiscernible) did not

15   respond to discovery, Your Honor, it's just not true.  We've

16   actually provided objections --

17             THE COURT:  No, no, again, I -- again, one of the

18   things about discovery is I know there's a long history of

19   back and forth, but what I do, which is I think consistent

20   with what all judges do, is the back and forth is fine up to

21   a certain point, but I don't have the bandwidth to get fully

22   involved in that.  So, I'm really trying to be bottom line.

23   Nobody needs to defend their honor.  Discovery disputes are

24   what they are.  People make requests.  People object and

25   people disagree, and then it comes to me.

1           So, when you say valuation, so Ms. Vanlare

2    mentioned certain reports that were provided.  What is it

3    beyond that, that you want?  Is there anything specifically

4    that you're looking for?

5           I -- well, let me first ask what your client --

6    who you represent in terms of the -- if it's an entity or

7    whether it's an individual, I don't need to hear the name

8    necessarily, but the -- what their holdings are so we can

9    have a sense of what is it that relates to your client.

10          There's obviously a lot of concerns about privacy.

11   There's already a decision that was issued when issues were

12   teed up.  So, the idea of in a blunderbuss fashion providing

13   all discovery to you that was provided to others has an

14   obvious problem in terms of confidentiality in light of the

15   status of the case.

16          So, it really needs to be a bit more tailored than

17   that.  So, what is it -- what are your client's interests in

18   the case?

19          MR. MEDINA:  I agree.  Thank you, Your Honor.

20   We're not looking for all the discovery.  Our client holds a

21   little over $2 million comprised of tokens in both Bitcoin

22   and Ethereum.  Our client is an entity.  We're looking for

23   information regarding valuation.  There are a number of

24   (indiscernible) that were served by the DCG party, the --

25   excuse me, the DCG parties on the same date that discovery

Page 47

1    was to be exchanged.

2            The information we're looking for is in connection

3    with discovery requests 1, 2, 4, 14, 15 and 25.

4            THE COURT:  Well, I don't have that in front of

5    me, so I don't know what those numbers mean.  You got to

6    tell me -- again, I'm just trying to get at the -- what is

7    it that you're -- there's specific documents or specific

8    things you would expect the Debtors to have other than what

9    Ms. Vanlare identified that you're looking for.

10           MR. MEDINA:  Sure.  Your Honor, the Debtor

11   identified Alvarez and Marsal as a witness on their amended

12   witness list for the confirmation hearing.  In connection

13   with that witness list, Alvarez and Marsal is intending, I

14   suppose, to testify with regards to the data and assumptions

15   and the methodologies in calculating the recoveries, the

16   valuation methodologies for determining whether or not

17   claims are impaired, and the information concerning

18   (indiscernible) distribution principles and projected

19   recoveries.

20           There are a few other points by number that I

21   mention in the Alvarez and Marsal subpoena, Your Honor, but

22   that covers most of them.  There's treatment of excess

23   assets that we wanted to see the documents on, and then

24   (indiscernible) documents related to inter-company

25   obligations.

1             THE COURT:  Well, so let me ask.  You mentioned a

2    list.  What is that list in what document?  Is that the

3    subpoena you referenced?

4             MR. MEDINA:  Yes, Your Honor.

5             THE COURT:  And --

6             MR. MEDINA:  So, on the 27th, the --

7             THE COURT:  Okay, go ahead.

8             MR. MEDINA:  I'm sorry, Judge.  On the 27th, the

9    DCG parties served -- I think they served about seven

10   subpoenas.  We just filed a joinder.  It's our intention to

11   just take information with regards to the valuation.  And

12   the reason, Your Honor, I think the Court is aware, the plan

13   provides for (indiscernible) set forth in the plan

14   supplement a valuation of Bitcoin, for example, tokens as of

15   the petition date, where those numbers are I think roughly

16   double at today's values.

17           And when I look at the illustrative range of

18   recoveries, Your Honor, on the high range -- and that's --

19   for the Court's reference, it's document number 887, Page

20   263 of 273.  On the high range of the distribution to

21   creditors in Class 7 under -- for GGC capital, the low range

22   of distribution indicated 73 percent to 100 percent recovery

23   at a hypothetical price of $34,000.

24           At today's values, the low range of recoveries

25   would be --

1           THE COURT:  No, I don't -- we don't -- I don't

2     need to get into that level of granularity.  I just need to

3     find out what it is that you want to know.  And so, what I

4     think you're saying --

5           MR. MEDINA:  Sure.

6           THE COURT:  -- is that you're piggybacking on some

7     other requests that were made and join in those requests on

8     -- as to valuation information.  So, let me ask Ms. Vanlare

9     about that.

10          MS. VANLARE:  Your Honor, again, I'm somewhat

11    puzzled by the word valuation beyond the information that

12    we've provided Mr. Medina, which we pointed him to publicly

13    file coin reports.  So, when we're talking about the value

14    of assets, the value is what it is.

15          The plan obviously says what it says with respect

16    to how various claims are treated.  The disclosure statement

17    hearing has a lot of disclosure as you know very well, Your

18    Honor, about the recoveries that are projected, the

19    assumptions that are underlying those.  So, I am truly

20    puzzled as to what additional information Mr. Medina would

21    like to see.

22          THE COURT:  Well, let me ask whether -- if you're

23    following Mr. Medina in referencing what was the request he

24    said was made by another party and certain specific numbers

25    in that request, whether it's a subpoena or discovery

Page 50

1    request or a letter request, I have no idea, but if you're

2    following that, and if so, is that something the Debtors

3    were going to respond to and be willing to share their

4    response on those particular numerical items, whatever it

5    is, whether it's a reference to things that have already

6    been provided, whether it's a reference to publicly

7    available documents, whatever it is.

8            I may be misunderstanding that, but if I -- if

9    I've got it right, I guess that's one way to address the

10   issue.

11           MS. VANLARE:  Your Honor, we --

12           MR. MEDINA:  That's (indiscernible) Your Honor.

13           MS. VANLARE:  -- we can certainly look, and I just

14   want to make sure, so this is with respect to DCG's

15   requests, and Mr. Medina would like documents in response to

16   1, 2, 4, 14, 15, and 25.  That's what I wrote down.  Is that

17   correct?

18           MS. MEDINA:  Yes, Your Honor.  For BAO, that's

19   correct, in connection with that subpoena.  The other -- the

20   only other information, Your Honor, that we had sought, and

21   I'm aware of Your Honor's confidential --

22           THE COURT:  Well, let me get -- let me run this

23   part to ground first before we go off topic.  So, yeah.  So,

24   I think you've got the numbers right, Ms. Vanlare, and I

25   don't -- again, I'm not in the weeds on this.  So, I'm a bit

Page 51

1    riffing in the dark, but I don't know if there's a Debtor

2    response to those or will be a Debtor response to those, and

3    if so, whether it's possible to give Mr. Medina whatever the

4    response is.  And I'm not saying what the response is,

5    whatever the response is with appropriate redactions, if

6    necessary.

7              MS. VANLARE:  We can certainly look at that.  I do

8    note that, first of all, one of those requests asks -- is a

9    piggyback-type request that asks for everything else

10   everybody else has said, which again we are -- we've

11   uniformly said is not appropriate.

12             But other than that --

13             THE COURT:  All right.  Well, putting that one

14   aside.

15             MS. VANLARE:  Putting that one aside, I think,

16   while it will present some challenges given, again, we've

17   had (indiscernible) meet and confers with other parties and

18   have -- we haven't necessarily done sort of searches in

19   relation -- in response to specific objections, we've done

20   kind of global, we can certainly take a look, Your Honor,

21   with respect to those specific requests and see if we can

22   produce in response to those.

23             THE COURT:  All right.  And obviously there may be

24   instances where that response has been narrowed down based

25   on certain conversations, and so my thought is whatever that

Page 52

```
 1    current response looks like, and if there are things that

 2    are, for one reason or another, inappropriate to share with

 3    Mr. Medina without redactions or otherwise, again, I don't

 4    have the request in front of me, but I guess the idea would

 5    be to follow form.  He shouldn't end up in a better place

 6    but end up in a similar place subject to confidentiality

 7    concerns.

 8             All right.

 9             MS. VANLARE:  Understood, Your Honor.

10             THE COURT:  So, Mr. Medina, you mentioned one

11    other issue.

12             MR. MEDINA:  Yes, Your Honor.  It's one other

13    issue.  Before -- the other issue is really -- it's pretty

14    straightforward.  I just wanted to hopefully clarify, Your

15    Honor, with regards to confidentiality, I note that we did

16    provide an executed, signed document jumping onto Your

17    Honor's confidentiality order.

18             THE COURT:  Well, but again, there's a decision

19    that's out there.  And so, the idea would be if there are

20    customers that the Debtors have a relationship with and

21    there's information that would reveal their identity, and

22    they're not your clients, the thought would be to keep that

23    confidential in the same way it's being kept confidential in

24    the cases.

25             So, I don't know why discovery would change the
```

Page 53

1    rules of what's contained in the decision that teed these

2    issues up in the first place.  So, again, I am a bit

3    whistling in the dark, right, as -- so, as somebody who's

4    not on the ground on these issues and having been involved

5    in a lot of discovery in my former life, I recognize I'm

6    trying to lay out some general principles that are flexible

7    enough to be dealt with in the context of what's actually

8    going on.

9              So, that's why I'm referencing the opinion and

10   just trying to be sensitive to it without dictating exactly

11   what the outcome should be, because again, I don't know

12   enough.  I could give you a more specific answer, but it's -

13   - would be throwing darts at a dartboard.  So, I don't want

14   to do that.

15             So, what was the other issue you had?

16             MR. MEDINA:  Your Honor -- thank you, Your Honor.

17   That's fair.  With regards to the -- there was a planned

18   supplement filed on December the 29th.  It's document number

19   117, and we were just trying to get -- with regards to the

20   redacted parties, there's a second half of a schedule that

21   was filed regarding the retained causes of action, and I had

22   asked Ms. Vanlare just for information to understand what

23   the value is, further information and whether or not those

24   redactions could be removed to understand what the value is

25   of those retained causes of action in connection with this

Page 54

1    plan.

2            THE COURT:  All right.

3            MAN:  What's your Social Security Number?

4            THE COURT:  Hold -- somebody's got an open line

5    that shouldn't, so please mute yourself unless somebody

6    reveal their Social Security Number for all the world, which

7    would be a bad thing.

8            So, Ms. Vanlare, any thoughts on that and not on

9    the social security question?

10           MS. VANLARE:  So, Your Honor, the exhibit to the

11   planned supplement that Mr. Medina is referencing, as he

12   noted that the retained causes of action, the -- as I

13   understand it, I think Your Honor has been very clear about

14   the identities of the counter-party as to the expected value

15   of the claims.  They are not broken down by party.  What we

16   have in the -- obviously the disclosure statement, the

17   recovery analysis does make certain assumptions.  So, I --

18   if the question whether we can provide the amount that we

19   are estimating for each of these causes of action; is that

20   the request?

21           MR. MEDINA:  Yeah, that would -- that should do

22   it, and also whether or not any --

23           THE COURT:  And to follow up on the earlier theme,

24   the idea, in the interest of efficiency, if there are

25   similar requests made by other parties that sort of follow

Page 55

1    form with that, in other words, to the extent anybody else

2    is asked, and maybe there's conversations with the

3    committee, maybe there's conversations with some other

4    interested party, the idea would be if we can sort of fold

5    that -- Mr. Medina's concerns into those -- that process

6    that's already undergoing -- underway.

7            MS. VANLARE:  Your Honor, I should note, nobody

8    else has asked for this information.  I do think that

9    individual -- information with respect to an individual

10   cause of action I don't think is appropriate to provide.

11   That's covered by privilege.  That would basically -- that's

12   asking --

13           THE COURT:  Yeah, that's fair.

14           MS. VANLARE:  -- you know, what we're getting to.

15   You know, to the extent he's looking for a total number,

16   again, we've carved out certain things out of -- there's

17   certain claims that are not included here, but if he's

18   looking for a total estimate, we can consider it.  Again, I

19   do worry about the extent to which that information speaks

20   to the likelihood of success that the Debtors are

21   estimating, which is not --

22           THE COURT:  Well, I understand that.  And

23   certainly, I've had an occasion to talk to other parties in

24   other cases about that.  It does implicate privilege issues,

25   and that's true even in cases where that's really the only

Page 56

1       source of recovery for an unsecured creditor pool.

2              Here, that's clearly not the case.  So, I would

3       suggest, Mr. Medina, sort of keeping your eyes on the prize,

4       meaning I think the recovery really is driven here by the

5       assets and the valuation of those assets.

6              This isn't really a case that's all about the

7       retained causes of action.  I'm not trying to minimize them,

8       but that's really not the driver here.  So, I think you

9       cited for your clients the range of recovery is estimated to

10      be 73 to 100 percent, so I don't think --

11             MR. MEDINA:  No.  I'm sorry.  Excuse me, Your

12      Honor.  I (indiscernible) 60 to 100.

13             THE COURT:  Well, I don't think -- but up to 100

14      percent, and so, my -- again, my understanding is the

15      retained causes of actions aren't -- don't play the same

16      sort of central role here as they do in other cases.

17             So, again, I'm not saying they're not worthwhile,

18      but I don't know that they are of the same significance in

19      terms of understanding the plan, and perhaps it's just a

20      better course to find out what those retained causes of

21      action are to the extent that you have questions about that,

22      and what's not being essentially resolved by virtue of

23      agreements in -- between parties that are memorialized or

24      would be memorialized in the plan.

25             So, that might be a more valuable way to look at

Page 57

1    it, but again, beyond that, I can't really offer much

2    guidance.  It can be a little bit of a tricky issue, and

3    you'll have a discussion about it, and if there's still an

4    issue, we'll burn that bridge when we get to it, so.

5              MS. VANLARE:  Your Honor, I'd just like to clarify

6    because I know a lot of people listen to these hearings, and

7    so, when we're talking about the retained causes of action

8    just now, it's the specific ones that are stated.

9              Obviously, there are significant retained causes

10   of action against the DCG parties, against Gemini.  They are

11   not part of the schedule.  They are, however, retained, and

12   there's significant disclosure with respect to those that's

13   separate and apart in the disclosure statement, again not

14   directly relevant to this discussion with Mr. Medina.  I

15   just --

16             THE COURT:  Well, no, it may be to the extent --

17             MS. VANLARE:  I just want to make sure.

18             THE COURT:  To the extent your -- that your answer

19   refers to parts of the disclosure statement or other things

20   that have already been made available that parties may not

21   be aware of, that certainly is relevant.  But I'm sorry, I

22   cut you off.  So, what was the last part of your question?

23             MS. VANLARE:  Was that a question for me?

24             THE COURT:  Yeah, I wasn't sure if there's

25   anything else you wanted me to respond to in your statement.

Page 58

1            MS. VANLARE:  Oh, no, I didn't have a question.  I

2    just said I just wanted to clarify that in case there are

3    creditors on the line, I didn't want them to think that we -

4    - somehow those very significant causes of action are not

5    being retained or are not part of this.  They absolutely

6    are.  It's just that the specific questions that Mr. Medina

7    has are not with respect to those.  They're with respect to

8    the ones that are listed.

9            THE COURT:  All right, fair enough.  All right.

10   With that, I think we probably accomplished all we can

11   accomplish.  I trust you'll chat and see where you are, and

12   if the issue is not fully resolved, then you'll know where

13   to find me.

14            All right.  Thank you very much.

15            MR. MEDINA:  Thank you, Judge.

16            MAN:  Thank you, Judge.

17            MS. VANLARE:  Thank you.

18            THE COURT:  And -- thank you.  And with that, I'll

19   turn it back over to folks here in the courtroom.  I think

20   we are up to the contested matters that are -- and the

21   adversary proceedings.  That is the motion to dismiss that

22   was filed by the Debtors as well as Gemini Trust Company's

23   motion to dismiss counterclaims.

24            And so, I'm going to switch binders here for a

25   moment, and let me just make sure I have everything in front

Page 59

1    of me that I need.

2            All right.  With that, I'll turn it over to

3    Debtor's counsel.

4            MR. BAREFOOT:  Thank you, Your Honor.  Luke

5    Barefoot from Cleary Gottlieb for the Debtors.  Your Honor,

6    we are now under agenda Items No. 1 and 2 under the

7    adversary proceeding portion of today's agenda, the dueling

8    motions to dismiss filed by the Debtors and by Gemini in

9    that adversary proceeding with respect to the claims and

10   certainly the counterclaims, all with respect to the

11   additional tranche of GBTC collateral.

12            THE COURT:  Right.

13            MR. BAREFOOT:  I am pleased to report that the

14   parties at least do agree on the proposed structure and

15   sequencing of argument today.  So, subject to Your Honor's

16   preferences, what the parties would propose for the reasons

17   of judicial economy that we discussed in connection with the

18   scheduling order, and given the intertwined nature of the

19   claims and counter-claims, that rather than proceed on one

20   set of arguments with the motion to dismiss for the Debtors

21   and then kind of repeat some of that for the Gemini motion

22   to dismiss, what the parties have agreed is that for

23   efficiency we would make a combined presentation.  The

24   Debtors will go first, you'll briefly hear from the

25   committee, and then Gemini will make its presentation, and

Page 60

1    then the parties will reserve their rights on potential

2    rebuttal.

3              THE COURT:  All right, I think that makes a lot of

4    sense.  It always can be a little awkward both for briefing

5    and for argument when you have these kinds of cross

6    arguments on different counts and in different motions, but

7    we have the contractual issues and then we have the other

8    issues.

9              And so, that's the way I'm thinking of it rather

10   than thinking of it by motion, parsing it out by claim, not

11   that I won't do that when it comes time to write an opinion,

12   but please proceed.

13             MR. BAREFOOT:  Okay.  So, logistically, just --

14   Your Honor, then I'll first address the Debtor's motion to

15   dismiss Counts 2, 3, and 4 of Gemini's complaint, all

16   relating to the additional GBTC collateral, as well as

17   Gemini's motion to dismiss the Debtor's mirror declaratory

18   judgment action and preference claims with respect to the

19   additional collateral.

20             THE COURT:  All right.

21             MR. BAREFOOT:  My colleague, Mr. Massey, will then

22   briefly address the motions to dismiss the entirety of the

23   complaint as to GAP and Holdco, the other two Debtors.

24   You'll then, as I mentioned here from Mr. Shore on behalf of

25   the committee, which has intervened as an adversary, or as a

Page 61

1    party in the adversary proceeding, and then we'll turn it

2    over to Gemini.

3            THE COURT:  All right.  And just to let folks

4    know, again being in your shoes in the past, you never quite

5    know how much time the bench has spent on things.  I have my

6    little chart here of all the agreements.  I've gone through

7    them more than once.  And so, I have all the relevant

8    language, dates, little bullet points.

9            So, I say that so you can sort of skip the basic

10   level introduction.  I know what the dispute is about, and

11   so you can cut to the chase, and my hope is that we'll have

12   a discussion.

13           And so, I will apologize in advance for cutting

14   you off to the extent I had -- have questions, and I know

15   that we will no doubt do violence to beautiful

16   presentations, you know, historic speeches that you would

17   give, but the idea is to make sure I sort of go through a

18   list of things that were on my mind, and again, I appreciate

19   everybody's flexibility that way, so.

20           MR. BAREFOOT:  Very much appreciated, Your Honor.

21           THE COURT:  Let's proceed.

22           MR. BAREFOOT:  So, Your Honor, just to set the

23   stage a bit, we are proceeding somewhat unusually here with

24   an expedited briefing schedule and with discovery

25   simultaneously in advance of even obtaining a decision on

Page 62

1    these motions to dismiss simply because of the magnitude and

2    importance of these claims for creditor recovery.

3              THE COURT:  Right.  And I understand these need to

4    be resolved before confirmation, and I don't see any reason

5    why that wouldn't happen.  So, that's in my schedule baked

6    in.  It will happen.  We're, even before getting through all

7    the papers, working on a statement of facts.  So, that's

8    completely understood, and I think we're all on the same

9    wavelength.

10             The other thing to the extent that it's relevant

11   to the parties, my thought is that this should be a written

12   decision, but to the extent that I reach a decision and

13   understand exactly what I intend on doing, but a decision

14   isn't ready yet, most of the time I'm unwilling to tell the

15   parties what I'm going to do until I actually finish, but

16   there are times when I say, no, I know what the answer is.

17             So, if that's helpful in terms of understanding

18   where things are, I'm happy to do that if I'm in a position

19   to do that.  So, I'll keep that in mind.  Again, I'm well

20   aware of the cash burn of extensive litigation on items as

21   important as this.  So, I will endeavor to do that, if I

22   can.  As I said, I can't always do that, but sometimes I

23   can.  And so, we'll see where we are at the end of the

24   argument after I go back and think about it a bit more.

25             MR. BAREFOOT:  Understood.  Thank you, Your Honor.

Page 63

1    So, before getting to the nitty gritty of each of the causes

2    of action that are the subject of motions to dismiss, the

3    Debtors would stipulate that Gemini has ably pled a breach

4    of contract claim.  The problem is that that breach of

5    contract claim that they haven't actually brought doesn't

6    give them anything more than the same unsecured damages

7    claim that they have on their loan balances.

8           What they haven't pled and what they can't plead

9    is something more than that damages claim, whether it's a

10   secure -- an actual perfected security interest or a

11   constructive trust.  The terms of the agreements and the

12   pleadings make clear that those causes of action fail.

13          First off, Your Honor, the dispute as to whether

14   they have a security interest can and should be resolved on

15   the bedrock definition of what is the scope of collateral.

16   The additional GBTC only became collateral upon transfer by

17   GGC, the pledgor, to the GTC account held in the name of

18   Gemini.  That's crystal clear in the definition of

19   collateral, and the places that Gemini tries to point in

20   other areas of the agreement do nothing to undermine or

21   address that.

22          They do focus on, in the definition of collateral,

23   the for the benefit of language.  That is ultimately

24   unavailing, because Gemini reads out of the agreement the

25   immediately preceding words, which is that it needs -- for

Page 64

1   it to be collateral, it need -- it must not only be for the

2   benefit of Gemini, but it also has to be transferred by or

3   on behalf of the pledgor, which was GGC.  As to the by GGC,

4   it's uncontested that GTC did not make the transfer that the

5   agreements required to the GTC account held in Gemini's

6   name.

7        Second --

8        THE COURT:  Well, let me ask a very general

9   question here, right?  So, as is often the case in contracts

10  one party's citing the precise language and somebody else is

11  citing the intent, and so, in citing the intent, there's

12  this notion that this is fundamentally unfair the way the

13  Debtors have read this.  Everybody understood what was

14  supposed to happen and now here we are.

15        So, in addressing that fundamental fairness

16  question, what would you say, right?  I think I understand

17  your papers are crystal clear on how you read the contract

18  language.  And so -- and I think that this is something that

19  also bleeds into the constructive trust argument.  So, it's

20  a very big picture point, but I'd be interested in your

21  views.

22        MR. BAREFOOT:  Let me answer your question first

23  with respect to the claim for the issuance of a valid

24  security -- a pledge of the security.

25        THE COURT:  Right.

Page 65

1          MR. BAREFOOT:  Whether something is unfair or

2    turned out in a way that smells like sour milk to someone is

3    honestly just irrelevant to the legal, technical question of

4    whether this agreement granted a valid security interest in

5    the additional GBTC.  It's really just irrelevant to the

6    question.

7          As to the constructive trust claim, I think that

8    does go to the one element that maybe Gemini has validly

9    pled, which is whether there was unjust enrichment.  My

10   answer, though, is that unjust enrichment is its own cause

11   of action, and there are no cases in either of the parties'

12   brief where -- briefs where a Court imposed a constructive

13   trust based solely on allegations of unjust enrichment.

14         There has to be more in terms of a confidential or

15   a fiduciary relationship, a transfer that was made by the

16   party that's claiming the constructive trust, and those

17   elements -- and the party also having a prior interest in

18   the goods or securities over which they're seeking a

19   constructive trust, and all of those elements are absent.

20         THE COURT:  So, I guess asked another way, these

21   things seem to have happened over a fairly short period of

22   time.  And so, while people note the dates, they don't

23   really necessarily talk about the timing in connection with

24   the understanding of how things actually happened, and I

25   don't know if there's anything worth commenting upon or

Page 66

1    discussing in connection with that.

2         MR. BAREFOOT:  I mean, Your Honor, I think the

3    facts concerning the sequencing and the transfer that was

4    contemplated to occur and simply did not really aren't in

5    dispute.

6         I think one thing that is important to note about

7    that, though, is we don't think you need to get to the

8    parties' intent.  We think you can resolve this on the four

9    corners of the security agreement and the second amendment.

10   But if you want to look at intent, Gemini extensively pleads

11   in its complaint all the extensive efforts that it undertook

12   after the second amendment was signed before the petition

13   date to actually secure the transfer of the collateral to

14   its own account.

15        Those are extremely telling.  If Gemini is correct

16   and actually believed that the moment DCG transferred the

17   GBTC collateral to GBC, that that created a valid security

18   interest and a valid pledge, there would be no reason for

19   them to have quite rightly followed up with the Debtors to

20   secure the second leg of the intended agreement.

21        So, in terms of just what Gemini itself alleges,

22   the party's conduct is inconsistent with a kind of after-

23   the-fact, manufactured claim that the transfer by GC to GGC

24   itself created the pledge.

25        THE COURT:  All right.  Thank you.

Page 67

1          MR. BAREFOOT:  But let me just go back Your Honor

2     to the for the benefit of language, because as always kind

3     of is the case when you read the briefing in the days before

4     argument, you wish you would have said something a little

5     bit more clearly.

6          Here, Gemini has not alleged anywhere in its

7     complaint that the transfer from DCG to GGC was made on

8     behalf of GGC, and let me just say that again, because in

9     the parties' briefing, we really focused on why a reading of

10    that transfer as being on behalf of GGC was nonsensical, but

11    there's a more threshold, basic point on which Your Honor

12    could rule, and that's that they have not alleged in their

13    complaint that the transfer from DCG to GGC was a transfer

14    made on behalf of the pledgor, and that is a required

15    element of the definition of collateral.

16          THE COURT:  So, I understand this is in addition

17    to your other arguments about I think you have in your reply

18    (indiscernible) essentially nonsensical to transfer it for

19    the benefit of to the actual entity that it's supposedly for

20    the benefit of, but so you're saying that while you

21    discussed it that way in -- at some point in your papers,

22    they actually haven't pled it that -- in that matter.

23          MR. BAREFOOT:  That's exactly right, Your Honor.

24          THE COURT:  All right.

25          MR. BAREFOOT:  They did plead the other element,

Page 68

1    which is that the transfer was for the benefit of, and they

2    make some factual allegations about that, but there is

3    simply no allegations, much less facts, that would make it

4    plausible that a transfer from DCG to GGC was at the same

5    time a transfer on behalf of GGC.

6           And as Your Honor pointed out, and I think we can

7    rest on our papers on this, we do discuss extensively why

8    that reading, even if they had pledged it, would be somewhat

9    nonsensical.

10           THE COURT:  All right.

11           MR. BAREFOOT:  I also think, Your Honor, it's

12    going back to actually the question that you asked about

13    kind of the sequencing and the timing of this, I think it's

14    really important to keep in mind when we're reading this

15    that at the time the parties negotiated and executed the

16    second amendment, everyone absolutely understood exactly how

17    the flow of funds was going to operate.

18           This was not a generic agreement for any kinds of

19    future pledges.  This was bespoke and done specifically with

20    the additional collateral, that it was contemplated and is

21    in the agreement that DCG will transfer to GGC, GGC will

22    transfer to Gemini.

23           So, if the parties had actually intended to rely

24    on the on behalf of or for the benefit of language in the

25    security agreement, they could have done that in a crystal-

Page 69

1    clear way.  They could have done it 10 different ways.  They

2    didn't do anything to touch the definition of collateral in

3    the security agreement, and they incorporated that

4    definition into the second amendment, which means that until

5    and unless the securities were in the GTC account in

6    Gemini's name, they were not collateral.

7              Your Honor, just also addressing kind of a

8    mechanical issue, if you want to get to look outside of the

9    definition of collateral, it's very clear that there was no

10   mechanism in place for Gemini to actually exercise remedies

11   over the shares until they were in their possession.

12             So, if the parties had actually intended for the

13   pledge to become effective immediately upon the transfer to

14   GGC, for that to have any meaning, there would have had to

15   be some sort of a deposit account, control agreement, or

16   other mechanic in place to allow or enable Gemini to

17   actually enforce and foreclose on the collateral, because

18   otherwise all they have again is their unsecured contract

19   claim, and it's very telling, Your Honor, that the parties

20   in Section 2 of the Security Agreement actually amended the

21   remedies provision in the security agreement, and they did

22   nothing in amending that to put in place an enforcement

23   mechanism that would be effective any time other than Gemini

24   actually had possession of the securities as the agreement

25   contemplated.

1            So, I expect I might hear from the other side.

2    Well, that supports Gemini's view that there's got to be

3    some -- if there's an intent to pledge, an intent to protect

4    us, that there's got to be some kind of protection that

5    should exist until the actual transfer under the Debtor's

6    view.  So, what would your response be to that?

7            MR. BAREFOOT:  These are sophisticated parties who

8    knew what they were doing.  There were a lot of parties in a

9    similar position who -- and it's not unique to this case

10   when you have an entity that's in distress, there's a

11   scramble for assets, a scramble to improve your position.

12           The fact that the Debtors didn't ultimately

13   perform, you have a breach of contract claim, you have your

14   loan claims, you don't have an entitlement to something that

15   the agreement doesn't provide.

16           THE COURT:  No.  Right.  So, you're saying that

17   this is essentially a cryptocurrency version of what happens

18   in lots of cases that someone says, well, we're trying to

19   reach various agreements and we're going to try to protect

20   you in this way and keep things going, but as the ship

21   continues to sink, that we're not in a position to do that

22   and we end up in bankruptcy?

23           MR. BAREFOOT:  And the petition intercedes, and

24   they have their -- they have claims under the contract.

25   They have claims under their loans, and they're going to

Page 71

1    receive pretty generous recoveries under those.  But what

2    they're not entitled to under the terms of this agreement is

3    to hog that security for themselves at the exclusion of all

4    other unsecured creditors.

5            And just to be clear, under our proposed

6    resolution of this issue, Gemini would share (indiscernible)

7    with other unsecured creditors in the distribution of the

8    additional GBTC collateral.  It's just that they don't get

9    all of the additional GBTC collateral.

10           Your Honor, I think then I -- unless Your Honor

11   has other questions specific to the count on the issuance of

12   a pledge, I think I can turn at least from my perspective to

13   the property of the estate argument.

14           THE COURT:  Please.

15           MR. BAREFOOT:  So, this is squarely the --

16           THE COURT:  Well, I do have one question --

17           MR. BAREFOOT:  Sure.

18           THE COURT:  -- which is they -- Gemini at one

19   point references a title, right, a title of a section as

20   opposed to the language of a section and says that that

21   title conveys a certain intent of the parties, and I think I

22   have your response to that, but anything that you wanted to

23   specifically mention?

24           MR. BAREFOOT:  Is this in reference to Section 1

25   of the pledge agreement?

Page 72

1                THE COURT:  Yeah.

2                MR. BAREFOOT:  So -- of the original security

3       agreement.  Actually, one thing that I would like to add to

4       that is that Section 1 of the pledge agreement is not about

5       the additional GBTC.  It's about the original GBTC that was

6       actually transferred in August of 2022.

7                So, to try to read an intent or infer something

8       from that section doesn't really make sense when we're

9       talking about a separate bucket of collateral.

10               THE COURT:  All right.

11               MR. BAREFOOT:  So, let me turn to the property of

12      the estate argument.  Your Honor, from our perspective, this

13      is squarely foreclosed by the terms of the second amendment

14      which Gemini really fails to engage with in the briefing.

15               Section 1 of the second amendment makes expressly

16      clear that DCG was transferring "all right, title, and

17      interest in and to the additional collateral free and clear

18      of all liens, claims, and encumbrances," full stop.

19               So, this language has no limitation or caveat that

20      would suggest or provide that GGC somehow received or had as

21      of the petition date anything less than full legal and

22      equitable title.  There's just no basis in the second

23      amendment to argue that GGC acquired some limited interest

24      in the additional collateral, and I think the cases that

25      Gemini cites, you know, some of which for example occur --

Page 73

1    arose in the context of an escrow agreement really are

2    distinguishable and unavailing from a situation where you

3    have a full, clean transfer of title.

4           Gemini's property of the estate argument is also

5    internally inconsistent and self-defeating.  If Gemini

6    didn't -- or excuse me -- if Genesis did not acquire full

7    legal title, it could not have pledged the additional GBTC

8    shares to Gemini and it could not have made the

9    representations concerning title free and clear that section

10   5B of the Security Agreement would have required.

11          That's all I wanted to say about constructive --

12   or about property of the estate, and I propose we move to

13   constructive trust.

14          THE COURT:  Yeah, that would be fine.  I just want

15   to make sure -- obviously I have the agreements because

16   they're attached to the complaint.  So, you're saying the --

17   Section 1 of the Security Agreement entitled Transfer of

18   Collateral is referencing the transfer of the initial

19   collateral.

20          MR. BAREFOOT:  Of the security, Your Honor.

21   That's correct.

22          THE COURT:  Right.  Yeah.  All right.

23          MR. BAREFOOT:  That's correct.

24          THE COURT:  I just -- you said that, and I wanted

25   to make sure I connected all the dots looking -- having it

Page 74

1    in front of you.  So, thank you.

2            MR. BAREFOOT:  So, Your Honor, turning to the

3    constructive trust argument, at the outset this is barred by

4    the existence of a valid contract between the parties.  All

5    of the arguments you're hearing today are about our

6    competing interpretations of the agreements that govern the

7    additional GBTC collateral, and Gemini concedes that, as it

8    really must, this is a principle under New York law that

9    generally a -- the existence of an agreement forecloses a

10   constructive trust claim.

11           Its answer to that defense is mainly the

12   misstatement that they're not bound by the terms of the

13   second amendment because the Debtors are challenging its

14   validity.

15           The Debtors are doing no such thing.  The Debtors

16   are putting forth their own interpretation of the second

17   amendment, but if you contrast what we did with the second

18   amendment with what we did with the first amendment, we are

19   challenging the first amendment.  We brought a constructive

20   fraudulent conveyance claim with respect to the first

21   amendment.

22           We didn't bring any such claim with respect to the

23   second amendment and all of our arguments and our own

24   declaratory judgment action depend on the existence and

25   interpretation of the second amendment.

1              THE COURT:  All right.  To segue to a related

2      topic, the language is about nobody being a fiduciary for

3      anybody in connection with this, which you obviously cite

4      prominently.  There's -- Gemini sort of tries to put some

5      guardrails around that, and what's your response to that?

6              MR. BAREFOOT:  That's exactly where I was going to

7      go, Your Honor.  Gemini's arguments on this are dancing on

8      the head of a pin at best.  They're saying that the

9      disclaimer in the Master Loans Agreement of any of the

10     existence of any fiduciary relationship pertains to the

11     loans, Capital L Loans.  It doesn't pertain to the Security

12     Agreement.

13             The Security Agreement incorporates all of the

14     defined terms from the Master Loan Agreement and the entire

15     purpose and intent of the Security Agreement is to secure

16     the obligations under the Capital L Loans, where the parties

17     in the Master Loan Agreement disclaimed a fiduciary

18     relationship.

19             THE COURT:  Is there a place that you would have

20     me look in the agreements themselves that you think best

21     memorializes that proposition?

22             MR. BAREFOOT:  I think it would be --

23             THE COURT:  I mean, I'm looking at the -- I'm

24     looking at Exhibit 1, the complaint, and the -- which is the

25     Security Agreement, and there's a whereas clause which makes

Page 76

1    -- the second whereas -- or the first whereas clause on the

2    first page makes reference to the Master Loan Agreements,

3    but -- and so, that's one place where I clearly saw it, and

4    it pops up in other places, but I was just curious to get

5    your take if there's anything that is particularly relevant

6    from your vantage point.

7              MR. BAREFOOT:  Your Honor, I think it's also the

8    second warehouse clause, where it says that the Security

9    Agreement is entered into in consideration of transactions

10   under the Master Loan Agreements, and that the pledge is to

11   secure the pledgor's obligations under the Master Loan

12   Agreements.

13             There's not an express bring down, I would say, of

14   that representation that's made that there is no fiduciary

15   relationship, but the fact that the parties didn't restate

16   it doesn't nullify it, and given the close and intertwined

17   relationship between the Security Agreement and the Master

18   Loan Agreement, I think it applies to their constructive

19   trust.

20             THE COURT:  And so are you saying -- I guess

21   there's two ways you could -- you view that, and maybe you

22   don't necessarily need to choose.  One, you could say the

23   language bars this claim, or you could say if you're looking

24   at all the evidence, it essentially pushes it to one side if

25   you're -- well, we're not looking at evidence, but the idea

Page 77

1    is if you're looking at the contract, you're trying to

2    understand the intent of the parties, there's that and there

3    isn't anything to contradict that.

4            MR. BAREFOOT:  Exactly right, Your Honor.

5            THE COURT:  All right.

6            MR. BAREFOOT:  And the entire Security Agreement

7    makes no sense unless there are Capital L Loans outstanding.

8    The purpose is to secure the obligations under those loans.

9    So, to say that the representations made in the Master Loan

10   Agreement have no relevance to the Security Agreement is

11   kind of ignoring the context.

12           THE COURT:  All right.

13           MR. BAREFOOT:  Turning to kind of the third

14   argument under the constructive trust font, there was no

15   transfer of value from Gemini.  All of the authorities that

16   we cited in our reply make clear that we don't think there

17   can be a constructive trust claim where Gemini didn't have

18   an interest in the property prior to the transfer.  It was

19   DCG's property when it was transferred to the Debtors.

20   Gemini had no interest in the property prior to entry into

21   the second amendment to the security agreement.

22           THE COURT:  All right.  And getting back to I

23   think where you started, it sounds like it's your view that

24   if the argument is, well, there has to be some way to remedy

25   this wrong, your view is that's what the breach of contract

Page 78

1   claim would be for.

2          MR. BAREFOOT:  Correct, correct, which they

3   haven't brought, and I understand why.  So, just finally,

4   Your Honor, on the constructive trust argument, there was no

5   unjust enrichment.

6          As I said, I think if you've pushed me to say

7   which of the factors of a constructive trust has Gemini

8   arguably pled, I think I'd say it was maybe unjust

9   enrichment, but New York law is unequivocal that a

10  constructive trust claim will fail in the absence of unjust

11  enrichment, and as the authorities in our brief make clear

12  in the bankruptcy context where the ultimate benefit of the

13  additional GBTC collateral isn't staying with the Debtors,

14  it's going to be distributed ratably to all of our

15  creditors, there's nothing unjust about that.

16         Even if the Court finds that they have adequately

17  pled unjust enrichment, that alone can't sustain a

18  constructive trust claim.

19         THE COURT:  So, what's the relationship between

20  the first argument and the second argument?  So, I'm

21  assuming your view is that if I find in the Debtor's favor

22  in the first argument, that that essentially in a way guts

23  the constructive trust argument because you say, well, this

24  is the way to read the contract.  So, therefore, if they

25  weren't entitled to the security, they -- there can't be an

Page 79

1   unjust enrichment.

2           MR. BAREFOOT:  Well, I think you could also get to

3   the same place, Your Honor, by saying if I'm interpreting

4   the Security Agreement in the second amendment and I find

5   that those are valid contracts that govern this issue, that

6   alone precludes a constructive trust claim, because there is

7   an agreement that the parties memorialized that under which

8   they had rights and claims there was no need for a

9   constructive trust.

10          THE COURT:  Right.  Well, I guess what I'm saying

11  is if the Debtors prevail on the argument as to the security

12  interest, is it your view that there's no way they could

13  prevail on the constructive trust?

14          MR. BAREFOOT:  I think they are independent, Your

15  Honor, and I don't think that dismissal -- in candor, I

16  don't think that dismissal of Count 2 --

17          THE COURT:  Mandates a dismissal of --

18          MR. BAREFOOT:  -- necessarily means that Count 4

19  would have to fail, unless you went with the theory that I

20  just articulated that if you are interpreting the second

21  amendment and saying that's the agreement that governs that

22  bars a constructive trust claim, I think in that way it --

23          THE COURT:  Well, let me back up for a second and

24  ask it this way.  I certainly can understand as a

25  theoretical matter that you could have a constructive trust

Page 80

1   claim and a breach of contract claim and say -- I'm sorry, a

2   claim -- security interest, and if you found that the party

3   had no security interest, you could still potentially have a

4   constructive trust claim.

5           I guess my question is on these facts, is that

6   possible, or is it very much shorting your (indiscernible)?

7   You're either dead or alive, and if you -- if on these facts

8   you -- Gemini doesn't win on its argument about security

9   interest on these facts, it can't win in the constructive

10  trust?

11          MR. BAREFOOT:  I think as long as Your Honor finds

12  that there is a valid and enforceable agreement and that's

13  what you're interpreting to determine whether there's a

14  security interest or not, I think that does foreclose a

15  constructive trust claim.

16          THE COURT:  All right.  I understand that you've

17  argued a number of things.  I'm just trying to tease out the

18  -- how they relate.

19          MR. BAREFOOT:  And there's eight different ways

20  you could skin that cat, and it's much more difficult, I

21  think, on the Gemini side to find enough factors to

22  plausibly state a constructive trust claim.

23          THE COURT:  All right.

24          MR. BAREFOOT:  So, let me turn, Your Honor, then

25  to -- I think that that brings us to the -- our response to

Page 81

1    Gemini's motion to dismiss.  So, first, Your Honor, they

2    moved to dismiss Counterclaim No. 4.  Counterclaim No. 4

3    seeks a declaratory judgment that there was no security

4    interest in the additional GBTC.  That is the 100-percent

5    mirror image of Gemini's Count 2, so I'm not going to spend

6    time on this, because in practice the dismissal of the

7    Debtor's counterclaim for a declaratory judgment would not

8    only be inconsistent with Gemini's Count 2 proceeding, but

9    it has -- it will have no practical effect.

10         As Gemini concedes, this Court is either going to

11   rule on the motion to dismiss in the context of Gemini's

12   declaratory judgment action or the parties are going to

13   proceed to discovery, and you'll hear from us at summary

14   judgment or at trial.

15         But one way or the other, as long as Gemini's

16   Count 2 for a declaratory judgment is going forward, there

17   will be a determination by the Court as to whether there was

18   a security interest in the additional GBTC collateral.

19         So, it really does nothing to -- other than give

20   them another bite at the apple to make the same contractual

21   arguments to say that our Counterclaim 4 should be

22   dismissed.

23         THE COURT:  All right.

24         MR. BAREFOOT:  So, then briefly, Your Honor, on

25   the safe harbors.  To set the stage on this a little bit, we

1   certainly expect, and you've seen from the pleadings that

2   are now being cited back at us from our dispute with Three

3   Arrows Capital, there is a very unsettled area of law here,

4   and we certainly, after the close of discovery, expect to

5   have a very spirited debate with Gemini about whether the

6   safe harbors apply, but it's procedurally inappropriate and

7   not possible to foreclose the question of whether the safe

8   harbors apply based on essentially arguments made by another

9   Debtor in another proceeding that were never ruled on.

10          And they do say in their reply, Your Honor, they

11   make the point that GGC was a party to that claim objection.

12   That's correct, but the basis on which GGC moved to expunge

13   those claims was effectively a no liability, that, you know,

14   it had no relationship with Three Arrows.  The relationship

15   with Three Arrows wasn't (indiscernible) GAP, the foreign

16   affiliate.

17          There was no evidence put in, in terms of either

18   the expert report or the declaration or the documents about

19   GGC.  It was all about GAP.  So, for example, when we --

20          THE COURT:  So, but let me cut you off there.  I

21   mean, this sounds very much like a motion for summary

22   judgment argument, right?  I think that's your point, right?

23          MR. BAREFOOT:  Correct, Your Honor.

24          THE COURT:  Is that based on the pleadings -- and

25   I think they're going to say, I think their argument is it's

Page 83

1    implicit that there's a representation that essentially it's

2    some sort of estoppel argument.  There hasn't been a finding

3    by a Court, so it's really not res judicata or collateral

4    estoppel.  So, I believe you correctly identified as sort of

5    a judicial estoppel argument that you've relied on something

6    for your benefit and can't change horses midstream.

7            But I'm guessing that your argument is that that

8    really is a factual discussion, not a pleading discussion,

9    right?  In other words, you can't do it based on what I have

10   in front of me.  We might be having a different discussion

11   if we were talking about summary judgment and what -- who's

12   got what burden and what that does, and whether the elements

13   are met.

14           But I think I understand your argument to be

15   that's not a today issue, putting aside whether you're

16   right, you're wrong, whoever is right, that that's -- is

17   that right?

18           MR. BAREFOOT:  That's exactly right, Your Honor.

19   And they make the point in their reply that they actually

20   are not trying to invoke judicial estoppel, and they're

21   right that they couldn't because there was never any ruling

22   or finding on this.

23           The Three Arrows Dispute was obviously settled

24   before the Court heard any of the evidence that we filed

25   that they now rely on.

Page 84

1            THE COURT:  All right.

2            MR. BAREFOOT:  Your Honor, they also kind of make

3    the point that this is not our pleading in the alternative,

4    that we didn't say this was in the alternative.  There

5    really was no opportunity for us to say that this was in the

6    alternative.  Aat the time, that was in a different

7    proceeding where we didn't yet have this adversary, but

8    there's no reason given the temporal difference and the

9    different procedural posture that we should be foreclosed

10   from making the argument that the safe harbors do not apply

11   and taking discovery to determine that.

12           I think one important position that I'd just like

13   to note in terms of discovery that we do need, they make

14   very, very much of the point that Gemini is a trust company

15   and therefore is a covered entity for purposes of the safe

16   harbors, but there's been no position taken by Gemini, much

17   less a ruling by Your Honor, as to whether Gemini is the

18   initial transferee or whether Gemini is a mere conduit and

19   the initial transferees are the (indiscernible) users

20   themselves.  So, without that ruling, it would be really

21   inappropriate to say I'm going to dismiss the preference

22   action because we don't know who the initial transferee is

23   yet.

24           THE COURT:  All right.

25           MR. BAREFOOT:  And just finally, Your Honor,

Page 85

1    there's no evidence here of what the assets were, right?  We

2    have the -- we have as an exhibit to the complaint the

3    Master Loan Agreements, but those are just template

4    agreements, those don't discuss what the actual assets that

5    were being loaned or borrowed were, and what the term of

6    that loan or borrow was.

7            At minimum, I think as Gemini concedes, for these

8    to be commodities or securities agreements, we would have to

9    have evidence of what the assets were that were being loaned

10   and a determination as to whether those assets were

11   securities or were commodities.

12           That's not anywhere in the record.  We don't have

13   anything in terms of the complaint or the exhibits as to

14   what was actually loaned that would enable the Court to make

15   a determination as to whether something is a security or a

16   commodity.  That also could be a very much fact-intensive

17   question where the Court could benefit from expert reports

18   and the like.

19           And just finally, there is the two-day issue that

20   they also concede.  Even if it is a loan of a security or a

21   commodity, in order for the safe harbors to apply, it has to

22   have a duration of more than two days.

23           THE COURT:  Right.

24           MR. BAREFOOT:  There's no allegations about for

25   all of the hundreds or even thousands of transactions what

Page 86

1    the duration of them were, and if they were open term, which

2    I think many were, whether in practice any of them were

3    closed out within two days.

4           So, without that kind of a factual record that

5    would develop in discovery, I just don't see how the Court

6    can rule on the safe harbor arguments at this point.

7           THE COURT:  All right.  Thank you very much.  Give

8    me a second to just check my notes over --

9           MR. BAREFOOT:  Of course, Your Honor.

10          THE COURT:  -- (indiscernible) you do the same.  I

11   think I understand your view about the term agreed to pledge

12   -- agreed to pledge to language, which is relied upon by

13   Gemini as essentially being consistent with a next step as

14   opposed to an actual pledge itself or has pledged or

15   something to that effect, but I don't know if there's

16   anything beyond what's in your papers that you wanted to say

17   on that subject given how much ink has spilled.

18          MR. BAREFOOT:  Your Honor, I think we can rest on

19   our papers on that.

20          THE COURT:  All right.  And with that, I do not

21   have anything further.

22          MR. BAREFOOT:  Thank you very much, Your Honor.

23   I'll cede the podium to Mr. Shore for the committee.  Oh,

24   excuse me.

25          THE COURT:  Yes.

1          MR. BAREFOOT:  I completely misspoke, and I will

2     cede the podium of my colleague, Mr. Massey, who's going to

3     address the hanging chad that I did not address, which is

4     the motion to dismiss the entirety of the complaint as to

5     the affiliate Debtors GAP and Holdco.

6          THE COURT:  Yes.

7          MR. BAREFOOT:  Thank you, Your Honor.

8          THE COURT:  All right.

9          MR. MASSEY:  Good morning, Your Honor.

10         THE COURT:  Good morning.

11         MR. MASSEY:  Jack Massey, Cleary Gottlieb Steen &

12    Hamilton for the defendants and counterclaim plaintiffs in

13    this matter.

14         As Mr. Barefoot alluded to, I'll be addressing the

15    Debtor's request for dismissal of all counts in Gemini's

16    complaint as to Genesis Global Holdco, LLC, or Holdco, and

17    Genesis Asia Pacific PTE Limited or GAP.

18         It is black letter law that a plaintiff must

19    allege facts sufficient to support a claim that is plausible

20    on its face as against each defendant.  Here, Gemini has

21    made specific allegations as against GGC to which GGC has

22    responded, but as against Holdco and GAP, Gemini has made a

23    handful of allegations against "Genesis," which they define

24    as GGC, Holdco, and GAP, and they've made a handful of

25    specific allegations against Holdco and GAP that are

Page 88

1    irrelevant to the relief sought.

2            Gemini admits that GGC was the only borrower under

3    the Earn Program, GGC was the only Genesis entity that was

4    party to the lending and security agreements that governed

5    the Earn Program, and GGC was the only entity that faced

6    Gemini in connection with the Earn Program.

7            Gemini's own pleadings state accurately that GGC

8    was the entity that received the additional GBTC shares from

9    DCG and did not pledge them on to Gemini, and these are the

10   core facts that give rise to Gemini's claims here.  They all

11   concern GGC.

12           Gemini argues that Holdco and GAP are appropriate

13   defendants because their complaint includes factual

14   allegations against those entities, and this is just not

15   accurate.

16           In their complaint, genocide -- Gemini, excuse me,

17   speculates that Holdco or GAP "may be holding the additional

18   GBTC shares now, and that one or both of them may be

19   responsible for the decision not to transfer those shares."

20   These are not factual allegations.  These are speculation,

21   and they do not form a basis on which a plausible claim for

22   relief can be stated.

23           Gemini also argues that their complaint alleges

24   that Holdco and GAP were "important players in the events

25   giving rise to Gemini's claims."  They do not cite any

1    allegation in the complaint to support this statement.

2            THE COURT:  So, I'm not -- I agree with you.  The

3    important players language doesn't really -- I'm not sure

4    what that means, but the language about may be holding

5    shares, so is the notion that they have them in there

6    because if they can't be afforded complete relief if they

7    don't include them, what's your -- do you have any thoughts

8    on that?

9            MR. MASSEY:  They mentioned that they don't

10   understand fully the corporate relationship between the

11   three Debtors and that we don't specify in our pleadings

12   whether Holdco and GAP might have an interest in the

13   security account in which the shares are held, and for that

14   reason, somehow that means that Holdco and GAP need to be

15   defendants in this action.

16           I don't think that gets you to it isn't possible

17   for there to be complete relief if Holdco and GAP are not

18   defendants in this action because, in fact, it is GGC that

19   has the security -- that has -- that holds the account, that

20   holds the shares.

21           Gemini has not pleaded otherwise.  There's no

22   facts in the record to suggest that somehow Holdco or --

23   and/or GAP control that account, and I think that answers

24   the concern.

25           THE COURT:  All right.  And as to the other

Page 90

1    language, may be responsible for decisions, I'm assuming

2    that your view on that is that that's too generic and too

3    general without something more?

4            MR. MASSEY:  It's simply speculation.  I think in

5    their pleadings, they allege that Gemini -- excuse me,

6    "Genesis" without specifying which entity, made the decision

7    not to transfer the shares on, and that's the basis for the

8    argument that maybe the other two Debtors may have had

9    something to do with that decision, but there's no more

10   particularized delegation than that, just to say maybe it

11   was a different one, and there's nothing in the record to

12   suggest that.

13           THE COURT:  Well, I guess in thinking about that,

14   I'm not sure it matters.  If the question is what the

15   security interest is, it either exists or it -- or a

16   constructive trust either exists or it doesn't exist, and it

17   doesn't really matter who decided to do what on those

18   counts.

19           I suppose it could potentially matter in discovery

20   on the equitable claim, but for the security interests, it

21   would seem to be irrelevant.  Any other thoughts on that

22   language?

23           MR. MASSEY:  No, I would just say I think that --

24   I think your take is quite right.  I think that the facts

25   here are fundamentally not in dispute, and therefore who may

Page 91

 1    have been, you know, contributing to some -- to the decision

 2    not to pledge the shares once they were received from DCG is

 3    neither here nor there.  The shares were received by GGC and

 4    they were not pledged by GGC, and that's not in dispute.

 5            THE COURT:  All right.  So, let me ask you a

 6    similar question as I asked Mr. Barefoot in terms of the

 7    relationship of this argument as to GAP and Holdco, as to

 8    the other aspects of the complaint.  What impact, if any,

 9    does a ruling on the security interest question, the

10    constructive trust question, have as to GAP and Holdco?

11            If I -- so, one thing.  If I rule in your favor,

12    or if I rule in Gemini's favor, any thoughts on that

13    question?

14            MR. MASSEY:  Your Honor, it seems to me that the

15    claim that Gemini has here is against GGC.  GGC undertook

16    all of the relevant actions here.  GGC was the party that

17    faced Gemini in all of the relevant contracts, in the

18    relationship, and there simply not a -- there is no

19    equitable effect on GAP or Holdco against whom Gemini has no

20    particular claim or equitable claim that it doesn't have

21    against GGC.

22            THE COURT:  All right.  You had said before sort

23    of loosely that, you know, GGC has the shares, and I wasn't

24    sure if it was appropriate or not to take that as a

25    representation about a fact, because in some senses, it does

Page 92

1    seem to moot out some of the dispute here, and as you know,

2    judges are always looking for practical solutions to

3    problems.  So, I don't know if there's anything worth

4    discussing on that front.

5              MR. MASSEY:  No, Your Honor.  I think we have not

6    -- there simply aren't facts in the record as to, you know -

7    - there is fulsome discovery that needs to happen on this

8    case.

9              THE COURT:  All right.

10             MR. MASSEY:  And we're not representing at this

11   time as to, you know, the extent of the interests of the

12   other Debtors in that securities account, but I think the

13   point stands that there is no claim against Holdco and GAP

14   that is particular and separate from the claim that is

15   against -- properly against GGC.

16             THE COURT:  All right.  And I think you answered

17   the question about what happens if, for some reason, I

18   decide to entertain Gemini's -- I end up agreeing with

19   Gemini on the security interest and/or the constructive

20   trust, and what impact that has or doesn't have as to GAP

21   and Holdco.

22             If I conclude that -- so, flipping that, if I

23   conclude that I agree with you all on the security interest

24   and the constructive trust arguments, does that moot out or

25   just -- well, let me put it another way.  Does that mandate

Page 93

1    a dismissal of the counts of the complaint as to GAP and

2    Holdco because there's nothing left?

3          MR. MASSEY:  I believe it does, Your Honor.

4    They've pleaded all of their claims as against all three of

5    the entities without specifying, you know, which allegations

6    support which claims, particularly as to which Debtor, and I

7    believe that to the extent that you dismiss the claims that

8    we're talking about here as to the additional GBTC shares,

9    that moots out the claims as against the other two Debtors

10   as well.

11         THE COURT:  All right.  Mr. Massey, anything else

12   that you'd like to address?

13         MR. MASSEY:  No, that's all the points that I

14   wanted to touch on, so unless Your Honor has any further

15   questions, that concludes our full argument this morning in

16   support of the motion to dismiss, and we'll reserve on

17   rebuttal after hearing from Gemini.

18         THE COURT:  All right.  Thank you very much.

19         MR. MASSEY:  Thank you, Your Honor.

20         THE COURT:  Very happy to hear from you, Mr.

21   Massey, and now we'll hear from the committee.

22         MR. SHORE:  I think it's good afternoon, Your

23   Honor from White & Case --

24         THE COURT:  Well --

25         MR. SHORE:  -- on behalf of the committee.  The

Page 94

1    committee is an intervenor in these adversary proceedings,

2    and we've committed not to be duplicative of anything that

3    the Debtors have been doing, and the fact -- but I want to

4    be clear, the fact that we haven't filed papers on this does

5    not mean that the UCC is not interested in this topic but

6    rather that we fully endorse what the Debtors have done,

7    what Mr. Barefoot and his team have done, in particular

8    bringing this issue to Your Honor quickly so that we can get

9    it resolved prior to confirmation.

10          Let me start here and explain maybe for -- less

11   for you and more for the people watching why the committee

12   is siding with the Debtors on this and against a large group

13   of creditors.

14          In any big case, the UCC is keenly interested in

15   allegations that a Debtor granted a security interest to a

16   party, to an unsecured creditor, on account of an antecedent

17   debt.

18          That is the allegation here.  There were loans

19   that were outstanding and the creditor came and said I want

20   a grant of a security interest, and the Debtors are alleged

21   to have done that.

22          It gets even more keen when that transfer is done

23   either within 90 days prior to the petition or within one

24   year, depending on whether it's an insider or not, and even

25   most keen when, whether or not that creditor actually got a

1    validly perfected security interest, has such a demonstrable

2    effect on creditor recoveries.

3              To be clear, the Gemini complaint says recognizing

4    the security interest will be a boon to the Gemini

5    creditors, but it will be a horrible result for the general

6    unsecured creditors, the Debtors who will not be looking to

7    that additional collateral until the Gemini lenders are paid

8    in full.

9              In any big case, when a committee is looking at

10   that situation, a grant of a security interest in an

11   antecedent debt, we're really focusing on two issues, the

12   actual grant or transfer of the interest in the Debtor's

13   property, and the appropriate notice to the creditor body by

14   perfection.

15             We've got issues with respect to both grant and

16   appropriate notice with respect to tranche one.  That's not

17   an issue that we're going to address today.  What we are

18   addressing is the tranche two, or what people have been

19   calling the additional collateral, and it's both an issue

20   with respect to the purported grant and to appropriate

21   notice.

22             Throughout the Gemini papers, they use the word

23   myopic focus on the grant.  That's exactly what has to be

24   done and what's done in every case, and that's what ends up

25   with results where a creditor who thought they were getting

Page 96

1    a lien on a million shares of stock got a lien on 1,000

2    shares of stock, because the person who typed up the grant

3    on no sleep wrote the word 1,000.  It's what causes somebody

4    who put a grant with the long name and not the abbreviation

5    was found not to have a security interest, or the opposite,

6    that they used the abbreviation and not the long name, and

7    it goes a little bit to the notice issue.

8            But the fact is in bankruptcies all the time, if

9    you don't get an exact grant with myopic focus by UCCs and

10   the Courts on what is actually granted, there's nothing

11   unfair about that, going back to the question you raised.

12   It's just the operation of the law, because it's not fair to

13   the general unsecured creditor body to be giving away

14   property interests of a Debtor when in fact, based on the

15   gestalt of the deal, rather than the exact language that the

16   parties put in the grant in Section 2 of the Security

17   Agreement that's in the record.

18           It is -- these kinds of grants are strictly

19   construed without the regard to subjective beliefs or the

20   gestalt of the deal, as I said.  This particular grant, as

21   Mr. Barefoot laid out, has a two-step process, and the

22   second step requires a transfer to Gemini or somebody that

23   Gemini controls, and that's not an oddity here.  It's

24   exactly what's needed.  There's -- just as an aside, there

25   is a debate in the crypto community, the crypto lender

Page 97

1    community, as to how you go about perfecting a lien on

2    crypto.  Can you do a grant of an interest in a security

3    agreement, do a UCC one, file the financing statement in the

4    appropriate place, also very difficult to figure out in a

5    crypto world, and perfect your interest that way, or do you

6    with a grant of interest and possession?

7            This regime is clearly the latter.  The security

8    agreement makes clear in Section 1, there needs to be a

9    transfer of collateral.  There is no UCC -- contemplated UCC

10   1 financing statement or DACA contemplated in the security

11   agreement and no allegation that either exists.

12           This is a possession perfection regime, and Mr.

13   Barefoot raised the issue of plausibility and noted, quite

14   correctly, why are you calling every day to get possession

15   of the collateral if possession of the collateral was not

16   necessary?

17           But let's focus on this other point.  The -- Count

18   3 is premised on the following story.  Three AC happens.

19   Gemini appropriately goes out and hires counsel to say what

20   is the effect of this.  The lawyers say you got to get a

21   security interest, and they talk about how they're going to

22   go about getting that security interest.

23           What they're saying now is what we actually

24   contemplated was that we get a security interest in

25   something that we weren't going to perfect.  That makes no

Page 98

1    sense.  Why would you ever take a security interest in

2    collateral when you have no ability to perfect that security

3    agreement -- interest?

4            So, obviously, what was happening here was a grant

5    of a security interest in what would fall into Gemini's

6    hands, either Gemini directly or somebody on behalf of

7    Gemini holding it for Gemini, and that's how the perfection

8    regime was going to work.  It was not this idea that what we

9    were going to do is grant a security -- as I said, grant a

10   security interest in something that we couldn't perfect on.

11           It also, this allegation that we have an interest

12   in property that we're not going to be able to perfect,

13   amounts to a secret security agreement, and there's a lot in

14   the law on the disfavoring of secret security agreements,

15   and that brings me to the issue of creditor notice.

16           There's no UCC 1, no DACA.  There's no -- there

17   will be no -- under their theory, there will be no notation

18   in the financial statements of Genesis of the interest in

19   the property, which is still on the books of GGC.  GGC will

20   just have a financial statement that says we hold all this

21   additional -- all these additional shares, and there'll be

22   no notation that those shares are either pledged or that

23   they're in the -- they're currently being held as collateral

24   for another loan.

25           So, it's not only -- it's going to throw a lot of

Page 99

1    "nots" in here, it's not only not unjust for Gemini to

2    obtain its interest post-petition, it's actually unfair to

3    the unsecured creditor body, many of whom who deposited

4    after August 2022, for the Court to recognize a security

5    interest or ownership interest in hundreds of millions of

6    dollars of GBTC which is on -- recorded on GGC's books or --

7    not getting into that debate over which entity -- on the

8    Debtor's books.

9              THE COURT:  And so, your point I'm taking is that

10   by moving the collateral off the books, it's no longer

11   secret, meaning no one's relying on that as collateral on

12   the books because it's not on the books.  It's been

13   transferred.

14             MR. SHORE:  Right, and that's why they -- that's

15   why you need to do a strict construction of both the grant

16   and focus on why that grant is being given in what would be

17   possessed, because that's the event that's going to provide

18   the notice.

19             So, when we think -- and I'm not trying to fault

20   Gemini for what they did.  Obviously, they attempted to be

21   proactive.  They tried to do the best they could to secure

22   their fiduciary's recoveries, and they were let down by the

23   Debtor.

24             Okay.  But everybody's been let down by the

25   Debtor.  All the unsecured creditors, almost the entirety of

Page 100

1      the unsecured creditor body had contracts with the Debtor

2      where the Debtor said they're going to get back cash or

3      crypto and they didn't.

4              But what they're asking for now, what Gemini is

5      asking for now, is for you to create a new cause of action.

6      I'll end here focusing on that last thing, which is the

7      constructive trust and how does that relate to whether or

8      not they have a security interest.

9              It happens all the time, as I said, that secured

10     creditors or purported secured creditors are found not to be

11     secured because the grant was defective, but you can't

12     create a new cause of action that no Court has found before

13     that the breach of the promise to provide a preference in

14     and of itself elevates the recovery of the party, the

15     creditor, who was promised that preference, particularly

16     where the promise here was for a purported safe harbor

17     preference.

18              It is a new cause of action, but the correct

19     result if the party does not have an appropriate grant is to

20     have them share in the collateral as a peer unsecured

21     creditor with everybody else.  It is not to elevate their

22     claim, either by saying actually it's no longer the Debtor's

23     property, or it's subject to a constructive trust, or we're

24     just going to treat it as the transfer had occurred and find

25     that it's safe harbor.

Page 101

1            The Gemini creditors, in the event that the Court

2     rules that the additional collateral is the Debtor's

3     property, it's not subject to a security interest, it's not

4     subject to a constructive trust, is for everybody to share

5     ratably in that unencumbered GBTC share pool.

6            And so, we'd ask you to -- without regard to

7     dealing with the first count or any of the issues with

8     respect to the initial grant, and the initial delivery,

9     dismiss Counts 3, 4, and 5.  Was that 2, 3, and 4?  Two, 3,

10    and 4.

11           THE COURT:  (Indiscernible) you can speak freely.

12    I had it all written down at one point.  I'm not -- well, I

13    confess not to be currently tracking the numbers.

14           MR. SHORE:  But I would add one more procedural

15    point.  I think the impact of the fact Gemini has

16    affirmatively sought the Court's ruling with respect to the

17    grant issue, and the interpretation of the security

18    agreement through their motion to dismiss, means that I

19    think what we're talking about is the dismissal with

20    prejudice at this point.

21           I don't think we're talking about go back and see

22    if you can replead it.  They've put that contract

23    affirmatively in front of Your Honor for your ruling.  So, I

24    think if you did rule that they were not granted a security

25    interest in that collateral, but it is nonetheless the

Page 102

```
 1   subject of the security agreement and the loan agreement,

 2   they don't have a constructive trust.  I think all those

 3   claims go away with prejudice without leave to replead.

 4            THE COURT:  All right.  Thank you.

 5            MR. SHORE:  Thank you, Your Honor.

 6            THE COURT:  All right.  It is now just about

 7   12:15.  I have a judge's meeting at 12:30, and so my

 8   inclination would be, unless this does great harm to

 9   anyone's schedule, is to break now and then come back after

10   lunch and then have Gemini present its argument and then

11   follow up with rebuttal.

12            I don't think it's fair or efficient or wise to

13   have you start and then stop, but I don't have a monopoly on

14   wisdom.  So, I don't know if anybody has any other ideas, so

15   I'll first look to Gemini.

16            MR. BURKE:  Donald Burke for Gemini.  That makes

17   sense to me, Your Honor.  I think it would be disruptive to

18   have to stop and start again.

19            THE COURT:  Yeah.  All right.

20            MR. BURKE:  I prefer to just go straight through

21   if it's --

22            THE COURT:  All right.  Sometimes you end up

23   saying the same thing twice when judges ask you questions

24   that lead to that, but you shouldn't have to -- you

25   shouldn't set it up so you are stuck with that problem right
```

Page 103

1    away.

2           So, let me ask.  Other than completion of this

3    argument, I think everything else on the agenda has been

4    addressed.

5           MR. BAREFOOT:  That's correct, Your Honor.

6           THE COURT:  All right.  So, let's adjourn to 2:00.

7    You can enjoy the wonderful environs of White Plains, and I

8    will see you then, and thank you for your flexibility.

9           (Recess)

10          THE COURT:  Good afternoon.  Once again, this is

11   Judge Sean Lane in the United States Bankruptcy Court for

12   the Southern District of New York, and we are resuming this

13   afternoon our oral argument in the Gemini Global Holdco

14   case, particularly in the adversary proceeding where motions

15   to dismiss have been filed.

16          We heard from the Debtors in the committee and now

17   it's the opportunity for Gemini Trust Company to present its

18   argument.  So, without further ado.

19          MR. BURKE:  Good afternoon, Your Honor.  Donald

20   Burke, Willkie Farr & Gallagher for the plaintiff, Gemini

21   Trust Company.  As you've already heard today, the parties'

22   motions present many legal issues that I want to walk

23   through, but I think it might be helpful just to step back,

24   you know, and check out the forest before we get to the

25   trees.

Page 104

 1           There are two undisputed points, or points that

 2      have to be taken as undisputed for purposes of these

 3      motions, that are important just to set the basic lay of the

 4      land.

 5           The first, and I think this is totally undisputed,

 6      is that the entire point of the second amendment was to

 7      provide additional security to Gemini on behalf of the Earn

 8      users to grant a secured interest in these additional GBTC

 9      shares that Gemini had sought to, you know, get the security

10      interest to protect and manage risk on behalf of those Earn

11      users.

12           All of the parties to the second amendment

13      intended that result, and I think that much is clear on the

14      face of the second amendment itself, and I think it's clear

15      from the concession we heard from Mr. Barefoot that --

16           THE COURT:  Well, it's also an allegation of the

17      complaint, which is taken as true for purposes of today's

18      motion.

19           MR. BURKE:  That's exactly right, Your Honor.  The

20      second point that I think has to be assumed to be true for

21      purposes of today's proceedings is that the additional

22      collateral is property that the Debtors now hold only

23      because of the second amendment and this three-party

24      agreement to provide additional security to the Earned

25      users.  That's the upshot of Paragraph 39 of our complaint

Page 105

1    where Gemini alleges that DCG's sole purpose in delivering

2    the additional collateral was this contemplated further

3    transfer onto Gemini and to provide security to the Earn

4    users pursuant to the second amendment.

5              THE COURT:  Well, I don't think anybody disputes

6    those, and again, they're taken as true for purposes of the

7    motions, but I don't know it changes the fact that we have

8    to parse the agreement and figure out what the agreement

9    means and how to interpret that, right?

10             I mean, so I don't -- so, does that -- what do you

11   want me to take from these two points vis-à-vis sort of

12   understanding of the contract language?

13             MR. BURKE:  Well, I think the first point I think

14   really does go to interpretation of the second amendment,

15   and it provides the background against which the Debtors

16   seek to read the second amendment in this self-defeating

17   manner where GCC can benefit from its own wrongful conduct.

18             THE COURT:  But is it -- well, is it self-

19   defeating?  I mean, it seems like there's an argument for

20   breach of contract, but as for self-defeating, with

21   sophisticated parties like that, and even without

22   sophisticated parties, I mean, sometimes we do exactly the

23   same contract interpretation in Chapter 13 cases involving

24   individual Debtors.  We look at what the language of the

25   contract says.

Page 106

1                    And certainly, the threshold challenge that you

2        have is the plain language seems -- it talks about two

3        transfers.  And so, it seems that you're trying to look

4        behind the two-transfer concept to say the two-transfer

5        setup is not significant or something that needs -- controls

6        in these circumstances.

7                    So, let's just jump right into that.

8                    MR. BURKE:  Sure.  So, I think the primary answer

9        to that concern is, as we laid out in our brief, like any

10       contract, the second amendment has to be construed --

11       understood in light of its overall intent, and it has to be

12       read as a whole.

13                   And so, I think it is a fundamental flaw in the

14       Debtor's submission here to focus so myopically and

15       exclusively on Section 2 of the Security Agreement.

16                   THE COURT:  But I think -- I mean, let me start

17       where I started with the Debtors.  You know, when you look

18       at the facts alleged, and the timing, it seems like things

19       were going poorly.  Gemini asked for additional security,

20       and there is a security agreement, there's a first

21       amendment, and there's a second amendment, and indeed,

22       there's not much time in terms of the calendar time between

23       the first and second amendment, and then there's a

24       bankruptcy.

25                   So, it's -- it just seems like there's -- things

Page 107

1    are in a state of difficulty, and the Debtors are saying

2    it's not as if the reading of it is contrary to the

3    circumstance or somehow does violence to the contract.  It's

4    just that that last step was not taken and that you look at

5    it like any other steps that need to be taken for security

6    interest, and maybe there's a breach of contract claim, but

7    there's -- it's just there are steps in the sort of

8    continuing deterioration of the economics here.  That step

9    was never taken.  So, that's their view of it.  So, what do

10   you make of that?

11            MR. BURKE:  So, I agree that that's the Debtor's

12   submission here.  I think the flaw in it, or where I would

13   push back, is that I think the understanding that the

14   Debtors have advanced, that the second transfer is

15   absolutely necessary to cause a transfer of the security

16   interest, I think that can't be squared with other aspects

17   of the agreement that we've cited and discussed in our

18   brief, and I think, you know, in our view, those other

19   provisions of the agreement are sufficiently incompatible

20   with the Debtor's understanding that they've foreclosed it

21   as a matter of law.  That's why we've, you know, cross-moved

22   on their counter for declaratory relief.

23            THE COURT:  But if that's the case, how -- your

24   reading, does it read out the second transfer as being

25   unnecessary?  And so that's -- that seems to be significant.

1          MR. BURKE:  So, I think what we understand the

2    language that the Debtors have focused on in the second

3    amendment to really deal with and focus on is a situation

4    where additional collateral might have passed between

5    Genesis and Gemini pursuant to a -- the collateral --

6          THE COURT:  But it doesn't say that.  I mean,

7    there's nothing in the agreement that says that in the event

8    that there's additional collateral or these other facts and

9    circumstances, then it's relevant or not relevant that

10   there's this second transfer.

11         It says this is the way the collateral works, and

12   there's one transfer and there's two transfers.  There's a

13   transfer that vests title and then there's another transfer,

14   and it doesn't separate out those two transfers as being

15   done for different purposes or under different

16   circumstances.  It contemplates they're going to happen, if

17   not together then sort of logically follow.

18         So, I didn't see anything in the agreement that

19   seems to put any daylight between the two as an intellectual

20   matter, like here, the significance of the first transfer is

21   that that's the security interest.  The significance of the

22   second transfer is if these things happen.

23         I'm just looking for something in the agreement

24   that signals that that would be the case, and what would you

25   point me to?

1          MR. BURKE:  I think I understand the question, and

2    I guess my response is that the -- it's really Section 1 of

3    the Security Agreement that we think is particularly

4    important, right, because that's where the two tranches of

5    collateral that were designated, and you know, were within

6    the contemplation of the parties as collateral are

7    identified.

8          You know, originally in the first iteration of the

9    Security Agreement, Section 1, that's the provision titled

10   transfer of collateral, that referred only to that initial

11   tranche of collateral and had an obligation to pass it along

12   to Gemini.

13         And then the second amendment basically strikes

14   out the content of Section 1 and replaces it with a new

15   Section 1 that includes both the initial tranche and the

16   additional tranche of collateral.

17         And so, the way we understand it is that the --

18   those provisions identify the assets that, you know,

19   everybody understood to be the subject of the

20   (indiscernible) agreement.

21         And then we do have a separate provision in

22   Section 2 by which, you know, other assets could potentially

23   become collateral in the future based on a transfer to

24   Gemini pursuant to the collateral top-up arrangements that,

25   you know, were elsewhere in the Security Agreement.

Page 110

1          And I think the sort of important next step of the

2   argument, Your Honor, is to think about other provisions in

3   the agreement that we just don't think can make sense if

4   collateral is understood in the way that the Debtors propose

5   here.  I don't think --

6          THE COURT:  But here's the thing, though.  Looking

7   at the second amendment, the second paragraph talking about

8   this additional collateral, right, that's the 31 million,

9   right?  It's the second paragraph.  It talks about the

10  parent transferring it to the pledgor, and then the pledgor

11  has to transfer it, and it's not the parent that's

12  identified as the pledgor.  It's GGC, right?  They're the

13  pledgor, Genesis Global Capital.

14         And so, it doesn't -- I mean, that seems to be

15  consistent with the notion it's the second transfer, because

16  that's when the pledge happens, because the parent is just

17  the parent and they're transferring it to the pledgor, but

18  it's not -- right, if you use the term parent, you're not --

19  you're -- to the -- and to pledgor, like that's the party

20  that's going to make the pledge.  So, how do you understand

21  that second paragraph in light of the language that's used?

22         MR. BURKE:  So, we understand the second paragraph

23  that you just read from, Your Honor, to be a related but

24  distinct issue from the question of whether, you know, a

25  particular asset is collateral under the agreement, right?

1          We certainly agree that GDC was obliged under the

2    agreement to transfer the collateral -- additional

3    collateral onto Gemini, and they were in breach of that

4    obligation, and they freely concede that they're in breach

5    of that obligation.

6          They -- I think that the Debtors try to argue that

7    Gemini's sort of ongoing pursuit of the additional

8    collateral should be taken as some kind of --

9          THE COURT:  Well, I'm not -- let's stick with the

10   language of the agreement for a second before we get into

11   sort of what are extraneous facts, because we're not on

12   summary judgment.  But again, that second paragraph uses the

13   term pledgor to talk about GGC and identifies the parent as

14   the parent.

15         So, your theory, as I understand it, from your

16   papers is that the parent is somehow pledging it, like you

17   just skip the second transfer entirely, that the second

18   transfer is not necessary to make the security agreement

19   effective, and I'm just trying to understand that in light

20   of the fact that this paragraph seems to contemplate that

21   two-step process by referring to GC as the pledgor, and not

22   only that, but the act of -- the relevant act, meaning that

23   this is the security agreement and the second transfer has

24   to happen.

25         So, am I missing something about the terminology?

Page 112

1    Is it somehow in your way -- in your reading irrelevant that

2    it talks about parents and then in the second one it talks

3    about the pledgor transferring or caused to be transferred?

4              MR. BURKE:  So, Your Honor, I think there are sort

5    of two layers to the question.  I want to try to divide them

6    up and respond to them separately if that's okay.

7              The one aspect of the question or one aspect of

8    the issue here is the fact that there is an obligation to

9    sort of further transfer onto Gemini, and I think we agree

10   that that obligation exists, but we don't think that's the

11   trigger or the sort of effectuating event for the granting

12   of a security interest.

13             The first point, and I want to make sure I respond

14   to it, is the designation of GGC as the pledgor, and I think

15   that that's important, and I think that explains our

16   understanding that the sort of conveyance of the security

17   interest occurs upon receipt of the collateral by --

18             THE COURT:  But that -- the language says -- so,

19   first it talks about the parent transferring the shares to

20   the pledgor, and then it says as promptly as practical after

21   such assignment, conveyance, transfer or delivery.  So, it's

22   separating out two separate events, because it says after

23   this happens, this shall happen, and the pledgor shall do

24   the following.

25             Doesn't that run against your reading that somehow

Page 113

1   these things are not -- the two steps are not legally

2   significant?

3           MR. BURKE:  I don't think so, Your Honor, because

4   the -- nothing in that language identifies that second step.

5   It's obviously there.  I don't dispute that it's in there.

6   Section 1 doesn't identify that second step as the event

7   that gives rise to the security interest.

8           And so, I think it's consistent to say that --

9           THE COURT:  But it uses the term pledgor, right?

10  I mean, that's significant, right?  Saying that this is the

11  entity that is pledging this security.  And so -- and it's

12  also by talking about after this first transfer conveyance,

13  the second step is supposed to happen.

14          And so that, right, I think those two things sort

15  of work in tandem in terms of separating out the events to

16  sort of just a common reading.  I don't know that this is --

17  I mean, we see a lot of impenetrable contract language here

18  in this court where we have to figure out a lot of things

19  that are -- people will say are clear as day, but they're

20  not.

21          This doesn't seem to be that difficult to

22  understand in terms of saying as promptly as practical after

23  this first event, the pledgor shall do the second event.

24          MR. BURKE:  Right.  I totally agree with you about

25  the sequence of the events that's contemplated here.  I

Page 114

1    guess maybe another way to try to try to address the concern

2    is to direct Your Honor's attention up one paragraph to the

3    -- which reprints the language that was -- that, you know,

4    already existed in the security agreement to deal with the

5    initial tranche.

6              THE COURT:  Right.

7              MR. BURKE:  And in there, GGC is referred to as

8    the pledgor, right?  That's the defined term for GGC in the

9    document as a whole, and there's no sort of two-step

10   arrangement contemplated there, because those were GBTC's

11   shares that were already on the books at GGC at that point.

12             THE COURT:  Right.

13             MR. BURKE:  And I don't think the sort of

14   sequential timing or the nomenclature used to refer to the

15   parties would necessarily indicate that it's that second

16   transfer that is sort of the moment at which the security

17   interest --

18             THE COURT:  But why is that?  If the first one

19   says there's only one step to make it effective, and the

20   second one says it's two steps, we know how to do it in one

21   step, but we decided to do it in two steps.  Doesn't that

22   undercut -- you know, and also the idea is for the first

23   one, it says the pledgor shall do X, and then it becomes

24   effective, and the second one says the pledgor shall

25   essentially do the second step, and then it becomes

Page 115

1    effective.  I'm not sure that that supports your reading

2    unless maybe there's something I'm missing.

3            MR. BURKE:  Well, I guess where I would push back

4    a little bit is that the language doesn't say "and that's

5    when it becomes effective."  I think that is additional

6    language that sort of means --

7            THE COURT:  Well, I'm -- yes, I would agree.

8    That's my conclusory label that I'm slapping on it.  No

9    contracts ever -- they don't usually say that, but in terms

10   of talking about transferring these things, I assume that

11   every -- that's the undercurrent, is exactly when is it

12   going to be effective in terms of providing security for

13   Gemini.

14           But anything else you wanted to say on this second

15   paragraph or on Section 1 at all?

16           MR. BURKE:  Well, I think I did want to make the

17   point, and I think this sort of maybe skips ahead a little

18   bit to the context -- the contextual, you know, provisions

19   that we were talking about before, but it's just important

20   to be clear here the way that the second amendment works and

21   how it sort of maps onto the first amendment.

22           THE COURT:  All right.

23           MR. BURKE:  The second amendment, you know, as you

24   see on the page we were just reading from, sort of goes

25   back, strikes out what was in Section 1 and replaces it with

Page 116

1   this larger provision.

2          That's important because it shows that, you know,

3   even after the second amendment, we had this what we regard

4   as a very strange situation that the heading here refers to

5   transfer of collateral, which doesn't make sense if you

6   adopt the Debtor's reading.  And --

7          THE COURT:  Well, but again, I'm not -- I mean,

8   there's case law that says you don't read titles to undo the

9   language -- the actual provisions of an agreement in a

10  contract.  But also, it's a short -- and that's because why,

11  as a practical matter, titles are shorthand, right?

12         So, when you're talking about collateral, I don't

13  know that it necessarily tells you when it becomes

14  collateral except it says this is the paragraph that deals

15  with collateral.  And so, it lays out all the provisions.

16  So, I'm not -- it's a lot of weight, a lot of water for a

17  title to carry if you want me to somehow say, well, it reads

18  in that it's collateral from the get-go.

19         I mean, I'm not sure how I stick the title in the

20  middle of the two transactions, because then your reading,

21  if it's collateral from the beginning, well, then it's

22  collateral even before the parent does anything.

23         MR. BURKE:  Well, I think I was at least trying to

24  articulate an answer to that concern previously, and I think

25  that's actually where designating GGC as the pledgor

Page 117

1   actually is important, and I think at least from our

2   perspective, that's why the delivery of the assets, the

3   designated GBTC shares to GGC, makes sense as the sort of

4   moment at which the security interest was -- would attach.

5          So, I think, you know, we would -- our position

6   here is that before it gets there, it wouldn't make sense to

7   treat GTC as a pledgor.  It doesn't even have the --

8          THE COURT:  No, I agree, but just because it

9   doesn't make sense to treat them as a pledgor under the

10   circumstances, other than sort of being the result, I'm

11   having trouble following how this language here gets you to

12   the result you want of saying that step one, end of story,

13   step two is there for other things, because the other things

14   aren't mentioned in here, and there doesn't seem to be any

15   language that suggests that there's that separation in the

16   party's mind to understand that that -- those two-step

17   processes somehow leads to -- or is a reflection of other

18   events to come.  And that's sort of where I'm struggling,

19   counsel, to understand looking at the agreement how you get

20   step one to be the one that counts and step two to be the --

21   to be essentially irrelevant.

22          MR. BURKE:  Well --

23          THE COURT:  I shouldn't say irrelevant.  That's --

24   to not be of significance for purposes of security.

25          MR. BURKE:  Right.  I -- if it's helpful, I can

Page 118

1    explain why I don't think it's irrelevant and why some of

2    the arguments we've heard from the other side don't really

3    hang together.

4              I mean, it was obviously important to Gemini to

5    get, you know, actual delivery of these shares.  You know,

6    we have acknowledged that Gemini, you know, as anybody

7    would, made efforts to secure actual delivery of the assets.

8    But I don't think there's the logical connection that the

9    Debtors are trying to draw between those activities by

10   Gemini and a suggestion that the shares were not already

11   subject to the security agreement at the time, because

12   there's plenty of other reasons why Gemini would want to

13   actually have them in their possession.  Obviously, it

14   facilitates enforcement of the security interests.  Probably

15   wouldn't be in this situation.

16             THE COURT:  Yeah.  No, I get it.  And I apologize

17   to all the parties to the extent I opened the door to this

18   conversation.  I was trying to sort of take a top-level

19   view, but I recognize that extrinsic evidence is extrinsic

20   evidence.

21             We're here on a motion to dismiss.  I take the

22   allegations of the complaint as true.  We don't look at

23   extrinsic evidence.  We can look at the contracts that are

24   attached and their reference, so they're incorporated, even

25   if they weren't attached, but they're attached.

Page 119

1            So, that's all nice in terms of understanding why

2     we may have ended up here, but it's -- for purposes of the

3     motion to dismiss, for -- and the security question, I --

4     they're irrelevant.  Maybe they're relevant to the -- to

5     your other claim, but I don't think it matters.

6            MR. BURKE:  I think that's how we see it as well,

7     Your Honor.  I --

8            THE COURT:  Yeah.  That's fair.

9            MR. BURKE:  Could I sort of circle back to the --

10    your concern you raised about giving too much effect to the

11    title of the provision?

12           THE COURT:  Right.

13           MR. BURKE:  Because I think that's a legitimate

14    concern.  It's something that, you know, warrants attention

15    here.  I guess my first point is I don't understand the

16    Debtors who have argued that a title is categorically

17    irrelevant to the interpretation of a contract.  I -- maybe

18    I missed that.  I don't think I've seen that argument from

19    them.

20           And I would emphasize that unlike many other

21    agreements, this one doesn't have the provision that sort of

22    expressly instructs the interpreter not to give effect to

23    section headings and the like.

24           So, I think that's, you know, a salient fact to

25    consider here.  You know, as we've heard several times,

1    these are, you know, sophisticated parties and they could

2    have included that --

3              THE COURT:  But the heading doesn't say the

4    transfer of the collateral occurs after the transfer from

5    the parent.  It says transfer of collateral.  And so, I

6    mean, putting aside the question of whether it's -- the

7    heading's gone entirely because Section 1 is amended and

8    restated in its entirety to follow and there is no title at

9    all, but I'm not quite sure how the title gets you where you

10   want to be, because again, it's a very general title about

11   transfer of collateral.

12             So, it doesn't say when the transfer of collateral

13   -- that's what the paragraph does.  And so -- and people

14   disagree about the result of that, but I'm not sure -- how

15   is the language of the title transfer of collateral get you

16   to have it effective after the first transfer but not the

17   second.

18             MR. BURKE:  So, two-part response to that if

19   that's okay.  I think the way that we think about it, it's

20   sort of less specific, you know, guidance, you know, from

21   the section heading in terms of which, you know,

22   understanding of the agreement you have to -- the

23   interpreter should adopt.  I mean, I'll grant you, it's a

24   very brief section heading, and you know, it's not

25   profoundly detailed.  That's certain here.

1           But I think the problem for the Debtors here is

2     that it's unnatural to refer to transfer collateral if the

3     thing that is being transferred pursuant to this -- these

4     various steps isn't collateral until the very end, right?

5           We -- I think that would --

6           THE COURT:  But again, if that's your point, then

7     you seem to be implying that it's transfer of collateral the

8     moment it's spoken of, which is clearly not the case because

9     it hasn't left -- the first initial transfer hasn't left the

10    pledgor, and for the second one, it hasn't left the parent.

11          So, I don't know that it -- how it informs --

12    again, you want to jump in in the middle of a process.  So,

13    relying on the heading seems to say it is from the beginning

14    of time or we just look to the paragraph, and if it is from

15    the beginning of time, that doesn't work.  So, nothing about

16    the title tells me that we should jump in in the middle of

17    the two transfers, and that's where I'm having the problem,

18    because if it's referring to collateral and you say, well,

19    that means everything -- any reference to these shares means

20    they're collateral from the get-go, then that means they're

21    -- that means there's a security interest before they're

22    ever transferred in any of these circumstances.  I mean,

23    that the logical outgrowth of the argument.

24          MR. BURKE:  I think I understand the concern, and

25    I think that's where the designation of GGC as the pledgor

Page 122

1    doesn't work here, and I think that's why it makes sense to

2    us to sort of -- you know, we don't see it as sort of

3    jumping in the middle of the, you know, the steps or however

4    it was described.

5              I think it's always collateral.  That's I think

6    the sort of overriding understanding of the agreement, but

7    you have to add on the fact that GGC is the pledgor, and so

8    it doesn't make sense to think about a security interest

9    having been transferred before GGC even has any possession

10   of the collateral.

11             THE COURT:  But for the first paragraph, and I

12   guess I know there's other things, are you maintaining that

13   those shares are collateral before -- those 30 million

14   shares are collateral before GGC transferred them to the

15   Great Scale Bitcoin Trust?

16             MR. BURKE:  Sorry, this is the first -- the pre-

17   existing language.

18             THE COURT:  Yeah, the first -- yeah, the pre-

19   existing line.

20             MR. BURKE:  Yes.  Yes.  I mean --

21             THE COURT:  You're saying they're collateral

22   before they're transferred?

23             MR. BURKE:  Right.  Right.  I think it's the same

24   logic.  We don't understand the transfer to be the -- I

25   mean, I think they are undeniably collateral once they've

Page 123

1    been transferred.  I think, you know, that's the Debtor's

2    understanding of the agreement.  And so, you know, at that

3    point, there's not even a dispute, but I think our position

4    would extend to both of these paragraphs, because they use,

5    you know, the same language and it's the same conceptual

6    set-up.

7              THE COURT:  All right.  I'm having -- I will admit

8    that I'm having trouble following how that works if they're

9    collateral from the beginning of time once the title is put

10   on there, but I think we've I think had our discussion as

11   far as we can go.  If there's other things you want to throw

12   in there on that, that's fine, but I think we've gone back

13   and forth.

14             So, sticking with the language of the agreement

15   and the security interest question, what else shall we chat

16   about?

17             MR. BURKE:  I think the other -- really the only

18   other point that I think I wanted to make sure I got to is

19   Section 5 of the agreement we think provides additional

20   contextual evidence.

21             There are representations and warranties in this

22   section that really don't make sense if the collateral

23   becomes collateral only after it's transferred, right?  In

24   Section 5, GGC represents that it's the sole owner or the

25   collateral or it has the right to transfer it.

Page 124

1           If you adopt the Debtor's understanding of the

2      chronology here, then I don't think that representation can

3      really make sense, because after the collateral has been

4      transferred on to Gemini, GGC no longer has any right to

5      transfer.  It doesn't even have it at all, so.

6           THE COURT:  But again, I'm just having under --

7      I'm not sure what you want that paragraph to say then.  I

8      mean, so people talk about plain meaning in contract

9      language.  Are we supposed to spill a lot of ink to say that

10     GGC is the pledgor, but it doesn't -- the collateral isn't

11     pledged until after the transfer?

12          I mean, I'm just -- it seems to be a fairly

13     standard-looking paragraph as is often the case to say if

14     we're going to pledge something to you, we have to represent

15     we're the owner of it, and it's not the tail wagging the dog

16     saying we're telling you exactly how the security interest

17     should operate and what makes it effective, but we're just

18     saying that we have -- we own the property so that can -- it

19     can be used as collateral.  It can be pledged as security.

20          And I'm -- so, what would you say to that concern

21     that I have that -- in the section -- you want to talk about

22     titles, in the section about representations and warranties,

23     where it's basically saying we want to make it clear that if

24     we're going to get this to you as security, we actually own

25     it.

Page 125

1          I mean, that's what that paragraph says to me.  Is

2     there a reason why it should carry more water in this

3     particular debate when we have this section talking about

4     the actual transfer of collateral in Section 1?

5          MR. BURKE:  Right.  So, I would draw your

6     attention to the prefatory language in Section 5 before you

7     get to the A's and the B and the C.  The pledgor represents

8     and warrants to the agent as of the date hereof, and on each

9     day that any loan remains outstanding, that -- so, I think

10    the -- there's a chronological point there.  That

11    representation and warranty is made upon execution of the

12    agreement before transfer of any assets to Gemini, right?

13    In Subparagraph A there's a warranty or --

14          THE COURT:  So, you're telling me we could take

15    transfer of collateral out that first section and it

16    wouldn't matter, because Section 5 transfers the collateral

17    and makes the security of your client?

18          MR. BURKE:  I don't think you could strike out the

19    transfer --

20          THE COURT:  I would agree with you.

21          MR. BURKE:  Because I -- that's the provision that

22    identifies the particular shares of GBTC in these two

23    tranches that are the subject of the agreement.  So, I don't

24    think any of this would work without that specific

25    designation.

1          THE COURT:  But I've got to say, your way of

2     reading this language about representations would make

3     parties hesitant to make representations less they granted

4     legal rights in collateral or other things, it would be a

5     potential minefield, right?  Because people say, well, the

6     reason why we have a section on the transfer of the

7     collateral, we have a section about warranties is because we

8     want to make it clear, we're going to give you something.

9     It's ours.  That's what the representation is, and the other

10    section is how we're going to do it.

11          And I think this is a not uncommon kind of

12    language.  I mean, warranties and representations are common

13    for these sorts of things so that people know what they're

14    getting, and I'm just -- I'm hesitant to look for that to

15    actually tell me to actually control the -- when the

16    security is actually granted here.

17          Again, the language here seems to be pretty

18    vanilla, and the reading you're asking me to give it would

19    seem to require that this language in 5 be a lot more

20    specific as opposed to having me read in and imbue this with

21    language the meaning that you want.

22          Am I missing something about that?

23          MR. BURKE:  Well, I guess I can imagine different

24    ways that Section 5 could have been written that would be

25    consistent with the Debtor's understanding of how the

Page 127

1    security agreement works as a whole.

2            You could have timed these representations and

3    warranties to, you know, so that they are made and become

4    effective at the time you transfer the collateral to Gemini.

5    If that's --

6            THE COURT:  But I don't think people would find

7    that acceptable, because they want to know that that for

8    number -- for B that in fact the Debtor owned it before they

9    transferred it.

10           So, I think saying that they only become operable

11   after the transfer I think would make things -- I think

12   you'd have a lot of fights over that, because you'd say,

13   wait a minute, now there's a representation that the Debtors

14   own it, but it was just transferred.  So, who actually owns

15   it?  And by the way, how do we know that you owned it before

16   you transferred it?  Maybe you had possession of it.  Maybe

17   you weren't the owner.

18           I mean, this is -- again, this language looks just

19   like one, it's not -- it doesn't seem overly difficult to

20   parse.  And so, I'm again having trouble reading it to give

21   your client the rights that you're claiming here, because I

22   don't -- it seems to put a -- the language sort of is

23   straining under the reading that you're giving me.

24           And again, I'm not trying to be -- to brow beat

25   you or be cute.  I just want to make sure I understand where

1    you're coming from in terms of understanding the arguments

2    and just being as transparent as I can with what my concerns

3    are.

4           MR. BURKE:  No, I understand that, and we welcome

5    hearing your concerns so that hopefully we can try to

6    address them.  That's --

7           THE COURT:  All right.

8           MR. BURKE:  -- totally understood.  I think --

9           THE COURT:  I think I've asked you a lot of

10   questions.  So, I know you have a number of things you want

11   to get to.  So, I promise to lay off for a few minutes as

12   you get through your other items.

13          MR. BURKE:  So, I'll move on to my next point in

14   just a second, but just before we leave that one, I want to

15   make sure I'm clear about this.  You know, there are cross-

16   motions here on the security interest question, and I think

17   for us to prevail on our motion to dismiss the counterclaim,

18   the agreement has to be unambiguous in our favor.  For the

19   Debtors to prevail, the agreement would have to be

20   unambiguous in their favor.

21          And I think even if Your Honor doesn't accept our

22   argument that these various contextual indications

23   conclusively adopt our reading of the security agreement.

24   We would submit that they at least, you know, provide the

25   sort of ambiguity that would just allow both claims to go

Page 129

1    forward here.

2           THE COURT:  All right.

3           MR. BURKE:  I wanted to make sure I didn't miss

4    that one and then I think the other -- the only other point

5    on the Security Agreement count our security agreement

6    counts is just to make sure that we articulate and you

7    understand our alternative argument, which does sort of take

8    Section 2 of the Security Agreement as the sole determiner

9    of whether an asset becomes collateral.

10          And in our view, the transfer that's been alleged

11   here would qualify under Section 2 of the agreement, because

12   it's a transfer on behalf of GGC, and it's a transfer for

13   the benefit of Gemini and the Earn users.

14          I actually don't -- I'm not sure if the Debtors

15   even dispute the second point, but I think it's, you know,

16   pretty clear that the whole point of this operation was to

17   provide security to Gemini and the Earn users.  I don't

18   think it's a stretch to --

19          THE COURT:  Well, I don't think anyone disagrees

20   with that.  The question is whether your client has a breach

21   of contract claim or an argument that it has security.  So,

22   I guess my question is here, when talking about the pledges,

23   the signs, and grants to the agent for the benefit of the

24   agent and the principal lenders, the security interest to

25   all the pledgor's rights to all property from time to time

Page 130

1    transferred by or on behalf of the pledgor, my question

2    about the transfer buyer on behalf of the pledgor, if it's

3    being transferred from the parent to the pledgor, that seems

4    an odd reading of that paragraph, right?  Because one would

5    assume if there's a transfer on behalf of the pledgor, it

6    may be going from a third party to somebody else for the

7    benefit of the pledgor, but if it's being -- if the transfer

8    in your view, the first transfer that's operative, is going

9    from the parent to the pledgor, or GGC, I'm having trouble

10   understanding the -- why that would qualify, because it

11   doesn't, at least as a matter of sort of common sense, seem

12   to easily fall into what you would expect under that

13   language.

14          MR. BURKE:  So, I think the key allegation in the

15   complaint here is in Paragraph 39 where Gemini alleges that

16   DCG's sole purpose in delivering the assets that -- the

17   shares to GGC was to facilitate, you know, this further

18   transfer to Gemini and to provide security to the Earn

19   users.

20          And so, I think that's the crucial point to

21   understand here, the --

22          THE COURT:  Right.  But if I have the agreements,

23   don't I go to the agreements, right?  The agreements are all

24   incorporated here.  So, I understand that paragraph to not

25   supersede the agreements but rather to be your summary of

1    what the agreements mean, right?

2              In other words, I'm not going to say, well, the

3    agreements say X, but you've alleged in Paragraph 39 that

4    this somehow trumps agreements, and if the two

5    (indiscernible) I'm going to look at the agreements.

6              MR. BURKE:  No, that's certainly true, Your Honor.

7    But I think, I guess let me try it this way.  Paragraph 39 I

8    think provides the factual allegation that underlies this

9    alternative argument that we've advanced in the briefs here,

10   because it is where we allege that the sole purpose of this

11   transfer was to get the shares to GGC so that they could,

12   you know, facilitate the security for the Earn users, and I

13   think it's --

14             THE COURT:  But I agree with -- I mean, so the

15   Debtor needed that transfer to happen so that it had

16   sufficient collateral to pledge as security.  So, clearly

17   it's in furtherance of the desire to get your client

18   security.  I don't think that that's in dispute, but again,

19   in terms of making it effective, when it's being transferred

20   to GGC, it's not leaving the Genesis family, and it hasn't

21   been sent elsewhere, and it's -- I'm just having trouble

22   understanding.

23             But again, I think I've mentioned this, so I think

24   I have your answer, but I don't know at that point that it's

25   for the -- how it results in a security interest I guess is

Page 132

1   to put it bluntly.

2        MR. BURKE:  So, I guess if it's helpful, I think

3   that the chain of logic from our perspective is the sole

4   purpose is to facilitate this providing the security to the

5   Earn users.  That's the factual allegation in the complaint.

6   I think it's a legal characterization that, you know, that

7   factual allegation is consistent with the language in the

8   agreement about a transfer on behalf of GGC.

9        And so, that's the chain of logic underlying the

10  alternative argument.  And then also, I think that the

11  transfer would be for the benefit of Gemini and the Earn

12  users, again, because obviously the sort of end goal here

13  was to provide the security for Gemini and the underlying

14  earn borrowing.

15       But also, does that have to be read in the context

16  of -- early in the sentence where it says the pledgor hereby

17  pledges, grants -- assigns and grants to the agent a

18  security interest in the pledgor's right and title?

19       So, doesn't that language dovetail with Section 1

20  in terms of the -- saying that there's -- which uses for the

21  second transfer the reference to the pledgor as opposed to

22  the parent, right?  Doesn't that all sort of work together?

23       We've said the pledgor is going to make this

24  second transfer.  The Debtors say that's what creates the

25  security interest.  This says when the pledgor hereby

Page 133

1    pledges this stuff, and that, again, it's tied to the

2    actions of the pledgor just like the first initial transfer

3    was when the pledgor makes the transfer.

4              MR. BURKE:  So, I think I get off the train I

5    think at the very last stop.  The -- Section 2 doesn't

6    require a transfer by GGC.  It doesn't require action by

7    GGC.  It's also satisfied by a transfer made on behalf of

8    GGC.

9              And our point is under the circumstances that

10   we've alleged where the whole point was to allow GGC to

11   provide security, that the DCG to GGC transfer is properly

12   understood to be on behalf of GGC.  And under the language

13   of the agreement, that's enough to trigger the granting of

14   the security interest, or at a minimum, there's sufficient

15   ambiguity that both sides' competing claims should be

16   allowed to proceed here.

17             THE COURT:  All right.

18             MR. BURKE:  So, I'll turn now to constructive

19   trust if that's okay with Your Honor?

20             THE COURT:  Please.

21             MR. BURKE:  I think here, the main problem with

22   the Debtor's submission is they're trying to reduce the

23   constructive trust remedy to a rigid checklist of elements,

24   but that's not what New York law provides.

25             The Court of Appeals and the 2nd Circuit have

Page 134

1    rejected this sort of checklist approach.  The Court of

2    Appeals said in the Simmons case that this isn't a rigidly

3    limited doctrine.  In Counihan against Allstate, the 2nd

4    Circuit described it as a flexible doctrine.

5            So, I think the key question is really whether an

6    asset-specific equitable remedy is warranted under all the

7    circumstances to prevent unjust enrichment.  We shouldn't be

8    looking for, you know, four steps to check off.  It's a more

9    holistic inquiry consistent with the equitable nature of the

10   remedy here.

11           So, I think that the first and most important

12   point is unjust enrichment, and that's --

13           THE COURT:  Right, but if you said it's flexible,

14   it's hard to imagine that that's first and most important.

15   Is there a case that says that's the most important element?

16           MR. BURKE:  I believe the cases say that unjust

17   enrichment is a necessary predicate.

18           THE COURT:  Right, so --

19           MR. BURKE:  So, it's flexible, but with a

20   necessary element.  And so, I think that's -- maybe first

21   isn't right, but I think most important --

22           THE COURT:  But does -- if your client -- if I

23   find your client is entitled to the security and it's being

24   -- was unjustly withheld, I get it.  If the contract says

25   your client was entitled, didn't get a security interest,

Page 135

1    should have gotten one but didn't get one, where does your

2    argument stand on that for unjust enrichment?

3              MR. BURKE:  So, I want to make sure I understand.

4              THE COURT:  Meaning you have a breach of contract

5    claim, but you didn't get a security interest.

6              MR. BURKE:  So, I think our unjust enrichment or

7    our constructive trust claim is pled in the alternative, and

8    it could proceed consistent with that determination as to

9    the security agreement claim.

10             And I think the Simmons case that we cited in the

11   papers from the Court of Appeals illustrates that principle,

12   because that's a case where the Court of Appeals recognized

13   that the insolvency of a potential defendant where you would

14   have a legal remedy is a reason to conclude that the legal

15   remedy would be -- let me just make sure I got the language

16   right -- fruitless and worthless.  So, I --

17             THE COURT:  But would it be fruitless here?  I

18   mean, or worthless.  Wouldn't it mean that you have an

19   unsecured claim and that you're going to recover the way all

20   the other -- or could recover the way all the other

21   unsecured creditors would recover for breach of contract?

22             MR. BURKE:  So, I think that that's not correct,

23   and it actually sort of circles back to unjust enrichment.

24   So, I think these elements do sort of blend and merge

25   together.

Page 136

1          The -- there is a common fact pattern that many,

2     if not all, of the Debtors, depositors, and lenders have

3     experienced here, right?  All of the depositors I think

4     would say they were defrauded into lending or keeping their

5     loans outstanding.  Gemini and I think all of the ear users

6     agree with that.

7          And so, that is a -- you know, that is a common

8     fact pattern, and it's an injury that is widely shared by,

9     you know, if not all of the creditors agree, many of the

10    creditors in this case.

11         What's different here is that Gemini has -- Gemini

12    and the Earn users have been injured by a separate and

13    distinct injury and malfeasance by the Debtors in the sense

14    that if there's, you know, specific assets that as I noted

15    at the outset of my remarks wouldn't even be in the Debtor's

16    hands at all but for this arrangement, that the Debtors

17    engineered and then, you know, frustrated by intercepting

18    the additional GBTC shares.

19         And so, I think that's the distinction here

20    between the sort of (indiscernible) case that First Central

21    and all of those other decisions address where the court in

22    bankruptcy has a legitimate concern that recognizing a

23    constructive trust as to one asset is going to earmark that

24    asset for one creditor, right, and correspondingly deplete

25    the resources available for the other creditors, that, you

Page 137

```
 1   know, is generally true, but it's also totally clear that

 2   First Central and those related cases, they don't, you know,

 3   absolutely bar the position of a constructive trust in a

 4   bankruptcy case.  The Powers Appliance case from the 2nd

 5   Circuit --

 6             THE COURT:  Well, but I guess I'm losing what

 7   you're trying to -- what you're asking me to divine from

 8   this.  Are you saying that Gemini is -- the Debtors have

 9   said Gemini is -- the recovery would go to Gemini.  It

10   wouldn't go to other creditors, and therefore this falls

11   squarely inside those line of cases that make it -- that

12   support the Debtors.

13             You're mentioning the Earn users, but I'm not

14   quite sure what connection you want me to bring.  Is Gemini

15   getting this money than to give to the Earned users.  Is

16   what -- I mean, what is it that makes -- and whether it's

17   Gemini recovering separately apart from the Earned users or

18   the Earn users, then you're still benefiting a certain

19   subset of the bankruptcy case, right?

20             MR. BURKE:  Right, and --

21             THE COURT:  So, I guess I'm just -- if you could -

22   -

23             MR. BURKE:  I apologize.  I probably ran a few

24   different issues together.  I tried to be --

25             THE COURT:  All right.  Yeah.  No, that's why it's
```

Page 138

1    -- so, I -- but I want to make sure I understand where

2    you're coming from on this.

3            MR. BURKE:  So, I think one response is -- I

4    didn't mean to sort of draw a distinction between Gemini and

5    the Earn users.

6            Gemini is acting in this case as agent for the

7    Earn users.  The whole point of bringing this case was to,

8    you know, pursue the interests of the Earn users by

9    vindicating the property rights in the additional GBTC

10   shares and then also dealing with the initial collateral

11   that's sort of off on a different procedural path here.

12           So, I'm not trying to suggest that there's some

13   distinction between Gemini's interests and the Earn users'

14   interests --

15           THE COURT:  No, I guess I'm a little confused as

16   to -- I haven't seen anything in the record that says Gemini

17   is going to recover this and distribute it to the Earn

18   users.  I understand that this security was set up because

19   Gemini had this Earned user program.

20           But again, I don't know that it matters in the

21   sense that -- whether they're -- Gemini is going to keep it

22   or whether the Gemini is going to give it to the Earned

23   users.  It's still a subset of the unsecured creditor pool.

24   And so, I guess I'm trying to understand what that would

25   mean if --

Page 139

1           MR. BURKE:  Right, so I do want to make sure I

2    respond to that concern as well.

3           THE COURT:  Yeah.

4           MR. BURKE:  And the -- I guess the first response

5    is that the dynamic that you just identified, which is an

6    important one to consider, is going to be true in every

7    bankruptcy case whenever a plaintiff seeks to impose a

8    constructive trust on assets that would otherwise be

9    available for distributions to unsecured creditors.

10           So, if it were the case that it is inherent --

11           THE COURT:  I would agree with you.  It's -- I

12    think obviously this doctrine comes up in a lot of non-

13    bankruptcy instances.  And so, I think it's a, much as you

14    said, a factor but not a -- it's not a -- dispositive of

15    anything.

16           MR. BURKE:  Right.  And so, I think the next step

17    is --

18           THE COURT:  But you would agree, though, that that

19    factor seems to counsel against your client here, right, in

20    terms of the way bankruptcy works.

21           MR. BURKE:  Well, I -- so, I think there is a

22    general proposition that is recognized in cases like First

23    Central and a number of other cases that the Debtors have

24    cited where Courts are cautious in the bankruptcy setting

25    before recognizing a constructive trust, and there is this

Page 140

1   idea that -- where the sort of only effect of the remedy

2   would be to benefit one creditor at the expense of the

3   other, that maybe -- what's the right way to say it?  Maybe

4   less unjust or something in the bankruptcy context vis-à-vis

5   other circumstances.

6          But I don't think that principle actually applies

7   here.  And -- but I think the first --

8          THE COURT:  Well, I guess my question is why not?

9          MR. BURKE:  Well, if I could, I just want to make

10  the preliminary point that it can't be the case that that

11  principle applies across the board in bankruptcy cases

12  because we know --

13         THE COURT:  No, I agree it's not dispositive, but

14  it seems pretty clear it's a factor in the constructive

15  trust analysis as cases have looked at.  So, but then you

16  said, but it doesn't apply here, and that's where I'm sort

17  of wondering why.

18         MR. BURKE:  Right.  And so, I think the key point

19  there is that we're talking about assets that wouldn't even

20  be held by a Debtor at all but for this malfeasance that

21  underlies the unjust enrichment theory and the constructive

22  trust --

23         THE COURT:  Well, but I assume we're talking about

24  the circumstance.  If your client prevails and has a

25  security interest, then the constructive trust issue we

Page 141

1    could reach, might not reach, depends on how you look at it.

2    But if you reach the constructive -- and so, I -- the

3    colloquy I'm having with you now is really what happens in

4    the constructive trust theory in the context that you don't

5    find a security interest, and then it means that it actually

6    is property of the estate, and you're asking to impose a

7    constructive trust, and I'm having trouble understanding why

8    that doesn't at least implicate the concerns identified by

9    the bankruptcy courts in terms of the sort of recovery of

10   other creditors of the estate.

11          MR. BURKE:  I guess I don't want to fight on

12   whether or not the concern is implicated versus

13   distinguishable.  I think the key point is that the assets

14   that would be, you know, subject to the constructive trust

15   are assets that would not have been on the balance sheet

16   here but for this malfeasance.

17          And so, it's --

18          THE COURT:  But you can say that about any

19   creditor, because all creditors are entitled to be paid.  I

20   mean, that's the reason why I think -- why you have in

21   constructive trust that concern raised, because there are

22   all sorts of creditors who say you were supposed to pay me.

23   And so, to quote the (indiscernible), what's so particular

24   with you, right?  And that's the question.  And so, and

25   that's what I'm trying to get at, why that concern operates

Page 142

1    differently in the context of this case.

2            MR. BURKE:  And I -- the best way I can articulate

3    it is I guess that in general, creditors of a bankrupt

4    Debtor don't have an asset-specific claim on any particular

5    assets, and that's what it means to be an unsecured

6    creditor, right?

7            THE COURT:  Right.

8            MR. BURKE:  And they may say I have been harmed

9    because I was supposed to be paid 100 cents on the dollar

10   and instead I'm getting only 50 cents or 20 cents, or

11   there's nothing left for me.  And that -- you know, that is

12   a harm, but it's not the kind of harm that kind of is

13   sufficient to trigger the position of constructive --

14           THE COURT:  So, let me just restate to make sure I

15   have this right.  So, your -- the premise for saying this

16   isn't like those other cases, because you say, well, the

17   agreement clearly contemplates a security interest, and even

18   if that security interest wasn't properly effectuated such

19   that it actually exists, there's no -- the contract provides

20   for it and it didn't happen, which puts your client, Gemini,

21   in a different position from other folks and therefore makes

22   this concern in these cases less applicable or not

23   applicable at all to your situation.

24           MR. BURKE:  So, I think that logic would be

25   sufficient to rule in our favor, and I think it's correct.

Page 143

1    I think that what you just described is very similar to the

2    circumstances that the 2nd Circuit dealt with in the

3    Howard's Appliance case.

4            That was a case where there were assets that were

5    subject to the security interest.  They were -- as I

6    understand it, they were moved by the Debtor out of the

7    warehouse where the security interest would have been

8    perfected in violation of the agreements between the Debtor

9    and the creditor, and the Court of Appeals said, you know,

10   it's not under the UCC or whatever the governing law would

11   have been.  It wasn't a properly perfected security

12   interest.

13           But because the reason that it wasn't perfected

14   was this sort of fraudulent malfeasance by the Debtor, those

15   were the circumstances that gave rise to a constructive

16   trust.  And I think the key factor there is we're talking

17   about assets and particular property, and that helps to

18   distinguish it from the (indiscernible) case where we're

19   talking about, you know, similarly situated creditors who

20   are all just being paid less than full on their claim.

21           I think our case is actually stronger than that,

22   though, because we're not talking about a security interest

23   that was granted in property that was already on the

24   Debtor's balance sheet.  That is easier to think of as sort

25   of the one creditor, sort of the favorite creditor holding

Page 144

1    assets out of the estate away from the other creditors.

2              Here, we're talking about assets that are there on

3    the balance sheet only because of this arrangement with

4    Gemini and the Debtor's malfeasance and refusing to comply

5    with their obligations.

6              THE COURT:  Well, I think I understand your first

7    point that the Debtor -- in your view, it's the Debtor's

8    misbehavior that led to it not being perfected and that

9    supports the imposition of a constructive trust.

10             The notion that the funds are only there because

11   of this long-standing relationship, that seems a point that

12   could happen with any creditor, right?  People have

13   relationships, whether you're a vendor or whether you're any

14   of the folks who invested in Genesis.

15             So, I don't know that that's -- I don't know that

16   that distinguishes this case, but I understand your point is

17   that -- to be that the reason it wasn't perfected as to

18   these specific assets is because of the wrongdoing -- the

19   alleged wrongdoing by the Debtor, and that that changes the

20   calculus for a constructive trust.

21             MR. BURKE:  And I think there's a distinction.

22   There may be many cases where you could identify the

23   particular asset that is there, you know, on the Debtor's

24   balance sheet only because of a relationship with, you know,

25   some particular creditor.

Page 145

1          I don't think standing alone that would be

2     sufficient to recognize a constructive trust.  I think there

3     actually -- you know, there needs to be some wrongdoing on

4     the part of the Debtor that sort of --

5          THE COURT:  Well, I don't know that those two

6     things by themselves necessarily justify the imposition of a

7     constructive trust, because if the act of not paying is the

8     wrongdoing, then every creditor in every bankruptcy has the

9     right to impose a constructive trust, and that can't be

10    right.

11         MR. BURKE:  I agree.  That can't be right, and

12    that's not our position here.  The -- it's the wrongdoing in

13    bringing the assets -- you know, sort of intercepting the

14    asset.  That is how I think about it here.  You know, it's

15    not like they came out of Gemini's pockets, but they were --

16    the assets were intercepted on the way to Gemini, and that

17    was, you know, what everybody understood was supposed to

18    happen.

19         And those are assets that, you know, could have

20    been transferred directly to Gemini, right?  Had Gemini

21    known that the Debtors were going to behave in this manner,

22    you know, they might have, you know, come to a different set

23    of mechanics to avoid this possibility.

24         And so, I think all of these together, there's a

25    combination of malfeasance as to a particular property,

Page 146

1    malfeasance that results in that property ending up on the

2    balance sheet when it wouldn't have been there anyway, and I

3    think it's different from the sort of (indiscernible) harm

4    that every unsecured creditor experiences that they're just

5    not being paid in full because of the filing in the

6    bankruptcy petition.

7              THE COURT:  All right.  Anything else on

8    constructive trust?

9              MR. BURKE:  I just want to briefly touch on the

10   Debtor's remaining two arguments, the fiduciary or

11   confidential relationship and then this idea that the -- you

12   know, you need to identify assets that were transferred by

13   the plaintiff.

14             I think the common theme for both of those two

15   arguments is that they are, you know, repeating this

16   checklist flaw that identified at the outset of this section

17   --

18             THE COURT:  Well, but they're referencing case --

19   they're referencing factors that have been considered by

20   Courts.  So, I mean, you said it's a flexible test.  So, I

21   don't know that you can say it's a flexible test and then

22   say that they can't cite cases that are cited by other

23   courts as significant.

24             I mean, you can weigh them differently, I suppose.

25   But there are many multifactor tests in the law.  We'd all

1    be lost without multifactor tests, I think.  So --

2            MR. BURKE:  That's entirely fair, and I don't

3    begrudge the Debtors citing these cases.  I think our point

4    is that, you know, stepping back for a minute, this is

5    supposed to be a flexible doctrine, that it should be

6    examined, that the question should be examined holistically.

7            The question -- the core question is whether

8    Gemini and the Earn users have an equitable entitlement to

9    particular, you know, asset-specific remedy, and I think the

10   confidential or fiduciary relationship, this idea of, you

11   know, assets that were transferred from the plaintiff, those

12   are both common circumstances in which it is, you know,

13   appropriate to impose that asset-specific remedy, but it

14   doesn't mean that those are, you know, limitations on the

15   doctrine.

16           And I really -- I think in particular on the

17   concept that constructive trust is appropriate only when the

18   asset was transferred from a plaintiff, I just don't see the

19   grounding in any coherent theory of what this remedy is

20   there for.  I don't think it's any less unjust to have, you

21   know, a defendant trick the plaintiff into handing over its

22   own funds rather than what we have here where the defendant

23   sort of -- the malfeasance is intercepting the funds on the

24   way to -- the assets on the way to the plaintiff.

25           THE COURT:  Well, I think I have a sense of what

Page 148

```
 1    the doctrine is most classically used for, and that's why

 2    the fiduciary aspect comes in where someone is supposed to

 3    be acting on your behalf and is not.

 4             And so, you may not have a contractual provision

 5    that says they can't do what they did, but you had an

 6    element of trust that should have precluded the actions that

 7    they took.

 8             And so, that seems to be -- the fiduciary aspect

 9    seems to be a pretty significant aspect of the cases in the

10    flexible approach.

11             So, what's -- but let me ask you about the --

12    there's a cite or an argument that you -- the constructive

13    trust claims are equitable and are generally not permitted

14    where a valuable -- a valid written contract exists.

15             And so, it seems like everybody's arguing about

16    what the contract means.  Nobody is arguing that it doesn't

17    exist.  And so, what's your take on that?

18             MR. BURKE:  So, I think our best case is the

19    Simmons case from the New York Court of Appeals, which

20    recognizes that the -- the insolvency of the potential

21    defendant on a, you know, legal claim for damages is a

22    reason to conclude that the contractual remedy is fruitless

23    and isn't adequate.

24             So, the -- I think the -- this inquiry into

25    whether there is a governing contract is really a specific,
```

Page 149

1    as I understand it, a specific instance of the broader

2    principle that, to have an equitable remedy, you have to

3    demonstrate the inadequacy of your legal remedies.

4            And I think the Simmons case holds that where you

5    might have a legal remedy under the contract, but the

6    potential defendant is insolvent and wouldn't be able to

7    satisfy your legal claim.  That's a circumstance in which it

8    would be appropriate to impose a constructive trust.  I

9    think that Howard's Appliance case is another one to look

10   at.

11           THE COURT:  And what's the theory behind that,

12   that you can't recover from the Debtor but you could recover

13   from these assets, right?

14           MR. BURKE:  Right.  I mean --

15           THE COURT:  But I'm wondering how that would apply

16   in this circumstance.  There's a bankruptcy estate, and

17   there are assets for recovery.  And so, it makes -- I can

18   understand the carve-out where you say you're judgment

19   proof.  We -- you can't get blood from a stone.  There's

20   nothing there.

21           But that's not true here.  There's a breach of

22   contract claim that you can have and can recover as an

23   unsecured creditor.  So, how does the -- what's your

24   response to that concern?

25           MR. BURKE:  Well, I think the key point is that

```
 1    the breach of contract claim, you know, I guess that --

 2    trying to spin this out, I think it would be a claim for,

 3    you know, the damages from failure to transfer the

 4    collateral on when they were supposed to do so promptly.

 5            But I think that's sort of a piece with the

 6    existing claim that the lenders -- Earn lenders already have

 7    for the assets that they loan to Genesis, you know, to have

 8    the --

 9            THE COURT:  Well, but isn't that a question of

10    what the measure of damages would be under those

11    circumstances, right?  So, you can't double recover damages,

12    but you could say we're supposed to get this pledged, which

13    meant we should have had a minimum of that recovery, and if

14    we're only going to get this amount of recovery in the

15    bankruptcy, then the delta would be how we've been harmed by

16    the failure to actually carry out the security agreement.

17            Well, I guess --

18            THE COURT:  Sorry, that's a lot.  You don't

19    necessarily have to answer.  I'm just thinking out loud.

20            MR. BURKE:  Well, I think the -- at least the way

21    I think about it, Your Honor, is that, you know, if we had

22    the collateral and had been able to foreclose on it, it

23    would have satisfied the antecedent debt obligations.

24            And so, I guess that's where I'm coming from, that

25    the legal claim for breaching the security agreement seems
```

Page 151

1     to sort of overlap with the pre-existing, you know, claim

2     that -- you know, of the lenders for the loan assets.

3               THE COURT:  I would agree with that.

4               MR. BURKE:  And so, I think that's why the -- it

5     seems appropriate to analogize it to that Simmons case and

6     to say, well, you know, there's not really any effective

7     remedy, you know, under the security agreement, if you've

8     concluded that there was no transfer of the security

9     interests and it's just an unsecured claim for, you know,

10    reaching the promise to transfer.

11              And so, you know, we would fall back to the --

12    that equitable doctrines and constructive trust, and I guess

13    the other case I wanted to cite to you is the Howard's

14    Appliance case from the 2nd Circuit.

15              That was a case, as I mentioned, that has sort of

16    similar fact patterns where the malfeasance led to -- the

17    malfeasance breaching an agreement with the creditor led to

18    an inability to perfect the security interest, and the 2nd

19    Circuit said those were circumstances where it was

20    appropriate to impose a -- I suppose you could have said in

21    that case you should have sued the Debtor for, you know,

22    breaching the contract by moving the inventory from one

23    warehouse to another.

24              But that's not what the 2nd Circuit said.  And I -

25    - just to be clear, that's not a case where any of these

Page 152

1   issues were actually, you know, argued and decided by the

2   Court.  I cite that only to provide an example of a case

3   where the 2nd Circuit didn't even seem to think there was an

4   issue here that you could have a claim based on a breach of

5   that agreement to keep the inventory in one place versus

6   another.

7           And you know, although there might have been some

8   legal remedy that could have been an unsecured claim for

9   bankruptcy, the Court nonetheless thought it was appropriate

10  to impose a constructive trust.

11          THE COURT:  All right.

12          MR. BURKE:  I should note, that was a New Jersey

13  law case, I believe, but I don't think this principle we're

14  talking about differs from state to state, because I think

15  it's the broader principle that the legal remedy displaces

16  the equitable remedy that we're really talking about.  And

17  so, I think that's at least persuasive authority under the

18  circumstances here.

19          THE COURT:  All right.  Counsel, what else on

20  constructive trust or anything else we should discuss?

21          MR. BURKE:  I think that's it on constructive

22  trust unless the Court has any further questions.  I want to

23  move on to the avoidance claims before, you know -- just a

24  couple of small points to clean up at the end.

25          THE COURT:  Well, since we're talking about the

Page 153

1    other claims where we get to avoidance, the other claims

2    have the other two defendants, so -- that are the subject of

3    the motion.  So, maybe we should jump in and address those,

4    and then we can pivot to the avoidance claims.

5              MR. BURKE:  Sure.  I don't think there's much

6    daylight, and I think, Your Honor, you articulated what's

7    going on here, you know, earlier today, I don't know what

8    time that was, that why are those entities, defendants,

9    here?  It's a protective measure, right?  We don't have, you

10   know, x-ray vision to know exactly, you know, where the GBTC

11   shares might be held at any moment.

12             You know, the Debtors have filed in this case cash

13   and coin reports that treat the three Debtor entities, you

14   know, as, you know, consolidated entity for purposes of

15   those reports.

16             So, that's why they're defendants.  We think it's

17   appropriate as a protective measure, but I'm not sure -- I

18   guess the only other point is I'm not sure much turns on

19   this, in any event.

20             Like, all of these claims relate to particular

21   property.  They're sort of in rem declaratory judgment

22   claims.  And so, I mean, it seems almost academic to me

23   whether or not, you know -- which of these Debtors that file

24   pleadings through the same counsel or defendants in the

25   case.

1          THE COURT:  All right.

2          MR. BURKE:  So, is it okay if I move on to the

3     (indiscernible) issues?

4          THE COURT:  Please.

5          MR. BURKE:  I guess I think I understood or heard

6     from Your Honor the concern that by moving to dismiss here

7     we're trying to sort of move up factual issues that might be

8     more appropriate for the summary judgment stage.  So, I want

9     to try to respond to that concern.

10          THE COURT:  All right.

11          MR. BURKE:  One -- I guess one overall point or

12     starting point is just to emphasize that, yes, the safe

13     harbor issues can be factually intensive, and in some cases,

14     they may require discovery and very fine-grained factual

15     judgments, but that's not universally true.

16          We cited at Page 12 of our motion to dismiss brief

17     cases where this issue was adjudicated as a matter of law

18     and a motion to dismiss including the Enron against Bear

19     Stearns case.  So, I don't think there's any procedural

20     impropriety in trying to address issues where it's possible

21     to do so at the motion to dismiss stage, including, you

22     know, relying on judicially noticeable information.  That's

23     what happened in the Enron against Bear Stearn's case.  If

24     you -- you know, there's public filings and SEC reports that

25     informed the Court's decision on a motion to dismiss under

Page 155

1    the safe harbor there.

2         So, I think -- I guess one other preliminary point

3    is just to come back on the Three Arrows claim objection

4    that we talked about earlier today.  Just I don't

5    (indiscernible) actually relevant to our bottom-line

6    conclusion here because we're not invoking the estoppel

7    doctrine, but it's worth noting if you look at the Three

8    Arrows claim objection, I think it's Docket 658 on Page 17,

9    that's the argument by the Debtors that there was no factual

10   allegations as to Holdco, but the Debtor didn't press that

11   same argument with respect to GGC.

12        In the Three Arrows setting, GGC and GAP were

13   defined together as Genesis, and as I read their pleading,

14   the rest of the arguments other than this Page 17, you know,

15   Holdco didn't do anything argument, they're pressed on

16   behalf of both GAP and GGC, so I just --

17        THE COURT:  So, if you're not relying on judicial

18   estoppel, what are you relying on?  There's the classic

19   you've said this before and you can't escape your earlier

20   position.  There's res judicata.  here's collateral

21   estoppel.  There's judicial estoppel, and there's law of the

22   case.

23        So -- or maybe there's something else.  So, what's

24   the legal doctrine under which, in your view, I can rely on

25   those pleadings?

Page 156

1           MR. BURKE:  So, I'm not asking you to rely --

2     that's why I -- you know, it's -- I wanted to correct the

3     record about this point, but you know, it --

4           THE COURT:  Well, but you mentioned them as saying

5     this is what the Debtors -- this is the Debtor's own

6     statement about X, Y, and Z, so Judge, that checks the box

7     on one of the safe harbor requirements.  So, how do I get

8     there in terms of --

9           MR. BURKE:  Right.  So, we --

10          THE COURT:  -- relying on those pleadings?

11          MR. BURKE:  I think the answer to that concern is

12    we've pressed the same arguments sort of in short form in

13    our own motion to dismiss, and the reason we did it in short

14    form is that for every one of those propositions we could

15    say, and the Debtors agree with us, see paragraph whatever

16    of the Three Arrows claim objection.

17          But you know, we have a paragraph in there that

18    explains why these -- the lending arrangements that we're

19    talking about satisfy the four-part test for a forward

20    contract under the code and how that links up with the rest

21    of the definitional provisions, et cetera, et cetera.

22          So, I think that the conceptual point is we've

23    made the arguments citing the relevant legal materials.

24    We've also said, by the way, Judge, the Debtors --

25          THE COURT:  But how do I rely on it?  So, putting

Page 157

1    aside the doctrines that we just mentioned, there certainly

2    is the informal doctrine of I have some skepticism, because

3    over here you argued this.  That's not a legally cognizable

4    doctrine.

5              MR. BURKE:  We have some (indiscernible) that do,

6    but --

7              THE COURT:  Right?  But it is one of those things

8    that people confront when they say, well, this is how you've

9    looked at the world before, and it affects people's -- the

10   credibility of positions, perhaps, and shades things, but

11   it's not a -- it doesn't foreclose something.  It doesn't

12   say that box is definitively checked.  It's a -- in the

13   grand, overall weighing of things, it's in there.

14             MR. BURKE:  It's (indiscernible).

15             THE COURT:  But for this, on a motion to dismiss,

16   you know, the idea is that I need the allegations -- I take

17   the allegations as true, but to rely on the safe harbors, I

18   need to meet certain requirements, and this can get very

19   tricky.  I've had to do this in other cases in a very thorny

20   record.

21             And so, the -- in order to check that box, you're

22   citing this, and the Debtors are saying, Judge, you can't

23   rely on that here.  I'm not hearing you disagree with that

24   in terms of some sort of estoppel or preclusive doctrine.

25   So, how do I get there?

Page 158

1          I mean, it may be a good argument in your favor if

2     we ever have to argue it on, like, summary judgment, but how

3     it -- on a motion to dismiss is it something that enters the

4     conversation?

5          MR. BURKE:  Sure.  So, I guess there are a couple

6     of parts to the argument, but I guess the first point is

7     this is how we put it in the reply, and I think this is in

8     part responsive to your question here.

9          The estoppel goes to whether they could disavow

10    their earlier positioning now.  And as I said, we're not

11    invoking the estoppel doctrine here.  So, maybe it's open to

12    them to disavow their prior position, but I don't think

13    they've done so, and I think they actually have to do so by

14    joining issue here --

15         THE COURT:  Yeah, but if you want to prevail,

16    right, you have -- it's an affirmative defense, you have the

17    burden.  And so, I think they just did and said, Judge, it

18    can mean a lot of different things under the circumstances.

19    We never got to litigate it, and there's a lot of reasons

20    why you should discount that as a clear, unambiguous

21    statement of the position of the Debtors.

22         And so, I think they have disavowed it, but I

23    don't know that they have an obligation to do so if you've

24    got to prove it.  I need to check the box.  So, if there was

25    an allegation --

```
 1            MR. BURKE:  Yeah, I --

 2            THE COURT:  -- in the complaint that you said as

 3    for the safe harbors, such -- so and so, blah, blah, blah,

 4    blah, blah, therefore is a forward contract, and their

 5    answer said admitted, touchdown, right?  That checks that

 6    box.

 7            But this is awfully fuzzy to use a non-legal term,

 8    and I'm wondering how I can consider it in the context of a

 9    motion to dismiss.  I don't think the, well, we mentioned it

10    and they didn't really disagree with us, that's -- I don't -

11    - that doesn't -- I don't think that gets me there.

12            MR. BURKE:  Well, I think --

13            THE COURT:  At least today.

14            MR. BURKE:  I hope it does.

15            THE COURT:  But under what doctrine?

16            MR. BURKE:  Well, we articulated a legal argument

17    in our motion, right, that the sort of core issue here is

18    whether these lending arrangements are properly

19    characterized as forward contracts for purposes of the

20    Bankruptcy Code.

21            That was our argument.  We cited the relevant

22    statutory provisions in the case law.  And also, we said by

23    the way, the Debtors agree to this in this other pleading,

24    but don't focus on the last one, focus on the first two, the

25    sort of ordinary legal argument.
```

Page 160

1          I think we've articulated that argument.  It's

2     incumbent on the Debtors to explain somehow --

3          THE COURT:  But it's an affirmative defense, which

4     you have to prove, and so you have to prove it here in the

5     context of construing all the allegations in their

6     counterclaims as true and showing that the rest of the

7     record of what I can take judicial notice of is -- I can

8     actually properly take judicial notice.

9          And judicial notice, people get a little expansive

10    with it, it's really not supposed to be anything that's

11    expansive, right?  It -- because judges shouldn't be in the

12    business of saying, well, this is a hotly contested set of

13    facts, so I'm going to take judicial notice.  That's not --

14    that's where the doctrine really falls apart and puts Courts

15    in places that nobody wants us to be.

16          So, it's really got to be a lay-up for judicial

17    notice, and I have the Debtors saying, Judge, we disagree

18    that you can consider this and for the following reasons.

19    And so, that's sort of where I find myself.  I'm just -- and

20    that's why I keep asking about a doctrine, whether there's

21    something that says under these circumstances, a Court can

22    consider this for purposes of a dismissal motion as

23    categorically established, and that's sort of where I am.

24          I understand as a practical matter in terms of

25    persuasive, Judge, they don't really seem to say a whole lot

Page 161

1    that tells me that we're wrong about this, but they raised

2    some questions, but I don't -- isn't it their obligation to

3    come ahead and whatever, but I don't think for this posture

4    -- the question is for this posture with a burden on you as

5    an affirmative defense whether it's something that can be

6    addressed here today.

7              MR. BURKE:  Right.  That's -- that concern makes

8    sense to me.  I guess that one of the key points here is I

9    think that characterization of these arrangements I think is

10   ultimately a legal question, not a factual one.

11             And so, I don't -- I guess the burden of proof and

12   the -- you know, the ability to bring evidence to bear on

13   those particular issues where we, you know, advanced a legal

14   argument in our brief I don't think is the right way of

15   thinking about it, right?  I think --

16             THE COURT:  Well, but you still have to -- even if

17   some of these requirements are not particularly

18   controversial and are sort of -- kind of check the box, the

19   two-day requirement and things like that, you still have to

20   establish them.  And so, that's -- and that's what I think

21   the argument is, that you can't on this factual record --

22   and I don't doubt under the right circumstances, you may be

23   able to consider it on a motion to dismiss, but I suspect

24   those cases deal with an instance where everything has been

25   distilled factually and nobody disagrees on sort of the key

Page 162

1    aspects and is fighting over the legal significance of one

2    or two things.  I could be wrong.

3              MR. BURKE:  Well, I guess, I think the -- I guess

4    the key point is it's just -- it's hard for us to identify

5    based on the Debtor's submission here what the actual

6    factual issues are that they're pointing to.  Is it the two-

7    day thing?  Is it the characterization of certain assets as

8    commodities versus something else, right?  You know, I don't

9    think they've really argued that issue here, and that's one

10   of the issues where I say maybe they could disavow their

11   prior position, but they haven't really --

12             THE COURT:  Well, so the initial transferee I

13   think was one that was mentioned, right?

14             MR. BURKE:  Okay.  And I think on that one, I

15   think that's just -- that issue is logically irrelevant

16   here, because the relevant claims are -- you know, there are

17   counterclaims asserted against Gemini.  They allege in Count

18   7, Counterclaim 7, that Gemini was the initial transferee,

19   right?  So, that's the claim that's in front of the Court

20   here, and that's the claim as to which, you know, we need

21   to, if possible, you know, get a determination on these safe

22   harbor issues.

23             The suggestion that there might be other claims

24   against other people who may or may not qualify for the safe

25   harbor I think is just -- it's irrelevant to whether the

1    claim that they've actually pled against Gemini should be

2    permitted to go forward.

3              THE COURT:  All right.

4              MR. BURKE:  I mean, I guess in the event that we

5    are -- that Gemini was a conduit rather than an initial

6    transferee, that is a -- that's a defense to the claim for

7    Gemini, but I don't think they can point to a different

8    failure point for their claim and say, well, that's a reason

9    that you can't articulate -- or you can't adjudicate this

10   other defense at this stage.

11             So, I think unless you have other questions about

12   the avoidance issues, I think I can leave it there.  On the

13   property of the estate claim, you know, I think when you

14   look at all of the circumstances here, the arrangement that

15   is embodied in the second amendment looks very close to the

16   escrow (indiscernible) conduit examples that we've cited in

17   the briefs.

18             I think it's, like, hard to understand how what's

19   happened here differs from those situations, and that's the

20   basis for our argument there.  I mean, I'm content to leave

21   that mostly to the briefs unless you have questions there.

22             THE COURT:  No, that's fine.

23             MR. BURKE:  I did want to respond, and then I can

24   finally wrap up.  I appreciate your patience and indulgence,

25   Your Honor.  I wanted to respond to a few points that Mr.

Page 164

1    Shore made on behalf of the UCC here.

2           The -- you made a number of arguments that echo

3    points that the Debtors made in their brief about the

4    ability to enforce the security agreement, how that bears on

5    whether or not the security interest was there in the first

6    place.

7           I think all of that is sort of intent-type

8    extrinsic evidence that isn't really properly in front of

9    the Court at this stage.  If we're getting to that, it means

10   that the words of the contract are ambiguous, and maybe Mr.

11   Shore has a point, maybe he doesn't, you know, in terms of

12   the practicalities and the intent, et cetera, but I don't

13   think that's a topic for today's proceedings.

14          The only other point I wanted to address from Mr.

15   Shore's remarks was his invocation of this secret lien idea

16   and the idea that, you know, because of the way things

17   transpired here, it would be inappropriate to recognize a

18   constructive trust on these claims.

19          I think Mr. Shore sort of misunderstood or

20   misdescribed the relevant chronology here.  The -- these

21   assets that we're talking about here, the additional GBTC

22   shares, according to the Debtor's allegations, they didn't

23   even arrive at Genesis until after Genesis had shut down its

24   lending and borrowing business back in November.

25          So, this isn't a case where other creditors would

Page 165

1    have been lending into the business on the basis of GBTC's

2    shares that were on the balance sheet, and you know, were

3    subject to a secret property interest for Gemini.

4           THE COURT:  Well, I took his comment to be a

5    general policy argument saying that when you bargain for

6    security interests like this where possession is relevant

7    and thus the second transfer, that it's important because

8    what it does is take the asset off the books and therefore

9    people won't look at the books and rely on the books with

10   the assets still there but somehow isn't property of the

11   estate.  And so, I understood it to be a policy argument

12   that way.

13          MR. BURKE:  I think that's an argument that would

14   have general applicability in some cases.  My point is

15   narrower, that the chronology here is inconsistent with that

16   concern, because by the time these shares ended up at

17   Genesis, they had already shut down their lending and

18   borrowing business, so.

19          THE COURT:  Well, I think the notion is that for

20   that kind of a policy argument, you're not really as

21   concerned about how it's going to play out in a particular

22   case, but that there's a -- that the way the law works

23   dovetails with the policy argument in the sense that this is

24   why it works this way, because it's important, and however

25   the chips fall in a particular case is what it is, but

Page 166

1    that's why these concerns are what they are.  But again, I -

2    - that's how I understood it, and I don't know if you have

3    anything to say about that.

4            MR. BURKE:  I think that's the right way of

5    thinking about it.  If you are faced with construing a

6    statute that has to apply across the board, or if you would

7    think about various potential applications, think about the

8    policy implications, and that would help you arrive at, you

9    know, a sensible reading of the statute, because it has to

10   apply to all of those circumstances.

11           At least as I understood Mr. Shore's remarks, this

12   portion of it was intended to be relevant, at least in part,

13   to the constructive trust claim, and I don't think the same

14   concerns apply there, because that is, you know, equitable,

15   case-specific, flexible doctrine, and it's totally

16   appropriate to look at the particular circumstances of the

17   case rather than trying to implement sort of across-the-

18   board policy judgments that might make more sense in other

19   cases.

20           THE COURT:  All right.  Thank you very much.

21           MR. BURKE:  So, I think that's all I have unless

22   you have further questions.

23           THE COURT:  I do not.

24           MR. BURKE:  I don't want to collect the various

25   counts, because that confuses me.  I'd urge you to deny

Page 167

1    their motion and grant our motion.

2              THE COURT:  All right, fair enough.  That's a

3    perfectly fair way to summarize it.

4              MR. BURKE:  Thank you, Your Honor.

5              THE COURT:  Thank you very much.

6              All right.  So, let me hear a response from the

7    Debtor.  And I'll take this opportunity to thank counsel for

8    engaging back and forth as I wrestle with these issues.  I

9    appreciate it.  It's very helpful, even again if it means

10   that people have to stray far field from their scripts, but

11   it really is a very helpful thing to have an evolving, live

12   argument.

13             So, Mr. Barefoot?

14             MR. BAREFOOT:  Thank you, Your Honor.  Luke

15   Barefoot from Cleary Gottlieb for the Debtors.  Three

16   extremely brief points, one on the security interest

17   contract question and two on constructive trust.

18             First, on the security interest grant question

19   under the language of the contract, I wanted to follow up on

20   the discussion that you had with Mr. Burke about Section 1

21   of the second amendment where it specifically describes the

22   first step of the transfer as being made from DCG to the

23   pledgor and then contemplates that the pledgor, which of

24   course is GGC, would make the second step of the transfer

25   into Gemini's GTC account.

Page 168

1          That -- we did not discuss this previously, but

2     that description of GGC as the pledgor making that second

3     transfer is inherently incompatible with the alternative

4     argument that they've made that the transfer was made --

5     that the transfer from DCG was being made on behalf of

6     Gemini.

7          If you were going to rely on Section 2 of the

8     security agreement to say, as they've said, that the

9     transfer from DCG to GGC was made on behalf of GGC, you

10    never would have drafted the operative transfer language to

11    describe GGC as a pledgor.

12         On a related point, Your Honor, they have not

13    alleged that -- anywhere that the transfer from DCG was made

14    on behalf of GGC.

15         THE COURT:  Right.

16         MR. BAREFOOT:  And Mr. Burke went through

17    Paragraph 39 with you of the complaint.  That paragraph does

18    allege that the sole purpose of the transfer was to have GGC

19    in turn provide those shares to Gemini, but it does not

20    allege that the transfer was made on behalf of the GG -- the

21    transfer to GGC was made on behalf of GGC.

22         Turning to the constructive trust arguments, Your

23    Honor, Mr. Burke repeatedly talked about and their briefs

24    talked about that our retention of the GBTC by failing to

25    complete the second step of the contemplated transfer was

Page 169

1    wrongdoing or somehow unjust.

2           What it was, Your Honor, and I think you've heard

3    this from me, was a breach of contract.  But going back to,

4    you know, first-year contracts classes, a breach of contract

5    is not wrongdoing.  You can have an efficient breach.  You

6    can have a Debtor who, if it were to complete its

7    contractual requirements, would be creating preferences at

8    the expense of its creditor body to whom it owed fiduciary

9    duties more broadly.  So, the mere fact that we failed to

10   live up to the contractual requirement to transfer the GBTC

11   does not amount to wrongdoing or unjust conduct.

12          And the final point, Your Honor, a very discrete

13   point on the constructive trust issue, you heard from Mr.

14   Burke, and it is cited in their briefs, the New York Court

15   of Appeals in the Simmons case where they suggested that

16   insolvency and inadequacy of remedies at law made

17   constructive -- made a constructive trust claim available.

18          Obviously, that was a New York Court of Appeals

19   case.  It was not decided in the bankruptcy context, and we

20   would ask the Court to look instead at the First Century

21   (indiscernible) Dreier cases that were decided in the

22   bankruptcy context and talk about the particular reluctance

23   to apply constructive trust where there is no inequity in

24   treating all unsecured creditors.

25          THE COURT:  So, let me just ask you about that.

Page 170

1    There was some suggestion that -- we sort of ping-pong back

2    and forth between, well, if we phrase it that way,

3    everything is a constructive trust versus the notion that --

4    whether this sort of -- if you don't agree with Gemini here,

5    then the constructive trust doctrine doesn't serve any

6    purpose, and it can't be that you write it out based on the

7    factors identified by the Debtors.

8             So, it's a big picture point in terms of the

9    purpose of a constructive trust and how you view it and what

10   that means for this case.  So, any comment on that?

11            MR. BAREFOOT:  I mean, Your Honor, I think you hit

12   the nail on the head when you said -- and we don't disagree

13   with Gemini that it is a flexible test.  It is not a rigid

14   test, and the Courts have been clear that not every factor

15   need be clear -- need be clearly present in every case to

16   grant a constructive trust, but the only factor that I think

17   you've really even heard facts alleged about is unjust

18   enrichment, and that alone can't be the basis for a

19   constructive trust claim or there would be no distinction

20   between an unjust enrichment claim and a constructive trust

21   claim.

22            THE COURT:  All right.  Thank you very much.

23   Anything else?

24            MR. BAREFOOT:  No.  Thank you for your time, Your

25   Honor.

Page 171

1          THE COURT:  All right.

2          Mr. Shore, briefly?

3          MR. SHORE:  Thank you.  I'll just be very brief,

4   and I only rise because there seems to be some confusion

5   about my argument, and that's my fault.  So, I want to

6   clarify any confusion.

7          MR. SHORE:  It's probably just easiest to pull out

8   Section 2, the pledge, which is in Exhibit 1 to the

9   complaint.  There's only one pledge, only one instance in

10  which a Debtor granted a property right in part of its

11  property, and it's in Section 2, the pledge, in the August

12  security agreement before the business was shut down.

13         There's three parts to the pledge.  When you get -

14  - after the definition of secured obligations.  The pledgor

15  hereby pledges, assigns, and grants to the agent for the

16  benefit of the agent and the principal lenders a security

17  interest in all the pledgor's right, title, and interest in

18  and to all property.

19         Now, if it ended there, we'd be having a

20  discussion like we do in cases that that's too vague to

21  grant a security interest in all property, and therefore

22  there's no security interest granted at all.

23         So, obviously, what follows is very important.  It

24  says from time to time the contemplation here on its face

25  was that there would be something happening in the future.

Page 172

1    That's why you have the rep and warranty.  If we're going to

2    transfer from time to time in the future, we're going to

3    draw down the rep that we own what we're transferring to

4    you.  That explains why you have that definition of

5    collateral.  Then it says transferred by or on behalf of the

6    pledgor, and then the third part, to or for the benefit of

7    the agent of the principal lenders.

8              There are two ways to read that language.  One is

9    property is going to be moving from the Debtor companies to

10   the creditor or somebody under the creditor's control.  My

11   point is, is that makes sense because the way of perfecting

12   here is going to be control.

13             So, we're not giving you a security interest in

14   something that you're not going to be -- ever be able to

15   perfect, because you're not filing a UCC 1.  The other way

16   of looking at it is what you're hearing here, which is the

17   secret lien concept.

18             No, the actual lien is going to arise when

19   somebody subjectively believes that an intercompany transfer

20   is ultimately going to move out to the creditor.  That's my

21   secret lien point.

22             So, for example, if GBTC -- or sorry, if the trust

23   itself, Grayscale Trust, transfers GBTC to DCG, their

24   argument would be if the intent was that that was ultimately

25   going to be transferred onto the agent, then a lien arises,

Page 173

1    or security interest arises, or because we've alleged that

2    the intercompany transfer from DCG to GGC was ultimately for

3    the benefit of somebody else, then the security interest

4    arises.

5            And my policy point was when faced between an

6    interpretation of the agreement that says the lien arises

7    when it's leaving the Debtor family and one that says the

8    lien arises when somebody within the corporate family

9    subjectively intends to benefit a creditor, the former

10   should always be taken over the latter because the latter is

11   the secret lien problem, where creditors' rights and

12   creditors' recoveries are going to be determined based upon

13   the subjective views of a transferring party within an

14   inter-corp -- within a corporate family as to why they're

15   making that transfer.

16           So, from our perspective on the face of the

17   document, there is no movement from the corporate Debtor to

18   the creditor, and therefore no lien arises.  The only

19   argument with respect to constructive trust is if you read

20   this as giving a lien, then we have the perfection problem.

21           So, if you agree with me that there -- no security

22   interest was granted, I think subjective -- or sorry,

23   constructive trust goes away as well.  The problem I have,

24   and I just want to give the Debtors some credit here for

25   their pre-petition activities, for Gemini to say, oh, well,

Page 174

1    at least the agreement is ambiguous, give me another shot to

2    replead here, this agreement is ambiguous as to whether or

3    not it's the -- it must leave the corporate family or the

4    subjective intent within the corporate family, it would have

5    been -- the wrong act here would have been for the Debtors

6    in a period in which they're collapsing and they've shut

7    down redemptions to then say, I'm not sure what this

8    contract says, whether I -- they have a lien now or they're

9    going to have a lien later.  I'm just going to send it out.

10   I'm going to send out hundreds of millions of dollars to

11   GBTC.

12           So, I don't think it's this constant refrain that

13   somehow the Debtors did something wholly inappropriate here

14   by not blowing that GBTC out the door, is just not supported

15   by the allegations in the complaint -- either of the

16   complaints.

17           THE COURT:  All right.

18           MR. SHORE:  Thank you.

19           THE COURT:  Thank you.  Anything else from any

20   other party?

21           All right.  I'd like to thank all counsel for

22   their arguments today, very helpful.  Everything was

23   incredibly well presented, and I understand this is an issue

24   of importance for confirmation, and so I will have a

25   decision before confirmation.

Page 175

1          I've learned in this job never to promise precise

2    dates, because fate has a sense of humor, but if I'm in a

3    position to let you know anything, I will do that, and in

4    the meantime, we'll just work on a decision.  And with that,

5    unless there's anything else, I again thank you all.

6          Oh, I'm reminded, thank you, to request if you

7    would request a copy of the transcript so that's part of the

8    record, and with that, thank you all very much.  Have a

9    wonderful afternoon.

10          (Whereupon these proceedings were concluded at

11    3:56 PM)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          **I N D E X**

2

3                          RULINGS

4                                              Page        Line

5   Moonalpha settlement granted               23          21

6   No books and records claims                29           4

7   15th and 16th omnibus claim objections     35          20

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 177

1              C E R T I F I C A T I O N

2

3      I, Sonya Ledanski Hyde, certified that the foregoing

4   transcript is a true and accurate record of the proceedings.

5

6

7

8   Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20   Veritext Legal Solutions

21   330 Old Country Road

22   Suite 300

23   Mineola, NY 11501

24

25   Date:  January 22, 2024