WILLIAM K. HARRINGTON
United States Trustee
U.S. Department of Justice
Office of the United States Trustee
One Bowling Green, Suite 534
New York, New York 10004

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------- x

| | | |
|---|---|---|
| In re | : | Chapter 11 |
| | : | |
| GENESIS GLOBAL HOLDCO, LLC, *et al.*,[1] | : | Case No. 23-10063 (SHL) |
| | : | |
| Debtors. | : | Jointly Administered |

-------------------------------------------------- x

### OBJECTION OF THE UNITED STATES TRUSTEE TO THE CONFIRMATION OF THE DEBTORS' AMENDED JOINT CHAPTER 11 PLAN

William K. Harrington, United States Trustee for Region 2 (the "United States Trustee"), by his counsel, respectfully objects to the *Amended Joint Chapter 11 Plan* (the "Plan") filed on November 28, 2023. ECF No. 989. In support of his objection, the United States Trustee respectfully states as follows:

### PRELIMINARY STATEMENT

The Plan contains several provisions that are not permitted under the Bankruptcy Code, and therefore, the Plan fails to meet the confirmation requirements. First, the Plan provides that, on the Plan's Effective Date, the Debtors are required to pay the legal fees of non-statutory creditor groups without such group filing an administrative expense motion or seeking any court approval; the Debtors have simply unilaterally deemed such legal fees to be an allowed

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable), are Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 250 Park Avenue South, 5th Floor, New York, NY 10003.

administrative expense. Second, the Plan exculpates conduct that is yet to occur and outside the
supervision of the court and exculpates entities and individuals whose duties will not commence
until after the Effective Date. Further, the persons or entities who are exculpated and the causes
of action which are exculpated are overbroad. Third, the Plan's injunction provision operates as
an impermissible backdoor third-party release in that it enjoins any person and any entity in the
world from suing parties exculpated or released under the Plan, even if such person or entity has
rejected the Plan in the Plan voting process. Indeed, in large part, it renders the entire "opt-in"
consent process a nullity. Fourth, the Plan appears to impose additional burdens and legal
requirements on certain creditors, which are not found in the Bankruptcy Code. For the reasons
and details stated below, the U.S. Trustee respectfully requests the Court deny confirmation and
order amendments.

## FACTUAL BACKGROUND

1.      On January 19, 2023 (the "Petition Date"), the Debtors each commenced a
voluntary case under Chapter 11 of the Bankruptcy Code.

2.      On February 3, 2023, the United States Trustee appointed a seven-member
committee of unsecured creditors, which is the only statutory committee appointed in these
cases. ECF No. 53.

3.      Various ad hoc groups were formed throughout the case. Relevant to this
Objection, on March 3, 2023, Ad Hoc Group of Genesis Lenders (the "Ad Hoc Group")
represented by Proskauer Rose LLP filed its verified 2019 statement. ECF No. 114. The Ad Hoc
Group consists of 78 holders of claims denominated by USD and digital assets. *Id.*

4.      On January 12, 2024, the Ad Hoc Group of Dollar Lenders (the "Dollar Group"), represented by Pryor Cashman LLP, filed its verified 2019 statement. ECF No. 1150.  The Dollar Group primarily consists of holders of claims denominated in USD and USDC. *Id.*

5.      The Debtor filed the *Amended Joint Chapter 11 Plan* on November 28, 2023 (the "Plan"). ECF No. 989.

**A. If Approved, Non-Statutory Creditor Groups' Legal Fees Will Be Paid Without Any Review or Order from the Court.**

6.      The Plan provides that, unless the Plan Support Agreement (the "PSA") was terminated, the Debtors shall pay (i) the Ad Hoc Group Restructuring Expenses in full in cash on the Effective Date, as allowed administrative expenses, without further order of the Court and (ii) the Dollar Group Restructuring Fees and Expenses incurred up to Effective Date as allowed administrative expenses pursuant to the PSA, in full in cash on Effective Date, without any requirement to file a fee application or without any requirement for the Bankruptcy Court's review or approval.  Plan Art. II E. ECF No. 989 at 37 of 114.[2]

7.      "Ad Hoc Group Restructuring Expenses" is defined as "subject to the terms and conditions of the existing fee reimbursement letters executed by the Debtors, all accrued, but unpaid, documented fees and expenses of the Ad Hoc Group Counsel in connection with the Restructuring." ECF No. 989 at 6, Definition No. 6.

8.      "Dollar Group Restructuring Fees and Expenses" is defined as "subject to the terms and conditions of the PSA, all accrued, but unpaid, documented fees and expenses of the Dollar Group Counsel in connection with the Restructuring." *Id.* at 15, Definition No. 77.

---

[2] The page numbers herein refer to the numbers at the top of the document.

9.     "Restructuring" is defined as "all actions that may be necessary or appropriate to effectuate the transactions described in, approved by, or contemplated by the Plan." *Id.* at 27, Definition No. 183.

10.    To date, the Debtors have not filed the "existing fee reimbursement letters" referenced in the Ad Hoc Group Restructuring Expenses, nor did they seek the court's approval thereof.

11.    The Plan Support Agreement was filed on November 29, 2023. ECF No. 1008. Relevant to these payments, it provides,

> The Confirmation Order and the Amended Plan shall provide that, on the Effective Date, the Debtors shall pay (A) pursuant to the terms and conditions of existing fee reimbursement letters executed by the Debtors, all (1) fees generated and expenses incurred by Proskauer Rose LLP on behalf of the Ad Hoc Group during the Chapter 11 Cases and, thereafter, in connection with consummation of the transactions contemplated by the Amended Plan, and (2) unless a greater amount is ordered by the Bankruptcy Court, fees and expenses incurred by Kirkland & Ellis LLP, as co-counsel to the Ad Hoc Group during the period from the Petition Date up to and including February 22, 2023, in the amount up to Three Hundred Thousand Dollars ($300,000.00), and (B) the fees and expenses incurred by Pryor Cashman LLP, on behalf of the Dollar Group, in an amount up to Three Hundred Thousand Dollars ($300,000.00).

ECF No. 1008 at 31.

12.    Based on the docket entries, there is no public record of Kirkland & Ellis LLP appearing in this case for the Ad Hoc Group. The 2019 statement filed by the Ad Hoc Group referenced Proskauer Rose LLP only. *See* ECF No. 114.

15.    So far, the Debtors have not filed a motion to approve the PSA.

**B. Exculpation Provisions Provide Exculpation for Conduct Outside Court's Supervision and to Entities That Were Potentially Not Involved in the Cases.**

16.    The Exculpation provision in the Plan provides, in part, the following,

> [E]ach Exculpated Party is hereby exculpated from any Claim, Cause of Action …
> related to any act or omission in connection with, relating to, or arising out of …

4

Monetization Transaction[3], the Debtors' out-of-court restructuring efforts, the filing of the Chapter 11 Cases … the administration and implantation of the Plan, including … the distribution of any property pursuant to the Plan, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date related to the foregoing ….

ECF No. 989 at 90.

17.  The Exculpation provision further provides,

The Confirmation Order shall provide that the Exculpated Parties (to the extent applicable) have, and upon completion of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

*Id.* at 91.

18.    "Exculpated Party" is defined, in part, as

(i) the Debtors, (ii) the Wind-Down Debtors, (iii) the Committee and its members (solely in their capacities as such), (iv) the members of the Ad Hoc Group SteerCo (solely in their capacities as such), (v) the PA Officer (solely in its capacity as such), (vi) the members of the Wind-Down Oversight Committee (solely in their capacities as such), (vii) the members of the Litigation Oversight Committee (solely in their capacities as such), (viii) the Gemini Distribution Agent (solely in its capacity as such and solely to the extent that the Gemini Distribution Agent is implementing the Plan), and (ix) each Related Party of each Entity described in the foregoing clauses (i)–(viii) (in each case, solely in such Person's capacity as such) …; *provided still further* that any of the current and former employees, officers, and directors of the Debtors (solely in such Person's capacity as such) who served as employees, officers, or directors of the Debtors as of the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date, shall be an Exculpated Party only with the written consent of the Special Committee, which shall be disclosed in the Plan Supplement.

ECF No. 989 at 16, Definition No. 88.

---

[3] "Monetization Transaction" means any transaction that results in the sale, monetization, or liquidation of any of the assets of the Debtors or the Wind-Down Debtors, including any such transaction performed by the Gemini Distribution Agent with respect to the Gemini GBTC Shares, the Gemini Earn Operations Assets, the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value), or any assets of the Debtors or the Wind-Down Debtors distributed to the Gemini Distribution Agent.

20.     According to the Plan Supplement filed on December 29, 2023, "the Special Committee has, subject to the reservation of rights set forth herein, provided its prior written consent for the release[4] of current or former employees, officers, and directors of the Debtors (solely in such Person's capacity as such) who served as an employee, officer or director of the Debtors from or after the Petition Date, including any employees of GGT who served or functioned as employees of a Debtor pursuant to a shared services agreement (solely in their capacities as such) as of the Petition Date, whose identities have been or will be provided, in writing, to the Ad Hoc Group Counsel and Committee Counsel on a confidential, professional-eyes-only basis on or prior to the Effective Date." ECF No. 1117 Ex. F.

20.     "Related Party" means, with respect to any Entity, such Entity's predecessors, successors and assigns, parents, subsidiaries, Affiliates, and all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, and such persons' respective heirs, executors, estates, servants, and nominees. ECF No. 989 at 26. Definition 179.

21.     While not listed in the Exculpation provision, the Plan also exculpates the Disbursing Agent and Gemini Distribution Agent as follows –

> Except on account of gross negligence, fraud, or willful misconduct, each of the Disbursing Agent and the Gemini Distribution Agent shall have no (a) liability to any party for actions taken in accordance with the Plan or in reliance upon information provided to it in accordance with the Plan or (b) obligation or liability to any party who (i) does not hold a Claim against the Debtors as of the Distribution

---

[4] It is unclear if the term "release" in this Plan Supplement also means exculpation; however, given that this plan supplement is the only document that provides releases to employees, it is reasonable to assume the release therein also means exculpation.

Record Date or any other date on which a distribution is made or (ii) does not otherwise comply with the terms of the Plan.

ECF No. 989 at 78.

**C. The Injunction Provision Enjoins Any Person or Entity of Any Causes of Action Released or Exculpated Against any Released or Exculpated Party**

21.     The Injunction Provision provides, in part, that,

> … Further, to the maximum extent permitted under applicable law, the Confirmation Order shall permanently enjoin the commencement or prosecution by any Person[5] or Entity[6], whether directly, derivatively, or otherwise, of any Causes of Action released or exculpated pursuant to this Plan, including the Enjoined Actions, against any Released Party or Exculpated Party other than the Debtors or the Wind-Down Debtors.

ECF No. 989 at 91.

**D. The Plan Imposes Additional Burdens on Certain Claim Holders.**

22.     The Plan requires certain claim holders to "exhaust[] all remedies" with the Debtors' insurance company first and "immediately upon insurer's agreement" to satisfy in full or in part of a claim, "the applicable portion of such claim be expunged to the extent of any agreed upon satisfaction without an objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court." ECF No. 989 at 83.

23.     The Plan provides that "notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any Holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such Holder has filed a motion requesting the right to seek such reconsideration on or before twenty-one (21) days after the date on which such Claim is estimated." *Id.* at 84.

---

[5] "Person" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.  Plan Definition No. 161
[6] "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code. Plan Definition No. 80.

24.    The Plan provides that "any claim that has been listed in the schedules as disputed, contingent, or unliquidated and for which no proof of claims has been timely filed, shall be deemed disallowed and shall be expunged without any further notice, action, order of approval of the bankruptcy court." *Id.* at 85.

25.    The Plan provides the following with respect to the disallowance of certain claims,

> Any Claims held by Entities from which property is recoverable under section 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and Holders of such Claims may not receive any distributions on account of such Claims until such time as such Causes of Action against that Entity have been settled or a Court order with respect thereto has been entered and all sums due, if any, to the Debtors by that Entity have been turned over or paid to the Debtors or the Wind-Down Debtors; *provided, however,* that, notwithstanding the foregoing and the commencement of the Gemini Preference Action, the Holders of Allowed Gemini Lender Claims (other than any Gemini Insider) shall be entitled to receive distributions in accordance with the Plan (including the Distribution Principles) until the Gemini Preference Determination; and, *provided, further,* that any distribution on account of any Gemini Insider shall be held by the Gemini Distribution Agent on behalf of such Gemini Insider until such time as the Gemini Determinations are Final Orders and then in accordance therewith, unless otherwise ordered by an order by the Bankruptcy Court that has not been stayed or vacated or a Final Order.

*Id.* at 85.

26.    "Gemini Preference Action" means "the adversary proceeding seeking to avoid and recover transfers made by GGC to or for the benefit of Gemini and the Gemini Lenders by filing the *Complaint*, ECF No. 1, Adv. Pro. 23-01203 (SHL) against Gemini and the Gemini Lenders." Plan Definition No. 115.

## OBJECTION

Section 1129(a) of the Bankruptcy Code provides that the court shall confirm a plan only if it complies with all of the requirements of section 1129(a). Relevant to this Objection, a plan

must comply with the applicable provisions of this title, a plan's proponents must comply with the applicable provisions of this title, and a plan must be proposed in good faith and not by any means forbidden by law. 11 U.S.C. § 1129(a)(1)-(3).

The Code also requires that the Debtors, as plan proponents, bear the burden of proof with respect to the confirmation requirements by a preponderance of the evidence. *In re Charter Commc'ns,* 419 B.R. 221, 243 (Bankr. S.D.N.Y. 2009) (citing *Heartland Fed. Savs. & Loan, Ass'n v. Briscoe Enters.* (In re *Briscoe Enters.*), 994 F.2d 1160, 1165 (5th Cir. 1993) (stating that "[t]he combination of legislative silence, Supreme Court holdings, and the structure of the Code leads this Court to conclude that preponderance of the evidence is the debtor's appropriate standard of proof both under § 1129(a) and in a cramdown")). Consistent with these standards, the United States Trustee objects to confirmation of the Plan.

### A. The Exculpation Provision Is Overreaching.

The exculpation provision and exculpated parties in the Plan are beyond the scope of section 1125(e), which is the only section of the Bankruptcy Code that provides for exculpation. Section 1125(e) provides,

> A person that solicits acceptance or rejection of a plan in good faith and in compliance with the applicable provisions of this title or that participates in good faith and in compliance with the applicable provisions of this title, in the offer, issuance, sale, or purchase of a security, offered or sold under the plan, of the debtor, of an affiliate participating in a joint plan with the debtor, or of a newly organized successor to the debtor under the plan, is not liable, on account of such solicitation or participation, for violation of any applicable law, rule, or regulation governing solicitation of acceptance or rejection of a plan or the offer, issuance, sale, or purchase of securities.

It is clear from the statutory language that section 1125(e) only exculpates conduct related to (i) the solicitation or rejection of a plan and (ii) the offer, issuance, sale or purchase of securities offered or sold under a plan.  Even allowing for an expanded view on exculpation,

however, exculpations do not go beyond the transactions that have been reviewed and approved by the court. *See In re Aegean Marine Petroleum Network, Inc*. 599 B.R. 717 (Bankr. S.D.N.Y. 2019)(Wiles, J.). There is also a temporal limitation on exculpation clauses: they should not extend prior to the Petition Date or past the effective date of a plan. *See* SEC v. Universal Exp., Inc., 475 F.Supp. 2d 412, 425 (S.D.N.Y. 2007) (Lynch, J.), aff'd sub nom. SEC v. Altomare, 300 F.App'x 70, 71 (2d Cir. 2008) (the "liability shield of §1125(e) specifically applies to the disclosure and solicitation period prior to approval of a reorganization plan"); *In re Mallinckrodt PLC*, 639 B.R. 837, 883 (Bank. D. Del. 2022) (exculpation "only extends to conduct that occurs between the Petition Date and the effective date").

As an initial matter, the Exculpation Provision extends its protection to actions taken outside of the Court's supervision. The Debtors seek to exculpate Exculpated Parties from (i) pre-petition conduct: the filing of the Chapter 11 cases, (ii) post-effective date conduct: Monetization Transactions, the administration and implementation of the Plan including, the distribution of any property pursuant to the Plan, and (iii) conduct that is outside the Court's review: the Debtors' out-of-court restructuring efforts. *See* Plan at 86. None of these activities were or will be under the Court's supervision or review and, therefore, have no legal basis to be exculpated. [7]

While not listed in the Exculpation Provision, the Plan also seeks to, under the title of "No Liability," preemptively and prospectively exculpate the Disbursing Agent and Gemini Distribution Agent, both of which will make or facilitate distributions pursuant to the Plan after

---

[7] The Exculpation provision contains a phrase "… or upon any other act or omission, the transaction, agreement, event, or other occurrence taking place on or before the Effective Date related to the foregoing," but it is unclear from the punctuation whether it intends or in effect, limits the foregoing conduct to pre-effective date.

the Plan is confirmed, thus outside of the Court's supervision. *See* Plan at 78. Such prospective exculpation lacks a proper legal basis.

Further, the Exculpated Parties here include post-effective-date entities/persons and broadly defined Related Parties who likely have very little to do with the case. *See* Plan Definition No. 88. A proper exculpation is a protection of court-supervised fiduciaries. "The exculpation clause must be limited to the fiduciaries who have served during the chapter 11 proceeding: estate professionals, the Committees and their members, and the Debtors' directors and officers*." In re Washington Mut., Inc.*, 442 B.R. 314, 350–51 (Bankr. D. Del. 2011). Exculpation provisions are based "to some extent . . . on the theory that court-supervised fiduciaries are entitled to qualified immunity for their actions." *Aegean*, 599 B.R. at 721.

Here, the Exculpated Parties include the members of Ad Hoc Group Steer Co., the PA Officer, members of the Wind-down Oversight Committee, the members of the Litigation Oversight Committee, the Gemini Distribution Agent, and the Related Parties of each foregoing. ECF No. 989 at 16, Definition No. 88.  While the Ad Hoc Group is an active participant in the case, they are not the estate's fiduciary; they are only fiduciary to their own interests, and they have successfully advocated and advanced their interest. There is no legal basis to give them extra reward: exculpation, in addition to the economic interest they have obtained in the course of negotiation and advocacy. *See Roni LLC v. Arfa*, 74 A.D.3d 442, 444 (2010), *aff'd*, 18 N.Y.3d 846 (2011) ("A conventional business relationship between parties dealing at arm's length does not give rise to fiduciary duties.").

 The PA Officer, members of the Wind-down Oversight Committee, the members of the Litigation Oversight Committee, and Gemini Distribution Agent are undisputedly post-effective date entities.  That means what they do and how they do it will be out of the Court's oversight.

11

The Court simply is not at the vantage point to make that judgment. While not listed in the definition of Exculpated Party, the Disbursing Agent and Gemini Distribution Agent, both of which will make or facilitate distributions pursuant to the Plan after the Plan is confirmed, will also be prospectively exculpated under the Plan. *See* Plan 78.

These parties will likely be entitled to applicable protection afforded by state law or governing documents, *see e.g.* Plan at 59 ("the Plan Administration Agreement may include reasonable and customary indemnification provisions for the benefit of the PA Officer, the New Board, the Litigation Oversight Committee, the Wind-Down Oversight Committee, and/or other parties"), but they are not entitled to additional, prospective relief from the Bankruptcy Court since their post-effective-date duties have not commenced yet. *See Wash. Mut.*, 442 B.R. at 348 ("The Liquidating Trust and its Trustee have not done anything yet for which they need a release. They will not even come into existence until the Plan is confirmed.").

In fact, the list of those parties who are exculpated for actions they have taken or may take includes a potential cast of thousands. If someone is related in some manner to an Exculpated Party, they are also exculpated. This list extends to successors and assigns, parents, subsidiaries, Affiliates, and all of their respective current and former officers and directors, principals, shareholders, members, managers, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, and such persons' respective heirs, executors, estates, servants, and nominees. ECF No. 989 at 26. Definition 179. It is difficult to fathom what connection any of these delineated persons or parties have to do with these cases or with any of the transactions occurring in these cases. As such, the list of Related Parties is incredibly broad and not supported by the record.

Under the Plan Supplement filed on December 29, 2023, the Debtors' employees who served the estates post-petition have been granted releases (including the Release and Exculpation as defined in the Plan) by the Special Committee. It appears that all current and former employees, officers, and directors of the Debtors who served the Debtors from or after the Petition Date have been released. ECF No. 1117 Ex. F. While the Debtors and Special Committee provided certain justifications for such release, it still is problematic to some extent. The Special Committee can not make decisions for the voting creditors. It is unclear whether a voting creditor's refusal to release certain employees can override the Special Committee's decision to release them. Also, since the list of released personnel will be provided to Ad Hoc Group counsel and UCC counsel on a "professional eyes only basis," the creditors in those groups, even the statutory committee, would have no idea who these released employees are before their right of rejecting such release was taken away.

Moreover, if confirmed, the Confirmation Order will include a provision that rules and determines that the Exculpated Parties have, and upon completion of the Plan shall be deemed to have participated in good faith and compliance with applicable laws with regard to the solicitation of, distribution of, consideration pursuant to the Plan and therefore are not liable at any time for the violation of any applicable law governing the solicitation of acceptance or such distributions made pursuant to the Plan. *See* Plan at 91.

Two problems with this provision. First, the Court cannot provide a prospective ruling on future conduct, *i.e.*, the distribution of consideration under the Plan. The Court is simply not in the position to make a ruling or finding now on conduct that will occur from the effective date to the completion of the plan. Second, section 1125(e) exculpates solicitation of plan acceptance and the issuance, sale, or purchase of securities under the Plan. The latter is a very specific act

aimed at balancing the securities law requirement. *See* 7 Collier on Bankruptcy P 1125.01 (16th

2023) ("Section 1125(e) provides any person who solicits acceptance or rejection of a plan on

the basis of an approved disclosure statement, with a 'safe harbor' from liability for violation of

state or federal securities laws or regulations"). Distribution of consideration pursuant to the plan

is not the same as the issuance, sale, or purchase of a security and, therefore, has no legal basis to

be exculpated, in addition to it being post-effective-date conduct outside the Court's review.

Finally, parties that engage in Monetization Transactions will be exculpated.

Monetization Transaction is defined in the Plan as "any transaction that results in the sale,

monetization, or liquidation of any of the assets of the Debtors or the Wind-Down Debtors,

including[8] …." The definition is exceedingly broad, including practically any transaction that

occurs pre-confirmation and post-confirmation.  It does not even have to be related to the

bankruptcy cases as the Debtors, in their ordinary course of business, undoubtedly engage in the

"sale, monetization or liquidation" of their assets. It appears all those activities will be exculpated

according to the current language.

### B. The Injunction Provision Is Not Only Extraordinarily Broad But Also Operates as a Release of Non-Debtor Third Parties

The Injunction Provision provides, in part, "… Further, to the maximum extent

permitted under applicable law, the Confirmation Order shall permanently enjoin the

commencement or prosecution by any Person[9] or Entity[10], whether directly, derivatively,

or otherwise, of any Causes of Action released or exculpated pursuant to this Plan,

---

[8] According to the Rules of Interpretation in the Plan, the words "include" and "including" and variations thereof shall not be deemed to be terms of limitation and shall be deemed to be followed by the words "without limitation. Plan at 32-33.

[9] "Person" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.  Plan Definition No. 161

[10] "Entity" shall have the meaning set forth in section 101(15) of the Bankruptcy Code. Plan Definition No. 80.

including the Enjoined Actions, against any Released Party or Exculpated Party other than the Debtors or the Wind-Down Debtors." ECF No. 989 at 91.

Injunction provisions typically serve the function of explicating the effect of discharge. While the Debtors here correctly stated their status as to dischargeability and a temporary injunction, the quoted section appears to effectively impose a non-consensual release on every person and every entity existing in the world, as here "Entity" "includes person, estate, trust, governmental unit, and United States trustee" and "Person" "includes individual, partnership, and corporation, but does not include governmental unit …" *See* 11 U.S.C. § 101(15), (41). Therefore, the injunction provision appears, in effect, a hidden third-party release that binds everyone and every entity, even those who may not have given affirmative consent, by checking the opt-in box on the ballot.[11]

A release of a non-debtor by another non-debtor must be effectuated by affirmative consent, and anything short of clear affirmative consent should be disapproved. *See In re Chassix Holdings, Inc., et al.*, 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (warning that Bankruptcy Court should be wary of approving voting procedures that effectively would impose releases on creditors who have not affirmatively manifested their consent to them); *Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.),* 416 F.3d 136,

___

[11] There appears to be an ambiguity on the ballot. The ballot states, "if you return a ballot that votes to accept the Plan and affirmatively opt into the release provisions in Article VIII of the Plan, you will be deemed, as of the plan effective date, to have conclusively …. released and discharged all claims and causes of actions (as set forth in the Plan and as permitted by applicable law) against the Released Parties (as defined in the Plan)." *See* ECF No. 1027 at 50, 67. It is unclear whether the opt-in mechanism covers only Article VIII Section E (Releases by Releasing Parties) or covers both Article VIII Section E and Article VIII Section G (Injunction). If it covers only Section E (Releases by Releasing Parties) as some cases do, *see, e.g.*, 23-11891, ECF No. 13 at 66 of 147 (specifying the opt-in release is only with respect to section 8.4 of the Plan: releases by releasing parties), then the Injunction provision effectively serves a hidden non-consensual release. If it covers both Section E and Section G of Article VIII, then it seems only people/entities who affirmatively opt-in and vote for the plan will be bound by the Injunction, thereby alleviating the U.S. Trustee's concern.

15

142 (2d Cir. 2005) (citing *In re Specialty Equip. Cos.*, 3 F.3d 1043, 1047 (7th Cir. 1993)

(a non-debtor release may be permissible in rare circumstances, among which is when the

affected creditors consent to the giving releases). Here, should the Plan be confirmed, even

persons who do not vote for this hidden third-party release will be bound to it.

### C. The Plan Improperly Deems the Legal Fees for Ad Hoc Group and the Dollar Group as Allowed Administrative Expenses Without Any Court Approval Process and Any Legal Basis.

The Plan obliges the Debtors to pay the legal fees and expenses incurred by the Ad Hoc

Group and the Dollar Group in connection with the Restructuring and unilaterally "deems" such

fees as allowed administrative expenses without any motion or court order. Neither group is a

statutory group or committee, and the legal fees are with respect to the bankruptcy cases;

therefore, the only legal basis to get such fees paid are sections 503(b)(3)(D) and 503(b)(4),

which allows administrative expenses for "committee representing creditors other than a

committee appointed under section 1102 under this title, in making a substantial contribution in a

case under chapter 11."

The Debtors themselves characterized such legal fees as administrative expenses and

listed them alongside conventional administrative expenses in the Plan. *See* Plan at 6-7

Definition No. 11. However, any administrative expense must go through a court-sanctioned

allowance process under section 503(b) before it can become allowed unless it is under sections

363 and 364. *See* 4 Collier on Bankruptcy at ¶ 503.04 ("Administrative expenses, except

ordinary course expenses paid pursuant to sections 363 and 364 of the Code, are allowed only

after notice and a hearing and are not 'deemed allowed' but rather must be actually allowed by

court order."). Nowhere in the Bankruptcy Code authorizes a debtor to unilaterally deem

allowance of an administrative expense.

16

Section 503(b) is the "exclusive avenue" governing the allowance of administrative

expenses, including professional fees incurred by an entity seeking allowance of a claim for

substantial contribution.  *In Lehman Bros. Holdings, Inc.*, 508 B.R. 283, 289-290 (S.D.N.Y.

2014).  By enacting Section 503(b) of the Bankruptcy Code, Congress provided a specific

procedure and standard for the allowance and approval of fees and expenses incurred by ad hoc

committees and others in making a substantial contribution to a case. "[T]hose provisions

[Sections 503(b)(3)(D) and 503(b)(4)] require the bankruptcy court to provide notice and a

hearing and to determine for itself that a substantial contribution has been made. Whatever the

merits of that scheme, it is binding on courts and bankruptcy participants." *Id.* at 294.

Based on the history of the case, it would be virtually impossible for the Ad Hoc Group

or the Dollar Group to satisfy the substantial contribution standard. In the plans filed on

November 17, 2023 and November 27, 2023 (eleven days and one day before the current Plan),

the Debtors conditioned the payment of Ad Hoc Group Restructuring Expenses upon the

occurrence of "Ad Hoc Group Acceptance Event," which was defined as "members of the Ad

Hoc Group holding at least $1.5 billion of the Claims asserted against GGC have agreed, in

writing, to support the Plan and not object to the Plan or commence any litigation in respect of

the Plan." ECF No. 948 at 35, No. 979 at 36.  Therefore, the payment of Ad Hoc Group's legal

fees appeared to be more of an inducement or incentive to support the Plan than a *bona fide*

substantial contribution to the case, which is typically demonstrated by such things as increasing

the estate value or providing a tangible benefit to all creditors.

Under the PSA, in addition to paying Proskauer Rose, the Debtor is also required to pay

Kirkland & Ellis (up to $300,000), which allegedly represented the Ad Hoc Group from the

Petition Date to February 22, 2023, yet has never filed a notice of appearance in this case.  ECF

17

No. 1008 at 31; *see* the docket generally. Also, under the PSA, the Debtor is required to pay Proskauer Rose not only for services rendered during the Chapter 11 cases but also "thereafter, in connection with consummation of the transactions contemplated by the Amended Plan." *Id.* Notably, fees as yet to be earned cannot currently be characterized as administrative expenses for distributions to be made on the effective date of the Plan.

With respect to the Dollar Group, for which the Debtor promised to pay legal fees up to $300,000, while its 2019 statement said they were formed in July 2013, they were nowhere to be found on the docket until on the plan that was filed on November 27, 2023 and on the PSA was filed on November 29, 2023. So far, Dollar Group does not appear to have filed even one pleading in the case. *See* the docket generally. While the U.S. Trustee has little doubt counsel for the Dollar Group has worked diligently for the group, one can hardly argue they have made any contribution to the estate as a whole, let alone a substantial contribution that entitles their legal fees to be paid by the estate. Yet, without applications for substantial contributions having been filed – as they must before the reimbursement of the legal fees for any of these ad hoc groups is considered – the United States Trustee, this Court, and parties-in-interest are unable to appropriately consider whether such requests have merit.

### D. The Plan Imposes Additional Burdens on Holders of Certain Claims

The Plan requires a claim holder to exhaust remedies with the Debtor's insurance company first (and no distribution will be made until all remedies are exhausted under the insurance policy) and immediately upon the insurance company's agreement to satisfy the claim in full or in part, such portion of the claim may be expunged to the extent of insurance company's satisfaction, without further notice, action or order from the Court. Plan at 83.

Such a mechanism does not appear to be fair to the claim holder. First, the Debtor is presumably the beneficiary of the insurance policy and has contract privity with its insurer; it seems illogical to ask the creditor, who has the claim against the Debtor and may or may not have a claim against the insurance company, to exhaust all remedies with the insurance company, before any distribution can be made to such creditor. Second, if the insurance company does not fulfill its agreement to pay the claim, the creditor's claim (to the extent covered by the insurance policy) will still be expunged. Third, the creditor may disagree with the insurance company's compensation amount and thus disagree on the Debtor's remaining liability, and based on the current language, the credit would have no place to litigate it.

Under the Plan, if a holder of an estimated claim intends to seek reconsideration, it first must file a motion requesting the right to seek reconsideration of its claim within 21 days after such claim is estimated, expressly "notwithstanding section 502(j)". *See* Plan at 84. Section 502(j) does not require a claim holder to first seek the right to file a motion for reconsideration, nor does it require a motion for reconsideration to be filed by a certain date. Since the Code does not have the requirements, the Court would likely be puzzled at what standards should be used in adjudicating a motion seeking the right to file a motion for reconsideration. And it is unfair for the creditors to have to comply with a Debtor-created law that is not found in the Bankruptcy Code.

The Plan provides that "any claim that has been listed in the schedules as disputed, contingent, or unliquidated and for which no proof of claims has been timely filed, shall be deemed disallowed and shall be expunged without any further notice, action, order of approval of the bankruptcy court." *See* Plan 85. Bankruptcy Rule 3003(c)(3) authorizes the

19

Court for cause to extend the time of filing proof of claims. While the Debtor's bar date order was approved, it is not uncommon that some creditors may have excusable reasons for not filing the proof of claim timely, and the court may find cause in that circumstance. At a minimum, the Plan should provide some notices, and the Debtors or Wind-down debtors can certainly object to such late-filed claim when it is filed. The claim holder should be afforded ample due process in the bankruptcy process.

The Plan appears to seek to track the language of section 502(d) regarding the disallowance of claims pending turnover and avoidance actions. *See* Plan at 85. However, it is unclear whether claim holders are not entitled to receive any distributions on account of turnover and avoidance actions while the turnover actions and avoidance actions against them are pending or whether this provision can be used to preclude any distributions while actions of all natures against them are pending. If it means the latter, then it goes well beyond the scope of section 502(d).

In the same provision regarding 502(d), the Plan appears to treat Gemini lenders (against which the Debtors have a pending preferential action) differently from other avoidance action defendants by allowing them to receive distribution before the litigation is settled while not allowing other defendants to receive distribution. *See* Plan at 85 ("notwithstanding the foregoing and the commencement of the Gemini Preference Action, the Holders of Allowed Gemini Lender Claims (other than any Gemini Insider) shall be entitled to receive distributions in accordance with the Plan (including the Distribution Principles) until the Gemini Preference Determination"). There is no basis for this differing treatment.

## **CONCLUSION**

WHEREFORE, the U.S. Trustee respectfully requests the Court deny confirmation and

order certain changes to be made and grant such other and further relief as it may deem just and

proper.

Dated: New York, New York
       January 29, 2024


Respectfully submitted,


                              WILLIAM K. HARRINGTON
                              UNITED STATES TRUSTEE

                    By:       */s/ Tara Tiantian*
                              Greg M. Zipes
                              Tara Tiantian
                              Trial Attorneys
                              One Bowling Green, Suite 534
                              New York, New York 10004
                              Tel. No. (212) 510-0500