**OTTERBOURG P.C.**
James V. Drew
230 Park Avenue
New York, New York 10169
Telephone: (212) 661-9100
jdrew@otterbourg.com

*Counsel to SOF International, LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------X
                                                         :
In re:                                                   :          Chapter 11
                                                         :
GENESIS GLOBAL HOLDCO, LLC, et al.,    :          Case No. 23-10063 (SHL)
                                                         :
                                   Debtor.      :          (Jointly Administered)
                                                         :
---------------------------------------------------------X

### OBJECTION OF SOF INTERNATIONAL, LLC TO DEBTORS'
### AMENDED JOINT CHAPTER 11 PLAN

SOF International, LLC ("SOF"), by and through its undersigned counsel, hereby submits

this objection (the "Objection") to *Debtors' Amended Joint Chapter 11 Plan* [Dkt. 1031, Ex. A]

(the "Plan"),[1] and respectfully states as follows:

### Preliminary Statement

1.      SOF is a member of the official committee of unsecured creditors in these cases,

and a Gemini Lender.  SOF's principal, an individual, has been named as one of the members of

the Litigation Oversight Committee and Wind-Down Oversight Committee.  SOF has faithfully

executed its fiduciary duties to unsecured creditors in these cases, and intends to continue doing

so post-Effective Date.

---

[1] Capitalized terms but not defined herein shall have the meanings set forth in the Plan.

2.     SOF is generally supportive of the Plan because it contemplates distributions of substantially all of the Debtors' value to creditors and preserves the ability for the estates to pursue litigation claims to enhance that value.

3.     That said, SOF has concerns regarding the treatment of Gemini Lender claims, and the potential for prejudice to Gemini Lender interests going forward post-Effective Date, which are the subject of this Objection.  Broadly speaking, the Objection raises the following issues: (i) lack of clarity regarding the method by which Gemini Lender distributions from Gemini will be calculated and distributed and how Gemini's claims asserted on its own behalf interact with Gemini Lender claims, (ii) possible uncertainty regarding the proposition that Gemini Lenders are entitled to the full appreciated value of the Gemini GBTC Shares regardless of any recovery that Gemini Lenders receive from the Debtors on their unsecured claims, and (iii) lack of appropriate representation of the interests of Gemini Lenders in connection with the ongoing litigation between Gemini and the Debtors, and any proposed settlement of such litigation.  SOF has attempted to resolve the relevant issues informally, with some success, but certain open issues remain.

4.     In particular, issues around the treatment of recoveries of the value of the Gemini GBTC Shares are important, and the amounts at issue very material.  Assuming that the Debtors are unsuccessful in challenging the status quo with respect to those shares (which SOF believes they should and will be), Gemini Lenders will be entitled to (i) their pro rata portion of the Gemini GBTC Shares, plus (ii) a pro rata recovery from the Debtors under the Plan on a deficiency claim calculated on the assumption that Gemini's foreclosure on the Gemini GBTC Shares in November 2022 was valid.  In that event, the total recovery for Gemini Lenders considering both elements could very well exceed the total amount of Gemini Lender claims

against the Debtors that was owed at any relevant point in time (whether at the time of the foreclosure, the Petition Date, or as of today considering changes in "coin" values and/or interest and fees).   Indeed, the total recovery for Gemini Lenders considering both elements has no theoretical upper limit, because the value of the Gemini GBTC Shares have no theoretical upper limit and are simply a non-estate asset held by Gemini for the benefit of Gemini Lenders (i.e., ownership, with full risk of loss) to eventually be distributed less any applicable costs and fees (again, assuming that the Debtors are unsuccessful in challenging the status quo).

5.      This conclusion seems self-evident, and yet some parties have expressed a view that total recovery for Gemini Lenders cannot exceed full "in kind" recovery at current coin values (perhaps including interest, perhaps not), and so Gemini Lenders should never expect a better result.   SOF has received shifting and unclear explanations for this supposed upper limit on total recovery, and respectfully suggests that no coherent basis for such a limit exists. Accordingly, clarity on this point is needed in the Plan.

6.      But the foregoing clarifications, by themselves, are not enough, because like all litigation, the litigation regarding the treatment of the Gemini GBTC Shares is likely to eventually settle.   And such a settlement after the Effective Date of the Plan apparently will not even require Court approval.   Only the Litigation Oversight Committee and Wind-Down Oversight Committee and Gemini will have a say in such a settlement, and SOF will need to be recused from those discussions.   Given the incentives of the parties and the positions taken by parties to date, SOF is concerned that a post-Effective Date settlement will be crafted without full consideration of Gemini Lenders' legal entitlement, even if it exceeds full "in kind" recovery at current values (or allow such recovery to be traded away inappropriately).   There are a number

of possible solutions to this issue as discussed herein, including creation of an estate-funded committee of Gemini Lenders under the Plan.

7.      SOF is only one Gemini Lender, and is on the path to being sidelined post-Effective Date on issues affecting Gemini Lenders.  And so SOF appeals to this Court for relief.

## Background

A.      Gemini Lender Claims

8.      Gemini has filed a proof of claim on behalf of Gemini Lenders (Claim No. 356) (the "Gemini Master Claim") asserting a claim denominated in 53 cryptocurrency coin units listed in Exhibit B annexed thereto with corresponding coin quantities, which Gemini asserted had a total gross value of not less than $1,122,467,217.65 measured as of approximately 11:00 p.m. (Eastern Standard Time) on the Petition Date, plus a claim for unliquidated amounts.[2]  Those same 53 cryptocurrency coin units and quantities had a value of approximately $1.57 billion as of January 22, 2024 at 4:00 p.m. (ET).[3]

9.      Further, the Gemini Master Claim identified 10 cryptocurrency coin units listed in Exhibit D annexed thereto with corresponding coin quantities, which Gemini asserted had a total gross value of not less than $36,414,135.40 measured as of approximately 11:00 p.m. (Eastern Standard Time) on the Petition Date, and which Gemini allegedly was authorized under the relevant agreements to hold in "reserve" on behalf of the Gemini Lenders.[4]  Those same 10 cryptocurrency coin units and quantities had a value of approximately $46.9 million as of January

---

[2] *See* Gemini Master Claim, Annex ¶ 6.
[3] A table of such coin quantities and prices is set forth as **Exhibit A**.  Coin prices were obtained using https://www.coinbase.com/ (accessed on January 23, 2024).
[4] *See* Gemini Master Claim, Annex ¶ 7.B.

22, 2024 at 4:00 p.m. (ET).[5]  These "reserve" coins are referred to in the Plan as the Gemini Reserved Coins.[6]

10.    Gemini has also filed a proof of claim on its own behalf (Claim No. 406) (the "Gemini Proprietary Claim") asserting a claim denominated in 53 cryptocurrency coin units listed in Exhibit B annexed thereto (the same coin units as in the Gemini Master Claim) with corresponding coin quantities, which Gemini asserted had a total gross value of not less than $13,541,860.54 measured as of approximately 11:00 p.m. (Eastern Standard Time) on the Petition Date, plus costs and expenses and other unliquidated amounts.[7]  Those same 53 cryptocurrency coin units and quantities had a value of approximately $16.6 million as of January 22, 2024 at 4:00 p.m. (ET).[8]

B.    Plan Treatment of Gemini Lender Claims

11.    The Plan contemplates that the Allowed Gemini Lender Claim is a single claim held by Gemini.[9]  The Plan is not entirely clear with regard to whether (and to what extent) the Gemini Proprietary Claim will be included in the Allowed Gemini Lender Claim (or will be treated separately in whole or in part).

12.    The amount of the Allowed Gemini Lender Claim is subject to certain reductions (in an amount referred to as the Gemini Asset Value).  There are four categories of assets whose value may be included in the Gemini Asset Value, as follows: (i) the Gemini BTC Shares, (ii) the Additional GBTC Shares, (iii) the Gemini Reserved Coins, and (iv) the Gemini Earn Operations Assets.[10]

---

[5] *See* **Exhibit A**.
[6] *See* Plan, Article I.A.116.
[7] *See* Gemini Proprietary Claim, Annex ¶ 6.
[8] *See* **Exhibit A**.
[9] *See* Plan, Article VI.C.1.d.
[10] *See* Plan, Article I.A.102.

13.    The Gemini BTC Shares are 30,905,782 GBTC shares currently held by Gemini for the benefit of the Gemini Lenders.  GBTC shares have a publicly reported price that recently peaked on January 11, 2024 at a price of $40.69 per share.[11]  Based on that price, the recent peak value of the Gemini GBTC Shares was in excess of $1.25 billion.  As of January 22, 2024, at 4:00 p.m. (ET), the publicly reported price of GBTC shares was $35.82 per share,[12] which would imply a value of the Gemini GBTC Shares in excess of $1.1 billion.  The value of the Gemini GBTC Shares may or may not be deducted from the amount of the Allowed Gemini Lender Claim, depending on the outcome of the Gemini Deficiency Claim Determination and the Gemini GBTC Shares Determination (i.e., depending on the outcome of litigation between Gemini and the Debtors).[13]

14.    Similarly, the Additional GBTC Shares are 31,180,804 GBTC shares held by the Debtors in which Gemini asserts a security interest and/or other rights including a constructive trust.  The recent peak value of the Additional GBTC Shares as of January 11, 2024 was in excess of $1.25 billion, and the implied value using GBTC pricing as of January 22, 2024 at 4:00 p.m. (ET) was also in excess of $1.1 billion.  To the extent that Gemini is successful, the relevant value of the Additional GBTC Shares would be included in the Gemini Asset Value.[14]

---

[11] *See* Google Finance, GBTC share price,
https://www.google.com/finance/quote/GBTC:NYSEARCA?authuser=0&window=5D (last accessed on January 24, 2024).  Please note that, until recently, GBTC shares traded on the "OTCQX" market run by OTC Markets Group (*see* https://www.otcmarkets.com/).  Now, following the conversion of GBTC to an exchange traded fund on January 11, 2024, GBTC shares are traded on the NYSE Arca exchange (*see* https://www.nyse.com/markets/nyse-arca).  Historical GBTC prices remain publicly available on a continuous basis despite the change in trading platforms.
[12] *Id.*
[13] *Cf.* Distribution Principles (value of the Gemini GBTC Shares will be offset to determine the Remainder Gemini Lender Claim); Plan, Articles III.C.7.b. and I.A.102 ("for each Distribution Date prior to the Gemini Deficiency Claim Determination, the Gemini GBTC Shares shall be excluded from the calculation of Gemini Asset Value, including for purposes of calculating the Remainder Gemini Lender Claims (as defined in the Distribution Principles)"); Plan, Article I.A.102 (Gemini Asset Value includes the value of the Gemini GBTC Shares as determined by the Gemini Deficiency Claim Determination "solely to the extent that the Gemini GBTC Shares Determination determines that Gemini, on behalf of the Gemini Lenders, has a valid security interest in the Gemini GBTC Shares").
[14] *See* Plan, Article I.A.102.

15.    The Gemini Reserved Coins (a mix of 10 coins held in reserve by Gemini) had a value as of January 22, 2024 at 4:00 p.m. (ET) of approximately $46.9 million.[15]  The value of the Gemini Reserved Coins (at the Average Price – measured over the period starting 15 days prior to confirmation ending 15 days after confirmation) will be included in the Gemini Asset Value, unless otherwise agreed by Gemini and the Debtors with the consent of the Committee and the Ad Hoc Group, or otherwise ordered by the Court.[16]

16.    The Gemini Earn Operations Assets are identified in the Plan as a list of 53 cryptocurrency coin units (the same coin units as in the Gemini Master Claim) plus an additional unit identified as "USD" (which presumably means cash in US dollars), each with corresponding coin quantities.  According to the Debtors, the Gemini Earn Operations Assets had a value as of October 31, 2023 of $7,435,845.[17]  Those same units and quantities had a value of approximately $9.5 million as of January 22, 2024 at 4:00 p.m. (ET).[18]  The value of the Gemini Earn Operations Assets (at the Average Price – measured over the period starting 15 days prior to confirmation ending 15 days after confirmation) will be included in the Gemini Asset Value.[19]

17.    Distributions on account of Allowed Gemini Lender Claims are to be made by the Debtors to Gemini, and Gemini is required to hold such distributions in trust in a segregated account for the benefit of Gemini Lenders and distribute to Gemini Lenders on a pro rata basis as soon as practicable.[20]

18.    Separately, but contemporaneously with the initial distribution, Gemini is required to distribute (i) the Gemini Reserved Coins (to the extent included in the Gemini Asset Value), (ii)

---

[15] *See* **Exhibit A**.
[16] *See* Plan, Article I.A.102.
[17] *See* Dkt. 1031, page 306 of 306.
[18] *See* **Exhibit A**.
[19] *See* Plan, Article I.A.102.
[20] *See* Plan, Article VI.C.1.d.

the Gemini Earn Operations Assets, and (iii) the proceeds of monetizing the Gemini GBTC Shares (but this third element cannot be distributed until resolution of the Gemini litigation).[21] Such separate distributions made by Gemini do not appear to reduce the Gemini Lender Claims on a dollar for dollar basis under the terms of the Plan (which makes sense because those items would already have been deducted from the gross claim to the extent provided for otherwise in the Plan).

19.     SOF understands that Gemini has committed to not hold back, reserve or offset against any distributions it is obligated to make under the Plan on the basis of any purported legal risk that Gemini may have, but SOF requests clarification on that point in the confirmation order.

C.     Litigation Regarding the Treatment of the Gemini GBTC Shares

20.     As noted above, the treatment of the Gemini GBTC Shares is being litigated, which will determine the outcome of the Gemini Deficiency Claim Determination and the Gemini GBTC Shares Determination.

21.     In that litigation, the Debtors are arguing that (i) the amendment of the relevant security agreement on November 7, 2022 which permitted retention of the Gemini GBTC Shares as collateral by Gemini beyond an otherwise impending deadline to return the collateral by November 15, 2022 was an avoidable fraudulent transfer (and as a remedy, seek return of the Gemini GBTC Shares to the Debtors), and (ii) even if no avoidable fraudulent transfer occurred with respect to the Gemini GBTC Shares (i.e., the Gemini GBTC Shares are properly treated as collateral), the sale of such shares to Gemini in November 2022 (sometimes referred to as the "foreclosure") was improper and thus Gemini should be deemed to continue to hold the GBTC shares merely as collateral (not as an owner for the benefit of the Gemini Lenders).

---

[21] *Id.*

22.     There are essentially three possible outcomes in this litigation absent a settlement: (i) the Debtors will successfully use their fraudulent conveyance theory to obtain the return of the Gemini GBTC Shares to the Debtors (for re-distribution to all holders of allowed claims, not just the Gemini Lenders) ("Scenario A"), (ii) the Debtors' fraudulent conveyance theory will fail but the Debtors will successfully challenge the validity of the sale of the Gemini GBTC Shares to Gemini such that Gemini will be deemed the holder of the Gemini GBTC Shares as current collateral ("Scenario B"), or (iii) the Debtors' theories will fail completely, and the Gemini GBTC Shares will be confirmed to have been properly sold to Gemini for the benefit of the Gemini Lenders in November 2022 ("Scenario C").

23.     Below is a table showing SOF's estimate of potential total recoveries for Gemini Lenders in each of the three scenarios above, using the following assumptions: (a) asset values as of January 22, 2024 at 4:00 p.m. (ET), (b) claim amounts based on as-filed claims and SOF's estimates of fees and expenses and interest for illustrative purposes, (c) unsecured creditor recoveries based on Debtors' estimates (low of 61% and high of 78%),[22] and (d) Gemini fails in arguments with respect to the Additional GBTC Shares.[23]

---

[22] *See* Dkt. 1031, page 296 of 306.
[23] A table showing the assumptions and inputs used in creating this table are set forth in **Exhibit B**.

| Line # | Scenario | (A) Gemini GBTC Shares Treated as Debtors' Property (Not Collateral) | (B) Gemini GBTC Shares Treated as Held by Gemini (as Collateral) | (C) Gemini GBTC Shares Treated as Owned by Gemini Lenders (Valid Sale/Foreclosure as of November 16, 2022) |
|---|---|---|---|---|
| 1 | Total Gemini Lender Coin Claim as of Petition Date | $ 1,136.0 | $ 1,136.0 | $ 1,136.0 |
| 2 | Claim Deduction for Value of Gemini Reserved Coins | $ 46.9 | $ 46.9 | $ 46.9 |
| 3 | Claim Deduction for Value of Gemini Earn Operations Assets | $ 9.5 | $ 9.5 | $ 9.5 |
| 4 | Net Gemini Lender Coin Claim Before Applying GBTC Share Value (equals (1) Less (2) and (3)) | $ 1,079.6 | $ 1,079.6 | $ 1,079.6 |
| 5 | Claims Deduction Based on Value of Gemini GBTC Shares Previously Applied as Collateral | $ - | $ - | $ 284.3 |
| 6 | Net Gemini Lender Coin Claim After All Above Deductions (equals (4) less (5)) | $ 1,079.6 | $ 1,079.6 | $ 795.3 |
| 7 | Net Secured Gemini Lender Coin Claim | $ - | $ 1,079.6 | $ - |
| 8 | Net Unsecured Gemini Lender Claim | $ 1,079.6 | $ - | $ 795.3 |
| 9 | Interest, Costs and Fees Payable if Fully Secured | $ - | $ 60.4 | $ - |
| 10 | Net Secured Claim Including Interest, Costs and Fees | $ - | $ 1,140.0 | $ - |
| 11 | Distribution From Genesis on Secured Claim Under Plan | $ - | $ 1,107.0 | $ - |
| 12 | Distribution From Genesis on Unsecured Deficiency Claim Under Plan | $ 842.1 | $ - | $ 485.1 |
| 13 | Total Distribution From Genesis (equals (11) plus (12)) | $ 842.1 | $ 1,107.0 | $ 485.1 |
| 14 | Distribution by Gemini of Gemini GBTC Shares | $ - | $ - | $ 1,107.0 |
| 15 | Distribution by Gemini of Gemini Reserved Coins | $ 46.9 | $ 46.9 | $ 46.9 |
| 16 | Distribution by Gemini of Gemini Earn Operations Assets | $ 9.5 | $ 9.5 | $ 9.5 |
| 17 | Total Distribution by Gemini (equals (14) plus (15) plus (16)) | $ 56.4 | $ 56.4 | $ 1,163.4 |
| 18 | Total Recovery under Plan and from distribution from Gemini (equals (13) plus (17)) | $ 898.5 | $ 1,163.4 | $ 1,648.6 |
| 19 | Total percentage recovery for Gemini Earn customers (% of Petition Date Claim) | 79.1% | 102.4% | 145.1% |
| 20 | Total percentage recovery for Gemini Earn customers (% of Petition Date Claim Plus Interest and Fees) | 75.1% | 97.2% | 137.8% |
| 21 | Total percentage recovery for Gemini Earn customers (% of Current Coin Values Without Interest) | 56.7% | 73.4% | 104.0% |
| 22 | Total percentage recovery for Gemini Earn customers (% of Current Coin Values With Interest) | 54.6% | 70.7% | 100.2% |

24.     Despite the fact that coin values change constantly and thus the specific numbers above become immediately outdated regardless of how often they are refreshed, and SOF's estimates of claim amounts and fees and expenses and interest are very rough, the foregoing table illustrates a few points as follows:

25.     First, assuming Scenario C is the outcome, total Gemini Lender recoveries (line 18) has no theoretical upper limit.  In that scenario, Gemini Lenders are the owners of all the upside or downside in changes in GBTC prices.  This is so assuming that there is no creative "interpretation" of complex Plan language that would provide for another result by applying caps or offsets in some way or another.

26.     Second, due to rising GBTC prices, full recovery to Gemini Lenders appears to be roughly available right now under Scenario C (but given crypto price volatility there is certainly no guarantee this will continue to be true).[24]

27.     Third, Scenarios A and B represent huge re-distributions in value away from Gemini Lenders, of at least several hundreds of millions of dollars.  The parties that benefit in those scenarios are presumably the Debtors' other creditors (and, SOF certainly hopes, not the Debtors' insiders and equityholders), subject to this Court's approval of the otherwise applicable Distribution Principles under the Plan.[25]

D.     Post-Effective Date Governance and Potential Subsequent Settlements

28.     On and after the Effective Date, the Debtors' estates and many of their actions generally will be subject to direction by the Wind-Down Oversight Committee and the Litigation Oversight Committee.  SOF's principal has been selected as a member of both such committees, and specifically as the Wind-Down Oversight Gemini Lender Member and the Litigation Oversight Gemini Lender Member, respectively.[26]

29.     Under the Plan, with the Wind-Down Committee's and the Litigation Oversight Committee consent, major disputes involving the Debtors' estates (such as the ongoing Gemini litigation) may be settled, apparently without a requirement of Court approval.[27]

---

[24] Of course ongoing volatility in GBTC prices affects Gemini Lender recoveries very significantly.  In Scenario A, it affects recoveries directly, dollar for dollar (on a pro rata basis).  In Scenario B (where the Gemini GBTC Shares would be treated as current collateral), the result is similar in that Gemini Lenders bear significant downside risk, but the upside benefit would be limited to the value of the Gemini Lenders' claim (presumably including postpetition interest and fees to the extent the claim is oversecured).  And even in Scenario A, Gemini Lenders bear significant downside risk from GBTC price volatility, although other creditors would similarly share that risk pro rata.

[25] SOF takes no position with regard to the Distribution Principles.

[26] See Dkt. 1117.

[27] See Plan, Articles VII.B ("Except as otherwise specifically provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Wind-Down Debtors, by order of the Bankruptcy Court, shall together have the sole authority to, with five (5) days prior notice to the Wind-Down Oversight Committee: (1) File, withdraw, or litigate to judgment objections to Claims or Interests; (2) settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court, provided that any settlement or compromise of a Disputed Claim that results in an Allowed Claim

30.     As the Wind-Down Oversight Gemini Lender Member and the Litigation Oversight Gemini Lender Member, SOF's principal would be required to be recused from any consideration by those committees of a settlement with Gemini.[28]

## Objection

A.    Beneficial Ownership of the Gemini-Held Assets by Gemini Lenders

31.     Upon information and belief, Gemini currently holds the Gemini GBTC Shares, the Gemini Reserved Coins and the Gemini Earn Operations Assets solely for the benefit of the Gemini Lenders (the "Gemini-Held Assets"), subject to the Debtors' claimed interest in the Gemini GBTC Shares, and except for a relatively small portion of the claims held by Gemini as a principal and not as an agent.  Accordingly, Gemini has no beneficial interest in such Gemini-Held Assets except with respect to any claims Gemini holds as a principal and not as agent, and except to the extent that Gemini has a right to deduct fees and costs from the proceeds thereof pursuant to the terms of the relevant agreements.

32.     SOF understand that Gemini acknowledges the foregoing, but requests confirmation in clear and unequivocal language in the Plan and/or the confirmation order.

---

equal to or greater than $5 million shall require the Wind-Down Oversight Committee's Consent") and IV.A.11 ("Except as otherwise provided in the Plan or the Plan Administration Agreement, on and after the Effective Date, the PA Officer, in consultation with the Wind-Down Oversight Committee, may compromise or settle any Claims related to the Wind-Down Debtors' Assets without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules and may pay the charges that it incurs on or after the Effective Date for Wind-Down Debtors' Expenses, professionals' fees, disbursements, expenses, or related support services without application to the Bankruptcy Court; provided, however, that the Wind-Down Oversight Committee's Consent shall be required for any settlement that would Allow a Claim at a value at or above $5 million; provided further that the Litigation Oversight Committee's Consent shall be required for any settlement of Retained Causes of Action as provided herein and in the Plan Administration Agreement.").

[28] See Plan, Articles IV.A.3 ("… the Wind-Down Oversight Committee Bylaws shall expressly provide that the Wind-Down Oversight Gemini Lender Member shall be recused from all matters pertaining to (x) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (y) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413") and IV.A.4 ("… the Litigation Oversight Gemini Lender Member shall be recused from all matters pertaining to (x) any Causes of Action or other claims against any Gemini Party or any Gemini Lender and (y) any Claim asserted by Gemini or any Gemini Lender, including in the Proofs of Claim Filed by Gemini in the Chapter 11 Cases at Claim Nos. 356, 369, 400, 406, 407, and 413").

33.     It is notable in this regard that the Debtors themselves recently claimed uncertainty on this issue.  In the Debtors' most recent pleading in the Gemini litigation, the Debtors claim that Gemini's theory with respect to who owns a beneficial interest in the Gemini GBTC Shares has changed since the filing of Gemini's complaint on October 27, 2023, from what was originally a theory that Gemini purchased the Gemini GBTC Shares as a principal, to its position now that it purchased the Gemini GBTC Shares as agent.[29]   Indeed the Debtors describe Gemini's current position (one in which Gemini purchased the Gemini GBTC Shares as agent, not as principal) as a "novel" credit bid theory.[30]

34.     There is nothing novel about Gemini's position that it holds the Gemini GBTC Shares as agent.  The facts are simple and not in dispute: Gemini sent an email stating that it had executed a "private sale to us" and that the purchase price (which it inartfully characterized as "proceeds") less costs and expenses "will be applied as set forth in Section 3(b) of the Security Agreement to the Secured Obligations (as defined in the Security Agreement)."[31]   But there were no "proceeds" as such because Gemini did not pay an out-of-pocket purchase price to anyone – it simply offset against debt, as it clearly stated.  That debt was owed to the Gemini Lenders, meaning that Gemini Lenders paid the purchase price, via their agent, Gemini, in the form of an offset against debt owed to them.[32]   That is a credit bid transaction, regardless of whether Gemini used the phrase "credit bid" in its email or in later pleadings.  The Debtors lamely point to language in the preliminary statement in Gemini's Complaint that might suggest no offset

---

[29] *See* Adv. Pro. No. 23-01192, Dkt. 32, ¶ 35.

[30] *Id*. at ¶ 31.

[31] *See* Adv. Pro. No. 23-01192, Dkt. 9-4.

[32] Perhaps hypothetically Gemini as principal could have "paid" Gemini as agent, which could have meant that Gemini as principal was the owner of the Gemini GBTC Shares, but that would have required Gemini as principal to actually pay a purchase price in the form of cash or crypto – it could not offset against debt because Gemini as principal was not owed the debt.

against debt occurred[33] but Gemini's email could not have been clearer that a debt offset did occur.

35.     As noted above, SOF understands that Gemini disclaims any uncertainty on this point.  That said, if Gemini's actual legal status as merely the holder of the Gemini GBTC Shares as agent (and not principal) really is in question, at this late stage in these cases and on the precipice of confirmation of a Plan under which Gemini would be given full control over the fate of the Gemini Lenders' recoveries, it certainly needs to be resolved with finality beforehand.

B.      Treatment of Gemini Proprietary Claim

36.     SOF requests clarification regarding whether (and to what extent) the Gemini Proprietary Claim will be included in the Allowed Gemini Lender Claim (or will be treated separately in whole or in part).

37.     SOF respectfully submits that the proper way to treat the Gemini Proprietary Claim is that (i) the "coin claim" included therein should share ratably with the Allowed Gemini Lender Claims (assuming that Gemini did indeed lend coins to the Debtors in the same manner as the other Gemini Lenders) but as a separate claim subject to offset to the extent that the Debtors have affirmative claims against Gemini, (ii) Gemini's claim for costs and fees should be allowed and paid to the extent permitted by applicable law but be made subject to a transparent process by which a representative of the Gemini Lenders can review and approve such fees and expenses and the method by which those costs and expenses are applied (given that certain fees and expenses likely are appropriately dilutive of Gemini Lender recoveries or as an "off the top" deduction from such recoveries, while others likely are properly borne only by Gemini), and (iii) Gemini's other claims (for contribution or otherwise) should be treated separately and allowed or

---

[33] *See* Adv. Pro. No. 23-01192, Dkt. 32, ¶ 37 (quoting Gemini Complaint at ¶ 5 ("Gemini was "holding $284.3 million in proceeds from that foreclosure for the benefit of Earn Users.")).

disallowed to the extent permitted by applicable law from the Debtors' estates (not as an offset or deduction from Gemini Lender recoveries).

C.    Pro Rata Distribution of Gemini-Held Assets to Gemini Lenders

38.    The Plan provides that Gemini shall distribute the Gemini-Held Assets (or in the case of the Gemini GBTC Shares, their value, subject to the outcome of litigation), but merely states that Gemini should do so "pro rata" without further explanation.[34]

39.    Accordingly, a more specific description of "pro rata" is appropriate and necessary to set forth the method by which the Gemini-Held Assets are allocated among Gemini Lenders.  SOF respectfully submits that the following methodology would be fair and equitable:

   a.  Gemini shall make distributions to Gemini Lenders on a pro rata basis, based on amounts owed to Gemini Lenders as of November 16, 2022, plus interest since that date through the Effective Date at the interest rates advertised on Gemini's online platform as of November 16, 2022, and considering increases or decreases in applicable coin values through the Effective Date of the Plan.

   b.  Such distribution shall be made available in the denominations owing to Gemini Lenders up to the claim values used for purposes of calculating pro rata redemptions, to the extent practicable and permitted under applicable law, or otherwise in cash in the equivalent dollar value owed to such Gemini Lenders based on a conversion rate as determined by publicly available market prices as of the Effective Date.

40.    This methodology would approximate the situation in which Gemini Lenders would have held the investments in the Gemini Earn Program through the Effective Date, and redeemed on or about that date, with distributions made "in kind" in the quantities hypothetically owing with interest promised under the Gemini Earn Program, and treat any recoveries in excess

---

[34] *See* Plan, Article VI.C.1.d. ("In addition, the Gemini Distribution Agent shall arrange to deliver or direct the delivery of (i) in connection with, and contemporaneous with, Gemini effectuating the Debtors' initial distribution to the Gemini Lenders, the Gemini Reserved Coins (solely to the extent included in the Gemini Asset Value) and the Gemini Earn Operations Assets and (ii) as soon as practicable following any Monetization Transaction of Gemini GBTC Shares (other than the Gemini GBTC Shares Reserve), the proceeds of such Monetization Transaction of Gemini GBTC Shares, in each case to the Holders of Allowed Gemini Lender Claims **on a pro rata basis**.") (emphasis added).  SOF understands that the Distribution Principles only govern distributions of assets of the Debtors' estates by the PA Officer, and thus "pro rata" as used in Article VI.C.1.d as highlighted above is not defined by the Distribution Principles.

of those amounts "owed" as an investment gain to be shared pro rata in cash. This is consistent with the idea of making Gemini Lenders whole, which SOF understands is possible given the economics and consistent with the intentions of the major parties involved in these cases. SOF stands ready to work with Gemini and the Debtors to prepare specific Plan language to effectuate the foregoing methodology.

> D.    Resolution of Litigation Regarding Gemini GBTC Shares and Representation of Separate Interests of Gemini Lenders

41.    Given the incentives of the parties in these cases, SOF is concerned that if the Gemini litigation is permitted to be carried over into a post-Effective Date context, the rights of Gemini Lenders are at risk of being prejudiced under the current Plan structure.

42.    Specifically, as noted above, SOF will be required to be recused from decisions made on behalf of the Debtors' estates on these issues. And settlements apparently will not require this Court's approval. Accordingly, the only party that would represent the interests of Gemini Lenders on these important matters post-Effective Date would be Gemini itself, with little to no oversight. But Gemini may have its own parochial interests that color its decision-making, such as a particular focus on releases and/or relief from regulatory consequences (as opposed to maximum recovery for Gemini Lenders), and a desire to shape any settlement to favor its recovery on the Gemini Proprietary Claim at the expense of recoveries on the Gemini Lender Claims (or, conceivably, completely unrelated outside business or other interests). Moreover, Gemini acts primarily in these cases only as an agent, not a principal, which leaves it with a relatively small economic stake in comparison to the amounts at issue.

43.    There a few possible solutions to this state of affairs, and SOF includes some suggestions at the end of this section. SOF has discussed these issues with the Debtors and stands ready to discuss further with the parties and this Court.

44.     As these or other options are considered, SOF would like to raise the following additional considerations which it finds relevant to what solution is ultimately selected.

45.     First, the interests of creditors other than Gemini Lenders have dominated these cases.  The members of the Ad Hoc Group, whose professionals are funded by the estates, have had a tremendous amount of influence on the path pursued in these cases, and the Court is well aware.  As is their right, given the large amounts owing to their constituency – but SOF is unaware of any significant Gemini Lender role in Ad Hoc Group decisions.  Moreover, the Committee is dominated by non-Gemini Lender creditors – SOF is the only member of the Committee that is predominantly a Gemini Lender.  Accordingly, while interests of Gemini Lenders have been raised and considered during these cases, it is simply the case that the major estate-funded parties in these cases have an incentive to redistribute value away from Gemini Lenders, and that seems to be the path chosen in respect of the Gemini GBTC Shares.  And the Debtors have enthusiastically taken on that redistribution effort.  Gemini Lenders, despite being a widely dispersed group of small dollar value creditors that are arguably the most in need of estate funded representation (much more so that the concentrated group of large dollar value creditors represented by the Ad Hoc Group), are paradoxically the least represented.

46.     Second, it is all the more galling to see the redistribution effort pursued so aggressively, because SOF believes that Gemini has strong legal arguments in respect of the Gemini GBTC Shares, and beyond that, the equities favor the Gemini Lenders, when considering the following:

Valid Sale/Foreclosure

a.  UCC § 9-610(c)(2) authorizes a purchase by a secured party in a private disposition (like Gemini did here) where the collateral is "of a kind that is customarily sold on a recognized market or the subject of widely distributed standard price quotations."

b. GBTC shares are clearly "the subject of widely distributed standard price quotations" as any internet search can confirm.

c. GBTC shares also were, at the time of the sale, customarily sold on a recognized market.[35]

d. UCC § 9-611(d) provides that no notice of the sale was required, because the GBTC shares were "of a type that is customarily sold on a recognized market."

e. Section 3(a) of the relevant Security Agreement authorized private sales without notice.[36]

f. Notice of the private sale was in fact provided by e-mail,[37] and was reasonable under the circumstances given that the Debtors had announced a freeze on withdrawals which demonstrated a lack of available liquidity to redeem collateral in any event (and any purported damages are speculative for same reason).

g. The purported lack of any subsequent actions by Gemini to transfer or otherwise dispose of the Gemini GBTC Shares following the initial sale does not mean that no "disposition" occurred.[38]  Indeed what more of a disposition can a credit bidder that already has control over the collateral be expected to exercise?[39]

h. The subsequent failure by Gemini to distribute the value of the Gemini GBTC Shares can give rise to no damages in favor of the Debtors.  Only the Gemini Lenders themselves could have been harmed by such failure.  If the value of the shares had subsequently fallen, the Debtors would not have been responsible to Gemini Lenders for the shortfall – the Gemini Lenders could only have looked to Gemini in that instance.

i. There is no other basis in equity to penalize the Gemini Lenders for Gemini's failure to distribute the value of the Gemini GBTC Shares.  Gemini Lenders have been denied access to their funds since November 2022.  If the value of the Gemini GBTC Shares had been distributed by Gemini in November 2022, Gemini Lenders would have had the opportunity to invest the proceeds as they saw fit.  The fact that Gemini continues to hold the Gemini GBTC Shares simply results in a "forced" investment, which investment happily has resulted in significant unrealized gains – but it could have resulted (and still could result) in losses. Gemini Lenders bore the risk of loss, so it is only fair that they enjoy the gain.

---

[35] *See Roth v. Rothstein*, D. Kan. Case No. 13-cv-2101 (DDC-TJJ), Report and Recommendation Notice dated Dec. 23, 2014, Dkt. 283 at p. 36 (concluding that the OTCQB is a "recognized market"), *aff'd*, 92 F.Supp.3d 1041 (2015).
[36] *See* Dkt. 845, page 26 of 61.
[37] *See* Adv. Pro. No. 23-01192, Dkt. 9-4.
[38] *See Burns v. Anderson*, 123 F. App'x 543 (4th Cir. 2004) (notice of private sale announced via SEC filing and in accordance with terms of Security Agreement was valid disposition).
[39] To the extent relevant, Gemini did apparently move the shares into in a new account following the disposition, reflecting an exercise of dominion and control over the shares.  *See* Dkt. 845, ¶ 45 n.10.

No Fraudulent Transfer

j.  Avoidance of the November 7, 2022 amendment of the Security Agreement
(which amendment indefinitely extended the impending November 15, 2022
deadline to return the Gemini GBTC Shares to the Debtors) as a fraudulent transfer
would contradict the per se rule in this District that the original pledge of the
collateral was in exchange reasonably equivalent value.[40]  If the original pledge of
collateral on account of pre-existing debt was per se in exchange for reasonably
equivalent value, then it would be illogical that giving permission for Gemini to
continue to hold that same collateral for a longer time could be avoidable as
lacking reasonably equivalent value.

k.  The November 7, 2022 amendment provided significant value to the Debtors in the
form of forbearance and continued opportunity to remain operational, the value of
which courts consistently recognize.[41]

l.  The November 7, 2022 amendment was entered into at a time when Gemini's
notice of termination of the Gemini Earn Program was already set to expire on
November 12, 2022 (30 days after a notice of termination given on October 13,
2022).  Accordingly, absent the amendment, Gemini could have simply allowed
the Gemini Earn Program to terminate and demanded the repayment of all loans,
or else foreclosed on the shares.  The amendment thus represented a transfer of no
(or virtually no) value by the Debtors as compared to the otherwise applicable
status quo at the time.

---

[40] *See Geron v. Palladin Overseas Fund, Ltd. (In re AppliedTheory Corp.)*, 330 B.R. 362, 363-64 (S.D.N.Y. 2005)
(reiterating per se rule in Southern District of New York that grant of a security interest to collateralize antecedent
debt incurred in the form of a loan constitutes reasonably equivalent value as a matter of law).

[41] *See Cuevas v. Hudson United Bank (In re M. Silverman Laces, Inc.)*, 2002 WL 31412465, *6 (S.D.N.Y. Oct. 24,
2002) (affirming bankruptcy court's finding that debtor received reasonably equivalent value for grant of lien on
inventory in the form of forbearance from exercising remedies on defaulted obligations); *1756 W. Lake St. LLC v. Am.
Chartered Bank*, 787 F.3d 383 (7th Cir. 2015) (affirming summary judgment in favor of defendants, where
forbearance by defendants provided unquantified benefits to debtor including allowing continued operations for
approximately four years, and plaintiff failed to prove that such benefits were not reasonably equivalent to $200,000
which was the maximum amount that transferred property value may have exceeded debt owing); *Williams v. BBVA
Compass Bank (In re Positive Health Management, Inc.)*, S.D.Tex. Case No. 11-cv-3436, Proposed Findings of Fact
and Conclusions of Law Regarding Trustee's Complaint for Avoidance of Transfers and Related Relief dated Sept.
20, 2011, Dkt. 1 at 17 fn. 7 (finding that debtor received reasonably equivalent value for payments of approximately
$360,000 where forbearance resulted in debtor having continued use of building to run operations and thus receiving
potential to make over $4 million in operating revenue), *aff'd on other grounds*, 769 F.3d 899 (5th Cir. 2014); *First
State Bank of Red Bud v. Official Comm. of Unsecured Creditors (In re Schaefer)*, 2011 WL 1118666, at *5 (S.D. Ill
March 28, 2011) (reversing lower court and ordering that constructive fraud claim be dismissed because plaintiff had
failed to show that transaction lacked reasonably equivalent value where debtor received certain value in exchange for
collateralization of antecedent debt in the form of forbearance and avoiding acceleration); *The Official Comm. of
Unsecured Creditors of Propex Inc. v. BNP Paribas (In re Propex Inc.)*, 415 B.R. 321, 324-25 (Bankr. E.D. Tenn.
2009) (dismissing claim to avoid interest rate increase as constructively fraudulent transfer where debtor received
forbearance in exchange that gave opportunity to avoid bankruptcy, even if short-lived); *see also Butler Aviation Int'l,
Inc. v. Whyte (Matter of Fairchild Aircraft Corp.)*, 6 F.3d 1119, 1126-27 (5th Cir. 1993) (affirming lower court
holdings that debtor received reasonably equivalent value for payments to fuel supplier made to keep subsidiary
operational, given that debtor expected to sell aircraft to subsidiary in the coming years and hoped to sell subsidiary as
a going concern).

m. Gemini has potential "safe harbor" defenses.

n. Gemini may argue that the litigation cannot be pursued because the action would not benefit the estates or otherwise would result in a windfall.

Other Factors

o. Gemini Lenders may have claims against Gemini directly (e.g., for prepetition fraud or similar claims), and Gemini and the Debtors may have individualized claims against each other on various bases.  But, upon information and belief, neither Gemini nor the Debtors have any potential claims against the Gemini Lenders directly (other than potential avoidance claims which are being waived under the Plan).  Accordingly, any contribution of value by Gemini in a settlement of these issues should only add to Gemini Lender recoveries, and cannot be structured as a trade of Gemini Lender recoveries in exchange for Gemini receiving a release.

p. The Debtors raised a new argument last week for the first time (at least to SOF's knowledge), stating that Gemini's credit bid might be voidable on the basis of some alleged illegal conduct on Gemini's part under applicable securities laws.[42] To the extent Debtors' argument has any validity (which is far from clear), the only possible remedy should be against Gemini itself and not Gemini Lenders given that they were good faith lenders for value.[43]

47.    Add to all this the fact that continued pursuit of the Gemini litigation will require incurring untold amounts of professional fees, and hold up much larger immediate distributions to all creditors (all for a very speculative potential benefit).

48.    In light of all the above, some suggested solutions (which are not necessarily mutually exclusive) include:

a. The Plan could be amended to provide that the Gemini GBTC Shares Determination and the Gemini Deficiency Claim Determination are each conditions precedent to the Effective Date of the Plan.  Accordingly, the Gemini litigation would need to be resolved before any creditors receive distributions.

---

[42] *See* Adv. Pro. No. 23-01192, Dkt. 32, ¶ 33 n.9 ("Gemini could have been in violation or various state or federal securities or bank regulatory laws that require registration or authorization to purchase securities on behalf of others and which provide for transactions in violation of such laws to be void or voidable." (citing 15 U.S.C. § 78o (generally requiring persons acting as securities brokers to register as such); 15 U.S.C. § 78cc (providing for contracts made in violation of the Exchange Act to be void).").

[43] *See* 15 U.S.C. § 78cc(c) ("Nothing in this chapter shall be construed … (2) to afford a defense to the collection of any debt or obligation or the enforcement of any lien by any person who shall have acquired such debt, obligation, or lien in good faith for value and without actual knowledge of the violation of any provision of this chapter or any rule or regulation thereunder affecting the legality of such debt, obligation, or lien.").

b.   The Court could direct an expedited mediation of the Gemini litigation.

c.   The Court could consider and decide certain issues in the Gemini litigation on an expedited basis, to narrow the scope of the dispute.

d.   A committee with duties only to Gemini Lenders and with estate-provided funding could be appointed, either now or upon the Effective Date.

e.   The Plan could be amended to give such a Gemini Lender committee consent/consultation rights with respect to any proposed settlement of the Gemini litigation.

f.   The Plan could be amended to require notice and a hearing of any proposed settlement of the Gemini litigation, whether before or after the Effective Date.

49.   In sum, SOF believes that a full and fair resolution of the Gemini litigation should be achievable and would be the right result.  Gemini Lenders have waited long enough, with far too little input or control over the outcome.  The value is there for a full recovery for Gemini Lenders with no legitimate prejudice to other creditors, and there is no way to know how long this will continue to be true.  Gemini Lenders should be made whole, now.  And SOF submits that conditioning Plan effectiveness on resolution of these issues might provide the parties the necessary motivation for a resolution.

50.   If the litigation must continue, SOF believes that the current Plan structure risks Gemini Lenders' legitimately owed recoveries being traded away without their voice being heard.  In that instance, a Gemini Lender committee with estate funding and a duty only to Gemini Lenders would be the appropriate solution.  But, at a minimum, the current Plan structure (with no opportunity for Gemini Lenders to object to a potential Gemini settlement) cannot stand.

E.   Opt Out Right of Gemini Lenders From GBTC Price Volatility

51.   Given the significant ongoing exposure that Gemini Lenders have to volatility in GBTC pricing, their current status as "forced" investors without direct representation, and the

possibility of future lengthy delays in resolution of the Gemini litigation, Gemini Lenders should be given a voice with regard to whether they would prefer that Gemini liquidate and hold the proceeds of the Gemini GBTC Shares.

52.    Accordingly, the Plan should be amended to require Gemini to provide Gemini Lenders the option to "opt out" of continuing exposure to volatility in GBTC pricing and authorize Gemini to liquidate a corresponding amount of GBTC to satisfy expected distributions of the value of the Gemini GBTC Shares (and to limit the recovery of such Gemini Lenders that opt out to their pro rata portion of the proceeds of such liquidated Gemini GBTC Shares).

F.    No Hold-Back From Distributions

53.    As noted above, SOF requests that the confirmation order include language reflecting Gemini's commitment to not hold back, reserve or offset against any distributions it is obligated to make under the Plan on the basis of any purported legal risk that Gemini may have.

G.    Reporting

54.    The Plan should provide that Gemini (and not just the Debtors) shall provide regular updates to the Court regarding the status of any distributions to Gemini Lenders.  The format of Gemini's and the Debtors' reporting should be consistent with one another such that Gemini Lenders can readily understand the total value that they should have received when adding both distributions together, based on a common value date or other consistent criteria.

## CONCLUSION AND RESERVATION OF RIGHTS

**WHEREFORE,** SOF respectfully requests that the Court refuse to approve the Plan absent modifications requested herein, and grant such other and further relief as is just and proper in this case. SOF expressly reserves the right to amend or supplement this Objection, to file additional objections, and to introduce evidence supporting this Objection and any other objections at any hearing on the Plan.

Dated: New York, New York
      January 31, 2024

                                       **OTTERBOURG P.C.**

                                       By: */s/ James V. Drew*
                                       James V. Drew
                                       230 Park Avenue
                                       New York, New York 10169
                                       Tel: (212) 661-9100
                                       jdrew@otterbourg.com

                                       *Counsel to SOF International, LLC*

**Exhibit A**

**Gemini Lender Claim Coin Values**

| Coin | Symbol | Gemini Master Claim Coin Count | Gemini Reserved Coin Count | Gemini Earn Operations Assets Coin Count | Gemini Proprietary Claim Coin Count | Price as of January 22, 2024 at 4 pm | Gemini Master Claim Coin Value as of January 22, 2024 at 4 pm | Gemini Reserved Coin Value as of January 22, 2024 at 4 pm | Gemini Earn Operations Assets Value as of January 22, 2024 at 4 pm | Gemini Proprietary Claim Coin Value as of January 22, 2024 at 4 pm |
|---|---|---|---|---|---|---|---|---|---|---|
| Bitcoin | (BTC) | 15094.38061 | 457.38311 | 1.38270 | 100.79382 | $ 40,139.7400 | $ 605,884,513.25 | $ 18,359,239.15 | $ 55,501.22 | $ 4,045,837.86 |
| Gemini Dollar | (GUSD) | 375437385.03887 | | 274102.04000 | 7543612.12000 | $ 1.0000 | $ 375,437,385.04 | $ - | $ 274,102.04 | $ 7,543,612.12 |
| Ethereum | (ETH) | 157019.76702 | | 4.64575 | 1216.95000 | $ 2,338.7300 | $ 367,226,839.73 | $ - | $ 10,865.15 | $ 2,846,117.47 |
| USD Coin | (USDC) | 55215289.12338 | 19581426.16582 | 72127.31886 | 999026.55000 | $ 1.0000 | $ 55,215,289.12 | $ 19,581,426.17 | $ 72,127.32 | $ 999,026.55 |
| Solana | (SOL) | 284128.92393 | 16525.67399 | 1624.51050 | 2519.50000 | $ 85.6300 | $ 24,329,959.76 | $ 1,415,093.46 | $ 139,106.83 | $ 215,744.78 |
| Chainlink | (LINK) | 1524285.66444 | 109377.21072 | 1317.89547 | 1081.14000 | $ 14.7600 | $ 22,498,456.41 | $ 1,614,407.63 | $ 19,452.14 | $ 15,957.63 |
| DogeCoin | (DOGE) | 195432319.00300 | 38333429.46440 | 4606063.19593 | 654353.88000 | $ 0.0818 | $ 15,986,363.69 | $ 3,135,674.53 | $ 376,775.97 | $ 53,526.15 |
| Filecoin | (FIL) | 2601610.12845 | 0.00000 | 332985.31171 | 37911.85000 | $ 5.1400 | $ 13,372,276.06 | $ - | $ 1,711,544.50 | $ 194,866.91 |
| Polygon | (MATIC) | 16964467.24016 | 1183437.45998 | 73552.74577 | 222304.75000 | $ 0.7600 | $ 12,892,995.10 | $ 899,412.47 | $ 55,900.09 | $ 168,951.61 |
| Bitcoin Cash | (BCH) | 44121.77423 | | 4395.32359 | 356.77357 | $ 235.5100 | $ 10,391,119.05 | $ - | $ 1,035,142.66 | $ 84,023.74 |
| Litecoin | (LTC) | 127209.28188 | | 1165.82731 | 445.96206 | $ 67.7700 | $ 8,620,973.03 | $ - | $ 79,008.12 | $ 30,222.85 |
| Multi Collateral Dai | (DAI) | 8326580.27024 | 1855610.30954 | 1492.05438 | 83364.53000 | $ 1.0000 | $ 8,326,580.27 | $ 1,855,610.31 | $ 1,492.05 | $ 83,364.53 |
| Fantom | (FTM) | 21093013.71697 | | 5109069.44386 | 186060.63000 | $ 0.3500 | $ 7,382,554.80 | $ - | $ 1,788,174.31 | $ 65,121.22 |
| Injective | (INJ) | 135922.61314 | | 6601.47982 | 377.23499 | $ 35.2100 | $ 4,785,835.21 | $ - | $ 232,438.10 | $ 13,282.44 |
| Aave | (AAVE) | 33788.94252 | | 641.98830 | 108.16729 | $ 92.9100 | $ 3,139,330.65 | $ - | $ 59,647.13 | $ 10,049.82 |
| Uniswap | (UNI) | 511292.12990 | | 7080.56741 | 1524.63000 | $ 6.0900 | $ 3,113,767.00 | $ - | $ 43,120.66 | $ 9,285.00 |
| Maker | (MKR) | 1338.38039 | | 34.06493 | 4.49732 | $ 1,947.9600 | $ 2,607,111.46 | $ - | $ 66,357.12 | $ 8,760.59 |
| The Graph | (GRT) | 17337624.76576 | | 511348.28867 | 83227.92000 | $ 0.1500 | $ 2,600,643.71 | $ - | $ 76,702.24 | $ 12,484.19 |
| Decentraland | (MANA) | 5593977.33440 | | 24935.37266 | 15053.95000 | $ 0.4500 | $ 2,517,289.80 | $ - | $ 11,220.92 | $ 6,774.28 |
| Basic Attention Token | (BAT) | 9388882.97198 | | 4212.11402 | 40940.10000 | $ 0.2200 | $ 2,065,554.25 | $ - | $ 926.67 | $ 9,006.82 |
| PAX Gold | (PAXG) | 1014.97374 | | 17.54432 | 0.79527 | $ 2,001.1800 | $ 2,031,145.15 | $ - | $ 35,109.34 | $ 1,591.48 |
| Amp | (AMP) | 425936380.55768 | 2372748.82360 | 12697252.08387 | 303893.00000 | $ 0.0039 | $ 1,661,151.88 | $ 9,253.72 | $ 49,519.28 | $ 1,185.18 |
| Curve DAO Token | (CRV) | 3110821.20254 | | 4826.58716 | 45801.53000 | $ 0.5100 | $ 1,586,518.81 | $ - | $ 2,461.56 | $ 23,358.78 |
| ApeCoin | (APE) | 1139985.53965 | | 68634.66171 | 13904.96000 | $ 1.3500 | $ 1,538,980.48 | $ - | $ 92,656.79 | $ 18,771.70 |
| 1inch Network | (1INCH) | 3012033.46334 | | 471446.59138 | 57642.50000 | $ 0.3900 | $ 1,174,693.05 | $ - | $ 183,864.17 | $ 22,480.58 |
| Fetch.ai | (FET) | 2013560.72968 | | 1965621.49805 | 49904.36000 | $ 0.5700 | $ 1,147,729.62 | $ - | $ 1,120,404.25 | $ 28,445.49 |
| Storj | (STORJ) | 1811065.26136 | | 28979.50844 | 12731.98000 | $ 0.5500 | $ 996,085.89 | $ - | $ 15,938.73 | $ 7,002.59 |
| Zcash | (ZEC) | 43919.47370 | | 109.83631 | 32.50197 | $ 22.6000 | $ 992,580.11 | $ - | $ 2,482.30 | $ 734.54 |
| Yearn.Finance | (YFI) | 128.16024 | 2.54456 | 4.81534 | 0.73621 | $ 7,118.8100 | $ 912,348.39 | $ 18,114.22 | $ 34,279.49 | $ 5,240.93 |
| 0x | (ZRX) | 2737146.67279 | | 31743.96452 | 6680.96000 | $ 0.3000 | $ 821,144.00 | $ - | $ 9,523.19 | $ 2,004.29 |
| Synthetix | (SNX) | 237906.95297 | | 23465.59673 | 4636.60000 | $ 3.3000 | $ 785,092.94 | $ - | $ 77,436.47 | $ 15,300.78 |
| Compound | (COMP) | 14038.76435 | | 358.93908 | 52.39177 | $ 52.9800 | $ 743,773.74 | $ - | $ 19,016.59 | $ 2,775.72 |
| Tezos | (XTZ) | 695291.94572 | | 39173.36133 | 5101.30000 | $ 0.9700 | $ 674,433.19 | $ - | $ 37,998.16 | $ 4,948.26 |
| Axie Infinity | (AXS) | 90870.92788 | | 2425.10230 | 1708.86000 | $ 7.3600 | $ 668,810.03 | $ - | $ 17,848.75 | $ 12,577.21 |
| SushiSwap | (SUSHI) | 597029.85073 | | 14755.07914 | 2808.61000 | $ 1.0800 | $ 644,792.24 | $ - | $ 15,935.49 | $ 3,033.30 |
| Loopring | (LRC) | 2690498.81970 | | 1555797.01249 | 25407.72000 | $ 0.2300 | $ 618,814.73 | $ - | $ 357,833.31 | $ 5,843.78 |
| Ankr | (ANKR) | 23335928.06780 | | 23205161.51570 | 57349.86000 | $ 0.0231 | $ 539,059.94 | $ - | $ 536,039.23 | $ 1,324.78 |
| UMA | (UMA) | 60303.18218 | | 2638.51827 | 44.97614 | $ 5.6200 | $ 338,903.88 | $ - | $ 14,828.47 | $ 252.77 |
| Orchid | (OXT) | 3699739.25944 | | 94912.56191 | 2759.90000 | $ 0.0908 | $ 335,936.32 | $ - | $ 8,618.06 | $ 250.60 |
| SKALE | (SKL) | 3980478.77162 | | 1904756.72718 | 10445.96000 | $ 0.0696 | $ 277,041.32 | $ - | $ 132,571.07 | $ 727.04 |
| Kyber Network Crystal v2 | (KNC) | 434572.64381 | | 1727.79251 | 1026.41000 | $ 0.5900 | $ 256,397.86 | $ - | $ 1,019.40 | $ 605.58 |
| Ren | (REN) | 4231486.62614 | | 4238653.73172 | 3499.27000 | $ 0.0542 | $ 229,346.58 | $ - | $ 229,735.03 | $ 189.66 |
| Alchemix | (ALCX) | 8676.38998 | | 1602.68169 | 164.37334 | $ 23.5000 | $ 203,895.16 | $ - | $ 37,663.02 | $ 3,862.77 |
| Bancor | (BNT) | 267993.78019 | | 22566.62684 | 5098.70000 | $ 0.7000 | $ 187,595.65 | $ - | $ 15,796.64 | $ 3,569.09 |
| Livepeer | (LPT) | 24673.14661 | | 232.63711 | 43.90727 | $ 7.0700 | $ 174,439.15 | $ - | $ 1,644.74 | $ 310.42 |
| Balancer | (BAL) | 34868.76091 | | 3030.37812 | 441.14751 | $ 3.7300 | $ 130,060.48 | $ - | $ 11,303.31 | $ 1,645.48 |
| Chiliz | (CHZ) | 688964.61830 | | 32785.72092 | 2339.21000 | $ 0.0953 | $ 65,658.33 | $ - | $ 3,124.48 | $ 222.93 |
| Rally | (RLY) | 5660470.43017 | | 2519625.42696 | 98377.10000 | $ 0.0070 | $ 39,623.29 | $ - | $ 17,637.38 | $ 688.64 |
| Tokemak | (TOKE) | 24563.56460 | | 8289.07956 | 144.73088 | $ 0.6700 | $ 16,457.59 | $ - | $ 5,553.68 | $ 96.97 |
| Ribbon Finance | (RBN) | 25405.57346 | | 9805.34161 | 173.47668 | $ 0.4700 | $ 11,940.62 | $ - | $ 4,608.51 | $ 81.53 |
| LUNA | (LUNA) | 286.06027 | | 61360.59601 | 0.00000 | $ 0.5800 | $ 165.91 | $ - | $ 35,589.15 | $ - |
| TerraClassicUSD | (USTC) | 1260.54345 | | 13263.57257 | 0.00000 | $ 0.0245 | $ 30.88 | $ - | $ 324.96 | $ - |
| MIR | (MIR) | 4.17330 | | 90.35325 | 0.00000 | $ 0.0200 | $ 0.08 | $ - | $ 1.81 | $ - |
| USD (Cash) | | | | 269311.00000 | | $ 1.0000 | $ - | $ - | $ 269,311.00 | $ - |
| **Totals** | | | | | | | **$ 1,568,199,486.75** | **$ 46,888,231.66** | **$ 9,507,283.05** | **$ 16,585,139.43** |

**Exhibit B**

**Table of Assumptions and Inputs Used For Analysis of Gemini Lender Recoveries**

| Assumptions/Inputs (in millions unless indicated) | Total | Gemini Master Claim | Gemini Proprietary Claim |
|---|---|---|---|
| Total Coin Claim as of Petition Date | $ 1,136.0 | $ 1,122.5 | $ 13.5 |
| Interest on Coin Claim Since Petition Date | $ 45.4 | $ 44.9 | $ 0.5 |
| Other Costs and Fees Added | $ 15.0 | $ 5.0 | $ 10.0 |
| Total Interest, Costs and Fees | $ 60.4 | $ 49.90 | $ 10.54 |
| Total Petition Date Claim Plus Interest and Costs/Fees | $ 1,196.4 | $ 1,172.4 | $ 24.0 |
| Total Claim at Current Coin Values | $ 1,584.8 | $ 1,568.2 | $ 16.6 |
| Total Claim at Current Coin Values Plus Interest and Costs/Fees | $ 1,645.2 | $ 1,618.10 | $ 27.14 |
| Plan Unsecured Creditor Recovery Percentage (Low) | 61% | | |
| Plan Unsecured Creditor Recovery Percentage (High) | 78% | | |
| Value date | 1/22/2024 | | |
| Gemini GBTC Shares | 30.905782 | | |
| GBTC Price on 11/16/2022 ($/share) | $ 9.20 | | |
| GBTC Price on Value Date ($/share) | $ 35.82 | | |
| Gemini GBTC Shares Value as of 11/16/2022 | $ 284.3 | | |
| Gemini GBTC Shares Value as of Value Date | $ 1,107.0 | | |
| Value of Gemini Reserved Coins as of Value Date | $ 46.9 | | |
| Value of Gemini Earn Operations Assets as of Value Date | $ 9.5 | | |