Jeremy C. Hollembeak
BAIRD HOLM LLP
1700 Farnam St. Ste. 1500
Omaha, NE 68102
Telephone (402) 636-8317
jhollembeak@bairdholm.com

*Counsel to Holders of Claim Nos. 402 & 405*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| Genesis Global Holdco, LLC, *et al.*,[1] | Case No.:  23-10063 (SHL) |
| Debtors. | Jointly Administered |

**CLAIMANTS' SUR-REPLY TO DEBTORS' REPLY IN SUPPORT OF**
**THE SEVENTH OMNIBUS OBJECTION (NON-SUBSTANTIVE) TO CERTAIN**
**CLAIMS PURSUANT TO 11 U.S.C. § 502 AND FED. R. BANKR. P. 3007 (MODIFY AND**
**ALLOW AS MODIFIED) WITH RESPECT TO CLAIM NOS. 402 AND 405**

---

[1] The "Debtors" in these Chapter 11 Cases are, collectively, Genesis Global Holdco, LLC; Genesis Global Capital, LLC ("GGC"); Genesis Asia Pacific Pte. Ltd. ("GAP").

# TABLE OF CONTENTS

Page No.

SUR-REPLY ................................................................................................................... 1

A. The Plain Language of the Master Loan Agreements Supports Allowance of the Filed Claims in their Full Asserted Amounts ......................................................................................... 2

i. The Debtors' Reading of Section III(b) Conflicts with Its Plain Language and Cannot Be Supported by Applicable Rules of Contract Construction............................................................. 3

ii. A Late Fee of 1% a Year is An Absurd Result that Cannot be Used by Debtors to Create Ambiguity Where None Exists ......................................................................................... 5

B. Loan and Late Fees were Properly Computed on a Compunding Basis................................. 12

C. The Filed Claims are Prima Facie Valid and cannot be Disallowed at this Time.................... 13

CONCLUSION .............................................................................................................. 18

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re 785 Partners LLC*,
   470 B.R. 126 (Bankr. S.D.N.Y. 2012) ...................................................................11

*AXA Inv. Managers UK Ltd. v. Endeavor Cap. Mgmt. LLC*,
   890 F. Supp. 2d 373 (S.D.N.Y. 2012).....................................................................9

*Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.*,
   100 A.D.3d 100, 951 N.Y.S.2d 19 (2012) ..............................................................8

*Blue Citi, LLC v. 5Barz International, Inc.*,
   338 F.Supp.3d 326 (S.D.N.Y. 2018).....................................................................10

*DaPuzzo v. Globalvest Mgmt. Co., L.P.*,
   263 F. Supp. 2d 714 (S.D.N.Y. 2003) .....................................................................6

*Klein v. Kim*,
   No. 2:20-CV-01628-BJR, 2022 WL 717051 (W.D. Wash. Mar. 10, 2022) ............5

*Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*,
   784 F.3d 78 (2d Cir. 2015)...............................................................................6, 12

*Manfra, Tordella & Brookes, Inc. v. Bunge*,
   794 F.2d 61 (2d Cir. 1986)...................................................................................10

*Pereira v. Prompt Mortg. Providers of N. Am., LLC (In re Heavey)*,
   608 B.R. 341 (Bankr. E.D.N.Y. 2019) ....................................................................8

*In re Polaroid Corp.*,
   527 B.R. 335 (D. Minn. 2015) ..............................................................................17

*Russkaya Reklama, Inc. v. Milman*,
   47 Misc. 3d 88, 9 N.Y.S.3d 759 (N.Y. App. Term. 2015).......................................5

*Themis Capital, LLC v. Democratic Republic of Congo*,
   626 Fed.Appx. 346 (2d Cir. 2015)...................................................................12, 13

*In re Yates Dev., Inc.*,
   241 B.R. 247 (Bankr. M.D. Fla. 1999) .................................................................10

The respective holders (each a "Claimant") of Claim No. 405 and Claim No. 402 (together, the "Filed Claims"), which are subject to pending objections under the Debtors' Seventh Omnibus Objection (ECF No. 999). On December 21, 2023, in accordance with the Claims Procedures Order (ECF No. 498) and instructions in the Seventh Omnibus Objection, Claimants filed a response in opposition to the Seventh Omnibus Objection and in support of full and final allowance of their respective Filed Claims pursuant to Sections 105 and 502 of the Bankruptcy Code (ECF No. 1076, the "Response").[2] Following discussion on the record of the January 18, 2024 hearing before the Court, a preliminary hearing on Seventh Omnibus Objection as it relates to the Filed Claims is scheduled to go forward at the omnibus hearing starting at 11:00 A.M. (prevailing Eastern time) on February 8, 2024 (the "Hearing"). On January 19, 2024, with this Court's authorization, Debtors and Claimants agreed that (i) the deadline would be extended for Debtors to file a reply to the Response, which reply the Debtors' timely filed on January 23, 2024 (ECF No. 1188, the "Reply"), and (ii) the Claimants would be permitted to file a sur-reply by February 1, 2024. *See* Notice of Adjournment (ECF No. 1179), last paragraph.

## SUR-REPLY

Claimants' hereby timely reply (the "Sur-Reply") to the Debtors' Reply and in further opposition to the Seventh Omnibus Objection as it relates to the Filed Claims. For the reasons below and in the Claimants' Response, the Court should overrule the Seventh Omnibus Objection as it relates to the Filed Claims, and allow the Filed Claims in their full stated amounts. In support of their Sur-Reply, Claimants respectfully state as follows:

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Response.

1

**A.**     **The Plain Language Of The Master Loan Agreements Supports Allowance Of The Filed Claims In Their Full Asserted Amounts**

1.     The parties' disagreement concerns the proper application of the identical Loan Fee and Late Fee provisions contained in Sections III(a) and III(b), respectively, of the Master Loan Agreements ("MLAs").  These provisions provide, in full:[3]

> **III.     Loan Fees and Transaction Fees.**
>
> (a) Loan Fee
>
> Unless otherwise agreed, [GAP/GGC] agrees to pay [Claimant] a financing fee on each Loan (the "Loan Fee").  When a Loan is executed, [GAP/GGC] will be responsible to pay the Loan Fee as agreed to herein and annualized in the relevant Loan Term Sheet and subject to change if thereafter agreed by [GGC/GAP] and [Claimant].  Except as [GAP/GGC] and [Claimant] may otherwise agree, Loan Fees shall accrue from and include the date on which the Loaned Digital Currencies are transferred to [GAP/GGC] to the date on which such Loaned Digital Currencies are repaid in their entirety to [Claimant].
>
> [Claimant] shall calculate any Loan Fees owed on a daily basis and provide [GAP/GGC] with the calculation upon request.  The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies.
>
> (b) Late Fee
>
> For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which [GAP/GGC] has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with Section III(c), [GAP] shall incur an additional fee (the "Late Fee") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Digital Currencies.

2.     For the reasons set forth in Response, a plain reading construction of these provisions supports allowance of the Filed Claims in their full asserted amounts.[4]  The Debtors' arguments to the contrary are unavailing for the following reasons.

---

[3] GAP is the Borrower under Claim No. 402 and GGC is the Borrower under Claim No. 405.

### i.   The Debtors' Reading Of Section III(b) Conflicts With Its Plain Language And Cannot Be Supported By Applicable Rules Of Contract Construction

3.      The Debtors' attempt to read Section III(b) as providing for a Late Fee calculated at 1% per year, as opposed to 1% each day, rests nearly entirely on the term "annualized" being read in the past tense.  *See* Reply ¶ 20 ("the MLAs must specify that the 1% rate **has been** 'annualized'" (emphasis added)); *Id.* ¶ 21, n.16 (arguing Claimants "misrepresent" the dictionary definition of "annualized" by using its present tense).   The Debtors' reading is wholly unsupported by the plain language of the MLAs and common sense.  Accrual of Late Fees was a contingent, future event at the time the parties entered into the MLAs.   Understandably, therefore, Section III(c) is drafted in the future conditional tense, providing that for each future day *after* the "Maturity Date" on which the Loans have not been repaid in full, GAP/GGC "shall incur" an additional Late Fee of "1% (annualized, calculated daily)."  Thus, "annualized" should be given its plain meaning, in the same tense as the rest of the provision, as an action (*i.e.* a verb) that has not been taken at the time of contracting but that may be taken in the future if specified triggering events occur.   In other words, "annualized" as used in Section III(b) describes a calculation *to be applied* to the "1%" Late Fee if the fee is triggered by GAP's/GGC's failure to repay the Loans at maturity.

4.      This reading is supported by the exact same forward-looking use of "annualize" in Section III(a).  Specifically, the MLAs by design are prepared in anticipation that they would govern subsequent loans between the parties, with certain key terms of the loan set forth in term

---

[4] The Debtors' suggestions that the only questions before the Court is whether or not to sustain their objection to the Filed Claims and that the Claimants are improperly seeking allowance of their claims without filing a standalone motion can and should be rejected out of hand.   The Bankruptcy Code unequivocally establishes an objection to a claim – here, the Debtors' Seventh Omnibus Objection – as the only event required to trigger this Court's obligation to "determine the amount of such claim" and "allow such claim in such amount."  11 U.S.C. § 502(b).

sheet.   Accordingly, Section III(a) states, in future tense, that when any new loan is later executed, "[GAP/GGC] will be responsible to pay the Loan Fee … *annualized* in the relevant Loan Term Sheet."   In other words, the Claimants and the Debtors agreed under Section III(a) that anytime thereafter they executed a loan to be governed by the MLAs, they would annualize the rate of the agreed Loan Fee so that it would be expressed in the governing Term Sheet on a yearly basis.   Which – as the Debtors point out (Reply ¶ 23) – is exactly the parties did in the Term Sheets for both outstanding Loans.   Thus, contrary to the Debtors' suggestion otherwise (Reply ¶ 23, n.17), Claimants' reading of the word "annualized" applies the same meaning to the term in both Sections III(a) and III(b).   This reading – which applied to the plain language of Section III(b) produces a Late Fee of 1% per day – is clearly a reasonable reading of that provision.

5.       By contrast, the Debtors' interpretation is not reasonable.   Debtors' posit that the single word "annualized" must be plucked out of the forward looking Section III(b), given its past-tense meaning, and then re-inserted as an "adjective" signaling to the reader that the numerical rate it purportedly modifies has already "been calculated or adjusted to reflect a rate based on a full year."   *See* Reply ¶ 21, n.16.   In other words, the Debtors' ask the Court to read "annualized" to mean "per annum."   *See* Reply ¶ 24 ("annualized" is used in Section III(b) "to make clear that 1% is, in fact, the annual rate").   But in fact the two terms are not synonymous. "Annualized" in this context means "to convert a short term calculation or rate into an annual rate."[5]   It is defined as an action verb—"to convert."   Per annum, on the other hand, suggests that the stated rate is already the rate for one year, without the need to convert it.

---

[5] *See* Chris B. Murphy, Annualize: Definition, Formulas, and Examples updated Mar. 3, 2023, available at https://www.investopedia.com/terms/a/annualize.asp, last visited January 31, 2024.

6.      According to the Debtors, reading "annualized" to mean "per annum" is "actually necessary" because "[n]owhere else but Section III(b) is the Late Fee annual rate specified." *Id*. But there is nothing incomplete or otherwise remarkable about a loan agreement not expressing interest or fees in terms of an annual rate – particularly where, as here, the loan issued thereunder matures less than one year after being issued.   In fact, financial instruments fitting that description are commonplace and frequently require the parties to do their own calculations of effective annual rates using the shorter-term rates expressly set forth therein.[6]  Having a word to describe such calculations is the very reason the term "annualized" exists as part of the commercial lexicon. Thus, the Debtors' argument that 1% "annualized" in Section III(c) must mean 1% per year because otherwise the MLAs lack an explicit annual rate for calculating the Late Fee cannot withstand scrutiny.   The Debtors offer no other arguments or precedent to explain why, if the MLAs' drafters meant 1% "annualized" to mean 1% "per annum", they simply didn't say so in Section III(b).

### ii.    A Late Fee Of 1% Per Year Is An Absurd Result That Cannot Be Used By Debtors To Create Ambiguity Where None Exists

7.      In their Response, Claimants set forth important contextual details about the Master Loan Agreements to demonstrate that reading Section III(b) to provide a Late Fee of 1% per year is an absurd, commercially unreasonable result.  For example, Claimants explained that the Loans they issued to the Debtors under the MLAs are unsecured, short-term loans of volatile digital currencies entered into during a period of extraordinary volatility (late May through

---

[6] *See, e.g.*, *Klein v. Kim*, No. 2:20-CV-01628-BJR, 2022 WL 717051, at *1 (W.D. Wash. Mar. 10, 2022) (adjudicating dispute concerning "a series of short-term, high-interest cryptocurrency loans" such as loan for "160,000 USDT with an interest rate of 10% over 90 days – equating to 40% annually"); *Russkaya Reklama, Inc. v. Milman*, 47 Misc. 3d 88, 90, 9 N.Y.S.3d 759, 760 (N.Y. App. Term. 2015) (adjudicating disputes concerning six month promissory note under with interest accrued "at the rate of two (2%) per month").

September 2022), that Claimants relied on the Late Fees of 1% per day under in Section III(b) as an important protection against the downside risks the Loans presented, and that their reliance was reasonable in light of large late fees being customary terms in crypto lending marketplace. *See* Response ¶¶ 34-36. In their Reply, the Debtors tellingly do not dispute any of these contextual details. Instead, they attack them as both irrelevant and outside the scope of what the Court can consider at this stage of the dispute. *See* Reply ¶ 25. Neither of these attacks can withstand scrutiny.

8. Under applicable New York law and case precedent, the contextual details in Claimants' Response are clearly both relevant and properly considered as part of a determination whether Section III(b) has more than one reasonable construction. *See Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 91 (2d Cir. 2015) ("The terms of a contract should be construed according to their plain meaning, taking into account 'the reasonable expectation and purpose of the ordinary businessperson, ***in the factual context in which terms of art and understanding are used***.'") (emphasis added) (quoting *Uribe v. Merchs. Bank of N.Y.*, 91 N.Y.2d 336, 341, 670 N.Y.S.2d 393, 693 N.E.2d 740 (1998)); *DaPuzzo v. Globalvest Mgmt. Co., L.P.*, 263 F. Supp. 2d 714, 729 (S.D.N.Y. 2003) ("[T]he central inquiry under New York law as to whether an ambiguity exists in a contract is whether the terms 'could suggest more than one meaning ***when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business***.'") (emphasis added) (quoting *Morgan Stanley Group Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir.2000)).

9.     As it considers the parties' competing constructions of the Section III(b), this Court can and should consider these undisputed contextual details.  The Court can also draw upon its experience and common sense and/or to take judicial notice of available information about crypto lending "customs, practices, usages and terminology".  The Court has now presided over these Chapter 11 Cases for more than a year, and no doubt appreciates many important differences between short-term cryptocurrency lending on digital platforms and fiat-currency lending in traditional capital markets.  Those differences are reflected in the customary terms and practices in each environment.   Needless to say, quantitatively comparing the interest that accrues post-default on a typical multi-year US dollar-denominated term loan to the late fees that accrue post-maturity on an unsecured 60-day loan of Polkadot is like comparing apples to kumquats.   The Court need not turn a blind eye to such obvious differences and their implications on this dispute to keep itself from impermissibly considering extrinsic evidence.

10.     Nor are Claimants calling on this Court to impermissibly "speculate" by asking it to weigh the commercial reasonableness of its reading of Section III(b) in full view of the inherent risks in crypto-lending and unprecedented crypto-market volatility when the Loans were executed in late May and September 2022.   *See* Reply ¶ 25.  Importantly, the Court need not look outside the four-corners of the Master Loan Agreements to confirm the impact of these risks and volatility.   Both MLAs include the same Section II(e), titled "Redelivery in an Illiquid Market," which provides certain alternative ways the Loans could be repaid in the event that the loaned cryptocurrency (USDC or DOT) experienced a decrease in market value of 90% or more, or was delisted from multiple exchanges, during the terms of the Loans.   On its face, this provision demonstrates that at the time of contracting, the parties were so concerned about the possibility of a near-total loss in value of the loaned cryptocurrency over a short time period that

they included language in the MLAs to address it.  A remarkable provision without a counter-part in traditional commercial loan agreements, Section II(e) clearly evidences how the inherent risks and market volatility weighed on the parties and influenced the terms on which they agreed to move forward with the Loans.

11.     The Court can and should consider Section II(e) and draw reasonable inferences therefrom when reading III(b).  *See Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A.*, 100 A.D.3d 100, 106, 951 N.Y.S.2d 19 (2012) ("The existence of ambiguity is determined by examining the entire contract and considering the relation of the parties and the circumstances under which it was executed, with the wording viewed in the light of the obligation as a whole and the intention of the parties as manifested thereby'") (cleaned up; citations omitted).  Doing so undersores the absurdity and complete absence of commercial reasonableness in a 1% per year late fee.  Both Loans earned Loan Fees at rates (8% per year and 14% per year, respectively) that provided Claimants little or no margin over what they had been receiving by staking or lending their USDC and DOT on other platforms prior to entering the Loans.  Because of this, and the fact that the Loans were both unsecured, the Claimants were entirely dependent upon the Late Fee to address the credit risk they were taking on by economically incentivizing the Debtors to timely repay the Loans at their stated maturities, and by compensating Claimants for damages and costs they would incur if the Debtors failed to do so.  Put simply, Claimants would not have provided the Loans in the first place if Section III(b) entitled them to Late Fees of only 1/365% of the outstanding balance per day.

12.    The Debtors make no effort to establish that a Late Fee of 1% *per year* resulting

from their interpretation of Section III(b) is not absurd, much less commercially reasonable.[7]

Instead, they argue a Late Fee of 1% *per day* resulting from Claimants' reading of the provision

is unreasonable.  *See* Reply ¶ 26. For support of this conclusion, the Debtors cite the provisions

of New York's penal code that makes it criminally usury to charge more than 24% per annum in

certain circumstances.  *Id*. (citing N.Y. Penal L. §§ 190.40, 190.42).  However, the Debtors

concede (as they must) that both Loans fall outside statute and are not criminally usurious

because both are for more than $2.5 million.  *Id*.; *see* NY Gen. Oblig § 5-501 ("No law

regulating the maximum rate of interest which may be charged, taken or received, *including*

*section 190.40 and section 190.42 of the penal law*, shall apply to any loan or forbearance in the

amount of two million five hundred thousand dollars or more") (emphasis added).  Nevertheless,

they argue, the mere possibility that the parties *could have* executed a loan in an amount less than

$2.5 million governed by the MLAs maintains the relevance of New York's criminal usury limit

(and, by implication, the public policy it represents) to the Court's analysis of the reasonableness

of a 1% per day Late Fee (which equates to 365% per year, without compounding).

13.    The Debtors' usury argument widely misses the mark.   First, and foremost,

because the Loans far exceed the $2.5 million limit, sections 190.40 and 190.42 of the penal law

do not apply and there is no compelling reason for their further consideration on that basis alone.

*See AXA Inv. Managers UK Ltd. v. Endeavor Cap. Mgmt. LLC*, 890 F. Supp. 2d 373, 388–90

(S.D.N.Y. 2012) (explaining "[w]e need not linger over the public-policy question" because

---

[7] Nor could they, as 1% per year would be shockingly low even for a secured loan in a traditional
commercial context.  *Cf. Pereira v. Prompt Mortg. Providers of N. Am., LLC* (*In re Heavey*), 608 B.R.
341, 354 (Bankr. E.D.N.Y.  2019) (collecting cases in which secured creditors' claims for post-petition
default interest were allowed under Section 506(b), where default rates from those cases represented
spreads of 18.625%, 12%, and 8.8% over the respective non-default rates).

liquidated damages provision was not subject to usury statutes. "Thus, there is nothing inherently amiss in the provision and it will survive or fall based on a contextual determination with respect to enforceability."). Moreover, regardless of loan amount, Section III(b) of the MLAs would fall outside the ambit of both criminal and civil New York usury laws because those laws "do not apply to defaulted obligations." *See Manfra, Tordella & Brookes, Inc. v. Bunge*, 794 F.2d 61, 63 n.2 (2d Cir. 1986); *see also Blue Citi, LLC v. 5Barz International, Inc*., 338 F.Supp.3d 326 (S.D.N.Y. 2018) ("While the Second Circuit has not squarely ruled on the issue, the majority of district courts in this Circuit to have considered the issue have held that New York's usury laws do not apply to default interest rates.").

14. Aside from their usury argument, the Debtors cite no authority for the proposition that a Late Fee of 1% per day is commercially unreasonable. Even if they had, a Late Fee of 1% per day was and is commercially reasonable under the circumstances. In many respects, the Late Fee provision functions similarly to an option contract, setting forth the price the parties agreed in advance that GAP/GGC would have to pay each day to keep the Loans outstanding. Thus, *In re Yates Dev., Inc.*, 241 B.R. 247 (Bankr. M.D. Fla. 1999), is instructive by analogy. There, a potential purchaser agreed with a seller to pay $1000 per day for the exclusive option to purchase certain real estate. *Id*., at 250. The option lasted for three months, but provided the purchaser could extend the offer thereafter for $5000 per day. *Id*. The purchaser filed Chapter 11 before the option expired. *Id*. In connection with subsequently seeking authority to assume the option contract and buy the property, the purchaser asked the bankruptcy court to, in effect, disallow as unenforceable the portion of the accruing unpaid option fee (i.e. assumption cure cost) that represented the additional $4000 per day over and above the original $1000 per day fee. In support, the purchaser represented the additional $4000 per day had accumulated to an effective

interest rate of 88% (based on the price of the underlying property), that this amount would continue to increase until the sale actually closed at some date in the future, and that its final sum "should shock the conscience of the court." *Id*. at 257, n.4. The bankruptcy court held the purchaser to the terms of its bargain, however, and the Eleventh Circuit affirmed, explaining "it is never the role of a court to rewrite a contract to make it more reasonable for one of the parties or to relieve a party from what turns out to be a bad bargain." 256 F.3d 1285, 1290 (11th Cir. 2001). *See also In re 785 Partners LLC*, 470 B.R. 126, 132 (Bankr. S.D.N.Y. 2012) ("Even where the default rate strikes the judge as high, a court cannot rewrite the parties' bargain based on its own notions of fairness and equity").

15.    Here, whether viewed as a provision for an option fee, default interest, penalty, or none of the above, Section III(b) represents the parties agreement on the allocation of risk in the event GAP/GGC failed to repay the Loans at maturity. After the parties reached this agreement and the Loans were made, GAP/GGC failed to repay the Loans at their November 2022 maturities, effectively extending a six-month loan by an additional one-third term (Loan No. 402) and *doubling* the term of a 60-day loan (Loan No. 405) by two additional months before the petition date (which was now more than a year ago). Under the circumstances, the accumulation of the Late Fees set forth in the Filed Claims is not an absurd result. Moreover, the Court cannot disallow or reduce the amount of the Claimant's prepetition claims based on the equitable considerations. *Id*. at 132-33.

16.    Accordingly, the Late Fees included in the Filed Claims are commercially reasonable and should be allowed.

*    *    *    *    *

17.    "A contract is ambiguous when reasonable minds could differ as to its meaning."

*Luitpold Pharms., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 87 (2d

Cir. 2015).  Here, for the reasons above, Claimants' respectfully submit reasonable minds cannot

differ about the proper reading of Section III(b).  Whether reading the plain language of the

MLAs in isolation, or within the context of the short-term digital currency lending environment

from which they arose, the inescapable conclusion is that it entitles Claimants to a Late Fee

calculated at 1% per day.  Accordingly, the Filed Claims should be allowed in their full asserted

amounts.

**B.    Loan And Late Fees Were Properly Computed On A Compounding Basis**

18.    The Debtors object to Claimants calculating the Loan Fee and Late Fee portions

of their claim on a compounding basis.  *See* Reply ¶¶ 33-34.  Section III(a) of both MLAs

provides "[t]he Loan Fee will be calculated off *all outstanding portions* of the Loaned Digital

Currencies." (emphasis added).  Section III(b) of both MLAs similarly requires Late Fees to be

calculated on "*all outstanding portions* of the Loaned Digital Currencies."  (emphasis added)

The phrase "all outstanding portions" in these provisions must mean all fees and charges, in

addition to principal.  If it only meant principal, as the Debtors' suggest, then why use the term

"portions"?  Moreover, to the extent the Debtors are relying on the term "Loaned Digital

Currencies" to be interpreted as principal only, they are wrong.  That term, although capitalized,

is *not* defined in the MLAs.  Tellingly, however, the MLAs do define a term, "Loaned Assets,"

to effectively mean *just* the principal that was loaned and remains outstanding.[8]  If the parties

had intended the Loan Fees and Late Fees not to be compounding, they would have used the

---

[8] Specifically, the MLAs define "Loaned Assets" in relevant part to mean "any Digital Currency or U.S.
Dollar amount transferred in a Loan hereunder until such Digital Currency (or identical Digital Currency)
or U.S. Dollar amount is transferred back to Lender hereunder …."

term Loaned Assets instead of Loaned Digital Currencies in the language from Sections III(a) and III(b) quoted above.  Finally, it is clear that a contract providing for compound interest can be enforceable without explicitly referring to "compounding" or "interest on interest" – language that would be especially odd here, since the MLAs accrue in "Fees", not "interest".  *See Themis Capital, LLC v. Democratic Republic of Congo*, 626 Fed.Appx. 346 (2d Cir. 2015).  Under the circumstances, reference in both provisions to "*all outstanding portions* of the Loaned Digital Currencies" is sufficiently explicit.

19.

**C.    The Filed Claims Are *Prima Facie* Valid And Cannot Be Disallowed At This Time**

20.    For the reasons already stated, the Court should overrule the Seventh Omnibus Objection and allow the Filed Claims in full based on a plain reading construction of the Master Loan Agreements.  Even if that were not the case, the Filed Claims nevertheless remain *prima facie* valid and cannot be disallowed unless and until (i) the Debtors satisfy their burden to produce evidence to substantiate their objections, something they have yet to do, (ii) Claimants are given the opportunity to challenge such evidence and to produce their own, and (iii) this Court determines the amount of the Filed Claims that should be allowed based on the preponderance of the of the full evidentiary record before it.

21.    As the leading bankruptcy treatise explains, "[a] properly filed proof of claim is *prima facie* evidence of the validity and amount of the claim.  The party objecting to the claim has the burden of going forward and of introducing evidence sufficient to rebut the presumption of validity."  9 COLLIER ON BANKRUPTCY ¶ 3001.09[2] (Richard Levin & Henry J. Sommer eds., 16th ed.).  If an objector rebuts the presumption, the claimant must be afforded an opportunity to offer further evidence before the validity and amount of its claim is determined based on the

preponderance of the evidence.  *See id*.  But "[u]nless an objector introduces evidence as to the invalidity of the claim or the excessiveness of its amount, the claimant need offer no further proof of the merits of the claim."  4 COLLIER ON BANKRUPTCY ¶ 502.02[3][e] (Richard Levin & Henry J. Sommer eds., 16th ed.).

22.    The Court should reject the Debtors' attempts to short-circuit these procedures and run rough-shod over Claimants' due process rights.  First, Debtors' repeated refrain that the Filed Claims "should not be afforded *prima facie* validity" is not credible, much less persuasive.  *See* Reply ¶¶ 3, 32.  The Filed Claims are based on written agreements.  Therefore, in accordance with Bankruptcy Rule 3001(c)(1), Claimants included copies of those agreements and thorough breakdowns of how all asserted Loan Fees and Late Fees were calculated with their timely submitted proofs of claim.  In doing so, Claimants' established *prima facie* validity of the Filed Claims as a matter of law.  9 COLLIER ON BANKRUPTCY ¶ 3001.09[1] (Richard Levin & Henry J. Sommer eds., 16th ed.).  Indeed, that Claimants provided sufficient detail to put the Court and parties on notice of the bases of their Filed Claims is readily demonstrated by the Debtors' own Reply, which raises challenges on such granular bases as Claimants' calculation of the Loan Fee based on a 360-day year (as opposed to a 365-day year).[9]  *See* Reply ¶ 17.

23.    Nothing in the Claims Procedures Order allows the Debtors to avoid this result.  *See* Reply ¶ 29.  As an initial matter, the Claims Procedures Order addresses modifications to Bankruptcy Rule 3007.  *See* Claims Procedures Order ¶ 1.  The order makes no reference to

---

[9] It is also belied by the Debtors' own actions as a claimant in the FTX bankruptcy cases.  There, the Debtors' presumably believed the proof of claim they filed for amounts of outstanding principal, Loan Fees and Late Fees allegedly owed to GGC by Alameda Research Ltd. under a master loan agreement was facially valid, notwithstanding they did not attach a copy of the agreement or provide calculation details of the components of their claimed amounts.  *See* Claim Number 4506, available at https://restructuring.ra.kroll.com/FTX/Home-ClaimInfo, last visited January 30, 2024 (a true and correct copy is attached here to as Exhibit 1).

Bankruptcy Rule 3001 at all, much less a modification to the *prima facie* claim threshold thereunder. Moreover, despite Debtors' suggestion otherwise, no such modification lives in the order's provision for "a non-evidentiary hearing to address whether the Contested Claim has failed to state a claim against the Debtors which can be allowed and should be dismissed pursuant to Bankruptcy Rule 7012(b) (a '<u>Sufficiency Hearing</u>')." *See* Claims Procedures Order ¶ 2(a). That provision, on its face, does not *require* this Court to make a ruling as to a Contested Claim's facial validity at the conclusion of a Sufficient Hearing or before it authorizes the submission of evidence and scheduling of an evidentiary "Merits Hearing." Even if it did, the application of Bankruptcy Rule 7012(b) does not represent a more exacting threshold to facial claim validity than what applicable law already requires. In fact, it arguably lowers the threshold. For example, the Debtors concede the Filed Claims contain a "summary of the[] purported contents and import" of the Demand Letters, but nevertheless insist the letters (a) are inadmissible extrinsic evidence at this stage of proceedings and (b) even if admissible, are nothing more than self-serving statements the Court must view as in conflict with the plain language of the Master Loan Agreements. *See* Reply ¶¶ 29-31. But in applying Civil Rule 12(b)(6) at the Sufficiency Hearing, the Court must take all statements in the Filed Claims as true – including Claimants' "summary of the[] purported contents and import" of the Demand Letters – and must draw all reasonable inferences therefrom in a light most favorable to Claimants – such as an inference that the Debtors' repeated failure to dispute the Claimants' "1% per day" Late Fee calculation in November and December 2022 is strong evidence that they agreed that is what the agreements provided.

24.    Finally, the Debtors' cannot use the Claims Procedures Order to side-step their own burden of production. Contrary to the Debtors' suggestion otherwise, the Court cannot

make a determination to disallow facially valid claims at this stage.  *See* Reply ¶ 29.  Once it concludes the Filed Claims are facially valid, if the Court is not prepared on the parties written submissions and oral argument alone to allow the Filed Claims in full, the appropriate next steps are for the parties to engage in discovery, prepare evidentiary submissions and, if appropriate, proceed to an evidentiary "Merits Hearing."  As noted above, the Debtors bear the burden of production unless and until they submit evidence sufficient to rebut the validity of the Filed Claims.  Indisputably, they have not satisfied this burden at present, with their only submission to date being the unchallenged declaration testimony of their financial advisor.  *See* Reply Ex. B. Moreover, should the Debtors eventually meet this burden, Claimants would still be entitled to the opportunity to present evidence of their own.  The Debtors criticize Claimants for "gestur[ing] towards the potential, and premature need, for discovery and extrinsic evidence." *See* Reply ¶ 1; *id*. ¶ 32.  But there is nothing premature about it, especially given the shrinking runway to confirmation and the Debtors' stated opposition to allowance of any portion of the Filed Claims until this dispute is resolved.

25.     If the Court is not prepared to allow the Filed Claims in full based on the plain language of the Master Loan Agreements, following the Hearing on February 8th the parties should proceed directly to targeted discovery and evidentiary submissions on an expedited timeframe so this dispute can be resolved prior to initial distributions being made under a confirmed plan.  The Debtors cannot substantiate the objection with declaration testimony about their books and records and transparent threats that the Court's allowance of the Filed Claims "would potentially have significant consequences for the Debtors' claims pool more broadly." And the Claimants cannot be deprived of facially valid prepetition claims without the opportunity to challenge that testimony and those threats (and any other evidence the Debtors

16

marshal).  The impact that allowance of the Filed Claims might have on the rights other creditors

with similar claims is irrelevant to whether the Filed Claims should be allowed in the first place.

By contrast, however, the Debtors' refusal to object to some of those other claims, and the

reasons behind that refusal, are highly probative. As indicated in the Response, Claimants have

reasons to believe the Debtors' objection (a) is inconsistent with their historical treatment of

Loan Fees and Late Fees under their MLAs, and (b) represents a position only arrived at months

after the Filed Claims were asserted to avoid scrutiny of their disparate treatment of favored

creditors and other MLA counter-parties (*e.g.*, DCG).  Debtors say nothing in their Reply to

meaningfully refute these allegations.[10]  Unless the Court allows the Filed Claims in full,

Claimants must be afforded the opportunity to obtain discovery on these and other issues

relevant to their Filed Claims before parts of those claims could be disallowed.  *See In re*

*Polaroid Corp.*, 527 B.R. 335, 346 (D. Minn. 2015) ("Bankruptcy Court abused its discretion

when it declined to allow [creditor] any discovery prior to ruling on the merits of … claim

objections.").

[REMAINDER OF PAGE INTENTIONLLY BLANK]

---

[10] In a carefully-worded footnote, the Debtors claim to have consistently treated "similarly-situated Claims *subject to the Seventh Omnibus Objection*."  *See* Reply ¶ 25, n.19 (emphasis added). What the Debtors do not say, however, is that their objection to the Filed Claims is consistent with their treatment of *all* similarly-calculated loan fee and late fee claims asserted against the estate or acknowledged in their books and records.

17

## CONCLUSION

For all the foregoing reasons, the Court should enter an order (i) overruling the Seventh Omnibus Claims Objection as it relates to the Filed Claims, (ii) allowing the Filed Claims on a final basis for all purposes in their full stated amounts, and (iii) granting such other relief as it deems just and proper.

Dated: Omaha, Nebraska
February 1, 2024

*/s/ Jeremy C. Hollembeak*
Jeremy C. Hollembeak
BAIRD HOLM, LLP
1700 Farnam Street
Suite 1500
Omaha, NE 68102-2068
Phone: 402-344-0500
jhollembeak@bairdholm.com

*Counsel to Holders of Claim Nos. 402 & 405*

## CERTIFICATE OF SERVICE

I certify that on February 1st, 2024, I caused a copy of the foregoing document to be served by Electronic Case Filings System for the United States Bankruptcy Court for the Southern District of New York.

*/s/ Jeremy C. Hollembeak*
Jeremy C. Hollembeak
BAIRD HOLM, LLP
1700 Farnam Street
Suite 1500
Omaha, NE 68102-2068
Phone: 402-344-0500
jhollembeak@bairdholm.com
