## EXHIBIT A

Declaration of █████████ in Support of the Genesis Crypto Creditors Ad Hoc Group's Objection to Confirmation of the Debtors' Chapter 11 Joint Plan of Reorganization, January 8, 2024

**MᶜDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**
Darren Azman
Joseph B. Evans
Lucas Barrett
One Vanderbilt Avenue
New York, New York 10017-3852
Telephone: (212) 547-5400
Facsimile: (212) 547-5444

**MᶜDᴇʀᴍᴏᴛᴛ Wɪʟʟ & Eᴍᴇʀʏ LLP**
Gregg Steinman (*pro hac vice*)
333 SE 2nd Avenue, Suite 4500
Miami, Florida 33131-2184
Telephone: (305) 329-4473
Facsimile: (305) 503-8805

*Counsel to the Genesis Crypto Creditors
Ad Hoc Group*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Genesis Global Holdco, LLC., *et al.*,[1] | ) | Case No. 23-10063 (SHL) |
| | ) | |
| | ) | (Jointly Administered) |
| | ) | |

**DECLARATION OF** ▮▮▮▮▮▮▮▮▮▮▮▮ **IN SUPPORT OF THE GENESIS CRYPTO CREDITORS AD HOC GROUP'S OBJECTION TO CONFIRMATION OF THE DEBTORS' CHAPTER 11 JOINT PLAN OF REORGANIZATION**

I, ▮▮▮▮▮▮▮▮▮▮ hereby declare under penalty of perjury:

1.    I submit this declaration (this "<u>Declaration</u>") in support of the Genesis Crypto

Creditors Ad Hoc Group's (the "<u>Crypto Creditors Group</u>") forthcoming objection to confirmation

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's tax identification number (as applicable) are: Genesis Global Holdco, LLC (8219); Genesis Global Capital, LLC (8564); and Genesis Asia Pacific Pte. Ltd. (2164R). For the purpose of these Chapter 11 Cases, the service address for the Debtors is 175 Greenwich Street, Floor 38, New York, NY 10007.

Confidential - Filed Under Seal

of the *Debtors' Amended Joint Chapter 11 Plan* [ECF No. 989] (as amended and supplemented from time to time, the "Plan").

2.      The statements in this Declaration are, except where specifically noted, based on my personal knowledge.

3.      I have been a member of the Crypto Creditors Group since November 23, 2023.

4.      ████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

5.      I have been interested in computer science and computer programming since I was in high school.  I became involved in the crypto industry in approximately 2012.  At first, I followed the crypto industry as a technological development and purchased a small amount of Bitcoin ("BTC").  I knew of Barry Silbert, the CEO of Digital Currency Group, Inc., as an early BTC pioneer.

6.      I have known about Genesis since I began to follow the crypto industry.  Although I generally knew of Genesis and the services it offered, I did not become a customer of Genesis until 2021.  I first became interested in becoming a Genesis customer in June of 2021 when I learned more about Genesis's lending business (the "Genesis Investment Program") from Genesis's website.  Below is an accurate screen capture of the Genesis website as it existed on June 24, 2021, as recorded by the Wayback Machine at https://web.archive.org/web/20210624080248/https://genesistrading.com/lending/.



Trading Lending Custody **Genesis** About Contact Account

Lending

The World's Largest Digital Asset Lender

Genesis helps clients increase capital efficiency and access alternative liquidity for hedging, speculation, institutional market-making and working capital needs.

Learn More

How can Genesis help you?

Financing Offerings

Genesis lends digital assets like BTC and USDC structured to meet the needs of institutional funds and market-makers.

Yield Generation

Holders of digital currencies can earn yield on their assets by lending directly to Genesis, a regulated and trusted counterparty.

See Also: **Trading** See Also: **Custody**

Why Genesis?

- Two-way price discovery, access to large loan supply, fixed rates, long durations, and other tools to meet hedging, speculation, and working capital needs.
- Lending and trading products streamlined in a single workflow to provide easy access to liquidity, create additional sources of return and increase capital efficiency.
- Loans can be customized to scale arbitrage and market making trades, short the spot market in size across venues, and hedge overall portfolio risk.
- Comprehensive real-time and historical analytics, including cash and crypto balances, interest payments, loan durations and more.
- Our lending desk is a Money Services Business registered with FinCen.

7. The website contained a form that interested individuals could fill out to obtain more information about the Genesis Investment Program. Below is an accurate screen capture of the form on the Genesis website as it existed on June 24, 2021, as recorded by the Wayback Machine at https://web.archive.org/web/20210624080248/https://genesistrading.com/lending/.



8.      Before I filled out the form on the Genesis website, I conducted due diligence into Genesis and its business practices.  I reviewed documents that were publicly available, including reports that Genesis issued on a quarterly basis.  Accurate copies of the quarterly reports that Genesis published from Q1 2020 through Q4 2022 are attached hereto as Exhibit A.

9.      To better understand Genesis's business, I also followed and reviewed statements made by Genesis executives on Twitter, in interviews, and in news articles.  I relied on these statements in deciding to apply to become a Genesis Investment Program customer.

10.     I also knew that many others in the crypto industry had invested with Genesis and thought that my agreement with Genesis would be very similar to others.

Confidential - Filed Under Seal

11.    In approximately June 2021, I filled out the Genesis Investment Program application form.  I was then contacted by a representative of Genesis who requested more information from me to ensure that I met the qualifications to become a customer of the Genesis Investment Program.

12.    After my application to become a Genesis Investment Program customer was approved, I was assigned a personal Genesis representative, Hanson Birringer ("Hanson"), with whom I mostly communicated.  In addition to a Telegram chat with Hanson, I also was added to a separate group chat with other Genesis customer service representatives, including Hanson, Griffin Tiedy.  The majority of my communications with Genesis's representatives were through Telegram.

13.    After receiving a copy of the Master Borrow Agreement (the "MBA"), I recall asking several questions about it.  Prior to participating in the Genesis Investment Program, I wanted to make sure that Genesis was financially healthy.  For this reason, I also recall asking about the representations in the MBA that Genesis was solvent and not in bankruptcy.  I also requested documentation establishing that Genesis was solvent.  A Genesis representative responded by providing me with copies of the quarterly reports referenced earlier.  *See* Exhibit A.

14.    I did not individually negotiate any of the terms of the MBA.  Nor did any of the questions I asked Genesis about the MBA result in any changes to the MBA's.

15.    I executed the MBA on June 18, 2021.  The MBA provided general terms pursuant to which Genesis could request a transaction of a specific amount of cryptocurrency or U.S. dollars with a specified maturity date in return for fixed profits paid in the same denomination of crypto that I provided to Genesis.  The provisions of the MBA generally provided the way in which Genesis could make the request, the manner and time in which I had to respond, and the procedures

Confidential - Filed Under Seal

for the transfer of the crypto or fiat currency. The MBA also provided other terms governing the relationship between me and Genesis, including termination of the MBA, collateralization for the transactions, and the parties' rights upon certain eventualities occurring in the broader crypto market, events of default, and the parties' representations and warranties. An accurate copy of the MBA is attached hereto as Exhibit B.

16.     The specifics of each transaction were governed by "term sheets." Generally speaking, these term sheets specified the amount and type of crypto or fiat currency that was the subject of the transaction; the rate of return of the transaction; whether the transaction was a fixed or open term transaction; if the transaction was fixed, the maturity date of the transaction; whether and by how much the transaction was collateralized; the margin limit, margin refund, and initial margin requirements (as those terms were defined in the MBA); and the Genesis wallet address for which crypto was to be sent.

17.     Genesis provided regular updates on the profit rates they were able to offer in the Genesis Investment Program. I received these updates through my personal Genesis representatives via Telegram both unprompted and when I requested them. The profit rates changed on a regular basis. It was my understanding that Genesis used its expertise and business acumen to set the yield at a rate that would be attractive to Genesis Investment Program customers. I understood that Genesis used the crypto that its Genesis Investment Program customers provided to fund trading strategies through their institutional trading desks for other Genesis customers. I also understood that Genesis monitored and analyzed its customers and lending balance sheet to determine risk levels of lending. These practices in turn allowed Genesis to set yield rates based on its analysis of the market and status of its business investments. Accurate copies of my Telegram messages with Genesis representatives are attached hereto as Exhibit C.

Confidential - Filed Under Seal

18.     I knew that many others had invested with Genesis and believed that my arrangement with Genesis was very similar to others.

19.     I invested with Genesis because I believed that I would profit from the efforts of Genesis employees and executives who would exercise their discretion and leverage their expertise to re-lend and otherwise invest the cryptocurrency I provided.  I based this belief on conversations with Genesis representatives, marketing materials, quarterly reports, and other publicly available information about Genesis.

20.     For example, Genesis representatives told me that they would relend and otherwise invest the crypto I provided to them to crypto "market makers" and that they had used their expertise to limit the risk of their counter-parties and only make prudent loans and investments to the best "market makers."  I believed that I would profit from the BTC I provided to Genesis because of Genesis employees and executives efforts' and expertise to locate, negotiate, and execute profitable and safe loans and other investments with the BTC that I provided.

21.     Prior to June 2022, if I had any interest in executing a term sheet and entering into a transaction with Genesis, I had to affirmatively reach out to my assigned customer representative. Beginning in June 2022, customer representatives began proactively reaching out to me to solicit transactions under the MBA.  At this time, I also noticed that the profit rates Genesis offered were much higher than usual.  Whereas previously the yield tables would show yields of approximately 1% to 3%, by June 2022, Genesis was offering profit rates over 4%.  By October 2022, those profit rates were approximately 6% to 6.5%.  The customer representatives even indicated to me that Genesis could offer higher profit rates if I was interested in transactions with higher yields than those shown on the tables.

Confidential - Filed Under Seal

22.     On July 6, 2022, Hanson forwarded a statement from Genesis's CEO, Michael Moro, addressing the turmoil in the crypto market caused by the failure of Three Arrows Capital ("3AC").  Hanson also put me in touch with a more high-ranking Genesis employe who I recall was named Hamill.  In response to my questions around this time, Genesis customer representatives assured me that Genesis was solvent and showed me a balance sheet indicating that Genesis had more assets than liabilities.  Genesis customer representatives also explained that Genesis had taken proactive steps to derisk its balance sheet and charge higher fees to individuals and institutional borrowers who were borrowing from Genesis.  They said these strategies allowed Genesis to offer higher yield rates to Genesis Investment Program customers interested in entering transactions with Genesis under their MBAs during a period of industry volatility.

23.     After executing the MBA in April 2021, I entered into two term sheets with Genesis. The first term sheet, dated August 11, 2022 (the "August 2022 Term Sheet"), provided for a transaction of 301.68804514 BTC at a 6-month fixed maturity date of February 11, 2022.  The profit rate on the transaction was 4.5%.  Pursuant to the August 2022 Term Sheet, I sent crypto to Genesis at a specified wallet address on August 11, 2022.  An accurate copy of the August 2022 Term Sheet is attached hereto as Exhibit D.

24.     I entered a second term sheet, dated September 22, 2022 (the "September 2022 Term Sheet"), which provided for 200 BTC at a one-year fixed maturity date of September 22, 2023. The profit on the transaction was 4.25%.  Pursuant to the September 2022 Term Sheet, I sent crypto to Genesis at a specified wallet address on September 22, 2022.  An accurate copy of the September 2022 Term Sheet is attached hereto as Exhibit E.

25.     After the collapse of FTX Trading Co. and Alameda Research Ltd., Hanson provided Twitter statements from Genesis's CEO addressing the market turmoil, including a tweet

stating that Genesis had "managed [its] lending book and [had] no material net credit exposure."

This tweet further stated, "Our experienced trading and risk management teams are constantly

assessing credit, volatility, and liquidity in the market to optimize our positioning and operations.

Genesis is committed to being a leading digital assets market maker and continuing to drive the

industry forward."  An accurate copy of this Genesis tweet is attached hereto as Exhibit F.

26.     Genesis paused withdrawals or transactions through the Genesis Investment

Program on November 16, 2022.  I have not received back the principal or profits I was owed

pursuant to the August 2022 and September 2022 Term Sheets.

27.     I considered the Genesis Investment Program to be an important strategy to hedge

risk.  From my early involvement in the crypto industry, I was aware of the price volatility of BTC.

The Genesis Investment Program provided an important hedge against the decrease in the price of

BTC in my portfolio.  Genesis guaranteed monthly profit payments of in-kind crypto.  In the event

BTC prices drastically reduced, I would have still received these monthly profit payments and thus

hedged some of that risk.

28.     Based on extensive conversations with other members of the Crypto Creditors

Group, I understand that the experiences of the other members were similar.  It is my further

understanding that all members of the Crypto Creditors Group invested in the Genesis Investment

Program for similar reasons as I described above.

29.     I reviewed copies of the Master Borrow Agreements and Term Sheets from

members of the Crypto Creditors Group.  I understand that accurate copies of these Master Borrow

Agreements and Term Sheets were provided, which are attached hereto as Exhibit G.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing

statements are true and correct to the best of my knowledge and belief.

Dated:    January 8, 2024
          New York, New York

*Member of the Genesis Crypto Creditors
Ad Hoc Group, solely in his capacity as
such*

# EXHIBIT A

Confidential - Filed Under Seal

# DIGITAL ASSET LENDING SNAPSHOT

## 2020 | Q1 Insights

Matt Ballensweig | Roshun Patel | Leon Marshall



111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Email: lend@genesiscap.co
Call: 917.536.6804

genesiscap.co
twitter.com/gen_capital
linkedin.com/company/genesis-global-capital

# DIGITAL ASSET LENDING SNAPSHOT
## 2020 | Q1 Insights

## Summary Statistics

- **2020 Q1 Originations: $2.0B**
- **Originations ITD: $6.2B**
- **Total Active Loans as of Mar 2020: $649M**
- **Reached $1B+ in Active Loans on Feb 14, 2020**

## Robust Growth – Major $1B Milestone

Genesis had its largest quarter ever in its digital asset lending business in Q1. We added more than $2B in new originations, doubling the previous record of $1B set last quarter, and up 354% from the same quarter last year. Active Loans Outstanding touched $1B in mid-February before settling to $649M at the end of the quarter. Active Loans were up ~20% from the previous quarter despite a 50% intraday drawdown in the price of BTC in mid-March.



Cumulative originations increased 46.6% from the prior quarter, marking an eighth consecutive quarter of strong growth and bringing total originations to nearly $6.2B since we launched the lending business in March 2018. Our loan portfolio substantially increased in value through increased cash and bitcoin loan issuance, offset by a decrease in the notional value of crypto loans outstanding.



111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Email: lend@genesiscap.co
Call: 917.536.6804

**genesiscap.co**
twitter.com/gen_capital
linkedin.com/company/genesis-global-capital

# DIGITAL ASSET LENDING SNAPSHOT
## 2020 | Q1 Insights

| ($ in mm, except BTC Price) | 12/31/2019 | 3/31/2020 | QoQ Growth |
|---|---|---|---|
| Cumulative Originations | $4,251 | $6,231 | 46.6% |
| Cumulative Loans | $2,710 | $3,937 | 45.3% |
| Cumulative Borrows | $1,542 | $2,294 | 48.8% |
| Active Loans | $545 | $649 | 19.1% |
| BTC Price | $7,145 | $6,469 | -9.5% |



Cumulative Originations (ITD)

## Q1 2020 Asset Composition

Despite increasing the last three quarters, cash loan composition fell in the first quarter of 2020. This decrease came mostly in the last two weeks of March amid the broad market selloff and significant deleveraging which we'll discuss more in depth later. BTC and cash lending still dominated the loan portfolio comprising 81.4% of the value. The infrastructure, maturity and general interest in BTC/USD markets relative to altcoin/USD markets is much greater and we don't see that trend redirecting anytime soon.

| Asset | 6/30/2019 | 9/30/2019 | 12/31/2019 | 3/31/2020 |
|---|---|---|---|---|
| BTC | 62.5% | 50.2% | 47.3% | 44.8% |
| BCH | 0.5% | 0.3% | 3.4% | 5.8% |
| ETH | 3.9% | 7.5% | 5.0% | 5.6% |
| ETC | 0.9% | 3.0% | 2.7% | 2.1% |
| XRP | 2.5% | 3.6% | 2.7% | 2.3% |
| LTC | 3.7% | 2.0% | 0.9% | 0.7% |
| USD and Equivalents | 23.5% | 31.2% | 37.2% | 36.6% |
| Other | 2.5% | 2.2% | 0.9% | 2.1% |



111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Email: lend@genesiscap.co
Call: 917.536.6804

genesiscap.co
twitter.com/gen_capital
linkedin.com/company/genesis-global-capital

# DIGITAL ASSET LENDING SNAPSHOT
## 2020 | Q1 Insights

## An Update on Our Portfolio and Position within the Market

We feel incredibly proud of our team's performance and strength over the last quarter, and specifically through the challenges presented by COVID-19. Despite being in the epicenter of the global pandemic and experiencing first-hand the volatility and unpredictability of the market, we have never felt better about our business and our leading position within the digital asset lending space.
In Q1 we reached an incredible milestone of $1B in active loans outstanding while experiencing no defaults, capital losses or delinquencies at any point over the period. We continue to provide robust financing and consistent yield to some of the largest investors within this asset class.

Despite being forced to operate remotely, we've strengthened our communication firmwide, hired across engineering, sales and operations, increased international activity, and strengthened our balance sheet through continued reinvestment in our business. We have the utmost appreciation for all our clients and employees who have allowed us to be in this position of strength.
Despite some of the challenges COVID-19 has presented, we have extracted a ton of value from this period. Global market uncertainty along with intense volatility in mid-March acted as a natural stress test on Genesis and the crypto market at large. We think these are the best times to evaluate areas for additional investment and ultimately find solutions to have a stronger operation moving forward. While we can proudly say we passed this stress test, we think there is a lot of insight we can share with our clients and counterparties.
We're going to provide an intimate glimpse into what our desk experienced on March 12th. What did lending and borrowing look like during the 50% intraday drawdown? What observations did we make about exchange activity? What did margin calling look like? How did we manage our treasury and fund flows? Before we bring you courtside, we'd like to first touch on some key decisions we made as a firm to help us work through this period.

**G**

111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Email: lend@genesiscap.co
Call: 917.536.6804

**genesiscap.co**
twitter.com/gen_capital
linkedin.com/company/genesis-global-capital

## Risk Management Approach – Holistic, Dynamic and Adaptive

We've been relatively vocal about how we manage risk, so we'd like to take this time to clarify our framework and some of the decisions we made through this period of intense volatility. We believe our approach to managing risk is one of the key reasons we've been able to find success in this industry and is something we take pride in addressing with our network of lenders.

**Institutional Risk Framework**

Because we are an institutional lender, our loan portfolio is comprised of the leading hedge funds, trading firms, miners, and corporations in the industry. We distinguish ourselves from other crypto lenders by being able to understand our clients' needs at the most granular level – What are they trying to accomplish? What strategies are they running? What instruments are they trading? What does their delta exposure look like? How do they think about security and risk management? We spend a lot of time addressing these issues with our clients to both service their bespoke needs and manage our risk levels.

We don't have a cookie-cutter approach to mitigating risk, but rather look at risk specific to each of our relationships and then again at the portfolio level. We have many levers to pull to ensure Genesis is well protected, including collateral, calculated exposure limits based on quantitative and qualitative due-diligence, margin management, ongoing transparency and health updates, and macro hedging tools. Our risk system works around the clock to monitor our exposure and the health of our portfolio. Our ability to responsibly manage risk and face zero defaults through one of the most volatile days in bitcoin's history highlights the strength of our methodology. We believe our framework sets us up for continued success and gives us the flexibility to make smart decisions even in a turbulent market.

111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Email: lend@genesiscap.co
Call: 917.536.6804

genesiscap.co
twitter.com/gen_capital
linkedin.com/company/genesis-global-capital

# DIGITAL ASSET LENDING SNAPSHOT

## 2020 | Q1 Insights

**Dynamic Credit Extension**

As we mentioned previously, Genesis doesn't manage risk using a cookie-cutter approach. We do not have pre-set LTVs and do not extend credit unless we believe it's rightfully earned and appropriate within the context of the relationship, trade, and time of issuance. To avoid any confusion, we refer to credit as the extension of financing based on the capitalization and financial strength of the counterparty rather than the asset that counterparty pledges as collateral.
Aside from credit extension, Genesis primarily lends on an "over-collateralized" basis – i.e., the collateral pledged exceeds the value of the loan. There is a difference between extending a loan and extending credit. Loans can be backed by either collateral assets or by credit.

We noticed some market confusion around Genesis' lending appetite during the most recent period of volatility. At no point did Genesis stop making loans, but we did take a more conservative approach to credit extension during this period. We wound up originating a significant portion of the entire quarter's loans during the month of March and never once paused lending activity.

Our conservative approach followed the principles of our Risk Framework. The time a loan is made is a significant component in the risk framework, and we felt that this time in global markets was a major black swan event. We concluded that the general assumptions we make in normal market conditions didn't quite apply, and so the time element of our credit formula wasn't in harmony with the other components. Over-collateralized loan demand was strong during this period, which reaffirmed our decision to tighten credit.

111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Email: lend@genesiscap.co
Call: 917.536.6804

genesiscap.co
twitter.com/gen_capital
linkedin.com/company/genesis-global-capital

# DIGITAL ASSET LENDING SNAPSHOT
**2020 | Q1 Insights**

## A Timeline of Events (Through our eyes)

Q1 was an eventful period for markets. In January 2020, Bitcoin was coming off a solid 2019 with about a 100% year-over-year return. As the price rallied into February past $10k, forward curves were extremely steep, with March futures implying over a 30% annualized return. The timeline of events that occurred from this point through the end of the quarter tell a story full of highs and lows.

**Feb 14: Market Apex**

BTC is holding strong above $10k and our loan book just crossed $1 billion in active loans outstanding. This was a huge milestone for our team and a testament to two years of incredible support from clients.

**Mar 3:  Building towards The Great Deleveraging**

A trend we noticed throughout the quarter was leverage building in the derivatives market. The main driver of that leverage was the lucrative short basis trade to March expiry.

- The basis trade is supported by lenders issuing cash loans collateralized in crypto so borrowers can take that cash inventory to derivatives exchanges, purchase spot, and sell futures. Trading desks can get leverage with minimal capital requirements on both spot and futures. On the spot side, if we lend assets that are used to trade immediately after the borrow is secured, we can simply keep the proceeds generated from the trade as collateral and require borrowers to top-up incremental margin. Effectively they can get spot long and short exposure without tying up the capital required to trade the entirety of spot. On the futures side, exchanges can offer similar. On either leg, credit can also be issued, further reducing the capital outlay. In a contango regime, most of the short open-interest on futures is leveraged "smart" money betting on the normalization of forward curves.

111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Email: lend@genesiscap.co
Call: 917.536.6804

genesiscap.co
twitter.com/gen_capital
linkedin.com/company/genesis-global-capital

# DIGITAL ASSET LENDING SNAPSHOT
## 2020 | Q1 Insights

That begs the question, who is buying against the trading firms in futures during a contango regime? Our hypothesis is most of that bid is bullish traders avoiding the perpetual funding rate, leveraging long using futures instead of perpetual swaps as well as a portion from OTC firms who sold BTC spot at a premium and are hedging with futures. In both cases, the flow that ultimately leads to the bid in futures during contango is speculative while the opposing flow is arbitrage. The level of contango represents the magnitude of speculation, so when the implied annualized return is sustained at 30% ann. despite arbitrage traders piling in short basis, the speculators are on aggregate outpacing the arbitrage flow.

This positioning in the market implies that when basis contracts, the market should expect a large influx of cash and deficit of BTC from the perspective of lenders and OTC desks since as traders sell spot and buy future to close the basis, BTC demand and USD supply both spike.

Ultimately, this realization of positioning in the market helped us prepare for the impending Great Deleveraging primarily on two fronts. First, we ensured our liabilities had enough duration to support outsized inventory turnover for a sustained period. Second, we amassed the largest sum of reserve assets in our history for the benefit of robust liquidity, particularly with large revolving lines of credit.

**Mar 9: Sell Pressure Building**

About a week later, it all starts happening. BTC slides below $10k, causing futures to start inching closer to spot pricing. Most of the fund flows pertained to margin calls on this date - even with a relatively lower BTC basis than a few weeks prior, the return was still objectively good enough where cash was still worth borrowing. The first round of margin calls completes smoothly, and our borrowers are headed into the rest of the week with freshly topped up collateral.

111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Email: lend@genesiscap.co
Call: 917.536.6804

genesiscap.co
twitter.com/gen_capital
linkedin.com/company/genesis-global-capital

# DIGITAL ASSET LENDING SNAPSHOT
## 2020 | Q1 Insights

Mar 12: "Black Thursday" aka "The Great Deleveraging"

On March 12, BTC began the day trading at about $8k. Over the course of the week, global financial markets saw unprecedented levels of selling with a massive flight to dollars. Essentially every asset in the world was evaluated against holding dollars and the flight to safety was relentless. BTC was no exception. Ultimately, every BTC trade has a person behind it, or a computer trying to figure out where people would be willing to buy or sell. The BTC market is subject to the same emotions and fear humanity faced in this period. When markets are faced with unprecedented adversity, all correlations can rapidly go to one.

As BTC started tanking, the Great Deleveraging introduced in the March 3rd section began coming to fruition. BTC fell below $7k, then $6k, and then by the evening in New York, $5k and soon $4k. A 50% crash in mere hours is significant, even for BTC. There was a vicious cycle of deleveraging because as BTC spot prices fell, futures started unwinding heavily and liquidations on long contracts cascaded the price of futures well below spot. Since a ton of capital was long spot and short future, those positions became highly opportunistic to exit amid the volatility. Unwinding basis positions compounded the spot selling and added more liquidations in futures. The long open interest was annihilated, and the short basis positions flattened up realizing massive profits extremely quickly. All those closures generated cash and created BTC demand.

A phenomenon to note here is many liquid derivatives venues are collateralized in BTC. That means long futures positions are collateralized with the same underlying asset. This can create a major problem if the dollar amount of spot BTC needed to sell at a certain price to cover a derivatives liquidation exceeds the spot liquidity at that price. In other words, consider a variable X which represents the notional amount of spot BTC needed to liquidate given a one dollar drop in futures. Consider a variable Y which represents the notional amount of liquidity in spot BTC at that price. If X/Y < 1 everything is okay, which most of the time is the case.

111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Email: lend@genesiscap.co
Call: 917.536.6804

genesiscap.co
twitter.com/gen_capital
linkedin.com/company/genesis-global-capital

# DIGITAL ASSET LENDING SNAPSHOT
## 2020 | Q1 Insights

However, if X/Y > 1, liquidations can cascade the price down. When we saw the prints of liquidations on derivatives venues on Thursday evening relative to where spot was trading, the dislodgement was blatantly noticeable.

Traders were scrambling to send margin to exchanges, lenders were refunding collateral to traders, and OTC desks had significant settlement volumes (Genesis' trading desk for example saw some of the largest OTC volumes since our inception in 2013). The mempool started to get clogged, delaying confirmations. Typically, exchanges don't care if assets are on the way to the exchange, they only care if they are confirmed and at the exchange. The liquidations were compounded further as traders who had margin ready to go off-platform couldn't get it to the exchange to meet the requirements of their rapidly falling collateral value.

### Mar 13: Immediate Aftermath

The below figure displays the magnitude of cash loans returned to Genesis in the latter half of March: we realized two thirds of the USD loan returns for all of Q1, with the majority concentrated between March 9 and March 19. Over these days everyone on our team stepped up in a big way – risk, originations, operations, legal, and accounting all worked tirelessly to ensure all components of our business operated smoothly. On top of all the previously mentioned flows, clients also started to sell collateral held with us and fresh inventory to our trading desk meaning we had to provide competitive bids across many assets we were sending off our balance sheet. Ultimately, thanks to our team as well as our partners on both spot lending and derivatives liquidity, we were able to support all functions around the clock.

111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Email: lend@genesiscap.co
Call: 917.536.6804

genesiscap.co
twitter.com/gen_capital
linkedin.com/company/genesis-global-capital

# DIGITAL ASSET LENDING SNAPSHOT
## 2020 | Q1 Insights



**Mar 19: End of Quarter and Near-Term Stabilization**

As the market stabilized at the end of the quarter, lending activity normalized and we made the following observations about this tumultuous period:

- Our client base is well insulated from consumer credit, as they are mostly trading firms which perform extremely well in periods of high volatility.
- Our business is primarily digital – even a global lockdown does not affect business continuity.
- Given this innate resilience, we expect a very strong 2020 with growth across originations, outstanding loans, and clients.

## Closing Thoughts

Though we are still very much in an uncertain time, we are confident in our ability to weather future periods of extreme market turbulence. Our world class team, top-notch risk management systems, and high caliber, sophisticated client base allows us to scale our lending business well into the future. We hope everyone is staying safe and we look forward to brighter times ahead.

**If you have questions, please contact:**

**Matt Ballensweig**
Vice President
matt@genesiscap.co

**Roshun Patel**
Associate
roshun@genesiscap.co

---



111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Email: lend@genesiscap.co
Call: 917.536.6804

**genesiscap.co**
twitter.com/gen_capital
linkedin.com/company/genesis-global-capital

**Genesis**

Q2 | 2020

# Market Observations



Confidential • Filed Under Seal

Genesis

# Summary Statistics

**$2.2B**
2020 Q2 Originations

**$1.42B**
Total Active Loans as of June 2020

**$5.25B**
Q2 Spot Volume Traded

**$400M**
Q2 Derivatives Volume Traded Since June 1st

# Reintroducing our Quarterly Report

As we do every quarter, we'd like to highlight some of the key trends we observed being at the epicenter of digital asset markets. This quarter's report, along with future reports, will not only focus on lending activity like our previous issues, but will also include color and commentary from both our spot and newly launched derivatives trading desk.

In May, we announced our plans to build the preeminent digital asset prime broker — a one-stop shop for trading, lending, and custody. Part of this effort is to increase our trading capabilities and offer a more comprehensive and seamless client experience. With that in mind, we launched our derivatives trading desk at the end of Q1, offering a mix of products ranging from futures to options. The addition of both bilateral and cleared options trading allows us to provide liquidity across spot, derivative, and lending markets to our clients. This new expansion puts us in a unique position to provide insight across these segments and to discuss the synergies between them.

# Digital Asset Lending

Genesis continues to see tremendous growth in its lending business, adding over $2.2B in new originations in Q2 marking its largest quarter ever. For comparison, this is a 324% increase in originations from the same quarter last year. Active Loans Outstanding surged past $1B and ended the quarter at $1.4B, up from $649mm last quarter, representing a 118% increase QoQ.

Confidential - Filed Under Seal

**Market Observations**  Q2 | 2020    **Genesis**

### Active Loans Outstanding



Cumulative originations increased 35.3% from the prior quarter, marking a ninth consecutive quarter of strong growth and bringing total originations to nearly $8.4B since we launched the lending business in March 2018. Our loan portfolio substantially increased in value through increased cash and bitcoin loan issuance, along with an increase in the notional value of crypto loans outstanding.

| ($ in mm, except BTC Price) | 3/31/2020 | 6/30/2020 | QoQ Growth |
|---|---|---|---|
| Cumulative Originations | $6,231 | $8,431 | 35.3% |
| Active Loans | $649 | $1,417 | 118.4% |
| BTC Price | $6,469 | $9,238 | 42.8% |

### Cumulative Originations



# Genesis

# Q2 2020 Loan Portfolio Composition

Despite decreasing in the previous three quarters, BTC loan composition increased in the second quarter of 2020. This increase in BTC loan concentration came mostly from the fact that USD loan composition decreased over the same period. Futures curves remained relatively flat through Q2 incentivizing traders to go long basis by borrowing BTC, selling through our spot desk for USD and then going long near-dated futures to take a view that curves might steepen. Despite this rotation of USD into BTC, the combination of these two assets still dominates the loan portfolio, comprising 83.2% of the value. The infrastructure, maturity, and general interest in BTC/USD markets relative to altcoin/USD markets is much greater and we don't see that trend redirecting any time soon.

| Asset | 9/30/2019 | 12/31/2019 | 3/31/2020 | 6/30/2020 |
|-------|-----------|------------|-----------|-----------|
| BTC | 50.2% | 47.3% | 44.8% | 51.2% |
| BCH | 0.3% | 3.4% | 5.8% | 4.5% |
| ETH | 7.5% | 5.0% | 5.6% | 7.4% |
| ETC | 3.0% | 2.7% | 2.1% | 1.7% |
| XRP | 3.6% | 2.7% | 2.3% | 1.9% |
| LTC | 2.0% | 0.9% | 0.7% | 0.3% |
| USD & Equivalents | 31.2% | 37.2% | 36.6% | 32.0% |
| Other | 2.2% | 0.9% | 2.1% | 1.0% |

# Digital Asset Trading

In previous reports, we focused solely on lending activity. As we evolve into a prime broker, it is important to share insight across our entire company. Since 2013, Genesis has been a leader in institutional digital asset trading covering clients around the world. We have traded billions of dollars in volume every year and continue to see strong growth in both the US and overseas. On the spot side, Genesis traded $5.25B in Q2 volume, up from $4.0B in Q1. The majority of the flow was traded on an OTC basis, with the rest reaching exchanges.

Confidential - Filed Under Seal

Q2 | 2020    **Genesis**

At the end of May, we officially launched our derivatives trading desk as a complement to our existing spot trading and lending businesses. Since then, we have quickly developed our ability to trade both linear and non-linear derivative products globally, and can trade on a bilateral OTC basis or on exchanges. In our first full month of derivatives trading, we traded $400M notional across forwards and options with nearly 50 active counterparties across 10 different assets. Roughly 67% of trading volume was executed bilaterally and the remaining 33% was executed on exchange. Roughly 80% of our volume has been concentrated in the BTC/USD cross, with ETH/USD and other major tokens making up the rest. We also traded options in some of the more frontier assets, including recent trades on up-and-coming Defi governance tokens.

# Derivatives – The New Kid on the Block

While our client-facing derivatives desk is the new kid on the block at Genesis, we are jumping in head-first with some major advantages. First, the Genesis lending desk has always been an active participant and driver of funding markets and forward curves, and we have traded them in all kinds of market regimes. We have always been engaged with clients in repo-like transactions, financing trades and leveraged purchases and sales – the same types of synthetic exposures that we are currently pricing and trading in derivative format.

Second, Genesis has access to some of the deepest sources of funding and liquidity in the market through our spot trading and lending businesses, which are among the most established in the industry. We have unique market visibility on forward pricing because of our access to term funding. Our risk capacity, balance sheet, strong risk management, and connectivity have enabled us to quickly connect volatility buyers and sellers, while offering competitive pricing for larger blocks of options and forward risk.

    Confidential - Filed Under Seal

Q2 | 2020   **Genesis**

# Options Are Like a Swiss-Army Knife

In a nutshell, the Genesis derivative desk is a principal liquidity provider of options and forwards in a derivative market that is still relatively nascent. We fill a gap where the market liquidity on the orderbook is not deep enough or when a client wants a more high-touch, customized solution. We face clients with varying appetite for risk and who have quite different needs. Below, we have illustrated a variety of the different problems that options can help solve.

| Institution | Activity | Description |
|---|---|---|
| Hedge Fund | Short-Term Speculation | Express a specific catalyst-driven view with a short-dated option play |
| Long-Term Holder | Yield Generation | Overwrite (sell call options) to generate yield |
| Fund Investor | Downside Hedging | Reduce downside beta to crypto with puts |
| Miner | Future Cash Flow Hedging | Hedge income stream, balance sheet exposures or future cashflows |
| Lender/Borrower | Collateral Management | Hedge the value of crypto collateral using a "collar" |
| Trading Firm | Basis Speculation | Express a view on the futures / spot spread |
| Individual Investor | Long-Term Investing | Accumulate a position in an asset at a discount to spot via option selling |

   Confidential - Filed Under Seal

So what are some of the specific trades and themes so far? Let's dive into the details:

| Thematic Flow | Description |
|---|---|
| Systematic Call Overwriting | Holders of BTC are selling 10-20% OTM call options in rangebound, low-vol markets generating 20-30% ann yields. |
| Convex Upside Payouts | Both vol-speculators and purely directional counterparties are buying longer-dated, far OTM call options as a leveraged, low-premium way to get exposure to BTC. Some view the call wing as underpriced given the upside potential and fat-tailed nature of BTC. We also see more convex requests like one-touch and binary calls to reduce premium further. |
| Token Replacement | Counterparties with exposure to more esoteric, frontier assets are replacing their spot exposure with derivatives in the form of risk reversals or spreads. |
| Minor Cross-Currency Pairs | Counterparties that want to express a view on BTC dominance vs alts might look at buying options on BTC/ETH which is a lower vol asset than either of its major crosses, because of the correlation between BTC/USD and ETH/USD. |
| Hedging Long-Term Holdings | As the sole authorized participant for the largest asset manager in crypto, Genesis interacts with many long-term holders of beta products like GBTC who may look to hedge their position with puts or calls. |

# The Hunt for Yield – Lending, Call Overwriting and Liquidity Mining

A major theme in Q2 was the demand for yield on crypto assets. Yield drives markets in crypto and in other asset classes, but the last three months seemed specifically yield-centric. Maybe it was due to the lower volatility, or perhaps due to the exponentially growing infrastructure and product creativity, but we saw a massive pickup in interest this quarter in many forms. The three forms of yield generation most prevalent are spot lending, call overwriting, and most recently, liquidity mining. There are risks and rewards inherent to each, but there seems to be an insatiable appetite for all of them. Below we outline the profile and provide insight into each strategy.

Confidential - Filed Under Seal

# Genesis

| Yield Strategy | Structure | Overview | Est Yield (%) | Risks/Downsides | Participants |
|---|---|---|---|---|---|
| Spot Lending | Fixed Income + Upside Participation | Holders of crypto or cash lend directly to Genesis to earn fixed interest on a monthly basis | Asset dependent, but indicatively 6-12% ann with 100% upside participation in asset on loan | • Counterparty choice is critical<br><br>• Liquidity risk | • HNW<br><br>• Hedge Funds<br><br>• Miners<br><br>• Asset Managers |
| Call Option Overwriting | Bullet Interest + Partial Upside Participation | Holders of digital assets sell out of the money call options to generate premium paid upfront while sacrificing upside in their position | Variable, but indicatively around 20-30% ann with 10-20% upside participation of underlying asset | • Loss of upside on asset underlying the call option<br><br>• Counterparty risk | • Miners<br><br>• HNW<br><br>• Hedge Funds |
| Liquidity Mining | Fixed Income + New Asset Creation | Traders can deposit assets to decentralized financial protocols like Compound to earn interest and accrue positions in additional governance tokens | Variable, but 5-15% ann with 100% upside in asset deposited | • Protocol/ Platform risk<br><br>• Risk of margin call/forced-liquidation on "borrowed" asset | • Hedge funds<br><br>• Trading firms |

# Hunt for Yield – Direct Lending

In Q2 – and especially in June – we saw tremendous growth in both the number of unique institutional lenders on the Genesis platform and the total interest paid to that pool of lenders relative to previous months. As of June 30, 2020, there were 112 unique lenders, up 24% from the previous month and 187% from last year. June's total interest payout represented 19% of all interest paid in the past 12 months.

Confidential - Filed Under Seal

**Market Observations**    Q2 | 2020    **Genesis**



Lending directly to Genesis is attractive to many institutions given the simplicity of structure, monthly interest payments, and the fact that the lenders maintain the long exposure to the loaned asset. Investors who know they want to be long for an extended period of time and want to earn incremental interest on their holdings can receive monthly payments at rates ranging between 6% and 12% annually depending on the asset. The main risks and considerations when thinking about spot lending are concentrated around counterparty quality. Given our long-standing reputation, balance sheet, and risk management framework, Genesis has proven to be a high-quality lender and has faced no defaults or capital losses despite operating through many volatile periods. Many of the lenders that face us directly are high net worth individuals, hedge funds with long exposure that want to generate additional alpha, miners that have reserves in crypto, and other managers seeking yield.

# Hunt for Yield - Call Option Overwriting

As an alternative to spot lending, many of our counterparties are selling out-of-the-money call options to generate yield via premiums.

After the March 12th crash, many market participants (survivors, if we're being honest) found themselves holding BTC risk acquired at low cost bases. With implied volatility holding firm around 100v across the term structure, traders reduced their exposure to spot by selling call options. When spot settled back into a range-bound market between

$9,000 and $10,000, the call sellers emerged in May to sell implied vol from 90v down to current levels near 50v in the front. For the most part, this strategy has worked well as realized vol in the 20s is the lowest we've seen since Fall 2018. Against current market levels, the typical call selling program is targeting 20-30% annualized yields by selling 10-20% OTM calls.



**Implied Volatility vs BTC/USD Spot**

# Hunt for Yield - Liquidity Mining on Decentralized Finance (DeFi) Protocols

DeFi is on a journey. From the early days of EtherDelta and ZRX in 2017 to the yield farming craze of 2020, DeFi has made strides in awareness, adoption, and functionality. There is a lot to unpack. We could have an entire report dedicated to all the technology improvements, merits, and risks in the current DeFi landscape. Instead, we will focus primarily on the impact DeFi markets have on forward curves, rates, and OTC lending demand.

There is no denying at the crux of the most recent boom in DeFi is something which was initially called "yield farming" or "liquidity mining."

A platform offers users who commit capital to the platform money in the form of tokens. Users deposit their holdings into the platform to enjoy highly profitable fixed income. As

Confidential - Filed Under Seal



they send more assets to the protocol, the assets under management of the protocol increase and the token is perceived to represent something growing in value. Buyside liquidity and the price of the token increase. The money being paid by the platform is now more valuable, attracting more users to deposit their holdings, creating a positive reflexive loop for user capital on the platform and token price. Until perhaps the music stops.

When looking at yield farming and removing the complexities around the token mechanics of individual platforms, yield farming is incentivizing user acquisition with negative fees. In this case, those fee payouts to users are denominated in the protocols' native token and are paid out proportionately to the amount of assets users commit to the platform. There are likely people that would say we are oversimplifying, but most people are farming to make money rather than accruing a share of a network they think has future value.

For completeness, the network value case is that DeFi protocols cannot take regulatory risk by having an entity responsible for operating an unregulated money services business. Protocols can dissolve the LLCs they raised equity from and convert that equity to tokens, half of which are given to existing equity holders and half which will be slowly distributed to users— the liquidity mining. Over time, all the tokens are distributed and the users of the platform own a share of the network where they can vote on protocol changes and effectively run a decentralized autonomous organization (DAO).

Negative fees to incentivize user growth is not necessarily a bad or novel thing by any means — recall Uber and Lyft competing for market share in new cities. Both companies would offer highly subsidized rides to attract loyalty. There is a feedback loop where users flock to the platform to accrue negative fees, the volume on the platform increases, the value of the token rises with additional volume, and the negative fees become even more attractive.

As a result of the above, it's not surprising DeFi yield farming has impacted our lending business, particularly on the demand side. The demand to borrow assets which have the most advantageous fee structures increases when the market is hot and rapidly decreases once the market is onto the next asset. At the start, we saw interest in BAT and REP skyrocket after those Compound markets were paying hefty fees. Over time, we have seen the demand normalize primarily to stablecoins like USDT, USDC, and DAI as they are easier to source and still highly profitable to farm.

Q2 | 2020                **Genesis**

One interesting note is the interaction between USD rates, basis, and yield farming. Without implying any causation, there is a flow in the market when DeFi platforms offer high enough subsidized rates on depositing USD, crypto holders will sell their spot holdings, buy futures, and yield on the cash generated from the spot sale. Effectively holders can long basis, maintain their crypto exposure, and participate in the high yields on dollars. This flow contributes to a widening basis, although it is unclear how significant the impact will be. Since yield farming became popular in mid-June, we have seen a spike in September basis from below 5% annualized to over 8%.

# Conclusion

In summary, we have seen very strong growth in direct lending, call overwriting and liquidity mining and believe that this growth will only continue into Q3 and beyond. We're excited to continue providing products and services to our counterparties that enable them to capture this return across various market opportunities. As always, please don't hesitate to reach out to our desk with any questions, comments or ideas. Onwards and upwards!

Confidential - Filed Under Seal

**Genesis**

## About Genesis

Genesis launched the first U.S. OTC bitcoin trading desk in 2013. Since then, we've grown to facilitate billions in monthly digital currency trades, loans and transactions. We're a one-stop-shop for sophisticated market participants to trade, borrow, lend and custody digital currencies, with unparalleled access to deep pools of global liquidity throughout the digital asset ecosystem.

## Get in Touch

markets@genesistrading.com
250 Park Ave S 5th floor, New York, NY 10003
Phone: (212) 668-5921

genesistrading.com

# Q2 Market Observations Report

Written by Matt Ballensweig, Roshun Patel, Joshua Lim & Leon Marshall

Confidential - Filed Under Seal



**Genesis Q3 2020**

# Digital Asset Market Report

**Genesis**

Confidential - Filed Under Seal

# Q3 Market Activity Snapshot

# $5.2B
2020 Q3 Loan Originations

# $2.1B
Total Active Loans as of Sep 2020

# $4.5B
Q3 Spot Volume Traded

# $1B
Q3 Derivatives Volume Traded

## 2020 YTD:

# $12.6B
Spot YTD

# $1.4B
Derivatives YTD

# $11.4B
Loan Originations YTD

**Genesis**

# Introduction

As we do every quarter, we will highlight some of the key trends we observed across all our business lines including spot trading, derivatives trading, and lending. As we continue down the path of becoming the preeminent digital asset prime broker, we formally launched our Genesis Custody offering in Q3.

Genesis Custody now acts as a central repository that allows our clients to safely secure their assets on the same platform that provides the ability to trade, borrow, and lend across a multitude of different venues and products. This infrastructural upgrade is one of many that allows Genesis to expand on our unique position as a nexus point within the digital asset space. Being at the center of crypto capital markets allows us to provide invaluable insight to our clients in a way that is unique.

**More Information**

To learn more about Genesis, or to work together with the Genesis team, contact us at:

**info@genesistrading.com**
**www.genesistrading.com**



# Introduction

Some of the other upcoming initiatives on the Genesis roadmap are:

→   Institutional lending API: a systematic solution for deposit aggregators to earn yield on behalf of their users facing a trusted and established lending institution.

→   Capital Introduction and Fund Administration Services: a way for hedge fund clients to tap into the DCG and Genesis network of potential investors.

→   Agency trading: aggregated and robust liquidity across a multitude of exchanges with pass through execution.

→ **Lending**    Trading    Derivatives    Macro Insights

# 1

### Lending
# Digital Asset Lending

Genesis continues to see tremendous growth in its lending business, **adding over $5.2B in new originations in Q3, marking its largest quarter ever by a landslide**. For comparison, this is more than double the loan originations from last quarter of $2.2B, which was also record breaking. In summary, QoQ loan originations continue to grow at an exponential rate. Active Loans Outstanding surged to $2.1B at the end of Q3, up from $1.4B last quarter, representing roughly a 50% increase.



**Active Loans Outstanding**

Cumulative originations increased 61.5% from the prior quarter, marking a tenth consecutive quarter of strong growth and **bringing total originations to $13.6B since we launched the lending business in March 2018**. Our loan portfolio substantially increased in value through increased cash and altcoin loan issuance, along with a modest increase in the notional value of crypto loans outstanding.

| $ in mm, except BTC Price | 06/30/20 | 09/30/20 | QoQ Growth |
|---|---|---|---|
| Originations Since Inception | $8,431 | $13,614 | 61.5% |
| Active Loans | $1,417 | $2,121 | 49.7% |
| BTC Price | $9,238 | $10,784 | 16.7% |



➔ **Lending**      Trading      Derivatives      Macro Insights



## Cumulative Originations

## The Appetite for Yield on Digital Assets Continues to Grow

In Q3 – and especially in September – we saw tremendous growth in both the number of unique institutional lenders on the Genesis platform and the total interest paid to that pool of lenders relative to previous months. As of September 30, 2020, there were 165 unique lenders, up 47.3% from the previous quarter and 275% from last year. September's monthly total interest payout represented over 20% of all interest paid in the trailing 12-month period.



## Lenders to Genesis Continue to Grow in Number and Scale

**Genesis**

➜ **Lending**        Trading        Derivatives        Macro Insights

# Q3 2020 Loan Portfolio Composition

The third quarter marked an interesting inflection point in the composition of our loan portfolio. BTC as a percentage of loans outstanding fell sharply QoQ from 51.2% to 40.8% as of September 30, 2020. BTC composition fell while the overall size of the loan portfolio increased dramatically, indicating that most of the growth came from other assets. Specifically, ETH, USD and Equivalents and "other" altcoins drove the increase in book size in Q3. ETH loans outstanding jumped to 12.4% of the overall book, USD increased to 34.5%, and other altcoins jumped to almost 5.0%.

The main driver of this portfolio shift came from the impact of liquidity mining on DeFi protocols that we outlined in our previous report. We saw DeFi interest rate arbitrage drive significant new issuance where our trading counterparties started actively borrowing ETH and stablecoins to lever up liquidity mining strategies. These counterparties, at the same time, borrowed the associated governance tokens such as UNI, YFI, COMP and LEND to hedge their future in-kind earnings.

Outside of growth in assets like ETH and cash, there was not much change in the portfolio composition across the other coins like BCH, XRP, and LTC.

| Asset | 12/31/19 | 03/31/20 | 06/30/20 | 09/30/20 |
|---|---|---|---|---|
| BTC | 47.3% | 44.8% | 51.2% | 40.8% |
| BCH | 3.4% | 5.8% | 4.5% | 4.3% |
| ETH | 5.0% | 5.6% | 7.4% | 12.4% |
| ETC | 2.7% | 2.1% | 1.7% | 1.0% |
| XRP | 2.7% | 2.3% | 1.9% | 1.4% |
| LTC | 0.9% | 0.7% | 0.3% | 0.6% |
| USD & Equivalents | 37.2% | 36.6% | 32.0% | 34.5% |
| Other | 0.9% | 2.1% | 1.0% | 4.9% |



Lending    →    **Trading**    Derivatives    Macro Insights

# 2

### Trading
# Digital Asset Trading

On the spot trading side, Genesis traded $4.5B in Q3 volume, up 285% from the same quarter in 2019. While the majority of transactions still traded on an OTC basis with major institutional counterparties, we have seen a consistent upward trend in electronic execution as a percentage of our overall trading composition.

In September, Genesis executed almost 30% of all spot trading volume through its new Prime smart-order routing engine. We expect this trend to continue as we introduce new algorithmic strategies that we can 1) allow our clients to access directly through our upcoming launch of agency trading; and 2) use internally to hedge our principal trading flow allowing us the ability to make tighter markets for clients on larger OTC trades.



**Genesis Spot Trading Volumes**

Total Volume Traded — Electronic Execution as %

# 3

### Derivatives
# Digital Asset Derivatives

The Genesis derivatives business continues to grow rapidly since its launch in June 2020. We have seen rapid uptake in option structures for hedging and expressing views in crypto assets. The interest in derivatives originates from a few major channels. First, our lending franchise has opened the door to bilateral credit relationships with many major institutional counterparties in the space, and derivatives are in many ways another yield instrument. Second, our affiliate, Grayscale's asset management products are often the first entry point into crypto for family offices, high net worth individuals and asset managers, and our derivatives offering allows risk mitigation around their positions. Finally, our spot trading counterparties view options as a way to get leverage in a more contained format, which has taken more of a critical role since the BitMEX and OKEx market structure shakeups.

Our total bilateral derivatives volume hit $1.0B in the quarter across bilateral options and forwards and exchange-cleared blocks on venues like CME. This is up +150% from a partial Q2, when we launched our derivatives trading business. Since then, we have traded linear and non-linear derivatives with over 75 unique institutional counterparties across 15+ different assets. BTC/USD comprises 90% of volume, with ETH/USD and altcoin crosses comprising the rest. Notably, the desk saw increased interest in recently-launched token underlyers, especially as counterparties look to protect downside on big pops, monetize locked or unvested exposure and generate yield via overwrites on longer-term holdings. Roughly 75% of trading volume was executed bilaterally and the remaining 25% was executed on exchange.

We'd like to highlight a couple major thematic developments in the derivatives market. First, we have seen how BTC spot has become more tightly coupled to risk assets in the broader macro world. Many people view tech stocks or gold or short USD as a proxy for BTC spot. More recently in our discussions with more sophisticated macro investors, crypto vol is similarly being viewed in a relative

**Genesis**

value context to liquid vol markets in FX, rates and equities. While the correlations wax and wane, as the post-corporate treasury asset allocation announcement rallies have demonstrated, we may inevitably see more and more macro vol beta being expressed in crypto.

Second, the embedded optionality in DeFi is a driving theme of hedging flow. While the majority of liquidity pool participants do not necessarily hedge their impermanent loss exposure, we believe more sophisticated market-neutral yield investors are consciously considering their short gamma coming from constant-product AMMs like Uniswap. Genesis internal models estimate aggregate market short position in some of the major pools at several million USD gamma. While market exposure isn't by any means the main source of risk in DeFi protocols -- regulatory, operational, protocol risk and flash-loan exploits to name a few – it is certainly one that can be controlled via a replicating options portfolio.

Finally, there is increased activity in long-dated options and forwards activity in BTC and ETH. While supply and demand can come at mismatched times, we are increasingly seeing both sides of the trade. Buyers of vol are generally thesis-driven crypto funds that are looking for "upside insurance" to keep up with beta-driven performance of passive long-only funds. Sellers can range from simple overwrites to more sophisticated structured product flow. Our demand extends to Dec 2021 and beyond as market participants use far OTM calls as limited-loss levered exposure.

**4**

## Macro Insights
# Bank Balance Sheets

## Bank Balance Sheets are Increasing and So Is Our Funding Base

Since March, the world has changed drastically. Much of that change has been reflected in monetary and fiscal policy by global central banks. As a lending desk in an alternative asset class with many of our clients closely tied to the traditional financial system, we would be naive to think we are entirely insulated from the permeating actions of central banks. In particular, we have seen a significant increase in our own inventory since March fueled by additional institutions willing to deploy assets to Genesis.

The Fed balance sheet swiftly moved from $4T pre-March to $7T today in an unprecedented expansion not seen since the wake of the 2008 financial crisis. All that capital had to end up somewhere, and after seeing the Q3 earnings reports of many major banks, it is evident they are sitting on more cash with a lower net interest margin (NIM) than ever before. In other words, deposits are increasing at a faster rate than new loan originations - in the third quarter firmwide deposits at J.P. Morgan[1] were up 30% while loans were only up 1%. There are many reasons why - on the demand side small business loans and mortgages are perceived to be more risky to underwrite during the COVID-19 crisis. On the supply side there is simply too much cash to deploy at yields attractive relative to risk.

1   Reference: **3Q20 ERF Exhibit 99.1 Narrative**

However, there is one subset of a bank's clientele that has thrived since the COVID-19 crisis in March. That subset is trading firms, removed from the perils of physical businesses, living in an abstract world of screens and numbers with the nimble ability to move positions with the click of a button. Trading firms thrive on volatility and uncertainty, profiting where others are forced to make tough decisions. These clients are among an elite few, alongside high net worth individuals and hedge funds, that receive cash financing from banks via prime brokerage lines at rates and leverage much more favorable than typical retail bank loans.

**Genesis**

Lending          Trading          Derivatives          → **Macro Insights**

We suspect there has been a significant increase in credit distributed by banks to prime brokerage lines across hedge funds, trading firms, and high net worth individuals. Here are a few examples of trends which support this thesis:

→   Previous cash borrowers are flipping the script and opting to lend us cash. Prior to March, this would be much less common, these firms would rarely lend cash to Genesis against BTC collateral, given their own funding needs. Now, that has shifted - there seems to be ample cash on the balance sheets of top-tier trading firms.

→   Vastly increased institutional participation in the CME BTC basis trade. Open interest (OI) on CME has steadily increased over the past quarter, where it is now a contender for the top spot in BTC futures open interest. Every futures market has equal and opposite open positions. We suspect the long contracts are institutions buying BTC delta without a care for implied funding, while the short contracts are trading firms collapsing the basis against a long spot leg. The increase in OI indicates there is more spot BTC out there on the balance sheets of firms willing to short the CME basis. Since the CME cannot take BTC as collateral, there should be more BTC out there in the market as a result of these basis positions. Naturally, as seen in the below figure, BTC inflows to Genesis set record highs in Q3 and have only trended up over the year.

### Daily BTC Lent to Genesis as a % of Total BTC Lent to Genesis YTD



In sum, the flow of funds looks something like this:

→  Fed expanded asset base significantly, deposits at major banks outpaced loans since March

→  Banks must make loans somewhere; prime brokerage clients are great places to deploy excess capital during a pandemic

→  These clients have historically worked closely with Genesis and are now lending both excess USD and BTC generated from the short CME basis trade back to Genesis, ultimately increasing our asset base as well

In Q4, Fed balance sheet expansion may continue so we suspect all the above trends will persist for at least another quarter. The implication of this expansion on forward curves should be more compression and more moderate implied yields - perhaps today's 12-15% annualized near month basis is equivalent to February's 30% annualized. Unlike previous regimes where unregulated offshore exchanges fueled the majority of calendar futures trading, we expect the CME growth story to continue into 2021.

## About Genesis

Genesis is a global leader in institutional digital asset markets, facilitating billions of dollars in digital currency transactions on a monthly basis. We provide sophisticated market participants advanced tools to trade spot and derivatives, lend, borrow, and custody digital assets, alongside full-service digital asset prime brokerage services.

## Stay Connected

For more information from this report, contact us at **info@genesistrading.com**, or call us at (212) 668-5921.

**www.genesistrading.com**

**Twitter**
**LinkedIn**
**Facebook**

## Learn More About Our Services

**About Genesis**
**Genesis Prime**

## Q3 Report By:









**Matt Ballensweig**
VP, Head of Lending
matt@genesiscap.co

**Roshun Patel**
Associate
roshun@genesiscap.co

**Joshua Lim**
VP, Head of Derivatives
jlim@genesistrading.com

**Leon Marshall**
Head of Institutional Sales (Europe & Asia)
leon@genesistrading.com

**Disclosures**

This research is for our clients only. Other than disclosures relating to Genesis, this research is based on current public information that we consider reliable, but we do not represent it is accurate or complete, and it should not be relied on as such. The information, opinions, estimates and forecasts contained herein are as of the date hereof and are subject to change without prior notification. We seek to update our research as appropriate, but various regulations may prevent us from doing so. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment. Genesis conducts a global prime brokerage service, integrating digital asset lending, trading, and custodial services. Genesis Global Trading, Inc., registered in the United States with the SEC as a broker-dealer, is a member of SIPC (**https://www. sipc.org**).  SIPC coverage does not cover digital assets, virtual currency, cryptocurrency, or other related assets. Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and principal trading desks that reflect opinions that are contrary to the opinions expressed in this research. The analysts named in this report may have from time to time discussed with our clients, including Genesis salespersons and traders, or may discuss in this report, trading strategies that reference catalysts or events that may have a near-term impact on the market price of the digital assets discussed in this report, which impact may be directionally counter to the analyst's published price target expectations for such digital assets. Any such trading strategies are distinct from and do not affect the analyst's fundamental rating or commentary for such digital assets. We and our affiliates, officers, directors, and employees, will from time to time have long or short positions in, act as principal in, and buy or sell, the digital assets and securities or derivatives thereof, if any, referred to in this research. The views attributed to third party presenters at Genesis arranged conferences, including individuals from other parts of Genesis or its parent, Digital Currency Group (DCG), and any affiliates or subsidiaries of thereof, do not necessarily reflect those of Genesis and are not an official view of Genesis. Any third party referenced herein, including any salespeople, traders and other professionals or members of their household, may have positions in the products mentioned that are inconsistent with the views expressed by analysts named in this report. This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of any investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments. Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors.

**Genesis Q4 2020**

# Q4 Market Observations

**Genesis**

Confidential - Filed Under Seal

# Q4 Market Activity Snapshot

# $7.6B

2020 Q4 Loan Originations

# $3.8B

Total Active Loans as of Dec 2020

# $8.1B

Q4 Spot Volume Traded

# $4.5B

Q4 Derivatives Volume Traded

## 2020 Overall Results

| $20.7B | $5.9B | $19B |
|---|---|---|
| Spot YTD | Derivatives YTD | Loan Originations YTD |

**Genesis**

# Introduction

This report highlights key trends Genesis observed across the digital asset market in Q4 2020. It is written from the vantage point of our core businesses, which include spot trading, derivatives trading, and lending.

Q4 was an incredible finish to a year that was already notable for significant growth at Genesis and the market at large. Genesis set both quarterly and yearly records for spot and derivatives trading volume, and loan originations hit new highs driven by the pickup in market activity, the tremendous growth in institutional buying, and an influx of new investments into Grayscale products. Genesis has grown alongside the increased volume flowing across our desk - expanding our reach globally, improving our technological capabilities, adding support to trade new assets, and doubling our team in headcount.

We believe this market's momentum will continue to accelerate as we head into 2021, and we are continuing to evolve our digital asset prime brokerage offering with the following principles in mind:

**More Information**

To learn more about Genesis, or to work together with the Genesis team, contact us at:

**info@genesistrading.com**
**www.genesistrading.com**



**Genesis**

# Introduction - Principles

1. **Access to capital** and a sizable **balance sheet** are key differentiators.

   → It has become more important than ever for us to have adequate working capital across coin and cash as the size of our clients and the scale of their activities with us have grown. We have seen substantial benefits from our ability to provide immediate liquidity and financing to our institutional trading counterparts.

   → We will continue working to provide the most robust access globally to BTC, USD (stable), and other digital assets. We surpassed $5B in assets at the end of 2020.

2. **Great client-service and customer partnerships** will remain core to our business.

   → We will always view finding the most creative and effective ways to help our clients execute on their vision as our first priority.

   → We are extremely focused on staying nimble and flexible as we scale our execution platform.

3. A **comprehensive platform** and service offering will help our clients achieve **greater capital efficiency**.

   → We continue to expand Genesis Prime, reducing friction and cost of capital for our clients while developing new ways to trade, lend, custody and receive financing against assets on the platform.

As we move into 2021, we've done a deep dive on key trends from 2020 to better understand the market's evolution and anticipate our clients' needs.

**Q4 Report**

**Table of Contents**

→ Lending
→ Trading
→ Derivatives
→ Macro Environment: Stablecoins

**Genesis**

➔ **Lending**       Trading       Derivatives       Macro Environment: Stablecoins

# 1                        Digital Asset Lending

Genesis continued to see tremendous growth in our lending business across Q4. In total, we **added over $7.6B in new originations. This marked our largest quarter to date,** up from $5.2B of new originations in Q3, which had been our largest quarter at that time. Active Loans Outstanding surged to $3.8B at the end of Q4, up from $2.1B last quarter, representing a roughly 80% increase.

**Active Loans Outstanding**



Cumulative originations increased 55.6% from Q3, marking an eleventh consecutive quarter of strong growth and **bringing our total originations to $21.2B since we launched the lending business in March 2018**. Our loan portfolio substantially increased in value through a combination of new issuances across cash and coin, along with a significant rise in asset prices on existing bitcoin loans.

| ($ in mm, except BTC Price) | 09/30/20 | 12/31/20 | QoQ Growth |
|---|---|---|---|
| Originations Since Inception | $13,614 | $21,186 | 55% |
| Active Loans | $2,121 | $3,821 | 80% |
| BTC Price | $10,784 | $29,374 | 172% |



➔ **Lending**      Trading       Derivatives       Macro Environment: Stablecoins



**Cumulative Originations**

## Institutional Lenders Enter the Market in Q4, But the Demand for Cash is Relentless

In Q4, Genesis saw a wave of new institutional USD and stablecoin lenders enter the market. In addition to structuring a new facility with one of our banking partners, we saw a significant uptick in lending volumes with ultra-high-net-worth individuals, corporations, traditional hedge funds, and family offices who wanted to enter the market for the first time. These counterparties saw the potential to generate excess yield on idle cash until the time was right to deploy that cash towards long positions in BTC. Our loan origination data supports this qualitative assessment through a few different lenses.

First, we noticed an increase in the average origination size of USD and stablecoin loans to Genesis. At the end of Q3, the average ticket was about $2.0mm, which has now increased to $4.0mm, representing a 100% increase QoQ.

Second, we also saw the average loan size from first-time lenders



**Average USD Origination Size**



➔ **Lending**          Trading          Derivatives          Macro Environment: Stablecoins

increasing from $590k to $3.2mm in the past quarter, representing a
538% quarterly increase.



**Average Origination Size via First-Time Lenders**

We believe these trends point towards a shift in the demographics
of USD lenders in crypto markets. In previous reports, we noted
a structural gap between the reliance on levered products such
as futures or perpetual swaps vs. the amount of cash that is being
deployed to arb those products vs. spot markets. We believe we may
be in the early stages of seeing more of that institutional cash flow
into the digital asset space in various ways. That said, taking a closer
look at the spread/basis between futures and spot markets, we will
still need to see a lot more cash inflows before spreads normalize.

Even with significant new cash originations generated over the last



**Basis (% ann) to near future**

➔ **Lending**        Trading        Derivatives        Macro Environment: Stablecoins



**USD Originations**

two quarters, funding curves in the most recent bull-run continue to widen out given how much long exposure is being taken via levered products relative to fully-funded spot buying. We believe this is due to the lack of cash available to sophisticated trading firms to fully collapse the structural basis that continues to persist, despite the ability to capture double-digit yields fully secured in BTC. As Genesis continues to expand access to capital, we are encouraged that more traditional lending institutions are continuing to take advantage of yield opportunities in the market.

## Q4 2020 Loan Portfolio Composition

In the fourth quarter, our BTC as a percentage of loans outstanding increased significantly from 40.8% to 53.9% as of December 31, 2020. We believe this was due to the price appreciation of BTC and its inflation impact on loans outstanding. ETH loans outstanding as a % of our portfolio also continued to increase QoQ, currently representing 15.5% of our book. Significant new ETH loan issuance was tied to in-kind borrow/trust creates for Grayscale products and to other new ETH-trusts on the market where the public shares tend to trade higher than the NAV/underlying. Cash and Equivalents, along with other non-major cryptos, fell as a % of our portfolio primarily attributable to BTC's and ETH's price inflation.

Unlike XRP, other smaller cap assets had minimal changes QoQ. XRP has shrunk to 0.4% of the loan portfolio, given our decision to actively wind down XRP lending and borrowing altogether following the

BTC as a Percentage of
Loans Outstanding:

# 53.9%

**Genesis**

→ **Lending**      Trading      Derivatives      Macro Environment: Stablecoins

SEC lawsuit and enforcement action. In addition to ceasing lending and borrowing activity, we have stopped making markets in XRP on the spot OTC and derivatives trading side of our business. We have bundled all small coin percentages in the table below in the "others" category.

| Asset | 03/31/20 | 06/30/20 | 09/30/20 | 12/31/20 |
|---|---|---|---|---|
| BTC | 44.8% | 51.2% | 40.8% | 53.9% |
| BCH | 5.8% | 4.5% | 4.3% | 2.9% |
| ETH | 5.6% | 7.4% | 12.4% | 15.5% |
| ETC | 2.1% | 1.7% | 1.0% | 0.2% |
| XRP | 2.3% | 1.9% | 1.4% | 0.4% |
| LTC | 0.7% | 0.3% | 0.6% | 1.0% |
| USD & Equivalents | 36.6% | 32.0% | 34.5% | 23.2% |
| Other | 2.1% | 1.0% | 4.9% | 2.8% |

Lending    → **Trading**    Derivatives    Macro Environment: Stablecoins

# 2 Digital Asset Trading

Genesis traded $8.1B in Q4 spot volume, up 80% from Q3. While the majority of transactions are still traded on an OTC basis with major institutional counterparties, we have seen a consistent upward trend in electronic execution as a percentage of the overall trading composition. In Q4, Genesis executed almost 32.3% of all spot trading volume through our new Prime smart-order routing engine, increasing 27.8% from Q3. We expect this trend to continue as we introduce new algorithmic strategies 1) that we can allow our clients to access directly via our upcoming agency trading launch; and 2) that we can use internally to hedge our principal trading flow, providing the ability to make tighter markets for our clients on larger OTC trades.



**Genesis Spot Trading Volumes**

In addition to expanding our electronic capabilities, we have also broadened our suite of supported crypto assets. This has been important in the growth of Genesis trading volumes. The biggest driver of growth here has been that our counterparties generally want to do all of their trading with one counterparty. (For example, if a fund wants to sell BTC for an altcoin, they do not want to make one trade

with Genesis and another with a different dealer, as the operational burden would be too cumbersome.) The assets we choose to support are determined through multiple lenses, depending on the Genesis entity involved - 1) permissible assets based on the regulatory framework; 2) client demand (newly added assets we began dealing with in at least one of our entities in Q4 include AAVE, ADA, ALGO, ATOM, COMP, DOT, FIL, KSM, LINK, RUNE, SNX, SOL, SUSHI, THETA, UNI, and YFI) and 3) always acting in the best interests of our clients and the general public.

# 3
# Digital Asset Derivatives

## Crypto Options Reach Institutional Scale in Q4 2020

While Q4 2020 provided no shortage of excitement in crypto spot markets, with BTC powering to new all-time highs from an initial low of $9,800, the crypto options market was a particular bright spot and showed real signs of maturing as a precision hedging and leveraged directional instrument used by both institutional market participants and "whales" alike. Among the major crypto options milestones we observed in Q4:

→ The week leading up to Christmas marked the highest options volume ever recorded in digital assets. This included nearly $5.5bn in options notional traded, compared to previous high weekly volumes of $2.1bn at the end of July 2020.

→ Deribit itself printed over $1.06bn in options notional traded on December 17, 2020 – which was particularly impressive considering Coinbase spot BTC/USD volumes on that day were $1.22bn.

→ Bit.com, a crypto-native derivatives venue, launched as a competitor to Deribit. For now, Deribit continues to dominate market share with over 82% of volume vs. Bit.com's 8% and CME's 3%.

→ CME announced that it is expanding its suite of crypto products to include ETH/USD futures and presumably options thereafter.

Q4 Notional Traded:

# $4.5B

Lending        Trading    ➔  **Derivatives**        Macro Environment: Stablecoins



### Deribit Option vs. Coinbase Spot Volume

■ Coinbase weekly BTC/USD options notional traded (USD)

▬ Deribit weekly BTC/USD options notional traded (USD)

(Skew.com)

**Q4 Options Volume Market Share %**



■ Deribit
■ Bit.com
▬ CME
▬ Others

(Skew.com)

At Genesis, our derivatives desk saw +350% quarter-on-quarter volume growth across bilateral OTC and negotiated option blocks to $4.5bn in notional traded. This growth was driven by increased activity from our existing counterparties alongside new institutional and high net worth individual counterparties using derivatives in a few key thematic ways, which we provide more detail on below. Our counterparty base grew +50% to a triple-digit number of unique active clients. Increased demand also brought more esoteric asset names to our mix – Genesis now supports 20 different crypto assets

Quarterly Growth in
Counterparty Base:

# 50%

Genesis

for pricing of options risk. While BTC continued to capture the lion's share of our volumes at 80%, ETH demand grew dramatically to 15% of total volume, with the remaining comprising various alts. We address the notable rise in ETH activity below, as we believe certain market structure dynamics contributed to the explosion of risk positioning here.

## Thematic Flows

To go into more depth on our thematic flows - the **systematic overwriting** flow was ever-present this quarter, represented by 250-1000 BTC blocks in 1-2 month far OTM strikes. With the increase in vols from the low 50's in Oct. to the high 80's in Dec., overwrite programs gained more traction - typically concentrating on the $35k to $50k strikes (+40-90% above to spot). Despite strikes being far OTM, the trade was still attractive for buyers and sellers: directional buyers saw large mark-to-market gains on low-premium calls due to both the near pullback-free nature of the rally and the accompanying rise of implied vols as we broke through all-time highs. (We'll talk more about the demand for these calls below.) Sellers continued to lock in annualized yields of 20-40% per annum for systematic overwrite programs while remaining comfortable getting called out of their BTC risk at take-profit levels. We tend to see more of this flow in OTC format as our collateralization terms can be customized to meet counterparty demand – however, this one-sided flow caused pricing discrepancy between OTC prices for vols and forwards vs. listed markets on Deribit and CME. We saw dealers who became constrained on short vol positions and on-exchange margin requirements back off from OTC bids as they managed the OTC-exchange basis risk.

Any recap of Q4 crypto options activity would be remiss not to mention to the **whale buyer of 29-Jan BTC/USD upside calls**, which was in many ways the flip side of the systematic overwrites. If the Q4 narrative in spot was driven by the emergence of large institutional buyers via TWAP executions (e.g., Microstrategy), the narrative in options was dominated by this singular whale buyer concentrated in the $32k and $36k strikes. Their long position was initiated on October 30 in early morning EST. Executing on Deribit via Paradigm's block trading platform, the buyer bought a total of 4,000 contracts

QoQ Derivatives Trading Growth:

# 350%

Lending        Trading        → **Derivatives**        Macro Environment: Stablecoins

on the $32k strike and 16,000 contracts on the $36k strike, paying roughly $890k in premium. At the time spot was trading around $13,300 and 30-day realized vol was sub 40 vol, making these strikes seem impossibly far away at +140% and +170% from spot. ATM implied vol was 60 while those far upside strikes traded 84-87 vol. The size of these trades caused a great deal of excitement in the dealer community and some consternation over concentration of risk on Deribit.

There was some thought that short gamma exposure from the seller(s), assuming they were delta-hedging the position, would cause BTC/USD to rapidly shoot to strike if we broke the overhanging resistance levels on the way to BTC/USD ATH at $20k. In effect, this dynamic, coupled with the relentless corporate and institutional TWAP bid for BTC spot, did drive BTC/USD from $20k to a high of $42k in less than a month from mid-December to mid-January. At the same time, mid-market vols on strikes reached a high of 160 before the whale started to unwind and roll their position to higher strikes in mid-January for one of the largest hauls in crypto options history, realizing over $40mm in P&L.

| Strike | Number of contracts (BTC) | Reference BTC/ USD spot price | Premium per unit (BTC) | Total premium paid (BTC) | Total premium paid (USD) |
|---|---|---|---|---|---|
| 32,000 | 1,000.00 | $13,314.00 | 0.0047 | 4.70 | $62,575.80 |
| 32,000 | 1,000.00 | $13,279.00 | 0.0047 | 4.70 | $62,411.30 |
| 32,000 | 2,000.00 | $13,292.00 | 0.0047 | 9.40 | $124,944.80 |
| 36,000 | 2,200.00 | $13,316.00 | 0.0030 | 6.60 | $87,885.60 |
| 36,000 | 1,800.00 | $13,321.00 | 0.0030 | 5.40 | $71,993.40 |
| 36,000 | 4,000.00 | $13,281.00 | 0.0030 | 12.00 | $159,372.00 |
| 36,000 | 8,000.00 | $13,285.00 | 0.0030 | 24.00 | $318,840.00 |
| **Total** | **20,000.00** | | | **66.80** | **$887,962.90** |

Source: Paradigm

**Genesis**

Lending          Trading          → **Derivatives**          Macro Environment: Stablecoins



(Skew.com)

Another major theme for the quarter was the **re-pricing of risk** across product categories. With BTC/USD and most of the crypto complex reaching new all-time highs at the end of Q4, it became apparent we were entering into a new volatility regime, unlike the range-bound trading we had seen over the past few years. Spot BTC entered price-discovery mode to find a new equilibrium where supply would meet surging demand. Because this rally was born from a very low-realized vol environment in Sep and Oct 2020, when 10-day realized was regularly sub 20 vol - and because there was an overhang of call overwrites in the $12-15k range - it took a long time for implied vols to re-price into this new regime. The insatiable demand for long exposure (and, in particular, the high-strikes in 29-Jan expiry) caused forward curves, implied vols, and upside skew metrics to blow out. By the end of Q4, 3mo rolling basis on BTC/USD widened from 6% to 11%, 1mo ATM implied vol went from mid 30's to high 80's and 1mo skew went from +10% to -20%.

In many ways the explosion in implied vols overshot realized vol, which never exceeded 85 vol over a rolling 30-day window (which extends to today, in mid-January, where implieds are well north of 140 vol.) This widening of implied-realized spread is indicative of a **broader dislocation across OTC and listed options** (CME and Deribit). The widening out of offer-side liquidity on listed venues

**Genesis**

Lending          Trading          → Derivatives          Macro Environment: Stablecoins

speaks to a few constraints facing dealers and liquidity providers.
First, there can be major mismatches on OTC collateral terms vs.
Deribit and CME, both in % of notional as well as in type of collateral:
Deribit only accepts in-kind (BTC for BTC/USD calls), and CME only
accepts USD. As cash demand exploded, which was reflected in
the widening basis spreads, the imbalance of collateral types and
amounts was reflected in the dispersion of implied vol and forward
pricing for bullish option trades – generally, CME was more expensive
than Deribit, which was, in turn, more expensive than OTC where
there was greater supply in overwrites. Second, collateral constraints
and exchange exposure limits likely restricted the size at which
dealers and liquidity providers could supply vols into listed markets to
close the implied-realized spread.



**BTC/USD 1mo ATM implied vol**

(Skew.com)



**BTC/USD 3mo annualized basis %**

(Skew.com)

Lending          Trading          ➔  **Derivatives**          Macro Environment: Stablecoins



**BTC/USD 1mo 25d skew**

(Skew.com)

With Q4 closing near all-time highs in spot after three years in the doldrums, Genesis' trading desk saw a strong bid for **downside hedging structures into year-end**. For macro and crypto-native hedge funds, structures primarily took the form of BTC/USD $15k to $25k puts expiring in the first two weeks of 2021 -- some specifically looking to hedge against potential tax-selling at the top of the new year. For some Defi-focused funds, hedging in ETH/USD was the primary beta exposure. In total, Genesis traded volumes in several hundred million USD notional of downside exposure across strikes and assets.

Finally, looking forward to Q1, many of our trading counterparties added calls on ETH, which turned out to be extremely perspicacious. There were several primary catalysts for ETH upside going into the new year: 1) demand for spot as a replacement for equitized trust products such as ETHE being liquidated on the secondary market, 2) a drawdown in on-exchange inventory of spot ETH causing supply-side shock panic, 3) a longer-term reduction of ETH free float from trust product creations and ETH2 staking, 4) retail demand for ETH and other legacy top 10 assets as a catch up to BTC and 5) a rotation play away from BTC (and XRP).

**Genesis**

Lending          Trading          ➔  **Derivatives**          Macro Environment: Stablecoins

In 2021, a major focus for our derivatives desk is to integrate derivatives more directly into the Genesis Prime platform, which already fully incorporates Genesis spot OTC and lending activity. We're planning to roll out innovative pricing and execution products on the platform to automate trade execution and lifecycle management, dramatically streamlining both processes over the course of the year.

**Genesis**

# 4                    Macro Environment: Stablecoins

## The Rise of Stablecoins and the Potential Macro Impact on Global Money Flows

Every quarter we look to take a step back from our book to highlight a macro theme relevant to our business and global finance. Last quarter we explored the role of expanding bank balance sheets, which we believed were leading to more credit being issued to prime brokerage clients and translating to more USD lending to Genesis as funds flowed down the grapevine. As noted in our Q4 report above, the size of our USD lenders has increased significantly on average since then, which we believe represents more institutional counterparties trading larger blocks. This quarter we want to conduct a deeper dive on the medium of USD settlement - the stablecoin.

Prior to 2018, USDT was the primary centralized option for stablecoins. There are costs to the flow of creating and redeeming USDT – in practice this means once fiat enters USDT it tends to stick, serving as a one-way onramp for fiat into the crypto ecosystem. Deep liquidity for BTC/USDT pairs across global exchanges made it easy to create and leg into the next asset.

Starting in 2018, PAX, USDC, GUSD, and TUSD evolved the stablecoin landscape by enabling zero cost creation and redemption mechanisms. This impacted the growth of stablecoins in a number of ways. First, stablecoins now had more viable, regulated two-way flows to and from fiat and on-chain. As a result, the breadth of market participants willing to transact expanded significantly. Traditional institutions like public banks and more conservative trading firms were more willing to float balances, receivables and execute trade settlements in newer stablecoins given the efficiency to redeem into the fiat banking system. USDT also experienced positive externalities from this growth, with deeply liquid USDT/USDC and similar pairs expanding on both DeFi and centralized exchanges.

Lending        Trading        Derivatives        ➔ **Macro Environment: Stablecoins**

Fast forward to Q4 2020, and the growth of stablecoins has exploded. As of 12/31/20, stablecoins had $27.5B in total locked float, up from approximately $2.5B as of 12/31/18, representing a 1,100% increase over two years[1].

1    Reference: **Messari Stablecoin Index**



**Stablecoin Majors Market Cap**

At the moment, this is a relative drop in the bucket to M1 and other measures of fiat in the traditional banking system, but from a longer-term view - assuming a conservative, two-year linear growth rate - from here, that would lead to $300B in float by the end of 2023. What might prove to be a more realistic exponential growth rate assumption would see a float pushing $1T by the end of 2023.

What are the implications of this type of growth in digital dollars? How will central banks react? What risks might arise? We've compiled some thoughts on this below.

First, we believe central banks should get ahead of the inevitable $1T float figure by incorporating stablecoin data into their datasets. In many ways, this data is cleaner to see, with all transactions

centralized on-chain rather than a mix of fragmented reports. Ultimately, this allows viewing stats like velocity through a more accurate trend and helps make better, more informed decisions.

A macro risk this highlights more broadly is that the pace of regulation and policymaking is not keeping up with the pace of innovation. A key point in the stablecoin growth story has been that it started as a relatively grassroots movement. No central bank greenlit the creation of digital dollars - local governments in various jurisdictions worked with trust companies, private banks, and issuers to create necessary products for continued market evolution. Exploding stablecoin use grew out of product-market fit, and their volumes have encouraged legacy competitors to improve their own transfer mechanisms. Policymakers' stance on stablecoins will be a factor potentially affecting ongoing innovation.

## About Genesis

Genesis is a global leader in institutional digital asset markets, facilitating billions of dollars in digital currency transactions on a monthly basis. We provide sophisticated market participants advanced tools to trade spot and derivatives, lend, borrow, and custody digital assets, alongside full-service digital asset prime brokerage services.

## Stay Connected

For more information from this report, contact us at **info@genesistrading.com**, or call us at (212) 668-5921.

**www.genesistrading.com**

**Twitter**
**LinkedIn**
**Facebook**

## Learn More About Our Services

**About Genesis**
**Genesis Prime**

## Q4 Report By:



**Matt Ballensweig**
Head of Institutional Lending
matt@genesiscap.co



**Roshun Patel**
VP, Institutional Lending
roshun@genesiscap.co



**Joshua Lim**
Head of Derivatives
jlim@genesistrading.com



**Leon Marshall**
Head of Institutional Sales
leon@genesistrading.com



**Mike Paleokrassas**
Managing Director, Co-Head of Trading & Sales
m.paleokrassas@genesistrading.com

**Genesis**

**Disclosures**

This research is for our clients only. Other than disclosures relating to Genesis, this research is based on current public information that we consider reliable, but we do not represent it is accurate or complete, and it should not be relied on as such. The information, opinions, estimates and forecasts contained herein are as of the date hereof and are subject to change without prior notification. We seek to update our research as appropriate, but various regulations may prevent us from doing so. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment. Genesis conducts a global prime brokerage service, integrating digital asset lending, trading, and custodial services. Genesis Global Trading, Inc., registered in the United States with the SEC as a broker-dealer, is a member of SIPC (**https://www. sipc.org**).  SIPC coverage does not cover digital assets, virtual currency, cryptocurrency, or other related assets. Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and principal trading desks that reflect opinions that are contrary to the opinions expressed in this research. The analysts named in this report may have from time to time discussed with our clients, including Genesis salespersons and traders, or may discuss in this report, trading strategies that reference catalysts or events that may have a near-term impact on the market price of the digital assets discussed in this report, which impact may be directionally counter to the analyst's published price target expectations for such digital assets. Any such trading strategies are distinct from and do not affect the analyst's fundamental rating or commentary for such digital assets. We and our affiliates, officers, directors, and employees, will from time to time have long or short positions in, act as principal in, and buy or sell, the digital assets and securities or derivatives thereof, if any, referred to in this research. The views attributed to third party presenters at Genesis arranged conferences, including individuals from other parts of Genesis or its parent, Digital Currency Group (DCG), and any affiliates or subsidiaries of thereof, do not necessarily reflect those of Genesis and are not an official view of Genesis. Any third party referenced herein, including any salespeople, traders and other professionals or members of their household, may have positions in the products mentioned that are inconsistent with the views expressed by analysts named in this report. This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of any investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments. Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors.

**Genesis Q1 2021**

# Q1 Market Observations

**Genesis**

Confidential - Filed Under Seal

# Q1 Market Activity Snapshot

# $20.0B

2021 Q1 Loan Originations

# $9.0B

Total Active Loans as of Mar 2021

# $31.5B

Q1 Spot Volume Traded

# $10.5B

Q1 Derivatives Volume Traded

**Genesis**

# Introduction

Genesis is building the world's premier institutional digital asset financial services firm.

This report highlights key trends our team observed across institutional digital asset markets in Q1. Genesis has a unique vantage point on the industry with business lines spanning spot trading, derivatives trading, lending, custody, treasury and prime brokerage services.

In Q1, Genesis facilitated over $60B in trades, loans and transactions. As the largest institutional digital asset lender, our loan book grew to over $9B in active loans outstanding. This report outlines what we saw during a particularly notable phase of growth as Coinbase's direct listing focused attention on digital assets globally.

**More Information**

To learn more about Genesis, or to work together with the Genesis team, contact us at:

**info@genesistrading.com**
**www.genesistrading.com**



**Genesis**

Q1 2021 - MARKET OBSERVATIONS REPORT          3 - 25
Confidential - Filed Under Seal

➜ **Lending**        Trading        Derivatives        Milestones & Future Scenarios

# 1    Digital Asset Lending

---

In Q1, Genesis **added over $20B in new originations**. This marks a significant increase over the $7.6B we originated in Q4 2020.

Active Loans Outstanding increased to $9B, up 136.4% from $3.8B last quarter.



**Active Loans Outstanding**

Genesis Internal Data

Cumulative originations increased 94.8%. This marks our twelfth consecutive quarter of growth and **brings total originations to $40B since the launch of our lending business in March 2018**.

Our loan portfolio increased substantially in value through a combination of new issuance across cash, ETH, and Decentralized Finance (DeFi) assets alongside a significant rise in asset prices across our existing crypto book.

| ($ In MM, Except BTC Price) | 12/31/2020 | 03/31/2021 | QoQ Growth |
|---|---|---|---|
| Cumulative Originations | $21,137 | $41,181 | 94.8% |
| Active Loans | $3,821 | $9,033 | 136.4% |
| BTC Price | $29,374 | $58,919 | 100.6% |



➔ **Lending**          Trading          Derivatives          Milestones & Future Scenarios



**Cumulative Originations**

Genesis Internal Data

## Q1 2021 Loan Portfolio Composition

When examining our Q1 loan portfolio composition, **a few key stories are important to highlight**.

| Asset | 06/30/2020 | 09/30/2020 | 12/31/2020 | 03/31/2021 |
|---|---|---|---|---|
| BTC | 51.2% | 40.8% | 53.9% | 42.8% |
| BCH | 4.5% | 4.3% | 2.9% | 1.3% |
| ETH | 7.4% | 12.4% | 15.5% | 27.0% |
| ETC | 1.7% | 1.0% | 0.2% | 0.2% |
| XRP | 1.9% | 1.4% | 0.4% | 0.1% |
| LTC | 0.3% | 0.6% | 1.0% | 0.7% |
| USD & Equivalents | 32.0% | 34.5% | 23.2% | 21.0% |
| Other | 1.0% | 4.9% | 2.8% | 7.0% |

### Lackluster BTC Borrow Demand

We saw a significant decline in BTC as a percentage of our overall portfolio composition, falling to 42.8% from 53.9% over the previous quarter.



➔ **Lending**        Trading        Derivatives        Milestones & Future Scenarios

There are several reasons why, on a relative basis, there was less BTC lent out to the market in Q1 than over previous quarters. First, the level of demand to borrow BTC to arbitrage products like the Grayscale Bitcoin Trust (GBTC) declined as the premium to Net Asset Value (NAV) shifted and became a discount towards the end of the first quarter. Traders who previously borrowed BTC to contribute in-kind to the private placement or similar securities, with the intent to sell at a premium in the public market after the vesting period, lost the ability to arbitrage this spread. As a result, less BTC borrow was needed to enable this trade.

**Discount or Premium to NAV Chart**



Ycharts.com

Separately, spreads between futures and spot markets were present and persisted. Borrowing BTC to short spot and long future to bet on a widening curve doesn't make sense when basis is trading wide.

Given the lackluster demand for BTC borrow, yields on borrowed BTC also fell substantially. In previous quarters, Genesis borrowed BTC at between 3-6% per ann. In the current market structure, in most cases, rates have fallen to 1-3%.

Later in this report, we'll dive in deeper on BTC rate compression and discuss why we think we're currently close to the floor.

## DeFi Driving Growth In ETH And Alt Borrow

Another important narrative to highlight around our loan portfolio is the increase in ETH and other altcoin loans as a percentage of our book.



➔ **Lending**     Trading          Derivatives          Milestones & Future Scenarios

ETH and other altcoins now represent roughly 35% of our lending business. In notional terms that is $3.15B. In ETH terms (based on quarter-end ETH/USD prices) that equates to 1.6mm ETH outstanding to borrowers.

With the rise of DeFi protocols, and yield opportunities on platforms including Compound, Uniswap, Sushiswap, Aave, and Maker, there are more openings for traders to arbitrage Centralized Finance (CeFi) lenders with DeFi.

Over the last year, total ETH locked in DeFi increased significantly from $15B to $60B, a **300% increase**. ETH Genesis has on loan increased from $465mm in Q4 to $2.4B in Q1, a **400% increase**.

Setting aside the general price appreciation of ETH, we were not surprised to see our active loans in ETH continue to rise with the Total Value Locked (TVL) on DeFi protocols. Many of the hedge funds actively innovating and utilizing these protocols are also active borrowers from Genesis.

## USD And Stablecoin Demand

The final theme to highlight around our portfolio composition is that USD and stablecoins have remained roughly 21% of our book (despite a 136% increase in the notional size of our loan book.)

This means we have added roughly $1.2B in new cash loans this quarter. Demand for cash has been ongoing as the implied yields on BTC basis remained at trailing 12-mo highs, reaching roughly 40% per ann by the end of the quarter.

As seen in the chart below, the average 3-mo rolling basis in Q1 was roughly 22% per ann, significantly higher than the average over the trailing three quarters.



➔ **Lending**      Trading      Derivatives      Milestones & Future Scenarios



Skew.com

This persistence in basis premium has led many more institutions to eye crypto yield opportunities, driving our cash portfolio's continued growth.

As the June basis continued to widen into the end of the quarter, our derivatives desk saw increasing demand from macro discretionary firms and arb shops to put on the basis / cash-and-carry trade through our desk. Some key advantages for trading the basis in a bilateral OTC format include physical settlement of the forward and collateralizing the forward with the underlying crypto asset.

In many ways, the persistence of basis is a cash-deficit issue within crypto market structure. As more large balance sheet lenders, including medium and large-sized banks grow comfortable with the idea of holding BTC as a collateral asset, there should be increasing downward pressure on basis spreads correlated with more cash entering the market.

Genesis is helping to bridge the gap between the digital asset market structure and multi-billion-dollar institutions, including banks, traditional lenders and trading firms.

We are also excited to grow our partnerships with existing lenders including Gemini Earn, Luno, LEDN, BitcoinIRA and Circle, and to build new relationships with lenders who want to put cash to work at rates that are highly competitive relative to alternative credit markets.

**Genesis**

# 2        Digital Asset Trading

Genesis traded **$31.5B in spot in Q1**, an increase of 287% from Q4 2020. Much of this volume came from new market participants. These numbers were bolstered by the launch of **Genesis Treasury**, our newest service that helps corporates enter the market through various accumulation strategies. Genesis Treasury has seen a tremendous amount of interest.

Genesis continues to broaden its suite of supported crypto assets. Although most transactions are traded on an OTC basis to minimize market impact, there has also been a consistent upward trend in electronic execution as a percentage of our overall trading composition. 33% of spot trading utilized our Prime smart-order routing engine, an increase over the previous quarter. We expect usage to continue to grow as we introduce new algorithmic strategies that clients will be able to access directly when we launch agency trading. We will also be using these strategies internally to hedge our principal trading flow, allowing us to make tighter markets for clients on larger OTC trades.



**Genesis Spot Trading Volumes**

Genesis Internal Data

Lending    → **Trading**    Derivatives    Milestones & Future Scenarios

When viewing our top 100 largest clients by OTC volume traded, Genesis saw volume from "Corporates" increase to over 25% of our total activity. Much of this surge was attributable to a mix of clients taking positions in bitcoin for the first time, existing clients adding to their positions, and clients choosing to take a more active approach to manage their exposure.

|  | Q2 2020 | Q3 20202 | Q4 2020 | Q1 2021 |
|---|---|---|---|---|
| Corporates | 0.00% | 0.60% | 0.49% | 27.06% |
| HNW | 4.90% | 2.40% | 4.21% | 13.00% |
| Dealers/MMs | 17.26% | 13.53% | 9.84% | 9.55% |
| HF/FO | 16.25% | 23.20% | 11.31% | 20.57% |
| Payments | 59.43% | 51.67% | 14.06% | 8.92% |
| Retirement | 0.18% | 7.28% | 0.09% | 0.12% |
| Miners | 0.38% | 0.26% | 0.18% | 0.05% |
| Passive Funds | 1.60% | 1.06% | 59.83% | 20.72% |

Before Q1 2021, hedge funds and passive funds were some of our largest clients by OTC volume. As corporate clients began buying bitcoin for their treasuries in Q1, our ratios shifted. The entrance of companies like Tesla, MicroStrategy and Square led to a wave of interest from corporates looking to work together with Genesis Treasury for their own treasury allocation efforts.

**Genesis**

Lending    → **Trading**    Derivatives    Milestones & Future Scenarios



Genesis expects this trend to continue as more corporates enter digital asset markets and want to execute various accumulation and hedging strategies.

# 3                                Digital Asset Derivatives

The Genesis derivatives desk saw 133% quarter-on-quarter growth across bilateral OTC and negotiated derivative blocks **to reach $10.5B in notional traded**.

Although we grew our counterparty base by 21% over the quarter, our most significant drivers of growth were higher frequencies of trades and increased notional per trade from our crypto-native hedge fund client base. These clients were early adopters of our platform and were well-positioned to take advantage of the OTC liquidity we provided to take short-term, tactical bets in option format.

From a high level, the major thematic categories of our flow netted out to:

→ HNW individuals and systematic yield funds taking advantage of higher implied vols and the spot rally to lighten up on length via call overwriting.

→ Recycling risk in medium- to long-dated calls between overwriters and counterparties looking to add length in a levered but limited-loss format. (The relative implied funding cost of perpetual swaps vs. longer-dated futures sometimes made buying longer-dated calls a more attractive option.)

→ Corporate accounts and venture books using puts to hedge their business risk or illiquid portfolio risk.

→ Selective hedging of impermanent loss via short-dated gamma portfolios.

→ The proliferation of DeFi assets, new token issuances and vesting schedules creating and increasing demand for hedging products. This quarter saw an explosion of new base layers and protocols focused on everything from file storage to data indexing to NFT's.



Lending        Trading       → **Derivatives**        Milestones & Future Scenarios

Genesis has partnered with major stakeholders across these ecosystems to match supply and demand using our balance sheet and in derivative format. (Reach out to our desk if we can help grow liquidity for your project.)

## Looking For Patterns

Although bitcoin doubled in price from $29k at year-end to a mid-March high of $62k, the path between those points was hardly a smooth ride.

In BTC's run in Q4, there were few major pullbacks, largely staying below 75v realized. In Q1 BTC regularly realized north of 100v in BTC/USD, especially during Jan's -23% sell-off into option expiry and Feb's -23% sell-off (also into expiration). The market quickly picked up on this pattern and sold into March expiry -14% only to rally post-expiry.



**BTC/USD Spot Price**
**(Option Expiry Dates Indicated In Dotted Vertical Lines)**

Genesis Internal Data



**1-Month Realized Volatility In BTC/USD Spot Price**

Skew.com

Lending       Trading     → **Derivatives**       Milestones & Future Scenarios

The table below shows the performance of a buy-on-expiration strategy over the last three months. There have been multiple explanations for why this occurred. Some of our clients told us they believed dealers deliberately pushed spot below open call strikes where they are short. We did not find that interpretation compelling, given most dealers are not taking large delta risk in their options books.

| Month | Date of Peak | Peak BTC/USD Spot Price | Option Expiry Date | Expiry BTC/USD Settlement Price | Peak-To-Expiry Return % | Expiry +7d BTC/USD Spot Price | Expiration to +7d Return % |
|-------|--------------|-------------------------|--------------------|--------------------------------|-------------------------|-------------------------------|----------------------------|
| Jan 2021 | 8-Jan-21 | 41,986 | 29-Jan-21 | 32,210 | -23.3% | 37,625 | 16.8% |
| Feb 2021 | 21-Feb-21 | 58,367 | 26-Feb-21 | 44,741 | -23.3% | 47,190 | 5.5% |
| Mar 2021 | 13-Mar-21 | 61,788 | 26-Mar-21 | 53,204 | -13.9% | 59,555 | 11.9% |

Another explanation is that spot is gravitating toward or getting pinned on long gamma strikes that dealers are concentrated in, either in listed or OTC strikes. The chart below shows open interest by listed strike at Feb expiration which does show concentration in $44k and $46k strikes.



**Open Interest By Strike Prior To Feb Expiry**

Genesisvolatility.io

**Genesis**

Lending          Trading        → **Derivatives**       Milestones & Future Scenarios

A third explanation is related to monthly fund flows – with new fund subscriptions being deployed at the end of the month into the first week of the new month (option expiry is always the last Friday of the month), BTC/USD outperforms post-expiry.

A final explanation – having seen this pattern emerge for the last few expirations – is that it's possible a number of systematic funds may have been trading cyclicality more aggressively.

## Relative Value In Vol

Throughout Q1 Bitcoin implied volatility naturally followed realized volatility as it round-tripped higher then lower. The early Jan rally in implied vols came with the sharp move higher in BTC/USD spot at the top of the year due to capital inflows. The peak in 1-month implied vols above 140v came in mid-Jan as BTC/USD looked poised to take out previous highs around $40k.

A spillover effect from traditional markets came from the GME short squeeze at the end of Jan. GME was a visceral demonstration of the power of retail to collectively move markets. As GME peaked in the high $400s per share, BTC/USD bottomed in the low $30k range, and we saw a small surge in implied vol to 117v as upside tail risk came into focus.



**BTC/USD Implied vs Realized Vol**

Genesis Internal Data

Lending          Trading      → **Derivatives**      Milestones & Future Scenarios

Counterparties also brought up relative risk premia across BTC and traditional assets as an area of focus. Below, we've charted 1-month implied-to-realized ratios for BTC/USD, gold and SPX. While this is a relatively short time-series, it illustrates the relative risk premia moved broadly in line, with equities serving as a weak leading indicator for crypto:



**Implied-To-Realized Ratios Across Assets**

Genesis Internal Data

Deribit also began publishing DVOL[1] recently - a forward implied vol index for BTC/USD intended to emulate the VIX index for equities.

1    Reference: **Deribit**

We believe Deribit will list linear and non-linear products linked to DVOL soon. Genesis expects to be a liquidity provider as DVOL products become an important hedging instrument for our counterparties.

## Rotation Trades For A Range-Bound BTC Market

BTC dominance reached a peak at the beginning of the year before slumping to new lows as the quarter progressed.

Meanwhile, market euphoria expressed itself dramatically through the upward performance of altcoins.

Lending        Trading        ➔ **Derivatives**        Milestones & Future Scenarios

There were several major reasons for the decline in BTC dominance and the rise of alts (including DeFi governance tokens):

First and foremost, DeFi became a phenomenon in the crypto community. Historically, the main knock on DeFi has been that it is largely inaccessible to regular retail investors and traders. With the rise of more user-friendly products that require little more than Metamask to start trading, lending and borrowing, TVL exploded. At the same time, celebrity investors became vocal proponents of DeFi protocols. Coinbase and Gemini aggressively listed governance tokens - making them widely accessible to retail investors and increasing awareness of the technology. Controversy around GME/Robinhood also served as a call-to-action for many traders who viewed the episode as an indictment of centralized trading platforms, compelling them to explore DeFi as an alternative.

Second, the institutional adoption of ETH became a major theme on the back of DeFi's growth, which occurred largely on ETH's network. EIP 1559 provided another deflationary catalyst bolstering ETH's monetary premium. As additional access vehicles like the Ethereum ETFs in Canada and the CME ETH futures emerged, diversifying crypto allocations in ETH became much easier.

Finally, while ETH was in the spotlight, challengers to its claim on being THE DeFi base layer started to arrive on the scene. Notable competitors include Solana (SOL) backed by Alameda, Polkadot (DOT), which gained strong traction in Asia, and Binance Smart Chain (BNB), a marginally more centralized chain designed to make it easy to port ETH projects. All of these challengers benefited from a migration of dev talent and users as gas costs on ETH climbed higher.



**ETH Mean Gas Price (USD)**

Genesis Internal Data

**Genesis**

Lending        Trading        ➔  **Derivatives**        Milestones & Future Scenarios

The Genesis derivatives desk expanded its offerings to include underlying assets across each of these new ecosystems over the course of Q1. It also facilitated spread trades in synthetic format. While altcoin vols can be steep, especially in names with one-sided flow, we have been active in calls and puts for clients looking to add convexity or generate yield in these names.



Lending        Trading        Derivatives        → **Milestones & Future Scenarios**

# 4                    Milestones & Future Scenarios

## Institutional Milestones For Crypto

If 2020 marked the beginning of the institutional epoch in crypto, the first quarter of 2021 was a Cambrian explosion of institutional investment themes and capital inflows into crypto assets of all stripes. The positive news for crypto stood in stark contrast to the negative headlines for traditional markets, especially as drama around GameStop and Archegos unfolded.

In Q1, many marquee traditional financial services firms revived their crypto trading efforts which had been shelved since the 2017 ICO bubble popped:

→ **Goldman Sachs** announced they will begin actively trading Bitcoin futures and NDFs with clients while working on a custody offering.

→ **Morgan Stanley** expanded the mandates of a dozen of their branded mutual funds to include GBTC and CME futures. The firm also began to offer crypto fund products via their private wealth management platform and reportedly evaluated a bid for a Korean crypto exchange.

→ **BNY Mellon** announced a partnership with Fireblocks to offer crypto custody services.

Institutional market access proliferated beyond Grayscale products and the CME futures market:

→ **Fidelity** filed for a Bitcoin ETF, following Morgan Stanley/NYDIG, VanEck and WisdomTree.

→ **Canada** continued to push the bar for listed products with Purpose, CI, 3iQ and Evolve all launching Bitcoin and Ethereum ETFs.

→ **CME** added to their stable of crypto futures with the launch of ETH futures and micro BTC futures geared towards smaller investors.



Lending          Trading          Derivatives          → **Milestones & Future Scenarios**

The trend of corporate treasury reserves and merchant adoption of crypto accelerated:

→ **Tesla** announced a $1.5B treasury allocation into BTC while accepting crypto payments for purchases.

→ **Microstrategy** completed another $1bn offering of convertible notes to fund BTC purchases.

→ **Meitu**, a Chinese app company, purchased $50mm in BTC and ETH as part of a board-approved investment policy.

→ **Paypal** made several significant inroads into crypto – including buying custodian Curv, launching a crypto checkout service and offering crypto trading via its Venmo app.

→ **Visa** began using USDC to settle transactions. They also began using the ETH network to receive payment at their account with Anchorage.

Meanwhile, politicians and regulators continued to focus on strengthening market integrity and fostering innovation:

→ The **SEC** charged Ripple Labs with conducting an unregistered securities offering, with implications on all token issuances.

→ **The New York Attorney General's office** settled with Bitfinex and Tether, ending a two-year inquiry into reserves at the stablecoin issuer.

→ **Miami Mayor** Francis Suarez announced his intention to make the city a hub for crypto innovation, offering to pay public employees and accept taxes in crypto. In another surprise, crypto exchange FTX won naming rights for the home arena of the Miami Heat

The loudest drumbeat behind the institutional activity in Q1 was Coinbase's S-1 registration, which became a matter of public record at the end of Feb. While the market widely anticipated their direct listing, the event created visibility, additional access and price discovery for public investors interested in crypto. Although many macro factors converged to create such a bullish Q1, we believe much of the institutional bid underlying price action was positioning into this catalyst.



Confidential - Filed Under Seal

# "What Happens If..."

Given where the market is now, there is a lot of foreshadowing and prediction emphasis on near-term outlooks and price movements. In this section, given the range of variables and moving pieces, we explore several plausible future scenarios.

## What happens if BTC yields keep falling?

Currently, BTC yields are falling due to the supply side expanding while the demand side has fewer low-hanging opportunities.

There are several reasons why BTC supply in the market has increased. 1) As the lending industry matures, holders have grown more comfortable seeking out yield on their assets. 2) It's grown easier to earn yield on deposits than ever before, with programs like Gemini Earn, Ledn, and Luno offering simple points of access for worldwide communities of users. 3) As the futures curve is richer to spot, cash piles into long spot and short futures. That long spot inventory adds to supply in the market.

On the demand side, many of the easier trades in the market dried up in Q1. The largest example of this was the trust premium arbitrage trade discussed earlier in this report, which resulted in diminished demand into trusts.

All of this begs the question - where do BTC rates floor?

The key consideration to determine this is the ability to use BTC as collateral to borrow other assets, primarily stablecoins and cash (USD). So long as BTC can be used as collateral to borrow USD, the opportunity of USD yields impacts what you pay on BTC.

For example, suppose there are 40-100% annual interest yield opportunities available in USD. In that case, it makes sense to borrow BTC unsecured at some positive rate such that you can borrow from either centralized desks or decentralized protocols to generate USD at a positive rate. Margin is a major consideration, but so long as you can manage the borrow appropriately, the positive unsecured rate on BTC factors into your weighted average cost of capital on



USD. Leading decentralized finance protocols like MKR and AAVE often have stable borrow rates in the 5% to 9% annualized range, substantially below market-neutral cash yield strategies.

## What happens if 1T is allocated towards short basis?

The Bitcoin basis trade is one of the most well-known and longstanding arbitrage opportunities in the history of commodity markets. As FTX CEO Sam Bankman-Fried explains **here**, there is a useful framework for thinking about the basis spread. It goes like this:

The crypto market is currently worth 1T, yet traders want it to be worth 4T. There is only 0.5T willing to be loaned to the market to express that view, so the remaining 2.5T of demand is bid up in interest rates. The key variables at play here are:

>     M: the current market cap

>     D: the desired market cap

>     C: the amount of cash available to be loaned into the market

>     R: the amount bidding up interest rates

A formula to express the above becomes D - M*C = R.

To answer the initial question of what happens if 1T of cash liquidity is injected into the crypto market, it depends on what the market is currently worth relative to what it is expected to be worth.

Right now, holding forward market cap expectations constant, 1T should reduce interest rates and basis spreads. However, if forward market cap expectations widen, the 1T matters much less.

Ultimately, it's easy to say as more cash piles into the crypto ecosystem, interest rates should collapse. In reality, it's more nuanced than that. Looking only at the infusion side is solely the supply side. The demand side for forward growth expectations plays a large factor.



To take this exercise further, if the interest rate between USD and BTC widens so broadly that the rate on USD is multiple magnitudes higher than BTC, the derivatives market could partially break. Quarterly futures would widen over their duration, but ultimately - at expiry - they should match spot price and offer traders the ability to get out. On the other hand, perpetual swaps would perpetually widen and risk never coming back to parity. One way to exit this type of move would be to buy back the perp and sell a calendar future against it, but if the flow became too large the calendar futures could, in theory, trade cheap to perp but rich to spot. In this scenario you would have a very unusual forward curve where spot and calendar trade below perp. While the probability of this occurring is extremely low, it's worth keeping an eye on and watching as the market evolves.

## About Genesis

Genesis is a global leader in institutional digital asset markets, facilitating billions of dollars in digital currency transactions on a monthly basis. We provide sophisticated market participants advanced tools to trade spot and derivatives, lend, borrow, and custody digital assets, alongside full-service digital asset prime brokerage services.

## Stay Connected

For more information from this report, contact us at **info@genesistrading.com**, or call us at (212) 668-5921.

**www.genesistrading.com**

**Twitter**
**LinkedIn**
**Facebook**

## Learn More About Our Services

**About Genesis**
**Genesis Prime**

## Q1 Report By:







**Matt Ballensweig**
Head of Institutional Lending
matt@genesiscap.co

**Roshun Patel**
VP, Institutional Lending
roshun@genesiscap.co

**Joshua Lim**
Head of Derivatives
jlim@genesistrading.com

**Disclosures**

This research is for our clients only. Other than disclosures relating to Genesis, this research is based on current public information that we consider reliable, but we do not represent is accurate or complete. This research should not be relied upon as investment advice. The information, opinions, estimates and forecasts contained herein are as of the date hereof and are subject to change without prior notification. We seek to update our research as appropriate. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment. Genesis conducts a global prime brokerage service, integrating digital asset lending, trading, and custodial services. Genesis Global Trading, Inc., registered in the United States with the SEC as a broker-dealer, is a member of SIPC (**https://www.sipc.org**). SIPC coverage does not cover digital assets, virtual currency, cryptocurrency, or other related assets. Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and principal trading desks that reflect opinions that are contrary to the opinions expressed in this research. The analysts named in this report may have from time to time discussed with our clients, including Genesis salespersons and traders, or may discuss in this report, trading strategies that reference catalysts or events that may have a near-term impact on the market price of the digital assets discussed in this report, which impact may be directionally counter to the analyst's published price target expectations for such digital assets. Any such trading strategies are distinct from and do not affect the analyst's fundamental rating or commentary for such digital assets. We and our affiliates, officers, directors, and employees, will from time to time have long or short positions in, act as principal in, and buy or sell, the digital assets and securities or derivatives thereof, if any, referred to in this research. The views attributed to third party presenters at Genesis-arranged conferences, including individuals from other parts of Genesis or its parent, Digital Currency Group (DCG), and any affiliates or subsidiaries of thereof, do not necessarily reflect those of Genesis and are not an official view of Genesis. Any third party referenced herein, including any salespeople, traders and other professionals or members of their household, may have positions in the products mentioned that are inconsistent with the views expressed by analysts named in this report. This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of any investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments. Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors.

**Genesis Q2 2021**

# Q2 Market Observations

**Genesis**

Confidential - Filed Under Seal

# Q2 Market Activity Snapshot

# $25.0B

2021 Q2 Loan Originations

# $8.3B

Total Active Loans as of Jun 2021

# $29.2B

Q2 Spot Volume Traded

# $8.5B

Q2 Derivatives Volume Traded

**Genesis**

# Introduction

This report highlights **key developments observed in crypto markets and across Genesis' core businesses** in Q2 2021.

Activity in the broader market and at Genesis confirms the **changing role of bitcoin** (BTC) as the industry's gateway asset and highlights the **emerging protagonism of Ethereum and decentralized finance** (DeFi). From late 2020 until the end of Q2 2021, BTC's dominance in market cap declined from over 70% to under 45%. Ether (ETH) and prominent DeFi tokens more than doubled in price over that same period.

At Genesis, at the end of 2020, bitcoin[1] accounted for 54% of our loan book. By the end of Q2, that percentage fell to just over 42%, with ETH and smaller assets picking up much of the difference.  At the end of 2020, BTC accounted for 80% of our overall spot trading activity. By the end of Q2, that percentage fell to 47%, with ETH increasing to roughly 25% of overall spot volume. Genesis also saw increased trading of DeFi tokens, including UNI, SUSHI and AAVE, and increased trading of Ethereum competitors, including SOL and BNB. Additional client interest in DeFi led to Genesis Custody adding **support for AAVE, COMP, DAI and UNI** over the quarter.

Alongside greater asset diversification, the overall market in Q2 saw a sharp run-up in prices and volumes, followed by a sharp drop as sentiment corrected.

At Genesis, while this impacted some of our headline metrics, we still saw meaningful business growth. **New loan originations increased over 60%** to reach an all-time high of $25 billion for the quarter, marking our thirteenth consecutive quarter of growth. Despite a 41% decline in the price of BTC over Q2, our **total Active Loans Outstanding decreased by only 8.1%** to $8.30 billion.

---

[1]  Throughout, we use Bitcoin with uppercase to denote the network, and bitcoin with lowercase or BTC when referring to the asset.

# Introduction

Our trading desk **increased electronic execution** in Q2 from 32.5% of all Genesis trading activity to over 42%. Despite an overall market trading volume contraction of 33% and an overall market cap reduction of 20%, **our trading desk completed $29.20 billion in trades**, which represented a 7% decline from Q1.

On the Genesis derivatives desk, our **counterparty base grew by 15%**, including the notable addition of large macro discretionary hedge funds looking to enter the crypto derivatives market for the first time. Genesis Custody also increased its number of **onboarded entities by 22%**.

Over the following pages, we provide additional insights into results from major Genesis business lines. We also provide our thoughts on crypto market developments including structural imbalances between lenders and borrowers, ideas on why crypto yields and USD yields diverged, and major upcoming developments that could influence Q3.

**More Information**

To learn more about Genesis, or to work together with the Genesis team, contact us at:

**info@genesistrading.com**
**www.genesistrading.com**

→ **Lending**   Trading    Derivatives    Custody    Market Update    Looking Ahead

# 1 Digital Asset Lending

In Q2 2021, Genesis marked its largest quarter to date with **$25.0 billion in new originations**, up from $20.0 billion in Q1. Despite a 41% decline in BTC price, total Active Loans Outstanding decreased only 8.1% to $8.30 billion. Mark-to-market depreciation in book value was offset by organic loan portfolio growth.



Genesis' originations rose almost 8x year-over-year and were 60.6% higher than at the end of Q1. Cumulative originated value reached $66 billion since the launch of our lending business in March 2018. This marked our thirteenth consecutive quarter of strong lending growth.

| ($ In MM, Except BTC Price) | 03/31/2021 | 06/30/2021 | QoQ Growth |
|---|---|---|---|
| Cumulative Originations | $41,170 | $66,124 | 60.6% |
| Active Loans | $9,033 | $8,299 | -8.1% |
| BTC Price | $58,919 | $35,049 | -40.5% |

**Genesis**

→ **Lending**    Trading    Derivatives    Custody    Market Update    Looking Ahead



**Cumulative Originations**

# Q2 2021 Loan Portfolio Composition

Looking at our loan portfolio composition in Q2 2021, there are a **few key stories that are important to highlight**.

| Asset | 09/30/2020 | 12/31/2020 | 03/31/2021 | 06/30/2021 |
|---|---|---|---|---|
| BTC | 40.8% | 53.9% | 42.8% | 42.3% |
| BCH | 4.3% | 2.9% | 1.3% | 1.6% |
| ETH | 12.4% | 15.5% | 27.0% | 27.9% |
| ETC | 1.0% | 0.2% | 0.2% | 1.4% |
| XRP | 1.4% | 0.4% | 0.1% | 0.1% |
| LTC | 0.6% | 1.0% | 0.7% | 0.7% |
| USD and Equivalents | 34.5% | 23.2% | 21.0% | 21.1% |
| Other | 4.9% | 2.8% | 7.0% | 5.0% |

 Source: Genesis internal data

**Genesis**

# Low WACC on BTC, ETH Allowed for Greater Loan Issuance Despite Tighter Market

Despite much lower asset values in BTC and ETH, the composition of our active portfolio stayed in line with Q1. Although there were fewer delta-neutral yield opportunities in the market, Genesis was still able to add to the number of BTC and ETH on loan given our robust access to capital across a variety of deposit venues.

Since our weighted average cost of capital (WACC) on crypto assets was significantly lower than our cost in USD, Genesis had more room to lend crypto at lower rates, even when spreads were much tighter. For instance, even when our borrowers could only generate 5-10% ROI using BTC or ETH working capital, we were still able to finance them, knowing our cost on those assets was slightly below. There only needs to be a small opportunity to make money in a backwardation market for Genesis to squeeze out spread and provide capital to trading counterparties.

Conversely, if borrowers needed USD or USDC working capital and average ROI was 5-10%, we likely would not have been able to source cash at a rate that would make sense and would have been less active in a low-spread contango market.

Overall, Genesis has more room to lend BTC and ETH than it does to lend USD or USDC in a tighter market. As a result, in a flat curve environment, we were able to increase our BTC and ETH loans. Over the same period, our USD book saw limited growth.

# Supply Outpacing Demand in Digital Currency Lending Market

One of the reasons Genesis is able to source cheap BTC and ETH to power our institutional borrowing network is that we are connected to deposit-aggregating retail platforms, including Gemini Earn, Luno,[2]

2    Luno is a subsidiary of Genesis parent company DCG.

LEDN and BitcoinIRA. These companies provide a gateway for their users to earn yield. We have seen the retail supply side of the market develop much faster than the institutional demand side, with most retail supply in the form of BTC and ETH.

As background, unlike the case of traditional markets and USD, where investors with cash can easily access investment opportunities including equities, fixed income and other products that allow for the generation of passive income, there are limited options to generate income with crypto other than direct deposit on retail exchanges like Gemini and Luno. With crypto, we are just scratching the surface when it comes to the concept of "productive assets."

In the past, retail exchanges offering lending programs provided a simplistic medium for "hodlers" to compound their wealth. They attracted many users quickly, even at low interest rates. Since they started as exchanges first, their infrastructure pertaining to user mapping, custody and accounting had already been built. Genesis increasingly works with these exchanges as a trusted partner, serving as a bridge connecting yield-hungry communities with risk-adjusted yield.

The demand side of the market has different barriers and has been slower to develop.

Unlike the supply side, which is highly retail-focused, the demand side is mostly comprised of large trading firms, hedge funds, quant funds, exchanges, dealers and brokerages. For this group, it takes time to get connected to multiple exchanges, develop a regulatory game plan, find a custodian, etc. Many of the most active crypto trading firms are native to the market. Most traditional funds are still working through their setups.

There is a difference in ramp-up times to access different parts of the market (i.e., lending vs. trading/arbitrage), and this is one of the big reasons we see a compression in crypto lending rates across the board. Rate-makers (suppliers) are getting access to the market faster

**Genesis**

than rate-takers (borrowers), and offers for capital are stacking up faster than bids.

The chart below illustrates the utilization of our BTC loans on platform over time. Since the beginning of 2020, Genesis has seen a compression in utilization given the flood of new supply on the market, with the institutional market unable to absorb the inventory.



**BTC Utilization Of Total Genesis Deposits**

Source: Genesis Internal Data

This trend is likely to continue as more yield platforms come together. It should persist until a new wave of institutional borrowers enter the market and increase the pie or until current borrowers have outsized opportunities to generate alpha in high-spread markets.

# Cash Rates Down, Crypto Rates Up

Cash lending yields and volumes were the main stories of Q1. Since then, we've seen a meaningful reduction in new cash borrowing demand in the institutional market given the collapse in spot/futures spreads that occurred since May. At the same time, the market is currently flush with investors looking for yield. This supply-demand imbalance has pushed cash rates much lower than over previous quarters.

Borrowing demand tends to increase in a bearish market, and crypto lending rates have moved a bit higher. When funding rates on perpetual futures are mostly negative (meaning those who are short futures pay those who are long to keep prices in line with the market), a popular trade is to borrow spot to short and then go long the perpetual future, earning the funding rate.

**Genesis**

Lending    ➜ **Trading**    Derivatives    Custody    Market Update    Looking Ahead

# 2                    **Digital Asset Trading**

Genesis traded **$29.2 billion in spot in Q2**, a year-over-year increase of 487%. This was slightly lower than last quarter's volume over the bull run.

While price levels ended the quarter lower, Q2 saw significant bouts of volatility, including on May 19th when bitcoin experienced one of its largest intraday drawdowns of all time.

During the month of May, Genesis traded 50% of the company's overall volume for the quarter. We discuss this period in greater detail later on in this report.



**Genesis Spot Trading Volumes**

Source: Genesis Internal Data

Legend: ■ Total Spot Volume Traded    ■ Electronic Execution as %

In our Q1 Market Observations report, Genesis noted an increasing trend of electronic execution as a percentage of our overall trading volume. In Q2, this continued with **electronic execution composing**

**Genesis**

**42% of all trading activity** at Genesis. During this time, Genesis was able to help clients systematically leg into spread trades across both futures and spot markets in a variety of different assets, taking delta neutral views and collecting funding or basis.

Another trend that continued into Q2 was the broadening of crypto assets supported on the Genesis platform. **BTC trading accounted for roughly 47%** of our overall spot trading activity, down from roughly 80% in Q2 2020. ETH took most of that share, accounting for roughly 25% of overall volumes on the spot desk. BTC dominance in the cryptocurrency ecosystem fell to the lowest levels we have seen since January 2018.



**Trading Volume (% Total)**

While BTC and ETH  dominated total notional traded, we saw continued demand to trade altcoins. Large cap DeFi products were at the forefront of the transition, with total value locked (TVL) in DeFi protocols skyrocketing.

**Genesis**

# 3                              Digital Asset Derivatives

The second quarter of 2021 started with a sugar high spurred by institutional and retail enthusiasm around the Coinbase direct listing and the explosive growth in DeFi volumes and value locked.

However, while the crypto community was buzzing with outsized funding rounds, the launch of major projects, rotation into smaller-cap assets and the growing adoption of bitcoin as a reserve asset for corporates and sovereigns, the making of a major crash was in the works.

Through the highs and lows, the Genesis derivatives desk continued to operate as a reliable hedging partner to crypto funds looking to protect their downside over the quarter. Genesis traded **$8.5 billion of notional volume** across bilateral OTC and negotiated blocks, compared to $10.5 billion in the previous quarter, reflecting the market-wide muted environment for options trading towards the second half of Q2. The Genesis **counterparty base grew by 15% including large macro discretionary hedge funds entering the crypto derivatives market for the first time**. We discuss some of their market-neutral trades in focus below.

## A Dissection Of The May 2021 Crash

While April 14th, the day of the Coinbase listing, marked a new all-time high for BTC/USD at $64,900, we ended the quarter at $35k, a -46% drawdown. Trouble started with profit-taking from our discretionary macro trading counterparties going into the weekend post listing. A break below $60k on April 18th then took the markets to $50k on nearly $4 billion of BTC/USD liquidations across derivative exchanges.

A relief rally at the beginning of May was supported by inflows into crypto funds. A reflexive buy-the-dip mentality drove many funds to

**Genesis**

add call options to play for a quick bounce, even while 1-month implied vols dithered in the low 70s – in retrospect, this was one of the most opportune vol buying windows this year. A number of our crypto-native hedge fund clients also took advantage by adding well-timed puts and put spreads as systematic portfolio hedges, leading to double-digit percent fund outperformance vs. benchmark on the month, discussed in more detail in the sections below. $60k became a resistance level for BTC. By the end of the month, we had tested the low $30k range twice.

BTC 1-month implied vol



What caused the May 2021 crash? The two week period from May 9th to 22nd saw a wave of P&L destruction and a reset to 0% performance YTD for BTC/USD (setting aside outperformance in ETH and DeFi assets). At the start of the period, a series of tweets from Elon Musk that canceled Tesla's merchant acceptance of BTC triggered widespread ESG concerns around the mining sector. This was paired with and compounded by a dangerously levered market and an exogenous shock from China over the subsequent week. On the evening of Tuesday, May 18th (New York time), BTC/USD broke $40k, a level that was watched by many. This triggered a cascade of liquidations and exhausted order book bids, and BTC touched a low of $28k. A spate of negative headlines, including an operational error by BlockFi and additional IRS and US Treasury scrutiny on crypto transactions, added to the bearish overhang.

**Genesis**

While ETH outperformed up to this point, bolstered by ETH2 ESG proponents, the fact that it continued to trade well relative to BTC made it a target for portfolios needing to cover BTC margin calls. On the morning of Wednesday, May 19th, ETH/USD fell from $3,400 to a low of $1,800. Other alts followed, finishing the week in the low levels as all correlations went to 1. On Friday, May 21st, China also piled on top of ESG and US regulatory concerns with its own strenuous warnings against Bitcoin mining in the country. There was a lost-in-translation moment between Western and Chinese market participants as the gravity of new Chinese regulatory actions far overshadowed what the market had previously seen.

ETH drop on May 19, 2021



What caused the liquidations? While retail leverage in the form of centralized derivative exchanges' open interest is the easiest metric to point to, crypto market structure has evolved to include multiple fragmented sources of levered liquidation risk. We view these risks in descending order of importance:

→   Futures trading/margin trading platforms accessible to retail like Binance, Huobi, Bybit

→   Off-exchange sources of leverage, including centralized loan books

**Genesis**

→  Options trading platforms like Deribit and the short gamma of option market-making books

→  Embedded short gamma in DeFi AMMs and lending protocols like Maker CDPs and Uniswap LPs



# Market-Neutral Spreads In Focus

Bitcoin's year-to-date round-trip was no doubt exhilarating for directional macro traders, but it provided more excitement to market-neutral arb shops.

The first notable event occurred at the end of February with the inversion from NAV premium of +10% to discount of -10% on Grayscale's market-leading GBTC bitcoin trust.[3] This inversion coincided with the launch of ETF products in Canada with a creation and redemption mechanism. The emergence of these alternative access vehicles put pressure on trust product premiums without a similar redemption mechanism. A discount persisted to the end of Q2, reaching a low of -20% before bouncing back to the -10% range as the issuer announced its intention to convert a trust into a product with a redemption mechanism as soon as legally possible, and DCG[4] announced a share purchase program.

3   Grayscale Investments is a sister company of Genesis. Genesis Global Trading is an Authorized Participant in the Grayscale Trust share creations and distributions.

4   Digital Currency Group (DCG) is the parent company of both Grayscale Investments and Genesis.

**Genesis**

Lending      Trading      ➔  **Derivatives**      Custody      Market Update      Looking Ahead



The second notable event started at the beginning of March and continues to this day. The basis spread (premium of forward curve to spot price for BTC/USD) widened to historic levels, hitting a high of 45% annualized for the 3mo point. Is there a connection between these two events? In this section, we explore why there may have been a spillover from one trade to the other.

A common market-neutral trade structure for the GBTC trust product is to 1) borrow BTC from a lending desk, 2) contribute the BTC into the trust at NAV, 3) hold the product for the seasoning period of six months and 4) sell the product in the secondary market at the habitual premium to NAV to generate USD used to buy back BTC spot and return the loan. As demand for this trade structure declined, demand for crypto asset borrow declined commensurately.

If crypto yields and USD yields had declined in tandem, the forward premium might have stayed in line – however, several factors caused a differential in yield moves:

➔  First, with broad crypto price appreciation (BTC/USD doubling over the quarter) and total crypto market cap hitting as high as $2 trillion, the available inventory of crypto in USD terms exploded, which further depressed crypto yields.

**Genesis**

→ Second, the mainstreaming of DeFi lending platforms caused further supply to emerge, compressing crypto yields further.

→ Finally, we can infer that demand for long exposure in crypto expanded enormously as investors followed the momentum and added length, causing USD yields to increase.

BTC 3-month forward spread to spot, % annualized



The June basis continued to widen into mid-April in line with spot touching ATH. Our derivatives desk saw increasing demand from macro discretionary firms and arb shops to put on the basis / cash-and-carry trade. Some key advantages for trading the basis in a bilateral OTC format include physical settlement of the forward leg and collateralizing such with the underlying crypto asset.

The sell-off in May created the exact opposite dynamic of the April widening, increasing demand:

→ First, de-risking and hedging from macro investors and long-term holders as BTC/USD came off the highs – this reduced the available borrow inventory of crypto, which expanded crypto yields.

→ Second, the liquidation on DeFi lending platforms and the general decline in price levels removed supply, expanding crypto yields further.

**Genesis**

→  Finally, levered exposure on exchanges was liquidated (nearly $6bn in length liquidated), causing futures to trade at a massive discount. Some exchanges had -14% annualized discounts as order books were wiped. The retail appetite for synthetic exposure disappeared, destroying institutional demand for USD in the cash-and-carry.

After the May crash, our derivatives desk saw a reversal of the Q1 flows into the basis trade, and many funds unwound their cash-and-carry positions with 15%+ realized P&L gains in under one month. The persistence of hedging demand for crypto inventory and the elimination of retail levered length capped the basis in the 2-5% annualized range through the rest of Q2.

# Outperforming Via Systematic Put-Hedging

As BTC/USD marched to new highs in April, a number of our forward-thinking crypto-native hedge fund and corporate treasury counterparties meaningfully stepped up their systematic put-hedging programs. Within our crypto-native fund segment, we saw a number of venture books with relatively illiquid or locked-up holdings use BTC/USD and ETH/USD puts as a portfolio-level overlay to reduce beta exposure. We also had a number of quant and event-driven firms with hefty altcoin allocations similarly use one-week to one-month out-of-the-money options to protect from crash scenarios.

As an example, in early May, a fund could have purchased a two-week 10% OTM 15% wide put spread for roughly 1.5% in $100 million notional size. For one of our most perspicacious counterparties, this type of 10-to-1 payout produced double-digit percent outperformance relative to benchmark.

Lending     Trading     → **Derivatives**     Custody     Market Update     Looking Ahead



This increased demand for systematic protection is reflected in both our internal put vs call activity as well as the market price of skew in the one-month bucket:



**Genesis**

# 4                              Custody

In Q2 2021, the **number of entities onboarded to Genesis Custody increased by 22%**. In addition, 63% of Genesis Custody customers also have a trading and/or lending account with Genesis, while 50% of the 605 new applicants in Q2 2021 selected trading, lending or derivatives & custody as of interest. These stats are particularly interesting as they speak to the need for integrated trading, lending and custody for institutional clients seeking to allocate to digital assets.

Since the acquisition of crypto custodian VO1T in May of 2020, the Genesis and VO1T team have spent the better part of 2020 and early 2021 working diligently behind the scenes to integrate VO1T's proprietary technology into the broader Genesis ecosystem. Some highlights on the continued growth of our custody solution:

**Portfolio management and yield participation:**

→   Genesis Custody customers have access to seamless portfolio management/execution via Genesis Global Trading, as well as yield generation opportunities via Genesis Global Capital.

**Security:**

→   Client private keys are fully segregated and held in HSMs in deep cold storage in repurposed nuclear bunkers in multiple sites around the world. In addition, client assets are protected by an industry leading insurance policy.

**Pricing:**

→   Genesis Custody offers customers an annual flat fee for digital asset custody, with annual rebates if the customer is trading with Genesis Trading or lending/borrowing with Genesis Global Capital.

Lending    Trading    Derivatives    Custody    ➔ **Market Update**    Looking Ahead

# 5 Market Update

In spite of strong fundamental growth across the crypto asset industry, market sentiment shifted in Q2 to produce negative returns in most crypto assets. BTC fell by over 40%, breaking a run of four consecutive quarters with strong price gains. ETH, on the other hand, gained 18.4% on the back of technological progress in the underlying protocol and increasing interest in decentralized applications (dapps).

The weak crypto market sentiment stood out against a backdrop of continued gains in principal macro market indicators supported by economic reopening in many areas. The S&P 500 was up over 10% in the quarter, commodity prices rallied sharply and most bond categories posted positive returns as longer-term interest rates dropped.

| G | Q2 % chg vs Q1 | | Q2 % chg vs Q1 |
|---|---|---|---|
| BTC | -40.6% | S&P 500 | 10.4% |
| ETH | 18.4% | Nasdaq | 9.5% |
| LTC | -27.1% | FTSE 100 | 4.8% |
| BNB | -4.2% | Gold | 4.2% |
| ADA | 16.2% | Silver | 7.1% |
| XRP | 21.9% | TLT Long Bond ETF | 6.6% |

(Sources: CoinMarketCap, CoinDesk, gold.org, silverprice.org, Yahoo Finance)

The contrast between the macro and crypto asset performance underlines the widening division in market perceptions of the macro situation. While many investors focused on economic growth resulting from the end of lockdowns, others warned of lingering danger, recurring shocks and an impossible-to-correct debt explosion. Employment

numbers are sending mixed signals, and there is little agreement on just what the escalating CPI numbers mean. Public comments from the Federal Reserve (the "Fed") hint at nimble footwork that attempts to mask internal uncertainty, and focus is now on whether the Fed will be able to do what it needs to if/when the inflation message becomes clearer.

It's almost as if bitcoin, perceived by many to be a hedge against fiat currency debasement, decided to sit this one out until that narrative gets clearer.

In the absence of strong positive news for the largest cryptocurrency by market cap, negative news set the tone. The energy mix of bitcoin mining came under renewed scrutiny, which had the beneficial effect of unleashing a wave of information to correct the misconceptions. Chinese authorities moved against crypto activities, triggering the closure of most mining operations in the country as well as the pivot or closure of several exchanges. This heightened BTC selling pressure as Chinese operations divested, but will improve the geographical dispersion of mining operations, mitigating a perceived risk point. In the US, regulators became more public in their concern over the role of cryptocurrency in money laundering and ransomware, and Binance – one of the leading crypto exchanges in terms of volume – came under official pressure in several jurisdictions.

Eric Peters, CIO of One River Asset Management, highlighted the market's resilience:[5]

> *"In human history, no single asset has come under such coordinated assault by the very global institutions that perpetually inflate asset prices in the name of securing prosperity. And yet, through it all, digital asset trading carried on, obliterating the leveraged longs, wiping out the weak. For the first time in decades, we saw the ferocious beauty of truly free markets operating at scale."*

Off-chain BTC spot trading volumes on leading fiat exchanges[6] trailed off in June, after reaching an all-time daily high of almost $9 billion on May 19th. However, the daily average for May was $2.7 billion, lower

[5]  Eric Peters, "**In Human History, No Single Asset Has Come Under Such Coordinated Assault By Global Institutions,**" ZeroHedge, May 24, 2021.

[6]  Coinbase, LMAX Digital, Bitstamp, Kraken, Gemini and itBit – data from skew.com.

than January's daily average of $3.0 billion, and – for the first time – lower than ETH's May daily average of $3.0 billion. While BTC spot volume was lower in Q2 than in Q1, ETH's quarterly volume reached new highs, indicating a shift in market focus.

## Market rotation

This shift is reflected in the breakdown of Genesis' operating figures mentioned in the introduction. It can also be seen in the ratio of BTC's market cap to that of ETH, which shows the expanding role of ETH as an institutional portfolio asset:



Market rotation: BTC/ETH market cap declining



Looking beyond ETH, DeFi market cap ended up 43% lower than at the end of Q1, although the overall weight of DeFi tokens in the crypto market capitalization held steady at around 5%.

In spite of price declines for many of its leading tokens, DeFi activity continued to grow. The dollar value of tokens locked in decentralized applications, adjusted to smooth asset price fluctuations,[7] has more than doubled since Q1. This growth was largely driven by SushiSwap, Aave, Curve and Compound on the Ethereum blockchain.

7    The TVLadj metric was introduced by Dapp Radar to value locked tokens at the asset prices of 90 days earlier. This partially abstracts the token price increase effect to reveal a more fundamental growth pattern.

## Strong growth in adjusted TVL for most leading DeFi platforms



One notable driver of DeFi volumes is growing interest from institutions. Millennium Management, Point72 Asset Management and Matrix Capital Management are just some of the well-known hedge funds reportedly looking into setting up crypto products including DeFi exposure. A report released in May by PwC showed that crypto hedge funds are investing a greater percentage of their AUM in DeFi assets.[8] Furthermore, the second quarter saw the launch of several DeFi investment vehicles, including funds, index products and ETPs.

While market sentiment depressed the price performance of most crypto assets during the quarter, the tailwinds of network growth overlaid with growing interest and some focused hype did deliver some isolated strong performances.

8    PwC, **3rd Annual Global Crypto Hedge Fund Report 2021**

| G | Q2 % chg vs Q1 | | Q2 % chg vs Q1 |
|---|---|---|---|
| FIL | -69% | LINK | -33% |
| LUNA | -69% | COMP | -18% |
| DOT | -55% | AXS | -10% |
| SUSHI | -44% | BNB | -2% |
| UNI | -36% | SOL | 66% |
| AAVE | -34% | DOGE | 369% |

(Source: CoinMarketCap)

# 6         Looking Ahead

## Technology

Significant technological steps are expected in Q3 that will meaningfully impact the usability, throughput and valuations of several main crypto applications.

### Bitcoin

Taproot, set to activate in November, is the most significant upgrade to Bitcoin since the SegWit upgrade enhanced transaction throughput in 2017. Unlike Ethereum, upgrades on Bitcoin are few and far between given the intentional simplicity of its code and the difficulty of achieving consensus across the ecosystem. In this case, consensus was achieved with relatively little controversy (compared to the debates around the SegWit proposal and the resulting split of the network into BTC and BCH) which is indicative of the expected positive impact on Bitcoin's functionality.

Rolled into the Taproot upgrade is the implementation of Schnorr signatures, which will enhance network security, take up less space in Bitcoin blocks and simplify more complex applications. This should reduce transaction fees and enable more flexibility when constructing transactions, both of which could broaden Bitcoin's potential use cases and user base. Other Taproot benefits include greater privacy, in that transaction types will be masked, making a simple peer-to-peer transfer indistinguishable from a more sophisticated operation involving smart contracts.

Aside from the improved functionality, this change serves to remind the market that Bitcoin is not just a distributed monetary system and a provably hard asset – it is also a liquid early-stage technology play with an increasingly sophisticated capital market and 12 years of robust operating history.

**Genesis**

## Ethereum

Ethereum also has a major change on the short-term horizon, happening even sooner than that of Bitcoin. The London upgrade is expected to go live in early August[9] and will be in the form of a hard fork, which means that blocks processed on the old version will not be valid on the updated protocol.

The London upgrade includes Ethereum Improvement Proposal (EIP) 1559, which changes how Ethereum fees work. Instead of a discretionary fee amount, which proved confusing to users and often led to delayed transaction confirmations, users will pay a set "base" fee which will adjust according to network congestion. This will improve the usability of Ethereum by simplifying transaction fees and ensuring fewer delayed transactions.

Another key element of EIP 1559 is the change in ether's inflation. ETH paid in the base fee will be burned and removed from the network. The removal of ether from circulation will also reduce the network's inflation (currently approximately 4%) and, depending on the amount of fees burned, could turn ether into a deflationary asset.

## DeFi

Many DeFi applications have been hampered by congestion and high fees on Ethereum; some even migrated to other blockchains in search of a better experience for their users. Layer-2 solutions are evolving fast, however, and promise to alleviate scalability issues while offering applications access to the Ethereum network and community.

Q3 should see significant progress in Layer-2 and similar protocols. Two of the leading solutions – Arbitrum and Optimism – are expected to announce major mainnet launches in Q3. Several DeFi protocols have already launched beta versions on one or the other. The continued development and growth of Layer-2 solutions will not only improve usability and economics for many DeFi protocols; they will also attract new applications and new users.

9    The London hard fork will activate at block 12,965,000, which at time of writing was expected on August 4th.

The technological progress across crypto asset protocols not only showcases the innovation that has always characterized the sector. It also points to increasing intrinsic value as use cases attract users who generate cash flows. The outlook for crypto asset prices over the next few months is uncertain, as narratives are volatile in the face of confusing macro indicators and increasing regulatory attention. But progress on the industry's fundamentals combined with growing interest from traditional market participants will continue to push the sector forward.

## Regulation

At Genesis, we see emerging regulatory clarity as a plus for institutional investors. However, in the short term, uncertainty around the details of eventual crypto regulatory moves adds risk and was likely one of the factors behind Q2's lackluster crypto market performance.

Nonetheless, progress towards greater regulatory clarity is accelerating. The growing involvement of legacy financial institutions in crypto markets is making the industry harder to ignore, with an alphabet soup of regulatory agencies around the world officially putting crypto assets on their to-do list.

A lack of regulatory clarity has often been cited as a barrier to institutional investment, especially from the more traditional areas of finance. While more detailed regulation will impose some limits on current activity, it will also signal official acceptance that the crypto asset class is now a permanent feature of the investment landscape. Further, a clearer idea of the limits and protections for crypto platforms and their users could encourage even more investment in market infrastructure companies and related services, strengthening the ecosystem overall.

The SEC currently has over ten BTC and two ETH ETF applications in the pipeline. Greater regulatory clarity could bring forward approval of at least some of the candidates,[10] which could trigger a meaningful inflow of retail and institutional investment.

10   Grayscale Investments, a sister company of Genesis and currently the manager of the industry's largest bitcoin trust GBTC, has said that it will **convert the trust into an ETF** as soon as legally possible.

## About Genesis

Genesis is a global leader in institutional digital asset markets, facilitating billions of dollars in digital currency transactions on a monthly basis. We provide sophisticated market participants advanced tools to trade spot and derivatives, lend, borrow, and custody digital assets, alongside full-service digital asset prime brokerage services.

### Stay Connected

For more information from this report, contact us at **info@genesistrading.com**, or call us at (212) 668-5921.

**www.genesistrading.com**

**Twitter**
**LinkedIn**
**Facebook**

### Learn More About Our Services

**About Genesis**
**Genesis Prime**
**Lending FAQ**
**Custody FAQ**

## Q2 Report By:

**Matt Ballensweig**
Head of Institutional Lending
matt@genesiscap.co

**Roshun Patel**
VP, Institutional Lending
roshun@genesiscap.co

**Joshua Lim**
Head of Derivatives
jlim@genesistrading.com

**Noelle Acheson**
Head of Market Insights
nacheson@genesistrading.com

**John Conneely**
VP, Institutional Custody Sales
jconneely@genesistrading.com

**Greg Guttas**
VP, Trading
gguttas@genesistrading.com

**Eugene Chang**
Associate, Institutional Lending
echang@genesistrading.com

**Sebastian Higgs**
VP, Custody Services
shiggs@genesistrading.com

**Genesis**

**Disclosures**

This research is for our clients only. Other than disclosures relating to Genesis, this research is based on current public information that we consider reliable, but we do not represent is accurate or complete. This research should not be relied upon as investment advice. The information, opinions, estimates and forecasts contained herein are as of the date hereof and are subject to change without prior notification. We seek to update our research as appropriate. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment. Genesis conducts a global prime brokerage service, integrating digital asset lending, trading, and custodial services. Genesis Global Trading, Inc., registered in the United States with the SEC as a broker-dealer, is a member of SIPC (**https://www.sipc.org**). SIPC coverage does not cover digital assets, virtual currency, cryptocurrency, or other related assets. Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and principal trading desks that reflect opinions that are contrary to the opinions expressed in this research. The analysts named in this report may have from time to time discussed with our clients, including Genesis salespersons and traders, or may discuss in this report, trading strategies that reference catalysts or events that may have a near-term impact on the market price of the digital assets discussed in this report, which impact may be directionally counter to the analyst's published price target expectations for such digital assets. Any such trading strategies are distinct from and do not affect the analyst's fundamental rating or commentary for such digital assets. We and our affiliates, officers, directors, and employees, will from time to time have long or short positions in, act as principal in, and buy or sell, the digital assets and securities or derivatives thereof, if any, referred to in this research. The views attributed to third party presenters at Genesis-arranged conferences, including individuals from other parts of Genesis or its parent, Digital Currency Group (DCG), and any affiliates or subsidiaries of thereof, do not necessarily reflect those of Genesis and are not an official view of Genesis. Any third party referenced herein, including any salespeople, traders and other professionals or members of their household, may have positions in the products mentioned that are inconsistent with the views expressed by analysts named in this report. This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of any investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments. Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors.

**Genesis Q3 2021**

# Q3 Market Observations

**Genesis**

Confidential - Filed Under Seal

# Q3 Market Activity Snapshot

# $35.7B

2021 Q3 Loan Originations

# $11.1B

Total Active Loans as of Sept 2021

# $25.0B

Q3 Spot Volume Traded

# $12.7B

Q3 Derivatives Notional Value Traded

# Introduction

In a quarter marked by the accelerating march of traditional finance into crypto markets, a market rotation into Layer-1 (L1) tokens and growing institutional interest in DeFi, Genesis continued its growth in lending, trading and custody to deliver our largest quarter to date.

→   Q3 loan originations reached $35.7 billion, up over 586% year-on-year and 40% vs Q2 2021.

→   Spot trading grew over 450% vs Q3 2020.

→   The derivatives desk's notional volume traded was up over 12x year-on-year, and up almost 50% on the quarter.

→   Our custody team grew the number of onboarded clients by 47% vs Q2 2021, and increased the number of assets supported by 50%.

→   What's more, over the past year our headcount has tripled to 139 as of the end of September 2021, spread across three continents.

The growth across all our divisions further solidifies our prime brokerage offering as one of the leaders in the crypto market, as a growing number of institutional investors look for services beyond reliable execution and custody including new types of trading strategies, crypto-finance products and yield services.

In this report, we discuss our Q3 results in more detail, and provide insights into some of the driving market trends behind our progress.

**More Information**

To learn more about Genesis, or to work together with the Genesis team, contact us at:

**info@genesistrading.com**
**www.genesistrading.com**

Genesis

# 1                        Genesis Q3 Results

Q3 marked our largest quarter to date, reaching record numbers on loan originations, derivatives volumes and custody clients.

## Lending

The Genesis lending desk handled $35.7 billion in new originations, up from $25.0 billion in Q2, marking both a company record and our fourteenth consecutive quarter of strong lending growth.

Cumulative originations surpassed the $100 billion milestone mark since our lending business launched in March 2018.



**Lending: Cumulative Originations ($ billion)**

Source: Genesis Internal Data

Active loans outstanding rose 34% over the quarter to $11.1 billion from $8.3 billion in Q2. Over the same period BTC rose 25%, leading to greater organic growth in our loan portfolio.

➔    **Results**       The Search for Yield       Vol Market Dynamics       About Genesis



Loan book composition continued adjustments initiated in Q1. While BTC loans increased overall, relative weighting continued to decline as demand reacted to the narrowing basis and the GBTC discount. BTC accounted for 32.4% of outstanding loans at the end of Q3, down from 42.3% at the end of Q2 and 53.9% at the end of 2020.

ETH loans, on the other hand, saw strong growth both in absolute terms and in relative weighting alongside greater demand from institutions looking to engage with DeFi platforms. By the end of Q3, ETH accounted for 32.0% of our loan book, up from 27.9% in Q2 and 15.5% at the end of 2020.

Genesis also saw growth in USD and equivalent loans, which reached 29.5% of outstanding loans at the end of Q3, up from 21.1% in Q2 and 23.2% at the end of 2020.

→  **Results**     The Search for Yield     Vol Market Dynamics     About Genesis

| Asset | 12/31/2020 | 03/31/2021 | 06/30/2021 | 09/30/2021 |
|---|---|---|---|---|
| BTC | 53.9% | 42.8% | 42.3% | 32.4% |
| BCH | 2.9% | 1.3% | 1.6% | 1.0% |
| ETH | 15.5% | 27.0% | 27.9% | 32.0% |
| ETC | 0.2% | 0.2% | 1.4% | 0.3% |
| XRP | 0.4% | 0.1% | 0.1% | 0.1% |
| LTC | 1.0% | 0.7% | 0.7% | 0.5% |
| USD and Equivalents | 23.2% | 21.0% | 21.1% | 29.5% |
| Other | 2.8% | 7.0% | 5.0% | 4.3% |

 **Source: Genesis internal data**

| ($ In MM, Except BTC Price) | 06/30/2021 | 09/30/2021 | QoQ Growth |
|---|---|---|---|
| Cumulative Originations | $66,083 | $101,747 | 54.0% |
| Active Loans | $8,299 | $11,128 | 34.1% |
| BTC Price | $35,049 | $43,791 | 24.9% |

Later in this report, we provide more detail on market trends that influence the composition of our loan book in *"The Search for Yield"*.

# Derivatives

Q2's swift deleveraging resulted in a peak-to-trough sell-off of over 50%. Q3 centered on the reestablishment of market stability, and with that came renewed risk taking in the derivatives markets. Listed options open interest (OI) opened the quarter at $5 billion and more than doubled to above $10 billion by the end of September.

➔  **Results**      The Search for Yield      Vol Market Dynamics      About Genesis

Genesis saw a Q3 resurgence of derivatives trading activity that culminated in over $12.7 billion notional value on a global basis, including bilateral OTC, negotiated block trades and exchange-traded volumes. This total represents approximately +50% quarter-on-quarter growth and was a new record for the derivatives desk, surpassing our strong Q1 and reflecting a resurgence of institutional activity in the market alongside a broadening of Genesis's counterparty base.



**Derivatives: Notional Traded ($ billion)**

As many in the TradFi world eagerly awaited the October slate of upcoming "'40 Act" futures-based ETFs on bitcoin[1], our trading desk marked several important milestones on the path to broader institutional adoption.

First, Genesis became an active CME futures and options block liquidity provider to multiple global investment banks and $100bn+ asset managers, as liquidity and open interest deepened.

Second, Genesis was a maker for the first two trades ever printed in the Bitcoin BTIC (Basis Trade at Index Close) product listed on CME, an important innovation for funds benchmarked to the 4 PM London Bitcoin Reference Rate. Genesis was similarly involved in the first ever block of micro bitcoin futures upon listing, opening a new way for retail to get more granular exposure to the market.

[1]  Throughout, we use Bitcoin with uppercase to denote the network, and bitcoin with lowercase or BTC when referring to the asset.

**Genesis**

Third, Genesis launched bilateral options and forward liquidity in SOL and other Layer-1 (L1) and blue-chip DeFi assets rapidly gaining adoption with institutional investors, providing active two-way vol markets on names including SOL, LUNA, FTM and DYDX as they underwent exchange listings, product launches, liquidity mining programs and token unlock events.

Finally, Genesis hired new options traders to create round-the-clock coverage for all our clients.

We offer a deeper analysis of the derivatives markets in the *"Vol Market Dynamics"* section later in this report.

# OTC Spot

The Genesis spot desk traded roughly $25 billion in volume in Q3 with over 500 OTC trading counterparties, a year-on-year increase of over 450%.



**OTC: Spot Trading ($ million)**

July was our slowest month of the quarter as we caught the back end of the market breakdown from mid-May, with the bottoming of the market in mid-July. August, in contrast, was our busiest month, seeing over 43% of the quarter's activity.

**Genesis**

Volume was slightly skewed to the buy side, with a 55/45 buy-sell ratio. Over the past year, Genesis doubled the number of assets traded from 32 in Q3 2020 to 63 in Q3 2021. BTC and ETH continued to be the dominant assets on the desk, but we were also active in ETC, BCH, ZEC, XLM, ADA, LINK, DAI, LPT, BSV, MANA, UNI, BAT, LTC, SOL, CRV, YFI, AAVE, SNX, UMA, MKR, COMP, ZEN, SUSHI, FIL, ZRX, GRT, BNT, MATIC, EOS, ALGO, ATOM, XTZ, BNB, USDT, HNT, THETA, RUNE, DOGE, SNX, DOT, AVAX, SRM, FTM, FTT, TFUEL, ORBS, REN, LUNA and HBAR.

In contrast to our loan portfolio, our Q3 desk weighting of BTC increased as anticipation of the listing of the first US BTC ETFs revived market interest. At the end of Q3, BTC accounted for approximately 61% of our OTC trading activity (58% when taking USDT into account), up from 47% in Q2.

## Custody

Genesis Custody also had a strong quarter with a 47% increase in the number of customers onboarded during Q3 vs Q2.

Genesis facilitated $450 million in transactions and added seven new supported assets: SOL, BAT, GRT, MKR, YFI, REN and LPT.

Our Q3 custody strategy was defined by the feedback that clients and prospects are looking for more than just reliable custody - hedge funds, family offices, venture capital firms and corporates want to learn about what's possible and do more with their custodied assets.

Given growing interest from prospects and customers around options including staking opportunities, Genesis began staking ZEN for clients in Q3 and SOL in early October.

In Q3, Genesis Custody also worked closely with our lending desk to enable Filecoin miners to borrow FIL with greater capital efficiency. Rewards in FIL mining are distributed as follows: 1) 25% initially and 2) 75% vested in 180 days, which allows the Genesis lending team

to structure flexible lending agreements without overburdening borrowers through over-secured lending structures similar to those implemented by most lenders in the industry. This arrangement, created across our Lending and Custody groups, not only helps mitigate slashing risk, it also helps alleviate capital intensity for Filecoin miners.

# 2

# Q3 Crypto Market Trends: The Search for Yield

- by Eugene Chang

## BTC demand continues to trend downwards

In Q1 2021, Genesis first noted a significant decline in the weighting of BTC in our overall portfolio due to the relative lack of BTC-denominated trading opportunities. While this paused in Q2, it resumed over the third quarter due to the continued GBTC premium inversion and flattening of the basis curves.

A significant structural change we've noted in the market has been the deleveraging of retail exchanges, with top platforms including Binance and FTX instituting maximum leverage caps. Combining with the follow through on the ban in China, this has created a shift towards institutionalization in the industry and led to an environment where opportunities to arbitrage the spot and futures markets have declined significantly.

BTC rates for both borrows and loans have not changed dramatically since the end of Q1 2021, and are sometimes quoted at a discount with duration depending on the market environment. While interest from crypto-native institutions has shifted away from BTC to ETH and DeFi tokens, anticipation of and the listing in October of the first US BTC ETFs served as a catalyst for the widening of the BTC basis. This could continue as more organic flow from traditional institutions, 401(k)s and RIAs enters the market.

## ETH garners greater demand as crypto-native institutions adopt DeFi

With rising adoption on DeFi platforms, Genesis saw greater borrowing appetite in ETH (and sometimes BTC) from institutions to post as collateral or liquidity pairs across DeFi applications.

Throughout Q3, L1 alternatives (alts[2]) continued to attract more developers and capital, resulting in the development of new decentralized applications. Many institutions are exploring yield opportunities across L1s, which often provide attractive rates for stablecoin and ETH/BTC pairs.

While L1s compete on transaction speed and security, incentive programs have catalyzed a storm of cross-chain activity, leading to a reduction in ETH's market share in favor of L1s including Solana (SOL), Terra (LUNA), Avalanche (AVAX) and Fantom (FTM). During Q2, ETH alternatives including Binance Smart Chain (BSC), Polkadot (DOT) and Polygon (MATIC, a Layer-2/sidechain hybrid) saw greater market capitalization gains. However, they were outpaced in Q3 by L1 financial incentives encouraging more rotation into those protocols.

While the alt rotation playbook reverted back to deploying capital towards BTC and ETH towards the end of Q3, the adoption of L1s opened up more opportunities to diversify portfolios.

2    Throughout, we use "alts" to refer to cryto assets other than the "majors" of BTC and ETH.



DeFi Total Value Locked ($ billion)

Source: DeFi Llama

Legend: BSC, Polygon, Solana, Terra, Fantom, Avalanche, Arbitrum, ETH Dominance %

Alongside greater interest in ETH loan originations during the quarter, altcoins (alts) – and particularly L1 alternatives – saw a boost in demand, serving as natural liquidity pairs for DeFi yield opportunities. These alts were difficult to source throughout the quarter 1) because of this demand, and 2) because the hurdle rates are tethered to the staking rewards on those protocols. As a result, much of the circulating supply was and is locked and earning staking rewards with duration. Opportunity cost acts as a disincentive to unstake or unpledge from the protocol which limits available supply.

## Cash demand has rebounded as investors seek both flexibility and leverage

While some of the mix shift down in BTC is due to rising popularity in ETH, another meaningful component has been growing demand in USD and stablecoin borrowing. BTC, ETH and USD are currently each almost one third of our loan portfolio. This may point towards a persisting trend where BTC basis opportunities are less attractive, where ETH and USD demand (especially in DeFi) outpace and could potentially become the primary allocation of our loan portfolio.

We noted at the end of Q1 2021 that implied yields on the near-dated 3-month BTC rolling basis reached ~40% annualized, which was symbolic of a cash deficit in the industry. However, through the past two quarters, the BTC basis has remained range bound, clustering around 10% annualized. Still, cash demand picked up significantly this quarter as institutions sought both flexibility in investment strategy and leverage on existing positions with fundamental conviction.



**BTC FTX 3-month Rolling Basis Annualized**

Source: skewAnalytics

As the cryptocurrency industry continues its progress towards mainstream adoption, larger balance sheet lenders – including medium and large banks as well as multi-strategy investors – are likely to look to further diversify their exposure to this asset class. Genesis is committed to helping bridge the gap between these institutions and the digital asset space - not only to enable the sourcing of yield-generating opportunities through DeFi solutions, but also to provide greater flexibility in financing to borrowers such as active crypto native institutions, trading firms and corporate clients.

Results        The Search for Yield        ➔  **Vol Market Dynamics**        About Genesis

# 3

# Q3 Crypto Market Trends: Vol Market Dynamics

- by Gordon Grant, Ravi Doshi

After Q2's swift deleveraging resulted in a peak-to-trough sell-off of over 50%, Q3 centered on the reestablishment of market stability, as well as renewed risk taking in the derivative markets.

Listed BTC options open interest opened the quarter at $5 billion, rising to $7 billion by the end of September and more than doubling to above $10B by mid-October.



**BTC Options Open Interest ($ billion)**

Source: skewAnalytics

OK Ex    CME    Bit.com    Ledger X    Deribit

Given the firmer footing in spot markets, the trend in vol for Q3 was lower, particularly in the wake of the confirmed bottom in bitcoin and ether prices on July 20th.

With the highly anticipated London hard fork in the first week of August, Genesis saw a large amount of vol buying in both ETH upside and downside 3-6 months out. This led dealers to bid up BTC vega to cover risk.

**Genesis**

As ETH surged to $3,350, marking a 100% gain in a few short weeks, ETH vol reached 120 implied volatility (IV) and took BTC vol up with it past 100 IV. This marked the top in vol for BTC and ETH for the quarter; few if any clients had the appetite to sell vol into this move. Miners were, however, actively selling shorter-dated meatier calls throughout the quarter, especially in July and August.



**BTC and ETH ATM 3-month Implied Volatility**

Source: skewAnalytics

In comparison to the Spring, the term structure of IV was more upward sloping with 3-month to 6-month IVs leading the charge. Genesis saw relatively muted demand for gamma throughout the quarter apart from a handful of idiosyncratic buyers of short-dated calls looking to create a squeeze into illiquid weekend sessions. The consistent ~35 delta 1- to 2-month call selling pressure from miners continues to be a mainstay of significant size in these markets.

By mid-August, with BTC trading ~$45k and ETH ~$3k, Genesis began to see low delta outright calls as well as call spreads bought in large volume, with strikes ranging from $75k-$125k in BTC and $5k-$15k in ETH. Those sizable flows took dealers short December and March expirations, which as a result continue to trade rich on the term structure.

There remains continued interest from clients to pay up for far out of the money (OTM) calls and call spreads, and the result is a vol surface

anchored by 3-month to 6-month IVs near 85 and 95 for BTC and ETH respectively. Collectively, these flows have yielded vol smiles where troughs near the money are in contrast to steep premiums for sub 15 delta call wings.





# Climbing the Wall of Worry

Compared to the substantial volatility of implied vols during the neck-snapping deleveraging in Q2, Q3 saw far more constrained shifts in IVs. Moreover, BTC skews stayed implacably bid for puts over calls in spite of increasingly bullish price action, in part to hedge a steady stream of FUD throughout the quarter.



**BTC 90-day 25D Skew**

Results    →    **The Search for Yield**    Vol Market Dynamics    About Genesis

Q3 saw BTC and ETH claw out of a hole over wide but broadly higher trading ranges, all while overcoming one problematic headline after another.



**Q3 FUD Timeline (BTC price USD)**

As the market digested those risks, there were plenty of retracements offering bulls the opportunity to reload on delta at increasingly cheaper implied vols. Steadfast buyers of BTC on these FUD-driven dips helped stabilize the market. But, ultimately, it was the number of constructive prospects for bitcoin that definitively marked the continuation of the bull run and set the stage for a return to BTC dominance.

→  *Sovereign support:* El Salvador's adoption of BTC as legal tender

→  *Mining resurgence:* Swift recovery of the Bitcoin hashrate as exiled Chinese miners resumed operations in the US and elsewhere, bolstering network security, intervention-free functioning and a greener footprint

→  *ETF breakthrough:* Permissive regulatory feedback about futures-based bitcoin ETFs leading to the first listings in mid-October

→  *Weakening institutional credibility:* Anecdotally encapsulated by absurd (yet serious) discussions about minting a $1 trillion platinum coin to solve the thorny US debt ceiling crisis

**Genesis**



**BTC Mean Hashrate, 7-day Moving Average**

Source: Glassnode

# Alternative L1 Bonanza

In the midst of those countervailing crosswinds, patience was certainly required to participate in Q3's BTC upswing. More consistent though – and with more spectacular returns – was the rise of alternative L1s as a major theme both for delta-1 and, subsequently, for vol markets.

The prices of SOL, AVAX, FTM, ALGO and ADA started to pick up mid-Q3, delivering quarterly returns of between 50-450%. Adoption of these L1s was driven by the financing and development of the respective ecosystems as well as by frenetic DeFi and NFT activity on-chain. Client flow in alts predominantly featured call overwrites, often in substantial size, with some demand for alt vol by clients to express directional views.



Q3 Price Performance Layer-1s

Source: Messari

Legend: AVAX · FTM · SOL · ALGO · ADA · ETH · BTC

# Final Thoughts

In the context of the rebound of the crypto complex, the elevated BTC put skew in Q3 offered consistently profitable opportunities to sell rich puts on spot dips or buy increasingly discounted gamma/meaty OTM calls. While there were sporadic intervals where vol performed at or above implied volatility, those who took a short vega position were handsomely rewarded. Gamma remained unloved since the summer, notwithstanding the meaningful pickup in realized volatility which has held well above short-dated IVs. Genesis clients opportunistically acted on recommendations from our daily market commentary to purchase 1-week to 1-month options during September to great effect.

As we begin the start of Q4, demand for front-end options seems to be finally picking up, as market participants large and small position themselves for the late October ETF decisions. Guided by ongoing counterparty and market dialogue, Genesis anticipates a strong fourth quarter of derivatives activity, and the desk looks forward to deeper, broader engagement with clients across the asset class.

## About Genesis

Genesis is a full-service digital currency prime brokerage providing a single point of access for select qualified individuals and global institutional investors. Genesis combines unrivaled operational excellence, a seamless user experience, and best-in-class client service to provide the full suite of services global investors require to manage their digital asset portfolios.

The firm offers sophisticated market participants a fully-integrated platform to trade, borrow, lend, and custody digital assets, creating new opportunities for yield while increasing capital efficiency for counterparties.

### Stay Connected

For more information from this report, contact us at **info@genesistrading.com**, or call us at (212) 668-5921.

**www.genesistrading.com**

**Twitter**
**LinkedIn**
**Facebook**

### Learn More About Our Services

**About Genesis**
**Genesis Prime**
**Lending FAQ**
**Custody FAQ**

## Q3 Report By:

**Eugene Chang**
Associate, Institutional Lending
echang@genesistrading.com

**Noelle Acheson**
Head of Market Insights
nacheson@genesistrading.com

**Reed Werbitt**
Director, Cash Trading
rwerbitt@genesistrading.com

**Roshun Patel**
VP, Institutional Lending
roshun@genesiscap.co

**Sebastian Cohen**
Economist
scohen@genesistrading.com

**Gordon Grant**
VP, QR and Trading
ggrant@genesistrading.com

**Matt Ballensweig**
Head, Institutional Lending
matt@genesiscap.co

**Jordan Goldman**
Chief Marketing Officer
jgoldman@genesistrading.com

**Ravi Doshi**
VP, Derivatives
rdoshi@genesistrading.com

**Joshua Lim**
Head of Derivatives
jlim@genesistrading.com

**John Conneely**
Director, Institutional Custody Sales
jconneely@genesistrading.com

**Sebastian Higgs**
VP, Custody Services
shiggs@genesistrading.com

**Greg Guttas**
VP, Trading
gguttas@genesistrading.com

## Genesis

**Disclosures**

This research is for our clients only. Other than disclosures relating to Genesis, this research is based on current public information that we consider reliable, but we do not represent is accurate or complete. This research should not be relied upon as investment advice. The information, opinions, estimates and forecasts contained herein are as of the date hereof and are subject to change without prior notification. We seek to update our research as appropriate. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment. Genesis conducts a global prime brokerage service, integrating digital asset lending, trading, and custodial services. Genesis Global Trading, Inc., registered in the United States with the SEC as a broker-dealer, is a member of SIPC (**https://www.sipc.org**). SIPC coverage does not cover digital assets, virtual currency, cryptocurrency, or other related assets. Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and principal trading desks that reflect opinions that are contrary to the opinions expressed in this research. The analysts named in this report may have from time to time discussed with our clients, including Genesis salespersons and traders, or may discuss in this report, trading strategies that reference catalysts or events that may have a near-term impact on the market price of the digital assets discussed in this report, which impact may be directionally counter to the analyst's published price target expectations for such digital assets. Any such trading strategies are distinct from and do not affect the analyst's fundamental rating or commentary for such digital assets. We and our affiliates, officers, directors, and employees, will from time to time have long or short positions in, act as principal in, and buy or sell, the digital assets and securities or derivatives thereof, if any, referred to in this research. The views attributed to third party presenters at Genesis-arranged conferences, including individuals from other parts of Genesis or its parent, Digital Currency Group (DCG), and any affiliates or subsidiaries of thereof, do not necessarily reflect those of Genesis and are not an official view of Genesis. Any third party referenced herein, including any salespeople, traders and other professionals or members of their household, may have positions in the products mentioned that are inconsistent with the views expressed by analysts named in this report. This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of any investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments. Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors.

**Genesis Q4 2021**

# Q4 Market Observations

**Genesis**

Confidential - Filed Under Seal

# Q4 Market Activity Snapshot
(with Q4/Q3 growth)

# $50B (+40%)

2021 Q4 Loan Originations

# $12.5B (+12%)

Total Active Loans as of Dec 31, 2021

# $30.8B (+23%)

Q4 Spot Volume Traded

# $20.7B (+62%)

Q4 Derivatives Notional Value Traded

# 2021 Market Activity Snapshot

(with 2021/2020 growth)

## $130.6B (+587%)

2021 Loan Originations

## $12.5B (+227%)

Total Active Loans as of Dec 31, 2021

## $116.5B (+463%)

2021 Spot Volume Traded

## $53.8B (+812%)

2021 Derivatives Notional Value Traded

# Introduction

Q4 '21 marked our largest quarter to date, cementing a year of strong growth across all Genesis business lines while highlighting several key trends we observed in the market:

→   The continued diversification of digital asset investments

→   The deepening sophistication of institutional investors entering the crypto market

→   New types of institutions participating in the market

→   Increasing allocations from managers of diversified portfolios

→   The growing need for multi-service institutional prime brokerages

Over the following pages, we provide a breakdown of our lending, derivatives, spot and custody activities across Q4 and 2021, paired with in-depth insights from our lending and derivatives desks. Our intent is to shed light on the overall growth of digital asset markets alongside the expansion of Genesis' activity in the space.

Selected highlights:

→   In Q4, Genesis loan originations reached **$50 billion**, up over **565%** year-on-year and **40%** vs. Q3 2021. Loan originations for 2021 were approximately **6.9x higher than** 2020.

→   Active loans outstanding on December 31 were **$12.5 billion**, over **12%** higher than the end of Q3 and almost **3.3x** the amount outstanding at the end of 2020.

→   The spot desk saw a **23%** increase in trading volume compared to Q3, and an increase of **279%** compared to Q4 2020. Across 2021 as a whole, Genesis spot volumes grew **5.6x** over 2020.

**More Information**

To learn more about Genesis, or to work together with the Genesis team, contact us at:

info@genesistrading.com
www.genesistrading.com

→   The derivatives desk traded over **$20.7 billion** in notional value, an increase of **62%** vs. Q3 and over **360%** higher than Q4 2020. Total notional value traded by the desk in 2021 grew **9.1x** over 2020, to **$53.8 billion**.

→   The number of clients onboarded by Genesis Custody grew **53%** over the quarter.

→   Genesis' headcount grew **22%** over the quarter to reach **170 employees** spread across three continents.

→   **Results**      Crypto Lending Market      Vol Market Dynamics      About Genesis

# 1    Genesis Q4 & 2021 Results

## Lending

Genesis' lending desk finished the year with over $150B in cumulative originations since its launch in March of 2018. Over $50 billion in new originations were executed in Q4, up over 40% from the $35.7 billion originated over the previous quarter. This marked the desk's fifteenth consecutive quarter of growth.



Lending: Cumulative Originations ($bn)

Source: Genesis Internal Data

Active loans outstanding climbed to $12.5 billion to close the quarter, up 12.3% from Q3's $11.1 billion and 227% from the $3.8 billion outstanding at the end of Q4 2020. Loans outstanding peaked at over $16 billion in mid-November before seeing a wave of year-end deleveraging as prices on most cryptocurrencies fell.

# Genesis

## Lending: Active Loans Outstanding ($ million)



Source: Genesis Internal Data

Over the quarter, we noted an ongoing change in our lending mix between BTC and USD, with BTC losing its outsized dominance in our portfolio. At the end of 2020, BTC represented as much as 53.9% of our lending mix whereas USD and equivalents only represented 23.2%. Primarily due to the GBTC discount, this dynamic has since flipped with BTC accounting for 27.5% of our lending mix and USD-and-equivalent loans increasing to almost 40% by the end of '21. While some of this movement was due to a correction in price in both BTC and ETH, we also noticed organic growth in USD originations relative to previous quarters with clients seeking more flexibility going into year end.

In Q3, we highlighted the strong growth we'd been seeing in both absolute volume and relative weighting for ETH originations. We noted this was partially due to greater demand from clients engaging with DeFi platforms. While DeFi demand hasn't waned, focus has shifted towards layer-1 (L1) alternatives resulting in slightly higher originations in those coins.

→ **Results**    Crypto Lending Market    Vol Market Dynamics    About Genesis

| Asset | 3/31/2021 | 6/30/2021 | 9/30/2021 | 12/31/2021 |
|---|---|---|---|---|
| BTC | 42.8% | 42.3% | 32.4% | 27.5% |
| ETH | 27.0% | 27.9% | 32.0% | 25.7% |
| USD & Equivalents | 21.0% | 21.1% | 29.5% | 39.9% |
| Other | 9.3% | 8.7% | 6.1% | 7.0% |

| ($ in mm, except BTC Price) | 9/30/2021 | 12/31/2021 | QoQ Growth |
|---|---|---|---|
| Cumulative Originations | $101,161 | $151,588 | 49.8% |
| Active Loans | $11,128 | $12,502 | 12.3% |
| BTC Price | $43,791 | $46,306 | 5.7% |

# Derivatives

Genesis saw another record quarter in derivatives trading activity with over $20.7 billion in notional value traded globally. This figure includes bilateral OTC, negotiated block trades and exchange traded volumes, representing 62% quarter-on-quarter growth and a 360% increase over our results in Q4 2020.

Over the course of 2021 Genesis derivatives traded $53.8 billion in notional options volume, a 812% increase over 2020.



Derivatives: Notional Traded ($ billion)

Source: Genesis Internal Data

**Genesis**

Other notable milestones:

→ Since the launch of our derivatives desk, we've traded with 260 unique counterparties.

→ We've traded $325 million notional in altcoin options and have proven to be one of the premier desks for altcoin liquidity.

→ In early December, we printed the first ever ETH Micro futures trade on the CME. We expect to continue growing our footprint across CME crypto products in 2022.

→ In December, Genesis was #1 in market share for blocked BTC and ETH exchange-cleared options via Paradigm with over $1.5 billion traded.

→ Over several days across the quarter, Genesis' combined OTC and exchange volumes eclipsed 50% of global daily Deribit volumes.

# OTC Spot

The Genesis spot desk traded over $30.8 billion in volume in Q4, an increase of over 23% vs Q3. These volumes were 279% higher than Q4 of 2020.

Total spot trading volume for the year reached $116.5 billion, a 463% increase over 2020.



OTC: Spot Trading ($ billion)

Source: Genesis Internal Data

Desk volume was moderately skewed to the buy side, with a 53/47 buy-sell ratio, and was slightly more balanced than Q3 (55/45).

Growing client activity diversification by asset as seen by our lending and derivatives desks was also seen by our spot desk. In Q4, BTC accounted for approximately 48% of spot volume, down from over 60% in Q3). ETH made up 33% of our total.

The number of assets traded by our spot desk more than doubled in Q4 to reach 131. While BTC and ETH continued to be our dominant assets, Genesis was also active in 129 others, including SOL, LUNA, DOT, ATOM, ZEC, MANA and LINK.

# Custody

Genesis Custody closed 2021 with a 53% increase in the number of customers onboarded vs Q3.

The business also reached a critical milestones during Q4:

Genesis Custody was approved by the Financial Conduct Authority (FCA) as a cryptoasset business, signifying Genesis Custody has strong controls, governance and a compliance frameworks to counter financial crime that hold up to the same anti-money laundering standards as other financial institutions under the FCA's purview.

Over the course of Q4, Genesis Custody also began staking assets for clients. We've taken steps to continue to expand our portfolio of services offered, and to better integrate custody into our clients' trading and portfolio management workflows.

Results    →    **Crypto Lending Market**    Vol Market Dynamics    About Genesis

# 2    The Crypto Lending Market: A Tale of Two Quarters

— by Eugene Chang, Associate, Institutional Lending



**Chart 1:** FTX Futures annualized rolling 3-month basis. Markets were separated by two prominent phases during this quarter. Positive headlines included the announcement of BITO. These were eventually overshadowed by a general "bearish" macro environment.

In the first half of Q4, Genesis saw a continuation of the euphoric/bullish environment present at the end of Q3. Leading up to the BITO ETF announcement, our lending desk saw a continued bid on dollar borrow, compounded by the general rebound in traditional equity markets that had been playing out since September.

Notwithstanding our perpetual effort to source more capital, demand for USD leverage outweighed institutional supply, pushing rates on cash as high as mid-teens during the height of the bull market. As belief among traders grew that mainstream crypto adoption would imminently become reality, investors attempted to capture the "basis" trade and BTC yields soared just above 20% in October. This dynamic resulted in new all-time highs in our outstanding loan portfolio.



**Chart 2:** FTX annualized perpetual funding rates for both BTC and ETH in Q4 2021. While, directionally, funding rates matched basis, they generally lagged as rates illustrate the level of cash demand in exchange venues.

While spot markets continued to recapture new daily highs in early November, annualized basis for both BTC and ETH remained in the mid-10% range. In the meantime, perpetual funding rates for BTC and ETH crossed 30% on some major exchanges, representing higher demand for cash as investors levered up their trades.

During this period, much of the lending mix shifted toward USD and ETH originations, paired with the return of the SOL-LUNA-AVAX rotation executed by crypto native institutions to capture outsized yield. Lending also saw growing interest in DeFi 2.0 protocols and gaming tokens, signaling investors' appetite to position wider outside the risk spectrum. In the background, there were growing concerns in the macro investing community around the US Federal Reserve's posturing on high inflation. In the run-up to the FOMC's statement in mid-December, both BTC and ETH trended downwards with heightened volatility on November 26th (post-Thanksgiving Day) and December 3rd. Both days also coincided with corrections in equity markets.

During this downtrend, both BTC and ETH originations slowed while USD originations grew, continuing the insatiable demand for USD we noted in Q2 2021. USD borrowing typically correlates to an uptrend in market sentiment. In this case, investors may have preferred the flexibility USD offers, especially since the December correction wasn't as pronounced as the correction experienced in May 2021.

Similarly, alongside the compression of annualized basis for both USD and ETH—which followed through into funding rates in perpetual markets and DeFi yields—our lending desk noticed a slight ongoing compression in OTC borrow rates that continued throughout the year across all asset classes.

## NFTs: A New Paradigm in Crypto Lending

Genesis is committed to continuing to bridge the gap between traditional financial institutions and digital asset markets.

As part of this commitment, over the second half of 2021, we expanded our NFT-backed lending portfolio by underwriting loans backed by high-quality, "blue-chip" NFT collateral.

Currently, most of our NFT lending volumes are driven by HNW individuals. Loans are underwritten on platforms that extract floor values on liquid NFT assets. Some existing platforms price in attributes to the NFT, but we believe this approach tends to undervalue assets and results in either unattractive loan notionals or LTV rates that don't meet our appetite. We perceive this as a product market gap that Genesis can solve by offering bespoke terms.

In Q4, Genesis announced an NFT loan transaction with Meta4 Capital, an NFT venture capital firm specializing in acquiring rare and historically significant NFTs. Meta4 used loan proceeds to purchase three NFTs from Sotheby's Metaverse "Natively Digital" October NFT auction.

Currently, Genesis houses curated NFT collateral while determining proper LTV for each loan. Ultimately, we are exploring the development of an institutional marketplace of participants that could launch innovative products addressing both liquidity and hedging requirements amidst recent high-profile raises of NFT venture funds. While this market is still in its nascent stages, we believe institutional adoption will continue to grow, and that the appetite for NFTs and metaverse ecosystems will continue to develop rapidly among both institutional and mainstream audiences.

# 3   Q4 Crypto Derivatives Market Dynamics

— by Gordon Grant, VP Quantitative Research and Trading,
and Ravi Doshi, Trader Derivatives + Spot

Against the backdrop of crypto permeating global financial markets, Q4's bated excitement progressed towards downright euphoria around the prospect of the approval of the first US-based Bitcoin ETF.

Listed BTC options open interest opened the quarter at $7 billion and quickly doubled to over $15 billion, as both crypto-native and traditional investors placed their bets ahead of the long-awaited ETF decision. As those positions rolled off in late November, open interest dumped precipitously and slid lower with each weekly expiry, ending the year at a still respectable $11 billion—a 57% increase from the start of year.



**Chart:** Listed BTC options open interest for Q4 showing significant bet-taking around the ETF Event.

With the ETF listing, bitcoin prices convincingly broke $65k to set a new all-time high, taking the broader crypto market up with it. As the market leapt higher, implied vols spiked and demand for upside calls created unsustainably steep vol smiles. 1-month basis spreads blew out from 10% at the start of Q4 to over 23% as traditional finance market participants began buying thinly traded CME futures to express bullish views. By contrast, the second half of the quarter saw the market gradually lower its expectations for a blockbuster finish to 2021. BTC and

Results          Crypto Lending Market     →   **Vol Market Dynamics**          About Genesis

ETH experienced numerous deleveraging flash crashes culminating in a 40%+ drawdown in early December from the all-time high of $69k. As spot sold off, 1-month basis spreads hit a low of 0.5% and call buying abruptly turned into call selling.

After the ETF launch, in spite of repeated attempts at breaking higher, client flows were markedly asymmetric in BTC. Call sellers effectively capped the market in both spot and implied volatility (IV), and—barring isolated cases such as the Thanksgiving weekend price drop and the Art Basel weekend bloodbath—we did not see particularly high implied vol levels. 1-month IV averaged 81.3% over the quarter while realized volatility (RV) was roughly 66%. In comparison, BTC 1-year IV averaged 92% while RV was 80.5% for 2021.



**Chart:** 1-month IV averaged 81.3% through the quarter, seeing a sharp decline into year-end as spot traded in a tight choppy range after recovering from quarterly lows set in early December.

Client interest to purchase vol came in fits and starts, testing the depth of BTC and ETH options markets where, on certain days, Genesis' combined OTC and exchange volumes eclipsed 50% of global daily Deribit volumes.

As bitcoin made continually lower highs and repeatedly flushed out weak hands with sharp wicks lower throughout the quarter, changes in the volatility surface caught crypto derivatives traders' attention. The flat term structure observed at the start of Q4 gave way to insatiable demand

**Genesis**

Results        Crypto Lending Market        ➔  **Vol Market Dynamics**        About Genesis

for weekly options in both BTC and ETH around the ETF event. Genesis saw 1-week to 1-month IV spreads blowing out 30 vol points favoring the shorter date from nearly at a par in the early days of the quarter.



**Chart:** BTC 1-week to 1-month ATM implied vol spread saw a massive spike heading into the bitcoin ETF decision.

From mid-November, as ETH began to ease from the $5,000 neighborhood, there emerged a persistent interest to purchase puts and sell calls, presumably to collar substantial gains after the near trebling from summer lows. With skews trading sharply to the call amidst ETH's unstoppable rally, Genesis suggested to clients that 1- to 3-month puts were cheap and trading costless collars could be an attractive way to take advantage of the mispricing of downside risk. Those collars began as a trickle before turning into a torrent, with a relentless bid for ETH puts and a concomitant offer in calls, particularly for the December 31st expiry. Clients that acted on this market commentary were handsomely



**Chart:** ETH 90-day skew ripped from the lows of -18% (calls over puts) seemingly in a straight line to +4% (puts over calls) in the quarter.

rewarded as the 2021 ETH skew shifted sharply to the put.

Amidst this regime shift, our desk signaled to its clients that longer-dated OTM calls remained stubbornly bid and offered a significant opportunity to call sellers. Over the quarter, the ETH 2022 expiry low-delta calls quietly deflated by some 25+ IV from their prior highs.

The story was similar in BTC, where near-dated skews initially began to tumble from well-bid for calls to well-bid for puts, as dealers started to cover short-dated downside exposure with increasing urgency in expectation of a gamma squeeze scenario in a selloff. In domino-effect style, longer-dated puts followed suit and began to trade at a material premium to calls, which was exacerbated by persistent miner call overwriting flow throughout the quarter.

Along with downward pressure on spot and skew, basis spreads were hammered and we saw the seasonal surge of take-profit interest rival the aftermath of the spring sell off. Genesis deployed new proprietary algorithmic execution strategies to continue to gain market share and provide tight pricing in this growing corner of the crypto market that remains a catch-all for both traditional finance and crypto native names.

BTC Futures Annualized Rolling 1-month Basis (%)



**Chart:** Q4 saw 1-month rolling basis bottom at near 0.5% before rallying back up to 9% to end the year.

# Alt-Coin Options Demand Explodes

Yet there was more substance to the Q4 options story than the myopic outperformance of puts and the rollercoaster rise and fall in basis; the quarter marked our busiest of 2021 in terms of alt-coin derivatives, with combined notional volumes exceeding $325 million.

Players took the opportunity to access still fresh vol markets in alts, mainly SOL, LUNA, AVAX, ADA, BCH and MKR, and to express both bullish and bearish views, with traded IVs that ranged from bargain-basement to the vertiginous. Our traded alt options universe broadened with significant prints in BNB, FTM, HNT, RAY and ZEN, as well as BSV, which saw a significant spike in volumes (and implied vols) around the watershed Kleiman v Wright trial.

# Death DeFi-ing Growth

As the rhetorical question "Is crypto dead again?" rang across our desk throughout Q4's downdraft, one corner of the market continued its Promethean ascent: the surge of new decentralized exchanges (DEXes). DeFi derivatives platforms, yield farms and options vaults caught the attention of even jaded natives as capital poured into new protocols. Mango and DYDX showed significant volume growth in linear DeFi derivatives, while newcomers like Chest, Dopex, Friktion and Katana joined the likes of Ribbon and offered the ease of DeFi options trading with the click of a button.

On-chain DeFi options vaults saw a parabolic rise in trading volumes with over $1 billion in total value locked (TVL). Genesis is an integral player in the DEX ecosystem—we expect that DeFi protocols will play a much greater role in liquidity provision, price discovery and vol surface dynamics in 2022.

As a transacting party on several DeFi vaults, Genesis has seen (and participated in) market forces driving the efficiency and rationalization of pricing across disparate venues. Genesis will continue to grow our presence in this space, as we believe DEX volumes could easily usurp CEX volumes in 2022. Irrespective of where bitcoin may be tomorrow or a month from now, DeFi is here to stay and poised to make ongoing changes to the crypto ecosystem.

Results        Crypto Lending Market    →  **Vol Market Dynamics**        About Genesis

# The ETH/BTC Cross

What does depend meaningfully on the price of bitcoin, however, is the often scrutinized ETH/BTC ratio. At the start of the year, ETH/BTC sat barely above .02 before surging fourfold to .08 before the spring selloff. Following a 40% collapse in May, it staged a remarkable recovery, surpassing prior highs on the way to nearly .09 as NFT and DeFi mania converted once fair-weather Ethereans into diehard believers.



**Chart:** ETH/BTC performed spectacularly in 2021 rallying 230% in the past 12 months.

Notwithstanding the drumbeat of Bitcoin maximalists or those who contend that ETH is plagued by punitive transaction costs, the narrative driving ETH's rise has simply been that Ethereum may serve as the foundation for the future digital asset ecosystem. The notion of a 'flippening' (when ETH's market cap will exceed BTC's—roughly .16 in ratio terms) is often seen as a fait accompli by one side of this heated rivalry.

In late October, the options market began to reflect 'Eth-maxi' positioning, with stratospheric bids for ETH upside wings and risk reversals blown out to the call. However, for much of the time that ETH/BTC surged in the last months of the year, participants carrying ETH/BTC longs seemingly chose to express this view in the spot market.

Seeing a market need that wasn't being addressed, Genesis began to price ETH/BTC options in early December. Unsurprisingly, daily returns of BTC/USD and ETH/USD are historically correlated as high as .85.

**Genesis**

Quoting options in the cross, however, presents potential quanto-risk in terms of pricing conventions and necessitates selling out of the cross-vol and effectively getting long correlation near 1.0. Moreover, with limited ability to hedge the underlying pair directly, trading the spot legs individually can incur substantial slippage. These complexities resulted in ETH/BTC vol having never traded as a cross currency option until Genesis printed the very first known trade of its kind this quarter.

Since transacting the first couple of tickets, a groundswell of interest has arisen in ETH/BTC options. If the 'flippening' does occur, we expect meaningful fireworks in the correlation space with the potential fracturing of well-trodden paradigms. Market participants will continue to trust Genesis as a source of derivatives liquidity in this cross pair as the saga between the top two cryptocurrencies carries on.

## Final Thoughts

While 'bearish' isn't a mentality much in force in our universe, 2021 was if nothing else a testament to the merits of smart tactical trading around a core position. The alpha generated from implementing well-timed basis trades or call overwrites, and the drawdown mitigation realized through opportunistically buying cheap vol or collaring length, was significant. As the asset class continues to mature, the advantages of a comprehensive approach to portfolio management will continue to prove prudent.

Among Genesis' greatest assets are our clients and the relationships we have with them. Providing strategy and timely analysis along with best-in-class execution will continue to be a core abiding principle of ours as we cast our gaze towards the next twelve months and the opportunities they may afford for our business and our clients.

## About Genesis

Genesis is a full-service digital currency prime brokerage providing a single point of access for select qualified individuals and global institutional investors. Genesis combines unrivaled operational excellence, a seamless user experience, and best-in-class client service to provide the full suite of services global investors require to manage their digital asset portfolios.

The firm offers sophisticated market participants a fully-integrated platform to trade, borrow, lend, and custody digital assets, creating new opportunities for yield while increasing capital efficiency for counterparties.

### Stay Connected

For more information from this report, contact us at **info@genesistrading.com**, or call us at (212) 668-5921.

**www.genesistrading.com**

**Twitter**
**LinkedIn**
**Facebook**

### Learn More About Our Services

**About Genesis**
**Genesis Prime**
**Lending FAQ**
**Custody FAQ**

## Q4 Report By:

**Matt Ballensweig**
MD, Co-Head Trading & Lending
mballensweig@genesistrading.com

**Eugene Chang**
Associate, Institutional Lending
echang@genesistrading.com

**Roshun Patel**
VP, Institutional Lending
roshun@genesiscap.co

**Joshua Lim**
MD, Head of Derivatives Trading
jlim@genesistrading.com

**Gordon Grant**
VP, QR and Trading
ggrant@genesistrading.com

**Ravi Doshi**
Trader, Derivatives + Spot
rdoshi@genesistrading.com

**John Conneely**
Director, Institutional Custody
jconneely@genesistrading.com

**Reed Werbitt**
MD, Head of Cash Trading
rwerbitt@genesistrading.com

**Jordan Goldman**
Chief Marketing Officer
jgoldman@genesistrading.com

**Noelle Acheson**
Head of Market Insights
nacheson@genesistrading.com

## Disclosures

This research is for our clients only. Other than disclosures relating to Genesis, this research is based on current public information that we consider reliable, but we do not represent is accurate or complete. This research should not be relied upon as investment advice. The information, opinions, estimates and forecasts contained herein are as of the date hereof and are subject to change without prior notification. We seek to update our research as appropriate. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment. Genesis conducts a global prime brokerage service, integrating digital asset lending, trading, and custodial services. Genesis Global Trading, Inc., registered in the United States with the SEC as a broker-dealer, is a member of SIPC (**https://www.sipc.org**). SIPC coverage does not cover digital assets, virtual currency, cryptocurrency, or other related assets. Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and principal trading desks that reflect opinions that are contrary to the opinions expressed in this research. The analysts named in this report may have from time to time discussed with our clients, including Genesis salespersons and traders, or may discuss in this report, trading strategies that reference catalysts or events that may have a near-term impact on the market price of the digital assets discussed in this report, which impact may be directionally counter to the analyst's published price target expectations for such digital assets. Any such trading strategies are distinct from and do not affect the analyst's fundamental rating or commentary for such digital assets. We and our affiliates, officers, directors, and employees, will from time to time have long or short positions in, act as principal in, and buy or sell, the digital assets and securities or derivatives thereof, if any, referred to in this research. The views attributed to third party presenters at Genesis-arranged conferences, including individuals from other parts of Genesis or its parent, Digital Currency Group (DCG), and any affiliates or subsidiaries of thereof, do not necessarily reflect those of Genesis and are not an official view of Genesis. Any third party referenced herein, including any salespeople, traders and other professionals or members of their household, may have positions in the products mentioned that are inconsistent with the views expressed by analysts named in this report. This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of any investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments. Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors.

Genesis Q1 2022

# Q1 Market Observations

Genesis

Confidential - Filed Under Seal

# Q1 Market Activity Snapshot

# $43.7B

2022 Q1 Loan Originations

# $14.6B

Total Active Loans as of March 31, 2022

# $27.8B

Q1 Derivatives Notional Value Traded

# $11.4B

Q1 Spot Volume Traded

# Introduction

Against a backdrop of a weak crypto market weighed down by macroeconomic concerns around the outlook for liquidity and the impact of the war in Europe, Genesis achieved notable growth in most of its operations. This highlights the expanding interest in crypto asset allocations and trading strategies, despite lower overall crypto market volumes and high levels of uncertainty throughout almost all asset types. We are seeing institutions continue to develop their crypto strategies and strengthen their understanding of the industry, along with deeper engagement with the broad range of products and services that Genesis can offer.

Over the following pages, we provide a breakdown of our lending, derivatives, spot and custody activities across Q1 2022, along with in-depth insight from our lending and derivatives desks. With this, we hope to shed light on the evolution of crypto asset markets as well as the expansion of Genesis' activity in the space.

Selected highlights include:

→   In Q1 2022, the USD amount of active loans outstanding grew to $14.6 billion, a level 17% higher than at the end of the previous quarter, and 62% higher than at the end of Q1 2021.

→   As of March 31, cumulative originations had reached $195 billion.

→   The notional volume traded by the derivatives desk in Q1 reached $27.6 billion, up over 33% from Q4.

→   Assets under Genesis custody increased by 23% over Q1.

→   The USD volume of assets moved from Genesis Custody to our trading or lending desks increased by 141% vs. Q4.

→   Genesis headcount increased ___% over the quarter to reach ____ employees spread across three continents and multiple time zones. TKTK

**More Information**

To learn more about Genesis, or to work together with the Genesis team, contact us at:

**info@genesistrading.com**
**www.genesistrading.com**

Confidential - Filed Under Seal

→  **Results**        Crypto Lending Market Insight        Crypto Derivatives Market Insight        Conclusion        About Genesis

# 1        Genesis Q1 Results

## Lending

Despite a market environment faced with many uncertainties as valuations across all crypto assets nearly halved from November peaks, the Genesis lending desk originated over $43.7 billion in loans in Q1 2022, bringing cumulative originations since inception in March 2018 to $195 billion.



Active loans outstanding climbed to $14.6 billion to close the quarter, up 16.7% from the end of 2021. This is especially notable given the 4.9% drop in the BTC price and the 15.2% fall[1] in the ETH price over the quarter. Despite the weak market environment, Genesis saw a strong level of activity mainly due to organic volume driven by new institutions entering the industry and by increasing demand for cash loans. This has allowed Genesis to capitalize on its core competitive strengths as a leading digital asset prime broker.

---

1    Calculated according to the Coin Metrics reference rate at 0:00UTC.

Our portfolio mix continues to skew towards cash, which now represents close to 50% of our overall active book. This weighting is the highest since Genesis' inception and indicates both compressed basis spreads across major crypto assets indicating continued inflow of cash supply, as well as Genesis' improved access to cash supply from different sources.

This quarter, we highlight the growing institutionalization from traditional sources of capital. Regional, crypto-progressive banks such as Silvergate and Signature have significantly expanded their scope in crypto financing, not only providing loans to CeFi players such as Genesis, but also to several crypto-native, cash flow generating businesses. We specifically highlight Silvergate's $205 million loan to MacroStrategy LLC (a subsidiary of MicroStrategy, Inc), which was structured as a BTC collateralized margin loan. Several other regional banks such as BankProv, Customer's Bank and Cross River have also more recently expanded their coverage to provide financing for high quality, crypto-native businesses and emerging fintechs. Specifically, with BankProv we note an expansion of USD services through Banking as a Service APIs, on/off ramps, and virtual ledgers with payment solutions. This represents a significant shift from previous cycles and continues to indicate growing confidence in cryptocurrency as an institutional asset class.

Active Loans Outstanding



Millions
$18,000
$16,000
$14,000
$12,000
$10,000
$8,000
$6,000
$4,000
$2,000
$-

$44
$98
$108/$154
$181
$447
$450
$1,011
$545
$650
$1,417
$2,123
$3,821
$9,033
$8,299
$11,128
$14,594

The weighting of BTC in the loan portfolio was slightly higher than in Q4 largely due to organic originations, but term basis trading opportunities compressed throughout the quarter. The weighting of ETH trended downward over Q1 to levels last observed in Q4 2020, although growing interest in staking, especially with the approaching Eth2 merge, has presented opportunities to generate yield in DeFi. Interestingly, other token loan originations grew slightly throughout the quarter. While this is partially due to the valuation uplift of certain layer-1 ETH alternatives, Genesis has been able to actively source from its institutional pipeline to meet counterparty demand for delta-neutral or hedging strategies.

| Asset | 3/31/2021 | 6/30/2021 | 9/30/2021 | 12/31/2021 | 3/31/2022 |
|---|---|---|---|---|---|
| BTC | 42.8% | 42.3% | 32.4% | 27.5% | 28.7% |
| ETH | 27.0% | 27.9% | 32.0% | 25.7% | 16.0% |
| USD and Stablecoins | 21.0% | 21.1% | 29.5% | 39.9% | 48.0% |
| Other | 9.3% | 8.7% | 6.1% | 7.0% | 7.3% |

| ($ in mm, except BTC Price) | 9/30/2021 | 12/31/2021 | 3/31/2022 | QoQ Growth |
|---|---|---|---|---|
| Cumulative Originations | $100,957 | $151,588 | $195,263 | 28.8% |
| Active Loans | $11,128 | $12,502 | $14,594 | 16.7% |
| BTC Price | $43,791 | $46,306 | $45,539 | -1.7% |

# Derivatives

Genesis saw another record quarter in derivatives trading activity with over $27.6 billion in notional value traded globally. This figure includes bilateral OTC, negotiated block trades and exchange-traded volumes, representing 33% quarter-on-quarter growth.

Other notable milestones:

→  In Q1, Genesis was #1 in market share for blocked BTC and ETH Deribit-cleared derivatives via Paradigm with over $6.6 billion transacted.

→  Genesis traded $4.7 billion notional in altcoin derivatives. This was our highest quarterly total yet as we continue to prove our ability to help stakeholders hedge and speculate in even the most esoteric of markets.

→  The Genesis derivatives desk traded 61 different assets in the first quarter of 2022.

→  In March, we printed the first ever ETH and BTC Micro options trades on the CME.

# OTC Spot

The Genesis spot desk traded over $11.4 billion in volume in Q1, a notable drop from Q4, reflecting the weaker market and declining spot volumes across the industry.

The trend toward greater diversification of assets seen over previous quarters, and reflected in our lending and derivatives desks, continued in Q1. BTC comprised 48% of the traded volume, in line with last quarter, while ETH saw a drop from 33% to 23% of total traded volume in Q1. The desk saw a notable increase in activity across assets such as LUNA, SOL, AVAX, ZEC, LINK, ATOM and GALA, to highlight a few.

Despite the weak market, OTC spot customers were 15% skewed to the buy side, with a 46/54 buy/sell ratio.

# Custody

Assets under Genesis custody increased by 23% quarter-on-quarter, while the USD volume of assets moved from Genesis Custody to our trading or lending desks increased by 141% over the same period as we continued to integrate our lending and trading desk more tightly into our FCA-registered custodian.

The number of customers onboarded increased by 36% over the quarter, mainly large public and private mining companies, VC firms and other traditional asset managers on a global level on the back of our FCA registration as well as the roll out of 24/5 support.

SOL was Genesis Custody's largest asset increase over the quarter, up 70%, supporting the continuing diversification beyond BTC and ETH that we're seeing throughout our operations. Strong growth was also seen in BTC (+46%) and USDC (+62%) custody.

# 2    Q1 Crypto Lending Market Insight

—by Eugene Chang; Joshua Shaked

## Crypto Funding Opportunities

Since the middle of last year, we noted a macro trend occurring in which BTC was gradually becoming a smaller proportion of our portfolio mix. Part of the reason is the lack of opportunities in BTC cash and carry trades (basis trades) as the 3-month trailing, 3-month basis continued to compress especially during the first quarter of 2022. This can also be seen in the ETH basis, which used to trade at a slight premium to BTC. For Q1 2022, basis averaged about 4–5%, the lowest quarterly average we've seen in two years and notably lower than the 8-9% for the trailing 12 months witnessed throughout 2021. However, with growing loan origination mix in assets other than BTC/ETH/cash, we observed clients focusing on delta neutral trades in alts, especially in the SOL-LUNA-AVAX complex. Many clients are also focused on DeFi funding opportunities in these native layer-1 blockchains, sometimes offering more attractive rates than in typical ETH blockchain protocols.



**Figure 1:** FTX futures annualized rolling 3-month basis. Basis opportunities in both BTC and ETH averaged 4–5% during the quarter and reached trough levels of 2% in late February as bearish macro sentiment rolled over. There was a noticeable recovery heading towards the end of the quarter, but this is the first time that basis has remained at these levels in the past two years. (Source: Skew.com)

BTC basis continues to suppress as we note the influx of retail aggregators deploying to CeFi providers. We continue to observe this decline in

the basis trade opportunity, as highlighted in our quarterly report of Q3 2021. While this has provided opportunities for Genesis to source BTC at cheaper yields for clients, the use case for BTC is also gradually shifting from a yield-generative to a risk-protective asset. This is also evident in DeFi, where the main use case for WBTC (Wrapped BTC) is as collateral on lending protocols. Meanwhile, we observe growing comfort on the part of traditional financial institutions and fintech companies to underwrite margin loans using BTC as collateral, a stark contrast from previous cycles when BTC had yet to achieve growing mainstream acceptance, and more importantly, risk underwriters.

Genesis has established itself as an integral player between traditional capital providers and crypto CeFi/DeFi participants. We continue to observe a gradual institutionalization in debt markets with increased bank participation, triparty repo structures and syndicated, high yield issuances. We highlight expanding BTC-backed loan offerings from banking providers such as Silvergate and Signature Bank, as well as corporate treasuries such as MicroStrategy's adopting BTC as an integral asset on their balance sheet and asset managers such as Van Eck and One River adopting digital asset strategies to diversify their offerings to clients. Meanwhile, Genesis remains focused on USD debt financing from multiple institutional pipelines as it is still challenging for cryptocurrency-focused firms to source USD capital. This is highlighted in our loan mix as we were able to successfully source cash during this quarter to help service our clients' capital requirements.



**Figure 2:** Lido staked ETH APR vs # of staked ETH on Lido. Typically, there is a negative correlation between rates and supply of staked ETH. We specifically highlight the huge inflow of ETH in March which correlates to the low basis yields observed between the futures vs spot markets. (Source: Dune Analytics @LidoAnalytical)

In ETH, we contrast the basis opportunity between ETH and staking (on platforms such as Lido) and highlight the growing supply since the second half of 2021. In March 2022, the Eth2 merge narrative emerged as a major catalyst that lifted valuation of ETH towards the end of Q1 2022. This served as a positive catalyst to the industry in an otherwise cautiously optimistic backdrop throughout the quarter as prices for major tokens remained rangebound. With ETH basis compressing and staking rewards on Lido higher (and less volatile), relatively, we observed an increase in supply of

**Genesis**

staked ETH originating from both retail and institutional pipelines. Finally, we expect ETH funding costs to eventually increase towards the end of the year coinciding with rumors on the release date of the Eth2.

# Bridging the Gap between CeFi and DeFi

As part of Genesis' commitment to serve as the portal between traditional financial institutions and the digital asset space, we always expand upon opportunities to broaden our products and services to lead the industry in advancing innovation.

Another narrative to highlight in Q1 is the growing adoption of permissioned DeFi protocols such as Maple, TrueFi, GoldFinch, Clearpool, and others. Genesis is a stakeholder in Maple and an active participant in the ecosystem. We are confident in these projects that have developed permissioned gateways for institutions to access DeFi, bolstering industry KYC and AML standards while adapting to regulatory requirements. The automation of these platforms has promoted user-friendly experiences that are not only major competitive advantages of DeFi platforms, but are also processed under the same framework of traditional underwriting standards that are familiar to institutions. This clear value proposition is helping institutions be more confident entering into DeFi as many are beginning to launch pilot projects and strategies.

This quarter, Genesis has also partnered with Compound through its Compound Treasury service to continue our ecosystem partnership with major DeFi platforms. Compound Treasury has created a platform to enable financial institutions to access the benefits of the Compound protocol, which extends over-collateralized loans in a compliant manner adhering to regulatory guidelines. We believe that institutional adoption would require meeting these standards for DeFi protocols, and as such are honored to have the opportunity to work with one of the leading DeFi players in our industry to establish this groundwork.

As a result of increased institutional capital inflow to regulated crypto markets, the basis opportunity on regulated, centralized exchanges has compressed. While institutional capital is willing to deploy to regulated crypto markets, unregulated areas such as DeFi remain underserved and inefficient. The next frontier of crypto yield inefficiency might converge to DeFi.

Some popular yield opportunities in DeFi today include Anchor Protocol and Maple Finance. Anchor and Maple are both credit protocols that foster two-sided marketplaces for lenders and borrowers. Maple's platform focuses on servicing unsecured credit to institutional borrowers, whereas Anchor is user agnostic and operates on an overcollateralized basis. Anchor pays a fixed 19.5% APY to UST depositors, which is largely subsidized by a dwindling $300 million UST yield reserve. Maple pays a variable 12—14% APY to USDC depositors, depending on the pool, which is subsidized by the protocol's MPL tokens.

For institutions that can solve for DeFi counterparty risk, smart contract security risk and compliance risk, the rewards are large. As more institutions look to DeFi as a yield source, there's greater demand for institutional DeFi infrastructure.

Over Q1 2022, we've noticed that institutions are slowly positioning themselves to take advantage of DeFi market inefficiencies. In early March, Avalanche announced a $290 million incentive fund to spur the development of subnets, Avalanche's horizontal scaling solution. A portion of the incentive fund will be allocated to building out a permissioned DeFi subnet that enables participating institutions to interact with DeFi in a permissioned environment.

In other news, FIS, a leading technology provider to banks and capital markets firms, is partnering with Fireblocks in an attempt to onboard tradfi firms to institutional DeFi products like Aave Arc. BloXroute, a DeFi infrastructure firm that helps users get superior trade execution by frontrunning the mempool, raised $80 million in a Series B round from SoftBank, Jane Street and others. The raise shows that big trading firms and market makers are mulling DeFi participation by investing in infrastructure that enhances trade execution and on-chain finality.

Verite, a decentralized identity standard developed with support from Circle, Centre, Coinbase and Block, announced in February 2022 that it is building an open-source standard for sharing, issuing and verifying digital identity. Along with its involvement in Verite, Circle is simultaneously seeking a U.S. crypto bank charter. As USDC looks set to become a regulated, FDIC-insured product issued by banks and financial institutions, some believe that USDC will no longer be able to freely circulate in permissionless DeFi markets. Ultimately, it is possible that the DeFi stablecoin market converges to a dichotomy between permissioned and permissionless markets, where USDC dominates permissioned DeFi, and decentralized stablecoins like DAI, UST, and FRAX circulate in permissionless DeFi.

# 3    Q1 Crypto Derivatives Market Insight
— by Gordon Grant; Ravi Doshi

## Risk Reversal

The seasonal slide in crypto that began post-Thanksgiving 2021 accelerated into the start of Q1 2022. Crypto market caps cascaded lower in unison as global inflation (particularly in the U.S.) hit multi-decade highs. The bond markets successively breached key levels after the 10-year yield surpassed 1.8% in early January. From there, rates ripped higher to ~2.5%, sending shockwaves through all corners of the market. Crypto initially faltered in sympathy as BTC plumbed $35k and ETH crashed below $2,400, roughly 25% and 35% lower than the start of the year.

However, conflict in Europe weighed just as heavily in driving price action and ultimately led to extremely choppy markets. Throughout the quarter, Bitcoin's narrative ricocheted between competing alter egos: a high-beta risk asset tightly correlated to tech in a stock-market swoon; or a decentralized store of value against the backdrop of shocking CPI prints and geopolitical instability.



**Chart:** BTC's correlation to Nasdaq spikes higher in Q1.

Results        Crypto Lending Market Insight    ➔  **Crypto Derivatives Market Insight**        Conclusion        About Genesis

BTC realized correlations, implied volatility and skew gyrated with spot prices as markets repriced Fed policy expectations post-Russia's invasion of Ukraine. Sentiment swung from near certainty of incoming lower lows in crypto with ~9 rate hikes looming, to optimism of a new bull market on the heels of Russia's excommunication from the SWIFT network and the freezing of its USD reserves abroad. Bitcoin's growing global adoption as a non-sovereign, immutable store of value began to feel more certain than ever before. Against this narrative, BTC swiftly moved higher from $37k to $45k taking the rest of the crypto market with it.



Chart: Q1'22 Historical BTC price action showcasing the steep drop in prices at the start of the year, followed by choppy action throughout the quarter.

Implied volatilities saw their highest print of the quarter in late February as news of Russia's invasion spooked markets. Participants began to reach for gamma protection pushing 1-week IV's to over 87% in BTC. Without fail, natural hedgers saw this as a golden opportunity to sell rich premiums and began hammering meaty upside calls in the front end of the curve. These heavy market flows drove BTC vols back to a 6-handle in a hurry, before continued uncertainty around the potential for a world war saw vols creep up into the mid-70s over the coming weeks.

Notwithstanding the persistent whipsaw price action, demand for either protective downside or directional upside proved mostly fleeting, with vols hitting cyclical lows in the final days of the quarter. By the third week of March, 9-month BTC implied volatility was trading in the mid-60s and 9-month ETH vol was priced less than 10 points higher. Eventually, these

**Genesis**

levels proved too cheap to ignore. Genesis highlighted to clients the value proposition of owning long-dated vega that was realizing above its implied vols and subsequently saw over $500k of vega bought in a matter of days, a size that is unquestionably 'institutional grade'.

With exchange traded volumes of BTC options hovering near $5 billion weekly even in a somewhat directionless market, and the material upsizing of outright ticket sizes, the crypto derivative arena is clearly attracting larger and larger players. However, while BTC and ETH prices tread water at similar levels to nearly a year ago, overall listed crypto derivatives volumes experienced a marginal quarter-on-quarter decline as traders continue to wait for prices to break out of the range. For Genesis however, Q1'22 marked another quarterly volume record for the derivatives business, with a ~33% increase from Q4'21. Thanks to broadening client engagement across a wider range of products, our market share continues to expand.



**Chart:** Q1'22 IV's showcasing the steep decline of vols into the end of the quarter

Results          Crypto Lending Market Insight     →  **Crypto Derivatives Market Insight**          Conclusion          About Genesis



**Chart:** 25D skew seesawed with spot prices throughout the quarter, with a central tendency to puts remaining bid over calls.



**Chart:** BTC listed options volumes showing a steady baseline near $5 billion over the quarter, a marginal decline from Q4 2021.

As the breadth and quality of market participants grows, baseline volatility in the underlying asset continues to decrease. This reflects a greater market depth and capacity to absorb larger linear and non-linear derivatives flows. We are observing the crypto markets mature in real time: 90-day realized volatility is currently 17 vol points below the level

**Genesis**

Results        Crypto Lending Market Insight    →  **Crypto Derivatives Market Insight**        Conclusion        About Genesis

it was at in July of last year, while average options volumes are double what they were when Bitcoin fell back below $40,000 at that time. This has led to a meaningful shift in perspective for vol traders: in 2022, BTC IVs in the 80's has been a screaming sale, whereas in 2021 it was a rather normal occurrence, neither rich nor cheap.



**Chart:** 90-day historical realized volatility over the past year. Overall market maturation is resulting in lower levels in BTC realized volatility.



**Chart:** BTC 2-week/2-month options volume in USD vega terms over a 12-hour rolling window has regularly exceeded $20k of vega (nearly 75% of the time), reflecting consistent demand for the equivalent of ~1000 BTC units of benchmark front month 20 delta option, one of the most frequently traded instruments in our analytics.

**Genesis**

# Surging Stablecoin Interest

Time will tell whether the aforementioned end-of-quarter appetite for vega in crypto majors represents a cyclical bottom or if it simply reflects demand for a proxy hedge against pervasive uncertainty. The latter dovetails neatly with the banner derivatives' trade of the quarter: short USDT.

While the much-bandied transaction made headlines in late March, cumulative interest expressing the bearish USDT thesis was robust well before the news broke. While shorting an asset which is designed to be capped at parity appears to require no further optionality, the derivatives desk saw substantial interest to put on the short tether trade not just in OTC forwards but also via options. Notwithstanding the challenge of pricing an essentially binary outcome, nonlinear derivatives on stablecoins continue to gain interest from the traditional financial community.

Counterparties around the world have strongly differing views on USDT: many crypto-native firms are comfortable with the risk profile of USDT and view it as foundational to their trading and payments businesses, but many traditional financial institutions look through to tether's underlying reserves to evaluate its credit risk. Given the size of the USDT market and its centrality to crypto liquidity, we've been able to facilitate large sizes on both sides of this trade.

While the USDT short is set to play out over quarters to come, LUNA, the obverse of another major dollar stable UST, was also a key saga of the first three months of 2022. Insofar as non-crypto natives took a deep-dive on the potential vulnerabilities of tether, the crypto-native community was locked in its own existential debate about the viability of the Terra protocol and the potential for a disorderly unwind of the algorithmic stablecoin that is UST. Though of a lower order of magnitude, Genesis saw consistent, broadening two-way engagement with its client base to position around the now fourth largest circulating stablecoin in the market.

The fate of both LUNA and UST depends on a symbiotic functional relationship between them, and the notion that a sudden decrease in UST demand could necessitate a LUNA supply shock became a regular feature of Q1 FUD. This phenomenon drove demand for downside in the January sell-off that saw LUNA break below $50, and it similarly engendered a significant boost in demand for calls and call spreads on the impressive recovery that pushed LUNA back above $100.



**Chart:** LUNA/USD price action in Q1 showing the abrupt sell-off from $90 to $50 and stunning reversal to end the quarter at nearly $106.

During the rally in LUNA, UST deposits swelled geometrically by billions of dollars as UST yield seekers could not pass up the juicy 19.5% interest offered through Anchor Protocol. This tremendous growth in UST market cap demanded a commensurate burn of LUNA tokens which pushed spot back into the triple digits. Throughout March, hedging interest emerged at those levels to lock in outsized gains, and as such, LUNA forwards and options became Genesis' top traded altcoin derivative over the quarter.

Genesis' capacity to not only advise on and price a diverse array of these novel trades, but also print tickets in the hundreds of millions to even billions of dollars is what sets us apart. Month after month we continue to attract the biggest names across crypto and tradfi who seek the ability to express their crypto market views in the most efficient way possible with one of the most reputable counterparties in the space.

**Genesis**

# 4      Conclusion

With the world's reserve currencies increasingly mired in geopolitical conflict and weakened by inflation, Bitcoin's moment—and perhaps that of the crypto asset class more broadly—has seemingly arrived. As adoption of cryptocurrency increases, it constitutes a growing portion of select foreign reserves, corporate treasuries and retail savings accounts around the world. Bitcoin and other cryptocurrencies may eventually be held by a large swath of sovereign states, state-owned enterprises and public institutions alongside their traditional holdings.

The deepening of the digital asset derivatives market will play a key part in that kind of monumental ascent to financial prominence. But in order for such a new world order to become reality, cryptocurrency markets must continue to mature. The ability of participants to efficiently hedge their risk in any market environment, and take directional and volatility-related views through derivative products, is an essential precondition.

What we have seen in the first quarter of 2022—particularly in terms of continued growth in our volumes, derivatives product offerings and client base—bodes well in this respect. As the premier derivatives dealer in the space, Genesis will continue to be at the forefront of this maturation process.

Results          Crypto Lending Market Insight          Crypto Derivatives Market Insight          Conclusion          → About Genesis

## About Genesis

Genesis is a full-service digital currency prime brokerage providing a single point of access for select qualified individuals and global institutional investors. Genesis combines unrivaled operational excellence, a seamless user experience, and best-in-class client service to provide the full suite of services global investors require to manage their digital asset portfolios.

The firm offers sophisticated market participants a fully-integrated platform to trade, borrow, lend, and custody digital assets, creating new opportunities for yield while increasing capital efficiency for counterparties.

### Stay Connected

For more information from this report, contact us at **info@genesistrading.com**, or call us at (212) 668-5921.

**www.genesistrading.com**

**Twitter**
**LinkedIn**
**Facebook**

### Learn More About Our Services

**About Genesis**
**Genesis Prime**
**Lending FAQ**
**Custody FAQ**

## Q1 - 2022 Report By:

**Eugene Chang**
Associate, Institutional Lending
echang@genesistrading.com

**Gordon Grant**
VP, QR and Trading
ggrant@genesistrading.com

**Joshua Lim**
Head of Derivatives
jlim@genesistrading.com

**Noelle Acheson**
Head of Market Insights
nacheson@genesistrading.com

**John Conneely**
VP, Institutional Custody Sales
jconneely@genesistrading.com

**Reed Werbitt**
Director, Cash Trading
rwerbitt@genesistrading.com

**Jordan Goldman**
Chief Marketing Officer
jgoldman@genesistrading.com

**Sebastian Higgs**
VP, Custody Services
shiggs@genesistrading.com

**Roshun Patel**
VP, Institutional Lending
roshun@genesiscap.co

**Ravi Doshi**
Trader, Derivatives + Spot
rdoshi@genesistrading.com

**Disclosures**

This research is for our clients only. Other than disclosures relating to Genesis, this research is based on current public information that we consider reliable, but we do not represent is accurate or complete. This research should not be relied upon as investment advice. The information, opinions, estimates and forecasts contained herein are as of the date hereof and are subject to change without prior notification. We seek to update our research as appropriate. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment. Genesis conducts a global prime brokerage service, integrating digital asset lending, trading, and custodial services. Genesis Global Trading, Inc., registered in the United States with the SEC as a broker-dealer, is a member of SIPC (**https://www.sipc.org**). SIPC coverage does not cover digital assets, virtual currency, cryptocurrency, or other related assets. Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and principal trading desks that reflect opinions that are contrary to the opinions expressed in this research. The analysts named in this report may have from time to time discussed with our clients, including Genesis salespersons and traders, or may discuss in this report, trading strategies that reference catalysts or events that may have a near-term impact on the market price of the digital assets discussed in this report, which impact may be directionally counter to the analyst's published price target expectations for such digital assets. Any such trading strategies are distinct from and do not affect the analyst's fundamental rating or commentary for such digital assets. We and our affiliates, officers, directors, and employees, will from time to time have long or short positions in, act as principal in, and buy or sell, the digital assets and securities or derivatives thereof, if any, referred to in this research. The views attributed to third party presenters at Genesis-arranged conferences, including individuals from other parts of Genesis or its parent, Digital Currency Group (DCG), and any affiliates or subsidiaries of thereof, do not necessarily reflect those of Genesis and are not an official view of Genesis. Any third party referenced herein, including any salespeople, traders and other professionals or members of their household, may have positions in the products mentioned that are inconsistent with the views expressed by analysts named in this report. This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of any investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments. Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors.

**Genesis Q2 2022**

# Q2 Market Observations

**Genesis**

Confidential - Filed Under Seal

# Q2 Market Activity Snapshot

# $40.4B

2022 Q2 Loan Originations

# $4.9B

Total Active Loans as of June 30, 2022

# $26.6B

Q2 Derivatives Notional Value* Traded

# $17.2B

Q2 Spot Volume Traded

* inclusive of negotiated block- and exchange- traded futures

# Introduction

The second quarter of 2022 is likely to be remembered as one of the more dramatic in the crypto ecosystem's history. Beyond the loss of approximately $1.2 trillion in value from aggregate crypto asset market capitalization, investors and market infrastructure participants also had to endure the collapse in value of a leading blockchain ecosystem, and the default of a significant crypto hedge fund and some high-profile market infrastructure players.

Genesis was not immune to the market drop and the damage to overall sentiment. As we've stated publicly, Genesis had loan exposure to Three Arrows Capital. Our parent company DCG assumed the liability related to losses on these loans, leaving our balance sheet healthy so Genesis could continue to be a source of strength for our clients.

In the report below, we share key Q2 operating figures across our business lines and insights into the crypto derivatives markets during the quarter. Institutional activity was muted during the quarter, and particularly in June, as idiosyncratic events and an uncertain macroeconomic backdrop led to a significant "risk-off" tone.

Selected highlights include:

→ Our lending desk originated $40.4 billion in new loans, a decline of 9% from the previous quarter.

→ Market conditions contributed to a 66% drop in active loans outstanding to $4.9 billion from $14.6 billion in Q1.

→ Our spot desk traded over $17.2 billion OTC, an increase of over 51% quarter-over-quarter.

→ Our derivatives desk traded $26.6 billion in notional value, down 4% from Q1.

→ Clients onboarded to Genesis Custody increased 20% over the quarter.

**More Information**

To learn more about Genesis, or to work together with the Genesis team, contact us at:

info@genesistrading.com
www.genesistrading.com

→ Our entity Genesis Global Capital (GGC) International Limited joined the International Swaps and Derivatives Association (ISDA) as a Primary Member to continue to help shape the direction of digital asset derivatives markets.

→ Our subsidiary Genesis Asia Pacific Pte. Ltd. became one of a handful of Singapore-based digital payment token service providers to receive in-principle approval by the Monetary Authority of Singapore for a Major Payment Institution license. Despite challenging market conditions, we are proud of the dedication and integrity of the entire Genesis team, and we look forward to working alongside our clients as crypto capital markets continue to evolve.

Confidential - Filed Under Seal

# 1          Genesis Q2 Results

## Lending

Industrywide, crypto lending suffered a strong contraction in Q2, resulting in a shift in market structure. However, Genesis continued to be an active participant in yield markets in perpetuity and serviced all our clients' needs on both the demand and supply side. Looking ahead, the crypto credit markets will evolve, and institutional lending will continue to be a core component of Genesis' overall prime offering.

The Genesis lending desk originated approximately $40.4 billion in loans, 9% less than in Q1, with most originations occurring in the first two months of the quarter. The USD amount of active loans outstanding ended the quarter at $4.9 billion, down substantially from the previous quarter and reflective of the significant challenges in the credit markets during the quarter.

USD and equivalents constituted 53.7% of our loan book, significantly higher than the 48% represented by this stable group of assets at the end of Q1. This "flight to quality" is also seen in the increase in the weighting of BTC loans on our book, up to 30.4% from 28.7% at the end of Q1. ETH's weighting reflected its relative price underperformance for the quarter, 11.4% at the end of Q2, down from Q1's 16.0%.

## Spot

The Genesis spot desk traded over $17.2 billion in OTC volume in Q2, an increase of over 51% from Q1. The desk engaged with over 720 counterparties, a 25% quarter-on-quarter increase.

BTC comprised 56% of the traded volume, notably higher than the 48% seen in Q1, and reflective of the market's risk aversion in the second half of the year.

In June, our Genesis Asia Pacific Pte. Ltd. entity (Genesis Asia Pacific) received in-principle approval by the Monetary Authority of Singapore for a Major Payment Institution license. This makes Genesis Asia Pacific one of a handful of Singapore-based digital payment token service providers to have received in-principle approval.

## Derivatives

Trading activity on the derivatives desk dropped along with asset prices - notional value traded globally reached approximately $26.6 billion, 4% lower than in Q1. This figure includes bilateral OTC, negotiated block trades and exchange-traded volumes.

In June, Genesis printed our first OTC exotics options trades and we have seen significant customer interest in this new offering. The firm will look to build a robust exotics business throughout the second half of the year.

In Q2 Genesis continued to rank as the #1 dealer for block liquidity on the Paradigm platform, clearing over $5.8 billion in notional volume for the quarter.

In May, our entity GGC International Limited joined the International Swaps and Derivatives Association (ISDA) as a Primary Member. Genesis, through its GGC International Limited entity, was one of the first participants in the OTC crypto derivatives market, and one of the first to provide options liquidity to crypto-native hedge funds and corporates. This helped to shape much of the existing documentation that has become embedded into derivatives relationships throughout the industry. As a member of ISDA, Genesis will continue to actively shape the direction of digital asset derivatives markets.

## Custody

In a quarter that saw significant drawdowns in crypto markets broadly, Genesis Custody processed its highest number of quarterly transactions, representing an 8% increase over Q1.

In addition, we saw a record $400 million in transfers to the Genesis trading and lending desks, highlighting the utility of seamless access to liquidity without sacrificing security.

Our integrated service led to a 20% increase in the number of custody clients over Q2, bringing the year-on-year increase to 255%. Additionally, Genesis Custody grew its worldwide footprint and now supports clients in over 10 countries around the globe.

# 2

# Q2 Derivatives Market Insights

—by Gordon Grant, Ravi Doshi

## The Second (Quarter) Coming

Q2 2022 witnessed a deep reckoning for the crypto market.

Harbingers of chaos arrived in May. Anchor protocol was the ultimate darling of the DeFi lending sector. Offering 19% compounded annualized returns, it had amassed tens of billions in assets, sucking in crypto treasuries, dealing desks, long-only managers and even market neutral funds. Despite a tardy transition to variable-rate, tiered yields intended to ensure the platform's long-term viability, Anchor was unable to overcome excessive imbalances and shore up points of weak liquidity in its underlying framework. These factors caused the protocol to implode in rapid, catastrophic fashion when the negative convexity inherent to an infinite LUNA mint mechanism kicked in, dragging the entire crypto market with it as the Luna Foundation Guard dumped treasury assets and LUNA token pricing **dropped 99%**.

As a result, crypto market participants that had been accumulating relatively cheap downside protection in early Q2, regardless of the underlier, were handsomely rewarded in the firestorm following May 8th's UST peg break. Holders of long volatility cashed out at the expense of LUNA+UST longs, chronic underwriters and other programmatic option shorts who had been selling lower and lower implied volatilities (IVs) in a self-immolating hunt for yield before the crisis. From a nadir of 60% in April, 1-month ATM vols soared to a local zenith of 125% in May, and the pain of volatility shorts was painted on the screens.

Results    →    **Derivatives Market Insights**    About Genesis





One would have expected the collapse of Terra to mark the end of collective naïveté in which yield-seekers, both neophytes and veterans alike, had willfully suspended disbelief to participate in the enthusiasm for arbitrarily high stablecoin yields. Yet even after the ecosystem designed to support what some have come to think of as a comprehensive ponzi scheme imploded, there remained a healthy debate as to whether an algorithmic stablecoin, or indeed any stablecoin, could survive. Concomitantly, there also persisted

through the end of May and into June a continued propensity for carry trades that effectively relied on the same mechanisms and structures which had failed in the Terra experiment.

In terms of desk flows, it's surprising to note that apart from selective bouts of sheer panic, we saw a far greater amount of volatility selling (in terms of call overwrites, and earlier in the quarter, put sales) than we did protective put buying. The derivatives desk also observed a reasonably differentiated split between crypto native and tradfi flows in terms of their tack to navigate and hedge in extreme market conditions: newer entrants from conventional asset classes tended to take a volatility-driven approach to trading the downtrend by loading up on gamma, curve trades, skew and convexity spreads, while crypto natives preferred directional put spreads and aggressive near atm call sales to recoup the cost of holding on to secular delta length.

It was not, however, an easy tape to trade; the behavior of volatility and hedge-related pricing throughout the quarter was noteworthy not just for the way it exploded violently around both the Terra debacle and June's barrage of insolvencies, but equally for the manner in which IVs imploded on cue immediately after each episode.

Between the time of the UST depeg in mid-May and the final hours of the Consensus festival in Austin, Texas a month later, 1-month to 3-month implied volatility fell anywhere from 40 to 80 points, depending on the tenor. In the week following the conference, volatility and skew nearly trebled, only to halve again thereafter through the end of the quarter, with IVs settling broadly below the same levels that they were at this time last year.

Thus, second quarter option dynamics in crypto proved treacherous at best with extreme volatility of volatility (and volatility of skew). If there is a lesson to be learned, it is that tranquility in IVs does not rule out another exponential move higher if global risk assets slide further or crypto-specific drivers such as further forced liquidations persist in the third quarter.

# The Center Can(not?) Hold

But for all the Sturm und Drang in the options markets for crypto majors, the quarter's single most talked about trade was USDT, for which there remained, almost irrespective of any exogenous force, a persistent and even at times feverish appetite for downside. Yet notwithstanding the single, momentary 'depeg' from parity that occurred when BTC first breached $27k in the wake of the LUNA fiasco, the collective size put into those trades gave little joy.

USDT exposure was manifested through borrow-and-short, OTC forwards, and both outright options and options spreads across the April-June period. It became something of a flagbearer for the entire classification of peg-break trades in vogue during Q2. Following the collapse in UST, the heuristic search for binary punts took on a thematic bent which meant that not just USDT, but also stETH/ETH, DAI, USDC, USDD and other 'stables' or managed equilibria garnered a disproportionate share of attention from players who were otherwise completely loathe to strap on conventional downside protection in BTC (or ETH).

USDT has, however, held relatively steady absent a brief plunge toward 96 cents, and much as things fell apart in Q2, the center of the global crypto ecosystem did manage to hold throughout the quarter.

# Mere Anarchy

The maelstrom in the crypto market over the course of the second quarter in some sense appears, as events often do in the fullness of time, an inevitable consequence of the aggressive withdrawal of policy accommodation in real time by the Federal Reserve (and other global central banks). Neither the conflict in Ukraine, nor the progress towards the Ethereum merge, nor the prospect of a physical BTC ETF seemed to matter as much as Fed policy in the face of crypto's first sustained test of monetary tightening and balance

sheet reduction. Crypto had been the beneficiary of one of history's greatest runups in asset prices post-pandemic, and the present correction has been chalked up by many as fittingly symmetric.

Yet it was the manner in which entropy took hold that caused greatest consternation.

Unlike any other crypto correction (or winter) of times past, massive leverage at scale - on lending books, between counterparties, and even vis-à-vis derivatives venues, suddenly mattered in a way few had previously thought conceivable. Many have likened Q2 2022 to crypto's "Lehman moment"; it remains to be seen whether the quarter's pronounced FUD over systemic risk vis-à-vis Terra, Tether and TAC et al will prove the global peak, but to practitioners of traditional financial markets who have traded through past crises, it certainly had echoes of the days when dealing desks and risk teams worked 24/7 to figure out where exposures lay, who owed whom, and what exactly should be considered 'safe' exposure. An options book was no longer the sum of its constituent parts but rather a multidimensional array of interlinkages between mark-to-market, collateral, liquidity, and, perhaps most significantly, contractual requirements to fulfill obligations based on rapidly changing market valuations.

Crippling considerations such as forced insolvency, bankruptcy claims and jurisdictional issues came to the fore, rocking risk models and catalyzing a degree of paralysis heretofore unseen in this dynamic asset class. For although the UST crash saw spreads widen, liquidity thinned out on another order of magnitude in mid-to-late June as the extent of the crypto credit crunch revealed itself. Counterparty risk was thrust into the spotlight as every day seemed to bring news of fresh contagion and any prior assumptions of credit quality had to be reevaluated. On top of this, participants caught short volatility or short puts into the death spiral paid a hefty price to exit their positions, greatly reducing risk appetite to provide tight pricing in meaningful size.

In the most spectacular instance of that phenomenon, crypto's "poster child" hedge fund Three Arrows Capital was revealed to have parlayed layers of borrowed funds to facilitate untrammeled

Results                    → **Derivatives Market Insights**                    About Genesis

trading at scale. As markets slid lower in nearly unabated fashion following a brief respite in the wake of the Terra ecosystem collapse, according to public reports, margin call after margin call were missed, and liquidations across venues began in force, with material consequences for market pricing: stETH/ETH parity came unglued, bitcoin-linked ETF discounts plumbed new lows, basis probed 0 and implied volatility and skew exploded.





The conclusion of that saga, or indeed its ultimate ramifications, may be far from imminent, but certain critical effects have already been felt by the derivatives market:

1) Venues themselves came under fire. Deribit announced that it had taken remedial action to mitigate risk related to a major counterparty's position(s). The concomitant effects on liquidity and spreads on the exchange which represents >95% of BTC + ETH options was noticeable, as routine bid/offer width more than doubled in many cases and volumes declined substantially.



**BTC Options Open Interest**

Source: Genesis, Skew.com



**BTC Options Volume**

Source: Genesis, Skew.com

2) On the demand side, the capacity of market participants to commit balance sheet to buying into longer-term options trades declined both as a function of perceived shifts in counterparty risk and owing to a reduction in the availability of capital for backbook vega bets in addition to the aforementioned widening of spreads. Moreover, on the supply side, yield seek which previously may have been directed to defi is now more likely to be allocated to vanilla sources of premium generation (i.e., selling options). Net net, notwithstanding the tremendous amount of stress to which crypto markets have been subject, vega in particular continues its broadly secular march lower (although perhaps not for the hoped-for reason of the normalization of the asset class), and there is little to no risk premium embedded in short- to medium-dated implied vs realized volatility.



**BTC 6-month ATM Implied Vol**

**Source:** Genesis, Skew.com



**BTC 3-month Implied vs Realized Volatility**

**Source:** Genesis, Skew.com

**Genesis**

3) The breadth of participation narrowed in Q2 and may require a lengthier curative period than past corrective cycles before broadening once more. The magnitude of the shock to the thesis of secular crypto gains is not trivial. With protocols blowing up, major ecosystem linchpins giving way, and marquee players ceasing to exist overnight, the marketplace may remain more focused on staunching profit-and-loss bleed and ensuring survival for the months ahead. In that circumstance, investors may have less bandwidth for testing the waters on new products or allocating discretionary capital, all else equal. However, that also may suggest, all else equal, that participants could remain underinvested in the asset class far longer than typical, creating the potential for violent realignment if risk assets recover and animal spirits return.

## Conclusion

There are reasons to remain sanguine about the continued growth of the crypto derivatives marketplace and the broadening use cases and modalities for options, both vanilla and exotic, to become an even more omnipresent feature of this landscape. Our desk's conversations with clients continue to feature productive dialogue regarding episodic and thematic opportunities. Whether it concerns positioning for something as specific as an ETF approval, programmatically overwriting calls, or playing for protocol shifts such as the coming ETH merge, both dedicated tradfi and crypto natives are engaging at scale, with an increasing array of choices for instruments, including crosses like ETH/BTC as well as exotics. In particular, Genesis printed its maiden digital option during the second quarter, among the first to be traded in the market, and we fully expect to roll out a complete suite of exotic options in the quarter(s) ahead.

Two-way interest in the market, which balances relatively bleak macro against the prospects for a squeeze higher in risk proxies, may be expected. Particularly as the dust continues to settle for the

Confidential - Filed Under Seal

moment and summer doldrums wait around the corner, the market may be primed for gappy, erratic price action. Coupled with thinner markets, the potential price paths could be more binary than usual in the event of a material positive catalyst such as a shift in the Fed's stance, or adverse crypto-specific regulatory action.

Although the market has paused for a breather as of mid-July, further fallout could also remain a possibility. Token prices sustained at these levels will make the economics challenging on mining credit, collateral repayments, and even fund redemptions. Just as inflation, war and equity risk premia will continue to guide the direction of crypto markets and their levels of volatility, skew and convexity, so too will issues of liquidity, credit and collateral remain requirements that play a dominant role in trading considerations as the industry stays cautiously alert heading into Q3.



Results    Derivatives Market Insights    ➔    About Genesis

# About Genesis

Genesis is a full-service digital currency prime brokerage providing a single point of access for select qualified individuals and global institutional investors. Genesis combines unrivaled operational excellence, a seamless user experience, and best-in-class client service to provide the full suite of services global investors require to manage their digital asset portfolios.

The firm offers sophisticated market participants a fully-integrated platform to trade, borrow, lend, and custody digital assets, creating new opportunities for yield while increasing capital efficiency for counterparties.

## Stay Connected

For more information from this report, contact us at **info@genesistrading.com**, or call us at (212) 668-5921.

**www.genesistrading.com**

**Twitter**
**LinkedIn**
**Facebook**

## Learn More About Our Services

**About Genesis**
**Genesis Prime**
**Lending FAQ**
**Custody FAQ**

## Q2 2022 report by:

**Gordon Grant**
VP, Quantitative Rsch & Trading
ggrant@genesistrading.com

**Ravi Doshi**
VP, Derivatives & Spot Trading
rdoshi@genesistrading.com

**Reed Werbitt**
MD, Head of Cash Trading
rwerbitt@genesistrading.com

**John Conneely**
Director, Institutional Custody
jconneely@genesistrading.com

**Noelle Acheson**
Head of Market Insights
nacheson@genesistrading.com

**Ainsley To**
Senior Research Analyst
ato@genesistrading.com

**Marc Yaklofsky**
Head of Comms
myaklofsky@genesistrading.com

**Dave Hamilton**
VP, Derivatives Trading
dhamilton@genesistrading.com

**Sana Cherukuri**
VP, Spot & Derivatives
scherukuri@genesistrading.com

## Disclosures

This research is for our clients only. Other than disclosures relating to Genesis, this research is based on current public information that we consider reliable, but we do not represent is accurate or complete. This research should not be relied upon as investment advice. The information, opinions, estimates and forecasts contained herein are as of the date hereof and are subject to change without prior notification. We seek to update our research as appropriate. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment. Genesis conducts a global prime brokerage service, integrating digital asset lending, trading, and custodial services. Genesis Global Trading, Inc., registered in the United States with the SEC as a broker-dealer, is a member of SIPC (**https://www.sipc.org**). SIPC coverage does not cover digital assets, virtual currency, cryptocurrency, or other related assets. Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and principal trading desks that reflect opinions that are contrary to the opinions expressed in this research. The analysts named in this report may have from time to time discussed with our clients, including Genesis salespersons and traders, or may discuss in this report, trading strategies that reference catalysts or events that may have a near-term impact on the market price of the digital assets discussed in this report, which impact may be directionally counter to the analyst's published price target expectations for such digital assets. Any such trading strategies are distinct from and do not affect the analyst's fundamental rating or commentary for such digital assets. We and our affiliates, officers, directors, and employees, will from time to time have long or short positions in, act as principal in, and buy or sell, the digital assets and securities or derivatives thereof, if any, referred to in this research. The views attributed to third party presenters at Genesis-arranged conferences, including individuals from other parts of Genesis or its parent, Digital Currency Group (DCG), and any affiliates or subsidiaries of thereof, do not necessarily reflect those of Genesis and are not an official view of Genesis. Any third party referenced herein, including any salespeople, traders and other professionals or members of their household, may have positions in the products mentioned that are inconsistent with the views expressed by analysts named in this report. This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of any investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments. Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors.

## Disclaimer

IRS Circular 230 Disclosure: Genesis Global Trading, Inc. and its global affiliates (collectively, "Genesis") do not provide legal, compliance, tax or accounting advice.  Accordingly, to the extent there is any discussion of U.S. tax matters included in these materials, it is not intended or written to be used, and cannot be used or relied upon, by you for the purpose of avoiding any tax penalties and may have been written in connection with the promotion or marketing of any transaction contemplated hereby.   You should seek professional advice in respect of your specific circumstances from an independent tax advisor.

This presentation and the material contained herein are confidential and may not be distributed in whole or in part to anyone other than the intended recipients. Unauthorized reproduction or distribution of all or any of this material or the information contained herein is strictly prohibited.  Neither this presentation nor any related discussion may be disclosed or used for any purpose other than as described below without the prior written consent of Genesis.  These materials were prepared exclusively for the benefit and use of the Genesis client or the potential Genesis client to whom it is directly delivered and/or addressed (the "Company") in order to assist the Company in evaluating, on a preliminary basis, the feasibility of a possible transaction or transactions or other business relationship.  Further, these materials are for discussion purposes only and are incomplete without reference to, and should be viewed solely in conjunction with, the oral briefing

provided by Genesis and the terms and disclosures set forth on the Genesis website, which are deemed incorporated herein.

The information provided in this communication does not constitute investment advice, financial advice, trading advice, or other advice. Genesis is not acting as your fiduciary.  You are advised to make your own assessment of whether a Genesis service that you are considering is suitable for you and ensure that you have the necessary experience and knowledge to understand the risks involved in relation to those particular services, transactions or investments. Prior to entering into any transaction, you should determine, without reliance upon us or our affiliates, the economic risks and merits (and independently determine that you are able to assume these risks) as well as the legal, tax and accounting characterizations and consequences.  In this regard, by accepting this presentation, you acknowledge that (a) we are not in the business of providing (and you are not relying on us for) legal, tax or accounting advice, (b) there may be legal, tax or accounting risks associated with any transaction, (c) you should receive (and rely on) separate and qualified legal, tax and accounting advice and (d) you should apprise senior management in your organization as to such legal, tax and accounting advice and our disclaimer as to these matters. By accepting receipt of this presentation, the recipient will be deemed to represent that they possess, either individually or through their advisers, sufficient investment expertise to understand the risks involved in any transactions or services discussed herein and that they have not relied in whole or in part on any of the information provided by Genesis in making such determination.

The trading of digital currency as herein described is an inherently risky activity. Digital currency does not benefit from the protections afforded by the Securities Investor Protection Corporation. A counterparty's ability to enter into derivatives with Genesis depends on satisfying a number of regulatory requirements imposed on derivatives under the Dodd–Frank Wall Street Reform and Consumer Protection Act and applicable law including but not limited to characterization as an eligible contract participant under the U.S. Commodity Exchange Act.

The permissibility of borrowing and lending from and to counterparties may depend on Genesis's licenses, a counterparty's circumstances and the applicability of local lending and borrowing laws. The custody of digital currency is not subject to protections or insurance provided by the Federal Deposit Insurance Corporation or other US governmental programs. Genesis provides its services solely in connection with supported digital currencies.   Genesis trading services are available to select qualified institutional investors and accredited individuals (a) who have assets equal to or greater than $10mm (including digital currency holdings, as applicable) and (b) who are interested in (i) trading amounts equivalent to at least USD $250,000 (whether in cash or digital assets) per transaction, or (ii) lending or borrowing at least 100 BTC, 1,000 ETH or USD $2,000,000, whether in cash or stablecoins.

Any prices or levels contained herein are preliminary and indicative only and do not represent bids or offers. These indications are provided solely for your information and consideration, are subject to change at any time without notice and are not intended as an offer to sell or a solicitation to purchase any financial instrument.  Nothing contained herein shall constitute any representation or warranty as to future performance of any financial instrument, credit, currency rate or other market or economic measure.  In preparing this presentation, we have relied upon and assumed, without independent verification, the accuracy and completeness of all information available from public sources or which was provided to us by or on behalf of the Company or which was otherwise reviewed by us.   Genesis does not make any representations or warranties, express or implied, as to the accuracy or completeness of the information provided herein.  Any estimates included herein constitute our judgment as of the date hereof represent potential future events that may or may not be realized and are not a complete analysis of every material fact representing any product. Any estimates included herein constitute our judgment as of the date hereof and are subject to change without any notice. We and/or our affiliates may make a market in these instruments for our customers and for our own account. Accordingly, Genesis may have a position in any such instrument at any time.

Genesis and Genesis Trading are marketing names for certain businesses of Genesis Global Trading, Inc. and its global affiliates and if and as used herein may include as applicable employees or officers of any or all of such entities irrespective of the marketing name used. Products and services may be provided by affiliates as may be appropriate to provide such services under applicable law.  Securities and digital assets are not deposits or other obligations of any commercial bank, are not guaranteed by any commercial bank and are not insured by the Federal Deposit Insurance Corporation. GGC International Limited is incorporated in the British Virgin Islands ("BVI").  BVI law

may restrict the types of tradable instruments.  Genesis Global Trading, Inc, a Delaware corporation, has been granted a Virtual Currency License by the New York State Department of Financial Services and is registered with the U.S. Securities and Exchange Commission as a broker dealer.  Genesis Asia Pacific Pte. Ltd. Is a private limited company organized under the laws of Singapore.  Genesis Global Capital, LLC is a limited liability company organized under the laws of Delaware. Genesis Custody Limited is registered as a cryptoasset business with the UK Financial Conduct Authority and is not licensed in the United States. Certain services may not be available in a counterparty's jurisdiction.

© 2022 Genesis Global Trading, Inc.  All rights reserved.  "Genesis", the Genesis logo, and other Genesis trademarks and service marks referenced herein are trademarks and service marks of Genesis and are used and registered throughout the world.

**Genesis**

**Genesis Q3 2022**

# Q3 Market Observations

Genesis

Confidential - Filed Under Seal

# Q3 Market Activity Snapshot

# $8.4B

2022 Q3 Loan Originations

# $2.8B

Total Active Loans as of Q3 2022

# $18.7B

2022 Q3 Derivatives Notional Value* Traded

# $9.6B

2022 Q3 Spot Volume Traded

*Inclusive of negotiated block- and exchange- traded futures and options

**Genesis**

# Introduction

The third quarter of 2022 saw a confluence of macroeconomic crosscurrents and crypto specific narratives, compressing volatility and elevating correlations in the digital asset space. Total crypto market capitalization finished the quarter up a meager 4.6% at $905 billion[1] a far cry from its ~$3 trillion peak in November of last year but a respectable showing during a period of stagnation, as fears of further declines following the events of the summer did not materialize, in stark contrast to common perceptions of crypto's high–beta personality.

The consolidation in cryptocurrency prices has nonetheless allowed Genesis to continue its diligent navigation of the crypto winter, with a redoubled focus on technology to drive our business, combined with enhanced tooling and risk management solutions, whilst recalibrating to a more tactical stance towards market participation across desks. Conditions remained formidable against a backdrop of cataclysmic dislocations in developed market rates and inflation, which jarred risk sentiment in most asset classes. Yet there were also unique opportunities over the quarter, including the highly anticipated Ethereum Merge, which catalyzed paradigm shifts in market structure.

Our Q3 report shares a breakdown of activities within our key business lines, as well as in-depth insight from our derivatives desk over this tumultuous, watershed period in crypto's history.

Selected summary figures include:

→ Our lending desk originated $8.4 billion staying active through the market sell off.

→ Total active loans stood at $2.8 billion, down from $4.9 billion in Q2.

→ Our spot desk traded over $9.6 billion OTC, across 100+ assets.

→ Our derivatives desk traded $18.7 billion in notional value, down 30% from Q2.

→ Genesis Custody services saw an increase in clients onboarded, up 8% from Q2 and 280% YOY.

**More Information**

To learn more about Genesis, or to work together with the Genesis team, contact us at:

**info@genesistrading.com**
**www.genesistrading.com**

1    Data from **TradingView**

→ **Results**      Derivatives Market Insights      About Genesis

# 1      Genesis Q3 Results

## Lending

Genesis' lending desk originated approximately $8.4B in loans as the industry's appetite for leverage continues to wane in the face of deteriorating macro conditions impacting nearly all risk assets. USD amount of active loans outstanding ended at $2.8B, down substantially from previous quarters. USD and equivalents constituted ~35% of our loan book which is, in parallel fashion, materially lower than the previous quarter's portion of ~54%. However, a shift in the mix of both BTC and ETH to ~37% and ~16% of the loan book could have implications on both the type of opportunities and market participants in this phase of the cryptocurrency cycle. Interestingly, other smaller cap tokens are almost 13% of the loan book, the highest since 2020, as borrowers are keen to hedge balance sheet exposures or take opportunistic bets.

| Asset Mix | Q2 2021 | Q3 2021 | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 |
|---|---|---|---|---|---|---|
| BTC | 42.3% | 32.4% | 27.5% | 28.7% | 30.1% | 36.5% |
| ETH | 27.9% | 32.0% | 25.7% | 16.0% | 11.4% | 16.2% |
| USD & Equivalents | 21.1% | 29.5% | 39.9% | 48.0% | 53.7% | 34.7% |
| Other | 8.7% | 6.1% | 7.0% | 7.3% | 4.8% | 12.7% |

 **Source: Genesis internal data**

| | Q4 2021 | Q1 2022 | Q2 2022 | Q3 2022 |
|---|---|---|---|---|
| Cumulative Originations ($m) | $150,956 | $195,263 | $236,009 | $244,426 |
| Active Loans ($m) | $12,502 | $14,594 | $4,919 | $2,802 |
| BTC Price | $46,306 | $45,539 | $18,874 | $19,496 |

 **Source: Genesis internal data**

**Genesis**

➜  **Results**        Derivatives Market Insights        About Genesis

# Spot

The Genesis spot desk traded over $9.6 billion in OTC volume in Q3, down 44% quarter-on-quarter mostly due to the significant decrease in average spot prices while activity remained constant on a unit basis.

Despite the Merge dominating the news cycle and price action in Q3, our flows remained heavily concentrated in BTC, exceeding last quarter by accounting for 67% of our OTC flows. ETH activity accounted for 23% by comparison. Alt coin activity has steadily decreased as we continue to see a "flight to quality" in these uncertain times. As a signpost for the secular adoption and broadening of the asset class, though, our custody business saw the highest quarterly increase ever in net inflows in Solana (SOL), up 217% from Q2.

Overall, the challenging global backdrop for risk has led to beguiling trading conditions for crypto assets. As benchmark asset classes remained choppy at best, crypto markets finished the quarter in search of a new impetus to finally find more meaningful direction going into year end.

# Derivatives

Trading activity on the derivatives desk slid lower by 30% quarter over quarter - notional value traded globally reached approximately $18.7 billion. This figure includes bilateral OTC, negotiated block trades and exchange-traded volumes.

In early September, **Genesis printed the first ETH Macro CME options trade** and will look to continue to support new products on that venue.

Across Q3, Genesis continued to rank as the #1 dealer for block liquidity on the Paradigm platform[2], clearing over $7.1 billion in notional volume for the quarter.

[2]  Paradigm official statistics, October 2022, **https://admin.chat.paradigm.co/derivatives-stats**

**Genesis**

Results    ➔    **Derivatives Market Insights**    About Genesis

# 2    Q3 Derivatives Market Insights

—by Gordon Grant & Ravi Doshi

## Merging Markets

The third quarter of 2022 was, for the most part, a case of traveling a long way to go nowhere. For although Q3 saw a fierce bear-market rally in risk-assets which extended, for a brief period, to crypto, selling pressure – on spot, forward/funding rates, implied volatility, and skew - was the prevalent theme in the market as virtually everything went lower in 'sell it all' fashion.

BTC carved out a roughly $7,000 range holding the June lows of $17,700 but decisively failed at the $25,000 resistance level, ending the quarter seemingly pinned to $20,000 on the nose.

ETH, of course, was a far juicier story with a ~100% range from a low of ~$1,000 to a high of over $2,000 before retracing back to $1,300 by September 30th post-merge.

In some ways it's remarkable that crypto didn't fare far worse. Developed market currencies and interest rates saw some of their most brutal moves in decades with multi standard deviation shocks in treasuries and gilts as well as the pound and the yen, among others. The VIX held convincingly above 30, and the prospects of both a soft landing in G10 economic growth along with a swift end to inflationary pressures were dashed.

It's hard to say whether the injection of serious volatility into the developed market world is simply a case of a decade's worth of medical experimentation coming a cropper, or whether the western-driven financial order was, as many proponents of digital assets believe, simply doomed to this kind of "cryptification": the degree of wild gyrations in benchmark asset classes has begun to look a lot more like crypto, and crypto vol has, for a change, subsided in spite of a serious macro storm.



Results    →    **Derivatives Market Insights**    About Genesis

# "Good Support at Zero"

It's often joked, when prognosticating on the future patterns of fat-tailed crypto return distributions, that the market may have a long way to go to find a bottom. And while this 'winter' has shown characteristic demand at key if arbitrary price points, vols closed out the quarter at a local nadir and continued to trickle lower thereafter into what seemed a bottomless pit.

In both velocity and magnitude, the post-merge vol compression in Ether was amongst the most violent drawdowns in IVs that we have experienced. The serial autocorrelated effects in options markets were in full force as implied volatility posted session after session of successive declines thereafter.

Although realized volatility sustained itself over a few noisy days past mid-September, close-to-close volatility grinded lower along with spot prices during a persistent positive spot:vol correlation regime. The explanation for that relationship was, in hindsight, obvious: the market had gorged itself on optionality, both upside and downside. Pre-merge, moreover, there was little to no skew for OTM calls priced into the ETH surface across the term structure, with a noticeable preference for left-hand tail protection. With the market effectively girded for any eventuality, 'insurance premiums' embedded in Ether options collapsed from September 14th to mid-day on September 16th, in a drastic fashion.



**BTC – ATM Implied Volatility**
BTC 1m IV drops from ~75% to ~65% post-Merge, in tandem with a collapse in ETH IV after a gamma squeeze the prior week

**Source:** Genesis, Deribit



Results     →     **Derivatives Market Insights**     About Genesis



**ETH - ATM Implied Volatility**
ETH 1m IVs dropped swiftly below ~75% into quarter end, after reaching ~110% pre-Merge

Source: Genesis, Deribit

# Skewered

Moreover, as is often the case in crypto, ETH skew, which had predicted a rise in vol on lower spot, turned out to be completely mis calibrated:

At the start of merge week, the October 28th expiry was priced for a nearly 15iv increase in the event of 25% drop in spot.

Yet the opposite occurred: after stalling near $1,600 throughout the September 14th session with the implosion of vol and concomitant spike in the amount of local fixed strike gamma, ETH/USD spot rolled over in the days that followed, cascading from 1600 to 1300 in quick succession. Rather than rallying meaningfully as the volatility smile[3] would have suggested, IVs underperformed even the most conservative sticky-delta assumption: At-the-money vols in October crashed from ~105 to ~90 in just hours post-merge, and subsequently slid to 80% as spot fell and both protective and speculative options positions were dumped. While legacy call holders saw premiums evaporate, it was long put positions, particularly if dynamically hedged, that took heavy losses.

The noteworthy underperformance of skew is not a surprise. Bitcoin and ETH surfaces are often, particularly during sizable shocks, not a reliable indicator of actual observed volatility dynamics. From the correlation between spot and implied vol to the implicit level of vol of vol in the tails of the distribution, the vol smiles do not always predict

3     The tendency for implied volatility it be higher for more out of the money options.

**Genesis**

reality. For that reason, notwithstanding the continuing maturation of these markets, Genesis expects inefficiently priced volatility to remain an alluring attraction of this industry for both market-neutral and directional players.



## Crowd(ed) Funding

No assessment of the quarter past would be complete without at least a brief glimpse at the extreme conditions that persisted in ETH funding markets around the merge. From trading slightly negative into the beginning of Q3, ETH rates plumbed the abyss as the merge marched closer, owing to a combination of:

1.  Hedging (outright longs seeking to neutralize delta by selling perpetual futures)

2.  Arb flows (buyers of ETH spot and sellers of ETH perps and/or fixed date futures to earn forked tokens for ETH held on chain at the time of the merge 'snapshot')

3.  Delta neutral Curve trades (sellers of ETH perps to buy fixed date futures)

Perp funding rates annualized negatively to the tune of hundreds of percentage points into the last hours before the merge with perps trading more than 0.5% below spot for a brief moment.

**ETH Perpetual Futures - Funding Rate**





**Source:** Genesis, Glassnode

Ultimately, the moves in the ETH futures curve were just as – if not even more - violent than those seen in the vol markets. More than a month ahead of the event, smart money began buying physical ETH and selling September and December term futures when they were still priced at a 4% annualized premium to spot. Traders were positioning to earn the soon-to-be-created ETHW token for each unit of ETH they held. This trade became crowded quickly and the ETH futures curve went from contango into steep backwardation. The ETH December futures traded at a nearly 7% annualized discount to spot a day before the event.

**Genesis**

Once the merge was successful, the entire market raced to unwind the trade: sell to close ETH spot, buy to close September or December futures, and sell newly airdropped ETHW at market. This exorbitant pressure on spot also ETH contributed to the market selling off precipitously, leaving many ETH maximalists scratching their heads at the price action.

Interestingly, the September and December futures basis rallied sharply (moving higher ~$26 in the span of a few hours against spot) but never reverted back into contango. Since then, a more rational arbitrage-free backwardation has set in, which should be the case for an asset with an expected benchmark staking yield of 5%.

 **ETH Futures - Annualized Rolling 3-month Basis**    



**Source:** Genesis, FTX

# The Macro Takedown

While Q2 was challenging for the crypto industry at large, Q3 was particularly dramatic for developed market inflation and, as a consequence, G10 fixed income and FX. 2 year rates in the US spiked wildly towards 5%, 10s crested 4%, and the dollar surged to near-parity against the British pound and multi decade highs against the yen. USD liquidity tightened substantially, yet for all the tightening of financial conditions induced by the Fed (and other global central banks), price pressures did not significantly abate.

As such, risk assets simply could not convincingly pull themselves off the mat. Rallies were short lived and the prospects of a sustained recovery in sentiment were repeatedly dashed.

Results    ➜    **Derivatives Market Insights**    About Genesis

The chronic macro overhang capped valiant efforts by market participants throughout the last three months to alight upon new uptrends. For instance, going into the September 9th expiry, one large player began to accumulate a significant position in short dated bitcoin calls for the following week, publicly advertising on his twitter account that a gamma squeeze was in full effect. As he hoovered more optionality, paying well through screen offers for size, BTC vols and skew ripped over the four days leading up to the September 13th CPI release, with IVs for September 16th and September 30th expiries rallying 10-15 vol points or more. Yet the buyer's $4mm in premium paid vanished within hours as inflation far exceeded expectations; bitcoin came crashing down from 23,500 straight back to the magnetic level of 20,000 where it spent most of the rest of the quarter.

The surge in ETH that began in mid-July felt much the same, if evincing broader-based participation. On July 15th, crypto native directional players grabbed upwards of 30,000 units of 2 week ETH calls around the 90% IV level as spot bumped through 1200 with another 20,000+ units traded on Genesis' OTC books by Saturday July 16th. Within 48 hours ETH/USD surged $200, and the Jul22/Jul29 calendar spiked some 15 points as one-week implied volatility skyrocketed and the front of the curve traded flat at nearly ~100%. Burgeoning open interest in ETH upside was perpetuated with each phase of pre-merge prep as the testnets fell into line throughout the summer, and with limited pullbacks, the market set itself up for a proper assault on the psychologically key 2,000 level. Unlike the failed attempts at 25,000 in BTC, with an actual catalyst in place and no top-heavy supply from miners, 2k was in fact pierced. Genesis derivatives desk saw substantial 2-way flows at the highs, both in terms of spot and vol, and we hit a new franchise volume record, trading 1,336,000 units of ETH options on Deribit in August, ranking first globally[4] in a month where ETH options volume rivaled that of BTC.

4    Deribit official statistics provided to exchange market makers, as of 5 September, 2022; **www.deribit.com**

Results     →     **Derivatives Market Insights**     About Genesis

**Deribit August 2022 Options Ranking**





**Source:** Deribit

It is not surprising that with the push to a cyclical post crisis ETH/USD peak occurring in August, to a large extent, the market had by and large prepositioned for the merge well ahead of the mid-September event date. As such, our participation in global exchange traded ETH options volumes declined by 45% month on month as the quarter ended.

OTC engagement remained, however, robust, with >100,000 units of ETH options in direct bilateral trades with our core client base in the September 9th - 16th period. Yet for all the turnover in the eight-week leadup to the event in which ETH at one point had rallied over 80%, the success of the merge was rapidly discounted in two contradictory yet complementary ways:

1.  The collapse in vol adjusted for the substantial reduction in risk premium ascribed to holding ETH; both crash insurance and bullish optionality outlived their usefulness, and the potential for idiosyncratic variance was rationally priced out of the market.

2.  The concurrent decline in spot ETH/USD was, however, in deference to the dreadful outlook for risk and especially growth assets for which, at least up through mid-September, ETH had been traded as a correlative proxy. Even though, post-merge, ETH is conceivably a more attractive asset with better fundamentals, those were not sufficient to justify higher prices in the face of broader considerations. The tremendous technological accomplishment that was the merge could not hold a

**Genesis**

candle to soaring bond yields, crashing foreign exchange rates, the moribund trajectory of once high-flying tech stocks, and the plethora of macroeconomic headwinds.

# Conclusion

Heading into the fourth quarter, the cryptocurrency market is lacking directional momentum as participants are taking stock after a beleaguering summer of endless negative headlines. Bitcoin listed options open interest has declined by over 65% from a ~$15B high claimed in Q4 2021. ETH options however saw a new high in activity this quarter as sizeable bets and hedges were placed ahead of the merge. ETH 'flippened' BTC's listed OI ('open interest') as it topped $8B in August only to match BTC at $5B to end of the quarter, an occurrence in which the Genesis Derivatives desk played a principal role both on and off exchange.

**BTC Options - Open Interest**
BTC options open interest grinds ~60% lower from its peak in Oct-21



Source: Genesis, Deribit, OKEx

**ETH Options - Open Interest**
ETH options open interest breaks $8bn ahead of the Merge



Source: Genesis, Deribit, OKEx

As the global economy sputters amidst the swiftest pace of interest rate hikes by the Fed in recent history, the probability of a sustained rally in crypto has been heavily discounted, both in terms of option pricing and market sentiment. While Genesis expects the derivatives market to continue to grow, previous highs in open interest may not be topped until market psychology takes a decisive turn. In particular, futures markets are currently pricing in expectations of the first fed funds rate cut to come at the end of 2023, with some Fed officials jawboning against the prospect of any ease in the year ahead, further pressuring risk assets.



**Historic Hiking Cycles**
Rates are rising faster than any other hiking cycle in recent history

**Source:** Genesis, FRED

While such a pivot - whenever it may come - is not necessarily the only bullish scenario for crypto, it is the easiest to envision yet also far from immediate. Genesis remains prepared for a sustained crypto winter in light of such powerful macro headwinds. Bitcoin's apparent stability at the 20,000 level may be tested if global risk assets enter a phase of more disorderly declines or indeed if the perpetual motion machine of options sales and collapsing realized vol can somehow reverse itself. At the time of writing, crypto volatility has finally found its footing after plunging to cyclical lows, suggesting that the pervasive degree of both apathy and complacency may actually portend a less tranquil quarter ahead. Regardless, as things shake out, we will continue to provide reliable options markets for our clients and patiently await the nigh-on inevitable recovery of animal spirits and a hoped-for next bull market.

Results    →    **Derivatives Market Insights**    About Genesis

|  | 07/01/22 | 09/30/22 |
|---|---|---|
| BTCV1m | 84% | 67% |
| BTCV3m | 79% | 70% |
| ETHV1m | 113% | 82% |
| ETHV3m | 111% | 84% |
| BTC 25d RR 1m | 16% | 4% |
| ETH 25d RR 1m | 22% | 12% |
| BTC 15d Bfly 3m | 7% | 4% |
| ETH 10d Bfly 3m | 9% | 5% |

 **Source: Genesis internal data**

Confidential - Filed Under Seal

Results        Derivatives Market Insights        ➜    **About Genesis**

## About Genesis

Genesis is a full-service digital currency prime brokerage providing a single point of access for select qualified individuals and global institutional investors. Genesis combines unrivalled operational excellence, a seamless user experience, and best-in-class client service to provide the full suite of services global investors require to manage their digital asset portfolios. The firm offers sophisticated market participants a fully integrated platform to trade, borrow, lend, and custody digital assets, creating new opportunities for yield while increasing capital efficiency for counterparties.

### Stay Connected

For more information from this report, contact us at **info@genesistrading.com**, or call us at (212) 668-5921.

**www.genesistrading.com**

**Twitter**
**LinkedIn**
**Facebook**

### Learn More About Our Services

**About Genesis**
**Genesis Prime**
**Lending FAQ**
**Custody FAQ**

## Q3 2022 Report By:

**Gordan Grant**
Director, Co-head of Trading
**ggrant@genesistrading.com**

**Ravi Doshi**
Director, Co-head of Trading
**rdoshi@genesistrading.com**

**John Conneely**
Director, Institutional Custody
**jconneely@genesistrading.com**

**Ainsley To**
Senior Research Analyst
**ato@genesistrading.com**

**Greg Guttas**
VP, Spot & Derivatives
**gguttas@genesistrading.com**

**Jake Kaufman**
VP, Spot & Derivatives
**jkaufman@genesistrading.com**

**Genesis**

Confidential - Filed Under Seal

# Disclosures

Other than disclosures relating to Genesis, this research is based on current public information that we consider reliable, but we do not represent is accurate or complete. This research should not be relied upon as investment advice. The information, opinions, estimates and forecasts contained herein are as of the date hereof and are subject to change without prior notification. We seek to update our research as appropriate. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment. Genesis conducts a global prime brokerage service, integrating digital asset lending, trading, and custodial services. Genesis Global Trading, Inc., registered in the United States with the SEC as a broker-dealer, is a member of FINRA, and is a member of SIPC (https://www.sipc.org). SIPC coverage does not cover digital assets, virtual currency, cryptocurrency, or other related assets. Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and principal trading desks that reflect opinions that are contrary to the opinions expressed in this research. The analysts named in this report may have from time to time discussed with our clients, including Genesis salespersons and traders, or may discuss in this report, trading strategies that reference catalysts or events that may have a near-term impact on the market price of the digital assets discussed in this report, which impact may be directionally counter to the analyst's published price target expectations for such digital assets. Any such trading strategies are distinct from and do not affect the analyst's fundamental rating or commentary for such digital assets. We and our affiliates, officers, directors, and employees will from time to time have long or short positions in, act as principal in, and buy or sell, the digital assets and securities or derivatives thereof, if any, referred to in this research. The views attributed to third party presenters at Genesis-arranged conferences, including individuals from other parts of Genesis or its parent, Digital Currency Group (DCG), and any affiliates or subsidiaries of thereof, do not necessarily reflect those of Genesis and are not an official view of Genesis. Any third party referenced herein, including any salespeople, traders and other professionals or members of their household, may have positions in the products mentioned that are inconsistent with the views expressed by analysts named in this report. This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of any investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments. Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors.

## IRS Circular 230 Disclosure

Genesis Global Trading, Inc. and its global affiliates (collectively, "Genesis") do not provide legal, compliance, tax or accounting advice. Accordingly, to the extent there is any discussion of U.S. tax matters included in these materials, it is not intended or written to be used, and cannot be used or relied upon, by you for the purpose of avoiding any tax penalties and may have been written in connection with the promotion or marketing of any transaction contemplated hereby. You should seek professional advice in respect of your specific circumstances from an independent tax advisor. This presentation and the material contained herein are confidential and may not be distributed in whole or in part to anyone other than the intended recipients. Unauthorized reproduction or distribution of all or any of this material or the information contained herein is strictly prohibited. Neither this presentation nor any related discussion may be disclosed or used for any purpose other than as described below without the prior written consent of Genesis. These materials were prepared exclusively for the benefit and use of the Genesis client or the potential Genesis client to whom it is directly delivered and/or addressed (the "Company")

in order to assist the Company in evaluating, on a preliminary basis, the feasibility of a possible transaction or transactions or other business relationship. Further, these materials are for discussion purposes only and are incomplete without reference to, and should be viewed solely in conjunction with, the oral briefing provided by Genesis and the terms and disclosures set forth on the Genesis website, which are deemed incorporated herein. The information provided in this communication does not constitute investment advice, financial advice, trading advice, or other advice. Genesis is not acting as your fiduciary. You are advised to make your own assessment of whether a Genesis service that you are considering is suitable for you and ensure that you have the necessary experience and knowledge to understand the risks involved in relation to those particular services, transactions or investments. Prior to entering into any transaction, you should determine, without reliance upon us or our affiliates, the economic risks and merits (and independently determine that you are able to assume these risks) as well as the legal, tax and accounting characterizations and consequences. In this regard, by accepting this presentation, you acknowledge that (a) we are not in the business of providing (and you are not relying on us for) legal, tax or accounting advice, (b) there may be legal, tax or accounting risks associated with any transaction, (c) you should receive (and rely on) separate and qualified legal, tax and accounting advice and (d) you should apprise senior management in your organization as to such legal, tax and accounting advice and our disclaimer as to these matters. By accepting receipt of this presentation, the recipient will be deemed to represent that they possess, either individually or through their advisers, sufficient investment expertise to understand the risks involved in any transactions or services discussed herein and that they have not relied in whole or in part on any of the information provided by Genesis in making such determination. The trading of digital currency as herein described is an inherently risky activity. Digital currency does not benefit from the protections afforded by the Securities Investor Protection Corporation. A counterparty's ability to enter into derivatives with Genesis depends on satisfying a number of regulatory requirements imposed on derivatives under the Dodd–Frank Wall Street Reform and Consumer Protection Act and applicable law including but not limited to characterization as an eligible contract participant under the U.S. Commodity Exchange Act.

The permissibility of borrowing and lending from and to counterparties may depend on Genesis's licenses, a counterparty's circumstances and the applicability of local lending and borrowing laws. The custody of digital currency is not subject to protections or insurance provided by the Federal Deposit Insurance Corporation or other US governmental programs. Genesis provides its services solely in connection with supported digital currencies. Genesis trading services are available to select qualified institutional investors and accredited individuals (a) who have assets equal to or greater than $10mm (including digital currency holdings, as applicable) and (b) who are interested in (i) trading amounts equivalent to at least USD $250,000 (whether in cash or digital assets) per transaction, or (ii) lending or borrowing at least 100 BTC, 1,000 ETH or USD $2,000,000, whether in cash or stablecoins. Any prices or levels contained herein are preliminary and indicative only and do not represent bids or offers. These indications are provided solely for your information and consideration, are subject to change at any time without notice and are not intended as an offer to sell or a solicitation to purchase any financial instrument. Nothing contained herein shall constitute any representation or warranty as to future performance of any financial instrument, credit, currency rate or other market or economic measure. In preparing this presentation, we have relied upon and assumed, without independent verification, the accuracy and completeness of all information available from public sources or which was provided to us by or on behalf of the Company or which was otherwise reviewed by us. Genesis does not make any representations or warranties, express or implied, as to the accuracy or completeness of the information provided herein. Any estimates included herein constitute our judgment as of the date hereof represent potential future events that may or may not be realized and are not a complete analysis of every material fact representing any product. Any estimates included herein constitute our judgment as of the date hereof and are subject to change without any notice. We and/or our affiliates may make a market in these instruments for our customers and for our own account. Accordingly, Genesis may have a position in any such instrument at any time.

Genesis and Genesis Trading are marketing names for certain businesses of Genesis Global Trading, Inc. and its global affiliates and if and as used herein may include as applicable employees or officers of any or all of such entities irrespective of the marketing name used.

**Genesis**

Products and services may be provided by affiliates as may be appropriate to provide such services under applicable law. Securities and digital assets are not deposits or other obligations of any commercial bank, are not guaranteed by any commercial bank and are not insured by the Federal Deposit Insurance Corporation. GGC International Limited is incorporated in the British Virgin Islands ("BVI"). BVI law may restrict the types of tradable instruments. Genesis Global Trading, Inc, a Delaware corporation, has been granted a Virtual Currency License by the New York State Department of Financial Services and is registered with the U.S. Securities and Exchange Commission as a broker dealer. Genesis Asia Pacific Pte. Ltd. Is a private limited company organized under the laws of Singapore. Genesis Global Capital, LLC is a limited liability company organized under the laws of Delaware. Genesis Custody Limited is registered as a cryptoasset business with the UK Financial Conduct Authority and is not licensed in the United States. Certain services may not be available in a counterparty's jurisdiction.

© 2022 Genesis Global Trading, Inc. All rights reserved. "Genesis", the Genesis logo, and other Genesis trademarks and service marks referenced herein are trademarks and service marks of Genesis and are used and registered throughout the world.

**Genesis Q4 2022**



# Q4 Market Observations

**Genesis**

Confidential - Filed Under Seal

# Introduction

In the fourth quarter of 2022, tumultuous events rocked the crypto markets, and yet during this challenging period, the Genesis derivatives and spot trading desks continued to meet client demand and remain leaders in the industry. We are incredibly thankful to our clients, who have supported us throughout an extremely difficult time for crypto.

We spent much of Q4 addressing the situation of our lending business. Despite our efforts, on January 19th, Genesis Global Holdco, LLC, and two lending business subsidiaries filed voluntary petitions under Chapter 11 of the U.S. Bankruptcy Code. Since then, we have made significant progress and announced an agreement in principle with key creditors on February 10th. We aim to keep all stakeholders informed of our progress as we continue to meet important milestones.

We are laser-focused on adapting for the future and demonstrating our commitment to this industry and to our clients for years to come. We thank our talented team at Genesis for their ongoing dedication and commitment and are excited about working together to build Genesis for the future.

Wishing all our readers a successful 2023 and that we see a brighter period for our industry ahead.

**More Information**

To learn more about Genesis, or to work together with the Genesis team, contact us at:

info@genesistrading.com
www.genesistrading.com

**Press**

All press inquiries should be directed to:

press@genesistrading.com

# 1 Genesis Q4 Results

## Spot

Q4 started off with a rally that took BTC up 5.5% and ETH up over 18% in October, but the collapse of FTX and the subsequent fallout through the rest of the market quickly dragged BTC back to new lows of the cycle in November. While volumes spiked significantly in the midst of the FTX event and its dramatic news cycle, conditions across the spot market were weak and volumes were subsequently diminished for the back half of November and December. The worst performances in Q4 came from assets in the Solana ecosystem, with SOL falling 70% over the course of the quarter compared to 15% for BTC and 10% for ETH, while Solana altcoins fared similarly or worse. The last two weeks of the year saw some of the lowest volatility in majors of this cycle, with BTC trading in a sub-$700 range in the final week of the year for the first time since summer 2020.

Along with prices and volumes, liquidity conditions also materially suffered in Q4 as many market makers either disappeared or became relatively undercapitalized. The absence of FTX in the perpetual futures markets, lack of credit availability in the industry, and diminished capital position of liquidity providers moved spreads in everything from low-cap altcoins to majors to their widest in years. We expect these liquidity conditions to improve as taker interest ticks up and new capital is deployed. However, at the end of 2022, it was very difficult to place any serious size in crypto spot markets and to minimize price impact. Overall, this quarter will be remembered as one where the institutional crypto market crossed a rubicon with FTX and was left to find new footing, new narratives, and new capital to drive price going forward.

➔  **Results**        Derivatives Market Insights        About Genesis

# Derivatives

The final three months of 2022 served as a suitable punctuation mark to the ceaseless turmoil seen throughout the year. The default of FTX proved to be a veritable sum of all fears that left the entire market, including crypto derivatives, reeling in shock and battered by the ramifications of the fallout. Yet in some senses, the asset class found its own measure of antifragility as it decoupled from other macro risk proxies and, once the initial trauma of a leading light's downfall subsided, entered something of a recuperative if fitful phase of extreme low-volatility (and relatively low-turnover) as December drew to a close. Genesis' derivatives volumes were materially less than prior quarters, but Q4 was not without its share of excitement and fruitful fodder for reflection.



# 2  Q4 Derivatives Market Insights

## Alter Ego

The Fourth Quarter was something of a senseless proposition for cryptocurrency markets, bookended by moribund levels of activity in both October and December with a violent, panic-stricken November that witnessed the year's most lurid surge in volatility. 1-week implied vol gapped from 40% to 140% in bitcoin and from 60% to 210% in ether in just five trading days (5th to 9th November) as Alameda Research collapsed and FTX filed for bankruptcy thereafter.

Yet there was no sustained follow-through in terms of incremental market chaos: after cresting 130% (for BTC) and 170% (for ETH) in mid-November, 10-day historical volatility of crypto price returns hit record lows to close out the year, breaching 8% and 13% in BTC and ETH on the 31st of December.  Options pricing followed suit, with 1 week implied volatilities hitting 30% and 40% respectively in the last hours of 2022, notwithstanding unsubstantiated fears of an imminent Binance collapse, withdrawal freezes at most major crypto lending platforms, and lingering fears about the viability of nearly all centralized derivatives trading venues.

Cryptocurrencies bounced along the bottom lackadaisically as if there was no one left to sell.  Participation cratered as the daily average $ value of options traded across exchanges languished at less than $200mio for each bitcoin and ether. And despair etched itself, therefore, in the trading tape not through fresh lows in prices but in terms of sheer inertia. The market witnessed, effectively, a bearish regime of apathetic volumes, depressed volatility, and increasingly uncorrelated behaviors with respect to other asset classes.

Results   →   **Derivatives Market Insights**   About Genesis



**Good Grief**

Depending on the timing, a Q4 survey of the derivatives industry, and the digital asset space more broadly, would have offered markedly heterogenous results. October evinced something of tranquil complacence in the wake of September's successful ETH merge and what would appear in hindsight to be a form of benign neglect that months of carnage could still in fact leave more bodies to be exhumed.

**Bitcoin: Options ATM Implied Volatility - 1 Week - Deribit**



Source: Glassnode

Yet November evoked not just the same disarray that was seen in the wake of the Terra and Three Arrows events in Q2, but also something akin to betrayal and even anger. As volatility exploded, Sam Bankman Fried's very public if eccentric discourse not only left traders searching for clues but exacerbated a nascent sense that much of the crypto hype of the bull cycle may itself have been a meme, a feeling compounded by lurid podcasts featuring ex-convict Martin Shkreli and Interpol fugitive Do Kwon, just as the FTX meltdown furor hit a fever pitch.

**Ethereum: Options ATM Implied Volatility - 1 Week - Deribit**



Source: Glassnode

And finally, December felt like nothing so much as an extreme version of the catatonic resignation of crypto winters past, perhaps one bleak enough to incite an early spring thaw.

**Genesis**

Results    →    **Derivatives Market Insights**    About Genesis



**Source:** Glassnode

The abrupt shifts in mood from month to month felt like a convulsive bout of collective grieving. As a result, market participants were left with little ability to reject an existential null hypothesis: that the death rattle of crypto had been heard. Because presumptions that the worst was behind the market were so thoroughly dashed as FTX crumbled, October's attempted return to normalcy could not last. Contrariwise, bets on the clustering of crisis volatility beyond mid November were equally ill advised. Thus, Q4 was, if nothing else, an exercise in highly disciplined, tactical trading. It was also a humbling reminder that, for an asset class as ostensibly binary as crypto is, when it comes to IVs, the floor is often lower, and the ceiling far higher, than well-reasoned locally biased heuristics could suggest.

More pointedly, although the quarter turned out to be something of a snoozer as volatility went out at the absolute lows of the year, vol of vol itself, somewhat curiously, began to rise fairly steadily in the weeks following the FTX collapse.

**Genesis**

Results    →    **Derivatives Market Insights**    About Genesis

**Bitcoin: ATM Vol and SABR VolVol**



Source: BlockScholes

There are, though, good reasons for this, which become apparent using an heuristic if simplistic lens. As vol declined over the back half of the quarter, it became more natural for the market to price in the propensity for implieds to rise in a sharp shift away from local ranges, as a corollary, with the compression of local, realized vol and the incipient tendency of programmatic vol selling, demand for insurance to cover those near-the-money shorts began to push up the degree of wing premiums priced into the smile. By construction, a parametrization such as the kind evinced by the above graph may tend (though does not necessarily have) to fit a more convex surface at lower levels of ATM vol. That's due in part, of course, to the fact that at lower numerical levels of vol with the same trading increments (which in crypto tend to be in ½ vega points), as vol itself ticks over in the normal course of trading, vol of vol will be higher (a 1 point change in implieds at a level of 50v is twice the percentage as the same change at 100v).

# Turn. Over.

That degree of elevation in vol of vol became apparent in the nature of options market making throughout Q4. While Genesis derivs saw OTC flows meaningfully whittled down to close out the year given chronic uncertainty around venue stability, baleful headlines about perceived counterparty risk, and overall lack of conviction, exchange traded volumes remained comparatively robust.

**Genesis**

**We continued to top the leaderboard for block trades cleared on the Paradigm platform for the entirety of 2022.**

Our desk volume reached ~40% of the global daily total on Deribit for Tuesday, December 7th. Similarly, we continued to top the leaderboard for negotiated block trades cleared on the Paradigm platform, exceeding 20% of the weekly market share at times and with ~$4bn in Deribit-cleared block-trade volume in Q4, some 33% more than our closest competitor as our market share continued to expand into the double digits for the entirety of 2022, with weekly maker market share exceeding 33% at times.

Overall, activity levels were, admittedly, materially lower than the prior quarter as most OTC and many exchange-focused participants chose to close risk and wait out the pervasive threat of further unknowns within the asset class. Given that context, a select handful of dedicated players, principally crypto natives but also those incorporating core volatility-driven theses and some macro focused names, chose to use the opportunity of the soporific ambience to structure their books for upside in the New Year. Not surprisingly, dedicated crypto derivatives participants latched onto the intersection of the year's lows in spot and, essentially, some of the lowest-ever levels in vol, to optimize exposure for a crypto recovery and hopefully turn the page on the bear market. Those trades ran the gamut from vega reups via strike roll downs in longer dated tenors to disciplined reloads on front month gamma, both of which would later pay off handsomely in the second week of 2023 and which constituted a significant portion of our trading activity in the last weeks of the fourth quarter.

# Conclusion

The final weeks of 2022 felt as bleak a time as there's been since the inception of the still-nascent crypto options market, which only emerged in earnest after the last crypto winter of 2018. The whipsaw in IVs around the FTX cataclysm felt as toxic as the exchange's default itself, leaving no small amount of wreckage strewn across the market.

**Genesis**

The damage to sentiment, ranging from the loss of macro beta to the vicious circle of ever-lower implied and realized vol seemed almost terminal. News about a string of miner bankruptcies, Cefi blowups, and the unknown future of lending activity contextualized a market that would have scarcely hinted at any ability to pull itself off the mat just weeks later in a new year.

Yet that is exactly what happened, with an abrupt bounce in spot prices (ranging from 20% to over 200% depending on the asset) and a vicious snapback in vol, which served as, at the very least, a sharp rap on the knuckles to what had come to be a wide-reaching contingent of smug sellers of volatility.

As it is has done so many times before, the asset class, and the derivative silo in particular, stared into the abyss only to prove that rumors of its death were indeed exaggerated.

## About Genesis

Genesis is a full-service digital currency prime brokerage providing a single point of access for select qualified individuals and global institutional investors. Genesis combines unrivalled operational excellence, a seamless user experience, and best-in-class client service to provide the full suite of services global investors require to manage their digital asset portfolios. The firm offers sophisticated market participants a fully integrated platform to trade, borrow, lend, and custody digital assets, creating new opportunities for yield while increasing capital efficiency for counterparties.

**Stay Connected**

For more information from this report, contact us at **info@genesistrading.com**, or call us at (212) 668-5921.

**www.genesistrading.com**
**Twitter**
**LinkedIn**
**Facebook**

**Learn More About Our Services**

**About Genesis**
**Genesis Prime**
**Lending FAQ**
**Custody FAQ**

## Q4 2022 Report By:

**Gordan Grant**
Director, Co-head of Trading

**Ravi Doshi**
Director, Co-head of Trading

**Greg Guttas**
VP, Spot & Derivatives

**Jake Kaufman**
VP, Spot & Derivatives

**Bobby Davis**
AVP, Sales Strategy & Operations

**Chana White**
AVP, Marketing

# Disclosures

Other than disclosures relating to Genesis, this research is based on current public information that we consider reliable, but we do not represent is accurate or complete. This research should not be relied upon as investment advice. The information, opinions, estimates and forecasts contained herein are as of the date hereof and are subject to change without prior notification. We seek to update our research as appropriate. Other than certain industry reports published on a periodic basis, the large majority of reports are published at irregular intervals as appropriate in the analyst's judgment. Genesis conducts a global prime brokerage service, integrating digital asset lending, trading, and custodial services. Genesis Global Trading, Inc., registered in the United States with the SEC as a broker-dealer, is a member of FINRA, and is a member of SIPC (**https://www.sipc.org**). SIPC coverage does not cover digital assets, virtual currency, cryptocurrency, or other related assets. Our salespeople, traders, and other professionals may provide oral or written market commentary or trading strategies to our clients and principal trading desks that reflect opinions that are contrary to the opinions expressed in this research. The analysts named in this report may have from time to time discussed with our clients, including Genesis salespersons and traders, or may discuss in this report, trading strategies that reference catalysts or events that may have a near-term impact on the market price of the digital assets discussed in this report, which impact may be directionally counter to the analyst's published price target expectations for such digital assets. Any such trading strategies are distinct from and do not affect the analyst's fundamental rating or commentary for such digital assets. We and our affiliates, officers, directors, and employees will from time to time have long or short positions in, act as principal in, and buy or sell, the digital assets and securities or derivatives thereof, if any, referred to in this research. The views attributed to third party presenters at Genesis-arranged conferences, including individuals from other parts of Genesis or its parent, Digital Currency Group (DCG), and any affiliates or subsidiaries of thereof, do not necessarily reflect those of Genesis and are not an official view of Genesis. Any third party referenced herein, including any salespeople, traders and other professionals or members of their household, may have positions in the products mentioned that are inconsistent with the views expressed by analysts named in this report. This research is not an offer to sell or the solicitation of an offer to buy any security in any jurisdiction where such an offer or solicitation would be illegal. It does not constitute a personal recommendation or take into account the particular investment objectives, financial situations, or needs of individual clients. Clients should consider whether any advice or recommendation in this research is suitable for their particular circumstances and, if appropriate, seek professional advice, including tax advice. The price and value of any investments referred to in this research and the income from them may fluctuate. Past performance is not a guide to future performance, future returns are not guaranteed, and a loss of original capital may occur. Fluctuations in exchange rates could have adverse effects on the value or price of, or income derived from, certain investments. Certain transactions, including those involving futures, options, and other derivatives, give rise to substantial risk and are not suitable for all investors.

## IRS Circular 230 Disclosure

Genesis Global Trading, Inc. and its global affiliates (collectively, "Genesis") do not provide legal, compliance, tax or accounting advice. Accordingly, to the extent there is any discussion of U.S. tax matters included in these materials, it is not intended or written to be used, and cannot be used or relied upon, by you for the purpose of avoiding any tax penalties and may have been written in connection with the promotion or marketing of any transaction contemplated hereby. You should seek professional advice in respect of your specific circumstances from an independent tax advisor. This presentation and the material contained herein are confidential and may not be distributed in whole or in part to anyone other than the intended recipients. Unauthorized reproduction or distribution of all or any of this material or the information contained herein is strictly prohibited. Neither this presentation nor any related discussion may be disclosed or used for any purpose other than as described below without the prior written consent of Genesis. These materials were prepared exclusively for the benefit and use of the Genesis client or the potential Genesis client to whom it is directly delivered and/or addressed (the "Company")



in order to assist the Company in evaluating, on a preliminary basis, the feasibility of a possible transaction or transactions or other business relationship. Further, these materials are for discussion purposes only and are incomplete without reference to, and should be viewed solely in conjunction with, the oral briefing provided by Genesis and the terms and disclosures set forth on the Genesis website, which are deemed incorporated herein. The information provided in this communication does not constitute investment advice, financial advice, trading advice, or other advice. Genesis is not acting as your fiduciary. You are advised to make your own assessment of whether a Genesis service that you are considering is suitable for you and ensure that you have the necessary experience and knowledge to understand the risks involved in relation to those particular services, transactions or investments. Prior to entering into any transaction, you should determine, without reliance upon us or our affiliates, the economic risks and merits (and independently determine that you are able to assume these risks) as well as the legal, tax and accounting characterizations and consequences. In this regard, by accepting this presentation, you acknowledge that (a) we are not in the business of providing (and you are not relying on us for) legal, tax or accounting advice, (b) there may be legal, tax or accounting risks associated with any transaction, (c) you should receive (and rely on) separate and qualified legal, tax and accounting advice and (d) you should apprise senior management in your organization as to such legal, tax and accounting advice and our disclaimer as to these matters. By accepting receipt of this presentation, the recipient will be deemed to represent that they possess, either individually or through their advisers, sufficient investment expertise to understand the risks involved in any transactions or services discussed herein and that they have not relied in whole or in part on any of the information provided by Genesis in making such determination. The trading of digital currency as herein described is an inherently risky activity. Digital currency does not benefit from the protections afforded by the Securities Investor Protection Corporation. A counterparty's ability to enter into derivatives with Genesis depends on satisfying a number of regulatory requirements imposed on derivatives under the Dodd–Frank Wall Street Reform and Consumer Protection Act and applicable law including but not limited to characterization as an eligible contract participant under the U.S. Commodity Exchange Act.

The permissibility of borrowing and lending from and to counterparties may depend on Genesis's licenses, a counterparty's circumstances and the applicability of local lending and borrowing laws. The custody of digital currency is not subject to protections or insurance provided by the Federal Deposit Insurance Corporation or other US governmental programs. Genesis provides its services solely in connection with supported digital currencies. Genesis trading services are available to select qualified institutional investors and accredited individuals (a) who have assets equal to or greater than $10mm (including digital currency holdings, as applicable) and (b) who are interested in (i) trading amounts equivalent to at least USD $250,000 (whether in cash or digital assets) per transaction, or (ii) lending or borrowing at least 100 BTC, 1,000 ETH or USD $2,000,000, whether in cash or stablecoins. Any prices or levels contained herein are preliminary and indicative only and do not represent bids or offers. These indications are provided solely for your information and consideration, are subject to change at any time without notice and are not intended as an offer to sell or a solicitation to purchase any financial instrument. Nothing contained herein shall constitute any representation or warranty as to future performance of any financial instrument, credit, currency rate or other market or economic measure. In preparing this presentation, we have relied upon and assumed, without independent verification, the accuracy and completeness of all information available from public sources or which was provided to us by or on behalf of the Company or which was otherwise reviewed by us. Genesis does not make any representations or warranties, express or implied, as to the accuracy or completeness of the information provided herein. Any estimates included herein constitute our judgment as of the date hereof represent potential future events that may or may not be realized and are not a complete analysis of every material fact representing any product. Any estimates included herein constitute our judgment as of the date hereof and are subject to change without any notice. We and/or our affiliates may make a market in these instruments for our customers and for our own account. Accordingly, Genesis may have a position in any such instrument at any time.

Genesis and Genesis Trading are marketing names for certain businesses of Genesis Global Trading, Inc. and its global affiliates and if and as used herein may include as applicable employees or officers of any or all of such entities irrespective of the marketing name used.

Products and services may be provided by affiliates as may be appropriate to provide such services under applicable law. Securities and digital assets are not deposits or other obligations of any commercial bank, are not guaranteed by any commercial bank and are not insured by the Federal Deposit Insurance Corporation. GGC International Limited is incorporated in the British Virgin Islands ("BVI"). BVI law may restrict the types of tradable instruments. Genesis Global Trading, Inc, a Delaware corporation, has been granted a Virtual Currency License by the New York State Department of Financial Services and is registered with the U.S. Securities and Exchange Commission as a broker dealer. Genesis Asia Pacific Pte. Ltd. Is a private limited company organized under the laws of Singapore. Genesis Global Capital, LLC is a limited liability company organized under the laws of Delaware. Genesis Custody Limited is registered as a cryptoasset business with the UK Financial Conduct Authority and is not licensed in the United States. Certain services may not be available in a counterparty's jurisdiction.

© 2023 Genesis Global Trading, Inc. All rights reserved. "Genesis", the Genesis logo, and other Genesis trademarks and service marks referenced herein are trademarks and service marks of Genesis and are used and registered throughout the world.

# EXHIBIT B

Confidential - Filed Under Seal

# MASTER BORROW AGREEMENT

This Master Borrow Agreement ("Agreement") is made on this <u>June 18, 2021</u> ("Effective Date") by and between

Genesis Global Capital, LLC ("Genesis" or "Borrower"), a limited liability company organized and existing under the laws of Delaware with its principal place of business at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310 and

Name: _███████_____("Lender")

Formation: ███████_____

Formation Location (country or US state): _Not Applicable_____

Address: _███████_____

## RECITALS

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend U.S. Dollars or Digital Currency to Borrower, and Borrower will pay a Loan Fee and return such U.S Dollars or Digital Currency to Lender upon the termination of the Loan; and

**WHEREAS**, Borrower intends to use any Loaned Assets under this Agreement in its Digital Currency lending business;

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, the Borrower and the Lender hereby agree as follows:

## I.    Definitions

"***Airdrop***" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "***Applicable Airdrop***" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time.  A "***Non-Applicable Airdrop***" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Currency, or a distribution that depends on a wallet of the relevant Digital Currency meeting a threshold requirement.

"***Authorized Agent***" has the meaning set forth in Exhibit A.

"***Borrower***" means Genesis Global Capital, LLC.

Confidential - Filed Under Seal

"*Borrower Email*" means lend@genesiscap.co.

"*Business Day*" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

"*Business Hours*" means between the hours of 9:00 am to 5:00 pm New York time on a Business Day.

"*Call Option*" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement and in particular Section II(c)(ii).

"*Close of Business*" means 5:00 pm New York time.

"*Collateral*" is defined as set forth in Section IV(a)

"*Digital Currency*" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), or any digital currency that the Borrower and Lender agree upon.

"*Digital Currency Address*" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Currency.

"*Early Termination Fee*" means any charge or fee agreed to be paid by the Borrower and Lender in the Loan Term Sheet when the Agreement is terminated prior to the Termination Date.

"*Fixed Term Loan*" means a Loan with a pre-determined Maturity Date, where Borrower does not have a Prepayment Option and Lender does not have a Call Option.

"*Hard Fork*" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"*Lender*" means _____.

"*Lender Email*" means _____.

"*Loan*" means a request for a loan or an actual loan of Digital Currency or U.S. Dollars made pursuant to and in accordance with this Agreement and a Loan Term Sheet.

"*Loan Balance*" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees, Late Fees, and any Earlier Termination Fee for a particular Loan.

"*Loan Documents*" means this Master Borrow Agreement and any and all Loan Term Sheets entered into between Lender and Borrower.

"*Loan Effective Date*" means the date upon which a Loan begins.

Confidential - Filed Under Seal

"*Loan Fee*" means the fee paid by Borrower to the Lender for the Loan.

"*Loan Term Sheet*" means the agreement between Lender and Borrower on the particular terms of an individual Loan, which shall be memorialized in an agreement as set forth in Exhibit B or in a form approved by Lender comparable therewith.

"*Loaned Assets*" means any Digital Currency or U.S. Dollar amount transferred in a Loan hereunder until such Digital Currency (or identical Digital Currency) or U.S. Dollar amount is transferred back to Lender hereunder, except that, if any new or different Digital Currency is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Currency shall be deemed to become Loaned Assets in addition to the former Digital Currency for which such exchange is made.  For purposes of return of Loaned Assets by Borrower, such term shall include Digital Currency of the same quantity and type as the Digital Currency, as adjusted pursuant to the preceding sentence.

"*Maturity Date*" means the pre-determined future date upon which a Loan becomes due in full, whether by Term or Call Option.

"*New Token Fee*" means payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender including, but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment.

"*Open Loan*" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"*Prepayment Option*" means the Borrower has the option to repay or return the Loaned Assets prior to the Maturity Date without incurring Early Termination Fees, subject to this Agreement and in particular Section II(c)(iii).

"*Term*" means the period from the Loan Effective Date through Termination Date.

"*Term Loan with Call Option*" means a Loan with a pre-determined Maturity Date where Lender has a Call Option.

"*Term Loan with Prepayment Option*" means a Loan with a pre-determined Maturity Date where Borrower has a Prepayment Option.

"*Termination Date*" means the date upon which a Loan is terminated.

## II.    <u>General Loan Terms.</u>

(a) <u>Loans of Digital Currency or U.S. Dollars</u>

3

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request from the Lender a Loan to Borrower of a specified amount of Digital Currency or U.S. Dollars, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan on terms acceptable to Lender and as set forth in a corresponding Loan Term Sheet.

(b) <u>Loan Procedure</u>

From time to time during the Term of this Agreement, during the hours of 9:00 am New York time to 4:00 pm New York time on a Business Day (the "<u>Request Day</u>"), by email directed to Lender Email (or such other address as Lender may specify in writing), an Authorized Agent of Borrower may request from Lender a Loan of a specific amount of Digital Currency or U.S. Dollars (a "<u>Lending Request</u>").  Provided Lender receives such Lending Request prior to 3:00 pm New York time, Lender shall by email directed to Borrower Email (or such other address as Lender may specify in writing) to inform Borrower whether Lender agrees to make such a Loan.  If Lender fails to provide Borrower with an acceptance as to a particular Lending Request prior to Close of Business on the Request Day, such Lending Request shall be deemed to have been denied by Lender.

As part of its Lending Request, Borrower shall provide the following proposed terms:

(i)     Whether U.S. Dollars or Digital Currency, and if Digital Currency, the type of Digital Currency;

(ii)    the amount of Digital Currency or U.S. Dollars;

(iii)   whether the Loan is to be a Fixed Term Loan, a Term Loan with Prepayment Option, or an Open Loan;

(iv)    the Loan Effective Date; and

(v)     the Maturity Date (if a Fixed Term Loan or a Term Loan with Prepayment Option).

If Lender agrees to make a Loan in accordance with Borrower's proposed terms, Lender shall commence transmission to either (x) the Borrower's Digital Currency Address the amount of Digital Currency, or (y) Borrower's bank account by bank wire the amount of U.S. Dollars, as applicable, as such Digital Currency Address or bank wire instruction is set forth in the Lending Request on or before Close of Business on the Request Day.  In the event Lender requests a modification to the proposed terms, including a proposal for a Call Option, Lender shall provide notice of such, and upon Borrower's acceptance of said modified terms, Lender shall commence transmission to Borrower's Digital Currency Address the amount of Digital Currency set forth in the Lending Request on or before Close of Business on the Request Day.

The specific and final terms of a Loan shall be memorialized using the Loan Term Sheet, which shall be delivered and executed after the final terms of a Loan are agreed to and prior to the delivery of the Loaned Assets.  In the event of a conflict of terms between this Master Borrow Agreement and a Loan Term Sheet, the terms in the Loan Term Sheet shall govern.

(c) <u>Loan Repayment Procedure</u>

(i) <u>Loan Repayment</u>

4

Unless otherwise specified in subsections (ii) and (iii) below, upon the earlier of the Maturity Date, the Recall Delivery Day, or the Redelivery Day (as defined below) for a Loan, Borrower shall repay the entirety of the Loan Balance to Lender by Close of Business. If Lender has not provided to Borrower a Digital Currency Address for receiving the repayment of a Loan by Close of Business on the day prior to the earlier of the Maturity Date, the Recall Delivery Day (defined below), or the Redelivery Day (defined below), then such Loan will become an Open Loan on said Maturity Date or Redelivery Day, whichever applicable, and no additional Loan Fees shall be accrued after the Maturity Date or the Redelivery Day.

(ii) <u>Call Option</u>

For Loans in which the Lender has a Call Option (e.g. Open Loans, etc.), Lender may during Business Hours (the "<u>Recall Request Day</u>") demand repayment of a portion or the entirety of the Loan Balance (the "<u>Recall Amount</u>"). Lender will notify Borrower of Lender's exercising of this right by email to Borrower's Email. Borrower will then have until Close of Business on the seventh Business Day after the Recall Request Day (the "<u>Recall Delivery Day</u>") to deliver the Recall Amount.

In the event of a Call Option where Lender demands only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Recall Delivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date or the subsequent Recall Delivery Day.

(iii) <u>Prepayment Option</u>

For Loans in which Borrower has a Prepayment Option (e.g. Open Loans, Term Loans with Prepayment Option, etc.), Borrower may notify Lender during Business Hours of Borrower's intent to return the Loan prior to the Maturity Date or the date Lender exercises its Call Option without being subject to, and as a result will not incur, Early Termination Fees as set forth in Section III(d). Borrower shall provide said notice at least one Business Day prior to the date on which the Borrower will repay all or a portion of the Loan Balance (said later date, the "Redelivery Day"). Borrower's exercising of its Prepayment Option shall not relieve it of any of its other obligations herein, including without limitation its payment of owed Loan Fees and Late Fees.

In the event of a Prepayment Option where the Borrower repays only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Redelivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date, the Recall Delivery Day, or a subsequent Redelivery Day.

(d) <u>Termination of Loan</u>

A Loan will terminate upon the earlier of:

(i)     the Maturity Date;

(ii)    the repayment of the Loan Balance by Borrower prior to the Maturity Date;

5

(iii)  the occurrence of an Event of Default as defined in Section VII; however, Lender shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan.  In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

(iv)  in the event any or all of the Loaned Assets becomes in Borrower's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization, arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Borrower's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and termination of this Agreement except as specified in Section XXIII.

In the event of a termination of a Loan, any Loaned Assets or Collateral shall be redelivered immediately and any fees or owed shall be payable immediately to the appropriate party specified herein.

(e)  Redelivery in an Illiquid Market

If (i) the seven-day average daily trading volume across each of the three highest-volume digital currency exchanges that report prices for the applicable Digital Currency (as measured by the 30-day average daily trading volume of the applicable Digital Currency on the Loan Date) (these such exchanges, the "Liquidity Exchanges") has decreased by 90% from the date of the Loan Term Sheet to the Maturity Date, Recall Delivery Day, or Redelivery Day, whichever applicable, or (ii) the Loaned Assets ceases to be listed on any of the Liquidity Exchanges (the duration of either event herein designated, the "Illiquid Period"), Borrower may repay the Loan in U.S. Dollars equal to the volume-weighted average price of the Loaned Assets on the Liquidity Exchanges (measured at 4:00 p.m. New York time ) during the Illiquid Period, up to a maximum of 30 days (the "Illiquid Market Spot Rate").

If two of the three Liquidity Exchanges limit or suspend withdrawals or transactions in the Loaned Assets on the Maturity Date, the Recall Delivery Day, or the Redelivery Day, whichever applicable, the requirement for Borrower to return the Loaned Assets shall be temporarily suspended, without penalty or default, including without limitation the incurring of additional Loan Fees, until such time that at least two of the Liquidity Exchanges allow the resumption of withdrawals of and transactions in the Loaned Assets.

**III.    Loan Fees and Transaction Fees.**

(a)  Loan Fee

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as agreed

6

to herein and annualized in the relevant Loan Term Sheet and subject to change if thereafter agreed by Borrower and Lender. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from, but excluding, the date on which the Loaned Digital Currencies or Loaned U.S. Dollars are transferred to Borrower until, and including, the date on which such Loaned Digital Currencies or Loaned U.S. Dollars are repaid in their entirety to Lender.

Lender shall calculate any Loan Fees owed on a daily basis and provide Borrower with the calculation upon request.  The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

(b) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with Section III(c), Borrower shall incur an additional fee (the "Late Fee") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

(c) Payment of Loan Fees and Late Fees

Unless otherwise agreed, any Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) five (5) Business Days after receipt of an invoice from Lender or (ii) the termination of all Loans hereunder (the "Payment Due Date").  An invoice for Loan Fees and any Late Fees (the "Invoice Amount") shall be sent out on the first Business Day of the month and shall include any Loan Fees, Late Fees, and Early Termination Fees incurred and outstanding during the previous month and periods.  Borrower shall have up to five Business Days from the date of said Invoice to pay the Invoice Amount.  Failure of Lender to timely send an invoice in accordance with the preceding sentence shall not be considered a material default under Section VIII(d) nor shall it relieve Borrower of its obligation to pay any Loan Fees, Late Fees, and Early Termination Fees owed herein nor negate any Event of Default resulting from Borrower's failure to timely pay such fees.  The Loan Fee, Late Fees, and Early Termination Fees shall be payable, unless otherwise agreed by the Borrower and Lender in the Loan Term Sheet, in the same Loaned Assets that were borrowed, whether U.S. Dollars or Digital Currency on the same blockchain and of the same type that was loaned by the Lender during the Loan.

(d) Early Termination Fees

For Fixed Term Loans and Term Loans with Call Options, if Borrower returns the Loaned Assets prior to the Maturity Date, Borrower shall pay to Lender a fee equal to twenty percent (20%) of the Loan Fee that would have accrued from the date of the repayment until the Maturity Date of the Loan (the "Early Termination Fee").  The Early Termination Fee is due with the repayment of the Loaned Assets.  The Early Termination Fee shall not apply if Borrower returns the Loaned Assets to Lender in the event of a Hard Fork (as defined in Section V) or if Lender moves up the Maturity Date to an earlier date by exercising a Call Option.

7

(e) <u>Taxes and Fees</u>

Borrower shall report to the Internal Revenue Service ("<u>IRS</u>") all Loan Fees paid to Lender under this Agreement, and shall provide applicable IRS form annually documenting the amount reported to the IRS. For any Loan Fees paid in Digital Currency, such Loan Fees shall be calculated at the Coinbase Pro spot rate at 4 p.m. New York time daily on any day that Loan Fees accrue. Neither Borrower nor Lender shall have any liability to the other party for any taxes due under this Agreement.

## IV.    <u>Collateral Requirements</u>

(a) <u>Collateral</u>

If agreed in a Loan Term Sheet, Borrower shall provide as collateral an amount of U.S. Dollars, or Digital Currency as set forth below, or to be determined and agreed upon by the Borrower and Lender ("<u>Collateral</u>") and memorialized using the Loan Term Sheet. The Collateral will be calculated as a percentage of the value of the Loaned Assets, such value determined by a spot rate agreed upon in the Loan Term Sheet. Borrower shall, prior to or concurrently with the transfer of the Loaned Assets to Borrower, but in no case later than the Close of Business on the day of such transfer, transfer to Lender the agreed upon Collateral.

Collateral shall always be valued in U.S. Dollars, but Borrower may, if mutually agreed by both parties, provide the Collateral (in whole or in part) to Lender in Digital Currency in an amount equal to the value of the Collateral in U.S. Dollars at a spot rate determined by Borrower. For the avoidance of doubt, upon the repayment of the Loaned Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited, net of any Additional Collateral, Margin Call, or Refunded Collateral adjustments (as defined below in Sections IV(c) & (e)). If a Hard Fork in the blockchain of Digital Currency meeting the criteria in Section V occurs while Lender is holding such Digital Currency as Collateral, Lender shall return the New Tokens (as defined in Section V) to Borrower in addition to the Collateral and Additional Collateral. If a Hard Fork occurs that does not meet the criteria in Section V, Lender shall have no obligation to return any New Tokens to Borrower.

The Collateral transferred by Borrower to Lender, as adjusted herein, shall be security for Borrower's obligations in respect of such Loan. Borrower hereby pledges with, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the Loaned Assets by Lender to Borrower and which shall cease upon the return of the Loaned Assets by Borrower to Lender.

(b) <u>Loan and Collateral Transfer</u>

If Lender transfers Loaned Assets to Borrower and Borrower does not transfer Collateral to Lender as provided in Section IV(a), Lender shall have the absolute right to the return of the Loaned Assets; and if Borrower transfers Collateral to Lender, as provided in Section IV(a), and Lender

Confidential - Filed Under Seal

DocuSign Envelope ID: 681A316-B1F4-47D5-B8G3-FE6BEA79A5B

does not transfer the Loaned Assets to Borrower, Borrower shall have the absolute right to the return of the Collateral.

(c) <u>Margin Calls</u>

If during the Term of a Loan the value of the Loaned Assets increases, or the value of the Collateral decreases, so that the value of the Loaned Assets becomes equal to or greater than the value of the Collateral (the "<u>Margin Call Limit</u>"), Lender shall have the right to require Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "<u>Additional Collateral</u>") as measured by the spot rate published on Coinbase Pro (such rate, the "<u>Margin Call Spot Rate</u>").

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "<u>First Notification</u>") to the Borrower at the email address indicated in Section XIII (or such other address as the parties shall agree to in writing) that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Margin Call Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate. Borrower shall have twenty-four (24) hours from the time Lender sends such First Notification to (x) respond and send payment to Lender in accordance with subsection (d) below, or (y) respond that the value of the Loaned Assets, value of the Collateral, or spot rate as indicated on Coinbase Pro as applicable, has decreased sufficiently such that it is no longer at or above the Margin Call Spot Rate. If Lender agrees by email that Borrower's response according to (y) above is correct, then no other action is required by Borrower.

If Borrower fails to respond to the First Notification within twenty-four (24) hours, or Lender rejects Borrower's response pursuant to (y) above and the spot rate of the Loaned Assets is still at least at the Margin Call Spot Rate, Lender shall send a second email notification (the "<u>Second Notification</u>") repeating the information in provisions (i) – (iv) in the preceding paragraph. Borrower shall have twelve (12) hours from the time Lender sends the Second Notification to respond according to (x) or (y) in the preceding, and Lender has the right to accept or reject Borrower's response as stated above. Upon Lender's rejection of Borrower's response to the Second Notification, Borrower shall make immediate payment of Additional Collateral as set forth in Section IV(d) below. Failure to provide Additional Collateral, or failure by Borrower to respond to either the First Notification or the Second Notification, shall give Lender the option to declare an Event of Default under Section VII below.

Borrower acknowledges that its obligations hereunder, including those in this Section IV, continue regardless of Lender's request for Additional Collateral and Borrower's acceptance or rejection of the same.

(d) <u>Payment of Additional Collateral</u>

Payment of the Additional Collateral shall be made by bank wire to the account, or if applicable the Digital Currency Address, specified in the Loan Term Sheet or by a return of the amount of Loaned Assets necessary to make the Collateral percentage indicated in the Loan Term Sheet correct based on the Margin Call Spot Rate. For any return of Loaned Assets made in accordance

Confidential - Filed Under Seal

with this Section, Borrower is still responsible for payment of any Early Termination Fees that apply to the particular Loan.

(e)  Refund of Collateral

If during the Term of a Loan the value of the Loaned Assets decreases, or the value of the Collateral increases, so that the value of the Collateral relative to the value of the Loaned Assets becomes equal to or greater than the percentage indicated in the Loan Term Sheet (the "Collateral Refund Limit"), Borrower shall have the right to require Lender to return an amount of Collateral so that the Collateral is at no greater than the percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "Refunded Collateral") as measured by the spot rate published on Coinbase Pro (such rate, the "Collateral Refund Spot Rate").

If Borrower requires Lender to repay Refunded Collateral, it shall send an email notification (the "First Refund Notification") to the Lender at the Lender Email that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Collateral Refund Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate.  Lender shall have twenty-four (24) hours from the time Borrower sends such First Refund Notification to (x) respond and send payment to Borrower in accordance with subsection (f) below, or (y) respond that the value of the Loaned Assets as a percentage of the value of the Collateral has increased sufficiently such that it is no longer at or below the Collateral Refund Spot Rate.  If Borrower agrees by email that Lender's response according to (y) above is correct then no other action is required by Lender.

If Lender fails to respond to the First Refund Notification within twenty-four (24) hours, and the value of the Loaned Assets is still at or below the Collateral Refund Spot Rate, Borrower shall send a second email notification (the "Second Refund Notification") repeating the information in (i) – (iv) in the preceding paragraph.  Lender shall have twelve (12) hours from the time Borrower sends the Second Refund Notification to respond according to (x) or (y) in the preceding paragraph.  Failure by Lender to respond to either the First Refund Notification or the Second Refund Notification shall give Borrower the option to declare an Event of Default under Section VII below.

(f)  Payment of Refunded Collateral

Payment of the Refunded Collateral shall be made by bank wire to the account specified by the Borrower or to a Digital Currency Address specified by the Borrower, as applicable.

(g)  Return of Collateral

Upon Borrower's repayment of the Loan and acceptance by Lender of the Loaned Assets into Lender's Digital Currency Address, with such delivery being confirmed on the relevant Digital Currency blockchain ten times, Lender shall initiate the return of Collateral within two Business Days to a bank account designated by Borrower or, where Digital Currency is Collateral, into an applicable Digital Currency Address on the behalf of Borrower.

**V.    Hard Fork**

10

(a) <u>Notification</u>

In the event of a public announcement of a future Hard Fork or an Airdrop in the blockchain for any Loaned Assets, Lender shall provide email notification to Borrower.

(b) <u>No Immediate Termination of Loans Due to Hard Fork</u>

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated.  Borrower and Lender may agree, regardless of Loan type, either (i) to terminate a Loan without any penalties on an agreed upon date or (ii) for Lender to manage the Hard Fork on the behalf of Borrower.  Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Currency to Lender and Lender transfers said Digital Currency back to Borrower pursuant to this section.

(c) <u>Lender's Right to New Tokens</u>

Lender will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Currency protocol or an Applicable Airdrop (the "New Tokens") if following two conditions are met:

- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).

For the above calculations, the source for the relevant data on the market capitalization, and 24-Hour Trading Volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source).

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Lender.  If sending the New Tokens to Lender is burdensome, upon Lender's written agreement with Borrower, Borrower can reimburse Lender for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount of the New Tokens owed using the spot rate agreed upon by the Parties at the time of said repayment, or (ii) returning the borrowed Digital Currency so that Lender can manage the split of the underlying digital tokens as described in Section IV(b) above.  Alternatively, subject to Lender's written agreement, the parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender.  In all cases, Borrower will be solely responsible for payment of additional costs

11

DocuSign Envelope ID: 6814A316-B1F4-47D5-B8C3-EF6BEA79A45B

incurred by any transfer method other than returning the New Tokens to Lender, including but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment. For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this Section V shall continue for any New Tokens that meet the criteria in this subsection (c) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement.

## VI.    Representations and Warranties.

The parties to this Agreement (individually, a "Party," collectively the "Parties") hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each Party represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution, delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Currency, Collateral, or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws

(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

Confidential - Filed Under Seal

(h) Lender represents and warrants that it has, or will have at the time of the loan of any Digital Currency, the right to lend such Loaned Assets subject to the terms and conditions hereof, and free and clear of all liens and encumbrances other than those arising under this Agreement.

(i) Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof.

(j) Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest in said Collateral subject to the terms and conditions hereof.

## VII.   Default

It is further understood that any of the following events shall constitute an event of default hereunder against the defaulting Party, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to return any and all Loaned Assets upon termination of any Loan however, Borrower shall have ten Business Days to cure such default;

(b) the failure of Borrower to pay any and all Loan Fees, Late Fees, or to remit any New Tokens, however, Borrower shall have ten Business Days to cure such default;

(c) the failure of either Party to transfer Collateral or Additional Collateral, including any Refunded Collateral, as required by Section IV, however, a Party shall have ten Business Days to cure such default;

(d) a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;

(e) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not be dismissed within thirty (30) days of the initiation of said proceedings; or

(f) any representation or warranty made by either Party in any of the Loan Documents that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

## VIII.   Remedies

Confidential - Filed Under Seal

(a) Upon the occurrence and during the continuation of any Event of Default on a Loan by Borrower, the Lender may, at its option: (1) declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable; (2) transfer any Collateral for a Loan from the collateral account to Lender's operating account necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by the Loan; and/or (3) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity. If any Event of Default by Borrower under Sections VII(a), (b), (c), or (d) persist for thirty days or more, or immediately upon an Event of Default by Borrower under Sections VII(e) or (f), the Lender may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Borrower.

(b) Upon the occurrence and during the continuation of any Event of Default on a Loan by Lender, the Borrower may, at its option: (1) demand a return of any and all Collateral in the control or possession of Lender or its agents; (2) withhold repayment of the Loaned Assets and any outstanding Loan Fees, Late Fees or other amounts claimed by Lender; and/or (3) exercise all other rights and remedies available to the Borrower hereunder, under applicable law, or in equity. If any Event of Default by Lender under Sections VII (c) or (d) persist for thirty-days or more, or immediately upon an Event of Default by Lender under Sections VII (e) or (f), the Borrower may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Lender.

(c) In addition to its rights hereunder, the non-defaulting Party shall have any rights otherwise available to it under any other agreement or applicable law; however, the non-defaulting Party shall have an obligation to mitigate its damages in a commercially reasonable manner.

## IX.    Rights and Remedies Cumulative.

No delay or omission by a Party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each Party stated herein are cumulative and in addition to all other rights provided by law, in equity.

## X.    Survival of Rights and Remedies

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets or Collateral, and termination of this Agreement.

## XI.    Governing Law; Dispute Resolution.

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York,

Confidential - Filed Under Seal

State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The parties agree to waive their rights to a jury trial. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

## XII.    **Confidentiality.**

(a) Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information"). Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XIV, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii) available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b) Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XII.

(c) Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

(d) The provisions of this Section XII will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; provided that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure. Notwithstanding the foregoing, Lender may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e) The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement. Notwithstanding anything in this agreement to

Confidential - Filed Under Seal

DocuSign Envelope ID: 681A316-B1F4-47D5-B8G3-FF6BEA79A5B

the contrary, a Party may retain copies of Confidential Information (the "Retained Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XII; provided, however, that such Party agrees that any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and the confidentiality obligations of this Section XII shall survive with respect to the Retained Confidential Information for so long as such information is retained.

### XIII.  Notices.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth in the recitals.

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

### XIV.   Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

### XV.    Single Agreement

Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other.  Accordingly, Borrower and Lender hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.  In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other.

### XVI.   Entire Agreement.

This Agreement, each exhibit referenced herein, and all Loan Term Sheets constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.  Nothing in this Section XVI shall be construed to conflict with or negate Section XV above.

### XVII.  Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that Lender may not assign this Agreement or any rights or duties

Confidential - Filed Under Seal

hereunder without the prior written consent of the Borrower (such consent to not be unreasonably withheld). Borrower may assign this Agreement or any rights or duties hereunder upon notice to Lender. Notwithstanding the foregoing, in the event of a change of control of Lender or Borrower, prior written consent shall not be required so such Party provides the other Party with written notice prior to the consummation of such change of control. For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party. Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, or Loan Term Sheet hereunder, shall create any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns. For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc. The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

## XVIII. <u>Severability of Provisions.</u>

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XIX. <u>Counterpart Execution.</u>

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any Party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XX. <u>Relationship of Parties.</u>

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

## XXI. <u>No Waiver.</u>

The failure of or delay by either Party to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be

17

DocuSign Envelope ID: 6814A316-B1F4-47D5-B8C3-EF6BEA79A5B

construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent such Party from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

## XXII.  **Indemnification.**

Lender shall indemnify and hold harmless Genesis, or any of its parents or affiliates, from and against any and all third party claims, demands, losses, expenses and liabilities of any and every nature (including attorneys' fees of an attorney of Genesis' choosing to defend against any such claims, demands, losses, expenses and liabilities) that Genesis may sustain or incur or that may be asserted against it arising out of Genesis' borrowing  Digital Currency from Lender under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to Genesis' bad faith, gross negligence or willful misconduct in the performance of its duties under this Agreement.

## XXIII. **Term and Termination.**

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either Party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period. The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VIII or upon 30 days' notice by either Party to the other.

In the event of a termination of this Agreement, any Loaned Assets or Collateral shall be redelivered immediately and any fees owed shall be payable immediately.

## XXIV. **Miscellaneous.**

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate.  This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.  The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement.  The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

Confidential - Filed Under Seal

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

LENDER:

By: _____
Name:
Title:  Not Applicable


BORROWER:

GENESIS GLOBAL CAPITAL, LLC

By: ___*Kristopher Johnson*___
Name: Kristopher Johnson
Title: Senior Risk Officer

19

## EXHIBIT A

Authorized Agents.  The following are authorized to deliver Lending Requests on behalf of
Borrower in accordance with Section II hereof:

Name: ████████████████████

Email: ████████████████████

Name: N/A

Email: N/A

Borrower may change its Authorized Agents by notice given to Lender as provided in
accordance with Section XV.  Such notice shall not be considered to be a modification of or
amendment to this Agreement for purposes of Section XVI.

20

Confidential - Filed Under Seal

DocuSign Envelope ID: 681A316-B1F4-47D5-B8C3-FF6BEA79A15B

## EXHIBIT B

## LOAN TERM SHEET

This loan agreement dated [DATE OF TERM SHEET] between Genesis Global Capital, LLC ("Genesis") and [COMPANY NAME] ("Lender") incorporates all of the terms of the Master Borrow Agreement between Genesis and Borrower on [DATE OF MASTER AGREEMENT] and the following specific terms:

Borrower:      Genesis Global Capital, LLC

Lender:       [COMPANY NAME]

Borrowed Asset:

Amount of Currency:

Borrow Fee:

Loan Type:      [Open Loan]
         [Fixed Term Loan]
         [Term Loan With Prepayment Option]

Maturity Date:

GENESIS GLOBAL CAPITAL, LLC   [COMPANY NAME]


By: _____  By: _____
Name:          Name:
Title:          Title:

21

# TRI-PARTY SETTLEMENT AGREEMENT

This Tri-Party Settlement Agreement (the "Agreement") is hereby made and entered into and dated as of
June 18, 2021 by and between ████████████
("Counterparty") and each of the entities listed on Schedule A, as defined therein, and as may be amended from time to time by any entity listed on Schedule A (each, a "Genesis Entity" and each Genesis Entity and Counterparty, a "Party" and together the "Parties").

**WHEREAS**, Counterparty has entered into business relationships with one or more Genesis Entity that may include trading digital currency, borrowing or lending digital currency, trading digital currency-based derivatives, or receiving digital currency custodial services; and

**WHEREAS**, in the course of its transactions with Genesis Entities, Counterparty may engage in a transaction with one Genesis Entity followed immediately by a transaction with a different Genesis Entity (the combination of two such transactional components, an "Intercompany Transaction"); and

**WHEREAS**, when engaging in an Intercompany Transaction, to ensure prompt, efficient and secure settlement of the transactional components of the Intercompany Transaction, Counterparty may request that a Genesis Entity settle with another Genesis Entity on Counterparty's behalf (an "Intercompany Settlement");

**NOW THEREFORE**, in consideration for the promises, rights and obligations set forth below, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.  <u>Settlement Instruction</u>

If Counterparty engages in an Intercompany Transaction and wants to request an Intercompany Settlement then the following procedure shall be followed:

   a.  Counterparty shall request such Intercompany Settlement in writing to each Genesis Counterparty involved in the Intercompany Transaction, with an email copy to each of legal@genesistrading.com and compliance@genesistrading.com.
   b.  Each Genesis Entity involved in the Intercompany Transaction shall have sole discretion whether to agree to an Intercompany Settlement for any Intercompany Transaction.
   c.  If all relevant Genesis Entities agree to the Intercompany Settlement for the Intercompany Transaction, one or more of the Genesis Entities shall send an email summary of the settlement to Counterparty, which shall serve as confirmation of the settlement of the Intercompany Transaction.

2.  <u>Independent Transactions</u>

Each of Counterparty and the relevant Genesis Entities represent that any transactional components that make up an Intercompany Transaction are separate and distinct transactions, conducted at arm's length. No

DocuSign Envelope ID: 6814A316-B1F4-47D5-B8G3-EF6BEA79A45B

part of any Intercompany Transaction is conditioned on any other part of an Intercompany Transaction. Counterparty represents that it was not induced by any Genesis Entity into entering into any Intercompany Transaction with the promise of a better price on any transaction that makes up a part of the Intercompany Transaction. Counterparty agrees that any claim or dispute with any Genesis Entity relating to any transactional component is with that Genesis Entity only and no other Genesis Entity that may be party to another transactional component of an Intercompany Transaction or party to this Agreement.

3.    Third-Party Delivery

Each of Counterparty and any Genesis Entity consents to the delivery of digital currency or U.S. Dollars by another Genesis Entity on behalf of Counterparty to satisfy certain obligations of Counterparty in an Intercompany Transaction, each as evidenced in and governed by the agreement or terms relevant to a certain transactional component.

4.    Additional Representations and Warranties

Counterparty hereby represents and warrants to each Genesis Entity that as of the date hereof:

a.    This Agreement has been duly executed and delivered by Counterparty and this Agreement constitutes a valid and legally binding obligation of Counterparty, enforceable against Counterparty in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally.

b.    Neither the execution and delivery of this Agreement, nor the consummation of an Intercompany Transaction contemplated herein, does or will violate any statute, regulation, rule, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency, or court to which Counterparty is subject or conflict with, violate or constitute a default under any agreement, debt or other instrument to which Counterparty is a party.

c.    Counterparty agrees, understands and acknowledges that (i) Counterparty is solely responsible for any decision to enter into an Intercompany Transaction subject to this Agreement, including the evaluation of any and all risks related to any such Intercompany Transaction; and (ii) in entering into any such Intercompany Transaction, Counterparty has not relied on any statement or other representation of any Genesis Entity other than as expressly set forth herein.

5.    Confidentiality

Each Party shall hold in confidence all information obtained from the other Party in connection with this Agreement (collectively, "Confidential Information"). Each Party shall keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose such Confidential Information to any person or use such Confidential Information for any purpose other than the transactions contemplated by this Agreement. The provisions of this Section 3 will not restrict a Party from disclosing the other Party's Confidential Information to  such Party's affiliates, subsidiaries, officers, directors,

DocuSign Envelope ID: 6814A316-B1F4-47D5-B8C3-FF6BEA79A5B

employees, contractors, attorneys, accountants, bankers or consultants with a need to know such Confidential Information, and will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law or regulation; *provided* that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure.  Notwithstanding the foregoing, a Party may disclose the other Party's Confidential Information without notice pursuant to a request or other regular routine inspection by a governmental agency or regulatory authority.  The obligations with respect to Confidential Information shall survive for a period of one (1) year from the date of this Agreement.

6.    <u>Governing Law; Dispute Resolution</u>

a.    The laws of the State of New York shall govern this Agreement, without regard to its conflict of law principles.

b.    If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.  If any proceeding is brought for enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

7.    <u>Entire Agreement</u>

This Agreement, together with the Master Agreement, represents the entire Agreement between the Parties relating to the subject matter contained herein and in the event there is any conflict or inconsistency between the terms and conditions of the Master Agreement and those of this Agreement, the terms and conditions of this Agreement shall control and govern the rights and obligations of the Parties.  Further, the provisions of this Agreement and the Master Agreement shall together supersede all prior oral and written commitments, contracts and understandings with respect to the subject matter contained herein. This Agreement may only be amended by mutual written agreement of the authorized representatives of each Party. This Agreement may be signed in one or more counterparts; each counterpart shall be deemed an original and all counterparts together shall constitute one and the same instrument.

Confidential - Filed Under Seal

**In Witness Whereof**, the Parties have caused this Agreement to be duly executed by their respective authorized representatives as of the day and year above written.

**On behalf of the Genesis Entities listed on Schedule A**



By:    *Arianna Pretto-Sakmann*
          77A200507D6D40F...

Name:   Arianna Pretto-Sakmann

Title:    General Counsel

By:                             _____

Name:                   _____

Title:    Not Applicable
                 _____

## <u>SCHEDULE A</u>

<u>Genesis Entities</u>:
Genesis Global Trading, Inc.
Genesis Global Capital, LLC
GGC International Limited
Genesis Asia Pacific PTE. LTD.
Genesis Custody Limited

Confidential - Filed Under Seal

# **EXHIBIT C**

Confidential - Filed Under Seal

**<> Genesis**

4 members

---

June 12, 2022

**Deleted Account**
Hey ███████ can show 3.25% for 3 month FT on ETH if any cares
2:11 PM

Hi Griffin. Sorry for the delayed response. But, For now I only have BTC available for lending. Thx for keeping me updated on the rates.
4:33 PM ✓✓

**Deleted Account**
No problem thanks for checking   4:33 PM

---

June 13, 2022

**Hanson Birringer** 🎏
Hi ███████ we are also at 3% for 3 month FT on BTC, know that was a prior hurdle for you if any interest
5:59 AM

Hi. Can you send me the standard chart for this week's rates?
8:11 AM ✓✓

**Deleted Account**
Hey   8:11 AM

# Genesis
A Digital Currency Group Company

| BTC | | ETH | | USD | |
|---|---|---|---|---|---|
| **Duration** | **Rate** | **Duration** | **Rate** | **Duration** | **Rate** |
| open term | 1.00% | open term | 1.00% | open term | 5.00% |
| 1-month | 2.50% | 1-month | 2.50% | 1-month | 6.00% |
| 2-month | 2.75% | 2-month | 3.50% | 2-month | 7.00% |
| 3-month | 3.00% | 3-month | 3.75% | 3-month | 8.00% |
| 4-month | 2.75% | 4-month | 3.50% | 4-month | 8.50% |
| 5-month | 2.50% | 5-month | 3.25% | 5-month | 8.25% |
| 6-month | 2.25% | 6-month | 3.00% | 6-month | 8.00% |
| 7-month | 2.00% | 7-month | 2.75% | 7-month | 7.75% |
| 8-month | 1.75% | 8-month | 2.50% | 8-month | 7.50% |
| 9-month | 1.65% | 9-month | 2.40% | 9-month | 7.25% |
| 10-month | 1.60% | 10-month | 2.35% | 10-month | 7.00% |
| 11-month | 1.55% | 11-month | 2.30% | 11-month | 7.00% |
| 12-month | 1.50% | 12-month | 2.25% | 12-month | 7.00% |

Genesis minimums: BTC = 100 units | ETH = 1000 units | USD and major stables = $2mm
*Indicative rates as of June 13th, 2022. Genesis borrows unsecured. Rates are subject to change

Thx.   8:12 AM ✓✓

**Deleted Account**
Let us know if anything suits, happy to p...

Confidential - Filed Under Seal

Write a message...

4 members

Thx.  8:12 AM ✓✓

**Deleted Account**
Let us know if anything suits, happy to potentially improve rate
depending on the size                                          8:12 AM

Ok. Thx. Will discuss with ▮▮▮  8:14 AM ✓✓

**Deleted Account**
Sounds good thanks  8:14 AM

June 20, 2022

**Hanson Birringer** ⚑
Hi ▮▮▮ good morning, we have seen rates tick up going into
the new week here if any cares on BTC. 3-6 months FT would be
above your 3% target rate from the past

1 Month = 3.0%
3 Month = 3.50%
6 Month = 4.25%
9 Month = 3.75%
12 Month = 3.65%                                              7:36 AM

Hi. So I assume you guys survived the weekend massacre? 😬
7:39 AM ✓✓

**Hanson Birringer** ⚑
Haha everything all good over here, we were working through the
weekend amidst the volatility                                7:40 AM

Seriously my ▮▮▮ is super scared. ▮▮▮ kept searching for stories
saying Genesis was losing a TON of BTC and might go bankrupt. I
laughed it off.                                              7:40 AM ✓✓

**Hanson Birringer** ⚑
If you▮▮ would like to hop on a call today we are more than happy
to chat through things                                       7:41 AM

Understand there is a lot of uncertainty here, we want to make sure
we are all on the same page with our clients 😊              7:41 AM

Confidential - Filed Under Seal


Write a message...

< > **Genesis**

4 members


Understand there is a lot of uncertainty here, we want to make sure we are all on the same page with our clients 😄    7:41 AM

That's an interesting idea. Send me the full rate table and let me ask
   7:42 AM ✓✓


**Hanson Birringer** ⌐
Sure thing will 1-1 you   7:43 AM

**June 27, 2022**


Hi. Is there an updated lending rate table for this week?
   11:15 AM ✓✓

**Deleted Account**
hi - can find the updated rate table here:   11:16 AM

**Forwarded from H**

# Genesis
A Digital Currency Group Company

| BTC | | ETH | | USD | |
|---|---|---|---|---|---|
| **Duration** | **Rate** | **Duration** | **Rate** | **Duration** | **Rate** |
| Open Term | 2.00% | Open Term | 2.00% | Open Term | 7.00% |
| 1-month | 3.00% | 1-month | 3.00% | 1-month | 8.00% |
| 2-month | 3.50% | 2-month | 3.50% | 2-month | 8.50% |
| 3-month | 4.00% | 3-month | 4.00% | 3-month | 9.00% |
| 4-month | 4.25% | 4-month | 4.50% | 4-month | 9.25% |
| 5-month | 4.50% | 5-month | 4.75% | 5-month | 9.75% |
| 6-month | 4.25% | 6-month | 4.75% | 6-month | 10.00% |
| 7-month | 4.25% | 7-month | 4.50% | 7-month | 9.75% |
| 8-month | 4.00% | 8-month | 4.50% | 8-month | 9.75% |
| 9-month | 3.90% | 9-month | 4.50% | 9-month | 9.75% |
| 10-month | 3.85% | 10-month | 4.50% | 10-month | 9.50% |
| 11-month | 3.80% | 11-month | 4.50% | 11-month | 9.50% |
| 12-month | 3.75% | 12-month | 4.50% | 12-month | 9.50% |

Genesis minimums: BTC = 100 units | ETH = 1000 units | USD and major stables = $2mm
\* Indicative rates as of June 27th 2022. Genesis borrows unsecured. Rates are subject to change.   11:16 AM

Thx.   11:17 AM ✓✓

**July 6, 2022**


**Hanson Birringer** ⌐
Hi  , I wanted to send you this latest post by our CEO which addresses the prior conversations we had, let us know if you have any questions
https://twitter.com/michaelmoro/status/1544733037182812160
   12:51 PM

Confidential - Filed Under Seal

 Write a message...

4 members

**July 6, 2022**

**Hanson Birringer** 🎐
Hi ▮▮▮, I wanted to send you this latest post by our CEO which addresses the prior conversations we had, let us know if you have any questions
https://twitter.com/michaelmoro/status/1544733037182812160
12:51 PM

Hi. Thx for sending the link. ▮▮▮ says the statement is not clear. Did DCG step in because this incident drained all your reserves and thus you guys would have gone bankrupt? Or did they step in so you didn't have to dip into your reserves.
1:45 PM ✓✓

**H**
> Hi. Thx for sending the link. ▮▮▮ says the statement is not cle...

Hey ▮▮▮ – DCG stepped in so we did not have to dip into reserves.
1:51 PM

Ok. Thx for the answer. ▮▮▮ is asking to gauge how good your risk assessment Dept. is. Honestly we thought it was impeccable. Obviously it was not and we hope you guys make some permanent changes in risk management policies from this incident. We honestly never ever considered for 1 second that there would be a scenario where Genesis could go bankrupt. We never trusted Celsius or BlockFi or any of the others. That's why ▮▮▮ were giving BTC loans to you guys at half the rate Celsius was offering. ▮▮▮ thought there would be dramatically lower risk to us by lending to Genesis than to anyone else. It's scary to read you guys almost went bankrupt.
1:58 PM ✓✓

**H**
hey ▮▮▮ apologies was on a call. Happy to jump on the phone when time.
2:51 PM

Hi Hamill. Are you in a more senior position than Hanson?
3:41 PM ✓✓

**H**
will send a DM    3:42 PM

Confidential - Filed Under Seal

Write a message...

Genesis
4 members

**H**
will send a DM  3:42 PM

Hi. Is that 10:30 Central time? We're in Central time.  3:52 PM ✓✓

**H**
invite sent  3:55 PM

July 25, 2022

Hi. Is there an updated lending rate table for this week?
11:56 AM ✓✓

**Hanson Birringer** 📈
Hey ▮▮▮▮  11:56 AM

## Genesis
A Digital Currency Group Company

| BTC Duration | Rate | ETH Duration | Rate | USD Duration | Rate |
|---|---|---|---|---|---|
| Open Term | 2.00% | Open Term | 2.00% | Open Term | 7.00% |
| 1-month | 3.00% | 1-month | 3.00% | 1-month | 7.75% |
| 2-month | 3.25% | 2-month | 3.25% | 2-month | 8.00% |
| 3-month | 3.50% | 3-month | 3.50% | 3-month | 8.25% |
| 4-month | 3.75% | 4-month | 3.75% | 4-month | 8.50% |
| 5-month | 4.00% | 5-month | 4.00% | 5-month | 8.75% |
| 6-month | 4.25% | 6-month | 4.25% | 6-month | 9.00% |
| 7-month | 4.00% | 7-month | 4.00% | 7-month | 9.25% |
| 8-month | 4.00% | 8-month | 4.00% | 8-month | 9.50% |
| 9-month | 3.90% | 9-month | 3.90% | 9-month | 9.50% |
| 10-month | 3.85% | 10-month | 3.85% | 10-month | 9.50% |
| 11-month | 3.80% | 11-month | 3.80% | 11-month | 9.50% |
| 12-month | 3.75% | 12-month | 3.75% | 12-month | 9.50% |

Genesis minimums: BTC = 100 units | ETH = 1000 units| USD and major stables = $2mm
* Indicative rates as of July 25th 2022. Genesis borrows unsecured. Rates are subject to change.

Updated rates here  11:56 AM

Seeing rates start to level out these last few weeks  11:57 AM

Ok. Thx.  11:57 AM ✓✓

August 2, 2022

Hi. Is there an updated lending rate table for this week?
11:47 AM ✓✓

**Deleted Account**
Hey ▮▮▮▮  11:48 AM

Confidential - Filed Under Seal


Write a message...



4 members

[redacted] Ok. Thx. 11:57 AM

August 2, 2022

[redacted] Hi. Is there an updated lending rate table for this week? 11:47 AM

Deleted Account
Hey [redacted] 11:48 AM

**Genesis**
A Digital Currency Group Company

| BTC | | ETH | | USD | |
|---|---|---|---|---|---|
| Duration | Rate | Duration | Rate | Duration | Rate |
| Open Term | 2.00% | Open Term | 2.00% | Open Term | 7.00% |
| 1-month | 3.00% | 1-month | 3.00% | 1-month | 7.75% |
| 2-month | 3.25% | 2-month | 3.25% | 2-month | 8.00% |
| 3-month | 3.50% | 3-month | 3.50% | 3-month | 8.25% |
| 4-month | 3.75% | 4-month | 3.75% | 4-month | 8.50% |
| 5-month | 4.00% | 5-month | 4.00% | 5-month | 8.75% |
| 6-month | 4.25% | 6-month | 4.25% | 6-month | 9.00% |
| 7-month | 4.00% | 7-month | 4.00% | 7-month | 9.25% |
| 8-month | 4.00% | 8-month | 4.00% | 8-month | 9.50% |
| 9-month | 3.90% | 9-month | 3.90% | 9-month | 9.50% |
| 10-month | 3.85% | 10-month | 3.85% | 10-month | 9.50% |
| 11-month | 3.80% | 11-month | 3.80% | 11-month | 9.50% |
| 12-month | 3.75% | 12-month | 3.75% | 12-month | 9.50% |

Genesis minimums: BTC = 100 units | ETH = 1000 units | USD and major stables = $2mm 11:48 AM
* Indicative rates as of August 1st 2022. Genesis borrows unsecured. Rates are subject to change.

[redacted] Thx. 11:49 AM

August 8, 2022

[redacted] Hi. Is there an updated lending rate table for this week? 12:07 PM

Deleted Account
Hey [redacted] 12:08 PM

**Genesis**
A Digital Currency Group Company

| BTC | | ETH | | USD | |
|---|---|---|---|---|---|
| Duration | Rate | Duration | Rate | Duration | Rate |
| Open Term | 2.00% | Open Term | 2.00% | Open Term | 7.00% |
| 1-month | 3.00% | 1-month | 3.00% | 1-month | 7.75% |
| 2-month | 3.25% | 2-month | 3.25% | 2-month | 8.00% |
| 3-month | 3.50% | 3-month | 3.50% | 3-month | 8.25% |
| 4-month | 3.75% | 4-month | 3.75% | 4-month | 8.50% |
| 5-month | 4.00% | 5-month | 4.00% | 5-month | 8.75% |
| 6-month | 4.25% | 6-month | 4.25% | 6-month | 9.00% |
| 7-month | 4.00% | 7-month | 4.00% | 7-month | 9.25% |
| 8-month | 4.00% | 8-month | 4.00% | 8-month | 9.50% |
| 9-month | 3.90% | 9-month | 3.90% | 9-month | 9.50% |
| 10-month | 3.85% | 10-month | 3.85% | 10-month | 9.50% |
| 11-month | 3.80% | 11-month | 3.80% | 11-month | 9.50% |

Confidential - Filed Under Seal

Write a message...

<> **Genesis**

4 members

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5-month | 4.00% | 5-month | 4.00% | 5-month | 8.75% |
| 6-month | 4.25% | 6-month | 4.25% | 6-month | 9.00% |
| 7-month | 4.00% | 7-month | 4.00% | 7-month | 9.25% |
| 8-month | 4.00% | 8-month | 4.00% | 8-month | 9.50% |
| 9-month | 3.90% | 9-month | 3.90% | 9-month | 9.50% |
| 10-month | 3.85% | 10-month | 3.85% | 10-month | 9.50% |
| 11-month | 3.80% | 11-month | 3.80% | 11-month | 9.50% |
| 12-month | 3.75% | 12-month | 3.75% | 12-month | 9.50% |

Genesis minimums: BTC = 100 units | ETH = 1000 units| USD and major stables = $2mm
* Indicative rates as of August 8th 2022. Genesis borrows unsecured. Rates are subject to change.

Thx. 12:08 PM ✓✓

**August 11, 2022**

**Hanson Birringer**
Hi ▮▮▮▮ confirming we will roll the full balance of ~300 BTC to new 6 month FT 4.5%
9:52 AM

Yes. But make it for the full balance of the account which is more than 300–ie. Sweep all the previously paid interest into this new term.
9:53 AM ✓✓

**Hanson Birringer**
Yes agree, flagging that to my colleagues @briangenesis and @Griffin_Genesis for the new TS
9:54 AM

Did you have any interest in re-lending any ETH/USD as well?
edited 9:55 AM

Not at this point. But I'm always watching rates. Thx. 9:56 AM ✓✓

**Hanson Birringer**
Sounds good, if there is a certain rate you have in mind feel free to let us know
9:57 AM

No problem. Thx. 10:03 AM ✓✓

**September 6, 2022**

Hi. Is there an updated lending rate table for this week?
7:58 AM ✓✓

**Hanson Birringer**
Hey ▮▮▮ good morning 7:58 AM

Not yet, team putting it together

Confidential - Filed Under Seal

Write a message...

**Hanson Birringer** 🖋
Hey ▓▓▓▓ good morning  7:58 AM


Not yet, team putting it together  7:58 AM

Hi. Just update me when it's ready. Thx.  8:07 AM ✓✓

**Hanson Birringer** 🖋
Sounds good, will do  8:07 AM

**Deleted Account**

# Genesis
A Digital Currency Group Company

| BTC | | | ETH | | | USD | |
|-----|-----|---|-----|-----|---|-----|-----|
| **Duration** | **Rate** | | **Duration** | **Rate** | | **Duration** | **Rate** |
| open term | 1.25% | | open term | 1.25% | | open term | 4.00% |
| 1-month | 1.50% | | 1-month | 1.50% | | 1-month | 5.50% |
| 2-month | 2.25% | | 2-month | 2.25% | | 2-month | 7.00% |
| 3-month | 2.75% | | 3-month | 2.75% | | 3-month | 7.50% |
| 4-month | 3.25% | | 4-month | 3.25% | | 4-month | 7.75% |
| 5-month | 3.50% | | 5-month | 3.50% | | 5-month | 8.00% |
| 6-month | 4.00% | | 6-month | 4.00% | | 6-month | 8.25% |
| 7-month | 3.50% | | 7-month | 3.50% | | 7-month | 8.50% |
| 8-month | 3.25% | | 8-month | 3.25% | | 8-month | 8.75% |
| 9-month | 3.25% | | 9-month | 3.25% | | 9-month | 9.00% |
| 10-month | 3.25% | | 10-month | 3.25% | | 10-month | 9.00% |
| 11-month | 3.25% | | 11-month | 3.25% | | 11-month | 9.00% |
| 12-month | 3.25% | | 12-month | 3.25% | | 12-month | 9.00% |

Genesis minimums: BTC = 100 units | ETH = 1000 units | USD and major stables = $2mm
*Indicative rates as of September 6th, 2022. Genesis borrows unsecured. Rates are subject to change


9:45 AM

Thx.  9:46 AM ✓✓

**September 7, 2022**

**Hanson Birringer** 🖋
Hey ▓▓▓▓▓ any specific cares on above? Particularly better
suited to borrow cash FT for a ~3 months here  12:51 PM

I don't have cash to lend. Just BTC. Im surprised lending rates for
BTC are relatively low given all the turmoil in the market.
12:55 PM ✓✓

**Hanson Birringer** 🖋
Understood appreciate that!  12:56 PM

Confidential - Filed Under Seal

 Write a message...

 Genesis

4 members

12:55 PM ✓✓

**Hanson Birringer** 🦅
Understood appreciate that! 12:56 PM

Rates have really settled out in the market since the summer turmoil at this point
12:56 PM

Thx for the update. 12:57 PM ✓✓

September 12, 2022

Hi. Is there an updated lending rate table for this week?
8:00 AM ✓✓

**Hanson Birringer** 🦅
Hi ███ good morning, not yet will send later today when we have it ready
8:01 AM

Ok. Thx. 8:01 AM ✓✓

**Deleted Account**
Hey ███████ 8:02 AM



# Genesis
A Digital Currency Group Company

| BTC | | ETH | | USD | |
|---|---|---|---|---|---|
| **Duration** | **Rate** | **Duration** | **Rate** | **Duration** | **Rate** |
| Open Term | 1.50% | Open Term | 1.50% | Open Term | 4.00% |
| 1-month | 2.00% | 1-month | 2.00% | 1-month | 5.50% |
| 2-month | 3.00% | 2-month | 3.00% | 2-month | 7.00% |
| 3-month | 3.25% | 3-month | 3.25% | 3-month | 7.50% |
| 4-month | 3.50% | 4-month | 3.50% | 4-month | 7.75% |
| 5-month | 3.75% | 5-month | 3.75% | 5-month | 8.00% |
| 6-month | 4.00% | 6-month | 4.00% | 6-month | 8.25% |
| 7-month | 3.75% | 7-month | 3.75% | 7-month | 8.50% |
| 8-month | 3.75% | 8-month | 3.75% | 8-month | 8.75% |
| 9-month | 3.65% | 9-month | 3.65% | 9-month | 9.00% |
| 10-month | 3.60% | 10-month | 3.60% | 10-month | 9.00% |
| 11-month | 3.55% | 11-month | 3.55% | 11-month | 9.00% |
| 12-month | 3.50% | 12-month | 3.50% | 12-month | 9.00% |

Genesis minimums: BTC = 100 units | ETH = 1000 units | USD and major stables = $2mm
* Indicative rates as of September 12th 2022. Genesis borrows unsecured. Rates are subject to change.

Thx. 8:04 AM ✓✓

September 19, 2022

Hi. Is there an updated lending rate table for this week?

Confidential - Filed Under Seal

Write a message...

**September 19, 2022**

Hi. Is there an updated lending rate table for this week?
9:11 AM ✓✓

**Deleted Account**
Hey ████ will send over shortly   9:11 AM

Any update??   11:54 AM ✓✓

**Deleted Account**



# Genesis
A Digital Currency Group Company

| BTC | | ETH | | USD | |
|---|---|---|---|---|---|
| **Duration** | **Rate** | **Duration** | **Rate** | **Duration** | **Rate** |
| Open Term | 1.00% | Open Term | 1.00% | Open Term | 4.00% |
| 1-month | 1.50% | 1-month | 1.50% | 1-month | 4.50% |
| 2-month | 1.75% | 2-month | 1.75% | 2-month | 5.00% |
| 3-month | 2.00% | 3-month | 2.00% | 3-month | 5.50% |
| 4-month | 2.50% | 4-month | 2.50% | 4-month | 6.00% |
| 5-month | 2.75% | 5-month | 3.00% | 5-month | 6.50% |
| 6-month | 3.00% | 6-month | 3.50% | 6-month | 7.00% |
| 7-month | 3.25% | 7-month | 3.75% | 7-month | 7.50% |
| 8-month | 3.50% | 8-month | 4.00% | 8-month | 8.00% |
| 9-month | 3.75% | 9-month | 4.25% | 9-month | 8.50% |
| 10-month | 3.85% | 10-month | 4.50% | 10-month | 9.00% |
| 11-month | 4.00% | 11-month | 4.75% | 11-month | 9.50% |
| 12-month | 4.25% | 12-month | 5.00% | 12-month | 10.00% |

Genesis minimums: BTC = 100 units | ETH = 1000 units | USD and major stables = $2mm
* Indicative rates as of September 19th 2022. Genesis borrows unsecured. Rates are subject to change.

11:59 AM

Thx.   12:00 PM ✓✓

**September 22, 2022**

**Hanson Birringer**
Hi ████, confirming we can do 200 BTC at 12 month 4.25% FT. Will get a term sheet out this afternoon
12:34 PM

Yes. That's correct.   12:35 PM ✓✓

**Hanson Birringer**
Great, will ask @briangenesis here to confirm address for you to use and we can process a test transaction if you would like
12:35 PM

**Deleted Account**

Confidential - Filed Under Seal

 Write a message...

<> Genesis

4 members

Great, will ask @briangenesis here to confirm address for you to use and we can process a test transaction if you would like 12:35 PM

**Deleted Account**
sure one moment 12:36 PM

**Deleted Account**
██████████████
same btc address works 12:36 PM

██████████████████████████ 12:36 PM

Yes. That's the address I have. No need for test transaction 12:37 PM ✓✓

**Deleted Account**
sounds good 12:38 PM

**Deleted Account**
200 btc received 2:55 PM

Thx. 2:56 PM ✓✓

September 26, 2022

Hi. Is there an updated lending rate table for this week? 9:43 AM ✓✓

**Deleted Account**
Hey ██████ 9:44 AM

# Genesis
### A Digital Currency Group Company

| BTC Duration | Rate | ETH Duration | Rate | USD Duration | Rate |
|---|---|---|---|---|---|
| Open Term | 1.00% | Open Term | 1.00% | Open Term | 4.00% |
| 1-month | 1.25% | 1-month | 1.25% | 1-month | 4.25% |
| 2-month | 1.50% | 2-month | 1.50% | 2-month | 4.75% |
| 3-month | 1.75% | 3-month | 1.75% | 3-month | 5.25% |
| 4-month | 2.25% | 4-month | 2.25% | 4-month | 5.75% |
| 5-month | 2.50% | 5-month | 2.75% | 5-month | 6.25% |
| 6-month | 2.75% | 6-month | 3.25% | 6-month | 6.75% |
| 7-month | 3.00% | 7-month | 3.50% | 7-month | 7.25% |
| 8-month | 3.25% | 8-month | 3.75% | 8-month | 7.75% |
| 9-month | 3.50% | 9-month | 4.00% | 9-month | 8.25% |
| 10-month | 3.60% | 10-month | 4.25% | 10-month | 8.75% |
| 11-month | 3.75% | 11-month | 4.50% | 11-month | 9.25% |
| 12-month | 4.00% | 12-month | 4.75% | 12-month | 9.75% |

Confidential - Filed Under Seal

Write a message...

4 members

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 6-month | 2.75% | | 6-month | 3.25% | | 6-month | 6.75% |
| 7-month | 3.00% | | 7-month | 3.50% | | 7-month | 7.25% |
| 8-month | 3.25% | | 8-month | 3.75% | | 8-month | 7.75% |
| 9-month | 3.50% | | 9-month | 4.00% | | 9-month | 8.25% |
| 10-month | 3.60% | | 10-month | 4.25% | | 10-month | 8.75% |
| 11-month | 3.75% | | 11-month | 4.50% | | 11-month | 9.25% |
| 12-month | 4.00% | | 12-month | 4.75% | | 12-month | 9.75% |

Genesis minimums: BTC = 100 units | ETH = 1000 units| USD and major stables = $2mm
\* Indicative rates as of September 26th 2022. Genesis borrows unsecured. Rates are subject to change.

Thx.  9:45 AM ✓✓

**October 3, 2022**

Hanson Birringer

## Genesis
A Digital Currency Group Company

| BTC | | | ETH | | | USD | |
|---|---|---|---|---|---|---|---|
| Duration | Rate | | Duration | Rate | | Duration | Rate |
| Open Term | 1.00% | | Open Term | 1.00% | | Open Term | 4.00% |
| 1-month | 1.25% | | 1-month | 1.25% | | 1-month | 4.25% |
| 2-month | 1.50% | | 2-month | 1.50% | | 2-month | 4.75% |
| 3-month | 2.75% | | 3-month | 2.75% | | 3-month | 5.25% |
| 4-month | 3.50% | | 4-month | 3.50% | | 4-month | 5.75% |
| 5-month | 4.50% | | 5-month | 4.50% | | 5-month | 6.25% |
| 6-month | 5.00% | | 6-month | 5.00% | | 6-month | 6.75% |
| 7-month | 4.75% | | 7-month | 4.75% | | 7-month | 7.25% |
| 8-month | 4.50% | | 8-month | 4.50% | | 8-month | 7.75% |
| 9-month | 4.25% | | 9-month | 4.25% | | 9-month | 8.25% |
| 10-month | 4.00% | | 10-month | 4.00% | | 10-month | 8.75% |
| 11-month | 3.75% | | 11-month | 3.75% | | 11-month | 9.25% |
| 12-month | 3.50% | | 12-month | 3.50% | | 12-month | 9.75% |

Genesis minimums: BTC = 100 units | ETH = 1000 units | USD and major stables = $2mm
\* Indicative rates as of October 3rd, 2022. Genesis borrows unsecured. Rates are subject to change.

Hi good morning, sending along our updated rate card for you. Want to highlight the notable uptick from last week on the 6 month duration, we are at 5% for both ETH and BTC should you choose to originate a new loan there
8:50 AM

 left the group

Thx for the update  10:04 AM ✓✓

**October 10, 2022**

Hanson Birringer  owner

## Genesis
A Digital Currency Group Company

| BTC | | | ETH | | | USD | |
|---|---|---|---|---|---|---|---|
| Duration | Rate | | Duration | Rate | | Duration | Rate |
| Open Term | 1.00% | | Open Term | 1.00% | | Open Term | 4.00% |
| 1-month | 1.25% | | 1-month | 1.25% | | 1-month | 4.25% |

Confidential - Filed Under Seal

Write a message...

**&lt;&gt; Genesis**

4 members

October 10, 2022

**Hanson Birringer** 🖋                                                Reply



# Genesis
A Digital Currency Group Company

| BTC | | ETH | | USD | |
|---|---|---|---|---|---|
| **Duration** | **Rate** | **Duration** | **Rate** | **Duration** | **Rate** |
| Open Term | 1.00% | Open Term | 1.00% | Open Term | 4.00% |
| 1-month | 1.25% | 1-month | 1.25% | 1-month | 4.25% |
| 2-month | 1.50% | 2-month | 1.50% | 2-month | 4.75% |
| 3-month | 2.00% | 3-month | 2.00% | 3-month | 5.25% |
| 4-month | 2.50% | 4-month | 2.50% | 4-month | 5.75% |
| 5-month | 3.00% | 5-month | 3.00% | 5-month | 6.25% |
| 6-month | 3.50% | 6-month | 3.50% | 6-month | 6.75% |
| 7-month | 4.00% | 7-month | 4.00% | 7-month | 7.25% |
| 8-month | 4.50% | 8-month | 4.50% | 8-month | 7.75% |
| 9-month | 5.00% | 9-month | 5.00% | 9-month | 8.25% |
| 10-month | 4.50% | 10-month | 4.50% | 10-month | 8.75% |
| 11-month | 4.00% | 11-month | 4.00% | 11-month | 9.25% |
| 12-month | 3.50% | 12-month | 3.50% | 12-month | 9.75% |

Genesis minimums: BTC = 100 units | ETH = 1000 units | USD and major stables = $2mm
* Indicative rates as of October 10th, 2022. Genesis borrows unsecured. Rates are subject to change.

7:43 AM

Hey ____ good morning, our latest rate card here. Continue to be well bid for duration with emphasis for 9 month at 5%   7:44 AM

Thx. Big change on the 6 month rate !!   7:44 AM ✓✓

**Hanson Birringer** 🖋                                                owner
Yes just moved out further along the curve to reflect where we are seeing fresh demand   7:45 AM

Ok. I'm keeping an eye on this.   7:47 AM ✓✓

**Hanson Birringer** 🖋                                                owner
Sounds good, do you have a specific rate/duration in mind that you are particularly eyeing?   7:48 AM

Sorry for the late response. Just saw your message. I'm just following the rates in general for now.   5:58 PM ✓✓

**Hanson Birringer** 🖋                                                owner
No worries, let us know if you need anything!   6:07 PM

Thx.   6:07 PM ✓✓

October 17, 2022

Confidential - Filed Under Seal

Write a message...

4 members

**October 17, 2022**

**Hanson Birringer**           owner

Hey ███████████ good afternoon 👋

I wanted to reach out and send along our latest rate card for your reference on yields for assets lent to Genesis. Our team has seen a notable uptick in borrower demand which is reflected in our bid for duration on latter end of the curve.

Want to highlight in particular that we are bid 6% on BTC for 7 month FT, 6% bid on ETH for 5 month FT and 10.75% bid on USD/ stables for 12 month FT. Let me know if this is of any interest and we can chat further if you have any questions, thank you!

*edited 2:55 PM*

# Genesis
A Digital Currency Group Company

| BTC | | ETH | | USD | |
|---|---|---|---|---|---|
| **Duration** | **Rate** | **Duration** | **Rate** | **Duration** | **Rate** |
| Open Term | 1.00% | Open Term | 1.00% | Open Term | 4.00% |
| 1-month | 1.50% | 1-month | 2.00% | 1-month | 5.50% |
| 2-month | 2.00% | 2-month | 3.00% | 2-month | 6.00% |
| 3-month | 3.50% | 3-month | 4.00% | 3-month | 6.50% |
| 4-month | 4.50% | 4-month | 5.00% | 4-month | 7.00% |
| 5-month | 5.00% | 5-month | 6.00% | 5-month | 7.50% |
| 6-month | 5.50% | 6-month | 5.75% | 6-month | 8.00% |
| 7-month | 6.00% | 7-month | 5.50% | 7-month | 8.50% |
| 8-month | 5.75% | 8-month | 5.25% | 8-month | 9.00% |
| 9-month | 5.50% | 9-month | 5.00% | 9-month | 9.50% |
| 10-month | 5.25% | 10-month | 5.00% | 10-month | 10.00% |
| 11-month | 5.00% | 11-month | 5.00% | 11-month | 10.50% |
| 12-month | 4.75% | 12-month | 5.00% | 12-month | 10.75% |

Genesis minimums: BTC = 100 units | ETH = 1000 units | USD and major stables = $2mm
* Indicative rates as of October 17th, 2022. Genesis borrows unsecured. Rates are subject to change.

*2:55 PM*

Thx for sending this. Wow. I'm surprised. I don't recall seeing rates this high in the last year. Will definitely consider this.   *2:57 PM* ✓✓

**Hanson Birringer**           owner

Absolutely let me know, happy to help answer/address any specific questions

*2:58 PM*

For some more context we have seen that big uptick in coin borrow demand from large institutional clients who are executing arbitrage trades in the market. Through our conversations with them these last few weeks things have started to look a lot more appealing in current market conditions driving that demand. The trades are revolved around cross exchange trades and listed product arbitrage

Confidential - Filed Under Seal

Write a message...


trades in the market. Through our conversations with them these last few weeks things have started to look a lot more appealing in current market conditions driving that demand. The trades are revolved around cross exchange trades and listed product arbitrage which require working capital on hand. The premium for duration we are paying enables both us (and then our counterparts) to lock in cost of capital to properly duration match assets/liabilities on the balance sheet

Happy to chat further over the phone if you'd like as well   3:01 PM

**October 18, 2022**

**Hanson Birringer**        owner
Hey    good morning, wanted to check in on the above or any feedback you might have on the rate card if anything caught your interest? We also can provide you with a lending snapshot report which provides some greater detail on our counterparty exposure, collateral levels and current liquidity/equity on the book if that would give you greater comfort   9:47 AM

Hi Hanson. I'm definitely thinking about this. Why don't you go ahead and send me that report you mentioned.   10:57 AM ✓✓

**Hanson Birringer**        Reply
Hi   , sounds good I'll get that over to you shortly   10:57 AM

Just sent to your email, let me know if a certain time works this week for us to discuss over the phone if you'd like and we can coordinate from there. In the interim was there a specific asset/duration that you were thinking of in particular?   11:03 AM

I got the email. I'll find time to look thru it. I'll let you know if I have any questions. Thx.   11:24 AM ✓✓

**Hanson Birringer**      owner       Confidential - Filed Under Seal
Sounds good, thanks   11:24 AM

4 members

**Hanson Birringer** 🔥 owner
Sounds good, thanks ▮▮▮▮ 11:24 AM

October 20, 2022

Hi Hanson. How are the rates holding up? 10:57 AM ✓✓

**Deleted Account**
Hey ▮▮▮▮ Hanson off desk at the moment 10:59 AM

Anything you are eyeing in particular? 10:59 AM

The 7 month 6%. Any chance to improve on that rate?
11:00 AM ✓✓

**Hanson Birringer** 🔥 owner
Hi ▮▮▮▮ 11:01 AM

How many units are you thinking here? 11:01 AM

How about 200? 11:03 AM ✓✓

**Hanson Birringer** 🔥 Reply
BTC? 11:04 AM

Can move to 6.25% for you there on that amount 11:04 AM

Can you call me? 11:08 AM ✓✓

**Hanson Birringer** 🔥 owner
Yes, what is a good number? 11:09 AM

▮▮▮▮▮▮ ↩ 1 11:09 AM ✓✓

**Hanson Birringer** 🔥 owner
One min let me step into a phone booth here in the office
11:10 AM

**Hanson Birringer** 🔥 owner
Thanks for the call ▮▮▮▮, let us know if you would like to move
forward with the 200 BTC for 9 months 6.5% or any other structure
at your convenience

Confidential - Filed Under Seal

Write a message...

⟨⟩ Genesis

4 members

**Hanson Birringer** 🎏      owner
Thanks for the call ▮▮▮▮, let us know if you would like to move forward with the 200 BTC for 9 months 6.5% or any other structure at your convenience
     11:34 AM

What's the longest term you can offer at 6.5%?   12:22 PM ✓✓

**Hanson Birringer** 🎏      owner
Hey ▮▮▮▮, we can do 10 months there for 200 BTC, could extend out a bit more to 12 months for 300+ units
     12:31 PM

Ok. Let's do 200 BTC for 10 months at 6.5%. But into ▮▮▮▮ account. ▮▮▮▮ here with me so you can send ▮▮▮ a Telegram message to confirm.
     12:37 PM ✓✓

**Hanson Birringer** 🎏 owner
You got it   12:37 PM

will confirm in ▮▮▮ chat   12:37 PM

October 24, 2022

**Hanson Birringer** 🎏      Reply

# Genesis
A Digital Currency Group Company

| BTC | | ETH | | USD | |
|---|---|---|---|---|---|
| **Duration** | **Rate** | **Duration** | **Rate** | **Duration** | **Rate** |
| Open Term | 1.00% | Open Term | 1.00% | Open Term | 4.00% |
| 1-month | 1.25% | 1-month | 1.75% | 1-month | 5.50% |
| 2-month | 2.25% | 2-month | 3.25% | 2-month | 6.00% |
| 3-month | 3.75% | 3-month | 4.25% | 3-month | 6.50% |
| 4-month | 4.75% | 4-month | 5.25% | 4-month | 7.00% |
| 5-month | 5.00% | 5-month | 6.00% | 5-month | 7.50% |
| 6-month | 5.50% | 6-month | 5.75% | 6-month | 8.00% |
| 7-month | 6.00% | 7-month | 5.50% | 7-month | 8.50% |
| 8-month | 5.75% | 8-month | 5.25% | 8-month | 9.00% |
| 9-month | 5.50% | 9-month | 5.00% | 9-month | 9.50% |
| 10-month | 5.25% | 10-month | 5.00% | 10-month | 10.00% |
| 11-month | 5.00% | 11-month | 5.00% | 11-month | 10.50% |
| 12-month | 4.75% | 12-month | 5.00% | 12-month | 10.75% |

Genesis minimums: BTC = 100 units | ETH = 1000 units | USD and major stables = $2mm
\* Indicative rates as of October 24th 2022. Genesis borrows unsecured. Rates are subject to change.

Hi ▮▮▮▮▮ good morning, sending over our latest rate card for your reference. If you have any interest across the curve happy to chat, thank you!
     8:00 AM

Hi Hanson. Do you have time for a quick call?   9:14 AM ✓✓

Confidential - Filed Under Seal

 Write a message...

4 members

Hi Hanson. Do you have time for a quick call?  9:14 AM  ✓✓

**Hanson Birringer** �げ  owner
Hi ███  9:14 AM

███████████

Surely, does your cell phone number work?  9:14 AM

Yes. Cell phone is fine.  9:15 AM  ✓✓

**Hanson Birringer** 🔰  owner
Great, ringing shortly  9:17 AM

Hi ███, confirming we can do 300 BTC 12 month FT 6.5%, let us
know if this will be out of you or ████ account  9:23 AM

Yes. We will do that amount at those terms but let me get back to
you if from ████ act. ██ busy now.  9:27 AM  ✓✓

**Hanson Birringer** 🔰  owner
Thanks ████ sounds good  9:43 AM

Hi. We will be sending them from ████ act. You can confirm in
██ Telegram and email██ the DocuSign. Thx.  10:05 AM  ✓✓

**Hanson Birringer** 🔰  owner
Thanks ████, will do  10:05 AM

Will make sure to keep you updated on the rates and flag if we have
any particular axe for a duration for additional size for you
10:06 AM

Thx.  10:07 AM  ✓✓

October 31, 2022

**Hanson Birringer** 🔰  owner

### Genesis
A Digital Currency Group Company

Confidential - Filed Under Seal

Write a message...



4 members

Thx. 10:07 AM ✓✓

**October 31, 2022**

**Hanson Birringer** 🍴    Reply

## Genesis
### A Digital Currency Group Company

| BTC | | ETH | | USD | |
|---|---|---|---|---|---|
| **Duration** | **Rate** | **Duration** | **Rate** | **Duration** | **Rate** |
| Open Term | 1.00% | Open Term | 1.00% | Open Term | 6.00% |
| 1-month | 1.50% | 1-month | 1.75% | 1-month | 6.50% |
| 2-month | 2.50% | 2-month | 3.00% | 2-month | 7.50% |
| 3-month | 4.50% | 3-month | 3.50% | 3-month | 8.00% |
| 4-month | 4.75% | 4-month | 4.00% | 4-month | 8.75% |
| 5-month | 5.25% | 5-month | 4.50% | 5-month | 9.75% |
| 6-month | 5.50% | 6-month | 5.00% | 6-month | 10.50% |
| 7-month | 5.75% | 7-month | 5.50% | 7-month | 10.75% |
| 8-month | 6.00% | 8-month | 6.00% | 8-month | 11.00% |
| 9-month | 5.75% | 9-month | 5.75% | 9-month | 11.25% |
| 10-month | 5.50% | 10-month | 5.50% | 10-month | 11.50% |
| 11-month | 5.25% | 11-month | 5.25% | 11-month | 11.75% |
| 12-month | 5.00% | 12-month | 5.00% | 12-month | 12.00% |

Genesis minimums: BTC = 100 units | ETH = 1000 units | USD and major stables = $2mm
* Indicative rates as of October 31st 2022. Genesis borrows unsecured. Rates are subject to change.

Good morning

Sending over our latest rate card for your reference. Also wanted to highlight that our Q3 report is out where you can read a full summary and deep dive into how our business helped clients navigate through challenging market conditions:
https://genesistrading.com/insights/quarterly-reports    9:11 AM

Thx. 9:12 AM ✓✓

**November 7, 2022**

Any updated rates for this week? 9:43 AM ✓✓

**Hanson Birringer** 🍴    owner

## Genesis
### A Digital Currency Group Company

| BTC | | ETH | | USD | |
|---|---|---|---|---|---|
| **Duration** | **Rate** | **Duration** | **Rate** | **Duration** | **Rate** |
| Open Term | 1.00% | Open Term | 1.00% | Open Term | 6.00% |
| 1-month | 1.75% | 1-month | 1.75% | 1-month | 7.00% |
| 2-month | 2.50% | 2-month | 2.50% | 2-month | 8.00% |

Confidential - Filed Under Seal

 Write a message...

4 members

Any updated rates for this week?  9:43 AM ✓✓

**Hanson Birringer** 🔺                                    Reply

# Genesis
A Digital Currency Group Company

| BTC | | ETH | | USD | |
|---|---|---|---|---|---|
| **Duration** | **Rate** | **Duration** | **Rate** | **Duration** | **Rate** |
| Open Term | 1.00% | Open Term | 1.00% | Open Term | 6.00% |
| 1-month | 1.75% | 1-month | 1.75% | 1-month | 7.00% |
| 2-month | 2.50% | 2-month | 2.50% | 2-month | 8.00% |
| 3-month | 3.00% | 3-month | 3.00% | 3-month | 9.75% |
| 4-month | 3.50% | 4-month | 3.50% | 4-month | 9.85% |
| 5-month | 4.00% | 5-month | 4.00% | 5-month | 9.95% |
| 6-month | 4.50% | 6-month | 4.50% | 6-month | 10.00% |
| 7-month | 5.00% | 7-month | 5.00% | 7-month | 10.50% |
| 8-month | 5.50% | 8-month | 5.50% | 8-month | 11.00% |
| 9-month | 5.25% | 9-month | 5.25% | 9-month | 11.25% |
| 10-month | 5.00% | 10-month | 5.00% | 10-month | 11.50% |
| 11-month | 4.75% | 11-month | 4.75% | 11-month | 11.75% |
| 12-month | 4.50% | 12-month | 4.50% | 12-month | 12.00% |

Genesis minimums: BTC = 100 units | ETH = 1000 units | USD and major stables = $2mm
* Indicative rates as of November 7th 2022. Genesis borrows unsecured. Rates are subject to change.

Hi ▮▮▮▮ here is our latest rate card for your context
                                                    ↩ 1  9:44 AM

you read my mind sir  9:44 AM

haha  9:44 AM

Thx.  9:44 AM ✓✓

November 8, 2022

**Hanson Birringer** 🔺                                    owner
Hi ▮▮▮ I sent to ▮▮▮ but for good measure want to flag to
you

https://twitter.com/GenesisTrading/status/1590106896698028032?
s=20&t=rB3i5xGv7mmSQ84Uz8Xabw

> **Twitter**
> **Genesis**
> With regard to today's market events, we have managed our
> lending book and have no material net credit exposure. In
> addition, Genesis has no exposure to any tokens issued by cent...

                                                    4:34 PM

Thx. Good to know. ▮▮▮ was super worried. I told ▮ you guys

Confidential - Filed Under Seal

Write a message...

**<> Genesis**
4 members

addition, Genesis has no exposure to any tokens issued by cent...
4:34 PM

Thx. Good to know. ▇▇▇ was super worried. I told ▇▇ you guys went thru this already. Hopefully your procedures are different now so that the 3AC situation can't happen again.
4:35 PM ✓✓

**Hanson Birringer** ⌐                                                owner
Absolutely, don't think the last few days were on anyones radar. We continue to operate here amidst the market volatility so please let us know if anything we can assist with
4:38 PM

Let me know if lending rates for BTC should massively spike. I've always believed your customers are borrowing BTC at rates that are too cheap. You guys should be charging higher rates. 💁
4:40 PM ✓✓

**Hanson Birringer** ⌐                                                owner

  **Hanson Birringer**
  Hi ▇▇▇▇▇ here is our latest rate card for your context

We can show a slight premium here for duration, how many units would you be looking to lend?
4:41 PM

Let me know next week. No way ▇▇▇▇ is in any kind of lending mood right now !!!! ▇▇ kept sending me rumors from Twitter saying you guys were insolvent. I told ▇ stop reading that !!!     4:43 PM ✓✓

I honestly didn't know ▇▇ contacted you. ▇▇ didn't tell me. Shows you how worried ▇▇ was.
4:44 PM ✓✓

**Hanson Birringer** ⌐                                                owner
Haha sounds good, we can touch base in future when things settle down
4:44 PM

November 9, 2022

**Hanson Birringer** ⌐                                                owner
Hey ▇▇▇▇ passing along our latest official comment here just now
https://twitter.com/GenesisTrading/status/1590391027214725120?
s=20&t=Xh2bDRsrsWq3yIb840I26A

Let us know if we can help with anything
11:15 AM

Confidential - Filed Under Seal

Write a message...

4 members

**November 9, 2022**

**Hanson Birringer** ⚡                                                    owner
Hey ███████ passing along our latest official comment here just now
https://twitter.com/GenesisTrading/status/1590391027214725120?
s=20&t=Xh2bDRsrsWq3yIb840I26A


Let us know if we can help with anything                          11:15 AM

**November 11, 2022**

**Hanson Birringer** ⚡                                                    Reply
Hi ██████ good morning —

I wanted to reach out and highlight an email we've sent through to
our client base providing an update on our current balance sheet as
we position Genesis for its next phase of growth.

**While the operation of our lending and trading businesses have
not been impacted by recent market events, Genesis has taken
steps to strengthen its balance sheet with an additional equity
infusion of $140M from our parent company, Digital Currency
Group.**

This additional capital will bolster our position as a global leader in
crypto capital markets and allow us to support our clients and the
growing demand for our services.

Genesis continues to operate with transparency as we always have,
and we remain steadfastly committed to our clients throughout all
market conditions.


Please let us know if you have any questions today, thank you.
                                                                  7:31 AM

Thanks for the update. I can't believe you guys have weathered two
massive catastrophic black swan events in one year !! There's no
way I could have imagined ANOTHER horrific episode occurring
again after the 3AC fiasco. I can't think of any other firm that can
match you guys in terms of concern for your client's assets. Very
impressed.                                                8:45 AM ✓✓


**Hanson Birringer** ⚡                                                    owner
thank you ███████ your support is much appreciated, this last week
certainly caught everyone off guard with how it all played out

Confidential - Filed Under Seal

 | Write a message...



**<> Genesis**

4 members

impressed.                                                          8:45 AM ✓✓

**Hanson Birringer** 🎐                                          owner
thank you ███████ your support is much appreciated, this last week
certainly caught everyone off guard with how it all played out
                                                                   8:49 AM

please let us know if we can help with anything these next few days,
your longstanding relationship to our firm is not forgotten   8:49 AM

**November 14, 2022**

Any update on rates this week?   10:09 AM ✓✓

**Hanson Birringer** 🎐                                          owner
Hi ██████, nothing at this time   10:12 AM

Ok. Send the me the table when it's ready.   10:12 AM ✓✓

👍 👍

**November 15, 2022**

Hi. Is there an updated rate table yet?   11:04 AM ✓✓

**Hanson Birringer** 🎐                                          owner
Hey ██████, not yet we have no updated rate card at the moment
given market conditions although we have seen cost to borrow
capital significantly increase which would result in higher rates we
can offer to lenders conceptually. We are waiting for things to settle
down a bit more before we can truly assess how to price the book
from a rates perspective
                                                                   11:07 AM

Ok. Keep me updated.   11:09 AM ✓✓

**Hanson Birringer** 🎐                                          owner
Yes absolutely will do   11:09 AM

**November 16, 2022**

Is anyone still here?   9:58 AM ✓✓

Confidential - Filed Under Seal

Write a message...

<> **Genesis**

4 members

**Hanson Birringer** owner
Yes absolutely will do 11:09 AM

November 16, 2022

Is anyone still here? 9:58 AM ✓✓

**Hanson Birringer** owner
Hey ████ 9:58 AM

Yes our entire team is here 9:58 AM

You have time for a phone call?? 9:58 AM ✓✓

**Hanson Birringer** Reply
I am on a few back to back now, if you can send over any specific
questions ahead of time that would be best given our teams
bandwidth today (many clients reaching out at once) and I will get
back to you as soon as I can 10:00 AM

Ok. No problem. I can ask here. Probably same ? You are being
asked already. First is there any hope you guys will survive this? The
CEO says too many withdrawal requests suddenly but I thought the
loans we made could not be recalled early. Or could they? 10:03 AM ✓✓

**Hanson Birringer** owner
Yes thank you, give me a few here and I'll revert asap 10:04 AM

Ok 10:05 AM ✓✓

**Hanson Birringer** owner
1. We have been actively monitoring the ongoing situation and this
week as market conditions continued to deteriorate post FTX/
Alameda fraudulent activity the liquidity within the global crypto
credit markets was impacted. We are taking as many steps as we
possibly can trying to come to a solution and have been told by our
management team to be able to provide an updated path forward
to clients by next week

2. That is correct, FT loans cannot be withdrawn before the
expiration date 10:27 AM

Confidential - Filed Under Seal

Write a message...


management team to be able to provide an updated path forward to clients by next week

2. That is correct, FT loans cannot be withdrawn before the expiration date    10:27 AM

So is what's happening that many clients tried to withdraw OT deposits at once or that you guys had a lot more exposure to FTX losses than the $175 million reported?    10:30 AM ✓✓

**Hanson Birringer** 🏦    owner
The former, the FTX losses were specific to our trading business not lending    10:32 AM

The CEO did say the trading and lending business are separate. But it appears only the lending business is being affected by the FTX mess. I don't understand. If anything it should be the trading business that's shutdown.    10:36 AM ✓✓

**Hanson Birringer** 🏦    owner
The influx of capital calls and liquidity mismatch is not a function of funds stuck on FTX but more a function of overwhelming attempts to withdraw all assets (which is happening industry wide)    10:38 AM

we are currently working with external parties to structure potential solutions, as soon as I have more information I will send over to you asap    10:38 AM

And I take it there's no one else you guys can borrow BTC from to meet withdrawal requests? This type of sudden withdrawals didn't happen during the 3AC event?    10:41 AM ✓✓

Hanson, please go ahead and try to give me a call when you have time.    1:59 PM ✓✓

**Hanson Birringer** 🏦    owner
Hi ▋▋▋, I can call you at 4pm ET if you are free    2:01 PM

Yes. That's fine. Thx.    2:01 PM ✓✓

**Hanson Birringer** 🏦    owner
Great, will call your cell    2:02 PM

Confidential - Filed Under Seal

Write a message...

4 members

**Hanson Birringer** 🎏   owner
Great, will call your cell   2:02 PM

talk soon   2:02 PM

Cell is fine.   2:02 PM  ✓✓

November 22, 2022

Hello. Is there anyone here who has a few minutes for a call?
3:06 PM  ✓✓

**Hanson Birringer** 🎏   Reply
Hey ▮▮▮▮, yes give me 5 minutes   3:07 PM

Ok. Thx.   3:08 PM  ✓✓

November 23, 2022

Hi guys. Just wanted you to know that ▮▮▮▮ received the email
your CEO sent today but I did not. I think my email address (
▮▮▮▮▮▮▮▮▮▮ is missing from your main customer
mailing list. Can you please make sure it's added?
↩ 1   11:02 AM  ✓✓

**Sebastian Cohen**
Hey ▮▮▮▮▮   11:04 AM

sure thing   11:04 AM

will make sure we add your email to your accounts contact list
11:04 AM

Can you also have the people that handle the email send me the
email that just went out. Thx.   11:07 AM  ✓✓

**Sebastian Cohen**
will flag for our comms team   11:08 AM

**Genesis Global Capital Update.pdf**
90.8 KB
OPEN WITH

Confidential - Filed Under Seal

✎ Write a message...

<> Genesis
4 members

Genesis Global Capital Update.pdf
90.8 KB

**OPEN WITH**

You can also see the update from our CEO here
11:09 AM

Hi guys. Just wanted you to know that ████ received the emai...
my team's informed me this is already the email address associated
with the account
11:11 AM

**SC** could you check if the email went to a different folder? 11:11 AM

I did. Checked 'All Folders'. Even checked spam. Nothing
11:12 AM ✓✓

I didn't get an invitation to the conference call last week either. So
there's a mailing list that my email address is not on. 11:13 AM ✓✓

**Sebastian Cohen**
**SC** understood, digging a bit deeper into the issue 11:16 AM

December 1, 2022

Hi. Can you guys clarify what's going on with interest payments
during the withdrawal pause? I see there's a daily interest statement
being generated. However on 12-1 I would usually see a new OT
loan with the NOV interest but I don't see that. So what's going on?
Thx. 7:25 AM ✓✓

**Hanson Birringer** 🎏 owner
Hey ████ let me confirm with our legal team regarding interest/
new loans 7:36 AM

My thinking is that interest is accruing but not being paid out until
the withdrawal pause is lifted. If that happens then I expect accrued
interest to be paid out. But this is just my guess so please confirm.
7:39 AM ✓✓

December 2, 2022

Confidential - Filed Under Seal

Write a message...

▮ <> Genesis

4 members

new loans 7:36 AM

My thinking is that interest is accruing but not being paid out until the withdrawal pause is lifted. If that happens then I expect accrued interest to be paid out. But this is just my guess so please confirm.
7:39 AM ✓✓

### December 2, 2022

Any update on this issue? I noticed there's a daily interest statement for Dec 1 also.
9:09 AM ✓✓

**Hanson Birringer** 🖋 Reply
Hey ▮, I can confirm that interest is not being paid out at this time. As it relates to the statements on the online portal I have been told that they are currently delayed given the curren circumstances but should expect to have additional clarity over the coming days/ next week
9:12 AM

So is interest accruing but not being paid or is it not even accruing?
9:13 AM ✓✓

**Hanson Birringer** 🖋 owner
At this time I can't answer general questions about interest accrual, late fees, and other such matters. If you require an answer from us at this time I can refer your question to our legal team, who can review your specific case. Please be patient as this can take some time, their email is **legal@genesistrading.com** and feel free to cc me (hanson@genesistrading.com)
9:17 AM

Ok. Thx. 9:17 AM ✓✓

### January 27

Hi Hanson. ▮ and I are filling out the UCC forms today. Can you tell me the balance of BTC you show for ▮ as of today?
11:58 AM ✓✓

**Hanson Birringer** 🖋 owner
Hey ▮ these balances should be available for ▮ on the Prime Platform under the "Lending" tab
11:59 AM

Thx. 12:02 PM ✓✓

Confidential - Filed Under Seal

Write a message...

4 members

interest to be paid out. But this is just my guess so please confirm.

7:39 AM ✓✓

**December 2, 2022**

Any update on this issue? I noticed there's a daily interest statement for Dec 1 also.

9:09 AM ✓✓

**Hanson Birringer** 🔶      owner

Hey ▓▓▓, I can confirm that interest is not being paid out at this time. As it relates to the statements on the online portal I have been told that they are currently delayed given the curren circumstances but should expect to have additional clarity over the coming days/ next week

9:12 AM

So is interest accruing but not being paid or is it not even accruing?

9:13 AM ✓✓

**Hanson Birringer** 🔶      owner

At this time I can't answer general questions about interest accrual, late fees, and other such matters. If you require an answer from us at this time I can refer your question to our legal team, who can review your specific case. Please be patient as this can take some time, their email is **legal@genesistrading.com** and feel free to cc me (**hanson@genesistrading.com**)

9:17 AM

Ok. Thx.   9:17 AM ✓✓

**January 27**

Hi Hanson. ▓▓▓ and I are filling out the UCC forms today. Can you tell me the balance of BTC you show for ▓▓▓ as of today?

11:58 AM ✓✓

**Hanson Birringer** 🔶      owner

Hey ▓▓▓, these balances should be available for ▓▓▓ on the Prime Platform under the "Lending" tab

11:59 AM

Thx.   12:02 PM ✓✓

**January 28**

**H left the group**

Confidential - Filed Under Seal

Write a message...

# EXHIBIT D

Confidential - Filed Under Seal

# EXHIBIT B

# LOAN TERM SHEET

The following loan agreement dated August 11th, 2022 incorporates all of the terms of the Master Borrow Agreement entered into by Genesis Global Capital, LLC ("Genesis") and ████████████████████ on June 18th, 2021 and the following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ██████████ |
| Borrowed Asset: | BTC |
| Amount of Borrowed Asset: | 301.68804514 BTC |
| Borrow Fee: | 4.50% annual |
| Loan Type: | Fixed Term |
| Maturity Date: | February 11th, 2023 |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |
| Genesis BTC Address: | ████████████████████████████ |

Genesis Global Capital, LLC  ██████████

By: _____
Name:  Adim Offurum
Title:  Vice President

By: _____
Name: ██████████████
Title:

Customer

# EXHIBIT E

Confidential - Filed Under Seal

## EXHIBIT B

## LOAN TERM SHEET

The following loan agreement dated September 22nd, 2022 incorporates all of the terms of the Master Borrow Agreement entered into by Genesis Global Capital, LLC ("Genesis") and ████████████████ on June 18th, 2021 and the following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ████████ |
| Borrowed Asset: | BTC |
| Amount of Borrowed Asset: | 200 BTC |
| Borrow Fee: | 4.25% annual |
| Loan Type: | Fixed Term |
| Maturity Date: | September 22nd, 2023 |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |
| Genesis BTC Address: | ████████████████████████ |

Genesis Global Capital, LLC  ████████

By: _Nebiyou Getahun_ By: ████████
    ——347BA590AD0F461...
Name: Nebiyou Getahun Name: ████████
Title: Senior Associate Credit Risk Title: Customer

Confidential - Filed Under Seal

# **EXHIBIT F**

Confidential - Filed Under Seal

**Post**



**Genesis**
@GenesisTrading

With regard to today's market events, we have managed our lending book and have no material net credit exposure. In addition, Genesis has no exposure to any tokens issued by centralized exchanges. We continue to meet the needs of our clients around the world across all products.

4:20 PM · Nov 8, 2022

💬 100          ↺ 158          ♡ 817          🔖 33          ⬆️

Post your reply                    **Reply**

**Genesis** @GenesisTrading · Nov 8, 2022
Our experienced trading and risk management teams are constantly assessing credit, volatility, and liquidity in the market to optimize our positioning and operations. Genesis is committed to being a leading digital assets market maker and continuing to drive the industry forward.

💬 13          ↺ 6          ♡ 116          Confidential - Filed Under Seal  📊   🔖  ⬆️

# EXHIBIT G

Confidential - Filed Under Seal

# MASTER BORROW AGREEMENT

This Master Borrow Agreement ("Agreement") is made on this ___August 3, 2021___ ("Effective Date") by and between

Genesis Global Capital, LLC ("Genesis" or "Borrower"), a limited liability company organized and existing under the laws of Delaware with its principal place of business at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310 and

Name: ███████ _____("Lender")

Formation: ___Not Applicable_____

Formation Location (country or US state): ___Not Applicable_____

Address: ███████████_____

## RECITALS

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend U.S. Dollars or Digital Currency to Borrower, and Borrower will pay a Loan Fee and return such U.S Dollars or Digital Currency to Lender upon the termination of the Loan; and

**WHEREAS**, Borrower intends to use any Loaned Assets under this Agreement in its Digital Currency lending business;

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, the Borrower and the Lender hereby agree as follows:

## I.    Definitions

"*Airdrop*" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "*Applicable Airdrop*" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time. A "*Non-Applicable Airdrop*" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Currency, or a distribution that depends on a wallet of the relevant Digital Currency meeting a threshold requirement.

"*Authorized Agent*" has the meaning set forth in Exhibit A.

"*Borrower*" means Genesis Global Capital, LLC.

1

Confidential - Filed Under Seal

"*Borrower Email*" means lend@genesiscap.co.

"*Business Day*" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

"*Business Hours*" means between the hours of 9:00 am to 5:00 pm New York time on a Business Day.

"*Call Option*" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement and in particular Section II(c)(ii).

"*Close of Business*" means 5:00 pm New York time.

"*Collateral*" is defined as set forth in Section IV(a)

"*Digital Currency*" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), or any digital currency that the Borrower and Lender agree upon.

"*Digital Currency Address*" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Currency.

"*Early Termination Fee*" means any charge or fee agreed to be paid by the Borrower and Lender in the Loan Term Sheet when the Agreement is terminated prior to the Termination Date.

"*Fixed Term Loan*" means a Loan with a pre-determined Maturity Date, where Borrower does not have a Prepayment Option and Lender does not have a Call Option.

"*Hard Fork*" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"*Lender*" means _____.

"*Lender Email*" means _____.

"*Loan*" means a request for a loan or an actual loan of Digital Currency or U.S. Dollars made pursuant to and in accordance with this Agreement and a Loan Term Sheet.

"*Loan Balance*" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees, Late Fees, and any Earlier Termination Fee for a particular Loan.

"*Loan Documents*" means this Master Borrow Agreement and any and all Loan Term Sheets entered into between Lender and Borrower.

"*Loan Effective Date*" means the date upon which a Loan begins.

Confidential - Filed Under Seal

"*Loan Fee*" means the fee paid by Borrower to the Lender for the Loan.

"*Loan Term Sheet*" means the agreement between Lender and Borrower on the particular terms of an individual Loan, which shall be memorialized in an agreement as set forth in Exhibit B or in a form approved by Lender comparable therewith.

"*Loaned Assets*" means any Digital Currency or U.S. Dollar amount transferred in a Loan hereunder until such Digital Currency (or identical Digital Currency) or U.S. Dollar amount is transferred back to Lender hereunder, except that, if any new or different Digital Currency is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Currency shall be deemed to become Loaned Assets in addition to the former Digital Currency for which such exchange is made. For purposes of return of Loaned Assets by Borrower, such term shall include Digital Currency of the same quantity and type as the Digital Currency, as adjusted pursuant to the preceding sentence.

"*Maturity Date*" means the pre-determined future date upon which a Loan becomes due in full, whether by Term or Call Option.

"*New Token Fee*" means payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender including, but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment.

"*Open Loan*" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"*Prepayment Option*" means the Borrower has the option to repay or return the Loaned Assets prior to the Maturity Date without incurring Early Termination Fees, subject to this Agreement and in particular Section II(c)(iii).

"*Term*" means the period from the Loan Effective Date through Termination Date.

"*Term Loan with Call Option*" means a Loan with a pre-determined Maturity Date where Lender has a Call Option.

"*Term Loan with Prepayment Option*" means a Loan with a pre-determined Maturity Date where Borrower has a Prepayment Option.

"*Termination Date*" means the date upon which a Loan is terminated.

## II.    <u>General Loan Terms.</u>

(a) <u>Loans of Digital Currency or</u> U.S. Dollars

3

Confidential - Filed Under Seal

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request from the Lender a Loan to Borrower of a specified amount of Digital Currency or U.S. Dollars, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan on terms acceptable to Lender and as set forth in a corresponding Loan Term Sheet.

(b) <u>Loan Procedure</u>

From time to time during the Term of this Agreement, during the hours of 9:00 am New York time to 4:00 pm New York time on a Business Day (the "<u>Request Day</u>"), by email directed to Lender Email (or such other address as Lender may specify in writing), an Authorized Agent of Borrower may request from Lender a Loan of a specific amount of Digital Currency or U.S. Dollars (a "<u>Lending Request</u>").  Provided Lender receives such Lending Request prior to 3:00 pm New York time, Lender shall by email directed to Borrower Email (or such other address as Lender may specify in writing) to inform Borrower whether Lender agrees to make such a Loan.  If Lender fails to provide Borrower with an acceptance as to a particular Lending Request prior to Close of Business on the Request Day, such Lending Request shall be deemed to have been denied by Lender.

As part of its Lending Request, Borrower shall provide the following proposed terms:

(i)     Whether U.S. Dollars or Digital Currency, and if Digital Currency, the type of Digital Currency;

(ii)    the amount of Digital Currency or U.S. Dollars;

(iii)   whether the Loan is to be a Fixed Term Loan, a Term Loan with Prepayment Option, or an Open Loan;

(iv)    the Loan Effective Date; and

(v)     the Maturity Date (if a Fixed Term Loan or a Term Loan with Prepayment Option).

If Lender agrees to make a Loan in accordance with Borrower's proposed terms, Lender shall commence transmission to either (x) the Borrower's Digital Currency Address the amount of Digital Currency, or (y) Borrower's bank account by bank wire the amount of U.S. Dollars, as applicable, as such Digital Currency Address or bank wire instruction is set forth in the Lending Request on or before Close of Business on the Request Day.  In the event Lender requests a modification to the proposed terms, including a proposal for a Call Option, Lender shall provide notice of such, and upon Borrower's acceptance of said modified terms, Lender shall commence transmission to Borrower's Digital Currency Address the amount of Digital Currency set forth in the Lending Request on or before Close of Business on the Request Day.

The specific and final terms of a Loan shall be memorialized using the Loan Term Sheet, which shall be delivered and executed after the final terms of a Loan are agreed to and prior to the delivery of the Loaned Assets.  In the event of a conflict of terms between this Master Borrow Agreement and a Loan Term Sheet, the terms in the Loan Term Sheet shall govern.

(c) <u>Loan Repayment Procedure</u>

(i) <u>Loan Repayment</u>

4

Unless otherwise specified in subsections (ii) and (iii) below, upon the earlier of the Maturity Date, the Recall Delivery Day, or the Redelivery Day (as defined below) for a Loan, Borrower shall repay the entirety of the Loan Balance to Lender by Close of Business.  If Lender has not provided to Borrower a Digital Currency Address for receiving the repayment of a Loan by Close of Business on the day prior to the earlier of the Maturity Date, the Recall Delivery Day (defined below), or the Redelivery Day (defined below), then such Loan will become an Open Loan on said Maturity Date or Redelivery Day, whichever applicable, and no additional Loan Fees shall be accrued after the Maturity Date or the Redelivery Day.

(ii) <u>Call Option</u>

For Loans in which the Lender has a Call Option (e.g. Open Loans, etc.), Lender may during Business Hours (the "<u>Recall Request Day</u>") demand repayment of a portion or the entirety of the Loan Balance (the "<u>Recall Amount</u>").  Lender will notify Borrower of Lender's exercising of this right by email to Borrower's Email.  Borrower will then have until Close of Business on the seventh Business Day after the Recall Request Day (the "<u>Recall Delivery Day</u>") to deliver the Recall Amount.

In the event of a Call Option where Lender demands only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Recall Delivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date or the subsequent Recall Delivery Day.

(iii) <u>Prepayment Option</u>

For Loans in which Borrower has a Prepayment Option (e.g. Open Loans, Term Loans with Prepayment Option, etc.), Borrower may notify Lender during Business Hours of Borrower's intent to return the Loan prior to the Maturity Date or the date Lender exercises its Call Option without being subject to, and as a result will not incur, Early Termination Fees as set forth in Section III(d).  Borrower shall provide said notice at least one Business Day prior to the date on which the Borrower will repay all or a portion of the Loan Balance (said later date, the "Redelivery Day").  Borrower's exercising of its Prepayment Option shall not relieve it of any of its other obligations herein, including without limitation its payment of owed Loan Fees and Late Fees.

In the event of a Prepayment Option where the Borrower repays only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Redelivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date, the Recall Delivery Day, or a subsequent Redelivery Day.

(d) <u>Termination of Loan</u>

A Loan will terminate upon the earlier of:

(i)       the Maturity Date;

(ii)      the repayment of the Loan Balance by Borrower prior to the Maturity Date;

5

(iii)    the occurrence of an Event of Default as defined in Section VII; however, Lender shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan.  In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

(iv)    in the event any or all of the Loaned Assets becomes in Borrower's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization, arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Borrower's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and termination of this Agreement except as specified in Section XXIII.

In the event of a termination of a Loan, any Loaned Assets or Collateral shall be redelivered immediately and any fees or owed shall be payable immediately to the appropriate party specified herein.

(e)  Redelivery in an Illiquid Market

If (i) the seven-day average daily trading volume across each of the three highest-volume digital currency exchanges that report prices for the applicable Digital Currency (as measured by the 30-day average daily trading volume of the applicable Digital Currency on the Loan Date) (these such exchanges, the "Liquidity Exchanges") has decreased by 90% from the date of the Loan Term Sheet to the Maturity Date, Recall Delivery Day, or Redelivery Day, whichever applicable, or (ii) the Loaned Assets ceases to be listed on any of the Liquidity Exchanges (the duration of either event herein designated, the "Illiquid Period"), Borrower may repay the Loan in U.S. Dollars equal to the volume-weighted average price of the Loaned Assets on the Liquidity Exchanges (measured at 4:00 p.m. New York time ) during the Illiquid Period, up to a maximum of 30 days (the "Illiquid Market Spot Rate").

If two of the three Liquidity Exchanges limit or suspend withdrawals or transactions in the Loaned Assets on the Maturity Date, the Recall Delivery Day, or the Redelivery Day, whichever applicable, the requirement for Borrower to return the Loaned Assets shall be temporarily suspended, without penalty or default, including without limitation the incurring of additional Loan Fees, until such time that at least two of the Liquidity Exchanges allow the resumption of withdrawals of and transactions in the Loaned Assets.

## III.    Loan Fees and Transaction Fees.

(a)  Loan Fee

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as agreed

6

to herein and annualized in the relevant Loan Term Sheet and subject to change if thereafter agreed by Borrower and Lender. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from, but excluding, the date on which the Loaned Digital Currencies or Loaned U.S. Dollars are transferred to Borrower until, and including, the date on which such Loaned Digital Currencies or Loaned U.S. Dollars are repaid in their entirety to Lender.

Lender shall calculate any Loan Fees owed on a daily basis and provide Borrower with the calculation upon request. The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

(b) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with Section III(c), Borrower shall incur an additional fee (the "Late Fee") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

(c) Payment of Loan Fees and Late Fees

Unless otherwise agreed, any Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) five (5) Business Days after receipt of an invoice from Lender or (ii) the termination of all Loans hereunder (the "Payment Due Date"). An invoice for Loan Fees and any Late Fees (the "Invoice Amount") shall be sent out on the first Business Day of the month and shall include any Loan Fees, Late Fees, and Early Termination Fees incurred and outstanding during the previous month and periods. Borrower shall have up to five Business Days from the date of said Invoice to pay the Invoice Amount. Failure of Lender to timely send an invoice in accordance with the preceding sentence shall not be considered a material default under Section VIII(d) nor shall it relieve Borrower of its obligation to pay any Loan Fees, Late Fees, and Early Termination Fees owed herein nor negate any Event of Default resulting from Borrower's failure to timely pay such fees. The Loan Fee, Late Fees, and Early Termination Fees shall be payable, unless otherwise agreed by the Borrower and Lender in the Loan Term Sheet, in the same Loaned Assets that were borrowed, whether U.S. Dollars or Digital Currency on the same blockchain and of the same type that was loaned by the Lender during the Loan.

(d) Early Termination Fees

For Fixed Term Loans and Term Loans with Call Options, if Borrower returns the Loaned Assets prior to the Maturity Date, Borrower shall pay to Lender a fee equal to twenty percent (20%) of the Loan Fee that would have accrued from the date of the repayment until the Maturity Date of the Loan (the "Early Termination Fee"). The Early Termination Fee is due with the repayment of the Loaned Assets. The Early Termination Fee shall not apply if Borrower returns the Loaned Assets to Lender in the event of a Hard Fork (as defined in Section V) or if Lender moves up the Maturity Date to an earlier date by exercising a Call Option.

Confidential - Filed Under Seal

(e) Taxes and Fees

Borrower shall report to the Internal Revenue Service ("IRS") all Loan Fees paid to Lender under this Agreement, and shall provide applicable IRS form annually documenting the amount reported to the IRS. For any Loan Fees paid in Digital Currency, such Loan Fees shall be calculated at the Coinbase Pro spot rate at 4 p.m. New York time daily on any day that Loan Fees accrue. Neither Borrower nor Lender shall have any liability to the other party for any taxes due under this Agreement.

## IV.    Collateral Requirements

(a) Collateral

If agreed in a Loan Term Sheet, Borrower shall provide as collateral an amount of U.S. Dollars, or Digital Currency as set forth below, or to be determined and agreed upon by the Borrower and Lender ("Collateral") and memorialized using the Loan Term Sheet. The Collateral will be calculated as a percentage of the value of the Loaned Assets, such value determined by a spot rate agreed upon in the Loan Term Sheet. Borrower shall, prior to or concurrently with the transfer of the Loaned Assets to Borrower, but in no case later than the Close of Business on the day of such transfer, transfer to Lender the agreed upon Collateral.

Collateral shall always be valued in U.S. Dollars, but Borrower may, if mutually agreed by both parties, provide the Collateral (in whole or in part) to Lender in Digital Currency in an amount equal to the value of the Collateral in U.S. Dollars at a spot rate determined by Borrower. For the avoidance of doubt, upon the repayment of the Loaned Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited, net of any Additional Collateral, Margin Call, or Refunded Collateral adjustments (as defined below in Sections IV(c) & (e)). If a Hard Fork in the blockchain of Digital Currency meeting the criteria in Section V occurs while Lender is holding such Digital Currency as Collateral, Lender shall return the New Tokens (as defined in Section V) to Borrower in addition to the Collateral and Additional Collateral. If a Hard Fork occurs that does not meet the criteria in Section V, Lender shall have no obligation to return any New Tokens to Borrower.

The Collateral transferred by Borrower to Lender, as adjusted herein, shall be security for Borrower's obligations in respect of such Loan. Borrower hereby pledges with, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the Loaned Assets by Lender to Borrower and which shall cease upon the return of the Loaned Assets by Borrower to Lender.

(b) Loan and Collateral Transfer

If Lender transfers Loaned Assets to Borrower and Borrower does not transfer Collateral to Lender as provided in Section IV(a), Lender shall have the absolute right to the return of the Loaned Assets; and if Borrower transfers Collateral to Lender, as provided in Section IV(a), and Lender

Confidential - Filed Under Seal

does not transfer the Loaned Assets to Borrower, Borrower shall have the absolute right to the return of the Collateral.

    (c) <u>Margin Calls</u>

If during the Term of a Loan the value of the Loaned Assets increases, or the value of the Collateral decreases, so that the value of the Loaned Assets becomes equal to or greater than the value of the Collateral (the "<u>Margin Call Limit</u>"), Lender shall have the right to require Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "<u>Additional Collateral</u>") as measured by the spot rate published on Coinbase Pro (such rate, the "<u>Margin Call Spot Rate</u>").

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "<u>First Notification</u>") to the Borrower at the email address indicated in Section XIII (or such other address as the parties shall agree to in writing) that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Margin Call Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate. Borrower shall have twenty-four (24) hours from the time Lender sends such First Notification to (x) respond and send payment to Lender in accordance with subsection (d) below, or (y) respond that the value of the Loaned Assets, value of the Collateral, or spot rate as indicated on Coinbase Pro as applicable, has decreased sufficiently such that it is no longer at or above the Margin Call Spot Rate. If Lender agrees by email that Borrower's response according to (y) above is correct, then no other action is required by Borrower.

If Borrower fails to respond to the First Notification within twenty-four (24) hours, or Lender rejects Borrower's response pursuant to (y) above and the spot rate of the Loaned Assets is still at least at the Margin Call Spot Rate, Lender shall send a second email notification (the "<u>Second Notification</u>") repeating the information in provisions (i) – (iv) in the preceding paragraph. Borrower shall have twelve (12) hours from the time Lender sends the Second Notification to respond according to (x) or (y) in the preceding, and Lender has the right to accept or reject Borrower's response as stated above. Upon Lender's rejection of Borrower's response to the Second Notification, Borrower shall make immediate payment of Additional Collateral as set forth in Section IV(d) below. Failure to provide Additional Collateral, or failure by Borrower to respond to either the First Notification or the Second Notification, shall give Lender the option to declare an Event of Default under Section VII below.

Borrower acknowledges that its obligations hereunder, including those in this Section IV, continue regardless of Lender's request for Additional Collateral and Borrower's acceptance or rejection of the same.

    (d) <u>Payment of Additional Collateral</u>

Payment of the Additional Collateral shall be made by bank wire to the account, or if applicable the Digital Currency Address, specified in the Loan Term Sheet or by a return of the amount of Loaned Assets necessary to make the Collateral percentage indicated in the Loan Term Sheet correct based on the Margin Call Spot Rate. For any return of Loaned Assets made in accordance

Confidential - Filed Under Seal

DocuSign Envelope ID: 8B2A38EA-E7C5-4CC9-909A-57B191D42E0A

with this Section, Borrower is still responsible for payment of any Early Termination Fees that apply to the particular Loan.

(e) <u>Refund of Collateral</u>

If during the Term of a Loan the value of the Loaned Assets decreases, or the value of the Collateral increases, so that the value of the Collateral relative to the value of the Loaned Assets becomes equal to or greater than the percentage indicated in the Loan Term Sheet (the "<u>Collateral Refund Limit</u>"), Borrower shall have the right to require Lender to return an amount of Collateral so that the Collateral is at no greater than the percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "<u>Refunded Collateral</u>") as measured by the spot rate published on Coinbase Pro (such rate, the "<u>Collateral Refund Spot Rate</u>").

If Borrower requires Lender to repay Refunded Collateral, it shall send an email notification (the "<u>First Refund Notification</u>") to the Lender at the Lender Email that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Collateral Refund Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate.  Lender shall have twenty-four (24) hours from the time Borrower sends such First Refund Notification to (x) respond and send payment to Borrower in accordance with subsection (f) below, or (y) respond that the value of the Loaned Assets as a percentage of the value of the Collateral has increased sufficiently such that it is no longer at or below the Collateral Refund Spot Rate.  If Borrower agrees by email that Lender's response according to (y) above is correct then no other action is required by Lender.

If Lender fails to respond to the First Refund Notification within twenty-four (24) hours, and the value of the Loaned Assets is still at or below the Collateral Refund Spot Rate, Borrower shall send a second email notification (the "<u>Second Refund Notification</u>") repeating the information in (i) – (iv) in the preceding paragraph.  Lender shall have twelve (12) hours from the time Borrower sends the Second Refund Notification to respond according to (x) or (y) in the preceding paragraph.  Failure by Lender to respond to either the First Refund Notification or the Second Refund Notification shall give Borrower the option to declare an Event of Default under Section VII below.

(f) <u>Payment of Refunded Collateral</u>

Payment of the Refunded Collateral shall be made by bank wire to the account specified by the Borrower or to a Digital Currency Address specified by the Borrower, as applicable.

(g) <u>Return of Collateral</u>

Upon Borrower's repayment of the Loan and acceptance by Lender of the Loaned Assets into Lender's Digital Currency Address, with such delivery being confirmed on the relevant Digital Currency blockchain ten times, Lender shall initiate the return of Collateral within two Business Days to a bank account designated by Borrower or, where Digital Currency is Collateral, into an applicable Digital Currency Address on the behalf of Borrower.

**V.    Hard Fork**

10

(a) <u>Notification</u>

In the event of a public announcement of a future Hard Fork or an Airdrop in the blockchain for any Loaned Assets, Lender shall provide email notification to Borrower.

(b) <u>No Immediate Termination of Loans Due to Hard Fork</u>

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated. Borrower and Lender may agree, regardless of Loan type, either (i) to terminate a Loan without any penalties on an agreed upon date or (ii) for Lender to manage the Hard Fork on the behalf of Borrower. Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Currency to Lender and Lender transfers said Digital Currency back to Borrower pursuant to this section.

(c) <u>Lender's Right to New Tokens</u>

Lender will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Currency protocol or an Applicable Airdrop (the "New Tokens") if following two conditions are met:

- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).

For the above calculations, the source for the relevant data on the market capitalization, and 24-Hour Trading Volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source).

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Lender. If sending the New Tokens to Lender is burdensome, upon Lender's written agreement with Borrower, Borrower can reimburse Lender for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount of the New Tokens owed using the spot rate agreed upon by the Parties at the time of said repayment, or (ii) returning the borrowed Digital Currency so that Lender can manage the split of the underlying digital tokens as described in Section IV(b) above. Alternatively, subject to Lender's written agreement, the parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender. In all cases, Borrower will be solely responsible for payment of additional costs

11

incurred by any transfer method other than returning the New Tokens to Lender, including but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment.  For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this Section V shall continue for any New Tokens that meet the criteria in this subsection (c) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement.

## VI.    <u>Representations and Warranties.</u>

The parties to this Agreement (individually, a "Party," collectively the "Parties") hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each Party represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution,  delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Currency, Collateral, or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws

(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

Confidential - Filed Under Seal

DocuSign Envelope ID: 8B2A38EA-E7C5-4CC9-902A-57B191D12E0A

(h) Lender represents and warrants that it has, or will have at the time of the loan of any Digital Currency, the right to lend such Loaned Assets subject to the terms and conditions hereof, and free and clear of all liens and encumbrances other than those arising under this Agreement.

(i) Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof.

(j) Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest in said Collateral subject to the terms and conditions hereof.

## VII.   Default

It is further understood that any of the following events shall constitute an event of default hereunder against the defaulting Party, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to return any and all Loaned Assets upon termination of any Loan however, Borrower shall have ten Business Days to cure such default;

(b) the failure of Borrower to pay any and all Loan Fees, Late Fees, or to remit any New Tokens, however, Borrower shall have ten Business Days to cure such default;

(c) the failure of either Party to transfer Collateral or Additional Collateral, including any Refunded Collateral, as required by Section IV, however, a Party shall have ten Business Days to cure such default;

(d) a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;

(e) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not be dismissed within thirty (30) days of the initiation of said proceedings; or

(f) any representation or warranty made by either Party in any of the Loan Documents that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

## VIII.   Remedies

Confidential - Filed Under Seal

DocuSign Envelope ID: 8B2A38EA-E7C5-4CC9-909A-57B191D12E0A

(a) Upon the occurrence and during the continuation of any Event of Default on a Loan by Borrower, the Lender may, at its option:  (1) declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable; (2) transfer any Collateral for a Loan from the collateral account to Lender's operating account necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by the Loan; and/or (3) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity.  If any Event of Default by Borrower under Sections VII(a), (b), (c), or (d) persist for thirty days or more, or immediately upon an Event of Default by Borrower under Sections VII(e) or (f), the Lender may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Borrower.

(b) Upon the occurrence and during the continuation of any Event of Default on a Loan by Lender, the Borrower may, at its option:  (1) demand a return of any and all Collateral in the control or possession of Lender or its agents; (2) withhold repayment of the Loaned Assets and any outstanding Loan Fees, Late Fees or other amounts claimed by Lender; and/or (3) exercise all other rights and remedies available to the Borrower hereunder, under applicable law, or in equity.  If any Event of Default by Lender under Sections VII (c) or (d) persist for thirty-days or more, or immediately upon an Event of Default by Lender under Sections VII (e) or (f), the Borrower may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Lender.

(c) In addition to its rights hereunder, the non-defaulting Party shall have any rights otherwise available to it under any other agreement or applicable law; however, the non-defaulting Party shall have an obligation to mitigate its damages in a commercially reasonable manner.

## IX.    Rights and Remedies Cumulative.

No delay or omission by a Party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each Party stated herein are cumulative and in addition to all other rights provided by law, in equity.

## X.    Survival of Rights and Remedies

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets or Collateral, and termination of this Agreement.

## XI.    Governing Law; Dispute Resolution.

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules.  If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York,

14

Confidential - Filed Under Seal

DocuSign Envelope ID: 8B2A38EA-F7C5-4CC9-902A-57B191D12E0A

State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The parties agree to waive their rights to a jury trial. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

## XII.    **Confidentiality.**

(a) Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information"). Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XIV, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii) available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b) Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XII.

(c) Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

(d) The provisions of this Section XII will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; provided that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure. Notwithstanding the foregoing, Lender may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e) The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement. Notwithstanding anything in this agreement to

15

DocuSign Envelope ID: 8B2A98EA-F7C5-4CC9-903A-57B191D12E0A

the contrary, a Party may retain copies of Confidential Information (the "Retained Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XII; provided, however, that such Party agrees that any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and the confidentiality obligations of this Section XII shall survive with respect to the Retained Confidential Information for so long as such information is retained.

## XIII.   Notices.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth in the recitals.

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

## XIV.   Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

## XV.   Single Agreement

Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other. Accordingly, Borrower and Lender hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted. In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other.

## XVI.   Entire Agreement.

This Agreement, each exhibit referenced herein, and all Loan Term Sheets constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements. Nothing in this Section XVI shall be construed to conflict with or negate Section XV above.

## XVII.   Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that Lender may not assign this Agreement or any rights or duties

Confidential - Filed Under Seal

hereunder without the prior written consent of the Borrower (such consent to not be unreasonably withheld).  Borrower may assign this Agreement or any rights or duties hereunder upon notice to Lender.  Notwithstanding the foregoing, in the event of a change of control of Lender or Borrower, prior written consent shall not be required so such Party provides the other Party with written notice prior to the consummation of such change of control.  For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party.  Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, or Loan Term Sheet hereunder, shall create any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns.  For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc.  The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

### XVIII. Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

### XIX.    Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any Party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

### XX.     Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

### XXI.    No Waiver.

The failure of or delay by either Party to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be

Confidential - Filed Under Seal

DocuSign Envelope ID: 8B2A38EA-E7C5-4CC9-902A-57B191D12E0A

construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent such Party from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

## XXII. **Indemnification.**

Lender shall indemnify and hold harmless Genesis, or any of its parents or affiliates, from and against any and all third party claims, demands, losses, expenses and liabilities of any and every nature (including attorneys' fees of an attorney of Genesis' choosing to defend against any such claims, demands, losses, expenses and liabilities) that Genesis may sustain or incur or that may be asserted against it arising out of Genesis' borrowing Digital Currency from Lender under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to Genesis' bad faith, gross negligence or willful misconduct in the performance of its duties under this Agreement.

## XXIII. **Term and Termination.**

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either Party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period. The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VIII or upon 30 days' notice by either Party to the other.

In the event of a termination of this Agreement, any Loaded Assets or Collateral shall be redelivered immediately and any fees owed shall be payable immediately.

## XXIV. **Miscellaneous.**

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate. This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement. The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement. The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

Confidential - Filed Under Seal

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

LENDER:

By: _____

Name:

Title:   Individually

BORROWER:

GENESIS GLOBAL CAPITAL, LLC

By: _____

Name: Kristopher Johnson

Title: Senior Risk Officer

19

DocuSign Envelope ID: 882A28EA-E7C5-4CC9-909A-57B191D12E0A

## EXHIBIT A

Authorized Agents.  The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section II hereof:

Name: lending
Email: lend@genesiscap.co

Name: risk
Email: risk@genesiscap.co

Borrower may change its Authorized Agents by notice given to Lender as provided in accordance with Section XV.  Such notice shall not be considered to be a modification of or amendment to this Agreement for purposes of Section XVI.

20

Confidential - Filed Under Seal

**EXHIBIT B**

**LOAN TERM SHEET**

This loan agreement dated [DATE OF TERM SHEET] between Genesis Global Capital, LLC ("Genesis") and [COMPANY NAME] ("Lender") incorporates all of the terms of the Master Borrow Agreement between Genesis and Borrower on [DATE OF MASTER AGREEMENT] and the following specific terms:

Borrower:                          Genesis Global Capital, LLC

Lender:                            [COMPANY NAME]

Borrowed Asset:

Amount of Currency:

Borrow Fee:

Loan Type:                         [Open Loan]
                                   [Fixed Term Loan]
                                   [Term Loan With Prepayment Option]

Maturity Date:


GENESIS GLOBAL CAPITAL, LLC              [COMPANY NAME]


By: _____          By: _____
Name:                              Name:
Title:                             Title:

21

# TRI-PARTY SETTLEMENT AGREEMENT

This Tri-Party Settlement Agreement (the "Agreement") is hereby made and entered into and dated as of August 3, 2021 _____ by and between ██████████ _____ ("Counterparty") and each of the entities listed on Schedule A, as defined therein, and as may be amended from time to time by any entity listed on Schedule A (each, a "Genesis Entity" and each Genesis Entity and Counterparty, a "Party" and together the "Parties").

**WHEREAS**, Counterparty has entered into business relationships with one or more Genesis Entity that may include trading digital currency, borrowing or lending digital currency, trading digital currency-based derivatives, or receiving digital currency custodial services; and

**WHEREAS**, in the course of its transactions with Genesis Entities, Counterparty may engage in a transaction with one Genesis Entity followed immediately by a transaction with a different Genesis Entity (the combination of two such transactional components, an "Intercompany Transaction"); and

**WHEREAS**, when engaging in an Intercompany Transaction, to ensure prompt, efficient and secure settlement of the transactional components of the Intercompany Transaction, Counterparty may request that a Genesis Entity settle with another Genesis Entity on Counterparty's behalf (an "Intercompany Settlement");

**NOW THEREFORE**, in consideration for the promises, rights and obligations set forth below, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. <u>Settlement Instruction</u>

If Counterparty engages in an Intercompany Transaction and wants to request an Intercompany Settlement then the following procedure shall be followed:

    a. Counterparty shall request such Intercompany Settlement in writing to each Genesis Counterparty involved in the Intercompany Transaction, with an email copy to each of legal@genesistrading.com and compliance@genesistrading.com.

    b. Each Genesis Entity involved in the Intercompany Transaction shall have sole discretion whether to agree to an Intercompany Settlement for any Intercompany Transaction.

    c. If all relevant Genesis Entities agree to the Intercompany Settlement for the Intercompany Transaction, one or more of the Genesis Entities shall send an email summary of the settlement to Counterparty, which shall serve as confirmation of the settlement of the Intercompany Transaction.

2. <u>Independent Transactions</u>

Each of Counterparty and the relevant Genesis Entities represent that any transactional components that make up an Intercompany Transaction are separate and distinct transactions, conducted at arm's length. No

Confidential - Filed Under Seal

part of any Intercompany Transaction is conditioned on any other part of an Intercompany Transaction. Counterparty represents that it was not induced by any Genesis Entity into entering into any Intercompany Transaction with the promise of a better price on any transaction that makes up a part of the Intercompany Transaction. Counterparty agrees that any claim or dispute with any Genesis Entity relating to any transactional component is with that Genesis Entity only and no other Genesis Entity that may be party to another transactional component of an Intercompany Transaction or party to this Agreement.

3.    Third-Party Delivery

Each of Counterparty and any Genesis Entity consents to the delivery of digital currency or U.S. Dollars by another Genesis Entity on behalf of Counterparty to satisfy certain obligations of Counterparty in an Intercompany Transaction, each as evidenced in and governed by the agreement or terms relevant to a certain transactional component.

4.    Additional Representations and Warranties

Counterparty hereby represents and warrants to each Genesis Entity that as of the date hereof:

a.    This Agreement has been duly executed and delivered by Counterparty and this Agreement constitutes a valid and legally binding obligation of Counterparty, enforceable against Counterparty in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally.

b.    Neither the execution and delivery of this Agreement, nor the consummation of an Intercompany Transaction contemplated herein, does or will violate any statute, regulation, rule, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency, or court to which Counterparty is subject or conflict with, violate or constitute a default under any agreement, debt or other instrument to which Counterparty is a party.

c.    Counterparty agrees, understands and acknowledges that (i) Counterparty is solely responsible for any decision to enter into an Intercompany Transaction subject to this Agreement, including the evaluation of any and all risks related to any such Intercompany Transaction; and (ii) in entering into any such Intercompany Transaction, Counterparty has not relied on any statement or other representation of any Genesis Entity other than as expressly set forth herein.

5.    Confidentiality

Each Party shall hold in confidence all information obtained from the other Party in connection with this Agreement (collectively, "Confidential Information"). Each Party shall keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose such Confidential Information to any person or use such Confidential Information for any purpose other than the transactions contemplated by this Agreement. The provisions of this Section 3 will not restrict a Party from disclosing the other Party's Confidential Information to  such Party's affiliates, subsidiaries, officers, directors,

Confidential - Filed Under Seal

employees, contractors, attorneys, accountants, bankers or consultants with a need to know such Confidential Information, and will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law or regulation; *provided* that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure. Notwithstanding the foregoing, a Party may disclose the other Party's Confidential Information without notice pursuant to a request or other regular routine inspection by a governmental agency or regulatory authority. The obligations with respect to Confidential Information shall survive for a period of one (1) year from the date of this Agreement.

6.　　Governing Law; Dispute Resolution

　　a.　The laws of the State of New York shall govern this Agreement, without regard to its conflict of law principles.

　　b.　If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. If any proceeding is brought for enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

7.　　Entire Agreement

This Agreement, together with the Master Agreement, represents the entire Agreement between the Parties relating to the subject matter contained herein and in the event there is any conflict or inconsistency between the terms and conditions of the Master Agreement and those of this Agreement, the terms and conditions of this Agreement shall control and govern the rights and obligations of the Parties. Further, the provisions of this Agreement and the Master Agreement shall together supersede all prior oral and written commitments, contracts and understandings with respect to the subject matter contained herein. This Agreement may only be amended by mutual written agreement of the authorized representatives of each Party. This Agreement may be signed in one or more counterparts; each counterpart shall be deemed an original and all counterparts together shall constitute one and the same instrument.

Confidential - Filed Under Seal

**In Witness Whereof**, the Parties have caused this Agreement to be duly executed by their respective authorized representatives as of the day and year above written.

**On behalf of the Genesis Entities listed on Schedule A**

By: _Arianna Pretto-Sakmann_
    DocuSigned by:
    77A200507D6D40F...

Name:  Arianna Pretto-Sakmann

Title:  General Counsel

By: _____

Name: _____

Title:  Individually _____

DocuSign Envelope ID: 8B2A38EA-E7C5-4CC9-902A-57B191D12E0A

## SCHEDULE A

Genesis Entities:
Genesis Global Trading, Inc.
Genesis Global Capital, LLC
GGC International Limited
Genesis Asia Pacific PTE. LTD.
Genesis Custody Limited

# EXHIBIT B

# LOAN TERM SHEET

The following loan agreement dated October 20th, 2022 incorporates all of the terms
of the Master Borrow Agreement entered into by Genesis Global Capital, LLC
("Genesis") and ███████████████████████████ on August 3rd, 2021 and the
following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ██████████████ |
| Borrowed Asset: | BTC |
| Amount of Borrowed Asset: | 200 BTC |
| Borrow Fee: | 6.50% annual |
| Loan Type: | Fixed Term |
| Maturity Date: | August 20th, 2023 |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |
| Genesis BTC Address: | ████████████████████████████ |

Genesis Global Capital, LLC    ███████████████

By: _Nebiyou Getahun_____    By: _____
Name: Nebiyou Getahun    Name: ███████████████
Title: Senior Associate Credit Risk    Title: Customer

Confidential - Filed Under Seal

# EXHIBIT B

# LOAN TERM SHEET

The following loan agreement dated October 24th, 2022 incorporates all of the terms of the Master Borrow Agreement entered into by Genesis Global Capital, LLC ("Genesis") and ███████████████████ on August 3rd, 2021 and the following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ████████ |
| Borrowed Asset: | BTC |
| Amount of Borrowed Asset: | 300 BTC |
| Borrow Fee: | 6.50% annual |
| Loan Type: | Fixed Term |
| Maturity Date: | October 24th, 2023 |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |
| Genesis BTC Address: | ████████████████████ |

Genesis Global Capital, LLC    ████████

By: _____
DocuSigned by:
*Alain Passini*
347BA590AD0F461...
Name: Alain Passini
Title: Vice President Credit Risk

By: _____
████████
Name: ████████
Title: Customer

Confidential - Filed Under Seal

# EXHIBIT B

## LOAN TERM SHEET

The following loan agreement dated September 14th, 2022 incorporates all of the terms of the Master Borrow Agreement entered into by Genesis Global Capital, LLC ("Genesis") and ███████████████████████ on August 3rd, 2021 and the following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ████████████ |
| Borrowed Asset: | BTC |
| Amount of Borrowed Asset: | 307.23526083 BTC |
| Borrow Fee: | 4.00% annual |
| Loan Type: | Fixed Term |
| Maturity Date: | March 14th, 2023 |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |
| Genesis BTC Address: | ████████████████████████████ |

Genesis Global Capital, LLC    ████████████

By: _____    By: _____
Name:   Adim Offurum              Name: ████████████
Title:  Vice President            Title:   Customer

# MASTER BORROW AGREEMENT

This Master Borrow Agreement ("Agreement") is made on this <u>September 27, 2022</u> ("Effective Date") by and between

Genesis Global Capital, LLC ("Genesis" or "Borrower"), a limited liability company organized and existing under the laws of Delaware with its principal place of business at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310 and

Name: ███████ _____ ("Lender")

Formation: <u>N/A</u> _____

Formation Location (country or US state): <u>N/A</u> _____

Address: ████████████████ _____.

## RECITALS

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend U.S. Dollars or Digital Currency to Borrower, and Borrower will pay a Loan Fee and return such U.S Dollars or Digital Currency to Lender upon the termination of the Loan; and

**WHEREAS**, Borrower intends to use any Loaned Assets under this Agreement in its Digital Currency lending business;

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, the Borrower and the Lender hereby agree as follows:

## I.    Definitions

"*Airdrop*" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "*Applicable Airdrop*" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time. A "*Non-Applicable Airdrop*" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Currency, or a distribution that depends on a wallet of the relevant Digital Currency meeting a threshold requirement.

"*Authorized Agent*" has the meaning set forth in Exhibit A.

"*Borrower*" means Genesis Global Capital, LLC.

1

Confidential - Filed Under Seal

"*Borrower Email*" means lend@genesiscap.co.

"*Business Day*" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

"*Business Hours*" means between the hours of 9:00 am to 5:00 pm New York time on a Business Day.

"*Call Option*" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement and in particular Section II(c)(ii).

"*Close of Business*" means 5:00 pm New York time.

"*Collateral*" is defined as set forth in Section IV(a)

"*Digital Currency*" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), or any digital currency that the Borrower and Lender agree upon.

"*Digital Currency Address*" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Currency.

"*Early Termination Fee*" means any charge or fee agreed to be paid by the Borrower and Lender in the Loan Term Sheet when the Agreement is terminated prior to the Termination Date.

"*Fixed Term Loan*" means a Loan with a pre-determined Maturity Date, where Borrower does not have a Prepayment Option and Lender does not have a Call Option.

"*Hard Fork*" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"*Lender*" means ▉▉▉▉▉▉▉▉▉▉▉_____.

"*Lender Email*" means ▉▉▉▉▉▉▉▉▉▉▉▉▉▉▉_____.

"*Loan*" means a request for a loan or an actual loan of Digital Currency or U.S. Dollars made pursuant to and in accordance with this Agreement and a Loan Term Sheet.

"*Loan Balance*" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees, Late Fees, and any Earlier Termination Fee for a particular Loan.

"*Loan Documents*" means this Master Borrow Agreement and any and all Loan Term Sheets entered into between Lender and Borrower.

"*Loan Effective Date*" means the date upon which a Loan begins.

Confidential - Filed Under Seal

DocuSign Envelope ID: 85F04A5E-628F-46CA-9671-283607582A7E

"*Loan Fee*" means the fee paid by Borrower to the Lender for the Loan.

"*Loan Term Sheet*" means the agreement between Lender and Borrower on the particular terms of an individual Loan, which shall be memorialized in an agreement as set forth in Exhibit B or in a form approved by Lender comparable therewith.

"*Loaned Assets*" means any Digital Currency or U.S. Dollar amount transferred in a Loan hereunder until such Digital Currency (or identical Digital Currency) or U.S. Dollar amount is transferred back to Lender hereunder, except that, if any new or different Digital Currency is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Currency shall be deemed to become Loaned Assets in addition to the former Digital Currency for which such exchange is made.  For purposes of return of Loaned Assets by Borrower, such term shall include Digital Currency of the same quantity and type as the Digital Currency, as adjusted pursuant to the preceding sentence.

"*Maturity Date*" means the pre-determined future date upon which a Loan becomes due in full, whether by Term or Call Option.

"*New Token Fee*" means payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender including, but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment.

"*Open Loan*" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"*Prepayment Option*" means the Borrower has the option to repay or return the Loaned Assets prior to the Maturity Date without incurring Early Termination Fees, subject to this Agreement and in particular Section II(c)(iii).

"*Term*" means the period from the Loan Effective Date through Termination Date.

"*Term Loan with Call Option*" means a Loan with a pre-determined Maturity Date where Lender has a Call Option.

"*Term Loan with Prepayment Option*" means a Loan with a pre-determined Maturity Date where Borrower has a Prepayment Option.

"*Termination Date*" means the date upon which a Loan is terminated.

## II.   <u>General Loan Terms.</u>

(a) <u>Loans of Digital Currency or </u>U.S. Dollars

3

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request from the Lender a Loan to Borrower of a specified amount of Digital Currency or U.S. Dollars, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan on terms acceptable to Lender and as set forth in a corresponding Loan Term Sheet.

(b) <u>Loan Procedure</u>

From time to time during the Term of this Agreement, during the hours of 9:00 am New York time to 4:00 pm New York time on a Business Day (the "<u>Request Day</u>"), by email directed to Lender Email (or such other address as Lender may specify in writing), an Authorized Agent of Borrower may request from Lender a Loan of a specific amount of Digital Currency or U.S. Dollars (a "<u>Lending Request</u>").  Provided Lender receives such Lending Request prior to 3:00 pm New York time, Lender shall by email directed to Borrower Email (or such other address as Borrower may specify in writing) to inform Borrower whether Lender agrees to make such a Loan.  If Lender fails to provide Borrower with an acceptance as to a particular Lending Request prior to Close of Business on the Request Day, such Lending Request shall be deemed to have been denied by Lender.

As part of its Lending Request, Borrower shall provide the following proposed terms:

(i)      Whether U.S. Dollars or Digital Currency, and if Digital Currency, the type of Digital Currency;

(ii)     the amount of Digital Currency or U.S. Dollars;

(iii)    whether the Loan is to be a Fixed Term Loan, a Term Loan with Prepayment Option, or an Open Loan;

(iv)     the Loan Effective Date; and

(v)      the Maturity Date (if a Fixed Term Loan or a Term Loan with Prepayment Option).

If Lender agrees to make a Loan in accordance with Borrower's proposed terms, Lender shall commence transmission to either (x) the Borrower's Digital Currency Address the amount of Digital Currency, or (y) Borrower's bank account by bank wire the amount of U.S. Dollars, as applicable, as such Digital Currency Address or bank wire instruction is set forth in the Lending Request on or before Close of Business on the Request Day.  In the event Lender requests a modification to the proposed terms, including a proposal for a Call Option, Lender shall provide notice of such, and upon Borrower's acceptance of said modified terms, Lender shall commence transmission to Borrower's Digital Currency Address the amount of Digital Currency set forth in the Lending Request on or before Close of Business on the Request Day.

The specific and final terms of a Loan shall be memorialized using the Loan Term Sheet, which shall be delivered and executed after the final terms of a Loan are agreed to and prior to the delivery of the Loaned Assets.  In the event of a conflict of terms between this Master Borrow Agreement and a Loan Term Sheet, the terms in the Loan Term Sheet shall govern.

(c) <u>Loan Repayment Procedure</u>

(i)  <u>Loan Repayment</u>

4

Unless otherwise specified in subsections (ii) and (iii) below, upon the earlier of the Maturity Date, the Recall Delivery Day, or the Redelivery Day (as defined below) for a Loan, Borrower shall repay the entirety of the Loan Balance to Lender by Close of Business. If Lender has not provided to Borrower a Digital Currency Address for receiving the repayment of a Loan by Close of Business on the day prior to the earlier of the Maturity Date, the Recall Delivery Day (defined below), or the Redelivery Day (defined below), then such Loan will become an Open Loan on said Maturity Date or Redelivery Day, whichever applicable, and no additional Loan Fees shall be accrued after the Maturity Date or the Redelivery Day.

(ii)  Call Option

For Loans in which the Lender has a Call Option (e.g. Open Loans, etc.), Lender may during Business Hours (the "Recall Request Day") demand repayment of a portion or the entirety of the Loan Balance (the "Recall Amount"). Lender will notify Borrower of Lender's exercising of this right by email to Borrower Email. Borrower will then have until Close of Business on the seventh Business Day after the Recall Request Day (the "Recall Delivery Day") to deliver the Recall Amount.

In the event of a Call Option where Lender demands only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Recall Delivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date or the subsequent Recall Delivery Day.

(iii)  Prepayment Option

For Loans in which Borrower has a Prepayment Option (e.g. Open Loans, Term Loans with Prepayment Option, etc.), Borrower may notify Lender during Business Hours of Borrower's intent to return the Loan prior to the Maturity Date or the date Lender exercises its Call Option without being subject to, and as a result will not incur, Early Termination Fees as set forth in Section III(d). Borrower shall provide said notice at least one Business Day prior to the date on which the Borrower will repay all or a portion of the Loan Balance (said later date, the "Redelivery Day"). Borrower's exercising of its Prepayment Option shall not relieve it of any of its other obligations herein, including without limitation its payment of owed Loan Fees and Late Fees.

In the event of a Prepayment Option where the Borrower repays only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Redelivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date, the Recall Delivery Day, or a subsequent Redelivery Day.

(d)  Termination of Loan

A Loan will terminate upon the earlier of:

(i)      the Maturity Date;

(ii)     the repayment of the Loan Balance by Borrower prior to the Maturity Date;

5

(iii)     the occurrence of an Event of Default as defined in Section VII; however, Lender shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan. In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

(iv)     in the event any or all of the Loaned Assets becomes in Borrower's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization, arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Borrower's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and Termination of this Agreement except as specified in Section XXIII.

In the event of a termination of a Loan, any Loaned Assets or Collateral shall be redelivered immediately and any fees or owed shall be payable immediately to the appropriate party specified herein.

(e)   Redelivery in an Illiquid Market

If (i) the seven-day average daily trading volume across each of the three highest-volume digital currency exchanges that report prices for the applicable Digital Currency (as measured by the 30-day average daily trading volume of the applicable Digital Currency on the Loan Date) (these such exchanges, the "Liquidity Exchanges") has decreased by 90% from the date of the Loan Term Sheet to the Maturity Date, Recall Delivery Day, or Redelivery Day, whichever applicable, or (ii) the Loaned Assets ceases to be listed on any of the Liquidity Exchanges (the duration of either event herein designated, the "Illiquid Period"), Borrower may repay the Loan in U.S. Dollars equal to the volume-weighted average price of the Loaned Assets on the Liquidity Exchanges (measured at 4:00 p.m. New York time ) during the Illiquid Period, up to a maximum of 30 days (the "Illiquid Market Spot Rate").

If two of the three Liquidity Exchanges limit or suspend withdrawals or transactions in the Loaned Assets on the Maturity Date, the Recall Delivery Day, or the Redelivery Day, whichever applicable, the requirement for Borrower to return the Loaned Assets shall be temporarily suspended, without penalty or default, including without limitation the incurring of additional Loan Fees, until such time that at least two of the Liquidity Exchanges allow the resumption of withdrawals of and transactions in the Loaned Assets.

## III.    **Loan Fees and Transaction Fees.**

(a)   Loan Fee

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as agreed

Confidential - Filed Under Seal

to herein and annualized in the relevant Loan Term Sheet and subject to change if thereafter agreed by Borrower and Lender. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from, but excluding, the date on which the Loaned Digital Currencies or Loaned U.S. Dollars are transferred to Borrower until, and including, the date on which such Loaned Digital Currencies or Loaned U.S. Dollars are repaid in their entirety to Lender.

Lender shall calculate any Loan Fees owed on a daily basis and provide Borrower with the calculation upon request. The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

   (b) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with Section III(c), Borrower shall incur an additional fee (the "Late Fee") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

   (c) Payment of Loan Fees and Late Fees

Unless otherwise agreed, any Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) five (5) Business Days after receipt of an invoice from Lender or (ii) the termination of all Loans hereunder (the "Payment Due Date"). An invoice for Loan Fees and any Late Fees (the "Invoice Amount") shall be sent out on the first Business Day of the month and shall include any Loan Fees, Late Fees, and Early Termination Fees incurred and outstanding during the previous month and periods. Borrower shall have up to five Business Days from the date of said Invoice to pay the Invoice Amount. Failure of Lender to timely send an invoice in accordance with the preceding sentence shall not be considered a material default under Section VII(d) nor shall it relieve Borrower of its obligation to pay any Loan Fees, Late Fees, and Early Termination Fees owed herein nor negate any Event of Default resulting from Borrower's failure to timely pay such fees. The Loan Fee, Late Fees, and Early Termination Fees shall be payable, unless otherwise agreed by the Borrower and Lender in the Loan Term Sheet, in the same Loaned Assets that were borrowed, whether U.S. Dollars or Digital Currency on the same blockchain and of the same type that was loaned by the Lender during the Loan.

   (d) Early Termination Fees

For Fixed Term Loans and Term Loans with Call Options, if Borrower returns the Loaned Assets prior to the Maturity Date, Borrower shall pay to Lender a fee equal to twenty percent (20%) of the Loan Fee that would have accrued from the date of the repayment until the Maturity Date of the Loan (the "Early Termination Fee"). The Early Termination Fee is due with the repayment of the Loaned Assets. The Early Termination Fee shall not apply if Borrower returns the Loaned Assets to Lender in the event of a Hard Fork (as defined in Section V) or if Lender moves up the Maturity Date to an earlier date by exercising a Call Option.

Confidential - Filed Under Seal

(e) <u>Taxes and Fees</u>

Borrower shall report to the Internal Revenue Service ("<u>IRS</u>") all Loan Fees paid to Lender under this Agreement, and shall provide applicable IRS form annually documenting the amount reported to the IRS.  For any Loan Fees paid in Digital Currency, such Loan Fees shall be calculated at the Coinbase Pro spot rate at 4 p.m. New York time daily on any day that Loan Fees accrue.  Neither Borrower nor Lender shall have any liability to the other party for any taxes due under this Agreement.

## IV.    <u>Collateral Requirements</u>

(a) <u>Collateral</u>

If agreed in a Loan Term Sheet, Borrower shall provide as collateral an amount of U.S. Dollars, or Digital Currency as set forth below, or to be determined and agreed upon by the Borrower and Lender ("<u>Collateral</u>") and memorialized using the Loan Term Sheet.  The Collateral will be calculated as a percentage of the value of the Loaned Assets, such value determined by a spot rate agreed upon in the Loan Term Sheet.  Borrower shall, prior to or concurrently with the transfer of the Loaned Assets to Borrower, but in no case later than the Close of Business on the day of such transfer, transfer to Lender the agreed upon Collateral.

Collateral shall always be valued in U.S. Dollars, but Borrower may, if mutually agreed by both parties, provide the Collateral (in whole or in part) to Lender in Digital Currency in an amount equal to the value of the Collateral in U.S. Dollars at a spot rate determined by Borrower.  For the avoidance of doubt, upon the repayment of the Loaned Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited, net of any Additional Collateral, Margin Call, or Refunded Collateral adjustments (as defined below in Sections IV(c) & (e)).  If a Hard Fork in the blockchain of Digital Currency meeting the criteria in Section V occurs while Lender is holding such Digital Currency as Collateral, Lender shall return the New Tokens (as defined in Section V) to Borrower in addition to the Collateral and Additional Collateral.  If a Hard Fork occurs that does not meet the criteria in Section V, Lender shall have no obligation to return any New Tokens to Borrower.

The Collateral transferred by Borrower to Lender, as adjusted herein, shall be security for Borrower's obligations in respect of such Loan.  Borrower hereby pledges with, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the Loaned Assets by Lender to Borrower and which shall cease upon the return of the Loaned Assets by Borrower to Lender.

(b) <u>Loan and Collateral Transfer</u>

If Lender transfers Loaned Assets to Borrower and Borrower does not transfer Collateral to Lender as provided in Section IV(a), Lender shall have the absolute right to the return of the Loaned Assets; and if Borrower transfers Collateral to Lender, as provided in Section IV(a), and Lender does not transfer the Loaned Assets to Borrower, Borrower shall have the absolute right to the return of the Collateral.

8

(c) <u>Margin Calls</u>

If during the Term of a Loan the value of the Loaned Assets increases, or the value of the Collateral decreases, so that the value of the Loaned Assets becomes equal to or greater than the value of the Collateral (the "<u>Margin Call Limit</u>"), Lender shall have the right to require Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "<u>Additional Collateral</u>") as measured by the spot rate published on Coinbase Pro (such rate, the "<u>Margin Call Spot Rate</u>").

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "<u>First Notification</u>") to the Borrower at the email address indicated in Section XIII (or such other address as the parties shall agree to in writing) that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Margin Call Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate.  Borrower shall have twenty-four (24) hours from the time Lender sends such First Notification to (x) respond and send payment to Lender in accordance with subsection (d) below, or (y) respond that the value of the Loaned Assets, value of the Collateral, or spot rate as indicated on Coinbase Pro as applicable, has decreased sufficiently such that it is no longer at or above the Margin Call Spot Rate.  If Lender agrees by email that Borrower's response according to (y) above is correct, then no other action is required by Borrower.

If Borrower fails to respond to the First Notification within twenty-four (24) hours, or Lender rejects Borrower's response pursuant to (y) above and the spot rate of the Loaned Assets is still at least at the Margin Call Spot Rate, Lender shall send a second email notification (the "<u>Second Notification</u>") repeating the information in provisions (i) – (iv) in the preceding paragraph. Borrower shall have twelve (12) hours from the time Lender sends the Second Notification to respond according to (x) or (y) in the preceding, and Lender has the right to accept or reject Borrower's response as stated above.  Upon Lender's rejection of Borrower's response to the Second Notification, Borrower shall make immediate payment of Additional Collateral as set forth in Section IV(d) below.  Failure to provide Additional Collateral, or failure by Borrower to respond to either the First Notification or the Second Notification, shall give Lender the option to declare an Event of Default under Section VII below.

Borrower acknowledges that its obligations hereunder, including those in this Section IV, continue regardless of Lender's request for Additional Collateral and Borrower's acceptance or rejection of the same.

(d) <u>Payment of Additional Collateral</u>

Payment of the Additional Collateral shall be made by bank wire to the account, or if applicable the Digital Currency Address, specified in the Loan Term Sheet or by a return of the amount of Loaned Assets necessary to make the Collateral percentage indicated in the Loan Term Sheet correct based on the Margin Call Spot Rate.  For any return of Loaned Assets made in accordance with this Section, Borrower is still responsible for payment of any Early Termination Fees that apply to the particular Loan.

Confidential - Filed Under Seal

(e) Refund of Collateral

If during the Term of a Loan the value of the Loaned Assets decreases, or the value of the Collateral increases, so that the value of the Collateral relative to the value of the Loaned Assets becomes equal to or greater than the percentage indicated in the Loan Term Sheet (the "Collateral Refund Limit"), Borrower shall have the right to require Lender to return an amount of Collateral so that the Collateral is at no greater than the percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "Refunded Collateral") as measured by the spot rate published on Coinbase Pro (such rate, the "Collateral Refund Spot Rate").

If Borrower requires Lender to repay Refunded Collateral, it shall send an email notification (the "First Refund Notification") to the Lender at the Lender Email that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Collateral Refund Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate. Lender shall have twenty-four (24) hours from the time Borrower sends such First Refund Notification to (x) respond and send payment to Borrower in accordance with subsection (f) below, or (y) respond that the value of the Loaned Assets as a percentage of the value of the Collateral has increased sufficiently such that it is no longer at or below the Collateral Refund Spot Rate. If Borrower agrees by email that Lender's response according to (y) above is correct then no other action is required by Lender.

If Lender fails to respond to the First Refund Notification within twenty-four (24) hours, and the value of the Loaned Assets is still at or below the Collateral Refund Spot Rate, Borrower shall send a second email notification (the "Second Refund Notification") repeating the information in (i) – (iv) in the preceding paragraph. Lender shall have twelve (12) hours from the time Borrower sends the Second Refund Notification to respond according to (x) or (y) in the preceding paragraph. Failure by Lender to respond to either the First Refund Notification or the Second Refund Notification shall give Borrower the option to declare an Event of Default under Section VII below.

(f) Payment of Refunded Collateral

Payment of the Refunded Collateral shall be made by bank wire to the account specified by the Borrower or to a Digital Currency Address specified by the Borrower, as applicable.

(g) Return of Collateral

Upon Borrower's repayment of the Loan and acceptance by Lender of the Loaned Assets into Lender's Digital Currency Address, with such delivery being confirmed on the relevant Digital Currency blockchain ten times, Lender shall initiate the return of Collateral within two Business Days to a bank account designated by Borrower or, where Digital Currency is Collateral, into an applicable Digital Currency Address on the behalf of Borrower.

Confidential - Filed Under Seal

## V.    **Hard Fork**

### (a) Notification

In the event of a public announcement of a future Hard Fork or an Airdrop in the blockchain for any Loaned Assets, Lender shall provide email notification to Borrower.

### (b) No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated. Borrower and Lender may agree, regardless of Loan type, either (i) to terminate a Loan without any penalties on an agreed upon date or (ii) for Lender to manage the Hard Fork on the behalf of Borrower. Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Currency to Lender and Lender transfers said Digital Currency back to Borrower pursuant to this section.

### (c) Lender's Right to New Tokens

Lender will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Currency protocol or an Applicable Airdrop (the "New Tokens") if following two conditions are met:

- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).

For the above calculations, the source for the relevant data on the market capitalization, and 24-Hour Trading Volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source).

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Lender. If sending the New Tokens to Lender is burdensome, upon Lender's written agreement with Borrower, Borrower can reimburse Lender for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount of the New Tokens owed using the spot rate agreed upon by the Parties at the time of said repayment, or (ii) returning the borrowed Digital Currency so that Lender can manage the split of the underlying digital tokens as described in Section V(b) above. Alternatively, subject to Lender's written agreement, the

11

parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender.  In all cases, Borrower will be solely responsible for payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender, including but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment.  For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this Section V shall continue for any New Tokens that meet the criteria in this subsection (c) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement.

## VI.    **Representations and Warranties.**

The parties to this Agreement (individually, a "Party," collectively the "Parties") hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each Party represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution, delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Currency, Collateral, or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws

(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place

12

of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h) Lender represents and warrants that it has, or will have at the time of the loan of any Digital Currency, the right to lend such Loaned Assets subject to the terms and conditions hereof, and free and clear of all liens and encumbrances other than those arising under this Agreement.

(i) Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof.

(j) Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest in said Collateral subject to the terms and conditions hereof.

## VII.    Default

It is further understood that any of the following events shall constitute an event of default hereunder against the defaulting Party, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to return any and all Loaned Assets upon termination of any Loan however, Borrower shall have ten Business Days to cure such default;

(b) the failure of Borrower to pay any and all Loan Fees, Late Fees, or to remit any New Tokens, however, Borrower shall have ten Business Days to cure such default;

(c) the failure of either Party to transfer Collateral or Additional Collateral, including any Refunded Collateral, as required by Section IV, however, a Party shall have ten Business Days to cure such default;

(d) a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;

(e) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not dismissed within thirty (30) days of the initiation of said proceedings; or

(f) any representation or warranty made by either Party in any of the Loan Documents that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

13

Confidential - Filed Under Seal

## VIII.  Remedies

(a) Upon the occurrence and during the continuation of any Event of Default on a Loan by Borrower, the Lender may, at its option:  (1) declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable; (2) transfer any Collateral for a Loan from the collateral account to Lender's operating account necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by the Loan; and/or (3) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity.  If any Event of Default by Borrower under Sections VII(a), (b), (c), or (d) persist for thirty days or more, or immediately upon an Event of Default by Borrower under Sections VII(e) or (f), the Lender may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Borrower.

(b) Upon the occurrence and during the continuation of any Event of Default on a Loan by Lender, the Borrower may, at its option:  (1) demand a return of any and all Collateral in the control or possession of Lender or its agents; (2) withhold repayment of the Loaned Assets and any outstanding Loan Fees, Late Fees or other amounts claimed by Lender; and/or (3) exercise all other rights and remedies available to the Borrower hereunder, under applicable law, or in equity.  If any Event of Default by Lender under Sections VII (c) or (d) persist for thirty (30) days or more, or immediately upon an Event of Default by Lender under Sections VII (e) or (f), the Borrower may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Lender.

(c) In addition to its rights hereunder, the non-defaulting Party shall have any rights otherwise available to it under any other agreement or applicable law; however, the non-defaulting Party shall have an obligation to mitigate its damages in a commercially reasonable manner.

## IX.    Rights and Remedies Cumulative.

No delay or omission by a Party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each Party stated herein are cumulative and in addition to all other rights provided by law, in equity.

## X.    Survival of Rights and Remedies

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets or Collateral, and termination of this Agreement.

## XI.    Governing Law; Dispute Resolution.

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules.  If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration

Confidential - Filed Under Seal

Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The parties agree to waive their rights to a jury trial. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

## XII.   **Confidentiality.**

(a) Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information"). Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XII, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii) available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b) Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XII.

(c) Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

(d) The provisions of this Section XII will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; provided that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure. Notwithstanding the foregoing, either Party may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e) The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement. Notwithstanding anything in this agreement to the contrary, a Party may retain copies of Confidential Information (the "Retained

Confidential - Filed Under Seal

Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XII; provided, however, that such Party agrees that any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and  the confidentiality obligations of this Section XII shall survive with respect to the Retained Confidential Information for so long as such information is retained.

### XIII.  Notices.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth in the recitals.

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

### XIV.  Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

### XV.  Single Agreement

Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other.  Accordingly, Borrower and Lender hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.  In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other.

### XVI.  Entire Agreement.

This Agreement, each exhibit referenced herein, and all Loan Term Sheets constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.  Nothing in this Section XVI shall be construed to conflict with or negate Section XV above.

### XVII.  Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that Lender may not assign this Agreement or any rights or duties hereunder without the prior written consent of the Borrower (such consent to not be unreasonably

Confidential - Filed Under Seal

withheld).  Borrower may assign this Agreement or any rights or duties hereunder upon notice to Lender.  Notwithstanding the foregoing, in the event of a change of control of Lender or Borrower, prior written consent shall not be required so such Party provides the other Party with written notice prior to the consummation of such change of control.  For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party.  Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, or Loan Term Sheet hereunder, shall create any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns.  For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc.  The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

### XVIII. Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

### XIX.    Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.

### XX.     Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

### XXI.    No Waiver.

The failure of or delay by either Party to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent such Party from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either

Confidential - Filed Under Seal

Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

## XXII.  Indemnification.

Lender shall indemnify and hold harmless Genesis, or any of its parents or affiliates, from and against any and all third party claims, demands, losses, expenses and liabilities of any and every nature (including attorneys' fees of an attorney of Genesis' choosing to defend against any such claims, demands, losses, expenses and liabilities) that Genesis may sustain or incur or that may be asserted against it arising out of Genesis' borrowing Digital Currency from Lender under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to Genesis' bad faith, gross negligence or willful misconduct in the performance of its duties under this Agreement.

## XXIII. Term and Termination.

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either Party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period. The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VIII or upon 30 days' notice by either Party to the other.

In the event of a termination of this Agreement, any Loaned Assets or Collateral shall be redelivered immediately and any fees owed shall be payable immediately.

## XXIV.  Miscellaneous.

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate.  This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.  The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement.  The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

*[Signature page follows.]*

18

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

LENDER:

███████████████

████████████████████

By: _____ _

Name: ███████████████

Title:  N/A

BORROWER:

GENESIS GLOBAL CAPITAL, LLC

By: _____

Name:  Andrew Sullivan

Title:  General Counsel, Lending

Confidential - Filed Under Seal

**EXHIBIT A**

Authorized Agents.  The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section II hereof:

Name: Lending
Email: lend@genesiscap.co

Name: Risk
Email: Risk@genesiscap.co

Borrower may change its Authorized Agents by notice given to Lender as provided in accordance with Section XIII.  Such notice shall not be considered to be a modification of or amendment to this Agreement for purposes of Section XIV.

Confidential - Filed Under Seal

## EXHIBIT B

## LOAN TERM SHEET

This loan agreement dated [DATE OF TERM SHEET] between Genesis Global Capital, LLC ("Genesis") and [COMPANY NAME] ("Lender") incorporates all of the terms of the Master Borrow Agreement between Genesis and Borrower on [DATE OF MASTER AGREEMENT] and the following specific terms:

Borrower:                          Genesis Global Capital, LLC

Lender:                            [COMPANY NAME]

Borrowed Asset:

Amount of Currency:

Borrow Fee:

Loan Type:                         [Open Loan]
                                   [Fixed Term Loan]
                                   [Term Loan With Prepayment Option]

Maturity Date:


GENESIS GLOBAL CAPITAL, LLC            [COMPANY NAME]


By: _____          By: _____
Name:                              Name:
Title:                             Title:

21

# EXHIBIT B

# LOAN TERM SHEET

The following loan agreement dated October 3rd, 2022 incorporates all of the terms of
the Master Borrow Agreement entered into by Genesis Global Capital, LLC
("Genesis") and ████████████████████████████ on [mbaDate] and the
following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ████████ |
| Borrowed Asset: | BTC |
| Amount of Borrowed Asset: | 46.4356839 BTC |
| Borrow Fee: | 5.00% annual |
| Loan Type: | Fixed Term |
| Maturity Date: | April 3rd, 2023 |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |
| BTC Deposit Address: | ████████████████████ |

Genesis Global Capital, LLC    ████████████

By: _____     By: _____ ████████████
Name:    Alain Passini           Name: ████████████
Title:   Senior Associate Credit Risk    Title:    Principal

Confidential - Filed Under Seal

DocuSign Envelope ID: 4955C05B-AF7E-4497-BAA4-19B249572D9D

# EXHIBIT B

# LOAN TERM SHEET

The following loan agreement dated August 26th, 2021 incorporates all of the terms of the Master Digital Currency Borrow Agreement entered into by Genesis Global Capital, LLC ("Genesis") and ████████████████████████████████ on August 25th, 2021 and the following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ██████████████ |
| Borrowed Asset: | BTC |
| Amount of Borrowed Asset: | 100 BTC |
| Borrow Fee: | 1.50% annual |
| Loan Type: | Open Term |
| Maturity Date: | N/A |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |
| Genesis BTC Address: | |

Genesis Global Capital, LLC        ██████████████

By: _Kristopher Johnson_          By: _____
  E5D870D05A1C4B3...
Name: Kristopher Johnson           Name: ██████████████
Title: Head of Risk               Title:    Individual

Confidential - Filed Under Seal

# EXHIBIT B

# LOAN TERM SHEET

The following loan agreement dated August 10th, 2022 incorporates all of the terms of the Master Borrow Agreement entered into by Genesis Global Capital, LLC ("Genesis") and ███████████████████████████████ on August 24th, 2021 and the following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ██████████████ |
| Borrowed Asset: | BTC |
| Amount of Borrowed Asset: | 101.40201928 BTC |
| Borrow Fee: | 4.25% annual |
| Loan Type: | Fixed Term |
| Maturity Date: | February 10th, 2023 |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |
| Genesis BTC Address: | ██████████████████ |

Genesis Global Capital, LLC        ██████████████████

By: _____        By: _____
Name: Adim Offurum        Name: ██████████████
Title: Vice President        Title: Individual

Confidential - Filed Under Seal

DocuSign Envelope ID: 8C6B53A3-8867-41AA-BCC1-441F45250203

## MASTER BORROW AGREEMENT

This Master Borrow Agreement ("Agreement") is made on this ___August 24, 2021___
("Effective Date") by and between

Genesis Global Capital, LLC ("Genesis" or "Borrower"), a limited liability company organized and existing under the laws of Delaware with its principal place of business at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310 and

Name: ████████████████████_____("Lender")

Formation: ___Not Applicable_____

Formation Location (country or US state): ___Not Applicable_____

Address: _████████████████████_____

## RECITALS

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend U.S. Dollars or Digital Currency to Borrower, and Borrower will pay a Loan Fee and return such U.S Dollars or Digital Currency to Lender upon the termination of the Loan; and

**WHEREAS**, Borrower intends to use any Loaned Assets under this Agreement in its Digital Currency lending business;

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, the Borrower and the Lender hereby agree as follows:

### I.   Definitions

"*Airdrop*" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "*Applicable Airdrop*" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time. A "*Non-Applicable Airdrop*" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Currency, or a distribution that depends on a wallet of the relevant Digital Currency meeting a threshold requirement.

"*Authorized Agent*" has the meaning set forth in Exhibit A.

"*Borrower*" means Genesis Global Capital, LLC.

Confidential - Filed Under Seal

"*Borrower Email*" means lend@genesiscap.co.

"*Business Day*" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

"*Business Hours*" means between the hours of 9:00 am to 5:00 pm New York time on a Business Day.

"*Call Option*" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement and in particular Section II(c)(ii).

"*Close of Business*" means 5:00 pm New York time.

"*Collateral*" is defined as set forth in Section IV(a)

"*Digital Currency*" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), or any digital currency that the Borrower and Lender agree upon.

"*Digital Currency Address*" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Currency.

"*Early Termination Fee*" means any charge or fee agreed to be paid by the Borrower and Lender in the Loan Term Sheet when the Agreement is terminated prior to the Termination Date.

"*Fixed Term Loan*" means a Loan with a pre-determined Maturity Date, where Borrower does not have a Prepayment Option and Lender does not have a Call Option.

"*Hard Fork*" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"*Lender*" means _____ .

"*Lender Email*" means _____ .

"*Loan*" means a request for a loan or an actual loan of Digital Currency or U.S. Dollars made pursuant to and in accordance with this Agreement and a Loan Term Sheet.

"*Loan Balance*" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees, Late Fees, and any Earlier Termination Fee for a particular Loan.

"*Loan Documents*" means this Master Borrow Agreement and any and all Loan Term Sheets entered into between Lender and Borrower.

"*Loan Effective Date*" means the date upon which a Loan begins.

Confidential - Filed Under Seal

"*Loan Fee*" means the fee paid by Borrower to the Lender for the Loan.

"*Loan Term Sheet*" means the agreement between Lender and Borrower on the particular terms of an individual Loan, which shall be memorialized in an agreement as set forth in Exhibit B or in a form approved by Lender comparable therewith.

"*Loaned Assets*" means any Digital Currency or U.S. Dollar amount transferred in a Loan hereunder until such Digital Currency (or identical Digital Currency) or U.S. Dollar amount is transferred back to Lender hereunder, except that, if any new or different Digital Currency is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Currency shall be deemed to become Loaned Assets in addition to the former Digital Currency for which such exchange is made. For purposes of return of Loaned Assets by Borrower, such term shall include Digital Currency of the same quantity and type as the Digital Currency, as adjusted pursuant to the preceding sentence.

"*Maturity Date*" means the pre-determined future date upon which a Loan becomes due in full, whether by Term or Call Option.

"*New Token Fee*" means payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender including, but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment.

"*Open Loan*" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"*Prepayment Option*" means the Borrower has the option to repay or return the Loaned Assets prior to the Maturity Date without incurring Early Termination Fees, subject to this Agreement and in particular Section II(c)(iii).

"*Term*" means the period from the Loan Effective Date through Termination Date.

"*Term Loan with Call Option*" means a Loan with a pre-determined Maturity Date where Lender has a Call Option.

"*Term Loan with Prepayment Option*" means a Loan with a pre-determined Maturity Date where Borrower has a Prepayment Option.

"*Termination Date*" means the date upon which a Loan is terminated.

## II.    <u>General Loan Terms.</u>

(a) <u>Loans of Digital Currency or </u>U.S. Dollars

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request from the Lender a Loan to Borrower of a specified amount of Digital Currency or U.S. Dollars, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan on terms acceptable to Lender and as set forth in a corresponding Loan Term Sheet.

    (b) <u>Loan Procedure</u>

From time to time during the Term of this Agreement, during the hours of 9:00 am New York time to 4:00 pm New York time on a Business Day (the "<u>Request Day</u>"), by email directed to Lender Email (or such other address as Lender may specify in writing), an Authorized Agent of Borrower may request from Lender a Loan of a specific amount of Digital Currency or U.S. Dollars (a "<u>Lending Request</u>").  Provided Lender receives such Lending Request prior to 3:00 pm New York time, Lender shall by email directed to Borrower Email (or such other address as Borrower may specify in writing) to inform Borrower whether Lender agrees to make such a Loan.  If Lender fails to provide Borrower with an acceptance as to a particular Lending Request prior to Close of Business on the Request Day, such Lending Request shall be deemed to have been denied by Lender.

As part of its Lending Request, Borrower shall provide the following proposed terms:

      (i)      Whether U.S. Dollars or Digital Currency, and if Digital Currency, the type of Digital Currency;

      (ii)     the amount of Digital Currency or U.S. Dollars;

      (iii)    whether the Loan is to be a Fixed Term Loan, a Term Loan with Prepayment Option, or an Open Loan;

      (iv)    the Loan Effective Date; and

      (v)     the Maturity Date (if a Fixed Term Loan or a Term Loan with Prepayment Option).

If Lender agrees to make a Loan in accordance with Borrower's proposed terms, Lender shall commence transmission to either (x) the Borrower's Digital Currency Address the amount of Digital Currency, or (y) Borrower's bank account by bank wire the amount of U.S. Dollars, as applicable, as such Digital Currency Address or bank wire instruction is set forth in the Lending Request on or before Close of Business on the Request Day.  In the event Lender requests a modification to the proposed terms, including a proposal for a Call Option, Lender shall provide notice of such, and upon Borrower's acceptance of said modified terms, Lender shall commence transmission to Borrower's Digital Currency Address the amount of Digital Currency set forth in the Lending Request on or before Close of Business on the Request Day.

The specific and final terms of a Loan shall be memorialized using the Loan Term Sheet, which shall be delivered and executed after the final terms of a Loan are agreed to and prior to the delivery of the Loaned Assets.  In the event of a conflict of terms between this Master Borrow Agreement and a Loan Term Sheet, the terms in the Loan Term Sheet shall govern.

    (c) <u>Loan Repayment Procedure</u>

      (i) <u>Loan Repayment</u>

Unless otherwise specified in subsections (ii) and (iii) below, upon the earlier of the Maturity Date, the Recall Delivery Day, or the Redelivery Day (as defined below) for a Loan, Borrower shall repay the entirety of the Loan Balance to Lender by Close of Business.  If Lender has not provided to Borrower a Digital Currency Address for receiving the repayment of a Loan by Close of Business on the day prior to the earlier of the Maturity Date, the Recall Delivery Day (defined below), or the Redelivery Day (defined below), then such Loan will become an Open Loan on said Maturity Date or Redelivery Day, whichever applicable, and no additional Loan Fees shall be accrued after the Maturity Date or the Redelivery Day.

(ii) <u>Call Option</u>

For Loans in which the Lender has a Call Option (e.g. Open Loans, etc.), Lender may during Business Hours (the "<u>Recall Request Day</u>") demand repayment of a portion or the entirety of the Loan Balance (the "<u>Recall Amount</u>").  Lender will notify Borrower of Lender's exercising of this right by email to Borrower Email.  Borrower will then have until Close of Business on the seventh Business Day after the Recall Request Day (the "<u>Recall Delivery Day</u>") to deliver the Recall Amount.

In the event of a Call Option where Lender demands only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Recall Delivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date or the subsequent Recall Delivery Day.

(iii) <u>Prepayment Option</u>

For Loans in which Borrower has a Prepayment Option (e.g. Open Loans, Term Loans with Prepayment Option, etc.), Borrower may notify Lender during Business Hours of Borrower's intent to return the Loan prior to the Maturity Date or the date Lender exercises its Call Option without being subject to, and as a result will not incur, Early Termination Fees as set forth in Section III(d).  Borrower shall provide said notice at least one Business Day prior to the date on which the Borrower will repay all or a portion of the Loan Balance (said later date, the "Redelivery Day").  Borrower's exercising of its Prepayment Option shall not relieve it of any of its other obligations herein, including without limitation its payment of owed Loan Fees and Late Fees.

In the event of a Prepayment Option where the Borrower repays only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Redelivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date, the Recall Delivery Day, or a subsequent Redelivery Day.

(d) <u>Termination of Loan</u>

A Loan will terminate upon the earlier of:

(i)    the Maturity Date;

(ii)    the repayment of the Loan Balance by Borrower prior to the Maturity Date;

(iii)    the occurrence of an Event of Default as defined in Section VII; however, Lender shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan.  In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

(iv)    in the event any or all of the Loaned Assets becomes in Borrower's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization, arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Borrower's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and termination of this Agreement except as specified in Section XXIII.

In the event of a termination of a Loan, any Loaned Assets or Collateral shall be redelivered immediately and any fees or owed shall be payable immediately to the appropriate party specified herein.

(e)  Redelivery in an Illiquid Market

If (i) the seven-day average daily trading volume across each of the three highest-volume digital currency exchanges that report prices for the applicable Digital Currency (as measured by the 30-day average daily trading volume of the applicable Digital Currency on the Loan Date) (these such exchanges, the "Liquidity Exchanges") has decreased by 90% from the date of the Loan Term Sheet to the Maturity Date, Recall Delivery Day, or Redelivery Day, whichever applicable, or (ii) the Loaned Assets ceases to be listed on any of the Liquidity Exchanges (the duration of either event herein designated, the "Illiquid Period"), Borrower may repay the Loan in U.S. Dollars equal to the volume-weighted average price of the Loaned Assets on the Liquidity Exchanges (measured at 4:00 p.m. New York time ) during the Illiquid Period, up to a maximum of 30 days (the "Illiquid Market Spot Rate").

If two of the three Liquidity Exchanges limit or suspend withdrawals or transactions in the Loaned Assets on the Maturity Date, the Recall Delivery Day, or the Redelivery Day, whichever applicable, the requirement for Borrower to return the Loaned Assets shall be temporarily suspended, without penalty or default, including without limitation the incurring of additional Loan Fees, until such time that at least two of the Liquidity Exchanges allow the resumption of withdrawals of and transactions in the Loaned Assets.

## III.    Loan Fees and Transaction Fees.

(a)  Loan Fee

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as agreed

Confidential - Filed Under Seal

to herein and annualized in the relevant Loan Term Sheet and subject to change if thereafter agreed by Borrower and Lender. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from, but excluding, the date on which the Loaned Digital Currencies or Loaned U.S. Dollars are transferred to Borrower until, and including, the date on which such Loaned Digital Currencies or Loaned U.S. Dollars are repaid in their entirety to Lender.

Lender shall calculate any Loan Fees owed on a daily basis and provide Borrower with the calculation upon request. The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

(b) <u>Late Fee</u>

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with Section III(c), Borrower shall incur an additional fee (the "<u>Late Fee</u>") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

(c) <u>Payment of Loan Fees and Late Fees</u>

Unless otherwise agreed, any Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) five (5) Business Days after receipt of an invoice from Lender or (ii) the termination of all Loans hereunder (the "<u>Payment Due Date</u>"). An invoice for Loan Fees and any Late Fees (the "<u>Invoice Amount</u>") shall be sent out on the first Business Day of the month and shall include any Loan Fees, Late Fees, and Early Termination Fees incurred and outstanding during the previous month and periods. Borrower shall have up to five Business Days from the date of said Invoice to pay the Invoice Amount. Failure of Lender to timely send an invoice in accordance with the preceding sentence shall not be considered a material default under Section VIII(d) nor shall it relieve Borrower of its obligation to pay any Loan Fees, Late Fees, and Early Termination Fees owed herein nor negate any Event of Default resulting from Borrower's failure to timely pay such fees. The Loan Fee, Late Fees, and Early Termination Fees shall be payable, unless otherwise agreed by the Borrower and Lender in the Loan Term Sheet, in the same Loaned Assets that were borrowed, whether U.S. Dollars or Digital Currency on the same blockchain and of the same type that was loaned by the Lender during the Loan.

(d) <u>Early Termination Fees</u>

For Fixed Term Loans and Term Loans with Call Options, if Borrower returns the Loaned Assets prior to the Maturity Date, Borrower shall pay to Lender a fee equal to twenty percent (20%) of the Loan Fee that would have accrued from the date of the repayment until the Maturity Date of the Loan (the "Early Termination Fee"). The Early Termination Fee is due with the repayment of the Loaned Assets. The Early Termination Fee shall not apply if Borrower returns the Loaned Assets to Lender in the event of a Hard Fork (as defined in Section V) or if Lender moves up the Maturity Date to an earlier date by exercising a Call Option.

Confidential - Filed Under Seal

(e) <u>Taxes and Fees</u>

Borrower shall report to the Internal Revenue Service ("<u>IRS</u>") all Loan Fees paid to Lender under this Agreement, and shall provide applicable IRS form annually documenting the amount reported to the IRS. For any Loan Fees paid in Digital Currency, such Loan Fees shall be calculated at the Coinbase Pro spot rate at 4 p.m. New York time daily on any day that Loan Fees accrue. Neither Borrower nor Lender shall have any liability to the other party for any taxes due under this Agreement.

## IV.    <u>Collateral Requirements</u>

(a) <u>Collateral</u>

If agreed in a Loan Term Sheet, Borrower shall provide as collateral an amount of U.S. Dollars, or Digital Currency as set forth below, or to be determined and agreed upon by the Borrower and Lender ("<u>Collateral</u>") and memorialized using the Loan Term Sheet. The Collateral will be calculated as a percentage of the value of the Loaned Assets, such value determined by a spot rate agreed upon in the Loan Term Sheet. Borrower shall, prior to or concurrently with the transfer of the Loaned Assets to Borrower, but in no case later than the Close of Business on the day of such transfer, transfer to Lender the agreed upon Collateral.

Collateral shall always be valued in U.S. Dollars, but Borrower may, if mutually agreed by both parties, provide the Collateral (in whole or in part) to Lender in Digital Currency in an amount equal to the value of the Collateral in U.S. Dollars at a spot rate determined by Borrower. For the avoidance of doubt, upon the repayment of the Loaned Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited, net of any Additional Collateral, Margin Call, or Refunded Collateral adjustments (as defined below in Sections IV(c) & (e)). If a Hard Fork in the blockchain of Digital Currency meeting the criteria in Section V occurs while Lender is holding such Digital Currency as Collateral, Lender shall return the New Tokens (as defined in Section V) to Borrower in addition to the Collateral and Additional Collateral. If a Hard Fork occurs that does not meet the criteria in Section V, Lender shall have no obligation to return any New Tokens to Borrower.

The Collateral transferred by Borrower to Lender, as adjusted herein, shall be security for Borrower's obligations in respect of such Loan. Borrower hereby pledges with, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the Loaned Assets by Lender to Borrower and which shall cease upon the return of the Loaned Assets by Borrower to Lender.

(b) <u>Loan and Collateral Transfer</u>

If Lender transfers Loaned Assets to Borrower and Borrower does not transfer Collateral to Lender as provided in Section IV(a), Lender shall have the absolute right to the return of the Loaned Assets; and if Borrower transfers Collateral to Lender, as provided in Section IV(a), and Lender does not transfer the Loaned Assets to Borrower, Borrower shall have the absolute right to the return of the Collateral.

(c) <u>Margin Calls</u>

If during the Term of a Loan the value of the Loaned Assets increases, or the value of the Collateral decreases, so that the value of the Loaned Assets becomes equal to or greater than the value of the Collateral (the "<u>Margin Call Limit</u>"), Lender shall have the right to require Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "<u>Additional Collateral</u>") as measured by the spot rate published on Coinbase Pro (such rate, the "<u>Margin Call Spot Rate</u>").

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "<u>First Notification</u>") to the Borrower at the email address indicated in Section XIII (or such other address as the parties shall agree to in writing) that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Margin Call Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate. Borrower shall have twenty-four (24) hours from the time Lender sends such First Notification to (x) respond and send payment to Lender in accordance with subsection (d) below, or (y) respond that the value of the Loaned Assets, value of the Collateral, or spot rate as indicated on Coinbase Pro as applicable, has decreased sufficiently such that it is no longer at or above the Margin Call Spot Rate. If Lender agrees by email that Borrower's response according to (y) above is correct, then no other action is required by Borrower.

If Borrower fails to respond to the First Notification within twenty-four (24) hours, or Lender rejects Borrower's response pursuant to (y) above and the spot rate of the Loaned Assets is still at least at the Margin Call Spot Rate, Lender shall send a second email notification (the "<u>Second Notification</u>") repeating the information in provisions (i) – (iv) in the preceding paragraph. Borrower shall have twelve (12) hours from the time Lender sends the Second Notification to respond according to (x) or (y) in the preceding, and Lender has the right to accept or reject Borrower's response as stated above. Upon Lender's rejection of Borrower's response to the Second Notification, Borrower shall make immediate payment of Additional Collateral as set forth in Section IV(d) below. Failure to provide Additional Collateral, or failure by Borrower to respond to either the First Notification or the Second Notification, shall give Lender the option to declare an Event of Default under Section VII below.

Borrower acknowledges that its obligations hereunder, including those in this Section IV, continue regardless of Lender's request for Additional Collateral and Borrower's acceptance or rejection of the same.

(d) <u>Payment of Additional Collateral</u>

Payment of the Additional Collateral shall be made by bank wire to the account, or if applicable the Digital Currency Address, specified in the Loan Term Sheet or by a return of the amount of Loaned Assets necessary to make the Collateral percentage indicated in the Loan Term Sheet correct based on the Margin Call Spot Rate. For any return of Loaned Assets made in accordance with this Section, Borrower is still responsible for payment of any Early Termination Fees that apply to the particular Loan.

(e) Refund of Collateral

If during the Term of a Loan the value of the Loaned Assets decreases, or the value of the Collateral increases, so that the value of the Collateral relative to the value of the Loaned Assets becomes equal to or greater than the percentage indicated in the Loan Term Sheet (the "Collateral Refund Limit"), Borrower shall have the right to require Lender to return an amount of Collateral so that the Collateral is at no greater than the percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "Refunded Collateral") as measured by the spot rate published on Coinbase Pro (such rate, the "Collateral Refund Spot Rate").

If Borrower requires Lender to repay Refunded Collateral, it shall send an email notification (the "First Refund Notification") to the Lender at the Lender Email that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Collateral Refund Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate. Lender shall have twenty-four (24) hours from the time Borrower sends such First Refund Notification to (x) respond and send payment to Borrower in accordance with subsection (f) below, or (y) respond that the value of the Loaned Assets as a percentage of the value of the Collateral has increased sufficiently such that it is no longer at or below the Collateral Refund Spot Rate. If Borrower agrees by email that Lender's response according to (y) above is correct then no other action is required by Lender.

If Lender fails to respond to the First Refund Notification within twenty-four (24) hours, and the value of the Loaned Assets is still at or below the Collateral Refund Spot Rate, Borrower shall send a second email notification (the "Second Refund Notification") repeating the information in (i) – (iv) in the preceding paragraph. Lender shall have twelve (12) hours from the time Borrower sends the Second Refund Notification to respond according to (x) or (y) in the preceding paragraph. Failure by Lender to respond to either the First Refund Notification or the Second Refund Notification shall give Borrower the option to declare an Event of Default under Section VII below.

(f) Payment of Refunded Collateral

Payment of the Refunded Collateral shall be made by bank wire to the account specified by the Borrower or to a Digital Currency Address specified by the Borrower, as applicable.

(g) Return of Collateral

Upon Borrower's repayment of the Loan and acceptance by Lender of the Loaned Assets into Lender's Digital Currency Address, with such delivery being confirmed on the relevant Digital Currency blockchain ten times, Lender shall initiate the return of Collateral within two Business Days to a bank account designated by Borrower or, where Digital Currency is Collateral, into an applicable Digital Currency Address on the behalf of Borrower.

Confidential - Filed Under Seal

## V.    **Hard Fork**

### (a) Notification

In the event of a public announcement of a future Hard Fork or an Airdrop in the blockchain for any Loaned Assets, Lender shall provide email notification to Borrower.

### (b) No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated. Borrower and Lender may agree, regardless of Loan type, either (i) to terminate a Loan without any penalties on an agreed upon date or (ii) for Lender to manage the Hard Fork on the behalf of Borrower. Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Currency to Lender and Lender transfers said Digital Currency back to Borrower pursuant to this section.

### (c) Lender's Right to New Tokens

Lender will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Currency protocol or an Applicable Airdrop (the "New Tokens") if following two conditions are met:

- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).

For the above calculations, the source for the relevant data on the market capitalization, and 24-Hour Trading Volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source).

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Lender. If sending the New Tokens to Lender is burdensome, upon Lender's written agreement with Borrower, Borrower can reimburse Lender for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount of the New Tokens owed using the spot rate agreed upon by the Parties at the time of said repayment, or (ii) returning the borrowed Digital Currency so that Lender can manage the split of the underlying digital tokens as described in Section IV(b) above. Alternatively, subject to Lender's written agreement, the

Confidential - Filed Under Seal

DocuSign Envelope ID: 866B53A3-8867-41AA-BCC1-441F45250308

parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender.  In all cases, Borrower will be solely responsible for payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender, including but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment.  For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this Section V shall continue for any New Tokens that meet the criteria in this subsection (c) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement.

## VI.    <u>Representations and Warranties.</u>

The parties to this Agreement (individually, a "Party," collectively the "Parties") hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each Party represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution, delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Currency, Collateral, or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws

(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place

of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h) Lender represents and warrants that it has, or will have at the time of the loan of any Digital Currency, the right to lend such Loaned Assets subject to the terms and conditions hereof, and free and clear of all liens and encumbrances other than those arising under this Agreement.

(i) Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof.

(j) Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest in said Collateral subject to the terms and conditions hereof.

## VII.   **Default**

It is further understood that any of the following events shall constitute an event of default hereunder against the defaulting Party, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to return any and all Loaned Assets upon termination of any Loan however, Borrower shall have ten Business Days to cure such default;

(b) the failure of Borrower to pay any and all Loan Fees, Late Fees, or to remit any New Tokens, however, Borrower shall have ten Business Days to cure such default;

(c) the failure of either Party to transfer Collateral or Additional Collateral, including any Refunded Collateral, as required by Section IV, however, a Party shall have ten Business Days to cure such default;

(d) a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;

(e) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not be dismissed within thirty (30) days of the initiation of said proceedings; or

(f) any representation or warranty made by either Party in any of the Loan Documents that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

## VIII.    Remedies

(a) Upon the occurrence and during the continuation of any Event of Default on a Loan by Borrower, the Lender may, at its option:  (1) declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable; (2) transfer any Collateral for a Loan from the collateral account to Lender's operating account necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by the Loan; and/or (3) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity.  If any Event of Default by Borrower under Sections VII(a), (b), (c), or (d) persist for thirty days or more, or immediately upon an Event of Default by Borrower under Sections VII(e) or (f), the Lender may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Borrower.

(b) Upon the occurrence and during the continuation of any Event of Default on a Loan by Lender, the Borrower may, at its option:  (1) demand a return of any and all Collateral in the control or possession of Lender or its agents; (2) withhold repayment of the Loaned Assets and any outstanding Loan Fees, Late Fees or other amounts claimed by Lender; and/or (3) exercise all other rights and remedies available to the Borrower hereunder, under applicable law, or in equity.  If any Event of Default by Lender under Sections VII (c) or (d) persist for thirty-days or more, or immediately upon an Event of Default by Lender under Sections VII (e) or (f), the Borrower may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Lender.

(c) In addition to its rights hereunder, the non-defaulting Party shall have any rights otherwise available to it under any other agreement or applicable law; however, the non-defaulting Party shall have an obligation to mitigate its damages in a commercially reasonable manner.

## IX.    Rights and Remedies Cumulative.

No delay or omission by a Party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each Party stated herein are cumulative and in addition to all other rights provided by law, in equity.

## X.    Survival of Rights and Remedies

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets or Collateral, and termination of this Agreement.

## XI.    Governing Law; Dispute Resolution.

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules.  If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration

DocuSign Envelope ID: 8C6B53A3-8867-41AA-BCC1-441F45250308

Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The parties agree to waive their rights to a jury trial. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

## XII.    **Confidentiality.**

(a) Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information"). Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XIV, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii) available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b) Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XII.

(c) Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

(d) The provisions of this Section XII will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; provided that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure. Notwithstanding the foregoing, Lender may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e) The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement. Notwithstanding anything in this agreement to the contrary, a Party may retain copies of Confidential Information (the "Retained

Confidential - Filed Under Seal

DocuSign Envelope ID: 866B53A3-8867-41AA-BCC1-441F45250303

Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XII; provided, however, that such Party agrees that any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and the confidentiality obligations of this Section XII shall survive with respect to the Retained Confidential Information for so long as such information is retained.

## XIII.  Notices.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth in the recitals.

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

## XIV.  Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

## XV.  Single Agreement

Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other.  Accordingly, Borrower and Lender hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.  In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other.

## XVI.  Entire Agreement.

This Agreement, each exhibit referenced herein, and all Loan Term Sheets constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.  Nothing in this Section XVI shall be construed to conflict with or negate Section XV above.

## XVII.  Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that Lender may not assign this Agreement or any rights or duties hereunder without the prior written consent of the Borrower (such consent to not be unreasonably

withheld). Borrower may assign this Agreement or any rights or duties hereunder upon notice to Lender. Notwithstanding the foregoing, in the event of a change of control of Lender or Borrower, prior written consent shall not be required so such Party provides the other Party with written notice prior to the consummation of such change of control. For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party. Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, or Loan Term Sheet hereunder, shall create any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns. For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc. The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

## XVIII. <u>Severability of Provisions.</u>

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XIX. <u>Counterpart Execution.</u>

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any Party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XX. <u>Relationship of Parties.</u>

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

## XXI. <u>No Waiver.</u>

The failure of or delay by either Party to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one

Confidential - Filed Under Seal

circumstance will not prevent such Party from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

### XXII. **Indemnification.**

Lender shall indemnify and hold harmless Genesis, or any of its parents or affiliates, from and against any and all third party claims, demands, losses, expenses and liabilities of any and every nature (including attorneys' fees of an attorney of Genesis' choosing to defend against any such claims, demands, losses, expenses and liabilities) that Genesis may sustain or incur or that may be asserted against it arising out of Genesis' borrowing Digital Currency from Lender under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to Genesis' bad faith, gross negligence or willful misconduct in the performance of its duties under this Agreement.

### XXIII. **Term and Termination.**

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either Party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period. The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VIII or upon 30 days' notice by either Party to the other.

In the event of a termination of this Agreement, any Loaned Assets or Collateral shall be redelivered immediately and any fees owed shall be payable immediately.

### XXIV. **Miscellaneous.**

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate. This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement. The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement. The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

*[Signature page follows.]*

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

LENDER:



By █████████████████
Name: ████████████████
Title: Individual

BORROWER:

GENESIS GLOBAL CAPITAL, LLC

By: _Kristopher Johnson_
Name: Kristopher Johnson
Title: Head of Risk

Confidential - Filed Under Seal

DocuSign Envelope ID: 8C6B53A3-8867-41AA-BCC1-141F45250308

**EXHIBIT A**

Authorized Agents.  The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section II hereof:

Name: Lending
Email: lending@genesiscap.co

Name: Risk
Email: Risk@genesiscap.co

Borrower may change its Authorized Agents by notice given to Lender as provided in accordance with Section XV.  Such notice shall not be considered to be a modification of or amendment to this Agreement for purposes of Section XVI.

Confidential - Filed Under Seal

DocuSign Envelope ID: 8C6B53A3-8867-414A-BCC1-141F45250308

## EXHIBIT B

## LOAN TERM SHEET

This loan agreement dated [DATE OF TERM SHEET] between Genesis Global Capital, LLC ("Genesis") and [COMPANY NAME] ("Lender") incorporates all of the terms of the Master Borrow Agreement between Genesis and Borrower on [DATE OF MASTER AGREEMENT] and the following specific terms:

Borrower:                          Genesis Global Capital, LLC

Lender:                            [COMPANY NAME]

Borrowed Asset:

Amount of Currency:

Borrow Fee:

Loan Type:                         [Open Loan]
                                   [Fixed Term Loan]
                                   [Term Loan With Prepayment Option]

Maturity Date:

GENESIS GLOBAL CAPITAL, LLC                [COMPANY NAME]


By: _____          By: _____
Name:                              Name:
Title:                             Title:

Confidential - Filed Under Seal

DocuSign Envelope ID: 8C6B53A3-8867-414A-BCC1-141F45250303

## TRI-PARTY SETTLEMENT AGREEMENT

This Tri-Party Settlement Agreement (the "Agreement") is hereby made and entered into and dated as of August 24, 2021 _____ by and between █████████████████████ _____ ("Counterparty") and each of the entities listed on Schedule A, as defined therein, and as may be amended from time to time by any entity listed on Schedule A (each, a "Genesis Entity" and each Genesis Entity and Counterparty, a "Party" and together the "Parties").

**WHEREAS**, Counterparty has entered into business relationships with one or more Genesis Entity that may include trading digital currency, borrowing or lending digital currency, trading digital currency-based derivatives, or receiving digital currency custodial services; and

**WHEREAS**, in the course of its transactions with Genesis Entities, Counterparty may engage in a transaction with one Genesis Entity followed immediately by a transaction with a different Genesis Entity (the combination of two such transactional components, an "Intercompany Transaction"); and

**WHEREAS**, when engaging in an Intercompany Transaction, to ensure prompt, efficient and secure settlement of the transactional components of the Intercompany Transaction, Counterparty may request that a Genesis Entity settle with another Genesis Entity on Counterparty's behalf (an "Intercompany Settlement");

**NOW THEREFORE**, in consideration for the promises, rights and obligations set forth below, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.   Settlement Instruction

If Counterparty engages in an Intercompany Transaction and wants to request an Intercompany Settlement then the following procedure shall be followed:

   a. Counterparty shall request such Intercompany Settlement in writing to each Genesis Counterparty involved in the Intercompany Transaction, with an email copy to each of legal@genesistrading.com and compliance@genesistrading.com.
   b. Each Genesis Entity involved in the Intercompany Transaction shall have sole discretion whether to agree to an Intercompany Settlement for any Intercompany Transaction.
   c. If all relevant Genesis Entities agree to the Intercompany Settlement for the Intercompany Transaction, one or more of the Genesis Entities shall send an email summary of the settlement to Counterparty, which shall serve as confirmation of the settlement of the Intercompany Transaction.

2.   Independent Transactions

Each of Counterparty and the relevant Genesis Entities represent that any transactional components that make up an Intercompany Transaction are separate and distinct transactions, conducted at arm's length. No

part of any Intercompany Transaction is conditioned on any other part of an Intercompany Transaction. Counterparty represents that it was not induced by any Genesis Entity into entering into any Intercompany Transaction with the promise of a better price on any transaction that makes up a part of the Intercompany Transaction. Counterparty agrees that any claim or dispute with any Genesis Entity relating to any transactional component is with that Genesis Entity only and no other Genesis Entity that may be party to another transactional component of an Intercompany Transaction or party to this Agreement.

3.      Third-Party Delivery

Each of Counterparty and any Genesis Entity consents to the delivery of digital currency or U.S. Dollars by another Genesis Entity on behalf of Counterparty to satisfy certain obligations of Counterparty in an Intercompany Transaction, each as evidenced in and governed by the agreement or terms relevant to a certain transactional component.

4.      Additional Representations and Warranties

Counterparty hereby represents and warrants to each Genesis Entity that as of the date hereof:

  a.  This Agreement has been duly executed and delivered by Counterparty and this Agreement constitutes a valid and legally binding obligation of Counterparty, enforceable against Counterparty in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally.

  b.  Neither the execution and delivery of this Agreement, nor the consummation of an Intercompany Transaction contemplated herein, does or will violate any statute, regulation, rule, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency, or court to which Counterparty is subject or conflict with, violate or constitute a default under any agreement, debt or other instrument to which Counterparty is a party.

  c.  Counterparty agrees, understands and acknowledges that (i) Counterparty is solely responsible for any decision to enter into an Intercompany Transaction subject to this Agreement, including the evaluation of any and all risks related to any such Intercompany Transaction; and (ii) in entering into any such Intercompany Transaction, Counterparty has not relied on any statement or other representation of any Genesis Entity other than as expressly set forth herein.

5.      Confidentiality

Each Party shall hold in confidence all information obtained from the other Party in connection with this Agreement (collectively, "Confidential Information"). Each Party shall keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose such Confidential Information to any person or use such Confidential Information for any purpose other than the transactions contemplated by this Agreement.  The provisions of this Section 3 will not restrict a Party from disclosing the other Party's Confidential Information to  such Party's affiliates, subsidiaries, officers, directors,

Confidential - Filed Under Seal

DocuSign Envelope ID: 866B53A3-8867-41AC-BCC1-141F45250208

employees, contractors, attorneys, accountants, bankers or consultants with a need to know such Confidential Information, and will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law or regulation; *provided* that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure.  Notwithstanding the foregoing, a Party may disclose the other Party's Confidential Information without notice pursuant to a request or other regular routine inspection by a governmental agency or regulatory authority.  The obligations with respect to Confidential Information shall survive for a period of one (1) year from the date of this Agreement.

6.    Governing Law; Dispute Resolution

a.    The laws of the State of New York shall govern this Agreement, without regard to its conflict of law principles.

b.    If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.  If any proceeding is brought for enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

7.    Entire Agreement

This Agreement, together with the Master Agreement, represents the entire Agreement between the Parties relating to the subject matter contained herein and in the event there is any conflict or inconsistency between the terms and conditions of the Master Agreement and those of this Agreement, the terms and conditions of this Agreement shall control and govern the rights and obligations of the Parties.  Further, the provisions of this Agreement and the Master Agreement shall together supersede all prior oral and written commitments, contracts and understandings with respect to the subject matter contained herein. This Agreement may only be amended by mutual written agreement of the authorized representatives of each Party. This Agreement may be signed in one or more counterparts; each counterpart shall be deemed an original and all counterparts together shall constitute one and the same instrument.

**In Witness Whereof**, the Parties have caused this Agreement to be duly executed by their respective authorized representatives as of the day and year above written.

**On behalf of the Genesis Entities listed on Schedule A**



By:    Arianna Pretto-Sakmann

Name:  Arianna Pretto-Sakmann

Title:  General Counsel

By:    _____

Name:  _____

Title:  Individual
       _____

Confidential - Filed Under Seal

## <u>SCHEDULE A</u>

<u>Genesis Entities</u>:
Genesis Global Trading, Inc.
Genesis Global Capital, LLC
GGC International Limited
Genesis Asia Pacific PTE. LTD.
Genesis Custody Limited

Confidential - Filed Under Seal

## MASTER BORROW AGREEMENT

This Master Borrow Agreement ("Agreement") is made on this _____

3/5/2021 | 15:03:33 PST

("Effective Date") by and between

Genesis Global Capital, LLC ("Genesis" or "Borrower"), a limited liability company organized and existing under the laws of Delaware with its principal place of business at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310 and



_____ ("_____" or "Lender") an individual residing at_____ .

## RECITALS

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend U.S. Dollars or Digital Currency to Borrower, and Borrower will pay a Loan Fee and return such U.S Dollars or Digital Currency to Lender upon the termination of the Loan; and

**WHEREAS**, Borrower intends to use any Loaned Assets under this Agreement in its Digital Currency lending business;

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, the Borrower and the Lender hereby agree as follows:

### I.    Definitions

"*Airdrop*" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "*Applicable Airdrop*" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time.  A "*Non-Applicable Airdrop*" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Currency, or a distribution that depends on a wallet of the relevant Digital Currency meeting a threshold requirement.

"*Authorized Agent*" has the meaning set forth in Exhibit A.

"*Borrower*" means Genesis Global Capital, LLC.

"*Borrowed Amount*" refers to the value of the Loaned Assets in U.S. dollars on the Loan Effective Date.

"*Borrower Email*" means lend@genesiscap.co.

1

Confidential - Filed Under Seal

"*Business Day*" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

"*Business Hours*" means between the hours of 9:00 am to 5:00 pm New York time on a Business Day.

"*Call Option*" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement and in particular Section II(c)(ii).

"*Close of Business*" means 5:00 pm New York time.

"*Collateral*" is defined as set forth in Section IV(a)

"*Digital Currency*" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), or any digital currency that the Borrower and Lender agree upon.

"*Digital Currency Address*" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Currency.

"*Fixed Term Loan*" means a Loan with a pre-determined Maturity Date, where Borrower does not have a Prepayment Option and Lender does not have a Call Option.

"*Hard Fork*" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"*Lender*" means █████████████ _____.

"*Lender Email*" means _____ ████████████████ _____.

"*Loan*" means a request for a loan or an actual loan of Digital Currency or U.S. Dollars made pursuant to and in accordance with this Agreement and a Loan Term Sheet.

"*Loan Balance*" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees, Late Fees, and any Earlier Termination Fee for a particular Loan.

"*Loan Documents*" means this Master Borrow Agreement and any and all Loan Term Sheets entered into between Lender and Borrower.

"*Loan Effective Date*" means the date upon which a Loan begins.

"*Loan Fee*" means the fee paid by Borrower to the Lender for the Loan.

2

"*Loan Term Sheet*" means the agreement between Lender and Borrower on the particular terms of an individual Loan, which shall be memorialized in an agreement as set forth in Exhibit B or in a form approved by Lender comparable therewith.

"*Loaned Assets*" means any Digital Currency or U.S. Dollar amount transferred in a Loan hereunder until such Digital Currency (or identical Digital Currency) or U.S. Dollar amount is transferred back to Lender hereunder, except that, if any new or different Digital Currency is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Currency shall be deemed to become Loaned Assets in addition to the former Digital Currency for which such exchange is made.  For purposes of return of Loaned Assets by Borrower, such term shall include Digital Currency of the same quantity and type as the Digital Currency, as adjusted pursuant to the preceding sentence.

"*Maturity Date*" means the pre-determined future date upon which a Loan becomes due in full, whether by Term or Call Option.

"*Open Loan*" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"*Prepayment Option*" means the Borrower has the option to repay or return the Loaned Assets prior to the Maturity Date without incurring Early Termination Fees, subject to this Agreement and in particular Section II(c)(iii).

"*Term*" means the period from the Loan Effective Date through Termination Date.

"*Term Loan with Call Option*" means a Loan with a pre-determined Maturity Date where Lender has a Call Option.

"*Term Loan with Prepayment Option*" means a Loan with a pre-determined Maturity Date where Borrower has a Prepayment Option.

"*Termination Date*" means the date upon which a Loan is terminated.

## II.    **General Loan Terms.**

(a) Loans of Digital Currency or U.S. Dollars

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request from the Lender a Loan to Borrower of a specified amount of Digital Currency or U.S. Dollars, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan on terms acceptable to Lender and as set forth in a corresponding Loan Term Sheet.

Confidential - Filed Under Seal

(b) <u>Loan Procedure</u>

From time to time during the Term of this Agreement, during the hours of 9:00 am New York time to 4:00 pm New York time on a Business Day (the "<u>Request Day</u>"), by email directed to Lender Email (or such other address as Lender may specify in writing), an Authorized Agent of Borrower may request from Lender a Loan of a specific amount of Digital Currency or U.S. Dollars (a "<u>Lending Request</u>").  Provided Lender receives such Lending Request prior to 3:00 pm New York time, Lender shall by email directed to Borrower Email (or such other address as Lender may specify in writing) to inform Borrower whether Lender agrees to make such a Loan. If Lender fails to provide Borrower with an acceptance as to a particular Lending Request prior to Close of Business on the Request Day, such Lending Request shall be deemed to have been denied by Lender.

As part of its Lending Request, Borrower shall provide the following proposed terms:

    (i)      Whether U.S. Dollars or Digital Currency, and if Digital Currency, the type of Digital Currency;

    (ii)     the amount of Digital Currency or U.S. Dollars;

    (iii)    whether the Loan is to be a Fixed Term Loan, a Term Loan with Prepayment Option, or an Open Loan;

    (iv)    the Loan Effective Date; and

    (v)     the Maturity Date (if a Fixed Term Loan or a Term Loan with Prepayment Option).

If Lender agrees to make a Loan in accordance with Borrower's proposed terms, Lender shall commence transmission to either (x) the Borrower's Digital Currency Address the amount of Digital Currency, or (y) Borrower's bank account by bank wire the amount of U.S. Dollars, as applicable, as such Digital Currency Address or bank wire instruction is set forth in the Lending Request on or before Close of Business on the Request Day.  In the event Lender requests a modification to the proposed terms, including a proposal for a Call Option, Lender shall provide notice of such, and upon Borrower's acceptance of said modified terms, Lender shall commence transmission to Borrower's Digital Currency Address the amount of Digital Currency set forth in the Lending Request on or before Close of Business on the Request Day.

The specific and final terms of a Loan shall be memorialized using the Loan Term Sheet, which shall be delivered and executed after the final terms of a Loan are agreed to and prior to the delivery of the Loaned Assets.  In the event of a conflict of terms between this Master Borrow Agreement and a Loan Term Sheet, the terms in the Loan Term Sheet shall govern.

(c) <u>Loan Repayment Procedure</u>

    (i)  <u>Loan Repayment</u>

Unless otherwise specified in subsections (ii) and (iii) below, upon the earlier of the Maturity Date, the Recall Delivery Day, or the Redelivery Day (as defined below) for a Loan, Borrower shall repay the entirety of the Loan Balance to Lender by Close of Business.  If Lender has not

<div align="center">4</div>

provided to Borrower a Digital Currency Address for receiving the repayment of a Loan by Close of Business on the day prior to the earlier of the Maturity Date, the Recall Delivery Day (defined below), or the Redelivery Day (defined below), then such Loan will become an Open Loan on said Maturity Date or Redelivery Day, whichever applicable, and no additional Loan Fees shall be accrued after the Maturity Date or the Redelivery Day.

(ii) <u>Call Option</u>

For Loans in which the Lender has a Call Option (e.g. Open Loans, etc.), Lender may during Business Hours (the "<u>Recall Request Day</u>") demand repayment of a portion or the entirety of the Loan Balance (the "<u>Recall Amount</u>").  Lender will notify Borrower of Lender's exercising of this right by email to Borrower's Email.  Borrower will then have until Close of Business on the seventh Business Day after the Recall Request Day (the "<u>Recall Delivery Day</u>") to deliver the Recall Amount.

In the event of a Call Option where Lender demands only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Recall Delivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date or the subsequent Recall Delivery Day.

(iii) <u>Prepayment Option</u>

For Loans in which Borrower has a Prepayment Option (e.g. Open Loans, Term Loans with Prepayment Option, etc.), Borrower may notify Lender during Business Hours of Borrower's intent to return the Loan prior to the Maturity Date or the date Lender exercises its Call Option without being subject to, and as a result will not incur, Early Termination Fees as set forth in Section III(d).  Borrower shall provide said notice at least one Business Day prior to the date on which the Borrower will repay all or a portion of the Loan Balance (said later date, the "Redelivery Day").  Borrower's exercising of its Prepayment Option shall not relieve it of any of its other obligations herein, including without limitation its payment of owed Loan Fees and Late Fees.

In the event of a Prepayment Option where the Borrower repays only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Redelivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date, the Recall Delivery Day, or a subsequent Redelivery Day.

(d) <u>Termination of Loan</u>

A Loan will terminate upon the earlier of:

(i)      the Maturity Date;

(ii)     the repayment of the Loan Balance by Borrower prior to the Maturity Date;

(iii)    the occurrence of an Event of Default as defined in Section VII; however, Lender shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan.  In the event of reinstitution of

5

DocuSign Envelope ID: AA15566-C520-4C48-9BD7-EF3650843763

the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

(iv)   in the event any or all of the Loaned Assets becomes in Borrower's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization, arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Borrower's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and termination of this Agreement except as specified in Section XXIII.

In the event of a termination of a Loan, any Loaned Assets or Collateral shall be redelivered immediately and any fees or owed shall be payable immediately to the appropriate party specified herein.

(e) Redelivery in an Illiquid Market

If (i) the seven-day average daily trading volume across each of the three highest-volume digital currency exchanges that report prices for the applicable Digital Currency (as measured by the 30-day average daily trading volume of the applicable Digital Currency on the Loan Date) (these such exchanges, the "Liquidity Exchanges") has decreased by 90% from the date of the Loan Term Sheet to the Maturity Date, Recall Delivery Day, or Redelivery Day, whichever applicable, or (ii) the Loaned Assets ceases to be listed on any of the Liquidity Exchanges (the duration of either event herein designated, the "Illiquid Period"), Borrower may repay the Loan in U.S. Dollars equal to the volume-weighted average price of the Loaned Assets on the Liquidity Exchanges (measured at 4:00 p.m. New York time ) during the Illiquid Period, up to a maximum of 30 days (the "Illiquid Market Spot Rate").

If two of the three Liquidity Exchanges limit or suspend withdrawals or transactions in the Loaned Assets on the Maturity Date, the Recall Delivery Day, or the Redelivery Day, whichever applicable, the requirement for Borrower to return the Loaned Assets shall be temporarily suspended, without penalty or default, including without limitation the incurring of additional Loan Fees, until such time that at least two of the Liquidity Exchanges allow the resumption of withdrawals of and transactions in the Loaned Assets.

## III.   **Loan Fees and Transaction Fees.**

(a) Loan Fee

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as agreed to herein and annualized in the relevant Loan Term Sheet and subject to change if thereafter agreed by Borrower and Lender. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from, but excluding, the date on which the Loaned Digital Currencies or

Confidential - Filed Under Seal

DocuSign Envelope ID: AA315566-C520-4C48-98D7-5F3650845763

Loaned U.S. Dollars are transferred to Borrower until, and including, the date on which such Loaned Digital Currencies or Loaned U.S. Dollars are repaid in their entirety to Lender.

Lender shall calculate any Loan Fees owed on a daily basis and provide Borrower with the calculation upon request.  The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

(b) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with Section III(c), Borrower shall incur an additional fee (the "Late Fee") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

(c) Payment of Loan Fees and Late Fees

Unless otherwise agreed, any Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) five (5) Business Days after receipt of an invoice from Lender or (ii) the termination of all Loans hereunder (the "Payment Due Date").  An invoice for Loan Fees and any Late Fees (the "Invoice Amount") shall be sent out on the first Business Day of the month and shall include any Loan Fees, Late Fees, and Early Termination Fees incurred and outstanding during the previous month and periods.  Borrower shall have up to five Business Days from the date of said Invoice to pay the Invoice Amount.  Failure of Lender to timely send an invoice in accordance with the preceding sentence shall not be considered a material default under Section VIII(d) nor shall it relieve Borrower of its obligation to pay any Loan Fees, Late Fees, and Early Termination Fees owed herein nor negate any Event of Default resulting from Borrower's failure to timely pay such fees.  The Loan Fee, Late Fees, and Early Termination Fees shall be payable, unless otherwise agreed by the Borrower and Lender in the Loan Term Sheet, in the same Loaned Assets that were borrowed, whether U.S. Dollars or Digital Currency on the same blockchain and of the same type that was loaned by the Lender during the Loan.

(d) Early Termination Fees

For Fixed Term Loans and Term Loans with Call Options, if Borrower returns the Loaned Assets prior to the Maturity Date, Borrower shall pay to Lender a fee equal to twenty percent (20%) of the Loan Fee that would have accrued from the date of the repayment until the Maturity Date of the Loan (the "Early Termination Fee").  The Early Termination Fee is due with the repayment of the Loaned Assets.  The Early Termination Fee shall not apply if Borrower returns the Loaned Assets to Lender in the event of a Hard Fork (as defined in Section V) or if Lender moves up the Maturity Date to an earlier date by exercising a Call Option.

(e) Taxes and Fees

Confidential - Filed Under Seal

Borrower shall report to the Internal Revenue Service ("IRS") all Loan Fees paid to Lender under this Agreement, and shall provide Lender Form 1099-INT annually documenting the amount reported to the IRS.  For any Loan Fees paid in Digital Currency, such Loan Fees shall be calculated at the Coinbase Pro spot rate at 4 p.m. New York time daily on any day that Loan Fees accrue.  Neither Borrower nor Lender shall have any liability to the other party for any taxes due under this Agreement.

## IV.    Collateral Requirements

(a) Collateral

If agreed in a Loan Term Sheet, Borrower shall provide as collateral an amount of U.S. Dollars, or Digital Currency as set forth below, or to be determined and agreed upon by the Borrower and Lender ("Collateral") and memorialized using the Loan Term Sheet.  The Collateral will be calculated as a percentage of the value of the Loaned Assets, such value determined by a spot rate agreed upon in the Loan Term Sheet.  Borrower shall, prior to or concurrently with the transfer of the Loaned Assets to Borrower, but in no case later than the Close of Business on the day of such transfer, transfer to Lender the agreed upon Collateral.

Collateral shall always be valued in U.S. Dollars, but Borrower may, if mutually agreed by both parties, provide the Collateral (in whole or in part) to Lender in Digital Currency in an amount equal to the value of the Collateral in U.S. Dollars at a spot rate determined by Borrower.  For the avoidance of doubt, upon the repayment of the Loaned Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited, net of any Additional Collateral, Margin Call, or Refunded Collateral adjustments (as defined below in Sections IV(c) & (e)).  If a Hard Fork in the blockchain of Digital Currency meeting the criteria in Section V occurs while Lender is holding such Digital Currency as Collateral, Lender shall return the New Tokens (as defined in Section V) to Borrower in addition to the Collateral and Additional Collateral.  If a Hard Fork occurs that does not meet the criteria in Section V, Lender shall have no obligation to return any New Tokens to Borrower.

The Collateral transferred by Borrower to Lender, as adjusted herein, shall be security for Borrower's obligations in respect of such Loan.  Borrower hereby pledges with, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the Loaned Assets by Lender to Borrower and which shall cease upon the return of the Loaned Assets by Borrower to Lender.

(b) Loan and Collateral Transfer

If Lender transfers Loaned Assets to Borrower and Borrower does not transfer Collateral to Lender as provided in Section IV(a), Lender shall have the absolute right to the return of the Loaned Assets; and if Borrower transfers Collateral to Lender, as provided in Section IV(a), and Lender does not transfer the Loaned Assets to Borrower, Borrower shall have the absolute right to the return of the Collateral.

Confidential - Filed Under Seal

(c) <u>Margin Calls</u>

If during the Term of a Loan the value of the Loaned Assets increases, or the value of the Collateral decreases, so that the value of the Loaned Assets becomes equal to or greater than the value of the Collateral (the "<u>Margin Call Limit</u>"), Lender shall have the right to require Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "<u>Additional Collateral</u>") as measured by the spot rate published on Coinbase Pro (such rate, the "<u>Margin Call Spot Rate</u>").

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "<u>First Notification</u>") to the Borrower at the email address indicated in Section XIII (or such other address as the parties shall agree to in writing) that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Margin Call Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate. Borrower shall have twenty-four (24) hours from the time Lender sends such First Notification to (x) respond and send payment to Lender in accordance with subsection (d) below, or (y) respond that the value of the Loaned Assets, value of the Collateral, or spot rate as indicated on Coinbase Pro as applicable, has decreased sufficiently such that it is no longer at or above the Margin Call Spot Rate. If Lender agrees by email that Borrower's response according to (y) above is correct, then no other action is required by Borrower.

If Borrower fails to respond to the First Notification within twenty-four (24) hours, or Lender rejects Borrower's response pursuant to (y) above and the spot rate of the Loaned Assets is still at least the Margin Call Spot Rate, Lender shall send a second email notification (the "<u>Second Notification</u>") repeating the information in provisions (i) – (iv) in the preceding paragraph. Borrower shall have twelve (12) hours from the time Lender sends the Second Notification to respond according to (x) or (y) in the preceding, and Lender has the right to accept or reject Borrower's response as stated above. Upon Lender's rejection of Borrower's response to the Second Notification, Borrower shall make immediate payment of Additional Collateral as set forth in Section IV(d) below. Failure to provide Additional Collateral, or failure by Borrower to respond to either the First Notification or the Second Notification, shall give Lender the option to declare an Event of Default under Section VII below.

Borrower acknowledges that its obligations hereunder, including those in this Section IV, continue regardless of Lender's request for Additional Collateral and Borrower's acceptance or rejection of the same.

(d) <u>Payment of Additional Collateral</u>

Payment of the Additional Collateral shall be made by bank wire to the account, or if applicable the Digital Currency Address, specified in the Loan Term Sheet or by a return of the amount of Loaned Assets necessary to make the Collateral percentage indicated in the Loan Term Sheet correct based on the Margin Call Spot Rate. For any return of Loaned Assets made in accordance with this Section, Borrower is still responsible for payment of any Early Termination Fees that apply to the particular Loan.

Confidential - Filed Under Seal

(e) Refund of Collateral

If during the Term of a Loan the value of the Loaned Assets decreases, or the value of the Collateral increases, so that the value of the Collateral relative to the value of the Loaned Assets becomes equal to or greater than the percentage indicated in the Loan Term Sheet (the "Collateral Refund Limit"), Borrower shall have the right to require Lender to return an amount of Collateral so that the Collateral is at no greater than the percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "Refunded Collateral") as measured by the spot rate published on Coinbase Pro (such rate, the "Collateral Refund Spot Rate").

If Borrower requires Lender to repay Refunded Collateral, it shall send an email notification (the "First Refund Notification") to the Lender at the Lender Email that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Collateral Refund Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate. Lender shall have twenty-four (24) hours from the time Borrower sends such First Refund Notification to (x) respond and send payment to Borrower in accordance with subsection (f) below, or (y) respond that the value of the Loaned Assets as a percentage of the value of the Collateral has increased sufficiently such that it is no longer at or below the Collateral Refund Spot Rate. If Borrower agrees by email that Lender's response according to (y) above is correct then no other action is required by Lender.

If Lender fails to respond to the First Refund Notification within twenty-four (24) hours, and the value of the Loaned Assets is still at or below the Collateral Refund Spot Rate, Borrower shall send a second email notification (the "Second Refund Notification") repeating the information in (i) – (iv) in the preceding paragraph. Lender shall have twelve (12) hours from the time Borrower sends the Second Refund Notification to respond according to (x) or (y) in the preceding paragraph. Failure by Lender to respond to either the First Refund Notification or the Second Refund Notification shall give Borrower the option to declare an Event of Default under Section VII below.

(f) Payment of Refunded Collateral

Payment of the Refunded Collateral shall be made by bank wire to the account specified by the Borrower or to a Digital Currency Address specified by the Borrower, as applicable.

(g) Return of Collateral

Upon Borrower's repayment of the Loan and acceptance by Lender of the Loaned Assets into Lender's Digital Currency Address, with such delivery being confirmed on the relevant Digital Currency blockchain ten times, Lender shall initiate the return of Collateral within two Business Days to a bank account designated by Borrower or, where Digital Currency is Collateral, into an applicable Digital Currency Address on the behalf of Borrower.

## V.    **Hard Fork**

(a) Notification

10

In the event of a public announcement of a future Hard Fork or an Airdrop in the blockchain for any Loaned Assets, Lender shall provide email notification to Borrower.

### (b) No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated. Borrower and Lender may agree, regardless of Loan type, either (i) to terminate a Loan without any penalties on an agreed upon date or (ii) for Lender to manage the Hard Fork on the behalf of Borrower. Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Currency to Lender and Lender transfers said Digital Currency back to Borrower pursuant to this section.

### (c) Lender's Right to New Tokens

Lender will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Currency protocol or an Applicable Airdrop (the "New Tokens") if any two of the following four conditions are met:

- *Hash Power*: the average hash power mining the New Token on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the hash power mining the Loaned Assets on the day preceding the Hard Fork or Applicable Airdrop (calculated as a 3-day average of the 3 days preceding the Hard Fork).
- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).
- *Wallet Compatibility*: the New Token is supported by either BitGo wallets or Ledger wallets within 30 days of the Hard Fork or Applicable Airdrop.

For the above calculations, the source for the relevant data on the Digital Currency hash power, market capitalization, and 24-Hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the hash power of the New Token will be bitinfocharts.com (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

Confidential - Filed Under Seal

DocuSign Envelope ID: AA815566-CF20-4C48-98D7-5F3650845763

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Lender. If sending the New Tokens to Lender is burdensome, upon Lender's written agreement with Borrower, Borrower can reimburse Lender for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount of the New Tokens owed using the spot rate agreed upon by the Parties at the time of said repayment, or (ii) returning the borrowed Digital Currency so that Lender can manage the split of the underlying digital tokens as described in Section IV(b) above. Alternatively, subject to Lender's written agreement, the parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender. In all cases, Borrower will be solely responsible for payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender, including but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment. For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this Section V shall continue for any New Tokens that meet the criteria in this subsection (c) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement.

## VI.    **Representations and Warranties.**

The parties to this Agreement (individually, a "Party," collectively the "Parties") hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each Party represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution, delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Currency, Collateral, or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws

Confidential - Filed Under Seal

(f)  Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

(g)  Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h)  Lender represents and warrants that it has, or will have at the time of the loan of any Digital Currency, the right to lend such Loaned Assets subject to the terms and conditions hereof, and free and clear of all liens and encumbrances other than those arising under this Agreement.

(i)  Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof.

(j)  Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest in said Collateral subject to the terms and conditions hereof.

## VII.   Default

It is further understood that any of the following events shall constitute an event of default hereunder against the defaulting Party, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a)  the failure of the Borrower to return any and all Loaned Assets upon termination of any Loan however, Borrower shall have ten Business Days to cure such default;

(b)  the failure of Borrower to pay any and all Loan Fees, Late Fees, or to remit any New Tokens, however, Borrower shall have ten Business Days to cure such default;

(c)  the failure of either Party to transfer Collateral or Additional Collateral, including any Refunded Collateral, as required by Section IV, however, a Party shall have ten Business Days to cure such default;

(d)  a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;

13

(e) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not be dismissed within thirty (30) days of the initiation of said proceedings; or

(f) any representation or warranty made by either Party in any of the Loan Documents that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

## VIII.    Remedies

(a) Upon the occurrence and during the continuation of any Event of Default on a Loan by Borrower, the Lender may, at its option:  (1) declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable; (2) transfer any Collateral for a Loan from the collateral account to Lender's operating account necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by the Loan; and/or (3) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity.  If any Event of Default by Borrower under Sections VII(a), (b), (c), or (d) persist for thirty days or more, or immediately upon an Event of Default by Borrower under Sections VII(e) or (f), the Lender may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Borrower.

(b) Upon the occurrence and during the continuation of any Event of Default on a Loan by Lender, the Borrower may, at its option:  (1) demand a return of any and all Collateral in the control or possession of Lender or its agents; (2) withhold repayment of the Loaned Assets and any outstanding Loan Fees, Late Fees or other amounts claimed by Lender; and/or (3) exercise all other rights and remedies available to the Borrower hereunder, under applicable law, or in equity.  If any Event of Default by Lender under Sections VII (c) or (d) persist for thirty-days or more, or immediately upon an Event of Default by Lender under Sections VII (e) or (f), the Borrower may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Lender.

(c) In addition to its rights hereunder, the non-defaulting Party shall have any rights otherwise available to it under any other agreement or applicable law; however, the non-defaulting Party shall have an obligation to mitigate its damages in a commercially reasonable manner.

## IX.    Rights and Remedies Cumulative.

No delay or omission by a Party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each Party stated herein are cumulative and in addition to all other rights provided by law, in equity.

## X.    Survival of Rights and Remedies

14

DocuSign Envelope ID: AA815566-C620-4C48-98D7-EF36508B763

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets or Collateral, and termination of this Agreement.

### XI.    Governing Law; Dispute Resolution.

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules.  If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.  The parties agree to waive their rights to a jury trial.  If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

### XII.    Confidentiality.

(a) Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information").  Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XIV, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii) available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b) Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XII.

(c) Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

Confidential - Filed Under Seal

(d) The provisions of this Section XII will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; provided that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure. Notwithstanding the foregoing, Lender may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e) The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement. Notwithstanding anything in this agreement to the contrary, a Party may retain copies of Confidential Information (the "Retained Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XII; provided, however, that such Party agrees that any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and the confidentiality obligations of this Section XII shall survive with respect to the Retained Confidential Information for so long as such information is retained.

## XIII.    **Notices.**

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth below:

Lender: ███████████

████████████████████████

Email: ██████████████

Borrower:
Genesis Global Capital, LLC
111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Attn: Michael Moro, CEO
Email: michael@genesiscap.co

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

## XIV.    **Modifications.**

16

Confidential - Filed Under Seal

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

## XV.    Single Agreement

Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other.  Accordingly, Borrower and Lender hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.  In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other.

## XVI.    Entire Agreement.

This Agreement, each exhibit referenced herein, and all Loan Term Sheets constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.  Nothing in this Section XVI shall be construed to conflict with or negate Section XV above.

## XVII.   Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that Lender may not assign this Agreement or any rights or duties hereunder without the prior written consent of the Borrower (such consent to not be unreasonably withheld).  Borrower may assign this Agreement or any rights or duties hereunder upon notice to Lender.  Notwithstanding the foregoing, in the event of a change of control of Lender or Borrower, prior written consent shall not be required so such Party provides the other Party with written notice prior to the consummation of such change of control.  For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party.  Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, or Loan Term Sheet hereunder, shall create any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns.  For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc.  The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

## XVIII. Severability of Provisions.

Confidential - Filed Under Seal

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XIX.  Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any Party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XX.  Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

## XXI.  No Waiver.

The failure of or delay by either Party to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent such Party from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

## XXII.  Indemnification.

Lender shall indemnify and hold harmless Genesis, or any of its parents or affiliates, from and against any and all third party claims, demands, losses, expenses and liabilities of any and every nature (including attorneys' fees of an attorney of Genesis' choosing to defend against any such claims, demands, losses, expenses and liabilities) that Genesis may sustain or incur or that may be asserted against it arising out of Genesis' borrowing  Digital Currency from Lender under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to Genesis' bad faith, gross negligence or willful misconduct in the performance of its duties under this Agreement.

## XXIII. Term and Termination.

18

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either Party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period.   The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VIII or upon 30 days' notice by either Party to the other.

In the event of a termination of this Agreement, any Loaned Assets or Collateral shall be redelivered immediately and any fees owed shall be payable immediately.

### XXIV. **Miscellaneous.**

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate.  This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.  The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement.  The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

Confidential - Filed Under Seal

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

LENDER:



By: _____
Name: _____


BORROWER:

GENESIS GLOBAL CAPITAL, LLC

By: _____  *Kristopher Johnson*
    DocuSigned by:
    E5D870D05A1C4B3...
Name: Kristopher Johnson
Title: Senior Risk Officer

20

Confidential - Filed Under Seal

## EXHIBIT A

Authorized Agents.  The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section II hereof:

Name: matt ballensweig
Email: matt@genesiscap.co

Name: roshun patel
Email: roshun@genesiscap.co

Borrower may change its Authorized Agents by notice given to Lender as provided in accordance with Section XV.  Such notice shall not be considered to be a modification of or amendment to this Agreement for purposes of Section XVI.

21

DocuSign Envelope ID: AA315566-C620-4C48-98D7-5F36508481762

**EXHIBIT B**

**LOAN TERM SHEET**

This loan agreement dated [DATE OF TERM SHEET] between Genesis Global Capital, LLC ("Genesis") and [COMPANY NAME] ("Lender") incorporates all of the terms of the Master Borrow Agreement between Genesis and Borrower on [DATE OF MASTER AGREEMENT] and the following specific terms:

Borrower:                         Genesis Global Capital, LLC

Lender:                           [COMPANY NAME]

Borrowed Asset:

Amount of Currency:

Borrow Fee:

Loan Type:                        [Open Loan]
                                  [Fixed Term Loan]
                                  [Term Loan With Prepayment Option]

Maturity Date:

GENESIS GLOBAL CAPITAL, LLC              [COMPANY NAME]

By: _____                 By: _____
Name:                                    Name:
Title:                                   Title:

Confidential - Filed Under Seal

DocuSign Envelope ID: 83A52FD9-1BDFD-4E66-A2B4-276BB70080C6

# EXHIBIT B

# LOAN TERM SHEET

The following loan agreement dated February 10th, 2022 incorporates all of the terms of the Master Borrow Agreement entered into by Genesis Global Capital, LLC ("Genesis") and ██████████████████████ on March 5th, 2021 and the following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ████████████ |
| Borrowed Asset: | BTC |
| Amount of Borrowed Asset: | 51.60503606 BTC |
| Borrow Fee: | 1.60% annual |
| Loan Type: | Fixed Term |
| Maturity Date: | February 10th, 2023 |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |
| Genesis BTC Address: | ████████████████████████ |

Genesis Global Capital, LLC          ████████████

By: _____          By: _____
Name:  Adim Offurum          Name: ████████████
Title:  Vice President          Title:  Individual

# EXHIBIT B

# LOAN TERM SHEET

The following loan agreement dated September 25th, 2022 incorporates all of the terms of the Master Borrow Agreement entered into by Genesis Global Capital, LLC ("Genesis") and ███████████████████ on March 5th, 2021 and the following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ██████████ |
| Borrowed Asset: | BTC |
| Amount of Borrowed Asset: | 100 BTC |
| Borrow Fee: | 4.25% annual |
| Loan Type: | Fixed Term |
| Maturity Date: | September 25th, 2023 |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |
| Genesis BTC Address: | ████████████████████ |

Genesis Global Capital, LLC    ██████████

By: _Alain Passini_____
    347BA590AD0E461
Name: Alain Passini
Title: Senior Associate Credit Risk

By: _____
Name: ██████████
Title: Individual

Confidential - Filed Under Seal

# EXHIBIT B

# LOAN TERM SHEET

The following loan agreement dated September 25th, 2022 incorporates all of the
terms of the Master Borrow Agreement entered into by Genesis Global Capital, LLC
("Genesis") and ███████████████████ on March 5th, 2021 and the
following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ████████ |
| Borrowed Asset: | ETH |
| Amount of Borrowed Asset: | 500 ETH |
| Borrow Fee: | 3.50% annual |
| Loan Type: | Fixed Term |
| Maturity Date: | March 25th, 2023 |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |
| Genesis ETH Address: | ████████████████ |

Genesis Global Capital, LLC ████████

By: _Alain Passini_
  ───347BA590AD0F461
Name: Alain Passini
Title: Senior Associate Credit Risk

By: ████████
Name: ████████
Title: Individual

# EXHIBIT B

# LOAN TERM SHEET

The following loan agreement dated September 25th, 2022 incorporates all of the terms of the Master Borrow Agreement entered into by Genesis Global Capital, LLC ("Genesis") and ▮▮▮▮▮▮▮▮▮▮▮▮ on March 5th, 2021 and the following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ▮▮▮▮▮▮▮▮ |
| Borrowed Asset: | ETH |
| Amount of Borrowed Asset: | 1,300 ETH |
| Borrow Fee: | 5.00% annual |
| Loan Type: | Fixed Term |
| Maturity Date: | September 25th, 2023 |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |
| Genesis ETH Address: | ▮▮▮▮▮▮▮▮▮▮▮▮▮ |

Genesis Global Capital, LLC ▮▮▮▮▮▮▮

By: _Alain Passini_
    —347BA590AD0E461
Name: Alain Passini
Title: Senior Associate Credit Risk

By: ▮▮▮▮▮▮▮
Name: ▮▮▮▮▮▮▮
Title: Individual

Confidential - Filed Under Seal

DocuSign Envelope ID: 46BA916B-C0B2-4247-A354-950C5EB2C4B7

# EXHIBIT B

## LOAN TERM SHEET

The following loan agreement dated October 15th, 2022 incorporates all of the terms of the Master Borrow Agreement entered into by Genesis Global Capital, LLC ("Genesis") and ██████████████████████ on March 5th, 2021 and the following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ████████ |
| Borrowed Asset: | USDC |
| Amount of Borrowed Asset: | 520,833.09 USDC |
| Borrow Fee: | 5.70% annual |
| Loan Type: | Open Term |
| Maturity Date: | N/A |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |

Genesis Global Capital, LLC        ████████

By: _Alain Passini_                By: _____
Name: Alain Passini                Name: ████████
Title: Vice President  Credit Risk  Title: Individual

Confidential - Filed Under Seal

DocuSign Envelope ID: 465A916B-C0B2-4247-A354-950C5EB3C4B7

# EXHIBIT B

# LOAN TERM SHEET

The following loan agreement dated October 15th, 2022 incorporates all of the terms
of the Master Borrow Agreement entered into by Genesis Global Capital, LLC
("Genesis") and ███████████████████████ on March 5th, 2021 and the
following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ███████████ |
| Borrowed Asset: | USDC |
| Amount of Borrowed Asset: | 600,000 USDC |
| Borrow Fee: | 6.00% annual |
| Loan Type: | Fixed Term |
| Maturity Date: | November 15th, 2022 |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |

Genesis Global Capital, LLC        ███████████

By: _____        By: _____
Name: Alain Passini                Name: ███████████
Title: Vice President  Credit Risk Title:    Individual

Confidential - Filed Under Seal

# MASTER BORROW AGREEMENT

This Master Borrow Agreement ("Agreement") is made on this <u>January 14, 2022</u> ("Effective Date") by and between

Genesis Global Capital, LLC ("Genesis" or "Borrower"), a limited liability company organized and existing under the laws of Delaware with its principal place of business at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310 and

Name: <u>█████████</u> ("Lender")

Formation: <u>Not Applicable</u>

Formation Location (country or US state): <u>Not Applicable</u>

Address: <u>████████████</u>

# RECITALS

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend U.S. Dollars or Digital Currency to Borrower, and Borrower will pay a Loan Fee and return such U.S Dollars or Digital Currency to Lender upon the termination of the Loan; and

**WHEREAS**, Borrower intends to use any Loaned Assets under this Agreement in its Digital Currency lending business;

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, the Borrower and the Lender hereby agree as follows:

## I.    Definitions

"***Airdrop***" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "***Applicable Airdrop***" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time. A "***Non-Applicable Airdrop***" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Currency, or a distribution that depends on a wallet of the relevant Digital Currency meeting a threshold requirement.

"***Authorized Agent***" has the meaning set forth in Exhibit A.

"***Borrower***" means Genesis Global Capital, LLC.

"*Borrower Email*" means lend@genesiscap.co.

"*Business Day*" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

"*Business Hours*" means between the hours of 9:00 am to 5:00 pm New York time on a Business Day.

"*Call Option*" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement and in particular Section II(c)(ii).

"*Close of Business*" means 5:00 pm New York time.

"*Collateral*" is defined as set forth in Section IV(a)

"*Digital Currency*" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), or any digital currency that the Borrower and Lender agree upon.

"*Digital Currency Address*" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Currency.

"*Early Termination Fee*" means any charge or fee agreed to be paid by the Borrower and Lender in the Loan Term Sheet when the Agreement is terminated prior to the Termination Date.

"*Fixed Term Loan*" means a Loan with a pre-determined Maturity Date, where Borrower does not have a Prepayment Option and Lender does not have a Call Option.

"*Hard Fork*" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"*Lender*" means _____.

"*Lender Email*" means _____.

"*Loan*" means a request for a loan or an actual loan of Digital Currency or U.S. Dollars made pursuant to and in accordance with this Agreement and a Loan Term Sheet.

"*Loan Balance*" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees, Late Fees, and any Earlier Termination Fee for a particular Loan.

"*Loan Documents*" means this Master Borrow Agreement and any and all Loan Term Sheets entered into between Lender and Borrower.

"*Loan Effective Date*" means the date upon which a Loan begins.

DocuSign Envelope ID: E76A480C-6BE9-44CE-8689-3F01077EG3E3

"*Loan Fee*" means the fee paid by Borrower to the Lender for the Loan.

"*Loan Term Sheet*" means the agreement between Lender and Borrower on the particular terms of an individual Loan, which shall be memorialized in an agreement as set forth in Exhibit B or in a form approved by Lender comparable therewith.

"*Loaned Assets*" means any Digital Currency or U.S. Dollar amount transferred in a Loan hereunder until such Digital Currency (or identical Digital Currency) or U.S. Dollar amount is transferred back to Lender hereunder, except that, if any new or different Digital Currency is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Currency shall be deemed to become Loaned Assets in addition to the former Digital Currency for which such exchange is made.  For purposes of return of Loaned Assets by Borrower, such term shall include Digital Currency of the same quantity and type as the Digital Currency, as adjusted pursuant to the preceding sentence.

"*Maturity Date*" means the pre-determined future date upon which a Loan becomes due in full, whether by Term or Call Option.

"*New Token Fee*" means payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender including, but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment.

"*Open Loan*" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"*Prepayment Option*" means the Borrower has the option to repay or return the Loaned Assets prior to the Maturity Date without incurring Early Termination Fees, subject to this Agreement and in particular Section II(c)(iii).

"*Term*" means the period from the Loan Effective Date through Termination Date.

"*Term Loan with Call Option*" means a Loan with a pre-determined Maturity Date where Lender has a Call Option.

"*Term Loan with Prepayment Option*" means a Loan with a pre-determined Maturity Date where Borrower has a Prepayment Option.

"*Termination Date*" means the date upon which a Loan is terminated.

## II.    <u>General Loan Terms.</u>

(a) <u>Loans of Digital Currency or</u> U.S. Dollars

Confidential - Filed Under Seal

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request from the Lender a Loan to Borrower of a specified amount of Digital Currency or U.S. Dollars, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan on terms acceptable to Lender and as set forth in a corresponding Loan Term Sheet.

(b) <u>Loan Procedure</u>

From time to time during the Term of this Agreement, during the hours of 9:00 am New York time to 4:00 pm New York time on a Business Day (the "<u>Request Day</u>"), by email directed to Lender Email (or such other address as Lender may specify in writing), an Authorized Agent of Borrower may request from Lender a Loan of a specific amount of Digital Currency or U.S. Dollars (a "<u>Lending Request</u>"). Provided Lender receives such Lending Request prior to 3:00 pm New York time, Lender shall by email directed to Borrower Email (or such other address as Borrower may specify in writing) to inform Borrower whether Lender agrees to make such a Loan. If Lender fails to provide Borrower with an acceptance as to a particular Lending Request prior to Close of Business on the Request Day, such Lending Request shall be deemed to have been denied by Lender.

As part of its Lending Request, Borrower shall provide the following proposed terms:

(i)     Whether U.S. Dollars or Digital Currency, and if Digital Currency, the type of Digital Currency;

(ii)    the amount of Digital Currency or U.S. Dollars;

(iii)   whether the Loan is to be a Fixed Term Loan, a Term Loan with Prepayment Option, or an Open Loan;

(iv)    the Loan Effective Date; and

(v)     the Maturity Date (if a Fixed Term Loan or a Term Loan with Prepayment Option).

If Lender agrees to make a Loan in accordance with Borrower's proposed terms, Lender shall commence transmission to either (x) the Borrower's Digital Currency Address the amount of Digital Currency, or (y) Borrower's bank account by bank wire the amount of U.S. Dollars, as applicable, as such Digital Currency Address or bank wire instruction is set forth in the Lending Request on or before Close of Business on the Request Day. In the event Lender requests a modification to the proposed terms, including a proposal for a Call Option, Lender shall provide notice of such, and upon Borrower's acceptance of said modified terms, Lender shall commence transmission to Borrower's Digital Currency Address the amount of Digital Currency set forth in the Lending Request on or before Close of Business on the Request Day.

The specific and final terms of a Loan shall be memorialized using the Loan Term Sheet, which shall be delivered and executed after the final terms of a Loan are agreed to and prior to the delivery of the Loaned Assets. In the event of a conflict of terms between this Master Borrow Agreement and a Loan Term Sheet, the terms in the Loan Term Sheet shall govern.

(c) <u>Loan Repayment Procedure</u>

(i) <u>Loan Repayment</u>

Confidential - Filed Under Seal

DocuSign Envelope ID: F76A480C-6BE9-44CE-8683-3F01077EC352

Unless otherwise specified in subsections (ii) and (iii) below, upon the earlier of the Maturity Date, the Recall Delivery Day, or the Redelivery Day (as defined below) for a Loan, Borrower shall repay the entirety of the Loan Balance to Lender by Close of Business. If Lender has not provided to Borrower a Digital Currency Address for receiving the repayment of a Loan by Close of Business on the day prior to the earlier of the Maturity Date, the Recall Delivery Day (defined below), or the Redelivery Day (defined below), then such Loan will become an Open Loan on said Maturity Date or Redelivery Day, whichever applicable, and no additional Loan Fees shall be accrued after the Maturity Date or the Redelivery Day.

(ii) Call Option

For Loans in which the Lender has a Call Option (e.g. Open Loans, etc.), Lender may during Business Hours (the "Recall Request Day") demand repayment of a portion or the entirety of the Loan Balance (the "Recall Amount"). Lender will notify Borrower of Lender's exercising of this right by email to Borrower Email. Borrower will then have until Close of Business on the seventh Business Day after the Recall Request Day (the "Recall Delivery Day") to deliver the Recall Amount.

In the event of a Call Option where Lender demands only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Recall Delivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date or the subsequent Recall Delivery Day.

(iii) Prepayment Option

For Loans in which Borrower has a Prepayment Option (e.g. Open Loans, Term Loans with Prepayment Option, etc.), Borrower may notify Lender during Business Hours of Borrower's intent to return the Loan prior to the Maturity Date or the date Lender exercises its Call Option without being subject to, and as a result will not incur, Early Termination Fees as set forth in Section III(d). Borrower shall provide said notice at least one Business Day prior to the date on which the Borrower will repay all or a portion of the Loan Balance (said later date, the "Redelivery Day"). Borrower's exercising of its Prepayment Option shall not relieve it of any of its other obligations herein, including without limitation its payment of owed Loan Fees and Late Fees.

In the event of a Prepayment Option where the Borrower repays only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Redelivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date, the Recall Delivery Day, or a subsequent Redelivery Day.

(d) Termination of Loan

A Loan will terminate upon the earlier of:

(i)      the Maturity Date;

(ii)     the repayment of the Loan Balance by Borrower prior to the Maturity Date;

Confidential - Filed Under Seal

(iii)     the occurrence of an Event of Default as defined in Section VII; however, Lender shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan. In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

(iv)     in the event any or all of the Loaned Assets becomes in Borrower's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization, arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Borrower's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and Termination of this Agreement except as specified in Section XXIII.

In the event of a termination of a Loan, any Loaned Assets or Collateral shall be redelivered immediately and any fees or owed shall be payable immediately to the appropriate party specified herein.

(e) Redelivery in an Illiquid Market

If (i) the seven-day average daily trading volume across each of the three highest-volume digital currency exchanges that report prices for the applicable Digital Currency (as measured by the 30-day average daily trading volume of the applicable Digital Currency on the Loan Date) (these such exchanges, the "Liquidity Exchanges") has decreased by 90% from the date of the Loan Term Sheet to the Maturity Date, Recall Delivery Day, or Redelivery Day, whichever applicable, or (ii) the Loaned Assets ceases to be listed on any of the Liquidity Exchanges (the duration of either event herein designated, the "Illiquid Period"), Borrower may repay the Loan in U.S. Dollars equal to the volume-weighted average price of the Loaned Assets on the Liquidity Exchanges (measured at 4:00 p.m. New York time ) during the Illiquid Period, up to a maximum of 30 days (the "Illiquid Market Spot Rate").

If two of the three Liquidity Exchanges limit or suspend withdrawals or transactions in the Loaned Assets on the Maturity Date, the Recall Delivery Day, or the Redelivery Day, whichever applicable, the requirement for Borrower to return the Loaned Assets shall be temporarily suspended, without penalty or default, including without limitation the incurring of additional Loan Fees, until such time that at least two of the Liquidity Exchanges allow the resumption of withdrawals of and transactions in the Loaned Assets.

## III.    **Loan Fees and Transaction Fees.**

(a) Loan Fee

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as agreed

to herein and annualized in the relevant Loan Term Sheet and subject to change if thereafter agreed by Borrower and Lender.  Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from, but excluding, the date on which the Loaned Digital Currencies or Loaned U.S. Dollars are transferred to Borrower until, and including, the date on which such Loaned Digital Currencies or Loaned U.S. Dollars are repaid in their entirety to Lender.

Lender shall calculate any Loan Fees owed on a daily basis and provide Borrower with the calculation upon request.  The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

(b) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with Section III(c), Borrower shall incur an additional fee (the "Late Fee") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

(c) Payment of Loan Fees and Late Fees

Unless otherwise agreed, any Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) five (5) Business Days after receipt of an invoice from Lender or (ii) the termination of all Loans hereunder (the "Payment Due Date").  An invoice for Loan Fees and any Late Fees (the "Invoice Amount") shall be sent out on the first Business Day of the month and shall include any Loan Fees, Late Fees, and Early Termination Fees incurred and outstanding during the previous month and periods.  Borrower shall have up to five Business Days from the date of said Invoice to pay the Invoice Amount.  Failure of Lender to timely send an invoice in accordance with the preceding sentence shall not be considered a material default under Section VII(d) nor shall it relieve Borrower of its obligation to pay any Loan Fees, Late Fees, and Early Termination Fees owed herein nor negate any Event of Default resulting from Borrower's failure to timely pay such fees.  The Loan Fee, Late Fees, and Early Termination Fees shall be payable, unless otherwise agreed by the Borrower and Lender in the Loan Term Sheet, in the same Loaned Assets that were borrowed, whether U.S. Dollars or Digital Currency on the same blockchain and of the same type that was loaned by the Lender during the Loan.

(d) Early Termination Fees

For Fixed Term Loans and Term Loans with Call Options, if Borrower returns the Loaned Assets prior to the Maturity Date, Borrower shall pay to Lender a fee equal to twenty percent (20%) of the Loan Fee that would have accrued from the date of the repayment until the Maturity Date of the Loan (the "Early Termination Fee").  The Early Termination Fee is due with the repayment of the Loaned Assets.  The Early Termination Fee shall not apply if Borrower returns the Loaned Assets to Lender in the event of a Hard Fork (as defined in Section V) or if Lender moves up the Maturity Date to an earlier date by exercising a Call Option.

Confidential - Filed Under Seal

DocuSign Envelope ID: F76AA80C-6BE9-44CE-8683-3F01077EC3E2

(e) Taxes and Fees

Borrower shall report to the Internal Revenue Service ("IRS") all Loan Fees paid to Lender under this Agreement, and shall provide applicable IRS form annually documenting the amount reported to the IRS. For any Loan Fees paid in Digital Currency, such Loan Fees shall be calculated at the Coinbase Pro spot rate at 4 p.m. New York time daily on any day that Loan Fees accrue. Neither Borrower nor Lender shall have any liability to the other party for any taxes due under this Agreement.

## IV.    Collateral Requirements

(a) Collateral

If agreed in a Loan Term Sheet, Borrower shall provide as collateral an amount of U.S. Dollars, or Digital Currency as set forth below, or to be determined and agreed upon by the Borrower and Lender ("Collateral") and memorialized using the Loan Term Sheet. The Collateral will be calculated as a percentage of the value of the Loaned Assets, such value determined by a spot rate agreed upon in the Loan Term Sheet. Borrower shall, prior to or concurrently with the transfer of the Loaned Assets to Borrower, but in no case later than the Close of Business on the day of such transfer, transfer to Lender the agreed upon Collateral.

Collateral shall always be valued in U.S. Dollars, but Borrower may, if mutually agreed by both parties, provide the Collateral (in whole or in part) to Lender in Digital Currency in an amount equal to the value of the Collateral in U.S. Dollars at a spot rate determined by Borrower. For the avoidance of doubt, upon the repayment of the Loaned Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited, net of any Additional Collateral, Margin Call, or Refunded Collateral adjustments (as defined below in Sections IV(c) & (e)). If a Hard Fork in the blockchain of Digital Currency meeting the criteria in Section V occurs while Lender is holding such Digital Currency as Collateral, Lender shall return the New Tokens (as defined in Section V) to Borrower in addition to the Collateral and Additional Collateral. If a Hard Fork occurs that does not meet the criteria in Section V, Lender shall have no obligation to return any New Tokens to Borrower.

The Collateral transferred by Borrower to Lender, as adjusted herein, shall be security for Borrower's obligations in respect of such Loan. Borrower hereby pledges with, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the Loaned Assets by Lender to Borrower and which shall cease upon the return of the Loaned Assets by Borrower to Lender.

(b) Loan and Collateral Transfer

If Lender transfers Loaned Assets to Borrower and Borrower does not transfer Collateral to Lender as provided in Section IV(a), Lender shall have the absolute right to the return of the Loaned Assets; and if Borrower transfers Collateral to Lender, as provided in Section IV(a), and Lender does not transfer the Loaned Assets to Borrower, Borrower shall have the absolute right to the return of the Collateral.

Confidential - Filed Under Seal

(c) Margin Calls

If during the Term of a Loan the value of the Loaned Assets increases, or the value of the Collateral decreases, so that the value of the Loaned Assets becomes equal to or greater than the value of the Collateral (the "Margin Call Limit"), Lender shall have the right to require Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "Additional Collateral") as measured by the spot rate published on Coinbase Pro (such rate, the "Margin Call Spot Rate").

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "First Notification") to the Borrower at the email address indicated in Section XIII (or such other address as the parties shall agree to in writing) that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Margin Call Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate. Borrower shall have twenty-four (24) hours from the time Lender sends such First Notification to (x) respond and send payment to Lender in accordance with subsection (d) below, or (y) respond that the value of the Loaned Assets, value of the Collateral, or spot rate as indicated on Coinbase Pro as applicable, has decreased sufficiently such that it is no longer at or above the Margin Call Spot Rate. If Lender agrees by email that Borrower's response according to (y) above is correct, then no other action is required by Borrower.

If Borrower fails to respond to the First Notification within twenty-four (24) hours, or Lender rejects Borrower's response pursuant to (y) above and the spot rate of the Loaned Assets is still at least the Margin Call Spot Rate, Lender shall send a second email notification (the "Second Notification") repeating the information in provisions (i) – (iv) in the preceding paragraph. Borrower shall have twelve (12) hours from the time Lender sends the Second Notification to respond according to (x) or (y) in the preceding, and Lender has the right to accept or reject Borrower's response as stated above. Upon Lender's rejection of Borrower's response to the Second Notification, Borrower shall make immediate payment of Additional Collateral as set forth in Section IV(d) below. Failure to provide Additional Collateral, or failure by Borrower to respond to either the First Notification or the Second Notification, shall give Lender the option to declare an Event of Default under Section VII below.

Borrower acknowledges that its obligations hereunder, including those in this Section IV, continue regardless of Lender's request for Additional Collateral and Borrower's acceptance or rejection of the same.

(d) Payment of Additional Collateral

Payment of the Additional Collateral shall be made by bank wire to the account, or if applicable the Digital Currency Address, specified in the Loan Term Sheet or by a return of the amount of Loaned Assets necessary to make the Collateral percentage indicated in the Loan Term Sheet correct based on the Margin Call Spot Rate. For any return of Loaned Assets made in accordance with this Section, Borrower is still responsible for payment of any Early Termination Fees that apply to the particular Loan.

DocuSign Envelope ID: E76A180C-6BE9-44CE-8683-3F04077EC3E2

(e) Refund of Collateral

If during the Term of a Loan the value of the Loaned Assets decreases, or the value of the Collateral increases, so that the value of the Collateral relative to the value of the Loaned Assets becomes equal to or greater than the percentage indicated in the Loan Term Sheet (the "Collateral Refund Limit"), Borrower shall have the right to require Lender to return an amount of Collateral so that the Collateral is at no greater than the percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "Refunded Collateral") as measured by the spot rate published on Coinbase Pro (such rate, the "Collateral Refund Spot Rate").

If Borrower requires Lender to repay Refunded Collateral, it shall send an email notification (the "First Refund Notification") to the Lender at the Lender Email that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Collateral Refund Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate. Lender shall have twenty-four (24) hours from the time Borrower sends such First Refund Notification to (x) respond and send payment to Borrower in accordance with subsection (f) below, or (y) respond that the value of the Loaned Assets as a percentage of the value of the Collateral has increased sufficiently such that it is no longer at or below the Collateral Refund Spot Rate. If Borrower agrees by email that Lender's response according to (y) above is correct then no other action is required by Lender.

If Lender fails to respond to the First Refund Notification within twenty-four (24) hours, and the value of the Loaned Assets is still at or below the Collateral Refund Spot Rate, Borrower shall send a second email notification (the "Second Refund Notification") repeating the information in (i) – (iv) in the preceding paragraph. Lender shall have twelve (12) hours from the time Borrower sends the Second Refund Notification to respond according to (x) or (y) in the preceding paragraph. Failure by Lender to respond to either the First Refund Notification or the Second Refund Notification shall give Borrower the option to declare an Event of Default under Section VII below.

(f) Payment of Refunded Collateral

Payment of the Refunded Collateral shall be made by bank wire to the account specified by the Borrower or to a Digital Currency Address specified by the Borrower, as applicable.

(g) Return of Collateral

Upon Borrower's repayment of the Loan and acceptance by Lender of the Loaned Assets into Lender's Digital Currency Address, with such delivery being confirmed on the relevant Digital Currency blockchain ten times, Lender shall initiate the return of Collateral within two Business Days to a bank account designated by Borrower or, where Digital Currency is Collateral, into an applicable Digital Currency Address on the behalf of Borrower.

Confidential - Filed Under Seal

## V.    **Hard Fork**

(a) Notification

In the event of a public announcement of a future Hard Fork or an Airdrop in the blockchain for any Loaned Assets, Lender shall provide email notification to Borrower.

(b) No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated.  Borrower and Lender may agree, regardless of Loan type, either (i) to terminate a Loan without any penalties on an agreed upon date or (ii) for Lender to manage the Hard Fork on the behalf of Borrower.  Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Currency to Lender and Lender transfers said Digital Currency back to Borrower pursuant to this section.

(c) Lender's Right to New Tokens

Lender will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Currency protocol or an Applicable Airdrop (the "New Tokens") if following two conditions are met:

- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).

For the above calculations, the source for the relevant data on the market capitalization, and 24-Hour Trading Volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source).

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Lender.  If sending the New Tokens to Lender is burdensome, upon Lender's written agreement with Borrower, Borrower can reimburse Lender for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount of the New Tokens owed using the spot rate agreed upon by the Parties at the time of said repayment, or (ii) returning the borrowed Digital Currency so that Lender can manage the split of the underlying digital tokens as described in Section V(b) above.  Alternatively, subject to Lender's written agreement, the

Confidential - Filed Under Seal

parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender. In all cases, Borrower will be solely responsible for payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender, including but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment. For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this Section V shall continue for any New Tokens that meet the criteria in this subsection (c) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement.

## VI.    Representations and Warranties.

The parties to this Agreement (individually, a "Party," collectively the "Parties") hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each Party represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution, delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Currency, Collateral, or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws

(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place

of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h) Lender represents and warrants that it has, or will have at the time of the loan of any Digital Currency, the right to lend such Loaned Assets subject to the terms and conditions hereof, and free and clear of all liens and encumbrances other than those arising under this Agreement.

(i) Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof.

(j) Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest in said Collateral subject to the terms and conditions hereof.

## VII.    Default

It is further understood that any of the following events shall constitute an event of default hereunder against the defaulting Party, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to return any and all Loaned Assets upon termination of any Loan however, Borrower shall have ten Business Days to cure such default;

(b) the failure of Borrower to pay any and all Loan Fees, Late Fees, or to remit any New Tokens, however, Borrower shall have ten Business Days to cure such default;

(c) the failure of either Party to transfer Collateral or Additional Collateral, including any Refunded Collateral, as required by Section IV, however, a Party shall have ten Business Days to cure such default;

(d) a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;

(e) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not be dismissed within thirty (30) days of the initiation of said proceedings; or

(f) any representation or warranty made by either Party in any of the Loan Documents that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

## VIII.  **Remedies**

(a) Upon the occurrence and during the continuation of any Event of Default on a Loan by Borrower, the Lender may, at its option:  (1) declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable; (2) transfer any Collateral for a Loan from the collateral account to Lender's operating account necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by the Loan; and/or (3) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity.  If any Event of Default by Borrower under Sections VII(a), (b), (c), or (d) persist for thirty days or more, or immediately upon an Event of Default by Borrower under Sections VII(e) or (f), the Lender may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Borrower.

(b) Upon the occurrence and during the continuation of any Event of Default on a Loan by Lender, the Borrower may, at its option:  (1) demand a return of any and all Collateral in the control or possession of Lender or its agents; (2) withhold repayment of the Loaned Assets and any outstanding Loan Fees, Late Fees or other amounts claimed by Lender; and/or (3) exercise all other rights and remedies available to the Borrower hereunder, under applicable law, or in equity.  If any Event of Default by Lender under Sections VII (c) or (d) persist for thirty (30) days or more, or immediately upon an Event of Default by Lender under Sections VII (e) or (f), the Borrower may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Lender.

(c) In addition to its rights hereunder, the non-defaulting Party shall have any rights otherwise available to it under any other agreement or applicable law; however, the non-defaulting Party shall have an obligation to mitigate its damages in a commercially reasonable manner.

## IX.  **Rights and Remedies Cumulative.**

No delay or omission by a Party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each Party stated herein are cumulative and in addition to all other rights provided by law, in equity.

## X.  **Survival of Rights and Remedies**

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets or Collateral, and termination of this Agreement.

## XI.  **Governing Law; Dispute Resolution.**

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules.  If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration

Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The parties agree to waive their rights to a jury trial. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

## XII.    **Confidentiality.**

(a) Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information"). Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XII, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii) available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b) Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XII.

(c) Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

(d) The provisions of this Section XII will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; provided that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure. Notwithstanding the foregoing, Lender may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e) The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement. Notwithstanding anything in this agreement to the contrary, a Party may retain copies of Confidential Information (the "Retained

Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XII; provided, however, that such Party agrees that any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and the confidentiality obligations of this Section XII shall survive with respect to the Retained Confidential Information for so long as such information is retained.

### XIII.   Notices.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth in the recitals.

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

### XIV.   Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

### XV.   Single Agreement

Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other. Accordingly, Borrower and Lender hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted. In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other.

### XVI.   Entire Agreement.

This Agreement, each exhibit referenced herein, and all Loan Term Sheets constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements. Nothing in this Section XVI shall be construed to conflict with or negate Section XV above.

### XVII.   Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that Lender may not assign this Agreement or any rights or duties hereunder without the prior written consent of the Borrower (such consent to not be unreasonably

withheld). Borrower may assign this Agreement or any rights or duties hereunder upon notice to Lender. Notwithstanding the foregoing, in the event of a change of control of Lender or Borrower, prior written consent shall not be required so such Party provides the other Party with written notice prior to the consummation of such change of control. For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party. Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, or Loan Term Sheet hereunder, shall create any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns. For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc. The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

## XVIII. Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XIX. Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any Party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XX. Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

## XXI. No Waiver.

The failure of or delay by either Party to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one

circumstance will not prevent such Party from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

## XXII.  Indemnification.

Lender shall indemnify and hold harmless Genesis, or any of its parents or affiliates, from and against any and all third party claims, demands, losses, expenses and liabilities of any and every nature (including attorneys' fees of an attorney of Genesis' choosing to defend against any such claims, demands, losses, expenses and liabilities) that Genesis may sustain or incur or that may be asserted against it arising out of Genesis' borrowing Digital Currency from Lender under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to Genesis' bad faith, gross negligence or willful misconduct in the performance of its duties under this Agreement.

## XXIII. Term and Termination.

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either Party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period. The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VIII or upon 30 days' notice by either Party to the other.

In the event of a termination of this Agreement, any Loaned Assets or Collateral shall be redelivered immediately and any fees owed shall be payable immediately.

## XXIV. Miscellaneous.

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate.  This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.  The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement.  The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

*[Signature page follows.]*

Confidential - Filed Under Seal

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

LENDER:

██████████

By: _____
Name: ████████████
Title:  Individual


BORROWER:

GENESIS GLOBAL CAPITAL, LLC


By: _____
Name: Kristopher Johnson
Title: Head of Risk

Confidential - Filed Under Seal

**EXHIBIT A**

Authorized Agents.  The following are authorized to deliver Lending Requests on behalf of
Borrower in accordance with Section II hereof:

Name: Lending
Email: lend@genesiscap.co

Name: Risk
Email: Risk@genesiscap.co

Borrower may change its Authorized Agents by notice given to Lender as provided in
accordance with Section XV.  Such notice shall not be considered to be a modification of or
amendment to this Agreement for purposes of Section XVI.

DocuSign Envelope ID: E76A480C-6BE9-44CE-8683-3F01077EC3F2

## EXHIBIT B

## LOAN TERM SHEET

This loan agreement dated [DATE OF TERM SHEET] between Genesis Global Capital, LLC ("Genesis") and [COMPANY NAME] ("Lender") incorporates all of the terms of the Master Borrow Agreement between Genesis and Borrower on [DATE OF MASTER AGREEMENT] and the following specific terms:

Borrower:                          Genesis Global Capital, LLC

Lender:                            [COMPANY NAME]

Borrowed Asset:

Amount of Currency:

Borrow Fee:

Loan Type:                         [Open Loan]
                                   [Fixed Term Loan]
                                   [Term Loan With Prepayment Option]

Maturity Date:

GENESIS GLOBAL CAPITAL, LLC                [COMPANY NAME]


By: _____          By: _____
Name:                              Name:
Title:                             Title:

## TRI-PARTY SETTLEMENT AGREEMENT

This Tri-Party Settlement Agreement (the "Agreement") is hereby made and entered into and dated as of ___January 14, 2022___ by and between ██████████ _____ ("Counterparty") and each of the entities listed on Schedule A, as defined therein, and as may be amended from time to time by any entity listed on Schedule A (each, a "Genesis Entity" and each Genesis Entity and Counterparty, a "Party" and together the "Parties").

**WHEREAS**, Counterparty has entered into business relationships with one or more Genesis Entity that may include trading digital currency, borrowing or lending digital currency, trading digital currency-based derivatives, or receiving digital currency custodial services; and

**WHEREAS**, in the course of its transactions with Genesis Entities, Counterparty may engage in a transaction with one Genesis Entity followed immediately by a transaction with a different Genesis Entity (the combination of two such transactional components, an "Intercompany Transaction"); and

**WHEREAS**, when engaging in an Intercompany Transaction, to ensure prompt, efficient and secure settlement of the transactional components of the Intercompany Transaction, Counterparty may request that a Genesis Entity settle with another Genesis Entity on Counterparty's behalf (an "Intercompany Settlement");

**NOW THEREFORE**, in consideration for the promises, rights and obligations set forth below, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1. <u>Settlement Instruction</u>

If Counterparty engages in an Intercompany Transaction and wants to request an Intercompany Settlement then the following procedure shall be followed:

    a. Counterparty shall request such Intercompany Settlement in writing to each Genesis Counterparty involved in the Intercompany Transaction, with an email copy to each of legal@genesistrading.com and compliance@genesistrading.com.

    b. Each Genesis Entity involved in the Intercompany Transaction shall have sole discretion whether to agree to an Intercompany Settlement for any Intercompany Transaction.

    c. If all relevant Genesis Entities agree to the Intercompany Settlement for the Intercompany Transaction, one or more of the Genesis Entities shall send an email summary of the settlement to Counterparty, which shall serve as confirmation of the settlement of the Intercompany Transaction.

2. <u>Independent Transactions</u>

Each of Counterparty and the relevant Genesis Entities represent that any transactional components that make up an Intercompany Transaction are separate and distinct transactions, conducted at arm's length. No

Confidential - Filed Under Seal

DocuSign Envelope ID: E76A480C-6BE9-44CE-8683-3F01077EC3E2

part of any Intercompany Transaction is conditioned on any other part of an Intercompany Transaction. Counterparty represents that it was not induced by any Genesis Entity into entering into any Intercompany Transaction with the promise of a better price on any transaction that makes up a part of the Intercompany Transaction. Counterparty agrees that any claim or dispute with any Genesis Entity relating to any transactional component is with that Genesis Entity only and no other Genesis Entity that may be party to another transactional component of an Intercompany Transaction or party to this Agreement.

3.      Third-Party Delivery

Each of Counterparty and any Genesis Entity consents to the delivery of digital currency or U.S. Dollars by another Genesis Entity on behalf of Counterparty to satisfy certain obligations of Counterparty in an Intercompany Transaction, each as evidenced in and governed by the agreement or terms relevant to a certain transactional component.

4.      Additional Representations and Warranties

Counterparty hereby represents and warrants to each Genesis Entity that as of the date hereof:

a.   This Agreement has been duly executed and delivered by Counterparty and this Agreement constitutes a valid and legally binding obligation of Counterparty, enforceable against Counterparty in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally.

b.   Neither the execution and delivery of this Agreement, nor the consummation of an Intercompany Transaction contemplated herein, does or will violate any statute, regulation, rule, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency, or court to which Counterparty is subject or conflict with, violate or constitute a default under any agreement, debt or other instrument to which Counterparty is a party.

c.   Counterparty agrees, understands and acknowledges that (i) Counterparty is solely responsible for any decision to enter into an Intercompany Transaction subject to this Agreement, including the evaluation of any and all risks related to any such Intercompany Transaction; and (ii) in entering into any such Intercompany Transaction, Counterparty has not relied on any statement or other representation of any Genesis Entity other than as expressly set forth herein.

5.      Confidentiality

Each Party shall hold in confidence all information obtained from the other Party in connection with this Agreement (collectively, "Confidential Information"). Each Party shall keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose such Confidential Information to any person or use such Confidential Information for any purpose other than the transactions contemplated by this Agreement.  The provisions of this Section 3 will not restrict a Party from disclosing the other Party's Confidential Information to  such Party's affiliates, subsidiaries, officers, directors,

Confidential - Filed Under Seal

DocuSign Envelope ID: E76A480C-6BE9-44CE-8683-3F01077EC3E3

employees, contractors, attorneys, accountants, bankers or consultants with a need to know such Confidential Information, and will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law or regulation; *provided* that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure.  Notwithstanding the foregoing, a Party may disclose the other Party's Confidential Information without notice pursuant to a request or other regular routine inspection by a governmental agency or regulatory authority.  The obligations with respect to Confidential Information shall survive for a period of one (1) year from the date of this Agreement.

6.      <u>Governing Law; Dispute Resolution</u>

     a.    The laws of the State of New York shall govern this Agreement, without regard to its conflict of law principles.

     b.    If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.  If any proceeding is brought for enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

7.      <u>Entire Agreement</u>

This Agreement, together with the Master Agreement, represents the entire Agreement between the Parties relating to the subject matter contained herein and in the event there is any conflict or inconsistency between the terms and conditions of the Master Agreement and those of this Agreement, the terms and conditions of this Agreement shall control and govern the rights and obligations of the Parties.  Further, the provisions of this Agreement and the Master Agreement shall together supersede all prior oral and written commitments, contracts and understandings with respect to the subject matter contained herein. This Agreement may only be amended by mutual written agreement of the authorized representatives of each Party. This Agreement may be signed in one or more counterparts; each counterpart shall be deemed an original and all counterparts together shall constitute one and the same instrument.

**In Witness Whereof**, the Parties have caused this Agreement to be duly executed by their respective authorized representatives as of the day and year above written.

**On behalf of the Genesis Entities listed on Schedule A**

By: _Arianna Pretto-Sakmann_
⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
DocuSigned by:
77A200507D6D40F...

Name:  Arianna Pretto-Sakmann

Title:  General Counsel

By: ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
██████ 5B7AF8A4CF8F42C...

Name: ██████████ ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

Title: Individual ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯

Confidential - Filed Under Seal

DocuSign Envelope ID: E76A480C-6BE9-44CE-8683-3F04077EG3E2

## SCHEDULE A

Genesis Entities:
Genesis Global Trading, Inc.
Genesis Global Capital, LLC
GGC International Limited
Genesis Asia Pacific PTE. LTD.
Genesis Custody Limited

# EXHIBIT B

# LOAN TERM SHEET

The following loan agreement dated July 16th, 2022 incorporates all of the terms of the Master Borrow Agreement entered into by Genesis Global Capital, LLC ("Genesis") and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ on January 14th, 2022 and the following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ▮▮▮▮▮▮ |
| Borrowed Asset: | BTC |
| Amount of Borrowed Asset: | 150 BTC |
| Borrow Fee: | 4.25% annual |
| Loan Type: | Fixed Term |
| Maturity Date: | January 16th, 2023 |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |
| Genesis BTC Address: | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |

Genesis Global Capital, LLC    ▮▮▮▮▮▮

By: _____     By: _____
Name: Adim Offurum     Name: ▮▮▮▮▮
Title: Vice President     Title: ▮▮▮▮▮

Confidential - Filed Under Seal

# MASTER LOAN AGREEMENT

This Master Loan Agreement ("Agreement") is made on this <u>November 22, 2021</u> ("Effective Date") by and between:

 Genesis Global Capital, LLC ("Genesis" or "Lender"), a limited liability company organized and existing under the laws of Delaware with its principal place of business at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310

and

Name: _███████_____("Borrower")

Formation: __N/A_____

Formation Location (country or US state): __N/A_____

Address: _██████████████████_____

# RECITALS

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend Digital Currency or U.S. Dollars to Borrower, and Borrower will pay a Loan Fee and return such Digital Currency or U.S. Dollars to Lender upon the termination of the Loan; and

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, the Borrower and the Lender hereby agree as follows:

## I.    Definitions

"***Airdrop***" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "***Applicable Airdrop***" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time.  A "***Non-Applicable Airdrop***" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Currency, or a distribution that depends on a wallet of the relevant Digital Currency meeting a threshold requirement.

"***Authorized Agent***" has the meaning set forth in Exhibit A.

"***Borrower***" means _██████████_____.

"***Borrower Email***" means ████████████████_____.

Confidential - Filed Under Seal

DocuSign Envelope ID: B6AA056E18BF1-4FB3-BFCC-9CFBA41507AF

"*Business Day*" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

"*Business Hours*" means between the hours of 9:00 am to 5:00 pm New York time on a Business Day.

"*Call Option*" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement.

"*Close of Business*" means 5:00 pm New York time.

"*Collateral*" is defined as set forth in Section IV(a).

"*Digital Currency*" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), or any digital currency that the Borrower and Lender agree upon.

"*Digital Currency Address*" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Currency.

"*Fixed Term Loan*" means a Loan with a pre-determined Maturity Date, where Borrower does not have a Prepayment Option and Lender does not have a Call Option.

"*Hard Fork*" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"*Lender*" means Genesis.

"*Loan*" means a request for a loan or an actual loan of Digital Currency or U.S. Dollars made pursuant to and in accordance with this Agreement and a Loan Term Sheet.

"*Loan Balance*" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees, Late Fees, and any Earlier Termination Fee or New Token Fee for a particular Loan, as defined in Sections III and V.

"*Loan Documents*" means this Master Loan Agreement and any and all Loan Term Sheets entered into between Lender and Borrower.

"*Loan Effective Date*" means the date upon which a Loan begins.

"*Loan Fee*" means the fee paid by Borrower to the Lender for the Loan.

"*Loan Term Sheet*" means the agreement between Lender and Borrower on the particular terms of an individual Loan, which shall be memorialized in an agreement as set forth in Exhibit B or in a form approved by Lender comparable therewith.

2

Confidential - Filed Under Seal

"*Loaned Assets*" means any Digital Currency or U.S. Dollar amount transferred in a Loan hereunder until such Digital Currency (or identical Digital Currency) or U.S. Dollar amount is transferred back to Lender hereunder, except that, if any new or different Digital Currency is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Currency shall be deemed to become Loaned Assets in addition to the former Digital Currency for which such exchange is made.  For purposes of return of Loaned Assets by Borrower or purchase or sale of Digital Currencies pursuant to Section IX, such term shall include Digital Currency of the same quantity and type as the Digital Currency, as adjusted pursuant to the preceding sentence.

"*Maturity Date*" means the pre-determined future date upon which a Loan becomes due in full.

"*New Token Fee*" means payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender including, but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment.

"*Open Loan*" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"*Prepayment Option*" means Borrower has the option to repay or return the Loaned Assets prior to the Maturity Date, subject to this Agreement.

"*Term*" means the period from the Loan Effective Date through Termination Date.

"*Term Loan with Call Option*" means a Loan with a pre-determined Maturity Date where Lender has a Call Option.

"*Term Loan with Prepayment Option*" means a Loan with a pre-determined Maturity Date where Borrower has a Prepayment Option.

"*Termination Date*" means the date upon which a Loan is terminated.

## II.    General Loan Terms.

(a) Loans of Digital Currency or U.S. Dollars

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request from the Lender a Loan to Borrower of a specified amount of Digital Currency or U.S. Dollars, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan on terms acceptable to Lender and as set forth in a corresponding Loan Term Sheet.

(b) Loan Procedure

From time to time during the Term of this Agreement, during the hours of 9:00 am New York time to 4:00 pm New York time on a Business Day (the "Request Day"), by email directed to lend@genesiscap.co (or such other address as Lender may specify in writing), an Authorized

3

DocuSign Envelope ID: B60A056E-8DF1-4EB3-BE5C-9CFBA415D7AF

Agent of Borrower may request from Lender a Loan of a specific amount of Digital Currency or U.S. Dollars (a "Lending Request"). Provided Lender receives such Lending Request prior to 3:00 pm New York time, Lender shall by email directed to Borrower Email (or such other address as Borrower may specify in writing) to inform Borrower whether Lender agrees to make such a Loan. If Lender fails to provide Borrower with an acceptance as to a particular Lending Request prior to Close of Business on the Request Day, such Lending Request shall be deemed to have be denied by Lender.

As part of its Lending Request, Borrower shall provide the following proposed terms:

(i)     Whether U.S. Dollars or Digital Currency, and if Digital Currency, the type of Digital Currency;

(ii)    the amount of Digital Currency or U.S. Dollars;

(iii)   whether the Loan is to be a Fixed Term Loan, a Term Loan with Prepayment Option, or an Open Loan;

(iv)    the Loan Effective Date; and

(v)     the Maturity Date (if a Fixed Term Loan or a Term Loan with Prepayment Option).

If Lender agrees to make a Loan, Lender shall commence transmission to either (x) the Borrower's Digital Currency Address the amount of Digital Currency, or (y) Borrower's bank account by bank wire the amount of U.S. Dollars, as applicable, as such Digital Currency Address or bank wire instruction is set forth in the Lending Request on or before Close of Business on the Request Day.

The specific and final terms of a Loan shall be memorialized using the Loan Term Sheet. In the event of a conflict of terms between this Master Loan Agreement and a Loan Term Sheet, the terms in the Loan Term Sheet shall govern.

(c) Loan Repayment Procedure

(i) Loan Repayment

Unless otherwise specified in subsections (ii) and (iii) below, upon the earlier of the Maturity Date, the Recall Delivery Day, or the Redelivery Day (as defined below) for a Loan, Borrower shall repay the entirety of the Loan Balance to Lender by Close of Business.

(ii) Call Option

For Loans in which the Lender has a Call Option (e.g. Open Loans, etc.), Lender may during Business Hours (the "Recall Request Day") demand repayment of a portion or the entirety of the Loan Balance (the "Recall Amount"). Lender will notify Borrower of Lender's exercising of this right by email to Borrower Email. Borrower will then have until Close of Business on the second Business Day after the Recall Request Day (the "Recall Delivery Day") to deliver the Recall Amount.

4

In the event of a Call Option where Lender demands only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Recall Delivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date or the subsequent Recall Delivery Day.

      (iii) Prepayment Option

For Loans in which Borrower has a Prepayment Option (e.g. Open Loans, Term Loans with Prepayment Option, etc.), Borrower may notify Lender during Business Hours of Borrower's intent to return the Loan prior maturity or Lender's exercising of its Call Option. Borrower shall provide said notice at least two Business Days prior to the date on which the Borrower will repay all or a portion of the Loan Balance (said later date, the "Redelivery Day"). Borrower's exercising of its Prepayment Option shall not relieve it of any of its obligations herein, including without limitation its payment of owed Loan Fees and Late Fees.

In the event of a Prepayment Option where the Borrower repays only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Redelivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date, Recall Delivery Day, or subsequent Redelivery Day.

    (d) Termination of Loan

A Loan will terminate upon the earlier of:

      (i)      the Maturity Date;

      (ii)     the repayment of the Loan Balance by Borrower prior to the Maturity Date;

      (iii)    the occurrence of an Event of Default as defined in Section VII; however, Lender shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan. In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

      (iv)    in the event any or all of the Loaned Assets becomes in Lender's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization. arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Lender's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and termination of this Agreement except as specified in Section XXIV.

### III.    Loan Fees and Transaction Fees.

(a) Loan Fee

Confidential - Filed Under Seal

DocuSign Envelope ID: 860A056E-89F1-4EB3-BFC6-9CFBA415D7AF

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as agreed to herein and annualized in the relevant Loan Term Sheet and subject to change if thereafter agreed by Borrower and Lender. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from, but excluding, the date on which the Loaned Digital Currencies or Loaned U.S. Dollars are transferred to Borrower until, and including, the date on which such Loaned Digital Currencies are repaid in their entirety to Lender. For any Loan, the minimum Loan Fee shall be the Loan Fee that would accrue for one day.

Lender shall calculate any Loan Fees owed on a daily basis and provide Borrower with the calculation upon request. The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies. The Loan Fee is payable monthly by Borrower in arrears.

(b) Origination Fee

For certain Loans, Lender may charge Borrower a fee (the "Origination Fee") to be paid at the time the Collateral is delivered to Lender. If an Origination Fee applies to a Loan, the Loan Term Sheet shall set forth the amount of the Origination Fee and whether the Origination Fee is to be paid in U.S. Dollars or in a Digital Currency.

(c) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with section III(c), Borrower shall incur an additional nominal fee (the "Late Fee") of a 10% (annualized, calculated daily) on all outstanding portions of the Loaned Digital Currencies and Loan Fees. If a Late Fee is imposed under this Section III(b) due to an event that would constitute an Event of Default under Section VIII, the imposition of a Late Fee by the Lender does not constitute a waiver of its right to declare an Event of Default for the same event.

(d) Payment of Loan Fees and Late Fees

Unless otherwise agreed, any Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) five (5) Business Days after receipt of an invoice from Lender or (ii) the termination of all Loans hereunder (the "Payment Due Date"). An invoice for Loan Fees and any Late Fees (the "Invoice Amount") shall be sent out on the first Business Day of the month and shall include any Loan Fees and Late Fees incurred during the previous month. Borrower shall have up to five Business Days from the date of said Invoice to pay the Invoice Amount. Failure of Lender to timely send an invoice in accordance with the preceding sentence shall not relieve Borrower of its obligation to pay any Loan Fees and Late Fees owed herein nor negate any Event of Default resulting from Borrower's failure to timely pay such fees. The Loan Fee and Late Fees shall be payable, unless otherwise agreed by the Borrower and Lender in the Loan Term Sheet, whether U.S. Dollars or Digital Currency on the same blockchain and of the same type that was loaned by the Lender during the Loan.

6

Notwithstanding the foregoing, in all cases, all Loan Fees and Late Fees shall be payable by Borrower immediately upon the occurrence of an Event of Default hereunder by Borrower.

(e) <u>Taxes and Fees</u>

All transfer or other taxes or third party fees payable with respect to the transfer, repayment, and/or return of any Loaned Assets or Collateral hereunder shall be paid by Borrower.

## IV.    **Collateral Requirements**

(a) <u>Collateral</u>

Unless otherwise agreed by the parties, or modified in the Loan Term Sheet or as set forth below, Borrower shall provide as collateral an amount of U.S. Dollars or Digital Currency (such choice at the sole discretion of the Lender) to be determined and agreed upon by the Borrower and Lender ("<u>Collateral</u>") and memorialized using the Loan Term Sheet.  Unless otherwise agreed by the parties in the Loan Term Sheet, the Collateral shall initially be 120% of the value of the Loaned Assets, such value determined by a spot rate agreed upon in the Loan Term Sheet.  Borrower shall, prior to or concurrently with the transfer of the Loaned Assets to Borrower, but in no case later than the Close of Business on the day of such transfer, transfer to Lender the agreed upon Collateral.

Collateral shall always be valued in U.S. Dollars, but Borrower may, if mutually agreed by both parties, provide the Collateral (in whole or in part) to Lender in Digital Currency in an amount equal to the value of the Collateral in U.S. Dollars at a spot rate determined by Lender.  For the avoidance of doubt, upon the repayment of the Loaned Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited, net of any Additional Collateral or Margin Call adjustments (as defined below in Section IV(c)).  If a Hard Fork in the blockchain of the Digital Currency serving as Collateral meeting the criteria in Section V occurs while Lender is holding Digital Currency as Collateral, Lender shall return the New Tokens (as defined in Section V) to Borrower in addition to the Collateral and Additional Collateral.  If such a Hard Fork occurs that does not meet the criteria in Section V, Lender shall have no obligation to return any New Tokens to Borrower.

The Collateral transferred by Borrower to Lender, as adjusted herein, shall be security for Borrower's obligations in respect of such Loan and for any other obligations of Borrower to Lender hereunder.  Borrower hereby pledges with, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the Loaned Assets by Lender to Borrower and which shall cease upon the return of the Loaned Assets by Borrower to Lender.  In addition to the rights and remedies given to Lender hereunder, Lender shall have all the rights and remedies of a secured party under the UCC.

During the term of the Loan, Borrower agrees and affirms Lender's entitlement to and use of the Collateral, including but not limited use in lending, investing, transferring to bank and other accounts upon which Lender, or a third party, is the account holder or the beneficiary, or re-

7

pledging as collateral in other transactions involved with Lender's digital currency lending and borrowing business. Such entitlement and use shall not relieve Borrower or Lender of any of its obligations hereunder.

(b) <u>Loan and Collateral Transfer</u>

If Lender transfers Loaned Assets to Borrower and Borrower does not transfer Collateral to Lender as provided in Section IV(a), Lender shall have the absolute right to the return of the Loaned Assets; and if Borrower transfers Collateral to Lender, as provided in Section IV(a), and Lender does not transfer the Loaned Assets to Borrower, Borrower shall have the absolute right to the return of the Collateral.

(c) <u>Margin Calls</u>

If during the Term of a Loan the value of the Loaned Assets increases, or the value of the Collateral decreases, so that the value of the Loaned Assets becomes equal to or greater than the value of the Collateral (the "<u>Margin Call Limit</u>"), Lender shall have the right to require Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in Section IV(a) relative to the value of the Loaned Assets (the "<u>Additional Collateral</u>"). The parties may modify this standard in the Loan Term Sheet by (i) setting a different ratio of the value of the Loaned Assets and Collateral or (ii) the creation of a Margin Call rate to be indicated on the Loan Term Sheet, as measured by the spot rate published on Coinbase Pro (such rate, the "<u>Margin Call Spot Rate</u>") over the spot rate indicated in the Loan Term Sheet, or the prior Margin Call Spot Rate, as applicable. In the event of the creation of a Margin Call Spot Rate, Lender shall have the right to require Borrower to contribute Additional Collateral so that the Collateral is at least the same percentage in the applicable Loan Term Sheet, relative to the value of the Loaned Assets at the Margin Call Spot Rate.

In the event the value of the Loaned Assets decreases below the value of the Collateral, Lender may, at its sole discretion, return a portion of the Collateral in an amount determined by Lender; however, in such an event, Lender reserves its rights under this Section IV to request Borrower to contribute collateral up to the original amount of Collateral and also Additional Collateral if required.

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "<u>First Notification</u>") to the Borrower at the email address indicated in Section XV (or such other address as the parties shall agree to in writing) that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Margin Call Spot Rate, if applicable, and (iv) the amount of Additional Collateral required based on the Margin Call Limit or, if applicable, the Margin Call Spot Rate. Borrower shall have six (6) hours from the time Lender sends such First Notification to (x) respond and send payment to Lender in accordance with subsection (d) below, or (y) respond that the value of the Loaned Assets, value of the Collateral, or spot rate as indicated on Coinbase Pro, as applicable, has decreased sufficiently such that it is no longer at or above the Margin Call Limit or, if applicable, the Margin Call Spot Rate. If Lender agrees by email that Borrower's response according to (y) above is correct, then no other action is required by Borrower. If Lender fails to agree by email with Borrower's response in accordance with (y) by

8

Close of Business that same day, such shall be deemed as Lender's rejection of Borrower's response and a re-statement of Lender's original demand for Borrower to contribute Additional Collateral.

If Borrower fails to respond to the First Notification within six hours, or Lender rejects Borrower's response pursuant to (y) above, whether affirmatively by email or by non-reply as set forth above, Lender shall send a second email notification (the "Second Notification") repeating the information in provisions (i) – (iv) in the preceding paragraph. Borrower shall have three (3) hours from the time Lender sends the Second Notification to respond according to (x) or (y) in the preceding, and Lender has the right to accept or reject Borrower's response as stated above. Upon Lender's rejection of Borrower's response to the Second Notification, whether affirmatively by email or by non-reply by the Close of Business that same day, Borrower shall make immediate payment of Additional Collateral as set forth in Section IV(d) below. Failure to provide Additional Collateral, or failure by Borrower to respond to either the First Notification or the Second Notification, shall give Lender the option to declare an Event of Default under Section VII below.

Borrower acknowledges that its obligations hereunder, including those in this Section IV, continue regardless of Lender's request for Additional Collateral and Borrower's acceptance or rejection of the same.

(d) Payment of Additional Collateral

Payment of the Additional Collateral shall be made by bank wire to the account specified in the Loan Term Sheet or by a return of the amount of Loaned Assets (for any Loan other than a Fixed Term Loan) necessary to make the Collateral percentage indicated in the Loan Term Sheet correct based on the Margin Call Limit or, if applicable, the Margin Call Spot Rate.

(e) Return of Collateral

Upon Borrower's repayment of the Loan and acceptance by Lender of the Loaned Assets into Lender's Digital Currency Address, with such delivery being confirmed on the relevant Digital Currency blockchain ten times, Lender shall initiate the return of Collateral within five Business Days to a bank account designated by Borrower or, where Digital Currency is Collateral, into an applicable Digital Currency Address on the behalf of Borrower.

## V.   **Hard Fork**

(a) Notification

In the event of a public announcement of a future Hard Fork or an Airdrop in the blockchain for any Loaned Assets or Collateral, Lender shall provide email notification to Borrower.

(b) No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated. Borrower and Lender may agree, regardless of Loan

9

type, either (i) to terminate the Loan without any penalties on an agreed upon date or (ii) for Lender to manage the Hard Fork on the behalf of Borrower.  If the Lender manages the Hard Fork on behalf of Borrower, Borrower shall return the Loaned Assets to Lender two business days prior to the scheduled Hard Fork or Airdrop.  Lender shall not be obligated to return any Collateral to the Borrower during the period in which Lender manages the Loaned Assets on the behalf of Borrower.  Lender shall fork the Loaned Assets, and following the Hard Fork shall return to Borrower the Loaned Assets but not any New Tokens (as defined below).  For any whole days in which Lender manages the Loan Digital Currency pursuant to this section, the Loan Fee for those days shall not accrue.  Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Currency to Lender and Lender transfers said Digital Currency back to Borrower pursuant to this section.

(c)  Lender's Right to New Tokens

Genesis will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Currency protocol or an Applicable Airdrop (the "New Tokens") if the following two conditions are met:
- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).

For the above calculations, the source for the relevant data on the, market capitalization, and 24-Hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source).

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Genesis.  If sending the New Tokens to Genesis is burdensome, upon Lender's written agreement with Borrower, Borrower can reimburse Genesis for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount of the New Tokens owed using the spot rate determined by Lender in its reasonable discretion at the time of said repayment, or (ii) returning the borrowed Digital Currency so that Genesis can manage the split of the underlying digital tokens as described in Section IV(b) above.  Alternatively, subject to Lender's written agreement, the parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender.  In all cases, Borrower will be solely responsible for payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender, including but not limited to technical costs, third party fees, and tax

10

obligations for the transaction, including but not limited to a tax gross-up payment. For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this Section V shall continue for any New Tokens that meet the criteria in this subsection (c) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement. If Borrower fails to transfer the New Tokens to Lender, or provide alternative compensation to Genesis as agreed to in accordance with this subsection, within 60 days from the Hard Fork or Applicable Airdrop, such failure will be considered an Event of Default in accordance with Section VIII(b), and Borrower shall incur an additional fee (the "Hard Fork Fee") equal to 10% (annualized, calculated daily) of all outstanding portions of the Loaned Digital Currencies and Loan Fees. Lender's charging of the Hard Fork Fee does not constitute a waiver of its right to declare an Event of Default for the same event.

## VI.    **Representations and Warranties.**

The parties to this Agreement hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each party hereto (individually, a "Party", collectively the "Parties") represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution, delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Currency, Collateral, or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws

(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

11

Confidential - Filed Under Seal

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h) Lender represents and warrants that it has, or will have at the time of the loan of any Loaned Assets, the right to lend such Loaned Assets subject to the terms and conditions hereof.

(i) Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to return such Loaned Assets subject to the terms and conditions hereof, and, free and clear of all liens and encumbrances other than those arising under this Agreement.

(j) Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest in said Collateral subject to the terms and conditions hereof.

## VII.    Covenants

Promptly upon (and in any event within seven (7) Business Days after) the execution of this Agreement, Borrower shall furnish Lender with Borrower's most recent audited annual and (if applicable) quarterly financial statements and any other financial statements mutually agreed upon by Borrower and Lender.   For each successive year, Borrower shall also furnish Lender with Borrower's future audited annual financial statements by Borrower's fiscal year end or within seven (7) Business Days thereof.

## VIII.   Default

It is further understood that any of the following events shall constitute an event of default hereunder, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to return any and all Loaned Assets and any New Tokens as defined by Section V upon termination of any Loan;

(b) the failure of Borrower to pay any and all Loan Fees or Late Fees when due hereunder, or to remit any New Tokens or pay any New Token Fee in accordance with Section V; however, Borrower shall have ten days to cure such default;

(c) the failure of Borrower to transfer Collateral or Additional Collateral, or a failure by Borrower to respond to Lender's First or Second Notifications, as required by Section IV;

(d) a material default by Borrower in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by Borrower to abide by its obligations in Section IV or V of this Agreement and Borrower's failure to cure said material default within ten days;

Confidential - Filed Under Seal

(e) any Event of Default (as such term is defined each applicable Loan Term Sheets) caused by Borrower shall occur and shall be continuing beyond any applicable grace periods under such Loan Term Sheets, including but not limited to failure to make any payment due thereunder;

(f) Borrower's default in any other agreement or failure to perform any obligation with Genesis or any of its affiliates;

(g) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against the Borrower and are not be dismissed within thirty (30) days of the initiation of said proceedings;

(h) any event or circumstance occurs or exists that is a material adverse effect on the business, operations, prospects, property, assets, liabilities or financial condition of, Borrower, taken as a whole, or a material adverse effect on the ability of Borrower to perform its obligations under the Loan Documents, including but not limited to the ability to return, transfer, repay, or pay any and all Loaned Assets, Loan Fees, and Late Fees;

(i) Borrower causes or permits any partner, member or other equity interest holder in Borrower to, directly or indirectly, transfer, convey, assign, mortgage, pledge, hypothecate, alienate or lease the partnership interest, membership interest or other equity interest of such partner, member, other equity interest holder in Borrower without Lender's prior written consent. Notwithstanding the foregoing, the Lender shall not unreasonably withhold such consent for transfers of membership interests for purposes of estate planning which do not result in a change of control of the Borrower;

(j) any representation or warranty made by Borrower in any of the Loan Documents that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof; or

(k) Borrower notifies Lender of Borrower's inability to or its intention not to perform its obligations hereunder, or otherwise disaffirms, rejects, or repudiates any of its obligations hereunder.

## IX.    <u>Remedies</u>

(a) Upon the occurrence and during the continuation of any Event of Default by Borrower, the Lender may, at its option:  (1) declare the entire Loan Balance outstanding for any Loan hereunder immediately due and payable; (2) terminate this Agreement and any Loan upon notice to Borrower; (3) transfer any Collateral from the collateral account to Lender's operating account necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by this Agreement or by Genesis in furtherance of its performance hereunder and/or its lending business, including but not limited to using the Collateral to purchase the relevant Digital Currency to replenish Lender's supply of the relevant Digital Currency or selling any Collateral in a relevant market for such Digital Currency; (4)

13

purchase on Lender's own account a like amount of Loaned Assets in a relevant market for such Digital Currency and then collect from Borrower amounts expended by Lender for such purchase ; (5) exercise its rights under Section XII herein; and (6) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity; provided, that upon any Event of Default pursuant to Section VIII as to a particular Loan, the entire Loan Balance then outstanding hereunder shall automatically become and be immediately due and payable.

(b) On the occurrence of any Event of Default under Sections VIII(g) or (h), this Agreement and any and all Loans made pursuant to this Agreement shall be terminated immediately and become due and payable, and Lender shall have immediate right to the Collateral to the fullest extent permitted herein and by law.

(c) In the event that the purchase price of any replacement Digital Currency pursuant to Section IX (a)(3) & (a)(4) above exceeds the amount of the Collateral, Borrower shall be liable to Lender for the amount of such excess together with interest thereon in the amount of 10% or as modified in the Loan Term Sheet. As security for Borrower's obligation to pay such excess, Lender shall have, and Borrower hereby grants, a security interest in any property of Borrower then held by or for Lender and a right of setoff with respect to such property and any other amount payable by Lender to Borrower. The purchase price of replacement Digital Currency purchased under this Section shall include, and the proceeds of any sale of Collateral shall be determined after deduction of, broker's fees and commissions and all other reasonable costs, fees and expense related to such purchase or sale (as the case may be). In the event Lender exercises its rights under this Section, Lender may elect in its sole discretion, in lieu of purchasing all or a portion of the replacement Digital Currencies or selling all or a portion of the Collateral, to be deemed to have made, respectively, such purchase of replacement Digital Currencies or sale of Collateral for an amount equal to the price therefor on the date of such exercise obtained from a generally recognized source.

(d) To the extent that the Loans are now or hereafter secured by property other than the Collateral, or by the guarantee, endorsement or property of any other person, then upon an Event of Default by Borrower, Lender shall have the right in its sole discretion to determine which rights, security, liens, security interests or remedies Lender shall at any time pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting any of them or any of Lender's rights hereunder.

(e) In connection with the exercise of its remedies pursuant to this Section IX, Lender may (1) exchange, enforce, waive or release any portion of the Collateral or Loans in favor of the Lender or relating to any other security for the Loans; (2) apply such Collateral or security and direct the order or manner of sale thereof as the Lender may, from time to time, determine; and (3) settle, compromise, collect or otherwise liquidate any such Collateral or security in any manner following the occurrence of an Event of Default, without affecting or impairing the Lender's right to take any other further action with respect to any Collateral or security or any part thereof.

14

Confidential - Filed Under Seal

DocuSign Envelope ID: B6AA056E18DF1-4EB3-BFCS-9CFBAA4507AF

(f)  In addition to its rights hereunder, the Lender shall have any rights otherwise available to it under any other agreement or applicable law.

## X.    Rights and Remedies Cumulative.

No delay or omission by the Lender in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of the Lender stated herein are cumulative and in addition to all other rights provided by law, in equity.

## XI.    Survival of Rights and Remedies

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets or Collateral, and termination of this Agreement.

## XII.    Collection Costs.

In the event Borrower fails to pay any amounts due or to return any Digital Currency or upon the occurrence of any Event of Default in Section VIII hereunder, Borrower shall, upon demand, pay to Lender all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs, broker fees, and technology costs incurred by the Lender in connection with the enforcement of its rights hereunder.

## XIII.    Governing Law; Dispute Resolution.

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules.  If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.  The parties agree to waive their rights to a jury trial.  If any preceding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

## XIV.    Confidentiality.

(a)  Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information").  Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XIV, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii)

15

available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b) Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XIV.

(c) Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

(d) The provisions of this Section XIV will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; *provided* that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure. Notwithstanding the foregoing, Lender may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e) The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement. Notwithstanding anything in this agreement to the contrary, a Party may retain copies of Confidential Information (the "Retained Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XIV; provided, however, that such Party agrees that any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and the confidentiality obligations of this Section XIV shall survive with respect to the Retained Confidential Information for so long as such information is retained.

## XV.    Notices.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth in the recitals.

16

Confidential - Filed Under Seal

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

## XVI.    Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

## XVII.    Single Agreement

Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other.  Accordingly, Borrower and Lender hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.  In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other.  Accordingly, Borrower and Lender hereby agree that (a) each shall perform all of its obligations in respect of each Loan hereunder, and that a default in the performance of any such obligation by Borrower or by Lender (the "Defaulting Party") in any Loan hereunder shall constitute a default by the Defaulting Party under all such Loans hereunder, and (b) the non-defaulting Party shall be entitled to set off claims and apply property held by it in respect of any Loan against obligations owing to it in respect of any other Loan with the Defaulting Party.

## XVIII.    Entire Agreement.

This Agreement, each exhibit referenced herein, and all Loan Term Sheets constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.  Nothing in this Section XVIII shall be construed to conflict with or negate Section XVII above.

## XIX.    Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that Borrower may not assign this Agreement or any rights or duties hereunder without the prior written consent of the other Party (such consent to not be unreasonably withheld).  Lender may assign this Agreement or any rights or duties hereunder upon notice to Borrower.  Notwithstanding the foregoing, in the event of a change of control of Lender or Borrower, prior written consent shall not be required so such Party provides the other Party with written notice prior to the consummation of such change of control.  For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party.  Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, or Loan Term Sheet hereunder, shall create

Confidential - Filed Under Seal

any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns. For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc. The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

## XX.    Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XXI.    Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any Party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XXII.    Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

## XXIII. No Waiver.

The failure of or delay by Genesis to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent Genesis from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

## XXIV. Indemnification.

Confidential - Filed Under Seal

A Borrower shall indemnify and hold harmless Lender, or any of its parents or affiliates, from and against any and all third party claims, demands, losses, expenses and liabilities of any and every nature (including attorneys' fees of an attorney of Genesis' choosing to defend against any such claims, demands, losses, expenses and liabilities) that it may sustain or incur or that may be asserted against it arising out of Genesis' lending of Digital Currency to Borrower under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to that Lender's bad faith, gross negligence or willful misconduct in the performance of its duties under this Agreement. This indemnity shall be a continuing obligation of Borrower, its successors and assigns, notwithstanding the termination of this Agreement.

## XXV.  Term and Termination.

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either Party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period. The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VIII or upon 30 days' notice by either Party to the other.

In the event of a termination of this Agreement, any Loaned Assets shall be redelivered immediately and any fees owed shall be payable immediately.

## XXVI. Miscellaneous.

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate. This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement. The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement. The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

*[Signature page follows.]*

19

Confidential - Filed Under Seal

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

BORROWER:

█████████████

By: _____

Name: ████████████

Title:  Jr

LENDER:

GENESIS GLOBAL CAPITAL, LLC

By: _____
      *Kristopher Johnson*
Name: Kristopher Johnson
Title: Head of Risk

20

Confidential - Filed Under Seal

DocuSign Envelope ID: B6A056E18DF1-4EB3-BE5C-9CFBA415D7AF

## EXHIBIT A

Authorized Agents.  The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section II hereof:

Name: n/a
Email: n/a

Name: n/a
Email: n/a

Borrower may change its Authorized Agents by notice given to Lender as provided herein.

Confidential - Filed Under Seal

## EXHIBIT B

## LOAN TERM SHEET

This loan agreement dated [DATE OF TERM SHEET] between Genesis Global Capital, LLC ("Genesis") and [BORROWER] ("Borrower") incorporates all of the terms of the Master Loan Agreement between Genesis and Borrower on [DATE OF MASTER AGREEMENT] and the following specific terms:

Lender:                                Genesis Global Capital, LLC

Borrower:                             [BORROWER]

Borrowed Asset:

Amount of Currency:

Borrow Fee:

Loan Type:                           [Open Loan]
                                           [Fixed Term Loan]
                                           [Term Loan With Prepayment Option]

Maturity Date:

Collateral Asset:

Collateral:

Margin Call Limit:


GENESIS GLOBAL CAPITAL, LLC          [BORROWER]


By: _____          By: _____
Name:                                Name:
Title:                               Title:

DocuSign Envelope ID: 268208764-7B40-45B3-0499-D4212220A566

# EXHIBIT B

## LOAN TERM SHEET

The following loan agreement dated October 5th, 2022 incorporates all of the terms of the Master Borrow Agreement entered into by Genesis Global Capital, LLC ("Genesis") and ████████████████████ on February 9th, 2021 and the following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ████████ |
| Borrowed Asset: | BTC |
| Amount of Borrowed Asset: | 3,000 BTC |
| Borrow Fee: | 5.00% annual |
| Loan Type: | Fixed Term |
| Maturity Date: | April 5th, 2023 |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |
| Genesis BTC Address: | ████████████████████████ |

Genesis Global Capital, LLC    ████████

By: _____    By: _____
Name: Nebiyou Getahun    Name: ████████
Title: Senior Associate Credit Risk    Title: Mr.

Confidential - Filed Under Seal

## MASTER BORROW AGREEMENT

This Master Borrow Agreement ("Agreement") is made on this <u>3/2/2021 | 18:47:40 PST</u>
("Effective Date") by and between

Genesis Global Capital, LLC ("Genesis" or "Borrower"), a limited liability company organized
and existing under the laws of Delaware with its principal place of business at 111 Town Square
Place, Suite 1203, Jersey City, NJ 07310 and



 ("_____" or
"Lender") an individual residing at_ _____ .

## RECITALS

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to
time, seek to initiate a transaction pursuant to which Lender will lend U.S. Dollars or Digital
Currency to Borrower, and Borrower will pay a Loan Fee and return such U.S Dollars or Digital
Currency to Lender upon the termination of the Loan; and

**WHEREAS**, Borrower intends to use any Loaned Assets under this Agreement in its Digital
Currency lending business;

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the
receipt and sufficiency of which hereby acknowledged, the Borrower and the Lender hereby
agree as follows:

## I.    Definitions

"**Airdrop**" means a distribution of a new token or tokens resulting from the ownership of a
preexisting token. For the purposes of Section V, an "**Applicable Airdrop**" is an Airdrop for
which the distribution of new tokens can be definitively calculated according to its distribution
method, such as a pro rata distribution based on the amount of the relevant Digital Currency held
at a specified time.  A "**Non-Applicable Airdrop**" is an Airdrop for which the distribution of new
tokens cannot be definitively calculated, such as a random distribution, a distribution to every
wallet of the relevant Digital Currency, or a distribution that depends on a wallet of the relevant
Digital Currency meeting a threshold requirement.

"**Authorized Agent**" has the meaning set forth in Exhibit A.

"**Borrower**" means Genesis Global Capital, LLC.

"**Borrowed Amount**" refers to the value of the Loaned Assets in U.S. dollars on the Loan
Effective Date.

"**Borrower Email**" means lend@genesiscap.co.

1

"**Business Day**" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

"**Business Hours**" means between the hours of 9:00 am to 5:00 pm New York time on a Business Day.

"**Call Option**" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement and in particular Section II(c)(ii).

"**Close of Business**" means 5:00 pm New York time.

"**Collateral**" is defined as set forth in Section IV(a)

"**Digital Currency**" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), or any digital currency that the Borrower and Lender agree upon.

"**Digital Currency Address**" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Currency.

"**Fixed Term Loan**" means a Loan with a pre-determined Maturity Date, where Borrower does not have a Prepayment Option and Lender does not have a Call Option.

"**Hard Fork**" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"**Lender**" means ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

"**Lender Email**" means _▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

"**Loan**" means a request for a loan or an actual loan of Digital Currency or U.S. Dollars made pursuant to and in accordance with this Agreement and a Loan Term Sheet.

"**Loan Balance**" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees, Late Fees, and any Earlier Termination Fee for a particular Loan.

"**Loan Documents**" means this Master Borrow Agreement and any and all Loan Term Sheets entered into between Lender and Borrower.

"**Loan Effective Date**" means the date upon which a Loan begins.

"**Loan Fee**" means the fee paid by Borrower to the Lender for the Loan.

2

DocuSign Envelope ID: 35585A38-2F35-4CD6-A480-91A8A86B7883

"*Loan Term Sheet*" means the agreement between Lender and Borrower on the particular terms of an individual Loan, which shall be memorialized in an agreement as set forth in Exhibit B or in a form approved by Lender comparable therewith.

"*Loaned Assets*" means any Digital Currency or U.S. Dollar amount transferred in a Loan hereunder until such Digital Currency (or identical Digital Currency) or U.S. Dollar amount is transferred back to Lender hereunder, except that, if any new or different Digital Currency is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Currency shall be deemed to become Loaned Assets in addition to the former Digital Currency for which such exchange is made.  For purposes of return of Loaned Assets by Borrower, such term shall include Digital Currency of the same quantity and type as the Digital Currency, as adjusted pursuant to the preceding sentence.

"*Maturity Date*" means the pre-determined future date upon which a Loan becomes due in full, whether by Term or Call Option.

"*Open Loan*" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"*Prepayment Option*" means the Borrower has the option to repay or return the Loaned Assets prior to the Maturity Date without incurring Early Termination Fees, subject to this Agreement and in particular Section II(c)(iii).

"*Term*" means the period from the Loan Effective Date through Termination Date.

"*Term Loan with Call Option*" means a Loan with a pre-determined Maturity Date where Lender has a Call Option.

"*Term Loan with Prepayment Option*" means a Loan with a pre-determined Maturity Date where Borrower has a Prepayment Option.

"*Termination Date*" means the date upon which a Loan is terminated.

## II.    <u>General Loan Terms.</u>

(a) <u>Loans of Digital Currency or </u>U.S. Dollars

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request from the Lender a Loan to Borrower of a specified amount of Digital Currency or U.S. Dollars, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan on terms acceptable to Lender and as set forth in a corresponding Loan Term Sheet.

3

DocuSign Envelope ID: 35E85A38-DF35-4CD6-A480-91A8A86B7883

(b) <u>Loan Procedure</u>

From time to time during the Term of this Agreement, during the hours of 9:00 am New York time to 4:00 pm New York time on a Business Day (the "<u>Request Day</u>"), by email directed to Lender Email (or such other address as Lender may specify in writing), an Authorized Agent of Borrower may request from Lender a Loan of a specific amount of Digital Currency or U.S. Dollars (a "<u>Lending Request</u>").  Provided Lender receives such Lending Request prior to 3:00 pm New York time, Lender shall by email directed to Borrower Email (or such other address as Lender may specify in writing) to inform Borrower whether Lender agrees to make such a Loan. If Lender fails to provide Borrower with an acceptance as to a particular Lending Request prior to Close of Business on the Request Day, such Lending Request shall be deemed to have been denied by Lender.

As part of its Lending Request, Borrower shall provide the following proposed terms:

(i)      Whether U.S. Dollars or Digital Currency, and if Digital Currency, the type of Digital Currency;
(ii)     the amount of Digital Currency or U.S. Dollars;
(iii)    whether the Loan is to be a Fixed Term Loan, a Term Loan with Prepayment Option, or an Open Loan;
(iv)    the Loan Effective Date; and
(v)     the Maturity Date (if a Fixed Term Loan or a Term Loan with Prepayment Option).

If Lender agrees to make a Loan in accordance with Borrower's proposed terms, Lender shall commence transmission to either (x) the Borrower's Digital Currency Address the amount of Digital Currency, or (y) Borrower's bank account by bank wire the amount of U.S. Dollars, as applicable, as such Digital Currency Address or bank wire instruction is set forth in the Lending Request on or before Close of Business on the Request Day.  In the event Lender requests a modification to the proposed terms, including a proposal for a Call Option, Lender shall provide notice of such, and upon Borrower's acceptance of said modified terms, Lender shall commence transmission to Borrower's Digital Currency Address the amount of Digital Currency set forth in the Lending Request on or before Close of Business on the Request Day.

The specific and final terms of a Loan shall be memorialized using the Loan Term Sheet, which shall be delivered and executed after the final terms of a Loan are agreed to and prior to the delivery of the Loaned Assets.  In the event of a conflict of terms between this Master Borrow Agreement and a Loan Term Sheet, the terms in the Loan Term Sheet shall govern.

(c) <u>Loan Repayment Procedure</u>

(i)  <u>Loan Repayment</u>

Unless otherwise specified in subsections (ii) and (iii) below, upon the earlier of the Maturity Date, the Recall Delivery Day, or the Redelivery Day (as defined below) for a Loan, Borrower shall repay the entirety of the Loan Balance to Lender by Close of Business.  If Lender has not

4

provided to Borrower a Digital Currency Address for receiving the repayment of a Loan by Close of Business on the day prior to the earlier of the Maturity Date, the Recall Delivery Day (defined below), or the Redelivery Day (defined below), then such Loan will become an Open Loan on said Maturity Date or Redelivery Day, whichever applicable, and no additional Loan Fees shall be accrued after the Maturity Date or the Redelivery Day.

(ii) Call Option

For Loans in which the Lender has a Call Option (e.g. Open Loans, etc.), Lender may during Business Hours (the "Recall Request Day") demand repayment of a portion or the entirety of the Loan Balance (the "Recall Amount"). Lender will notify Borrower of Lender's exercising of this right by email to Borrower's Email. Borrower will then have until Close of Business on the seventh Business Day after the Recall Request Day (the "Recall Delivery Day") to deliver the Recall Amount.

In the event of a Call Option where Lender demands only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Recall Delivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date or the subsequent Recall Delivery Day.

(iii) Prepayment Option

For Loans in which Borrower has a Prepayment Option (e.g. Open Loans, Term Loans with Prepayment Option, etc.), Borrower may notify Lender during Business Hours of Borrower's intent to return the Loan prior to the Maturity Date or the date Lender exercises its Call Option without being subject to, and as a result will not incur, Early Termination Fees as set forth in Section III(d). Borrower shall provide said notice at least one Business Day prior to the date on which the Borrower will repay all or a portion of the Loan Balance (said later date, the "Redelivery Day"). Borrower's exercising of its Prepayment Option shall not relieve it of any of its other obligations herein, including without limitation its payment of owed Loan Fees and Late Fees.

In the event of a Prepayment Option where the Borrower repays only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Redelivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date, the Recall Delivery Day, or a subsequent Redelivery Day.

(d) Termination of Loan

A Loan will terminate upon the earlier of:

(i)      the Maturity Date;

(ii)     the repayment of the Loan Balance by Borrower prior to the Maturity Date;

(iii)    the occurrence of an Event of Default as defined in Section VII; however, Lender shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan. In the event of reinstitution of

5

the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

(iv)    in the event any or all of the Loaned Assets becomes in Borrower's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization, arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Borrower's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and termination of this Agreement except as specified in Section XXIII.

In the event of a termination of a Loan, any Loaned Assets or Collateral shall be redelivered immediately and any fees or owed shall be payable immediately to the appropriate party specified herein.

(e) Redelivery in an Illiquid Market

If (i) the seven-day average daily trading volume across each of the three highest-volume digital currency exchanges that report prices for the applicable Digital Currency (as measured by the 30-day average daily trading volume of the applicable Digital Currency on the Loan Date) (these such exchanges, the "Liquidity Exchanges") has decreased by 90% from the date of the Loan Term Sheet to the Maturity Date, Recall Delivery Day, or Redelivery Day, whichever applicable, or (ii) the Loaned Assets ceases to be listed on any of the Liquidity Exchanges (the duration of either event herein designated, the "Illiquid Period"), Borrower may repay the Loan in U.S. Dollars equal to the volume-weighted average price of the Loaned Assets on the Liquidity Exchanges (measured at 4:00 p.m. New York time ) during the Illiquid Period, up to a maximum of 30 days (the "Illiquid Market Spot Rate").

If two of the three Liquidity Exchanges limit or suspend withdrawals or transactions in the Loaned Assets on the Maturity Date, the Recall Delivery Day, or the Redelivery Day, whichever applicable, the requirement for Borrower to return the Loaned Assets shall be temporarily suspended, without penalty or default, including without limitation the incurring of additional Loan Fees, until such time that at least two of the Liquidity Exchanges allow the resumption of withdrawals of and transactions in the Loaned Assets.

## III.    Loan Fees and Transaction Fees.

(a) Loan Fee

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as agreed to herein and annualized in the relevant Loan Term Sheet and subject to change if thereafter agreed by Borrower and Lender. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from, but excluding, the date on which the Loaned Digital Currencies or

6

Loaned U.S. Dollars are transferred to Borrower until, and including, the date on which such Loaned Digital Currencies or Loaned U.S. Dollars are repaid in their entirety to Lender.

Lender shall calculate any Loan Fees owed on a daily basis and provide Borrower with the calculation upon request.  The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

(b) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with Section III(c), Borrower shall incur an additional fee (the "Late Fee") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

(c) Payment of Loan Fees and Late Fees

Unless otherwise agreed, any Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) five (5) Business Days after receipt of an invoice from Lender or (ii) the termination of all Loans hereunder (the "Payment Due Date").  An invoice for Loan Fees and any Late Fees (the "Invoice Amount") shall be sent out on the first Business Day of the month and shall include any Loan Fees, Late Fees, and Early Termination Fees incurred and outstanding during the previous month and periods.  Borrower shall have up to five Business Days from the date of said Invoice to pay the Invoice Amount.  Failure of Lender to timely send an invoice in accordance with the preceding sentence shall not be considered a material default under Section VIII(d) nor shall it relieve Borrower of its obligation to pay any Loan Fees, Late Fees, and Early Termination Fees owed herein nor negate any Event of Default resulting from Borrower's failure to timely pay such fees.  The Loan Fee, Late Fees, and Early Termination Fees shall be payable, unless otherwise agreed by the Borrower and Lender in the Loan Term Sheet, in the same Loaned Assets that were borrowed, whether U.S. Dollars or Digital Currency on the same blockchain and of the same type that was loaned by the Lender during the Loan.

(d) Early Termination Fees

For Fixed Term Loans and Term Loans with Call Options, if Borrower returns the Loaned Assets prior to the Maturity Date, Borrower shall pay to Lender a fee equal to twenty percent (20%) of the Loan Fee that would have accrued from the date of the repayment until the Maturity Date of the Loan (the "Early Termination Fee").  The Early Termination Fee is due with the repayment of the Loaned Assets.  The Early Termination Fee shall not apply if Borrower returns the Loaned Assets to Lender in the event of a Hard Fork (as defined in Section V) or if Lender moves up the Maturity Date to an earlier date by exercising a Call Option.

(e) Taxes and Fees

Confidential - Filed Under Seal

DocuSign Envelope ID: 35E85A38-2F35-4CD6-A480-91A8A86E7883

Borrower shall report to the Internal Revenue Service ("IRS") all Loan Fees paid to Lender under this Agreement, and shall provide Lender Form 1099-INT annually documenting the amount reported to the IRS.  For any Loan Fees paid in Digital Currency, such Loan Fees shall be calculated at the Coinbase Pro spot rate at 4 p.m. New York time daily on any day that Loan Fees accrue.  Neither Borrower nor Lender shall have any liability to the other party for any taxes due under this Agreement.

## IV.    Collateral Requirements

### (a) Collateral

If agreed in a Loan Term Sheet, Borrower shall provide as collateral an amount of U.S. Dollars, or Digital Currency as set forth below, or to be determined and agreed upon by the Borrower and Lender ("Collateral") and memorialized using the Loan Term Sheet.  The Collateral will be calculated as a percentage of the value of the Loaned Assets, such value determined by a spot rate agreed upon in the Loan Term Sheet.  Borrower shall, prior to or concurrently with the transfer of the Loaned Assets to Borrower, but in no case later than the Close of Business on the day of such transfer, transfer to Lender the agreed upon Collateral.

Collateral shall always be valued in U.S. Dollars, but Borrower may, if mutually agreed by both parties, provide the Collateral (in whole or in part) to Lender in Digital Currency in an amount equal to the value of the Collateral in U.S. Dollars at a spot rate determined by Borrower.  For the avoidance of doubt, upon the repayment of the Loaned Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited, net of any Additional Collateral, Margin Call, or Refunded Collateral adjustments (as defined below in Sections IV(c) & (e)).  If a Hard Fork in the blockchain of Digital Currency meeting the criteria in Section V occurs while Lender is holding such Digital Currency as Collateral, Lender shall return the New Tokens (as defined in Section V) to Borrower in addition to the Collateral and Additional Collateral.  If a Hard Fork occurs that does not meet the criteria in Section V, Lender shall have no obligation to return any New Tokens to Borrower.

The Collateral transferred by Borrower to Lender, as adjusted herein, shall be security for Borrower's obligations in respect of such Loan.  Borrower hereby pledges with, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the Loaned Assets by Lender to Borrower and which shall cease upon the return of the Loaned Assets by Borrower to Lender.

### (b) Loan and Collateral Transfer

If Lender transfers Loaned Assets to Borrower and Borrower does not transfer Collateral to Lender as provided in Section IV(a), Lender shall have the absolute right to the return of the Loaned Assets; and if Borrower transfers Collateral to Lender, as provided in Section IV(a), and Lender does not transfer the Loaned Assets to Borrower, Borrower shall have the absolute right to the return of the Collateral.

Confidential - Filed Under Seal

(c) <u>Margin Calls</u>

If during the Term of a Loan the value of the Loaned Assets increases, or the value of the Collateral decreases, so that the value of the Loaned Assets becomes equal to or greater than the value of the Collateral (the "<u>Margin Call Limit</u>"), Lender shall have the right to require Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "<u>Additional Collateral</u>") as measured by the spot rate published on Coinbase Pro (such rate, the "<u>Margin Call Spot Rate</u>").

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "<u>First Notification</u>") to the Borrower at the email address indicated in Section XIII (or such other address as the parties shall agree to in writing) that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Margin Call Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate. Borrower shall have twenty-four (24) hours from the time Lender sends such First Notification to (x) respond and send payment to Lender in accordance with subsection (d) below, or (y) respond that the value of the Loaned Assets, value of the Collateral, or spot rate as indicated on Coinbase Pro as applicable, has decreased sufficiently such that it is no longer at or above the Margin Call Spot Rate. If Lender agrees by email that Borrower's response according to (y) above is correct, then no other action is required by Borrower.

If Borrower fails to respond to the First Notification within twenty-four (24) hours, or Lender rejects Borrower's response pursuant to (y) above and the spot rate of the Loaned Assets is still at least the Margin Call Spot Rate, Lender shall send a second email notification (the "<u>Second Notification</u>") repeating the information in provisions (i) – (iv) in the preceding paragraph. Borrower shall have twelve (12) hours from the time Lender sends the Second Notification to respond according to (x) or (y) in the preceding, and Lender has the right to accept or reject Borrower's response as stated above. Upon Lender's rejection of Borrower's response to the Second Notification, Borrower shall make immediate payment of Additional Collateral as set forth in Section IV(d) below. Failure to provide Additional Collateral, or failure by Borrower to respond to either the First Notification or the Second Notification, shall give Lender the option to declare an Event of Default under Section VII below.

Borrower acknowledges that its obligations hereunder, including those in this Section IV, continue regardless of Lender's request for Additional Collateral and Borrower's acceptance or rejection of the same.

(d) <u>Payment of Additional Collateral</u>

Payment of the Additional Collateral shall be made by bank wire to the account, or if applicable the Digital Currency Address, specified in the Loan Term Sheet or by a return of the amount of Loaned Assets necessary to make the Collateral percentage indicated in the Loan Term Sheet correct based on the Margin Call Spot Rate. For any return of Loaned Assets made in accordance with this Section, Borrower is still responsible for payment of any Early Termination Fees that apply to the particular Loan.

Confidential - Filed Under Seal

(e) <u>Refund of Collateral</u>

If during the Term of a Loan the value of the Loaned Assets decreases, or the value of the Collateral increases, so that the value of the Collateral relative to the value of the Loaned Assets becomes equal to or greater than the percentage indicated in the Loan Term Sheet (the "<u>Collateral Refund Limit</u>"), Borrower shall have the right to require Lender to return an amount of Collateral so that the Collateral is at no greater than the percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "<u>Refunded Collateral</u>") as measured by the spot rate published on Coinbase Pro (such rate, the "<u>Collateral Refund Spot Rate</u>").

If Borrower requires Lender to repay Refunded Collateral, it shall send an email notification (the "<u>First Refund Notification</u>") to the Lender at the Lender Email that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Collateral Refund Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate.  Lender shall have twenty-four (24) hours from the time Borrower sends such First Refund Notification to (x) respond and send payment to Borrower in accordance with subsection (f) below, or (y) respond that the value of the Loaned Assets as a percentage of the value of the Collateral has increased sufficiently such that it is no longer at or below the Collateral Refund Spot Rate.  If Borrower agrees by email that Lender's response according to (y) above is correct then no other action is required by Lender.

If Lender fails to respond to the First Refund Notification within twenty-four (24) hours, and the value of the Loaned Assets is still at or below the Collateral Refund Spot Rate, Borrower shall send a second email notification (the "<u>Second Refund Notification</u>") repeating the information in (i) – (iv) in the preceding paragraph.  Lender shall have twelve (12) hours from the time Borrower sends the Second Refund Notification to respond according to (x) or (y) in the preceding paragraph. Failure by Lender to respond to either the First Refund Notification or the Second Refund Notification shall give Borrower the option to declare an Event of Default under Section VII below.

(f) <u>Payment of Refunded Collateral</u>

Payment of the Refunded Collateral shall be made by bank wire to the account specified by the Borrower or to a Digital Currency Address specified by the Borrower, as applicable.

(g) <u>Return of Collateral</u>

Upon Borrower's repayment of the Loan and acceptance by Lender of the Loaned Assets into Lender's Digital Currency Address, with such delivery being confirmed on the relevant Digital Currency blockchain ten times, Lender shall initiate the return of Collateral within two Business Days to a bank account designated by Borrower or, where Digital Currency is Collateral, into an applicable Digital Currency Address on the behalf of Borrower.

**V.    Hard Fork**

(a) <u>Notification</u>

Confidential - Filed Under Seal

In the event of a public announcement of a future Hard Fork or an Airdrop in the blockchain for any Loaned Assets, Lender shall provide email notification to Borrower.

    (b) <u>No Immediate Termination of Loans Due to Hard Fork</u>

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated.  Borrower and Lender may agree, regardless of Loan type, either (i) to terminate a Loan without any penalties on an agreed upon date or (ii) for Lender to manage the Hard Fork on the behalf of Borrower.  Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Currency to Lender and Lender transfers said Digital Currency back to Borrower pursuant to this section.

    (c) <u>Lender's Right to New Tokens</u>

Lender will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Currency protocol or an Applicable Airdrop (the "New Tokens") if any two of the following four conditions are met:

- *Hash Power*: the average hash power mining the New Token on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the hash power mining the Loaned Assets on the day preceding the Hard Fork or Applicable Airdrop (calculated as a 3-day average of the 3 days preceding the Hard Fork).
- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).
- *Wallet Compatibility*: the New Token is supported by either BitGo wallets or Ledger wallets within 30 days of the Hard Fork or Applicable Airdrop.

For the above calculations, the source for the relevant data on the Digital Currency hash power, market capitalization, and 24-Hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the hash power of the New Token will be bitinfocharts.com (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

<center>11</center>

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Lender. If sending the New Tokens to Lender is burdensome, upon Lender's written agreement with Borrower, Borrower can reimburse Lender for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount of the New Tokens owed using the spot rate agreed upon by the Parties at the time of said repayment, or (ii) returning the borrowed Digital Currency so that Lender can manage the split of the underlying digital tokens as described in Section IV(b) above. Alternatively, subject to Lender's written agreement, the parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender. In all cases, Borrower will be solely responsible for payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender, including but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment. For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this Section V shall continue for any New Tokens that meet the criteria in this subsection (c) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement.

## VI.    Representations and Warranties.

The parties to this Agreement (individually, a "Party," collectively the "Parties") hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each Party represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution, delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Currency, Collateral, or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws

Confidential - Filed Under Seal

(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h) Lender represents and warrants that it has, or will have at the time of the loan of any Digital Currency, the right to lend such Loaned Assets subject to the terms and conditions hereof, and free and clear of all liens and encumbrances other than those arising under this Agreement.

(i) Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof.

(j) Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest in said Collateral subject to the terms and conditions hereof.

## VII.   Default

It is further understood that any of the following events shall constitute an event of default hereunder against the defaulting Party, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to return any and all Loaned Assets upon termination of any Loan however, Borrower shall have ten Business Days to cure such default;

(b) the failure of Borrower to pay any and all Loan Fees, Late Fees, or to remit any New Tokens, however, Borrower shall have ten Business Days to cure such default;

(c) the failure of either Party to transfer Collateral or Additional Collateral, including any Refunded Collateral, as required by Section IV, however, a Party shall have ten Business Days to cure such default;

(d) a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;

13

(e) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not be dismissed within thirty (30) days of the initiation of said proceedings; or

(f) any representation or warranty made by either Party in any of the Loan Documents that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

## VIII.  Remedies

(a) Upon the occurrence and during the continuation of any Event of Default on a Loan by Borrower, the Lender may, at its option:  (1) declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable; (2) transfer any Collateral for a Loan from the collateral account to Lender's operating account necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by the Loan; and/or (3) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity.  If any Event of Default by Borrower under Sections VII(a), (b), (c), or (d) persist for thirty days or more, or immediately upon an Event of Default by Borrower under Sections VII(e) or (f), the Lender may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Borrower.

(b) Upon the occurrence and during the continuation of any Event of Default on a Loan by Lender, the Borrower may, at its option:  (1) demand a return of any and all Collateral in the control or possession of Lender or its agents; (2) withhold repayment of the Loaned Assets and any outstanding Loan Fees, Late Fees or other amounts claimed by Lender; and/or (3) exercise all other rights and remedies available to the Borrower hereunder, under applicable law, or in equity.  If any Event of Default by Lender under Sections VII (c) or (d) persist for thirty-days or more, or immediately upon an Event of Default by Lender under Sections VII (e) or (f), the Borrower may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Lender.

(c) In addition to its rights hereunder, the non-defaulting Party shall have any rights otherwise available to it under any other agreement or applicable law; however, the non-defaulting Party shall have an obligation to mitigate its damages in a commercially reasonable manner.

## IX.  Rights and Remedies Cumulative.

No delay or omission by a Party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each Party stated herein are cumulative and in addition to all other rights provided by law, in equity.

## X.  Survival of Rights and Remedies

14

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets or Collateral, and termination of this Agreement.

## XI.    Governing Law; Dispute Resolution.

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. The parties agree to waive their rights to a jury trial. If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

## XII.    Confidentiality.

(a) Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information"). Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XIV, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii) available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b) Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XII.

(c) Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

15

Confidential - Filed Under Seal

(d) The provisions of this Section XII will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; provided that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure. Notwithstanding the foregoing, Lender may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e) The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement. Notwithstanding anything in this agreement to the contrary, a Party may retain copies of Confidential Information (the "Retained Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XII; provided, however, that such Party agrees that any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and the confidentiality obligations of this Section XII shall survive with respect to the Retained Confidential Information for so long as such information is retained.

## XIII.    **Notices.**

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth below:

Lender: ████████████
████████████

Email: ████████████

Borrower:
Genesis Global Capital, LLC
111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Attn: Michael Moro, CEO
Email: michael@genesiscap.co

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

## XIV.    **Modifications.**

16

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

## XV.    Single Agreement

Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other.  Accordingly, Borrower and Lender hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.  In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other.

## XVI.    Entire Agreement.

This Agreement, each exhibit referenced herein, and all Loan Term Sheets constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.  Nothing in this Section XVI shall be construed to conflict with or negate Section XV above.

## XVII.    Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that Lender may not assign this Agreement or any rights or duties hereunder without the prior written consent of the Borrower (such consent to not be unreasonably withheld).  Borrower may assign this Agreement or any rights or duties hereunder upon notice to Lender.  Notwithstanding the foregoing, in the event of a change of control of Lender or Borrower, prior written consent shall not be required so such Party provides the other Party with written notice prior to the consummation of such change of control.  For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party.  Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, or Loan Term Sheet hereunder, shall create any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns.  For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc.  The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

## XVIII.    Severability of Provisions.

Confidential - Filed Under Seal

DocuSign Envelope ID: 35585A38-2F35-4CD6-A480-91A8A86E7883

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XIX.    Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any Party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XX.    Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

## XXI.    No Waiver.

The failure of or delay by either Party to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent such Party from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

## XXII.    Indemnification.

Lender shall indemnify and hold harmless Genesis, or any of its parents or affiliates, from and against any and all third party claims, demands, losses, expenses and liabilities of any and every nature (including attorneys' fees of an attorney of Genesis' choosing to defend against any such claims, demands, losses, expenses and liabilities) that Genesis may sustain or incur or that may be asserted against it arising out of Genesis' borrowing  Digital Currency from Lender under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to Genesis' bad faith, gross negligence or willful misconduct in the performance of its duties under this Agreement.

## XXIII. Term and Termination.

18

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either Party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period.   The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VIII or upon 30 days' notice by either Party to the other.

In the event of a termination of this Agreement, any Loaned Assets or Collateral shall be redelivered immediately and any fees owed shall be payable immediately.

### XXIV. **Miscellaneous.**

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate.  This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.  The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement.  The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

Confidential - Filed Under Seal

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

LENDER:



By: _____

Name: _____

BORROWER:

GENESIS GLOBAL CAPITAL, LLC

By: _____

Name: Kristopher Johnson

Title: Senior Risk Officer

20

Confidential - Filed Under Seal

## EXHIBIT A

Authorized Agents.  The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section II hereof:

Name: Matt Ballensweig
Email: Matt@genesiscap.co

Name: Roshun Patel
Email: Roshun@genesiscap.co

Borrower may change its Authorized Agents by notice given to Lender as provided in accordance with Section XV.  Such notice shall not be considered to be a modification of or amendment to this Agreement for purposes of Section XVI.

Confidential - Filed Under Seal

**EXHIBIT B**

**LOAN TERM SHEET**

This loan agreement dated [DATE OF TERM SHEET] between Genesis Global Capital, LLC ("Genesis") and [COMPANY NAME] ("Lender") incorporates all of the terms of the Master Borrow Agreement between Genesis and Borrower on [DATE OF MASTER AGREEMENT] and the following specific terms:


Borrower:                          Genesis Global Capital, LLC

Lender:                            [COMPANY NAME]

Borrowed Asset:

Amount of Currency:

Borrow Fee:

Loan Type:                         [Open Loan]
                                   [Fixed Term Loan]
                                   [Term Loan With Prepayment Option]

Maturity Date:


GENESIS GLOBAL CAPITAL, LLC              [COMPANY NAME]


By: _____       By: _____
Name:                             Name:
Title:                            Title:

Confidential - Filed Under Seal

# EXHIBIT B

# LOAN TERM SHEET

The following loan agreement dated August 29th, 2022 incorporates all of the terms of the Master Borrow Agreement entered into by Genesis Global Capital, LLC ("Genesis") and ███████████████ on March 2nd, 2021 and the following specific terms:

| | |
|---|---|
| Borrower: | Genesis |
| Lender: | ████████ |
| Borrowed Asset: | BTC |
| Amount of Borrowed Asset: | 250 BTC |
| Borrow Fee: | 4.00% annual |
| Loan Type: | Fixed Term |
| Maturity Date: | March 1st, 2023 |
| Collateral: | - |
| Margin Limit: | 0.00% of loan value (on a net loan basis) |
| Margin Refund: | 0.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 0.00% of loan value (on a net loan basis) |
| Genesis BTC Address: | ████████████████████ |

Genesis Global Capital, LLC    ████████

By: _____  By: _____
    *Adim Offurum*
    ──51A74E1BFF2C494...
Name: Adim Offurum         Name: ████████
Title: Vice President      Title: Personal

## MASTER BORROW AGREEMENT

This Master Borrow Agreement ("Agreement") is made on this 9th day of February, 2021 ("Effective Date") by and between Genesis Global Capital, LLC ("Genesis" or "Borrower"), a limited liability company organized and existing under the laws of Delaware with its principal place of business at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310 and ███████████ or "Lender") an individual residing at ████████████████ .

## RECITALS

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend U.S. Dollars or Digital Currency to Borrower, and Borrower will pay a Loan Fee and return such U.S Dollars or Digital Currency to Lender upon the termination of the Loan; and

**WHEREAS**, Borrower intends to use any Loaned Assets under this Agreement in its Digital Currency lending business;

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, the Borrower and the Lender hereby agree as follows:

### I. Definitions

"**Airdrop**" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "**Applicable Airdrop**" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time. A "**Non-Applicable Airdrop**" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Currency, or a distribution that depends on a wallet of the relevant Digital Currency meeting a threshold requirement.

"**Authorized Agent**" has the meaning set forth in Exhibit A.

"**Borrower**" means Genesis Global Capital, LLC.

"**Borrowed Amount**" refers to the value of the Loaned Assets in U.S. dollars on the Loan Effective Date.

"**Borrower Email**" means lend@genesiscap.co.

"**Business Day**" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

1

Confidential - Filed Under Seal

"***Business Hours***" means between the hours of 9:00 am to 5:00 pm New York time on a Business Day.

"***Call Option***" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement and in particular Section II(c)(ii).

"***Close of Business***" means 5:00 pm New York time.

"***Collateral***" is defined as set forth in Section IV(a)

"***Digital Currency***" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), or any digital currency that the Borrower and Lender agree upon.

"***Digital Currency Address***" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Currency.

"***Fixed Term Loan***" means a Loan with a pre-determined Maturity Date, where Borrower does not have a Prepayment Option and Lender does not have a Call Option.

"***Hard Fork***" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"***Lender***" means ██████████.

"***Lender Email***" means ████████████████.

"***Loan***" means a request for a loan or an actual loan of Digital Currency or U.S. Dollars made pursuant to and in accordance with this Agreement and a Loan Term Sheet.

"***Loan Balance***" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees, Late Fees, and any Earlier Termination Fee for a particular Loan.

"***Loan Documents***" means this Master Borrow Agreement and any and all Loan Term Sheets entered into between Lender and Borrower.

"***Loan Effective Date***" means the date upon which a Loan begins.

"***Loan Fee***" means the fee paid by Borrower to the Lender for the Loan.

"***Loan Term Sheet***" means the agreement between Lender and Borrower on the particular terms of an individual Loan, which shall be memorialized in an agreement as set forth in Exhibit B or in a form approved by Lender comparable therewith.

Confidential - Filed Under Seal

"*Loaned Assets*" means any Digital Currency or U.S. Dollar amount transferred in a Loan hereunder until such Digital Currency (or identical Digital Currency) or U.S. Dollar amount is transferred back to Lender hereunder, except that, if any new or different Digital Currency is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Currency shall be deemed to become Loaned Assets in addition to the former Digital Currency for which such exchange is made. For purposes of return of Loaned Assets by Borrower, such term shall include Digital Currency of the same quantity and type as the Digital Currency, as adjusted pursuant to the preceding sentence.

"*Maturity Date*" means the pre-determined future date upon which a Loan becomes due in full, whether by Term or Call Option.

"*Open Loan*" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"*Prepayment Option*" means the Borrower has the option to repay or return the Loaned Assets prior to the Maturity Date without incurring Early Termination Fees, subject to this Agreement and in particular Section II(c)(iii).

"*Term*" means the period from the Loan Effective Date through Termination Date.

"*Term Loan with Call Option*" means a Loan with a pre-determined Maturity Date where Lender has a Call Option.

"*Term Loan with Prepayment Option*" means a Loan with a pre-determined Maturity Date where Borrower has a Prepayment Option.

"*Termination Date*" means the date upon which a Loan is terminated.

## II.    General Loan Terms.

(a) Loans of Digital Currency or U.S. Dollars

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request from the Lender a Loan to Borrower of a specified amount of Digital Currency or U.S. Dollars, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan on terms acceptable to Lender and as set forth in a corresponding Loan Term Sheet.

(b) Loan Procedure

From time to time during the Term of this Agreement, during the hours of 9:00 am New York time to 4:00 pm New York time on a Business Day (the "Request Day"), by email directed to Lender Email (or such other address as Lender may specify in writing), an Authorized Agent of Borrower may request from Lender a Loan of a specific amount of Digital Currency or U.S.

3

Dollars (a "Lending Request").  Provided Lender receives such Lending Request prior to 3:00 pm New York time, Lender shall by email directed to Borrower Email (or such other address as Lender may specify in writing) to inform Borrower whether Lender agrees to make such a Loan. If Lender fails to provide Borrower with an acceptance as to a particular Lending Request prior to Close of Business on the Request Day, such Lending Request shall be deemed to have been denied by Lender.

As part of its Lending Request, Borrower shall provide the following proposed terms:

| | | |
|---|---|---|
| (i) | Whether U.S. Dollars or Digital Currency, and if Digital Currency, the type of Digital Currency; |
| (ii) | the amount of Digital Currency or U.S. Dollars; |
| (iii) | whether the Loan is to be a Fixed Term Loan, a Term Loan with Prepayment Option, or an Open Loan; |
| (iv) | the Loan Effective Date; and |
| (v) | the Maturity Date (if a Fixed Term Loan or a Term Loan with Prepayment Option). |

If Lender agrees to make a Loan in accordance with Borrower's proposed terms, Lender shall commence transmission to either (x) the Borrower's Digital Currency Address the amount of Digital Currency, or (y) Borrower's bank account by bank wire the amount of U.S. Dollars, as applicable, as such Digital Currency Address or bank wire instruction is set forth in the Lending Request on or before Close of Business on the Request Day.  In the event Lender requests a modification to the proposed terms, including a proposal for a Call Option, Lender shall provide notice of such, and upon Borrower's acceptance of said modified terms, Lender shall commence transmission to Borrower's Digital Currency Address the amount of Digital Currency set forth in the Lending Request on or before Close of Business on the Request Day.

The specific and final terms of a Loan shall be memorialized using the Loan Term Sheet, which shall be delivered and executed after the final terms of a Loan are agreed to and prior to the delivery of the Loaned Assets.  In the event of a conflict of terms between this Master Borrow Agreement and a Loan Term Sheet, the terms in the Loan Term Sheet shall govern.

(c) Loan Repayment Procedure

(i) Loan Repayment

Unless otherwise specified in subsections (ii) and (iii) below, upon the earlier of the Maturity Date, the Recall Delivery Day, or the Redelivery Day (as defined below) for a Loan, Borrower shall repay the entirety of the Loan Balance to Lender by Close of Business.  If Lender has not provided to Borrower a Digital Currency Address for receiving the repayment of a Loan by Close of Business on the day prior to the earlier of the Maturity Date, the Recall Delivery Day (defined below), or the Redelivery Day (defined below), then such Loan will become an Open Loan on said Maturity Date or Redelivery Day, whichever applicable, and no additional Loan Fees shall be accrued after the Maturity Date or the Redelivery Day.

Confidential - Filed Under Seal

(ii) <u>Call Option</u>

For Loans in which the Lender has a Call Option (e.g. Open Loans, etc.), Lender may during Business Hours (the "<u>Recall Request Day</u>") demand repayment of a portion or the entirety of the Loan Balance (the "<u>Recall Amount</u>").  Lender will notify Borrower of Lender's exercising of this right by email to Borrower's Email.  Borrower will then have until Close of Business on the seventh Business Day after the Recall Request Day (the "<u>Recall Delivery Day</u>") to deliver the Recall Amount.

In the event of a Call Option where Lender demands only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Recall Delivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date or the subsequent Recall Delivery Day.

(iii) <u>Prepayment Option</u>

For Loans in which Borrower has a Prepayment Option (e.g. Open Loans, Term Loans with Prepayment Option, etc.), Borrower may notify Lender during Business Hours of Borrower's intent to return the Loan prior to the Maturity Date or the date Lender exercises its Call Option without being subject to, and as a result will not incur, Early Termination Fees as set forth in Section III(d).  Borrower shall provide said notice at least one Business Day prior to the date on which the Borrower will repay all or a portion of the Loan Balance (said later date, the "Redelivery Day").  Borrower's exercising of its Prepayment Option shall not relieve it of any of its other obligations herein, including without limitation its payment of owed Loan Fees and Late Fees.

In the event of a Prepayment Option where the Borrower repays only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Redelivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date, the Recall Delivery Day, or a subsequent Redelivery Day.

(d) <u>Termination of Loan</u>

A Loan will terminate upon the earlier of:

(i)     the Maturity Date;

(ii)    the repayment of the Loan Balance by Borrower prior to the Maturity Date;

(iii)   the occurrence of an Event of Default as defined in Section VII; however, Lender shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan.  In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

(iv)    in the event any or all of the Loaned Assets becomes in Borrower's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether

5

governmental, industrial, or otherwise, or by any court of law or dispute resolution organization, arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Borrower's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and termination of this Agreement except as specified in Section XXIII.

In the event of a termination of a Loan, any Loaned Assets or Collateral shall be redelivered immediately and any fees or owed shall be payable immediately to the appropriate party specified herein.

(e) Redelivery in an Illiquid Market

If (i) the seven-day average daily trading volume across each of the three highest-volume digital currency exchanges that report prices for the applicable Digital Currency (as measured by the 30-day average daily trading volume of the applicable Digital Currency on the Loan Date) (these such exchanges, the "Liquidity Exchanges") has decreased by 90% from the date of the Loan Term Sheet to the Maturity Date, Recall Delivery Day, or Redelivery Day, whichever applicable, or (ii) the Loaned Assets ceases to be listed on any of the Liquidity Exchanges (the duration of either event herein designated, the "Illiquid Period"), Borrower may repay the Loan in U.S. Dollars equal to the volume-weighted average price of the Loaned Assets on the Liquidity Exchanges (measured at 4:00 p.m. New York time ) during the Illiquid Period, up to a maximum of 30 days (the "Illiquid Market Spot Rate").

If two of the three Liquidity Exchanges limit or suspend withdrawals or transactions in the Loaned Assets on the Maturity Date, the Recall Delivery Day, or the Redelivery Day, whichever applicable, the requirement for Borrower to return the Loaned Assets shall be temporarily suspended, without penalty or default, including without limitation the incurring of additional Loan Fees, until such time that at least two of the Liquidity Exchanges allow the resumption of withdrawals of and transactions in the Loaned Assets.

## III.    **Loan Fees and Transaction Fees.**

(a) Loan Fee

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as agreed to herein and annualized in the relevant Loan Term Sheet and subject to change if thereafter agreed by Borrower and Lender. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from, but excluding, the date on which the Loaned Digital Currencies or Loaned U.S. Dollars are transferred to Borrower until, and including, the date on which such Loaned Digital Currencies or Loaned U.S. Dollars are repaid in their entirety to Lender.

Lender shall calculate any Loan Fees owed on a daily basis and provide Borrower with the calculation upon request.  The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

Confidential - Filed Under Seal

(b) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with Section III(c), Borrower shall incur an additional fee (the "Late Fee") of a 1% (annualized, calculated daily) on all outstanding portions of the Loaned Digital Currencies or Loaned U.S. Dollars.

(c) Payment of Loan Fees and Late Fees

Unless otherwise agreed, any Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) five (5) Business Days after receipt of an invoice from Lender or (ii) the termination of all Loans hereunder (the "Payment Due Date"). An invoice for Loan Fees and any Late Fees (the "Invoice Amount") shall be sent out on the first Business Day of the month and shall include any Loan Fees, Late Fees, and Early Termination Fees incurred and outstanding during the previous month and periods. Borrower shall have up to five Business Days from the date of said Invoice to pay the Invoice Amount. Failure of Lender to timely send an invoice in accordance with the preceding sentence shall not be considered a material default under Section VIII(d) nor shall it relieve Borrower of its obligation to pay any Loan Fees, Late Fees, and Early Termination Fees owed herein nor negate any Event of Default resulting from Borrower's failure to timely pay such fees. The Loan Fee, Late Fees, and Early Termination Fees shall be payable, unless otherwise agreed by the Borrower and Lender in the Loan Term Sheet, in the same Loaned Assets that were borrowed, whether U.S. Dollars or Digital Currency on the same blockchain and of the same type that was loaned by the Lender during the Loan.

(d) Early Termination Fees

For Fixed Term Loans and Term Loans with Call Options, if Borrower returns the Loaned Assets prior to the Maturity Date, Borrower shall pay to Lender a fee equal to twenty percent (20%) of the Loan Fee that would have accrued from the date of the repayment until the Maturity Date of the Loan (the "Early Termination Fee"). The Early Termination Fee is due with the repayment of the Loaned Assets. The Early Termination Fee shall not apply if Borrower returns the Loaned Assets to Lender in the event of a Hard Fork (as defined in Section V) or if Lender moves up the Maturity Date to an earlier date by exercising a Call Option.

(e) Taxes and Fees

Borrower shall report to the Internal Revenue Service ("IRS") all Loan Fees paid to Lender under this Agreement, and shall provide Lender Form 1099-INT annually documenting the amount reported to the IRS. For any Loan Fees paid in Digital Currency, such Loan Fees shall be calculated at the Coinbase Pro spot rate at 4 p.m. New York time daily on any day that Loan Fees accrue. Neither Borrower nor Lender shall have any liability to the other party for any taxes due under this Agreement.

Confidential - Filed Under Seal

### IV.    Collateral Requirements

(a) Collateral

If agreed in a Loan Term Sheet, Borrower shall provide as collateral an amount of U.S. Dollars, or Digital Currency as set forth below, or to be determined and agreed upon by the Borrower and Lender ("Collateral") and memorialized using the Loan Term Sheet. The Collateral will be calculated as a percentage of the value of the Loaned Assets, such value determined by a spot rate agreed upon in the Loan Term Sheet. Borrower shall, prior to or concurrently with the transfer of the Loaned Assets to Borrower, but in no case later than the Close of Business on the day of such transfer, transfer to Lender the agreed upon Collateral.

Collateral shall always be valued in U.S. Dollars, but Borrower may, if mutually agreed by both parties, provide the Collateral (in whole or in part) to Lender in Digital Currency in an amount equal to the value of the Collateral in U.S. Dollars at a spot rate determined by Borrower. For the avoidance of doubt, upon the repayment of the Loaned Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited, net of any Additional Collateral, Margin Call, or Refunded Collateral adjustments (as defined below in Sections IV(c) & (e)). If a Hard Fork in the blockchain of Digital Currency meeting the criteria in Section V occurs while Lender is holding such Digital Currency as Collateral, Lender shall return the New Tokens (as defined in Section V) to Borrower in addition to the Collateral and Additional Collateral. If a Hard Fork occurs that does not meet the criteria in Section V, Lender shall have no obligation to return any New Tokens to Borrower.

The Collateral transferred by Borrower to Lender, as adjusted herein, shall be security for Borrower's obligations in respect of such Loan. Borrower hereby pledges with, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the Loaned Assets by Lender to Borrower and which shall cease upon the return of the Loaned Assets by Borrower to Lender.

(b) Loan and Collateral Transfer

If Lender transfers Loaned Assets to Borrower and Borrower does not transfer Collateral to Lender as provided in Section IV(a), Lender shall have the absolute right to the return of the Loaned Assets; and if Borrower transfers Collateral to Lender, as provided in Section IV(a), and Lender does not transfer the Loaned Assets to Borrower, Borrower shall have the absolute right to the return of the Collateral.

(c) Margin Calls

If during the Term of a Loan the value of the Loaned Assets increases, or the value of the Collateral decreases, so that the value of the Loaned Assets becomes equal to or greater than the value of the Collateral (the "Margin Call Limit"), Lender shall have the right to require Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in the Loan

8

DocuSign Envelope ID: 6DB7661E-9ACA-4C00-8373-5042B8D25DA7F

Term Sheet relative to the value of the Loaned Assets (the "<u>Additional Collateral</u>") as measured by the spot rate published on Coinbase Pro (such rate, the "<u>Margin Call Spot Rate</u>").

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "<u>First Notification</u>") to the Borrower at the email address indicated in Section XIII (or such other address as the parties shall agree to in writing) that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Margin Call Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate.  Borrower shall have twenty-four (24) hours from the time Lender sends such First Notification to (x) respond and send payment to Lender in accordance with subsection (d) below, or (y) respond that the value of the Loaned Assets, value of the Collateral, or spot rate as indicated on Coinbase Pro as applicable, has decreased sufficiently such that it is no longer at or above the Margin Call Spot Rate.  If Lender agrees by email that Borrower's response according to (y) above is correct, then no other action is required by Borrower.

If Borrower fails to respond to the First Notification within twenty-four (24) hours, or Lender rejects Borrower's response pursuant to (y) above and the spot rate of the Loaned Assets is still at least at the Margin Call Spot Rate, Lender shall send a second email notification (the "<u>Second Notification</u>") repeating the information in provisions (i) – (iv) in the preceding paragraph. Borrower shall have twelve (12) hours from the time Lender sends the Second Notification to respond according to (x) or (y) in the preceding, and Lender has the right to accept or reject Borrower's response as stated above.  Upon Lender's rejection of Borrower's response to the Second Notification, Borrower shall make immediate payment of Additional Collateral as set forth in Section IV(d) below.  Failure to provide Additional Collateral, or failure by Borrower to respond to either the First Notification or the Second Notification, shall give Lender the option to declare an Event of Default under Section VII below.

Borrower acknowledges that its obligations hereunder, including those in this Section IV, continue regardless of Lender's request for Additional Collateral and Borrower's acceptance or rejection of the same.

(d) <u>Payment of Additional Collateral</u>

Payment of the Additional Collateral shall be made by bank wire to the account, or if applicable the Digital Currency Address, specified in the Loan Term Sheet or by a return of the amount of Loaned Assets necessary to make the Collateral percentage indicated in the Loan Term Sheet correct based on the Margin Call Spot Rate.  For any return of Loaned Assets made in accordance with this Section, Borrower is still responsible for payment of any Early Termination Fees that apply to the particular Loan.

(e) <u>Refund of Collateral</u>

If during the Term of a Loan the value of the Loaned Assets decreases, or the value of the Collateral increases, so that the value of the Collateral relative to the value of the Loaned Assets becomes equal to or greater than the percentage indicated in the Loan Term Sheet (the "<u>Collateral Refund Limit</u>"), Borrower shall have the right to require Lender to return an amount of Collateral so that

9

the Collateral is at no greater than the percentage indicated in the Loan Term Sheet relative to the value of the Loaned Assets (the "Refunded Collateral") as measured by the spot rate published on Coinbase Pro (such rate, the "Collateral Refund Spot Rate").

If Borrower requires Lender to repay Refunded Collateral, it shall send an email notification (the "First Refund Notification") to the Lender at the Lender Email that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Collateral Refund Spot Rate and (iv) the amount of Additional Collateral required based on the Margin Call Spot Rate. Lender shall have twenty-four (24) hours from the time Borrower sends such First Refund Notification to (x) respond and send payment to Borrower in accordance with subsection (f) below, or (y) respond that the value of the Loaned Assets as a percentage of the value of the Collateral has increased sufficiently such that it is no longer at or below the Collateral Refund Spot Rate. If Borrower agrees by email that Lender's response according to (y) above is correct then no other action is required by Lender.

If Lender fails to respond to the First Refund Notification within twenty-four (24) hours, and the value of the Loaned Assets is still at or below the Collateral Refund Spot Rate, Borrower shall send a second email notification (the "Second Refund Notification") repeating the information in (i) – (iv) in the preceding paragraph. Lender shall have twelve (12) hours from the time Borrower sends the Second Refund Notification to respond according to (x) or (y) in the preceding paragraph. Failure by Lender to respond to either the First Refund Notification or the Second Refund Notification shall give Borrower the option to declare an Event of Default under Section VII below.

(f)  Payment of Refunded Collateral

Payment of the Refunded Collateral shall be made by bank wire to the account specified by the Borrower or to a Digital Currency Address specified by the Borrower, as applicable.

(g)  Return of Collateral

Upon Borrower's repayment of the Loan and acceptance by Lender of the Loaned Assets into Lender's Digital Currency Address, with such delivery being confirmed on the relevant Digital Currency blockchain ten times, Lender shall initiate the return of Collateral within two Business Days to a bank account designated by Borrower or, where Digital Currency is Collateral, into an applicable Digital Currency Address on the behalf of Borrower.

**V.    Hard Fork**

(a)  Notification

In the event of a public announcement of a future Hard Fork or an Airdrop in the blockchain for any Loaned Assets, Lender shall provide email notification to Borrower.

(b)  No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated. Borrower and Lender may agree,

10

regardless of Loan type, either (i) to terminate a Loan without any penalties on an agreed upon date or (ii) for Lender to manage the Hard Fork on the behalf of Borrower. Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Currency to Lender and Lender transfers said Digital Currency back to Borrower pursuant to this section.

(c) Lender's Right to New Tokens

Lender will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Currency protocol or an Applicable Airdrop (the "New Tokens") if any two of the following four conditions are met:

- *Hash Power*: the average hash power mining the New Token on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the hash power mining the Loaned Assets on the day preceding the Hard Fork or Applicable Airdrop (calculated as a 3-day average of the 3 days preceding the Hard Fork).
- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).
- *Wallet Compatibility*: the New Token is supported by either BitGo wallets or Ledger wallets within 30 days of the Hard Fork or Applicable Airdrop.

For the above calculations, the source for the relevant data on the Digital Currency hash power, market capitalization, and 24-Hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the hash power of the New Token will be bitinfocharts.com (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Lender. If sending the New Tokens to Lender is burdensome, upon Lender's written agreement with Borrower, Borrower can reimburse Lender for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount of the New Tokens owed using the spot rate agreed upon by the Parties at the time of said repayment, or (ii) returning the borrowed Digital Currency so that Lender can manage the split of

11

the underlying digital tokens as described in Section IV(b) above.  Alternatively, subject to Lender's written agreement, the parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender.  In all cases, Borrower will be solely responsible for payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender, including but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment.  For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this Section V shall continue for any New Tokens that meet the criteria in this subsection (c) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement.

## VI.    Representations and Warranties.

The parties to this Agreement (individually, a "Party," collectively the "Parties") hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each Party represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution,  delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Currency, Collateral, or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws

(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

Confidential - Filed Under Seal

DocuSign Envelope ID: 6DB7661E19ACA4C00-8273-5042B8D25DA7F

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h) Lender represents and warrants that it has, or will have at the time of the loan of any Digital Currency, the right to lend such Loaned Assets subject to the terms and conditions hereof, and free and clear of all liens and encumbrances other than those arising under this Agreement.

(i) Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to transfer such Loaned Assets subject to the terms and conditions hereof.

(j) Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest in said Collateral subject to the terms and conditions hereof.

## VII.    <u>Default</u>

It is further understood that any of the following events shall constitute an event of default hereunder against the defaulting Party, and shall be herein referred to as an "Event of Default" or "Events of Default":

(a) the failure of the Borrower to return any and all Loaned Assets upon termination of any Loan however, Borrower shall have ten Business Days to cure such default;

(b) the failure of Borrower to pay any and all Loan Fees, Late Fees, or to remit any New Tokens, however, Borrower shall have ten Business Days to cure such default;

(c) the failure of either Party to transfer Collateral or Additional Collateral, including any Refunded Collateral, as required by Section IV, however, a Party shall have ten Business Days to cure such default;

(d) a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by either Party to abide by its obligations in Section IV or V of this Agreement and such Party's failure to cure said material default within ten Business Days;

(e) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against a Party and are not be dismissed within thirty (30) days of the initiation of said proceedings; or

Confidential - Filed Under Seal

(f) any representation or warranty made by either Party in any of the Loan Documents that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof however, a Party shall have ten Business Days to cure such default.

## VIII.  Remedies

(a) Upon the occurrence and during the continuation of any Event of Default on a Loan by Borrower, the Lender may, at its option:  (1) declare the entire Loan Balance outstanding for the Loan hereunder immediately due and payable; (2) transfer any Collateral for a Loan from the collateral account to Lender's operating account necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by the Loan; and/or (3) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity.  If any Event of Default by Borrower under Sections VII(a), (b), (c), or (d) persist for thirty days or more, or immediately upon an Event of Default by Borrower under Sections VII(e) or (f), the Lender may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Borrower.

(b) Upon the occurrence and during the continuation of any Event of Default on a Loan by Lender, the Borrower may, at its option:  (1) demand a return of any and all Collateral in the control or possession of Lender or its agents; (2) withhold repayment of the Loaned Assets and any outstanding Loan Fees, Late Fees or other amounts claimed by Lender; and/or (3) exercise all other rights and remedies available to the Borrower hereunder, under applicable law, or in equity.  If any Event of Default by Lender under Sections VII (c) or (d) persist for thirty-days or more, or immediately upon an Event of Default by Lender under Sections VII (e) or (f), the Borrower may, at its option, (4) terminate this Agreement and any Loan hereunder upon notice to Lender.

(c) In addition to its rights hereunder, the non-defaulting Party shall have any rights otherwise available to it under any other agreement or applicable law; however, the non-defaulting Party shall have an obligation to mitigate its damages in a commercially reasonable manner.

## IX.    Rights and Remedies Cumulative.

No delay or omission by a Party in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder. All rights of each Party stated herein are cumulative and in addition to all other rights provided by law, in equity.

## X.    Survival of Rights and Remedies

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets or Collateral, and termination of this Agreement.

Confidential - Filed Under Seal

### XI.    Governing Law; Dispute Resolution.

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules.  If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.  The parties agree to waive their rights to a jury trial.  If any proceeding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

### XII.    Confidentiality.

(a)  Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information").  Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XIV, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii) available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b)  Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XII.

(c)  Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

(d)  The provisions of this Section XII will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; provided that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such

Confidential - Filed Under Seal

disclosure.  Notwithstanding the foregoing, Lender may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e)  The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement.  Notwithstanding anything in this agreement to the contrary, a Party may retain copies of Confidential Information (the "Retained Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XII; provided, however, that such Party agrees that any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and the confidentiality obligations of this Section XII shall survive with respect to the Retained Confidential Information for so long as such information is retained.

### XIII.    Notices.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth below:

Lender:



Borrower:
Genesis Global Capital, LLC
111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Attn: Michael Moro, CEO
Email: michael@genesiscap.co

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

### XIV.    Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

### XV.    Single Agreement

16

Confidential - Filed Under Seal

Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other.  Accordingly, Borrower and Lender hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.  In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other.

## XVI.  **Entire Agreement.**

This Agreement, each exhibit referenced herein, and all Loan Term Sheets constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements.  Nothing in this Section XVI shall be construed to conflict with or negate Section XV above.

## XVII.  **Successors and Assigns.**

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that Lender may not assign this Agreement or any rights or duties hereunder without the prior written consent of the Borrower (such consent to not be unreasonably withheld).  Borrower may assign this Agreement or any rights or duties hereunder upon notice to Lender.  Notwithstanding the foregoing, in the event of a change of control of Lender or Borrower, prior written consent shall not be required so such Party provides the other Party with written notice prior to the consummation of such change of control.  For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party.  Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, or Loan Term Sheet hereunder, shall create any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns.  For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc.  The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

## XVIII. **Severability of Provisions.**

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XIX.  **Counterpart Execution.**

Confidential - Filed Under Seal

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any Party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XX.    Relationship of Parties.

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

## XXI.    No Waiver.

The failure of or delay by either Party to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent such Party from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

## XXII.    Indemnification.

Lender shall indemnify and hold harmless Genesis, or any of its parents or affiliates, from and against any and all third party claims, demands, losses, expenses and liabilities of any and every nature (including attorneys' fees of an attorney of Genesis' choosing to defend against any such claims, demands, losses, expenses and liabilities) that Genesis may sustain or incur or that may be asserted against it arising out of Genesis' borrowing  Digital Currency from Lender under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to Genesis' bad faith, gross negligence or willful misconduct in the performance of its duties under this Agreement.

## XXIII.    Term and Termination.

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either Party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period.   The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VIII or upon 30 days' notice by either Party to the other.

18

DocuSign Envelope ID: 6DB7661E-9ACA-4C00-8273-5042B8D25D47F

In the event of a termination of this Agreement, any Loaned Assets or Collateral shall be redelivered immediately and any fees owed shall be payable immediately.

**XXIV. <u>Miscellaneous.</u>**

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate.  This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.  The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement.  The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

Confidential - Filed Under Seal

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

LENDER:



By: _____
Name:
Title:

BORROWER:

GENESIS GLOBAL CAPITAL, LLC

By: _____  *Kristopher Johnson*
DocuSigned by:
E5D870D05A1C4B3...
Name: Kristopher Johnson
Title: Senior Risk Officer

20

Confidential - Filed Under Seal

DocuSign Envelope ID: 6DB7661E-9ACA-4C00-8273-5042B8D25D47F

## EXHIBIT A

Authorized Agents.  The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section II hereof:

Name: Matt Ballensweig
Email: Matt@genesiscap.co

Name: Roshun Patel
Email: Roshun@genesiscap.co

Borrower may change its Authorized Agents by notice given to Lender as provided in accordance with Section XV.  Such notice shall not be considered to be a modification of or amendment to this Agreement for purposes of Section XVI.

Confidential - Filed Under Seal

DocuSign Envelope ID: 6DB7661E-9ACA-4C00-8273-5042B8D25D47E

## EXHIBIT B

## LOAN TERM SHEET

This loan agreement dated [DATE OF TERM SHEET] between Genesis Global Capital, LLC ("Genesis") and ████████ ("Lender") incorporates all of the terms of the Master Borrow Agreement between Genesis and Borrower on [DATE OF MASTER AGREEMENT] and the following specific terms:

Borrower:                          Genesis Global Capital, LLC

Lender:                            ████████

Borrowed Asset:

Amount of Currency:

Borrow Fee:

Loan Type:                         [Open Loan]
                                   [Fixed Term Loan]
                                   [Term Loan With Prepayment Option]

Maturity Date:

GENESIS GLOBAL CAPITAL, LLC                    ████████

By: _____          By: _____
Name:                              Name:
Title:                             Title:

22

# TRI-PARTY SETTLEMENT AGREEMENT

This Tri-Party Settlement Agreement (the "<u>Agreement</u>") is hereby made and entered into and dated as of 9th day of February, 2021 by and between ████████ ("<u>Counterparty</u>"), an individual residing at ██ ████████ and each of the entities listed on Schedule A, as defined therein, and as may be amended from time to time by any entity listed on Schedule A (each,  a "<u>Genesis Entity</u>" and each Genesis Entity and Counterparty, a "<u>Party</u>" and together the "<u>Parties</u>").

**WHEREAS**, Counterparty has entered into business relationships with one or more Genesis Entity that may include trading digital currency, borrowing or lending digital currency, trading digital currency-based derivatives, or receiving digital currency custodial services; and

**WHEREAS**, in the course of its transactions with Genesis Entities, Counterparty may engage in a transaction with one Genesis Entity followed immediately by a transaction with a different Genesis Entity (the combination of two such transactional components, an "<u>Intercompany Transaction</u>"); and

**WHEREAS**, when engaging in an Intercompany Transaction, to ensure prompt, efficient and secure settlement of the transactional components of the Intercompany Transaction, Counterparty may request that a Genesis Entity settle with another Genesis Entity on Counterparty's behalf (an "<u>Intercompany Settlement</u>");

**NOW THEREFORE**, in consideration for the promises, rights and obligations set forth below, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    <u>Settlement Instruction</u>

If Counterparty engages in an Intercompany Transaction and wants to request an Intercompany Settlement then the following procedure shall be followed:

     a.  Counterparty shall request such Intercompany Settlement in writing to each Genesis Counterparty involved in the Intercompany Transaction, with an email copy to each of legal@genesistrading.com and compliance@genesistrading.com.

     b.  Each Genesis Entity involved in the Intercompany Transaction shall have sole discretion whether to agree to an Intercompany Settlement for any Intercompany Transaction.

     c.  If all relevant Genesis Entities agree to the Intercompany Settlement for the Intercompany Transaction, one or more of the Genesis Entities shall send an email summary of the settlement to Counterparty, which shall serve as confirmation of the settlement of the Intercompany Transaction.

2.    <u>Independent Transactions</u>

Each of Counterparty and the relevant Genesis Entities represent that any transactional components that make up an Intercompany Transaction are separate and distinct transactions, conducted at arm's length.  No

part of any Intercompany Transaction is conditioned on any other part of an Intercompany Transaction. Counterparty represents that it was not induced by any Genesis Entity into entering into any Intercompany Transaction with the promise of a better price on any transaction that makes up a part of the Intercompany Transaction. Counterparty agrees that any claim or dispute with any Genesis Entity relating to any transactional component is with that Genesis Entity only and no other Genesis Entity that may be party to another transactional component of an Intercompany Transaction or party to this Agreement.

3.    Third-Party Delivery

Each of Counterparty and any Genesis Entity consents to the delivery of digital currency or U.S. Dollars by another Genesis Entity on behalf of Counterparty to satisfy certain obligations of Counterparty in an Intercompany Transaction, each as evidenced in and governed by the agreement or terms relevant to a certain transactional component.

4.    Additional Representations and Warranties

Counterparty hereby represents and warrants to each Genesis Entity that as of the date hereof:

a.    This Agreement has been duly executed and delivered by Counterparty and this Agreement constitutes a valid and legally binding obligation of Counterparty, enforceable against Counterparty in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally.

b.    Neither the execution and delivery of this Agreement, nor the consummation of an Intercompany Transaction contemplated herein, does or will violate any statute, regulation, rule, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency, or court to which Counterparty is subject or conflict with, violate or constitute a default under any agreement, debt or other instrument to which Counterparty is a party.

c.    Counterparty agrees, understands and acknowledges that (i) Counterparty is solely responsible for any decision to enter into an Intercompany Transaction subject to this Agreement, including the evaluation of any and all risks related to any such Intercompany Transaction; and (ii) in entering into any such Intercompany Transaction, Counterparty has not relied on any statement or other representation of any Genesis Entity other than as expressly set forth herein.

5.    Confidentiality

Each Party shall hold in confidence all information obtained from the other Party in connection with this Agreement (collectively, "Confidential Information"). Each Party shall keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose such Confidential Information to any person or use such Confidential Information for any purpose other than the transactions contemplated by this Agreement.  The provisions of this Section 3 will not restrict a Party from disclosing the other Party's Confidential Information to  such Party's affiliates, subsidiaries, officers, directors,

Confidential - Filed Under Seal

DocuSign Envelope ID: 6DB7661E19ACA4C00-8373-5042B8D5DA7E

employees, contractors, attorneys, accountants, bankers or consultants with a need to know such Confidential Information, and will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law or regulation; *provided* that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure. Notwithstanding the foregoing, a Party may disclose the other Party's Confidential Information without notice pursuant to a request or other regular routine inspection by a governmental agency or regulatory authority. The obligations with respect to Confidential Information shall survive for a period of one (1) year from the date of this Agreement.

6.    <u>Governing Law; Dispute Resolution</u>

a.    The laws of the State of New York shall govern this Agreement, without regard to its conflict of law principles.

b.    If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. If any proceeding is brought for enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

7.    <u>Entire Agreement</u>

This Agreement, together with the Master Agreement, represents the entire Agreement between the Parties relating to the subject matter contained herein and in the event there is any conflict or inconsistency between the terms and conditions of the Master Agreement and those of this Agreement, the terms and conditions of this Agreement shall control and govern the rights and obligations of the Parties. Further, the provisions of this Agreement and the Master Agreement shall together supersede all prior oral and written commitments, contracts and understandings with respect to the subject matter contained herein. This Agreement may only be amended by mutual written agreement of the authorized representatives of each Party. This Agreement may be signed in one or more counterparts; each counterpart shall be deemed an original and all counterparts together shall constitute one and the same instrument.

Confidential - Filed Under Seal

DocuSign Envelope ID: 6DB7661E9ACA4C00-8373-5042B8D25D47F

**In Witness Whereof**, the Parties have caused this Agreement to be duly executed by their respective authorized representatives as of the day and year above written.

**On behalf of the Genesis Entities listed on Schedule A**

By: _Michael Moro_
    DocuSigned by:
    705B2FE45937490...                    By: _____

Name: S. Michael Moro                    Name: _____

Title:   CEO                             Title: _____

## SCHEDULE A

<u>Genesis Entities</u>:

Genesis Global Trading, Inc.
Genesis Global Capital, LLC
GGC International Limited
Genesis Asia Pacific PTE. LTD.
Genesis Custody Limited

Confidential - Filed Under Seal

# MASTER LOAN AGREEMENT

This Master Loan Agreement ("<u>Agreement</u>") is made on this 23th day of November, 2020 ("<u>Effective Date</u>") by and between Genesis Global Capital, LLC ("<u>Genesis</u>" or "<u>Lender</u>"), a limited liability company organized and existing under the laws of Delaware with its principal place of business at 111 Town Square Place, Suite 1203, Jersey City, NJ 07310 and ███████ ████████████████████████████████████████████████████████████ ██████████████

# RECITALS

**WHEREAS**, subject to the terms and conditions of this Agreement, Borrower may, from time to time, seek to initiate a transaction pursuant to which Lender will lend Digital Currency or U.S. Dollars to Borrower, and Borrower will pay a Loan Fee and return such Digital Currency or U.S. Dollars to Lender upon the termination of the Loan; and

Now, therefore, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which hereby acknowledged, the Borrower and the Lender hereby agree as follows:

## I.   Definitions

"***Airdrop***" means a distribution of a new token or tokens resulting from the ownership of a preexisting token. For the purposes of Section V, an "***Applicable Airdrop***" is an Airdrop for which the distribution of new tokens can be definitively calculated according to its distribution method, such as a pro rata distribution based on the amount of the relevant Digital Currency held at a specified time.  A "***Non-Applicable Airdrop***" is an Airdrop for which the distribution of new tokens cannot be definitively calculated, such as a random distribution, a distribution to every wallet of the relevant Digital Currency, or a distribution that depends on a wallet of the relevant Digital Currency meeting a threshold requirement.

"***Authorized Agent***" has the meaning set forth in Exhibit A.

"***Borrower***" means ████████████████████

"***Borrowed Amount***" refers to the value of the Loaned Assets in U.S. dollars on the Loan Effective Date.

"***Borrower Email***" means ████████████████████

"***Business Day***" means a day on which Genesis is open for business, following the New York Stock Exchange calendar of holidays.

"***Business Hours***" means between the hours of 9:00 am to 5:00 pm New York time on a Business Day.

"***Call Option***" means Lender has the option to demand immediate payment of a portion or the entirety of the Loan Balance at any time, subject to this Agreement.

"***Close of Business***" means 5:00 pm New York time.

"***Collateral***" is defined as set forth in Section IV(a).

"***Digital Currency***" means Bitcoin (BTC), Bitcoin Cash (BCH), Ether (ETH), Ether Classic (ETC), or Litecoin (LTC), or any digital currency that the Borrower and Lender agree upon.

"***Digital Currency Address***" means an identifier of alphanumeric characters that represents a digital identity or destination for a transfer of Digital Currency.

"***Fixed Term Loan***" means a Loan with a pre-determined Maturity Date, where Borrower does not have a Prepayment Option and Lender does not have a Call Option.

"***Hard Fork***" means a permanent divergence in the blockchain (e.g., when non-upgraded nodes cannot validate blocks created by upgraded nodes that follow newer consensus rules, or an airdrop or any other event which results in the creation of a new token).

"***Lender***" means Genesis.

"***Loan***" means a request for a loan or an actual loan of Digital Currency or U.S. Dollars made pursuant to and in accordance with this Agreement and a Loan Term Sheet.

"***Loan Balance***" means the sum of all outstanding amounts of Loaned Assets, including New Tokens, Loan Fees, Late Fees, and any Earlier Termination Fee or New Token Fee for a particular Loan, as defined in Sections III and V.

"***Loan Documents***" means this Master Loan Agreement and any and all Loan Term Sheets entered into between Lender and Borrower.

"***Loan Effective Date***" means the date upon which a Loan begins.

"***Loan Fee***" means the fee paid by Borrower to the Lender for the Loan.

"***Loan Term Sheet***" means the agreement between Lender and Borrower on the particular terms of an individual Loan, which shall be memorialized in an agreement as set forth in Exhibit B or in a form approved by Lender comparable therewith.

"***Loaned Assets***" means any Digital Currency or U.S. Dollar amount transferred in a Loan hereunder until such Digital Currency (or identical Digital Currency) or U.S. Dollar amount is transferred back to Lender hereunder, except that, if any new or different Digital Currency is created or split by a Hard Fork or other alteration in the underlying blockchain and meets the requirements set forth in Section V of this Agreement, such new or different Digital Currency

2

shall be deemed to become Loaned Assets in addition to the former Digital Currency for which such exchange is made.  For purposes of return of Loaned Assets by Borrower or purchase or sale of Digital Currencies pursuant to Section IX, such term shall include Digital Currency of the same quantity and type as the Digital Currency, as adjusted pursuant to the preceding sentence.

"*Maturity Date*" means the pre-determined future date upon which a Loan becomes due in full.

"*Open Loan*" means a Loan without a Maturity Date where Borrower has a Prepayment Option and Lender has a Call Option.

"*Prepayment Option*" means the Borrower has the option to repay or return the Loaned Assets prior to the Maturity Date, subject to this Agreement.

"*Term*" means the period from the Loan Effective Date through Termination Date.

"*Term Loan with Call Option*" means a Loan with a pre-determined Maturity Date where Lender has a Call Option.

"*Term Loan with Prepayment Option*" means a Loan with a pre-determined Maturity Date where Borrower has a Prepayment Option.

"*Termination Date*" means the date upon which a Loan is terminated.

## II.    <u>General Loan Terms.</u>

(a)  <u>Loans of Digital Currency or U.S. Dollars</u>

Subject to the terms and conditions hereof, Borrower may, in its sole and absolute discretion, request from the Lender a Loan to Borrower of a specified amount of Digital Currency or U.S. Dollars, and Lender may, in its sole and absolute discretion, extend such Loan or decline to extend such Loan on terms acceptable to Lender and as set forth in a corresponding Loan Term Sheet.

(b)  <u>Loan Procedure</u>

From time to time during the Term of this Agreement, during the hours of 9:00 am New York time to 4:00 pm New York time on a Business Day (the "<u>Request Day</u>"), by email directed to lend@genesiscap.co (or such other address as Lender may specify in writing), an Authorized Agent of Borrower may request from Lender a Loan of a specific amount of Digital Currency or U.S. Dollars (a "<u>Lending Request</u>").  Provided Lender receives such Lending Request prior to 3:00 pm New York time, Lender shall by email directed to Borrower Email (or such other address as Lender may specify in writing) to inform Borrower whether Lender agrees to make such a Loan.  If Lender fails to provide Borrower with an acceptance as to a particular Lending Request prior to Close of Business on the Request Day, such Lending Request shall be deemed to have be denied by Lender.

3

As part of its Lending Request, Borrower shall provide the following proposed terms:

(i)  Whether U.S. Dollars or Digital Currency, and if Digital Currency, the type of Digital Currency;

(ii)  the amount of Digital Currency or U.S. Dollars;

(iii)  whether the Loan is to be a Fixed Term Loan, a Term Loan with Prepayment Option, or an Open Loan;

(iv)  the Loan Effective Date; and

(v)  the Maturity Date (if a Fixed Term Loan or a Term Loan with Prepayment Option).

If Lender agrees to make a Loan, Lender shall commence transmission to either (x) the Borrower's Digital Currency Address the amount of Digital Currency, or (y) Borrower's bank account by bank wire the amount of U.S. Dollars, as applicable, as such Digital Currency Address or bank wire instruction is set forth in the Lending Request on or before Close of Business on the Request Day.

The specific and final terms of a Loan shall be memorialized using the Loan Term Sheet.  In the event of a conflict of terms between this Master Loan Agreement and a Loan Term Sheet, the terms in the Loan Term Sheet shall govern.

(c)  <u>Loan Repayment Procedure</u>

(i)  <u>Loan Repayment</u>

Unless otherwise specified in subsections (ii) and (iii) below, upon the earlier of the Maturity Date, the Recall Delivery Day, or the Redelivery Day (as defined below) for a Loan, Borrower shall repay the entirety of the Loan Balance to Lender by Close of Business.

(ii)  <u>Call Option</u>

For Loans in which the Lender has a Call Option (e.g. Open Loans, etc.), Lender may during Business Hours (the "<u>Recall Request Day</u>") demand repayment of a portion or the entirety of the Loan Balance (the "<u>Recall Amount</u>").  Lender will notify Borrower of Lender's exercising of this right by email to Borrower's Email.  Borrower will then have until Close of Business on the second Business Day after the Recall Request Day (the "<u>Recall Delivery Day</u>") to deliver the Recall Amount.

In the event of a Call Option where Lender demands only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Recall Delivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date or the subsequent Recall Delivery Day.

(iii) <u>Prepayment Option</u>

For Loans in which Borrower has a Prepayment Option (e.g. Open Loans, Term Loans with Prepayment Option, etc.), Borrower may notify Lender during Business Hours of Borrower's intent to return the Loan prior maturity or Lender's exercising of its Call Option. Borrower shall provide said notice at least two Business Days prior to the date on which the Borrower will repay all or a portion of the Loan Balance (said later date, the "Redelivery Day"). Borrower's exercising of its Prepayment Option shall not relieve it of any of its obligations herein, including without limitation its payment of owed Loan Fees and Late Fees.

In the event of a Prepayment Option where the Borrower repays only a portion of the Loan Balance, Borrower shall repay said portion of the Loan Balance on the Redelivery Day and the remaining portion of the Loan Balance on the earlier of the Maturity Date, Recall Delivery Date, or subsequent Redelivery Day.

(d) Termination of Loan

A Loan will terminate upon the earlier of:

(i)     the Maturity Date;

(ii)    the repayment of the Loan Balance by Borrower prior to the Maturity Date;

(iii)   the occurrence of an Event of Default as defined in Section VII; however, Lender shall have the right in its sole discretion to suspend the termination of a Loan under this subsection (iii) and reinstitute the Loan. In the event of reinstitution of the Loan pursuant to the preceding sentence, Lender does not waive its right to terminate the Loan hereunder; or

(iv)    in the event any or all of the Loaned Assets becomes in Lender's sole discretion a risk of being: (1) considered a security, swap, derivative, or other similarly-regulated financial instrument or asset by any regulatory authority, whether governmental, industrial, or otherwise, or by any court of law or dispute resolution organization. arbitrator, or mediator; or (2) subject to future regulation materially impacting this Agreement, the Loan, or Lender's business.

Nothing in the forgoing shall cause, limit, or otherwise affect the Term and termination of this Agreement except as specified in Section XXIV.

## III.    Loan Fees and Transaction Fees.

(a) Loan Fee

Unless otherwise agreed, Borrower agrees to pay Lender a financing fee on each Loan (the "Loan Fee"). When a Loan is executed, the Borrower will be responsible to pay the Loan Fee as agreed to herein and annualized in the relevant Loan Term Sheet and subject to change if thereafter agreed by Borrower and Lender. Except as Borrower and Lender may otherwise agree, Loan Fees shall accrue from, but excluding, the date on which the Loaned Digital Currencies or Loaned U.S. Dollars are transferred to Borrower until, and including, the date on which such

Loaned Digital Currencies are repaid in their entirety to Lender. For any Loan, the minimum Loan Fee shall be the Loan Fee that would accrue for one day.

Lender shall calculate any Loan Fees owed on a daily basis and provide Borrower with the calculation upon request. The Loan Fee will be calculated off all outstanding portions of the Loaned Digital Currencies. The Loan Fee is payable monthly by Borrower in arrears.

(b) Origination Fee

For certain Loans, Lender may charge Borrower a fee (the "Origination Fee") to be paid at the time the Collateral is delivered to Lender. If an Origination Fee applies to a Loan, the Loan Term Sheet shall set forth the amount of the Origination Fee and whether the Origination Fee is to be paid in U.S. Dollars or in a Digital Currency.

(c) Late Fee

For each Calendar Day in excess of the Maturity Date or the Recall Delivery Day (whichever is applicable) in which Borrower has not returned the entirety of the Loaned Assets or failed to timely pay any outstanding Loan Fee in accordance with section III(c), Borrower shall incur an additional nominal fee (the "Late Fee") of a 10% (annualized, calculated daily) on all outstanding portions of the Loaned Digital Currencies and Loan Fees. If a Late Fee is imposed under this Section III(b) due to an event that would constitute an Event of Default under Section VIII, the imposition of a Late Fee by the Lender does not constitute a waiver of its right to declare an Event of Default for the same event.

(d) Payment of Loan Fees and Late Fees

Unless otherwise agreed, any Loan Fee or Late Fees payable hereunder shall be paid by Borrower upon the earlier of (i) five (5) Business Days after receipt of an invoice from Lender or (ii) the termination of all Loans hereunder (the "Payment Due Date"). An invoice for Loan Fees and any Late Fees (the "Invoice Amount") shall be sent out on the first Business Day of the month and shall include any Loan Fees and Late Fees incurred during the previous month. Borrower shall have up to five Business Days from the date of said Invoice to pay the Invoice Amount. Failure of Lender to timely send an invoice in accordance with the preceding sentence shall not be considered a material default under Section VIII(d) nor shall it relieve Borrower of its obligation to pay any Loan Fees and Late Fees owed herein nor negate any Event of Default resulting from Borrower's failure to timely pay such fees. The Loan Fee and Late Fees shall be payable, unless otherwise agreed by the Borrower and Lender in the Loan Term Sheet, whether U.S. Dollars or Digital Currency on the same blockchain and of the same type that was loaned by the Lender during the Loan.

Notwithstanding the foregoing, in all cases, all Loan Fees and Late Fees shall be payable by Borrower immediately upon the occurrence of an Event of Default hereunder by Borrower.

(e) Taxes and Fees

All transfer or other taxes or third party fees payable with respect to the transfer, repayment, and/or return of any Loaned Assets or Collateral hereunder shall be paid by Borrower.

### IV.    **Collateral Requirements**

(a) Collateral

Unless otherwise agreed by the parties, or modified in the Loan Term Sheet or as set forth below, Borrower shall provide as collateral an amount of U.S. Dollars or Digital Currency (such choice at the sole discretion of the Lender) to be determined and agreed upon by the Borrower and Lender ("Collateral") and memorialized using the Loan Term Sheet.  Unless otherwise agreed by the parties in the Loan Term Sheet, the Collateral shall initially be 120% of the value of the Loaned Assets, such value determined by a spot rate agreed upon in the Loan Term Sheet. Borrower shall, prior to or concurrently with the transfer of the Loaned Assets to Borrower, but in no case later than the Close of Business on the day of such transfer, transfer to Lender the agreed upon Collateral.

Collateral shall always be valued in U.S. Dollars, but Borrower may, if mutually agreed by both parties, provide the Collateral (in whole or in part) to Lender in Digital Currency in an amount equal to the value of the Collateral in U.S. Dollars at a spot rate determined by Lender.  For the avoidance of doubt, upon the repayment of the Loaned Assets at the termination of a Loan, Lender shall return to Borrower the same amount and type of Collateral that was deposited, net of any Additional Collateral or Margin Call adjustments (as defined below in Section IV(c)).  If a Hard Fork in the blockchain of the Digital Currency serving as Collateral meeting the criteria in Section V occurs while Lender is holding Digital Currency as Collateral, Lender shall return the New Tokens (as defined in Section V) to Borrower in addition to the Collateral and Additional Collateral.  If such a Hard Fork occurs that does not meet the criteria in Section V, Lender shall have no obligation to return any New Tokens to Borrower.

The Collateral transferred by Borrower to Lender, as adjusted herein, shall be security for Borrower's obligations in respect of such Loan and for any other obligations of Borrower to Lender hereunder.  Borrower hereby pledges with, assigns to, and grants Lender a continuing first priority security interest in, and a lien upon, the Collateral, which shall attach upon the transfer of the Loaned Assets by Lender to Borrower and which shall cease upon the return of the Loaned Assets by Borrower to Lender.  In addition to the rights and remedies given to Lender hereunder, Lender shall have all the rights and remedies of a secured party under the UCC.

During the term of the Loan, Borrower agrees and affirms Lender's entitlement to and use of the Collateral, including but not limited use in lending, investing, transferring to bank and other accounts upon which Lender, or a third party, is the account holder or the beneficiary, or re-pledging as collateral in other transactions involved with Lender's digital currency lending and borrowing business.  Such entitlement and use shall not relieve Borrower or Lender of any of its obligations hereunder.

(b) Loan and Collateral Transfer

If Lender transfers Loaned Assets to Borrower and Borrower does not transfer Collateral to Lender as provided in Section IV(a), Lender shall have the absolute right to the return of the Loaned Assets; and if Borrower transfers Collateral to Lender, as provided in Section IV(a), and Lender does not transfer the Loaned Assets to Borrower, Borrower shall have the absolute right to the return of the Collateral.

(c) Margin Calls

If during the Term of a Loan the value of the Loaned Assets increases, or the value of the Collateral decreases, so that the value of the Loaned Assets becomes equal to or greater than the value of the Collateral (the "Margin Call Limit"), Lender shall have the right to require Borrower to contribute additional Collateral so that the Collateral is at least the same percentage indicated in Section IV(a) relative to the value of the Loaned Assets (the "Additional Collateral"). The parties may modify this standard in the Loan Term Sheet by (i) setting a different ratio of the value of the Loaned Assets and Collateral or (ii) the creation of a Margin Call rate to be indicated on the Loan Term Sheet, as measured by the spot rate published on Coinbase Pro (such rate, the "Margin Call Spot Rate") over the spot rate indicated in the Loan Term Sheet, or the prior Margin Call Spot Rate, as applicable. In the event of the creation of a Margin Call Spot Rate, Lender shall have the right to require Borrower to contribute Additional Collateral so that the Collateral is at least the same percentage in the applicable Loan Term Sheet, relative to the value of the Loaned Assets at the Margin Call Spot Rate.

In the event the value of the Loaned Assets decreases below the value of the Collateral, Lender may, at its sole discretion, return a portion of the Collateral in an amount determined by Lender; however, in such an event, Lender reserves its rights under this Section IV to request Borrower to contribute collateral up to the original amount of Collateral and also Additional Collateral if required.

If Lender requires Borrower to contribute Additional Collateral, it shall send an email notification (the "First Notification") to the Borrower at the email address indicated in Section XV (or such other address as the parties shall agree to in writing) that sets forth: (i) the value of the Loaned Assets, (ii) the value of the Collateral, (iii) the Margin Call Spot Rate, if applicable, and (iv) the amount of Additional Collateral required based on the Margin Call Limit or, if applicable, the Margin Call Spot Rate. Borrower shall have six (6) hours from the time Lender sends such First Notification to (x) respond and send payment to Lender in accordance with subsection (d) below, or (y) respond that the value of the Loaned Assets, value of the Collateral, or spot rate as indicated on Coinbase Pro, as applicable, has decreased sufficiently such that it is no longer at or above the Margin Call Limit or, if applicable, the Margin Call Spot Rate. If Lender agrees by email that Borrower's response according to (y) above is correct, then no other action is required by Borrower. If Lender fails to agree by email with Borrower's response in accordance with (y) by Close of Business that same day, such shall be deemed as Lender's rejection of Borrower's response and a re-statement of Lender's original demand for Borrower to contribute Additional Collateral.

If Borrower fails to respond to the First Notification within six hours, or Lender rejects Borrower's response pursuant to (y) above, whether affirmatively by email or by non-reply as set

8

forth above, Lender shall send a second email notification (the "Second Notification") repeating the information in provisions (i) – (iv) in the preceding paragraph. Borrower shall have three (3) hours from the time Lender sends the Second Notification to respond according to (x) or (y) in the preceding, and Lender has the right to accept or reject Borrower's response as stated above. Upon Lender's rejection of Borrower's response to the Second Notification, whether affirmatively by email or by non-reply by the Close of Business that same day, Borrower shall make immediate payment of Additional Collateral as set forth in Section IV(d) below. Failure to provide Additional Collateral, or failure by Borrower to respond to either the First Notification or the Second Notification, shall give Lender the option to declare an Event of Default under Section VII below.

Borrower acknowledges that its obligations hereunder, including those in this Section IV, continue regardless of Lender's request for Additional Collateral and Borrower's acceptance or rejection of the same.

(d) Payment of Additional Collateral

Payment of the Additional Collateral shall be made by bank wire to the account specified in the Loan Term Sheet or by a return of the amount of Loaned Assets (for any Loan other than a Fixed Term Loan) necessary to make the Collateral percentage indicated in the Loan Term Sheet correct based on the Margin Call Limit or, if applicable, the Margin Call Spot Rate.

(e) Return of Collateral

Upon Borrower's repayment of the Loan and acceptance by Lender of the Loaned Assets into Lender's Digital Currency Address, with such delivery being confirmed on the relevant Digital Currency blockchain ten times, Lender shall initiate the return of Collateral within five Business Days to a bank account designated by Borrower or, where Digital Currency is Collateral, into an applicable Digital Currency Address on the behalf of Borrower.

**V.    Hard Fork**

(a) Notification

In the event of a public announcement of a future Hard Fork or an Airdrop in the blockchain for any Loaned Assets or Collateral, Lender shall provide email notification to Borrower.

(b) No Immediate Termination of Loans Due to Hard Fork

In the event of a Hard Fork in the blockchain for any Loaned Assets or an Airdrop, any outstanding Loans will not be automatically terminated. Borrower and Lender may agree, regardless of Loan type, either (i) to terminate the Loan without any penalties on an agreed upon date or (ii) for Lender to manage the Hard Fork on the behalf of Borrower. If the Lender manages the Hard Fork on behalf of Borrower, Borrower shall return the Loaned Assets to Lender two business days prior to the scheduled Hard Fork or Airdrop. Lender shall not be obligated to return any Collateral to the Borrower during the period in which Lender manages

DocuSign Envelope ID: 4DBF73C6157E2-46A3-BF5E-384072AA020D

the Loaned Assets on the behalf of Borrower.  Lender shall fork the Loaned Assets, and following the Hard Fork shall return to Borrower the Loaned Assets but not any New Tokens (as defined below).  For any whole days in which Lender manages the Loan Digital Currency pursuant to this section, the Loan Fee for those days shall not accrue.  Nothing herein shall relieve, waive, or otherwise satisfy Borrower's obligations hereunder, including without limitation, the return of the Loaned Assets at the termination of the Loan and payment of accrued Loan Fees, which includes the per diem amounts for days on which Borrower transfers Digital Currency to Lender and Lender transfers said Digital Currency back to Borrower pursuant to this section.

(c) Lender's Right to New Tokens

Genesis will receive the benefit and ownership of any incremental tokens generated as a result of a Hard Fork in the Digital Currency protocol or an Applicable Airdrop (the "New Tokens") if any two of the following four conditions are met:

- *Hash Power*: the average hash power mining the New Token on the 30th day following the occurrence of the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the hash power mining the Loaned Assets on the day preceding the Hard Fork or Applicable Airdrop (calculated as a 3-day average of the 3 days preceding the Hard Fork).
- *Market Capitalization*: the average market capitalization of the New Token (defined as the total value of all New Tokens) on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 5% of the average market capitalization of the Loaned Assets (defined as the total value of the Loaned Assets) (calculated as a 30-day average on such date).
- *24-Hour Trading Volume*: the average 24-hour trading volume of the New Token on the 30th day following the occurrence the Hard Fork or Applicable Airdrop (calculated as a 30-day average on such date) is at least 1% of the average 24-hour trading volume of the Loaned Assets (calculated as a 30-day average on such date).
- *Wallet Compatibility*: the New Token is supported by either BitGo wallets or Ledger wallets within 30 days of the Hard Fork or Applicable Airdrop.

For the above calculations, the source for the relevant data on the Digital Currency hash power, market capitalization, and 24-Hour trading volume will be blockchain.info (or, if blockchain.info does not provide the required information, bitinfocharts.com, and if neither provides the required information, the parties shall discuss in good faith to mutually agree upon another data source) and the source for the hash power of the New Token will be bitinfocharts.com (or, if bitinfocharts.com does not provide the required information, the parties shall discuss in good faith to mutually agree upon another data source prior to the 30-day mark of the creation of the New Token).

If the Hard Fork or Applicable Airdrop meets the criteria above, Borrower will have up to 60 days from the Hard Fork or Applicable Airdrop to transfer the New Tokens to Genesis.  If sending the New Tokens to Genesis is burdensome, upon Lender's written agreement with Borrower, Borrower can reimburse Genesis for the value of the New Tokens by either (i) a one-time payment in the same Loaned Assets transferred as a part of the Loan reflecting the amount

of the New Tokens owed using the spot rate determined by Lender in its reasonable discretion at the time of said repayment, or (ii) returning the borrowed Digital Currency so that Genesis can manage the split of the underlying digital tokens as described in Section IV(b) above. Alternatively, subject to Lender's written agreement, the parties may agree to other methods of making Lender whole for Borrower's failure to transfer New Tokens to Lender.  In all cases, Borrower will be solely responsible for payment of additional costs incurred by any transfer method other than returning the New Tokens to Lender, including but not limited to technical costs, third party fees, and tax obligations for the transaction, including but not limited to a tax gross-up payment.  For the avoidance of doubt, if Borrower returns a Loan to Lender prior to the 30th day following a Hard Fork, Borrower's obligations under this Section V shall continue for any New Tokens that meet the criteria in this subsection (c) for such Loan on the 30th day following the Hard Fork. Lender's rights to New Tokens as set forth in this Section shall survive the termination of the relevant Loan, return of the Loaned Assets, and termination of this Agreement.  If Borrower fails to transfer the New Tokens to Lender, or provide alternative compensation to Genesis as agreed to in accordance with this subsection, within 60 days from the Hard Fork or Applicable Airdrop, such failure will be considered an Event of Default in accordance with Section VIII(b), and Borrower shall incur an additional fee (the "Hard Fork Fee") equal to 10% (annualized, calculated daily) of all outstanding portions of the Loaned Digital Currencies and Loan Fees.  Lender's charging of the Hard Fork Fee does not constitute a waiver of its right to declare an Event of Default for the same event.

## VI.    Representations and Warranties.

The parties to this Agreement hereby make the following representations and warranties, which shall continue during the term of this Agreement and any Loan hereunder:

(a) Each party hereto (individually, a "Party", collectively the "Parties") represents and warrants that (i) it has the power to execute and deliver this Agreement, to enter into the Loans contemplated hereby and to perform its obligations hereunder, (ii) it has taken all necessary action to authorize such execution,  delivery and performance, and (iii) this Agreement constitutes a legal, valid, and binding obligation enforceable against it in accordance with its terms.

(b) Each Party hereto represents and warrants that it has not relied on the other for any tax or accounting advice concerning this Agreement and that it has made its own determination as to the tax and accounting treatment of any Loan, any Digital Currency, Collateral, or funds received or provided hereunder.

(c) Each Party hereto represents and warrants that it is acting for its own account.

(d) Each Party hereto represents and warrants that it is a sophisticated party and fully familiar with the inherent risks involved in the transaction contemplated in this Agreement, including, without limitation, risk of new financial regulatory requirements, potential loss of money and risks due to volatility of the price of the Loaned Assets, and voluntarily takes full responsibility for any risk to that effect.

(e) Each Party represents and warrants that it is not insolvent and is not subject to any bankruptcy or insolvency proceedings under any applicable laws

(f) Each Party represents and warrants there are no proceedings pending or, to its knowledge, threatened, which could reasonably be anticipated to have any adverse effect on the transactions contemplated by this Agreement or the accuracy of the representations and warranties hereunder or thereunder.

(g) Each Party represents and warrants that to its knowledge the transactions contemplated in this Agreement are not prohibited by law or other authority in the jurisdiction of its place of incorporation, place of principal office, or residence and that it has necessary licenses and registrations to operate in the manner contemplated in this Agreement.

(h) Lender represents and warrants that it has, or will have at the time of the loan of any Loaned Assets, the right to lend such Loaned Assets subject to the terms and conditions hereof.

(i) Borrower represents and warrants that it has, or will have at the time of return of any Loaned Assets, the right to lend such Loaned Assets subject to the terms and conditions hereof, and, free and clear of all liens and encumbrances other than those arising under this Agreement.

(j) Borrower represents and warrants that it has, or will have at the time of transfer of any Collateral, the right to grant a first priority security interest in said Collateral subject to the terms and conditions hereof.

## VII.    <u>Covenants</u>

Promptly upon (and in any event within seven (7) Business Days after) the execution of this Agreement, Borrower shall furnish Lender with Borrower's most recent audited annual and (if applicable) quarterly financial statements and any other financial statements mutually agreed upon by Borrower and Lender. For each successive year, Borrower shall also furnish Lender with Borrower's future audited annual financial statements by Borrower's fiscal year end or within seven (7) Business Days thereof.

## VIII.    <u>Default</u>

It is further understood that any of the following events shall constitute an event of default hereunder, and shall be herein referred to as an "<u>Event of Default</u>" or "<u>Events of Default</u>":

(a) the failure of the Borrower to return any and all Loaned Assets and any New Tokens as defined by Section V upon termination of any Loan;

(b) the failure of Borrower to pay any and all Loan Fees or Late Fees when due hereunder, or to remit any New Tokens or pay any New Token Fee in accordance with Section V; however, Borrower shall have ten days to cure such default;

12

(c) the failure of either Party to transfer Collateral or Additional Collateral, or a failure by Borrower to respond to Lender's First or Second Notifications, as required by Section IV;

(d) a material default by either Party in the performance of any of the other agreements, conditions, covenants, provisions or stipulations contained in this Agreement, including without limitation a failure by Borrower to abide by its obligations in Section IV or V of this Agreement and Borrower's failure to cure said material default within ten days;

(e) any Event of Default (as such term is defined each applicable Loan Term Sheets) caused by Borrower shall occur and shall be continuing beyond any applicable grace periods under such Loan Term Sheets, including but not limited to failure to make any payment due thereunder;

(f) Borrower's default in any other agreement or failure to perform any obligation with Genesis or any of its affiliates;

(g) any bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings for the relief of debtors or dissolution proceedings that are instituted by or against the Borrower and are not be dismissed within thirty (30) days of the initiation of said proceedings;

(h) any event or circumstance occurs or exists that is a material adverse effect on the business, operations, prospects, property, assets, liabilities or financial condition of, such Party, taken as a whole, or a material adverse effect on the ability of Borrower to perform its obligations under the Loan Documents, including but not limited to the ability to return, transfer, repay, or pay any and all Loaned Assets, Loan Fees, and Late Fees;

(i) Borrower causes or permits any partner, member or other equity interest holder in Borrower to, directly or indirectly, transfer, convey, assign, mortgage, pledge, hypothecate, alienate or lease the partnership interest, membership interest or other equity interest of such partner, member, other equity interest holder in Borrower without Lender's prior written consent. Notwithstanding the foregoing, the Lender shall not unreasonably withhold such consent for transfers of membership interests for purposes of estate planning which do not result in a change of control of the Borrower;

(j) any representation or warranty made by either Party in any of the Loan Documents that proves to be incorrect or untrue in any material respect as of the date of making or deemed making thereof; or

(k) either Party notifies the other of its inability to or its intention not to perform its obligations hereunder, or otherwise disaffirms, rejects, or repudiates any of its obligations hereunder.


**IX.     Remedies**


13

(a) Upon the occurrence and during the continuation of any Event of Default by Borrower, the Lender may, at its option:  (1) declare the entire Loan Balance outstanding for any Loan hereunder immediately due and payable; (2) terminate this Agreement and any Loan upon notice to Borrower; (3) transfer any Collateral from the collateral account to Lender's operating account necessary for the payment of any nonpayment, liability, obligation, or indebtedness created by this Agreement or by Genesis in furtherance of its performance hereunder and/or its lending business, including but not limited to using the Collateral to purchase the relevant Digital Currency to replenish Lender's supply of the relevant Digital Currency or selling any Collateral in a relevant market for such Digital Currency; (4) purchase on Lender's own account a like amount of Loaned Assets in a relevant market for such Digital Currency and then collect from Borrower amounts expended by Lender for such purchase ; (5) exercise its rights under Section XII herein; and (6) exercise all other rights and remedies available to the Lender hereunder, under applicable law, or in equity; provided, that upon any Event of Default pursuant to Section VIII as to a particular Loan, the entire Loan Balance then outstanding hereunder shall automatically become and be immediately due and payable.

(b) On the occurrence of any Event of Default under Sections VIII(g) or (h), this Agreement and any and all Loans made pursuant to this Agreement shall be terminated immediately and become due and payable, and Lender shall have immediate right to the Collateral to the fullest extent permitted herein and by law.

(c) In the event that the purchase price of any replacement Digital Currency pursuant to Section IX (a)(3) & (a)(4) above exceeds the amount of the Collateral, Borrower shall be liable to Lender for the amount of such excess together with interest thereon in the amount of 10% or as modified in the Term Sheet.  As security for Borrower's obligation to pay such excess, Lender shall have, and Borrower hereby grants, a security interest in any property of Borrower then held by or for Lender and a right of setoff with respect to such property and any other amount payable by Lender to Borrower.  The purchase price of replacement Digital Currency purchased under this Section shall include, and the proceeds of any sale of Collateral shall be determined after deduction of, broker's fees and commissions and all other reasonable costs, fees and expense related to such purchase or sale (as the case may be).  In the event Lender exercises its rights under this Section, Lender may elect in its sole discretion, in lieu of purchasing all or a portion of the replacement Digital Currencies or selling all or a portion of the Collateral, to be deemed to have made, respectively, such purchase of replacement Digital Currencies or sale of Collateral for an amount equal to the price therefor on the date of such exercise obtained from a generally recognized source.

(d) To the extent that the Loans are now or hereafter secured by property other than the Collateral, or by the guarantee, endorsement or property of any other person, then upon an Event of Default by Borrower, Lender shall have the right in its sole discretion to determine which rights, security, liens, security interests or remedies Lender shall at any time pursue, relinquish, subordinate, modify or take any other action with respect thereto, without in any way modifying or affecting any of them or any of Lender's rights hereunder.

(e) In connection with the exercise of its remedies pursuant to this Section IX, Lender may (1) exchange, enforce, waive or release any portion of the Collateral or Loans in favor of the Lender or relating to any other security for the Loans; (2) apply such Collateral or security and direct the order or manner of sale thereof as the Lender may, from time to time, determine; and (3) settle, compromise, collect or otherwise liquidate any such Collateral or security in any manner following the occurrence of an Event of Default, without affecting or impairing the Lender's right to take any other further action with respect to any Collateral or security or any part thereof.

(f) In addition to its rights hereunder, the non-defaulting Party shall have any rights otherwise available to it under any other agreement or applicable law.

## X.    Rights and Remedies Cumulative.

No delay or omission by the Lender in exercising any right or remedy hereunder shall operate as a waiver of the future exercise of that right or remedy or of any other rights or remedies hereunder.  All rights of the Lender stated herein are cumulative and in addition to all other rights provided by law, in equity.

## XI.    Survival of Rights and Remedies

All remedies hereunder and all obligations with respect to any Loan shall survive the termination of the relevant Loan, return of Loaned Assets or Collateral, and termination of this Agreement.

## XII.    Collection Costs.

In the event Borrower fails to pay any amounts due or to return any Digital Currency or upon the occurrence of any Event of Default in Section VIII hereunder,  Borrower shall, upon demand, pay to Lender all reasonable costs and expenses, including without limitation, reasonable attorneys' fees and court costs, broker fees, and technology costs incurred by the Lender in connection with the enforcement of its rights hereunder.

## XIII.    Governing Law; Dispute Resolution.

This Agreement is governed by, and shall be construed and enforced under, the laws of the State of New York without regard to any choice or conflict of laws rules.  If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction.  The parties agree to waive their rights to a jury trial.  If any preceding is brought for the enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

## XIV.  **Confidentiality.**

(a) Each Party to this Agreement shall hold in confidence all information obtained from the other Party in connection with this Agreement and the transactions contemplated hereby, including without limitation any discussions preceding the execution of this Agreement (collectively, "Confidential Information").  Confidential Information shall not include information that the receiving Party demonstrates with competent evidence was, or becomes, (i) available to the public through no violation of this Section XIV, (ii) in the possession of the receiving Party on a non-confidential basis prior to disclosure, (iii) available to the receiving Party on a non-confidential basis from a source other than the other Party or its affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants (the "Representatives"), or (iv) independently developed by the receiving Party without reference to or use of such Confidential Information.

(b) Each Party shall (i) keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose or allow the disclosure of such Confidential Information to any third party, except as otherwise herein provided, and (ii) restrict internal access to and reproduction of the Confidential Information to a Party's Representatives only on a need to know basis; provided, however, that such Representatives shall be under an obligation of confidentiality at least as strict as set forth in this Section XIV.

(c) Each Party also agrees not to use Confidential Information for any purpose other than in connection with transactions contemplated by this Agreement.

(d) The provisions of this Section XIV will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law, regulation, or direction by a court of competent jurisdiction or government agency or regulatory authority with jurisdiction over said Party; *provided* that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure.  Notwithstanding the foregoing, Lender may disclose the other Party's Confidential Information without notice pursuant to a written request by a governmental agency or regulatory authority.

(e) The obligations with respect to Confidential Information shall survive for a period of three (3) years from the date of this Agreement.  Notwithstanding anything in this agreement to the contrary, a Party may retain copies of Confidential Information (the "Retained Confidential Information") to the extent necessary (i) to comply with its recordkeeping obligations, (ii) in the routine backup of data storage systems, and (iii) in order to determine the scope of, and compliance with, its obligations under this Section XIV; provided, however, that such Party agrees that  any Retained Confidential Information shall be accessible only by legal or compliance personnel of such Party and the confidentiality obligations of this Section XIV shall survive with respect to the Retained Confidential Information for so long as such information is retained.

## XV.    Notices.

Unless otherwise provided in this Agreement, all notices or demands relating to this Agreement shall be in writing and shall be personally delivered or sent by Express or certified mail (postage prepaid, return receipt requested), overnight courier, electronic mail (at such email addresses as a Party may designate in accordance herewith), or to the respective address set forth below:

Borrower:



Lender:
Genesis Global Capital, LLC
111 Town Square Place, Suite 1203
Jersey City, NJ 07310
Attn: Michael Moro, CEO
Email: michael@genesiscap.co

Either Party may change its address by giving the other Party written notice of its new address as herein provided.

## XVI.    Modifications.

All modifications or amendments to this Agreement shall be effective only when reduced to writing and signed by both parties hereto.

## XVII.    Single Agreement

Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder constitute a single business and contractual relationship and have been entered into in consideration of each other.  Accordingly, Borrower and Lender hereby agree that payments, deliveries, and other transfers made by either of them in respect of any Loan shall be deemed to have been made in consideration of payments, deliveries, and other transfers in respect of any other Loan hereunder, and the obligations to make any such payments, deliveries and other transfers may be applied against each other and netted.  In addition, Borrower and Lender acknowledge that, and have entered into this Agreement in reliance on the fact that, all Loans hereunder have been entered into in consideration of each other. Accordingly, Borrower and Lender hereby agree that (a) each shall perform all of its obligations in respect of each Loan hereunder, and that a default in the performance of any such obligation by Borrower or by Lender (the "Defaulting Party") in any Loan hereunder shall constitute a default by the Defaulting Party under all such Loans hereunder, and (b) the non-defaulting Party

17

DocuSign Envelope ID: 4DBF73C6157E2A6A3-BF5F304072AAG02D

shall be entitled to set off claims and apply property held by it in respect of any Loan hereunder against obligations owing to it in respect of any other Loan with the Defaulting Party.

## XVIII. Entire Agreement.

This Agreement, each exhibit referenced herein, and all Loan Term Sheets constitute the entire Agreement among the parties with respect to the subject matter hereof and supersedes any prior negotiations, understandings and agreements. Nothing in this Section XVIII shall be construed to conflict with or negate Section XVII above.

## XIX. Successors and Assigns.

This Agreement shall bind and inure to the benefit of the respective successors and assigns of each of the parties; provided, that Borrower may not assign this Agreement or any rights or duties hereunder without the prior written consent of the other Party (such consent to not be unreasonably withheld). Lender may assign this Agreement or any rights or duties hereunder upon notice to Borrower. Notwithstanding the foregoing, in the event of a change of control of Lender or Borrower, prior written consent shall not be required so such Party provides the other Party with written notice prior to the consummation of such change of control. For purposes of the foregoing, a "change of control" shall mean a transaction or series of related transactions in which a person or entity, or a group of affiliated (or otherwise related) persons or entities acquires from stockholders of the Party shares representing more than fifty percent (50%) of the outstanding voting stock of such Party. Neither this Agreement nor any provision hereof, nor any Exhibit hereto or document executed or delivered herewith, or Loan Term Sheet hereunder, shall create any rights in favor of or impose any obligation upon any person or entity other than the parties hereto and their respective successors and permitted assigns. For the avoidance of doubt, any and all claims and liabilities against Genesis arising in any way out of this Agreement are only the obligation of Genesis, and not any of its parents or affiliates, including but not limited to Digital Currency Group, Inc. and Genesis Global Trading, Inc. The Parties agree that none of Genesis' parents or affiliates shall have any liability under this Agreement nor do such related entities guarantee any of Genesis' obligations under this Agreement.

## XX. Severability of Provisions.

Each provision of this Agreement shall be severable from every other provision of this Agreement for the purpose of determining the legal enforceability of any specific provision.

## XXI. Counterpart Execution.

This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by email or other electronic method of transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any Party delivering an executed counterpart of this Agreement by email or other electronic method of transmission also shall deliver an original executed counterpart of this

Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Agreement.

## XXII. **Relationship of Parties.**

Nothing contained in this Agreement shall be deemed or construed by the Parties, or by any third party, to create the relationship of partnership or joint venture between the parties hereto, it being understood and agreed that no provision contained herein shall be deemed to create any relationship between the parties hereto other than the relationship of Borrower and Lender.

## XXIII. **No Waiver.**

The failure of or delay by Genesis to enforce an obligation or exercise a right or remedy under any provision of this Agreement or to exercise any election in this Agreement shall not be construed as a waiver of such provision, and the waiver of a particular obligation in one circumstance will not prevent Genesis from subsequently requiring compliance with the obligation or exercising the right or remedy in the future. No waiver or modification by either Party of any provision of this Agreement shall be deemed to have been made unless expressed in writing and signed by both parties.

## XXIV. **Indemnification.**

A Party shall indemnify and hold harmless the other Party, or any of its parents or affiliates, from and against any and all third party claims, demands, losses, expenses and liabilities of any and every nature (including attorneys' fees of an attorney of Genesis' choosing to defend against any such claims, demands, losses, expenses and liabilities) that it may sustain or incur or that may be asserted against it arising out of Genesis' lending of Digital Currency to Borrower under this Agreement, except for any and all claims, demands, losses, expenses and liabilities arising out of or relating to that Party's bad faith, gross negligence or willful misconduct in the performance of its duties under this Agreement.  This indemnity shall be a continuing obligation of Borrower, its successors and assigns, notwithstanding the termination of this Agreement.

## XXV. **Term and Termination.**

The Term of this Agreement shall commence on the date hereof for a period of one year, and shall automatically renew for successive one-year terms annually, unless either Party provides notice of a desire to terminate the contract no less than ten (10) days prior to the end of such one-year period.   The foregoing notwithstanding, this Agreement may be terminated as set forth in Section VIII or upon 30 days' notice by either Party to the other.

In the event of a termination of this Agreement, any Loaned Assets shall be redelivered immediately and any fees owed shall be payable immediately.

## XXVI. **Miscellaneous.**

Whenever used herein, the singular number shall include the plural, the plural the singular, and the use of the masculine, feminine, or neuter gender shall include all genders where necessary and appropriate.  This Agreement is solely for the benefit of the parties hereto and their respective successors and assigns, and no other Person shall have any right, benefit, priority or interest under, or because of the existence of, this Agreement.  The section headings are for convenience only and shall not affect the interpretation or construction of this Agreement.  The Parties acknowledge that the Agreement and any Lending Request are the result of negotiation between the Parties which are represented by sophisticated counsel and therefore none of the Agreement's provisions will be construed against the drafter.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first above written.

BORROWER:



LENDER:

GENESIS GLOBAL CAPITAL, LLC

By: _____

Name: Kristopher Johnson

Title: Senior Risk Officer

## EXHIBIT A

Authorized Agents.  The following are authorized to deliver Lending Requests on behalf of Borrower in accordance with Section II hereof:

Name: ███████████
Email: ███████████████████

Name: ███████████
Email: ███████████████████████

Borrower may change its Authorized Agents by notice given to Lender as provided herein.

## EXHIBIT B

## LOAN TERM SHEET

This loan agreement dated [DATE OF TERM SHEET] between Genesis Global Capital, LLC ("Genesis") and ██████████████████ ("Borrower") incorporates all of the terms of the Master Loan Agreement between Genesis and Borrower on [DATE OF MASTER AGREEMENT] and the following specific terms:

Lender:                          Genesis Global Capital, LLC

Borrower:                        ████████████████

Borrowed Asset:

Amount of Currency:

Borrow Fee:

Loan Type:                       [Open Loan]
                                 [Fixed Term Loan]
                                 [Term Loan With Prepayment Option]

Maturity Date:

Collateral Asset:

Collateral:

Margin Call Limit:


GENESIS GLOBAL CAPITAL, LLC          ██████████████████████


By: _____         By: _____
Name:                            Name:
Title:                           Title:

23

# TRI-PARTY SETTLEMENT AGREEMENT

This Tri-Party Settlement Agreement (the "<u>Agreement</u>") is hereby made and entered into and dated as of 23th day of November, 2020 by and between ███████████████████████████ ███████████████████████████████████ and each of the entities listed on Schedule A, as defined therein, and as may be amended from time to time by any entity listed on Schedule A (each, a "<u>Genesis Entity</u>" and each Genesis Entity and Counterparty, a "<u>Party</u>" and together the "<u>Parties</u>").

**WHEREAS**, Counterparty has entered into business relationships with one or more Genesis Entity that may include trading digital currency, borrowing or lending digital currency, trading digital currency-based derivatives, or receiving digital currency custodial services; and

**WHEREAS**, in the course of its transactions with Genesis Entities, Counterparty may engage in a transaction with one Genesis Entity followed immediately by a transaction with a different Genesis Entity (the combination of two such transactional components, an "<u>Intercompany Transaction</u>"); and

**WHEREAS**, when engaging in an Intercompany Transaction, to ensure prompt, efficient and secure settlement of the transactional components of the Intercompany Transaction, Counterparty may request that a Genesis Entity settle with another Genesis Entity on Counterparty's behalf (an "<u>Intercompany Settlement</u>");

**NOW THEREFORE**, in consideration for the promises, rights and obligations set forth below, and other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.    <u>Settlement Instruction</u>

If Counterparty engages in an Intercompany Transaction and wants to request an Intercompany Settlement then the following procedure shall be followed:

    a.  Counterparty shall request such Intercompany Settlement in writing to each Genesis Counterparty involved in the Intercompany Transaction, with an email copy to each of legal@genesistrading.com and compliance@genesistrading.com.

    b.  Each Genesis Entity involved in the Intercompany Transaction shall have sole discretion whether to agree to an Intercompany Settlement for any Intercompany Transaction.

    c.  If all relevant Genesis Entities agree to the Intercompany Settlement for the Intercompany Transaction, one or more of the Genesis Entities shall send an email summary of the settlement to Counterparty, which shall serve as confirmation of the settlement of the Intercompany Transaction.

2.    <u>Independent Transactions</u>

Each of Counterparty and the relevant Genesis Entities represent that any transactional components that make up an Intercompany Transaction are separate and distinct transactions, conducted at arm's length. No part of any Intercompany Transaction is conditioned on any other part of an Intercompany Transaction. Counterparty represents that it was not induced by any Genesis Entity into entering into any Intercompany Transaction with the promise of a better price on any transaction that makes up a part of the Intercompany Transaction. Counterparty agrees that any claim or dispute with any Genesis Entity relating to any transactional component is with that Genesis Entity only and no other Genesis Entity that may be party to another transactional component of an Intercompany Transaction or party to this Agreement.

3.    Third-Party Delivery

Each of Counterparty and any Genesis Entity consents to the delivery of digital currency or U.S. Dollars by another Genesis Entity on behalf of Counterparty to satisfy certain obligations of Counterparty in an Intercompany Transaction, each as evidenced in and governed by the agreement or terms relevant to a certain transactional component.

4.    Additional Representations and Warranties

Counterparty hereby represents and warrants to each Genesis Entity that as of the date hereof:

a.  This Agreement has been duly executed and delivered by Counterparty and this Agreement constitutes a valid and legally binding obligation of Counterparty, enforceable against Counterparty in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally.

b.  Neither the execution and delivery of this Agreement, nor the consummation of an Intercompany Transaction contemplated herein, does or will violate any statute, regulation, rule, judgment, order, decree, ruling, charge or other restriction of any government, governmental agency, or court to which Counterparty is subject or conflict with, violate or constitute a default under any agreement, debt or other instrument to which Counterparty is a party.

c.  Counterparty agrees, understands and acknowledges that (i) Counterparty is solely responsible for any decision to enter into an Intercompany Transaction subject to this Agreement, including the evaluation of any and all risks related to any such Intercompany Transaction; and (ii) in entering into any such Intercompany Transaction, Counterparty has not relied on any statement or other representation of any Genesis Entity other than as expressly set forth herein.

5.    Confidentiality

Each Party shall hold in confidence all information obtained from the other Party in connection with this Agreement (collectively, "Confidential Information"). Each Party shall keep such Confidential Information confidential and shall not, without the prior written consent of the other Party, disclose such Confidential Information to any person or use such Confidential Information for any purpose other than the transactions

contemplated by this Agreement. The provisions of this Section 3 will not restrict a Party from disclosing the other Party's Confidential Information to such Party's affiliates, subsidiaries, officers, directors, employees, contractors, attorneys, accountants, bankers or consultants with a need to know such Confidential Information, and will not restrict a Party from disclosing the other Party's Confidential Information to the extent required by any law or regulation; *provided* that the Party required to make such a disclosure uses reasonable efforts to give the other Party reasonable advance notice of such required disclosure in order to enable the other Party to prevent or limit such disclosure. Notwithstanding the foregoing, a Party may disclose the other Party's Confidential Information without notice pursuant to a request or other regular routine inspection by a governmental agency or regulatory authority. The obligations with respect to Confidential Information shall survive for a period of one (1) year from the date of this Agreement.

6.    Governing Law; Dispute Resolution

  a. The laws of the State of New York shall govern this Agreement, without regard to its conflict of law principles.

  b. If a dispute arises out of or relates to this Agreement, or the breach thereof, and if said dispute cannot be settled through negotiation it shall be finally resolved by arbitration administered in the County of New York, State of New York by the American Arbitration Association under its Commercial Arbitration Rules, or such other applicable arbitration body as required by law or regulation, and judgment upon the award rendered by the arbitrators may be entered in any court having jurisdiction. If any proceeding is brought for enforcement of this Agreement, then the successful or prevailing party shall be entitled to recover attorneys' fees and other costs incurred in such proceeding in addition to any other relief to which it may be entitled.

7.    Entire Agreement

This Agreement, together with the Master Agreement, represents the entire Agreement between the Parties relating to the subject matter contained herein and in the event there is any conflict or inconsistency between the terms and conditions of the Master Agreement and those of this Agreement, the terms and conditions of this Agreement shall control and govern the rights and obligations of the Parties. Further, the provisions of this Agreement and the Master Agreement shall together supersede all prior oral and written commitments, contracts and understandings with respect to the subject matter contained herein. This Agreement may only be amended by mutual written agreement of the authorized representatives of each Party. This Agreement may be signed in one or more counterparts; each counterpart shall be deemed an original and all counterparts together shall constitute one and the same instrument.

**In Witness Whereof,** the Parties have caused this Agreement to be duly executed by their respective authorized representatives as of the day and year above written.

**On behalf of the Genesis Entities listed on Schedule A**

By: 

DocuSigned by:

*Michael Moro*

705B2EE45937490

Name:  S. Michael Moro

Title:  CEO

DocuSign Envelope ID: 4DBF73C6-57E2-46A3-BF55-304072AA020D

## SCHEDULE A

<u>Genesis Entities</u>:
Genesis Global Trading, Inc.
Genesis Global Capital, LLC
GGC International Limited
Genesis Asia Pacific PTE. LTD.
Genesis Custody Limited

# EXHIBIT B

# LOAN TERM SHEET

The following loan agreement dated November 11th, 2022 incorporates all of the terms of the Master Loan Agreement entered into by Genesis Global Capital, LLC ("Genesis") and ████████████████████████ on November 23rd, 2020 and the following specific terms:

| | |
|---|---|
| Lender: | Genesis |
| Borrower: | ███████ |
| Borrowed Asset: | BTC |
| Amount of Borrowed Asset: | 175 BTC |
| Borrow Fee: | 6.00% annual |
| Loan Type: | Open Term |
| Maturity Date: | N/A |
| Collateral: | 12.32 BTC, 299.999391 ETH, 3,399,499.75 USD |
| Margin Limit: | 130.00% of loan value (on a net loan basis) |
| Margin Refund: | 140.00% of loan value (on a net loan basis) |
| Initial Margin Requirement: | 135.00% of loan value (on a net loan basis) |

Genesis Global Capital, LLC    ███████████████



By: _____
Name: Nebiyou Getahun
Title: Senior Associate Credit