## **EXHIBIT D**

Extract of Deposition of Paul Aronzon, January 31, 2024

Page 1

1

2    UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

3    ——————————————————————————————————————

4    In re:

5    GENESIS GLOBAL HOLDCO, LLC, et al.,

6                        Debtors.

7

Case No.: 23-10063 (SHL)

8    ——————————————————————————————————————

9

January 31, 2024

10                        8:39 a.m.

11

12

13

14            VIDEOCONFERENCE DEPOSITION of

15    PAUL ARONZON, pursuant to Notice, held at

16    8786 North Promontory Ridge Drive, Park

17    City, Utah before Wayne Hock, a Notary

18    Public of the State of New York.

19

20

21

22

23

24

25

Page 128

1                    P. Aronzon

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23   EXAMINATION BY

24   MS. GRIFFITH:

25        Q.    Good afternoon, Mr. Aronzon.

Page 129

1                    P. Aronzon

2              Do you hear me okay?

3       A.     Yes.

4       Q.     Great.

5              My name is Greer Griffith.  I'm

6    with the law firm McDermott Will and

7    Emery, and I represent the ad hoc crypto

8    creditors group.

9              So this morning you testified

10   that you were one of two special committee

11   members; correct?

12      A.     Yes.

13      Q.     How frequently did the special

14   committee meet?

15      A.     It's impossible to say, but

16   several times, sometimes daily, and

17   certainly many times each week over the

18   entire time frame.  It's a very busy, busy

19   committee.

20      Q.     And when you met, was it in

21   person, over the phone, e-mail, a

22   combination?

23              MS. VANLARE: Objection.

24              THE WITNESS:  It is mostly

25        videoconference.  Certainly there

Page 130

1                    P. Aronzon

2        would have been phone calls.  There

3        were many in-person meetings, but I

4        usually attended by videoconference.

5        Q.    And was one of the purposes of

6    the special committee to conduct

7    investigations?

8              MS. VANLARE: Objection.

9              THE WITNESS:  Yes.

10              Sorry, I waited, I waited, I

11        wasn't sure.

12              MS. VANLARE: You did.

13        Q.    Did you run the special

14    committee investigations?

15              MS. VANLARE: Objection.

16              THE WITNESS:  Did I run them?

17        I'm not sure what you're asking me.

18        Q.    Were you in charge of the

19    special committee investigations?

20              MS. VANLARE: Objection.

21              THE WITNESS:  The special

22        committee obviously directs its

23        professionals, and the professional

24        here conducted an investigation on our

25        behalf.

Page 131

1          P. Aronzon

2      Q.     What was your role regarding the
3   investigations then?

4            MS. VANLARE: Objection.  Asked
5        and answered.

6            THE WITNESS:  My role is that of
7        an independent director who's a member
8        of a special committee, and the
9        committee's job is to -- among all the
10       other things that we had on our plate,
11       to look into claims and causes of
12       action that might exist.

13      Q.     And you said that you advised
14   professionals who assisted with conducting
15   the investigation; correct?

16           MS. VANLARE: Objection.
17       Misstates testimony.

18           THE WITNESS:  I didn't advise
19       anybody.  But we, as a special
20       committee, did direct and make
21       business decisions about the
22       investigation to the extent we were
23       asked to do so.

24      Q.     And which professionals did you
25   work with as part of this investigation?

Page 132

1           P. Aronzon

2               MS. VANLARE: Objection.

3               THE WITNESS:  The company's

4      professionals.  There's, as you know,

5      there's Cleary, that's the main --

6      they would be the main focus of the

7      discussions.  And then of course there

8      was support on the financial side from

9      A&M, Alvarez and Marsal, and also to

10     the extent necessary, Moelis and

11     Company.

12     Q.     And did all three of these

13  different professional groups provide

14  updates to the special committee?

15              MS. VANLARE: Objection.  Vague.

16              THE WITNESS:  On what?  We got

17     regular updates on a variety of

18     topics.

19     Q.     What did they update you about?

20  What type of topics?

21              MS. VANLARE: Objection.

22              THE WITNESS:  Everything we were

23     working on, whether it was the plan,

24     settlement negotiations, litigation

25     matters, claims disputes, legal issues

Page 133

1                    P. Aronzon

2        from time to time on a daily basis,

3        frankly, and certainly the

4        investigative issues.

5        Q.    Did they provide reports to you

6    about documents that they were collecting

7    or reviewing in connection with the

8    investigation?

9              MS. VANLARE: Objection.

10             And I would caution the witness

11       to the extent your answer would

12       disclose any client privilege.

13             THE WITNESS:  We did receive

14       reports.

15       Q.    And what type of reports?  I'm

16   not asking for you to reveal any

17   attorney-client privileged information,

18   but were these reports summarizing

19   documents that were collected from

20   individuals, were they summarizing

21   interviews that were conducted?

22             MS. VANLARE: Objection.

23             And again, to the extent your

24       answer would involve revealing any

25       client-attorney communications, I

Page 134

1                         P. Aronzon

2          would instruct you not to answer.

3                  THE WITNESS:  They were very

4          detailed reports about all of the

5          activities of our investigative team.

6          Q.    And do you consider those

7      reports to be privileged information?

8                  MS. VANLARE: Objection.  Calls

9          for a legal conclusion.

10                 THE WITNESS:  I believe they are

11         privileged.

12                 MS. GRIFFITH: And I have my

13         colleague Matthew Gibson on with me.

14                 Matthew, could you upload the

15         amended disclosure statement.

16                 (Whereupon, a document entitled

17         Amended Disclosure Statement With

18         Respect to The Amended Joint Plan of

19         Genesis Global Holdco, LLC

20         was marked Aronzon Exhibit 6

21         for identification.)

22         Q.    And when that's uploaded as an

23     exhibit, I believe we're at Exhibit 6.

24                 I'm going to direct your

25     attention to the bottom of page

Page 135

1                      P. Aronzon

2    thirty-six.

3        A.      I'm closing the Exhibit 5; okay?

4                Page what now?

5        Q.      It's thirty-six on the bottom of

6    the page.  On the top it will say page

7    fifty-one of three hundred six.  But for

8    the record, this is the amended disclosure

9    statement with respect to the is amended

10   joint plan of Genesis Global Holdco, LLC,

11   et al., under Chapter 11 of the bankruptcy

12   code filed at document 1031 publicly on

13   the docket.

14       A.      Okay, I've got it.

15       Q.      And if you look at the bottom of

16   that page, it says, "Cleary has shared the

17   findings from the investigation with the

18   special committee and counsel to the UCC

19   and the ad hoc group".

20               Do you see that?

21       A.      Yes.

22       Q.      Are these detailed reports that

23   you're referencing that fall under the

24   findings that Cleary shared about its

25   investigation?

```
 1                    P. Aronzon
 2            MS. VANLARE: Objection.  Vague.
 3            MR. WEST: Objection.
 4            THE WITNESS:  Go ahead.
 5            MS. VANLARE: Objection.  Vague.
 6            And also I would add again, to
 7       the extent this would reveal any
 8       attorney-client privilege, I would
 9       instruct you not to answer.
10            THE WITNESS:  I heard somebody
11       else say something.
12            MS. VANLARE: I believe that was
13       Mr. West.
14            THE WITNESS:  I actually -- I
15       can't give you any substance, but what
16       I can tell you is I don't know exactly
17       what was shared.
18       Q.   Were the reports, the detailed
19   reports that were shared with you, also
20   shared with counsel to the UCC and the ad
21   hoc group?
22            MS. VANLARE: Objection.
23            THE WITNESS:  I don't know.
24       Q.   Who would have that information?
25       A.   Our counsel and probably the UCC
```

Page 137

1                         P. Aronzon

2      counsel and ad hoc group counsel.  They

3      can tell you what they got and what was

4      delivered.

5          Q.    And do you have these reports in

6      your possession, these detailed finding

7      reports?

8              MS. VANLARE: Objection.

9              THE WITNESS:  Sitting here right

10         now in my hand, no.

11         Q.    But if you were able to look in

12     your e-mail or in your personal

13     possession.

14             MS. VANLARE: Objection.

15             Counsel, you're misrepresenting

16         what's written on the page, so I would

17         caution the witness.

18             THE WITNESS:  I am sure that I

19         have reports that were provided by our

20         counsel.

21         Q.    Is the special committee

22     investigation still ongoing?

23         A.    I believe that we are still --

24     I'm not quite sure how to answer this.

25             There is work that is ongoing by

Page 138

```
 1                         P. Aronzon
 2    our counsel on a variety of issues having
 3    to do with a variety of different
 4    subjects.  I don't know how to describe it
 5    any better than that.  I mean, for
 6    instance, you know, we have work that
 7    we're doing in connection with plan
 8    releases.  That work is ongoing.  I don't
 9    know if that fits into your
10    categorization, but that is a topic that I
11    know is still in process.
12         Q.    How about an investigation into
13    potential claims the estate might have?
14               MS. VANLARE: Objection.
15               To the extent your answer would
16        reflect or reveal any attorney-client
17        privileged information, I would
18        instruct you not to answer.
19               THE WITNESS:  All I can really
20        say is there is continuing work being
21        done in certain areas.
22         Q.    Did the special committee
23    investigate all claims that the estate
24    might have?
25               MS. VANLARE: Objection.
```

Page 139

```
 1                        P. Aronzon
 2         Objection to form.
 3              And again, Mr. Aronzon, to the
 4         extent your answer would reveal any
 5         attorney-client communications, I
 6         would instruct you not to answer.
 7              THE WITNESS:  I'm not quite sure
 8         how to answer this.  The special
 9         committee relied on its professionals
10         to assist in determining what to
11         investigate and what not to.
12         Q.    What type of claims did the
13    special committee investigate?
14              MS. VANLARE: Objection.
15              To the extent that your answer
16         would reveal any attorney-client
17         communication, I would instruct you
18         not to answer.
19              THE WITNESS:  I'll try to do
20         this generically; okay?
21              To the extent that a claim would
22         be, quote, an asset of our estate, we
23         looked at it through our
24         professionals.
25              To the extent a claim would
```

Page 140

1                          P. Aronzon

2          result in something to do with claims

3          that are asserted against the estate,

4          we would look at that.  And I'm doing

5          it really generally because I don't

6          know how to be specific without

7          revealing discussions and privileged

8          information.  And then obviously to

9          the extent people apprised us of

10         things they thought should be

11         investigated, if we thought there was

12         a reason to follow up, we would do so.

13         And there may be other types of things

14         that we would look at depending on the

15         issues and the timing and everything

16         else.

17         Q.    Did the special committee

18    investigate potential claims against

19    former directors, officers, and employees

20    at Genesis?

21              MS. VANLARE: Objection.

22              And again, Mr. Aronzon, to the

23         extent any part of your answer would

24         reveal attorney-client communication,

25         I would instruct you not to answer.

Page 141

1                    P. Aronzon

2              THE WITNESS:  I think the answer

3        is in certain circumstances, yes.

4        Q.    Did the special committee

5   investigate potential claims against

6   current directors, officers, and employees

7   at Genesis?

8              MS. VANLARE: Objection.  Asked

9        and answered.

10             And again --

11             MS. GRIFFITH: The prior question

12        was about former.  This is current.

13             MS. VANLARE: I'm referencing

14        your prior question in response to Mr.

15        Aronzon already testified all of the

16        types of claims and issues that were

17        considered by the special committee.

18             MS. GRIFFITH: He did not specify

19        who he was investigating those claims

20        against, just the time frames.

21             MS. VANLARE: His testimony

22        addresses this question.

23             Mr. Aronzon, again to the extent

24        your answer would reflect or reveal

25        any client-attorney privileged

Page 142

P. Aronzon

1    communications, I would instruct you

2    not to answer.

3          THE WITNESS:  It is a category

4    that we looked into.

5    Q.    Approximately how many

6    individuals were employed at Genesis at

7    any given time in 2022?

8    A.    I don't know.

9    Q.    Ballpark number.

10          MS. VANLARE: Objection.  Asked

11    and answered.

12          THE WITNESS:  I really have no

13    basis to make that determination.

14    Q.    Approximately how many directors

15    and officers were employed at Genesis at

16    any given time in 2022?

17          MS. VANLARE: Objection.

18          THE WITNESS:  I don't know the

19    exact number.

20    Q.    Ballpark estimate.

21          MS. VANLARE: Objection.

22          THE WITNESS:  Directors?  I came

23    in at the end of 2022 and I think

24    there were four directors.

Page 143

1                    P. Aronzon

2            I'm really not certain of the

3       total number.  I'm more focused or

4       have been more focused on who is

5       around after I became a member of the

6       board.  And as I testified earlier

7       this morning, there were a few other

8       directors and the special committee at

9       some point a few months into the case,

10      two, three, four, five, I don't

11      remember, basically took over.

12      Q.    Do you know how many individuals

13   are currently employed at Genesis?

14            MS. VANLARE: Objection.

15            THE WITNESS:  No.  They've been

16      downsizing.  I don't know the number.

17      Q.    Do you know how many individuals

18   are current directors and officers at

19   Genesis?

20            MS. VANLARE: Objection.

21            THE WITNESS:  Directors, there's

22      Tom Conheeney and myself.  And as I

23      said earlier this morning, I'm not

24      sure whether the other directors, for

25      instance the DCG directors, I don't

Page 144

1                        P. Aronzon

2         recall whether they actually formally

3         resigned or not.  But the special

4         committee has functioned as the board

5         for many months now.

6              Officers, there's a handful,

7         two, three, four.

8         Q.    How many interviews have been

9    conducted as part of the special

10   committee's investigation?

11             MS. VANLARE: Objection.

12             THE WITNESS:  I don't know the

13        number.  Several.

14        Q.    And this will refresh your

15   recollection if we look at the amended

16   disclosure statement again, Exhibit 6,

17   page thirty-six on the bottom, page

18   fifty-one of three one six on the top.

19             MS. VANLARE: I'm sorry, counsel,

20        what page was that again?

21             MS. GRIFFITH: Sure.

22             So on the bottom, it's numbered

23        page thirty-six.  At the top of the

24        PDF, it says page fifty-one of three

25        hundred six.

Page 145

1              P. Aronzon

2          MS. VANLARE: Thank you.

3      Q.    Are you on that page?

4      A.    Yes.

5      Q.    And if you look right in the

6   middle of that page, there's a paragraph

7   that states, "as part of the

8   investigation, Cleary conducted more than

9   thirty interviews with approximately

10  twelve current and former employees

11  allocated to the company".

12          Do you see that?

13     A.    Yes.

14     Q.    And if you keep reading, it

15  says, "between December 4, 2022 and

16  January 24, 2023, Cleary conducted ten

17  preliminary interviews with current

18  employees".

19          Do you see that?

20     A.    Yes.

21     Q.    And then the next sentence

22  states that Cleary -- states in part,

23  "Cleary conducted at least nineteen more

24  substantive interviews with both current

25  and former employees".

Page 146

```
 1                    P. Aronzon

 2           Do you see that?

 3      A.    Yes.

 4      Q.    So it looks like there's ten

 5  preliminary interviews, nine substantive

 6  interviews that took place.  But the first

 7  sentence states approximately twelve

 8  current and former employees were

 9  interviewed.  And so I'm trying to figure

10  that out.

11           Does that mean that similar --

12  the same individuals were interviewed

13  twice, both for the preliminary interviews

14  and the substantive interviews?

15           MS. VANLARE: Objection.

16           THE WITNESS:  I don't know.

17      Q.    Do you know who Cleary

18  interviewed?

19           MS. VANLARE: Objection.

20           And to the extent this would

21      reveal attorney-client communication,

22      I would instruct the witness not to

23      answer.

24           THE WITNESS:  I can't answer it

25      without talking about the reports that
```

Page 147

```
 1                    P. Aronzon
 2        we received.
 3        Q.     You publicly filed details about
 4   the results of the special committee
 5   investigation here on the docket in the
 6   amended disclosure statement.  You can't
 7   really pick and choose what is considered
 8   privilege or what's not considered
 9   privilege.  You put the topic of
10   interviews in the amended disclosure
11   statement revealing what you investigated.
12   And so I'm asking who were the targets of
13   these interviews.
14             Do you know who they were?
15             MS. VANLARE: Objection.
16             The information that is in the
17        disclosure statement is by definition
18        public.  Other information relating to
19        the investigation is privileged.  The
20        witness has already testified that he
21        can't answer your question without
22        revealing privileged information.
23        Therefore, I would instruct the
24        witness not to answer the question.
25        Q.     Are you claiming that it's
```

Page 148

```
 1                    P. Aronzon
 2   privileged information whether you know
 3   who was interviewed or not?
 4            MS. VANLARE: I'm not sure if
 5        you're referencing -- if you're
 6        addressing your question to the
 7        witness or to me.
 8            However, in response to your
 9        question, my objection stands.  And
10        again, I would instruct the witness
11        not to answer to the extent the answer
12        reveals privileged communication,
13        which he said it would.
14   Q.    Mr. Aronzon, I'm asking is the
15   identity of the witnesses who were
16   interviewed privileged information, in
17   your opinion?
18            MS. VANLARE: Ms. Griffith,
19        objection.
20            Again, I'm happy to repeat what
21        I just said, but it's the same
22        objection and same instruction to the
23        witness.
24   Q.    Did you sit in on any of these
25   interviews?
```

Page 149

1                    P. Aronzon

2            MS. VANLARE: Objection.

3            You may answer yes or no.

4            THE WITNESS:  No.

5       Q.    Did you ask any questions during

6    any of these interviews via prewritten

7    questions that were sent?

8            MS. VANLARE: Objection.

9            And again, Mr. Aronzon, I would

10       instruct you not to reveal any

11       attorney-client communications or

12       attorney work product in connection

13       with the investigations.

14           THE WITNESS:  Are you asking did

15       I ask our lawyers to ask specific

16       questions?

17      Q.    Yes.

18           MS. VANLARE: Objection.

19           I would instruct the witness not

20       to answer to the extent it reveals any

21       attorney work product or

22       attorney-client communications.

23      Q.    I'm not asking the substance of

24    the questions, I'm asking your involvement

25    and if you were -- the level of your

Page 150

```
 1                    P. Aronzon
 2   involvement.
 3            MS. VANLARE: If you're asking
 4       the witness if he spoke to his counsel
 5       about the investigations; is that your
 6       question?
 7            MS. GRIFFITH: Yes, did he help
 8       prepare for the interviews.
 9            MS. VANLARE: Again --
10            MS. GRIFFITH: I'm not asking
11       which questions he prepared, I'm
12       asking whether he was part of the
13       process for preparing for the
14       interviews that were conducted on
15       behalf of the special committee.
16            MS. VANLARE: Counsel, again
17       objection to your questions.
18            And I would instruct the witness
19       not to answer as it all calls for
20       privileged information.
21       Q.    Did you -- do you know if these
22   interviews were recorded?
23            MS. VANLARE: Same objection.
24            You may answer yes or no, if you
25       know.
```

Page 151

1                    P. Aronzon

2              THE WITNESS:  I don't know.

3        Q.    Did you review any transcripts

4    of these interviews?

5              MS. VANLARE: Objection.

6              Again, I'm going to instruct the

7         witness not to answer as this goes

8         into the details of the investigation

9         which are all privileged.

10             MS. GRIFFITH: On what basis is

11        whether Mr. Aronzon, who's a special

12        committee member who's tasked with

13        evaluating whether individuals should

14        be released privileged if he reviewed

15        an interview transcript?  I'm not

16        asking his thoughts or analysis of the

17        interview transcript, I'm asking

18        whether he reviewed it.

19             MS. VANLARE: Counsel, you're

20        asking questions that relate to the

21        conduct of an investigation that was

22        done by counsel and you're asking

23        about actions and conversations and

24        events that took place in the context

25        of a -- again an investigation that is

Page 152

1                    P. Aronzon

2          attorney-client communication and/or

3          attorney work product.

4          Q.    So are you refusing to answer

5     the question of whether the special

6     committee reviewed any interview

7     transcripts?

8               MS. VANLARE: Again, objection.

9          The witness is not refusing.  I'm

10         instructing the witness not to answer

11         for the reasons that I identified

12         earlier.

13         Q.    And just so the record is clear,

14    are you refusing to identify which

15    witnesses were interviewed as part of the

16    special committee investigation that are

17    listed here in the paragraph in the

18    amended disclosure statement that we

19    looked at?

20              MS. VANLARE: Objection.

21              Again, as stated previously, the

22         witness is not refusing.  I am

23         instructing the witness not to answer,

24         however, for the reasons I identified

25         earlier in that it calls for

Page 153

                        P. Aronzon

1      attorney-client communication and

2      attorney work product and is therefore

3      privileged information.

4          Q.     And are you going to take your

5  counsel's advice, Mr. Aronzon?

6          A.     I always do.

7          Q.     How were the individuals that

8  were interviewed selected to be

9  interviewed?

10             MS. VANLARE: Again, objection,

11         for the same reason.  This goes into

12         the details of the investigation and

13         is all subject to attorney-client

14         privilege and attorney work product,

15         and I would instruct the witness not

16         to answer.

17         Q.     Are you following that

18  instruction again?

19         A.     I always do.

20         Q.     Was anyone that was interviewed

21  not a current or former employee of

22  Genesis?

23             MS. VANLARE: Objection.

24             Once again, the question calls

1               P. Aronzon

2       for privileged information.  I would

3       instruct the witness not to answer.

4       Q.     Are you going to answer the

5    question, Mr. Aronzon?

6       A.     No.

7       Q.     During the course of your

8    investigation, did the special committee

9    investigate communications that Genesis

10   had with Genesis customers?

11           MS. VANLARE: Objection once

12       again for the same reason.  Calls for

13       privileged communication.

14           And I would instruct the witness

15       not to answer.

16       Q.     Once again, Mr. Aronzon, are you

17   going to answer the question or not?

18       A.     No.  And when I'm instructed not

19   to answer, I'm not going to answer.

20       Q.     The special committee

21   investigated DCG; correct?

22           MS. VANLARE: Mr. Aronzon, you

23       may answer yes or no, but beyond that

24       I would caution -- well, I would

25       instruct you to answer yes or no to

Page 155

```
 1                    P. Aronzon
 2      that question.
 3                 THE WITNESS:  Yes.
 4      Q.     And if we look at the top of
 5   page thirty-six, there's much more than a
 6   yes or no answer that was publicly filed
 7   on the docket about the special
 8   committee's investigation into DCG.  I'll
 9   read the line into the record.
10              It says, "as part of its
11   mandate, the special committee was charged
12   with evaluating and improving transactions
13   with affiliates, including DCG parties and
14   investigating the debtors' relationships
15   and transactions with DCG parties.  One of
16   the primary purposes of this investigation
17   has been to assess whether the debtors
18   have potentially viable claims against the
19   DCG parties and to assist the special
20   committee in the exercise of its fiduciary
21   duties".
22              Do you see that?
23      A.     Yes.
24      Q.     Has the special committee
25   determined whether the debtors have
```

Page 156

```
 1                       P. Aronzon
 2   potentially viable claims against the DCG
 3   parties?
 4             MS. VANLARE: Objection.
 5             Counsel, the language is what it
 6        is.  You're misstating the language.
 7        Obviously the witness can refer to
 8        what is in the disclosure statement.
 9             THE WITNESS:  At the bottom of
10        the page there's a sentence that says,
11        "the special committee concluded that
12        there are colorable claims against
13        certain DCG parties for various causes
14        of action", and it goes on to say,
15        "including potential claims based on
16        alter ego, preference, and other legal
17        cognizable rights".
18        Q.    And has the special committee
19   ever calculated a value of these claims?
20             MS. VANLARE: Objection.
21             I'm going to instruct the
22        witness not to answer as it would
23        reveal attorney work product and
24        attorney-client communication.
25        Q.    And you're following that advice
```

Page 157

                         P. Aronzon

1    again, Mr. Aronzon?

2        A.    As I said earlier.

3        Q.    I have to keep asking for the

4    record.

5        A.    I understand.

6        Q.    Thank you for your cooperation.

7              Did the special committee

8    investigate potential preference claims

9    against DCG parties?

10             MS. VANLARE: You may answer yes

11        or no, Mr. Aronzon.

12             THE WITNESS:  Yes.

13       Q.    And did the special committee

14   also investigate preference claims against

15   Gemini and Gemini lenders?

16             MS. VANLARE: Objection.

17             To the extent your answer would

18        reveal any attorney-client

19        communication or attorney work

20        product, again the disclosure

21        statement is a publicly filed document

22        and has information relating to the

23        investigations.

24             THE WITNESS:  Can I ask a

Page 158

1                      P. Aronzon

2        question?  Is there a paragraph that

3        talks about preference claims so I can

4        see what we said publicly?

5        Q.    Yes.  On page forty-five at the

6    bottom, page sixty of three hundred six at

7    the top, there's a paragraph on the

8    special committee's investigation and its

9    analysis of preference claims relating to

10   Gemini and/or the Gemini lenders.

11            Do you see that?

12       A.    It's paragraph A?

13       Q.    Yes.

14       A.    Little A?  Yes.

15       Q.    So were you involved with the

16   investigation into preference claims

17   against Gemini and the Gemini lenders?

18            MS. VANLARE: Objection.

19            You can answer yes or no.

20            THE WITNESS:  Involved, I'm not

21       sure what that means, but our

22       professionals did this work.

23       Q.    And did your professionals

24   report their findings on this work to the

25   special committee?

1              P. Aronzon

2              MS. VANLARE: Objection, but you

3         can answer yes or no.

4              THE WITNESS:  I believe they

5         did.

6         Q.   So you just testified that the

7    special committee investigated potential

8    preference claims against the DCG parties,

9    Gemini, and the Gemini lenders.

10             Did the special committee

11   investigate potential preference claims

12   against parties other than those entities?

13             MS. VANLARE: Objection.

14             You may answer yes or no, but

15        anything revealing attorney-client

16        communication or work product I would

17        instruct you not to answer.

18             THE WITNESS:  I believe the

19        answer is yes.

20        Q.   Did the special committee

21   investigate preference claims against

22   former directors and officers of Gemini?

23             MS. VANLARE: Objection.  Calls

24        for -- again, calls for privileged

25        communication.

Page 160

1               P. Aronzon

2          You may answer yes or no to the

3      extent it would not reveal attorney

4      work product or privileged

5      communications.

6          THE WITNESS:  I actually don't

7      recall all of the individuals or

8      entities that we looked at besides

9      those identified in the disclosure

10     statement.  I'd have to go digging

11     around to see.

12     Q.    So sitting here today, you can't

13 recall if the special committee

14 investigated potential preference claims

15 against directors, former directors and

16 officers at Gemini?

17          MS. VANLARE: Objection.

18     Misstates his testimony.

19          Counsel, if you want to point

20     him to a section of the disclosure

21     statement, please do so.  The

22     disclosure statement or the plan.

23          MS. GRIFFITH: I'm asking from

24     his recollection as someone who was

25     critical to approving whether

Page 161

1                    P. Aronzon

2        directors and officers at Gemini are

3        getting releases, if he considered

4        preference claims against those

5        individuals as part of that analysis.

6             MS. VANLARE: Mr. Aronzon, you

7        may answer yes or no, but beyond that

8        I would instruct you not to answer as

9        it would call for privileged

10       communications and attorney work

11       product.

12            THE WITNESS:  Well, I'm not

13       quite sure how to answer this, because

14       the releases don't apply to former

15       directors and officers.  It only

16       relates to people who were working for

17       the company from and after the

18       petition date.  I don't recall the

19       group of people we looked at, but we

20       certainly looked at a number of

21       different entities and individuals.

22       Q.    And when you're saying you

23  looked at a number of different entities

24  and individuals, you're talking about

25  looking at them and whether there was

Page 162

1                          P. Aronzon

2    preference claims against them; that's

3    what you meant by looking at them?

4               MS. VANLARE: Objection.

5               THE WITNESS:  It was all done

6          professionals, that's number one.

7               And number two, when I say

8          looking at them, we would have looked

9          at preference claims, and we may have

10         looked at other things, too, depending

11         on what we know or didn't know at the

12         time.

13    Q.    Do you know if any of the

14    individuals that are currently set to

15    receive releases have preference liability

16    to the estate?

17               MS. VANLARE: Objection.

18         Attorney-client privilege and work

19         product.

20               I would instruct the witness not

21         to answer.

22    Q.    Are you going to answer the

23    question?

24    A.    I was waiting for you to ask.

25               No, I'm not.

Page 163

1            P. Aronzon

2       Q.    Do you know the answer to that

3    question without revealing the answer?

4    Just in general, do you know if any of the

5    individuals on the released Genesis

6    personnel list have preference liability

7    to the estate?

8            MS. VANLARE: Objection to the

9       extent answering that would reveal

10      attorney-client communication.

11           THE WITNESS:  I don't know how

12      to answer it without talking about

13      what we learned from our

14      professionals, so it's -- I don't

15      think I can answer it without that.

16      Q.    Whether you know or do not know

17   a fact is not privileged information.

18           MS. VANLARE: Counsel, you're

19      using legal terminology, for example

20      "preference liability", that is

21      inherently a legal question, and so

22      how the witness would answer that, it

23      would be of course informed by

24      communications with counsel and legal

25      analysis.

Page 164

1                    P. Aronzon

2      Q.    You could answer.

3      A.    I can't.

4            MS. VANLARE: I think he can't.

5      I think he's answered the question.

6      Q.    Do you know if any of the

7      individuals set to get releases withdrew

8      any assets from Genesis within ninety days

9      prior to the petition date?

10           MS. VANLARE: Objection.

11      Objection to form.

12           If you know the answer.

13           THE WITNESS:  What I know I

14      learned through all of our

15      professionals' work, so it's hard for

16      they to answer that.

17      Q.    You can still answer yes or no

18      if you know that fact or not.

19           MS. VANLARE: He's already

20      answered the question.

21           THE WITNESS:  Yeah.

22      Q.    You did not answer yes or no.

23      A.    I don't know how to answer it

24      without talking about what I learned from

25      our professionals.  That's my problem

Page 165

```
1                    P. Aronzon
2    here.  I don't want an inadvertent comment
3    to be made to argue for some kind of
4    waiver.
5        Q.    Whether individuals withdrew
6    assets from Genesis is not privileged
7    information.
8             MS. VANLARE: Objection.  It's
9        not clear what you mean by your
10        question, first of all.
11        Q.    Individuals that are set to get
12    releases, if they withdrew any assets of
13    any kind, crypto included, from Genesis
14    within ninety days of the petition date is
15    not a privileged fact.  That's just a
16    fact.
17             MS. VANLARE: Mr. Aronzon, again
18        if -- to the extent you can answer
19        without conversations with counsel,
20        you may answer.  But to the extent
21        this is -- that your knowledge comes
22        from conversations with counsel and is
23        informed by conversations with
24        counsel, I would instruct you not to
25        answer.
```

```
                                        Page 166
 1                    P. Aronzon
 2            THE WITNESS:  I believe it is
 3       informed by conversations with
 4       counsel.
 5       Q.     So separate from communications
 6   with counsel, I don't want you to reveal
 7   that, I just want to know yes or no if you
 8   know whether any of the individuals that
 9   are set to get releases withdrew any
10   assets from Genesis within the ninety-day
11   period.
12            MS. VANLARE: Ms. Griffith,
13       you've asked -- I didn't mean to
14       interrupt.
15            MS. GRIFFITH: I'm not asking the
16       substance, I'm asking the fact, does
17       he know that fact or does he not know
18       that fact.  That is not a privileged
19       question.  Whether or not he knows
20       that, that's a yes or no answer.
21            MS. VANLARE: Ms. Griffith, the
22       witness has answered at least three
23       times that he is unable to answer that
24       question without revealing
25       conversations that he's had with
```

Page 167

                              P. Aronzon

1

2     counsel.

3     Q.    So you're refusing to answer the

4     question whether, as a special committee

5     member, you know that in a way that would

6     not reveal privileged communications; is

7     that correct?

8              MS. VANLARE: Objection to that

9         comment.  He's not refusing to answer.

10        He has answered the question and you

11        can review the transcript as to his

12        answer.

13    Q.    My question's still pending.

14             Is that correct?

15             MS. VANLARE: Objection.  He's

16        answered the question.

17    Q.    Are you still going to refuse to

18    answer the question, Mr. Aronzon, so we

19    can wrap up this part?

20             MS. VANLARE: Objection to your

21        characterization.  He's not refusing.

22        He has answered the question.

23             Mr. Aronzon, if you want to

24        clarify that your answer stands, you

25        can do so, and hopefully we can move

Page 168

1                       P. Aronzon

2        on.

3               THE WITNESS:  I believe all of

4        the information I have here came from

5        counsel.

6               MS. GRIFFITH: I'm going to

7        introduce as a new exhibit, Exhibit 7.

8               (Whereupon, a document entitled

9        Exhibit F was marked Aronzon

10       Exhibit 7 for identification.)

11              THE WITNESS: Can I close the

12       disclosure statement?  Are we done

13       with it?

14              MS. GRIFFITH: Yes.  We might go

15       back to it at one point, but for now

16       we're done with it.

17              And this, for the record, is a

18       notice of filing for plan supplement

19       for the debtors' amended joint

20       Chapter 11 plan filed publicly on the

21       docket as number 1117.

22       Q.    Tell me when you're able to

23    access that, please.

24       A.    I have it.

25       Q.    And if you could flip to the end

Page 169

1                        P. Aronzon

2    of this document, page twenty-one of

3    twenty-two, that's Exhibit S and it's

4    titled Justification For Exculpated and

5    Released Parties.

6         A.    I have it.

7         Q.    The first paragraph of this page

8    has a defined term in it called the

9    released Genesis personnel.

10             Do you see that?

11        A.    Yes.

12        Q.    Were current Genesis employees

13   included in the released Genesis personnel

14   list?

15             MS. VANLARE: Objection.

16             THE WITNESS:  Current as of

17        when?

18        Q.    You tell me.

19             MS. VANLARE: Objection.

20             THE WITNESS:  Well, I'm reading

21        the language.

22             "Subject to our reservation of

23        rights, the special committee has

24        provided its prior written consent for

25        the release of current or former

Page 170

1                        P. Aronzon

2        employees, officers, directors of the

3        debtors solely in such person's

4        capacity as such who served as an

5        employee, officer, or director of the

6        debtors pursuant" -- no, "of the

7        debtors from and after the petition

8        date, including any employees of GGT

9        who served or functioned as employees

10       of the debtor pursuant to a shared

11       services arrangement with GGT".

12              So when you use the word

13       "current", if you're using it the way

14       it's included here, then the answer is

15       yes.

16       Q.    And are you, as a special

17    committee member, familiar with the

18    individuals that are on the -- with the

19    released --

20              MS. GRIFFITH: Strike that.

21       Q.    Are you familiar, as a special

22    committee member, with who is on the

23    released Genesis personnel list?

24              MS. VANLARE: Objection.

25              To the extent you know, you can

Page 171

1                    P. Aronzon

2        answer, but I would caution to the

3        extent it would reveal any

4        attorney-client communications.

5              THE WITNESS:  Am I familiar with

6        who's on the list?

7        Q.    Yes, have you reviewed the list?

8        A.    I believe I've seen it, yes, or

9    a list.  And the work is not done yet, so

10   the list could change.

11       Q.    The list as it stands now, does

12   it contain current Genesis employees on

13   it?

14             MS. VANLARE: Objection.

15             THE WITNESS:  Genesis meaning

16       the whole empire of Genesis?

17       Q.    Yes.

18             MS. VANLARE: Objection.

19             THE WITNESS:  I believe it does.

20             Sorry, Jane.

21       Q.    And are any individuals that are

22   currently on the released Genesis

23   personnel list former employees, officers,

24   or directors of Genesis?

25             MS. VANLARE: Objection.

Page 172

```
 1                    P. Aronzon
 2            You may answer if you know.
 3            THE WITNESS:  If people were
 4       there on the petition date who fit in
 5       those categories and they left
 6       subsequently, then I believe the
 7       answer is yes.
 8       Q.    How many of the individuals that
 9  are currently on the released Genesis
10  personnel list have been interviewed?
11            MS. VANLARE: Objection.
12            This goes into the investigation
13       which again is subject to attorney
14       work product and attorney-client
15       privilege and I would instruct the
16       witness not to answer.
17       Q.    And once again, I'm not asking
18  for you to reveal your discussions with
19  counsel.  I'm asking if you know, as a
20  special committee member, the number of
21  employees on the list that were
22  interviewed or not as a fact.
23            MS. VANLARE: Again, that goes
24       into the way in which the
25       investigation was conducted which is
```

Page 173

1              P. Aronzon

2       subject to privilege, and I would

3       instruct the witness not to answer the

4       question.

5       Q.   Are you going to answer the

6  question?

7       A.   No.

8       Q.   Do you know if the special

9  committee is planning on interviewing all

10  of the individuals on the list prior to

11  the list being finalized?

12              MS. VANLARE: Same objection.

13       This again calls for privileged

14       communication and attorney work

15       product, and I would instruct the

16       witness not to answer.

17       Q.   Are you going to answer the

18  question?

19       A.   I follow the instructions of my

20  counsel.

21       Q.   In your opinion, as a special

22  committee member, separate from the advice

23  of your counsel, do you think it's

24  necessary to interview all of the people

25  that are set to get releases prior to them

Page 174

```
 1                   P. Aronzon
 2   being released?
 3              MS. VANLARE: Objection.  Calls
 4        for privileged communication and
 5        attorney work product, and I would
 6        instruct the witness not to answer.
 7        Q.    Are you going to answer that
 8   question?
 9        A.    No.
10        Q.    Have you personally interviewed
11   anyone that is set to be released on the
12   released Genesis personnel list?
13              MS. VANLARE: Objection.  Again
14        calls for the details of the
15        investigation which is subject to
16        attorney-client privilege and attorney
17        work product, and I would instruct the
18        witness not to answer.
19        Q.    Are you claiming that whether
20   you, as a special committee --
21              MS. GRIFFITH: Strike that.
22        Q.    Earlier in this deposition, you
23   testified that you were not working on the
24   special committee as an attorney; correct?
25        A.    I'm not working as an attorney
```

Page 175

```
 1                    P. Aronzon
 2   for anybody anywhere since 2019.
 3        Q.    So if you were to interview a
 4   witness personally, that would not be an
 5   interview conducted in an attorney
 6   fashion; correct?
 7              MS. VANLARE: Objection.
 8              Anything relating to the
 9        investigation is subject to privilege
10        as it was conducted by counsel and
11        under the direction of counsel and as
12        such, I would instruct the witness not
13        to answer.
14        Q.    I'm not asking whether counsel
15   conducted these interviews.  I'm asking
16   whether you, Mr. Aronzon, you, as a
17   special committee member, conducted any
18   interviews of any person that is set to be
19   released.
20              MS. VANLARE: And again, my
21        comment was broader than what you just
22        stated, which is to say that the way
23        in which the investigation was
24        conducted was directed by counsel, and
25        so any details relating to the
```

```
 1                     P. Aronzon

 2         investigation, unless they're made

 3         public through the disclosure

 4         statement or the plan supplement, are

 5         subject to privilege, and I would

 6         instruct the witness not to answer

 7         those questions.

 8         Q.    You previously testified that

 9    you did not conduct any interviews.  So

10    I'm just asking if you personally

11    interviewed anyone that's going to be

12    released.

13              MS. VANLARE: Objection.

14              MS. GRIFFITH: It's a yes or no

15         answer.

16              MS. VANLARE: You have the

17         testimony that you have.  You can

18         refer to the transcript.

19         Q.    Are you going to answer the

20    question, Mr. Aronzon?

21         A.    Was I instructed not to?

22              MS. VANLARE: I object to the

23         question.  You can refer to prior

24         testimony.

25              If you want to repeat the
```

Page 177

                        P. Aronzon

1                       P. Aronzon

2       question and prior testimony to

3       refresh the witness' recollection, I

4       would have no objection to that.

5       Q.    Have you personally interviewed

6   any person or entity, so a representative

7   of an entity, that is currently set to

8   receive a release?

9           MS. VANLARE: What was his prior

10      testimony?  Are you reading his prior

11      testimony, counsel?

12          MS. GRIFFITH: No, I'm repeating

13      the question that I had which you

14      objected to.

15          MS. VANLARE: Correct.

16          I am asking you if you are

17      asking -- if you are representing that

18      he testified to something, please --

19          MS. GRIFFITH: This is a

20      different question.

21          MS. VANLARE: Okay.

22      Q.    Have you personally interviewed,

23   Mr. Aronzon, any person that is --

24      A.    It's Aronzon, Aronzon.

25      Q.    My apologies.

Page 178

                          P. Aronzon

1

2        A.      Ignore the Z.  I have no idea

3    where it came from.  It's Aronzon.

4        Q.      My apologies, Aronzon.

5               Have you personally interviewed

6    anyone or a representative of any entity

7    that is set to get a release?

8               MS. VANLARE: Objection.  Again

9         calls for information relating to the

10        way in which the investigation was

11        conducted, and as such, I would

12        instruct the witness not to answer.

13        Q.      Sorry, you're refusing to answer

14    that question?

15        A.      I'm instructed not to.

16        Q.      Looking at the first paragraph

17    that we looked at previously which you

18    read out loud in part on the record, it

19    says that "the special committee has,

20    subject to the reservation of rights set

21    forth herein, provided its prior written

22    consent for the release of current or

23    former employees, officers, and directors

24    of the debtors, solely in such person's

25    capacity as such who served as an

Page 179

```
 1                    P. Aronzon
 2    employee, officer, or director of the
 3    debtors from or after the petition date".
 4           Do you see that?
 5       A.    Yes.
 6       Q.    What did you do as a special
 7    committee member to feel confident that
 8    releases were warranted prior to granting
 9    written consent?
10           MS. VANLARE: Objection to the
11       extent it would reveal any
12       attorney-client communications.
13           But to the extent that -- you
14       can answer the question without
15       revealing any attorney-client
16       communication, you may do so.
17           THE WITNESS:  Without revealing
18       anything I was told, he relied on our
19       professionals, including our counsel.
20       Q.    Did the special committee make
21    any independent decisions separate from
22    counsel?
23           MS. VANLARE: Objection.  Vague.
24           THE WITNESS:  I can't answer
25       that one without revealing
```

Page 180

```
 1                    P. Aronzon
 2       conversation with counsel.
 3       Q.    So did the special committee
 4    independently, separate from
 5    communications with counsel, consider
 6    whether releases of current or former
 7    employees should be granted?  Did it make
 8    an independent decision separate from
 9    counsel?
10            MS. VANLARE: Objection.
11            To the extent that the question
12       calls for any attorney-client
13       privileged communications or attorney
14       work product, I would instruct you not
15       to answer.
16       Q.    Are you going to answer the
17    question?
18       A.    I'm not sure how to answer it.
19       Q.    The special committee provided
20    written consent for the release of certain
21    former and current Genesis personnel;
22    correct?
23       A.    That is exactly what the
24    disclosure statement says.
25       Q.    And do you know that in your
```

Page 181

1                          P. Aronzon

2    personal capacity separate and aside from

3    just reading this piece of paper?

4        A.    Yes.

5        Q.    And let's talk about the process

6    for that.

7                What is involved with you giving

8    written consent?

9                MS. VANLARE: Objection.

10               THE WITNESS:  I don't know how

11          to answer this without talking about

12          all the things we discussed with

13          counsel.

14               MS. VANLARE: I'm sorry, are you

15          asking the mechanics as in e-mail

16          or --

17       Q.    To decide whether to release

18   someone or not, you considered a variety

19   of factors; correct?

20               MS. VANLARE: Objection.

21               To the extent you can answer

22          without attorney-client privilege, a

23          yes or no question.

24               THE WITNESS:  We considered a

25          variety of facts, correct.

Page 182

1                    P. Aronzon

2        Q.    And was your analysis of those

3    factors completely in alignment with

4    everything your counsel told you or did

5    you ever disagree with anything counsel

6    said?

7              MS. VANLARE: Objection.

8              I'm going to instruct the

9         witness not to answer as it calls for

10        attorney-client communication.

11       Q.    In your opinion, did you just

12   rubber stamp what your counsel told you

13   about whether employees should be on the

14   released list, or did you, as a special

15   committee member, make your own

16   independent assessment?

17             MS. VANLARE: Objection to the

18        form.

19             As to the substance of the

20        question again, I would caution the

21        witness to the extent your answer

22        would reveal any attorney-client

23        communication or work product, I would

24        instruct you not to answer.  To the

25        extent there's any part of the answer

Page 183

1                   P. Aronzon

2      that you can speak to about the

3      process that would not reveal

4      attorney-client communication, you may

5      do so.

6           THE WITNESS:  There was

7      extensive discussion between us and

8      our counsel about all of this.

9      Q.   Was there any separate analysis

10   done without counsel?

11           MS. VANLARE: Objection.

12           I believe the witness has

13      already testified that the information

14      and the deliberations were with

15      counsel or on the basis of attorney

16      work product.

17           As such, I would instruct the

18      witness not to answer.

19      Q.   Are you not going to answer that

20   question?

21      A.   I'm not.

22      Q.   Are releases being sought for

23   those on the released Genesis personnel

24   list for both pre and post-petition

25   conduct of individuals on the list?

Page 184

1              P. Aronzon

2          MS. VANLARE: Objection.

3          THE WITNESS:  I'd have to look

4      at the actual release language.  It's

5      pretty dense.  But I believe it is for

6      pre and post conduct.

7      Q.    And how is the prepetition

8   conduct of the individuals on the Genesis

9   released personnel list investigated prior

10   to these individuals being put on the

11   list?

12          MS. VANLARE: Again, objection.

13      This directly calls for the results of

14      an investigation conducted by counsel

15      and would reveal attorney-client

16      communication and as such, I would

17      instruct the witness not to answer.

18      Q.    Are you going to answer the

19   question?

20      A.    No.

21      Q.    Do you know if any individual on

22   the Genesis released personnel list ever

23   was employed by or served as a director of

24   any digital currency group entity other

25   than the debtors?

Page 185

1              P. Aronzon

2         MS. VANLARE: Objection.

3         To the extent this would reveal

4    attorney-client privileged

5    information, to the extent you know as

6    a fact matter, you may answer.

7         THE WITNESS:  I believe in the

8    very first paragraph at the end

9    there's a sentence that says, "for the

10   avoidance of doubt, none of the

11   released Genesis personnel are or also

12   DCG parties".  I've have to go look at

13   the definition of DCG parties, but I

14   believe the answer -- if you're asking

15   me were any of those people who were

16   employed at Genesis also employed at

17   DCG and are they getting a release, I

18   think the answer is no, they're not.

19   Q.    Do you know if any of the

20   individuals currently on the Genesis

21   released personnel list ever were involved

22   in any way with debtors lending to any DCG

23   entity?

24        MS. VANLARE: Objection.

25        I would caution to the extent

Page 186

1                    P. Aronzon

2        this would reveal any attorney-client

3        privilege or work product.

4              To the extent you know as a fact

5        matter, you may answer.

6              THE WITNESS:  Ask it again.

7        Q.    Do you know if any of the

8    individuals currently on the released

9    Genesis personnel list ever were involved

10   with debtors lending to any DCG-owned

11   entity?

12             MS. VANLARE: Objection.

13             To the extent the witness would

14       have this information, to the extent

15       he does that results from

16       attorney-client communications or

17       attorney work product, I would

18       instruct the witness not to answer.

19       Q.    It's your knowledge as a fact.

20   So it's a yes or no question whether,

21   sitting here today, you know that.

22             MS. VANLARE: To the extent that

23       the information that the witness knows

24       came from an investigation subject to

25       privilege and -- to the extent it came

Page 187

```
 1                      P. Aronzon
 2          from attorney-client communications,
 3          it is privileged.  The witness
 4          obviously doesn't have fact -- well, I
 5          don't believe the witness is a fact
 6          witness as to the period of time that
 7          you're asking about because he was not
 8          appointed -- he was not an employee
 9          and he was only appointed to the
10          special committee, as he testified to
11          previously, in November of 2022.
12               MS. GRIFFITH: The special
13          committee is charged with the ultimate
14          authority of granting releases and the
15          witness testified that prepetition
16          conduct was considered in whether to
17          grant these releases.  So I'm asking
18          about prepetition conduct and whether
19          he is aware, if he has the knowledge,
20          as a special committee member with the
21          authority to grant these releases, if
22          any of the individuals that are
23          currently on the released Genesis
24          personnel list were ever involved with
25          debtors lending to any DCG-end entity.
```

Page 188

1                  P. Aronzon

2           MS. VANLARE: Again, objection.

3           To the extent the information

4       came from counsel and is -- and came

5       from an investigation conducted by

6       counsel, it is privileged, and I would

7       instruct the witness not to answer.

8       Q.    So are you saying the fact --

9   I'm not asking the substance, I'm not

10  asking who was involved or what was

11  investigated, I'm asking the fact about

12  whether debtors lending to any DCG-owned

13  entities was investigated.

14          That's privileged?  That's what

15  you're claiming?

16          MS. VANLARE: The subject of the

17      investigation that was conducted and

18      the topics of that investigation are

19      attorney work product and are subject

20      to privilege.

21          I would instruct the witness not

22      to answer.

23      Q.    If, in your opinion as a special

24  committee member, you were to find out

25  that any individual on the released

Page 189

```
 1                    P. Aronzon
 2   Genesis personnel list was ever involved
 3   with debtors lending to any DCG-owned
 4   entity, would that impact your decision on
 5   whether to grant that individual or entity
 6   a release?
 7               MS. VANLARE: Objection.
 8               Again, calls for speculation.
 9               But secondly again, you're
10       asking for what the witness knows and
11       may have discussed or assessed in the
12       context of an investigation that is
13       conducted by counsel at the direction
14       of counsel and is therefore
15       privileged.
16               As such, I would instruct the
17       witness not to answer.
18       Q.    Are you refusing to answer the
19   question?
20       A.    I'm not instructed not to.
21       Q.    The subject of releases and the
22   justification for released parties is
23   publicly filed on the docket and it's a
24   matter that will be heard in court.  It's
25   a matter of whether the plan will be
```

Page 190

1                    P. Aronzon

2    confirmed.  So we're allowed to ask facts

3    about the releases and what was done to

4    determine if the releases are appropriate

5    or not.

6              MS. VANLARE: Ms. Griffith, the

7         information -- you're right in that

8         there was information about the

9         releases and the justification for

10        exculpating released parties was filed

11        as part of the plan supplement.

12        There's also disclosure in the

13        disclosure statement.

14              However, a lot of the

15        information relating to this topic is

16        privileged therefore, your questions

17        call for privileged information and I

18        therefore, depending on the question,

19        have instructed the witness not to

20        answer in accordance with the fact

21        that again it is subject to privilege.

22              If you have an issue with that,

23        we can discuss it.

24    Q.    I'm move on to my next question.

25              Do you know if any of the

Page 191

```
 1                      P. Aronzon
 2    individuals currently on the released
 3    Genesis personnel list were ever involved
 4    with Genesis' lending to Grayscale Bitcoin
 5    Trust?
 6              MS. VANLARE: Objection.
 7              Once again, you've asked this
 8         question multiple times.
 9              MS. GRIFFITH: I've never asked
10         about Grayscale Bitcoin Trust.
11              MS. VANLARE: You're right, I
12         stand corrected, it's a different
13         question.  However, I'm going to have
14         a similar instruction to the witness,
15         which is to say that, to the extent
16         that anything you know about this came
17         from your conversations with counsel,
18         I will instruct you not to answer.
19         Q.   And are you going to answer the
20    question?
21         A.   I follow my instructions.
22         Q.   Sitting here today as a special
23    committee member, would it impact your
24    decision on whether to authorize releases
25    if you were to find out that any of the
```

Page 192

                    P. Aronzon

1    individuals on the released Genesis

2    personnel list ever were involved with

3    Genesis' lending to Grayscale Bitcoin

4    Trust?

5            MS. VANLARE: I'm going to object

6        and once again instruct the witness

7        not to answer as it calls for

8        privileged information and attorney

9        work product done as part of the

10       investigation.

11               And with that, we don't have to

12       stop now, but I do note the time,

13       we've been going on for some time, and

14       I don't know if Mr. Aronzon would like

15       a lunch break.  I raise that.  We

16       don't have to do it right now.  If the

17       witness would like to, I think it's

18       going to be time for a break soon.

19           MS. GRIFFITH: We can take a

20       break now.  That's fine.

21           THE WITNESS:  Let's not take too

22       long.

23           MS. VANLARE: If you'd rather

24       not, Mr. Aronzon, it's up to you.

Page 193

```
 1                    P. Aronzon
 2            THE VIDEOGRAPHER: I do have to
 3      reset the video though, counsel.  It
 4      only takes a few seconds.  Whatever
 5      you want to do.
 6            Should we go off for a few
 7      minutes?
 8            THE WITNESS:  Sure.  Let's --
 9      five minutes, ten minutes, what do you
10      want?
11            MS. GRIFFITH: Let's take a
12      ten-minute break.
13            THE WITNESS:  You've got it.
14            THE VIDEOGRAPHER: The time is
15      12:44.
16            We are off the record.
17            (Whereupon a break was taken)
18            THE VIDEOGRAPHER: The time is
19      1:05.
20            We are on the record.
21      Q.    So to jump back in, we were
22  talking about the released Genesis
23  personnel list and what the special
24  committee considered prior to providing
25  written consent for the release of
```

Page 194

1                          P. Aronzon

2    individuals on this list.

3              So my next question is: Do you

4    know as a fact if any of the Genesis

5    released personnel ever held any Grayscale

6    ETF?

7              MS. VANLARE: Objection.

8              As previously noted, the answer

9        would reflect communications with

10       counsel and attorney work product as a

11       result of the investigation or created

12       as part of the investigation and as

13       such, I would instruct the witness not

14       to answer.

15       Q.    Are you going to answer the

16   question?

17       A.    No.

18       Q.    Do you know, as a fact, if any

19   of the individuals on the released Genesis

20   personnel list were ever involved with

21   debtors lending to Three Arrows Capital?

22             MS. VANLARE: Objection.

23             I believe the answer calls for

24       attorney-client communications and

25       attorney work product and, as such, I

Page 195

1                    P. Aronzon

2       would instruct the witness not to

3       answer.

4       Q.    Are you going to answer the

5   question?

6       A.    No.

7       Q.    Was whether individuals on the

8   Genesis released personnel list was ever

9   involved with debtors lending to Three

10  Arrows Capital a fact that was considered

11  prior to the special committee granting

12  consent for the releases?

13          MS. VANLARE: Objection.  Calls

14      for attorney-client communications,

15      attorney work product.

16          I'm going to instruct the

17      witness not to answer.

18      Q.    You can answer.

19          MS. VANLARE: I'm going to

20      instruct the witness not to answer for

21      the reasons I just noted.

22      Q.    If your answer is that you're

23  not going to your answer, that could be

24  your answer.

25          MS. VANLARE: I am instructing

Page 196

1               P. Aronzon

2        the witness not to answer.

3        Q.    Are you following your counsel's

4    instructions?

5        A.    Yes.

6        Q.    Was a fact considered by the

7    special committee whether any of the

8    individuals on the released Genesis

9    personnel list were ever involved with

10   debtors lending to FTX or Alameda

11   Research?

12            MS. VANLARE: Same objection.

13            The answer to this question

14       would reveal attorney-client

15       communication and attorney work

16       product and as such, I would instruct

17       the witness not to answer.

18       Q.    And are you following your

19   counsel's instruction?

20       A.    Yes.

21       Q.    Back to that first paragraph

22   that we looked at where it states that it

23   was the special committee which provided

24   prior written consent for the releases of

25   current and former employees.

Page 197

```
 1                    P. Aronzon

 2              I just wanted to ask your

 3    opinion, does that written consent mean

 4    that the decision was the special

 5    committee's decision or Cleary's decision?

 6              MS. VANLARE: Objection.

 7              First, are you referring to

 8         paragraph -- the first paragraph of

 9         Exhibit 7?

10              MS. GRIFFITH: Yes, Exhibit --

11         yes, Exhibit 7 but first paragraph of

12         Exhibit F of Exhibit 7.

13              MS. VANLARE: Then objection to

14         form.

15              THE WITNESS:  This I can answer;

16         correct?

17              MS. VANLARE: You may answer.

18              THE WITNESS:  It's the special

19         committee's decision.

20         Q.    Did you have to -- I'm sorry,

21    did I cut you off?

22         A.    No.

23         Q.    My video might have a slight

24    lag.

25              In making this decision, did you
```

Page 198

1                    P. Aronzon

2    have to accept Cleary's recommendations or

3    could the special committee make its own

4    separate decision about whether releases

5    were appropriate or not?

6              MS. VANLARE: Objection to form.

7              To the extent this would reveal

8         attorney-client communications, I

9         would instruct the witness not to

10        answer.

11             THE WITNESS:  So the question is

12        did we have to accept advice from our

13        professionals?

14   Q.    Yes.

15   A.    No, we don't have to accept it.

16   Q.    Did you accept all of the advice

17   from your professionals in making your

18   independent decision about whether

19   releases were appropriate?

20             MS. VANLARE: Objection.  Calls

21        for attorney-client communication.

22             I'm going to instruct the

23        witness not to answer.

24   Q.    Are you going to follow the

25   advice of your counsel?

Page 199

                         P. Aronzon

1

2       A.      I am.

3       Q.      Do you know if there's currently

4    any litigation between the debtors and any

5    of the individuals or entities on the

6    released Genesis personnel list?

7               MS. VANLARE: Objection.

8               The answer calls for

9       attorney-client communications and

10      attorney work product.

11              I'm going to instruct the

12      witness not to answer.

13      Q.      Are you going to follow your

14   counsel's advice?

15      A.      Yes.

16      Q.      Are you aware of any publicly

17   filed litigation or claims against any

18   individual on the Genesis released

19   personnel list?

20              MS. VANLARE: Objection.

21              I believe the answer calls for

22      attorney-client communications and

23      attorney work product.

24              I instruct the witness not to

25      answer.

Page 200

```
 1                    P. Aronzon
 2        Q.     Have you separately considered
 3   as a factor in whether to grant releases
 4   whether there are any currently litigation
 5   between the debtors and any of the
 6   individuals on the Genesis released
 7   personnel list?
 8              MS. VANLARE: Objection.
 9              The question calls for
10        attorney-client communications and
11        work product, and as such, I'm going
12        to instruct the witness not to answer.
13        Q.     Are you going to follow your
14   counsel's advice?
15        A.     Yes.
16        Q.     Are you aware if any of the
17   releases being granted to the individuals
18   and individuals on the released Genesis
19   personnel list are being granted as part
20   of any settlement of any existing
21   litigation or claims against released
22   Genesis personnel?
23              MS. VANLARE: Objection.
24              Objection to form and calls for
25        attorney-client communications and
```

Page 201

1              P. Aronzon

2      work product and, as such, I would

3      instruct the witness not to answer.

4      Q.    And are you following your

5   counsel's advice?

6      A.    Yes.

7      Q.    What is the total potential

8   litigation value of claims the estate may

9   have against all of the individuals listed

10   on the released Genesis personnel list?

11          MS. VANLARE: Objection.

12          I'm going to instruct the

13      witness not to answer beyond what is

14      publicly available.  The question

15      calls for information that is

16      privileged and, as such, I will

17      instruct the witness not to answer.

18          MS. GRIFFITH: I'm going for a

19      number.  A number is not privileged

20      information.

21          MS. VANLARE: I disagree.  I

22      think you're asking for privileged

23      information, and I will instruct the

24      witness not to answer.

25      Q.    Yes or no, was the total

Page 202

1                         P. Aronzon

2    potential litigation value of claims

3    something that was calculated or

4    considered by the special committee?

5              MS. VANLARE: Objection.  Calls

6         for attorney-client communications and

7         attorney work product.

8              I'm going to instruct the

9         witness not to answer.

10        Q.    And are you going to follow your

11   counsel's instruction?

12        A.    Yes.

13        Q.    Would it be a relevant factor to

14   your decision in granting releases the

15   potential litigation value of claims the

16   estate may have against all of those

17   listed on the released Genesis personnel

18   list?

19             MS. VANLARE: Objection to form.

20             You may answer yes or no.

21             THE WITNESS:  It's a factor.

22        Q.    And yes or no, was it something

23   you considered?

24             MS. VANLARE: That's not the

25        question you asked.

Page 203

```
 1                    P. Aronzon
 2              MS. GRIFFITH: That's a new
 3        question.
 4              MS. VANLARE: If that's a new
 5        question, objection, that question
 6        calls for privileged communication
 7        and, as such, I would instruct the
 8        witness not to answer.
 9        Q.    And are you following your
10   counsel's advice?
11        A.    Yes.
12        Q.    Then moving to section two of
13   Exhibit 7, the Exhibit F part of
14   Exhibit 7, and if we look down to section
15   two, it says justifications for the
16   release, and it lists several
17   justifications for the releases.
18              Are you familiar with those
19   justifications?
20        A.    Yes.
21        Q.    Were these justifications
22   something you considered when granting
23   consent to release the individuals on the
24   Genesis released personnel list?
25              MS. VANLARE: I would caution the
```

Page 204

1                    P. Aronzon

2          witness not to reveal any

3          attorney-client communications, but I

4          believe you can answer the question.

5                    THE WITNESS:  Yes.

6          Q.      The first bullet point reads,

7      "the releases of the released Genesis

8      personnel apply only to officers,

9      directors, and employees who have provided

10     services to the estates on or after the

11     petition date.  The special committee

12     believes that such person contributed,

13     either directly or indirectly, to the

14     debtors' restructuring efforts in the

15     Chapter 11 cases".

16                   Do you see that?

17         A.      Yes.

18         Q.      What is meant by "such persons

19     contributed" in this paragraph?

20                   MS. VANLARE: Objection.

21                   I believe the question calls for

22          attorney-client communications and, as

23          such, I would instruct the witness not

24          to answer.

25                   MS. GRIFFITH: I'm asking what is

Page 205

```
 1                    P. Aronzon
 2        meant on a publicly filed document
 3        that's a justification for a release
 4        being granted.  What contributions did
 5        people that are getting releases offer
 6        the estate?  That's a fact.
 7             MS. VANLARE: Objection.  The
 8        question calls for attorney-client
 9        communications and attorney work
10        product as a result of an
11        investigation that was conducted and
12        discussions that took place with
13        counsel and, as such, I would instruct
14        the witness not to answer the
15        question.
16        Q.    Separate and aside from any
17   communications with counsel, are you aware
18   of any contributions that any employee
19   currently set to get a release has offered
20   the estate?
21             MS. VANLARE: Objection.
22             I would -- to the extent your
23        answer -- what you know and to the
24        extent your answer reflects
25        discussions with counsel, I would
```

Page 206

1                    P. Aronzon

2        instruct you not to answer.

3        Q.     You can answer.

4        A.     Everything I know about this

5     comes out of our discussions with our

6     professionals, especially our counsel.  So

7     I don't know how to answer other than

8     that.

9        Q.     So sitting here as a special

10    committee member, you don't know any

11    contributions that any person getting a

12    release contributed to the estate that you

13    would not consider a privileged

14    contribution that you could not reveal?

15            MS. VANLARE: Objection to form

16        and asked and answered.  I believe the

17        witness answered the question you

18        previously posed.

19       Q.     Would you --

20       A.     Am I supposed to say something

21    or no?

22       Q.     Do you have anything to add?

23       A.     No.  What I learned about the

24    contributions I learned in our discussions

25    with counsel.

Page 207

P. Aronzon

1

2      Q.    So you have no nonprivileged

3   information about contributions that those

4   set to get releases under the plan

5   contributed to the estate?

6              MS. VANLARE: Objection.  Asked

7         and answered.

8              THE WITNESS:  Correct.

9      Q.    Do you know if all of the

10   individuals on the released Genesis

11   personnel list have made contributions

12   either directly or indirectly to the

13   estate?

14              MS. VANLARE: Objection.  It goes

15         into attorney-client communications

16         and attorney work product and, as

17         such, I would instruct the witness not

18         to answer.

19      Q.    I'm asking about your personal

20   knowledge as a special committee member

21   who you testified has the ultimate

22   decision whether or not to grant releases

23   separate and apart from your counsel's

24   advice.

25              MS. VANLARE: Objection.  Asked

Page 208

1                    P. Aronzon

2        and answered.  Misstates his

3        testimony.  And again, I think the

4        witness has already testified several

5        times that what he learned about this

6        topic came from conversations with

7        counsel.

8             Same objection.  Same

9        instruction.

10       Q.    And so are you not going to

11   answer the question?

12       A.    I'm following my counsel's

13   advice.

14       Q.    Have you ever calculated or

15   considered the total dollar value of

16   contributions that those are on the

17   released Genesis personnel list offered to

18   the estate?

19             MS. VANLARE: Objection.

20             You can answer yes or no if you

21       think you can without revealing

22       attorney-client information -- excuse

23       me, attorney-client communication or

24       attorney work product.

25             THE WITNESS:  I don't know how

Page 209

```
 1                      P. Aronzon
 2      to answer it without referring to the
 3      discussions we've had with counsel.
 4      And you asked me this before and I
 5      said the same thing.
 6      Q.    Did you consider whether you
 7   could hire any new individuals or
 8   consultants that would make the same
 9   contributions that those that fall on this
10   released Genesis personnel list were
11   contributing to the estate instead?
12           MS. VANLARE: Objection.  The
13      question is vague.
14           THE WITNESS:  Are you asking
15      could we have hired other people to do
16      the job that our people did?
17      Q.    Yes.
18      A.    Why would I do that?
19      Q.    A potential reason could be so
20   you do not have to release them and
21   therefore forfeit any potential causes or
22   claims of action against those individuals
23   if it was to be revealed at any point in
24   time that they were involved in
25   misconduct.
```

Page 210

1              P. Aronzon

2         MS. VANLARE: Is there a

3     question, Ms. Griffith?

4     Q.    Yes.

5         Did you ever consider whether

6  new employees or consultants could be

7  hired to do the job that the current

8  employees that are set to get releases are

9  doing?

10        MS. VANLARE: Objection.

11    Objection to form.

12        To the extent you can answer

13    this question without revealing

14    attorney-client communications or

15    attorney work product, you may answer.

16        THE WITNESS:  I guess I have a

17    couple of comments.

18        One, I don't make decisions

19    about hiring people for Genesis.  We

20    have management that does that.

21        Two, the answer is no, I did not

22    consider it.

23    Q.    And who is management at Genesis

24  that makes those decisions?

25    A.    We have a number of officers and

Page 211

1              P. Aronzon

2    directors who make hiring and firing

3    decisions.

4        Q.    And are any of those individuals

5    on the released Genesis personnel list?

6              MS. VANLARE: Objection.

7              I'm going to instruct the

8        witness not to answer.  It reflects

9        attorney-client communication and

10       attorney work product.

11       Q.    Are you following your counsel's

12   directions?

13       A.    Yes.

14       Q.    The next bullet point states,

15   "the released Genesis personnel have

16   knowledge and insight into the debtors'

17   business and transactions that may be

18   critical to the resolution of litigation

19   against the DCG parties and the Gemini

20   parties as well as various regulatory and

21   enforcement actions relating to the

22   debtors' prepetition businesses".

23             Do you see that?

24       A.    Yes.

25       Q.    Do you know -- and this is a

```
 1                      P. Aronzon
 2    number, not who, a number -- how many of
 3    the individuals on the released Genesis
 4    personnel list have this knowledge and
 5    insight?
 6            MS. VANLARE: Objection.
 7            I believe the answer calls for
 8        privileged information with counsel
 9        and attorney work product, and as
10        such, I'm going to instruct the
11        witness not to answer.
12        Q.    Are you following the direction
13    of your counsel?
14        A.    Yes.
15        Q.    Who would have this knowledge
16    about which Genesis employees have, quote,
17    knowledge and insight into the debtors'
18    businesses and transactions?
19            MS. VANLARE: Objection.  Calls
20        for privileged communication and
21        attorney work product.
22            As such, I would instruct the
23        witness not to answer.
24        Q.    Are you following the advice of
25    your counsel?
```

Page 213

```
 1                    P. Aronzon
 2       A.    Yes.
 3       Q.    Do you know if any of the
 4  individuals on the released Genesis
 5  personnel list have overlapping, quote,
 6  knowledge and insight into the debtors'
 7  business and transactions?
 8            MS. VANLARE: Objection to form,
 9       but also I would instruct the witness
10       not to answer to the extent it reveals
11       any attorney-client communication or
12       attorney work product.
13       Q.    Are you following your counsel's
14  direction?
15       A.    Yes.
16       Q.    Have you or the special
17  committee calculated or considered dollar
18  value that could be assigned to this
19  contribution to the estate being the
20  knowledge and insight into the debtors'
21  business and transactions that those on
22  the released Genesis personnel was tasked?
23            MS. VANLARE: Objection.
24            To the extent this question
25       calls for privileged information,
```

Page 214

1                      P. Aronzon

2          attorney-client communications, and/or

3          attorney work product, I would

4          instruct the witness not to answer.

5          Q.    And are you following your

6     counsel's direction?

7          A.    Yes.

8          Q.    Have any of the individuals on

9     the released Genesis personnel list

10    refused to cooperate with resolution of

11    litigation against the DCG parties and the

12    Gemini parties as well as various

13    regulatory and enforcement actions

14    relating to the debtors' prepetition

15    business unless they received releases?

16              MS. VANLARE: Objection.

17              I'm going to -- to the extent it

18          reveals attorney-client privilege,

19          attorney work product, I'm going to

20          instruct the witness not to answer.

21          Q.    Is this a factor that you

22    considered in granting consent to these

23    individuals?

24              MS. VANLARE: Same objection.

25          Calls for privileged information and

Page 215

```
 1                    P. Aronzon
 2      attorney work product.
 3      Q.    Are you going to follow your
 4   counsel's advice?
 5      A.    Yes.
 6      Q.    There are more than a hundred
 7   individuals currently on the released
 8   Genesis personnel list; correct?
 9            MS. VANLARE: Objection.
10            I don't know if you know as a
11      fact matter.  You may answer.  But
12      otherwise, to the extent it calls for
13      attorney-client communication or
14      attorney work product, I would
15      instruct you not to answer.
16            THE WITNESS:  I don't know the
17      exact number.
18      Q.    Do you know if it's more than a
19   hundred individuals on the Genesis
20   released personnel list?
21            MS. VANLARE: Same objection.
22            And to the extent what you know
23      comes from conversations with counsel,
24      I would instruct you not to answer
25      that question.
```

Page 216

```
 1                    P. Aronzon
 2              THE WITNESS:  I don't know.
 3       Q.    Do you know if it's more than
 4   five hundred people on the released
 5   Genesis personnel list?
 6              MS. VANLARE: Same objection.
 7              To the extent any information
 8         you have on this comes from counsel,
 9         I'm going to instruct you not to
10         answer.
11              THE WITNESS:  I don't know the
12         number.
13       Q.    Do you know -- referring back to
14   that second bullet point on the Exhibit F
15   page of Exhibit 7 referring to the
16   knowledge and insight, do you know if some
17   individuals are getting released solely
18   because they have knowledge and insight
19   into the debtors' business and
20   transactions?
21              MS. VANLARE: Objection.  Calls
22         for privileged communication, attorney
23         work product.
24              I'm going to instruct the
25         witness not to answer.
```

Page 217

1                    P. Aronzon

2       Q.    Are you going to follow your

3    counsel's advice?

4       A.    Yes.

5       Q.    If we flip to the next page,

6    page twenty-two of twenty-two of this PDF,

7    the second bullet point down states, "the

8    special committee's investigation has not

9    identified wrongdoing on the part of the

10   released Genesis personnel that would give

11   rise to claims or causes of action that

12   are likely to provide value to the

13   debtors' estates".

14           Do you see that?

15      A.    Yes.

16      Q.    What is meant by "provide value

17   to the debtors' estates" here?

18           MS. VANLARE: Objection.  I

19       believe the document is clear.

20       Anything that's not publicly available

21       is going to be subject to privilege,

22       and I'm going to instruct the witness

23       not to answer.

24      Q.    And are you following your

25   counsel's advice?

Page 218

```
 1                      P. Aronzon
 2        A.    Yes.
 3        Q.    As a special committee member,
 4   what would you consider value to the
 5   debtors' estates here, in your opinion,
 6   separate and apart from discussions with
 7   counsel?
 8              MS. VANLARE: Objection.  Vague.
 9              Are you talking about generally
10        what is value?  More context.
11              MS. GRIFFITH: I'm talking about
12        what the witness would consider value
13        to the debtors' estates here in his
14        opinion as a special committee member
15        separate and apart from his
16        discussions with counsel.
17              MS. VANLARE: If there's any --
18        so objection to form.
19              But if there is anything that
20        you know that doesn't come from your
21        discussions with counsel, you may
22        answer.  But otherwise, to the extent
23        the question calls for privileged
24        communications or attorney work
25        product, I'm going to instruct not to
```

Page 219

```
 1                    P. Aronzon
 2        answer.
 3                THE WITNESS:  Are you asking me
 4        my own opinion of the word "value",
 5        what does it mean?
 6        Q.    Yes, in this paragraph, how you
 7    would interpret that, what that means.
 8        A.    In this paragraph relates to
 9    attorney-client communication and
10    discussion.
11                Away from this paragraph, if you
12    give me a minute, I'll go get a
13    dictionary.  It will tell me whether I
14    agree with it or not.
15        Q.    So without a dictionary, do you
16    have an opinion as to what value to the
17    debtors' estates would be?
18                MS. VANLARE: Objection.  Vague.
19                THE WITNESS:  Just my own
20        personal opinion is that value can be
21        a lot of different things.  It can be
22        -- I'm just going to go through a
23        list.  There's no priority here.  It's
24        whatever comes into my head at the
25        moment as I'm talking to you as if
```

Page 220

1                    P. Aronzon

2          this were a conversation.

3               But there's things like spending

4          time helping us in some manner or

5          fashion, working for us above and

6          beyond just normal salaries, because

7          we're talking about personnel here.

8          It can be paying money back to us.  It

9          can be transferring assets to us other

10         than cash or paying money.  It can be

11         a lot of things.  It can be providing

12         assistance that is, you know, hard to

13         quantify.  It's just a whole variety

14         of different things that any one of us

15         would consider valuable.

16         Q.    Was everything that you

17    considered value as part of your analysis

18    of whether or not to grant releases

19    included on this justifications for the

20    release section?

21               MS. VANLARE: Objection.

22         Objection to form.  Unclear.

23               Are you talking about the

24         entirety of the exhibit or are you

25         talking about the bullet point that

Page 221

```
 1                    P. Aronzon
 2        talks about wrongdoing and claims that
 3        would or would not provide value?
 4             MS. GRIFFITH: The entirety of
 5        the exhibit.  I was just responding to
 6        the witness' last response.
 7             THE WITNESS:  Are you asking me
 8        if, in the conversations with counsel,
 9        we considered all those things that I
10        just like off the top of my head
11        mentioned as possible value
12        propositions?
13        Q.    I was trying to understand if
14   those were actual value propositions that
15   you considered for this matter or if that
16   was just hypothetical examples of value
17   unconnected to this case.
18             MS. VANLARE: Objection.
19        Objection to form.
20             You may answer unless the --
21        however, to the extent the question
22        would reveal any attorney-client
23        privilege, I would caution you on that
24        point.
25             THE WITNESS:  You asked me my
```

Page 222

                          P. Aronzon

1

2     own opinion of value.  I gave you some

3     ideas.

4          To the extent you're asking

5     about things on this page or in our

6     decision-making, you're asking about

7     the conversations with our counsel.

8     Q.   If an employee was found to have

9  committed misconduct such that a claim or

10  cause of action could be brought against

11  that employee, would you consider any

12  recovery from that claim or cause of

13  action against that employee to be able to

14  fall under the value bucket to the estate

15  or could add value to the estate?

16          MS. VANLARE: Objection to form.

17          Again, counsel, are you asking

18     about the Exhibit 7 and the bullet

19     point that talks about claims not

20     providing value to the estate or

21     something else?

22          MS. GRIFFITH: No, that was not

23     connected to that.  That was me trying

24     to understand the special committee

25     members' understanding of what could

Page 223

                              P. Aronzon

1
2      constitute value.

3              MS. VANLARE: Could you maybe
4      restate the question?

5              MS. GRIFFITH: Sure.

6      Q.      If an employee -- this is
7      separate and apart from what's on the page
8      here.

9              If a Genesis employee committed
10     misconduct.

11              Are you following that?

12     A.      Are you asking me?

13     Q.      Yes.

14     A.      I'm following that, yes.

15     Q.      This is a hypothetical.

16     A.      Okay.

17     Q.      If a Genesis employee committed
18     misconduct, the estate could potentially
19     bring litigation asserting a claim against
20     that employee for such misconduct;
21     correct?

22              MS. VANLARE: Objection.

23              THE WITNESS:  Theoretically
24     possible.

25              Did you tell me not to answer

Page 224

1                      P. Aronzon

2       that or no?

3              MS. VANLARE: No, I was objecting

4       to the form.

5              THE WITNESS:  Theoretically,

6       yes, we could.

7       Q.    And if there was a recovery from

8    the pursuit of that cause of action or

9    claim against that employee, would you

10   consider that recovery to be value for the

11   estate?

12             MS. VANLARE: Objection.

13             I would caution you not to

14       reveal any attorney-client

15       communication, and I object to form.

16             To the extent you can answer the

17       question without revealing

18       attorney-client communication, you may

19       do so.

20             THE WITNESS:  We're not talking

21       about this page, we're talking about

22       just my own understanding here?

23       Q.    Correct.

24       A.    So without referring to this

25    page or any of the prior questions about

Page 225

1                    P. Aronzon

2    our employees, if we're going to bring an

3    action against somebody -- and it doesn't

4    even have to be an employee, it could be

5    anybody -- one of the things we look at is

6    whether they could actually pay us back,

7    so creditworthiness and is it worth it.

8              So in that respect, I would

9    consider payments, if people have the

10   capacity to do so, to be valuable.

11             I'm sorry, did somebody say

12   something?

13             So I don't know if that answers

14   your question or not.  But if somebody can

15   pay me back and I believe we have a claim

16   against them, then that's value that we

17   would certainly consider.

18        Q.   So we're on the same page, I

19   just wanted to make sure we had the same

20   understanding about potential types of

21   value to the estate.

22             So now directing your attention

23   away from that hypothetical and back to

24   the bullet point in Exhibit 7 which states

25   "the special committee's investigation has

```
                                              Page 226
 1                      P. Aronzon
 2    not identified wrongdoing on the part of
 3    released Genesis personnel that would give
 4    rise to claims or causes of action that
 5    are likely to provide value to the
 6    debtors' estate", what type of wrongdoing
 7    was considered?
 8              MS. VANLARE: Objection.  I
 9         believe the answer calls for
10         attorney-client communication and
11         attorney work product and, as such, I
12         would instruct the witness not to
13         answer.
14         Q.    Are you following your counsel's
15    advice?
16         A.    Yes.
17         Q.    In your opinion, if a -- what
18    the publicly filed words on the page
19    state, "the special committee's
20    investigation has not identified
21    wrongdoing", why would a release be
22    necessary of individuals who committed no
23    wrongdoing?
24              MS. VANLARE: Objection.  Calls
25         for a legal conclusion.
```

Page 227

P. Aronzon

2          To the extent your answer would
3     reveal any attorney-client
4     communications, I would instruct you
5     not to answer the question.
6     Q.     And I'm asking this in your
7  opinion as a special committee member that
8  had to make an independent decision on
9  these releases about whether or not to
10  accept recommendations and advice from
11  counsel.
12          So in your independent thought
13  process about whether to grant these
14  releases, have you considered why an
15  individual that the special committee has
16  not identified any wrongdoing on the part
17  of would need to be released?
18          MS. VANLARE: Objection.  Calls
19     for a legal conclusion.
20          And also, to the extent your
21     answer would reveal any
22     attorney-client communications, I
23     would instruct you not to answer.
24     Q.     Have you considered this
25  separate and apart from counsel?

Page 228

1                        P. Aronzon

2        A.      Not in the context of our case,

3     no.

4        Q.      Okay.

5              The next bullet point on this

6     page states, "any surviving claims against

7     the released Genesis personnel would be

8     costly and unlike to result in significant

9     recoveries for the debtors' estates

10     because of the very limited directors and

11     officers insurance coverage, which at

12     present provides no more than 8.7 million

13     in coverage".

14              What was the estimated cost of

15     bringing any surviving claims against the

16     released Genesis personnel?

17              MS. VANLARE: Objection.

18              The answer calls for attorney

19        work product and, as such, I would

20        instruct the witness not to answer.

21        Q.      Are you following your counsel's

22     advice?

23        A.      Yes.

24        Q.      Was the estimated cost of

25     bringing any surviving claims against the

Page 229

1                    P. Aronzon
2    released Genesis personnel a fact that the
3    special committee considered when deciding
4    whether or not to grant releases?
5              MS. VANLARE: Objection.
6              To the extent you can answer
7         without revealing attorney-client
8         communication, you may do so.
9              THE WITNESS:  I can't answer it
10        without referring to what we discussed
11        with counsel.
12        Q.    What surviving claims against
13   the released Genesis personnel are
14   referred to in this bullet point as a
15   justification for why these individuals
16   should be released?
17             MS. VANLARE: Objection.
18             Calls for privileged
19        communication and attorney work
20        product and, as such, I would instruct
21        the witness not to answer.
22        Q.    Are you following your counsel's
23   advice?
24        A.    Yes.
25        Q.    Do you know if all of the

Page 230

```
 1                      P. Aronzon
 2   individuals that are currently on the
 3   released Genesis personnel list were
 4   covered by directors and officers
 5   insurance?
 6            MS. VANLARE: Objection.
 7            If you have any knowledge
 8        separate and apart from discussions
 9        with counsel, you may answer.
10            Otherwise, I would instruct you
11        not to answer.
12        Q.   You may answer.
13        A.   I'm trying to figure out if I
14   know anything away from our discussions
15   with counsel.
16            What's the question again?  I'm
17   sorry.
18            You're asking me if people are
19   not insured; is that what you're asking
20   me?
21        Q.   No, I'm asking you if all of the
22   individuals that are currently on the
23   released Genesis personnel list would be
24   covered by directors and officers
25   insurance.
```

Page 231

1                        P. Aronzon

2               Was that a fact or something

3    that the special committee looked into as

4    part of its investigation?

5               MS. VANLARE: Objection.  Calls

6         for attorney work product.

7               As such, I would instruct the

8         witness not to answer.

9         Q.    Are you following your counsel's

10   advice?

11        A.    Yes.

12        Q.    The first bullet point on this

13   page -- and I'll just read the first

14   sentence out loud but feel free to read

15   the whole paragraph -- states, "the

16   released Genesis personnel are entitled to

17   indemnification pursuant to the debtors'

18   governing documents".

19              THE WITNESS:  This is the first

20        bullet on this page?

21        Q.    Do you see that first paragraph?

22        A.    Yes.

23        Q.    In granting releases to those on

24   the released Genesis personnel list, was a

25   factor considered by the special committee

Page 232

```
 1                      P. Aronzon
 2    whether an individual was entitled to
 3    indemnification pursuant to the debtors'
 4    governing documents?
 5               MS. VANLARE: Objection to form.
 6               You may answer yes or no.
 7               THE WITNESS:  Yes.
 8        Q.    Did the special committee
 9    confirm that each and every one of the
10    individuals on the released Genesis
11    personnel list was, in fact, entitled to
12    indemnification pursuant to debtors'
13    governing documents?
14               MS. VANLARE: Objection.  Calls
15          for privileged communication and
16          attorney work product.
17               I'm going to instruct the
18          witness not to answer.
19        Q.    And are you following your
20    counsel's advice?
21        A.    Yes.
22        Q.    Another bullet point on this
23    page states that "the debtors' releases of
24    the released Genesis personnel expressly
25    exclude any claims arising out of gross
```

Page 233

1                    P. Aronzon

2    negligence, fraud, or willful misconduct

3    as determined by a final order".

4            Do you see that?

5        A.    Yes.

6        Q.    Has the special committee

7    estimated or considered an estimated value

8    of the total claims that would arise out

9    of gross negligence, fraud, or willful

10   misconduct that could be brought against

11   released Genesis personnel?

12           MS. VANLARE: Objection.  Calls

13       for privileged communication and

14       attorney work product.

15           As such, I'm going to instruct

16       the witness not to answer.

17       Q.    Are you following your counsel's

18   direction?

19       A.    Yes.

20       Q.    Is it your understanding that

21   individuals on the released Genesis

22   personnel list are being released from all

23   claims besides gross negligence, fraud, or

24   willful misconduct?

25           MS. VANLARE: Objection.

Page 234

1               P. Aronzon

2          To the extent you know the

3     answer to that, you may answer it.

4     However, I would caution you not to

5     reveal any attorney-client

6     communication or attorney work

7     product.

8          THE WITNESS:  I'd have to look

9     at the release together with you, but

10    I think that's correct, they are being

11    released from any and all claims other

12    than the ones specified in this

13    bullet.

14    Q.    And does any and all claims

15  include known and unforeseen claims?

16          MS. VANLARE: Objection.

17          THE WITNESS:  Again, I'd have to

18    look at the release, but I believe

19    that's correct.

20    Q.    What benefit is the estate

21  receiving from releasing individuals from

22  unforeseen claims?

23          MS. VANLARE: Objection.

24          You have publicly filed

25    documents.  Anything beyond that is

Page 235

                              P. Aronzon

1          subject to attorney-client privilege

2          and attorney work product, and as

3          such, I would instruct the witness not

4          to answer.

5               MS. GRIFFITH: What publicly

6          filed documents are you referencing?

7               MS. VANLARE: The disclosure

8          statement in the plan supplement.

9     Q.     Would you be able to point me,

10   Mr. Aronzon, to where it talks about that

11   in the publicly filed documents?  Are you

12   familiar with that?

13               MS. VANLARE: Objection.

14               THE WITNESS:  Well -- go ahead,

15          Jane.

16               MS. VANLARE: Objection to form.

17               If you know, you may answer.

18               THE WITNESS:  I know that there

19          are provisions in the plan that

20          provide for the release and carveouts.

21          I know that there is some language in

22          the disclosure statement, I don't know

23          page numbers for either, and you have

24          on the screen in front of you the

Page 236

1                      P. Aronzon
2         answer to the questions you just asked
3         me, which is, you know, what is it
4         that -- I guess it's what is the
5         estate receiving and why are you doing
6         this.  It's all listed there.
7         Q.    So because I need to hear it,
8    there was a lot of attorney-client
9    privilege objections.
10              In your voice and in your
11   opinion, what value is the estate
12   receiving?
13              MS. VANLARE: Objection.
14        Q.    For granting releases of all of
15   the individuals listed on the released
16   Genesis personnel list.
17              MS. VANLARE: Objection.  Asked
18        and answered.  The witness has
19        answered your question.
20        Q.    You can answer.
21        A.    The values listed on these pages
22   that we're looking at in this exhibit, is
23   it number seven or Exhibit F, I guess it
24   is.  And they're laid out here.
25        Q.    Which -- are you referring to

Page 237

```
 1                    P. Aronzon
 2   bullet points?  What bullet points are you
 3   referring to?
 4       A.    All of them under section two.
 5       Q.    So help me understand that.
 6            The one we referred to, "the
 7   special committee's investigation has not
 8   identified wrongdoing on the part of the
 9   released Genesis personnel that would give
10   rise to claims or causes of action that
11   are likely to provide value to the
12   debtors' estates".
13            How does that add value to the
14   debtors' estates?
15            MS. VANLARE: Objection.  Being
16       argumentative.  The witness has
17       already explained that the exhibit
18       provides justifications for the
19       releases and it does that and that's
20       what it states on the page.  He's
21       already answered the question many
22       times.
23       Q.    You can answer.
24       A.    If we can't recover value, we'd
25   be wasting money, creditors' money, in
```

1                    P. Aronzon

2    chasing it.

3        Q.    Are all -- is all of the value

4    that the estate gets from consenting to

5    the release of those on the released

6    Genesis personnel list included in this

7    Exhibit F or are there things outside of

8    that's listed on Exhibit F?

9            MS. VANLARE: Objection.  Calls

10       for privileged communications and

11       attorney work product and, as such, I

12       will instruct the witness not to

13       answer.

14       Q.    I'm not asking about his

15    communications with counsel, I'm asking is

16    all of the value on this publicly filed

17    page or is there something else that you

18    discussed with counsel.  I don't want to

19    know the substance, I don't want to know

20    what you discussed with counsel.  I just

21    want to know is this a comprehensive

22    summary or is there something else out

23    there?

24            MS. VANLARE: Objection.

25            To the extent you can answer

Page 239

1                      P. Aronzon

2       without revealing any attorney-client

3       communications or attorney work

4       product, you may do so.

5              THE WITNESS:  I can't answer it

6       without disclosing conversations with

7       counsel.

8       Q.    Then I'm going to refer us back

9    to the amended disclosure statement, which

10   was Exhibit 6.

11      A.    So I can close this Exhibit 7?

12      Q.    And on page one hundred three on

13   the bottom part of the page, page one

14   hundred eighteen of three hundred six of

15   the PDF, there's a footnote sixteen.

16      A.    Hold on.

17             MS. VANLARE: I apologize, what

18      was the page numbers?

19             MS. GRIFFITH: Sure.

20             So the bottom page number is

21      page one hundred three and the top

22      page number is page one hundred

23      eighteen of three hundred six of the

24      PDF.

25             THE WITNESS:  Page one hundred

1                    P. Aronzon

2        eighteen of three hundred six.

3        Q.    And do you see footnote sixteen

4    contains a definition for released party

5    in the amended plan?

6        A.    Yes.

7        Q.    And this definition of released

8    party is different than the definition of

9    released Genesis personnel that we were

10   just looking at in the plan supplement;

11   correct?

12       A.    If you say so.  I don't have the

13   definition of released Genesis parties in

14   front of me, but I believe you're correct.

15       Q.    And released party as defined in

16   the amended plan includes the debtors;

17   right?

18       A.    Yes.

19       Q.    The ad hoc group's steerco and

20   its members solely in their capacities as

21   such; correct?

22       A.    Yes.

23       Q.    The committee and its members

24   solely in their capacities as such?

25       A.    Yes.

Page 241

1              P. Aronzon

2      Q.     And each related party of each

3    entity described in the foregoing clauses

4    little Roman numeral I through three, in

5    each case solely in its capacity as such?

6      A.     Yes, that's what this says.

7      Q.     Do you know why the umbrella

8    term "related party" is being used instead

9    of individually listing individuals and

10    entities that would constitute a related

11    party in this definition?

12              MS. VANLARE: Objection.

13              Calls for a legal conclusion.

14              To the extent -- to the extent

15         answering this question would reveal

16         any attorney-client communications or

17         attorney work product, I would caution

18         the witness on that fact and instruct

19         the witness not to answer.

20      Q.     You may answer if you're able

21    to.

22      A.     I'd have to see the definition

23    of related party, and then I'd have to

24    consider what was just stated in the

25    objection.

Page 242

```
 1                        P. Aronzon
 2       Q.    Could you, sitting here today,
 3  tell me any person or entity that's
 4  considered a related party?
 5            MS. VANLARE: Objection.
 6            THE WITNESS:  Without looking at
 7       the definition, I'm guessing.
 8       Q.    You could -- where in this
 9  disclosure statement is related party
10  defined?
11            MS. VANLARE: Objection.
12       Q.    Do you know?
13       A.    I would -- I'm guessing.  But if
14  you look at the plan definition, there's
15  probably a definition of related party,
16  but I'd have to go look.
17            Do you want to show it to me?
18  Do you want to find it and pull it out?
19       Q.    While we have this exhibit open,
20  it's page one hundred eighty-three of
21  three hundred six.
22       A.    One hundred eighty-three?
23       Q.    And it's defined term number one
24  hundred seventy-nine.
25       A.    I'm looking at page one hundred
```

Page 243

```
 1                    P. Aronzon
 2    eighty-three of three hundred six, and I
 3    don't see that.
 4              One hundred seventy-nine?  Okay,
 5    it is on page one hundred eighty-four of
 6    what I'm looking at.
 7       Q.    And I'll read the definition out
 8    loud.
 9              So related party means, with
10    respect to any entity, such entity's
11    predecessors, successors, and assigns,
12    parents, subsidiaries, affiliates, and all
13    of the respective current and former
14    officers and directors, principals,
15    shareholders, members, managers, partners,
16    employees, agents, trustees, advisory
17    board members, financial advisors,
18    attorneys, accountants, actuaries,
19    investment bankers, consultants,
20    representatives, management companies, and
21    such persons respective of heirs,
22    executors, estates, servants, and
23    nominees.
24              Do you see that?
25       A.    Yes.
```

Page 244

                        P. Aronzon

1
2    Q.    That covers potentially a lot of
3    different people and entities; correct?
4              MS. VANLARE: Objection.
5              THE WITNESS:  I'm sorry, I
6       didn't hear what you said.
7    Q.    In your opinion --
8    A.    Jane, Jane.
9              MS. VANLARE: Objection to form,
10      but you may answer.
11             THE WITNESS:  Okay, okay.
12             So it covers -- your statement
13      is it covers a lot of different people
14      and entities?  Yes, it does.
15   Q.    So as a special committee
16   members charged with authorizing releases
17   in this matter, how did you feel
18   comfortable that all of the people and
19   entity that would fall under the
20   definition of related party warrant a
21   release?
22             MS. VANLARE: Objection.
23      Objection to form and objection to the
24      extent the answer calls for privileged
25      communications.

Page 245

```
 1            P. Aronzon
 2            I would instruct the witness not
 3       to answer to the extent your answer
 4       would involve any attorney-client
 5       communications or attorney work
 6       product.
 7            THE WITNESS:  I can't really
 8       answer the specific question without
 9       referring to the discussions with our
10       counsel.
11       Q.    Did you consider whether a list
12  of the specific individuals and entities
13  should be used instead of the umbrella
14  definition term "related party"?
15            MS. VANLARE: Objection.  Calls
16       for privileged communications and
17       attorney work product, and as such, I
18       would instruct the witness not to
19       answer.
20       Q.    Are you following your counsel's
21  instructions?
22       A.    Yes.
23       Q.    Can you, sitting here today,
24  name even one example of an entity or
25  individual that potentially could fall
```

Page 246

```
 1                      P. Aronzon
 2   under the definition of related party?
 3            MS. VANLARE: Objection.
 4            I would just caution the
 5       witness, to the extent we are subject
 6       to a reaction order, we would -- I
 7       don't know if your answer would call
 8       for revealing any specific individuals
 9       or institutions, but I would caution
10       the witness, in the event that it may,
11       given the confidentiality
12       considerations and the judge's rulings
13       and instructions on the record on that
14       point.
15            THE WITNESS:  I have no idea
16       what you just said in terms of the
17       limitations on what I can and can't
18       say.
19            Can I answer it like about
20       myself?
21            MS. VANLARE: Yes.
22            THE WITNESS:  Fine.
23            I'm a director, and to the
24       extent the debtor is granting a
25       director release, I would get one.
```

Page 247

1                    P. Aronzon

2      Q.      What investigation did the

3   special committee conduct into potential

4   causes of actions or claims that may exist

5   against related parties?

6              MS. VANLARE: Objection.  Calls

7         for attorney-client privilege and

8         attorney-client communication and, as

9         such, I would instruct the witness not

10        to answer.

11     Q.      Are you following your counsel's

12   instruction?

13     A.      Yes.

14     Q.      Did the special committee

15   conduct an investigation into potential

16   causes of actions or claims against

17   related parties?

18             MS. VANLARE: Objection.

19             The investigation -- the

20        information relating to the

21        investigation is in the publicly filed

22        documents.

23             To the extent the information is

24        not there, it would be subject to

25        privilege and, as such, I would

Page 248

1                    P. Aronzon

2       instruct the witness not to answer.

3       Q.    Are you following your counsel's

4    advice there?

5       A.    Yes.

6       Q.    Do you know of any going back to

7    the definition of released party which was

8    on page one hundred eighteen of three

9    hundred six of this exhibit?

10      A.    Is it also the definition right

11   below the one I just looked at so I don't

12   have to change pages?

13      Q.    I believe so.  So let's look at

14   it there to make it easy.

15      A.    Okay.

16      Q.    Do you know if any individual or

17   entity on this list withdrew any assets

18   from Genesis within one year of the

19   petition date?

20           MS. VANLARE: Counsel, objection.

21      You asked these questions before.

22           So objection to form.

23      Objection.  Asked and answered.

24           And again, as before, I'm going

25      to instruct the witness not to answer

Page 249

1              P. Aronzon

2      as your question calls for privileged

3      communication and attorney work

4      product.

5      Q.    Are you following your counsel's

6   directions?

7      A.    Yes.

8      Q.    Who investigated whether the

9   special committee members should be

10   released is?

11          MS. VANLARE: Objection.

12          To the extent the question calls

13      for attorney-client privilege or

14      attorney work product, I'm going to

15      instruct you not to answer.

16      Q.    You can answer.

17      A.    The question is who

18   investigated?

19      Q.    Yes.

20      A.    I don't know how to answer this

21   without referring to counsel, so --

22   because counsel investigated it.

23      Q.    And when you say "counsel", does

24   that mean Cleary?

25      A.    Yes.

Page 250

1                    P. Aronzon

2       Q.    So a couple of more questions on

3    a different topic.

4            But before moving on to that

5    topic, is it your contention, sitting here

6    today, that the releases that will be

7    granted to those that fall under the

8    definition of released party and those

9    that are on the released Genesis personnel

10   list are valid?

11           MS. VANLARE: Objection.

12       Objection to the form.  Calls for a

13       legal conclusion.

14           And to the extent the answer

15       calls for privileged communication and

16       attorney work product, I would

17       instruct the witness not to answer.

18       Q.    I'm asking the special committee

19   member.

20           Is it the special committee's

21   contention that the releases contemplated

22   in the plan are valid?

23           MS. VANLARE: Objection to form.

24       I don't know what you mean by this.

25           And again, I would caution the

Page 251

1                    P. Aronzon

2        witness not to reveal any

3        attorney-client communication or

4        attorney work product.

5              MS. GRIFFITH: I'll rephrase.

6        Q.    Is it the special committee's

7    contention that the releases contemplated

8    in the plan are appropriate?

9              MS. VANLARE: Objection.

10             You may even to the extent you

11       can without revealing any

12       attorney-client communication or

13       attorney work product.

14             THE WITNESS:  Yes.

15       Q.    Can you please explain each and

16   every fact that you rely on to come to

17   that conclusion?

18             MS. VANLARE: Objection.

19             That calls for attorney-client

20       communication and attorney work

21       product, and as such, I would instruct

22       the witness not to answer.

23       Q.    Are you following your counsel's

24   direction?

25       A.    Yes.

Page 252

1                    P. Aronzon

2        Q.     Do you or your fellow special

3    committee member plan to testify at the

4    plan confirmation hearing?

5              MS. VANLARE: Objection.  Calls

6         for attorney-client communication,

7         attorney work product.

8              I would instruct the witness not

9         to answer.

10       Q.     Are you following your counsel's

11   advice?

12       A.     Yes.

13       Q.     So it's clear for the record,

14   are you refusing to provide an answer

15   about any fact that you will rely on to

16   come to your conclusion about why the

17   releases in the plan are appropriate?

18             MS. VANLARE: Counsel, objection.

19        You are -- the witness is not refusing

20        to answer.  The witness has been

21        answering your questions for several

22        hours now.  There is -- as we reviewed

23        during this deposition, there are

24        justifications for releases and

25        exculpations that are provided as part

Page 253

```
 1                    P. Aronzon
 2        of the plan supplement and in the
 3        disclosure statement, the witness has
 4        testified about that information, so
 5        objection to your characterization.
 6        It is absolutely not the case that the
 7        witness is refusing.
 8             To the extent your questions
 9        called for attorney work product or
10        attorney-client communications, I am
11        instructing the witness not to answer
12        those questions.
13        Q.   So are you following your
14   counsel's directions to not respond to my
15   question right now about what facts you're
16   relying on in coming to the condition
17   conclusion that the releases in the plan
18   are appropriate?
19             MS. VANLARE: Objection.  All the
20        same objections.  Asked and answered.
21             And again, as your question
22        calls for privileged communication and
23        attorney work product, I would
24        instruct the witness not to answer.
25        Q.   Are you following your counsel's
```

Page 254

```
 1                    P. Aronzon
 2   directions?
 3        A.    Yes.
 4        Q.    Are you refusing to answer this
 5   question on the basis of privilege?
 6             MS. VANLARE: Objection.
 7             He is not refusing to answer the
 8        question.  I am instructing the
 9        witness not to answer the question.
10        Q.    Are you following your counsel's
11   instruction not to answer the question on
12   the basis of privilege?
13        A.    Yes.
14        Q.    In addition to the information
15   in the plan supplement and the disclosure
16   statement, what facts did you rely on in
17   deciding that the releases in the plan are
18   appropriate?
19             MS. VANLARE: Objection.  Calls
20        for attorney-client communication and
21        attorney work product and, as such, I
22        would instruct the witness not to
23        answer.
24             MS. GRIFFITH:  On what basis are
25        the facts that the special committee
```

Page 255

```
 1                    P. Aronzon
 2      member relied on in making an
 3      independent determination about
 4      whether the releases in the plan are
 5      appropriate attorney-client
 6      privileged?
 7             MS. VANLARE: Objection.  That's
 8      not an appropriate question.
 9             MS. GRIFFITH: That's my question
10      to you.  I'm challenging your
11      objection.
12             MS. VANLARE: I see.
13             The scope of the investigation
14      is attorney work product.  Any
15      communications that may have occurred
16      between counsel and the witness are
17      privileged communications and, as
18      such, questions that call for the
19      witness to reveal any of that
20      information are not allowed, and I am
21      instructing the witness not to answer
22      them.
23      Q.    And to be clear, for the record,
24   I am not asking about your communications
25   with counsel, I am asking about the
```

Page 256

1              P. Aronzon

2    underlying facts which are not privileged

3    information that you considered and relied

4    on in coming to the conclusion that the

5    releases contemplated in the plan are

6    appropriate.

7              MS. VANLARE: Counsel, we have

8         discussed for again many hours the --

9         you've asked many questions on the

10        topic, the witness has responded to

11        many questions on the topic to the

12        extent that he has any facts

13        independent of client communications.

14             To the extent your questions

15        call for information, facts, or legal

16        conclusions that he has based on

17        conversations with counsel and that

18        are a result of attorney work product,

19        those are privileged.

20             MS. GRIFFITH: So are you

21        directing your attention not to answer

22        my question?

23             MS. VANLARE: I need to look back

24        to what your question was, but I

25        believe that was my objection, yes,

Page 257

1                    P. Aronzon

2       and my instruction.

3              MS. GRIFFITH: Court reporter,

4       could you read back my question,

5       please.

6              (Whereupon the requested portion

7       was read back by the reporter)

8              MS. VANLARE: I believe you said

9       that that was not a question for the

10      witness.

11             MS. GRIFFITH: No, my -- I had a

12      separate comment to you which I could

13      scroll back.

14             That was a question for the

15      witness.  The one I asked you is

16      further up.

17             My question to you is.

18      Question: "On what basis are the facts

19      that the special committee member

20      relied on in making an independent

21      determination about whether the

22      releases in the plan are appropriate

23      attorney-client privileged".

24             The question that the court

25      reporter just read back is the

Page 258

1                    P. Aronzon

2        question that I posed to the witness,

3        which is pending.

4             MS. VANLARE: Sorry, can you read

5        that question again?

6             (Whereupon the requested portion

7        was read back by the reporter)

8             MS. VANLARE: I have stated my

9        objection on the many times.  Again,

10       the witness has testified to his

11       knowledge separate and apart from

12       counsel.  Any information beyond

13       what's already publicly available in

14       the disclosure statement and the plan

15       supplement and the information he's

16       already testified to as to his own

17       knowledge, that would be privileged

18       communications with counsel and

19       attorney work product and, as such, I

20       would instruct the witness not to

21       answer.

22       Q.    And are you following your

23  counsel's directions not to answer on the

24  basis of privilege?

25       A.    Yes.

Page 259

```
 1                      P. Aronzon
 2      Q.      Then shifting topics, only a
 3   couple of questions left -- and thank you
 4   very much for your endurance here --
 5              MS. GRIFFITH: Matthew, if you
 6         could bring up the final exhibit, and
 7         we will call this Exhibit 8.
 8              (Whereupon, a document entitled
 9         Notice of Filing of Plan Supplement
10         was marked Aronzon Exhibit 8
11         for identification.)
12              THE WITNESS: I'm closing six; is
13         that okay?
14      Q.      Yes.
15              And are you able to open this
16   exhibit?
17      A.      Yes.
18      Q.      And this exhibit is notice of
19   filing of plan supplement for the debtors'
20   amended joint Chapter 11 plan publicly
21   filed on the docket as document 1144.
22              And if you scroll down in the
23   exhibit, there's an Exhibit M which is
24   titled Setoff Principles For Allowance of
25   Certain Claims.
```

Page 260

                                P. Aronzon

1

2        A.    Okay.

3        Q.    And my question to you is: Why

4   is the debtor using the petition date

5   valuation for claims that the debtor has

6   against creditors who borrowed crypto from

7   the debtor?

8              MS. VANLARE: Objection.

9        Objection to form.

10             To the extent the question would

11        reveal any privileged communication, I

12        would caution you.  If you know the

13        answer to the question aside from

14        privileged communication, you may

15        answer it.

16             THE WITNESS:  I really can't

17        answer this without going into

18        privileged information.

19        Q.    If the debtor is using current

20   pricing for claims the debtor has against

21   creditors that borrowed crypto, would that

22   impact the net claim values?

23             MS. VANLARE: Objection.

24             Counsel, it's not clear to me

25        what you're asking.  I don't know if

Page 261

```
 1              P. Aronzon
 2       it's clear to the witness.
 3             Are you referring to a specific
 4       part of the exhibit?
 5             MS. GRIFFITH: I'm referring to
 6       the setoff principles.
 7       Q.    And so the setoff principles
 8  have the debtor using petition date
 9  valuation for claims the debtor have
10  against creditors that borrowed crypto;
11  correct?  Do you know if that's correct?
12             MS. VANLARE: Objection.
13             You may answer if you understood
14       the question.
15             THE WITNESS:  I'm not sure I do.
16       Q.    Are you aware that the debtor
17  has some claims against creditors that
18  borrowed crypto?
19             MS. VANLARE: Objection.
20             You may answer.
21             THE WITNESS:  Okay.
22             I don't know how to answer this.
23       Because as I'm sitting right here
24       looking at the language, I'm not
25       seeing what you're referring to.
```

Page 262

P. Aronzon

1

2     Q.    Well, we can ask this question

3     apart from the document.

4           So you can put the document

5     aside and I could just ask in general with

6     your understanding of the plan, are you

7     aware that the debtors have claims against

8     creditors that borrowed cryptocurrency

9     from the debtors?

10    A.    So we -- the debtor loaned

11    crypto assets to an individual; is that

12    your -- is that what you're saying?

13    Q.    Yes, that's what I'm asking.

14          Are you aware if that is the

15    case?

16    A.    And if we did loan it, those

17    people owe us something; is that your

18    point?

19    Q.    Yes, that's what I'm asking you

20    to confirm, if that's your understanding.

21          MS. VANLARE: Objection.

22          You may answer.

23          THE WITNESS:  Yeah, I'm trying

24    to think about this and I'm looking at

25    this exhibit to see if it helps me.

Page 263

```
 1                        P. Aronzon
 2              Look, we were in the lending
 3         business, so Genesis would loan cash
 4         or digital assets to counterparties
 5         and in some instances those
 6         counterparties would pledge cash or
 7         digital assets to collateralize our
 8         loan.  In other instances, we would
 9         loan cash or digital assets to a
10         counterparty and sometimes we would
11         borrow cash or digital assets from the
12         same counterparty.  Those are two
13         categories that I know of that we
14         attempted to I guess describe in this
15         exhibit.  In those settings, there may
16         be setoff principles that come to
17         apply so that you get to a net number
18         for the claim.
19         Q.    And in those instances that you
20    just described where Genesis would loan
21    cash or digital assets to counterparties,
22    Genesis would have a claim against those
23    individuals that it loaned cash or digital
24    assets to; correct?
25         A.    Those people would owe us money,
```

Page 264

1                        P. Aronzon

2    correct.

3        Q.    And to determine the amount that

4    those people owe under the setoff

5    principles as it's currently drafted, is

6    it correct that petition date valuation is

7    being used to calculate the amount that is

8    currently owed?

9               MS. VANLARE: Objection.

10              THE WITNESS:  There's no set off

11         unless they also pledged collateral or

12         we separately from the identical party

13         borrowed assets or cash.  So there's

14         two parts to this.  You don't get one

15         without the other.

16              In either of those two cases, we

17         would net one against the other to

18         come up with a claim, either they owe

19         us or we owe them depending on the

20         netting.

21              If your question is did we use

22         the petition date for both of those

23         purposes, I believe the answer is yes.

24        Q.    And by using petition date

25    valuation for both of those consensus, as

Page 265

1                    P. Aronzon

2    I just said, wouldn't that result in

3    creditors that borrowed cryptocurrency

4    receiving a higher value than creditors

5    that did not borrow cryptocurrency?

6              MS. VANLARE: Objection.

7              THE WITNESS:  The claim on the

8         petition date is a certain amount and

9         the value of where it's coined is a

10        certain amount and the net amount

11        results in a net claim for or against

12        depending on the numbers.  So without

13        looking at a specific claim or an

14        example, it's almost impossible for me

15        to guess to answer you directly, but

16        it could result in a claim being

17        bigger because the value of crypto on

18        the petition date might have been less

19        than, for instance, it is today or

20        some other date.

21             You look at the petition date

22        for the two numbers and you do a

23        netting and it goes one way or the

24        other.  If you pick a different date

25        for the netting, you'd get a different

Page 266

```
 1                    P. Aronzon
 2        answer.
 3              MS. GRIFFITH: Okay.
 4              I have no further questions, and
 5        I'm very appreciative of your time
 6        today.
 7              THE WITNESS:  Okay.
 8              MS. GRIFFITH: Thank you very
 9        much.
10              I don't know if any other
11        counsel has questions on the line, but
12        no further questions from me.
13              Thank you again.
14
15
16
17
18
19
20
21
22
23
24
25
```